# EXHIBIT 10

Stephen E. Petty, PE, CIH, CSP

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MDL No. 2741

Case No. 3:16-md-02741-VC

IN RE:  ROUNDUP PRODUCTS
LIABILITY LITIGATION

This document relates to:

Pollard v. Monsanto
Company

Case No.3:16-cv-04100-VC

_____/


VIDEOTAPED DEPOSITION OF
STEPHEN E. PETTY, PE, CIH, CPS


DATE TAKEN:      November 6, 2019

TIME:            12:11 - 3:51 p.m.

LOCATION:        Best Western Plus Oceanside Inn
                 1180 Seabreeze Boulevard
                 Fort Lauderdale, Florida 33316

COURT REPORTER:  Lori G. Erwin, RPR
                 Notary Public - State of Florida

Stephen E. Petty, PE, CIH, CSP

Page 2

```
 1   APPEARANCES:
 2   JERRY KRISTAL, ESQUIRE
     Weitz & Luxenberg
 3   700 Broadway
     New York, New York 1000
 4   212-558-5500
     jkristal@weitzlux.com
 5   Appearing on behalf of the Plaintiff
 6   JOHN M KALAS, ESQUIRE
     Hollingsworth LLP
 7   1350 I Street, N W
     Washington, DC 20005
 8   202-898-5800
     jkalas@hollingsworthllp com
 9   Appearing on behalf of the Defendant
10
     Also Present:
11
     ELYSE SHIMADA, ESQUIRE
12   DANIEL MURNER, ESQUIRE
     Hollingsworth, LLP
13   1350 I Street, N W
     Washington, DC 20005
14
     Danielle DeSantis, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          E X H I B I T S
 2
     DEFENDANT'S EXHIBIT 8, EES GROUP      --
 3   INVOICES
 4   DEFENDANT'S EXHIBIT 9, FACTUAL         7
     SUMMARY AND EXPERT OPINIONS REPORT,
 5   IN RE:  POLLARD
 6   DEFENDANT'S EXHIBIT 10, ROUNDUP      121
     LABEL
 7
     DEFENDANT'S EXHIBIT 11, ROUNDUP      133
 8   LABEL
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          I N D E X
 2   Witness                          Page
 3   Stephen E Petty, PE, CIH, CSP
 4   DIRECT EXAMINATION
     BY MR KALAS              6
 5
     CROSS EXAMINATION              125
 6   BY MR KRISTAL
 7   REDIRECT EXAMINATION           133
     BY MR KALAS
 8
     RECROSS EXAMINATION            135
 9   BY MR KRISTAL
10          E X H I B I T S
11   Exhibit                         Page
     (Exhibits attached to transcript)
12   (Exhibits 1-8 were marked
      in Janzen case )
13
     DEFENDANT'S EXHIBIT 1, MONSANTO       --
14   COMPANY'S NOTICE TO TAKE ORAL AND
     VIDEOTAPED DEPOSITION OF STEPHEN E PETTY
15
     DEFENDANT'S EXHIBIT 2, SUMMARY OF
16   EXPERT WITNESS CASES
17   DEFENDANT'S EXHIBIT 3, DECEMBER 12,   --
     2017 AMENDED RESIDENTIAL EXPOSURE
18   ASSESSMENT FOR RESIDENTIAL REVIEW
19   DEFENDANTS EXHIBIT 4, OVERVIEW OF
     FACTORS AFFECTIVE DERMAL ABSORPTION
20   OF GLYPHOSATE THROUGH SKIN
21   DEFENDANTS EXHIBIT 5, PETTY REVIEW
     COMMENTS ON DAVIES DERMAL REPORTS
22
     DEFENDANTS EXHIBIT 6, STEPHEN E       --
23   PETTY CURRICULUM VITAE
24   DEFENDANTS EXHIBIT 7, RETENTION       --
     AGREEMENT OF STEPHEN E PETTY
25
```

Page 5

```
 1   Fort Lauderdale, Florida
 2   Wednesday, November 6, 2019
 3   12:11 p.m.
 4       THE VIDEOGRAPHER:  On the record.  My name
 5   is Danielle DeSantis.  I'm a videographer for
 6   Golkow Litigation Services.  Today's date is
 7   November 6, 2019, and the time is 12:11 p.m.
 8       This video deposition is being held in
 9   Fort Lauderdale, Florida, in the matter of
10   Pollard versus Monsanto Company for the
11   United States District Court, Northern
12   District of California.  The deponent is
13   Stephen E. Petty.
14       Will counsel please identify themselves.
15       MR. KRISTAL:  Jerry Kristal from Weitz &
16   Luxenberg on behalf of the Pollards,
17   Mr. Pollard.
18       MR. KALAS:  John Kalas, Elyse Shimada, and
19   Daniel Murner from Hollingsworth LLP on behalf
20   of Monsanto company.
21       THE VIDEOGRAPHER:  The court reporter is
22   Lori Erwin and will now swear in the witness.
23       THE COURT REPORTER:  Would you raise your
24   right hand.
25       Do you swear or affirm the testimony you
```

2 (Pages 2 to 5)

Stephen E. Petty, PE, CIH, CSP

---

**Page 6**

1  give will be the truth, the whole truth, and
2  nothing but the truth?
3      THE WITNESS: I do.
4      STEPHEN E. PETTY, PE, CIH, CSP,
5  was thereupon called as a witness herein, and after
6  having been first duly sworn or affirmed to testify to
7  the truth, was examined and testified as follows:
8      DIRECT EXAMINATION
9  BY MR. KALAS:
10     Q. Doctor -- sorry. Mr. Petty.
11     A. I'll take that.
12     Q. Thanks for getting back with us. I know it's
13  lunch --
14     MR. KRISTAL: He earned a Ph.D. on the
15     two-minute break we had.
16     MR. KALAS: There you go. I know it's --
17     THE WITNESS: I would longer than that,
18     but I just was slow.
19  BY MR. KALAS:
20     Q. I know it's lunchtime. So if you need a break
21  at any point or you're feeling like you need to stop,
22  let us know.
23     A. Thank you. I really worry more about them.
24  They do the hard work.
25     MR. KALAS: Mr. Kristal and I spoke off

---

**Page 7**

1  the record before we started this Pollard
2  portion of the day, and we agreed that
3  Exhibits 1 through 8 in the Janzen matter are
4  also marked for this matter.
5      Do you concur, Mr. Kristal?
6      MR. KRISTAL: I do concur.
7      (Defendant's Exhibit 9 was marked.)
8  BY MR. KALAS:
9      Q. Okay. So I'm going to mark as Exhibit 9 the
10  Pollard report you served in this case.
11     A. Okay.
12     Q. And, again, I've put the references on the
13  back again.
14     A. The amended --
15     Q. Yeah. It's not the amended list. It's the
16  original list that was supplied with this report on
17  October 3rd.
18     A. Oh, okay. So you don't have the --
19     Q. I'm not marking it right now. If I need to
20  ask about it, I will. But that's the original list
21  that was served. I'm just creating a record that this
22  is what we got on October 3rd.
23     A. Oh, I see what you're saying.
24     Q. Okay?
25     A. Okay. I get it. It's the one last week was

---

**Page 8**

1  not marked.
2      Q. Okay. Now, Mr. Petty, you've never been an
3  employee of Monsanto, correct?
4      A. That is correct.
5      Q. You've never been an employee of Bayer,
6  correct?
7      A. No.
8      Q. You've never been an employee of EPA, correct?
9      A. No. I've worked for them, but I've not been
10  an employee of the EPA.
11     Q. Okay. Have you ever opined outside of
12  litigation in public that FIFRA regulations have been
13  violated?
14     A. Outside of litigation?
15     Q. Yes, sir.
16     A. I have not.
17     Q. Okay. Have you ever been asked by EPA to
18  interpret FIFRA regulations for them?
19     A. I have not.
20     Q. Have you ever been asked by EPA to draft FIFRA
21  regulations for them?
22     A. I have not.
23     Q. Do you hold yourself out as an ethicist?
24     A. I don't know what that -- I mean, I don't know
25  what that means.

---

**Page 9**

1      Q. Okay.
2      A. I always try to give as accurate of, as I said
3  to you before, balls and strikes as best I can with the
4  information I had.
5      I've worked my whole career and wrote the book
6  on the defense side for the insurance industry. So
7  I've done some plaintiff work here in the last few
8  years but --
9      Q. Yeah. And I'm not --
10     A. And so, I mean, as far as -- ethicist, to me,
11  means ethics or study of ethics. And in that sense, I
12  try to behave as ethically as I can.
13     Q. I understand you may personally try to behave
14  ethically. But my question is getting at a different
15  issue. So maybe I wasn't clear enough.
16     A. No.
17     Q. Do you hold yourself out as a professional who
18  opines on the ethics of others?
19     MR. KRISTAL: Well, as you know from the
20     report, Mr. Petty is not offering an opinion
21     as to whether whatever Monsanto did was or
22     wasn't ethical.
23  BY MR. KALAS:
24     Q. Can you read in --
25     MR. KRISTAL: If that's what you're trying

---

3 (Pages 6 to 9)

Stephen E. Petty, PE, CIH, CSP

Page 10

1      to get at.
2    BY MR. KALAS:
3      Q. -- on page 2 of your report, the first bullet
4    under my opinions.
5      A. Sure. Was not fully transparent, honest with
6    users and the U.S. EPA OPP with what they knew about
7    the hazards of Roundup and when they knew of these
8    hazards.
9      Q. Okay. Are you going to opine that Monsanto
10   was not honest?
11     A. I'm not going to get in their minds. I'm
12   going to take documents and I'm going to show what the
13   documents said and the information they provided and do
14   a compare and contrast and let the jury decide whether
15   what Monsanto, how they represented that information is
16   accurate.
17     Q. So let me come back to my question.
18         Well, let me ask this question. Is it
19   unethical to be dishonest?
20     A. I would think so.
21     Q. Okay. Are you an expert on the ethics of
22   honesty?
23         MR. KRISTAL: Oh, gosh. Beyond the scope.
24         THE WITNESS: I guess not. I don't know.
25

Page 11

1    BY MR. KALAS:
2      Q. Let's keep going.
3      A. I mean, I'm involved -- I am a member of so
4    many associations, PE, CIH, CSP. There's only like two
5    hundred of us in the whole U.S. that have all three,
6    and each one of those have significant ethics
7    requirements.
8         I have to take ethics continuing education
9    courses every year for my PEs in all the states I'm in.
10   So, I mean, we're reminded of that constantly in our
11   ongoing requirements to maintain our certificates,
12   whether it be PE or CIH or CSP.
13     Q. Have you ever published a paper in
14   peer-reviewed literature on the ethics of corporations?
15     A. On the ethics, no.
16     Q. Okay.
17     A. I'm here as an exposure warnings expert.
18     Q. I know you say that, but I need to make sure
19   because your report sometimes seems to get outside that
20   range. So I want you to explain today exactly what
21   you're doing.
22         Are you an expert on the state of mind of a
23   corporation?
24         MR. KRISTAL: Objection. Beyond the
25   scope.

Page 12

1         THE WITNESS: I don't know what's in their
2    minds. Like I said to you before, what I do
3    is take the statements they've made in the
4    literature and I compare and contrast what
5    they've said with what the information -- with
6    what they either did or what the information,
7    or with what standards or best practices or
8    standards of care say they should do. And
9    based on documents, I make those comparisons.
10   And we'll let the jury decide whether or not
11   they were transparent and followed those best
12   practices and standards of care.
13   BY MR. KALAS:
14     Q. To be clear, you don't know what was in
15   Monsanto's mind at any point throughout the history you
16   reviewed?
17     A. I don't think anybody could know what's in
18   their mind.
19     Q. Okay.
20     A. What I'm doing is I'm comparing and
21   contrasting what they say and what they publish against
22   what they say they will do and should have published as
23   well as documentation where they provide information to
24   the EPA about a study and compare and contrast that
25   with what the study actually said.

Page 13

1         So my entire analysis is all really,
2    ultimately, on those opinions, compare and contrast
3    with respect to documents, what's been written.
4      Q. Have you ever worked at a company that
5    manufactures pesticides?
6      A. I have not, sir.
7      Q. Okay. Have you ever drafted a pesticide
8    label?
9      A. I have not.
10     Q. Have you ever draftiside --
11     A. Draftiside?
12     Q. Yeah. Have you ever drafted a pesticide MSDS
13   or SDS?
14     A. Huh-uh. I'm sorry. No.
15     Q. Okay. Have you ever published a peer-reviewed
16   article on purported toxic effects of inert ingredients
17   in pesticides?
18     A. I have not.
19     Q. Have you ever published a peer-reviewed
20   article on the dermal absorption of an herbicide?
21     A. Not of an herbicide, but I've certainly done
22   the peer-reviewed published paper that's the foundation
23   for assessment of complex hydrocarbons and --
24     Q. That's benzene, correct? Benzene paper?
25     A. No. It's complex hydrocarbons, benzene

Stephen E. Petty, PE, CIH, CSP

## Page 14

1 and complex hydrocarbons.
2 Q. That was your 2011 paper?
3 A. Correct.
4 Q. Okay. Have you ever -- so let me make sure
5 it's clear. Have you ever published, though, a
6 peer-reviewed paper on the dermal absorption of an
7 herbicide?
8 A. Not an herbicide, but the methodology is the
9 same. It's very similar.
10 Q. Have you ever published a peer-reviewed paper
11 on the absorbed dose of any pesticide in an
12 occupational setting?
13 A. A peer-reviewed paper?
14 Q. Yes, sir.
15 A. I have not.
16 Q. Have you ever talked to anyone at Monsanto
17 about glyphosate?
18 A. No. I don't believe so.
19 Q. Have you ever talked to anyone at Bayer about
20 glyphosate?
21 A. Not about glyphosate.
22 Q. Have you ever --
23 A. I've talked to them about other things.
24 Q. Have you ever worked as a licensed pesticide
25 applicator?

## Page 15

1 A. I have not, sir.
2 Q. Have you ever passed the written certification
3 exam for a licensed pesticide applicator?
4 A. No.
5 Q. Have you ever published a peer-reviewed paper
6 on the drift of pesticides?
7 A. I have not, sir.
8 Q. Have you ever published a peer-reviewed paper
9 on the aerosolization of pesticides?
10 A. Not a peer-reviewed paper, no, but I've
11 certainly done calculations on those.
12 Q. Okay. Are you a dermatologist?
13 A. No.
14 Q. Have you ever published a peer-reviewed
15 article on the pharmacokinetics of a pesticide?
16 A. I have not, sir.
17 Q. Have you ever designed a rhesus monkey study?
18 A. Gosh. We had all those at Battelle. I have
19 not done that though, but we have certainly --
20 MR. KRISTAL: How about Reese's Peanut
21 Butter Cup study?
22 MR. KALAS: Halloween, man. I had a lot
23 of those.
24 THE WITNESS: No comment.
25 BY MR. KALAS:

## Page 16

1 Q. In previous cases where you've testified as an
2 expert, have you at times relied on EPA data?
3 A. Well, sure. I've used exposure factor
4 handbook data points, for example, on skin area.
5 Q. Have you found EPA's data in the times you've
6 relied on it in previous cases to be reliable?
7 A. Sometimes yes, sometimes no.
8 I mean, even EPA -- remember, I talked earlier
9 about -- I've been around too long. That's my problem.
10 As I say, I'm closer to the end than the beginning.
11 As I talked about before, the science evolves
12 constantly, and I can give you dozens of examples that
13 I -- I was a research scientist in a lab for 20 years.
14 And so even the EPA, if you look at the exposure factor
15 handbooks, and I've got them, those numbers change with
16 time.
17 So when you ask the question about whether
18 they're reliable or not, well, if you use the data
19 knowing full well sometimes it's going to change or --
20 but there are other areas, like I've done the review of
21 their risk assessment and I -- the State of Ohio
22 recognizes me as an expert in risk assessment because I
23 taught them over -- I had five 8-hour classes where I
24 taught the regulator risk assessment. And it's clear
25 to me that that risk assessment has got serious flaws

## Page 17

1 in it.
2 So when you say, well, is there a reliable
3 entity, yeah, exposure factor handbook. I'm pretty
4 comfortable with those factors, although they've
5 evolved with time.
6 Am I happy with -- do I think that they've
7 done a good job in their risk assessment for
8 glyphosate, no. I think it's a terrible job.
9 Q. Have you had to -- you mentioned you've taught
10 individuals from EPA before, right?
11 A. No. But in Ohio it's called BUSTR, Bureau of
12 Underground Storage Tank Regulators.
13 Q. So I'm asking about the federal EPA.
14 MR. KRISTAL: It's B-U-S-T-R, all caps.
15 THE WITNESS: Yeah.
16 BY MR. KALAS:
17 Q. I'm asking about the federal EPA. Have you
18 interacted with folks from the federal EPA before?
19 A. Oh, yeah, way back. I mean, my first project
20 ever at Battelle in '79, I think was -- we were -- it
21 was a combined EPA Coastguard -- now I've got to step
22 back.
23 There were two projects I was first assigned
24 to because I was a brand new -- I do the dog work when
25 you're an entry level engineer. And this was before

Stephen E. Petty, PE, CIH, CSP

Page 18

1  the national priority list stuff. That dates me.
2      So my job for region 10 was to call all these
3  manufacturers and find out where they put all their
4  wastes. And based on that information, that's what set
5  the priority list in region 10.
6      Q.  Okay. And --
7      A.  So, yeah. I've had early interaction with
8  EPA.
9      Q.  Okay. Did you find the folks you worked with
10  at EPA to be competent?
11      A.  Well, that's a loaded question.
12      There's a spectrum of abilities, like in any
13  organization. I generally say that if you're a
14  world-renowned scientist, typically you wouldn't go to
15  EPA. But there's good people there. There's also some
16  people that aren't so good.
17      Q.  Okay. Do you have any opinion about whether
18  or not the scientists -- well, strike that.
19      Let me keep going. What special training, if
20  any, have you undergone for reviewing and interpreting
21  the meaning of emails sent by a company?
22      A.  Special training on emails?
23      Q.  Yes, sir. Emails.
24      A.  I don't know how to answer that question. I
25  mean, they're just part of -- I don't know if -- I

Page 19

1  don't even know how to answer that question.
2      Q.  Have you undergone any special training to
3  explain to juries what people mean in an email?
4      MR. KRISTAL: Objection. Form. Assumes
5  there is such a thing.
6      THE WITNESS: Well, appreciate that --
7      MR. KALAS: That's a really great point,
8  Jerry.
9      MR. KRISTAL: Exactly. You're saying like
10  are you a ventriloquist. There's no such
11  thing.
12      THE WITNESS: So anyway --
13      MR. KRISTAL: It doesn't mean people don't
14  do it all the time and can't be qualified as
15  an expert.
16      THE WITNESS: The experience I do bring to
17  the table is I'm unique in the sense that I'm
18  advanced degree chemical engineer with an MBA
19  where my emphasis was on behavioral marketing,
20  how to persuade people to take actions.
21      The art of persuasion is -- the three
22  major factors are emotional appeal,
23  propaganda, repeated message, and logic; in
24  that order of effectiveness.
25      So I've had significant training through

Page 20

1  my MBA. I finished first in my class, 4.0.
2  So I was a decent student. And I did it while
3  I was working full-time. So I was -- and I
4  had kids. So I was pretty happy about that,
5  to be honest with you. It was a tough time.
6      But it taught me a lot about the way
7  people behave and how to persuade people. In
8  fact, I disagreed strongly with my professor
9  at the time because I believed logic was the
10  way things should go, not emotional appeal.
11  BY MR. KALAS:
12      Q.  I would agree with that.
13      A.  And he spent an enormous amount of time with
14  me, giving me multiple examples of advertisement where
15  emotional appeal was much more effective than logic and
16  finally convinced me that, in fact -- and the fact that
17  people behave emotionally more than logically, in
18  general.
19      So when you ask whether or not I've had
20  training on that side of the equation, it's sort of
21  unique that I -- I certainly have the technical
22  training in chemical engineering, et cetera, but I also
23  have the behavioral training through my MBA.
24      Q.  Let me make sure I understand because the
25  question may not have been directed to that but --

Page 21

1      A.  I'll give you the essence of interpreting
2  stuff and --
3      Q.  Yeah. When you're taking that class --
4      A.  Classes.
5      Q.  -- on -- classes on persuasion --
6      A.  Well, it's marketing.
7      Q.  -- marketing persuasion, did they give you any
8  special training in those classes to explain to people
9  what somebody means in an email?
10      A.  I don't know how you'd do that exactly. All
11  you can rely on is the words in the email and compare
12  and contrast that to other emails and look at either
13  the -- what the language says versus what's going on
14  and make those -- it's a compare and contrast with what
15  the words are. That's it.
16      Q.  Have you undergone any special training in
17  your MBA or elsewhere to explain what somebody who
18  wrote an email was thinking when they wrote that email?
19      MR. KRISTAL: Objection. Beyond the
20  scope.
21      THE WITNESS: I just answered that
22  question.
23  BY MR. KALAS:
24      Q.  My question was a little different. I asked
25  about meant. This time I'm asking thinking. So it's

6 (Pages 18 to 21)

Stephen E. Petty, PE, CIH, CSP

---

**Page 22**

1  different.
2      A.  Well, I mean, you asked me before about
3  whether I knew -- this is really a subset of an earlier
4  question, but that's fine.  And that is, do I know what
5  people -- what's in their minds.  And I've already
6  answered that question saying, of course not, I don't
7  know what's in their mind.  But if you want to ask
8  subversions of that, we can take the time to do that.
9      Q.  Okay.  Have you undergone any special training
10  to understand how companies use emails to guide company
11  policy?
12          MR. KRISTAL:  Objection.  Assumes facts
13      not in evidence.
14          THE WITNESS:  I don't know what you mean
15      by special training.
16          Certainly emails are used to convey
17      information, and I'm looking at that
18      information and comparing and contrasting it
19      with other emails to see what's being written
20      and how that compares to their understanding
21      in writing of the situation, of standards,
22      et cetera.
23          So I'm using whatever they write to
24      compare and contrast with codes of conduct,
25      what's going on at the time in terms of

---

**Page 23**

1      experimental work, et cetera.
2  BY MR. KALAS:
3      Q.  Let me ask you a hypothetical.  You've
4  heard -- well, this part isn't hypothetical, but you've
5  heard Donald Trump has told NASA that we should go to
6  Mars, right?  You've heard about that?
7      A.  I haven't, but okay.
8      Q.  Okay.  Well, then it is a hypothetical to you.
9  But let's assume Donald Trump told NASA, let's go to
10  Mars.  Let's assume Donald Trump is not reelected
11  president in 2021, okay.
12      A.  Okay.
13      Q.  Somebody else comes in as president.  There
14  might be an email, hypothetically, from a scientist at
15  NASA to another scientist at NASA in 2018 that says,
16  we're going to Mars, correct?
17          MR. KRISTAL:  Objection.  What do you mean
18      by correct?  You're stating a hypothetical.
19      You're asking if what you just said is what
20      you just said.
21          THE WITNESS:  Well, I don't know that he
22      would say -- I don't know.  It's such a weird
23      hypothetical because I don't know that -- if I
24      were a scientist, I wouldn't say, we're going
25      to Mars.  I would say we have a program to --

---

**Page 24**

1          I was in the world where -- I worked on the
2      space shuttle, so that tells you how old I am.
3  BY MR. KALAS:
4      Q.  I've been to the Rockwell plant in L.A., seen
5  the booster engines.  It's pretty cool.
6      A.  I actually worked on it.
7      Q.  It's pretty cool.
8      A.  I worked on the solid rocket boosters.
9          So but having said that -- and I did the FMEA
10  on, after it blew up, on how to reduce risk, failure
11  modes and effects analysis.
12          But one thing you learn when you're in those
13  programs is that there are dozens, if not hundreds, of
14  contractors and dozens, if not hundreds, of scientists
15  and engineers.  And my little piece of the world was a
16  small piece of the world, even though I had the role I
17  had.
18          And so your hypothetical is foreign to me
19  because I've been involved in these processes on big
20  projects, and nobody would write an email that says
21  that.
22      Q.  Okay.  Let me ask you this.  Do people
23  sometimes write things in emails that -- well, strike
24  that.  We'll keep moving.
25          Have you undergone any special training to

---

**Page 25**

1  understand how Monsanto uses emails to guide company
2  policy?
3          MR. KRISTAL:  Objection.  Assumes facts
4      not in evidence.
5          THE WITNESS:  I honestly don't know what
6      you mean by special training.  I mean, emails
7      is simply a form of communication.  I mean,
8      it's got its pluses and minuses.
9          I'm one of the dinosaurs that still writes
10      letters because I think that you can put your
11      thoughts together better.  But having said
12      that, it is one of the preeminent forms of
13      communication today.
14  BY MR. KALAS:
15      Q.  Well, let me ask you this.  Have you seen a
16  document at Monsanto that lays out that they use emails
17  to write out official stances on their positions on
18  scientific studies or do they use a memo or a
19  backgrounder for that?  Have you seen anything that
20  lays out the policy?
21          MR. KRISTAL:  Objection to form.
22          THE WITNESS:  Well, I've seen the
23      documents you've referred to, I've seen.  And
24      whether it be an email or a backgrounder, I
25      think the backgrounders are worse than the

---

7 (Pages 22 to 25)

Stephen E. Petty, PE, CIH, CSP

| Page 26 |
|---|

1 emails. But whether they have a policy -- I
2 haven't seen all their policy documents, if
3 that's what you're asking me.
4 BY MR. KALAS:
5  Q. Well, did you ask Mr. Kristal to send you the
6 policies on where Monsanto lays out within the company
7 their official scientific positions?
8  MR. KRISTAL: Assumes facts not in
9 evidence.
10  THE WITNESS: To the ex -- to be honest
11 with you, to the extent -- all I can tell you
12 is the documents that I either sent or used
13 that I found on my own are 1 through 500 and
14 something in Appendix A.
15  If they're included there, then either I
16 obtained them or they were obtained through
17 counsel. If they're not there, I didn't.
18 That's all I can tell you. And it's the short
19 answer because otherwise I'm going to have to
20 go through all those 58 pages and try to
21 figure out whether I did or didn't.
22 BY MR. KALAS:
23  Q. Are you an expert in morality?
24  MR. KRISTAL: Objection. Beyond the
25 scope.

| Page 27 |
|---|

1  THE WITNESS: I don't even know how to
2 answer that question. I mean, I don't even
3 know if there's such things. But I look at it
4 differently. My responsibility is to act
5 ethically and as moral as I can. That's the
6 goal.
7 BY MR. KALAS:
8  Q. Are you an expert in judging the morality of
9 others?
10  MR. KRISTAL: Objection. Beyond the
11 scope.
12  THE WITNESS: That's -- that's -- I
13 certainly have no intent to talk about their
14 morality. I'm talking about their
15 transparency and the information they
16 conveyed, which I don't -- I think that
17 that's -- either you conveyed what you said
18 you would do or you didn't. And that's sort
19 of a compare and contrast; did you do what you
20 said you would do or did you not.
21  Somebody else can decide whether that's
22 moral or not moral. I'm not there to make
23 that decision. I'm there to preside the
24 compare and contrast about what they said they
25 would do and what they actually did.

| Page 28 |
|---|

1 BY MR. KALAS:
2  Q. Are you an expert in the honesty of others?
3  MR. KRISTAL: Objection. Beyond the
4 scope.
5  THE WITNESS: I think it's the same
6 response.
7 BY MR. KALAS:
8  Q. Okay. I would appreciate if you give the same
9 answer then on the record. Are you an expert in the
10 honesty of others?
11  MR. KRISTAL: Objection. Beyond the
12 scope.
13  THE WITNESS: In the context -- only in
14 the context in a compare and contrast of
15 documents. Do they say they're going to this
16 in one -- like, for instance, Donna Farmer
17 says internally, can't say that the
18 formulation is not a carcinogen. And then
19 privately she says that it isn't.
20  Well, I can comment that she says one
21 thing here and another thing here. Is she
22 being honest about -- in those two documents,
23 is that the same opinion? Is that being
24 honest with one group and not with another
25 or -- that's what I mean in that context.

| Page 29 |
|---|

1  When I'm talking about the written
2 communications, are they being provided -- I'm
3 not talking about what's in her head. I'm
4 talking about what do the documents say with
5 respect to what's said in one case versus
6 another case.
7 BY MR. KALAS:
8  Q. What class did you take on honesty?
9  A. I've never taken a class on honesty.
10  Q. What degree do you hold in interpreting
11 honesty?
12  A. Well, I can't say that.
13  The ethics classes that I take every year have
14 provisions that address that issue of honesty, that
15 you're to behave ethically and honestly. So I've taken
16 dozens of those over 40 years. Because I've got six
17 states and I've got to take one -- I've got to take an
18 honesty class in each state.
19  Q. So you've taken honesty classes?
20  A. Well, ethics.
21  Q. Okay. So I'm asking, sir, about honesty
22 because you wrote here in your report that Monsanto was
23 not honest. So I want to understand the training you
24 have to state Monsanto was not honest.
25  A. No, no, no. I'm saying were not fully

Stephen E. Petty, PE, CIH, CSP

Page 30

1  transparent and honest with users.
2  Q. Okay.
3  A. What I'm talking about there is, is the
4  information they're conveying to users the same as they
5  have internally.
6  Q. Okay. So when you say the word honest, you
7  mean that is the information same that they've put
8  out externally as internally, right? That's what you
9  mean?
10  MR. KRISTAL: Objection to form.
11  THE WITNESS: In part.
12  BY MR. KALAS:
13  Q. Okay. What's the other part?
14  A. Well, sometimes they have it both -- they
15  have -- there's part of the standard of care that says
16  that the salespeople shall be trained, should be
17  sufficiently trained so that the information they
18  provided to customers is accurate.
19  If those people are given information that is
20  different from what's known -- so, for instance, I give
21  examples where they say in deposition, salespeople,
22  yeah, I told the customers Roundup's biodegradable.
23  Well, we know from way back that that's not
24  necessarily true. So there's a violation -- there's
25  somebody internally that knows we've been fined, we've

Page 31

1  been called out, that we can't use that language. In
2  fact, FIFRA says you're not supposed to use that
3  language. And yet we continue -- we continue either
4  not to correct the record or there's something going on
5  there because the salespeople deposed in this time
6  frame continue to the point of that deposition to say,
7  yeah, I was telling people it was biodegradable.
8  So the question you ask yourself is, as a
9  layperson, is the information that's being conveyed to
10  those salespeople honest information about what they
11  know. That's how I'm using it in that context. I'm
12  comparing and contrasting the information they know
13  versus what they're telling their internal people and
14  external people.
15  Q. Okay. So --
16  A. It's in that context.
17  Q. I understand, I think.
18  So the context is -- let me just read this
19  back -- is that what you're trying to do is take what
20  was said internally, what was said externally, and
21  opine as to whether as a layperson that was an honest
22  statement?
23  A. More importantly, transparent.
24  Q. Got it. Okay.
25  A. The transparency is the issue because --

Page 32

1  recall, we had the discussion this morning that the
2  fundamental concept in industrial hygiene is that those
3  who are trained on the hazards will protect themselves
4  from those hazards and those that aren't won't protect
5  themselves as well.
6  So that transparency is absolutely important
7  in order for the end users to have the, one, the
8  opportunity to know and make a choice on the product,
9  but, two, to protect themselves. Because it's an
10  understood concept since Hamilton in 1918 that those
11  that -- those that are informed will do a better job
12  protecting themselves.
13  Q. Okay. Let's go to your report. Let's go to
14  page 35.
15  A. I am there.
16  Q. And you explained to me earlier, I think, in
17  the Janzen deposition that when you use brackets, that
18  is meant to set up what your opinions are, right?
19  A. Yes.
20  Q. Okay. So if we look at the bottom of 35, you
21  state in your report at roman numeral little one:
22  Monsanto knew that inert ingredients like surfactants
23  are not actually really inert.
24  Did I read that correctly?
25  A. You did.

Page 33

1  Q. Tell me the methodology you went through to
2  determine what Monsanto knew. How did you get in their
3  head?
4  A. I didn't get in their head. I got into the
5  documents.
6  Q. Okay.
7  A. I got into the documents where they're pulling
8  the product from the marketplace. There's a whole
9  series of documents about them saying this tallow amine
10  is a problem. It's toxic.
11  Q. Okay. Let's go to page 30 --
12  A. Remember I talked about the hierarchy of
13  controls for an industrial hygienist, and the first one
14  is substitution.
15  Q. Okay. Let's go to page 37, bracket --
16  A. Okee-dokie.
17  Q. Top bracket, you state: Donna Farmer -- I'm
18  looking at number one -- Donna Farmer says privately
19  that one cannot say Roundup does not cause cancer but
20  wants to say publicly that Roundup does not cause
21  cancer.
22  A. Yes.
23  Q. Okay. You say that?
24  A. Those are my words, yes.
25  Q. Okay. How do you know, what methodology did

9 (Pages 30 to 33)

Stephen E. Petty, PE, CIH, CSP

Page 34

1  you go through to understand what Donna Farmer wanted
2  to say publicly? How did you understand her intent?
3      A.  By reading the previous document.
4      Q.  By reading the email?
5      A.  Reading the email.
6      Q.  Okay.
7      A.  I'm simply looking at the words she says in
8  one case. Here she says, you cannot say this is
9  bubbling up because somebody wants -- this is from the
10  public affairs folks.
11      Q.  Yeah.
12      A.  In other words, she's responding back to the
13  people that are going to talk to the public.
14      Q.  Okay.
15      A.  And she's saying, you cannot say that Roundup
16  does not cause cancer. Okay. She says that. She's
17  going to say to the republic people, you can't say
18  that.
19      Q.  Okay.
20      A.  Okay. That's fine. But then she says
21  subsequent, she says: But in long-term exposure
22  studies of animals, Roundup did not cause cancer, birth
23  defects, or adverse effects.
24          So there's -- I think there's a contradiction
25  in that language.

Page 35

1      Q.  So by reading the email, you were able to
2  determine what Donna wanted to say; is that fair?
3      A.  No. Not what she wanted to say. It's -- what
4  I'm saying here is she's saying in this email to the
5  public affairs people -- when I use the word say, I'm
6  not using it like she's talking to me. I'm using it
7  what she's saying in writing.
8      Q.  Got it. So what you're doing here is
9  basically taking the email that Donna Farmer wrote here
10  and you are interpreting the meaning of that email,
11  right, in bullet point one?
12      A.  Absolutely not.
13      Q.  Not. Okay.
14      A.  There's no interpretation. There's a compare
15  and contrast.
16      Q.  So the statement what Donna Farmer wants to
17  say, in your opinion, is not an interpretation? That's
18  fine if it is, we can move on.
19      A.  It's not an interpretation. It's a compare
20  and contrast of what she says in one case. It's just
21  rolling up what she said in one case versus another.
22      Q.  All right. Let's go to 39.
23      A.  Again, my methodology is the same. I take
24  written documents and I compare and contrast those.
25  What's required -- I don't have any audio. I'm not

Page 36

1  getting in their minds. I don't have any audio of
2  Donna Farmer.
3      Q.  Okay.
4      A.  So when I say the word say, I'm saying say
5  with respect to the written words.
6      Q.  Okay. Let's keep going. We're not going to
7  spend all day on this, but I want to ask you a few more
8  of these. Page 39.
9      A.  Okay.
10      Q.  You state in that first bracket that starts
11  again -- do you see that?
12      A.  Okay.
13      Q.  Okay. I'm going to second sentence: Even
14  Ms. Farmer suggested warning statement is a bit of
15  wordsmithing and arguably false since she really does
16  not know that no unreasonable adverse affects to people
17  are expected and never defines the word unreasonable.
18          Did I read that correctly?
19      A.  I believe so, yes.
20      Q.  Okay. What methodology did you employ to
21  figure out what Dr. Farmer really does not know?
22      A.  Her own emails.
23      Q.  Okay. Got it.
24      A.  Her written emails.
25      Q.  Got it. Page 40.

Page 37

1      A.  The methodology is compare and contrast the
2  information in the written documents.
3      Q.  Got it. Let's keep going.
4      A.  Okay.
5      Q.  Page 40, bracket: Both Farmer and Heydens
6  clearly understand that toxicological work has focused
7  on the active ingredient glyphosate but not the inert
8  ingredients like the surfactants or the product as a
9  whole.
10          Did I read that correctly?
11      A.  Correct.
12      Q.  Okay. Explain to me what methodology you
13  undertook to determine what Dr. Farmer and Dr. Heydens
14  clearly understood.
15      A.  Their internal correspondence, their written
16  words.
17      Q.  Page --
18      A.  Compare and contrast. Here it's just a
19  statement of -- Heydens says -- they're obviously
20  communicating. So here he's saying: Not surprisingly
21  we were in good shape with respect to glyphosate but
22  vulnerable with respect to surfactants.
23          I think it's pretty black and white.
24      Q.  Sure. Okay. We'll keep going.
25          Bottom of page 40 to top of page 41. You

Stephen E. Petty, PE, CIH, CSP

Page 38

1  state in the bracket: These statements regarding
2  Dr. Parry's work provides additional insights into
3  Monsanto's knowledge and intentions as well.
4       Little roman numeral one: They would like to
5  deceive the public by using toxicological results from
6  products no longer on the market to represent products
7  currently on the market with different surfactants.
8       Did I read that correctly?
9       A. You did.
10      Q. Okay. What methodology did you undertake to
11  determine that Monsanto wanted to deceive the public?
12      A. Compared and contrast their internal
13  documents.
14      Q. Okay. Last one of these, and we'll move on to
15  something else -- well, two more. Go to page 218.
16      A. I'm almost there. Okay.
17      Q. You state in the first sentence of the
18  bracket: Clearly these folks know each other since
19  they refer to Dr. Moore only by his first name,
20  Patrick.
21      Did I read that correctly?
22      A. Yes.
23      Q. Okay. What methodology did you go through to
24  determine that these people clearly know each other?
25      A. Compared and contrast the written documents.

Page 39

1       Q. Okay. Let's go to page 242.
2       A. I am there.
3       Q. Are you a lawyer?
4       A. Are you -- are --
5       Q. I'm asking if you're a lawyer.
6       A. Did you look at my credentials?
7       Q. Yes, sir. Are you a lawyer?
8       A. Did I indicate I was a lawyer on my
9  credentials?
10      Q. Can you answer the question, please.
11      A. I mean, it's just a waste of time, but the
12  answer is no. I've shown that to you already. I mean,
13  if you want to waste time, this is an example.
14      Q. 242, you state: Monsanto -- top bracket --
15  Monsanto clearly demonstrates that they will not be
16  bound simply by laws or regulations in terms of doing
17  what is right.
18      Did I read that correctly?
19      A. You did.
20      Q. Okay. What legal training do you have to
21  determine that Monsanto has not been bound by laws?
22      MR. KRISTAL: Objection. It's -- I object
23  because it assumes facts not in evidence.
24      THE WITNESS: First of all, I don't have
25  to have legal training to make that statement

Page 40

1  based on reviewing and comparing and
2  contrasting what is said.
3       I'm just comparing and contrasting the
4  documents. In fact, almost every case I'm
5  involved in, the reason I'm an expert is
6  because if I'm pulled in on an OSHA case --
7  the laws are written by the lawyers, okay,
8  fine. But I'm being brought in to interpret
9  how to do a compare and contrast with what is
10  said should happen with what actually
11  happened.
12      And so as part of my training as a CIH,
13  for example, or a CSP, there's a whole section
14  on regulatory. I'm trained on what do the
15  regulations say. I don't have to have a -- in
16  fact, most of my outside-of-litigation
17  responsibility is to tell somebody, did you
18  comply with something or not.
19      So I don't have to be a lawyer in order to
20  provide that information to people or form an
21  opinion on that.
22  BY MR. KALAS:
23      Q. So you intend to offer opinions in this case
24  that Monsanto violated laws?
25      A. I intend to say with a comparison and contrast

Page 41

1  with what the law says and what they did, that there
2  is -- that they didn't follow that language, yes.
3       Q. Okay. Thank you.
4       A. I do not intend to be a lawyer, but I intend
5  to perform my role that I would normally provide as an
6  industrial hygienist.
7       Q. Okay. Now, you believe the warnings on
8  Roundup are deficient, right? We've talked about that
9  all day today, right?
10      A. Some of them are, yes.
11      MR. KRISTAL: Objection as to form.
12  BY MR. KALAS:
13      Q. Okay. And, in fact -- and we talked about
14  this, I think, in the last deposition. You talk about
15  in your report, I think it's page 92, that an
16  industrial hygienist cannot wait -- maybe it's not 92.
17  I'll find it. I'm sure you remember the language, but
18  let me find it so we're looking off the same thing.
19      I'll withdraw the question.
20      Okay. Page 96.
21      A. Okee-dokie. I am there.
22      Q. Okay. You state that industrial hygiene is a
23  discipline that does not await absolute proof the
24  health of the public has been compromised, correct?
25      A. In the sense -- in a legal sense -- in other

11 (Pages 38 to 41)

Stephen E. Petty, PE, CIH, CSP

Page 42

1    words, I'll give you an example, not because I'm a
2    causation expert.  But in Texas we'll have certain
3    requirements legally for whether or not benzene can
4    cause disease, factor of two or whatever.
5         I don't have to do that.  I'm not that expert
6    to know that.  It's doing the exposure part and doing a
7    lot of them.  If you go all the way back to the Broad
8    Street well, which is the beginnings in London of
9    epidemiology -- it's a fascinating story and it's
10   insightful, and you may know it.
11        And basically -- and hopefully I've
12   interpreted this right -- a gentleman began to plot --
13   the father of epidemiology -- the deaths in London --
14        Q.  Also starred in Game of Thrones, right?
15        A.  I don't know.  You're older than I am.
16        Q.  It's a joke.  It's a joke.
17        A.  So I don't know.
18        Q.  Go ahead.
19        A.  I don't even know Game of Thrones.
20        But, anyway, he plotted -- he noticed that
21   there was a higher density of deaths around the Broad
22   Street well.  In those days, which I didn't appreciate,
23   the priest controlled the crank on the well.
24        Q.  You had to put a little money in the jar?
25        A.  I don't know.  It was something.

Page 43

1         So this individual went to the priest or
2    whoever and said, would you please not let people use
3    this well, don't give them the crank.  And then he
4    noticed that the death fell off precipitously.  He did
5    not know that it was cholera.  He didn't know why
6    exactly.
7         But it goes back to the origins of the public
8    health argument, which is, let's err on the side of
9    public health and safety to see if we can get a control
10   on this situation, as we learn.  It's not wait till we
11   have -- I won't say perfect information, but super
12   scientifically -- not scientifically -- but something
13   like we have in Texas where you've got to have a factor
14   of two or something, with all the epidemiology.
15        As we start to see issues, we're anticipating
16   there might be a problem, let's take steps to mitigate
17   the effect on the public so that we err on the side of
18   public health and safety.  And so that's what we do and
19   that's what I'm saying here.
20        Q.  Okay.  So when an industrial hygienist
21   anticipates there might be a public health problem,
22   it's your opinion that they need to err on the side of
23   public health and safety, true?
24        A.  I think that's a good position to take.
25        Q.  Okay.  And you're an industrial hygienist,

Page 44

1    certified, right?
2         A.  Correct.
3         Q.  You took an oath regarding the practice of
4    protecting health, right?
5         A.  I don't know if I took an oath.  I don't know
6    what that means.
7         Q.  You're bound by a code of ethics as a
8    certified industrial hygienist, true?
9         A.  Sure.  There's an ethics section in there.
10        Q.  Okay.  And one of the things that is covered
11   in that ethics section is protection of the public
12   health, right?
13        A.  I don't recall that language, to be honest
14   with you.  If you represent it is -- I don't know.
15   There's certainly an ethics section there.  I just
16   don't recall the language.
17        Q.  Well, let's remove it from that.  You
18   personally take it very serious, seriously, that the
19   public's health should be protected, right?
20        A.  As best you can, yes.
21        Q.  Okay.  And you believe that the lack of
22   warnings regarding carcinogenicity, inert products in
23   Roundup, personal protective equipment, are all
24   deficiencies in the Roundup labeling, right?
25        MR. KRISTAL:  Object to the form of the

Page 45

1    question.
2         MR. KALAS:  I can break them up if you
3    want me to but...
4         THE WITNESS:  My answers are much more
5    complex than that.  That's the difficulty.
6    BY MR. KALAS:
7         Q.  Okay.  Let me ask it then -- let me break it
8    up.  Do you believe that the fact that the Roundup
9    label does not warn of a potential risk of cancer is a
10   deficiency in the Roundup label?
11        A.  When you take -- the definition of labeling
12   extends all the way to advertising and MSDS sheets in
13   this case.  Do you understand that?
14        Q.  And we can use all that.
15        A.  So in that context, the MSDS requires you to
16   list whether or not a product's been defined as a
17   carcinogen under IARC, NTP, National Toxicological
18   Program, or EPA.
19        Q.  Okay.
20        A.  And sometimes one will say yes and sometimes
21   one will say no and sometimes they'll all say yes,
22   sometimes they'll all say no --
23        Q.  Okay.
24        A.  -- the product or whatever.
25        Since in this case, if you read FIFRA, the

12 (Pages 42 to 45)

Stephen E. Petty, PE, CIH, CSP

Page 46

1  MSDSs are provided as part of the material with the
2  product, at least they're supposed to be.  They, in
3  fact, are part of labeling.
4      Q.  Okay.
5      A.  So in that context, I would say, yes, it
6  should be part of labeling.
7      Q.  Okay.  And do you believe there are certain
8  portions of the Roundup label, using the definition you
9  used, SDS package label, commercials, that do not
10  contain a cancer warning, right?
11      A.  I'm trying to get to your question again.  I'm
12  sorry.
13      Q.  No, no, no.  I know we're getting up on lunch.
14      You define labeling as SDS or MSDS and they --
15      A.  No.  I don't define it.  FIFRA defines it.
16      Q.  Okay.  The package label --
17      A.  But I'm just saying how FIFRA ultimately pulls
18  even MSDSs into labeling as well as advertising.
19      Q.  And advertising.  Those three areas.
20      You believe that there are portions of those
21  areas, even today, that don't have cancer warnings on
22  them, right?
23      A.  Sure.
24      Q.  Okay.  And do you believe that's a deficiency
25  in those portions of the label?

Page 47

1      A.  I believe that that is a deficiency because
2  without the public being informed that that's
3  possible -- I'm not saying that anybody has to agree.
4      Q.  Right.
5      A.  But from a public health and safety
6  standpoint, while that whole issue is being resolved,
7  it's important to give people that choice.
8      Say there's a one chance in a thousand, or
9  whatever it is, a million.  If the person that's using
10  the product has that information, then they can make
11  that choice.  But if they don't have the information,
12  they don't get to make the choice.
13      So the first thing you want to do is give the
14  individual user that information.  If they continue to
15  want to use it, okay.
16      Q.  Okay.
17      A.  On the other hand, the second piece of that is
18  that this concept, this industrial hygiene concept, it
19  goes way back, that informed workers protect themselves
20  better.  Even if they choose to continue to use it,
21  they'll almost inherently take -- like you mentioned
22  this, if I notice I get something on me, I'll go wash
23  it off.
24      Well, if I know it's a carcinogen, I think all
25  of us around the table, if we knew it was a carcinogen

Page 48

1  or might be, even if it might be, I think we'd be a
2  little more proactive in washing it off if we thought
3  it could hurt us.
4      Q.  Okay.  So --
5      A.  And that's where I'm coming from.
6      Q.  Got it.
7      A.  I'm not going to get into the bows of whether
8  it's -- is it a carcinogen or isn't it.  I'm saying
9  we're on the front end of this process where we're
10  trying to take what's out there at the time and give
11  the public a choice.
12      Q.  I think we beat the horse pretty dead on what
13  you're going to say.  So we won't re-plow that again.
14      PPE, you believe that some of the PPE
15  recommendations on the labeling, even today, are
16  deficient, correct?
17      A.  Oh, absolutely.
18      Q.  Okay.  You believe that some of the
19  disclosures regarding inert ingredients on the
20  labeling, even today, are deficient, correct?
21      A.  I don't know about that.  I was -- I was -- my
22  opinions on that were different.
23      My opinions were in looking at what the POEA
24  did to plants, under the definition of FIFRA,
25  defoliating the leaves, et cetera, that study suggests

Page 49

1  that it meets the definition of an active ingredient.
2  That was my opinion.
3      Q.  Okay.  So your opinion is that POEA should be
4  listed -- should have been listed as an active
5  ingredient on the labeling?
6      A.  It appears that it should have been.
7      Q.  Okay.  And to the extent that POEA is still in
8  any Roundup products today, you would still believe
9  that POEA should be listed as an active ingredient on
10  the label, right?
11      A.  That would be my opinion, based on the fact
12  that it defoliates the leaves as well as the active
13  ingredient itself.  And Monsanto has products where
14  they have multiple active ingredients.
15      Q.  And you're aware that people are still using
16  Roundup out in the world today, right?  Still on the
17  market?
18      A.  Oh, absolutely.
19      Q.  Okay.  And given the fact that --
20      A.  Lots of people do things that I wouldn't
21  condone, like drinking and driving.
22      Q.  Sure.  I'm not asking if you condone Roundup
23  use or not.  But appreciate that.
24      A.  But, I mean, just because they're doing it
25  doesn't mean that it's good or bad.

13 (Pages 46 to 49)

Stephen E. Petty, PE, CIH, CSP

Page 50

1     Q. But you believe, as an industrial hygienist
2 who's taken an oath to protect public health, you
3 believe that people are still in danger from these
4 deficiencies in the labeling, right?
5     MR. KRISTAL: Objection to the form of the
6 question.
7     THE WITNESS: I don't know about in
8 danger. I believe that the -- it's a
9 different question. We're going to go back
10 through the same thing. I'm not telling you
11 whether the decision on whether it's a
12 carcinogen or not has been fully vetted.
13     What I'm saying is there's some science
14 that says it is. And under the MSDS, it has
15 to be listed as such.
16 BY MR. KALAS:
17     Q. I understand.
18     A. And so what I'm saying is, as an industrial
19 hygienist, I have the obligation to let people know and
20 I have the obligation to recommend that they protect
21 themselves.
22     I am not a physician, so I'm not going to go
23 out there and say, you're in -- in fact, that's a
24 standard question in industrial hygiene. If we see a
25 dangerous situation, do we tell the employee to stop

Page 51

1 doing it.
2     There's only one scenario where that's true,
3 and it's called immediately dangerous to life and
4 health. Like, I'll give you an example. I was in a
5 building one night, Friday night, I got called at eight
6 o'clock. Now it's two o'clock. The building is
7 sagging. The sides are popping out.
8     I go up into the attic. It's 120 degrees.
9 And I'm crawling around, and I'm not a small guy. And
10 I'm on my belly. I go there and I see all the king
11 pins for all the rafters are separated. And the owner
12 says to me -- now, I'm working for the insurance
13 company -- why does the building got a problem.
14     This is Friday night at six o'clock by the
15 time I'm done. The owner says to me, it's my busiest
16 night, Friday night, I'd like to keep the business
17 open.
18     I said, sir -- I said, I can't tell you what
19 to do. I said, but I will say this. If it was my
20 family, I wouldn't put them in the table in that
21 restaurant.
22     But what I did do is I went back to my client,
23 the insurance company. And this is unusual, but I
24 reported to them -- and it was hard to get ahold of
25 them because it was Friday at seven o'clock by the time

Page 52

1 I got home. I said, we have a scenario here where I
2 consider it to be immediately dangerous to life and
3 health. They don't come up fetch. You need to inform
4 your client of my findings so that at least they have
5 that information.
6     Q. Got it.
7     Okay. So now that you've reached these
8 opinions about the Roundup labeling, have you written
9 EPA to ask them to force Monsanto to put stronger
10 labeling on Roundup labels?
11     A. I have not.
12     MR. KRISTAL: Objection to the form of the
13 question.
14 BY MR. KALAS:
15     Q. Did you go to the AIHA meeting this year to
16 present to your fellow IHs about the potential dangers
17 in the labeling of Roundup?
18     MR. KRISTAL: Is Monsanto releasing
19 Mr. Petty from his obligations under the
20 confidentiality order?
21     MR. KALAS: I'm not going to answer that.
22 I'm asking what he did.
23     MR. KRISTAL: Well, yeah, but that would
24 be in violation of the confidentiality order
25 if it's based on documents that are

Page 53

1 confidential.
2     So if you're willing to release him, I
3 think that would be great.
4 BY MR. KALAS:
5     Q. Can you answer the question, please. Did you
6 go to the IHA meeting and present --
7     A. I didn't go to that meeting, I don't think.
8     Q. Okay. Did you present to IHs at any point,
9 since you've come to the conclusion that the Roundup
10 labeling is deficient, to tell them that you think the
11 users of Roundup should use greater PPE?
12     MR. KRISTAL: Is Monsanto releasing
13 Mr. Petty from his obligations under the
14 confidentiality order to do exactly that?
15     MR. KALAS: If it's not an objection,
16 please don't speak here.
17     MR. KRISTAL: But you're asking a question
18 that would be contrary and violative of the
19 order that has been signed in this case. And
20 if you are asking him that question, it's
21 obviously a misleading question. So I'm not
22 sure why you're doing it.
23 BY MR. KALAS:
24     Q. Can he answer the question, please.
25     Have you gone to an IH meeting anywhere in the

14 (Pages 50 to 53)

Stephen E. Petty, PE, CIH, CSP

Page 54

1   country to present on your opinions on Roundup
2   labeling?
3       MR. KRISTAL:  Same objection.
4       THE WITNESS:  I haven't gone to an IH
5   meeting.  I've gone to an ASHRAE meeting, but
6   that's a different, different animal.
7   BY MR. KALAS:
8       Q.  What's ASHRAE?
9       A.  American Society of Heating, Refrigeration,
10  and Air Conditioning Engineers.
11      Q.  They don't use a lot of Roundup there.
12      That was a joke.  It's not even a question.
13      A.  No, no, no.  I'm trying to figure out how to
14  respond with another quippy answer, but I couldn't come
15  up with anything quickly.
16      Q.  Have you written an article in the
17  peer-reviewed literature to state, for instance, I
18  can't tell you about all the documents I've relied on,
19  but I think the labeling for Roundup is deficient?
20      A.  I haven't.  But as soon as I retire, I'm
21  writing a book.
22      Q.  Okay.  Can't wait for that.
23      A.  And it's going to be a --
24      Q.  I've got a lot of good books from Jerry's side
25  that I've read.  They've all been entertaining.

Page 55

1       A.  It's not Jerry's side.  It will be from the
2   insurance side as well.
3       Q.  Okay.  Have you written a letter to the editor
4   in your local paper here in Florida, where they use
5   Roundup quite a bit, to warn people that they should
6   wear more personal protective equipment when they use
7   Roundup?
8       A.  No.  But I have -- I've been asked -- a number
9   of people know, friends and family, know that I'm
10  involved with Roundup litigation.
11      Q.  Well, I understand that people may know.
12      A.  And they ask me, the people when I go back to
13  Ohio they'll ask me, the EES employees, should I use
14  Roundup.  And I said, well, the data that it's a
15  carcinogen are, you know, going back and forth.  But I
16  said, damn well better protect yourself from dermal
17  exposure.
18      Q.  Okay.  So you've told friends and families,
19  but have you told the public to protect the public
20  health?
21      A.  Well, that is the public because some of those
22  people, I don't even -- they're employees of a company
23  I don't own anymore.
24      Q.  Have you written --
25      A.  To the extent that I can, I have.

Page 56

1       Q.  Have you written -- can you write a letter to
2   the editor of your local paper today if you want to?
3       A.  I write a thousand pages a month.  I write all
4   sorts of papers.  You could write.  It's a matter of
5   how many things you want to take on in writing.
6       Q.  Sure.  Have you told the New York attorney
7   general that Monsanto violated their orders?
8       A.  I don't know how I could do that without
9   providing them with a basis for it.
10      Q.  Okay.  Have you submitted a complaint to
11  the --
12      A.  And I'm not sure I could do that without
13  providing the documents.
14      Q.  Have you submitted a complaint to the FCC
15  regarding the advertising Monsanto has created on
16  Roundup?
17      A.  I have not.
18      MR. KALAS:  Let's go off the record.
19      THE VIDEOGRAPHER:  1:08 p.m.  Going off
20  the record.
21      (Discussion off the record.)
22      (A lunch break was taken.)
23      THE VIDEOGRAPHER:  2:11 p.m.  Back on
24  record.
25

Page 57

1   BY MR. KALAS:
2       Q.  Mr. Petty, did you have a good lunch?
3       A.  It was okay.
4       Q.  Good.  Okay is good.
5       Let's keep going, shall we?
6       A.  Sounds like a plan.
7       Q.  Okay.  So let's talk about Mr. Pollard.
8       If you can turn to your notes regarding your
9   call with Mr. Pollard.  I guess two calls.  Those are
10  in Exhibit 9 at, I believe, page 517.
11      A.  All righty.  I'm there.
12      Q.  Okay.  So you had two calls with Mr. Pollard,
13  correct?
14      A.  I did.
15      Q.  Okay.  And one was in July of 2019, right?
16      A.  Correct.
17      Q.  And one was in August of 2019, right?
18      A.  Correct.
19      Q.  Okay.  And the first call took about
20  two-and-a-half hours, right?
21      A.  Correct.
22      Q.  Okay.  And the second call took about an hour,
23  right?
24      A.  Correct.
25      Q.  Okay.  So like Mr. Janzen, have you reviewed

15 (Pages 54 to 57)

Stephen E. Petty, PE, CIH, CSP

Page 58

1  the transcript under oath of Mr. Pollard?
2      A.  No.
3      Q.  Okay.  Do you know, sitting here today,
4  whether the questions you would want to ask Mr. Pollard
5  regarding his dermal exposure to Roundup were asked at
6  his deposition when he was under oath?
7      A.  I wouldn't know that without reading the
8  deposition.
9      Q.  Okay.  Do you know if Mr. Pollard's attorneys
10  asked any questions of Mr. Pollard at deposition?
11      A.  How does that answer differ from the previous
12  one?  If I haven't seen the deposition, how would I
13  know that?
14      Q.  Okay.  Now, your call --
15      A.  I can't know what I don't know.
16      Q.  Okay.  And also you didn't see any documents
17  from that deposition that were marked regarding
18  Mr. Pollard's use of Roundup, right?
19      A.  Correct.
20      Q.  Okay.  So you had not seen and still have not
21  seen, sitting here today, any exposure history put
22  together by Mr. Pollard for use at his deposition,
23  correct?
24      A.  Correct.
25      Q.  Okay.

Page 59

1      A.  Well, I don't -- if the interview was done
2  before his deposition and he brought that in as part of
3  it, I don't know -- I don't know what was attached to
4  his deposition.
5          So to be candid, if the interview were part of
6  that, then the answer would be, yeah, I've seen some of
7  it.  If it wasn't, then I wouldn't have.
8      Q.  Okay.
9          (A brief interruption.)
10          MR. KRISTAL:  For the video, that's got
11          nothing to do with this deposition other
12          than allowing ingress and egress.
13  BY MR. KALAS:
14      Q.  And you haven't seen any plaintiff fact sheet
15  that was filled out by Mr. Pollard under the penalty of
16  perjury in this case, right?
17      A.  I don't know about the penalty of perjury and
18  all that, but I haven't seen a fact sheet.
19      Q.  Okay.  Likewise, you haven't seen any amended
20  plaintiff fact sheets either filled out by Mr. Pollard,
21  correct?
22      A.  Correct.
23      Q.  Okay.  Now, when you had this call with
24  Mr. Pollard, was Mr. Pollard put under oath the way you
25  were today at deposition?

Page 60

1      A.  Not to my knowledge.
2          As I said, it's the same response as I had in
3  the earlier deposition, which is I've done over a
4  thousand interviews, and I don't recall a single one
5  where they were ever under --
6      Q.  And forgive me for asking some of these
7  questions again.  Mr. Kristal has indicated that this
8  deposition is stand-alone for Mr. Pollard.  So I may
9  need to ask some of the similar questions again.  Okay?
10      A.  Okay.  Is your response the same, would
11  probably work.
12      Q.  Okay.  Well, that transcript may not be here.
13  So we'll --
14      A.  That's fine.  It's your right to ask however
15  you want.  Fire away.
16      Q.  There wasn't a court reporter sitting there
17  when you interviewed Mr. Pollard, taking down what was
18  said, like we have here today, right?
19      A.  Correct.
20      Q.  Okay.  And, in fact, you note on Mr. Pollard's
21  interview summary sheet here that your notes -- or
22  strike that -- phone log is not an official transcript
23  of the conversation, correct?
24      A.  It's not a transcript.  That's correct.
25      Q.  And you took down these notes, correct?

Page 61

1      A.  I did.
2      Q.  Now, you've had two calls, we established
3  that, with Mr. Pollard, right?
4      A.  Correct.
5      Q.  Now, the first one, who was on the call?
6      A.  In the first one there was Mr. Pollard and
7  myself and then his wife, ████ -- I believe
8  that's his wife; that's how she introduced herself --
9  Matt Hans from Weitz Luxenberg, and then David Domina
10  from Domina Law Group.
11      Q.  Okay.
12      A.  The second call was just myself and
13  Mr. Pollard.
14      Q.  Okay.  So Weitz & Luxenberg is a law firm,
15  correct?
16      A.  Correct.
17      Q.  The Domina Law Group is a law firm, correct?
18      A.  Correct.
19      Q.  To your understanding, Mr. Hans and David
20  Domina are both lawyers, correct?
21      A.  I know David Domina is.  I don't know
22  necessarily if Mr. Hans is or isn't.
23      Q.  Okay.
24      A.  He was just on the phone.
25      Q.  Did the attorneys -- well, let me strike that

16 (Pages 58 to 61)

Stephen E. Petty, PE, CIH, CSP

Page 62

 1   since you don't know if Matt Hans is an attorney.
 2        Did Matt Hans or David Domina speak on this
 3   call, the first call with Mr. Pollard?
 4        A.  Similar to my earlier deposition responses,
 5   there was introduction.  I don't know if Matt -- yeah,
 6   Matt would have introduced it, I think.  Weitz
 7   Luxenberg set up the calls.
 8        So we had a call-in number and I called in,
 9   and then there's an introduction where everybody
10   introduces themselves on the phone.  And then they say,
11   okay, Mr. Petty, please ask your questions.  And then
12   that's what happens.
13        Q.  Okay.  And beyond that introductory period,
14   did the attorneys speak at all on the call beyond that?
15        A.  If they did, it would have been a follow-up
16   question.  If that happened, it may have been once or
17   twice in the whole two hours.  It was very little --
18   and I wouldn't even remember what it was.  It would be
19   I'd asked a question and they'd ask a follow-up
20   question.
21        Q.  Okay.  So you have a recollection that the --
22   well, I shouldn't say attorneys -- that Mr. Hans or Mr.
23   Domina may have asked a follow-up question on your call
24   with Mr. Pollard, but you can't recall specifically
25   what those questions are?

Page 63

 1        A.  Yeah.  I mean, it was -- if there were ten
 2   thousand questions, I asked all but two.
 3        Q.  Okay.  Okay.  That's fine.
 4        A.  I mean, I don't know if there were that many
 5   questions, but it's that kind of situation.
 6        Q.  Okay.
 7        A.  And typically at the end I'll ask is anybody
 8   else on the line, and usually people have fallen off.
 9   But whoever is there would say, okay, thank you, and
10   we're done.
11        Q.  Okay.  And though you don't recall the
12   specific questions that may have been asked by either
13   Matt Hans or David Domina, do you recall the subject
14   matter at all?
15        A.  No.  I really don't.
16        Q.  Like last deposition, I need to ask these
17   questions.
18        A.  Sure.
19        Q.  Did you invite any attorneys from Monsanto to
20   participate in this call?
21        A.  I didn't, but I didn't set up the call so...
22        Q.  Do you know if Mr. Kristal invited any
23   attorneys from Monsanto to participate?
24        A.  I don't know.  I don't know the answer to that
25   question.

Page 64

 1        Q.  Did you invite any expert witnesses from
 2   Monsanto to participate in the call?
 3        A.  I don't even know who they were, so how would
 4   I do that?  I don't have any way of even doing that.
 5        Q.  Okay.
 6        A.  I don't even know if they were disclosed.
 7        Q.  So since you didn't know who they were, it is
 8   true that Monsanto's exposure expert in the Pollard
 9   case, to your knowledge, has not had the opportunity to
10   conduct an interview on Mr. Pollard's exposure the same
11   way you have?
12        A.  I don't know that that's true.  I don't know
13   one way or the other, but he certainly had the benefit
14   of my interview because they get the reports.
15        Mine are -- the way the system works is they
16   get the plaintiff's reports before the defense reports
17   are due.  So there's ample opportunity to ask or verify
18   any of those answers to questions I may have asked
19   during --
20        Q.  Sorry.  Did I cut you off?
21        A.  No, no.  Go ahead.
22        Q.  Okay.  Do you know if Mr. Kristal or
23   Mr. Domina or anybody else has made Mr. Pollard
24   available for a follow-up interview by Dr. Phalen after
25   Dr. Phalen received your report?

Page 65

 1        A.  I don't even know if that's allowed.  I have
 2   no idea.  I don't know.  I'm not part of that process.
 3        Q.  Okay.
 4        A.  I don't know what the legal system is with
 5   respect to that.
 6        Q.  Now, when you interviewed Mr. Pollard, was
 7   anybody sitting in the room with Mr. Pollard beyond his
 8   wife?
 9        A.  Not that I know of.
10        Q.  Okay.  But you didn't have a video conference
11   set up, right?
12        A.  I didn't.  But I can tell you that if there's
13   somebody else in the room, I usually know.
14        I mean, I've done interviews in earlier cases
15   where both the father and the mother were present and
16   one spoke and one really didn't, but they were
17   identified early on.
18        Q.  Did you ask on this call, the first call, if
19   there was anybody in the room with Mr. Pollard beyond
20   his wife?
21        A.  I didn't, but the very first comment that
22   comes on the call is, can everybody identify who they
23   are so I can write this down.
24        Q.  Right.  And I understand that everybody on the
25   call, to your knowledge, identified who they were,

Stephen E. Petty, PE, CIH, CSP

## Page 66

1  right?
2      A.  Right.
3      Q.  But they did not identify where they were, as
4  far as you know?
5      A.  I guess that's technically true.
6      Q.  Okay.
7      A.  I mean, or at least I didn't write it down at
8  the time.
9      Q.  Okay.  And again, I know I'm rehashing ground
10  we talked about this morning --
11      A.  That's fine.  I understand.
12      Q.  Would I be able to find an official transcript
13  of either of your calls anywhere?
14      A.  I did not tape record the call.
15      Q.  Okay.  Now, Mr. Pollard was diagnosed with NHL
16  marginal zone in 2016, correct?
17      A.  Correct.
18      Q.  Okay.  And he was 63 years old, right?
19      A.  Yes.
20      Q.  Okay.  And you asked in this deposition -- or
21  excuse me.  Strike that question.
22          You asked in your interview about
23  Mr. Pollard's work history, correct?
24      A.  I did.
25      Q.  Okay.  And he worked as a teenager on farms;

## Page 67

1  is that right?
2      A.  Yes.
3      Q.  Okay.  So let's go to the page where I'm
4  looking at, it's page 518.  Is that what you're looking
5  at as well, sir?
6      A.  I am.
7      Q.  Okay.  And this was in the 1960s in Nebraska,
8  right?
9      A.  Correct.
10      Q.  And you state here that products used was dad
11  worked with 2,4-D and he wasn't very close to the
12  father when dad worked with 2,4-D.  Is that fair?
13      A.  Not involved or not close, yes.  That's what
14  he said.  Whatever the words are, that's my
15  recollection of what he said.
16      Q.  Okay.  Now, you're aware that the 1960s were a
17  time period before Roundup was introduced to the
18  market, correct?
19      A.  Sure.
20      Q.  How do you know, based on your investigation
21  in this case, that 2,4-D was the only pesticide product
22  used on the farm in the '60s?
23      A.  How do I know?
24      Q.  Yes, sir.
25      A.  My knowledge comes directly from the interview

## Page 68

1  for what Mr. Pollard told me he knew.
2      Q.  Okay.  And did you do any investigation into
3  the type of crops they were raising on the farm in
4  Fremont, Nebraska?
5      A.  On his farm or any farm or -- no, I did not.
6      Q.  Well, okay.  So first of all, on the father's
7  farm.
8      A.  In this time frame?
9      Q.  Yes, sir.
10      A.  No.  I don't believe I asked that question.
11      Q.  How about the neighbors' farms?
12      A.  I did not ask that question.
13      Q.  Do you know if 2,4-D was indicated for use in
14  or around the crops that they were raising on their
15  farm in Fremont, Nebraska, either his father's or the
16  neighbors'?
17      A.  Well, you're presuming that this was put on
18  crops, right.
19      Q.  I said around.  2,4-D would kill most crops, I
20  would think.
21      A.  Right.
22      Q.  So I said around but...
23      A.  Okay.  That's why I was asking.  So thanks for
24  clarifying it.
25      Q.  Uh-huh.

## Page 69

1      A.  Your question again?  I apologize.
2      Q.  Sorry.  I'll ask it again.  Do you know if
3  2,4-D was indicated for use in or around the crops that
4  they were raising on the father's farm or the
5  neighbors' farm?
6      A.  Well, I'm not familiar with the crops.  So,
7  no, I don't have any knowledge of that one way or
8  another.
9      Q.  Did you do any research beyond your interview
10  with Mr. Pollard as to pesticides typically used on
11  farms in Nebraska in the 1960s?
12      A.  Unless -- the only -- the quickest way to
13  answer that question, if it isn't -- to the extent that
14  it would have been listed as one of my exhibits.
15  Otherwise, I would not have.
16      Q.  Sitting here today, following your two
17  interviews with Mr. Pollard, do you have any opinion
18  that other pesticides may have been used on his -- on
19  the farms in Nebraska in the 1960s?
20      A.  The only information I have is what he told
21  me.
22      Q.  Okay.  Did you ask Mr. Pollard what he did
23  specifically as a farm laborer when he worked on his
24  father and neighbors' farms?
25      A.  Well, I did, and he said he did farm chores as

18 (Pages 66 to 69)

Stephen E. Petty, PE, CIH, CSP

Page 70

1    required.
2        Q.  So what type of chores?  Did you follow up
3    there?
4        A.  I did not.
5        Q.  Okay.  Did you ask if he drove a tractor at
6    all?
7        A.  Well, I think I just answered your question.
8    So you want to ask more versions of the same question?
9    I'm just trying to get there.
10       Q.  I'm asking -- so let me just tell you where
11   I'm coming from.
12       A.  I'm just trying -- you're concerned about
13   time, and I just told you in the general sense I don't
14   know what activities he did.  Now you want to go into
15   sub activities he did.  So I don't know how I can
16   answer a question differently.
17       Q.  Okay.  So answer it the same way.  Did you ask
18   him if he drove a tractor?
19       A.  I did not ask him if he drove a tractor.
20       Q.  Okay.  Did you ask him if he worked around
21   livestock on the farm in the '60s?
22       A.  Whatever I asked him, I recorded.
23       Q.  Okay.  And whatever his answers were, you
24   recorded; that's your testimony?
25       A.  I tried to.

Page 71

1        Q.  Okay.  You've done your research -- you talked
2    a lot in your report -- well, maybe not a lot.  That's
3    probably an unfair characterization.  You talked some
4    in your report about pesticide drift, right?
5            You cite the Bemer article, B-E-M-E-R, and
6    some other articles.
7        A.  If you want to -- I mean, the biggest thing I
8    talked about was looking at Stoke's law particle size
9    and how long it would stay suspended.  So I don't know
10   if that's what you're talking about or -- I guess I
11   would -- if there's something specific in my report
12   about drift, I would request that you show me what it
13   is you're asking the question about.
14       Q.  It's okay.  It was just a prefatory question.
15           Did you do any research following your
16   discussion with Mr. Pollard into any potential drift
17   characteristics of 2,4-D?
18       A.  Of 2,4-D?
19       Q.  Yes, sir.
20       A.  Not specific to 2,4-D.
21       Q.  Did you do any research after your interview
22   with Mr. Pollard about any potential dioxin
23   contamination in any of the pesticides used on the farm
24   in the 1960s?
25       A.  No, not in this case.

Page 72

1        Q.  Okay.  Now, he held a couple non-agricultural
2    jobs between when he stopped working on his neighbor
3    and father's farms and location 6 when he started
4    working again as a farmer, right?
5        A.  Oh, I see what you -- yes, that's true.
6    That's true.
7        Q.  Yeah.  Okay.  And so when he we go to
8    location 6, that's when he returned to the farming
9    industry, right?
10       A.  The farming industry, okay.  I just would
11   consider it farming, but that's fine.  I think of
12   industry as plants and factories.
13           MR. KRISTAL:  Just a different kind of
14   plants.
15           THE WITNESS:  That's okay.  I'm sorry.  I
16   was reacting to the word industry.
17   BY MR. KALAS:
18       Q.  That's fine.
19           Now, when he returned back to farming, he told
20   you on your call he used Lasso, Roundup, and Dow
21   Treflan, right?
22       A.  Correct.
23       Q.  Okay.  What's the active ingredient in Lasso?
24       A.  I don't recall.  I did look it up at one time,
25   but I don't recall it off the top of my head.

Page 73

1        Q.  What's the active ingredient in Dow Treflan?
2        A.  The same response.  I did look them up, but I
3    just don't recall right now.  I didn't write it down.
4        Q.  You didn't write that down anywhere in your
5    report, right?
6        A.  Correct.
7        Q.  Okay.  Are you aware there are people relying
8    on your report for their dose assessments?
9            MR. KRISTAL:  Objection.
10           THE WITNESS:  Well, I wasn't until you
11   told me that they were.
12   BY MR. KALAS:
13       Q.  Okay.  I'm just asking if you knew that.
14       A.  Not until today.
15       Q.  Okay.
16       A.  I mean, I --
17       Q.  So you didn't consent to anybody relying on
18   your interviews for somebody else's dose assessment,
19   right?
20           MR. KRISTAL:  What's the relevance of
21   whether he did or didn't consent?
22           MR. KALAS:  I'm just asking the question.
23           MR. KRISTAL:  Yeah, but it's a ridiculous
24   question.
25           THE WITNESS:  I presume that when I write

Stephen E. Petty, PE, CIH, CSP

Page 74

1    the report, it will be used by counsel as they
2    see best fit.
3    BY MR. KALAS:
4        Q.   And you didn't write your notes here with the
5    intent of providing it to another professional in the
6    field to rely upon for a dose assessment; you wrote
7    them down for your analysis, correct?
8        A.   Well, that's a tough question to answer
9    because I knew from the previous St. Louis cases that
10   they were relied upon.
11          So while I didn't know explicitly these would
12   be relied on, certainly in the back of my mind I knew
13   it could happen because it had happened before.
14       Q.   Okay.  You told me that you haven't talked to
15   Dr. Sawyer since between your third and fourth
16   depositions in the Winston case, correct?
17       A.   That's my recollection, yes.
18       Q.   Okay.  So you haven't talked to Dr. -- you
19   didn't talk to Dr. Sawyer prior to these interviews
20   that you held with the plaintiffs in the Pollard case,
21   for instance, about what he might find important in a
22   exposure assessment interview?
23       A.   Well, you asked two questions, did I talk to
24   him before -- I'm going to answer that one first -- and
25   then --

Page 75

1        Q.   Let me break it up.
2        A.   I mean, you're asking multiple question
3    questions.
4        Q.   I'll break it up for you.  My question goes to
5    the fact -- for the Pollard case specifically.  Did you
6    have a call with Dr. Sawyer prior to your phone calls
7    with Mr. Pollard about what he might find important for
8    you to find out from Mr. Pollard?
9        A.   No.  I would want to do it independently
10   anyway.
11       Q.   Okay.  Now, going back --
12       A.   Just like, I assume, if he wanted to do an
13   interview, he would ask the questions he wants to ask.
14       Q.   Going back to location number 6, it says here
15   that they had corn and soy fields at location number 6,
16   right?
17       A.   Correct.
18       Q.   Okay.  And is there -- are there any other
19   crops, to your knowledge, they raised at location
20   number 6 beyond corn and soy between the periods of
21   1980 and 1991?
22       A.   I would only know what he told me.
23       Q.   Okay.  And that's what he told you?
24       A.   It's a limit of -- that's what he told me.
25       Q.   Okay.  And --

Page 76

1        A.   But they were done in context, I think, with
2    the crops that they were applying these pesticides to.
3        Q.   All right.  And beyond your discussion with
4    Mr. Pollard -- same question I asked you about location
5    number 1 -- did you do any independent research
6    following the discussion with Mr. Pollard to determine
7    whether there were other herbicides or pesticides used
8    on corn or soybeans between 1980 and 1991 in the
9    Nebraska region?
10       A.   Short of having that information in some of
11   the documents that are attached, beyond that, I would
12   not have.
13       Q.   Okay.  Did you ask Mr. Pollard -- strike that.
14          Let's go to 527 through 528.
15       A.   Okay.  I am there.
16       Q.   Now, it says here on 527 to 528 when you're
17   talking about pesticide use, location 1A, father's
18   farm -- that's location 6 we were just talking about,
19   right, father's farm?
20       A.   Just trying to make sure.  We've gone through
21   a few of these today.
22       Q.   Me too.  Me too.  That's why I'm asking.
23       A.   I believe that is correct.
24       Q.   Okay.  Now, on 527 and 528 you discuss here
25   how he used the product on his father's farm, correct?

Page 77

1        A.   Are you talking about where I have the method
2    dispensed?  Is that what you're referring to?
3        Q.   Yes, sir.  The application equipment, for
4    instance.  So you have a handheld pump sprayer and you
5    have a tractor sprayer.
6        A.   Yeah.  To the extent that he's told me what he
7    used to dispense the product, yes.
8        Q.   Okay.  Prior to 1988 you don't discuss in your
9    notes how he applied Roundup.
10       A.   That's because -- if you go to 523 -- he's
11   only applying Roundup from '88 to '91.
12       Q.   Okay.  So it's your testimony -- I just want
13   to make that clear -- he did not use Roundup until
14   1988?
15       A.   That's what he told me.  So that's why I
16   wouldn't have anything before that.
17       Q.   Okay.  So let's keep going then.
18       A.   I'm just confused.
19       Q.   I just wanted to make sure the record was
20   clear.
21          Going back to the use on the farm, originally
22   in those first two seasons he used a hand pump sprayer,
23   correct?  That's '88 and '89.
24       A.   Yes.
25       Q.   And then '90 to '92 he turned to a tractor

20 (Pages 74 to 77)

Stephen E. Petty, PE, CIH, CSP

Page 78

1    sprayer, right?
2        A.   Yes.
3        Q.   Okay.  And in the Roundup litigation up to
4    this point, have you reviewed any hand pump sprayers,
5    backpack sprayers, as part of your opinions?  In other
6    words, is that something you would normally do when
7    assessing this, ask to see sprayers if they still
8    exist?
9        A.   In what context?  I mean, in a Roundup case or
10   in any case or -- I've been doing this for a long time.
11       Q.   Let me preface it.  Oftentimes in these cases
12   there's allegations that sprayers leaked.  You've read
13   about leaking sprayers --
14       A.   Okay.
15       Q.   -- or you've heard about it from plaintiffs
16   from time to time, right?
17       A.   I don't know if I can answer that question.
18           When I'm looking at the dermal associated with
19   leaking, I just want to know what percent areas are
20   wetted, regardless of how it gets there.  So I kind of
21   cut through the PPE, the clothing, the type of event
22   that gets the product to the skin.  I'm cutting to the
23   chase, if you will.
24       Q.   And my question is going to something a little
25   different, which is in that assessment, do you inspect

Page 79

1    any of the equipment if it is still in existence to see
2    if it is, in fact, leaking and how much it may leak?
3        A.   Traditionally not.
4        Q.   Okay.
5        A.   Even when I do site inspections, they're
6    usually -- things have changed.  In other words, it's
7    after the fact.  And so I would be criticized just as
8    heavily if I looked at a sprayer in 2019 and said, see,
9    it leaks at this rate.  And you say, well, how do you
10   know it leaked that way in 2016.
11          So it's a no-winner in the sense that if I
12   look at it and I find something now, what's the
13   relevance back then.  It's hard to prove.
14       Q.   Okay.
15       A.   So there's limited value in doing that.
16       Q.   So you don't -- if I understand you correctly,
17   up to this point you don't have any intention to bring
18   a sprayer into court and show the jury that it was
19   leaking since you haven't examined any sprayers, right?
20           MR. KRISTAL:  You mean a particular
21   plaintiff's sprayer or exemplar sprayer as to
22   how one could leak?
23           MR. KALAS:  Well, I guess my question goes
24   more --
25           THE WITNESS:  In any case or this case?

Page 80

1    BY MR. KALAS:
2        Q.   In the Roundup litigation, have you carried
3    that out as part of your exposure assessment,
4    inspecting potentially leaking sprayers?
5        A.   I've certainly -- I'm trying to think back in
6    the St. Louis cases where there were actually named
7    sprayers, for example.  I've looked up to verify that
8    those are the names of the sprayers and the capacities
9    and things like that.
10       Q.   My question is more about a tangible good.
11       A.   Yeah.
12       Q.   Have you had Mr. Kristal say to Mr. Pollard,
13   Mr. Pollard, to the extent you still have sprayers you
14   used while you were applying Roundup, please send those
15   to me so I can send them along to Mr. Petty.  Have you
16   asked Mr. Kristal to do that?
17       A.   I haven't asked him to do it, but it would
18   have limited value because it's twenty years later.
19       Q.   Got it.
20       A.   I mean, as I said before, legitimately so, I
21   would be criticized by trying to apply data twenty
22   years later to something that happened twenty years
23   earlier.
24       Q.   Did you ask Mr. Pollard when you discussed his
25   tractor spraying with him what sort of tractors and --

Page 81

1    strike that.  Let me ask it more specifically.
2           Did you ask Mr. Pollard what the fuel source
3    was of the tractors used at location 1B?
4        A.   I did not.
5        Q.   Did you ask Mr. Pollard what the fuel source
6    was of the tractors used at location 1, neighbor and
7    father's farms, back on page 518?
8        A.   I did not.
9        Q.   Okay.  Mr. Pollard grew up on a farm, right?
10       A.   Let me check this for a second.
11           I just don't know the answer to that one way
12   or the other.  I don't have data from '50 -- I don't
13   have data from when he was born in 1952 to his first
14   job working around farms that I have is in 1965.
15       Q.   Okay.
16       A.   So and then, of course, he had an intervening
17   period -- I do have some data in the early '70s, where
18   he went to school, et cetera, et cetera.  But to be
19   candid, I don't know the answer to that question.
20       Q.   And that's -- that raises something I want to
21   ask you about your general practice in these
22   interviews.  You ask about where people work in these
23   interviews, right?
24       A.   Sure.
25       Q.   Okay.  But one thing you haven't asked about

21 (Pages 78 to 81)

Stephen E. Petty, PE, CIH, CSP

## Page 82

1  in these interviews, that I've reviewed at least, is
2  all the locations that they've lived at, correct?
3      A.  Correct.
4      Q.  And there are exposures that are carcinogenic
5  that people are exposed to in their home from time to
6  time, true?
7          MR. KRISTAL:  You mean the Roundup?
8          MR. KALAS:  Very funny, Jerry.
9          You can answer.
10         THE WITNESS:  I don't know how to answer
11     that question because --
12         MR. KRISTAL:  And I was joking, for the
13     record.
14         THE WITNESS:  It really depends on the
15     home and its construction and a whole host of
16     things so...
17  BY MR. KALAS:
18     Q.  It's dependent, right?  I mean, you need to
19  know something about where they live.
20     A.  But in general, the only one I can think of is
21  asbestos, for example.
22     Q.  Right.  I lived in a house in historic
23  Annapolis that had asbestos shingles on the side and I
24  was told if I disturbed those shingles, I might have
25  some asbestos exposures.

## Page 83

1          MR. KRISTAL:  Oh, you had a good warning.
2          THE WITNESS:  Sorry.
3          MR. KALAS:  No.  That's okay.  And this
4      isn't about me.  We'll move on.
5          THE WITNESS:  But I will tell you that
6      asbestos shingles -- I've written a book and I
7      talk about asbestos shingles and they are --
8      I've had people want to replace those
9      shingles.  And I said as long as they're
10     intact, they are wonderful materials.
11  BY MR. KALAS:
12     Q.  It's difficult to replace them.  I speak from
13  personal experience.
14     A.  So until it becomes friable, leave it alone.
15     Q.  Yes.  Okay.  Let's move on.
16         You don't --
17     A.  I mean, I'm certified -- I shouldn't say that.
18  I guess I have my asbestos certificate, so that's why I
19  can --
20     Q.  You don't know specifically to Mr. Pollard all
21  the places where he lived in his life, correct?
22     A.  I do not.
23     Q.  Okay.  And you don't know what sort of
24  drinking water sources he had at the places he lived in
25  his life, as far as well water versus city water?

## Page 84

1      A.  I don't absolutely know that.  That's correct.
2      Q.  Okay.
3      A.  I grew up on well water.  But if you're out
4  rural, you tended to in those days.
5      Q.  I've had both and so I think it tastes better
6  sometimes.
7      A.  It's the carcinogens in it.
8      Q.  Maybe so.  Who knows.
9      A.  I'm just kidding.
10     Q.  You don't know what contaminants may have been
11  in the well water that Mr. Pollard was exposed to if he
12  had -- well, strike that because that assumes facts
13  that you don't know.
14         You don't know what contaminants were in the
15  drinking water Mr. Pollard was exposed to in his
16  residences throughout his life?
17     A.  Probably not, and it's unknowable.
18         You know why I know it's unknowable?  Because
19  I'm one of the few people in the city of Columbus that
20  actually asked for their water test, because I was
21  getting bottled water and I wanted to see the
22  composition of the water of Columbus versus the
23  composition of my bottled water.
24         And the difficulty there is they only test for
25  a handful of constituents, as you may know.  So you

## Page 85

1  don't know what all those constituents are.
2          So it's an unknowable question.  But by and
3  large, when you do find out there are issues, it's
4  because in this day and age, most of the major
5  contamination types of situations we're familiar with
6  because of NPL sites, et cetera.
7      Q.  Are you aware the state of Nebraska has
8  monitored for nitrates in drinking water for decades?
9      A.  Well, that's one of them.  But I'm just
10  telling you I can show you the limited list of things
11  that are monitored for.
12     Q.  Okay.
13     A.  And it's -- that's just the way it is.
14     Q.  Okay.  Do you know the level of nitrates in
15  the drinking water Mr. Pollard was exposed to
16  throughout his life?
17     A.  No.
18     Q.  Do you know if Mr. Pollard's -- do you know --
19     A.  To add to that, I don't know if it's knowable
20  because if it was well water, I'm sure that it was
21  never measured.
22     Q.  Okay.  Do you know in Mr. Pollard's case
23  whether any of the farms he lived -- excuse me --
24  worked or hypothetically lived on had a burn pit?
25     A.  I don't know the answer to that question.

Stephen E. Petty, PE, CIH, CSP

Page 86

1    Q.  Okay.  Now, turning to Mr. Pollard's work at
2  the co-op, this is, I guess, location 7 -- location 8.
3    A.  Okay.
4    Q.  Okay.  In the interim period between location
5  6 and location 7, he became what's known as an
6  agronomist licensed applicator; is that true, according
7  to your interview?
8    A.  That's what he told me, yes.  He became a
9  licensed applicator.
10   Q.  What does it mean in the state of Nebraska to
11  become a licensed pesticide applicator?
12   A.  I'm just familiar with the licensing
13  requirements under the federal ones.
14   Q.  Okay.  So let's start with the federal ones
15  and maybe end at the federal ones.
16       You're not familiar with the State of
17  Nebraska's licensing requirements?
18   A.  Well, classically, they adopt federal
19  regulations.  I mean, I just know that from experience.
20  So but I'm just telling you, I haven't read the
21  Nebraska version of it.
22   Q.  Fair enough.  So let's go to federal.
23  What does it mean to be a licensed pesticide applicator
24  under federal law?
25   A.  There's some training requirements and there's

Page 87

1  a testing requirement ultimately.
2    Q.  What sort of training do licensed pesticide
3  applicators receive, if you know?
4    A.  It depends on who gives the training.  The
5  regulations talk in general terms about what should be
6  in the training, but I'm not trying to be superfluous
7  on that.  I'm just saying it really depends on who they
8  get the training from.
9    Q.  What do the regulations call for in the
10  training of a licensed pesticide applicator, if you
11  know?
12   A.  Well, it's general generic training about
13  hazards, about pathways, about PPE.
14   Q.  Okay.  So let's start with --
15   A.  It's typically not, typically not as much of
16  this training is -- because I've both given it and
17  received, not this specific training, but PPE training,
18  for example -- it's typically not chemical specific or
19  they'll use an example chemical.
20       So it's pretty treetop level training.  I'll
21  just leave it at that.
22   Q.  Okay.  You mentioned hazards, PPE.
23       What are, under federal law, what are licensed
24  pesticide applicators trained to do regarding PPE, if
25  you know?

Page 88

1    MR. KRISTAL:  Objection.  Beyond the
2  scope.
3    THE WITNESS:  I don't recall it off the
4  top of my head, so I don't want to give an
5  answer and then be wrong.
6  BY MR. KALAS:
7    Q.  Certainly don't want you to do that.
8    A.  I've read it.  I have read it.  I've actually
9  downloaded the whole history of the federal regulations
10  on pesticide applicators.  I just don't have it all
11  committed to memory.
12   Q.  Okay.  You didn't ask Mr. Pollard what he was
13  trained to do as a licensed pesticide applicator,
14  right?
15   A.  Indirectly I would have asked him about his
16  PPE and his warnings.
17       I'm just trying to find that real quick.  And
18  that should reflect his training.  I'm going to 541.
19   Q.  Yeah.  I know where you're going.
20       Go ahead.  Go ahead.
21   A.  So, anyway, I can read all of this, but
22  basically this gives an indication late in his career
23  he was given -- he was fit tested to wear a respirator.
24  He never wore one according to -- says he was fit
25  tested twice.

Page 89

1       Again, heard of HAZCOM, so he has some
2  training on that, but again very late in his career.
3  He had heard of the term MSDS.
4       The difficulty, again, for him was that he
5  says he was never, as part of any training, provided
6  information on the chemical hazards of Roundup
7  specifically, Roundup products.  And then he makes the
8  statement that there was a meeting with a non-local
9  Monsanto rep that said -- was wearing a Monsanto
10  shirt -- that said that Roundup was safe enough to
11  drink.
12       So kind of the answer is, yes, he's had some
13  training in the 2014/15 time frame on hazards and how
14  to deal with those, but it wasn't Roundup specific
15  apparently.
16   MR. KALAS:  Move to strike as
17  nonresponsive.
18  BY MR. KALAS:
19   Q.  I asked you if you asked him what training he
20  received in 1992 or thereabouts when he became a
21  licensed pesticide applicator, not how he interpreted
22  warnings.
23       So did you ask him specifically about the
24  training in 1992?
25   MR. KRISTAL:  Objection to form.

23 (Pages 86 to 89)

Stephen E. Petty, PE, CIH, CSP

Page 90

1    THE WITNESS: I asked him about training,
2 period.
3 BY MR. KALAS:
4    Q.   And it's your opinion that he had never heard
5 of a material safety data sheet or safety data sheet
6 until 2000 or so?
7    MR. KRISTAL: Objection to form.
8    THE WITNESS: He said around 2000 or so.
9 BY MR. KALAS:
10    Q.   Okay.  So as part of training of a licensed
11 pesticide applicator, do you recall whether or not they
12 are told or are supposed to be told about what a safety
13 data sheet is?
14    A.   Well, first of all, if that's what the
15 training is, it's deficient by nature.  They're not
16 supposed to be told.  They're supposed to be able to
17 read and understand it.
18    Q.   But that's not the question you asked him.
19 You asked him if he'd ever heard of the term, so that's
20 why I asked it that way.
21    A.   Well, yeah.  But if you've never heard of the
22 term MSDS, then how would you have any training or
23 knowledge of an MSDS?
24    Q.   That's my question, sir.  That's what I'm
25 getting at.

Page 91

1    As, under your understanding -- if you can't
2 recall right now, that's fine, we'll move on -- are
3 licensed applicators supposed to be trained on how to
4 at least source a material safety data sheet as a
5 licensed applicator?
6    MR. KRISTAL: Objection to form.
7    THE WITNESS: It's the difference between
8 theory and reality.  In other words, remember
9 I said earlier it depends on who gives the
10 training and what's in the training.
11 BY MR. KALAS:
12    Q.   Right.
13    A.   And I've -- I don't have access to the
14 training materials that he was given, but I have done
15 several, perhaps a dozen or more, where I've actually
16 had the training that was given to a worker, and it's
17 not good.
18    Q.   Okay.  Is he --
19    A.   So the question is -- when he says he doesn't
20 remember it, that tells you a lot about the training,
21 right?
22    Q.   Maybe.  But that's what it tells you.
23    A.   No.  No.  Because he doesn't -- when I'm
24 asking him if he's been -- believe me, I've done
25 hundreds of these interviews.  These people are going

Page 92

1 to tell me if they've heard of MSDSs, when they've
2 heard of them.  If he doesn't recall one until then,
3 why -- I just -- I mean, I don't know why he would say
4 he didn't -- I mean, it tells me that there wasn't
5 anything in that training that struck the, that allowed
6 him to recall the MSDS discussion in that training.
7    Q.   Okay.
8    A.   And I will tell you that a lot of this
9 training -- I don't have access to his training manual,
10 but I have dozens of examples, if not hundreds, where
11 the training is not what one might think it is.
12    There's a difference between what I can tell
13 you that -- I've made opinions over and over again that
14 the regulation on MSDSs says this with respect to
15 training and HAZCOM.
16    You look at the training, and you know what
17 the guys tell me.  It was computer based, they told me
18 to come in for five minutes when I have time, I sign
19 the log and I leave.
20    So there's a difference is all I'm saying
21 between what's supposed to happen and what actually
22 happens.  And what I'm saying is if you're asking the
23 question of me, well, he says the regulations say you
24 should have knowledge of MSDSs based on what the
25 regulations say, okay.  But if he doesn't recall it,

Page 93

1 that says something about the training.
2    Q.   Okay.  So let me make sure I understand your
3 testimony.  The regulations say, regardless of the
4 quality of the training, that he is supposed to have
5 knowledge of SDSs, correct?
6    MR. KRISTAL: Objection.
7    THE WITNESS: Not in that era.  SDSs
8 didn't happen until '17.
9 BY MR. KALAS:
10    Q.   The regulations say regardless of the quality
11 of the training --
12    A.   Well, it's your question, not mine.
13    Q.   -- regardless of the quality of the training,
14 that he's supposed to have knowledge of MSDSs.
15    A.   That's the intent.
16    MR. KRISTAL: Objection.
17 BY MR. KALAS:
18    Q.   Okay.  Now, you mentioned something about --
19 and I think you were getting to this, but it goes maybe
20 to your methodology here in the interview generally.
21 What do you do to make sure people are telling you the
22 truth in an interview?
23    A.   I try to ask lots of -- let me give you an
24 example.  When I'm doing the skin -- that's one of all
25 time -- but when I'm doing the skin questions, the

24 (Pages 90 to 93)

Stephen E. Petty, PE, CIH, CSP

## Page 94

1 first thing I do is ask him, do you recall if your
2 hands got wetted at any time, yes or no.
3 And then I go through all the skin areas;
4 hands, wrists, forearms, upper arms, face, neck, chest,
5 back, thighs, lower legs, ankles, feet.
6 Q. Okay.
7 A. It's usually a yes/no kind of response.
8 If someone were to say to me, yeah, I got my
9 hands wetted, didn't get my wrist wetted, but I got my
10 forearms wetted, I'd say, are you sure your wrists
11 didn't get wetted? I mean, you got your hands, your
12 wrists, your forearms.
13 Q. I think I understand. So --
14 A. So you do ask questions like that so that you
15 can make sure that there's -- you know, just based on
16 my knowledge and experience of doing so many of these
17 interviews, I'm going to know right away whether
18 something, you know, is inconsistent with what one
19 would expect.
20 Q. So if you had somebody who came in and said, I
21 got my hands and forearm wetted but not my wrists, your
22 follow-up question would be, are you sure you didn't
23 have exposure to the wrists as well?
24 A. Or are you sure the forearms were wetted.
25 Q. Okay. But that wasn't the example you gave

## Page 95

1 previously.
2 A. I didn't. But I'm going to ask for -- the
3 inconsistency there is you have two skin areas with an
4 adjacent skin area that isn't wetted.
5 So the obvious first question is, are you sure
6 the forearms weren't wetted. If they say yes -- or the
7 wrists -- then I'm going to say, well, then the
8 follow-up is, are you sure the forearms were wetted.
9 Q. My question was a little more basic initially,
10 which is Mr. Pollard has brought a lawsuit, correct?
11 A. Yes.
12 Q. Mr. Pollard is asking for monetary damages in
13 the lawsuit, correct?
14 A. I assume so. I'm...
15 Q. Okay. What do you do as a professional to
16 ensure somebody isn't exaggerating their story in order
17 to make it more likely they win their lawsuit?
18 A. One thing I can tell you is -- and I hear it
19 over and over again -- my gosh, we've never had anybody
20 ask us those kind of questions.
21 I mean, how many times does somebody get asked
22 were your fingers wetted, what percentage of the time.
23 So it's pretty difficult when you go through that whole
24 process because it takes a good hour, because I'm
25 asking not only each skin area, percent area wetted,

## Page 96

1 percent time wetted, post dermal, yes or no,
2 application, and how long.
3 That takes a long time. And all I can tell
4 you is -- you're a lawyer. You read lots of
5 depositions. You have a sense, I think --
6 Q. Okay.
7 A. -- as to who's more credible and who's not.
8 Or you will make that judgment, whether it's right or
9 wrong. But I'm constantly trying to look at the data
10 points they give me in context with having done a
11 thousand of these and see if there's consistency.
12 If there's not, I'm going to ask follow-up
13 questions.
14 Q. Tell me about a time you were taking one of
15 these interviews and your sense was, this person is
16 exaggerating their exposure to this compound, I don't
17 feel comfortable working on this case.
18 Tell me about that time in your thousands of
19 interviews.
20 A. I don't know that I've ever, based on
21 interviews, I've said I'm not comfortable working on
22 this case.
23 It's the other way around. I've done it on
24 many case where I'll say -- when I'm asked to work on a
25 case, I'll say, I would say like eight hours or so.

## Page 97

1 Not on a case like this necessarily. It's so large.
2 I would take eight hours or so to review the
3 initial files and see if I -- if I -- if there's
4 something there that I can professionally do. And I
5 can tell you I've made many lawyers mad saying, I can't
6 help you.
7 Q. Okay. Did you --
8 A. So but as part of the interview, by the time
9 I'm that deep into it, it would be more like if the
10 person said, you know, every time I sprayed, my entire
11 legs were soaked, I would say, no, I don't believe
12 that.
13 Q. You don't think that somebody who would say
14 that would be credible?
15 A. All the time. I just -- I mean, all the way
16 up to -- yeah, probably not.
17 Q. Okay.
18 A. I mean, at least I would ask -- I don't know
19 about credible. I wouldn't use the term credible.
20 I would just say, I don't think that answer is
21 likely accurate. It has nothing to do with whether
22 they're credible. I just don't think that particular
23 answer probably is right based on my experience in
24 asking that question for a lot of different chemical
25 and exposure scenarios.

25 (Pages 94 to 97)

Stephen E. Petty, PE, CIH, CSP

Page 98

1      Now, if they said, you know, the front of my
2  legs but the upper half or the lower half, you know,
3  one time out of ten, okay, I could see that's okay.
4  But if they say their entire legs were soaked all the
5  time, no, you would -- I don't think anybody around
6  this table would think that's right.
7      So in those scenarios -- and they happen from
8  time to time -- I will follow up and try to, whether
9  it's over or underexposure. My experience is generally
10  people underestimate how much of their skin area is
11  wetted. But I'm not there to tell them they're right
12  or wrong. It's just to look for inconsistencies.
13      Q. All right. And did you go back -- I think I
14  know the answer to this, but I haven't asked for this
15  specific purpose. Did you go back to Mr. Pollard's
16  deposition to analyze it against what he told you for
17  inconsistencies?
18      MR. KRISTAL: Why would you ask a question
19  like that when you've already elicited that
20  Mr. Petty hasn't seen the deposition?
21  BY MR. KALAS:
22      Q. Did you do it?
23      MR. KRISTAL: Do what? How could he
24  possibly have done that? It's a ridiculous
25  question.

Page 99

1      Once you rule out the general, I've never
2  seen his deposition, you could ask him a
3  thousand questions about what was in or not in
4  the deposition and whether he's seen it, and
5  the answer would always be the same, which is
6  no because he hasn't seen the deposition.
7  So I object. And I'm going to cut that
8  off if you keep going because at some point
9  it's harassment.
10  BY MR. KALAS:
11      Q. Did you do it?
12      A. How could I have? I mean, I've already -- I
13  mean, I would have made the same comment.
14      I've told you originally -- you've been making
15  the comments about wasting time. When I give you the
16  general that I have not seen his deposition, then any
17  questions about what I've seen in the deposition, how
18  could I have answered those questions?
19      Q. Did you call any of the people who worked at
20  the co-op or did you -- let me ask this first. Did you
21  ask Mr. Pollard for any names of his coworkers at the
22  co-op?
23      A. If I had, they would be in here. I don't
24  recall that I did. But if I'd asked him those names,
25  then they would be listed.

Page 100

1      Q. Did you -- well, since you didn't ask him for
2  any names, did you get the names of the --
3      A. I didn't say that. That wasn't my answer.
4      Q. Okay.
5      A. You weren't listening to my answer.
6      Q. Since you didn't receive any names from him --
7      A. No. I said, if I did, they would be in here.
8  I just haven't looked.
9      Q. Okay. So --
10      A. Maybe I didn't. I'm just saying --
11      Q. So why don't you look and tell me if you got
12  any names from him that you wrote down.
13      A. I'm not trying to be difficult. I'm just --
14      Q. No, no, no. Be -- we want to be precise. Go
15  ahead.
16      A. I mean, I don't know if it's important.
17  That's why I was giving you that room to continue or
18  not continue.
19      Q. I appreciate that, but I'll keep the question
20  pending.
21      A. I scrambled the pages.
22      MR. KRISTAL: Yeah. Maybe reorganize it
23  back so it's paginated.
24      THE WITNESS: It is true that I do not
25  have the names of coworkers. All I have is

Page 101

1  the names of the companies of other farms, but
2  not the coworkers.
3  BY MR. KALAS:
4      Q. And did you source from any other methods the
5  names of the coworkers of Mr. Pollard at the co-op?
6      A. I have not.
7      Q. Okay. So because you have not done that, you
8  don't know who his coworkers were, correct?
9      A. I don't know their names, no. I know he had
10  coworkers but, no, I didn't interview the coworkers and
11  I didn't ask about the coworkers.
12      Q. Okay. And because you didn't interview the
13  coworkers, you don't know, sitting here today, if the
14  coworkers would corroborate that Mr. Pollard used
15  Roundup the way he said he used Roundup at the co-op,
16  correct?
17      A. Well, that has a yes and a no.
18      As an industrial hygienist -- it is true that
19  I haven't talked to the coworkers, but I'm here to tell
20  you that the most reputable person, from an industrial
21  hygiene, typically is the person themselves.
22      It's always considered secondary information
23  to get it from coworkers, family members, et cetera.
24  In fact, in cases I've been involved in where the
25  individual is deceased, you're relegated to doing that.

26 (Pages 98 to 101)

Stephen E. Petty, PE, CIH, CSP

Page 102

1    But the answer's, no, I haven't spoken to the
2    coworkers.
3           But in terms of corroboration, I would just
4    say that the worker, the individual himself, is the one
5    that you would rely on first and foremost, from an
6    industrial hygiene standpoint.
7       Q.   Have you talked to anybody about Mr. Pollard's
8    use of Roundup who does not have a financial interest
9    in winning a lawsuit against Monsanto?
10      A.   Well, it's the same question.  I just said I
11   haven't talked to any coworkers.
12      Q.   Well, I asked about anybody now.  Have you
13   talked to anybody about Mr. Pollard's use of Roundup
14   who does not have a financial interest in winning a
15   lawsuit against Monsanto?
16      A.   The only one in the Pollard case that I've
17   talked to is Mr. Pollard.
18      Q.   Okay.  And Mr. Pollard -- well, strike that.
19   I've asked that already.
20          Now, when he was working at the co-op, he told
21   you he filled shuttles, correct?
22      A.   If you want to bring me to that page, we can
23   get it quicker.
24      Q.   524.
25      A.   524.  All right.  I'm there.

Page 103

1       Q.   Okay.
2       A.   Okay.
3       Q.   Okay?
4       A.   I'm there.
5       Q.   He told you he filled shuttles while working
6    in the plant at the co-op, correct?
7       A.   Well --
8           MR. KRISTAL:  Objection.
9           THE WITNESS:  -- part of the time he said
10   he helped fill.
11          So I think the answer -- the question is
12   oversimplified with respect to what I was
13   actually told.
14          If you look at that entire period when he
15   was in the plant -- well, the entire period of
16   time for location 7, part of the time he said
17   he did help fill shuttles.  And some of the
18   time he said he didn't.
19   BY MR. KALAS:
20      Q.   And when he filled shuttles, he did not tell
21   you that he wore gloves, correct?
22      A.   He specifically mentioned plastic gloves but
23   when cleaning nozzles and unloading tankers.  That's
24   the time he recalled using gloves.
25          Appreciate that's of secondary interest to me

Page 104

1    because I just care about whether it's BPA clothing,
2    et cetera, is what skin areas are wetted.  There are
3    all sorts of ways, as I've indicated in that document I
4    gave you, that even with PPE, you can get skin wetted.
5       Q.   Okay.  We may talk about --
6       A.   So I just cut through the chase and say, okay,
7    what percentage of your skin areas were wetted,
8    regardless of whether you were wearing gloves, not
9    wearing gloves, et cetera.
10      Q.   We may talk about that in a bit.
11          It would have been the responsibility of the
12   co-op to make SDSs available for Mr. Pollard, correct?
13      A.   No.
14      Q.   It would not have been the responsibility of
15   the co-op?
16      A.   Because they didn't exist in that time frame.
17   They were MSDSs.
18      Q.   Okay.  I will ask it again.
19      A.   I'm just helping you out.
20      Q.   Hey, I appreciate it.  I'll take all the help
21   I can get.
22          It would have been the responsibility of the
23   co-op to make MSDSs available to Mr. Pollard, correct?
24      A.   Presuming they got them.
25      Q.   Okay.  And do you know if the MSDS or label

Page 105

1    for Ultra Max and Power Max stated that chemically
2    resistant gloves should be worn when handling?
3       A.   We can go to my report and look at what some
4    of those say, if you want.  Or if you want to just --
5    if you want my opinion on that, assuming that's true,
6    either way, however you want me to answer that.
7       Q.   So you've covered that in your report
8    one way or another and written it down?
9       A.   I've talked about the warnings, yes.  And
10   there's hundreds of pages.
11      Q.   Okay.  So --
12      A.   And then I've commented on that particular
13   warning, in fact.
14      Q.   Okay.  So we'll let that warning stand as it
15   is.
16          Do you know if Mr. Pollard -- did you ask
17   Mr. Pollard if he read the label for Roundup Ultra Max
18   or Roundup Power Max before using -- or before filling
19   shuttles?
20      A.   Let me check.  Since the MSDSs are part of the
21   label, it looks like in 2000 or so he would have been
22   reading MSDSs, but it's also conflicted with the
23   mid-1990s him being told it was safe.
24          So I think that -- so to the extent to answer
25   your question, since MSDSs were part of the labeling,

27 (Pages 102 to 105)

Stephen E. Petty, PE, CIH, CSP

Page 106

1  then, yes, in the 2000 or so time frame he would have
2  been reading labeling material.
3      Q.  So let me narrow the question.  Did you ask
4  Mr. Pollard if he reviewed the label that accompanied
5  the shuttle product, the label on the product?
6      A.  Well, the MSDS company as the product's
7  supposed to.
8      Q.  Okay.  So --
9      A.  Are you -- I'm not trying to be difficult, but
10  labeling -- labeling is used in a colloquial way.
11      Q.  Sure.
12      A.  As well as a warnings way.
13      Q.  You know, we could simplify this maybe, if I
14  understand what you're saying correctly.  Is it your
15  testimony that when an agricultural grade product of
16  Roundup is sent out, both the label that's affixed to
17  the product, taped on the product, and the MSDS are
18  attached for availability for whoever uses it, or is
19  supposed to be?
20      MR. KRISTAL:  Assumes facts not in
21      evidence.  Object.
22      THE WITNESS:  No.  I don't think that's
23      what I was saying with my answer.
24      What I was saying with my answer was that
25      under FIFRA --

Page 107

1  BY MR. KALAS:
2      Q.  You're saying the term encompasses all of it.
3  Got it.
4      So when I say -- and I'll be very specific --
5      A.  We talked about that.
6      Q.  I'll be very specific.  When I'm asking about
7  the label in this coming question, I'm asking the label
8  affixed to the product, not the --
9      MR. KRISTAL:  Which product?
10      MR. KALAS:  The Ultra Max and the Power
11      Max.
12      MR. KRISTAL:  Which container?  In other
13      words, you're assuming something that's not in
14      evidence.  You're assuming these are hundreds
15      and hundreds of gallons of stuff he's pumping.
16      You're saying there's a label somewhere,
17      affixed to the tank, affixed to the side of
18      something?
19  BY MR. KALAS:
20      Q.  Well, let me ask you that.
21      That's a good point, Jerry.
22      Did you ask him whether or not there was a
23  label on any of these for him to read?
24      MR. KRISTAL:  Well, when you say "any of
25      these," which are you talking about?

Page 108

1      In other words, the two-and-a-half gallon
2      jugs, we can all agree there were labels on
3      them.  But there are lots of other products
4      here, and you keep morphing into and it's not
5      clear what you're asking.
6  BY MR. KALAS:
7      Q.  Did you ask Mr. Pollard if there were labels
8  affixed to any of the Roundup products he mixed or
9  loaded?
10      A.  Well, I wouldn't think that the -- boy, that's
11  such a broad question.
12      Q.  I'm just asking if you asked him.
13      A.  I think we talked about that before and I said
14  to the extent that he would have looked at them to do
15  the mixing, because there's instructions on the mixing.
16      Q.  Okay.  I think I recall that, but I don't know
17  if that was Janzen or this case.  So let's make sure.
18      A.  That's what I'm looking for, yeah.
19      Q.  Okay.  Make sure.
20      A.  And where I'm headed, I'll give you the page
21  once I get there.
22      Q.  Okay.
23      A.  Yes.  In fact, on 528.
24      Q.  I see it.  Instructions on the container.
25      A.  Yes.

Page 109

1      Q.  Okay.
2      A.  So I guess the answer would be yes.
3      Q.  And when he mixed the concentrate product, did
4  you ask him if he read the entire label from front to
5  back?
6      A.  Hopefully there's not a back because it's on
7  something.
8      Q.  Colloquial term.
9      Did you ask him if he read the entire label
10  from top to bottom?
11      A.  I just want to be accurate.
12      I don't know that I asked him if he read it
13  from top to bottom.  I asked him what he recalled about
14  the hazards and what he recalled about the label.  And
15  he recalled the mixing instructions, and that's not a
16  surprise because, as you've seen in my report, even
17  though best practices say that warnings should be
18  clearly a priority, it's not Monsanto's priority as the
19  first four levels to have any of the hazards
20  information, health and safety information, as any one
21  of the first four priorities.
22      Q.  Okay.  So you know, sitting here right now,
23  what Monsanto's priorities are?
24      A.  I know what they've said they are.
25      Q.  Okay.  So let's keep going.

28 (Pages 106 to 109)

Stephen E. Petty, PE, CIH, CSP

Page 110

1    A.  Let me -- let me just -- I want to -- since
2  you've asked the question, let's -- I just want to make
3  sure the record shows what I'm referring to.
4    Q.  Okay.
5    A.  Specifically what I'm talking on this report
6  is my analysis.  Remember, I said I used documents.
7  I'm not saying what's in their mind.  I'm saying what
8  these documents show.  And I have a document on page 5
9  of this report, figure 1-4, that says priority of
10 communication on their labels.  That's a Monsanto
11 document.  And the first four priorities have nothing
12 to do with health and safety.
13   Q.  Thank you for reading and interpreting that
14 document for me.
15   A.  I'm not interpreting.  I'm just showing you
16 what it says.  There's no interpretation required
17 there.  It's simply to read it.
18   Q.  Thank you for showing me what the document
19 says.  Let's keep going.
20       At location 7, the co-op, you got considerable
21 amount of information about how Mr. Pollard handled
22 Roundup at that facility, correct?
23   A.  I don't know how to answer that question.
24       I got the information that I asked about for
25 the various activites because he had multiple

Page 111

1  activities.  So I asked for the same information for
2  each of those activities.  There were just multiple
3  activities.
4    Q.  Did you ask him what other products he filled
5  shuttles on customers' trucks with?
6        In other words, beyond Roundup products, did
7  you ask him what other pesticides he would have handled
8  while filling shuttles in the facility?
9    A.  I did not ask him what other products he
10 filled shuttles.  I did not.
11   Q.  Why not?
12   A.  I don't know how to answer a question about
13 why I didn't ask something I didn't ask.  I'm not sure
14 logically how you can answer that question.
15   Q.  Okay.  That's fine.
16       What other pesticides -- did you ask him what
17 other pesticides they sold at the co-op?
18   A.  I think that's the same question.
19   Q.  No.  I asked what he handled but...
20   A.  No.  It's the same question because whatever I
21 asked him, I wrote down.  So we don't have to go too
22 long into this.  I mean, if I asked him, it would be
23 here, right?
24   Q.  Well, this isn't an official transcript
25 though, right?

Page 112

1    A.  Sure.  It's a -- I don't know what you mean by
2  that.  This is a reflection of stuff that he -- it's
3  not a -- what I mean by that is it's certainly not a
4  tape recording, but it's a reflection of all of the
5  pertinent information that I asked him, as best as I
6  can -- as I recalled.
7    Q.  Okay.  And you didn't find it pertinent to ask
8  him what other pesticides they sold at the co-op,
9  correct?
10   A.  I think I answered that question.
11   Q.  Okay.  And beyond specifically what other
12 pesticides they sold at the co-op, did you ask him when
13 he was filling shuttles at the co-op what he wore on
14 when he was filling shuttles with other pesticides at the
15 co-op?
16   A.  I didn't ask him what he wore on -- other than
17 PPE.
18   Q.  Yes.  That's what I'm asking about.
19   A.  The PPE questions are generic to that job.
20   Q.  So you believe it's his testimony -- or strike
21 that.
22       You believe that Mr. Pollard wore the same PPE
23 at the co-op no matter which pesticide he would have
24 been handling?
25   A.  That's not what I said.

Page 113

1    Q.  Okay.
2    A.  You're good at that, but that's not what I
3  said.
4        What I said was when I get done with a given
5  section, I will ask them, what source of PPE did you
6  wear?  First I have to explain what PPE is oftentimes,
7  but eventually they understand.  And I'll say, did you
8  wear any gloves when you were in that location and, if
9  so, what kind of gloves?  Did you wear a respirator?
10 You know, did you wear a rubber suit?
11       But the key ones are -- the reason I always
12 ask the respirator one is that's -- that's used as a
13 basic input parameter to the inhalation exposures if I
14 go in detail, because there's discounting associated
15 with the use of respirator.
16       And then on the glove side, that obviously has
17 an impact on the dermal potentially.  But mainly I ask
18 it because I don't, in some respects, since I'm asking
19 the question about what percentage of the skin area and
20 time did your hands get wet, it's secondary to best
21 information because I'm only interested in what gets to
22 the skin, regardless of whether there's glove material
23 on it or not.
24   Q.  And specifically here, you're only interested
25 in what Roundup got to the skin?

29 (Pages 110 to 113)

Stephen E. Petty, PE, CIH, CSP

Page 114

1  A. Ultimately when I ask questions about dermal
2  exposure, ultimately I'm asking those questions about
3  Roundup getting to the skin. That is correct.
4  Q. So -- and if you don't know the answer to
5  this, that's okay. Do you know if Mr. Pollard wore the
6  same PPE for handling other pesticides while working at
7  the co-op as he wore when handling Roundup?
8  A. There was almost no PPE worn. There was some
9  plastic gloves but only when cleaning nozzles and
10  unclean tankers. So it's kind of a null question.
11  Q. Okay. So my question is different because
12  it's your statement that there was almost no PPE worn.
13  What I'm trying to understand --
14  A. Well, there was no respirators worn, period.
15  Q. Okay. And what I'm trying to understand is
16  whether the statement "there is no PPE worn" from you,
17  under your understanding of the interview, applied to
18  all of his activities at the co-op or just his Roundup
19  activities at the co-op.
20  A. In general, it's my impression I'm asking if
21  he wore PPE, period.
22  Q. Got it. Okay. Now --
23  A. Because, remember, there's other sections
24  where I did ask about other products, and I'm asking
25  the same PPE questions. So it's consistent in that

Page 115

1  sense. I'm asking about the PPE where there's
2  occasions where he's listed other products as well.
3  Q. Okay. I think I might have asked this, but
4  I'm not sure, so I'm going to ask it to be sure.
5  A. Sure.
6  Q. Have you received the report of Dr. Phalen in
7  the Pollard case?
8  A. I believe so. I mean, they're a big stack on
9  the corner of my desk.
10  Q. Have you reviewed the pictures taken by
11  Dr. Phalen and other experts on the Pollard matter?
12  A. If I have, it's flipping through it. I've not
13  spent -- on all those reports, I haven't probably spent
14  fifteen minutes.
15  Q. Okay. Are you aware there were pesticides
16  observed on site visits by Dr. Phalen and other experts
17  of the Pollard properties that are not listed in your
18  exposure assessment?
19  A. I'm not, but I'm not sure it's relevant
20  because how does what's there today reflect what was
21  there twenty years ago?
22  Q. Okay.
23  A. I mean, that's always the issue. Remember the
24  issue you raised about, well, how about the containers
25  and the leaking and all that.

Page 116

1  I would do the same thing you're suggesting.
2  I would write down whatever I saw that day, but the
3  criticism would always be, how do you know that's what
4  was used three years ago, four years ago, five years
5  ago. And you don't have a time machine, so you can't
6  really answer that question.
7  Q. And it's up to the jury to decide what's
8  relevant, not you, right?
9  A. I don't know what that question has to do with
10  anything.
11  MR. KRISTAL: Well, it's up to the judge
12  first.
13  BY MR. KALAS:
14  Q. Okay. Now, if we go to page 541, you talk
15  about warnings, right?
16  A. Yes, sir. I do.
17  Q. Okay. Now, you asked him if he reviewed --
18  ever heard of the term material safety data sheet. We
19  talked about that. And he's told you 2000 or so,
20  right?
21  A. Yes.
22  Q. Okay. Did you ask him if in 2000 he reviewed
23  the material safety data sheet for the Roundup products
24  he was using at that time?
25  A. It depends on the meaning of reviewed. If

Page 117

1  you're asking did he have a full comprehension of those
2  warnings or not, I don't know. I don't know what's in
3  his mind and what he knew or didn't know.
4  He certainly was looking at the labeling
5  information before for the mix rates. There isn't a
6  priority on these things, on the labels anyway, for
7  warnings.
8  On the MSDSs, I've already talked at length in
9  here about the deficiencies in those and whether they
10  would be adequate to warn anyway. But as far as
11  whether I know the extent to which he read and
12  understood the MSDSs, I don't know.
13  Q. Okay. My question, in maybe review, was not
14  clear enough, so I will try to make it more narrow.
15  When you asked him about whether he ever heard
16  of the term material safety data sheet and he told you
17  around 2000, did you follow up and say or ask, in that
18  time when you first heard of it, around 2000, did you
19  look at the material safety data sheet for the Roundup
20  products you were looking at?
21  A. I'm confused. What other -- would there be a
22  different material data sheet than the ones he's
23  working with?
24  Q. Well, I'm confused -- let me tell you where
25  I'm confused about. You asked him in this warning

Stephen E. Petty, PE, CIH, CSP

Page 118

1    section, have you ever heard of the term material
2    safety data sheet generally, right?
3        A.  Right.
4        Q.  Okay.  And so I am trying to find out if there
5    was a follow-up question about whether or not he then,
6    after he heard of the term material safety data sheet,
7    looked at the material safety data sheet at all for
8    Roundup.
9        A.  I see what you're saying.
10       Q.  Okay.
11       A.  Well, that's the nature of the follow-up
12   question that's here, which is any training -- ever had
13   any training or knowledge about the hazards of Roundup
14   products.
15           And what I'm trying to get to there is the
16   reality of what I consider deficiencies in the MSDS
17   combined with the small print and all the difficulties
18   that are well documented in the literature about
19   reading MSDSs and trying to figure out what his
20   knowledge was of the hazards, where his, where he --
21   what he knew or what he thinks he knew.
22           And that's why I say -- then I go specifically
23   to the Roundup products.  And his knowledge was he
24   didn't think they had the potential to harm him, in
25   reviewing that.  That's what he said to me.  And it was

Page 119

1    re-enforced with this earlier meeting where he met with
2    reps who said it was safe enough to drink.
3            So his -- he's -- that's his knowledge base.
4    That's where -- what he told me about his knowledge of
5    the hazards.
6        MR. KALAS:  I'm going to move to strike as
7    not responsive.
8    BY MR. KALAS:
9        Q.  I just, because I don't have an official
10   transcript, I just want to know whether this specific
11   question I'm going to ask came out of your mouth when
12   you were talking to him.
13       A.  Okay.
14       Q.  Did you ask Mr. Pollard --
15       A.  Is that like I asked him instead of out of my
16   mouth?  Is that the polite way to say it?
17       MR. KRISTAL:  I'd give an Ace Ventura
18   scene, but I won't.
19   BY MR. KALAS:
20       Q.  Did you ask Mr. Pollard --
21       A.  It's the politeness factor that I'm concerned
22   about.
23       Q.  Did you ask Mr. Pollard, after you heard of
24   the term material safety data sheet --
25       A.  Yes, sir.

Page 120

1        Q.  -- did you look or consult the material safety
2    data sheet for Roundup.  Did those -- did that question
3    get asked by you?
4        A.  That's the intent of the follow-up question.
5    That's why what I tried to answer to you, which is, as
6    soon as I asked that question, then I say, with respect
7    to the Roundup products.  It's a follow-up from the
8    MSDS question, follows directly.
9        Q.  Okay.
10       A.  And that's where I'm trying to get not only
11   MSDS but the totality of his knowledge about the
12   hazards of Roundup products.
13       Q.  Okay.  So the question that you followed up --
14   the specific question you followed up --
15       A.  I apologize for interrupting you.  The
16   questions were asked in this order.
17       Q.  So these are the specific questions you would
18   have asked?
19       A.  Yes.
20       Q.  Okay.  And there --
21       A.  I mean, whether it would be word for word,
22   hopefully it would be very close but --
23       Q.  And there wouldn't have been questions in
24   between?
25       A.  There would have not been questions in -- if

Page 121

1    there were, I would have written the responses.
2        Q.  Okay.
3        A.  So, for example, when I asked him if he wore a
4    respirator -- that's the question, right -- and he says
5    yes, but then he's -- but he says only some of the
6    time.  Then I follow up with a question to get that
7    time frame and kind of that situation nailed down.
8            So when you say, is that just the question you
9    asked, well, if there's something in between, then I
10   try to indicate that.  That's all I'm telling you.
11       Q.  Now, I'm going to mark -- I think it's 10.
12       MS. SHIMADA:  10, yes.
13   BY MR. KALAS:
14       Q.  You state here Mr. Pollard told you he never
15   thought Roundup had the potential to harm him, right?
16       A.  Correct.
17       Q.  Okay.  I'm going to mark as Exhibit 10 the SDS
18   for Roundup Ultra Max Herbicide.
19       A.  Well, technically it's an MSDS but --
20       Q.  MSDS.  I will get it right before the day is
21   over.
22       A.  2016/17 is the crossover.
23           (Defendant's Exhibit 10 was marked.)
24   BY MR. KALAS:
25       Q.  And the effective date of this MSDS is 2001,

31 (Pages 118 to 121)

Stephen E. Petty, PE, CIH, CSP

Page 122

1  correct?
2      A.  Yes.  I'm just trying to give you the dates so
3  you'll know.
4      Q.  Right.  Now, he told you he never thought
5  Roundup had the potential to harm him.  Can you go down
6  to the hazards identification section.
7      A.  Okay.
8      Q.  Under emergency overview, does it say:
9  Caution, causes moderate eye irritation?
10     A.  It does.
11     Q.  Is moderate eye irritation a harm?
12     A.  Depends if you ask me or if you ask him.
13     Q.  Okay.  In your opinion, is moderate eye
14  irritation a harm?
15     A.  Theoretically, yes.  For most workers,
16  probably not.
17     Q.  Okay.
18     A.  I will tell you I've asked -- to answer that
19  question in a little more detail, I cannot tell you the
20  number of workers I've asked the question, If you saw
21  the word cancer, would you have paid more attention to
22  these warnings?  And the answer's almost a hundred
23  percent yes.  So the words do matter.
24         And that goes all the way -- by the way, that
25  goes all the way back to documents on warnings I

Page 123

1  reviewed back into the '50s where telling people it has
2  a potential to cause cancer gets their attention.
3  That's all I'm saying.
4      Q.  Okay.
5      A.  At the working level.
6      Q.  Does this say under -- strike that.
7         If you go to first aid measures.
8      A.  Where are you at?  I'm sorry.
9      Q.  Section 4.
10     A.  Section 4.  Next page.
11     Q.  Yeah.
12     A.  All righty.
13     Q.  Do you see first aid measures?
14     A.  Yes.
15     Q.  It says:  Skin contact, immediately wash
16  affected skin with plenty of water.
17         Did I read that correctly?
18     A.  Yes.
19     Q.  Okay.  Did Mr. Pollard wash affected skin with
20  plenty of water when Roundup came into contact with his
21  skin?
22     A.  I don't believe he did.
23     Q.  All right.  Let's move on.  You talk about the
24  fact that Mr. Pollard told you that during a winter
25  meeting in the 1990s, mid-1990s, a non-local Monsanto

Page 124

1  representative, he was wearing a Monsanto shirt, told
2  him Roundup was safe enough to drink.
3         Is that what you wrote here?
4      A.  Correct.
5      Q.  Now, how did Mr. Pollard know that the person
6  who told him Roundup was safe enough to drink was a
7  Monsanto representative?
8      A.  Because he said he was wearing a Monsanto
9  shirt and he asked him about Roundup.
10     Q.  Okay.  Can I purchase a Monsanto shirt, even
11  though I don't work for Monsanto?
12     A.  I don't know.
13     Q.  Okay.  Have you looked into that to verify
14  this individual worked for Monsanto?
15     A.  I can't -- I don't have a time machine.
16     Q.  Have you --
17     A.  I mean, if I could go back into the 1990s, I
18  guess I could go ask him.
19     Q.  Have you ever worn -- what's your favorite
20  sports team?
21     A.  Seattle Seahawks.
22     Q.  Okay.  Have you ever worn a Seahawks piece of
23  gear, a shirt, a hat?
24     A.  Never have.
25     Q.  Okay.  Have you seen other people wear it?

Page 125

1      A.  Oh, sure.
2      Q.  Do you assume those people work for the
3  Seahawks because they're wearing the shirt?
4      A.  I've never really even thought about that.  I
5  don't even know how to answer that question.  I don't
6  know.  I don't know.
7      Q.  Okay.  Okay.  Now, why don't we stop the
8  Pollard portion of our fun, and I'll turn the witness
9  over to Mr. Kristal.
10         THE WITNESS:  Thank you, sir.
11         MR. KRISTAL:  3:37, is that the current
12     time?
13         THE WITNESS:  Thank you.
14         MR. KALAS:  Yeah.
15            CROSS EXAMINATION
16  BY MR. KRISTAL:
17     Q.  Could you take the MSDS sheet.
18     A.  Sure.
19     Q.  Okay.  You note in your interview of
20  Mr. Pollard that the shift from Ultra to Power Max
21  happened at some point in time with a span from 1996 to
22  2014.
23         I'm just looking -- if you could look at
24  your --
25     A.  Oh, I see what you're saying.  Do you have a

32 (Pages 122 to 125)

Stephen E. Petty, PE, CIH, CSP

Page 126

1   page number, Jerry, real quick or you want me to --
2       Q.  Well, it's mentioned in a number of occasions
3   but, for example, 530.
4       A.  Just to speed me up.
5       Q.  The paragraph under the distance, it says from
6   1996 to April 2014, product changed from Ultra to Power
7   Max at some point in time.
8       A.  Yes.
9       Q.  And is that repeated throughout when he was
10  talking about that change from Ultra Max to Power Max?
11  I'm trying to find others so I can move this along.
12      A.  Yeah.  On 531 it says the same thing.
13      Q.  Okay.  Also if you look at 524, number 1,
14  roman numeral -- small roman numeral three, iii.
15  Aye-yi-yi.
16      A.  Pretty funny.
17      Q.  Product changed from Ultra Power Max at some
18  point --
19      A.  Yes.
20      Q.  Is there any way to know if the MSDS sheet
21  dated August 24th, 2001, was even the MSDS sheet that
22  was available at the time that Mr. Pollard was exposed
23  to Roundup Ultra Max?
24          MR. KALAS:  Objection to form.
25

Page 127

1   BY MR. KRISTAL:
2       Q.  In other words, if he started using Ultra Max
3   before that or after that, would this be the operative
4   MSDS?  Is there any way to tell that?
5       A.  He says -- this one's Ultra Max.  So we don't
6   know when that transition occurred, so we don't know
7   whether this is relevant or not.
8       Q.  Were you asked in the Pollard case, in part,
9   to conduct a standard industrial hygiene exposure
10  assessment with respect to Roundup in terms of the
11  number of events and the number of hours?
12      A.  I was.
13          MR. KALAS:  Objection to form.
14          THE WITNESS:  Woops, I'm sorry.
15  BY MR. KRISTAL:
16      Q.  What were you asked to do with respect to
17  Mr. Pollard specifically in terms of an exposure
18  assessment?  What were you asked to do?
19      A.  I was specifically asked to look at his
20  Roundup exposures in terms of events and times and
21  activities.
22          But it's really -- it's really my decision to
23  ask the broader questions about his work history and
24  his other exposures to other products.  I mean, that
25  really wasn't technically what I was asked to do, but I do

Page 128

1   that out of completeness.
2       Q.  Okay.  Were you asked to, in terms of
3   preparing an exposure assessment to Roundup, to look at
4   every possible source of an exposure to any carcinogen
5   throughout his entire life?
6       A.  No.
7       Q.  Were you asked to look at every possible
8   contaminant in any form that he ever had in his entire
9   life?
10      A.  No.  And I've never been asked that in any
11  project I've ever been involved in.
12      Q.  Did the type of tractor fuel that he used one
13  way or the other address his exposures to Roundup?
14      A.  No.
15      Q.  Whether he had well water or some other source
16  of water, does that tell you with respect to exposures
17  to Roundup, except for whatever might be in the water?
18  Is that relevant in any other way?
19          MR. KALAS:  Objection to form.
20          THE WITNESS:  No.
21  BY MR. KRISTAL:
22      Q.  Whether there was a burn pit or not a burn pit
23  on the farm, does that address the question of exposure
24  to Roundup?
25      A.  Not unless he was burning containers with,

Page 129

1   spec containers with Roundup in them.
2       Q.  Okay.  In your report do you discuss at
3   various times different requirements under FIFRA, the
4   Federal Insecticide, Fungicide, and Rodenticide Act?
5       A.  I do.
6       Q.  And do you discuss specifically, for example,
7   requirements under FIFRA as to labeling?
8       A.  I do.
9       Q.  And do you address requirements under FIFRA
10  with respect to advertising and promotion of
11  pesticides?
12      A.  Yes.
13      Q.  And do you compare that to what Monsanto
14  actually did in terms of -- let's start with
15  labeling -- what the requirements require and what
16  Monsanto did?
17      A.  I do.
18      Q.  Do you compare --
19      A.  Or I did.
20          MR. KALAS:  Let me -- sorry.  Let me
21  object to form to the last question.
22          Go ahead.
23  BY MR. KRISTAL:
24      Q.  Did you compare the requirements of FIFRA for
25  reporting data to the EPA and compare it to whether or

33 (Pages 126 to 129)

Stephen E. Petty, PE, CIH, CSP

Page 130

1   not Monsanto provided EPA with certain data?
2        MR. KALAS:  Same objection.
3        THE WITNESS:  Yes.
4   BY MR. KRISTAL:
5        Q.   Did you compare what FIFRA requires with
6   respect to advertising and promotion with what Monsanto
7   actually did with respect to Roundup in terms of
8   advertising and promotion?
9        MR. KALAS:  Same objection.
10       THE WITNESS:  Yes.
11   BY MR. KRISTAL:
12       Q.   Did you look at the requirements of the
13   International Code of Conduct for the pesticide
14   industry, which over the years has had a change of
15   names?
16       A.   Correct.  And they had multiple standards, if
17   you want to call it that, and I looked at several of
18   those.
19       MR. KALAS:  Same objection.
20   BY MR. KRISTAL:
21       Q.   Okay.  Did you look at the labeling standard?
22       A.   I did.
23       Q.   Did you look at the advertising and promotion
24   standard under the International Code of Conduct?
25       A.   I did.

Page 131

1        Q.   And did you compare that, those standard
2   requirements, to what Monsanto actually did with
3   respect to labeling, for example?
4        A.   I did.
5        MR. KALAS:  Same objection.
6   BY MR. KRISTAL:
7        Q.   And did you compare the International Code of
8   Conduct requirements to what Monsanto actually did with
9   respect to advertising and promotion?
10       MR. KALAS:  Same objection.
11       THE WITNESS:  I did.
12   BY MR. KRISTAL:
13       Q.   If you look at page 241 of the report, you
14   were asked to -- I'm sorry, 242 -- you were asked about
15   the opinion at the top of 242 in the brackets, quote:
16   Monsanto clearly demonstrates that they will not be
17   bound simply by laws or regulation in terms of doing
18   what is right, end quote.  Do you see that?
19       A.   Yes.
20       Q.   Okay.  And on the prior page, do you quote
21   specifically a document which has a statement by you,
22   Grant, the chairman, president, and CEO of Monsanto at
23   the time?
24       A.   Yeah.  That's the basis for my opinion.
25       Q.   And did you quote Mr. Grant as saying, quote,

Page 132

1   that means we always need to do what is right even when
2   we are faced with situations not governed by specific
3   laws or regulations, end quote?
4        A.   I did.
5        Q.   So was the opinion that you expressed on 242
6   tied specifically to, in part, to what Mr. Grant
7   himself said in a Monsanto document?
8        MR. KALAS:  Objection to form.
9        Go ahead.
10       THE WITNESS:  Yes.
11   BY MR. KRISTAL:
12       Q.   Were you reading Mr. Grant's mind or reading
13   what he actually wrote?
14       MR. KALAS:  Objection to form.
15       THE WITNESS:  I can't read his mind, so I
16       was clearly reading -- I was basing it on the
17       document, on what was written.
18   BY MR. KRISTAL:
19       Q.   Okay.  On page 95 and 96 you were asked the
20   question -- I'm sorry, on page 96 you were asked the
21   question --
22       A.   I am there.
23       Q.   -- with respect to the field of industrial
24   hygiene, up top --
25       A.   Yes.

Page 133

1        Q.   -- first paragraph of your opinion, being
2   devoted in part to erring on the side of public health
3   in controlling hazards that may cause public health
4   issues?
5        A.   Correct.
6        Q.   And was that statement taken directly from the
7   American Industrial Hygiene Association's definition of
8   the field of industrial hygiene?
9        MR. KALAS:  Objection to form.
10       THE WITNESS:  It was.
11   BY MR. KRISTAL:
12       Q.   Okay.  So are you reading the AIHA's mind or
13   just simply articulating what it is that they have said
14   in terms of defining their own profession?
15       MR. KALAS:  Objection to form.
16       THE WITNESS:  I'm never reading anybody's
17       mind.  I'm always basing my opinions on
18       documents, on what is written.
19       MR. KRISTAL:  Those are all the questions
20   I have.
21       MR. KALAS:  I just have a -- I think two
22   follow-ups.
23       MR. KRISTAL:  It's 3:47.
24       MR. KALAS:  Okay.  3:47, back on my time.
25   I'm going to mark as Exhibit 11 a MSDS for

34 (Pages 130 to 133)

Stephen E. Petty, PE, CIH, CSP

Page 134

1    Roundup Power Max Herbicide.
2        (Defendant's Exhibit 11 was marked.)
3            REDIRECT EXAMINATION
4    BY MR. KALAS:
5    Q.  Does that appear to be from 2007?
6    A.  It does.
7    Q.  Okay.  Is that during the time period in which
8    Mr. Pollard was using Ultra Max and/or Power Max?
9        MR. KRISTAL:  Objection to form.
10       THE WITNESS:  I just want to check on
11   location 7.
12   BY MR. KALAS:
13   Q.  Sure.
14   A.  I think my answer is the same as before, is
15   that there was a transition between the Ultra and Power
16   Max, at least that's what he told me, in terms of what
17   they were using.
18       What I'm trying to say is I don't know when
19   that transition occurred, so I don't know whether this
20   is relevant or not.  It's still -- it's in that
21   intervening period, but it could be or it could not be.
22   Q.  Got it.
23       Okay.  Other question, did you ask -- you
24   talked a little bit with Mr. Kristal just now about
25   advertisements.  Did you ask Mr. Pollard if he had

Page 135

1    observed any advertisements for Roundup?
2    A.  I did not ask him if he'd seen advertisements
3    for Roundup.
4        MR. KALAS:  Okay.  I don't have any more
5    questions unless you do.
6        MR. KRISTAL:  With respect to --
7        MR. KALAS:  What time?  Sorry.
8        THE VIDEOGRAPHER:  3:48.
9            RECROSS EXAMINATION
10   BY MR. KRISTAL:
11   Q.  With respect to the information you may have
12   obtained during your master's program with respect to
13   marketing, what effect do advertisements have
14   generally, whether or not somebody has seen an ad with
15   respect to certain products?
16       MR. KALAS:  Objection to form.
17       THE WITNESS:  Well, recall, I think my
18   earlier testimony -- and counsel said he was
19   sad it was this way.  But I said that the
20   three forms -- the three ways simply that one
21   can persuade someone else is through emotional
22   appeal, propaganda, which doesn't -- it's not
23   a negative term.  It just means saying the
24   same thing over and over again, you know, pay
25   your fair share or something like that, which

Page 136

1    is said often enough, whether it's true or
2    not, people will tend to believe.  And then
3    last -- and unfortunately, when I was a
4    scientist, logic was viewed as the least
5    effective way to persuade.
6        So when you look at the Hawaii literature
7    and the stuff that was on the ITO website
8    where it compares Roundup to innocuous other
9    materials, table salt, whatever, it's really
10   based on the emotional appeal aspect of
11   marketing, which is to imply emotionally that
12   this is just the same -- or if you say it's
13   just as safe as baby shampoo, which was also
14   said in documents that I've cited in this
15   report, those are emotional appeal arguments
16   because they're -- the intent from a marketing
17   standpoint is to persuade people that the
18   product is safe.
19       I don't know what's in their minds, but I
20   do know from a pure marketing standpoint, from
21   being trained in marketing and the art of
22   persuasion, that's the intent as far as when
23   you make a comparison of something that in
24   this case would be generally viewed as safe,
25   as opposed to something that we'll argue about

Page 137

1    what it is, but it's going to imply that it's
2    safe.
3        And that's done intentionally in marketing
4    all the time because it's based on the concept
5    of emotional appeal.
6        MR. KRISTAL:  That's all I have.
7        MR. KALAS:  Okay.  I think we're off the
8    record in Pollard.
9        THE VIDEOGRAPHER:  3:51 p.m.  Going off
10   the record.  This marks the end of the
11   deposition.
12       (Deposition concluded at 3:51 p.m.)
13       (Signature not waived.)
14
15
16
17
18
19
20
21
22
23
24
25

35 (Pages 134 to 137)

Stephen E. Petty, PE, CIH, CSP

**Page 138**

1             CERTIFICATE OF DEPONENT

2

3     STATE OF FLORIDA

4     COUNTY OF PALM BEACH

5

6         I, the undersigned, declare under penalty of

7    perjury that I have read the foregoing transcript, and I

8    have made any corrections, additions, or deletions that

9    I was desirous of making; that the foregoing is a true

10   and correct transcript of my testimony contained herein.

11       EXECUTED this _____ day of _____,

12   20___, at _____, _____.

13       (City)     (State)

14

15

16           _____

17        STEPHEN E. PETTY, PE, CIH, CSP

18

19

20

21

22

23

24

25

**Page 139**

1           ERRATA SHEET

2    RECORD CHANGES HERE - DO NOT WRITE ON THE TRANSCRIPT

3    IN RE: Pollard vs Monsanto Company

4    DATE: Wednesday, November 6, 2019

5    PAGE LINE   CHANGE     REASON

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   Under penalties of perjury, I declare that I have read

      the foregoing document and that the facts stated in it

23   are true

24   _____    _____

25   Date       STEPHEN E. PETTY, PE

**Page 140**

1            CERTIFICATE OF OATH

2

3

     STATE OF FLORIDA

4

     COUNTY OF PALM BEACH

5

6

7        I, Lori G. Erwin, Registered Professional

8    Reporter, Notary Public, State of Florida, certify that

9    STEPHEN E. PETTY, PE, CIH, CSP, personally appeared

10   before me on the 6th day of November, 2019, and was duly

11   sworn.

12

13       Signed this 11th day of November, 2019.

14

15

16

17          _____

18        Lori G. Erwin, RPR

         Notary Public, State of Florida

19       My Commission GG 297744

         Expires: 02/16/2023

20

21

22

23

24

25

**Page 141**

1          CERTIFICATE OF REPORTER

2

3    THE STATE OF FLORIDA

4    COUNTY OF PALM BEACH

5

6        I, Lori G. Erwin, Registered Professional

7    Reporter, do hereby certify that I was authorized to

     and did stenographically report the deposition of

8    STEPHEN E. PETTY, PE, CIH, CSP; that a review of the

     transcript was requested; and that the foregoing

9    transcript, pages 4 through 137, is a true and

     complete record of my stenographic notes.

10      I further certify that I am not a relative,

     employee, attorney, or counsel of any of the parties,

11   nor am I a relative or employee of any of the

     parties' attorney or counsel connected with the

12   action, nor am I financially interested in the

     action.

13

14      The foregoing certification of this transcript

     does not apply to any reproduction of the same by any

15   means unless under the direct control and/or

     direction of the certifying reporter.

16

17     Dated this 11th day of November, 2019.

18

19

20         _____

21        Lori G. Erwin, RPR

         Registered Professional Reporter

22

23

24

25

36 (Pages 138 to 141)