# EXHIBIT 11

Stephen E. Petty, PE, CIH, CSP

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


IN RE:  ROUNDUP PRODUCTS          MDL No. 2741
LIABILITY LITIGATION              Case No. 3:16-md-02741-VC

This document relates to:

Dickey v. Monsanto Company
Case No. 3:19-cv-04102-VC

Domina v. Monsanto Company
Case No. 3:16-cv-05887-VC


_____x




VIDEOTAPED
DEPOSITION OF:    STEPHEN E. PETTY, PE, CIH, CSP

IN RE:           Domina v. Monsanto Company

DATE TAKEN:      Tuesday, November 5, 2019

START TIME:      2:17 p.m.

LOCATION:        Best Western Plus Oceanside Inn
                 1180 Seabreeze Boulevard
                 Fort Lauderdale, Florida  33316

COURT REPORTER:  Dianne N. Sarkisian, CSR, RPR,
                 Notary Public - State of Florida.

Stephen E. Petty, PE, CIH, CSP

---

**Page 2**

1   APPEARANCES:
2
3       JERRY KRISTAL, ESQUIRE
        Weitz & Luxenberg
4       700 Broadway
        New York, New York  10003
5       (212) 558-5500
        jkristal@weitzlux.com
6
            Appearing on behalf of the Plaintiff.
7
8
9       ANTHONY N. UPSHAW, ESQUIRE
        MELISSA R. ALVAREZ, ESQUIRE
10      McDermott Will & Emery LLP
        333 SE Second Avenue
11      Suite 4500
        Miami, Florida  33131
12      (305) 347-6551
        aupshaw@mwe.com
13      malvarez@mwe.com
14
15
16  ALSO PRESENT:
17      Danielle DeSantis, Video Technician
18
19
20
21
22
23
24
25

---

**Page 4**

1   DEFENDANT'S EXHIBIT 8, FACTUAL        10
    SUMMARY AND EXPERT OPINIONS REPORT,
2   IN RE: DOMINA
3   DEFENDANT'S EXHIBIT 9, MATERIALS       11
    CONSIDERED LIST
4
    DEFENDANT'S EXHIBIT 10, LABEL REVIEW   72
5   MANUAL, CHAPTER 7
6   DEFENDANT'S EXHIBIT 11, LABEL REVIEW   80
    MANUAL, CHAPTER 10
7
    DEFENDANT'S EXHIBIT 12, 40 CFR         94
8   SECTION 158.500
9   DEFENDANT'S EXHIBIT 13, EPA NEWS       107
    RELEASES FROM HEADQUARTERS
10
11  DEFENDANT'S EXHIBIT 14,                124
    AUGUST 7, 2019 LETTER
12  PLAINTIFF'S EXHIBIT 15, OEHHA          135
    STATEMENT RE: US EPA'S PRESS RELEASE
13  AND REGISTRANT LETTER ON GLYPHOSATE
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1               INDEX
2   Witness                    Page
    Stephen E  Petty, P E
3
4   DIRECT EXAMINATION
    BY MR  UPSHAW:              6
5
    CROSS EXAMINATION
6   BY MR  KRISTAL:            132
7   REDIRECT EXAMINATION
    BY MR  UPSHAW:            149
8
9
10
            EXHIBITS
11
12  Exhibit                    Page
    (Exhibits attached to transcript )
13
14  DEFENDANT'S EXHIBIT 1, MONSANTO        6
    COMPANY'S AMENDED NOTICE TO TAKE ORAL
15  AND VIDEOTAPED DEPOSITION OF STEPHEN
    E  PETTY
16  DEFENDANT'S EXHIBIT 2, SUMMARY OF      7
    EXPERT WITNESS CASES
17
    DEFENDANT'S EXHIBIT 3, DECEMBER 12,    7
18  2017 LETTER
19  DEFENDANT'S EXHIBIT 4, OVERVIEW OF     7
    FACTORS AFFECTIVE DERMAL ABSORPTION
20  OF GLYPHOSATE THROUGH THE SKIN
21  DEFENDANT'S EXHIBIT 5, PETTY REVIEW    7
    COMMENTS ON DAVIES DERMAL REPORTS
22
    DEFENDANT'S EXHIBIT 6, STEPHEN E       7
23  PETTY CURRICULUM VITAE
24  DEFENDANT'S EXHIBIT 7, EXPERT WITNESS  8
    CONSULTING AGREEMENT OF STEPHEN PETTY
25

---

**Page 5**

1   Fort Lauderdale, Florida
2   Tuesday, November 5, 2019
3   2:17 p.m.
4       VIDEO TECHNICIAN:  We are now on the
5   record.  My name is Danielle DeSantis.  I'm a
6   videographer for Golkow Litigation Services.  Today's
7   date is November 5th, 2019, and the time is 2:17 p.m.
8   This video deposition is being held in Fort
9   Lauderdale, Florida, in the matter of Domina versus
10  Monsanto Company, for the United States District
11  Court, Northern District of California.  The deponent
12  is Stephen E. Petty.
13      Would counsel please identify themselves.
14      MR. KRISTAL:  Jerry Kristal from Weitz &
15  Luxenberg for the Plaintiffs.
16      MR. UPSHAW:  Anthony Upshaw from McDermott
17  Will & Emery for Defendant.
18      MS. ALVAREZ:  Melissa Alvarez of McDermott
19  Will & Emery, also for the Defendant.
20      VIDEO TECHNICIAN:  The court reporter is
21  Dianne Sarkisian, and will now swear in the witness.
22      COURT REPORTER:  Sir, do you swear, the
23  testimony you're about to give is the truth, the whole
24  truth, and nothing but the truth?
25      THE WITNESS:  I do.

---

Stephen E. Petty, PE, CIH, CSP

---

Page 6

1    COURT REPORTER: Thank you
2    STEPHEN E Petty, PE, CIH, CSP,
3    was thereupon called as a witness herein, and after
4    having first been duly sworn or affirmed to testify to
5    the truth, was examined and testified as follows:
6           DIRECT EXAMINATION
7    BY MR UPSHAW:
8    Q   Mr Petty, good afternoon
9    A   Good afternoon
10          (DEFENDANT'S EXHIBIT 1, MONSANTO
11          COMPANY'S AMENDED NOTICE TO TAKE ORAL
12          AND VIDEOTAPED DEPOSITION OF STEPHEN E
13          PETTY WAS MARKED FOR IDENTIFICATION )
14   BY MR UPSHAW:
15   Q   We're together at this time on the Domina versus
16       Monsanto company case  I'm going to hand you what's
17       been marked as Exhibit 1, and ask if you've seen this
18       deposition notice before?
19   A   No, but I saw a version very similar to it with a
20       different addre -- the only difference would be, I saw
21       one with a different deposition location, but the
22       balance of it I think is the same to the one I've seen
23       earlier
24   Q   In a previous deposition we talked about a number of
25       exhibits in what was the Dickey deposition this

---

Page 7

1    morning.  You provided copies of several documents
2    that you had prepared since the time you have prepared
3    your factual summary and expert opinions report,
4    correct?
5    A.  Similars, that's true.
6    Q.  If we can stipulate with you and counsel that we will
7        refer to Exhibits 2 through 7...
8           MR. KRISTAL:  Um-hum.
9           MR. UPSHAW:  2 through 7 of the Dickey
10       deposition, we won't attach them to this deposition;
11       is that all right with you?
12          THE WITNESS:  Sure.
13          MR. UPSHAW:  Mr. Kristal?
14          MR. KRISTAL:  Sure.
15          (DEFENDANT'S EXHIBIT 2, SUMMARY
16          OF EXPERT WITNESS CASES)
17          (DEFENDANT'S EXHIBIT 3, DECEMBER 12,
18          2017 LETTER)
19          (DEFENDANT'S EXHIBIT 4, OVERVIEW OF
20          FACTORS AFFECTIVE DERMAL ABSORPTION
21          OF GLYPHOSATE THROUGH THE SKIN)
22          (DEFENDANT'S EXHIBIT 5, PETTY REVIEW
23          COMMENTS ON DAVIES DERMAL REPORTS)
24          (DEFENDANT'S EXHIBIT 6, STEPHEN E.
25          PETTY CURRICULUM VITAE)

---

Page 8

1           (DEFENDANT'S EXHIBIT 7, EXPERT WITNESS
2           CONSULTING AGREEMENT OF STEPHEN PETTY)
3    BY MR UPSHAW:
4    Q   Okay  Included in -- I'm sorry -- included in those
5        documents was your CV  Let me run through them to
6        make sure we know what we're talking about  I think
7        Exhibit 2 was your summary of expert cases?
8    A   Correct, as well as deposition and trial testimony
9    Q   Right  And that hasn't changed since this morning?
10   A   No
11          MR. KRISTAL:  Well, you have to add this
12       morning still -- just kidding
13          MR  UPSHAW:  The list hadn't changed
14   BY MR UPSHAW:
15   Q   Number 3 was a document dated December 12, 2017, is
16       the EPA intended residential exposure assessment for a
17       registration review, and we discussed that this
18       morning, correct?
19   A   We didn't really discuss it, but we -- briefly we did
20   Q   Well, we discussed why you had it today?
21   A   Correct
22   Q   We didn't go into the details of the document?
23   A   You're correct
24   Q   That was Number 3
25          Number 4 was an overview of factors

---

Page 9

1    affecting dermal absorption of glyphosate through the
2    skin, and we talked about why you created this
3    document?
4    A.  That is correct.
5    Q.  And that you would at some point in subsequent factual
6        summary and expert opinion reports absorb it into your
7        report?
8    A.  Correct.  We went to the point of showing where we
9        would absorb it, yes.
10   Q.  Number 5 for that deposition as well as this is your
11       review comments on Davies dermal reports dated
12       November 1, 2019, correct?
13   A.  Correct.
14   Q.  And we discussed that I think in some detail this
15       morning?
16   A.  In some detail, yes.
17   Q.  Number 6 was your CV?
18   A.  Correct.
19   Q.  And Number 7 was your...
20          MR. KRISTAL:  Administrative file.
21   BY MR. UPSHAW:
22   Q.  Yeah.  Your invoices and retention letter?
23   A.  Correct.
24   Q.  Do you have any documents with regard to Mr. Domina's
25       case that are specific to his case that we didn't

---

Stephen E. Petty, PE, CIH, CSP

## Page 10

1 discuss this morning that you brought with you today?
2 A Other than the outline of factual summary and the
3 expert reports as well as the attached interview and
4 then the calculations
5 (DEFENDANT'S EXHIBIT 8, FACTUAL SUMMARY
6 AND EXPERT OPINIONS REPORT, IN RE:
7 DOMINA WAS MARKED FOR IDENTIFICATION )
8 BY MR UPSHAW:
9 Q Perfect, which is where I was going to go next So
10 we're going to mark Mr Domina's factual summary and
11 expert opinions report as Exhibit 8 for his
12 deposition, okay, and you have a copy in front of you?
13 A I do
14 Q I'll mark this one, and those changes we'll have to go
15 back over
16 MR KRISTAL: You want to do that now?
17 MR UPSHAW: Yeah, I was going to say --
18 MR KRISTAL: Page 63?
19 MR UPSHAW: So let me ask the question and
20 we'll let the witness do it
21 BY MR UPSHAW:
22 Q Are there any corrections that you would like to make
23 to Mr Domina's report?
24 A Yes, sir I'd like to make, uh On page 63, top of
25 the page there are, uh, in the original there were two

## Page 11

1 bullets before section 4.5.6. The second bullet I've
2 eliminated.
3 Q. I understand there's one other?
4 A. And then...
5 MR. KRISTAL: 257.
6 A. Page 257.
7 BY MR. UPSHAW:
8 Q. And your references?
9 A. And it's the first... There's a continuation of a
10 bullet from the previous page, but the first bullet
11 indicated, where it starts with, he was provided, uh,
12 the third line down between, uh, the word "not" has
13 been added.
14 Q. It's in the first bullet point on that page, right?
15 A. Correct.
16 Q. I just noticed, the next bullet point says, did not?
17 A. Correct.
18 Q. Okay. Any more corrections, additions or deletions to
19 Mr. Domina's report?
20 A. No.
21 (DEFENDANT'S EXHIBIT 9, MATERIALS
22 CONSIDERED LIST WAS MARKED FOR
23 IDENTIFICATION.)
24 BY MR. UPSHAW:
25 Q. We previously marked in the Dickey deposition your

## Page 12

1 materials considered list dated November 4, 2019.
2 That was marked as Exhibit 9. Can we all stipulate
3 that it hasn't changed from this morning?
4 A. That's correct, yes.
5 MR. UPSHAW: And we'll use that in this
6 deposition as well, Mr. Kristal?
7 MR. KRISTAL: Yes.
8 MR. UPSHAW: That's one less document we
9 have to worry about.
10 BY MR. UPSHAW:
11 Q. Have you prepared any demonstratives or exhibits that
12 you created that you have not brought with you?
13 A. That's an interesting question.
14 I guess technically the answer would be
15 yes, but I probably don't intend to uti -- in other
16 words, if I put a, uh... If I put in a figure where
17 I've highlighted text or something like that, what I
18 do physically is download the document, save it in
19 PDF. Then I use PDF to highlight. Then I use another
20 program to convert it to jpgs, the whole document, and
21 then I cut out the page, I save that as a jpg, then I
22 move that into PowerPoint, the particular page I want,
23 and then I'll put a box around or whatever I want to
24 add to it, if I add anything, and then I save
25 PowerPoint as a jpg, and take it back into the jpg

## Page 13

1 function. And what do I want to say? You hit the
2 enhance button so it makes the darks look dark and
3 whatever, and then I use that as a jpg file and put it
4 in.
5 So in that process, I'm going to create
6 many, many pages out of a document that are jpgs. I
7 may only use the one, but technically I guess those
8 other pages could be material that could be used, I
9 guess, but there's not the intent to use it, but when
10 I'm going to take a document and create some sort of
11 figure for these reports, you know, like on pages 186
12 and 187, I'm doing all of this by converting things to
13 jpg, moving into PowerPoint, working with 'em, moving
14 'em back into jpgs, and then pulling 'em into Word.
15 So there's... I'm going to have all the
16 other pages other than the ones I use that are
17 technically there as demonstratives, I guess, but I
18 don't really have any reason to use those pages. Does
19 that make any sense? I'm just trying to technically
20 answer your question correctly.
21 Q. Understood that you're trying to technically answer
22 it.
23 Let me focus my question a little better.
24 Have you created any exhibits you intend to
25 use at trial?

Stephen E. Petty, PE, CIH, CSP

Page 14

1  A.  No.
2  Q.  Have you created any PowerPoints that you intend to
3      use at trial?
4  A.  I have not.
5          MR. KRISTAL:  Just as a heads-up, we may
6      use some of the figures or things in the report --
7          MR. UPSHAW:  Sure.
8          MR. KRISTAL:  -- as demonstratives at trial
9      with Mr. Petty.
10         MR. UPSHAW:  Understood.  Thank you.  Yes,
11     understood.
12         MR. KRISTAL:  Not at all.
13 BY MR. UPSHAW:
14 Q.  My question was --
15         MR. KRISTAL:  No, I understood your
16     question.
17         MR. UPSHAW:  Right.
18         MR. KRISTAL:  I just didn't want there to
19     be some misunderstanding.
20         THE WITNESS:  And to add to that, I mean,
21     obviously versions of what are in Word are also
22     available on my computer in jpgs or pngs as well as in
23     PowerPoint.
24 BY MR. UPSHAW:
25 Q.  Sure.

Page 15

1  A.  But the ones I intend to use, so far, I put in the
2      report.
3  Q.  Right.  My question was beyond that understanding, as
4      Mr. Kristal, you can pull whatever you want to pull on
5      these and create them.
6          Have you at this point created any
7      demonstratives or exhibits?
8  A.  But I'm just saying, when I think of demonstratives, I
9      think of writing something in PowerPoint.  That's why
10     I was trying to answer your question as correctly as I
11     could.
12 Q.  And have you done that, I guess, with the intent to
13     use it at trial?
14 A.  I have not.
15 Q.  Okay.
16 A.  I've done it with the intent to put it in these
17     reports.
18 Q.  All right, thank you.
19         Okay.  Let's shift then directly to
20     Appendix F of Mr. Domina's report.
21         MR. KRISTAL:  516, actually.
22         MR. UPSHAW:  Sorry, I meant G.
23         MR. KRISTAL:  I have 529 maybe.
24         MR. UPSHAW:  '17.
25         MR. KRISTAL:  7... '17?

Page 16

1          THE WITNESS:  Do you want G or F, I'm
2      sorry, sir?
3  BY MR. UPSHAW:
4  Q.  We're going to go to his interview first.
5  A.  Okay.  So we're going to F.
6          MR. KRISTAL:  That's at 516, isn't it?
7          MR. UPSHAW:  Did you say 516?  Anyway...
8          MR. KRISTAL:  Well, the title, Appendix F,
9      Larry Domina's interview is 516.
10         MR. UPSHAW:  Okay.  We're being extremely
11     accurate.
12         MR. KRISTAL:  No.  Actually you were more
13     accurate this time 'cause technically the interview
14     starts on 517.
15 BY MR. UPSHAW:
16 Q.  You spoke to Mr. Domina on two occasions?
17 A.  I did.
18 Q.  Two separate phone calls within five days of each
19     other?
20 A.  Correct.
21 Q.  Both telephone interviews?
22 A.  Both were telephone interviews.
23 Q.  Were there any more than telephone interviews, meaning
24     were they Skype, FaceTime, or any type of facial
25     interaction?

Page 17

1  A.  They were not.  They were audible only.
2  Q.  Have you ever seen Mr. Domina?
3  A.  I have not.
4  Q.  On the first interview you have listed...  Well, let
5      me ask this:  On your Appendix F, you had outside
6      parties listed as Ms. Greenwald, Mr. Hans, and Mr.
7      Domina as attending the interview.  Did they attend
8      both interviews?
9  A.  Well, we should clarify Domina.  ██████ was his
10     brother who is also an attorney.  I just want to make
11     that distinction.  When you say Domina, we have the
12     plaintiff and we have the attorney.
13 Q.  We should...  We should delineate in this case, of
14     course, between Mr. Larry Domina and ██████.
15 A.  That's correct.
16 Q.  ██████ is the attorney?
17 A.  He's one of the attorneys, yes.
18 Q.  Right.  But the plaintiff here is Attorney Larry
19     Domina?
20         MR. KRISTAL:  I don't think he's an
21     attorney.
22         MR. UPSHAW:  I was going to say, I didn't
23     mean that.
24 BY MR. UPSHAW:
25 Q.  But the plaintiff here is Larry Domina?

Stephen E. Petty, PE, CIH, CSP

Page 18

1   A.  Correct.
2   Q.  Is Larry... Are Larry and ███ related?
3   A.  My understanding is that they are.
4   Q.  And what is their relation?
5   A.  I believe they're brothers.
6   Q.  Okay.
7   A.  I'm not certain of that, but I'm pretty sure they are.
8   Q.  All right.  On the July 26th interview, who other than
9       Larry Domina was present?
10  A.  All these outside parties were only present on the
11      July 26th interview.  Only myself and Larry Domina
12      were present on the July 31st interview.
13  Q.  And why was there a subsequent interview for
14      approximately 10 minutes?
15  A.  It was almost exactly the same situation.  I believe
16      on the mixing questions, I had not asked distance
17      away.  And so I called him simply to get those
18      distance aways for the mixing distances for
19      completeness.
20  Q.  And you called Mr. Larry Domina directly on the 31st?
21  A.  I did.  We went back and forth.  And I'm not sure.
22      Ultimately on the connection that was made, he may
23      have called me, but it was only the two of us on the
24      phone.  I called him initially.  I know for a fact
25      that I left a voicemail and I called him multiple

Page 19

1       times and then eventually I think he called me back.
2   Q.  Any further communication with Mr. Domina -- and from
3       now on I'm going to be referring to the plaintiff, Mr.
4       Domina and not his brother.
5   A.  Okay.
6   Q.  Any further communication with Larry Domina since his
7       interview on July 31?
8   A.  No, not with me.
9   Q.  With you, yes.
10          All right, okay.  That would include any
11      email communication or text or anything like that?
12  A.  No.  I've never emailed Mr. Domina.  I don't even know
13      his email address.
14  Q.  Have you had any communications with his brother,
15      ███████, to confirm what plaintiff, Larry Domina,
16      talked about during his interview?
17  A.  The onl -- no.  I guess the short answer is no.
18  Q.  Did ███████ add anything, any information during
19      your initial interview with Larry Domina?
20  A.  Not that I recall.  He just listened.
21  Q.  Okay.
22  A.  He wasn't a dermal expert -- just kidding.
23  Q.  He wasn't a what?
24  A.  He wasn't a dermal expert.
25  Q.  Oh.

Page 20

1           MR. KRISTAL:  But he had some skin in the
2       game.
3           MR. UPSHAW:  Some levity there, right?
4   BY MR. UPSHAW:
5   Q.  When you have a section here under discussion items
6       and you list several people, there's no box really for
7       brother, right?
8   A.  That's true.
9   Q.  Okay.
10  A.  That's true.
11  Q.  If he had added information, how would you have
12      indicated that on your summary sheet?
13  A.  I would have, uh...  Had that happened, I would have
14      put the information and then put brackets from
15      whoever.  I've done it in the past, if there's a wife
16      on the phone, for instance.  If she adds some
17      commentary, then I'll indicate from spou -- you know,
18      from spouse or whatever.
19  Q.  And you asked Mr. Domina, the plaintiff, specifically
20      about his smoking history?
21  A.  I did.
22  Q.  Did you have the opportunity to review Mr. Domina's
23      deposition transcript prior to your interview?
24  A.  I've never seen the deposition transcript, so I
25      wouldn't know whether it even existed prior to his

Page 21

1       interview so I don't know how to answer that question.
2   Q.  Well, we know you haven't seen it prior.  And my next
3       question would be, have you seen it subsequently, and
4       you'd probably say no.
5   A.  Yeah.  I guess that's the right answer.
6   Q.  Have you ever reviewed Mr. Domina's plaintiff fact
7       sheet?
8   A.  No, I don't believe so.  I mean, I knew they were
9       farmer -- he was a farmer from Nebraska, but I don't
10      know.  That's about all I knew, I think.
11  Q.  And in Mr. Domina's case, did you have the opportunity
12      or were you given the opportunity to review any of his
13      medical records?
14  A.  I don't recall seeing any of his medical records, so I
15      guess the answer's no.
16  Q.  Okay.
17  A.  I don't know about the opportunity, but I haven't seen
18      them, so...
19  Q.  You note here that he was diagnosed with non-Hodgkin's
20      lymphoma on May 12, 2012, correct?
21  A.  That's what he told me, yeah.
22  Q.  Why is that important?
23  A.  We talked about this before, but typically when I'm
24      doing exposure assessments, we don't count the
25      exposure after the date of diagnosis.

6 (Pages 18 to 21)

Stephen E. Petty, PE, CIH, CSP

## Page 22

1  Q.  And did he indicate what subtype of non-Hodgkin's
2  lymphoma he contracted?
3  A.  I don't believe he did.  If he had, I would have
4  written it down.
5  Q.  Have you reviewed any non-plaintiff fact witness
6  transcripts related to Mr. Domina's case?
7  A.  I have not.
8  Q.  And that would be specific:  Any coworkers, spouses,
9  family, friends?
10  A.  Well, I guess we can't go there, but as I said this
11  morning, I don't think I've seen any deposition
12  transcripts since I testified in the Saint Louis cases
13  for any of the Monsanto cases other than the three or
14  four we talked about this morning.
15  Q.  Right.  And I understand and I realize some of this
16  may feel repetitive from this morning, but this is a
17  separate case --
18  A.  No, I understand.
19  Q.  -- and separate deposition.
20  A.  And that's why I was kind of trying to figure out how
21  to answer that.
22  Q.  And I realize some of these are plaintiff-specific, so
23  I apologize 'cause they are the same questions.
24        Do you account for any family history or
25  prior health when you are doing your workup of a

## Page 23

1  plaintiff?  That's a general question.
2  A.  Do I account for that?  I think the answer's no.  I
3  mean, I can be aware of it at times, but it doesn't...
4  I'm not doing the specific causation, so it's not
5  really relevant to the exposure side.
6  Q.  Does it impact your calculations in what you do at
7  all, the family history?
8  A.  No.  I mean, if I included it, it would just be sort
9  of the front-end of a report where I put some
10  background of where they lived and who his mom and dad
11  were, whatever, I mean, but generally I don't.
12  Q.  In Mr. Domina's case, did you have access or get the
13  opportunity to inspect any of the containers or
14  sprayers that he said he used during his interview?
15  A.  I don't know.  Did you ask if I had the opportunity or
16  did I?
17  Q.  Well, first I asked, did you have the opportunity.  If
18  you said no, then that kind of answers the next
19  question.
20  A.  Well, I'm sure I always have the opportunity, but I
21  have not... I have not inspected them.
22  Q.  Did you have the --
23  A.  I mean, I could have the opportunity.
24  Q.  Right.
25  A.  We haven't done that.

## Page 24

1  Q.  Okay.  Did you visit the locations that Mr. Domina
2  refers to in -- referred to in his interview?
3  A.  Have I visited those locations?
4  Q.  Yeah.
5  A.  Not, not...  Not with respect to this case.
6        I mean, I've been in Nebraska.  That's
7  where my family grew up, my dad's family, but I
8  haven't visited specifically his farm sites.
9  Q.  Okay.  That's what I mean.  Have you been to
10  Coleridge, Nebraska.
11  A.  I've been in that area, yeah.
12  Q.  Yeah?
13  A.  (No Response.)
14  Q.  Let's turn to your locations first, which is page 518
15  of your report.  The first location was a home farm in
16  Coleridge, Nebraska.  This is the first one he told
17  you about, right?
18  A.  Correct.
19  Q.  And it's your process to try to get the interviewee
20  to remember back as far as they can with regard to
21  potential work sites or exposure sites?
22  A.  Particularly job sites.  That's my goal is to go back
23  as far as I can as to places you worked and then ask
24  them about chemicals they might have been exposed to
25  at those sites.  And then if there's chemicals of

## Page 25

1  interest, then we bore in on that later.
2  Q.  So here, he says his job was a farmer and his work
3  activities were farming.  Did he get into any more
4  specifics than he's a farmer and he farmed?
5  A.  No.  No, he didn't.
6  Q.  Do we know what that entails when he says he was
7  farming?
8  A.  Well, in this particular case, we don't know any more
9  than what he said here that he was farming, no.
10  Q.  Do you ask, uh...  And again, this is only from what I
11  see in your interview.  With regard to job location
12  number 1, he didn't seem to give you a lot of detail.
13        Do you inquire further to attempt to get
14  more detail; does that help you?
15        MR. KRISTAL:  Object to the form of the
16  question.
17  A.  That's an interesting question.
18        I always like to say that more information
19  is better than less in an absolute sense, but then you
20  have the practical side of keeping, making the
21  interview not be too long or people wear out, 'cause
22  I'm going to be asking them super-detailed questions
23  about skin area, et cetera.
24        So the reality is that the detailing on his
25  farming is not gonna nes -- if I know the materials or

Stephen E. Petty, PE, CIH, CSP

Page 26

1    the pesticides he used, time times he used and how he
2    used them, et cetera, that's what I'm -- I'm
3    interested in the exposure-related information as
4    opposed to the detailing about how he did his farming.
5  BY MR. UPSHAW:
6    Q.  And you get that when you ask about the different
7       activities at a particular location?
8    A.  Correct.
9    Q.  He identifies in the products used in your summary two
10      products.  One is a Roundup product and the other is
11      2,4-D, correct?
12   A.  Correct.
13   Q.  And you obtain use information for both?
14   A.  More so for the Roundup than for the 2,4-D, but yes, I
15      did obtain some for both.
16   Q.  And is there a reason why you did not pursue as much
17      information with regard to the 2,4-D as you do for
18      Roundup products?
19   A.  Of course.
20   Q.  For Mr. Domina?
21   A.  Of course.  I was asked to determine his Roundup
22      exposures.
23   Q.  Okay.  Not his total exposure?
24   A.  Well, I don't...  I don't know what you mean by total
25      exposure.  There could be, you know, other things as

Page 27

1    well.  So I certainly am interested in other products
2    he used and I try to be transparent about that, but in
3    terms of doing the detailed calculations, I'm going to
4    do it on the chemicals that I've been asked to do the
5    exposure on.
6    Q.  Understood, which would be, you've been asked to do a
7       detailed calculation with regard to Roundup products,
8       correct?
9    A.  Correct.
10   Q.  But that's not a detailed calculation with regard to
11      all of his pesticide use, correct?
12   A.  I didn't do the same level of detail for the other
13      pesticides, that's true.
14   Q.  Okay.
15   A.  But there's certainly no...  I'm trying to be
16      transparent about what other products he did use.
17   Q.  Understood.  And this is not any criticism of what you
18      did.  I'm just trying to understand what you did --
19      what you were asked to do, I should say.
20   A.  Yeah, I...  Well, I was asked to do an interview of
21      Mr. Domina on, on, uh, an industrial hygiene interview
22      and that includes exposures to, in this case,
23      pesticides and other chemicals that could cause
24      disease and that's what I tried to do.
25          Now, with regards to the detailed

Page 28

1    information on, uh...  I was also asked to basically
2    look at what were the -- what were the detailed
3    exposures with respect to the Roundup products, and
4    that's why there's more attention paid to those
5    products in the interview.
6    Q.  You said you asked about in your interview chemicals
7       that cause disease.  Did...
8          First off, is there a list of chemicals
9       that you have that in your opinion cause disease?
10         MR. KRISTAL:  Objection to form.
11   A.  Well...
12         MR. KRISTAL:  It also misstates the
13      evidence.
14   A.  Yeah.  One of the things that you do is, as an
15      industrial hygienist, is you're going to try to look
16      at things that in a generic sense, in a general
17      causation sense are associated with the disease he has
18      or at least potentially.
19         And I think I gave you the example in one
20      of my last depositions about going into a home,
21      outside of litigation, where I was asked to figure out
22      why this person was sick and they -- and I do the
23      interview and they -- in this case it was biologics.
24      So they said we want you to sample for mold.  And I
25      said, well -- I did the interview when I first got

Page 29

1    there.  I pick up the phone, I said, I want to test
2    for bacteria.  And they said no, we sent you there to
3    do mold.  And I said, well, the problem is that
4    there's raw sewage on the ground and that's E. coli
5    and that's gram negative, gram positive bacteria, and I
6    want to test for those.  So...  And her symptoms were
7    gastrointestinal.  Mold is respiratory tract.
8          So we...  That's one of the...  Forty
9    percent of the CIH exam is toxicology, because we're
10   kind of the first people out there, that the universe
11   of things that could cause somebody to feel bad, we're
12   there to try to figure it out.  And depending on the
13   situation I'm involved with, some of that's been
14   predefined.  To some extent, the world's been reduced
15   down and in some cases it hasn't.
16         In this case, I'm being asked to look at
17   pesticide, uh, primarily pesticide exposures, but
18   I'm...  I'm being broader than that.  Just as a
19   professional, I want to know whether the chemicals
20   this person might have been exposed to, because I
21   know, for example, that benzene-containing chemicals
22   have been associated with NHL.
23         So...  So in that sense, I'm always going
24   to broaden the picture a little bit to try to get more
25   information, that, you know, I...  I've been...  I've

8 (Pages 26 to 29)

Stephen E. Petty, PE, CIH, CSP

Page 30

1  been involved in heat stress cases, I've been involved
2  in ventilation cases, I've been involved in biologics
3  cases, I've been involved in ionizing radiation and
4  nonionizing radiation. In fact, that's what I spent
5  the last week and a half doing, alpha, beta and gamma
6  exposure. And so each case has chemicals of concern.
7  And I'll try to broaden that slightly. If I know...
8  If I have information based on experience and testing
9  that says, I need to ask some other questions, then
10 I'll do that as well, but you appreciate, you kind of
11 winnow down the things that somebody might have been
12 exposed to, so that's what I'm doing here.
13         The reason I'm asking about these other
14 chemicals isn't because counsel asked me to ask about
15 those other chemicals. I'm doing it because I think I
16 need to do that as an industrial hygienist.
17 Q.  So the only chemicals you asked about were Roundup
18 products and 2,4-D?
19 A.  No. I said, what other chemical products do you
20 recall using and those are what they said.
21         You recall from other, uh, the 14 Saint
22 Louis cases, in some cases there were lots of other
23 products listed. It's just whatever they volunteer.
24 Q.  And so Mr. Domina volunteered Roundup products and
25 2,4-D?

Page 31

1  A.  Yes.
2  Q.  Does 2,4-D cause non-Hodgkin's lymphoma?
3  A.  I don't know. I'm not a cau --
4  Q.  You said you narrowed it down to -- and you add -- add
5  during your interview "chemicals of concern," I think
6  was the term you used?
7  A.  Sure.
8  Q.  So is 2,4-D a chemical of concern for you?
9  A.  It's a chemical of concern in the sense that I need to
10 list it because it's an alternative product he's used.
11 I was referring to that is -- and I think I've said it
12 multiple times -- I have a really long-term strong
13 background in benzene and leukemia and there are a lot
14 of factors associated with benzene that cause that.
15 So I'm looking for chemicals that might have benzene
16 in them as well.
17 Q.  Does 2,4-D have benzene in it?
18 A.  I don't know. I don't think so. I think it's got
19 dioxin in it, but I don't think it's got, uh... I
20 don't think it has benzene in it, to my knowledge.
21 Q.  So Mr. Domina's first location was his home farm. Do
22 you know whether that was a commercial farm or family
23 farm?
24         MR. KRISTAL: Object to form.
25 A.  I really don't know how to answer that question. I

Page 32

1  think it was a place where he lived and it's a
2  place... I grew up on a farm. So, I mean, how do you
3  make that distinction between what you -- where you
4  live and what you're raised to sell? I mean, it's...
5  It's not like you're in the urban inner city where you
6  work somewhere and you live somewhere or something
7  like that. I mean, it's... It's kind of both. It
8  can be.
9  Q.  How big was his farm?
10 A.  I don't know.
11 Q.  How many acres did they farm?
12 A.  I think you just asked that.
13 Q.  Well, one is how big it is and that would include, if
14 there was a residence on it; and the other would be
15 how much of that farm was actually used for
16 agriculture business. Do you know?
17 A.  I do not know.
18 Q.  Do you know whether they had any animals or livestock?
19 A.  On the previous they -- I don't believe -- I don't
20 know. I don't know. Whatever information he provided
21 to me is here, so...
22 Q.  I'm just asking. That's fine.
23 A.  If I didn't list it, then either it wasn't brought out
24 or I didn't ask the question.
25 Q.  So here with Mr. Domina with regard to personal

Page 33

1  protection equipment, you've indicated, when asking
2  the question about gloves, yes and no, and we've
3  talked about this previously?
4  A.  We have.
5  Q.  Same --
6  A.  My responses would be the same --
7  Q.  -- response?
8  A.  -- as your -- to your questions as you asked earlier.
9  Q.  In Mr. Domina's interview, you said he would wear
10 cotton gloves 20 percent of the time. That was his
11 information --
12 A.  Yes.
13 Q.  -- I assume?
14 A.  Yes.
15 Q.  Okay.
16 A.  I wouldn't have any idea.
17 Q.  So one of the reasons why I asked you the earlier
18 question was -- under pesticide, use location, you
19 indicated here that it was a farm, same physical
20 property, but it had two addresses over time.
21         Did you have any indication during your
22 interview of whether the size of that farm changed
23 from 1994 to present? Like, did they buy more acreage
24 surrounding them? Any indication that the farm grew
25 during that period of time? More spring is what I'm

9 (Pages 30 to 33)

Stephen E. Petty, PE, CIH, CSP

## Page 34

1    asking.
2         MR. KRISTAL:  Object to form.
3    A.  Well, the exposure in the spring would be called out
4        for in the information about spring.
5         But with regards to the address, I remember
6        this because he made a big deal about the fact that,
7        even though there were two addresses, it was the same
8        physical property.  Now, whether or not they added
9        acreage to that or farmed additional acreage, I don't
10       know.
11   BY MR. UPSHAW:
12   Q.  Okay.
13   A.  But he just said basically that their mailing address
14       changed, even though it was the same physical address.
15   BY MR. UPSHAW:
16   Q.  And you didn't inquire any further into that?
17   A.  I did not, no.
18   Q.  Activity 1 you have here at that location was he used
19       a 25 gallon tank mounted onto a tractor, and you make
20       it a point of indicating that there were four seats
21       occupied by children or friends.  Were those words
22       that he used?
23   A.  Yes, yes, absolutely.
24   Q.  Do you know if these were his children, children from
25       the neighborhood?

## Page 35

1    A.  I don't know.
2    Q.  He just said children?
3    A.  He just said children.
4    Q.  Do we know whether or not these children or friends
5        were employed?
6    A.  I don't know.
7    Q.  Okay.
8    A.  I don't know.
9    Q.  All right.  And is it your understanding that there
10       were four wands coming from this tank that were used
11       to spray?  I mean, it says four seats and wands.  I'm
12       trying to see where the "and" fits in.
13   A.  Yeah.  My understanding was that there...  That...
14       I...
15            I don't know that he necessarily had all of
16       them occupied all the time, but my understanding was
17       there were four positions with four -- there was a
18       pump system from the tank that pressurized these lines
19       and wands so that there was the capacity to have four
20       wands.
21   Q.  And it was your understanding that he wasn't doing the
22       actual spraying.  He was driving the tractor?
23   A.  In that particular activity that was my understanding.
24   Q.  Yeah, yeah, I'm sorry.  I should have been specific,
25       activity number 1.

## Page 36

1    A.  Yes.
2    Q.  And that would change his exposure, wouldn't it,
3        whether he was actually holding the wand or he's
4        holding the -- holding the steering wheel?
5            MR. KRISTAL:  Object to form.
6    A.  No.  I guess the answer is, it could, but I don't
7        think so.  A couple reasons.  One, when I ask him what
8        percent of your body got wet or what areas got wet and
9        how often, et cetera, that accounts for the spray that
10       wetted him.  So whether he applied it or not, I don't
11       think...  I'm kind of cutting to the chase at that
12       point.
13   BY MR. UPSHAW:
14   Q.  I understand.
15   A.  With respect to inhalation, you would think perhaps
16       being further away it might, but I've not gone down
17       that road to calculate the milligrams inhalation, but
18       recall that I did that Stokes' law calculation, that
19       it takes -- I forget how many minutes -- but it takes
20       a long time to fall six feet.  It's on the order of
21       minutes.  So if you're moving along and this stuff's
22       suspended and it's falling at six feet a minute, you
23       know, and your tractor's moving along, you're going to
24       sweep through that plume, if you will, of aerosol.
25       Does that make any sense?

## Page 37

1    Q.  No, it doesn't, but that's irrelevant at the moment.
2    A.  I'm just saying, if it's suspended --
3    Q.  Right.
4    A.  -- depending on wind direction, et cetera --
5    Q.  Okay, here we go.
6    A.  -- it can -- it can...
7            So when you ask that question, that's why
8        it has some yes and no components.
9    Q.  The only question I asked was, was his exposure going
10       to be different from whether he was spraying the wand
11       or spraying of -- or driving the tractor, which I
12       believe you answered and I appreciate that.
13   A.  Well...  And I think it has some yes or no components,
14       being as an inhalation or dermal.
15   Q.  I think you pointed that out, so I understand.
16            Specifically, you asked him specifically,
17       wherever he was located, even if he was trottin'
18       behind the tractor, you asked him specifically where
19       he was exposed or wetted and how often?
20   A.  Correct.  And how long did it stay on him afterwards.
21   Q.  Right.  When did he, uh...
22   A.  Finally clean up?
23   Q.  Clean up or shower or whatever.  Okay.
24            Under spraying, you've broken it down
25       between '75 and '84.  Why did you use that breakdown?

Stephen E. Petty, PE, CIH, CSP

Page 38

1  A. (No Response.)
2  Q. '75 and '84 and then '84 to '80... '84 to '96. It
3     doesn't... The reason I ask, it doesn't correlate
4     with the address change, so I'm trying to figure out
5     why that's different.
6  A. No. He made the point that the product usage rate
7     changed between those -- over those 20 years. It
8     changed in that time frame such that... I'm just
9     trying to look at the numbers real quick.
10  Q. Yeah. For one was 20 seasons and there's 11 seasons.
11  A. The difference is... The difference is that in the
12     first interval, he gave me the number of spray events
13     per month for the season whereas in the second
14     interval he just, in his mind it was easier to think
15     of how many days a season he sprayed.
16  Q. Total?
17  A. Total. And that's how in his mind, you know, 'cause I
18     probably asked him the same question. He says, well,
19     I'm not... I don't know about that, but I know I
20     didn't... It was like 40 days a season.
21  Q. Do you ask or did you ask Mr. Domina what the rate of
22     spray of his wands for his tank was?
23  A. I didn't, but I could back it out. I've got his
24     number of mixes and the time that he's spraying. I
25     mean, I could... I could back that out.

Page 39

1  Q. But you haven't done that?
2  A. I haven't done that.
3  Q. And again, you list here PPE for event number 1 as the
4     gloves, yes, no; and cotton gloves, at all times?
5     MR. KRISTAL: At times.
6  A. At times.
7  BY MR. UPSHAW:
8  Q. I'm sorry, at times. I added a word there. At times.
9     Did he -- and it led to my next question --
10     did he give you an indication as he did previously
11     under location 1, that is 20 percent, 30 percent, 50
12     percent?
13  A. He couldn't. I'm sure I asked him, and he said he
14     just couldn't. He just didn't have a number he could
15     remember.
16  Q. Activity 2 was a different type of sprayer; is that
17     why it's a separate activity or no? Oh, no. It's
18     cleaning the nozzles, I'm sorry. Activity 2 is
19     cleaning the clogged nozzles.
20  A. Yeah. I tried to keep the same sprayer, mixer, all --
21     cleaning nozzles all in the same place.
22  Q. Okay, you did that.
23     Okay. And did he indicate how he cleaned
24     the nozzles, the clogged nozzles?
25  A. He did.

Page 40

1  Q. And how did he say he cleaned them?
2  A. He said he blew 'em out with his mouth.
3  Q. Did you list that in your exposure chart at page 524
4     as a different category?
5  A. 524?
6  Q. Yeah, under pesticide use and exposure information
7     chart. The third item down.
8  A. Yeah. I indicated in the distance away, I said, one
9     to two feet, but he blew nozzles out with his mouth.
10  Q. Okay. And then where he blew nozzles out with his
11     mouth, which is the distance feet away, right, column?
12  A. Well, no. He wanted to say that typically his face
13     would be... Appreciate, he's disassembling these
14     nozzle assemblies off the wand and so he's talking
15     about two diff -- what he was trying to tell me was
16     that from his nose to where he's taking things apart,
17     it's like one to two feet, but then he would bring it
18     to his mouth and blow it out and then reassemble it.
19     So that's what I'm trying to convey with those words.
20  Q. And yet when you ask him where he had dermal exposure,
21     he says he had it on his face, approximately 10
22     percent of his face, a hundred percent of the time?
23  A. Correct.
24  Q. Is that 10 percent where you would consider his lips?
25  A. I don't.

Page 41

1  Q. Is that how you get that breakdown to 10 percent?
2  A. I don't. I didn't include his lips because to me
3     that's internal skin area and it's ingestion. I don't
4     know how... I wasn't... You know, the problem with
5     that is how do you know... Nobody's going to know
6     that I know of how much he ingested.
7  Q. Okay.
8  A. Other than there obviously has to be some ingestion,
9     albeit minor, but... So I looked at that... The skin
10     area we're talking about on the face is different.
11     That has to do...
12  Q. Yeah. That's my... That's my question. What's 10
13     percent?
14  A. Of the face?
15  Q. Yeah. I mean, he came with this number, 10 percent?
16  A. Um-hum.
17  Q. Is that a yes?
18  A. Yes.
19  Q. Okay.
20  A. I'm sorry. I'm sorry.
21  Q. She has trouble taking down "um-hum."
22  A. You are correct.
23  Q. And so when you interpret that 10 percent, what is...
24     What is he... Where is he getting the 10 percent?
25     That's not his head. You said it's the

11 (Pages 38 to 41)

Stephen E. Petty, PE, CIH, CSP

## Page 42

1    face, right --
2    A.  It's the face area.
3    Q.  -- and you broke that down previously?
4    A.  Yeah.  I would use the EPA Exposure Factors Handbook
5    Values --
6    Q.  Okay.
7    A.  -- for a male, 50 percentile values.  That's what I
8    would use.
9    Q.  I'm just trying to get an idea of what you would
10    consider 10 percent.  Like your chin, your right
11    cheek, eye?  I'm trying to figure out where you get 10
12    percent.
13          MR. KRISTAL:  It's about 10; 10.
14    A.  I didn't do the calculation.
15    BY MR. UPSHAW:
16    Q.  I understand.  I understand.  I may be putting you on
17    the spot here.
18    A.  It's not the spot.  I'm just trying to give you an
19    answer to that.  I'm trying to remember the surface
20    area of a male face.  I know that both hands are
21    around a thousand centimeter squared, but I just don't
22    recall.
23    Q.  Okay.  I recognize you weren't asked to do that.  I
24    appreciate that.  It was a question.  And I appreciate
25    you trying to answer it.

## Page 43

1        Okay.  Let's go back into the substance of
2    the interview with, uh, sticking with activity 2, you
3    also note that he used cotton gloves at times and the
4    same thing, you put yes and no for the reasons we've
5    discussed earlier about whether or not cotton gloves
6    are PPE.
7    A.  Yeah.  It's sort of the same.  Maybe I can convey a
8    better answer or an answer that rolls that up better.
9        I'm looking at this from the standpoint of
10    PPE, in other words, but most blue collar, labor type
11    workers, they don't have my knowledge about what
12    constitutes PPE in many cases.  So I'll ask them
13    gloves.  I'm asking it.  What I'm really looking for
14    is PPE.  But when they say yeah, I wear gloves some of
15    the time, then I'll ask, well, what kind of gloves?
16        Well, I guess...  I guess I could write two
17    sets of columns, non-PPE stuff and PPE stuff, but I
18    just combine it there to say, they...  They think
19    they're wearing some gloves that are protective, but I
20    know they're not, so I don't want the reader to think
21    that, just that, but that that answer is PPE.
22    Q.  Okay.
23    A.  'Cause it's not.
24    Q.  All right.
25    A.  "Cause I know it's not, but I'm going through that

## Page 44

1    effort to try to figure out, um...  Those are my...
2    My PPE questions.  They may or may not even understand
3    what PPE means, but I can start by saying, did you
4    wear gloves?
5    Q.  And I think you previously testified, you asked about
6    other forms of PPE other than just gloves and
7    respirator, correct?
8    A.  Sure.  And it's... A lot of times -- it's not here --
9    but a lot of times they'll say, oh, yeah, I wore a
10    respirator and then I'll say, did it have...  Was it
11    half face or full face?  And they'll go, no, it's the
12    white ones with the rubber bands on 'em.  And I'll
13    say, well, that's a dust mask.
14    Q.  Okay.
15    A.  So, I mean... So yeah.  I'll...  I'll ask about and
16    they'll say, well, they wore a dust mask.  I'll say
17    okay.
18    Q.  I meant with regard to other PPE items such as boots.
19    You asked them did they wear boots and other specific
20    PPE equipment, not just gloves and respirators, right?
21    A.  Sure.  If they...  If they...  If they indicated any
22    other, whether it be clothing, PPE, or boots, or I
23    guess goggles, ear protection.
24    Q.  Okay.
25    A.  But there wasn't anything indicated.

## Page 45

1    Q.  Right.  And you don't put a note for all of them.
2    What I'm asking is, on your reports, you don't list
3    out everything and put no, no, no, no, no?
4    A.  It's sort of like the dermal, if they -- if I go
5    through that whole list from feet to top of the head,
6    I'm just listing the ones that they say yes on.
7    Q.  But you listed no for respirator?
8    A.  I did.  I did list no for respirator.
9    Q.  Why do you pick that one out versus boots?
10    A.  Because it's the primary method for personal
11    protection inhalation.
12    Q.  Okay.
13    A.  So that's...  That's a critical piece of information
14    and standard exposure assessment calculations is
15    whether a respirator was worn or not.
16    Q.  Activity number 3 is another spraying event on Roundup
17    Ready Crops.  Is that the difference in this spring
18    event between activity number 1?
19    A.  Yes.  My...  My impression were on the initial ones on
20    the tractor, that they're just spraying weeds in and
21    around the, uh...  And then eventually they, they --
22    Q.  I'm sorry, in and around what?
23    A.  It says here they sprayed on fields before the advent
24    of Roundup Ready seeds.  So they were spraying on the
25    fields' weeds --

12 (Pages 42 to 45)

Stephen E. Petty, PE, CIH, CSP

## Page 46

1  Q. Okay.
2  A. -- with this four-wheeler.
3        And then --
4  Q. On activity 3?
5  A. And activity 3 is he's... He's trying to remember
6     kind of when these things happened, so he remembers it
7     sort of with, when the Roundup Ready seed, he started
8     remembering that.
9  Q. Um-hum.
10 A. At least that was in... I mean, I... I don't make
11    these differences up in activities. They're...
12    They're explained to me in their mind when different
13    -- when they, they -- they reflect on different
14    exposure-type of activities or events. So that I just
15    go -- I go along with that and try to understand,
16    well, okay, during that time or activity, explain to
17    me what you did and how often you did it, et cetera.
18        So he... He made the distinction that the
19    next activity he remembered was when, at the time when
20    he started spraying Roundup Ready Crops. That's just
21    how he remembered it.
22 Q. Okay.
23 A. There's nothing particular to me. It's just what he
24    remembered.
25 Q. On activity number 1 -- sorry to drop back to that for

## Page 47

1     a second -- where he switched to, from '84 to '96, to
2     40 days and hours per day or event, that's five to six
3     hours for each of those 40 days?
4  A. Yes.
5  Q. Okay. And the distance that you have of four to six
6     feet was the distance he said he was away from the
7     spraying?
8  A. From the nozzle tip, yeah.
9  Q. Now, going on activity number 3, which we indicated
10    some -- why we made that difference. In the 15
11    seasons from '96 to 2012...
12 A. It's a big distinction. He's gone to the thousand-
13    gallon tank.
14 Q. Yeah. That's my next question.
15        So he's got a much larger tank?
16 A. And a spray bar.
17 Q. And he's using a tractor with a spray bar.
18        Do you know what that is?
19 A. What a spray bar is?
20 Q. Yeah.
21 A. Yeah. In general, I do.
22 Q. Do you know how it works?
23 A. Well, yeah. I mean, in the sense you have a... I
24    mean, I built a spray bar. I have a spray bar at work
25    that we use to simulate wind-driven rain. I actually

## Page 48

1     designed and built it to an ASTM standard.
2  Q. Okay.
3  A. So the spray bars are designed ultimately to deliver a
4     certain amount of material in a certain cone space or
5     area period of time. And they do that by nozzle size,
6     nozzle spacing and pressure of the fluid entering the
7     nozzle.
8  Q. And you also determined the size of the droplets that
9     are released from the nozzle along the spray bar?
10 A. I think theoretically you could, assuming that --
11    usually, though, that would assume a pristine spray
12    nozzle.
13 Q. Certainly.
14 A. But yeah, in a laboratory environment --
15 Q. You normally start out that way, right?
16 A. Yeah.
17 Q. Okay.
18 A. I'm sure you could.
19 Q. Now, during this period with the, I assume it was a
20    new tractor, was he in a cab or uncabbed tractor?
21        Just for ease of reference, it's on 522.
22 A. Yeah. Just bear with me for a second, I apologize.
23 Q. No problem.
24 A. We're on activity...
25 Q. 3.

## Page 49

1  A. 3. He says on 522, he was in a cab tractor most of
2     the time.
3  Q. And how did you interpret most of the time?
4  A. I didn't.
5  Q. Okay.
6  A. I'll go to my next question 'cause it didn't.
7        Did that comment that he was in a cab
8     tractor most of the time have any impact on your
9     calculations for Mr. Domina?
10 A. Not specifically, because I'm gonna... I'm gonna go
11    ask him... To the extent that I did calculations, uh,
12    dealing with dermal I'm going to ask him what percent
13    of the skin was wet at what percent of the time. So
14    whether he's in or out of it, on average, I'm going to
15    ask him... You know, that cab may reflect in all of
16    that information the reason his percent of the time is
17    less than a hundred percent of the time, for example.
18 Q. In your opinion...
19 A. In fact, it's... I'm sorry.
20 Q. Go ahead.
21 A. In fact, the percent time... That's what I was
22    looking back on these dermal numbers. He's only
23    saying 10 to 20 percent of the time the skin's wetted.
24    So he... He clearly, in my mind, having done these
25    interviews, ultimately the cab is reflected in the

13 (Pages 46 to 49)

Stephen E. Petty, PE, CIH, CSP

## Page 50

1    percent time the skin is wetted.
2         I mean, if he'd had told me a hundred
3    percent of the time his skin was wetted when he was in
4    the cab, then I would probably go back to him and say,
5    hey, uh, you sure about that?
6    Q.  So if we compare the time when you first dis -- when
7    he first discussed spraying weeds before Roundup seeds
8    which is the first entry on your chart, Mr. Domina
9    says -- and just related to hands, both hands -- that
10   under percent area wet, I'm unsure what you mean by
11   both times.  There are only two events?
12   A.  Well, we've got the first nine seasons and the second
13   11 seasons.  So I could have put the date in twice.
14   He said, well, my experience was that my dermal
15   exposures were the same for all 20 years.
16   Q.  Okay.
17   A.  That's all I'm saying.
18   Q.  So he says that he wet up 75 percent of his hands --
19   I'm talking about the first entry -- 30 to 50 percent
20   of the time.  Did I read that line correctly?
21   A.  Yes.
22   Q.  And then when he moves to a cab tractor, he says with
23   regard to both hands he wetted up 7 -- he wetted 70
24   percent -- 75 percent of his hands, but now 10 to 20
25   percent of the time?

## Page 51

1    A.  Yeah, but it's asked differently than that.  I will
2    ask him, when your hands got wetted, not how often,
3    but when they got wetted, how much would get wetted?
4    Q.  Okay.
5    A.  Then the question --
6    Q.  Is that the 75 number?
7    A.  Yes, yes.
8    Q.  All right, thank you.
9    A.  And then...  Then I'll say, okay, but what percent of
10   the time or range of percent of the times did that
11   happen?  In other words, you could have a scenario
12   that somebody's involved in an activity where there's
13   material splashing, but once in a blue moon it gets on
14   their face, so maybe it's five percent of their face,
15   but it only happens one time out of 20.  So I'm trying
16   to make a distinction or a separation between when the
17   skin's wetted, how much gets wetted, and then how
18   often that happens.
19   Q.  Um-hum.
20   A.  So you see the separation here where he's saying, when
21   my skin got wetted, it was kind of the same amount of
22   the skin by area for a lot of these areas, but it
23   happened a lot less.
24   Q.  A lot less, even using the top value from 50 to only
25   20 percent?

## Page 52

1    A.  No, no, no.  Because using your example, okay, it was
2    75, 30 to 50 percent of the time.  So, let's say,
3    midpoint's 40, right?
4    Q.  Okay.
5    A.  Well, hopefully we're not disagreeing with the
6    midpoint of 30 to 50.
7    Q.  Okay.
8    A.  So then we go down to the lower example that we were
9    just citing.  It's again the same percent skin area,
10   when wetted, the same got wetted, now we're at 10 to
11   20, so the midpoint of that's 15.  So we're moving
12   from 40 to 15 percent of the time.  It's quite a drop.
13   Q.  And does this drop take into account any of the time
14   lapse between 30 years ago and roughly seven or eight
15   years ago?
16   A.  I don't know how to answer that question.  I mean, it
17   account...  Certainly it accounts for the different
18   time frames because they're done in different time
19   frames.
20   Q.  Okay.
21   A.  And it is what it is.  That's what he told me --
22   Q.  Right.
23   A.  -- his skin was; how much of it was wetted of the
24   different areas and how often.
25   Q.  Okay.  Did it strike you as odd that Mr. Domina said

## Page 53

1    he cleaned the nozzles by blowing in them with his
2    mouth?
3    A.  Have you grown up on a farm?  And I only mean that in
4    the sense that you're just trying to get things
5    accomplished as best you can and, uh...  My sense in
6    talking to him was that by the time I interviewed him,
7    he realized that probably wasn't the best, but he's...
8    I think he's just telling me what he did and I'm
9    recording it.
10        What he thinks or what he thought at the
11   time versus what he thinks now, you'd have to ask him.
12   I don't know.
13   Q.  Is that a recommended method of cleaning a nozzle?
14   A.  Um...
15   Q.  Since you spent time on a farm.
16   A.  Well, I will tell you, in the '70s we all siphoned
17   gasoline with our mouths.
18   Q.  So going back to my question...
19   A.  And I will tell you that I just interviewed a guy last
20   week who had the same experience in the '70s.  So, you
21   know, would I say that's a good practice today?  No.
22   Would I say that that practice existed back then?
23   Yes.  And I know that based on experience and I know
24   that on doing interviews of people who did the same
25   thing 'cause I worked as a -- a bit as a mechanic and

14 (Pages 50 to 53)

Stephen E. Petty, PE, CIH, CSP

## Page 54

1 when I talk to mechanics.
2 So it's a tough question to answer in the
3 sense the time has changed and knowledge has changed.
4 If you asked me today if I think that's a good
5 practice and what I know today, I would say no. But
6 back in that era, I don't... If... I don't think
7 that they recognized the hazards of what they were
8 doing.
9 Q. We're talking about an era from '75 to 1996.
10 A. I understand.
11 Q. Okay. Just... Then no. 'Cause you had mentioned the
12 '70s, but what he's talking about, as far as using his
13 mouth to clean a nozzle, was for a period of 20 years,
14 from 1975 to '96, right?
15 A. Right.
16 Q. Okay.
17 A. And I don't think he did it every time, but he said at
18 times he did that. I mean I think he was being frank.
19 Q. Other than being frank, you think that's a recommended
20 method for cleaning out nozzles, even 1996?
21 MR. KRISTAL: Object to form.
22 A. I just answered that question as best I can.
23 BY MR. UPSHAW:
24 Q. Okay.
25 A. It depends on your knowledge and what you've been

## Page 55

1 told.
2 Q. I appreciate that.
3 Do you know whether or not Mr. Domina used
4 the same equipment to spread 2,4-D as he did to spread
5 the Roundup Concentrate or Roundup product?
6 A. Are we referring to that first era?
7 Let me go back and see if we're asking this
8 question, what specifically equipment and what era.
9 I got the location 1, activity 1. I don't
10 have the answer to that question, one way or the
11 other. I just didn't ask that question.
12 Q. Do you know whether or not Mr. Domina used 2,4-D in
13 his larger thousand gallon closed cab tractor?
14 A. Well, when I read back on location... When I read it
15 on 518 -- and that's all I know is the questions I
16 asked him or the information he either gave me to the
17 questions or volunteered. He says that he did use
18 2,4-D from the early years to this day.
19 Q. Um-hum.
20 A. So... And it was primarily used for spot-spraying and
21 around buildings and pastures. He didn't explicitly
22 answer that question, but I... I get the impression
23 it wasn't used. I mean, it's not much to jump from
24 that statement to say it doesn't look like he's doing
25 a lot of crop spraying with 2,4-D, but I didn't ask

## Page 56

1 him that question directly.
2 Q. So you're not gonna jump to that conclusion, because
3 you didn't ask him the specific question?
4 A. Well, if you ask me more likely than not, I would say
5 not, but I don't know for sure because I didn't ask
6 that question.
7 Q. Right. What kind of pastures did he have?
8 Are you talking about, you know, acres and
9 acres of cow pastures?
10 A. Well, I grew up on a farm and so a pasture is normally
11 for livestock as opposed to crops.
12 Now, after you cut the field, you can put
13 the critters in there to get a little bit of the
14 stubble that's left in the fall, but generally a
15 pasture is a different area than the crop, where
16 you're raising crops.
17 Q. And weeds grow in the pastures, right?
18 A. Oh, yeah. I used to have to handpick 'em.
19 Q. And you can use 2,4-D to get rid of weeds in a
20 pasture, correct?
21 A. Well, certainly, but I'm referring back to the fact
22 that he's talking about using the big sprayer on
23 Roundup Ready Crops.
24 Q. Right.
25 A. We're talking about the pastures.

## Page 57

1 Q. We were talking about the big, the big tractor, the
2 1,000 gallons.
3 A. So I'm just trying to answer your question. And I'm
4 just saying that it more likely than not that he was
5 using it there, but I don't know absolutely.
6 Q. Understood. Do you know whether Mr. Domina's tractor
7 allowed him to operate the spray bar from inside the
8 cab or did he have to have others operate outside the
9 cab?
10 A. I don't know those details. I didn't ask.
11 Q. Let's see, activity number 4 for Mr. Domina was
12 maintenance/repair of spray pumps. And here, when you
13 talk about the maintenance and repair, we're talking
14 about the, I assume it's larger, the 1,000 gallon tank
15 on the back of a tractor with a spray bar. That's the
16 maintenance we're talking about for activity 4, right?
17 A. Absolutely, yeah.
18 Q. And he did that twice a season?
19 A. On average, yep.
20 Q. On average. And what do you mean distance from one to
21 three feet; from what?
22 A. That's the distance from where he believes there's a
23 residual product in the pump to the nose. That's what
24 I'm asking.
25 Q. And did he indicate to you specifically that there

15 (Pages 54 to 57)

Stephen E. Petty, PE, CIH, CSP

## Page 58

1    would be residual pesticide in the pump?
2    A.  Well, he volunteered that this was one of the ways he
3      was exposed to Roundup.
4    Q.  Okay.
5    A.  I didn't ask him, by the way, did you maintain pumps?
6      I mean, he's listing the activities where he believes
7      he had Roundup exposure.
8    Q.  Again, gloves, you put yes and no.  We discussed that,
9      right?
10   A.  Right.
11   Q.  And this I don't understand.  I think I'm missing
12     something.
13   A.  You'll have to direct me to where you're not
14     understanding.
15   Q.  Yeah, I'm gonna.  Hold on.  I have to make sure my
16     pages are correct.  I got it now.
17        I answered my own question.  Thank you.
18        All right.  Activity number 5 is cleaning
19     clogged spray nozzles.  And we're referring to the
20     spray nozzles on the spray bar in that section?
21   A.  Yes.  Yes, we are.  It's the times where he's doing
22     the Roundup Ready Crops, the same.  So it's the spray
23     bar on the tractor.
24   Q.  And he again from 1996 to 2012 blew the nozzles out
25     with his mouth?

## Page 59

1    A.  Uh, I'm trying to get to where you're at here.
2    Q.  Page 2 -- I'm sorry -- 523, where you say, maintenance
3      and repair of clogged spray nozzles.  Your last bullet
4      point.
5    A.  Yes.  He said at times he had done that during that
6      time interval.  This isn't suggesting he did it all
7      the time.  I never got that impression.  I just said
8      that he did it.
9    Q.  Do you make any indication here in your interview
10     summary that he said, I didn't do it all the time?
11   A.  No, because I wasn't going to do an ingestion
12     calculation.  So at that point, what do I do with that
13     information, anyway?
14   Q.  Right, okay.
15   A.  I mean, he's not going to be able to tell me how much
16     he swallowed, I don't think.
17   Q.  And then on page 524, you do an exposure and
18     consumption and dermal exposure...  What do you call
19     it, a calculation?
20   A.  The exposures and consumptions, most of that gets
21     rolled from those previous pages we just covered, and
22     then...  And then what I'm adding to it really is the
23     dermal piece, but it's a place where I can put all the
24     information that I've collected previously in one
25     place to see if I've not asked some of those earlier

## Page 60

1    questions, but...  So there is some repetition here of
2      the information that I've collected in those previous
3      things and put the part that's added that's typically
4      new is all the dermal exposure columns.
5    Q.  And then the post-application information as well?
6    A.  Well, it's under the dermal exposure columns, but yes.
7    Q.  Oh, I got it.  I see, yes.  Okay, it encompasses that.
8      All right, very well.
9    A.  But you are correct.
10   Q.  And the time frame he gave for the time between he
11     would have any contact or exposure to Roundup and
12     washing was always one to six hours?
13   A.  Yeah.  I mean, because he would say, well, if I did
14     the activity late in the day, then I might go home and
15     clean up, but if I did it in the morning, it might be
16     several hours before I, you know, and I did other
17     things.  So that's kind of how those ranges come
18     about.
19   Q.  It's my understanding that the type of Roundup that
20     was used by Mr. Domina is what he identified, right?
21     And I think he just says Roundup Concentrate, correct?
22   A.  And then he'll identify certain size containers in one
23     case that it came in.  Well, yes.  He identifies it...
24     I'm just looking at 519, for example.
25   Q.  Sure.

## Page 61

1    A.  He used the Roundup Concentrate and the 2-1/2 gallon
2      jugs, about 2-1/2 gallon jugs, and he believed they
3      were white in color.  That's what he remembers for
4      that time interval.
5        Same for activity 2.
6        Now, in activity 3, he says that, uh...
7    Q.  Hold on before you go there.  I'm sorry, finish what
8      you're saying.  I interrupted.  Go ahead.
9    A.  In activity 3 on page 521, he specifically recalls
10     buying it, I call it bulk, but in 250 gallon
11     containers, and he said he did remember that the name
12     of the product changed with time, but he discontinued
13     to buy it in the same size containers.
14   Q.  In your opinion, was it the same material, that is the
15     same product that Mr. Domina purchased from 1996 to
16     2012 in 250-gallon containers that you know now
17     with regard to the different Roundup products?
18        MR. KRISTAL:  Objection to form.
19   A.  I think they're based on, having done a lot of these
20     interviews now, there was a progression from the
21     original Roundup formulation on up.  There were...
22     There were some nuances, particularly in the inert
23     ingredients, but by and -- and there might be just
24     slight changes in the glyphosate concentration.
25        So I guess the answer is, technically yeah,

16 (Pages 58 to 61)

Stephen E. Petty, PE, CIH, CSP

Page 62

1    there were probably some changes in the formulations
2    over that time.
3    Q.  Mr. Petty, do you know for a fact that there were
4        changes in the formulation, both in concentration of
5        glyphosate and in the surfactants based upon your
6        research in these cases, correct?  Which is included
7        right here in your report, right?
8            MR. KRISTAL:  Object to form.
9    A.  Well, actually, I comment.  I mean, it's kind of a yes
10       or no answer.  I do comment on the...  I'm...  I'm not
11       dismissing the fact there were changes, that's clear.
12       What those changes are are difficult to know and
13       that's -- that's one of the criticisms not only by me
14       but others, and that oftentimes the ingredients are
15       listed as proprietary or unlisted, so you don't know
16       what they are.
17           So when you ask me, you know that for sure,
18       I can't know what I don't know.  And in some cases I
19       know and I've learned more as time has evolved, but
20       there's still many, many examples, even in my report
21       where the, the -- you don't have a 100 percent of the
22       ingredients listed.
23   BY MR. UPSHAW:
24   Q.  Don't you have a chart in your report?  I believe it
25       is table 7.3 that lists, I don't know, how many

Page 63

1    different MSDSs for Roundup Weed & Grass Killer Super
2    Concentrate?
3    A.  I thought you were going to go to the table in the
4        front.
5    Q.  What I'm referring to is page 164.
6    A.  Yeah.  This illustrates my point entirely.  I just
7        flipped it open, and on page 422, uh...
8    Q.  Another place?
9    A.  And I'm just pulling one out, but you've got the
10       glyphosate listed at 41 percent and then the inert
11       ingredients at 59.  So when you say to me, well, you
12       know that they change with time, yes and no.  I know
13       what I know from what they tell me, but many of these
14       products don't list what those other ingredients are,
15       so I don't know if they've changed or not.
16           I do -- you know, you know separately when
17       you look at the earlier table -- that's where I
18       thought you were going to take me -- was this table
19       where I was looking at surfactants.  And this is on...
20       It starts on page...  It's table 4-1, but it starts on
21       page 15 of this Exhibit 8.
22           And here again we, we, uh, what I was
23       looking for was whether or not POEA was one of the
24       ingredients, but we have an idea that there's changes,
25       but we don't have the percentages.  So I'm not

Page 64

1    disagreeing with you that there was changes in
2    formulations, but...  But, for instance, it looks like
3    the POEA until very recently was always a surfactant
4    in almost all of these products.  So that's where your
5    answer has some yes and no components to it.
6    Q.  Okay.  Your chart on page 524...  I appreciate these
7        may be a little repetitive for you, so bear with me.
8    A.  Fire away.
9    Q.  Is your section on dermal exposures considered a
10       dermal dose calculation?
11   A.  It is not a dermal dose calculation.
12   Q.  Can you use this information to calculate dermal dose?
13   A.  It can be used in part to do that, yes.
14   Q.  What do you mean it can be used in part?
15   A.  Well, you still have to have the flux.  You still have
16       to have --
17   Q.  So you need more than this is what I'm saying?
18   A.  You certainly need the flux value, yes.
19   Q.  Would that flux value come from Mr. Domina?
20   A.  Traditionally not.
21   Q.  Do you need any other information from Mr. Domina to
22       complete a dermal dose?
23   A.  No, probably not.  I mean, I take this information
24       as...  I take this information as I'd never get
25       another chance to talk to this gentleman.  Maybe

Page 65

1    something happens to him or I just never get a chance
2    to interview him.  So I'm taking this information as
3    if, if I have to do a dermal dose, do I have enough
4    information, individual specific information, that I
5    can then do those analysis if I choose to do so or I'm
6    asked to do so.
7    Q.  And for Mr. Domina, have you been asked to perform a
8        dermal dose calculation?
9    A.  I have not.
10   Q.  Do you have any intention of doing a dermal dose
11       calculation for Mr. Domina?
12   A.  I do not.
13   Q.  Do you know if any other expert in this case has
14       calculated Mr. Domina's dermal dose?
15   A.  I don't know.  I mean, I've not seen it.  Any comment
16       I would make would be speculation.  I don't have any
17       firsthand knowledge.
18   Q.  Okay.  Have you been told that any other expert is
19       going to rely on the data that you have collated here
20       to perform a dermal dose calculation?
21   A.  I haven't been told that.  I mean, anything I would
22       say would be speculation based on the Saint Louis
23       cases, but I don't have any independent knowledge of
24       people using my interviews or the information in them.
25   Q.  Do you have a conclusion with regard to Mr. Domina's

17 (Pages 62 to 65)

Stephen E. Petty, PE, CIH, CSP

Page 66

1 exposure?
2 A. Sure. It would be, really, looking at the summaries
3 on the very last page here, at least with respect to
4 the Roundup exposures that he had.
5 Q. You know, I'm gonna...
6 A. 534, I'm sorry.
7 Q. Yeah, get the rest of it. It's not the rest of it.
8 My last is 534, right?
9 A. I hope so.
10 Q. Yeah, gotcha.
11 A. My opinions would first be that Mr. Domina experienced
12 thousands of exposure events and thousands of exposure
13 hours for Roundup products and then he had significant
14 dermal or skin contact to those products when he used
15 them.
16     MR. KRISTAL: You think you can get a
17 natural breaking point?
18     MR. UPSHAW: Yeah, we can do that. Why
19 don't we give our court reporter a breather. Thank
20 you.
21     We should have told you at the beginning
22 that Mr. Petty and I will go until the cows come home,
23 so to speak.
24     COURT REPORTER: Oh.
25     MR. UPSHAW: And then you have to let us

Page 67

1 know.
2     COURT REPORTER: Okay.
3     VIDEO TECHNICIAN: 3:41 p.m., going off the
4 record.
5     (Recess taken at 3:41 p.m.)
6     (Back on the record at 3:53 p.m.)
7     VIDEO TECHNICIAN: 3:53 p.m., back on
8 record.
9     MR. UPSHAW: Perfect.
10 BY MR. UPSHAW:
11 Q. Mr. Petty, we're back from break. Thank you for
12 considering our court reporter.
13 A. Yeah, my fault.
14 Q. Does your conclusion with regard to Mr. Domina have
15 anything or tell you anything about what caused his
16 disease?
17 A. I'm not a causation expert, so my job was just to
18 calculate events and times and let the Epi and medical
19 folks make a decision on that. Use that information
20 as they so please.
21 Q. I've asked you this on other occasions. Have you had
22 any communications or correspondence with any other
23 expert witness in this case; plaintiff or defense?
24 A. In this case, no.
25     I want to go back and correct that earlier

Page 68

1 answer about causation.
2     I am not a specific causation expert. I am
3 a general causation expert. But I don't intend to
4 offer either general or specific causation expert
5 opinions in this case. I just wanted to make that
6 distinction on the term, causation.
7 Q. Okay.
8 A. Because I've been approved in courts to give general
9 causation opinions in Daubert hearings. In fact, it's
10 a requirement really in my profession to be able to
11 offer general causation opinions. I don't intend to
12 for this case, but I don't want you to think that I'm
13 not a causation. The problem becomes the term,
14 causation, has to be defined in litigation as either
15 specific causation expert or general causation expert.
16 Q. You have not been involved or testified at any Daubert
17 hearings with regard to glyphosate, have you?
18 A. I have... How would I say this?
19     There is a Daubert challenge in the Saint
20 Louis cases is my understanding, but I --
21     MR. KRISTAL: No. The question is whether
22 you've testified at a hearing.
23     MR. UPSHAW: Yeah.
24 A. Have I testified at a hearing? I have not.
25 BY MR. UPSHAW:

Page 69

1 Q. Are you aware of any rulings by any judges involved in
2 a glyphosate case where your ability to testify has
3 been either -- has been decided by a particular judge?
4 A. In glyphosate?
5 Q. Yes, sir.
6 A. On glyphosate? No, I'm not aware of that, one way or
7 the other.
8 Q. We talked about your revised materials considered list
9 in this morning's deposition. I believe it's Exhibit
10 9. Remember that?
11 A. Yes, sir.
12 Q. Just making sure we did that.
13     Is there anything we have not discussed on
14 which you will offer an expert opinion regarding Mr.
15 Domina specifically?
16 A. Well, I would say yes, in the sense that, uh, my --
17 but my -- I know you're trying to limit what I might
18 speak to.
19     My opinions would be contained within the
20 exhibits for this deposition as well as opinions I've
21 offered during the deposition testimony as well as
22 any of my deposition testimony in the Saint Louis
23 cases.
24 Q. Okay.
25 A. Because I don't think we've covered the same material

18 (Pages 66 to 69)

Stephen E. Petty, PE, CIH, CSP

Page 70

1  necessarily. I'm not complaining, but the opinions
2  that I've offered in tho -- in the previous five days
3  depositions or those reports I would offer. I didn't
4  offer any opinions in the reports, but I did in the
5  depositions. I offered opinions. And those opinions
6  I would still rely on for the Domina case.
7  Q. Are the opinions that you've offered in previous
8  depositions now included in Mr. Domina's expert
9  report?
10 A. I would say, the vast majority are. I can't say a
11 hundred percent they all are 'cause I just don't
12 remember all the questions and answers over those five
13 days.
14 Q. And if I understand it correctly, where you have
15 included opinions in Mr. Domina's report, you have
16 bracketed them and placed them in bold; is that
17 correct?
18 A. For the sub-opinions, I've tried to do that. Then I
19 have that section 10, which is sort of a roll-up of
20 overall opinions, but that has been my intent.
21 Whether I did it in every case, I don't know, but that
22 was the intent.
23 Q. Part of your report in Mr. Domina's case refers to
24 chapter 12 of the Labor Review Manual, right, it's one
25 of your appendix, I believe?

Page 71

1  A. Yeah. I think it's E or something like that.
2  Q. Did you review any other chapters of the Label Review
3  Manual in preparing your factual summary and expert
4  opinions report?
5  A. Did I review them again beyond what I'd done in the
6  past; is that what you're asking?
7  Q. No. When you put this report together, you took it
8  upon yourself to include chapter 12. Is that the only
9  chapter you're relying on the Label Review Manual?
10 MR. KRISTAL: Object to form.
11 A. No. I rely on the entire manual. Just this is the
12 area of emphasis. And, in fact, it's one of the
13 listed exhibits. So I think we had a whole series of
14 questions in, I want to say, my fourth or fifth
15 deposition in the Saint Louis cases on other chapters,
16 for example.
17 BY MR. UPSHAW:
18 Q. Okay.
19 A. So we've... We covered not only this chapter, but we
20 covered many of the other chapters as well. You were
21 the one that asked the questions and I tried to answer
22 them as best I could.
23 Q. I vaguely remember that, and I don't remember whether
24 we talked about chapter 7. Are you familiar with
25 chapter 7?

Page 72

1  A. Not off the top of my head, I wouldn't. I mean, if
2  you showed it to me, I'm sure it would bring it back
3  to my mind quickly.
4  Q. Okay.
5  A. But it may have been one you covered last time.
6  MR. UPSHAW: Let me mark this as Exhibit
7  10. I don't know if I've got another one.
8  MS. ALVAREZ: I have another one.
9  MR. UPSHAW: You know what, I got one.
10 (DEFENDANT'S EXHIBIT 10, LABEL REVIEW
11 MANUAL, CHAPTER 7 WAS MARKED FOR
12 IDENTIFICATION.)
13 BY MR. UPSHAW:
14 Q. Are you familiar with chapter 7: Precautionary
15 statements; precautionary statements in the Labor
16 Review Manual?
17 A. I've read this chapter, yes.
18 Q. Let's turn to page 7-2. And at the bottom of 7-2, I
19 believe it's Roman numeral III, it talks about...
20 Well, the title is acute toxicity classification?
21 A. Okay.
22 Q. And rather than you and I read the entire paragraph,
23 you're familiar with this paragraph, right, or do you
24 need a second to review it?
25 A. Well, let me read it.

Page 73

1  Q. Sure.
2  A. It's been --
3  Q. I understand. That's why I didn't want to just jump
4  into it.
5  A. -- months since I've seen it.
6  (Witness reviewed document.)
7  A. Okay, I've read it.
8  Q. So just to step back a second 'cause we're talking
9  about a Label Review Manual. We're talking about the
10 EPA Label Review Manual revised in March of 2018,
11 right?
12 A. That's what it says on the front page.
13 Q. Well, has there been a revision that you're aware of
14 since 2018?
15 A. I think the different chapters all have different
16 revision dates --
17 Q. Correct.
18 A. -- as I recall. So I, I --
19 Q. I should have asked the question differently.
20 A. It's a... It's kind of hard to answer that question.
21 Q. You're right, and I apologize.
22 I should have asked, are you aware of any
23 revisions to chapter 7 since the revision of March
24 2018?
25 A. No, no. I don't know, one way or the other.

19 (Pages 70 to 73)

Stephen E. Petty, PE, CIH, CSP

## Page 74

1   Q.  I apologize, that was a poor question 'cause every
2       chapter does get revised, as necessary.
3   A.  Yeah, because the 12 years and 13.
4   Q.  Right.  All right.  So the Labor Review Manual is what
5       guides anyone who has a pesticide label has to follow
6       the Labor Review Manual, correct?
7   A.  Well, technically they got to follow FIFRA.  This is
8       just a document that's designed to help them along,
9       but ultimately they're going to refer back to FIFRA.
10      They're going to default to that.
11  Q.  This expands on FIFRA.  FIFRA is the statute that,
12      that -- under which the EPA is required to then give
13      you further guidance through its publications, that is
14      the Labor Review Manual, correct?  That's the way
15      Congress works, right?
16  A.  Well, I don't know how Congress works, but this is
17      another document that they've produced, but I'm just
18      telling you that ultimately you rely back on what the
19      language is in FIFRA.
20  Q.  Sure.  But you have to follow the Labor Review Manual
21      or the EPA will not approve your label, correct?
22          MR. KRISTAL:  Objection.
23  A.  I think you got to follow FIFRA.  I don't know that
24      you got to follow the Label Review Manual.
25  BY MR. UPSHAW:

## Page 75

1   Q.  So you don't think that you...  You can ignore the
2       Labor Review Manual.  As long as you're following
3       FIFRA, whatever else the EPA says that you're required
4       to do is not important; is that what you're saying?
5   A.  No, I don't think so.  That's...
6   Q.  Okay.  I'm just trying to figure where you're -- how
7       you're differentiating between FIFRA and what the EPA
8       is requiring for the label.
9   A.  Well, it's the difference between a law and a guidance
10      document.
11  Q.  And is it your testimony that you don't have to follow
12      the guidance document for the EPA to approve of your
13      label?  If you...  If you think in your mind that you
14      followed FIFRA and the statute, then who cares what
15      EPA has to say?
16          MR. KRISTAL:  Objection to form.
17  A.  I don't think I said that at all, but I...  That's
18      such a broad question.  Where do I answer parts of it?
19          First of all, the FIFRA standards are
20      minimums.  So there's nothing that precludes you from
21      doing more.  The guidance documents are someone's
22      interpretation of the FIFRA.  It's been issued.  But
23      ultimately, if you...  If...  If you're going to be
24      held to the fire about what you got to do, you gotta
25      follow the regulation.  That's all I'm saying.

## Page 76

1   BY MR. UPSHAW:
2   Q.  You're saying that the guidelines that are provided
3       and produced by EPA are just someone's, I think was
4       the word you used, someone's interpretation of FIFRA?
5   A.  Well, I don't know who wrote this.  I mean, I'll give
6       you an example.
7           I was...  I was one of the coauthors in
8       1999.  The Ohio EPA decided for BUSTR, more properly,
9       in the underground storage tank world to go to risk
10      assessment.  Before, they just had this arbitrary
11      methodology, and we convinced them to start using risk
12      assessment.  And I was on the rules committee that
13      helped write the rules, but then it had to go through
14      a whole legal process.  And when we got all done with
15      the regulation, then BUSTR asked me, will you write an
16      enabling document for us, and I did that, but I
17      wasn't...  I wasn't an employee of theirs.  In fact, I
18      didn't get paid, I did it voluntarily.
19          So all I'm telling you is, this is still
20      some person interpreting FIFRA to the best of their
21      ability, I guess.  I don't know who wrote this.  It's
22      not necessarily the EPA wrote it.  It could have been.
23  Q.  And you're equating the Ohio EPA to the federal
24      Environmental Protection Agency?
25  A.  I've been involved in multiple rules development and

## Page 77

1       that's not atypical.
2   Q.  So you're saying that some random person in an office
3       in EPA probably wrote this?
4   A.  I'm not saying some random person.  I'm just saying,
5       it could or could not be an EPA person.  It could be a
6       subcontractor.
7   Q.  Are these rules the Label Review Manual approved by,
8       you know, the head of EPA?
9   A.  I have no idea who approved, who signed off on this.
10      I just don't know.
11  Q.  Regardless, let's get back to the point.
12  A.  Well, you're asking the question.
13  Q.  I know.  And I'm changing the subject.
14          Roman numeral III, acute toxicity
15      classification, the first sentence -- and we both read
16      it now -- talks about the six acute toxicity studies
17      performed with what?
18  A.  Well, you've skipped over the early...  I always am
19      interested in adjectives 'cause they define a
20      sentence.
21  Q.  Why don't you read the first sentence for the record?
22  A.  It says, "The signal word, hazards to humans and
23      domestic animals, non-WPS PPE, and first-aid
24      statements, are typically determined by the results of
25      the six acute toxicity studies performed with the

20 (Pages 74 to 77)

Stephen E. Petty, PE, CIH, CSP

| Page 78 | Page 80 |
|---|---|
| 1  production formulations." | 1  confused. |
| 2  So they use the word, typically. | 2  (DEFENDANT'S EXHIBIT 11, LABEL REVIEW |
| 3  Q.  Well, I didn't ask you that. | 3  MANUAL, CHAPTER 10 WAS MARKED FOR |
| 4  A.  That's a big flag. | 4  IDENTIFICATION.) |
| 5  Q.  I asked you to read the first sentence.  I didn't ask | 5  A.  Thank you. |
| 6  you to dissect the first sentence, and you've done | 6  BY MR. UPSHAW: |
| 7  that. | 7  Q.  In chapter 10, go to page, I think it's 10-6.  I think |
| 8  Now, my next question is, does this | 8  you have... |
| 9  sentence refer to the active ingredient or does it | 9  A.  You asked questions about this last time. |
| 10  refer to the entire product formulation? | 10  Q.  Yeah.  It's table 1, we talked about last time. |
| 11  A.  It's not clear, because they're using the word, are | 11  A.  We, at length. |
| 12  typically. | 12  Q.  And I didn't remember whether you had included in your |
| 13  Q.  Okay. | 13  report or not. |
| 14  A.  That's my point. | 14  A.  Included what? |
| 15  Q.  Does the sentence refer to -- very simple, look at the | 15  Q.  Table 1. |
| 16  English language here -- does the sentence refer to | 16  A.  I don't think that table ends up... It's kind of a... |
| 17  the product formulation or the active ingredient? | 17  That table, if you look at the standard -- |
| 18  A.  It just says, typically. | 18  Q.  Let me get a question -- |
| 19  Q.  You're missing... What are the last two words of that | 19  A.  The tables that I cited straight from the standard and |
| 20  first sentence, Mr. Petty? | 20  they begin on page 114. |
| 21  A.  "Product formulation." | 21  Q.  When you say straight from the standard, you cite a |
| 22  Q.  Okay. | 22  table from CFR? |
| 23  A.  But that's not... That's not the answer to the | 23  A.  Correct. |
| 24  question you... I mean, those are what those words | 24  Q.  Is that what you're saying? |
| 25  say, but that's not what the sentence says. | 25  A.  Yes. |

| Page 79 | Page 81 |
|---|---|
| 1  Q.  So the answer... Wait.  So I think my question, Mr. | 1  Q.  What page are you on? |
| 2  Petty, was:  Does the sentence refer to product | 2  A.  I said 114.  It begins on 114.  And then the tables |
| 3  formulation or the active ingredient?  And you're | 3  extend through 117. |
| 4  saying the sentence doesn't say, product formulation? | 4  Q.  Right.  And if I recall correctly, you state that |
| 5  A.  No.  It says, are typically.  So it's not... It's not | 5  this, the tables 6-1 through 6-9, are pesticide |
| 6  defining it as necessarily... | 6  warnings language in FIFRA, correct, based on acute |
| 7  If it had said, are determined, period; | 7  rather than chronic hazards, and you do nine different |
| 8  didn't use the, are typically -- | 8  tables; is that right? |
| 9  Q.  Okay. | 9  A.  I didn't do 'em.  I'm just... I'm just repeating |
| 10  A.  -- then that would be definitive. | 10  them. |
| 11  The sentence is not definitive. | 11  Q.  Well, you added them onto your -- in -- into your |
| 12  Q.  You use this same language in your report, don't you? | 12  report, right? |
| 13  A.  I don't know.  Show me an example. | 13  A.  I'm just repeating the language that's in the... |
| 14  Q.  Page 104. | 14  Q.  But that's where these come from? |
| 15  A.  Okay. | 15  A.  Oh, yeah.  I've cited.  You see where I've cited it |
| 16  Q.  I'm not using my copy, so I've got to find where you | 16  from, Exhibit 29; sections 156.60 to 156.80. |
| 17  refer to signal words. | 17  Q.  Right.  I guess... And we talked about that in detail |
| 18  Mr. Petty, you're familiar with chapter 10 | 18  and we talked about chapter 10. |
| 19  of the Label Review Manual, correct, that's the Worker | 19  A.  This came up in context before that you were |
| 20  Protection Label? | 20  suggesting or, or suggesting that this table 1 |
| 21  A.  I think we talked about it before. | 21  suggested that socks were PPE and I violently |
| 22  Q.  Right.  I was going to say, we discussed that section | 22  disagreed that that's the case. |
| 23  I think in some detail.  Let me just ask you a quick | 23  Q.  I hope you weren't violent. |
| 24  question, which in my review of my notes we didn't | 24  A.  No, but I meant, uh... Uh... |
| 25  ask.  Let me mark that as Exhibit 11, so we don't get | 25  Q.  So let me ask a question 'cause I think that sets the |

Stephen E. Petty, PE, CIH, CSP

Page 82

1   table for us.
2          MR. KRISTAL:  Well, I'm not sure if Mr.
3   Petty was done with his answer.
4          MR. UPSHAW:  I don't think there was an
5   answer.  He was trying to explain where we were, which
6   is not in response to any question I had.
7          MR. KRISTAL:  Well, I disagree.
8   BY MR. UPSHAW:
9   Q.  My question is --
10         MR. KRISTAL:  Finish your answer.
11  A.  Ask your question.
12  BY MR. UPSHAW:
13  Q.  Thank you.  My question is...
14  A.  I'm just trying to recall what we talk -- we talked
15      about this before.
16  Q.  Right.
17  A.  I don't know if we want to rehash the same stuff,
18      that's all.
19  Q.  Well, I'm going to ask my question, whether it's been
20      asked in another deposition or not.
21  A.  That's fine.  I'm just trying to remind you that we've
22      talked about this.
23  Q.  I appreciate that.  We didn't talk about this
24      specifically, what I'm trying to get an answer to.
25          Table 1 is handler personal protection

Page 83

1   equipment for WPS products, and we talked about what
2   WPS was, right?  Can you tell us for this deposition?
3   A.  Worker protection standard.
4          COURT REPORTER:  What is that?
5   BY MR. UPSHAW:
6   Q.  Worker protection standard products?
7   A.  Yeah.  That's what my understanding of it is.
8   Q.  Now, this table shows data that, according to chapter
9       10, what is prescribed is prescribing as PPE, correct?
10      You don't have to agree with it, but that's what
11      they're saying it is.
12  A.  I don't know that they're necessarily saying that,
13      because you have to take this in context with the 170
14      language which defines PPE and uh, 'cause ultimately
15      you rely back to the statute, and I also refer back to
16      the fact that I'm a CIH.  So almost any industrial
17      hygienist would never agree that this table is showing
18      -- it's showing a combination of PPE items in some
19      cases and non-PPE items in others.
20  Q.  And so what I'm saying is, when this table,
21      specifically under 1, where it says, table 1 below
22      shows how the correct product-specific handler
23      protective clothing is derived in the acute toxicity
24      review, based on the toxicity category for a given
25      product.

Page 84

1          What this table is including as PPE, you
2   would disagree with, correct?
3   A.  Not just me.  The EPA doesn't agree with that.  Not in
4       the statute.
5   Q.  So EPA's own document in your opinion is wrong and
6       misleading?
7   A.  Well, we just talked about whether this is...  It
8       certainly has an EPA title on it, but it was prepared
9       by someone, who knows what, but as I talked about
10      before in the earlier section, the...  If I'm...  It's
11      my job to protect a worker.  Am I'm going to rely on a
12      guidance document or am I going to rely on the law?
13      I'm going to rely on the law and the statute.
14  Q.  Where...
15  A.  And if I'm not...  If I'm not...  And if I'm not
16      cogni...
17          Honestly, if I'm not smart enough, I
18      haven't had enough training or experience to know that
19      socks aren't PPE, I have no business trying to protect
20      workers, honestly.
21  Q.  Where it says note on the same page, 10-6, just above
22      the number 1, it says, "Note:  All end-use
23      occupational use products, (whether worker protection
24      or non-worker protection) need to have a minimum
25      baseline label required for work clothes for handlers

Page 85

1   consisting of long-sleeved shirt, long pants, shoes --
2   and socks -- or socks and shoes."
3          You would disagree with that, correct?
4   A.  You need to read the rest of this paragraph.  I
5       wouldn't...  I wouldn't --
6   Q.  I'm about to read it.  Do you disagree with that?
7   A.  Label required...  Label required.  What do you mean,
8       do I disagree with it?  Do I disagree that --
9   Q.  The minimum baseline required work clothes for
10      handlers consisting of long-sleeved shirt, long pants,
11      shoes and socks; that all end-use occupational work
12      products have to have that as a minimum?
13  A.  I don't know if I agree or disagree with it.  I
14      just...  I, I...  It's not PPE.  It's not going to
15      protect anybody from anything.
16  Q.  The next section, the next sentence says, "Technically
17      these work clothes items are not considered PPE, but
18      they can be required on labels," and they refer you to
19      the CFR section that allows that, correct?
20  A.  I'm not certain about that.  They refer to that CFR,
21      but I don't...  I think that, uh, that CFR is pretty
22      clear that, uh, if -- if you're saying that this is
23      going to protect workers -- that's what I'm interested
24      in -- I'm just going to say no, this document isn't
25      going to do that.

22 (Pages 82 to 85)

Stephen E. Petty, PE, CIH, CSP

Page 86

1  Q. So you wouldn't... You say this document's wrong?
2     If, if... If the EPA labels a product --
3  A. I don't think that's what I just said.
4  Q. Well, let me finish.
5  A. No, no. Let me finish. I don't think I said that.
6  Q. I think you did finish 'cause I asked the next
7     question.
8           Do you want to add on to your answer?
9           Do you agree or disagree with this
10    document; yes or no?
11 A. It's not that I agree or disagree with it. I disagree
12    with your interpretation of it.
13 Q. My interpretation of what's written here?
14 A. Exactly.
15 Q. That says, when you have a category I, danger, those
16    items listed under category I are the minimums you
17    need to -- you need to wear as handler personal
18    protection equipment. Did I misconstrue that?
19 A. Those words are there, but that's not the...
20    That's... That's not the... If you read the intent
21    of protecting workers, protecting workers does not
22    occur with non-PPE equipment.
23 Q. Okay.
24 A. Period.
25 Q. So the EPA is wrong when it says the minimum you need

Page 87

1     to protect workers under category I, danger label,
2     that's wrong?
3  A. I'd have to look at the 170 language. The 170
4     language is clear. That's what I've been saying all
5     along. I would rely --
6  Q. This refers to CF --
7  A. -- back -- I would rely -- let me finish, please.
8  Q. Go ahead. Go ahead.
9  A. I would rely primarily on... I would rely again on
10    the statute. And remember, these are minimums.
11    Monsanto goes through all kinds of lengths to say that
12    they're going to do more than the minimum.
13 Q. So that's a verbatim quote: We are going to do more
14    than the minimum?
15 A. It's pretty close.
16 Q. Okay.
17 A. It's pretty -- let me get the language just so we have
18    it on the record.
19 Q. You do that. Do that.
20 A. Page 242, last paragraph before my comments, opinions.
21    It says: At Monsanto, we comply with all relevant
22    international, national, local --
23 Q. I'm sorry, 242; where?
24 A. Last paragraph.
25 Q. Okay. I'm sorry, my last paragraph is your bold and

Page 88

1     bracketed.
2  A. Well, I said, above my opinions.
3  Q. That's what I did not hear. Go ahead.
4  A. It says:  At Monsanto, we comply with all relevant
5     international, national, and local laws and
6     regulations. We conduct numerous... We conduct
7     rigorous assessments to establish the safety of all
8     our products. In addition, by meeting or exceeding
9     all regulatory requirements, we assure our customers
10    that we have established the safety of all our
11    products and, when required, have satisfied rigorous
12    reviews by appropriate regulatory authorities to
13    assure the freedom to use our products and market them
14    internationally.
15          And then it says earlier on page -- bottom
16    of 241 -- Our business decisions have a direct impact
17    on our customers, business partners, shareholders, and
18    the communities where we live and work. This means we
19    will always need to do what is right, even when we are
20    faced with situations not governed by specific laws or
21    regulations. Our code is designed to aid us in making
22    the right choice, providing clear instructions for
23    appropriate business conduct.
24          So they're saying, they're not bound simply
25    by the laws. They're going to do above and beyond.

Page 89

1     That's the implication.
2  Q. That's how you interpret that?
3  A. I don't interpret it. Those are the words.
4  Q. That's what the words say, right?
5  A. That's what the words say.
6  Q. The words say that we will do above and beyond the
7     law?
8  A. They say that they will exceed all regulatory
9     requirements.
10 Q. It says, we will meet or exceeding all regulatory
11    requirements?
12 A. Right.
13 Q. There's an "or" there, right?
14 A. And they also say they're going to do what's right.
15 Q. Okay.
16 A. And what's right means that... I would be stunned if
17    Monsanto doesn't know that socks and and, uh, pants
18    are not PPE.
19 Q. That's a disjointed response, Mr. Petty.
20 A. No, it's not disjointed.
21 Q. You said, what's right is --
22          MR. KRISTAL: Let him finish.
23          MR. UPSHAW: Let me finish my comment and
24    my question.
25          MR. KRISTAL: And I'll object to the

23 (Pages 86 to 89)

Stephen E. Petty, PE, CIH, CSP

Page 90

1   comment.
2       MR. UPSHAW:  Thank you.
3   BY MR. UPSHAW:
4   Q.  You said, what's right and then you said, I'd be
5       surprised if Monsanto thinks socks.  What's right is
6       does not go with the second part of your sentence.
7       Would you please explain what you mean?
8       MR. KRISTAL:  Objection to form.
9   A.  Yes.  Monsanto clearly has, I would expect, some
10      health and safety experts.  And I would be stunned if
11      they would say that socks and pants and shirts are
12      PPE.  And in order to protect people, you... Aside...
13      You have to hire a few controls.  First thing is you
14      substitute out the bad thing.  The second thing is you
15      keep in a closed container, engineering controls.
16      Third thing, you keep 'me out of the area,
17      administrative controls.  And the fourth thing is PPE.
18          But the PPE is clearly not socks and jeans
19      and shirts.  And the implication that doing what's
20      right is to allow people to be exposed dermally to a
21      chemical, that that's right is in my opinion wrong and
22      I think their, their health and safety professionals
23      would have to agree that that's not PPE.
24  Q.  Thank you.  You qualified your answer sufficiently.  I
25      appreciate that.

Page 91

1           Looking at... Let me go back a second
2       because we were referring to chapter 7.
3   A.  Chapter 7?
4   Q.  Yes.  Go back to, I think it's Exhibit 10, right?
5   A.  Yes.
6   Q.  All right.  And we were looking at the first sentence
7       and you and I talked about the first sentence of Roman
8       numeral III, acute toxicity classification, right,
9       that language?
10  A.  Yes.
11  Q.  Okay.  And I asked the question... Other than
12      repeating what I said, I'll ask you a new question.
13          You agree with that language with regard to
14      toxicity studies performed with the product
15      formulation, right, in determining a signal word?
16  A.  I did what?  I'm not sure what you're asking.
17  Q.  You agree with the first sentence of chapter 7, Roman
18      numeral III?
19  A.  I don't know what agree with it means.  I... If
20      you're asking me if that's what the words say, I'll
21      say yeah, that's what the words say.
22  Q.  And do you agree with what the words say?
23  A.  In what context?
24  Q.  That the signal word, hazards to humans and domestic
25      animals, non-WPS PPE and first-aid statements, are

Page 92

1       typically determined by the results of six acute
2       toxicity studies performed with the product
3       formulation.
4   A.  If you're asking me what those words say, I'll say
5       yeah, that's what those words say.
6   Q.  And you've repeated similar words in your report for
7       Mr. Domina, correct?
8   A.  I don't know.  You were trying to find them before.
9   Q.  Yes.
10  A.  I assume you found them.
11  Q.  I did.  I was working off of one of your old reports,
12      not your new report.  Go to page 115.
13  A.  Yep.
14  Q.  Your tables, which we were just looking at in section
15      6-3 --
16  A.  Well, they're not my tables.
17  Q.  Wait a minute.  I will rephrase.
18          The tables in your report, tables 6-1 to
19      6-9 from FIFRA, according to the first paragraph of
20      section 6.3, you basically copied them; is that what
21      you're saying?
22  A.  That... That was the intent.
23  Q.  Okay.
24  A.  I mean, I didn't make these up.
25  Q.  And do you, because you copied them in here, do you

Page 93

1       have any disagreement with those tables per se as part
2       of your report?
3   A.  I'd have to know specifically what you're asking.
4   Q.  Any portion of FIFRA section that you've copied into
5       your report in section 6.3, do you disagree with any
6       of the information listed in tables 6-1 through 6-9?
7   A.  I don't know how to answer that question, I really
8       don't.
9   Q.  Well, you can tell, look at it and tell me, I disagree
10      with table 6-1, category II, or I disagree with table
11      6-3, product C.
12          Do you disagree with any of the information
13      included in table 6-1 through 6-9 of your report?
14  A.  I... I disagree that labeling should be based simply
15      on acute toxicity, yes.
16  Q.  Do you disagree with the words on page 115 below table
17      6.2, which say signal words are found on pesticide
18      product labels, and they describe the acute (short
19      term) toxicity of the formulated pesticide product.
20      The signal word can be either danger, warning, or
21      caution.
22  A.  Is there a question?
23  Q.  I... I started out with, do you disagree with the
24      sentence under table 6.2.
25  A.  That's what those words say.

Stephen E. Petty, PE, CIH, CSP

|  | Page 94 |
|---|---|

1  Q.  Do you disagree with those words, Mr. Petty?
2  A.  I don't know.  In context with what? I mean, I write a
3      whole chapter on acute warnings versus chronic
4      warnings versus the history of warnings, and I...  And
5      I'm critical of acute only warnings.  I'm critical of
6      how Monsanto worked to get the -- how they handled the
7      dermal data to influence and try to convince EPA that
8      they should move the signal classifica -- words and
9      classifications to lower levels.
10         So in the context of all of this, I'm not
11     sure how to answer your question.
12  Q.  Okay.  I think you've just answered it, sir.
13         All right.  40 CFR requires that there be
14     acute toxicity six-pack, right, for all labels, for
15     all end-use products?
16  A.  40 CFR, where?  Show me the section that --
17  Q.  40 CFR, section 158.500.
18  A.  Show it to me, please.
19         MR. UPSHAW:  Let's mark this as Exhibit 12.
20         (DEFENDANT'S EXHIBIT 12, 40 CFR
21         SECTION 158.500 WAS MARKED FOR
22         IDENTIFICATION.)
23  BY MR. UPSHAW:
24  Q.  Here you go.
25  A.  Thank you.

|  | Page 95 |
|---|---|

1         MR. KRISTAL:  Do you have one for me?
2         MR. UPSHAW:  Yeah.
3         MR. KRISTAL:  Thank you.
4  BY MR. UPSHAW:
5  Q.  Are you familiar with this section of the CFR,
6      toxicity data requirements table?
7  A.  I've read it.  I don't know if the term, familiar, is
8      right, but go ahead.
9  Q.  You seen it before, though?
10  A.  I believe I've seen it.
11  Q.  And you are familiar with the procedure for an end-
12     user product label to be approved by the EPA, right?
13  A.  Yeah.  I believe so, overall.
14  Q.  Right.
15  A.  I mean, it's...  It's a...  They're completely reliant
16     on the information they get from the manufacturer, but
17     yes.
18  Q.  And part of the information they get from the
19     manufacturer who's requesting to have their product
20     label approved is to submit an acute toxicology six-
21     pack, right?
22  A.  Part of it.
23  Q.  That's why I said, part of the information that they
24     submit.
25  A.  Well, I just agreed with you.

|  | Page 96 |
|---|---|

1  Q.  All right.  Let me look at this for a second.
2         It's your opinion that despite what's
3      required in 158.500, that, as long as the pesticide
4      poses only an acute hazard and the acute hazard is at
5      levels shown in the tables that we were just talking
6      about, the label on the pesticide containers is
7      prescriptive as indicated in these exact tables.  And
8      I'll refer you to page 117, your commentary below
9      table 6-9.
10  A.  Okay.
11  Q.  So as I understand your commentary, if there is a
12     pesticide which may have a more long-term or chronic
13     hazard, then these tables still apply?
14  A.  Well, they apply in part still.  I mean, my criticism
15     isn't to do with the tables.  It's to do with the data
16     that resulted in the selection of what values to use
17     from the tables.  That's where I spend dozens and
18     dozens of pages.
19  Q.  So you don't have a problem with the procedure that
20     the EPA uses, that is to use acute toxicity six-pack?
21  A.  Oh, I'm critical of that as well as are others.  I
22     cite others from 1980s forward who are critical of it.
23  Q.  So you're critical of the process as well as the
24     information that's put into the process?
25  A.  It's an arcane process, yeah, absolutely.

|  | Page 97 |
|---|---|

1  Q.  And that because the EPA only uses acute toxicity
2      data, then the PPE required is inappropriate --
3         MR. KRISTAL:  Objection to form.
4  Q.  -- for a particular pesticide?
5  A.  Try that one on me again, I'm sorry.
6  BY MR. UPSHAW:
7  Q.  I'm connecting your disagreement with the EPA's use of
8      an acute tox six-pack to determine the level of PPE
9      required.
10  A.  Well, it's more than that.  I mean, they have a
11     fundamental requirement if they have any new data that
12     would impact it, to provide that data.  So they didn't
13     provide the TNO data, for example.
14  Q.  When you say that, and just so we're clear...
15  A.  The manufacturer has an obligation; a, a...  An active
16     obligation if they have new significant information,
17     to provide that to the EPA.
18  Q.  And is it your --
19  A.  And when I look at the basis for their six-pack, they
20     didn't always do that.
21  Q.  Didn't always do that when, on every single new
22     formulation that's been presented to the EPA?
23  A.  No, no.  Look at all the dermal information that I
24     reviewed at length, and ask yourself if all of those
25     studies and all that information was provided to the

25 (Pages 94 to 97)

Stephen E. Petty, PE, CIH, CSP

## Page 98

1  EPA. It wasn't.
2  Q. My question, sir, is --
3  A. And they had a proactive requirement if there's a
4  significant finding -- in the case of the TNO, they
5  had very -- a relatively -- they knew that they had
6  levels above -- they were seeing levels above what
7  the Europeans required, which is a three percent
8  penetration rate.
9  Q. Which products, Mr. Petty, are you referring to --
10  A. Well, we want to go back --
11  Q. -- every single -- every single Monsanto Roundup
12  formulation or a particular Monsanto Roundup product?
13  A. Monsanto is making the choice on which products they
14  want to test and which data they want to provide to
15  the EPA. The EPA doesn't tell them which ones to
16  provide. It's not their job.
17  Q. So you're familiar that for every Roundup formulation
18  which is on the market today, it has to go through a
19  separate acute toxicity six-pack and be approved, the
20  labels approved, right?
21  A. I think if they're real close... I'm not sure
22  absolutely... I'm not sure if absolutely every one
23  is, but I don't know.
24  Q. So you're not sure?
25  A. I'm not sure if every one is.

## Page 99

1  Q. So we won't make that definitive statement.
2  For every formulation that you're aware of
3  that has been submitted for a label, you recognize
4  that for every one of those formulations they have to
5  go through the same procedure, that is provide an
6  acute tox six-pack and other information to EPA,
7  right; that's just basic?
8  A. Amongst other things.
9  Q. Right, amongst other things.
10  And it's your contention, sir, regarding
11  your opinion that Monsanto didn't update that
12  information -- should they have updated it for every
13  single formulation or for certain formulations? And
14  what time frame. So that's a second question. You'll
15  answer that one now.
16  A. Sure.
17  MR. KRISTAL: Object to form.
18  BY MR. UPSHAW:
19  Q. I was giving you a look-ahead as to where my next
20  question was going.
21  162.8 on page 119 says -- talks at length.
22  Q. 162?
23  A. .8(d) is what I'm referring to.
24  Q. Okay.
25  A. Has, imposes on the registrant the affirmative duty to

## Page 100

1  report any additional factual information regarding
2  adverse effects on man or the environment of a
3  pesticide.
4  Q. And what's the date of that?
5  A. What's the date of what, 162.8?
6  Q. From what you're referring to here.
7  A. I say, that's been done as far back as 1975, and I'm
8  citing Exhibit 18, this page of the Federal Register.
9  Q. Okay.
10  A. The duty falls on the applicant and registrant because
11  they are in the better position to monitor the
12  literature as regards to a particular pesticide.
13  And then under 162.8, if you look on the
14  bottom of page 120 and the top of 121: If at any time
15  after the registration of a pesticide product the
16  registrant has additional information regarding any
17  adverse effects on man or the environment, he shall
18  submit such information to the administrator.
19  Q. And it's your opinion that Monsanto has never done
20  that?
21  A. I didn't say they've never done it. I said, they
22  haven't done it on some... They killed a key study.
23  Q. So it's one study that they haven't -- they didn't put
24  in?
25  A. It... It's... You know, if I wanna... If you want

## Page 101

1  me to walk you through all the dermal analysis, I'll
2  do that, and I'll show you in each one where either
3  they partially -- they either didn't provide the
4  information or they provided, for instance, in
5  Westerly, they provided EPA ultimately with the data,
6  assuming that the only mechanism was the material that
7  shows up in the urine, and they knew internally that
8  wasn't true.
9  Q. And so every study that you say Monsanto did not
10  supply or provide to the EPA, you talk about here in
11  your report?
12  A. No, but I have focused on the dermal side and I have
13  examples.
14  Q. So every dermal study that you say that Monsanto did
15  not provide to the EPA as required in the sections you
16  just read is here in your report?
17  A. I'm not saying that, either. I gave examples. This
18  report would be thousands of pages long if I did an
19  analysis of every study.
20  Q. How many studies do you think there are that the --
21  A. Well, I just --
22  Q. -- that the EPA -- that the EPA did not receive?
23  A. I just got four more at the end of last week --
24  Q. Okay.
25  A. -- that I just reviewed for you in as timely a way as

Stephen E. Petty, PE, CIH, CSP

Page 102

1     I could and I provided a summary of that.
2   Q.  So it's your opinion that the EPA was unaware of the
3       Davies studies?
4   A.  It's not a matter of whether they're aware or not.
5       It's a matter of whether they understand the
6       limitations of them. I... I go through a lengthy
7       example of the interpretation of, for instance, the
8       dermal irritation study that was done by... We can go
9       back through all of these because there's so many
10      examples.
11  Q.  Let's stick with Davies. Let's stick with the Davies
12      since that's your new stuff.
13  A.  No. Let's... Let's...
14  Q.  'Cause that's where my question was then centered on.
15  A.  No, it was more than that. But fine, if we want to
16      change the question, that's fine.
17  Q.  So you read a section at the bottom of page 120 of
18      your report, continues on page 121, that at any time
19      the registration of a pesticide product, the
20      registrant had additional information regarding any
21      adverse effects on man or the environment, he shall
22      submit the information to the administrator.
23          Is it your opinion, sir, that the EPA was
24      unaware of those four Davies studies that you've just
25      added recently to your --

Page 103

1   A.  Well, I'm not even... I'm not even... I don't know
2       why you've picked that. I was just saying, there's,
3       there's dozens of studies. I haven't looked at them
4       all, but the ones that I've looked at and reported on,
5       they either didn't report them or they misleadingly
6       reported the results.
7   Q.  And what section of your report? Is that contained in
8       one section?
9   A.  Section 4.
10  Q.  Okay.
11  A.  Is where the dermal piece of it is. And I also talk
12      at length about misrepresentation of how information
13      is then used in their marketing and advertising and
14      labels.
15  Q.  We're not talking about that right now, are we? We're
16      talking about --
17  A.  Well, 'cause it's part of EPA and it's part of
18      warnings. That's what I'm here for.
19  Q.  You referred to section 162.8, right, and you read a
20      section. Does that have anything to do with
21      marketing? No. Does it?
22  A.  Ultimately it does, because whether the data --
23  Q.  Is there anything in that... Is there anything in
24      that section that talks about --
25  A.  Let me give you an example. You just asked me, does

Page 104

1       it have to do with marketing, and I'll tell you why.
2   Q.  Sure.
3   A.  Go to page 63.
4   Q.  Sure.
5   A.  And this is the '86 Maibach study where they looked at
6       dermal irritation with glyphosate, Pine-Sol liquid
7       cleaner, Johnson's Baby Shampoo, liquid dishwashing
8       detergent.
9   Q.  Um-hum.
10  A.  And we have --
11  Q.  What year was that study again?
12  A.  1986.
13  Q.  '86. How long ago was that?
14  A.  That was 14, uh... 12 years after they introduced the
15      product.
16  Q.  But that was, from 2019, that was, uh, what, 33 years?
17  A.  They're still, in their marketing literature, saying
18      it's as safe as baby shampoo.
19  Q.  You're missing my point.
20  A.  No. I'm making the point that their... That the...
21      You're saying, how does this get translated to the
22      marketing side.
23  Q.  Okay, go ahead. Sorry to interrupt you.
24  A.  And the baby shampoo doesn't have any dermal effect,
25      and yet I've got in the back of this report where

Page 105

1       they're telling customers it's just as safe as
2       shampoo.
3   Q.  Okay. And so --
4   A.  That's not true.
5   Q.  -- what does that have to do with the section we were
6       referring to, which is 19 --
7   A.  Because they use this study as well --
8   Q.  -- 162.8?
9   A.  -- because on 66, you'll see that they -- there's
10      correspondence with the EPA where -- and this is the
11      exact correspondence where they misrepresented the
12      study to the EPA. There's no doubt about it.
13  Q.  And what does that have to do with section 162.8?
14  A.  Well, that's a different question.
15          I was talking about... I said to you that
16      I have dozens of examples here where either they
17      didn't report the data like TNO or they misrepresented
18      the data. I was giving you an example of where they
19      misrepresented. Then you said, well, where did they
20      do that in the marketing, and I just gave you that
21      example.
22  Q.  Okay.
23  A.  So then you ask a different question and you go
24      backwards, so that's fine.
25  Q.  Okay.

27 (Pages 102 to 105)

Stephen E. Petty, PE, CIH, CSP

## Page 106

1   A.  The TNO study was the example I gave you.
2   Q.  And it's your opinion that the EPA, as I started out
3       with a few minutes ago, that the EPA was unaware,
4       remains unaware, and remains unfamiliar with the
5       results of the TNO study?
6   A.  That's my understanding.  I see no evidence it was
7       ever submitted to them.
8   Q.  Okay.  Last time we were together I asked you if you
9       had seen the EPA August 8, 2019 news release, and I
10      think you told me you had not?
11  A.  I believe that's true.
12  Q.  Since then, have you seen it and read it, reviewed it?
13  A.  I don't think so.
14  Q.  After I informed you that it was in existence in
15      September, you thought it was what, unimportant to add
16      that to your body of knowledge?
17                  MR. KRISTAL:  Object to the form.
18  A.  Well, I don't think that's true at all.
19  BY MR. UPSHAW:
20  Q.  Did you look for it after I clued you in that there
21      was this EPA August 2019 news release?
22  A.  I didn't look for it.
23  Q.  Why not?
24  A.  I don't know.  I had many other, uh, many things to do
25      and I've reviewed many, many documents between now and

## Page 107

1       then -- hundreds of them
2   Q   Mr Kristal and counsel for Weitz Luxenberg or Mr
3       Domina, not our plaintiff, but his brother, didn't
4       send you this news release in the materials that they
5       sent you?
6   A   Is it in the list of reliance materials?
7   Q   We're not going to go back through what's listed and
8       what you reviewed, but it's not in your list of
9       reliance materials?
10  A   Then I would have been sent it, that's my point
11  Q   All right
12  A   I've explained at length the process we go through,
13      and what's there is what we've received
14  Q   Okay  Do you remember it?  Do you want me to
15  A   I don't remember it, but you showed it to me once
16      before
17                  (DEFENDANT'S EXHIBIT 13, EPA NEWS
18                  RELEASES FROM HEADQUARTERS WAS MARKED
19                  FOR IDENTIFICATION )
20  BY MR  UPSHAW:
21  Q   Let's mark as Exhibit 13   By the way, did you
22      review the transcript of your other depositions that
23      we were involved in?
24  A   I believe so
25  Q   You look for any errors we may have --

## Page 108

1   A.  Sure.
2   Q.  -- scrivener's errors that may have happened?
3   A.  Mainly look for typos and misspellings.
4   Q.  Did you look at the exhibits to that deposition?
5   A.  I don't get the exhibits unless I ask for them.
6   Q.  Did you ask for the exhibits?
7   A.  I did not.
8   Q.  Do you want a chance to read this again?
9   A.  Sure.
10  Q.  Yes, sir, sorry.
11  A.  Okay.  I've read through it.
12  Q.  The first sentence starts off with the EPA is issuing
13      guidance to registrants.  That would include Monsanto,
14      right?
15  A.  Sure.
16  Q.  And it says:  Issuing guidance to registrants of
17      glyphosate to ensure clarity on labeling of the
18      chemical on their products.
19                  So that would include Roundup?
20      It would.
21  Q.  Next sentence says:  The EPA will no longer approve
22      product labels, claiming glyphosate -- glyphosate --
23      is a known -- is known to cause cancer.  A false claim
24      that does not meet the labeling requirements of the
25      Federal Insecticide, Fungicide, and Rodenticide Act or

## Page 109

1       FIFRA.
2                   I read that correctly, right?
3   A.  That's what those words say.
4   Q.  Do you disagree with the EPA, that glyphosate is known
5       to cause cancer?
6   A.  I'm not the toxicology expert in this case and I don't
7       pretend to be, but I will tell you that from an
8       industrial hygiene standpoint where our responsibility
9       is to air on the side of public safety and to
10      anticipate and recognize potential hazards, that the
11      conservative approach would be to protect as if it
12      were, because the science continues to evolve.
13                  So whether or not it's a carcinogen or not,
14      I'm not here to have an opinion on, one way or the
15      other, because that's not my job and that's not my
16      expertise for this chemical.
17                  My expertise is, do I take the body of
18      knowledge -- and I'm here to say to you that as an
19      industrial hygienist, we rely not only on information
20      from the US, particularly in industrial hygiene on
21      chemicals, but from other sources as well, and the
22      proper thing to do, if I'm going to protect someone,
23      if there is a study, a significant study that says it
24      could and there are others that say it couldn't -- I
25      think we've had this discussion before, whether it can

Stephen E. Petty, PE, CIH, CSP

Page 110

1 or it can't -- my job is to provide -- is to protect
2 against, against potential hazards, but more
3 importantly it's -- on the warning side, the job is to
4 inform the customer so they have a choice. Even if
5 the probability is very low or it's uncertain or it's
6 evolving science, why should I not show that customer
7 that work and let them make the decision.
8        So that's what I'm saying, from a public
9 health and safety standpoint is, I'm not here to say
10 EPA's right or wrong or somebody else is right or
11 wrong. I'm here to say, there's conflicting data, but
12 you should know all the data so you can make a choice,
13 Customer. Even if the odds are low, now I've given
14 the customer that choice. If I don't provide that
15 information as an industrial hygienist, then they
16 don't have -- or warnings expert, if they don't have
17 the information, then they never have a choice.
18        In other words, you can say, okay, EPA says
19 it's not, IARC says it is. Here's... They're
20 conflicting opinions. Then me as Customer, if I'm
21 told that, then I get to make the choice. But if I
22 exclude that from the label, then how do I as a
23 customer even know that there's other information?
24        So that's how I look at this. I look at it
25 from an industrial hygiene warning standpoint, not

Page 111

1 from a toxicology standpoint, because I'm not here as
2 a toxicologist. I'm here to say, okay, our job is
3 really to be out in front, to make sure that we
4 anticipate and recognize potential hazards before
5 they're locked in solid and to give people the
6 warnings and the choices so they can make informed
7 decisions. And some will decide, we believe EPA and
8 some will say they believe IARC, but if they have both
9 the information in that binary, they get to make that
10 choice.
11        The manufacturer or the EPA doesn't become
12 judge and jury. You let the customer make the
13 decision, and that's how I look at it from a health
14 and safety standpoint.
15 Q. Done?
16 A. I think so.
17 Q. I don't want to interrupt you.
18 A. Thank you.
19        MR. UPSHAW: Move to strike as non-
20 responsive.
21 BY MR. UPSHAW:
22 Q. Is it your opinion then that the EPA is not, quote,
23 out in front of the glyphosate question?
24 A. On the issue of, of... I'm not here to define what...
25 I'm not here as the cancer expert for glyphosate. So

Page 112

1        I don't have an opinion, one way or the other.
2 Q. That's not the question. The question here in this --
3 A. Well, what do you mean by out front then?
4 Q. I'm using your language. You said that as an IH and
5 so on and so forth, that you want to be out in front
6 where there's a question of whether or not some agent
7 may or may not cause harm to humans.
8        My question to you, sir, is: Is it your
9 opinion that the EPA is not, quote, out in front of
10 the glyphosate issue?
11 A. It's a non sequitur. That's not what I'm saying.
12 What I'm saying is, EPA says one thing. As an
13 industrial hygienist, as a warnings expert, when I'm
14 trying to warn customers on potential hazards or to
15 how to protect them, is it my job to pick the winner
16 and loser study? No. IARC says this, EPA says this,
17 somebody else says this. If it's a significant study,
18 what I should do is report it, and let the customer
19 decide whether they want to use the product, how they
20 want to protect themselves. Hopefully, I give them
21 some advice as part of that warnings and how to do
22 that, that's proper, but I'm talking about out front
23 from the standpoint of industrial hygiene warnings and
24 not trying... I'm not going to try to decide whose
25 cancer study is better than somebody else's. That's

Page 113

1 not my expertise. My expertise is, there's data out
2 there that says this and there's data out there that
3 says that. Put it out there and let people have that
4 choice. If you don't do that, then they don't have
5 the choice, that's the difficulty, from a warnings
6 standpoint.
7 Q. And who makes that decision, sir, on who has that
8 choice: Monsanto, the manufacturer, or the regulatory
9 agency, in this case EPA?
10 A. Monsanto should make that choice on their labels to
11 show significant studies and, you know, that's...
12 Monsanto ultimately is the one that provides the
13 information and makes the labels. They provide what
14 they're going to do to the EPA. The EPA... The EPA
15 rarely will tell somebody they can't over-warn.
16 Q. Really?
17 A. It's unusual.
18 Q. Do you see here where it says that any label claiming
19 glyphosate is a known cancer, a false claim that does
20 not meet the labeling requirements; do you think that
21 the EPA would allow Monsanto to include, quote, a
22 false claim, close quote, on its label?
23        MR. KRISTAL: Object to form.
24 A. I don't think Monsanto was ever, to my knowledge,
25 going way back to the mouse study, ever interested in

29 (Pages 110 to 113)

Stephen E. Petty, PE, CIH, CSP

## Page 114

1  having glyphosate declared a carcinogen.  In fact,
2  they were against it all the way.
3  BY MR. UPSHAW:
4  Q.  That's not my question.
5  A.  And so they're providing the input by which EPA makes
6  decisions.
7  Q.  Who makes the -- I'm sorry, go ahead.
8  A.  And so, you know, it's kind of backwards here.  EPA --
9  or, I mean, Monsanto could have said, you know what,
10  IARC said this, we had that mouse study that said
11  this.  We're kind of not sure yet.  But, instead, they
12  tried to defeat the mouse study by finding a, uh...
13  There was almost a two-year back and forth with EPA
14  and Monsanto on all of that.  Monsanto, because of the
15  requirements that would occur if in fact it was a
16  carcinogen, Monsanto frankly fought very hard to keep
17  it from being declared that way.
18  Q.  Let's bring...  Let's bring --
19  A.  So the bottom line is that Monsanto wasn't proactive
20  in saying, you know...  In fact, they go round and
21  round about not only glyphosate, but they say we don't
22  really know what the toxicity of the product is from a
23  chronic standpoint.
24  Q.  Okay.
25  A.  So I'm of the opinion that Monsanto certainly wasn't

## Page 115

1  making any effort to encourage EPA to go ahead and
2  over-warn.  In fact, they were trying to discourage
3  them from doing that.
4  Q.  Are you done?
5  A.  Um-hum.
6  Q.  You are aware that nothing can be included on a FIFRA-
7  regulated label that is not approved by the EPA,
8  right, nothing?
9  A.  Well, it's sort of like they submit it and the EPA
10  says yes.  So it goes back to the original question.
11  If Monsanto wanted to put stuff on there, that doesn't
12  mean that EPA -- that, that said -- let's say that
13  Monsanto said, you know what, we're going to say it's
14  a potential carcinogen.  We're not sure, but it's a
15  potential carcinogen.  I don't think that EPA would
16  necessarily say you can't do that.
17  Q.  You don't think?
18  A.  No.  EPA is going to basically take the...  The, the
19  manufacturer is required to provide them with the
20  information they have.  They're...  They're
21  basically...  They have to make their decision on the
22  information they're provided.
23  Q.  The EPA doesn't go out and get any of its own
24  information with regard to products that are submitted
25  to it?

## Page 116

1  A.  Well, I mean, that's an absolute question and I'm
2  going to say it has a yes or no component to it.  By
3  and large, EPA is dependent, as they say in the
4  regulation, on the manufacturer to provide that
5  information.
6  Q.  And so --
7  A.  Is it true -- let me finish.
8  Q.  Please do.
9  A.  Is it...  Do they ever go out on their own and look
10  for something?  Perhaps, but they're relying primarily
11  on the manufacturer for input.
12  Q.  And is it your opinion then that the EPA has gone no
13  further than the various manufacturers of glyphosate-
14  based herbicides to obtain information with regard to
15  the carcinogenicity of Roundup or other glyphosate-
16  based herbicides?
17  A.  I mean, you keep trying to walk me into this
18  discussion about the, all the toxicology, and I keep
19  telling you, I'm not the toxicologist on this project.
20  What I'm telling you is that there was nothing to
21  prevent Monsanto from saying oh, there's a possibility
22  that it's a carcinogen.
23  Q.  Did the EPA consider IARC?
24  A.  I assume they did at some level.  There's a lota...
25  There's a lot of debate about that, even within EPA.

## Page 117

1  Q.  Did the EPA consider more than just the data submitted
2  by one manufacturer of glyphosate-based products in
3  IARC?
4        MR. KRISTAL:  Objection.
5  A.  You're trying to rope me into the toxicology.
6  BY MR. UPSHAW:
7  Q.  No.
8  A.  I have no opinion on the...  I'm not going to be the
9  toxicology expert.
10  Q.  And I appreciate that.
11  A.  I'm the warnings expert and I'm the dermal expert.
12  Q.  Okay.  We're talking about warnings.  And you told me
13  you're familiar with the EPA's procedure --
14  A.  Well, to some extent.
15  Q.  -- in creating -- in creating warnings.
16        Oh, you're not totally familiar with that
17  procedure?
18  A.  Well, I don't know what totally familiar means.
19  Q.  Well, you don't know the procedure from front to back?
20  A.  I don't know how to answer that question.
21  Q.  Either you do or you don't.  You know from step 1
22  to -- from step A to step Z?
23  A.  I don't know how to answer that question.
24  Q.  Do you know the flow diagram of how, when you come up
25  with a product, what you have to do to submit your

Stephen E. Petty, PE, CIH, CSP

Page 118

1    initial label, what you have to submit, what
2    toxicology, uh, six-pack?
3    A.  I read the regulations, like, and we've gone through
4    that.
5    Q.  Sure.  And you've never done that before, right?
6    A.  Never done what?
7    Q.  You've never submitted a product for registration.
8    A.  I have not submitted a product for registration.
9    Q.  Are you familiar with California's Prop 65
10   determination regarding glyphosate?
11   A.  I'm familiar with prop 65 and I'm familiar with the
12   fact that based on the IARC study, that they believed
13   under their regulations that that information should
14   be made available to the public.
15   Q.  And do you know that the federal EPA disagrees with
16   California with regard to whether or not glyphosate
17   should be labeled as a carcinogen to humans?
18   A.  There's litigation going back and forth.  I'm not
19   familiar with all of that.
20   Q.  Are you familiar with any of the -- strike that.
21          Were you provided with any of the letters
22   between Monsanto and EPA regarding the prop 65
23   warning?
24   A.  I was trying to think out loud.  I don't know if I was
25   provided with the letters, but there was some back and

Page 119

1    forth in a deposition, I thought, that talked about
2    that, and I just don't recall the... I think there
3    was some discussion about that in, uh, in one of the
4    later depositions I've read, but I don't recall having
5    the attachments.
6    Q.  Okay.
7    A.  I know there was some back and forth on that.  That's
8    all I recall.
9    Q.  Is it your opinion, Mr. Petty, that Monsanto can
10   include a warning or information regarding the
11   potential -- strike that.
12          Is it your opinion that Monsanto can modify
13   its label to include information about the product
14   possibly being carcinogenic?
15           MR. KRISTAL:  Objection to form.
16   A.  Could they?
17   BY MR. UPSHAW:
18   Q.  Yes.
19   A.  Well, it would be part of the process of submitting
20   new information.  And I think at that point it kicks
21   it into a different category.  I'll look for the exact
22   language.
23   Q.  Well, while you're doing that, tell me if there's
24   anywhere in your report how Monsanto would do that.
25   A.  Well, it's under new information.  I mean, we've gone

Page 120

1    through that earlier.  It's under 162.8.
2    Q.  There's information?
3           MR. KRISTAL:  Well, let him finish the
4    first question you asked because while he's looking
5    for the answer, you're asking another question.
6           MR. UPSHAW:  Sure.
7           MR. KRISTAL:  I don't think that's fair.
8    BY MR. UPSHAW:
9    Q.  Go ahead.
10   A.  So first, the information would get submitted to them
11   as new information.
12   Q.  What information?
13   A.  Significant findings that would affect human health or
14   the environment.  Potentially affect human health or
15   the environment.
16   Q.  And these would be findings that the EPA's unaware of
17   at this point, right?
18   A.  Well, they have a proactive requirement to submit it,
19   whether EPA knew it or not.
20   Q.  So...
21   A.  So let me... Let me --
22   Q.  I'm sorry, go ahead.
23   A.  -- get to the first question.
24   Q.  All right.
25   A.  So what happens is, if it has the potential to be a

Page 121

1    carcinogen, then it moves into this category called...
2    Let's see... Bear with me.  Let me get the section.
3           MR. KRISTAL:  Can I move this along by
4    telling him what page he's already written about that
5    he's looking for or are we going to waste time?
6           MR. UPSHAW:  I appreciate your assistance
7    and thank you for asking, Mr. Kristal.
8           MR. KRISTAL:  And the answer is...
9           MR. UPSHAW:  No.  I appreciate your
10   assistance.  Thank you.  Or I would have said no, let
11   him look for it.
12           MR. KRISTAL:  Look at 102.
13   A.  Yes.  It's earlier than the acute stuff.
14          So it falls under the concept of restricted
15   use products ultimately.  And it would be this 154.
16   On 105, it would be criteria for initiation of a
17   special review if there's a finding of significant
18   evidence, including potential for inducing tumors in
19   humans.
20   BY MR. UPSHAW:
21   Q.  And what would be that validated test or other
22   significant evidence that you would suggest that
23   Monsanto submit to EPA, that EPA does not already have
24   in its possession?
25           MR. KRISTAL:  Objection to form.

31 (Pages 118 to 121)

Stephen E. Petty, PE, CIH, CSP

Page 122

1  A.  I don't know.  You asked me if that information were
2     available, how would it play out, and how would they
3     change the label.  That's what I'm trying to answer
4     the question.  That was the base question.
5  BY MR. UPSHAW:
6  Q.  Okay.  And that was my follow-up question.
7  A.  Well, I haven't finished.
8        So it goes through the initiation of a
9     special review and there's a whole series of criteria
10    associated with that.  And then, if in fact that's
11    shown to be true and it's a restricted use product and
12    that -- then the label would have the fact that it's a
13    potential carcinogen on it, but it would also come
14    with restricted use and a lot more requirements for
15    personal protective equipment as well as limitations
16    on who could use the product.
17        MR. KRISTAL:  We've been going about an
18    hour and a half almost, I think, since we last
19    started.  Are you at a break point soon?
20        MR. UPSHAW:  Soon.
21        VIDEO TECHNICIAN:  I need to change the
22    card.
23        MR. UPSHAW:  When do you need to change it,
24    now?
25        VIDEO TECHNICIAN:  Five minutes.

Page 123

1        MR. UPSHAW:  All right.  Change it now.
2        VIDEO TECHNICIAN:  Can we go off?
3        MR. UPSHAW:  Yes.
4        VIDEO TECHNICIAN:  5:19, going off the
5     record.
6        (Recess taken at 5:19 p.m.)
7        (Back on the record at 5:31 p.m.)
8        VIDEO TECHNICIAN:  5:31, back on record.
9  BY MR. UPSHAW:
10 Q.  Okay.  Mr. Petty, let me show you...  Well, let me ask
11    you, do you know what was attached to the Exhibit 13,
12    which was the press release?  Have you seen what was
13    attached to that?
14 A.  Let me check.  I'm just trying to see if I saw this
15    before or not.  It strikes me it was in a deposition.
16 Q.  I know it was in the last one you and I were together
17    in.
18 A.  No, no, no.  I meant the...  You asked if I've seen
19    that since then.
20        (Witness reviewing documents.)
21 Q.  Are you looking...  I should ask, what are you looking
22    for?
23 A.  I'm just trying...  You asked me if I saw some on the
24    back of this, but I said that I saw this in a
25    deposition, so I'm just trying to see if I -- if

Page 124

1     there's something --
2  Q.  You realize it's on your materials considered list,
3     right?
4  A.  That's what I'm looking at, yeah.
5  Q.  Can I help you and direct you to item 552?
6  A.  Here it is.  Okay, there it is.
7  Q.  And this was in a group of documents that were added
8     subsequent to our last meeting in September of this
9     year, right?
10 A.  It was.
11        (DEFENDANT'S EXHIBIT 14,
12        AUGUST 7, 2019 LETTER WAS
13        MARKED FOR IDENTIFICATION.)
14 BY MR. UPSHAW:
15 Q.  And in looking at...  Well, understanding that you
16    have looked at 552, let me hand you Exhibit 14, which
17    was attached to 13.
18        MR. KRISTAL:  Thank you.
19        MR. UPSHAW:  Mr. Kristal's familiar with
20    that.
21 A.  This has less interest to me because it's post
22    exposure.
23 BY MR. UPSHAW:
24 Q.  Okay.
25 A.  It's post the date of disease on Mr. Domina.

Page 125

1  Q.  But it goes to the heart, I believe, of your opinions
2     with regard to Roundup labeling and mislabeling,
3     doesn't it?
4  A.  No, because it's after the fact.
5  Q.  So your opinions are --
6  A.  I mean, my --
7  Q.  I'm sorry.
8  A.  Let me finish.
9  Q.  I thought you were finished.
10 A.  I thought I said it's after the fact.
11 Q.  Okay, go ahead.
12 A.  I said, it's after the fact, because if you read my
13    report, I go back all the way to MCA, Delaney clause,
14    this whole issue about carcinogens, pesticides and how
15    that gets handled up from really about 1958 forward.
16    And that language is the language that I was reviewing
17    because it's the language that predates his -- or is
18    consistent with time before disease.
19 Q.  Does your report with regard to your opinion that
20    Monsanto has not followed the standards, its own
21    standards, regulatory standards or statutory -- I
22    mean, its own standards, industry standards or
23    regulatory standards; is that opinion through today or
24    through some other date?
25 A.  It's primarily through the period in which he would

32 (Pages 122 to 125)

Stephen E. Petty, PE, CIH, CSP

Page 126

1     have had access to information and labels --
2   Q. So --
3   A. -- when he used the product.
4   Q. So that period is dependent on Mr. Domina's use of
5     glyphosate?
6   A. Well, ultimately, I think it's dependent on a
7     combination of exposures. Obviously dependent on date
8     of diagnosis. But then as far as warnings and
9     labeling where Mr. Domina became aware of some of
10    these hazards, that was probably sometime afterwards,
11    but it certainly wasn't in August of 2019.
12  Q. So give me a date. I'm trying to get some parameters.
13    You've gone all the way back to, I think you said the
14    '50s, up through when we should discuss --
15  A. I would say it would be when he first recognized that
16    Roundup could be a hazard.
17  Q. And what date would that be?
18  A. Probably at some point before he filed his Complaint.
19    Just before he filed his Complaint.
20  Q. Do you have a specific date for me? And I don't even
21    need a day. Just give me a month and a year so I have
22    some parameters I can work on.
23  A. It would be... We can use his Complaint date as a
24    close enough.
25  Q. Which is?

Page 127

1   A. I have to look up the date of the Complaint for... I
2     don't have it in front of me, but it certainly was
3     before August 7th of 2019.
4   Q. And for some other plaintiff, which includes literally
5     the exact same information that we talked about this
6     morning, specifically Mr. Dickey, do those dates
7     change because we're talking about Mr. Dickey versus
8     Mr. Domina?
9   A. They probably change slightly, but not substantially.
10  Q. Okay. And so is it your opinion today that the EPA's
11    stance as reflected in the August 2019 documents I
12    just showed you, 13 and 14, are of no relevance to you
13    or your opinion?
14  A. Not when I'm looking at... I don't know about no
15    relevance. I mean, you always make these absolute
16    statements. I guess everything has some relevance,
17    but it has limited or minimal relevance to me because
18    I'm looking at what they knew when and the times were
19    either during or before he used these products.
20  Q. Are you done? I don't want to --
21  A. Yes, thank you.
22  Q. I always hesitate. And it seems like when I get ready
23    to ask a question you're going to add on, so I'm going
24    to ask now.
25         Let me refer you to Exhibit 14.

Page 128

1   A. Okay.
2   Q. Middle of the first paragraph and there's a sentence
3     there that starts:  EPA considered a more extensive
4     dataset than IARC.
5          Do you see that?
6   A. Yes.
7   Q. Would you read that entire sentence for me?
8   A. The one that starts with that?
9   Q. Yes, sir.
10  A. "EPA considered a more extensive dataset than IARC,
11    including studies submitted to support registration of
12    glyphosate and studies identified by EPA in the open
13    literature as part of a systematic review."
14  Q. We were just discussing before the break the materials
15    that EPA had at its disposal -- and I recognize I'm
16    generalizing -- and you were telling me about the
17    process that you would suggest that Monsanto use, if
18    Monsanto wanted to include some type of mention of
19    carcinogenicity on its label, correct?
20         MR. KRISTAL: Object to the form of that
21    question.
22  A. Well, you asked me... There was a series of questions
23    as to who has responsibility of providing the
24    information to the EPA and I said it's the registrant.
25  Q. Okay. And this letter of August 7, 2019, says that

Page 129

1     the EPA looks beyond the information provided by the
2     registrant, correct?
3   A. I don't know what they looked at. I mean, I'm not the
4     cancer expert, so I just don't --
5   Q. It's got nothing to do with cancer.
6   A. Yes, it does.
7   Q. Only has to do with labeling.
8   A. Yes -- no, it doesn't.
9          This is the studies with respect to the,
10    um... They're referring specifically to IARC, so how
11    can you say it doesn't relate to cancer?
12  Q. Is it your opinion, Mr. Petty, that Monsanto's
13    labeling was wrong and misleading?
14         MR. KRISTAL: Object to the form of the
15    question.
16  A. When you define labeling, is everything up to
17    advertising?  Absolutely.
18  BY MR. UPSHAW:
19  Q. Is it your opinion, Mr. Petty, that Monsanto could
20    have added whatever it needed to be added from a
21    quote/unquote IH standpoint to air on the side of
22    public safety?
23         MR. KRISTAL: Objection to the form.
24  A. I've given examples of, uh... It's... It's different
25    than... It's worse than that. They have internal

33 (Pages 126 to 129)

Stephen E. Petty, PE, CIH, CSP

## Page 130

1    information where an example would be that, in fact,
2    they were -- they were cited and fined by New York
3    State on the, using the term, biodegradation, for
4    example, and they continued to use that term in their
5    literature for years afterwards.  So that's part of
6    the labeling, the information associated with the
7    product is part of the labeling.  So when you're
8    looking at what gets out to the public, there is no
9    doubt -- and I give example after example of
10   information that they provided to the public, whether
11   they said it was as safe as shampoo is not only --
12   it's certainly misleading, if not absolutely false.
13 Q.  Are you familiar with the prop 65 warning language
14   specifically that's being requested; that had been
15   requested by California?
16 A.  I'm familiar with prop 65, but I did not spend a lot
17   of time looking at prop 65 because, again, this is
18   very late in the process.  I have in other cases
19   looked at prop 65 issues, but not for this one.
20 Q.  Okay.  So I guess you don't know what California was
21   requested be added to the Roundup labels, specifically
22   the language?  It's okay if you don't.  I just didn't
23   know if --
24 A.  Well, I mean, I don't know exactly what the words
25   were, but they were citing IARC, I know that much, and

## Page 131

1    they were citing the IARC that says it's, you know,
2    it's a pos -- or it's a potential human carcinogen or
3    something to that effect.
4  Q.  Right, and that's the point I'm making.  You're not
5    familiar with the exact language.  Something to that
6    effect is not what I'm asking.  Do you know the
7    specific language?
8  A.  Oh, you're asking a question?
9  Q.  Do you know the specific language?
10        MR. KRISTAL:  Hold on one second.
11        COURT REPORTER:  I'm okay.
12        MR. UPSHAW:  You're okay?
13        COURT REPORTER:  Yeah, uh-huh.
14        MR. UPSHAW:  I heard you and then I kept
15   going.
16 A.  I've seen it, but I don't recall it, off the top of my
17   head.  I've seen it as part of the Muscleman exhibits
18   or the testimony, but I just don't recall it, off the
19   top of my head.
20        MR. KRISTAL:  You mean Muckerman?
21        THE WITNESS:  Muckerman.  I never say his
22   name right.
23        MR. KRISTAL:  Nobody does.
24        THE WITNESS:  Muckerman.
25 BY MR. UPSHAW:

## Page 132

1  Q.  And you seen this and you recognize that the EPA, not
2    only disagrees with California's request, but forbids
3    its registrants from adding the requested language
4    from California to its labels, correct?
5  A.  I haven't paid...  It's all after.  To me, it's
6    information that's after the warning.  I'm looking at
7    the history of warnings from 1958 forward or so or
8    actually 1943 forward, and this is...  This is all
9    much later than that.
10        So the back and forth on that, I mean, it
11   has limited importance in my opinions.
12        MR. UPSHAW:  All right.  Mr. Petty, I don't
13   have any further questions with regard to Mr. Domina.
14        MR. KRISTAL:  All right.  Let's start
15   working backwards.
16        CROSS EXAMINATION
17 BY MR. KRISTAL:
18 Q.  You're familiar with OSHA, the Occupational Safety and
19   Health Administration?
20 A.  I am.
21 Q.  Does OSHA control what are called Material Safety Data
22   Sheets in terms of language in those?
23 A.  Certainly.  It's 29 CFR 1910, 120 -- 1200, section G.
24 Q.  And does Roundup have Material Safety Data Sheets?
25 A.  They do.

## Page 133

1  Q.  And OSHA require a manufacturer to put an IARC cancer
2    warning on the Material Safety Data Sheet, if IARC
3    determines that the substance is a probable carcinogen
4    or a carcinogen?
5  A.  EPA...  The three areas are NTP, IARC, and EPA, I
6    think, are the three sources.  And if they declare it
7    that, they have to indicate that on those three
8    sources and what they say are indicated on the MSDS,
9    all three agencies.
10 Q.  Now, Mr. Upshaw showed you Exhibit 14 and 15.
11        MR. UPSHAW:  13 and 14.
12        MR. KRISTAL:  13 and 14, thank you.
13 BY MR. KRISTAL:
14 Q.  And Exhibit 14 is on your materials considered list as
15   Exhibit 552, right, he pointed that out to you?
16 A.  I think the first one, exhibit --
17 Q.  No, 14, the August 7 --
18        MR. UPSHAW:  They go together.
19        MR. KRISTAL:  No, I know they go together.
20        THE WITNESS:  Oh, the one, 8/8.  I see 8/8.
21 BY MR. KRISTAL:
22 Q.  8/7/2019, this 552 on the materials considered list,
23   correct?
24 A.  Let me just look real quick.
25 Q.  Sure.

34 (Pages 130 to 133)

Stephen E. Petty, PE, CIH, CSP

Page 134

1    A.  I'm looking at page 312 and August 7th. Exhibit 14 is
2        on 552.
3    Q.  And when he had showed you Exhibit 13, which is the
4        August 8th, 2019, EPA press release, you said you
5        thought you had read it in a recent deposition.
6            Is the volume II of Mr. Muckerman's
7        deposition Exhibit 554?
8    A.  It is.
9    Q.  And if you look at the Exhibit 52 from that
10       deposition, 554-52, August 8, 2019, that's the press
11       release.  That is Exhibit 13 of this deposition,
12       correct?
13   A.  Correct.  It's the next-to-the-last one on 314.
14   Q.  And let me show you next exhibit --
15   A.  Page 314.
16   Q.  -- from Mr. Muckerman's, which is the California
17       Environmental Protection Agency's response, and I
18       don't have it printed out.  It is the August 12th,
19       2019, what's called OEHHA, capital O-E-H-H-A, which is
20       the Office of Environmental Health Hazard Assessment.
21   A.  And I'm familiar with that.
22   Q.  And that was also sent to you when the Muckerman
23       deposition was sent to you, correct?
24   A.  Correct.
25           MR. UPSHAW:  Do you have a copy?

Page 135

1            MR. KRISTAL:  I didn't know you were going
2    to be using it, I didn't think, so it's on the copies.
3            THE WITNESS:  It's on the CD.
4            MR. KRISTAL:  It is on the, uh...
5            THE WITNESS:  Disk drives.
6            MR. UPSHAW:  Yeah.  We can't mark it for
7    the deposition.
8            MR. KRISTAL:  No.  I'll...  I'll --
9            MR. UPSHAW:  You're showing him something
10   in a depo that I --
11           MR. KRISTAL:  No, I understand.  I will
12   mark this as Exhibit 15, print a copy, and get it to
13   Dianne so she can include it in this; is that okay?
14           MR. UPSHAW:  Perfect.
15           MR. KRISTAL:  Okay.  I agree, that should
16   be here.
17           (PLAINTIFF'S EXHIBIT 15, OEHHA
18           STATEMENT RE: US EPA'S PRESS RELEASE
19           AND REGISTRANT LETTER ON GLYPHOSATE
20           WAS MARKED FOR IDENTIFICATION.)
21   BY MR. KRISTAL:
22   Q.  So the title of Exhibit 15 is OEHHA statement
23       regarding US EPA's press release and registrant letter
24       on glyphosate.  Do you see that?
25   A.  I do.

Page 136

1    Q.  And Exhibit 13 and 14 were the EPA press release and
2        the registrant letter, correct?
3    A.  Correct.
4    Q.  And it reads, quote:  On August 8th, 2019, the US
5        Environmental Protection Agency, US EPA, issued a
6        press release and letter concerning cancer warnings
7        for glyphosate that mischaracterized California's
8        Proposition 65 Right to Know Law.
9            Do you see that?
10   A.  I do.
11   Q.  And proposition 65 is a California right-to-know law;
12       is that your understanding?
13   A.  It is.
14   Q.  And involved in this issue is California, based on
15       IARC's determination that glyphosate was a probable
16       human carcinogen, wanted to put on labels of Roundup
17       sold in California, information about the product
18       being a cancer-causing agent.  That's what proposition
19       65 required?
20   A.  Correct.
21   Q.  And the EPA is saying in these letters that California
22       should not follow its own law; is that right?
23           MR. UPSHAW:  Objection to form.
24   BY MR. KRISTAL:
25   Q.  Well, let's read this.  OEHHA added glyphosate to the

Page 137

1        proposition 65 list of carcinogens in July 2017, based
2        on a finding by the World Health Organization, the
3        World Health Organizations International Agency for
4        Research on Cancer, IARC, that glyphosate is both an
5        animal carcinogen and probably carcinogenic to humans.
6        The listing was also supported by IARC's finding that
7        studies of humans exposed to different glyphosate
8        formulations in different geographic regions, at
9        different times, reported similar increases in the
10       same type of cancer, non-Hodgkin lymphoma.  OEHHA's
11       listing of glyphosate as a carcinogen was unanimously
12       upheld by the California's Fifth District Court of
13       Appeal, following legal challenges by Monsanto
14       Company, and others who opposed the listing.
15           Did I read that correctly, first of all?
16   A.  Yes.
17   Q.  So is this stating here that California
18       Environmental Protection Agency stating that
19       California had put glyphosate on the list of
20       carcinogens, according to this right-to-know law in
21       California?
22           MR. UPSHAW:  Object to the form.
23   A.  That's what it appears to be saying.
24   BY MR. KRISTAL:
25   Q.  Okay.  Now, to continue reading:  OEHHA objects to US

35 (Pages 134 to 137)

Stephen E. Petty, PE, CIH, CSP

Page 138

1    EPA's characterization of any warning concerning
2    glyphosate's carcinogenicity as a false claim.  US
3    EPA's assertion is based on its view that glyphosate
4    is not likely to cause cancer in humans.  That
5    position conflicts with the determination made by IARC
6    and its scientific panel, which included experts from
7    the US National Cancer Institute, US EPA, and the US
8    National Institute of Environmental Health, who
9    carefully evaluated the extensive scientific evidence
10   on glyphosate's carcinogenicity.  It is disrespectful
11   of the scientific process for US EPA to categorically
12   dismiss any warnings based on IARC's determination as
13   false, end quote.
14            Was that the position of the California
15   Environmental Protection Agency regarding EPA's claim
16   that a cancer warning would be a false claim?
17            MR. UPSHAW:  Objection to form.
18   A.  That's what they're saying, yes.
19   BY MR. KRISTAL:
20   Q.  It says in the middle of the next paragraph:
21   Proposition 65 is a right-to-know statute, approved
22   overwhelming by California voters in 1986 that ensures
23   consumers receive accurate, science-based information
24   about the chemicals to which they are exposed.
25            Is that what you were talking about in

Page 139

1    terms of giving information to the consumer, for the
2    consumer to then make a decision as to what risk they
3    wish to encounter or not encounter?
4            MR. UPSHAW:  Objection to form.
5    A.  Certainly.  That's why you see, for example, on the
6    MSDSs where they list the three agencies, EPA, NTP and
7    IARC, they'll have different opinions on chemicals as
8    to whether they're carcinogens or not.  But at least
9    the individual reading them then has the ability to
10   decide.  They're given that information to make their
11   own decision.
12   BY MR. KRISTAL:
13   Q.  The signal word on a label that Mr. Upshaw was talking
14   about, is that determined as was laid out and as Mr.
15   Upshaw referred to it as the acute six-pack?
16   A.  That's... Yes, that's how he's refer... He was
17   referring to just the acute portion, yes.
18   Q.  And is there a distinction in toxicology and in
19   industrial hygiene between acute toxicity and chronic
20   toxicity?
21   A.  Yeah.  The distinction is... There's actually three
22   distinctions usually:  Acute, subacute, and chronic,
23   but yeah.
24   Q.  Okay.
25   A.  And chronic is typically associated with carcin -- you

Page 140

1    know, whether or not a material is a carcinogen.
2    Q.  On page 100 of your report in this case, you lay out a
3    series of definitions and down about three-quarters of
4    the way down, and this -- these definitions come from
5    FIFRA, the statute that controls pesticides?
6    A.  It does.  It comes from 162.3, I believe.
7    Q.  And here you wrote in terms of the FIFRA statute, what
8    it says, quote:  The term, acute toxicity, means the
9    property of a substance or mixture of substances to
10   cause adverse effects in an organism through a single
11   short-term exposure.
12            Is that your understanding of how FIFRA
13   defines acute exposure?
14   A.  That's how they define it, yes.
15   Q.  And they also have a definition for chronic toxicity,
16   which talks about repeated or continuous exposures,
17   correct?
18   A.  Correct, up to at least half the lifetime of the
19   organism.
20   Q.  And is cancer a chronic or an acute problem?
21            MR. UPSHAW:  Objection to form.
22   A.  Typically from an industrial hygiene health and safety
23   standpoint, it would be considered -- when you're
24   looking at risk assessment, for example, it's a
25   chronic hazard.

Page 141

1    BY MR. KRISTAL:
2    Q.  And the signal words that Mr. Upshaw was talking about
3    on a label don't take into account chronic toxic
4    problems such as cancer?
5    A.  Or even subchronic, that's correct.
6    Q.  Or subchronic, okay.
7            Now, you write on page 102 of your report
8    about what's called restricted use pesticides.  Do you
9    see that up top?
10   A.  I do.
11   Q.  And you quoted from the statute 40 CFR, section
12   152.170 and then you have some subsections, but you
13   wrote, uh, quoting from the statute, quote:  When
14   used in accordance with label directions or widespread
15   and commonly recognized practice, the pesticide may
16   cause significant subchronic toxicity, chronic
17   toxicity, or delayed toxic effects on man as a result
18   of single or multiple exposures to the product
19   ingredients or residue as the criteria for being
20   listed as a restricted use pesticide; is that correct?
21   A.  Correct.
22   Q.  And then you go on in your report to talk about the
23   various restrictions that are placed on restricted use
24   pesticides; do you not?
25   A.  I do.

Stephen E. Petty, PE, CIH, CSP

Page 142

1  Q.  Do restricted use pesticides have to be labeled
2      differently than general use pesticides that don't
3      present chronic toxic problems such as cancer?
4  A.  Absolutely.
5  Q.  And here, you -- not only is the labeling different,
6      but there are restrictions on the distribution and
7      sale of restricted use products; are there not?  You
8      list them?
9  A.  On 102 and 103, yeah.
10 Q.  And there are restrictions on the advertising of
11     restricted use products?
12 A.  Absolutely.
13 Q.  And could you read for us on 103 your opinion after
14     that section that's in the brackets?
15 A.  It says:  Thus a product that contains a carcinogen
16     that may cause significant chronic toxicity must be
17     labeled a restricted use product and must contain
18     additional warnings regarding the reason or reasons
19     for the restricted designation.  Further advertising
20     restrictions exist for the restricted use product.
21 Q.  Now, you mentioned a mouse study and something called
22     the Delaney clause in response to Mr. Upshaw's
23     questioning about warnings on labels.
24         If you go to page 112 of your report...
25 A.  I'm there.

Page 143

1  Q.  And you have sort of a summary opinion based on the
2      1983 mouse study and the results of that particular
3      study in terms of labeling; do you not?
4  A.  I do.
5  Q.  And what would have been the two effects on labeling
6      in the mid 1980s if Roundup had been determined to be
7      an oncogene, a substance that causes tumors; oncogene?
8  A.  Right.  As opposed to cancer per se, it tends to cause
9      tumors.
10 Q.  That's right.  Well, is that the distinction between
11     oncogenicity and carcinogenicity?
12 A.  Yes.
13 Q.  So if a substance such as Roundup was determined to
14     cause tumors, whether they were malignant or benign
15     tumors, would there be restrictions on the labeling
16     and use of that product?
17 A.  Yes.
18 Q.  And what are...  What would two of those be that you
19     list on page 112?
20 A.  Well, as I write on 112, two of the implications are
21     clear, that the product labeling would have fallen
22     under the restricted use classification, and then you
23     would need special labeling.  And then secondly that,
24     since it falls under...  It would have fallen under
25     the Delaney clause back in that era.  We've severely

Page 144

1      restricted its usage since then.  And the Delaney
2      clause basically said you couldn't apply anything that
3      was a recognized carcinogen to foods and, uh...  So
4      that would have restricted its use.
5  Q.  And on pages -- you referenced this briefly -- page
6      117, 118, 119.  If you look at 119...
7          If a pesticide is determined to be a
8      chronic hazard as opposed to simply having an acute
9      problem such as irritating the skin, would there be
10     questions of whether either it would be registered in
11     the first instance or whether the registration could
12     be canceled?
13 A.  Well, there's language within the, uh, when you read
14     the Federal Register language, especially you read the
15     preambles, it's clear that if, if in fact it's found
16     that it's, uh, has a chronic hazard and is a potential
17     carcinogen, that they cancel registration particularly
18     and until they figure out, even if it's just potential
19     and the work isn't definitive, this is where they want
20     to air on the side of public safety.  They say, well,
21     we're gonna not allow it in the marketplace until we
22     figure this out, basically.
23         And, uh, or the other thing is they can put
24     it into a restricted use category, which has the
25     supplemental labeling, it has restrictions on who can

Page 145

1      apply it, and it has severe restrictions on who can
2      sell and buy -- who can sell it as well as how it can
3      be advertised or not advertised.
4  Q.  I want to turn now to some of the specific items
5      relating to Mr. Domina and his use of Roundup, okay?
6  A.  Okay.
7  Q.  You had mentioned that Mr. Domina told you that, even
8      though he used Roundup Concentrate at times, the exact
9      name, Roundup this or Roundup that, would change over
10     years?
11 A.  Correct.
12 Q.  But at all times that are referenced in your exposure
13     assessment, when you were talking about Roundup, you
14     were talking about some form of Roundup Concentrate?
15 A.  Correct.
16 Q.  All right.
17 A.  In this particular situation, yes.  In this particular
18     defendant -- or plaintiff.
19 Q.  Yeah.  And during the time periods that Mr. Domina was
20     discussing up through 2012, all Roundup contained some
21     percentage of glyphosate?
22 A.  That's my understanding.
23         It was later that there was some Roundup
24     formulations that didn't contain glyphosate.
25 Q.  Okay.

37 (Pages 142 to 145)

Stephen E. Petty, PE, CIH, CSP

Page 146

1    A.  I know of one in 2016.
2    Q.  And you said at different times the percentages of
3        glyphosate in the Roundup concentrations might change
4        a little bit based on formulation.  Can you give us a
5        general range where that would have fallen, if you're
6        able?
7    A.  Yeah.  I think I talk about that upfront.  Just for
8        the concentrate?
9    Q.  Yes.  Well, he only used concentrate, right?
10   A.  Right, right.
11   Q.  Okay.
12   A.  I talk on page 13...  I talk a little bit about the
13       compositions of the Roundup Concentrate beginning on
14       really about page 12 in my report.  And the original
15       formulation typically was around 41 percent glyphosate
16       and concentrate.
17   Q.  I believe you said at that time frame up through 2012,
18       almost all of the Roundup formulations contain as a
19       surfactant POEA?
20           MR. UPSHAW:  Object to form.
21   A.  Based on the data that I've seen, yes, that's true.  I
22       think on the table 4-1, where we had quite a few
23       different products, and 94 percent...  Well, 16 out of
24       17 had POEA as the surfactant in 'em.
25   BY MR. KRISTAL:

Page 147

1    Q   Based on the objection, let me ask it this way, can
2        you estimate approximately what percent of Roundup
3        products up through 2012 contained as surfactant POEA?
4    A   I don't know the exact number
5    Q   Approximately?
6    A   It's   It's   It's   The vast majority, I would
7        say it would be, based on that data, it would be on
8        the order of 90 percent or more
9    Q   I'd like to discuss the blowing out of the nozzles
10       that were clogged on the, either the spray bar or the
11       wands that were discussed earlier
12   A   Okay
13   Q   You said in response to whether that was a good
14       practice or not, it depends on the knowledge he had
15       and what he was told   Do you recall that?
16   A   I do
17   Q   And what was Mr Domina told by Monsanto about Roundup
18       and whether or not it could cause any problems?
19           MR UPSHAW: Objection, form
20   A   I'll check what my exact words were in the interview
21       He says on multiple occasions, multiple occas -- I'm
22       going to page 526 -- that it was so safe you could
23       drink it, and it was extremely safe
24   BY MR  KRISTAL:
25   Q   So if someone is being informed by the manufacturer of

Page 148

1        a product that it is extremely safe, and so safe that
2        you can drink it, is there anything unusual about that
3        person putting the nozzle, which has the substance in
4        it and blowing it out under those circumstances?
5    A.  No.  If they thought it was safe, you know, they had
6        no warning to act or behave otherwise.
7    Q.  At the beginning of the deposition, earlier this
8        afternoon you were asked if you've ever seen Mr.
9        Domina and you said no.  Does that matter to your
10       exposure assessment?
11   A.  Not for the calculations that I completed, no.
12   Q.  Does it matter with respect to any opinions contained
13       in your report and expressed today?
14   A.  No.
15   Q.  The fact that you didn't inspect the sprayers or the
16       containers, does that affect your exposure assessment
17       and the calculations you made?
18   A.  No.
19   Q.  Or any other opinion in your report or expressed
20       today?
21   A.  No.
22   Q.  Whether the farm that he lived on was a family or
23       commercial farm, does that affect any of the exposure
24       assessment calculations you made?
25   A.  No, 'cause I'm just drilling down to what he actually

Page 149

1        did with the Roundup.
2    Q.  Does it affect any other opinion in your report or
3        that you've expressed today?
4    A.  No.
5    Q.  The fact that you didn't visit his location, does that
6        affect the calculations of your exposure assessment in
7        this case for Mr. Domina?
8    A.  No.
9    Q.  Does it affect any other opinion in your report or
10       expressed today?
11   A.  No.
12   Q.  How big his farm was and/or how many acres were
13       actually used for agricultural production, does that
14       matter, one way or the other, to your exposure
15       assessment calculations?
16   A.  No.
17   Q.  Does it matter with respect to any of your opinions
18       expressed in your report or given orally?
19   A.  No.
20           MR. KRISTAL:  That's all the questions I
21       have.
22           MR. UPSHAW:  Okay.  Follow up on that a
23       little bit.
24           REDIRECT EXAMINATION
25   BY MR. UPSHAW:

38 (Pages 146 to 149)

Stephen E. Petty, PE, CIH, CSP

Page 150

1  Q.  Mr. Petty, you list on page 526, working our way back
2      the other way, that Mr. Domina said in the '70s or
3      '80s, a Roundup representative told him on two
4      occasions, it was so safe you could drink it, right,
5      that's what you put, those were his words?
6  A.  Those were his words.
7  Q.  Okay.
8  A.  He was adamant about it.
9  Q.  Did you ask him any information in any further detail
10     of the '70s or '80s?
11 A.  I asked him if he remembered the name of the
12     representative and he said he did not.  And I asked
13     him, uh...  Yeah, that was...  I just asked him, did
14     you...  Did you know the name -- that's what I
15     remember asking him -- did you know the name of the
16     person or persons that said that to you, and he said
17     he did not remember their names.
18 Q.  So you didn't ask him any additional details, like
19     where, when, those type of things?  I mean, he cited
20     two decades here where he was told twice.
21 A.  No, I don't recall asking him that.
22 Q.  Do you know whether or not Mr. Domina met with his
23     counsel prior to your interview of him on July 26,
24     2019?
25 A.  I don't know.

Page 151

1  Q.  Okay.  Mr. Petty, it seems that you wanted to talk a
2      little bit about cancer with counsel here.  You wanted
3      to talk about oncogenicity and carcinogenicity.
4          So you want to talk about cancer now?
5  A.  With respect to how warnings are set up in terms of
6      risk assessments, in that sense, yes, but not in terms
7      of whether or not -- not going through all the cancer
8      studies and who says what to whom.
9  Q.  Um-hum.
10 A.  What we do when we're looking at MS --
11         MR. KRISTAL:  Object to the, uh --
12 A.  -- DSs --
13         MR. KRISTAL:  -- comments --
14 A.  -- or, uh --
15         MR. KRISTAL:  -- unwarranted comments.
16 A.  -- warnings is you're just looking at what are those,
17     particularly whatever those agencies say.
18 BY MR. UPSHAW:
19 Q.  You do hold yourself out as someone who has a
20     significant understanding of toxicology, right?
21 A.  I certainly have been, uh...  I've had coursework and
22     I've been trained and I have books on that.  So from
23     the standpoint of an industrial hygiene standpoint,
24     then I would say yes.  As an industrial hygienist,
25     I've been tested on toxicology to the extent that

Page 152

1      industrial hygienists are tested on that.
2  Q.  Are you a toxicologist?
3  A.  I'm, uh...  I guess it depends on how you define that
4      term.  I'm not board certified in toxicology, but I
5      certainly am qualified as an expert in toxicology,
6      based on education, training and experience.
7  Q.  You have a degree in toxicology?
8  A.  I don't have a degree in toxicology, no.
9  Q.  Yet you hold yourself out as an expert in toxicology?
10         MR. KRISTAL:  Objection, asked and
11     answered.
12 A.  Well, I've tried to ex...  From an industrial hygiene
13     standpoint, I have to have...  As is required under
14     the industrial hygiene CIH exam, where it's 40 percent
15     questions on toxicology, we have to have a general
16     understanding of toxicology in order to do our job,
17     yes.
18 BY MR. UPSHAW:
19 Q.  In your familiarity with toxicology, you're familiar
20     with the difference between something that's
21     oncogenetic and carcinogenic, correct?
22 A.  As defined her -- yeah, I put that definition in here
23     so that I had that understanding of that definition,
24     yes.
25 Q.  And you have familiarity with the process of cancer

Page 153

1      mutation?
2  A.  No, not necessarily.
3  Q.  No?  You don't know anything about that?
4  A.  I don't know about nothing, but I wouldn't hold myself
5      out as being an expert in all of that, no.
6  Q.  So somebody who -- or if you were shown or had seen
7      some of the data that was reviewed by not only the EPA
8      but by the European Union, IARC and others, you're
9      familiar with looking at that toxicology data,
10     correct?
11 A.  I haven't done that, so...
12 Q.  I didn't ask you that.  You'd be familiar with looking
13     at that toxicology data?
14         MR. KRISTAL:  If he had done one thing, he
15     would be familiar with the other; is that what you're
16     asking?
17 BY MR. UPSHAW:
18 Q.  Do you understand my question, sir?
19 A.  Ask it again and I'll try to see if I can answer it.
20 Q.  Sure.  If you were shown the data that the EPA has
21     reviewed with regard to toxicological testing that
22     were -- tests that were submitted to them -- or
23     toxicological tests submitted to the European Union or
24     other regulatory agencies around the world, in
25     addition to the toxicology studies that were presented

Stephen E. Petty, PE, CIH, CSP

Page 154

```
 1        to IARC, you'd be familiar with the methodology or
 2     reviewing them, correct?
 3              MR. KRISTAL: Object to the form.
 4     A. Not necessarily.
 5     BY MR. UPSHAW:
 6     Q. No?  Be foreign to you?
 7     A. I don't know about that.  I haven't looked at it, so I
 8        don't have an opinion on it.
 9     Q. I didn't ask you that.
10     A. Well, I know.  But how would I know if it's foreign or
11        not if I haven't seen it?
12     Q. Has the EPA ever labeled glyphosate a restricted use
13        product?
14     A. They have not.
15     Q. Has the EPA ever --
16     A. I have concerns about that with the mouse study.
17     Q. Has the EPA ever asked a registrant to cancel its
18        glyphosate-based product?
19     A. I don't know how to answer that question.
20     Q. Well, has a registration for Roundup ever been
21        canceled?
22     A. Not to my knowledge.
23     Q. Has glyphosate been reregistered?
24     A. I believe it has.
25     Q. In 40 years, how many times has glyphosate been
```

Page 155

```
 1        reregistered?
 2     A. I'm not sure.  I know at least once.
 3     Q. How many products have gone through the EPA
 4        registration product -- EPA registration process that
 5        have been manufactured by just Monsanto, not including
 6        any of its competitors?
 7              MR. KRISTAL:  Objection, beyond the scope.
 8     Q. I don't know the answer to that question.
 9     BY MR. UPSHAW:
10     Q. Do you know how many different glyphosate-based
11        herbicides there are on the market today?
12     A. I think when I was doing that table on the production
13        rate with time early on, once the patent expired in,
14        whenever it expired, 17 years after '74, there was
15        discussion about how many people were manufacturing
16        glyphosate-based products, but I don't recall that
17        number off the top of my head, but I recall seeing
18        data with time when I put that chart together of the
19        amount of glyphosate produced with time.
20     Q. As Mr. Kristal said, give me an estimate.
21        Approximate.
22     A. I... I don't have an estimate.
23     Q. Over a hundred?
24     A. I don't recall the number.
25     Q. Over 50?
```

Page 156

```
 1     A. I think I've answered the question.
 2     Q. You don't have any idea at this point; you don't
 3        recall?
 4     A. I just don't recall.
 5              MR. UPSHAW:  Okay.  No further questions.
 6     A. I... I know that I... I look... I know that it was
 7        there when I was doing these... Let me look and see
 8        where that's at.
 9              MR. UPSHAW:  I don't have any further
10        questions for you.
11              MR. KRISTAL:  I think he's trying to
12        answer.
13              MR. UPSHAW:  Yeah.  I'm just telling him.
14        He can look for it if he wants, that's fine.
15              THE WITNESS:  No, it's not in there.  I was
16        just looking at the number of manufacturers and
17        products went up obviously after the patent expired,
18        but I don't recall exactly how many.
19              MR. UPSHAW:  Thank you for your time, Mr.
20        Petty.
21              MR. KRISTAL:  I have no further questions.
22        Thank you for your time, Everyone.
23              VIDEO TECHNICIAN:  6:17 p.m., going off the
24        record.  This marks the end of the deposition.
25              THE WITNESS:  I'll read.
```

Page 157

```
 1              COURT REPORTER:  Okay.  Yes, sir.
 2        (Deposition concluded at 6:17 p m.)
 3        Signature not waived.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

40 (Pages 154 to 157)

Stephen E. Petty, PE, CIH, CSP

---

Page 158

1          CERTIFICATE OF DEPONENT

2

3   STATE OF FLORIDA   )
                  ) ss.

4   COUNTY OF MIAMI-DADE)

5

6       I, the undersigned, declare under penalty of

7   perjury that I have read the foregoing transcript, and I

8   have made any corrections, additions, or deletions that I

9   was desirous of making; that the foregoing is a true and

10   correct transcript of my testimony contained therein.

11       EXECUTED this _____ day of _____,

12   20____, at _____, _____.

13        (City)        (State)

14

15

16
        _____
        STEPHEN E. PETTY, P E.

17

18

19

20

21

22

23

24

25

---

Page 159

1       ERRATA  SHEET

2   RECORD CHANGES HERE - DO NOT WRITE ON THE TRANSCRIPT

3   IN RE: Domina vs  Monsanto Company

4   DATE: Tuesday, November 5, 2019

5   PAGE  LINE    CHANGE     REASON

6   _____  _____  _____  _____

7   _____  _____  _____  _____

8   _____  _____  _____  _____

9   _____  _____  _____  _____

10   _____  _____  _____  _____

11   _____  _____  _____  _____

12   _____  _____  _____  _____

13   _____  _____  _____  _____

14   _____  _____  _____  _____

15   _____  _____  _____  _____

16   _____  _____  _____  _____

17   _____  _____  _____  _____

18   _____  _____  _____  _____

19   _____  _____  _____  _____

20   _____  _____  _____  _____

21   _____  _____  _____  _____

22   Under penalties of perjury, I declare that I have read the
      foregoing document and that the facts stated in it are true

23

24
   _____  _____

25   (Date)     STEPHEN E  PETTY, P E

---

Page 160

1           CERTIFICATE OF OATH

2

3   THE STATE OF FLORIDA)

4   COUNTY OF MIAMI-DADE)

5

6       I, Dianne N. Sarkisian, CSR, Certified Shorthand

7   Reporter, in my capacity as a Notary Public of the State of

8   Florida at Large, authorized to administer oaths on this 5th

9   day of November 2019, at 2:17 PM, certify that STEPHEN E.

10   PETTY, P.E. personally appeared before me and took an oath

11   or affirmation for the purpose of giving testimony in the

12   above-entitled matter.

13

14

15

16

17
        _____
        Dianne N. Sarkisian
        Notary Public - State of Florida

18        My Commission No. FF948599
        Expires:  01-06-2020

19

20

21

22

23

24

25

---

Page 161

1         CERTIFICATE OF REPORTER

2

3   THE STATE OF FLORIDA)

4   COUNTY OF MIAMI-DADE)

5

6       I, DIANNE N. SARKISIAN, CSR, Certified Shorthand

7   Reporter, and Notary Public of the State of Florida,

8   do hereby certify that I was authorized to and did

9   stenographically report the deposition of STEPHEN E.

10   PETTY, P E.; that a review of the transcript was

11   requested; and that pages 1 through 161 is a true

12   record of the foregoing transcript.

13       I FURTHER CERTIFY that I am not a relative nor

14   employee of any counsel, nor any of the parties in

15   said suit, nor am I financially interested in the

16   action.

17       DATED this 7th day of November 2019, at Miami,

18   Miami-Dade County, Florida.

19

20

21

22
        _____
        Dianne N. Sarkisian
        Certified Court Reporter

23

24

25

---

41 (Pages 158 to 161)