# EXHIBIT 12

Stephen E. Petty, PE, CIH, CSP

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


IN RE:  ROUNDUP PRODUCTS          MDL No. 2741
LIABILITY LITIGATION              Case No. 3:16-md-02741-VC

This document relates to:

Dickey v. Monsanto Company
Case No. 3:19-cv-04102-VC

Domina v. Monsanto Company
Case No. 3:16-cv-05887-VC


_____x




VIDEOTAPED
DEPOSITION OF:      STEPHEN E. PETTY, PE, CIH, CSP

IN RE:              Dickey v. Monsanto Company

DATE TAKEN:         Tuesday, November 5, 2019

START TIME:         9:48 a.m.

LOCATION:           Best Western Plus Oceanside Inn
                    1180 Seabreeze Boulevard
                    Fort Lauderdale, Florida  33316

COURT REPORTER:     Dianne N. Sarkisian, CSR, RPR,
                    Notary Public - State of Florida.

Stephen E. Petty, PE, CIH, CSP

Page 2

```
 1     APPEARANCES:
 2
 3        JERRY KRISTAL, ESQUIRE
          Weitz & Luxenberg
 4        700 Broadway
          New York, New York  10003
 5        (212) 558-5500
          jkristal@weitzlux.com
 6
              Appearing on behalf of the Plaintiff.
 7
 8
 9        ANTHONY N. UPSHAW, ESQUIRE
          MELISSA R. ALVAREZ, ESQUIRE
10        McDermott Will & Emery LLP
          333 SE Second Avenue
11        Suite 4500
          Miami, Florida  33131
12        (305) 347-6551
          aupshaw@mwe.com
13        malvarez@mwe.com
14
15
16     ALSO PRESENT:
17        Danielle DeSantis, Video Technician
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2     Witness                     Page
       Stephen E  Petty, P E
 3
 4     DIRECT EXAMINATION
       BY MR  UPSHAW:                   5
 5
 6     CROSS EXAMINATION
       BY MR  KRISTAL:               136
 7
              EXHIBITS
 8
       Exhibit                     Page
 9     (Exhibits attached to transcript )
10     DEFENDANT'S EXHIBIT 1, MONSANTO       5
       COMPANY'S AMENDED NOTICE TO TAKE
11     ORAL AND VIDEOTAPED DEPOSITION OF
       STEPHEN E  PETTY
12
       DEFENDANT'S EXHIBIT 2, SUMMARY OF     6
13     EXPERT WITNESS CASES
14     DEFENDANT'S EXHIBIT 3, DECEMBER       9
       12, 2017 LETTER
15
       DEFENDANT'S EXHIBIT 4, OVERVIEW OF   10
16     FACTORS AFFECTING DERMAL ABSORPTION
       OF GLYPHOSATE THROUGH THE SKIN
17
       DEFENDANT'S EXHIBIT 5, REVIEW        14
18     COMMENTS OF DAVIES DERMAL REPORTS
19     DEFENDANT'S EXHIBIT 6, CURRICULUM    24
       VITAE OF STEPHEN E  PETTY, P E
20
21     DEFENDANT'S EXHIBIT 7, EXPERT        24
       WITNESS CONSULTING AGREEMENT
22     DEFENDANT'S EXHIBIT 8, FACTUAL       30
       SUMMARY AND EXPERT OPINIONS REPORT
23     IN RE: DICKEY
24     DEFENDANT'S EXHIBIT 9, ROUNDUP      120
       MATERIALS CONSIDERED LIST
25
```

Page 4

```
 1     Fort Lauderdale, Florida
 2     Tuesday, November 5, 2019
 3     9:48 a m
 4              VIDEO TECHNICIAN:  We are now on the
 5     record  My name is Danielle DeSantis  I'm a
 6     videographer for Golkow Litigation Services  Today's
 7     date is November 5th, 2019, and the time is 9:48 a m
 8     This video deposition is being held in Fort
 9     Lauderdale, Florida, in the matter of Dickey versus
10     Monsanto Company and Domina versus Monsanto Company,
11     for the United States District Court, Northern
12     District of California  The deponent is Stephen E
13     Petty
14              Would counsel please identify themselves
15              MR  KRISTAL:  Jerry Kristal from Weitz &
16     Luxenberg on behalf of the Plaintiffs
17              MR  UPSHAW:  Anthony Upshaw from McDermott
18     Will & Emery on behalf of Defendant
19              MS  ALVAREZ:  Melissa Alvarez on behalf of
20     the Defendant as well
21              VIDEO TECHNICIAN:  The court reporter is
22     Dianne Sarkisian, and will now swear in the witness
23              COURT REPORTER:  Sir, do you swear, the
24     testimony you're about to give is the truth, the whole
25     truth, and nothing but the truth?
```

Page 5

```
 1              THE WITNESS:  I do.
 2              COURT REPORTER:  Thank you.
 3              STEPHEN E. PETTY, PE, CIH, CSP,
 4     was thereupon called as a witness herein, and after
 5     having first been duly sworn or affirmed to testify to
 6     the truth, was examined and testified as follows:
 7              DIRECT EXAMINATION
 8     BY MR. UPSHAW:
 9     Q.  Mr. Petty, good morning.
10     A.  Good morning.
11     Q.  We are here today for initially your deposition in the
12         Dickey versus Monsanto case.  Are you aware of that?
13     A.  Well, I knew there's seven of them I'm here for
14         deposition on, but okay, that's one of them.
15              (DEFENDANT'S EXHIBIT 1, MONSANTO
16              COMPANY'S AMENDED NOTICE TO TAKE
17              ORAL AND VIDEOTAPED DEPOSITION OF
18              STEPHEN E. PETTY WAS MARKED FOR
19              IDENTIFICATION.)
20     BY MR. UPSHAW:
21     Q.  So let me mark as Exhibit 1 the deposition notice and
22         give us some structure, to begin with.
23              Today, we're going to start off with
24         discussing Mr. Dickey.  Here is Exhibit 1.
25              MR. UPSHAW:  I have a copy, if you want,
```

Stephen E. Petty, PE, CIH, CSP

Page 6

1      Mr. Kristal.
2          MR. KRISTAL: Thank you.
3   BY MR. UPSHAW:
4   Q.  This is going to be probably the easiest question for
5       you today. Have you seen this before?
6   A.  No. Well, I've seen a version, but not this one.
7   Q.  Specifically with this address on it you've probably
8       never seen it before, since I think we changed
9       locations here rather recently, but you've seen these
10      notices of deposition with a similar attachment as
11      Exhibit A, Definitions?
12  A.  Assuming it has the same language, yes.
13  Q.  You also provided us before we got started, you and
14      Mr. Kristal, several documents and I will mark those
15      now just for us to refer to and then we'll go back
16      into the notice of deposition and talk about what we
17      requested you to bring.
18          (DEFENDANT'S EXHIBIT 2, SUMMARY OF
19          EXPERT WITNESS CASES WAS MARKED FOR
20          IDENTIFICATION.)
21  BY MR. UPSHAW:
22  Q.  So I'm marking as Exhibit 2, what's been titled, as I
23      read it, summary of...
24          These are your mics, I'm sorry.
25          The summary of expert --

Page 7

1   A.  I put a second one on, yeah, right. You know, press
2       conference.
3   BY MR. UPSHAW:
4   Q.  -- summary of expert witness cases; is that correct?
5   A.  Yes.
6   Q.  Can you tell us what you've put together here?
7   A.  This should be a list of cases since about 2001 that
8       I've been retained on and disclosed. In addition to
9       that, in the third column under subject, if I've ever
10      been deposed or testified in trial, that information's
11      indicated in that column.
12          So, for example, on the third page, very
13      last row, this one with Bucci, Bailey, Javins,
14      exposure to combustion products, you'll note at the
15      bottom it says deposed by defendant on 3/1/2006. And
16      the one above, you can see, uh, it was by Prascik and
17      Cutlip. I was deposed two different times in that
18      case and then I testified in a trial. Deposed twice
19      in 2005, testified in a trial in 2006.
20          So that provides you information on any
21      cases where I've either been deposed or testified in
22      trial.
23  Q.  Okay. Would this be a comprehensive list?
24  A.  I'm hopeful.
25  Q.  As best to your recollection?

Page 8

1   A.  Yeah, as best to my recollection. I'm just trying to
2       see if the last Roundup depositions are listed here.
3          MR. KRISTAL: I think down at the bottom it
4       says it's from August; updated as of August.
5          THE WITNESS: Yeah. It's not absolutely
6       current because I know you deposed me for five days on
7       the Kane, et al. cases.
8          MR. KRISTAL: I didn't see Kane in there.
9          THE WITNESS: I think that's what it says,
10      which turned into Winston.
11  A.  So it looks like there might be... The only
12      depositions I've had since the last time you deposed
13      me is your depositions, so they're not included in
14      there.
15  BY MR. UPSHAW:
16  Q.  Let me clarify that. I think you just said in the
17      last deposition you had since my deposition was yours.
18  A.  The one in Ohio, where you folks visited for a couple
19      days and I was deposed the fourth and fifth days.
20  Q.  All right. In September?
21  A.  On Winston, et al., yeah.
22          MR. KRISTAL: Right. In the Winston case,
23      there were five days of deposition?
24          THE WITNESS: Yeah. A total of five.
25          MR. UPSHAW: By the way, I never deposed

Page 9

1       you, I don't think in the Kane matter, but be that as
2       it may. So...
3          THE WITNESS: Well, all I'm saying is that
4       that turned into Winston.
5          MR. UPSHAW: Not -- no.
6          THE WITNESS: At least from my perspective.
7          MR. UPSHAW: Let me... Let me ask a
8       question and we'll do this --
9          THE WITNESS: We'll straighten it out.
10          MR. UPSHAW: We'll do this for question and
11      answer way, rather than us speculating.
12  BY MR. UPSHAW:
13  Q.  All right. Have you attempted to update this since
14      August 7, 2019, going backwards?
15  A.  Not to my knowledge.
16          (DEFENDANT'S EXHIBIT 3, DECEMBER
17          12, 2017 LETTER WAS MARKED FOR
18          IDENTIFICATION.)
19  BY MR. UPSHAW:
20  Q.  Okay. Exhibit 3 that you've provided today through
21      Mr. Kristal is the US EPA -- is a US EPA document
22      dated December 12, 2017. Can you tell us why you
23      brought that with you to this deposition?
24  A.  Yeah. It was in, uh, as a follow-up.
25          MR. UPSHAW: Thank you.

3 (Pages 6 to 9)

Stephen E. Petty, PE, CIH, CSP

Page 10

1  A.  I believe it was the fifth day of the Roundup
2      depositions in Winston.  It might have been earlier,
3      but I thought it was the last day where there was some
4      risk assessment documents that you provided to me and
5      asked me questions about and I mentioned that I had
6      problems with the risk assessments I had re -- well,
7      first I'd mentioned I had problems with -- I had
8      criticisms with the risk assessments that I had
9      reviewed, the risk assessment I reviewed on glyphosate
10     and you provided some documents and I said no, that's
11     not what I reviewed or no, that's not what I was
12     talking about.  And so I went back and pulled the
13     document that I was talking about and that's what this
14     is.
15                 (DEFENDANT'S EXHIBIT 4, OVERVIEW OF
16             FACTORS AFFECTING DERMAL ABSORPTION
17             OF GLYPHOSATE THROUGH THE SKIN WAS
18             MARKED FOR IDENTIFICATION.)
19  BY MR. UPSHAW:
20  Q.  Okay.  I've marked as Exhibit 4, a document entitled
21     overview of factors affecting dermal absorption of
22     glyphosate through the skin.
23  A.  Okay.
24  Q.  Can you tell us what that is?
25  A.  This is sort of a summary of literature that has been

Page 11

1      produced in this case, in general, and what I did was
2      just summarized what it has to say with respect to the
3      specific issue of how dermal rates of transfer through
4      the skin can be impacted, and so I tried to summarize
5      that in a quick brief, if you will.
6  Q.  You've provided us in Mr. Dickey's case a factual
7      summary and expert opinions report.  Is Exhibit 4 not
8      included in that report?
9  A.  Is exhibit...
10  Q.  Exhibit 4, which we just went over, right here.
11  A.  Can I look at it and then answer your questions?
12  Q.  Certainly.
13  A.  It'll be in the list of references at the back.  If
14     it's in there, it is.  If it's not in there, then it
15     will be in list of reliance materials.
16  Q.  Do you have Mr. Dickey's report with you?
17  A.  Um...
18             MR. KRISTAL:  We have it somewhere, yes.
19  A.  Yes, I have one right here.
20             MR. KRISTAL:  Oh, is that Dickey?
21             THE WITNESS:  Yes.
22             MR. KRISTAL:  I know we have all of them.
23             MR. UPSHAW:  Okay.
24  BY MR. UPSHAW:
25  Q.  And guide me when you get to the page where we should

Page 12

1      be looking.
2  A.  It would be on 272.  And it is not on that list
3      because the last one is a Label Review Manual for 2017
4      and this is a...  Oh, you're asking about...  I'm
5      sorry, I misunderstood your question.  You're asking
6      about, was Exhibit 4 in this report?
7  Q.  Yes.
8  A.  It is not.
9  Q.  Okay.
10  A.  I apologize.  I was thinking of Exhibit 3.
11  Q.  No problem.
12             Exhibit 4 is something that you created
13     after you created the summary and expert opinions
14     report?
15  A.  It is.
16  Q.  And why did you feel it necessary to add to the 500-
17     plus pages we already have?
18  A.  Because this material became, in part, available to me
19     between the time that I drafted this report and this
20     date; in other words, in the intervening month I've
21     continued to receive additional materials.  And since
22     this report was issued, rather than reissuing it, I
23     said, well, I'll just put together an overview summary
24     of the information that au -- some of this is already
25     in this report, like this first paragraph is, but

Page 13

1      there were additional materials that impact transfer
2      through the skin and I thought it was important to
3      have a summary of those in one place.
4  Q.  So if I understand you correctly, there are certain
5      paragraphs in Exhibit 4 that you've pulled from the
6      expert opinions report and then added to those?
7  A.  Correct, absolutely.
8  Q.  And where in exhibit...
9             Where in the factual summary and expert
10     opinions report did you pull this information about
11     surfactant in the (inaudible)?
12  A.  We talked about this before, but let me see if I can
13     find it quickly.
14             It's on the part...  The section that I
15     pulled to start this is on page 76 of the Dickey
16     report, towards the bottom.  It starts in the middle.
17             In fact, you can see the, in July 2001, if
18     you look at the paragraph two thirds of the way down:
19     In July 2001, Monsanto's ███████ and Bates --
20  Q.  Um-hum.
21  A.  -- I think you can see that language picks up on
22     this Exhibit 4 right away, so...
23  Q.  And then on page 77, where you say, thus -- the first
24     paragraph:  Thus, in 2001, Monsanto clearly, so on and
25     so forth, you've now in Exhibit 4 inserted Holmgaard,

Stephen E. Petty, PE, CIH, CSP

## Page 14

1     et al , and some additional text?
2   A   Correct, and some other folks as well; Exhibits 561,
3     562  Nielsen, et al , is 561
4   Q   Okay  And is there any other -- any further reference
5     to your expert report in Mr  Dickey's case other than
6     that first paragraph in Exhibit 4?
7   A   Not to my knowledge
8           (DEFENDANT'S EXHIBIT 5, REVIEW COMMENTS
9             OF DAVIES DERMAL REPORTS WAS MARKED FOR
10            IDENTIFICATION )
11  BY MR  UPSHAW:
12  Q   Okay  Marked as Exhibit 5, a document entitled Petty
13    Review Comments on 2015, '16 and '17 Davies dermal
14    reports dated November 1, 2019  Can you tell us what
15    that document is, please?
16  A   Sure  I made a request for any additional dermal
17    related studies that I might not have seen, and these
18    were provided at the end of last week
19  Q   Who did you make that request to?
20  A   Counsel
21  Q   Mr Kristal?
22  A   Yeah, and Ms  Greenhold -- Greenwald
23  Q   Greenwald?
24  A   So they provided those to me I think on the 30th  And
25    as you well know, I've done detailed reviews of the

## Page 15

1     dermal studies I've been aware of.  And so I thought
2     it was important that you know that I'd seen those
3     studies.  And these are basically my review and
4     criticisms of those studies.
5   Q.  Which studies are you referring to?
6   A.  There are two 2015 studies by Davies, et al.  I guess
7     it's Davies.  And there's a 2016 -- they're DTL
8     studies.  And there's a 2016 Davies study.  And then
9     there's a 2017 Davies study.  So it's those four.
10  Q.  And you hadn't seen those four studies prior to, I
11    guess you said, October 30th?
12  A.  Correct, but I made a request to see those.
13  Q.  And in Exhibit 5, you make specific criticisms of
14    those four studies?
15  A.  Well, yeah.  It's not only just the criticisms, but
16    it's the review of the actual data that's provided in
17    those studies and then comments on that data.  So
18    yeah, yeah it, but I'm also extracting, if
19    you will, the actual data from the studies.  So...
20  Q.  For what purpose?
21  A.  To support the basis for my criticisms.  In other
22    words, for example, I'm critical of the fact that...
23  Q.  Well, let's talk about number 1.
24  A.  Yeah?
25  Q.  What's your first criticism of the Davies, the four

## Page 16

1     Davies studies?
2   A.  You'll look at table 1, for example?
3   Q.  Well, wait.  Before we go to table 1, can you tell me
4     what your first criticism is, which I believe I'm
5     reading right that says, the results were so low they
6     are at or near the detection limit.  This is because a
7     combination of material used and skin area used were
8     too small to measure meaningful results.  That's the
9     first criticism, right?
10  A.  Yeah.  What I'm saying here is that if you -- if you
11    have an instrument that could -- let's just say you
12    have an instrument can measure values down to a 100, a
13    100 or greater, and then you report a value that's a
14    hundred or you report a value, let's say, 50.  Well,
15    that value is meaningless because it's below the
16    ability of the instrument to measure that value.
17          Does that make any sense?
18  Q.  (No Response.)
19  A.  So in this case, the April 2, 2015, the 0- to 6-hour
20    data, the values measured are .002, but the detection
21    limit's .004.  So they're reporting a value that's
22    half of what the ability of the instrument is to
23    measure it.
24          The other thing you notice is that the
25    standard deviations are on the same order of magnitude

## Page 17

1     as the value themselves.  So it's...  I've had too
2     much statistics in my life, but -- in graduate school
3     -- but if you look at a normal distribution and you
4     say, okay, two standard deviations is a 95 percent
5     confidence interval, okay, that's well understood in
6     statistics.
7           So if you take that plus or minus number
8     and multiply it by 2, it's 1.96 -- it's two standard
9     deviations, but let's just use two -- then it's saying
10    that that value is .002, plus or minus .004.
11          Well, that means that we have technically
12    in the bottom end of that interval, we have a negative
13    absorption rate, and it also -- and a large chunk of
14    the data is below zero.  Well, that just says it's
15    garbage.  I mean, it just says this study's garbage.
16  Q.  And so your overall...  Your overall opinion of, let's
17    stick with the April 2015 study, is that it should not
18    be relied upon with regard to dermal absorption?
19  A.  Absolutely, that's true.  And there are other reasons
20    as well.  I have other criticisms of those studies,
21    but specifically with respect to just the data itself,
22    the data itself are showing values below detection
23    limits, but the other thing, the other criticisms I
24    have is -- it's asterisked there -- is what they did
25    in all these studies is that they put a minimum amount

Stephen E. Petty, PE, CIH, CSP

Page 18

```
 1      of material in a test cell on a skin sample and they
 2      have a receiving fluid on the back side and then he
 3      looked for how much material gets through.  And at the
 4      end of six hours, they took the material that sits on
 5      top of the skin, they took it off, and they wiped the
 6      heck -- scrubbed and did what they call skin washing
 7      and tried to clean all the material off the skin.
 8           But then they continue to run the test for
 9      six to 20 -- up to 24 hours -- and then they scrub it
10      again at 24 hours, but they're also measuring the
11      transfer rates after they've taken -- after they've
12      scrubbed the skin and then they're reporting that data
13      and using it as an overall average.
14           Well, they killed the test at six hours.
15      So it's like, why are you averaging data where you've
16      taken the material away?  It's just a bizarre test,
17      that's all I'm telling you.  It's just a weird test.
18 Q.   Others have relied on these Davies studies?
19 A.   What's that?
20 Q.   Others have relied on these Davies studies?
21 A.   Yeah.  I mean, the reason it came up is at the same
22      time on the 30th I received some of the, uh... I
23      haven't had a chance to go through them, but I
24      received the expert re -- the defense expert report,
25      some of the defense expert reports in these cases --
```

Page 19

```
 1      and they were relying on Davies 2015 to 2018.
 2           That's why I asked for these reports.  I
 3      haven't had a chance to go through them in detail
 4      because I wanted to look at the underlying studies
 5      they relied on.  But yes, one of the -- the primary
 6      dermal studies that the latest defense reports rely on
 7      are Davies 2015; '15, '16 and '17.
 8 Q.   Do you have listed in your MCL what expert reports
 9      you've received?
10 A.   I don't, because I would have to put them on reliance
11      material and I haven't gone through them.
12 Q.   Okay.  You haven't had a chance to rely on them yet?
13 A.   No.
14 Q.   Do you know off the top of your head whose reports
15      you've received?
16 A.   I don't remember the names, even.  I just went through
17      them quickly enough to see what the key papers were
18      that they relied on.
19 Q.   Yeah.  I was just trying to determine.  And do you
20      know if those reports you received were from the
21      Dickey case?
22 A.   Yes, yes.  If you gave me the names of the guys doing
23      derm, it would probably strike me, but I don't
24      remember the names, because I haven't really prepared
25      a detailed review of those reports.
```

Page 20

```
 1 Q.   The second criticism you have in Exhibit 5 is that the
 2      formulations were put together in a test tube and do
 3      not reflect products used by plaintiffs and perhaps
 4      anyone?
 5 A.   I would just say that they're... They're, uh... I
 6      don't know if it's a test tube, per se, but they were
 7      a glass vessel.  By that I'm referring to the fact
 8      it's in a laboratory setting.  They're not using a
 9      commercial product, per se.  They're making up the
10      formulation in a glass jar with glass balls.
11           And so I looked at... Table 2 is a list of
12      what they reported as the formulations.  And what I
13      noticed was the first two studies in 2015 is a gel
14      material, first of all, and I don't recall...
15           My criticism is I don't recall that these
16      were the products that were used by these clients.
17      And more importantly, the formulations don't have
18      either a surfactant or the surfactant isn't like POEA.
19      So then my criticism is, how do these materials in
20      their dermal transfer rates reflect products that were
21      used by these plaintiffs?  I don't think they do.
22 Q.   Let me step back a second 'cause I didn't understand
23      one thing you said.
24           You said these formulations didn't have a
25      surfactant or that the surfactant was not a POEA?
```

Page 21

```
 1 A.   It depends on which one you look at.
 2 Q.   Okay.
 3 A.   Some studies had a surfactant.  Like the last... The
 4      one at the bottom of the page, the 2017, does say they
 5      have a surfactant called SynerGene GD2.
 6 Q.   Okay.
 7 A.   That's not POEA.  So it has a surfactant.
 8           But the other ones before then, if you look
 9      at the formulations, I don't see evidence that they
10      are surfactants there.  What I don't know for sure is
11      the very first one, co-formulant - Novethix L-10.  I'm
12      not sure what that is.  I haven't had a chance to dig
13      that out yet.
14 Q.   And you are aware that there are glyphosate-based
15      herbicides that do not use POEA as a surfactant?
16 A.   Well, especially recently, yes, but the original
17      formulation on POEA.
18 Q.   On page 6 of Exhibit 5, your criticisms of the Davies
19      report, it says, thus, the four instruments -- and you
20      give a number of bullet points there.  This is kind of
21      a summation of your problems with the testing?
22 A.   Well, no.  It's above and beyond the first...
23           Well, yes, yes.  It's a summation of the
24      first two criticisms, if you will.
25 Q.   Okay.
```

6 (Pages 18 to 21)

Stephen E. Petty, PE, CIH, CSP

Page 22

1  A.  At least it's additional criticisms of those beyond
2      the two tabled information.  And then beyond that, I
3      have beyond the two criticisms, I have substantive
4      criticisms as well.
5  Q.  Right.  I'm just trying to understand what you've put
6      together here.  So where you say, thus, the four
7      instruments, you basically pull out the criticisms
8      that you just talked about in criticism one and two?
9  A.  No, these are in addition to.
10 Q.  These are in addition, okay.
11         'Cause you had just told me about the gel
12      formulations.  And again, I haven't read this before
13      you handed it to me, but I'm trying to work through
14      here.
15            Like the last bullet point, the uses of gel
16      formulations on two occasions, you just said was part
17      of criticism two.
18 A.  Well, it's somewhat there.  I mean, I have comments to
19      the right in table 2, which are criticisms, but in
20      addition to that, I note some stuff there.  So there's
21      a mixture in the back, but I'm not...  For example, in
22      these bulleted items here, I'm not talking about the
23      statistical and detection limit criticisms I have in
24      the table 1.
25 Q.  So for me to understand the document, should I look at

Page 23

1      comments for all of the criticisms or are they
2      surmised in these...
3  A.  You should look at the comments and the tables along
4      with these bulleted items.
5  Q.  And the first two are repetitive, I assume?
6  A.  A tad bit, but not too much.
7  Q.  And you have other criticisms are quickly summarized
8      below.  Are those new criticisms of these studies?
9  A.  These are in addition to, yes.
10 Q.  So none of these are repetitive of other criticisms
11      you have in the document?
12 A.  Well, let me check to...  I just want to go through
13      these to make sure I answer properly.
14 Q.  Sure.
15 A.  On page 7, I expand on the asterisked item in table 1
16      by asking the question about why they were skin
17      samples.  So I've talked about the fact they were
18      washed twice, but here I expand on that a bit.
19            Other than that, these would be new
20      criticisms.
21 Q.  Okay.
22 A.  Like I said, the second skin washes are values that
23      are 400 times the total transfer at 24 hours, so
24      traditionally that would be included after the first
25      wash is material that's in the skin under OECD

Page 24

1      guidelines, so...  And that amount of material left in
2      the skin is four times what they're reporting as the
3      amount of material that they use for the dermal
4      transfer rate.
5            (DEFENDANT'S EXHIBIT 6, CURRICULUM
6            VITAE OF STEPHEN E. PETTY, P.E. WAS
7            MARKED FOR IDENTIFICATION.)
8  BY MR. UPSHAW:
9  Q.  Okay.  I'm going to mark as Exhibit 6, a CV that was
10      provided this morning.  Is this your current and
11      updated CV?
12 A.  It's my current CV.  I think it's the same CV as I
13      provided to you during the last deposition.
14 Q.  Back in I think it was September?
15 A.  September.
16 Q.  No updates since then?
17 A.  I don't believe so.
18            (DEFENDANT'S EXHIBIT 7, EXPERT
19            WITNESS CONSULTING AGREEMENT WAS
20            MARKED FOR IDENTIFICATION.)
21 BY MR. UPSHAW:
22 Q.  Then as Exhibit 7, you provided a composite of a file
23      you referred to earlier before we got started.  I
24      think you said it was your admin file.  Just confirm
25      that for me.

Page 25

1  A.  Confirm that it's from the admin file?
2  Q.  If that is your admin file.
3  A.  I don't control my admin file, I'll be honest with
4      you.  So what it is in my mind is it would be stuff
5      that would normally be in an admin file, which is a
6      retention agreement and invoicing.
7  Q.  Okay.  Let's walk through it real quick so we know
8      what documents in Exhibit 7.
9            So the first document is dated...
10 A.  I don't mean to say I don't control my admin file in
11      the sense that I don't have ultimate responsibility.
12      I just mean that my admin people put the material in
13      and maintain it.
14 Q.  Okay.  The first document dated January 26, I believe,
15      2018, is your consulting agreement?
16 A.  Correct.
17 Q.  The next document I have is an invoice dated July 31,
18      2019; is that correct?
19 A.  Correct.
20 Q.  And the invoice is for Monsanto Nebraska/CA?
21 A.  Correct.
22 Q.  And so if I read this correct, you spent 42 hours and
23      admin spent 11 and a half hours?
24 A.  Correct.
25 Q.  And the total was $17,090?

7 (Pages 22 to 25)

Stephen E. Petty, PE, CIH, CSP

Page 26

1  A. Correct.
2  Q. And then attached to that in my packet is a, I think a
3     vendor account check for that amount?
4  A. Correct.
5  Q. Is that... What is that document?
6  A. Um...
7  Q. I see it's a copy. I see it's been redacted.
8  A. This would have been the stub on the check that we
9     were paid for our work on Roundup cases from probably
10    Weitz Luxenberg.
11 Q. And you did this redaction?
12 A. No.
13 Q. Who did this redaction?
14 A. My office.
15 Q. Why?
16 A. Because it probably reflected another case --
17 Q. Okay.
18 A. -- that I was doing for them.
19 Q. Okay, I see. And that second page, just so I'm clear,
20    is dated 8/12/2019?
21 A. Second page?
22 Q. See where it says the date?
23 A. Yes, that's my understanding as well.
24 Q. Okay. The next document is an invoice from August 31,
25    correct?

Page 27

1  A. Correct.
2  Q. The amount is $5,581.
3        And on this invoice, you did 13 and a
4     quarter hours of work --
5  A. Okay.
6  Q. -- for the month of August, I assume?
7  A. Yes.
8  Q. Okay.
9  A. We invoice at the end of the month.
10 Q. Right. And on this one it just says, Nebraska expert
11    witness support.
12 A. Yes. Initially... My initial understanding was, I
13    was going to do four Nebraska cases and there were
14    three additional added to it.
15 Q. Okay.
16 A. So that's how it kind of got set up originally.
17 Q. And in my packet, the attached document, I would
18    assume, is another stub from a check --
19 A. Yes.
20 Q. -- that was paid; showing you were paid this amount?
21 A. Correct.
22 Q. You did not send an invoice in the month of September?
23 A. I did not. I was working on other things.
24 Q. And you sent the next invoice October 31, a few days
25    ago?

Page 28

1  A. Well, I don't know it was sent October 31. I think
2     normally we do the invoicing for end of -- this is the
3     invoice for October, through the end of the month. So
4     I think... I think they might be in the mail today,
5     for all I know.
6  Q. And on this particular invoice for Monsanto Nebraska
7     it shows you conducted 45 and a half hours worth of
8     work?
9  A. Correct.
10 Q. Would that all have been in October?
11 A. Yes.
12 Q. Okay.
13 A. My recollection was, there was a burst of work at the
14    beginning of the month to get these reports done, and
15    then there was some work done towards the end to get
16    ready for depositions and new material that had come
17    in.
18 Q. Okay, all right. Let's go back to Exhibit 1. I don't
19    want to get too far down the line. Go to the request
20    for production, and I think we have covered everything
21    that you brought. Let's see what category it falls
22    into, if we can, quickly.
23        If you go to the document where it says,
24    request for production -- you got it there in front of
25    you.

Page 29

1        Number 1, show the amount you were billed.
2     I think we just went over that, the last exhibit,
3     correct?
4  A. Yes.
5  Q. Number 2 would be each invoice you've rendered in
6     connection. We just went over that, correct?
7  A. I believe so, yes.
8  Q. All documents that you have considered in support of
9     deposition testimony in this case. Those would be
10    included in your materials, your MCL, materials
11    considered list?
12        MR. KRISTAL: Well, we also provided the
13    documents themselves on the thumb drive.
14 A. Yeah. We got the thumb drives, we got some hard copy,
15    and we got the list of materials considered list. So
16    I think we kind of hit it multiple directions.
17 BY MR. UPSHAW:
18 Q. All documents that you reviewed, we just discussed,
19    right, from the multiple directions that you've hit
20    for number 4?
21 A. Yes.
22 Q. For number 5 is your curriculum vitae. We just
23    discussed that as well, correct?
24 A. Yep.
25 Q. And number 6 would be documents sufficient to show any

8 (Pages 26 to 29)

Stephen E. Petty, PE, CIH, CSP

Page 30

1    testimony you provide as an expert witness over the
2    past four years.  I think we've gone even further than
3    that with the...
4    A.  Right, this Exhibit 2.
5    Q.  Right, okay.  Very well.
6        All right.  This morning we're going to
7    concentrate as I said a couple times on Mr. Dickey's
8    case.
9    A.  Okay.
10   Q.  And let me refer you to your report.
11   A.  Okay.
12       (DEFENDANT'S EXHIBIT 8, FACTUAL
13       SUMMARY AND EXPERT OPINIONS REPORT
14       IN RE: DICKEY WAS MARKED FOR
15       IDENTIFICATION.)
16   BY MR. UPSHAW:
17   Q.  Your report's dated October 3rd, 2019.  We'll mark
18   that as Exhibit 8.  And since you prepared the report,
19   I think we've talked about any changes or additions
20   you've made, and those are the documents you provided
21   me earlier today; is that correct?
22   A.  Ultimately been provided, yes.  I don't know if we
23   discussed them all, but we've certainly --
24   Q.  Well, I thought we discussed everything you brought
25   this morning.

Page 31

1    A.  Well, yeah, but there's probably 150 documents on the
2    list of reliance materials that's different than when
3    the last time you deposed me.
4    Q.  Very good.  We're going to get to that in a second
5    about just kind of what your additions are.
6        All right.  Let's jump forward then to your
7    interview of Mr. Dickey.
8        And you prepared I believe as Exhibit G, I
9    want to say, your, uh...
10       MR. KRISTAL:  Page 516?
11   BY MR. UPSHAW:
12   Q.  Your exposure summary and calculations.
13   A.  Okay.
14       MR. UPSHAW:  529 in my packet.  May be
15   different in yours, but --
16       MR. KRISTAL:  No, no, no.  I think the
17   pagination was somewhat different on some of them.
18       MR. UPSHAW:  It's just my printout, so just
19   go to your Exhibit...
20       THE WITNESS:  I'm on F.
21       MR. UPSHAW:  Exhibit G, first.
22       THE WITNESS:  Exhibit G.
23       MR. KRISTAL:  Oh, I see.
24   BY MR. UPSHAW:
25   Q.  Do you have Appendix G?

Page 32

1    A.  Okay, you're skipping.  That's why I was confused
2    'cause the interview is actually Appendix F.
3    Q.  Right.  Skip right to G.
4    A.  Okay.
5    Q.  All right.  You got it all bound.
6        I was going to put it aside 'cause I just
7    want to ask some basic questions about this that came
8    up.
9        Since we last met in September, you've
10   added a few things, such as section 10 to your report?
11   A.  Section 10?
12   Q.  Which is your calculations section.
13   A.  I'm not understanding section 10, I'm sorry.
14   Q.  You have...
15       You remember, you numbered section 7,
16   section 8 --
17   A.  Oh, okay.  I see what you're saying.
18   Q.  -- in your actual report?
19   A.  Okay.
20   Q.  And since we last met, you added a section 10 to Mr.
21   Dickey's report.  I think it's...  Well, mine is page
22   265, but it's at the bottom of this page, 10.0?
23   A.  It's kind of a yes and a no.
24       I brought handwritten...  In the last fifth
25   day, I brought I believe this text to you as sort of

Page 33

1    an overview of my opinions.
2    Q.  Okay.
3    A.  But in these reports, I went ahead and just put it in
4    the main report.
5        Does that make any sense?
6    Q.  It does.  It does.
7    A.  So I believe that most of this -- I might have edited
8    a couple typo changes or something, but I'm pretty
9    sure I brought this page with me to my depositions in
10   the previous Saint Louis cases, but I did go ahead and
11   add it.
12       You are correct in the sense that I went
13   ahead and formally put it in this report.
14   Q.  So you somewhat answered my question.
15       This section now in Mr. Dickey's report
16   kind of summarizes what methodologies you used to come
17   to your summaries and conclusions and opinions,
18   correct?
19   A.  It's a methodology and a roll-up of my -- remember we
20   talked before at length about it's kind of a roll-up
21   of my raw opinions 'cause the report has got dozens of
22   opinions in it.  Now, we talked about before it was a
23   factual report.  Now, it's a report that includes the
24   opinions.  And I've tried to put those in brackets and
25   bold in most cases within the report itself.

9 (Pages 30 to 33)

Stephen E. Petty, PE, CIH, CSP

Page 34

1  Q.  Yeah.  So give me an example of where you did 'cause
2      if I recall correctly, you made it very clear when we
3      last met that the report you provided was not an
4      expert report with regard to your opinions.
5  A.  That's correct.
6  Q.  And you seem to have now added specific opinions into
7      Mr. Dickey's report.
8  A.  Sure.
9          MR. KRISTAL:  Well, Saint Louis didn't
10     require a report.
11         MR. UPSHAW:  Well, you and I can talk about
12     that, but we don't need that on our commentary during
13     the depo.
14 A.  I'm just trying to randomly pull one out.
15 BY MR. UPSHAW:
16 Q.  Yeah.  That's kind of what I was asking for.  You
17     don't have to go to something specific.
18 A.  I was on 57.  I don't know if they're paginated the
19     same.  I'm just trying to find a bracketed area.
20 Q.  If you...  Yeah, let's try that.  Let's see if I can go
21     to 57 and we'll see if it's close.
22 A.  See if it's the same.  It's just the page I flipped
23     open.
24 Q.  Okay.  Now, mine has 7.1 1, definitions and --
25 A.  First word up on the page, "remember"?

Page 35

1  Q.  It is, "remember that Wester."
2  A.  Okay.  There's a bracket there.  See underneath that
3      paragraph there's a bracket?
4  Q.  Um-hum.
5  A.  "Monsanto knows -- I'm referring to this paragraph --
6      that glyphosate stored in the skin is technically a
7      dose."  That's an opinion.  A sub-opinion.
8  Q.  And just as an additional example, then page 56, if
9      you look over, near the bottom of the page you have
10     bracketed and in bold "However, note that this
11     conclusion assumed that only --" so on and so forth.
12     I won't read the whole thing.
13 A.  Right.  So I tried to call out and they're throughout.
14 Q.  Okay.
15 A.  So, anyway.
16 Q.  You've also included or have you -- I should ask the
17     question.
18         Have you included also any additional
19     studies or articles or reports that you refer to --
20 A.  Oh, yeah.
21 Q.  -- in the text?
22 A.  Absolutely.
23 Q.  All right.
24 A.  They haven't changed really the opinions.  They
25     generally just support 'em.  I usually add it.  If I

Page 36

1      had an exhibit, I'll say "see also."
2  Q.  And you've added that here?
3  A.  And I've added it in.
4  Q.  You added new videos to your list as well?
5  A.  I think two, yes.
6  Q.  Anything else that you've added that would be of note;
7      any advertisements that you added?
8  A.  Well, I went to...  Let me see.  I don't know if it's
9      advertisements, but promotional material.  Let me see
10     if I can find it.  I apologize for scrambling through
11     this thing.
12 Q.  That's all right.  It's a large document.
13 A.  Yeah.  For instance, uh...
14 Q.  I think we're pretty close on the pagination.  Give me
15     a page.
16         MR. KRISTAL:  I think it's the exact same
17     pagination.
18         THE WITNESS:  Yeah, I'm sorry, I'm just
19     getting to the page.
20 A.  It's under, say, 126 and 127.
21 BY MR. UPSHAW:
22 Q.  Okay.
23 A.  And there should be a figure, 7-1 and 7-2, hopefully.
24 Q.  Yes, sir.
25 A.  And so this...  This is, uh...  It actually starts on

Page 37

1      the previous pages.  That's why I was flipping around
2      a little bit, but barely, when I start talking about
3      Mr. Muckerman.
4  Q.  Um-hum.
5  A.  But this is some promotional material.  In a July 2015
6      Hawaii State Fair, Monsanto Roundup was being compared
7      to other products, which is in violation of FIFRA as
8      well as standard of care, industry standard of care
9      documents.  And while it was prepared by another
10     party, it's utilized by someone representing Monsanto.
11     But more importantly, this -- this same material was
12     referred to by Donna Farmer, as I indicate on the
13     bottom of page 27 in a 2014 email where she says, flat
14     out, this isn't allowed.  And yet a year later it
15     continues to be used and continued to be on the
16     Monsantoito.com web page until very recently when it
17     was pulled down.
18         So the fact that Monsanto is utilizing this
19     information on their web page, provide information to
20     users or distributors, knowing that they shouldn't be
21     is, I think, an issue.
22 Q.  Interesting you -- we, we run across this 'cause I
23     noticed this in just a quick review of your report.
24         You make a reference to a video from a
25     Hawaii State Fair, in Hawaii.  Well, you give an email

10 (Pages 34 to 37)

Stephen E. Petty, PE, CIH, CSP

Page 38

1     address?
2  A.  Right.
3  Q.  Where did you come about this?  This wasn't in your
4     previous report.
5  A.  It was additional material that I either got or was
6     provided between the times that I had done those Saint
7     Louis case reports and the time current.  Now, some of
8     the material wasn't, because I believe the April 21st,
9     2014 email...  Well, I'll have to check.  I may have
10     had that already, I don't know.
11  Q.  Who provided you with this video and...
12  A.  The video itself, I actu...  I mean, I was made aware
13     of it, but I actually went out and got it myself
14     'cause I photo edited it in the sense of being able to
15     put it into a movie program so I could clip it to get
16     stills.
17  Q.  And you say that the...
18  A.  So I actually technically got it myself.
19  Q.  Right.  Who told you it existed?
20  A.  I don't recall who told me it existed.
21  Q.  How did you find this?  I mean, why would you include
22     this?  That's two separate questions.  How did you
23     find this?
24  A.  How did I find it?
25  Q.  Um-hum.

Page 39

1  A.  I just typed in...  I typed in keywords and it came
2     up.  That's how I found it.
3  Q.  What type of keywords would you type in to find
4     something like this?
5  A.  Monsanto, Hawaii, videos; things like that.
6  Q.  Why would you type in Monsanto and Hawaii?
7  A.  Because I was looking for a video that was done in
8     Hawaii.  I knew it was done in Hawaii.
9  Q.  So you knew there was some video that was done in
10     Hawaii of some Monsanto product?
11  A.  Well, I knew there was some video done in Hawaii of
12     someone comparing the safety of the Monsanto product
13     to other common products.
14  Q.  Okay.  And you state here, the authenticity -- I'm
15     looking at page 126 -- the authenticity of this video,
16     using Kathy Feldman's phone, was made during the
17     September 25th, 2019 depo of Kathy Feldman.
18         Can you turn to Exhibit 555?
19  A.  555.
20  Q.  So you have that listed here in your exhibits, right?
21  A.  Yes.  315, I think.
22  Q.  So have you seen the September 25th, 2019 depo of Ms.
23     Feldman?
24  A.  Yes.
25  Q.  And you have a copy of it?

Page 40

1  A.  Yes.
2  Q.  And who provided that to you?
3  A.  Plaintiff's counsel.
4  Q.  And who provided you Exhibit 556?
5  A.  I think I found it on the internet.
6  Q.  All right.  Well, let's talk about...  Let's go back
7     to Mr. Dickey.  I guess we should start with his
8     interview before I get into your Appendix G so you're
9     on the right track.  Let's start with --
10         MR. KRISTAL:  So we are going back to 516?
11         MR. UPSHAW:  516, yes.
12         THE WITNESS:  That's why I was confused
13     before.
14         MR. UPSHAW:  Yeah, I was going to jump
15     right to it, but I've been cool.  We'll talk about his
16     interview first.
17  BY MR. UPSHAW:
18  Q.  Okay.  Mr. Petty, I have in front of me your interview
19     summary sheet, which is part of your report and expert
20     opinions.  This is a summary sheet that you've used in
21     the past, correct?
22  A.  It is.
23  Q.  And you have testified regarding where the summary
24     sheet came from and how you create it and your normal
25     interview process; have you not?

Page 41

1  A.  I have.  In fact, I think I provided kind of a blank
2     form of that.  You requested that at some point last
3     time and I provided it.
4  Q.  I believe so.  And did you follow that same procedure
5     with Mr. Dickey?
6  A.  I tried to.
7  Q.  He was interviewed twice?
8  A.  That is correct.
9  Q.  Why was he interviewed twice?
10  A.  Because when I got done writing it up, I realized I
11     hadn't asked certain questions and I wanted to fill
12     in...  I think particularly there were a couple
13     situations where I didn't ask him his distance away or
14     something like that.  There were just a handful of
15     scenarios where I didn't ask the information that I
16     wanted, and I notice that when I write up all the
17     notes.  I see, okay, I'm missing that cell.  I don't
18     have that information.  So I called him back and it
19     took awhile to get ahold of him again, but he did call
20     and we got through four or five, six questions and
21     that was it.
22  Q.  So you set up the second interview?
23  A.  I believe that I did, yes.
24  Q.  And you called him directly?
25  A.  I did.  Well, I left a voicemail.

11 (Pages 38 to 41)

Stephen E. Petty, PE, CIH, CSP

Page 42

1  Q. Right. But you called him directly. You didn't call
2     counsel, his -- his lawyer, and ask to have a second
3     interview set up?
4  A. Oh, I think that I formally told them that I wanted to
5     talk to, I think -- he's not the only one that I
6     follow up with -- but that I had a few questions that
7     I hadn't asked that I wanted to ask and see what the
8     answers were, and they said fine, call him.
9  Q. Were they present -- and they, as in his counsel --
10    present on the second interview call?
11 A. I don't think there was counsel present on any of the
12    second calls.
13 Q. I only know of one second call. You have any other
14    calls with Mr. Dickey?
15 A. I'm talking about... I look at all seven.
16 Q. Well, I'm not looking at all seven. Let's, if we can,
17    it keeps it straight in my mind.
18 A. I think you're asking in a generic sense.
19 Q. I apologize for the bad question.
20 A. Okay.
21 Q. With regard to Mr. Dickey specifically, were there any
22    counsel on the second call?
23 A. No, I don't believe so.
24 Q. From your notes at page 517 of your report, you list
25    outside parties as attending the interview: Ms.

Page 43

1     Greenwald, Matt Hans, and David Domina; is that
2     correct?
3  A. Correct.
4  Q. And they were present during the first interview?
5  A. Well, at least initially they were. Sometimes they
6     would drop off and sometimes they wouldn't. I
7     wouldn't know. I didn't ask at the end who was left.
8  Q. And who set up the first interview on July 26, 2019?
9  A. It was a joint process because I was asked if I would
10    interview these folks; and then there was a back and
11    forth between administrations on both sides, my
12    administration and their administration on times it
13    would work for the counsel, for the interviewee, for
14    myself. And so that was a back and forth. It took
15    sometime to get those scheduled.
16 Q. Okay. Were you in Florida or Ohio when you conducted
17    this interview?
18 A. I'd have to look. I know that the... I know that
19    some of... Well, I don't recall specifically. I,
20    I... And you're asking specifically about Dickey,
21    right?
22 Q. Yes, sir.
23 A. I don't... I can't tell you specifically. I'm pretty
24    sure the initial interviews... Well, I'm also certain
25    that the initial interviews were in Florida. It would

Page 44

1     be easy... Well, I'm sure of that. I know that some
2     of the second interviews, but I'm not sure of Dickey,
3     occurred when I was in Ohio.
4  Q. Okay. Obviously -- and we've talked about this
5     before -- you conduct these interviews over the phone?
6  A. I do.
7  Q. Not in person?
8  A. These were not conducted in person, no.
9  Q. Did you speak to or have you spoken to Mr. Dickey
10    other than on these two occasions?
11 A. I have not.
12 Q. Have you had any other communications with Mr. Dickey,
13    any email follow-ups or anything of that nature?
14 A. No.
15 Q. I would ask letters, but nobody writes letters
16    anymore.
17 A. Actually, I do.
18 Q. A few people write letters.
19 A. I actually write thank you letters.
20       MR. KRISTAL: Only to attach to emails.
21 BY MR. UPSHAW:
22 Q. Prior to the interviews had you met Mr. Dickey before?
23 A. No.
24 Q. Would you know what Mr. Dickey looks like?
25 A. I don't know how to answer that. I don't believe so.

Page 45

1     I just... I'd have to think back on that.
2  Q. Okay.
3  A. I don't believe so.
4  Q. You've never seen an image of him, be it by Skype or
5     FaceTime or photo?
6  A. Well, I haven't seen it by Skype or FaceTime, that's
7     for sure. I just don't recall. The problem is that I
8     work on many different reports. And, in fact, since
9     I've done these interviews and since I did the report
10    in early October, I've been involved in three other
11    big projects, so...
12 Q. It's okay.
13 A. And sometimes they have pictures and, you know, I
14    just... I lose track sometime of whether I've seen a
15    picture of somebody or not, but that's the honest
16    answer.
17 Q. You didn't have to explain. It's okay if you don't
18    recall.
19 A. I just don't recall.
20 Q. Okay.
21 A. I'm trying to be as honest --
22 Q. I appreciate that.
23 A. -- and correct as I can be.
24 Q. Now, prior to the interview of Mr. Dickey did you have
25    his deposition?

Stephen E. Petty, PE, CIH, CSP

Page 46

1  A. No.
2  Q. Have you read Mr. Dickey's deposition transcript?
3  A. No, I don't have his deposition.
4  Q. Have you had the opportunity to review his plaintiff
5     fact sheet?
6  A. I don't recall seeing that, because I remember going
7     into the interviews without much information, so I
8     don't recall seeing those.
9  Q. Do you know or did you have the opportunity first to
10    review any of Mr. Dickey's medical records?
11 A. No, but I typically wouldn't because I'm not the
12    causation expert.
13 Q. I didn't ask that question. Yes or no? That's fine.
14 A. I'm just telling you, you know, I've done several
15    hundred of these, so I typically don't.
16       If I see the medical records, the only
17    thing I'm generally interested in is confirmation of
18    biographical information, date of birth, where they
19    might have lived, date of disease, things like that
20    that I would use from an exposure standpoint.
21 Q. And what disease did Mr. Dickey have?
22 A. He reported non-Hodgkin's lymphoma to me.
23 Q. Did he report what subtype?
24 A. I don't recall that he did. If he had, I would have
25    written it down.

Page 47

1  Q. You note that he didn't smoke cigarettes, I think, or
2     cigars; is that correct?
3  A. Correct, or chew tobacco.
4  Q. Or chew tobacco.
5       Are there other risk factors for
6     non-Hodgkin's lymphoma that you consider in your
7     interviews?
8  A. Well, sure. I went through his time in the service
9     and whether or not he had any exposures in the
10    service. I went through all of the places that he
11    told me he had worked over his career, to look if
12    there were other exposure factors at other locations.
13 Q. I understand that. And my question was, did you ask
14    him about any other risk factors for non-Hodgkin's
15    lymphoma other than a smoking history?
16       MR. KRISTAL: Asked and answered.
17 A. I think I just answered that question.
18 BY MR. UPSHAW:
19 Q. Did you review any fact witness transcripts,
20    deposition transcripts?
21 A. No, not to my knowledge.
22       MR. KRISTAL: Are you talking non-Monsanto
23    employees, for example?
24 BY MR. UPSHAW:
25 Q. Did you understand my question?

Page 48

1  A. Not really.
2  Q. I'll make it even easier. Did you look at any
3     deposition transcripts prior to interviewing Mr.
4     Dickey that refer to Mr. Dickey's case?
5  A. Not to my knowledge.
6  Q. Okay.
7  A. Other than -- not -- not with respect to -- I did not
8     have Mr. Dickey's deposition. I don't even know if it
9     had happened yet.
10       I typically would ask for Social Security
11    records, just things like that, but they just said we
12    need to get him interviewed, so we tried to get the
13    interview scheduled.
14 Q. Sure. Have you had the opportunity to review Mr.
15    Dickey's Social Security records?
16 A. I don't believe so.
17 Q. And you reviewed the Social Security records to
18    confirm the work history, correct?
19 A. In part. I mean, I just... I just did an extensive
20    case where almost half of the time was non-Social
21    Security records because he was paid under the table.
22    So it's part of the equation, but it's not all of it.
23 Q. Sure. If I understand your previous answer to my
24    question regarding risk factors, in your opinion the
25    only risk factors for non-Hodgkin's lymphoma are

Page 49

1  chemical, pesticide, herbicide exposure, and smoking;
2  is that correct?
3  A. No.
4  Q. What other risk factors are there?
5  A. I'm not the ris -- I'm not the causation expert, so I
6  don't even look at that. I'm looking at things, that
7  this is a standard spreadsheet. I -- I know -- or, I
8  mean, an interview sheet -- and I know a lot of these
9  questions come from -- well, the smoking question
10 primarily comes from, oftentimes from benzene
11 interviews, where there's benzene in cigarette smoke.
12 So I calculate a benzene exposure from smoking in
13 those cases.
14       But as far as trying to determine all the
15 risk factors, I'm just simply looking at his exposure
16 history with respect to chemicals and products he used
17 and trying to identify those and memorialize those as
18 best as I can from what he remembers.
19 Q. So this is not a benzene case?
20 A. It is not.
21 Q. Why would you ask about smoking and whether or not the
22 smoking or tobacco products that the person you
23 interviewed contain benzene if this is not a benzene
24 case?
25       MR. KRISTAL: Objection to form.

13 (Pages 46 to 49)

Stephen E. Petty, PE, CIH, CSP

Page 50

1  A. I think I answered that que -- I mean, the, -- there's
2     benzene in cigarette smoke.
3  BY MR. UPSHAW:
4  Q. I understand.
5  A. And various forms of leukemia have been associated
6     with exposure to benzene, so that's why the question's
7     asked.
8  Q. Did you visit any of the locations that Mr. Dickey
9     referred to in his interview?
10 A. I did not.
11 Q. Do you have any idea of the size of the farms that Mr.
12    Dickey worked on?
13 A. I did not. I don't believe I did that.
14 Q. No indication in your interview of how many acres he
15    would be working other than the size? I mean, the
16    size, when I asked you about the size, I meant, you
17    know, the entire area that could potentially be
18    sprayed. I'm not asking...
19         Any indication of how many acres were
20    actually farmed on that particular property?
21 A. I think I asked that question. I asked the rate of
22    use of products for various activities to deal with
23    weeds, and so I went through at length on the
24    activities, times, amount of product used, type of
25    product used, et cetera.

Page 51

1         I was interested in exposure, not the
2     acreage.
3  Q. Right. You didn't look at how many acres he was
4     actually spraying?
5  A. It wasn't a primary concern. It was more... I was
6     more interested in how much product he used and how
7     long he sprayed.
8  Q. Okay.
9  A. And... And what his exposures were associated with
10    those events; how much of a, you know, did his skin
11    get wetted. And if so, what areas and for how long
12    and what percentage of time.
13 Q. During your interviews did you ask Mr. Dickey where
14    the product was purchased from?
15 A. I did not. I just asked him the size of the container
16    and if he remembered anything about the container
17    itself.
18 Q. You asked Mr. Dickey -- I should say it this way.
19         Did you ask Mr. Dickey the different types
20    of products that he used?
21      MR. KRISTAL: Are you talking about
22    Roundup?
23      MR. UPSHAW: I wasn't that specific.
24 A. Well, I mean on the interviews, beginning on page 522,
25    when I asked him about the product he was adamant that

Page 52

1     it was a Roundup Concentrate. It was in about a 2-1/2
2     gallon jug. And that he continued to use that same
3     2-1/2 gallon jug of concentrate for at least the first
4     four activities. I'm looking at page 526.
5         So to the extent that that's what he told
6     me, that's what he told me.
7  Q. Any indication during your interview or in your
8     interview summary here that Mr. Dickey used any other
9     chemical, pesticide or herbicide, other than Monsanto
10    concentrate, Roundup Concentrate?
11 A. Yeah. I asked that question on -- beginning on 518 --
12    other exposures. And then it looks like on 521, he
13    mentioned that he used some 2,4-D, and then Roundup
14    Concentrate. Those were the two products he recalled
15    using.
16 Q. Is it your opinion that 2,4-D is a glyphosate-based
17    herbicide?
18 A. I don't have an opinion on it at all. I'm just
19    reporting another product that he used.
20 Q. And what is 2,4-D?
21 A. It's another herbicide.
22 Q. What's the active ingredient?
23 A. I don't know the chemical name, off the top of my
24    head.
25 Q. Do you know whether or not it's manufactured by

Page 53

1     Monsanto?
2  A. I didn't look that up, one way or the other. I'm just
3     trying to see what else he used.
4  Q. After you took Mr. Dickey's interview, do you
5     summarize it right away? Did you summarize it right
6     away?
7  A. Within 24 hours, yes.
8  Q. Do you record the interview?
9  A. No.
10 Q. You take handwritten notes while you're taking the
11    interview, if I recall correctly, right?
12 A. Yes.
13 Q. And then you take your notes and put it into your kind
14    of template we see here?
15 A. Yes. Well, I start with that template, but then it...
16    I've got markings all over it and there's digressions
17    and it comes back to issues.
18 Q. Right.
19 A. So I try to collect all the information and put it in
20    the same place.
21 Q. And do you keep your written notes?
22 A. I do not. I never have.
23 Q. Once the interview is complete, did you make any
24    effort to corroborate any of the statements Mr. Dickey
25    made with coworkers or other individuals?

14 (Pages 50 to 53)

Stephen E. Petty, PE, CIH, CSP

Page 54

1   A.  I have not talked to anyone else, if and when I get
2       the depositions and I can look at that, but my honest
3       experience is that, particularly with respect to
4       dermal, I mean, I've given this form, I can't tell you
5       the number of defense attorneys who have seen my
6       interview form for IH interviews, and I can tell you
7       in several hundred depositions I review that nobody
8       asks the dermal questions I ask, even when they have
9       the interview ahead of time.
10  Q.  Yeah.  It even took you two interviews this time,
11      right?
12  A.  No, not even close to asking those same questions.
13      They don't ask the skin areas.
14  Q.  I think you missed what I said.
15          I said, even to get the questions that you
16      wanted to ask Mr. Ducky, it even took you two
17      interviews, because at the end of the first interview
18      you still had additional questions you wanted to ask,
19      correct?
20  A.  No, that's not what I'm saying at all.
21          What I'm saying is that there were maybe
22      four length questions that I hadn't asked, but I was
23      talking about the dermal and the dermal questions had
24      been asked.  And in terms of...
25          It'll be interesting to see if after having

Page 55

1       these interviews, if you all ask these questions; what
2       skin areas and what percent of the time and what
3       percent of the skin area were wetted.  I'll be very
4       curious to see if you ask those questions 'cause you
5       have my interview form for the previous 14 interviews.
6   Q.  Um-hum.
7   A.  So we'll just see if you ask those questions.
8           My experience is it doesn't happen.
9           MR. UPSHAW:  All right.  Move to strike,
10      nonresponsive.
11  BY MR. UPSHAW:
12  Q.  Let's go to the pesticide used at the farm near
13      Laurel, Nebraska.  I think that is number 2, since
14      there was no pesticide used at location 1, which was
15      his truck driving of the chickens; am I correct?
16      That's location 2, right?
17  A.  Yeah.  He indicated that he was not aware of any
18      chemical exposures when he did that job.
19  Q.  For location 1?
20  A.  Correct.
21  Q.  All right.
22  A.  Or job 1, yeah.
23  Q.  All right.  So location 2, he worked for Alfalfa DI
24      plant in and around Laurel, Nebraska, as a laborer, as
25      you've indicated here, correct?

Page 56

1   A.  Correct.
2   Q.  And there was no chemical exposure at that location?
3   A.  Not that there were...  Well, other than dust.  We
4       both laughed 'cause we both hauled hay when we were
5       young and it's a lousy job.  It's hot and you get that
6       hay all over ya.  And he said, other than the dust.  I
7       said yeah.
8   Q.  Location 3 was also work around Laurel, and it was on
9       his father's farm?
10  A.  Yes, that is correct, and he didn't recall chemical
11      exposures when he was doing that work.
12  Q.  Then on location 4, the time frame of working at this
13      location was from 1963 to 2003; is that correct?
14  A.  Correct.
15  Q.  Did he discuss how this then became his farm?
16  A.  My recollection was, it was sort of a transition.  He
17      was working on his -- for his father, helping his
18      father, and then eventually his father obviously was
19      getting older and he started to take over more and
20      more of the work, and eventually he pretty much, you
21      know, did the work.  He took over.
22  Q.  Right.  And once he took over, you list products that
23      were used on the farm?
24  A.  I don't know -- okay.
25  Q.  Is that not correct?  I mean, under location 4, which

Page 57

1       is the same location --
2   A.  It's the same location he took over.  I mean, I think
3       there was a transition where, from the time that it
4       was father -- his father's farm and he was working for
5       his father and then they sort of were doing it jointly
6       and then he's taking over.  So, I mean, it's...
7           I'm only reacting to that term of when he
8       took over.  I mean, the fact of the matter is he's
9       saying that -- whether he took -- he was taking over
10      whatever.  He was utilizing these products from that
11      time frame.  I'm just...  I'm not sure he controlled
12      the farm or didn't control the farm in 1963.  I don't
13      know.
14  Q.  To get more detail of Mr. Dickey's actual use, we have
15      to turn to the tables that you have at the end, right,
16      with regard to when he mixed a product, how long he
17      took to mix product, how many times he sprayed, so on
18      and so forth, correct?
19  A.  No.  We get that information from the interview
20      itself.
21  Q.  I understand that, but to find that information in
22      your report, we have to turn to the table?
23  A.  No.  There's lots of information listed in, in --
24      starting on 522.  I'm not sure what table you're
25      referring to.  The table on page -- are you referring

Stephen E. Petty, PE, CIH, CSP

---

Page 58

1 to the table on 528 -- 26?
2 Q. The only tables you have connected to Mr. Dickey's
3 interview.
4 A. Well, this table rolls up some of the information that
5 begins on 522, but it then fills in, if you will, a
6 lot of the dermal information. But as far as the
7 number of seasons and the events and times and
8 distance away, that's -- that all starts on 522.
9 It's repeated, if you will, or some of it's
10 summarized on those tables, but the actual -- when I
11 do the interview, I'm actually taking the information
12 the way it's presented here.
13 Q. Okay, all right. Let's look through some of that
14 then. And this, again, is all information Mr. Dickey
15 provided to you?
16 A. Correct.
17 Q. So he mixed his own product?
18 A. He did.
19 Q. From concentrate?
20 A. Yes. At least for...
21 Q. And the type of pump he used, I'm looking at activity
22 1, sprayed weeds using the one gallon tank held --
23 tank -- handheld tank with a wand and nozzle?
24 A. Yes, that's what he reported.
25 Q. This is not a backpack. This is kind of a tank you

---

Page 59

1 walk around with, with a nozzle?
2 A. Correct. That's my understanding.
3 Q. Do you know where he sprayed this on his property?
4 A. He just told me he was using it to spray weeds. He
5 didn't say specifically where.
6 Q. Right. He didn't say, my weeds in the driveway or my
7 weeds in the field?
8 A. He didn't say.
9 Q. Okay.
10 A. I'm interested in how much product he used and how
11 often he used it and how much he got it on. I'm the
12 exposure guy.
13 Q. So you indicate that he had two or three mixing events
14 each spraying event; is that right?
15 A. No. He had two or three events per month.
16 Q. Okay.
17 A. Uh, a season.
18 Q. Including mixing and spraying?
19 I'm trying to understand what you got
20 written. That's my basic question.
21 A. Well, are we talking about -- well, it's --
22 Q. I'm looking at mixing.
23 A. Mixing, okay. Let's walk through it then so we're not
24 confused.
25 Q. That's exactly what I'm trying to do.

---

Page 60

1 A. Okay. Well, then tell me where you're at.
2 Q. I got season.
3 A. Just tell me where you're at and then I'll say, you
4 know --
5 Q. Let's go to product exposure data.
6 A. Okay.
7 Q. Mixing. We're going to talk about how he mixed it,
8 right, or his, his discussion of how he mixed.
9 A. It's not how he's mixing. It's how often he mixed and
10 how long it took to mix and how far away he was from
11 the stuff.
12 Q. Go to the third bullet point. It say, events or days
13 or days/months, and you have a colon -- actually you
14 have a period and then a colon and it says, hyphen,
15 two to three mixes/spraying events. Explain what you
16 mean by that. Is that events or days and months?
17 A. No. It's events or days. An event is -- happens.
18 Uh, it's... It's events or days per month. So it's
19 two to three mixes per month, per... It's two or
20 three mixes per spraying event.
21 Q. And if you go to spraying, the same third bullet
22 point, events or days per season, 30 days or events/
23 season on average. Can you explain that?
24 A. So he's saying that for a season that extends from mid
25 May to August/September -- and he says he did this for

---

Page 61

1 10 to 11 seasons -- that during those seasons, on
2 average for those months, he would spray a total of 30
3 days per season on average.
4 So the way this ties back to the data above
5 is that for each spraying day or event, he would have
6 two or three mixes.
7 Q. And it would take him five minutes to mix each time?
8 A. Correct.
9 Q. Okay, makes sense. Under PPE, you have yes and no
10 blocked. Why?
11 A. He... He thought that perhaps PPE was cotton gloves.
12 I don't consider that to be PPE, but he did.
13 Q. So if we were putting down -- hold on, let me ask the
14 question.
15 So if you're writing down what the
16 interviewer tells you when you ask him, did he wear
17 PPE -- let me rephrase that -- if you asked him
18 whether he wore gloves, he said yes?
19 A. Right.
20 Q. And when you asked him what type, he said cotton?
21 A. Right.
22 Q. And then you put down the opinion that that's not PPE,
23 so then you blocked out the no as well?
24 A. Correct.
25 Q. So this is some of your own editorial in the

---

Stephen E. Petty, PE, CIH, CSP

Page 62

1    interview?
2  A.  I don't know if it's editorial. I mean, I have to
3    know what PPE is in order to ask him if he's wearing
4    PPE.
5  Q.  Did you ask him whether he was wearing PPE or did you
6    ask him whether he's wearing gloves?
7  A.  Well, I asked him if he was wearing gloves.
8  Q.  And he said yes?
9  A.  He said yes. And I said what type of gloves?
10  Q.  So the only block that should have been marked here,
11    if you are transcribing what the interviewer, in this
12    case Mr. Dickey said, should have been the yes box?
13  A.  No, of course not, because it's titled PPE. If that
14    title PPE wasn't there, then I might agree with you,
15    but I wouldn't agree with you at all if it was... I
16    mean, Monsanto thinks cotton is PPE apparently, but I
17    certainly don't.
18  Q.  Let's go to activity 2 then for Mr. Dickey. He's
19    spraying weeds with a 20 gallon tank and a handheld
20    wand and nozzle, and the tank is on a tractor. What's
21    the significance of listing that it was occupied by
22    others who would spray while he drove? What's that
23    mean?
24  A.  He had other people on the tractor with him and he had
25    multiple wands. He had kids, young people, that

Page 63

1    would, uh... He was operating the tractor and doing
2    the mixing and driving, but there were other people in
3    the back of the tractor that were actually doing the
4    spraying.
5  Q.  So he wasn't holding the wand when the product was
6    being distributed?
7  A.  In general, I believe that's the case, yes.
8  Q.  But he did the mixing?
9  A.  He did mixing.
10  Q.  And he filled the tank on the tractor?
11  A.  Correct.
12  Q.  And this is his estimate of how far away when you have
13    here distance away. I assume that's distance away
14    from spraying or distance away from mixing. You have
15    it under mixing. Kind of hard to mix two to three
16    feet away, I think.
17          MR. KRISTAL: Well, you haven't seen Mr.
18    Dickey's arms.
19          MR. UPSHAW: That is true.
20  A.  I'm asking him how far is it from the product to your
21    nose. I don't know why that's so hard to be two to
22    three feet away.
23  BY MR. UPSHAW:
24  Q.  No. I should have asked the question, what do you
25    refer to in distance away.

Page 64

1  A.  Well, it's because I'm looking at --
2  Q.  Is it distance from spraying or distance from the mix
3    -- from his face to where the vessel he's mixing the
4    stuff in?
5  A.  Well, the distance on mixing is that distance there.
6    And the distance on spraying is on the next page.
7    It's five to six feet away.
8  Q.  I gotcha.
9  A.  I'm always looking at basically your face because
10    that's where the inhalation exposure would occur, if
11    it occurred.
12  Q.  And this is his estimate, five to six feet away from
13    those people who are doing the actual spraying?
14  A.  That's what he told me, yes.
15  Q.  And for these activities, he didn't wear any gloves at
16    all?
17  A.  That's what he told me.
18  Q.  Activity number 3 was again using a 20 gallon tank
19    mounted on a tractor and others would be spraying, but
20    this activity is cleaning the nozzles?
21  A.  Yeah, this isn't spraying, this is cleaning the
22    nozzles. In other words, they get clogged up from
23    time to time and you have to get out and take them
24    apart or do whatever he had to do to unclog them.
25  Q.  Did he describe how he cleaned the nozzles?

Page 65

1  A.  Let me check something. I'm trying not to mix people
2    up.
3          And what I'm look at is page 526, under
4    cleaning nozzles, clogged nozzles. He did not
5    specifically tell me in that case how he went about
6    cleaning the nozzles.
7  Q.  Going back a bit to activity 2, which is the actual
8    spraying activity where it's cleaning the nozzles, he
9    told you he was driving the tractor six to eight hours
10    on an event day?
11  A.  (No Response.)
12  Q.  Or six to seven hours?
13  A.  Yeah. On the spraying activity, it was six to eight
14    hours is what he was saying, on average.
15  Q.  Okay. Do you know whether these were employees who
16    were spraying, who were holding the wand, spraying?
17  A.  I don't know for sure. I thought it was kids, but I
18    don't recall.
19  Q.  Nothing in here indicates that these are --
20  A.  I didn't write it down.
21  Q.  -- quote/unquote kids? I mean, it just says others.
22  A.  I don't know. I guess that's the answer, I don't
23    know. I didn't write it down.
24  Q.  Was this a commercial farm or was it family owned?
25  A.  Well, it was a farm that his father farmed for years.

17 (Pages 62 to 65)

Stephen E. Petty, PE, CIH, CSP

Page 66

1    So, I mean, I don't know the answer to whether they
2    physically owned the property or they just continued
3    to farm land they'd farmed for a couple generations.
4  Q.  Okay.
5        MR. KRISTAL:  We've been going about 90
6    minutes.
7        MR. UPSHAW:  Oh, yeah.
8        MR. KRISTAL:  If you want to take a break
9    at a good time?
10  BY MR. UPSHAW:
11  Q.  It's up to you.  Mr. Petty, you know how it goes.
12  A.  Where are we for time, I mean, where are we at
13    clockwise?
14        MR. KRISTAL:  20 after 11.
15        MR. UPSHAW:  Hold on.  Let's take a break.
16        VIDEO TECHNICIAN:  11:17 and going off the
17    record.
18        (Recess taken at 11:17 p.m.)
19        (Back on the record at 11:32 a.m.)
20        VIDEO TECHNICIAN:  11:32 a.m.  We're back
21    on the record.
22  BY MR. UPSHAW:
23  Q.  Okay, Mr. Petty, before we broke, we were talking
24    about the events that you indicated in your interview
25    summary of Mr. Dickey.  Let me ask you some questions

Page 67

1    about event 4, which you have here as a quote/unquote
2    bad event.
3        Is that what he called it or is that what
4    you called it?
5  A.  That's what he called it.
6  Q.  And he described this bad event to you as a wind
7    incident?
8  A.  Yeah.  Basically he described it as he was pouring
9    material in and kind of, I guess, flows down in sheet
10    flow into this tank and he said a big burst of wind
11    came up and it had blew it as he was pouring it out of
12    the container into the mix tank on the ves -- this 20
13    gallon mix tank, it blew out -- it moved the stream
14    sideways onto him.
15  Q.  Um-hum.
16  A.  It was a single event.
17  Q.  That's noted on your summary chart or I think you call
18    it your roll-up on page 526-527.
19  A.  That's not really a roll-up.  I call it my dermal
20    tables.
21  Q.  Okay.
22  A.  But it does have some roll-up information in it.
23  Q.  Well, we'll call it whatever you like to call it.
24  A.  It's mainly the dermal.  It's where I take in the
25    dermal information.

Page 68

1  Q.  Where do you indicate this --
2  A.  Page 527.
3  Q.  -- quote/unquote bad event, right, it's the last thing
4    on here?  No?
5  A.  Yeah.
6  Q.  Right.  Yes, exactly.  I knew I saw it.
7        Now, you...  You list where you have dermal
8    exposures for this particular singular event, and I'm
9    going by your description.  You include his face, his
10    neck, and his legs?
11  A.  That's what he told me.
12  Q.  Okay.  How does a single event get included in your
13    calculations?
14  A.  What calculations?
15  Q.  Whatever calculations you've done with regard to Mr.
16    Dickey.  It's exposure calculation.
17  A.  It's included as a single event and whatever the time
18    is of that event.
19  Q.  So it's just included in the total time of exposure?
20  A.  You can go to the calculations and just look at it on
21    page 522.
22  Q.  522?
23  A.  Actually, it's 533.
24  Q.  Okay.
25  A.  I'm sorry, I misspoke.

Page 69

1        And it's easy to see, because the first row
2    is the soaking event, total one; events total one.
3    Time of exposure, it's a hundredth of an hour on the
4    median or the midpoint.
5        So if you look down below on events-total,
6    there's 2823 calculated throughout this appendix and
7    2822 are some other events.
8  Q.  Okay.  So you just roll it into the amount of --
9  A.  Total events.
10  Q.  -- total events and total time?
11  A.  In terms of numbers of events, it's obviously not a
12    significant portion of the events at all.
13  Q.  And how about with regard to exposure, dermal
14    exposure, is it a significant event at .01 hours?
15  A.  It's a significant event in the sense that it contacts
16    a lot of the skin area, but it's a single event.
17  Q.  That doesn't weigh any more, any less in your
18    calculation, a single, as you call it, soaking event?
19  A.  Well, I didn't do the dermal dose, so...  But
20    obviously the dose for that event would be higher
21    than, say, for the other types of events because
22    there's more skin involved.
23  Q.  Right.
24  A.  But I, I never --
25  Q.  You didn't do --

18 (Pages 66 to 69)

Stephen E. Petty, PE, CIH, CSP

Page 70

1   A. I didn't do the dose calculation.
2   Q. -- a dose calculation?
3   A. (No Response.)
4   Q. And as we've discussed previously, were you asked to
5       do a dose calculation of Mr. Dickey?
6   A. No. And I'm certainly capable of doing it, but no.
7   Q. Okay.
8   A. I did a bunch of dose calculations last week, but not
9       for this one.
10  Q. Okay. And let's go back to 526 and 527; finish that
11      up.
12  A. Okay.
13  Q. Pesticide use and exposure information chart.
14      Am I labeling that correctly so we're both
15      on the same page?
16  A. Sure. On 526 is where you're at?
17  Q. Yes, sir.
18  A. It continues, but yes.
19  Q. Okay. And you have the last event on 527.
20      You separate between mixing events,
21      spraying events, and then the nozzle cleaning event
22      here, correct?
23  A. And the single splashing event or whatever you want to
24      call it, bad event.
25  Q. He calls it bad. We'll stick with his terminology.

Page 71

1       There are basically two separate time
2       frames that you've identified here, 1975 to '86, and
3       then '86 to 2002?
4   A. Correct, correct.
5   Q. Why the separation?
6   A. Primarily here, this is where he goes from hand-
7       spraying to spraying on the vehicle. So that if you
8       go back, backwards, that's really the distinction.
9   Q. Right. So it appears in 1986 he switches from a
10      hand-sprayer to a vehicle-mounted tank?
11  A. I just want to make sure I'm correct on that.
12  Q. Okay.
13  A. No, there's an overlap. I'm going back. Let's see...
14      On the spraying, that's correct. On the spraying,
15      that is correct. You are correct.
16      Sorry about that. I just want to make sure
17      I was right.
18  Q. And when you look at, uh, when you asked and look at
19      his dermal exposures as a summary, there was only one
20      activity, the first activity where he actually used
21      gloves, cotton; but he used gloves, correct?
22  A. At least part of the time, yes. That's why I always
23      ask the question. Regardless of PPE or clothing
24      material, I always ask percent area and percent time
25      that the skin is wetted because that then addresses

Page 72

1       the PPE as well as the clothing 'cause you can still
2       have PPE on and get dermal exposure for a whole bunch
3       of reasons.
4       So I cut right to the chase and say, okay,
5       on the skin areas, which skin area do you ever recall
6       getting wetted and I just march through them.
7   Q. And you run down a list, if I recall correctly?
8   A. Correct. And then I'll ask, okay, we're going to
9       separate now, and I -- I've talked to you about this
10      before in testimony that -- then I'll go through the
11      area or range of areas that he recalls on typically
12      that would get wetted, whether it be very low, very
13      high, some range, and they'll come up with a value.
14      And I do that for each of the skin areas. And I'll
15      say, okay, it may have happened, but did it happen all
16      the time or did it happen part of the time.
17      And then the last series of questions
18      are -- because this material doesn't evaporate or not
19      very well and there's good evidence, even if you wipe
20      your skin, there's still residual -- I'll, I'll look
21      at the post-dermal application. I call it post-
22      application dermal exposure, which is how long was it
23      till you really did a good cleanup of your skin,
24      because there's ongoing exposure that occurs until --
25      really until there's a good cleaning of the skin.

Page 73

1   Q. Okay. And as an example, you put here with regard to
2       how long he waited before cleanup, you put from four
3       to 10 hours?
4   A. Yes.
5   Q. On each occasion?
6   A. On each occasion.
7   Q. The first entry on 526, you've put here, as far as
8       dermal exposure, never wore gloves. That's not what's
9       indicated in your interview; is that right?
10  A. Let me go back to that last question.
11      It's not necessarily -- I want to correct
12      that answer.
13  Q. Sure.
14  A. When you asked me if it's four to 10 hours on each
15      occasion, what he's saying is, on average, my
16      recollection is four to 10 hours.
17      So there could be one that's more, there
18      could be one that's less. So I need to correct that
19      answer.
20  Q. Okay.
21  A. These questions are all on average, what's your
22      recollection.
23  Q. Understood. And you don't question that, right? I
24      mean, whatever number they give you is the number they
25      give you?

19 (Pages 70 to 73)

Stephen E. Petty, PE, CIH, CSP

## Page 74

1  A.  I'll question certain things.  I think we've talked
2     about this before.  If they say they get it on their
3     -- some skin on their hands and they get it on their
4     forearms, and I'll ask about the wrist and they'll say
5     no, and I'll say, well, it would kind of make sense
6     that if it got it on your hands and your forearms, the
7     wrists would be involved as well.  And either they'll
8     say yes or they'll say no.
9           But yes, there's -- I always ask, if
10    there's something that doesn't pass -- you know, if I
11    -- I've done so many interviews, I've done hundreds,
12    that if something -- I can sense right away if there's
13    something that doesn't make sense and I'll revisit and
14    I'll revisit and try, you know, and sometimes they
15    don't remember and I'll say, okay, that's your best
16    recollection, move on.
17 Q.  Best recollection of an average?
18 A.  No.  Sometimes they'll say --
19 Q.  Well, let me give you a better question, I apologize.
20          So what you write here is their best
21    recollection, in the last column on page 526 is their
22    best recollection of the average time that Mr. Dickey
23    waited before he cleaned up if he was exposed?
24 A.  Well, I'm saying that answer applies both to the
25    percent area wetted as well as the percent time.

## Page 75

1     Those are overall averages.  On average, what's your
2     recollection?
3 Q.  Right.
4 A.  There's no way on 3,000 events they're going to
5     remember the times and the events for each of those
6     thousands of events.
7 Q.  And the first entry here where we talked about Mr.
8     Dickey using the sprayer where it says, never wore
9     gloves, that's incorrect, right?
10 A.  It's not incorrect in the sense that when I went
11    back -- I'm recording what he says.  He mentioned that
12    he wore cotton gloves when I first did the interview.
13 Q.  Um-hum.
14 A.  But when I was asking these dermal questions, he said,
15    well, I never use gloves.  Okay, I write that down.
16    I'm not...  To me, it's, it's...  In this case, it's
17    less of an issue to follow up on.  I recognize that
18    there's a disparity there.  I'm putting it there
19    because I put down what he tells me.  But since
20    they're cotton gloves and I'm asking the question
21    about, on hands what percent area and what percent of
22    the time, I'm asking -- whether there's gloves or not
23    gloves, I really in many respects don't care because I
24    want to know what percent of the skin and what percent
25    of the time it got wetted.

## Page 76

1 Q.  I understand.
2 A.  If it didn't get wetted, then there's not any
3     exposure.  If it gets wetted, there's exposure.
4 Q.  I just asked, because it seems to be inconsistent.
5 A.  It does.
6 Q.  Hold on.
7 A.  Yeah.
8 Q.  Inconsistent on the chart, because the first entry
9     here you don't mention he ever says he wore gloves,
10    cotton or otherwise, yet on the last entry on 527, you
11    specifically write down what he did wear, which was a
12    tee shirt and jeans all the time.  That's the --
13 A.  Where's the tee shirt?
14 Q.  -- confusing part.
15          In 527, you specifically write down what
16    Mr. Dickey said he was wearing at the time of this
17    event.  Yet, when you wrote down on the first entry on
18    526, you make no mention that previously he said he
19    wore gloves or wore gloves sometime.  You just said
20    never wore gloves.
21 A.  Well, you asked a bunch of questions, but to answer
22    your question about why on the single large event I
23    asked about the clothing was I wanted to make -- when
24    they start to say that their chest or their legs --
25    obviously they're not doing this naked, so I want to

## Page 77

1     know -- now, remember, you're wearing clothes.  Did
2     you recall specifically that it wetted that chest
3     skin?  That's a...
4           You asked earlier, do I do crosschecks of
5     the questions I ask.  Well, that's...  That's a case
6     there, when they start to say they're getting wet --
7     wet on -- they recall their skin on their chest or
8     their legs being wetted and they're wearing clothing,
9     I want to validate that.
10          The difference here is a different
11    question.  There is a difference between what he said
12    that sometimes he wore cotton gloves before and now
13    he's saying no gloves, but with respect to the
14    exposure analysis, it doesn't matter to me because I'm
15    recording it because he said this, but I'm, I'm...  It
16    doesn't matter to me because I'm after, regardless if
17    there were gloves worn part of the time or not, what
18    percentage of the time and what percent of the area
19    were wetted.
20 Q.  Okay.
21 A.  And with respect to, in this case, hands.
22          And you see that he's not saying all the
23    time that his hand skin was wetted.  He's saying one
24    time out of four.
25 Q.  Speaking of clothing, does it matter what the person

Stephen E. Petty, PE, CIH, CSP

Page 78

1    was wearing at the time they say that their skin was
2    wetted in your calculations of exposure?
3    A.   Only... Only to the extent... That's why I wrote
4    this section on dermal exposure and how, the things
5    that impacted. And there's lots of discussion in
6    there from their literature on people wearing clothes,
7    wearing gloves, and still have significant dermal
8    exposures for a whole host of reasons we could go into
9    it.
10          And so the answer is yes and no. It
11   does... It... It could matter in the sense that if
12   I'm going to do some crosschecking on... If the
13   person told me that they wore full-up PPE; they wore
14   rubber suits and they wore rubber gloves and they were
15   taped together at the joints, and all of a sudden they
16   said, you know, a hundred percent of my hand's getting
17   wet, I'm going to say, are you sure?
18          If they're wearing street clothes, like I
19   said, if it's on the torso of the body, I'm going to
20   ask, are you sure with those clothes that you were
21   getting the skin wetted.
22          But at the end of the day, the reason I say
23   no is because I'm cutting through that by asking them
24   straight-up, what skin areas got wetted regardless of
25   what you're wearing.

Page 79

1          So yeah, you use it for crosschecking
2    answers, but ultimately that's what counts. If it's
3    on the skin, it's providing material for dermal
4    exposure.
5    Q.   And if a plaintiff you're interviewing says that it
6    was on -- whatever the material was, in this case
7    Roundup or some other pesticide was on their skin --
8    you write that down, because that's what they --
9    they're telling you as far as the time and number of
10   events that they were quote/unquote wetted, correct?
11   A.   No, that's different. I ask them initially a whole
12   series of questions that will allow me to calculate
13   numbers of events in an amount of time. But for each
14   event, then I ask them a separate question: For these
15   events during this time period on average what percent
16   of your skin was wetted by area and what percent of
17   the time did that happen by area? And then the post-
18   dermal, post-application dermal questions.
19          So then if I were going to do a dose
20   calculation, I would discount the number of events or
21   the time of all those events by the time that he says
22   the skin wasn't wetted. And I'd also discount the
23   skin area by the percent areas that weren't wetted.
24   Q.   Right. So, as an example --
25   A.   I mean, I don't know if you've seen some of the ones

Page 80

1    where I've actually done dermal dose calculations.
2    Q.   As an example with Mr. Dickey, just taking the
3    first entry, you note that his dermal exposure to both
4    hands was a quarter of the time, right?
5    A.   Correct.
6    Q.   That it was wet?
7    A.   On average.
8    Q.   On average. Yet, you don't... In the calculations
9    that you provided in this case, you don't reduce the
10   number of events or the time by 25 percent, correct?
11   A.   'Cause I haven't done a dermal dose calculation.
12   Q.   Right. I'm... I'm not disagreeing with you. I'm
13   trying to understand your point here.
14   A.   No. I'm being fully transparent. I'm saying, the
15   total number of events and times that he was exposed
16   to products, whether it be inhalation or dermal, those
17   total number of events are there, but now they're
18   going to have -- if you're going to go through and do
19   the detailed inhalation, if I'm going to go do
20   milligrams for inhalation and milligrams for dermal,
21   that data is going to get adjusted based on individual
22   skin areas, et cetera, et cetera.
23   Q.   Um-hum.
24   A.   But these are the events and the times are the built
25   starting points to then do subsequent analysis.

Page 81

1    Q.   Understood. The first section of, uh, in your title
2    on page 526 says exposures and consumption. Why did
3    you add the words, "and consumption"?
4    A.   Because it's the amount used. Consumption, meaning
5    not that he's drinking it, but consumption meaning
6    that the amount of product used, because if I were
7    going to do near-field exposure calculations, then I
8    would need to know how much product is being used for
9    a given event.
10          So it's a number that's, uh, that I asked
11   for, anticipating I may be -- if I go through and I do
12   a Nicas near-field exposure, inhalation exposure model
13   calculation, then I'm going to need to know how much
14   product was used per event.
15   Q.   And your indication on this chart of how much product
16   was used during an event, again, let's take the first
17   entry for Mr. Dickey. Under the column which says,
18   amount used/event, you have here, mixed concentration
19   with water as per instruction --
20   A.   Right.
21   Q.   -- two to three times -- oh, two to three mixes per
22   event.
23          How does that indicate the amount consumed?
24   A.   Then I would have to... I could use that information
25   to go back and look at Monsanto's mixing directions to

Stephen E. Petty, PE, CIH, CSP

Page 82

1   then make that analysis.  I mean, these are the
2   starting points.  I have to get enough information so
3   that I know I can take that information and then go do
4   the calculations.  It doesn't mean that he's giving me
5   a hundred percent of what I need, but he's got to give
6   me the base input that I can now go use with other
7   things I know to make those calculations, should I
8   decide to do so or be asked to do so.
9   Q.  For what you've done for Mr. Dickey in his report, the
10  type of PPE used doesn't matter, correct, for what
11  you've done here?
12  A.  I... I'm not aware that he used PPE, but, but, uh...
13  I guess I tried to answer that before, yeah.  In terms
14  of like the dermal data where I'm asking the skin area
15  wetted and the time wetted, probably not much so, but
16  if I were going to do inhalation on that side, that
17  would matter.
18  Q.  That wasn't my question.  That's why I asked
19  specifically 'cause I know if you do other things, you
20  would use that information.  You -- you've discussed
21  that with me in the past.
22      For what you've done here, it doesn't
23  really matter what PPE Mr. Dickey was or was not
24  wearing, correct?
25  A.  No, I don't think that's true.  Uh...

Page 83

1   Q.  Does it change the number...  If Mr. Dickey had told
2   you that he was wearing a rubber suit on 10 different
3   events, would you not include those events in your
4   total event count?
5   A.  I would include the events, but I'd also include the
6   PPE information.
7   Q.  Why?  Does it change the number of total events?
8   A.  'Cause it would change the downstream use of that
9   data.
10  Q.  I'm not asking you that.  I'm asking you, for what
11  you've provided here on these charts in this report,
12  does it change the number of events?
13  A.  Well, you asked that before.  It, it...  It could if
14  what he told me was inconsistent with some of the
15  data.  If I was using it to crosscheck, you might not
16  see it yet here, but it would have changed.  I would
17  have gone back and forth with him on the data, to get
18  the data right.
19  Q.  Does it change the number of events, Mr. Petty?
20  A.  It could have.
21  Q.  How would...  How in your chart that we have in front
22  of you for Mr. Dickey, if he had 10 events, wearing
23  the most PPE anyone could ever wear, does that change
24  the number of events?
25  A.  On how I use those, yes.

Page 84

1   Q.  Okay.  But does it change the number?
2   A.  It would.  Once I did the inhalation and I did the
3   dermal exposures, it would have.
4   Q.  Mr. Petty, did you do a dermal or did you do an
5   inhalation on any of this information that we've got
6   right here?
7   A.  In a...  In a, uh...  In the sense of looking at total
8   time and total events, I do.
9   Q.  Okay.  So you're telling us --
10  A.  Along with...  Along with all of the dermal data that
11  I've actually provided.
12  Q.  So you're tell --
13  A.  It is quantitation.
14  Q.  You're telling us here that when you've looked at Mr.
15  Dickey or any of the other plaintiffs that you've
16  looked at and they tell you that they're wearing some
17  type of PPE, that you adjust the number of total
18  events?
19      MR. KRISTAL:  Objection.
20  A.  I could have.
21  BY MR. UPSHAW:
22  Q.  That's not my question --
23  A.  I don't know.
24  Q.  -- not could have.
25      Do you; yes or no?

Page 85

1   A.  When I do, it depends on the situation and whether I'm
2   asked to calculate it.
3   Q.  Do you change the length of time of an event?  When
4   you look at total time in what you've provided right
5   here -- not what you could do, what you possibly do,
6   what you may do in some future case -- from what
7   you've provided today, if someone is wearing PPE,
8   specifically Mr. Dickey, whether or not he's wearing
9   PPE, does it change the amount of time of each event?
10  A.  It would.
11  Q.  How so?
12  A.  Because when I'm doing a dermal dose calculation, I
13  have a line item on effectiveness of PPE.
14  Q.  But you didn't do dose calculations here, so stop
15  referring to things you didn't do.  You didn't do any
16  dose calculations here, right?
17      MR. KRISTAL:  My suggestion is we turn down
18  the volume a little.
19      MR. UPSHAW:  We could do that.
20      MR. KRISTAL:  And relax a little.
21  BY MR. UPSHAW:
22  Q.  Did you do any dose calculations here, sir?
23  A.  I did not do dose calculations.
24  Q.  So let's not talk about dose calculations, okay?
25  A.  But you can't escape that from...  This is the

Stephen E. Petty, PE, CIH, CSP

Page 86

1 beginning... This is the initial entry point of
2 information used. I'm taking this information to
3 allow me as a baseline to go do all that analysis.
4 Q. But you weren't asked to do any other analysis in Mr.
5 Dickey's case, correct?
6 A. But I take 'em as if I were.
7 Q. No, no. That's not my question, Mr. Petty.
8 Were you asked to do any other calculations
9 in Mr. Dickey's case?
10 A. I wasn't asked to do... I wasn't asked to do any
11 calculations.
12 Q. Okay. But you gratuitously provided a total event
13 calculation and a total time of exposure calculation,
14 correct?
15 A. Absolutely.
16 Q. Given what you've provided, Mr. Petty, whether or not
17 Mr. Dickey was wearing PPE, given what you were
18 provided -- what you've provided, does it change any
19 of your numbers that you've provided whether or not
20 Mr. Dickey was wearing PPE?
21 A. Does it change any of the numbers?
22 Q. These basic numbers that you've told us you provided
23 here.
24 A. I'm confused by the question, because I don't think he
25 ever wore any PPE.

Page 87

1 Q. Doesn't matter. That's my whole point. It doesn't
2 matter what PPE he may or may not have worn. It
3 doesn't change the number of events.
4 A. It does matter 'cause he didn't wear any PPE. That's
5 what I'm trying to figure out.
6 Q. Let me give you a hypothetical.
7 A. I mean, your question is asking something that didn't
8 happen.
9 Q. Then, Mr. Petty, let me give you a hypothetical.
10 A. I don't see any PPE.
11 Q. If you have a plaintiff that you've interviewed and
12 that plaintiff has 100 total number of events, and on
13 10 of those events they are wearing head-to-toe PPE,
14 does that change the total number of events, not
15 whether you're going to calculate anything else; does
16 it change the total number of events in my
17 hypothetical?
18 A. I've never done an analysis that way.
19 Q. That's not my question. That's a hypothetical, sir.
20 A. I would never... I would never... I don't know how
21 to do that 'cause it's a hypothetical I would never
22 do.
23 Q. Okay.
24 A. In other words, if you look at where I've taken this
25 raw data and then converted it to milligrams exposure

Page 88

1 or whatever, PPM years or whatever you want, those
2 events are all decreased based on -- there's actually
3 a line item on effectiveness of PPE.
4 Q. Okay.
5 A. So --
6 Q. So given --
7 MR. KRISTAL: I don't think he was done.
8 MR. UPSHAW: I'm sorry.
9 BY MR. UPSHAW:
10 Q. Please, complete your answer. I want to make sure he
11 says everything he needs to say.
12 A. And there's also... And it's both on the dermal side
13 and on the inhalation side, but the... There is some
14 back and forth that goes on. If there's a PPE
15 situation, which there isn't here, the numbers that
16 get put here reflect backward questions to them about
17 if -- if I have somebody that says they wore rubber
18 gloves a hundred percent of the time, but they say
19 they have 50 percent of the skin area is wetted, I'm
20 going to say, well, how can that be, and they either
21 say, well, they ripped or flowed down the tops when I
22 put my hands up and down or I took 'em off and put 'em
23 back on --
24 Q. Right.
25 A. -- whatever they say.

Page 89

1 Q. But, Mr. Petty --
2 A. But that would change then the number that would be
3 here.
4 Q. That would change the dermal exposure number, correct?
5 A. Percentage, yes.
6 Q. Does it change the number of events?
7 A. If they... If they then went back and said, you know,
8 you're right, it's not getting wet, then yeah, it
9 would.
10 Q. So you would then discount the number of events based
11 upon what they tell you under dermal exposure?
12 A. No. It would decrease the number of events of that --
13 yes, that would have happened, absolutely.
14 Q. Okay.
15 A. But I've rarely seen that. I mean, it's a
16 hypothetical. You know, I'm not writing down
17 scenarios where there's no dermal exposure.
18 Q. I didn't say there was none 'cause, again, your dermal
19 exposures are averages, correct?
20 A. Well, there... There is some that... I mean, like
21 this one, two, three... He's... He's saying, I don't
22 really recall. He's not saying there was zero, but he
23 says, I really don't recall getting much on my skin.
24 Q. I understand --
25 A. So I said, okay.

Stephen E. Petty, PE, CIH, CSP

## Page 90

1  Q. -- but that's not my question.
2  A. Okay.
3  Q. My question is, when you take down these numbers, this
4     50 percent or 75 percent or whatever it might be,
5     these are all averages, right?
6  A. On average, yes, they certainly are.
7  Q. They're not specific. Some can be zero, some could be
8     more?
9  A. I don't know how to answer that question.
10 Q. If it's an average, it's got to be an average, right?
11    You told me you're --
12    MR. KRISTAL: Well, they could all be the
13    same, same average.
14 BY MR. UPSHAW:
15 Q. -- a statistical wizard.
16 A. Well, yeah. But if the standard deviation doesn't go
17    to zero, then it wouldn't include zero. I mean,
18    whatever two or three standard deviations are from
19    that number.
20 Q. All right.
21 A. But, you know, that -- that hypothetical may or may
22    not include.
23 Q. Do any... Does any of the information under either of
24    the categories you have in your chart, exposures and
25    consumption or dermal exposure, are either of those

## Page 91

1     categories affected by varying weather conditions?
2  A. Well, they would encompass that.
3  Q. How so?
4  A. Because I'm asking, on average, what percent of the
5     skin was wetted, for example.
6  Q. Okay.
7  A. And what percent of the time.
8  Q. Do you ask questions or does it make a difference in
9     the information that you provided as to the time of
10    day someone is applying?
11 A. I mean, to jump back and answer your question, this
12    one-time event was related to the weather because the
13    guy -- he told me, Mr. Dickey told me that it was this
14    burst of wind came up and pushed this.
15 Q. And that's an easy one, right? I mean, he told you
16    that there was an event, it was a burst of wind. But
17    on these other five -- other four events -- 'cause
18    cleaning a nozzle would have nothing to do with
19    weather conditions -- there's no mention of half these
20    days was windy, half these days was airy?
21 A. Well, it would encompass whatever those conditions
22    were, on average.
23 Q. On average?
24 A. Sure.
25 Q. Right. Do you ask those questions: Was it windy half

## Page 92

1     the days, was it windy a quarter of the days?
2  A. No, because what I care about is on average through
3     all those weather events, what percent of the skin got
4     wetted.
5  Q. Do you ask whether or not the, the, uh, person you're
6     interviewing ever sprayed Roundup or any glyphosate-
7     based product in the rain?
8  A. I didn't ask him that question.
9  Q. Does it matter whether or not they are using their
10    product for occupational or industrial use when you
11    are doing your interview?
12 A. It could.
13 Q. How so?
14 A. It really, it comes about as to who's responsible, so
15    there's completely different, uh, if I'm... If I'm
16    looking at warnings, OSHA generally applies to
17    employees whereas other best practices documents would
18    apply to, say, residential use, so --
19 Q. I'm sorry, go ahead.
20 A. So yeah. It depends on, when I'm looking at warnings
21    I have to be aware of, if -- if one of the -- I just
22    did one last week on an amputation and I have to know
23    whether it was in -- involved in, uh -- who he was
24    working for, was he a subcontractor, what -- what
25    violations of regulations occurred? So yeah, it does

## Page 93

1     depend, because then I'm going to look at what would
2     apply.
3  Q. So when we look at your report for Mr. Dickey, who we
4     would agree was a farmer, right?
5  A. Right.
6  Q. Then everything in your report with regard to your
7     expert opinions for Mr. Dickey deals with Mr. Dickey's
8     type of plaintiff, that is farmers and farming?
9     MR. KRISTAL: Objection to the form.
10 A. No, not to... Not at all. I thought you were asking
11    a hypothetical on on, uh, does it matter whether --
12    what their occupation is, and it depends on the case.
13 BY MR. UPSHAW:
14 Q. I did. That is true.
15    My initial question was, does it depend on
16    whether the use was occupational or residential, that
17    is, the use of glyphosate.
18 A. It could. It may or may not, but it could.
19 Q. And how does the use of glyphosate, either in an
20    occupational or residential setting, make a difference
21    for you in providing the information you've provided
22    to us today?
23    MR. KRISTAL: Are you talking about the big
24    report or the section on the dermal?
25    MR. UPSHAW: Well, there's only one section

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Stephen E. Petty, PE, CIH, CSP

Page 94

1  on Mr. Dickey, so...
2      THE WITNESS:  Only one section?  There's a
3  whole report.
4  BY MR. UPSHAW:
5  Q.  This whole report deals with Mr. Dickey?
6  A.  It would apply to Mr. Dickey, yeah.
7  Q.  So everything in this report applies to Mr. Dickey?
8  A.  Certainly.
9  Q.  So everything in this report about any ITO use or
10  residential use applies to Mr. Dickey?
11  A.  With respect to the way in which, uh...  If I'm
12  looking at the standard of care for how Monsanto was
13  communicating what it knew to its distributors and
14  customers, then it would ultimately apply 'cause it's
15  on their website, for example.
16  Q.  Did Mr. Dickey ever purchase any residential use
17  Roundup?
18  A.  He purchased whatever he purchased.  I mean, how do
19  you make that...  We had that discussion...  We had
20  that discussion before about whether you're a retail
21  customer or you're a retail...
22      The whole issue within OSHA on warnings
23  about when you go to a store and you purchase a
24  product, how do you know if you're a sole -- if you're
25  an employee because you're self-employed or that

Page 95

1  you're just a residential user?  And this is an area
2  that I've explored at length and it is a little bit of
3  a gray zone, to put it mildly.  So when you start
4  asking questions, was...  Was he a residential user or
5  was he an employee, if he's working for himself, he's
6  an employee, but he might also be applying it partly
7  as a residential user.
8  Q.  I think my...  I had a very simple question.  Do you
9  know whether Mr. Dickey ever purchased Roundup?
10  A.  I don't recall.
11  Q.  Do you know whether Mr. Dickey ever used Roundup for
12  personal or residential use?
13  A.  All I know is what he said he used and how often he
14  used it.  That's all I know.
15  Q.  And what he provided information about was his use in
16  farming, correct?
17  A.  Well, on the farm.
18  Q.  Did he distinguish on the farm versus around his
19  residence?
20  A.  I don't recall that he did.  He just recalled how many
21  times he used it and how many events.
22  Q.  Did he provide you -- I'm sorry, go ahead, finish.  I
23  cut you off again.
24  A.  Yeah.  I mean, the information he provided, I've been
25  very explicit.  It's in the interview.

Page 96

1  Q.  So what you've told me, going back to the large
2  report, the 500-plus page report --
3      MR. KRISTAL:  It's not a 500-plus page
4  report.
5      MR. UPSHAW:  Uh, I think the pages go to
6  5...
7      MR. KRISTAL:  Yeah.  It includes the CV.
8  It includes multi -- the report goes up through
9  approximately page 266, and there are two appendices.
10      MR. UPSHAW:  Let me help Mr. Kristal.
11  BY MR. UPSHAW:
12  Q.  So when I refer back to the factual summary --
13      MR. KRISTAL:  It's not rocket science.  We
14  can look at the pagination and see how many pages the
15  report is.
16      MR. UPSHAW:  You don't want me to ask a
17  question?
18      MR. KRISTAL:  I want you to ask a question.
19      MR. UPSHAW:  Okay.
20      MR. KRISTAL:  I don't want you to say
21  something that's not accurate on the record.
22      MR. UPSHAW:  Then I'm going to make it
23  extremely accurate for you, Mr. Kristal.
24      MR. KRISTAL:  Thank you.
25  BY MR. UPSHAW:

Page 97

1  Q.  The document that you've provided to us with regard to
2  Mr. Dickey's case of 528 pages, including all
3  appendices, my question to you, sir, is -- and I think
4  you've answered this part of it -- is all this entire
5  document deals with Mr. Dickey's case?
6  A.  I guess I'm confused.
7      I'm using a base report on warnings and
8  what Monsanto knew about things, et cetera, as part of
9  my comments about adequacy of warnings to the public
10  in general.  So in that sense it does.
11  Q.  So when you apply your comments and opinions with
12  regard to the accuracy of warnings to the general
13  public, is it your opinion that that applies to Mr.
14  Dickey?
15  A.  In general, yes, because I've gone through hundreds of
16  MSDSs --
17  Q.  All right.
18  A.  -- and the warnings are essentially the same.
19  Q.  And so when you apply what you learned through these
20  hundreds of documents and the opinions that you
21  provide in this 528-page document, including
22  appendices, do you know whether Mr. Dickey ever saw a
23  warning?
24  A.  Well, he would have had to.  They were on the
25  containers.

Stephen E. Petty, PE, CIH, CSP

Page 98

1  Q.  That's not my question, whether he would have had to.
2     That's an assumption on your part.
3  A.  No, it's not.
4  Q.  Did you ask him the question whether or not he ever
5     looked at a warning on a container that he used in
6     your interview?
7  A.  Uh, let me ask that question. I'm looking at 528.
8  Q.  Okay, thank you.
9  A.  So this is questions I ask him about what he heard and
10    knew.
11 Q.  Right.  And these are those questions that you have as
12    part of your template, correct?
13 A.  Some of them, yes.
14 Q.  Okay.
15 A.  And so we walk through 'em.  And then he -- he said to
16    me, in the '70s a local Laurel, Nebraska, Roundup rep
17    told him on two or three occasions it was totally
18    safe.  It was so safe you could drink it.
19        And then he went to these commodity classic
20    meetings and he asked the Monsanto Roundup reps about
21    it and they verified what he was being told locally,
22    that it was so safe you could drink it, and that it
23    was completely safe.
24        Well, that's the information that
25    Monsanto's providing to him.  And so when I compare

Page 99

1     that to what Monsanto is actually saying to people
2     through their literature and their representatives,
3     then -- then that's -- that information's relevant to
4     compare that to what he's being told.
5  Q.  Mr. Petty, I move to strike as nonresponsive and I'll
6     ask my question again.
7        Do you know whether Mr. Dickey ever read a
8     warning on a container of Roundup?
9        MR. KRISTAL:  Objection, assumes facts not
10    in evidence.
11 A.  I don't know how to answer that question.
12        I asked him what he knew about warnings and
13    this is what he told me.
14 BY MR. UPSHAW:
15 Q.  Do you have any indication in your interview that Mr.
16    Dickey ever read a Monsanto warning on a Roundup
17    product?
18        MR. KRISTAL:  Same objection.
19 A.  He said he didn't think it had the potential to harm
20    him.
21 Q.  That's not my question.
22        MR. UPSHAW:  Can you read my question
23    back --
24        COURT REPORTER:  Yes, sir.
25        MR. UPSHAW:  -- Miss Court Reporter?

Page 100

1        (A portion of the record
2        was read by the reporter.)
3        MR. KRISTAL:  Same objection.
4        THE WITNESS:  All I can tell you is, when I
5     asked the questions about warnings, this is what he
6     told me.
7  BY MR. UPSHAW:
8  Q.  So the answer to my question would be no, you have no
9     indication as to whether or not Mr. Dickey ever read
10    -- and the operative word there is read -- a Monsanto
11    warning?
12        MR. KRISTAL:  Objection.
13 A.  He said he never thought it had the potential to harm
14    him.
15 BY MR. UPSHAW:
16 Q.  I understand that.
17 A.  So the only place that he can get information is from
18    the containers he's using or in advertisements from
19    people he talks to.
20 Q.  I beg to differ, sir, 'cause you just point out here
21    in two paragraphs here where he got information other
22    than the sources that you just commented on.
23 A.  Or what the Roundup representative said?  That was the
24    third item in my response.
25 Q.  So the answer to my question then, Mr. Petty, is very

Page 101

1     simple:  You have no indication that he ever read a
2     Monsanto product warning --
3        MR. KRISTAL:  Same objection.
4  BY MR. UPSHAW:
5  Q.  -- do you?
6  A.  I disagree.  I asked him, did you think... I asked
7     him about this, did you...  He wasn't provided an
8     MSDS, we know that, but when I asked him, did you...
9     Did you have any information to think that the Roundup
10    would harm you, well, the only thing he would have,
11    short of an MSDS, the label, or representatives he
12    talked to, would be these things.
13 Q.  What do you mean by these things?  These things is
14    what?
15 A.  The things I just listed here on page 5 -- I read them
16    to you three times.
17 Q.  And you don't list here a label, do you?
18 A.  It's implied that he never felt that the Roundup had
19    the potential to harm him.
20 Q.  You would imply?
21 A.  I don't imply.  He told me that.
22 Q.  So do you imply from what he told you that he must
23    have read a label?
24 A.  No.  I imply that there's only two or three ways that
25    he would be able to have such information.

Stephen E. Petty, PE, CIH, CSP

Page 102

1  Q. Okay. And so do you, from your -- from your
2     assumption that there's only two or three ways, then
3     you imply or assume that Mr. Dickey must have read the
4     label?
5  A. No, I didn't say that.
6  Q. So did Mr. Dickey read a label or not?
7        MR. KRISTAL: Now, you're shifting the
8     question. Is this a different question?
9        MR. UPSHAW: If there's an objection here,
10    then state your objection and I'll be happy to ask
11    you, if I need to, for correction rather than
12    coaching.
13       MR. KRISTAL: I'm just asking you if it's
14    the same question you've been asking or if you changed
15    questions.
16 BY MR. UPSHAW:
17 Q. Mr. Petty, you need the court reporter to read it back
18    'cause I think we're on the same page.
19 A. I'm not sure we are, but go ahead.
20       MR. UPSHAW: Please read it back, ma'am, my
21    question, that's all you need.
22       (A portion of the record
23       was read by the reporter.)
24       MR. KRISTAL: Objection as to form.
25       THE WITNESS: I'm not sure I even

Page 103

1     understand the question, but what I'm saying here is
2     that he didn't... I did ask him, do you have MSDSs.
3     He did not. So he wasn't provided the MSDSs. Then,
4     were you given any training on the hazards, chemical
5     hazards of the product? He never thought it could
6     harm him. Now, what he does have, we know, is he has
7     the containers. And the other thing we know is -- and
8     he says, I didn't think it had any potential to harm
9     me. Well, there's only two places that I know of that
10    he can get that information, either from reading the
11    labels or -- and/or from what these reps are telling
12    him that he tried to validate.
13 BY MR. UPSHAW:
14 Q. So what's your assumption then?
15 A. There's no assumption. That's what he said.
16 Q. The only two places are, as you just said, either the
17    reps or the label. What's your assumption?
18 A. There's no assumption.
19 Q. Did he get it from the reps or the label?
20 A. I said, and/or.
21 Q. So did he get it from the reps?
22 A. Well, I know he got information from the reps.
23 Q. Do you know whether he got information from the label?
24 A. He said it... He... What he said is he didn't know
25    it had the potential to harm him. That's what I'm

Page 104

1     trying to relate.
2        You asked why, when we started this
3     discussion, was why do I include all the rest of the
4     balances of the report. Because the balance is, what
5     is Monsanto -- are they being transparent about what
6     they know to the public.
7  Q. Actually, my question was about the labeling. It was
8     only whether or not the rest of the -- wait a minute.
9  A. We started differently.
10 Q. Wait a minute.
11 A. No, I have to correct you.
12 Q. There's nothing to correct yet. I haven't finished
13    the question.
14       MR. KRISTAL: Well, that's because you
15    interrupted his answer.
16       MR. UPSHAW: Well, 'cause he's...
17       MR. KRISTAL: He was trying to finish his
18    answer after you interrupted him to ask your question.
19       MR. UPSHAW: Then let's start again.
20       THE WITNESS: Sure.
21 BY MR. UPSHAW:
22 Q. My questions to you previously were whether or not
23    your entire, as you called it just now, report
24    dealt -- was, was directed at Mr. Dickey's case. That
25    was the premise of my question, which I think we've

Page 105

1     gone around on enough now.
2        Since I have limited time, I don't plan to
3     get into another round of questions that I don't feel
4     you are answering fully. You may disagree. We'll
5     agree to disagree.
6        I'd like to move on now to Appendix G.
7  A. Okay.
8  Q. And if I... You know, if Mr. Kristal wants to give me
9     limited time, I'm happy to jump back in, but I don't
10    think he is today, so...
11       MR. KRISTAL: More tomorrow.
12       MR. UPSHAW: More tomorrow, so...
13       THE WITNESS: You're coming back tomorrow?
14       MR. UPSHAW: Let's, uh... Let's jump to
15    Appendix G, which is your exposure summary and
16    calculations.
17       THE WITNESS: Okay, I'm there.
18       MR. UPSHAW: Starts on page 530.
19 BY MR. UPSHAW:
20 Q. Now, is this dermal dose calculation?
21 A. No.
22 Q. Okay.
23 A. Not... Not in terms of taking it.
24       It's a dermal exposure analysis, but it's
25    not a dermal dose calculation.

27 (Pages 102 to 105)

Stephen E. Petty, PE, CIH, CSP

## Page 106

1  Q. All right.
2  A. At least that's part of it.
3  Q. What do you mean that's part of it?
4  A. Well, part of doing dermal exposure is to figure out
5  what areas are exposed and for how long.
6  Q. I think we've already established, you have not done a
7  full risk exposure assessment, correct?
8  A. Well, risk assessment's a whole different animal than
9  a exposure assessment.
10  Q. Correct. But you haven't done a risk assessment.
11  A. So I don't know if you're... You're asking if I've
12  done a risk assessment?
13      MR. KRISTAL: Is there a question?
14  BY MR. UPSHAW:
15  Q. Yes, sir. You've not done a full risk and exposure
16  assessment.
17      MR. KRISTAL: Objection to form.
18  A. I haven't even started a risk assessment. That's a
19  whole different animal.
20  BY MR. UPSHAW:
21  Q. Basically a point there. This was an easy one. This
22  is an easy yes.
23  A. I mean, I commented on in different materials about
24  the risk assessment the EPA did and I've commented on
25  the pathways they did or didn't consider, and I've

## Page 107

1  commented on the pathways I've considered. And that,
2  the pathway issue would be part of what one would
3  consider risk assessment.
4      Just to do a two-second summary, risk
5  assessment is normally associated with EPA and --
6  Q. May... May I interrupt you?
7  A. And exposure assessments with industrial hygiene.
8  Q. Okay.
9  A. It's two differential animals.
10  Q. Got you. It was a simple question. If you could have
11  answered yes or no, we'd have moved on to the next
12  one, so...
13  A. But I have commented on risk assessment. That's why
14  it's confusing.
15  Q. That wasn't my question. Let me ask it again and I'll
16  be more specific.
17      For Mr. Dickey, did you do an exposure -- a
18  risk exposure, full risk exposure assessment; yes or
19  no?
20      MR. KRISTAL: Objection to form. What is a
21  full risk assessment?
22      MR. UPSHAW: If he has that question, Mr.
23  Kristal, he'll ask that question.
24      MR. KRISTAL: The question doesn't make
25  sense.

## Page 108

1      MR. UPSHAW: That's... Well, then just
2  say, objection to form. I'll ask you then, what's
3  your objection? And you'll say, it doesn't make sense
4  to me. And then I'll ask him a question, does it make
5  sense to you? And then we'll go from there.
6      MR. KRISTAL: Okay.
7      MR. UPSHAW: But you don't have to explain
8  to him what he has to ask me next, which would be...
9      THE WITNESS: What you describe, I don't...
10  I've never heard of.
11      MR. UPSHAW: Okay.
12      THE WITNESS: And I've done dozens of risk
13  assessments and I've done dozens, if not hundreds, of
14  exposure assessments.
15  BY MR. UPSHAW:
16  Q. Did you do a risk assessment for Mr. Dickey?
17  A. I did not do what I define as a risk assessment.
18  Q. Did you do an exposure assessment for Mr. Dickey?
19  A. In part, yes.
20  Q. In what part?
21  A. I calculated events, I calculated times, and I
22  reported skin areas, in terms of times and skin
23  wetted, areas wetted, post-dermal exposures, distance
24  away. I've quantitated all sorts of things.
25  Q. And you've also already told us that you did not do a

## Page 109

1  dermal absorption calculation for Mr. Dickey, correct?
2      MR. KRISTAL: Asked and answered.
3  A. I'm not trying to be difficult with you, but you're
4  not asking the right question. And I have done a
5  dermal exposure assessment, but I have not done a
6  dermal dose calculation. If you ask me the question,
7  have you calculated a milligrams dose, then I would
8  try to answer your question.
9  BY MR. UPSHAW:
10  Q. I'll use your nomenclature.
11  A. I'm trying to help you.
12  Q. And I'm using your nomenclature, which I thought we
13  had already talked about.
14      You didn't do that for Mr. Dickey?
15  A. Didn't do what? I did an expo... You asked the
16  exposure and I said yes, I did. And, and you -- or
17  you're, you're -- you're implying that I -- that I'm
18  not answering it correctly. I did not do a dose.
19  Q. Okay.
20  A. That is a different question.
21  Q. Okay.
22  A. But I did an exposure analysis. I just didn't do
23  the dose.
24  Q. Okay. We did not do a dermal dose analysis, correct?
25  A. I didn't do a dermal dose calculation. The analysis

28 (Pages 106 to 109)

Stephen E. Petty, PE, CIH, CSP

Page 110

1    is all the stuff that leads to that.
2    Q.  All right.  Did you do a dermal dose calculation, Mr.
3    Petty?
4    A.  I did not.
5    Q.  Okay.
6    A.  I'm not trying to be difficult with you.
7    Q.  I know.
8    A.  I really am not.
9    Q.  I'll use the correct nomenclature, if you choose.
10         Do you know if any other experts have done
11   a dermal dose calculation for Mr. Dickey?
12   A.  On your side, I think...  I think your experts have.
13   I...  I have seen the num...  I've seen it briefly,
14   but I haven't reviewed it.
15   Q.  Do you know of any plaintiff experts who have done a
16   dermal dose calculation for Mr. Dickey?
17   A.  I...  I have not seen any other work.  I've not seen
18   other experts' reports, so I don't know.
19   Q.  Do you know if any other expert has used your
20   calculations which we have here in front of us, and
21   your interview summary which we just talked about, to
22   determine Mr. Dickey's dermal dose?
23   A.  In these cases, I don't know.  Again, the only reason
24   I say that --
25   Q.  I'm only talking about these cases.  So we'll have to

Page 111

1    go fast.  If you don't in these cases, then that's the
2    great answer.
3    A.  I'm not aware of how or what's been done with these at
4    all.
5    Q.  What is your final conclusion with regard to Mr.
6    Dickey's individual exposure?
7         MR. KRISTAL:  Objection to form.
8    A.  Well, it would be --
9    BY MR. UPSHAW:
10   Q.  I should say -- and I apologize, I didn't ask a good
11   question.
12        What is your conclusion with regard to Mr.
13   Dickey's exposure to pesticides?
14        MR. KRISTAL:  Same objection.
15   A.  Well, specifically with respect to Roundup pesticide,
16   that he had thousands of exposure events and thousands
17   of hours of exposure, and that exposure included
18   significant skin areas during those exposures.
19   BY MR. UPSHAW:
20   Q.  In your opinion with regard to glyphosate, do you
21   discount any exposure he may have had to 2,4-D?
22   A.  Discount?  I don't know how I would do that.
23   Q.  I don't, either.  How do you leave that out?
24   A.  I don't know how I'd discount it.  I mean, I would...
25   I could calculate the number of 2,4-D events and say,

Page 112

1    okay, these are...  But I wasn't asked to look at
2    2,4-D events, but I've got data there.  I guess I
3    could go back and try to...  I've reported the data,
4    but I'm just calculating the Roundup exposure events.
5    Q.  You have the data on page 521 for Mr. Dickey's use of
6    2,4-D, correct?
7    A.  Right, but I wouldn't discount the Roundup data.
8    That's what I'm confused by.
9    Q.  You can't discount the Roundup data?
10   A.  No.  You asked me, how did I discount the Roundup data
11   with 2,4-D, and I don't understand that.
12   Q.  All right.  Let me back up then.  You have the data
13   for Mr. Dickey's 2,4-D use, correct?
14   A.  I have some data, yes.
15   Q.  Well, it's the data that he provided to you.
16   A.  Yeah, but I didn't go into the same level of request
17   for information to be able to do the same types of
18   calculations.
19   Q.  Right.  So this is, what you provided us are your
20   calculations with regard to Mr. Dickey's Roundup
21   exposure, right?
22   A.  To the extent that I've calculated them, yes.
23   Q.  Right.  It's not with regard to Mr. Dickey's pesticide
24   exposure, correct?
25   A.  No.  He had some exposure to 2,4-D.

Page 113

1    Q.  With regard to the information that you've provided in
2    your report, including these values and dermal data on
3    page 530 and 531, do they in any way tell you what
4    caused Mr. Dickey's disease?
5    A.  I'm not the causation expert, so I wouldn't offer
6    opinions on that.
7    Q.  Okay.
8    A.  Not in this case -- or cases, I guess.
9    Q.  Does your opinion with respect to any of the
10   individual exposure data that you've collected and
11   provided us in this portion specifically to Mr. Dickey
12   have anything to do with Monsanto-specific documents
13   that were referenced earlier in your report?
14   A.  Yeah.
15   Q.  How so?
16   A.  'Cause they, they...  If your question...  Ask your
17   question again.  I want to make sure I have the
18   answer.
19   Q.  Well, I'll make sure.
20        MR. UPSHAW:  Did you get it?
21        THE WITNESS:  I apologize.
22        MR. UPSHAW:  Try it.
23        COURT REPORTER:  Oh, okay.
24        (A portion of the record
25        was read by the reporter.)

Stephen E. Petty, PE, CIH, CSP

## Page 114

1          MR. UPSHAW: It's pretty close.
2          MR. KRISTAL: Object to form and this
3     portion you were pointing is Appendix F and G?
4          MR. UPSHAW: Yes, sir.
5          THE WITNESS: I'm really not sure how to
6     answer that question.
7          I mean, if... If you're asking me, are
8     there any documents that I've referred to in the bulk
9     of the report that tie specifically to an individual
10    number, then I would say no. But if... If you asked
11    me with respect to how would those documents affect or
12    potentially affect his exposures had he known or had
13    that information been provided to better protect him,
14    in other words, if, uh, then it would have impacted
15    these numbers because he could have protected himself
16    or not used the product. There's a whole bunch of
17    things.
18         So do those documents have anything to do
19    with a hundred percent of the time his hands were
20    wetted? No, but --
21    BY MR. UPSHAW:
22    Q.  That wasn't the question.
23    A.  But if -- if you're asking me, would -- would those
24    numbers -- could those numbers have been impacted
25    based on all of the stuff I discussed in here? Yes.

## Page 115

1     Q.  That wasn't my question.
2     A.  Well, it's a difficult question.
3          MR. KRISTAL: I thought it was a very broad
4     question.
5          MR. UPSHAW: Thank you for that opinion.
6          MR. KRISTAL: You're welcome.
7          MR. UPSHAW: And much appreciated for your
8     answer, Mr. Petty. I understand.
9          THE WITNESS: I am trying to help you with
10    dermal, I really am.
11    BY MR. UPSHAW:
12    Q.  Have you communicated with any other expert witness,
13    any other plaintiff expert witness?
14         MR. KRISTAL: Object to form.
15    A.  Well, in what sense? I know we had this question
16    before and I, I believe that I probably have cont...
17    I contacted I think Doc -- well, I didn't contact, he
18    called me. Between the two sets of depositions for
19    the Saint Louis cases, there was some confusion last
20    time, and I went back and I checked and -- because my
21    initial three days I said I didn't talk to anybody,
22    and then you came back in the second three day -- or
23    second two days and you said, well, your first answer
24    was you didn't talk to him, now you're saying you did.
25    Well, I had to go -- and I was a bit confused frankly

## Page 116

1     and, uh, 'cause I knew I had talked to him.
2          Well, the truth of the matter was, in
3     looking back at my calendar, I had talked to -- or my
4     timecards -- I had talked to him between the five days
5     of deposition; the first block of three in the second.
6          So to answer your question, I've talked to
7     him back with regards to the Saint Louis cases, but I
8     have not spoken to any of them with regards to these
9     cases that I'm being deposed on these next two days.
10    BY MR. UPSHAW:
11    Q.  And who is him?
12    A.  Dr. Sawyer.
13    Q.  Okay. So you haven't talked to Dr. Sawyer since the
14    time you had that discussion that we previously talked
15    about?
16    A.  I have not.
17    Q.  Do you know whether Dr. Sawyer has been given the data
18    that you have created with regard to Mr. Dickey?
19    A.  I don't know, I wasn't part of that. I wasn't part of
20    that process, so I just don't know.
21    Q.  I know you stated earlier you received copies of
22    transcripts of defense experts.
23         Have you received any copies of transcripts
24    of plaintiff experts?
25         MR. KRISTAL: Object to form.

## Page 117

1     A.  For these? For this case, Dickey case?
2     BY MR. UPSHAW:
3     Q.  Yes, sir.
4     A.  Not specific to this case.
5     Q.  Have you reviewed deposition transcripts of Dr. Sawyer
6     previously?
7     A.  I don't know how to answer that question. It doesn't
8     strike me that I have, but I just don't know.
9     Q.  Would you include the deposition transcripts of any
10    experts that you have read on your materials
11    considered list?
12    A.  Yes. I'm almost certain I would have.
13    Q.  Do you know whether or not you've done that in this
14    case?
15    A.  That's why I don't believe that I have, because they
16    would have been on that list and I don't recall them
17    being on that list.
18    Q.  You have any plans to speak with any other experts
19    before trial regarding your opinions in connection
20    with this litigation?
21    A.  I don't know. I have no idea. If I'm called or if
22    I'm asked to talk to him, I will. I don't know.
23    Q.  Okay.
24    A.  I'm just going back to your last question.
25         I have seen transcripts of -- but I think

Stephen E. Petty, PE, CIH, CSP

Page 118

1      it's in the Saint Louis cases, in that era.  I've seen
2      transcripts, I believe, of some plaintiff experts from
3      the California cases.
4   Q.  Which once?
5   A.  I don't even remember.
6   Q.  Would they be on your materials considered list?
7   A.  Not for these cases, no.
8   Q.  What do you mean, not for these cases?
9   A.  Well, I mean, I, I didn't, uh...  They just aren't.
10      That's all I can tell you.
11  Q.  Materials that you've reviewed with regard or in
12      relation to other glyphosate matters that you've
13      worked on and considered for those matters, are all of
14      those materials listed on your current materials
15      considered list for this case?
16  A.  I have to look.
17  Q.  And I don't know.  I would suspect that your most
18      recent one is not in the report that you have in front
19      of you, right?  Wasn't it updated just a few days ago?
20  A.  Yeah, but the, the...  Any dep...  Any depositions
21      that I was provided, that I would have reviewed in
22      the, I want to call it the Saint Louis cases that I've
23      been deposed on previously, would have been early --
24      this list was added to.  Does that make any sense?
25  Q.  Yes, sir.

Page 119

1   A.  And you'll see on like page 276 that I'm provided
2      depositions of...
3   Q.  Hold on, let me...  Let me...  I had the materials
4      considered list separately, so...
5   A.  Well, it's in that, too.
6   Q.  I know.  But when you said 276, I said like, wait a
7      minute --
8   A.  Oh, I'm sorry.
9   Q.  -- let me flip to the document that you're referring
10      to.
11  A.  And I'm just looking down this list and...
12  Q.  Let me look with you, hold on.  I want to catch up
13      with you.  Oh, you're right, on Appendix A, okay.
14  A.  So the third one is Dennis Weisenburger.
15  Q.  Um-hum.
16  A.  He's, I think, a plaintiff's expert.  Yes?
17  Q.  Correct.
18  A.  And I believe Fleming is.
19          I...  I mean, these are...  These are the
20      depositions and I know some of them are plaintiff's
21      depositions.  That's all I'm trying to say.
22          It's been a long time ago that I read these
23      and you can tell, because they're some of the first
24      materials that I received.
25  Q.  Let me ask it a different way.

Page 120

1          You and I have previously reviewed your
2      materials.  Well, this is your list of exhibits.  Is
3      this what you would consider your materials considered
4      list?
5   A.  No.  It's part of it.
6   Q.  Okay.
7   A.  Materials considered list consists of the materials I
8      call it generally references, generally publicly
9      available.  It also has then things that are sort of
10      case specific, which is what I call exhibits.
11  Q.  Right.
12  A.  And then there's --
13  Q.  And just so we're not jumping around, I'm going to
14      have you hold that thought because I want to mark this
15      so we're not all just kind of talking about things in
16      abstract.  I will mark your materials considered list
17      that was provided November 4, 2019, as Exhibit 9, and
18      I'll hand that to you.
19          (DEFENDANT'S EXHIBIT 9, ROUNDUP
20          MATERIALS CONSIDERED LIST WAS
21          MARKED FOR IDENTIFICATION.)
22  A.  Thank you.
23  BY MR. UPSHAW:
24  Q.  So we're all talking about the same thing.
25          MR. UPSHAW:  Do you want one, Mr. Kristal?

Page 121

1      Give you more trees in your life.
2   BY MR. UPSHAW:
3   Q.  So what we were handed is, under the title, materials
4      considered, was your publicly available reference
5      materials and your exhibit list.  And you were
6      referring to, just to take you back to what you were
7      talking about and I interrupted you, the last page I
8      think of your publicly available reference materials,
9      page 13; am I correct there, or maybe you were
10      referring to something else?
11  A.  Well, maybe we should just walk through this real
12      quick?
13  Q.  Please.
14  A.  If you're amenable to that?
15          Pages 2 through 9, or what I list as
16      publicly available reference materials, and those are
17      either textbooks or their web page indicated or what.
18          Then I have on page 10, a whole series of
19      codes and standards.  They're again, publicly
20      available, but I go ahead and list them independently.
21  Q.  Okay.
22  A.  And that continues on 11, 12, and 13.
23  Q.  Very good.
24  A.  And then I call -- what I call the list of exhibits,
25      and this list has been slightly updated from what's in

31 (Pages 118 to 121)

Stephen E. Petty, PE, CIH, CSP

Page 122

1  the actual exhibits, whatever that, the big report is
2  for Dickey.
3  Q.  8.
4  A.  8?
5  Q.  Um-hum.
6  A.  But it, by and large, is the most of that Appendix A.
7     There's a couple, handful of items added to it.
8  Q.  Okay.
9  A.  And then beyond that...  Let's see if there's anything
10    beyond that.  What I've done is simply -- it's
11    convenient to just take a screenshot of my directory
12    of all my videos that I then enclose on a CD or on a
13    -- not a CD -- but a flash drive.
14         So in toto -- and along -- then I also
15    indicate on that same page the interviews that I've
16    done as well and the summary table.  So that is the
17    composite, if you will, of the reliance materials.
18 Q.  And to bring this in full circle, other than some of
19    the initial entries on Petty list of exhibits, which
20    is page 14 of this where you indicate certain reports
21    of various experts, do you recall or have you included
22    any other reports or expert testimony that you
23    reviewed on your list of exhibits?
24 A.  Short of just going through it --
25 Q.  Let's do it this way, do you know what the number was

Page 123

1  when we were last together?
2  A.  I don't.
3         MR. KRISTAL:  Yeah, it's right here in the,
4  uh...
5  A.  No, because we don't have a copy of one of the Saint
6     Louis reports in front of us, unless they have it on
7     their computer or whatever.
8  BY MR. UPSHAW:
9  Q.  Well, let's do it this way.  I'll ask you the
10    question.  If you don't know or you can't tell me,
11    then we can go from there.
12 A.  I think it's...  Well, I don't know the absolute
13    answer to that.  I think it was in the early five
14    hundreds before.  And now we're at almost -- or
15    high -- no, I think it was...  Well, actually I can
16    tell, because I've got the depositions of the Saint
17    Louis clients, so let me just go through this real
18    quick.
19 Q.  Right.
20 A.  And I apologize.  I've just come up to speed on all of
21    this.  I don't know the exact number where I would
22    have ended on the Saint Louis cases, but it would have
23    been in the 500 teens area, and now we're at 550...
24    Well, we're at 572.
25 Q.  Um-hum.

Page 124

1  A.  Now, appreciate that some of these have more than
2     one -- no, they don't.
3  Q.  554 has a number of attachments.
4  A.  Yeah.  I just wanted to make sure that that wasn't a
5     number that you could count on.
6  Q.  And 553 is a number of attachments.
7  A.  Yeah.  So it was on the order of a hundred additional
8     documents been added.
9  Q.  In any of those documents that you added, do they
10    reflect that you reviewed any transcripts or reports
11    of any experts?
12 A.  The only deposition I see is Muckerman at 554.
13        MR. KRISTAL:  It starts at 553.  There were
14  two volumes.
15        THE WITNESS:  Oh, I'm sorry.  Thank you.
16 A.  I misspoke.  Muckerman, there's two Muckerman
17    depositions, 553 and 554.
18 BY MR. UPSHAW:
19 Q.  Okay.
20 A.  And...
21 Q.  Should I assume that you have read those depositions?
22 A.  I have read those depositions.
23 Q.  And then you are aware that he, Mr. Muckerman, is not
24    an expert?
25        MR. KRISTAL:  I think we can all agree on

Page 125

1  that one.
2  BY MR. UPSHAW:
3  Q.  In these cases.  Mr. Kristal didn't hear the end of my
4     question.
5  A.  I don't, uh...  Well, I don't see any evidence that I,
6     that I've seen any other, uh, other than those two
7     Muckerman depositions since...
8         MR. KRISTAL:  There's one listed at 555 and
9  it's in black and white.
10        THE WITNESS:  You know, but -- but he's
11  asking about plaintiff's expert depositions.
12        MR. KRISTAL:  Oh, oh, oh, all right.
13        THE WITNESS:  I think.  I think that's what
14  he's asking.
15        MR. UPSHAW:  I recognize that Mr. Kristal
16  would love to be deposed, but you and I are on the
17  right page.  We're asking you about expert
18  depositions.
19        MR. KRISTAL:  I wouldn't love to be
20  deposed.
21        MR. UPSHAW:  Seems like it today.
22  You're...  You're...  You're very active today.
23        MR. KRISTAL:  If you think this is very
24  active, you should sit in on some of the depositions
25  we take and listen to your attorneys.  I've made

32 (Pages 122 to 125)

Stephen E. Petty, PE, CIH, CSP

## Page 126

1 maybe --
2     MR. UPSHAW: No, thank you.
3     MR. KRISTAL: -- a dozen depositions --
4 objections, I mean.
5     THE WITNESS: But I recall... Appreciate
6 that when material comes in, my office manager gets it
7 first and then she adds it to this list of exhibits
8 and then they're piled up and at some point, at some
9 interval, I will go through a stack of this stuff.
10 It's an efficiency thing. I've talked about this
11 before. And so it's... It's not like stuff comes in
12 and I don't purposely add it to this list. You know
13 what I'm saying?
14 BY MR. UPSHAW:
15 Q. Um-hum.
16 A. So if we got material in, whether it be stuff that I
17 pulled off the internet and gave to her or it came in
18 through counsel or somewhere else, she would add it to
19 this list almost automatically, because the first
20 thing she does is type in whatever it is and put a
21 label on it and put in a pile and say, okay, more,
22 additional Roundup material is here, when you get to
23 it.
24     And I'm not trying to blame her for whether
25 there's stuff here or not here. All I'm trying to

## Page 127

1 tell you is the control -- there isn't some mechanism
2 where she doesn't put stuff in the pile.
3 Q. Okay.
4 A. She wouldn't know, one way or the other. She's
5 just... When it comes in, she labels it and puts it
6 in a pile. So if it's not there, it's unlikely that
7 it exists.
8 Q. Understand. And given what you just told us as to
9 your process of receiving documents or materials
10 related to your retention as an expert in these
11 matters, can you tell us, sitting here today, that you
12 actually reviewed all of the materials that were put
13 in your glyphosate pile by your secretary?
14 A. Absolutely.
15 Q. So there's nothing here on the list that is still
16 resting in the must review glyphosate materials that
17 have come in and my assistant has labeled and placed
18 on the list?
19 A. That's not true, because I just got all your --
20 remember I said earlier -- all of the defense expert
21 reports.
22 Q. But they're not on the list yet?
23 A. Because I'm not relying on them yet.
24 Q. Okay.
25 A. I mean, because if I said they were reliance

## Page 128

1 materials, then you would say, okay, I want to ask you
2 a bunch of questions about those. Well, I haven't
3 read 'em yet.
4 Q. So she doesn't put them on the list until you read
5 'em?
6 A. (No Response.)
7 Q. That's not what you just said to me, but I'm... I'm
8 just asking.
9 A. No. I tried to be transparent about that. The only
10 ones that aren't on there are... I didn't put them on
11 there because they're... They're listed as reliance
12 materials. And until I've actually read the stuff,
13 I'm not going to add it to my report. I'm the one
14 that writes the report.
15 Q. Understandable. And I was not questioning whether or
16 not you would add them to your report or not. We were
17 talking about your materials considered list, and I do
18 understand that you haven't -- if you haven't
19 considered it, you don't add it. Yet, you just told
20 me that the process you have in your office is, when
21 something comes in glyphosate-related, your
22 administrator adds it to the list and puts it in your
23 pile.
24 A. And there's a new pile.
25 Q. Okay.

## Page 129

1 A. And the pile that I was able to get through was the
2 Davies material, which I'd asked for a day bef --
3 and, and I was able to get through that because I wanted to
4 rely -- review the underlying documents and the expert
5 reports before I read the reports. And to that
6 extent, I -- we've list -- we gave those to you at the
7 last minute obviously because I got them at the last
8 minute. And I even prepared a separate small write-up
9 so that you have that as well.
10 Q. Correct.
11 A. Like on Saturday. So... But I have not... You are
12 correct in the sense that on that list there are
13 defense expert reports which I have not reviewed and
14 are not on this list.
15 Q. Right. You asked her to remove those for our purposes
16 of today?
17 A. I would ask you to remove those, yes.
18 Q. No, you asked... Got it, understood.
19 A. I mean, I'm not relying on those reports yet --
20 Q. Right.
21 A. -- or I may never, I don't know. I'm just, I haven't
22 reviewed them.
23 Q. Got it.
24 A. But if you ask me if there's anything else in the
25 pile, you're correct. There's a new pile with those

Stephen E. Petty, PE, CIH, CSP

Page 130

1    reports that I haven't looked at.
2  Q.  Anything that you've reviewed that's on the list
3      currently that changed or affects any of your opinions
4      in your report?
5  A.  I never had opinions in the last report.  So, I mean,
6      you asked me opinions, but what I'm saying is -- go
7      ahead.
8  Q.  I was going to say, if I need to rephrase that I will.
9      We're talking about --
10 A.  Dickey.
11 Q.  -- Exhibit 8, Dickey.
12         You've added, since you finished Dickey,
13     some documents to the materials considered list.
14         My question is:  On those documents that
15     you've recently added, do they change or affect any of
16     your opinions in the Dickey report?
17 A.  I don't know that they changed them.  They... I think
18     in general they added to them.  The sections that I
19     would add to the report I brought separately.
20 Q.  Okay.
21 A.  If... If I were given the ideal situation, I would
22     fold those in, like the one section I told you where I
23     pulled the first paragraph, I'd fold that right in
24     there.
25 Q.  All right.

Page 131

1  A.  But I don't think they change the underlying opinions.
2      They just support them.  And I'm just trying to think
3      through that question, but there, there -- and then
4      the dermal write-up would in fact -- I don't know if
5      it would change the opinions or not, but it would be
6      another write-up of other dermal studies.  So I would
7      have opinions about the Davies 2015; '15, '16, and '17
8      reports that aren't in here, but I've given those to
9      you separately.
10         So I'm not trying to be evasive.  I'm just
11     trying to say, the things that I think that are new
12     and that change from October 3rd to today, I've tried
13     to bring that in here as separate small quick write-
14     ups with opinions so that you have those in front of
15     you.
16 Q.  I appreciate that.
17         Do you intend between now and the time of
18     trial to insert or include the documents, the sections
19     you just talked about into your report for Mr. Dickey?
20 A.  I don't, but if I do additional cases obviously, not
21     unlike the change from the Saint Louis cases to this,
22     there will probably be an update based on new
23     information I get.
24 Q.  Understood.
25         MR. UPSHAW:  Given the time, it's 12:55, I

Page 132

1      can stop now.  If there's anything left on Mr. Dickey,
2      I'll clean it up when we come back from lunch and then
3      move right to Mr. Domina.
4         MR. KRISTAL:  Would you prefer that I ask
5      my questions after each person or save them till the
6      end or -- it doesn't matter to me.
7         MR. UPSHAW:  Yeah.  I'd prefer you do it
8      after each person.  These are separate independent --
9         MR. KRISTAL:  No, no.  That's why I'm
10     asking.
11         MR. UPSHAW:  Yes.  I prefer we finish a
12     deposition and we start a new one 'cause we never know
13     how these are going to get split and reshuffled.
14         MR. KRISTAL:  No, no, no.  I'll do whatever
15     you wish to do.
16         MR. UPSHAW:  All right.  Let's go off the
17     record now for lunch.
18         VIDEO TECHNICIAN:  12:56 p.m., going off
19     the record.
20         (Lunch recess taken at 12:56 p.m.)
21         (Back on the record at 1:57 p.m.)
22         VIDEO TECHNICIAN:  1:57 p.m., back on
23     record.
24 BY MR. UPSHAW:
25 Q.  Okay.  Mr. Petty, we're coming back from lunch.  I

Page 133

1      have a few more questions from you in this deposition.
2         Is there anything that we haven't discussed
3      with regard to Mr. Dickey that you will offer as an
4      expert opinion about?
5         MR. KRISTAL:  Objection.
6         MR. UPSHAW:  I know that's broad.
7         MR. KRISTAL:  Other than...
8         MR. UPSHAW:  With regard to Mr. Dickey,
9      specifically.
10 A.  The opinions I would offer, I guess to wrap it, would
11     be anything that's in this report, anything from this
12     deposition, any attachments, any opinions offered in
13     the attachments, and then any testimony I've given
14     previously on these, the Saint Louis cases as it
15     relates to some of the warnings, information, et
16     cetera.
17 BY MR. UPSHAW:
18 Q.  Do you have any intention to conduct any additional or
19     revised assessments of Mr. Dickey?
20 A.  I've not been asked.  I don't intend to.
21         MR. KRISTAL:  Just for the record, when you
22     said this, Mr. Petty was pointing to Dickey Exhibit 8.
23         THE WITNESS:  8.
24         MR. UPSHAW:  8, okay.
25 BY MR. UPSHAW:

34 (Pages 130 to 133)

Stephen E. Petty, PE, CIH, CSP

Page 134

1  Q. And do you intend to make any revisions, amendments or
2     corrections to your factual summary and expert opinion
3     report with regard to Mr. Dickey?
4  A. Oh, there are two corrections to the one I brought
5     versus the one you may have.
6  Q. Okay.
7  A. You didn't get to that.
8  Q. That's why I asked.
9  A. Good. Wait a second. Page 257.
10 Q. 257? Yes.
11 A. I think... My problem is, mine's corrected.
12    The first bullet where he says he was
13    provided information by Monsanto that Roundup was
14    biodegradable --
15 Q. Um-hum.
16 A. -- that references? And then it says, but not that
17    Monsanto agreed. I don't believe the "not" was in the
18    one that was provided to you on October 3rd.
19 Q. So...
20 A. So I added the word, not.
21 Q. Okay.
22 A. And then there's one other. I don't know if that's...
23    I don't know what you, if that shows up your way in
24    yours, but there was a "not" missing.
25    MR. KRISTAL: That shows up with that, the

Page 135

1     "not"?
2     MR. UPSHAW: Correct.
3  A. And then... Bear with me.
4     MR. KRISTAL: Just to tie it up, we're
5     talking about knots.
6  A. I'm almost there, I apologize.
7     MR. KRISTAL: It's a bad joke.
8     MR. UPSHAW: One of your worst.
9     MR. KRISTAL: Ill take that as a
10    compliment. It's a volume business.
11 A. All righty. I believe it's on page 63. At the top of
12    the page, I don't know if yours starts with -- mine
13    starts with "subjecting," and then there are two
14    bullets after that. I've since deleted the second
15    bullet," Franz does not, as OECD recommends." I've
16    deleted that bullet.
17 BY MR. UPSHAW:
18 Q. When did you make these changes?
19 A. This weekend, when I was reading it to get ready. I
20    always see a couple of things each time you read 'em.
21 Q. Okay.
22 A. That's all I saw, but I'm glad you asked because I had
23    a few changes.
24 Q. All right.
25 A. And that would apply to the other reports as well.

Page 136

1  Q. The other reports as in...
2  A. Domina.
3  Q. Okay.
4  A. Well, I guess I can't go there, but...
5  Q. We'll get to that. I can only ask you about Mr.
6     Dickey at the moment.
7     Okay. Any intent to make any other
8     additions or deletions other than what we talked about
9     with the other exhibits that you provided today?
10 A. No, not that I'm aware of.
11    MR. UPSHAW: I don't have any further
12    questions regarding Mr. Dickey.
13    MR. KRISTAL: It's 2:02. I have a couple,
14    just a few.
15    CROSS EXAMINATION
16 BY MR. KRISTAL:
17 Q. You were asked questions earlier about whether or not
18    you knew what Mr. Dickey looks like. Does that matter
19    what he looks like in terms of the exposure assessment
20    that you've done?
21 A. In terms of the exposure assessment I've done, it
22    would not matter.
23 Q. You were asked whether you had visited any of the
24    locations where he sprayed Roundup. Does that matter
25    to the exposure assessment you've done?

Page 137

1  A. No.
2  Q. You were asked questions about the size of the farms
3     he worked on. Does that matter to the exposure
4     assessment he did?
5  A. Not to the assessment I did, no.
6  Q. You asked questions where he purchased the Roundup
7     from. Does that matter to the exposure assessment you
8     did?
9  A. No.
10 Q. And do you base your exposure assessment on your
11    interviews of the plaintiffs?
12 A. I do.
13 Q. Last brief line. You were asked questions whether Mr.
14    Dickey ever looked at a Roundup label.
15    If you would turn to page 522, which is the
16    section of the Dickey report, specific to Mr. Dickey
17    in terms of the exposure assessment, you indicate
18    there what instructions he followed with respect to
19    mixing the Roundup he used.
20 A. Um...
21 Q. If you look under method dispensed, do you see that?
22 A. Yeah. The concentrate was added as per the mixing
23    instructions on the container.
24 Q. And is that something that Mr. Dickey conveyed to you?
25 A. Yes.

35 (Pages 134 to 137)

Stephen E. Petty, PE, CIH, CSP

Page 138

1   Q.  What does that indicate to you in terms of whether he
2       ever read the label of Roundup?
3   A.  Well, he certainly read it with respect to the mixing
4       instructions.
5   Q.  And the next three pages, 523 to 524 and 525, under
6       the method dispensed section, do all three of those
7       pages contain the same sentence, quote, the
8       concentrate was added as per the mixing instructions
9       on the container, end quote?
10  A.  Yes.
11          MR. KRISTAL:  That's all I have.
12          MR. UPSHAW:  Okay.  That concludes Mr.
13  Dickey's deposition.
14          VIDEO TECHNICIAN:  2:04 p.m., going off the
15  record.  This marks the end of the deposition.
16          (Discussion held off record at 2:04 p.m.)
17          (Back on the record at 2:07 p.m.)
18          MR. UPSHAW:  All right.  Mr. Kristal and I
19  have reviewed the exhibits to be attached.
20          For Exhibit 8, Mr. Petty had identified two
21  corrections to his factual summary and expert opinions
22  report.  I have made those corrections to the court
23  reporter copy of Exhibit 8, and we will attach that to
24  the deposition.
25          Is that fine with you?

Page 139

1           MR. KRISTAL:  Yes.
2           (Deposition concluded at 2:08 p.m.
3           Signature not waived.)

Page 140

1               CERTIFICATE OF DEPONENT
2
3   STATE OF FLORIDA   )
                       ) ss.
4   COUNTY OF MIAMI-DADE)
5
6       I, the undersigned, declare under penalty of
7   perjury that I have read the foregoing transcript, and I
8   have made any corrections, additions, or deletions that I
9   was desirous of making; that the foregoing is a true and
10  correct transcript of my testimony contained therein.
11      EXECUTED this _____ day of _____,
12  20____, at _____, _____.
13          (City)            (State)
14
15
16      _____
                STEPHEN E. PETTY, P.E.
17
18
19
20
21
22
23
24
25

Page 141

1               ERRATA  SHEET
2   RECORD CHANGES HERE - DO NOT WRITE ON THE TRANSCRIPT
3   IN RE:  DICKEY VS  MONSANTO COMPANY
4   DATE:  TUESDAY, NOVEMBER 5, 2019
5   PAGE   LINE        CHANGE        REASON
6   ____  ____  _____  _____  _____
7   ____  ____  _____  _____  _____
8   ____  ____  _____  _____  _____
9   ____  ____  _____  _____  _____
10  ____  ____  _____  _____  _____
11  ____  ____  _____  _____  _____
12  ____  ____  _____  _____  _____
13  ____  ____  _____  _____  _____
14  ____  ____  _____  _____  _____
15  ____  ____  _____  _____  _____
16  ____  ____  _____  _____  _____
17  ____  ____  _____  _____  _____
18  ____  ____  _____  _____  _____
19  ____  ____  _____  _____  _____
20  ____  ____  _____  _____  _____
21  ____  ____  _____  _____  _____
22  Under penalties of perjury, I declare that I have read the
    foregoing document and that the facts stated in it are true
23
24
    _____  _____
25   (Date)        STEPHEN E  PETTY, P.E

Golkow Litigation Services - 1.877.370.DEPS

Stephen E. Petty, PE, CIH, CSP

Page 142

```
 1              CERTIFICATE OF OATH
 2
 3    THE STATE OF FLORIDA)
 4    COUNTY OF MIAMI-DADE)
 5
 6         I, Dianne N. Sarkisian, CSR, Certified Shorthand
 7    Reporter, in my capacity as a Notary Public of the State of
 8    Florida at Large, authorized to administer oaths on this 5th
 9    day of November 2019, at 9:48 AM, certify that STEPHEN E.
10    Petty, P.E. personally appeared before me and took an oath
11    or affirmation for the purpose of giving testimony in the
12    above-entitled matter.
13
14
15
16
                      _____
17                    Dianne N. Sarkisian
                      Notary Public - State of Florida
18                    My Commission No. FF948599
                      Expires:  01-06-2020
19
20
21
22
23
24
25
```

Page 143

```
 1            CERTIFICATE OF REPORTER
 2
 3    THE STATE OF FLORIDA)
 4    COUNTY OF MIAMI-DADE)
 5
 6         I, DIANNE N. SARKISIAN, CSR, Certified Shorthand
 7    Reporter, and Notary Public of the State of Florida,
 8    do hereby certify that I was authorized to and did
 9    stenographically report the deposition of STEPHEN E.
10    Petty, P.E.; that a review of the transcript was
11    requested; and that pages 1 through 143 is a true
12    record of the foregoing transcript.
13         I FURTHER CERTIFY that I am not a relative nor
14    employee of any counsel, nor any of the parties in
15    said suit, nor am I financially interested in the
16    action.
17         DATED this 6th day of November 2019, at Miami,
18    Miami-Dade County, Florida.
19
20
21
                      _____
22                    Dianne N. Sarkisian
                      Certified Court Reporter
23
24
25
```