# EXHIBIT 2

William R. Sawyer, Ph.D.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | § MDL No. 2741<br>§ Case No. 3:16-md-02741-VC |
| ———————————————————— | § |
| | § |
| This document relates to: | § |
| | § |
| Janzen v. Monsanto Company | § |
| Case No. 3:19-cv-04103-VC | § |
| ———————————————————— | § |

- - -

Friday, November 15, 2019

- - -

        Videotaped deposition of WILLIAM R. SAWYER,
Ph.D., held at South Seas Resort, 5400 Plantation
Road, Captiva, Florida 33924, commencing at
8:01 a.m., on the above date, before Susan D.
Wasilewski, Registered Professional Reporter,
Certified Realtime Reporter, Certified Realtime
Captioner, Florida Professional Reporter

                  - - -

        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
            deps@golkow.com

William R. Sawyer, Ph.D.

## Page 2

```
1    APPEARANCES:
2    WEITZ & LUXENBERG
     BY:  JERRY KRISTAL, ESQUIRE
3         jkristal@weitzlux.com
     220 Lake Drive East, Suite 210
4    Cherry Hill, New Jersey 08002
     Phone: (856) 755-1115
5    Representing Plaintiffs
6
7
8    WILKINSON WALSH & ESKOVITZ
     BY:  CALI COPE-KASTEN, ESQUIRE
9         ccope-kasten@wilkinsonwalsh.com
     2001 M Street, NW, 10th Floor
10   Washington, D.C. 20036
     Phone: (856) 755-1115
11   Representing Defendant Monsanto Company
12
13
14   ALSO PRESENT:
15        MATTHEW ALLISON, Videographer
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1              - - -
2            INDEX
3              - - -
4    Testimony of:  WILLIAM R SAWYER, Ph D       Page
5      DIRECT EXAMINATION BY MS COPE-KASTEN        5
6
7
8            E X H I B I T S
9         (Attached to transcript)
10   WILLIAM R SAWYER, Ph D  DEPOSITION EXHIBITS    PAGE
11   Exhibit 1  Monsanto Company's Amended Notice to    5
               Take Oral and Videotaped Deposition
12             of Dr  William Sawyer
13   Exhibit 2  October 9, 2019 Report from
               Toxicology Consultants & Assessment
14             Specialists, LLC
15   Exhibit 3  November 7, 2019 Invoice for           9
               Professional Services
16
     Exhibit 4  Royce Janzen Roundup Exposure Summary  42
17             July 2019
18   Exhibit 5  Article: Pesticide exposure as risk    46
               factor for non-Hodgkin lymphoma
19             including histopathological subgroup
               analysis
20             Mikael Eriksson, et al
21
22
23
24
25
```

## Page 4

```
1              - - -
2         THE VIDEOGRAPHER:  Good morning.  We are now
3    on the record.  My name is Matthew Allison.  I am
4    a videographer for Golkow Litigation Services.
5    Today's date is November 15th, 2019, and the time
6    is 8:01 a.m.
7         This video deposition is being held in
8    Captiva, Florida, in the matter of Royce Janzen
9    vs. Monsanto, for the United States District
10   Court, Northern District of California.  The
11   deponent is Dr. William Sawyer.
12        Will all counsel please identify themselves
13   for the record.
14        MR. KRISTAL:  Jerry Kristal from Weitz &
15   Luxenberg on behalf of Royce Janzen.
16        MS. COPE-KASTEN:  Cali Cope-Kasten from
17   Wilkinson Walsh & Eskovitz on behalf of Monsanto.
18        THE VIDEOGRAPHER:  The court reporter is
19   Susan Wasilewski, and will now swear in the
20   witness.
21        THE COURT REPORTER:  Would you raise your
22   right hand?
23        Do you solemnly swear or affirm the
24   testimony you're about to give will be the truth,
25   the whole truth, and nothing but the truth?
```

## Page 5

```
1         THE WITNESS:  Yes, I do.
2         THE COURT REPORTER:  Thank you.
3         WILLIAM R. SAWYER, Ph.D., called as a
4    witness by Defendant Monsanto Company, having been
5    duly sworn, testified as follows:
6              DIRECT EXAMINATION
7    BY MS. COPE-KASTEN:
8      Q.  Good morning, Doctor.
9      A.  Good morning.
10     Q.  I'm going to start by handing you what I've
11   marked as Exhibit 1 to your deposition, which is the
12   notice of deposition for Mr. Janzen's case.
13        (Sawyer Exhibit 1 was marked for identification.)
14   BY MS. COPE-KASTEN:
15     Q.  Have you seen this document before?
16     A.  Yes.
17     Q.  Have had you a chance to review it?
18     A.  Yes.
19     Q.  Did you bring any documents today in
20   response to this notice of deposition?
21     A.  Yes.
22     Q.  What did you bring?
23     A.  Exhibits that were marked yesterday, and
24   additionally, the notice of deposition for David
25   Domina, two pages from a previous report in the
```

William R. Sawyer, Ph.D.

## Page 6

1    Russo vs. Monsanto case dated October 4th, 2019,
2    trials and deposition over the past four years,
3    Pretrial Order Number 185, just the cover page, a
4    invoice for two days of deposition, and an e-mail
5    from Jerry Kristal to Jennifer Clark I outlining
6    the schedule for yesterday and today.
7        Additionally, I brought additional studies,
8    which I believe all but three were produced on
9    Monday, November 11th.  Would you like me to go
10   through these?
11       Q.  No, I would like you to name the three that
12   were not produced on Monday, though.
13       A.  I would need assistance with that from
14   Attorney Kristal because I didn't keep a note on
15   that.  I sent everything to Attorney Kristal's law
16   firm to be produced, and I think that he has
17   actually a better handle on what was produced and
18   what wasn't.
19       MR. KRISTAL:  Am I understanding.  Are you
20   talking about the IARC document and the
21   Paraguayan children?
22       THE WITNESS:  Yes, I think -- well, I almost
23   think those were produced.
24       MR. KRISTAL:  Right.  That's why I'm
25   not really --

## Page 7

1        THE WITNESS:  Well, it may be -- maybe
2    everything was produced on Monday then.
3        MS. COPE-KASTEN:  Can I just make a request
4    that at a break we figure out what the
5    studies are that are --
6        A.  Oh, I know what it is.  It's this handbook
7    of herbicide.
8        MR. KRISTAL:  Right.
9        Q.  Okay.
10       A.  That was actually produced --
11       MR. KRISTAL:  That was produced yesterday,
12   yes, at the deposition.
13       A.  Yeah, yeah.
14       MR. KRISTAL:  And the 27 articles that were
15   added to the materials considered list were on
16   the list on Monday, and then we separately sent
17   an e-mail with the IARC update, so to speak --
18       THE WITNESS:  Right.
19       MR. KRISTAL:  -- and the -- I think it's the
20   Leite, L-e-i-t-e, article regarding Paraguayan
21   children and glyphosate exposure.
22       A.  Right.  Those were a supplement.  They were
23   sent on November 11th as per the three-day request.
24       MR. KRISTAL:  Right.
25       Q.  Is there anything beyond what Mr. Kristal

## Page 8

1    has just outlined or what has been on any materials
2    considered list that you've had so far that you are
3    relying on to reach your opinions in today's case?
4        A.  I'm not necessarily relying on these.  I
5    brought them to try to expedite the deposition
6    process.  I brought safety data sheets and a couple
7    of labels on products that Mr. Dickey used.  It's
8    possible that some of these might be responsive to
9    chemicals used in the current matter, but I am not
10   sure of that.  Other than that, nothing.
11       MR. KRISTAL:  And I don't know if there is
12   confusion or not, but I think Dr. Sawyer had
13   brought a Redweld with documents in them, which
14   are the same as he just articulated, and although
15   there was mention that somebody would ask him
16   about it yesterday, nobody actually did, so he's
17   telling you what was in there.
18       MS. COPE-KASTEN:  Understood.
19       MR. KRISTAL:  And still is in there, and it
20   is still being brought to the deposition.
21       MS. COPE-KASTEN:  All right.
22   BY MS. COPE-KASTEN:
23       Q.  I'm now handing you what has been marked as
24   Exhibit 2 to your deposition.
25       (Sawyer Exhibit 2 was marked for identification.)

## Page 9

1    BY MS. COPE-KASTEN:
2        Q.  Do you recognize that this is a copy of your
3    report for Mr. Janzen?
4        A.  Yes.
5        Q.  Does this report include some general
6    causation opinions?
7        A.  Yes.
8        Q.  Does this report also include all
9    case-specific opinions you have as to Mr. Janzen?
10       A.  Yes.
11       Q.  Did you have all information that you needed
12   in order to reach your opinions in Mr. Janzen's
13   case?
14       A.  Yes.
15       Q.  One of the items that you mentioned is in
16   your Redweld is an invoice for two days of
17   deposition?
18       A.  Correct.
19       Q.  Can I get you to pull that out again,
20   please?
21       A.  Certainly.
22       Q.  I'm going to mark that as Exhibit 3 to your
23   deposition.
24       (Sawyer Exhibit 3 was marked for identification.)
25   BY MS. COPE-KASTEN:

William R. Sawyer, Ph.D.

Page 10

1     Q. Thank you. Exhibit 3 looks like it is an
2  invoice dated November 7, 2019, for $13,000. Is
3  that accurate?
4     A. Yes. That's for two days deposition as per
5  my regular fee schedule.
6     Q. And that was yesterday and today?
7     A. Yes.
8     Q. In addition to that $13,000, have you billed
9  Plaintiff's counsel for any of the time that you
10 have worked in Mr. Janzen's matter?
11    A. Not yet, but I hope to attend to that
12 shortly.
13    Q. Do you have an estimate of how much time you
14 have spent working on Mr. Janzen's case?
15    A. That would be a very rough approximate.
16    Q. I'll take your rough approximate.
17    A. I haven't looked at any of the billing
18 entries. Probably 40 to 50 hours total for the
19 seven. Well, it could -- I'll give a wider range
20 just to be accurate. It could be 40 to 60.
21       MS. COPE-KASTEN: Mr. Kristal, we would
22 request those invoices at the time that he
23 actually submits them to your office.
24       MR. KRISTAL: Okay. Also, just to clear the
25 record, I think you specifically asked about

Page 11

1  Mr. Janzen. I think Dr. Sawyer is referencing
2  the seven plaintiffs. Is that accurate?
3       THE WITNESS: Yes.
4       MR. KRISTAL: In terms of that hour count?
5       THE WITNESS: That's right. That's for the
6  seven.
7  BY MS. COPE-KASTEN:
8     Q. It's for the seven Wave 1 MDL remand cases,
9  correct?
10    A. Yes.
11    Q. One of which is Mr. Janzen's case?
12    A. Exactly.
13    Q. And you haven't broken down at this point or
14 you're not prepared to say today exactly how many of
15 those 40 to 60 hours would be Mr. Janzen alone?
16    A. No. I haven't even looked at the total.
17    Q. Did you meet with Mr. Janzen's counsel in
18 preparation for your testimony here?
19    A. Not today but I did meet with Attorney
20 Kristal on Wednesday evening.
21    Q. How long did you meet with him?
22    A. I would have to estimate our actual meeting
23 time was probably -- seeing how I ignored him for
24 the first hour to finish some other work, I would
25 have to estimate about three hours.

Page 12

1     Q. Have you had any other phone calls with
2  Mr. Kristal or any of the other lawyers for
3  Mr. Janzen in the course of preparing your opinions
4  in Mr. Janzen's case?
5     A. No. I've only spoken with Attorney Kristal
6  on this case, and I don't -- really don't recall any
7  phone calls discussing the results of my reports.
8  No, I have to say no.
9     Q. Have you had any conversations with any of
10 Mr. Janzen's other experts about Mr. Janzen's case?
11    A. No.
12    Q. Have you ever met Mr. Janzen?
13    A. No.
14    Q. Have you ever spoken to Mr. Janzen?
15    A. Just looking at my report, it doesn't appear
16 I -- I would say no, no, I did not.
17    Q. Have you ever spoken to any of Mr. Janzen's
18 treating physicians?
19    A. No.
20    Q. Have you read any depositions in preparation
21 for your opinions in Mr. Janzen's case?
22    A. Yes.
23    Q. Which depositions?
24    A. Just Royce Janzen.
25    Q. Did you take any notes during the course of

Page 13

1  your review of Mr. Janzen's deposition that are not
2  contained directly within your report at this time?
3     A. No.
4     Q. Have you reviewed any of Mr. Janzen's
5  medical records?
6     A. Yes, I have.
7     Q. Have you reviewed what you understand to be
8  the entirety of the medical records that Mr. Janzen
9  has had produced in connection with this case, or
10 only select records?
11    A. Only select records that -- with respect to
12 initial diagnosis, technology results.
13    Q. How did you identify or select which records
14 to review?
15    A. I specifically asked for records that
16 provided information on initial diagnosis, pathology
17 confirmation, and anything with respect to smoking
18 history or other toxicological aspects in terms of
19 prior chemotherapy or immunosuppressant use and that
20 type of thing.
21    Q. Aside from prior chemotherapy or other
22 immunosuppressant use, is there anything else that
23 is encompassed within the request you made of
24 Mr. Janzen's counsel for records relating to other
25 toxicological aspects of his case?

William R. Sawyer, Ph.D.

Page 14

1      A.  I don't understand your question, actually.
2      Q.  You said that you asked for records that
3  referred to smoking history or other toxicological
4  aspects of Mr. Janzen's case?
5      A.  Yes.
6      Q.  And you listed prior chemotherapy or
7  immunosuppressant use as two examples of
8  toxicological aspects of his case?
9      A.  Yes.
10      Q.  Is there anything other than prior
11  chemotherapy or immunosuppressant use that you would
12  consider to be a toxicological aspect of this case
13  that you specifically asked for prior records on?
14      A.  Yeah, history of tobacco, alcohol, drugs of
15  abuse, and I think that was all I asked for on this.
16      Q.  Why did you ask for prior tobacco history?
17      A.  To establish the smoking history, if any.
18      Q.  Why is a smoking history relevant to you in
19  Mr. Janzen's case, or any case?
20      A.  For two reasons: One, heavy smoking in the
21  40 to 60-plus pack-year range in some studies is
22  associated with an increased incident rate of NHL
23  and could serve as an additional risk factor at high
24  pack-year levels.
25          Secondly, there is a strong interaction

Page 15

1  shown in the study by George, et al., which I've
2  referenced, indicating that glyphosate interacts
3  with a carcinogenic polynuclear aromatic hydrocarbon
4  producing a strong promotion effect, so it is of
5  interest to know if the person was smoking
6  cigarettes during the time of glyphosate use.
7      Q.  Why did you ask about alcohol history?
8      A.  There is some speculation that heavy
9  alcoholism can result in certain hematopoietic
10  malignancies.
11      Q.  Are you aware that Mr. Janzen is an
12  agricultural worker?
13      A.  Of course.  Yeah, I have seen evidence of
14  that both in his deposition attachments, photos, and
15  his testimony.
16      Q.  And you understand that a significant amount
17  of his Roundup spraying that he has alleged is in
18  connection with that agricultural work?
19      A.  Yes.
20      Q.  Have you visited any of the properties on
21  which Mr. Janzen claims to have sprayed Roundup?
22      A.  No.
23      Q.  I understand that you are relying on
24  Mr. Petty's calculation with respect to the number
25  of hours that Mr. Janzen was exposed to Roundup; is

Page 16

1  that accurate?
2      A.  Yes, you are correct.
3      Q.  Do you recall when Mr. Janzen was diagnosed
4  with non-Hodgkin's lymphoma?
5      A.  His initial onset was with a submandibular
6  mass which I think was in May 2013, and then I know
7  in July he underwent a surgical procedure with
8  pathology performed, so officially it would have
9  been July of 2013.
10      Q.  You would agree with me that any Roundup
11  exposure that Mr. Janzen had after July 2013 did not
12  contribute to his initial diagnosis with NHL?
13      A.  Yes.  Potentially served as promotion during
14  the period of time of treatment, but certainly post
15  exposure had nothing to do with his initial
16  diagnosis.
17      Q.  And you're aware that Mr. Janzen has been
18  cancer free since late 2013?
19      A.  That, I'm not sure.
20          MR. KRISTAL:  Objection.
21      A.  I'd defer you to the medical oncologist.
22      Q.  Do you know how long Mr. Janzen has been in
23  remission?
24      A.  No, I have not reviewed the -- all of the
25  medical records, and I certainly haven't reviewed

Page 17

1  the most recent.
2      Q.  You're aware that Mr. Petty calculated
3  Mr. Janzen's exposure to Roundup through
4  approximately 2015?
5      A.  Yes.
6      Q.  Are you aware that Mr. Janzen continues to
7  spray Roundup today?
8      A.  No.
9      Q.  I'm going to mark as Exhibit 4 to your
10  deposition -- well, do you have a copy of
11  Mr. Janzen's testimony on your computer today?
12      A.  Yes.
13      Q.  Rather than marking this, I'm just going to
14  have you take a look at page 19 of Mr. Janzen's
15  testimony.
16      A.  One comment I have is I notice Exhibit 3
17  doesn't have a name on it, and I'm just alerting you
18  because on the table we have depositions -- multiple
19  deposition names.
20      Q.  Will you do me a favor and just make sure
21  that the ones that have no name get kept in one
22  stack and Susan and I will take care of that?
23      A.  Great.  Okay.  I'm on page 19.
24      Q.  All right.  Take a look at lines 5 through 6
25  for me.

5 (Pages 14 to 17)

William R. Sawyer, Ph.D.

Page 18

1    A.   Yes.
2    Q.   Based on that testimony from Mr. Janzen, do
3  you understand Mr. Janzen to still be spraying
4  Roundup?
5    A.   At the time of his deposition, yes.
6    Q.   And you have no reason to dispute whether
7  he's telling the truth in that situation?
8    A.   No.
9    Q.   And you don't have any knowledge one way or
10 the other as to whether he continues to spray
11 Roundup today, in November 2019?
12   A.   I have no idea.
13   Q.   I take it that because you were not aware
14 that Mr. Janzen was still spraying Roundup as of the
15 time of his deposition, you're not aware of the
16 manner in which Mr. Janzen was spraying Roundup at
17 that point?
18   A.   No.
19   Q.   Do you know what other chemicals Mr. Janzen
20 had on his property in the 1980s?
21   A.   I have included in Table A a summary of
22 additional pesticides and products he used.  I'm not
23 certain what years these were used.
24   Q.   Is it your understanding that the four
25 products that are listed in Table A are the only

Page 19

1  products that Mr. Janzen has ever used on his
2  property in addition to Roundup, pesticides or
3  otherwise?
4    A.   No, I'm not certain of that.
5    Q.   Would it be helpful to you from a
6  toxicological perspective to know what other
7  chemicals Mr. Janzen may have used on his farm?
8    A.   Yes.  I think there were some others in his
9  deposition that were inconsequential, which I didn't
10 tabulate.  These are primary products that he used
11 that -- some of which potentially have Group 2B
12 carcinogenic effects, not including lymphoma, and
13 none of them are Group 2A, probably human
14 carcinogens.
15   Q.   Let's spend a little bit of time on Table A,
16 since we're on it now.  There are four substances
17 listed here?
18   A.   Yes.
19   Q.   For two of those four, Lasso --
20      MR. KRISTAL:  You meant are there four
21 products listed?
22   Q.   Four products.  There are four products
23 listed?
24   A.   There are.
25   Q.   Two of those four products you have

Page 20

1  indicated contain a chemical that IARC has labeled
2  as a Group 2B, possible human carcinogen?
3    A.   Yes.
4    Q.   Those are Lasso and Lorsban?
5    A.   Correct, which I discussed in some detail
6  yesterday.
7    Q.   The product that they contain is
8  naphthalene?
9    A.   Naphthalene was used as a carrier -- part of
10 the carrier solvent, yes.  It's not --
11   Q.   Another --
12   A.   It's not known to induce NHL in any studies
13 and it is a animal carcinogen.  It's considered a
14 possible human carcinogen but there is insufficient
15 evidence to make that determination that it is
16 probable in humans.
17   Q.   What evidence do you believe is necessary
18 for a chemical or product to move from being a
19 possible human carcinogen to being a possible human
20 carcinogen that could lead to specifically the
21 development of non-Hodgkin's lymphoma in humans?
22      MR. KRISTAL:  Objection; form.  Are you
23 asking his opinion generally or in the IARC
24 classification scheme?
25      MS. COPE-KASTEN:  He can answer however he

Page 21

1  understands the question.
2      MR. KRISTAL:  Well, that's why I objected.
3  The question is not clear.
4    A.   Are you asking what methodology I follow?
5    Q.   Yes.
6    A.   I follow the weight of evidence methodology,
7  which includes the Bradford Hill criteria, and
8  initially I look at experimental studies, which
9  include animals, and whether there is a plausible or
10 known mechanism.  As in glyphosate, there is clear
11 evidence of genotoxicity in animal studies and
12 bioassays.
13      Then I next look for coherence and
14 consistency among those studies, that is of
15 mechanistic studies, as well as animal carcinogenic
16 bioassays, and then review the human epidemiologic
17 literature, which I've largely deferred to the
18 epidemiologist in this case with respect to the
19 strengths of association in humans with respect to
20 glyphosate and NHL.
21      And the temporality and the latency period,
22 which I have evaluated in this case.  Also, the
23 consistency of the studies and the coherence, that
24 means studies of different groups at different
25 locations, different places, different times,

William R. Sawyer, Ph.D.

Page 22

1 showing the same endpoint, which is NHL.
2      And in some of these factors, the weight of
3 evidence of the strength and weaknesses of each
4 study, and toxicologists apply that approach on a
5 routine basis in determining whether or not a
6 chemical is carcinogenic in animals or humans. And
7 it is possible and very common to have sufficient
8 animal evidence through experimental studies to be
9 reasonably conclusive that a carcinogen is of a 2B
10 status and definitively causes cancer in animals,
11 but in many cases the human evidence isn't there,
12 and there's not always a direct correlation between
13 animal and human cancers. That depends on metabolic
14 pathways and other factors.
15      A good example is arsenic does not share the
16 same carcinogenic profile in animals as it does
17 humans because it's metabolized differently.
18      Q.  The answer that you just gave me is about
19 how something is considered a -- in a toxicological
20 perspective, considered a possible human carcinogen.
21 What I want to know is you told me that naphthalene
22 is a possible human carcinogen but not for
23 non-Hodgkin's lymphoma; is that correct?
24      MR. KRISTAL:  Objection to the form of the
25 question, particularly the leading.

Page 23

1      A.  It's not a probable human carcinogen. It's
2 a possible human carcinogen. It's been demonstrated
3 in animals to induce certain malignancies, but it
4 has not been shown in humans to produce NHL, and it
5 is not a -- what we call a Group 2A status
6 carcinogen, such as Roundup.
7      Q.  Do you think that it is possible for a
8 chemical to cause non-Hodgkin's lymphoma in humans
9 even if there are no studies indicating that it
10 causes non-Hodgkin's lymphoma in humans?
11      MR. KRISTAL:  Objection.
12      A.  Sure. We could speculate on many different
13 chemicals, but it would be poor science to speculate
14 in that manner.
15      Q.  You would agree with me that atrazine is
16 another chemical that you believe does not have
17 current evidence in humans for causing non-Hodgkin's
18 lymphoma?
19      A.  That's correct. There is insufficient
20 evidence. Currently IARC has flagged atrazine as
21 deserving sufficient -- sufficiently more
22 investigation and studies, but currently there is
23 insufficient data. The atrazine studies were not
24 statistically significant in humans with respect to
25 NHL; however, there is enough evidence to encourage

Page 24

1 further studies.
2      Q.  I want to clarify something in the comments
3 column of your Table A for atrazine. You've
4 indicated IARC Group 3 not carcinogenic to humans.
5 Do you see that?
6      A.  Yes.
7      Q.  You would agree with me that IARC Group 3 is
8 in fact not not carcinogenic to humans?
9      A.  Yeah. I think my problem here is really
10 typographical. I'm speaking of two different things
11 here. One is IARC Group 3, which means insufficient
12 data to evaluate. Number 2 under comment, it's not
13 carcinogenic in humans. So really, that's a -- the
14 colon should not be there after the 3. It should be
15 a period.
16      Q.  Under naphthalene in Lasso and Lorsban, the
17 colon after Group 2B lists the description of what
18 IARC 2B is, correct?
19      A.  Yes.
20      Q.  And you're telling me that the same is not
21 true for the colon and subsequent description after
22 Group 3 for atrazine, that's a separate comment?
23      A.  Yeah. Atrazine Group 3 -- to the best of my
24 knowledge, IARC Group 3 is insufficient data.
25      Q.  So you don't mean to indicate in this box

Page 25

1 that IARC has determined that atrazine is not
2 carcinogenic to humans?
3      A.  That's what I said a moment ago, yes.
4 That's my comment based on the summary of the human
5 epidemiologic literature and data. As I said, there
6 were some elevated odds ratios but not significant.
7      Q.  Is possible human carcinogen your comment
8 with respect to the carcinogenic potential of
9 naphthalene?
10      A.  No. That is incorrect typographical form.
11      Q.  Are you aware that Dr. Phalen has conducted
12 a site inspection of Mr. Janzen's property?
13      A.  No.
14      Q.  Have you reviewed Dr. Phalen's report in
15 Mr. Janzen's case?
16      A.  No.
17      Q.  Do you intend to do so before trial in
18 Mr. Janzen's case?
19      A.  Possibly.
20      Q.  I take it, then, that you are not aware that
21 Dr. Phalen photographed a number of chemicals on
22 Mr. Janzen's property that are not listed either in
23 Mr. Janzen's plaintiff fact sheet or during
24 Mr. Janzen's deposition?
25      MR. KRISTAL:  Object to form.

7 (Pages 22 to 25)

William R. Sawyer, Ph.D.

Page 26

1    A.  That's possible.  I haven't reviewed it yet.
2    Q.  Because you haven't reviewed that, you also
3  have not at this point investigated the carcinogenic
4  potential of specific chemicals that are on that
5  list?
6        MR. KRISTAL:  Objection.
7    A.  I would disagree with that.  It's very
8  likely I have if you were to sum up all of the
9  tables I have prepared in the various Monsanto
10  reports outlining the potential carcinogenicity of
11  different agricultural products.  I have quite a
12  long list I've evaluated in previous reports, and so
13  to say that I haven't done so for any of those
14  chemicals is probably incorrect.
15    Q.  In order to know what opinions you would
16  offer in Mr. Janzen's case with respect to any other
17  chemicals he was exposed to in addition to Roundup,
18  atrazine, DiPel, Lasso and Lorsban, I would have to
19  look through other reports that you have given in
20  other cases; is that accurate?
21        MR. KRISTAL:  Objection.
22    A.  You could, or you could ask me right now.
23    Q.  I want to take a look at page 5 of your
24  report.  On page 5 you have a subheading that says
25  Exposure Factors.  Do you see that?

Page 27

1    A.  Yes.
2    Q.  If you look at the beginning of the second
3  paragraph under Exposure Factors, you state that
4  Mr. Janzen, according to his plaintiff fact sheet,
5  used Roundup for approximately 20 years without any
6  personal protective gear.
7    A.  Yes.
8    Q.  Does the presence of personal protective
9  gear make any difference to you in calculating
10  exposure days?
11    A.  No.  It's not possible to quantitatively
12  adjust eight-hour time-weighted exposure days based
13  on gear.  That would be some type of self-proclaimed
14  methodology, because the studies themselves don't
15  address various forms of exposure gear.
16    Q.  What is his personal protective equipment
17  relevant to in your analysis?
18    A.  I'm not sure I understand your question.
19    Q.  You've chosen to indicate in your report
20  that he did not use personal protective gear.  Why
21  did you do so?
22    A.  That's a primary prong of my investigation
23  as a toxicologist as to his degree of exposure dose.
24    Q.  Did you calculate a degree of exposure dose
25  for Mr. Janzen?

Page 28

1    A.  Yeah.  I calculated his exposure days on a
2  time-weighted eight-hour basis and compared them to
3  the human epidemiologic studies at the thresholds of
4  exposure associated with statistically and
5  significantly increased rates of NHL among
6  applicators.
7    Q.  Did you perform any calculation about
8  Mr. Janzen's exposure dose to Roundup aside from the
9  exposure days you just listed?
10    A.  No.  That would not be necessary to
11  calculate his dose.  The referenced dose metric
12  studies do not evaluate increased rates of NHL based
13  on milligram per kilogram per day dosage, and
14  conducting such an exercise could be useful in
15  comparing a snapshot dose to the AOEL, but other
16  than that, it's not consistent with the methodology
17  used in the epidemiologic studies.
18    Q.  If personal protective gear has no bearing
19  on exposure days -- which you just told me is
20  accurate, correct?
21    A.  That's not exactly what I said.
22    Q.  How does personal protective gear have
23  bearing on exposure days?
24    A.  It's not considered in the dose metric of
25  the studies of exposure days.

Page 29

1    Q.  If personal protective gear is not
2  considered in the dose metric for exposure days,
3  what assessment is personal protective gear relevant
4  to that you are conducting here?
5    A.  To specifically determine if, how and when
6  glyphosate, POEA, or other materials in the product
7  contacted Mr. Janzen and ultimately achieved
8  systemic absorption, and protective gear is very
9  important in evaluating that process.
10    Q.  If a person sprays Roundup wearing gloves,
11  long sleeves, long pants, and boots for eight hours,
12  do they have a different number of exposure days
13  than someone who sprays Roundup for eight hours
14  wearing a short sleeve shirt, shorts, flip-flops,
15  and no gloves?
16    A.  The dose metric methodology used in the six
17  cited studies in my report, those are human
18  epidemiological studies, does not evaluate exposure
19  days on the basis you just described, rather, on the
20  basis of an average applicator.
21    Q.  So the answer would be no, they have the
22  same number of exposure days?
23    A.  That's not what I said.
24    Q.  Do you believe that they have a different
25  number of exposure days?

William R. Sawyer, Ph.D.

Page 30

1    A.  Let me finish.
2    Q.  Go ahead.
3    A.  You're putting words in my mouth.  That's
4   not what I said.  If you would like me to repeat
5   what I said, I will do so.
6    Q.  I'll ask a different question.  In the
7   hypothetical that I gave, where one person has
8   sprayed Roundup wearing long pants, long sleeves,
9   boots and gloves, and one person has sprayed Roundup
10  for the identical amount of time, eight hours in
11  both cases, wearing short sleeves, shorts,
12  flip-flops, and no gloves, tell me how many exposure
13  days each of those people would have to Roundup.
14   A.  Following the methodology as published, they
15  would have the same number of exposure days.
16   Q.  Is the methodology as published the
17  methodology that you followed in reaching your
18  opinions in Mr. Janzen's case?
19   A.  Yes.  It is the only methodology that
20  provides a dose metric with respect to the rate of
21  NHL via odds ratio or other measurements.
22   Q.  You would agree with me that under the
23  published methodology and the methodology that you
24  followed in Mr. Janzen's case, the presence of
25  personal protective equipment does not impact the

Page 31

1   total number of exposure days that that person has
2   to Roundup?
3        MR. KRISTAL:  Object to form.
4    A.  The question is unclear.
5    Q.  Under the methodology that you used in
6   Mr. Janzen's case, and the published methodology in
7   the six epidemiological studies that you are talking
8   about for calculating exposure days, a person's use
9   of personal protective equipment does not impact how
10  many exposure days are calculated for that
11  individual, correct?
12       MR. KRISTAL:  Object to form.
13   A.  I'm sorry.  I don't understand your
14  question.  You stated two different things.  You
15  said the methodology I used, and the methodology in
16  the published studies.  I am totally confused.  I
17  didn't use any self-proclaimed methodology.  I
18  followed the methodology in the six peer-reviewed
19  and generally accepted studies, so I do not
20  understand your question.
21   Q.  You and I are on the same page about that.
22  I'm saying using the methodology that you used and
23  that is in these six peer-reviewed studies, which is
24  identical, so the only methodology that we're
25  talking about here is exposure days, correct?

Page 32

1    A.  Yes.
2    Q.  Using that exposure days methodology, there
3   is no difference in the number of exposure days that
4   you would calculate for an individual based on their
5   level of personal protective equipment, correct?
6    A.  Yes.
7    Q.  On page 7 of your report you have a section
8   that states Time Frame of Exposures.  Do you see
9   that?
10   A.  I do.
11   Q.  And the first time frame of exposure, which
12  is also the only time frame of exposure for
13  Mr. Janzen, is 1984 to 2015?
14   A.  That's right.
15   Q.  The second bullet point there says:  Also
16  cleaned clogged nozzles.  About 50 percent of the
17  time he blew on the nozzles with his mouth, and 50
18  percent of the time used a wire to clean the
19  nozzles.
20       Did I read that correctly?
21   A.  Yes.
22   Q.  Do you mean to indicate there that by
23  blowing on the nozzle with his mouth, his lips came
24  into contact with the nozzle?
25   A.  I would have to defer that to Mr. Petty

Page 33

1   and/or Mr. Janzen as there is not a refined
2   definition of that in the deposition or plaintiff
3   fact sheet.
4    Q.  Is it relevant to your analysis of
5   Mr. Janzen's case whether his lips came into contact
6   with the nozzle that had sprayed Roundup?
7    A.  It's not terribly important because whether
8   or not his lips contacted the nozzle, he still has
9   handled the nozzle with his hands.  With gloves on
10  or gloves off, either way he would have a mouth --
11  hand-to-mouth contamination problem from handling a
12  wet nozzle with a glove or with a hand, and then
13  interacting by holding his hands to his mouth.
14  There is still a confirmed pathway for hand-to-mouth
15  exposure.
16       So whether he did or not, there is still a
17  problem here in terms of exposure.
18   Q.  Do you have any information on which to base
19  an opinion that Mr. Janzen touched a Roundup nozzle
20  with his hand and subsequently touched his mouth
21  with the hand that had touched the Roundup?
22   A.  Again, I really have to defer that to the
23  interviewer, Mr. Petty, or directly back to
24  Mr. Janzen.  I'm not here to -- in a position to
25  judge what he did or guess at that.

9 (Pages 30 to 33)

William R. Sawyer, Ph.D.

Page 34

1    Q.  Does it change the number of exposure days
2  that Mr. Janzen has to Roundup whether his mouth
3  came into contact with the nozzle or if he blew on
4  it from inches away?
5    A.  No.
6    Q.  Does it change his potential absorbed dose
7  if his mouth came into contact with the nozzle or if
8  he blew on it from several inches away?
9    A.  It could.
10   Q.  And you have not performed any calculation
11 to know what degree that might have impacted his
12 absorbed dose?
13   A.  No.
14   Q.  On the same page of your report that we've
15 just been looking at, the next bullet point down
16 states that sometimes Roundup would get on
17 Mr. Janzen's skin when he was using a sprayer and
18 that he would be, quote, sitting in it.
19      Do you see that?
20   A.  Yes.
21   Q.  And he estimates that that happened about 20
22 percent of the time?
23   A.  Yes.
24   Q.  Does the fact that Mr. Janzen was sitting in
25 Roundup impact the number of exposure days he had?

Page 35

1    A.  No.
2    Q.  From a toxicological perspective, is the
3  absorbed dose of Roundup relevant to the question of
4  whether Roundup is a substantial contributing factor
5  to a person's non-Hodgkin's lymphoma?
6    A.  I didn't understand your question.
7    Q.  From a toxicological perspective, does your
8  assessment of whether Roundup is a substantial
9  contributing factor to a person's non-Hodgkin's
10 lymphoma change based on their absorbed dose of
11 Roundup?
12   A.  It doesn't change but it's certainly
13 necessary to assess whether the individual sustained
14 absorbed dose similar to those in the human studies.
15   Q.  Is it accurate to say that knowing a
16 person's absorbed dose is necessary to determine
17 whether Roundup is a substantial contributing factor
18 to their non-Hodgkin's lymphoma?
19     MR. KRISTAL:  Objection.
20   A.  Yes, and I have confirmed by review of the
21 exposure scenarios various PPE, duration of use, an
22 assessment of clothing, leakage on the back to the
23 degree that individual was sitting in liquid, and
24 other such factors, whether or not Mr. Janzen
25 sustained absorbed dose, and used the dose metric of

Page 36

1  the human studies to determine whether his exposure
2  was in range with that of the human studies based on
3  exposure days.
4    Q.  Can you tell me what Mr. Janzen's absorbed
5  dose of Roundup was?
6    A.  No.  That was not necessary to calculate
7  because there is nothing to compare it to in the
8  human studies that provide a dose metric, that is
9  the human studies which have examined the
10 statistically significant rate of NHL have not been
11 performed based on a milligram per kilogram dose.
12   Q.  Would you agree with me that it is possible
13 to spray Roundup in a zero exposure manner?
14   A.  Near zero, but not -- probably never
15 reaching exact zero, but close to it, and that would
16 require a fully chemically resistant Tyvek suit and
17 a Level A self-contained breathing apparatus and
18 sealed gloves.  Under such conditions, the only
19 thing left might be some exposure on the cheeks, and
20 even that has been shown in military sarin attacks
21 in Iran and Iraq during the 1980s to cause
22 fatalities to frontline fighters because of
23 minimally exposed skin.
24      So that's why I'm saying it's not -- it's
25 very -- it would be very difficult to say zero

Page 37

1  exposure because there is always going to be some,
2  but it can be reduced to near zero.
3    Q.  Is it your opinion that the toxicologic
4  profile of Roundup is comparable to the profile of
5  sarin gas?
6    A.  No.
7    Q.  Is it your opinion that the carcinogenic
8  potential of Roundup is comparable to the
9  carcinogenic potential of sarin gas?
10   A.  That's a good question.  Diisopropyl
11 fluorophosphate, which is sarin, from a chemical
12 structure relationship, is rather different.  I
13 don't know that it's been studied and it would be
14 sort of odd to study diisopropyl fluorophosphate
15 carcinogenicity because it is so extremely toxic,
16 and on a fatal basis, that it would be, number one,
17 too dangerous to study, and it would most likely
18 kill the test animals before they got a chance to
19 develop any malignancies, so I would say no.
20   Q.  Do you intend to offer any opinions about
21 sarin gas to the jury in Mr. Janzen's case?
22   A.  No.
23   Q.  On to top of page 5 --
24     MR. KRISTAL:  Unless you ask about it.
25   Q.  On the top of page 5 of your report you note

10 (Pages 34 to 37)

William R. Sawyer, Ph.D.



**Page 38**

1  that Mr. Janzen's father died from █████████
2    A.  Correct.
3    Q. ████████████████████████████████
█  ██████████████████████████
5    A.  Yes.
6    Q. ██████████████████████████████
█  ████████████████
8    A.  That's right.
9    Q.  Does a person's family history of
10  hematopoietic cancers increase their risk of
11  developing non-Hodgkin's lymphoma?
12    A.  There is some evidence that in -- I think
13  it's the McDuffie study, with respect to
14  first-generation relatives having an increased risk
15  of NHL.
16    Q.  Did you account for Mr. Janzen's family
17  history when you formed your opinion that Roundup is
18  a substantial contributing factor to Mr. Janzen's
19  non-Hodgkin's lymphoma?
20    A.  I did.  I included it in page 5 of my
21  report, and I'm, of course, deferring the opinion
22  with respect to hereditary factors to the
23  appropriate expert, who is a medical oncologist.
24    Q.  Is it accurate to say that you did not
25  attempt to weigh the comparative risk that

**Page 39**

1  Mr. Janzen's family history posed to his development
2  of non-Hodgkin's lymphoma against the risk that you
3  believe Roundup poses to Mr. Janzen for developing
4  non-Hodgkin's lymphoma?
5    A.  Yes.  That opinion is more appropriately
6  handled by the medical oncologist.  What I have done
7  is noted in my summary, to a reasonable
8  toxicological certainty, that the risk of NHL from
9  the Roundup exposures over approximately 29 years
10  substantially contributed to and added to such
11  underlying risk factors.
12      So he may have already had some hereditary
13  risk factor, that I am deferring to the medical
14  oncologist, but what is certain is that his Roundup
15  use certainly added to that underlying risk, if any.
16    Q.  Are you offering an opinion in this case
17  that Mr. Janzen would not have developed
18  non-Hodgkin's lymphoma but for his exposure to
19  Roundup?
20      MR. KRISTAL:  Objection.
21    A.  No.
22    Q.  You're aware that Mr. Janzen had a mixture
23  of diffuse large B-cell lymphoma and follicular
24  lymphoma?
25    A.  Yeah.  Interesting diagnosis.

**Page 40**

1    Q.  Are you aware of any study reporting a
2  statistically significant association between
3  glyphosate or Roundup exposure and follicular
4  lymphoma?
5      MR. KRISTAL:  Objection.
6    A.  No, only as a subtype mixed in with the
7  overall NHL finding, but I'm not aware of any
8  studies that show a statistically significant
9  increase specific to only follicular.  In fact,
10  the -- one of the metaanalysis studies looked
11  specifically at follicular lymphoma and did not find
12  a significant increased relationship.
13    Q.  Do you recall seeing a discussion in
14  Mr. Janzen's deposition about dermatology records
15  for Mr. Janzen?
16      MR. KRISTAL:  Objection to form.
17    A.  No.
18    Q. █████████████████████████████████
█  ██████████████████████████████████
██  █████████████████
21    A.  I think that may have been -- let me check.
22  No.
23    Q.  Would it impact your opinion in this case as
24  to whether Roundup was a substantial contributing
25  factor to Mr. Janzen developing non-Hodgkin's

**Page 41**

1  lymphoma ██████████████████████████████████
█  ████████████████████
3    A.  Yes.  I'm already aware of that, █████████
█  ████████████████████ which
5  that in itself, according to either the McDuffie or
6  Eriksson 2008 study, I forget which, was found as an
7  additional risk factor, so I'm already aware of
8  that, and his Roundup use certainly would add to
9  that underlying risk factor.
10    Q.  Did you see in Mr. Janzen's deposition where
11  he stated that some fungicides, occasionally mixed
12  with insecticides, are sprayed on his property
13  through aerial spraying?
14      MR. KRISTAL:  Object to form.
15    A.  Yeah, he stated that at his farm there were
16  aerial applications of some fungicides, and
17  occasionally there was some insecticides in it.
18    Q.  Do you know which fungicides were sprayed on
19  Mr. Janzen's property?
20    A.  No.
21    Q.  Did you take any steps to attempt to
22  determine what fungicides those were?
23    A.  No, and the reason is I'm not aware of any
24  fungicides that are class 2A carcinogens or cause
25  NHL.  There are none.

11  (Pages 38 to 41)

William R. Sawyer, Ph.D.

## Page 42

1    Q.  Did you attempt to determine which
2  insecticides were aerially sprayed on Mr. Janzen's
3  property?
4    A.  I did not, and for the same reason.  There
5  are no insecticides that I have evaluated to date
6  that cause NHL.
7    Q.  Mr. Petty found a minimum of 515.8 exposure
8  days and a maximum of 928.1 exposure days for
9  Mr. Janzen.  Is that correct?
10    MR. KRISTAL:  Where are you looking?
11    Q.  Page 7 of your report.
12    MR. KRISTAL:  Thank you.  Object to the form
13  of the question.
14    A.  Yes.
15    Q.  Based on the number of hours Mr. Petty
16  calculated, you came up with a mean exposure day
17  calculation of 722.3 days for Mr. Janzen?
18    A.  Yes, and I should add that would be about 10
19  percent higher if I subtracted out the years between
20  2013 and '15.
21    Q.  Are you aware that Mr. Janzen made his own
22  calculation of his Roundup exposure days?
23    A.  No.
24    (Sawyer Exhibit 4 was marked for identification.)
25  BY MS. COPE-KASTEN:

## Page 43

1    Q.  I'm going to mark as Exhibit 4 to your
2  deposition Exhibit 6 to Mr. Janzen's deposition,
3  which is a Roundup summary exposure that Mr. Janzen
4  testified he created for himself.  Have you seen
5  this before?
6    A.  It may be one of his attached exhibits to
7  the deposition.  I'm not sure.
8    Q.  You can check if you like, but based on the
9  sticker at the bottom and Mr. Janzen's testimony,
10  this is Exhibit 6 attached to his deposition.
11    A.  All right.
12    Q.  If you look at the total that Mr. Janzen has
13  listed at the bottom, he came up with 243.625
14  exposure days for himself.  Do you see that?
15    A.  Yes.
16    Q.  Do you know why Mr. Petty ended up with two
17  to three times more exposure days for Mr. Janzen
18  than Mr. Janzen believes he was exposed to Roundup?
19    A.  No.  I'd defer you to Mr. Petty.
20    Q.  Did you do anything to attempt to reconcile
21  those two numbers?
22    A.  No.  I relied on Stephen Petty, who is a
23  CIH, and I relied on his calculation.
24    Q.  Would you agree with me that if Mr. Petty's
25  calculation came out to 722.3 mean Roundup exposure

## Page 44

1  days, and Mr. Janzen's calculation was 243.625
2  Roundup exposure days, either Mr. Petty or
3  Mr. Janzen has to be wrong about how many total days
4  he was exposed to Roundup?
5    MR. KRISTAL:  Objection; assumes facts.
6    A.  Look, I have not evaluated the exposure day
7  calculations, so I'm just not in a position to guess
8  at who is right or wrong.  All I can tell you is
9  that if it were 20 -- 243 hours is still 24 times
10  above the maximal threshold in the studies that I've
11  referenced and relied on.  It's an enormous day --
12  number of exposure days any way you look at it.
13    Q.  Is someone with 244 exposure days to Roundup
14  at the same risk for developing non-Hodgkin's
15  lymphoma as someone with 928 exposure days to
16  Roundup?
17    A.  Both values exceed the threshold, maximal
18  threshold of the studies.  One of the studies did
19  show a dose response relationship, and I am not
20  going to speculate on whether or not 243 would
21  exceed the risk levels stated in the generally
22  accepted studies.  I am relying on the data as is
23  within those studies and am not going to
24  second-guess or try to allow you to divide my
25  attention into some type of methodology that has not

## Page 45

1  been tested.
2    Q.  Asking about a hypothetical Roundup
3  applicator, if a hypothetical Roundup applicator
4  sprays Roundup for 244 days, exposure days, are they
5  at the same risk for developing non-Hodgkin's
6  lymphoma as if that same person sprayed Roundup for
7  928 exposure days?
8    A.  The studies haven't evaluated that, so I am
9  not going to offer any opinion.
10    Q.  You used a phrase a moment ago, "maximal
11  threshold."  Do you recall that?
12    A.  Yes.
13    Q.  Tell me what maximal threshold means in this
14  context.
15    A.  Well, of the six referenced studies in my
16  report, the minimal thresholds are ever or never
17  used glyphosate products.  The next threshold is
18  spelled out in my report on page 13, Table 2, as
19  less or equal than two days, or greater than two
20  days; and the next threshold is greater than 10
21  days, and that is the highest threshold used in the
22  studies.
23    There is not a threshold set at 243 days and
24  that's why I am not providing an opinion to that
25  particular question.  The maximal threshold was

William R. Sawyer, Ph.D.

Page 46

1  greater than 10 days in the referenced studies.
2     Q.  Do you know how the number of 10 days was
3  chosen for the Eriksson study as a threshold?
4     A.  Is it okay if I open the Eriksson study and
5  look?
6     Q.  Go ahead.  I'll mark it as an exhibit to
7  your deposition so we can just all be on the same
8  page about that.
9     (Sawyer Exhibit 5 was marked for identification.)
10    A.  Just to be clear, would you repeat your
11  question or read it back?
12    Q.  Do you know how 10 days was chosen as the
13  threshold in the Eriksson study?
14    A.  On page 1659, under Table 2, there is an
15  entry that the number of exposed case controls, odds
16  ratios and 95 percent confidence intervals, agents
17  with more than 20 exposed subjects were also divided
18  in two groups based on median number of days among
19  exposed controls.
20       It doesn't -- that doesn't totally answer
21  the question, so I don't see a direct answer in the
22  study.
23    Q.  Is it accurate to say -- and I don't want to
24  put words in your mouth here, so I'm asking is it
25  accurate to say that you have not attempted to

Page 47

1  determine how much a person's risk for non-Hodgkin's
2  lymphoma might increase once they are beyond the
3  threshold, it's your opinion that if they are beyond
4  the 10-day threshold, Roundup is a substantial
5  contributing factor to their non-Hodgkin's lymphoma?
6     A.  Well, clearly the six studies that have
7  various thresholds, 10 is the most demanding, and
8  there is statistically and significantly increased
9  odds ratios associated with exposures greater than
10  10 days.  In fact, even lower thresholds show
11  statistically significant increases, as seen within
12  the metaanalysis studies.
13       So, yeah, it's my opinion that there is
14  increased risk above that threshold, yes.
15    Q.  Is it your opinion that any person exposed
16  to greater than 10 lifetime days of Roundup who
17  subsequently develops non-Hodgkin's lymphoma has
18  Roundup as a substantial contributing factor to that
19  non-Hodgkin's lymphoma?
20       MR. KRISTAL:  Objection.
21    A.  I don't understand.
22       MR. KRISTAL:  Incomplete hypothetical.
23    Q.  If a person is diagnosed with non-Hodgkin's
24  lymphoma, and they have had greater than 10 days of
25  exposure to Roundup, is it your opinion that Roundup

Page 48

1  will always be a substantial contributing factor to
2  that individual's non-Hodgkin's lymphoma?
3     A.  That depends on several factors.  So the
4  answer is yes if the various factors are met, and
5  that would be assessment of the temporality and
6  latency period, assessment of the conditions of
7  exposures, and also assessing the days of exposure
8  as eight-hour time-weighted exposure days consistent
9  with Eriksson 2008, who used the full working day in
10  Sweden, which is eight hours, in the dose metrics,
11  and in that case, yes.
12    Q.  Do the epidemiology studies that you are
13  relying on here factor into their conclusions the
14  temporality or latency for an applicator's use of
15  glyphosate or Roundup?
16       MR. KRISTAL:  Object to form.
17    A.  Only the studies that I tabulated in my
18  report on page 120 have, to some extent, addressed
19  that question.
20    Q.  When you say conditions of exposure is a
21  factor that you would consider in determining
22  whether Roundup is a substantial contributing factor
23  to a person's non-Hodgkin's lymphoma, what do you
24  mean by conditions of exposure?
25    A.  Assessment of the exposures with respect to

Page 49

1  clothing, equipment, PPE, that are relevant
2  ultimately to verifying whether or not systemic dose
3  occurred.  So if that person was, as Attorney
4  Kristal used as an example yesterday, in a glass --
5  sealed glass sphere, that would be a zero exposure
6  in terms of systemic dosage.  The outside of the
7  glass might be wet but the individual would be free
8  of any glyphosate.
9        If a person were wearing drill coveralls,
10  leather boots, long sleeves, Neoprene gloves up to
11  the elbows, with sleeves tucked into the gloves as
12  per the recommendations of Monsanto in their
13  Herbicide Application Handbook, Exhibit 5 Domina,
14  and a face mask as recommended by internal Monsanto
15  scientists as referenced in the MONGLY, M-O-N-G-L-Y,
16  document in my report, with a head covering, as also
17  recommended, then the systemic dose would be
18  reduced; however, at levels that could still
19  approach or even exceed the AOEL level based upon I
20  believe it's the Spanish evaluation study I've
21  referenced in my report, but that would be a
22  protected circumstance.
23       An unprotected circumstance would be a home
24  gardener who is wearing shorts, T-shirt, sneakers
25  that are webbed and unsealed.

13 (Pages 46 to 49)

William R. Sawyer, Ph.D.

Page 50

1    So I evaluate the plaintiff with respect to
2 the level of personal protective gear and
3 determination of systemic dose based upon other
4 studies of similarly clothed and PPE-fitted
5 individuals, and I am not aware of any conditions
6 with respect to Mr. Janzen that would place him at a
7 systemic dose that would decrease his exposure below
8 those that I referenced in other dose metric
9 studies.
10    Q.   Have you ever seen individual data with
11 respect to personal protective equipment for the
12 participants in the six epidemiology studies that
13 you have referenced in Table 2 of your report?
14    A.   No.  The epidemiologic studies that cover
15 tens of thousands of applicators are -- provide a,
16 really, a cross-section of the full gamut of
17 exposures.  They do not specifically single out
18 applicators in certain dress codes or in specific
19 application processes, but what is known is that
20 since the year 1982, the World Health Organization
21 has issued a standard protocol for workers applying
22 pesticide products, which include herbicides, and
23 the dress code is similar to what I just presented a
24 few moments ago.  That is the standard dress code.
25    And the human epidemiologic studies are

Page 51

1 measuring a cross-section of everyone who uses
2 glyphosate products.  So it's reasonable to at least
3 reference the standard dress code, the standard PPE
4 code for the application of pesticides, and consider
5 that the human epidemiologic studies that I've
6 referenced do include people who are appropriately
7 protected.
8    Q.   Do those studies also include people who
9 are, in your words, not appropriately protected?
10    A.   Yes.  As I said, the human epidemiologic
11 studies is a cross-section of the full gamut of
12 applicators.  The studies do not pick out and select
13 out only certain types of applicators.
14    Q.   Are you able to say whether Mr. Janzen's use
15 of personal protective equipment materially differed
16 from the majority of the participants in the
17 Agricultural Health Study?
18    A.   Are you referring prior to his diagnosis or
19 after?
20    Q.   Prior to.
21       MR. KRISTAL:  Object to form.
22    A.   The six studies with dose metrics that I've
23 referenced cover a cross-section of the full gamut
24 of PPE.  They do not specify any one particular
25 level of protection.

Page 52

1    Q.   So just asking about Andreotti and the
2 Agricultural Health Study, you aren't able to
3 determine based on the information that you have
4 whether Mr. Janzen's use of personal protective
5 equipment materially differed from the majority of
6 the participants in the Agricultural Health Study
7 prior to his diagnosis for non-Hodgkin's lymphoma?
8       MR. KRISTAL:  Object to form.
9    A.   With respect to the Agricultural Health
10 Study, his level of PPE prior to his cancer
11 diagnosis was, in general, less than that in the AGH
12 study since he was inconsistent with the respect to
13 gloves, primarily.
14    Q.   What information are you relying on for the
15 opinion that the majority of the participants in the
16 Agricultural Health Study were consistent with their
17 use of gloves?
18    Just so I'm tracking, are you looking in
19 your report right now or are you looking in
20 Andreotti?
21    A.   I'm looking at the Agricultural Health
22 Study.
23    Q.   Specifically the 2018 publication?
24    A.   Well, what came up was the '96 study and I
25 was looking at the PPE.  In that study there was a

Page 53

1 discussion on protective gloves, disease rates among
2 persons who reported use of protective gloves with
3 rates of those who did not.  So there may be, as I
4 recall, some statistics with respect to
5 those percent of those who used gloves.  I know it
6 was recorded in one of these studies.
7    Q.   You're currently looking at something from
8 1996?
9    A.   That's what I'm looking at, is the Alavanja,
10 et al., Agricultural Health Study, A-l-a-v-a-n-j-a,
11 et al., and I'm not finding any statistics on
12 percentage of those wearing gloves.  Perhaps the
13 later study did but I don't have that -- it would
14 take me a moment to go through my file and find it,
15 but it's possible that the later Agricultural Health
16 Study gave a percentage on those who wore gloves,
17 those who did not, but I can state that not everyone
18 in the Agricultural Health Study wore gloves.  It
19 was a mixture and it was regionally dependent on the
20 weather.
21    In the southern states, there was a much
22 higher percentage of those who did not wear gloves
23 versus the northern states.
24    Q.   And what is that based on?
25    A.   It's based -- it's in the study.  It's a

14 (Pages 50 to 53)

William R. Sawyer, Ph.D.

Page 54

1  finding in the study, in the Agricultural Health
2  Study.
3      Q.  When you say that it's in the agricultural
4  health study, just to help me because there are a
5  number of different publications coming out of that
6  study, which specific publication are you talking
7  about?
8      A.  Well, if you would like me to take 10
9  minutes, I'll find it.  I have it, I just don't have
10 the printed copy in front of me, but it's a study
11 I've discussed in other depositions where I was
12 questioned by Monsanto with respect to gloves.
13     Q.  Do you know the name of the lead author
14 sitting here today?
15     A.  No.  It's one of the Agricultural Health
16 Studies, and it specifically studied the
17 preponderance of gloves in the northern states
18 examined versus I think North Carolina, and there
19 was a very substantial difference in the percent of
20 agricultural sprayers who wore gloves and it was
21 deemed to be weather-related.  Gloves in Florida,
22 from washing my boat in my Neoprene gloves, I can
23 literally pour the water out of my gloves when I'm
24 done from sweating, and it's very difficult to wear
25 Neoprene gloves when the heat index is 105 degrees.

Page 55

1      MR. KRISTAL:  Are you getting close to
2  ending this or -- we've been going about an hour
3  and 40 minutes or so.
4      MS. COPE-KASTEN:  We can take a break now.
5      MR. KRISTAL:  Well, if you want to finish up
6  Janzen and you only have a few more minutes,
7  that's fine.  I don't have --
8      A.  I would say keep on going, if you wish.  I
9  don't have any problem, unless the court reporter is
10 getting worn out.
11     THE COURT REPORTER:  I'm all right.
12     THE WITNESS:  And Matt will -- we'll keep
13 Matt awake.
14     THE VIDEOGRAPHER:  I need to take like a
15 one-minute break within the two hours.
16     MS. COPE-KASTEN:  Let's just take a quick
17 break right now, just a quick one, not a full --
18     THE WITNESS:  Okay.
19     THE VIDEOGRAPHER:  We're going off the
20 record at 9:41.
21     (Recess from 9:41 a.m. until 9:50 a.m.)
22     THE VIDEOGRAPHER:  We're back on the record.
23 The time is 9:50.
24 BY MS. COPE-KASTEN:
25     Q.  Dr. Sawyer, before the break we were talking

Page 56

1  about the Agricultural Health Study and personal
2  protective equipment in the study.  Do you know how
3  many states the Agricultural Health Study was
4  conducted in?
5      A.  Multiple.
6      Q.  Do you know how many participants in the
7  Agricultural Health Study were driving in enclosed
8  tractor cabs versus with open air exposure?
9      A.  No.  I know the study included roughly
10 26,000 individuals.
11     Q.  26,000 as of the 2018 update?
12     A.  No, no.  The earlier version.
13     (Discussion off the record.)
14     Q.  Do you have any information that would
15 enable you to say whether Mr. Janzen's use of
16 personal protective equipment, and in this context
17 I'm going to include at times an enclosed tractor
18 cab, materially differed from other participants in
19 the Agricultural Health Study?
20     MR. KRISTAL:  Objection.
21     A.  Okay.  I'm looking at 2018 Andreotti.  One
22 thing I note is that Andreotti does state that,
23 quote:  It is important to note that these studies
24 have been conducted in different time periods.
25 Changing agricultural practices, such as pesticide

Page 57

1  application methods and use of personal protective
2  equipment, may impact actual exposure levels.
3      So there is an admission that personal
4  protective equipment practices has changed over the
5  years, and we are looking at a fairly wide range of
6  years in the current matter, which I think goes from
7  1984 up to and past the time of diagnosis, all the
8  way to 2015.
9      I am really not finding the specific
10 information that you're asking in the current
11 Agricultural Health Study.
12     Q.  Is it fair to say then that sitting here
13 today, and after your review of the current
14 Agricultural Health Study, you don't have any
15 information to indicate that Mr. Janzen's use of
16 personal protective equipment materially differed
17 from other participants in the Agricultural Health
18 Study?
19     MR. KRISTAL:  Object to form.
20     A.  Because of the 1984 to 2015 range, and the
21 differing use of equipment practices over a similar
22 wide range of years in the various Agricultural
23 Health Studies, it's difficult to provide you with a
24 yes-no answer on that.  There's just not sufficient
25 information in the Agricultural Health Study on a

William R. Sawyer, Ph.D.

Page 58

1  year-by-year basis to make that assessment.
2      Q.   Did the Agricultural Health Study in the
3  2018 Andreotti publication find a statistically
4  significant increased risk of non-Hodgkin's lymphoma
5  with glyphosate or Roundup exposure in the fourth
6  quartile?
7      A.   No.
8          MR. KRISTAL:  Objection to form.
9      Q.   Is knowing what percentage of the time
10  Mr. Janzen used a hand or backpack sprayer as
11  compared to pulling a tank behind a vehicle, like an
12  ATV, relevant to your opinion that Roundup was a
13  substantial contributing factor to his NHL?
14      A.   Yes.  Both techniques have in common
15  exposure routes and both techniques have special
16  occasional exposures of high magnitude.  For
17  example, backpack spraying, based upon the
18  peer-reviewed study evidence and Monsanto's own
19  in-house documents, results in, very often, a wet
20  back due to leakage and/or spillage through the vent
21  onto the back.
22          In the current matter, Mr. Janzen stated it
23  was so leaky that he ended up sitting in it, in the
24  liquid from the backpack, as per his deposition I am
25  referencing.

Page 59

1          On the other hand, tractor spraying with
2  booms results in considerable hand to mouth or just
3  hand exposure due to the typical clogging of spray
4  nozzles and/or the nozzles being damaged or the
5  hoses coming loose from the nozzles due to the
6  boom's nozzles impacting objects.
7          So each methodology of spraying has its own
8  specific individual characteristics of exposure and
9  excursions of exposure with respect to the unusual
10  events that I just stated.
11      Q.   In the course of forming your opinions in
12  Mr. Janzen's case, did you attempt to parse out what
13  percentage of the time Mr. Janzen was using
14  different spray methodologies?
15      A.   No.  I relied upon exposure day metrics as
16  that's the only comparison available to the dose
17  metric studies.  I qualitatively considered these
18  excursions as long -- as well as his dress and level
19  of PPE in determining whether or not there was --
20  and to what degree, if any, protection was afforded.
21      Q.   Is there a name for the qualitative
22  methodology you used to consider those factors?
23      A.   Yes.  It's numerous studies, such as the
24  Machado study, who measured the PDE, potential
25  dermal exposure, on patches put throughout the body.

Page 60

1  These were -- the patches, specifically Carefree
2  female sanitary pads, placed on the head, face,
3  neck, arms and forearms, hands, front thorax, back
4  thorax, legs, and thigh front, legs and thigh back,
5  and feet.  Similar studies were done using adhesive
6  pads by Monsanto in their study MON2139, and in
7  other publications as well that I've referenced and
8  have followed.
9          And the methodology has also been assessed
10  using the POEM model, but the methodology actually
11  measures the amount of spray and spray drift or
12  leakage on various parts of the body, and studies
13  that I also have referenced, and some of which are
14  actually referenced within Machado, provide
15  coefficient of penetration through various types of
16  clothing, for example, cotton pants at 20 percent.
17          And I've also fully referenced the available
18  studies on dermal absorption once that -- the
19  glyphosate Roundup material makes it to the skin
20  through clothing, and the dermal absorption rate of
21  three percent resulting in systemic circulation.
22  These are all peer-reviewed methodologies that I've
23  referenced, nothing that I have self-created, and
24  that is what I used in assessing Mr. Janzen's
25  exposure and propensity for systemic dose, and that

Page 61

1  is consideration of protective gloves, face
2  protection, coveralls, rubber boots, waterproof
3  jacket, waterproof trousers, rubber boots.  These
4  are all factors and recommendations made by
5  Monsanto, by their in-house scientists, to reduce
6  exposures, and I considered those factors and the
7  factors of the World Health Organization, 1982, for
8  standard dress for applying pesticides, and I
9  considered these factors when assessing Mr. Janzen's
10  exposure, and I also considered the label that, for
11  some reason, doesn't include most of these factors.
12      Q.   My question was just is there a name that
13  you use that you call that methodology?
14      A.   Are you asking me the methodology in
15  determining the systemic dose?
16      Q.   I'm asking you about the qualitative
17  methodology you said you used to consider a number
18  of factors beyond exposure days.  Does that
19  methodology have a name?
20      A.   Well, what's commonly referred to in the
21  literature and by Monsanto is, initially, potential
22  dermal exposure.  That is defined as the amount of
23  herbicide impacting the exposed skin or the outer
24  clothing of the body.  The PDE is then per equation
25  and I can just pick one.  I'll pick Machado-Neto,

16 (Pages 58 to 61)

William R. Sawyer, Ph.D.

## Page 62

1  M-a-c-h-a-d-o-N-e-t-o, year 2000.
2      The equation assesses the PDE via different
3  application methods, such as lever-operated
4  knapsack, which is a backpack, or a tractor driver,
5  or mixing solution, and various types of
6  tractor-trailer boom applications, and resulting
7  personal -- or I mean potential dermal exposure,
8  which is then multiplied by the clothing
9  permeability depending on what part of the body.
10  For example, boots is only I think 1 percent,
11  whereas pants is 22.4 percent.
12      And different studies have somewhat
13  different values. I think the PEOM method, UK PEOM
14  uses 20 percent through cotton clothing. Other
15  studies have shown much higher percentages if the
16  clothing becomes wet.
17      So there isn't any particular name for what
18  you're asking. It's simply a measure of initially
19  dermal -- potential dermal exposure and then
20  quantifying that by the permeability of the
21  protective gear, and then assessing that by
22  multiplying the skin contact level by the dermal
23  absorption rate and assessing the square centimeters
24  of each of the body regions impacted. There have
25  been approaches of that type published by -- in the

## Page 63

1  literature and by Monsanto.
2      Q.  Did you calculate a potential dermal
3  exposure for Mr. Janzen?
4      MR. KRISTAL:  Objection; asked and answered.
5      A.  No, I did not make a quantitative dose
6  calculation as there is nothing to compare it to in
7  the dose metric human studies. That could be
8  compared to an animal study, but toxicologists do
9  not offer causation opinions based on animal models.
10      The AOEL is an operator exposure level which
11  can be used just to compare whether a dose is in the
12  range of the AOEL, but it doesn't tell us anything
13  in terms of whether or not -- that that level is not
14  designed for cancer. It's designed for reproductive
15  hazard in animals. So the AOEL is not a level that
16  is a threshold of cancer.
17      So there is a certain amount of information
18  that a milligram per kilogram dose level can provide
19  and it's pretty minimal, because the studies that
20  have been generally accepted and published on humans
21  with respect to induction of NHL use exposure years,
22  not milligram per kilogram body weight measurements.
23      Q.  Do you intend to offer an opinion at trial
24  that compares Mr. Janzen's clothing to studies like
25  the Machado study that you just discussed with

## Page 64

1  respect to what his potential dermal exposure might
2  have been?
3      A.  Probably.
4      Q.  Is that information contained anywhere
5  within your report?
6      A.  Yes.
7      Q.  Where in your report can I find a comparison
8  between Mr. Janzen's clothing and the clothing in
9  any given study that you have looked at?
10      MR. KRISTAL:  Can I just state something?
11  Because it's going to be buried I think in the
12  context of the last answer. Dr. Sawyer said
13  exposure years. I think that was just a
14  misstatement. You meant exposure days?
15      THE WITNESS:  Correct.
16      MR. KRISTAL:  I was going to ask later but
17  by that time it would be buried. Thank you.
18      A.  On page 16 and 17 I reference Machado-Neto,
19  year 2000, I explained how the study was conducted,
20  and on page 17 I provide exposure measures for total
21  dermal exposure of a backpack sprayer similar to
22  that of Mr. Janzen at 1945 milligrams per day as a
23  PDE, with penetration through the clothing onto the
24  skin of 253.9 milligram per day, and I also
25  reference the penetration values at 20 percent,

## Page 65

1  5 percent and 1 percent for rubber gloves. I'm
2  sorry. It was -- the 20 percent was overalls and
3  hoods, 5 percent for boots, 1 percent for rubber
4  gloves, 1 percent for facial mask.
5      Two percent dermal absorption was used by
6  Machado. I prefer to use three percent, which has
7  been generally accepted in the past and is
8  consistent with the studies up to the point of about
9  2008.
10      Q.  You would agree with me that nothing on
11  these pages references Mr. Janzen?
12      A.  No. I'm referencing studies -- different
13  studies that mirror what he did. I don't have any
14  way of going back in time and measuring his exact
15  dose.
16      Q.  Where -- what I'm asking is where in this
17  report can I find the opinions that you intend to
18  give with respect to what Mr. Janzen's potential
19  dermal exposure would have been in line with the
20  information that was published in these studies?
21      A.  Well, he --
22      MR. KRISTAL:  Object to form.
23      A.  Some of the application processes carried
24  out mirror these individuals; however, these would
25  be a severe underestimate as they were fully

17 (Pages 62 to 65)

William R. Sawyer, Ph.D.

---

## Page 66

1   protected with head covering, face mask, Neoprene
2   gloves, drill pants -- which I've researched. I
3   know what drill pants look like -- and leather
4   boots.
5        MR. KRISTAL: There was a joke embedded in
6   there.
7        MS. COPE-KASTEN: I gathered as much.
8   A.  It was pretty funny, too, but at any rate --
9        MR. KRISTAL: Funny but not appropriate for
10  depositions.
11       THE WITNESS: No. Google drill pants,
12  you'll see what I mean.
13  A.  But, at any rate, the fact is this study is
14  interesting in that it provides different scenarios
15  that mirror Mr. Janzen, and provide quantitative
16  data and penetration values from sprayers who are
17  spraying a highly water soluble surrogate and
18  actually doing laboratory measurements on the
19  Carefree pads that were placed on the various areas
20  of the body, and then actually measuring how much
21  penetrated through the various protective gear.
22       So this would represent a severe
23  underestimate, because Mr. Janzen, until his later
24  years of application, did not wear head covering,
25  face mask, rubber gloves or Neoprene gloves up to

---

## Page 67

1   his elbow, with long sleeve shirts and drill
2   coveralls, but, rather, he was less protected and,
3   thus, these numbers do mirror his exposure but
4   underestimate them.
5   Q.  And that is the opinion that you intend to
6   offer to the jury?
7   A.  Certainly. Do you disagree with that?
8        MR. KRISTAL: It doesn't matter whether Cali
9   agrees or disagrees.
10  A.  But it's a peer-reviewed validated study.
11  It's not something that I self-proclaimed and
12  created that has been untested. There is multiple
13  other studies and this is just one of them.
14  Q.  Do you know when the first non-Hodgkin's
15  lymphoma cancer cell appeared in Mr. Janzen's body?
16  A.  No. There is no methodology to be able to
17  make such a determination.
18  Q.  Do you know whether there was any Roundup in
19  Mr. Janzen's system at the time he developed his
20  first non-Hodgkin's lymphoma cancer cell?
21  A.  No. There is no methodology available for
22  such a determination.
23       MS. COPE-KASTEN: Thank you, Dr. Sawyer.
24  That's all the questions that I have for now. I
25  will turn it over to Mr. Kristal.

---

## Page 68

1        MR. KRISTAL: I have no questions.
2        THE VIDEOGRAPHER: This concludes the
3   deposition. The time is 10:21.
4        (Whereupon, the deposition concluded at
5   10:21 a.m.)

---

## Page 69

1        C E R T I F I C A T E
2   I, SUSAN D WASILEWSKI, Registered
3   Professional Reporter, Certified Realtime Reporter,
4   Certified Realtime Captioner, and Florida
5   Professional Reporter, do hereby certify that,
6   pursuant to notice, the deposition of WILLIAM R
7   SAWYER, Ph D , was duly taken on Friday,
8   November 15, 2019, at 8 01 a m , before me
9        The said WILLIAM R SAWYER, Ph D , was duly
10  sworn by me according to law to tell the truth, the
11  whole truth and nothing but the truth and thereupon
12  did testify as set forth in the above transcript of
13  testimony  The testimony was taken down
14  stenographically by me  I do further certify that
15  the above deposition is full, complete, and a true
16  record of all the testimony given by the said
17  witness, and that a review of the transcript was
18  requested
19
20  _____
21  Susan D  Wasilewski, RPR, CRR, CCP
22  (The foregoing certification of this transcript does
23  not apply to any reproduction of the same by any
24  means, unless under the direct control and/or
25  supervision of the certifying reporter )

---

William R. Sawyer, Ph.D.

| Page 70 |
|---|

```
 1              INSTRUCTIONS TO WITNESS
 2
 3
 4        Please read your deposition over carefully
 5   and make any necessary corrections.  You should
 6   state the reason in the appropriate space on the
 7   errata sheet for any corrections that are made.
 8
 9        After doing so, please sign the errata sheet
10   and date it.  It will be attached to your
11   deposition.
12
13        It is imperative that you return the
14   original errata sheet to the deposing attorney
15   within thirty (30) days of receipt of the deposition
16   transcript by you.  If you fail to do so, the
17   deposition transcript may be deemed to be accurate
18   and may be used in court.
19
20
21
22
23
24
25
```

| Page 72 |
|---|

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2
 3        I, _____, do hereby
 4   acknowledge that I have read the foregoing pages, 1
 5   through 71, and that the same is a correct
 6   transcription of the answers given by me to the
 7   questions therein propounded, except for the
 8   corrections or changes in form or substance, if any,
 9   noted in the attached Errata Sheet
10
11
12   _____   _____
13   WILLIAM R  SAWYER, Ph D            DATE
14
15
16
17
18   Subscribed and sworn to before me this
19   _____ day of _____, 20____
20   My Commission expires: _____
21
22   _____
     Notary Public
23
24
25
```

| Page 71 |
|---|

```
 1            ------
 2          E R R A T A
 3            ------
 4   PAGE  LINE  CHANGE
 5   ____  ____  _____
 6      REASON: _____
 7   ____  ____  _____
 8      REASON: _____
 9   ____  ____  _____
10      REASON: _____
11   ____  ____  _____
12      REASON: _____
13   ____  ____  _____
14      REASON: _____
15   ____  ____  _____
16      REASON: _____
17   ____  ____  _____
18      REASON: _____
19   ____  ____  _____
20      REASON: _____
21   ____  ____  _____
22      REASON: _____
23   ____  ____  _____
24      REASON: _____
25
```

| Page 73 |
|---|

```
 1            LAWYER'S NOTES
 2   PAGE  LINE
 3   ____  ____  _____
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25
```

19 (Pages 70 to 73)