# EXHIBIT 5

## *TCAS*

**Toxicology Consultants & Assessment Specialists, LLC**

Toxic Exposures · Environmental Testing · Risk Assessment · Forensic Toxicology · Causation Evaluation

January 14, 2019

Jeffrey Travers, Esq.
Curtis Hoke, Esq.
The Miller Firm, LLC
108 Railroad Avenue
Orange, VA  22960

**Re: Alva and Alberta Pilliod v. Monsanto Co.**

Dear Attorneys Travers and Hoke:

Per your request, I have reviewed the documents noted below.  Based upon the information provided and application of generally-accepted toxicological methodology and referenced sources as cited herein, I have stated my opinions in this matter.

- Plaintiff Facts Sheets for Alva and Alberta Pilliod
- Medical records for Alva and Alberta Pilliod
- Deposition of Robert Fisher, M.D., Ph.D., dated December 17, 2018
- Deposition of Alva Pilliod dated December 21, 2018
- Deposition of Alberta Pilliod dated December 20, 2018
- Photographs from Alva and Alberta Pilliod
- Numerous peer-reviewed, generally accepted studies (as referenced and footnoted)
- Monsanto Company documents (as referenced)

# CONTENTS

Part A: Medical History and Exposure Review ........................................................................ 1

  Alberta Pilliod.................................................................................................................... 1

    General Information.................................................................................................... 1

    Health Factors........................................................................................................... 1

    Family History........................................................................................................... 1

    Alcohol, Tobacco and Employment History............................................................ 2

    Summary of Non-Hodgkin's Lymphoma Diagnosis................................................. 2

    Deposition of Alberta Pilliod dated December 20, 2018.......................................... 3

  Alva Pilliod ....................................................................................................................... 7

    General Information.................................................................................................... 7

    Health Factors........................................................................................................... 7

    Family History........................................................................................................... 7

    Alcohol, Tobacco and Employment History............................................................ 7

    Summary of Non-Hodgkin's Lymphoma Diagnosis................................................. 8

    Deposition of Alva Pilliod dated December 21 2018 ............................................... 8

Part B: Assessment of Exposure to Roundup®..................................................................... 10

  General Information Regarding Use of Roundup by the Pilliods ...................................... 10

    Phone Interview with Alberta and Alva Pilliod, January 8, 2019 ........................... 10

    Roundup Application Notes..................................................................................... 10

    Notes on Personal Protection.................................................................................. 11

    Application Frequency ............................................................................................. 12

Part C: Dose Calculation of the Pilliods to Roundup® (mg/kg-day)....................................... 13

  Evaluating the Pilliods' systemic Glyphosate Exposure from Roundup Use.................... 13

    Volume of Roundup Sprayed by the Pilliods ........................................................... 13

    Roundup Dose........................................................................................................ 14

    Body Weight Assessment & Use of the POEM Methodology ................................ 15

      Alva Pilliod's Glyphosate Dose at ████████████.................................. 16

      Alberta Pilliod's Glyphosate Dose at ████████████ ............................... 17

      Validation of the "UK Predictive Operator Exposure Model" (UK POEM) ........... 20

      Dermal Absorption Rate Used in UK POEM Methodology ................................... 21

      Pilliod Glyphosate Exposure Compared to Three Epidemiological Studies ................ 22

      Pilliod Exposure Comparison to Exposure Rate Studies ..................................... 23

      Comparison of Mr. and Mrs. Pilliod's Dose to Other Glyphosate Applicators ............... 24

  Summary of Exposure Dose Calculations ...................................................................... 25

Part D: Introduction to Glyphosate Exposure & Toxicity - Monsanto's Glyphosate Biomonitoring and Dose
Measurement Reliability...................................................................................................... 26

  Glyphosate (Roundup®) History and Use ...................................................................... 28

    Contaminants within Roundup® (Surfactants, Adjuvants and Co-formulants) ................ 29

    Carcinogenic Substances in Roundup®................................................................. 33

    Genotoxic Agents, Promotors and Inadequately Studies Chemicals....................... 34

    Modes of Action and Safety Considerations ......................................................... 34

  Glyphosate (Roundup®) Formulations: Chemical and Physical Information ..................... 36

  Toxicological Considerations of Mr. & Mrs. Pilliod's Exposure and Dose ........................ 41

Glyphosate Exposure ............................................................................................................. 41

Systemic Dose ........................................................................................................................ 41

Routes of Exposure ............................................................................................................... 42

   Ingestion .............................................................................................................................. 42

   Inhalation ............................................................................................................................. 42

   Dermal Absorption .............................................................................................................. 42

Mechanisms of Absorption ................................................................................................... 43

   The Dermal Barrier ............................................................................................................. 43

   Percutaneous Absorption of Glyphosate ........................................................................... 46

   Percutaneous Absorption Models ....................................................................................... 47

   Dermal Absorption In Vitro Measurement Methods ........................................................... 48

   Other Measurement Models and Methods ......................................................................... 49

Dosing Techniques and Measurement Considerations ........................................................ 50

   In Vitro Dermal Absorption of Herbicides through Rat versus Human Skin ...................... 51

   "Triple Pack" Methodology .................................................................................................. 51

**Dermal Absorption and Pharmacokinetic Studies of Glyphosate** .......................................... 53

Models Used to Measure Glyphosate Dermal Absorption ................................................... 53

   Maibach Study (1983) ........................................................................................................ 53

   Wester, et al., Study (1991) ............................................................................................... 56

   Concern of Cross-Contamination in the Wester, et al., study (1991) ................................ 59

Review of Monsanto Studies ................................................................................................ 61

   Monsanto in Vitro Absorption Study of Glyphosate by DTL (2010) - (MON 79545) 450 g/L
   Glyphosate SL Formulation (MON 79545) .......................................................................... 61

   Monsanto in Vitro Absorption Study of Glyphosate by DTL (2010) - (MON 52276) .......... 65

   Monsanto in Vitro Absorption Study of Glyphosate by DTL (2010) - (MON 79351) .......... 65

   Monsanto in Vitro Absorption Study of Glyphosate by DTL (2015) - (MON 76829) 72 g/L
   Glyphosate Gel Formulation ............................................................................................... 66

   Monsanto in Vitro Absorption Study of Glyphosate by DTL (2015) - (MON 76258) 7.2g/L
   Glyphosate Gel Formulation .............................................................................................. 67

   Monsanto in Vitro Absorption Study of Glyphosate by DTL (2016) - (MON 76952) 500 g/L
   Glyphosate SL Formulation ................................................................................................ 69

   Monsanto in Vitro Absorption Study of Glyphosate by DTL (2015) - (MON 76879) 360 g/L
   Glyphosate SL Formulation ................................................................................................ 71

Effects of Temperature on Skin Used in Laboratory Experiments ....................................... 74

**Studies, Reviews & Articles Impacted by Wester and Maibach Studies** ................................ 84

Regulatory Guidance on Dermal Absorption and Recovery ................................................ 88

Errors and Omissions in Monsanto Communications .......................................................... 89

Factors Intensifying Dermal Absorption of Glyphosate ....................................................... 94

   Co-Formulants .................................................................................................................... 95

   Surfactants .......................................................................................................................... 96

   Indirect Disclosures of Surfactant and Co-Formulant Toxicity .......................................... 98

Examples of Surfactant and Co-Formulant Toxicity ............................................................. 99

Regulatory Considerations Based on Surfactant and Co-Formulant Toxicity ...................... 100

   Monsanto TNO Dermal Penetration Study with Co-Formulant Cocoamine ...................... 101

   Humectants ......................................................................................................................... 105

   Adjuvants ............................................................................................................................ 105

Enhanced Absorption Due to Skin Damage ................................................................... 106
Glyphosate's Role in Skin Damage .......................................................................... 107
Lack of Personal Protective Equipment (PPE) ............................................................ 107
Other Factors Increasing Dermal Absorption ............................................................. 108

Part E: Toxicological Assessment of Mr. & Mrs. Pilliod's Exposure to Glyphosate (Systemic Exposure &
Mechanism of NHL Induction) ....................................................................................... 110
Roundup and Glyphosate Genotoxicity ........................................................................ 110
Non-Hodgkin's Lymphoma Latency Estimates (Mr. & Mrs. Pilliod's NHL) ......................... 112

Part F: Summary of Objective Toxicological Factors ........................................................ 115
Evidential Considerations ............................................................................................ 115
Summary and Conclusions .......................................................................................... 117

Pilliod v. Monsanto Co.
January 14, 2019
Page 1

## Part A: Medical History and Exposure Review

### Alberta Pilliod

#### General Information

Alberta Pilliod is a white female born on ███████████████
██████████████████████████████████ She has been married to Alva Pilliod
for the past 48 years and the couple now reside at a home at ████████████
██████████ which they purchased in approximately 1982.  A former school teacher and
school administrator (including principal), she retired in 2004.  Beginning in 2005, she
continued to work as an administrator on an "as needed" basis as well as traveled
extensively with her husband.  However, due to her diagnosis of non-Hodgkin's
lymphoma (NHL) in the spring of 2015, she was unable to continue any further
employment or travel.

#### Health Factors

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████

Mrs. Pilliod described herself as extremely healthy up through February of 2015.  Several
weeks later, however, she presented to her physician ████████████████████
██████████████████████████████████ However, her physician referred
her to a neurologist.  After a brain biopsy was completed, a primary CNS lymphoma (NHL)
was diagnosed in April 2015.  Although she had a relapse in July 2016, she is currently
in remission.

#### Family History

Mrs. Pilliod's father died ███████████████████████████████
████████████████████████ Her mother died ████████████████████
██████████████████████████

Pilliod v. Monsanto Co.
January 14, 2019
Page 2

**Alcohol, Tobacco and Employment History**

Records and deposition testimony indicate that Mrs. Pilliod ████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

**Table 1**

**Employment History – Alberta Pilliod**



**Summary of Non-Hodgkin's Lymphoma Diagnosis**

Mrs. Pilliod initially presented to physicians in March of 2015 with vertigo, gait instability, intermittent diplopia and headaches that had developed ten days prior. A CT scan of the head on March 12, 2015, was negative for any acute abnormality. Two days later, she suffered a fall and hit her head on the bathroom floor. A repeat CT scan on March 14, 2015, revealed a stable, hyper-dense, region within the right inferior anterior cerebellum and midbrain. A follow-up CT scan of the chest, abdomen and pelvis did not reveal any primary malignancies. Initially thought to be a cerebellar stroke per an MRI, a lumbar puncture revealed high levels of white cells and protein indicating infection or inflammation. She was treated with steroids and released with follow-up instructions for another MRI and an appointment with the neurology clinic on April 6, 2015.

The next MRI on April 6, 2015, revealed changes favoring a cellular process such as lymphoma given the low apparent diffusion coefficient (ADC) values and mild increased perfusion surrounding the fourth ventricle. There was no evidence of supratentorial leptomeningeal disease. The increased size of the ventricles was consistent with a component of obstructive hydrocephalus, likely secondary to the increasing mass effect upon cerebral aqueduct. She underwent a staging PET scan on April 8, 2015, which confirmed an FDG-avid multi-lobulated mass lesion in the right cerebellar vermis, crossing the midline and also another hyper-metabolic lesion on the floor cerebral

Pilliod v. Monsanto Co.
January 14, 2019
Page 3

aqueduct. The lesions correlated with the brain MRI findings and were consistent with central nervous system (CNS) lymphoma. Following a brain biopsy of the posterior fossa on April 9, 2015, the pathology results revealed abnormal lambda monotypic B-cell population, expressing CD19, CD20, CD23 and CD38, negative for CD10. FISH was negative for BCL2, BCL6 and MYC.  These findings were all consistent with diffuse large B-cell lymphoma.

After receiving treatment, a repeat MRI brain on July 31, 2016, revealed two new abnormal enhancing lesions in the right lateral ventricle (5 x 5 x 6 mm) and right periventricular white matter (6 x 8 x 9 mm) which was concerning for disease recurrence in a patient with a prior history of CNS lymphoma.

Mrs. Pilliod was treated at the University of California's San Francisco medical center with methotrexate, temozolomide, and rituximab (MT-R) chemotherapy in October, 2016.  She also completed consolidation with etoposide and cytarabine. Her most recent MRI of the brain in October 2017 shows no evidence of disease. She is currently prescribed Revlimid® (lenalidomide) 5 mg daily, three weeks on and one week off.

**Deposition of Alberta Pilliod dated December 20, 2018**

Mrs. Pilliod characterized both herself and her husband as "exclusive" Roundup users and herself as a "real sprayer"[1] because she believed Roundup was "extremely safe to use.  I told my husband it was like sugar water. It was no danger. It was safe on animals. Just safe for everything."[2]  She understood this based on TV commercials she had seen, but had never done any research on the product herself.  She noted that she had only read the label on Roundup bottles for approximately the first two times of use but admitted that "the labels probably changed somewhat" over the years.

The Pilliods have owned several properties since their marriage.  Varying amounts of Roundup were used on the properties according to the size and degree of rain received in each area:

- █████████████████ – This property was purchased in approximately 1982 and is the current residence of the couple.  It consists of 10,000 square feet (1/4 acre)

---

[1] Deposition of Alberta Pilliod dated December 20, 2018, page 126.

[2] Id., page 84.

Pilliod v. Monsanto Co.
January 14, 2019
Page 4

with a 1,700 square foot house, a short driveway, a pool with a large cement patio,[3] three raised vegetable gardens and walking paths.  Mrs. Pilliod stated that they began using Roundup shortly after purchasing this home; however, as this location did not have the rainy conditions of other properties they owned, the weeds were not as insidious. They resprayed the same areas of the property probably once every two months for nine months of the year.

- ████████████████████████ – The Pilliods owned this three acres of undeveloped property from 2001-2004.  It was purchased with the intent to build a new home on the top, flat portion of the property. During the first six months of ownership, high brush was cleared and then the couple began spraying one acre where the house would be built as well as along a long driveway and around a fence (noted to stretch around the perimeter of the property). As there was no water at this location, occasionally bottled water was brought along to dilute the super concentrate or it was premixed at home in a tank sprayer for use at ████████████████.[4] Generally, however, they used the ready-to-use formulation of Roundup and due to wet conditions in the valley, sprayed once per month by canvassing the entire property for weeds.  Ultimately, they never built a house but sold the land in 2004.

- ████████████████████████ – Mrs. Pilliod described this property as being one acre with a small house in poor shape on it (less than 1,000 square feet) as well as a barn, chicken coop, small 12 x 12 fenced-in area, large circular driveway and a fence.  She noted that this was a very weedy area due to rainy conditions in Valley Springs and they went over the entire property once per month with Roundup.  This property was purchased in 2004 but the Pilliods only used Roundup on it up until 2011 when it became occupied as a rental home.

- 4████████████████████████ – Owned from 2008 to 2010, this one acre property was noted to be sprayed less than other properties just to make it more presentable.  It contained a 1,200-1400 square foot house and a barn as well

---

[3] Mrs. Pilliod stated that they sprayed a lot around the pool and cement area to keep weeds from coming up.

[4] Per telephone conversation with Mrs. Pillioid on January 14, 2019.

[5] Mrs. Pilliod confirmed via telephone call on January 11, 2019, that the house number given in her deposition, 7108, was incorrect and it was actually ████████████████

Pilliod v. Monsanto Co.
January 14, 2019
Page 5

as a fence and took approximately two hours to do a complete spray.  Mrs. Pilliod characterized this as approximately ½ hour per week.

- ███████████████████████████████ – The Pilliods did not spray any Roundup on this property as it was rented out to their daughter.

Mrs. Pilliod usually sprayed Roundup in the mornings or evenings.  She tried to avoid spraying "on real windy days" or when it was wet or rainy outside.  While she believes the package label specified that the product shouldn't be used on windy days, to her, it was just "common sense."  Typically, they used Roundup from February through October of each year (9 month period) on each property.

The couple used both the super concentrated and ready-to-use versions of Roundup but more often than not used the ready-to-use in the 1.33 gallon-sized jug.  (She estimated that 15% of the time the concentrate was used while 85% of the time, the ready-to-use version was used.)  When using the concentrated formulation, she sprayed using a small, gallon-sized hand pump sprayer.  She never used a backpack-type sprayer.

Per Mrs. Pilliod's testimony, if they were using the concentrated version, her husband would always perform the dilution of concentrate with water according to "whatever it said, I imagine."[6]  When mixing (as well as spraying), he typically wore jeans, tennis shoes, long-sleeved cotton shirt or T-shirt and a straw hat.  (Mrs. Pilliod noted that because of ████████████████████████ █████████████████████████████ ████████  He never wore gloves or a dust mask.  She does not think he washed his hands after mixing the product with any consistency. Her husband did spill the Roundup on himself while mixing it "probably 2-3 times."  If it was on his hands, he would wash them; if on his clothes, he would ignore it.

Mrs. Pilliod typically wore shorts and flip flops with a tank top or t-shirt when spraying.  Occasionally, she wore long pants when at the ████████ or ████████ properties because the weeds were much worse there.  She estimates that approximately 20 times she got the spray on her hands due to carelessness, wind and/or mist.  She would not wash her hands unless it was a lot of spray; she generally just wiped her hands off in the dirt.  She also recalled getting spray on her feet, approximately ten times, but did not wash her feet

---

[6] Deposition of Alberta Pilliod, page 93.

[7] Many episodes on his hands, face, arms, legs and chest – former Southern California surfer.  First episode was in the '70s prior to the use of Roundup.

Pilliod v. Monsanto Co.
January 14, 2019
Page 6

even though she was only wearing flip flops.  Occasionally, she got spray on her legs (approximately five times) when she was in the vicinity of where her husband was spraying. She did not wash it off. She never wore gloves when spraying and her prescription eyeglasses were her only eye protection.

After she finished spraying weeds, she did not do anything in particular to make sure there was no residual Roundup remaining on her person. She would wash up (not a shower) when she went back into the house although not necessarily right after she used Roundup.  She continued to wear the clothes that she had been spraying the Roundup in for the rest of the day and had no particular clothes specific for outdoor yard activities.

With respect to other chemical products used on their properties, Mr. Pilliod applied a dormant spray[8] on their fruit trees between one and three times per year.  She is not sure if that is a pesticide but she never handled it.  She used Miracle-Gro on their three raised vegetable gardens where they grew strawberries, tomatoes, zucchini, radishes and watermelons for personal consumption.

Prior to their cancer diagnoses and for approximately one year, the Pilliods had a professional exterminating company spray around the outside of their home at ██████ ██████ for ants and sow bugs but discontinued this service due to its expense. Mrs. Pilliod believes that they may have used Decon to poison mice.

Mrs. Pilliod used an Avon product (Skin So Soft) on her skin which is known to repel insects.  She also recalled using "Cutter" and "Off" approximately five times each over the years but stopped using these products because they contained Deet.

She did not use Roundup while undergoing chemotherapy and the couple completely discontinued use of Roundup on their properties in January 2017 when they realized that there was a possible connection between glyphosate and their NHL diagnoses.  The couple now control weeds with a mixture of vinegar and salt water.

---

[8] The product Mrs. Pilliod is referring to is a horticultural dormant spray oil concentrate designed as a self-emulsifying spray composed of paraffinic oil. The use of the oil provides a wet "envelop" to smother over-wintering eggs of European red spider mites, apple aphids, etc. The product's MSDS states that the product been evaluated and "tests on laboratory animals with highly-refined oils such as those contained in this product have shown no evidence of carcinogenicity. None of the other components in this product are listed by IARC, NTP or OSHA as a carcinogen.  (Bonide All Seasons Horticultural & Dormant Spray Oil Concentrate, MSDS ID # 480)

Pilliod v. Monsanto Co.
January 14, 2019
Page 7

## Alva Pilliod

### General Information

Alva Pilliod is a white male born on ██████████████████. He grew up in California and graduated from high school in ████; he then enlisted in the Army where he was stationed in Germany as a cryptographer.  He has an MBA in international finance and business management; he retired four years ago.  He has been married to Alberta for the past ██ years and the couple has two adult children. They currently reside at the home at ████████████████████████, which they purchased in approximately ███.

### Health Factors

Mr. Pilliod has a ██████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████

### Family History

Mr. Pilliod's ████████████████████████████████████
███████████████████████████████████████████

### Alcohol, Tobacco and Employment History

Records and deposition testimony indicate that Mr. Pilliod ██████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████ His employment history is shown in Table 2 below. No occupational exposure to chemicals was noted.[9]

---

[9] Mr. Pilliod noted exposure to solvents on his Plaintiff Fact Sheet; however, when questioned during a telephone interview on January 8, 2017, he "had no clue" why he wrote that.

Pilliod v. Monsanto Co.
January 14, 2019
Page 8

**Table 2**

**Employment History – Alva Pilliod**

| Time period | Employer | Occupation |
|---|---|---|
| 1961-1964 | United States Army | Cryptographer |
| College years | | Various odd jobs including cable car grip man, baker, apartment building manager and cook |
| After graduation from college until 2012 | Goodyear Tire & Rubber Company | Sales Manager |
| 2012-2014 | Columbus Distributing | Accounts Receivable/Payable |

## Summary of Non-Hodgkin's Lymphoma Diagnosis

Mr. Pilliod initially presented to his physician for pain in his back and hip.  In June 2011, he was diagnosed with diffuse large B cell lymphoma, stage IV (a form of NHL) with bone metastases.  He was almost completely bedridden for a period of time for fear of breaking fragile bones; however, he responded well to three months of chemotherapy (six cycles of Rituximab, cyclophosphamide, doxorubicin (hydroxydaunomycin), Oncovin (vincristine) and prednisolone (R-CHOP) albeit with a 30 pound weight loss.  He is currently in remission. He does describe having continuing "mini" seizures which he believes is a by-product of "chemo brain."

## Deposition of Alva Pilliod dated December 21 2018

With respect to Roundup, Mr. Pilliod states that "I had used it in my home initially.  I saw no warning on the containers so I used it around my house, around the swimming pool and in the garden.  And I bought some properties in a town called Shellville.  And I bought properties that I had rebuilt or improved and I had used excessive Roundup on those properties."[10]

---

[10] Deposition of Alva Pilliod dated December 21, 2018, pages 32-33.

Pilliod v. Monsanto Co.
January 14, 2019
Page 9

Over the years, he cannot quantify how much Roundup he used.  "I would use quite a few gallons of it on rough areas like the acreage on ▮▮▮▮▮▮  Different houses required different amounts of Roundup and I explained how it would be around 360 gallons."[11]

When spraying, Mr. Pilliod wore jeans, tennis shoes and long sleeve shirts as well as a hat with a brim covering his face.  Due to previous skin cancers, he stayed covered as much as possible.  Occasionally, he wore gloves.  He noted that the Roundup sometimes seeped through his jeans but as there was no water supply (at the ▮▮▮▮▮ property), he just ignored it. Occasionally, he got Roundup on his legs, feet and arms when mixing or putting the hand-held sprayer together.  He characterized this as happening every two weeks with an amount spilled of "maybe half a cup."  He would wash hands after working with Roundup but did not shower.

Initially, he read the labels on Roundup products, but after using three or four times, he no longer did.  He stated that there were no warnings given on the labels.  In fact, he specifically recalls a large display at his local hardware store that said it was "completely safe.  And you could drink it.  If you sprayed some in your dog dish, your animal will be fine…That was all wrong."[12]

He tried a generic brand of glyphosate one time but found it was too strong as, a year later, nothing was growing back in the spot that he sprayed.  Otherwise, he always used the Roundup brand of glyphosate.

When asked about other chemical exposures over the years, he noted exposure to diesel fuel when fueling his sailboat every six months (approximately ten gallons per year).  He also recalled coming in contact "with the chemicals from…I call it a dirt cloud" in 1977.  He described this as a large plume of dust when a farmer was plowing in the Delta region of California.  He believes this could have been a possible exposure to herbicides and insecticides.

---

[11] Id., page 33.  Mr. Pilliiod estimated 360 gallons of Roundup used over all properties over the usage period from 1982-2017.  Mrs. Pilliod described using 387 gallons (see Table 3 below).

[12] Id., page 71.

Pilliod v. Monsanto Co.
January 14, 2019
Page 10

## Part B: Assessment of Exposure to Roundup®

### General Information Regarding Use of Roundup by the Pilliods

For approximately 30 years, starting in approximately 1982, the couple used Roundup on a regular basis to kill weeds around their home as well as on other properties they had purchased for investment opportunities. While the couple used both the super concentrated form of Roundup™ (which requires dilution with water),[13] more often than not, they used the ready-to-use formulation which they purchased in gallon-sized jugs. (Mrs. Pilliod estimates that 15% of the time they used the concentrated version and 85% of the time, they used the ready-to-use product.) They would both apply the product around their properties using a hand-held sprayer (for the diluted product) or from the large jug containing the ready-to-use product.[14] (See "Roundup Application Notes" below.)

In January of 2017, Mr. Pilliod came to believe that there was a connection between his "excessive use" of Roundup and their cancers.  He asked his oncologist if Roundup was responsible, but she told him that she had no information on that. The Pilliods no longer use Roundup but instead use a mixture of vinegar and salt water to treat weeds on their property.

### Phone Interview with Alberta and Alva Pilliod, January 8, 2019

A teleconference interview was conducted on January 8, 2019, and directed by Dr. Sawyer. Some minor details are noted thoughout the report and are referenced accordingly. No contradictory information was ascertained.

### Roundup Application Notes

To spray the Roundup concentrate after it was mixed with water, the Pilliods would use a small (approximately one gallon size), pump-handle sprayer that was filled by Mr. Pilliod. (See **Figure 1**).  When using the ready-to-use product, Roundup was sprayed directly from the 1.33 gallon jug.  At a distance, the stream setting would be used while closer to the ground, the mist setting was utilized.

---

[13] Per Mrs. Pilliod's deposition, her husband carried out the majority of the mixing of the Roundup with the water per the directions on the bottle.

[14] No backpack-type sprayers were ever used.

Pilliod v. Monsanto Co.
January 14, 2019
Page 11



**Figure 1. Tank sprayer previously used by the Pilliods**

## Notes on Personal Protection

As stated above, Mrs. Pilliod typically wore shorts, a tank top or t-shirt and flip flops when spraying Roundup.  However, Mr. Pilliod, being careful about excessive sun exposure, typically wore jeans, a long-sleeved shirt, tennis shoes and a wide-brimmed straw hat. Neither he nor his wife wore gloves, goggles, a mask or any other protective clothing. They did not shower after spraying Roundup and usually wore the same clothes for the entire day.

Mrs. Pilliod noted the use of Skin So Soft, an Avon beauty product known for its ability to repel bugs.  (See section entitled "Factors Intensifying Dermal Absorption of Glyphosate" as such creams have been shown to enhance dermal absorption of other substances.)

Pilliod v. Monsanto Co.
January 14, 2019
Page 12

## Application Frequency

As stated in the depositions of the Pilliods, different properties required different weed control operations. Table 3 (below) references the varying amounts of Roundup applications on each property over specific time spans.

**Table 3**
**Application Frequency of Roundup over Five Properties[15]**

| Property Address (years sprayed) | Application Frequency | Individual Amount Sprayed | Area Sprayed |
|---|---|---|---|
| ▮▮▮▮ | One hour per week for nine months of the year from 1982 to 2012 | Alva - 202.5 gallons (75%) Alberta –67.5 gallons (25%) Total – 270 gallons | Driveway, pool, cemented backyard, garden, front and around house. Area sprayed = 5,223 sqft[16] (0.049 ha) |
| ▮▮▮▮ | Two hours per week for nine months of the year from 2001-2004. (Note that no spraying was performed for the first six months of ownership.[18]) | Alva – 33.75 gallons (75%) Alberta – 11.25 gallons (25%) Total – 45 gallons | Long driveway,[19] fence line, flat area where house was to be built = 28,549 sq.ft.[20]    Total area sprayed = 30,054 sqft[21] (0.28 Ha) |
| ▮▮▮▮ | One hour per week for nine months of the year from 2004-2011 | Alva – 47.25 gallons (75%) Alberta – 15.75 gallons (25%) Total – 63 gallons | Circular driveway, around house, barn, chicken coop and weedy fence line. Total area = 3,898 sqft (0.036 Ha)[22] |
| ▮▮▮▮ | One-half hour per week. | Alva – 6.75 gallons (75%) Alberta – 2.5 gallons (25%) Total – 9 gallons | Around the house in general, fence, yard in general and long drive way. Total area = 4,703 sqft (0.044 Ha)[23] |

[15] Based on information provided by Alberta Pilliod in her December 20, 2018, deposition, pages 20-27.

[16] Total property size 10,000 square feet, (minus) less approximately 1,700 square feet house, less 385 sq.ft. driveway, less 475 sq ft pool area, and less 1,401 sq ft tree covered backyard, less 816 sqft front and side lawn (next to pool). 10,000 sqft – 4777 sqft = approximately 5,223 sq. ft.

[17] Brush was too high for the first half of the year to begin spraying.

[18] Alberta Pilliod deposition, page 23.

[19] This section was not readily visible on satellite image of the property.

[20] Note that this value is an underestimation as Mrs. Pilliod (page 23 of her deposition) recalled spraying approximately 1 acre (43,560 sqft).

[21] Square feet area of fence line = 622.25 + 548 + 134 + 201.17 = 1,505.42 sq ft + (plus) Flat area where house was to be built = 28,549 sq.ft. = 30,054.42 sqft

[22] Circular driveway - 2358.30 sqft, around house – 66.75 sqft, barn and chicken coop - 187.65 sqft, and fence line - 1,284.92 sqft (A very weedy area). Total area sprayed = 3,897.62 sqft.

[23] Driveway = 145.44 sqft + fence 364.13 sqft + around house 131.40 sqft + around the yard in general 4,062.35, = 4,703.32sqft

Pilliod v. Monsanto Co.
January 14, 2019
Page 13

| Thus, a total of 387 gallons was used by the Pilliods over their 30 year exposure period. |
| --- |

## Part C: Dose Calculation of the Pilliods to Roundup® (mg/kg-day)

### Evaluating the Pilliods' systemic Glyphosate Exposure from Roundup Use

Mrs. Pilliod testified in her December 20, 2018, deposition with respect to their estimated Roundup applications. Per her testimony, "*we spent about an hour spraying each week for nine months each year.*"[24]  Per Mrs. Pilliod's testimony, the ratio of their spraying work was approximately 25% vs 75% for her and her husband, respectively. Based upon the testimony and quantities used, Mr. Pilliod sprayed more aggressively than his wife.

### Volume of Roundup Sprayed by the Pilliods[25]

██████████████████████: Spraying occurred here from 1982 – 2012 (30 years). Total gallons sprayed of diluted Roundup Super Concentrate™ and ready-to-use Roundup™ was 270 gallons, providing an average spray of 9 gallons per year. Mr. and Mrs. Pilliod sprayed 9 months of the year; hence, they sprayed approximately 1 gallon per month. Mrs. Pilliod testified that they sprayed for one hour a week (1 hour on a given day of spraying); hence, 0.25 gallons per week/per spraying session. Per the distribution of spraying (25% to 75%), this equates to 0.063 gallons (0.24 L) for Alberta Pilliod and 0.188 gallons (0.71 L) for Alva Pilliod per spraying session. The section of the property sprayed was 0.049 Ha. The dose exposure equals 4.89 L/Ha[26] for Alberta and 14.49 L/Ha for Alva.[27]

██████████████████████ Spraying occurred here from 2001[28] – 2004 (2.5 years). Total gallons sprayed was 45 gallons providing an average spray of 18 gallons per year. They sprayed 9 months of the year; hence, they sprayed approximately 2 gallons per month. They sprayed for two hours a week in one hour sessions; hence, 0.5 gallons per week and <u>0.25 gallons per spraying session</u>. Per the distribution of spraying (25% to 75%), this equates to 0.063 gallons (0.24 L) for Alberta Pilliod and 0.188 gallons (0.71 L) for Alva Pilliod per spraying session. The section of the property sprayed was

---

[24] Id. Page 22, line 2 – 3.

[25] Based on information provided by Alberta Pilliod in her December 20, 2018, deposition, Pages 20 – 27.

[26] 0.24 L divided by 0.049 Ha = 4.89 L/Ha.

[27] 0.71 L divided by 0.049 Ha = 14.49 L/Ha

[28] Did not spray for the first 6 months of owning the property.

Pilliod v. Monsanto Co.
January 14, 2019
Page 14

0.28 Ha (or 0.14 Ha – half sprayed each session). The dose exposure is 1.7 L/Ha[29] for Alberta and 5.1 L/Ha for Alva.[30]

███████████████████████████: Spraying occurred here from 2004 – 2011 (7 years). Total quantity sprayed was 63 gallons providing an average spray of 9 gallons per year. They sprayed 9 months of the year; hence, they sprayed approximately 1 gallon per month. They sprayed for one hour per week; hence, 0.25 gallons per week/per spraying session. Per the distribution of spraying (25% to 75%), this equates to 0.063 gallons (0.24L) for Alberta Pilliod and 0.188 gallons (0.71 L) for Alva Pilliod per spraying session. The section of the property sprayed was 0.036 Ha. The dose exposure of 6.7 L/Ha[31] for Alberta Pilliod and 19.72 L/Ha for Alva Pilliod.[32]

███████████████████████████: Spraying occurred here from 2008 – 2010 (2 years). Total amount sprayed was 9 gallons providing an average spray of 4.5 gallons per year. They sprayed 9 months of the year; hence, sprayed approximately 0.5 gallon per month. The Pillions sprayed for one half hour per week; hence, 0.125 gallons per week. Per the distribution of spraying (25% to 75%), this equates to 0.031 gallons (0.12 L) for Alberta Pilliod and 0.094 gallons (0.36 L) for Alva Pilliod per spraying session. The section of the property sprayed was 0.044 Ha. The dose exposure of 2.72 L/Ha[33] for Alberta Pilliod and 8.18 L/Ha for Alva Pilliod.[34] Mrs. Pilliod typically sprayed for an hour except at this location.

**Roundup Dose**

The Pilliods used Roundup Super Concentrate® in their residential landscaping work approximately 15% of the time and diluted it with water per the label instructions.    Mr. Pilliod performed the work of mixing the concentrate with water.  The following information is found on the label of a Roundup Super Concentrate® 1 gallon (128 fl. oz.) jug.

---

[29] 0.24 L divided by 0.14 Ha = 1.7 L/Ha.

[30] 0.71 L divided by 0.14 Ha = 5.1 L/Ha

[31] 0.24 L divided by 0.036 Ha = 6.66 L/Ha.

[32] 0.71 L divided by 0.036 Ha = 19.72 L/Ha

[33] 0.12 L divided by 0.044 Ha = 2.72 L/Ha.

[34] 0.36 L divided by 0.044 Ha = 8.18 L/Ha

Pilliod v. Monsanto Co.
January 14, 2019
Page 15

---

**ACTIVE INGREDIENT:**
**\*Glyphosate, isopropylamine salt . . . 50.2%**
**OTHER INGREDIENTS . . . . . . . . . . 49.8%**
**\*Contains 3.6 pounds glyphosate acid per US gallon**
**Tank Sprayer: Use of a Roundup® Brand Sprayer is recommended. A plastic, fiberglass, plastic-lined steel or stainless steel sprayer may also be used.**
- **For best results, add 2 ½ fl. oz. (5 Tbs.) to 1 gallon of water.**
- **Spot treat or spray evenly over 300 sq. ft.**
- **For easy to kill weeds such as seedlings, add 1 ½ fl. oz. (3 Tbs.) to 1 gallon of water.**

---

The Pilliods used the pre-mixed Roundup Ready Weed and Grass Killer® approximately 85% of the time. The following information is found on the label for this product:

---

**ACTIVE INGREDIENTS:**
**Glyphosate, isopropylamine salt  . . . . . . . . . . 2.0%\***
**Pelargonic acid and related fatty acids  . . . . . 2.0%**
**OTHER INGREDIENTS . . . . . . . . . . . . . . . . . 96.0%**

**TOTAL . . . . . . . . . . . . . . . . . . . . . . . . . . 100.0%**

**\*Contains 0.1 lbs. glyphosate acid equivalent per US gallon**

**Convenient, no-mix formula.**

---

Note that while the "OTHER INGREDIENTS" in this formulation cannot be precisely determined, Roundup® formulations typically contain surfactants such as POEA and water.[35] Additionally, product formulations changed over time as documented below.

**Body Weight Assessment & Use of the POEM Methodology**

Over the course of their 30 years of exposure to Roundup, Mr. Pilliod's weight did not vary substantially from ███████████████ according to a telephone interview conducted on January 8, 2019.  Also during that telephone interview,[36] Mrs. Pilliod stated that her weight varied from ██████████████ from the middle 1980s up through the time of her diagnosis. The mid-range of her weight is ███████████████

---

[35] "Polyoxyethylene alkamine (POEA CAS #61791-2), water and FD&C Blue No. 1 (CAS #3844-45-9).

[36] Interview conducted by Dr. Sawyer on January 8, 2019.

Pilliod v. Monsanto Co.
January 14, 2019
Page 16

The internal glyphosate dose from the Pilliods' Roundup use for ███████████ Valley Springs, CA, property when using the Roundup Super Concentrate was determined using the United Kingdom Predictive Operator Exposure Model (UK POEM). The model was developed and tested for home operator use including the use of home garden sprayers.

The POEM parameters were adjusted to Roundup Super Concentrate® density. The selected application method for the model was the "Home Garden Sprayer," and the application volume for a low volume nozzle sprayer is 100 L/Ha.[37] A dermal absorption of three percent (3%) was selected for the model.[38]

The results from the model are shown in Figures 2 and 3 and are reported below.

### Alva Pilliod's Glyphosate Dose at ███████████

Mr. Alva Pilliod sprayed glyphosate super concentrate 15% of the time. He testified in deposition and consistent with his phone interview that he mixed and used glyphosate super concentrate at their various properties (but less frequently at ███████████ ███████████ as he and had to bring his own water to perform the mixing or pre-mix at home). Roundup Super Concentrate® has a glyphosate concentration of 431 mg/ml.[39] The UK POEM was used in determine his exposure dose at 3% dermal absorption.

The dermal dose to his hands during mixing and loading is added to the dermal absorbed dose given his lack of personal protective equipment use and wearing permeable clothing; inhalation exposure is determined to be 0.44 mg/day. The percent dermal absorption used in the model is 3%. The UK POEM results given Mr. Alva Pilliod's weight of 90.7 kg results in a total dose when spraying with super concentrate at ███████████ ██████ of **0.14 mg/kg-day**[40] (see Figure 2). It should be noted however, Mr. Pilliod generally used ready-to-use Roundup at this address which does not require mixing or preparation. Thus this dose value represents the highest per day exposures sustained by Mr. Pilliod.

---

[37] Roundup Pro Biactive® Label, Agrigem, 2007.

[38] 3% dermal absorption may be an underestimate as discussed in Section D (below).

[39] 3.6 lbs of glyphosate per US gallon = 1,632,930 mg/3,785.41 ml

[40] Current modeling software as provided by Monsanto (new UK POEM).

Pilliod v. Monsanto Co.
January 14, 2019
Page 17

### Alberta Pilliod's Glyphosate Dose at ▮▮▮▮▮▮▮

Mrs. Alberta Pilliod sprayed glyphosate super concentrate 15% of the time. Her husband performed the mixing of Roundup™ super concentrate for spraying at their property at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Roundup Super Concentrate® has a glyphosate concentration of 431.4 mg/ml.[41] The UK POEM was adjusted to have zero input from exposures during mixing and loading as Alva Pilliod performed the mixing. Her exposure dose at 3% dermal absorption was calculated using her mid-range weight of 86.18 kg.

The dermal dose during mixing and loading is calculated to be 0 mg/day. Given her lack of personal protective equipment use and wearing permeable clothing particularly wearing shorts and t-shirt were factored into the model. The percent dermal absorption used in the model is 3%. According to the UK POEM Home/Garden methodology, her total dermally-absorbed combined with the inhalation exposure of 0.015 mg/day (100% exposure absorbed) and given Mrs. Alberta Pilliod's mid-range weight of 86.18 kg. results in a total dose of **0.084 mg/kg-day**.[42] This exposure is an underestimation as she wore flip-flops (not shoes) while spraying.

Additionally, Mr. and Mrs. Pilliod reported multiple events of spillage on to their hands from blow back of the spray (as well as from mixing for Mr. Pilliod). The model further underestimates their true exposure with respect to unwashed hands, wearing glyphosate-soaked clothing and the use of flip-flops by Mrs. Pilliod. It should also be recognized that the POEM model does not adjust for permeable sneakers, low cut ankle socks or skin lotion. Thus, increased dermal exposure and absorption is not accounted for by the model (an underestimate). Consequently, Mr. Alva Pilliod sustained an internal glyphosate dose of **0.14 mg/kg-day** (see Figure 2) while his wife, Mrs. Alberta Pilliod had an internal glyphosate dose of **0.084 mg/kg-day** (see Figure 3). It should be noted that the acceptable operator exposure level (AOEL) designed for non-cancer effects is set at a dose level of **0.1 mg/kg/day**.[43]

---

[41] 3.6 lbs of glyphosate per US gallon = 1,632,930 mg/3,785.41 ml

[42] Current modeling software as provided by Monsanto (new UK POEM).

[43] In 2015, the AOEL for glyphosate was revised by the EFSA  to 0.1 mg/kg-day from 0.2 mg/kg/day which was based on a Tier 2 assessment based on a short-term rabbit teratogenicity study Thus, the Pilliods' dose calculation is not intended as a measurement of NHL risk, but rather, is useful for comparison with the AOEL demonstrating that the dose is within a reasonable range of the AOEL indicating exposures similar to that of occupationally exposes applicators.

Pilliod v. Monsanto Co.
January 14, 2019
Page 18

**THE UK PREDICTIVE OPERATOR EXPOSURE MODEL (POEM)**

Alva Pilliod - ▮▮▮▮▮▮▮

| | | | | |
|---|---|---|---|---|
| Application method | Home garden sprayer (5 litre tank). Outdoor, low level target | | | ▼ |
| Product | **Roundup Super Concentrate** | Active substance | | **Glyphosate** |
| Formulation type | water-based ▼ | a.s. concentration | | **431** mg/ml |
| Dermal absorption from product | **3** % | Dermal absorption from spray | | **3** % |
| Container | Home garden, separate measure ▼ | | | |
| PPE during mix/loading | None ▼ | PPE during application | | None |
| Dose | **5.1** l/ha | Work rate/day | | **0.14** ha |
| Application volume | **100** l/ha | Duration of spraying | | **1** h |

EXPOSURE DURING MIXING AND LOADING

| | | | |
|---|---|---|---|
| Container size | Home garden pack | | litres |
| Hand contamination/operation | | 0.1 | ml |
| Application dose | | 5.1 | litres product/ha |
| Work rate | | 0.14 | ha/day |
| Number of operations | | 1 | |
| Hand contamination | | 0.1 | ml/day |
| Protective clothing | | None | |
| Transmission to skin | | 100 | % |
| Dermal exposure to formulation | | 0.1 | ml/day |

DERMAL EXPOSURE DURING SPRAY APPLICATION

| | | | | | |
|---|---|---|---|---|---|
| Application technique | Home garden sprayer (5 litre tank). Outdoor, low level target | | | | |
| Application volume | | 100 | spray/ha | | |
| Volume of surface contamination | | 50 | ml/h | | |
| Distribution | | Hands | Trunk | | Legs |
| | | 25% | 25% | | 50% |
| Clothing | | None | Shirt | | Pants |
| Penetration | | 100% | 20% | | 18% |
| Dermal exposure | | 10 | 2.5 | | 4.5 ml/h |
| Duration of exposure | | 1 | h | | |
| Total dermal exposure to spray | | 17 | ml/day | | |

ABSORBED DERMAL DOSE

| | Mix/load | | Application | | |
|---|---|---|---|---|---|
| Dermal exposure | 0.1 | ml/day | | 17 | ml/day |
| Concen. of a.s. product or spray | 431.4 | mg/ml | | 22.0014 | mg/ml |
| Dermal exposure to a.s. | 43.14 | mg/day | | 374.0238 | mg/day |
| Percent absorbed | 3 | % | | 3 | % |
| Absorbed dose | 1.2942 | mg/day | | 11.220714 | mg/day |

INHALATION EXPOSURE DURING SPRAYING

| | | |
|---|---|---|
| Inhalation exposure | 0.02 | ml/h |
| Duration of exposure | 1 | h |
| Concentration of a.s. in spray | 22.0014 | mg/ml |
| Inhalation exposure to a.s. | 0.440028 | mg/day |
| Percent absorbed | 100 | % |
| Absorbed dose | 0.440028 | mg/day |

PREDICTED EXPOSURE

| | | |
|---|---|---|
| Total absorbed dose | 12.954942 | mg/day |
| Operator body weight | 90.7 | kg |
| Operator exposure | 0.142832878 | mg/kg bw/day |

**Figure 2: UK-POEM calculations for Mr. Alva Pilliod at ▮▮▮▮▮▮
when Roundup Super Concentrate was used**

Pilliod v. Monsanto Co.
January 14, 2019
Page 19

## THE UK PREDICTIVE OPERATOR EXPOSURE MODEL (POEM)

**Alberta Pilliod ▮▮▮▮▮**

| | | | |
|---|---|---|---|
| Application method | Home garden sprayer (5 litre tank). Outdoor, low level target | | ▼ |
| Product | **Roundup Super Concentrate** | Active substance | **Glyphosate** |
| Formulation type | water-based ▼ | a.s. concentration | **431** mg/ml |
| Dermal absorption from product | **3** % | Dermal absorption from spray | **3** % |
| Container | Home garden, separate measure ▼ | | |
| PPE during mix/loading | None ▼ | PPE during application | None |
| Dose | **1.7** l/ha | Work rate/day | **0.14** ha |
| Application volume | **100** l/ha | Duration of spraying | **1** h |

### EXPOSURE DURING MIXING AND LOADING

| | | |
|---|---|---|
| Container size | Home garden pack | litres |
| Hand contamination/operation | 0.1 | ml |
| Application dose | 1.7 | litres product/ha |
| Work rate | 0.14 | ha/day |
| Number of operations | 0 | |
| Hand contamination | 0 | ml/day |
| Protective clothing | None | |
| Transmission to skin | 100 | % |
| Dermal exposure to formulation | 0 | ml/day |

### DERMAL EXPOSURE DURING SPRAY APPLICATION

| | | |
|---|---|---|
| Application technique | Home garden sprayer (5 litre tank). Outdoor, low level target | |
| Application volume | 100 | spray/ha |
| Volume of surface contamination | 50 | ml/h |

| Distribution | Hands | Trunk | | Legs | |
|---|---|---|---|---|---|
| | 25% | 25% | | 50% | |
| Clothing | None | T-Shirt | | Shorts | |
| Penetration | 100% | 20% | | 18% | |
| Dermal exposure | 10 | | 3.5 | 18.85 | ml/h |
| Duration of exposure | 1 | h | | | |
| Total dermal exposure to spray | 32.35 | ml/day | | | |

### ABSORBED DERMAL DOSE

| | Mix/load | | Application | | |
|---|---|---|---|---|---|
| Dermal exposure | 0 | ml/day | | 32.35 | ml/day |
| Concen. of a.s. product or spray | 431.4 | mg/ml | | 7.3338 | mg/ml |
| Dermal exposure to a.s. | 0 | mg/day | | 237.24843 | mg/day |
| Percent absorbed | 3 | % | | 3 | % |
| Absorbed dose | 0 | mg/day | | 7.1174529 | mg/day |

### INHALATION EXPOSURE DURING SPRAYING

| | | |
|---|---|---|
| Inhalation exposure | 0.02 | ml/h |
| Duration of exposure | 1 | h |
| Concentration of a.s. in spray | 7.3338 | mg/ml |
| Inhalation exposure to a.s. | 0.146676 | mg/day |
| Percent absorbed | 100 | % |
| Absorbed dose | 0.146676 | mg/day |

### PREDICTED EXPOSURE

| | | |
|---|---|---|
| Total absorbed dose | 7.2641289 | mg/day |
| Operator body weight | 86.18 | kg |
| Operator exposure | 0.084290194 | mg/kg bw/day |

**Figure 3: UK-POEM calculations for Mrs. Alberta Pilliod at ▮▮▮▮▮▮▮▮▮
when Roundup Super Concentrate was used**

Pilliod v. Monsanto Co.
January 14, 2019
Page 20

### *Validation of the "UK Predictive Operator Exposure Model" (UK POEM)*

The UK Predictive Operator Exposure Model (UK POEM) is developed, maintained and used by U.K. Health and Safety Executive in its operator exposure assessment guidelines for pesticide registration.[44]

Monsanto has introduced an updated version of the "UK Predictive Operator Exposure Model" (UK POEM). The UK POEM methodology was used and relied upon by Monsanto for many years in calculating human exposure which regulatory agencies in Europe then compare to the acceptable operator exposure level (AOEL) during the pesticide registration process. [45]

The POEM model was developed to measure potential dermal exposure on the body surface and systemic absorption. It was designed to accommodate different pesticides and herbicides (such as Roundup) and provides the ability to enter a wide range of parameters, such as product, active ingredient, density, percent dermal absorption, and allows for different tools of herbicide application including the home garden sprayer.

In addition to the UK POEM's use in regulatory evaluation, it has been used in peer-reviewed research studies to assess exposure to different pesticides.[46] And it is used by other countries agencies such as New Zealand's Environmental Protection Authority[47] in assessing risk to outdoor home pesticide users.[48] When New Zealand's Environmental

---

[44] U.K. Health and Safety Executive, HSE, "Operator Exposure,"2016, Data requirements handbook, Retrieved from: http://www.hse.gov.uk/pesticides/topics/pesticide-approvals/pesticides-registration/data-requirements-handbook/operator-exposure.htm

[45] "Operator exposure assessment for MON 2139 UK – Case" MONGLY06509236

"UK POEM calculations in preparation of meeting Spanish competent authorities." MONGLY01275627

[46] Lawson, A., et al., "Three Methods to Assess Levels of Farmers' Exposure to Pesticides in the Urban and Peri-urban Areas of Northern Benin," 2017, Tunisian Plant Protection Journal, Vol.12, pp. 91–108.

Illyassou, K., et al., "Risk Assessment for Small Farmers Exposed to Plant Protection Products in the Niger River Valley," 2017, Comm. Appl. Biol. Sci.

[47] EPA, "Risk Assessment Methodology for Hazardous Substances: How to assess the risk, cost and benefit of new hazardous substances for use in New Zealand," 2018, Environmental Protection Authority.

[48] Illyassou, K., et al., "Risk Assessment for Small Farmers Exposed to Plant Protection Products in the Niger River Valley," 2017, Comm. Appl. Biol. Sci.

EPA, "Risk Assessment Methodology for Hazardous Substances: How to assess the risk, cost and benefit of new hazardous substances for use in New Zealand," 2018, Environmental Protection Authority.

Pilliod v. Monsanto Co.
January 14, 2019
Page 21

Protection Authority selected the UK POEM model (and peer-reviewed it) to use in evaluation risk to users of pesticide concentrates in areas outside the home, they justified it stating that the UK-POEM "*is considered a suitable model for home use pesticide applications because it:*

- *is an internationally developed model based on a robust dataset,*
- *it allows for small handheld sprayers and smaller container sizes for the mixing and loading making it more suitable for a home user, and*
- *specifically includes user scenarios that more accurately reflect home applications than the commercial models.*"[49]

### Dermal Absorption Rate Used in UK POEM Methodology

Historically, as part of the UK POEM exposure calculations, Monsanto and the regulators assumed that only 3% of the dermal exposure dose is absorbed which is inaccurate as noted in the a email message entitled "dermal absorption" from ███████████████ (a then-Monsanto Toxicologist) to █████████████ (a Crop Protection Lead). It states:

> "~ 98% of the absorbed dose originates from field application and so the impact will be negligible [sic]. The work of Wester showed 2.2 ± 1.5% in vivo with the concentrated formulation and a max of 2.2 ± 0.5% in vitro with the spray dilution. I suppose that's the reason why a derm pen value of < 3% was selected. We should remember that Wester excluded the presence of glyphosate in the skin due to the absence of partition of glyphosate with the stratum corneum. By contrast, in the Franz study, a large amount of glyphosate was detected in the epidermis (0.5 – 5%). And as we know now, 5 – 20% of the dose of glyphosate could be stored in the skin.
>
> I think we should be <u>really happy</u> if the regulators allow us to use the 3% derm pen values."

More recently, Monsanto has chosen to use a dermal absorption rate of 1% in its new (revised) UK POEM dose calculation model and supposedly based on objective studies (sponsored by Monsanto). Inexplicably, the dermal absorption rate(s) being claimed by Monsanto are now <u>lower by orders of magnitude</u> than prior models and pharmacokinetic studies (as discussed in section D of the report).

---

[49] EPA, "Risk Assessment Methodology for Hazardous Substances: How to assess the risk, cost and benefit of new hazardous substances for use in New Zealand," 2018, Environmental Protection Authority.

Pilliod v. Monsanto Co.
January 14, 2019
Page 22

**Pilliod Glyphosate Exposure Compared to Three Epidemiological Studies**



**Days of exposure per year over the period of the Pilliod's exposure[50]**

1982 – 2012:   (█████████) 4 days per month X 9 months/year = "36 days of exposure" per year from 1982 until 2000 (for 30 years)[51] = **1,080 days of exposure**

*Spraying on different days of the week for other properties include*:

████████ 2001 –2004: 8 days per month[52] X 9 months/year = "72 days of exposure" per year from 2001 until 2004 (for 2.5 years) = **180 days of exposure**

███████ 2004 – 2011: 4 days per month X 9 months/year = "36 days of exposure" per year from 2004 until 2008 (for 7 years) **= 252 days of exposure**

███████ 2008 - 2010: 4 days per month[53] X 9 months/year = "36 days of exposure" per year from 2011 until 2012 (for 2 years) = **72 days of exposure**

Mr. and Mrs. Pilliods' dermal exposures generally occurred for much longer than the reported period of spraying as while they washed their hands after each application they retained Roundup residue on their clothing and skin from drift and overspray (bare legs and arms for Mrs. Pilliod). Furthermore, they did not change clothes after applying Roundup and did not shower immediately after the applications. Mr. Pilliod stated that he had to do more than their routine spraying after rains.

It is not known from their testimony if spraying occurred on entirely separate days for all properties or if on somedays they sprayed multiple properties on the same day (given that the period of their ownership of multiple properties overlapped). Hence, the minimum number of days of spraying Roundup can be established as 1,080 days. Given that spraying at ██████████ only occurred for half an hour, it can be left out of calculations. Thus, total days of exposure would <u>1,512 days</u>.

---

[50] This estimation makes the assumption that they did not spray multiple properties in one day.

[51] Spraying did not begin until the later half of the year.

[52] 8 days per month (two hours a week in one hour sessions each time) for █████████████

[53] Spraying only occurred for a half hour.

Pilliod v. Monsanto Co.
January 14, 2019
Page 23

Consequently, in total, Mr. and Mrs. Pilliod accumulated between **1,080 - 1,584 days of exposure**[54] while working to maintain their properties between 1982 and 2012.

### *Pilliod Exposure Comparison to Exposure Rate Studies*

**Eriksson, M., et al., 2008 study:**[55]   This is a case-control study of exposure to pesticides and the risk factor for non-Hodgkin's lymphoma in persons in cases in Sweden between 1999 and 2002. Different exposure levels were classified according to days of exposure. Mr. and Mrs. Pilliod accumulated 1080 – 1,584 days of exposure. The association of glyphosate exposure with non-Hodgkin's lymphoma followed a dose response pattern with an odds ratio (OR) of 1.69 for 10 days of exposure or less, and 2.36 for greater than 10 days of exposure.

- With respect to a lifetime exposure comparison, then Mr, and Mrs. Pilliod's exposure was >10 days (1,080 – 1,584 days), which is associated with a non-Hodgkin lymphoma odds ratio (OR) of 2.36 per the Eriksson et al., 2008 study.

**McDuffie, H. et al., 2001:**[56]   This is a Canadian case-control study that investigated the association of specific pesticides with non-Hodgkin's lymphoma that created dose-response levels based on days/year of personally mixing or applying herbicides. The study revealed that glyphosate exposures between >0 and ≤ 2 days per year has an NHL odds ratio (OR) of 1.0, while exposures greater than 2 days of exposure per year had a NHL OR of 2.12.

- The "definition of pesticide exposure, which discriminated (a) between incidental, bystander, and environmental exposure as compared with more intensive exposure and (b) between cases and controls, was a cumulative total of 10 h per year to any combination of pesticides. The screening questions in the postal questionnaire were used to trigger telephone interviews among those with cumulative exposure of ≥10 h/year to any combination of herbicides, insecticides, fungicides, fumigants and/or algicides."

---

[54] 1080 + 180 + 252 + 72 days = 1,584 days.

[55] Eriksson, M., et al., "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis," 2008, International Journal Cancer, Vol.123, pp. 1657 – 1663.

[56] McDuffie H., et al., "Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health," 2001, Cancer Epidemiology, Biomarkers & Prevention, Vol.10, pp. 1155 – 1163.

Pilliod v. Monsanto Co.
January 14, 2019
Page 24

- Mr and Mrs. Pilliod's exposures were >10 hours per year at 36 to 108[57] hours per year for 30 years and from 2001 to 2010

- The study reveals age group stratification, 19 year olds to <30; 30-39; 40-49; 50-59; and greater than 60 years old. "The random control subject selection was stratified by age $\pm$ 2 years to be <u>comparable with the age distribution</u> of the entire case group (STS, HD, NHL and MM) within each province."

- Mr. and Mrs. Pilliod's exposures occurred far greater than 2 days per year (between 36 – 108 days per year) while the study shows that glyphosate exposures greater than 2 days per year reveal an odds ratio of 2.12.

The study by McDuffie, H. et al., 2001, documented statistically significant dose-responses; odds ratio of **2.12 (1.20–3.73)** for the "more than >2 days per year" group. Based on the methods section, this is defined as 10 or more hours per year. This study was stratified by age groups and was statistically significant.  It should be noted that Mr. and Mrs. Pilliod's advanced age of 69 and 71, respectively, at the time of diagnosis places them in the highest risk age for lymphoma. However, the additional risk from glyphosate is additive to the naturally occurring increased risk level.

### Comparison of Mr. and Mrs. Pilliod's Dose to Other Glyphosate Applicators

**Andreotti, G., et al., 2018**[58] - I have compared Mr. and Mrs. Pilliod's pesticide use to "The Agricultural Health Study" (AHS) which is an ongoing cohort study which includes 54,251 licensed pesticides applicators from Iowa and North Carolina with 82.8% reporting use of  glyphosate. The study is funded by the National Cancer Institute and the National Institute of Environmental Health.[59] An updated evaluation of glyphosate and cancer risk was conducted in the AHS[60] and included cancer incidences through 2012 in North Carolina and 2013 in Iowa. The reported lifetime days frequency of pesticide application is shown in **Table 6**.

---

[57] 36 + 72 days

[58] Andreotti, G., et al., "Glyphosate Use and Cancer Incidence in the Agricultural Health Study," 2018, JNCI J Natl Cancer Inst., Vol.110 (5), doi: 10.1093/jnci/djx233.

[59] Id.

[60] Id.

Pilliod v. Monsanto Co.
January 14, 2019
Page 25

**Table 6**

**Demographic Characteristics of "The Agricultural Health Study"[61] Cohort (Total applicators n = 54,251)**

| Lifetime days of glyphosate use (Quartiles) | Lifetime days of glyphosate use (Tertiles) |
|---|---|
| 1 – 13.74 | 1 – 19.9 |
| 13.75 – 38.74 | 20 – 61.9 |
| 38.75 – 108.4 | ≥ 62.0 |
| ≥ 108.5 | |
| **Median Quartile: 1 – 38.75** | **Median Tertile: ≥38.75** |

Mr. and Mrs. Pilliod's glyphosate application at a lifetime of 1,080 – 1,584 days of exposure placed both of them in the highest (fourth quartile and third tertile) ranges of lifetime days of exposure. NOTE: Mr. and Mrs. Pilliod's exposure history falls within the parameters of "The Agricultural Health Study" Cohort in Tables 6 (highlighted) which places them significantly above the median exposures. Their exposures history is also consistent with that of human epidemiological exposures with statistically significant increased rates of NHL.

## Summary of Exposure Dose Calculations

The above dose calculations in mg/kg-day represent a reasonable estimate of the dermally absorbed dose when using the super concentrate.  It should be noted that the mixing absorbed dose is not the crucial factor that drives the overall dosage. The Pilliods' application dose was underestimated due to the inability of the POEM model to specifically include semi-permeable sneakers, low cut ankle socks, wetting of both hands, and use of Skin So Soft application (which enhances dermal absorption through the stratum corneum). Additionally, sweating underneath clothing has not been specifically assessed by Monsanto as an exacerbating factor to dermal absorption of glyphosate. Had these intermittent and unresolved exposures been included, the calculation would have resulted in higher absorbed doses based on the referenced dermal absorption studies.

---

[61] Id.

Pilliod v. Monsanto Co.
January 14, 2019
Page 26

## Part D: Introduction to Glyphosate Exposure & Toxicity - Monsanto's Glyphosate Biomonitoring and Dose Measurement Reliability

Exposure models have been developed in the last 20 years and used to estimate the exposure dose of professional operators to biocides during application. The accuracy of these models' ability to assess actual exposure is primarily determined by the pharmacokinetic studies and assumptions used in developing the model (such as dermal absorption rate and other variables).

PK models simulate the absorption, distribution, metabolism and excretion (ADME) within a living system. Biomonitoring and dosimetry data are combined with PK models (pharmacokinetic models) to reconstruct or estimate the exposure dose. It is, therefore, essential to have a good understanding of the pharmacokinetics to ensure a good estimate of the exposure dose.

As most Monsanto glyphosate formulations constitute "trade secrets" and are thus unpublished, the general scientific community has had minimal availability to assess the toxicity of the various glyphosate formulations. As a result there are discrepancies and differences of opinions as to the pharmacokinetics (or ADME) of glyphosate which have not been entirely assessed in and published in the peer-reviewed literature.

However, Monsanto has conducted some limited in-house studies and internal Monsanto communications recognize the limitations of these studies.  As ▮▮▮▮▮▮▮ the head of Monsanto's Regulatory Affairs Unit, wrote:

> *"ADME has always been the weak link in our argument…we have not got rid of that problem."*[62]

---

[62] MONGLY02221147

Pilliod v. Monsanto Co.
January 14, 2019
Page 27

When assumptions in a critical, Monsanto-contracted pharmacokinetics study were questioned by Spanish regulators, Monsanto corporate employee, ██████████, wrote,

> *"Even though we can absorb additional 'uncertainty factors' in our risk assessment based on our biomonitoring results, I feel uncomfortable with this discussion. This approach by Spain sets a precedent and contradicts the fact that we always claimed to fully understand the glyphosate pharmacokinetics."[63]*

Additional information is contained within an unpublished Monsanto study in which the percentage of dermal absorption was shown to be <u>as high as 10%</u> (TNO rat skin study). Since dermal exposure is the most significant route of exposure, a small change in the percentage of dermal exposure can have a great effect on the overall exposure. Monsanto acknowledges this fact directly in a July 2001 draft:

> *"One of the product specific parameters that can make a big difference in the exposure assessment is the dermal uptake factor which is the fraction of the amount of active ingredient on the skin surface that is absorbed by the skin tissue."[64]*

In an August 16, 2011, email, ██████████ wrote, regarding dermal absorption,

> *"In Europe, we are getting prepared to submit MON 79991 (720 g/kg) for approval under the new Reg 1107/2009. We ran the UKPOEM model using a dermal penetration value of 3% and do not pass when applying 3.6 kg/ha for the tractor-mounted sprayer. I am aware of the set of studies that you ran on dermal absorption using pure K-salt and IPA-salt and also MON 52276 and MON 79351 which showed dermal absorption values of 1%. Putting 1% in the model, we get a good result, so will need to show that the 1% dermal absorption numbers are equally valid for the MON 79991 formulation."[65]*

---

[63] MONGLY02155829

[64] ██████████, July 2001, Confidential draft, "Clustering glyphosate formulations with regard to the testing for dermal uptake."

[65] MONGLY04107779

Pilliod v. Monsanto Co.
January 14, 2019
Page 28

## Glyphosate (Roundup®) History and Use

Glyphosate is the active ingredient in various Roundup® herbicide formulations. The Monsanto Company discovered the herbicide activity of glyphosate in 1970 and initiated sales and distribution for weed control in 1974. Glyphosate is not selective and is used on food and non-food crops. Over the subsequent four decades, glyphosate use as an herbicide has greatly expanded. It is used in agriculture, forestry, industrial right-of-ways and in residential applications worldwide.

Glyphosate's use in agriculture has been further expanded by the development of genetically-modified plants that are tolerant to glyphosate treatment (Roundup-Ready®).[66] This has significantly increased the use of glyphosate on these crops for weed control with no concern for crop injury.[67]  As a result, genetically-modified crops contain far more glyphosate residue than conventional crops.

The introduction of glyphosate-resistant (GR) crops in 1996 and the expiration of the glyphosate patent have resulted in its ubiquitous use today characterized by a 15-fold global increase since the mid 1990's.[68]

According to glyphosate pesticide registration, in 1993, approximately 13 to 20 million acres of land had been treated with 18.7 million pounds of glyphosate and used mostly on hay/pasture, soybeans and corn.[69]  According to the U.S. Geological Survey, in 2014, 300 million pounds of glyphosate were used on agricultural land in the U.S.  Since 1974 in the U.S., over 3.5 billion pounds of glyphosate have been applied.[70]

---

[66] Williams, G. et al.,  Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans," 2000,  Regulatory Toxicology and Pharmacology, Vol.31, pg. 117-165.

[67] Duke, S. S., "Encyclopedia of Agrochemicals," 2003, John Wiley & Sons.

[68] Benbrook, C.M., "Trends in glyphosate herbicide use in the United States and globally," 2016 Environmental Sciences Europe. 28:3.

[69] U.S. EPA, "Registration eligibility decision-facts: Glyphosate," 1993 United States Environmental Protection Agency, Prevention, Pesticides and Toxic Substances (7508W), EPA-738-F-93-011.

[70] Benbrook, C.M., "Trends in glyphosate herbicide use in the United States and globally," 2016, Environmental Sciences Europe. 28:3.

Pilliod v. Monsanto Co.
January 14, 2019
Page 29

**Contaminants within Roundup® (Surfactants, Adjuvants and Co-formulants)**

A 2017 toxicological study[71] by Tarazona, et al., reviewed the scientific basis of glyphosate's carcinogenic classification and offered the following guidance with respect to contaminants in glyphosate and Roundup® surfactants, adjuvants and co-formulants:

"Surfactants are frequently used in herbicide formulations including glyphosate. Polyethoxylated tallowamines are several orders of magnitude more cytotoxic than glyphosate (Mesnage, et al., 2013); the mode of action is cell death with inhibition of the mitochondrial succinate dehydrogenase activity and membrane damage leading to necrosis. This mode of action is different from glyphosate while similar to that observed for glyphosate-based formulations (Benachour and Seralini, 2009). These tallowamines also produce oxidative and DNA damage (Nobels, et al., 2011), and increase the apoptotic potential of glyphosate (Kim, et al., 2013). Other surfactants as well as solvents used in pesticides formulations are cytotoxic and possibly genotoxic (Nobels, et al., 2011)."

It will be seen in the following data tables that a variety of substances have been added to the product to increase or enhance absorption. Unfortunately, it has not been possible to assess the actual constituent components of Roundup surfactants because (in the U.S.) such mixtures are protected as "proprietary" formulations. For example, the label on Roundup Original Max herbicide (which contains a proprietary surfactant) merely states "Other Ingredients: 51.3%."  In other words, more than half of the volume of the product consists of water and unknown substances.

Without good information, substance toxicity cannot be scientifically or toxicologically evaluated with reliance and accuracy. It should be further noted that individual chemical assessment is the recommended worldwide method for carcinogenic substances as highlighted in the previous document:

The UN and EU guidance recommends carcinogenicity and genotoxicity studies to be conducted on individual chemicals, limiting testing of mixtures/formulations to cases where synergistic effects are expected (United Nations 2015).[72]

---

[71] Tarazona, et al., "Glyphosate toxicity and carcinogenicity: a review of the scientific basis of the European Union assessment and its differences with IARC," National Institutes of Health, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5515989/

[72] Id.

Pilliod v. Monsanto Co.
January 14, 2019
Page 30

**Table 7** lists the various substances Mr. & Mrs. Pilliod were most likely exposed from their Roundup® exposures during the years 1982 to 2009.[73]

**Table 7**
**List of 22 Chemicals Known to be Present in Roundup® Based on Product Labels[74] and Used by the Pilliods based on Product and Year**

| Compound/Substance | Years Label Shows Used in Roundup |
|---|---|
| 1-dodecanamine (surfactant) | 1999 |
| Ammonium Sulfate | 2002 |
| Antifoam ("A," "AF," "C") | 1999 |
| Antimicrobial Agent | 1992, 1995, 1998, 2002 |
| Dimethyl polysiloxane | 1995 |
| Dipropylene glycol | 1998, 2002 |
| Glyphosate | 1992, 1995, 1996, 1998, 2002 |
| MON 013962 Technical Solution | 1999 |
| Nonanoic acid | 1998, 2002 |
| Pelargonic acid | 1992, 1995, 2002 |
| Polyoxyethylene alkyl amine | 2002 |
| Polyoxyethylene alkyl phosphate ester (surfactant) | 1999 |
| Polyoxyethylene alkylamine (surfactant) | 1992, 1995, 1999 |
| Potassium hydroxide | 1992, 1995, 1998, 2002 |
| Propylene glycol (co-solvent) | 1999 |
| SAG 10 | 1999 |
| SAG 30 | 1999 |
| Silicone emulsion | 1999 |
| Silicone emulsion (dimethylpolysiloxane) | 1998, 2002 |
| Surfactant Blend (tallowamine, glycerine) | 2002 |
| Surfactant Mon 59112 | 1996, 1998, 1999, 2002 |
| Water | 1992, 1995, 1996, 1998, 2002 |

---

[73] Note: No product formulation data was provided Super concentrate or ready-to-use formulations for U.S. EPA registration years 1982 to 1994, 1997, 1999, 2001, 2003-2008 or 2010.

[74] Product formulation data provided by Monsanto in response to Interrogatory demand for only certain years. The above years correspond to the years these products were used by the Pilliods. No product formulation data was provided for U.S. EPA registration years 1993, 1994, 1997, 1999, 2001, 2003-2008 or 2010.

Pilliod v. Monsanto Co.
January 14, 2019
Page 31

There are several critical points to note with respect to this formulation chronology:

- The basic product formulation has not changed significantly over the years.

- Although every product contains surfactants in various forms, the word "surfactant" only appears in selected years. Labels often substituted different POEAs as a specific surfactant. Sometimes a proprietary mixture is presented in abbreviated form.

- **Table 8** presents a detailed breakdown of the various Roundup® formulations available to the Pilliods, based on the product labels available for assessment.

**Table 8**

**Roundup® formulations used by the Pilliods - Chemicals within Glyphosate and Roundup Surfactants, Adjuvants and Co-formulants**

| Product Brand Name | Formulation(s) |
|---|---|
| Roundup® Ready-To-Use Weed & Grass Killer EPA Reg: 71995-08 (7/13/1992) | ████████████████████████████ ██████████████████████████ ███ |
| ROUNDUP ® SuperConcentrate Weed& Grass Killer 2 (12-3-1999) | █████████████████ ███████████████ ███████████ █████████████████ ████████████████████ ██████████████ ██████████████ |
| Roundup® Ready-To-Use Weed & Grass Killer [1] EPA Reg: 71995-12 (8/16/1995) | ████████████████████████████ ██████████████████████████████ █████████████████ |
| Roundup® Ready-To-Use Weed & Grass Killer [2] EPA Reg: 71995-13 (11/6/1995) | ████████████████████████████ ██████████████ |
| Roundup® Weed & Grass Killer {1} Super Concentrate EPA Reg: 71995-18 (10/17/1996) | ██████████████████████████ ████████████████████████████ ████ |
| Roundup® Weed & Grass Killer [1] Ready- To-Use EPA Reg: 71995-23 (5/20/1998) | ██████████████████████████ ██████████████████████████ █████████████████████████ ██████████████████ |

Pilliod v. Monsanto Co.
January 14, 2019
Page 32

**Table 8**

**Roundup® formulations used by the Pilliods - Chemicals within Glyphosate and Roundup Surfactants, Adjuvants and Co-formulants**

| Product Brand Name | Formulation(s) |
|---|---|
| Isopropylamine Salt of Glyphosate<br><br>(MON 0139, 62%)<br><br>CAS# 38641-94-0<br><br>(July 17, 1999) | ███████████ <br> ██████ <br> ██████ <br> ███████ <br> ███████ <br> ████████ <br> █████████████ |
| Roundup® Weed & Grass Killer Ready-To-Use<br>EPA Reg: 71995-32<br>(9/9/2002)<br>(multiple formulations) | ████████████████████████ <br> ██████████████████████████ <br> ██████████████████████████ <br> ███████████████████████████ <br> ███████████████████████████ <br> ███ |
| Roundup® Ready-to-Use Weed & Grass Killer III<br>EPA Reg: 71995-33<br>(9/9/2002)<br>(multiple formulations) | ████████████████████████ <br> ██████████████████████████ <br> █████████████████████████ <br> ███████████████████████ <br> ██████████████████████████ <br> █████████████ <br><br> ██████████████████████████ <br> ████████████████ <br><br> ████████████████████████ <br> ███████████████████████████ <br> ██████████████████████████ <br> ████████████████ |

Pilliod v. Monsanto Co.
January 14, 2019
Page 33

## Carcinogenic Substances in Roundup®

There are three known carcinogenic substances identified as present in Roundup® either as formulation components or manufacturing artifacts.

- **Formaldehyde** is classified by IARC as a Class I Human Carcinogen and a probable human carcinogen (class B1) by U.S. EPA. National Cancer Institute researchers have concluded that, based on human study data and lab research, exposure to formaldehyde may cause leukemia in humans, particularly myeloid leukemia.

- **Ethylene Oxide** is a carcinogenic and mutagenic gas. It is classified by both U.S. EPA and by IARC as a human carcinogen by inhalation. Studies show that exposures to ethylene oxide are associated with an increased risk of cancers of white blood cells. Ethylene Oxide was identified by Monsanto as being present in Roundup as long ago as 2000 (per Safety Data Sheet) noting that ethylene oxide accumulates in the top ("headspace") of product containers and can be inhaled when the lid is removed. However, only very small quantities are required to produce adverse health effects. (The odor threshold for ethylene oxide varies between 250 and 700 ppm; consequently the gas is already at toxic concentrations when it can be smelled.) Efforts were made by Monsanto to *remove cancer warning labels* for ethylene oxide by virtue of the concentration being below the OSHA action trigger level.

- **N-Nitroso** (NDMA) is classified by IARC as a Class I Human Carcinogen (2012) based on mechanistic and relevant data. It is classified by the U.S. EPA as a B2 probable human carcinogen based on the induction of tumors at multiple sites in different mammal species. N-nitroso-glyphosate was identified in 1986 (per Monsanto internal document[75]); however, although a chronic feeding study was found to be unacceptable, no additional data or studies were requested. The FAO specification governing the matter stated that *"Any impurity capable of creating an adverse effect above or beyond that of the active ingredient is potentially relevant and may therefore have to be controlled by the specification."* However, there is no record of any action taken.

---

[75] Monsanto correspondence dated January 28, 2015, from ███████████████, D. discussing impurities in glyphosate products.

Pilliod v. Monsanto Co.
January 14, 2019
Page 34

**Genotoxic Agents, Promotors and Inadequately Studies Chemicals**

There are several such candidate substances in Roundup® which are (a) unclassified by regulatory agencies and/or (b) substances for which only limited data or no peer-reviewed study data exists.

Such limitations make objective assessment very difficult as there is no single source of authority or regulatory guidance upon which to draw. For example, in a European Food Safety statement,[76] POE-tallowamine caused positive carcinogenic findings in a number of test systems. The consensus was that the likely causative basis was cytotoxicity (note that POEA compounds are banned in Europe and other countries outside the U.S.) There are also inconsistent results (depending on whose data is consulted) which note that an "unidentified" glyphosate-based formulation proved to be cytotoxic in bone marrow. However, tests of other formulations were negative.

Additionally, some substances only become carcinogenic when mixed with (or in the presence of) other substances, which include formulation impurities. The interactive characteristics of such substances are not always clear. For instance, surfactant "C-6330" (an ethoxlylated fatty amine used by Monsanto) is noted as being *very toxic to aquatic organisms."* The MSDS for this surfactant actually says very little of practical use as its composition is simply noted as "Proprietary." Such obfuscation of chemical components merely serve to confound the assessment process as one does not (and cannot) know what is actually being assessed.

As previously noted, product ingredients can be examined individually when they are identified. However, it is critically important to note that when combined, these ingredients may have very different properties than the individual ingredients alone.

**Modes of Action and Safety Considerations**

Glyphosate can be applied both as a ground spray and as an aerial spray. It is used to modify plant growth, speed up the ripening of fruit, applied as a ground spray for peanuts and an aerial spray for sugarcane.[77]  Glyphosate is also sprayed directly on wheat just prior to harvest, a rather peculiar practice called "browning" or "desiccating."

---

[76] "Request for the evaluation of the toxicological assessment of the co-formulant POE-tallowamine," European Food Safety Administration, November, 2015

[77] Id.

Pilliod v. Monsanto Co.
January 14, 2019
Page 35

Glyphosate is absorbed by the leaves and stems of the plant and readily translocated throughout.  It destroys the plant by reducing the production of certain aromatic amino acids that form the proteins critical for plant growth and development.[78]   Specifically, glyphosate disrupts the shikimate acid pathway[79] by inhibiting the activity of a key enzyme (EPSP synthase) that is needed to form the essential amino acids.[80,81,82]  The shikimate acid pathway is a crucial process in all higher-order plants.  Thus, glyphosate will kill most plants. Glyphosate-resistant crops use an alternative EPSP enzyme and are, therefore, specifically engineered to withstand extremely high levels of glyphosate without perishing. This metabolic process is also a crucial one in many microorganisms, but it is not utilized directly by animals or humans.

Throughout the years, Monsanto has advertised and promoted the safety of their Roundup® products by claiming that the active ingredient, glyphosate, works by targeting an enzyme found in plants, but not in people or pets.  However, recent evidence suggests that glyphosate may disrupt the essential shikimate process in bacteria, particularly the beneficial bacteria of the human intestinal tract.

Additionally, glyphosate has been shown to sporadically cause potent inhibitions in the xenobiotic-metabolizing enzyme CYP2C9[83] which is responsible for biotransformation, metabolism and elimination of various toxic compounds from the body.[84]

---

[78] Jaworski, E. G., "Mode of action of N-phosphonomethylglycine. Inhibition of aromatic amino acid biosynthesis," 1972,   J. Agric. Food Chem. 20 (6), pg. 1195-1198.

[79] Williams, G. et al., "Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans," 2000, Regulatory Toxicology and Pharmacology, Vol.31, pg. 117 - 165.

[80] Boocock, M. R., "Kinetics of 5-enolpyruvylshikimate-3-phosphate synthase inhibition by glyphosate," 1983, FEBS Letters 154, pg. 127-133.

[81] Hollander, H., & Amrhein, N., "The site of the inhibition of the shikimate pathway by glyphosate," 1980, Plant Physiol 66(5), pg. 823-829.

[82] Schönbrunn, E. et al., "Interaction of the herbicide glyphosate with its target enzyme 5-enolpyruvylshikimate 3-phosphate synthase in atomic detail," 2001, Proc Natl Acad Sci USA Feb 13; 98(4), pg. 1376–1380.

[83] Abass, K., Turpeinen, M., and Pelkonen, O. "An evaluation of the cytochrome P450 inhibition potential of selected pesticides in human hepatic microsomes," 2009, Journal of Environmental Science and Health Part B, 44(6).

[84] Gueguen, Y. et al., "Cytochromes P450: xenobiotic metabolism, regulation and clinical importance," 2006, Ann Biol Clin (Paris) 64, pg. 535-548.

Pilliod v. Monsanto Co.
January 14, 2019
Page 36

A recent review by Samsel and Seneff (2013) hypothesized that glyphosate's known ability to disrupt the intestinal bacteria flora and to suppress a family of enzymes that play an important role in detoxifying harmful chemicals could be contributing to a rise in modern human diseases worldwide.[85]   Glyphosate has also been demonstrated to be genotoxic and carcinogenic, as discussed below in detail.

## Glyphosate (Roundup®) Formulations: Chemical and Physical Information

Glyphosate is the declared active ingredient (DAI) in Monsanto's Roundup® herbicide products; however, it is only one ingredient in the formulation and *is almost never applied in isolated form.*  Other substances (referred to as co-formulants) are added in order to modify the physicochemical properties, thereby improving the efficacy of the glyphosate-based formulation.[86,87,88]  Examples of co-formulants are spreaders, compatibility agents, anti-foaming agents, drift retardants and surfactants.  The specific identities and the amounts of co-formulants in the herbicide formulations have largely been kept confidential because they are considered by the manufacturers to be proprietary data.  Often, co-formulants are declared as "inert" as they do not act directly on the intended target, i.e., the weed.  Moreover, they historically have not been included in either toxicity tests of pesticides on mammals for the establishment of their acceptable daily intake (ADI) or in animal carcinogenicity studies.

Most glyphosate-based formulations (GBFs) contain the same three primary ingredients: (1) glyphosate salt, (2) co-formulants (e.g. surfactants) and (3) inert ingredients (e.g., "water").[89] Formulations differ from one another by the specific salt included in the formulation and the amount and type of surfactants, other co-formulants and inert ingredients.

---

[85] Samsel, A. and Seneff, S., "Glyphosate's suppression of cytochrome P450 enzymes and amino acid biosynthesis by the gut microbiome: Pathways to modern diseases," 2013, Entropy (15), pg. 1416-1463.

[86] Defarge, N. E., "Co-formulants in glyphosate-based herbicides disrupt aromatase activity in human cells below toxic levels," 2013, Int J Environ Res Public Health. 13(3), pg. 264.

[87] Nobels, I. et al., "Toxicity ranking and toxic mode of action evaluation of commonly used agricultural adjuvants on the basis of bacterial gene expression profiles," 2013, PLoS ONE 6, pg. 264.

[88] Haefs R. et al., "Studies on a new group of biodegradable surfactants for glyphosate," 2002, Pest Manag. Sci. 58, pg. 825–833.

[89] ████████████████, Confidential draft.  "Clustering glyphosate formulations with regard to the testing for dermal uptake," 2001, (Tab 15; see also MONGLY01839476 for draft of this document.)

Pilliod v. Monsanto Co.
January 14, 2019
Page 37

Glyphosate-based formulation ingredients can be examined individually; however, one must be mindful that the sum of these ingredients may have very different properties than the individual ingredients alone. This is especially important when investigating the absorption of a GBF herbicide into non-target organisms.

The salt of glyphosate in a GBF is comprised of an organic base combined with glyphosate. Glyphosate [N-(phosphonomethyl) glycine] is amphoteric (can act as either an acid or a base) and is practically insoluble in organic solvents.[90] Glyphosate as a weak acid has a hydrogen ion held to a phosphorous group by a weak electrostatic charge. By replacing this hydrogen ion with a different cation (organic base), herbicide manufacturers are able to make a more water-soluble glyphosate salt. Isopropylamine (IPA) is the organic base that is most commonly used in Roundup formulated products.[91,92] This cation is also bound by a weak electrostatic charge and may not stay with the glyphosate acid; once it is added to water by the applicator, it can be easily replaced by other positively charged ions from the water.[93]

Thus, the glyphosate that is working in the plant is usually not associated with the original salt.[94] The specific salt used in the formulation may not significantly impact herbicide performance but rather is selected to ensure that the formulated product handles well, is compatible with other products that might be included and will not cause adverse crop responses. The glyphosate concentration in the final formulation will depend on the salt used as each salt has a different molecular weight. A lighter salt will result in a higher glyphosate concentration.[95]

---

[90] Williams, G. et al., "Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans," 2000, Regulatory Toxicology and Pharmacology, Vol.31, pg. 117 - 165.

[91] Id.

[92] ▮▮▮▮▮▮▮▮▮▮▮▮, Confidential draft. "Clustering glyphosate formulations with regard to the testing for dermal uptake," 2001, (Tab 15; see also MONGLY01839476 for draft of this document.)

[93] Interactions between glyphosate and calcium salts found in water are the primary reason for adding AMS to the spray tank. (http://www.weeds.iastate.edu/mgmt/2001/glyphosateformulations.htm)

[94] ▮▮▮▮▮▮▮▮▮▮▮ Confidential draft. "Clustering glyphosate formulations with regard to the testing for dermal uptake," 2001, (Tab 15; see also MONGLY01839476 for draft of this document.)

[95] The active ingredient concentration in a GBF is specified as a glyphosate equivalent or an acid equivalent (a.e.) referring to the free form of the acid. This allows for comparability between formulations.

Pilliod v. Monsanto Co.
January 14, 2019
Page 38

Throughout the years, several salt types have been used to formulate glyphosate products including isopropylamine (IPA), ammonium, sodium and potassium glyphosate salts[96] (see **Table 9**). Glyphosate isopropylamine salt is the one most commonly used in Roundup® formulated products[97] and commonly used in all glyphosate-based products.[98]

**Table 9**

**Properties of Glyphosate and Common Salts of Glyphosate in Roundup®[99]**

| Herbicidal Agent | Solubility in water (g/L) | MW (g/mol) | Molecular Formula |
|---|---|---|---|
| Glyphosate acid | pH 1.9: 10.5<br>pH 7.0: 157 | 169.07 | $C_3H_8NO_5P$ or<br>$HOOCCH_2NHCH_2PO(OH)_2$ |
| Glyphosate Potassium salt | 900[a] | 207.16 | $C_3H_7KNO_5P$ |
| Glyphosate Ammonium salt | 300[a] | 186.11 | $C_3H_{11}N_2O_5P$ |
| Glyphosate Sodium salt | 500[a] | 191.06 | $C_3H_7NNaO_5P$ |
| Glyphosate Isopropylamine salt (IPA) | pH 7.0: 900<br>pH 4.1: 786 | 228.19 | $C_6H_{17}N_2O_5P$ or<br>$C_3H_9N - C_3H_8NO_5P$ |

[a] From "Managing Glyphosate. Performance of different salts and adjuvants." Grants Research and Development Corporation. GRDC Project code ICN00016.

Aside from the organic base and the salt used, the other major difference between glyphosate-based formulations is the inclusion of <u>co-formulants</u>. Some co-formulants are "pre-loaded" or included by the manufacturer in the GBF while others, called adjuvants, are added by the end user to modify the herbicide to the particular situation in which it is being used.[100]

---

[96] ████████████ Confidential draft. "Clustering glyphosate formulations with regard to the testing for dermal uptake." 2011, (Tab 15; see also MONGLY01839476 for draft of this document.)

[97] Giesey, J. P., Dobson, S., & Solomon, K. R., "Ecotoxicological risk assessment for Roundup herbicide," 2000, Rev. Environ. Contam. Toxicol. 167, pg. 35-120.

[98] U.S. EPA, "Registration eligibility decision-Facts: Glyphosate," 1993, United States Environmental Protection Agency, Prevention, Pesticides and Toxic Substances (7508W), EPA-738-F-93-011.

[99] http://npic.orst.edu/factsheets/archive/glyphotech.html

[100] The terms "co-formulants" and "adjuvants" are sometimes used interchangeably in the literature. A fact sheet form Cornell University states, "A pesticide adjuvant is broadly defined as any substance added to the spray tank, separate from the pesticide formulation that will improve the performance of the pesticide. Sometimes adjuvants are more narrowly defined as a substance added to a pesticide

Pilliod v. Monsanto Co.
January 14, 2019
Page 39

Adjuvants are not added to the GBF by the manufacturer mainly because different types of crops may require different types of adjuvant, e.g., certain crops are sensitive to oils, some are difficult to wet, etc. Thus, herbicide manufacturers avoid limiting the application of a given herbicide to only one crop or situation.

As an example of adjuvant use, the addition of ammonium sulfate (AMS) and water conditioners have been shown to significantly improve weed control with glyphosate. Water in some regions contains excessive amounts of salts including calcium, magnesium, iron and sodium, and these salts bind to glyphosate and reduce its absorption and solubility. The sulfate component of AMS is negatively charged and will bind to positively charged salts so that they cannot reduce the activity of glyphosate. Other commonly used adjuvants include emulsifiers, dispersants, stabilizing agents, compatibility agents, buffering agents, anti-foam agents, spreader-stickers, drift retardants and surfactants.

Some GBFs may contain a greater percentage of co-formulants than glyphosate salt. These are listed simply as "Other Ingredients" on the label. For example, the label on Roundup Original Max herbicide, which contains a proprietary surfactant, reads

| **ACTIVE INGREDIENT** | |
|---|---|
| Glyphosate N (phosphonomethyl) glycine, in the form of its potassium salt | 48.7% |
| OTHER INGREDIENTS | 51.3% |
| | 100% |

The most commonly pre-loaded co-formulants used in herbicides are surfactants. Surfactants are complex chemicals that facilitate and accentuate the emulsifying, dispersing, spreading, wetting or other surface modifying properties of aqueous solutions. For example, waxes on plant leaves are lipophilic and chemically non-polar and thus repel water while herbicides such as glyphosate are highly hydrophilic and chemically polar.

---

mixture to improve its physical qualities and, hence, its effectiveness." http://psep.cce.cornell.edu/facts-slides-self/facts/gen-peapp-adjuvants.aspx

Pilliod v. Monsanto Co.
January 14, 2019
Page 40

Adding surfactants will significantly increase how well glyphosate spreads on and enters leaf surfaces. A surfactant can also reduce the amount of glyphosate washed off of plants by rain. Surfactants in herbicides vary greatly in their nature and concentration and are added to increase the absorption rate of the acid into the plant's leaf and stem tissue. Sometimes a combination of surfactants is used in one glyphosate formulation.  The most prevalently used surfactants in herbicides contain POEA (PolyOxyEthylene alkylAmine).

The co-formulants in a GBF (individually or in combination with one another) can have a profound toxicological effect on a non-target organism.  Some of these co-formulants may synergistically attenuate the negative effects of glyphosate, or as in the case of surfactants which can increase dermal absorption, may simply increase glyphosate's systemic exposure.  Surfactants, as well as other co-formulants, are particularly important with respect to a risk assessment and are, therefore, discussed in detail later in this report.

Roundup is offered in dry or aqueous formulations at various concentrations. Glyphosate is commonly formulated with water at 2.13 M (356 g/L free acid) or as an isopropylamine salt 480 g/L.[101] The ethoxylated tallowamine (POEA) surfactant in Roundup Classic is designated by Monsanto as MON 0818[102] with a concentration that is typically reported as approximately 15% of the formulation weight to volume or 150 g/L.[103,104,105,106]

---

[101] Williams, G. et al., "Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans," 2000, Regulatory Toxicology and Pharmacology, Vol.31, pg. 117 - 165.

[102] Monsanto response to the concern of the Slovenian authorities on the composition of the Plant Protection Product MON 79376 (360 g/ 1 glyphosate) and the surfactant MON 59117 (CAS n ° 68478-96-6). MONGLY02817577

[103] Id.

[104] Diamond, G., Durkin, P., "Effects of surfactants on the toxicity of glyphosate with specific reference to RODEO," 1997, Syracuse Research Corporation, SERA TR 97-206-1b.

[105] Giesey, J. P., Dobson, S., & Solomon, K. R., "Ecotoxicological risk assessment for Roundup herbicide," 2000, Rev. Environ. Contam. Toxicol. 167, pg. 35-120.

[106] Defarge, N. E., "Co-formulants in glyphosate-based herbicides disrupt aromatase activity in human cells below toxic levels, 2016, Int J Environ Res Public Health, Vol. 13(3, pg. 264.

Pilliod v. Monsanto Co.
January 14, 2019
Page 41


## Toxicological Considerations of Mr. & Mrs. Pilliod's Exposure and Dose

In assessing exposure, toxicologists examine how humans come into contact with chemicals, the amounts of the chemical that enters the body (absorbed dose) as a result of contact and how these amounts change over time (pharmacokinetics). The goal of the exposure assessment is to quantify the amounts over various time periods. The quantitative expression of those amounts is referred to as <u>dose</u>. Thus, dose is the measurement needed to quantify a chemical's risk of toxicity. Therefore, the first goal of any exposure assessment is to objectively establish dose.

### Glyphosate Exposure

The ubiquitous use of Roundup imposes a tremendous increase in the potential for human exposure, not only to the active ingredient (glyphosate) but to other chemicals (or "co-formulants") as well. This section reviews the dose measurement methods.

### Systemic Dose

When a person is exposed to a chemical such as glyphosate, the dose physically contacting the body is referred to as the "exposure dose." This is different from the "systemic dose" which enters the bloodstream and reaches various organs within the body.

Systemic dose is typically only a portion of the exposure dose and is identified through pharmacokinetic (PK) or chemical disposition studies that can trace the fate of a chemical after it enters the body. Pharmacokinetic studies investigate the amount of a chemical absorbed by the body, how the chemical is distributed throughout the body to specific tissues, how the chemical is metabolized and finally, how a compound is excreted from the body. This is commonly known as ADME (absorption, distribution, metabolism and excretion).

ADME data is applied in conjunction with epidemiological and occupational exposure studies that have included biomonitoring and dosimetry for use in the human health risk assessment process. Thus, pharmacokinetic studies provide a necessary link between estimates of exposure, toxicity studies and estimates of human risk. It is, therefore, imperative that these studies are designed, conducted and interpreted accurately.

Pilliod v. Monsanto Co.
January 14, 2019
Page 42

### Routes of Exposure

The route of exposure controls how a chemical is absorbed into the body. The primary routes by which potential toxins become absorbed into a person's system are (a) ingestion, (b) inhalation and (c) dermal absorption.

#### *Ingestion*

Ingestion of herbicides may be intentional (as in suicides and poisonings) or unintentional through the consumption of residue-laden foods. In the current matter of assessing exposure in operator use, intentional ingestion is not considered since it will contribute negligibly to the overall exposure.

#### *Inhalation*

Since the vapor pressure of glyphosate is very low ($9.8 \times 10^{-8}$ mm Hg or $1.31 \times 10^{-2}$ mPa at $25°C$),[107] inhalation during mixing and preparation of an herbicide is typically not a significant contributor to exposure <u>unless</u> an aerosol is produced. Thus, inhalation during spray application of the herbicide can be a factor. Such exposure depends mainly on droplet size of the spray and the equipment used for spraying. Different nozzle types (often modified by farmers to increase discharge) will generate different volumetric droplet size distributions. Lesmes-Fabian, et al., found that for the standard discharge nozzle as used in their study, approximately 5% of the total volume of droplets was smaller than 100 μm.[108] In dry climates, droplets less than 100 μm are subject to evaporation and are respirable.

#### *Dermal Absorption*

In the current matter, Mrs. Pilliod estimated that 15% of the time the Roundup super concentrate liquid was mixed by her husband while 85% of the time, the ready-to-use product was used. For occupational users such as farmers, a key determinant of a person's exposure is how the herbicide is actually handled and/or applied.[109] This dermal exposure will occur throughout the mixing, loading and application of herbicides as well as through re-entry (i.e., handling stems, leaves or soil after herbicide treatment). In the

---

[107] National Toxicology Program, U.S. Department of Health and Human Services.

[108] Lesmes-Fabian, C., Garcia-Santos, G., Leuenberger, F., Nuyttens, D., & Binder, C. R, "Dermal exposure assessment of pesticide use: The case of sprayers in potato farms in the Colombian highlands," 2012, Science of the Total Environment, 430, pg. 202-208.

[109] Curwin, B.D. et al., "Urinary and hand wipe pesticide levels among farmers and non-farmers in Iowa," 2005, Journal of Exposure Analysis and Environmental Epidemiology, Vol. 15, pg. 500–508.

Pilliod v. Monsanto Co.
January 14, 2019
Page 43

above dose calculation for the Pilliods, zero mixing and handling was included in the dose calculation equations using the Home & Garden POEM methodology. Thus, Mr. Pilliod's dermal exposure was significantly underestimated.

Studies have found that workers performing the common farm task of "thinning" are more exposed to pesticides than (for example) workers who are harvesting or pruning.[110,111] One study[112] found a higher level of pesticides in the house and vehicle dust of the thinning workers. Additionally, their children revealed higher urinary pesticide metabolite concentrations which showed evidence of a "take-home pesticide pathway."[113] The same study showed that workers in apple or pear crops had higher pesticide metabolite concentrations than those who worked in peach, cherry or grape crops.[114] Mrs. Pilliod described most of the their work performed using Roundup® to be equivalent to selective thinning.

**Mechanisms of Absorption**

Farmers, forestry workers and landscapers are primarily exposed to herbicide chemicals through dermal contact during mixing, loading or application of the glyphosate formulation as well as through re-entry. Therefore, with respect to occupational exposure, the skin is the predominant route by which glyphosate enters the human body.

***The Dermal Barrier***

Human skin is a complex organ consisting essentially of two layers: a thin, outermost layer called the epidermis and a much thicker under-layer called the dermis. It is the outer layer of the epidermis, called the stratum corneum (SC) that provides the primary

---

[110] de Cock, J. et al., "Determinants of exposure to captan in fruit growing," 1998, Am Ind Hyg Assoc J 59, 1998a, pp. 166–172 and 1998b, pg. 158-165.

[111] Simcox, N.J. et al., "Farmworker exposure to organophosphorus pesticide residues during apple thinning in central Washington State," 1999, Am Ind Hyg Assoc J 60, pg. 752–761.

[112] Coronado, GD, Thompson, B, Strong, L, Griffith, WC, and Islas, I., "Agricultural task and exposure to organophosphate pesticides among farm workers," 2004, Environ Health Perspect 112, pg.142–147.

[113] The take-home pesticide pathway is the pathway that children and spouses of agricultural workers are exposed through. (Hyland, C. and Ouahiba Laribi, Q., "Review of take-home pesticide exposure pathway in children living in agricultural areas," 2017, Environmental Research. Volume 156, pg. 559–570.)

[114] Coronado, GD, et al., "Organophosphate pesticide exposure and work in pome fruit: Evidence for the take-home pesticide pathway," 2006, Environ Health Perspect 114 (7), pg. 999-1006.

Pilliod v. Monsanto Co.
January 14, 2019
Page 44

protective barrier function of the skin. This barrier is largely responsible for resisting the entry of foreign agents into the human body.

The stratum corneum is primarily composed of non-living cells, or corneocytes, in a brick and mortar type system of lipid matrix. Corneocytes are terminally differentiated keratinocytes that have migrated from the epidermis to the skin's surface. The composition of the stratum corneum lipid matrix is dominated by three lipid classes: (1) cholesterol, (2) free fatty acids and (3) ceramides which are waxy lipid molecules. These lipids adopt a highly ordered, three dimensional structure of stacked, densely packed lipid layers[115]  as shown in Figures 4 and 5.



Stratum corneum
Stratum lucidum
Stratum granulosum
Stratum spinosum
Stratum basale
Melanocyte
Dermis

Dead cells filled with keratin
Lamellar granules
Keratinocyte
Merkel cell
Sensory neuron

**Figure 4: Epidermal Layers of Human Skin**
Image courtesy of Wiki Journal of Medicine

---

[115] van Smeden, J. and Bouwstra, J.A., "Stratum corneum lipids: Their role for the skin barrier function in healthy subjects and atopic dermatitis patients," 2016, Curr Prob. Dermatol 49, pg. 8-26.

Pilliod v. Monsanto Co.
January 14, 2019
Page 45



**Figure 5: Layers of the epidermis, basal cell layer, stratum spinosum, stratum granulosum and the stratum corneum showing dermal penetration (Abd, 2016)[116]**

---

[116] Abd, et al., "Skin models for testing of transdermal drugs, 2016, Clin Pharmacol. 2016; 8: 163–176.

Pilliod v. Monsanto Co.
January 14, 2019
Page 46

*Percutaneous Absorption of Glyphosate*

A chemical can enter the stratum corneum directly through the corneocyte cells, through channels between the cells or through follicles, pores and glands. Due to its structure, the stratum corneum is highly lipophilic (lipid loving) and hydrophobic (tending to repel water). Thus, lipid-soluble chemicals are able to penetrate this layer into the circulatory system much more efficiently than water-soluble chemicals.

Since glyphosate is a small hydrophilic molecule, it travels easily thru the channels and follicles; however, it cannot easily pass through lipid layers. The stratum corneum is, therefore, the rate-limiting barrier in the absorption of a hydrophilic agent such as glyphosate. The rate at which glyphosate passes through this outer layer determines the overall absorption rate of the chemical into the body.

Once glyphosate has been absorbed into the stratum corneum, it may pass through into the viable epidermis and then into the dermis where it is transported systemically by the dermal blood supply or lymphatics and circulated to other areas of the body. This passive diffusion process is governed by Fick's law which states that the rate of absorption or flux (J) of any substance across a barrier is proportional to its concentration difference across that barrier.

The stratum corneum is resistant to penetration of weak acids but is much less effective against organic acids and some inorganic chemicals. Organic and alkaline chemicals can soften the keratin cells in the skin and pass through this layer to the dermis where they are able to enter systemic circulation.

The thickness of the skin, as well as its lipophilicity, varies with location on the body. Areas of the body such as the forearms, which may be particularly hairy, are most easily penetrated by chemicals since they can enter the small ducts containing the hair shafts. Chemicals can also enter through cuts, punctures or scrapes of the skin since these are breaks in the protective layer. Due to the nature of their occupation, the skin of farmers (particularly their hands) typically have a higher percentage of fine cracks and breaks than that of the average person.

Pilliod v. Monsanto Co.
January 14, 2019
Page 47

### *Percutaneous Absorption Models*

The term "percutaneous" refers to any action involving penetration of the skin. Accurate determination of the rate at which agents penetrate the skin is critical for assessing the dose and potential risk from exposure.  Dermal penetration is generally considered to occur by passive diffusion (Fick's law); however, in living organisms, biotransformation of a substance within the deeper viable regions of the skin (via metabolism) can also occur prior to systemic absorption.

The amount of a chemical that is absorbed through the skin is dependent on the properties of both the chemical and the skin.  The most significant properties impacting the absorption of a chemical are its water and lipid solubility, molecular weight, degree of ionization and polarity.[117]  The most important properties of the skin are the number (density) of follicles, the thickness of the stratum corneum and the sebum composition as well as the distance of capillaries to the surface of the skin.

Dermal penetration studies are conducted to measure the absorption or penetration of a substance through the skin barrier and into the skin and determine whether it has the potential to be absorbed into the systemic circulation.  A wide range of experimental protocols exist for the determination of percutaneous absorption; the protocol used in any particular experiment will depend on the penetrant being studied.

Penetration studies may be conducted in vivo (in whole living animals) or in vitro (outside of a living organism).  In assessing the risk of human exposure to glyphosate, the aim of a dermal absorption study is to measure the amount of glyphosate that passes into and through human skin and into systemic circulation.

Due to greater differences between rodents and humans verses primates and humans, in vivo human studies would provide the most accurate dermal penetration models. However, inasmuch as such studies would be both impractical and unethical, animals such as rats, mice, and monkeys are used for in vivo studies of the absorption of glyphosate.

---

[117] Van Ravenzwaay, B. and Leibold, E., "A comparison between in vitro rat and human and in vivo rat skin absorption studies, 2004, Toxicol. In Vitro. 18(2), pg. 219-25.

Pilliod v. Monsanto Co.
January 14, 2019
Page 48

### *Dermal Absorption In Vivo Measurement Methods*

In vivo dermal absorption measurement methods include two methods: (1) the indirect method of surface disappearance and surface recovery whereby the dermal absorption is inferred and (2) direct methods of determining dermal absorption which includes measuring glyphosate in the blood, excreta (urine or feces) or stratum corneum or by estimating through biological or pharmacological responses.[118]

Zendzian, 2000,[119] published a method for measuring glyphosate in excreta and in carcasses as well as the quantity remaining in the skin after washing.  The Zendzian study states that the United States Environmental Agency's Office of Pesticide Programs (OPP) has developed a standard protocol for evaluating the dermal penetration of pesticides in the rat.  This protocol was formalized in 1994 as a guideline for dermal absorption studies of pesticides.

As of the year 2000, in excess of 263 studies on the dermal absorption of over 160 pesticide chemicals had been submitted to OPP as part of the pesticide registration and risk assessment processes. From this standard protocol, it is possible to describe quantitatively (via dose and time) the entrance of a chemical into and penetration through the mammalian epidermis into the systemic circulation, as well as the chemical's concentration in blood, the body and its excretion in urine and feces.

### *Dermal Absorption In Vitro Measurement Methods*

Since in vivo studies are complex and expensive, in vitro methods are more widely used as a screening method for dermal penetration estimates. In vitro experiments involve the use of a diffusion cell, wherein two chambers, donor and receptor, are separated by a membrane (human or animal skin).  There are many variations, but all diffusion cells involve the penetrant passively diffusing from the donor chamber into the receptor chamber where it can be measured.

---

[118] U.S. EPA, "Dermal exposure assessment: A summary of EPA approaches," September 2007. United States Environmental Protection Agency, National Center for Environmental Assessment Office of Research and Development, EPA/600/R-07/040F

[119] Zendzian, R.P., "Dermal absorption of pesticides in the rat," 2000, AIHAJ, Vol. 61(4), pg. 473-83.

Pilliod v. Monsanto Co.
January 14, 2019
Page 49

In 2007, the U.S. EPA published "Dermal Exposure Assessment: A Summary of EPA Approaches" which provides a dermal exposure assessment methodology for treated surfaces.[120]   The U.S. EPA and other regulatory agencies accept a wide diversity of in vitro protocols, but they caution comparing these studies due to differences in study conditions. These include cell type (i.e. static or flow through), the membrane selected, composition of the receptor fluid and the dosing method (infinite or finite).

### Other Measurement Models and Methods

In a static diffusion cell, also known as a Franz cell,[121] the penetrant diffuses from the donor chamber through the membrane into a "static" receptor chamber of a fixed volume which is continually stirred. In a flow through cell or Bronaugh[122] cell, in vivo conditions are simulated by using a constantly flowing receptor fluid that mimics in vivo blood flow beneath the skin membrane.  The skin membrane is bathed below by a flowing solution maintained at 37 degrees C.

When studying the absorption of glyphosate, the membrane separating the chambers is typically human (from cadavers), rat or monkey skin and may be full thickness or dermatomed (sliced).   Dermatomed skin, wherein only the epidermis is used after it has been separated from the dermis, is commonly used because full-thickness skin can be cumbersome in the diffusion apparatus. Since glyphosate is hydrophilic, the main barrier to its diffusion across the skin resides in the stratum corneum and, therefore, the absence of the dermal tissue is generally not of concern.[123]   Ideally, when fresh skin is used, the receptor fluid should allow skin metabolic activity.

---

[120] U.S. EPA, "Dermal exposure assessment: A summary of EPA approaches," September 2007. United States Environmental Protection Agency, National Center for Environmental Assessment Office of Research and Development, EPA/600/R-07/040F

[121] Franz TJ., "Percutaneous absorption. On the relevance of in vitro data," 1975, J Invest Dermatol.  64, pg. 190–5.

[122] Bronaugh, R., H. Hood, M. Kraeling, and J. Yourick, "Determination of percutaneous absorption by *In Vitro* techniques," 1999, pg. 229-233 <u>in</u> Percutaneous Absorption, 3rd ed., R.L. Bronaugh and H.I. Maibach, eds. New York: Marcel Dekker, Inc.

[123] Williams, A.., "Transdermal and dermal drug delivery: From theory to clinical practice," 2003, London, Pharmaceutical Press.

Pilliod v. Monsanto Co.
January 14, 2019
Page 50

## Dosing Techniques and Measurement Considerations

The loading (or dosing) of the donor chamber in all diffusion cells is accomplished in one of two ways:  (1) infinite dosing or (2) finite dosing.

In the infinite dosing, or flux, technique, a high concentration of glyphosate is installed into the donor chamber (so its concentration does not decrease) while the concentration is measured in the receptor chamber over time until steady state is reached. This allows for the calculation of a permeability coefficient.

The finite dose technique allows the herbicide to be tested under conditions similar to those found in vivo.  The donor chamber is loaded with a known amount of herbicide which is depleted due to penetration during the course of the experiment. The concentration of the herbicide in the receptor fluid is measured to determine the percent of the original dose that penetrated the skin per unit area of skin over a period of time.

Loading conditions can greatly impact calculation of percent absorption. As the applied dose becomes greater than the absorbable amount, the excess does not contribute to absorption but it does diminish the observed percent of dose that is absorbed.[124] Therefore, when comparing in vitro results of percent absorption, all the dosing conditions should be maintained as finite dose applications rather than flux.[125]

Rat skin is generally (but not always) more permeable than human skin.  In a review of 79 studies which measured absorption of 110 chemicals, four chemicals were found that are less permeable through rat skin than human skin.[126]  Van Ravenzwaay also found that in comparing human in vitro skin with in vivo rat skin, the penetration of 3 of 12 chemicals was greater through human skin than thru rat skin.  This held true at 4, 8 and 10 hours after dosing.[127]

---

[124] Frasch, H.F. et al., "Analysis of finite dose dermal absorption data: Implications for dermal exposure assessment," 2014, J Expo Sci Environ Epidemiol, 24(1), pg. 65–73.

[125] Guidance Notes on Dermal Absorption, OECD Environment, Health and Safety Publications, Series on Testing and Assessment No. 156. ENV/JM/MONO(2011)36.

[126] Jung, E, and Maibach, H., "Animal models for percutaneous absorption," 2014, in  Shah, V., Maibach, H., and Jenner, J. eds. Topical Drug Bioavailability, Bioequivalence, and Penetration, 2nd ed. New York: Springer, pg. 21-40.

[127] Van Ravenzwaay, B. and Leibold, E., "A comparison between in vitro rat and human and in vivo rat skin absorption studies," 2004, Toxicol In Vitro., Vol. 18(2), pg. 219-25.

Pilliod v. Monsanto Co.
January 14, 2019
Page 51

A recent study has also questioned the reliability of converting percutaneous absorption data from rats to humans due to the mentioned differences in species as they studied the absorption of hazardous substances.[128]

### *In Vitro Dermal Absorption of Herbicides through Rat versus Human Skin*

The use of rat skin in percutaneous absorption models is premised on the theory that rat skin is generally more permeable than human skin; however, there have been some cases which have reported that rat skin is less permeable.[129]

Monsanto attempted to demonstrate (and failed) that the dermal penetration of Propachlor® (2-chloro-N-isopropyl-N-phenylacetamide) through human skin was lower than in rat skin.  Instead, the study revealed:

- Concentrate formulation: The percent penetration with human skin **is equal to** the percent penetration with rat skin.

- Spray dilution: The percent penetration with human skin **is greater than** the percent dermal penetration with rat skin (p<0.05).

- Microautoradiographies clearly revealed **stores** of Propachlor in the epidermis of human skin.[130]

### *"Triple Pack" Methodology*

The term "Triple Pack" refers to the use of three types of dermal absorption data from:  1) in vivo rat; 2) in vitro rat and 3) in vitro human dermal absorption studies.[131]  This approach is used to refine the estimation of dermal absorption by correcting for differences between in vitro and in vivo absorption rates in rats as well as for species differences between rats and humans.[132]

---

[128] Korinth G, Goen T, Schaller KH, & Drexler H., "Discrepancies between different rat models for the assessment of percutaneous penetration of hazardous substances," 2007a, *Archives of Toxicology* **81,** pg. 833-840.

[129] Hotchkiss, SA, et al., "Percutaneous absorption of 4,4'-methylene-bis (2-chloroaniline) and 4,4'-methylenedianiline through rate and human skin in vitro," March, 1993, Toxicology In Vitro, Volume 7(2), pg. 141-148.

[130] Monsanto email (Tab 21) from ▮▮▮▮▮▮▮▮ on 3/29/2002 to ▮▮▮▮▮, et al.

[131] U.S. EPA OPP Memorandum June 2, 2010.  "Review of Triple Pack dermal absorption studies for Maxim Quattro."

[132] Id.

Pilliod v. Monsanto Co.
January 14, 2019
Page 52

The "Triple Pack" approach is based on the premise that the absorption difference between humans and rats will show in the same proportion in both in vitro and in vivo test (which may not be true).  It should also be noted that the "Triple Pack" approach should be used to estimate a dermal absorption value <u>only</u> when the three studies are conducted under the same experimental conditions.[133]

Monsanto has recently (2010 – 2017) contracted with Dermal Technology Laboratories, Ltd. However, only in vitro **human cadaver skin** has been used (although potentially removed from living subjects through surgical reduction procedures). Most importantly, the DTL studies **<u>fail to include</u>** the "Triple Pack" methodology.

More <u>accurate</u> measurement models generally include animal or primate in vivo measurements since in vitro human cadaver skin does not have an intact physiologic and metabolic system present to accommodate active blood capillary transport gradients or metabolism as do the in vivo models.  Studies have shown there are species differences in the absorption of different chemicals:  measurements in rats, rabbits or pigs may or may not reflect human absorption.[134]  A more accurate model includes dermal absorption across primate (monkey) skin.  Often, though not always, in vivo monkey skin most accurately resembles percutaneous absorption across human skin.

Numerous studies have been published using skin from different animal models. However, the knowledge that there is a significant difference in absorption when it comes to different animal species and humans has led to the necessity of a thorough interpretation when adapting data from animal studies that are to be used in relation to humans.  Interpretation of the data to refine dermal absorption values can vary between regulatory authorities.[135,136]

---

[133] "Guidance notes on dermal absorption," OECD Environment, Health and Safety Publications, Series on Testing and Assessment No. 156. ENV/JM/MONO(2011) 36.

[134] Rozman, KK and Klaassen CD., "Absorption, distribution and excretion of toxicants," <u>in</u> Cassarett & Doull's Toxicology, The Basic Science of Poisons. 5th edition. 1996. McGraw-Hill.

[135] "Guidance notes on dermal absorption," OECD Environment, Health and Safety Publications, Series on Testing and Assessment No. 156. ENV/JM/MONO(2011)36.

[136] U.S. EPA OPP Memorandum June 2, 2010.  "Review of Triple Pack dermal absorption studies for Maxim Quattro."

Pilliod v. Monsanto Co.
January 14, 2019
Page 53


## Dermal Absorption and Pharmacokinetic Studies of Glyphosate

### Models Used to Measure Glyphosate Dermal Absorption

There are four primary models which have been used to measure glyphosate dermal absorption: (1) the Maibach studies of 1983 and (2) the Wester et al., studies of 1991. (3) Franz (1983) and (4) TNO (2002). All of these studies were funded by Monsanto. This section reviews these studies and assesses the findings in light of present-day objective science.

### Maibach Study (1983)

Full Title: Maibach, H.I. (1983) "(a) Elimination of [14]C-glyphosate in Rhesus monkeys following a single parenteral dose, (b) Percutaneous absorption of 14C-glyphosate in Roundup formulation in Rhesus monkeys following a single topical dose." Unpublished report No. MA-81-349, dated 1 April 1983, from University of California, School of Medicine; San Francisco, California, USA. Submitted to WHO by Monsanto Int. Services SA, Brussels, Belgium.

This Monsanto-funded study included human in vitro testing as well as an in vivo primate (monkey) testing.  The test material was a Roundup® formulation supplied by Monsanto; the formulation used was the mono isopropylamine salt of glyphosate. No surfactants or other adjuvants were listed as ingredients.

- Part (a): [14]C-Glyphosate (MON 0139; isopropylamine salt) was administered to four Rhesus monkeys through intramuscular (IM) injection. Maibach found that, on average, 89.9% of the injected dose was excreted in the urine.  He did not, however, measure the amount of glyphosate eliminated in the feces.  Maibach reported two distinct phases of urinary excretion:  (1) 0-24 hours $t_{1/2}$ = 6.9 hrs., (2) 1-7 days $t_{1/2}$ = 35.1 hrs., concluding that "systemic doses of glyphosate in MON 039 are rapidly eliminated in monkeys, predominantly via the urine."

- Part (b):  [14]C-Glyphosate (MON 0139; isopropylamine salt) was dermally applied to Rhesus monkeys at a concentration of 1.13 mg/cm$^2$.  The IM data from Part (a) was used to quantify the dermal penetration obtained in this part of the experiment.

There are problems with the findings of this study as explained below.

Pilliod v. Monsanto Co.
January 14, 2019
Page 54


Since the majority of [14]C-Glyphosate administered by IM injection was excreted rapidly thru the urine, Maibach erroneously assumed that 89.9% of the dermal dose would be eliminated in the urine as well.  He used this correction factor for incomplete urinary excretion (89.9%) to determine that 1.8% of the applied dermal dose penetrated the skin. This conclusion was errant for several reasons:

1) Two different routes of exposure (IM verses dermal);

2) Two different paths of excretion (urinary and fecal);

3) Failure to measure the [14]C-Glyphosate excreted in the feces.

Additionally, a further error was made by assuming the unrecovered glyphosate was permanently bound in the skin.  The skin-washing procedure removed 14.2% (standard deviation of 3.5%) of the applied [14]C-label on the glyphosate.  Therefore, only 16% (14.2 + 1.8) of the dermally-applied glyphosate was recovered.   "The total percent recovery … was low, i.e., 16.0%. Although a definitive explanation cannot be offered for the low recovery, previous experience suggests that much of the test material may in some way bind to or in the skin and cannot be removed by washing.  This bound material is not apparently available for systemic absorption."[137]

The key point is that this explanation is inconsistent with generally-accepted guidelines. For example, OECD guidelines[138] cite an adequate mean recovery is in the range of 100 ± 10% (OECD, 2004).  If the test material did indeed bind to or in the skin, then it could have been available for absorption and, according to guidelines given by OECD, would have to be included in the amount absorbed.[139]

In 1985, the U.S. EPA classified the Maibach, 1983, study as unacceptable since the majority of the dose could not be accounted for.  Currently, most authorized agencies calculate by "absorbed amount + amount remaining in the treated area tissue + (when

---

[137] Maibach, H.I., "(a) Elimination of 14C-glyphosate in Rhesus monkeys following a single parenteral dose, (b) Percutaneous absorption of 14C-glyphosate in Roundup formulation in Rhesus monkeys following a single topical dose," 1983, Unpublished report No. MA-81-349, from University of California, School of Medicine, San Francisco, California, USA. Submitted to WHO by Monsanto Int. Services SA, Brussels, Belgium.

[138] Guidelines require that at least 90% of the dose be accounted for compared to just 16% in the Maibach study.

[139] OECD/OCDE 427, "Guidelines for the testing of chemicals.  Skin absorption in vivo Method," Adopted: 13 April 2004.

Pilliod v. Monsanto Co.
January 14, 2019
Page 55

necessary) amount remaining in the skin tissue after a washing process" when calculating the absorption amount.[140]

In communications regarding the Maibach study, ██████████████ Senior Product Toxicologist at Monsanto, wrote (April 11, 1983):

> *"The total percent recovery (percent label removed by washing plus total percent label contained in urine) was low, i.e., 16.0%. A definitive explanation for the low recovery is not provided in the report, but the author does state that previous experience would suggest that much of the test material may in some way bind to or in the skin and cannot be removed by washing. In support of this, it has been reported (Vickers, 1963) that a "chemical reservoir" is formed in the skin after drug application which is eventually shed without penetration. Thus, it is concluded that the bound material is not apparently available for systemic absorption." [141]*

It is critical to note that the OECD guidelines state that the amount of substance not found in the donor chamber must be considered absorbed and, therefore, potentially available in the systemic circulation. This also accounts for the amount of substance deposited in the skin.[142]

Subsequent experiments have demonstrated that absorption of chemicals temporarily deposited in the skin can continue for up to 24 hours after exposure has ended. Thus temporary skin deposition will potentially underestimate the true absorption if assessed in blood or urine immediately following exposure (within 24 hours).[143]

---

[140] Jaehwan, S., "Comparison of international guidelines of dermal absorption tests used in Pesticides Exposure Assessment for Operators," 2014, Toxicol Res 4, pg. 251-260.

[141] MONGLY01330783

[142] OECD, "Guidance document for the conduct of skin absorption studies," 2004a, Paris. 28, pg.1-31.

[143] "Dermal absorption of pesticides – evaluation of variability and prevention," 2009, Danish Environmental Protection Agency. Pesticides Research No. 124, 13.1.

Pilliod v. Monsanto Co.
January 14, 2019
Page 56

**Wester, et al., Study (1991)**

Full Title: Wester, R. et al., "Glyphosate skin binding, absorption, residual tissue distribution and skin decontamination," 1991, Fundamental and Applied Toxicology 16, pp. 725-732.

This Monsanto-funded study included human in vitro testing as well as an in vivo primate (monkey) testing.  The test material was a Roundup® formulation supplied by Monsanto; it is not stated what glyphosate salt was used in the formulation. The exact formulation was not disclosed, but no surfactants or other adjuvants were listed as ingredients.

In vitro human skin absorption:  A finite dose technique was used with human plasma as the receptor fluid in a flow-through diffusion cell.  Dosing concentrations ranged from 2.6 $\mu g/cm^2$ to 154.0 $\mu g/cm^2$ with exposure times of 30 minutes, 4 hours, 8 hours and 16 hours.  The greatest absorption (2.2 ± 0.5 %) occurred at the lowest glyphosate dose concentration (2.6 $\mu g/cm^2$) after 8 hours of exposure.  This was more than twice that which was absorbed at any of the other dose concentrations after 8 hours.

The data in this study is highly variable, i.e., it shows no discernable pattern with respect to the dose and time of exposure other than that the highest percentage of absorption occurred at the lowest dermal dose.  The standard deviation of the mean was greater than the mean for 12 of the 20 means reported.  No overall accountability (mass balance) was provided for this part of the study; no data was provided with respect to how much glyphosate was lost.  Thus, it was not possible to compare the percentage lost to that of the in vivo dermal study.

In vivo rhesus monkeys IV doses:  Three Rhesus monkeys were intravenously dosed with 93 μg glyphosate and three were dosed with 9 μg glyphosate. The study found that in the six monkeys, 95% - 99% of the IV administered dose was recovered in the urine.  Overall accountability was greater than 96% of the administered doses.  Wester, et al., used these results to make the assumption that all dermally-absorbed glyphosate would similarly be excreted in the urine.  This assumption is invalid according to their data reported in the next part of the study (see below).

In vivo rhesus monkeys dermal dosing:  Eight monkeys were dermally dosed with one of two doses as summarized in **Table 10**.

Pilliod v. Monsanto Co.
January 14, 2019
Page 57

**Table 10**

**Disposition of Glyphosate Following Topical Administration to Rhesus Monkeys[144]**

| Disposition Site | Percentage of applied dose* | |
| --- | --- | --- |
| | Dose C = 5400 µg/20 cm$^2$ | Dose D = 500 µg/20 cm$^2$ |
| Urine | 2.2 ± 1.5 | 0.8 ± 0.6 |
| Feces | 0.7 ± 0.5 | 3.6 ± 1.6 |
| **Urine + Feces** | **2.9 ± 2.0** | **4.4 ± 2.2** |
| Surface Washes | 73.5 ± 6.0 | 77.1 ± 9.2 |
| Contaminated Solids | 0.05 ± 0.1 | 0.3 ± 0.1 |
| **Total** | **76.5 ± 6.7** | **81.8 ± 6.9** |

Topical administration in 4 Rhesus monkeys per dose:  *each value is the mean ± SD for 4 monkeys."

The above data reveals several critical findings:

1) The low topical dose was excreted primarily in the feces. In the monkeys administered Dose D, 3.6 % of the dermally-applied dose was recovered in the feces whereas only 0.8 % was recovered in the urine (**total dermal absorption of 4.4%).** From this data, it is apparent that **urine recovery does not accurately represent the amount of glyphosate that was dermally absorbed**. In this case, 4.5 times more glyphosate was found in the feces than in the urine.

2) This study finding is deeply troubling since epidemiology studies rely on urine concentrations to quantify the systemic dose of glyphosate exposure through dermal absorption. The lower dose (Dose D) at 500 µg/20 cm$^2$ corresponds to real world exposures in farmers and applicators. Thus, the exposure studies prepared by Monsanto that have relied on urinary excretion are in error by a factor of 4.5 times the current calculated values. From the data in this study, the total systemic dose from dermal exposure can be calculated:

$$\textbf{GLY}_{\textbf{systemic}} = \textbf{GLY}_{\textbf{urine}} + \textbf{GLY}_{\textbf{feces}}$$

$$= \textbf{GLY}_{\textbf{urine}} + \textbf{4.5 x GLY}_{\textbf{urine}}$$

$$\textbf{GLY}_{\textbf{systemic}} = \textbf{5.5 x GLY}_{\textbf{urine}}$$

---

[144] Wester, R. et al., "Glyphosate skin binding, absorption, residual tissue distribution and skin decontamination, 1991, Fundamental and Applied Toxicology 16, pg. 725-732.

Pilliod v. Monsanto Co.
January 14, 2019
Page 58

The actual systemic dose in the human epidemiological exposure studies could have been accurately quantified by including the relative amount of glyphosate that would have been excreted in the feces **but which was not measured**.

3) The dose of 5,400 µg/20 cm$^2$ is too large to accurately represent the dose/absorption relationship. As previously explained, dosing conditions can have enormous effects on percent absorption. The excessive dosing in this case is approaching infinite dosing and the excess does not contribute to absorption, but it does diminish the calculated percent of dose absorbed.[145] U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/cm$^2$; larger doses can exceed saturation of the absorption process.[146]  The resulting error herein is an **artificially reduced percent absorption**; this high saturation dose resulting in 2.9% absorption is not relevant when looking at percent absorption.

4) The effect of glyphosate on skin has been shown to depend on the relative concentration of glyphosate. Dermal cells exposed to low levels of glyphosate have been shown to induce a stiffening of the cytoskeleton (the cell's internal structural support) while higher levels of glyphosate cause gross changes in cell shape.[147]  As **realistic exposure levels were not used**, the findings are automatically suspect.

5) Only 81.8 % of the applied "Dose D" was recovered. The authors claimed that the remaining 18.2 % was "lost" since it was not detected.  If any of the missing 18.2% remained in the monkey in tissue or fluid that was not tested, the amount absorbed would have been underestimated.  The lost material is beyond the acceptable limit according to OECD guidelines of mass balance. If all of the missing 18.2 % is assumed to have remained in the monkey and is included the amount absorbed, the total % of applied dose absorbed becomes 22.6%. Either way, a casual and unverifiable "claim" that 18.2% of the dose was "lost" can scarcely be regarded as objective and should be added to the amount absorbed (4.4%) to provide an upper limit value of 22.6%.

6) The impact of surfactants on absorption is still not considered in this study.

---

[145] Frasch, H.F. et al., "Analysis of finite dose dermal absorption data: Implications for dermal exposure assessment," 2014, J Expo Sci Environ Epidemiol, Vol. 24(1), pg. 65–73.

[146] U.S. EPA OPPTS 870.7600, "Health effects test guidelines dermal penetration," August 1998, pg. 4.

[147] Heu, C. et al., "Glyphosate-induced stiffening of HaCaT keratinocytes, a peak force tapping study on living cells," 2012, Journal of Structural Biology, 178, pg. 1-7.

Pilliod v. Monsanto Co.
January 14, 2019
Page 59

From Wester, et al., it is reasonable to conclude that dermal absorption at "Dose D" reasonably estimates a **dermal absorption dose ranging from 4.4% to 22.6%**. More importantly, the epidemiological exposure studies **underestimate the systemic dose** from dermal absorption **by a factor of 4.5** due to the failure to consider hepato/fecal elimination at the lower dose levels.

### *Concern of Cross-Contamination in the Wester, et al., study (1991)*

The rhesus monkeys were placed in metabolic chairs for the dosage period (12 hours) of the study, then housed individually in metabolic cages. A belly plate and apron were positioned on the metabolism chair under the skin-dosing site. A pan collected urine, feces, and other solids such as residual food and hair. Surface washes collected the residual dose left on the skin.

Only 75-80% of the dermally applied dose was recovered in all the collections. Wester noted that the missing 20-25% dose was "lost" during the procedure, and he considered this not to be unusual as similar losses had occurred in previous studies. He attributed the loss to exfoliation of skin, which "will scatter microscopic tissue and bound chemical to the atmosphere, making total accountability impossible to achieve."

Wester did not mention any other mechanisms of loss, such as monkeys touching the dosing sites, which would have easily explained the unacceptable 20-25% loss of the dose amount. Therefore, it is reasonable to conclude that such losses did not occur.

Metabolic chairs come in various configurations as shown in the images below, as different types of research will require different restraining needs. These "chairs" allow for the isolation of body parts with the use of belly plates, restraints, etc. (See **Figure 6** and **Figure 7**).

Pilliod v. Monsanto Co.
January 14, 2019
Page 60



**Figure 6: Metabolic chairs for primates[148]**



**Figure 7: Primate chairs used in study testing**

---

[148]  Images retrieved from http://www.oipa.org/international/photo/vivisection_primates.htm and from
https://www.thomasrecording.com/solutions/solution-primate.html

Pilliod v. Monsanto Co.
January 14, 2019
Page 61

## Review of Monsanto Studies

### *Monsanto in Vitro Absorption Study of Glyphosate by DTL (2010) - (MON 79545) 450 g/L Glyphosate SL Formulation (MON 79545)*

In February 2010, Dermal Technology Laboratory (DTL) Ltd., in the United Kingdom, completed their Monsanto-commissioned laboratory study entitled "In vitro absorption of glyphosate through human epidermis" (MON 79545) wherein they investigated the absorption and distribution of glyphosate in three different herbicide formulations.  For all three formulations, they concluded that the dermal absorption of glyphosate from exposure to the herbicide would be minimal and <u>far less than 1%</u>. The study specifically concluded that, for the high undiluted dose, "the mean total amount of absorbed glyphosate was 0.0573 ug/cm$^2$ (**0.012%** of applied dose)." For the dilution 1 to 15.6 (28.8 g/L) dilution and 1 to 188 (2.4 g/L) dilution (consistent with spray applications), "the mean total amounts of absorbed glyphosate were 0.379 and 0.021 ug/cm$^2$ (**0.129%** and **0.082%** of applied dose), respectively." In this study, glyphosate was removed from the surface of the epidermis by washing and then tape stripping. The amount of glyphosate on the epidermis after tape stripping, including that absorbed, was termed "potentially biologically available" and was determined to be 0.**049%, 0.796% and 0.245%** in order of increasing glyphosate formulation concentration.

However, there are serious problems with this study (as well as with other DTL studies) that contribute to inconsistency and, as a consequence, warrant its exclusion.

The design of the study included finite dosing of 10 μL/cm$^2$ which was used on a surface of 2.54 cm$^2$; this was left un-occluded for an exposure period of 24 hours with no interim wash.  A static-type glass diffusion cell was used with dermatomed human skin.  Each formulation was applied in three doses: one concentrated dose and two diluted doses. Thus, the amount of glyphosate in the 25.4 μL volume applied depended on the dilution. The absorption process was followed by taking samples of the receptor fluid (physiological saline) at recorded intervals throughout the exposure period.

Assessment of the DTL methodology reveals that 4,589 μg glyphosate acid/cm$^2$ was used in the formulation concentrate study and 293 μg glyphosate acid/cm$^2$ was used in the 1 to 15.6 dilution and 25 μg glyphosate acid/cm$^2$ was used in the 1 to 188 dilution study.

Pilliod v. Monsanto Co.
January 14, 2019
Page 62

U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/cm$^2$; larger doses can exceed saturation of the absorption process.[149] Thus, the formulation concentration dose used *was not in compliance* and exceeded the threshold for maximum practical dose by a factor of 4.6.

DTL failed to properly follow OECD GD 28 (OECD, 2004c) regulations with respect to the definition and methodology that defines absorbed dose:

- The laboratory **did not include** the glyphosate recovered from the tape stripping as they claimed that it was not biologically available.

- They also **did not include** the amount of glyphosate recovered from stratum corneum (available for eventual absorption).

The "In vitro absorption of glyphosate through human epidermis" study presents itself as a pre-destined design failure.  It is completely inconsistent with other previous Monsanto in vitro and in vivo studies and should be excluded as DTL violated OECD test regulations

Under "OECD guidelines for the testing of chemicals, Skin Absorption: in vitro Method 428," adopted April 13,l 2004, "The test substance remaining in the skin should be considered as absorbed unless it can be demonstrated that absorption can be determined from receptor fluid values alone."  Analysis of the other components (material washed off the skin and remaining within the skin layers) allows for further data evaluation including total test substance disposition and percentage recovery.

OECD GD 28 (OECD, 2004c) notes that, under certain circumstances, in vivo skin levels of test compound need not be considered to be percutaneously absorbed.[150] This is appropriate where it can be demonstrated that test compound in the layers of skin at the end of a study will ultimately remain in the skin or be removed by the surface shedding of the stratum corneum.

However, for in vitro studies, OECD GD 28 notes that microcirculation is obliterated and the terminal stratum corneum levels may be elevated compared with in vivo levels. For these studies, OECD GD 28 states "…it is therefore necessary that skin levels of test compound measured at the end of a study be included with the receptor fluid levels to

---

[149] U.S. EPA OPPTS 870.7600, "Health effects test guidelines dermal penetration," August 1998, pg. 4.

[150] OECD Guidance notes on dermal absorption, Draft, October 22, 2010.

Pilliod v. Monsanto Co.
January 14, 2019
Page 63

determine total percutaneous absorption. Skin absorption may be expressed using receptor fluid alone provided that this can be justified."

The current approach taken by nearly all regulatory agencies is to determine the dermal absorption value by adding the absorbed dose and the chemical remaining in the application site and surrounding skin following washing. This is appropriate for both in vivo and in vitro studies, <u>unless compelling evidence</u> is presented that demonstrates that at least some portion of the residue in the skin is unlikely to be absorbed. However, there is currently some international disagreement about whether part or all of the test substance should be included in the dermal absorption value that is retained in the stratum corneum and can be removed by tape stripping.

For <u>in vivo studies</u>, it is widely accepted that, if absorption can be demonstrated as complete (see 7.1.3), then all or part of the chemical remaining in the skin may be considered as unavailable for absorption.

For <u>in vitro</u> studies, some regulatory authorities have a similar approach as for in vivo studies in that some of the amount retained in the skin may be considered as unavailable for systemic absorption.

Others would include all of the test substance retained in the skin following in vitro exposure. The following sections provide guidance to assist in the consideration of whether to exclude some portion of the residue in the skin.

**Tape stripping**

OECD GD 28 states that skin fractionation may be conducted following exposure either in vitro or in vivo, noting that tape stripping can be difficult in vitro with epidermal membranes, rodent skin, study durations of more than 24 hours or where the test preparation alters the stratum corneum.

Test substance retained in the top few layers of the stratum corneum (i.e., contained in the first few tape strips) may be removed by desquamation and therefore may not be absorbed. This includes substances retained in the top few layers of the stratum corneum as well as material that has not penetrated into the stratum corneum but is protected from wash-off; for example, in hair follicles or sweat ducts.

Pilliod v. Monsanto Co.
January 14, 2019
Page 64

In the European Union and some other countries, it is the general practice to exclude the amount that was found in the first (upper) <u>two tape strips</u> at study completion both in vitro and in vivo.

Test substance in lower layers of the stratum corneum may penetrate into the dermis or may be removed by desquamation. Determination of the potential bioavailability of this test substance should be made on a case-by-case basis.

Dermal absorption is primarily a diffusion-driven process, and therefore test substances in the lower layers of the stratum corneum should be assumed to form a reservoir that may become systemically available <u>unless it can be demonstrated in vivo</u> that absorption is complete and this test substance will remain in the stratum corneum until exfoliated.

Deviations or lack of documentation within the DTL (2010) studies include:

- Failure to include glyphosate remaining in the stratum corneum

- No documentation as to how the split-thickness skin measurement (typically 200-400 µm thick) is prepared.

- Although tape striping was performed, all of the layers were excluded from the "mean total amounts of absorbed glyphosate" at **0.012%**, **0.129%** and **0.082%** as reported.

- Tape stripping has only been discussed in the "Draft" 2010 OECD regulations and is limited to the first two tape strip extractions. Even if it were the official regulation, DTL deviated from the proposed methodology.

In summary, *"The current approach taken by nearly all regulatory agencies is to determine the dermal absorption value by adding the absorbed dose and the chemical remaining in the application site and surrounding skin following washing. This is appropriate for both in vivo and in vitro studies unless compelling evidence is presented that demonstrates that at least some portion of the residue in the skin is unlikely to be absorbed."* (OECD, "Guidance Notes on Dermal Absorption (draft)," October 22, 2010)

It is also critical to note that results of the 1 to 188 spray dilution MON 79545 dermal absorption study (0.082% absorbed) falls approximately 35 times below the prior 3% dermal absorption value established by the U.S. EPA and 54 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991).

Pilliod v. Monsanto Co.
January 14, 2019
Page 65

### *Monsanto in Vitro Absorption Study of Glyphosate by DTL (2010) - (MON 52276)*

In February 2010, Dermal Technology Laboratory (DTL) Ltd., also completed their Monsanto-commissioned lab study entitled "In vitro absorption of glyphosate through human epidermis." For MON 52276 concentrate (undiluted dose), "the mean total amount of absorbed glyphosate was 0.332 ug/cm$^2$ (0.009% of applied dose)." For the 1 to 12.5 dilution and 1 to 150 dilution (consistent with spray applications), "the mean total amounts of absorbed glyphosate were 0.086 and 0.023 ug/cm$^2$ (0.029% and **0.092%** of applied dose), respectively." Thus, compared to earlier (non-DTL studies), results of the above MON 52276 high dose dermal absorption study fell approximately 103 times below the prior 3% dermal absorption value established by the U.S. EPA and 151 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991). The MON 52276 diluted dose dermal absorption study fell approximately 33 times below the prior 3% dermal absorption value established by the US EPA and 48 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991).

### *Monsanto in Vitro Absorption Study of Glyphosate by DTL (2010) - (MON 79351)*

Studies on MON 79351, also completed in February 2010, reported for the high undiluted dose that "the mean total amount of absorbed glyphosate was 0.342 ug/cm$^2$ (**0.007%** of applied dose)." For the 1 to 16.7 dilution (consistent with spray applications), "the mean total amounts of absorbed glyphosate was 0.553 ug/cm$^2$ (**0.182%** of applied dose)." Thus, compared to earlier (non-DTL studies), results of the above MON 79351 high undiluted dose dermal absorption study fell approximately 16 times below the prior 3% dermal absorption value established by the U.S. EPA and 24 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991).

The above studies were carried out under the direction of R.J. Ward.  DTL is managed by Dave Fox who was previously the head of the in vitro percutaneous absorption group at Syngenta Central Toxicology Laboratory. (Syngenta is also a producer of glyphosate and seeds.)

The above DTL studies are vastly inconsistent and discrepant compared to all prior Monsanto glyphosate dermal absorption studies performed by non-DTL laboratories. The inexplicable differences in dermal absorption bioavailability unquestionably renders the study credibility as suspect and, as a consequence, warrants its exclusion.

Pilliod v. Monsanto Co.
January 14, 2019
Page 66

### *Monsanto in Vitro Absorption Study of Glyphosate by DTL (2015) - (MON 76829) 72 g/L Glyphosate Gel Formulation*

In April 2015, Dermal Technology Laboratory (DTL) Ltd., completed their Monsanto-commissioned lab study entitled "72 g/L Glyphosate Gel Formulation (MON 76829) - In Vitro Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate."

Human skin samples were obtained from the National Disease Research Interchange (NDRI, Philadelphia, Pennsylvania, U.S.A.). Skin sections were cut at a thickness setting of 400 μm using an electric dermatome. It is not stated in the methodology whether tissues were also separated by heat.

The type of static glass diffusion cell used in this study had an exposed skin surface area of 2.54 cm$^2$ and a receptor volume of approximately 4.5 mL. Discs of approximately 3.3 cm diameter of prepared skin were mounted, dermal side down, in diffusion cells held together with individually numbered clamps and placed in a water bath maintained at 32°C ± 1°C. A nominal application rate of 10 μL/cm$^2$ or 720 μg glyphosate acid/cm$^2$ was reported.

DTL concluded that the highly concentrated gel formulation had a dermal absorption rate of glyphosate from exposure to the herbicide gel at 6, 8 and 10 hours of 0.013 μg/cm$^2$, 0.018 μg/cm$^2$ and 0.014 μg/cm$^2$, respectively. These respective amounts expressed as percentages of the applied dose were 0.002%, 0.003% and 0.002%. The mean amount penetrated over the entire 24 hour experimental period was 0.018 μg/cm$^2$, corresponding to **0.003%** of the applied dose. "Practically all of the applied glyphosate acid (105%) was washed off the surface of the skin following the six hour exposure with a further 0.048% being removed at the 24 hour wash." The proportions of the dose applied that were recovered from the donor chamber, stratum corneum (tape strips 1-5), and remaining skin were 0.042%, 0.003% and 0.009%, respectively. The proportions of the dose applied that were recovered from the donor chamber, stratum corneum (tape strips 1-5), and remaining skin were 0.042%, 0.003% and 0.009%, respectively. The bioavailability of glyphosate acid from this gel formulation was reported to be **0.011%** of the applied dose.

Assessment of the DTL methodology reveals that 720 μg glyphosate acid/cm$^2$ was used in this study. The U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/cm$^2$; larger doses can exceed saturation of the absorption

Pilliod v. Monsanto Co.
January 14, 2019
Page 67

process.[151] Thus, the dose used was in compliance, but at the upper range (72% of the threshold).

It is not stated in the methodology whether tissues were also separated by heat and if so, what temperature or duration.  Results of the MON 76829 gel dermal absorption study fall approximately 272 times below the prior 3% dermal absorption value established by the U.S. EPA and 400 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991).

Most importantly, this study tested a glyphosate gel and did not include any surfactants which are typically a major component of Roundup formulations and allow for penetration of the formulation.

The study was carried out under the direction of Diane J. Davis who worked for Syngenta until 2007.  As mentioned earlier, DTL is managed by Dave Fox who was previously the head of the in vitro percutaneous absorption group at Syngenta Central Toxicology Laboratory. (Syngenta is also a producer of glyphosate and seeds.) This DTL study is vastly inconsistent and discrepant compared to all prior Monsanto glyphosate dermal absorption studies performed by non-DTL laboratories. The inexplicable differences in dermal absorption bioavailability renders the credibility of this study of questionable merit and, as a consequence, warrants its exclusion.

### Monsanto in Vitro Absorption Study of Glyphosate by DTL (2015) - (MON 76258) 7.2g/L Glyphosate Gel Formulation

In April 2015, Dermal Technology Laboratory (DTL) Ltd., also completed their Monsanto-commissioned lab study entitled "7.2 g/L Glyphosate Gel Formulation (MON 76258) - In Vitro Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate"

Human skin samples were obtained from the National Disease Research Interchange (NDRI, Philadelphia, Pennsylvania, U.S.A.). Skin sections were cut at a thickness setting of 400 μm using an electric dermatome. It is not stated in the methodology whether tissues were also separated by heat.

The type of static glass diffusion cell used in this study had an exposed skin surface area of 2.54 cm$^2$ and a receptor volume of approximately 4.5 mL. Discs of

---

[151] U.S. EPA OPPTS 870.7600, "Health effects test guidelines dermal penetration," August 1998, pg. 4.

Pilliod v. Monsanto Co.
January 14, 2019
Page 68

approximately 3.3 cm diameter of prepared skin were mounted, dermal side down, in diffusion cells held together with individually numbered clamps and placed in a water bath maintained at 32°C ± 1°C. A nominal application rate of 10 µL/cm$^2$ or 720 µg glyphosate acid/cm$^2$ was reported.

DTL concluded that the gel formulation had a dermal absorption rate of glyphosate from exposure to the herbicide at 6, 8 and 10 hours of 0.005 µg/cm$^2$. These respective time points can be expressed as percentages of the applied dose; i.e., 0.002%, 0.003% and 0.002%. The mean amount penetrated over the entire 24 hour experimental period was 0.006 µg/cm$^2$, corresponding to **0.008%** of the applied dose. "Practically all of the applied glyphosate acid (103%) was washed off the surface of the skin following the six hour exposure with a further 0.211% being removed at the 24 hour wash." The proportions of the dose applied that were recovered from the donor chamber, stratum corneum (tape strips 1-5), and remaining skin were 0.035%, 0.017% and 0.023%, respectively. The bioavailability of glyphosate acid from this gel formulation was **0.040%** of the applied dose.

Assessment of the DTL methodology reveals that 7.2 µg glyphosate acid/cm$^2$ was used in this study. The U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/cm$^2$; larger doses can exceed saturation of the absorption process.[152] Thus, the dose used was in compliance at the upper range (7.2% of the threshold).

It is not stated in the methodology whether tissues were also separated by heat and if so, what temperature or duration.  Results of the MON 76258 gel dermal absorption study fall approximately 75 times below the prior 3% dermal absorption value established by the U.S. EPA and 110 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991).

Most importantly, this study tested a glyphosate gel and did not include any surfactants which are typically a major component of Roundup formulations and allow for penetration of the formulation.

As above, the study was carried out under the direction of Diane J. Davis who worked for Syngenta up to 2007.  DTL is managed by Dave Fox who was previously the head of the

---

[152] U.S. EPA OPPTS 870.7600, "Health effects test guidelines dermal penetration," August 1998, pg. 4.

Pilliod v. Monsanto Co.
January 14, 2019
Page 69

in vitro percutaneous absorption group at Syngenta Central Toxicology Laboratory. (Syngenta is also a producer of glyphosate and seeds.) This DTL study is vastly inconsistent and discrepant compared to all prior Monsanto glyphosate dermal absorption studies performed by non-DTL laboratories. The inexplicable differences in dermal absorption bioavailability renders the credibility of this study of questionable merit and, as a consequence, warrants its exclusion.

### *Monsanto in Vitro Absorption Study of Glyphosate by DTL (2016) - (MON 76952) 500 g/L Glyphosate SL Formulation*

During August 2016, Dermal Technology Laboratory (DTL) Ltd., UK, also completed their Monsanto-commissioned lab study entitled "500 g/L Glyphosate SL Formulation (MON 76952) - In Vitro Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate"

Human skin samples were obtained from the National Disease Research Interchange **(NDRI,** Philadelphia, Pennsylvania, U.S.A.). Skin sections were cut at a thickness setting of 400 μm using an electric dermatome. It is not stated in the methodology whether tissues were also separated by heat.

The type of static glass diffusion cell used in this study had an exposed skin surface area of 2.54 cm$^2$ and a receptor volume of approximately 4.5 mL. Discs of approximately 3.3 cm diameter of prepared skin were mounted, dermal side down, in diffusion cells held together with individually numbered clamps and placed in a water bath maintained at 32°C ± 1°C. A nominal application rate of 10 μL/cm$^2$ or 720 μg Glyphosate acid/cm$^2$ was reported.

DTL concluded that the 500 g/L formulation concentrate had a dermal absorption rate of glyphosate with the mean amount penetrated over the entire 24 hour experimental period of 0.022 μg/cm$^2$, corresponding to 0.022% of the applied dose. The mean amount penetrated over the entire 24 hour experimental period was 0.512 μg/cm$^2$, corresponding to **0.010%** of the applied dose. Bioavailable dose was determined to be 0.088%.

The 1/500 w/v aqueous spray dilution after a small lag phase of 1 hour, there was "practically no glyphosate was absorbed (0.0006 μg/cm$^2$/hour)", the mean absorption rate of glyphosate acid through human dermatomed skin increased to 0.002 μg/cm$^2$/hour between 1-2 hour. This reduced to 0.0003 μg/cm$^2$/hour between 4-12 hours and 0.0001

Pilliod v. Monsanto Co.
January 14, 2019
Page 70

$\mu g/cm^2$/hour between 12-24 hours. Over the 24 hour experimental period the mean absorption rate was 0.0003 $\mu g/cm^2$/hour.

The amounts of glyphosate acid that were absorbed through human skin at 6, 8 and 10 hours were 0.005 $\mu g/cm^2$, 0.006 $\mu g/cm^2$ and 0.006 $\mu g/cm^2$, respectively. These amounts expressed as percentages of the applied dose were 0.052%, 0.058% and 0.063%. The mean amount penetrated over the entire 24 hour experimental period was 0.008 $\mu g/cm^2$, corresponding to **0.081%** of the applied dose. Bioavailable dose was determined to be 0.200%.

Assessment of the DTL methodology reveals that 5000 $\mu g$ Glyphosate acid/$cm^2$ and 10 $\mu g$ Glyphosate acid/$cm^2$ was used in this study. The U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/$cm^2$; larger doses can exceed saturation of the absorption process.[153] Thus, the high dose used exceeded the threshold by a factor of 5.

It is not stated in the methodology whether tissues were also separated by heat and if so, what temperature or duration.

Results of the 500 g/L MON 76952 concentrate dermal absorption study fell approximately 300 times below the prior 3% dermal absorption value established by the US EPA and 440 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., Study (1991).

Results of the spray dilution MON 76952 dermal absorption study fell approximately 37 times below the prior 3% dermal absorption value established by the US EPA and 54 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., Study (1991).

There is no indication that surfactants are present in this glyphosate formulation.

The study was carried out under the direction of Diane J. Davis who worked for Syngenta up to 2007.  DTL is managed by Dave Fox who was previously the Head of the in vitro percutaneous absorption group at Syngenta Central Toxicology Laboratory (Syngenta is also a producer of glyphosate and seeds). This DTL study is vastly inconsistent and discrepant compared to all prior Monsanto glyphosate dermal absorption studies

---

[153] U.S. EPA OPPTS 870.7600, "Health effects test guidelines dermal penetration," August 1998, pg. 4.

Pilliod v. Monsanto Co.
January 14, 2019
Page 71

performed by non-DTL laboratories. The inexplicable differences in dermal absorption bioavailability renders the credibility of this study of questionable merit and, as a consequence, warrants its exclusion.

### Monsanto in Vitro Absorption Study of Glyphosate by DTL (2015) - (MON 76879) 360 g/L Glyphosate SL Formulation

During August 2017, Dermal Technology Laboratory (DTL) Ltd., UK, also completed their Monsanto-commissioned lab study entitled "360 g/L Glyphosate SL Formulation (MON 76879) - In Vitro Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate"

Human skin samples were obtained from the National Disease Research Interchange (**NDRI,** Philadelphia, Pennsylvania, U.S.A.). Skin sections were cut at a thickness setting of 400 µm using an electric dermatome. It is not stated in the methodology whether tissues were also separated by heat.

The type of static glass diffusion cell used in this study had an exposed skin surface area of 2.54 cm$^2$ and a receptor volume of approximately 4.5 mL. Discs of approximately 3.3 cm diameter of prepared skin were mounted, dermal side down, in diffusion cells held together with individually numbered clamps and placed in a water bath maintained at 32°C ± 1°C. A nominal application rate of 10 µL/cm$^2$ or 720 µg Glyphosate acid/cm$^2$ was reported.

DTL concluded that the 360 g/L formulation concentrate had a dermal absorption rate of glyphosate from exposure to the herbicide with the mean amount penetrated over the entire 24 hour experimental period was 0.791 µg/cm$^2$, corresponding to 0.022% of the applied dose.

A 1/267 w/v aqueous spray dilution had a dermal absorption rate of glyphosate absorbed through human skin at 6, 8, 10 and 12 hours were 0.004 µg/cm$^2$, 0.004 µg/cm$^2$, 0.005 µg/cm$^2$ and 0.005 µg/cm$^2$, respectively. These amounts expressed as percentages of the applied dose were 0.029%, 0.033%, 0.035% and 0.037%. The mean amount penetrated over the entire 24 hour experimental period was 0.006 µg/cm$^2$, corresponding to **0.042%** of the applied dose.

"Practically all of the applied glyphosate acid (102%) was washed off the surface of the skin following the six hour exposure with a further 0.375% being removed at the 24 hour wash." The proportions of the dose applied that were recovered from the donor chamber,

Pilliod v. Monsanto Co.
January 14, 2019
Page 72

stratum corneum, and remaining skin were 0.080%, 0.032% and 0.111%, respectively.

The bioavailability of glyphosate acid from the spray dilution is the sum of the receptor fluid dose at 24 hours plus the amount remaining in the skin following tape stripping and tape strips 3-5. This was **0.162%** of the applied dose.

Assessment of the DTL methodology reveals that 3600 µg Glyphosate acid/cm$^2$ and 13.5 µg Glyphosate acid/cm$^2$ was used in this study. The U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/cm$^2$; larger doses can exceed saturation of the absorption process.[154] Thus, the high dose used exceeded the threshold by a factor of 3.6.

It is not stated in the methodology whether tissues were also separated by heat and if so, what temperature or duration.

Results of the spray dilution MON 76859 dermal absorption study fall approximately 18.5 times below the prior 3% dermal absorption value established by the US EPA and 27.5 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., Study (1991).

This MON 76879 commercial formulation is noted to contain a surfactant called Synergen GD2 was at a volume of 4.78% w/w, while glyphosate (pure acid, and salt) was 60.63% w/w. For comparison, the ethoxylated tallowamine (POEA) surfactant in Roundup Classic is designated by Monsanto as MON 0818[155] is a concentration that is typically reported as approximately 15% of the formulation weight to volume or 150 g/L.[156,157,158,159]   Per

---

[154] U.S. EPA OPPTS 870.7600, "Health effects test guidelines dermal penetration," August 1998, pg. 4.

[155] Monsanto response to the concern of the Slovenian authorities on the composition of the Plant Protection Product MON 79376 (360 g/ 1 glyphosate) and the surfactant MON 59117 (CAS n ° 68478-96-6). MONGLY02817577

[156] Id.

[157] Diamond, G., Durkin, P., "Effects of surfactants on the toxicity of glyphosate with specific reference to RODEO," 1997, Syracuse Research Corporation, SERA TR 97-206-1b.

[158] Giesey, J. P., Dobson, S., & Solomon, K. R., "Ecotoxicological risk assessment for Roundup herbicide," 2000, Rev. Environ. Contam. Toxicol. 167, pg. 35-120.

[159] Defarge, N. E., "Co-formulants in glyphosate-based herbicides disrupt aromatase activity in human cells below toxic levels, 2016, Int J Environ Res Public Health, Vol. 13(3, pg. 264.

Pilliod v. Monsanto Co.
January 14, 2019
Page 73

Johan van Burgsteden, "In vitro percutaneous absorption study with [14C]-glyphosate using viable rat skin membranes," June 14, 2002, **Unaudited draft report** V4478 (TNO Dermal Penetration Study);   MON 35012 is known to constitute glyphosate isopropylamine salt (46% w/w) and surfactant cocoamine (18% w/w), water and minor ingredients (35.5% w/w). In that study, penetration of glyphosate was found to range from 2.6% to 10.3%.

The study was carried out under the direction of Diane J. Davis who worked for Syngenta up to 2007.  DTL is managed by Dave Fox who was previously the Head of the in vitro percutaneous absorption group at Syngenta Central Toxicology Laboratory (Syngenta is also a producer of glyphosate and seeds). This DTL study is vastly inconsistent and discrepant compared to all prior Monsanto glyphosate dermal absorption studies performed by non-DTL laboratories. The inexplicable differences in dermal absorption bioavailability renders the credibility of this study of questionable merit and, as a consequence, warrants its exclusion.

Pilliod v. Monsanto Co.
January 14, 2019
Page 74

**Effects of Temperature on Skin Used in Laboratory Experiments**

A 1998 study[160] by Wester, et al., concluded that:

> "...human skin will sustain viability for 8 days following donor death in this system. Heat-treated (60°C water for one minute) and heat-separated epidermis and dermis **lose viability**.
>
> **Conclusions:** Human skin viability can be maintained for absorption studies. **It is recommended that** … **heat separation and skin freezing not be used** in absorption studies where skin viability and metabolism might be contributing factors to the study.
>
> "Dermatomed skin was heat-treated at 60°C for one minute to simulate the heat-separation procedure to produce epidermis separated from dermis (but no separation was performed) (Table 2). Lactate production decreased significantly (p<0.000; p<0.04) for both heat-treated skin samples. Therefore, **heating to separate epidermis from dermis damages viability**.
>
> "In another study [Table 3] lactate production was determined in heat-separated epidermis and dermis. The cumulative lactate production was much less than intact dermatomed skin, again showing the **detrimental effect of heat-separation on skin viability**."

These study citations clearly reveal that the outcomes of skin absorption tests can be influenced merely by choosing a particular skin preparation procedure. The profound differences in DTL results provide objective evidence that the laboratory may have engaged in such practices. It is further noteworthy that with regard to changes that occur in skin when subjected to low temperatures, Mesager et al., noted in a 2003 article[161] that:

> "Skin is complex and may display variable structural and metabolic change 'ex vivo'. … Frozen samples showed some sign of stratum corneum fragmentation, although this was not obvious. LDH activity measured in fresh samples kept at 4 °C was low, but it was stable up to 7 days. Fresh samples kept at 32 °C had a comparable LDH activity to the ones kept in the fridge up to 4 days. Frozen samples, thawed and then kept at 4 °C showed a stable LDH activity after 24 h of incubation. However, frozen samples incubated at 32 °C demonstrated a high variability in results, with up to 800 U/L of LDH activity after 5 days of incubation. … Although the measurement of enzyme activity was easy to perform and gave reproducible results, the use of single-enzyme activity (measuring only one pathway among the many metabolic pathways occurring within a cell) ***can be criticized when used on its own***."

**Table 11** summarizes the available glyphosate dermal absorption studies.

---

[160] Wester, et al., "Human Cadaver Skin Viability for In Vitro Percutaneous Absorption: Storage and Detrimental Effects of Heat-Separation and Freezing," 1998, Pharmaceutical Research, Vol. 15, No. 1

[161] Messager, et al., "Assessment of skin viability: Is it necessary to use different methodologies?" Skin Research and Technology, December, 2003, 9: 321–330

Pilliod v. Monsanto Co.
January 14, 2019
Page 75

**Table 11**
**Glyphosate Dermal Absorption Studies**

| Name/Author | Study Sponsor | Date | Specie | Design | Full Skin | Derma-tomed Skin | Stated % Dermal Absorption | % Absorption Including Unaccounted | Notes |
|---|---|---|---|---|---|---|---|---|---|
| Franz, "Evaluation of the percutaneous absorption of three formulations of glyphosate" | Monsanto | 1983 | Human | in vitro | Yes | Yes | 0.028% MON0139<br><br>0.063% Roundup<br><br>0.152% Spray Mix | 0.152% (fluid) plus 4.02% ("in epidermis") = 4.17% absorption | Study used unfrozen abdominal human skin obtained at autopsy; used radioactive glyphosate as labeled recovery target; failed to include unaccounted per OECD regulations; |
| Maibach, "Elimination of 14C-glyphosate in Rhesus monkeys…" | Monsanto | 1983 | Primate | in vivo | Yes | No | 1.80% | >1.8% | U.S. EPA guidelines require that at least 90% of dose be accounted for as compared to 16% in the Maibach study. U.S. EPA classified the study as <u>unacceptable</u> since the majority of dose was not accounted for. |
| Wester, "Glyphosate skin binding, absorption, residual tissue distribution and skin decontamination." | Monsanto | 1991 | Human, Primate | in vitro in vivo | Yes | No | 4.4% (low dose)<br><br>2.9% (high dose) | 22.6% (if bound and unaccounted amount added per OECP regulations) | Inappropriately large dose exceeded saturation; caused <u>artificial reduction</u> of percentage absorbed in test subjects. Additionally, study underestimates systemic dose from dermal absorption by a factor of 4.5 due to omission of fecal elimination. Authors state 18.2% was "lost." OECD regulations require bound or unaccounted dose to be added. Thus, 4.4% + 18.2% = 22.6%. |

Pilliod v. Monsanto Co.
January 14, 2019
Page 76

**Table 11**
**Glyphosate Dermal Absorption Studies**

| Name/Author | Study Sponsor | Date | Specie | Design | Full Skin | Derma-tomed Skin | Stated % Dermal Absorption | % Absorption Including Unaccounted | Notes |
|---|---|---|---|---|---|---|---|---|---|
| Wester, *"In vitro human skin absorption."* | Monsanto | 1991 | Human | *in vitro* | - | - | 2.2% (± 0.5%) | - | Internal documents record fact that Monsanto considered study results "too risky" to submit. Study discontinued by Monsanto prior to regulatory review; results never published. |
| TNO Study: van Burgsteden, "In vitro percutaneous absorption study [14C]-glyphosate using viable rat skin membranes" (MON 35012) | Monsanto | 2002 | Rat | *in vitro* | - | - | 2.6% ± 1.4 % (low dose)  10.3% ± 4.2 % (high dose) | Variable recovery Up to 18% absorption | Maximum penetration of 10.3 % occurred with the higher dose of MON 35012 concentrate which contained the surfactant Cocoamine; one test membrane absorbed approximately 18% of the applied dose. |
| TNO Study (MON 0319) (70%) | Monsanto | 2002 | Rat | *in vitro* | - | - | 1.4% ± 2.2 % (low dose)  1.3% ± 1.9 % (high dose) | Variable recovery | IPA salt of glyphosate only; no surfactant in test formulation. Wide range of statistical variability reported (more than 100%) |

Pilliod v. Monsanto Co.
January 14, 2019
Page 77

**Table 11**
**Glyphosate Dermal Absorption Studies**

| Name/Author | Study Sponsor | Date | Specie | Design | Full Skin | Derma-tomed Skin | Stated % Dermal Absorption | % Absorption Including Unaccounted | Notes |
|---|---|---|---|---|---|---|---|---|---|
| DTL, "450 g/L glyphosate *in vitro* absorption of glyphosate through human epidermis." (MON79545) | Monsanto | Feb 2010 | Human | *in vitro* | No | Yes | 0.012% (high dose) 0.129% (med dose) 0.082% (low dose) | 0.049% (high dose) 0.796% (med dose) 0.245% (low dose) | Bioavailability (i.e. (absorbed + epidermis after tape striping) was 0.049%, 0.796% and 0.245% in order of increasing glyphosate concentration applied. This would have been higher but the study excluded all glyphosate recovered from the stratum corneum.   Study did not state tissue thickness. Manually teased away dermis following 60° emersion for 40-45 seconds. Failed to include stratum corneum quantities in total absorbed dose. |

Pilliod v. Monsanto Co.
January 14, 2019
Page 78

**Table 11**
**Glyphosate Dermal Absorption Studies**

| Name/Author | Study Sponsor | Date | Specie | Design | Full Skin | Derma-tomed Skin | Stated % Dermal Absorption | % Absorption Including Unaccounted | Notes |
|---|---|---|---|---|---|---|---|---|---|
| DTL, "360 g/L glyphosate *in vitro* absorption of glyphosate through human epidermis." (MON 52276)" | Monsanto | Feb 2010 | Human | *in vitro* | No | Yes | 0.009% (high dose) 0.029% (med dose) 0.092% (low dose) | 0.064% (high dose) 0.134% (med dose) 0.277% (low dose) | Bioavailable percentage would have been higher but the study excluded all glyphosate recovered from the stratum corneum. When compared to earlier (non-DTL studies) high undiluted dose dermal absorption study this fell 333.33 times below the prior 3% dermal absorption value established by the U.S. EPA and 488.89 times less than that of the 4.4% dermal absorption rate measured in primates by Wester, et al. (1991). These inexplicable findings of vastly lower absorption findings fail to note that the glyphosate formulation is essentially unchanged since earlier studies were conducted. |

Pilliod v. Monsanto Co.
January 14, 2019
Page 79

**Table 11**
**Glyphosate Dermal Absorption Studies**

| Name/Author | Study Sponsor | Date | Specie | Design | Full Skin | Derma-tomed Skin | Stated % Dermal Absorption | % Absorption Including Unaccounted | Notes |
|---|---|---|---|---|---|---|---|---|---|
| DTL, "480 g/L glyphosate *in vitro* absorption of glyphosate through human epidermis" (MON79351)" | Monsanto | Feb 2010 | Human | *in vitro* | No | Yes | 0.007% (high dose) 0.182% (med dose) 0.048% (low dose) | 0.123% (high dose) 0.262% (med dose) 0.799% (low dose) | The bioavailable amount in the low dose dilution was 0.8%, this amount exclude all glyphosate in the stratum corneum, and would have been higher. When compared to earlier (non-DTL studies), high undiluted dose dermal absorption study fell ~16 times below the prior 3% dermal absorption value established by the US EPA and ~24 times less than that of the 4.4% dermal absorption rate measured in primates by Wester, et al. (1991). These inexplicable findings of vastly lower absorption findings fail to note that the glyphosate formulation is essentially unchanged since earlier studies were conducted. |

Pilliod v. Monsanto Co.
January 14, 2019
Page 80

**Table 11**
**Glyphosate Dermal Absorption Studies**

| Name/Author | Study Sponsor | Date | Specie | Design | Full Skin | Derma-tomed Skin | Stated % Dermal Absorption | % Absorption Including Unaccounted | Notes |
|---|---|---|---|---|---|---|---|---|---|
| DTL, "72 g/L Glyphosate Gel Formulation - *In Vitro* Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate" (MON 76829) | Monsanto | Apr 2015 | Human | *in vitro* | No | Yes | 0.003% ("applied dose") | 0.011% | No surfactants were used in this study which is a typical component that helps with absorption in Roundup formulations. Study fails to state whether tissues were separated by heat and if so what temperature or duration.  Results fall approximately 272 times below the prior 3% dermal absorption value established by the US EPA and 400 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester study (1991). Study is vastly inconsistent and discrepant compared to all prior Monsanto glyphosate dermal absorption studies performed by non-DTL laboratories |
| DTL, "72 g/L Glyphosate Gel Formulation (MON 76258) - *In vitro* Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate" | Monsanto | Apr 2015 | Human | *in vitro* | No | Yes | 0.008% ("applied dose") | 0.04% | No surfactants were used in this study which is a typical component that helps with absorption in Roundup formulations. Tissue cut @ 400 μm thickness via electrical dermatome; no implication whether tissue was heated; tissue was stored frozen at -20˚C. Complete amounts of recovered glyphosate in  stratum corneum were not included. |

Pilliod v. Monsanto Co.
January 14, 2019
Page 81

**Table 11**
**Glyphosate Dermal Absorption Studies**

| Name/Author | Study Sponsor | Date | Specie | Design | Full Skin | Derma-tomed Skin | Stated % Dermal Absorption | % Absorption Including Unaccounted | Notes |
|---|---|---|---|---|---|---|---|---|---|
| DTL, "500 g/L Glyphosate SL Formulation - *In vitro* Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate," (MON 76952) | Monsanto | Aug 2016 | Human | *in vitro* | No | Yes | 0.010% (high dose) 0.081% (diluted dose) | 0.088% (High dose) 0.200% (diluted dose) | 5,000 µg glyphosate acid/cm$^2$ and 10 µg glyphosate acid/cm$^2$ used. U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/cm$^2$; larger doses can exceed saturation of the absorption process.  Thus, the high dose used exceeded the threshold by a factor of 5. Tissue cut @ 400 µm thickness via electrical dermatome; no implication whether tissue was heated; tissue was stored frozen at -20℃.  There is no indication that surfactants are present in this glyphosate formulation. |

Pilliod v. Monsanto Co.
January 14, 2019
Page 82

**Table 11**
**Glyphosate Dermal Absorption Studies**

| Name/Author | Study Sponsor | Date | Specie | Design | Full Skin | Derma-tomed Skin | Stated % Dermal Absorption | % Absorption Including Unaccounted | Notes |
|---|---|---|---|---|---|---|---|---|---|
| DTL, "360 g/L Glyphosate SL Formulation (MON 76258) - *In vitro* Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate" | Monsanto | Aug 2017 | Human | *in vitro* | No | Yes | 0.022% (high dose) 0.042% (diluted dose) | 0.277% (high dose) 0162% (diluted dose) | Study results fall approximately 18.5 times below the prior 3% dermal absorption value established by the US EPA and 27.5 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester study (1991). Tissue cut @ 400 μm thickness via electrical dermatome; no implication whether tissue was heated; tissue was stored frozen at -20˚C. Surfactants use is at a percentage lower that typical/classic glyphosate formulations |

Pilliod v. Monsanto Co.
January 14, 2019
Page 83



Figure 8: Historical Dermal Absorption Factors by Study[162]

The study compilation presented in Table 11 reveals a remarkable finding. As shown in **Figure 8**, something "unexplained" appears to have happened in 2010. Monsanto made no significant alterations in product formulations, yet glyphosate dermal absorption inexplicably dropped – *by more than two orders of magnitude.*

This remarkable event may possibly be explained by the fact that the results for each year (2010, 2015, 2016, 2017) were produced by the same laboratory ("DTL"). As no other evident changes in product formulation occurred, it is evident that procedures and methodology at DTL have impacted the results. The DTL reports offered to account for this change in percent absorption were vague and non-specific. DTL (as previously noted) failed to apply "Triple Pack" methods to validate their *in vitro* laboratory tests.

The DTL establishment was contracted by Monsanto and managed by a gentleman who was previously in charge of the in vitro percutaneous absorption group at Syngenta Central Toxicology Laboratory – who is also a producer of glyphosate and seeds.

---

[162] Wester used roundup which contained surfactants; Maybach's dermal absorption was radio labeled glyphosate dissolved in roundup which contained surfactants and water; TNO study formulation also contained surfactants.

Pilliod v. Monsanto Co.
January 14, 2019
Page 84

## Studies, Reviews & Articles Impacted by Wester and Maibach Studies

Inasmuch as there are numerous, highly significant flaws in the two Monsanto-sponsored studies, it is important to understand the impact these have had on other studies, reviews and published articles (some of which were authored by Monsanto consultants).

1. Williams, GM, Kroes, R., and Munro, IC, "Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans," 2000, Regulatory Toxicology and Pharmacology. Vol. 31, pp. 117–165.

   The Williams, et al., risk assessment article opined that the dermal penetration of glyphosate is very low based on results from studies in Rhesus monkeys and in vitro studies with human cadaver samples.  With respect to the Wester studies, Williams failed to acknowledge the documented fecal elimination route and only relied on urinary excretion.  Additionally, Williams, et al., failed to note the difference in fecal verses urinary excretion dependent upon dose level including the extraordinarily high dose level of pure product on the skin of primates within the Wester studies.

   The Williams, et al., review stated,[163] "Maibach (1983) studied the in vivo dermal absorption of glyphosate when undiluted Roundup herbicide was applied to the skin of monkeys. Penetration was slow as only 0.4 and 1.8% of the applied dose was absorbed over 24 hours and 7 days, respectively. A second study in Rhesus monkeys investigated the absorption of diluted glyphosate (1:29) to simulate a spray solution (Wester, et al., 1991). Dermal penetration was found to be 0.8 and 2.2% at low and high dose (500 or 5,400 mg/cm$^2$, respectively). Wester, et al. (1991) also reported that the in vitro percutaneous absorption of glyphosate through human skin was no more than 2% when applied for up to 16 hours either as concentrated Roundup or as a diluted spray solution."

2. Niemann, Lars, et al., "A critical review of glyphosate findings in human urine samples and comparison with the exposure of operators and consumers," 2015, Journal für Verbraucherschutz und Lebensmittelsicherheit, Vol 10, Issue 1, pp 3-12.

   The basic assumption in Niemann, et al., is that dermally absorbed glyphosate is eliminated nearly entirely through urine and that "measuring of urine levels could be a powerful tool for human biomonitoring."  The study fails to reference or acknowledge the Wester and Maibach studies and does not consider dermally absorbed glyphosate

---

[163] Williams, pg. 123-124.

Pilliod v. Monsanto Co.
January 14, 2019
Page 85

at low, steady state rates of absorption being metabolized and excreted primarily through the feces.

Niemann, et al., states, "For active substances in plant protection products (PPP) with <u>well-defined urinary elimination</u>, no potential for accumulation and virtually no metabolism, measuring of urine levels could be a powerful tool for human biomonitoring. Such data may provide reliable estimates of actual internal human exposure that can be compared to appropriate reference values such as the 'acceptable daily intake (ADI)' or the 'acceptable operator exposure level (AOEL)'."

Based on the Wester (1991) study, the evidence of "well defined urinary elimination" has been compromised. Such an assumption is misleading and potentially dangerous with respect to the human health risk assessment and comparisons to current ADI or the AOEL regulatory levels. Studies cited by Niemann, et al., include non-dermal dose assessments such as male SD rates receiving oral dosing (Brewster et al 1991)[164], oral dosing in feed (Chan & Mahler 1992)[165] and IV and oral doses in rats (Anadon, et al., 2009).[166] None of the cited studies involve dermal dosing and **do not** establish "well defined urinary elimination" which is simply assumed. Furthermore, the Brewster study found that urine and feces were equally important routes of elimination and after 7 days the total body burden (~1%) of the dose administered was mostly in bone. Since dermal glyphosate exposure is the primary route of exposure contributing to systemic exposure in agricultural users, the assumption that distribution, metabolism, and excretion are identical by IV and dermal routes of exposure leads to **egregious errors** in systemic dose calculations.

3. Acquavella, J. et al., "**Glyphosate** biomonitoring for farmers and their families: results from the Farm Family Exposure Study,"2004, Env. Health Perspect 112, pp. 321–326.

---

[164] Brewster, D.W., Warren, J., and Hopkins, W.E., "Metabolism of glyphosate in Sprague-Dawley rats: Tissue distribution, identification, and quantitation of glyphosate-derived materials following a single oral dose," July 1991, Fundamental and Applied Toxicology, Volume 17, Issue 1, pg. 43-51.

[165] Chan, P. and Mahler, J., "Glyphosate (CAS No. 1071-83-6) administered in dosed feed to F344/N rats and B6C3F1 mice," 1992, U.S. Department of Health and Human Services. NTP Technical Reports Series No. 16. NIH Publication 92-3135.

[166] Anadón, A. et al., "Toxicokinetics of glyphosate and its metabolite aminomethyl phosphonic acid in rats," 2009, Toxicol Lett 190(1), pg. 91-95.

Pilliod v. Monsanto Co.
January 14, 2019
Page 86

In an internal Monsanto document entitled, "Glyphosate Stewardship, Epidemiology and the Farm Family Exposure Study," Monsanto scientists report the study impetus:

> "We have been working to maintain glyphosate's favorable reputation through a strategy that anticipates challenges and puts appropriate initiatives in place. One of those initiatives is a unique research program called the Farm Family Exposure Study (FFES)." [167]

The report further states

> "The FFES was developed to fill two data gaps. First, there is a (PPE) information about applicator pesticide exposure under "real world" conditions. Second, there is little empirical exposure information for farm children although children's health is a driving force in environmental regulation and a focus of epidemiologic research." [168]

The "FFES" is a biomonitoring study which evaluated urinary glyphosate concentrations for forty-eight farm families (farmers, spouses and their children) the day before, the day of and three days after a glyphosate application. The authors used the urinary concentrations to estimate systemic doses which they then compared to the U.S. EPA reference dose of 2 mg/kg/day.

The main assumption in their analytic method is "Pharmacokinetic research indicates that absorbed glyphosate is excreted unchanged, predominantly in urine (Williams 2000)."[169] Unfortunately, glyphosate is <u>not</u> excreted predominately through the urine in primates, especially at low doses, as demonstrated by the Wester, 1991, study.

The authors used the 95% urinary recovery that Wester reported using IV dosing to correct their data for complete pharmacokinetic recovery. This correction factor is <u>not applicable to this data</u> since the farmers and their family members were presumably exposed *dermally* and not through IV dosing.

Monsanto also points out the limited degree of accuracy of their urinary glyphosate measurements in the Acquavella, et al, 2004, biomonitoring study:

---

[167] "Glyphosate Stewardship, Epidemiology, and the Farm Family Exposure Study," MONGLY00905651

[168] Id, MONGLY00905652

[169] Acquavella, J., et al., "Glyphosate biomonitoring for farmers and their families: results from the Farm Family Exposure Study," 2004, Environ Health Perspect, 112, pg. 321–326.

Pilliod v. Monsanto Co.
January 14, 2019
Page 87

> "Monsanto's analytic chemistry expertise was essential to the FFES. However, **our current method is outdated**. It requires relatively large volumes of urine (100 ml, versus 5 ml for the 2,4-D and chlorpyrifos methods) and produces less precise results than methods for other FFES chemicals. **Given the likelihood that human health allegations will continue to surface for glyphosate**, it seems advisable to invest in modernizing the analytic method to increase analytic flexibility and precision."[170]

4.  Solomon, K., "Glyphosate in the general population and in applicators: a critical review of studies on exposure," 2016, Critical Reviews in Toxicology, 46(1), pp. 21-27.

    In the Solomon, 2016, review, it is again assumed that "the systemic dose of glyphosate can be estimated from the total amount of glyphosate excreted in the urine over the four or five days following and including the day of application." A "correction for incomplete excretion" of 95% is made "based on observations in TK[171] studies in monkeys which showed that 95% of total systemic dose was excreted via urine (Wester, et al., 1991), divided by 0.95."[172]  Solomon does not consider dermally absorbed glyphosate at low, steady state rates of absorption being metabolized and excreted primarily through the feces.

5.  Monsanto's Spanish "OPEX" biomonitoring study entitled, "MON 78294: An Applicator Exposure Study Conducted in Spain," Autumn 2005.

    This study was conducted in order to estimate a systemic dose for occupational users of glyphosate and determine whether certain uses of the product resulted in unacceptable levels of dermal penetration. Monsanto submitted results of the studies to Spanish regulatory authorities as part of the herbicide registration process.  A report was prepared for submission to the U.S. EPA, but it is unclear if it was ever submitted. In their determination of the systemic dose, they extrapolated the Wester, et al., 1991, study results to their biomonitoring data.  As in the other examples cited above, doing so invalidates their values of the estimated systemic dose.

---

[170] "Glyphosate Stewardship, Epidemiology, and the Farm Family Exposure Study", MONGLY00905655

[171] TK is an abbreviation for toxicokinetic and is used here as a synonym for pharmacokinetic

[172] Solomon, K., "Glyphosate in the general population and in applicators: a critical review of studies on exposures," 2016, Critical Reviews in Toxicology, 46(1), pg. 21-27.

Pilliod v. Monsanto Co.
January 14, 2019
Page 88

**Regulatory Guidance on Dermal Absorption and Recovery**

Either knowingly or unknowingly, Monsanto regularly misstates or understates glyphosate dermal absorption recovery and factors in its communications. It is not the purpose of this toxicological risk assessment to draw conclusions about the intent of such misstatements. However, it is helpful to understand the position of regulatory agencies on these points and to briefly review some key guidelines pertinent to this issue.

---

**OECD:  18-Aug-2011 GUIDANCE NOTES ON DERMAL ABSORPTION Series on Testing and Assessment No. 156**

The current default approach taken by nearly all regulatory agencies is to determine the dermal absorption value by adding the absorbed dose and the <u>chemical remaining in the skin</u>, following washing. This is appropriate for both in vivo and in vitro studies unless compelling evidence demonstrates that some portion of the residue in the skin is unlikely to be absorbed. OECD TG 427 and 428 (OECD 2004a and 2004b) require a mean mass balance <u>recovery</u> of the test substance of between <u>90–110%</u>.  The OECD GD28 (OECD 2004c) contains the same recommendation with a caveat that for volatile test substances and unlabeled test substances, a range of 80–120% is acceptable. However, with the in vivo study design, recoveries outside this range may be acceptable but must be justified.

The criteria to justify mean mass balance recovery values outside the acceptance range can be summarized by the following examples:

1. **Recovery values exceed the recommended range**: If the recoveries exceed the accepted maximum range, the data generated should not be normalized because that would result in potentially underestimated absorption values. <u>If these absorption values are not acceptable when a risk assessment is conducted, then the study should be repeated</u> to address any bias resulting from excessive recoveries.

2. **Recovery values below the recommended range**: Low recoveries raise the concern that the value for absorbed dose could be lower than that which would be achieved from a study where the recoveries were within the guideline range. The reason for low recovery may be attributable to the following factors: (a) incomplete application of dose, (b) loss to the experimental equipment, (c) incomplete extraction from matrices (or incomplete collection of exhaled $CO_2$), (d) evaporation, (e) unlabeled test preparations, metabolism or degradation or (f) insufficiently high analytical LODs/LOQs, in particular where non-labelling analytical methods are applied.

Pilliod v. Monsanto Co.
January 14, 2019
Page 89

**Errors and Omissions in Monsanto Communications**

During the glyphosate registration process in Spain, the Spanish Ministry of Health advised Monsanto of errors in their "OPEX" study. Faced with denial of Spanish product registration, Monsanto employees communicated concerns regarding pharmacokinetics of glyphosate. The following excerpts summarize some of the Monsanto communications.

A.  Communication of ████████████ (11-4-2008):  Subject:  Pk (Pharmacokinetics) recovery Wester, et al.

> "The IV data gives in vivo disposition of a systemic available dose. This dose could be the result of aggregate systemic exposure (meaning a systemic dose after combined oral, dermal, inhalation exposure). The total accountability of this experiment is high >96% - ~100% and we know exactly the amount that was systemically available. The recovery factor for urine is therefore relevant and reliable." [173]

Notably, the dose was not an "aggregate systemic exposure" as stated, but the result of an IV "push" injection. **This is clearly stated in the study.** Thus, one cannot conclude that the recovery factor from IV dosing is "relevant and reliable" to dermal dosing.  It is critical to note that IV administration presents a **tremendously high acute dose** to the liver.  Saturation of the liver as an elimination pathway to the feces would result in spill over to the urinary excretion elimination pathway.   Giving the same (IV) dose quantity over a slow drip period of 24 hours would not expose the liver to potential saturation. The email conversation further states:

> "The in vivo dermal absorption experiment yielded variable results (table 4) and much lower total accountability 77-82% which is normal for this kind of experiment. The authors take the outcome of the IV-experiment to justify the use of the urinary excretion results from the topical experiment **only** as an estimate for dermal uptake: 'Since all of the IV administered doses were excreted in urine, the percutaneous absorption of glyphosate is estimated to be 0.8-2.2% of the applied dose' (p728-729). They did not take the feces into account based on the iv-study." [174]

Either knowingly or unknowingly, Monsanto employee ████████████████ failed to take hepatic excretion through the feces into account and appears to have relied solely on the IV study. This omission produced **acutely high blood levels** not comparable to those

---

[173] MONGLY02155831

[174] Id.

Pilliod v. Monsanto Co.
January 14, 2019
Page 90

achieved through slow, steady-state dermal absorption.  Additionally, the erroneous urinary recovery assumption that Monsanto used to correct the systemic dose is in **grave error by a factor of 4.5x** and, therefore, is in no way a *"good estimate."*

B.  Communication of ▮▮▮▮▮▮▮▮ (11-4-2008, response to ▮▮▮▮▮: Subject: Pk recovery, Wester, et al.

> "Many thanks for your help which I will try to defend as Monsanto position, but the authorities will decide next week.  That: means they are now doing the homework- if our proposed safety evaluation for CAYENNE formulation is compatible with the Acceptable Operating Exposure Level (AOEL) for glyphosate. I imagine we do not have other studies on the urine/feces excretion after topical applications of glyphosate to support our position. **As it is critical that we have our product accepted in this coming meeting**, I would like to complete my defense with a paragraph like this one:
>
> "Although we believe that the Intravenous dose is accepted by toxicology peer reviewers as the best indicator to simulate the systemic presence of glyphosate, in case the Spanish authorities consider that the excretion through the urine should be taken from the **variable data** reported in the topical administration (urine/urine + feces = 75.86% or 18.18%), the average excretion in the urine of 47.02% would mean that our final exposure values should be multiplied by 2.13, resulting in exposure levels which are well below the AOEL. of 0.2 mg/kg/day." [175]

Several documents and in-house Monsanto studies report that the IV model is the best indicator as to how systemically administered glyphosate is metabolized and excreted.  This statement is <u>inaccurate</u> since it is the dermal systemic dose that is of primary interest to both toxicologists and regulatory authorities.

There are no reports of applicators intravenously injecting themselves with glyphosate. In the absence of actual primate dermal absorption data, the IV model should have been compared to animal models with urinary and fecal measurements conducted.

However, *it is not an acceptable practice in toxicology* to replace real *in vivo* data with a "model" unless the actual dermal dosing data was faulty. There is no evidence to support this.

---

[175] MONGLY02155830

Pilliod v. Monsanto Co.
January 14, 2019
Page 91

Monsanto's "variable data" problem has been used to avoid the finding of the alternate fecal elimination pathway. The "high variability" issue has been mis-applied in order to dismiss the primate dermal absorption test results.  Monsanto has dismissed the primate data by failing to disclose why the "variable data" was excessive.

The variability of the data (i.e., the percentage of urinary versus fecal elimination) varied due to absorption saturation at the high dose as described previously and, therefore, only the low dose is relevant since it is closer to real-world exposure scenarios.  Thus, the exposure values should be multiplied by **5.50,** not 2.13.

C. Communication of ███████████ (11-5-2008, response to All):  Subject:  Pk recovery, Wester, et al.

> "Even though we can absorb additional 'uncertainty factors' in our risk assessment based on our biomonitoring results, I feel uncomfortable with this discussion. This approach by Spain sets a precedent and **contradicts the fact that we always claimed to fully understand the glyphosate pharmacokinetics**. The Wester IV experiment suggests that almost the entire 'systemically' available dose was excreted in urine. The low dose topical in vivo experiment suggests that almost the entire dose (82%) that was absorbed through the skin was excreted in feces (3.6% feces versus 0.8% in urine). We should have a robust and well-documented explanation for this and stick to our original risk assessment or develop additional data to fully understand this matter and adjust our systemic dose calculations accordingly." [176]

---

[176] Id.

Pilliod v. Monsanto Co.
January 14, 2019
Page 92

D. Communication of ██████████ (11-4-2008, response to ████): Subject: Pk recovery, Wester, et al.

> "Joel, Donna & I have discussed your approach and you are correct. How much below the AOEL are your calculations? Christophe - by our rough calculations Jaime's approach is approximately 50x below the AOEL of 0.2 mg/kg/day, Even if we applied the 90th percentile for the passive dosimetry numbers we would be below the AOEL." [177]

The pharmacokinetics assumed to be correct using the IV methodology are contradicted by the primate dermal absorption studies. ██████████ states, *"This approach by Spain sets a precedent and contradicts the fact that we always claimed to fully understand the glyphosate pharmacokinetics."* This contradicts Monsanto's claim of fully understanding the pharmacokinetics of glyphosate. He cites the discrepancy in the Wester study and the need to further investigate in order to fully understand the pharmacokinetics (and thereby "adjust" systemic dose calculations).

E. Response communication of ██████████ (11-10-2008, response to All): Subject: Pk recovery, Wester, et al.

> "To fully address this issue would likely require a repeat of the monkey dermal and intravenous studies. We no longer own the custom-designed monkey chairs that prevented exfoliated abdominal skin from contaminating the excreta. Additionally, it is not clear whether similar chairs are used anymore by any researcher or if they would even be allowed. Thus, conducting a new series of monkey studies may not be easy nor inexpensive. Furthermore, it is not clear to me that such a study is necessary and would be **totally without risk**. Should we arrange a conference call to discuss this?"[178]

---

[177] MONGLY02155829

[178] MONGLY02155826

Pilliod v. Monsanto Co.
January 14, 2019
Page 93

F.  Communication of ██████████ (11-10-2008, response to team):  Subject:  Pk recovery, Wester, et al.

> "To me, all this discussion continues to show that we still need solid data for ADME (Absorption, Distribution, Metabolism and Excretion) arising from dermal exposure.
>
> 1. Our dermal absorption endpoint is based on the literature and, as I recall, we failed to get the original data to support the results.
>
> 2. The movement of glyphosate in the blood flow from dermal contact is different to that through oral or intravenous exposure. The little data we have suggests that the excretion is significantly more through the feces than the urine.
>
> 3. Dermal exposure is the greatest risk of exposure for operators. Therefore, we need to be secure on the ADME of such exposure.
>
> 4. The WHO and EU reviews focus on the IV and oral but not the dermal. My position is, therefore, unchanged. We need to address this properly in the Annex II dossier and, therefore, should be considering a study.[179]

The movement of glyphosate in the blood flow from dermal contact is different to that through oral or intravenous exposure. It is precisely because such differences exist that clinical researchers (and toxicologists) apply published study findings according to the guidance provided.

The study evidence that has documented that glyphosate *excretion is significantly more through the feces than the urine."* This finding is highly significant as it directly contradicts a key assertion found in many of Monsanto's published study results that elimination through urine alone accounts for the majority of recovery. Thus, this assumption can impact the results and accuracy of dermal absorption studies and biomonitoring studies of workers who have their urine tested.

---

[179] MONGLY02155827

Pilliod v. Monsanto Co.
January 14, 2019
Page 94

G. Communication of ████████████ (11-12-2008, response to ████████████):
   Subject:  Pk recovery, Wester, et al.

> "Monsanto is a company with recurring discussions (which is good!)... You will remember that we discussed this in length with a lot of people before we initiated the Spanish OPEX study... (please see attached). The outcome was that (1) other animal data confirmed the Wester findings; (2) such a study would **be too risky** (potential for finding another mammalian metabolite); and (3) we would wait for the evaluation of Spain. Looking forward to this discussion on the 24th of November. I also recall that David has asked 2 external pharmacologists for an opinion on the Wester study. Would that opinion be available by that time?"[180]

The charge and responsibility of the toxicologist is to determine the ADME (absorption, distribution, metabolism and excretion) as ADME are critical components in the risk assessment process.

It is always of great importance to identify all metabolites since certain chemicals have been known to produce toxic metabolites under high dose levels (such as Tylenol) or carcinogenic metabolites (such as metabolites of benzene).  Failing to perform a needed study due to the risk of finding an adverse result that could negatively impact unrelated agendas represents an unacceptable practice in the field of toxicology.

**Factors Intensifying Dermal Absorption of Glyphosate**

Beyond the underestimation of dermal absorption by Monsanto, there are additives within Roundup® formulations that further increase dermal absorption of glyphosate. There are numerous factors governing the rate and degree of glyphosate dermal absorption, both intrinsically and potentially. These include (a) "co-formulants" (ingredients other than the active ingredient such as detergents or anti-foam agents), (b) surfactants (compounds which lower surface tension), (c) humectants (to inhibit moisture loss), (d) adjuvants (chemicals which modify the effect of other agents), (e) absorption enhancement due to skin damage, lesions, cracks and other irregularities, (f) lack of personal protective gear and (g) other factors such as penetration enhancers and skin creams. This section reviews and assesses these factors as toxicological considerations.

Generally speaking, with the exception of substances of a proprietary nature or which have not been disclosed by Monsanto, most of the considerations mentioned above

---

[180] MONGLY02155826

Pilliod v. Monsanto Co.
January 14, 2019
Page 95

tend to <u>intensify</u> absorption rather than reduce it. The following sections review each factor individually given the limited information available at this time.

### Co-Formulants

The exact identities and amounts of the co-formulants in GBF herbicides are usually unknown as they are kept as confidential trade secrets. In many countries (including the U.S.), manufacturers are only required to identify the declared active ingredient (DCI), i.e. glyphosate. The co-formulants (i.e. all ingredients other than the DCI) have rarely been identified and have often been declared as "inert ingredients."[181]

Herbicide manufacturers frequently take advantage of regulatory agency definitions of "inert ingredients." Despite their name, inert ingredients may be biologically or chemically active and are labeled inert only because of their function in the formulated product. For example, an herbicide ingredient can be considered "inert" if it has no direct effect on the intended target, i.e. the weed. In herbicides, the ingredients added to enhance absorption, increase ionization, prevent foaming or reduce drifting are characterized by the manufacturer as "inert ingredients" since they do not directly kill the weeds. However, they are not necessarily without toxicity to animals or humans.

Independent studies of complete herbicide formulations are not generally possible as specific herbicide formulations are protected. Manufacturers of co-formulants have been historically unwilling to provide them to scientists who wish to assess toxicity. Consequently, most co-formulants have evaded scientific scrutiny and regulation.

In a confidential draft report dated July, 2001, entitled, "Clustering glyphosate formulations with regard to the testing for dermal uptake," Monsanto scientist ███████ ██████ stated:

> "Glyphosate has a whole series of different formulations. The differences between those formulations are based on:
> - The different salt types used to formulate the active ingredient
> - The use of different surfactants
> - The active ingredient/surfactant ratio
> - The concentrations of active ingredient and surfactants
> - The presence or absence of other inert ingredients such as anti-foam agents.

---

[181] Defarge, N. et al., "Co-formulants in glyphosate-based herbicides disrupt aromatase activity in human cells below toxic levels," 2016, Int J Environ Res Public Health, Vol. 26;13(3), pii: E264.

Pilliod v. Monsanto Co.
January 14, 2019
Page 96

He also added:

> Until today Monsanto has conducted formulation specific dermal uptake research only on the formulation Roundup (MON2139).  It is clear that because of the compositional differences, the dermal uptake data for Roundup can't be extrapolated as such towards the wide range of formulations.  Every ingredient in a formulation can have a specific influence of dermal uptake. **Scientific experimental evidence is necessary**."

Detergents in herbicides act as mediators which change the absorption by increasing bioavailability[182] or by affecting the skin barrier function.[183,184]  Brand and Mueller (2002) showed dermal penetration of commercially formulated compounds was significantly greater ($p < 0.05$) than that of pure compounds at the same concentration.[185]

### Surfactants

Like co-formulants, the exact identities and amounts of surfactants in GBF herbicides are usually unknown as they are kept as confidential trade secrets. The most predominately used surfactants in GBFs are polyoxyethylene alkylamine (POEA) surfactants.[186,187]

POEA is an acronym, not a specific chemical, which encompasses a wide range of alkyl-amine ethoxylate compounds. Within the group of POEA surfactants, the chemistry is complex and varied.   Ethoxylated tallowamine has been the traditional surfactant component and the most well-known 'inert' ingredient contained in the original Roundup® formulation and many others. It is a POEA non-ionic surfactant consisting of beef tallow fatty acid-derived alkyl chains converted to primary amines and ethoxylated

---

[182]Sartorelli, et al, 1997.

[183]Treffel, P. & Gabrad, B., "Skin penetration and sun protection factor of ultraviolet filters from two vehicle," 1996, Pharmaceut Res, Vol. 13, pg. 770-774.

[184]Tupker, R. et al., "Susceptibility to irritants: role of barrier function, skin dryness and history of atopic dermatitis," 1990, *BJD.* Volume 123, Issue 2, pg. 199–205.

[185] Brand, R.M. & Mueller, C., "Transdermal penetration of atrazine, alachlor, and trifluralin: effect of formulation," 2002, Toxicol Sci., Vol. 68(1), pg. 18-23.

[186]Williams, G., et al., "Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans," 2000, Regulatory Toxicology and Pharmacology, Vol.31, pg. 117 - 165.

[187] Diamond, G., Durkin, P., "Effects of surfactants on the toxicity of glyphosate with specific reference to RODEO," 1997, Syracuse Research Corporation, SERA TR 97-206-1b.

Pilliod v. Monsanto Co.
January 14, 2019
Page 97

with between 10 to 20 ethylene oxide (EO) units.[188] It is often mixed with polyethylene glycol, or other surfactants, plus other materials to facilitate manufacturing and formulation stability.[189] Roundup's surfactants include 1,4-dioxane (a probable human carcinogen) as an impurity at about 0.03%.[190]

POEA significantly increases penetration in plant cells as well as in animal cells. Richard, et al., found that the addition of surfactants "greatly facilitated" the penetration of glyphosate through animal cell membranes.[191]

It is helpful to understand that, due to corporate secrecy and proprietary concealment, POEA was first recognized as a common ingredient in herbicides in the 1980's when physicians in Japan reported that morbidity and deaths of patients who drank Roundup® were due to POEA, not glyphosate.[192]   POEA is an eye irritant, toxic to aquatic organisms, penetrates cell membranes and disrupts their structure and function. Diamond and Durkin made the following observations regarding surfactants in glyphosate based formulations:

1. **Multiple Formulations**: The formulations are chemical mixtures and must be considered as mixtures in toxicity assessments. In this context, an assessment of the specific surfactants in any of the formulations or generalizations about the toxicology of surfactants as a group may not apply to the formulations. This consideration places extreme importance on data regarding the toxicity of the formulations themselves. *The lack of such data will render any predictions about the effects of the formulations on glyphosate highly uncertain.*[193]

---

[188] From an internal Monsanto report, Surfactant Issue Analysis, Issue: Increasing public attention to the POEA (Polyoxyethlene alkylamine) surfactant component of glyphosate formulations in connection with claims of adverse impact to aquatic life (recently, amphibians) and human health (in vitro (cell culture) toxicity tests). MONGLY01700591

[189] Id.

[190] Monsanto, 1990 in Diamond, G., Durkin, P., "Effects of surfactants on the toxicity of glyphosate with specific reference to RODEO," 1997, Syracuse Research Corporation, SERA TR 97-206-1b.

[191] Richard, S., et al., "Differential effects of glyphosate and Roundup on human placental cells and aromatase," 2005, Environmental Health Perspectives.

[192] Sawada, Y., Nagai, Y., Ueyama, M., and Yamarnoto, I., "Probable toxicity of surface active agent in commercial herbicide containing glyphosate," 1988, Lancet 1 (8580), pg. 29.

[193] Diamond, G., Durkin, P., "Effects of surfactants on the toxicity of glyphosate with specific reference to RODEO," 1997, Syracuse Research Corporation, SERA TR 97-206-1b.

Pilliod v. Monsanto Co.
January 14, 2019
Page 98

2. **Unknown Interactions:** Surfactants can be expected to interact with and perturb the structure, physical properties and function of membranes.[194]

3. **Objective Evidence is Lacking:** For specific mechanisms of interactions between glyphosate and surfactants.[195]

4. **Multiplicity of Potential Reactions:** The structural characteristics of extreme hydrophilicity and hydrophobicity of surfactants may result in very different interactions with hydrophobic and hydrophilic herbicides. Thus, the relatively water-soluble isopropylamine salt of glyphosate may interact differently with surfactants than the less water-soluble parent compound or other more insoluble herbicides.[196]

### *Indirect Disclosures of Surfactant and Co-Formulant Toxicity*

In 2013, Mesnage, et al., published their study of nine herbicides containing glyphosate including five different formulations of Roundup. After studying the chemicals' patterns using mass spectrometry, Mesnage and his colleagues determined the identity of co-formulants in Roundup® and performed toxicity analyses.  They deduced the chemical structure of additives in six of the nine formulations and showed that each of these supposedly inert ingredients was more toxic than glyphosate alone.[197]

Subsequently, other studies have examined the toxicity of these co-formulants and measured significant enhancement of toxicity. While there occasionally may be performance differences between glyphosate products, these differences are more likely to be caused by the differences in surfactants formulated with the product.

Defarge, et al., 2016, study showed that each of the five co-formulants affected the function of both the mitochondria in human placental cells and aromatase, an enzyme that affects sexual development. Not only did these chemicals, which are not named on herbicide labels, affect biological functions, they did so at levels far below the concentrations used in commercially available products. In fact, POEA, an "inert" ingredient, was between <u>1,200 and 2,000 times more toxic to cells than glyphosate</u>,  the "active" ingredient.   They also reported that six glyphosate formulations similarly

---

[194] Id.

[195] Id.

[196] Id.

[197] Mesnage, R., Bernay, B., and Séralini, G.E., "Ethoxylated adjuvants of glyphosate-based herbicides are active principles of human cell toxicity," 2013, Toxicology 313(2-3), pg. 122-8.

Pilliod v. Monsanto Co.
January 14, 2019
Page 99

decreased aromatase activity in human placental cells at concentrations much lower than glyphosate alone [198]

## Examples of Surfactant and Co-Formulant Toxicity

There is a general agreement and consensus that co-formulants can be more toxic for animals than glyphosate itself.[199] For example, cytotoxicity of the commercial formulation Roundup® to human peripheral mononuclear cells was 30-fold higher ($LC_{50}$ = 56 mg/L) than for the active ingredient ($LC_{50}$=1640 mg/L). Several in vitro and in vivo studies with parallel testing of glyphosate active ingredient and Roundup® showed that only the commercial formulation was genotoxic.[200]

New Zealand registration data revealed Roundup contained POEA.[201]   Other formulations may contain much higher levels, even as high as 60-80%, as in the Genamin formulation.[202]   In studies using hepatic (HepG2), embryonic (HEK293) and placental (JEG3) cell lines to compare ten formulations of glyphosate, the most toxic were those that contained POEA.  This surfactant induced necrosis and disrupted the structure and function of cell membranes with negative dose-dependent effects on cellular respiration and membrane integrity between 1 and 3 mg/L.[203]
POEA potentiates the effect of glyphosate, facilitating its penetration of cell membranes and bioaccumulation in cells.[204] The bio-concentration factor for glyphosate is also increased in the presence of POEA in the aquatic environment.[205]

---

[198] Defarge, N. et al., "Co-formulants in glyphosate-based herbicides disrupt aromatase activity in human cells below toxic levels," 2016, Int. J. Environ. Res. Public Health 13, pg. 264.

[199] Defarge, N. et al., "Co-formulants in glyphosate-based herbicides disrupt aromatase activity in human cells below toxic levels," 2016, Int. J. Environ. Res. Public Health 13, pg. 264.

[200] Bolognesi, et al., "Biomonitoring of genotoxic risk in agricultural workers from five Colombian regions: Association to occupational exposure to glyphosate," 2009, Journal of Toxicology and Environmental Health Part A, 72, pg. 986—997.

[201] Watts MA, "The poisoning of New Zealand,"1994, AIT Press, Auckland. From Pesticide Action Network (PAN). http://pan-international.org/wp-content/uploads/Glyphosate-monograph.pdf

[202] Mesnage, R. et al., "Ethoxylated adjuvants of glyphosate-based herbicides are active principles of human cell toxicity," 2013.

[203] Id.

[204] Richard, S. et al., "Differential effects of glyphosate and Roundup on human placental cells and aromatase," 2005, Environ Health Perspect 113(6), pg. 716-20.

[205] Annett R, Habibi HR, Hontela A., "Impact of glyphosate and glyphosate-based herbicides on the freshwater environment," 2014, J Appl Toxicol 34(5), pg. 458-479.

Pilliod v. Monsanto Co.
January 14, 2019
Page 100

## Regulatory Considerations Based on Surfactant and Co-Formulant Toxicity

In the absence of clear, unambiguous information pertaining to a commercial product's chemical composition, some countries take a hardline approach to regulation. For example, due to toxicity concerns, Germany removed glyphosate products containing POEA from their market in 2014[206] and the European Union banned them in 2016.[207] The New Zealand Environmental Protection Agency (NZ EPA) has current approvals for 91 formulations of glyphosate of which 69 contain POEA. The New Zealand EPA refuses to name them "because the composition of the formulations is commercial-in-confidence information."[208]

This situation is typical of many countries. The decree that banned the use of glyphosate formulations containing POEA in Italy named 55 formulations, including well-known names such as Roundup®, Rodeo® and Touchdown® and brands from Cheminova, Syngenta, Nufarm, Dow AgroSciences, and Arysta as well as Monsanto and some Italian companies.[209]

The key point here is that experimental studies suggest that the toxicity of POEA is greater than the toxicity of glyphosate alone and commercial formulations alone. However, safety evaluations performed by Monsanto have largely been performed on pure glyphosate or without identification of all ingredients. There is also evidence that glyphosate preparations containing POEA are more toxic than those containing alternative surfactants. Since surfactants contribute to the toxicity of glyphosate formulations, adverse health consequences are not necessarily caused by glyphosate alone, but as a consequence of complex and variable mixtures. Even Monsanto has recognized this in correspondence (as cited in this assessment).

---

[206] Farrer P, & Falck M., "Toxic glyphosate herbicides fly under the EU's regulatory radar," 2014, Pesticides News 96, pg. 1-4.

[207] EC. 2016. Glyphosate. European Commission - Fact Sheet FAQs: Glyphosate. Brussels. June 29th. http://europa.eu/rapid/pressrelease_MEMO-16-2012_en.htm

[208] NZ Parliament. 2016. Written questions 10151, 10153, 10154. Steffan Browning to the Minister for the Environment. New Zealand Parliament Paremata Aotearoa, Wellington. https://www.parliament.nz/en/pb/order-paper-questions/ written-questions/?criteria.Keyword=glyphosate&criteria. Timeframe=&criteria.DateFrom=&criteria.DateTo=&criteria. ParliamentNumber=-1&criteria.ParliamentNumber=-1&criteria. MemberOfParliament=&criteria.Portfolio=Environment

[209] Pesticide Action Network (PAN). http://pan-international.org/wp-content/uploads/Glyphosate-monograph.pdf

Pilliod v. Monsanto Co.
January 14, 2019
Page 101

### *Monsanto TNO Dermal Penetration Study with Co-Formulant Cocoamine*

Monsanto's previously reported dermal absorption studies did not include surfactant co-formulants.  Monsanto did find evidence of the effects of one surfactant**,** cocoamine, on dermal absorption in their TNO dermal penetration studies. These studies were not submitted to the U.S. EPA or to any European regulatory agency.

TNO Study: Johan van Burgsteden, "In vitro percutaneous absorption study with [14C]-glyphosate using viable rat skin membranes," June 14, 2002, Unaudited draft report V4478 (Tab 24).

Glyphosate in formulations MON 35012 and MON 0139 (70%) was examined for in vitro percutaneous absorption through viable rat skin membranes. Both contain the IPA salt of glyphosate, but MON 35012 also contains the surfactant cocoamine. Both the concentrated formulation and the field dilution were tested as shown in **Table 12**.  After eight hours of exposure, the test substance was removed from the application site and samples of the receptor fluid were collected for an additional 40 hours.

**Table 12**
**Formulations and Doses Tested in TNO Dermal Absorption Studies**

| Formulation | Ingredients | Dose (mg gly/cm$^2$) | |
| --- | --- | --- | --- |
| | | Concentrate | Field dilution |
| MON 35012 | Glyphosate Isopropylamine salt (46% w/w)<br>Surfactant Cocoamine (18% w/w)<br>Water & minor ingredients (35.5% w/w) | 6.249 | 0.080 |
| MON 0139 70% | Isopropylamine salt (62% w/w)<br>Inert ingredients (38% w/w) | 6.343 | 0.080 |

Pilliod v. Monsanto Co.
January 14, 2019
Page 102

The investigators in this study used doses outside the range recommendations of the U.S. EPA 1998 Health Effects Test Guidelines for dermal penetration as follows:

> The maximum practical dose is on the order of 1 mg/cm$^2$—larger doses tend to fall off the skin or exceed saturation of the absorption process. When only three doses are given, the highest dose should be on the order of 0.1 mg/cm$^2$.[210]

There are two doses in this study, the higher dose being 6.2 times larger than the recommended maximum dose. Furthermore, the U.S. EPA Guidelines state that:

> The maximum dose volume should not exceed 10 µL/cm2. Larger volumes of liquid have been found to flow on the skin and produce uneven distribution on the dosed area.[211]

In this study, 10 µL of the test samples was applied on a 0.64 cm$^2$ skin surface area. This is the equivalent of 15.6 µL/cm$^2$, which is more than one and one half times greater than the recommended maximum (liquid) dose. The excess in both the concentration and the volume of the concentrated doses will contribute to absorption saturation as described by the U.S. EPA:

> The amount of chemical coverage on the skin surface can influence the amount of dermal absorption. Chemical coverage of the skin surface may be incomplete where only part of the surface is covered or it may be complete where the entire skin surface is covered. In both cases, only the amount of chemical in contact with the skin surface is available for absorption such that the capacity of the skin to absorb the chemical may be exceeded.[212]

The results of the eight hour exposures are shown in **Table 13**.

---

[210] U.S. EPA OPPTS 870.7600, "Health Effects Test Guidelines Dermal Penetration," August 1998, pg. 4.

[211] Id.

[212] U.S. EPA OPPTS 870.7600, "Health Effects Test Guidelines Dermal Penetration," August 1998, pg. 3.

Pilliod v. Monsanto Co.
January 14, 2019
Page 103

**Table 13**

**Percent Absorption of Glyphosate (percent of dose)**

| Dose | MON 35012 (containing surfactant) | | MON 0319 (70%) (no surfactant) | |
|---|---|---|---|---|
| | Penetration within 48 hrs | Mass balance | Penetration within 48 hrs | Mass balance |
| | % of dose | | % of dose | |
| Low dose | 2.6 ± 1.4 % (2.10 µg/cm²) | 73.4 % | 1.4 ± 2.2 % (1.13 µg/cm²) | 82 .6 % |
| High dose | 10.3 ± 4.2 % (646.3 µg/cm²) | 132.4 % | 1.3 ± 1.9 % (80.8 µg/cm²) | 128 .2 % |

The following key points emerged from the exposure/absorption tests:

- The maximum penetration of **10.3 %** occurred with the higher dose of MON 35012 concentrate which contained the surfactant Cocoamine.

- Even at the lower glyphosate dose of 0.080 mg/cm² of MON 35012, the penetration was 2.6 % of the dose which is greater than Monsanto had previously reported.

- The mass balance was found to range from 73 % to 132 %.  This variability is very high as guidelines cite an adequate mean recovery is in the range of 100 ± 10%. (OECD, 2004). This suggests variability in the amount of absorption among the rat skin membrane samples at each dosing.

- In fact, while the mean penetration of the higher dose in MON 35012 was 646.3 µg/cm², one membrane absorbed approximately 1,100 µg/cm², or about **18 %** of the applied dose. The mean penetration of the lower dose of MON 35012 was 2.10 µg/cm² while the maximum penetration was about 3.5 µg/cm² or approximately **4.4 %** of the applied dose.

- At the lower dose, using the worst case scenario, the missing 27% of the dose should be included in the amount absorbed and, therefore, the amount of absorbed glyphosate would be 30% of the applied dose.

The measured 10.3 % dermal absorption of glyphosate through rat skin in the presence of a surfactant was not received well by Monsanto.

Pilliod v. Monsanto Co.
January 14, 2019
Page 104

In a message from ████████████ (3-29-02) to ████████, et al:  Subject:
"TNO dermal penetration studies: new issues and topics for the conference call of
Tuesday, 2 April (8 A.M STL time)," the following was noted:

> "As of today we received preliminary surprising results on in vitro dermal penetration of
> propachlor and glyphosate through rat skin, it is imperative that we work closely together and
> communicate well on the conduct, the practical difficulties and the results associated with these
> studies.
>
> Glyphosate:
>
> - The EU rapporteur for glyphosate used a dermal penetration factor of 3% based on several
> published in vitro/in vivo dermal penetration studies
>
> - We launched human and rat in vitro dermal penetration studies with MON 35012 with and
> without surfactant
>
> - Preliminary results with rat skin are not acceptable (see fax); due to very bad reproducibility
> (sic) that TNO cannot explain, they proposed to repeat the study in parallel with the human skin
> study. However, we can already conclude that:
>
> a. For the concentrate MON 35012, the % in vitro dermal penetration of glyphosate through rat
>    skin is between 5 and 10%
>
> b. For the spray dilution of MON 35012, the % in vitro dermal penetration of glyphosate through
>    rat skin will be around 2%
>
> c. The dermal penetration of glyphosate itself in the absence of surfactant is lower than 1.5%."

A follow-up communication from Mr. ████████████ (4-2-02, to ████████████:
Subject: "TNO dermal penetration studies: new issues and topics for the conf call of
Tuesday, 2 April (8 A.M STL time)."

> "… My primary concern is with the glyphosate in terms of the potential for this work to blow
> Roundup risk evaluations (getting a much higher dermal penetration than we've ever seen
> before."

Monsanto did not share this study with the public or the scientific community. Additionally,
Monsanto decided <u>not to have it repeated</u>. Some incidental communications on this
subject are available for consideration:

Pilliod v. Monsanto Co.
January 14, 2019
Page 105

████████████ (4-4-02):

> "Although we agreed to repeat the in vitro dermal penetration study with rat skins as proposed by TNO, we came to the conclusion that the penetration of glyphosate would have been [probably] greater than the 3% already imposed by the German authorities.  We decided thus to STOP the study (effective today morning)."

With further explanation, ██████████ (4-5-02):

> "…we initiated the studies from a regulatory angle to help meet the requirements for operator exposure, given that the Annex I endpoint for dermal absorption for glyphosate was set at 3%, …the results of the rat skin studies show levels of absorption for glyphosate of a similar order to the Annex I endpoint, also confirm our expectation that surfactant concentration affects the dermal absorption… therefore, from the regulatory angle, there is no point in pursuing the studies further."

### Humectants

In addition to surfactants, Roundup® formulations also contain humectants which reduce the loss of moisture.  As Monsanto notes,[213]

> "Certain co-**formulants like humectants that will make it highly likely we will get large amounts penetrating the skin.**"

Humectants include chemicals such as ethylene glycol (anti-freeze).  Ethylene glycol is included in most Roundup formulations.  In addition to increasing dermal absorption, ethylene glycol is a toxic chemical in and of itself.[214]  It is uncertain whether Monsanto ever studied the effect of ethylene glycol on glyphosate dermal absorption.[215]

### Adjuvants

Adjuvants may be added to glyphosate formulations prior to use to improve their efficacy against weeds by enhancing penetration of glyphosate into the target plant. However, many of these may also increase the toxicity of glyphosate to other species.  For example, organosilicone surfactants, described as the most potent of adjuvants and

---

[213] Monsanto MONGLY06653096

[214] MONGLY01832749 (Toxic to children at 70 cc of Roundup with 5% ethylene glycol.)

[215] MONGLY01745304

Pilliod v. Monsanto Co.
January 14, 2019
Page 106

commonly added to glyphosate formulations, are now linked to a decline in honeybees in the U.S.[216] The common adjuvant surfactant TN-20 used in glyphosate formulations caused cell death and mitochondrial damage in rat cells which disrupts the integrity of the cellular barrier to glyphosate and promotes its toxicity.[217]  Martini, et al., (2016) demonstrated that adjuvants other than POEA inhibited proliferation and differentiation of mammalian 3T3-L1 fibroblasts to adipocytes.[218]

### Enhanced Absorption Due to Skin Damage

Skin, by its nature, is often compromised due to cracking and fissures, by cuts, scrapes, chemical damage, water-submersion, burns, sensitivity reactions, eczema and infections. This is particularly true for outdoor workers.  Breaks in the protective lipophilic barrier of the stratum corneum significantly increase absorption of hydrophilic compounds. A compromised protective lipid barrier will allow the hydrophilic glyphosate to pass through into the hydrophilic dermis, thus avoiding slow diffusion through the lipid layer. Percutaneous absorption studies have demonstrated that glyphosate deposition in damaged skin is five times that of healthy skin and penetration through damaged skin is increased 20-fold.[219]  The integrity of the skin also effects the distribution of chemicals within the skin compartments which will have implications in the efficacy of hand-washing after herbicide exposure.[220]

With respect to applicators, the acute quantity of glyphosate entering the skin is low. However, with repeated doses, especially coupled with a failure to wash the skin before it can be absorbed, the cumulative dose increases. Studies have documented that

---

[216] Mullin CA, Fine JD, Reynolds RD, Frazier MT, "Toxicological risks of agrochemical spray adjuvants: organosilicone surfactants may not be safe," 2016, Front Public Health, 4:92.

[217] Kim YH, Hong JR, Gil HW, Song HY, Hong SY, "Mixtures of glyphosate and surfactant TN20 accelerate cell death via mitochondrial damage-induced apoptosis and necrosis," 2013, Toxicol In Vitro 27(1), pg.191-197.

[218] Martini, C. et al., "Glyphosate-based herbicides with different adjuvants are more potent inhibitors of 3T3-L1 fibroblast proliferation and differentiation to adipocytes than glyphosate alone," 2016, Comparative Clinical Pathology,  Volume 25, Issue 3, pg. 607–613.

[219] Nielsen, J. et al., "Defense against dermal exposures is only skin deep: significantly increased penetration through slightly damaged skin," 2007, Arch Dermatol Res, Vol. 299, pg. 423-431.

[220] Id.

Pilliod v. Monsanto Co.
January 14, 2019
Page 107

glyphosate penetration of skin increases linearly with time. Thus, if the worker is unaware of the exposures, absorption continues.[221]

### Glyphosate's Role in Skin Damage

Evidence of glyphosate interference with mitochondrial function is increasingly emerging in the scientific literature. Mitochondria are the powerhouse bodies within cells which are necessary in the programmed cell death needed to form skin. Impairment of mitochondrial function reduces the transition of dermal to epidermal cells leading to a decrease in the protective epidermis.[222]

Additional studies by Heu, et al., have demonstrated glyphosate-induced structural changes.[223] In these studies, the control cells show Young's modulus values respectively increasing approximately 4-fold for 6 hours and 3-fold for 18 hours. These increases reflect a significant rise in cell stiffness. Heu, et al., reported that after a gentle cytotoxic treatment (6 h, 15 mM-glyphosate), the topography profile changes.  The cells exhibit a flattened membrane and a different distribution of native protrusions. They also show a complex subcellular filamentous network with numerous membrane junction points.[224] Thus, glyphosate itself has an intrinsic propensity to damage skin.

### Lack of Personal Protective Equipment (PPE)

The presence of systemic glyphosate in humans has been well documented and previously reported.[225] Acquavella, et al., performed biomonitoring of 48 farmers, their spouses and 79 children (4-18 years) for glyphosate in urine the day before as well as one and three days after glyphosate application (tractor and boom). They reported detectable levels of glyphosate in urine on the day of application in sixty percent of the farmers (geometric mean was 3 ppb, the maximum value was 233 ppb, and the highest estimated systemic dose was 0.004 mg/kg).  The maximum value of 233 ug/L was from

---

[221] Kezic, S. & Nielsen, J.B, "Absorption of chemicals through compromised skin," 2009, International Archives of Occupational and Environmental Health, Vol. 82(6), pg. *677-88*.

[222] Heu, C., et al., "A step further toward glyphosate-induced epidermal cell death: Involvement of mitochondrial and oxidative mechanisms," 2012, Environmental Toxicology and Pharmacology 34.

[223] Heu C, Berquand A, Elie-Caille C, Nicod L., "Glyphosate induced stiffening of HaCat keratinocytes, a Peak Force Tapping study in living cells," 2012, J Struc Biol 178, pg. 1-7.

[224] Id.

[225] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, et al., "Glyphosate biomonitoring for farmers and their families: results from the Farm Family Exposure Study," 2004, Environ Health Perspect 112, pg. 321-326.

Pilliod v. Monsanto Co.
January 14, 2019
Page 108

a farmer whose teenage son also had the highest urinary concentration of 29 ug/L among children. Farmers who did not use rubber gloves had five times more glyphosate in their urine than those wearing protective gloves. Various glyphosate-based formulas were used with various surfactants and/or salts. The proportions of participants with detectable urinary glyphosate differed between the two states: 87% detection rate in South Carolina; 36% in Minnesota. The urine concentrations were similarly different: 7.9 µg/L on day of application in South Carolina; 1.4 µg/L on day of application in Minnesota. The proportion of applicators wearing rubber gloves in Minnesota (96%) was much greater than that in South Carolina (43%) suggesting that the use of gloves is responsible for the differences seen. It is interesting to note that a similar proportion of glove-wearing applicators was reported by Alavanja, et al., 1999: 39% in North Carolina; 76% in Iowa.

### *Other Factors Increasing Dermal Absorption*

Various skin cream compounds applied to the skin prior to handling pesticides have been demonstrated to alter percutaneous absorption as reported in a study by Brand, et al., (2007).[226] In these studies, four commercially available moisturizing creams were tested with respect to their capacity as transdermal penetration enhancers using the herbicide 2,4-dichlorophenoxyacetic acid (2,4-D) as a model compound. Their data demonstrated that pre-treatment with three of the four creams increased the absorption of 2,4-D as evidenced by either an increased cumulative penetration or shorter lag-times.

Korinth, et al., (2003) reported that skin barrier creams have been demonstrated to enhance the penetration rates of different industrial solvents. The creams significantly enhanced the penetration rates of solvents from complex mixtures compared with the single solvents.[227]

---

[226] Brand, R. et al., "Transdermal absorption of the herbicide 2,4-dichlorophenoxyacetic acid is enhanced by both ethanol consumption and sunscreen application," 2007, Food and Chemical Toxicology, Volume 45, Issue 1, pg. 93-97.

[227] Korinth G, Geh S, Schaller KH, Drexler H., "*In vitro* evaluation of the efficacy of skin barrier creams and protective gloves on percutaneous absorption of industrial solvents," 2003, Int Arch Occup Environ Health, Vol. 76(5), pg. 382-6.

Pilliod v. Monsanto Co.
January 14, 2019
Page 109

Ethanol is also well known as a topical penetration enhancer as it is frequently used in transdermal drug delivery systems (patches). Bommannan, et al., (1991)[228] found during in vivo studies with human skin that ethanol enters the skin and removes measurable quantities of the lipid barrier material from the stratum corneum. This lipid extraction may lower the skin barrier function and render the membrane more permeable which is the most likely explanation for the effect of ethanol as a skin penetration enhancer.

The mechanism by which ethanol facilitates permeation of a solute, such as glyphosate, is referred to as the "'pull" (or "drag") effect.[229]   Hand sanitizer use has become widespread in the U.S. and typical hand sanitizers contain on average of 62% ethanol.

Thus, the use of creams and lotions to treat dry, cracking skin as well as the use of hand sanitizers potentiate the dermal absorption of glyphosate among occupational applicators.

---

[228] Bommannan D, Potts RO, Guy RH, "Examination of the effect of ethanol on human stratum-corneum in vivo using infrared-spectroscopy," 1991, J Control Release, Vol. 16, pg. 299–304.

[229] Heard CM, Kung D, Thomas CP, "Skin penetration enhancement of mefenamic acid by ethanol and 1,8-cineole can be explained by the "pull" effect," 2006, Int J Pharm., Vol. 321, pg. 167–170.

Pilliod v. Monsanto Co.
January 14, 2019
Page 110

## Part E: Toxicological Assessment of Mr. & Mrs. Pilliod's Exposure to Glyphosate (Systemic Exposure & Mechanism of NHL Induction)

### Roundup and Glyphosate Genotoxicity

Genotoxicity is the ability of a chemical to cause damage to genetic information, *i.e.* the DNA in cells, thereby causing genetic mutations that may lead to cancer. There is strong scientific evidence that that glyphosate is genotoxic and glyphosate-based formulations such as Roundup cause oxidative stress capable of damaging DNA.

A very recent study by Wozniak et al.,[230] published in 2018, incubated human peripheral blood mononuclear cells (PBMCs) for 24 hours in the formulation Roundup 360 PLUS, glyphosate, and its metabolite aminomethylphosphonic acid (AMPA). The study assessed the impact on DNA damage at concentrations of the tested chemicals ranging from 1 to 1000 μM. The Roundup formulation caused DNA damage (single strand breaks, double strand breaks, ALS formation, DNA lesions) even at concentrations as low as 5 μM, and glyphosate and AMPA caused DNA lesions at concentrations of 250 μM and 500 μM respectively. The amount of DNA damage caused by the chemicals increased from AMPA to glyphosate to Roundup 360 PLUS, with Roundup causing DNA damage at concentrations 50 times lower than glyphosate.  The DNA strand breaks induced at 10 μM application of Roundup were not repaired after incubation with PBMCs (incubation with PBMCs were shown to significantly repair DNA damage at 5 μM Roundup, 250 μM glyphosate and 500 μM AMPA were repaired). This underlined the point that glyphosate formulations are more toxic than glyphosate itself. The study also proposed that the damage occurred through oxidative reactions.

Another recent study of Suarez-Larios et al. (2017) reveals a genotoxic mode of action for glyphosate pesticides. An investigation was undertaken by Suarez-Larios, et al.,[231] to determine whether or not exposure to pesticides would induce double strand breaks (DSB) in cells (a lesion related to the formation of chromosomal rearrangements and increased leukemia risk).  Of the eight pesticides tested (endosulfan, glyphosate, pentachlorophenol, permethrin, propoxur, AMPA, endosulfan lactone, and paraoxon), four showed a significant effect on the number of cells with double strand breaks.

---

[230] Wozniak, E., et al., "The mechanism of DNA damage induced by Roundup 360 PLUS, glyphosate and AMPA in human peripheral blood mononuclear cells – genotoxic risk assessment," 2018, Food and Chemical Toxicology, doi: 10.1016/j.fct.2018.07.035

[231] Suarez-Larios, K., et al., "Screening of pesticides with the potential of inducing DSB and successive recombinational repair," 2017, Journal of Toxicology. Volume 2017.

Pilliod v. Monsanto Co.
January 14, 2019
Page 111

However, glyphosate and paraoxon (both organo-phosphates) showed the greatest increase in the number of cells with DSB.  Further, it was determined that glyphosate and paraoxon reduced the number of viable cells in a dose-dependent manner; specifically, going from 100% cell viability to 70% with glyphosate. Not only did these two pesticides induce greater breakage, they also induced the phosphorylation[232] of KU80, a protein that participates in the c NHEJ recombinational repair pathway, which is responsible for repair of the cells when DSB occur.

It was further noted in the study that these effects occurred at low concentrations in an acute treatment to cells in the laboratory setting.  "Effects over longer exposure in actual environmental settings are expected to produce cumulative damage if repeated events of recombination take place over time."  In other words, the more often a cell is damaged by glyphosate-induced breakage, the less likely the c NHEJ recombinational repair pathway will be able to repair it.  Thus, the linear approach required by the U.S. EPA methodology is appropriate as the mode of action proposed by Suarez-Larios et al. is not a threshold-based genotoxic mechanism.  Other studies indicate that glyphosate can act as an endocrine disruptor[233] and has tumor-promoting activity.[234]

In vivo observations of human populations exposed to spraying of Roundup have revealed statistically significant outcomes demonstrating genotoxicity at low exposure levels[235] as well as in vivo studies of laboratory animals fed Roundup.[236] These studies challenge both animal and human systems providing in vivo doses of Roundup® with resulting genotoxicity.

---

[232] Phosphorylation plays a critical role in the regulation of cellular processes.

[233] Gasnier, C., et al., "Glyphosate-based herbicides are toxic and endocrine disruptors in human cell lines," 2009, Toxicology, Vol. 262, pg. 184 -191.

Thongprakaisang, S., et al., "Glyphosate induces human breast cancer cells growth via estrogen receptors," 2013, Food and Chemical Toxicology, doi: http://dx.doi.org/10.1016/j.fct.2013.05.057

[234] George, J., et al., "Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach," 2010, Journal of Proteomics, Vol. 73, pg. 951 – 964.

[235] Paz-y-Miño, C., et al., "Evaluation of DNA damage in an Ecuadorian population exposed to glyphosate," 2007, Genetics and Molecular Biology, 30(2).

Bolognesi, C., et al., "Biomonitoring of genotoxic risk in agricultural workers from five Colombian regions: Association to occupational exposure to glyphosate," 2009, Journal of Toxicology and Environmental Health, Part A, Vol. 72, pg. 986 -997.

[236] Peluso, M., et al, "32P-postlabeling detection of DNA adducts in mice treated with herbicide roundup," 1998, Environmental and Molecular Mutagenesis. Vol. 31(1), pp. 55 -59. DOI: 10.1002/(SICI)1098-2280(1998)31:1<55::AID-EM8>3.0.CO;2-A

Pilliod v. Monsanto Co.
January 14, 2019
Page 112

Furthermore, the exposure was to the Roundup® product itself, not merely the chemical glyphosate. Additionally, these human cell studies present conditions with low dosing and concentrations and are therefore in no way extreme cases or otherwise inapplicable.

## Non-Hodgkin's Lymphoma Latency Estimates (Mr. & Mrs. Pilliod's NHL)

A chemical's genotoxicity may lead to cancer causing mutations in cells, however a distinct amount of time elapses during which mutations and DNA damage accumulate in cells before malignant cancer is diagnosed. Latency refers to the time between initial exposure to a cancer causing chemical and when a physician correctly diagnoses cancer.

There is no single peer-reviewed, generally-recognized latency range "threshold" for the more than 60 subtypes of lymphoma (Morton et al., 2014).[237] Various sources cite latency intervals ranging as high as 25 years or more. Most estimates are based upon absence of information as opposed to hard evidence. For this reason, only studies which adequately account for error rates via a 95% confidence interval (which accounts for most confounding variables) can be considered in any comparative compilation.

From the compilation of peer-reviewed latency estimates in **Table 16**, a surmised latency interval of 0.4 to 25 years falls within the general estimates of the studies cited therein. Although no single study is conclusive and future studies will undoubtedly clarify this issue, the weight of evidence suggests that this range offers an acceptable degree of scientific credibility for purposes of an objective toxicological assessment.

Mr. and Mrs. Pilliod's first exposure to Roundup occurred approximately in 1982, approximately 33 years prior to her diagnosis. Mr. Pilliod's exposures to glyphosate initiated approximately 29 years prior to his diagnosis. Since that time they both received consistent and repeated exposures every year up to their lymphoma diagnoses. Hence, the exposure period falls well with the possible latency range for NHL development.

---

[237] Morton, et. al., "Etiologic heterogeneity among non-Hodgkin lymphoma subtypes: the Inter-Lymph Non-Hodgkin Lymphoma Subtypes Project," August 2014, J Natl Cancer Inst Monogr. (48), pg. 130-44.

Pilliod v. Monsanto Co.
January 14, 2019
Page 113

**Table 16**

**Compilation of Peer-Reviewed NHL Latency Estimates**

| Study/Source | Summary of Findings | Latency |
|---|---|---|
| USEPA Glyphosate Issue Paper: September, 2016[238] | "Some have argued that the follow-up period (median=7 years) in De Roos, et al. (2005) is not sufficiently long to account for the latency of NHL (Portier, et al., 2016); however, the latency period for NHL following environmental exposures is relatively unknown and estimates have ranged from 1-25 years (Fontana et al., 1998; Kato et al., 2005; Weisenburger, 1992)." | 1 to 25 yrs |
| USEPA Glyphosate Issue Paper: September, 2016 | "Eriksson, et al., (2008) evaluated the impact of time since first exposure. This study found an increased effect estimate for subjects with more than 10 years of glyphosate exposure prior to diagnosis of NHL. This finding suggests a potential for a longer latency for NHL than the follow-up period in De Roos, et al. (2005)." | 10 yrs |
| USEPA Glyphosate Issue Paper: September, 2016 | "Two case-control studies evaluating the risk of NHL (Eriksson, et al., 2008 and McDuffie, et al., 2001) observed increased effect estimates in the highest exposure categories analyzed. Eriksson, et al. (2008) found a greater effect estimate for subjects with >10 days (based on the median days of exposure among controls) and >10 years of exposure (for latency analysis) when compared to subjects with =10 days and 1-10 years of exposure, respectively; … however, given the latency analysis of NHL was limited to Eriksson, et al. (2008) and lack of NHL latency understanding in general, further studies are needed to determine the true latency of NHL. McDuffie, et al. (2001), stratifying based on the average number of days per year of exposure, observed similar effect estimates in the lower exposure category (>0 and =2 days/year) while a greater effect estimate was observed in the highest exposure category (>2 days/year)." | 10 yrs |
| 9-11 Monitoring and Treatment, World Trade Center Health Program[239] | "A minimum latency period of 2 years has been reported for non-Hodgkin lymphoma (Bennett, et al. 1991) following treatment of Hodgkin disease with chemotherapy and radiotherapy which is similar to the latency for secondary acute leukemia (Nadler and Zurbenko 2013; Tucker et al. 1988)." | 0.4 to 2 yrs (minimum) |

---

[238] USEPA, "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," USEPA's Office of Pesticide Programs, September 12, 2016, https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf

[239] "Minimum Latency & Types or Categories of Cancer," World Trade Center Health Program, Revised: January 6, 2015, https://www.cdc.gov/wtc/pdfs/WTCHP-Minimum-Cancer-Latency-PP-01062015.pdf

Pilliod v. Monsanto Co.
January 14, 2019
Page 114

On July 7, 2017, the State of California listed glyphosate as a carcinogen, a chemical "known to cause cancer" under the state's Proposition 65 law.  The ruling followed a move by the World Health Organization's International Agency for Research on Cancer (IARC) classifying glyphosate as a "probable human carcinogen."

Monsanto is fighting the state's action but the California Supreme Court denied the company's request to stop the listing from taking effect while litigation is underway. Monsanto's vice president of global strategy announced that *"We will continue to aggressively challenge this improper decision."* Monsanto further alleged that IARC *"ignored crucial scientific data that undermines its conclusion."* To date, Monsanto has produced no objective evidence to support its contention, other than pointing to its own sponsored studies which have been shown to be flawed and incomplete.

Pilliod v. Monsanto Co.
January 14, 2019
Page 115

## Part F: Summary of Objective Toxicological Factors

### Evidential Considerations

The following summaries represent significant considerations in formulating an objective toxicological assessment of Mr. and Mrs. Pilliod with respect to Roundup® exposure and subsequent non-Hodgkin's Lymphoma diagnosis:

- **Chronic Glyphosate Exposure:** Mrs. Pilliod characterized herself and her husband as "exclusive" Roundup users and herself as a "real sprayer."[240] Mrs. Pilliod stated that she believed Roundup® was "extremely safe to use." Mr. & Mrs. Pilliod both applied Roundup® from 1982 at their primary residence and other properties through 2008. Mrs. Pilliod wore shorts and flip flops with a tank top or t-shirt when spraying. Mr. Pilliod wore jeans, tennis shoes, long-sleeved cotton shirt or T-shirt and a straw hat. These practices facilitated enhanced absorption. The Pilliods accumulated approximately1,080 - 1,584 days of exposure while tending to the four properties. Acute exposure doses were sometimes left on the skin for prolonged periods of time as they did not shower immediately after application, which contributed to dosage. The Pilliods' exposure history falls within the parameters of "The Agricultural Health Study" Cohort, placing them in the highest grouping (above the median) for lifetime days of exposure. Additionally, the Pilliods were within the range of exposures reported in two epidemiological studies.

- **Dermal Absorption Rates Higher than Calculated by Monsanto:** As previously discussed in great detail, the correct dermal absorption rate for glyphosate ranges between 3% and 10% (as opposed to the defective values recently issued by Monsanto's contractor, DTL Laboratory). The Pilliods' dose was calculated using the an absorption rate of 3% resulting in a systemic dose of 0.14 mg/kg-day and 0.084 mg/kg-day for Mr. and Mrs. Pilliod, respectively. Mr. Pilliod's dose at 3% dermal absorption exceeded the acceptable operator exposure level (AOEL) of 0.1 mg/kg-day. There are also numerous other factors that could increase skin absorption of glyphosate for instance, when temperatures are elevated, sweating may contribute to increased skin absorption, Mrs. Pilliod's use of skin cream, etc.

---

[240] Deposition of Alberta Pilliod dated December 20, 2018, page 126.

Pilliod v. Monsanto Co.
January 14, 2019
Page 116

- **Lack of Personal Protective Gear (PPG):** The Pilliods did not wear gloves when applying (or when mixed by Mr. Pilliod) Roundup and neither wore protective equipment such as impermeable pants, boots or gloves. The Farm Family Exposure Study (Acquavella, et al[241]) found that applicators who did not use rubber gloves had five times more glyphosate in their urine than those wearing protective gloves.

- **Comparison to Three (3) Epidemiological Studies:** The Pilliod's exposures were compared to three epidemiological studies. Two studies (Eriksson et al. study[242], McDuffue et al. 2001[243] showed that the exposure level was consistent with reported increased odd ratios of NHL that ranged from 2.1 - 3.04.

- **Mechanism of Carcinogenicity:** The Pilliods were exposed to the Roundup product, not glyphosate alone. Roundup and glyphosate have been demonstrated in numerous scientific studies to repeatedly cause DNA damage, with Roundup being more damaging than glyphosate alone. This genotoxicity is the <u>first stage</u> in cancer formation. One of these studies, Wozniak et al.,[244] further demonstrated that Roundup at a higher dose was even able to prevent the natural repair of damaged DNA.

- **Latency of Non-Hodgkin's Lymphoma:** The compilation of peer-reviewed latency estimates presented herein offers a surmised latency interval of at least 0.4 to 25 years. This range falls within the estimates in the cited studies (see Table 16). Based upon the study findings, the weight of available evidence indicates that a minimum latency interval of 0.4 to 25 years is scientifically reliable. Thus, the Pilliod's emergence of NHL after a continuous application history of more than 25 years is consistent with the generally-accepted NHL latency interval.

---

[241] ████████████████████████████ et al., "Glyphosate biomonitoring for farmers and their families: results from the Farm Family Exposure Study," 2004, Environ Health Perspect 112, pg. 321-326.

[242] Eriksson, M., et al., "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis," 2008, International Journal Cancer, Vol.123, pp. 1657 – 1663.

[243] McDuffie H., et al., "Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health," 2001, Cancer Epidemiology, Biomarkers & Prevention, Vol.10, 1155 – 1163.

[244] Wozniak, E., et al., "The mechanism of DNA damage induced by Roundup 360 PLUS, glyphosate and AMPA in human peripheral blood mononuclear cells – genotoxic risk assessment," 2018, Food and Chemical Toxicology, doi: 10.1016/j.fct.2018.07.035

Pilliod v. Monsanto Co.
January 14, 2019
Page 117

## Summary and Conclusions

It is important to understand that in the present matter, my specific causation opinion is limited to a quantitative evaluation of exposure, dose and duration. General causation in the present matter includes evaluation of the various chemicals in Roundup® and the mechanisms of exposure which include dermal absorption, how Roundup penetrates the skin, the effects of product formulations and adjuvants, co-carcinogens, ADME, latency period, etc.

With regard to specific causation, I have determined whether the doses sustained by Mr. and Mrs. Pilliod are similar to those sustained by applicators as documented in the generally-accepted, peer-reviewed applicator studies. The dosage similarity is also in the range of applicators just below or above the AOEL. I have deferred epidemiological causation opinions to other experts retained in the current matter.

Based on the totality of objective evidence and the findings of applicable studies as cited herein, it is my opinion, to reasonable toxicological certainty that on the basis of exposure, dose and duration, Mr. and Mrs. Pilliod's documented exposure to Roundup® over a period of more than 25 years was a significant factor contributing to their development and subsequent diagnosis of non-Hodgkins lymphoma.

_____

William R. Sawyer, Ph.D., D-ABFM
Chief Toxicologist