# EXHIBIT 8



Deposition of
# William Sawyer, Ph.D.

## Volume I

**Date:** July 16, 2019

**Case:** Walter Winston, et al. v. Monsanto Company

**No.** 1822-CC00515

**Court Reporter:** Sandra G. Pemberton, RPR, CRR, FPR

Paszkiewicz Court Reporting
Phone: 618-307-9320
Toll-Free: 855-595-3577
Fax: 618-855-9513

Page 1

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI


WALTER WINSTON, et al.,

    Plaintiffs,

vs.

                    CASE NO.: 1822-CC00515

MONSANTO COMPANY,

    Defendant.

_____


Deposition of

William Sawyer, Ph.D.

9:09 a.m. - 4:55 p.m.

Tuesday, July 16, 2019

Sanibel Harbour Marriott Resort and Spa
Fort Myers, Florida

Sandra G. Pemberton, RPR, CRR, FPR



VOLUME I (Pages 1-227)

William Sawyer, Ph.D.
July 16, 2019

## Page 2

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs:
    Jerry Kristal, Esquire
    WEITZ & LUXENBERG
    220 Lake Drive East, Suite 210
    Cherry Hill, New Jersey 08002
    855 977 9411
    jkristal@weitzlux.com

On behalf of the Defendant:
    Steven E Derringer, Esquire
    BARTLIT BECK, LLP
    Courthouse Place
    54 West Hubbard Street
    Chicago, Illinois 60654
    312 494 4415
    steven.derringer@bartlit-beck.com

On behalf of the Defendant:
    Jennifer L Filippazzo, Esquire
    McDERMOTT WILL & EMERY
    340 Madison Avenue
    New York, New York 10173
    212 547 5551
    jfilippazzo@mwe.com

Also Present:
    Carl Sobeck, Videographer

## Page 3

INDEX

EXAMINATIONS                    PAGE
DIRECT EXAMINATION BY MR. DERRINGER          8

DESCRIPTION OF EXHIBITS
EXHIBIT        DESCRIPTION         PAGE
Defendant's Exhibit-1    Wozniak study      27
Defendant's Exhibit-2    Dr. Sawyer's Report    44
Defendant's Exhibit-3    Changes Made to Dose  45
        Calculations
        Originally Submitted
        on July 9, 2019.
Defendant's Exhibit-4    Changes Made to Dose  46
        Calculations
        Originally Submitted
        on July 11th of
        2019.  Changes Made
        July 12th, 2019
Defendant's Exhibit-5    Notes concerning     47
        Deion Sanders
Defendant's Exhibit-6    Dr. Sawyer's Report   48
Defendant's Exhibit-7    Definition of       51
        veracity
Defendant's Exhibit-8    Summary Roundup® Use   60
        Information for Dr.

## Page 4

Defendant's Exhibit-9    Materials Considered   63
        List - July 9, 2019
Defendant's Exhibit-10   Winston, et al.,      67
        Table 10 notes
Defendant's Exhibit-11   Report by Dr. Sawyer   95
Defendant's Exhibit-12   Plaintiffs'           99
        Interview Summary
        Sheets by Stephen
        Perry
Defendant's Exhibit-13   Printout of an Excel  102
        spreadsheet dated
        July 3rd, 2019
        bearing the initials
        SEP
Defendant's Exhibit-14   Monsanto Document    126
Defendant's Exhibit-15   UK POEM Calculations 133
        in Preparation of
        Meeting Spanish
        Competent
        Authorities
Defendant's Exhibit-16   An applicator       134
        Exposure Study
        Conducted in Spain
        Using Biomonitoring
Defendant's Exhibit-17   IARC monograph      150

## Page 5

Defendant's Exhibit-18   McDuffie 2001 study  156
Defendant's Exhibit-19   Eriksson 2008 study  176
Defendant's Exhibit-20   Leon study          188
        meta-analysis
Defendant's Exhibit-21   Andreotti 2018 study 201
Defendant's Exhibit-22   Zhang 2019          205
        meta-analysis
Defendant's Exhibit-23   Glyphosate Use and   217
        Association with
        Non-Hodgkin's
        Lymphoma, Major
        Histological
        Subtypes:  Findings
        from the North
        American Pooled
        Project.

Defendant's Exhibit-24   A Case-Control Study  242
        of Non-Hodgkin
        Lymphoma and Exposure
        to Pesticides
Defendant's Exhibit 25   Glyphosate Induces   273
        Benign Monoclonal
        Gammopathy and

2 (Pages 2 to 5)

William Sawyer, Ph.D.
July 16, 2019

---

**Page 6**

1  Defendant's Exhibit-26  Glyphosate Induces  316
2      Benign Monoclonal
3      Gammopathy and
4      Promotes Multiple
5      Myeloma Progression
6      in Mice
7
8  Defendant's Exhibit-27  Web Page from the  317
9      American Cancer
10     Society Titled,
11     "Types of B-cell
12     Lymphoma."
13 Defendant's Exhibit-28  Mr. Stephen  357
14     Gatewood's Interview
15     Summary Sheet.
16 Defendant's Exhibit-29  Mrs. Vicki Gatewood's  423
17     Interview Summary
18     Sheet
19 Defendant's Exhibit-30  Miscellaneous  449
20     Document from Dr.
21     Sawyer's File
22
23 (Original exhibits were returned to the witness and
24 copies of the exhibits have been attached to the
25 original transcript.)

---

**Page 7**

1      THE VIDEOGRAPHER:  This is the video
2  deposition of William Sawyer, Ph.D.  Today's date
3  is July 16th, 2019.  The time is now 9:09 a.m.
4      This is the case of Winston, et al., versus
5  Monsanto Company, Case No. 1822-CC-515, Circuit
6  Court of the City of St. Louis, Missouri.
7      My name is Carl Sobeck representing Paszkiewicz
8  and the court reporter today is Sandi Pemberton
9  also representing Paszkiewicz Court Reporting.
10     Will counsel please identify themselves for the
11 record.
12     MR. DERRINGER:  Steve Derringer, Barlit Beck
13 in Chicago on behalf of Monsanto.
14     MS. FILIPPAZZO:  Jennifer Filippazzo from
15 McDermott, Will & Emery, New York City, on behalf
16 of Monsanto.
17     MR. KRISTAL:  Jerry Kristal on behalf of the
18 Winston plaintiffs.
19     THE VIDEOGRAPHER:  Will the court reporter
20 please swear the witness.
21      WILLIAM SAWYER, Ph.D.,
22 having been produced and first duly sworn as a witness,
23 testified as follows:
24     THE WITNESS:  I do.
25     THE REPORTER:  Thank you.

---

**Page 8**

1      DIRECT EXAMINATION
2  BY MR. DERRINGER:
3      Q.  Good morning, Dr. Sawyer.
4      **A.  Good morning.**
5      Q.  Can you state your full name, please?
6      **A.  William Robert Sawyer.**
7      Q.  And where do you live?
8      **A.  [REDACTED].**
9      Q.  I know you've been through many depositions
10 before.  I'll remind you that any time you need to take
11 a break, just let me know and we'll take a break so
12 long as a question is not pending, okay?
13     **A.  Very good.**
14     Q.  And I'm going to ask you to do your very best
15 to listen carefully to the questions that I ask and to
16 attempt to the best of your ability to answer the
17 question that I've asked.  Is that fair?
18     **A.  I certainly will.**
19     Q.  Great.  You've given several days of
20 depositions in litigation related to Roundup® in the
21 past, correct?
22     **A.  Many days, yes.**
23     Q.  Your deposition was taken in the Johnson case
24 February 26 and 27th of 2018, correct?
25     **A.  Yes, two days.**

---

**Page 9**

1      Q.  In the Hall/Peterson case, your deposition was
2  taken over the course of two days, August 13th and
3  October 16th of 2018, correct?
4      **A.  Yes.**
5      Q.  In the Hardeman, Stevick and Gebeyehou case,
6  the MDL, the federal MDL, your deposition was taken by
7  me, in fact, in December -- December 20th of 2019; is
8  that correct?
9      **A.  Yes.**
10     Q.  Your deposition was taken in the Pilliod case
11 on February 6th, 2019.
12     Do you recall that?
13     **A.  I do.**
14     Q.  And your deposition was taken in the Cazier
15 case on April 30th, 2019.
16     Do you recall that?
17     **A.  Yes, I do.**
18     Q.  You've also testified in two Roundup® trials;
19 is that right?
20     **A.  Yes.**
21     Q.  You testified in the Johnson trial on July 6,
22 2018, correct.
23     **A.  Yes.**
24     Q.  And you testified most recently on the Pilliod
25 trial on April 11th of 2019, correct?

William Sawyer, Ph.D.
July 16, 2019

---

## Page 10

1    **A.  Yes.**
2    Q.  All of the testimony I've just described you
3  gave under oath, correct?
4    **A.  Correct.**
5    Q.  You told the truth during that testimony?
6    **A.  Yes.**
7    Q.  You testified as accurately as you could
8  during that testimony?
9    **A.  Yes.**
10    Q.  Do you stand by all of that prior testimony as
11  you sit here today?
12    **A.  Yes.**
13    Q.  You've testified before that you have used
14  Roundup® before at your home; is that right?
15    **A.  I have.**
16    Q.  When did you start using Roundup® at your
17  home?
18    **A.  I believe in New York state in approximately**
19  **1996 or 1997.**
20    Q.  And when was the last time that you used
21  Roundup® at your home?
22    **A.  Approximately -- sometime late winter, early**
23  **spring of this year.**
24    Q.  And when you used it in late winter, early
25  spring of this year, was that here in Florida?

---

## Page 11

1    **A.  Yes.**
2    Q.  And was your pattern of use of Roundup® from
3  1996 to 1997 until your most recent use this year, was
4  it generally consistent over that time period?
5    MR. KRISTAL:  Objection to form.
6    **A.  No.**
7  BY MR. DERRINGER:
8    Q.  Tell me your pattern of usage of Roundup®.
9  What I mean by that, Dr. Sawyer, is how often did you
10  use it during the year?
11    **A.  Well, in New York state, I used it only from**
12  **approximately May to September, approximately two to**
13  **three times per season.  And that was until 2012.**
14  **Actually, about May 2012, I sold the property.**
15       **And in Sanibel, Florida, I began using it in**
16  **2003, July of 2003, and used it last during the spring**
17  **of this year.  However, there were, at one -- at one**
18  **point, two properties in Florida.  Simultaneously for a**
19  **period of about two or three years.**
20    Q.  Which -- which years were those?
21    **A.  Approximately 2003 -- no, no, I'm sorry,**
22  **approximately 2009 to 2012.**
23    Q.  In New York state, you said you used it from
24  May through September approximately two to three times
25  per season.  Does that mean two to three times during

---

## Page 12

1  the course of that -- that time span, May to September?
2    **A.  That's correct.**
3    Q.  Okay.  So in any given year, you would use it
4  two to three times.
5    **A.  Yes.**
6    Q.  While you were in New York.
7    **A.  That is right.**
8    Q.  And what about starting in July of 2003 down
9  in Florida at Sanibel, how many months were you using
10  it during the year and how many times during that time
11  period did you typically use it?  "It" being Roundup®.
12    **A.  Well, on the Sanibel Captiva Road property,**
13  **initiating in 2003, I used Roundup® bimonthly.**
14    Q.  Okay.  What does that mean, bimonthly?
15    **A.  Bimonthly means every two months.**
16    Q.  Thank you.
17    **A.  Until the point that I sold the property in**
18  **2000 -- let me think a minute.  I sold it in 2012.**
19       **And I also used it typically bimonthly at the**
20  **current, ▮▮▮▮▮▮▮▮, property from the date of**
21  **purchase, which was February of 2009, until present;**
22  **however, over the past, I'd have to say, you know,**
23  **geez, probably six years, I have been -- I've learned a**
24  **mechanism to obtain huge truckloads of mulch at no**
25  **charge.**

---

## Page 13

1    Q.  Okay.
2    **A.  And it corresponds with when the County trims**
3  **the trees on the power lines of the Sanibel Captiva**
4  **Road.  And I approached the supervisor and let them**
5  **know that I have a triple lot with a turnaround that**
6  **can actually accommodate a truck to come in and dump**
7  **the load and leave rather than driving all the way to**
8  **Fort Myers with it, so I had -- you know, I have a pile**
9  **of mulch about seven feet high waiting to spread right**
10  **now.  It's -- it's in the process of aging.  Sort of**
11  **like a fine wine.**
12    Q.  So in Florida, let me make sure I have this
13  right, from 2003, July 2003 through 2012, you used
14  Roundup® every two months at -- during -- during what
15  period of the year?  The entire year?
16    **A.  For which property?**
17    Q.  For the first property.  What was the address
18  of that property in Sanibel?
19    **A.  ▮▮▮▮▮▮▮▮▮▮▮▮**
20  ▮▮▮▮▮▮▮▮▮▮▮▮
21    **A.  Yes.**
22    Q.  Captiva.
23       How many months out of the year did you use
24  Roundup® at that point?
25    **A.  As I stated, year round.**

---

4  (Pages 10 to 13)

William Sawyer, Ph.D.
July 16, 2019



Page 14

1  Q.  Okay.  So at ███████████ you
2  used Roundup® about six times a year?
3  A.  Yes.
4  Q.  And at the current property -- where is that
5  located?
6  A.  ████████
7  Q.  You were also using it from 2009 until present
8  approximately six times per year?
9  A.  No.
10 Q.  How often are you using it?
11 A.  2012 to -- I'm sorry, 2009 to 2014, bimonthly.
12 As of approximately 2014, only twice a year, as I
13 acquired heavy mulch.  The property is completely
14 mulched and I hand pull most of the weeds unless
15 there's some of these other types of weeds that kind of
16 make a carpeting effect that are hard to pull.
17 Q.  In New York state, what was the address of the
18 property where you used Roundup®?
19 A.  ████████████
20 Q.  Can you spell that?
21 A.  ████████████████
22 ██
23 ██  ████████  And that started in 1996, 1997,
25 and when did you sell that property?

Page 15

1  A.  2012.
2  Q.  So at 2██
3  ██  you used Roundup® every year between May and
4  September two to three times per year from 1996 to
5  2012; is that right?
6  MR. KRISTAL:  Object to form.  Asked and
7  answered.
8  A.  Yes.
9  BY MR. DERRINGER:
10 Q.  The property at Singingwoods Drive, how large
11 was that property?
12 A.  Two acres.  Almost entirely grass with no weed
13 control on the grass, only spot spraying around the
14 sunflower bed and the young -- well, no longer young,
15 but at the time, young trees that I planted.
16 Q.  And during your time at Singingwoods, on those
17 two to three times that you used Roundup®, how long
18 were you using it on each occasion?
19 A.  Typically, 30 minutes.
20 Q.  And do you have any way to tell the total area
21 over which you used Roundup® for those 30 minutes?
22 A.  It's possible if I had a Google Earth image I
23 could map out and then determine the square footage and
24 convert that to hectares.  It's possible, yes.
25 Q.  Do you have any estimate as you sit here

Page 16

1  today?
2  A.  No, it would be speculation.
3  Q.  ██████████████████
4  ██  ████████████
5  ██  ███████
6  ██  ██████████
7  ██  ██████
8  ██  ████████
9  ██
10 Q.  When you used that year round every other
11 month -- well, first, how large of a property did you
12 have at ██████
13 MR. KRISTAL:  Object to form.
14 A.  That was a small property.  Approximately 100
15 foot by 150 feet square -- or rectangular.
16 BY MR. DERRINGER:
17 Q.  And on the occasions you used Roundup® at ████
18 ████████  how long were you using it on
19 each occasion that you used it?
20 A.  About 30 minutes.  That yard was also mulched,
21 but, again, there would be pop-ups and some pretty deep
22 weeds.
23 Q.  What type of spraying did you do?
24 A.  Backpack.
25 Q.  Did you do spot spraying?

Page 17

1  A.  Yes.
2  Q.  Anything other than spot spraying at 5██
3  ██████████
4  A.  No.
5  Q.  And do you have any way to estimate the total
6  area over which you spot sprayed Roundup® at ██
7  ██████████  on each of the occasions that you
8  used Roundup® there?
9  A.  If I had an image of the property -- and that
10 would be a tough thing to get, yeah, because it's
11 completely canvassed with trees.  So I would have to
12 get a print from the construction of the property which
13 shows the driveway and defines the house and the pool
14 and the dock and that type of thing.  So it -- yeah, I
15 could do it, but it's not something that I can do right
16 now.
17 Q.  Okay.  And you have no way of estimating right
18 now an answer to that question?
19 A.  No.  It would be speculation.
20 Q.  Okay.  And then when you moved to your current
21 property -- did you say that was on ████████
22 A.  That's correct.
23 Q.  Okay.  And, again, I apologize, I just don't
24 have it in front of me.  ████████████
25 ████████

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

William Sawyer, Ph.D.
July 16, 2019

Page 18

1    Q.  When you used -- well, how large is that
2    property?
3        A.  Well, the canal frontage is 300 feet.  I think
4    the roadside is about 300 and -- a little over 300
5    feet.  And then the depth of the property, I'm not
6    certain, I think it's around 150, 200 feet deep.
7        Q.  Any idea about the total square acreage?
8        A.  I could.  I have aerial images of the
9    property, but, you know, I've never attempted to
10   calculate my spot spraying area.
11       Q.  Okay.  And at ▇▇▇ when you used
12   Roundup®, was it exclusively spot spraying?
13       A.  With the exception of when I first moved in.
14   There were some areas that were covered to the degree
15   that ten or 20 square foot areas had to be blanketed,
16   but other than that, just spot spraying.
17       Q.  And on the occasions when you used Roundup® at
18   6450, other than that initial blanketing that you
19   mentioned, how long would you spend on each occasion
20   using Roundup®?
21       A.  About 30 minutes.
22       Q.  And when you used Roundup® for that initial
23   blanketing when you first moved in, how long did that
24   take you?
25       A.  I can't recall.

Page 19

1        Q.  Do you have any way to calculate the area that
2    you would typically spray -- spot spray Roundup® over
3    at 6450 Pine?  Any way to calculate the total area?
4        MR. KRISTAL:  Objection, asked and answered.
5        A.  Certainly.  I would have to look at the
6    imagery I have, which I think is Google Earth imagery,
7    and calculate the areas which were sprayed.  I think it
8    could be done.  It's not something I've ever
9    contemplated doing.
10       The reason is, is that since mid to late
11   1990s, I was aware of the potential carcinogenicity of
12   Roundup® and I altered my spray head by drilling it
13   through both structures of the spray head, eliminating
14   aerosolic drift, and I always wear protective equipment
15   and neoprene gloves, et cetera.  I've never had any
16   exposure to it.
17   BY MR. DERRINGER:
18       Q.  Um --
19       A.  Because I knew that protective equipment was
20   necessary.
21       Q.  I'm not -- I'm going to try not to interrupt
22   you today as a courtesy, but I'm going to ask you to
23   remember my first instruction -- actually, my second
24   instruction, which was try to listen to my question
25   carefully and answer that question.

Page 20

1        A.  Okay.
2        Q.  So let me ask you about the reason why it's
3    not something you ever contemplated doing.
4        A.  No, I answered your question, sir.  I exactly
5    answered your question.
6        Q.  No, you didn't, but --
7        MR. KRISTAL:  We don't need to argue over it.
8    I think he answered the question also.  Let's move
9    on.
10       MR. DERRINGER:  Let's just -- let's just move
11   on.
12       MR. KRISTAL:  He'll answer the questions the
13   way he feels appropriate to answer the questions.
14   BY MR. DERRINGER:
15       Q.  We --
16       THE WITNESS:  It's not the answer he wanted.
17       MR. DERRINGER:  Understood.
18   BY MR. DERRINGER:
19       Q.  Why did you only use Roundup® two to three
20   times per season up in New York?
21       A.  Well, we lived in an elevated area directly
22   impacted by Lake Ontario.  We received 125 inches of
23   snow per year.  And on May 9th, 1995, the day our
24   younger daughter was born, we had nearly a foot of
25   snow.  It starts snowing in October.  We usually have

Page 21

1    frost in September.  So it's a beautiful place for
2    about ten weeks.  And, really, that's -- it's the
3    weather.
4        Q.  Okay.  So you -- well, let me ask you this:
5    When you sprayed Roundup®, when you used Roundup® on
6    your property, what was the effect of the Roundup®?
7        MR. KRISTAL:  And I'll object to this line of
8    questioning.  We're here at an expert deposition.
9    I've obviously given you some leeway about Dr.
10   Sawyer's personal use, but we're getting way far
11   afield.  And if it's going to continue more than
12   just a couple more minutes, we'll just get Judge
13   Norton on the phone and have his --
14       MR. DERRINGER:  I completely disagree with the
15   basis of your objection.  I'm going to continue
16   this line of question.
17       MR. KRISTAL:  If you've got more than a few
18   minutes, we'll take a break and call Judge Norton.
19       MR. DERRINGER:  Okay.
20       A.  Are you going to ask about my boat like in the
21   Johnson deposition?
22   BY MR. DERRINGER:
23       Q.  No, I'm not going to ask about your boat.
24       What was the effect of the Roundup® when you
25   used it?

6 (Pages 18 to 21)

William Sawyer, Ph.D.
July 16, 2019

## Page 22

1  A. The effect is that it would kill the weeds.
2  Q. Did it kill all of the weeds that you sprayed
3  it on?
4  A. It did. It was -- it was effective.
5  Q. How long did it take until the weeds grew
6  back?
7  A. Seasonally in Florida, rather quickly in the
8  tropical season, which extends from about -- it varies
9  each year. This year we had a dry season all the way
10  into June. But, typically, from April until sometime
11  in October, we have what's called tropical season. Our
12  average rain in July is 17 inches. And during that
13  phase, weeds come back rather quickly. Not so in the
14  dry season.
15  Q. When is the dry season?
16  A. Again, sometime in October. It usually
17  starts -- we usually start getting the heavy rains in
18  April or May.
19  Q. And how long would it take for the weeds to
20  grow back in the dry season?
21  A. You would begin to see some growth in about
22  two months. Not a lot of growth, but tiny growth.
23  Q. And into the wet season?
24  A. Very significant growth in two months.
25  Q. Okay. And in New York, how long would it take

## Page 23

1  for the weeds to grow back?
2  A. I don't recall. That's just something -- it's
3  too many years ago. I don't -- don't really recall
4  that.
5  Q. Okay. Do you recall at the Pilliod trial just
6  a few months ago you testified -- you made the claim
7  that Roundup® was 50 times more genotoxic than
8  glyphosate. Do you recall that testimony?
9  MR. KRISTAL: Object. Assumes facts not in
10  evidence.
11  A. Without seeing it in print, I can't -- I can't
12  recall it, no.
13  BY MR. DERRINGER:
14  Q. I'm handing you your testimony -- a transcript
15  of your testimony from the Pilliod trial from Thursday,
16  April 11, 2019, and, specifically, I want to draw your
17  attention to page 3,171 of that transcript at line 20.
18  And so why don't you just go ahead and read
19  that out loud. 3171, line 20. This is Mr. Wisner, who
20  you know, I believe, asking you questions, and you
21  giving answers.
22  A. (The document was examined.)
23  Q. Can you read that out loud?
24  MR. KRISTAL: Do you have a copy?
25  MR. DERRINGER: You don't have that in your

## Page 24

1  file, in your computer?
2  A. Okay. Starting on line 20.
3  "QUESTION: So using these two numbers, how
4  much more genotoxic is Roundup® relative to
5  glyphosate?
6  "ANSWER: About 50 times.
7  So, "We talked earlier about" --
8  BY MR. DERRINGER:
9  Q. That's all.
10  A. -- "how POEA was six times" --
11  Q. Sir, that's all I'm asking you to read.
12  A. "ANSWER: Right."
13  Q. Okay. So am I correct that you now -- well,
14  strike that.
15  Do you now recall, sir, after reading your
16  sworn testimony that you made the claim in the Pilliod
17  trial that Roundup® was 50 times more genotoxic than
18  glyphosate?
19  A. As well as line 23 and 25, correct.
20  Q. Okay. That claim that you made that Roundup®
21  is 50 times more genotoxic relative to glyphosate, that
22  was based on the Wozniak study, right?
23  THE REPORTER: I'm sorry?
24  MR. DERRINGER: The Wozniak study.
25  THE REPORTER: Thank you.

## Page 25

1  A. Yes.
2  BY MR. DERRINGER:
3  Q. Dr. Sawyer, is there any other study on which
4  you base your claim that Roundup® is 50 times more
5  genotoxic than glyphosate?
6  MR. KRISTAL: Objection to the form.
7  THE VIDEOGRAPHER: Stand by. Hold on. I lost
8  power for some reason.
9  MR. DERRINGER: Let's go off the record.
10  (Recess.)
11  THE VIDEOGRAPHER: We're back on record. The
12  time is 9:59. There was a brief interruption in
13  the power.
14  BY MR. DERRINGER:
15  Q. Dr. Sawyer, we had to go off the record
16  because there was a power interruption to our video
17  apparatus.
18  Before we went off the record, my question to
19  you was whether there was any other study on which you
20  base your claim that Roundup® is 50 times more
21  genotoxic than glyphosate, and I noticed that -- that
22  you pulled out two different documents that you were
23  looking at as you were preparing to answer that
24  question.
25  First, let me ask you, what are the documents

7 (Pages 22 to 25)

William Sawyer, Ph.D.
July 16, 2019

## Page 26

1   that you were reviewing?

2   **A. Only one document. It's my report.**

3   Q. Your report submitted in this case, the

4   Winston case?

5   **A. Yes.**

6   Q. Okay. So, then, can you now answer the

7   question that I asked, which was whether there was any

8   other study on which you base your claim that Roundup®

9   is 50 times more genotoxic than glyphosate?

10   **A. Well, I refer to the Bolognesi study,**

11   **B-o-l-o-g-n-e-s-i, 1997 study. I don't claim that**

12   **study showed a 50-fold increase, but ten times.**

13   **Also, I refer to the Kang study, K-a-n-g, in**

14   **which glyphosate increased genetic abnormalities and**

15   **that Roundup® 41 percent glyphosate, excuse me, was**

16   **also studied and compared. And that the authors**

17   **conclude that, excuse me, both chemicals had a**

18   **significant impact.**

19   **And also I refer to the AIASSA study,**

20   **A-I-A-S-S-A, from 2019 in which genotoxic damage was**

21   **assessed using various biomarkers and that -- that**

22   **study included human data.**

23   Q. Is there any other study on which you're

24   basing your claim that Roundup® is 50 times more

25   genotoxic than glyphosate other than Wozniak?

## Page 27

1   **A. No, but there's certainly -- the studies show**

2   **a range, a reasonable range.**

3   Q. Okay. Let me show you what I've marked as

4   Exhibit 1.

5   (Defendant's Exhibit-1 was marked for

6   identification.)

7   BY MR. DERRINGER:

8   Q. Dr. Sawyer, is Exhibit 1 the Wozniak study on

9   which you rely to base your claim that Roundup® is 50

10   times more genotoxic than glyphosate?

11   MR. KRISTAL: Objection to the form.

12   **A. Yes.**

13   BY MR. DERRINGER:

14   Q. Now, this study involved an in-vitro

15   experiment in cells, correct?

16   **A. It did. And --**

17   Q. What does that mean, to be an in-vitro

18   experiment in cells?

19   **A. This was performed in a test tube and it was**

20   **measuring what we call AMPA effects upon DNA damage at**

21   **various concentrations. And I think they range from**

22   **about one to a thousand micromolar solutions.**

23   **So the Roundup® formulation was found to cause**

24   **single strand-breaks of the DNA, double strand-breaks**

25   **at other DNA lesions at concentrations all the way down**

## Page 28

1   **to five micromolar per liter.**

2   Q. Yes, sir, we'll get to the result in a minute.

3   I was just -- my question was simply what does it mean

4   to be an in-vitro experiment in cells?

5   **A. That is not performed in a living animal, a**

6   **human, but in a test tube.**

7   Q. Okay. Thank you.

8   And I want to be sure that I understand how you

9   came up with your 50 times more genotoxic number.

10   If you turn to page 515 of Exhibit 1, the

11   Wozniak study. Are you there? Do you have that in

12   front of you?

13   **A. I do.**

14   Q. Now, am I right that your claim that Roundup®

15   is 50 times more genotoxic than glyphosate is based on

16   a comparison between figure 2(A) and figure 2(B)? Is

17   that right?

18   **A. (The document was examined.)**

19   Q. Do you recall my question?

20   **A. I do, but --**

21   Q. Okay.

22   **A. -- I can't answer that question.**

23   Q. Let me see if maybe I can help walk you

24   through it.

25   Based on your testimony that you gave in

## Page 29

1   Pilliod back on April 11th, I think it was, 2019, you

2   walked through these two figures.

3   The top panel, figure 2(A), that's the

4   concentration in Roundup® formulation, right?

5   MR. KRISTAL: Can I see the transcript so that

6   Dr. Sawyer can see the transcript? Thank you.

7   BY MR. DERRINGER:

8   Q. Is that right, sir?

9   **A. It did. That the top figure is showing a**

10   **statistically significant difference between the**

11   **oxidized pyrimidines and the oxidized purines at a**

12   **concentration of five micromolar of Roundup®.**

13   Q. Right, Roundup® 360 Plus, correct?

14   **A. That's correct.**

15   Q. Okay. And figure 2(B) is showing data from

16   the test in glyphosate, correct?

17   **A. Right. The concentration 50 times higher, at**

18   **250 micromolar.**

19   Q. Okay, so --

20   **A. At which point there is a statistically**

21   **significant difference.**

22   Q. Right. So -- so your 50 times higher is a

23   reflection of the magnitude of difference between a

24   concentration of 5 micromolar and 250 micromolar; is

25   that right?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

William Sawyer, Ph.D.
July 16, 2019

## Page 30

1    A.  Right, 250 divided by five is 50.
2    Q.  And that's how you come up with your 50 times
3    greater or 50 times more genotoxic allegation; is that
4    right?
5         MR. KRISTAL:  Objection to the form.
6    A.  Opinion or allegation?  I don't understand the
7    question.
8    BY MR. DERRINGER:
9    Q.  Is that -- is the comparison between the data
10   at -- of Roundup® 360 Plus at 5 micromolar compared to
11   the data of glyphosate at 250 micromolar, is that the
12   way that you derive your opinion that Roundup® is 50
13   times more genotoxic than glyphosate?
14   A.  Yes, based on the -- the DNA strand-breaks
15   that were used, yes.
16   Q.  Okay.  What are the ingredients in Roundup®
17   360 Plus?
18   A.  (The document was examined.)
19   Q.  Let me withdraw that question and ask a more
20   precise one.
21        What are the ingredients in the Roundup® 360
22   Plus that was used in the Wozniak study, Dr. Sawyer?
23   A.  (The document was examined.)
24        I'm not finding an answer for that in the
25   study, but I may have an answer to that in my report in

## Page 31

1    table 22 possibly.
2    Q.  Where was the Roundup® 360 Plus used in the
3    Wozniak study purchased; do you know?
4    A.  The material section didn't state.
5    Q.  Do you know where this Wozniak study was
6    conducted?
7    A.  Poland.
8    Q.  Does your -- does anything in your report that
9    you're looking at -- and we'll get to your report in a
10   little bit, I think you mentioned there might be an
11   answer you said in table 22, anything in your report,
12   table 22, reflect Roundup® 360 Plus commercially
13   available in Poland?
14   A.  No, but that's -- there's an assumption that
15   it was purchased in Poland.  It could have been
16   purchased in -- literally, anywhere.  It could have been
17   purchased directly from Mizerna.  It could have
18   been purchased as a direct purchase from Monsanto.  Who
19   knows?
20   Q.  You have no knowledge about where it was
21   purchased, correct?
22   A.  No.
23   Q.  Am I correct?
24   A.  That's correct.
25   Q.  Okay.  Go back to figure 2(A).  To page 515 of

## Page 32

1    Exhibit 1 Wozniak.
2    A.  (The document was examined.)
3         Okay.
4    Q.  The X axis reflects concentration of what?
5    A.  Roundup® 360 Plus in units of micromolar.
6    Q.  Okay.  And the concentration of Roundup® 360
7    Plus, that is expressed as the concentration of
8    glyphosate that's contained in the preparation,
9    correct?  In figure 2(A).
10   A.  (The document was examined.)
11   Q.  And let me direct you to another part of the
12   study that may help you answer that question.
13        If you look at page 512, Dr. Sawyer, the top of
14   the page, left column under section 2.3, "Cells
15   Treatment," the authors write, "The concentrations of
16   Roundup® 360 Plus (expressed as glyphosate contained in
17   preparation) were from .001 to 10 micromolar."
18        Do you see that?
19   A.  (The document was examined.)
20        No, I don't actually.  I'm still looking.
21   Q.  Okay.  Take a look at the top of page 512.
22   A.  Cells treatment.
23   Q.  Under, "Cells Treatment," second sentence.
24   Can you read that?  You can read it out loud.
25   A.  I found it now, yeah.

## Page 33

1    Q.  Okay.  That sentence says, "The concentrations
2    of Roundup® 360 Plus (expressed as glyphosate contained
3    in preparation) were from .001 to ten micromolar,"
4    correct?
5    A.  Correct.
6    Q.  And if you look at figure 2(A), which shows
7    concentrations going from .001 to 10 micromolar,
8    correct?
9    A.  Yes.
10   Q.  And so when figure 2(A) reports, for example,
11   a 5 micromolar concentration of Roundup® 360 Plus,
12   that's really showing 5 micromolar of glyphosate plus
13   whatever additional ingredients come along with that
14   amount of glyphosate in the formulation, correct?
15   A.  Right, and as I recall, I -- I can check my
16   report to be exact, but I think glyphosate 360 Plus had
17   a fairly high concentration percentwise of glyphosate
18   in it, so that -- that -- hypothetically, let's say it
19   was 480 milligrams per mill.  That would basically cut
20   the factor from 50 fold to 25 fold, so I think I see
21   where you're going with this, and -- but that doesn't
22   negate the difference.  And I cited that it showed
23   ten-fold higher strength, so...
24   Q.  All I'm asking right now, sir, is whether
25   that -- the concentrations reflected in figure 2(A)

William Sawyer, Ph.D.
July 16, 2019

## Page 34

1 ranging from .001 to 10 micromolar, those are actually
2 concentrations of glyphosate, correct?
3    **A.   Correct.**
4    Q.   And then if you look at the figure you
5 mentioned, that is, the 5 micromolar figure or data
6 point in figure 2(A), I think you mentioned, if you
7 look at the bar, it corresponds to DNA damage of about
8 6 percent; is that right?
9    **A.   (The document was examined.)**
10    **No.  Wait a minute -- yeah, that's correct.**
11    Q.   Okay.  Then, just going to your methodology
12 here, as you look down at figure 2(B) and take a look
13 at where that same 6 percent DNA damage occurred, it
14 occurred at a concentration of 250 micromolar
15 glyphosate, right?
16    **A.   (The document was examined.)**
17    **Yes.**
18    Q.   And then I think you just said before, what
19 you did is you divided 250 by five and you came up with
20 50, right?  50 times more genotoxic, correct?
21    **A.   (The document was examined.)**
22    **Yes.**
23    Q.   Okay.  Now, you said in your earlier answer
24 that -- that the high concentration of glyphosate,
25 hypothetically, if it was 480 milligrams per mill, it

## Page 35

1 would basically cut that 50-fold factor of 50 times
2 greater to 25 times greater.  Can you explain how you
3 come up with that, what you meant by that?
4    **A.   Well, if the solution contained only 48**
5 **percent glyphosate, then, that would, roughly, require**
6 **twice as much solution to have the same amount of**
7 **glyphosate as in the pure glyphosate chart shown in**
8 **figure 2(B).**
9    Q.   So meaning twice as much glyphosate.  Then
10 what you would do is reduce that -- or multiply that
11 five by two and you divide ten into 250 and then
12 it's 25 times greater.  Is that how you're calculating
13 that?
14    **A.   That's correct.**
15    Q.   Okay.  Now, is there a reason why you did --
16 you did not discuss with the jury in Pilliod the DNA
17 damage that occurred in Wozniak for any concentration
18 of glyphosate below 5 for figure 2(A) and below 250 for
19 figure 2(B)?
20    MR. KRISTAL:  Objection to form.
21    **A.   Yes.**
22 BY MR. DERRINGER:
23    Q.   What was the reason why you decided not to
24 discuss those lower concentrations with the jury?
25    MR. KRISTAL:  Objection, assumes facts not in

## Page 36

1 evidence.
2    **A.   Since this is an in-vitro study, the**
3 **concentrations cannot be directly applied to humans due**
4 **to differences in several factors; metabolism,**
5 **concentration in certain tissues, for example, in the**
6 **epidermis or residual -- in the bone.  There's**
7 **different pharmacokinetics and so on, so it's not**
8 **generally accepted that one can take an in-vitro number**
9 **and micromolars and directly apply that to a human.**
10 **And, more importantly, to answer your question**
11 **regarding the less than 5, is that the values were not**
12 **statistically significant at the 95 percent level of**
13 **certainty.**
14 BY MR. DERRINGER:
15    Q.   Okay.  That's what these asterisks mean in
16 figures 2(A) and 2(B), that anything with an asterisk
17 indicates a statistically significant finding and
18 anything without an asterisk indicates a finding that's
19 not statistically significant; is that right?
20    **A.   Crudely.  What it means is that a single**
21 **asterisk is at the 95 percent confidence interval and**
22 **the triple asterisk indicates a 99.9 percent level of**
23 **certainty, less than .001.**
24    Q.   And what does no asterisk mean?
25    **A.   Not statistically significant.**

## Page 37

1    Q.   And when we talk about statistical
2 significance, that's comparing the particular dose at
3 issue with the negative control in that same figure,
4 the negative control being zero; is that right?
5    **A.   That's correct.**
6    Q.   Okay.  So, for example, in figure 2(A), the
7 Wozniak authors found a statistically significant
8 difference between the amount of DNA damage at 5
9 micromolar Roundup® 360 Plus and no presence at all of
10 Roundup® 360 plus, correct?
11    MR. KRISTAL:  Objection to form.
12    **A.   I didn't quite follow your question.**
13 BY MR. DERRINGER:
14    Q.   Sure.  The authors in Wozniak found a
15 statistically significant difference of DNA damage when
16 they compared the results at 5 micromolar of Roundup®
17 360 Plus to the results of 0 micromolar of Roundup® 360
18 Plus, correct?
19    **A.   Yes.**
20    Q.   Okay.  And when there's no asterisk, it
21 indicates that there was no statistically significant
22 difference, for example, in figure 2(A), when you
23 compare the DNA damage that the Wozniak authors found
24 at 1 micromolar of Roundup® 360 Plus to the DNA damage
25 they found at 0 micromolar of Roundup® 360 Plus,

10  (Pages 34 to 37)

William Sawyer, Ph.D.
July 16, 2019

## Page 38

1  correct?
2      **A.  Yes.**
3      Q.  And the only kind of apples-to-apples
4  comparison we can make from figures 2(A) and 2(B) in
5  terms of the same concentration, at least as it's
6  reported here, is .5 micromolar; is that right?
7      MR. KRISTAL:  Objection to form.  Objection to
8  form.
9      **A.  I don't understand your question.**
10  BY MR. DERRINGER:
11      Q.  Sure.  If I wanted -- well, let me ask you
12  this:  When the authors of the Wozniak study examined
13  the amount of DNA damage found at .5 micromolar of
14  Roundup® 360 Plus, how much DNA damage did they find?
15  What percent?  Approximately.
16      **A.  3. 3 percent.**
17      Q.  Okay.  And when they -- the authors of Wozniak
18  examined the DNA damage that they found when they
19  tested a concentration of glyphosate at .5 micromolar
20  in figure 2(B), what percent DNA damage did they find?
21      **A.  From a statistical standpoint, no difference.**
22      Q.  Well, what did they find?
23      **A.  About the same.**
24      Q.  Okay.  Wozniak is a single study, right?
25      **A.  Yes.**

## Page 39

1      Q.  And when you stand up to talk to the jury, if
2  you talk to the jury about genotoxicity, Dr. Sawyer,
3  you're going to be sure to tell them about all of the
4  data that you reviewed relating to genotoxicity, right?
5      MR. KRISTAL:  Objection.  Dr. Sawyer is going
6  to be answering questions that the attorneys ask
7  him.  So if you ask that, he'll answer.
8      MR. DERRINGER:  Please refrain from a
9  specifying objection.  It's improper.  Let me
10  finish.
11      MR. KRISTAL:  No, I was in the middle of
12  something and you jumped in.
13      MR. DERRINGER:  Okay.  Continue your
14  inappropriate speaking objection.
15      MR. KRISTAL:  I disagree.  You're assuming Dr.
16  Sawyer gets up and says whatever he wants, and you
17  know it doesn't happen that way.
18      MR. DERRINGER:  Are you done with your
19  speaking objection?
20      MR. KRISTAL:  I didn't make a speaking
21  objection.
22      MR. DERRINGER:  Okay.  Under Missouri rules,
23  your objections are limited to form.  Speaking
24  objections are improper.
25      MR. KRISTAL:  Okay.  Stop asking misleading

## Page 40

1  questions.
2      MR. DERRINGER:  They're not misleading at all.
3  BY MR. DERRINGER:
4      Q.  Okay.  When you get up to talk to the jury,
5  Dr. Sawyer, if you talk to the jury about
6  genotoxicities, will you be sure to tell them about all
7  of the data that you've reviewed relating to the
8  genotoxicity?
9      MR. KRISTAL:  Object to the form.
10      **A.  Probably not.  I would be all there all day**
11  **talking about genotoxicity.  I -- I will answer**
12  **questions as appropriate and as thoroughly as possible.**
13  BY MR. DERRINGER:
14      Q.  Are you going to tell the jury it's important
15  to use the weight-of-the-evidence approach to the
16  question of whether Roundup® or glyphosate are
17  genotoxic?
18      MR. KRISTAL:  Same objection.
19      **A.  Certainly.  That's why I referenced multiple**
20  **studies in my report.**
21  BY MR. DERRINGER:
22      Q.  And what does "weight of the evidence" mean?
23      **A.  To examine each study for its accuracy,**
24  **reliability, and appropriateness and then weigh each**
25  **study.  For example, a human study carries far more**

## Page 41

1  **weight than an animal study.  And an animal study**
2  **generally carries more weight than an in-vitro study.**
3      Q.  Can you turn to page 514 of Exhibit 1 Wozniak?
4  Bottom left, section 3.1 3 is titled, "Plasmid
5  Relaxation Assay."
6      Do you see that?
7      **A.  I do.**
8      Q.  Do you see that the Wozniak authors report
9  that, according to their results, both Roundup® 360
10  Plus, as well as glyphosate and AMPA, did not bind
11  directly with DNA?  Do you see that?
12      **A.  I do.**
13      Q.  What's your understanding of what that means?
14      **A.  (The document was examined.)**
15      **That the mechanism would be indirect according**
16  **to this statement you just read, which is based on**
17  **electrophoretic separation.**
18      Q.  What does that mean, the mechanism would be
19  indirect?  What do you mean by that?
20      **A.  Well, for example, one of the contaminants in**
21  **Roundup®, ethylene oxide, binds directly to DNA and it**
22  **causes direct damage, where an indirect genotoxication**
23  **connects with other mechanisms to alter DNA.**
24      Q.  What does it mean to you when a study shows
25  that no DNA adduct formation was observed?

11 (Pages 38 to 41)

William Sawyer, Ph.D.
July 16, 2019

Page 42

1    A.  Well, again, that -- that would be indicative
2  of a nondirect mechanism.  For example, benzo(a)pyrene
3  binds directly to DNA.  In connection with the measure
4  of human blood, it's what we call DNA adduct, and that
5  binding alters the DNA sequence such that mutagenic
6  processes occur.
7    Q.  More generally speaking, sir, what is a DNA
8  adduct?
9    A.  It's a compound that is a chemical binding
10  directly to the DNA and impairing its ability to be
11  read correctly.
12    Q.  Did Wozniak find that neither Roundup® 360
13  Plus nor glyphosate nor AMPA create or form DNA adduct?
14    A.  That's what they reported, correct.
15    Q.  Can you turn to page 515?
16    A.  (The document was examined.)
17    Q.  Did the Wozniak authors find that DNA
18  strand-breaks induced by a 5 micromolar concentration
19  of Roundup® 360 Plus were totally repairable after 120
20  minutes post-incubation?
21    A.  (The document was examined.)
22    Where are you?
23    Q.  Bottom left of page 515.
24    A.  (The document was examined.)
25    Q.  I'll ask that again in case you missed it.

Page 43

1    Did the Wozniak authors, Dr. Sawyer, find that
2  DNA strand-breaks that were induced by a 5 micromolar
3  concentration of Roundup® 360 Plus were totally
4  repairable after 120 minutes post-incubation?
5    A.  I believe that was true at 5 micromolar, but
6  not at higher levels such as the highest concentration.
7  So there was a dose-dependent finding.
8    Again, the fact that DNA repair was complete
9  in-vitro does not in any way indicate that would be the
10  case in a human.
11    Q.  This was a -- was Wozniak done in human cells
12  or animal cells?
13    A.  Human, but in-vitro.  And one must remember,
14  that was a 120-minute interval, so, certainly, there
15  would be an open window for mutagenic processes to
16  occur.  Up to 120 minutes is probably micromolar.
17    Q.  Is there any evidence in the Wozniak study
18  that you have in front of you that mutagenic processes
19  occurred during that 120-minute window?
20    A.  That, they didn't test.  They stated that DNA
21  strand-breaks into the human cells occurred at 5
22  micromolars.  That's a serious problem for a cell that
23  is dividing during that time interval of 120 minutes.
24    Q.  Is there any evidence in the Wozniak study
25  that you have in front of you that mutagenic processes

Page 44

1  occurred during the 120-minute window post-incubation?
2    A.  No, that was not evaluated in the study.
3    (Defendant's Exhibit-2 was marked for
4  identification.)
5  BY MR. DERRINGER:
6    Q.  I'm handing you what's been marked as Exhibit
7  2.
8    A.  (The document was examined.)
9    Q.  This is -- has a cover page with a date of
10  July 11th, 2019 on the letterhead of Toxicology
11  Consultants & Assessment Specialists, LLC, addressed to
12  Robin Greenwald, Re:  Winston, et al., versus Monsanto
13  Company, et al.
14    Sir, is this your report in this Winston
15  matter?  It has a total of 209 pages.
16    A.  (The document was examined.)
17    It's an earlier version, yes.
18    Q.  The July 11th report that is Exhibit 2 is an
19  earlier version of your report in this case?
20    A.  Yes.  You were provided updates.
21    MR. KRISTAL:  There were two two- or
22  three-page corrections or updates, so to speak.
23  One was July 11th.  I think that's what Dr. Sawyer
24  is referring to.
25    A.  That is correct, with replacement pages.

Page 45

1    (Defendant's Exhibit-3 was marked for
2  identification.)
3  BY MR. DERRINGER:
4    Q.  I'm marking as Exhibit 3 and handing to your a
5  page double-sided titled, "Changes Made to Dose
6  Calculations Originally Submitted on July 9, 2019."
7  This was provided to us by your -- by Mr. Winston or
8  the Winston plaintiffs' attorneys.
9    Are these the revisions to your July 11th, 2019
10  report that you've just mentioned?
11    A.  In part.  There was another page submitted, as
12  well.
13    Q.  Do you have that page with you?
14    MR. KRISTAL:  It was July 11th.  That was
15  sent -- I think we may have copies, but it was -- I
16  know Robin had sent it to whomever she was
17  interfacing with on your side.
18    A.  It's marked "Changes Made on July 12th."
19  BY MR. DERRINGER:
20    Q.  I don't believe we have that.
21    MR. KRISTAL:  Okay.  I'm trying to see if we
22  have a copy for you.  I know it was sent.
23    THE WITNESS:  It looks like this (indicating).
24    MR. KRISTAL:  Yep.
25    THE WITNESS:  It has the attached pages to it.

12  (Pages 42 to 45)

William Sawyer, Ph.D.
July 16, 2019

Page 46

1      MR. KRISTAL:  Got it.  Do you want to check to
2   see if that's that?
3      THE WITNESS:  Let's see if it's complete.
4      (The documents were examined.)
5      MR. DERRINGER:  Let me go off the record.
6      THE VIDEOGRAPHER:  10:19, off record.
7      (Recess.)
8      THE VIDEOGRAPHER:  Back on record.  The time
9   is 10:35.
10  BY MR. DERRINGER:
11     Q.  Dr. Sawyer, what I want to do is mark and have
12  you confirm what constitutes your report in this case
13  and so you have in front of you Exhibit 2, which is
14  dated July 11th.  It's a 209-page report that you
15  submitted to Attorney Greenwald in the Winston case.
16     (Defendant's Exhibit-4 was marked for
17  identification.)
18  BY MR. DERRINGER:
19     Q.  Also in front of you or, actually, I'm going
20  to put in front of you now is Exhibit 4, which is
21  titled, "Changes Made to Dose Calculations Originally
22  Submitted on July 11th of 2019.  Changes Made July
23  12th, 2019."  Do you see that?
24     A.  Yes.
25     Q.  And then already marked as Exhibit 3 is a

Page 47

1   two-page document marked -- titled, "Changes Made to
2   Dose Calculations Originally Submitted on July 9th,
3   2019."
4      And I'm also going to mark now as Exhibit 5 a
5   document that was just provided to us here at the
6   deposition.
7      (Defendant's Exhibit-5 was marked for
8   identification.)
9   BY MR. DERRINGER:
10     Q.  We can clip it or staple it later, but this is
11  titled, "Deion Sanders," and that seems to have some
12  data about Mr. Sanders and then attached to that are
13  deposition pages.
14     Do you see that?
15     A.  I do.
16     Q.  Okay.
17     MR. KRISTAL:  I think before you ask, I -- did
18  I give you two copies of Exhibit 4?
19     MR. DERRINGER:  Just one.
20     MR. KRISTAL:  Hmm.  Okay.
21     MR. DERRINGER:  That's the only one I've got.
22     MR. KRISTAL:  Okay.  We'll figure out -- it's
23  not a problem.  We'll work it out.
24  BY MR. DERRINGER:
25     Q.  So, Dr. Sawyer, Exhibits 2, 3, 4, and 5, taken

Page 48

1   together, do they constitute your report in this case?
2      A.  There's probably about three or four typos
3   that I found.  For example, on page 33, the top line, I
4   had Mr. Temple.  I crossed it out and wrote Mr. Karr.
5   I mean, a couple of minor things of that sort, which
6   constitute my full report.
7      So the answer is, yes, but this would -- the
8   fact that I'm pointing out that there are probably
9   three or four cross-outs at the most.
10     Q.  Okay.  What you're referring to in your hand
11  is a different physical document than what I marked as
12  Exhibit 2.  Is that -- and so I -- you can look at
13  whatever you want.  I just need to know what you're
14  looking at.  That document you were just flipping
15  through, is it the same as Exhibit 2?
16     A.  No, it contains the updated pages that are
17  contained in Exhibit 4.
18     Q.  Okay.
19     A.  And it also has, I think, about three
20  locations where I've crossed out and inserted a
21  different word due to typographical error.
22     Q.  All right.  Then why don't we go ahead and
23  mark as Exhibit 6 the physical document that you say
24  reflects the changes that were made in Exhibit 4.
25     (Defendant's Exhibit-6 was marked for

Page 49

1   identification.)
2   BY MR. DERRINGER:
3      Q.  Does Exhibit 6, then -- the only differences
4   between Exhibit 6 and Exhibit 2 are that Exhibit 6
5   includes the changes reflected on Exhibit 4 between the
6   changes made July 12th and the changes reflected on
7   Exhibit 3, which were the changes made to the
8   calculation originally submitted on July 9th and some
9   cross-outs or corrections that you made, as well?
10     A.  Yes.
11     Q.  Okay.  Let me then just hand that back to you.
12     A.  Okay.
13     Q.  And just to confirm, Exhibit 2, which is the
14  July 11th report, that already includes all of the
15  changes that you listed on Exhibit 3, correct?  Exhibit
16  3 is up here (indicating).
17     A.  (The document was examined.)
18     Yes.
19     Q.  Okay.  And so the only new changes that are in
20  Exhibit 6, which is your expert report that you brought
21  with you today, are those reflected in Exhibit 4, along
22  with any kind of cross-outs or corrections that you
23  made, correct?
24     A.  Yes.  Yes, but I need to point out, in Exhibit
25  4, I've also attached to Exhibit 4 replacement pages --

13  (Pages 46 to 49)

William Sawyer, Ph.D.
July 16, 2019

Page 50

1    Q.  Okay.
2    A.  -- that are in Exhibit No. 6.
3    Q.  Okay.  So the replacement pages in Exhibit 4
4    are identical to those corresponding pages that are
5    this Exhibit 6.
6    A.  Yes.
7    Q.  Okay.  Thank you.  And the Exhibit 5 that you
8    provided today relating to Deion Sanders, Mr. Kristal
9    took a page off of the cover page.  There's some
10   handwriting on the back that he has retained.  Was that
11   your handwriting on the back of that?
12   A.  I didn't see it.
13       MR. DERRINGER:  Okay.  Mr. Kristal, could you
14   just show him that --
15       MR. KRISTAL:  I think it's in front of him.
16   It's this one here (indicating).
17   BY MR. DERRINGER:
18   Q.  If you will just turn that over.  Is that your
19   handwriting?
20   A.  It is.
21   Q.  And what is that?
22   A.  It's the definition from the dictionary of the
23   term veracity.
24   Q.  The definition of veracity?
25   A.  Yes.

Page 51

1        MR. DERRINGER:  Okay.  Let's go ahead and mark
2    that Exhibit 7.
3        (Defendant's Exhibit-7 was marked for
4    identification.)
5    BY MR. DERRINGER:
6    Q.  Can you just read what you wrote there in
7    terms of the definition of veracity?
8    A.  Yes, I will read what Jen in my office refers
9    to as Bill's scribbles.  If I can read it.
10       Definition 1, conformity to facts and
11   accuracy.  Definition 2, truth.  Well, which actually
12   in the dictionary said truthfulness.
13   Q.  How do you know?
14   A.  I have a memory.
15   Q.  You -- I'm sorry?
16   A.  My memory.
17   Q.  Your memory, okay.
18       And when did you write that down?
19   A.  Last night.
20   Q.  Why did you look up the definition of veracity
21   and write it down?
22   A.  In anticipation of the question you're going
23   to ask me.
24   Q.  What was that question that you expect to be
25   asked today?

Page 52

1    A.  The use of the word in my report.
2        MR. KRISTAL:  What is the definition of
3    veracity?  No.
4        MR. DERRINGER:  Mr. Kristal, I would
5    appreciate it if you wouldn't testify for the
6    witness.
7        MR. KRISTAL:  I'm not testifying.
8    BY MR. DERRINGER:
9    Q.  Okay.  So, then, Exhibit -- we've established
10   Exhibits 2, 3, 4, and 6, and 5 constitute your report
11   in this case, correct?
12       MR. KRISTAL:  Objection.
13   A.  Yeah, I still have some other notes, but
14   you'll get to them eventually probably.
15   BY MR. DERRINGER:
16   Q.  Okay.  Did you bring those notes with you?
17   A.  Certainly.
18   Q.  Okay.  And where are they?
19   A.  In the folder.
20   Q.  Okay.  I'd like to look at that during our
21   lunch break.  Is that okay with you?
22   A.  You can look at all of the stuff, certainly.
23   Q.  Great.  Why don't we refer to Exhibit 6 as
24   your report, and when you need to refer to changes that
25   are made in Exhibit -- well, I guess Exhibit 6 contains

Page 53

1    all of the changes that you've made except for the
2    reflection of Deion Sanders is different data, but
3    we'll refer to Exhibit 6 as your report in this case,
4    which you've already confirmed for me is identical to
5    Exhibit 2, except that it contains the changes made in
6    Exhibit 4, correct?
7    A.  Yes.
8    Q.  Okay.  Do you stand by what's in Exhibit 6 as
9    your work in this case?
10   A.  Yes.
11   Q.  If you were permitted, would you have any
12   reservations about publishing this report to the judge
13   and the jury in this case?
14   A.  I don't understand what that means.
15   Q.  If you were permitted to give the judge and
16   the jury in this case your report, Exhibit 6, would you
17   have any reservations in doing that?
18   A.  I would have to make out a change on a certain
19   page dealing with Deion Sanders where I used the term,
20   "All of the plaintiffs in this case exceeded the
21   various thresholds in the human epidemiological studies
22   except Deion Sanders."  I would have to cross that out
23   because he exceeded all of the thresholds, as well,
24   based on Exhibit 5.
25       And if I made that change, the answer would be

14  (Pages 50 to 53)

William Sawyer, Ph.D.
July 16, 2019

Page 54

1    **yes.**
2        Q.  If you made that change that you just
3    described, you'd have no reservations about providing
4    Exhibit 6, your report in this case, to the judge and
5    the jury.
6        **A.  Correct.**
7        Q.  Okay.  And you would provide it to them as a
8    reflection of your work in this case.
9            MR. KRISTAL:  Objection.  He'll provide it to
10   them and if for some reason we mark them or
11   somebody seeks to admit them and the judge allows
12   it.
13   BY MR. DERRINGER:
14       Q.  If you were permitted, you would be willing to
15   provide Exhibit 6 with the change that you just
16   mentioned about Deion Sanders to the judge and the jury
17   in this case as a reflection of your work in this case,
18   correct?
19           MR. KRISTAL:  Same objection.  It depends on
20   somebody wants to use it or not whether it's
21   permitted.
22       **A.  Yeah, I don't understand the question fully.**
23           MR. DERRINGER:  Again, it's an inappropriate
24   speaking objection, Mr. Kristal.  I asked you to
25   refrain from doing so.

Page 55

1            MR. KRISTAL:  It's a misleading question.
2            MR. DERRINGER:  Let me finish.  Refrain from
3    coaching the witness.
4            MR. KRISTAL:  I'm not coaching the witness.
5    Every time you ask a misleading question, I'm going
6    to say something.
7            MR. DERRINGER:  Okay.  Inappropriate under
8    Missouri rules.
9            MR. KRISTAL:  I disagree.
10           MR. DERRINGER:  Have you read the Missouri
11   rules?
12           MR. KRISTAL:  When I am under oath being
13   deposed, I'll allow you to ask me question.
14           MR. DERRINGER:  Can you tell me the basis for
15   the objections -- the speaking objections, why you
16   believe they're appropriate to make?
17           MR. KRISTAL:  As I said, when I'm under oath,
18   I'll answer your questions.
19   BY MR. DERRINGER:
20       Q.  Sir, are you offering a specific causation
21   opinion about each of the individuals listed on the
22   cover page of Exhibit 6, your report?
23       **A.  Yes.**
24       Q.  And what is your case-specific opinion for
25   each of these plaintiffs?

Page 56

1
██████████
██
██████████████████████
██
████████████████████████████
██
██████████████████████████████
██
██████████████████████████████
██
██████████████████████████
██                        **prior to his NHL diagnosis.  But, at**
11   **any rate, all of the plaintiffs in this case, even**
12   **those who did have risk factors, which I discussed,**
13   **received a sufficient dose and duration of Roundup® to**
14   **place them at a substantially increased risk of the**
15   **development, subsequent diagnosis, and/or promotion of**
16   **their malignancy.**
17       Q.  You hold that opinion to a reasonable degree
18   of scientific certainty for each and every plaintiff in
19   this Winston case; is that right?
20       **A.  I do.**
21       Q.  Okay.  And is the complete basis for that
22   specific causation opinion for each and every plaintiff
23   contained in your report in this case?
24       **A.  Yes.**
25       Q.  Okay.  You're not offering any specific

Page 57

1    causation opinion about Rhonda Johnson, are you?
2            MR. KRISTAL:  That case was withdrawn.
3        **A.  I didn't -- I didn't quite understand the**
4    **name.**
5    BY MR. DERRINGER:
6        Q.  Rhonda Johnson.
7            MR. KRISTAL:  That case was withdrawn, so I'm
8    not sure why you're asking opinions about a case
9    that doesn't exist.
10       **A.  I have no information on that individual.**
11   **None. I've never read any records on that individual,**
12   **so I can't answer your question.**
13   BY MR. DERRINGER:
14       Q.  Did you follow the same process for learning
15   about each of the 14 plaintiffs about whom you've
16   provided an opinion in this case?
17       **A.  Yes.**
18       Q.  Can you -- can you describe everything you did
19   to learn about each plaintiff in this case?  And just
20   to be clear, we'll be talking about them individually a
21   little bit later.  I just want to get a general
22   overview, Dr. Sawyer, of your general methodology of
23   how you went about learning about the plaintiffs in
24   this case.
25       **A.  Well, initially, I reviewed brief summaries**

15  (Pages 54 to 57)

William Sawyer, Ph.D.
July 16, 2019

Page 58

1  that were provided by the Weitz & Luxenberg law firm
2  which contained information largely provided by Stephen
3  Petty, P-e-t-t-y, who is a certified industrial
4  hygienist.
5          I then received -- well, the next step was I
6  set up phone interviews with all 14 plaintiffs and
7  inquired upon -- well, actually, before that -- I don't
8  know, I can't remember if it was before or after -- I
9  reviewed depositions.  Actually, I did it before and
10 after.  I reviewed depositions as late as last night.
11         So throughout the process, I reviewed the
12 depositions, sometimes more than once, but I did
13 prepare and conduct questioning directly with each
14 plaintiff with respect to their medical history, their
15 use of Roundup®, personal protective equipment,
16 environmental conditions, potential confounding
17 chemical or radiological exposures, pharmaceutical
18 history, assessment of other medical factors which are
19 important with respect to the induction or promotion of
20 NHL.  And I also reviewed, as I recall them, brief
21 reports prepared by Stephen Petty.
22         These reports were called the plaintiffs'
23 interview summary sheet by Mr. Petty.
24         And I also reviewed a set of computation
25 tables from Stephen Petty.

Page 59

1          More importantly, I reviewed numerous Monsanto
2  documents and numerous peer-reviewed generally accepted
3  toxicological and human epidemiological studies.  And
4  then I prepared Exhibit 6.
5     Q.  Is there anything else that you did to learn
6  about the plaintiffs in this case?
7     A.  Well, I compared the initial summary of
8  Stephen Petty's interview information with his later
9  documents referred to as the plaintiffs' interview
10 summary sheets and determined if there were any
11 changes, differences, discrepancies.  And I also
12 compared Steve Petty's more recent spreadsheet values
13 of exposure hours to my calculations and made a
14 determination of whether they were similar or if they
15 were discrepant and, if discrepant, why?
16         And I'm -- it's possible I'm forgetting some
17 other steps, but that's all I recall at this time.
18    Q.  When did you begin the process of learning
19 anything about these plaintiffs?
20    A.  June 17th.  Well, I had a phone call with
21 Attorney Greenwald before that, just a general
22 overview, but I think the first information I received
23 was on June 17th.
24    Q.  And on June 17th, the first information that
25 you received were those what you called brief summaries

Page 60

1  prepared by Weitz & Luxenberg?
2     A.  That's correct.
3          (Defendant's Exhibit-8 was marked for
4  identification.)
5  BY MR. DERRINGER:
6     Q.  I'm handing you Exhibit 8.  Exhibit 8 is
7  titled, "Summary Roundup® Use Information for Dr.
8  William Sawyer."  This was provided to us in connection
9  with your deposition.
10         Have you seen this before?
11    A.  Yes.
12    Q.  And is this one of the items that you've just
13 mentioned when describing what you did to learn about
14 the plaintiffs in this case?
15    A.  It is.
16    Q.  Okay.  Which one is it?
17    A.  The document I referred to as summary --
18 initial summary.
19    Q.  All right.
20    A.  Prepared by Weitz & Luxenberg based primarily
21 on information that they received from Industrial
22 Hygienist Stephen Petty.
23    Q.  Okay.  So Exhibit 8 is not something that you
24 prepared, correct?
25    A.  Correct.

Page 61

1     Q.  And Exhibit 8 is the first information you
2  received about any of the plaintiffs in this case?
3     A.  Yes.
4     Q.  Do you have any understanding as to the
5  ordering of the plaintiffs in this document?  It's not
6  alphabetical.
7     A.  No.
8     Q.  Okay.
9     A.  I reordered my set into alphabetical order.
10    Q.  Okay.  Have you met any plaintiff in this
11 case?
12    A.  No.
13    Q.  Could you tell us what any plaintiff in this
14 case looks like?
15    A.  Yeah, that's a good point.  One thing I failed
16 to mention, I did receive some photos.  And do I -- I
17 don't recall whether I saw photos of plaintiffs or not.
18 Photos in my report of a spray tank, for example.
19    Q.  Did you receive photos other than those that
20 are reproduced in your report?
21    A.  Yes.
22    Q.  Okay.  And --
23    A.  They're -- they're in a list.  There's a list
24 that I renamed as the documents reviewed.
25    Q.  You say you renamed it as documents reviewed.

16  (Pages 58 to 61)

William Sawyer, Ph.D.
July 16, 2019

## Page 62

1  Are you talking about appendix A to your report?
2  **A.  No, materials considered list.  That's the**
3  **complete list.  It's called, "Materials Considered**
4  **List," July 9th, 2019.**
5  Q.  Okay.  We've been told that the materials
6  considered list is also reproduced in your report as
7  appendix A.  Is that right?
8  **A.  That's true, but it's incomplete.**
9  Q.  Well, appendix A of your report -- let me take
10  a look at Exhibit 6.
11  **A.  Exhibit 6?**
12  Q.  Exhibit 6 is -- that's the only copy of
13  Exhibit 6 that you brought with you today?
14  **A.  It is.**
15  Q.  Okay.  So let me go ahead and take a look at
16  that.
17  **A.  (A document was handed.)**
18  Q.  (The document was examined.)
19  Yeah, if you look at Exhibit A of -- I'm sorry,
20  appendix A of Exhibit 6, am I correct, sir, that that
21  is dated July 7th?
22  **A.  Let's see.**
23  Q.  Page 189, I believe, within your report?
24  **A.  (The document was examined.)**
25  Q.  Is that right?

## Page 63

1  **A.  Yes.**
2  Q.  Okay.
3  **A.  That's right.**
4  Q.  And that's appendix A, "Document Reliances."
5  Is that what it's called?
6  **A.  It is, but there were some additional items**
7  **added.**
8  Q.  Well, take a look at Exhibit 6 -- Exhibit 6,
9  appendix A, and confirm for me that that has 354
10  entries.
11  **A.  It does.**
12  Q.  Okay.  And you're telling me that there's
13  another MCL or document reliance list that has
14  additional materials on it?
15  MR. KRISTAL:  Objection to form.
16  THE WITNESS:  Yeah, your firm -- your firm has
17  provided us.  It includes the depositions -- not
18  the depositions, the summaries, some Monsanto
19  documents.
20  BY MR. DERRINGER:
21  Q.  Can I see what you're looking at, sir?
22  **A.  Yeah, page 2, it says, "Additional Documents,"**
23  **starting at item 355.**
24  Q.  I'll go ahead and mark that.
25  (Defendant's Exhibit-9 was marked for

## Page 64

1  identification.)
2  BY MR. DERRINGER:
3  Q.  Sir, I'm marking as Exhibit 9 the document
4  that you just handed me, 22 pages with 380 entries
5  titled, "Materials Considered List - July 9, 2019."
6  Is Exhibit 9 your complete materials considered
7  list in this case?
8  **A.  Yes.**
9  Q.  Getting back to pictures, have you -- well,
10  the photos that you've seen in this case, who did you
11  receive those from?
12  **A.  Weitz & Luxenberg law firm.**
13  Q.  And as you sit here today, could you tell us
14  what any plaintiff looks like?
15  **A.  No.  Well, yes.  I do recall two photos of**
16  **Deion Sanders, one as a very young child and another**
17  **photo of him in high school wearing his football gear.**
18  Q.  Can you tell us what any other plaintiff looks
19  like?
20  **A.  No.  I spoke to them all, but I did not have a**
21  **video operation during the interviews.**
22  Q.  Have you physically examined any plaintiff in
23  this case?
24  **A.  No.  They're alive.  I only examine dead**
25  **tissue.  I'm a forensic toxicologist, not a treating**

## Page 65

1  physician.
2  Q.  Other than Deion Sanders' dad, have you met or
3  spoken to any relative of any plaintiff in this case?
4  **A.  Yes.**
5  Q.  Who?
6  **A.  Well, it's confusing.  When I was on the phone**
7  **with Vicki, her husband Steve also interjected some**
8  **comments.  And when I was on the phone with him, she**
9  **interjected some comments, so --**
10  Q.  Right, I understand that Vicki is Steve
11  Gatewood -- Vicki Gatewood is Steve Gatewood's relative
12  and Steve Gatewood is Vicki Gatewood's relative because
13  they're married; is that right?
14  **A.  Yes.**
15  Q.  Okay.  Other than Deion Sanders' dad and Vicki
16  and Steve Gatewood, have you met or spoken to any
17  relative of any other plaintiff in this case?
18  **A.  I don't believe so.**
19  Q.  Other than Deion Sanders' dad and Vicki
20  Gatewood and Steve Gatewood, have you met or spoken to
21  anyone who lived with any of the plaintiffs in this
22  case?
23  **A.  No.**
24  Q.  Have you met or spoken -- met or spoken to
25  anyone who worked with any plaintiff in this case?

17 (Pages 62 to 65)

William Sawyer, Ph.D.
July 16, 2019

Page 66

1    A.  No.
2    Q.  Did you read the deposition of each of the 14
3 plaintiffs in this case?
4    A.  Yes.
5    Q.  Did you read the entire deposition in each
6 instance?
7    A.  No, there were some areas I skipped over that
8 had to do with finances and irrelevant data sections.
9    Q.  You believe you read every part of every
10 plaintiff deposition in this case that was relevant to
11 what you were asked to discuss; is that right?
12    A.  No, I -- I missed some sections and I had to
13 go back, for example, and look closer at Deion Sanders,
14 in part because -- the questions were so poorly formed,
15 I couldn't understand.  When the questions were
16 being -- questions were being asked what property they
17 belonged to, I went back and rereviewed that and found
18 some ways to determine what those response properties
19 belonged to.
20    Q.  How did you become aware that you missed some
21 sections in the deposition related to Deion Sanders?
22    A.  Based upon my analysis of the Winston, et al.,
23 table 10 in my report to that of the more current
24 analyses of Stephen Petty and I prepared an inventory
25 of whether my work corresponded with Mr. Petty's or

Page 67

1 whether it was discrepant and then looked further to
2 try to determine causes of those discrepancies.
3    Q.  All right.  So the discrepancy with respect to
4 Deion Sanders, between your calculations and Dr.
5 Petty's calculations, is what caused you to go back and
6 look at the Deion Sanders' information more closely?
7    A.  Yes, his -- for example, in the Deion Sanders,
8 I believe the exposure hours calculated by Stephen
9 Petty were more than double what I had calculated.
10    Q.  What is the document you just pulled out of
11 your folder?
12    A.  It's this tally list of my assessment of the
13 document of Mr. Petty's versus my table 10.
14    Q.  Okay.  Can I have that, please?
15    A.  Sure.
16    (A document was handed.)
17    Q.  Thank you.
18    MR. DERRINGER:  We'll go ahead and mark that
19 as Exhibit 10.  It's titled, "Winston, et al.,
20 Table 10 notes."
21    (Defendant's Exhibit-10 was marked for
22 identification.)
23 BY MR. DERRINGER:
24    Q.  Did you prepare these notes?
25    A.  Yes.

Page 68

1    Q.  Okay.  And you say Dr. Petty's more recent
2 assessment.  You talked about reviewing a brief record
3 prepared by Dr. Petty and then you talked about Dr.
4 Petty, reviewing his computation tables.  Is this more
5 recent assessment something different from what you've
6 described before in terms of what you reviewed from Mr.
7 Petty -- from Dr. Petty?
8    MR. KRISTAL:  It's actually Mr. Petty.
9    A.  It is, and I'll explain why if you wish.
10 BY MR. DERRINGER:
11    Q.  I just want to know everything that you relied
12 on to learn about the plaintiffs in this case, so in
13 addition to Mr. Petty's brief reports, what you
14 described, I think, as a plaintiff interview summary
15 sheet, and in addition to the computation tables from
16 Mr. Petty that you disclosed to us earlier in this
17 deposition, is there another piece of work product from
18 Mr. Petty that you used to learn about the plaintiffs
19 in this case?
20    A.  Yes.
21    Q.  And what is that?
22    A.  Simply a very brief phone call asking some
23 questions to Mr. Petty regarding the terminology used
24 in his Excel spreadsheet summarizing his analyses.
25    Q.  How many times have you spoken to Mr. Petty?

Page 69

1    A.  Just once.
2    Q.  And was that one time the conversation you
3 just mentioned?
4    A.  Yes.
5    Q.  How long did that conversation last?
6    A.  I would approximate about 15 minutes.
7    Q.  When did that take place?
8    A.  Yesterday afternoon.
9    Q.  Have you ever met Mr. Petty?
10    A.  No.
11    Q.  Other than the depositions of the plaintiffs
12 in this case, did you read any other depositions to
13 learn about the plaintiffs in this case?
14    A.  (The document was examined.)
15    Nope.
16    Q.  What did you just pull out of your folder?
17 Oh, that was what was already marked as, what, Exhibit
18 9?
19    A.  Yeah, do you want to mark it again?
20    Q.  No, I would rather you not put it back in your
21 folder, though.  Let's keep it out for the court
22 reporter.
23    A.  I'm probably going to keep stuff in my order
24 so I can answer your questions efficiently.
25    Q.  Okay.  Just by the end of the deposition, I

18  (Pages 66 to 69)

William Sawyer, Ph.D.
July 16, 2019

Page 70

1    want to make sure --
2         MR. KRISTAL:  Of course, the court reporter
3    will have all of these originally marked exhibits.
4         THE WITNESS:  Yes.
5    BY MR. DERRINGER:
6         Q.   Did you speak to any of the plaintiffs'
7    doctors in this case?
8         A.   No.
9         Q.   Did you read any of the depositions of any of
10   the plaintiffs' doctors in this case?
11        A.   No.
12        Q.   Can you tell me the name of any plaintiffs'
13   doctor in this case?
14        A.   Well, maybe I did.  You asked had I read
15   depositions?
16        Q.   Did you read any depositions of any of the
17   plaintiffs' doctors?
18        A.   I don't recall if they were treating
19   physicians or retained experts.  Let me check the list
20   here, and I'll tell you.
21        Q.   Again, you're looking at Exhibit 9?
22        A.   Yeah.
23             (The document was examined.)
24             My memory gets a little confused because I'm
25   working on other cases, as well.

Page 71

1             No, I did not read any depositions of any
2    treating physicians.  No.
3         Q.   Okay.  Do you know the names of any of the
4    plaintiffs' doctors?
5         A.   No.
6         Q.   When you reviewed the depositions of the
7    plaintiffs, did you make notes?
8         A.   Into MS Word, which ultimately became my
9    report, of course.
10        Q.   So any notes that you made when you reviewed
11   the depositions of the plaintiffs in this case
12   ultimately became part of your report which is Exhibit
13   6; is that right?
14        A.   That's correct.
15        Q.   And the part of your report that bears those
16   notes ultimately became -- are reflected in the section
17   of your report where you discuss the factual
18   circumstances of each plaintiff; is that right?
19        A.   That's correct.  My interview is in there, as
20   well --
21        Q.   Okay.
22        A.   -- as part of that, of each plaintiff,
23   summary.
24        Q.   And would it be the same answer with respect
25   to those interviews, that is, did you make notes during

Page 72

1    those interviews?
2         A.   No.  I -- I had Jen and Bonnie, rotating
3    actually, taking down all of the information into my
4    draft, which is Exhibit 6.
5         Q.   Okay.
6         A.   As far as me taking notes, no, I really
7    didn't -- I didn't write anything down.
8         Q.   We'll get to the interviews in a minute, but
9    while you mentioned their names, is that Jen Clark?
10        A.   Yeah, she's my office manager.
11        Q.   And what's Bonnie's last name?
12        A.   Serlin, S-e-r-l-i-n.
13        Q.   What's her role in your business?
14        A.   She's a part-time assistant.  When I get real
15   busy, she -- she assists.  She has a master's in
16   chemistry, and she's very intelligent.  More so than I.
17        Q.   Did you review any of the plaintiffs' medical
18   records in this case?
19        A.   No.
20        Q.   Have you ever visited any of the places where
21   any of the plaintiffs in this case live?
22        A.   No.
23        Q.   Have you ever visited any of the places where
24   any of the plaintiffs in this case worked?
25        A.   Well, not for the purpose of this case.  I

Page 73

1    mean, I've been to Cape Canaveral.  I know it's a huge
2    area.  No, not -- not for the purpose of this case.
3         Q.   Have you ever visited any of the places where
4    any of the plaintiffs in this case claim to have used
5    Roundup®?
6         A.   Well, I cycle down on my bike to Naples all
7    the time.  It's possible I passed some of the
8    properties treated by one of the plaintiffs, but, no,
9    not -- not for this purpose.  As I say, not any of the
10   properties for the purpose of this matter.
11        Q.   Let's talk about your interviews of these
12   plaintiffs.  You interviewed every one of the 14
13   plaintiffs?
14        A.   Yes.
15        Q.   And I know from your prior work in these cases
16   that you've followed this procedure in the past when
17   you interviewed plaintiffs; is that right?
18             MR. KRISTAL:  Object to the form.
19        A.   I'm not sure I understand.
20   BY MR. DERRINGER:
21        Q.   Sure.  This is not the first time you've
22   interviewed plaintiffs for the purpose of learning
23   about their history and alleged exposure to Roundup®,
24   right?
25        A.   I have interviewed plaintiffs and defendants

19  (Pages 70 to 73)

William Sawyer, Ph.D.
July 16, 2019

Page 74

1   in matters of this sort since 1989, 30 years ago.
2       Q.  Right.  And in the cases that we went over at
3   the beginning of the deposition where you've testified
4   under oath before dealing with different plaintiffs, in
5   all of those cases, you also interviewed those
6   plaintiffs like you interviewed the plaintiffs here,
7   right?
8       A.  Well, I'm trying to recall if I did it the
9   same way.  I can't -- I can't say I did it exactly the
10  same way.  I don't recall.
11      Q.  Okay.  You interviewed all of these plaintiffs
12  on one day in June of this year, correct?
13      A.  One very long day.
14      Q.  That was June 19th?
15      A.  Yeah, it was -- it was exhaustive.
16      Q.  So when did you start with your interviews of
17  the plaintiffs on that day?
18      A.  I think I -- I think I scheduled -- I think we
19  started at -- pretty early.  It was either 8:00 or 8:30
20  a.m.
21      Q.  And just take me through the day.  Not the
22  substance of your interviews yet, but how did you
23  schedule them and how long was each interview and how
24  long did the day go?
25      A.  Well, for efficiency --

Page 75

1       MR. KRISTAL:  Object to the form.
2       Go ahead.
3       A.  For efficiency -- actually, you asked me
4   multiple questions.
5   BY MR. DERRINGER:
6       Q.  I did.  I'm happy to break it up if it would
7   be easier for you.
8       A.  Yeah.
9       Q.  Sure.  You said you started your day around
10  8:00 or 8:30, right?
11      A.  Yes.
12      Q.  And that's the time you started with the first
13  interview?
14      A.  Correct.
15      Q.  How long did the first interview take?
16      A.  The interviews varied from -- well, most of
17  them are 30 minutes.  They were set to be 30 minutes,
18  but they varied from 20 to 40 minutes, depending on how
19  efficiently the plaintiff was able to answer questions.
20  And also the complexity of the matter.  For example,
21  the DNH farm versus residential exposures and so on, it
22  took a long time to sort through, where other
23  plaintiffs had only a single property exposure and they
24  were mentally charged and able to answer questions
25  quickly.  So it varied.

Page 76

1       Q.  When did you complete the last interview?
2   What time of the day?
3       A.  I believe it was about 5:30 p.m.
4       Q.  And how long did you take for any kind of
5   break, like a lunch break or anything like that?
6       A.  One hour.
7       Q.  A one-hour lunch break?
8       A.  Yeah.  That was the only break.  That's why I
9   had Bonnie and Jen rotating on each one because I knew
10  I would burn them out.
11      Q.  Okay.  How long did you take in between each
12  interview?
13      A.  Zero.  Zero.  It was a scramble to try to get
14  to the next call without leaving them on hold.  The law
15  firm assisted by setting up the calls so I didn't have
16  to dial.  As soon as I was done with one call, the next
17  one was connected.
18      Q.  Who was on the phone during the interviews?
19      A.  Jen Clark, Bonnie Serlin, myself, the
20  plaintiff, and I think on the initial call, an attorney
21  was on the line, but I don't believe that the attorney
22  was present on the calls for the information-gathering
23  process.  I could be wrong, but I don't recall
24  attorneys being involved in any way on the calls other
25  than getting them mechanically set up.

Page 77

1       Q.  Who was the first interview?
2       A.  I don't -- I don't recall.  They were not
3   conducted in alphabetical order, so -- I don't think.
4   No.  I know Chap -- Mr. Chaplick was later in the day.
5   I don't recall.
6       Q.  Just so I can get the mechanics right, the
7   attorneys at Weitz & Luxenberg were the ones who
8   mechanically made the call happen, meaning, they dialed
9   the number and then dialed you in?
10      A.  Yes.
11      Q.  Okay.  And was it a conference call, like, did
12  he -- did you have to dial into a, you know, conference
13  line?
14      A.  Initially, I think that was the case, yes.
15  And it was set up so that I was in my office in Florida
16  and Jen and Bonnie were in their office -- in my office
17  in Skaneateles, New York, and we were able to dial into
18  one central line which the attorney in charge then
19  connected each plaintiff to our call.  So I don't think
20  I had to redial in except after lunch.
21      Q.  Who was the attorney who was arranging these
22  calls, to your knowledge?
23      A.  I don't know.
24      Q.  You don't know the name of the attorney?
25      A.  No.

20  (Pages 74 to 77)

William Sawyer, Ph.D.
July 16, 2019

Page 78

1    Q.  And you said the attorney wasn't involved in
2  the information-gathering process?  Is that right?
3         MR. KRISTAL:  Objection to form.
4  BY MR. DERRINGER:
5    Q.  Yeah, that -- let me strike that.
6         Did the attorney speak during the day on the
7  phone?
8    **A.   Initially, introducing me to the plaintiff and**
9  **acknowledging that Jen or Bonnie was on the line.**
10 **Beyond that, I don't recall any interruptions or**
11 **anything like that.**
12   Q.  Did the attorney do that -- the attorney from
13 Weitz & Luxenberg do that for every plaintiff
14 interviewed, meaning you started every interview where
15 the attorney from Weitz & Luxenberg introduced the
16 plaintiff to you, you to the plaintiff, and told the
17 plaintiff that Bonnie and Jen were on the line?
18   **A.   I think so.**
19   Q.  Okay.
20   **A.   Yeah, I believe every time.**
21   Q.  And did the attorney stay on the line for the
22 entire interview?
23   **A.   Possibly -- possibly in a monitoring**
24 **situation, but no -- no sounds.  I mean, I think they**
25 **had to be monitoring because they knew when I was**

Page 79

1  ending the call, so...
2    Q.  So to the best of your knowledge, an attorney
3  from Weitz & Luxenberg was on the call -- was on -- was
4  present for the interview, but didn't participate in
5  the interview.  Is that fair?
6    **A.   Yes, but I think in the capacity of, I would**
7  **say, conducting the mechanics of the process.**
8    Q.  To your knowledge, they never hung up,
9  correct?
10   **A.   At lunchtime.**
11   Q.  Okay.  So they hung up again at lunchtime, the
12 attorney did -- the attorney did, everybody did, right?
13   **A.   Yeah, we terminated at lunchtime.**
14   Q.  And then you picked up again after lunch and
15 it was the same process in the afternoon as it was in
16 the morning, right?
17   **A.   That's accurate.**
18   Q.  Okay.
19   **A.   Excuse me, I just need to take a quick break.**
20   Q.  I'm true to my word.  I told you we'd take
21 breaks whenever you need one as long as a question
22 wasn't pending, so let's take a break.
23         THE VIDEOGRAPHER:  11:23.  End of media 1.
24 Going off record.
25         (Recess.)

Page 80

1         THE VIDEOGRAPHER:  We're back on record.  The
2  time is 11:40, start of media 2.
3  BY MR. DERRINGER:
4    Q.  Dr. Sawyer, when we took our break, we were
5  discussing the interviews that you conducted with each
6  of the plaintiffs in this case.  Were any of those
7  interviews done under oath?
8    **A.   No.**
9    Q.  Did you conduct any follow-up interview with
10 any of the plaintiffs?
11   **A.   Yes.**
12   Q.  Which one?
13   **A.   (The document was examined.)**
14       **Well, Deion Sanders' dad, Ken Sanders.**
15   Q.  Did you speak to any other plaintiff more than
16 once?  Let me strike that question.
17       Did you conduct any other follow-up interview
18 with any other plaintiff?
19   **A.   It's possible.  I just don't recall.**
20   Q.  What's your best recollection as you sit here
21 today?
22   **A.   I thought that I did have an outstanding**
23 **question which I followed up on, but I don't know who.**
24   Q.  This would be someone different than relating
25 to Deion Sanders?

Page 81

1    **A.   Maybe.**
2    Q.  It could just be your Deion Sanders' follow-up
3  interview you recall right now with his dad?
4    **A.   I thought I had a question regarding an**
5  **exposure time, whether a half hour or one hour.  Some**
6  **missing data point somewhere that I followed up on, but**
7  **I don't remember who.**
8    Q.  How did you follow up on that missing data
9  point, whatever it was?
10   **A.   Phone call.**
11   Q.  Did you call the plaintiff directly?
12   **A.   No.**
13   Q.  How did you arrange that phone call?
14   **A.   I didn't have the plaintiffs' phone numbers.**
15 **I would have had to have called the law firm and asked**
16 **them to patch me in.  Or give me the number.**
17   Q.  Do you recall directly calling any plaintiff
18 in this case?
19   **A.   It seems that I did, but I may be confusing it**
20 **with another matter.**
21   Q.  Okay.  To the best of your recollection as you
22 sit here today, you conducted a -- one interview on
23 June 19th of each of the plaintiffs you've already
24 described.
25   **A.   No, not June 19th, no.**

21  (Pages 78 to 81)

William Sawyer, Ph.D.
July 16, 2019

Page 82

1    Q.  No, I'm saying, at least in your report, you
2  report that you conducted interviews of plaintiffs over
3  the course of one day, which was June 19th, 2019.
4    A.  June 19th.
5       (The document was examined.)
6    Q.  Take a look at your report, if you would like.
7    A.  It's July 19th.
8    Q.  Well, July 19th would be in the future.
9       MR. KRISTAL:  Which is why it's a special
10  event.
11    A.  I guess it was June 19th.  I'm all mixed up.
12  If it says June 19th, it was.
13  BY MR. DERRINGER:
14    Q.  So --
15    A.  You'll see that on the billing invoice, too,
16  which you already have.
17    Q.  No, we don't, but if you brought it with you
18  today, it's something we asked for.
19    A.  Robin said she was bringing it.
20    Q.  Okay.  We'll get to that.
21    A.  Okay.
22    Q.  But you conducted your day of interviews with
23  the 14 plaintiffs on June 19th, you've generally
24  described that to us.  You then say you had a follow-up
25  interview Deion Sanders' dad, is that right, you

Page 83

1  specifically recall that?
2    A.  I do.
3    Q.  Okay.  And how long did that interview last?
4    A.  Oh, probably about 20 minutes.
5    Q.  And do you have a specific recollection of
6  speaking to any other plaintiff at any other time?
7    A.  No.  But I can't rule it out.
8    Q.  Did you have an outline that you followed or a
9  script that you followed with each of these interviews
10  on June 19th?
11    A.  What I recall was I had a page from Exhibit 8
12  which, following review of Exhibit 8, I had covered the
13  first page, complete with Bill scribbles, bullet point,
14  Bill scribbles, just to remind me of things throughout
15  my review of this, which I -- it kind of aided me in
16  making sure I didn't miss any questions.
17    Q.  Okay.  So to the degree you followed some kind
18  of outline during your interviews on June 19th, what it
19  sounds like you did, correct me if I'm wrong, is you
20  took Exhibit 8, the summaries you received from Weitz &
21  Luxenberg, and covered all of the areas or attempted to
22  cover all of the areas that are covered in these
23  summaries?
24    A.  Not only covered in the summaries, but items
25  that were not covered in the summaries.

Page 84

1    Q.  Okay.  So how did you -- did you follow any
2  kind of standard methodology or procedure to ask about
3  items that were not covered in the summaries?  Meaning,
4  were there topics --
5    A.  Yes --
6    Q.  -- not covered in the summaries that you made
7  it a point to inquire about during your interviews?
8    A.  I did, and what I -- I did.  I started off
9  with the demographics of the individual, where they
10  lived, the birth date, time of diagnosis.  And then
11  confirmed the actual diagnosis.  Questions regarding
12  medical history, major surgeries, any diseases,
13  immunosuppression.  I asked about treating for lupus or
14  organ transplants, a series of medical conditions that
15  would be significant in the current matter.
16       I asked regarding long-term pharmaceuticals,
17  especially steroids.  And as I recall, I did have one
18  person who had a month of steroid treatment for asthma,
19  but that was not significant with respect to NHL
20  induction.
21       And then I moved on to the use of Roundup®.
22  And was very detailed in terms of asking questions
23  regarding the method of preparing the Roundup®, the
24  type of Roundup®, whether it was premixed, concentrate,
25  and how it was diluted, and whether any type of PPE was

Page 85

1  used.  I kind of gave examples of gloves, cloth gloves,
2  apron gloves.  I asked questions about how often the
3  gloves were changed, new one.  And then talked about
4  the spraying, what type of unit, whether it was an
5  electric prepackaged or a pump prepackaged, a backpack
6  or a cylindrical or a round pump sprayer.
7       I asked questions about contact with the
8  Roundup® in terms of not only during the preparation,
9  if any, but also in the mechanics of the equipment,
10  whether the spray heads clogged ever.  And if so, how
11  was it cleared?  Whether the backpack had wet drippings
12  on the back of the shirt.
13       This was a very detailed assessment in terms
14  of the application, time for application, how often,
15  years, descriptions of the areas that were applied if
16  they could provide it in terms of the width of the
17  spray area and the length of it.
18       The dermal exposures, I questioned regarding
19  specifically what clothing was worn.  I had one woman
20  who was wearing her swimsuit during application at
21  times.  Then I asked the more specific questions about
22  dermal contact in terms of the depth of the weeds,
23  whether there was contact with sprayed material on
24  weeds or other modes of direct contact.
25       For example, there was one instance where a

22  (Pages 82 to 85)

William Sawyer, Ph.D.
July 16, 2019

Page 86

1 woman actually sprayed underneath her
2 25-foot-plus-diameter decking around the pool and then
3 she got done spraying and immediately while spraying,
4 she would reach in and pull the larger weeds and have
5 direct dermal contact with her hands and forearms and
6 described it as being wet and messy.
7    Just a lot of descriptive information I was
8 able to ascertain by asking questions specific to
9 different potential circumstances. I asked a farmer
10 did he have his boom sprayers behind the tractor or in
11 front of the tractor. They were in front of the
12 tractor.
13    So I had to individually ask questions
14 pertinent to each type of application to get a full
15 picture of what was going on.
16    Q. Besides the general topics, what else did you
17 cover in the interview? You talked about demographics,
18 birth date, time of diagnosis, medical history, and
19 then a lot of details about their use of Roundup®.
20    A. Yeah, these --
21    Q. What were the other main topics you covered in
22 your interviews with each plaintiff?
23    A. Potential -- I asked what other products have
24 you used on your yard or on your residential property
25 or occupationally. And I gave examples. For example,

Page 87

1 I jogged the memory sometimes by saying have you ever
2 used any insect sprays in your yard or in the house?
3 Have you used any other chemicals to treat weeds or
4 fertilize your lawn? And so on. And I asked numerous
5 questions along those lines to attempt to trigger
6 memories on potential products that might potentially
7 have some bearing on the NHL.
8    Q. What other general topic did you cover during
9 these interviews, if anything else?
10    A. Time between application, on the average, and
11 time that hands were washed and time of application and
12 the average of the time that showering or bathing
13 occurred.
14    Q. Okay. I put that in the general Roundup®
15 discussion that you described in some detail just a few
16 minutes ago.
17    A. I should also mention on the -- I also asked
18 questions on family medical history in terms of other
19 malignancies diagnosed among first-generation relatives
20 and second-generation relatives in the medical
21 questioning section.
22    Q. Okay. Any other general topics that you
23 covered with each of these plaintiffs when you
24 interviewed them on June 19th?
25    A. Well, like I said, in terms of PPE, I gave

Page 88

1 many examples in terms of what type of shoes, were they
2 boots, were they sneakers? If so sneakers, were
3 they -- did they have a mesh where you could see your
4 sock?
5    Q. Just tell me the general topics. You
6 mentioned PPE and you mentioned that you discussed that
7 with him.
8    A. Other general topics. Of course, occupation
9 use to any other chemicals. I covered that with them.
10    Q. That would be under potential confounding
11 factors?
12    A. Yes.
13    Q. Anything else? Do you have any other general
14 topics you made sure to cover with each of the
15 plaintiffs during your telephone interviews with them?
16    A. Not that I recall. It's possible, but not
17 that I remember.
18    Q. Did you read the depositions of the plaintiffs
19 before or after you conducted the interviews?
20    A. Largely, after.
21    Q. All right. Pages 8 through 49 of your report,
22 do those summarize each of the interviews that you
23 conducted?
24    A. Yes.
25    Q. And how did you decide what to put in your

Page 89

1 report in this section, pages 8 through 49, from your
2 interview discussions? How did you decide what to
3 actually put in there?
4    A. Really, everything except irrelevant
5 information.
6    Q. Okay. So, then, is everything that you know
7 about each of these plaintiffs that's relevant to your
8 causation opinion contained at pages 8 through 49 of
9 your report?
10    A. Well, in terms of the relative facts of the
11 case, yeah. ███████████████████████
12 ███████████████████████████████
13 ███  Yeah, I mean, I think so. ██████████
14 ██████████████████████
15 ████████████████
16 ████████████████████████████
17 █████████████████████████████
18 ███████████████████████████
19 ██████████████████████████████
20 ███████████████████████████
21 ███████████████████████████
22 ████████████████████████████
23 ████████████████████████████
24 ████████████████████████████
25    Q. It was pointed out to you by the attorneys at

23 (Pages 86 to 89)

William Sawyer, Ph.D.
July 16, 2019



Page 90

1    Weitz & Luxenberg --
2    **A.  It was.**
3    Q.  ▉▉▉▉▉▉▉▉▉▉▉▉
4    **A.  Yes.**
5    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉▉▉
10   Q.  And what is the basis for your understanding
11   that there was some controversy, as you just described?
12   **A.  I'd rather not speculate.  I'm not clear.**
13   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉

Page 91

1    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉
6    **A.  Oh, speaking with the -- the attorneys.**
7    Q.  Okay.  Did the attorneys contact you about any
8    other omissions in your report?
9    MR. KRISTAL:  Objection.
10   **A.  I can't -- I can't say they contacted me.  I**
11   **was discussing with the attorneys -- going through each**
12   **of my summaries on the plaintiffs and discussing my**
13   **findings and so on, so it just happened to come up.**
14   BY MR. DERRINGER:
15   Q.  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  and the amendments
17   you've made regarding Mr. Sanders and details about
18   him, do you believe there are any other relevant
19   omissions in your report regarding your knowledge of
20   the plaintiffs' factual circumstances relevant to your
21   opinion?
22   **A.  No.**
23   Q.  You're not offering an opinion about any
24   plaintiff's current condition, are you?  Medical
25   condition.

Page 92

1    MR. KRISTAL:  Object to form.
2    **A.  The only opinion related to that is one from a**
3    **toxicologic standpoint, continued exposures to Roundup®**
4    **after diagnosis is still a concern due to cancer**
5    **promotion.**
6    THE REPORTER:  Due to what?
7    THE WITNESS:  Cancer promotion.
8    BY MR. DERRINGER:
9    Q.  Do you plan to testify as to any plaintiffs'
10   diagnosis?
11   **A.  No.**
12   Q.  That's not your job as a toxicologist,
13   correct?
14   **A.  No, I totally defer to the oncologist.**
15   Q.  Are you aware whether any treater of any
16   plaintiff in this case has identified glyphosate or
17   Roundup® as a cause of that plaintiff's cancer?
18   **A.  I'm not aware.**
19   Q.  Are you aware whether any treater of any
20   plaintiff in this case has advised that plaintiff to
21   discontinue their use of glyphosate or Roundup®?
22   **A.  I was told that by plaintiffs, and I don't**
23   **know who or how many, but it came up during the**
24   **interview.  I didn't think it was important enough to**
25   **take down and include, but, yeah, there -- there were**

Page 93

1    some comments made.  When I asked the question of when
2    did you stop using Roundup®, if ever, at least more
3    than two plaintiffs stated that their physician
4    requested them to avoid Roundup® and/or any chemical
5    exposures.
6    It may -- I may have a line of that in my
7    report actually.  I may have included that, but I
8    know -- I know that did come up in a couple of
9    interviews.
10   Q.  And as you sit here today, can you tell us
11   which plaintiffs told you that?
12   **A.  No, no.  It wasn't -- it wasn't very relevant**
13   **to my assessment.**
14   Q.  Okay.
15   **A.  It's more something that, you know, maybe**
16   **attorneys would be interested in at trial, but it's**
17   **not -- not something that's -- you know, who -- what**
18   **physician said what, it really isn't relevant to me.**
19   Q.  Does the report that's in front of you,
20   Exhibit 6, together with the changes you made in
21   Exhibit 10, t▉▉▉▉▉▉▉▉▉▉▉▉
     ▉▉▉▉▉▉▉▉▉▉▉▉▉  does that
23   contain all of the opinions that you intend to offer in
24   this case?
25   **A.  Yes.**

24  (Pages 90 to 93)

William Sawyer, Ph.D.
July 16, 2019

Page 94

1    Q.  If you look at that report, and, again,
2  there's just one copy of it that's here at the
3  deposition, it appears, so I'm going to be referring to
4  the report from July 11th, but if there's changes,
5  you'll let me know.  If you look at the report in front
6  of you, Exhibit 6, do you see that some of it has a
7  heading dated July 11th and then some of it has a
8  heading dated July 7th beginning at page 156?
9    A.  (The document was examined.)
10    I do.
11    Q.  Okay.
12    A.  Yes.  And I --
13    Q.  Can you help me understand how you went about
14  writing this report such that a portion of it has a
15  heading of July 11th, another portion has a heading of
16  July 7th?
17    A.  Yeah, it means that I had, for whatever
18  reason, a section break at that page, so when I changed
19  the section header, it didn't carry through because
20  there must have been a section break at page 157.  I
21  wasn't aware of that.  In fact, I never noticed it
22  until you pointed it out.
23    Q.  Can I take a look at Exhibit 6?
24    A.  (A document was handed.)
25    Q.  Thank you, sir.  Thank you.

Page 95

1    (Defendant's Exhibit-11 was marked for
2    identification.)
3  BY MR. DERRINGER:
4    Q.  I'm going to mark as the next exhibit, which
5  is Exhibit 11, I believe it is, a document that I
6  believe has 61 pages, although the pages are pages 9
7  through 69.  This was served on us, that is, Monsanto,
8  last week as a disclosure of some of the information
9  that you were going to be presenting in this case.  You
10  see this is a version of your report, it appears, dated
11  July 9th, 2019.
12    Do you see that?
13    A.  Yes.
14    Q.  Okay.  Did you write this?
15    A.  Yes.
16    Q.  And can you explain -- well, let me -- let me
17  strike that.
18    If you look at Exhibit 3, which is right up
19  here (indicating) --
20    A.  Okay.
21    Q.  -- do you see that exhibit reflects changes
22  that were made to your report from July 9th to whenever
23  Exhibit 3 was produced?
24    Do you see that?
25    A.  I do.

Page 96

1    Q.  Okay.  And my understanding is, I want to make
2  sure I'm correct about this, if you take what you have
3  from July 9th, the changes that are reflected in
4  Exhibit 3 are then reflected in the report that was
5  served on July 11th and carrying over to the report
6  that is Exhibit 6; is that right?
7    A.  Yes.
8    Q.  Okay.  When did you begin writing the report
9  in this case?
10    A.  The day after my interview of plaintiffs.
11    Q.  When did you end your writing of this report?
12    A.  Well, the final amendment to the report was
13  yesterday in this Exhibit No. 5.
14    Q.  Okay.  Do you intend to create further
15  amendments to this report?
16    A.  When you point out a typo or whatever today,
17  yes, I will cross it out and fix it.
18    Q.  Okay.
19    A.  Beyond that, no.
20    Q.  And am I right that there are substantial
21  portions of your report that you carried over from
22  earlier reports that you had written from -- that were
23  in association with other Roundup® cases in which you
24  had provided testimony?
25    A.  That's correct.

Page 97

1    Q.  Looking at Exhibit 6, can you tell me, really,
2  just table of contents, or you can look at whatever you
3  need to look at, can you identify for me what was
4  carried over from earlier reports that you had written
5  prior to your work on the Winston case?  And I --
6    A.  Well, I would have to say, in summary,
7  starting on page 91 up through page -- up to page 183,
8  there were large pieces here and there that are
9  carryover from other reports, but a lot of new
10  information added and added some modifications.
11    Q.  Can you pull out Exhibit 9, which is your
12  reliance list, I believe?
13    MR. KRISTAL:  Object to the form.
14    A.  Yeah, my materials considered list.
15  BY MR. DERRINGER:
16    Q.  Materials considered list, thank you.
17    Is this a complete list of materials that you
18  considered in connection with the opinions you're
19  offering in this case?
20    A.  Yes.
21    Q.  Did you review any additional materials not on
22  this list in arriving at your opinions in this case?
23    A.  Not that I am aware of, no.
24    Q.  Did you prepare that materials considered
25  list?

William Sawyer, Ph.D.
July 16, 2019

Page 98

1  **A.  I -- I did with the exception of some items**
2  **that I missed that the law firm assisted me with, and**
3  **that would be on page 22.  For example, I had failed to**
4  **include the exposure summaries of the various**
5  **plaintiffs, 14 of them, and there were three Monsanto**
6  **documents that I thought I had included, but, I think,**
7  **just to be certain, we included them again, Exhibit**
8  **No. 370 and 372.  So it's about -- yeah, is there what,**
9  **24?**
10  Q.  24 items that you just identified that someone
11  else put on to that materials considered list other
12  than yourself?
13  **A.  Yes.**
14  Q.  Everything else is material that you included
15  yourself on that materials considered list?
16  **A.  Yes, there's nearly 400 items here, so it's --**
17  **it's possible I missed something.  It is possible, but**
18  **to the best of my ability, everything I've reviewed and**
19  **looked at is here.**
20  Q.  The exposure summaries that you mentioned on
21  page 22 of your materials considered list, Exhibit 9,
22  are those the summaries provided to you by Weitz &
23  Luxenberg?
24  **A.  Yes.**
25  Q.  Okay.  That's Exhibit 8 in this case, right?

Page 99

1  In this deposition.
2  **A.  Yes.**
3  Q.  Okay.
4  **A.  And I should point out that the reason**
5  **Exhibit -- well, I don't think you marked it yet, but**
6  **the reason the Excel summary and the summaries --**
7  **interview summary sheets from Stephen Petty are not in**
8  **here is because those were more recently received.  I**
9  **think these are materials that, I think, were used in**
10  **his deposition.**
11  Q.  Okay.
12  **A.  If I'm not mistaken.**
13  Q.  And you arrived at your opinions in this case
14  prior to seeing whatever Petty materials you just
15  referred to, correct?
16  **A.  I did, with the exception of my Exhibit --**
17  Q.  10?
18  **A.  -- 10 where I actually did a check of my**
19  **results versus his analyses.**
20  Q.  Okay.  Why don't you go ahead and take those
21  materials out of your folder and we'll mark those so we
22  have a record of what you're referring to.
23          (Defendant's Exhibit-12 was marked for
24  identification.)
25  **A.  Well, the first thing I'm referring to is**

Page 100

1  the -- what do you call this thing?  The notice
2  (indicating).  I don't know if you want to mark that or
3  not.
4  BY MR. DERRINGER:
5  Q.  No, no, you referred to some Petty materials?
6  Mr. Petty materials that you reviewed.
7  **A.  Yeah.**
8  Q.  That's what I want to mark.
9  **A.  Okay.  Yeah, the first thing, I have about 210**
10  **pages of these plaintiffs' interview summary sheets.  I**
11  **only printed one here on Mr. Cook because I was**
12  **examining that and I wanted it in paper form.  So I**
13  **reviewed all of them, but not -- I didn't print them**
14  **out, okay?**
15  Q.  Thank you.
16  **A.  That's not representative of the only one.**
17  Q.  Right, but I --
18          MR. KRISTAL:  These were all produced last
19  week at Mr. Petty's deposition, just --
20          MR. DERRINGER:  Thank you.
21  BY MR. DERRINGER:
22  Q.  And the first time you saw any of these
23  interview summary sheets was when?
24  **A.  Immediately after his deposition, very rapidly**
25  **after that.**

Page 101

1  Q.  His deposition concluded on Friday, July 12th.
2  **A.  Yeah.**
3          MR. KRISTAL:  It was actually Wednesday.
4  **A.  Yeah, I think it was toward the end of the**
5  **week.**
6          MS. FILIPPAZZO:  The 11th.
7  BY MR. DERRINGER:
8  Q.  Thursday, the 11th is when it concluded.  So
9  the first time you would have seen these interview
10  sheets would be no earlier than Thursday, July the 9th.
11  **A.  That's right.  I actually think I received**
12  **those on the 11th or the morning of the 12th.**
13  Q.  Okay.  It's indicated that Dr. -- Mr. Petty's
14  interview summary sheet for Mr. Brian Cook, you say
15  it's not representative.  I think what you mean is it's
16  not the only one.  You said you had, like, 200 some-odd
17  pages of these, but it is an exemplar of the kind of
18  material that you were provided with from Mr. Petty's
19  deposition with respect to interview summary sheets for
20  all the plaintiffs in this case.
21  **A.  Yes, that's accurate.**
22  Q.  Okay.
23  **A.  I also have the Excel sheet I referred to of**
24  **his analyses.**
25          MR. KRISTAL:  Which was also produced at the

26 (Pages 98 to 101)

William Sawyer, Ph.D.
July 16, 2019

Page 102

1    deposition last week.
2         (Defendant's Exhibit-13 was marked for
3    identification.)
4    BY MR. DERRINGER:
5         Q.   Okay.  We'll mark this as Exhibit 13.  This is
6    an Excel spreadsheet -- printout of an Excel
7    spreadsheet dated July 3rd, 2019 bearing the initials
8    SEP on the top left, pages 1 through 19.  And just
9    explain to me first when you received this Exhibit 13.
10        MR. KRISTAL:  Actually, based on the date, I
11   believe it was produced the week before the
12   deposition.
13   BY MR. DERRINGER:
14        Q.   When did you first see this Excel spread --
15   this material in Exhibit 13?
16        **A.   This one, I don't recall.**
17        Q.   You don't recall when you received it.
18        **A.   I can't give you the date on this.  I don't**
19   **know.**
20        Q.   Okay.  And what use did you make of it?
21        **A.   I used it in the comparison of my table 10**
22   **exposure days or exposure years -- yeah, days, versus**
23   **the exposure hours in Exhibit 13.**
24        Q.   Okay.  Dr. Sawyer, are you a dermatologist?
25        **A.   No.**

Page 103

1         Q.   Okay.  Turn to page 7 of Exhibit 6, please.
2         MR. KRISTAL:  The pages may not match up, so
3    I'm just saying if you're using 2 to give him a
4    page --
5         MR. DERRINGER:  I understand.
6    BY MR. DERRINGER:
7         Q.   What you have in front of you is the Exhibit
8    6, your most up-to-date report in this case.  I'll ask
9    you to be referring to that report as we continue this
10   deposition, but we have not been provided with a copy
11   of that report, Dr. Sawyer, and so the only -- the most
12   recent copy of your report that we've been provided
13   with is Exhibit 2.
14        So I'm going to be referring to Exhibit 2 and
15   if there are page numbers that have been changed going
16   from Exhibit 2 to Exhibit 6, you'll let me know, okay?
17        MR. KRISTAL:  Do you think there's a way to
18   copy it over the lunch break, I just think it
19   will --
20        MR. DERRINGER:  I agree.
21   BY MR. DERRINGER:
22        Q.   Okay.  Does page 7 begin --
23        THE WITNESS:  I don't think it's going to
24   happen here.  Based on experience.
25   BY MR. DERRINGER:

Page 104

1         Q.   Does page 7 begin with a section that's
2    titled, "Dose Metrics and Calculation Methodology"?
3         **A.   Yes.**
4         Q.   Okay.  Some of these questions I'll be asking
5    just to -- just to orient you to the right page and to
6    make sure you and I are looking at the same page of
7    your report.
8         Am I correct that you did not make any
9    calculation of dose in terms of milligrams per
10   kilograms per day for any plaintiff in this case?
11        **A.   That is correct.**
12        Q.   Now, in the second paragraph on page 7, you
13   say, "However, significantly, plaintiffs in the current
14   matter either lack the ability to reasonably recall the
15   exact information used with respect to percent
16   glyphosate" --
17        **A.   No, no, it says exact formulation used.**
18        Q.   I'll read it again.  "However, significantly,
19   plaintiffs in the current matter either lacked the
20   ability to reasonably recall the exact formulation used
21   with respect to percent glyphosate, lacked recall of
22   dilution factors, used multiple different Roundup®
23   products, or could not provide reasonable measurements
24   in units of hectares sprayed with respect to areas
25   sprayed."

Page 105

1         Do you see where you wrote that?
2         **A.   Yes.**
3         Q.   How are these plaintiffs different from other
4    plaintiffs about whom you've opined in the past where
5    you have calculated a dose in terms of milligrams per
6    kilograms per day?
7         MR. KRISTAL:  Object to form.
8         **A.   I would have to have gone back to each**
9    **plaintiff as I did, for example, in Pilliod, where I**
10   **asked the law firm to pass on to the plaintiff aerial**
11   **view through Google Earth of their properties, confirm**
12   **that I'm looking at the correct property, and then via**
13   **telephone conference, as I did with the Pilliods, which**
14   **was a rather extensive, long, agonizing process, asked**
15   **where it was sprayed with them looking at their map and**
16   **my map and delineate the area sprayed and being able to**
17   **calculate the square footage sprayed.**
18        **I didn't carry that out -- there specifically**
19   **was not time to do that for these 14 people and it was**
20   **not required anyway because dosage in the epidemiologic**
21   **studies is based on hours or days of exposure, not**
22   **milligram per kilogram per day use.  That is only**
23   **usable in comparing to the AOEL to gauge whether a**
24   **person is within a range of -- of heavy sprayer, which**
25   **would be indicative of somebody at the AEOL level.**

27  (Pages 102 to 105)

William Sawyer, Ph.D.
July 16, 2019

Page 106

1    So there was also in some cases a person or
2 two who wasn't sure of the exact product, whether it
3 was -- in the 1980s, whether it was -- what the exact
4 label was, where, in the Pilliod matter, they knew what
5 product they purchased.
6    I also had a number of people who had multiple
7 different properties, which would have taken an
8 enormous amount of time to evaluate each one of those
9 using Google Earth, a few maps and so on, so there
10 simply -- to sum it up, the amount of information I
11 would have gained from calculating the milligram per
12 kilogram dose and comparing to the AOEL was not of
13 significant importance to -- have to include.
14 BY MR. DERRINGER:
15    Q.  If you had had enough time, would you have
16 been capable of calculating a dose in terms of
17 milligrams per kilogram per day for each of these
18 plaintiffs, as you've done in the past?
19    MR. KRISTAL:  Object to the form.
20    A.  I think I would have run into trouble on a
21 couple of them that did not know precisely what
22 formulation was used.  And that's important because I
23 have to know how many milligrams per milliliter of
24 glyphosate is in the solution.  I need to know what the
25 dilution factor was.

Page 107

1    And so not knowing the exact product would
2 make that process difficult.  And as I say, I think I
3 could have ascertained the hectares sprayed given
4 enough time and effort.
5    And as I did with Pilliod, where there was
6 uncertainty, I simply eliminated that property.  I
7 could have done that and just focused on a more recent
8 property that a person had a better recall on.  It's
9 possible, but the information gained certainly did not
10 warrant the -- the process under the time constraints.
11 BY MR. DERRINGER:
12    Q.  When you say it didn't warrant the process, do
13 you mean it didn't warrant the time it would have taken
14 you to engage in the process that would have been
15 required to calculate a dose in terms of milligrams per
16 kilograms per day?
17    A.  Correct, yeah.  It has very specific input
18 requirements and I would have to ascertain that
19 information for all of those inputs and -- for 14
20 people.  And the fact is, my milligram per kilogram per
21 day in prior cases, there was an objection to me even
22 comparing that to an AOEL and I was not allowed in
23 Johnson to even use the word AOEL, so I think that
24 would have been potentially a futile process anyway.
25    Q.  Yeah.  You calculated a dose of milligrams per

Page 108

1 kilograms per day with respect to Mr. Hall, correct?
2    A.  Yes.
3    Q.  You calculated a dose in terms of milligrams
4 per kilograms per day?
5    A.  And I should point out that there's a Daubert
6 motion against me using that in the case which has not
7 been decided yet.
8    Q.  You calculated the dosage as milligrams per
9 kilograms per day for Plaintiff Stevick, correct?
10    A.  I'm sorry, I couldn't hear the last part.
11    Q.  Stevick.
12    A.  Oh, Stevick.  Ms. Stevick.
13    A.  Yeah.
14    A.  Certainly.
15    Q.  Yes?
16    A.  Yes.
17    Q.  You calculated a dose in terms of milligrams
18 per kilograms per day for both of the Pilliods,
19 correct?
20    A.  I did.  Yeah, under a lot of effort, but, yes,
21 I did.
22    Q.  And that effort included going back, you said,
23 I think, a few times to reinterview the Pilliods to get
24 more information to assist you in calculating that
25 dose, correct?

Page 109

1    A.  And sending them overhead charts.  And what I
2 ended up using was just one property.  The property had
3 nothing on it other than a driveway, it was very easy
4 to -- to determine the area sprayed with a high level
5 of certainty.
6    Q.  Did you calculate a dose in terms of
7 milligrams per kilograms per day in the Cazier case?
8    A.  Only for the backpack spraying.  It would
9 be -- it was too much uncertainty with respect to all
10 of the different farm properties sprayed.
11 Historically, there was just an enormous amount of farm
12 property spraying and too many of the properties
13 were -- were of unknown acreage and -- and the
14 application rates were -- were not known in some of the
15 properties.  So I focused only on the backpack sprayer
16 because there I had some fairly solid information --
17 input information to use in the model.
18    Q.  Page 7 of your report, third paragraph on the
19 page, the one that begins, "Thus, the generally
20 accepted UK POEM model."  Do you see that?
21    A.  Yes.
22    Q.  Okay.  In the second sentence, you say,
23 "Instead, inconsistent with the generally accepted
24 methodology published within the human epidemiological
25 studies, dose calculations were derived from exposure

28  (Pages 106 to 109)

William Sawyer, Ph.D.
July 16, 2019

Page 110

1  frequency and duration data as provided by plaintiffs
2  in depositions, telephone interviews, and all other
3  sources of reliable information."
4       We've talked about your review of depositions
5  and your telephone interviews. What are other all
6  sources of reliable information that you used in this
7  case for these plaintiffs to derive exposure -- dose
8  calculations?
9       **A.  Well, I compared my dose calculations that I**
10  **derived primarily from deposition testimony and**
11  **telephone interview with that of information from the**
12  **CIH, Steve Petty.**
13      Q.  What -- so is that one of the other sources of
14  reliable information that you're referring to here on
15  page 7 of your report?
16      **A.  That was the other source, yeah.  But I used**
17  **that really in a comparative sense.**
18      Q.  Okay.  Because you write here, "Other
19  sources," plural.  What you really mean is one other
20  source, the one you've just described, Mr. Petty's
21  information?
22      **A.  Yeah.  The various summaries that he provided,**
23  **yeah.**
24      Q.  And then you write, "Considerable effort has
25  been expended to objectively verify the veracity of

Page 111

1  plaintiff testimony in this regard."
2       Tell me what you did -- what was the
3  considerable effort, quote/unquote, that you expended
4  to, quote, objectively verify the veracity of plaintiff
5  testimony, end quote?
6       **A.  I compared my interview information to**
7  **deposition testimony, which I largely, very largely,**
8  **had not reviewed the depositions prior to my**
9  **interviews, and made comparisons.  And what was**
10  **interesting was there were some differences, but they**
11  **were minor, which is -- is important in terms of not**
12  **finding substantial discrepancies.  And, again, I used**
13  **the word veracity as a measure of accuracy.  I'm not**
14  **using the veracity in the second definition of telling**
15  **the truth.**
16      **That's for the jurors to decide, not me.  I am**
17  **not in the position to judge whether a juror is**
18  **truthful or not, but I can look at two sources of**
19  **information, in fact, three when I include Steve**
20  **Petty's interviews, and determine whether or not the**
21  **data is consistent and accurate.**
22      Q.  So you talked about your effort being
23  reviewing the deposition testimony.  What else do you
24  include when you write, "Considerable effort has been
25  expended to objectively verify the veracity of

Page 112

1  plaintiff testimony in this regard"?  What other effort
2  did you undertake?
3       **A.  I want to tell you right new, reviewing 14**
4  **depositions, 210 pages of Steve's documents, and making**
5  **these calculations was -- was a tremendous effort.**
6  **Very time-consuming, difficult.  You know, my vision is**
7  **still a little blurry from spending so much time on**
8  **this.  It was not an easy job.**
9       Q.  What other effort did you undertake?
10      **A.  That's it.**
11      Q.  And who objectively verified the veracity of
12  plaintiff testimony?
13      **A.  Me.**
14      Q.  Anybody else?
15      **A.  No.**
16      Q.  And you've mentioned the word "veracity."  You
17  said you're not using it in terms of truthfulness; is
18  that right?
19      **A.  Yeah, I want to be very careful of that so**
20  **that doesn't appear as a false statement in the Daubert**
21  **motion you're going to prepare.  I'm not judging their**
22  **truthfulness.**
23      Q.  Okay.  You said, instead, you are -- you are
24  using it as a measure of accuracy.  Is that right?
25      **A.  Yes.**

Page 113

1       Q.  Okay.  Tell me how you would go about
2  determining which of three different accounts of a
3  plaintiff's use of Roundup® is the accurate one if they
4  say something in their deposition that's not the same
5  that they say to you in an interview, it's not the same
6  as they reported or Mr. Petty reported in his
7  summaries?
8       MR. KRISTAL:  Object to the form.
9  BY MR. DERRINGER:
10      Q.  I just want to know how you would go about
11  determining or verifying which of those three different
12  data points is the accurate data point.
13      MR. KRISTAL:  Object to form.
14      **A.  Well, I can start with Exhibit 10.  I made**
15  **comparisons.  And the next step was to very carefully**
16  **examine each source to determine whether I had missed**
17  **something.  And a good example is Deion Sanders.  I**
18  **noted a discrepancy between the CIH number of exposure**
19  **hours versus my calculation.  I also noted that the CIH**
20  **used, in one calculation, I believe it was, two days**
21  **per month where I used one per month.  And I went back**
22  **to the deposition and examined that and determined who**
23  **is right and realized in the deposition that I had been**
24  **unable to understand what number of hours in the**
25  **deposition was remarked as I recall, 45 minutes**

29 (Pages 110 to 113)

William Sawyer, Ph.D.
July 16, 2019

Page 114

1     repeatedly by Deion, 45 minutes to an hour, I could not
2     understand what property it was attached to, so I
3     defaulted to my interview where Deion said several
4     times per month which, to me, is vague, so I used once
5     per month to be conservative.  But after rereviewing
6     the deposition, and I have the pages attached to
7     Exhibit 5 -- well, yeah, I do right there -- I did find
8     on some prior pages and post pages information that
9     confirmed that the 45 minutes to one hour was actually
10    the testimony and that my use of, I think it's 30
11    minutes once a month, was the reason for the
12    discrepancy.
13        So in recalculating in Exhibit 5, based solely
14    upon deposition testimony, my number of hours now is
15    very similar to that of Stephen Petty's analysis, and
16    the problem was resolved.  So that's the process I
17    took.
18    BY MR. DERRINGER:
19        Q.  Okay.  So -- so what you said in that answer
20    was that you would make comparisons.  You would compare
21    your calculations based on your interviews with what
22    Stephen Petty had calculated?  Is that the comparison
23    you're talking about?
24        A.  And rereview of the depositions.
25        Q.  Well, did you rereview the deposition in every

Page 115

1     instance or only when there was some discrepancy
2     between your calculations and Mr. Petty's calculations?
3         A.  I think in every instance that I identified on
4     Exhibit 10 of discrepancy.
5         Q.  Okay.  And that's when you would rereview the
6     deposition, correct?
7         A.  Yes, rereview the deposition and Petty's
8     detailed information in his spreadsheet, which was very
9     helpful, and then my information in my report, and the
10    summary of each individual.
11        Q.  Right.  And then you would -- which would be
12    the determining factor?  It sounded to me from your
13    answer like you would go with whatever the plaintiff
14    said under oath in the deposition.
15        A.  That's correct.  That's my primary
16    determinant --
17        Q.  Okay.  And that's how you -- that was your
18    primary determinant of how you objectively verified the
19    accuracy of plaintiff testimony, correct?
20        A.  Yes.
21        Q.  Okay.  And then the next sentence on page 7,
22    you write, "Significant focus has been placed upon
23    verification of information throughout this
24    assessment."
25        A.  Yes, I reviewed this, I've had Bonnie and

Page 116

1     Jen at my office rereview it, and the initial filing
2     that was sent on July 7th only included the
3     calculations and -- but I -- you know, I put a lot of
4     focus on reviewing for accuracy.  Because there's a lot
5     of calculations and a lot of difficulties in the
6     deposition the way questions were asked, and in some
7     cases not asked, that it made the process challenging.
8         Q.  There were questions that were not asked in a
9     deposition.  You had the opportunity to go back to the
10    plaintiffs to ask those questions yourself, correct?
11        A.  Well, fortunately, in my design of
12    questioning, I -- I covered most everything.  I think
13    the only time I really had to go back was there was
14    somebody, I wasn't sure whether it was a half hour or
15    one hour.  And also I needed to contact Mr. Ken Sanders
16    simply because, for some reason, he had not been
17    deposed and, understandably, Deion Sanders really
18    couldn't recall all of the specifics when he was five
19    years old.  He recalled some information, but not --
20    not enough that I was comfortable with it, so I called
21    his dad.
22        Q.  There was nothing that prevented you during
23    your investigation in this case asking to have further
24    discussions or conversations with any of the
25    plaintiffs, correct?

Page 117

1         A.  I'm sorry, it's just me.  I didn't understand
2     your question.
3         Q.  Okay.
4         A.  It was probably a good one.
5         Q.  Was there anything that prevented you from
6     asking for further time to have discussion -- let me
7     strike that.  Let me start over.
8         Was there anything that prevented you from
9     requesting more time with any of the plaintiffs to ask
10    them more questions if you had determined that there
11    was information you needed?
12        A.  No.  In fact, on my interviews, as I say, a
13    number of them ran over 40 minutes and something was
14    scheduled.  So I made sure I had all the information I
15    needed.
16        And what was interesting about this, once I
17    ascertained that information, at that point in time, I
18    looked at maybe one or two depositions.  So then when I
19    looked at the depositions, that was really interesting
20    to see what was said under oath versus my interview
21    and, eventually, what Steve Petty had concluded in his
22    summaries.  So I think the process was well validated.
23        There's always going to be some level of
24    variability when ascertaining information via
25    questionnaire or via telephone.  In fact, you know, I

30  (Pages 114 to 117)

William Sawyer, Ph.D.
July 16, 2019

## Page 118

1    was happy to see some variability.  That's normal.  I
2    mean, if everything gave me the exact same number, you
3    know, that would almost seem impossible.  So there was
4    some variability.
5        Q.  There was nothing that prevented you from
6    requesting another interview with any of the
7    plaintiffs, right?
8            MR. KRISTAL:  Objection, asked and answered.
9        A.  No.
10   BY MR. DERRINGER:
11       Q.  The last thing on this, page 7, I just want to
12   make sure I understand your answer about what the
13   significant focus compromised of.
14           When you talk about that in the last sentence
15   of the third paragraph, I think you said the
16   significant focus that had been placed on verification
17   of information throughout this assessment, that was
18   your rereviewing anything, Jen rereviewing everything,
19   your assistant, and Bonnie, your assistant, rereviewing
20   everything; is that right?
21       A.  Yes, but, more importantly, when I wrote this
22   sentence, I was referring to primarily -- the
23   information I had ascertained, I verified through
24   testimony under oath.  That was the important -- you
25   know, really, the major purpose of that sentence.

## Page 119

1        Q.  Okay.  And the testimony under oath is the
2    plaintiff testimony in this case.
3        A.  Correct.
4        Q.  Okay.  Why don't we go off the record and take
5    our lunch break.
6            MR. KRISTAL:  Sure.
7            THE VIDEOGRAPHER:  12:38, off record.
8            (Recess.)
9            THE VIDEOGRAPHER:  We are back on record.
10       Time is 1:48 p.m.
11   BY MR. DERRINGER:
12       Q.  Good afternoon, Dr. Sawyer.
13       A.  Hello.
14       Q.  The approximately 30-minute interviews that
15   you conducted with each of the plaintiffs in this case,
16   how much of those 30 minutes did you spend talking to
17   the plaintiff about Roundup® and their use of Roundup®?
18       A.  Probably half.  It varied.  We had -- as I
19   said, we had some who had multiple properties and were
20   far more complex.  Others, the Roundup® and the
21   property was very straightforward, it went pretty
22   quick.
23       Q.  But as a general matter, an average, would you
24   say about half of each interview was spent on
25   discussion of the plaintiffs' use of Roundup®?

## Page 120

1            MR. KRISTAL:  Objection.
2        A.  Yeah, for quantitative purposes, yeah.  There
3    was a lot of detail I needed.
4        Q.  Okay.  I'm back on page 50 and 51 of your
5    report, Exhibit 6.  And you've told me already that you
6    did not calculate a dose in terms of milligrams per
7    kilograms per day for any plaintiff in this case.  Am I
8    correct that your exposure assessment in this case is
9    based on calculating a figure that you call exposure
10   days?
11       A.  Yes, as in the studies, it's called exposure
12   days, yeah.
13       Q.  And at the last paragraph on page 50, the one
14   that has the header, "Calculation of 'Exposure Days,'"
15   you write -- or you talk about the determination of
16   exposure days as being an important and necessary step
17   in the dose assessment process, right?
18       A.  Yes.
19       Q.  Okay.  Now, in the past, you've compared your
20   exposure days' calculation to thresholds that you found
21   in three epidemiology studies.
22           Do you recall that?
23       A.  Yes.
24       Q.  And, in fact, you did the same thing here.
25   And if you'll turn over, I guess, to page 64, am I

## Page 121

1    correct, sir, that you compared the exposure days for
2    each plaintiff that you calculated to thresholds that
3    you found in the Eriksson 2008 study, the McDuffie 2001
4    study, and the Andreotti 2018 study?
5        A.  Yes.
6        Q.  And it appears here that you also looked at
7    two additional epidemiology studies in this case,
8    meta-analyses, one being a Leon 2019 meta-analysis, and
9    the other being Zhang 2019 meta-analysis; is that
10   right?
11       A.  Yeah.  Yeah, these were studies that were not
12   available in the prior reports.
13       Q.  So am I correct that what you did in this case
14   to assess the exposure and causation for each plaintiff
15   is you calculated their exposure days, according to
16   your methodology, and then compared the results of that
17   calculation to thresholds that were found in the five
18   studies that we just went over or that we just listed;
19   Eriksson, McDuffie, Andreotti, Leon, and Zhang.
20           MR. KRISTAL:  Object to the form.
21   BY MR. DERRINGER:
22       Q.  Is that right?
23       A.  No.  No, it's not my -- my methodology.
24       Q.  Well, in order to -- well, let me -- let me
25   take it step by step.

31 (Pages 118 to 121)

William Sawyer, Ph.D.
July 16, 2019

Page 122

1    Actually, let me step back.
2         What was incorrect about my description of how
3    you determined whether plaintiffs' injuries were -- or
4    whether Roundup® was a substantial factor in causing
5    the plaintiffs' cancers?
6         **A.  I compared exposure data ascertained via**
7    **deposition and questionnaire administration as done --**
8    **rather, as -- in comparison to the human epidemiologic**
9    **studies, which compiled exposure time in terms of hours**
10   **or days as per the Eriksson, McDuffie, Andreotti, Leon,**
11   **and Zhang studies.**
12        **I didn't write any methodology de novo.**
13   **There's nothing new here or novel.  I'm following the**
14   **prescribed methodology of those studies and -- and**
15   **simply comparing the exposure days of plaintiffs to**
16   **that of the studies.  So I don't fabricate my**
17   **methodology.  It's not mine.  That's a nice term to use**
18   **in a Daubert motion, but it's not true.**
19        Q.  What you did here is calculated exposure days
20   for each plaintiff and then compared those exposure
21   days to thresholds that you found -- threshold of
22   exposure times and the days that you found in the five
23   epidemiology studies that are listed in your report at
24   pages 64, 65, and 66, correct?
25        **A.  That's correct.**

Page 123

1         Q.  Okay.  Did you compare -- for purposes of your
2    opinion in this case, did you compare the exposure days
3    of each plaintiff or of any plaintiff that you
4    calculated to measurements in any other epidemiology
5    study?
6         **A.  No.  There were no other epidemiological**
7    **studies on glyphosate/non-Hodgkin's lymphoma that**
8    **contained dose metrics.**
9         Q.  On page 50, under the last paragraph or under
10   the heading, "Calculation of 'Exposure Days,'" you
11   write in the second sentence --
12        MR. KRISTAL:  Just wait a second.
13   BY MR. DERRINGER:
14        Q.  Sure, I'll wait until you're there.
15        **A.  (The witness moved head up and down.)**
16        Q.  Dr. Sawyer, are you there?
17        **A.  Yes.**
18        Q.  Okay.  Under, "Calculation of 'Exposure
19   Days,'" the second sentence, you write, "Each
20   plaintiff's individual exposure circumstances were
21   assessed and validated to within the limits of each
22   plaintiff's recall abilities."
23        What do you mean by to within the limits of
24   each plaintiff's recall of --
25        **A.  As years and decades pass, the recall ability**

Page 124

1    **of humans decreases in quantity of detail.  For**
2    **example, somebody who sprayed yesterday would be able**
3    **to recall -- recall much more detail than picking out a**
4    **date in 1980.  It's just common sense.**
5         Q.  So does this mean that you were able --
6    according to what you've written here, you believe you
7    were able to validate each plaintiff's exposure
8    circumstances to the degree that the plaintiff could
9    recall details about his or her exposure circumstances;
10   is that right?
11        **A.  Yes.  And I -- as I noted and as you already**
12   **know from reviewing this report, there is some variability**
13   **between the questionnaire response and the plaintiffs'**
14   **deposition testimony.  There's uncertainty where a**
15   **person gives a range and says, well, it's between 45**
16   **and 60 minutes, or whatever range.  There's some plus**
17   **or minus error associated with time and ability to**
18   **recall specific details.**
19        Q.  So to the degree the plaintiff could not
20   recall specific details, you, obviously, could not
21   validate those exposure circumstances, correct?
22        **A.  That's correct.  And -- and you're probably**
23   **aware that, there's many footnotes in my report, that I**
24   **did not include certain properties.  What I focused on**
25   **was the most significant exposure and the most complete**

Page 125

1    **depth.  And if I had come across a property where the**
2    **data was sketchy, I counted it as 0 exposure.**
3         Q.  When you wrote that you validated each
4    plaintiff's individual exposure circumstances, how did
5    you validate those exposure circumstances?
6         **A.  As I answered earlier, by comparison of**
7    **questions that were administered by CIH compared to the**
8    **deposition and compared to the responses to my**
9    **questioning.**
10        Q.  CIH is Stephen Petty's information?
11        **A.  Correct.**
12        Q.  Okay.  And so the discussion we had before the
13   lunch break about how you validated information, you
14   used word the "validate" here in the same way?
15        **A.  Yes.**
16        Q.  Let's go to the next page where you define
17   hours sprayed in a day, page 51.  You're defining six
18   hours of exposure as one exposure day in your
19   assessment, correct?
20        **A.  Yes.**
21        Q.  You cited to a few documents.  We'll mark as
22   our next exhibit the first document you cited to on
23   page 51.
24        MR. KRISTAL:  It looks like the deposition is
25   going to take a bleak turn.  I'm making a joke

32  (Pages 122 to 125)

William Sawyer, Ph.D.
July 16, 2019

Page 126

1    based on the author's name. Sorry. I telegraph my
2    jokes better.
3          MR. DERRINGER: We're not to bleak yet.
4          MR. KRISTAL: We're not to bleak yet. All
5    right. That's coming. Sorry.
6          (Defendant's Exhibit-14 was marked for
7    identification.)
8    BY MR. DERRINGER:
9       Q.  Dr. Sawyer, I just handed you what's been
10   marked as Exhibit 14. It is the document, you'll see,
11   that you cited at footnote 88 of your report on page
12   51. It bears a Bates label on the front page of
13   MONGLY01075506.
14          In the first paragraph of your report on page
15   51, you refer to a Monsanto document. Is this the
16   document you are referring to?
17      A.  (The document was examined.)
18          Yes.
19      Q.  And you're relying on this document to support
20   your opinion that one exposure day constitutes six
21   hours of exposure. Is that right?
22      A.  Yeah, in terms of default data used in the UK
23   POEM, yes.
24      Q.  And you're relying -- if you look at footnote
25   58, you're relying on appendices 8 through 14; is that

Page 127

1    right?
2       A.  Yes.
3       Q.  So go ahead and turn to appendix 8, which is
4    at page Bates stamped on the bottom right
5    MONGLY01075538. Let me know when you're there.
6       A.  I'm there.
7       Q.  Okay. And if you look at appendix 8, appendix
8    9, and appendix 10, those all deal with tractor-mounted
9    applications of Roundup®; is that right?
10      A.  Yes.
11      Q.  Okay. And they all have an input for duration
12   of spraying of six hours, right?
13      A.  They do.
14      Q.  Okay. That's what you're relying on?
15      A.  In part.
16      Q.  Okay. And then if you go to -- right, because
17   you are relying on other appendices, as well. If you
18   look at appendix 11 -- actually, let me just ask you,
19   on appendix 8, 9, and 10, those are occupational uses,
20   tractor-mounted; is that right?
21      A.  Yes.
22      Q.  Okay. And the dose range on those, appendix
23   8, 9, and 10, it goes from 0.07 migs per kigs per day
24   up through 0.67 migs per kigs per day? That's what's
25   calculated as the dose in appendices 8, 9, and 10?

Page 128

1       A.  Well, yes.
2       Q.  Okay. And then you go to the second set of
3    three, which is appendices 11, 12, and 13, and these
4    are all handheld sprayers, correct?
5       A.  That's right.
6       Q.  And they all also have an input of a spraying
7    duration of six hours, correct?
8       A.  That's correct.
9       Q.  And, again, this is part of what you're
10   relying on to form the basis of your opinion that six
11   hours of exposure constitutes one exposure day?
12      A.  Yeah, I'm being very conservative. Most
13   sprayers have lunchtime. It's exhaustive work in hot
14   weather carrying -- carrying a backpack around.
15   Sprayers have to move from one location to another.
16   They don't generally stay in the same spot for the
17   entire day. Whether it be a homeowner moving to -- an
18   applicator moving to another property or a homeowner
19   who only sprays an hour a day, I'm adding them up as --
20   as a sum of six hours.
21          So the documents we just looked at are six
22   examples using a duration of spray of six hours, which
23   is higher than -- most likely a higher number than what
24   we would see in the real world.
25      Q.  Appendices 11, 12, and 13, those also are

Page 129

1    occupational exposures, correct?
2          MR. KRISTAL: Object to form.
3       A.  (The document was examined.)
4          Not necessarily.
5    BY MR. DERRINGER:
6       Q.  Okay. The dose ranges for appendices 11, 12,
7    and 13 that are calculated based on this six-hour day
8    of spraying range from 0.28 to 0.59 milligrams per
9    kilograms per day; is that right?
10      A.  Yes.
11      Q.  And you also relied on appendix 14. Let's
12   turn to that.
13          What's the application method that's entered
14   here?
15      A.  Home garden.
16      Q.  That's a home garden sprayer?
17      A.  Yeah.
18      Q.  Okay. And for the home garden sprayer, what
19   was the duration of spraying that was entered?
20      A.  Only .5 hour.
21      Q.  Half an hour?
22      A.  Yeah, and that's why I -- for either the
23   applicator or the home gardener, five hours is
24   certainly an appropriate default value to use. It
25   would most likely be even shorter, but when I say I'm

33 (Pages 126 to 129)

William Sawyer, Ph.D.
July 16, 2019

Page 130

1  being very conservative, the longer that number is, the
2  smaller the exposure days in the calculations of these
3  plaintiffs.
4        For example, if I used eight hours, the number
5  of exposure days in my report would have been lower.
6     Q.  The dose for the operator exposure on appendix
7  14, which is the home garden sprayer, that's 0.12
8  milligrams per kilograms per day, right?
9     A.  Yes.
10    Q.  And I asked you before if appendices 11, 12,
11 and 13 were occupational use.
12       Having now looked at appendices 11, 12, and 13,
13 and also at appendix 14, do you understand that
14 appendices 11 through 14 are occupational use as
15 opposed to appendix 14, which clearly states it's a
16 home use?
17       MR. KRISTAL:  Objection.
18 BY MR. DERRINGER:
19    Q.  Is that your understanding?
20    A.  Not necessarily.  When we look at the input
21 values, what we're looking at is .01 hectare versus 1
22 hectare and we're looking at an application rate, a
23 dose of .01 hectares per day versus 1 hector a day in a
24 time .5 versus 6.  So based one the input numbers and
25 the PPE with respect to gloves on or off, we see that

Page 131

1  we have gloves on in appendix 13 and we have no
2  gloves -- let's see, I think that might be no gloves.
3  If it's a no glove, then I would agree that's correct,
4  but I'm looking.
5        Okay.  I don't think there are any gloves.
6  So, then, yeah, I agree with you that this would be an
7  applicator exposure versus a home garden exposure.  So,
8  yeah, you're right.
9     Q.  Okay.  Let's just clean up what I think you
10 just agreed to.
11       Appendices 11, 12, and 13 reflect occupational
12 use of Roundup®, correct?
13    A.  Yes.
14    Q.  And appendix 14 reflects home use of -- or
15 residential use of Roundup®, correct?
16    A.  Correct.  And, of course, what the data shows
17 and the actual dosage is that, per time of use, the
18 home gardeners receive a higher exposure level.
19    Q.  Right, and the exposure level that's
20 calculated in appendix 14 is .1209 milligrams per
21 kilograms per body weight per day, right?
22    A.  Yes, for half-hour exposure.
23    Q.  And that's for a person who weighs 60
24 kilograms; is that right?
25    A.  It is.

Page 132

1     Q.  And it's for a person who is not wearing any
2  gloves when they are using Roundup®, correct?
3     A.  Correct.  T-shirts and shorts, yeah.
4     Q.  Okay.  You -- you refer to this, by the way,
5  in your report as a Monsanto internal document.  Do you
6  see that?  Page 51 of your report?
7     A.  I do.  It's marked confidential, produced
8  subject to protective order with an MONGL number, my
9  understanding as a toxicologist, not a lawyer, is that
10 this is a protected document.  I keep it confidential.
11 I shred my materials when I'm done with them.  That's
12 how this is being handled.
13    Q.  Understood.  Have you ever seen submissions to
14 regulatory agencies before?
15    A.  Of course.
16    Q.  Based on the cover page of this document, do
17 you believe that this is a document that was submitted
18 to a regulatory agency in August of 2010?
19    A.  No.  I have no -- no evidence that it was ever
20 submitted.  The fact that it's marked confidential, et
21 cetera, leads me to believe that this is not a public
22 document.
23    Q.  Have you ever asked the attorneys representing
24 the plaintiffs in this case about whether this has ever
25 been submitted to a regulatory agency?

Page 133

1     A.  No.  It would have no bearing in the report if
2  it was or was not, so -- in terms of the six-hour spray
3  time issue.
4        (Defendant's Exhibit-15 was marked for
5        identification.)
6  BY MR. DERRINGER:
7     Q.  I'm handing you what I've marked as Exhibit
8  15.  This is an exhibit titled, "UK POEM Calculations
9  in Preparation of Meeting Spanish Competent
10 Authorities."  It's got a Bates number at the bottom
11 MONGLY01275627.
12       Sir, is this the document that you cite and
13 from which you quote on page 51 of your report?
14    A.  Yes.
15    Q.  Okay.  Is it the document that you cite at
16 footnote 89?
17    A.  Yes.
18    Q.  And is this one of the documents you rely on
19 as the basis for your opinion that one exposure day is
20 equivalent to six hours of exposure?
21    A.  Yes.
22    Q.  Do you agree that this document, Exhibit 15,
23 relates to worker exposures, not residential exposures?
24    A.  It does.  And that's very important, because
25 there's just numerous examples here of the use of six

34  (Pages 130 to 133)

William Sawyer, Ph.D.
July 16, 2019

Page 134

1 hours of duration of spraying and, obviously, that --
2 homeowners generally spray less than six hours based
3 upon all of the plaintiff analyses in this case. So it
4 would be incorrect to use an eight-hour exposure time
5 as is used in industrial hygiene assessments, which are
6 typically based on an eight-hour exposure 48 weeks of
7 the year totaling 1,920 hours per year. That would not
8 be the correct approach.
9        And the reason is, when spraying, due to the
10 need to take a lunch break and a need to have some rest
11 periods, sprayers just don't continually spray for more
12 than six hours. There's no evidence of that anywhere I
13 can find. So I think my use of six hours is very
14 conservative number, as it reduces the number of
15 exposure days in my report.
16        If I used a -- lower number than the default
17 value that's been used in the literature that I
18 presented, the exposure day calculations in my report
19 would have been higher. So I'm being conservative and
20 I'm going in a direction to error to not overestimate
21 exposure days.
22        (Defendant's Exhibit-16 was marked for
23 identification.)
24 BY MR. DERRINGER:
25   Q.  I hand you what is marked as Exhibit 16. This

Page 135

1 is a document with a Bates number at the bottom right
2 MONGLY12391621. The cover page notes it's a study with
3 a study title of, "An applicator Exposure Study
4 Conducted in Spain Using Biomonitoring." The author is
5 Marian Bleeke.
6        Is this the document or the exposure study by
7 Bleeke that you cite to on page 51 of your report and
8 upon which you rely for the basis of your opinion that
9 one exposure day equals six hours of exposure?
10   A.  Yes. This is a very, very Bleeke study. It
11 does provide information of the maximum exposure of
12 five hours, which is less than the six-hour value I'm
13 using which, again, means I'm being very conservative
14 in my approach and not overestimating the plaintiffs'
15 cumulative exposures.
16   Q.  Do you agree that that this study, Exhibit 16,
17 assesses exposure of professional applicators?
18   A.  I do.
19   Q.  Do you agree that this study does not assess
20 exposure of residential users of Roundup®?
21   A.  Yes. And that is an important point because
22 it means my use of six hours for residential plaintiffs
23 is underestimating their exposure.
24   Q.  Okay. Let's go to your plaintiff exposure day
25 calculations on page 52. And, actually, let's look at

Page 136

1 table 10. And I want to confirm that your assessment
2 of exposure date -- first, let me tell you -- let me
3 ask you, table 10 has five different columns; is that
4 right?
5   A.  Yes.
6   Q.  And the fifth column is titled, "Exposure
7 Days," right?
8   A.  Yes.
9   Q.  And am I right that your assessment of
10 exposure days is reflected in the fifth column of table
11 10?
12   A.  Yes. Exposure days, that is six hours of
13 exposure to constitute a day. Not just one hour for 30
14 minutes.
15   Q.  And the figure reflected in the fifth column
16 of table 10 for each plaintiff that you -- what you
17 call their exposure days, that's based on the
18 information that you list in the third column of table
19 10 which is titled, "As reported and verified in my
20 interview and deposition review," is that correct?
21   A.  Yes.
22   Q.  And you've explained to me already how you
23 used the information compiled by CIH by Stephen Petty,
24 but it appears to me, and I just would like to have you
25 confirm this, your ultimate assessment or conclusion of

Page 137

1 how many exposure days were experienced by each
2 plaintiff, that is, column 5 of table 10, that's based
3 solely on the information that you obtained from your
4 interview and deposition review reflected in the third
5 column of table 10, correct?
6   A.  Yes.
7   Q.  And just to walk through this so I -- so we
8 understand what you did, let's take Kyle Chaplick, as
9 an example. It looks like you took a cumulative number
10 of hours -- hours of exposure that you estimated
11 between 101 and 495 hours.
12        Do you see that?
13   A.  No, it's 72 and -- you're looking at -- you're
14 not looking at the current version.
15   Q.  I must not be.
16   A.  The replacement pages may help, Exhibit 4.
17   Q.  Yeah, this is something we didn't have until
18 today. I didn't have it until today. Let me take a
19 look.
20        (The document was examined.)
21        Nope, the same thing.
22        If you look at table 10, third column, can you
23 read to me what the last four -- five lines of your
24 column say starting with, "Cumulative hours of
25 exposure" --

35 (Pages 134 to 137)

William Sawyer, Ph.D.
July 16, 2019

Page 138

1    A.  "Cumulative hours of exposure estimated at 72
2  to 495 hours with average annual exposure of 9.2 and 45
3  hours for 11 years."
4    Q.  Okay.
5      MR. DERRINGER:  We seem to have a different
6  version and what's in front of Dr. Sawyer has never
7  been produced, and I don't know where it comes
8  from.
9  BY MR. DERRINGER:
10   Q.  We've been through this morning pretty
11  exhaustively the different iterations of your report.
12  I was under the impression that what is reflected in
13  Exhibit 4, your corrections to the dose calculations,
14  was incorporated into what's in front of you as Exhibit
15  6.
16   A.  Yeah, even Jen, when she printed this for me,
17  she wrote -- handwrote here in pencil -- yeah, "Updated
18  July 12th, '19," and these were sent out in this --
19   Q.  You're looking at the wrong thing.
20   A.  Yeah.
21   Q.  Exhibit 4 says, "Changes Made July 12, 2019."
22   A.  Can I see that, please?
23   Q.  Will you confirm for me that Exhibit 4 is
24  titled, "Changes made July 12, 2019"?
25   A.  Yeah, it says it right here on the top.

Page 139

1    Q.  Correct.
2    A.  72 to 495.
3    Q.  You directed me, sir, to the page -- the table
4  attached.  Take a look at the table attached under Kyle
5  Chaplick, and please tell me what numbers are there.
6    A.  (The document was examined.)
7      101 to 495.  Oh, it says right here, Jen wrote
8  on it, that's the 7/11 version and she wrote on this --
9  I wrote on this.  This is the July 12th version.  So
10  you have everything.
11   Q.  Well, you represented it differently this
12  morning.  I'll take that.
13   A.  I'm sorry.
14      MR. KRISTAL:  It appears that the front page
15  of that exhibit are the corrections.  I have the
16  corrected pages, but those are the old pages so you
17  can compare them with the corrections.
18  BY MR. DERRINGER:
19   Q.  So if we take Kyle Chaplick, you then said
20  there are cumulative hours of exposure estimated at 72
21  to 495 hours, correct?
22   A.  Yes.
23   Q.  And then what you did is you divided each of
24  those numbers by six; is that right?
25   A.  Yes.

Page 140

1    Q.  And that got you exposure days of 40 -- I'm
2  sorry, 12 to 82; is that right?
3    A.  Yes.
4    Q.  And then your exposure day figure you relied
5  on is 47 days, correct?
6    A.  Yes.
7    Q.  And how did you get to 47 days?
8    A.  It's a midpoint.
9    Q.  Midpoint of mean?  Is that right?
10   A.  Let me check.
11   Q.  Are you taking out your calculator, your
12  phone?
13   A.  Yeah.
14      MR. KRISTAL:  You can call it his in-house
15  mathematician.
16  BY MR. DERRINGER:
17   Q.  Using the -- are you using the calculator?
18   A.  Yes, it's my in-house mathematician.
19      Yeah, so it's the mean or the midpoint.
20  Either gives the same number.
21   Q.  Okay.  And then another example, let's go over
22  to James Dean Cole on your next page, and let's just
23  take a quick look here at what Stephen Petty reported
24  to you.
25      It looks like he reported 256 hours per year of

Page 141

1  residential use; is that right?  I'm in the second
2  column there.
3    A.  (The document was examined.)
4      Yes, he provided the occupational 128 to 1280
5  for three years, and then the residential use, as well.
6    Q.  Right.  I'm asking you, his residential use
7  number was 256 hours per year, correct?
8    A.  Yes.
9    Q.  Okay.  And if you look up above, he's -- he
10  reports an exposure interval between 1979 and 2016.  Do
11  you see that?
12   A.  Yes.
13   Q.  And he says it varied residential and
14  occupational use, correct?
15   A.  Yes.
16   Q.  And his occupational use was three years,
17  right?
18   A.  Yes.
19   Q.  So if you take 1979 to 2016, that's 37 years,
20  right?  You can use your in-house mathematician if you
21  would like, your calculator on your phone.
22   A.  No, that's correct.
23   Q.  Okay.  So let's subtract out the three years.
24  So that would give us 34 years of residential use,
25  right?

36  (Pages 138 to 141)

William Sawyer, Ph.D.
July 16, 2019

Page 142

1    MR. KRISTAL: From 1979 to 2016?
2    MR. DERRINGER: That's 37 years, but I'm --
3  I'm only focused right now on trying to determine
4  the residential use.
5    MR. KRISTAL: Got it. Okay, thank you.
6  BY MR. DERRINGER:
7    Q. The occupational use, he -- you reported that
8  he states that that happened for three years, so I'm
9  going to take those years out. And if you take 34
10  years of residential use --
11    A. Why? I don't understand why you're taking
12  those --
13    MR. KRISTAL: Those are not mutually
14  exclusive.
15    MR. DERRINGER: Oh, okay.
16  BY MR. DERRINGER:
17    Q. So then the 37 years of use at 256 hours per
18  year, how many total hours would that be?
19    A. 9472.
20    Q. 9472. Okay. And then we go over to your
21  column, you report that he sprayed residentially, Mr.
22  Cole, from 1978 to 2000. Do you see that?
23    A. Yes.
24    Q. Okay. So that's 22 years, right?
25    A. Yes.

Page 143

1    Q. So let's go and just use your figure of 22
2  years. And if you take Mr. Petty's 256 hours per year
3  and multiply that by 22 years, what -- how many hours
4  do you get?
5    A. 5632.
6    Q. 5,632. Okay.
7      You report a total exposure residentially of
8  2,310 hours; is that right?
9    A. Yes.
10    Q. Okay. And --
11    A. Yeah, I think you're forgetting footnote 95.
12    Q. Well, residential application at [REDACTED]
13  you're saying that that's where the difference comes
14  in? Because you'll acknowledge that your figure of
15  2,310 hours is less than half the number of hours that
16  Mr. Petty reports, right?
17    A. Yeah. So the explanation is I performed a
18  gross underestimate because I only included exposures
19  at Cobb County Parks and the residential applications
20  at [REDACTED].
21    Q. Where else did he live? That is, Mr. Cole.
22  Where else did he live other than [REDACTED]?
23    A. (The document was examined.)
24    Q. Which exhibit are you looking at now?
25    A. 13.

Page 144

1    Q. That's the Excel spreadsheet from Mr. Petty?
2    A. It is.
3    MR. KRISTAL: Would you like me to help move
4  this along or -- there's a very simple explanation.
5    A. So, we have two different years here of
6  residential use as per Stephen Petty's Exhibit No. 13.
7  You have a 1989, approximately, and then we have a
8  1996, '97, and 1982, 1996, '97 residential properties.
9  I didn't include all of the residential property use.
10  BY MR. DERRINGER:
11    Q. What else did he live?
12    A. I don't remember.
13    Q. Okay. Now, you also attempted to determine
14  the other chemicals to which plaintiffs were exposed;
15  is that right?
16    A. Yes.
17    Q. Turn to page 82. Table 19. Does that contain
18  a list or a summary of the other potential chemical
19  exposures that you determined the plaintiffs may have
20  been -- or may have experienced?
21    A. That includes any other chemical products
22  which the plaintiffs gave me information to include.
23    Q. And how did you go about eliciting that
24  information from the plaintiffs?
25    A. As I said before, I asked questions of other

Page 145

1  products and chemicals that you have used on your yard
2  or outdoors or in the garage or in the home, and I gave
3  examples such as ant bait, Raid, insect spray, other
4  chemicals in the garden or yard. And this is the
5  responses I received.
6    Q. Did you mention any other examples for the
7  plaintiffs during the interviews other than ant bait,
8  Raid, insect spray or other chemicals in the garden and
9  yard?
10    A. Lawn fertilizers.
11    Q. Anything else? I'm asking for specific
12  indication of examples you gave in your interviews.
13    A. Occupational exposures to chemicals.
14    Q. Okay. Anything else?
15    A. No.
16    Q. And then you say that you did a toxicological
17  assessment, I'm on page 83, of potential secondary
18  exposures. Do you see that?
19    A. Page 83? I see a bullet list of the items.
20    Q. Yes, I apologize, page 82. Second sentence on
21  the page, you say, "A toxicological assessment of
22  potential secondary exposures was conducted." Is that
23  right?
24    A. Well, "With respect to plaintiff's NHL
25  diagnosis," period.

37 (Pages 142 to 145)

William Sawyer, Ph.D.
July 16, 2019

Page 146

1     Q. Right. Who conducted that assessment?
2     A. Me.
3     Q. And on page 83, you write, "It is necessary
4 to" -- this is right on your bullet point -- "necessary
5 to establish the carcinogenic properties of these
6 substances and determine whether any are capable of
7 inducing or promoting the NHL with which all plaintiffs
8 have been diagnosed."
9     Do you see that?
10     A. Yes.
11     Q. Can you tell me how you determined whether any
12 of the substances are capable of inducing or promoting
13 NHL?
14     A. Yeah. As per table 20, I obtained the
15 material safety data sheet to determine what chemicals
16 were in the product. Many of these I'm already very
17 familiar with anyway, but, nonetheless, I established a
18 reference to the material safety data sheets. I also
19 researched IARC as to whether the chemicals are
20 probable human carcinogen or not, yes or no, and
21 whether there's human evidence of these chemicals
22 causing NHL.
23     I will note on the Ace Weed and Feed or
24 Mecoprop, the answer is officially no, but I wrote
25 potentially because I was able to find a study that

Page 147

1 indicated that there is potential. It's not -- not a
2 probable human carcinogen or even listed as a
3 carcinogen, but there is one study that is confounded
4 with other chemicals including glyphosate that suggest
5 that it's possible.
6     Q. So you looked -- you pulled the MSDSs, the
7 material safety data sheets for each of these products;
8 is that what you're saying?
9     A. Yea. And if there was any sufficient evidence
10 in the human epidemiological literature, as well.
11     Q. Okay. That -- let me focus on that. Again, I
12 want to know what you did in this case.
13     What kind of searching did you do in the human
14 epidemiological literature with respect to each of the
15 ingredients that you list in table 20 of your report?
16     A. In general, none if it was a noncarcinogen
17 chemical such as Prestone Antifreeze or --
18     Q. How did you determine as a threshold matter
19 whether it was a noncarcinogenic chemical?
20     A. Basic toxicology. It's no question it's a
21 carcinogen. There's no evidence for it. And I also,
22 of course, referenced IARC.
23     Q. How did you research IARC? What did you do to
24 research IARC?
25     A. Simply looked at the IARC table. You're

Page 148

1 probably familiar with that.
2     Q. And for each chemical, if it was on the --
3 tell me how you used the IARC table in your assessment
4 of the carcinogenicity of the substances?
5     A. Determined what classification was, whether it
6 was 2(A), 2(B), or just none.
7     Q. What classification would cause you to put
8 down that this was either known to cause NHL or a
9 probable human carcinogen?
10     A. As the table shows, probable human carcinogen.
11     Q. Right. What classification in IARC would you
12 require in order to say yes under probable human
13 carcinogen?
14     A. 2(A).
15     Q. Okay. And if it was not 2(A) but it was 2(B),
16 you would still put a note down under that column,
17 right?
18     A. That's correct.
19     Q. Okay. And other than looking at -- and what
20 was it in the MSDS that you were looking for to be able
21 to answer the questions that you pose in this table,
22 known to cause NHL, probable human carcinogen?
23     A. Twofold. One is the chemical ingredients.
24 And No. 2, whether the MSDS cites the product as being
25 a probable human carcinogen.

Page 149

1     And you will see for the first one, Ace Weed
2 and Feed, MSD states none are listed as carcinogens.
3 That's none of the ingredients, OSHA, NTP, IARC or
4 ACGISH. That's right out of the MSDS.
5     Q. I have a -- I have a question about that, sir.
6     Is your comment here, that your conclusion is
7 based on the MSDS and that none of the ingredients are
8 listed as carcinogens in OSHA, NTPIR, or ACGIH, because
9 you independently looked at all of those sources, or is
10 what you've written here reflecting that the MSDS
11 itself says that none of the ingredients in Ace Weed
12 and Feed are listed as carcinogens in OSHA, NAP, IARC,
13 OR ACGIH?
14     MR. KRISTAL: Object to form.
15     A. The second choice.
16     And also in conjunction with the actual
17 updated IARC assessment.
18     Q. Okay. Did you go to look at what the NTP has
19 to say about any of the ingredients listed on table 20
20 of your report?
21     A. I did in cases where there was some
22 possibility of that, such as a chemical being a
23 probable human carcinogen or -- my knowledge as a
24 toxicologist of the possibility of something being
25 published out there, and a good example of that was the

38 (Pages 146 to 149)

William Sawyer, Ph.D.
July 16, 2019

Page 150

1  mecoprop.
2      Q.  If in doing your work here and looking at all
3  of these products, if you looked at the MSDS and it
4  didn't say anything about carcinogenicity and you
5  looked at IARC and it wasn't listed under
6  classification 2(A), probable human carcinogen, did you
7  do anything else with respect to the ingredients in
8  that product?
9      A.  Yes.
10      Q.  What did you do to research any of the other
11  ingredients listed on table 20 to determine whether
12  they had carcinogenic potential?  Tell me, per
13  chemical, which chemicals you actually researched.
14      A.  2-4-D, I have something on that.
15          For example, 2-4-D, I pulled the -- the IARC
16  monograph summary on DDT, Lindane, and 2-4-D.
17      Q.  Okay.
18      A.  You probably already saw this in the file.
19      Q.  No, I haven't seen your file.
20      A.  Okay.
21      Q.  You can keep that out.  I'll mark it.
22      A.  I'm going to put it back after you mark it.
23      Q.  That's fine.
24          (Defendant's Exhibit-17 was marked for
25  identification.)

Page 151

1  BY MR. DERRINGER:
2      Q.  Anything else you did to research the
3  potential carcinogenicity on any of the chemicals that
4  you list -- or the ingredients you list on table 20
5  other than looking at the MSDSs and the -- and the IARC
6  listings and for 2-4-D referring to this press release
7  that has now been marked as Exhibit 17?
8      A.  I don't understand.  You asked me a question
9  about what I did specifically on the first item, Ace
10  Weed and Feed, which is 2-4-D.
11      Q.  No, no.
12      A.  Now you're asking me a new question?
13      Q.  No, I'm asking the same question I asked
14  before.  And that is if the MSDS for any of the
15  products listed on table 20 did not indicate a
16  potential for carcinogenicity and product or the
17  ingredient was not listed as a probable human
18  carcinogen in the IARC listing, tell me what you did to
19  further research -- for any of these ingredients listed
20  in table 20, to further research whether they were
21  potential carcinogens to humans.
22      A.  Well, one thing I did was go to IARC and look
23  at the reports, the lengthy reports, to see if there
24  were any referenced studies.
25          I also went to --

Page 152

1      Q.  Which report?
2      A.  The full assessments on chemicals included
3  under IARC.
4      Q.  And is it your testimony, sir, that when you
5  put this table together and did your work in this case,
6  for every ingredient that's listed, you ran the
7  full-length IARC report for every one of those
8  chemicals?
9      A.  No, that's not --
10          MR. KRISTAL:  Object to the form.
11  BY MR. DERRINGER:
12      Q.  Then tell me which of these ingredients you
13  read the full-length report for.
14      A.  Never read the full-length report.  As I said,
15  in some of the chemicals, I looked for references
16  within the IARC report as I did also with ATSDR
17  toxicological profile in cases where I have noted
18  chemicals that have potential to be of interest and then
19  looked for any specific human studies in those
20  documents.
21          And in some cases, I also did literature
22  searches.  I did for mecoprop.
23      Q.  For what other ingredient did you do a
24  literature search?
25      A.  I looked at -- I reviewed studies on Dicamba.

Page 153

1  And the rest of the compounds had no potential for
2  either exposure or -- and/or human carcinogens -- human
3  carcinogenicity.
4      Q.  Based on what?  How did you come to that
5  conclusion?
6      A.  Based upon my expert training and experience,
7  as well as the negative value listed under IARC, as
8  well as the negative values for the MSDS sheets.
9      Q.  If you researched any of these ingredients
10  beyond looking at the IARC listings and the MSDSs that
11  you cite to in table 20, would the information you
12  reviewed be reflected in your materials considered
13  list?
14      A.  Yes, where I found relevant studies.  And, for
15  example, the mecoprop study.
16      Q.  For any of the ingredients listed on table 20,
17  did you perform any PubMed searches?
18      A.  Yes.
19      Q.  For which one?
20      A.  Mecoprop, dicamba.
21      Q.  Anything else?
22      A.  Possibly 2-4-D, but I don't remember.
23      Q.  And any result of that PubMed search that you
24  consider would be listed on your materials considered
25  list at the end of your report, correct?

39 (Pages 150 to 153)

William Sawyer, Ph.D.
July 16, 2019

---

Page 154

1    **A. Anything that was positive, yeah. The**
2    **mecoprop is the only thing that came up that has any**
3    **possibility.**
4        Q. On the MSDSs that you reviewed, what year did
5    you attempt to find for each of those MSDSs?  How did
6    you determine which MSDS to refer to for a particular
7    product?
8    **A. I went with the most recent.**
9        Q. How do you know it was the most recent?
10   **A. I don't actually.**
11       **No, I don't know.  I can't answer that.**
12       Q. Okay.
13   **A. I just --**
14       Q. Did you make any attempt to match the MSDS to
15   the year that -- that a particular plaintiff claimed
16   they used the product?
17   **A. No.**
18       Q. Would you have liked to have seen the most
19   recent MSDS for each of these products listed on table
20   20?
21   **A. I believe my research provided me with the**
22   **most recent MSDSs, but I can't guarantee that.  Most of**
23   **the MSDSs you'll see I've listed are relatively recent.**
24       MR. DERRINGER:  Why don't we take a break.  I
25   know our video is about to expire.

---

Page 155

1        THE VIDEOGRAPHER:  The time is 2:45.  End of
2    media 2.  Off record.
3        (Recess.)
4        THE VIDEOGRAPHER:  We're back on the record.
5    The time is 3:04, start of media 3.
6    BY MR. DERRINGER:
7        Q. Dr. Sawyer, could you turn to page 64 of your
8    report.  This section of your report is titled,
9    "Calculation of Plaintiff Time-Weighted Dose as
10   Compared to Human NHL Studies."
11       Do you see that?
12   **A. Yes.**
13       Q. The second paragraph, you say, "The following
14   studies are applicable in the current matter as
15   exposure durations were concordantly assessed."  Can
16   you tell us what you mean by "concordantly assessed"?
17   **A. In different pieces.  For example, Eriksson**
18   **uses different -- well, McDuffie uses several different**
19   **break points, different thresholds, different**
20   **statistics at different exposure days.  It's not just**
21   **one metric.  There's several.**
22       Q. Is that what you mean by concordantly
23   assessed?
24   **A. Yeah.**
25       Q. Okay.  Let's go ahead with McDuffie.  I'm

---

Page 156

1    going to hand you Exhibit 18.
2        (Defendant's Exhibit-18 was marked for
3    identification.)
4    BY MR. DERRINGER:
5        Q. Which is the McDuffie 2001 study that you've
6    cited in your report and -- are you looking for your
7    own copy of it?
8    **A. Yeah, I may have some highlights.**
9        Q. That's fine.
10   **A. There we go.**
11       **My colleague was named Duffie a long time ago.**
12       Q. If you could turn back to --
13   **A. In fact, I named my boat the McDuff after**
14   **that.**
15       Q. Turn back to page 51 of your report, Exhibit
16   6.  I may have the wrong page again.  Are you on page
17   51 there?
18   **A. 61.**
19       Q. 51, I'm sorry.  It should be a page that is
20   entitled, "Defining Hours Sprayed in a Day."  Are you
21   there?
22   **A. Yeah.**
23       Q. Okay.  And if you look at Exhibit 3, which is
24   a chart you provided to us titled, "Changes Made to
25   Dose Calculations Originally Submitted on July 9th," I

---

Page 157

1    think you'll notice you made a few changes to pages 51
2    and 52; is that right?
3    **A. Yeah.**
4        Q. Okay.  And on page 51 under, "Defining Hours
5    Sprayed in a Day," you said, after the third paragraph
6    in this section, the next three paragraphs were
7    omitted; is that right?
8    **A. Yes.**
9        Q. If you look at Exhibit 11, which is the part
10   of your report that we received sometime around July
11   9th -- let me know when you have Exhibit 11 in front of
12   you.
13   **A. I know what it is.**
14       Q. Okay.
15   **A. Yeah.**
16       Q. Exhibit 11 actually has the paragraphs that
17   you omitted in it.  I'm going to ask you some questions
18   about those paragraphs, so if you want to look at your
19   Exhibit 11, you may.  If not, that's your choice.
20       Why did you omit those paragraphs?
21   **A. Because upon rereading over and over again,**
22   **attempting to understand what McDuffie did, it finally**
23   **dawned on me that there were two different things going**
24   **on.  There was a pilot study which defined the metric**
25   **and later in one of the tables in the report was**

---

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

William Sawyer, Ph.D.
July 16, 2019

Page 158

1  another metric which was greater than two days.  And
2  they're independent concepts.  So what I wrote in those
3  three paragraphs was incorrect, and I removed it.
4      Q.  You had claimed in those paragraphs that in
5  McDuffie -- in the McDuffie study, more than two days
6  per year was defined as ten or more hours per year.
7  You're not making that claim anymore, are you?
8      A.  I said ten or more hours for two years.
9      Q.  Well --
10     A.  I'm sorry, ten or more hours for two days.  I
11 believe that's what I wrote.
12     Q.  That's why I think you might want to have
13 Exhibit 11 in front of you.
14     A.  All right.
15     Q.  Again, it's your choice.
16     A.  Well, I just -- I remember.  I never said ten
17 hours in one day.
18     Q.  So if you go to page 52 of your July 9th
19 report excerpt --
20     A.  52, okay.  Exhibit 11.  That may not be
21 Exhibit 11 there.  This is Exhibit 2.  Oh, what does
22 Exhibit 11 look like?
23     Q.  (Indicating).
24     A.  Oh, it's a little short thing.
25     Q.  Correct.

Page 159

1      A.  That's somewhere here.  Here it is.
2      Q.  Go to page 2 of Exhibit 11, which is your July
3  9, 2019 report excerpt.
4      A.  Okay.
5      Q.  If you look at the top there, you write, based
6  on the methods section, this is defined as ten hours --
7  ten or more hours per year and the this is greater than
8  two days per year.  Do you see that?
9      A.  Right, I said -- ten or more hours per year,
10 not ten or more hours per day is what I said a minute
11 ago, and you disagreed with that.
12         MR. KRISTAL:  I think your question asked ten
13 hours per day, your original question.
14         MR. DERRINGER:  The record will reflect.
15         MR. KRISTAL:  It is what it is.
16 BY MR. DERRINGER:
17     Q.  As you can see here in Exhibit 11, you had
18 made the assertion that in McDuffie, they defined more
19 than two hours per year as ten or more hours per year.
20 And my question is, are you still making that claim?
21         MR. KRISTAL:  You should read back.  I --
22 well, I object.  I don't think that's an
23 understandable question.
24 BY MR. DERRINGER:
25     Q.  Do you understand my question?

Page 160

1      A.  No, I really don't.
2      Q.  Okay.
3      A.  The part about the claim, I don't understand
4  it.
5      Q.  This part about the claim?
6      A.  The claim.
7      Q.  The part about the -- the claim?
8      A.  The claim, yeah.
9      Q.  I'm reading what you wrote in Exhibit 11.
10     A.  Okay.
11     Q.  Okay?  And in Exhibit 11, you report that
12 McDuffie shows a statistically significant dose
13 response odds ratio of 2.12 with a confidence interval
14 between 1.20 and 3.73 for the, quote, greater than two
15 days per year group.  Do you see that?
16     A.  Yes.
17     Q.  And then you write -- you say that was
18 reported in McDuffie.  You then write, "Based on the
19 methods section, this is defined as ten or more hours
20 per year."
21         Do you see that?
22     A.  I do.
23     Q.  And I'm asking you if you are still asserting,
24 as you do in Exhibit 11, that in McDuffie, greater than
25 two days per year is defined as ten or more hours per

Page 161

1  year.
2      A.  I answered that question five minutes ago.
3      Q.  I'm asking if you're making that assertion
4  anymore.
5      A.  You don't understand.  It's not in the -- show
6  me where it's in the -- the current report.
7      Q.  I'm not sure -- it's not in your current
8  report.
9      A.  Show me.
10     Q.  You took it out of your report.
11     A.  Yes.
12     Q.  I want to make sure that you're not making
13 that claim anymore.
14         Can you confirm that?
15     A.  Well, yes, I -- I deleted that from my report
16 and I explained in detail why, that there are two
17 different definitions operating in this study.  One was
18 a pilot.  And the other was the actual analysis of two
19 days per year or more.  And that is why I deleted that
20 from my report.
21     Q.  So anything on page 52 of Exhibit 11 that you
22 deleted from your current report, which is Exhibit 6,
23 you deleted because you determined that what you had
24 written is incorrect.  Is that right?
25     A.  Yes.  Yes.

41 (Pages 158 to 161)

William Sawyer, Ph.D.
July 16, 2019

Page 162

1     So maybe we can spend, like, an hour in front
2  of the jury explaining my mistake.  No, no one is
3  perfect.
4     Q.  Do you have any basis to say how the McDuffie
5  authors defined more than two days per year in their
6  study?
7     A.  No.
8     Q.  All right.  The result in McDuffie that you
9  rely on is the odds ratio of 2.12 in table 8 of
10  McDuffie, Exhibit 18.  If you can take a look at that.
11     A.  (The document was examined.)
12     Q.  And just to cross-reference, in your report,
13  you discuss McDuffie and its result at page 65 of your
14  report in this case.  64 and 65 so you have that in
15  front of you, as well.
16     A.  Okay.  So we're looking at table 8?
17     Q.  Table 8.
18     A.  Okay.
19     Q.  Am I right that it's table 8 where you derive
20  the statistically significant dose response odds ratio
21  of 2.12 for the greater than two days per year group?
22     A.  That's correct.
23     Q.  Okay.  And this is an odds ratio of 2.12 for
24  male applicators in Canada who used glyphosate-based
25  herbicides for more than two days per year, right?

Page 163

1     A.  Yes.
2     Q.  And that result that you relied on, that's
3  adjusted only for age and province and residence,
4  correct?
5     A.  Yes.
6     Q.  Now, do you agree, Dr. Sawyer, that the
7  McDuffie study puts someone in the more than two days
8  per year category if they used glyphosate-based
9  herbicides for ten days or if they used it for a
10  thousand days?  It wouldn't matter.  Both of those
11  people would be in the one- to two-day group, correct?
12     A.  Yes.  They would both have a substantially
13  increased odds ratio based on this study.
14     Q.  There are 59 people that are classified in the
15  greater than two-day exposure group under glyphosate in
16  table 8; is that right?  23 cases, that is, people with
17  NHL, and 36 controls, that is people without NHL,
18  correct?
19     A.  Yes.
20     Q.  Okay.  If somebody used Roundup® for five
21  minutes on three days in a single year, they would be
22  placed into this greater than two days category, right?
23     A.  No.  As we already learned, applicators are
24  generally six hours per day of exposure.
25     Q.  Yeah, but you've already told us you have no

Page 164

1  basis to say how they classified people in this study
2  or what -- how they defined more than two days.
3     A.  In your own words a moment ago, you said
4  applicators.  This is an applicator study, isn't it?
5     Q.  My question is --
6     A.  Applicators don't apply just 15 minutes, based
7  on the evidence I provided.
8     Q.  My -- my question is, if somebody used
9  Roundup® for five minutes on three days in a single
10  year, they would be placed in the greater than two days
11  category, correct?
12     A.  No.
13     Q.  And you base that on what?
14     A.  The definition of pesticide exposure
15  discriminates --
16     Q.  What page are you on?
17     A.  1156, left column, partway through the pilot
18  study.
19     Q.  Okay.  And you've, I think, testified earlier
20  that you read this very carefully, right?
21     A.  Yes.
22     Q.  Okay.  And what you're about -- go ahead, tell
23  me what you're basing it on, your answer of no that you
24  gave to my question of whether someone using Roundup®
25  for five minutes on three days in a single year would

Page 165

1  be placed in the greater than two days category.
2     A.  That is a distinguishing factor between cases
3  and controls.  There's a cumulative total of ten hours
4  per year to any combination.
5     Q.  Yeah, but table 8 includes controls in people
6  who used it more than two days.  You understand that,
7  right?
8     A.  (The document was examined.)
9     Q.  Do you understand that?
10     A.  (The document was examined.)
11     Can you repeat the question?
12     Q.  Sure.  If someone used Roundup® for five
13  minutes on three days in a single year, they would be
14  placed, in the McDuffie study, in the greater than two
15  days category, correct?
16     A.  (The document was examined.)
17     Q.  Or am I right that you just can't tell from
18  the information provided in the McDuffie study?
19     MR. KRISTAL:  Objection, form.
20     A.  (The document was examined.)
21     Yes, if your hypothetical is true, then, only
22  15 minutes of exposure over three days would constitute
23  an increased odds ratio of 2.92 with a 95 percent
24  confidence level.
25  BY MR. DERRINGER:

42  (Pages 162 to 165)

William Sawyer, Ph.D.
July 16, 2019

Page 166

1    Q.  I'm asking you if you can tell from the
2   McDuffie study whether someone who reported using
3   Roundup® for five minutes on the three days in a single
4   year would be placed in the greater than two days
5   category?  Can you -- can you answer that question
6   based on the information in the McDuffie study?
7    A.  (The document was examined.)
8        That's a very unlikely scenario because this
9   study included a large number of applicators, and
10  applicators on the average would be applying more than
11  five minutes.
12   Q.  This study doesn't include only applicators,
13  does it?
14   A.  No.
15   Q.  In fact --
16   A.  It includes either residence or applicators.
17   Q.  Correct.  So I'll ask my question again.
18       You cannot determine, based on the McDuffie
19  study, whether someone who used Roundup® for five
20  minutes on three days in a single year would or would
21  not be placed into the greater than two days category,
22  correct?
23   A.  (The document was examined.)
24       Well, it's possible they could be and, if so,
25  that makes my use of a minimum of six hours for

Page 167

1   exposure day -- in other words, in your scenario, it
2   only takes 15 minutes to produce a significant result.
3   In my scenario, I'm requiring ten hours or more.  So,
4   clearly, I'm being extraordinarily conservative
5   compared to this study, if your -- if your scenario is
6   right.
7    Q.  And if someone used Roundup® six hours per day
8   every working day of the year for 20 years, they'd also
9   be placed in this greater than two day category, right?
10   A.  That's right.
11   Q.  Okay.  Now, if you look at table 8, we were
12  talking before that there are 59 people classified
13  under the glyphosate-exposed group for two or more
14  days.  Do you see that?
15   A.  Yeah.
16   Q.  What's the average days of use among those 59
17  people in the McDuffie study?
18   A.  The study doesn't provide that information.
19   Q.  How many of the 23 people in the cases, that
20  is, those with NHL, used glyphosate-based herbicide
21  less than ten days per year?
22   A.  Could you repeat that?
23   Q.  Sure.  How many of the 23 people included in
24  the table 8 who had NHL and used glyphosate-based
25  herbicide more than two days a year used it less than

Page 168

1   ten days per year?
2    A.  Repeat that again?
3    Q.  Let me ask it a different way.
4        What do you know about how often any of the 23
5   people included in table 8 under the NHL column who
6   used -- used glyphosate-based herbicides more than two
7   days a year?
8    A.  All 23.
9    Q.  How often did they use it?
10   A.  The study doesn't say.
11   Q.  Right.  So can you tell me how many of those
12  23 people used it more than 100 days per year?
13       MR. KRISTAL:  Objection.  You're being silly.
14  You could ask anyone and the answer could be the
15  same.
16       MR. DERRINGER:  I'm going to ask my questions.
17       MR. KRISTAL:  I understand.  You're wasting
18  time.
19       MR. DERRINGER:  Well, your speaking objections
20  are wasting time and I think the record will
21  reflect where time is wasted today.
22       MR. KRISTAL:  The record will reflect.  If you
23  continue to ask these type of questions --
24       MR. DERRINGER:  Just because you prefer the
25  witness not to answer them doesn't give you a right

Page 169

1   to make a speaking objection.
2        MR. KRISTAL:  If someone says I can't -- it
3   doesn't say in the study, then you could ask
4   anyone.
5   BY MR. DERRINGER:
6    Q.  How many of the 23 people that we're talking
7   about here developed NHL in the McDuffie study who used
8   glyphosate-based herbicides more than two days a year
9   used it more than 100 days per year?
10   A.  Somewhere between 0 and 23.
11   Q.  Right.  And how many of the 36 controls listed
12  on table 8 who used glyphosate more than two days per
13  year used it for more than 100 days per year?
14       MR. KRISTAL:  Same objection.
15   A.  Same answer.
16  BY MR. DERRINGER:
17   Q.  Well, it's between 0 to 23?  Is that your
18  answer?
19   A.  0 to 36.
20   Q.  Okay.  Am I right that you don't know anything
21  about how many days per year any of the 59 people
22  listed in table 8 who used glyphosate-based herbicide
23  for more than two days per year -- you don't know
24  anything about how often they used glyphosate-based
25  herbicides other than that they used it for more than

43  (Pages 166 to 169)

William Sawyer, Ph.D.
July 16, 2019

Page 170

1 two days per year.
2     MR. KRISTAL:  Objection, asked and answered.
3 BY MR. DERRINGER:
4     Q.  Is that right?
5     A.  I don't understand the question.
6     Q.  Am I correct, sir, that other than the fact
7 that the 59 people we've been talking about who
8 were reported in McDuffie to use glyphosate for more
9 than two days per year, other than the fact that the
10 study reports that they used it for more than two days
11 per year, you don't know anything else about how often
12 any of those 59 people used glyphosate-based herbicide.
13     MR. KRISTAL:  Same objection.
14 BY MR. DERRINGER:
15     Q.  Am I right?
16     A.  Oh, no, they used it more than two days per
17 year.
18     Q.  You know that.  You don't know anything else
19 about the number of days per year that they used the
20 glyphosate-based herbicides; am I correct?
21     MR. KRISTAL:  Asked and answered.
22     MR. DERRINGER:  Asked but not answered.
23     MR. KRISTAL:  Asked and answered multiple
24 times.
25     A.  No, my report reflects that it's based upon

Page 171

1 greater than two days per year at six hours per day.
2 BY MR. DERRINGER:
3     Q.  When you just said no, were you answering my
4 question?
5     A.  Yeah.
6     Q.  Okay.  What do you know about the smoking
7 history of any of the 59 individuals who used
8 glyphosate-based herbicides more than two days per year
9 as reported in the McDuffie study?
10     A.  What do I know?
11     Q.  Yeah.
12     A.  I know that they would have been at a
13 substantially increased risk of NHL from the promotion
14 process of the dibenzanthracene from the tar in
15 cigarette smoke.  That, I do know.
16     Q.  That wasn't my question.  What do you know
17 about the smoking history of any of the 59 individuals
18 who reported in the McDuffie study used
19 glyphosate-based herbicides more than two days per
20 year?
21     MR. KRISTAL:  Objection, asked and answered.
22     A.  I know that the -- probability of
23 cigarette smoking has been studied in Canada.  That is,
24 what percent of the people smoke.  That would be
25 assessed and provided as a general index, but beyond

Page 172

1 that, nothing.
2 BY MR. DERRINGER:
3     Q.  Have you done that assessment?
4     A.  It would be of no -- of no value.  It would be
5 the same number.
6     Q.  Have you done that assessment?
7     A.  It would be the same -- that number would be
8 an average value for the unexposed and the exposed
9 group.  It wouldn't delineate any further detail.
10     Q.  I'm not asking you whether you -- what that
11 would show.  I'm asking if you've done the assessment?
12     A.  It wouldn't show anything.
13     Q.  But I'm asking you if you've done the
14 assessment?
15     A.  No, I wouldn't waste my time on that, no.
16     Q.  Were the cases and controls here randomized so
17 that the incidence of smoking among cases in controls
18 was randomly distributed?
19     A.  I don't believe so.
20     Q.  What do you know about the family history of
21 cancer for any of the 59 individuals who are included
22 in table 8 who were reported to use glyphosate-based
23 herbicide more than two days per year?
24     A.  Table 1, and I should also add table 1 does
25 actually give some information on smoking.  It shows

Page 173

1 that with respect to family history of cancer, there is
2 a statistically significant increase of about 31
3 percent higher.
4     Q.  You understand that table 1 is just a
5 comparison of demographic and other background
6 attributes between those who developed NHL and those
7 who did not have NHL.  You understand that, right?
8     A.  Yeah, but it's directly applicable to the
9 question you answered -- or asked.
10     Q.  Well, how many -- how many -- how many people
11 in this study, this table 1 report, had a family
12 history of cancer in a first-degree relative?
13     A.  Repeat that?
14     Q.  Well, I'm make it simpler so you don't have to
15 do any math.
16     Table 1 reports that, among the NHL group
17 that's numbered 517 people, 219 of them had a family
18 history -- or reported a family history of cancer in
19 any first-degree relative, correct?
20     A.  Yes, the OR ratio as 1.31 was statistically
21 significant.
22     Q.  That's not what I'm asking.  I'm simply asking
23 about the 219 people out of 517 had a family history of
24 cancer in any first-degree relative.  If you go to
25 table 8, you don't have any way of knowing whether

44  (Pages 170 to 173)

William Sawyer, Ph.D.
July 16, 2019

Page 174

1    those 23 people who used glyphosate more than two days
2    per year and developed NHL are included among the 219
3    reported in table 1 who had a family history of cancer
4    in a first-degree relative, correct?
5        A.  It's possible some of them are.  The fact
6    is --
7        Q.  You have no way of knowing, right?
8        A.  Let me finish my answer.
9            -- that the odds ratio with respect to family
10   history of the first-degree relative is 1.31, whereas
11   the table 8 odds ratio was 2.12.  So, certainly, if --
12   even if a disproportional number of first degrees were
13   in that greater than two year -- or two-day assessment,
14   it would be unlikely to account for such a highly
15   elevated odds ratio of 2.12.  And back to the smoking
16   issue, there is no significant difference between
17   current smoker, ex-smoker, and nonsmoker with respect
18   to NHL in table 1.
19       Q.  Okay.  Let's go to table 1, then, sir.
20   Smoking history.  Can you tell me whether any of the
21   people listed as a current smoker, that's 91 people
22   under NHL, any of those 91 people used glyphosate-based
23   herbicides for more than two days per year?
24       A.  No, but I can tell you that the odds ratio is
25   .98.  There was absolutely no clue of any difference

Page 175

1    between the smokers and the nonsmokers.
2        Q.  Right.  You understand that table 1 doesn't
3    break the data out according to who used what
4    pesticide, correct?
5        A.  Yes.
6        Q.  Okay.  And can you tell me whether any of the
7    298 current smokers among the controls used glyphosate
8    for more than -- well, let me strike that.
9            Can you tell me how many of the 298 controls
10   who reported -- who were reported as current smokers
11   used glyphosate-based herbicides for more than two days
12   per year?
13           MR. KRISTAL:  Object to the form.
14       A.  No.
15   BY MR. DERRINGER:
16       Q.  Back to table 8.  Among the 59 people reported
17   to have used glyphosate-based herbicides for more than
18   two days per year, can you tell me how many of them had
19   a history of immunosuppressive insufficiency?
20       A.  No, that information is not provided.
21       Q.  Among the --
22       A.  And, more importantly, no one in this case
23   other than ████████████████████████████
█ ███████████████ ████████
25       Q.  Can you tell me, for the 23 people who are

Page 176

1    reported to have NHL and have used glyphosate-based
2    herbicides more than two days per year, what other
3    pesticides they used?  Those 23 people.
4        A.  No, but I believe, if I recall, the Eriksson
5    study did segregate that.
6        Q.  Can you tell me what the weight of any of
7    those 23 people are?
8        A.  No.
9        Q.  Let's go on to Eriksson; since you just
10   brought it up.
11           MR. KRISTAL:  Oh, you were going to go there
12   anyway.
13           (Defendant's Exhibit-19 was marked for
14   identification.)
15   BY MR. DERRINGER:
16       Q.  I'm handing you what I've marked as Exhibit
17   19.  It's a -- well -- Dr. Sawyer, is Exhibit 19 the
18   Eriksson 2008 study upon which you rely in your report
19   including at page 64 of your report?
20       A.  It is.
21       Q.  And am I right that what you're relying on in
22   Eriksson is the odds ratio reported in that study of
23   2.36 for people in Sweden who used global --
24   glyphosate-based herbicides for more than ten days?
25       A.  Yes.

Page 177

1        Q.  Okay.  And that's reported at table 2; is that
2    right?
3        A.  (The document was examined.)
4        Q.  It's on page 1659.
5        A.  (The document was examined.)
6            Yes.
7        Q.  Okay.  And that's a result that is adjusted
8    for age, sex, and year of diagnosis or enrollment,
9    correct?
10       A.  Yes.
11       Q.  It's not adjusted for use of any other
12   pesticide, correct?
13       A.  (The document was examined.)
14           Well, not exactly.  Page 1658 does report that
15   glyphosate was the dominating agent.
16       Q.  Yeah, I'm asking if the 2.36 odds ratio on
17   which you rely was adjusted for anything other than
18   age, sex, and year of diagnosis and enrollment.
19       A.  I didn't understand that.
20       Q.  The odds ratio of 2.36 on which you rely is
21   reported at table 2 of the Eriksson study.  I want to
22   know if that was adjusted for anything other than age,
23   sex, and year of diagnosis or enrollment.
24       A.  Well, it -- it was, in the sense that there
25   was segregation with respect to other pesticides, and

45 (Pages 174 to 177)

William Sawyer, Ph.D.
July 16, 2019

Page 178

1 the glyphosate remained statistically significant.
2    Q.  Where is that reported, sir?
3    A.  Page 1658.
4    Q.  And tell me exactly what you're referring to.
5    A.  Paragraph under herbicides in the right bottom
6 corner.
7    Q.  Okay.  Can you show me where that says -- that
8 paragraph says that that odds ratio that you just
9 reported, 2.02, was adjusted -- took into account and
10 adjusted statistically for the use of other pesticides?
11    A.  (The document was examined.)
12       Well, it states that, in this category, the
13 dominating agent was glyphosate, which is reported by
14 29 cases and 18 controls which produced OR 202, 95
15 percent CI 1.10 to 3.71.  If both phenoxyacetic acids
16 and glyphosate were excluded, exposure to the
17 herbicides, 37 different agents reported, but no one by
18 more than six subjects at most, gave a nonsignificant
19 OR of 1.22.  So there is segregation, knocking out the
20 other 37 pesticides.
21    Q.  You've relied on this study before, haven't
22 you?
23    A.  Yes.
24    Q.  Yeah.  When was the first time you read this
25 study?  Do you recall?

Page 179

1    A.  Years ago.  I don't know.
2    Q.  And you relied on it so far in every case in
3 which you've submitted a report in this Roundup®
4 litigation, correct?
5    A.  Yes.
6    Q.  Okay.  And you do know that table 2 is an
7 unadjusted result, that is, that 2.36 is not adjusted
8 for use of other pesticides.  You know that, right?
9    A.  Correct, but it also shows a suggestion of
10 dose response.
11    Q.  I understand.  We'll get to that.
12       And now you've testified that there was
13 segregation and it still showed a statistically
14 significant outcome.  You've looked at table 7 before,
15 right, sir?  Go to page 1661.
16    A.  (The document was examined.)
17    Q.  I know you've testified before you're not an
18 epidemiologist and you're deferring the epidemiology to
19 the epidemiologists, but do you have an understanding
20 the difference between a univariate analysis and a
21 multivariate analysis?
22    A.  Yes.
23    Q.  Do you understand that multivariate analysis
24 is the analysis that adjusts for the use of certain
25 other pesticides?

Page 180

1    A.  It takes into account using a statistical
2 formula.
3    Q.  Right.  And the odds ratio for glyphosate,
4 once you adjust for certain other pesticides, is no
5 longer statistically significant, correct?  As reported
6 by Eriksson in table 7.
7    A.  Yes.  The -- the 95 percent confidence
8 interval is no longer achieved; however, the odds ratio
9 remains -- appears to be elevated at 1.51.
10    Q.  So let's go to -- you said the dose response
11 analysis, table 2.  The less than ten days, greater
12 than ten days, that's what you're referring to by dose
13 response segregation, right?
14    A.  Yeah, as stated in the text, as well, that the
15 dose response regarding herbicides is total -- in
16 total, a glyphosate yield an increase OR, the highest
17 exposure group.  Table 2.  For phenoxy acids, however,
18 no such association was demonstrated.
19    Q.  Thank you.  And do you agree, sir, that the
20 Eriksson study put someone in the more than ten days
21 category if they used glyphosate-based herbicides for
22 11 days?
23    A.  Yes.  And --
24    Q.  And do you agree that the Eriksson study --
25       MR. KRISTAL:  Well, Dr. Sawyer was in the

Page 181

1 middle of answering.
2       MR. DERRINGER:  He answered the question.
3 BY MR. DERRINGER:
4    Q.  But if you'd like to add to your answer, go
5 right ahead.
6    A.  Yeah, the point is that, that glyphosate, out
7 of all of these chemicals, is the only one that showed
8 dose -- a statistically significant increase in dose
9 response.
10    Q.  Sir, do you believe that's an answer to the
11 question I asked?
12    A.  Yes.
13    Q.  Okay.  Do you remember the question that I
14 asked?
15    A.  No.
16    Q.  Do you agree that the Eriksson study puts
17 someone in the more than ten days category if they used
18 glyphosate-based herbicides for a thousand days in
19 their lifetime?
20    A.  The answer is greater than ten.
21    Q.  Do you agree that the Eriksson study
22 classified someone as having -- as being in the more
23 than ten days category if they used glyphosate-based
24 herbicides for a thousand days in their life?
25       MR. KRISTAL:  Asked and answered.

46 (Pages 178 to 181)

Page 182

**A. I can't answer that. I can only say the study shows great than ten days.**
BY MR. DERRINGER:
Q. Which, by definition, would include someone that had used it for a thousand days, correct?
MR. KRISTAL: Asked and answered.
BY MR. DERRINGER:
Q. Are you able to answer that question?
**A. It could include any number. I can't specify what number.**
Q. I'm asking if it would include a thousand days.
**A. It would include somewhere between greater than ten and whatever the highest single person exposure was.**
Q. What was the highest single person exposure in Eriksson to glyphosate-based herbicides?
**A. We don't know.**
Q. You don't know?
**A. The study doesn't state.**
Q. How many -- let me ask you, do you -- do you know what Eriksson used to define what a day was?
**A. (The document was examined.)**
**No.**
Q. Look at table 2. The greater than ten day

Page 183

category used 26 people; is that right?
**A. (The document was examined.)**
**No. 29.**
Q. Well, I'm adding 17 and 9. What are you adding?
**A. I misunderstood your question. I thought you asked how many in both groups were included, and that would be 29.**
Q. There are 26 people in the Eriksson study classified as having used glyphosate-based herbicides greater than ten days, correct?
**A. That's true.**
Q. How many of those 26 people have a history of smoking?
**A. I'm going to check, but I don't think that was defined.**
**(The document was examined.)**
**The study doesn't reveal the information.**
Q. So you have no way of knowing how many of those 26 people have a history of smoking, correct?
**A. No.**
Q. I'm correct?
**A. I do not know. The study does not state.**
Q. Am I correct that you do not know how many of those 26 people have a history of smoking?

Page 184

**A. The study doesn't provide that information.**
Q. Are you unable to just answer my question? Am I correct that you don't --
MR. KRISTAL: He is answering your question.
MR. DERRINGER: No, he's not.
MR. KRISTAL: He is answering your question.
MR. DERRINGER: No, he's not.
MR. KRISTAL: We disagree.
BY MR. DERRINGER:
Q. Am I correct that you do not know how many of those 26 people have a history of smoking? Am I correct, yes or no?
**A. Can you rephrase the question so I can understand it?**
Q. Let me just ask the question again. I'll rephrase it in a minute, but I want to make sure that I ask the question as clearly as possible so everyone can hear what question you don't understand.
Am I correct that you do not know how many out of 26 people who were reported in McDuffie at table 2 to use glyphosate-based herbicides more than ten days have a history of smoking? Am I correct, yes or no?
**A. Yes. However, the study does not indicate how many.**
Q. What is the average weight of the 26 people

Page 185

reported to have used glyphosate-based herbicides more than ten days?
**A. The study does not provide that information.**
Q. What -- how many of the 26 people have a family history of cancer?
**A. The same answer.**
Q. How many of the 26 people have a history of autoimmune disease?
**A. Same answer.**
Q. How many of those 26 people have a history of immunosuppressant insufficiency?
**A. Same answer.**
Q. How many of those people used other pesticides?
**A. The study does not provide that information.**
Q. How many of those people, those 26 people, used glyphosate-based herbicides for more than a thousand days?
MR. KRISTAL: Objection, asked and answered.
**A. The study does not provide that information.**
BY MR. DERRINGER:
Q. It could be all of them, correct?
**A. (The document was examined.)**
**The study doesn't provide that information.**
Q. What is the average days of use that those 26

William Sawyer, Ph.D.
July 16, 2019

Page 186

1  people used glyphosate?
2      A.  The study does not provide that information.
3      Q.  How many of those 26 people used
4  glyphosate-based herbicides every single day during the
5  years that they used it?
6      A.  Again, the study does not provide that
7  information.
8      Q.  Back to your report, you can put Eriksson to
9  the side, when you're ready, I'm going to look at page
10 65 of your report.
11     A.  (The document was examined.)
12     Q.  Under the paragraph numbered 3, Andreotti, if
13 you go underneath table 12 to the paragraph that
14 begins, "Plaintiffs' exposure days," do you see that?
15     A.  Yes.
16     Q.  Okay.  You write in the middle of that
17 paragraph, "The Agricultural Health Study did not find
18 a statistically elevated risk of NHL," and then,
19 semicolon, you write, "Thus, the study is limited in
20 its use beyond indicating where each plaintiff is
21 relative to the 54,251 applicators assessed."
22        What -- what did you mean by the study is
23 limited in its use beyond indicating -- well, let me
24 ask you this:  What did you mean by where each
25 plaintiff is relative to the 54,251 applicators

Page 187

1  assessed?
2      A.  What tertile each plaintiff falls into.
3      Q.  Did you consider the agricultural health
4  studies, the Andreotti study, for anything in your
5  analysis other than indicating where each plaintiff is
6  relative to the applicators assessed in that study?
7      A.  Well, I attempted to, but there's no
8  statistically significant threshold to compare against.
9  So I am using this simply to show where the applicators
10 and residents in the current matter fall.
11     Q.  And because there was no statistically
12 finding -- statistically significant finding of an
13 elevated risk in the Andreotti study elevated with NHL,
14 you determined that it would not be of use in your
15 analysis?  Is that correct?
16     A.  That's not what I said.  I said that there --
17 the study does not provide a threshold of where -- at
18 what level of exposure NHL occurs.
19     Q.  Did you consider the Andreotti study and its
20 results for anything in your analysis of the
21 plaintiffs' -- strike that.
22        Did you consider the Agricultural Health Study,
23 Andreotti 2018, for anything in your analysis of what
24 caused the plaintiffs' cancer in this case?
25     A.  Same answer.  I attempted to, but there's no

Page 188

1  threshold value at which NHL occurs at a statistically
2  significant elevated rate for comparison.
3      Q.  You noted on your table 12 -- in some of the
4  changes you noted, you took out the last row there.
5  That last row had reported a median quartile and the
6  median tertile.  Is there a reason why you omitted
7  that?
8      A.  Yes.
9      Q.  What was the reason?
10     A.  Didn't make any sense.  If you look at the way
11 it was actually worded -- let me go back to the Exhibit
12 11.
13     Q.  Going to page 67 of that.
14     A.  (The document was examined.)
15        Yeah, the median quartiles is -- doesn't make
16 any sense and neither does the median tertile, greater
17 than or equal.  A median would be a single fixed
18 number, not a range.
19     Q.  Where did you get those figures from?
20     A.  Well, I -- I believe out of the Agricultural
21 Health Study.
22     Q.  Let's go to Exhibit 20.
23        (Defendant's Exhibit-20 was marked for
24 identification.)
25 BY MR. DERRINGER:

Page 189

1      Q.  Let's talk about the Leon study meta-analysis
2  that you rely on.  I'm handing you that study marked as
3  Exhibit 20.
4          MR. KRISTAL:  Thank you.
5          MR. DERRINGER:  You're welcome.
6          I have one for you.
7          MS. FILIPPAZZO:  Thank you, perfect.
8  BY MR. DERRINGER:
9      Q.  Sir, is Exhibit 20 a copy of the Leon study on
10 which you're relying for your opinion in this case?
11     A.  (The document was examined.)
12        Yes.
13     Q.  All right.  If you go to page 8, table 2, am I
14 correct that the Leon study showed that there was no
15 association between exposure to glyphosate and
16 non-Hodgkin's lymphoma overall?
17     A.  Yes.
18     Q.  And -- and here when we're talking glyphosate,
19 we're talking about the glyphosate used -- well, strike
20 that.
21        When Leon is talking about glyphosate, as is
22 the case in any of these human epi studies, they're
23 talking about glyphosate-based herbicides, the whole
24 formulation, correct?
25     A.  Yes.

48  (Pages 186 to 189)

William Sawyer, Ph.D.
July 16, 2019

Page 190

1    Q.  I had a few questions about what you wrote on
2  page 68 of your report.  I think it's still on the same
3  page.  No, 60 --
4    A.  6.
5    Q.  -- 6, thank you.
6      In your description of the Leon study, you
7  refer to a Cox regression model.  What is that?
8    A.  It's a statistical method for determining
9  ratios, 95 percent confidence.
10   Q.  Can you tell me how they work, how that model
11  works, a Cox regression model?
12   A.  I'm going to defer that to the epidemiologist.
13   Q.  Okay.  Do you have any idea how it works?
14   A.  Possibly, but I'm going to defer that to the
15  epidemiologist.
16   Q.  And you talk about hazard ratio.  What's a
17  hazard ratio?
18   A.  Similar to a risk ratio.
19   Q.  How is it different from a risk ratio?
20   A.  I don't recall.
21   Q.  Did you ever know?
22      Well, I'll withdraw the question.
23      As you sit here today, can you explain to me
24  the difference between a hazard ratio and a risk ratio?
25   A.  No, I forget.

Page 191

1    Q.  And you also talk about a random effects
2  meta-analysis.  What is that?
3    A.  I'll defer that to the epidemiologist.
4    Q.  Do you have any idea what it is?
5    A.  I believe it's similar to a multivariant
6  analysis.
7    Q.  What's a multivariant analysis?
8    A.  Takes into account effects from other
9  potential factors that could enhance the statistical
10  tests for the compounded question.
11   Q.  Finally, you talk about calculating meta-HRs.
12  What -- what is that?
13   A.  Combined results of more than one study.
14   Q.  And how is that calculated; do you know?
15   A.  No.  I would defer that to the epidemiologist.
16   Q.  Okay.  So -- all right.  If you look at the
17  abstract for the Leon study, that's Exhibit 20 -- tell
18  me when you've got that in front of you.
19   A.  (The document was examined.)
20   Q.  Do you have it?
21   A.  I have it, yeah.
22   Q.  That -- under, "Methods," it starts, "We
23  investigated the relationship of every use."  Do you
24  see that?
25   A.  Yes.

Page 192

1    Q.  Okay.  And look at what you wrote on page 66.
2  The fourth line down at the end of the first paragraph,
3  you say -- you wrote, "Specifically, the authors," and
4  then, "Investigated the relationship of the 'ever
5  use.'"
6      Do you see that?
7    A.  Yeah.
8    Q.  Am I right you just copied the method section
9  from Leon into your report?
10   A.  Yes.  Absolutely.
11   Q.  Okay.
12   A.  And I started off with a subtitle of Leon, et
13  al., 2019, and the reference to that study.
14   Q.  Right.  And you just copied it straight away,
15  right?
16   A.  Absolutely.
17   Q.  Yeah, except you actually made a little bit of
18  a change here because you didn't include some of the
19  methods section, right?
20   A.  Maybe.  The background.
21   Q.  Well, you didn't include in the third line of
22  the methods section in Leon, "Overall, a major subtypes
23  and a prudent analysis of three large agricultural
24  worker cohorts."  That, you didn't include in here,
25  right?  You copied over the first sentence ending in

Page 193

1  NHL, and then continued with copying the rest of the
2  abstract in Leon, correct?
3    A.  Yes.
4    Q.  Okay.  And you didn't put any quotation marks
5  around that, did you?
6    A.  No, the only thing I quoted, it looks like,
7  is --
8    Q.  Right.  So you didn't attribute what you
9  copied here to the original source, Leon, correct?
10   A.  Well, I intended to.  That's how I started off
11  the paragraph.  That's how I think it's implied.
12   Q.  It's how you -- where are the quotations at
13  the beginning of the paragraph?
14   A.  I said I think it's implied.
15   Q.  Okay.  The Leon study involved farmers and
16  farm workers, correct?
17   A.  Yes, it says so on the first line of page 66,
18  farmers or agricultural workers from France.
19   Q.  Not just France, right?
20   A.  Norway and the USA, yeah.
21   Q.  And so we had three cohorts, three groups of
22  farmers and farm workers here.  Like you just said,
23  France, Norway, and the United States.  Am I right,
24  this is a never/ever -- strike.  This is ever/never
25  analysis; is that right?

49 (Pages 190 to 193)

William Sawyer, Ph.D.
July 16, 2019

Page 194

1   **A.  Yes.**
2   Q.  It's not possible to calculate dose response
3   using Leon, correct?
4   **A.   Correct.**
5   Q.  And turn to pages 14 and 15 of the Leon study
6   on which you rely.  The -- tell me when you're there.
7   The bottom of 14, bottom right side.
8   **A.  (The document was examined.)**
9   **Okay.**
10  Q.  The authors acknowledge, and I'm quoting, "An
11  additional exposure assessment limitation," which they
12  say involved using ever/never use of pesticide active
13  ingredients as a method of exposure to explore
14  associations with cancer outcomes.  They call it a
15  logical first step.
16       The authors write, "This metric alone is not
17  sufficient to characterize cancer risk from pesticide
18  exposure," end quote.
19       Do you agree with that?
20  **A.  Yes, by itself, sure.**
21  Q.  The Leon study did not adjust for smoking
22  history, correct?
23  **A.  Correct.**
24  Q.  The Leon study --
25  **A.  It couldn't, because studies that it was using**

Page 195

1   **did not have that information.**
2   Q.  The Leon study did not adjust for alcohol
3   intake, correct?
4   **A.  Correct.**
5   Q.  And the Leon study did not adjust for family
6   history of cancer, correct?
7   **A.  Correct.**
8   Q.  And if you go to page 15, we were there just
9   before, the next paragraph we left off at, top of the
10  page, left side, the authors write, "False-positive
11  associations among our findings may have occurred given
12  the large number of comparisons."
13       Do you see that?
14  **A.  Yes.**
15  Q.  Do you have any reason to disagree with what
16  the authors state there?
17  **A.  No.**
18  Q.  Now, in order to put these cohorts together,
19  the study subjects, the Leon group used a few different
20  databases, correct?
21  **A.  Three.**
22  Q.  For France, what database did they use?
23  **A.  I believe it was the Defarge, D-e-f-a-r-g-e**
24  **study.  No, maybe that's not it.  Hang on.  That's not**
25  **it.**

Page 196

1   Q.  I'll refer you to page 3 of the Leon study
2   which --
3   **A.  I have a study right here.  The L-e-d-e-q-u-e**
4   **- M-o-r-a-l-i-s study agricultural and cancer --**
5   **AGRICAN, A-G-R-I-C-A-N, cohort study.**
6   Q.  Right.  That's the study referred to at page 3
7   of the Leon publication, is that right, under AGRICAN?
8   **A.  It is.**
9   Q.  Okay.
10  **A.  And I have the study right here.**
11  Q.  Thank you.  That's footnote 22, right, to the
12  Leon study?
13  **A.  Yes.**
14  Q.  Okay.  And for Norway, what database was used?
15  **A.  It was a Norwegian study of pesticides.  That**
16  **would have been, I guess, Eriksson.**
17  Q.  Well, just go ahead and take a look at the
18  Leon paper.  If you look at page 3, it's the CNAP,
19  right?
20  **A.  It's the CNAP, yeah, yeah.**
21  Q.  Okay.
22  **A.  Yeah.**
23  Q.  And the study that reported that according to
24  Leon is footnote 23, which is Kristensen, correct?
25  Published in 1996, right?

Page 197

1   **A.  Right.**
2   Q.  Okay.  Now, the AGRICAN and the CNAP, those
3   two studies that you just referred to, did they obtain
4   information from the study subjects about their
5   specific pesticide use, that is, which pesticides they
6   used, or did they measure that in a different way?
7   **A.  Measured it in a different way.**
8   Q.  And, in fact, what they did is they used a
9   method called crop exposure matrices to classify study
10  subjects as having been exposed or not exposed to a
11  particular pesticide, correct?
12  **A.  Yes.**
13  Q.  And what's your understanding of what a crop
14  exposure matrix is and how it was used in the AGRICAN
15  and CNAP groups?
16  **A.  I defer that to the epidemiologist.**
17  Q.  Okay.  Do you agree at least that that's
18  described in the Leon paper at page 4 under the
19  paragraph, "Crop-Exposure Matrices," and the paragraph
20  under, "Assignment of Potential Pesticide Exposure
21  Based on CEM"?
22  **A.  Yes.**
23  Q.  Okay.
24  **A.  As well as figure 1, which attempts to explain**
25  **it, but it's still something I would defer to the**

50  (Pages 194 to 197)

William Sawyer, Ph.D.
July 16, 2019

Page 198

1 epidemiologist.
2    Q.  Is your knowledge about how crop exposure
3 matrices were used in AGRICAN and CNAP limited to
4 what's written on page 4 under the paragraphs,
5 Crop-Exposure Matrices and Assignment of Potential
6 Pesticide Exposure Based on CEM, and the figure on page
7 5?
8    A.  Yeah.
9    Q.  Okay.  Do you know for which crops Roundup® or
10 glyphosate was authorized or recommended for use by the
11 French government in 2005, 2006, or 2007?
12    A.  No.
13    Q.  Do you know for which crops Roundup® or
14 glyphosate were authorized to produce by the Norwegian
15 government in 1969, 1974, 1979, 1985, or 1989?
16    A.  It could be my hearing, but I thought you said
17 1969.
18    Q.  I did.
19    A.  Can you repeat that question?
20    Q.  Sure.  And maybe the source of your confusion
21 is because glyphosate wasn't made available until the
22 '70s.  Is that why you had a question about your
23 hearing?
24    A.  Yeah, it was still used to clean tanks.
25    Q.  Okay.  Well, the reason I mentioned those

Page 199

1 years is because if one looks at the methods section,
2 the CNAP is a study that looked at -- looked at -- was
3 conducted and based on a census that was conducted in
4 1969, 1974, 1979, and 1985, and 1989 by Statistics
5 Norway.  Do you see that?
6    A.  I don't, but I recall that.
7    Q.  Yeah, it's on page 3 under the CNAP paragraph
8 on the left-hand side?
9    A.  Yes.
10    Q.  Okay.  So I just want to know if you know for
11 which crops Roundup® or glyphosate was authorized to
12 produce by the Norwegian government in any of those
13 years, 1969, 1974, 1979, 1985, or 1989.
14    A.  Well, obviously, not in 1969.  Beyond that, we
15 don't know.
16    Q.  We don't know or you don't know?
17    A.  I don't think that information was in the
18 study.
19    Q.  Right.  I assume there's other ways to obtain
20 that information.  I just want to find out if you know
21 that information.
22    A.  No.
23    Q.  Let's go to page 7, which I think is the
24 finding you are relying on of diffuse large B-cell
25 lymphoma.  Is that right?

Page 200

1    A.  It is.
2    Q.  And so I'm looking at that paragraph on page
3 7, right-hand side, second paragraph down.  Can you
4 tell me which of the three -- which of the three
5 underlying cohort studies, that is, the French study,
6 AGRICAN; the Norwegian study, CNAP; or the Agricultural
7 Health Study in the United States, which of those three
8 studies is driving the DLBCL results?
9    A.  Well, I know it's not the -- the
10 Ledeque-Moralis, et al , study.
11    Q.  That's the French study, the AGRICAN?
12    A.  Yeah.
13    Q.  Okay.  It's not that one.
14    A.  By process of elimination, it's not.  Now, in
15 terms of the other two studies, they both contribute,
16 but I'm not sure which one contributes more.
17    Q.  Right, but if you -- if you look at -- okay.
18 Which of those -- so it's not the AGRICAN study.
19 Between CNAP and AHS, which one had a statistically
20 significant finding?  DLBTL.
21    A.  Well, the hazard ratio is 1.67 as
22 significantly elevated in CNAP, whereas in the AHS, it
23 was elevated at 1.2, but it was not statistically
24 significant.
25    Q.  Okay.  The CNAP was the only statistically

Page 201

1 significant finding among the three groups, that is,
2 the French AGRICAN, the Norwegian CNAP, and the United
3 States AHS; is that right?
4    A.  Yes, but it was -- it appears to be elevated
5 in the AHS, but not at the 95 percent level certainly.
6    Q.  And let's look at that AHS data.  The odds
7 ratio that's reported in AHS is 1.20.  Is that right?
8    A.  Yes, that's what I said.
9    Q.  Yep.  And --
10    A.  And I earlier said you can't tell which
11 contributes more because of the size of the number of
12 subjects and so on.  So the one study was statistically
13 significant and the other showed an elevated ratio
14 because it had a larger population.
15        (Defendant's Exhibit-21 was marked for
16 identification.)
17 BY MR. DERRINGER:
18    Q.  I'm showing you what's been marked as Exhibit
19 21.  This is the Andreotti 2018 study.  You've seen
20 that study before, correct?
21    A.  I have it right here.
22    Q.  Do you have that in front of you?
23    A.  Yeah.
24    Q.  Exhibit 21?  Okay.  And, again, Leon reports
25 an Agricultural Health Study hazard ratio of 1.20 with

51 (Pages 198 to 201)

William Sawyer, Ph.D.
July 16, 2019

Page 202

1    a 95 percent confidence interval from 1.2 and 1.98.
2    And if you go to the Andreotti study on page 513 under
3    DLBCL, table 2 -- let me know when you're there.
4    **A. (The document was examined.)**
5    **Yes.**
6    Q. Can you show me where in table 2, under
7    diffuse large B-cell lymphoma Andreotti reports a
8    hazard ratio of 1.20 with a 95 percent confidence
9    interval of .72 to 1.98?
10   **A. No, I can't, and all I can tell you, this**
11   **study is broke up into quartiles, so in the**
12   **meta-analysis study, it wasn't reported as quartile**
13   **analysis. So different statistics were employed in the**
14   **meta-analysis.**
15   Q. And, in fact, the Leon meta-analysis, the data
16   it used from the Agricultural Health Study was not as
17   complete as the data that was used in the Andreotti
18   publication, correct?
19   **A. That, I can't answer. I'd have to defer to a**
20   **epidemiologist.**
21   Q. Well, you've read the Leon study, right?
22   **A. Yes.**
23   Q. Okay. Turn to page 12 of that study.
24   **A. (The document was examined.)**
25   Q. The top right of that page, first sentence

Page 203

1    reads, "The follow-up time was longer in the AHS
2    publication" --
3    **A. I don't see it.**
4    Q. Are you at page 12?
5    **A. Yes.**
6    Q. Okay. Right-hand column. Top of the page.
7    **A. It starts off, "Every use" --**
8    Q. Yeah, I'm saying the first full sentence.
9    **A. Okay.**
10   Q. Are you there now?
11   **A. Yeah.**
12   Q. "The follow-up time was longer in the AHS
13   publication, up to 2012 and 2013 and, thus, more cases
14   were included than in our analysis," that is, the Leon
15   analysis, "130 in the AHS publication versus 113 DLBCL
16   cases in the Leon publication."
17   Do you see that?
18   **A. Yes.**
19   Q. And that's what I mean by the data from the
20   Leon study on DLBCL and the AHS study was not as
21   complete as the data reported for DLBCL in the AHS
22   study, correct?
23   **A. As complete. What do you mean by complete?**
24   Q. Well, the Andreotti report of the AHS study,
25   Exhibit 21, reports 130 cases of diffuse large B-cell

Page 204

1    lymphoma, correct?
2    **A. Yes.**
3    Q. And the Leon study used only 113 of those
4    cases in its analysis, correct?
5    **A. Yes.**
6    Q. That's what I mean by not as complete.
7    **A. Agree.**
8    Q. Okay. And do you know what the hazard ratio
9    and confidence interval would be for glyphosate and
10   DLBCL if the Leon analysis had included all of the data
11   on DLBCL that was included in the Andreotti
12   publication?
13   **A. No.**
14   Q. Are you interested in finding out?
15   **A. Yes.**
16   Q. Page 8 of the Leon study, table 2, the line
17   right under glyphosate talks about phenoxy herbicides.
18   Tell me when you're there.
19   **A. (The document was examined.)**
20   **Yes.**
21   Q. Okay. In the Leon study, they found that
22   the -- that exposure to phenoxy herbicides has a
23   protective effect against non-Hodgkin's lymphoma,
24   correct? A hazard ratio of .81, which is statistically
25   significant. Is that right?

Page 205

1    **A. Yes.**
2    Q. Do you have any reason to doubt that this is a
3    reliable finding?
4    **A. I -- you know, I haven't evaluated it from**
5    **that standpoint, whether it's healthy worker effect or**
6    **actually chemical effect. I haven't made that**
7    **evaluation. And, of course, you know what healthy**
8    **worker effect is.**
9    Q. The last study you rely on in your calculation
10   of plaintiff time weighted dose as opposed to human AHS
11   study is the Zhang study, correct? Is that right?
12   **A. Zhang.**
13   Q. Yes. Published in 2019, correct?
14   **A. Yes.**
15   Q. I'll mark as Exhibit 22 the Zhang 2019
16   meta-analysis.
17   (Defendant's Exhibit-22 was marked for
18   identification.)
19   BY MR. DERRINGER:
20   Q. You've seen this before?
21   **A. I have it right here (indicating).**
22   Q. And what this study did is it combined the
23   results from six other studies, right?
24   **A. Yes.**
25   Q. And those six other studies have differences

52 (Pages 202 to 205)

William Sawyer, Ph.D.
July 16, 2019

Page 206

1    between them, correct?
2        A.   All studies are different.
3        Q.   Well, five of the six studies are case control
4    studies and one of them is a cohort study, correct?
5        A.   Yes.
6        Q.   In four of the studies, including Zhang, Zhang
7    incorporates and relies on unadjusted odds ratios, and
8    for two of the studies, Zhang incorporates and relies
9    upon adjusted odds ratios, correct?
10       A.   Yeah.
11       Q.   And Zhang meta-analysis combines some studies
12   that do an ever/never analysis with other studies that
13   do a days per year of exposure analysis with another --
14   other studies that do an intensity weighted lifetime
15   exposure days analysis, correct?
16       A.   Yes.
17       Q.   On page 67 of your report, I'll wait until
18   you're there --
19       A.   (The document was examined.)
20            Page what?
21       Q.   67.  If it's still the same page as in your
22   Exhibit 6.
23       A.   In my report, 67?
24       Q.   (The attorney moved head up and down.)
25       A.   Okay.

Page 207

1        Q.   The first new paragraph that begins with,
2    "Their findings" --
3        A.   Yes.
4        Q.   Okay.  You write, "The authors caution on the
5    interpretation of the numerical risk estimates because
6    of the heterogeneity between the studies."
7            Do you see that?
8        A.   Yes.
9        Q.   What does that mean?  What did you mean when
10   you wrote that?
11       A.   Just the differences in study design and one
12   being the cohort and the others being case control.
13   There's differences in the thresholds in terms of
14   statistical significance, never/ever versus greater
15   than one day versus less than ten days or greater than
16   ten days.
17       Q.   And why would those differences -- what I
18   think you're referring to as heterogeneity, is that
19   what you mean by differences?
20       A.   Yeah, that the studies are not all conducted
21   in the exact same manner, and that has its positives,
22   too, that if the study -- all the studies are conducted
23   in one similar manner, they could actually miss an
24   effect.
25       Q.   Why does the differences between the studies

Page 208

1    or the heterogeneity between the studies, why does that
2    mean that one should be cautious about the
3    interpretation of the numerical risk estimates?
4        A.   Because the studies did not count the exposure
5    metric all in the same exact manner.
6        Q.   What does it mean to be cautious about the
7    interpretation of the numerical risk estimates?  What
8    do you understand that to mean?
9        A.   Well, for example, concluding that less than
10   ten days -- ten exposure hours of glyphosate would be
11   safe, that one could make such a statement or --
12       Q.   Is that what the Zhang study found?
13       A.   No, I just gave you an example, a hypothetical
14   example.
15       Q.   Right, but what you -- what you are referring
16   to in your report is that the authors of the Zhang
17   study caution on the interpretation of the numerical
18   risk estimates in the Zhang study, so I'm wondering
19   what you interpret that to mean.  How should -- how
20   should you be cautious of the Zhang numerical risk
21   estimates?
22       A.   That the plus or minus is -- is wider than
23   just a single number.
24       Q.   What do you mean by that?
25       A.   That due to the differences in how these

Page 209

1    various studies measured exposure, the exposure value
2    has some plus or minus variability.
3        Q.   And -- and one should be cautious about the
4    degree to which one relies on either positive or
5    negative association reported in the Zhang study; is
6    that right?
7            MR. KRISTAL:  Object to form.
8        A.   Only with respect -- no, only with respect to
9    the exposure metric, that is, the days of exposure,
10   hours of exposure, that there's not an exact cut-off
11   point.  You know, the study stated that the evidence in
12   terms of glyphosate-based herbicides increasing their
13   risk for NHL was -- I think their word was compelling.
14           They're not downplaying the causation aspect,
15   they're simply stating that the exposure metric number
16   in terms of exposure hours or time is not well defined.
17   BY MR. DERRINGER:
18       Q.   Take a look at Exhibit 22, the Zhang study,
19   and show me in there, sir, where they say that.
20       A.   (The document was examined.)
21           I didn't say they said that.  You asked me a
22   different question.  You asked me what I mean by the
23   cautionary warning.
24       Q.   You said -- you wrote that the authors caution
25   on the interpretation.  You told me what you think that

53  (Pages 206 to 209)

William Sawyer, Ph.D.
July 16, 2019

Page 210

1  means, and I want to know where in the Zhang study
2  report you're basing your interpretation of the
3  sentence that you included in your report?
4      A.  I'll read a sentence, part of it.
5          Interpretation of the numerical risk
6  estimates.  That is what they're cautioning about,
7  numerical risk estimates.  It has to do with the dose
8  and the degree of risk per dose.
9      Q.  And what I'm asking you is show me the
10 basis -- show me what it is in the Zhang report that
11 you're using as your basis to say that when they talk
12 about interpretation of the numerical risk estimates,
13 they're talking about the dose and the degree of risk
14 in a dose.
15     A.  They're referring to, quote, caution on the
16 interpretation of the numerical risk estimates because
17 of the heterogeneity between the studies, end quote.
18 That's out of their report.
19     Q.  Where?
20     A.  I'll take ten minutes and find it for you, but
21 that is in their report.
22     Q.  You don't quote it, so I'm wondering if you're
23 suggesting to me it is something you're taking from the
24 report instead of being quoted from the report?
25     A.  It's from the report.

Page 211

1      Q.  Okay.  Why don't we take our break.
2          THE VIDEOGRAPHER:  4:37, off record.
3      (Recess.)
4          MR. DERRINGER:  Let's go back on the record,
5  then.
6          THE VIDEOGRAPHER:  All right.  Stand by.
7  We're back on record.  The time is 4:38.
8  BY MR. DERRINGER:
9      Q.  So, Doctor, are you willing to look through
10 and tell me where in the Zhang report they say that
11 they -- that the interpretation of the numerical risk
12 estimate, the caution -- strike that.
13         I'll withdraw that.
14     A.  Yeah, because you know it's in there.  It's in
15 the report.
16     Q.  You'll agree that you did not put any -- well,
17 let me strike that.
18         When you quoted from the authors in this
19 paragraph, you put whatever you quoted from the report
20 in quotation marks, correct?
21         MR. KRISTAL:  Objection.  Form.
22 BY MR. DERRINGER:
23     Q.  Did you?
24     A.  I was not consistent with that, no.
25     Q.  You were not consistent with attributing

Page 212

1  material from someone else's report that you put into
2  your report?
3      A.  I referenced the report, but I was very sloppy
4  in terms of using quotes.
5      Q.  Okay.  Do you see in the same paragraph we're
6  talking about that you do quote directly from the
7  report and you put that quote in quotation marks and
8  italics, correct?
9      A.  Yes.
10     Q.  Okay.  And you -- your testimony here today is
11 that the caution on the interpretation of the numerical
12 risk estimates, because of the heterogeneity between
13 the studies, that that is a quote from the Zhang
14 report.  Is that right?
15     A.  That wording is in the report, yes.
16     Q.  Okay.  And your -- let me ask you this:  Is it
17 in the report, to your recollection, that
18 interpretation of numerical risk estimates refers to
19 the interpretation of dose and the -- dose and dose
20 response?
21     A.  Yeah, the dose response --
22     Q.  Is that in the report?  I'm sorry, that --
23     A.  The word response is not in the report.
24     Q.  By report, I mean, is that in the Zhang study?
25     A.  The word dose response, no.

Page 213

1      Q.  Okay.
2      A.  No, what they're referring to, they
3  specifically talk about the risk estimate.  The value
4  of the risk ratio.
5      Q.  Right.  And my question, and then we'll leave
6  this topic, is that whether you believe that what the
7  authors are referring to there is simply that one
8  should be cautious about the interpretation of risk
9  estimates based on their dose metrics in that report?
10     A.  That's correct.
11     Q.  Okay.  What data from the Agricultural Health
12 Study, that is, the 2019 Andreotti report, what data
13 did the Zhang authors use?
14         MR. KRISTAL:  Are you asking just about the
15 2018 Andreotti report?
16         MR. DERRINGER:  Correct.
17     A.  Well, on page 7, the reference is to the
18 recently published update.  Footnote 14 from the
19 Agricultural Health Study.  And that is referring to
20 the 2018 report by Andreotti, et al.
21 BY MR. DERRINGER:
22     Q.  Right.  In your report, sir, page 66, Zhang,
23 the meta-relative risk that you're relying on reported
24 in Zhang is 1.41 with a 95 percent confidence interval,
25 1.13 to 1.75; is that right?

54  (Pages 210 to 213)

William Sawyer, Ph.D.
July 16, 2019

Page 214

1    A.  That's right.
2    Q.  Okay.  And that is reported in the Zhang
3  manuscript at page 41, correct?  In the table at page
4  41.
5    A.  Yeah, it is.
6    Q.  Okay.  And in that table, that result on which
7  you're relying, 1.41, is reported in the very last
8  column, that is the furthest right-hand column in
9  table 4, correct?
10    A.  Yes.
11    Q.  And you see there's an entry for Andreotti, et
12  al., at the top?
13    A.  Yes.
14    Q.  That's the 2018 Agricultural Health Study
15  publication, correct?
16    A.  That's what I referred to, footnote 14 in the
17  Zhang study.
18    Q.  When I asked you what data is Zhang relying on
19  to come to the 1.41 risk ratio that you're relying on,
20  what I meant was what data from that Andreotti study
21  are they relying on?
22    A.  Well, they're using the most up-to-date 2018
23  data.
24    Q.  Right.  They're reporting and they're using a
25  risk ratio of 1.12 with a confidence interval of .83 to

Page 215

1  1.51, correct?
2        MR. KRISTAL:  Objection.
3    A.  I believe so.  They're using, as you would
4  call it, the most complete data set.
5  BY MR. DERRINGER:
6    Q.  Okay.  Now, go ahead and take a look at
7  Exhibit 21, which is the Andreotti study.  You can keep
8  that page open in Zhang so you've got the Andreotti
9  data that Zhang is relying on.
10    A.  Okay.  Which page?
11    Q.  Well, first, let me ask you, that Andreotti
12  data from the Agricultural Health Study that Zhang
13  relied on, that's not statistically significant,
14  correct?
15        MR. KRISTAL:  Objection.  Form.
16    A.  By itself?
17  BY MR. DERRINGER:
18    Q.  Yeah, by itself.
19    A.  No, but it is in the meta-analysis.
20    Q.  I understand -- I understand -- and if you go
21  to the Andreotti study, let's see if we can find where
22  that risk ratio that the Zhang authors used is
23  reported.  Why don't you go to page 515.
24    A.  What table?
25        MR. KRISTAL:  Yeah, ours doesn't have that

Page 216

1  pagination.
2  BY MR. DERRINGER:
3    Q.  Or page 6 of 8.  This is table 3.
4    A.  Okay.
5    Q.  Are you there?
6    A.  Yeah.
7    Q.  And did you find the data that -- the data
8  point that was used by the Zhang authors for their 1.12
9  risk ratio in Andreotti?
10        MR. KRISTAL:  Objection, form.
11    A.  That's not possible, as Andreotti breaks it up
12  in quartiles, and the data is not shown in that fashion
13  in the Zhang study.
14  BY MR. DERRINGER:
15    Q.  Is it your understanding that -- the data that
16  is shown in the Zhang study in table 4 for Andreotti,
17  1.12, is it your understanding that that is not broken
18  up or does not reflect any particular quartile of
19  classification?
20    A.  Yeah.  According to page 41 in Zhang, that's
21  true.
22    Q.  Did you make any -- well, first of all, where
23  on page 41 of Zhang does that say that the 1.12 risk
24  ratio that's reported from Andreotti is based on a
25  complete data set as opposed to just a quartile?  Where

Page 217

1  does it say that?
2    A.  (The document was examined.)
3        The information is not there to answer the
4  question.
5    Q.  Okay.  You can put Andreotti away, then.
6        But your understanding is that that data point,
7  1.12 risk ratio with a confidence interval of .83 to
8  1.51 that was used by the Zhang authors from the
9  Andreotti study to generate their 1.41 risk ratio --
10  meta-risk ratio, your understanding is that -- that
11  comes from the complete Andreotti data set, correct?
12    A.  That's what the study states on page 41.  It
13  says with AHS 2018, and it references the very study in
14  footnote 14.
15    Q.  Have you --
16        (Defendant's Exhibit-23 was marked for
17  identification.)
18  BY MR. DERRINGER:
19    Q.  Dr. Sawyer, I am marking or have marked as
20  Exhibit 23 a study by Pahwa titled, "Glyphosate Use and
21  Association with Non-Hodgkin's Lymphoma, Major
22  Histological Subtypes:  Findings from the North
23  American Pooled Project."
24        Have you seen this before?
25    A.  (The document was examined.)

William Sawyer, Ph.D.
July 16, 2019

Page 218

1      **No.**
2      Q.  Is this -- well, strike that.
3          Have you heard of this North American pooled
4      project before?
5      **A.  Yes.  I've heard the name.  That's about it.**
6      Q.  Do you have any sense or any knowledge of what
7      the difference is between a meta-analysis and a pooled
8      analysis?
9      **A.  My understanding from my training and**
10     **experience in epidemiology is pooled is including raw**
11     **data as opposed to analyzing existing statistical**
12     **analysis.**
13     Q.  Is that a question that you would defer to the
14     epidemiologist in this case?
15     **A.  I would prefer to, yes.**
16     Q.  And you will see that this is -- Pahwa 2019,
17     it is a pooled analysis like we mentioned, like the
18     title mentions, the North American pooled project.  And
19     if you turn to page 2 under, "Methods," they describe
20     the study population in exposure assessment and you'll
21     see that the NAPP, North American Pooled Project, this
22     is what's written in the study publication, involved
23     pooling data from case control studies of soft tissue,
24     sarcoma, lymphatic, and hematopoietic cancers in the
25     United States and Canada.

Page 219

1          Do you see that?
2      **A.  Yes.**
3          MR. KRISTAL:  I object to questioning on this.
4      It's 4:50.  Dr. Sawyer has said he hasn't read
5      this.  So if you're going --
6          MR. DERRINGER:  I know he hasn't seen it
7      before, so I know he hasn't relied on it.  This is
8      my --
9          MR. KRISTAL:  And if you want to ask questions
10     on it, it's only fair to let him read it for
11     exactly the reasons you just said.
12         MR. DERRINGER:  All right.  Thank you for the
13     speaking objection.
14         MR. KRISTAL:  It's not a speaking objection,
15     it's a direction that I'm going to direct the
16     witness not to answer questions on this unless he
17     has to chance to read it.
18         MR. DERRINGER:  That's an absolutely
19     inappropriate objection.
20     BY MR. DERRINGER:
21     Q.  Dr. Sawyer, can you look at footnote 9?
22         MR. KRISTAL:  I would suggest you read the
23     full manuscript before answering any questions.
24     **A.  I can't find what -- I can't find what year**
25     **this was published.  Nor does it say.**

Page 220

1      BY MR. DERRINGER:
2      Q.  Take a look at reference 9, the back of the --
3      **A.  Right, I see McDuffie.**
4      Q.  Yeah.  Is that the same 2001 McDuffie study on
5      which you're relying in this case?
6          MR. KRISTAL:  I certainly have no objection to
7      that.
8      **A.  It is.**
9      BY MR. DERRINGER:
10     Q.  Do you understand that this pooled analysis
11     includes that McDuffie 2001 study?
12     **A.  No, I'm still trying to figure out what year**
13     **this was written.**
14     Q.  Okay.  You can take a look actually at the
15     very back.  It says it was received for publication on
16     the 22nd of August 2018.
17         Do you see that?
18     **A.  I see that.**
19     Q.  Okay.
20     **A.  Okay.**
21         MR. KRISTAL:  That doesn't say when it was
22     published.
23         MR. DERRINGER:  I understand that.
24     BY MR. DERRINGER:
25     Q.  You can see it's been published, yes?

Page 221

1      **A.  Yes.**
2      Q.  Okay.  And so you believe -- I shouldn't ask
3      you that.  Let me strike that.
4          Is it reasonable and fair to say it was
5      published sometime after August 22nd of 2018?
6      **A.  Yes.**
7      Q.  Okay.  And since you haven't reviewed it and
8      you haven't relied on it and never seen it before, I
9      won't ask you questions about -- about this other than
10     to ask you that if this includes -- if this study
11     includes dose metric data?  Like the kind of data
12     you've been looking for, you've told us, is this
13     something that you would be interested in taking a look
14     at and considering in this case?
15     **A.  I think that requires a legal opinion, which**
16     **I -- I can't provide.  When I say a legal opinion, that**
17     **is, whether it would be admissible.  Since we're here**
18     **at deposition today and if I read this and supplement**
19     **my report, it might be -- it might be untimely, so I**
20     **can't answer that.**
21     Q.  You've never seen that before today, correct?
22     **A.  Correct.**
23     Q.  The Pahwa study, correct?
24     **A.  Right.**
25     Q.  Okay.  And you didn't rely on it for your

56 (Pages 218 to 221)

William Sawyer, Ph.D.
July 16, 2019

---

**Page 222**

1   opinions in this case, correct?
2       **A.   Right.**
3           **Are you asking me a new question now?**
4   Q.   No, it's my question.
5       **A.   The second -- the last question was whether I**
6   **would -- why don't you read it back?**
7   Q.   No.   My last question was you didn't rely on
8   the Pahwa 2019 study for your opinions in this case,
9   correct?
10      **A.   Correct, but there was another question that I**
11  **didn't finish answering.**
12  Q.   I don't believe so.
13      **A.   Yeah, I --**
14          MR. KRISTAL:   Why don't you read -- if I can
15      see the realtime, read the question back and let
16      him finish answering the question.   It had to do
17      with whether he would be interested in reading it.
18  BY MR. DERRINGER:   No, you gave an answer to that
19  question.   You said that you think it requires a legal
20  opinion.
21          MR. KRISTAL:   And he was in the middle of the
22      answer.
23          MR. DERRINGER:   No, he wasn't.
24      **A.   You cut me off, I think.**
25  BY MR. DERRINGER:

---

**Page 223**

1   Q.   No, you said you can't answer that.   Period.
2   That's what you said.
3       **A.   Okay.**
4   Q.   All right.   You said you don't want to go
5   beyond 5:00 p.m.   If we continue, I'd be going into a
6   different subject area, so this would be an appropriate
7   time to end for the day if you want to end at or before
8   5:00.   If you're willing to go beyond 5:00, we can
9   continue.
10          MR. KRISTAL:   Well, why don't we end?
11          MR. DERRINGER:   Okay.
12          THE VIDEOGRAPHER:   The time is 4:55.   Off
13      record.
14          (Witness excused.)
15          (The deposition was suspended at 4:55 p.m.)
16              - - -
17
18
19
20
21
22
23
24
25

---

**Page 224**

1                   CERTIFICATE
2
3
4   STATE OF FLORIDA)
    COUNTY OF DUVAL )
5
6           I, Sandra G. Pemberton, RPR, CRR, certify
    that I was authorized to and did stenographically
7   report the deposition of William Sawyer, Ph.D.; that a
    review of the transcript was requested; and that the
8   transcript is a true and complete record of my
    stenographic notes.
9
10          I further certify that I am not a
    relative, employee, attorney, or counsel of any of the
11  parties, nor am I a relative or employee of any of the
    parties' attorneys or counsel connected with the
12  action, nor am I financially interested in the action.
13
            DATED this 22nd day of July, 2019.
14
15
16          Sandra G. Pemberton, RPR, CRR, FPR
17
18
19
20
21
22
23
24
25

---

**Page 225**

1                   CERTIFICATE OF OATH
2
3
    STATE OF FLORIDA )
4   COUNTY OF DUVAL  )
5
6           I, the undersigned authority, certify that
7   William Sawyer, Ph.D. personally appeared before me and
    was duly sworn.
8
9           WITNESS my hand and official seal this
10  22nd day of July, 2019.
11
12          _____
            Sandra G. Pemberton
13          Notary Public - State of Florida
            My Commission No. GG169455
14          Expires:   January 13, 2022
15
16
17
18
19
20
21
22
23
24
25

---

57  (Pages 222 to 225)

William Sawyer, Ph.D.
July 16, 2019

Page 226

```
1           ERRATA SHEET
2   IN RE:  Winston v. Monsanto
3   PAGE   LINE   CHANGE          REASON
4   _____  _____  _____   _____
5   _____  _____  _____   _____
6   _____  _____  _____   _____
7   _____  _____  _____   _____
8   _____  _____  _____   _____
9   _____  _____  _____   _____
10  _____  _____  _____   _____
11  _____  _____  _____   _____
12  _____  _____  _____   _____
13  _____  _____  _____   _____
14  _____  _____  _____   _____
15  _____  _____  _____   _____
16  _____  _____  _____   _____
17  _____  _____  _____   _____
18  _____  _____  _____   _____
19  _____  _____  _____   _____
20  _____  _____  _____   _____
21  _____  _____  _____   _____
22          Under penalties of perjury, I declare that
    I have read the foregoing pages of my deposition and
23  that it is true and correct, subject to any changes in
    form or substance entered here.
24
    _____      _____
25  Date                 William Sawyer, Ph.D.
```

Page 227

```
1
2           COMES NOW THE WITNESS, WILLIAM SAWYER, PH D ,
3   and having read the foregoing transcript of the
4   deposition taken on the 16th day of July, 2019,
5   acknowledges by signature hereto that it is a true
6   and accurate transcript of the testimony given on
7   the date hereinabove mentioned
8
9
10
11          _____
12          William Sawyer, Ph D
13
14
15      Subscribed to before me this _____ day of
16  _____, 2019
17
18          _____
19          NOTARY PUBLIC
20
21  My Commission Expires: _____
22
23  Winston, et al , vs  Monsanto Company, et al
24  Reporter:  Sandra G  Pemberton, RPR, CRR, FPR
25  Date Taken:  July 16, 2019
```

58  (Pages 226 to 227)



Deposition of
# William Sawyer, Ph.D.

## Volume II

**Date:** July 17, 2019

**Case:** Walter Winston, et al. v. Monsanto Company

**No.** 1822-CC00515

**Court Reporter:**  Sandra G. Pemberton, RPR, CRR, FPR

Paszkiewicz Court Reporting
Phone:  618-307-9320
Toll-Free:  855-595-3577
Fax:  618-855-9513

Page 228

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI


WALTER WINSTON, et al.,

        Plaintiffs,

vs.
                                CASE NO.: 1822-CC00515

MONSANTO COMPANY,

        Defendant.

_____


                    Videotaped Deposition of

                    William Sawyer, Ph.D.

                    9:05 a.m. - 5:11 p.m.

                    Wednesday, July 17, 2019

            Sanibel Harbour Marriott Resort and Spa
                    Fort Myers, Florida
            Sandra G. Pemberton, RPR, CRR, FPR




                    VOLUME II (Pages 228-454)

William Sawyer, Ph.D.
July 17, 2019

Page 229

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs:
 Jerry Kristal, Esquire
 WEITZ & LUXENBERG
 220 Lake Drive East, Suite 210
 Cherry Hill, New Jersey 08002
 855 977 9411
 jkristal@weitzlux.com

On behalf of the Defendant:
 Steven E Derringer, Esquire
 BARTLIT BECK, LLP
 Courthouse Place
 54 West Hubbard Street
 Chicago, Illinois 60654
 312 494 4415
 steven.derringer@bartlit-beck.com

On behalf of the Defendant:
 Jennifer L Filippazzo, Esquire
 McDERMOTT WILL & EMERY
 340 Madison Avenue
 New York, New York 10173
 212 547 5551
 jfilippazzo@mwe.com

Also Present:
 Carl Sobeck, Videographer

Page 230

INDEX

EXAMINATIONS                           PAGE
DIRECT EXAMINATION BY MR DERRINGER          8
CONT'D DIRECT EXAMINATION BY MR DERRINGER  234

DESCRIPTION OF EXHIBITS

EXHIBIT      DESCRIPTION              PAGE
Defendant's Exhibit-1   Wozniak study      27
Defendant's Exhibit-2   Dr Sawyer's Report 44
Defendant's Exhibit-3   Changes Made to Dose 45
        Calculations
        Originally Submitted
        on July 9, 2019
Defendant's Exhibit-4   Changes Made to Dose 46
        Calculations
        Originally Submitted
        on July 11th of
        2019 Changes Made
        July 12th, 2019
Defendant's Exhibit-5   Notes concerning    47
        Deion Sanders
Defendant's Exhibit-6   Dr Sawyer's Report  48
Defendant's Exhibit-7   Definition of       51
        veracity
Defendant's Exhibit-8   Summary Roundup® Use 60
        Information for Dr

Page 231

Defendant's Exhibit-9   Materials Considered 63
        List - July 9, 2019
Defendant's Exhibit-10   Winston, et al.,    67
        Table 10 notes
Defendant's Exhibit-11   Report by Dr. Sawyer 95
Defendant's Exhibit-12   Plaintiffs'         99
        Interview Summary
        Sheets by Stephen
        Perry
Defendant's Exhibit-13   Printout of an Excel 102
        spreadsheet dated
        July 3rd, 2019
        bearing the initials
        SEP
Defendant's Exhibit-14   Monsanto Document   126
Defendant's Exhibit-15   UK POEM Calculations 133
        in Preparation of
        Meeting Spanish
        Competent
        Authorities
Defendant's Exhibit-16   An applicator       134
        Exposure Study
        Conducted in Spain
        Using Biomonitoring
Defendant's Exhibit-17   IARC monograph      150

Page 232

Defendant's Exhibit-18   McDuffie 2001 study  156
Defendant's Exhibit-19   Eriksson 2008 study  176
Defendant's Exhibit-20   Leon study           188
        meta-analysis
Defendant's Exhibit-21   Andreotti 2018 study 201
Defendant's Exhibit-22   Zhang 2019           205
        meta-analysis
Defendant's Exhibit-23   Glyphosate Use and   217
        Association with
        Non-Hodgkin's
        Lymphoma, Major
        Histological
        Subtypes: Findings
        from the North
        American Pooled
        Project.
Defendant's Exhibit-24   A Case-Control Study 242
        of Non-Hodgkin
        Lymphoma and Exposure
        to Pesticides
Defendant's Exhibit 25   Glyphosate Induces   273
        Benign Monoclonal
        Gammopathy and

2 (Pages 229 to 232)

William Sawyer, Ph.D.
July 17, 2019

---

Page 233

```
 1   Defendant's Exhibit-26   Glyphosate Induces    316
 2                            Benign Monoclonal
 3                            Gammopathy and
 4                            Promotes Multiple
 5                            Myeloma Progression
 6                            in Mice
 7
 8   Defendant's Exhibit-27   Web Page from the     317
 9                            American Cancer
10                            Society Titled,
11                            "Types of B-cell
12                            Lymphoma."
13   Defendant's Exhibit-28   Mr. Stephen           357
14                            Gatewood's Interview
15                            Summary Sheet.
16   Defendant's Exhibit-29   Mrs. Vicki Gatewood's 423
17                            Interview Summary
18                            Sheet
19   Defendant's Exhibit-30   Miscellaneous         449
20                            Document from Dr.
21                            Sawyer's File
22
23   (Original exhibits were returned to the witness and
24   copies of the exhibits have been attached to the
25   original transcript.)
```

---

Page 234

```
 1          THE VIDEOGRAPHER:  We are now on the video
 2   record.  This is the continued deposition of
 3   William Sawyer, Ph.D. the date is July 17th, 2019.
 4   The time is now 9:05 a.m.
 5          DIRECT EXAMINATION (continued)
 6   BY MR. DERRINGER:
 7       Q.  Good morning, Dr. Sawyer.
 8       A.  Good morning.
 9       Q.  Do you understand you're still under oath?
10       A.  Yes.
11       Q.  In the past when I've taken your deposition,
12   you've said that you were deferring to the
13   epidemiologist on the epidemiology in this case.  Is
14   that true here, as well?
15          MR. KRISTAL:  Object to the form.
16       A.  Your question is very general.  You'll have to
17   break that up to be able to answer it.
18   BY MR. DERRINGER:
19       Q.  Sure.  Back at the deposition that I took of
20   you in December of 2018 relating to Mrs. Stevick, you
21   testified that you were not the one who was evaluating
22   the strength of the associations, the statistical
23   significance, and all of the potential confounders and
24   so on in the epidemiology studies, you testified that
25   that is deferred.
```

---

Page 235

```
 1          MR. KRISTAL:  Object to the form.  If you're
 2   citing or quoting from a dep, I'd like to see.
 3          MR. DERRINGER:  Absolutely.
 4   BY MR. DERRINGER:
 5       Q.  I'm referring to your deposition in December,
 6   page 241, lines 11 to 23.  I'll put it in front of you.
 7       A.  Okay.  Line what?
 8       Q.  Take a look at -- look at whatever you want,
 9   but take a look at page 241.  I'm referring to lines 11
10   to 23 of your MDL deposition.
11       A.  (The document was examined.)
12          Well, the answer is --
13          MR. KRISTAL:  May I see a copy?
14          THE WITNESS:  (Indicating).
15          MR. DERRINGER:  Dr. Sawyer shares his copy
16   with you, Mr. Kristal.
17   BY MR. DERRINGER:
18       Q.  Dr. Sawyer, go ahead.  Did you read what you
19   testified to under oath before?
20       A.  I'll wait until I have it back.
21       Q.  Okay.
22       A.  (The document was examined.)
23       Q.  Did you testify in December of 2018 that
24   you're not the one who is evaluating the strength of
25   the associations, the statistical significance, and all
```

---

Page 236

```
 1   of the potential confounders and so on in those
 2   studies, that is deferred?
 3          MR. KRISTAL:  Objection.
 4   BY MR. DERRINGER:
 5       Q.  That was your testimony under oath in December
 6   of 2018, correct?
 7       A.  In Stevick.
 8       Q.  Yeah, in Stevick.
 9       A.  That was at the time of Stevick, yes.
10       Q.  I'm asking today, in this case, are you
11   deferring to the epidemiologist in evaluating the
12   strength of the associations, the statistical
13   significance, and all of the potential confounders and
14   so on in the epidemiology studies that you cite to in
15   your report in this case?
16          MR. KRISTAL:  Object to the form.
17       A.  The answer is yes and no.
18   BY MR. DERRINGER:
19       Q.  Okay.  Tell me why you are answering that
20   question no.
21       A.  As I said on line 9 of page 241.
22          "ANSWER:  Yes.  But only with respect to the
23   dose being in range of those studies."
24          That is the primary use of the studies, but,
25   secondarily, I am assessing as a toxicologist potential
```

---

3  (Pages 233 to 236)

William Sawyer, Ph.D.
July 17, 2019

Page 237

1  confounding factors. And to do that, that does
2  necessitate the use of epidemiology studies.
3  Toxicologists rely on epidemiological studies in
4  determining whether a chemical causes a certain
5  endpoint. So I cannot disregard epidemiological
6  studies in total, as I do rely on them with respect to
7  potential confounders such as cigarette smoke or, as I
8  spoke of yesterday, potentially Mecoprop, or other
9  chemicals.
10     Q. Which are the epidemiology studies on
11  glyphosate for glyphosate-based herbicides on which you
12  are relying to evaluate confounding factors?
13        MR. KRISTAL: Object to form.
14     A. Specific to glyphosate --
15  BY MR. DERRINGER:
16     Q. Glyphosate or glyphosate-based herbicides,
17  correct.
18     A. Yes. I am deferring the epidemiological
19  studies to the epidemiologist.
20     Q. Okay. Then -- then, I'll refine my question.
21        Are you referring to the epidemiologist all of
22  the epidemiology in the epidemiology studies that you
23  rely on relating to glyphosate and glyphosate-based
24  herbicides?
25        MR. KRISTAL: Objection to form.

Page 238

1     A. In part. What I am relying on is, as per I
2  said in line 9, yes, but only with respect to dose
3  being in range of those studies.
4  BY MR. DERRINGER:
5     Q. Okay. And just so that we're clear about what
6  that answer was in response to, you said yes, but only
7  with respect to the dose being in the range of those
8  studies. That was to my question that asked you
9  whether your opinion was based on the epidemiology
10  studies that you identified at pages 26 through 29 of
11  your Stevick report and the bullet point at page 120 of
12  your Stevick report. And you said, yes, you relied on
13  those studies or your report is -- your opinion is
14  based on those studies, but only with respect to the
15  dose being in the range of those studies. Is that
16  right?
17        MR. KRISTAL: Object to form.
18     A. Almost. In this case, I have --
19  BY MR. DERRINGER:
20     Q. I'm sorry to interrupt. "This case" being the
21  Winston case?
22     A. Right.
23     Q. Okay.
24     A. In the Winston case, I have -- as per page 69,
25  I have five human epidemiological studies I'm relying

Page 239

1  on in comparison. Actually, I have six. I have one
2  more by Hardell with respect to the clarification
3  yesterday that, in Sweden, a working day is eight
4  hours, not five minutes, and I can -- if you wish, I
5  could take the time to point you to that, but I'm
6  relying on six human epidemiological studies with
7  respect to the dose comparison. And -- so that -- that
8  is a difference between the Stevick matter. I think
9  there, there were less than that number.
10     Q. Okay. In Stevick, there were three that you
11  were relying on.
12     A. I think that's true.
13     Q. And so now you're amending your report to say
14  that the epidemiology studies that you're relying on --
15  and as I understand it, you're relying on it to compare
16  dose in those studies in terms of exposure days to the
17  exposure days of the plaintiffs in this case. Is that
18  what you mean by you're relying on those studies?
19        MR. KRISTAL: Object to the form.
20     A. Yeah, that there are thresholds in that study,
21  for example, ten days or greater as a threshold, which
22  everyone in this case meets. Even using an eight-hour
23  working day, which reduces my result by 33 percent,
24  everyone is still over ten hours.
25     Q. And you're relying -- so that's how you -- and

Page 240

1  the studies you're now relying on are six epidemiology
2  studies. Am I right, those are listed on your table XX
3  on page -- in Exhibit 2, the report that was served, it
4  was page 68. Is that now at page 67 of Exhibit 6?
5     A. Page 67.
6        (The document was examined.)
7        Page -- actually, it's page 68; however, there
8  is one additional study from Hardell and Eriksson 1999
9  that I'm using with respect to working day being
10  defined in Sweden as -- I did a little research on
11  this, too. In Sweden, the working day is eight hours.
12  Actually, more recently, they're switching to a
13  six-hour working day, but...
14     Q. What research did you do on that?
15     A. First, I reviewed the 2008 study from
16  yesterday.
17     Q. The Eriksson study?
18     A. Right. And discovered on page 1658, "As in
19  our previous lymphoma studies, we used a minimum
20  criteria of one full day exposure to the categories
21  exposed," and then I have two footnotes. And that
22  footnote goes back to the Hardell/Eriksson study from
23  1999 which they again talk about working days.
24        Working days also is a --
25     Q. Is that all of the research that you did that

4  (Pages 237 to 240)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William Sawyer, Ph.D.
July 17, 2019

Page 241

1  you just mentioned, you went back to the Hardell study?
2     **A. Yes, and then just briefly reviewed some**
3  **information on U.S. Department of Labor and Sweden in**
4  **terms of definition of what a working day is.**
5     Q. What information did you review exactly?
6     **A. I didn't bring that.**
7     Q. No, but you --
8     **A. I didn't print it or anything.**
9     Q. Was this last night?
10    **A. In part, last night, and a little bit this**
11 **morning.**
12    Q. Okay. So tell me what you remember about the
13 information that you're now relying on.
14    **A. Well, that in Sweden, at the time of the 2008**
15 **study, the working day was defined as eight hours.**
16    Q. What's your source for that?
17    **A. I don't remember the exact source.**
18    Q. Okay.
19    **A. I can look it up during a break or something.**
20    Q. What else are you relying on?
21    **A. The five other studies --**
22    Q. No, no, stop. I'm asking what else are you
23 relying on for your statement now that, in Sweden, a
24 working day is defined as eight hours? You mentioned
25 the Hardell study and you've mentioned that you saw

Page 242

1  something either last night or this morning, but you
2  didn't print it out, you didn't bring it with you, and
3  I can't recall what it was.
4     **A. Yes.**
5     Q. Okay. Anything else?
6     **A. No.**
7     Q. Can I have the Hardell study that you brought
8  with you today?
9     **A. Sure.**
10       **(The document was handed.)**
11    Q. Thank you. I'm going to mark that as Exhibit
12 24 to the deposition.
13       (Defendant's Exhibit-24 was marked for
14 identification.)
15 BY MR. DERRINGER:
16    Q. That is a study by Hardell and Eriksson, "A
17 Case-Control Study of Non-Hodgkin Lymphoma and Exposure
18 to Pesticides," from 1999. All right. So now if we
19 talk the about the studies -- the epidemiology studies
20 you're relying on for your exposure or exposure days
21 opinion in this case, those are six studies now; is
22 that right?
23    **A. Yes.**
24    Q. Okay. And those are the six studies -- the
25 five studies listed in table XX at page -- in Exhibit

Page 243

1  2, it's 68. I don't know what it is in the copy of
2  your report.
3     **A. It's 68.**
4     Q. Okay. So it's those five studies plus the
5  Hardell study, correct?
6     **A. Yes.**
7     Q. Okay. And back to where I was starting this
8  morning, other than the exposure day threshold that is
9  expressed as a -- as a number in each of those six
10 cases, are you deferring all of the remaining
11 epidemiology as reflected in those studies to the
12 epidemiologists?
13    MR. KRISTAL: Object to form.
14    **A. No, I also addressed latency period in my**
15 **report, which requires information from the**
16 **epidemiologic studies I referenced.**
17 BY MR. DERRINGER:
18    Q. Which ones?
19    **A. They're in the report.**
20    Q. No, which studies are you relying on in
21 addressing latency period? I'm talking about the
22 epidemiology studies.
23    **A. Yeah, I have a table. I'll give it to you in**
24 **a moment.**
25    Q. Table 29?

Page 244

1     **A. Yes. My page 184.**
2     Q. Okay. And so what are the epidemiology
3  studies you're relying on in that table?
4     **A. Those that are listed in the table.**
5     Q. Fontana -- well, DeRoos 2005?
6     **A. Yes.**
7     Q. Portier 2016?
8     **A. Yes.**
9     Q. You believe that's an epidemiology study?
10    **A. I don't recall.**
11    Q. Did you read it?
12    **A. Yes.**
13    Q. Your testimony under oath today is you've read
14 Portier 2016.
15    **A. No.**
16    Q. Did you read Portier 2016?
17    **A. No. I don't recall.**
18    Q. Tell me what you know about Fontana 1998.
19 That's also listed on table 29.
20    **A. Let me think for a minute. It may be what I'm**
21 **referencing are references with DeRoos. That's**
22 **possible. I don't recall.**
23    Q. Well, tell me what you know about Fontana
24 1998, which is a study that you wrote down in table 29?
25    MR. KRISTAL: Objection.

5  (Pages 241 to 244)

William Sawyer, Ph.D.
July 17, 2019

## Page 245

1    A.  I don't recall.
2    BY MR. DERRINGER:
3    Q.  Can you tell me anything about Fontana in
4    1998?
5    A.  No.
6    Q.  Tell me what you know about Kato 2005.
7    A.  I don't recall.
8    Q.  Can you tell me anything about Kato 2005?
9    A.  I'm going to consult my reference list.
10    (The document was examined.)
11    Q.  Dr. Sawyer, is Kato 2005 on your materials
12    considered list?
13    A.  No.
14    Q.  Is Fontana 1998 on your materials considered
15    list?
16    A.  No.
17    Q.  Is Weisenburger 1992 on your materials
18    considered list?
19    A.  No.
20    Q.  Is -- is Portier 2016 on your materials
21    considered list?
22    A.  No.
23    Q.  Okay.  Is Bennett 1991 on your materials
24    considered list?
25    A.  No.

## Page 246

1    Q.  Is Nadler and Zurbenko 2013 on your materials
2    considered list?
3    A.  (The document was examined.)
4    I can't find the correct spelling on table 29.
5    Where are you reading that from?
6    MR. KRISTAL:  In the quote.
7    BY MR. DERRINGER:
8    Q.  Very bottom.
9    MR. KRISTAL:  Not the footnote there.
10    MR. DERRINGER:  I'll direct him.  Thanks,
11    Jerry.
12    BY MR. DERRINGER:
13    Q.  Table 29, bottom row, very last two lines of
14    the second column.
15    A.  (The document was examined.)
16    Q.  Do you see Nadler and Zurbenko?
17    A.  Yeah, I think what's going on here, the way I
18    set this table up, the studies that you're naming that
19    are not in my materials considered list are within the
20    document on the left-hand column.  For example, Kato or
21    Weisenburger are in the USDA Glyphosate Issue Paper.
22    The study that you're referring to, that's in the 9/11
23    monitoring and treatment, World Trade Center Health
24    Program document.  I believe those are within those
25    documents.

## Page 247

1    Q.  Yeah.
2    MR. DERRINGER:  I am going to again object to
3    the coaching of the objection.
4    MR. KRISTAL:  It's not coaching.  There were
5    quotation marks.
6    MR. DERRINGER:  I understand.  It's not
7    your -- you're not answering questions in this
8    deposition, Jerry.
9    MR. KRISTAL:  I understand that.  There were
10    quotation marks in the report.
11    MR. DERRINGER:  It's Dr. Sawyer's report.  If
12    he wants to note that, he's free to do so.
13    BY MR. DERRINGER:
14    Q.  Dr. Sawyer, is Nadler and Zurbenko on your
15    materials considered list?
16    A.  No.  However, it's -- it's within a study that
17    is on my list.
18    Q.  Okay.
19    A.  It's considered -- these are studies within a
20    study, within a major study.
21    Q.  And so the study source on the left-hand
22    side -- there's two of them that you've listed on table
23    29, correct?
24    A.  Yes.
25    Q.  Okay.  And when you say you're relying on the

## Page 248

1    epidemiology for latency period, the only epidemiology
2    that you're relying on for latency period are any of
3    the studies that are quoted in the two sources that you
4    list on table 29; is that right?
5    A.  Yes.  They're summarized within those
6    documents.
7    Q.  Understood.  And of those, which epidemiology
8    studies have you even read?
9    A.  I think DeRoos 2005, but let me just check
10    that.  Yeah, DeRoos is item 38.  I referenced DeRoos,
11    and I read it.
12    Q.  What was the latency period that was studied
13    in DeRoos 2005?
14    A.  (The document was examined.)
15    I believe a median of seven years.
16    Q.  That's what's written here that you quoted
17    from the USEPA Glyphosate Issue Paper.  Can you tell me
18    the actual what the latency period that was studied in
19    DeRoos 2005 was?
20    A.  I don't know, I don't have the study with me.
21    If you have the study, I'll be happy to look at it.
22    Q.  You're the one that's relying on it, sir.
23    MR. KRISTAL:  It's not a memory test.
24    A.  There's 400 studies here, sir, I can't
25    remember all of them.  That's ridiculous.

6 (Pages 245 to 248)

William Sawyer, Ph.D.
July 17, 2019

Page 249

1 BY MR. DERRINGER:
2    Q.  That's clear.  That's clear.
3    A.  It constitutes about 5,000-plus pages of
4 material.
5    Q.  Okay.  Other than the -- well, what is it in
6 the six studies, epidemiology studies that you've
7 listed -- strike that.
8        You've listed five studies at table XX, five
9 epidemiology studies at table XX of your report on page
10 68, and you've also added Hardell 1999 to that list.
11        What is it about those studies that you're
12 deferring to the epidemiologist in this case?
13        You're looking at a table from Zhang right now?
14    A.  I am.
15    Q.  I'm asking you about table XX in your report,
16 page 68.
17    A.  Well, I'm looking at this and thinking.  I
18 know you prefer I don't think, but sometimes I have to.
19    Q.  No, sir, I prefer that you do think.
20    A.  Now, you've asked me a fairly complex
21 question.
22    Q.  Well, in the past, you've been able to answer
23 that question with -- without straining about it.  I
24 just wanted to know -- let me ask you, are you going to
25 be evaluating -- for any of the six epidemiology

Page 250

1 studies that are on your table XX at page 68 of your
2 report, are you going to be the one who is evaluating
3 the strength of the associations, the statistical
4 significance, and all of the potential cofounders --
5 I'm sorry, confounders in those six studies?
6        MR. KRISTAL:  Objection to form.
7    A.  The question is multiple.  I could answer it
8 piece by piece.
9 BY MR. DERRINGER:
10    Q.  Are you --
11    A.  For example, yesterday, you asked me questions
12 regarding the weight of evidence of the studies.  You
13 asked me questions, for example, why wasn't the 1.12
14 risk ratio that was in Andreotti used fully in Zhang,
15 and the answer is, yes, it was, page 38, table 1.  You
16 asked me lots of little intricate pieces of information
17 that involve overall weight of evidence of a study in
18 determining whether glyphosate is a carcinogen.  That
19 is not my role in this case.
20        I deferred the overall determination of weight
21 of evidence of the epidemiological studies to the
22 epidemiologist; however, there are epidemiological
23 studies which I rely on as a toxicologist with respect
24 to threshold dose where, statistically -- statistically
25 significant occurrences occur and I'm relying on -- on

Page 251

1 the studies I've referenced, the six studies, with
2 respect to that, and also the determination of what
3 constitutes the dose in those studies.  And I'm also
4 using the various epidemiological studies in my role as
5 a toxicologist in determination of other chemicals and
6 whether or not they are potential or actual confounding
7 factors in this matter.
8    Q.  Are you the one who will be evaluating the
9 strength of the associations in the six epidemiology
10 studies that you've listed on page 68 of your report or
11 are you deferring that to the epidemiologist?
12    A.  I want to make sure we get this right.  I'm
13 not completely clear of the question.
14    Q.  A few months ago, you testified that you were
15 not the one who would be evaluating the strength of the
16 associations in the three studies; Eriksson, McDuffie,
17 and Andreotti that you relied on in the Stevick case.
18 You said under oath that's correct.  I'm asking you
19 the same question in this case.
20        MR. KRISTAL:  Object to form.
21 BY MR. DERRINGER:
22    Q.  Are you the one who will be evaluating the
23 strength of the associations in the six studies that
24 you list on table XX on page 68 of your report, or is
25 that issued deferred to the epidemiologist?

Page 252

1        MR. KRISTAL:  Object to the form.
2    A.  That's a twofold question.
3 BY MR. DERRINGER:
4    Q.  Are you the one who will be evaluating the
5 strength of the associations in the six epidemiology
6 studies that are listed at table XX of page 68 of your
7 report in this case?  And by six, I mean the five plus
8 Hardell that you added today.
9    A.  I will be assessing the strength of the
10 association with respect to dose response; that is,
11 what statistically significant risk ratio -- odds ratio
12 occurs at a given dose.  And, of course, I will -- it
13 makes a difference whether the number is 2.1 or 1.2 or
14 8.5.  I mean, of course, I look at the strength of the
15 association, that is, the significance.  However, I'm
16 not the one who is evaluating the body of literature
17 and weighing each study for its merits and determining
18 whether or not glyphosate is a carcinogen.  That is, in
19 itself, an enormous task and that, I am deferring to
20 the epidemiologist.
21    Q.  Between December 2018 and now, what
22 epidemiology training have you had?
23    A.  The same as before.  For whatever the years
24 are in my CV, I taught a section of the epidem --
25 epidemiology course at the medical school in Syracuse,

7  (Pages 249 to 252)

William Sawyer, Ph.D.
July 17, 2019

Page 253

1   New York. I've had biostatistics and epidemiology
2   training as part of my Ph.D. program. And I've used
3   epidemiologic studies now for 31 years.
4       Q. Okay. I'm asking a different question.
5       Between December 2018 and today, what
6   epidemiology training have you had?
7       MR. KRISTAL: Asked and answered.
8       A. I started -- I started off -- my answer was --
9   I believe if we read it back, it says the same as
10  before, and I quoted what that information is.
11  BY MR. DERRINGER:
12      Q. Okay. Let me try to be more clear.
13      What new epidemiology training have you had
14  between December 2018 and today?
15      MR. KRISTAL: Asked and answered.
16      MR. DERRINGER: Not answered.
17      MR. KRISTAL: That's what makes a horse race.
18      A. No other beyond my 31 years of experience, my
19  biostatistic and epidemiology course training at
20  Indiana University School of Medicine, and my master's
21  program, biostatistics, and my experience teaching a
22  portion of the epidemiological -- epidemiology course
23  for the second-year medical students at Upstate Medical
24  Center.
25      Q. When did you teach that course last?

Page 254

1       A. I gave up my appointment when I moved to
2   Florida, so that would have been -- I'd have to look at
3   my CV.
4   BY MR. DERRINGER:
5       Q. When did you move to Florida?
6       A. Well, I don't think it coincides exactly. I'd
7   have to look at my CV.
8       Q. Can you tell me, as you sit here today, the
9   last time that you taught the class you just referred
10  to?
11      A. Without seeing my CV, no. I'm not going to
12  guess at it.
13      Q. Was it before 2010?
14      A. Possibly.
15      Q. You just don't know for sure?
16      A. Are you asking me to guess?
17      Q. No, I'm asking what you know.
18      A. I said I need my CV to review that.
19      Q. Okay. What new courses -- well, strike that.
20      What courses in epidemiology have you taken
21  since December of 2010?
22      A. No further courses beyond my training at
23  Indiana University School of Medicine in biostatistics,
24  epidemiology, and my master's biostatistics course and
25  teaching for nearly 15 or 20 years a course to medical

Page 255

1   students in epidemiology. Nothing further than that.
2       Q. What new seminars have you taken in
3   epidemiology since December 2018?
4       A. No seminars.
5       Q. Can you tell the jury what level of increased
6   risk in an epidemiology study is high enough to be a
7   significant contributing factor to a disease?
8       MR. KRISTAL: Objection to the form.
9       A. Yes.
10  BY MR. DERRINGER:
11      Q. What is it?
12      A. It depends on the population. In general,
13  USEPA historically for large populations that include
14  millions of people use a default value of one times ten
15  to minus six, one per million.
16      Now, if the risk has potential benefit to a
17  population, like chlorine in water, the EPA uses a one
18  in 10,000 value as an acceptable risk because there is
19  an, indeed, benefit from that use of chlorine in the
20  water. So it depends on the situation. If it's from a
21  pollutant that is illegally discharged impacting a
22  population, the risk level is usually -- the acceptable
23  risk level is tighter than one times ten to minus four.
24      Q. In this case, you've been relying on relative
25  risk ratios or hazard ratios, correct, for the

Page 256

1   epidemiology -- for your epidemiology opinion?
2       A. Or odds ratios, yes.
3       Q. Okay. What is the odds ratio threshold
4   reflecting an increased risk that's high enough for you
5   to consider something to be a significant contributing
6   factor to a disease?
7       A. Well, it depends on the population, but I'll
8   give you an example. 1 -- odds ratio of 1.1 that is
9   statistically significant, it would be a tremendous
10  public health threat if 10 percent of the U.S.
11  population used the product. Let's say it's a product
12  that kills weeds and 10 percent of the population uses
13  it, which is, what, 30 million people. Then, 1.1 odds
14  ratio is an enormous number of cancer deaths, and that
15  would be of concern.
16      If it's something that only an individual -- a
17  single person is being exposed to, then, if no one else
18  in the world was exposed to it except one person, then
19  that 1.1 may not be sufficient to be a concern.
20      Q. Have you, sir, made a determination of what
21  the threshold point estimate is above which you would
22  consider the risk of non-Hodgkin's lymphoma from
23  exposure to glyphosate-based herbicides to be high
24  enough to be considered a significant contributing
25  factor?

8  (Pages 253 to 256)

William Sawyer, Ph.D.
July 17, 2019

Page 257

1    MR. KRISTAL: Objection.
2    A.  I -- I don't know how many individuals in the
3  U.S. or worldwide are exposed as home and garden or
4  professional applicators.  If I had that number, I
5  could make some rough calculations, but I don't know.
6  I know it's -- it's a big number, so I -- I just don't
7  have enough information to precisely calculate
8  anything.
9    Q.  Can you -- can you tell me whether you
10  determined -- for purposes of your analysis in this
11  case, whether you've determined a point estimate in the
12  epidemiology studies that, in your opinion, is the
13  point estimate threshold above which you would consider
14  glyphosate-based herbicides to be a significant
15  contributing factor to non-Hodgkin's lymphoma?
16    MR. KRISTAL: Objection.
17  BY MR. DERRINGER:
18    Q.  Have you made that determination?
19    A.  Well, again, the general methodology accepted
20  in the United States is based on relative risk, as I
21  said a few moments ago, and there is no magic threshold
22  of, you know, 1.5 or 1.63, or whatever.  There is no
23  such generally accepted magic threshold, rather, it's
24  based on population size, number of people affected.
25  And that is the general methodology which is followed.

Page 258

1    And so are you asking me to make up some kind
2  of novel methodology and give you a number?
3    Q.  No, I'm asking you if you've made a
4  determination of what the point estimate threshold is
5  above which you would consider glyphosate-based
6  herbicides to be a significant contributing factor to
7  non-Hodgkin's lymphoma.
8    MR. KRISTAL: Objection.
9    A.  That would require me to produce a novel
10  opinion that would be struck.  I'm not going to do
11  that.
12  BY MR. DERRINGER:
13    Q.  Okay.  So you haven't.
14    A.  It's risk based.  And if you -- you know, if I
15  knew the number of people exposed to Roundup® in the
16  U.S., I could give you a fairly precise number.  In
17  fact, I would base it on a one times ten to the minus
18  four to the ten to the minus six risk level range and
19  give you that value.
20    Q.  Have you done that in this case?
21    MR. KRISTAL: Objection.
22    A.  No, this case is not evaluating everyone in
23  the U.S., it's evaluating 14 individuals with NHL.
24  BY MR. DERRINGER:
25    Q.  Okay.  You're not a cancer biologist, are you?

Page 259

1    A.  I have a BS and a master's in molecular
2  biology.  I guess I am a biologist, by definition.
3    Q.  Okay.
4    A.  I don't know about the cancer part, but I am a
5  biologist and I'm a toxicologist.
6    Q.  You've testified before that DNA damage
7  happens to all of us every day through natural
8  processes; is that right?
9    MR. KRISTAL: Objection.
10    A.  Of course, it does.
11    Q.  Yeah.  That includes DNA strand-breaks like
12  single strand-breaks and double strand-breaks?
13    MR. KRISTAL: Same objection.
14    A.  Yes.  And, hopefully, we -- our repair
15  mechanisms are not impaired by glyphosate so we can get
16  on with life.
17  BY MR. DERRINGER:
18    Q.  Do you know anything about how DNA damage
19  progresses to cause cancer?
20    A.  There are numerous theories, yes.
21    Q.  Okay.  Well, let me -- let me just see if --
22  well, let me ask this:  Let's start with a normal cell,
23  one that's not damaged, okay?
24    A.  All right.
25    Q.  Okay.  And let's say something happened to

Page 260

1  that cell that causes an error in the DNA of that cell.
2  I believe you said it happens naturally, but -- forget
3  about how it's happening.  Let's just say something
4  happens to cause an error in the DNA.  Is that -- are
5  you with me so far?
6    A.  Yes.
7    Q.  Okay.  That's called genotoxicity, right?
8    A.  Correct.
9    Q.  And when we talk about whether DNA damage can
10  lead to cancer, you have to take into account whether
11  the DNA error that happens is important, right?
12    A.  Yes.
13    Q.  And that would include considering what part
14  of the DNA -- the DNA is damaged.
15    A.  Yeah, the terminal ends or strand-breaks,
16  yeah.
17    Q.  What's the difference, if you know, between
18  the coding parts of the DNA and noncoding parts of the
19  DNA?
20    A.  Well, that there is tremendous redundancy and
21  that's part of a protective mechanism.
22    Q.  I'm not sure I understood the answer.
23    Is that the difference between coding parts and
24  noncoding parts, that there's -- there's redundancy in
25  what?

9 (Pages 257 to 260)

William Sawyer, Ph.D.
July 17, 2019

Page 261

1     **A.  The coding sequences are redundant in many**
2 **portions of the DNA.**
3     Q.  Okay.  But what's the difference between the
4 coding part of the DNA and the noncoding part?  If you
5 know.
6     **A.  Well, the coding is critical in terms of**
7 **ultimate RNA protein synthesis processes, where the**
8 **noncoding part is not used for that purpose.**
9     Q.  And if damage to the DNA or an error in the
10 DNA is to a noncoding part of the DNA, that's not going
11 to lead to cancer, will it?
12     **A.  That insult itself, no, but if there are other**
13 **aspects going on beyond that, certainly, even just**
14 **oxidative stress.**
15     Q.  Okay.  I mean, I -- we're just focused right
16 now on DNA damage as a mechanism.  I understand
17 there -- that you believe there are other mechanisms,
18 as well, oxidative stress being perhaps one of them.
19 I'm putting that to the side.
20     **A.  Okay.**
21     Q.  So if we just talk about DNA damage and the
22 mechanism, do you agree that the damage or the error to
23 the DNA -- it has to happen to a part of the DNA
24 responsible for coding of some kind, is that right, in
25 order for it to ultimately progress down the path to

Page 262

1 cancer.
2     **A.  Again, the hypothetical you're giving me, if**
3 **that's the only insult, yes.**
4     Q.  Okay.  And so let's then assume that the
5 damage or the error affected a part of the DNA that
6 actually is an important part like the coding part,
7 okay?
8     **A.  Yes.**
9     Q.  Okay.  The damage or the error of that DNA, it
10 can be so severe that the cell dies, right?
11     **A.  It can.**
12     Q.  Is that called cytotoxicity?
13     **A.  Yes.**
14     Q.  And if a cell dies, it can't reproduce, can
15 it?
16     **A.  Correct.**
17     Q.  It's effectively removed from a person's pool
18 of cells, right?
19     **A.  Yes.**
20     Q.  And if it dies, the cell dies, then the damage
21 that caused the cell death can lead to cancer, right?
22     **A.  No.**
23     Q.  Not correct?
24     **A.  No, no, it can't.**
25     Q.  It can if the cell --

Page 263

1     **A.  No, no, can't.**
2     Q.  Can't.  So if the cell dies, then the damage
3 that caused the cell death cannot lead to cancer; is
4 that correct?
5     MR. KRISTAL:  Objection to the form.
6     **A.  It will increase oxidative stress.  So, I**
7 **mean, secondarily, it can.**
8     Q.  Okay.
9     **A.  In other words, the process -- the process**
10 **you're referring to cannot lead to cancer, but**
11 **sufficient cellular death from any source can -- can**
12 **increase oxidative stress, so if you were doing that**
13 **continually throughout a lifetime, it might possibly**
14 **lead to cancer, but the process you're referring to**
15 **strictly itself can't.**
16     Q.  And I understand you've got your opinions
17 about oxidative stress and there are studies that have
18 looked specifically at whether glyphosate causes
19 oxidative stress, right?
20     **A.  Yes.**
21     Q.  Okay.  But I'm again focused on this DNA error
22 or DNA damage pathway.
23     So if the damage to the DNA causes cell death,
24 that damage is not going to lead to cancer, correct?
25     MR. KRISTAL:  Objection to form.

Page 264

1     **A.  As I already answered, not unless it is**
2 **chronic and opens up its particular organ to a high**
3 **level of oxidative stress.**
4     Q.  Okay.  So, then, let's keep going down the
5 pathway and assume that the error is to an important
6 part of the DNA, like a coding part, but it's not so
7 severe that it caused the cell to die, okay?
8     **A.  Okay.**
9     Q.  Okay.  So you've already said, I think, that
10 the human body has repair mechanisms to repair errors
11 in our DNA or damage to our DNA; is that right?
12     **A.  Yes.**
13     Q.  And if the DNA is repaired by the body, then
14 that's not going to lead to any further consequences,
15 will it?
16     MR. KRISTAL:  For that particular cell?
17     MR. DERRINGER:  Yeah.
18     **A.  Can you ask that question again?**
19 BY MR. DERRINGER:
20     Q.  Sure.  If the DNA is repaired, if the -- if
21 the damage to the DNA or the error in the DNA is
22 repaired by the body, then that damage or error is not
23 going to lead to cancer.  Is that right?
24     MR. KRISTAL:  Object to form.
25     **A.  As long as apoptosis is not affected.  In**

10 (Pages 261 to 264)

William Sawyer, Ph.D.
July 17, 2019

Page 265

1  other words, if that process of continual damage and
2  repair upregulates apoptosis, that is the control
3  mechanism that prevents cells from keep dividing, so as
4  long as that upregulation doesn't occur -- so, really,
5  it's a matter of -- if this happens frequently enough,
6  the natural process can be overcome.
7  BY MR. DERRINGER:
8      Q.  So with that caveat, again, let's just focus
9  on the single cell here that we've been talking about,
10 and so if that DNA damage or error in that cell is
11 repaired by the body, then, that DNA damage or error is
12 not going to lead to cancer; is that correct?
13     MR. KRISTAL:  Objection.  If you're talking
14 about in that one single cell, that's fine.
15     A.  Yeah, I mean, if you're looking blindly at the
16 whole system and just looking at that cell, that's
17 correct.
18 BY MR. DERRINGER:
19     Q.  Okay.  So let's then assume that the damage or
20 error to the DNA is to an important part of the DNA, it
21 wasn't so severe that it caused that cell to die, and
22 the repair mechanisms that we all have in our bodies
23 didn't repair that error, in that case, sometimes that
24 error or that damage to the DNA of the cell, it gets
25 replicated when the cell reproduces; is that right?

Page 266

1      A.  Yes.
2      Q.  Okay.  And in that case, the cells that are
3  generated from the parent cell will also have that
4  error or damage in the DNA, as well, right?
5      A.  Yes.
6      Q.  And that's called cell mutation?
7      A.  Yes.
8      Q.  Is that also called mutagenicity?
9      A.  Yes.
10     Q.  And many times, am I right, that those
11 mutations may not be of the type -- may not be the kind
12 of mutation that can lead to cancer, right?
13     A.  That's true, but they can be, as well.
14     Q.  Understood.
15        So, for example, let's take an athlete who has
16 a greater lung capacity than the average person, okay?
17 Could that have been because there was an error in the
18 coding part of that person's DNA that got replicated to
19 other cells that caused this remarkable increase in
20 their lung capacity more than the average person?
21     A.  That question was asked in Medical Genetics at
22 Indiana University School of Medicine, and I'll never
23 forget it.  The professor --
24     Q.  That exact question?
25     A.  Almost -- almost exact.  Almost exact.  And

Page 267

1  his answer was the chances of that would be like taking
2  a screwdriver or a tool and putting it into the
3  electronic circuit boards of the television set and
4  expecting to get a cleaner picture.  The odds are
5  extremely un -- unlikely.
6      Q.  Right.  You're a swimmer, right?
7      A.  Yes.
8      Q.  That's why we only see someone like Michael
9  Phelps once in a generation, right?
10     A.  Well, Michael Phelps has extra huge hands.
11 You know, I've asked the coach how I could web my
12 fingers to go a little faster, but he has huge hands
13 and big feet.
14     Q.  Some of that might be caused by mutations of
15 DNA errors in coding --
16     A.  Probably --
17     Q.  -- in Michael Phelps, right?
18     A.  Probably not.  It's probably already in his
19 genome and that particular genome was triggered?
20     Q.  Right, but --
21     A.  Hereditary.
22     Q.  It's hereditary, but, originally, that genome
23 was created by something out of the ordinary like that
24 we're talking about here, right?
25     MR. KRISTAL:  Object to form.

Page 268

1      A.  Yeah, I mean, it -- remember, we have billions
2  of cells that are undergoing mitosis at any one time.
3  So although that's an extremely rare event, if it's
4  happening at an elevated rate, then, the risk of a
5  malignancy increases.
6      Q.  Okay.  But in any event, sometimes the
7  mutations of the DNA error lead to outcomes that are
8  not adverse outcomes, right?
9      A.  Yeah.  Extremely rare, but, yes.
10     Q.  And sometimes those mutations may be of a type
11 that can continue down a path that may lead to cancer,
12 right?
13     A.  Yes.
14     Q.  Okay.  So now let's keep going down the path
15 where we assume that the error or damage to the coding
16 part of the DNA was not so severe that it caused the
17 cell to die and that the human body's repair mechanisms
18 didn't repair the error or damage and that it's
19 reproduced in other cells and that that error or damage
20 is -- that is reproduced is something that can lead to
21 cancer instead of other effects, okay?
22     A.  Such as an echo gene.
23     Q.  Even once you have a mutation in a group of
24 cells, the immune system is going to target those
25 groups of mutated cells and attempt to destroy them,

11 (Pages 265 to 268)

William Sawyer, Ph.D.
July 17, 2019

Page 269

1  correct?
2       MR. KRISTAL:  Object to form.
3       A.  Unfortunately, not always.
4  BY MR. DERRINGER:
5       Q.  But that's what the immune system is designed
6  to do, right?
7       A.  With a prokaryotic cell, absolutely.  With a
8  eukaryotic cell, and even a toenail fungus is
9  eukaryotic, the immune system has a very difficult time
10 distinguishing.  And so you can't really say 100 --
11 with 100 percent certainty that such cells would be
12 eliminated and --
13      Q.  Yeah, I'm not asking you whether they will be
14 or won't be.  I'm just asking whether the immune system
15 is designed to identify and target groups of mutated
16 cells and is designed to attempt to destroy them?
17      A.  Well, that's one of the big problems we have
18 with malignancies and the oncologist will discuss that,
19 that the immune system has a very difficult time
20 differentiating certain types of these cells.
21      Q.  But the immune system is designed to identify
22 and eliminate these types of groups of mutated cells,
23 right?
24      A.  It's designed to, but not -- not with 100
25 percent level of accuracy.

Page 270

1       Q.  Isn't this why we look at a damaged or
2  suppressed immune system in order to determine whether
3  someone is at an increased risk of developing cancer?
4       MR. KRISTAL:  Object to the form.
5       A.  That is true, but, then again, one has to
6  consider what type of immune suppression occurs,
7  whether it's the natural killer cells, T-cells, just --
8  the immunologist just has to look very closely at the
9  individual's profile, and that makes a big difference.
10      For example, the cyclosporine has a tremendous
11 ability to increase the onset of NHL because that drug
12 inhibits very specific, let's just say, pieces of the
13 immune system that do exactly what you're talking
14 about.
15 BY MR. DERRINGER:
16      Q.  Do you have any evidence that Roundup® or
17 glyphosate affects the body's natural DNA repair
18 mechanisms?
19      MR. KRISTAL:  Object to form.
20      A.  I believe I cited a study with respect to
21 that, yes.
22 BY MR. DERRINGER:
23      Q.  Okay.  What's the study?
24      A.  (The document was examined.)
25      Well, I guess not.  I thought I had something

Page 271

1  on either POEA or glyphosate that I read, but I'm not
2  able to find it at the moment.
3       Q.  Okay.  Then, am I correct that you don't have
4  any evidence that Roundup® or glyphosate affects the
5  body's natural DNA repair mechanism?
6       A.  It does.  I know I've reviewed it and I
7  thought it was in my report, actually.
8       Q.  But as you sit here today, you can't cite to
9  any study to support that statement.
10      A.  Let me check one more thing in my index.
11      (A document was examined.)
12      No, not that I can find.
13      Q.  Okay.  Do you have any evidence that Roundup®
14 or glyphosate affects the body's immune suppression
15 mechanisms?
16      MR. KRISTAL:  Same objection.
17      A.  Did you say glyphosate or Roundup®?
18 BY MR. DERRINGER:
19      Q.  Both -- either one.
20      A.  (The document was examined.)
21      Yeah, I have reviewed a study of such, but I
22 can't recall.
23      Q.  Do you recall would it be more than one study
24 on the issue of whether Roundup® or glyphosate affects
25 the body's immune suppression mechanism?

Page 272

1       A.  Just one study.
2       Q.  Okay.  And as you sit here today, you can't
3  tell us what that study is?
4       A.  No.
5       Q.  Okay.  Do you agree that substances can be in
6  your body but never get into your cells?
7       A.  Yes.
8       Q.  Do you agree that substances that get into
9  your bloodstream can go through your bloodstream, end
10 up in your urine, and then be excreted intact?
11      A.  Yes.
12      Q.  And that is they're not absorbed, right?
13      A.  Well, they can be absorbed, but it can still
14 remain in the urine.  And penicillin is an excellent
15 example excreted in the urine.  Back in the 1940s and
16 early '50s, urine was collected and the penicillin was
17 removed from the urine and reused and injected --
18      Q.  Was --
19      A.  -- from urine.
20      Q.  Right.  Was it absorbed in the body?
21      A.  Yes.
22      Q.  Okay.  Would you agree that there are
23 substances that get into the bloodstream, go through
24 the bloodstream, not be absorbed in your body, end up
25 in your urine, and then be excreted intact?

12  (Pages 269 to 272)

William Sawyer, Ph.D.
July 17, 2019

Page 273

1    A.  Absolutely.  Glyphosate is not one of them.
2    Q.  Can you point to -- well, let me -- you
3  mentioned yesterday a study that you put in your
4  report.  I'll mark it as Exhibit 25.
5       (Defendant's Exhibit-25 was marked for
6    identification.)
7  BY MR. DERRINGER:
8    Q.  I'm handing that to you now.
9       MR. DERRINGER:  Jerry, there's a copy for you.
10      MR. KRISTAL:  Thank you.
11      MR. DERRINGER:  You're welcome.
12  BY MR. DERRINGER:
13    Q.  This is a study by Wang that you referred to
14  in your report titled, "Glyphosate Induces Benign
15  Monoclonal Gammopathy and Promotes Multiple Myeloma
16  Progression in Mice."
17      Do you see that?
18    A.  Yes.
19    Q.  Okay.  And you've read this study before?
20    A.  Yes, I have my version here.
21    Q.  Your marked-up version of the study?
22    A.  Yeah.
23    Q.  Okay.  This paper reports that they conducted
24  a chronic study; is that right?  If you'd like, you can
25  turn to page 2 of 11 under, "Materials and Methods."

Page 274

1    A.  I agree, 72 weeks.
2  BY MR. DERRINGER:
3    Q.  Right.  And that's the chronic study that they
4  conducted?
5    A.  Yeah.
6    Q.  And how many treatment groups were in that
7  chronic study?
8    A.  (The document was examined.)
9       Eight-week-old mice, five per group, were
10  dosed at 0, 1, 5, and 10 or 30 gram per liter
11  glyphosate for seven days before sacrifice.
12    Q.  Is that the chronic study, sir?
13    A.  No, that's the acute.  I'm looking for the
14  chronic.
15      The treated mice began to reach humane
16  endpoints starting at week 60.  Treatment groups were
17  provided one gram of glyphosate in the drinking water
18  for 72 weeks.  That was continuous chronic feeding.
19    Q.  Okay.  I'm asking how many treatment groups
20  were there in the chronic study in Wang?
21    A.  Oh, I thought you asked the length of
22  treatment.
23    Q.  No, no, I asked how many treatment groups were
24  there in the chronic study in Wang?
25    A.  (The document was examined.)

Page 275

1    Since it's not stated, I guess I would have to
2  assume just one.
3    Q.  Okay.  Do you know how many mice -- however
4  many treatment groups there were, whatever it was, one
5  or more, do you know how many mice there were per
6  treatment group?
7    A.  It would appear six wild type and six C57B1
8  mice.  Wait a minute, the wild type is the C57B1.
9    It's not clear.
10    Q.  Okay.  Am I right that there was no dose
11  response analysis in that chronic study?
12    Let me -- let me withdraw that and maybe make
13  it a little easier for you here.
14    All of the mice in the chronic study were given
15  a dose of 1000 -- I'm sorry, one gram per liter of
16  glyphosate in their drinking water, correct?
17    A.  Right.  A thousand milligrams per liter.
18    Q.  Okay.  And that was the only dose that was
19  administered in this study to the -- in the chronic
20  study, correct?
21    A.  Yes.
22    Q.  And because that was the only dose, this
23  chronic study did not do a dose response analysis,
24  correct?
25    A.  Correct.

Page 276

1    Q.  Okay.  Do you know what the appropriate dose,
2  in milligrams per kilogram, a thousand milligrams per
3  liter is?
4    A.  Well, these were mice, so we'd have to use a
5  default value of oral consumption.  And I would really
6  need to see if that value was tabulated, along with the
7  average weight of each of the mice.
8    Q.  I'm not asking you to make a conversion here
9  from an animal dose to a human dose, at least not yet.
10  I'm just asking whether you can do a conversion from a
11  thousand milligrams per liter to an approximate dose in
12  milligrams per kilogram?
13    A.  Well, as I said, the two pieces of information
14  needed are the average weight of the mice and the
15  amount of water that is consumed per day by the mice on
16  the average.
17    Q.  Okay.  What would a thousand milligrams per
18  liter convert to in a human, assuming an average, you
19  know, human weight of 70 kilograms?
20    A.  Well, that would be an erroneous conversion
21  unless you applied the human equivalency dose factor,
22  approximately 12.2, for a mouse to a human.  For
23  example, if I came up with a calculation of 100
24  milligram per kilogram value weight, we'd have to
25  divide that by 12.2 or -- I'm sorry, you would have to

13  (Pages 273 to 276)

William Sawyer, Ph.D.
July 17, 2019

## Page 277

1   multiply that by 12.2 to get the equivalent for the
2   mouse.  See, that is the HED from mouse to human that's
3   generally accepted at about 12, I think.
4       Q.  How many mice in the chronic --
5       A.  So if you want me to make a calculation, I
6   can.
7       Q.  I'm just asking if you know what the -- what a
8   thousand milligrams per liter in a human would be.
9       A.  Yeah, if we take the default value of 1 5
10  liters of water per day, divide it by a 70-kilogram
11  person, that would be 21.4 milligram per kilogram per
12  day.
13      Q.  Okay.
14      A.  And for a mouse, we'd have to multiply that by
15  about 12, which would be equivalent to about 257
16  milligram per kilogram per day for a mouse.
17      Q.  All right.  How many of the mice in the
18  chronic study completed the intended 72-week treatment
19  period?
20      A.  Well, glyphosate significantly affected the
21  health, all of which had to be euthanized by 72 weeks.
22  The surviving mice in other groups were sacrificed at
23  72 weeks.
24      Q.  I'm asking how many mice completed the
25  intended 72-week treatment period?  I can refer you to

## Page 278

1   page 2 if you'd like.
2       A.  (The document was examined.)
3       Q.  Right-hand column, middle of that paragraph,
4   there's a sentence that reads, "At week 72, the
5   remaining three surviving Vk*MYC mice" --
6       A.  Right, so 50 -- 50 percent, I believe.
7       Q.  Okay.  But three mice completed the intended
8   72-week treatment period; is that right?
9       A.  Yeah, yeah.  The study states that the
10  remainders were adversely affected from the glyphosate.
11      Q.  Okay.  What does Vk*MYC stand for?  What does
12  it mean?  It talks about three treated Vk*MYC mice.
13  What are those?
14      A.  Well, what I did in my report, I renamed that
15  term to a term that a normal person would be able to
16  understand.  Let's see if I can find the page.
17      Q.  Let me go to page 101.
18      A.  Yeah.  Okay.  And I referred to these mice as
19  specially bred mice, okay?  These are specially bred
20  mice that have a distinctive characteristic that
21  predisposes them.
22      Q.  To what?
23      A.  Increased production of the M protein.
24      Q.  Well, increased -- let's see.
25          These were genetically modified mice, right?

## Page 279

1       A.  Yes.
2       Q.  Okay.  And they were genetically modified so
3   that they -- so that they were predisposed to
4   developing multiple myeloma, right?
5       A.  Right.  They're actually predisposed -- they
6   produce an amount of gammopathy, which is, of course, a
7   precursor to multiple myeloma.
8       Q.  Right.  And that's the way in which they were
9   genetically modified to make them predisposed -- before
10  treatment with glyphosate, predisposed to develop
11  multiple myeloma, right?
12      A.  Right.  As I say, these are specially bred
13  mice, these.  They're GMO mice.  They have a specific
14  genetic characteristic.
15      Q.  The acute study, how many mice per treatment
16  group were in the acute study?
17      A.  I think I already provided that on page 2 of
18  11, the fourth -- the first paragraph on the right,
19  very bottom.  There were five per group in the acute
20  treatment group.
21      Q.  And how many treatment groups were there?  In
22  the acute study?
23      A.  (The document was examined.)
24          There was 0, 1, 5, 10, or 30.  So that would
25  be five groups.

## Page 280

1       Q.  And the five in each group, were they male or
2   female?
3       A.  Well, I'm not certain that the study
4   specified.  I don't remember seeing that.
5       Q.  Okay.  Would putting a thousand --
6       A.  Well, if you look at the bottom of page 211,
7   three lines from the bottom on the left, they were sex
8   matched.
9       Q.  Do you know what that means?
10      A.  Well, that the wild type and the specialty
11  bred mice were of the same sex.  Whether they're male
12  or female, I don't think the study states, but they
13  were sex matched.
14      Q.  Would a thousand milligrams per liter of
15  glyphosate in -- in water, would it change the acidity
16  of the water?
17      A.  It depends which salt.  If it's isopropylamine
18  salt -- we want to know what salt we're working with.
19  It said at the top that it was from Sigma-Aldrich, St.
20  Louis, Missouri.  It was glyphosate.  But it doesn't
21  really tell us, you know -- the isopropylamine, the ph,
22  I have listed in my report, I could turn to it and tell
23  you what it is, but I think it's slightly less than 7,
24  the DKA.
25      Q.  What -- what type of -- what type of

14  (Pages 277 to 280)

William Sawyer, Ph.D.
July 17, 2019

Page 281

1  glyphosate, what type of constituent would change the
2  acidity of the water if you put a thousand milligrams
3  per liter into the water?
4      A.  Which salt would change the acidity?
5      Q.  Which -- which glyphosate-based salt would do
6  that?  You said it depends on the glyphosate, so I'm
7  just wondering which type of glyphosate would change
8  the acidity of the water that was used in the chronic
9  study in the Wang paper?
10     A.  Actually, I think I have an answer to that in
11 my report.
12         (The document was examined.)
13         I'm thinking the potassium salt would be more
14 basic.
15     Q.  Which --
16     A.  Table 24, page 113.
17         You'll see I have listed the glyphosate acid,
18 potassium salt, ammonium salt, sodium salt, and
19 glyphosate isopropylamine, which is most commonly used
20 in the product.  I said that glyphosate isopropylamine
21 is dibasic, it has two pKa's, one 7 and one 4.1.
22     Q.  Which of these five glyphosate entries,
23 glyphosate products, or glyphosate compounds, I should
24 say -- let me strike that and start over.
25         Which of the five glyphosate compounds that you

Page 282

1  list on table 24 would change the acidity of the water
2  if you added a thousand milligrams per liter of
3  glyphosate to that water?
4      A.  Probably the glyphosate -- well, any of these
5  would change the water ph.  In what direction are you
6  asking?
7      Q.  I'm asking if it would change the acidity.
8      A.  They all -- some would be more basic, the
9  potassium salt.  The glyphosate acid would decrease the
10 ph.  It depends on which one you choose.
11     Q.  Okay.  So all five of these glyphosate
12 compounds that you list on table 24, if they -- if you
13 added a thousand milligrams per liter of them to water,
14 all of them would change the acidity of that water in
15 some way; is that right?
16     A.  At 1,000 milligrams per liter, if you were
17 using highly calcified well water, you would probably
18 have very minimal affect.  If you were using
19 laboratory-grade deionized water, it certainly would
20 change.  So that's important to understand, what the
21 water source was.
22     Q.  Do you know -- do you know what kind of water
23 was provided to the mice in the Wang study in the
24 chronic study?
25     A.  No, I don't think that's specified.

Page 283

1      Q.  Okay.  Does acidity have an effect on rodent
2  physiology?
3      A.  It can.  Again, the -- if it's enough to
4  overcome the natural buffering capacity of the water,
5  certainly.
6      Q.  What did the --
7          MR. KRISTAL:  When you reach a --
8          MR. DERRINGER:  I've got just a few more
9  questions on Wang, and then we can take a break.
10         MR. KRISTAL:  We've been going about an hour.
11         MR. DERRINGER:  Absolutely.
12 BY MR. DERRINGER:
13     Q.  What did the animals in the Wang study eat
14 when they were being treated in the study?  Does the
15 study tell you?
16     A.  (The document was examined.)
17         I don't recall seeing any dietary information.
18     Q.  How were the animals in the Wang study housed
19 during the study?  Does the study tell you that?
20     A.  Just sex matched.  That's all we know.  There
21 wasn't any specifics on the housing.
22     Q.  How many of the Vk*MYC, these genetically
23 modified mice, were examined pathologically in this
24 study?
25     A.  None, I believe.  That wasn't the purpose of

Page 284

1  the study.  They were specifically looking at
2  immunoglobins.
3      Q.  And what does that mean, examine
4  pathologically?  Does that mean you're actually looking
5  at cell tissues?
6      A.  No, standard --
7          MR. KRISTAL:  Object to the form.
8  BY MR. DERRINGER:
9      Q.  What does that mean for somebody who doesn't
10 understand?
11     A.  Well, necropsy involves initially -- I did
12 this with mice as part of my work I published way back.
13 It involves removing the critical organs and tissues
14 from the animal, subjecting those tissues to,
15 initially, formaldehyde and then various solutions of
16 alcohol and bedding into paraffin and producing thin
17 sections of the tissue and microscopic examination for
18 any abnormalities.  It also includes a number of
19 clinical tests of clinical chemistry hematology.
20         So you have the gross organ view, you have the
21 microscopic analysis, as well as the clinical
22 hematological analyses.  And there are some other
23 specialized tests, as well, depending on the design of
24 the study.
25     Q.  But, generally, that's what it means to

15  (Pages 281 to 284)

William Sawyer, Ph.D.
July 17, 2019

Page 285

1    examine an animal pathologically?
2        A.  Yes.
3        Q.  Okay.  This -- what was the route of exposure
4    to glyphosate in this Wang study?
5        A.  PO.
6        Q.  What does that mean?
7        A.  Oral.
8        Q.  Oral?  So they ingested it through their
9    mouth?
10       A.  Yeah.
11       Q.  The mice, right?
12       A.  Yeah.
13       Q.  All right.
14           MR. DERRINGER:  Take a break.
15           THE VIDEOGRAPHER:  The time is 10:31.  End of
16   media 1.  Off record.
17           (Recess.)
18           THE VIDEOGRAPHER:  We're back on record.  The
19   time is 10:52, start of media 2.
20   BY MR. DERRINGER:
21       Q.  Dr. Sawyer, when you just came back into the
22   room, you made a comment looking at Wang that you think
23   it was four groups and not one group in the chronic
24   study?  Is that what I heard you say?
25       A.  Yeah.  I see here that on page 4 of 11, first

Page 286

1    paragraph, 12 lines down, "Inspection of organs
2    revealed a marked increase in spleen weight and size in
3    Vk*MYC mice treated with glyphosate compared to the
4    three other groups," and then they said figure 1C and
5    E.  Let's see what that shows.  Figure 1.  Let's see
6    here.
7            (The document was examined.)
8            This is showing four groups.
9            The other thing I see in that sentence I just
10   read is that necropsy was performed and spleen weights
11   were measured, so, apparently, there was some level of
12   necropsy performed.  It's not specifying the extent of
13   the necropsy procedures, but...
14       Q.  So you now believe there were four treatment
15   groups in the chronic study of the Wang study; is that
16   right?
17       A.  Yeah.  In other words, there's a -- a zero
18   dose for the wild and the specially bred mice and
19   there's glyphosate treatment to the wild and specially
20   bred mice.  So you have four groups.
21       Q.  How many mice were in each of those four
22   groups?
23       A.  I said earlier -- five, I believe, is what I
24   said earlier.
25       Q.  And that was the acute study.

Page 287

1        Q.  Do you know how many were in each treatment
2    group in the chronic study?
3        A.  Yeah, I remember the -- no, it was five,
4    you're right.  Five per group, yeah.  Yeah.  Yeah.
5        Q.  So how many mice were there in each treatment
6    group in the chronic study?
7        A.  Well, figure 1 reads, A, "Schematic diagram of
8    the chronic exposure regimen in four groups of mice."
9    My copy is very light and hard to read, so I'm moving
10   kind of slow here.
11           The C and E, "Representative images of spleen
12   from four groups (two per group)," which means that
13   there's at least two per group.
14           MR. KRISTAL:  Is this easier to read?
15           THE WITNESS:  Oh, yeah, yeah, that's -- that's
16   darker.  Thank you.
17           (The document was examined.)
18           Well, it would appear to be three based on
19   figure 1.
20   BY MR. DERRINGER:
21       Q.  Three mice per --
22       A.  Yeah.
23       Q.  -- per each treatment group, is that right, in
24   the chronic study?
25       A.  Right, a total of 12.

Page 288

1        Q.  And just so I'm clear about the document
2    switch you just made, the one that -- the document
3    that's clearer to read is the one that's marked as
4    Exhibit 25 that I handed you today?
5        A.  Yes, my copy is very light and --
6        Q.  Okay.
7        A.  -- next to impossible to read.
8        Q.  And the copy you say is your copy, that's the
9    copy that was in your file?
10       A.  Yes.  The copy in my file, the legend is very
11   light, hard to read.
12       Q.  And the copy that's in your file is the one
13   that you marked up prior to today?
14       A.  Yes.
15       Q.  Is that the one that you reviewed in
16   preparation of presenting your report?
17       A.  It is.
18       Q.  Okay.  How many male and how many female mice
19   in each of those four treatment groups in the chronic
20   study of the Wang study?
21       A.  (The document was examined.)
22           Well, we know they were sex matched.  That's
23   about all.
24       Q.  Okay.  Can you turn to page 47 of your report?
25   Are you there?

16  (Pages 285 to 288)

William Sawyer, Ph.D.
July 17, 2019

Page 289

1    A.  Yeah.  I'm just arranging some papers here so
2  I don't get out of order and waste a lot of time.
3    Q.  Let me know when you're done arranging your
4  papers.
5    A.  Done.
6    Q.  I want to talk to you about the plaintiff
7  Walter Winston.  You report about Walter Winston on
8  pages 47 through 49 of your report in this matter; is
9  that correct?  Exhibit 6?
10    A.  Yes.
11    Q.  Okay.  Is everything that you know about
12  Walter Winston that's relevant to your opinion that
13  Roundup® is a substantial contributing factor to Mr.
14  Winston's cancer contained at pages 47 through 49 of
15  your report; table 10 of your report with respect to
16  the entry for Walter Winston, which I believe appears
17  on page 62 of your report at table 11 of your report
18  for the column -- for the row Walter Winston, and at
19  page 16 of the summary document that Weitz & Luxenberg
20  provided to you in this case?  It's Exhibit 8.
21    A.  (The document was examined.)
22    Q.  If you'd like, I can repeat the question.
23    A.  I'm -- I'm looking at the information and
24  preparing to answer your question.
25    Q.  (A document was handed.)

Page 290

1    A.  Thank you.
2    Q.  You're welcome.  I've handed you Exhibit 4,
3  which are changes that you made on the, I think, 12th
4  of July that should be incorporated in Exhibit 6, which
5  is the report you've been referring to throughout the
6  deposition.
7    A.  (The document was examined.)
8  No.
9    Q.  What do you have to add to that list to make
10  it a complete list of all of the information that you
11  know about Walter Winston that's relevant to your
12  opinion that Roundup® was a substantial contributing
13  factor to Mr. Winston's cancer?
14    A.  Page 47, 48, 49, page 62, page 63, page 72.
15    (The document was examined.)
16    Exhibit 4, Exhibit 8, Exhibit 12, Exhibit 13.
17  All of those documents are reflective with respect to
18  his exposure and dose.
19    Q.  Is there anything else that reflects what you
20  know about Walter Winston that's relevant to your
21  opinion that Roundup® was a substantial contributing
22  factor to Mr. Winston's cancer?
23    A.  Well, my entire report.
24    Q.  I'm talking about Mr. Winston specifically.
25    A.  Well, the sections of --

Page 291

1    Q.  Things that you know -- things that you know
2  about Mr. Winston.  That's what I'm asking about.
3    Is there anything else that you need to include
4  with that list to tell me everything you know about
5  Walter Winston that's relevant to your opinion that
6  Roundup® was a substantial contributing factor to Mr.
7  Winston's cancer?
8    A.  (The document was examined.)
9    I think that covers the documents that are
10  specific to Mr. Winston.
11    Q.  And you mentioned Exhibit 8 as one of those
12  documents.  If you look at Exhibit 8, am I correct,
13  that in Exhibit 8, what you're referring to is page 16?
14    A.  (The document was examined.)
15    MR. KRISTAL:  Aren't they slightly different
16  depending on whether someone is looking at the
17  alphabetized and unalphabetized?  I don't know
18  which one you're looking at.  You know what I'm
19  saying?
20    MR. DERRINGER:  I'm looking at Exhibit 8,
21  which was marked in the deposition.
22    A.  I know.
23    MR. DERRINGER:  I provided that to him.
24    THE WITNESS:  It's okay, it's the
25  unalphabetized.

Page 292

1  BY MR. DERRINGER:
2    Q.  Page 16?
3    A.  Yes.
4    Q.  And you also mentioned Exhibit 12.  Could I
5  see Exhibit 12?
6    A.  This is an example of the full exhibit.
7    Q.  Okay.  Well, this is Exhibit 12.
8    Is there anything in Exhibit 12 that reflects
9  any information about Walter Winston?
10    A.  Yes.  Yesterday, I defined Exhibit 12 as only
11  an exemplary piece of the entire set.
12    Q.  Right, that's Exhibit 12.
13    A.  Yes.
14    Q.  You haven't produced to us a summary interview
15  sheet for Mr. Walter Winston for -- from the EES Group.
16    A.  Sure, I did.  It's on my -- my --
17    MR. KRISTAL:  Two things.  We produced it last
18  week to Tony Upshaw and Melissa Alvarez at the
19  Petty dep.
20    MR. DERRINGER:  Okay.
21    MR. KRISTAL:  I have copies.  If you want to
22  look at them now, obviously, you have access to
23  them, but -- so we produced it to Monsanto, Dr.
24  Sawyer hasn't brought them here today.  I have them
25  here if you want to see them.  So I'm trying to

17  (Pages 289 to 292)

William Sawyer, Ph.D.
July 17, 2019

---

Page 293

1    move it along.  I don't know if you printed out
2    what we produced.
3           MR. DERRINGER:  I appreciate that, Jerry.
4    BY MR. DERRINGER:
5       Q.   So I just want to make sure the record is
6    clear.
7           Exhibit 12 in this deposition doesn't relate to
8    Walter Winston, but I think what you're saying, Dr.
9    Sawyer, is that you have a similar interview summary
10   sheet from Mr. Petty relating to Walter Winston, and
11   that's what you're referring to.  In your parlance, you
12   refer to Exhibit 12; is that right?
13      A.   Correct.  But, more importantly, I'm just
14   going to prove that I believe that is on my final
15   documents considered list.
16          MR. KRISTAL:  Yeah, nobody is fussing over
17   that.
18          THE WITNESS:  Okay.
19      A.   I just want to make sure it's clear that
20   that's not something new.  It's on my list.
21   BY MR. DERRINGER:
22      Q.   Understood.
23          And then when you refer to Exhibit 13 and 14 --
24   I don't have those in front of me.  We don't have
25   copies of those.  Can I see those?

---

Page 294

1       A.   13?
2       Q.   And 14.
3       A.   (The documents were handed.)
4           MR. KRISTAL:  14 is the dossier?
5    BY MR. DERRINGER:
6       Q.   Yeah, I think either I misheard you or you
7    misspoke.
8           Did you -- are you relying on Exhibit 14?
9       A.   What is that?
10      Q.   Our realtime is not up, so it's hard to know
11   that.  It's hard to confirm without the realtime.
12          Are you relying on Exhibit 14 for any
13   information specific to Walter Winston?
14          MR. KRISTAL:  Exhibit 14 is this (indicating),
15   the glyphosate, August 2010.
16      A.   I referred to 8.
17   BY MR. DERRINGER:
18      Q.   Yes.
19      A.   13.
20          MR. KRISTAL:  8, 12, and 13.  Did you say 14?
21   And, if you did, is that correct?
22          THE WITNESS:  No.
23          MR. KRISTAL:  Okay.
24      A.   I referred to 3, 4, 10, 6, 12, 8 --
25   BY MR. DERRINGER:

---

Page 295

1       Q.   Here's 13.
2       A.   13.
3       Q.   That's it, right.
4       A.   Right.  14 is not part of it.  I must have
5    mumbled or something.
6           MR. KRISTAL:  Or we misheard you.
7    BY MR. DERRINGER:
8       Q.   I may have misheard you.
9           Mr. Sawyer, Exhibit 13, you're, obviously, I
10   think, referring to the injuries relating to Walter
11   Winston, correct?
12      A.   Yes.  Yes, I am.  Yes.
13      Q.   Thank you.
14          Where does Mr. Winston live?
15      A.   Currently?
16      Q.   We can start with currently, sure.
17      A.   Well, I -- I know that he lives in St. Louis,
18   Missouri, and he has his own home and it's generally
19   full of kids, grandkids, and great grandkids.  I can
20   look and see what I have in terms of his current
21   address.
22      Q.   How do you know it's full of kids and great
23   grandkids and grandkids?
24      A.   Oh, I just know it is.
25      Q.   How?

---

Page 296

1       A.   Oh, just -- it's not really that relevant to
2    this case.
3       Q.   Yeah, but I'm asking how do you know it's
4    filled with kids, grandkids, and great grandkids?
5       A.   Somehow, on Monday, I happened to state to one
6    of the attorneys in this case --
7       Q.   One of the plaintiffs' attorneys?
8       A.   Yeah.  That when I interviewed Mr. Winston, he
9    was -- he was really very just pleasant to speak with.
10   He seemed like a great guy.  And one of the attorneys
11   went on and said, "Yeah," he says, "he actually has a
12   big family.  He has kids, grandkids, and great
13   grandkids, and they all love to stay at his house."
14      Q.   You don't know if they all live there, do you?
15      A.   No, I think they're visiting, but he's -- this
16   is supposed to be -- what I gathered just talking to
17   him, he seemed like a real remarkable -- remarkable
18   guy, pleasant, interesting to talk to, and apparently
19   kids -- his kids just love him, is what I -- I've been
20   told.
21      Q.   You've been told that by Mr. Winston's
22   attorneys, right?
23      A.   Yeah.  Yeah.  They were -- one of them was at
24   the house, actually.  That's why.
25          MR. KRISTAL:  Would you like the hard copy of

18  (Pages 293 to 296)

William Sawyer, Ph.D.
July 17, 2019

Page 297

1  the Winston summary?
2       MR. DERRINGER:  If you have it.
3       MR. KRISTAL:  I have it.  I mentioned it
4  earlier that I have it, and I just want to make
5  sure that we're all -- here's for you if you want
6  to mark a copy.  Here's another one.  I have one
7  for me.  I have them for all of plaintiffs if you
8  want.
9  BY MR. DERRINGER:
10     Q.  And you didn't put anything about his kids,
11  grandkids, or great grandkids in your report, did you?
12     **A.  No, I said a moment ago I didn't think it was**
13  **relevant to my investigation.**
14     Q.  Okay.  What I had asked was where he lives.
15  You said St. Louis.  Can you be any more specific than
16  that?
17       MR. KRISTAL:  Well, may I also, just to be
18  complete, and I'm not putting words in anybody's
19  mouth, he reviewed -- Dr. Sawyer reviewed the
20  depositions, which are listed for each of the
21  plaintiffs.  So to the extent you were asking about
22  the universe of things that relate --
23       MR. DERRINGER:  I was not asking not what
24  relates.
25  BY MR. DERRINGER:

Page 298

1       Q.  I was asking about the universe of information
2  you found relevant to your specific causation opinion.
3  I used that word deliberately because you had
4  mentioned, I think, yesterday that what you included in
5  your report were the items from your interview, from
6  your review of the depositions, et cetera, that you
7  found relevant.
8       MR. KRISTAL:  Right, and that's my point.
9  That's what I'm saying.  But in the articulation of
10  things relating specifically to Winston, maybe I
11  misheard, I don't think he said the depositions of
12  Mr. Winston.
13       MR. DERRINGER:  That's correct, because -- and
14  I take his answer as his truthful answer because my
15  question was specific.  It's a different one than
16  the one you are referring to now.  My question
17  was what he found relevant.  Let's just move on.
18       MR. KRISTAL:  Well, we're putting you on
19  notice that the deposition --
20       MR. DERRINGER:  You can redirect him at any
21  time.  Jerry, stop testifying.
22       MR. KRISTAL:  I'm just putting you on notice
23  that the deposition of Mr. Winston is also in the
24  universe of documents that you're talking.
25       MR. DERRINGER:  No, not that I'm talking

Page 299

1  about.
2       MR. KRISTAL:  Yes.
3       MR. DERRINGER:  That you're talking about.  Go
4  ahead.
5       MR. KRISTAL:  You asked about relevancy.  You
6  talked about getting information from the
7  depositions of the plaintiff.
8       MR. DERRINGER:  Stop testifying.
9       MR. KRISTAL:  I'm not testifying.
10      MR. DERRINGER:  Yes, you are.  You're putting
11  words in his mouth.  Stop doing it.
12      MR. KRISTAL:  He testified to that yesterday.
13      MR. DERRINGER:  I asked a different question
14  today and if you continue to testify --
15      MR. KRISTAL:  I'm not testifying.
16      MR. DERRINGER:  -- we're going to get the
17  judge on the phone.  Let's stop what you're doing,
18  Jerry.
19      MR. KRISTAL:  It's a simple thing of trying to
20  expedite this by giving you the universe of what he
21  reviewed.
22      MR. DERRINGER:  I appreciate you would like to
23  testify.  You're not being deposed.
24      MR. KRISTAL:  I'm not testifying.
25      MR. DERRINGER:  The record will reflect what's

Page 300

1  happening here.
2       MR. KRISTAL:  Exactly.
3  BY MR. DERRINGER:
4       Q.  Dr. Sawyer --
5       **A.  I need to add that.  Because I don't have the**
6  **printed deposition in front of me, I forgot to mention**
7  **it.  Obviously, it's in my report.**
8       Q.  The portions of the deposition that you found
9  relevant to your specific causation opinion regarding
10  Mr. Winston you included in your report, correct?
11      **A.  I did.**
12      Q.  Thank you.
13      The question I was asking before we were
14  interrupted was where in St. Louis does Mr. Winston
15  live?
16      **A.  (The document was examined.)**
17      **I don't have that information.**
18      Q.  How long -- wherever it is in St. Louis, do
19  you know how long he lives there -- he's lived there?
20      **A.  No.  I focused on his occupational exposures.**
21      Q.  Do you know what Mr. Winston looks like?
22      MR. KRISTAL:  I think we -- asked and
23  answered.
24      **A.  No photos, so I do not.**
25  BY MR. DERRINGER:

19 (Pages 297 to 300)

William Sawyer, Ph.D.
July 17, 2019



Page 301

1    Q.  How much does Mr. Winston weigh?
2    A.  (The document was examined.)
3       I don't have that information.
4    Q.  Do you know what he weighed between the years
5  2011 and 2013?
6    A.  No.
7    Q.  Do you know if Mr. Winston has lived in St.
8  Louis all of his life?
9    A.  No.
10   Q.  Do you know where else he's lived, if
11  anywhere?
12   A.  I don't know.
13   Q.

Page 302

1
17   Q.  How much must someone smoke for you to
18  consider smoking to be a substantial contributing
19  factor to that person's cancer?
20   A.  Are you asking how many pack years are
21  necessary to qualify a person as at risk of NHL from
22  cigarette smoking?
23   Q.  No, I'm asking you, in your opinion, how much
24  cigarette smoking or -- strike that.
25      In your opinion, how much smoking is required

Page 303

1  in order for you to consider that smoking history to be
2  a substantial contributing factor to a person's cancer?
3    A.  I'm going to defer that to the oncologists and
4  the epidemiologists.
5    Q.  You have no opinion on that?
6    A.  I'm familiar with some of the studies that
7  I've referenced.  I've referenced at least two in my
8  materials relied on, I relied on, on the reviewed list.
9  And I am not certain that I have the full deck of
10  studies on the human epidemiological aspects to provide
11  an exact pack year.
12   Q.  What about an approximate pack year?  I know
13  you're -- you said you're deferring to the oncologists
14  and the epidemiologists, but I'm asking for your own
15  opinion about how much smoking must someone have done
16  in their lifetime in order for you to consider that
17  smoking history to be a substantial contributing factor
18  to his or her cancer?
19      MR. KRISTAL:  Objection, asked and answered.
20   A.  Again, I can't place an exact number on it.  I
21  am familiar with at least one study that showed, I
22  think, 40 pack years to possibly produce a risk of NHL,
23  but, really, I'd have to defer that to the oncologists
24  and epidemiologists who more likely looked at all of
25  the epi literature.  You know, I am not handling every

Page 304

1  aspect of this case.
2  BY MR. DERRINGER:
3    Q.  What's the study you just referred to?
4    A.  There's an exhibit, which is my materials
5  considered list, and it's somewhere here.
6       Here it is.
7    Q.  What's the exhibit number?
8    A.  9.
9       (The document was examined.)
10   Q.  Can you tell me what this 40-pack year study
11  you're referring to is?
12   A.  (The document was examined.)
13      No, I actually don't have it.
14   Q.  What does Mr. Winston do for a living?
15   A.  He served as an application personnel of the
16  County of -- the City of St. Louis, rather, as an
17  applicator of Roundup®.
18   Q.  That was his job title?
19   A.  No, that's what he did.
20   Q.  Okay, but what was his job?  What was his job
21  title?
22   A.  I don't recall.
23   Q.  What was his occupation?
24   A.  Pesticide applicator.  Herbicide applicator.
25   Q.  And how do you know that?

20  (Pages 301 to 304)

William Sawyer, Ph.D.
July 17, 2019



**Page 305**

1    A.  I talked to him.
2    Q.  He told you that?
3    A.  That's what he did.
4    Q.  Okay.
5    A.  I don't know what his title is, but that's
6    what he did.
7    Q.  Did he do anything else?  Did he hold other
8    jobs during the course of his lifetime?
9    A.  (The document was examined.)
10    MR. KRISTAL:  I object to this whole line of
11    questioning.  I think it's completely relevant, but
12    I assume we'll have to argue that at that some
13    point in time.
14    MR. DERRINGER:  If you want to withdraw his
15    opinion on Mr. Winston -- the specific causation
16    opinion on Mr. Winston, do you want to withdraw it?
17    MR. KRISTAL:  Well, if I thought these
18    questions were relevant to the opinions that he's
19    going to be offering, then, I wouldn't have made my
20    objection.
21    MR. DERRINGER:  Okay.  Okay.  We'll continue,
22    then.
23    MR. KRISTAL:  We'll deal with the relevancy
24    objection later.
25    A.  He worked for the City of St. Louis Forestry

**Page 306**

1    Division.
2    BY MR. DERRINGER:
3    Q.  Yeah.  For how long?
4    MR. KRISTAL:  Same objection.
5    A.  He worked from -- at least in the capacity of
6    spraying, he worked from spring 2011 until late 2013.
7    He sprayed approximately six months per year.
8    BY MR. DERRINGER:
9    Q.  Yeah.  What did he do before 2011?  What was
10    his job?
11    MR. KRISTAL:  Same objection.
12    MR. DERRINGER:  You can have a standing
13    objection to relevancy if you would like.
14    MR. KRISTAL:  That, I appreciate.
15    A.  (The document was examined.)
16    I don't recall.  I didn't -- didn't include it
17    in my report.
18    BY MR. DERRINGER:
19    Q.  Did you ask him?
20    A.  Yes.
21    Q.  You asked Mr. Winston in your interview with
22    him on July -- on June 19th what different jobs he's
23    held during the course of his lifetime.  Did you ask
24    him that?
25    A.  I specifically asked him if he had sustained

**Page 307**

1    any chemical exposures in any of his occupational work.
2    Q.  Right.
3    A.  That's what I asked him.
4    Q.  Did you ask him what his occupational work
5    during the course of his lifetime was?
6    A.  I don't think so.  I just asked him if he had
7    sustained any chemical exposures during his occupation.
8    Q.  So can you tell us anything about what he did
9    for a living other than between the years 2011 and
10    2013?
11    A.  No.
12    [REDACTED]
18    A.  That's correct.
19    Q.  And what's the source of that information?
20    A.  Direct interview.
21    Q.  And is that current or is that historical?
22    Do you understand my question?
23    [REDACTED]

**Page 308**

1    [REDACTED]

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

William Sawyer, Ph.D.
July 17, 2019



**Page 309**

**Page 310**

23    Q.   Okay.  What is Mr. Winston's current health
24  status?
25    **A.   I'll defer that to the oncologist.**

**Page 311**

1    Q.   Do you know?
2    **A.   With 14 people, I may get mixed up.**
3         **I believe he is in remission, but, then again,**
4  **I sometimes get mixed up from person to person.**
5    Q.   When you say 14 people, I may get mixed up,
6  you mean you're dealing with 14 plaintiffs in this
7  case, right?
8    **A.   Yes.**
9    Q.   And sometimes the facts between the 14 get
10  confusing for you; is that right?
11    **A.   But -- from memory, yes.**
12

**Page 312**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

William Sawyer, Ph.D.
July 17, 2019

---

Page 313

1  ████████
2  ██████████████
3  ██ ██████████
4     Q.  Okay.  What else?
5     A.  And I also made it clear that I don't mean
6  after NHL, but prior to the development of N -- NHL.
7         You know, I went through this yesterday with
8  you.  You're asking me the same thing again, wasting
9  time, and then you're going to demand me to come back
10  here a third day.  I already answered these questions.
11     Q.  Not about Mr. Winston, you didn't.
12     A.  I answered -- I've told you what questions I
13  ask everyone.
14     Q.  So your -- so the answer you gave me yesterday
15  when I was asking generally about the questions you
16  asked, that's the -- those are the questions you asked
17  Mr. Winston, right?
18     A.  Yes.
19     Q.  Okay.  Did you -- did you find out whether Mr.
20  Winston used any household products, such as cleaning
21  products, other than Roundup®?
22     A.  No.  Cleaning products is nonsense.  I
23  consulted for a major U.S. janitorial company for many
24  years.  There are no carcinogens in cleaning products
25  that cause NHL.

---

Page 314

1     Q.  So you didn't ask about it.
2     A.  No, it's nonsense, something that the lawyers
3  are creating in this case to apparently fool people
4  with.
5     Q.  What's the company you consulted for?
6     A.  From 1994 until about 2003 -- I'm trying to
7  remember the name.  Something chemicals.  It will come
8  to me.  Spartan.  Spartan Chemicals.
9         And I did a tremendous amount of consulting
10  for them, a tremendous amount of research.
11     Q.  Is there any evidence that you found out in
12  your investigation of Mr. Winston that Mr. Winston used
13  products that contained solvents or anything that could
14  increase his risk of getting sick?
15     A.  Yes.
16     Q.  What were those products?
17     A.  He couldn't remember any.
18     Q.  And what did you do to ascertain that
19  information?  Is this going back to what you asked
20  yesterday?
21     A.  I asked about ant killer, bug spray, that kind
22  of thing.
23     Q.  Okay.  Tell me everything you know about Mr.
24  Winston's cancer.
25     A.  All I know about his cancer is that it was

---

Page 315

1  a -- DLBCL was diagnosed on May 2nd, 2016 at the age of
2  66.
3     Q.  Are you aware of any tumors anywhere else in
4  Mr. Winston?
5     A.  No.
6     Q.  Are you aware of any other cancer anywhere
7  else in Mr. Winston?
8     A.  No.
9     Q.  You mentioned he was diagnosed when he was 66
10  years old; is that right?
11     A.  Yes.
12     Q.  Do you agree there's nothing unusual about a
13  person being diagnosed with non-Hodgkin's lymphoma at
14  the age of 66?
15         MR. KRISTAL:  Objection to form.
16     A.  People are diagnosed at all ages.  The
17  treatment increases in the fifth and sixth decade of
18  life.
19  BY MR. DERRINGER:
20     Q.  Do you know what the average age is at the
21  time of diagnosis of DLBCL?
22     A.  I don't recall.  I did research some SEER
23  Registry information which I've given -- discussed in
24  prior depositions.
25     Q.  Do you agree that Mr. Winston likely had a

---

Page 316

1  declining immune system as a result of his age by the
2  time he was 66?
3     A.  Well, everyone does to some extent at age 66.
4     Q.  Are there people just like Mr. Winston who are
5  not exposed to glyphosate or Roundup® and who still
6  develop non-Hodgkin's lymphoma?
7     A.  Of course.  That's part of the SEER Registry
8  data that I previously provided in terms of the
9  incident rate per every five years of life.
10     Q.  Are there people just like Mr. Winston who are
11  not exposed to glyphosate or Roundup® who still develop
12  BLDCL?
13     A.  Yes.
14        (Defendant's Exhibit-26 was marked for
15     identification.)
16  BY MR. DERRINGER:
17     Q.  Let me hand you what we've marked as Exhibit
18  26.  This was provided -- well, Mr. -- let me see.
19  Hold on.  Yeah, Exhibit 26.  I'm putting that in front
20  of you.  Is this the -- you talked about Exhibit 12
21  being an exemplar.  Is this, Exhibit 26, the interview
22  summary sheet that you were provided with on Mr. Walter
23  Winston, that is, the summary from Mr. Petty?
24     A.  It is.
25     Q.  Okay.

---

23 (Pages 313 to 316)

William Sawyer, Ph.D.
July 17, 2019

| Page 317 | Page 319 |
|---|---|

**Page 317**

1    (Defendant's Exhibit-27 was marked for
2    identification.)
3    BY MR. DERRINGER:
4        Q.  I'm handing you what's been marked as Exhibit
5    27.
6        MR. DERRINGER:  Here you go, Jerry.
7        MR. KRISTAL:  Thank you.
8        MR. DERRINGER:  Sure.
9    BY MR. DERRINGER:
10       Q.  Exhibit 27 is a web page from the American
11   Cancer Society titled, "Types of B-cell Lymphoma."  You
12   have heard of the American Cancer Society?
13       A.  Of course.
14       Q.  And do you have any reason to doubt what they
15   write here in the second paragraph under DLBCL, second
16   sentence of the second paragraph -- well, let's just --
17   let's do both of those sentences.
18       Do you agree that DLBCL can affect people of
19   any age, but it occurs mainly in older people?
20       A.  Of course.
21       Q.  Do you agree that the average age at the time
22   of diagnosis is mid 60s?
23       A.  Yes.
24       Q.  If Mr. Winston had not used Roundup®, do you
25   agree that there would be nothing remarkable about the

**Page 318**

1    fact that he was diagnosed with DLBCL at the age of 66?
2        MR. KRISTAL:  Objection.
3        A.  No, but the chances are he wouldn't have
4    developed it.  He wouldn't have had double the risk
5    from glyphosate.
6    BY MR. DERRINGER:
7        Q.  And when you say "double the risk," what is
8    the point estimate or relative risk estimate that
9    you're relying on to say double the risk?
10       A.  I'm being very approximate.  I will defer to
11   the epidemiologist for the most accurate exact number,
12   but approximately -- based on the studies I've relied
13   on for dose determination, approximately double the
14   risk.
15       Q.  So you're talking about those six studies that
16   we've gone over?
17       A.  Yes.
18       Q.  Okay.  Do you agree that someone in Mr.
19   Winston's age-group can develop DLBCL from a natural
20   cause?
21       A.  Yes.
22   ████████████████████████████████████
23   ████████████████████████████████
24   ███████████
25

**Page 319**

1    ███████████        ████████████████████████
2    ██        ███████████████████████
3    ██        ██████████████████
4    ██        ████████████████████████████████████
5    ██        ███████████████████████
6    ██
7
8        Q.  Right, that's before he ever used Roundup®,
9    correct?
10       A.  Yes.
11       Q.  Now, you, I think, have concluded that Mr.
12   Winston used Roundup®; is that right?
13       A.  (The document was examined.)
14       I concluded that he used Roundup®, correct.
15       Q.  And how do you know for sure he used Roundup®
16   and not some other herbicide?
17       A.  He stated he used Roundup® Concentrate, which
18   he didn't pour, but which was poured into a large
19   container which water was added and mixed.
20       Q.  Okay.  You just said he stated he used
21   Roundup® at -- did you say concentrate or pro
22   concentrate?  I just didn't hear you.
23       A.  Roundup® Concentrate.
24       Q.  Okay.
25       A.  And he rarely mixed it himself.  That was not

**Page 320**

1    something he routinely did.  He sprayed.
2        Q.  And you learned that from your interview with
3    him?
4        A.  Yes.
5        Q.  Now, are you aware that Mr. Winston testified
6    at his deposition that he never saw a label or anything
7    identifying what he sprayed as being Roundup®?
8        A.  Maybe.
9        MR. KRISTAL:  Objection to form.
10       A.  I don't know.  I can't answer that, but I can
11   answer that he -- he said he believed it was Roundup®
12   and also purchase records show that it was possibly
13   Roundup PRO® Concentrate.
14   BY MR. DERRINGER:
15       Q.  What purchase records?
16       A.  I don't have them.
17       Q.  Have you ever seen them?
18       A.  No.
19       Q.  Did you make any attempt to determine if the
20   City of St. Louis Forestry Division even purchased
21   Roundup® from 2011 to 2013?
22       A.  No, my focus was not on the legal issues of, I
23   guess, the product -- who manufactured it.  My focus is
24   whether or not the exposure was a substantially
25   contributing factor to the onset, development, and

24  (Pages 317 to 320)

William Sawyer, Ph.D.
July 17, 2019

Page 321

1    promotion of his NHL.
2       Q.  Exposure to what?
3       A.  I really didn't have any interest in
4    determining what manufacturer it was.  That's not my
5    role in this case.  There's probably other experts
6    that -- that specialize in that type of work.
7       Q.  You said your role was to evaluate whether his
8    exposure was a contributing factor to his diagnosis.
9    Exposure to what?
10      A.  Glyphosate, Roundup®.
11      Q.  Okay.  And did you make any attempt to
12   determine if the City of St. Louis Forestry Division
13   purchased Roundup® from 2011 to 2013?
14      A.  No, I'm a toxicologist.  I'm not a lawyer.  I
15   can't issue a subpoena.
16      Q.  Did you -- did you make any attempt to
17   determine if the City of St. Louis Forestry Division
18   purchased other herbicides from 2011 to 2013?
19      A.  Well, it's not that I'm lazy and didn't make
20   an effort.  I'm not in a position to do that.
21      Q.  I'm asking if you made an effort to do that.
22      A.  Well, I don't appreciate the implications in
23   the question.
24      Q.  Did you make an effort to do that?
25      A.  No, I have no means of demanding documents

Page 322

1    from an agency.  That is -- I'm a toxicologist.  I'm a
2    scientist, not a, you know, a lawyer.
3       Q.  And how do you know for sure that Mr. Winston
4    used Roundup® and not some other herbicide?
5          MR. KRISTAL:  Object to form.
6       A.  As a statement from him that he believed it
7    was Roundup®.  Super -- not Super, Roundup PRO®
8    Concentrate.  Let me just check what he said.
9          (The document was examined.)
10         Roundup® Concentrate is what he called it.
11   BY MR. DERRINGER:
12      Q.  And you say in your report that Mr. Winston
13   described the liquid as yellow-green in color?
14      A.  He did.
15      Q.  Okay.  Any other source for that statement
16   other than what Mr. Winston told you in your interview
17   with him?
18      A.  No.
19      Q.  Now, you -- you had made some corrections to
20   when he sprayed the Roundup®.  I think in an earlier
21   version of your report, you said it was 2012 through
22   2013.  And then I think one of the changes you made, as
23   reflected on Exhibit 3, you changed that to spring
24   2011.  Do you remember that?
25      A.  Yes.

Page 323

1       Q.  Okay.  What -- what was the reason for why you
2    changed that?
3       A.  He said 2011 or 2012, but he thought it was
4    more likely 2011.  And I tried to be conservative and
5    initially used 2012, but then realized he -- he did say
6    he thought it was more likely 2011.
7       Q.  That was in your interview with him?
8       A.  Yes.
9       Q.  Okay.  So originally you put down 2012 -- you
10   had already interviewed him.
11      A.  I put down originally 2011-2012 in my report
12   on page 48, I think.
13      Q.  The report you're looking at is your revised
14   report.
15      A.  Well, I'll look at the other one.
16      Q.  Take a look at Exhibit 11, sir.  Exhibit 11 is
17   dated July 9th, page 48.  Very first line on that page,
18   can you just read that out loud?
19      A.  "Mr. Winston sprayed Roundup® from spring 2012
20   to late 2013."
21      Q.  And so what made you change -- decide to
22   change your report from spring 2012 to spring 2011?
23      A.  Well, that's a good question because I thought
24   he said 2011 or '12.  I'm looking at document 4.  I
25   changed on July 12th.  Spring 2011.  I don't know.

Page 324

1       Q.  So do you --
2       A.  I think that's because he told me '11-'12.
3       Q.  Okay.  Do you have any notes of that
4    conversation?
5       A.  No.
6       Q.  And also on page 48 of Exhibit 6, your revised
7    report, you said it was from -- well, you said he used
8    Roundup® through late 2013 and then you have a footnote
9    86 where you say he only sprayed one to two months in
10   2013?
11      A.  It could -- hang on a minute.
12         It could be I changed that to 2011 because I
13   rereviewed the deposition.
14      Q.  So back to my question on -- on 2000 -- late
15   2013, you put a footnote in there that said he only
16   sprayed one to two months in 2013.  Do you see that?
17      A.  On Exhibit 3?
18      Q.  No, Exhibit 6, your report, page 48.
19      A.  Okay.  What are you looking at?
20      Q.  First line, you say that Mr. Winston sprayed
21   Roundup® through late 2013.
22         Do you see that?
23      A.  I do.
24      Q.  Okay.  And then you have a footnote 86?
25      A.  Yes.

25  (Pages 321 to 324)

William Sawyer, Ph.D.
July 17, 2019

## Page 325

1    Q.  Footnote 86 says, "Only sprayed one to two
2    months in 2013."
3         Do you see that?
4    A.  Yes.
5    Q.  Okay.  And what is that based on, that he only
6    sprayed one to two months in 2013?
7    A.  I would have to look at the deposition to try
8    to figure that out.
9    Q.  Okay.
10   A.  I just don't recall.
11   Q.  And when you say late 2013, but that he only
12   sprayed one to two months in 2013, how do you reconcile
13   those two statements?  I mean, is -- is it your
14   understanding that he sprayed from the spring of 2011
15   through 2012 and then he sprayed -- stopped spraying
16   and then sprayed one to two months in late 2013?  Is
17   that your understanding?
18   A.  (The document was examined.)
19       Well, that would -- that would be the case if
20   he left the job in August of 2013, but I -- I don't
21   remember where I got that information.
22   Q.  I'm sorry, you said he left -- what makes you
23   think he left the job in August of 2013?
24   A.  That I stated he only sprayed -- I'll have to
25   look at the report.

## Page 326

1         (The document was examined.)
2         Only sprayed one to two months in 2013.
3    Normally, he sprays to the end of October.  So, really
4    he'd have to have left the job much earlier.  He'd have
5    to leave the job in June.  So I don't know for sure
6    where I got that information.  I may have looked again
7    at his deposition.
8    Q.  Okay.  Let's go to table 10, page 61 -- oh,
9    I'm sorry, page 62, the entry for Walter Winston.
10   A.  (The document was examined.)
11   Q.  And can you just walk me through -- the number
12   you come up with for his exposure days is 168 days?  Is
13   that still right or did you change that?
14   A.  279.
15   Q.  Okay.  Can you -- what I want to do is see
16   Exhibit 4, I think it is, which is your changes made on
17   July 12th.  Do you have that in front of you?
18   A.  Yes.
19   Q.  Can I take a look at that?
20   A.  (A document was handed.)
21   Q.  Thank you.
22       Okay.  Can you just walk me through how you
23   came up with, what did you say, 279 days?
24   A.  Yes.
25   Q.  Okay.  Just walk me through the calculation

## Page 327

1    that you made to get to 279 days.
2    A.  He worked for the forestry division spraying
3    from the spring of 2011 to -- to late 2013.  Sprayed
4    six months per year.  So he had a total of 2.25 years
5    of spraying because he worked September through
6    October, four to five days a week, three to ten hours
7    per day, four to five days per week times three to ten
8    hours a day times 26 weeks times 2.25 years equals 648
9    to 27005 hours.
10   Q.  Let me stop you there.  Is that a typo?
11   A.  Yeah, that's too many.  Too many zeroes.
12   Q.  What should that number be?
13       Are you using the calculator on your phone?
14   A.  Yes.
15       MR. KRISTAL:  Would you like me to try to move
16   this along?  Really, it's only arithmetic.
17       MR. DERRINGER:  Well, I'm seeing if he can do
18   the arithmetic.
19       MR. KRISTAL:  It's a simple answer.
20   A.  My calculator is screwy.  The phone does not
21   work well as a calculator very well.  Very often, it
22   has a memory of some number in it.
23       Well, I'm showing 2925 hours.
24   BY MR. DERRINGER:
25   Q.  Okay.  So instead of 27,005 hours, that should

## Page 328

1    be replaced with 29 -- 2,925 hours?
2    A.  Yes.
3    Q.  Okay.  So, then, you can continue.  I'm just
4    trying to, again, figure out how you came up with your
5    number of 279 exposure days.
6    A.  What I'm showing is 302 days.
7    Q.  302 exposure days?
8    A.  Yeah.
9    Q.  So does that 279 number need to be changed?
10   A.  Yes.
11   Q.  Okay.  And you were in the middle of telling
12   us about how you did this calculation and then you did
13   it silently, so just walk me through how you came up
14   with 302 exposure days here.
15   A.  Well, simply that he sprayed six months per
16   year.
17   Q.  Okay.
18   A.  April to September/October, four to five days
19   per week, three to ten hours per day, four to five days
20   per week.  Wait a minute.  I screwed up here in my --
21   what I'm explaining.
22       I multiplied, at the low end, four times three
23   times 26 weeks times 2.25 years, which equals 702
24   hours.
25   Q.  Okay.

26 (Pages 325 to 328)

William Sawyer, Ph.D.
July 17, 2019

Page 329

1    A.  And then I multiplied five days times ten
2  hours times 26 weeks times 2.25 years for the high
3  value.
4    Q.  What number was that?
5    A.  2925.
6    Q.  Okay.  And then what did you do?
7    A.  So the range is 702 it 225.  And then I took
8  the midpoint and divided it by six hours per exposure
9  day which, based on the Swedish definition of a full
10  workday, it should be eight hours.  So if I were to
11  divide that number by eight, I would not get 302,
12  rather, I would get 302 times .67, which would be 202
13  days at an eight-hour full workday definition.  So 202
14  would compare to the studies that I referenced.
15    Q.  302, did you say?
16    A.  202.
17    Q.  So you missed a step there, I think.  I just
18  want to make it clear.
19      You took the low end of 702 hours under your
20  calculation.
21    A.  Yeah.
22    Q.  And the high end of 2,925 under your
23  calculation.
24    A.  Right.
25    Q.  You then added those two numbers up and

Page 330

1  divided by two to get to the midpoint, correct?
2    A.  Yeah.
3    Q.  And what is that midpoint?
4    A.  1813.5.
5    Q.  Okay.  And then you divided 1813.5, I think
6  you said, by, originally, six hours and then you did it
7  by eight hours; is that right?
8    A.  Yeah.  Now I'm coming up -- when I divide it,
9  I get 227.
10    Q.  All right.
11    A.  This is cal -- this is not a good calculator.
12    Q.  You're using your iPhone?
13    A.  Yeah, but it somehow stores the last
14  calculation, I can't get rid of it, and then when I
15  make the next calculation, it carries it over.
16    Q.  So, so far today we've seen calculation of his
17  exposure days of -- well, in the July 11th report is
18  168 days.  And then in the July 12th report, it was --
19  in Exhibit 6, it was 279 days.  And then you've told us
20  302 days and 202 days, and then 226 days.
21      Which one of those is the right number of
22  exposure days that you are relying on in this case?
23    A.  Well, using the definition of an eight-hour
24  full workday, the correct answer is 227 days.
25    Q.  Okay.

Page 331

1    A.  And that is full workdays at eight hours per
2  workday.
3    Q.  Go back to page 48 on Mr. Winston, his
4  occupational use of Roundup®.
5    A.  (The document was examined.)
6    Q.  You mentioned that he used approximately one
7  tank per week.  I think that's in there.
8    A.  He claims they would finish a tank within a
9  week.
10    Q.  Right.
11    A.  He was not the only sprayer using the given
12  truck.
13    Q.  Right.  How much was in a tank?
14    A.  He wasn't sure.
15    Q.  Okay.  So do you have any -- any information
16  about how much Roundup® was in a tank?
17    A.  No.  He just described it as a big tank.  He
18  didn't know how much -- how many gallons.
19    Q.  Okay.  And how much of that approximately one
20  tank per week did Mr. Winston personally spray?
21    A.  He was not able to give me a percentage.
22    Q.  And when Mr. Winston wasn't spraying, where
23  was he?
24    A.  Doing other work for the forestry division.  I
25  don't know what the other jobs entailed.

Page 332

1    Q.  Okay.  And you wrote at the bottom of the
2  first paragraph on page 48 that it was possibly Roundup
3  PRO® Concentrate.  You say, "Purchase records show it
4  was possibly Roundup PRO® Concentrate."
5    A.  That's right.
6    Q.  I thought you said before you haven't seen any
7  purchase records but, your sentence here suggests that
8  you have seen them.  Can you tell me which purchase
9  records show that it was possibly Roundup PRO®
10  Concentrate?
11    A.  No.
12      MR. KRISTAL:  Object to form.
13  BY MR. DERRINGER:
14    Q.  Have you -- well, what are you referring to
15  here when you write, "Purchase records show it was
16  possibly Roundup PRO® Concentrate"?
17    A.  (The document was examined.)
18      I don't recall.
19    Q.  Why -- why did you write that?
20      MR. KRISTAL:  Objection to -- he just answered
21  that.
22    A.  I don't recall.
23  BY MR. DERRINGER:
24    Q.  What are the ingredients in the Roundup®
25  product that you believe Mr. Winston used?

27 (Pages 329 to 332)

William Sawyer, Ph.D.
July 17, 2019

---

Page 333

1    A.  In PRO Concentrate?
2    Q.  Just whatever the Roundup® product you believe
3  he used, I want to know what the ingredients are in
4  that product.
5    A.  (The document was examined.)
6        I don't have a product label from that era.
7  When I say "that era," meaning 2011 to 2013, so even if
8  I had the product label, it would probably just say
9  other ingredients anyway, but -- I don't have that
10  information.
11    Q.  Okay.  Do you have any information about how
12  much glyphosate Mr. Winston was actually exposed to?
13    A.  In what units?
14    Q.  In something other than exposure days.
15    A.  No.  And neither do the human epidemiology
16  studies differentiate between the different formulas of
17  glyphosate in Roundup.
18    Q.  Do you have any -- do you have any knowledge
19  about how much POEA Mr. Winston was exposed to?
20    A.  No.
21    Q.  Do you have any information about how much
22  formaldehyde Mr. Winston was exposed to?
23    A.  No.
24    Q.  Do you have any information about how much
25  ethylene oxide Mr. Winston was exposed to?

---

Page 334

1    A.  No.
2    Q.  Page 48 of your report, you say that when he
3  mixed the concentrate into the large container, the
4  concentrate would spill onto his hand?  How do you know
5  that?
6    A.  That's what he told me.
7    Q.  Okay.  Over what area did Mr. Winston spray
8  Roundup®?
9    A.  On all sorts of vegetation, tall and short.
10    Q.  How many acres did he spray Roundup® over?
11    A.  As I said yesterday, I did not ascertain
12  acreage or units of hectare in this case.
13    Q.  Would you be able to show me on a map where
14  Mr. Winston used Roundup®?
15    A.  No, I've made it clear yesterday that I did
16  not attempt to ascertain areas sprayed.
17    Q.  Did Mr. Winston ever use a backpack sprayer,
18  to your knowledge?
19    A.  Not to my knowledge.
20    Q.  Was Mr. Winston ever a farmer, to your
21  knowledge?
22    A.  I don't know.
23    Q.  Your understanding of what Mr. Winston wore
24  when he used Roundup®, is that contained at page 49 of
25  your report, Exhibit 6, under the paragraph, "Personal

---

Page 335

1  Protective Equipment"?
2    A.  Yes, and also in table 13.
3    Q.  Okay.  And is table 13 -- table 13 just a kind
4  of reproduction of the information that's reflected
5  in -- on page 49?  For Walter Winston?
6    A.  Yes.
7    Q.  Okay.  And do you have any idea of how much
8  glyphosate penetrated Mr. Winston's clothing when he
9  used Roundup®?
10    A.  Yes.
11    Q.  How much?
12    A.  I could give you percentages based on various
13  studies.
14    Q.  Okay.  How much in percentages penetrated Mr.
15  Winston's clothing?  How much glyphosate?
16    A.  (The document was examined.)
17        For his boots, approximately 5 percent or --
18  yeah, 5 percent.  Pants, 18 to 20 percent.  Cotton
19  gloves, 100 percent.  Cotton polyester short sleeve
20  shirts, I'm uncertain.  But his gloves are 100 percent
21  because they became wet when he sprayed.  They were wet
22  with Roundup®.  Complete penetration.
23    Q.  Any other estimate you --
24    A.  No.
25    Q.  -- you are going to offer about how much

---

Page 336

1  glyphosate penetrated Mr. Winston's clothing when he
2  used Roundup®?
3    A.  I believe the shirt is also, I think, 18
4  percent referenced in the POEM methodology, but I would
5  have to check that.
6    Q.  And what are you referring to when you're --
7  when you're testifying about these percentages?  What
8  page on your report?
9    A.  75 and table 13.  And I referenced table 13
10  because that states his hand became wet.
11    Q.  Okay.  And page 75, you're referring to table
12  14?
13    A.  No.  Paragraph above it -- two paragraphs.
14    Q.  You -- I'm sorry, you gave me some percentages
15  about how much glyphosate was going to -- would
16  penetrate his boots, in your opinion; his pants, in
17  your opinion; his gloves, in your opinion; things like
18  that.  Where are you -- where are you getting that
19  from, those percentages?
20    A.  A combination of the POEM methodology and
21  Machado, M-a-c-a-o-d-o hyphen N-e-t-o, et al, study on
22  safety of working conditions of glyphosate applicators.
23    Q.  I see.  Okay.  And so that eight -- that 20 --
24  18 to 20 percent -- well, let me start over.
25        For the 5 percent for the boots, where exactly

---

28  (Pages 333 to 336)

William Sawyer, Ph.D.
July 17, 2019



Page 337

1   are you getting that, up on your first paragraph of
2   page 75?
3       A.   Yeah, that's out of Machado-Neto.
4       Q.   Okay.  And the 18 to 20 percent for pants,
5   where is your source for that?
6       A.   The same, except I believe the POEM
7   methodology uses 18 percent.
8       Q.   Okay.  And your 100 percent for, I think you
9   said, gloves, what's your source for that?
10      A.   Cotton gloves, and they were -- his hands
11  became wet, so there was complete penetration of the
12  liquid to the skin.
13      Q.   Right, but where's your source for that?
14  What's your source?
15      A.   It's called common sense.  If one is wearing
16  cotton gloves and your hands become wet from the
17  outside material, it's penetrating.
18      Q.   Okay.  As a --
19      A.   We don't need a study for that.
20      Q.   And you're not relying on a study for that.
21      A.   No.
22      Q.   And were there other percentages you mentioned
23  when you answered my question about Mr. Winston and
24  what -- what amount of glyphosate would penetrate his
25  clothing?  You mentioned his shirt, I think.

Page 338

1       MR. KRISTAL:  Objection.  I don't think that
2   was the question.  I think you said Roundup®.
3       A.   Yeah, all I my responses are with respect to
4   Roundup®, and I stated the shirt, I believe, was the
5   same penetration factor as the pants, but I would need
6   to confirm that in the POEM methodology.
7   BY MR. DERRINGER:
8       Q.   All right.  So other than common sense for
9   your figure about gloves, which is what you cited, the
10  other percentages that you cited in your response,
11  you're relying either on the POEM model or
12  Machado-Neto, that study that's footnote 127 in your
13  report; is that right?
14      A.   Yes.
15      Q.   Okay.
16      MR. KRISTAL:  We've been going about another
17  hour and a half.  We're getting close to lunch.
18      MR. DERRINGER:  Happy to take a break.
19      THE VIDEOGRAPHER:  The time is 12:24.  End of
20  media 2.  Off record.
21      (Recess.)
22      THE VIDEOGRAPHER:  We're back on record.  The
23  time is 1:35, start of media 3.
24  BY MR. DERRINGER:
25      Q.   Good afternoon, Dr. Sawyer.

Page 339

1       The very last page of your report in this
2   matter, you state your conclusion or your opinion, "To
3   a reasonable degree of toxicological certainty, that on
4   the basis of exposure, dose, and duration, plaintiffs'
5   episodic exposures to Roundup® sustained over a period
6   of years was a substantial contributing factor to their
7   development and subsequent diagnoses of non-Hodgkin's
8   lymphoma."  It's at page -- is it 188?
9       A.   Yes.
10      Q.   Okay.  That's what you wrote there and signed
11  that at the bottom of the page?
12      A.   Correct.
13      Q.   And that applies to Mr. Winston?
14      A.   Yes.
15      Q.   What else was a substantial contributing
16  factor for Mr. Winston's development and subsequent
17  diagnosis of non-Hodgkin's lymphoma?
18
19
20
21
22
23
24
25

Page 340

1
2                                              So the
3   substantial risk factor is that of the Roundup®
4   exposure.  And I say that simply because the Roundup®
5   has the potential to
6
7
8
9
10
11
12
13
14      Q.   When you -- well, did you -- did you
15  investigate what the potential other contributing
16  factors were to Mr. Winston's development and
17  subsequent diagnosis of non-Hodgkin's lymphoma?
18      A.   There is some additional information here that
19  I should have noticed with respect to occupation and it
20  actually explains the reasons -- I have things in my
21  report I couldn't explain earlier regarding Mr.
22  Winston.
23      Q.   I asked you a question about whether you
24  investigated other potential contributing factors to
25  Mr. Winston's development and subsequent diagnosis of

29 (Pages 337 to 340)

William Sawyer, Ph.D.
July 17, 2019

Page 341

1 non-Hodgkin's lymphoma.
2   A. Oh, I did.
3   Q. Okay.
4   A. I reviewed this summary from the law firm.
5   Q. Okay. That's Exhibit 8?
6   A. Yeah. As I said yesterday, that was received
7 on June 17th, I believe. And I reviewed this
8 initially, this document. And this document does have
9 some information regarding potential co-contaminants.
10      For example, this document states motor oil,
11 gasoline. It also has number of years of use. It also
12 explains where I came up with April through
13 September/October. And it also explains where I
14 received information of a -- receipts or information
15 from the employer that suggested use of Roundup®
16 Concentrate. I was unable to answer some questions
17 earlier.
18      Clearly, this is the document that I derived
19 some of the information from.
20   Q. Okay.
21   A. And -- and it does show on here motor oil and
22 gasoline. I questioned Mr. Winston. He -- he didn't
23 state motor oil and gasoline, but --
24   Q. We'll get to the other chemical exposures in a
25 minute.

Page 342

1      This document that you just mentioned where you
2 derived information, this was the document provided to
3 you, you believe, on June 17th by Mr. Winston's
4 lawyers; is that right?
5   A. That's right.
6   Q. Okay. And when you say this is where you, you
7 know, derived information about purchase records
8 regarding the Roundup® that Mr. Winston allegedly used,
9 in this document that you were provided with by the law
10 firm representing Mr. Winston, are you relying on the
11 sentence here where it's written, "Purchase records
12 show it was possibly Roundup® PRO Concentrate"?
13   A. Yes.
14   Q. Okay. Do you know the basis for Mr. Winston's
15 lawyers putting that in this document?
16   A. My understanding is the majority of the
17 information in this document is from the CIH.
18   Q. What is CIH?
19   A. Steve Petty.
20   Q. Okay. Do you know when Mr. Petty initiated
21 his investigation or inquiry into anything related to
22 Mr. Winston?
23   A. No, I'd have to, you know, defer you to Mr.
24 Petty.
25   Q. All right. So can you say under oath the

Page 343

1 basis for the statement in here that was provided to
2 you by Mr. -- Mr. Winston's lawyers that purchase
3 records show it was possibly Roundup® PRO Concentrate?
4   A. I'm not sure I understand that.
5   Q. Do you know the basis for that statement?
6 Under oath, can you state that?
7      You said you had understanding it comes from
8 CIH. Is that your --
9   A. The document was prepared by Weitz & Luxenberg
10 law firm.
11   Q. I understand that. So what you're telling me
12 is that the source of your information that purchase
13 records show it was possibly Roundup® PRO Concentrate
14 is Mr. Winston's lawyers, correct?
15   A. No, you weren't listening -- listening
16 carefully. I said the majority of this information.
17 That's what I said on the record. I didn't say all of
18 it.
19   Q. The information on Exhibit 8?
20   A. Yeah.
21   Q. Okay. I'm asking you --
22   A. Much of it came from Steve Petty.
23   Q. I'm asking you now about the sentence,
24 "Purchase records show it was possibly Roundup® PRO
25 Concentrate." What's the basis for that sentence?

Page 344

1   A. Well, that -- that was from the lawyers at the
2 Weitz & Luxenberg law firm who prepared the document.
3   Q. Okay.
4   A. That's the source of that statement.
5   Q. And is that what you're relying on for the
6 statement in your report that says, "Purchase records
7 show it was possibly Roundup® PRO Concentrate"?
8   A. Yes.
9   Q. What I was asking you when you referred to
10 Exhibit 8 was what other potential causes or
11 contributing factors did you identify that could have
12 contributed to Mr. Winston's development and subsequent
13 diagnosis of non-Hodgkin's lymphoma ███████
14 ██
15 ██
16   A. That's all.
17   Q. And -- okay.
18      ████████████████
19 ██
20 ████████████████████████
21 ██
22 ████████████████████████
23 ██ █████████████████
24 ██ █████████████████████
25 ██ ████████████████████████

William Sawyer, Ph.D.
July 17, 2019



**Page 345**

2  Q.  What information from Mr. Petty are you now
3  referring to?
4  A.  The summary.
5  Q.  That Exhibit 26?
6  A.  Yeah.
7  Q.  Okay.  Go ahead and take that out.

**Page 346**

16  Q.  I think you also mentioned that you were aware
17  that he was exposed to motor oil and gasoline; is that
18  right?
19  A.  Yes.
20  Q.  Okay.  In fact, if you go to your report at
21  page 49, you write, "Mr. Winston was exposed to motor
22  oil and gasoline."
23       And then you refer the reader to tables 18 and
24  19.  Was that a typo there?  Do you mean tables 19 and
25  20?

**Page 347**

1  A.  (The document was examined.)
2       It looks like table -- I'm showing table 19
3  and 20.
4       MR. KRISTAL:  Yeah, that's what I had.
5  BY MR. DERRINGER:
6  Q.  Right.  In your report when you talk about Mr.
7  Winston, you refer the reader to pages 49, tables 18
8  and 19.  I'm asking you if that was a typo.  Did you
9  mean that it was 19 and 20?
10  A.  Yes, that's correct.
11  Q.  And so tell me how you ruled out Mr. Winston's
12  exposure to motor oil and gasoline as contributing
13  causes to the development and subsequent diagnosis of
14  Mr. Winston's non-Hodgkin's lymphoma.
15  A.  I ruled out -- motor oil is simply not
16  carcinogenic.  Motor oil, historically -- if we go back
17  nearly 100 years, shale oil that was used on the early
18  sewing machines, the first sewing machines that were
19  done, the workers developed skin cancer from the
20  polynuclear aromatic hydrocarbons in the crude/shale
21  oil that was used back then.
22       Motor oil has no carcinogens in it.  Table 20
23  indicates -- MSDS indicates it contains a substance
24  that is a probable cancer hazard based on animal
25  studies.

**Page 348**

1  Q.  Which substance is that?
2  A.  That is the naphthalene.  And naphthalene,
3  itself, is not in any way associated with NHL.
4  Q.  How do you know that?
5  A.  Nor is it a probable human carcinogen.
6  Q.  How do you know that?
7  A.  Years of experience in matters involving the
8  industry and review of studies, peer-reviewed
9  literature.  There's absolutely not a shred of
10  information ever published that would suggest
11  naphthalene would cause that.
12  Q.  Which studies have you reviewed?  I'm just
13  interested in the ones you're referring to in your
14  prior answer.
15  A.  I don't recall.  Many years' worth.
16  Q.  And other than looking at the MSDS for motor
17  oil reflected on table 20, did you do anything else to
18  investigate whether the ingredients that you've listed
19  in motor oil are carcinogenic?
20  A.  Yeah, compared them against the IARC
21  carcinogen list.
22  Q.  Anything else?
23  A.  No.
24  Q.  How was Mr. Winston exposed to motor oil?
25  A.  Through the use of gasoline and motor oil for

31 (Pages 345 to 348)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8508-16   Filed 12/20/19   Page 93 of 119

William Sawyer, Ph.D.
July 17, 2019

Page 349

1  lawn care equipment.
2  Q.  Where is -- where are you getting that
3  information from?
4  A.  Steve Petty interview, page 5, middle of the
5  page.
6  Q.  Okay.  Any other exposure you're aware of of
7  Mr. -- Mr. Winston to motor oil?
8  A.  No.
9  Q.  How much motor oil was Mr. Winston exposed to?
10  A.  Don't know.  It's irrelevant.  Completely
11  irrelevant.
12  Q.  How much, if any, ingredient listed on table
13  20 under motor oil was Mr. Winston exposed to?
14  A.  I just said I don't know, but it's completely
15  irrelevant.
16  Q.  You also mentioned, I think, that he was
17  exposed to gasoline?
18  A.  Yeah, so are the people in control groups in
19  the human studies.
20  Q.  In your chart --
21  A.  Nearly everyone puts gasoline in their
22  vehicle.
23    Let me finish my answer.
24  Q.  It sounded like you were finished, but,
25  please, go ahead.

Page 350

1  A.  There have been studies published that I have
2  reviewed, I don't know the names of them off the top of
3  my head, but I have reviewed numerous studies on
4  exposures to benzene during the filling of gasoline
5  tanks in vehicles by self-service drivers.  And the
6  studies have very -- very carefully and consistently
7  calculated the number of micrograms per cubic meter or
8  parts per billion of benzene into the air during
9  filling of gas into the car and those studies reveal
10  that the gasoline levels in the air when filling the
11  gas and converting the parts per million benzene use
12  are about a hundred to a thousand times lower than the
13  amount in the published studies that equate to
14  benzene-induced lymphatic malignancy.
15    The study -- the lymphatic malignancies in the
16  period required are about a minimum of ten to 20 parts
17  per million benzene years.  That's how it's measured.
18  The automotive gasoline self-service fillers are
19  hundreds of times lower than that.  And it's an
20  irrelevant issue, and to bring it up before a jury
21  would be giving them false information.
22  Q.  Can you name one study?
23  A.  No, I can't.  I don't memorize thousands of
24  studies that I read per year.
25  Q.  How was Mr. Winston exposed to gasoline?

Page 351

1  A.  Filling his lawnmower and, of course, his --
2  not his lawnmower, but the lawn equipment he used.
3  And, of course, as everyone in this room probably that
4  pumps self-service gasoline, through vapors that come
5  up, especially in older vehicles that did not have
6  vapor recovery systems.
7  Q.  Is that it?  Those are the ways he was exposed
8  to gasoline?  Is that your understanding?
9  A.  Yes.
10  Q.  Okay.  Did you write down gasoline as an
11  exposure for everybody -- every plaintiff in this case?
12  A.  No, that would be nonsense.  We're -- anyone
13  who fills a car with self-service has miniscule levels
14  of benzene, hundreds of times lower than the amount
15  required in the studies to produce a lymphatic
16  malignancy.
17  Q.  And what did you rely on to determine that
18  gasoline is not a carcinogen?
19  A.  The generally accepted assessment of gasoline
20  is that the benzene in the gasoline is a class A human
21  carcinogen, the gasoline mixture itself.  Although it
22  contains benzene, in the current gasoline, is generally
23  less than .5 percent, recognizes that it does contain
24  an IARC group 1 human carcinogen, but the mixture
25  itself is questionable.

Page 352

1  Q.  You mentioned before -- you said the benzene
2  has been classified as class A.  What are you referring
3  to there?
4  A.  Well, IARC would call it group 1.
5  Q.  Who -- what were you referring to as class A?
6  A.  Benzene.
7  Q.  Right, but who is classifying benzene as class
8  A, and what is class A?
9  A.  Well, different agencies use clarifications of
10  A rather than group 1.
11  Q.  Right.  Which agency are you referring to
12  using A and what is the -- what do they mean by group A
13  or class A?
14  A.  Well, EPA uses A, B1, B2, C.
15  Q.  How does EPA classify benzene?
16  A.  Not a class A.
17  Q.  And what is class A, according to EPA?
18  A.  Confirmed human carcinogen.
19  Q.  Other than looking at the MSDS and at the IARC
20  listing, did you do any further research into the
21  literature about whether gasoline or any of the
22  ingredients you list on table 20 under gasoline is a
23  possible human carcinogen?
24  A.  No, I don't need to.  I am intimately familiar
25  with the gasoline literature.  One -- one can go to the

32  (Pages 349 to 352)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

William Sawyer, Ph.D.
July 17, 2019

Page 353

1  literature and study on all of this, but the
2  reformulated gasoline that's currently used is not
3  considered, by agencies anyway, as a human carcinogen.
4      Q.  How much gas --
5      A.  Now, I will say this:  In Norway, I believe,
6  there is a cancer hazard warning for gasoline.
7  Possibly in other European countries, but not in the
8  U.S.  But the point is that the amount of benzene in
9  the gasoline that humans are exposed to when filling a
10  lawnmower or a car with gasoline is -- is an irrelevant
11  number.
12      Q.  Do you, in your practice, rely on the
13  classification of the Norwegian authorities or of the
14  United States authorities when it comes to classifying
15  benzene as a carcinogen or not?
16          MR. KRISTAL:  Objection to form.
17      A.  I -- I recognize both.
18  BY MR. DERRINGER:
19      Q.  Well, they're conflicting, right?
20      A.  Yep.
21      Q.  So which one is right, in your opinion?
22      A.  It depends on the dose.  If I were to expose
23  myself for year after year to levels of gasoline high
24  enough to produce ten or 20 part per million benzene
25  years, certainly, that -- that -- but, you know,

Page 354

1  there's a practical aspect to this.  If only half
2  percent of it is benzene and the air-monitoring studies
3  that have been performed during fill-ups of gasoline in
4  a vehicle show that the exposure limit -- level in part
5  per million years is 500 times below what's needed to
6  cause cancer.  It's just misleading to say it's a
7  carcinogen and that filling a lawnmower is going to
8  cause leukemia.  That's just very misleading.
9      Q.  What was the dose of gasoline to which Mr.
10  Winston was exposed?
11      A.  Gasoline or benzene?
12      Q.  Gasoline.
13      A.  I don't know.  It's irrelevant.  It's -- the
14  benzene is what one would have to consider.  The
15  gasoline studies all show on a -- on a time weighted
16  average basis, levels that are in the -- in the part
17  per billion.
18      Q.  What's the dose of benzene that Mr. Winston
19  was exposed to as a result of his exposure to gasoline?
20      A.  Hundreds of times less than the ten or 20
21  parts per million years that is required to cause
22  lymphatic malignancies.
23      Q.  Can you give me the dose that he was exposed
24  to?
25      A.  Yes.

Page 355

1      Q.  What is it?
2      A.  Less than .01 PPM benzene.
3      Q.  And what's your basis for stating that?  How
4  do you know?
5      A.  My familiarity with the studies of gasoline
6  fillers.
7      Q.  Yeah, but I'm asking about his dose.
8      A.  And there are studies of self-service people
9  and gasoline fillers, people who work full time pumping
10  gasoline into cars.  In some states such as New Jersey,
11  I don't think self-service exists.  I could be wrong,
12  but...
13          And there have been studies on the exposures
14  to full-time fillers versus the average U.S. citizen.
15  And those numbers are insufficient to pose any risk to
16  a self-service user.
17      Q.  Did you calculate in this case how much of any
18  of the ingredients listed on your table 20 next to
19  gasoline Mr. Winston was exposed to?
20      A.  No, it would be a complete waste of time.
21  It's an irrelevant matter.
22  ▮ ████████████████████████████
23  ▮ ████████████████████████
24  ▮ ██████████████████████████████
25  ▮ ████████████

Page 356

1  ▮ ██████████████████████████████
2  ▮ ██████████████████████████
3  ▮ ████████████████████████
4  ▮ ██████████████
5  ▮ ████████████████████████████████
6  ▮ ████████████████████████
7  ▮ ████████████
8      A.  No, I don't need to.  A month is insufficient
9  to be of any significance.
10      Q.  But it's just that one plaintiff that you --
11      A.  Yeah.  I doubt I even included it in the
12  report.
13      Q.  Okay.  And did you see any evidence in any
14  plaintiff in this case of any compromised immune
15  system?
16      A.  No.  Not -- not prior to --
17      Q.  Ms. Filippazzo is going to ask you some
18  questions about some of the other plaintiffs in this
19  case.  I thank you for your time.
20          MR. KRISTAL:  Why don't we take a break?
21          MR. DERRINGER:  Sure.
22          THE VIDEOGRAPHER:  2:03, off record.
23          (Recess.)
24          THE VIDEOGRAPHER:  We're back on record.  The
25  time is 2:23 p.m.

33 (Pages 353 to 356)

William Sawyer, Ph.D.
July 17, 2019

Page 357

1  BY MR. DERRINGER:
2      Q.  Well, Dr. Sawyer, contrary to what I just said
3  at the end of -- before going off the record, I've got
4  some more questions for you on some additional
5  plaintiffs.
6          I want to ask you some questions about Stephen
7  Gatewood.
8          You -- let me ask you -- actually, before I ask
9  you questions about Mr. Gatewood --
10         MR. DERRINGER:  Mr. Kristal, you were kind
11  enough to offer providing a printout of the CIH,
12  Mr. Petty, interview summary that Dr. Sawyer
13  reviewed relating to Mr. Gatewood.
14         MR. KRISTAL:  (A document was handed.)
15         MR. DERRINGER:  I appreciate that.
16         MR. KRISTAL:  During the break when you
17  stepped out, I gave Dr. Sawyer hard copies of all
18  of them so we wouldn't have to fumble around here.
19         MR. DERRINGER:  Okay.  Thank you.  So I'm
20  going to mark this as Exhibit 28.
21         (Defendant's Exhibit-28 was marked for
22  identification.)
23  BY MR. DERRINGER:
24      Q.  Dr. Sawyer, I'm handing you Exhibit 28, which
25  is titled, "Mr. Stephen Gatewood's Interview Summary

Page 358

1  Sheet."  EES Group is the title.
2          Is that the interview summary sheet from Mr.
3  Petty that you reviewed?
4      A.  It is.
5      Q.  Okay.  And I asked you a similar question with
6  respect to Mr. Winston.  I'll ask the same question
7  with respect to Mr. Gatewood and it probably won't
8  surprise you that I'll ask a similar question with
9  respect to other plaintiffs.
10         Is everything that you know about Stephen
11  Gatewood that's relevant to your specific opinion that
12  Roundup® was a substantial contributing factor in Mr.
13  Gatewood's cancer, is that contained at pages 18 to 20
14  of your report, that is, Exhibit 6; in addition to
15  table 10 of your report; table 11 of your report; pages
16  13 to 14 of Exhibit 8, which is the summary notes
17  provided to you by Mr. Gatewood's attorneys; and the
18  Gatewood entries in Exhibits 12 and 13; and the
19  interview summary that is Exhibit 28?
20      A.  No.
21      Q.  In addition to what I just listed, what else
22  reflects what you know about Mr. Stephen Gatewood
23  that's relevant to your opinion that Roundup® was a
24  substantial contributing factor to Mr. Gatewood's
25  cancer?

Page 359

1      A.  Table 13, page 72, which is the PPE.  That
2  table actually starts on page 71, so it would be table
3  13, page 71.
4      Q.  And as with -- well, strike that.
5          Am I correct that the information that you've
6  written in table 13 for Stephen Gatewood is also
7  contained at pages 18 to 20 of your report?
8      A.  I think so.
9      Q.  Okay.  Anything else?
10     A.  Yes.
11     Q.  What else?
12     A.  You may have mentioned this, but I -- I don't
13  remember hearing you say the No. 10 document.
14     Q.  Okay.  That's Exhibit 10 to this deposition?
15     A.  Yeah.  That's my notes on comparing Stephen
16  versus table 10.  Stephen Petty's interviews versus
17  table 10.
18     Q.  All right.  Anything else?
19     A.  I think you mentioned 3 and 4.
20     Q.  No, I didn't, but Exhibit 3 is incorporated
21  into Exhibit 6, isn't it?
22     A.  It could be, but I'm still referring to
23  Exhibit 3 -- I'm sorry, not Exhibit 4, Exhibit -- is
24  that a 4 or --
25         MR. KRISTAL:  It looks like a 9.

Page 360

1      A.  Yeah, so it's not -- Exhibit 9 is the --
2          MR. KRISTAL:  The materials considered list
3  that wasn't part of the report.
4      A.  And it is specific because --
5          THE WITNESS:  I'm sorry.
6  BY MR. DERRINGER:
7      Q.  Well, I would like you to testify.  Go ahead.
8          MR. KRISTAL:  I'm just telling you what
9  Exhibit 9 is.
10         MR. DERRINGER:  I understand.
11     A.  It does have specific things to Mr. Gatewood.
12  For example, his deposition.
13  BY MR. DERRINGER:
14     Q.  Okay.
15     A.  So I'm referring to that, as well.
16     Q.  Okay.  But I'm asking you a slightly different
17  question, and you were candid with me before when we
18  talked about Mr. Winston.
19         Is everything that you know about Stephen
20  Gatewood that is relevant to your opinion that Roundup®
21  was a substantial contributing factor to Mr. Gatewood's
22  cancer contained in pages 18 to 20 of your report;
23  Exhibit 6; table 10 of your report; table 11 of your
24  report; table 13 of your report; pages 13 to 14 of
25  Exhibit 8; and then the Stephen Gatewood entries for

34  (Pages 357 to 360)

William Sawyer, Ph.D.
July 17, 2019

| Page 361 |
| --- |

1 Exhibits 10, 11, and 12 and Exhibit 13 and Exhibit 28?
2    MR. KRISTAL:  Asked and answered.
3    **A.  Yes.**
4 BY MR. DERRINGER:
5    Q.  How tall is Mr. Gatewood?
6    **A.  Irrelevant, and this is a waste of time.**
7 **My -- I was asked by this law firm, Weitz & Luxenberg,**
8 **to evaluate the exposure and dose of glyphosate and the**
9 **composition of Roundup® and the toxicity of Roundup®**
10 **and whether or not these individuals had sustained an**
11 **increased -- a statistically significant and**
12 **substantial increased risk of malignancy.**
13    **Body weight, what color they are, how tall**
14 **they are, it's all nonsense.  It has nothing to do with**
15 **my assessment.  If you want to keep asking these**
16 **questions on each person, I'm going to start recording**
17 **how much time you're wasting.  It has nothing to**
18 **do -- I'm not doing a milligram per kilogram**
19 **calculation, so it's irrelevant what they weigh.**
20    Q.  How tall is Mr. Gatewood?
21    **A.  Irrelevant.**
22    Q.  Do you know?
23    **A.  No, it's irrelevant.**
24    Q.  How much does Mr. Gatewood weigh?
25    **A.  Completely irrelevant to my dose -- dose**

| Page 362 |
| --- |

1 **calculation, as the studies are in exposure years and**
2 **not milligram per kilogram body weight.**
3    Q.  How much does Mr. Gatewood weigh?
4    **A.  That's an irrelevant question because my**
5 **assessment is based on exposure years and the studies**
6 **do not contain milligram per kilogram body weight.**
7    Q.  Do you know how much Mr. Gatewood weighs?
8    **A.  No.  Same answer.**
9    Q.  Do you know how much Mr. Gatewood weighed from
10 1987 to 2011 when he used Roundup® allegedly?
11    MR. KRISTAL:  I'm assuming I have my same
12 objection?
13    MR. DERRINGER:  That's a good point.  Yes, I
14 will -- I will grant that, for the questions about
15 Mr. Gatewood, you have a standing objection to
16 relevance.
17    **A.  Again, the answer is unknown because it has no**
18 **bearing upon the human studies that document what**
19 **exposure dose levels are associated with non-Hodgkin's**
20 **lymphoma, thus, the body weight questions are**
21 **completely irrelevant to my assessment, and that's why**
22 **I don't know.**
23 BY MR. DERRINGER:
24    Q.  What does Mr. Gatewood do for a living?
25    **A.  Mr. Gatewood has had numerous different types**

| Page 363 |
| --- |

1 **of work varying from farmer, laborer, construction.  A**
2 **wide variety of jobs.**
3    Q.  Where are you getting that information?
4    **A.  Stephen Petty's interview summary sheet.**
5    Q.  And -- okay.  That's Exhibit 28; is that
6 right?
7    **A.  I think it's 26.**
8    Q.  That's for Mr. Winston.
9    **A.  Oh, I'm sorry, yeah.  These are -- these are**
10 **numbered differently, then.**
11    MR. KRISTAL:  What's numbered differently?
12 What number did you give it?  It is whatever it is.
13    MR. DERRINGER:  28.
14    **A.  Here we go.  28.  Thank you.**
15 BY MR. DERRINGER:
16    Q.  You're welcome.
17    You might want to keep that out because I'm
18 going to ask you a few questions about your last
19 answer.
20    When was Mr. Gatewood a laborer?
21    **A.  Well, in one capacity, '73 until July '77.**
22    Q.  And that was before he ever used Roundup®; is
23 that right?
24    **A.  Yes.**
25    Q.  And when was he a laborer -- well, was he also

| Page 364 |
| --- |

1 a laborer before 1973?  Go to page 2 of that document
2 you're looking at.  That's the Petty summary, Exhibit
3 28.
4    **A.  He was.**
5    **And also on page 6, he has another labor job.**
6    Q.  Okay.  And when did he work there, the laborer
7 job you referred to at page 6?
8    **A.  For about six months in 1979.**
9    Q.  I'm sorry, page 6?
10    **A.  Oh, I'm sorry, 1978 for approximately a year.**
11    Q.  And I think you mentioned he was a farmer?
12    **A.  No.**
13    Q.  Where did you find that?
14    **A.  No, I misread.  Framer.**
15    Q.  Framer.  What kind of framer; do you know?
16    MR. KRISTAL:  Constitution.
17 BY MR. DERRINGER:
18    Q.  What kind of framing?
19    **A.  Metal studs, drywall, which would be generally**
20 **associated with commercial buildings.**
21    Q.  Metal studs and drywall.  Is that also
22 associated with residential building?
23    **A.  Can be, but not common.  Usually, wood studs**
24 **are used in residential structures.**
25    Q.  Does it look like to you from reviewing Mr.

35 (Pages 361 to 364)

William Sawyer, Ph.D.
July 17, 2019

Page 365

1   Petty's interview notes or this summary sheet, which is
2   Exhibit 28, that Mr. Gatewood's main occupation was as
3   a laborer or a framer from 1971 until -- well, up until
4   2011, at least?
5        A.   Okay.
6        Q.   Is that -- is that what -- well, do you agree
7   with that?
8        A.   In general.  There may have been some gaps,
9   and I'd have to really provide a list to see if there
10  were any time gaps, but I'm not sure it was continuous
11  to 2011, but, certainly, the range you gave is correct
12  according to this summary.
13       Q.   And what can you -- what do you know about the
14  work that Mr. Gatewood did as a laborer?
15       A.   It was generally -- or exclusively light
16  construction.
17       Q.   What's your basis for saying that?
18       A.   Well, he did framing, worked with metal studs,
19  sheetrock, and he also did interior work with cabinets,
20  remodeling.  This is all light construction work.
21       Q.   And the basis for your knowledge that this is
22  what Mr. Gatewood did for his work, where does that
23  come from?  What's the basis for that?
24       A.   Summary prepared by Steve Petty, CIH.
25       Q.   Okay.  Did you discuss Mr. Gatewood's

Page 366

1   occupation and what he did for a living in your
2   interview with him on June 19th, 2019?
3        A.   Only limited, as I recall, to construction.
4   That's the only thing he told me.
5        Q.   There's nothing in your report, pages 18, 19,
6   and 20, that discuss Mr. Gatewood's occupation other
7   than your sentence on page 19 where you write, "Mr.
8   Gatewood did not apply Roundup® occupationally," right?
9        A.   That's right.  His construction work was
10  irrelevant.  There was no chemicals used other than
11  common materials that are used in framing.
12       Q.   How do you know that?
13       A.   I do know he -- he said light construction.
14       Q.   Right.  How do you know no chemicals were used
15  during his occupation?
16       A.   I specifically asked.  I specifically asked if
17  any pesticides were used indoors, outdoors, and powder
18  chemicals in the workplace, et cetera.
19       Q.   That was the question you asked him?
20       A.   That's the same question I've asked everyone.
21       Q.   You list in your report under Mr. Gatewood two
22  different residential locations, it looks like.  One at
23  ████████████  and then you've got one year -- well,
24  two locations, ███████████
25  ██████     Do you see that?

Page 367

1        A.   Yes.
2        MR. KRISTAL:  Is it Lake Road?
3        A.   Holly Oaks Lake Road.
4   BY MR. DERRINGER:
5        Q.   You're right.  Thank you for that correction.
6        Did Mr. Gatewood live at both of those
7   properties?
8        A.   I don't remember.  It would be irrelevant.
9   What I was interested in is his spray activity at these
10  properties, not whether it was at a relative's home, the
11  mother-in-law, or his home.
12       Q.   I just asked you if you know if he lived at
13  both of those properties.
14       A.   No, I don't know.  I really don't care.
15       Q.   Do you know why he sprayed at two different
16  properties?
17       A.   No.  That's not relevant to my assessment.
18       Q.   Have you ever visited or inspected any of the
19  properties where Mr. Gatewood says he used Roundup®?
20       A.   No.
21       Q.   Did you ever look them up electronically like
22  on Google Maps?
23       A.   No, I'm not -- I'm not assessing the area
24  sprayed for quantitative purposes.
25       Q.   Are you assessing the area sprayed for any

Page 368

1   purpose?
2        A.   I have asked questions regarding the height of
3   weeds, whether it was low groundwork or whether
4   elevated, fences and so on.  Those are questions I've
5   asked during the interviews with the various
6   plaintiffs.
7        Q.   And what did Mr. Gatewood tell you about the
8   height of the weeds, whether they were low ground,
9   whether they were fences where he sprayed?
10       A.   I'm just looking.  It's interesting because he
11  actually is one of the plaintiffs who did spray above
12  ground level.  And I stated on page 19 at his
13  residences, Mr. Gatewood had vines up to 40 feet tall
14  and would apply Roundup® to eliminate them (at face
15  level), but encountered drift exposures.
16       Q.   What's the basis for that statement?
17       A.   His response to my question.
18       Q.   In your interview.
19       A.   Yes.
20       Q.   Okay.  Other than what's written there, do you
21  have any information about the height of the material
22  that Mr. Gatewood sprayed with Roundup®, whether they
23  were low ground or whether they were fences?
24       A.   I didn't understand the question.
25       Q.   What else, other than the sentence you just

36 (Pages 365 to 368)

William Sawyer, Ph.D.
July 17, 2019



Page 369

```
 1   read me, can you tell me about his response to the
 2   question you say you asked Mr. Gatewood about the
 3   height of what he sprayed, whether they were low ground
 4   weeds, whether they were fences?  What was his response
 5   to that question?
 6       A.  That he had numerous trees with vines on them
 7   and he sprayed at face level and received drift into
 8   his face and upper body.
 9       Q.  What did he tell you about whether there were
10   fences on the property?
11       A.  I don't believe there were any.
12
19       Q.  What's the source of that information?
20       A.  My interview.
21       Let me check other documents, as well, to see
22   if there's any other -- if any of that information came
23   from other documents.
24       Q.  Sure.  You -- okay.
25       A.  (The documents were examined.)
```

Page 370

```
 1       It's possible that part of my response is from
 2   the deposition of Mr. Gatewood.
 3       Q.  It appeared to me, Dr. Sawyer, that throughout
 4   your report when something came from a plaintiff's
 5   deposition, you were pretty diligent, it looks like,
 6   about footnoting it.  Did you try to do that?
 7       A.  Yeah, but I was inconsistent.
 8       Q.  Okay.  So --
 9
```

Page 371

```
 1
11       Q.  Did you make an effort to include in your
12   report when -- when you were writing down your report
13   for each of the 14 plaintiffs in this case, if a
14   plaintiff mentioned that they had a family history of
15   cancer, did you make it your point to include that in
16   your report?
17       A.  Yes, and you will see that there are a number
18   of people here who provide that information in terms of
19   the relatives.
20
```

Page 372

```
 1
```

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

William Sawyer, Ph.D.
July 17, 2019

---

Page 373

1  else.
2  Q.  What was the surgical procedure he had?
3  A.  I'm not sure.
4  Q.  And how did you learn about his medical
5  history?
6  A.  Everything I told you, except for the surgical
7  procedure, I learned from my interview.
8  Q.  How did you learn about the surgical
9  procedure?
10  A.  Speaking with the attorneys.
11  Q.  Which attorneys?
12  A.  Robin Greenwald and -- and Jerry, as well.
13  Q.  Mr. Gatewood's attorneys?
14  A.  Yes.
15  Q.  And what did they tell you about this surgical
16  procedure?
17  [REDACTED]
18  [REDACTED]
19  [REDACTED]
20  [REDACTED]
21  [REDACTED]
22  [REDACTED]
23  [REDACTED]
24  [REDACTED]
25  [REDACTED]

---

Page 374

1  [REDACTED]
2  [REDACTED]
3  [REDACTED]
4  [REDACTED]
5  [REDACTED]
6  [REDACTED]
7  [REDACTED]
8  [REDACTED]
9  [REDACTED]
10  [REDACTED]
11  [REDACTED]
12  Q.  Did you notice in your -- well, do you have
13  any knowledge that there was any history or evidence of
14  any skin irritations experienced by Mr. Gatewood?
15  A.  Not that he told me about, no.
16  Q.  Any evidence of Mr. Gatewood experiencing any
17  eye irritations?
18  A.  (The document was examined.)
19      Not that came up in the interview, no.  I'm
20  going to check some other records here.
21  Q.  Sure.
22  A.  It's possible there was some mention of it in
23  the deposition, I suppose, but I don't recall.
24  Q.  Did you discover anything indicating that Mr.
25  Gatewood used any products that contained solvents or

---

Page 375

1  anything else that could increase his risk of getting
2  sick?
3  A.  Only in the Stephen Petty summary of -- he
4  occasionally used lacquer thinner.  However, that did
5  not have any capacity to produce NHL.
6  Q.  Anything else?
7  A.  Well, he stated in an interview that he used
8  Raid and Weed B Gon mix and spray for occasional spot
9  treatments of weeds.
10  Q.  Anything else?
11  A.  No.
12  Q.  What did you do to determine the universe of
13  products that Mr. Gatewood used that contained solvents
14  or anything that could increase his risk of getting
15  sick?
16      MR. KRISTAL:  Objection to form.
17  A.  Based on my -- the information I had, all he
18  used was occasional lacquer thinner at one of his
19  workplaces.
20  BY MR. DERRINGER:
21  Q.  Right.  What did you do to determine that?
22  Did you -- was this a topic of conversation in your
23  interview with him on June 19th?
24  A.  No.
25  Q.  Did you ask him on June 19th questions to try

---

Page 376

1  to figure out whether he had been exposed to other
2  products that contain solvents or anything else that
3  could increase his risk of getting sick?
4  A.  Yes, and he explained he used Raid and Weed B
5  Gon mix and spray.
6  Q.  And the questions you asked are the same ones
7  that you've described to me during our time together
8  yesterday; is that right?
9  A.  Yes, including occupational exposures.
10  Q.  You mentioned lacquer thinner from Mr. Petty's
11  summary.  Can you tell me where in Exhibit 28 you're
12  referring to?
13  A.  (The document was examined.)
14      Page 9, middle of the page.
15  Q.  Under, "Products Used"?
16  A.  Yeah.
17  Q.  Tell me everything you know, Dr. Sawyer, about
18  Mr. Gatewood's cancer.
19  A.  Well, it's a DLBCL.
20      No, let me check.
21      (The document was examined.)
22      Yeah, it was.  And he was 56 years old at the
23  time he was diagnosed.
24  Q.  What else do you know?
25  A.  (The document was examined.)

William Sawyer, Ph.D.
July 17, 2019

Page 377

1    I believe he is not in remission currently.
2  Very currently. Beyond that, I don't have any details.
3    Q. What makes you believe that?
4    A. Either he told me that or one of the attorneys
5  told me that from the meeting Monday, but I don't
6  remember which.
7    Q. One of the plaintiffs' attorneys?
8    A. Yes.
9    Q. You just mentioned a meeting you had with them
10  on Monday. How long did that meeting last?
11    A. Most of the day.
12    Q. What was the purpose of the meeting?
13    A. To discuss my findings.
14    Q. Had you discussed your findings with the
15  attorneys before Monday?
16    A. I had not.
17    MR. KRISTAL: And I would object to any
18    question about the substance of the discussions and
19    instruct the witness not to answer.
20  BY MR. DERRINGER:
21    Q. Who was present on Monday when you met with
22  the attorneys?
23    MR. KRISTAL: That's okay. As long as you
24    don't talk about substance, he can ask how long,
25    where we were, whether the dog was there.

Page 378

1    A. Robin and Jerry.
2  BY MR. DERRINGER:
3    Q. Robin Greenwald and Jerry Kristal?
4    A. Yes.
5    Q. Anybody else from your operation?
6    A. I had my -- two of my support staff were
7  there.
8    Q. Who are they?
9    A. Teddy and Bella.
10    Q. Are these your dogs?
11    A. Yeah, a golden and a sheltie. Yeah.
12    Q. And have you now told me everything you know
13  about Mr. Gatewood's cancer?
14    A. Yes.
15    Q. Okay. Does Mr. Gatewood have tumors anywhere
16  else in his body?
17    A. I don't -- I don't know. I would defer that
18  to the oncologist.
19    Q. Okay. Same question with whether he has
20  cancer anywhere else in his body; do you know?
21    A. Don't know. I would defer that to the
22  oncologist.
23    Q. You mentioned that Mr. Gatewood was, you said,
24  56 years old when he was diagnosed with -- with cancer;
25  is that right?

Page 379

1    A. Yes.
2    Q. All right. And are there people just like Mr.
3  Gatewood who are not exposed to Glyphosate or Roundup®
4  and who still develop non-Hodgkin's lymphoma?
5    MR. KRISTAL: Object to the form.
6    A. I'm not clear of -- I'm not clear of the
7  question.
8  BY MR. DERRINGER:
9    Q. Are there people just like Mr. Gatewood who
10  are not exposed to glyphosate or Roundup® and who still
11  develop non-Hodgkin's lymphoma?
12    MR. KRISTAL: Object to the form.
13  ███████████████████████████████████████
   ████████████████████████████████
14  ███
15  ████████████████████
16    I'm not sure what you're getting at.
17  BY MR. DERRINGER:
18  ███████████████████████
19  ███
20  ████████████████████
21  ██████████████████████████
22  ███
23  ███
24  ████████████████████████████
25  ███

Page 380

1  ███████████████████████████████████████
   ██████████████████████████
2  ████████████████████████████
3  ██
4  ██████████████████████████████████████
5  ██
6  ███████████████████████████████████████
7  ██
8  ███████████████████████████████████████
9  ██
10  ██████████████████████████████████
11  ██
12    Q. How did you learn about Mr. Gatewood's use of
13  Roundup®?
14    MR. KRISTAL: Objection. Other than what he's
15    already testified to?
16    MR. DERRINGER: I just want to know how he
17    learned about it, not what he knows. How did he
18    learn about it?
19    MR. KRISTAL: He just explained the universe
20    of things.
21    A. This will take a while, but I'll go through
22  the whole process again.
23    I initially reviewed the summary Roundup® use
24  information sheets provided by Weitz & Luxenberg. I
25  think they arrived, I think, around June 17th. Then --

39 (Pages 377 to 380)

William Sawyer, Ph.D.
July 17, 2019

| Page 381 |
| --- |

1  it was slightly -- they arrived slightly before my
2  interviews, I know that.
3         And then I assessed the summaries and made a
4  Bill scribble list of questions which covered the
5  standard methodology of assessment starting with
6  demographics, medical history, and so on and so forth.
7  And began con -- composing this draft report.
8         I then reviewed -- I may have reviewed one
9  deposition prior to.  Then I reviewed the depositions
10  and later I received the interview summary sheets from
11  CIH, as well as the Excel table from CIH.
12         And then I -- during the tail end of report
13  preparation or after the report preparation, really, I
14  did a comparison of the Stephen Petty, CIH, interviews
15  with respect to my table 10 to look for inconsistencies
16  and then, basically, troubleshoot and try to figure out
17  why there were inconsistencies, which I did solve,
18  and -- and then rereviewed the report.  Well, I should
19  say edited the report and sent out an edit on, I think
20  it was, July 11th.  And then it went out on the 12th.
21  BY MR. DERRINGER:
22     Q.  Can I see Exhibit 10, please?
23     A.  (A document was handed.)
24     Q.  Thank you.
25         Exhibit 10 is titled, "Winston, et al., Table

| Page 382 |
| --- |

1  10 Notes," and next to Stephen Gatewood, you write,
2  "Petty interview corresponds with table 10."
3         What did you mean when you wrote that?
4     A.  Well, that the exposure days was reasonably
5  consistent and, of course, that -- when I say
6  "reasonably consistent," I also consider whether I
7  included all of the properties.  Now, in this case, I
8  did.  In some cases, I only focused on the primary
9  exposure property.
10     Q.  How much Roundup® are you going to tell the
11  jury that Mr. Gatewood used?
12     A.  That he used a one- or two-gallon handheld
13  pump sprayer until he purchased a three-gallon backpack
14  unit in 2010.  And I go on to explain the application
15  duration over the years at the different locations and
16  provide a measure of exposure days to compare to the
17  human epidemiological studies.
18     Q.  Okay.  But how much Roundup® are you -- do you
19  believe he used?  Volumewise.
20     A.  Well, I can only go with what he stated in
21  his -- in his interviews with Stephen Petty or myself
22  and the deposition, of course.  And I have included in
23  table 3 the amounts he sprayed on given application
24  durations.  From that chart, one could readily add up
25  the total gallons of diluent.  It's simple math.

| Page 383 |
| --- |

1     Q.  On table 3 under, "Amount Sprayed," the 2009
2  entry, you give a figure of gallons per event.  What do
3  you -- what do you mean by "per event"?
4     A.  Well, all of -- everything in that column is
5  per event.
6     Q.  What does "per event" mean?
7     A.  For each time he sprayed.
8     Q.  So every time, for example, in the years 1987
9  to 2008 that Mr. Gatewood sprayed Roundup®, you believe
10  he sprayed one gallon of Roundup®; is that right?
11     A.  (The document was examined.)
12     Q.  Are you looking at Exhibit 28, the Stephen
13  Petty interview summary?
14     A.  Yes.
15     Q.  Are you looking at page 12 of that?
16     A.  I am.  And Stephen Petty actually ascertained
17  the same information as I did, that it was one gallon
18  per event.
19     Q.  And how do you know that this is information
20  you obtained in table 3 and it's not information you
21  took from Mr. Petty?
22     A.  (The document was examined.)
23         Well, I know I didn't get it directly from Mr.
24  Petty's document No. 28, I believe it is.
25     Q.  Okay.

| Page 384 |
| --- |

1     A.  That's not possible because I didn't have the
2  document at that time that I wrote this.
3         Table 3, I prepared this chart early on in my
4  report writing, so -- but I did have the summary from
5  the law firm, Weitz & Luxenberg, and -- and I
6  interviewed Stephen Gatewood and asked him the
7  questions of what years he sprayed and so on.
8         I know when I asked questions, I did in some
9  cases ask, "What did you spray at Olga Place?"  And I
10  would ask what years.  And in some cases, the
11  individual being interviewed would know the answer.
12  Other times, I'd have to say was it 1987 to 2008?  So
13  it's possible that this document --
14     Q.  Which one are you pointing to?
15     A.  The Weitz & Luxenberg document.
16         It's possible that I asked questions from
17  this, but this information is what Stephen told me.
18     Q.  Okay.  And I may be -- let me ask you, table
19  10 in your report, the one where you report exposure
20  information as compiled by CIH or Mr. Petty, and then
21  you also report -- that information is reported in your
22  interview, my question is, where did the information
23  from Mr. Petty come from?  If you know.  Well, I'm not
24  going to say if you know because you put the
25  information in there.  Do you know where it came from?

40  (Pages 381 to 384)

William Sawyer, Ph.D.
July 17, 2019

Page 385

1    A.  It came from Stephen Petty.  All I'm saying is
2 there were times when I interviewed people I would -- I
3 would have to ask, okay, well, you lived at Olga Place
4 and then they would start telling me and I would say
5 what year or what years did the -- was that a
6 continuous application duration over time?  And then I
7 would usually get an explanation of, no, it changed
8 because, you know, we -- we -- my wife wasn't helping
9 me anymore or my husband couldn't do it anymore and I
10 took over, as Vicki said, actually.  So they -- they
11 would give me these historical accounts.
12        You know, I don't know what else to tell you.
13 It's just how it worked.
14    Q.  That was a slightly different question, I
15 think.
16        Table 10 -- the information you reported in
17 table 10 under the column, "As Compiled by CIH" --
18    A.  Yes.
19    Q.  -- that's in your report in Exhibit 6 which
20 was dated, I think, July 11th; it's in your report that
21 Exhibit 2 which -- which we had on July 11th; and it's
22 in earlier iterations we've seen of your report such as
23 Exhibit 11, which is dated July 9th.
24        What was the source of your information by Mr.
25 Petty that you included in table 10 as early, at least,

Page 386

1 as July 9th?  Was it these interview summary sheets?
2    A.  No, I didn't have those yet.
3    Q.  Right.  So that's why I'm asking, what was the
4 source of your information?
5    A.  The summary Roundup® use information that I
6 received from the Weitz & Luxenberg law firm, which is
7 Exhibit 8.
8    Q.  Okay.  That's why I'm a little confused here,
9 Dr. Sawyer.
10        In table 10, the column is titled, "As Compiled
11 by CIH."
12    A.  Right.  That --
13    Q.  CIH -- hold on.
14    A.  My understanding is this data came from the
15 CIH.
16    Q.  Your understanding is that that data that the
17 Weitz & Luxenberg law firm gave you in Exhibit 8 came
18 from Mr. Petty, that is, CIH; is that right?
19    A.  Yeah, I was told that Stephen Petty had
20 interviewed the plaintiffs and that this was a brief
21 summary of information they had learned from Stephen
22 Petty.
23    Q.  And so when you wrote your report, you put
24 together table 10 and you wrote in the column -- second
25 column over, "As compiled by CIH," that information

Page 387

1 comes from a document that was prepared by the
2 plaintiffs' attorneys in this case, correct?
3    A.  That's right.
4    Q.  Okay.  And you hadn't spoken to Mr. Petty
5 before you wrote your report, correct?
6    A.  I had.  That's what formed the first section
7 of this report, were my interviews which were performed
8 on June 19th.
9    Q.  I'm not talking about Mr. Gatewood.
10        When you first wrote your report and you
11 included table 10 -- let me strike that.
12        Do you remember the first time you spoke to Mr.
13 Petty?
14    A.  Yeah, Monday, two days ago.
15    Q.  Okay.  So the information you took in table
16 10, the second column titled, "As compiled by CIH,"
17 that's information that the plaintiffs' lawyers gave to
18 you, correct?
19    A.  Table 28?
20    Q.  No.  Table 10 in your report.
21    A.  I mean, I'm sorry, document 28.
22    Q.  No.
23    A.  Table 10.
24    Q.  Because we know document 28 -- all these --
25 all these interview summary sheets --

Page 388

1    A.  Yeah.
2    Q.  -- when was the first time you saw those?
3    A.  I would have to say it was either -- I think
4 Thursday of last week.
5    Q.  Thursday of last week.
6    A.  I think so.
7    Q.  And you had written table 10 before Thursday
8 of last week.
9    A.  Oh, yeah, yeah.
10    Q.  Okay.  And so when you wrote table 10 and you
11 put in a column titled, "As compiled by CIH," the
12 information in that column comes from Exhibit 8 in this
13 deposition, which are the summary Roundup® use
14 information sheets that the plaintiffs' lawyers
15 provided to you, correct?
16    A.  That's right.
17    Q.  Okay.
18    A.  I'm going to take a brief break.
19    Q.  Sure.
20        THE VIDEOGRAPHER:  3:14, off record.
21        (Recess.)
22        THE VIDEOGRAPHER:  We're back on record.  Time
23 is 3:26.  Starts media No. 4.
24 BY MR. DERRINGER:
25    Q.  Dr. Sawyer, before we took the last break, we

41  (Pages 385 to 388)

William Sawyer, Ph.D.
July 17, 2019

Page 389

1   were discussing Mr. Gatewood's alleged exposure
2   history.  You were talking about table 10, but before
3   that, about table 3.  I think you had mentioned, this
4   is on page 18 of your report, when I asked you how much
5   Roundup did Mr. Gatewood use, you said it would just
6   be a matter of, I think, arithmetic where you would
7   multiply the amount sprayed on table 3 by, you know,
8   the events that are reflected -- the frequency of
9   events that are reflected in column 3 of table 3; is
10  that right?
11      A.  Right.  One would have to apply the number of
12  years, as well.  For example, 1987 to 2008 would have
13  to be considered and multiplied by the number of
14  application days per month and the number of months in
15  a year, as well.
16      Q.  If you go over to page 19, you report what Mr.
17  Gatewood recalled about the Roundup® products that he
18  used?
19          Do you see that?
20      A.  Yes.
21      Q.  And did that information in that sentence, the
22  one that starts, "Mr. Gatewood recalls that he used
23  Roundup® PRO Concentrate," and then you list two other
24  products, does that information come from your
25  interview of Mr. Gatewood?

Page 390

1       A.  It came from -- no.  It -- I can't say that.
2   It came -- it came from either the interview,
3   deposition, or, in part, from the summary of Roundup®
4   use I received from the Weitz & Luxenberg firm.  I
5   really can't distinguish what was directly from the
6   interview versus the other two possible sources.
7       Q.  If you go over to Exhibit 8, which is the
8   summary document you received from the plaintiffs'
9   lawyers, page 13 deals with Mr. Gatewood.
10          Do you see that?
11      A.  Yes.
12      Q.  And at the bottom, there's three footnotes.
13  They talk about what the bottles possibly were.  Does
14  that correspond to the three products that you list Mr.
15  Gatewood recalling that he used on page 19 of your
16  report?
17      A.  (The document was examined.)
18          That's helpful.
19          What that tells me is that this information on
20  page 19 came directly from Mr. Gatewood because if I
21  had taken it from this sheet --
22      Q.  -- this sheet being Exhibit 28?
23      A.  Yeah.
24          -- it would have read differently.  It would
25  have read Roundup® PRO Concentrate, not Roundup®

Page 391

1   Concentrate.  It would not have then said 24- to
2   48-ounce bottles, it would have been worded exactly
3   like it is on this document No. 8.  So this -- this is
4   information directly from Mr. Gatewood.
5       Q.  Are you sure about that?  Take a look at the
6   next sentence from the one you just referred to.
7       A.  Well, the first one is clear -- clearly
8   different.  It's a different name.  PRO Concentrate
9   versus Concentrate.
10      Q.  Roundup® PRO Concentrate is what you wrote in
11  your report that you recalled.  Take a look at footnote
12  5 of Exhibit 8.
13      A.  No, it says in my report on the first line,
14  "Roundup® Concentrate."  And in the footnote, it says,
15  "PRO Concentrate."
16      Q.  Do you understand on page 9 a sentence that
17  begins, you wrote this, "Mr. Gatewood recalls"?
18      A.  Yes.
19      Q.  Okay.  What's the first product that you
20  report Mr. Gatewood recalling that he used?
21      A.  Roundup® PRO Concentrate.  However, in the
22  prior sentence, I stated Roundup Concentrate.
23      Q.  You stated he would always purchase Roundup®
24  Concentrate.
25      A.  That's what he told me.

Page 392

1       Q.  In one quart -- in one quart, 24- to 48-ounce
2   bottles, right?
3       A.  That's exactly what he told me.
4       Q.  I'm asking you about the next sentence.
5       A.  Okay.
6       Q.  The next sentence, you wrote, "Mr. Gatewood
7   recalls that he used Roundup PRO Concentrate, Roundup
8   Poison Ivy Plus, and Roundup® Weed and Grass Killer
9   Super Concentrate.  Those three products are the same
10  products listed in the -- in footnotes 5, 6, and 7 on
11  page 13 of the summary that Mr. Gatewood's lawyer
12  prepared and provided to you, correct?
13      A.  Well, I think that's great.  It corresponds to
14  what he told me.
15      Q.  Well, this is why I'm asking you the question:
16  Are you sure he told you that or did you take these
17  particular product names from what the lawyers told
18  you?
19      A.  No.  That's exactly what he told me.
20  Otherwise, it would read, comes in a one-quart white
21  bottle, red labeling, red cap, possibly Roundup®
22  Poison -- that's not what this says.
23      Q.  Right.  What you're saying if you had gotten
24  it from the document the lawyers provided to you, you
25  would have copied it word for word from what the

42  (Pages 389 to 392)

William Sawyer, Ph.D.
July 17, 2019

## Page 393

1  lawyers gave to you?
2  **A. That's right.**
3  Q. Okay. And when you arrived at your specific
4  causation opinion for Mr. Gatewood, which product did
5  you incorporate into your opinion? That is, which
6  product do you believe he used?
7  **A. A Roundup® product that contains glyphosate.**
8  Q. Which one?
9  **A. The human epidemiologic studies don't specify.**
10  **Neither do I.**
11  Q. What are the ingredients in the Roundup®
12  product that you believe Mr. Gatewood used?
13  **A. Glyphosate.**
14  Q. What else?
15  **A. Insufficient information.**
16  Q. So you don't know.
17  **A. No, I would need to know what -- exactly what**
18  **year. And even then, it would be very difficult**
19  **because I only received limited information in the**
20  **confidential Monsanto documents as to formulation.**
21  Q. To how much glyphosate do you believe Mr.
22  Gatewood was exposed?
23  **A. The dose that I calculated is measured in**
24  **exposure days consistent with the methodology of the**
25  **human studies. I have not made any milligram per**

## Page 394

1  **kilogram body weight measurements or measurements such**
2  **as value in material sprayed. I haven't made those**
3  **calculations, as that's not consistent with the**
4  **methodology in the epi studies.**
5  Q. Do you have any idea to how much glyphosate
6  Mr. Gatewood was exposed?
7  **A. Yeah.**
8  Q. As a result of his use of Roundup®.
9  **A. I do, in units of exposure years.**
10  Q. What about in any other units?
11  **A. No, that would not be consistent with the**
12  **methodology.**
13  Q. Okay. And do you have any idea as to how much
14  POEA, if any, Mr. Gatewood was exposed as a result of
15  his use of Roundup®?
16  **A. I -- I can say in general, based on his use of**
17  **PRO Concentrate and Super Concentrate, that there's no**
18  **question he was exposed to tallowamine or other forms**
19  **of POEA. And in these two products I just named, there**
20  **are several different POEAs that are used**
21  **interchangeably. Not all at once, but some of the**
22  **products contain different POEA derivatives.**
23  Q. To how much POEA was Mr. Gatewood exposed?
24  **A. I don't understand the question. Are you**
25  **talking gallons, milligrams, exposure years, or just**

## Page 395

1  what?
2  Q. I'm talking about in any exposure metric other
3  than exposure days.
4  **A. Again, I'm following the prescribed**
5  **methodology in these studies and I'm basing my opinions**
6  **on exposure years, so I have not made any such**
7  **calculations.**
8  Q. Would it be the same answer if I asked you the
9  same question with respect to formaldehyde?
10  **A. Yes. I could tell you how much is in the**
11  **product, but I can't give you any estimate on exposure**
12  **years.**
13  Q. Would it be the same answer if I asked you
14  with respect to N-nitroso?
15  **A. Correct.**
16  Q. Same answer with respect to ethylene oxide?
17  **A. Yes.**
18  Q. You told me you can tell me how much
19  formaldehyde is in the product that Mr. Gatewood used.
20  **A. I didn't say that.**
21  Q. You said in the product.
22  **A. I didn't say the very product he used.**
23  Q. Oh, okay. Do you know how much formaldehyde
24  was in the product that Mr. Gatewood used?
25  **A. No, only historically what's been provided**

## Page 396

1  **through documents from Monsanto and the product coming**
2  **off of the -- the mill.**
3  Q. If you look at page 18 of your report with
4  respect to Mr. Gatewood, at the bottom of the page
5  right above table 3, you wrote that Mr. Gatewood
6  continued mixing the Roundup® Concentrate for his
7  wife's use, that is, after 2011.
8  Do you see that?
9  **A. (The document was examined.)**
10  **No. I know it's here.**
11  MR. KRISTAL: What page?
12  BY MR. DERRINGER:
13  Q. On Exhibit 2, it's page 18. It's just
14  above --
15  **A. Exhibit 2. Maybe that's the problem.**
16  Q. Let me orient you differently, then.
17  Right above table 3.
18  **A. Yes, I do.**
19  Q. Okay. So do you see you wrote that he
20  continued mixing the Roundup® Concentrate for his
21  wife's use, and that would be after 2011, right?
22  **A. Yes.**
23  Q. Okay. How many times did he do that?
24  **A. I did not -- I don't know. I did not include**
25  **that in my calculations, so I underestimated his**

43 (Pages 393 to 396)

William Sawyer, Ph.D.
July 17, 2019

---

Page 397

1  exposure.
2      Q.  You didn't include anything he did after 2011
3  in your exposure day estimate?
4      A.  I think I only went to August 2011.
5      Q.  And where would we look to find that?
6      A.  Table 10, page 55.
7      Q.  Thank you.  Okay.
8          You mentioned, I think in your report, that Mr.
9  Gatewood at some point purchased a backpack sprayer; is
10 that right?
11     A.  He did.
12     Q.  What's your understanding about whether Mr.
13 Gatewood had any leaking issues with his backpack
14 sprayer?
15     A.  (The document was examined.)
16         I have no information regarding that specific
17 to him, but I do have contained in the report data
18 which indicates the high exposure of backpack sprayers
19 to leakage onto the back of the body.
20     Q.  That type of exposure that you're reporting or
21 that you say you included in your report, that would
22 happen in instances where whatever is inside the
23 backpack actually does leak out and contact the
24 clothing or skin of the person wearing the backpack,
25 correct?

---

Page 398

1      A.  I don't understand your question.
2      Q.  Okay.
3      A.  I think what you're asking me is this would
4  occur only on leakage events?  If that's the question,
5  the answer is no.  The backpacks, even up to very
6  recently, have breather holes and a large cap.  And the
7  only way to put the backpack on is to bend the body and
8  swing the shoulder around and the swishing allows it to
9  leak out of the bleed hole, the air hole, and run down
10 the back, so it's not an issue of a hose coming off or
11 something blowing a hose off, it's simply a design
12 problem.
13         And that's why the studies that I've
14 referenced in my report indicate the highest contact
15 area in the body from backpack sprayers is not the
16 hands, it's about seven times higher on the back.
17     Q.  What do you know about how Mr. Gatewood used
18 his backpack sprayer?
19     A.  He didn't report any mishaps.
20     Q.  What else do you know about how Mr. Gatewood
21 used his backpack sprayer?
22     A.  How did he use it?
23     Q.  Yeah.
24     A.  He sprayed the weeds with it.
25     Q.  Yeah.  Did you ask him how he put it on?

---

Page 399

1      A.  Well, I don't think he had -- hired two people
2  to stand there and hold it.  I mean --
3      Q.  Did you ask him --
4      A.  He put it on like a normal person.
5      Q.  Did you ask him how he put it on?
6      A.  You put your hands through the strap and
7  then --
8      Q.  Did you ask him how he put it on?
9      A.  No.  I didn't ask him how he put his pants on
10 that morning either.  I mean, it's kind of a
11 no-brainer.
12     Q.  Did you ask him what his backpack looked like?
13     A.  No.
14     Q.  Can you describe his backpack to me?
15     A.  No, I cannot describe the backpack to you.  I
16 can tell you that he did use a backpack, I can tell you
17 when he bought it, and I can tell you what the studies
18 in the Monsanto have to say about backpack spraying.
19     Q.  At the Olga Place -- Olga Place location,
20 2931, do you know over what area Mr. Gatewood sprayed
21 Roundup®?
22         MR. KRISTAL:  Object to the form.  You mean a
23 measured area or by description?
24         MR. DERRINGER:  Either one.
25         MR. KRISTAL:  Okay.

---

Page 400

1      A.  Can you read back the question?
2          (The portion requested was read.)
3      A.  No.  It's irrelevant.  I'm not calculating the
4  acreage in this -- under the methodology used.
5  BY MR. DERRINGER:
6      Q.  And you believe this is a reliable methodology
7  that you used, right?
8      A.  Yeah, I wouldn't be using it if it weren't
9  reliable, correct.
10     Q.  Right.  You would use it in other Roundup®
11 cases, too, right?
12     A.  I have.
13     Q.  Can you tell me anything about the area that
14 Mr. Gatewood sprayed at the property at ███████
15 ███████████
16     A.  Well, I've already explained that it required
17 face-level spraying of vines that were tall and
18 climbing up the numerous trees on the property.  Other
19 than that, no.
20     Q.  Where does it say -- what's your basis for
21 saying he had to climb up numerous trees on the
22 property?
23     A.  No, no, I said the vines climb up.
24     Q.  Thanks for the clarification.
25     A.  Climbing a tree with a 50-pound backpack is

---

44 (Pages 397 to 400)

William Sawyer, Ph.D.
July 17, 2019

Page 401

1  not -- not something I think he did.
2      Q.  Is that your understanding of how heavy the
3  backpack was, 50 pounds, that Mr. Gatewood used?
4      A.  Well, if -- if you actually fill it to
5  capacity, between 40 to 50 pounds.
6      Q.  And how much did Mr. Gatewood fill it up to?
7      A.  Don't know.
8      Q.  Do you know anything about the area, that is,
9  the square feet of the places where he sprayed
10 Roundup®, "he" meaning Mr. Gatewood, at ███████
   ███  ████████████
12     A.  No, that's irrelevant to my assessment.  I'm
13 basing the assessment on days of exposure, not on area
14 sprayed.
15     Q.  Had Mr. Gatewood ever been a farmer?
16     A.  No.  Framer.
17     Q.  Framer, not a farmer?
18     A.  Yes, framer.
19         (Discussion off the record.)
20 BY MR. DERRINGER:
21     Q.  Page 20 of your report, you discuss on that
22 page what you learned about Mr. Gatewood's use of
23 personal protective equipment, correct?
24     A.  Say it again about the PPE?
25     Q.  Sure.  Am I right that what you learned about

Page 402

1  Mr. Gatewood's use of personal protective equipment is
2  reflected in your report at page 20 under the heading,
3  "Personal Protective Equipment"?
4      A.  Page 19.
5      Q.  The pages might be off because of the fact
6  that I'm looking at Exhibit 2 and you're looking at
7  Exhibit 6, for reasons we've already discussed.  That's
8  on page 19 on Exhibit 6?
9      A.  Right.
10     Q.  Okay.  So on page 19 of Exhibit 6 under the
11 paragraph, "Personal Protective Equipment," is that
12 where you discuss everything you know about Mr.
13 Gatewood's use of such equipment?
14     A.  Yes.
15     Q.  Okay.  And what was your source for that
16 information?
17     A.  That paragraph is 100 percent from Mr.
18 Gatewood from my interview.  I don't believe there's
19 any information in the paragraph that came from the
20 deposition or the summary.  I believe this is
21 essentially what he -- he explained in the interview.
22     Q.  Okay.  You'll recall, I'm sure, that I asked
23 you some questions with respect to Mr. Winston about
24 how much had certain compounds penetrated Mr. Winston's
25 clothing when he used Roundup®.  And my recollection,

Page 403

1  Dr. Sawyer, is that you told me you couldn't say with
2  respect to actual volume, but you had estimates in
3  terms of percentages.  Is that right?
4      A.  Yes, based on --
5          MR. KRISTAL:  Object to the form.
6      A.  -- peer-reviewed studies, as well as the POEM
7  default values.
8  BY MR. DERRINGER:
9      Q.  Right, and the peer-reviewed studies -- you
10 mentioned studies.  I think it was just one study that
11 you referred to earlier.  Is there another study that
12 you're referring to?
13     A.  No, let me --
14         MR. KRISTAL:  Object to the form.
15     A.  -- be more precise.  Within that study, you'll
16 find a reference to another study for those values.
17 BY MR. DERRINGER:
18     Q.  What's the other study that I would find the
19 reference to the values?
20     A.  It's referenced within the study I referenced.
21     Q.  Okay.  Go ahead and turn to page 75.
22     A.  It's like a dream within a dream within a
23 dream.
24         Page what?
25     Q.  75.

Page 404

1      A.  Okay.
2      Q.  This was the page, I think, that you referred
3  to earlier when I was asking you questions about what
4  percent of a compound would penetrate someone's
5  clothing when they were using Roundup®.
6          Do you remember that?
7      A.  I do.
8      Q.  Okay.  And so for Mr. Gatewood, would you be
9  giving the same answers that you gave for Mr. Winston
10 with respect to what percent of the glyphosate or any
11 other compound in the Roundup® would have penetrated
12 his clothing?
13     A.  The same, except his exposure was so
14 different, in that he wore sandals at times, he -- I
15 should say flip-flops, which is a sandal.  Tennis
16 shoes.  And that's very different than a leather boot.
17     Q.  Okay.  I was seeing if we could short-circuit
18 it, but I think you're right.
19         Let's go back to page 20, because they do have
20 different -- they report different uses of PPE.
21         So when you get back to page 20 -- actually, 19
22 in Exhibit 6, let me know.
23     A.  I'm there.
24     Q.  Okay, great.
25         So what percentage of glyphosate would

45  (Pages 401 to 404)

William Sawyer, Ph.D.
July 17, 2019

Page 405

1  penetrate, in your opinion, Mr. Gatewood's tennis shoes
2  when he used Roundup®?
3       **A.   Well, it depends if it's an open mesh fabric**
4  **or a waterproof-type tennis shoe.**
5       Q.   What type did he use?
6       **A.   I don't think I asked him because I would have**
7  **included that.**
8       Q.   Okay.
9       **A.   I'm sorry, I really -- I can't refer to the**
10  **literature on the percentage values because I haven't**
11  **seen any for tennis shoes.**
12      Q.   What about for flip-flops?
13      **A.   100 percent.**
14      Q.   Okay.  What about for his shorts?  What
15  percentage of the glyphosate would penetrate his
16  shorts, in your opinion?
17           MR. KRISTAL:  Objection.
18      **A.   It would be the same as the -- the -- more --**
19  **it was the same value for that of the fabric pants.**
20  BY MR. DERRINGER:
21      Q.   What's that value?
22      **A.   18 to 20 percent.  In fact, it could be higher**
23  **because, generally, shorts aren't as heavy as jeans**
24  **which that value is based upon.**
25      Q.   What about his cotton T-shirt or sleeveless

Page 406

1  shirt, what percentage of glyphosate, in your opinion,
2  would penetrate that, again, to get to his skin when he
3  used Roundup®?
4           MR. KRISTAL:  Objection to form.
5       **A.   18 to 20 percent.**
6  BY MR. DERRINGER:
7       Q.   And his cotton gloves, how much -- what
8  percentage of glyphosate would penetrate his cotton
9  gloves when he used Roundup®?
10          MR. KRISTAL:  Objection to the form.
11      **A.   That varies.  As low as 20 percent up to 100**
12  **percent.  It depends how saturated the glove becomes.**
13  **The cotton gloves, if there's minor exposure on a dry**
14  **hand, I believe I read about 20 percent penetration,**
15  **similar to that of the shirt fabric, but if the glove**
16  **becomes wet and soaked, then it's full penetration.**
17  BY MR. DERRINGER:
18      Q.   What was the situation with Mr. Gatewood?
19  What percentage did you apply or would you apply?
20      **A.   I don't think I asked him that -- about that.**
21  **I was somewhat limited on my questioning with Mr.**
22  **Gatewood.  He seemed to be in a lot of pain, and when I**
23  **asked him detailed questions, he would present almost**
24  **as if it was hurting him to talk and straining and so I**
25  **really didn't go into a lot of detail like I did with**

Page 407

1  most people.
2       Q.   Do you remember how long your interview was
3  with Mr. Gatewood?
4       **A.   Not very long.  Maybe 20 minutes.**
5       Q.   And the percentages that you just gave me,
6  those are from the POEM -- the UK POEM model and the
7  Machado-Neto study; is that right?
8       **A.   Yes, and in the Machado-Neto, there is a**
9  **reference to another study where these values were**
10  **developed.**
11      Q.   Do you know what that study is?
12      **A.   No, it's a study within a study.**
13      Q.   Okay.
14      **A.   It's referenced as a footnote.**
15      Q.   And would you apply the same percentages you
16  did for glyphosate if I asked you the same questions
17  with respect to the other ingredients in Roundup® such
18  as POEA, if it's there, or formaldehyde, if it's there,
19  things like that?
20          MR. KRISTAL:  Object to the form.
21      **A.   That's a pretty general question.  I'm not**
22  **sure you're specific enough for me to give a clear**
23  **answer.**
24  BY MR. DERRINGER:
25      Q.   Okay.  What percentage of any POEA that would

Page 408

1  have been in the Roundup® that you believe Mr. Gatewood
2  used penetrated his clothing?
3       **A.   You asked me what percentage of it would**
4  **penetrate?**
5       Q.   Yes.  Yes.
6       **A.   Approximately the same as that of glyphosate.**
7       Q.   And what percentage of formaldehyde, if it was
8  there at all, would have penetrated Mr. Gatewood's
9  clothing when he used Roundup®, in your opinion?
10      **A.   Approximately the same.  Both of those**
11  **compounds are completely water soluble and would travel**
12  **with the water soluble glyphosate.  There wouldn't be**
13  **any traumatic rapid separation as the -- due to the**
14  **similar water solubility.**
15      Q.   In your opinion, is that also true of
16  N-nitroso and ethylene oxide?
17      **A.   Yes.**
18      Q.   Other -- other than Roundup®, which you've
19  given the opinion was a substantial contributing factor
20  to Mr. Gatewood's development and subsequent diagnosis
21  of NHL, what else was a substantial contributing factor
22  in Mr. Gatewood's development and subsequent diagnosis
23  of NHL?
24      **A.   ████████████████████████████**
25      Q.   Yes.

46  (Pages 405 to 408)

William Sawyer, Ph.D.
July 17, 2019



**Page 409**

1   A. ▮▮▮▮▮

2   Q.  Okay.  And how did you go about examining

3   whether there were other factors or agents that were

4   contributing factors to Mr. Gatewood's development and

5   the subsequent diagnosis of non-Hodgkin's lymphoma?

6   **A.  I ask questions, as already explained,**

7   **relating to the long-term use of steroids, cyclosporin**

8   **A, secondary to tissue transplants or other products**

9   **that are carcinogenic and cause NHL.**

10   **I've asked these questions.  The information I**

11   **provided is everything I have.**

12

**Page 410**

1

**Page 411**

1

24   BY MR. DERRINGER:

25   Q.  Am I correct, then, that you cannot give a

**Page 412**

1   weight, among those four, to Roundup®'s alleged

2   contribution to Mr. Gatewood's development and

3   subsequent diagnosis of non-Hodgkin's lymphoma?

4   **A.  A relative weight?  No.  A weight relative to**

5   **those other three components, no.**

6   Q.  In your report at page 20, at least on Exhibit

7   2 it's page 20, you have a sentence under the heading,

8   "Other Potential Chemical Exposures."  Do you see that?

9   It might be on page 19 in your report in front of you.

10   **A.  Page 20, okay.**

11   Q.  Do you see the sentence under, "Other

12   Potential Chemical Exposures"?

13   **A.  Yes, I've already discussed that.**

14   Q.  And, again, here you wrote tables 18 and 19.

15   Do you mean tables 19 and 20?

16   **A.  Yes.**

17   Q.  And if you go over to table 20 and look at

18   Raid and Weed B Gon, let's start with, I guess, Raid,

19   is the Raid entry at page 20 -- I'm sorry, page 89,

20   table 20?  Is there an entry there for Raid Flying

21   Insect Killer?

22   **A.  Yes.**

23   Q.  Is there also an entry for Raid Fumigating

24   Fogger?

25   **A.  Yes.**

47 (Pages 409 to 412)

William Sawyer, Ph.D.
July 17, 2019

Page 413

1    Q.   Which of those two products did Mr. Gatewood
2  use?
3    A.   Don't know, so I'm assuming both.
4    Q.   And on both of those, your comments state,
5  "MSDS indicates no carcinogens."
6       Do you see that?
7    A.   Yes.
8    Q.   All right.  Which MSDS did you pull for those?
9  Do you know the year, for example?
10    A.   You know, I could pull out my cell phone and
11  type that link in and give you a year probably, but I
12  try to use, as I explained yesterday, the most recent
13  versions.
14    Q.   Okay.  When did Mr. Gatewood use either Raid
15  Flying Insect Killer or Raid Fumigating Fogger?  What
16  years?
17    A.   Don't know, but it's completely irrelevant and
18  a waste of time because there are no carcinogens in
19  that -- either subject -- either product.
20    Q.   And what's your basis for saying that?
21    A.   My training, experience, and review of the
22  literature.  And also review of IARC, as well as
23  material safety data sheet.
24    Q.   And what literature did you review to come to
25  that conclusion?

Page 414

1    A.   I think the studies are in the Exhibit 9, I
2  think.
3       MR. KRISTAL:  9, yeah.  It's also appendix A.
4  BY MR. DERRINGER:
5    Q.   Is this your materials considered list?
6    A.   Yeah.
7    Q.   Okay.  What -- what study?
8    A.   (The document was examined.)
9       I do have a couple of very recent pyrethrin
10  studies on techametrin [sic] and I failed to include
11  them in my review list.
12    Q.   Can you identify what they are for me today?
13    A.   Not out of memory, but I do have a couple
14  studies.  You'll see it shortly.  The report is in
15  there.  I actually wrote about a two-page section on
16  pyrethrins, and I did not include that section in this
17  report because I had not finished that section in the
18  other report yet.
19    Q.   Any other study that you are relying on when
20  you talk about the literature supporting your
21  conclusion that nothing in Raid, either the flying
22  insect killer or the fumigating fogger, is
23  carcinogenic?
24    A.   No.  You have to remember that neither of
25  these -- the only compound in there of any interest

Page 415

1  whatsoever is the pyrethrin and it's the permethrin.
2  Looking at butane, propane, calcium oxide, magnesium
3  oxide, these are two things that are in our vitamin
4  pills.  There's nothing carcinogenic that even
5  remotely possibly carcinogenic except that
6  tetramethrin.
7       And I checked that against the IARC list and I
8  actually pulled a couple of the newest studies I could
9  find.  I was very thorough on -- on the pyrethrin
10  issue.
11    Q.   How many studies did you find that you relied
12  on?
13    A.   Well, I found many, but I chose the most
14  thorough and recent studies.
15    Q.   How many?
16    A.   I know I have two that I've referenced that I
17  printed.
18    Q.   Okay.
19    A.   Maybe I have them here.  I'm not sure.
20       (The document was examined.)
21    No, I do not.
22    Q.   How much Raid Flying Insect Killer or
23  Fumigating Fogger was Mr. Gatewood exposed to?
24    A.   It's -- I don't know.  It's irrelevant to me.
25  It's not a carcinogen that caused NHL.

Page 416

1    Q.   All right.  You also mentioned Ortho Weed B
2  Gon as something he was exposed to, and that's on page
3  88 of your report in terms of table 20.
4       What did you do to determine whether any of the
5  ingredients listed in Ortho Weed B Gon are carcinogens?
6    A.   Again, I obtained the most recent MSDS, which
7  indicated no carcinogens.  I looked at MCPA, triclopyr,
8  dimethylamine dicamba on the --
9    Q.   Diethyline?
10    A.   Dimethylamine.
11    Q.   This is a different ingredient, I think.
12    A.   It is.  And did not find any evidence of
13  carcinogenicity in the probable human category under
14  IARC.  I may have the -- I know I was looking at
15  mecoprop and I think I have a mecoprop study here that
16  indicated -- let me look at it first.
17       (The document was examined.)
18    No, I don't have the mecoprop study with me,
19  but I think I -- no, I think I do actually, within
20  Eriksson or -- I think it was in Eriksson or McDuffie.
21       (The document was examined.)
22    Yeah, the Eriksson 2008 study does include
23  some assessments of MCPA, mecoprop.
24    Q.   What did the Eriksson 2008 study find in terms
25  of any relationship between MCPA and cancer?

48 (Pages 413 to 416)

William Sawyer, Ph.D.
July 17, 2019

Page 417

1    A.  A statistically elevated odds ratio, which did
2  not show a dose response relationship, but was
3  certainly elevated.
4    Q.  What was their figure?  What's the figure in
5  Eriksson?
6    A.  I think the odds ratio was 3.76 and
7  statistically significant.
8    Q.  Okay.  And that MCPA is one of the ingredients
9  in Ortho Weed B Gon, correct?
10    A.  It is.
11    Q.  And do you believe that that's carcinogenic?
12    A.  Do I believe what?
13    Q.  That that ingredient is carcinogenic?
14       Actually, let me -- well, I'll let you answer
15  that question first.
16    A.  (The document was examined.)
17       I'm waiting for a question.
18    Q.  Do you believe MCPA is carcinogenic was the
19  pending question.
20    A.  Well, according to IARC and all other
21  agencies, it is not; however, there is some evidence
22  within the Eriksson study which suggests that it could
23  be.  It's only one study and it's no dose response.  It
24  would be insufficient -- if, say, I was an expert
25  retained against Ortho Corporation for NHL among a

Page 418

1  group of 14 people, I would not have enough evidence to
2  opine, based on one study and no dose response
3  relationship as a carcinogen.  It would be
4  insufficient.
5    Q.  Okay.  What you -- what you wrote here on
6  table 20 next to MCPA was not that the evidence is
7  insufficient, you wrote it's not a probable human
8  carcinogen and it's not known to cause NHL; is that
9  right?
10    A.  That is correct.  It is absolutely not a
11  probable human carcinogen --
12    Q.  So --
13    A.  -- by IARC or any agency.  It's simply -- it's
14  not my opinion.  It's simply a black and white, no,
15  it's not.
16    Q.  And a probable human carcinogen, that's an
17  IARC classification, right?
18    A.  That's correct.  Or the EPA has a
19  classification.
20    Q.  Is their classification termed probable human
21  carcinogen or is it termed something else?
22    A.  Likely.
23    Q.  Likely what?
24    A.  I think EPA is likely.
25    Q.  But in table 20 when you used the word or the

Page 419

1  term "probable human carcinogen" in your table, you
2  were referring to IARC, correct?
3    A.  Yes.
4    Q.  Okay.
5    A.  No, but I actually looked at other agencies,
6  as well.
7    Q.  I'm just saying taking the term "probable
8  human carcinogen," you took that from IARC.
9    A.  Right, but if EPA said likely, I would have
10  included that.
11    Q.  And known to cause -- well, let me go back to
12  Eriksson, since you brought it up.
13       Were you looking at page 1659 of Eriksson when
14  you said Eriksson found some evidence of the
15  association between MCPA and NHL?  Is that what you
16  were referring to?
17    A.  Yeah, that's one table.
18    Q.  I'm on a page.  I didn't refer to a table.
19  There's two tables on that page.
20    A.  Table 2.
21    Q.  Okay.  Take a look down at table 3.
22    A.  Okay.
23    Q.  And take a look at the entry or the data for
24  diffuse large B-cell lymphoma.  Do you see that?
25    A.  Yes.

Page 420

1    Q.  For MCPA, what's the odds ratio?
2    A.  It's 2.59.
3    Q.  Let me try that again.
4       For MCPA, what is the odds ratio for diffuse
5  large B-cell lymphoma?
6    A.  Oh, for diffuse, I'm sorry.  3.94.
7    Q.  Is that a statistically significant finding?
8    A.  Oh, yes.
9    Q.  What is the odds ratio for glyphosate with
10  respect to diffuse large B-cell lymphoma?
11    A.  My eyes are getting tired, but I think it's
12  1.22.
13    Q.  And is that a statistically significant
14  finding?
15    A.  No.
16    Q.  How much Ortho Weed B Gon was Mr. Gatewood
17  exposed to?
18    A.  Let's see.
19       (The document was examined.)
20       I don't have any quantitative information on
21  that.
22    Q.  How often did Mr. Gatewood use Ortho Weed B
23  Gon?
24    A.  I don't have any quantitative information
25  regarding that.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

William Sawyer, Ph.D.
July 17, 2019

Page 421

1    Q. How often did Mr. Gatewood use any Raid
2  product?
3    **A. I don't know, but it's irrelevant. It's not a**
4  **carcinogen.**
5    Q. How often did Mr. Gatewood use a lacquer
6  finisher?
7    **A. According to the summary prepared by Mr.**
8  **Stephen Petty, I believe he stated he used it once and**
9  **it ruined his equipment and he never used it again.**
10  **But even if he had used it every day, it would be**
11  **irrelevant. It can cause neurological damage at high**
12  **levels, but it's not a carcinogen.**
13    Q. Okay. Take a look at table 19 in your report.
14  I have it at page 82.
15    **A. (The document was examined.)**
16       **Okay.**
17    Q. And am I correct that the way you put table 19
18  together is you went back to your summaries in your
19  report for each of the 14 plaintiffs, took a look at
20  the part of your summary for each plaintiff where you
21  discussed other potential chemical exposures, and then
22  listed them here in this table?
23    **A. Yeah, that's right.**
24    Q. Is table 19 a complete list of the potential
25  chemical exposures that you believe the plaintiffs

Page 422

1  were -- or the plaintiffs experienced in this case?
2       MR. KRISTAL: Objection to form.
3    **A. Based upon my summaries on the first section**
4  **of my report, yes. It's possible there might be some**
5  **additional information potentially in Mr. Petty's**
6  **summaries.**
7  BY MR. DERRINGER:
8    Q. Well, up here in the title of table 19, you
9  say that this summary is per CIH and interviews. The
10  interviews are the interviews you conducted, correct?
11    **A. Yes, and the summary received from the Weitz &**
12  **Luxenberg law firm that I stated was as per the CIH**
13  **interview.**
14    Q. All right. So when you write or wrote on page
15  82 of table 19, "Per CIH," you were actually referring
16  to the summaries that were prepared by and provided to
17  you by the plaintiffs' lawyers in this case, correct?
18    **A. Yes.**
19    Q. Okay. All right. I'm going to move on to
20  Vicki Gatewood.
21       You have said before that you don't want to go
22  beyond 5:00 and I believe I can complete my examination
23  with respect to Vicki Gatewood by 5:00, but I also
24  offer you the opportunity for a break if you need one.
25    **A. I'll try to keep going.**

Page 423

1    Q. Okay. Let me know if you do need a break.
2       MR. DERRINGER: Are you guys okay?
3       THE REPORTER: Uh-huh.
4       MR. DERRINGER: Okay, great.
5       THE WITNESS: This is beyond watching paint
6  dry.
7       MR. DERRINGER: Jerry, if you have the CIH --
8       MR. KRISTAL: Yeah, sure. I'm sorry.
9       MR. DERRINGER: That's okay. For
10  Mrs. Gatewood, we can mark them.
11       MR. KRISTAL: (A document was handed.)
12       MR. DERRINGER: Thank you very much.
13       MR. KRISTAL: Sure.
14       (Defendant's Exhibit-29 was marked for
15  identification.)
16  BY MR. DERRINGER:
17    Q. I'm handing you what has been marked as
18  Exhibit 29. You'll see it's titled, "Mrs. Vicki
19  Gatewood's Interview Summary Sheet," with a header of
20  EES Group.
21       Is Exhibit 29 the interview summary sheet that
22  you have recently reviewed from Mr. Stephen Petty?
23    **A. Yes.**
24    Q. And this relates to Mrs. Vicki Gatewood; is
25  that right?

Page 424

1    **A. Yes.**
2    Q. Okay. Is everything that you know about Vicki
3  Gatewood that is relevant to your opinion that Roundup®
4  was a substantial contributing factor to Ms. Gatewood's
5  cancer contained at pages 20 through 22 of your report;
6  table 10 of your report; table 11 of your report;
7  table 13 of your report; table 19 of your report; pages 11
8  and 12 of the summary document you received from
9  Mrs. Gatewood's lawyers, that is, Exhibit 8; and then
10  the entries for Mrs. Gatewood in Exhibits 10, 11, 12,
11  and 13; as well as Exhibit 28?
12    **A. Yes.**
13    Q. What does Mrs. Gatewood do for a living?
14    **A. Well, I know she got her master's degree in**
15  **management of some sort.**
16    Q. How do you know that?
17    **A. From the review of the document that was**
18  **prepared by Stephen Petty.**
19    Q. Exhibit 29?
20    **A. Yeah.**
21    Q. What else, if anything, do you know about what
22  Ms. Gatewood does for a living?
23    **A. Well, various sales positions, a liquor store**
24  **and general store. Way back, it looks like she was**
25  **doing computer programming in the early 1980s and**

50 (Pages 421 to 424)

William Sawyer, Ph.D.
July 17, 2019

Page 425

1    worked contract for -- a programmer for a second
2    company and programmer for a third company in her later
3    years.  Contract employee for Blue Cross.  And even
4    worked for JP Morgan as an information risk manager and
5    a senior IT security engineer for Citizens Insurance
6    Corporation, who we have our flood insurance through,
7    as everyone does in Florida.  And she worked right up
8    until present, I believe, for Citizens.
9        Q.  You're reading off of Exhibit 29, right?
10       A.  Yes.
11       Q.  Okay.  And when did you receive Exhibit 29?
12       A.  I think it was Thursday last week.
13       Q.  Okay.  Before Thursday last week, did you
14   know anything about what Mrs. Gatewood did for a
15   living?
16       A.  Only that she stated she had no -- no chemical
17   exposures of any type in her employment.
18       Q.  That's what you -- that what she told you in
19   your June 19th interview with her?
20       A.  Yes, that was --
21       Q.  Okay.
22       A.  -- a critical question I asked everyone.
23       Q.  Right, but did you know before you reviewed
24   Exhibit 29 last Thursday, or sometime after last
25   Thursday, did you know anything about what Ms. --

Page 426

1    Mrs. Gatewood did for a living?
2        A.  No.
3        Q.  How much does Mrs. Gatewood weigh?
4        A.  Well, this is a really such a waste of time.
5    Really.
6        Q.  How much does she weigh?
7        A.  This is just something to try to get on video
8    to show the jurors saying, "I don't know," "I don't
9    know," "I don't know."
10       Q.  How much does she weigh?
11       A.  Why don't we look at what's important?
12       Q.  How much does Mrs. Gatewood weigh?
13       A.  I'll have to go through the same answer then.
14   I don't know because that's irrelevant to an
15   exposure assessment based on exposure days, not based
16   on body weight.  Thus, that is irrelevant information.
17   I did not ascertain that.
18       Q.  What did Mrs. Gatewood weigh between 1987 and
19   2012?
20           MR. KRISTAL:  I assume I have my same line --
21           MR. DERRINGER:  You shouldn't assume anything,
22   but I will give you your same standing objection
23   with respect to relevance with questions I'm asking
24   Dr. Sawyer about Mrs. Vicki Gatewood.
25           MR. KRISTAL:  Thank you.

Page 427

1        A.  I do not have that information, as it is not
2    relevant to the methodology I followed in ascertaining
3    the days of exposure to compare to the human
4    epidemiologic studies.
5    BY MR. DERRINGER:
6        Q.  And is it your understanding that
7    Mrs. Gatewood lived at the same properties and during
8    the same years that Mr. Gatewood lived at those
9    properties?
10       A.  (The document was examined.)
11           I have not asked that question.  What I
12   ascertained is her hours of spray time at the various
13   properties, as opposed to where she resided.  In fact,
14   it's possible she didn't even reside at any of the
15   properties.  It would not make any difference in my
16   assessment.
17       Q.  So, do you know where Mrs. Gatewood lived at
18   any time in her life?
19       A.  No, that's not relevant to my assessment.
20   What is relevant is where she sprayed the Roundup®.
21       Q.  In your report, you have a table, table 4,
22   that states that Mrs. Gatewood reported that she
23   sprayed at two different properties; is that right?
24       A.  That's correct.
25       Q.  Okay.  And do you know why she sprayed at two

Page 428

1    different properties?
2        A.  No.  It's possible it was a relative's
3    property or a second property, but that is not very
4    relevant to my assessment, as my concern is how much
5    did she spray at each property, not whether she lived
6    there or not.
7        Q.  And in terms of how much Roundup®
8    Mrs. Gatewood used or how much she sprayed, how
9    would -- how would you go about calculating that?
10       A.  First, I'd have to calculate the number of
11   years of spraying at the given property.
12       Q.  Are you looking at table 4?
13       A.  Yes.
14       Q.  Okay.  And then what would you do?
15       A.  Assess the application frequency and how much
16   time it took to spray at each property and then add up
17   the amount of hours per year.
18       Q.  Right, but how would that tell you how much
19   Roundup® she sprayed?  Do you know how much she used
20   on -- per event, per time that she sprayed?
21       A.  Well, the number of liters per hectare is
22   relevant to a dose assessment using the POEM
23   methodology.  And I didn't use that methodology.  So
24   the answer is I don't have that information.  I didn't
25   need that information to conduct the exposure days

51  (Pages 425 to 428)

William Sawyer, Ph.D.
July 17, 2019



Page 429

1  analysis.
2      Q.  I appreciate that.
3          And separate and apart from liters per hectare
4  or something like that, I'm just wondering, every time
5  she used Roundup®, do you know how much Roundup® she
6  used?
7      A.  No, because the methodology requires the
8  exposure days use, not the amount of Roundup® she used.
9

Page 431

8      Q.  Right.  And what is Mrs. Gatewood's current
9  health status, if you know?
10     A.  I think she told me she's doing okay, but, you
11  know, that's something that I didn't include in the
12  reports because anything from the diagnosis point on is
13  really in the oncologist realm, but, of concern, I
14  asked all of the individuals how they're doing and how
15  they're feeling and tried to understand what they're
16  going through, but I -- I think she's doing okay, as I
17  recall.
18

Page 430

1

Page 432

1

8      Q.  And your knowledge about Mrs. Gatewood's
9  medical history comes from your interview with her on
10  June 19th?
11     A.  Yes.
12     Q.  Was there anyone else on the -- well, strike
13  that.
14         We talked yesterday that there was a lawyer on
15  the phone with you when you talked to the plaintiffs.
16  For Mrs. Gatewood, in particular, was Mr. Gatewood on
17  the phone with her?
18     A.  I -- I'm quite sure, yeah.
19     Q.  And for Mr. Gatewood, was Mrs. Gatewood on the
20  phone when you were interviewing Mr. Gatewood?
21     A.  That, I'm having trouble with.  I -- I don't
22  think so, but I -- I can't -- I can't say for sure.  He
23  might have been listening in.
24     Q.  Okay.  Did you ascertain whether or not
25  Mrs. Gatewood used any products that contained solvents

52 (Pages 429 to 432)

William Sawyer, Ph.D.
July 17, 2019

Page 433

1  or anything else that could increase her risk of
2  getting sick?
3      A.  Yes, I asked about not only home use of
4  products, but also any occupational exposures to
5  chemicals and radiation -- and/or radiation.
6      Q.  What did you learn?
7      A.  Well, let's look and see.
8          (The document was examined.)
9          Mrs. Gatewood was occasionally exposed to
10  Backwoods mosquito spray and ant and roach spray.
11     Q.  Are there any other products that contain
12  solvents or anything else that could increase
13  Mrs. Gatewood's risk of getting sick that you learned
14  that she used?
15     A.  None.
16     Q.  Tell me what you know about Mrs. Gatewood's
17  cancer.
18     A.  Well, it was diffuse large B-cell.  She was 56
19  years at the time of her diagnosis.  Currently 62 years
20  old.  She's undergone chemotherapy.  And I believe
21  she's doing -- I think, okay.  That's about all.
22     Q.  Are you aware of whether anyone found any
23  tumors anywhere else in her body?
24         MR. KRISTAL:  Objection to form.
25     A.  I'd have to defer that to the oncologist.

Page 434

1  BY MR. DERRINGER:
2      Q.  Are you aware of whether anyone found any
3  cancer anywhere else in her body?
4      A.  Not that she spoke about on the phone.  Again,
5  if -- if the medical oncologist went through all of her
6  medical records, I would defer that to that expert.
7          I'm going to take a very short break.
8          THE VIDEOGRAPHER:  4:30, off record.
9          (Recess.)
10         THE VIDEOGRAPHER:  We're back on record.  Time
11  is 4:47.
12  BY MR. DERRINGER:
13     Q.  Dr. Sawyer, how old was Ms. Winston when she
14  was diagnosed with cancer?
15         MR. KRISTAL:  Do you mean Gatewood?
16         MR. DERRINGER:  Thank you.
17         MR. KRISTAL:  It's getting late.
18         MR. DERRINGER:  Thank you.
19  BY MR. DERRINGER:
20     Q.  How long was Mrs. Gatewood -- I'll start over.
21         How old was Mrs. Gatewood when she was
22  diagnosed with cancer?
23     A.  As I said earlier, 56.
24     Q.  And did Mrs. Gatewood -- well, you
25  mentioned -- I'll strike that.

Page 435

1      Is it your understanding that the Roundup®
2  products that you believe Mrs. Gatewood used are the
3  same Roundup® products, whatever they were, that her
4  husband, Mr. Gatewood, used?
5      A.  I -- I do, simply because her husband mixed it
6  and she used it on the same properties for the same
7  years with the exception that her spraying continued to
8  May of 2012, while her husband's spraying ceased at an
9  earlier interval; however, he continued to mix it for
10  her.
11     Q.  Okay.  And if I ask you the same questions
12  that I asked you about the products and the ingredients
13  that Mr. Gatewood used, would you have the same answers
14  with respect to Mrs. Gatewood?
15     A.  Yes.
16     Q.  Mrs. Gatewood only used a handheld pump
17  sprayer to apply Roundup®; is that right?
18     A.  Yes.
19     Q.  She never used a backpack sprayer, correct?
20     A.  That's right.
21     Q.  On page 22, I believe it is, of your report,
22  you discuss the personal protective equipment that
23  Mrs. Gatewood reported to have used.
24         Do you see that?
25     A.  Yeah.

Page 436

1      Q.  We've discussed personal protective equipment
2  and how much glyphosate would penetrate the clothing
3  that she wore.  And you've expressed that before in
4  terms of a percentage.
5          What percentage of the glyphosate to which you
6  believe she used or which you believe she used would
7  penetrate, in your opinion, a cotton or fabric-based
8  T-shirt that Ms. Gatewood reported to have worn?
9      A.  18 to 20 percent.
10     Q.  Same question with respect to the sneakers
11  that she reported to have worn.
12     A.  Uncertain.
13     Q.  And same question with respect to the pants
14  that she reported to have worn.
15     A.  18 to 20 percent.
16     Q.  What about the cotton or fabric gardening
17  gloves that she used?  It says here -- you write that
18  she used those when she was pulling up weeds, but not
19  while spraying; is that correct?
20     A.  Right.
21     Q.  That's what she reported to you?
22     A.  Right, she used no gloves.
23     Q.  Okay.  And do you have any idea to how much
24  glyphosate Mrs. Gatewood actually was exposed during
25  the times that she used Roundup®?

53 (Pages 433 to 436)

William Sawyer, Ph.D.
July 17, 2019



Page 437

1   A.  No, only exposure days.
2   Q.  The same answer with respect to any of the
3   ingredients in Roundup®?
4   A.  Same answer.
5   Q.  Mrs. Gatewood never poured or mixed the
6   glyphosate concentrate, did she?
7   A.  No, she stated her husband did it.
8   Q.  And do you know over what amount of area
9   Mrs. Gatewood sprayed Roundup®?
10  A.  No.  That's irrelevant for my exposure
11  days/hours calculation.
12  Q.  Has Mrs. Gatewood ever been a farmer?
13  A.  No.
14  Q.  You've concluded that Roundup® was a
15  substantial contributing factor to Ms. Gate --
16  Mrs. Gatewood's development and subsequent diagnosis of
17  non-Hodgkin's lymphoma; is that right?
18  A.  Yes.
19  Q.  Did you identify anything else as a
20  substantial contributing factor to Mrs. Gatewood's
21  development and subsequent diagnosis of non-Hodgkin's
22  lymphoma?
23  A.  I did not.
24  Q.  And what did you do to assess and determine
25  whether there was anything else that was a substantial

Page 438

1   contributing factor to Mrs. Gatewood's development and
2   subsequent diagnosis of non-Hodgkin's lymphoma?
3   A.  Well, I've already stated, with respect to
4   hereditary family history, I ruled that out.  Assessed
5   her smoking history was not contributory.  Examined her
6   with respect to other potential chemicals, both home
7   use and/or occupational, and she reported using
8   Backwoods mosquito spray and ant and roach spray.
9       She did not recall any chemical exposures or
10  radiological exposures, for that matter.
11      And you'll see there were some -- someone or
12  some people I've interviewed who did report diagnostic
13  CT scans for other underlying medical problems.
14  Mrs. Gatewood did not report any CT scans or high
15  radiological exposures.
16  MR. KRISTAL:  I think I asked earlier when we
17  started with Mrs. Gatewood the same objection?
18  MR. DERRINGER:  You did.
19  MR. KRISTAL:  Okay.  Do I need to ask for
20  every plaintiff as we do them or is it a
21  standing-standing?
22  MR. DERRINGER:  I -- I think you should ask
23  for every plaintiff.
24  MR. KRISTAL:  Is your answer going to be
25  different?

Page 439

1   MR. DERRINGER:  I don't know.
2   BY MR. DERRINGER:
3   Q.  Did you do anything else to assess whether
4   there was anything else that was a substantial
5   contributing factor to Mrs. Gatewood's development and
6   subsequent diagnosis of non-Hodgkin's lymphoma?
7   A.  No.

Page 440

10  Q.  Were there other medical conditions of which
11  you became aware that Mrs. Gatewood has experienced?
12  A.  No.
13  Q.  Go ahead to page 82.  Back to tables 19 and
14  20.  And if you actually go to table 19, next to Vicki
15  Gatewood, you mentioned that she was occasionally
16  exposed to Backwood mosquito spray and ant and roach
17  spray.
18      Do you see that?
19  A.  Yes.
20  Q.  And then table 20 is where you list the
21  ingredient of each of those products.  Is the Backwoods
22  mosquito spray -- where is that listed here?
23  A.  That's actually made by Cutter.  It's on the
24  table -- well, the first page, table 20.
25  Q.  Okay.  Third entry under, "Name"?

54 (Pages 437 to 440)

William Sawyer, Ph.D.
July 17, 2019

Page 441

1    A.  Yes.
2    Q.  Cutter Backwoods Dry Insect Repellent.  Is
3  that right?
4    A.  Let me just double check.
5    Q.  Sure.
6    A.  I want to make sure I'm getting that correct.
7      (The document was examined.)
8      Yeah, that's it.
9    Q.  And what did you do to assess whether the
10  ingredients in Cutter Backwoods Dry Insect Repellant
11  were or could be a cause of Mrs. Gatewood's development
12  and subsequent diagnosis of non-Hodgkin's lymphoma?
13    A.  I reviewed the material safety data sheet
14  primarily for the ingredients because I -- you know,
15  it's -- the first thing I look at are the chemical
16  ingredients.
17      I also looked at the MSDS with respect to
18  trace contaminants, which sometimes can be found in the
19  last section of the MSDS under the California
20  disclosure rules.  And in this case, the disclosure
21  rules at the end of the MSDS sheet did state that there
22  were maybe trace amounts of benzene in the product.
23      The other ingredients are all noncarcinogenic,
24  although there is, as I said before, some concerns with
25  naphthalene.

Page 442

1      MR. KRISTAL:  It's getting late, so maybe Dr.
2  Sawyer is losing a little focus, but I think you
3  dropped down past the Backwoods in the last two
4  statements.
5    A.  Oh, yeah, I did.
6  BY MR. DERRINGER:
7    Q.  So the benzene that you just referred to,
8  that's, to your understanding, not an ingredient in
9  Cutter Backwoods Dry Insect Repellent?
10    A.  No, I misspoke.  I'm getting very tired.
11  That's diesel fuel I was talking about.
12    Q.  Okay.
13    A.  I don't think she sprayed herself with diesel
14  fuel.
15    Q.  We're just about done with Mrs. Gatewood and
16  then we'll wrap up for the day since it's 5:00.
17      But you looked -- so for Cutter Backwoods Dry
18  Insert Repellant, to determine whether that could be a
19  cause contributing to Mrs. Gatewood's non-Hodgkin's
20  lymphoma, you looked at the MSDS; is that right?
21    A.  Yeah, primarily for the chemical ingredients.
22  And this is an easy one.  It's DEET, ethanol and
23  isobutane.  Clearly noncarcinogenic based on my
24  familiarity, training, and experience.  Also based on
25  the MSDS, also based on IARC, clearly negative.

Page 443

1      There can be some problems with neurological
2  endpoint in young children or those with very small
3  body weight using high percentages of DEET, but
4  definitely not cancer.
5    Q.  And did you refer to any literature beyond the
6  MSDS and the IARC to come to that conclusion with
7  respect to the ingredients in Cutter Backwoods Dry
8  Insect Repellant?
9    A.  In the past, I have researched the current
10  literature, in the past, oh, probably past ten years,
11  on DEET.
12    Q.  You mean up to ten years ago that you
13  researched the literature that was then current?
14    A.  Yeah.  Yeah.
15    Q.  Okay.
16    A.  I have not updated my research.  To the best
17  of my knowledge, nothing new has come out on DEET in
18  terms of carcinogenicity in the MSDS was recent enough,
19  no.  I would have expected some type of warning on it.
20    Q.  And separate research you did for ethanol or
21  isobutane?
22    A.  No, it's nonsense.
23    Q.  All right.  Finally, with respect to the other
24  chemical exposure you noted for Mrs. Gatewood, that was
25  ant and roach spray.  Which product is that on your

Page 444

1  table 20?
2    A.  Well, I'll tell you what it's not.  It's not
3  the diesel fuel.
4      (The document was examined.)
5      I believe it's on the page -- second page
6  under fire ant killer Amdro.  Let me just double check.
7      (The document was examined.)
8      Yes, on the second page under fire ant killer
9  Amdro.
10    Q.  Okay.  And you note under comment that the EPA
11  classifies hydromethanol as a possible group C human
12  carcinogen.
13      Do you see that?
14    A.  Yes.
15    Q.  Okay.  And what did you do to further research
16  hydromethanol to determine whether it could have
17  contributed to Mrs. Gatewood's non-Hodgkin's lymphoma?
18    A.  I looked at the most recent national pesticide
19  information fact sheet referenced in footnote 142.
20    Q.  What did you find from that fact sheet?
21    A.  That it's a possible carcinogen, not a
22  probable, and the -- there's no evidence of -- it
23  causing lymphatic -- lymphometabolic malignancies.
24    Q.  Did you get that information from the National
25  Pesticide Information Center's fact sheet on

55  (Pages 441 to 444)

William Sawyer, Ph.D.
July 17, 2019

Page 445

1  hydromethanol?
2  **A.  Yes.**
3  Q.  Did you refer to or research any other
4  document or study on hydromethanol?
5  **A.  No.  There's -- no, I didn't.**
6  Q.  Okay.  And did you research anything else or
7  look at anything else, studies, publications for any
8  other -- other ingredients in fire ant killer Amdro?
9  **A.  No, I'm very familiar with sucrose.  That's**
10  **what most of us eat each day, large quantities of it.**
11  **Glycerine is also a harmless product that has --**
12  **actually is used in -- with approval of FDA in products**
13  **that we consume.**
14  Q.  How much Cutter Backwoods Dry Insect Repellant
15  did Mrs. Gatewood use?
16  **A.  I don't know.  It's irrelevant.  It's not a**
17  **product that can cause NHL.**
18  Q.  How much fire ant killer Amdro did
19  Mrs. Gatewood use?
20  **A.  Irrelevant.  I don't know because it doesn't**
21  **cause NHL.**
22  Q.  Okay.  As we've done in the past, Dr. Sawyer,
23  you've been kind enough to facilitate our reproduction
24  of copying of your Redwelds of material that you've
25  brought to depositions.  And what I want to do is just

Page 446

1  mark the entire set of the two Redwelds that you have
2  as an exhibit.  We'll mark it as Exhibit 30, I think is
3  what we're up to, and propose that we follow the same
4  protocol we have followed in the past for the copying
5  of those materials and getting them right back to you
6  in exactly the shape they're in, including where the
7  Post-it notes are and stickies and all of that, okay?
8  MR. KRISTAL:  And I would just ask Dr. Sawyer
9  to go through it.  If there's nothing that relates
10  to this litigation, then it should be removed.  If
11  it's related to litigation in this case, that's
12  fine.
13  The exhibits, you should --
14  THE WITNESS:  They stay.
15  MR. DERRINGER:  Yeah, let's keep the exhibits
16  here.
17  THE WITNESS:  We'll keep those separate.  No,
18  I guess there's a problem here.
19  Many of the documents are my originals that I
20  brought, so what will I be getting back?
21  MR. DERRINGER:  When you -- when you talk
22  about many of the documents are the originals you
23  brought, you mean the documents that have been
24  marked as exhibits --
25  THE WITNESS:  Yeah.

Page 447

1  MR. DERRINGER:  -- are from your Redwelds; is
2  that right?
3  THE WITNESS:  Right, right.
4  MR. DERRINGER:  All right.  What I propose is
5  this:  The exhibits have to be maintained by the
6  court reporter.  What we'll do is -- what we can
7  do, Dr. Sawyer, is just state on the record which
8  of the exhibits that have been marked at this
9  deposition are exhibits that you took from your
10  Redweld.  And then when we return the Redwelds to
11  you, or whoever is copying them will return them to
12  you, they will make sure that those exhibits are in
13  the Redwelds.
14  THE WITNESS:  Okay.
15  MR. KRISTAL:  In other words, you'll get back
16  your originals.
17  Is that what you're saying?
18  MR. DERRINGER:  Not necessarily.  The
19  originals should be the exhibits.
20  MR. KRISTAL:  Well, no, I don't think the
21  originals should be the exhibits.  We should make
22  copies and give him back his originals.
23  MR. DERRINGER:  Well, so long as we are
24  getting color copies that reflect the highlights.
25  MR. KRISTAL:  Whoever is making the copies

Page 448

1  should make them look like they look in the
2  originals.
3  MR. DERRINGER:  That's fine with me.
4  Dr. Sawyer, does that make sense to you?
5  Again, what I propose is we state on the record
6  which of the exhibits in this deposition are from
7  your Redwelds.  And then what we will do is the
8  court reporter will, obviously, make a copy of all
9  of the exhibits and we will also arrange to have
10  the remaining parts of your Redwelds copied.  And
11  then we will take the exhibits that were part of
12  your Redweld, we'll put them back in the Redweld,
13  and then send the entire Redwelds back to you.
14  THE WITNESS:  Okay.  That sounds good.
15  MR. DERRINGER:  I appreciate that.
16  THE WITNESS:  What I'm going to do is I'm
17  putting the appropriate things back into my
18  pockets.
19  MR. KRISTAL:  In other words, Dr. Sawyer is
20  going to take the exhibits that came out of his
21  Redwelds, he's going to put them back in his
22  Redwelds, so that the reporter can copy --
23  THE WITNESS:  They have exhibit numbers on
24  them.
25  MR. DERRINGER:  That's fine with me, as long

56  (Pages 445 to 448)

William Sawyer, Ph.D.
July 17, 2019

Page 449

1    as it's fine with our court reporter who will then
2    be responsible for copying the materials.
3         Is that acceptable to you, Madam Court
4    Reporter?
5         THE REPORTER: Sure.
6         MR. DERRINGER: Thank you.
7         MR. KRISTAL: My suggestion is -- I think it
8    will all fit in one Redweld, so just for
9    convenience.
10        THE REPORTER: If you would do this -- can we
11   go off the record?
12        MR. DERRINGER: Not quite yet.
13        THE REPORTER: Okay.
14        MR. DERRINGER: I'm going to mark the
15   Redweld -- I'm going to mark a Redweld with Exhibit
16   30. Into that Redweld would be all of the
17   materials that were in the two Redwelds that you
18   brought with you to the deposition. Do you see
19   that, Dr. Sawyer?
20        THE WITNESS: Yes, that will work.
21        MR. DERRINGER: Okay. That's Exhibit 30 to
22   this deposition.
23        (Defendant's Exhibit-30 was marked for
24   identification.)
25        MR. DERRINGER: And we will continue the

Page 450

1    deposition to a later date.
2         MR. KRISTAL: We'll discuss all of that and
3    hopefully come to some agreement.
4         MR. DERRINGER: Dr. Sawyer, thank you for your
5    time.
6         THE WITNESS: Okay.
7         THE VIDEOGRAPHER: The time is 5:11. Off
8    record.
9         (Witness excused.)
10        (The deposition was suspended at 5:11 p.m.)
11            - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 451

1                CERTIFICATE
2
3
4    STATE OF FLORIDA)
     COUNTY OF DUVAL )
5
6         I, Sandra G. Pemberton, RPR, CRR, certify
     that I was authorized to and did stenographically
7    report the deposition of William Sawyer, Ph.D.; that a
     review of the transcript was requested; and that the
8    transcript is a true and complete record of my
     stenographic notes.
9
10        I further certify that I am not a
     relative, employee, attorney, or counsel of any of the
11   parties, nor am I a relative or employee of any of the
     parties' attorneys or counsel connected with the
12   action, nor am I financially interested in the action.
13
          DATED this 22nd day of July, 2019.
14
15
16        Sandra G. Pemberton, RPR, CRR, FPR
17
18
19
20
21
22
23
24
25

Page 452

1            CERTIFICATE OF OATH
2
3
4    STATE OF FLORIDA  )
     COUNTY OF DUVAL   )
5
6
          I, the undersigned authority, certify that
7    William Sawyer, Ph.D. personally appeared before me and
     was duly sworn.
8
9         WITNESS my hand and official seal this
10   22nd day of July, 2019.
11
12   _____
     Sandra G. Pemberton
13   Notary Public - State of Florida
     My Commission No. GG169455
14   Expires: January 13, 2022
15
16
17
18
19
20
21
22
23
24
25

57 (Pages 449 to 452)

William Sawyer, Ph.D.
July 17, 2019

Page 453

```
 1              ERRATA SHEET
 2   IN RE:  Winston v. Monsanto
 3   PAGE  LINE  CHANGE          REASON
 4   _____ _____ _____   _____
 5   _____ _____ _____   _____
 6   _____ _____ _____   _____
 7   _____ _____ _____   _____
 8   _____ _____ _____   _____
 9   _____ _____ _____   _____
10   _____ _____ _____   _____
11   _____ _____ _____   _____
12   _____ _____ _____   _____
13   _____ _____ _____   _____
14   _____ _____ _____   _____
15   _____ _____ _____   _____
16   _____ _____ _____   _____
17   _____ _____ _____   _____
18   _____ _____ _____   _____
19   _____ _____ _____   _____
20   _____ _____ _____   _____
21   _____ _____ _____   _____
22        Under penalties of perjury, I declare that
     I have read the foregoing pages of my deposition and
23   that it is true and correct, subject to any changes in
     form or substance entered here.
24
     _____    _____
25   Date                   William Sawyer, Ph.D.
```

Page 454

```
 1        COMES NOW THE WITNESS, WILLIAM SAWYER, PH D ,
 2   and having read the foregoing transcript of the
 3   deposition taken on the 17th day of July, 2019,
 4   acknowledges by signature hereto that it is a true
 5   and accurate transcript of the testimony given on
 6   the date hereinabove mentioned
 7
 8
 9
10             _____
11             William Sawyer, Ph D
12
13
14   Subscribed to before me this _____ day of
15   _____, 2019
16
17             _____
18             NOTARY PUBLIC
19
20   My Commission Expires: _____
21
22   Winston, et al , vs  Monsanto Company, et al
23   Reporter:  Sandra G  Pemberton, RPR, CRR, FPR
24   Date Taken:  July 17, 2019
25
```

58 (Pages 453 to 454)