# EXHIBIT 18

```
 1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2

    IN RE: ROUNDUP PRODUCTS       § MDL No. 2741
 3  LIABILITY LIGITATION          § Case No. 3:16-md-02741-VC
    _____§
 4                                §
    This document relates to:     §
 5                                §
    Sanders v. Monsanto Company   §
 6  Case No. 3:16-cv-05752-VC     §
    _____§
 7

 8                         - - -
 9            Thursday, November 14, 2019
10                         - - -
11
12        Videotaped deposition of WILLIAM R. SAWYER,
13   Ph.D., held at South Seas Resort, 5400 Plantation
14   Road, Captiva, Florida 33924, commencing at
15   2:19 p.m., on the above date, before Susan D.
16   Wasilewski, Registered Professional Reporter,
17   Certified Realtime Reporter, Certified Realtime
18   Captioner, Florida Professional Reporter
19                         - - -
20              GOLKOW LITIGATION SERVICES
21         877.370.3377 ph | 917.591.5672 fax
22                   deps@golkow.com
23
24
25
```

Page 2

1  APPEARANCES:
2  WEITZ & LUXENBERG
   BY:  JERRY KRISTAL, ESQUIRE
3       jkristal@weitzlux.com
        220 Lake Drive East, Suite 210
4       Cherry Hill, New Jersey 08002
        Phone:  (856) 755-1115
5  Representing Plaintiffs
6
7
8  NELSON MULLINS RILEY & SCARBOROUGH LLP
   BY:  ERIC A. PAINE, ESQUIRE
9       eric.paine@nelsonmullins.com
        1320 Main Street
10      Columbia, South Carolina 29201
        Phone:  (803) 255-5518
11 Representing Defendant Monsanto Company
12
13
14 WILKINSON WALSH & ESKOVITZ
   BY:  CALI COPE-KASTEN, ESQUIRE
15      ccope-kasten@wilkinsonwalsh.com
        2001 M Street, NW, 10th Floor
16      Washington, D.C. 20036
        Phone: (856) 755-1115
17 Representing Defendant Monsanto Company
18
19
20 ALSO PRESENT:
21   MATTHEW ALLISON, Videographer
22
23
24
25

Page 3

1            - - -
2          I N D E X
3            - - -
4  Testimony of:  WILLIAM R. SAWYER, Ph.D.      Page
5    DIRECT EXAMINATION BY MR. PAINE..............  5
6    CROSS-EXAMINATION BY MR. KRISTAL............. 38
7    REDIRECT EXAMINATION BY MR. PAINE........... 43
8    RECROSS-EXAMINATION BY MR. KRISTAL.......... 47
9
10
11         E X H I B I T S
12       (Attached to transcript)
13 WILLIAM R. SAWYER, Ph.D. DEPOSITION EXHIBITS     PAGE
14 Exhibit 1  Monsanto Company's Third Amended     5
              Notice to Take Oral and Videotaped
15            Deposition of Dr. William Sawyer
              Excluding Appendix A - Documents
16
   Exhibit 2  October 9, 2019 Report from         6
17            Toxicology Consultants & Assessment
              Specialists, LLC
18
   Exhibit 3  Report of the Advisory Group to     43
19            Recommend Priorities for the IARC
              Monographs during 2020-2024
20
21
22
23
24
25

Page 4

1            - - -
2       THE VIDEOGRAPHER:  Good afternoon.  We are
3  now on the record.  My name is Matthew Allison.
4  I am a videographer with Golkow Litigation
5  Services.  Today's date is November 14th, 2019,
6  and the time is 2:19 p m.
7       This video deposition is being held in
8  Captiva, Florida, in the matter of John V.
9  Sanders vs. Monsanto Corpor -- Company, sorry,
10 taken in the United States District Court,
11 Northern District of California.  The deponent is
12 Dr. William R. Sawyer.
13      Will all counsel please identify themselves
14 for the record.
15      MR. KRISTAL:  Jerry Kristal, Weitz &
16 Luxenberg, on behalf of John Sanders.
17      MR. PAINE:  Eric Paine with Nelson Mullins
18 Riley & Scarborough on behalf of Monsanto.
19      MS. COPE-KASTEN:  Cali Cope-Kasten with
20 Wilkinson Walsh & Eskovitz on behalf of Monsanto.
21      THE VIDEOGRAPHER:  The court reporter is
22 Susan Wasilewski and will now swear in the
23 witness.
24      THE COURT REPORTER:  Would you raise your
25 right hand?

Page 5

1      Do you solemnly swear or affirm the
2  testimony you're about to give will be the truth,
3  the whole truth, and nothing but the truth?
4      THE WITNESS:  Yes.
5      THE COURT REPORTER:  Thank you.
6      WILLIAM R. SAWYER, Ph.D., called as a
7  witness by Defendant Monsanto Company, having been
8  duly sworn, testified as follows:
9           DIRECT EXAMINATION
10 BY MR. PAINE:
11   Q.  Welcome back, Dr. Sawyer.
12   A.  Thank you.
13   Q.  It's been a long time, five to six minutes,
14 I think.
15   A.  Yeah.
16   Q.  Okay.  Final deposition for today.  This is
17 about Mr. Sanders' case.  Do you have a full copy of
18 your report for Mr. Sanders with you, either printed
19 or electronic?
20   A.  Electronically.  I have it open.
21   Q.  Okay.  And let me, again, take care of the
22 usual housekeeping.
23  (Sawyer Exhibit 1 was marked for identification.)
24 BY MR. PAINE:
25   Q.  I'm marking as Exhibit 1 to your deposition

Page 6

1  a copy of the notice which has some document
2  requests, and same questions as last two
3  depositions. Did you bring your file pertaining to
4  Mr. Sanders' case with you today?
5     A.  I did.
6     Q.  Okay. And I know you've referred to that as
7  we go, so again, please feel free to do that as you
8  have in the prior two depositions.
9     (Sawyer Exhibit 2 was marked for identification.)
10 BY MR. PAINE:
11    Q.  I'm also marking for you and handing you as
12 Exhibit 2 the portion of your report, the narrative
13 portion of your report that runs through the
14 signature page, and this is for the Sanders case,
15 correct?
16    A.  Yes.
17    Q.  Okay. And that is through page 125. Again,
18 I do not have the materials considered list that was
19 served with the report on October 9, 2019, appended
20 to this, but I understand you have that on your
21 computer and you can refer to that if needed; is
22 that right?
23    A.  Yes.
24    Q.  Okay.
25        MR. KRISTAL: And just let me interrupt.

Page 7

1  Again, consistent with our agreement with
2  Monsanto on Monday, we served an updated
3  materials considered list on Monday,
4  November 11th.
5      MR. PAINE: I understand.
6  BY MR. PAINE:
7     Q.  That was a supplemental list that you helped
8  prepare, Dr. Sawyer; is that right?
9     A.  Yeah. My office provided that to Attorney
10 Kristal's office for production on Monday, September
11 -- not September.
12      MR. KRISTAL: November 11th.
13    A.  Not October -- let's try it over. I'm still
14 thinking about the September question.
15      Yeah, November 11th, 2019.
16    Q.  All right.
17      MR. KRISTAL: And then there was a separate
18 e-mail with two documents, one related to the
19 updates, so to speak, of IARC on glyphosate, plus
20 other chemicals, and the article involving
21 exposure to Roundup in Paraguayan children. I
22 think the author's name Leite, L-e-i-t-e, I think
23 is what we have.
24 BY MR. PAINE:
25    Q.  So, Doctor, on page 144 of your October 9,

Page 8

1  2019 report, there is a set of new documents
2  reviewed, the first of which is a plaintiff fact
3  sheet, deposition, medical records from Mr. Sanders,
4  right?
5     A.  Let me check.
6     Q.  Sure.
7     A.  So on page 144 is my list of new documents
8  reviewed.
9     Q.  Okay. And the first item there is plaintiff
10 fact sheet, deposition, medical records for
11 Mr. Sanders, right?
12    A.  Correct.
13    Q.  So my question to you is you had that
14 information about Mr. Sanders available to you when
15 you prepared your opinions that are in your
16 October 9, 2019 report, right?
17    A.  Yes.
18    Q.  Since that time have you reviewed or been
19 made aware of any additional facts or materials
20 specific to Mr. Sanders' case?
21    A.  No.
22    Q.  And did you have all of the information you
23 felt was necessary for you to prepare your opinions
24 specific to Mr. Sanders when you signed your report
25 on October 9, 2019?

Page 9

1     A.  Yes.
2     Q.  And your October 9, 2019, has the opinions
3  that you intend to express to the jury at the trial
4  of this case with respect to Mr. Sanders, correct?
5     A.  Yes.
6     Q.  Have you ever spoken with Mr. Sanders?
7     A.  No.
8     Q.  Have you ever participated in any kind of
9  phone conversation or communication with Mr. Sanders
10 even if you didn't speak directly to Mr. Sanders
11 yourself?
12    A.  No.
13    Q.  Do you have any intention to speak with
14 Mr. Sanders before trial?
15    A.  Not at this point.
16    Q.  All right. You've reviewed Mr. Sanders'
17 plaintiff fact sheet, right?
18    A.  I did.
19    Q.  And similar to other questions -- you might
20 notice a pattern here -- did you review the entirety
21 of Mr. Sanders' available medical records, or just
22 select medical records for Mr. Sanders?
23    A.  Only the portions that were specific to the
24 diagnosis of his low grade B-cell lymphoma, and the
25 pathology reports, and the information regarding his

Page 10

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2  Q. All right.
3     MR. KRISTAL: You mean ▮▮▮▮▮▮▮?
4  Alcoholic assumes -- sorry.
5  A. ▮▮▮▮▮▮▮, which includes --
6     MR. KRISTAL: ▮▮▮▮▮▮.
7  A. -- ▮▮▮▮▮▮▮▮▮▮.
8     MR. KRISTAL: Yeah.
9  Q. Have you reviewed -- you reviewed
10 Mr. Sanders' deposition, right?
11 A. Yes.
12 Q. And have you reviewed any other depositions
13 taken in his case?
14 A. No.
15 Q. Did you rely on Mr. Sanders' deposition
16 testimony for your opinions in this case?
17 A. Yes.
18 Q. Again, on page 144 of your report, materials
19 considered list, Item Number 2 under New Documents
20 Reviewed is Petty, Stephan, CIH, Factual Summary and
21 Expert Opinion Report, October 3, 2019, right?
22 A. Yes.
23 Q. Okay.
24 A. But I made an error. I did interview
25 Mr. Sanders.

Page 11

1  Q. You did?
2  A. Yes.
3  Q. And when did that occur?
4  A. Now I'm looking. Upon interview, on page 5,
5  October 9th, 2019, Footnote 3.
6  Q. Do you have any notes or other memoranda
7  from that interview with Mr. Sanders?
8  A. No. It would have gone directly into my
9  draft report.
10 Q. All right. What did you and Mr. Sanders
11 discuss during that interview?
12 A. What did we discuss?
13 Q. Uh-huh.
14 A. I'm looking at my report. I questioned him
15 regarding his prior adenocarcinoma and Barrett's
16 esophagus. Upon review, I asked him if he had any
17 history of HIV, AIDS, Crohn's decease, rheumatoid
18 arthritis, hepatitis B or C, prior malignancies with
19 chemotherapy, organ transplants, immunosuppressant
20 pharmaceuticals, ulcerative colitis, or long-term
21 prednisone use, and he stated he had not had any
22 such history, although he did state he had undergone
23 surgery for the esophageal adenocarcinoma but
24 without chemotherapy.
25 Q. All right. So you're referring to that

Page 12

1  second full paragraph on page 5 of your report?
2  A. Yes.
3  Q. Okay. And are there things in the rest of
4  your report specific to Mr. Sanders that you can
5  identify as coming specifically from your interview
6  with him?
7  A. Yes.
8  Q. All right. And what are those things,
9  please?
10 A. Really, that's all. I'm not finding
11 anything else that was not already in the
12 depositions or plaintiff fact sheet.
13 Q. How long did you speak with Mr. Sanders?
14 A. I don't recall. A short, short, short
15 interview. I didn't need much.
16 Q. All right. And what was -- what was it that
17 you needed from him?
18 A. It's like primarily what I questioned was
19 the second paragraph on page 5, which also gave me
20 some information regarding his -- whether or not he
21 was treated with chemotherapy for the esophageal
22 adenocarcinoma.
23 Q. Okay. So just so I'm clear, Dr. Sawyer, it
24 sounds like the purpose for you interviewing him and
25 the sum and substance of your conversation with

Page 13

1  Mr. Sanders was captured in the second full
2  paragraph on page 5 of your report about his medical
3  history?
4  A. Yes.
5  Q. Okay. The rest of the information in your
6  report pertaining to Mr. Sanders' case came from his
7  fact sheets and his depositions and his medical
8  record -- his deposition and medical records?
9  A. Yeah, which I understand is under oath, and
10 the fact sheet was under penalty of perjury, and I
11 attempted to limit my questions as much as I
12 possibly could and, rather, rely on the testimony at
13 which -- from what I'm seeing, I think everything I
14 have here is reference to his deposition and
15 plaintiff fact sheet.
16 Q. Okay. Did you question him at all about his
17 use of Roundup formulations over the years?
18 A. It doesn't appear so. I don't have any
19 specific references outside of the deposition and
20 fact sheet.
21 Q. So unlike our other two cases today that
22 we've talked about, in the Dickey and Domina cases,
23 in this case Mr. Petty didn't do an interview of
24 Mr. Sanders. Is that your understanding?
25 A. That's correct.

Page 14

1  Q. Okay. So we don't have an Appendix F or an
2  Appendix G for Mr. Petty's report like we do for
3  those other two cases, right?
4  A. No. Rather, we have a Table B.
5  Q. Table B, and Table B is what you prepared,
6  right?
7  A. Correct.
8  Q. You didn't derive that from Mr. Petty's
9  report or anybody else's report, right?
10  A. Correct. It's derived, as noted in the
11  bullets, from primarily deposition testimony. I
12  think there was some piece -- one little piece of it
13  from the plaintiff's fact sheet as per Footnote 14
14  on page 8.
15  Q. Let me catch up with you. Page -- okay.
16  Oh, okay. So Table C, which you've titled Exposure
17  Day Estimates for Mr. John Sanders, you have a
18  maximum -- or, I'm sorry, minimum lifetime exposure
19  days of 1,027.50, right?
20  A. Yes.
21  Q. And that was what you annotated with
22  Footnote 14, right?
23  A. Yes.
24  Q. Okay. And that's your own calculation,
25  correct?

Page 15

1  A. Yes.
2  Q. Okay. You did not do a specific dermal
3  absorption -- I'm sorry. You didn't do a specific
4  absorbed dose calculation for Mr. Sanders' case
5  either, correct?
6  A. No. It wasn't necessary. He has over 1,000
7  exposure days, compared to the minimum -- or I mean
8  the maximal threshold in the human epidemiologic
9  studies of 10 days. So he's a good 100 times above
10  that maximal threshold.
11  Q. Have you had any further communications with
12  Mr. Sanders?
13  A. No.
14  Q. Do you have any further intent to speak with
15  Mr. Sanders or communicate with Mr. Sanders before
16  trial?
17  A. No, not at this time. There's nothing I can
18  think of.
19  Q. Have you had any communications with any of
20  Mr. Sanders' doctors?
21  A. No.
22  Q. Have you spoken with any of plaintiffs'
23  other expert witnesses about Mr. Sanders' case
24  specifically?
25  A. No.

Page 16

1  Q. Did you conduct any kind of site inspection
2  or inspection of any of the equipment Mr. Sanders
3  used to apply Roundup?
4  A. No.
5  Q. Do you have any intention to conduct any
6  kind of site inspection or inspection of any
7  equipment that Mr. Sanders used to apply Roundup?
8  A. No.
9  Q. Now, in this case you have Table A,
10  Medications Prescribed for Mr. John Sanders. What's
11  the point of including a medication list for
12  Mr. Sanders?
13  A. See if he was on any long-term
14  immunosuppressive agents or pharmaceuticals that
15  induce lymphoma, such as cyclosporin A or others --
16  Q. Did you --
17  A. -- or even any carcinogenic pharmaceuticals
18  that are commonly used, like gabapentin, which is
19  associated with pancreatic cancer.
20  Q. So if a case comes to your attention or
21  someone has been using immunosuppressives, would
22  you -- or any of the other medications that you
23  mentioned that are associated with non-Hodgkin
24  lymphoma, would you consider those to be substantial
25  contributing factors to the development of

Page 17

1  non-Hodgkin lymphoma in a patient like that?
2    MR. KRISTAL: Object to form.
3  A. Well, certainly it's possible. There is a
4  lot of questions involved that in terms of if I did
5  identify one, I'd want to obtain the pharmacy
6  records and find out what the dosage was and when it
7  was started and how long it had been used.
8  Q. Now, putting aside the medications described
9  in the Table A, did you obtain any additional
10  information by way of a chemical inventory for
11  Mr. Sanders' case either in terms of what he
12  currently has on his properties or what he has used
13  historically, other than what you've described here
14  in Table B?
15    So, Doctor, are you able to answer my
16  question?
17  A. I'm looking. Really nothing beyond the
18  pesticide use reports.
19  Q. And tell me what you're referring to there,
20  please. Which pesticide use reports?
21  A. It's from his deposition, it was Exhibit 2,
22  I think. Yeah.
23  Q. Okay. And in your report you talk about
24  Mr. Sanders providing nearly 200 business records
25  showing purchases from '94 to '99 detailing the

Page 18

1  acquisition of primarily Roundup original herbicide.
2  Is that -- are those the documents you're referring
3  to?
4     A.  Yes.
5     Q.  Did those detail purchase or use of other
6  herbicides other than Roundup?
7     A.  No, they really didn't.
8     Q.  Okay.  So back to my question, Doctor.  Did
9  you do any kind of a current or historical chemical
10 inventory in Mr. Sanders' case other than what
11 you've discussed here in your report?
12    A.  No.
13    Q.  Did you ask Mr. -- strike that.
14       I'll ask you a little bit more about his
15 medical history.  You noted that he's a diabetic,
16 right?
17    A.  Yes.
18    Q.  Have there been studies published in the
19 peer-reviewed medical literature showing an
20 association between diabetes and an increased risk
21 for developing non-Hodgkin lymphoma?
22    A.  It's possible but I'm actually not familiar
23 with those studies and would defer that to the
24 medical oncologist.
25    Q.  So it's fair to say that as part of your

Page 19

1  formulation of opinions in this case, you didn't
2  assess whether diabetes or any of his other medical
3  conditions may have been contributing factors or
4  causes to his non-Hodgkin lymphoma; is that correct?
5     A.  Correct.  I am only assessing the
6  toxicological factors, not the medical factors.  The
7  pathologists and medical oncologists are best to
8  address hereditary or microbiological or potentially
9  diabetes or other such medical conditions.
10    Q.  Done from a toxicologic standpoint, did you
11 evaluate whether the ▮▮▮▮▮▮▮▮▮ hat he
12 engaged in for a number of years exposed him to any
13 chemicals that have been associated with an
14 increased risk of developing non-Hodgkin lymphoma?
15    A.  Yes.
16    Q.  And what -- ▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ That's a terrible
18 question.
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23    A.  Yes.
24    Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25    A.  ▮▮▮▮▮▮▮▮▮▮



Page 20

[Lines 1-20 redacted]
21    A.  I did.
22    Q.  Okay.  And 40 pack-years, correct?
23    A.  Yes.
24    Q.  Day in, day out for 40 years?
25    A.  Yes.

Page 21

1     Q.  Okay.  Multiple exposures per day?
2     A.  Yes.
3     Q.  And 40 years times 365 would be roughly --
4  I'm not even going to hazard the math -- 13 to
5  14,000 exposure days?
6     A.  Yes.
7     Q.  Although your report doesn't discuss
8  anything other than glyphosate-containing
9  formulations Roundup and Honcho, do you recall from
10 his deposition that he used other chemicals as part
11 of his occupation?
12    A.  Yes.
13    Q.  Okay.  And, for instance, he used something
14 called miscible oil that he mixed with Sevin.  Do
15 you recall that?
16    A.  Yes.
17    Q.  And what is Sevin, please, S-e-v-i-n?
18    A.  It's an organic -- organophosphate.
19    Q.  Okay.  Is it an insecticide; is that right?
20    A.  Yes, it is.
21    Q.  Do you recall the details of how much Sevin
22 he used and when he used Sevin in his career?
23    A.  Page 74 of his deposition discusses Sevin
24 and he used -- no, I didn't really -- I'm not really
25 certain how often he used it.

Page 22

1  Q. Is that the section of the deposition where
2  he talks about mixing Sevin with the miscible oil?
3  A. Yes, it is.
4  Q. And that's when he sprayed it on trees to
5  cover the trees?
6  A. Yes.
7  Q. And I think he said approximately 500
8  gallons covered about 22 trees. Is that your
9  recollection, too?
10 A. Yeah. Actually, he used it -- I think he
11 did say it was a daily job.
12 Q. What's the active ingredient in Sevin?
13 A. I think it could be chlorpyrifos. I should
14 probably -- well, let's see. In his deposition --
15 he didn't really say what ingredients, but out of
16 recall, I think it's chlorpyrifos. It's an
17 organophosphate. It's in my prior Monsanto report
18 tables with respect to its classification and with
19 respect to carcinogenicity and so on.
20 Q. Okay. Do you also recall from his
21 deposition that Mr. Sanders served in Vietnam?
22 A. Yes.
23 Q. And do you recall from his deposition that
24 while Mr. Sanders was serving in Vietnam, he was
25 exposed to Agent Orange?

Page 23

1     Are you checking his deposition?
2  A. Yeah.
3  Q. So have you found that reference?
4  A. Yes.
5  Q. Okay.
6  A. Yes, so that he, in fact, stated that he had
7  a disability because of Agent Orange.
8  Q. All right. So we've established that he
9  served in Vietnam, that he was exposed to Agent
10 Orange, and has received disability on account of
11 his Agent Orange exposure, correct?
12 A. Yes.
13 Q. Has Agent Orange been associated with an
14 increased risk of developing non-Hodgkin lymphoma?
15 A. Yes.
16 Q. I noted in your report that with respect to
17 his service, you only mention that he reported in
18 1971 that he had two drags from a marijuana
19 cigarette while serving in the military in Vietnam,
20 but, otherwise, neither his Vietnam service nor his
21 exposure to Agent Orange are mentioned anywhere in
22 your report; is that correct?
23 A. That's correct.
24 Q. So in fairness, Doctor, if you're going to
25 assess potential exposures and contributing factors

Page 24

1  to non-Hodgkin's lymphoma, shouldn't you have
2  accounted for his Agent Orange exposure?
3     MR. KRISTAL: Objection.
4  A. Yes.
5  Q. So you're not going to come and tell the
6  jury that the only potential exposure to a chemical
7  that may have accounted for Mr. Sanders developing
8  non-Hodgkin lymphoma was glyphosate either in
9  Roundup or Honcho, are you?
10 A. ███████████████████████████████
11 ███████████████████████████████████████
12 ███████████████████████████████████████
13 ███████████████████████████████
14 Q. Did Mr. Sanders read the Roundup label?
15 A. I don't recall.
16 Q. Were you aware that Mr. Sanders took pest
17 control classes and I think held an applicator's
18 license for pesticides?
19 A. Yes, I'm aware of that.
20 Q. Okay. Do you recall that Mr. Sanders
21 testified that when he learned -- that he learned
22 that his employee was required to wear personal
23 protective equipment consisting of a Tyvek suit with
24 boots and gloves in the 1990s while applying
25 products like Roundup?

Page 25

1     MR. KRISTAL: Objection to form.
2  Q. Do you recall him testifying about that?
3  A. Not in that exact wording, no.
4  Q. Let me direct your attention to page 135 of
5  Mr. Sanders' deposition.
6  A. Yeah, I'm on it.
7  Q. Okay. So just picking up around 7, and,
8  obviously, read as much or more of this as you like,
9  but picking up around line 7: Okay. When you read
10 it, how many times did you read the label?
11    Answer: I don't know. I don't have any
12 idea.
13    Question: You said you -- when it first --
14 when the regulations I guess first came out?
15    Answer: Yes.
16    Question: If you were an owner, you didn't
17 have to wear PPEs, but employees did, right?
18    Answer: Correct.
19    Question: Okay. And at some point you had
20 an employee, I think your friend?
21    Answer: Larry.
22    Question. Yeah. Did you make Larry wear
23 PPE?
24    Answer: I did.
25    Question: Okay. What kind of PPE did you

Page 26

1 make Larry wear?
2     Answer: It was one of those white Tyvek and
3 then he will always --
4     Question: Is that equipment you purchased?
5     Answer: Yes.
6     So does that refresh your recollection of --
7  A. It does but I'm not sure that your initial
8 question was in the same meaning of what he said.
9  Q. Sure. So let me circle back. But you
10 understood that from this training and from the
11 regulations, et cetera, and other sources, including
12 the label, that Mr. Sanders' understanding was that
13 employees of those holding pesticide applicator
14 licenses were supposed to use certain protective --
15 or personal protective equipment when applying
16 something like Roundup, right?
17  A. That was his understanding, yes.
18  Q. Okay. And my next question is do you recall
19 that Mr. Sanders testified that as an opener, he
20 considered himself exempt from or did not have to
21 wear that same permanent protective equipment that
22 his employee wore while applying Roundup?
23  A. Yes.
24  Q. Okay. So my question is if Mr. Sanders had
25 chosen to use that same personal protective

Page 27

1 equipment that he required of his employee, that is
2 a Tyvek suit, boots and gloves, that likely would
3 have reduced any amount of Roundup that potentially
4 would come into contact with his skin as he applied
5 Roundup as part of his job, right?
6  A. Yes.
7  Q. And it would also have reduced his exposure
8 to other herbicides or chemicals that he may have
9 used as part of his job, correct?
10  A. Yes.
11  Q. But again, in this case, your opinions are
12 based on the cumulative number of exposure days,
13 correct?
14  A. Yes.
15  Q. And you didn't calculate an observed dose
16 for Mr. Sanders just like you didn't calculate it
17 for Mr. Domina or Mr. Dicky in the earlier cases
18 today, correct?
19  A. Correct.
20  Q. Do you think Mr. Sanders should have been
21 wearing that same personal protective equipment?
22     MR. KRISTAL: Objection.
23  A. Are you referring to the boots, suit and
24 gloves?
25  Q. Uh-huh.

Page 28

1  A. That certainly would have afforded more
2 protection.
3  Q. So if he had come to you in 1990, 1991,
4 whenever this was, your recommendation to him would
5 have been, yeah, you should wear that, it's a good
6 idea?
7  A. In 1991?
8  Q. Yeah, or whenever he -- he said that was, I
9 think, when that regulation came into effect, or at
10 least that's when he began making his employee wear
11 that. I think it was around that period of time.
12     MR. KRISTAL: Doesn't it say here 2000,
13  2001?
14     MR. PAINE: I thought it was '91. Sorry if
15  I got that wrong.
16     MR. KRISTAL: No. Are we talking about the
17  California regulation that Dr. Sawyer notes on
18  page 7?
19     MR. PAINE: Let's see. Let me get it
20  straight. Ah, thank you.
21 BY MR. PAINE:
22  Q. I think you said he began taking pest
23 control classes in '90. So, yeah, whenever the
24 regulation was that required employees to begin
25 wearing personal protective equipment, your advice

Page 29

1 to him, had he asked you at that time, would have
2 been, yeah, you should do that, that's a good idea?
3  A. Agree.
4  Q. Well, let's look at page 159 of Mr. Sanders'
5 deposition, because I think this addresses the point
6 Mr. Kristal just brought up. Do you see in the
7 first, you know, eight, 10, 15 lines it talks about
8 what he wore typically while applying. Roundup up
9 to a certain point, it was a short sleeve shirt,
10 right? Do you see that?
11  A. Yes.
12  Q. Okay.
13  A. I do.
14  Q. And then it says, line 13: Was that always
15 a short sleeve shirt?
16     Answer: Toward the end I wore what -- what
17 the way they -- the way it ended up was in
18 California, the regulation is you had to -- the law
19 was you had to follow the label on the product, and
20 so after that I started wearing, as much as I hated
21 to, I started wearing the PPE, because they actually
22 had guys that would go around and they would write
23 you up if you were caught spraying without the
24 proper equipment on.
25     Question: What is your understanding as to

Page 30

1  when that law changed?
2      Answer: I can't remember the exact year
3  that that changed but it was probably after 2000.
4      Did I read all that correctly?
5    A.  Yes.
6    Q.  Okay.
7    A.  And I actually footnoted that at
8  Footnote 11, page 159 to 160, with respect to the
9  2000.
10   Q.  Okay.  And you did say in that bullet point
11  relating to Footnote 11:  Mr. Sanders wore no
12  personal protective equipment until a California
13  regulation was passed, quote, sometime after 2000,
14  2001.
15      Right?
16   A.  That's right.
17   Q.  Okay.  So up to that point, even though the
18  deposition testimony we've just read over the last
19  few minutes was he was -- his employee was required
20  to wear it, he was wearing what he always wore, a
21  short sleeve shirt, but when the regulation changed
22  around 2000 or 2001, he began wearing that same
23  personal protective equipment, right?
24   A.  That's what I have in my report.  That's
25  consistent with what he said, yes.

Page 31

1    Q.  Do you have any reason to think that
2  Mr. Sanders did not wear that type of Tyvek suit,
3  rubber gloves and boots as required from that point
4  until he last used a glyphosate-based herbicide in
5  2014?
6    A.  It's not your fault, I don't hear that well.
7  I didn't hear the first couple of words.
8    Q.  Sure.  I'll ask it again.  Do you have any
9  reason to think, based on what you know about
10  Mr. Sanders' case, that he did not use the Tyvek
11  suit, rubber gloves and boots as required from that
12  point, when the regulation went into effect in 2000
13  to 2001, up to the point he last used
14  glyphosate-based herbicides in 2014?
15   A.  So I think your question is do I have any
16  doubts with respect that he wore protective -- PPE
17  up to 2014?  I don't have any indications of that.
18  It is what it is -- what it states.
19   Q.  Sure.  So for that last, say, 13 or 14
20  years, or whatever it was from the time that
21  regulation went into effect, that Mr. Sanders
22  continued to wear the Tyvek suit, the boots and
23  rubber gloves, was potentially the last 13 or 14
24  years that he used glyphosate-based herbicides,
25  right?

Page 32

1    A.  Yes.
2    Q.  And using those pieces of personal
3  protective equipment, we can agree, would have
4  reduced the amount of glyphosate that might have
5  been -- landed on his skin and could potentially be
6  absorbed into his system, right?
7    A.  Yes.
8    Q.  Now, on page 4 of your report you talk about
9  the specific type of non-Hodgkin lymphoma that
10  Mr. Sanders was diagnosed with, right?
11   A.  Right.
12   Q.  Okay.  And then under medical diagnosis you
13  say:  Received a diagnosis of low-grade B-cell
14  lymphoma, a subtype of non-Hodgkin's lymphoma.
15      Right?
16   A.  Yes.
17   Q.  And then a little further down you talk more
18  specifically about the NHL diagnosis and the
19  pathology, right?
20   A.  Yes.
21   Q.  And in that second sentence you say:  The
22  finding raised the consideration of either marginal
23  zone lymphoma or lymphoplasmacytic lymphoma, LPL.
24      Right?
25   A.  Yes.

Page 33

1    Q.  Dr. Sawyer, are you aware of any
2  epidemiologic study that has found an increased risk
3  for either marginal zone lymphoma or
4  lymphoplasmacytic lymphoma in people who have been
5  exposed to glyphosate?
6      MR. KRISTAL:  Objection.
7    A.  No.  Those are uncommon forms and the
8  epidemiologic studies are incapable of reducing and
9  providing assessments on those two types of
10  lymphoma.  They are classified as a B-cell lymphoma
11  and fall under the general categories that were
12  tested in -- but I -- there are no studies that
13  specifically subtype those because they are so
14  infrequent.  There is, I think, over 60 types of
15  lymphoma.  I mean, they're -- the studies just do
16  not evaluate every form of lymphoma.
17   Q.  Do you recall that Mr. Sanders also, when he
18  served in the Army in Vietnam, drove trucks and
19  worked essentially in the motor pool from time to
20  time?
21   A.  Yes.
22   Q.  Okay.  And he was part of truck convoys
23  where he's moving materiel through country in truck
24  convoys?
25   A.  Yes.

Page 34

1  Q. And exhaust from gasoline and diesel engines
2  also contains benzene, doesn't it?
3  A. Yes.
4  Q. Do you know when the first non-Hodgkin
5  lymphoma malignant cell appeared in Mr. Sanders'
6  body?
7  A. No.
8  Q. Is it possible for you, through any method,
9  test, or procedure, to identify what year the first
10 non-Hodgkin's malignant cell appeared in
11 Mr. Sanders' body?
12 A. No, there is no such methodology to make
13 that determination.
14 Q. And is there any way you can identify the
15 month in which the first non-Hodgkin's malignant
16 cell appeared in Mr. Sanders' body?
17 A. Same answer.
18 Q. Is there any scientifically validated
19 method, test, or procedure whereby you could
20 identify or anybody could identify when the first
21 genetic changes occurred in Mr. Sanders' body that
22 led to the development of non-Hodgkin lymphoma in
23 his case?
24 A. Well, certainly there is a number of
25 methodologies for assessing genetic damage,

Page 35

1  chromosomal aberrations, et cetera, but none were
2  carried out prior to his diagnosis.
3  Q. So are you able to tell me when the first
4  genetic changes occurred in any of Mr. -- any cells
5  in Mr. Sanders' body that led to the development of
6  non-Hodgkin lymphoma?
7  A. There were no tests carried out to make that
8  determination.
9  Q. Now, in your report, Table B, you said that
10 his exposure frequency for glyphosate-containing
11 products, whether it was Roundup or Honcho, occurred
12 you said daily through spring, summer and fall.
13 Correct?
14 A. Yes.
15 Q. So I take it he was not using
16 glyphosate-containing products in the winter of any
17 of the years in issue, correct?
18 A. That's my understanding.
19 Q. Okay. And you've based your calculations on
20 him having roughly 274 days of exposure per year,
21 right? So, basically, winter is not -- winter is
22 what's omitted, right?
23 A. Yes.
24 Q. And during those -- sorry. Strike that.
25     Can you say to a reasonable degree of

Page 36

1  scientific certainty that any amount of glyphosate
2  from any source was present in Mr. Sanders' body
3  when the first cell underwent malignant
4  transformation to become a non-Hodgkin's lymphoma?
5  A. No, there is no such methodology to go back
6  in time and make such a determination.
7  Q. Can you say to a reasonable degree of
8  scientific certainty that any amount of glyphosate
9  from any source was present in Mr. Sanders' body
10 when the first steps that led to a malignant
11 transformation, that is any genetic change in any
12 cell occurred that led to his non-Hodgkin lymphoma?
13 A. No. Specific testing was not performed.
14 Q. Given what you told me a little earlier
15 today, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 A. No.
24 Q. Is it your understanding that Mr. Sanders'
25 NHL was successfully treated?

Page 37

1      MR. KRISTAL: Objection.
2  A. I -- I really have to defer that to the
3  medical oncologist.
4      MR. PAINE: All right. Let's do this.
5  Let's take a break, if we could. I'd like to
6  consult with Ms. Cope-Kasten. I may be pretty
7  close to done.
8      THE WITNESS: All right. I'm going to just
9  walk outside and stretch for a minute, if that's
10 okay.
11     MR. PAINE: Sure. Of course. Absolutely.
12     THE VIDEOGRAPHER: We're going off the
13 record at 3:09.
14    (Recess from 3:09 p.m. until 3:15 p.m.)
15     THE VIDEOGRAPHER: We're back on the record.
16 The time is 3:15.
17     MR. PAINE: Welcome back, Dr. Sawyer.
18     THE WITNESS: Thank you.
19     MR. PAINE: At this point I'm done with my
20 questions. I'm going to pass you to Mr. Kristal.
21 I may have additional questions after
22 Mr. Kristal's questions, but if not, thank you
23 for listening, thank you for participating, and I
24 appreciate your patience with me today.
25     THE WITNESS: Very good. Thank you.

Page 38

1  CROSS-EXAMINATION
2  BY MR. KRISTAL:
3  Q.  I just have a couple.  If you would turn to
4  your report on page 8, Table C, where you calculated
5  the years and days and hours of exposure.
6  A.  Correct.
7  Q.  In your table did you break out the number
8  of exposure days at an eight-hour day between
9  Roundup and Honcho, the other glyphosate-containing
10  herbicide?
11  A.  I did.
12  Q.  Okay.  And what were the years of the
13  Roundup exposures for which you calculated the
14  number of days?
15  A.  The years of use?
16  Q.  Yeah.
17  A.  1984 to 2005.
18  Q.  So that's 21 years?
19  A.  21 years, right.
20  Q.  Okay.  And how many hours did you calculate
21  for the 21 years just of the Roundup use, total
22  hours?
23  A.  Total hours was --
24  Q.  Sorry.  Total exposure days at eight hours
25  per day.

Page 39

1  A.  Yeah.  The total was 1,027.5.
2  Q.  Right.  I'm just talking about the Roundup
3  from 1984 to 19 -- from 2005.
4  A.  Oh, okay.  719 out of the 1,027, and what's
5  interesting, though, during that time span was the
6  period -- at least a major part of that period was
7  without PPE.
8  Q.  Well, let me ask the questions and we'll get
9  there.  Assuming Mr. Sanders, beginning in the year
10  2000, was completely covered, you know, in a bubble
11  and had zero exposure to Roundup, so if we took five
12  years off of that, he would have been exposed for 16
13  years instead of 21 years if he had zero exposure to
14  Roundup beginning in 2000?
15  A.  Correct.
16  Q.  Okay.  So using ballpark, five years is
17  approximately 20 percent of 21 years?
18  A.  Yes.
19  Q.  Okay.  So if we deducted the years 2000
20  through 2005 from the 719, we'd be deducting
21  approximately 142 hours or thereabouts, 150 hours?
22  A.  Round to 150, yeah.
23  Q.  Okay.  So if we subtract 150 -- I'm sorry --
24  days from the 719, would he still be well above the
25  epidemiological days of either 10 days total or two

Page 40

1  days per year?
2     MR. PAINE:  Objection.
3  A.  Yes, it would be way over.
4  Q.  Okay.  And if he was wearing that personal
5  protective equipment from the year 2000 onward,
6  would he -- and let's assume he had zero exposure
7  because of that, would he have had any exposure to
8  Honcho, the other glyphosate-containing herbicide?
9  A.  Well, not under the hypothetical of zero
10  exposure, no.
11  Q.  Right.  Okay.  So even assuming that's true,
12  would it still be your opinion to a reasonable
13  degree of scientific certainty that his Roundup
14  exposure from 1984 through the end of 1999 was a
15  substantial contributing factor to the development
16  of his non-Hodgkin lymphoma?
17  A.  Yeah.  To a reasonable toxicological
18  certainty it was clearly a substantial contributing
19  factor.
20  Q.  And if the other exposures, for example, to
21  Agent Orange, is considered a substantial
22  contributing factor to the development of
23  Mr. Sanders' non-Hodgkin lymphoma, does that fact,
24  if that's correct, mean that his Roundup exposure
25  was not also a substantial contributing factor?

Page 41

1     MR. PAINE:  Objection.
2  A.  Well, they both were.
3  Q.  Okay.  And same with the benzene or any
4  other exposure that he had, that you would also
5  consider it to be a substantial contributing factor?
6  A.  [REDACTED]
16  Q.  Okay.  Last couple of questions, different
17  subject:  You were asked about an insecticide called
18  Sevin, S-e-v-i-n.
19  A.  Right.
20  Q.  And from memory you were trying to remember
21  the active ingredients or the ingredients.  If I
22  showed you a page from your report in the Winston
23  Group case, would that help refresh your
24  recollection if you outlined exactly what's in
25  Sevin?

Page 42

1  A. It would.
2  Q. Okay.
3     MR. KRISTAL: I don't have a paper copy but
4  I will show you first. I'm going to be showing
5  Dr. Sawyer -- this is page 89 of his Winston
6  report, which was a Missouri state case group,
7  and he had a number of different substances for
8  the 14 plaintiffs and had a chart.
9     MR. PAINE: Okay.
10 BY MR. KRISTAL:
11 Q. So I'm showing you page 89 of what your
12 Winston report was.
13 A. Oh, yeah. So it's carbaryl, yeah, which
14 is a -- does not cause NHL and is not a 2A
15 carcinogen. The product Sevin does contain
16 crystalline silica, which is a known human group 1
17 carcinogen; however, that silica is confined
18 strictly to the lung and has no propensity or
19 ability to cause NHL and is irrelevant with respect
20 to NHL. It's sort of like asbestos causing, you
21 know, NHL. There's just no connection.
22    MR. KRISTAL: Okay. Eric, do you want to
23 use this to ask any --
24    MR. PAINE: No, that's okay. Thank you.
25    MR. KRISTAL: Those are all the questions I

Page 43

1  have.
2     REDIRECT EXAMINATION
3  BY MR. PAINE:
4  Q. Doctor, I'm going to -- well, I've got it
5  here, so we might as well use it.
6     (Sawyer Exhibit 3 was marked for identification.)
7  BY MR. PAINE:
8  Q. We marked another version of this -- another
9  copy of this earlier today. This is the -- I've
10 marked this as Exhibit 3. It's the same as was
11 Exhibit 7 in the Dickey case. This is IARC's
12 Monographs on the Identification of Carcinogenic
13 Hazards to Humans, Report of the Advisory Group to
14 Recommend Priorities for the IARC Monographs during
15 2020 to 2024, and this is something that you've
16 relied on for your opinions, right?
17 A. Yes.
18 Q. Okay. Go with me to page 43 in here,
19 please.
20 A. Okay. All right.
21 Q. Okay. And you just told us a moment ago,
22 after having your memory refreshed from your Winston
23 report, that Sevin contained carbaryl as an active
24 ingredient, right?
25 A. Yes.

Page 44

1  Q. And do you see here on page 43 that IARC has
2  listed evaluation of carbaryl as a high priority for
3  potential human carcinogenicity?
4  A. Right. I stated it's not a 2A. In fact,
5  it's currently a Group 3.
6  Q. Right. It's Group 3, which, according to
7  this, says: Carbaryl was evaluated by IARC
8  Monographs Program as not classifiable as to
9  carcinogenicity to humans, Group 3.
10    And that was in 1987, right?
11 A. Right.
12 Q. Okay. And that says because of the
13 unavailability of information on the carcinogenic
14 effects of carbaryl in humans, and inadequate
15 evidence of carcinogenicity in experimental animals,
16 right?
17 A. Yes.
18 Q. And that was as of 1987?
19 A. Correct.
20 Q. Okay. And then they go on and talk a little
21 bit about what's developed since then, as you would
22 expect IARC to do, right?
23 A. Yes.
24 Q. And in light of this new evidence that they
25 are at least referencing in this document, they've

Page 45

1  assigned it a high priority to assess for human
2  carcinogenicity in the next few years, right?
3  A. Yes.
4  Q. One of the things they talked about was on
5  page 44, there's a section called Cancer in Humans,
6  right?
7  A. Yes.
8  Q. And the first sentence reads: Several case
9  control studies of non-Hodgkin lymphoma among
10 farmers in the USA reported a relationship with
11 carbaryl handling.
12    Right?
13 A. Yes.
14 Q. Okay. And it goes on a few lines down to
15 say: The United States National Cancer Institute
16 Agricultural Health Study reported a small increase
17 in risk of non-Hodgkin lymphoma with exposure to
18 carbaryl. Although none of the findings were
19 statistically significant, risk of melanoma was
20 elevated compared with subjects who never used
21 carbaryl.
22    Right?
23 A. Yes.
24 Q. All right. So we're not going to go through
25 this whole thing but IARC appears to be of the mind

Page 46

1 that it's necessary to evaluate the new evidence on
2 whether or not carbaryl might be carcinogenic to
3 humans, right?
4     A.  Yes, I agree.
5     Q.  So the jury is still out on this, right,
6 about whether it is or isn't?
7     A.  Right.  Absolutely.  But keep in mind that
8 the findings have not been statistically
9 significant, so it's not possible right now with the
10 available data we have to suggest that this is a
11 potential human carcinogen with respect to NHL.
12 There is insufficient data to support that at this
13 time, but certainly it's important to further
14 research that and look at it under a microscope.
15    Q.  Doctor, Mr. Kristal had some questions for
16 you where, frankly, I was a little bit confused,
17 where he asked you some questions to assume that,
18 you know, essentially, Mr. Sanders was in a bubble
19 during certain years, you know, and wouldn't have
20 been -- I think the question was exposed to Roundup,
21 assuming he was in this hypothetical bubble.  Do you
22 recall those questions?
23    A.  Yeah.
24    Q.  Okay.  So let me make sure I'm really,
25 really, really clear on this.  If he's using Roundup

Page 47

1 and applying Roundup, that still counts as an
2 exposure day even if he's in this hypothetical
3 bubble, right?
4     A.  Yes.
5     Q.  What the hypothetical bubble does is prevent
6 absorption by his system of any Roundup, it keeps
7 Roundup from getting onto his skin and, therefore,
8 absorbed, right?
9     A.  Well, yes, with the hypothetical bubble,
10 yes, but there is no hypothetical bubble that is
11 perfect and it's -- I think his example was a
12 perfect bubble.
13    Q.  Fair enough.  My point is you would still
14 count days he's in this perfect bubble as exposure
15 days, right?
16    A.  Yes.
17    Q.  Okay.  But again, the question -- it's
18 different -- exposure days are different than dosage
19 absorbed, correct?
20    A.  Yes.
21        MR. PAINE: Okay.  Thank you.  That's all
22 I've got.
23            RECROSS-EXAMINATION
24 BY MR. KRISTAL:
25    Q.  Assuming he had no exposure days to Roundup

Page 48

1 for the last five years of his Roundup years, would
2 he still have had enough exposure days to be well
3 above the parameters in the epidemiological
4 studies --
5     A.  Yes.  As --
6     Q.  -- for non-Hodgkin lymphoma?
7     A.  As I stated a few moments ago, by a factor
8 of about seven.  In other words, 70 exposure days
9 versus a required 10 that meet all thresholds, so he
10 would still be seven times above it.
11    Q.  Well, I think you're mixing up Mr. Domina,
12 but assuming there was 90 percent less exposure to
13 Roundup of Mr. Sanders, then he'd be in that range
14 of about 70 days, right?  His total exposure days
15 Mr. Sanders had was how many?
16    A.  I think it was a little over 1,000.
17    Q.  I'm talking to Roundup specifically.  I'm
18 sorry.
19    A.  Okay.  Yeah, his Roundup exposure days was
20 719.
21    Q.  Okay.  So if we assume he had 90 percent
22 less exposure days, we'd subtract about 630 and he
23 would still have more than 70 exposure days?
24    A.  Right.  That's what I said, more than --
25 about 70 and that's about seven times the threshold

Page 49

1 of 10 exposure days.
2        MR. KRISTAL:  That's all I have.
3        MR. PAINE:  We're done.
4        THE VIDEOGRAPHER:  This concludes the
5 deposition.  The time is 3:29.
6        (Whereupon, the deposition concluded at
7 3:29 p.m.)

Page 50

1           C E R T I F I C A T E
2        I, SUSAN D. WASILEWSKI, Registered
3   Professional Reporter, Certified Realtime Reporter,
4   Certified Realtime Captioner, and Florida
5   Professional Reporter, do hereby certify that,
6   pursuant to notice, the deposition of WILLIAM R.
7   SAWYER, Ph.D., was duly taken on Thursday,
8   November 14, 2019, at 2:19 a.m., before me.
9        The said WILLIAM R. SAWYER, Ph.D., was duly
10  sworn by me according to law to tell the truth, the
11  whole truth and nothing but the truth and thereupon
12  did testify as set forth in the above transcript of
13  testimony.  The testimony was taken down
14  stenographically by me.  I do further certify that
15  the above deposition is full, complete, and a true
16  record of all the testimony given by the said
17  witness, and that a review of the transcript was
18  requested.
19
20  _____
21  Susan D. Wasilewski, RPR, CRR, CCP
22  (The foregoing certification of this transcript does
23  not apply to any reproduction of the same by any
24  means, unless under the direct control and/or
25  supervision of the certifying reporter.)

Page 51

1        INSTRUCTIONS TO WITNESS
2
3
4        Please read your deposition over carefully
5   and make any necessary corrections.  You should
6   state the reason in the appropriate space on the
7   errata sheet for any corrections that are made.
8
9        After doing so, please sign the errata sheet
10  and date it.  It will be attached to your
11  deposition.
12
13       It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the deposition
16  transcript by you.  If you fail to do so, the
17  deposition transcript may be deemed to be accurate
18  and may be used in court.

Page 52

1            - - - - - -
2            E R R A T A
3            - - - - - -
4   PAGE  LINE  CHANGE
5   ____  ____  _____
6    REASON: _____
7   ____  ____  _____
8    REASON: _____
9   ____  ____  _____
10   REASON: _____
11  ____  ____  _____
12   REASON: _____
13  ____  ____  _____
14   REASON: _____
15  ____  ____  _____
16   REASON: _____
17  ____  ____  _____
18   REASON: _____
19  ____  ____  _____
20   REASON: _____
21  ____  ____  _____
22   REASON: _____
23  ____  ____  _____
24   REASON: _____
25

Page 53

1         ACKNOWLEDGMENT OF DEPONENT
2
3        I, _____, do hereby
4   acknowledge that I have read the foregoing pages, 1
5   through 52, and that the same is a correct
6   transcription of the answers given by me to the
7   questions therein propounded, except for the
8   corrections or changes in form or substance, if any,
9   noted in the attached Errata Sheet.
10
11
12  _____     _____
13  WILLIAM R. SAWYER, Ph.D.             DATE
14
15
16
17
18  Subscribed and sworn to before me this
19  ____ day of _____, 20___.
20  My Commission expires: _____
21
22  _____
    Notary Public
23
24
25

Page 54

1          LAWYER'S NOTES
2  PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25