# EXHIBIT 21

William R. Sawyer, Ph.D.

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | § MDL No. 2741 <br> § Case No. 3:16-md-02741-VC <br> § <br> § |
| This document relates to: | § <br> § |
| Tanner v. Monsanto Company <br> Case No. 3:19-cv-04099-VC | § <br> § <br> § |

- - -

Friday, November 15, 2019

- - -

Videotaped deposition of WILLIAM R. SAWYER, Ph.D., held at South Seas Resort, 5400 Plantation Road, Captiva, Florida 33924, commencing at 2:51 p.m., on the above date, before Susan D. Wasilewski, Registered Professional Reporter, Certified Realtime Reporter, Certified Realtime Captioner, Florida Professional Reporter

- - -

GOLKOW LITIGATION SERVICES

877.370.3377 ph | 917.591.5672 fax

deps@golkow.com

William R. Sawyer, Ph.D.

## Page 2

```
 1    APPEARANCES:
 2    WEITZ & LUXENBERG
      BY:  JERRY KRISTAL, ESQUIRE
 3         jkristal@weitzlux.com
      220 Lake Drive East, Suite 210
 4    Cherry Hill, New Jersey 08002
      Phone:  (856) 755-1115
 5    Representing Plaintiffs
 6
 7
 8    WILKINSON WALSH & ESKOVITZ
      BY:  CALI COPE-KASTEN, ESQUIRE
 9         ccope-kasten@wilkinsonwalsh.com
      2001 M Street, NW, 10th Floor
10    Washington, D.C. 20036
      Phone: (856) 755-1115
11    Representing Defendant Monsanto Company
12
13
14    ALSO PRESENT:
15    MATTHEW ALLISON, Videographer
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1         ---
 2         INDEX
 3         ---
 4  Testimony of:  WILLIAM R  SAWYER, Ph D        Page
 5    DIRECT EXAMINATION BY MS  COPE-KASTEN         5
 6    CROSS-EXAMINATION BY MR  KRISTAL             36
 7
 8
 9         EXHIBITS
10       (Attached to transcript)
11  WILLIAM R  SAWYER, Ph D  DEPOSITION EXHIBITS   PAGE
12  Exhibit 1  Monsanto Company's Amended Notice to  5
             Take Oral and Videotaped Deposition of
13           Dr  William Sawyer
14  Exhibit 2  October 9, 2019 Report from Toxicology  7
             Consultants & Assessment Specialists,
15           LLC
```

## Page 4

```
 1         ---
 2       THE VIDEOGRAPHER:  Good afternoon.  We are
 3  now on the record.  My name is Matthew Allison.
 4  I am a videographer for Golkow Litigation
 5  Services.  Today's date is November 15th, 2019,
 6  and the time is 2:51 p.m.
 7       This video deposition is being held in
 8  Captiva, Florida, in the matter of Frank Tanner
 9  vs. Monsanto Company for the United States
10  District Court, Northern District of California.
11       Will all counsel please state their
12  appearance for the record.
13       MR. KRISTAL:  Jerry Kristal, Weitz &
14  Luxenberg, for Frank Tanner.
15       MS. COPE-KASTEN:  Cali Cope-Kasten from
16  Wilkinson Walsh & Eskovitz on behalf of Monsanto.
17       THE VIDEOGRAPHER:  The court reporter is
18  Susan Wasilewski and will now swear in the
19  witness.
20       THE COURT REPORTER:  Will you raise your
21  right hand?
22       Do you solemnly swear or affirm the
23  testimony you're about to give will be the truth,
24  the whole truth, and nothing but the truth?
25       THE WITNESS:  I do.
```

## Page 5

```
 1       THE COURT REPORTER:  Thank you.
 2       WILLIAM R. SAWYER, Ph.D., called as a
 3  witness by Defendant Monsanto Company, having been
 4  duly sworn, testified as follows:
 5           DIRECT EXAMINATION
 6  BY MS. COPE-KASTEN:
 7    Q.  Good afternoon, Dr. Sawyer.
 8    (Sawyer Exhibit 1 was marked for identification.)
 9    Q.  I am handing you what has been marked as
10  Exhibit 1 to your deposition in Mr. Tanner's case.
11  This is your notice of deposition for Mr. Tanner's
12  matter.  Have you had a chance to review this
13  document?
14    A.  Yes.
15    Q.  I understand that you brought some documents
16  with you today in response to this notice of
17  deposition.
18    A.  Yes.
19    Q.  Are those the materials that we have
20  discussed earlier today?
21    A.  Yes.
22    Q.  Is there anything that you have brought for
23  Mr. Tanner's case other than what we've already
24  discussed today?
25    A.  No.
```

William R. Sawyer, Ph.D.

### Page 6

1  Q. In forming your opinions in Mr. Tanner's
2  case, did you meet or speak with Mr. Tanner's
3  counsel?
4  A. Yes.
5  Q. Who did you meet or speak with?
6  A. Jerry Kristal.
7  Q. Did you meet with him or speak on the phone?
8  A. Met with him.
9  Q. How many times?
10 A. Just once regarding this case.
11 Q. Was that the meeting earlier this week on
12 Wednesday?
13 A. Yeah. That was Wednesday for about three
14 hours, and it was regarding the seven plaintiffs in
15 the matter at hand.
16 Q. Have you met Mr. Tanner?
17 A. No.
18 Q. Have you spoken with Mr. Tanner?
19 A. I have not. Yes, I have. I interviewed
20 him.
21 Q. Tell me about that interview. When did it
22 take place?
23 A. October 9th, 2019.
24 Q. I am handing you what has been marked as
25 Exhibit 2 to your deposition. That's your report in

### Page 7

1  this case.
2  (Sawyer Exhibit 2 was marked for identification.)
3  BY MS. COPE-KASTEN:
4  Q. Did you author this report?
5  A. Yes.
6  Q. Does it contain all of the general causation
7  opinions you intend to offer at trial for
8  Mr. Tanner?
9  A. Yes.
10 Q. Does it contain all of the case-specific
11 opinions you intend to offer for Mr. Tanner?
12 A. Yes.
13 Q. Did you have sufficient information to reach
14 all of the conclusions that you wanted to reach in
15 this case?
16 A. Yes.
17 Q. This report is dated October 9th, 2019.
18 A. It is.
19 Q. Your interview with Mr. Tanner was on the
20 same day that you submitted this report?
21 A. That's right.
22 Q. How long did you speak to Mr. Tanner on
23 October 9th?
24 A. I don't recall.
25 Q. Do you have a ballpark? Was it a long time,

### Page 8

1  short time?
2  A. I really don't remember. I was under --
3  under the gun time-wise on the deadline and it was a
4  long day, so I really don't remember.
5  Q. Do you remember the substance of your
6  conversation with him?
7  A. Well, I specifically do remember asking him
8  questions regarding any prior history of HIV or
9  AIDS, Crohn's disease, rheumatoid arthritis,
10 hepatitis B or C, prior malignancies,
11 chemotherapies, organ transplants, immunosuppressive
12 pharmaceuticals, ulcerative colitis, or long-term
13 prednisone use, which was negative.
14    I did ask him about smoking, if he had ever
15 smoked cigarettes or tobacco, and if so, did he ever
16 smoke more than 100 cigarettes in a lifetime, which
17 is the CDC threshold for a smoker. I also asked him
18 regarding his use of tobacco or drugs of abuse, and
19 with respect to his exposure history, there may have
20 been some questions to fill in the gaps, but I
21 recall primarily working off of the deposition
22 testimony and the plaintiff fact sheet. I don't
23 know that I had to ask him many questions regarding
24 his exposure history because it was reasonably well
25 compiled in the deposition.

### Page 9

1  Q. When you asked Mr. Tanner about his prior
2  medical conditions, did you ask him about those
3  because that information was not clear from his
4  medical records, or that was just the route that you
5  chose to get that information?
6  A. I generally ask those questions when I
7  interview a person, whether or not the information
8  is already in the record, just to be certain, and a
9  lot of times it's very difficult to find answers to
10 all of these questions in the medical records and
11 it's more expedient to just ask.
12 [REDACTED]

3 (Pages 6 to 9)

William R. Sawyer, Ph.D.

Page 10

[redacted]

Page 11

```
                                              hat this line that's
18   under History of Tobacco, Alcohol and Drug Use on
19   page 5, we can just strike that, that doesn't apply
20   to Mr. Tanner's case?
21       A.  That's correct.
22       Q.  You did not rely on an exposure calculation
23   by Mr. Petty with respect to Mr. Tanner, did you?
24       A.  No.  He did not assess Mr. Tanner, to my
25   knowledge.
```

Page 12

```
 1       Q.  As a result, you performed your own exposure
 2   days calculation for Mr. Tanner?
 3       A.  That's right.
 4       Q.  That exposure calculation appears in Table 2
 5   on the bottom of page 7 of your report?
 6       A.  Yes, both Table 1 and 2, actually.
 7       Q.  Can you walk me through your exposure
 8   calculations in Tables 1 and 2 for Mr. Tanner?
 9       A.  Yes.  It's simply that he initiated his
10   exposures to Roundup in 1984, he used Roundup
11   concentrate once per week for approximately 10
12   minutes, he typically sprayed with a 3.5 gallon
13   backpack sprayer, and his exposure was residential
14   and occupational.
15           He used to control weeds and maintain lawns
16   on estates in the Pasadena and Los Angeles area.
17   And then in 2001 to '06, sprayed every two weeks 30
18   minutes to three hours, used a two-and-a-half gallon
19   container, about 25 to 70 gallons of Roundup over
20   7- to 10-acre parks.
21           He also used a three-and-a-half gallon
22   backpack sprayer or a 35-gallon electric sprayer,
23   and this was occupational use or industrial turf and
24   ornamental.  The purpose was to control weeds in
25   Los Angeles County parks, and that information
```

Page 13

```
 1   results in Table 2.
 2           Once a week at 10 minutes, so per year that
 3   would be roughly 520 minutes, and over 16 years,
 4   that would be roughly 138 hours, which is 17.38 hour
 5   time-weighted days.
 6           And then from 2001 to 2006, he used it once
 7   every two weeks for 30 minutes to three hours, had
 8   105-minute average times 27 30-minute -- which
 9   equals 27 30-minutes per year, divided by 60 minutes
10   equals 45.5 hours, over five years equals 227.5
11   hours, which is equivalent to 28.4 time-weighted
12   eight-hour working days.
13           So the sum would be 45.6 average lifetime
14   exposure days.
15       Q.  Why did you choose to average the 30-minutes
16   to three-hours window of spraying from 2001 to 2006?
17       A.  Just to obtain a midpoint value.
18       Q.  Do you know how often Mr. Tanner sprayed at
19   105 to 180 minutes during that period?
20       A.  Yes.
21       Q.  How often?
22       A.  On the average, 105 minutes.
23       Q.  My question might not have been clear.  I
24   understand that you averaged that time period to
25   being a 105-minute average.  Do you know how often
```

William R. Sawyer, Ph.D.

Page 14

1  in actuality he sprayed for 30 minutes versus 105
2  minutes versus three hours, or anywhere else along
3  that spectrum?
4      A.  No.  I simply used a midpoint value.
5      Q.  If Mr. Tanner regularly sprayed for only
6  30 minutes and occasionally sprayed at 105 to 180
7  minutes, you would agree with me that your exposure
8  days estimate could potentially be lower?
9      A.  So what?  It would be 14 hours -- 14
10  exposure days lower, which would be 31 exposure
11  days; still three times above the threshold, so it
12  doesn't really matter.
13      Q.  Just to clarify, the answer to that is yes,
14  it could be lower but you don't believe that it
15  would matter even if it were lower?
16      A.  No.  No, I didn't say that.  It's not my
17  belief.  It's a mathematical truth that if we use
18  30 minutes rather than 30 minutes to three hours, if
19  we took the worst case -- well, it would be the best
20  case for him, actually, less exposure, but if we
21  took the lowest value possible, the 30 minutes, that
22  would roughly subtract off about 14 exposure days,
23  thus, the grand total would be about 34 exposure
24  days.  So it's just not important.  It's not a
25  relevant issue here.  He's already exceeding the

Page 15

1  greater than 10-day threshold of the studies.
2          I don't -- I don't disagree.  It could be
3  more towards the 30, it could toward -- more towards
4  the three hours.  Either way, it's still well above
5  the greater than 10-day threshold.
6      Q.  Do you recall Mr. Tanner testifying that he
7  worked for a couple of years on his father's
8  livestock farm?
9      A.  I do recall farm work.  I don't know if it
10  was livestock, I'm not sure, but, yeah, I do recall
11  the farm, farm work.
12      Q.  Are you aware of studies comparing livestock
13  farming and the risk of developing non-Hodgkin's
14  lymphoma?
15      A.  As I said in earlier depositions, I --
16  yesterday, I do recall the study and I think it was
17  somewhere in the Southeast US, I'm not sure, and
18  there -- I believe there was an association between
19  livestock farming and NHL.
20          I don't know how significant it was or if
21  it's been shown to be coherent through other types
22  of studies.  I really don't -- I haven't looked at
23  the study in many years, but I believe there is one.
24      Q.  Fair to say that you did not attempt to
25  determine what impact livestock farming may have had

Page 16

1  on Mr. Tanner's risk for developing non-Hodgkin's
2  lymphoma?
3      A.  No, and I would certainly defer that to an
4  infectious disease or medical ep -- medical
5  oncologist to evaluate since it is not a
6  toxicological matter but purely an infectious
7  disease or microbiological assessment, but even if
8  that were a reasonable risk factor, there still
9  would be, in this case, added to that risk the
10  Roundup exposures based on the studies that I'm
11  relying on.
12      Q.  Do you recall Mr. Tanner's testimony in his
13  deposition that he at least occasionally sprayed
14  other pesticides between 1961 and 1975, not
15  including Roundup?
16      A.  He was a licensed applicator, but -- he did
17  use several but wasn't able to recall the details.
18      Q.  Is it accurate to say that you do not know
19  which other pesticides Mr. Tanner sprayed at that
20  time?
21      A.  Weed oil, he said very rarely.
22      Q.  Any others in addition to weed oil?
23      A.  No.
24      Q.  To the extent that Mr. Tanner did spray
25  other pesticides between 1961 and 1975, those are

Page 17

1  not reflected in your assessment of any risks
2  Mr. Tanner may have had for non-Hodgkin's lymphoma
3  from other chemical exposures?
4          MR. KRISTAL:  Objection.
5      A.  Did you start out your question with the
6  word "if"?
7      Q.  I started out with the word "to."  To the
8  extant that Mr. Tanner had exposure.
9      A.  To the extent that he had -- see, that's the
10  part I don't understand.  Are you asking me to
11  assume hypothetically that he had exposure to
12  pesticides?
13      Q.  Let me break it down into separate
14  questions.
15          You just read in Mr. Tanner's deposition
16  that he testified that he occasionally sprayed
17  pesticides between 1961 and 1975, right?
18      A.  Right.
19      Q.  He said that he could not remember what the
20  brands were of those, correct?
21      A.  Correct.
22      Q.  Weed oil was one thing that you were able to
23  name that he used during that time period?
24      A.  Yes.
25      Q.  From his testimony that he used pesticides

5 (Pages 14 to 17)

William R. Sawyer, Ph.D.

Page 18

1  plural and could not remember the brands plural, is
2  it your understanding that Mr. Tanner was recalling
3  spraying more than one type of pesticide at that
4  time?
5      A.  Yes, during that duration, yes.
6      Q.  You did not take into account in assessing
7  Mr. Tanner's risks from other chemical exposures
8  what any of those pesticides might have been because
9  you don't know what they were, correct?
10         MR. KRISTAL:  Objection.
11     A.  If I understand your question right, that's
12 true.  We don't have any further information and he
13 was unable to provide me with any specific
14 information during the interview.
15     Q.  And -- but it's not your intention to tell
16 the jury that he did not have exposure to other
17 pesticides, you just don't know one way or the
18 other, right?
19     A.  Correct.
20     Q.  You specifically mentioned his testimony
21 that he used weed oil.  What is weed oil?
22         MR. KRISTAL:  Back in those days?
23         MS. COPE-KASTEN:  (Nodding head.)
24     A.  Donations from --
25         MR. KRISTAL:  I'm making a bad legal

Page 19

1  cannabis joke.
2         THE WITNESS:  Oh, you're thinking of that
3  weed oil.
4      A.  Well, it's not CBD oil.
5      Q.  What is it, your understanding, that weed
6  oil is as a pesticide?
7      A.  I believe what he's referring to, and it
8  hasn't been used in years because of its toxicity,
9  and that is light naphtha, which in fact does kill
10 weeds and grass.
11     Q.  Do you know with certainty that that's what
12 he's referring to when he says weed oil?
13     A.  Not with certainty because it's not
14 normally -- normally they're a little more
15 descriptive with it, but back in that era of time,
16 that would make sense, but it's really a slang name
17 that he's using.
18     Q.  If the product that he was using was light
19 naphtha, do I understand from prior testimony you
20 have given that you do not believe that to be a
21 probable or definite human carcinogen?
22     A.  Correct.  And it contains naphthalene, which
23 is an animal carcinogen, possible human carcinogen,
24 not associated with NHL.
25     Q.  Mr. Tanner testified that the weed oil left

Page 20

1  a tar on the soil.  Do you know what that refers to?
2      A.  That would be consistent with light naphtha
3  simply because the volatility is not very high, it
4  takes time to evaporate, and eventually can leave a
5  -- enough of a residue that airborne particulate
6  matter can stick to it and cause a visible dirty
7  coating on plants and leaves and other objects
8  sprayed, so that would be -- that would be an
9  appropriate description.
10     Q.  You understand that Mr. Tanner had a
11 landscaping business?
12     A.  Yes, and I referred to that as the
13 occupational work he did with -- in 2000 -- well,
14 really, before then, but increased it in 2001 to
15 2006.
16     Q.  The reason that his business increased
17 between 2001 and 2006 was because he received some
18 contracts from the Los Angeles Sanitation
19 Department?
20     A.  Exactly.
21     Q.  I want to break down Mr. Tanner's exposure
22 periods as you have broken them down in your report,
23 from 1984 to 2001, and then separately from 2001 to
24 2006.
25         Do you know what personal protective

Page 21

1  equipment Mr. Tanner was wearing between 1984 and
2  2001 at the time that he sprayed Roundup?
3      A.  Long sleeves and gloves.
4      Q.  Are you aware that Mr. Tanner attended
5  regular pesticide applicator training courses?
6      A.  Yes.
7      Q.  That's because he had a pesticide applicator
8  license?
9      A.  He did.
10     Q.  As part of those applicator training
11 courses, Mr. Tanner was advised to wear a Tyvek suit
12 when spraying pesticides.  Do you recall that?
13     A.  I do.
14     Q.  Are you aware that Mr. Tanner regularly did
15 wear a Tyvek suit when spraying pesticides?
16     A.  Eventually, that's true.
17     Q.  When is it your understanding he began
18 wearing a Tyvek suit to spray Roundup?
19     A.  I'm not finding it but I believe it was when
20 he accepted the contracts, and he spoke of at the
21 County properties there was a place to discharge the
22 Tyvek suits and wash up at the County facilities,
23 and he stated -- actually, he said -- he stated that
24 he used the Tyvek suits often from 1984 to 2000, and
25 then he said, "I should have said I used them

6 (Pages 18 to 21)

William R. Sawyer, Ph.D.

Page 22

rarely, because I do recall that if there was a very short time of spring, I might not have suited up with a Tyvek suit."
    And then that's on page 91 of the deposition. And then on line 23 he stated -- the question was: So what you're telling me is if a job wasn't a large job, you might not have suited up?
    And he said yes, and then that would be true because he was only doing, from 1984 to 2001, 10-minute jobs once a week, so that is consistent with his exposure frequency in Table 1.
    So I would -- my opinion, based on what I've read, is that he was fully suiting up between the years 2001 and 2006.
    Q.  I want to direct your attention to page 44, starting at line 19. Mr. Tanner was asked: And prior to getting the license in roughly 2001, did you take measures to protect yourself from pesticides such as those you mentioned, the Tyvek suit, the rubber boots, the face shield, is that something you did throughout your landscaping career, or later?
    Mr. Tanner's answer was: It was completely done from when I got the license, the applicator license. Always wore the suit, every time, without

Page 23

exception. From 1961, when I started Flora Landscaping, until 19 -- approximately 1975, I would use it sparingly.
    Did I read that correctly?
    A.  Yes. So we have three definitions: One is he used it all the time; the other one he used it sparingly; and then the later one that I pointed out is that he only used it on the longer jobs, didn't use it on the short jobs, which is -- correlates with 1984 to '01, where he only worked 10 minutes once per week, and he said he would not wear the suit unless it was a longer job.
    So it is what it is. My opinion is, based on what he said, he didn't wear the suit frequently until he started doing the longer jobs, and his jobs were only once a week at 10 minutes until 2001.
    I don't -- I'm not the judge or the jury, but it would appear to me that he did wear a Tyvek suit but not frequently until the later years.
    Q.  It is your opinion that between 2001 and 2006, he was consistently wearing the Tyvek suit for Roundup spraying jobs?
    MR. KRISTAL:  Objection.
    A.  Based upon his testimony, yes.
    Q.  In addition to the Tyvek suit during that

Page 24

time, he also wore rubber boots to spray Roundup?
    A.  Yes.
    Q.  In addition to a Tyvek suit and rubber boots, he also wore a face shield during that time?
    A.  He did, but I'm not sure of the frequency. Let me check. Well, he stated he wore it, so I'll assume it was all the time.
    Q.  What is the impact on dermal absorption of Roundup from wearing a Tyvek suit, rubber boots, and a face shield when spraying?
    A.  It depends on the type of Tyvek suit, whether it's a dust suit or an actual chemical-resistant suit. He doesn't explain what type of Tyvek suit he was wearing, so I really can't be very specific in answering that.
    Q.  Can you give me an answer for each of the two types of suits? If it was a dust suit, what would the impact be on dermal absorption of Roundup from wearing a Tyvek dust suit, a face shield, and rubber boots when spraying Roundup?
    A.  It can pass through the dust suit. The face shield is protective of the eyes especially. And the third thing I think you asked was rubber boots?
    Q.  Uh-huh. Yes.
    A.  Less than one percent penetration.

Page 25

    Q.  Do you know what the percentage of penetration is for a Tyvek dust suit?
    A.  No, but it is permeable. It's designed to allow vapor movement and air, but the pore size is small enough to block particulate.
    Q.  If what he was wearing was a Tyvek chemical-resistance suit in addition to a face shield and rubber boots, what would the impact be on his dermal absorption of Roundup when spraying?
    MR. KRISTAL:  Objection.
    A.  If the gloves were such that the sleeves of the Tyvek suit hindered the gloves, or if the gloves were taped, and the same with the boots, it would provide nearly 100 percent protection, except for the exposed upper neck and face and head and a slight amount from -- well, an inconsequential amount through inhalation with a face shield.
    Q.  You would agree with me that there is no difference in the number of exposure days Mr. Tanner had to Roundup regardless of the type of Tyvek suit he was wearing?
    A.  I'm sorry. I don't understand the question.
    Q.  If Mr. Tanner was wearing a Tyvek dust suit --
    A.  Yes.

7 (Pages 22 to 25)

William R. Sawyer, Ph.D.

Page 26

1  Q. -- he would have 45.6 exposure days to
2  Roundup, correct, that's what you calculated?
3  A. Yes.
4  Q. If Mr. Tanner were wearing a Tyvek
5  chemical-resistance suit, he would still have 45.6
6  lifetime average exposure days to Roundup?
7  A. No. I think if throughout the history, from
8  '84 to '06, he was wearing a chemically resistant
9  suit with gloves on, taped and sealed, both his
10  ankles and lower arms, with a face shield, his
11  exposure would be negligible and outside of the
12  range of the human studies. The human studies
13  aren't designed for somebody who is protected to
14  that degree, with the sleeves taped to the gloves
15  and the ankles taped to the chemically resistant
16  Tyvek suit.
17      I can say that's really an impossibility in
18  southern California, to wear a chemically resistant
19  Tyvek suit outdoors for three hours. He would end
20  up in hyperthermia, possibly malignant hyperthermia.
21  It would be -- it would be probably a
22  hospitalization each time. I mean, that's just --
23  it's just not reasonable that a person can be in a
24  chemically resistant suit because they are
25  nonbreathable and the heat in southern California in

Page 27

1  the summer, that just wouldn't work. It's not
2  even -- it's just not possible to do that, unless he
3  had -- if, you know, constantly replenishing with
4  fresh ice and so forth under the suit.
5  Q. Based on that understanding, is it your
6  belief that Mr. Tanner was likely wearing a Tyvek
7  dust suit when he was spraying Roundup?
8  A. Well, they are designed for comfort and
9  breathability, the Tyvek 400 suit, for example.
10  That's possible.
11  Q. Are there more than two types of Tyvek
12  suits?
13  A. Oh, yes. There's numerous, many different
14  models.
15  Q. And you don't know which one Mr. Tanner was
16  wearing?
17  A. No, but I can rule out chemically resistant
18  sealed at the sleeves and ankles in the summer heat
19  for three hours with a 40-pound backpack sprayer on
20  his back walking around. It would be rather
21  unlikely due to heat exhaustion.
22  Q. Would it be -- I'm not that familiar with
23  the chemically resistant suits. Would it be
24  possible for him to wear a Tyvek chemically
25  resistant suit outdoors in California under the

Page 28

1  conditions you just described if his gloves and
2  boots were not taped to the suit?
3  A. No, because the sleeves are tight elastic
4  and allow -- still allow very little air movement,
5  but the rule is under OSHA B, and I think OSHA A
6  certification under HSWA, which I've been certified
7  for many times, to prevent chemical entry one must
8  tape the end of the sleeve around the glove and seal
9  it, and the same with the ankle and the rubber boot,
10  and it's just to be certain there is no infiltration
11  of chemicals, so a safety issue.
12  Q. Did you review any medical records in
13  Mr. Tanner's case?
14  A. Just limited medical records on his
15  diagnosis from City of Hope Medical Center with
16  respect to his diagnosis and pathology as stated in
17  my report on page 8.
18  Q. Do you know whether Mr. Tanner had
19  follicular lymphoma or diffuse large B-cell
20  lymphoma?
21  A. DLBCL as per the pathology assessment and
22  the immunohistochemical analyses performed.
23  Q. Do you recall whether Mr. Tanner was
24  initially diagnosed with DLBCL at the time of his
25  non-Hodgkin's lymphoma diagnosis?

Page 29

1  A. Well, immunohistochemical stains showed
2  lymphoid aggregates composed of T cells and B cells.
3      And then the hematopathology assessment
4  revealed DLBCL, but I, without looking deeper into
5  the records, I don't know the dates or the time span
6  in between initial assessments versus the final
7  pathology assessment.
8  Q. Do you recall Mr. Tanner testifying that he
9  used fertilizers as part of his landscaping
10  business?
11  A. I did. It's in his deposition. He talks
12  about a nitrogen fertilizer, as I recall.
13  Q. Did you take into account any potential
14  genotoxic or carcinogenic effect from any of the
15  fertilizers Mr. Tanner may have used when coming to
16  your conclusions in this case?
17      MR. KRISTAL: Object to form.
18  A. I did. There are -- there is no genotoxic
19  or carcinogenic potential from organic fertilizers,
20  unless they are contaminated with plutonium or
21  uranium, thorium, isotopes, nuclear fuel.
22  Q. Do you know whether his were?
23  A. Let's hope not.
24      MR. KRISTAL: Giving new meaning to mushroom
25  cloud.

8 (Pages 26 to 29)

William R. Sawyer, Ph.D.

Page 30

1  MS. COPE-KASTEN: Could we go off the record
2  for just a moment?
3     THE VIDEOGRAPHER: We're going off the
4  record at 3:47.
5     (Recess from 3:47 p.m. until 3:49 p.m.)
6     THE VIDEOGRAPHER: We're back on the record.
7  The time is 3:49.
8  BY MS. COPE-KASTEN:
9     Q. On page 5 of your report you have a section
10 entitled Family Medical History.
11    A. Okay.
12 ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪
13 ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪
14    A. Yes, I'm aware of that.
15    Q. Between 1961 and 1975, Mr. Tanner used
16 personal protective equipment called a rain suit.
17 Do you know what a rain suit is?
18    A. That's a vague description. It can be,
19 among outdoor workers, a yellow -- typically yellow
20 suit with a hood, long sleeves, long pants, that is
21 designed to keep a person dry, basically.
22    Q. If he wore that rain suit when spraying
23 pesticides, what type of protection would the rain
24 suit offer?
25    A. I really can't say. I would have to have

Page 31

1  more specifics on the suit, and it's a vague
2  description. I'm not sure.
3     Q. Take a look around page 45 of his deposition
4  and see if that provides you with enough information
5  to answer it.
6     A. He states on page 45, line 17, question:
7  What's a rain suit?
8        Answer: Well, to protect yourself from
9  rain.
10       Okay is the question.
11       Answer: Basically, just plastic covers that
12 would -- where any liquid would be shielded from.
13       Question: Essentially, they cover the body?
14       Answer: Yes.
15       Was there head covering also or a face
16 covering?
17       Yes.
18       And would you use these rain suits when you
19 applied pesticides then, right?
20       Answer: Yes.
21       Okay. And then you said from 1961 through
22 '75 is when you used the rain suits, if I understand
23 correctly. Did you use something else in 1975, or
24 did something else change?
25       Answer: 19 --

Page 32

1     Question: Or is that when you were in the
2  office, from 1975 to 1984?
3     I was in the office.
4     Okay.
5     So I had no contact with any chemicals.
6     When you started working in the field again
7  in 1984, did you go back to using the rain suits or
8  did you use something else?
9        Answer: No.
10       The Witness: I used Tyvek.
11    Q. Does that give you any further information
12 about what level of protection a rain suit would
13 have provided Mr. Tanner from dermal absorption of
14 any substances he was spraying?
15    A. It could be reasonably effective, it depends
16 on the design and the ventilation aspects of the
17 suit. It may have multiple cuts and flaps for
18 ventilation. It may be two-piece. There is a lot
19 of ifs, so a photo of it would be helpful.
20    Q. I want to direct you to page 75 of
21 Mr. Tanner's deposition. Starting around line 13,
22 he's talking about horticultural oils that he used
23 to get rid of aphids and mites, m-i-t-e-s, around
24 his home.
25    A. Yes, I see that.

Page 33

1     Q. Is that also consistent with the light
2  naphtha that you were talking about earlier?
3     A. No. Actually, that is an oil that is still
4  used. It's used very commonly in California, for
5  example. It's generally used on a seasonal basis to
6  kill bugs and it's a very -- a completely harmless
7  paraffin type oil, paraffin-based oil, that's
8  sprayed onto the various fruit trees and it's
9  harmless to the tree but suffocates the larvae and
10 the various bugs. So that's not an oil that would
11 be sprayed on grass or weeds. It's strictly a
12 treatment that's commonly used even today for fruit
13 trees.
14    Q. Would it be considered an insecticide?
15    A. I don't believe it is. It's not an
16 insecticide. It's a harmless paraffinic type oil.
17    Q. I'm going to direct you to the page right
18 above that, page 74 from Mr. Tanner's deposition.
19    A. One other point to answer your question. I
20 did specifically evaluate that type of oil recently
21 in one of the Monsanto cases. It was in my report,
22 the name of the oil, the ingredients, the toxicity
23 rating, and so on, and, unfortunately, I don't
24 remember which plaintiff it was.
25    Q. Do you remember the name of the product

9 (Pages 30 to 33)

William R. Sawyer, Ph.D.

Page 34

1 itself?
2   A.  I don't.
3   Q.  On page 74 of Mr. Tanner's deposition he
4 talks about Ronstar, R-o-n-s-t-a-r, Pre-Emergent.
5       Are you familiar with Ronstar Pre-Emergent?
6   A.  No.  That's the first time I've seen that,
7 actually.
8   Q.  Do you know what the active ingredient is in
9 Ronstar?
10  A.  No.
11  Q.  When Mr. Tanner began spraying for the Los
12 Angeles County park system in 2001, he began using
13 an adjuvant called Foam A.  Are you familiar with
14 Foam A?
15  A.  No.
16  Q.  You told me earlier that you have read
17 Mr. Tanner's deposition.  Have you read any other
18 depositions in Mr. Tanner's case?
19  A.  No, just Mr. Tanner's deposition.
20  Q.  Have you performed a site inspection of any
21 of the properties on which Mr. Tanner alleges that
22 he sprayed Roundup?
23  A.  No.
24  Q.  Have you performed a chemical inventory of
25 Mr. Tanner's home?

Page 35

1   A.  No.
2   Q.  Aside from any chemicals that are identified
3 in Mr. Tanner's deposition or plaintiff fact sheet,
4 are you aware of what other chemicals Mr. Tanner was
5 exposed to in the course of his landscaping
6 business?
7   A.  No.
8   Q.  Are you aware of what chemicals Mr. Tanner
9 was exposed to in and around his home and his own
10 property, aside from those that are identified in
11 his deposition or plaintiff fact sheet?
12  A.  No, nothing more than what was in the
13 deposition and fact sheet.
14  Q.  Did you conduct a absorbed dose for
15 Mr. Tanner?
16  A.  No, I did not perform a POEM calculation
17 with respect to milligram per kilogram per day dose,
18 but, rather, calculate the dose assessment in the
19 units of exposure days as per the US -- not the
20 US -- the generally accepted peer-reviewed
21 epidemiological studies that offered a dose metric.
22      MS. COPE-KASTEN:  Can we go off the record?
23      THE VIDEOGRAPHER:  Going off the record at
24 4:02.
25      (Recess from 4:02 p.m. until 4:05 p.m.)

Page 36

1       THE VIDEOGRAPHER:  We're back on the record.
2 The time is 4:05.
3       MS. COPE-KASTEN:  Dr. Sawyer, thank you for
4 your time today.  I don't have any further
5 questions for you.
6            CROSS-EXAMINATION
7 BY MR. KRISTAL:
8   Q.  Very briefly, if you could please turn to
9 Mr. Tanner's report, page 7.  It's Exhibit 2.
10      THE VIDEOGRAPHER:  Mr. Kristal, could you
11 put your mic on?
12      MR. KRISTAL:  Thank you.  I will put my mic
13 on so I can be heard.
14  Q.  If you would turn to Exhibit 2, page 7,
15 please, and look at Table 2, the 2001 to 2006 row.
16 Do you see that?
17  A.  Yes.
18  Q.  I'm not sure I heard you correctly or you
19 may have misspoken, but if we used the 30-minute
20 time frame instead of the 105-minute average to
21 calculate exposure days, is that about 30 percent of
22 the total number?  In other words, instead of using
23 105, if we use 30, the ultimate number would be
24 reduced by about 70 percent?
25  A.  Let's see.  I was using 105 minutes.

Page 37

1   Q.  Right.
2   A.  So it would be roughly a differential of --
3   Q.  Thirty minutes is about 30 percent of 105
4 minutes?
5   A.  Yeah.  I was going to say about 31 percent,
6 yeah.
7   Q.  Okay.  So if you wanted to use the 30-minute
8 low end, you would multiply 28.4 exposure days by
9 31 percent and get the number of exposure days using
10 the 30-minute time frame?
11  A.  Yes.
12  Q.  Okay.
13  A.  Which would be roughly nine exposure days.
14  Q.  Okay.  So if he had nine exposure days
15 during the 2001 to 2006 period, and 17.3 during the
16 1984 to 2001, his lifetime exposure days would be
17 26.3?
18  A.  Correct.
19  Q.  And how does that compare to the highest
20 exposure metric and exposure days from the
21 epidemiological studies showing an increased risk?
22  A.  A factor of approximately 2.6 above the
23 upper threshold value of greater than 10 days.  And
24 I should also add even if I were to eliminate
25 completely and assume zero exposure from 2001 to

10 (Pages 34 to 37)

William R. Sawyer, Ph.D.

Page 38

1  2006, we would still have 17.3 exposure days from
2  1984 to 2001, which is also in great excess of even
3  the highest threshold value in the generally
4  accepted peer-reviewed studies.
5      Q. And what would your opinion be to a
6  reasonable degree of scientific certainty as to
7  whether or not his cumulative Roundup exposure was a
8  substantial contributing factor to the development
9  of his non-Hodgkin lymphoma if the exposure days
10 were 17.6?
11     A. It would not change the finding that to a
12 reasonable toxicological certainty, his excess of
13 10 exposure days per year resulted in an increase of
14 substantial contributory risk of contracting NHL.
15     Q. Whatever other chemicals Mr. Tanner may have
16 been exposed to, does that affect the number of
17 exposure days of Roundup that he had in his
18 lifetime?
19     A. No. The contribution from the Roundup is a
20 substantial factor in the development of his
21 lymphoma. Even if there had been other
22 contributors, they still add together and increase
23 overall risk of developing the disease.
24     Q. And if Mr. Tanner had any exposure to
25 livestock, does that in any way change his total

Page 39

1  lifetime exposure days to Roundup?
2      A. No.
3         MR. KRISTAL: I have no further questions.
4         THE VIDEOGRAPHER: This concludes the
5  deposition. The time is 4:10.
6         (Whereupon, the deposition concluded at
7  4:10 p.m.)

Page 40

1                 CERTIFICATE
2      I, SUSAN D  WASILEWSKI, Registered
3  Professional Reporter, Certified Realtime Reporter,
4  Certified Realtime Captioner, and Florida
5  Professional Reporter, do hereby certify that,
6  pursuant to notice, the deposition of WILLIAM R
7  SAWYER, Ph D , was duly taken on Friday,
8  November 15, 2019, at 2:51 p m , before me
9      The said WILLIAM R  SAWYER, Ph D , was duly
10 sworn by me according to law to tell the truth, the
11 whole truth and nothing but the truth and thereupon
12 did testify as set forth in the above transcript of
13 testimony  The testimony was taken down
14 stenographically by me   I do further certify that
15 the above deposition is full, complete, and a true
16 record of all the testimony given by the said
17 witness, and that a review of the transcript was
18 requested
19
20 _____
21 Susan D  Wasilewski, RPR, CRR, CCP
22 (The foregoing certification of this transcript does
23 not apply to any reproduction of the same by any
24 means, unless under the direct control and/or
25 supervision of the certifying reporter )

Page 41

                INSTRUCTIONS TO WITNESS


        Please read your deposition over carefully
and make any necessary corrections. You should
state the reason in the appropriate space on the
errata sheet for any corrections that are made.

        After doing so, please sign the errata sheet
and date it. It will be attached to your
deposition.

        It is imperative that you return the
original errata sheet to the deposing attorney
within thirty (30) days of receipt of the deposition
transcript by you. If you fail to do so, the
deposition transcript may be deemed to be accurate
and may be used in court.

11 (Pages 38 to 41)

William R. Sawyer, Ph.D.

Page 42

```
 1              ------
 2             E R R A T A
 3              ------
 4   PAGE  LINE  CHANGE
 5   ____ ____ _____
 6     REASON: _____
 7   ____ ____ _____
 8     REASON: _____
 9   ____ ____ _____
10     REASON: _____
11   ____ ____ _____
12     REASON: _____
13   ____ ____ _____
14     REASON: _____
15   ____ ____ _____
16     REASON: _____
17   ____ ____ _____
18     REASON: _____
19   ____ ____ _____
20     REASON: _____
21   ____ ____ _____
22     REASON: _____
23   ____ ____ _____
24     REASON: _____
25
```

Page 43

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3       I, _____, do hereby
 4   acknowledge that I have read the foregoing pages, 1
 5   through 42, and that the same is a correct
 6   transcription of the answers given by me to the
 7   questions therein propounded, except for the
 8   corrections or changes in form or substance, if any,
 9   noted in the attached Errata Sheet
10
11
12   _____    _____
13   WILLIAM R  SAWYER, Ph D              DATE
14
15
16
17
18   Subscribed and sworn to before me this
19   ____ day of _____, 20___
20   My Commission expires: _____
21
22   _____
     Notary Public
23
24
25
```

Page 44

```
 1          LAWYER'S NOTES
 2   PAGE  LINE
 3   ____ ____ _____
 4   ____ ____ _____
 5   ____ ____ _____
 6   ____ ____ _____
 7   ____ ____ _____
 8   ____ ____ _____
 9   ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
25
```