# Exhibit 2

```
1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: ROUNDUP PRODUCTS      )  MDL No. 2741

5    LIABILITY LITIGATION         )  Case Nos.

6    --------------------------   )  3:16-md-02741-VC

7    This document relates to:    )  3:16-cv-05658-VC

8    Emanuel Richard Giglio v.    )

9    Monsanto Co., Case No.       )

10   3:16-cv-05658                )

11

12        The deposition of CHADI NABHAN, MD, called by

13   the Defendant for examination, taken pursuant to the

14   Federal Rules of Civil Procedure of the United States

15   District Courts pertaining to the taking of

16   depositions, taken before JULIANA F. ZAJICEK, C.S.R.

17   No. 84-2604, a Notary Public within and for the County

18   of Kane, State of Illinois, and a Certified Shorthand

19   Reporter of said state, at The Westin O'Hare, 6100

20   North River Road, Rosemont, Illinois, on the 30th day

21   of August, 2019, commencing at 9:00 a.m.

22

23

24
```

1    PRESENT:

2    ON BEHALF OF THE PLAINTIFF:

3          ANDRUS WAGSTAFF, P.C.

4          1901 Harrison Street, Suite 1100

5          Oakland, California 94612

6          310-339-8214

7          BY:  KATHRYN M. FORGIE, ESQ.

8               kathryn.forgie@andruswagstaff.com

9

10   ON BEHALF OF THE DEFENDANT:

11         WILKINSON WALSH & ESKOVITZ

12         2001 M Street, NW, 10th Floor

13         Washington, D.C. 20036

14         202-847-4017

15         BY:  CALI COPE-KASTEN, ESQ.

16              ccope-kasten@wilkinsonwalsh.com;

17              MAX J. WARREN, ESQ.

18              mwarren@wilkinsonwalsh.com

19

20   THE VIDEOGRAPHER:

21         MR. MILO SAVICH,

22         Golkow Litigation Services.

23

24   REPORTED BY:  JULIANA F. ZAJICEK, CSR No. 84-2604.

Chadi Nabhan, M.D.



1                    I N D E X

2

3   WITNESS:                                PAGE:

4    CHADI NABHAN, M.D.

5        EXAM BY MS. COPE-KASTEN..............    6

6

7                     * * * * *

8

9               E X H I B I T S

10  NABHAN EXHIBIT                    MARKED FOR ID

11   No. 1     Expert Report of Chadi Nabhan, MD,    6
              MBA, FACP

12

     No. 2     Invoice                              9

13

Chadi Nabhan, M.D.

1              E X H I B I T S (Continued)

2   NABHAN EXHIBIT                    MARKED FOR ID



15

16

17

18

19

20

21

22

23

24

Chadi Nabhan, M.D.

1      THE VIDEOGRAPHER:  We are now on the record.  My

2   name is Milo Savich and I am a videographer for Golkow

3   Litigation Services.

4            Today's date is August 30th, 2019, and the

5   time is 9:01 a.m.

6            This video deposition is being held in

7   Rosemont, Illinois in the matter of Roundup, Giglio

8   versus Monsanto.  This case is being heard in the

9   Northern District of California.

10            The deponent is Chadi Nabhan.

11            Will counsel please identify themselves

12   for the record.

13      MS. COPE-KASTEN:  Cali Cope-Kasten from

14   Wilkinson Walsh on behalf of Monsanto.

15      MR. WARREN:  Max Warren also on behalf of

16   Monsanto.

17      MS. FORGIE:  Kathryn Forgie of Andrus Wagstaff

18   on behalf of the Plaintiff Giglio.

19      THE VIDEOGRAPHER:  The court reporter is Juliana

20   Zajicek, who will now swear in the witness and we may

21   then proceed.

22            (WHEREUPON, the witness was duly

23             sworn.)

24            CHADI NABHAN, M.D.,

Chadi Nabhan, M.D.

1   called as a witness herein, having been first duly

2   sworn, was examined and testified as follows:

3                    EXAMINATION

4   BY MS. COPE-KASTEN:

5       Q.    Good morning, Dr. Nabhan.

6       A.    Good morning.

7       Q.    You have been deposed before, so I'm going

8   to go ahead and skip the ground rules as long as

9   that's fine with you.

10      A.    Sure.

11      Q.    I'm going to start off by marking your

12  report in Mr. Giglio's case as Exhibit 1.

13              (WHEREUPON, a certain document was

14               marked Nabhan Deposition Exhibit

15               No. 1, for identification, as of

16               08/30/2019.)

17  BY THE WITNESS:

18      A.    Thank you.

19      MS. FORGIE:  Thank you, but I'm going to skip

20  it.

21  BY MS. COPE-KASTEN:

22      Q.    This is the report that you wrote in

23  Mr. Giglio's case?

24      A.    Yes.

1     Q.     Did you write this yourself?

2     A.     I typed it, yes.

3     Q.     Did you have any assistance in drafting

4  this report?

5     A.     No.

6     Q.     The report is dated August 20th, 2019, is

7  that correct?

8     A.     The final report is dated August 20th.  I

9  started it, obviously, before.

10     Q.     Does this report include all of the

11  opinions that you intend to offer at trial in

12  Mr. Giglio's case?

13     A.     Barring new information that might develop

14  between now and the trial dates, whether it's in the

15  form of literature or additional medical records, this

16  would -- this is pretty inclusive.

17     Q.     And with that same caveat about any new

18  medical records or new literature that might come up,

19  does this include all of the bases for your opinions

20  that you intend to offer in Mr. Giglio's case?

21     A.     Essentially, yes.  I was trying to be as

22  inclusive as possible.

23     Q.     Are all of the documents and materials

24  that you relied on in forming your opinions in this

Chadi Nabhan, M.D.

1    case listed either in this report or in your materials

2    considered list?

3         A.    They should be.  Obviously the -- my

4    materials considered list is way more inclusive than

5    the references you have in that report.  So I -- in

6    the report I reference the most essential ones for

7    that particular plaintiff/patient, but obviously I've

8    relied on a lot of additional references that you have

9    in the more general material inclusive list.

10        Q.    So, to the best of your knowledge, that

11   more inclusive materials considered list should list

12   everything that you relied on to form your opinions in

13   this case?

14        A.    It should.

15        Q.    You don't currently intend to offer any

16   opinions regarding Mr. Giglio that are not contained

17   within this report?

18        MS. FORGIE:  Objection; asked and answered.

19   BY THE WITNESS:

20        A.    Right.  I think as long as there is -- you

21   know, as you and I know sometimes things might evolve

22   or develop between now and a trial date because I

23   don't believe there is a trial date for him.  I will

24   have to look at additional material if they become

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Chadi Nabhan, M.D.

1  available or if there are additional literature that I

2  may look at between now and trial date, but if those

3  don't happen, this is pretty inclusive report.

4  BY MS. COPE-KASTEN:

5      Q.    I'm going to mark as Exhibit 2 to your

6  deposition the invoice that we received from your

7  counsel with respect to your time on the Giglio case.

8      A.    That was probably last year.  I have not

9  billed for anything this year.

10     MS. FORGIE:  She didn't ask you.

11     THE WITNESS:  Oh, I'm sorry.

12  BY MS. COPE-KASTEN:

13     Q.    We'll talk about it, don't worry.

14     MS. FORGIE:  I'm sure you will, too.  I'm just

15  trying to wait for a question.

16          I've got one.  Thank you, though.

17              (WHEREUPON, a certain document was

18              marked Nabhan Deposition Exhibit

19              No. 2, for identification, as of

20              08/30/2019.)

21  BY MS. COPE-KASTEN:

22     Q.    The document that I've just handed you is

23  an invoice that reflects at least some time that you

24  have spent on Mr. Giglio's case, correct?

Chadi Nabhan, M.D.

```
 1        A.    Correct.  This was time spent last year

 2   when I was consulted about this case.

 3        Q.    Okay.  So I just want to make sure that I

 4   understand the time that you've spent on this case so

 5   far.

 6              This invoice reflects three dates, all in

 7   2018, correct?

 8        A.    That's correct.

 9        Q.    November 29th, November 30th and

10   December 2nd?

11        A.    Correct.

12        Q.    This invoice reflects 13 hours total time

13   spent on those three dates, correct?

14        A.    Last year, yes.

15        Q.    And all of those were to review medical

16   records?

17        A.    Correct.

18        Q.    So I want to talk about what has happened

19   between December 2nd and today in terms of your work

20   on this case and I'll break it down into time periods.

21              You had a phone call with Mr. Giglio on

22   July 6th of this year?

23        A.    I had two phone calls.

24        Q.    Let's talk about the first one first.
```

Chadi Nabhan, M.D.

1      A.    Yeah, I'm trying to remember the dates to

2  confirm that.

3      Q.    Yeah, go ahead and look at your report.

4      A.    July 6th and August 17th, correct.

5      Q.    Between December 2nd, 2018, and July 6th,

6  2019, roughly how much time did you spend working on

7  Mr. Giglio's case?

8      A.    I have not invoiced counsel, but I would

9  say, it's an approximate, I hope that's okay?

10     Q.    Uh-huh.

11     A.    Maybe close to 20 hours, 20 -- 20 to

12  25 hours, something like that.

13     Q.    What did you do during those 20 to

14  25 hours generally?

15     A.    There was a -- a lot more medical records

16  that were provided to me by counsel regarding his

17  medical care and what he went through and I did a lot

18  of review to the medical literature as well and

19  re-review of anything pertaining to his case as well

20  as causation of non-Hodgkin lymphoma.

21     Q.    Did you begin writing your expert report

22  for this case at all during that time?

23     A.    I mean, usually it is very skeleton.  I

24  mean, so, for example, as I'm reviewing the medical

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Chadi Nabhan, M.D.

1    records and I note something in the past medical

2    history, I obviously type it on the -- in the past

3    medical history section.  If I see something

4    pertaining to the social history, I start typing it

5    and so forth as I'm reviewing.  So it's -- it's, you

6    know, as you read the records and as you see what is

7    in the records, I always type certain things

8    pertaining to the -- because I know I have to provide

9    the report, so I try to be as efficient and put the

10   things that are relevant in the segments that are

11   relevant to that.  So it's not that I review

12   everything and then I start report.  It's -- it's

13   sometimes in conjunction.

14        Q.   How much time did you spend speaking to

15   Mr. Giglio on July 6th, 2019?

16        A.   Either an hour or an hour-and-a-half.  It

17   is not more than an hour-and-a-half, and I usually put

18   that somewhere, but either -- maybe an hour-and-a-half

19   a most, between that and 60 to 90 minutes.

20        Q.   You had a second phone call with

21   Mr. Giglio then on August 17th of this year you said?

22        A.   Correct, if that's the -- yeah, August 17.

23        Q.   Between the first phone call on July 6th

24   and the second phone call on August 17th, how much

Chadi Nabhan, M.D.

 1  time, estimating as best as you can, did you spend

 2  working on Mr. Giglio's case?

 3       A.    Maybe another five to seven hours,

 4  something like that.  Essentially there were

 5  additional records being provided and -- and so forth.

 6       Q.    How long did you speak to Mr. Giglio on

 7  August 17th?

 8       A.    An hour.

 9       Q.    Why did you call Mr. Giglio a second time?

10       A.    He -- I was made aware that he had

11  submitted an Amended Plaintiff Fact Sheet to the one

12  that I had reviewed and in the -- there were

13  additional information in the, excuse me, in the

14  Amended Plaintiff Fact Sheet that I wanted to discuss

15  with him in person and try to understand why a new PFS

16  was submitted, and I felt it's always best to talk to

17  the person who resubmitted that.  So I wanted to get

18  some clarification about that.

19       Q.    Since August 17th up until today, which is

20  August 30th of 2019, how much time have you spent on

21  Mr. Giglio's case?

22       A.    A couple of days ago I spent a few hours

23  re-reviewing his records, timeline, my report and some

24  literature, yesterday I met with counsel for a few

Chadi Nabhan, M.D.

1  hours, and this morning I probably spent just an hour

2  in the morning before I came here.

3      Q.   For all of the time that you've told me

4  about in both 2018 and 2019 that you have estimated

5  working on Mr. Giglio's case, were you charging your

6  $550 per hour rate?

7      A.   As I told you, that -- that's my hourly

8  rate, but I have not billed for anything in 2019.  So

9  the only invoice so far for this case I billed was the

10  one from last year.  So no invoice has been generated

11  for work being done in, what, 2019.

12     Q.   Do you intend to charge your standard

13  hourly rate for the time that you've worked in 2019

14  whenever you do bill?

15     A.   Unless your experts don't charge, I will

16  charge.

17     Q.   I'm going to run through a few background

18  items now.  I understand that you have been asked

19  about these before.

20     A.   Okay.

21     Q.   The reason that I'm asking about them

22  again now, just so we are clear, is I want to make

23  sure that I have the most up-to-date information as we

24  head toward a trial in Mr. Giglio's case.  I'll be as

Chadi Nabhan, M.D.

1    brief as I can on these.

2            Okay?

3        A.    Sure.  Of course.

4        MS. FORGIE:  Thank you.

5    BY MS. COPE-KASTEN:

6        Q.    Is it still -- is it still true that as of

7    today you do not have a clinical practice seeing

8    patients?

9        A.    Correct.

10       Q.    As of today, is it still true that you do

11   not have hospital privileges at any hospital?

12       A.    Correct.

13       Q.    Is it still true as of today that you have

14   not published any original data regarding Roundup or

15   glyphosate?

16       A.    Correct.

17       Q.    As of today you have not published any

18   review articles about Roundup or glyphosate?

19       A.    Correct.

20       Q.    Is it still true that you have not

21   conducted any testing of pesticides or herbicides?

22       A.    Correct.

23       Q.    Is it still true that you have not

24   conducted any scientific research on Roundup or

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Chadi Nabhan, M.D.

1    glyphosate?

2         A.    Define this for me a little bit.

3               Are you talking primary scientific

4    research or just me researching literature?

5         Q.    Primary scientific research.

6         A.    Correct.

7         Q.    Is it still true that you have not

8    conducted any primary scientific research involving

9    any pesticide or herbicide?

10        A.    Correct.

11        Q.    Is it still true that you have never

12   conducted any animal cancer study?

13        A.    True.

14        Q.    I saw in your report that you are now an

15   adjunct professor at the University of South Carolina

16   in the Department of Clinical Pharmacy and Outcome

17   Sciences?

18        A.    Yes.

19        Q.    Go Cocks.

20        MS. FORGIE:  Wait.  What's that?

21        MS. COPE-KASTEN:  The South Carolina Gamecocks

22   are their --

23        MS. FORGIE:  Oh.

24        MS. COPE-KASTEN:  -- mascot.

1        MS. FORGIE:  You mean like a chicken?

2        MS. COPE-KASTEN:  Yeah.

3        MS. FORGIE:  Oh, okay.  Sorry.

4    BY MS. COPE-KASTEN:

5        Q.    Do you -- do you travel to Columbia for

6    that position?

7        A.    Not yet.  As a -- as part of this position

8    I will have to do that about twice a year to mentor

9    some of the junior faculty and as part of that

10   professorship, but it is not required.  This is

11   obviously voluntary travel to go there.

12       Q.    Does that mean that there is no student

13   teaching or lecture component along with this position

14   for you?

15       A.    There can be.  So, again, it's really me

16   and the head of that department, part of that role is

17   to supervise and mentor junior faculty and students

18   who are interested in this type of research, outcome

19   research and so forth, as well as us conducting

20   clinical research.

21              So there are weekly calls that we actually

22   go through all of the research that we are doing.  In

23   fact, I have a call also planned this afternoon to go

24   over the papers that we are planning on submitting in

 1    the next few months.  And some of that will require

 2    travel or it could be done virtually.

 3              So, again, it depends on the project, it

 4    depends on the plan.  It is not set in stone whether I

 5    need to travel there at any particular time or not.

 6         Q.    In your CV it looks like you have the date

 7    as starting in 2019.

 8              Do you remember when exactly you started

 9    that position?

10         A.    Yes.

11         Q.    Not like a day but what month?

12         A.    No.  I remember exactly.  July 1st.

13    That's when the appointment --

14         Q.    So this is a pretty new position?

15         A.    Yeah.  It's a three-year appointment.

16         Q.    You mentioned that you are going to have a

17    phone call regarding papers that you are planning on

18    submitting in the upcoming couple of months?

19         A.    Yes.  I mean, again, we have weekly calls

20    over the research we are doing and all of that.  I

21    just happened to plan a phone call later on this

22    afternoon.

23         Q.    Does any of that research involve

24    glyphosate or Roundup?

Chadi Nabhan, M.D.

1      A.     Not right now, no.

2      Q.     Does any of that research involve

3  pesticides or herbicides more generally?

4      A.     Not right now.

5      Q.     Do you have any intention -- do you have

6  any concrete intention at this time to be involved in

7  research at the University of South Carolina involving

8  glyphosate or Roundup?

9      A.     I can't answer that right now.  I'm not

10  really sure.

11      Q.     Have you spoken with any of your

12  colleagues at the University of South Carolina about

13  your views on glyphosate and Roundup?

14      A.     No, I have not.

15      Q.     Are you an expert in dermal absorption of

16  pesticides or herbicides?

17      MS. FORGIE:  Objection.

18  BY THE WITNESS:

19      A.     Define an expert, please.

20  BY MS. COPE-KASTEN:

21      Q.     Would you hold yourself out to colleagues

22  as an expert in pesticides or herbicides and their

23  dermal absorption?

24      A.     Well, I'm probably more than expert than a

Chadi Nabhan, M.D.

```
 1   general internist or somebody who has not read the

 2   literature.  I'm not as an expert as somebody who has

 3   spent their life working on dermal absorption or a

 4   toxicologist or -- or so forth, so I think everything

 5   is relative.  I think I'm more of an expert than

 6   somebody walking down the street who probably has

 7   never heard of that term or doesn't understand what

 8   you mean by dermal absorption.  So it depends who you

 9   are comparing me to.  As you know, that's -- that's

10   what I mean by asking you how you define an expert.

11        Q.   Would you defer to a toxicologist on

12   matters of dermal absorption of pesticides or

13   herbicides?

14        MS. FORGIE:  Objection.

15   BY THE WITNESS:

16        A.   I prefer to when if it's very deep

17   discussion and in-depth dialogue about dermal

18   absorption and so forth.  I do believe that

19   interpreting this information on clinical grounds and

20   which is the most important because this really what

21   matters to patients, you will require some clinician

22   who takes this information that the toxicologist is

23   discussing and try to apply it to a patient and try to

24   understand what that means from a patient perspective.
```

Chadi Nabhan, M.D.

1  Ultimately you need to have somebody that interprets

2  the evidence from clinical perspective and that's

3  where I view my role as a clinician.

4  BY MS. COPE-KASTEN:

5      Q.    Do you have any specific training in the

6  area of dermal absorption of pesticides or herbicides?

7      A.    I did not go to school for that particular

8  topic.

9      Q.    Do you have any training in the area of

10 weed science?

11     A.    I was not trained in weed science, no.

12     Q.    What is the purpose of conducting a

13 physical examination of a patient?

14     A.    Every patient that comes to clinic you

15 need to examine them to try to associate the symptoms

16 that they are having that they are coming to see you

17 with any possible physical exam signs that you may

18 identify that could explain the symptoms that they are

19 having.  If somebody comes to the office with back

20 pain, you probably should examine their back and just

21 see why they could possibly have a back pain.

22          So physical examination is a tool that

23 physicians have to identify the cause of some symptoms

24 that the patients that they see have and try to reach

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Chadi Nabhan, M.D.

1   the cause or reach a diagnosis of an ailment that a

2   patient has.

3        Q.    What information do you get from

4   conducting a physical examination of a patient that

5   you cannot get from talking to the patient without

6   conducting a physical exam?

7        A.    I'm not really sure I understand the

8   question.  So do you mind explaining what you mean by

9   that.

10       Q.    Is there a difference between talking to a

11  patient and conducting a physical examination of that

12  patient in person?

13       A.    Well, of course, otherwise the clinics

14  would be completely empty and there would be no

15  hospitals or clinics and -- and we could probably have

16  this deposition then virtually.  We don't need to be

17  in person if everything will be done virtually.

18             Yes, there is a role.  I mean, nothing, in

19  my opinion -- if you are the primary physician for

20  that particular patient, if you are the primary care

21  physician, the primary oncologist for that patient,

22  you need to talk to this patient in person and do a

23  physical exam.  I mean, the patient could tell you

24  over the phone if they have back pain, but if you are

Chadi Nabhan, M.D.

1    their treating physician, you can't really examine

2    their back over the phone.  And I think it's probably

3    fair to say, I hope we can all agree at least, that

4    physical examination for the physicians that care for

5    that patient is an important component of helping

6    these patients.

7         Q.    What I'm trying to get at is in that

8    process of conducting the physical examination of the

9    patient's back, in that example, what types of

10   information could you as a physician learn from that

11   physical exam that you would not have access to if all

12   you did was talk to the patient?

13        A.    Well, you have to do the physical exam.

14   There are certain physical examination and maneuvers

15   that you will have to do for somebody who has a back

16   pain that might allow you to understand why they have

17   the back pain or might guide you to decide what type

18   of imaging study, if any, you need to order for that

19   patient.  You can't have the patient -- you can't

20   press on a patient's back over the phone.  You can't

21   tell the patient to lie on the exam table and do a leg

22   raise test and raise their legs to see whether this

23   really aggra -- aggravates the pain or not on the

24   phone.

Chadi Nabhan, M.D.

1            So it depends, really, on the type of

2    symptom that the patient has and it depends on what

3    your suspicion in terms of the diagnosis and then you

4    have to do certain tests.  Maybe there is a rash on

5    their back and they have shingles and you need to look

6    at their back and see if they have a rash that might

7    explain the back pain.  They think it's back pain, but

8    the reality, it's really pain from shingles because

9    there is a rash.

10            So, I think that's, you know, like -- I

11    don't know -- I don't know how to answer this except

12    that this is a part of what every physician does and

13    they should do if they are the primary takers of that

14    patient.

15       Q.    Did you conduct a physical examination of

16    Mr. Giglio in this case?

17       A.    I did not, and I am not his primary

18    oncologist or I'm not his primary care physician.  So,

19    but his primary oncologist and his primary care

20    physicians obviously see him and he goes to see them

21    and they do these examinations and so forth, but I

22    don't have a physician/patient relationship with

23    Mr. Giglio to mandate that I need to do a physical

24    examination.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Chadi Nabhan, M.D.

1              I have done, as you know, and I've seen

2    other patients that I have been deposed about or

3    when -- and I've been in trial testimonies about.

4    Sometimes, when logistics allow from a patient

5    perspective, I like to do that if possible.  Some

6    patients may have a lot of fatigue and they just had

7    therapy and may not be able to travel easily or they

8    prefer not to, especially if they see so many other

9    doctors.  To them having one less doctor is probably

10   easier.  So at least for Mr. Giglio I did not conduct

11   a physical exam.

12        Q.    You said a couple of things in that

13   answer, so I just want to break it down into pieces.

14              So you did not conduct a physical

15   examination of Mr. Giglio?

16        A.    I did not.  I spoke to him on the phone.

17        Q.    Why didn't you conduct an examination of

18   Mr. Giglio specifically?

19        A.    It's not specifically.  It's not that I

20   decided that I will not do a physical examination of

21   Mr. Giglio versus I will do a physical examination of

22   Mr. Giglio.

23              He did have several recent visits with his

24   physicians that after the CAR T-cell therapy that he

Chad1 Nabhan, M.D.

1    had in April, and he had a very rough time with the

2    CAR T therapy and he was just recovering from the

3    treatment, he just did a PET scan sometimes in late

4    May, and I had a good conversation with him, I

5    reviewed all of his medical records, and I felt I have

6    all of the information that I need about his

7    particular situation, his particular case, and given

8    the facts all of his physicians also just saw him

9    recently, I felt it's okay to spare him the -- the

10   need to travel and get on a four, five-hour flight

11   to -- to see me for one-hour examination.  He has his

12   own physicians that were seeing him as well.

13        Q.   Was there anything different about

14   Mr. Giglio's case as compared to some of the other

15   plaintiffs in the Roundup litigations who have also

16   been recently seen by physicians that you have

17   conducted physical exams for?

18        A.   No, there is nothing different.  I mean, I

19   think sometimes -- sometimes things might be able to

20   work out for a particular patient that is able to

21   travel or not and sometimes things just don't work

22   out.  There is really no particular reason why this

23   was done versus not done.  I felt I got all of the

24   information that I needed specifically and there was

Chadi Nabhan, M.D.

 1  no essential need for me to see him in person at that

 2  point.

 3       Q.    Did anyone ask you to consider doing a

 4  physical examination of Mr. Giglio?

 5       MS. FORGIE:  Well, objection.  Don't respond to

 6  anything to do with discussions with any of the

 7  lawyers.  If you can answer that without discussions

 8  that you've had with me or other lawyers, you may do

 9  so.

10  BY THE WITNESS:

11       A.    No, this was not brought up.

12  BY MS. COPE-KASTEN:

13       Q.    Is there any way in which you feel your

14  assessment of Mr. Giglio's case is limited by the fact

15  that you were not able to conduct a physical

16  examination of him?

17       MS. FORGIE:  Objection; asked and answered.

18           You can answer it again.

19  BY THE WITNESS:

20       A.    No.  I believe I got all of the

21  information from speaking to him on two occasions,

22  reviewing all of his medical records and the medical

23  literature.  I have a very good knowledge of

24  everything he went through as well as of his case.

Chadi Nabhan, M.D.

1    BY MS. COPE-KASTEN:

2        Q.    Is Mr. Giglio's history in Section 7 of

3    your report largely based on your phone conversations

4    with him and your review of his medical records?

5        A.    What page is that?

6        Q.    Section 2 starts on page --

7        MS. FORGIE:  2 or 7?  I thought you said --

8    BY MS. COPE-KASTEN:

9        Q.    Sorry.  Section 2 of the report.

10       A.    Page 7.

11       Q.    Page 7.

12       A.    Section 2, okay.

13       MS. FORGIE:  Thank you.

14   BY THE WITNESS:

15       A.    Do you mind repeating the question?

16   BY MS. COPE-KASTEN:

17       Q.    Is the information that is contained in

18   Section 2 of your report largely based on your phone

19   conversations with Mr. Giglio and your review of his

20   medical records?

21       A.    Correct.

22       Q.    One of the things that your report

23   indicates is that Mr. Giglio did not use Roundup much

24   for residential personal use after 2008.

Chadi Nabhan, M.D.

```
 1                  Do you recall that?

 2       A.    I do recall writing that.  I don't

 3  remember which page.

 4       Q.    It is on Page 14.

 5       MS. FORGIE:  He can refer to his report, right?

 6  BY MS. COPE-KASTEN:

 7       Q.    Yeah, absolutely.  Please refer to your

 8  report any time you need to.

 9       A.    No, I remember writing this.  I just don't

10  remember the page.

11                  Yes, Page 14 you said?

12       Q.    Yes.

13       A.    Yeah, I see that, yeah.

14       Q.    Is that based on something that he told

15  you when you spoke over the phone?

16       A.    Yeah.

17       Q.    Did he tell you what not using it "much"

18  after that 2008 timeframe meant?

19       A.    I want to make sure we are looking at the

20  same thing.  You are looking at the second paragraph

21  of Page 14 when it says:  "Used Roundup for personal

22  residence from 1990 to 2008."

23                  That is what you are looking at?

24       Q.    Correct.  Yeah.  The -- the penultimate
```

Chadi Nabhan, M.D.

1    sentence in that paragraph says:  "He did not use it

2    for residential use much after 2008, and most of his

3    use afterwards was commercial for his business."

4         Did you ask Mr. Giglio or did he tell you

5    what he meant by the word "much" in that situation?

6    A.    No.  He just told me that he didn't use it

7    as much.  After that he -- I tried to get a little bit

8    more information as to what that meant, but he said it

9    was just here and there, so it didn't seem that he

10   used it in a manner that was significant clinically

11   based on the conversation I had with him after 2008

12   for residential purposes.

13   Q.    Did you make any attempt to quantify the

14   amount that he used for personal residential use

15   between 2008 and whenever he stopped using Roundup for

16   personal use?

17   A.    Not after 2008.  I think there was more

18   use for his business after 2008 as stated in the above

19   paragraph, from 2009 to 2014.  As I said, it seemed

20   from talking to him that it was very minimal used for

21   residential purposes after 2008, and it was very clear

22   that he was unable to quantify that in a very clear

23   manner that I did not -- I wasn't able to get a clear

24   answer for that, but I didn't think it was relevant.

Chadi Nabhan, M.D.

1        Q.    If you flip back one page in your report,

2   you made a note right in the middle of the page that

3   Mr. Giglio wore neoprene gloves when spraying Roundup

4   for his business?

5        A.    Yes, I see that.

6        Q.    On Page 14 when you are talking about his

7   personal residential use, again, in the middle of the

8   page you indicated that he did not wear gloves for

9   personal residential use when spraying Roundup?

10       A.    That's what he told me.

11       Q.    Did you ask Mr. Giglio why he wore gloves

12  to spray Roundup for commercial use but not for

13  personal residential use?

14       A.    I've seen inconsistencies in general with

15  a lot of patients into when they wear gloves, when

16  they don't wear gloves.  I don't -- in my experience,

17  this has never been a systematic way that I will wear

18  gloves here, I will not wear gloves there.  It is not

19  unusual to see that a little bit of differences when

20  somebody uses gloves versus not.

21            So it is very possible that because he

22  maybe was spending less time or less duration using

23  Roundup for personal residence or personal use, but

24  the reality is, it is not uncommon to see that people

Chadi Nabhan, M.D.

```
 1   are inconsistent in how they use gloves or not.  This
 2   did -- this did not strike me as something that is
 3   surprising.
 4        Q.    So you did not ask Mr. Giglio about that?
 5        A.    I didn't think it was surprising because,
 6   again, I've seen people use gloves and not use gloves
 7   in an inconsistent manner for no particular systematic
 8   reason.
 9        Q.    Because it was not surprising to you, you
10   did not ask him about it?
11        MS. FORGIE:  Objection; asked and answered.
12             You can answer it again.
13   BY THE WITNESS:
14        A.    I asked him what he wore, and as you can
15   see, I wrote that he did not wear gloves or goggles
16   when he was spraying for residential use and he was
17   wearing it when he was spraying for his work.  It is
18   possible this is part of a work policy that if you
19   have to do that for work, then you have to wear gloves
20   versus not.  I mean, I think this is not unusual, it
21   is not surprising, it is not inconsistent with what I
22   have seen in many other patients and plaintiffs.
23   BY MS. COPE-KASTEN:
24        Q.    Does it impact your opinion at all whether
```

Chadi Nabhan, M.D.

1  a plaintiff wears gloves when they spray Roundup or

2  does not wear gloves?

3      A.    I think it's a very important piece of

4  information to know what type of protective gear

5  patients or -- wear.  I do think that when patients do

6  not wear gloves they have higher risk of Roundup

7  exposure to the skin and more skin involvement which

8  is very critical and important when it comes to

9  Roundup.

10     Q.    What do you understand the last date to be

11 on which Mr. Giglio sprayed Roundup?

12     A.    For residential or for personal use?

13     Q.    Let's start with residential.

14           What do you understand the last date of

15 his residential use to be with respect to Roundup?

16     A.    Yeah, as I told you, I mean, after 2008,

17 at least from my recollection and understanding from

18 talking to him, it seemed it was very underwhelming

19 use for personal use after 2008.  He used it more from

20 1990 to 2008.  His work -- for his work he used it

21 from 2009 to 2014.  He may have used it a little bit

22 in 2015, but I believe when he got sick he stopped

23 using it.  From my understanding, his last use is

24 2014.

Chadi Nabhan, M.D.

1      Q.    Do you know when in 2014 his last

2  residential -- or his last commercial use of Roundup

3  was?

4      A.    I don't know the exact month.  When we

5  talked about it, he said when he got sick he stopped

6  spraying.  And I believe he got sick somewhere in

7  October 2014, but I don't have the exact month.

8      Q.    Have you ever had a patient misrepresent

9  something to you?

10     A.    What do you mean misrepresent exactly?

11     Q.    Tell you something that was not accurate.

12     MS. FORGIE:  Objection.

13  BY THE WITNESS:

14     A.    Yeah, when you say misrepresent, it means

15  the patient is lying to you, which is -- which is a

16  pretty big accusation.

17  BY MS. COPE-KASTEN:

18     Q.    Let me clarify.  Intentionally or

19  unintent- -- unintentionally telling you something

20  that turns out not to be true?

21     A.    Have I seen patients that, you know, they

22  forget something that they have told me if I -- and

23  their spouse or their significant other remind them or

24  they remember something later on and they call me, Oh,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Chadi Nabhan, M.D.

1    I forgot, I took that Advil last night and I forgot to

2    tell you that, yes, of course.  That's pretty much not

3    un -- not unusual, not surprising in any type of

4    clinical practice when patients forget and they

5    sometimes remember, sometimes they don't.

6              It -- I have been lucky, but very, very

7    few incidents where I would recall over a 20-year

8    career where I had a patient who was intentional in

9    either misstating facts or hiding facts, but

10   unfortunately there are bad apples in everything.

11        Q.    When you speak with or examine a patient,

12   are you gauging their credibility?

13        A.    When you see and examine a patient, and

14   especially with patients with cancer, you will always

15   give patients the benefit of the doubt, you will

16   always believe what the patient tells you, because if

17   you start with doubting what the patient is telling

18   you, you are going to make a lot of mistakes and you

19   are not going to help patients.

20              So I think it is very important to

21   understand what the patient tells you and take every

22   single complaint and every single thing that the

23   patient tells you in a very serious manner.  That's

24   really how you help people.

Chadi Nabhan, M.D.

```
 1        Q.    Do you agree with me that in the context

 2   of litigation it is important to be as accurate as

 3   possible with facts?

 4        MS. FORGIE:  Objection.

 5   BY THE WITNESS:

 6        A.    I think you are calling for an expert

 7   opinion in a legal matter, which I don't know how to

 8   answer that.  I believe it is always important to know

 9   the facts whether it's litigation or not litigation.

10            But what I can tell you is from a

11   physician perspective, it is -- you know, you start

12   always with realizing that the patient is credible,

13   they are here to ask for help and they are trying to

14   get your opinion.  If a patient comes in and tells me

15   they had fever yesterday and I start arguing with

16   them, Well, did you really have a fever for sure,

17   what -- how high, what time and so forth, it's just

18   not the way things work in medicine.  You really have

19   to understand what patients are going through and --

20   and help them.

21            In a litigation manner, I mean, I'm not

22   really sure how to answer that.  In my opinion, I --

23   I -- I'm approaching this as a physician, I talk to

24   these plaintiffs as physician, so I can't answer your
```

Chadi Nabhan, M.D.

1    question from a legal perspective.

2    BY MS. COPE-KASTEN:

3        Q.    Did you accept as true or give -- give the

4    benefit of the doubt to everything that Mr. Giglio

5    told you when you spoke with him on the phone?

6        A.    I did.  I did note some inconsistencies a

7    little bit here and there between his deposition and

8    what he -- when I talked to him on the phone in terms

9    of some of the number of hours, number of minutes of

10   spraying and so forth.  In my experience from prior

11   plaintiffs and prior patients, I -- I have seen some

12   of these inconsistencies, but, yes, I did give him the

13   benefit of the doubt; yes, I gave him credibility;

14   and, yes, I believed what he told me.  There was no

15   reason for me to doubt that he is telling me the

16   truth.

17       Q.    Tell me more about the inconsistencies

18   that you noted between the number of hours or minutes

19   sprayed between the deposition and what he told you on

20   the phone?

21       A.    You know, I don't remember the exact.

22   I'll have to reread his deposition again which I read

23   before, but I obviously wrote in my report what he

24   told me over the phone in terms of the actual amount

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Chadi Nabhan, M.D.

1    of time that he spent spraying, whether it is for

2    residential use or for personal use.  What I recall is

3    that some of the things that he told me were not

4    100 percent exactly similar to what he said in his

5    deposition.  That I recall.  I just don't remember

6    exactly because it's been a while since I read his

7    deposition.

8            But, you know, regardless for me whether

9    it was what he actually said in his deposition or what

10   he told me, the amount of spraying and the amount of

11   time that he spent using Roundup were very high anyway

12   you look at it, but, yes, I did note it, note slight

13   inconsistencies, I just don't recall exactly the

14   details of that.

15       Q.    Do you recall any inconsistencies other

16   than with respect to the amount of time he spent

17   spraying Roundup?

18       MS. FORGIE:  Objection.

19   BY THE WITNESS:

20       A.    I don't -- I don't recall specifically,

21   no.  It's been a while since I read his deposition.  I

22   think it was in July when I read it.

23   BY MS. COPE-KASTEN:

24       Q.    Where you saw an inconsistency between the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Chad1 Nabhan, M.D.

```
 1    deposition and what he told you on the phone with

 2    respect to the amount of time he spent spraying

 3    Roundup, did you go with what he told you over the

 4    phone or what he said in his deposition for reaching

 5    your final conclusions in this case?

 6         MS. FORGIE:  Objection.

 7    BY THE WITNESS:

 8         A.    Yeah, again, either way you would look at

 9    it, whether -- if you -- essentially what I look at is

10    the amount of exposure and the duration of exposure of

11    Roundup that these patients have had as well as other

12    risk factors to developing their lymphoma and so

13    forth.

14              And when you read his deposition -- when I

15    read his deposition and when I talked it him on the

16    phone, the exposure levels were very high either way.

17    So I don't think -- I think it's a matter of just

18    sometimes patients do not remember the detail.

19              If you put yourself in their shoes, the

20    amount of detail that, I'm sorry, you attorneys ask

21    these patients are very cumbersome, and unfortunately,

22    and I realize that this is what you have to do from a

23    legal perspective, but unfortunately you often don't

24    realize what these patients have gone through in terms
```

Chadi Nabhan, M.D.

```
 1   of chemotherapy, the side effects of chemotherapy,

 2   being in the hospital, being in ICUs and having

 3   infections.  He just had CAR T therapy just a couple

 4   of months ago, and there is very little, frankly,

 5   understanding into how much of this therapy affects

 6   the patient's ability to have this sharp memory that

 7   you demand of them.

 8              I'm not blaming you.  I mean, you have not

 9   taken care of patients in clinic, but this is not

10   something that is unusual in my clinical practice that

11   I've had for 20 years.

12              So as a clinician, you have to pick into

13   the important things and you have to cut through some

14   of the nuances and realize what are the important

15   type -- important information that you are looking at.

16   And, again, you ask for very specific detailed

17   questions that I understand you have to ask, but

18   you'll have to trust me and a lot of other physicians,

19   including your experts, I'm sure they are going to say

20   the same, patients can't remember all of these details

21   very accurately.  So it depends how you look at it, I

22   mean, obviously, and how you use the information, but

23   this is not unusual.

24   BY MS. COPE-KASTEN:
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Chadi Nabhan, M.D.

1      Q.    Have you visited any of the properties on

2  which Mr. Giglio sprayed Roundup?

3      A.    I have not.

4      Q.    You said earlier that you spoke to

5  Mr. Giglio on August 17th of this year because he

6  submitted an Amended Plaintiff Fact Sheet?

7      A.    Correct.

8      Q.    Did you review the very first Plaintiff

9  Fact Sheet that Mr. Giglio submitted in this case?

10     A.    I -- I reviewed two.  One of them, the one

11  before I talked to him on July 6th, and then there was

12  another one before I spoke to him again on July 17

13  (sic).  Those are the two ones I had, I believe.

14     Q.    So you did not review three?

15     MS. FORGIE:  Objection.

16  BY THE WITNESS:

17     A.    If -- I don't recall that.  But if I can

18  look in the break and just -- I'm remembering only

19  two.

20  BY MS. COPE-KASTEN:

21     Q.    Okay.

22     A.    But in the break I can take a look if

23  there was a third.  I don't remember a third one.  I

24  don't think I have a third one.

Chadi Nabhan, M.D.

```
 1        Q.     Are you aware that Mr. Giglio submitted a

 2   Plaintiff Fact Sheet prior to the one that you

 3   reviewed in August indicating that he had used Roundup

 4   for res -- residential personal use?

 5        A.     Prior to the July one?  I'm sorry.  Prior

 6   to the August 17 one, you mean?

 7        Q.     Um-hum.

 8        A.     That's the amended one, right, the one I

 9   reviewed?

10        Q.     That's the Second Amended Plaintiff Fact

11   Sheet he submitted.

12        A.     Okay.  So you are saying there are three?

13        Q.     Correct.

14        A.     If -- I'll have to look at my records.  I

15   don't -- I -- it doesn't -- I'm not remembering that I

16   looked at three.

17        Q.     Okay.

18        A.     Hopefully I -- we just talked about sharp

19   memory and it's kind of sad that I'm having to

20   struggle, but I'm remembering I reviewed two for sure,

21   one before July 6th and then it was amended and I

22   called him for July -- August 17.  I'm not recalling

23   reviewing a third one, which is you are alluding to,

24   but in the break I'll take a look in my file to see if
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Chadi Nabhan, M.D.

1    there is a third one.  I don't -- I'm not remembering

2    that.

3          Q.     When you spoke with Mr. Giglio on

4    August 17th, 2019, why did he tell you he amended the

5    Plaintiff Fact Sheet to include personal residential

6    use?

7          A.     Yeah, good question, because I asked.  I

8    asked about that.  And he -- at least what he told me

9    is he didn't think that he needed to write the

10   personal residential use.  He thought it's just enough

11   to write his occupational use or his work-related

12   exposure to Roundup.  And the other reason he gave me,

13   he said that he also couldn't remember accurately to a

14   degree that was required of him how much he actually

15   used it for residential use, if any.

16          So what I got -- the impression I got was

17   he didn't sense it was critical to talk about his

18   personal use.  Maybe he misunderstood the -- what the

19   Plaintiff Fact Sheet is saying and he just want to

20   talk about his occupational exposure, and maybe some

21   of it is just a memory issue, that even if he wanted

22   to put it in, he wasn't really certain how he would

23   answer that because he wasn't recalling the

24   information accurately.

Chadi Nabhan, M.D.

1      Q.    Did you ask him what prompted him to

2   change it as of August of this year?

3      A.    Yeah, I mean, I -- I did, and I think what

4   he said is -- I think I wrote that here, and you see

5   that on Page 15, the second paragraph, I said:

6            "I spoke with the patient again on

7   August 17, 2019, after he submitted an Amended

8   Plaintiff Fact Sheet to better understand what changes

9   he submitted.  He told me that he recalled using

10   Roundup for personal use and wanted to modify his

11   sheet."

12            So, really, I mean, from where I sat from

13   talking to him, as I told you, I got the impression

14   that his memory was not very sharp and it's either

15   that he just could not remember 100 percent how much

16   he used it for personal use and he did not want to put

17   inaccurate information in the Plaintiff Fact Sheet,

18   plus he also commented that he did not think it was as

19   important because he thought he should just answer

20   about occupational use.

21            So I -- I didn't get the 100 percent

22   reason except the fact that he recalled important

23   information and decided to amend it.  And I obviously

24   want to talk to him about it and understand it better.

Chadi Nabhan, M.D.

 1      Q.    Is it your understanding that Mr. Giglio

 2   sprayed Roundup for personal residential use during

 3   all 12 months out of the year between 1990 and 2008?

 4      A.    That's what he told me.

 5      Q.    Did you rely on the -- that information in

 6   coming to your conclusions in this case?

 7   MS. FORGIE:  Objection.

 8   BY THE WITNESS:

 9      A.    Well, my conclusions with this case were

10   irregardless of the personal use.  I mean, I -- as

11   I -- I mean, I've already reached my conclusion,

12   frankly, before I talked to him on August 17 because

13   his occupational exposure to Roundup was high and were

14   beyond what all of the literature I reviewed on

15   exposure to Roundup causing non-Hodgkin lymphoma.

16          So I did not -- I did not -- in my opinion

17   I did not need to have additional exposure information

18   to re -- to get in my -- to my opinion.  It was

19   already reached.  But it was important piece of

20   information that was new that I needed to -- to know

21   about and that's why I added that.

22          But that information did not change my

23   opinion.  My opinion was already formed.  It

24   solidified my opinion further because he has even more

Chadi Nabhan, M.D.

1   exposure than I even thought.  But he already, even

2   without the personal use, he had enough exposure.

3   BY MS. COPE-KASTEN:

4       Q.    Does it make any difference for your

5   opinion with respect to causation in this case whether

6   Mr. Giglio used Roundup for five years or used it for

7   over 20 years?

8       A.    Yeah, it's -- what is important is to take

9   a look at the totality of exposure, right.  I mean, I

10  think -- think of somebody who has used Roundup for

11  two years and every single day for two hours every

12  single day.  For whatever reason.  I realize that's an

13  extreme, but that's only two years, and the person is

14  spraying every single day, 365 days a year for two

15  years.

16          So I don't -- it doesn't -- it doesn't

17  have to be five years or six years.  You have to look

18  at each particular individual, how many days or hours

19  in a given year they sprayed, for how many years, and

20  try to correlate that with the epidemiologic

21  literature that has been published looking at the

22  duration of exposure and the quantity of exposure.

23          So, it's not necessarily the number of

24  years that matters.  It is how much you sprayed in

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Chadi Nabhan, M.D.

1   those years.

2        Q.    When you say that "it's not necessarily

3   the number of years" --

4        A.    It's how much you sprayed in those years,

5   that's what I -- that's a full sentence.

6        Q.    So it does not matter to you how many

7   years a person sprayed as long as you know the

8   information with respect to how many hours they have

9   sprayed?

10       MS. FORGIE:  Objection.

11  BY THE WITNESS:

12       A.    That's not what I said.

13       MS. FORGIE:  Excuse me.  Objection;

14  mischaracterizes the testimony.

15            You can answer.

16  BY THE WITNESS:

17       A.    That's totally not what I said.

18            What I said, you need to look at how much

19  a person sprayed in a given year or in a given five

20  years or in a given ten years.  You could have

21  somebody who used Roundup once in ten years and you

22  could have somebody who used Roundup 300 times in one

23  year.  So it's not the number of years.  You have to

24  take the number of years in conjunction with how much

1    time they spent spraying during that time period.

2    That's what I said.

3    BY MS. COPE-KASTEN:

4        Q.    If you knew that someone had sprayed

5    Roundup for 300 total hours but you didn't know for

6    how many years they had sprayed, could you make a

7    conclusion with respect to whether or not you believed

8    Roundup was a cause of non-Hodgkin's lymphoma in their

9    case?

10       MS. FORGIE:  Objection; calls for speculation.

11   BY THE WITNESS:

12       A.    I cannot answer questions without looking

13   at specific details of a case.  I mean, at the end of

14   the day, I need to know everything pertaining to that

15   hypothetical patient, about other possible risk

16   factors, about other things that this person actually

17   has and so forth to be able to give you an answer as

18   to whether Roundup caused this particular indi- --

19   hypothetical individual lymphoma.  I mean, this is

20   just taking one part of -- there is no additional

21   information.  I need way more information to make a

22   decision.

23   BY MS. COPE-KASTEN:

24       Q.    Let me try this and see if it gives you

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Chadi Nabhan, M.D.

1    enough information.

2            Let's take a 40-year-old plaintiff who has

3    no family history of cancer, no personal history of

4    cancer, no exposure to other carcinogenic agents or

5    allegedly carcinogenic agents that you are aware of,

6    no other risk factor that you would list in a report

7    for a patient, such as obesity --

8        A.    Which I --

9        MS. FORGIE:  Ah, there is no question.

10   BY THE WITNESS:

11       A.    I never listed obesity.

12       MS. FORGIE:  Ah, ah, ah.  There is no question.

13   We both agree on this.  Wait for the question, please.

14   BY MS. COPE-KASTEN:

15       Q.    -- (continuing) but you knew that that

16   patient had been exposed to 300 hours of spraying

17   Roundup, would you be able to make a conclusion with

18   respect to whether or not Roundup was a risk factor or

19   a cause of non-Hodgkin's lymphoma for that patient?

20       MS. FORGIE:  Objection; calls for speculation.

21   BY THE WITNESS:

22       A.    I would be able to make a conclusion it is

23   a risk factor for sure.  I mean, I think having

24   300 hours in a lifetime of spraying to Roundup will

Chadi Nabhan, M.D.

1   qualify as including Roundup in the risk factors that

2   I would look for as causative risk factors for this

3   individual's non-Hodgkin lymphoma.  I would not

4   exclude that.  And then I would look at the other

5   things that you were alluding to or discussing and see

6   whether I would keep Roundup or I would exclude it.

7           But 300 hours in a lifetime is --

8   surpasses the papers published that looked at more

9   than two days a year or more than ten days in a

10  lifetime, so, absolutely, you will include Roundup as

11  a risk factor.

12      Q.   Does that change if the -- same

13  hypothetical, but the number of hours that the person

14  has sprayed in a lifetime is 15?

15      MS. FORGIE:  Objection; calls for speculation.

16  BY THE WITNESS:

17      A.   Yeah, again, and it's really -- it depends

18  on -- I don't believe we know exactly the minimum

19  number of hours or the minimum number of days that are

20  required to put somebody as a risk factor.

21           I mean, that exact question that you are

22  getting into, because we'll probably go down to five

23  hours or one hour with the line of questioning, that

24  question has not been answered in the literature.

Chadi Nabhan, M.D.

1   Nobody has looked at this is the minimum number of

2   hours that a person needs in order to develop

3   non-Hodgkin lymphoma, but what the epidemiologic

4   literature has answered is that if you are exposed for

5   more than two days a year or more than ten days in a

6   lifetime, you are -- you are at substantially

7   increased risk of developing non-Hodgkin lymphoma --

8   doubling the risk of developing non-Hodgkin lymphoma.

9           But to my knowledge, the -- the answer to

10  the minimum number of days or hours that are required,

11  I'm not aware of literature that answered that

12  specific question.

13  BY MS. COPE-KASTEN:

14      Q.   If it turned out that Mr. Giglio never

15  sprayed Roundup for personal residential use, would

16  your conclusion in this case change?

17      MS. FORGIE:  Objection; asked and answered.

18  BY THE WITNESS:

19      A.   For personal and occupational use, like

20  nothing ever?

21  BY MS. COPE-KASTEN:

22      Q.   Nope.  Just for personal.

23           So if it turned out that Mr. Giglio

24  sprayed Roundup for commercial use between 2009 and

Chadi Nabhan, M.D.

```
 1   2014 but he never sprayed it for personal residential

 2   use, would anything change about your opinion?

 3        A.    Absolutely not.

 4        MS. FORGIE:  Objection -- wait.

 5            Objection; asked and answered.

 6        THE WITNESS:  I apologize.

 7   BY THE WITNESS:

 8        A.    Absolutely not.  My opinion would stay the

 9   same.

10        MS. FORGIE:  When you get a chance, a short

11   break, but when it's convenient.

12        MS. COPE-KASTEN:  Yeah, we -- we can go ahead,

13   I'm about to switch topics, so let's go off the

14   record.

15        MS. FORGIE:  That's what it looked like it.

16   That's why I said it.

17        THE VIDEOGRAPHER:  The time is 9:54 a.m. and we

18   are going off the video record.

19                (WHEREUPON, a recess was had

20                from 9:54 to 10:08 a.m.)

21        THE VIDEOGRAPHER:  The time is 10:08 a.m. and we

22   are back on the video record.

23   BY MS. COPE-KASTEN:

24        Q.    Dr. Nabhan, I want to go now over the
```

Chadi Nabhan, M.D.

1  chronology in Mr. Giglio's case.  I'm going to try to

2  go through it pretty quickly.  I think this will be

3  largely non-controversial, but I am going to ask you

4  for some of that detailed information we were talking

5  about before that lawyers can ask about, so I want you

6  to feel free to refer to your report any time you need

7  to.  Okay?

8      A.    Sure.

9      Q.    Mr. Giglio was initially diagnosed with

10  non-Hodgkin's lymphoma ███████████████████

11      A.    Correct.

12      Q.    When he was first diagnosed with

13  non-Hodgkin's lymphoma, he was diagnosed with diffuse

14  large B-cell lymphoma?

15      A.    Correct.

16      Q.    When do you believe Mr. Giglio first

17  developed diffuse large B-cell lymphoma?

18      A.    Impossible to tell, but this is an

19  aggressive type of lymphoma that's not going to linger

20  around for a long time before a patient has symptoms

21  and seek medical attention.  I would say less than six

22  months since he -- like he -- he must have started

23  having signs of non-Hodgkin lymphoma, but it is just

24  an aggressive type.  It is not going to be there for

1    years before he has lymphoma.



16              I'm not sure what he meant by rapid.

17    You'd have to ask him.

18        Q.    Mr. Giglio's NHL was treated with

19    chemotherapy?

20        A.    Correct.

21        Q.    He received a type of chemotherapy called

22    R-CHOP?

23        A.    Correct.

24        Q.    Mr. Giglio received six rounds of R-CHOP

Chadi Nabhan, M.D.

1   between November 2014 and February of 2015?

2        A.    Correct.

3        Q.    You would agree with me that Mr. Giglio

4   was responsive to R-CHOP therapy?

5        A.    Yes, he did achieve complete remission

6   after R-CHOP.

7        Q.    And after just one week of treatment his

8   lymph nodes were already shrinking?

9        A.    Yes, and he was feeling a little bit

10  better.

11       Q.    He did experience some neuropathy

12  initially with the R-CHOP therapy, correct?

13       MS. FORGIE:  Objection.

14  BY THE WITNESS:

15       A.    Yes, he did have neuropathy and he still

16  actually has neuropathy right now when I talked to

17  him.

18  BY MS. COPE-KASTEN:

19       Q.    Do you recall seeing in Mr. Giglio's

20  medical records that by the end of the first month of

21  R-CHOP therapy his neuropathy was actually gone?

22       A.    I'm sure if you are asking, it's probably

23  in the records.  I don't recall that particular

24  specific phrase.  I -- I do recall that he still has

Chadi Nabhan, M.D.

1    neuropathy right now and likely it is because of

2    there is so many additional chemotherapy that he has

3    had.  So, even if it's gone back then, he still has it

4    now.  I mean, he still had additional chemotherapy

5    afterwards.

6         Q.    I'm going to show you a record just

7    because I just want to make sure that we are

8    completely accurate with respect to the timeframes.

9    So I'm going to mark this as Exhibit 3 to your

10   deposition.

11              (WHEREUPON, a certain document was

12              marked Nabhan Deposition Exhibit

13              No. 3, for identification, as of

14              08/30/2019.)

15   BY THE WITNESS:

16        A.    Thank you.

17   BY MS. COPE-KASTEN:

18        Q.    This is a medical record for Mr. Giglio

19   from Medical Oncology Associates of San Diego?

20        A.    Yes.

21        Q.    If you look toward the upper right-hand

22   side, it says:  "Date:  December 22nd, 2014"?

23        A.    Yes.

24        Q.    So this would have been a little more than

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Chadi Nabhan, M.D.

 1    a month after Mr. Giglio started R-CHOP therapy,

 2    correct?

 3         A.    Correct.

 4         Q.    If you look with me in the very middle of

 5    the page, under Interval History, the last line before

 6    labs says:  "Neuropathy is gone"?

 7         A.    I see that.

 8         Q.    A CT scan in April 2015 showed no evidence

 9    of non-Hodgkin's lymphoma for Mr. Giglio, right?

10         A.    Say that again.

11         Q.    A CT scan in April 2015 --

12         A.    Correct.

13         Q.    -- showed no evidence of non-Hodgkin's

14    lymphoma for Mr. Giglio?

15         A.    Correct.

16         Q.    But Mr. Giglio had a recurrence of

17    non-Hodgkin's lymphoma in 2018?

18         A.    Correct.

19         Q.    His pathology report indicated that he had

20    recurrent DLBCL in April 2018.

21              Does that sound right?

22         A.    That's accurate, yes.

23         Q.    The features of Mr. Giglio's recurrent

24    cancer were not suggestive of high grade B-cell

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Chadi Nabhan, M.D.

1    lymphoma or double or triple hit lymphoma, correct?

2        MS. FORGIE:   Objection.

3    BY THE WITNESS:

4        A.    He had DLBCL, recurrent DLBCL.   There was

5    no evidence of double hit or triple hit lymphoma,

6    that's correct.

7    BY MS. COPE-KASTEN:

8        Q.    Mr. Giglio received three rounds of RICE

9    chemotherapy starting in May 2018?

10       A.    That's correct.   And this is the

11   additional chemotherapy I was mentioning that caused

12   the neuropathy that he is still having.   That's --

13   although it's resolved, the one you just mentioned,

14   these subsequent chemotherapies that we will go

15   through caused neuropathy.

16       Q.    The RICE therapy was not successful at

17   eliminating Mr. Giglio's non-Hodgkin's lymphoma?

18       A.    Yeah, unfortunately, and it is not really

19   designed to eliminate it.   It is designed to get him

20   into remission so he can undergo autologous stem cell

21   transplant, but because it didn't do that, that's why

22   the autologous transplant was aborted and he did not

23   have transplant.

24       Q.    Mr. Giglio then started what's called

Chadi Nabhan, M.D.

1    R-GemOx chemotherapy in July 2018?

2         A.    Correct, and the Ox stands for Oxaliplatin

3    which is -- which is -- the most common toxicity,

4    as -- as you know, is neuropathy.

5         Q.    Mr. Giglio stopped the R-GemOx

6    chemotherapy in October of 2018?

7         A.    Yes, in -- initially his dose of

8    Oxaliplatin was reduced in September 2018 because of

9    neuropathy and then the entire treatment was stopped

10   in October because it was not working.

11        Q.    Are you familiar with chimeric antigen

12   receptor T-cell therapy?

13        A.    Yes, I am.

14        Q.    Is that also more commonly known as CAR T

15   therapy?

16        A.    Yes.

17        Q.    You've never administered CAR T therapy to

18   a patient, have you?

19        A.    I have.

20        Q.    You have?

21        A.    When I was at the University of Chicago,

22   CAR T were on clinical trials and were part of the

23   clinical trials that were looking at CAR T efficacy,

24   and as part of the lymphoma program at the University

Chadi Nabhan, M.D.

1    of Chicago I was part of the physicians that used

2    CAR T for patients on clinical trials.  They were not

3    commercially approved.  And as you know, I left

4    University of Chicago in August 2016.  The first CAR T

5    was approved, I believe, in September 2017 and the

6    next one in November 2017.

7             So I have not administered them

8    commercially in the commercial space, if you will,

9    or -- but they were on clinical trials for several

10   years before.

11        Q.    Can you estimate how many patients you

12   administered CAR T therapy to personally?

13        A.    On clinical trials?

14        Q.    Correct.

15        A.    Maybe two.

16        Q.    Mr. Giglio underwent CAR T therapy for his

17   refractory DLBCL in 2019, right?

18        A.    Yes.

19        Q.    He underwent apheresis in March 2019?

20        A.    Right.  These are the standard ways to do

21   the CAR T, but yes.

22        Q.    What is apheresis?

23        A.    So the way -- I don't know how much you

24   want to spend on CAR T, but I will try to summarize it

Chadi Nabhan, M.D.

1    in a -- in an easily understandable way at least.

2                What you are doing with CAR T therapy is

3    you are trying to collect the T-cells from the patient

4    himself.  The process of collecting the T-cells is

5    done through apheresis, which is a patient usually

6    sits in a recliner chair or a machine or in bed, they

7    have IVs inside the veins and they collect these cells

8    that they have.  They isolate the T-cells.  These

9    T-cells then eventually get manipulated and worked at

10   by modifying their receptor and how they identify the

11   lymphoma cells.  Because essentially our immune system

12   fight these lymphoma cells through the T-cells, but

13   the T-cells somehow are not working for some of these

14   patients.  So you take the T-cells, you manipulate

15   them and you make them more capable of identifying the

16   lymphoma cells.

17               And then, several weeks later, the T-cells

18   are shipped back to the institution where the patient

19   is going to be treated and they are infused to the

20   patient over just one time, just one infusion.

21               Between the apheresis and the infusion of

22   CAR T, patients receive what we call lymphodepleting

23   chemotherapy.  And essentially that's designed to try

24   to eliminate additional cells that might affect the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Chadi Nabhan, M.D.

1    activity of CAR T by the time they get infused.

2            So that's what he had, the lymphodepleting

3    of fludarabine and cyclophosphamide and then he got

4    the CAR T.  So the apheresis is just the procedure to

5    collect these cells, if you will.

6       Q.    And he underwent that lymphodepleting

7    process and actually received the infusion of the

8    modified T-cells in April of 2019?

9       A.    Right.  So you get the lymphodepleting

10   therapy before you get the CAR T back.  So you get the

11   apheresis first to collect the T-cells, the T-cells

12   get shipped to the manufacturer, usually, where they

13   culture it and they manipulate it to make it more

14   powerful, this is just a layman term, to attack the

15   lymphoma cells.  The patient comes back in the

16   hospital, they get the lymphodepleting therapy, the

17   CAR -- and then they get the CAR T infused.

18      Q.    And those stages in Mr. Giglio's case took

19   place across March and April of 2019?

20      A.    I -- I thought essentially April, maybe

21   they started something in March, but I thought

22   essentially -- maybe they started it --

23      Q.    The apheresis?

24      A.    -- the apheresis in March and the infusion

Chadi Nabhan, M.D.

1    was April 9, 2019.

2        Q.    Mr. Giglio had a significant response to

3    CAR T therapy.  Would you agree with that?

4        A.    He had a very good response, although it's

5    too early to tell because we are four months from his

6    CAR T.  So, really, it's -- it's too soon to tell, but

7    I would say it's encouraging that he had the response

8    that he had so far, but we have to wait.  It's too

9    soon to say anything.

10        Q.    You would agree with me that at this time

11    Mr. Giglio is now in remission?

12        MS. FORGIE:  Objection.

13    BY THE WITNESS:

14        A.    Yeah, I -- I agree with you.  I would -- I

15    usually state when it's too soon, and I would say he

16    has no evidence of disease today.  So I would say that

17    currently today as we speak, to my knowledge his

18    lymphoma is not active and there is no evidence of

19    disease.  You can call this remission if you want.

20    That's fine.  It is just too -- too soon for me to --

21    to say that he is in a prolonged remission.  Four

22    months is nothing in the lymphoma world.

23    BY MS. COPE-KASTEN:

24        Q.    You said that you had worked on CAR T

Chadi Nabhan, M.D.

1    clinical trials when you were still at Chicago?

2         A.    Well, I wasn't the principal investigator,

3    but I -- we had the clinical trials available at the

4    University of Chicago.  So as somebody who saw

5    lymphoma patients, some patients of mine were enrolled

6    on these clinical trials.

7         Q.    Did you work with Dr. Caron Jacobson in

8    connection with CAR T therapy at any point?

9         A.    I did not collaborate with her on that.  I

10   know Caron.  She does a lot of work on CAR T.  She is

11   excellent, but we did not cross specifically on CAR T,

12   although, I mean, in lymphoma pretty much everybody

13   knows each other.

14        Q.    You are aware that Mr. Giglio sold his

15   artificial turf company in 2017?

16        A.    I am aware he sold his company, yes.

17        Q.    Are you intending to offer an opinion in

18   this case that the sale of that business was in any

19   way connected to his non-Hodgkin's lymphoma or

20   treatment for NHL?

21        MS. FORGIE:  Objection.

22   BY THE WITNESS:

23        A.    I have no knowledge of that.  This was not

24   something I asked.  I -- you'll have to ask him.

Chadi Nabhan, M.D.

1    BY MS. COPE-KASTEN:

2        Q.    Are you intending to offer an opinion that

3    Mr. Giglio was unable to perform his job

4    responsibilities for his artificial turf company as a

5    result of his non-Hodgkin's lymphoma or treatment?

6        MS. FORGIE:   Objection.

7    BY THE WITNESS:

8        A.    Well, he did tell me he stopped spraying

9    and working when he got sick.  I'm not sure if that's

10   why he sold the company.  I -- again, you'll have to

11   ask him.  But he did tell me that he was unable to

12   continue working when he got sick.

13   BY MS. COPE-KASTEN:

14       Q.    Did he tell you that there were any other

15   reasons that he was not able to work at that time?

16       A.    No, I -- I don't recall that he mentioned

17   anything like that.

18       Q.    Are you intending to offer any opinions

19   with respect to Mr. Giglio's ability to work moving

20   forward after today's date as a result of his

21   non-Hodgkin's lymphoma and therapy for non-Hodgkin's

22   lymphoma?

23       A.    I can if I'm so asked.

24       Q.    You have not been asked to do so so far?

Chadi Nabhan, M.D.

1      A.      Nobody has asked me.

2      Q.      In the Social History section of your

3   report, which is on Page 11, you indicate that

4   Mr. Giglio drinks rarely, if ever.

5              Do you see that?

6      A.      That's what he told me, yes.

7      Q.      What time period does that apply to?  Is

8   that talking about today?

9      A.      Yes.

10     Q.      Did you ask Mr. Giglio at all about his

11   social history with respect to alcohol consumption in

12   the past?

13     A.      We talked about it.  He said he would

14   drink socially and there are times where he would have

15   a drink a day or something like several drinks a week.

16     Q.      Did you see any indication in his medical

17   records that he was at one point up to ten drinks per

18   week but had cut back?

19     A.      I don't recall seeing that.

20     Q.      Can you list for me what risk factors for

21   non-Hodgkin's lymphoma you considered in Mr. Giglio's

22   case?

23     A.      Well, you have 30 pages of them, so.  I

24   mean, they are listed here.

Chadi Nabhan, M.D.

```
 1      Q.    They are only what's contained in your
 2  report, nothing else?
 3      A.    I -- I tried to be inclusive as possible.
 4  We can either go through them or I can just talk to
 5  them about it -- talk to you about them, whichever you
 6  want.
 7      Q.    I'll save you the time as long as you are
 8  going to represent that they are completely -- that
 9  everything you considered for him is encompassed
10  within this report?
11      MS. FORGIE:  Objection.
12  BY THE WITNESS:
13      A.    Yes.  I mean, we have disagreements
14  obviously over the years.  For example, you believe
15  smoking is a risk factor and I strongly don't believe
16  smoking is a risk factor.  I was struck by one of your
17  experts saying in one of his depositions that he
18  thought somebody who would drink alcohol maybe had a
19  risk factor.  It literally blew my mind away because
20  it is completely inaccurate and I went back and I
21  looked up alcohol and there is actually data that
22  alcohol reduces the risk of large cell lymphoma.
23      MS. FORGIE:  Excellent.
24  BY THE WITNESS:
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Chadi Nabhan, M.D.

1      A.    So it is actually even in my material

2  list.

3            So, there are -- the factors that I

4  believe, not the ones that Monsanto believes, are risk

5  factors for non-Hodgkin lymphoma that are reasonable

6  to put, I put them in my reports.

7            So obesity, for example, I don't believe

8  it's a risk factor.  It think it is very soft, if any,

9  but I put it in there to be exclusive.  But with the

10  caveat that we have some disagreements on risk

11  factors, I'm pretty inclusive here.

12  BY MS. COPE-KASTEN:

13      Q.    If Mr. Giglio never sprayed Roundup at all

14  for personal or commercial use, at the time that he

15  was diagnosed with non-Hodgkin's lymphoma in

16  October 2014, was he at an increased risk for

17  developing non-Hodgkin's lymphoma based on his age?

18      A.    So age increases the risk of all ailments

19  under the sun, period.  Heart disease, lung disease,

20  cancer, everything under the sun.  Just unfortunately

21  as we age, we are going to be more exposed to the

22  possibility of getting sick.  Choose any illness, few

23  caveats, of course, most illnesses obviously occur as

24  people age.  So anybody who is aging is going to be at

Chadi Nabhan, M.D.

1   increased risk of most cancers, including non-Hodgkin

2   lymphoma.  It doesn't mean age causes cancer.  It just

3   things happen as we age.

4       Q.    You would agree with me that Mr. Giglio

5   was close to the median age at which people are

6   diagnosed with non-Hodgkin's lymphoma at the time of

7   his diagnosis?

8       A.    I agree with that.

9       Q.    Tell me what you consider Mr. Giglio's

10  history of smoking to be?

11      A.    He told me he smoked very briefly

12  cigarettes for few months between '09 and '010, yeah.

13  He did smoke pipe, he said, in the late '90s and not

14  for a long time.  He said he smoked it for several

15  years, and I have between parentheses here, once or

16  twice a week.  This is the smoking history that he

17  shared with me.

18      Q.    Did you take that smoking history into

19  account when you were forming your opinions about what

20  caused Mr. Giglio's non-Hodgkin's lymphoma?

21      A.    Yes.

22      Q.    ████████████████████████████████████████

    ██ ████████████████████

24          Do you agree with me?

Chadi Nabhan, M.D.

1      A.     You are probably better in math than I am,

2   so I will agree with you.

3      Q.     In your experience, how common is it for

4   patients to start smoking in their ████████ for the

5   first time in their life?

6      MS. FORGIE:   Objection.

7   BY THE WITNESS:

8      A.     Absolutely no idea.

9   BY MS. COPE-KASTEN:

10     Q.     You are aware that Mr. Giglio's father was

11   a smoker?

Chadi Nabhan, M.D.

1      Q.    Did you take into account Mr. Giglio's

2   exposure to secondhand or passive smoking as a risk

3   factor for his development of non-Hodgkin's lymphoma?

4      A.    I -- I think I said that.  I'll say it

5   again.  I -- I don't believe smoking, primary smoking

6   is a risk factor to developing non-Hodgkin lymphoma.

7   So secondhand smoke is not a risk factor for

8   non-Hodgkin lymphoma.  I do take that into

9   consideration because it's part of the history, but

10  based on my knowledge, the literature and my

11  experience, smoking, whether it's primary smoking or

12  secondhand smoke, is not a risk factor to developing

13  non-Hodgkin lymphoma.

14     Q.    I'm going to mark as Exhibit 4 to your

15  deposition another medical record for Mr. Giglio.

16  This one is from October 30th, 2011.

17                 (WHEREUPON, a certain document was

18                  marked Nabhan Deposition Exhibit

19                  No. 4, for identification, as of

20                  08/30/2019.)

21     MS. FORGIE:  Thank you.  I'm sorry.  What number

22  are we, 4?

23     MS. COPE-KASTEN:  4.

24     MS. FORGIE:  Thank you.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Chadi Nabhan, M.D.

```
 1   BY MS. COPE-KASTEN:

 2        Q.    This is a medical record from Kaiser

 3   Foundation Hospital - San Diego Medical Center?

 4        A.    Correct.

 5        Q.    If you can turn with me to, it looks like

 6   internal Page 708 but at the bottom the Bates stamp

 7   ends in 709.

 8        A.    Okay.

 9        Q.    Do you see under the Emergency Department

10   Provider Notes where it says:  "Social History Main

11   Topics," about a third of the way down the page?

12        A.    Yes, I do.

13        Q.    Do you see where it says:  "Smoking

14   status:  Former smoker"?

15        A.    Yes.

16        Q.    Underneath that it lists "Quit Date:

17   August 15th, 1970."

18              Do you see that?

19        A.    Yes.

20        Q.    Did you ask Mr. Giglio whether he smoked

21   prior to or including 1970?

22        MS. FORGIE:  Objection.

23   BY THE WITNESS:

24        A.    It was an open-ended question.  I just
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Chadi Nabhan, M.D.

1   basically asked him as to do you smoke currently and

2   he does not.  Did you smoke before and he said yes and

3   we talked over when he smoked, how much he smoked and

4   what he smoked.

5   BY MS. COPE-KASTEN:

6        Q.    Did Mr. Giglio tell you that he smoked in

7   1970?

8        MS. FORGIE:  Objection.

9   BY THE WITNESS:

10       A.    He did not tell me he smoked in 1970, no.

11  BY MS. COPE-KASTEN:

12       Q.    Would it change your opinion if Mr. Giglio

13  smoked in 1970 or prior to that time?

14       A.    Smoking is not a risk factor to developing

15  non-Hodgkin lymphoma.  I'd like to get the information

16  as accurate as possible.  It would not change my

17  opinion.

18       Q.    Did you consider Mr. Giglio's use of

19  smokeless tobacco products to be a risk factor for him

20  developing non-Hodgkin's lymphoma?

21       A.    Smokeless tobacco is not a risk factor to

22  developing non-Hodgkin lymphoma.  I'm aware that he

23  smoked pipe and so forth, but none of these are --

24  increase the risk for developing non-Hodgkin lymphoma.

1      Q.    Are you aware that separate from smoking a

2   pipe and smoking cigarettes, Mr. Giglio has used

3   smokeless tobacco products?

4      A.    I don't recall that specific mention.  He

5   probably did.

6      Q.    I'm going to see if I can find it for you

7   just so we can be on the same page.

8   ██████████████████████████████████████████████

██  ██████████████████████████████████████████████████████████

██  ████████████████████████████  The first one we'll mark as

11  Exhibit 5.

12                  (WHEREUPON, a certain document was

13                   marked Nabhan Deposition Exhibit

14                   No. 5, for identification, as of

15                   08/30/2019.)

16      MS. FORGIE:  Thank you.

17   BY MS. COPE-KASTEN:

██      ██       ███████████████████████████████████

██   ████████████████████████████████████████████████████████

██      ██   ███████████████

██      ██   ████████████████████████████████████████

██   ████████████████████████████████████████████████████████████

██   ██████████████████████████████

██          ████████████████████████

Chadi Nabhan, M.D.

13          Do you see that?

14      A.    I do.

15      Q.    Did you take that information into account

16  when reaching your conclusions in this case?

17      A.    As -- as we just talked about, I -- I'm

18  aware that he smoked.  I have that in my report.  I'm

19  aware that he smoked cigarettes as well as pipes.  I

20  don't believe these are risk factor to developing any

21  type of non-Hodgkin lymphoma.  I could not recall that

22  he used smokeless tobacco.  Obviously he did,

23  according to this note, but I do not think that

24  smokeless tobacco increases the risk of non-Hodgkin

Chadi Nabhan, M.D.

```
 1    lymphoma at all.

 2         Q.    The last record on this, and I promise

 3    I'll move off the topic.  This is Exhibit 6.  ██████

██   ████████████████████████████████████████████████

 5                    (WHEREUPON, a certain document was

 6                     marked Nabhan Deposition Exhibit

 7                     No. 6, for identification, as of

 8                     08/30/2019.)

 9         MS. FORGIE:  Thank you.

10    BY MS. COPE-KASTEN:
```

Chadi Nabhan, M.D.

■

■        ■        ■        It's not clear how long he has been

3    smoking because he quit in 1970.  It seems like he had

4    a long hiatus, and then I don't know when he started,

5    but that would indicate some -- sometime he was

6    smoking in 2011.  When I talked to him he said he

7    smoked between '09 and '010.  He did not mention '011.

8        Q.    As a medical oncologist, are you aware of

9    whether there was a Surgeon General's Warning on

10   cigarette packages in 2011?

11       A.    Much earlier than 2011, yes, I believe,

12   I'm fully aware of that.

■        ■        ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■   ▬▬▬▬▬▬

■        ■        ▬▬▬▬▬▬▬▬    ▬▬▬▬▬▬▬▬

■   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■   ▬▬▬▬▬▬▬▬▬▬    ▬▬▬▬▬▬▬▬

■   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■        ■        ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬



Chadi Nabhan, M.D.





Chadi Nabhan, M.D.

1 ████████████████████████████████████████████

█ ████████████████████████████████████████

3      Q.    Do you know whether any of the records

4  with respect -- strike that.  I'm going to start over.

5           You cite a number of studies in your

6  report that discuss obesity and connections with

7  various types of cancer, right?

8      A.    Right.  So obesity in my view as written

9  in the report is not a causative risk factor for NHL

10 or DLBCL and there is a lot of literature that I -- I

11 didn't want to go like 20 pages just on obesity, but

12 if there is any type of risk, it is very soft risk and

13 that's why I put it in there.

14     Q.    Do you know whether those studies that you

15 cite in your report specifically assessed body

16 composition or whether they just used BMI as a proxy

17 for obesity?

18     A.    They used BMI which is one of the problems

19 in these studies because you can bring somebody who is

20 very muscular and has a high weight, it is muscle

21 weight, and tall and the BMI would be high or, right,

22 and that will give high BMI and then you really can't

23 tell.

24 ████████████████████████████████

Chadi Nabhan, M.D.

1   and one of your Monsanto experts agree on, that

2   obesity is not a causative risk factor, so we have

3   some agreement there.

4



Chadi Nabhan, M.D.









10      Q.    You would agree with me that this was

11   approximately five months before Mr. Giglio was

12   diagnosed with non-Hodgkin's lymphoma?

Chadi Nabhan, M.D.



20        Q.    And of course we wouldn't be fasting in

21   that case, right?

22        A.    Right.

23        Q.    When Mr. Giglio was applying artificial

24   turf, you said that he sometimes applied sand to the

Chadi Nabhan, M.D.

1    turf?

2         A.    He mentioned that to me.

3         Q.    Is it your understanding that the sand

4    there is basically infill to help the blades of

5    artificial turf stand up straight?

6         A.    I'm not technically savvy to understand,

7    frankly, how the process works.  He just said he would

8    just put a little bit of sand on the artificial turf.

9    I did not get into the detail into how he does it and

10   so forth.  I wanted to know all of the types of

11   exposures he has had, so, but it -- it sounded, he

12   said, it -- it is not very often, not very common, it

13   wasn't much.

14        Q.    Did you ask Mr. Giglio what protective

15   equipment he wore when he handled and applied the

16   sand?

17        A.    I asked him what protective equipment he

18   handled when he did all of the occupational, and I

19   think that's written in my note.

20        Q.    Did you ask him specifically with respect

21   to the sand?

22        MS. FORGIE:  Objection; asked and answered.

23             You can answer it again.

24   BY THE WITNESS:

Chadi Nabhan, M.D.

1     A.    I did not get an impression that his --

2  what he is using is going -- is differing based on the

3  compound that he is actually using.  It wasn't that he

4  would put on something different because it's all just

5  part of the process.

6          The other thing that's actually noteworthy

7  to -- to mention is that Mr. Giglio did not really

8  think of, you know, Roundup, for example, as a

9  hazardous material or a problem, so he did not really

10  feel as a consumer that he needed to wear anything.

11  So he -- you know, he didn't really feel he is

12  obligated to do that.

13  BY MS. COPE-KASTEN:

14     Q.    I want to be precise here.  Based on the

15  protective equipment that you describe in your report

16  for what he wore when he was spraying the Roundup for

17  commercial use, is it your understanding then that

18  when Mr. Giglio was handling and applying the sand he

19  was also generally wearing a T-shirt and shorts or

20  long pants?

21     MS. FORGIE:  Objection; asked and answered.

22          You can answer it.

23  BY THE WITNESS:

24     A.    My understanding is that the attire that

Chadi Nabhan, M.D.

1   he was wearing was the same regardless of what -- what

2   he was using.  That's my understanding.

3   BY MS. COPE-KASTEN:

4        Q.    Do you understand that the type of sand

5   that Mr. Giglio was applying was silica sand?

6        A.    I think that's most kind of sands.  I --

7   I -- I think that's most of them.  I don't know if

8   there are other types, but that's the only type I know

9   at least of.

10       Q.    Did you do any investigation into whether

11  silica sand exposure could increase Mr. Giglio's risk

12  of developing non-Hodgkin's lymphoma?

13       A.    I'm not aware that silica is a risk factor

14  to developing non-Hodgkin lymphoma.

15       Q.    Are you aware that IARC has evaluated the

16  carcinogenicity of silica products including silica

17  sand?

18       A.    I'm pretty sure there is a -- there is --

19  I believe that silica could increase the risk of

20  certain material -- for certain diseases but not

21  non-Hodgkin lymphoma to my knowledge.

22       Q.    Do you know what classification IARC gave

23  to the type of crystalline silica that silica sand is

24  made of?

1        A.    No, I don't know that, but I'm -- I -- I

2    will look at -- I'm not aware that it is linked to

3    non-Hodgkin lymphoma which is the disease we are

4    discussing.

5        Q.    Would knowing that information be helpful

6    to you in forming your conclusions in this case?

7        MS. FORGIE:   Objection.

8    BY THE WITNESS:

9        A.    I -- I do not believe silica increase --

10   increases the risk of non-Hodgkin lymphoma.  It is

11   analogous of we both know smoking is Category 1 for

12   lung cancer.  I'm not disputing smoking doesn't cause

13   lung cancer or bladder cancer.  It's IARC Class 1

14   plus, but has no risk for non-Hodgkin lymphoma.

15           The disease we are discussing is

16   non-Hodgkin lymphoma.  So if I don't believe silica

17   increases the risk of diffuse large B-cell lymphoma,

18   it is not relevant to this particular patient.

19   BY MS. COPE-KASTEN:

20       Q.    Did Mr. Giglio tell you what type of turf

21   he was applying with respect to the artificial turf?

22       A.    He said synthetic turf.  That's what we

23   talked about.

24       Q.    Did you specify what the synthetic

Chadi Nabhan, M.D.

```
 1   material was for that turf when you were talking with

 2   him?

 3       A.    I asked him about what type of materials

 4   he has used, and he -- we talked about Weed Guard,

 5   Jiffy Seal, he talked about Zeofill as well for the

 6   orders, the Roundup, and so -- and, again, and that's

 7   all what I was informed about and these are the things

 8   I looked at.

 9       Q.    Are you aware of a potential cancer risk

10   in connection with some types of artificial turf?

11       A.    I'm not aware of that, no.

12             Non-Hodgkin lymphoma you are talking

13   about?

14       Q.    I'm just asking about cancer generally

15   right now.

16       A.    We are talking about non-Hodgkin lymphoma,

17   so I'm not aware of a link of non-Hodgkin lymphoma.

18   I -- I realize that you are talking cancer.  I'm

19   talking non-Hodgkin lymphoma.  So the answer to your

20   question is I'm not aware of a link between synthetic

21   turf and NHL or DLBCL.

22       Q.    Can autoimmune disorders increase a

23   person's risk of developing non-Hodgkin's lymphoma?

24       A.    Yes.
```

Chadi Nabhan, M.D.





Chadi Nabhan, M.D.

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

███    ███

6      MS. FORGIE:  Ob -- objection.  I think at least

7  with regard to the medicine you should show him that

8  record.  You don't have to do all of them.

9      MS. COPE-KASTEN:  Okay.  Can we go off the

10  record for one moment.

11      THE VIDEOGRAPHER:  The time is 10:55 a.m.  This

12  is the end of Tape 1 and we are going off the video

13  record.

14                    (WHEREUPON, a recess was had

15                     from 10:55 to 11:00 a.m.)

16      THE VIDEOGRAPHER:  The time is 11:00 a.m.  This

17  is the beginning of Tape 2 and we are back on the

18  video record.

19                    (WHEREUPON, a certain document was

20                     marked Nabhan Deposition Exhibit

21                     No. 11, for identification, as of

22                     08/30/2019.)

23  BY MS. COPE-KASTEN:

24      ███    █████████████████████████████

Chadi Nabhan, M.D.









REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Chadi Nabhan, M.D.



REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Chadi Nabhan, M.D.



Chadi Nabhan, M.D.



Chadi Nabhan, M.D.



Chadi Nabhan, M.D.



Chadi Nabhan, M.D.

■    ■    ■    ████████████████

■    ████████████████████████████

■    ███████

■         ████████████    ████████████

■    ██████

■         ████████    ███████

7        THE VIDEOGRAPHER:  The time is 11:11 a.m. and we

8    are going off the video record.

9                  (WHEREUPON, a recess was had

10                  from 11:11 to 11:11 a.m.

11       THE VIDEOGRAPHER:  The time is 11:11 a.m. and we

12    are back on the video record.

13       MS. COPE-KASTEN:  Dr. Nabhan, I have no further

14    questions for you today.  Thank you.

15       THE WITNESS:  Thank you.

16       MS. FORGIE:  I don't think I do.  Let me talk to

17    him for just a minute off the record, please.

18       THE VIDEOGRAPHER:  Okay.  The time is 11:11 a.m.

19    This is the end of Tape 2.  It is also the end of the

20    deposition of Chadi Nabhan, M.D., and we are going off

21    the video record.

22       MS. COPE-KASTEN:  Oh, she -- hold on one second.

23    It probably is, but she is going to make sure that she

24    doesn't have any questions for him.

Chadi Nabhan, M.D.

```
 1        THE VIDEOGRAPHER:  Okay.  So -- so we are not

 2   off the record.  We are still on the record.  And I

 3   will go off the record now and resume when the

 4   attorney returns.

 5                    (WHEREUPON, a recess was had

 6                     from 11:12 to 11:13 a.m.)

 7        THE VIDEOGRAPHER:  The time is 11:13 a.m.  This

 8   is the true end of the deposition of Dr. Chadi Nabhan

 9   M.D.  And we are going off the video record.  It is

10   also the end of Tape 2 and it is 11:13 a.m.

11                    (Time Noted:  11:13 p.m.)

12             FURTHER DEPONENT SAITH NAUGHT.

13

14

15

16

17

18

19

20

21

22

23

24
```

Chadi Nabhan, M.D.

1                    REPORTER'S CERTIFICATE

2

3              I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

4    a Certified Shorthand Reporter, do hereby certify:

5              That previous to the commencement of the

6    examination of the witness herein, the witness was

7    duly sworn to testify the whole truth concerning the

8    matters herein;

9              That the foregoing deposition transcript

10   was reported stenographically by me, was thereafter

11   reduced to typewriting under my personal direction and

12   constitutes a true record of the testimony given and

13   the proceedings had;

14             That the said deposition was taken before

15   me at the time and place specified;

16             That I am not a relative or employee or

17   attorney or counsel, nor a relative or employee of

18   such attorney or counsel for any of the parties

19   hereto, nor interested directly or indirectly in the

20   outcome of this action.

21             IN WITNESS WHEREOF, I do hereunto set my

22   hand on this 5th day of September, 2019.

23

24             JULIANA F. ZAJICEK, Certified Reporter

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Chadi Nabhan, M.D.

```
 1                DEPOSITION ERRATA SHEET

 2

 3   Assignment No.  224893

 4   Case Caption:  Giglio vs. Monsanto

 5

 6           DECLARATION UNDER PENALTY OF PERJURY

 7

 8           I declare under penalty of perjury that I

 9   have read the entire transcript of my Deposition taken

10   in the captioned matter or the same has been read to

11   me, and the same is true and accurate, save and except

12   for changes and/or corrections, if any, as indicated

13   by me on the DEPOSITION ERRATA SHEET hereof, with the

14   understanding that I offer these changes as if still

15   under oath.

16

17                            CHADI NABHAN, MD

18

19

20   SUBSCRIBED AND SWORN TO

21   before me this       day

22   of                , A.D. 20___.

23

24           Notary Public
```

Chadi Nabhan, M.D.

```
 1                   DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                      CHADI NABHAN, MD
```

Chadi Nabhan, M.D.

```
 1              DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24                   CHADI NABHAN, MD
```