# Exhibit 6

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   IN RE:  ROUNDUP PRODUCTS      MDL No. 2741

 6   LIABILITY LITIGATION          Case No.

 7   _____ MDL No. 3:16-md-2741-VC

 8   Matteo Anthony Russo,

 9   Plaintiff,      Case No.

10   Vs.                           3:16-cv-06024-VC

11   MONSANTO COMPANY,

12             Defendant.

13   _____/

14

15

16

17              Videotaped Deposition of

18              Dennis Weisenburger, M.D.

19              Monday, November 4, 2019

20

21

22

23   Reported by:

24   JOSHUA MANEA, CSR No. 13754

25
```

```
 1                      APPEARANCES

 2

 3   For the Plaintiff:

 4        ANDRUS WAGSTAFF

 5        By: Kathryn M. Forgie, Esquire

 6        1901 Harrison Street, Suite 1100

 7        Oakland, CA 94612

 8        310.339.8214

 9        Kathryn.forgie@andruswagstaff.com

10

11   For the Defendant:

12        SHOOK, HARDY & BACON, LLP

13        By: Michelle M. Fujimoto, Esquire

14        5 Park Plaza, Suite 1600

15        Irvine, CA 92614

16        949.475.1500

17        Mfujimoto@shb.com

18

19   Also present:

20        Jim Lopez, Videographer

21        Golkow Global Litigation Services

22

23

24

25                      --oOo--
```

Dennis Weisenburger, M.D.

```
1                          INDEX

2

3    Examination by                              page

4    Ms. Fujimoto                                  7

5

6

7                       Exhibits

8          Deposition of Dennis Weisenburger, MD

9                    November 4, 2019

10

11   NUMBER              DESCRIPTION              PAGE

12   Exhibit 1      Monsanto Company's Notice to Take   8

13                  Oral and Videotaped Deposition

14                  Of Dr. Dennis Weisenburger,

15                  5 pgs

16   Exhibit 2      Dr. Weisenburger's handwritten      9

17                  Notes entitled Bill for

18                  Services, 1 pg

19   Exhibit 3      Dr. Weisenburger's file for        12

20                  This case, 57 pgs

21   Exhibit 4      Plaintiff's R. 26 Case-Specific    14

22                  Expert Disclosures, 42 pgs

23

24

25          (Exhibits continued on next page.)
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis Weisenburger, M.D.

1          (Exhibits continued from last page.)

2

3    NUMBER                DESCRIPTION                PAGE

4    Exhibit 5     Expert Report of Dennis            16

5                  Weisenburger, MD, 5 pgs

6    Exhibit 6     Plaintiff Fact Sheet, 15 pgs       31

7    Exhibit 7     First-Amended Plaintiff Fact       31

8                  Sheet, 15 pgs

9    Exhibit 8     Karnofsky Performance Status       38

10                 Scale Definitions Rating

11                 Criteria, 1 pg

12   Exhibit 9     Roundup label, 10 pgs              38

13   Exhibit 10    Pahwa article on Glyphosate        60

14                 Use, 20 pgs

15   Exhibit 11    South Coast Air Basin Smog         72

16                 Trend, 2 pgs

17   Exhibit 12    Daily Breeze article on            74

18                 LA Harbor smog, 10 pgs

19   Exhibit 13    Prop. 65 warning picture, 1 pg     81

20   Exhibit 14    Collection of medical records      86

21                 For Mr. Russo, 140 pgs

22

23

24

25          (Exhibits continued on next page.)

Dennis Weisenburger, M.D.

```
1          (Exhibits continued from last page.)

2

3   NUMBER              DESCRIPTION              PAGE

4   Exhibit 15    List of carcinogens in          96

5                 Cigarette smoke from the

6                 National Cancer Institute, 3 pgs

7   Exhibit 16    Paper called "Stem Cell         105

8                 Divisions, Somatic Mutations,

9                 Cancer Etiology, and Cancer

10                Prevention," by Cristian

11                Tomasetti and Lu Li and Bert

12                Vogelstein, 119 pgs

13

14

15

16

17

18

19

20

21

22

23

24

25                      --oOo--
```

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   IN RE:  ROUNDUP PRODUCTS      MDL No. 2741

 6   LIABILITY LITIGATION         Case No.

 7   _____ MDL No. 3:16-md-2741-VC

 8   Matteo Anthony Russo,

 9            Plaintiff,          Case No.

10   Vs.                          3:16-cv-06024-VC

11   MONSANTO COMPANY,

12            Defendant.

13   _____/

14

15            BE IT REMEMBERED that on Monday, November

16   4, 2019, commencing at the hour of 9:21 a.m. in the

17   Courtyard by Marriott, 700 Huntington Drive,

18   Monrovia, California, before me, JOSHUA MANEA, a

19   Certified Shorthand Reporter in and for the State of

20   California, personally appeared

21                 DENNIS WEISENBURGER, MD

22            Called as a witness herein, and after

23   having been first duly affirmed to tell the truth,

24   the whole truth, and nothing but the truth, was

25   examined and testified as follows.
```

```
 1                        --oOo--

 2              THE VIDEOGRAPHER:  We are now on the

 3   record.  My name is Jim Lopez.  I'm a videographer

 4   for Golkow Litigation Services.  Today's date is

 5   November 4th, 2019, and the time is approximately

 6   9:21 a.m.

 7              This video deposition is being held in

 8   Monrovia, California, in the matter of In Re:

 9   Roundup Products Liability Litigation, MDL number

10   2741, Case No. 3:16-md-02741-VC for the United

11   States District Court, Northern District of

12   California.  Case-specific:  Russo versus Monsanto

13   Company, case No. 3:16-cv-06024-VC.

14              The deponent is Dr. Dennis Weisenburger.

15   Counsel will be noted on the stenographic record.

16              Will counsel please identify themselves.

17              MS. FORGIE:  Kathryn Forgie for the

18   plaintiff.

19              MS. FUJIMOTO:  Michelle Fujimoto of Shook,

20   Hardy & Bacon on behalf of defendants.

21              THE VIDEOGRAPHER:  The court reporter will

22   now swear in the witness.

23              (Witness sworn.)

24                EXAMINATION BY MS. FUJIMOTO:

25        Q.   Thank you.  Good morning, Dr.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1    Weisenburger.  We have met before, if you recall, in

2    a deposition, a different deposition in this

3    litigation, correct?

4         A.   Yes.

5         Q.   And you've had your deposition taken as an

6    expert on behalf of plaintiffs quite a number of

7    times in the Roundup litigation, right?

8         A.   Yes.

9         Q.   Do you recall how many times?

10        A.   No.

11        Q.   Okay.  But you know the process and you

12   understand you are under oath, right?

13        A.   Yes.

14             (Exhibit 1 marked for identification.)

15   BY MS. FUJIMOTO:

16        Q.   Okay.  I'll mark as Exhibit No. 1 to the

17   deposition the notice of deposition that we've

18   served with regard to today's proceedings and that

19   would be your deposition in the Russo matter.  Do

20   you understand that?

21        A.   Yes.

22        Q.   Did you see this document before the

23   deposition today?

24        A.   Yes.

25        Q.   And did you read through it to see -- to

Dennis Weisenburger, M.D.

1    look at the requests for production of materials?

2        A.   Yes.

3        Q.   And did you ascertain to collect and

4    provide to plaintiff's counsel any responsive

5    documents?

6        A.   I brought my billings for this case.

7        Q.   Okay.  Good.  Could you get those out for

8    me?

9        A.   Sure.

10       Q.   Thank you.  All right.  And we will mark

11   as Exhibit No. 2 to the deposition.

12            (Exhibit 2 marked for identification.)

13            THE WITNESS:  Yes, I'd like to have that.

14   Maybe you could make a copy of it?

15   BY MS. FUJIMOTO:

16       Q.   Sure, will do.  We're going to mark as

17   Exhibit No. 2 to the deposition a handwritten piece

18   of paper that at the top says, "Bill for services -

19   D. Weisenburger, MD, re: Russo case."

20            Dr. Weisenburger, if you look at Exhibit

21   No. 2, is that your handwritten notes for an invoice

22   for your work in the Russo matter?

23       A.   Yes.

24       Q.   Okay.  And as I see, you have a date and

25   an amount of time from each entry; is that correct?

Dennis Weisenburger, M.D.

1     A.    Yes.

2     Q.    But no description, correct?

3     A.    No.

4     Q.    Okay.  So we can't tell, by looking at

5  this, what you did during these particular blocks of

6  time?

7     A.    That's correct.

8     Q.    And it appears that on a separate Post-it

9  note is the word "total" and "54 hours."  Is that

10  your handwriting?

11     A.    Yes.

12     Q.    And so is it fair for me to assume that at

13  least up to this point in time, up to November 2nd,

14  you have spent 54 hours on the Russo case?

15     A.    Yes.

16     Q.    Okay.  Do you have an estimate of how much

17  time you've spent on the various Roundup cases

18  you've been involved in, to date?

19     A.    No.

20     Q.    Do you have an estimate of how much money

21  you have billed in the litigation?

22     A.    Probably between $400,000 and $500,000.

23     Q.    Okay.  And that's over what period of

24  time?

25     A.    Probably about three years.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis Weisenburger, M.D.

1      Q.   And what is your hourly billing rate?

2      A.   $650.

3      Q.   Right.  So if we take 54 hours, times it

4   by $650 an hour, that will tell us how much you have

5   invoiced to this point in the Russo matter

6   specifically, correct?

7      A.   Yes.  Yes.

8      Q.   Okay.  Did you have any other documents or

9   materials that were responsive to the request?

10     A.   No.

11     Q.   Okay.  You have a folder in front of you,

12   I see.

13     A.   Yes.

14     Q.   And what is in the folder?

15     A.   My report, Russo report, and my two

16   general causation reports and the pathology reports

17   from Mr. Russo.

18     Q.   Okay.  May I take a look, please.  The

19   folder as a whole, please.  Thank you.  Okay.

20   Because we will attach copies.  I'll just take a

21   look.

22          And on the inside flap of your folder, is

23   this your writing?

24     A.   Right.

25     Q.   Okay.  And it looks like, on your copy of

Dennis Weisenburger, M.D.

1   the specific causation report for Mr. Russo, there

2   is some handwritten notes.  Is -- are -- is that

3   your handwriting?

4       A.   Yes.

5       Q.   Okay.  When did you make those notes?

6       A.   This weekend -- past weekend.

7       Q.   Okay.  And, I take it, to the extent we

8   see any handwriting or handwritten interlineations

9   on any of the documents in what I'll mark as Exhibit

10  3, would be your handwriting?

11           (Exhibit 3 marked for identification.)

12           THE WITNESS:  Yes.

13  BY MS. FUJIMOTO:

14      Q.   Okay.  And so for the record, I'm going to

15  attach as Exhibit No. 3 to the deposition Dr.

16  Weisenburger's file as it relates to the Russo case.

17      A.   So you'll need to make copies of all that.

18      Q.   Correct.  Will do.

19           All right.  And did you have any other --

20  and for the deposition, I'll give you back the file.

21  And just remember to get it back from you at the

22  end.  So you feel free to refer to it during the

23  deposition, if you need to.

24           Dr. Weisenburger, did you have any other

25  documents that were responsive to the notice of

Dennis Weisenburger, M.D.

1    deposition marked as Exhibit 1?

2         A.    No.

3         Q.    Did you update your materials-considered

4    list from the time it was served with your report

5    for -- as opposed to today or from then to today?

6         A.    No, just the Russo-specific documents like

7    medical records and things like that.

8         Q.    Okay.  What materials did you refer to and

9    rely upon for purposes of your report in Russo?

10        A.    The things that I've referenced.

11        Q.    Okay.  Only referenced in your report or

12   in the materials-considered list, as a whole?

13        A.    Well, there are things in the

14   materials-considered list, too, of course.

15        Q.    Okay.  So let me get clear from the

16   record:  From the time that your initial

17   materials-considered list was attached and served

18   with your report in Russo, have you reviewed any

19   additional materials from that point in time?

20        A.    No.

21        Q.    Okay.  Did you review any other of the

22   plaintiff's expert reports in this case?

23        A.    No.

24        Q.    Did you review any of the deposition

25   transcripts for the plaintiff's experts in this

Dennis Weisenburger, M.D.

```
 1   case?

 2        A.   Yes.  I reviewed Dr. Nabhan's deposition.

 3        Q.   Okay.  And when did you review Dr.

 4   Nabhan's deposition?

 5        A.   On Saturday.

 6        Q.   Okay.  Because it was just taken, right?

 7        A.   Right.

 8        Q.   Okay.  Have you reviewed Dr. Sawyer's

 9   deposition that was taken in Russo?

10        A.   No.

11        Q.   Okay.  Why did you review Dr. Nabhan's

12   deposition transcript?

13        A.   Well, because he's probably a similar role

14   to mine, and so I wanted to see what kind of

15   questions he was asked.

16        Q.   But you didn't see his report; you just

17   saw his deposition transcript?

18        A.   That's correct.

19             (Exhibit 4 marked for identification.)

20   BY MS. FUJIMOTO:

21        Q.   Okay.  All right.  So I'm going to mark as

22   Exhibit No. 4 to the deposition plaintiff's Rule 26

23   case-specific expert disclosures.

24             All right.  And if you will take a look at

25   Exhibit 4.  Let's see, page -- wait, they are not
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis Weisenburger, M.D.

```
 1    paginated, so it would be page 6 and on to page 7.

 2    And it is a description of your designation and your

 3    anticipated testimony.  Do you see that?

 4         A.   Yes.

 5         Q.   And it looks like all the other

 6    descriptions in the prior cases, right?

 7         A.   Yes.

 8         Q.   And, I assume, you agree with everything

 9    that summarizes in here the areas of your testimony?

10         A.   I do.

11         Q.   Okay.  And if you would keep going, you'll

12    see attached is a Dr. Weisenburger materials list,

13    case-specific?

14         A.   Yes.

15         Q.   And does that capture everything that you

16    have reviewed that was case-specific to Mr. Russo's

17    case up to this point?

18         A.   I believe so.

19         Q.   And then if you go to the next page and

20    the many following it, there is a

21    materials-considered list.  Do you see that?

22         A.   Yes.

23         Q.   And it goes up to --

24         A.   Yes.

25         Q.   -- 419 entries on the back page?
```

Dennis Weisenburger, M.D.

1       A.   Yes.

2       Q.   And for the record, the exhibits are

3   two-sided.  The -- so does this materials-considered

4   list capture all the materials or literature, I

5   should say, that you've reviewed up to this point in

6   the Russo case?

7       A.   That I relied on?  Yes.

8       Q.   Okay.  That you've relied on both for your

9   general causation opinions and then also your

10  case-specific opinions for Mr. Russo?

11      A.   Yes.

12      Q.   Okay.  All right.  I'll mark as Exhibit

13  No. 5 to the deposition a copy of your expert

14  report.

15           (Exhibit 5 marked for identification.)

16  BY MS. FUJIMOTO:

17      Q.   For -- specifically related to Mr. Russo.

18  Is that an accurate description of what I've marked

19  as Exhibit 4?

20      A.   Yes.

21      Q.   And does the contents of Exhibit 4 capture

22  all of the opinions that you intend to offer in this

23  case?

24      A.   Yes.  I have some corrections, but --

25      Q.   Okay.

Dennis Weisenburger, M.D.

```
 1        A.    -- the opinions are the same.

 2        Q.    All right.  What corrections do you have?

 3        A.    Well, in the second paragraph, first and

 4   second sentence, says -- it says, "Years 1993 to

 5   2013."  He actually started using Roundup in 1997,

 6   so.

 7        Q.    Okay.

 8        A.    Those are both corrections.

 9        Q.    So you are telling me, that second

10   paragraph of your report, the first sentence should

11   say, "Mr. Russo lived on multiple rented and owned

12   properties from 1997 to 2013, and used Roundup

13   herbicide for control of weeds on these properties"?

14        A.    Yes.

15        Q.    And then the next sentence should say,

16   "From 1997 to 2000, he lived at multiple

17   properties," et cetera, et cetera?

18        A.    Yes.

19        Q.    Okay.  Any other changes?

20        A.    Yes.  On the bottom of the second page,

21   the last paragraph, obviously, the change of the

22   dates changes the number of years that he used

23   Roundup.  So in the first sentence, I say Mr.

24   Roundup used -- "Mr. Russo used Roundup for 20

25   years."  It should be 16 years.
```

Dennis Weisenburger, M.D.

1             And then in the next sentence, where it

2    says, "He used Roundup approximately 740 times," it

3    should be "700 times."

4        Q.   Okay.

5        A.   And then on the last page in the middle of

6    the first paragraph, where it talks about latency,

7    the latency period, it reads, "The latency period in

8    this case (20 years) is consistent with a chemical

9    etiology," it should read 16 years instead of "20

10   years."

11       Q.   And do those changes in numbers at all

12   change any of the conclusions that you've reached?

13       A.   No.

14       Q.   So it doesn't matter to you that he was

15   allegedly exposed to Roundup from 1997 to 2013

16   versus 1993 to 2013?

17       A.   No, it doesn't change my opinion.

18       Q.   Okay.  And it doesn't matter to you that

19   he allegedly used or was exposed to Roundup for 16

20   years versus 20?

21       A.   No.

22       Q.   And it doesn't matter that he, apparently

23   or allegedly, used Roundup 700 times versus 740?

24       A.   It doesn't matter.

25       Q.   And for the latency period, it doesn't

Dennis Weisenburger, M.D.

1    matter to you that there is an apparent or alleged

2    latency period -- and we will talk about what you

3    mean by that -- of 16 years versus 20 years?

4         A.    It doesn't -- doesn't matter.

5         Q.    Okay.  Now, since our last deposition,

6    have you gone back and reviewed any of your prior

7    depositions?

8         A.    No.

9         Q.    Okay.  And as you sit here today, thinking

10   back about your testimony on any of those -- in any

11   of those Roundup depositions, is there anything that

12   you think you got incorrect or would like to change?

13        A.    Not to my knowledge.

14        Q.    Okay.  And we know that you've served a

15   general causation report and a supplemental general

16   causation report in the litigation, correct?

17        A.    Yes.

18        Q.    When was the last time you reviewed those

19   reports?

20        A.    This weekend.

21        Q.    Okay.  Anything in those reports that you

22   want to change?

23        A.    No.

24        Q.    And so you stand by everything that you've

25   testified to in any and all of the prior Roundup

Dennis Weisenburger, M.D.

```
 1   depositions; is that correct?
 2        A.   Yes.
 3        Q.   And you stand by each and everything that
 4   is in the reports that have been served by you in
 5   all of the Roundup cases?
 6        A.   I do, with the corrections that I've made.
 7        Q.   Fair enough.  All right.
 8             Let's stick, for a moment, with Exhibit 4
 9   which is your case-specific report pertaining to Mr.
10   Russo.  And I'll ask you some questions about that,
11   if we could.  So it says here in Exhibit 4, that you
12   reviewed both medical records -- or strike that.
13             You reviewed the medical records
14   concerning Mr. Matteo Russo; is that right?
15        A.   Yes.
16        Q.   And what date ranges of medical records
17   did you review?
18        A.   I don't remember.
19        Q.   Do you have any idea how far back they
20   went?
21        A.   No.  I didn't go back and review them
22   again last -- this weekend, so.
23        Q.   Okay.  Do you know whether they started at
24   the time that he was diagnosed with central nervous
25   system lymphoma?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis Weisenburger, M.D.

```
 1        A.   No.  I believe they went prior to that.

 2        Q.   Okay.  Any recollection or memory as to

 3   how far back?

 4        A.   No.

 5        Q.   Okay.  And are the medical records that

 6   you have in your file that we marked as Exhibit, I

 7   believe, 3, are those -- did those capture the

 8   medical records you reviewed?

 9        A.   I have only the pathology reports in the

10   file.

11        Q.   Okay.  And so you reviewed more than just

12   the pathology reports?

13        A.   Yes.

14        Q.   But you don't have any memory as to how

15   far back they went?

16        A.   No.

17        Q.   Okay.  Did you ask that they go back a

18   particular period of time?

19        A.   Well, I usually ask for all the medical

20   records.

21        Q.   Okay.  Because it would be important to

22   understand a person's medical history when you are

23   talking about what might have caused or been related

24   to a disease that he contracts at some point in

25   time, right?
```

Dennis Weisenburger, M.D.

```
 1              MS. FORGIE:  Objection.

 2              THE WITNESS:  Yes.

 3   BY MS. FUJIMOTO:

 4       Q.   Okay.  It says you also conducted a

 5   telephone interview with Mr. Russo; is that right?

 6       A.   Yes.

 7       Q.   And that was on August 29th, 2019?

 8       A.   Yes.

 9       Q.   Okay.  And who initiated that call?

10       A.   I think I called.

11       Q.   Okay.

12       A.   We had a prearranged call.

13       Q.   Okay.  How long did the call last?

14       A.   I don't know exactly.  Between an hour and

15   an hour and a half.

16       Q.   And was that the only communication you've

17   had with Mr. Russo related to this case?

18       A.   Yes.

19       Q.   You've never met him in person?

20       A.   No.

21       Q.   Never had any other telephone calls with

22   him?

23       A.   No.

24       Q.   Never examined him or did any other

25   medical intervention?
```

Dennis Weisenburger, M.D.

```
 1          A.    No.

 2          Q.    Was anyone else on the call?

 3          A.    No.

 4          Q.    And did you keep a record or a transcript

 5     of the call?

 6          A.    I took some notes of the call.

 7          Q.    Okay.  And did you bring those notes with

 8     you today?

 9          A.    No.

10          Q.    Okay.

11               MS. FUJIMOTO:  Are you claiming privilege

12     on those notes?

13               MS. FORGIE:  Yes, I am.  And also, he's --

14     well, I assume, you're going to ask that everything

15     that's in the notes is in his report, right?

16     BY MS. FUJIMOTO:

17          Q.    And so you are saying that when you had

18     this telephonic interview with Mr. Russo, you did

19     take notes of what was asked and what was said,

20     right?

21          A.    Yes.

22          Q.    Okay.  Prior to the call, did you have a

23     laid-out outline or Q-and-A set out?

24          A.    Yes.

25          Q.    Okay.  And is -- are these notes, like,
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1    typewritten and you just fill in underneath the

2    question or how did it work?

3          A.    I made kind of a grid.  And -- and then

4    asked the questions for each property.

5          Q.    Okay.  And then filled in the information?

6          A.    Yes.

7          Q.    Okay.  And, again, the -- did Mr. Russo --

8    strike that.

9                Are there any other -- is there any other

10   written documentation of what was said during this

11   telephonic interview other than this grid of your

12   notes related to the call?

13         A.    No.

14         Q.    Okay.  Is there anything in those notes

15   that you did not put in your report?

16         A.    Probably, yes.

17         Q.    Okay.  And how did you choose what to put

18   in and what not to put in?

19         A.    Well, I put in the report what I thought

20   was relevant to the etiology of his lymphoma.  So I

21   asked questions about smoking and drinking and

22   family history, et cetera, but I didn't put them in

23   the report because I didn't think they were

24   important to my -- my opinion.

25         Q.    Why would you ask about them if they

Dennis Weisenburger, M.D.

1  weren't important?

2      A.   Because you are going to ask me about

3  them.

4      Q.   Okay.  So you asked him for information

5  that you thought we might think is relevant, but you

6  don't.  Fair?

7           MS. FORGIE:  Objection.

8           THE WITNESS:  Well, in some -- family

9  history could be relevant.  So I -- I asked about

10  that to -- to make sure.  But then there were other

11  things that are sort of standard questions that I --

12  I asked just to make sure that I had the best

13  opinion about other things, like smoking, drinking,

14  use of other chemicals, et cetera.

15  BY MS. FUJIMOTO:

16      Q.   So there are standard questions that you

17  ask even though you don't think they are relevant?

18      A.   Yeah.

19      Q.   So for the -- for the corrections that you

20  made to Exhibit 4 on the years of alleged exposure,

21  did you get that wrong or did Mr. Russo?

22           MS. FORGIE:  Objection.

23           THE WITNESS:  I got that wrong.

24  BY MS. FUJIMOTO:

25      Q.   Okay.  So is it your testimony that he

Dennis Weisenburger, M.D.

1   actually told you '97, but you wrote '93?

2       A.   Yes.  Well, he actually lived on those

3   properties from 1993 on, but he didn't start using

4   the Roundup until 1997.  So that was my mistake.

5       Q.   Okay.  Are all the mistakes that were made

6   yours?  They are mistakes of what he told you versus

7   what you put in the report?

8       A.   Yes.

9            MS. FORGIE:  Objection.

10           THE WITNESS:  They are my mistakes.

11  BY MS. FUJIMOTO:

12      Q.   But without your handwritten notes, we

13  don't know if there are any other mistakes other

14  than what you've told us?

15           MS. FORGIE:  Objection.

16           THE WITNESS:  I don't think there are any

17  other mistakes.

18  BY MS. FUJIMOTO:

19      Q.   Did you read any pathology slides for Mr.

20  -- pertaining to Mr. Russo?

21      A.   Yes, I looked at the bone marrow slides

22  which were negative.  We attempted to get the slides

23  of the brain biopsy multiple times.  They weren't

24  sent.  So in the end, they sent me a video disk with

25  pictures of the brain pathology.  So I reviewed

Dennis Weisenburger, M.D.

1    that.

2        Q.   And when you reviewed the bone marrow

3    pathology and the pictures of the brain biopsy, did

4    you see anything in there that would make you

5    disagree with any aspect of the diagnosis?

6        A.   No.

7        Q.   And am I correct that when you looked at

8    the pathology or the photos of the pathology, that

9    simply by looking at it, you cannot tell or identify

10   any features that might tell you whether or not --

11   or to what extent he used glyphosate or Roundup?

12       A.   I couldn't tell that.

13       Q.   Right.

14            In fact, you can't ever -- no one can tell

15   that, right?

16       A.   Not from the pathology, no.

17       Q.   Okay.  So when you are looking down a

18   microscope or you are looking at photos of the

19   pathology in this case or any case, there is no way

20   to know whether or not that person ever used or was

21   exposed to Roundup or glyphosate, right?

22       A.   Yes.

23       Q.   And you note in your report that Mr. Russo

24   had diffuse large B-cell Non-Hodgkin's Lymphoma,

25   right?

Dennis Weisenburger, M.D.

1     A.    Yes.

2     Q.    What specific type did he have?

3     A.    He had diffuse large B-cell lymphoma.

4     Q.    That's it?

5     A.    Yes.

6     Q.    And for the brain biopsy, where was the

7  tumor located?

8     A.    In the cerebellum.

9     Q.    And they tested -- am I correct, they

10  tested the bone marrow, right?  Yes?

11     A.    Yes.

12     Q.    And he -- and there was no lymphoma in his

13  bone marrow, right?

14     A.    Right.

15     Q.    They checked his blood and there was no

16  lymphoma in the blood, right?

17     A.    I -- I don't know whether they checked his

18  blood.  They probably -- they probably looked at a

19  blood smear.  I don't remember.

20     Q.    Okay.  So you don't recall looking at any

21  cytology or serology reports?

22     A.    No.  I did look at the blood smear.  I

23  didn't see anything, so.

24     Q.    All right.  They checked his nodes, right?

25     A.    His lymph nodes?

Dennis Weisenburger, M.D.

1    Q.   Right.

2    A.   Yes.

3    Q.   Okay.  And they were clean, right?

4    A.   They weren't enlarged.

5    Q.   Okay.  They did -- or they checked his

6    spinal fluid.  Did you review the cytology results?

7    A.   No.

8    Q.   Okay.  Do you know, just by looking at

9    records, that that did not have any evidence of

10   lymphoma?

11   A.   Yes, it did not.

12   Q.   And, in fact, they checked his eyes and

13   his testicles as well and have no evidence of

14   lymphoma, right?

15   A.   Yes.

16   Q.   Okay.  And so at least at the time of

17   diagnosis, the lymphoma was isolated to the tumor in

18   the brain; is that right?

19   A.   Yes.

20   Q.   What is central nervous system lymphoma?

21   A.   It is lymphoma involving the central

22   nervous system.

23   Q.   Any other distinguishing factors in terms

24   of incidents or treatment?

25   A.   Well, it can be primary or secondary.  In

Dennis Weisenburger, M.D.

1    this case, it appeared to be primary because there

2    was no evidence of lymphoma found elsewhere.

3            Secondary involvement is more common than

4    primary involvement, but -- but a small percent of

5    diffuse B-cell lymphoma is -- is attributed to

6    primary CNS lymphoma.

7        Q.   It is just more rare, right?

8        A.   Yes, it is quite rare.

9        Q.   So although B-cell lymphoma is far more

10   common than T-cell, within the grouping of B-cell

11   lymphomas, the central nervous system lymphomas are

12   more rare?

13           MS. FORGIE:  Objection.

14           THE WITNESS:  Yes.

15   BY MS. FUJIMOTO:

16       Q.   All right.  And then if we look back at

17   Exhibit 4, which is your report, and we start at the

18   second paragraph and go on through, basically, the

19   end of the report, this is where you discuss Mr.

20   Russo's alleged use and exposure to Roundup, right?

21       A.   Yes.

22       Q.   Okay.  And is the information in this

23   report based solely on the telephone conversation

24   that you had with him on August 29th, 2019?

25       A.   Largely, yes.  I had reviewed the

Dennis Weisenburger, M.D.

1    deposition -- his deposition prior to that, his

2    wife's deposition.  And I had also reviewed the fact

3    sheets.  So I already had some information.

4        Q.   Okay.  Anything else you can think of?

5        A.   With regard to what?

6        Q.   With regard to what you based your -- your

7    opinions related to the alleged exposure?

8        A.   Those are the -- those are the things I

9    used.

10            (Exhibit 6 marked for identification.)

11   BY MS. FUJIMOTO:

12       Q.   All right.  I'm going mark as Exhibit 6,

13   to the deposition, plaintiff's fact sheet.

14            MS. FORGIE:  I didn't bring it, so.

15            MS. FUJIMOTO:  Okay.

16            (Exhibit 7 marked for identification.)

17            MS. FUJIMOTO:  And Exhibit 7.

18            MS. FORGIE:  Thank you.

19            MS. FUJIMOTO:  Sure.

20            MS. FORGIE:  I mean, I did...

21            MS. FUJIMOTO:  Plaintiff's

22   first-amended --

23            MS. FORGIE:  Sorry.

24            MS. FUJIMOTO:  -- fact sheet.  You want

25   the amended fact sheet, Kathryn?

Dennis Weisenburger, M.D.

1           MS. FORGIE:  No.

2           MS. FUJIMOTO:  No, okay.

3           MS. FORGIE:  Thank you, but I've got so

4    much paper here.

5           MS. FUJIMOTO:  All right.  Sure.

6    BY MS. FUJIMOTO:

7      Q.   Dr. Weisenburger, are these the fact

8    sheets, the plaintiff fact sheet and amended fact

9    sheet, that you reviewed related to Mr. Russo?

10     A.   Yes.

11     Q.   Okay.  Did you compare these fact sheets

12   with what he told you in the telephone conversation

13   to see if there were any inconsistencies or

14   discrepancies?

15     A.   I probably did.

16     Q.   Did you make any notes about any?

17     A.   There was one discrepancy that I

18   identified which was his use of Roundup on the El

19   Rey Road property in his routine maintenance of his

20   property.  And in -- I think in the deposition, he

21   -- he stated that he used Roundup once every two or

22   three weeks.  But when I queried him about it on the

23   phone, he said no, he used it once a week.

24     Q.   Okay.

25     A.   So that was the only discrepancy that I

Dennis Weisenburger, M.D.

 1  found between the depositions, the fact sheets and

 2  my interview with him.

 3       Q.   Okay.  And did you -- all right.  So let

 4  me just make sure, because I'd asked about fact

 5  sheets and you referenced deposition, too.  So you

 6  looked at the fact sheets and his deposition

 7  testimony and compared them to what he told you in

 8  the telephonic interview, in order to determine if

 9  there were any inconsistencies?

10       A.   Yes.

11       Q.   And the only one you recall is the -- how

12  often he used it at the ████████████████?

13       A.   Yes.

14       Q.   Okay.  Did you review either the report or

15  deposition of Dr. Sawyer with regard to what he was

16  told by Mr. Russo about his alleged use and exposure

17  to Roundup?

18       A.   No.

19       Q.   Okay.  So you have no idea whether there

20  are significant discrepancies or inconsistencies

21  between the two?

22            MS. FORGIE:  Objection.

23            THE WITNESS:  I don't -- I don't know if

24  there are.

25  BY MS. FUJIMOTO:



Dennis Weisenburger, M.D.

11      Q.   Okay.  So if we look at Mr. Russo's fact

12  sheets, his deposition testimony, his reports or

13  what he told Dr. Sawyer versus what he told you,

14  which one should we believe --

15           MS. FORGIE:  Objection.

16  BY MS. FUJIMOTO:

17      Q.   -- as being accurate?

18           MS. FORGIE:  Objection.

19           THE WITNESS:  I don't know.  I believe the

20  one that I wrote is the most accurate and the most

21  detailed.  I don't know how much time Dr. Sawyer

22  spent with him asking questions.

23           One of the discrepancies also from -- from

24  the deposition was the idea that he always wore

25  long-sleeved shirts and pants and boots, which just

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1    isn't true either.  When he -- he did that when he

2    was working in the canyons where the brush was

3    thick.

4           And -- but when he was working on his

5    property otherwise, he wore T-shirts and shorts and

6    flip-flops or tennis shoes.  So that wasn't

7    reflected at all in -- in the depositions.

8    BY MS. FUJIMOTO:

9           Q.   In his deposition.

10          You didn't read Dr. Sawyer's, right?

11          A.   I didn't.

12          Q.   Okay.

13          A.   But in his deposition.  I don't -- I don't

14   know what he old Dr. Sawyer, no.

15          Q.   So is what I'm hearing you say, is that

16   you believe that his reports to you regarding his

17   use and exposure to Roundup are the most accurate?

18          A.   I believe so.

19          Q.   In terms of memory and cognition, his

20   brain tumor was in the cerebellum, right?

21          A.   Right.

22          Q.   Okay.  Does that part of the brain have

23   anything to do with memory or cognition?

24          A.   Not much.  It is mostly involved in motor

25   skills.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis Weisenburger, M.D.

 1      Q.   And you recall seeing in the records that

 2  he had some -- early on, some degree of ataxia?

 3      A.   Yes.

 4      Q.   And that's consistent with the cerebellar

 5  injury, right?

 6      A.   Yes.

 7      Q.   But that certainly has gotten better;

 8  would you agree?

 9      A.   I believe it has, yes.

10      Q.   Okay.  Did you see in the records where

11  his Karnofsky score was 90 percent?

12      A.   I didn't see that.  At least, I don't

13  remember it.

14      Q.   Are you familiar with the Karnofsky --

15      A.   Yes.

16      Q.   -- method or the -- the chart, I guess I

17  should say?

18      A.   Yes.

19      Q.   And am I correct that 90 percent on that

20  scale indicates, "Able to carry on normal activity

21  with minor signs or symptoms of disease"?

22      A.   I don't know exact words.  I would accept

23  that.

24      Q.   Okay.

25      A.   I would accept that.

Dennis Weisenburger, M.D.

```
 1        Q.   Okay.  Let's just do this for the record.

 2        A.   It is a good score.

 3        Q.   Yeah.  I'll just mark as Exhibit 8, for

 4   the record, a one page of the Karnofsky performance

 5   status scale definitions rating criteria.

 6             (Exhibit 8 marked for identification.)

 7   BY MS. FUJIMOTO:

 8        Q.   Does that look consistent with what your

 9   understanding of that scale is?

10        A.   Yes.

11        Q.   Okay.  Okay.  So for the telephonic

12   interview, did you ask Mr. Russo about whether he

13   had read the labeling for the product?

14        A.   No.

15        Q.   Have you read the labeling for the

16   product?

17        A.   No.

18        Q.   Did -- do you not feel it is relevant to

19   your opinion?

20             MS. FORGIE:  Objection.

21             THE WITNESS:  It is not relevant to my

22   opinion.

23             (Exhibit 9 marked for identification.)

24   BY MS. FUJIMOTO:

25        Q.   I'll mark as Exhibit No. 9 to the
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1  deposition a copy of a Roundup label.  Dr. Sawyer

2  was asked about this.

3          I take it, Dr. Weisenburger, you've not

4  ever seen this label?

5      A.   I haven't.

6      Q.   Okay.  So looking at the third page of

7  Exhibit 9, up at the top left-hand corner, it says,

8  "Did you know?  This Roundup formula targets an

9  enzyme found in plants but not in people or pets."

10         Do you see that?

11     A.   Yes.

12     Q.   And although you hadn't seen this

13  particular label, you were aware of that, right?

14     A.   Yes.

15     Q.   You are aware that Roundup or glyphosate

16  works on a pathway that is -- does not exist in

17  humans?

18     A.   Yes.

19     Q.   Okay.  And then if you go to the next

20  page, it says on -- on how it works, you see there

21  where it talks about Roundup and it says, "It moves

22  through the weed to the root stopping the function

23  of an essential enzyme found in plants.  Weeds die,

24  roots and all, so they don't grow back."

25         When you assessed Mr. Russo's exposure

Dennis Weisenburger, M.D.

1    history, did you take that into account?

2            MS. FORGIE:  Objection.

3    BY MS. FUJIMOTO:

4        Q.   That once you kill the weeds with Roundup,

5    they don't come back?

6        A.   Well, maybe that specific weed doesn't

7    come back, but there is another one that comes back.

8        Q.   Okay.

9        A.   Yeah.  Sure.

10       Q.   And did you do any assessment or research

11   on what types of weeds were -- weeds were on any of

12   Mr. Russo's properties?

13       A.   Yes.  I -- he did -- he did talk about a

14   couple of weeds that were very resistant to Roundup

15   on the -- on the ███████████████  property.  I

16   didn't make note of it because it didn't, again,

17   make any difference to my opinion.  But -- but I

18   think, in general, he found the product to be very

19   effective.

20       Q.   So the question -- and so did you do any

21   research as to whether there were types of weeds on

22   any of the three -- any of the properties that Mr.

23   Russo allegedly used Roundup, did you do any

24   research as to how often those types of weeds would

25   grow in ████████████████████?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis Weisenburger, M.D.

```
 1        A.   No.

 2        Q.   Did you do any research to inform you on

 3   how often someone on this type of property would

 4   have to spray weeds during any given year?

 5        A.   No.  I took what he told me as fact with

 6   regard to what he actually did.

 7        Q.   And so you don't have a comparator to

 8   determine whether what Mr. Russo told you was

 9   realistic or plausible in relation to the types of

10   property he lived at in ██████████████████?

11             MS. FORGIE:  Objection.

12             THE WITNESS:  No.

13   BY MS. FUJIMOTO:

14        Q.   Okay.  And, I take it, then, setting aside

15   weeds, did you do any research to determine how

16   often someone in ██████████████████, what the

17   average person -- how often the average person has

18   to spray their yard or adjoining canyons in any

19   given year?

20             MS. FORGIE:  Objection.

21             THE WITNESS:  No, but it would depend a

22   lot on where you live.

23   BY MS. FUJIMOTO:

24        Q.   Right.

25        A.   And what kind of property you had.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis Weisenburger, M.D.

```
1        Q.   And did you do any research on the average
2   property owner in the areas in which Mr. Russo
3   lived?
4             MS. FORGIE:  Objection.
5             THE WITNESS:  No.
6   BY MS. FUJIMOTO:
7        Q.   Going down the label to the "user safety
8   recommendations," I assume, you think safety
9   recommendations and compliance with them are
10   important?
11        A.   Yes.
12        Q.   Okay.  First bullet says, "Clothing and
13   protective equipment exposed to this product should
14   be washed in detergent and hot water.  Such items
15   should be kept and washed separate from other
16   laundry."
17             Do you see that?
18        A.   Yes.
19        Q.   Do you know whether Mr. Russo did that?
20        A.   No.
21        Q.   It says, "Users should wash hands before
22   eating, drinking, chewing gum, using tobacco, or
23   using the toilet."
24             Do you see that?
25        A.   Yes.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1      Q.   Did you ask Mr. Russo whether he did that?

2      A.   Not specifically.  He -- he said that he

3  would -- excuse me -- often wash his hands after

4  getting pesticide on them, but I didn't ask

5  specifically about eating, drinking or chewing gum.

6      Q.   The third bullet says, "Users should

7  remove clothing immediately if product gets inside;

8  then wash thoroughly and put on clean clothing."

9          Did you ask Mr. Russo if he did that?

10     A.   Yes, I did ask him when he changed

11  clothes.

12     Q.   Okay.  And what did he say?

13     A.   So he said when he was working on the

14  canyon, he wore the same clothes all day until he

15  finished his work at the end of the day.  And then

16  he would take the clothes off and shower.  When he

17  was doing his routine work, he usually wore the

18  clothes for the rest of the day and showered the

19  next morning.

20     Q.   And if you go to the next page, when it

21  says "How to apply," the first sentence of the -- or

22  the first bullet says, "When spot treating weeds

23  around desirable plants, shield plants from drift

24  with a piece of cardboard or plastic."

25          Do you see that?

Dennis Weisenburger, M.D.

```
 1        A.   Yes.

 2        Q.   Okay.  And then down a little bit, the

 3   next -- second-to-the-next box, "When to apply:  For

 4   best results, apply during warm, sunny weather to

 5   accelerate systemic movement from foliage to roots.

 6   Apply when air is calm to prevent drift to desirable

 7   plants."

 8             Do you see that?

 9        A.   Yes.

10        Q.   Okay.  And then down below that, it says,

11   "Do not apply" -- under "application restrictions:"

12   "Do not apply this product in a way that will

13   contact any person or pet either directly or through

14   drift.  Only the person applying this product may be

15   in the area during application."

16             Do you see that?

17        A.   Yes.

18        Q.   And that's important, isn't it?

19        A.   Well, you don't want to get a product like

20   this on your pets or on other people.

21        Q.   And --

22        A.   So that's -- I assume that's what -- what

23   they are saying.

24        Q.   And what a lot of this is saying is that

25   this is a product that you need to be careful with
```

Dennis Weisenburger, M.D.

1    and not, you know, get on you too much, and if you

2    do or on your clothes, you need to take care to

3    clean, and not just yourself, but the clothes and

4    wash them separately.  And that it is important to

5    take that kind of due care with this kind of

6    product.  Fair?

7              MS. FORGIE:  Objection.

8              THE WITNESS:  Well, I would -- I would

9    interpret what they say literally.  Okay?

10   BY MS. FUJIMOTO:

11       Q.   All right.  So let's look at some of the

12   specifics on -- in your report, which is Exhibit 4,

13   with regard to Mr. Russo's alleged exposure.  All

14   right.

15             So, and these aren't numbered, but the

16   first page of your report, paragraph 2, is where you

17   start talking about where he lived on multiple

18   properties between -- and you've changed the dates

19   to -- from 1997 to 2013, right?

20       A.   Right.  He actually lived on the

21   properties in 1993, but he didn't use the Roundup

22   until 1997, so that's -- that's the -- that's the

23   change.

24       Q.   And here, you talk about him using

25   premixed Roundup, using a hand pumped sprayer and,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1   basically, spot spraying most of the time, right?

2       A.   Yes.

3       Q.   And so how did you calculate the degree of

4   exposure at these properties?

5       A.   Well, I considered what he sprayed, how he

6   sprayed it; what he wore; how long he used the

7   chemical; what he did after he finished.  So all of

8   the things in the paragraph I considered.

9       Q.   But did you do a calculation?

10      A.   No.

11      Q.   So you didn't take what he said and said,

12  "Okay.  He used it two times a month, six months per

13  year, so that means he used it 12 times a year, one

14  to two hours each, which means 12 to 24 hours per

15  year."  Did you do any of that kind of calculation?

16      A.   I did calculate the number of times per

17  year -- actually, the number of -- yeah, times per

18  year and the number of times for each property.  I

19  didn't calculate hours.  I calculated gallons.  And

20  that's in the last paragraph on the second page.

21      Q.   And do you have -- or did you make any

22  notes regarding the calculations that you made?

23      A.   Yes.

24      Q.   Okay.

25           MS. FUJIMOTO:  And are those being held on

Dennis Weisenburger, M.D.

1    privilege?

2            MS. FORGIE:  Yes.

3    BY MS. FUJIMOTO:

4       Q.   Okay.  And, again, the only inconsistency

5    you recall between what he told you and the fact

6    sheets and his depositions were the date changes

7    that you referenced?

8       A.   Yeah.  And the one use that I told you

9    about when he was doing his routine pesticide

10   applications on his property.

11      Q.   All right.  And then the next paragraph,

12   you talk about when he used -- allegedly used

13   Roundup from 2001 to July of 2005 on El Rey Road in

14   San Pedro, correct?

15      A.   Yes.

16      Q.   And, again, my question to you is similar:

17   Did you do a calculation of the times per year, how

18   many days per year, based on how many hours he used

19   it?

20      A.   I counted each time he used it as a day.

21      Q.   Okay.  So it wouldn't matter if --

22      A.   So I calculated the number of days.

23           MS. FORGIE:  Wait.

24           THE WITNESS:  I did not calculate the

25   number of hours.

Dennis Weisenburger, M.D.

```
 1    BY MS. FUJIMOTO:

 2         Q.   And so you would count as -- if,

 3    hypothetically, he had said, "I used it, you know,

 4    five days but only 15 minutes per day," you counted

 5    that as a day?

 6              MS. FORGIE:  Objection.

 7    BY MS. FUJIMOTO:

 8         Q.   Right?

 9         A.   I counted that as five days.

10         Q.   Five -- or five days, okay.

11              And you -- you calculated number of

12    gallons?

13         A.   I did.

14         Q.   And, again, any discrepancies or

15    inconsistencies with what he told you from what he

16    put in his fact sheets, versus what he told Dr.

17    Sawyer, versus what he said in his deposition?  Any

18    inconsistencies you were aware of, you've told us

19    already today?

20         A.   Yes.

21         Q.   And, I take it, then, setting aside your

22    notes, you haven't told us in your written report

23    the number of days or gallons that he used on each

24    property; you just give us a cumulative number,

25    right?
```

Dennis Weisenburger, M.D.

1     A.   Right.

2     Q.   Okay.  And then you talk about in your

3  report a period of time of 15 months when he lived

4  in Rancho Palos Verdes?

5     A.   Right.

6     Q.   And then you move on to his time at Rue

7  Ley -- that's R-u-e; second word, L-e-y -- Charlene

8  property in Rancho Palos Verdes?

9     A.   Yes.

10     Q.   And can you tell me, based on what you

11  gave us in your report, how many times per year he

12  used Roundup on the El Rey Road property?

13     A.   I calculated, but I don't have it in my

14  report.

15     Q.   And can you tell us how many times he used

16  -- allegedly used Roundup on the Rue Ley Charlene

17  property?

18     A.   Well, on the report, he used it

19  approximately 60 times a year.  It is in the next

20  paragraph on the last property.

21     Q.   Okay.  How many gallons?

22     A.   I -- I don't know for that property.  It

23  would be fairly easy to calculate it, because one

24  would simply have to take the number -- 60 gallons a

25  year, six and a half years, and then another 60

Dennis Weisenburger, M.D.

1    gallons a year for six and a half years.  So if you

2    do that multiplication, you'll have the number of

3    gallons.

4         Q.   Okay.  Well, and so when you say 60 times

5    per year during the last six and a half years, you

6    are not talking about how many times during the

7    16-year period of all of the use and alleged

8    exposure?

9         A.   No, it was -- you know, that was the most

10   frequent use.

11        Q.   Okay.  So here's my confusion.  If we go

12   to page 2 of your report, and you go to the last

13   paragraph, you say, "Mr. Russo used Roundup for 20

14   years," which you have corrected to be 16 years,

15   "before developing Non-Hodgkin's Lymphoma.  Over

16   this time period, he used Roundup approximately 700

17   times."

18             So my question is:  Is the 700 times over

19   the 16 years or the last six and a half years?

20        A.   Over the 16 years.

21        Q.   Okay.  And then you say, "And

22   approximately 60 times per year during the last six

23   and a half years."

24        A.   Yes.

25        Q.   Okay.  Well, how many times did he use it

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1    over the 16 years?

2         A.    Approximately 700.

3         Q.    Okay.  And does that include the 60 times

4    in the last six and a half years?

5         A.    Yes.

6         Q.    Okay.  All right.  So my calculations for

7    each of the properties, I did what you just

8    suggested.  And it looks as if, according to Mr.

9    Russo's telephonic interview with you and your

10   report, that in the various San Pedro houses, he

11   used it 72 to 84 times.  Does that sound about right

12   to you?

13        A.    I don't know.  I'd have to go back and do

14   the calculations.

15        Q.    And in the El Rey property, he used it in

16   the canyon 80 to 96 times, and in his yard, at least

17   40 times.  Does that sound accurate to you?

18        A.    I don't know.  I'd have to go back and

19   calculate it.

20        Q.    And then Rue Ley Charlene, according to

21   what he apparently told you, is he used it 112 to

22   168 times in the canyon and 280 times in the yard.

23   Does that sound right?

24        A.    Again, I don't know.  I'd have to go back

25   and calculate it.  We might have used slightly

Dennis Weisenburger, M.D.

 1    different numbers.  I used average numbers.

 2         Q.   Okay.  So my totals for all his properties

 3    were 584 to 668 times with 1,945 to 4,304 hours

 4    total.  Sound consistent with your estimate?

 5              MS. FORGIE:  Objection.

 6              THE WITNESS:  It is less than my estimate.

 7    BY MS. FUJIMOTO:

 8         Q.   Okay.

 9         A.   And I didn't calculate hours.

10         Q.   Okay.  The gallons that I calculated,

11    based on your report, was that it was, you know,

12    almost, let's see, 700 -- 4,000 gallons.  Is that

13    right?

14         A.   You calculated 4,000 gallons?

15         Q.   Yeah.

16         A.   I calculated over 1,000 gallons.

17         Q.   Okay.  Did you -- so what -- what was his

18    -- the mean number of days that he was exposed?

19         A.   On average over the 16 years, it was about

20    43 days a year.

21         Q.   Okay.  And over the 16 years?

22         A.   Yeah, about 43 days a year.  I think I did

23    an average of that.

24         Q.   All right.  And do you know if that is at

25    all in the range of what Dr. Sawyer estimated?

Dennis Weisenburger, M.D.

1       A.    No.

2       Q.    Does it matter to you?

3       A.    No.

4       Q.    If it is a lot different, do you think you

5   are right or he is right?

6            MS. FORGIE:  Objection.  Asked and

7   answered several times.

8            You can answer again.

9            THE WITNESS:  I have confidence in my

10  calculations.

11  BY MS. FUJIMOTO:

12      Q.    And when you did those calculations, did

13  you consider that someone allegedly used Roundup

14  over 700 times in 16 years?  Did you consider that

15  to be realistic?

16      A.    Yes.

17           MS. FORGIE:  Objection.

18           THE WITNESS:  Yes.

19  BY MS. FUJIMOTO:

20      Q.    And using over a thousand gallons of

21  Roundup, did that -- did you consider that to be

22  realistic?

23           MS. FORGIE:  Objection.

24           THE WITNESS:  Yeah, based on his

25  properties, I did.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1   BY MS. FUJIMOTO:

2       Q.   Okay.  And having said that, though, you

3   didn't do any research as to what the average use of

4   Roundup is in the areas in which he lived?

5            MS. FORGIE:  Objection.  Asked and

6   answered several times.

7            You can answer.

8            THE WITNESS:  Depending entirely on what

9   his practice was.

10  BY MS. FUJIMOTO:

11      Q.   Did you go to any of his properties?

12      A.   No.

13      Q.   Did you look at any satellite photographs

14  of the properties?

15      A.   No.

16      Q.   Okay.  And I know you didn't review Dr.

17  Sawyer's deposition, but he -- they talked about

18  aerial photographs and so forth.  You didn't look at

19  any of that?

20      A.   No.

21      Q.   And so, then, on what do you base your

22  opinion that Mr. Russo's estimates, to you, are

23  realistic?

24      A.   I'm taking them as fact.

25      Q.   Okay.  Just taking his reports at face

Dennis Weisenburger, M.D.

1    value?

2         A.    Yes.

3         Q.    You are assuming them to be correct?

4         A.    Yes.  As best he could remember, yes.

5         Q.    Okay.  Did you talk to Mr. Russo or factor

6    in any "incidents of spillage"?

7         A.    He -- he remembered, I think, one specific

8    incident where he spilled the concentrate on his

9    skin and clothing.  He recalled not infrequent

10   leakage of the sprayer where he would get it on his

11   hands, which is common.

12        Q.    And did you count those in your

13   calculations?

14        A.    No.  It would be highly unlikely one could

15   remember accurately how many times that occurred.

16        Q.    Did you take into account when Mr. Russo

17   wore protective clothing, such as long pants and

18   long sleeves, when he was in the canyons?

19             MS. FORGIE:  Objection.

20             THE WITNESS:  Yes.

21   BY MS. FUJIMOTO:

22        Q.    Okay.  And how did you factor that into

23   his assessing his degree of exposure?

24        A.    Well, I considered it.  I mean, it means

25   that he took some protection.  I think he was taking

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1    the protection mainly to protect himself from the

2    overgrowth of the weeds rather than from the

3    chemical itself.  So he was protecting himself from

4    getting scratched or poked or otherwise injured by

5    the heavy overgrowth in the canyons.

6        Q.   But I guess my question is more specific

7    than that.  Wearing long pants and long sleeves and

8    boots or covered shoes will reduce the amount of

9    exposure directly to your skin, right?

10            MS. FORGIE:  Objection.

11            THE WITNESS:  Yes, but he would still get

12   it on his hands.  He would still get it on his face,

13   on his neck.  And, in fact, he didn't always wear

14   short -- long-sleeved shirts when he was working.

15   He said it was very hot.  He would wear

16   short-sleeved shirts.  So I didn't put that in my

17   report, but, in fact, that's what he did.

18            And when he was working on the other parts

19   of the property, he didn't wear the long-sleeved

20   shirts of the pants or the boots.  He -- he didn't

21   take the precautions that he took in the canyons.

22   BY MS. FUJIMOTO:

23       Q.   So my question is:  During the times when

24   he did, did you factor in your calculations that his

25   exposure was reduced because he was protecting --

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis Weisenburger, M.D.

1   had protected, inadvertently or not, his legs and

2   arms from direct skin exposure?

3          MS. FORGIE:  Objection.  Asked and

4   answered.

5          THE WITNESS:  Yes, I did.

6   BY MS. FUJIMOTO:

7      Q.   And how did you reduce down your exposure

8   assessment based on when he wore protective clothing

9   and when he didn't?

10     A.   Well, I didn't attempt to do any kind of

11  quantitative or even semiquantitative analysis.  I

12  was impressed by the length of time that he sprayed

13  and the quantity -- quantity that he sprayed in the

14  canyons.

15     Q.   And did he tell you whether he wore

16  gloves?

17     A.   He did not wear gloves.

18     Q.   Okay.  But that's different from what he

19  said in his fact sheets and his deposition, right?

20     A.   I don't believe so.

21     Q.   You don't recall him saying that he didn't

22  recall whether he wore gloves or not?

23     A.   When I asked him whether he wore gloves,

24  he said he did not wear gloves.

25     Q.   Okay.  You said he got it on his hands and

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1    his neck and his face.  Did he tell you that?

2         A.   Yes.

3         Q.   Okay.  Did he tell you that he sprayed it

4    when it was windy?

5         A.   Yes, especially on the Rue Ley Charlene

6    property, which apparently was located in an area

7    that was quite windy.  So he would sometimes spray

8    it on windy days, yes.

9         Q.   Did you know that the label says don't

10   spray it on windy days?

11             MS. FORGIE:  Objection.

12             THE WITNESS:  Well, you showed it to me.

13   BY MS. FUJIMOTO:

14        Q.   Okay.  Did he know --

15        A.   It is not always easy to stop spraying.

16   And a wind can come up and it can go back down.  So,

17   you know, if he was in the middle of -- if he

18   started in the morning and he started spraying and

19   then it got windy, he wouldn't just stop spraying.

20   He would continue to do his work.

21        Q.   That's what he told you or you're just

22   assuming that?

23        A.   Well, that's what I'm assuming.

24        Q.   Okay.

25        A.   Because once he started his work, he

Dennis Weisenburger, M.D.

1   finished the day.  He didn't take a break or stop

2   just because it became windy.

3        Q.   Right.

4             He took bathroom breaks, though, right?

5        A.   I hope so.

6        Q.   Well, he testified to that?

7             MS. FORGIE:  Speaking of.

8   BY MS. FUJIMOTO:

9        Q.   Did you -- did you take that into account?

10       A.   I never asked him about it.

11       Q.   Okay.  And so did you -- did he tell you

12   that when he sprayed, he made it a point of spraying

13   low to the ground, to the root of the plant as

14   opposed to up high where it is going to blow back on

15   you?

16       A.   Well, in general, that's how one does it.

17   But if you have big weeds, you are spraying up.

18       Q.   Did he tell you he would spray up or did

19   he tell you he would always bend down and spray to

20   the roots?

21       A.   I don't remember him telling me that.

22       Q.   Do you remember what he said in his

23   deposition?

24       A.   When you spray the product, you spray it

25   on the leaves.  You don't spray it on the roots.

Dennis Weisenburger, M.D.

1     Q.   Okay.  Do you remember what he said in his

2   deposition?

3     A.   I don't specifically remember that, no.

4     Q.   Okay.

5          MS. FUJIMOTO:  Did you want to take a

6   break, Counsel?

7          MS. FORGIE:  Just a really fast one.

8          MS. FUJIMOTO:  All right.  We are going to

9   go off the record for a short break.

10          THE VIDEOGRAPHER:  Off the record.  The

11   time is approximately 10:31 a.m.

12          (Recess.)

13          (Exhibit 10 marked for identification.)

14          THE VIDEOGRAPHER:  With the approval of

15   Counsel, back on the record.  The time is

16   approximately 10:36 a.m.  This marks the beginning

17   of Recording Media No. 2.

18   BY MS. FUJIMOTO:

19     Q.   Okay.  Let me just do this relatively

20   quickly.  I'm going to mark as Exhibit 10.

21          MS. FUJIMOTO:  Do you want a copy of

22   Pahwa, Kathryn?

23          MS. FORGIE:  Are you going to be really

24   detailed?

25          MS. FUJIMOTO:  No.

Dennis Weisenburger, M.D.

```
 1              MS. FORGIE:  I think I'll take it and give
 2     it back to you.
 3              MS. FUJIMOTO:  You'll give it back to me.
 4     Okay.  All right.
 5              MS. FORGIE:  Is that rude?
 6     BY MS. FUJIMOTO:
 7         Q.   And Dr. Weisenburger, we talked about this
 8     last time at the Giglio (phonetic) deposition, so we
 9     won't go into it in detail.
10              MS. FORGIE:  I was just going to say, we
11     don't do a lot of --
12              MS. FUJIMOTO:  Of course not.  You know I
13     don't do that.
14     BY MS. FUJIMOTO:
15         Q.   But I want to ask you for purpose here on
16     Mr. Russo, okay?
17         A.   Okay.
18         Q.   We have talked about this before.  This is
19     the Pahwa article called, "Glyphosate Use and
20     Associations With Non-Hodgkin's Lymphoma, Major
21     Histological Subtypes:  Findings From the North
22     American Pooled Project."  And you have seen and
23     analyzed and reviewed this paper before, correct?
24         A.   Yes.
25         Q.   Okay.  And if we go to page 6 of the Pahwa
```

Dennis Weisenburger, M.D.

1    article and, in particular, Table 3, 4 and then on

2    the next page, we have Table 5.  And you remember

3    those data presentations in that article, correct?

4        A.   Yes.

5        Q.   And so for Table 3, they are giving us an

6    assessment of the potential increase in risk, if

7    any, associated with the number of years of

8    glyphosate use, right?

9        A.   Yes.

10       Q.   Okay.  And if you go down to "Diffuse

11   large B-cell lymphoma, the DLBCL."  And, I assume,

12   you agree, according to your calculations, Mr. Russo

13   falls into the greater than 3.5 years of use, right?

14       A.   Yes.

15       Q.   And am I correct that according to this

16   study, there is no statistically significant

17   increase in risk of Non-Hodgkin's Lymphoma with more

18   than 3.5 years of use?  Correct?

19            MS. FORGIE:  Objection.

20            THE WITNESS:  There is a small increase,

21   but it is not significant.

22   BY MS. FUJIMOTO:

23       Q.   Right.  It is not statistically

24   significant, correct?

25       A.   Yes.

Dennis Weisenburger, M.D.

1        Q.    And, I take it, you are one that that does

2    -- does that matter to you?

3        A.    Sure, it matters.

4        Q.    Okay.  I mean, because some -- or many

5    clinicians consider something that is not

6    statistically significant to never be clinically

7    significant?

8        A.    Well, I don't agree with that.

9        Q.    Okay.

10       A.    But I look -- I look at the data overall.

11       Q.    Okay.  And then if you go to Table 4, this

12   lays out the data in that way to look at whether

13   there is an increase in risk of Non-Hodgkin's

14   Lymphoma, some -- associated with the number of days

15   per year of glyphosate use, correct?

16       A.    Yes.

17       Q.    And if we go down to DLBCL, we see that

18   for greater than two days of use per -- strike that.

19            Am I correct that you believe that Mr.

20   Russo, if we're looking at Table 4, falls in the

21   greater than two days per year of use?

22       A.    Yes.

23       Q.    And if we look at that estimate, we see an

24   odds ratio of 2.14 with a confidence interval of

25   .017 to 4.28, correct?

Dennis Weisenburger, M.D.

1          MS. FORGIE:  I don't think you read that

2     right.

3          THE WITNESS:  Yes, that's for the --

4          MS. FORGIE:  1.7.

5          THE WITNESS: -- adjusted rate.

6     BY MS. FUJIMOTO:

7          Q.   Right.

8          A.   Based on adjustment for other pesticides,

9     yes.

10         Q.   Correct.

11              So the adjusted odds ratio is 2.14 with a

12    confidence interval of 1.07 to 4.28, correct?

13         A.   Yes.

14         Q.   Okay.  So that's close, but it is

15    statistically significant?

16         MS. FORGIE:  Objection.

17         THE WITNESS:  It is.

18    BY MS. FUJIMOTO:

19         Q.   Okay.  And then if we go to Table 5, that

20    gives us data on whether there is any increase in

21    risk seen, based on lifetime days of glyphosate use,

22    correct?

23         A.   Yes.

24         Q.   And, I assume, you would put Mr. Russo in

25    the greater than 3.5 cumulative lifetime days of

Dennis Weisenburger, M.D.

1    use, correct?

2        A.   Yes.  That's actually an error.  It should

3    be greater than 7.  It is a -- it is an error that

4    was discovered.  So they are hopefully going to make

5    a correction.  But the -- it is a -- I think

6    probably -- it is probably they were transferring

7    from table -- the first table to this table and

8    didn't make the corrections.

9        Q.   Wow.  It got through peer-review?  That's

10   a bummer.

11       A.   Yeah.

12       Q.   Okay.  So -- but looking at this, are you

13   -- are you assuming that greater than 7 days of use

14   would be about the same or you think it might be

15   different?

16       A.   I think the numbers are -- the odds ratios

17   are correct.  The -- just the entry of the number of

18   days is incorrect.

19       Q.   All right.

20       A.   So it is just the -- it is just the -- I

21   mean, the number of -- let's see, yeah.  So it is

22   the number -- total number of days.

23       Q.   Okay.  Lifetime days of use?

24       A.   Lifetime days.

25       Q.   Right.  And so according to Table 5,

Dennis Weisenburger, M.D.

1   whether it is greater than 3.5 or greater than 7, if

2   they amend it, what we see is that there is no

3   statistically significant increase in risk adjusted

4   or otherwise, right?

5        A.   That's correct.

6        Q.   Okay.  And so am I right that of the

7   three, you have chosen to rely on the one that is

8   barely statistically significant as opposed to the

9   two that are not?

10            MS. FORGIE:  Objection.

11   BY MS. FUJIMOTO:

12        Q.   Significant at all, right?

13            MS. FORGIE:  Objection.

14            THE WITNESS:  I don't use terminology like

15   "barely statistically significant."  It is

16   statistically significant.

17   BY MS. FUJIMOTO:

18        Q.   Right.

19        A.   And I'm relying mainly on the number of

20   days per year.  And as we've discussed before, I

21   think that this is the best reflection of intensity

22   of exposure and -- and in my experience from

23   previous studies, this is the one parameter that

24   best reflects risk, I think.

25        Q.   All right.  And so what you are telling

Dennis Weisenburger, M.D.

```
 1   us, then, is that according to how you view Pahwa,

 2   if a person used Roundup three days of the year for

 3   15 minutes, so, you know, basically 45 minutes, that

 4   that would be -- increase their risk more than if

 5   they used it one time eight hours a day for 25

 6   years?

 7             MS. FORGIE:  Objection.  Incomplete

 8   hypothetical.

 9             THE WITNESS:  I couldn't say that, because

10   I'd have to really consider carefully what you've

11   just said.  And it is a hypothetical, which I

12   haven't -- I haven't considered.

13   BY MS. FUJIMOTO:

14       Q.   Well -- well, but it -- part of it is

15   because it doesn't take make sense, does it?

16             MS. FORGIE:  Objection.  Your

17   hypothetical?

18             THE WITNESS:  Your hypothetical doesn't

19   make sense.  But this is the way epidemiologists

20   attempt to quantify risk.  It is fairly crude in the

21   way they do it, but it seems to be useful.  And they

22   did the same kinds of things in the agricultural

23   health study.  So this is what epidemiologists do.

24   BY MS. FUJIMOTO:

25       Q.   Well, and -- and -- but the hypothetical,
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1    when you say it doesn't make sense, it's that how it

2    plays out doesn't make sense, right?  And let me

3    explain.

4              Because what you are saying, by relying on

5    Table 4 instead of 3 or 5, is that as long as you

6    use it more than twice a year, even if it is one

7    year, that that's going to increase your risk more

8    than if you used it maybe only one time a year, but

9    for 10, 20 years, which would be Table 3, or if you

10   used it you know 10, 20 times over your lifetime?

11             MS. FORGIE:  Objection.  Calls for

12   speculation, incomplete hypothetical.  And this goes

13   to general causation.  This is supposed to be a

14   case-specific deposition.

15             THE WITNESS:  I wouldn't draw that

16   conclusion.  I'd have to look at every case, like

17   Mr. Russo, very specifically.

18   BY MS. FUJIMOTO:

19       Q.   Right.  And that's what we are doing.  You

20   said Mr. Russo falls under Table 4, the greater than

21   two days, right?

22       A.   He does.

23       Q.   And he would fall in Table 3 in the

24   greater than three and a half.  And in Table 5,

25   greater than three and a half or what you believe

Dennis Weisenburger, M.D.

1  will be -- should be amended to 7, right?

2          MS. FORGIE:  Objection.  Asked and

3  answered.

4          You can answer it again.

5          THE WITNESS:  Yes, that's where he would

6  fall.

7  BY MS. FUJIMOTO:

8      Q.   Okay.  Did you review the deposition of

9  Dr. Rudnick?

10     A.   I think I did.  Can we look on here?

11     Q.   Sure.

12     A.   Where is it?

13          I did, yes.

14     Q.   Okay.  And so do you recall that Dr.

15  Rudnick said that he discusses every potential

16  exposure with all of his NHL patients?

17     A.   I don't recall that, no.

18     Q.   Does that make sense to you?

19     A.   No.

20     Q.   Okay.

21     A.   Most oncologists don't do that.

22     Q.   All right.

23     A.   So he would be an exception.

24     Q.   Do you recall him saying that he asks

25  every patient about all potential exposures, and Mr.

Dennis Weisenburger, M.D.

```
 1   Russo did not report any to him?
 2        A.   No, I don't remember that, either.  But
 3   Dr. -- Mr. Russo probably wasn't aware of Roundup
 4   being a cause of his cancer at the time.  So he --
 5   he wouldn't have said it.
 6        Q.   Do you know whether he just hadn't seen
 7   any lawyer ads at that -- by that time?
 8        A.   I don't know.
 9        Q.   Okay.  Do you agree with Dr. Rudnick that
10   everyone is exposed to some dose of radiation
11   throughout our lives?
12        A.   Yes.
13        Q.   Do you agree with Dr. Rudnick that when we
14   talk about environmental exposures, that it includes
15   many things that we are exposed to throughout our
16   lives:  The air we breathe, the food we eat, our
17   jobs, where we live, and all the environmental
18   factors that relate to that?
19        A.   Yes.
20        Q.   And we have talked before about your
21   understanding and opinions about the genetic
22   underpinnings of cancer, including lymphomas.  Do
23   you remember that discussion?
24        A.   Not specifically, no.
25        Q.   No, okay.
```

Dennis Weisenburger, M.D.

1          But, certainly, you agree with the

2   generally-accepted idea that as our cells replicate

3   on a minute, hourly and daily basis, that there are

4   random mutations that occur?

5          MS. FORGIE:  Objection.

6          THE WITNESS:  Yes.

7   BY MS. FUJIMOTO:

8      Q.   Most of the time, if not all the time, we

9   hope that those mutations or errors get repaired,

10  right?

11     A.   Yeah, or the cells would die.

12     Q.   Or the cells die.

13          And you also agree that part of why age is

14  a risk factor for all cancers is that because for

15  every day we live, we are exposed to genetic hits or

16  errors that occur as a result of environmental

17  exposures?

18     A.   That's probably true.

19     Q.   And then we also -- some of us may have

20  heritable gene mutations or things that even further

21  increase our risk of getting cancer over time?

22     A.   Yes.

■■  ■■  ■■■  ■■■■■■■■■■■■

■■  ■■■■■■■■■■■■■■■■■■

■■  ■■■■■■■■■■■■■■■  ■

Dennis Weisenburger, M.D.

1    you take into account where he lived?

2         A.    No.

3         Q.    Okay.  You -- you've been in California

4    for how long?

5         A.    Seven years.

6         Q.    Okay.  So do you know where San Pedro is?

7         A.    Not off the top of my head.

8         Q.    Are you familiar with what they call the

9    "LA basin area"?

10        A.    Not really.

11        Q.    Okay.  Are you familiar with the Port of

12   San Pedro, Port of Los Angeles, those areas?

13        A.    Yes.

14        Q.    And you were aware that where Mr. Russo

15   spent most of his life was in those areas?

16        A.    Yes.

17              (Exhibit 11 marked for identification.)

18   BY MS. FUJIMOTO:

19        Q.    Okay.  I'm going to mark as Exhibit 11 to

20   the deposition a -- sorry about that -- a couple of

21   graphs on the South Coast Air Basin Smog Trends over

22   the last many, many years.

23              Dr. Weisenburger, do you know anything

24   about the historical air quality levels in the LA

25   basin and that area?

Dennis Weisenburger, M.D.

1          MS. FORGIE:  Counsel, I don't see a cover

2    page.  Where is this from?

3          MS. FUJIMOTO:  There is not a cover page.

4    This is, basically, Googling from the AQMD, the Air

5    Quality Management District, for Los Angeles County.

6          THE WITNESS:  Yes.  When I lived in Duarte

7    back in 1979 to '81, you couldn't see the mountains

8    most of the days.  So now you can see the mountains

9    all the time.  So it was pretty bad.

10   BY MS. FUJIMOTO:

11        Q.   Yeah.  And part of what happened, and if

12   you look at the -- this general graph, both days,

13   there was, basically, at South Coast Air Base and

14   Smog Trend, and Southern California Bad Air Days, do

15   you see that it was really high in the '70s, dips,

16   and then kind of starts to go down over time, right?

17        A.   Right.

18        Q.   Is that consistent with your memory or

19   experience in the Southern California area?

20        A.   Yes.

21        Q.   And a lot of the decline, thank goodness,

22   is part of the -- partly as a result of the Air

23   Quality Management changes that California made that

24   are a lot stricter than even the federal standards,

25   right?

Dennis Weisenburger, M.D.

1      A.   Yes.

2      Q.   Okay.  And that's because the quality of

3  our air has a lot of impact on our health and our

4  diseases, right?

5           MS. FORGIE:  Objection.

6           THE WITNESS:  Yes.

7           MS. FUJIMOTO:  Okay.  I'm going mark as

8  Exhibit No. 12 to the deposition a news article --

9           (Exhibit 12 marked for identification.)

10  BY MS. FUJIMOTO:

11      Q.   -- from The Daily Breeze from last year

12  about an investigation into the LA Harbor area and

13  the smog challenges that it is still facing as of

14  2018.  Is this -- have you ever heard of The Daily

15  Breeze in the LA area?

16      A.   No.

17      Q.   Okay.  But you are familiar with what the

18  South Coast Air Quality Management District is?

19      A.   Not really.

20      Q.   Not really, okay.

21           Are you aware that San Pedro is -- is very

22  near and in the area of the Ports of Los Angeles and

23  -- and San Pedro?

24           MS. FORGIE:  Counsel, I'm going to object

25  to using papers and documents that he's never seen

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis Weisenburger, M.D.

1   before and doesn't have a chance to read.  I think

2   that's unfair to the witness.

3   BY MS. FUJIMOTO:

4        Q.   Okay.

5        A.   I don't actually -- I haven't looked at

6   the map to find out where San Pedro is.

7        Q.   Okay.  So if you take a look at this

8   article, I just want to point out a couple of things

9   and see if it is something that you factored in when

10  you thought about Mr. Russo's cancer and cause.

11            It says here on the second page of this

12  document that -- it says, "It is one of several Port

13  of Los Angeles air-quality monitors, the nation's

14  heaviest-trading commercial marine complex belches

15  diesel soot and poisonous gases about five blocks

16  from the school.  The Ports of LA and Long Beach

17  together emit 100 tons of smog daily, according to

18  air-quality officials."

19            Were you aware of that information or data

20  when you formed your opinion regarding Mr. Russo?

21            MS. FORGIE:  Objection to the use of this

22  paper.

23            THE WITNESS:  No.

24  BY MS. FUJIMOTO:

25       Q.   If you go to the next page, first

Dennis Weisenburger, M.D.

1    paragraph, second sentence says, when it is talking

2    about the smog being emitted in that area, "The

3    particles are small enough to move through the lungs

4    and into the bloodstream, where they can circulate

5    carcinogens, lead, arsenic, sulfates, nitrates and

6    other gases, chemicals and metals into the brain."

7             Were you aware of those data?

8             MS. FORGIE:  Again, objection.

9             THE WITNESS:  No.

10   BY MS. FUJIMOTO:

11       Q.   But you have a general understanding that

12   smog includes, or has in it, a number of different

13   carcinogens, right?

14            MS. FORGIE:  Objection.

15            THE WITNESS:  Yes, but smog has never been

16   linked as a cause of Non-Hodgkin's Lymphoma.  It's

17   been linked to lung disease, asthma, bronchitis, and

18   in some studies, lung cancer.  But I don't -- I'm

19   not aware of any studies linking smog to

20   Non-Hodgkin's Lymphoma.

21   BY MS. FUJIMOTO:

22       Q.   And are you aware of the vast body of

23   literature over the last few decades that show the

24   long-lasting chronic affects even at low levels of

25   carcinogens in smog?

1              MS. FORGIE:  Again, objection.

2              THE WITNESS:  I have not studied that

3    topic.

4    BY MS. FUJIMOTO:

5         Q.   Okay.  If you go to -- so page 6 of this

6    exhibit.

7              MS. FORGIE:  Counsel, are there references

8    to any of this?

9              MS. FUJIMOTO:  At the end of the article.

10             MS. FORGIE:  Where?

11             MS. FUJIMOTO:  You have to click on the

12   link.

13             MS. FORGIE:  Ah.

14             MS. FUJIMOTO:  See it?  Complaints, who to

15   call, and then you have a -- two links for --

16             MS. FORGIE:  Right, but --

17             MS. FUJIMOTO:  -- for their data.

18             MS. FORGIE:  We don't have the references

19   to the data.

20             MS. FUJIMOTO:  No.  No.

21             MS. FORGIE:  So there is no way for him to

22   check the references.

23             MS. FUJIMOTO:  No.  No, but he can.  Sure.

24             MS. FORGIE:  Not before he answers your

25   question.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1               MS. FUJIMOTO:  And he knows.  Hey --

2               (Reporter admonishes to speak one at a

3       time.)

4               MS. FUJIMOTO:  You can object all you

5       want.  We have to lay foundations.  And we when we

6       get to trial, we get -- this is all questions about

7       what data he did or didn't have.  And if there is no

8       foundation for this at trial, it doesn't matter that

9       he knows or doesn't know.  But it is what he

10      factored in or didn't factor in as to his -- his

11      opinions.

12              MS. FORGIE:  I completely disagree with

13      that assessment.

14              MS. FUJIMOTO:  I'm sure you do.

15              MS. FORGIE:  I do.

16              MS. FUJIMOTO:  All right.

17              MS. FORGIE:  I think it is unfair.

18              MS. FUJIMOTO:  That's only because he

19      didn't factor any of it in, right?

20              MS. FORGIE:  No, because you are asking

21      him to comment on a paper that he's never read

22      before, and it doesn't even have the references to

23      it.

24              MS. FUJIMOTO:  Okay.  All right.  We'll

25      take care of that at trial.

Dennis Weisenburger, M.D.

1              (Reporter asks to repeat.)

2              MS. FUJIMOTO:  We will take care of it at

3      trial.

4              MS. FORGIE:  That's not the way scientists

5      read documents.

6              MS. FUJIMOTO:  Okay.

7      BY MS. FUJIMOTO:

8         Q.   Dr. Weisenburger, if you go to page 6, and

9      you go to "Connecting pollution to disease," and it

10     is the second-to-the-last paragraph.  And it says,

11     "Southern California residents are slightly more

12     likely to get cancer than the national average of 4

13     in 10 people, said South Coast Air Quality

14     Management District Health Effects Officer Joe K.

15     Ghosh."

16             Do you see that?

17             MS. FORGIE:  Objection.

18             THE WITNESS:  I see it.

19     BY MS. FUJIMOTO:

20        Q.   Did you do any research as to the cancer

21     incidents in the particular areas in which Mr. Russo

22     lived or Southern California generally?

23        A.   No.

24        Q.   Okay.  If you go to the last paragraph,

25     they continue to talk about the cardiovascular

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1  effects, mortality and then it says, "The air toxins

2  that people in our basin are exposed to will

3  increase your cancer risk by 900 in a million."

4         Do you see that?

5         MS. FORGIE:  Objection.

6         THE WITNESS:  That's what it says.

7  BY MS. FUJIMOTO:

8     Q.   Did you do any research as to how much

9  cancer risk might be increased in people in the LA

10  basin area based on the -- based on the air toxins?

11    A.   No.  But as I said, again, Non-Hodgkin's

12  Lymphoma has never been linked to air pollution.

13    Q.   Right.

14         It is a cancer, though, isn't it?

15    A.   Yes.

16    Q.   Okay.  You are familiar, Dr. Weisenburger,

17  with Prop. 65, right?

18    A.   Remind me, what is Prop. 65?

19    Q.   Well, living in Southern Cal -- or in

20  California, I assumed you knew everything about it.

21         Prop. 65 is based, in part, on IARC

22  findings and they basically require warnings on

23  anything that might be a carcinogen.

24    A.   Yes, I'm aware of that.

25    Q.   And have you seen Prop. 65 warnings in

Dennis Weisenburger, M.D.

1    different places?

2          A.    I have.

3          Q.    Okay.  Would you agree that they are in

4    every single parking garage in California?

5          A.    I don't --

6                MS. FORGIE:  Objection.

7                THE WITNESS:  I don't know that.

8    BY MS. FUJIMOTO:

9          Q.    Do you know if there is one in the parking

10   garage at City of Hope?

11         A.    I don't know that.

12         Q.    I'll mark as Exhibit No. 13 to the

13   deposition --

14               (Exhibit 13 marked for identification.)

15   BY MS. FUJIMOTO:

16         Q.    -- a typical Prop. 65 warning.

17               MS. FORGIE:  Counsel, what does this have

18   to do with the case-specific deposition we are doing

19   now?

20               MS. FUJIMOTO:  It is Mr. Russo's exposure

21   to carcinogens throughout his life as opposed to

22   isolated instances.

23   BY MS. FUJIMOTO:

24         Q.    Dr. Weisenburger, are you familiar with

25   this type of Prop. 65 warning?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis Weisenburger, M.D.

1      A.   Yeah, I've seen warnings like this.

2      Q.   Okay.

3      A.   It is.

4      Q.   Okay.  And I'll represent to you, it won't

5   make a difference at trial, but it is a picture that

6   I took that's in my -- I work in an office area with

7   office buildings and nice buildings and nice parking

8   garage, and this is in my parking garage.

9           Do you know whether Mr. Russo worked at

10  any locations where there are these Prop. 65

11  warnings?

12     A.   I do not.

13     Q.   Okay.  You -- did you look into what work

14  he did?

15     A.   He was a salesman.

16     Q.   Okay.  Do you remember or look into the

17  different locations that he worked at?

18     A.   No.

19     Q.   Okay.  And so you -- did you do anything

20  in your assessment to determine potential

21  environmental exposures he may have had in his

22  work-related activities?

23     A.   Well, we talked about exposure to other

24  pesticides, solvents, things that are known causes

25  of Non-Hodgkin's Lymphoma.  Those things, I did ask

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1    him about.  But I didn't ask him about signs in his

2    garage or air pollution.

3         Q.   Okay.  Did you ask him about any hobbies

4    that he had?

5         A.   Yes.

6         Q.   Okay.  What hobbies?

7         A.   Oh, I probably asked it in the terms of,

8    you know, "Did you use glues or solvents in any of

9    your hobbies?"  I didn't ask him specifically what

10   his hobbies were.  At least, I don't remember that I

11   did.

12        Q.   Did you ask him about specific chemicals

13   that you are specifically interested in vis-a-vis

14   cancer?

15        A.   I asked him about chemicals that have been

16   implicated in causing Non-Hodgkin's Lymphoma.  I

17   didn't ask about cancer in general.

18        Q.   Okay.  What specific chemicals that you

19   relate specifically to Non-Hodgkin's Lymphoma?

20        A.   Well, I asked him about, obviously,

21   pesticides, other pesticides he may or may not have

22   used.  I asked him about solvents, paint thinners,

23   specifically glues that he might have used in

24   hobbies that contain solvents.

25             So I mainly explored solvents because

Dennis Weisenburger, M.D.

1    that's the one other class of chemicals that are

2    implicated in causing Non-Hodgkin's Lymphoma.

3         Q.   Okay.  What type of chemicals are in

4    solvents are associated with NHL?

5         A.   Well, we -- we don't really know for sure

6    what the specific chemicals are in solvents.

7    Benzene has been one chemical that's been implicated

8    and it's in a lot of solvents.  But solvents tend to

9    be very complex mixtures of organic chemicals, and

10   we -- we usually don't know what in the solvent

11   mixture it actually is.  It could be multiple

12   things.  It could be benzene.

13        Q.   Right.

14             Benzene, certainly, is one that's

15   recognized as a chemical that can cause NHL?

16        A.   Yes.

17        Q.   Right.

18             Any other specific chemicals, in your

19   mind?

20        A.   Well, there are a whole array of

21   pesticides.

22        Q.   Well, specific ones, like, there are

23   specific ones, right?  Like dioxin and chlorophenols

24   and --

25        A.   Lindane.  Dioxin, the data is not so solid

Dennis Weisenburger, M.D.

1  on, but there is an -- I have a list at home of the

2  various pesticides that have been implicated in

3  Non-Hodgkin's Lymphoma.  And it is about, I don't

4  know, a dozen or two dozen pesticides.

5      Q.   Okay.  Maybe you can bring that next time

6  we have a deposition.

7           MS. FORGIE:  No way.

8  BY MS. FUJIMOTO:

9      Q.   And I'll ask you about it again.

10          Well, did you factor that list into your

11  assessment of whether Mr. Russo was exposed to any,

12  other that then glyphosate?

13     A.   I did, yes.

14     Q.   Okay.

15     A.   He wasn't exposed to any -- he wasn't

16  exposed to any other pesticides.

17     Q.   But you took that list that you have of

18  potential pesticide components or chemicals --

19     A.   Yes.

20     Q.   -- into account?

21     A.   Yes, I did.

22     Q.   Okay.  Well, as part of the bases of his

23  opinion.  I think that would be fair for you to

24  share with us.  We will deal with that next time.

25          I take it, then -- let's see, I'll mark as

Dennis Weisenburger, M.D.

```
 1   -- what are we at?  Next exhibit?  Let me see here.

 2        A.   13.

 3        Q.   13, okay.  So we are going to mark as

 4   Exhibit 14.

 5             (Exhibit 14 marked for identification.)

 6             MS. FUJIMOTO:  Okay.  A collection of

 7   medical records for Mr. Russo.  Do you want those?

 8             MS. FORGIE:  I don't know.

 9   BY MS. FUJIMOTO:

10        Q.   And let me point out for the record that

11   these are a collection of records, both Cedars-Sinai

12   Medical Center and a couple of other health care

13   providers that go in chronological order, for ease

14   of reference.  But each of them is Bates numbered so

15   we will be able to identify later if we talk about

16   specific ones.

17             Would you take a look through these and --

18   that are marked as Exhibit 14, and tell me whether

19   you recognize them?  I know you don't recall the

20   complete set that you reviewed, but are there any in

21   here that you say, "Oh, boy, I didn't see those"?

22        A.   I actually don't remember because it was

23   months ago when I went through the medical records.

24        Q.   Okay.

25        A.   I didn't go through all the medical
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis Weisenburger, M.D.

1    records again this weekend.  I pretty much focused

2    on my report.

3         Q.   Okay.

4         A.   I did have records going back prior to the

5    -- to the diagnosis but...

6         Q.   Okay.  Well, I'll ask you specifics, then.

7         A.   Okay.

8         Q.   Okay.  And we have already talked about

9    this, but you -- I -- I understand that you agree

10   that age is a risk factor for pretty much all

11   cancers because of what we have talked about before,

12   the ongoing or cumulative affect of genetic

13   mutations and exposures?

14        A.   Yes.

15        Q.   Okay.  Did you consider age to be a risk

16   factor for Mr. Russo?

17        A.   Well, I don't consider age a causative

18   risk factor.  Age is a risk factor for all of us.

19        Q.   Okay.  And gender?

20        A.   For some cancers, gender is also a risk

21   factor.

22        Q.   Okay.  And NHL is one of them, right,

23   meaning it occurs more in men than women?

24        A.   Yes.

25        Q.   Okay.  Family history?

1       A.    Yes.

2       Q.    Right.







Dennis Weisenburger, M.D.







Dennis Weisenburger, M.D.





Dennis Weisenburger, M.D.



Dennis Weisenburger, M.D.



Dennis Weisenburger, M.D.







17    BY MS. FUJIMOTO:

18         Q.    We talked earlier about the cumulative

19    genetic errors that occur in every person over time

20    and how those are influenced by the environment.  My

21    question to you is:  Whether you made an assessment

22    as to the role of genetic -- random genetic errors,

23    the role that random genetic errors may have played

24    in Mr. Russo's lymphoma?

25         A.    So random genetic errors would be largely

Dennis Weisenburger, M.D.

1    considered in the background to Non-Hodgkin's

2    Lymphoma.  And if then you also have exposure to a

3    specific etiologic risk factor that would increase

4    your risk above the background level.

5         Q.   Would you agree that a person -- that the

6    number of cumulative genetic errors that occur

7    randomly can be different for every person, just

8    from a genetic basis?

9         A.   Yes.

10        Q.   And do you agree that the number of errors

11   can be impacted by environmental exposure?

12        A.   Yes.

13        Q.   And those are environmental exposures over

14   time, right?

15        A.   Yes.

16        Q.   Okay.  Can you rule out that random

17   genetic errors played some role in the -- Mr.

18   Russo's Non-Hodgkin's Lymphoma?

19        A.   No.

20        Q.   Okay.  Can you quantify what role -- what

21   percentage role genetics played in his cancer?

22             MS. FORGIE:  Objection.

23             THE WITNESS:  I don't understand the

24   question.

25   BY MS. FUJIMOTO:

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1      Q.   Well, if you can't rule it out, if you

2  can't rule out genetics playing some role, are you

3  able to quantify what -- how big a role?

4           MS. FORGIE:  Objection.

5           THE WITNESS:  So you are talking about

6  random genetic abnormalities?

7  BY MS. FUJIMOTO:

8      Q.   Yes.

9      A.   Because genetics plays a role in every

10 cancer.

11     Q.   Right.  Exactly.

12     A.   So as I said, the random errors would be

13 considered in the population risk for any specific

14 cancer.  And so that would be the so-called

15 background risk, okay?  The risk in the general

16 population.

17           If one then also had risk associated with

18 environmental exposures, that would increase your

19 risk above the background population, which is what

20 we find in the epidemiologic studies when we look at

21 Roundup.

22     Q.   And we find it when we look all other

23 environmental exposures, too?

24           MS. FORGIE:  Objection.

25           THE WITNESS:  Well, not for Non-Hodgkin's

Dennis Weisenburger, M.D.

1    Lymphoma.  You might find it for lung cancer or you

2    might find it for -- depending on what exposures you

3    look at.  If you look at the exposures due to

4    smoking, you'll find it for lung cancer.

5    BY MS. FUJIMOTO:

6        Q.   We find it for benzene in Non-Hodgkin's

7    Lymphoma, right?

8        A.   Well, there is data out there that -- that

9    links the benzene to Non-Hodgkin's Lymphoma, that's

10   true.

25   BY MS. FUJIMOTO:

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis Weisenburger, M.D.

1     Q.   But you didn't look into his living and

2   working environments in San Pedro or the LA basin,

3   right?

4            MS. FORGIE:  Objection.

5            THE WITNESS:  I didn't.

6   BY MS. FUJIMOTO:

7     Q.   Okay.  And, certainly, if someone is

8   exposed to something that increases their risk of

9   developing Non-Hodgkin's Lymphoma compared to the

10   background of people who aren't exposed to that

11   particular thing, it doesn't mean they are going to

12   get cancer, right?

13    A.   No.  It means that they have an increased

14   risk of getting cancer.

15    Q.   Right.

16    A.   But -- but --

17    Q.   But it doesn't mean they will?

18            MS. FORGIE:  Wait, let him finish, please.

19   BY MS. FUJIMOTO:

20    Q.   Right?

21    A.   But it -- that's correct.  It doesn't mean

22   that they actually will.

23    Q.   Okay.  And, certainly, a person can have

24   zero known or recognized risk factors that would

25   increase their risk of NHL over background and yet

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1  they could still get NHL, right?

2      A.   Right.  As the other background -- what's

3  considered the background risk.

4      Q.   People without recognized risk factors get

5  NHL, right?

6      A.   Yes.  Yes.

7      Q.   And isn't it correct that the majority of

8  patients diagnosed with Non-Hodgkin's Lymphoma don't

9  have any recognized or established causes or risk

10  factors?

11     A.   In general, that's true.  Physicians

12  generally don't go into great detail trying to

13  elucidate the causes.  But I think, in general,

14  that's true.

15     Q.   And it is even more so with the rarer form

16  of Central Nervous System, or CNS, Lymphoma, right?

17          MS. FORGIE:  Objection.

18          THE WITNESS:  That's true.

19          MS. FUJIMOTO:  I'm going to mark as

20  Exhibit 16 to the deposition.

21          (Exhibit 16 marked for identification.)

22  BY MS. FUJIMOTO:

23     Q.   And I have all the supplemental data.

24  You'll see that part of it is folded over because

25  the supporting data for the study couldn't fit on

Dennis Weisenburger, M.D.

1    just an 8-by-10, so they are on a long sheet that is

2    -- is folded.

3             This is a paper called "Stem Cell

4    Divisions, Somatic Mutations, Cancer Etiology, and

5    Cancer Prevention," by Cristian Tomasetti and Lu Li

6    and Bert Vogelstein.  Have you seen this before,

7    Doctor?

8        A.   You know, I have seen it.  I think I saw

9    it back when it originally was published.

10       Q.   Okay.  In 2017?

11       A.   Probably.

12       Q.   And do you know -- or do you know of the

13   authors from Johns Hopkins?

14       A.   Bert Vogelstein's a very prestigious

15   cancer researcher, mainly in colon cancer.

16       Q.   All are pretty highly respected; don't you

17   think?

18       A.   Well, he is the only name I recognize.

19       Q.   All right.  So if you look at -- at this

20   Tomasetti paper, looking at the abstract first, it

21   says, the first sentence, "Cancers are caused by

22   mutations that may be inherited, induced by

23   environmental factors, or result from DNA

24   replication errors."

25             Do you see that?

Dennis Weisenburger, M.D.

```
 1        A.    Yes.

 2        Q.    And you agree with that, right?

 3        A.    Yes.

 4        Q.    That's what we have just been generally

 5   talking about?

 6        A.    Yes.

 7        Q.    Correct?

 8        A.    Yes.

 9        Q.    Okay.  And then you'll see that they go on

10   to say, "We studied the relationship between the

11   number of normal stem cell divisions and the risk of

12   17 cancer types in 69 countries throughout the

13   world.  The data revealed a strong correlation

14   between cancer incidence and normal stem cell

15   divisions in all countries, regardless of their

16   environment."

17              Do you see that?

18        A.    Yes.

19        Q.    And it says, "The major role of R" --

20   that's "random" -- "mutations in cancer etiology was

21   supported by an independent approach, based solely

22   on cancer genome sequencing and epidemiological

23   data, which suggested that random mutations are

24   responsible for two-thirds of the mutations in human

25   cancers."
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1            Do you see that?

2       A.   That's what he says.

3       Q.   And so when you read this paper, did you

4  agree or disagree with the overall concept of the

5  paper, what they were looking at?

6       A.   Well, what they are trying to do is trying

7  to understand what proportion of cancer is due to

8  random errors, what proportion of cancer is due to

9  environmental factors, and what proportion is due to

10  inheritance.

11            And, you know, I don't remember the paper

12  very well, so I really can't comment any more on it

13  because, you know, I -- it's been a long time since

14  I read it.

15       Q.   Do you recall that what they found -- and

16  you can see from the abstract what we, certainly,

17  can -- we'll go through some of their specific

18  findings.

19            But do you recall that generally what they

20  found is that by looking at all 69 countries that

21  had very different environments and different

22  environmental exposures, that the majority of

23  cancers are attributable to random replication

24  errors or gene mutations versus the environment or,

25  even less so, inheritance?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1          MS. FORGIE:  Objection.  He's been asked

2    about a paper he is not entirely --

3          (Reporter asks for clarification.)

4          MS. FORGIE:  He's been asked about a paper

5    he is not entirely familiar with.

6          (Reporter asks for clarification.)

7          MS. FORGIE:  That's not the way -- it is

8    not the way he reviews papers.

9          THE WITNESS:  So it's been a long time

10   since I've seen this paper.  I don't remember much

11   about it.  And I do know that there was a lot of

12   controversy around this paper and a lot of

13   disagreement among researchers regarding the

14   calculations and conclusions.  So it is -- it is an

15   interesting paper, but it is also a very

16   controversial paper.

17   BY MS. FUJIMOTO:

18        Q.   Can you cite me to any papers that have

19   been published since then that speak to the

20   controversy or present contrary data?

21        A.   Not specifically, no, but there are papers

22   out there.  I mean, I'd have to read this.  I'd have

23   to read the references.  I'd have to do a literature

24   search, none of which I have done.  So it is very

25   difficult for me to comment on this more than in a

Dennis Weisenburger, M.D.

1    very general way.

2         Q.   Would you be more comfortable if we take a

3    break and you read through it all carefully?

4         A.   No, because it is -- it would take me --

5    take me at least an hour to read this.

6         Q.   If you go to the last page, the last

7    column, last paragraph where they talk about the

8    data and the relationship, and it says, "First, the

9    data demonstrate that the correlation between cancer

10   incidence and the number of stem cell divisions in

11   various tissues cannot be explained by peculiarities

12   of the US population or its environment."

13            Do you agree or disagree with that?

14            MS. FORGIE:  Objection.  I don't think it

15   is fair to ask him questions, when he's already

16   stated he hasn't read it.  He hasn't read the

17   references.  It is completely unfair.

18            Doctor, only answer if you can.

19            THE WITNESS:  I don't have an opinion on

20   that.

21   BY MS. FUJIMOTO:

22        Q.   Okay.  They go on to say, on the

23   right-hand column, "Our results are fully consistent

24   with epidemiological evidence on the fraction of

25   cancers in developed countries that are potentially

Dennis Weisenburger, M.D.

1    preventable through improvements in environment and

2    lifestyle."

3              Do you agree or disagree with that?

4              MS. FORGIE:  Same objection.  Unfair.

5              THE WITNESS:  I don't have an opinion on

6    that.

7    BY MS. FUJIMOTO:

8        Q.   Okay.  They go on to say, "Of equal

9    importance, these studies provide a well-defined,

10   molecular explanation for the large and apparently

11   unpreventable component of cancer risk that has long

12   puzzled epidemiologists."

13             Do you agree or disagree with that?

14             MS. FORGIE:  Objection.

15             If you know?

16             THE WITNESS:  I don't have an opinion on

17   that.  I really can't comment on this paper without

18   reading it carefully, looking at all the data and

19   doing my own research in the literature on this

20   topic.

21   BY MS. FUJIMOTO:

22       Q.   Do you consider yourself to have any

23   expertise in -- in the molecular biology of genetic

24   mutations?

25       A.   I have a general knowledge of it as a

Dennis Weisenburger, M.D.

1    physician and pathologist.

2         Q.   So when this paper talks about the

3    "sources of random mutations in normal cells being

4    related to quantum effects of base pairing, mistakes

5    made by polymerases, hydrolytic deaminization of

6    bases, and damage by endogenously produced reactive

7    oxygen species or other metabolites," is that

8    something that you would be able to evaluate and

9    opine on, if you had time?

10        A.   Unless I did some research.  I mean, I

11   would agree with that statement.  But we know that

12   there is random damage that, usually, it's repaired

13   or the cells die.

14        Q.   Okay.  So for -- to the extent their

15   findings and the conclusion of this paper is that

16   irrespective -- when they take into account

17   environment in 69 different countries, that the

18   majority of cancers are attributable to random

19   genetic mutations, if that's the conclusion and

20   their ultimate finding, do you agree or disagree

21   with that?

22             MS. FORGIE:  Objection.

23   BY MS. FUJIMOTO:

24        Q.   Or not have an opinion?

25             MS. FORGIE:  Objection.  Unfair.

Dennis Weisenburger, M.D.

 1    Mischaracterizes the paper.

 2            THE WITNESS:  I don't have an opinion on

 3    it, because I haven't really read the paper

 4    carefully, and I haven't researched the topic at

 5    all.

 6            MS. FUJIMOTO:  Okay.  Well, Kathryn,

 7    apparently, understands it, if you know I've have

 8    misstated it.  Right?

 9            MS. FORGIE:  Well, I know your expert, Dr.

10    Mucci, has said she doesn't agree with this paper.

11            MS. FUJIMOTO:  Yeah.  Right.  Well, we

12    have it and -- anyway.

13            MS. FORGIE:  Well, I'm telling you:  Your

14    own expert doesn't agree with this.

15            MS. FUJIMOTO:  Yeah, talk about

16    misstating.

17            (Reporter admonishes to speak one at a

18    time.)

19            MS. FUJIMOTO:  Yes, understood.

20    Apologies.

21            MS. FORGIE:  Sorry.

22    BY MS. FUJIMOTO:

23        Q.   All right.  So, Doctor, let me ask you

24    this:  Is there any technique or medical test that

25    could determine the cause of a person's CNS

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis Weisenburger, M.D.

1    Lymphoma?

2        A.    Repeat the question.  I'm sorry.

3        Q.    Is there a technique or medical test that

4    can determine the cause of a person's CNS Lymphoma?

5        A.    Well, you can stain for Epstein-Barr

6    virus.  If you find Epstein-Barr virus in the tumor,

7    then you know that that's the cause of the tumor.

8    But otherwise, I would say no.

9        Q.    And under the current state of knowledge

10   in medical technology, setting aside the EBV virus,

11   is there any other way to determine the cause of CNS

12   Lymphoma?

13       A.    There is no test that would tell you that

14   a tumor is due to a specific agent.

15       Q.    All right.  Let's take a short break.

16           THE VIDEOGRAPHER:  With the approval of

17   counsel, going off the record.  The time is

18   approximately 11:40 a.m.

19           (Recess.)

20           THE VIDEOGRAPHER:  With the approval of

21   counsel, back on the record.  The time is

22   approximately 11:44 a.m.  This marks the beginning

23   of Video No. 3.

24           MS. FUJIMOTO:  All right, Doctor, I've

25   looked at everything, and I have no further

Dennis Weisenburger, M.D.

1    questions for you.

2              MS. FORGIE:  No questions.  Thank you,

3    Doctor.

4              MS. FUJIMOTO:  All right.  We are

5    finished.  Thank you very such.

6              THE WITNESS:  Thank you.

7              THE VIDEOGRAPHER:  With the approval of

8    counsel, this concludes today's video deposition.

9    Today's deposition consists of three recorded files.

10   The time is approximately 11:44 a.m.  We are now off

11   the record.

12             COURT REPORTER:  So both parties would

13   like to order a copy?

14             MS. FUJIMOTO:  Yes.  Standard order and a

15   rough draft.

16             MS. FORGIE:  Yes, I'd like to order a

17   copy.  And the doctor would like to read and sign.

18             (Deposition concluded at 11:44 a.m.)

19

20

21

22

23

24

25

Dennis Weisenburger, M.D.

1              Please be advised that I have read the

2      foregoing deposition.  I hereby state there are:

3      (Check one)

4

5      _____ NO CORRECTIONS ATTACHED

6

       _____ CORRECTIONS ATTACHED

7

8

9      _____

       DENNIS WEISENBURGER, MD

10

11

12     _____

       Date signed

13

14

15     Case Title:        Russo vs. Monsanto

16     Date of Deposition:  November 4, 2019

17     Job No.:            230221

18

19                       --oOo--

20

21

22

23

24

25

Dennis Weisenburger, M.D.

```
 1                 WITNESS CORRECTION SHEET

 2

 3    Please use this form if you have any corrections to

      your testimony.  Indicate the page number, line

 4    number and state your correction.  Please make it

      clear if you are adding, changing or deleting

 5    testimony.

 6    DEPOSITION OF:      Dennis Weisenburger, MD

      CASE:               Russo vs. Monsanto

 7    DATE OF DEPOSITION:  November 4, 2019

 8

      I, (please print name)_____, have the

 9    following corrections to make to my deposition:

10    PAGE     LINE                ADD/CHANGE/DELETE

11    _____    _____    _____

12    _____    _____    _____

13    _____    _____    _____

14    _____    _____    _____

15    _____    _____    _____

16    _____    _____    _____

17    _____    _____    _____

18    _____    _____    _____

19    _____    _____    _____

20    _____    _____    _____

21    _____    _____    _____

22    _____    _____    _____

23    _____    _____    _____

24    _____    _____    _____

25    SIGNATURE_____DATE_____
```

1                  REPORTER'S CERTIFICATE

2

3        I, JOSHUA MANEA, a duly licensed Certified

4   Shorthand Reporter of the State of California,

5   hereby certify that the witness in the foregoing

6   deposition was by me duly sworn;

7        That said testimony was taken down in

8   stenographic shorthand by me, a disinterested

9   person, at the time and place therein stated and was

10  thereafter reduced to typewriting and that the

11  testimony as transcribed is a true record of the

12  testimony given by the witness;

13       That before completion of the deposition,

14  review of the transcript [x] was [ ] was not

15  requested. If requested, any changes made by the

16  deponent (and provided to the reporter) during the

17  period allowed are appended hereto.

18       I further certify that I am not of counsel or

19  attorney for either or any of the parties to the

20  said deposition, nor in any way interested in the

21  outcome of this cause.

22       DATED this 14th day of November, 2019.

23       _____

24                    JOSHUA MANEA, Calif. CSR No. 13754

25