# Exhibit 7

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1                 UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: ROUNDUP PRODUCTS           )

     LIABILITY LITIGATION              )

5    _____ ) MDL No. 2741

     This document relates to:        ) Case No. 3:16-md-02741-VC

6                                      ) Volume I

     Giglio v. Monsanto Co., et al. )

7    Case No. 3:16-cv-05658-VC         )

     _____ ) Pages 1 to 184

8

9

10

11

12          Videotaped Deposition of DENNIS D.

13     WEISENBURGER, MD, Volume I, taken on behalf of

14     the Defendants, at 700 Huntington Drive,

15     Monrovia, California 91016, commencing at

16     9:05 a.m., Monday, September 23, 2019, before

17     Elizabeth Borrelli, a Certified Shorthand

18     Reporter in the State of California, License

19     No. 7844.

20

21

22

23

24

25

Dennis D. Weisenburger, M.D.

```
 1                A P P E A R A N C E S

 2

 3   For the Plaintiff:

 4            ANDRUS WAGSTAFF, P.C.
              BY:  KATHRYN M. FORGIE

 5            Attorney at Law
              1901 Harrison Street

 6            Suite 1100
              Oakland, California 94612

 7            (310) 339-8214 (direct)
              kathryn.forgie@andruswagstaff.com

 8

 9   For the Defendants:

10            SHOOK, HARDY & BACON
              BY:  MICHELLE M. FUJIMOTO

11            Attorney at Law
              5 Park Plaza

12            Suite 1600
              Irvine, California 92614-2546

13            (949) 475-1500
              mfujimoto@shb.com

14

              - AND -

15

              ARNOLD & PORTER KAYE SCHOLER

16            BY:  KATHRYN M. PODSIADLO
              Attorney at Law

17            777 South Figueroa Street
              44th Floor

18            Los Angeles, California 90017-5844
              (213) 243-4273 (direct)

19            kathryn.podsiadlo@apks.com

20        Also Present:

21            JIM LOPEZ, Videographer

22

23

24

25
```

Dennis D. Weisenburger, M.D.

1                   I N D E X

2    WITNESS                              EXAMINATION

3    DENNIS D. WEISENBURGER, MD

4    By MS. FUJIMOTO                              7

5

6

7                   EXHIBITS

8

9    WEISENBURGER, MD                            PAGE

10   Exhibit 1      Monsanto Company's Notice to        6
                    Take Oral and Videotaped
11                  Deposition of Dr. Dennis
                    Weisenburger, 9 pages
12
     Exhibit 2      Dennis Weisenburger, MD,            6
13                  Materials Considered List, 30
                    pages
14
     Exhibit 3      Dr. Weisenburger Materials          6
15                  List-Case Specific, 1 page
16   Exhibit 4      Plaintiff's R.26 Expert             6
                    Disclosures, 11 pages
17
     Exhibit 5      Expert Report of Dennis D.          6
18                  Weisenburger, MD, 156 pages
19   Exhibit 6      Article titled "Origin of           6
                    Chromosomal Translocations in
20                  Lymphoid Cancer," 12 pages
21   Exhibit 7      Article titled "AID Produces        6
                    DNA Double-Strand Breaks in
22                  Non-Ig Genes and Mature B-Cell
                    Lymphomas with Reciprocal
23                  Chromosome Translocations," 11
                    pages
24
     Exhibit 8      Plaintiff Fact Sheet dated         51
25                  December 14, 2018, 10 pages

Dennis D. Weisenburger, M.D.

| | | | |
|---|---|---|---|
| 1 | Exhibit 9 | Plaintiff Fact Sheet dated November 2, 2018, 12 pages | 51 |
| 2 | | | |
| | Exhibit 10 | Plaintiff Fact Sheet dated March 21, 2019, 12 pages | 51 |
| 3 | | | |
| 4 | Exhibit 11 | Plaintiff Fact Sheet dated August 15, 2019, 13 pages | 51 |
| 5 | | | |
| | Exhibit 12 | Pahwa article, Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project, 19 pages | 68 |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| | Exhibit 13 | Andreotti paper, "Glyphosate Use and Cancer Incidence in the Agricultural Health Study," 8 pages | 88 |
| 10 | | | |
| 11 | | | |



| | | | |
|---|---|---|---|
| 18 | | | |
| | Exhibit 18 | Article titled ""Chronic inflammation, joint replacement and malignant lymphoma," 4 pages | 134 |
| 19 | | | |
| 20 | | | |
| 21 | Exhibit 19 | Article titled "Diffuse B-Cell Non-Hodgkin's Lymphoma Presenting Atypically as Periprosthetic Joint Infection in a Total Hip Replacement," 12 pages | 137 |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

▋  ██████████      ██████████████████████      ████

                  ████████████████

2

   Exhibit 21    United States Environmental        157

3                 Protection Agency letter dated

                  August 7, 2019, 2 pages

4

   ██████████      ██████████████████████      ████

▋                  ████████████████

6  Exhibit 23    Letter to Dr. Weisenburger from    177

                  Kevin Rowe with Andrus Wagstaff

7                 dated June 20, 2019, 1 page

8

9                 INFORMATION REQUESTED

10                      (None)

11                UNANSWERED QUESTIONS

12                      (None)

13 ///

14 ///

15 ///

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.

```
 1          MONROVIA, CALIFORNIA; MONDAY, SEPTEMBER 23, 2019

 2                          9:05 A.M.

 3

 4             (Whereupon Exhibit 1 was marked for

 5             identification.)

 6             (Whereupon Exhibit 2 was marked for

 7             identification.)

 8             (Whereupon Exhibit 3 was marked for

 9             identification.)

10             (Whereupon Exhibit 4 was marked for

11             identification.)

12             (Whereupon Exhibit 5 was marked for

13             identification.)

14             (Whereupon Exhibit 6 was marked for

15             identification.)

16             (Whereupon Exhibit 7 was marked for

17             identification.)

18             THE VIDEOGRAPHER:  We are now on the

19   record.  My name is Jim Lopez.  I'm the videographer

20   for Golkow Litigation Services.  Today's date is

21   September 23, 2019, and the time is approximately

22   9:05 a.m.  This video deposition is being held in

23   Monrovia, California in the matter in re: Roundup

24   Products Liability litigation, MDL No. 2741 for

25   United States District Court, Northern District of
```

Dennis D. Weisenburger, M.D.

```
 1   California.  Case specific Giglio v. Monsanto

 2   Company, et al.  The deponent is Dr. Dennis

 3   Weisenburger.  Counsel will be noted on the

 4   stenographic record.

 5            Will counsel please identify themselves.

 6            MS. FORGIE:  Kathryn Forgie for the

 7   plaintiffs.

 8            MS. FUJIMOTO:  Michelle Fujimoto of Shook,

 9   Hardy & Bacon on behalf of defendants.

10            MS. PODSIADLO:  Kathryn Podsiadlo for

11   Monsanto.

12            THE VIDEOGRAPHER:  The court reporter will

13   now swear in the witness.

14            (Discussion off the record.)

15              DENNIS D. WEISENBURGER, MD,

16            having been duly administered

17          an oath in accordance with CCP 2094,

18         was examined and testified as follows:

19                    EXAMINATION

20   BY MS. FUJIMOTO:

21      Q.   Good morning, Dr. Weisenburger.

22      A.   Good morning.

23      Q.   My name is Michelle Fujimoto, and, as you

24   know, I represent Defendant, Monsanto Company, in

25   the lawsuit brought by Mr. Giglio.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.

1              Do you understand that?

2         A.   I do.

3         Q.   And I've seen quite a number of

4    transcripts so I'm aware that you have given quite a

5    number of depositions generally and quite a number

6    in this litigation; is that correct?

7         A.   Yes.

8         Q.   Okay.  Would it be fair, then, for me to

9    assume that we can forego all of the preliminaries

10   about the process today?

11        A.   Yes.

12        Q.   Okay.  But you do understand, as always,

13   that you're under oath, correct?

14        A.   Yes.

15        Q.   Okay.  Have you had a chance to go back

16   and review any of the transcripts of your other

17   depositions in the Roundup litigation?

18        A.   I did not.

19        Q.   Okay.  Sitting here today, is there

20   anything in any of the prior depositions that you

21   have since that time thought, "Oh, I wish I had said

22   this differently or I made an error and I need to

23   change it"?

24             MS. FORGIE:  Objection.

25             THE WITNESS:  Not that I can recollect,

Dennis D. Weisenburger, M.D.

1    no.

2    BY MS. FUJIMOTO:

3        Q.    Okay.  And so I take it, then, at least as

4    you sit here today, you stand by all of the

5    testimony that you gave under oath in the other

6    Roundup cases?

7        A.    Yes.

8        Q.    Okay.  And I understand that in those

9    cases, you also served expert reports; is that true?

10       A.    In some of them, yes.

11       Q.    Okay.  And in those in which you served

12   expert reports, have you gone back and looked at any

13   of them and thought that you needed to change

14   anything?

15       A.    No.  I might have made some changes at the

16   time I was deposed, but that would be only -- the

17   only thing.

18       Q.    And those would be reflected on the

19   record --

20       A.    Yeah.

21       Q.    -- of the deposition in that case?

22       A.    Yes.

23       Q.    Okay.  I am going to start with a few

24   administrative things, get some things marked, and

25   then we can get into -- to some more substance after

Dennis D. Weisenburger, M.D.

1   that.

2           So I've marked as Exhibit No. 1 to the

3   deposition a copy of --

4           MS. PODSIADLO:  Thank you.

5           MS. FUJIMOTO:  Okay --

6   BY MS. FUJIMOTO:

7       Q.   -- of the notice of deposition for your

8   deposition today.

9           Have you seen that document before,

10  Doctor?

11      A.   Yes.

12      Q.   Okay.  And did you take a look at the

13  request for production that was attached to it?

14      A.   Yes.

15      Q.   And did you review each of those to

16  determine whether or not you had responsive

17  documents?

18      A.   Yes.

19      Q.   And did you find any responsive documents?

20      A.   I brought my tabulated billing.  I haven't

21  billed yet other than receiving a retainer, but I

22  brought my tabulated billing up through yesterday.

23      Q.   Okay.  And could I see that, please?

24      A.   Yes.  It's kind of messy.

25      Q.   Okay.  And what else do you have in the

Dennis D. Weisenburger, M.D.

1    file folder that you have in front of you?

2         A.   I have this notice of deposition.  I have

3    my report.  And I have my two reports for general

4    causation that were submitted.

5         Q.   Okay.  Did you have any other documents or

6    res -- materials responsive to the request for

7    production that you didn't bring with you today?

8         A.   No.

9         Q.   Did you have any that you turned over to

10   your counsel but have not been brought today?

11        A.   No.

12             MS. FUJIMOTO:  Just reading this.

13   BY MS. FUJIMOTO:

14        Q.   All right.  Let me walk through a few more

15   of these administrative things before we ask about

16   the invoice.

17             I've marked as Exhibit No. 2 to the

18   deposition a copy of what was served on us a few

19   days ago and it's called a "Materials Considered

20   List."

21             Have you seen that document before,

22   Doctor?

23        A.   Yes.

24        Q.   And did you prepare that document?

25        A.   No.  My lawyers prepared it.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.

```
 1        Q.   Okay.  Did you review it before it was

 2   served?

 3        A.   Yes.

 4        Q.   Okay.  Can you tell me -- as I understand

 5   it, it is an updated or amended materials considered

 6   list for this case, right?

 7        A.   Yes.

 8        Q.   Can you point out to me what was changed

 9   or added?

10        A.   Not really.  Everything is alphabetical so

11   I don't know which things I added and which things I

12   didn't.  I didn't keep track of it.

13        Q.   Okay.  Do you know how many things were

14   added?

15        A.   No, because we kind of do it in a running

16   way.

17        Q.   Okay.  I'll come back to that.

18             What was also provided to us before the

19   deposition -- excuse me -- is a "Dr. Weisenburger

20   Materials List-Case Specific."

21             Have you seen that one before?

22        A.   Yes.

23        Q.   And did you prepare this?

24        A.   No.  My lawyers prepared it.

25        Q.   And did you review it before it was
```

Dennis D. Weisenburger, M.D.

```
 1    served?

 2         A.    Yes.

 3         Q.    And is it accurate with regard to the

 4    materials that you reviewed that were specific to

 5    Mr. Giglio?

 6         A.    Yes.

 7         Q.    It says here the first bullet is Emanuel

 8    Giglio's medical records.

 9              Do you recall which providers you

10    reviewed, which healthcare providers the records

11    came from?

12         A.    ████████████████████████████████████

██    ██████████████████████████████████████

14         Q.    Okay.  Did you -- do you recall or do

15    you -- can you tell me what the date range is for

16    the records that you reviewed?  How far ███████

17    they go and how recent did they go?

18         A.    They went back prior to his diagnosis of

19    lymphoma.  I don't remember how far back they went,

20    but...

21         Q.    More than a year?

22         A.    Probably not.

23         Q.    Okay.  I take it, then -- strike that.

24              So when you were reviewing and evaluating

25    Mr. Giglio's case, was one of the things that you
```

Dennis D. Weisenburger, M.D.

1  did was to look at risk factors he may or may not

2  have for non-Hodgkin's lymphoma?

3      A.   Yes, I did --

4      Q.   And you --

5      A.   -- that.

6      Q.   And you did that only for perhaps a year

7  prior to his diagnosis of NHL in 2014?

8           MS. FORGIE:  Objection.

9           THE WITNESS:  Well, I also had a telephone

10  interview with him for over an hour where we talked

11  about all those -- all those risk factors --

12  BY MS. FUJIMOTO:

13      Q.   Okay.

14      A.   -- so I -- I interviewed him personally.

15      Q.   All right.  So you relied on him to tell

16  you which risk factors he had?

17           MS. FORGIE:  Objection.

18           THE WITNESS:  I quizzed him specifically

19  about different risk factors.

20  BY MS. FUJIMOTO:

21      Q.   Okay.  So -- but in terms of separate and

22  apart from what he told you, did you review any

23  medical records dated earlier than 2013 with regard

24  to Mr. Giglio's health history and risk factors?

25      A.   Probably not.

Dennis D. Weisenburger, M.D.

1      Q.   Okay.  And it says you reviewed his

2    pathology, right?

3      A.   Yes.

4      Q.   Did you review the actual slides?

5      A.   Yes.  The slides of the initial biopsy,

6    that's the --

7      Q.   Okay.

8      A.   That's the only one I reviewed.

9      Q.   Okay.  And when you looked at his

10   pathology slides, did you make any notes about what

11   you saw when you looked down that microscope?

12     A.   I did.

13     Q.   And where are those notes?

14     A.   They're at home.

15     Q.   Okay.

16          MS. FUJIMOTO:  Counsel, I'm going to

17   request production of --

18          MS. FORGIE:  And we're not --

19          MS. FUJIMOTO:  -- those notes.

20          MS. FORGIE:  We're not going to agree to

21   that.  They're -- drafts, notes, all those things

22   are not discoverable.

23          MS. FUJIMOTO:  Well, it's --

24   BY MS. FUJIMOTO:

25     Q.   Doctor, did you --

Dennis D. Weisenburger, M.D.

1      A.   It's in my --

2      Q.   -- take --

3      A.   It's in my report.

4      Q.   Okay.  Did you take those notes as part of

5   the development of your opinion?

6           MS. FORGIE:  Objection.

7           THE WITNESS:  I -- I -- I agreed with the

8   pathology report, but I wrote down the things that I

9   actually reviewed, the slides, the number of slides,

10  the number of stains, the kinds of stains, so that I

11  could -- so I knew what I reviewed.

12  BY MS. FUJIMOTO:

13     Q.   And did you write down what you saw?

14     A.   Very briefly.  I wrote down -- I think I

15  wrote down a description of the cells and I wrote

16  down my interpretation of the immunostains, which

17  agreed with the report.

18     Q.   Did they differ in any respect from the

19  report?

20     A.   No.

21          MS. FORGIE:  Objection.

22  BY MS. FUJIMOTO:

23     Q.   And when we say "the report," we mean the

24  pathology report from the hospital or pathology lab?

25     A.   Yes, that --

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

```
 1        Q.    Okay.

 2        A.    I -- I agreed with the report.

 3        Q.    All right.

 4              MS. FUJIMOTO:  Kathryn, I do want to make

 5    note that we'll request that and we'll discuss it,

 6    meet and confer on that --

 7              MS. FORGIE:  Yeah, there --

 8              MS. FUJIMOTO:  -- offline.

 9              MS. FORGIE:  There's lots of agreements on

10    that --

11              MS. FUJIMOTO:  Sure.

12              MS. FORGIE:  -- that none of this is

13    discoverable.

14              MS. FUJIMOTO:  Fair -- fair enough.

15              MS. FORGIE:  And he's already testified

16    that everything that he wrote in his notes is

17    included in his expert reports.

18              [Reporter requests clarification.]

19              MS. FORGIE:  That everything he test --

20    everything that he put in his notes is included in

21    his expert report.

22              MS. FUJIMOTO:  Okay.  And that's fine.

23    We'll -- we'll talk about it --

24              MS. FORGIE:  Yeah, that's fine --

25              MS. FUJIMOTO:  -- later.
```

Dennis D. Weisenburger, M.D.

1            MS. FORGIE:  I'm happy to talk, but --

2            MS. FUJIMOTO:  Sure.

3            MS. FORGIE:  -- it's not going to change.

4    BY MS. FUJIMOTO:

5        Q.   When you --

6            MS. FUJIMOTO:  So much for meeting and

7    conferring, right?

8            MS. FORGIE:  Well --

9            MS. FUJIMOTO:  All right.

10           MS. FORGIE:  -- I said I'm happy to meet

11   and confer with you.

12           MS. FUJIMOTO:  All right.

13   BY MS. FUJIMOTO:

14       Q.   When you looked down -- what were you

15   looking -- why did you look at Mr. Giglio's

16   pathology slides?

17       A.   Well, I'm a pathologist, so part of my

18   practice whenever I serve as an expert witness is to

19   look at the pathology to make sure the diagnosis is

20   right, because that's critical to a case like this.

21   So -- so I always look at the slides, if possible,

22   before I'm deposed and certainly before trial.

23       Q.   And did -- based on that review, did you

24   conclude that Mr. Giglio, in fact, that it was a

25   correct diagnosis that he had non-Hodgkin's

Dennis D. Weisenburger, M.D.

1    lymphoma?

2        A.   Yes.

3        Q.   And specifically, subtype wise, he had

4    diffused large B-cell lymphoma, correct?

5        A.   Yes.

6        Q.   And we often see that is DLBCL, right?

7        A.   Yes.

8        Q.   The acronym?

9        A.   Yes.

10       Q.   Okay.  Did he -- did his pathology slides,

11   what you looked at, look characteristic and typical

12   of other NHL pathology cases you've reviewed?

13       A.   Well, most of what I've done is diffused

14   large B-cell lymphoma so they look similar.

15       Q.   Okay.

16       A.   Not identical, but they look similar.

17       Q.   All right.  About how many large B-cell

18   lymphomas do you review, say, in a given year or

19   diagnosis based on review?

20       A.   Hundreds.

21       Q.   Hundreds.

22            And has that been the case for several

23   years throughout your practice?

24       A.   Yes.

25       Q.   How many do you think you've seen over the

Dennis D. Weisenburger, M.D.

1    course of your career?

2         A.    Thousands.

3         Q.    Thousands?

4         A.    Tens of --

5         Q.    Okay.

6         A.    -- thousands.

7         Q.    And do those collectively, taking together

8    your -- all of that and your experience in that

9    regard, do they all basically look similar?

10        A.    Well, there's variations, so the variation

11   depends on what -- on the size of the cells, the

12   cytologic features of the cells and then the

13   background inflammatory cells, so there's a fair

14   amount of variability.

15        Q.    But when you look down the microscope, you

16   can pretty much tell that it's a large B-cell

17   lymphoma?

18        A.    Yes.

19        Q.    Okay.  When you look down the microscope

20   at these pathology slides, assuming you don't have

21   any other information, no medical records or

22   anything, you look at it blind, can you tell how old

23   the patient is from where the pathology or the

24   biopsy came from?

25        A.    No.

Dennis D. Weisenburger, M.D.

```
 1        Q.   Can't tell the gender either, right?

 2        A.   No.

 3        Q.   Are you able to tell ethnicity?

 4        A.   No.

 5        Q.   And you can't tell whether or not the

 6   person ever used Roundup --

 7        A.   No.

 8        Q.   -- right?  Okay.

 9             If you look down a pathology slide and a

10   person has been exposed to high doses of radiation,

11   that has pretty distinct features, doesn't it?

12             MS. FORGIE:  Objection.

13             THE WITNESS:  Well, it depends on what I'm

14   looking at.  If it's a tumor, it might look like

15   other tumors that weren't associated with radiation.

16   Sometimes, there are features that are associated

17   with radiation, including a lot of fibrosis and

18   scarring, but it just depends on what I -- what kind

19   of biopsy I'm looking at.

20   BY MS. FUJIMOTO:

21        Q.   But would it be fair to say that it looks

22   different enough that you know to order additional

23   tests to further specify whether or not the person

24   was radiation exposed?

25             MS. FORGIE:  Objection.
```

Dennis D. Weisenburger, M.D.

1            THE WITNESS:  It might prompt me to call

2    the clinician and ask him whether the patient had

3    been radiation exposed.

4    BY MS. FUJIMOTO:

5        Q.   Do you ever order additional tests that

6    would confirm a radiation-related cancer?

7        A.   No.

8        Q.   Do you know whether it's standard of care

9    to do that?

10       A.   I don't believe it is.  I don't know -- I

11   don't know what test I'd order.

12       Q.   Okay.  Are you -- how many times, let's

13   say, in your career have you diagnosed a

14   radiation-related tumor or cancer?

15       A.   I don't really know.  Not very many,

16   probably.

17       Q.   Is that something that's in your

18   wheelhouse or not?

19       A.   Well, if it's a lymphoma, it would be in

20   my wheelhouse or if it was the other kind of

21   hematologic malignancy, like leukemia or other --

22   other diseases, I -- I haven't looked at other organ

23   systems for a long time.  Most of the

24   radiation-induced tumors are sarcomas or carcinomas,

25   so I, in general, don't look at those unless someone

Dennis D. Weisenburger, M.D.

1  asked me to do it in consultation thinking it might

2  be a lymphoma or something.

3      Q.   Okay.  And if we limit it to lymphomas or

4  hematopoietic tumors or cancers, how many

5  radiation-related cases do you think you've

6  diagnosed or seen in your career?

7      A.   I have no idea.

8      Q.   Not many?

9          MS. FORGIE:  Objection.  Asked and

10  answered.  You can answer it --

11          THE WITNESS:  Well --

12          MS. FORGIE:  -- again.

13          Wait.  Let me get my objection.

14          Objection.  Asked and answered.

15          You can answer it again.

16          THE WITNESS:  Well, we often aren't told

17  that the patient had radiation.  Sometimes we know

18  it from the history or from previous pathology

19  reports, but we often don't know it.  Radiation, in

20  general, is not a risk factor for non-Hodgkin

21  lymphoma, but it -- it might come into play in some

22  of the therapy-related leukemias, and sometimes we

23  have the information; sometimes we don't, but it

24  doesn't influence our diagnosis one way or the

25  other.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1   BY MS. FUJIMOTO:

2        Q.   But it looks different, doesn't it?

3        A.   No.

4        Q.   It looks the same as any other lymphoma?

5        A.   Yep, it does.

6        Q.   Hmm, okay.  What about EBV-related

7   lymphomas, do they look the same as the non --

8   NHL -- idiopathic NHL cases?  Sorry.

9        A.   That's a complicated question.  So

10  sometimes they look the same, and sometimes they

11  look somewhat different and you can actually have a

12  clue that it might be related to EBV, but not

13  always.

14       Q.   And if you have a clue that it looks

15  different and might be related, in that instance, do

16  you order additional tests to confirm?

17       A.   Yes.

18       Q.   Okay.  What tests do you order?

19       A.   Well, we can do an in situ hybridization

20  stain called --

21            [Reporter requests clarification.]

22            THE WITNESS:  In situ.

23            In situ hybridization stain called the

24  EBER stain for Epstein-Barr virus proteins.  And if

25  the lymphoma's associated with EBV, then you se

Dennis D. Weisenburger, M.D.

1   positive staining in the nuclei of the cells.

2           There's another stain too, which it's an

3   immunostain for another viral protein call LMP.  And

4   I don't do it as routinely, but that -- that stains

5   the cytoplasm of the cells infected by EBV.  So --

6   so if we're trying to establish a diagnosis of

7   EBV-associated lymphoma, we -- we -- I usually order

8   the EBER stain.

9   BY MS. FUJIMOTO:

10      Q.   And -- and am I right that you do that

11  because EBV is a virus that's recognized as a risk

12  factor and likely cause of a lymphoma?

13      A.   Yes --

14      Q.   Okay.

15      A.   -- it's a cause of the lymphoma.

16      Q.   And so if you have a patient who is -- and

17  help me out, is it EBER positive or EBV positive if

18  the stain is confirmatory?  How would I --

19      A.   You could say it either way.

20      Q.   Okay.  If you have a patient or a case

21  where the pathology is EBV positive, would your

22  conclusion be that the lymphoma was caused by the

23  EBV virus?

24           MS. FORGIE:  Objection.

25           THE WITNESS:  Yes, if all of the cells

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1   were staining.  So sometimes we get secondary

2   infections in lymphomas where only a subset of the

3   cells stain or maybe some of the benign cells that

4   mix stain, and, of course, that is not causing the

5   lymphoma, but if all the tumor cells are staining,

6   then that's good evidence that EBV is actually the

7   cause of the tumor.

8   BY MS. FUJIMOTO:

9       Q.   Okay.  And is it 100 percent or is there

10  some kind of convention as to what percentage

11  threshold there is of stell -- cell-staining

12  positive?

13      A.   It should be more than 90 percent.  It

14  really should be 100 percent, but sometimes the

15  stain doesn't work or in areas of the tissue, the

16  stain may be weak due to other problems, so the

17  convention is usually -- I don't know what it is,

18  something like greater than 90 percent, I would say.

19      Q.   Okay.  And if -- if that is the case, are

20  there further tests that you do or is that

21  confirmatory?

22      A.   It's confirmatory for me.  I mean, there

23  are further tests you can do, but I don't think

24  they're necessary.

25      Q.   If there's some question, though, there's

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.

```
 1   further tests that will be done that will either say

 2   yes or no in terms of EBV positivity?

 3        A.   Yes, there are.

 4        Q.   Okay.  Did you get an opportunity to

 5   review the deposition of Dr. Sawyer that was taken

 6   in this case?

 7        A.   I did.

 8        Q.   You did?

 9        A.   Yes.

10        Q.   Okay.  And based on reviewing that

11   testimony, is there anything in your expert report

12   or opinions that have changed?

13        A.   Only one minor thing.  Yeah, and I don't

14   know what is truth, but in the deposition, it said

15   that he wore work boots when he was supplying --

16   when he was working on -- in his turf business, and

17   then when I questioned him, he said he wore canvas

18   shoes without socks.  So I put both in my report

19   because I wasn't sure.  Maybe he wore his work books

20   one day and canvas shoes the next.  I didn't clarify

21   that, but in -- in Sawyer's report, it said that he

22   considered the canvas shoes as his work boots.  So,

23   I mean, it isn't a change that I made in my report,

24   but it -- it -- it made we wonder whether he ever

25   did really wear work boots.
```

Dennis D. Weisenburger, M.D.

```
 1        Q.   Does it matter to your opinion whether it

 2   was canvas shoes or work boots?

 3        A.   No.

 4        Q.   Okay.  All right.  Some more admin here.

 5   We're going to go to Exhibit No. 4.  It's the expert

 6   disclosure.  I apparently don't have an extra copy.

 7             MS. FORGIE:  I don't --

 8   BY MS. FUJIMOTO:

 9        Q.   You can share it with your --

10        A.   I think you --

11        Q.   -- counsel.

12        A.   -- already gave it to me.

13             MS. FORGIE:  I've got it.

14   BY MS. FUJIMOTO:

15        Q.   Oh, did I -- the disclosure?

16             MS. FORGIE:  No, I don't think she --

17             THE WITNESS:  Oh, oh.

18             [Reporter requests clarification.]

19             THE WITNESS:  I don't know what I said.

20             MS. FUJIMOTO:  He thought I had already

21   given it to him, but I had not, so...

22   BY MS. FUJIMOTO:

23        Q.   So we're on Exhibit No. 4.  Which is

24   called Plaintiff's R or Rule 26 expert disclosures.

25             Have you seen this before,
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.

```
 1   Dr. Weisenburger?

 2        A.   I'm sure I have, yes.

 3        Q.   Okay.  And you'll see on -- the pages

 4   aren't paginated.  If you could look --

 5             MS. FORGIE:  I just looked at that.

 6   BY MS. FUJIMOTO:

 7        Q.   Maybe four pages from the back is a

 8   listing of your name and a description of what areas

 9   of testimony you were expected to give in the case.

10             Do you see that?

11        A.   Yes.

12        Q.   Okay.  Have you -- did you review that and

13   approve it before this was served?

14        A.   Yes.

15        Q.   Okay.  And the first paragraph talks about

16   your anticipated testimony regarding what we would

17   call generic or general causation issues in the

18   case; is that fair?

19        A.   Yes.

20        Q.   And then the second paragraph talks about

21   what you're going to testify to generally as to the

22   plaintiff's medical history, the review of

23   pathology, plaintiff's use of an exposure to Roundup

24   and that those things basically support your opinion

25   that Roundup use was a substantial contributing
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.

1    factor to the NHL; is that right?

2         A.   That's what I do in each case, yes.

3         Q.   Okay.  I was going to say, is this -- is

4    this pretty much just general language that's used

5    in every one of your disclosures?

6         A.   I believe so.

7         Q.   Because Mr. Giglio is not mentioned in

8    this document -- or in this page, right?

9         A.   I think it's general language.

10        Q.   Okay.  And is that a fair summary of the

11   extent of the opinions you plan to give in the case?

12        A.   Yes.  I -- you know, as I do in each

13   case's specific causation, I go through a

14   differential etiology to exclude other causes as

15   well as do a detailed evaluation of Roundup exposure

16   and other pesticide exposures.

17        Q.   Let me ask you on that, have you ever read

18   either a medical textbook or published articles

19   within the medical literature that refer to the

20   terms "differential etiology" as opposed to

21   "differential diagnosis"?

22        A.   No.  It's more of a legal term.

23        Q.   All right.  And so you learned that term

24   for the litigation, right?

25             MS. FORGIE:  Objection.

Dennis D. Weisenburger, M.D.

```
 1              THE WITNESS:  Yes.

 2  BY MS. FUJIMOTO:

 3      Q.   Okay.  All right.  Moving to Exhibit 5,

 4  this is --

 5              MS. FUJIMOTO:  Do you want a copy of his

 6  expert report with attachments?

 7              THE WITNESS:  This is --

 8              MS. FUJIMOTO:  You can have that.

 9              [Reporter requests clarification.]

10              MS. FORGIE:  I said yeah, I'll take it.

11  BY MS. FUJIMOTO:

12      Q.   Let's clarify for the record --

13              MS. FORGIE:  What's the number?

14  BY MS. FUJIMOTO:

15      Q.   Doctor, I understand that you previously

16  served in the litigation a general causation report

17  and a supplement to that general causation report,

18  right?

19      A.   That's correct.

20      Q.   And then this, what we've marked as

21  Exhibit 5, is intended to be your specific causation

22  report that pertains specifically to Mr. Emanuel

23  Giglio; is that right?

24      A.   Yes.

25      Q.   Okay.  And take a quick look and tell me
```

Dennis D. Weisenburger, M.D.

1    if, by looking at it, it appears to be an accurate

2    copy of your report for the Giglio case?

3           MS. FORGIE:  Can you tell me, I'm sorry,

4    what exhibit number this is?

5           MS. FUJIMOTO:  5.

6           MS. FORGIE:  Thank you.

7           THE WITNESS:  It does, yes.

8    BY MS. FUJIMOTO:

9       Q.   Okay.  All right.  Let me -- we're going

10   to end up making --

11      A.   Excuse me.

12      Q.   -- copies of this.  Let me ask you, and

13   I'm going to end up -- well, I've already premarked,

14   so we're going to end up marking this as Exhibit 8.

15   I just want to ask you about your invoice that you

16   produced, okay?

17          MS. FORGIE:  Can we get -- I don't have a

18   copy of that so we should probably get copies before

19   we talk about it.

20          MS. FUJIMOTO:  Okay.

21          THE WITNESS:  So I received --

22          MS. FUJIMOTO:  Fair enough.

23          THE WITNESS:  -- a retainer --

24          MS. FORGIE:  Either we can take a short

25   break --

Dennis D. Weisenburger, M.D.

```
 1              [Reporter requests attorney and witness

 2              speak one at a time.]

 3              MS. FORGIE:  Sorry.

 4              THE WITNESS:  So I received a retainer,

 5    but I haven't billed for the case yet so I plan to

 6    do that after the deposition.

 7    BY MS. FUJIMOTO:

 8        Q.   Okay.  And that's because -- I -- I've

 9    looked at some of your prior depositions and you're

10    always asked about it and you're asked about

11    invoices, right?

12        A.   Often, yes.

13        Q.   Okay.  And you've not invoiced yet in the

14    litigation or not for this case?

15        A.   Not for this case.

16        Q.   Okay.

17        A.   For other cases, I have.

18        Q.   All right.

19              MS. FUJIMOTO:  And fair enough, Kathryn,

20    we'll wait for a break and I'll get to that.

21              MS. FORGIE:  Thanks.

22              MS. FUJIMOTO:  No problem.

23              MS. FORGIE:  Because I don't have a copy

24    of that.

25              MS. FUJIMOTO:  Yeah.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

```
1              MS. FORGIE:  He just produced it today.

2              MS. FUJIMOTO:  I'll -- I'll leave it --

3              [Reporter requests clarification.]

4              MS. FORGIE:  Of it.

5              MS. FUJIMOTO:  All right.

6              MS. FORGIE:  Sorry, I'll try to be clear.

7  BY MS. FUJIMOTO:

8       Q.   Before we start talking substance on

9  Exhibit No. 5, so keep it in front of you because

10 we're going to go back to that, but I do have a

11 couple of things that I want to mark.

12             I'll mark as Exhibit 6 to the deposition

13 an article which was added to your materials

14 considered list, "Origin of Chromosomal

15 Translocations in Lymphoid Cancer," first author

16 Nussenzweig?

17      A.   Yes.

18      Q.   And mark as Exhibit 7 to the deposition

19 another article, "AID produces DNA double strand

20 breaks in non-IG genes and mature B-cell lymphomas

21 with reciprocal chromosome translocations," and the

22 first author is Robbi- -- Robbiani.

23             So, Doctor, I had reviewed Exhibit 2 which

24 was your materials considered list, and from

25 cross-checking the articles that were added were --
```

Dennis D. Weisenburger, M.D.

1    and if you have that in -- if you have Exhibit 2,

2    you can certainly pull it up and look, but the new

3    articles were No. 293, which is the Nussenzweig

4    paper, and 338, the Robbiani paper.  Sorry, it's

5    Exhibit 2, which is your materials considered list.

6        A.   Right.

7        Q.   You got it?  I believe, though, this is a

8    supplement, Doctor, so if you -- it would be more

9    accurate if you look at Exhibit No. 2 that we

10   previously marked.

11       A.   I see.

12       Q.   Yeah.  The list that was served with your

13   original report is different.

14            Okay.  There it is.

15            And if you would go --

16            MS. FUJIMOTO:  Kind of -- know which page

17   numbers, Kathryn.  I'm teasing you.

18            MS. FORGIE:  I hate that, and I --

19            MS. FUJIMOTO:  It's okay.

20            MS. FORGIE:  I've noted it and will

21   hopefully correct it.

22            THE WITNESS:  Well, you can just give me

23   the --

24   BY MS. FUJIMOTO:

25       Q.   Entry 293.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

```
 1              MS. FORGIE:  But at least here, we have

 2    numbers.

 3              MS. FUJIMOTO:  Yeah.

 4    BY MS. FUJIMOTO:

 5         Q.   And I could tell by cross-checking it was

 6    added and also the font is different, so that may --

 7         A.   Okay.

 8         Q.   -- point it out to you.

 9              Do you see 293?

10         A.   Yes.

11         Q.   And 338 is the Robbiani?

12         A.   Yes.

13         Q.   Okay.  Are these two articles articles

14    that you reviewed after you served your expert

15    report?

16         A.   No.

17         Q.   Okay.  Why did you supplement the

18    materials considered list or did you?

19         A.   Because these speak more, I would say,

20    toward general causation than specific causation, so

21    I didn't.

22         Q.   Okay.

23              [Reporter requests clarification.]

24              THE WITNESS:  They speak more towards

25    general causation than specific causation.
```

Dennis D. Weisenburger, M.D.

1           So I'm continuously reviewing material as

2    it's published and comes available to me.  And I add

3    things to my list on a rolling basis so that, you

4    know, I -- I -- I keep up with things.

5    BY MS. FUJIMOTO:

6       Q.   Did you find these two articles?

7       A.   Yes.

8       Q.   Okay.  Meaning they weren't sent to you;

9    you found them on your own?

10      A.   Yes.

11      Q.   Okay.  Did you specifically go to look for

12   them?

13      A.   Yes.

14      Q.   Okay.  Why?

15      A.   Well, because they had been referenced in

16   another article that I read.

17      Q.   Okay.  Do you remember which article that

18   was?

19      A.   Yes.  It was the Wang -- Wang article.

20      Q.   Okay.

21      A.   389.

22      Q.   The Wang paper on multiple myeloma

23   progression in mice?

24      A.   Yes.

25      Q.   Okay.  And what is the significance of

Dennis D. Weisenburger, M.D.

1    these papers to your opinion?

2         A.    Well, in this paper by Wang, they -- they

3    gave glyphosated drinking water to mice and they

4    were able to get an increased frequency of myeloma.

5    And -- and they did some other ancillary studies

6    where they looked at a specific enzyme called

7    activation-induced cytidine deaminase or -- or as --

8    acronym would be AID, A-I-D, and they found that the

9    mice that were treated with glyphosate had increased

10   levels of this enzyme in their lymphoid organs.  And

11   this enzyme is real important in B-cell maturation.

12   It mediates important genetic events, including

13   somatic hypermutation and immunoglobulin heavy

14   changing, class switching.

15          And -- and so it also mediates other

16   mutations and pathogenic translocations that occur

17   in patients with lymphoma and myeloma.  And so this

18   article by Wang came out.  I saw it.  I read it, and

19   then I read some of the articles that they

20   referenced to sort of expand my knowledge around

21   that topic.

22        Q.    And do either Exhibits 7 or 7 reference

23   glyphosate specifically?

24        A.    They do not.

25        Q.    And in terms of the AID enzyme, do you

Dennis D. Weisenburger, M.D.

1    have any evidence or data other than this Wang

2    paper -- strike that.

3            Do you believe these papers marked as

4    Exhibits 6 and 7 support some role of glyphosate in

5    the -- in lymphoma?

6        A.   Well, they support the Wang paper.  The

7    glyphosate isn't mentioned.  These are more

8    mechanistic papers just talking about gen- --

9    genetic events that happen in normal B cells and in

10   malignant B cells.  The Wang paper addresses it.

11   And these --

12       Q.   In mice?

13       A.   -- these papers -- in mice.

14           And -- and these papers are support of --

15   of the general discussion and conclusions that the

16   Wang paper draws.

17       Q.   Do they or is it your opinion that they

18   support a theory in terms of a mechanism by which

19   glyphosate could cause lymphoma?

20           MS. FORGIE:  Objection.

21           THE WITNESS:  I'm not sure about the use

22   of theory.  They support -- they support this AID as

23   a possible mechanism -- as -- as one possible

24   mechanism for causing lymphoma -- causing myeloma in

25   mice, and, you know, you -- I suppose one could

Dennis D. Weisenburger, M.D.

```
 1    consider it a theory because it needs to be studied

 2    further and confirmed by other people.  It's not --

 3    BY MS. FUJIMOTO:

 4         Q.   Right.

 5         A.   -- accepted science, but it's provocative.

 6         Q.   And -- and that really is why we call them

 7    theories, right, when -- when animal data provokes

 8    a -- more questions that should be pursued and

 9    followed up and that that constitutes a scientific

10    theory, by definition, right?

11              MS. FORGIE:  Objection.

12              THE WITNESS:  Well, a theory tends to be

13    something that is an idea or a thought without

14    any -- without any significant basis, experimental

15    basis and experimental results or facts, so this

16    Dr. Wang had the theory, had the idea, and,

17    therefore, he did the experimental studies to either

18    prove or refute his theory, and he proved his

19    theory.

20    BY MS. FUJIMOTO:

21         Q.   In mice?

22         A.   In mice.

23              MS. FORGIE:  Wait, let him finish his

24    answer.

25              THE WITNESS:  Yeah, he proved --
```

Dennis D. Weisenburger, M.D.

```
 1              MS. FORGIE:  You cut him off.

 2              THE WITNESS:  -- his theory in mice.

 3    BY MS. FUJIMOTO:

 4       Q.   Uh-huh.

 5       A.   But, as I said, it's -- it's one study, so

 6    it's -- you know, it's interesting.  It's

 7    provocative.  It possibly is an explanation why we

 8    only see lymphomas with Roundup.  We don't see --

 9    apparently, you see other kinds of cancers, lung

10    cancers, leukemias.  We see mainly lymphomas, and

11    this enzyme is very active in lymphoid cells,

12    particularly B cells.  So it may provide a window

13    into why -- why there's this specify -- specificity

14    for non-Hodgkin lymphoma related to glyphosate.

15    BY MS. FUJIMOTO:

16       Q.   Do you know whether glyphosate or any

17    ingredient in glyphosate operates on pathway

18    specific to plants?

19       A.   Yeah, it -- it has a -- it is the

20    shikimate pathway that it operates on in plants --

21       Q.   Right.

22       A.   -- yes.

23       Q.   And we don't have that same pathway in

24    humans, do we?

25       A.   We don't.
```

Dennis D. Weisenburger, M.D.

1      Q.   Okay.  But you had said -- and I thought I

2  had read this before, but let me confirm.

3           In your opinion, to the extent you hold

4  the opinion that glyphosate can cause lymphoma, is

5  it your opinion that that's the only cancer that

6  has -- is associated or can be caused by glyphosate?

7  That was an awful question.  That --

8      A.   Well --

9           MS. FORGIE:  You could object on

10  unintelligible, Kathryn, and that would have been

11  fine.

12           THE WITNESS:  Well --

13           MS. FORGIE:  If he can -- if he

14  understands it --

15  BY MS. FUJIMOTO:

16      Q.   Yeah, if you understand --

17           MS. FORGIE:  -- he can answer.

18  BY MS. FUJIMOTO:

19      Q.   -- what I'm asking.

20      A.   Yeah, so -- so I think-from my general

21  causation report and testimony, I think

22  non-Hodgkin's lymphoma is the one cancer that's

23  clearly linked to glyphosate.  There are some papers

24  that are also referenced in the Wang study that

25  suggests that myeloma is linked to glyphosate.  I

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

```
1   don't think that's really clear, but myeloma is, in

2   a way, a form of non-Hodgkin lymphoma.  It's kind of

3   a special -- people treat it as kind of a special

4   variant, but it -- it is part of the family of

5   non-Hodgkin lymphoma.  So -- but --

6       Q.   It starts in a --

7            MS. FORGIE:  Wait.  Please let him --

8            THE WITNESS:  So I would say --

9            MS. FORGIE:  -- finish.

10           THE WITNESS:  -- that there isn't good

11  evidence that glyphosate cause other tumors in

12  humans.  Even myeloma, I don't think there's good

13  evidence.  The evidence is very mixed.

14  BY MS. FUJIMOTO:

15      Q.   Much better answer than my question.

16  Thank you.

17           All right.  Looking at your expert report,

18  so we marked that as Exhibit 5, can you get that in

19  front of you?

20      A.   Okay.

21      Q.   All right.  And I don't want to go through

22  word by word, but from the first paragraph of your

23  report on Mr. Giglio, it looks to me like you

24  reviewed the medical records and conducted a

25  telephone interview of him on August 2, 2019, and
```

Dennis D. Weisenburger, M.D.

1    that forms the basis of the rest of that paragraph

2    where you recount certain facts.

3            Is that a fair summary?

4        A.   Yes.

5        Q.   Okay.  And we already talked about the

6    medical records so let me ask you about the

7    telephone interview with him.

8            How long did it last?

9        A.   At least an hour.  It was between an hour

10   and an hour and a half.  I don't remember.  At least

11   an hour.

12       Q.   Was anyone else a party to the call?

13       A.   No.

14       Q.   Did you call him?

15       A.   Yes.

16       Q.   And for what purpose?

17       A.   Well, it was to clarify some facts from

18   his medical history, to clarify some facts from his

19   depositions and then to ask him a standard set of

20   questions about his exposure and other risk factors.

21       Q.   Did you review any of his deposition

22   testimony regarding those issues?

23       A.   Yes.

24       Q.   And I take it, then, that you noticed that

25   there were conflicts between what he said in each of

Dennis D. Weisenburger, M.D.

1   his depositions in terms of his exposure?

2            MS. FORGIE:  Objection.

3            THE WITNESS:  There were some --

4   BY MS. FUJIMOTO:

5        Q.   Right.

6        A.   -- yes.

7        Q.   And was that part of the point of the

8   telephone interview is to clarify things?

9        A.   As best I could, yes.

10       Q.   Okay.  And did you review any of his fact

11   sheets?

12       A.   I did, yes.

13       Q.   Okay.  And I'll just, for administrative

14   purposes, attach them.

15            While I'm doing that, did you also notice

16   that Mr. Giglio was inconsistent in his report of

17   his use of Roundup in each of the fact sheets?

18            MS. FORGIE:  Objection.

19            THE WITNESS:  Yes.

20   BY MS. FUJIMOTO:

21       Q.   Okay.  And was that one of the

22   inconsistencies that you hoped to clarify?

23       A.   Yes.

24            MS. FORGIE:  Objection.

25   BY MS. FUJIMOTO:

Dennis D. Weisenburger, M.D.

1        Q.    Okay.  Did you clarify?

2        A.    Yes.

3        Q.    Did you transcribe the interview?

4        A.    I took some handwritten notes.

5        Q.    Okay.  Have you produced -- did you bring

6   with you those notes?

7        A.    No.

8              MS. FUJIMOTO:  Same objection, Kathryn.

9   I'm asking --

10             MS. FORGIE:  All right.

11             MS. FUJIMOTO:  -- that you produce the

12  notes that he took based on the telephone interview.

13             MS. FORGIE:  We're not going to produce

14  those.

15             MS. FUJIMOTO:  Okay.  We'll meet and

16  confer on that as well.

17             MS. FORGIE:  Yeah, we can have a meet and

18  confer.  Maybe there's something --

19             MS. FUJIMOTO:  Sure.

20             MS. FORGIE:  -- you can tell me that will

21  change my mind.

22             MS. FUJIMOTO:  All right.

23             MS. FORGIE:  But there is both an

24  agreement on those and rules.

25             MS. FUJIMOTO:  Okay.

Dennis D. Weisenburger, M.D.

```
 1              [Reporter requests clarification.]

 2              MS. FORGIE:  And rules on notes and

 3    drafts, conversations, things like that.

 4    BY MS. FUJIMOTO:

 5         Q.   So what do we have to look at,

 6    Dr. Weisenburg (sic), that would tell us what he

 7    told you in that telephone interview if you're not

 8    going to produce the notes?

 9         A.   It's in my report.

10         Q.   Okay.  And so you're telling me or is it

11    your testimony that everything in the report is

12    based on your telephone interview with him?

13              MS. FORGIE:  Objection.

14              THE WITNESS:  Well, not everything, but

15    everything related to -- pretty much related to his

16    Roundup exposure, yes.

17    BY MS. FUJIMOTO:

18         Q.   All right.  And when you interviewed him

19    about the inconsistences, let's say, between the

20    fact sheet on his exposure, which one did he say was

21    accurate or did he give you another version?

22         A.   Well, I --

23              MS. FORGIE:  Objection.

24              THE WITNESS:  Well, what -- what happened

25    is I noticed -- I noticed on the second fact sheet
```

Dennis D. Weisenburger, M.D.

 1    that he had deleted the residential exposure whereas

 2    it was on the first fact sheet, so I asked him

 3    specifically about that.  And -- and so we discussed

 4    it and -- and, you know, it was my intent to obtain

 5    his exposure information with regard to residential

 6    exposure as well as his occupational exposure.  And

 7    yeah, so that was -- that was the -- that -- that

 8    was one of the things I needed to clarify.

 9    BY MS. FUJIMOTO:

10        Q.   And did you also -- were you able to

11    clarify the discrepancies or inconsistencies between

12    his exposure on his use of Roundup in his

13    depositions?

14             MS. FORGIE:  Objection.

15             THE WITNESS:  Well, I asked him about some

16    of the things that he said in the deposition.  And

17    when there were discrepancies, we discussed it, and

18    I tried to determine what was truth, and -- and

19    that's what I put in my report.  So there may be

20    some discrepancies between my report and his

21    depositions as well, but these are the things that

22    he told me when I carefully questioned him about --

23    about it.

24    BY MS. FUJIMOTO:

25        Q.   And did you notice in reviewing

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1   Dr. Sawyer's deposition that he told him yet

2   something different?

3       A.   I don't remember specifics about that.

4   It's possible.

5       Q.   Okay.  Well, we'll go over some.

6            Why is it that you chose to believe what

7   he told you orally by phone versus something that he

8   wrote in a fact sheet that he signed under oath or

9   in a deposition where he testified under oath?

10           MS. FORGIE:  Objection.

11           THE WITNESS:  Well, I was -- my -- my goal

12  was try to -- to determine truth as best I could

13  and -- because there were some discrepancies and

14  things moved and in out of fact sheets.  You know,

15  I -- I tried to find out why.  You know, I asked him

16  why -- why did you delete the residential exposure

17  from the second fact sheet when, in fact, I think

18  it's important.  And he said -- well, he -- he

19  didn't think that he had had very much exposure and

20  he didn't remember very well the details and so he

21  felt uncomfortable putting in -- putting it in his

22  fact sheet so that's why he took it out.  But, in

23  fact, when I asked him about it, his memory really

24  was pretty good.  So, you know, he's had some

25  problems with memory, probably related to his cancer

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1    and the treatment he received.  And -- and it's

2    not -- it's actually not uncommon with patients who

3    get chemotherapy, that they sometimes don't remember

4    things as well as they should or they remember

5    things later that they didn't remember before, so...

6    BY MS. FUJIMOTO:

7        Q.   Did -- did you ask him why he then added

8    it back in to a later fact sheet?

9        A.   No, because I only spoke to him once, but

10   I --

11       Q.   Okay.

12       A.   -- I know that he did add it back in on --

13   on -- on a -- on a more recent fact sheet --

14       Q.   Okay.

15       A.   -- probably because I told him it was

16   important.

17       Q.   All right.

18            MS. FUJIMOTO:  We'll mark -- I have to

19   remember here.  I'm just going to mark a series of

20   his fact sheets so that we have them on the record.

21            So I'm going to mark as Exhibit No. 8 to

22   the deposition Plaintiff fact sheet, and the

23   signature is --

24            THE REPORTER:  Counsel, you said you were

25   going to mark the document Exhibit 8.  Are you

Dennis D. Weisenburger, M.D.

1  changing --

2           MS. FUJIMOTO:  Right.

3           THE REPORTER:  -- your mind?

4           MS. FUJIMOTO:  I'm reneging that.  I am.

5           THE REPORTER:  Okay.

6           MS. FUJIMOTO:  Sorry.  We're going to take

7  a break and make a copy first so I'm going to switch

8  up on you.  My apologies.

9           THE REPORTER:  No problem.

10          (Whereupon Exhibit 8 was marked for

11          identification.)

12          MS. FUJIMOTO:  All right.  So Exhibit

13  No. 8 is the plaintiff fact sheet dated December 14,

14  2018.

15          (Whereupon Exhibit 9 was marked for

16          identification.)

17          MS. FUJIMOTO:  Exhibit 9 is the plaintiff

18  fact sheet dated November 2, 2018.

19          (Whereupon Exhibit 10 was marked for

20          identification.)

21          MS. FUJIMOTO:  Exhibit 10 is the amended

22  Plaintiff fact sheet dated March 21, 2019.

23          (Whereupon Exhibit 11 was marked for

24          identification.)

25          MS. FUJIMOTO:  And Exhibit 11 is

Dennis D. Weisenburger, M.D.

1    Plaintiff -- amounted plaintiff fact sheet dated

2    August 15, 2019.

3              THE WITNESS:  So there are four fact

4    sheets?

5    BY MS. FUJIMOTO:

6         Q.  Yeah, I was going to ask about that,

7    because we had those produced, and this is the --

8    can you show your counsel afterwards?  I'm sorry.

9              MS. FORGIE:  Yeah, let me --

10   BY MS. FUJIMOTO:

11        Q.  I just made these --

12             MS. FORGIE:  Let me see these --

13   BY MS. FUJIMOTO:

14        Q.  -- last minute.

15             MS. FORGIE:  -- first.  So 8 is --

16             MS. FUJIMOTO:  Yeah.  While you're

17   looking...

18   BY MS. FUJIMOTO:

19        Q.  Your materials reviewed list for case

20   specific for Mr. Giglio listed three fact sheets and

21   I found four so I wanted to know if you had seen all

22   of them or --

23        A.  I've seen three --

24        Q.  -- not.

25        A.  -- fact sheets.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

```
 1       Q.   Three, okay.

 2            MS. FORGIE:  Can you just give me a

 3   second --

 4            MS. FUJIMOTO:  Sure.

 5            MS. FORGIE:  -- to mark these, please?

 6            MS. FUJIMOTO:  All right.

 7   BY MS. FUJIMOTO:

 8       Q.   So you have listed on Exhibit 3 your

 9   materials list --

10            MS. FORGIE:  Can you just give me a minute

11   to -- hold on.

12            MS. FUJIMOTO:  Sure.  I'm just doing

13   administrative.

14   BY MS. FUJIMOTO:

15       Q.   -- plaintiff fact sheet, amended plaintiff

16   fact sheet and second amended plaintiff fact sheet,

17   correct?

18       A.   Three -- three fact sheets.

19       Q.   Okay.

20       A.   I -- I don't -- I don't know what the

21   fourth one is --

22       Q.   Okay.

23       A.   -- whether that's an earlier one that I

24   never saw or what.

25       Q.   Okay.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1           MS. FUJIMOTO:  Why don't we go off the

2    record?

3           THE VIDEOGRAPHER:  Off video record.  The

4    time is approximately 9:57 a.m.

5           (Recess.)

6           THE VIDEOGRAPHER:  With the approval of

7    counsel, back on the record.  The time is

8    approximately 10:14 a.m.  This marks the beginning

9    of Recording Media No. 2.

10          MS. FUJIMOTO:  All right.  Back on the

11   record.

12   BY MS. FUJIMOTO:

13      Q.   Dr. Weisenburger, have you had a chance to

14   examine the four plaintiff fact sheets and

15   determined whether or not you had seen all of them?

16      A.   Well, one of them, I didn't see.  The

17   first two seem to be the same with regard to his

18   Roundup exposure, so I don't know -- I probably -- I

19   don't know.  I saw one of the first two and the

20   second and the third one.

21      Q.   Okay.  So you saw either or both of

22   Exhibits 8 and 9 and you know you saw Exhibit 10 and

23   11 --

24      A.   I saw either --

25      Q.   -- is that right?

Dennis D. Weisenburger, M.D.

1        A.    I saw either 8 or 9 and then I saw 10 and

2   11.

3        Q.    All right, great.  Thank you.

4              And just so that I'm clear, when you wrote

5   your report, you relied on what Mr. Giglio told you

6   in the telephone interview as opposed to what was in

7   his fact sheets that you reviewed; is that correct?

8        A.    Yes.

9        Q.    And you relied on what he told you in the

10  telephone call over and above his sworn deposition

11  testimony, correct?

12             MS. FORGIE:  Objection.

13             THE WITNESS:  Yes, where -- where I could

14  clarify it, yes.

15  BY MS. FUJIMOTO:

16        Q.    Okay.  All right.  Going back to

17  Exhibit 5, which is your expert report, the second

18  paragraph, in reading through it, you reference or

19  discuss his Roundup use on residential rented

20  properties; is that right?

21        A.    Yes.

22        Q.    Okay.  And you say here that "He lived on

23  three rented properties from 1990 to 2014 and used

24  Roundup herbicide for control of weeds on those

25  properties.  He sprayed the lawn, driveway and

Dennis D. Weisenburger, M.D.

1   sidewalk once per month for six months of the year

2   and for about 15 minutes each time."

3           Did I read that correctly?

4       A.   Yes.

5       Q.   And that sketches out or calculates out to

6   be about an hour and a half per year?

7       A.   Yes.

8       Q.   Okay.  Do you know whether that is

9   consistent with what he told Dr. Sawyer?

10      A.   Well, he -- he --

11          MS. FORGIE:  Objection.

12          THE WITNESS:  I don't remember what he

13   told Dr. Sawyer.  There -- there was -- he -- in --

14   I think in his second deposition where he went into

15   his residential exposure to -- to a great extent, he

16   said he used it every other month all 12 months, but

17   he told me that he used it every month for six

18   months.  So it turns out to be six times whether you

19   look at it one way or the other.  And -- and he told

20   someone that he used it 20 minutes each time versus

21   15 minutes each time, but -- so, you know, I mean,

22   as you know, remembering things that happened 20

23   years ago is -- and trying to approximate and guess

24   is not going to be terribly accurate.  I mean, I

25   thought things were consistent although the actual

Dennis D. Weisenburger, M.D.

1   data differed a little bit, but --

2   BY MS. FUJIMOTO:

3        Q.   Okay.

4        A.   -- not substantially.

5        Q.   And so generally, with regard to assessing

6   exposure -- and you said both scenarios sketch out

7   to be six days of a year, right?

8        A.   Yes.

9        Q.   And for each of those days, based on what

10  he told you, he sprayed for an hour and a half each

11  time, right, for 15 -- oh, sorry he sprayed for

12  about 15 minutes each time six months of the year,

13  right?

14       A.   Yes.  That's what he told me.

15       Q.   For exposure assessment, does it matter to

16  you if a person sprayed for 15 minutes six times a

17  year versus four hours six times a year?

18       A.   Yes, because four hours six times a year

19  would be much a greater time and at much greater --

20  presumably greater exposure.

21       Q.   Okay.  And so it does matter how long

22  within each day someone used the product?

23            MS. FORGIE:  Objection.

24            THE WITNESS:  Yes, I always ask that.

25  BY MS. FUJIMOTO:

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1       Q.   All right.  And does it matter to you the

2   number of days per year?

3       A.   Yes.

4       Q.   Does it matter to you the cumulative

5   exposure a person has over their lifetime?

6            MS. FORGIE:  Objection.

7            THE WITNESS:  Yes.

8   BY MS. FUJIMOTO:

9       Q.   And so for residential use, he told you

10  six months of the year for 15 minutes each time,

11  right?

12      A.   Yes.

13      Q.   And that he used already-mixed Roundup

14  grass and weed killer each year, right?

15      A.   Yes.

16      Q.   It sounds like he also told you that he

17  did not wear any protective clothing or equipment

18  when spraying.

19           Is that what he told you in the telephone

20  call?

21      A.   Yes.

22      Q.   Do you know whether Mr. Giglio told

23  Dr. Sawyer that he wore gloves when he sprayed

24  Roundup?

25      A.   Well, he sometimes --

Dennis D. Weisenburger, M.D.

```
 1            MS. FORGIE:  Objection.

 2            THE WITNESS:  I don't remember what he

 3    told Dr. Sawyer, but I did talk to him about the

 4    gloves, and he wore gloves sometimes when he was

 5    doing it as part of his business, but while -- when

 6    he was doing it at home on his residence, he didn't

 7    wear gloves.

 8    BY MS. FUJIMOTO:

 9       Q.   Okay.  And you don't know from or remember

10    from reading Dr. Sawyer's deposition that he told

11    him he wore gloves even in the residential scenario?

12            MS. FORGIE:  Objection.

13            THE WITNESS:  I don't remember that.

14    BY MS. FUJIMOTO:

15       Q.   Okay.  Did Mr. Giglio tell you whether or

16    not he had had any spills incidences during his

17    spraying of Roundup?

18       A.   Well, he didn't -- he didn't mix Roundup,

19    so, you know, he -- it's unlikely that he would have

20    spills so we didn't really talk about spills during

21    the residential -- the times he used it

22    residentially.

23       Q.   Okay.

24       A.   I think -- I think there is something in

25    the deposition about -- about spills, but I -- he
```

Dennis D. Weisenburger, M.D.

1    didn't -- you know, he didn't volunteer and I

2    didn't -- and I didn't really pursue it, because

3    usually, spills occur when you're mixing, when

4    you're actually mixing the concentrate.

5         Q.   So if the testimony or the record

6    currently is that Mr. Giglio did not experience any

7    spills while he was using Roundup, that would be

8    consistent and fine with your assessment?

9         A.   Yes.

10             MS. FORGIE:  Objection.

11   BY MS. FUJIMOTO:

12        Q.   Am I correct, though, that if a person

13   wears gloves, that that reduces exposure to some

14   extent?

15             MS. FORGIE:  Objection.

16             THE WITNESS:  It does, yes, depending on

17   the gloves you wear, but if you use good gloves that

18   are solvent-proof or liquid-proof, then you -- at

19   least your hands are protected, yes.

20   BY MS. FUJIMOTO:

21        Q.   Okay.  Neoprene would be one of those?

22        A.   Yes.

23        Q.   Okay.  Did you look at the label for the

24   product that Mr. Giglio used with respect to

25   recommendations for protective equipment?

Dennis D. Weisenburger, M.D.

 1      A.   No.

 2      Q.   So you don't know what the label says

 3   about spraying on windy days?

 4      A.   I think I saw an allusion to it in one of

 5   the other reports, but I didn't actually pursue that

 6   issue.

 7      Q.   But you know that Mr. Giglio testified

 8   that he did, in fact, spray whether it was a calm or

 9   a windy day?

10      A.   Yes.

11      Q.   So if you -- we think about your

12   assessment on his residential use, I'm going to then

13   go down and ask you to look at the fourth paragraph

14   where you say, "Mr. Giglio used Roundup herbicide

15   for 24 years before developing the NHL."

16           Do you see that part of your report?

17      A.   Yes.

18      Q.   Okay.

19           MS. FORGIE:  Fourth paragraph?

20           MS. FUJIMOTO:  Yes.

21           MS. FORGIE:  Oh, in the whole report.

22           THE WITNESS:  Right here (indicating).

23           MS. FORGIE:  Sorry.

24           MS. FUJIMOTO:  Yes.

25           MS. FORGIE:  I was counting on that page.

```
 1                 [Reporter requests clarification.]

 2                 MS. FORGIE:  On the whole report.  I was

 3      counting on that page only.  There is a fourth.

 4      Fourth paragraph?

 5                 MS. FUJIMOTO:  Yes.

 6                 MS. FORGIE:  Sorry, got it.

 7                 MS. FUJIMOTO:  No worries.

 8      BY MS. FUJIMOTO:

 9           Q.   And you say for 24 years he used Roundup

10      six days per year as his residential properties.

11           A.   It should be "on" --

12           Q.   You meant "at"?

13           A.   "On his residential" --

14           Q.   On?

15           A.   -- "properties."

16           Q.   Okay.  And you estimate his exposure,

17      then, was 144 days; is that right?

18           A.   Yes.  That's 6 times 24.

19           Q.   Okay.  And did you see in Dr. Sawyer's

20      deposition that he estimated his total residential

21      exposures today -- exposure days over the course of

22      25 years to be 21.8?

23           A.   So he -- he uses a different methodology.

24      That's why it's different.

25           Q.   Yeah, clearly.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1           It's really different, right?

2           MS. FORGIE:  Objection.

3   BY MS. FUJIMOTO:

4       Q.   Well, 2 -- 21.8 versus 144, that's a big

5   gap, right, or a big --

6           MS. FORGIE:  Objection.

7   BY MS. FUJIMOTO:

8       Q.   -- difference?

9       A.   It's a big difference.  So I -- I think --

10  I'm not sure exactly what he's doing.  What I'm

11  doing is just saying he -- he used it on this

12  many -- he used it this many times, which --

13      Q.   That's an earthquake.

14      A.   -- translates into this many days, okay?

15  He's calculating days based on using it for --

16  continuously for 8 or 10 hours.  I think that's what

17  he's doing.  So if he used it continuously for 8

18  hours, that would be one day in Dr. Sawyer's

19  methodology.  I think that's what he has done.  But

20  I -- I had some difficulty understanding his

21  methodology, but that's what I understand.  So his

22  days are days where he used it every minute for

23  eight hours, something like that.

24      Q.   Okay.  So --

25      A.   So obviously, it would be significantly

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.

1   less because he was only using it 15 minutes a day,

2   right, so --

3        Q.   So -- so -- but you're not exactly sure

4   what methodology he used; you just know it was

5   different from yours?

6             MS. FORGIE:  Objection.

7             THE WITNESS:  Yes.  I mean, I'm not a

8   toxicologist so I'm not exactly sure what

9   methodology -- I'm not -- I'm not -- I couldn't

10  validate his methodology.

11  BY MS. FUJIMOTO:

12       Q.   Okay, right.

13            So which one is right?

14            MS. FORGIE:  Objection.

15            THE WITNESS:  Well, you can use either --

16  either one.  You know, I used the ep- -- what I

17  would say is the epidemiologic definition of -- of

18  "use" in days.  So if he used it one day, that's one

19  day of use, but you could say one time of use if you

20  wanted to probably be more accurate.

21  BY MS. FUJIMOTO:

22       Q.   So it doesn't matter to you whether

23  Mr. Giglio's total lifetime exposure was 21.8 days

24  or 144 days?

25            MS. FORGIE:  Objection.  Mischaracterizes

Dennis D. Weisenburger, M.D.

1    the testimony.  Asked and answered.

2          You can answer --

3          THE WITNESS:  I would --

4          MS. FORGIE:  -- again.

5          THE WITNESS:  -- rely on my own report and

6    not -- I'm not relying on Dr. Sawyer's report so I

7    can't -- you know, I'm not -- he says what he says

8    and I say what I say.

9    BY MS. FUJIMOTO:

10     Q.   Well, so that's what I'm asking you,

11   though.

12          What -- so I take it, then, what you're

13   saying is that your calculation, you -- in your

14   opinion, you're correct, you're right, and

15   Dr. Sawyer is not?

16          MS. FORGIE:  Objection.

17   Mischaracterizes --

18          THE WITNESS:  No, I'm --

19          MS. FORGIE:  -- the testimony.

20          THE WITNESS:  -- just saying that he --

21   he -- his methodology was different than mine and,

22   therefore, his numbers are different than mine.

23   He's doing -- he's doing -- what an -- apparently,

24   what a toxicologist would do, and I'm doing what a

25   clinician or an epidemiologist would do.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

```
 1   BY MS. FUJIMOTO:

 2       Q.   You go on in paragraph 4 to say, "During

 3   the last five years, he used Roundup four to six

 4   days per week," and you estimated 1300 days or 260

 5   days per year; is that right?

 6       A.   Yes.

 7       Q.   And is that -- again, is that based on

 8   your telephone call with him?

 9       A.   Yes.

10       Q.   And do you know whether that differs from

11   what he told Dr. Sawyer?

12       A.   I don't know what he told Dr. Sawyer.

13       Q.   Do you know whether it different --

14   differs from Dr. Sawyer's assessment of his

15   occupational exposure versus residential?

16       A.   I -- I don't -- I don't remember.

17       Q.   And when you say "During the last five

18   years, he used Roundup four to six days per week,"

19   how long did he spray each day, meaning how many

20   hours are we talking?

21       A.   Yeah, so for each property, he sprayed

22   three times.  And the total -- depending on the

23   property.  If it was a small property, I think he

24   said it was about an hour.  If it was a large

25   property, it was around three hours.  So -- so he
```

Dennis D. Weisenburger, M.D.

1    did -- he did about two to three properties a week,

2    and his methodology was to clear the turf to bear

3    ground, then to spray the perimeter twice.  So he

4    would go around the perimeter twice on one day.

5    Then they would lay the turf, and then he would

6    spray the perimeter again on another day, the next

7    day, probably.  So each property was really two days

8    of spraying, okay?  So if he did two to three

9    properties a week, that would be four to six

10   sprayings a week, and I took the average of five.

11        Q.   And so how many hours do you think, total,

12   he was exposed?

13        A.   I didn't try to tabulate.  There's no way

14   to know because each time would have been based on

15   the size of the property, and all I know was the --

16   roughly the smallest property and the largest

17   property that he did, so, I mean, you would have to

18   have a detailed list of all the properties he did to

19   do that.

20        Q.   Right, right.

21             But it could -- exposure hours do matter

22   to some extent, right?

23             MS. FORGIE:  Objection.

24             THE WITNESS:  Yes, but -- so, you know, I

25   would say if did -- so if he did two -- say he did

Dennis D. Weisenburger, M.D.

1  two big properties in a week, it would be six hours.

2  BY MS. FUJIMOTO:

3      Q.   But we don't know whether that was the

4  case, right, for any given week?

5          MS. FORGIE:  Objection.

6          THE WITNESS:  We don't.

7          MS. FUJIMOTO:  Asked and answered.

8  BY MS. FUJIMOTO:

9      Q.   Okay.

10         MS. FORGIE:  You can answer again.

11         MS. FUJIMOTO:  All right.  So let me mark

12 as Exhibit No. 12 to the deposition --

13         (Whereupon Exhibit 12 was marked for

14         identification.)

15 BY MS. FUJIMOTO:

16     Q.   I'll give that to you.

17         MS. FUJIMOTO:  -- a copy of the --

18         MS. FORGIE:  Sorry, what was the number

19 again?

20         MS. FUJIMOTO:  -- Pahwa --

21         12.

22         MS. FORGIE:  Thank you.

23 BY MS. FUJIMOTO:

24     Q.   And this is an article that you've been

25 asked questions before, and I understand that, and I

Dennis D. Weisenburger, M.D.

1   won't repeat those general questions.

2           But this is the --

3           MS. FORGIE:  Thank you.

4   BY MS. FUJIMOTO:

5       Q.   -- article by Manisha Pahwa, et al. called

6   "Glyphosate use and associations with non-Hodgkin

7   lymphoma major histological subtypes: findings from

8   the North American Pooled Project."  And that is

9   from -- I'm looking for the exact date -- June 28,

10  2019.

11          Is that -- is that --

12      A.   It was published online first, so I'm --

13      Q.   First, right.

14          [Reporter requests clarification.]

15          THE WITNESS:  It was published --

16  BY MS. FUJIMOTO:

17      Q.   That's why I was trying to look --

18          THE WITNESS:  -- online -- online first.

19  BY MS. FUJIMOTO:

20      Q.   And at the time of your deposition -- your

21  last deposition in this litigation, only the online

22  version was available, right?

23      A.   I think that's correct --

24      Q.   And --

25      A.   -- yes.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

```
 1       Q.   And the supplemental report or -- strike

 2   that.

 3            The -- what do they call it?  The

 4   supplement to the article was apparently not yet

 5   available online; is that right?

 6       A.   I think that's correct --

 7       Q.   Okay.

 8       A.   -- yes.

 9       Q.   So what I've marked as Exhibit 12 is

10   actually Pahwa with the supplement.

11            Have you seen the supplement before today?

12       A.   Yes.

13       Q.   Okay.  Did you review it?

14       A.   I didn't review it for today.  I have

15   reviewed it.

16       Q.   Okay.  And did any of the information in

17   that supplement change your opinion in any way?

18       A.   No.

19       Q.   Okay.  Anything that you think is of

20   importance that I should -- that you should point

21   out to me in terms of supporting your opinion?

22            MS. FORGIE:  Objection.

23            THE WITNESS:  I don't know.  I'd have to

24   go back and look at it.  I haven't looked at it in

25   some months.
```

Dennis D. Weisenburger, M.D.

1   BY MS. FUJIMOTO:

2        Q.    Okay.  But as you sit here today, nothing

3   stands out?

4        A.    No, I don't think so.

5        Q.    Okay.  So looking at Pahwa, then, for

6   Mr. Giglio, you estimate his residential use at 144

7   days, and is it the occupational use at 260 days per

8   year?

9        A.    Yes.

10       Q.    And so if you go to the Pahwa article on

11   page 6 and look at Table 3 --

12             MS. FORGIE:  Are you on Exhibit 12 or the

13   other one?

14             MS. FUJIMOTO:  12.

15   BY MS. FUJIMOTO:

16       Q.    And Table 3 is "Duration of glyphosate use

17   and associations with non-Hodgkin lymphoma overall

18   and with histological subtypes," right?

19       A.    Table 3?

20       Q.    Table 3.

21       A.    Okay.

22       Q.    Okay.  And so we're talking about number

23   of years of glyphosate use, correct?

24       A.    Yes.

25       Q.    Do you see that?

Dennis D. Weisenburger, M.D.

1      A.   Yes.

2      Q.   Okay.  If we go down to the diffuse large

3  B-cell lymphoma, DLBCL, that -- the type that

4  Mr. Giglio had, I take it, then, you would agree

5  that he falls within the "greater than 3.5 years of

6  exposure" group under DLBCL --

7      A.   Yes.

8      Q.   -- correct?

9      A.   Yes.

10     Q.   And so his odds ratio would be 1.19,

11  adjusted for age, sex, state and things other than

12  use of other pesticides, right?

13          MS. FORGIE:  Objection.

14          THE WITNESS:  Correct.

15  BY MS. FUJIMOTO:

16     Q.   Okay.  And so what is that 1.19?  That's,

17  like, just a, what, like, 19 percent increase?

18     A.   Yes.

19     Q.   Okay.  And yet, when we look at the

20  reference range, the confidence interval spans 1 and

21  is 0.67 to 2.12, correct?

22     A.   Correct.

23     Q.   And that is not statistically significant,

24  is it?

25     A.   It's not significant.

Dennis D. Weisenburger, M.D.

1        Q.   Okay.  And then if you go to the odds

2   ratio where they actually adjust for exposure to

3   other pesticides that have 2,4-D and dicamba and the

4   use of malathion, the odds ratio goes down to 0.93,

5   correct?

6        A.   Yes.

7        Q.   So there's no increase seen in that group,

8   correct?

9             MS. FORGIE:  Objection.

10             THE WITNESS:  That's correct.

11   BY MS. FUJIMOTO:

12        Q.   And the -- certainly, the confidence

13   interval is .50 to 1.74.

14             Again, not statistically significant,

15   correct?

16        A.   Yes.

17             MS. FORGIE:  Objection.

18   BY MS. FUJIMOTO:

19        Q.   Okay.  Now, I know you reference the

20   greater than two days per year use, so let's look at

21   Table 4.

22        A.   Okay.

23        Q.   Okay.  And so Table 4 lists the risks

24   associated relative to the number of days per year

25   of glyphosate use, right?

Dennis D. Weisenburger, M.D.

1        A.    Yes.

2        Q.    Okay.  And then I take it if we go down to

3    the diffuse large B-cell lymphoma category, you

4    would put him under the "greater than two days of

5    use," right?

6        A.    Yes.

7        Q.    And that's two days of use per year --

8        A.    Yes.

9        Q.    -- right?

10            And if we go across to the odds ratio

11   that's not adjusted for other pesticide use, it's

12   2.83 with a confidence interval of 1.48 to 5.41,

13   correct?

14       A.    Yes.  So that's --

15       Q.    And then --

16       A.    That's significant.

17       Q.    Right.  And then they adjusted for

18   other -- those other pesticides, 2,4-D, dicamba and

19   malathion, and it's 2.14 with the confidence

20   interval 1.07 to 4.28, right?

21       A.    Yes.

22       Q.    And that's statistically significant?

23       A.    Yes.

24       Q.    Okay.  Barely, but we'll give him that,

25   right?

Dennis D. Weisenburger, M.D.

1           MS. FORGIE:  Objection.  There's no

2    question pending.

3    BY MS. FUJIMOTO:

4        Q.   And I -- and I take it from your report

5    that you chose to rely on this number?

6        A.   I did.

7        Q.   Okay.  So why did you choose that number

8    instead of the number of years per -- of use?

9        A.   Well, based on my experience, I noticed

10   that he's -- specifically when we looked at 2,4-D,

11   what we found was that the number of days ago per

12   year seemed to be the most predictive of risk

13   because it measures best intensity of exposure,

14   frequency of exposure, intensity of exposure.

15   Number of days per year, if you used it, say, just

16   one day a year for 50 years, it would seem like a

17   lot of exposure, but it isn't very much.  But if you

18   used it 10 times a year for 5 years or 10 years,

19   that's a much more intense exposure over a short

20   period of time.  So one is measuring basically

21   number of years of exposure, but it doesn't tell you

22   anything about intensity.  The other one is

23   measuring, I think, best intensity of exposure,

24   frequency of exposure over a short period of time.

25       Q.   All right.  So --

Dennis D. Weisenburger, M.D.

```
 1        A.   And I think that's the best surrogate

 2   marker in epidemiology for -- probably for chemicals

 3   and for pesticides.  And we found the same thing in

 4   our Nebraska study when we looked at 2,4-D.  The

 5   number of years was not predictive of risk, but the

 6   number of days per year was significantly predictive

 7   of risk, so it's the same finding that we've had in

 8   our other studies.

 9        Q.   All right.  So from what you're telling

10   me, then, is if I use glyphosate for three days per

11   year -- or strike that.  Let's use Mr. Giglio.

12             So if a person uses glyphosate six days a

13   year for 15 minutes each time, so that's an hour and

14   a half use here, and that's it, just that one year,

15   you're telling me that that person has an increased

16   risk of diffuse large B-cell lymphoma, but a person

17   that uses it only once a year, eight hours a day for

18   50 years does not have an increased risk.

19             Is that --

20             MS. FORGIE:  Object --

21   BY MS. FUJIMOTO:

22        Q.   -- what you're saying?

23             MS. FORGIE:  Objection.  Mischaracterizes

24   the --

25             THE WITNESS:  No.  It's --
```

Dennis D. Weisenburger, M.D.

1           MS. FORGIE:  -- testimony.

2           THE WITNESS:  -- a hypothetical.  These

3    are just parameters that epidemiologists use.  And

4    so I couldn't say one way or the other.  I'd have to

5    look at each case as a unique case.  But what I'm

6    saying is that I think as a surrogate of exposure,

7    number of days per year is a better measure of

8    intensity of the exposure than number of years, or

9    if you go to Table 5, total number of days, okay,

10   because that's heavily driven by the number of

11   years.

12   BY MS. FUJIMOTO:

13      Q.   So let me just -- and I know you recognize

14   hypotheticals.  You've dealt with them before.  So

15   you said you'd look at each case.  All right.  So

16   now we have Mr. Giglio, okay, and your opinion is

17   that if one uses -- he used glyphosate for 15

18   minutes, six days in a year, right?  Assume that's

19   the case.  A person -- Mr. Giglio, any person uses

20   glyphosate for 15 minutes six days per year, okay,

21   hour and a half total.  And then you have another

22   patient in front of you who used glyphosate only

23   once a year, but he sprayed it all day, eight hours

24   once a year every day for 50 years.

25           In your opinion, the person who used it

Dennis D. Weisenburger, M.D.

1   for six days would have a higher risk than the one

2   that used it 50 times over 50 years eight hours a

3   day?

4          MS. FORGIE:  Objection.  Mischaracterizes

5   the testimony.  Also, I think you're getting into

6   general causation, which is not --

7          THE WITNESS:  So --

8          MS. FORGIE:  -- the purpose of this

9   deposition.

10          Let me just finish my objection.

11          This is supposed to be specific to

12   Mr. Giglio.

13          [Reporter requests clarification.]

14          MS. FORGIE:  This is supposed to be

15   specific to Mr. Giglio.  I'm going to let him

16   answer, but I'm objecting on that grounds.

17          THE WITNESS:  So that makes no sense,

18   right, because --

19   BY MS. FUJIMOTO:

20      Q.   Right.

21      A.   -- the person who --

22          MS. FORGIE:  Wait, let him finish his

23   answer before you --

24          THE WITNESS:  -- was --

25          MS. FORGIE:  -- interrupt.

                         Dennis D. Weisenburger, M.D.

 1              THE WITNESS:  -- was exposed for eight

 2    hours a day once a year for 50 years -- that's what

 3    you said, right?

 4    BY MS. FUJIMOTO:

 5         Q.   Yes, uh-huh.

 6         A.   They had more exposure than the person who

 7    used it six times a year for 15 minutes.

 8         Q.   Right.

 9         A.    So the purpose of using these parameters

10    is -- is not to -- is not to come to -- is not to

11    sort of have them be used in the scenario that

12    you're talking about.  The -- the purpose here is to

13    see is there some kind of a dose response that

14    occurs, okay?  And there are different ways to look

15    at dose response; you can look at number of days;

16    you can look at number of years; you can look at

17    number of days per year, or you can look at the

18    product of that, which is total number of days.  And

19    epidem- -- epidemiologists look at all the different

20    parameters hoping that they will -- you know, that

21    the parameters will show them something that looks

22    like dose response.  And what I'm telling you is

23    that in my experience and in the work we've done in

24    the past, that number of days per year is the best

25    surrogate for intensity of the exposure, and

Dennis D. Weisenburger, M.D.

1   intensity of the exposure is probably -- it is the

2   one thing that seems to be predictive of risk.

3       Q.   Well, it's only --

4       A.   But --

5            MS. FORGIE:  Wait --

6            THE WITNESS:  -- you can set up all kinds

7   of scenarios that would contradict that.  And this

8   is just a general statement, okay?  It's a general

9   statement, so I have to look at each patient as a

10  unique patient to determine whether they had

11  significant exposure or not.

12  BY MS. FUJIMOTO:

13      Q.   And the point, though, or the conclusion,

14  then, has to be since -- that there is no dose

15  response if one looks at Pahwa and looks at Tables 3

16  and 4, because if there were a dose response, then

17  the tables would be consistent, that the more dose

18  and the more exposure, the greater the risk, but

19  that's not what these tables show, right?

20           MS. FORGIE:  Objection.  Mischaracterizes

21  the testimony.  This is general causation.  This is

22  not the purpose of this.

23           MS. FUJIMOTO:  This relates to --

24           MS. FORGIE:  I will let him answer --

25           MS. FUJIMOTO:  -- Mr. Giglio.

Dennis D. Weisenburger, M.D.

```
 1              MS. FORGIE:  No, you --

 2              MS. FUJIMOTO:  In his opinion about his

 3   exposure, he relied on Pahwa.  I'm entitled to ask

 4   him about Pahwa --

 5              MS. FORGIE:  You're entitled --

 6              MS. FUJIMOTO:  -- as much as I want.

 7              MS. FORGIE:  -- to ask him about questions

 8   about how he relied on it for Mr. Giglio --

 9              MS. FUJIMOTO:  Exactly.

10              MS. FORGIE:  -- not hypotheticals.

11              [Reporter requests clarification.]

12              MS. FORGIE:  For Mr. Giglio, not

13   hypotheticals like you're doing.  I'm not

14   instructing him not to answer.

15              MS. FUJIMOTO:  Understood.

16              MS. FORGIE:  But I'm not going to let it

17   go much further.

18              MS. FUJIMOTO:  Well, but if -- if these

19   tables he relied on don't make sense, it's

20   absolutely fair game.

21              MS. FORGIE:  Objection.

22   BY MS. FUJIMOTO:

23       Q.   And so these inconsistencies tell us that

24   there is no dose response, right?

25              MS. FORGIE:  Objection.
```

Dennis D. Weisenburger, M.D.

```
 1              THE WITNESS:  These inconsistencies just

 2   tell us that there are inconsistencies.  And in days

 3   per year, there is a clear dose response that is

 4   statistically significant.

 5   BY MS. FUJIMOTO:

 6        Q.   Well --

 7        A.   So --

 8        Q.   -- so --

 9              MS. FORGIE:  Wait, please let him

10   finish --

11              THE WITNESS:  So --

12              MS. FORGIE:  -- his answer.

13              THE WITNESS:  So --

14              MS. FUJIMOTO:  He paused.

15              MS. FORGIE:  You interrupt him all the

16   time.

17              MS. FUJIMOTO:  Okay, hang on.  Hang on.

18   I'm sorry.  Listen --

19              MS. FORGIE:  Hold on.

20              MS. FUJIMOTO:  -- you're way interrupting

21   far more than I am.  I'm only starting to ask when I

22   think he has paused.  And it's even more disruptive

23   that you jump in every time it happens.

24   BY MS. FUJIMOTO:

25        Q.   So I'll do my best to wait until you're
```

Dennis D. Weisenburger, M.D.

1   finished, I promise.

2           MS. FUJIMOTO:  And let's hold down the

3   objections and certainly speaking objections.

4           MS. FORGIE:  I will make whatever

5   objection I think is appropriate.  You have

6   interrupted him about seven or eight times now in

7   this deposition.  And that's not fair.  He's

8   entitled to finish his question before you interrupt

9   his train of thought.  So why don't I suggest that

10  you wait for a longer pause instead of just jumping

11  in and saying, "Oh, that's right" or "that's wrong"

12  whatever.

13  BY MS. FUJIMOTO:

14      Q.   Dr. Weisenburger, do you feel like you

15  haven't been able to complete any of your answers

16  this morning?

17      A.   No.  This is pretty typical for

18  depositions.

19      Q.   Okay.

20          MS. FUJIMOTO:  Would you read back my

21  question?

22  BY MS. FUJIMOTO:

23      Q.   I'll let you go ahead and answer again and

24  without interruption, fair?

25          MS. FORGIE:  Objection.

Dennis D. Weisenburger, M.D.

```
 1              MS. FUJIMOTO:  It was about dose response.

 2              THE REPORTER:  "Those" -- oh, that's the

 3      answer.  "So these notifications," I think that's

 4      what -- "tell us" --

 5              MS. FUJIMOTO:  Inconsistencies.

 6              THE REPORTER:  Oh, inconsistencies, yeah,

 7      sorry.  "Tell us that there is" -- "there is this

 8      dose response" --

 9              MS. FUJIMOTO:  No --

10              THE REPORTER:  -- "right?"

11              MS. FUJIMOTO:  "No dose response."

12              THE REPORTER:  All right.

13              MS. FORGIE:  All right, wait.  We need a

14      clear question.

15              (Record read as follows:

16                  "Q.  And so these inconsistencies

17              tell us that there is no dose response,

18              right?")

19              MS. FORGIE:  Objection.

20              THE WITNESS:  Now read my answer.

21      BY MS. FUJIMOTO:

22         Q.   Oh, you did finish?

23         A.   Well, I want to hear what my --

24         Q.   Okay.

25         A.   -- answer was.  I think I did finish
```

Dennis D. Weisenburger, M.D.

```
 1   but --

 2        Q.   Oh, okay.  I thought so too.

 3             (Record read as follows:

 4                  "Q:  These inconsistencies just

 5             tell us that there are inconsistencies.

 6             And in days per year, there is a clear

 7             dose response that is statistically

 8             significant." )

 9             THE REPORTER:  And then you -- she said

10   "so" and then you said "Well, so" and then there was

11   an objection.

12             THE WITNESS:  So I --

13   BY MS. FUJIMOTO:

14        Q.   Would you like --

15        A.   That's my.

16        Q.   -- to add anything else?

17        A.   No.  I think that there are

18   inconsistencies.  I know what I was going to say.  I

19   was going to say in a real world with perfect data,

20   everything should be consistent, but this is

21   epidemiologic research on people, and so things are

22   not always consistent.  And you have to then make

23   some judgments on what do you believe and what do

24   you think makes sense.  And -- and -- and based on

25   my previous experience, number of days per year
```

Dennis D. Weisenburger, M.D.

1    seems to be the best surrogate for intensity of

2    exposure and -- and -- and the one most likely to

3    predict risk and that's why I'm relying on it.

4        Q.   And so I take it, then, that there could

5    be other experts who, based on their experience,

6    believe that the more appropriate measure would be

7    number of years of use or number of years -- or

8    lifetime exposure would be more legitimate?

9             MS. FORGIE:  Objection.

10            THE WITNESS:  There may be other -- there

11   may be other experts who would believe that those

12   are better surrogates, but in my experience, they're

13   not.

14   BY MS. FUJIMOTO:

15       Q.   Are you finished?

16       A.   Yes.

17       Q.   Okay.  And so if we go to your assessment

18   of the lifetime days of -- of glyphosate exposure

19   for Mr. Giglio, if you go to Table 5 and we look at

20   the category for diffuse large B-cell lymphoma, we

21   would, again, put it in the "greater than 3.5 years

22   of use," correct?

23       A.   It's lifetime days.

24       Q.   All right.  Number of years used times --

25   yes, okay.  I'm sorry.  So number of years used

Dennis D. Weisenburger, M.D.

1   times days years handled, that's the -- kind of the

2   measurement, right?

3              So they're using number of years used and

4   times it by how many days per year of use, right?

5       A.    Yes.

6       Q.    Okay.  And if we look at the "greater than

7   3.5," we see that the odds ratios, neither one is

8   statistically significant irrespective of whether

9   they adjusted for other pesticides, correct?

10      A.    That's correct.

11      Q.    And both odds ratios are, like Table 3,

12  lower than they are in Table 4, correct?

13      A.    Yes.

14      Q.    So what did you -- what is your estimate

15  of the lifetime exposure for Mr. Giglio?

16      A.    In terms of days?

17      Q.    Sure.

18      A.    It would be the sum of 144 and 1300.

19      Q.    And you assumed he used Roundup four to

20  six days per week every week during the last five

21  years?

22              MS. FORGIE:  Objection.

23              THE WITNESS:  That's what I assumed.

24  BY MS. FUJIMOTO:

25      Q.    Okay.  And do you know whether he told

Dennis D. Weisenburger, M.D.

1    Dr. Sawyer a lesser number?

2         A.    I don't remember what he told Dr. Sawyer.

3    He did two to three properties a week.  For each

4    property, he sprayed two days.  So two times three

5    is -- two times four -- two times two is four and

6    two times three is six, so I took an average of

7    five.

8         Q.    Did you ask Mr. Giglio during the

9    telephone call about the discrepancies between what

10   he told Dr. Sawyer and what he told you?

11        A.    I had not read Dr. Sawyer's deposition at

12   that time so I didn't know what he had told

13   Dr. Sawyer.  All I knew was what was in his first

14   deposition.

15        Q.    Had you reviewed Dr. Sawyer's report?

16        A.    No.

17        Q.    Okay.

18             MS. FUJIMOTO:  And I'll mark as Exhibit

19   No. 13 to the deposition a copy of the Andreotti

20   paper from 2018 called "Glyphosate Use and Cancer

21   Incidence in the Agricultural Health Study."

22             (Whereupon Exhibit 13 was marked for

23             identification.)

24   BY MS. FUJIMOTO:

25        Q.    And you've been -- you've responded to a

Dennis D. Weisenburger, M.D.

1    number of questions regarding this paper in the

2    past, right?

3        A.   Yes.

4        Q.   And you stand by all those responses?

5        A.   I do.

6        Q.   Okay.  And if we go to page 513, Table 2

7    of the Andreotti paper, which is from the

8    Agricultural Health Study, and then we go down to

9    the subtype category of diffuse large B-cell

10   lymphoma, would it fair -- would it be fair for me

11   to assume that you placed Mr. Giglio in quartile 4,

12   which is the highest degree of exposure?

13       A.   Probably -- most probably, yeah.

14       Q.   Okay.  And at least, based on the

15   Agricultural Health Study data, the relative risk is

16   .97 with a confidence interval of 0.51 to 1.85.

17            That's not statistically significant, is

18   it?

19       A.   That's correct.

20       Q.   It doesn't show an increase in risk at

21   all?

22       A.   It does not, but I --

23            [Reporter requests clarification.]

24            THE WITNESS:  It does not, but in my

25   supplemental report, I explained why I don't place

Dennis D. Weisenburger, M.D.

1   much confidence or weight in this study.

2            [Reporter requests clarification.]

3            THE WITNESS:  In this study.

4   BY MS. FUJIMOTO:

5       Q.   Okay.  If you go back to Exhibit 5, which

6   is your report, and basically the last page, it

7   states that you did a careful review of his medical

8   records and a personal interview by yourself and

9   they revealed no other substantial cause of his NHL;

10  is that right?

11      A.   Yes.

12      Q.   And, again, we previously referenced what

13  you understand to be the date range of the medical

14  records that you reviewed?

15      A.   Yes.

16      Q.   Okay.  For the records that you did

17  review, and, as I understand it, it was probably

18  from a year prior to his diagnosis until this year?

19  I can't recall what you said.

20      A.   Yes --

21      Q.   Okay.

22      A.   -- until this year.

23      Q.   Do you know how recent the last record was

24  that you saw?

25      A.   It would have been about the time of his

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1    CAR-T cell therapy, maybe shortly thereafter, so it

2    would have been spring.

3              [Reporter requests clarification.]

4              THE WITNESS:  Spring.

5    BY MS. FUJIMOTO:

6        Q.   So did you -- when you looked through the

7    medical records, what, quote-unquote, risk factors

8    did you look for?

9        A.   Well, I -- I looked for the standard risk

10   factors that are known and accepted for non-Hodgkin

11   lymphoma.

12       Q.   Which are...

13       A.   Well, immunosuppression or

14   immunodeficiency, either inherited or acquired, look

15   for autoimmune diseases which are abnormalities in

16   the immune system.

17             [Reporter requests clarification.]

18             THE WITNESS:  Ab- -- yes.

19             I looked for specific infections that are

20   known and cause lymphoma, other specific exposures,

21   like other pesticides or solvents.  I ███████████

██  █████████████████████████████████████

██  ███████████████████████████████████████████

██  ████████████████████████████████████

██  ████████████████████████████████████

Dennis D. Weisenburger, M.D.



15   BY MS. FUJIMOTO:

16      Q.   What about age, do you consider age to be

17   a risk factor?

18      A.   Well, of course, people who get older have

19   a higher risk, but I don't consider it an etiologic

20   risk factor.  It is a risk factor, but it's not an

21   etiologic risk factor.

22      Q.   And as I understand it, it's a risk

23   factor, in part, because we understand, at its most

24   fundamental level, that cancer is a result of kind

25   of accumulated DNA damage or errors that cannot --

Dennis D. Weisenburger, M.D.

1   that, at some point, don't get repaired by our

2   repair system.

3           Is that a crude but fair way of

4   summarizing a very complicated subject?

5       A.   Yes.

6       Q.   Okay.  And, again, just talking broadly to

7   see if we can all be on the same page, so there

8   are -- am I right that all of us, every day of our

9   life, our DNA takes hits or has errors or

10  alterations that we repair, that we have natural,

11  inborn repair systems that repair damaged cells; is

12  that right?

13      A.   Yes.

14      Q.   And so for age being a risk factor, it's

15  really a function of the more days you live, the

16  more hits or things that might damage the DNA, the

17  more they -- those occur so, statistically, it's

18  more likely that one or some may get by our repair

19  system?

20      A.   Yes.

21      Q.   Okay.  And when they do, they end up

22  multiplying.  You know, there's overgrowth of

23  abnormal cells and that becomes a cancer at some

24  point?

25           MS. FORGIE:  Objection.

Dennis D. Weisenburger, M.D.

1          THE WITNESS:  I can accept that.

2  BY MS. FUJIMOTO:

3      Q.   Okay.  And am I right that our repair

4  system, a fundamental or a core part of our repair

5  system is our immune system?

6      A.   Well, I wouldn't use those terms.  Our

7  immune system protects us from things.

8      Q.   Right.

9      A.   And there are -- there are repair

10  mechanisms for genetic damage that occurs in genes

11  that are part of -- that are important for our

12  immunity.

13      Q.   And -- and is that why we see a lot of the

14  well-established known risk factors or causes of --

15  of NHL in particular is because -- or -- or they

16  involve immune deficiencies or autoimmune diseases,

17  some weakness or vulnerability of the immune system?

18          MS. FORGIE:  Objection.

19          THE WITNESS:  So with immune deficiencies,

20  usually the -- with immune deficiencies, usually,

21  the cause is Epstein-Barr virus, okay, because

22  you're so deficient that the virus can actually

23  infect the cells and cause them to become malignant.

24  There are also -- there are some immune deficiencies

25  that work in other ways, and autoimmune disease

Dennis D. Weisenburger, M.D.

```
 1   is -- is sort of a -- I would say more of a

 2   dis-regulated immune system, an abnormally

 3   regulated -- regulated immune system that allows

 4   more mistakes to occur, probably.

 5   BY MS. FUJIMOTO:

 6       Q.   And -- but -- but all of them, in some

 7   way, involve a dysfunction or problem with the

 8   immune system?

 9            MS. FORGIE:  Objection.

10   BY MS. FUJIMOTO:

11       Q.   That's why we --

12       A.   Well --

13       Q.   -- call them --

14       A.   Well --

15       Q.   -- immune deficiencies?

16       A.   Yeah, if you're a talking about immune

17   deficiencies, that's true.

18       Q.   And even if you're talking about

19   autoimmune diseases, that's a defect in the immune

20   system, right?

21       A.   Yes.

22            MS. FORGIE:  Objection.

23            THE WITNESS:  Yes.

24   BY MS. FUJIMOTO:

25       Q.   Okay.  And so then going back, then, to
```

Dennis D. Weisenburger, M.D.

1    age and the more we live, am I right that cancer

2    risk and the accumulation of DNA damage can be

3    inherited in some instances, meaning a person can

4    inherit a gene alteration, like BRCA1 or BRCA2 for

5    women and breast cancer?

6         A.   Yes.

7         Q.   And so if someone has a -- born with a

8    genetic mutation, that's going to increase their

9    risk of cancer?

10        A.   Yes, that's one --

11        Q.   Okay.

12        A.   -- way.

13        Q.   There are also instances where there are

14   congenital alterations or DNA defects that can

15   increase the risk of cancer, right?

16        A.   Yes.

17        Q.   And then there are acquired or

18   deficiencies or deletions or alterations in a gene,

19   right?

20        A.   Yes.

21        Q.   And -- and part of that is going to the

22   bigger category.

23             We are exposed to things every day of our

24   lives that can give additional hits to our DNA that

25   might increase our risk of cancer over time?

Dennis D. Weisenburger, M.D.

1      A.   That's true.

2      Q.   Okay.  And in terms of exposures for

3  someone -- and I'm just talking just generally -- is

4  it correct that certain lifestyle choices can

5  increase a person's risk of cancer?

6           MS. FORGIE:  Objection.  Again, we're

7  going far afield of specifics.

8           You can answer.

9           THE WITNESS:  Yes.

10  BY MS. FUJIMOTO:

11      Q.   Okay.  And so for someone who, let's say,

12  lives in a tropical climate or loves to sunbathe or

13  go to the beach all the time, they're exposed to the

14  sun more and that can increase the accumulation of

15  DNA damage and increases their risk of a skin cancer

16  over time?

17           MS. FORGIE:  Objection.

18  BY MS. FUJIMOTO:

19      Q.   Right?

20      A.   Yes.

21      Q.   And that would be true of people who work

22  outside.

23           Landscapers, farmers, people who are

24  outside and exposed to the sun more, they're at an

25  increased risk of cancer --

Dennis D. Weisenburger, M.D.

```
1              MS. FORGIE:  Objection.

2   BY MS. FUJIMOTO:

3       Q.   -- from the sun?

4       A.   If they don't take precautions and use

5   sunblock and big hats and all those kind of things.

6       Q.   And there are other everyday things that

7   can give us additional hits over time that -- you

8   know, things like exposure to gasoline fumes, any of

9   the toxic substances that might be in the ambient

10  air depending upon where we live, drinking coffee.

11  IARC categorizes caffeine as a probable carcinogen.

12            Everyday life supposes to us things

13  naturally that can give us DNA hits that can

14  increase our risk of cancer, right?

15            MS. FORGIE:  Objection.  This is --

16            THE WITNESS:  That's --

17            MS. FORGIE:  -- so general causation.

18            THE WITNESS:  That's true.

19  BY MS. FUJIMOTO:

20      Q.   Okay.  And then there's a whole other

21  category that probably comprises of lot of the

22  exposure cases, which is idiopathic non-Hodgkin's

23  lymphoma, right?

24      A.   Well, idiopathic non-Hodgkin's lymphoma

25  just means that --
```

Dennis D. Weisenburger, M.D.

```
 1              [Reporter requests clarification.]

 2              THE WITNESS:  Idiopathic -- idiopathic

 3    just means we don't know what caused it.

 4    BY MS. FUJIMOTO:

 5       Q.   Right.  So you're not able to identify

 6    either a gene or some specific pathologic, cytologic

 7    or other evidence of a particular mechanism that

 8    caused the cancer?

 9       A.   Well, sometimes, we can know the

10    mechanism.  We just don't know if it was -- if it

11    was a chemical or whether it was a diet or it was

12    something else.  I mean, so -- you know, so often

13    with lymphomas, we -- we know what the mechanism was

14    because we can find a chromosomal translocation

15    or -- or other genetic abnormality.  We can say,

16    "Well, you know, that" -- you know, that that's

17    probably what caused the lymphoma, but then the

18    question is, well, what caused the genetic

19    abnormality?  Can we identify a cause for that?

20       Q.   And if you have a patient where they're

21    obese, they smoke, they don't exercise and they're

22    aging while, under what we just discussed, it may be

23    that those increase the risk of cancer, would you

24    ever tell a patient like that, that, you know, the

25    fact that you smoked or the fact that you were out
```

Dennis D. Weisenburger, M.D.

1    in the sun or the fact that you were obese is the

2    cause of your cancer?

3            MS. FORGIE:  Objection.

4            THE WITNESS:  I might.  It would depend on

5    the degree of exposure.

6            MS. FUJIMOTO:  ███████   ████████████

█   ███████████████████████████████████████████

█   ████████████████████████████████████████

█   ██████████████████████████████████████████████

10           (Whereupon Exhibit 14 was marked for

11           identification.)

12   BY MS. FUJIMOTO:

13       ███   ████████████████████████████████████

█   ██████████████████████████████

15       A.   I don't believe so.

16       Q.   ███████████████████████████

█   ███████████████████████

18       A.   That's correct.

19       ███   ██████   ██████████   ███████████

█   ████████████████████████████████████████████

█   ████████████████████████████████████████████

22           Do you see that?

23       A.   Yes.

24       Q.   Okay.  █████████████████████████████

█   ████████████████████████████████████

Dennis D. Weisenburger, M.D.



1    ██████ .

2              Do you see that, under "Subjective"?

3       A.   Yes.

4       Q.   ████████████████████████████████

5    ████████████████████    ████████████████████

6    ████████████████████

7              Do you see that?

8       A.   Yes.

9       Q.   Did you take into account either of those

10   factors in assessing Mr. Giglio's risks of

11   non-Hodgkin lymphoma?

12      A.   ████████████████████████████

Dennis D. Weisenburger, M.D.



```
 1      Q.
 
 4      A.
 
20             MS. FORGIE:  Objection.

21   BY MS. FUJIMOTO:

22

24             MS. FORGIE:  Objection.

25             THE WITNESS:  Well, if it -- if it was
```

Dennis D. Weisenburger, M.D.

1    true, I would believe it and I would say yes, it

2    does increase risk, but, in fact, if you read that

3    literature carefully, just don't look at the review

4    articles, but actually read the literature

5    carefully, which I've done, it really looks to me

6    and to some of the other authors that it's -- it's

7    what's called a surveillance bias.  ██████████████

██  ████████████████████████████████████████  ███████

██  ██████████████████████████████████████████

██  █████████  ████████████████████████████████████

██  ██████████

12            [Reporter requests clarification.]

13            THE WITNESS:  You find it.

14            [Reporter requests clarification.]

15            THE WITNESS:  You find it.

16                ██████████████████████████████████

██  ██████████  ████████████████████████████████████

██  ██████████████████████████████████████████████

██  ██████████████████████████████████████████

██  ██████████████████████████

21    BY MS. FUJIMOTO:

22        Q.    And -- and surveillance bias, recall bias,

23    all of those things are important when you're

24    analyzing published studies, right?

25        A.    Right.  The study -- the studies have to

Dennis D. Weisenburger, M.D.

```
 1    make sense.

 2         Q.  ████████████████████████████

      ████████████████████████████████████

      ████████████████████████████████████████

      ████████████████████████

 6              Did you consider that in assessing

 7    Mr. Giglio's risk factors?

 8         A.  ███████████  ███████████████  ████

      ███████████████████████████████

      █████████████████████████████████████

      █████████████████████████████████████

      ███████████████████████████████  ████

      ██████████████████████████████████████

      █████████

15         Q. ████████████████████████████████

      ██████

           ████  ████████████████████████████

      ████████

19              [Reporter requests clarification.]

20              THE WITNESS:  The Nabhan dis- --

21              [Reporter requests clarification.]

22              THE WITNESS:  Nabhan deposition.

23              MS. FUJIMOTO:  N-A-B-H-A-N.

24              THE WITNESS:  Yeah.

25    BY MS. FUJIMOTO:
```

Dennis D. Weisenburger, M.D.



1     Q.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮

4     A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮

15    Q.   ▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮

20         ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22    A.   Where is that?  What page?

23    Q.   The Bates is 57, middle of the page.  The

24    progress note is from ▮▮▮▮▮▮▮▮▮▮

25    A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dennis D. Weisenburger, M.D.



1

2

3

4

5

6

7     Q.

8

9

10          MS. FORGIE:  Objection.

11          THE WITNESS:

12

13

14

15

16   BY MS. FUJIMOTO:

17     Q.

18

19          MS. FORGIE:  Objection.

20          THE WITNESS:  Yes.

21   BY MS. FUJIMOTO:

22     Q.

23

24     A.   I don't have a 58.

25          MS. FORGIE:  I don't see 58.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

```
 1                THE WITNESS:  I jumped right to 171.

 2   BY MS. FUJIMOTO:

 3        Q.   Hmm.  It's back in -- it's two-page --

 4   it's two-sided.  It still doesn't?

 5        A.   I go 57, 58 and then 171.

 6        Q.   Okay.

 7        A.   I've got an 81.

 8        Q.   The copy situation --

 9        A.   I got an 81 --

10        Q.   -- is not good.

11        A.   -- stuck in here.

12             MS. FORGIE:  Well, these --

13             MS. FUJIMOTO:  And 82.

14             MS. FORGIE:  It's also confusing --

15             [Reporter requests attorneys speak one

16             at a time.]

17             MS. FORGIE:  It's confusing because it

18   says "page 57" in one place and then underneath, the

19   Bates stamp is 58.

20             MS. FUJIMOTO:  Right, sorry.  So we -- I'm

21   using --

22             MS. FORGIE:  So --

23             MS. FUJIMOTO:  -- Bates numbers.

24             THE WITNESS:  Oh, Bates numbers.

25   BY MS. FUJIMOTO:
```

1        Q.    Yeah, I'm -- I apologize.

2              MS. FORGIE:  I just realized what you were

3    doing.

4              THE WITNESS:  Okay.

5    BY MS. FUJIMOTO:

6        Q.    All right.  ████████████████████████

         ████████████████████████████████

8              MS. FORGIE:  Right.

9    BY MS. FUJIMOTO:

10       Q.    -- in -- in strings, so --

11             MS. FORGIE:  So let's use Bates numbers.

12   BY MS. FUJIMOTO:

13       Q.    All right.  So Bates No. 58 --

14       A.    Okay.

15       Q.    -- ████████████████████████

     ████████████████████████████████████

     ██████████████████████████████████████

     ██████

19             MS. FORGIE:  Objection.

20             THE WITNESS:  I -- I -- I have no opinion

21   on that.

22   BY MS. FUJIMOTO:

23       Q.    Okay.  If you go, then, to -- and it's

24   because I had already big -- I had already

25   big-stapled this collection.  There is an added page

Dennis D. Weisenburger, M.D.

 1    and I'll have to add it to your exhibit before we

 2    give it to the court reporter -- and the Bates

 3    number is 82.

 4         A.   Yes.

 5         Q.   ██████████████████████████████████████

 ██   ████████████████████████████████████████████████

 ██   ████████████████████████████████████████████████

 8         Do you see that?

 9         A.   Yes.

10         Q.   Were you aware of that?

11         A.   No.

12         Q.   Okay.  So you didn't take that into

13    account in any way in your assessment of Mr. Giglio?

14         A.   █████████████████████████████████████

 ██   ████████████████████████████████████████████████

 ██   ████████████████████████████████████████████████

17         Q.   ██████████████████████████████████████

 ██   ████████████████████████████████████████████████

19         A.   I don't have an opinion on that either.

20         Q.   Okay.  All right.  If you go to the next

21    page in Exhibit 14, the Bates number is 172.  They

22    jump because I tried to do it chronologically.  And

23    this ████████████████████████████████████████

24    ████████████████████████████████████████████████

 ██   ████████████████████████████████████████████████

Dennis D. Weisenburger, M.D.

1      A.   Yes.

2      Q.   Okay. 

7

9      A.

19

25      Q.   Did -- what -- what date range or what

Dennis D. Weisenburger, M.D.



1    years did you use to do the average?

2       A.

4       Q.   For how -- how many years?

5       A.

8       Q.   Oh, okay.

9

11      Q.   I see.

12

15      A.   Yes.

16      Q.

18      A.   Yes.

19      Q.

22      A.

Dennis D. Weisenburger, M.D.



```
 1      Q.  ████████████████████████████████████
██  ████████████████████████████
 3      A.  Yeah.
 4      Q.  -- if you --
 5      A.  Yes.
 6      Q.  ████████████████████████████
 7      A.  Yes.
 8      Q.  ██████  ██████████████████████████████
██  ███████████████████████████████
10          ███████████████████████████
██  ███████
██     ███  ██████
██     ███  ██████  █████████████████████████████
██  ██████████████████████████
15          All right.  If you would go to -- well,
16   strike that.
17          It's going to be too confusing so I'm
18   going to go serially.  ████████████████████████
██  ██████
20          So if you stay where we were, we were on
21   Bates No. page 172.  And if you turn the page to
22   173, you'll see that one of the --  ████████████
██  █████████████████████████████████████████████
██  ████████████████████████████████
25          Do you see that?
```



```
 1      A.   Yes.

 2      Q.

 5           MS. FORGIE:  Objection.

 6           THE WITNESS:

11   BY MS. FUJIMOTO:

12      Q.   Okay.  Setting aside risk factors, okay,

13   for NHL, I'm not talking about that,

18           MS. FORGIE:  Objection.

19           THE WITNESS:  I don't have an opinion on

20   that.

21   BY MS. FUJIMOTO:

22      Q.

23

24      A.
```

1      Q.   ███████████████████    ██████████████

■      ████████████████████████████████████

■      ██████████████████   ███████████████████████

■      ████████████████████████████████████

■      ███████████████████████████████

6           You know what that is, right, Doctor?

7      A.   Yes.

8      Q.   ████████████████████████████████

■      ██████████████████████████████████████████

■      ████████████████████████████████████

11     A.   It's unlikely, but I -- I -- I have -- I

12  don't have an opinion on that.

13     Q.   Okay.  Now we're getting to -- go to Bates

14  Page No. 365.

15          And I actually meant to -- let's see.

16     ███████████████████████████████████

■   █████████   ████████████████████████████████████

■   ██████

19          Well, I can't find it.

20          All right.  Go to page 5 -- Bates No. 553.

21  ████████████████████████████████

22          ██████████████████   ██████████████████

■   ███████████████████████████████████████

■   █████████████████

25     A.   Yes.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.



```
 1      Q.   ████████████████████████████
 ██     ███████████████
 3      A.   Yes.
 4      Q.   -- right?
 5      A.   Yes.
 6      Q.   █████   ████████████████████
 ██     ████████████████████████████
 ██     ███████
 9           Did you see that?
10      A.   Yes.
11           ████   █████████████████████
 ██     ███████
13      A.   I did -- I don't believe I did.
14      Q.   ██████████████████████████
 ██     █████████████████████████████
 ██     ████████████████████████████████
 ██     ███████
18           MS. FORGIE:  Objection.
19           THE WITNESS:  I have no opinion on that.
20      It's unlikely.
21      BY MS. FUJIMOTO:
22      Q.   █████   ████████████████████
 ██     █████████████████████████████████
 ██     ███████████████████████████████
 ██     █████████████████████
```

Dennis D. Weisenburger, M.D.



1          Do you see that?

2     A.   Yes.

3     Q.   ███████████████████████

4          Does that sound right?

5     A.   Probably -- it probably is correct, yes.

6     ███  █████   ██████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████

10         Do you see that?

11    A.   Yes.

12    Q.   █████████████████████

███████████████████████

14    A.   █████████████████████

███████████████████████████████████

███████████████████   ███████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████   ██████████████████████████████

███████████████████████████

███████████████████████████

███████████████████████

24    ███  ██████   ████████████████████

███████████████████████████████████

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.

1    ████████████████████   ████████████████

▮    ██████████████████████████████████

▮    ███████████████████████████████████████

▮    █████████████████████████████████████

▮    ████████████████████████████

6        A.    Okay.

7        Q.    ████████████████████████████

▮    █████████████████████████████████

▮    ██████████████████

10            MS. FORGIE:  Objection.

11    BY MS. FUJIMOTO:

12        Q.    Fair?

13            MS. FORGIE:  Objection.

14            THE WITNESS:  ████████████████████

▮    ███████████████████████████████████████

▮    ██████████████████████████████████

17    BY MS. FUJIMOTO:

18        Q.    I saw that, okay.

19            And you --

20            MS. FORGIE:  None of you are smokers.

21    BY MS. FUJIMOTO:

22        Q.    And -- and --

23            [Reporter requests clarification.]

24            MS. FORGIE:  I said, "None of you are

25    smokers."

Dennis D. Weisenburger, M.D.

```
 1   BY MS. FUJIMOTO:

 2        Q.   ████████████████████████████

     ██  ███████████████████████████████

     ██  ██████████████████████████

 5        A.   No.

 6        Q.   Okay.

 7        A.   ███   █████████████████████

     ██  ███████████████████████████████

     ██  ███████████████████  ████████

10        Q.   Okay.  Well, that was going to be my next

11   question.

12             █████████████████████████

     ██  ██████████████████████████████

14        A.   I did.

15        Q.   Okay.  And you didn't think it was a risk

16   factor for him?

17        A.   No.

18        Q.   Okay.  ████████████████████

     ██  ███████████████████████████████

     ██  ██████████████████████████████

     ██  ██████

22             Does that sound about right?

23        A.   That's probably right.

24        Q.   And so certainly, over the last few

25   years -- let's see, between -- where were we at --
```



```
1

2

3

4      A.   Yes.

5      Q.   -- correct?

6      A.

7

8

9

10

11

12

13

14

15     A.   Yes.

16     Q.   And mechanistically, it makes sense,

17   right?

18          MS. FORGIE:  Objection.

19   BY MS. FUJIMOTO:

20     Q.   I've seen you explain it before.

21
```

Dennis D. Weisenburger, M.D.

1          ▮▮▮▮▮▮▮▮▮

2          Q.   Okay.

3          A.   So that's sort of the hypothesis, but it's

4    a difficult one to prove.

5          Q.   Okay.

6               MS. FORGIE:  So when you get to a

7    convenient place --

8               [Reporter requests clarification.]

9               MS. FORGIE:  -- can we take another short

10   break?

11              When you get to a convenient place, can we

12   please take another short break?

13              MS. FUJIMOTO:  Sure.

14              THE WITNESS:  It is getting warm in here,

15   don't you think?

16              MS. FORGIE:  Yes.

17              MS. FUJIMOTO:  Just a couple more

18   questions then we'll get off --

19              MS. FORGIE:  Whenever --

20              MS. FUJIMOTO:  -- of this exhibit.

21              MS. FORGIE:  -- is good for you.

22   BY MS. FUJIMOTO:

23         Q.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dennis D. Weisenburger, M.D.

1      ████████████████████████████████████████

██  ████████████████████████████████

3              You're -- you're not disputing any of

4      those, right?

5          A.   No.

6          Q.   Okay.  And they don't change your opinion?

7          A.   No.

8          Q.   Okay.

9              MS. FUJIMOTO:  All right.  Time for a

10     break.

11             MS. FORGIE:  Great.  Thanks.

12             THE VIDEOGRAPHER:  With the approval of

13     counsel, going off the record.  The time is

14     approximately 11:32 a.m.

15             (Recess.)

16             (Whereupon Exhibit 15 was marked for

17             identification.)

18             MS. FUJIMOTO:  With the approval of

19     counsel, back on the record.  The time is

20     approximately 11:46 a.m.  This marks the beginning

21     of Recording No. 3.

22     BY MS. FUJIMOTO:

23         Q.   ████████████████████████████  ████████

██  ████████████████████████████████████████

██  ████████████████████████████

Dennis D. Weisenburger, M.D.



```
 1            MS. FORGIE:  Thank you.

 2   BY MS. FUJIMOTO:

 3        Q.

 8            My first question is, take a look and tell

 9   me whether or not you previously reviewed these

10   records.

11        A.   Probably not.

12        Q.

18

21        A.

23        Q.   Because if he did, that would be a risk

24   factor you would consider?

25            MS. FORGIE:  Objection.
```

Dennis D. Weisenburger, M.D.

```
 1              THE WITNESS:  Yes.

 2   BY MS. FUJIMOTO:

 3        Q.   Okay.    ███████████████████████

     █  ██████████████

 5        A.   It may or may not.  I'd have to go look at

 6   the data on it, but...

 7        Q.   ████████████████████████████

     █  ███████

 9              MS. FORGIE:  Object --

10   BY MS. FUJIMOTO:

11        Q.   -- issue?

12              MS. FORGIE:  Objection.

13              THE WITNESS:  Yes.

14   BY MS. FUJIMOTO:

15        Q.   █████  ████████████████████████

     █  █████████████████████████  ███████

     █  ███████████████████████████

     █  ████████████

19        A.   Yes.

20        Q.   █████  ████████████████████████

     █  ██████████████████████████████████

     █  ████████████████  ████████████████

     █  ███████████████████████████

     █  ███████████████████████████

     █  █████████████████
```

Dennis D. Weisenburger, M.D.

```
 1      A.   That's correct.

 2      Q.   ████ ██████████████████████
 █ ████████████████████ ████████████████
 █ ██████████████████████████████████████
 █ ██████████████████████████████████████
 █ ████████████████████████████████

 7           What is that?

 8      A.   ████████████

 9      Q.   ████ █████████████████████████
 █ █████████████████████

11      A.   █████████████████████████
 █ █████████████████████ ████████████████
 █ ███████████████ █████████████████████

14      Q.   ████ ██████████████████████
 █ ██████████████████████████████████

16      A.   I considered it, but it's not a risk

17  factor for non-Hodgkin lymphoma.

18      Q.   ████ ██████████████████████
 █ ██████████████████████████████████████
 █ ████████████████

21      A.   Yes.

22      Q.   Okay.  From which records, do you recall?

23      A.   ██████████████████████████████
 █ ███████████████████████████ █████████████

25      Q.   Okay.
```

Dennis D. Weisenburger, M.D.



```
 1    A.    ████████████████████████████████

 2    Q.    ██████  ███████████████████  ███

 ▮    ████████████████████████████████████

 ▮    █████████████████████████████████████

 ▮    ██████████████████████████████████████

 ▮    ██████

 7    A.    Yes, I'm sure --

 8    Q.    Does that confirm --

 9    A.    -- it does.

10    Q.    ████████████████████

11    A.    ███████████████████████████████

 ▮    ██████████████████████████  ███████████

 ▮    █████████████████████████████

 ▮    ██████████████████

15          [Reporter requests clarification.]

16          THE WITNESS:  ████████████████████

 ▮    █████████

18          ██████████████████████████████  ███

 ▮    ███████████████████████████████

 ▮    ████████████████████████████████████

 ▮    ██████████████████

22    BY MS. FUJIMOTO:

23    Q.    And is that your opinion now or are you

24    speculating?

25          MS. FORGIE:  Objection.
```

Dennis D. Weisenburger, M.D.



```
 1           THE WITNESS:

 4    BY MS. FUJIMOTO:

 5       Q.   Okay.

10       A.   Yes.

11       Q.

14           MS. FORGIE:  Objection.

15           THE WITNESS:

24    BY MS. FUJIMOTO:

25       Q.   Okay.  So this suggests either, but you
```

Dennis D. Weisenburger, M.D.



 1  don't know -- either -- strike that.

 2

 4      A.

 9      Q.   Okay.  Do you know why that might be?

10      A.   Well, because lymphoma is

11  immunosuppressive.  It -- it -- it's a cancer of the

12  immune system so the immune system is not working

13  the way it should.

14           (Whereupon Exhibit 16 was marked for

15           identification.)

16  BY MS. FUJIMOTO:

17      Q.

22

24           Do you see that?

25      A.   Where is it?

Dennis D. Weisenburger, M.D.

```
 1        Q.   Under the first comment under "Orders."

 2        A.   Yeah, I mean, I don't know who wrote that

 3   comment.

 4        Q.   So had you seen that comment before?

 5        A.   No.

 6        Q.   Okay.  So you didn't run it to ground to

 7   see what -- what they were referencing or what it

 8   was related to?

 9        A.   No.

10        Q.   Okay.

11        A.   It sounds bogus to me.

12        Q.   Okay.  Let's see.

13             Okay.  If you would go to page 11, so that

14   would be the next one, and it comes from a █████████

██   ███████████████████████████████████████████████████

██   ███████

17        A.   What Bates number?

18        Q.   11.  ████████████████████████████████████

██   ██████████████████████████████████████████

20             MS. FORGIE:  I don't see that.

21             THE WITNESS:  441?  It goes --

22   BY MS. FUJIMOTO:

23        Q.   Yeah, they're not -- they're not

24   sequential because it's just a collection, so it's

25   four pages from the back.
```

```
1              MS. FORGIE:  I don't have an 11 in this.

2              THE WITNESS:  I don't have it either.

3   BY MS. FUJIMOTO:

4       Q.   Well, yeah, that was great copying.  Sorry

5   about that.  No, it's okay.  I -- I believe you.  I

6   just wanted to see which ones were there.

7              It's because you have the wrong exhibit,

8   sorry.  We went back to Exhibit 15.

9              MS. FORGIE:  Oh, you didn't tell us that.

10             MS. FUJIMOTO:  Yeah, I know.  I meant to.

11  That would be it.  And it would be fourth from the

12  back.

13             MS. FORGIE:  It is in there.

14             [Reporter requests clarification.]

15             MS. FORGIE:  It is in there.

16             MS. FUJIMOTO:  Okay.

17             MS. FORGIE:  I found it.  Can I show him

18  what it looks like?

19             THE WITNESS:  Okay.

20  BY MS. FUJIMOTO:

21      Q.   All right. ███████████████████████████████

██ ███████████████████████████████████████████████████

██ ██████████████████████████████████████████████

██ ████████████████████████████████████████████████████

██ ███████████████████████████    ███████████████████
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.



1

2          Do you see that?

3    A.    Yes.

4    Q.

5

6    A.    Yes.

7    Q.

8

9

10          Do you see that?

11    A.    Yes.

12    Q.

13

14    A.    Yes.

15    Q.

16

17          I take it you disagree with that?

18    A.    I disagree with it.

19    Q.    Do you know what they based it on?

20    A.

```
 1     ███████████████████████████████████

 █     ██████████████████████████

 3        Q. ██████████████████████████████████

 █     ███████████████████████████████████████

 █     ████████████████████████████████████

 █     ████████████████████████████████████████

 █     ████████████████

 8        A.    I relied on the --

 9              MS. FORGIE:  Objection.

10              THE WITNESS: ████████████████████

█      ████████████████████████████████████

12     BY MS. FUJIMOTO:

13        Q. ██████████████████████████████

█      ███████████████████████████████████████

█      ████████████

16              MS. FORGIE:  Objection.

17              THE WITNESS:  Probably, yes.

18     BY MS. FUJIMOTO:

19        ████    ██████    ██████████████████████

█      ███████████████████████████████████

█      ██████████████

22        A. ████████    ████████████████████████

█      ████████████████████████████████████

█      ████████████████████  ███████████████████

█      ████████████████████████████████████
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.

1   ████████████████████  ████████████████████

▮   ██████████████████████████████████

▮   ██████████████████████████████████

▮   ██████████████████

5        Q.    ██████  ████████████████████████

▮   ████████████████████████████

▮   ████████████████████

8        A.    That's true.

9        Q.    All right.

10            MS. FUJIMOTO:  ██████████████████████

▮   ████████████████████████████████

▮   ████████████████████████████████

13            (Whereupon Exhibit 17 was marked for

14            identification.)

15   BY MS. FUJIMOTO:

16        Q.    Doctor, have you seen these records

17   before?

18        A.    No.

19        Q.    Okay.  And this would be after

20   Mr. Giglio's initial diagnosis of NHL and he's in

21   remission, right?

22        A.    Right.

23        Q.    Okay.  And if you'll look at -- at the

24   first page of this, you'll see down at the bottom

25   that they reference basically his -- ██████████████

Dennis D. Weisenburger, M.D.



1

2

3

4

5

6

7

8

9

10     A.   Yes.

11     Q.

12

13

14     A.   I don't know where you see that.

15     Q.

16     A.   Yes.

17     Q.   Okay.

18

19

20     A.   Yes.

21     Q.   Okay.

22          MS. FUJIMOTO:

23

24

25

Dennis D. Weisenburger, M.D.

```
 1                (Whereupon Exhibit 18 was marked for

 2                identification.)

 3    BY MS. FUJIMOTO:

 4         Q.   Have you seen this document before, this

 5    published article before, Doctor?

 6         A.   No.

 7         Q.   Okay.  And it says, in the very beginning,

 8    ███████████████████████████████████████████████

 ▉    ██████████████████████████████████

10              Do you agree with that statement?

11         A.   I have no opinion on it.

12         Q.   ████████████████████████████████

 ▉    ████████████████████████████████████████████████

 ▉    ███████████████████

15              Do you see that?  Second sentence.

16         A.   Yes.  I don't have any -- I don't have any

17    comment on that either.

18         Q.   All right.  So you don't have an opinion

19    on that.

20              ████████████████████████████████

 ▉    ███████████████████████████████████████████

22         A.   ███████████████████████████████████

 ▉    ██████████████████████████████████

24         Q.   Right, after he was in remission.

25         A.   Yeah, so it wouldn't be --
```

Dennis D. Weisenburger, M.D.

1       Q.    Okay.

2       A.    -- a cause of his lymphoma if it happened

3   after his lymphoma, right?

4       Q.    That wasn't my question.  I'm not

5   suggesting that it caused his lymphoma.

6       A.    Okay.

7       Q.    Okay.  If you would go back to Exhibit 17,

8   ███████████████████████████████████████████████

9       A.    Okay.

10      Q.    And it's -- for page 523, it's a note from

11  ████████████████████████████████████████████████

█   ██████████████████████████████████████    ████████

█   ████████████████████████████████████████████

14            Do you see that?

15      A.    Yes.

16      Q.    Okay.  And it says, █████████████████████

█   ██████████████████████████████████████████████████

█   ████████████████████████████    ██████████████████

█   ███████████████████████████████████████████████████

█   ██████████████████████████████████████████████████

█   ██████████████████████████████████████████████

█   ██████████████████

23            Do you see that?

24      A.    Yes.

25      Q.    ███████████████████████████████████████

Dennis D. Weisenburger, M.D.



```
 1   ████████████████████████████████████████

 ▮   ███████████████

 3        A.   Yes.

 4        Q.   ████████████████████████████

 ▮   ████████████

 6             MS. FORGIE:  Objection.

 7             THE WITNESS:  It is.

 8   BY MS. FUJIMOTO:

 9        Q.   █████   ████████████████████████

 ▮   ████████████████████████████████████████

 ▮   ███████████████████████████████████

12        A.   No.

13        Q.   ████████████████████████████

 ▮   █████████████████████████████

15        A. ██████████████████████████████

 ▮   ████████████████████████████████████████

 ▮   ██████████████████████

18        Q.   █████   ████████████████████████

 ▮   ███████████████████████████████
```

20             MS. FUJIMOTO:  All right.  I'll mark as

21   Exhibit 19 to the deposition a paper entitled

22   "Diffuse B-Cell Non-Hodgkin's Lymphoma Presenting

23   Atypically as Periprosthetic Joint Infection in a

24   Total Hip Replacement."

25   ///

Dennis D. Weisenburger, M.D.

```
 1              (Whereupon Exhibit 19 was marked for

 2              identification.)

 3    BY MS. FUJIMOTO:

 4         Q.    Have you seen this article before, doctor?

 5         A.    Not this -- not that I remember.  I've

 6    seen articles like this, but I -- I don't know if

 7    I've seen this one.

 8         Q.    Okay.  And so you were aware, then, that

 9    there's an increase incidence of lymphoma involving

10    periprosthetic sites?

11         A.    Well, I'm not sure there have been studies

12    that actually demonstrated a -- a risk.  There are

13    case reports like this that show that lymphomas

14    sometimes occur at -- at the prosthetic site, and

15    the idea is that it's due to chronic inflammation,

16    but --

17         Q.    Okay.

18         A.    -- there are rare events and -- and mostly

19    case reports.

20         Q.    And -- and that's why this second

21    sentence, the authors go on to say, "Chronic

22    inflammation due to metal debris arising from the

23    prosthetic implants has been evidenced as one of the

24    causes for the development of soft tissue lymphomas,

25    albeit rarely."
```

Dennis D. Weisenburger, M.D.

1           That's --

2      A.   Right.

3      Q.   -- basically consistent with your

4   understanding?

5      A.   Right.

6      Q.   Okay.

7           MS. FUJIMOTO:  Okay.  I'm going to mark as

8   Exhibit No. 20 to the deposition a collection of,

9   basically, pathology records, primarily some from

10  Sharp Hospital and some from -- well, all are from

11  either Sharp Medical Office or Sharp Memorial

12  Hospital, and what I attempted to do was go

13  chronologically.

14           (Whereupon Exhibit 20 was marked for

15           identification.)

16  BY MS. FUJIMOTO:

17     Q.   And I'll ask you just to take a little bit

18  of time to look through it and tell me whether or

19  not you reviewed these pathology records.

20     A.    The -- the only pathology records I

21  reviewed were the three biopsies that showed

22  lymphoma and the -- the bone marrow -- the bone

23  marrow reports as well.

24     Q.   Okay.  So if we start, then, at this first

25  page of Exhibit 20, which is Bates 589, this

Dennis D. Weisenburger, M.D.

1    references a lymph encode inguinal biopsy collected

2    on October 2024 [sic], and results were reported

3    October 23, 2014.

4              So this was the biopsy you reviewed?

5       A.   I reviewed the records and --

6       Q.   Records.

7       A.   -- and the slides.

8       Q.   Okay.  And essentially, if we go to the

9    next page, the histologic type was reported as

10   mature B-cell neoplasm.

11             I assume you agreed with that, based on

12   your review of the slide?

13      A.   That's not a term I commonly use --

14             [Reporter requests clarification.]

15             THE WITNESS:  It's not a -- not a term I

16   commonly use, but it is a mature B-cell neoplasm.

17   It's not a histologic type, but --

18   BY MS. FUJIMOTO:

19      Q.   Well --

20      A.   -- diffuse large B-cell lymphoma is the

21   histologic type.

22      Q.   Okay.  I was going to ask what would you

23   have -- what terms would you have used?

24      A.   I would just say diffuse large B-cell

25   lymphoma.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1      Q.    Okay.  And that's where they -- what they

2   put under sub-type, right, diffuse large B-cell

3   lymphoma, correct?

4      A.    Right.

5      Q.    Okay.  And you agree with that, obviously?

6      A.    Yes.

7      Q.    And the immunohistochemical subtype,

8   non-germinal center B cell.

9           What does that mean?

10     A.    Well, there -- there -- there are a number

11  of subtypes of diffuse large B-cell lymphoma, and

12  they're sort of germinal center and post-germinal

13  center or non-germinal center, based -- based on the

14  phenotype.  It sort of tells --

15          [Reporter requests clarification.]

16          MS. FUJIMOTO:  Phenotype.

17          THE WITNESS:  Phenotype, yes.

18          So it's trying to categorize the lymphomas

19  based on their stage of differentiation.

20  BY MS. FUJIMOTO:

21     Q.    And this is something, though, that is

22  typically seen in pathology for diffuse large B-cell

23  lymphomas?

24     A.    Yes.

25     Q.    Okay.  And then it goes down and gives us

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.

1    further information, the immunophenotype, it was

2    positive for MUM1, negative for BCL-6 and CD10,

3    correct?

4         A.   Yes.

5         Q.   And, again, is that something that's

6    typical of most lymphomas that you see?

7         A.   Those tests are commonly done in diffuse

8    large B-cell lymphoma to determine whether it's a

9    germinal-center type or a non-germinal-center type.

10        Q.   And this was?

11        A.   And this was a non-germinal-center type,

12   yes.

13        Q.   Okay.  And, again, how does that break

14   down in terms of lymphomas?  What percentages

15   generally are non-germinal centers?

16        A.   About 40 percent are non-germinal center

17   and about 60 percent are germinal center.

18        Q.   Okay.  And then the KI-67 index is

19   40 percent; is that generally looking at cell

20   turnover or --

21        A.   Yes, it's --

22        Q.   -- proliferation?

23        A.   Proliferation.

24        Q.   Okay.

25        A.   Cell proliferation.

Dennis D. Weisenburger, M.D.

1        Q.   And then the immunophenotype through flow

2   cytometry are -- was positive for CD19 and 20 and

3   surface lambda, and then negative for CD5, CD10 and

4   CD23, correct?

5        A.   Yes.

6        Q.   And, again, none of these findings are

7   unusual in terms of a non-Hodgkin's lymphoma?

8        A.   That's correct.

9        Q.   Okay.  And nothing about these findings

10  tells you whether or not this person -- setting

11  aside medical records or otherwise, would tell you

12  that this person used Roundup?

13       A.   That's correct.

14       Q.   And then if you walk through the report,

15  if you go to 2535, that page and the following many

16  pages relate to the bone marrow test, correct?

17       A.   Yes.

18       Q.   Okay.  And what's the take-home from that?

19       A.   Well, the bone marrow was dissolved by

20  diffuse large B-cell lymphoma and this is the

21  cytogenetic karyotype, which is markedly abnormal

22  and complex.

23       Q.   Again, not unusual in terms of

24  non-Hodgkin's lymphoma and not unusual for DLBCL?

25       A.   That's correct.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.

1      Q.   And was there anything in the findings of

2  the bone marrow results that would tell you that the

3  person had been exposed to Roundup?

4      A.   No.

5      Q.   And then if you go to, let's see, page

6  156, to the cytogenetic analysis report by

7  VantagePoint.

8      A.   I don't know where that is.

9           MS. FORGIE:  It's like --

10          MS. FUJIMOTO:  Yeah.

11          THE WITNESS:  Is this in the same --

12          MS. FORGIE:  About halfway through.

13          [Reporter requests clarification.]

14          MS. FORGIE:  About halfway through.

15          It looks like that (indicating).

16          THE WITNESS:  All right.  Let's see if I

17  can find it.  Oh, here we go.

18  BY MS. FORGIE:

19     Q.   And the date is November 3, 2014.

20          I take it you --

21     A.   I think it's the same data, just put into

22  a different report.

23     Q.   Okay.  This is the lab --

24     A.   Report.

25     Q.   -- analysis report that formed the basis

Dennis D. Weisenburger, M.D.

1    of the earlier information we looked at?

2         A.    Yes.

3         Q.    Okay.  And I take it, then, that nothing

4    in this cytogenetic analysis report would tell you

5    whether or not this person was exposed to Roundup?

6         A.    Nothing.

7         Q.    Pretty typical of NHL and DCL -- D --

8    DB -- wait --

9         A.    DLBCL.

10        Q.    DLBCL, thank you.

11        A.    Yes.

12        Q.    Okay.

13        A.    Yes.

14        Q.    And so if we look at the relevant

15   pathology and laboratory and cytology and

16   histochemical tests related to Mr. Giglio's

17   diagnosis of NHL, none of those tests or test

18   results would tell you that Mr. Giglio had used

19   Roundup?

20        A.    That's correct.

21        Q.    And later, there are other medical records

22   where he had blood tests; he had urine tests; he had

23   fecal tests, correct?

24        A.    Yes.

25        Q.    And none of those results would tell a

Dennis D. Weisenburger, M.D.

1   person whether or not Mr. Giglio had been exposed to

2   Roundup?

3        A.   It didn't do any testing for Roundup or

4   glyphosate.

5        Q.   And so I'm correct, then, that none of the

6   data or the data collected on Mr. Giglio would tell

7   anyone that he was exposed to Roundup?

8        A.   None of the laboratory data.

9        Q.   Well, and that would include blood tests,

10  urine tests, fecal tests, cytology, histochemistry,

11  pathology, right?

12       A.   Yes.

13       Q.   Okay.  So if you look at Mr. Giglio's

14  records, the pathology, the immunohistochemistry,

15  cytology, all of that, and you think about your

16  review of his pathology slides, if you assume -- if

17  Mr. Giglio had never used Roundup, what would your

18  opinion be as to what caused his NHL?

19       A.   I wouldn't know.  I would probably assume

20  that his ███████ was a contributing factor, but I

21  really would be -- it would probably be idiopathic.

22       Q.   And what percentage of NHL diagnoses are

23  considered idiopathic?

24       A.   Well, nobody really knows, but I think

25  I've said around 70 percent --

Dennis D. Weisenburger, M.D.

1        Q.    Okay.

2        A.    -- in the past so it's somewhere in that

3    ballpark.

4        Q.    Okay.  And so with idiopathic

5    NHL -- strike that.

6            So in your assessment of Mr. Giglio's NHL

7    and the potential causes of it, are you able to rule

8    out genetics as a cause of his NHL?

9        A.    Well, ████████████████████

██  ███████████████████████████████████████

██  ████████████████

12        Q.    Well, I mean more in terms of inherit

13    or -- inherited or congenital or acquired defects.

14        A.    Yeah, pretty much you can rule it out

15    because most of those types of defects cause disease

16    early in life rather than late in life.

17        Q.    And are you able to rule out chance as

18    being the explanation for why he got NHL?

19        A.    No, but if you -- if you have a known

20    cause, you assume that, more likely than not, it's

21    the known cause that -- that actually causes the

22    disease rather than chance.

23        Q.    And so is it your opinion that exposure to

24    Roundup is a known cause of NHL?

25        A.    Yes.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1        Q.   Are you aware of any regulatory agency

2   around the world that agrees with you?

3        A.   No, but it's controversial.

4        Q.   Are you aware of any publications,

5   medical, scientific, any published literature that

6   states that glyphosate use or Roundup use is a known

7   cause of non-Hodgkin's lymphoma?

8        A.   Well, the Zhang article -- the recent

9   Zhang article, I think, makes a strong argument for

10  it.  And, by the way, the State of California does

11  recognize glyphosate as -- which is a regulatory

12  agency does reg -- does rec -- does recognize

13  glyphosate as cause of non-Hodgkin's lymphoma so

14  I -- I can't say no -- none.

15            But -- but --

16            MS. FORGIE:  Wait.

17            THE WITNESS:  It's -- it's not -- it's not

18  a subject that's been -- how to say it.  It's not a

19  subject that's been carefully written about in the

20  medical literature.  It's -- it's -- it's evolving

21  science.

22  BY MS. FORGIE:

23       Q.   So it's not generally accepted in the

24  medical community, you agree with that?

25            MS. FORGIE:  Objection.  Calls for

Dennis D. Weisenburger, M.D.

1    speculation.

2              THE WITNESS:  It's not generally known in

3    the -- in the -- in the medical community.

4    BY MS. FUJIMOTO:

5         Q.   So if it's not known, it can't be

6    generally accepted, right?

7              MS. FORGIE:  Objection.  Calls for

8    speculation.

9              THE WITNESS:  Right.  It's not generally

10   accepted.  You won't find it on lists from the City

11   of Hope or other places, but -- but we've known for

12   a long time that pesticides are risk -- pesticide

13   use is -- is a risk factor for non-Hodgkin's

14   lymphoma, and so this fits into that paradigm.

15   BY MS. FUJIMOTO:

16        Q.   Well, isn't it true, though, that the

17   studies on pesticides have really isolated the

18   increased risk -- the strong increased risk to --

19   enough to maybe put it on the cause list would be

20   very specific pesticides that in -- that contain

21   chlorophenyls and phenoxy -- phenoxylacetate (sic),

22   very specific things that glyphosate doesn't have,

23   right?

24              MS. FORGIE:  Objection.

25              THE WITNESS:  Right.  So the -- so the

Dennis D. Weisenburger, M.D.

1    risks have been -- have been increased with certain

2    specific herbicides and insecticides and fungicides,

3    and there's -- there's now, as you know, data also

4    on glyphosate.  So that's why the -- the IARC

5    committee, when they reviewed --

6           [Reporter requests clarification.]

7           THE WITNESS:  IARC, A -- I -- it's -- it's

8    I-A-R-C in caps.

9           When the IARC committee reviewed it, they

10   reviewed all the data that was available at that

11   time, all data that was made available to them at

12   that time, and came to the conclusion that

13   glyphosate was most probably a carcinogen that was

14   causing non-Hodgkin's lymphoma.  And there's been a

15   body of evidence that -- since that time that I

16   think is by and large supportive of that -- of that

17   conclusion that they drew and -- and I think they

18   got it right.  My own independent review of the

19   literature and -- and -- and the subsequent

20   literature that's evolved since that time, I think,

21   is -- is supportive of -- of their conclusion.  So

22   nothing happens overnight.  The regulatory bodies, I

23   think -- I think are paying attention to it.  It's

24   going to be reviewed again in Europe in -- in -- in

25   a few years, and we'll see what happens.

Dennis D. Weisenburger, M.D.

 1   BY MS. FUJIMOTO:

 2        Q.   So it's an unsettled question?

 3             MS. FORGIE:  Objection.  Asked and

 4   answered.

 5             You can answer it again.

 6             THE WITNESS:  You know, I think there's

 7   debate among the -- there's debate.

 8   BY MS. FUJIMOTO:

 9        Q.   Okay.

10        A.   Okay.  There's debate, but, in my mind,

11   having reviewed all this information, I'm convinced

12   that glyphosate is -- is genotoxic and I'm convinced

13   that it causes non-Hodgkin lymphoma.

14        Q.   So the IARC monograph on glyphosate, does

15   it say anywhere in it that glyphosate is a known

16   cause of non-Hodgkin's lymphoma?

17        A.   No.  It classifies at 2A, so it says it's

18   probably carc- -- it's a probable carcinogen, and

19   the one disease that it singles out is Non-Hodgkin's

20   lymphoma.

21        Q.   And my question is, do they say in

22   there -- setting aside increased risk, based on the

23   animal data and the limited human data, do they say

24   anywhere in the monograph that it is a known or

25   accepted cause of non-Hodgkin's lymphoma?

Dennis D. Weisenburger, M.D.

1            MS. FORGIE:  Objection.  Asked and

2    answered.

3            You can answer it again.

4            THE WITNESS:  No.  They say it's a -- it's

5    a prob -- it's probable.

6    BY MS. FUJIMOTO:

7        Q.   Because that's not their role, right?

8            MS. FORGIE:  Objection.

9    BY MS. FUJIMOTO:

10       Q.   To establish or say what is a risk factor

11   or not or a cause or not of a particular --

12       A.   No, that -- that is --

13       Q.   -- cancer?

14       A.   -- their role.

15       Q.   You think --

16       A.   That --

17       Q.   -- so?

18       A.   That is their role, yeah.  They identify

19   risk factors for various cancers, and then other

20   agencies do a risk analysis and determine, you know,

21   how do you apply that increased risk.

22       Q.   Okay.  So that's my point.

23            My question is, so, in your view, we know

24   the IARC monograph doesn't say glyphosate exposure

25   is a known cause of NHL, but it sounds like you're

Dennis D. Weisenburger, M.D.

```
 1   taking their risk factor data and drawing that

 2   conclusion --

 3        A.   I'm drawing my own --

 4        Q.   Is that accurate?

 5        A.   I'm drawing my own --

 6             MS. FORGIE:  Objection.

 7             THE WITNESS:  -- conclusion.

 8             MS. FORGIE:  Asked and answered.

 9             You can answer it again.

10             THE WITNESS:  I'm drawing my own

11   conclusion.

12   BY MS. FUJIMOTO:

13        Q.   Okay.  All right.  And Zhang, the Zhang

14   article, anywhere in that article where the authors

15   take their data and analyze it and say glyphosate is

16   a known cause of non-Hodgkin's lymphoma?

17             MS. FORGIE:  Objection.  Asked and

18   answered.

19             You can answer it --

20             THE WITNESS:  I --

21             MS. FORGIE:  -- again.

22             THE WITNESS:  I don't think they use that

23   exact phraseology in their paper.

24   BY MS. FUJIMOTO:

25        Q.   Are you aware of any published study
```

Dennis D. Weisenburger, M.D.

1    looking at all the data on glyphosate and

2    non-Hodgkin's lymphoma, is there one paper that says

3    this establishes that glyphosate is a known cause of

4    non-Hodgkin's lymphoma?

5            MS. FORGIE:  Objection.  Asked and

6    answered.

7            You can answer it again.

8            THE WITNESS:  The science is evolving,

9    and, you know, I would -- I -- my guess is in the

10   future, there -- that it -- that this -- this will

11   happen, but right now, it's -- the science is

12   evolving and -- and there's controversy.

13   BY MS. FUJIMOTO:

14       Q.   So it hasn't happened yet, right?

15           MS. FORGIE:  Objection.  Asked and

16   answered.

17           THE WITNESS:  Well --

18           MS. FORGIE:  This is the fourth time

19   you've --

20           THE WITNESS:  Who --

21           MS. FORGIE:  -- asked.

22           THE WITNESS:  Who's going to --

23           MS. FORGIE:  You can answer it again.

24           THE WITNESS:  -- do it?

25   BY MS. FUJIMOTO:

Dennis D. Weisenburger, M.D.

```
 1        Q.   Well, other than you?

 2             [Reporter requests clarification.]

 3             THE WITNESS:  Huh?

 4   BY MS. FUJIMOTO:

 5        Q.   Who's going to do it other than you is the

 6   question, isn't it?

 7        A.   That's right.  People have to actually sit

 8   down and do a detailed analysis like I did, like

 9   IARC did, not sort of a half analysis like EPA and

10   some of the other people did, to really come to that

11   conclusion.

12        Q.   Okay.

13        A.   And that will happen, okay?  That will

14   happen.

15        Q.   And so your assessment is that the EPA

16   analysis and reanalysis post IARC was kind of a

17   halfway attempt for review?

18        A.   I -- let's just say that they got it

19   wrong.

20        Q.   Okay.

21        A.   Okay.

22        Q.   And the -- and Health Canada got it wrong

23   too?

24        A.   Yep.

25        Q.   And the European regulatory agency got it
```

Dennis D. Weisenburger, M.D.

1  wrong too?

2      A.   Yep.

3      Q.   And all the other countries around the

4  world that analyzed all the data on glyphosate in

5  NHO got it wrong?

6           MS. FORGIE:  Objection.

7           THE WITNESS:  I think they got wrong.

8  BY MS. FUJIMOTO:

9      Q.   Okay.  And none of Mr. Giglio's treaters

10  told him that they thought his non-Hodgkin's

11  lymphoma was caused by his use of glyphosate, did

12  they?

13      A.   That's because they haven't reviewed

14  the -- the -- the literature.  They haven't -- they

15  haven't reviewed the literature.

16      Q.   Are you sure?  How do you know that?

17      A.   Well, I can -- you can read through their

18  depositions and they'll tell you that they haven't

19  researched it.

20      Q.   Oh, okay.  You're -- that's your memory of

21  their deposition is --

22      A.   Yeah.

23      Q.   So you think they testified that they

24  haven't reviewed the literature?

25      A.   Either that or they didn't have an

Dennis D. Weisenburger, M.D.

 1   opinion.

 2        Q.   You referenced earlier the -- California

 3   designating glyphosate as a carcinogen.

 4             What are you referencing?

 5        A.   I'm not sure.  I think California was

 6   mandating that -- that Monsanto put warning labels

 7   on their products.

 8        Q.   Okay.

 9        A.   And --

10        Q.   They do that a lot, don't they?

11             MS. FORGIE:  Wait, wait.  Please let him

12   finish.

13             THE WITNESS:  Yeah, yeah.  Well, they --

14   yeah, they do it a lot.  California is probably the

15   most aggressive state with regard to doing things

16   like that.

17   BY MS. FUJIMOTO:

18        Q.   And are you thinking back, because you

19   live in California, as do I, any instances where

20   California required a Prop 65 -- we call it a Prop

21   65 warning on something that you thought wasn't?

22        A.   I don't --

23             MS. FORGIE:  Objection.

24             THE WITNESS:  I don't really -- I don't

25   actually really pay a lot of attention to what they

Dennis D. Weisenburger, M.D.

1    do.

2    BY MS. FUJIMOTO:

3         Q.   Why is that?

4         A.   Because I lead a healthy, clean lifestyle

5    and I don't worry about stuff like that.

6         Q.   I thought -- I thought you might say --

7              MS. FORGIE:  That's his answer.

8    BY MS. FUJIMOTO:

9         Q.   -- it's because they designate everything

10   carcinogenic.

11             All right.  Were you aware that EPA

12   responded to California's -- the California agency

13   and said, "Don't require a label because that would

14   mean it would be a false warning"?

15             MS. FORGIE:  Objection.

16             THE WITNESS:  I'm aware that there's

17   some -- that there's some -- at least litigation

18   about this, yes.

19             MS. FUJIMOTO:  All right.  All right.

20   I'll mark as Exhibit 21 to the deposition the U --

21   United States Environmental Protection Agency letter

22   on August 7, 2019.

23             (Whereupon Exhibit 21 was marked for

24             identification.)

25   BY MS. FUJIMOTO:

Dennis D. Weisenburger, M.D.

```
 1        Q.   It says to -- to -- "Dear Registrant," and

 2   it references, if you said, the July 7, 20 -- or as

 3   you -- I think this is what you were thinking about,

 4   July 7, 2017 California listing glyphosate as a

 5   substance under Prop 65.

 6             Do you see that?

 7        A.   Yes.

 8        Q.   Did you -- had -- did you see this letter?

 9        A.   No.

10        Q.   But you are aware that EPA disagreed with

11   IARC's assessment and California's decision to

12   require a Prop 65 warning?

13        A.   Yes.

14        Q.   All right.  And if you go to the bottom

15   paragraph on that first page of the letter, it says,

16   "Given EPA's determination that glyphosate is not

17   likely to be carcinogenic to humans, EPA considers

18   the Prop 65 warning language based on the chemical

19   glyphosate to constitute a false and misleading

20   statement."

21             Do you see that?

22        A.   Yes.

23        Q.   And I take it you disagree with the EPA on

24   that too?

25        A.   I do.
```

Dennis D. Weisenburger, M.D.

```
 1        Q.   Okay.  All right.  Let's see.  If you go

 2  back to Exhibit 20, and we were -- we left off at

 3  the cytogenetic analysis report from the

 4  November 2014 pathology and cytology, and then right

 5  after that -- and it's Bates 2, 00002 -- there is --

 6  there are pathology reports that start from

 7  September 29, 2017, all the way through January of

 8  2019.

 9            Did you -- did you look at these pathology

10  records?

11        A.   I don't believe so, no.

12        Q.   Okay.  So your -- your memory of your

13  review of the pathology in the case relates to his

14  initial diagnosis?

15            MS. FORGIE:  Objection.

16            THE WITNESS:  Right.  I reviewed the --

17  the slides of the initial diagnosis and I reviewed

18  the reports of the bone marrows and -- and the other

19  two subsequent lymphoma biopsies.

20  BY MS. FUJIMOTO:

21        Q.   Okay.  Let's see where I'll -- we'll go

22  here then.

23            Okay.  So if you would go to -- I'm

24  looking for April of 2018.  There we go.

25        A.   874?
```

Dennis D. Weisenburger, M.D.

1      Q.   Yeah.

2           [Reporter requests clarification.]

3           THE WITNESS:  874.

4           MS. FORGIE:  That was fast.

5    BY MS. FUJIMOTO:

6      Q.   Oh, on Bates -- oh, I have 615, but that's

7    the addendum.  Let me see.

8           MS. FORGIE:  Bates 615?

9    BY MS. FUJIMOTO:

10     Q.   Okay, sorry.  I got ya.  You're right,

11   874.  And it's the anatomic pathology report dated

12   April 16, 2018.

13          Is that the one you're on?

14     A.   Yes.

15     Q.   Okay.  And am I correct that -- that this

16   information, as you look at it, relates to the fact

17   that Mr. Giglio had recurrence of his lymphoma in

18   April of 2018?

19     A.   Yes.

20     Q.   All right.  But you hadn't seen these

21   reports?

22     A.   I have seen these reports, but I didn't

23   see --

24     Q.   Oh.

25     A.   -- the slides.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.

1      Q.   Oh, I -- I under -- okay, I understand.

2           So you've seen the pathology reports

3   themselves that go through 2019?

4      A.   Yes.

5      Q.   Okay.  All right.  The only -- just the

6   actual slides that you looked at were the ones from

7   2014?

8      A.   Yes.

9      Q.   Okay.  And so am I right, then, that the

10  information or the data, the test results from April

11  of 2018 showed a recurrence of DLBCL, but the bone

12  marrow was negative, the flow cytometry was negative

13  and the blood was negative except for some

14  thrombocytopenia?

15     A.   That's correct.

16     Q.   Doctor, did you see any FISH results?

17     A.   No.

18     Q.   No?

19          Do you know why that is?  Is that not

20  standard?

21          MS. FORGIE:  Objection.

22          THE WITNESS:  Some people are doing it

23  routinely others are not, so --

24  BY MS. FUJIMOTO:

25     Q.   Okay.

Dennis D. Weisenburger, M.D.

 1      A.   -- on this -- this report, they did a

 2   stain for C-MYC and --

 3           [Reporter requests clarification.]

 4           THE WITNESS:  On this reported dated

 5   4/16/2018, they did an immunostain for C-MYC.

 6   That's C -- capital C, dash, capital M-Y-C, and you

 7   can see the expression was very low.  It says only

 8   6 percent right in the middle of the page there.

 9   So, you know, that would -- in my -- we do this as a

10   screening test at City of Hope so --

11   BY MS. FUJIMOTO:

12      Q.   Okay.

13      A.   -- when the C-MYC expression is low, we

14   don't do the FISH, but there --

15      Q.   I see.

16      A.   -- are other people who do -- do do it

17   routinely so it depends entirely on the institution.

18      Q.   Well, and I -- I was looking for it, but I

19   also thought I saw a reference to, you know,

20   requesting a FISH analysis, but I didn't see any

21   report.

22           So you didn't see any either?

23      A.   I didn't.

24      Q.   Okay.  Okay.  If we go to -- oh, here's

25   where it is, I think.  If you go to his -- the

Dennis D. Weisenburger, M.D.

```
 1   pathology reports from January of 2019, they start

 2   at Bates No. 237.

 3        A.   Okay.

 4        Q.   Okay.  And am I correct that with regard

 5   to the tests that were done in January of 2019,

 6   there were no FISH analysis done, no FISH test was

 7   done?

 8        A.   I didn't see any record of it, no.

 9        Q.   Okay.  What -- what would be the --

10   what -- what does FISH tell us in terms of genetics?

11        A.   Well, with FISH testing, you're looking

12   for a specific abnormality.  So there are FISH

13   probes for all the common translocations and other

14   genetic abnormalities that are seen in, for example,

15   non-Hodgkin lymphoma.

16        Q.   And, for the record, it's an acronym,

17   fluorescent in situ hybridization, right?

18        A.   Yeah.  So it's FISH in caps.

19             THE REPORTER:  Thank you.

20             MS. FUJIMOTO:  Let's go off the record for

21   a minute.

22             THE VIDEOGRAPHER:  Off the record.  The

23   time is approximately 12:37 p.m.

24             (Recess.)

25             THE VIDEOGRAPHER:  With the approval of
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1    counsel, back on the record.  The time is

2    approximately 12:51 p.m.  This marks the beginning

3    of Recording Media No. 4.

4    BY MS. FUJIMOTO:

5         Q.   All right.  Welcome back,

6    Dr. Weisenburger.

7              MS. FUJIMOTO:  I'm going to mark as

8    Exhibit 22 to the deposition records from UC San

9    Diego Health, and they start at January 9, 2019 to

10   June 5, 2019.

11             (Whereupon Exhibit 22 was marked for

12             identification.)

13   BY MS. FUJIMOTO:

14        Q.   Are these records that you -- would have

15   been included what you reviewed?

16        A.   Yes.

17        Q.   Okay.  And just to cover his -- his NHL

18   history a little bit, if you look at the first page,

19   which is Bates 32, and it's dated January 9, 2019,

20   and down below, there's an oncology history, and it

21   documents his NHL in October of 2014, number one,

22   right?

23        A.   Yes.

24        Q.   And then it lays out some tests that were

25   done in October of 2017 and then tests that were

Dennis D. Weisenburger, M.D.

1   done in April of 2018 where, ultimately, he was

2   diagnosed with a recurrence of his NHL, correct?

3       A.   Yes.

4       Q.   And then it walks through the different

5   tests that he underwent, did different treatments.

6            For the first NHL diagnosis in 2014, did

7   he undergo standard therapy?

8       A.   Yes.

9       Q.   Okay.  And he went into remission for a

10  period, right?

11      A.   Yes.

12      Q.   Okay.  And then he recurs in April of

13  2018.

14           And what do you understand with regard to

15  his treatment following that diagnosis?

16      A.   Well, he got what's called salvage

17  chemotherapy, which is RICE, and --

18           [Reporter requests clarification.]

19           THE WITNESS:  RICE.  It's all caps,

20  R-I-C-E.

21           And he had a response.  He responded, but

22  it was a partial response, and it wasn't -- the

23  response wasn't deep enough for him to go on to get

24  bone marrow transplant, so they switched him to

25  another salvage chemotherapy.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dennis D. Weisenburger, M.D.

 1    BY MS. FUJIMOTO:

 2         Q.   And that's the R GemOx?

 3         A.   Yes.

 4         Q.   Okay.

 5              THE WITNESS:  It's R, dash, capital G,

 6    small E-M, capital O, small X.

 7              THE REPORTER:  Thank you.

 8    BY MS. FUJIMOTO:

 9         Q.   And it looks like from that -- if you look

10    at the almost second to the last paragraph at the

11    beginning -- in that first section, it says he

12    decided not to pursue further therapy in the fall of

13    2018 in favor of alternate treat -- alternative

14    treatment.

15              Do you see that?

16         A.   Yes.

17         Q.   Did you talk to -- in your telephone

18    interview, did you talk to Mr. Giglio about that

19    decision in 2018?

20         A.   Yes.

21         Q.   Okay.  And what's your understanding of

22    what transpired?

23         A.   Well, they -- I think they offered him the

24    CAR-T cells as an alternative, but he decided he

25    didn't want to pursue that approach.  He thought he

Dennis D. Weisenburger, M.D.

 1    would go to Mexico and see if there was some

 2    alternative therapy there that might work, but then

 3    he didn't get any alternative therapy.  He ended up

 4    going back to his doctor and eventually decided to

 5    get the CAR-T cells, but he was untreated for about

 6    five to six months.

 7        Q.   Okay.  And ultimately, he changed his mind

 8    and decided to have the CAR-T?

 9        A.   Yes.

10             MS. FUJIMOTO:  And that's C-A-R, dash, T,

11    all caps.

12             THE REPORTER:  Thank you.

13    BY MS. FUJIMOTO:

14        Q.   And he had that in May of 2019, that CAR-T

15    therapy, correct?

16        A.   April.

17        Q.   April?  Okay.

18             And then if you would go in Exhibit 21 to

19    Bates 2823 --

20        A.   Exhibit --

21        Q.   And that's --

22        A.   Exhibit 21 --

23        Q.   Oh.

24        A.   -- or 22?

25        Q.   I'm sorry.  Where are we?  22, sorry.

Dennis D. Weisenburger, M.D.

```
 1    It's the one we're on.

 2         A.    Bates what?

 3         Q.    2823, and it's date -- it is a PET scan

 4    done on May 23, 2019.

 5              MS. FORGIE:  What's the number again,

 6    please?

 7              MS. FUJIMOTO:  2823.

 8              THE WITNESS:  I have 2850.

 9    BY MS. FUJIMOTO:

10         Q.    Yeah, it's after that.

11         A.    Oh, here it is.  It's after that, yeah.

12    Okay.

13         Q.    And am I correct --

14              MS. FORGIE:  Hold on, let me get there.

15    It -- oh, I found it, okay.

16              MS. FUJIMOTO:  Okay.

17              MS. FORGIE:  It's way after.

18    BY MS. FUJIMOTO:

19         Q.    And basically, the findings were there has

20    been significant reduction in size of metabolic

21    activity of the lymphadenopathy, right?

22         A.    Yes.

23         Q.    And there -- then it says there has been

24    interval resolution of the hypermetabolic right neck

25    and supraclavicular adenopathy, correct?
```

Dennis D. Weisenburger, M.D.

```
 1       A.   Yes.

 2       Q.   And the impression was that there was a --

 3   had been a significant response to therapy, right?

 4       A.   Yes.

 5       Q.   So that's good thing, isn't it?

 6       A.   Yeah, it's almost like a miracle.

 7       Q.   Okay.  And then if you keep going to

 8   page 2827, I want to draw your attention to a

 9   May 30, 2019 progress note.

10       A.   It's kind of hard because they're all out

11   of order.

12       Q.   I know.  Just go one at -- there -- I was

13   trying to get them chronological, and they got

14   Batesed not chronologically.

15       A.   Oh, here we go.

16            MS. FORGIE:  Where did you find it?

17            THE WITNESS:  Just keep going.

18            MS. FORGIE:  Okay.

19            Okay, got it.

20   BY MS. FUJIMOTO:

21       Q.   Do you have in front of you?

22            MS. FORGIE:  I do.

23   BY MS. FUJIMOTO:

24       Q.   And I'm looking basically at the bottom

25   paragraph there --
```

Dennis D. Weisenburger, M.D.

1       A.   Yes.

2       Q.   -- where he -- he was, you know, at the

3    clinic for a followup.  And the very bottom note

4    says, "Of note:  PET scan done on 5/23 at Sharp

5    facility.  He was told by his oncologist,

6    Dr. Redfern, that his lymphoma is gone."

7            Do you see that?

8       A.   Yes.

9       Q.   Okay.  And so as of -- certainly as of May

10   of 2019, his non-Hodgkin's lymphoma, according to

11   Dr. Redfern, was gone?

12           MS. FORGIE:  Objection.

13           THE WITNESS:  Well, they -- the -- they

14   couldn't -- they couldn't see anything positive on

15   the scan, so...

16   BY MS. FUJIMOTO:

17      Q.   So yes?

18      A.   "Gone" is a -- not a very scientific term,

19   but it means they couldn't -- they didn't see

20   anything so it was there and now it's not there,

21   so...

22      Q.   And have you reviewed any medical records

23   that postdate June of 2019?

24      A.   No, but when I interviewed him, he had

25   just had another scan, end of July, and it was also

Dennis D. Weisenburger, M.D.

1   the same.  It was negative.

2       Q.   Oh, okay.  And so as far as we know

3   sitting here today, his lymphoma is in remission?

4            MS. FORGIE:  Objection.

5            THE WITNESS:  Yeah, I'm not sure people

6   would use that term, but they -- they -- they

7   probably will want to wait a little longer because

8   it -- because it's really short, but they -- they

9   can't see the lymphoma so, you know, I -- I -- I

10  don't have a problem with that terminology.  The

11  clinicians, I think, would be more conservative, but

12  it -- it went -- it was dramatic -- it went away

13  dramatically, which it sometimes does with this

14  therapy.

15  BY MS. FUJIMOTO:

16      Q.   Okay.  And so do you have an opinion as to

17  Mr. Giglio's prognosis?

18      A.   Well, it's better than before he had the

19  CAR-T cell therapy.  You know, the followup on

20  patients treated with CAR-T is fairly short.

21  Probably about -- if I -- I don't remember the

22  numbers very carefully.  Probably about half of them

23  are cured, meaning that they -- they're disease

24  free -- I shouldn't say "cured."  About half of them

25  are disease free at about three years, so we'll see.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1    You know, he could -- he could be cured, but the

2    time is too short.  You usually wait at least five

3    years to use that term, "cured."

4        Q.    But at least as of right now, he's --

5    nothing can be seen on -- on his scan, so how would

6    you classify his health status?

7        A.    I would say that he had an excellent

8    response to the CAR-T cells, that he's probably in

9    remission and, you know, they'll follow him closely

10   probably for the next three to five years and, you

11   know, if he stays in remission, he may -- may well

12   be cured, but -- but he could relapse too.  I mean,

13   he's only maybe four months out from his CAR-T cell

14   therapy so that's very -- that's short.

15       Q.    Let me ask you about going back to -- not

16   just -- you know, his pathology, but your -- the

17   bases of your experience with non-Hodgkin's

18   lymphomas.  We've already talked about typical

19   findings and all that kind of stuff.

20             If you -- strike that.

21             Based on the type of lymphoma that

22   Mr. Giglio had, was this -- was its clinical course

23   typical?  I know we talked about the pathology being

24   typical.  Was his clinical course pretty typical?

25       A.    I would say yes.  There wasn't anything

Dennis D. Weisenburger, M.D.

1    extraordinary about it.  About -- I don't know,

2    about a third of the people fail R-CHOP, maybe

3    40 percent, they get salvage therapy.  If they have

4    a good response, they go to auto transplant and some

5    of them are cured, maybe, again, 30 or 40 percent.

6    If you don't go to auto transplant, the prognosis is

7    very poor.  Most patients usually die within a year

8    or two because the treatment doesn't work.  It

9    doesn't make the tumor go away.  So the CAR-T cells

10   is a new therapy that is an amazing therapy.

11        Q.   It sounds like it, at least for

12   Mr. Giglio --

13        A.   Yeah.

14        Q.   -- right?

15             So if you take all of the information you

16   have from the pathology and his clinical course,

17   would it be fair to say that Mr. Giglio could have

18   gotten same -- the exact same large B-cell --

19   diffuse large B-cell lymphoma even if he had never

20   used Roundup?

21        A.   Yes, he could have.

22        Q.   In fact, you see it a lot, don't you?

23        A.   Yes.

24        Q.   Okay.  Of the thousands of non-Hodgkin's

25   lymphoma cases that you have seen in your career, do

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1    you know how many were in patients who used Roundup?

2        A.   No.

3        Q.   And is that something that you ever even

4    ask about?

5        A.   Well, I don't see the patients so I don't

6    ask them what they used.  I work in the lab mainly,

7    so, I mean, in general, clinicians don't ask a lot

8    of questions to try to figure out what caused the

9    cancer.

10       Q.   Cause is not normally something that's

11   done; it's more geared toward what kind of cancer do

12   you have and how do we treat it?

13       A.   Yeah, yes.

14       Q.   Okay.  Do you -- are you a member of a

15   tumor -- the tumor board?

16       A.   Yes.

17       Q.   Okay.  And do you recall any discussions

18   where you're in the tumor board and you guys are

19   asking about a -- whether a particular patient was

20   exposed to Roundup?

21       A.   I don't -- I don't recall that in the

22   recent tumor board, no.

23       Q.   So this whole exercise is unique to this

24   litigation, fair?

25            MS. FORGIE:  Objection.

Dennis D. Weisenburger, M.D.

```
 1              THE WITNESS:  This exercise I went

 2    through?

 3    BY MS. FUJIMOTO:

 4         Q.   Yeah, well, this whole determining cause

 5    and considering, you know, what are risk factors and

 6    what would be a cause in a particular patient.

 7              MS. FORGIE:  Objection.

 8              THE WITNESS:  Yeah, it's mostly an

 9    exercise for litigation.

10    BY MS. FUJIMOTO:

11         Q.   Did you read any of the defense expert

12    reports?

13         A.   I did.

14         Q.   Which ones?

15         A.   I don't know if I read the reports or the

16    depositions.  Whatever -- what's on the list there?

17              MS. FORGIE:  Can he refer --

18    BY MS. FUJIMOTO:

19         Q.   Oh.

20              MS. FORGIE:  -- to his list?

21              MS. FUJIMOTO:  Oh, absolutely.

22              MS. FORGIE:  Can I show it to him?  It's

23    Exhibit 3.

24              MS. FUJIMOTO:  Yep.

25              MS. FORGIE:  Okay.
```

Dennis D. Weisenburger, M.D.

```
 1              THE WITNESS:  I -- I did have reports.

 2   BY MS. FUJIMOTO:

 3        Q.   Okay.

 4        A.   I did have -- I had Arber's report,

 5   LeBeau's report.

 6              [Reporter requests clarification.]

 7              THE WITNESS:  LeBeau.

 8              Mata- -- Matasar.  I did have some

 9   reports, yes.

10   BY MS. FUJIMOTO:

11        Q.   I take it you disagreed with the opinions

12   set forth in those reports?

13        A.   I did, yes.

14        Q.   Okay.  And did you read their depositions?

15        A.   No.

16        Q.   Okay.  All right.

17              MS. FUJIMOTO:  What are we on, 23?

18              THE REPORTER:  I don't know, I'm sorry.  I

19   don't -- I haven't been --

20              MS. FUJIMOTO:  He'll know better.

21              THE REPORTER:  -- marking them.

22   BY MS. FUJIMOTO:

23        Q.   Dr. Weisenburger, was the -- our last

24   Exhibit 22?

25        A.   I think so.
```

Dennis D. Weisenburger, M.D.

```
 1      Q.   Okay.

 2           THE REPORTER:  Yeah, I think so.

 3           MS. FORGIE:  I think it's 22.

 4           MS. FUJIMOTO:  Yeah, so we're going to

 5   mark as Exhibit 23 --

 6           MS. FORGIE:  I'm going to take that one

 7   back because that's mine.

 8   BY MS. FUJIMOTO:

 9      Q.   We're going to mark the invoice that you

10   kindly --

11           MS. FUJIMOTO:  Did you get a copy?  No.

12   BY MS. FUJIMOTO:

13      Q.   -- produced.

14           (Whereupon Exhibit 23 was marked for

15           identification.)

16   BY MS. FUJIMOTO:

17      Q.   And so it looks like Exhibit 23 is --

18   originally is a letter dated June 20, 2019, to you

19   from Kevin Rowe at Andrus Wagstaff law firm,

20   correct?

21      A.   Yes.

22      Q.   And --

23      A.   Yes.

24      Q.   Did you -- is that your handwriting?

25      A.   You mean the numbers?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1      Q.   Yes, the numbers.

2      A.   Yes.

3      Q.   Okay.  And tell me what you did to make

4   these notes.

5      A.   Well, each -- each day when I finished

6   some work, I recorded the number of hours that I

7   spent doing that, starting in June of this year and

8   up through September.

9      Q.   And did you make all your notes on this or

10   you collected it all on here?  I mean, you --

11      A.   Mostly, I -- I mean, sometimes, I would

12   write myself a note on my daily calendar to record

13   it here because this is the official record.

14      Q.   Okay.  And so it looks like you've spent

15   53.5 hours on Mr. Giglio's case?

16      A.   Yes.

17      Q.   And does that include any time for the

18   generic or general causation piece or this was just

19   specific to Mr. Giglio?

20      A.   Well, it's pretty much specific for

21   Mr. Giglio.  I mean, when I review the -- when I

22   prepare for a case, I do go back and review some of

23   the general causation, my reports and some of the

24   documents that -- I want to make sure that I --

25   they're fresh in my mind so I -- but I don't do a --

Dennis D. Weisenburger, M.D.

```
1    it's mostly preparation for gen- -- for -- for a

2    specific causation.

3         Q.   Okay.  And how much do you charge an hour

4    for your time?

5         A.   I was just telling Kathryn I'm increasing

6    my rate to 650 an hour, 650 an hour.

7         Q.   And will these 53 and half hours be

8    subject to the 650 an hour?

9         A.   Yes.

10        Q.   Okay.  And you plan to put all this in an

11   official invoice or is this your official invoice?

12        A.   No, no, I -- I will --

13        Q.   Okay.

14        A.   -- I'll recopy this into an official

15   invoice.

16        Q.   Okay.

17        A.   I'll probably wait until after I approve

18   the deposition and then just send a -- kind of a

19   final bill.

20        Q.   Okay.  All right.

21        A.   An interim bill.

22        Q.   Uh-huh.

23             [Reporter requests clarification.]

24             THE WITNESS:  An interim bill.

25             MS. FUJIMOTO:  Okay.  We'll go off just
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

1   for a minute.

2          THE VIDEOGRAPHER:  Off the record.  The

3   time is approximately 1:08 p.m.

4          (Discussion off the record.)

5          THE VIDEOGRAPHER:  With the approval of

6   counsel, back on the record.  The time is

7   approximately 1:10 p.m.  This marks the beginning of

8   Recording Media No. 5.

9          MS. FUJIMOTO:  Oh, I wish I had known

10  that.  We wouldn't have had to change.  I'm

11  finished.  I don't have any further questions.

12         MS. FORGIE:  Oh, geez.  Okay.  Nothing

13  further.  Thank you.

14         MS. FUJIMOTO:  Thank you, Doctor.

15         THE VIDEOGRAPHER:  With the approval of

16  counsel, this concludes today's deposition.  The

17  deposition consists of five recorded media files.

18  The time is approximately 1:10 p.m.  We are now off

19  the record.

20         (Off the record.)

21         THE REPORTER:  Can I just have you state

22  that you want the rough so -- on the record so that

23  we have --

24         MS. FUJIMOTO:  Yes.

25         THE REPORTER:  -- that?

Dennis D. Weisenburger, M.D.

```
 1              MS. FUJIMOTO:  I would --

 2              THE REPORTER:  Okay.

 3              MS. FUJIMOTO:  I would like to request a

 4    rough.

 5              THE REPORTER:  All right, thank you.

 6         (Whereupon, the deposition adjourned at 1:11 p.m.)

 7                         -oOo-

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Dennis D. Weisenburger, M.D.

1

2

3

4

5

6

7

8            I, DENNIS D. WEISENBURGER, MD, do hereby

9       declare under penalty of perjury that I have read

10      the foregoing transcript; that I have made any

11      corrections as appear noted, in ink, initialed by

12      me, or attached hereto; that my testimony as

13      contained herein, as corrected, is true and

14      correct.

15            Executed this _____ day of

16      _____, 20_____, at

17      _____, _____.

18            (City)                    (State)

19

20

21

22

23                        _____

                          DENNIS D. WEISENBURGER, MD

24                        Volume I

25

Dennis D. Weisenburger, M.D.

```
 1   STATE OF CALIFORNIA        )

                                )    ss.

 2   COUNTY OF LOS ANGELES      )

 3

 4           I, Elizabeth Borrelli, Certified Shorthand

 5   Reporter, Certificate No. 7844, for the State of

 6   California, hereby certify:

 7           I am the deposition officer that

 8   stenographically recorded the testimony in the

 9   foregoing deposition;

10           Prior to being examined the deponent was

11   first duly sworn by me;

12           The foregoing transcript is a true record

13   of the testimony given;

14           Before completion of the deposition,

15   review of the transcript [X] was [ ] was not

16   requested.  If requested, any changes made by the

17   deponent (and provided to the reporter) during the

18   period allowed are appended hereto.

19

20   Dated_____.

21

22

23                        _____

                          ELIZABETH BORRELLI, CSR 7844

24

25
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Dennis D. Weisenburger, M.D.

```
 1   NAME OF CASE:  In Re:  Roundup (Giglio v Monsanto Co.)

 2   DATE OF DEPOSITION:  Monday, September 23, 2019

 3   NAME OF WITNESS:  Dennis D. Weisenburger, MD

 4   Reason Codes:

 5        1.  To clarify the record.

 6        2.  To conform to the facts.

 7        3.  To correct transcription errors.

 8   Page _____ Line _____ Reason _____

 9   From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22

23

24                          _____

                                   Signature of Deponent

25
```