1

2

3

4

5

6

**WILKINSON WALSH + ESKOVITZ LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonwalsh.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonwalsh.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:    202-847-4005

**ARNOLD & PORTER KAYE SCHOLER**
Pamela Yates (CA Bar No. 137440)
(Pamela.Yates@arnoldporter.com)
777 South Figueroa St., 44th Floor
Los Angeles, CA 90017
Tel: 213-243-4178
Fax: 213-243-4199

7

8

9

10

11

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

12

13

*Attorneys for Defendant*
*MONSANTO COMPANY*

14

UNITED STATES DISTRICT COURT

15

NORTHERN DISTRICT OF CALIFORNIA

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | ) ) ) ) |
| | ) |
| *Carriere v. Monsanto Co.*, 3:18-cv-05778 | ) |
| *I. Hernandez v. Monsanto Co.*, 3:16-cv-05750 | ) |
| *Johansing v. Monsanto Co.*, 3:16-cv-05751 | ) |
| *Sanders et al. v. Monsanto Co.*, 3:16-cv-05752 | ) |
| *Wooten v. Monsanto Co.*, 3:17-cv-00781 | ) |
| *Calderon v. Monsanto Co.*, 3:19-cv-01630 | ) |
| *Harris v. Monsanto Co.*, 3:16-cv-003199 | ) |
| *R. Hernandez v. Monsanto Co.*, 3:16-cv-07364 | ) |
| *Perkins v. Monsanto Co.*, 3:16-cv-06025 | ) |
| *Dickey et al. v. Monsanto Co.*, 3:16-cv-05887 | ) |
| *Domina v. Monsanto Co.*, 3:16-cv-05887 | ) |
| *Janzen v. Monsanto Co.*, 3:19-cv-4103 | ) |
| *Pollard v. Monsanto Co.*, 3:19-cv-4100 | ) |
| *Tanner v. Monsanto Co.*, 3:19-cv-04099 | ) |

MDL No. 2741

Case No. 3:16-md-02741-VC

**MONSANTO COMPANY'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF SPECIFIC CAUSATION EXPERTS CHARALAMBOS ANDREADIS, CLAYTON SMITH, EDWIN ALYEA, BARRY BOYD, LAUREN PINTER-BROWN, RON SCHIFF, AND BRENT STAGGS IN WAVE ONE CASES ON *DAUBERT* GROUNDS**

Hearing dates: Jan. 29, 2020
Time:

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on January 29, 2020, in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its *Daubert* Motion to Exclude the Testimony of Specific Causation Experts Charalambos Andreadis, Clayton Smith, Edwin Alyea, Barry Boyd, Lauren Pinter-Brown, Ron Schiff, And Brent Staggs In Wave One Cases.  Monsanto seeks an order excluding the specific cause opinions of this expert under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

DATED:  November 26, 2019

Respectfully submitted,

/s/ *Brian L. Stekloff*

Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonwalsh.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonwalsh.com)
WILKINSON WALSH + ESKOVITZ LLP
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:    202-847-4005

Pamela Yates (CA Bar No. 137440)
(Pamela.Yates@arnoldporter.com)
ARNOLD & PORTER KAYE SCHOLER
777 South Figueroa St., 44th Floor
Los Angeles, CA 90017
Tel: 213-243-4178
Fax: 213-243-4199

Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
HOLLINGSWORTH LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
COVINGTON & BURLING LLP
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

*Attorneys for Defendant*
*MONSANTO COMPANY*

MONSANTO'S MOTION TO EXCLUDE SPECIFIC CAUSATION EXPERT TESTIMONY IN WAVE ONE CASES
3:16-MD-02741-VC

**INTRODUCTION**

Each of the Wave 1 Plaintiffs must present reliable expert evidence that Roundup specifically caused his or her non-Hodgkin's lymphoma (NHL), a disease with more than sixty different subtypes and no identifiable cause in the majority of cases. Plaintiffs' experts all purport to apply a "differential diagnosis" methodology to reach their specific causation opinions: a two-step process whereby they first purport to "rule in" all possible causes of Plaintiffs' NHL (in which they include Roundup), and then purport to "rule out" all causes except Roundup. The mere invocation of the phrase "differential diagnosis," however, does not sanitize what is otherwise an outcome-driven conclusion and inadmissible scientific testimony. All of Plaintiffs' experts rule in Roundup based on no more than the same flawed studies the general causation experts rely on, without accounting for the Plaintiffs' specific NHL sub-types. Further, the experts also fail to reliably consider and rule out other potential causes of Plaintiffs' NHL, including idiopathic causes that account for the majority of NHL. The bottom line for these witnesses is that Roundup will always be the cause of a plaintiff's NHL as long as the plaintiff was exposed to some amount of Roundup—regardless of the plaintiff's individual medical history and risk factors, regardless of the fact that the cause of NHL is unknown in the vast majority of cases, and regardless of when or how a plaintiff allegedly used Roundup.

**BACKGROUND**

**I.     Wave One Plaintiffs Have Disclosed a Handful of New Specific Cause Experts.**

On June 14, 2019, this Court scheduled two waves of cases, grouped by governing state law, to be prepared for transfer back to their home districts. The first wave consists of cases filed in California and Nebraska. Wave One Plaintiffs have disclosed the following new specific causation experts, all of whom, like the specific causation experts disclosed in the bellwether trials, purport to use a differential diagnosis in reaching their conclusion that Roundup caused each individual Plaintiff's specific subtype of NHL.

- **Dr. Barry Boyd** is a medical oncologist, Ex. 1, Boyd Dep. at 7:2–4, who has been disclosed in multiple Roundup cases across the country. For Wave One of the MDL, Dr. Boyd has been disclosed by Goldie Perkins.

- **Dr. Edwin Alyea** is an oncologist but has no expertise in epidemiology or the toxicology of

herbicides or pesticides.  Ex. 2, Alyea Dep. at 48:11–21, 49:2–4.  Dr. Alyea has been disclosed by Ruben Hernandez.

- **Dr. Lauren Pinter-Brown** is an oncologist, an internist, and a physician.  Ex. 3, Pinter-Brown (*Carriere*) Dep. at 33:19–20.  She has never presented information or opinions about glyphosate and NHL, *id.* at 49:12–20, and has never conducted any scientific research regarding Roundup, glyphosate, or pesticides of any kind, *id.* at 44:3–16.  Prior to being retained, Dr. Pinter-Brown had not reviewed any of the literature on which she now relies.  Dr. Pinter-Brown has been disclosed by numerous Plaintiffs in this litigation, including, in Wave One, Jerald Carriere, Peter Johnsing, and Harley Wooten.

- **Dr. Ron Schiff** is an oncologist who left clinical practice in 2015.  Ex. 4, Schiff (*Harris*) Dep. at 87:3–6.  In his clinical practice, Schiff never told a patient that his or her lymphoma was caused by Roundup.  *Id.* at 92:8–93:4.  Since leaving the practice of medicine, his sole source of income has been working as an expert witness.  *Id.* at 87:7–10.  As an expert witness, Dr. Schiff has never ruled out Roundup in any case that Plaintiffs' lawyers have asked him to review.  *Id.* at 91:3–7, 91:18–22.  Dr. Schiff has been disclosed by Ines Hernandez and Anthony Harris.

- **Dr. Charalambos Andreadis** is a medical oncologist.  Ex. 5, Andreadis Dep. at 33:15–17.  He has never conducted studies regarding herbicides and cancer, *id.* at 9:17–12:10, and he has no expertise that would allow him to determine the cause of a patient's cancer, *id.* at 33:22–35:22.  Nevertheless, Dr. Andreadis has been disclosed by his patient, Jaime Alvarez-Calderon ("Mr. Alvarez").  Significantly, Dr. Andreadis has *never* told Mr. Alvarez that Roundup caused or contributed to his cancer, even after he became an expert in this case.  *Id.* at 149:17–150:3.

- **Dr. Clayton Smith** is a hematologist.  Ex. 6, Smith Rep. at 1.  Although he has "cared for thousands of blood cancer patients" over the course of his career, *id.*, before joining this litigation he had never told a single patient that Roundup caused his or her NHL.  Ex. 7, Smith Dep. at 68:25–69:8.  Dr. Smith has also been disclosed by Mr. Alvarez.

- **Dr. Brent Staggs** is a physician with Pathology Laboratories of Arkansas, P.A.  Ex. 8, Staggs (*Dickey*) Rep. at 1.  Although he has "reviewed hundreds, if not thousands of cases of non-Hodgkin's lymphomas," he generally does so for the purpose of diagnosis, not to determine

causation.  *Id.*  Indeed, determining the specific cause of a patient's cancer is less than ten percent of his overall practice.  Ex. 9, Staggs (*Sanders*) Dep. at 44:24–47:1.  Dr. Staggs has never told a patient or treating oncologist that Roundup caused a patient's cancer.  *Id.* at 48:6–13.  He has been disclosed in numerous cases across this litigation, including by these six Plaintiffs in Wave One:  Robert Dickey, Larry Domina, Royce Janzen, Frank Pollard, John Sanders, and Frank Tanner.

## II.    These Wave One Plaintiffs All Had Risk Factors Associated with NHL.

As set forth at length in Monsanto's prior motion to exclude specific causation experts, "non-Hodgkin's lymphoma" is an umbrella term used to describe more than sixty different sub-types of cancer involving the lymphocytes, a type of white blood cell.  The various sub-types have different clinical and prognostic characteristics and may also have different risk factors and causes.  However, in the vast majority of NHL cases, the cause is unknown.  The fourteen Plaintiffs implicated in this motion have the following subtypes and risk factors for NHL.

- **Ruben Hernandez**, a resident of ████████████ was diagnosed with marginal zone B cell lymphoma, also known as MALT lymphoma, in 2015 at the age of ███  Ex. 10, R. Hernandez First Amended Fact Sheet at 6.  In addition to age, Mr. Hernandez has a number of risk factors for NHL, including significant commercial exposure to other pesticides. ████████████ ████████████████████████  *Id.* at 5–6.

- **Goldie Perkins**, a resident of ████████████, was diagnosed with NHL in July 2014.  Ex. 11, Perkins Fact Sheet at 5.  Ms. Perkins had a "very rare" type of "mixed endocervical lymphoma, 20% of which was a diffuse large-cell lymphoma and 80% of which was a follicular lymphoma."  Ex. 12, Boyd Rep. at 16.  ████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████

- **Jerald Carriere**, a ███████████████████████, was diagnosed with diffuse large B-cell lymphoma ("DLBCL"), leg type, in ████████████ Ex. 37, Carriere Fact Sheet at 2, 4, 6. ████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████

- **Peter Johansing**, a ███████████████████, was diagnosed with chronic lymphocytic leukemia ("CLL") for the first time in January 2004. Ex. 13, Johansing Second Amended Fact Sheet at 2, 5. ████████████████████████████████
  ████████████████████████████████████ *Id.* Mr. Johansing was a farmer and rancher his whole life. *Id.* at 2. Accordingly, he was exposed to other pesticides besides Roundup, including, for example, Asana XL, an herbicide containing the ingredient Esfenvalerate, which has been associated with NHL. *Id.* at 9; Ex. 14, Pinter-Brown (*Johansing*) Rep. at 9.

- **Harley Wooten**, a ██████████████████████, was diagnosed with and died of systemic anaplastic large cell lymphoma in November 2014. Ex. 15, Pinter-Brown (*Wooten*) Rep. at 2–3. ████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████

- **Ines Hernandez**, a ███████████████████, was diagnosed with follicular lymphoma in November of 2009, but chose not to receive treatment until May 2011. Ex. 17, Schiff (*I. Hernandez*) Dep. at 24:10–25:10. Ines Hernandez primarily used Roundup from 1997 to 2009 while owning and operating a lawn maintenance company. Ex. 18, I. Hernandez Fact Sheet at 8. He additionally used Roundup "as needed" at his own residence until 2016. Ex. 19, I. Hernandez Dep. at 107:1–4, 138:21–139:1, 139:14–140:4. Ines Hernandez was potentially exposed to a number of different carcinogens, primarily in different jobs he held over the course of his life, first working on a farm for five years in Mexico and then while working at two different factories

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

that manufactured cribs over the course of ten years. *Id.* at 22:1–21, 23:12–24:22. He was also potentially exposed to polychlorinated biphenyls (PCBs) and severe levels of smog and air pollutants while living in Long Beach, California.

- **Anthony Harris**, a ████████████████████ was diagnosed in January 2015 with Large B-cell Primary Central Nervous System Lymphoma. Ex. 20, Harris First Amended Fact Sheet. Harris has been repeatedly and consistently exposed to other chemicals that have been linked to NHL. *Id.* For twelve years he handled solvents at different auto body shops, for sixteen years he continuously inhaled secondhand smoke while working as a bartender, and for three months he was exposed to chemicals while working as a gas station attendant. *Id.* Moreover, Harris likely experienced chemical exposure while living adjacent to Camp Pendleton, a Marine Corps base where exercises involving aircraft and other military equipment frequently occur. Ex. 4, Schiff (*Harris*) Dep. at 118:15–119:23.

- **Jaime Alvarez Calderon**, a ██████████████████████, was diagnosed with DLBCL in March of 2014, at age ███ Ex. 6, Smith Rep. at 2–3, 7. It was later determined that Mr. Alvarez also had follicular lymphoma. *Id.* ████████████████████████ ███████████████████████████████████████████████████████ ████████████████████

- **Robert Dickey**, an ████████████████████████, was diagnosed with follicular lymphoma in December 2008 at age ███ Ex. 21, Dickey Fact Sheet at 2, 5. Mr. Dickey actively farmed from 1963 to 2003. *Id.* at 2; Ex. 22, Dickey Dep. at 24:8–24. Over the course of his lifetime he used a number of different herbicides, insecticides, and pesticides, including many whose names he can no longer recall. *Id.* at 61:10–14; *see also* Ex. 21, Dickey Fact Sheet at 9. ███████████████████████████████████████████████████████ ████████████████████████████████

- **Larry Domina**, a ████████████████████████, was diagnosed with follicular lymphoma in May 2012. Ex. 23, Domina Fact Sheet at 2, 5. He has farmed full time from 1973 to the present. Ex. 24, Domina Dep. at 42:2–6. In his career he has been exposed to a number of pesticides, many of which he cannot identify. *Id.* at 43:6–47:22. ████████████████

1

2  • **Royce Janzen**, a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was diagnosed with DLBCL in

3  July 2013. Ex. 25, Janzen Fact Sheet at 2–5. Another life-long farmer, he was exposed to a host

4  of carcinogens throughout his farming career. He used a variety of herbicides and insecticides

5  over the course of thirty-five years on the 6,400 acres he farmed. Ex. 26, Staggs (*Janzen*) Rep. at

6  11. He also changed the oil on his farm trucks, *id.*, Ex. 43, Janzen Dep. at 59:6–8, and used

7  cleaning solvents, although he was unable to identify which ones, *id.* at 199:4–17. ▓▓▓▓

8

9

10

11

12  • **Frank Pollard**, a ▓▓▓▓▓▓▓▓▓▓▓, was diagnosed with "marginal zone lymphoma

13  with Ig M paraproteinemia" in October 2016, at age ▓. Ex. 28, Pollard Fact Sheet; Ex. 29, Staggs

14  (*Pollard*) Rep. at 2, 10. Throughout his life, Mr. Pollard worked as a farmer and an agronomist,

15  through which he was exposed to a lengthy list of pesticides, including Bicep and Permit. Ex. 28,

16  Pollard Fact Sheet at 2–3, 10; Ex. 29, Staggs (*Pollard*) Rep. at 11–12. ▓▓▓▓

17

18

19  ▓▓▓▓▓.

20  • **John Sanders**, a resident of ▓▓▓▓▓▓, was diagnosed with "either marginal zone

21  lymphoma or lymphoplasmacytic lymphoma" in 2014. Ex. 30, Sanders Second Amended Fact

22  Sheet at 2, 4, 5; Ex. 31, Staggs (*Sanders*) Rep. at 11. Mr. Sanders worked on a citrus farm for

23  most of his life, where he used a variety of pesticides, "including Tender, Saminilla, miscible oil,

24  Sevin, and DelNav." *Id.* at 12. Several of these chemicals were carbamates and

25  organophosphates, both of which have been shown to increase the risk of developing NHL. Ex.

26  9, Staggs (*Sanders*) Dep. at 79:11–83:12. ▓▓▓▓

27

28  [1] ▓▓▓▓

MONSANTO'S MOTION TO EXCLUDE SPECIFIC CAUSATION EXPERT TESTIMONY
3:16-MD-02741-VC

1  ████████████████████████████████████████████████████

2  ████████████████

3  • **Frank Tanner**, a ███████████████████, was diagnosed with follicular lymphoma in 2005,

4    though there is some dispute as to whether he had large B-cell lymphoma as well.  Ex. 32, Tanner

5    Second Amended Fact Sheet at 2, 5; Ex. 33, Staggs (*Tanner*) Dep. at 18:2–13.  Mr. Tanner worked

6    in landscaping and maintenance for forty years.  *Id.* at 48:142–19.  Mr. Tanner was exposed to

7    multiple pesticides in this occupation, including an unidentified additive called "Foam A," but

8    nearly always wore a rain suit or Tyvek suit and rubber boots and gloves to protect himself.  Ex.

9    34, Staggs (*Tanner*) Rep. at 12.  Mr. Tanner was also exposed to potentially carcinogenic

10   chemicals when processing photographs and developing negatives while working for the Air

11   Force from 1957 to 1960.  *Id.* at 11.

12 **III.  Plaintiffs' Experts All Purport to Use a Differential Diagnosis in Forming Their Specific Causation Opinions.**

13 Like other specific causation experts previously assessed in this MDL, these experts purport

14 to reach their specific causation opinions through what they assert to be a differential diagnosis.  As

15 this Court has acknowledged, "differential diagnosis" is a term courts use to describe the "scientific

16 technique of identifying the cause of a medical problem by eliminating the likely causes until the

17 most probable one is isolated."  *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003)

18 (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999)).  This process requires

19 an expert to first "rule in" potential causes—i.e., "to compile a comprehensive list of hypotheses that

20 might explain the set of salient clinical findings under consideration."  *Id.*  The expert must then "rule

21 out" the possible causes using a scientific method until only the most likely cause remains.  *Id.*

22 While each of these experts recite the two differential diagnosis steps, in practice their analysis

23 fails to faithfully apply what is inherently a subjective exercise.  First, they rule in Roundup by

24 uncritically relying on the same flawed studies the general causation experts rely on and without

25 taking the Plaintiffs' specific subtype of NHL into account.  *E.g.* Ex. 4, Schiff (*Harris*) Dep. at 58:13–

26 15.  While quick to rule in Roundup in every case, in many cases these experts refuse to also rule in

27 known NHL risk factors for some Plaintiffs, even when other experts (assessing different Plaintiffs)

28

1   readily agree that such risk factors should be ruled in for any reliable differential diagnosis.  Second,

2   the experts purport to rule out every other relevant NHL risk factor except for Roundup, again without

3   considering the specific sub-type at issue, and without applying the same reasoning and rigor to the

4   potential alternative causes that they apply to Roundup.  And throughout their analyses, these experts

5   ignore altogether the possibility that no known cause of the Plaintiffs' NHL can be discerned;

6   according to these experts, if the Plaintiff came into contact with Roundup, that fact by itself excludes

7   the possibility of an idiopathic cause.

8   ## LEGAL STANDARD

9   Under *Daubert* and Federal Rule of Evidence 702, an expert may give opinion testimony only

10   if (a) the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to

11   understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts

12   or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) the expert "has

13   reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  In other

14   words, an expert must be qualified and must offer testimony that is both relevant and reliable.  *Id.*;

15   *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  Here, the experts' opinions

16   should be excluded because they are not reliable.

17   In the specific causation context, *Daubert* requires experts purporting to use a differential

18   diagnosis to carry out both aspects of that methodology—"ruling in" all possible causes and "ruling

19   out" all but the subject exposure—in a reliable fashion.  To reach an admissible causation opinion

20   through a reliable differential diagnosis, an expert must "accurately diagnose the nature of the disease,

21   reliably rule in the possible causes of it, and reliably rule out the rejected causes."  *In re Aredia &*

22   *Zometa Prod. Liab. Litig.*, 483 F. App'x 182, 188 (6th Cir. 2012).  Because the inherent malleability

23   of this methodology can shroud what may be little more than subjective guesswork, the district court

24   must "delve into the particular witness's method of performing a differential diagnosis to determine

25   if his or her ultimate conclusions are reliable."  *Poust v. Huntleigh Healthcare*, 998 F. Supp. 478, 496

26   (D.N.J. 1998).  Courts have consistently held that expert opinions that pay lip service to this

27   methodology but do not reliably apply it should be excluded.  *See, e.g.*, *In re Lipitor (Atorvastatin*

28   *Calcium) Mktg., Sales Practices & Prod. Liab. Litig.*, 892 F.3d 624, 642–45 (4th Cir. 2018).

In these personal injury cases, specific causation—here, whether Roundup caused Plaintiffs' NHL—is an essential element of Plaintiffs' claims. *See, e.g.*, *Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396, 402–04 (1985); *King v. Burlington N. Santa Fe Ry. Co.*, 762 N.W.2d 24, 34 (Neb. 2009). Under both California and Nebraska law, whether a chemical caused an individual's NHL is beyond the experience and common knowledge of lay jurors, so each Plaintiff must prove it through expert testimony. *Jones*, 163 Cal. App. 3d at 403; *Vallejo v. Amgen, Inc.*, 274 F. Supp. 3d 922, 925 (D. Neb. 2017). If Plaintiffs fail to present an admissible expert to establish specific causation, summary judgment is appropriate. *In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 957 (N.D. Cal. 2019). ("To defeat Monsanto's motion for summary judgment on this issue, the plaintiffs must present at least one admissible expert opinion to support [his] specific causation argument.").

## ARGUMENT

I. **Dr. Smith's Testimony Reveals That the Experts' Methodology Is Results Driven and Made for Litigation, and His Testimony Must Be Excluded.**

The differential diagnosis Plaintiffs' experts invoke does little more than dress up in the trappings of scientific method a pre-determined conclusion that Roundup caused Plaintiffs' NHL. The made-for-litigation nature of the experts' methodology is no better exemplified than by the testimony of Dr. Clayton Smith. At his deposition, Dr. Smith admitted that the differential diagnosis he conducted in the *Calderon* case was "very different" from the differential diagnoses he makes in medical practice, and indeed that he was not familiar with the methodology he used in the *Calderon* case until he was "instructed" by Plaintiff's counsel on what a differential diagnosis is "in the legal sense." Ex. 7, Smith Dep. at 190:1–25. Dr. Smith went on to testify that he actually *disagreed* with the differential diagnosis methodology he was "instructed" to use, and only employed it because he was told it was required in this case. *Id.* at 190:25–195:5. Dr. Smith further admitted that the methodology he employed has no known error rate, "was a purely subjective exercise," *id.* at 194:18–195:4, and that he had "no idea" how often he would be correct if he concluded that Roundup caused NHL in 100 patients identical to Mr. Alvarez, *id.* at 206:9–208:9.[2] Incredibly, in response to Dr.

---

[2] Dr. Smith also admitted that a differential diagnosis is not sufficient to conclude that a risk factor caused a particular disease, *id.* at 190:25–191:6; thus, on its face Dr. Smith's testimony does not satisfy Plaintiff's burden to prove causation.

Smith's testimony that he disagreed with this methodology, Plaintiff's counsel replied that "You did. You did. But that's what the judge put in his order." *Id.* at 194:25–195:4. If Plaintiffs can present Dr. Smith to satisfy their specific causation opinion with a methodology he did not understand and indeed disagreed with, then the specific causation requirement would be illusory. At a minimum, Dr. Smith's testimony must be excluded. Taken more broadly, Dr. Smith's testimony betrays the reality that each of these experts, in addition to the specific flaws in their testimony identified below, have employed an outcome-driven, made-for-litigation methodology that always results in Roundup as the cause of Plaintiffs' NHL.

## II. Monsanto Preserves Its Arguments That Plaintiffs' Experts Failed to Reliably Rule in Roundup as a Cause of Each Plaintiff's NHL.

Monsanto moves to exclude, under *Daubert*, Plaintiffs' specific causation experts on the grounds that they failed to reliably rule in Roundup as a cause of each Plaintiff's NHL. In particular, Monsanto maintains that the experts improperly rely on a small subset of flawed studies that do not establish a sufficiently high odds ratio to be relevant. However, consistent with the Court's direction not to relitigate issues previously ruled upon by the Court, but in order to fully preserve the appellate record, Monsanto hereby incorporates the following pleadings that were filed on the MDL docket addressing this issue:

- Monsanto Company's Motion to Exclude Testimony of Dr. Chadi Nabhan, Dr. Andrei Shustov, and Dr. Dennis Weisenburger on *Daubert* Grounds (ECF No. 2420);

- Monsanto's Company's Reply in Support of Motion To Exclude Testimony of Dr. Chadi Nabhan, Dr. Andrei Shustov, and Dr. Dennis Weisenburger on *Daubert* Grounds (ECF No. 2525);

- The Transcript of the February 13, 2019 Hearing (ECF No. 2763);

- Monsanto Company's Motion for Directed Verdict (ECF No. 2975);

- Monsanto Company's Motion for Judgment as a Matter of Law and for a New Trial (ECF No. 3976);

- Monsanto Company's Reply in Support of Motion for Judgment as a Matter of Law and for a New Trial (ECF No. 4301).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Monsanto also incorporates the developing science on glyphosate.  By incorporating by reference its prior filings, Monsanto is in no way waiving any of the arguments raised therein.

**III.    Plaintiffs' Experts Failed to Properly Assess Potential Alternative Causes of Plaintiffs' NHL.**

All of Plaintiffs' experts failed to adequately address the numerous potential causes of Plaintiffs' NHL other than Roundup, which is required for their opinions to be admissible.  *See Clausen*, 339 F.3d at 1058 ("A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation.") (quoting *Westberry,* 178 F.3d at 265).  The first step in a differential diagnosis is to "compile a comprehensive list of hypotheses that might explain" the plaintiff's injury.  *Id.*  The Ninth Circuit instructs experts to "[i]nclud[e] even rare entities in the list [to] ensure[] that such disorders are not overlooked."  *Id.* (citation and quotation marks omitted).  Then, in the second step of a differential diagnosis, the expert must "rule out" the possible causes until only the most likely cause remains.  Many of Plaintiffs' experts failed to consider known alternative causes altogether, thus failing to satisfy step one.  However, most of the experts dealt with potential alternative causes so casually that it is impossible to even discern whether they ruled in a cause and then ruled it out, or did not rule in the cause in the first place.  Indeed, several experts omitted possible alternative causes from their report entirely, only to claim, when confronted at their deposition, that they had, albeit briefly, considered those factors in their analyses. ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

Regardless of which step in the differential diagnosis is involved, the experts' testimony reveals that they did not seriously consider that something other than Roundup could have caused Plaintiffs' NHLs.  Instead, each started with the conclusion that Roundup was the cause, and then sought to justify that conclusion—and insulate it from scrutiny by the Court—by paying lip service to other potential causes.  An expert conducting a differential diagnosis "must provide reasons for rejecting alternative hypotheses 'using scientific methods and procedures' and the elimination of

1   those hypotheses must be founded on more than 'subjective beliefs or unsupported speculation.'"

2   *Clausen*, 339 F.3d at 1058 (quoting *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)).

3   Plaintiffs' experts have failed to do so here, and instead have engaged in a flawed, results-driven

4   "always Roundup" methodology—precisely the type of unreliable approach that *Daubert* prohibits.

5       Perhaps the best illustration of the unscientific nature of their testimony is the hopelessly

6   inconsistent manner in which they handled and addressed the individual risk factors of the Plaintiffs.

7   For example, although Dr. Pinter-Brown agreed that age was a "potential risk factor[]," Ex. 3, Pinter-

8   Brown (*Carriere*) Dep. at 51:15–17, Dr. Staggs testified that "numerical age is really irrelevant," Ex.

9   35, Staggs (*Dickey*) Dep. at 16:25.  Similarly, although Dr. Boyd readily agreed that ████ can

10  contribute to the development of cancer and that a growing body of literature links cancer to ████

11  Ex. 1, Boyd. Dep. at 29:2–12, 60:20–61:8, 69:2–70:4, Dr. Staggs failed to account for this risk factor

12  in light of his subjective belief that obesity does not have "an actual causal relationship" with NHL,

13  Ex. 35, Staggs ████ Dep. at 18:8–9.

14      Specific problems associated with each expert's testimony include the following:

15  **Dr. Boyd** failed to rule out a host of medical problems and other risk factors that could have,

16  and likely did, cause <u>Goldie Perkins'</u> rare subtype of NHL, rendering his opinion that Roundup caused

17  Mrs. Perkins' NHL unreliable. ████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████  Dr. Boyd never clearly ruled these factors out in either his report or

23  his deposition.  Instead, when pressed, he simply retreated to the position that her NHL could have

24  been "multicausal" or "multifactorial."  *Id.* at 81:7–18.  Such an indeterminate opinion cannot

25  possibly satisfy Plaintiff's burden under the differential diagnosis methodology.

26      Perhaps most significantly, Dr. Boyd failed to apply this same standard to Roundup as he did

27  to ████████████████████████.  Dr. Boyd claims the most "consistent and

28  ubiquitous risk factor" in Mrs. Perkins' history is the continued use of Roundup, Ex. 12, Boyd Rep.

1 ███████████████████████████████████████████████████████

2 ███████████████████████████████████████████████████████

3 ███████████████████████████████████████████████████████

4 ███████████████████████████████████████████████████████

5 ████████████████ Ex. 1, Boyd Dep. at 81:8–20, 56:7–15, 57:22–58:7.  Such a casual dismissal

6 designed to justify the desired conclusion does not meet *Daubert*'s rigorous standards.

7       **Dr. Alyea** failed to consider several factors that he acknowledged increase the risk of

8 developing NHL, and therefore never ruled these factors in during his differential diagnosis.  For

9 example, Dr. Alyea did not consider <u>Ruben Hernandez's</u> history of commercial exposure to other

10 pesticides even though he admitted that there is scientific evidence linking many such commercial

11 pesticides to NHL.  Ex. 2, Alyea Dep. at 219:4–16.  Dr. Alyea also did not consider Ruben

12 Hernandez's ███████████████████████████████████████

13 ████████████████████████ ███████████████████████

14 ███████████████████████████████████████████████████████

15 ███████████████████████████████████████████████████████

16 ███████████████████████████████████████████████████████

17 ███████████████████████████████████████████ Dr.

18 Alyea's differential diagnosis thus failed at the outset, as he failed to rule in what he otherwise

19 acknowledged to be NHL risk factors.

20 ███████████████████████████████████████████████

21 ███████████████████████████████████████████████████████

22 ███████████████████████████████████████████████████████

23 ███████████████████████████████████████████████████████

24 ███████████████████████████████████████████████████████

25 ███████████████████████████████████████████████████████

26 ███████████████████████████████████████████████████████

27 ███████████████████████████████████████████████████████

28 ███████████████████████████████████████████████████████

MONSANTO'S MOTION TO EXCLUDE SPECIFIC CAUSATION EXPERT TESTIMONY
3:16-MD-02741-VC

1

2

3

4     For her part, **Dr. Pinter-Brown** routinely failed to rule in factors that other experts have

5 acknowledged present risk factors for NHL.

6

7                                                                                   Dr. Pinter-Brown did not rule in

8 the first three of these factors in her differential diagnosis because she simply does not think they are

9 risk factors for non-Hodgkin's lymphoma.  *See* Ex. 3, Pinter-Brown (*Carriere*) Dep. at 119:5–23.

10 She draws this line despite the literature linking these factors to NHL—literature that is just as strong

11 as the glyphosate literature upon which she relies.  Similarly,

12

13                                                                     Moreover, while acknowledging that

14 radiation is a risk factor, Ex. 38, Pinter-Brown (*Carriere*) Rep. at 4, Dr. Pinter-Brown labored under

15 the mistaken belief that Mr. Carriere was not exposed to radiation—even though Mr. Carriere listed

16 this factor on his Fact Sheet and discussed his radiation cancer treatment in his deposition, Ex. 37,

17 Carriere Fact Sheet at 4; Ex. 39, Carriere 7/16/19 Dep. at 208:5–23.  Because of this mix of mistakes

18 or unwillingness to treat similar risk factors similarly, Dr. Pinter-Brown ended up with an initial list

19 of hypotheses that failed to account for all of the existing risk factors present for these Plaintiffs.

20     Dr. Pinter-Brown also did not rule in Peter Johansing's significant exposure to pesticides and

21 other agricultural products besides Roundup, including pesticides like Asana XL, that have been

22 linked to NHL.  Instead, she brushed off this factor by asserting that Mr. Johansing eliminated his

23 exposure to other pesticides by wearing the personal protective equipment recommended on the

24 material safety data sheets (MSDS) when using these products.  Ex. 14, Pinter-Brown (*Johansing*)

25 Rep. at 9–10; Ex. 40, Pinter-Brown (*Johansing*) Dep. at 159:18–160:16.  However, she also admitted

26 in her deposition that the use of personal protective equipment does not completely eliminate

27 exposure to a chemical.  She also did not account for why Roundup should be treated any differently,

28 as she testified she assumed Mr. Johansing would follow the directions on the Roundup MSDS for

the use of such equipment. Ex. 40, Pinter-Brown (*Johansing*) Dep. at 173:14–174:7.

Even for the few factors Dr. Pinter-Brown did rule in for the Plaintiffs she assessed, she applied the same squishy arguments to trying to rule these factors out. ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ Rather than concede the potential role these risk factors could play, she turned science on its head by arguing—without any scientific support—that these preexisting risk factors actually made these Plaintiffs "particularly susceptible" to developing NHL from exposure to glyphosate. Ex. 15, Pinter-Brown (*Wooten*) Rep. at 7; Ex. 14, Pinter-Brown (*Johansing*) Rep. at 11. Dr. Pinter-Brown's approach—which jettisons any semblance of scientific consistency for sake of reaching a predetermined outcome—illustrates an always-Roundup methodology that cannot be squared with *Daubert*. Whatever latitude an expert might have in conducting the "art" of a differential diagnosis, no reliable methodology could excuse such a cavalier disregard for the facts and for science.

**Dr. Schiff's** methodology suffers from a similar defect—a systematic failure to investigate the medical history and background of his assigned Plaintiffs, Ines Hernandez and Anthony Harris, thus failing to rule in several potential causative factors for both Plaintiffs. This deficiency in properly ruling in all risk factors renders his differential diagnosis incomplete and unreliable.

Ines Hernandez was potentially exposed to multiple different carcinogens over the course of his life, but Dr. Schiff never investigated or considered the potential exposure and, therefore, never ruled in any of the carcinogens in the first step of his differential diagnosis. For example, Dr. Schiff was aware that Ines Hernandez lived in Long Beach and that Long Beach residents have in the past been exposed to PCBs and severe levels of smog and air pollution. Yet, Dr. Schiff did nothing to investigate whether these were risks factor for Ines Hernandez by, for example, reviewing information or data from "air quality reports for the Long Beach area in the periods of time in which Mr. Hernandez lived there" and by investigating where exactly in Long Beach Hernandez lived and worked. Ex. 17, Schiff (*I. Hernandez*) Dep. at 69:14–70:16, 71:16–72:6, 73:17–77:1. These factors are particularly important because Mr. Hernandez, as a landscaper, spent most of his time outside.

1    Dr. Schiff also failed to fully investigate Ines Hernandez's occupational history.  He did not know

2    Ines Hernandez worked at a crib factory for ten years and thus did not investigate the potential

3    carcinogenic exposures Mr. Hernandez experienced during this decade.  *Id.* at 80:24–81:5.  This

4    failure to fully investigate Mr. Hernandez's background prevented Dr. Schiff from beginning his

5    differential diagnosis with a comprehensive list of potential causes.  His analysis, therefore, was

6    fatally flawed from the beginning.

7         Mr. Harris has likewise experienced significant levels of chemical exposure over the course

8    of his life time, which Dr. Schiff either summarily disregarded or failed to investigate at all.  Dr.

9    Schiff did not consider or even ask Mr. Harris about his occupational exposures to substances and

10   chemicals that he believes are carcinogenic, such as benzene, PCBs, chemicals in cigarette smoke,

11   and gasoline (benzene and butadiene, among many others), radiation, and organochlorines.  Ex. 4,

12   Schiff (*Harris*) Dep. at 100:16–101:22, 102:1–4, 111:6–9, 112:19–113:2.  Dr. Schiff did not consider

13   these potential alternative causes despite the fact that he knew Mr. Harris worked as a gas station

14   attendant and a bartender, where exposure to such carcinogenic substances is "ample" and assumed.

15   *Id.* at 114:23–117:3.  Moreover, Dr. Schiff did not even know that Harris worked at an auto body

16   reconditioning shop for sixteen years, and thus never considered the solvents to which Harris was

17   exposed.  Ex. 20, Harris First Amended Fact Sheet at 2, 3; Ex. 4, Schiff (*Harris*) Dep. at 116:13–19.

18   Dr. Schiff also did not consider Mr. Harris' residential exposure to substances and chemicals that he

19   acknowledges are carcinogenic.  Dr. Schiff did not look into and was not aware that Mr. Harris lived

20   near Camp Pendleton, where Mr. Harris was likely exposed on a daily basis to carcinogenic

21   chemicals.  *Id.* at 117:18–22, 118:11–120:2.  He admitted that he concluded Roundup was the cause

22   of Mr. Harris' CNS lymphoma "without having any information as to how that might compare to the

23   degree of exposure to other chemical causative factors."  *Id.* at 120:9–121:1.

24         Both **Dr. Smith** and **Dr. Andreadis** dismiss Mr. Alvarez's risk factors without sufficient

25   analysis.  The doctors acknowledged that Mr. Alvarez was a smoker for twenty-five years, but

26   disregarded the literature linking smoking and cancer.  Ex. 7, Smith Dep. at 173:19–21; 174:18–

27   175:6.  In addition, the doctors also did not consider Mr. Alvarez's age in their differential diagnoses.

28   Dr. Smith instead simply noted that "more than half of patients with NHL are 65 years old or older at

1   diagnosis," Ex. 6, Smith Rep. at 7, while Dr. Andreadis noted that "the median age of developing

2   DLBCL in US adults is 66 years," Ex. 41, Andreadis Rep. at 6.  In other words, at ▮ Mr. Alvarez

3   was too young.  This factor should not have been ruled out so hastily.  Many sources consider 60 to

4   be the appropriate threshold, *see, e.g.* https://www.mayoclinic.org/diseases-conditions/non-hodgkins-

5   lymphoma/symptoms-causes/syc-20375680.  In addition, when pressed, Dr. Andreadis admitted that

6   Mr. Alvarez "could have developed a [NHL] simply as the result of age." Ex. 5, Andreadis Dep. at

7   145:11–14.  Moreover, these experts should have considered his age as a factor given that Mr. Alvarez

8   has had multiple relapses, including to this day, at age ▮.  Ex. 6, Smith Rep. at 5–7.

9      **Dr. Staggs** examined five farmers and a landscaper and made the same errors with each one.

10   First, he failed to consider these Plaintiffs' exposures to other pesticides, even when they were using

11   the other pesticides "with some frequency and regularity," simply because their exposure (by his

12   characterization) was "so much less than Roundup." *See, e.g.*, Ex. 27, Staggs (*Janzen*) Dep. at 36:2–

13   22.  In addition, Dr. Staggs simply did not conduct any analysis when the Plaintiffs could not

14   remember the specific names of the pesticides they used or the timeframes during which they used

15   the products, both of which occurred frequently.  *Id.* at 36:24–37:4; Ex. 42, Staggs (*Domina*) Dep. at

16   113:17–24 ("[A]ll of the farmers that I looked at, they often said, well, we--you know, we've used

17   various things, they just couldn't remember them all.").  Moreover, it is not clear that when the

18   Plaintiffs did identify the other herbicides or pesticides they used, that Dr. Staggs actually researched

19   whether the substance was linked to NHL before disregarding it.  *See* Ex. 9, Staggs (*Sanders*) Dep. at

20   75:24–83:12 (failing to remember any specifics about the herbicides or insecticides Mr. Sanders used

21   and admitting that he failed to include any literature regarding the chemicals on his MCL and that he

22   did not find certain relevant literature during his search).

23

24

25

26

27

28

MONSANTO'S MOTION TO EXCLUDE SPECIFIC CAUSATION EXPERT TESTIMONY
3:16-MD-02741-VC



\*                    \*                    \*

Taken as a whole, these experts' reasoning closely tracks that of the experts excluded in *Lipitor*, whose conclusions "focused almost exclusively on the fact that [the plaintiff] took the drug and later developed the disease, rather than explaining what led her to believe that it was a substantial contributing factor as compared to other possible causes." 892 F.3d at 645. Here, as in *Lipitor*, the experts' reports simply "dismiss other possible causes in favor of [Roundup] in a cursory fashion that appeared closer to an *ipse dixit* than a reasoned scientific analysis." *Id.* The Court should exclude each experts' opinion on that basis.

IV.    **Plaintiffs' Experts Have Not Reliably Ruled Out Unknown Causes of Plaintiffs NHL and Instead Always Point to Roundup.**

Just as they fail to engage with the known alternative risk factors confronting Plaintiff, these experts take an equally unscientific dismissive approach to the possibility of unknown causes: they simply ignore the prospect. This Court has already acknowledged that because the vast majority of NHL cases have no known cause, an expert's specific causation opinion is inadmissible if it fails to account for or adequately grapple with idiopathy. *In re Roundup*, 358 F. Supp. 3d at 959. To be admissible "an expert must have a way to differentiate Roundup users who developed NHL because they used the product from Roundup users who would have developed NHL regardless." *Id.* These expert are unable to offer any reliable method for placing Plaintiffs in one category and not the other.

For the most part, these experts made no attempt at all to address idiopathy in their expert reports. Only when pressed in their depositions did these experts admit that idiopathy was a real problem that they failed to address. For example, **Dr. Smith** agreed that in most cases there is no clear reason why lymphoma develops and that all known risk factors still account for only a minority of cases of NHL. Ex. 7, Smith Dep. at 90:14–91:8, 103:17–104:4, 107:7–18, 110:14–17. Nevertheless, he never addressed idiopathy in his report on Mr. Alvarez and made no attempt to distinguish Mr. Alvarez from another Roundup user who would have developed NHL despite his or her exposure. *See* generally Ex. 6, Smith Rep. Similarly, **Dr. Pinter-Brown** did not address idiopathy in any of her three expert reports. However, when pressed, she agreed that "it's often not possible to tell which," of the many risk factors for NHL, "is the most important," or "which risk factor led to the development of [a patient's] NHL." Ex. 3, Pinter-Brown (*Carriere*) Dep. at 23:24–24:4. She also agreed that these Plaintiffs could "have gotten the exact same cancer without ever using Roundup." *Id.* at 23:19–27:19. **Dr. Andreadis** also conceded that some lymphomas "happen just randomly," Ex. 5, Andreadis Dep. at 152:2–4, that "Mr. Alvarez could have developed non-Hodgkin's lymphoma simply because it's a common cancer that strikes two out of every 100 men" and that "anybody could develop lymphoma," *id.* at 143:11–20. He too did not address idiopathy in his expert report.

**Dr. Schiff's** testimony is even more stunning. In October 2019, Dr. Schiff testified in another

1   case that eighty percent "of the patients [he] treated with non-Hodgkin lymphoma did not have a

2   known cause of their non-Hodgkin lymphoma." Ex. 4, Schiff (*Harris*) Dep. at 88:2–90:13. He also

3   admitted that he never once told a patient that their NHL was caused by Roundup. *Id.* at 92:24–93:4.

4   In contrast, since becoming an expert in this litigation, he has found Roundup to be the cause of each

5   Plaintiff's NHL, no matter the subtype or other risk factors present. *Id.* at 91:3–7, 91:18–22. To

6   explain this about-face, he points to his purportedly new "recognition of the lymphoma risks

7   associated with glyphosate and Roundup" when IARC issued its Monograph in 2015, right as he

8   retired from medical practice and became a full-time expert witness. *Id.* at 88:13–89:5. However, he

9   never reconciled that position with the fact that the literature upon which the IARC Monograph was

10  based, and on which he relied to rule in Roundup in his differential diagnosis, including McDuffie

11  2001 and Eriksson 2008, had been around for many years before he retired. Moreover, based on this

12  new-found knowledge, Dr. Schiff opined that out of every 140 patients with NHL who have also been

13  exposed to Roundup, forty of those patients' cancers could be attributed to Roundup. *Id.* at 80:17–

14  81:25. However, he was unable to clearly delineate which patients fell into which categories or

15  explain why he had yet to find a single Plaintiff's NHL that was not caused by Roundup. This

16  omission renders his testimony unreliable and inadmissible under *Daubert*. Ultimately, for Mr. Harris

17  and Ines Hernandez, Dr. Schiff could only point to their levels of exposure to justify ruling out

18  idiopathy, despite fully acknowledging that he had no threshold for how much exposure was sufficient

19  to cause or not cause NHL. *Id.* at 55:9–15, 57:11–58:6, 61:10–62:3, 83:5–16. In his view, like all of

20  these experts, once a Plaintiff establishes exposure to Roundup, that exposure will trump any potential

21  unknown risk factor in every situation. That conclusion defies any modicum of reliability and should

22  not be countenanced by this Court.

23                                        **CONCLUSION**

24          The Court should grant Monsanto's motion to exclude these specific causation experts on

25  *Daubert* grounds and grant summary judgment in Monsanto's favor because Plaintiffs have failed to

26  present at least one admissible expert opinion to support specific causation in each of their cases.

27

28

1   DATED: November 26, 2019                  Respectfully submitted,

2                                              */s/ Brian L. Stekloff*_____

3                                              Brian L. Stekloff (*pro hac vice*)
                                               (bstekloff@wilkinsonwalsh.com)
4                                              Rakesh Kilaru (*pro hac vice*)
                                               (rkilaru@wilkinsonwalsh.com)
5                                              WILKINSON WALSH + ESKOVITZ LLP
                                               2001 M St. NW, 10th Floor
6                                              Washington, DC 20036
                                               Tel: 202-847-4030
7                                              Fax: 202-847-4005

8                                              Pamela Yates (CA Bar No. 137440)
                                               (Pamela.Yates@arnoldporter.com)
9                                              ARNOLD & PORTER KAYE SCHOLER
                                               777 South Figueroa St., 44th Floor
10                                             Los Angeles, CA 90017
                                               Tel: 213-243-4178
11                                             Fax: 213-243-4199

12
                                               Eric G. Lasker (*pro hac vice*)
13                                             (elasker@hollingsworthllp.com)
                                               HOLLINGSWORTH LLP
14                                             1350 I St. NW
                                               Washington, DC 20005
15                                             Tel: 202-898-5843
                                               Fax: 202-682-1639
16

17                                             Michael X. Imbroscio (*pro hac vice*)
                                               (mimbroscio@cov.com)
18                                             COVINGTON & BURLING LLP
                                               One City Center
19                                             850 10th St. NW
                                               Washington, DC 20001
20                                             Tel: 202-662-6000

21
                                               Attorneys for Defendant
22                                             MONSANTO COMPANY

23

24

25

26

27

28

MONSANTO'S MOTION TO EXCLUDE SPECIFIC CAUSATION EXPERT TESTIMONY
3:16-MD-02741-VC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of November, 2019, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Brian L. Stekloff*