# Exhibit 2

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                 Master File No. 2741

 4              Case No. 3:16-MD-02741-VC

 5

 6    ********************************

 7    IN RE:  ROUNDUP PRODUCTS

      LIABILITY LITIGATION

 8

      _____

 9

      THIS DOCUMENT RELATES TO:

10

      RUBEN HERNANDEZ and MARTHA HERNANDEZ

11    V. MONSANTO COMPANY

      Case No. 3:16-CV-07364-VC

12

      ********************************

13

14

15            VIDEOTAPED DEPOSITION OF:

16             EDWIN P. ALYEA, II, M.D.

17                WESTIN HOTEL

18                70 3rd Avenue

19            Waltham, Massachusetts

20        November 15, 2019        9:09 a.m.

21

22             Darlene M. Coppola

23           Registered Merit Reporter

24           Certified Realtime Reporter
```

Edwin P. Alyea, M.D.

```
 1   APPEARANCES:

 2   Representing the Plaintiffs:

 3        GOLDBERG & OSBORNE

 4        698 East Wetmore Road

 5        Suite 200

 6        Tuscon, AZ 85705

 7        BY:  DAVID J. DIAMOND, ESQUIRE

 8             DEBORAH S. KERR, ESQUIRE

 9        T 520.879.7168

10        E ddiamond@goldbergandosborne.com

11          dkerr@1800theeagle.com

12

13   Representing the Defendant:

14        THE PIORKOWSKI LAW FIRM, PC

15        1800 K Street, NW

16        Suite 1000

17        Washington, DC 20006

18        BY:  JOSEPH D. PIORKOWSKI, ESQUIRE

19             ANNE P. HOVIS, ESQUIRE

20        T 410.952.0008

21        E jpiorkowski@lawdoc1.com

22          ahovis@lawdoc1.com

23   Also Present:

24   Marissa DeMonte, CLVS
```

Edwin P. Alyea, M.D.

```
 1                    INDEX
 2                 EXAMINATION
 3  Witness Name                                Page
 4  EDWIN P. ALYEA, M.D.
 5      Direct By Mr. Piorkowski ........................ 7
 6

                        EXHIBITS
 7
     Exhibit          Description                 Page
 8
     No. 1            Notice of Deposition         13
 9
     No. 2            Expert Report                24
10
     No. 3            First Supplemental           24
11                    Expert Report
12   No. 4            Curriculum Vitae             25
13   No. 5A           Hernandez Transcript,        84
                      Volume I
14
     No. 5B           Hernandez Transcript,        84
15                    Volume II
16   No. 5C           Hernandez Transcript,        84
                      Volume III
17
     No. 6            Article, Non-Hodgki's        91
18                    Lymphoma and Specific
                      Pesticide Exposures in
19                    Me:  Cross-Canada Study
                      of Pesticides and
20                    Health
21   No. 7            List of References          113
22   No. 8            Plaintiff's Second         117
                      Amended Fact Sheet
23

24
```

Edwin P. Alyea, M.D.

```
 1                         INDEX
 2                       EXHIBITS
 3    Exhibit          Description                Page
 4    No. 9            "Exposures to              181
                       Pesticides as Risk
 5                     Factor for
                       Non-Hodgkin's Lymphoma
 6                     and Hairy Cell
                       Leukemia:  Pooled
 7                     Analysis of Two Swedish
                       Case-control Studies"
 8
      No. 10           "Integrative assessment    182
 9                     of multiple pesticides
                       as risk factors for
10                     non-Hodgkin's lymphoma
                       among men"
11
      No. 11           "Pesticide exposure as     184
12                     risk factor for
                       non-Hodgkin lymphoma
13                     including
                       histopathological
14                     subgroup analysis"
15    No. 12           "Exposure to Multiple      186
                       Pesticides and Risk of
16                     Non-Hodgkin Lymphoma in
                       Men from Six Canadian
17                     Provinces"
18    No. 13           Expert report of           195
                       Alexandra Levine, M.D.
19
      No. 14           References by              206
20                     Appearance
21    No. 15           Reference in               206
                       Alphabetical Order,
22                     Abstracts Included
23    No. 16           "Some Organophosphate      206
                       Insecticides and
24                     Herbicides," Volume        112
```

Edwin P. Alyea, M.D.

```
 1                        INDEX

 2                       EXHIBITS

 3    Exhibit         Description                    Page

 4    No. 17          Table 2-13,                    237
                      Carcinogenicity
 5                    Classification

 6    No. 18          Glyphosate Reevaluation        244
                      Decision
 7
      No. 19          EPA's Proposed Interim         249
 8                    Registration Review
                      Decision from April
 9                    2019

10    No. 20          Glyphosate Issue Paper:    265
                      Evaluation of
11                    Carcinogenic Potential,
                      EPA's Office of
12                    Pesticide Programs,
                      September 12, 2016
13
      No. 21          HHS Public Access,             275
14                    Author manuscript

15    No. 22          ███████████████████      ████

      █               █████████████████

                      █████████

                      ███████████████████

17

18

19

20

21

22

23

24
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

```
 1                  (Deposition begins at 9:09 a.m.)

 2

 3                       THE VIDEOGRAPHER:  We are now on

 4        the record.  My name is Marissa DeMonte.  I'm

 5        the videographer for Golkow Litigation

 6        Services.  Today's date is November 15, 2019,

 7        and the time is 9:09 a.m.

 8             This video deposition is being held in

 9        Waltham, Massachusetts, in re Roundup products

10        liability litigation, relating to Ruben

11        Hernandez and Martha Hernandez versus Monsanto

12        Company for the United States District Court,

13        Northern District of California.  The deponent

14        is Edwin P. Alyea, M.D.

15                       Counsel, please state your

16        appearances.

17                       MR. DIAMOND:  David Diamond and

18        Debra Kerr for the plaintiff.

19                       MR. PIORKOWSKI:  Joseph

20        Piorkowski and Anne Hovis for Monsanto.

21                       THE VIDEOGRAPHER:  The court

22        reporter is Darlene Coppola.  She will now

23        swear in the witness.

24
```

```
 1                    EDWIN P. ALYEA, M.D.,

 2             a witness called for examination by

 3      counsel for the Defendant, having been

 4      satisfactorily identified by the production of

 5      his driver's license and being first duly

 6      sworn by the Notary Public, was examined and

 7      testified as follows:

 8

 9                    DIRECT EXAMINATION:

10      BY MR. PIORKOWSKI:

11             Q.   Good morning, Dr. Alyea.

12                  Could you state your full name for the

13      record?

14             A.   Edwin Pascal Alyea, III.

15             Q.   And what's your address?

16             A.   ████████████████████████████

        ██    ████████████████████████████

18             Q.   And have you given a deposition

19      previously?

20             A.   I have given a deposition previously.

21             Q.   On how many occasions?

22             A.   In total, three.  Within the past five

23      years, two.

24             Q.   Are you generally familiar with the
```

Edwin P. Alyea, M.D.

```
 1      ground rules?

 2           A.   It would certainly be helpful to hear

 3      them again.

 4           Q.   So I'm going to ask you a series of

 5      questions, and everything is being recorded by

 6      a court reporter.  And also, we have a

 7      videographer here today.

 8                You understand that, right?

 9           A.   Yes, sir.

10           Q.   If at any time you don't understand my

11      question, if you would ask me to rephrase it,

12      I would be happy to do that, okay?

13           A.   Yes, sir.

14           Q.   If you answer my question, I'll assume

15      you understood it; is that fair?

16           A.   Yes, sir.

17           Q.   It's difficult sometimes when we get

18      into these exchanges to not -- not to talk

19      over each other, but if we could, I'll do my

20      best to let you finish your answer, and if you

21      could let me finish my question so that we

22      have some space between the questions and the

23      answers, that's helpful for the court

24      reporter.
```

Edwin P. Alyea, M.D.

```
1              A.   I will do my best and remind me if I

2        crowd things.  I might -- I have some sound

3        behind me, so it's a little bit hard for me

4        the hear you, so I am going to kind of lean

5        forward.

6              Q.   Okay.  That's fine.

7                   If at any point you need a break, let

8        us know, and we'll accommodate that.  This

9        isn't -- this isn't an endurance contest, all

10       right?

11             A.   (Witness nodding.)

12             Q.   So in your report, you make reference

13       to a case called Merck Sharp & Dohme versus

14       Actavis?

15             A.   Yes, sir.

16             Q.   Is that the most recent time when you

17       testified?

18             A.   Yes, sir.

19             Q.   And on whose behalf did you testify in

20       that case?

21             A.   Actavis.

22             Q.   And what was nature of the case?

23             A.   The nature of the case was a patent

24       case regarding the position of an antifungal
```

Edwin P. Alyea, M.D.

```
1       that was -- that is used to treat patients and

2       the position of that antifungal with respect

3       to other antifungals that are currently

4       available.

5            Q.   Okay.  Was there a medical malpractice

6       issue in that case?

7            A.   No, sir.

8            Q.   So in your report, it says, "I have

9       testified at trial or by deposition in a

10      medical malpractice case, McGarr."

11                Is that -- McGarr is a different

12      case?

13           A.   McGarr versus Walmart was a separate

14      case.

15           Q.   And in McGarr versus Walmart, what was

16      the nature of that testimony?

17           A.   I would say it's been a number of

18      years.  I did not go back and review that

19      case.  To my recollection, it had nothing to

20      do with any of the entities that we are

21      discussing here.

22           Q.   Was it -- were you testifying on

23      behalf of the plaintiff or the defendant in

24      that case?
```

Edwin P. Alyea, M.D.

```
 1              A.   At that point it was the defendant.

 2              Q.   So you were testifying on behalf of a

 3        doctor whose care was being called into

 4        question?

 5              A.   Correct, that is correct.

 6              Q.   And then I think you mentioned -- did

 7        you -- in either of those cases -- I'm sorry.

 8        Let me start over.

 9                   Did you give a deposition in both of

10        those cases?

11              A.   I provided a deposition in both of

12        those cases, yes.

13              Q.   And did you testify at trial in either

14        of those cases?

15              A.   Only one, which is the second case,

16        which is the patent case which, I believe, is

17        referenced there.

18              Q.   And where was the trial on that case?

19              A.   Trenton, New Jersey.

20              Q.   And who prevailed in the case?

21              A.   So only through hearsay I hear that

22        Merck Sharp & Dohme did, but I've not ever

23        read anything definitive to that --

24              Q.   Fair enough.
```

Edwin P. Alyea, M.D.

1        A.    -- and have not followed up with the

2    parties.

3        Q.    And I think you said that there was

4    one other time that you had given a

5    deposition?

6        A.    Yes.

7        Q.    And what was that?

8        A.    That was 15 years ago.  It was a

9    medical malpractice case representing the

10   defense from a case from Miami, which was the

11   very first case that I did.

12       Q.    So in that medical malpractice case,

13   you were testifying on behalf of the defendant

14   physician?

15       A.    Correct.

16       Q.    Did that involve a lymphoma?

17       A.    No.  It involved acute leukemia.

18       Q.    Did the McGarr case involve lymphoma?

19       A.    Not that I recall.

20       Q.    Okay.  Your hourly rate is 600 an

21   hour; is that correct?

22       A.    Yes, sir.

23       Q.    So let me ask you, in terms of your

24   understanding, you're here testifying as an

Edwin P. Alyea, M.D.

1      expert on behalf of the plaintiff in this

2      case, correct?

3          A.   Correct.

4          Q.   Mr. Hernandez?

5          A.   Yes, sir.

6          Q.   What do you understand your role to be

7      in this case?

8          A.   I understand my role to review his

9      medical record and look at factors which may

10     contribute to his development of lymphoma.

11         Q.   And do you view your role as being --

12     you're here to be an objective, unbiased

13     scientist to provide your views or do you view

14     yourself as being an advocate for the

15     plaintiff here?

16         A.   I view myself as an objective view of

17     the data as I entered into this and as I have

18     reviewed the data.

19

20              (Exhibit No. 1 marked for

21     identification.)

22

23     BY MR. PIORKOWSKI:

24         Q.   Okay.  I'm going to hand you what I've

Edwin P. Alyea, M.D.

```
 1        marked as Exhibit 1, which is a Notice of

 2        Deposition.

 3                And if you see on Page -- have you

 4        seen this before?

 5        A.   (Witness reviews document.)

 6                I don't recall reading through this,

 7        no.

 8        Q.   All right.  You see on the third page

 9        it says, "Requests for production"?

10        A.   Yes.

11        Q.   All right.  And under No. 1 --

12        A.   Uh-huh.

13        Q.   -- it asks for documents sufficient to

14        show the total amount that you have billed in

15        connection with your work as an expert

16        involving Roundup, including, but not limited

17        to, your work in this case.

18                Do you see that?

19        A.   Yes.

20        Q.   And did you bring any documents with

21        you responsive to that request?

22        A.   I have -- I have not submitted an

23        invoice to date.

24        Q.   Okay.  Do you keep track of your time?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

```
 1          A.   Yes, sir, I do.

 2          Q.   How do you do that?

 3          A.   On a sheet of paper as I...

 4          Q.   Do you know how much time you've spent

 5     on this case so far?

 6          A.   I looked at it last night, and to

 7     date, I have listed 38 hours.

 8          Q.   38 hours?

 9          A.   (Witness nodding.)

10          Q.   Okay.  And just -- that 38 hours

11     includes meetings with counsel, correct?

12          A.   That includes meetings with counsel.

13          Q.   Phone calls with counsel?

14          A.   That includes phone calls with

15     counsel.

16          Q.   Reviewing the general literature on

17     glyphosate?

18          A.   Correct.

19          Q.   That includes reviewing

20     Mr. Hernandez's medical records?

21          A.   That is correct.

22          Q.   That includes preparation of your

23     expert report?

24          A.   That is correct.
```

Edwin P. Alyea, M.D.

```
 1              Q.   It -- does it include preparation for

 2         your deposition today?

 3              A.   That is correct.

 4              Q.   Are there any other categories of

 5         activities that I didn't include that you've

 6         spent time on?

 7              A.   I have not added up the past three

 8         days that I've applied effort to this case,

 9         which will add a number of hours, and it does

10         not include the help that I elicited from a

11         person who I hired to help me photocopy and

12         track down the resources that I needed, which

13         I didn't identify.

14                   MR. DIAMOND:  I just want to

15         interject one thing.  Give me a second to make

16         an objection before you answer.  I was going

17         to --

18                   THE WITNESS:  Yes, sir.

19                   MR. DIAMOND:  -- try to squeeze

20         a quick one in before you answered that

21         question, so just take a pause.  I'll see if I

22         can squeeze in an objection, if I need to, and

23         then we can go on.

24         BY MR. PIORKOWSKI:
```

Edwin P. Alyea, M.D.

1        Q.   So -- so the 38-hour estimate, you

2    said, does not include the last three days?

3        A.   Correct.

4        Q.   And what have you done over the last

5    three days to prepare for the deposition?

6        A.   I've reread my report several times, I

7    have reviewed the references, and I've

8    reviewed the materials that I used to develop

9    the report.

10       Q.   And what's the difference between --

11   when you say "references," are you talking

12   about scientific articles?

13       A.   References or scientific articles or

14   reports, as such, from the agencies that are

15   discussed in the report.

16       Q.   Okay.  Like the EPA --

17       A.   Yes, sir.

18       Q.   -- that sort of thing?

19       A.   Yes, sir.

20       Q.   Anything else?

21            I assume you had some meetings with

22   counsel over the last three days?

23       A.   Yes.

24       Q.   And how many hours -- how many hours

Edwin P. Alyea, M.D.

```
 1      in total did you spent over the last three

 2      days preparing for your deposition, sum total

 3      of all of your activity?

 4           A.    Six hours --

 5           Q.    Six hours?

 6           A.    -- would be my estimate, six to seven.

 7           Q.    Over three days?

 8           A.    Over three days.

 9           Q.    And how much time did you spend

10      meeting with counsel versus rereading your

11      report?

12           A.    Less than one hour.

13           Q.    If we go back to the notice of

14      deposition, the second one calls for each

15      invoice or bill that you rendered in

16      connection with your work in this case.

17                 My understanding is, from your

18      previous answer, that there are no invoices;

19      is that right?

20           A.    To date, I have not generated an

21      invoice.

22           Q.    And documents that you would consider

23      in support of your testimony --

24           A.    (Witness indicating.)
```

Edwin P. Alyea, M.D.

1       Q.   -- you brought?

2       A.   Those are in the report.

3       Q.   And are those documents that you

4    selected?

5       A.   These are documents that I selected.

6       Q.   And documents that you -- No. 4 is

7    documents that you reviewed, referred to, or

8    relied on in forming your opinion in this

9    case.

10           Are those also included in the binder

11   that you brought with you?

12      A.   Those are included in the binder.

13           (Witness indicating.)

14      Q.   So are there two different binders?

15      A.   There are two different binders.

16      Q.   Can you explain which one is which?

17      A.   Yes, sir.  This contains my report.

18   It contains an alphabetical list of the

19   references that I base my report on, and it

20   contains an annotated list of those references

21   in alphabetical order in -- or in order that

22   they appear.

23      Q.   So the record is clear, when you say

24   "this," you're referring to the white

Edwin P. Alyea, M.D.

```
1      binder?

2           A.   Yes, sir.

3           Q.   And the black binder?

4           A.   And then it includes within it the

5      physical articles themselves for reference.

6                The black binder includes the general

7      causation reports that I reviewed, from three

8      individuals, that have been supplied to me.

9           Q.   And who are -- so this is a -- in your

10     report you refer to you say, "I've read the

11     general causation expert reports"?

12          A.   Yes, sir.

13          Q.   Is that what you're referring to --

14          A.   Yes, sir.

15          Q.   -- that's in the black binder?

16          A.   Yes, sir.

17          Q.   And which general causation expert

18     reports have you read?

19          A.   Weisenburger, if that's pronounced --

20     Goodman and Ritz.

21          Q.   Ritz?

22          A.   Ritz, R-i-t-z.

23          Q.   And are they all expert witnesses who

24     represent -- or who are retained on behalf of
```

Edwin P. Alyea, M.D.

```
 1      plaintiffs?

 2           A.   My understanding is, is that

 3      Weisenburger and Ritz.  Goodman, I believe, is

 4      for Monsanto.

 5           Q.   And when you say in your report that

 6      "I have read the general causation expert

 7      reports, agree with them, and base my analysis

 8      in part on them," do you agree with everything

 9      that's in those general causation expert

10      reports?

11                     MR. DIAMOND:  Form.

12           A.   I would say I've read the reports and

13      I agree, in part, in some of the reports, but

14      not entirely.

15      BY MR. PIORKOWSKI:

16           Q.   Do you agree with Dr. Goodman's

17      report?

18           A.   I have reviewed Dr. Goodman's report.

19      There are parts that I'm not able to comment

20      on because it's outside my area of expertise.

21           Q.   Okay.  And what subject matters would

22      you consider to be in that category?

23           A.   I think to best address that, I would

24      need to -- I could open up his report and --
```

Edwin P. Alyea, M.D.

1          Q.    Sure.

2          A.    -- we could look for particular areas,

3     as an example.

4          Q.    Sure.

5          A.    (Witness reviews document.)

6               So as a general representation of

7     areas, his detailed explanations on oxidative

8     stress, mutagenicity studies, genotoxiity

9     studies.  And I've read those, but I'm not an

10    expert in those areas.

11         Q.    And genotoxicity studies, mutagenicity

12    studies.

13              And what was the third category?

14         A.    Oxidative stress.

15         Q.    Oxidative stress.

16         A.    And those are as examples.

17         Q.    When you say you're not an expert, do

18    I understand that to mean that you're not

19    taking issue with anything that he says?

20              You're not taking issue not that the

21    plaintiffs, more broadly, may not be taking

22    issue, but the person?

23                   MR. DIAMOND:  Form.

24    BY MR. PIORKOWSKI:

Edwin P. Alyea, M.D.

1          Q.   Let me reformulate the question just

2     to make sure.

3               As I understand what your testimony

4     is, you personally are not going to be

5     offering opinions to address any of those

6     areas of Dr. Goodman's report; is that fair?

7          A.   That is fair.

8          Q.   So if we go back to the notice again,

9     it asks for your current CV and I believe -- I

10    believe you provided us with a CV at the time

11    of your report; is that correct?

12         A.   I provided a CV within the last

13    several months, and it is not --

14         Q.   Is that still current?

15         A.   Yes, that is still current.

16         Q.   It said -- the one that I have says,

17    "Date prepared, February 22, 2019."

18               Does that sound like the most current

19    report -- current version of your CV?

20         A.    If it -- if there is a new one, it is

21    not substantially changed with the exception

22    of, perhaps, a few more articles which do not

23    pertain to this case.

24         Q.   Fair enough.  Let me just do a little

Edwin P. Alyea, M.D.

```
 1        housekeeping here.

 2                   MR. PIORKOWSKI:  Do you have the

 3        next Exhibit 2, please?

 4

 5              (Exhibit No. 2 marked for

 6        identification.)

 7

 8        BY MR. PIORKOWSKI:

 9           Q.   So I'm going to hand you what I've

10        marked as Exhibit 2.

11              Is Exhibit 2 a copy of the original

12        report that you submitted in this case?

13           A.   Yes, sir.

14

15              (Exhibit No. 3 marked for

16        identification.)

17

18        BY MR. PIORKOWSKI:

19           Q.   And I've also handed you Exhibit 3.

20        Exhibit 3 is a copy of the -- what's entitled,

21        "First Supplemental Expert Report"; is that

22        correct?

23           A.   Yes, sir.

24           Q.   And that large -- we'll come back to
```

Edwin P. Alyea, M.D.

```
1        that in a minute, but that's largely -- most

2        of the information that's in the first report

3        is also in the second report, correct?

4              In other words, it's not a supplement

5        as in being a separate addendum.  It's kind of

6        a rehash of the first report; is that fair?

7        A.   It is the report, as refined,

8        particularly, with respect to the references

9        and the time that I had to put this document

10       together referencing the document required

11       time, and this was to try and put it into a

12       better format for clarity.

13       Q.   Okay.  And then?

14

15             (Exhibit No. 4 marked for

16       identification.)

17

18       BY MR. PIORKOWSKI:

19       Q.   I'm handing you what we've marked as

20       Exhibit 4.

21       A.   Thank you.

22       Q.   That's the CV that I was referring to

23       earlier?

24       A.   Yes, sir.
```

Edwin P. Alyea, M.D.

1           Q.   To the best of your knowledge, that's

2       your most current CV, as you sit here today?

3           A.   I do not recall a subsequent

4       significant revision.

5           Q.   That's fair.  All right.

6                And then to go back to the Notice of

7       Deposition, Exhibit 1 again, under No. 6, it

8       says, "Documents sufficient to show any

9       testimony you provided as an expert witness

10      over the past four years, any sworn testimony

11      at deposition trial, Daubert hearings, or

12      other similar hearings."

13               Did you bring any documents responsive

14      to that?

15          A.   I did not because I did -- from the

16      time receiving this, I did not have time to go

17      back through my records to get those, and I'm

18      not sure that I actually have several of

19      those.

20          Q.   Okay.  So if we look to Exhibit 3,

21      your first supplemental report is Exhibit 3 --

22      well, let me ask you this:  Are you -- as you

23      sit here today, are there any corrections or

24      modifications that need to be made to

Edwin P. Alyea, M.D.

1        Exhibit 3 to make it complete and accurate?

2        A.   There are two revisions to the

3   document in reflection.

4        Q.   Okay.  Would you tell me what those

5   are?

6        A.   Yes, sir.  Let me just find them.

7   Under Roman Numeral III, exposure history, the

8   last line states, "He states that at no time

9   did he use precautions such as wearing gloves,

10  mask, or protective gear."

11       Q.   Yes.

12       A.   This was based on my reading of the --

13  I need to refer to the name of it.

14                    MR. DIAMOND:  Plaintiff fact

15  sheet.

16       A.   -- the plaintiff fact sheet.  In

17  reflection, in his deposition, he appeared to

18  suggest that on some occasions he would use

19  some type of protective gear.

20  BY MR. PIORKOWSKI:

21       Q.   At his deposition, he said he almost

22  always used protective gear, correct?

23                    MR. DIAMOND:  Form.

24       A.   I don't have --

Edwin P. Alyea, M.D.

```
 1        BY MR. PIORKOWSKI:

 2             Q.   Do you recall?

 3             A.   I don't recall the specific wording.

 4             Q.   We'll go over that later.

 5                  So when did you read his deposition?

 6             A.   I read his deposition early in the

 7        process.

 8             Q.   And did you read all three volumes of

 9        his deposition?

10             A.   I read all three volumes, yes.

11             Q.   Okay.  Did you read all of the

12        different plaintiff fact sheets?

13                       MR. DIAMOND:  Form.

14        BY MR. PIORKOWSKI:

15             Q.   Well, let me back up.

16                  Do you understand that there was --

17        there was a plaintiff fact sheet that was

18        submitted originally, and then there was a

19        first amended plaintiff fact sheet, then there

20        was a second amended plaintiff fact sheet,

21        then there was a third amended plaintiff

22        sheet.

23                  Do you understand that?

24             A.   I understand that the document I
```

Edwin P. Alyea, M.D.

```
 1        reviewed, which I have here, as I recall, is

 2        labeled the third amended fact sheet.

 3            Q.   And when did you review that the first

 4        time?

 5            A.   I reviewed that in the first third of

 6        my work in this work.

 7            Q.   Okay.  So to go back to your report,

 8        you said you need to make a correction.

 9                 And how would you correct that

10        sentence?  Just by striking it?

11                      MR. DIAMOND:  Form.

12            A.   As with the report in general, I would

13        need to give thought as to how to revise that.

14        BY MR. PIORKOWSKI:

15            Q.   Well, this is my opportunity to ask

16        questions, and you --

17            A.   Yes.

18            Q.   -- I think you indicated that that

19        needs to be changed or corrected; is that

20        right?

21            A.   As I mentioned, yes.

22            Q.   Right.  And so I'm asking, in what way

23        should it be changed to make it accurate?

24            A.   As I mentioned, I gave -- I give great
```

Edwin P. Alyea, M.D.

```
1      thought to how I word these.  I'm not sure I

2      could give you the final wording of that

3      today, other than it needs to be revised, as I

4      state he states "at no time," but the

5      deposition provides some alternative

6      information regarding that.

7           Q.   Is it the case that the plaintiff fact

8      sheet said that at no time did he wear

9      protective clothing?

10                    MR. DIAMOND:  Form.

11     BY MR. PIORKOWSKI:

12          Q.   Was that your understanding of the

13     plaintiff fact sheet?

14          A.   That was my understanding.  I have it

15     present, if one would like to review where

16     that information came from.

17          Q.   Okay.  Is -- my question is is that a

18     -- is that a conflict in terms of -- his

19     plaintiff fact sheet says one thing and his

20     deposition says another thing?

21                    MR. DIAMOND:  Form.

22          A.   As I interpreted the third amended

23     plaintiff fact sheet, there is a question that

24     asks whether he used protective gear, and the
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

1        box next to "none" is checked.

2        BY MR. PIORKOWSKI:

3            Q.   So you would agree that there's an

4        inconsistency between his answer on the

5        plaintiff fact sheet and his testimony at his

6        deposition with respect to that point?

7            A.   The deposition states that he did use

8        protective gear and the third amended says

9        "none," as I read it.

10           Q.   Now, I interrupted you.  You were

11       going over -- I originally had asked you

12       whether there were any corrections that needed

13       to be made, and you said that there were two.

14               And then you first pointed out the one

15       in Roman Numeral III, so I assume there's a

16       second one; is that right?

17           A.   Yes, sir.

18           Q.   What's the second correction that

19       needs to be made?

20           A.   Let me find that in the report, so I

21       can speak to its location.

22           Q.   Sure.

23           A.   (Witness reviews document.)

24               The second one would be under Numeral

Edwin P. Alyea, M.D.

```
 1          III, "Analysis of confounding factors."

 2               Q.   Okay.

 3               A.   Line 9, ███████████████████

    ██      ██████ -- I'm sorry.

 5                    (Witness reviews document.)

 6                    I'll correct myself, that this has

 7          been corrected.

 8               Q.   So there's, in fact, only one

 9          correction --

10               A.   Yes, sir.

11               Q.   -- to make?

12               A.   Yes, sir.

13               Q.   In -- do you see on Page 9, second

14          sentence under the conclusion?

15               A.   I'm sorry.  Where again?

16               Q.   Page 9, the second sentence --

17               A.   Yes, sir.

18               Q.   -- under conclusion.

19               A.   Yes, sir.

20               Q.   It says, "Epidemiological data support

21          an associate" -- is that supposed to be

22          association?

23               A.   Yes, sir.

24               Q.   Are you waiting for any additional
```

Edwin P. Alyea, M.D.

1       information before you arrive at your final

2       opinions in this case, or does this contain

3       and set forth all the opinions you intend to

4       offer?

5            A.   The opinion I offer is based on the

6       material that I have gathered to date, had an

7       opportunity to read and analyze.  Should

8       further data become available, I would

9       consider that in my report.

10           Q.   Fair enough.

11                But as you sit here today, is there

12      data -- or is there anything you're waiting

13      for that you haven't received yet?

14           A.   There is no data that I am waiting for

15      or have requested or looking for, with the

16      exception of one reference, which I've been

17      unable to see the physical reference.

18           Q.   Okay.  And what is that reference?

19           A.   I'll have to refer to it.

20           Q.   And just throughout the deposition, if

21      you need to refer to something -- the purpose

22      here is to make sure your testimony is

23      accurate.  It's not a memory testimony, so if

24      there's something you need to refer to to make

Edwin P. Alyea, M.D.

1      sure your testimony is accurate, then you

2      should feel free to refer to it, okay?

3           A.   Thank you.

4                So I'll first need to find the

5      document --

6           Q.   That's fine.

7           A.   -- and then the reference that...

8                (Witness reviews document.)

9                Okay. ████████████████████████

██         ████████████████████████████████

██      ████████████████████████

12          Q.   ███████████████████████████████

██      ████████████████

14          A.   ██████████████  ████████████████

██      ██████████████

██           ██  ████████████████████████████████

██      █████████████

██           ██  ████████████████████████████████

██           ██  ██████████████████████████████

██           ██  ████████████████████████████████████

██      ████████████████████████████████

██      ██████████████████

23          Q.   And what year?

24          A.   ████████████

Edwin P. Alyea, M.D.

1        Q.   And you were trying to find that

2    reference and have not been able to?

3        A.   Correct.

4        Q.   So with that one exception, does the

5    report, which we've marked as Exhibit 3, set

6    forth all of the opinions that you plan to

7    offer at the time of trial?

8        A.   As I mentioned in the report, should

9    further information become available, I've

10    reserved the right to amend my opinions.

11        Q.   So -- but as you sit here today,

12    without any additional information being

13    available, does your report contain all the

14    opinions you intend to offer at the time of

15    trial?

16        A.   As I sit here today, the opinions are

17    offered in my report, but should subsequent

18    informing become available, to be an objective

19    view of the situation, one may --

20        Q.   Fair.

21        A.   -- need to revise.

22        Q.   All right.  But is there any other

23    opinion, as you sit here today, that you plan

24    to offer that's not listed in your report?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1              A.   As of today, with the information that

 2         I have to date, there is no other opinion, but

 3         if other new information would be able to be

 4         objective, I would amend that report.

 5              Q.   Of course.

 6                   Does your report set forth all of the

 7         bases of your opinions based on the

 8         information you have available as of today?

 9              A.   I'm sorry.  Could you repeat that?

10              Q.   Does your report -- my previous

11         question was about your opinions, okay?

12                   This question is about the basis --

13         bases for your opinions, what your opinions

14         are based on, okay?

15                   Does your report set forth all of the

16         bases for your opinions, based on the

17         information that you have available, as you

18         sit here today?

19              A.   I'm sorry.  There were several "bases"

20         in that, so would you be kind enough to repeat

21         that once more.

22              Q.   Does your report set forth all of the

23         bases for your opinions that you plan to offer

24         at the time of trial with the caveat that
```

Edwin P. Alyea, M.D.

```
1        additional information may be available that

2        you need to consider at some later point?

3             A.   I continue to find the question

4        confusing.  The report expresses my opinions

5        based on the information that I have reviewed

6        and analyzed and would reserve the right to

7        amend it as new information becomes available.

8             Q.   Is there any information you consider

9        or you can -- that you view as being important

10       to your opinions that's not referenced in your

11       report or not specified in your report?

12            A.   As of today?

13            Q.   Yes.

14            A.   The information that -- from this

15       reference, I would like to review that and may

16       inform my opinion.

17                 In addition, I've been subsequently

18       made aware of other organizations that have

19       reviewed this matter from other countries.  I

20       did not know of that at the time of the

21       preparation of my report --

22            Q.   Okay.

23            A.   -- but subsequently have learned that.

24       It would be helpful to review those.
```

Edwin P. Alyea, M.D.

1        Q.   What countries have you learned about?

2        A.   I would need to review the document

3    from Levine which specified which other

4    countries have addressed this -- or

5    organizations, I should say.

6        Q.   By the document -- by Levine you're

7    talking about the expert report by Dr. Levine,

8    who's reviewed this case on behalf of the

9    defense?

10       A.   I believe we are talking about the

11   same report.

12       Q.   And in her report, she discusses other

13   agencies?

14       A.   She discusses other agencies, yes.

15       Q.   Now, if we go to -- starting on

16   Page 10 of your report and continuing through

17   the end, there's a bibliography, correct?

18       A.   Yes, sir.

19       Q.   And the bibliography contains both

20   medical articles and some materials related to

21   evaluations by agencies such as EPA or IARC,

22   correct?

23       A.   That is correct.

24       Q.   There's nothing on this list, though,

Edwin P. Alyea, M.D.

1        including depositions, correct?

2             A.   Correct.

3             Q.   Okay.  And as I understand your

4        testimony, you have read at least some

5        depositions, correct?

6             A.   Correct.

7             Q.   Okay.  And what depositions have you

8        read?

9                  MR. DIAMOND:  Form.

10            A.   The depositions that I've read include

11       Mr. Hernandez, a deposition by

12       Dr. Weisenburger, which was subsequent to the

13       production of my report.  I do not recall at

14       this time other depositions.

15                 MR. PIORKOWSKI:  Counsel, you

16       know, I mean, I think part of the requirements

17       under the federal rules are to have a list of

18       materials considered, and that would include

19       depositions, plaintiff fact sheets, other

20       information.

21            Could we maybe get an amended -- get

22       an agreement to provide us with, you know --

23                 MR. DIAMOND:  I'm more than

24       happy to provide you with everything that

Edwin P. Alyea, M.D.

1    he's --

2                        MR. PIORKOWSKI:  Yes.

3                        MR. DIAMOND:  -- reviewed that

4    he's based his opinions on.

5                        MR. PIORKOWSKI:  Can you shed

6    any light on the other depositions that he's

7    read besides Hernandez and Weisenburger.

8                        MR. DIAMOND:  I think Ms. Kerr

9    may be able to, but why don't we discuss that

10   at the break?

11                       MR. PIORKOWSKI:  Okay.  I was

12   going to suggest we probably take a break

13   about every hour or so, so...

14                       MR. PIORKOWSKI:  That's fine.

15   We didn't get started until about 9:10.

16                       MR. DIAMOND:  So we have a

17   little time.

18                       MR. PIORKOWSKI:  Yes.

19   BY MR. PIORKOWSKI:

20       Q.   When you say you didn't read

21   Dr. Weisenburger until after your report --

22   did I understand that correctly?

23       A.   That's correct.

24       Q.   -- did anything in that deposition

Edwin P. Alyea, M.D.

```
 1      affect any of your opinions?

 2           A.   Not that I recall.

 3           Q.   You remember reading the plaintiff's

 4      deposition, all three volumes, right?

 5           A.   I did read all three volumes.

 6           Q.   Did you read his wife's deposition?

 7           A.   I do not recall reading hers.

 8           Q.   Do you recall if you read any

 9      depositions of any of the treating physicians?

10           A.   I have not read any of the depositions

11      of the treating physicians.

12           Q.   And are there -- are there any medical

13      articles that you reviewed and considered but

14      did not include on your bibliography in

15      connection with your opinions in this case?

16           A.   I do not recall any article that I

17      reviewed and then discarded.

18           Q.   So if you reviewed it, whether --

19      whether it provided helpful information or

20      not, you listed it on the bibliography.  Is

21      that fair?

22           A.   That is correct.

23                     MR. DIAMOND:  Form.

24      BY MR. PIORKOWSKI:
```

Edwin P. Alyea, M.D.

 1          Q.   And then I think we discussed that you

 2     reviewed the third amended plaintiff fact

 3     sheet?

 4          A.   That is correct.

 5          Q.   As you sit here today, are there any

 6     other materials that you believe you reviewed

 7     in connection with your opinion?

 8               So we talked about the articles in the

 9     bibliography.  We talked about the plaintiff's

10     depositions.  We've talked about Dr.

11     Weisenburger's deposition.  We've talked about

12     the third amended plaintiff fact sheet.

13               Any other materials that you reviewed

14     in considering your opinions in this case?

15          A.   Well, as listed, the general causation

16     reports.

17          Q.   Okay.  That, we already talked about.

18          A.   Okay.

19          Q.   All right.  So those --

20          A.   The articles within here.

21          Q.   Those three, okay.

22               And then separately, I assume you also

23     reviewed at some point some of the

24     plaintiffs's medical records; is that right?

Edwin P. Alyea, M.D.

1          A.   I did review the plaintiff's medical

2     records, yes.

3          Q.   Do you have a list of what -- did you

4     review -- is it your understanding that you

5     reviewed all of the plaintiff's medical

6     records or did you review selected medical

7     records?

8          A.   I reviewed the records that were

9     supplied to me.

10          Q.   And do you have a record of what was

11     supplied to you?

12          A.   I believe there is a document that

13     lists where each of these come from, and I

14     could provide that.

15               MR. PIORKOWSKI:  Yes.  Well,

16     again, we would -- you know, obviously, that's

17     part of the basis of his opinions, so we would

18     ask that specific medical records that were

19     provided to him be --

20               MR. DIAMOND:  We should be able

21     to get that to you as well.

22               MR. PIORKOWSKI:  Okay.

23     BY MR. PIORKOWSKI:

24          Q.   So you're a specialist in oncology --

Edwin P. Alyea, M.D.

```
 1          hematology and oncology; is that right?

 2               A.   Yes, sir.

 3               Q.   And you specifically subspecialize in

 4          the treatment of hematological malignancies;

 5          is that fair?

 6               A.   That is correct.

 7               Q.   And in particular, you do a lot of

 8          work on the transplant service; is that...

 9               A.   That is correct.

10               Q.   And you're board-certified in

11          hematology and oncology?

12               A.   I am board-certified in medical

13          oncology and maintain my certification in

14          medical oncology.  I have previously been

15          boarded in hematology and internal medicine.

16               Q.   And you're not boarded in those now

17          today?

18               A.   I did not maintain my certification on

19          those.

20               Q.   And is -- and hematology and oncology

21          are -- I'm gathering from your answer that

22          they're separate boards -- separate boards?

23               A.   There is a board in hematology and

24          there is a board in medical oncology.
```

Edwin P. Alyea, M.D.

1          Q.   Now, did you ever complete a

2     fellowship in rheumatology?

3          A.   I did not.

4          Q.   Are you board-certified in

5     rheumatology?

6          A.   No, sir.

7          Q.   Do you belong to any professional

8     organizations focused on rheumatology?

9          A.   No, sir.

10         Q.   Have you made presentations at any

11    rheumatology meetings?

12         A.   No, sir.

13         Q.   Have you published any articles in

14    rheumatology?

15         A.   No, sir.

16         Q.   Do you consider yourself to be an

17    expert in rheumatology?

18         A.   No, sir.

19         Q.   With respect to -- did you ever

20    complete a fellowship in gastroenterology?

21         A.   No, sir.

22         Q.   Are you board-certified in

23    gastroenterology?

24         A.   No, sir.

Edwin P. Alyea, M.D.

1        Q.   Have you made presentations or

2     published articles in gastroenterology?

3        A.   No, sir.

4        Q.   Do you consider yourself to be an

5     expert in gastroenterology?

6        A.   No, sir.

7        Q.   Have you ever done a fellowship in

8     infectious diseases?

9        A.   No, sir.

10        Q.   Are you board-certified in infectious

11     diseases?

12        A.   No, sir.

13        Q.   Do you -- have you made any

14     presentations at meetings or published

15     articles in the field of infectious disease?

16        A.   I would have to review.  I have

17     collaborated with our infectious disease

18     colleagues on a number of studies, so I would

19     need to review.

20        Q.   Whether you -- whether there was any

21     article where you contributed?

22        A.   And was it published in the infectious

23     disease literature or was it published in the

24     hematologic malignancy literature, which many

Edwin P. Alyea, M.D.

1          of our studies do include an analysis of

2          infectious complications.

3              Q.   Do you consider yourself to be an

4          expert in infectious disease?

5              A.   No, sir.

6              Q.   Have you ever done a -- hepatology is

7          a subspecialty of gastroenterology; is that

8          right?

9              A.   That's my understanding.

10             Q.   And have you ever done a fellowship in

11         hepatology?

12             A.   No, sir.

13             Q.   Have you board-certified in

14         hepatology?

15             A.   No, sir.

16             Q.   Have you published any articles or

17         made any presentations in the area of

18         hepatology?

19             A.   No, sir, although, you know, I would

20         need to refer to the CV.  We have published

21         studies in veno-occlusive disease, which is,

22         as you are aware, a disease that involves the

23         liver and transplantation and other infectious

24         complications.

Edwin P. Alyea, M.D.

1          Q.   Do you consider yourself to be an

2     expert in hepatology?

3          A.   No, sir.

4          Q.   Have you ever had any specialized

5     training or fellowship in addiction

6     medicine?

7          A.   No, sir.

8          Q.   Do you consider yourself to be an

9     expert in addiction medicine?

10         A.   No, sir.

11         Q.   Have you -- have you done any

12    postgraduate training or do you have any

13    advanced degree in epidemiology?

14         A.   No, sir.

15         Q.   Are you a member of any organizations

16    that are focused on epidemiological methods or

17    epidemiological literature?

18         A.   No, sir.

19         Q.   Do you consider yourself an expert in

20    epidemiology?

21         A.   No, sir.

22         Q.   Do you consider yourself to have any

23    expertise in agricultural use of herbicides

24    and pesticides?

Edwin P. Alyea, M.D.

1           A.   No, sir.

2           Q.   How about toxicology of herbicides and

3      pesticides?

4           A.   No, sir.

5           Q.   Do you have an understanding of what a

6      herbicide is?

7           A.   A general understanding.

8           Q.   What's your general understanding?

9           A.   A compound which kills plants.

10          Q.   Okay.  And do you have an

11     understanding of what a pesticide is?

12          A.   I have a general understanding.

13          Q.   I understand.

14               And what's your general understanding

15     of what a pesticide is?

16          A.   A compound that kills pests.

17          Q.   And what do you mean by "pests"?

18          A.   My interpretation, from growing up on

19     a farm, initially with pests, I would just

20     think insects, but I know that we spray to

21     kill worms, other types of pests.

22          Q.   Fair enough.

23               And what is an insecticide?  What's

24     your general understanding of what that means?

Edwin P. Alyea, M.D.

1           A.   My general understanding would be an

2      agent to kill insects.

3           Q.   And is there overlap between

4      pesticides and insecticides based on your

5      general understanding?

6           A.   In my general use of these terms, I

7      would include insects as pests.

8           Q.   And I'm not trying to get you to

9      venture into an area that you're not

10     comfortable with, but we -- but in your

11     report, you do talk about literature that

12     deals with herbicides and pesticides, and I

13     just want to make sure we have a common

14     understanding of what we're talking about,

15     fair?

16          A.   Yes, sir.

17          Q.   And do you know -- when you read

18     Mr. Hernandez's deposition, do you remember

19     him talking about the time of the planting

20     season when herbicides are generally used?

21          A.   In a very general way.  As you recall,

22     it was a long deposition --

23          Q.   Yes.

24          A.   -- and...

Edwin P. Alyea, M.D.

1       Q.   Well, do you remember him talking

2   about how, during planting time, that's when

3   herbicides are generally used and during

4   subsequent times closer to the harvest, that's

5   when pesticides are used?

6       A.   I would need to review those specific

7   comments to fully...

8       Q.   Do you know, in general, from having

9   grown up on a farm, whether that's true?

10       A.   I can't recall that general premise of

11   application.

12       Q.   Okay.  What kind of farm did you grow

13   up on?

14       A.   I grew up on a farm in Kentucky that

15   raised cattle, pigs, and crops such as

16   tobacco, corn, soy beans, among a few other

17   things, but those were the principle things

18   that we had.

19       Q.   Did you work on the farm at all?

20       A.   I did work on the farm.  In

21   reflection, I didn't do any of the

22   applications or the mixing, but I was around

23   to see how it was stored and how it was mixed

24   and how it was applied.

Edwin P. Alyea, M.D.

```
 1           Q.   Okay.

 2           A.   And I would say the storage, at that

 3      time, when they put the concentrate in the

 4      Coca-Cola and Pepsi bottles, in reflection,

 5      probably was not a good idea.

 6           Q.   Do you have any personal experience

 7      with glyphosate or Roundup?

 8           A.   I do have personal experience with

 9      Roundup.

10           Q.   And in what respects?

11           A.   As I reflect, I do not recall in the

12      agricultural setting.  I do recall other

13      agents that were discussed, but again, I was

14      very young, and I must say I wasn't paying

15      particular attention to it.

16                In the residential setting, both

17      with -- my family and myself have used

18      Roundup.

19           Q.   Okay.  For how many years was that the

20      case?

21           A.   Oh, I haven't reflected on that fully.

22      I would say -- so I can't give a precise

23      answer, but since I've been --

24           Q.   A range?
```

Edwin P. Alyea, M.D.

```
 1           A.   Over 20 years, some intermittent

 2      exposure to it, or use.

 3           Q.   Have you stopped using it?

 4           A.   I have only used it once since I have

 5      been informed in this area, which was only

 6      recently, and I did adapt my use for it and

 7      have continued to give great thought about

 8      going forward.

 9           Q.   And how have you adapted your use?

10           A.   I used protective gear both on my

11      feet, my hands through double gloving, made

12      sure that the environment was not windy, used

13      it in a very limited way, unlike in the past

14      when I used it in other ways.

15           Q.   Okay.  Before -- so in your report,

16      you talk about a number of professional

17      societies that you belong to, including

18      American -- what's referred to as ASH,

19      American Society of Hematology?

20           A.   This is in the report?

21           Q.   Yes, sir.  Page 2 of Exhibit 3.

22                I wasn't quizzing you on it.

23           A.   Oh, no.

24           Q.   It's just in general reference.
```

Edwin P. Alyea, M.D.

```
 1            A.    Uh-huh, yes.

 2            Q.    It talks about you being a member of

 3       the American Society of Hematology, which is

 4       referred to as ASH, correct?

 5            A.    Correct.

 6            Q.    American Society of Clinical Oncology,

 7       correct?

 8            A.    Correct.

 9            Q.    American Society of Bone Marrow

10       Transplantation,  right?

11            A.    Correct.

12            Q.    And then you talk more about the bone

13       marrow registry and a DSM-5.  I want to ask

14       you about the professional organizations ASH

15       and the American Society of Clinical Oncology.

16               Do you tend to -- do you usually

17       attend their annual meetings?

18            A.    I will attend routinely the American

19       Society of Hematology.  Intermittently, I'll

20       attend the American Society of Clinical

21       Oncology.

22            Q.    Before getting involved in this

23       litigation, had you ever heard any

24       presentation at a professional meeting
```

Edwin P. Alyea, M.D.

1        discussing glyphosate as a cause of lymphoma?

2            A.   Not that I recall.

3            Q.   Have you ever told a patient that

4        Roundup caused their lymphoma?

5            A.   I have never told a patient that

6        Roundup has caused their lymphoma.  I have

7        been asked by patients what could be factors

8        of why I have lymphoma.

9            Q.   And did you list glyphosate as a

10       factor that could have been present in an

11       individual patient's case?

12           A.   I have not particularly used that

13       term.  And in the past, on occasions, I have

14       said that exposure to agents can cause this.

15       Only recently a patient has approached me

16       about did Roundup cause his CLL.

17           Q.   Is -- so let me go back to -- I want

18       to preface it.

19               Before you got involved in this

20       litigation -- let me just -- so we can make a

21       clean line -- had you ever either told a

22       patient that Roundup was a cause of their

23       lymphoma or was a factor that predisposed them

24       to a development of lymphoma?

Edwin P. Alyea, M.D.

1        A.   Specifically with respect to the name

2    Roundup?

3        Q.   Yes.

4        A.   No, I have not.

5        Q.   What about specifically with respect

6    to glyphosate?

7        A.   Specifically with respect to that

8    term, no.

9        Q.   And so do I understand what you're

10   saying is you've made reference to the fact

11   that herbicides and pesticides, agents such as

12   that, could be a factor in causing lymphoma.

13             Is that what -- when you say you're

14   referring -- let me -- that's a bad question.

15   Let me start over.

16             Is what you're -- is what you're

17   saying that you tell -- you have told patients

18   historically that herbicides and pesticides

19   could be a risk factor in the development of

20   their lymphoma?

21       A.   I would first say this only comes up

22   on occasion.  This is not a routine subject

23   that I broach, unless patients query about it.

24       Q.   Okay.

Edwin P. Alyea, M.D.

 1          A.   I did -- I have used, in some cases,

 2      general terms, such as exposure to herbicides

 3      and pesticides.

 4          Q.   Okay.  For how many years have you

 5      been aware that -- well, let me back up.

 6               If you look at some of the studies

 7      that you cite in your bibliography, many of

 8      them predate the IARC finding with respect to

 9      glyphosate, correct?

10          A.   That is correct.

11          Q.   And many of those studies show that

12      other herbicides and pesticides were risk

13      factors for the development of non-Hodgkin's

14      lymphoma, true?

15                    MR. DIAMOND:  Form.

16          A.   I would have to refer directly to the

17      articles that you're speaking about and the

18      dates that they were published.

19      BY MR. PIORKOWSKI:

20          Q.   Okay.  As you sit here, before you got

21      involved in this litigation, did you have, as

22      a part of your baseline knowledge, an

23      understanding that herbicides and pesticides

24      increase the risk of non-Hodgkin's lymphoma?

Edwin P. Alyea, M.D.

```
 1              A.   I had a general understanding that
 2         that is on the list of risk factors, yes.
 3              Q.   Is that something that you typically
 4         explored in evaluating your patients at the
 5         time of diagnosis?
 6                        MR. DIAMOND:  Form.
 7              A.   When I would meet patients, either at
 8         the time of their diagnosis or, more likely,
 9         subsequently in their course, I would ask
10         about an occupational history or exposure
11         history.
12         BY MR. PIORKOWSKI:
13              Q.   Is the nature of your practice --
14         because I know you're generally involved in
15         transplant, right?
16              A.   That is correct.
17              Q.   And is that kind of a tertiary care
18         function, for lack of a better term?
19                   In other words -- let me rephrase the
20         question.
21                   You're not generally making the
22         diagnosis and you're not the primary
23         oncologist who's diagnosing and treating the
24         patient initially after diagnosis; is that
```

Edwin P. Alyea, M.D.

```
 1        fair?

 2             A.   So in my current practice, I do see

 3        patients where I make the initial diagnosis

 4        and provide the initial treatment, but the

 5        vast majority of my practice reflects

 6        involvement later in the course for decisions

 7        as to how to proceed with therapy.

 8             Q.   And that's -- and the reason for that

 9        is because transplant is a treatment modality

10        that's typically used later in the course of

11        treatment, right?

12             A.   That is correct.  One may be

13        approached early in the course to say where

14        does transplant fit or is this person

15        appropriate, but yes, it fits later in the

16        course of treatment.

17             Q.   Have you found, in your practice, that

18        patients often want to know why they developed

19        a lymphoma?

20             A.   I can't speak to a certain number, but

21        it is a question, not only in lymphoma or any

22        other malignancies, people will often ask, How

23        did I get this?

24             Q.   Why did I get it and not somebody
```

Edwin P. Alyea, M.D.

1     else?

2          A.   That is correct.

3          Q.   Is it fair to say that in the vast

4     majority of cases of non-Hodgkin's lymphoma,

5     you're not able to identify a particular cause

6     or risk factor as to why that patient

7     developed lymphoma?

8                    MR. DIAMOND:   Form.

9          A.   In my reflection on the patients that

10    I've seen, most patients do not have definable

11    risk factors, so therefore, the etiology is

12    not clear.

13              There are, however, patients who do

14    have risk factors.  Whether those risk factors

15    contributed to the lymphoma, in many cases is

16    unknown, but it is a potential contributing

17    factor.

18    BY MR. PIORKOWSKI:

19         Q.   So how did you -- how did you first

20    get involved in this litigation?

21         A.   I was contacted by a firm that I

22    wouldn't even know what the proper term is,

23    almost like a referral firm that reached out

24    to me to say, do you have interest in hearing

Edwin P. Alyea, M.D.

```
 1        about this type of situation and being

 2        connected.

 3             Q.   And what was the name of the

 4        organization or the firm?

 5             A.   I want to -- I would have to give --

 6        the need to be specific, I have to look back,

 7        but as I recall, it's named Elite, L-i-e-t-e

 8        (sic).

 9             Q.   And did you tell Elite that you were

10        interested -- you would be interested in

11        hearing more about it?

12             A.   I said I would be interested and

13        open-minded to hear more about it.

14             Q.   And then what was the next step after

15        that?

16             A.   Again, I have not reflected on this

17        recently, but as I recall, I was then

18        contacted by members of the team that are

19        here, and I don't remember who was the first

20        contact.

21             Q.   And when was this first contact by

22        Elite or whatever the name was?

23             A.   Again, I would have to refer back to

24        my records, but as I look back, in terms of
```

Edwin P. Alyea, M.D.

1          getting documents for this, it looked like

2          initial communication was September.

3              Q.    September?

4              A.    Of this year.

5              Q.    Okay.

6              A.    May have been August.  I can't

7      remember, but it's --

8              Q.    In the time frame of August/September

9      this year?

10             A.    Recent.

11             Q.    Okay.  And do you remember with whom

12     your first contact was?

13             A.    With respect to the firm?

14             Q.    Not with respect to Elite, but with

15     respect to Mr. Diamond's firm here.

16             A.    We had a phone call to describe the

17     situation, and it may have been with Ms. Kerr

18     or Mr. Osborne or Mr. Diamond, I believe.

19             Q.    And did you agree to be an expert at

20     the time of that phone call?

21             A.    During the phone call, I explicitly

22     stated what my background was.  I listened to

23     their request to review the case, and I said,

24     with the background and credentials I have, I

Edwin P. Alyea, M.D.

1          will review the case and provide my thoughts.

2               Q.   Okay.  And approximately when was

3          that?

4               A.   I would say, again, that's --

5               Q.   Approximately the same time frame?

6               A.   Right around the first of September or

7          something like that, or first part of

8          September, but I could be wrong.  I would have

9          to refer back to the...

10                        MR. PIORKOWSKI:  We have been

11         going about an hour.  You want to take a

12         break?

13                        MR. DIAMOND:  Yes.  Why don't we

14         take a short break?  That would be great.

15                        MR. PIORKOWSKI:  Is that okay?

16                        THE WITNESS:  Yes.  That would

17         be great.

18                        THE VIDEOGRAPHER:  The time is

19         10:11.  This concludes Tape 1, and we're off

20         the record.

21

22               (Recess was taken from 10:11 to 10:32

23         a.m.)

24

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

```
 1                      THE VIDEOGRAPHER:  The time is

 2      10:32 a.m.  This the beginning of Tape 2.

 3      We're back on the record.

 4      BY MR. PIORKOWSKI:

 5           Q.   We're back on the record, Doctor.

 6                Based on your review of the literature

 7      and your understanding that you formulated to

 8      date, is -- are there any features of lymphoma

 9      that are unique to cases in which glyphosate

10      is implicated as being a risk factor or a

11      cause, in your view?

12           A.   So if you could repeat that question

13      for me, please?

14           Q.   Well, let me break it down.

15           A.   Yes.

16           Q.   Let's start with pathology.

17                Are there any features on the

18      pathology of lymphoma that are unique to

19      glyphosate, to your knowledge?

20           A.   So in my review of the material, as a

21      medical oncologist, not as a hepatic

22      pathologist, but as a medical oncologist, I am

23      not aware of any particular unique features in

24      my reading that would associate it with a
```

Edwin P. Alyea, M.D.

 1      particular agent of glyphosate.

 2          Q.   And let me just broaden that a little

 3      bit.

 4               To your knowledge, is there some

 5      objective test that can be performed on a

 6      particular individual who has lymphoma to

 7      determine whether glyphosate did or didn't

 8      have anything to do with that person's

 9      disease?

10          A.   To my knowledge, as a medical

11      oncologist, we do routinely use tests to

12      understand the origin or molecular features of

13      a lymphoma that help us with prognostication,

14      but in my reading, I found no relationship of

15      a particular one to glyphosate.

16          Q.   And is it -- you would agree that

17      non-Hodgkin's lymphoma is an umbrella term

18      that includes several distinct diseases; is

19      that fair?

20          A.   I'm not sure I would use the term

21      "diseases."  In my use of the term, as an

22      medical oncologist, I would say non-Hodgkin's

23      lymphoma defines a category of malignancies

24      that range anywhere from what we call low

Edwin P. Alyea, M.D.

```
 1        grade to high grade.

 2               And there are subsets within that that

 3        have names, and those names are -- as you know

 4        from the reading, pathologists apply names and

 5        we use those names to help us in terms of

 6        prognostication in defining therapy, so

 7        subtypes rather than different diseases.

 8           Q.   Fair.

 9               Is there any particular subtype of

10        non-Hodgkin's lymphoma to which you believe

11        patients who have been exposed to glyphosate

12        are susceptible?

13               Let me put it a little different.

14               Is there any subtype of lymphoma, to

15        your knowledge, with respect to which the risk

16        is increased by virtue of glyphosate exposure?

17                    MR. DIAMOND:  Form.

18           A.   As a medical oncologist, reading the

19        literature that I have, I focus my attention

20        on B-cell lymphoma, which is a general subset

21        of lymphoma, and particularly, low grade

22        lymphoma, and the most common type of high

23        grade lymphoma, which is large cell lymphoma

24        or diffuse large cell.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

```
 1      BY MR. PIORKOWSKI:

 2          Q.   I think my question's a little

 3      different.

 4               Your answer was that you focused your

 5      attention on B-cell lymphoma as part of your

 6      review, right?

 7          A.   Yes, sir.

 8          Q.   And that's based, in part, on the

 9      nature of the disease Mr. Hernandez has,

10      right?

11          A.   That is correct.

12          Q.   My question is -- let me back up.

13               In the background, if you just look at

14      the background population, there are a variety

15      of different subtypes of lymphoma that occur

16      in the population, true?

17          A.   That is correct.  There are a variety

18      of lymphomas.

19          Q.   And within the general population,

20      there are some subtypes that occur with

21      greater frequency than other subtypes, fair?

22          A.   I'm sorry.  Could you repeat that?

23          Q.   Well, so for example, diffuse large

24      B-cell lymphoma is a common type of subtype of
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

1      lymphoma, true?

2                    MR. DIAMOND:  Form.

3            A.   So within general view of subtypes of

4      lymphoma --

5      BY MR. PIORKOWSKI:

6            Q.   Right.

7            A.   -- as I follow your question, some are

8      more common than others.

9            Q.   Fair.  That's much more eloquently

10     put.

11                And so within -- with respect to

12     glyphosate as a risk factor, are there some

13     subtypes of lymphoma that, in your opinion,

14     after reviewing the literature, patients are

15     at increased risk of by virtue of having been

16     exposed to glyphosate, or alternatively, is it

17     just the same kind of representation that you

18     see of the background population?

19                    MR. DIAMOND:  Form.

20           A.   Going back, backwards in your

21     question, in my review of the literature,

22     which focused on lymphoma -- and we would have

23     to refer to the specific studies to delve into

24     fully your question -- lymphoma is often being

Edwin P. Alyea, M.D.

1     referred to as B-cell lymphomas, which are, by

2     far and away, the most common type of

3     lymphomas, and those most common ones are

4     large cell lymphoma, diffuse large B-cell

5     lymphoma, and low grade lymphoma.

6     BY MR. PIORKOWSKI:

7          Q.   But that's true both in the general

8     population and in the population of patients

9     who are exposed to glyphosate, right?

10                    MR. DIAMOND:   Form.

11         A.   So I guess what I would -- in my

12    review of the medical literature, I did not

13    try and distinguish with relative proportions

14    whether one was greater than another.

15              We would have to go through each study

16    and look at each study to say, did it focus on

17    lymphoma as a whole, did it focus on large

18    cell lymphoma, did it focus on low grade

19    lymphoma, or did it focus on lymphomas, which

20    can include T-cell lymphomas, which is kind of

21    another family of lymphomas.

22    BY MR. PIORKOWSKI:

23         Q.   Would you agree, without digging into

24    each study individually, that the vast

Edwin P. Alyea, M.D.

```
 1        majority of the cases' control studies look at

 2        lymphoma, non-Hodgkin's lymphoma, as a whole,

 3        including B-cell and T-cell and don't get

 4        involved in an analysis of the subtypes?

 5             A.   So to be accurate in my response, I

 6        would have to go back and look at those

 7        individual studies.  I do recall -- but I

 8        can't speak to it specifically right now --

 9        several did mention B-cell lymphomas as a part

10        of that.

11                  So I anticipate if we reviewed the

12        studies, we would go through that definition

13        of lymphoma as a whole, B-cell lymphoma, large

14        cell versus -- I'll just generalize, versus

15        other.

16             Q.   In reviewing this case, did you

17        approach your review of the case using the

18        same methodology that you would use if you

19        were diagnosing or treating one of your

20        patients?

21                       MR. DIAMOND:  Form.

22             A.   I don't know how to address that

23        question.  I can walk through how I address

24        the diagnosis of a patient.
```

Edwin P. Alyea, M.D.

```
 1      BY MR. PIORKOWSKI:

 2          Q.   Let me withdraw the question and try a

 3      different question.

 4               What methodology did you use in

 5      approaching your review of this case and

 6      trying to come to your opinions?

 7          A.   In trying to come to my opinion, I

 8      tried to look at the literature in a variety

 9      of ways.  Some of those areas I looked at, I

10      am not an expert in but reviewed the

11      literature regarding is there a concern

12      that -- and I'll speak in general terms -- is

13      the agent in question potentially associated

14      with the development of cancer, and how that's

15      determined could be in vivo or in vitro.

16               Number two would be, as I approached

17      it, did the individual have an exposure to

18      this agent and, to the best of my ability,

19      understand what the exposure reports are in

20      the literature and what was the individual's

21      exposure to the substance.

22               Number three is I looked at the

23      patient's medical record.

24               Number four, I applied my view as a
```

Edwin P. Alyea, M.D.

```
 1      medical oncologist and my view of risk to the

 2      epidemiologic data that exist that addressed

 3      either in a positive or in a way that did not

 4      support a relationship between an agent and

 5      exposure to an individual to attempt to

 6      formulate my opinion with respect to lymphoma.

 7          Q.   So let me go back to the beginning.

 8               You said first you start to look at

 9      whether the agent in question is potentially

10      associated with the development of cancer,

11      right?

12          A.   I would say that the order that I gave

13      you is not necessarily the order that I

14      started this road, but that is one of the

15      elements that I did look at.

16          Q.   Okay.  Regardless of the order, when

17      you refer to the agent in question, are you

18      referring to glyphosate?

19          A.   Yes, sir, but I also would include I

20      tried to generalize my knowledge to the other

21      agents that are listed in the study as well,

22      although I did not focus on them but to your

23      earlier question of herbicides, pesticides to

24      understand that there is agents.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

```
 1           Q.   So you looked not just at whether

 2      there was a relationship between glyphosate

 3      and cancer, but you also looked at whether

 4      there were relationships between other

 5      herbicides and pesticides and cancer as well?

 6           A.   In reviewing the studies?

 7           Q.   Yes.

 8           A.   A good review of the study would

 9      review the methodology, and it would review

10      the tables of data, which in some cases were

11      focused on glyphosate, in other cases involved

12      other agents as well.

13           Q.   And how did you -- when you say --

14      when you say exposure to the agent, you gave

15      me two subcategories there.

16                You said you look at exposure in the

17      literature, and then you looked at individual

18      exposure, right?

19           A.   (Witness nodding.)

20           Q.   Is that correct?

21           A.   Yes, sir.

22           Q.   One of the other ground rules that I

23      skipped over is that nods and -- nods of the

24      head aren't able to be picked up by our court
```

Edwin P. Alyea, M.D.

1        reporter, so we have to answer verbally.

2              A.   I recall that now.

3              Q.   So with respect -- did you derive any

4        conclusions about how much exposure to

5        glyphosate is necessary, based on your review

6        of the literature, in order for there to be a

7        association with non-Hodgkin's lymphoma?

8              A.   That is a very important question, and

9        as I mentioned, I looked at studies as to

10       exposure, each individual study, what the

11       exposure was, how that exposure was measured,

12       and then as I reviewed his history.  But I

13       have not come to a conclusion as to how much

14       of an exposure or if there is even a threshold

15       of exposure that needs to be present.

16             Q.   So as you sit here today, you don't

17       have an opinion about how much exposure is

18       necessary to make glyphosate a risk factor for

19       non-Hodgkin's lymphoma?

20                  MR. DIAMOND:  Form.

21             A.   From my review of the literature, I

22       have not been able to determine that there is

23       an amount, be it exposure at all, a threshold

24       amount.

Edwin P. Alyea, M.D.

```
 1                    In completion, I will say that in

 2          review of several studies, which we could

 3          review in detail, there are aspects of those

 4          studies that show exposure to these agents in

 5          these studies are associated with lymphoma.

 6                    There are two studies, in particular,

 7          which we could review in detail, that suggest

 8          that greater exposure may be associated with a

 9          greater risk of developing lymphoma.

10                    So therefore, if I am asked for a

11          specific number, that I've been unable to -- I

12          do not know that, but if there is a -- it does

13          appear in my reading of the literature that

14          there is a relationship between the amount of

15          exposure in some studies and the risk -- an

16          increased risk of developing lymphoma.

17          BY MR. PIORKOWSKI:

18               Q.   And what studies are you talking

19          about?

20               A.   So I would have to refer to the report

21          so that we can speak directly to those.

22               Q.   Sure.

23               A.   (Witness reviews document.)

24                    So McDuffie in 2001, Eriksson in
```

Edwin P. Alyea, M.D.

1       2008.

2                   And if I look further down, Zhang in

3       2019, which was a meta-analysis.

4           Q.   Zhang 2019 only looked at

5       highest-exposure patients, correct?

6           A.   There were some details in that study

7       as to how they group people into different

8       groups to make that determination, and I would

9       be happy to review that paper.

10          Q.   So in -- what information did you

11      review relevant to Mr. Hernandez's exposure

12      history?

13                  How did you determine what his

14      exposure history was?

15          A.   So as mentioned, I read his

16      deposition and the -- and correct me if I get

17      the name wrong -- the third amended fact

18      sheet, which details a list of occupations

19      that he had, duration of time, his reported

20      exposure, and the agent that was there, both

21      in the -- I'll use the term occupational

22      setting and in the residential setting.

23          Q.   Now, if we look at your report, you

24      say that his exposure history included an

Edwin P. Alyea, M.D.

```
 1      extensive history of exposure to Roundup and

 2      other glyphosate-based products beginning in

 3      1974 through 1984 in an agricultural setting,

 4      where the patient states Roundup would be

 5      applied and it would drench his skin and

 6      clothing, right?

 7          A.   Where are you, please?

 8          Q.   I'm reading from your report the

 9      exposure history.

10                   MS. HOVIS:  Page 5.

11          A.   I'm sorry, Page?

12      BY MR. PIORKOWSKI:

13          Q.   Page 5.

14          A.   (Witness reviews document.)

15          Yes.

16          Q.   Have I read that correctly?

17          A.   Yes.

18          Q.   So what's your understanding of -- let

19      me back up.  Let me rephrase.

20          Do you have an understanding of the

21      dose of glyphosate that he was exposed to that

22      you're using as a predicate for your

23      opinion?

24                   MR. DIAMOND:  Form.
```

Edwin P. Alyea, M.D.

1          A.   As mentioned before, I do not have a

2      dose in mind.

3      BY MR. PIORKOWSKI:

4          Q.   Are you aware of any urine test

5      results or blood test results that would show

6      his level of exposure to glyphosate in this

7      case?

8          A.   And you're referring --

9          Q.   Mr. Hernandez.

10         A.   As I sit here today, I'm not aware of

11     any tests that were performed.

12         Q.   Is it your understanding that it's

13     only during the time period of 1974 to 1984

14     that he was exposed to glyphosate in an

15     agricultural setting?

16         A.   As I recall from the third amended

17     fact sheet, which I would have to refer to in

18     detail to give the most accurate answer, as I

19     recall, that was during his time of employment

20     in the agricultural setting.

21         Q.   You do describe his exposure as being

22     extensive, right?  I mean, that's your word?

23         A.   That is a subjective word, yes.

24         Q.   Okay.  But I mean, you chose it

Edwin P. Alyea, M.D.

```
1        though, right?

2             A.   I chose it.

3             Q.   Right.

4             A.    I compared it to my own...

5             Q.   You compared it to your own exposure?

6             A.    As we said, subjectively, I read his

7        terms of his exposure both in the agricultural

8        setting, his contact with the agent.

9             Q.   Okay.  Do you have an understanding

10       of -- from all of the information you looked

11       at, his deposition, the plaintiff fact sheet,

12       is there anything else that bears on exposure

13       history as far as you -- other than those two

14       sources?

15            A.   With respect to Mr. Hernandez as an

16       individual?

17            Q.   His personal exposure history.  Was

18       there any other source of information, other

19       than the third amended fact sheet and his

20       deposition, that you have that you're basing

21       your opinion on his exposure history?

22            A.    To my knowledge, as I sit here today,

23       those are the two areas that I base my

24       exposure history off of.
```

Edwin P. Alyea, M.D.

1          Q.    In this sentence, you make reference

2      to other glyphosate-based products.

3              Do you see that?

4          A.    I do.

5          Q.    Okay.  Are there other

6      glyphosate-based products other than Roundup

7      that you believe he was exposed to?

8          A.    As I said here today, I cannot recall

9      that.  I would have to refer to the third

10     amended fact sheet to see if that's where that

11     terminology came from.

12         Q.    Do you want to take a look at it?

13         A.    Sure.  And this is...

14         Q.    Yes.

15         A.    (Witness reviews document.)

16              As I read it here today, in the third

17     amended fact sheet, it only refers to Roundup.

18         Q.    Okay.  And my reason for asking is,

19     because if he's exposed to some other

20     glyphosate-based product that was not

21     manufactured by Monsanto, that -- you

22     understand that would be important

23     information?

24                      MR. DIAMOND:  Form.

Edwin P. Alyea, M.D.

```
 1              A.   I believe I understand the importance

 2        of that.  I would have to refer back to his

 3        deposition.

 4        BY MR. PIORKOWSKI:

 5              Q.   But to the best of your knowledge,

 6        that would have been the source of the

 7        information, so Roundup is the only glyphosate

 8        product that you are aware of that he was

 9        exposed to, right?

10              A.   Correct.

11              Q.   What's your understanding of -- I

12        mean, having read his deposition, what's your

13        understanding of how frequently and how

14        extensively he was exposed?

15                   I mean, is it your understanding that

16        he was -- that he sprayed, you know, once a

17        month, once a year, every day?

18                   I'm just trying to get an

19        understanding of your -- what you're assuming

20        to be true for purposes of your opinion

21        while -- and this refers to in the

22        agricultural setting.  I'm not talking about

23        the residential setting.

24              A.   My view of his exposure history comes
```

Edwin P. Alyea, M.D.

1          from both his deposition as well as the first

2          amended -- or the third amended fact sheet

3          that we just discussed.

4                  In the third amended fact sheet, he

5          responded, when it said frequency of exposure,

6          daily; from 1974 to '84 in the Imperial Valley

7          in Phoenix, Arizona, he reported daily; in

8          Yuma, Arizona, he reported daily, and that

9          continues on in a number of areas.

10         Q.   And so you're assuming that to be true

11         for purposes of your opinions?

12         A.   That's the information that I was

13         provided, right.

14         Q.   And do you know whether -- can I

15         use -- see your copy of the third amended

16         complaint for a second.

17         A.   The third amended complaint?

18         Q.   Not the complaint, the third amended

19         fact sheet?

20         A.   Right.  This is the copy that I have.

21              (Witness complying.)

22         Q.   So when you -- when you say in your

23         report that -- you make reference in your

24         report to -- you use the term would "drench

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

```
 1        his skin and clothing," right?

 2             A.   Yes, sir.

 3             Q.   You got that language from Section 7

 4        where he says, under different -- under each

 5        of these different things, I would -- "The

 6        Roundup would be applied while I was working,

 7        and it would drench my skin and clothing,"

 8        right?

 9             A.   That is right.

10             Q.   Now, are you aware that he filed three

11        previous plaintiff fact sheets that didn't

12        have that information in there?

13             A.   I am not aware.

14             Q.   Would that be relevant to you?

15                  In other words, do you think that's

16        something he just remembered, you know, 20

17        years later, just kind of came to him or --

18                       MR. DIAMOND:  Form.  Foundation.

19             A.   I base my report on the information

20        that I received.  I don't have any prejudice

21        or preconceived notions about people's intent.

22        I just based it on information that I have.

23        BY MR. PIORKOWSKI:

24             Q.   And with respect to his residential
```

Edwin P. Alyea, M.D.

```
 1       use, what's your understanding of his

 2       residential use?

 3            A.   I'll refer again to the --

 4            Q.   Yes, please.

 5            A.   -- third amended fact sheet.

 6            Q.   Yes.

 7            A.   (Witness reviews document.)

 8                      MR. PIORKOWSKI:  Let me mark

 9       Exhibit 5.  So I'm going to mark this as 5,

10       but this is -- there are three subtypes of

11       this.  Maybe we can make it 5A, B, C.

12

13                 (Exhibit No. 5A marked for

14       identification.)

15

16                 (Exhibit No. 5B marked for

17       identification.)

18

19                 (Exhibit No. 5C marked for

20       identification.)

21

22       BY MR. PIORKOWSKI:

23            Q.   I'm sorry, Doctor.  You were referring

24       back to the plaintiff's third amended fact
```

Edwin P. Alyea, M.D.

1       sheet on the residential use?

2           A.   Yes, sir.

3                So at the end of Section 7 dated from

4       1985 to 2015 --

5           Q.   Right.

6           A.   -- he states that "Periodically,

7       during the spring and summer months, when

8       weeds grew around the home and fence, I

9       sprayed Roundup in my yard using a hand

10      sprayer."

11          Q.   Periodically, he says?

12          A.   In terms of -- in terms of frequency

13      of exposure, it says, "Periodically, during

14      spring or summer months, when weeds grew

15      around the home or fence."

16          Q.   And what are you interpreting that to

17      mean in terms of frequency of exposure?  Once

18      a year?  Twice a year?  Four or five times a

19      year?

20          A.   Again, this would be my impression of

21      the word "periodically," but it would be more

22      than once a year.  It would be, to use another

23      term, every so often.  So certainly more than

24      once.  I wouldn't use the term periodically

Edwin P. Alyea, M.D.

1         for once, probably wouldn't use it for twice.

2              Q.   Do you have any understanding about

3         whether during this -- this is like a 35-year

4         period we're talking about -- or 34-year

5         period we're talking about; is that right?

6              A.   19 -- for residential use --

7              Q.   Yes.

8              A.   -- it's from 1985 to 2015.

9              Q.   2015.  So 30-year period?

10             A.   (Witness nodding.)

11             Q.   And so during that thirty-year period,

12        do you have any understanding of whether we're

13        talking about, you know, a total of 30 times,

14        a total of 300 times, or anything in between,

15        or is it just too vague to have a -- to have a

16        impression?

17             A.   From the information I provided, I'm

18        unable to give an estimate of that number.

19             Q.   Do you understand it to mean that he

20        had exposure each and every year, or not

21        necessarily?

22             A.   From the information provided, I can't

23        speak specifically to whether he used it

24        yearly, but the information would suggest to

Edwin P. Alyea, M.D.

```
1        me, as I interpret it, that he used it

2        throughout that thirty-year period of time.

3            Q.   Okay.  Do you have an understanding as

4        to how much he used when he used it?

5                        MR. DIAMOND:  Form.

6        BY MR. PIORKOWSKI:

7            Q.   In other words, was he -- was he, you

8        know, spraying a field or was he, you know,

9        spraying a few weeds in the backyard?

10           A.   As I sit here today, the third amended

11       fact sheet does not give me insight into that.

12       I would need to review his deposition with

13       respect to his volume of use or what might be

14       a description of it.

15           Q.   Is it your view that, in this

16       situation, that his use during his employment

17       in his agricultural context is more important

18       than his use in the residential context?

19                        MR. DIAMOND:  Form.

20           A.   As I sit here today, with the

21       information that -- as I've reviewed the

22       medical literature regarding epidemiology

23       exposure to glyphosate and risk of lymphoma,

24       I'm not able to fully distinguish between
```

Edwin P. Alyea, M.D.

```
 1        those two, other than my general impression

 2        would be -- is -- given his description, his

 3        exposure in the agricultural setting -- and

 4        these are, again, just general opinions -- may

 5        have been greater in the agricultural setting,

 6        that he had a long duration of exposure in the

 7        residential setting applying it using a hand

 8        sprayer, so he was exposed in both settings.

 9            Q.   Well, but you would agree that if he

10        used it daily in an agricultural setting to

11        the point where his clothes were drenched,

12        that's a much more considerable exposure in

13        terms of quantitative -- quantitatively than

14        periodic spraying in a residential

15        application; is that fair?

16                    MR. DIAMOND:  Form.

17            A.   So again, from the information I am

18        provided, that description does sounds to me,

19        again, as I interpret it, as a significant

20        exposure, but I would say both are significant

21        in his exposure in the agricultural setting

22        and in the residential setting in terms of

23        duration of use and how it was used.

24        BY MR. PIORKOWSKI:
```

Edwin P. Alyea, M.D.

1          Q.   With the one correction that you made

2     concerning use of protective gear, do the

3     first two sentences in Section 3 represent

4     your best assessment of the available evidence

5     in terms of Mr. Hernandez's exposure to

6     glyphosate?

7          A.   (Witness reviews document.)

8               If you could repeat that first

9     sentence, second sentence, both.  I'm sorry.

10         Q.   I'm trying to take out the third

11    sentence for right now, which you corrected,

12    right?

13         A.   Yes, sir.

14         Q.   So my question is:  Do the first two

15    sentences under Roman Numeral III, exposure

16    history, represent your best assessment of the

17    available evidence in terms of Mr. Hernandez's

18    exposure to glyphosate?

19         A.   The first two sentences do represent

20    that view with the comment that we talked

21    about earlier with respect to other

22    glyphosate-based products, which, again, in

23    the third amended study, we do not see

24    referenced.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

1          Q.   Fair enough.

2               Now, in your report you say that --

3      you see Section 1 of your report that says,

4      "Discussion of causation"?

5                    MR. DIAMOND:  What page are you

6      looking at now?

7                    MR. PIORKOWSKI:  Page 6.

8          A.   Yes, sir.

9      BY MR. PIORKOWSKI:

10         Q.   The second paragraph, it says,

11     "Several investigators have reported a link

12     between herbicides, pesticides, and lymphoma,"

13     correct?

14         A.   That is correct.

15         Q.   You believe that to be true, right?

16         A.    In my analysis of epidemiologic data,

17     which I try and outline below, there are

18     several.

19         Q.   And then you go on to say,

20     "Epidemiologic studies addressing these links

21     have included both case control studies as

22     well as meta-analysis," correct?

23         A.   That is correct.

24         Q.   Now -- and then you go on to talk

Edwin P. Alyea, M.D.

1        about some glyphosate-specific issues.

2              The studies -- what are the main

3        studies that you're alluding to there?

4        A.   Well, there are two sets of studies,

5        as I mentioned.  We're talking about the

6        control studies of McDuffie, Hardell, De Roos,

7        and Eriksson, right, which are listed.

8              And then we mentioned one in which

9        there was not a relationship identified -- I

10       guess you pronounce that Cocco -- and then go

11       on to discuss another one, Orsi, which also

12       did not reach statistical significance of a

13       relationship.

14       Q.   So in McDuffie, let's -- do you have

15       the McDuffie paper handy?

16       A.   I don't have a copy.

17       Q.   I want to make sure that there's

18       not -- I want to make sure it's the same

19       paper.  I can give you a copy here.

20                    MR. PIORKOWSKI:  Why don't we

21       mark that as Exhibit 6.

22

23              (Exhibit No. 6 marked for

24       identification.)

Edwin P. Alyea, M.D.

```
 1

 2      BY MR. PIORKOWSKI:

 3          Q.   Let me hand you what I've marked as

 4      Exhibit 6 and ask you if that's the McDuffie

 5      paper that you're alluding to?

 6                    MR. PIORKOWSKI:  Did I give you

 7      one?

 8                    MR. DIAMOND:  You did not.  I

 9      can probably dig one up.

10                    MR. PIORKOWSKI:  Here you go.

11          A.   I'm just could going to confirm

12      because the format looks very...

13              (Witness reviews document.)

14              Yes.  This is the study in my binder.

15      BY MR. PIORKOWSKI:

16          Q.   So in this -- in this study, they

17      examined not just glyphosate, but they

18      examined many different exposures to a variety

19      of chemical classes of herbicides and

20      insecticides and fungicides, correct?

21          A.   That is correct, as pointed out within

22      the abstract and within the tables of the

23      article.

24          Q.   And among the -- well, is it fair to
```

Edwin P. Alyea, M.D.

1        say that this study found statistically

2        significant increased risk of NHL related to

3        exposure of a variety of other different

4        chemical agents other than glyphosate?

5            A.   (Witness reviews document.)

6                 So as stated in the abstract -- and we

7        can also look in the tables -- they list other

8        substances, dicamba, mecoprop, aldrin, for

9        significant indicator predictors for an

10       increased risk for lymphoma.

11           Q.   The first group they talked is phenoxy

12       herbicides, correct, as a group, and dicamba,

13       right?

14           A.   Where do you see the phenoxy

15       herbicide?

16           Q.   In the abstract.

17           A.   In the abstract.  Oh, yes, on the --

18       in the first column?

19           Q.   Yes.

20           A.   (Witness nodding.)

21           Q.   So let me just make sure that we're on

22       the same page in terms of what this study

23       showed.

24                 This study showed an increased risk of

Edwin P. Alyea, M.D.

1          NHL that was statistically significant related

2     to exposure to phenoxy herbicides, correct?

3          A.   Yes.

4          Q.   Related to exposure to dicamba,

5     correct?

6          A.   Yes.

7          Q.   Related to an exposure to carbamate,

8     correct?

9          A.   Yes.

10          Q.   Related to exposure to

11     organophosphorus insecticides, correct?

12          A.   Correct.

13          Q.   Related to exposure to amide

14     fungicides, right?

15          A.   Correct.

16          Q.   Related to exposure to fumigant carbon

17     tetrachloride, correct?

18          A.   Correct.

19          Q.   Related to exposure to 2,4

20     dichlorophenoxyacetic acid or 2,4-D,

21     correct?

22          A.   Correct.

23          Q.   Related to exposure to mecoprop,

24     correct?

Edwin P. Alyea, M.D.

```
 1          A.   Correct.

 2          Q.   Related to exposure to malathion,

 3     correct?

 4          A.   Oh, beyond the dicamba, down the

 5     malathion, yes.

 6          Q.   Related to exposure to

 7     4-chlorophenol -- actually, I'll just called

 8     it DDT, correct?

 9          A.   Correct.

10          Q.   Related to exposure to carbaryl,

11     correct?

12          A.   Correct.

13          Q.   Related to exposure to aldrin,

14     correct?

15          A.   Correct.

16          Q.   Related to exposure to Lindane,

17     correct?

18          A.   Correct.

19          Q.   Related to exposure to a fungicide

20     named Captan, correct?

21          A.   Correct.

22          Q.   And related to exposure to fungicide

23     sulfur compounds, correct?

24          A.   Correct.
```

Edwin P. Alyea, M.D.

1        Q.   And do you recall our discussion

2    earlier, when I mentioned -- I said that sort

3    of long before IARC ever reached its

4    conclusion about glyphosate specifically,

5    other -- there were -- there was medical

6    literature indicating that a variety of

7    different herbicides and insecticides were

8    associated with increased risk of

9    non-Hodgkin's lymphoma, correct?

10        A.   I'm sorry.  Could you repeat that?

11        Q.   You remember our discussion

12    previously, where we were talking about prior

13    to IARC's finding?

14        A.   Yes, sir.

15        Q.   And so this article that we were just

16    talking about here is published in 2001,

17    right?

18        A.   Correct.

19        Q.   And this article finds increased risk

20    of NHL with a variety of different pesticides,

21    herbicides, and insecticides, as we've already

22    reviewed, correct?

23        A.   Correct.

24        Q.   Now, was that something, back in 2001,

Edwin P. Alyea, M.D.

```
 1        that you were aware of as a practicing medical

 2        oncologist, the fact that these compounds were

 3        all potentially related to a risk of NHL?

 4                    MR. DIAMOND:  Form.

 5            A.   As I recall back to 2001, again, I --

 6        2001 is a long time ago.  I don't have a

 7        general knowledge.  I did not know specifics.

 8        I do know that.  The generality with which I

 9        knew of insecticides and herbicides as a risk

10        factor, I cannot recall at this point.

11        BY MR. PIORKOWSKI:

12            Q.   I'm not asking you whether you knew,

13        back in 2001, whether carbamate was a risk

14        factor.

15                 I'm asking whether you had a general

16        understanding that there were herbicides,

17        pesticides, and insecticides that could

18        increase the risk of NHL.

19            A.   What I can say, back in 2001, which,

20        again, is long time ago, I was aware of risk

21        factors for lymphoma.  Again, I'm not sure, if

22        you asked me at that time, what I would have

23        put on that list completely, because my

24        knowledge has grown through the years.
```

Edwin P. Alyea, M.D.

```
1              Q.   Now, in conducting your review here,

2       did you look at any data specifically on --

3       apart from this article, on the potential

4       association of Lindane with non-Hodgkin's

5       lymphoma?

6              A.   I did not focus on and was not asked

7       to focus on Lindane.

8              Q.   Did you look at whether DDT was

9       related to the risk of non-Hodgkin's lymphoma?

10             A.   As mentioned, I looked in a general

11      way at other agents, particularly ones that I

12      recognized by name, DDT, but I did not focus

13      my analysis on that.

14             Q.   Did you look on data on diazinon,

15      whether that is associated with a risk of NHL?

16             A.   As I stated previously, as I reviewed

17      each of these studies, I focused on

18      glyphosate, but also made myself familiar with

19      the other agents that were there in a general

20      way.

21             Q.   So all of these agents that we -- that

22      we went through, the list of -- we were

23      talking about the McDuffie paper -- you didn't

24      drill down and look specifically at those
```

Edwin P. Alyea, M.D.

```
 1      agents in terms of their potential cancer

 2      risk?

 3              You didn't do a comprehensive review

 4      of the literature with respect to those; is

 5      that fair?

 6                      MR. DIAMOND:  Form.

 7         A.   As I reviewed the literature, I

 8      reviewed each of these studies.  I looked for

 9      information regarding glyphosate.  I also

10      looked at other agents in the studies, but I

11      did not apply the same method that we talked

12      about earlier at each of those steps with

13      respect to those other agents.

14      BY MR. PIORKOWSKI:

15         Q.   Okay.  Do you know whether IARC has

16      classified Lindane as carcinogenic or probably

17      carcinogenic?

18         A.   As we sit here today, I have not

19      reviewed that.

20         Q.   Do you know whether IARC has

21      classified DDT as carcinogenic or potentially

22      carcinogenic?

23         A.   As we sit here today, I do not know

24      that.
```

Edwin P. Alyea, M.D.

```
1          Q.   Do you know whether IARC has

2     classified diazinon as carcinogenic or

3     potentially carcinogenic?

4          A.   As we sit here today, I do not know

5     that.

6          Q.   Do you know whether IARC has

7     classified malathion as carcinogenic or

8     potentially carcinogenic?

9          A.   As we sit here today, I have not

10    reviewed that.

11         Q.   Is that answer the same for the other

12    compounds we talked about in the McDuffie

13    paper?

14         A.   That answer would apply, yes.

15         Q.   Now, as a part of your review of this

16    case, did you determine whether Mr. Hernandez

17    was exposed to Lindane?

18         A.   So as I reviewed the records that were

19    supplied to me, and those included his

20    deposition, the medical record, and the third

21    amended fact sheet, I focused my attention on

22    glyphosate.  I do not recall, as I go through

23    that, other exposures and would need to

24    refresh myself with respect to his deposition
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

1          regarding that.

2                Q.   Is that answer the same with all of

3          these other compounds we talked about?

4                     In other words, DDT, diazinon,

5          malathion, you didn't really make an effort to

6          determine whether Mr. Hernandez was exposed to

7          those agents; is that fair?

8                A.   The information provided to me, I did

9          not focus on those issues.

10               Q.   Did you ask anybody that question?

11               A.   No, I did not have the opportunity to

12         interview the patient or to ask anyone.

13               Q.   You mentioned that in your report.

14         You say -- you say on Page 3 that "I have not

15         had the opportunity to interview or examine

16         the patient."

17               A.   Page 3?

18               Q.   Yes, sir.

19               A.   (Witness reviews document.)

20                    That is correct.

21               Q.   And is that something you asked to

22         do?

23               A.   No.

24               Q.   Is it something that you felt the need

Edwin P. Alyea, M.D.

```
1         to do in order to come to your final opinions?

2         A.   When I was asked to review his medical

3    records and provide opinion regarding the

4    medical literature, I did not feel it

5    necessary to speak with him.

6         Q.   You're aware that the compounds that

7    are referred to in the McDuffie paper that we

8    talked about were commonly used in

9    agricultural work, correct?

10        A.   Again, in my general review of the

11   material, I focused on glyphosate.  On a more

12   global view, do I know what agents were also

13   in use around that time?  I can't comment on

14   that because I did not delve into that.

15        Q.   The whole purpose -- part of the

16   purpose of McDuffie and others doing these

17   papers is they were looking at farm workers,

18   right?

19                  MR. DIAMOND:  Form.

20        A.   Again, as I reviewed the material, I

21   realized that there -- in the agricultural

22   setting, there are other agents that are in

23   the agricultural setting, and many of these

24   studies attempt to look at many agents as they
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

```
1       did their analysis.

2       BY MR. PIORKOWSKI:

3            Q.   So are you able to say that -- as

4       someone who is an agricultural worker for more

5       than a decade, are you able to say, to a

6       reasonable degree of medical certainty, that

7       Mr. Hernandez was not exposed to Lindane?

8            A.   As I've reviewed his deposition and

9       the third amended, I do not have evidence of

10      his other exposures.

11           Q.   Okay.  And is that answer the same for

12      DDT, diazinon, malathion, and all these other

13      compounds?

14           A.   Again, I would need to refresh my

15      review of his deposition, if any of those

16      things were particularly focused on, but as I

17      recall in general, sitting here today, I do

18      not recall a discussion of those exposures.

19           Q.   Okay.  Do you recall a discussion of

20      exposure to glyphosate in his deposition,

21      apart from what you saw in the plaintiff fact

22      sheet?

23           A.   As I sit here today, the focus on the

24      plaintiff fact sheet was on the term Roundup
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

1        that they used.

2              Q.    Roundup or glyphosate, do you remember

3        at his deposition him ever saying he was

4        exposed to glyphosate or Roundup in the

5        agricultural setting?

6              A.    Again, I reviewed his depositions

7        early on in the process, and I would need to

8        go back and review those specifics.

9              Q.    Okay.  All right.  Well, let me just

10       ask if -- is it possible for you to exclude

11       exposure to Lindane or DDT or diazinon in

12       Mr. Hernandez's case based on the information

13       you have?

14             A.    Based on the information that I have,

15       I am not able to exclude other exposures.

16             Q.    So I marked as Exhibit 5 -- excuse me.

17                   I marked as Exhibit 5 Mr. Hernandez's

18       deposition.  And because it's in three parts,

19       I kind of marked them as 5A, B, and C to kind

20       of help us, if that's okay.

21                        MS. HOVIS:  So it's three parts

22       of the deposition.

23                        MR. DIAMOND:  Three volumes.

24                        MR. PIORKOWSKI:  Three volumes,

Edwin P. Alyea, M.D.

 1      yes.

 2                      MR. DIAMOND:  It's about 11:30.

 3      I don't know if you want to keep going for a

 4      little bit, then take a break.

 5                      MR. PIORKOWSKI:  Give me ten

 6      minutes, maybe.

 7                      MR. DIAMOND:  Sure.

 8                      MR. PIORKOWSKI:  Is that good?

 9                      MR. DIAMOND:  Then we can figure

10      out if we want to order lunch.

11                      MR. PIORKOWSKI:  Yes.  That's a

12      good idea.

13      BY MR. PIORKOWSKI:

14          Q.   So let me ask you to turn to his

15      deposition, Day 1, which is 5A, at Page 66,

16      starting on Line 19.

17              Do you see that?

18          A.   Line 19, Page 66.

19          Q.   Right.  And starting on 19, it says,

20      "Question:  Okay.  Any of the times that you

21      sprayed herbicide, was there a name of the

22      herbicide on the container?

23              "Answer:  The can that they gave us is

24      already prepared.

Edwin P. Alyea, M.D.

1          "Question:  During any of the time you

2      sprayed herbicide in agriculture, did you ever

3      learn the name of the herbicide that you were

4      spraying?

5          "Answer:  I'm telling you again, they

6      don't tell us.  When they give you this can,

7      they give you the can so you can go do it, and

8      that's it, and most of the time we wouldn't

9      even ask."

10          And did I read that

11      testimony correctly?

12      A.   Yes, sir.

13      Q.   And you understand that what he's

14      being asked here is whether you know the name

15      of the herbicide that you've sprayed in your

16      agricultural work?

17      A.   Yes, sir, I understand that to be the

18      question.

19      Q.   And he's answering that he doesn't

20      know.  Is that your understanding of his

21      testimony?

22      A.   In reading of his testimony, yes, sir.

23      Q.   And then I want to also ask you to

24      look at Page 51?

Edwin P. Alyea, M.D.

```
 1            A.   51 of the deposition?

 2            Q.   Yes, sir.

 3            A.   Okay.

 4            Q.   Still the same 5A, 51 starting on

 5       Line 2.

 6                 And it says, "Question:  Okay.  The

 7       times that you actually sprayed a herbicide

 8       between 1965 and 1984, do you know the name or

 9       the names of the herbicide?

10                 "Answer:  No, not really, Miss, no."

11                 Do you see that?

12            A.   Yes, sir.

13            Q.   So again, he's being asked what

14       herbicide he was exposed to, and he's unable

15       to identify it, correct, that's his sworn

16       testimony?

17            A.   From his answer in the deposition --

18            Q.   Yes.

19            A.   -- correct.

20            Q.   And I would ask you to turn to

21       Page 41, Lines 17 through 20.

22                 Well, Let me back up and give you some

23       context.

24                 So if you start on Line 5, it says,
```

Edwin P. Alyea, M.D.

```
1              "While you were in the field between 1965 and

2         1984 washing lettuce with a backpack of water,

3         were there occasions when aerial pesticide

4         spraying was going on close enough where you

5         perceived the pesticides got on your body?"

6                   He says, "Several times.  Several

7         times the airplanes would fumigate.

8                   "Question:  And to the point that the

9         pesticide got on your skin?

10                  "Well, not precisely, but you smelled

11        it all.

12                  "Question:  Do you know what kind of

13        pesticides were being sprayed in the period

14        from 1965 to 1984?

15                  "Answer:  No."

16                  Correct?

17        A.   You've read that correctly.

18        Q.   So you understand that to mean that he

19        understood himself to be exposed to

20        pesticides, but he doesn't know what

21        pesticides.

22                  Is that your understanding of his

23        testimony?

24        A.   According in his deposition, yes.
```

Edwin P. Alyea, M.D.

```
 1            Q.   Now, would you agree with me that if

 2      Mr. Hernandez cannot say under oath, with

 3      certainty, that he was exposed to Roundup or

 4      glyphosate during his work in agriculture,

 5      then you certainly are not in a position to

 6      say that he was exposed to glyphosate in an

 7      agricultural work setting; is that fair?

 8                      MR. DIAMOND:  Form.

 9            A.   As I sit here today, I base my

10      assessment on the information that was

11      provided to me, which included the deposition

12      from Mr. Hernandez as well as the third

13      amended fact sheet.

14      BY MR. PIORKOWSKI:

15            Q.   Okay.  And in this particular case,

16      with respect to this particular issue; i.e.,

17      his exposure to glyphosate, there's a

18      disconnect and an inconsistency between what

19      his sworn deposition testimony says and what

20      the third amended plaintiff fact sheet says,

21      true?

22                      MR. DIAMOND:  Form.

23            A.   In the areas -- as I read it, as we

24      read together, in the areas of the deposition,
```

Edwin P. Alyea, M.D.

```
 1      there is no specific agent mentioned, and this

 2      is in contrast of the third amended fact sheet

 3      where Roundup is specifically mentioned.

 4      BY MR. PIORKOWSKI:

 5          Q.   So in that respect, the deposition

 6      testimony is inconsistent with the information

 7      in the plaintiff's third amended fact sheet,

 8      correct?

 9                    MR. DIAMOND:  Form.

10          A.   As I read it, in the deposition, he

11      does not specify a particular agent.  In the

12      third amended fact sheet, there is a specific

13      agent mentioned.

14      BY MR. PIORKOWSKI:

15          Q.   It's not just that he doesn't specify.

16      He says he doesn't know.  He said he never

17      knew.

18                    Isn't that a fair reading of his

19      deposition testimony?

20                    MR. DIAMOND:  Form.

21          A.   I would need to refer, again, to these

22      passages and the particular wording to

23      understand what conclusion I would reach about

24      that.
```

Edwin P. Alyea, M.D.

```
1        BY MR. PIORKOWSKI:

2            Q.   Well, if I represent to you that

3        nowhere in his deposition testimony does he

4        ever state affirmatively that he was exposed

5        to glyphosate or Roundup as a part of his

6        agricultural work, would you have to go back

7        and reevaluate your opinion about his

8        exposure?

9                        MR. DIAMOND:  Form.

10           A.   I based my opinions provided on the --

11       his deposition as well as the report and the

12       third amended fact sheet.

13       BY MR. PIORKOWSKI:

14           Q.   Right.  But when the third amended

15       fact sheet is inconsistent with his

16       deposition, how do you reconcile that?

17                        MR. DIAMOND:  Form.

18           A.   In my review, I don't view it as my

19       job to reconcile those two issues, but to take

20       the information that is presented to me and to

21       proceed with understanding what his potential

22       exposure was.

23       BY MR. PIORKOWSKI:

24           Q.   Okay.  But based on his deposition
```

Edwin P. Alyea, M.D.

```
1       testimony, are you prepared to come into court

2       and say that he was daily exposed to Roundup,

3       based on your review of the evidence, part of

4       the evidence being his testimony?

5                       MR. DIAMOND:  Form.

6           A.   In my review, the information I

7       provided regarding exposure history comes from

8       his deposition and his third amended fact

9       sheet.  And the third amended fact sheet, he

10      reports an exposure to Roundup, which is

11      daily.

12                      MR. PIORKOWSKI:  All right.  Why

13      don't we take a lunch break?

14                      MR. DIAMOND:  That sounds good.

15                      THE VIDEOGRAPHER:  The time is

16      11:34 a.m.  This concludes Tape 2.  We're off

17      the record.

18

19          (Recess was taken from 11:34 a.m. to

20      12:51 p.m.)

21

22                      THE VIDEOGRAPHER:  Time is 12:51

23      p.m.  This is the beginning of Tape 3.  We're

24      back on the record.
```

Edwin P. Alyea, M.D.

```
 1

 2              (Exhibit No. 7 marked for

 3      identification.)

 4

 5      BY MR. PIORKOWSKI:

 6          Q.   Good afternoon, Doctor.  How are

 7      you?

 8          A.   Fine, sir.

 9          Q.   Before we resume the afternoon, is

10      there any testimony from this morning that you

11      need to correct or amend?

12                   MR. DIAMOND:  Objection to form.

13          A.   No, sir.

14      BY MR. PIORKOWSKI:

15          Q.   Okay.  I'm going to hand you what I've

16      marked as Exhibit 7, and I'll represent that

17      this was provided to us as a supplement to the

18      materials in your bibliography, in your

19      report, as being the materials that you

20      considered in forming your opinions.

21              Is that consistent with your

22      understanding?

23          A.   Yes, sir.

24          Q.   And does the summary of the medical
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

1      records here appear to be consistent with your

2      recollection of what you reviewed?

3             A.   Without having it in front of me now,

4      they were extensive medical records, but this

5      does appear consistent with it.

6             Q.   And then it has down the third amended

7      plaintiff fact sheet, so I interpret that to

8      mean that you did not review any of the

9      previous plaintiff fact sheets; is that true?

10            A.   That is correct.

11            Q.   And then it has plaintiff's general

12     causation expert reports from the Hardeman

13     case, and then it has down here Weisenburger,

14     Portier, and Ritz.

15                 And I think, when I had asked you, I

16     remember you saying Weisenburger and Ritz.  I

17     don't remember you saying Portier.

18                 Did you look at --

19            A.   You are correct.  I did -- I had

20     forgotten that, yes.

21            Q.   So what did you look at?  You looked

22     at his report?

23            A.   I looked at his report.

24            Q.   And then you also mentioned you looked

Edwin P. Alyea, M.D.

```
 1        at Dr. Goodman's report.  He's one of

 2        Monsanto's experts; is that right?

 3            A.   Yes, sir.

 4            Q.   If we take this list, and then we also

 5        add the bibliography that's attached to your

 6        report, Exhibit 3, does that comprise the sum

 7        total of the materials that you considered in

 8        forming your opinions in this case?

 9            A.   Yes, sir, it does.

10            Q.   Did you read also Dr. Weisenburger's

11        deposition?

12            A.   So as I interpreted the question,

13        these were used in formulating my report.

14        Subsequent material that I have received that

15        was not available to me even at the time I

16        submitted the report, but that I've

17        subsequently reviewed, include the

18        Weisenburger and the Levine -- Weisenburger

19        deposition and the Levine --

20            Q.   Report?

21            A.   -- report.

22            Q.   And you're referring to Dr. Alexandra

23        Levine, right?

24            A.   I'm not sure I recall the first name,
```

Edwin P. Alyea, M.D.

```
 1        but it's the one I received just...

 2            Q.   Do you know Dr. Levine from your

 3        professional circles?

 4            A.   No, sir, I do not.

 5            Q.   And did you -- when did you look at

 6        Dr. Levine's report?

 7            A.   I received Dr. Levine's report late

 8        Wednesday afternoon and had an opportunity to

 9        read it Wednesday evening.

10            Q.   As in two days ago?

11            A.   As in two days ago.

12            Q.   Did -- in the wake of reading Dr.

13        Levine's report -- well, let me back up.

14                 Dr. Levine's report has a lot of

15        discussions of various articles in the

16        literature, correct?

17            A.   Yes, sir, it does.

18            Q.   Based on her report, did you go back

19        and look at any of the articles that she cited

20        in her report that were not cited in your

21        bibliography?

22            A.   I'm sorry.  Could you repeat that,

23        please?

24            Q.   All right.  There are articles that
```

Edwin P. Alyea, M.D.

```
 1      she cites in her report.  Some of those

 2      articles are not on your bibliography,

 3      correct?

 4           A.   That is correct.

 5           Q.   Did you go back and obtain copies of

 6      the articles that she cited that were not on

 7      your bibliography to review them?

 8           A.   No, sir, I did not.

 9           Q.   Do you plan to do that?

10           A.   I plan to be able to go back and spend

11      more time with that expert report.  Again, I

12      only received it two days ago, and it had one

13      reading through, but I would -- to get a full

14      grasp of the situation, I would look forward

15      to reviewing it again, and if there are

16      pertinent articles for review, I would try and

17      obtain those.

18                     MR. PIORKOWSKI:  Let's mark that

19      as Exhibit No. 8.

20

21           (Exhibit No. 8 marked for

22      identification.)

23

24      BY MR. PIORKOWSKI:
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

```
 1              Q.   I'm going to hand you what I've marked

 2       as Exhibit 8, which is plaintiff's second

 3       amended fact sheet.

 4                   Do you see that?

 5              A.   Yes.  I'm just getting a little out of

 6       order.

 7              Q.   Go ahead and get reorganized.  That's

 8       fine.

 9              A.   Yes.

10              Q.   *And do you see, if you compare the

11       second and the third amended fact sheet, the

12       language about being drenched, which is in the

13       third amended fact sheet, is not present in

14       the second amended fact sheet?

15                   Do you see that?

16              A.   Well, this information was just handed

17       to me this moment --

18              Q.   I know.

19              A.   -- so I would need to look through it

20       now --

21              Q.   I know.

22              A.   -- so --

23              Q.   That's fine.

24              A.   (Witness reviews document.)
```

```
 1                    MR. DIAMOND:  If you represent

 2      that as being true, I don't think he has any

 3      reason to question you.  He hasn't looked at

 4      it.

 5                    MR. PIORKOWSKI:  Just let him

 6      take a minute.  I will represent that it's

 7      true, but I also want him to be comfortable

 8      that that's right.

 9                    MR. DIAMOND:  Okay.

10      A.   (Witness reviews document.)

11            Now that I've had a chance to look at

12      this table, would you be kind enough to repeat

13      your question so I can make sure that --

14                    MR. PIORKOWSKI:  Sure.  Can you

15      read it back?

16            *(Question read.)

17      A.   I do not see the information regarding

18      "drenched my skin and clothing" wording in the

19      second amended fact sheet.

20      BY MR. PIORKOWSKI:

21      Q.   Okay.  Now, before our lunch break, we

22      were talking a little bit about the

23      plaintiff's deposition.

24            Do you recall that?
```

Edwin P. Alyea, M.D.

 1          A.   Yes, sir.

 2          Q.   When you evaluate your patients, have

 3     you ever used the term "reliable medical

 4     historian" or "unreliable medical historian"

 5     in your clinical practice?

 6          A.   So as I sit here today, I cannot

 7     recall particularly using those words that you

 8     have mentioned.  There are individuals who are

 9     challenged historians, yes.

10          Q.   What do you mean by that?

11          A.   As I sit here today, as I think of

12     taking a history from someone, there are some

13     patients who have difficulty with dates,

14     places, chronology of events.

15               This is not uncommon, especially not

16     uncommon in people who have cancer, in my

17     experience, because they're overwhelmed by a

18     life-changing situation.

19          Q.   And putting aside the -- at some point

20     though you need to make a determination, when

21     you're taking care of your patients, about

22     what information they provide you that you

23     consider reliable and what information you

24     don't consider reliable; is that fair?

Edwin P. Alyea, M.D.

```
 1                    MR. DIAMOND:  Object to form.

 2         A.   When I assess a patient and talk to a

 3     patient, I take the entirety of the

 4     information into account to make my judgment.

 5     Some of that information they provide me I may

 6     find, using the term, "more reliable," and

 7     there will be other areas where they are less

 8     precise.  And in those cases, then I need to

 9     judge how I'll handle that information.

10         Q.   So to go back to Mr. Hernandez's

11     deposition, I'd like to ask you to turn to

12     Exhibit 5.  You still have Exhibit 5?

13         A.   Yes.

14         Q.   So 5A at Page 37, Lines 3 through 19.

15              It says, "Question:  During the time

16     periods that you worked for Royal Packing

17     washing lettuce, did you ever use herbicides?

18              "Answer, directly?

19              "Question:  Correct.

20              "Answer:  Directly, I couldn't tell

21     you that I grabbed the bottles, and I moved

22     from one place to another, but to put it one

23     way, we knew it was poison.  We didn't know

24     what name.  To say that I took -- took it and
```

Edwin P. Alyea, M.D.

1          showered with it or I used it there, I

2          couldn't tell you that.  Oftentimes it's the

3          indirect use of it.

4                    "Question:  What chemicals are you

5          talking about that is poison?

6                    "Answer:  I couldn't tell you that.  I

7          don't have any idea."

8                    Did I read that correctly?

9          A.    Yes, sir.

10         Q.    Is that also information that you

11         considered as a part of your exposure

12         assessment with respect to Mr. Hernandez?

13         A.    When assessing my exposure history, I

14         looked at the depositions.  I reviewed the

15         third amended fact sheet, which was available

16         to me, as well as looked in the medical record

17         for any discussion of occupational exposure.

18         Q.    And was there any discussion in the

19         medical record of occupational exposure?

20         A.    As I sit here today, I do not recall

21         an extensive occupational history, but I would

22         need to review that in detail.

23         Q.    Do you recall ever seeing any

24         attribution that his lymphoma was related to

Edwin P. Alyea, M.D.

```
1        or caused by his glyphosate exposure in the

2        medical records?

3            A.   As I sit here today and reflect on

4        reviewing his medical records, I do not recall

5        an attribution such as that.

6            Q.   Let me ask you to turn to Page 185 of

7        5B, which is the January 10.

8                And I'm looking at Line 5 through 9,

9        where he's asked, "Do you know what type of

10       pesticides were used on the fields?"

11               "Answer:  They mostly don't tell you.

12       They just tell you to use this material, but

13       they don't tell you what type of material

14       they're using."

15               Is that information that you

16       considered as a part of your exposure

17       assessment?

18           A.   As I mentioned previously, the

19       exposure assessment was based on the

20       deposition, the third amended fact sheet, and

21       then looking for any evidence of an

22       occupational -- or exposure in the medical

23       record.

24           Q.   So the answer is yes, that is among
```

Edwin P. Alyea, M.D.

1          the information that you considered?

2               A.   That is among the information, yes.

3               Q.   Let me ask you to turn back to 5A,

4          Page 37, starting at Line 21.

5               A.   I'm sorry?

6               Q.   Page 37.

7               A.   37?

8               Q.   Yes, sir.

9               A.   Which line?  I'm sorry.

10              Q.   Line 21 through 25.

11              A.   (Witness nodding.)

12              Q.   "So when you were working for Royal

13         Packing, did you ever spray herbicides?

14                   "Answer:  I don't remember.  I don't

15         have the mind at the moment to tell you if it

16         happened.  If something like that happened, I

17         don't remember."

18                   Did I read that correctly?

19              A.   Yes, sir.

20              Q.   Then on the same page, Lines 12 -- I'm

21         sorry.  Let's turn to Page 186, which is in

22         5B.

23              A.   5B?

24              Q.   Yes, sir, starting on Line 13.

Edwin P. Alyea, M.D.

```
 1          A.   I'm sorry.  I'm just...

 2          Q.   Okay.

 3          A.   186, Line --

 4          Q.   13 through 16.

 5          A.   13 through 16.  Okay.

 6          Q.   It says, "In any of the work that

 7     you've worked in the field, have you

 8     participated in spraying the ground with a

 9     herbicide before planting?

10               "Not I directly."

11               Do you see that testimony?

12          A.   Yes, sir.

13          Q.   You considered that in formulating

14     your opinion on his exposure assessment, along

15     with the other information, correct?

16          A.   As I've stated previously, the

17     depositions, the third amended fact sheet, and

18     looking for an occupational history or

19     exposures in his medical record were what I

20     used to come to my --

21          Q.   Well, I just want to be clear because

22     you threw in another thing, the occupational

23     history, and I thought you said you don't

24     remember there being an occupational history
```

Edwin P. Alyea, M.D.

```
 1      in the medical record; is that right?

 2          A.   That is -- that -- as I sit here

 3      today, that's true.  I do remember, as I

 4      reviewed the medical records, looking for

 5      that.

 6          Q.   Fair enough.

 7               But you don't remember there -- as you

 8      sit here today, you don't remember there being

 9      any discussion of that in his records?

10          A.   As I sit here, I do not recall that

11      specifically.

12          Q.   Let me ask you to turn to Page 249.

13          A.   Is that still in B?

14          Q.   It's in -- the truth is they're all

15      sequentially number, so there's only one 249.

16               Yes, it's in B though.  You're right.

17          A.   Oh.

18          Q.   Lines 249, 24 -- I'm sorry, 249, 24,

19      through 250, Line 13.

20               "Question:  Did you understand" -- and

21      let me just give you the context for this

22      question.  They're talking about the plaintiff

23      fact sheet at this portion of the deposition.

24               It says, "Did you understand that you
```

```
 1        were exposed to any pesticides at Magda

 2        Express Freight.

 3                "Answer:  Yes.  That's what it says

 4        here."

 5                And I'll represent he's referring to

 6        the plaintiff fact sheet.

 7                "Question:  Is that true?

 8                "Answer:  Well, to say pesticides --

 9        well, I'm starting to get confused.  You're

10        confusing me.  To tell you -- I don't

11        understand why I said this, or what they wrote

12        on here.

13                "But the pesticides, that's what I'm

14        looking at, the use of pesticides in these

15        numbers.  Let me ask you, when you worked with

16        this questionnaire or fact sheet, did you fill

17        one out by hand or did you give your answers

18        verbally?

19                "Well, I filled out a lot by hand and,

20        perhaps, I made a mistake in this area.

21        That's probably what happened.  What else

22        could it be?"

23                Do you recall reading that?

24                        MR. DIAMOND:  Form.
```

Edwin P. Alyea, M.D.

     1          A.   I do recall reviewing the deposition.

     2     BY MR. PIORKOWSKI:

     3          Q.   Do you recall that particular excerpt?

     4          A.   Sitting here today, I did not recall

     5     that particular excerpt until we've gone

     6     through it now.

     7          Q.   Let me ask you to go back to Page 38,

     8     which is in Section A.

     9          A.   Page 38?

    10          Q.   Yes, sir.

    11               And so let's start on Line 12, down to

    12     25.

    13               So "Okay.  Going back to the time

    14     frame from 1965 to 1984, when you worked with

    15     Royal Packing, did you ever spray pesticides?

    16               "No.  I'm saying it again now

    17     directly.

    18               "Question:  Okay.  Well, but -- I'm

    19     sorry.  Okay.  But you say you're saying it

    20     again.  My first question was about

    21     herbicides.  This question was about

    22     pesticides.  So your answer -- so is your

    23     answer the same?

    24               "Witness:  Well, it's the same thing.

Edwin P. Alyea, M.D.

```
 1          It's -- they didn't tell me directly, here's

 2       the pesticides and spray it.  During that

 3       time, they used aerial spraying and herbicides

 4       are usually used before planting the crops."

 5             That's also testimony that you

 6       considered as a part of your assessment,

 7       right?

 8          A.   That is correct.

 9          Q.   Do you understand from his deposition

10       that the main agricultural work he did

11       involved harvesting crops, such as lettuce and

12       watermelons?

13          A.   As I sit here today, and I recall his

14       presentation, it sounded like he did a variety

15       of jobs, which -- those ones you mentioned

16       were part of it, and I think we've read about

17       washing lettuce.

18          Q.   And on Page 112 of Exhibit 5A, Lines

19       15 through 21, are you with me?

20          A.   Not quite.  Page 112.  What line,

21       please, sir?

22          Q.   15 through 21.

23             Have you -- "Question:  Have you ever

24       worn protective gloves while working in the
```

Edwin P. Alyea, M.D.

```
 1      field.

 2              "Answer:  I used them because

 3      otherwise my hands would have turned black."

 4              Correct?

 5      A.   That is correct.

 6      Q.   And that -- that's, in part, one of

 7      the -- one of the things you were alluding to

 8      earlier when you corrected the sentence in

 9      your exposure history relating to use of

10      protective equipment, correct?

11      A.   That is correct.

12      Q.   Now, I want to talk a little bit about

13      his residential use now and turn to that.

14              So if we turn to 5B at 177, Lines 7

15      through 11 --

16      A.   I'm sorry, I didn't hear the last

17      part.

18      Q.   Yes, Lines 7 through 11.

19      A.   177?

20      Q.   Yes, sir.

21              Actually, let's start at Line 2.

22              ██████████████████████████████████

        ██  ████████████

24              Do you see that?
```

Edwin P. Alyea, M.D.

```
1          A.   Yes, sir.

2          Q.   And I don't know if you plotted out

3     his different residences, but he lived -- this

4     is an apartment that he lived in for 13 years

5     up to and including 1990, okay?

6          A.   I'll take that as...

7          Q.   Okay.  And he's asked, "And is this

8     the area of the yard in your apartment

9     building, the building that actually says ████

██        ████████  right?  This is the north, this is the

11    east, this is the west, so that" -- he's being

12    shown a picture of his residence, okay?

13               And he says, "Maybe you can just point

14    to where you used Roundup."

15               And he says, "This is where we would

16    trim the grass, in this area.  I did not use

17    it at home.  And where I used it was when I

18    lived on ████████████.  When I was here, I

19    worked at the fields I explained to you

20    before."

21               So he's representing that during this

22    period of time, up to and including 1990, to

23    his recollection, he did not use Roundup.

24               Is that your understanding?  Is that
```

Edwin P. Alyea, M.D.

1       consistent with your understanding?

2                       MR. DIAMOND:  Form.

3           A.   Sitting here today and reading the

4       deposition, I understand that he didn't use it

5       while at ███████████

6       BY MR. PIORKOWSKI:

7           Q.   Okay.  Fair enough.

8                And then he made reference to the

9       ███████████, but in between those two, he lived

10      in a place called ███████████

11               And if you go back to July -- if you

12      go back to 5A at 127, Lines 13 to 16 --

13          A.   I'm sorry.  I just -- I don't have

14      these tabbed, so it's a little harder for me.

15          Q.   No.  Take your time.

16          A.   I'm on Page 127 now.

17          Q.   Yes, sir.  So Lines 13 to 16, and I'll

18      represent that this is the -- this is the

19      address where he lived subsequent to ██████

20      based on the history we've been provided,

21      okay.  It's called ███████████

22               And the question is:  "Did you apply

23      any herbicides to any of the yard in this

24      area?

Edwin P. Alyea, M.D.

```
 1                "Answer:  Not here, not here, not

 2        here, because it was a government property."

 3                And is that consistent with your

 4        understanding, that during that period of

 5        time, he didn't use Roundup?

 6                     MR. DIAMOND:  Form.

 7           A.   As per the lines that we just reviewed

 8        in the deposition, that is what it states.

 9        BY MR. PIORKOWSKI:

10           Q.   Then I'll represent to you that the

11        next place that he lived from 1995 to 1996 was

12        a the place he alluded to earlier called

13        ██████████ which -- you remember that when we

14        were talking about the ███████ he made

15        reference to ██████████.

16                If you turn to 5A at 133, Lines --

17        starting at Line 12, he's asked, "How long did

18        you live at that property?

19                "Answer:  About a year.

20                "How many times did you spray the back

21        fence during that year that you lived there?

22                "Answer:  I couldn't tell you.  I

23        couldn't tell you how many.

24                "Question:  Can you say whether it was
```

Edwin P. Alyea, M.D.

1      more than once?

2              "Answer:  Yes, it was more than once.

3              "Now was it more than five times?

4              "I don't remember how many times it

5      was, but it was a few."

6              Is that consistent with your

7      understanding of the -- of his residential

8      exposure history?

9                  MR. DIAMOND:  Form.

10         A.   As you just read, my understanding of

11     his residential history comes from the

12     deposition as well as the third plaintiff fact

13     sheet.

14     BY MR. PIORKOWSKI:

15         Q.   So at this point we're up to 1996, and

16     at that point he's used -- according to his

17     testimony, he's used Roundup a few times

18     total, right?

19         A.   As I sit here today, it's difficult

20     for me to follow the dates.  Obviously, you've

21     had the ability to map out a line.  I've based

22     my results on the discussion on the deposition

23     and the third plaintiff fact sheet.

24         Q.   Assuming I've represented correctly

Edwin P. Alyea, M.D.

```
1        the dates that he's lived at various

2        addresses, and based on the testimony we just

3        reviewed, you agree, as of 1996, that means he

4        would have used Roundup in a residential

5        capacity a few times, fair?

6                    MR. DIAMOND:  Form.

7            A.   As you have presented the data, if

8        that's how you've presented it, I agree.

9        BY MR. PIORKOWSKI:

10           Q.   Then if you turn to Page 145, Line 17

11       through 20, I'll represent to you that the

12       next address at which he lived has been

13       represented to us as ███████████████

██       ████████████████████████

15                    And the question begins on Line 17.

16                    "Question:  Do you recall how often

17       you applied the herbicide to weeds on the

18       fence at ███████████

19                    "Answer:  During the first month, I

20       used it about once a week, and it was

21       eradicated and that was it.

22                    "After 8 -- after ████████, where

23       was the next place that you lived?"

24                    And he goes on to say, "████████
```

Edwin P. Alyea, M.D.

1      ███████████████

2           So we have -- if we're kind of adding

3      up cumulatively from the ████████ address --

4      if he says, I used it for a month once a week,

5      that would be another, let's say, four times,

6      fair?

7                     MR. DIAMOND:  Form.

8           A.   So again, in reading this, how many

9      years did he live at this address?

10     BY MR. PIORKOWSKI:

11          Q.   One.

12          A.   Just one.  So as stated, once a month.

13          Q.   I'm sorry.  Once in the first month,

14     he says.

15          A.   Once a week.

16          Q.   During the first month?

17          A.   During the first month.  Once a week

18     during the first month.

19          Q.   Right.  Which is a total of four

20     times --

21          A.   Total of four.

22          Q.   -- fair?

23          A.   (Witness nodding.)

24          Q.   Right.  The next property that he

```
1     lived at is ██████████████     If you turn

2     to -- let's see here -- if we turn to Line 17

3     through 20 --

4          A.   I'm sorry.  Is this Page 146?

5          Q.   Yes, sir.

6               It says, "Did you use any herbicides

7     while you lived at ████████

8               "Answer:  I don't remember here

9     because, well, I was very busy."

10              Okay.  So he doesn't recall whether he

11    used it or not, fair?

12         A.   I agree with your statement.

13         Q.   Then the next address is ███████████

██      ████████  which at Page -- if you look at Page

15    150, he talks about his use at that address,

16    and it starts on Page -- on Line 6.

17              It says, "Question:  Did you use any

18    herbicides while you were at that address?

19              "Answer:  No, not there.  I didn't use

20    anything there either."  Okay?

21         A.   (Witness nodding.)

22         Q.   I'll represent that that was his --

23    based on our information that is available to

24    us, between 1999 and 2001, okay?
```

Edwin P. Alyea, M.D.

1          A.    Agree.

2          Q.    Then the next address was called the

3    ████████████████████, where he lived in

4    2001.  And if we look at Page 153, we see the

5    history of his period of time during his

6    residence at ████████████████

7                And on Line 13 on Page 153, it says,

8    "Did you use any herbicide products on that

9    property while you lived there?"

10               And he says, "No, not there."

11               Do you see that?

12         A.    Yes, I do.

13         Q.    And then the next address is ██████

██      ████████  where he lived from 2001 to 2013.

15               And if we go to 5B, at Page 183, he's

16   asked, "The times that you did use Roundup in

17   the area of the houses or apartments that you

18   lived in, how long on average would it take to

19   do an application?"

20               He says, "As I said before, perhaps I

21   used it there once or twice, but that's it."

22               And then he's asked, "Okay.  Are you

23   talking about just the ████████████████

██      ████████████  which is -- which is his subsequent

Edwin P. Alyea, M.D.

1        address.

2                And he says, "Yes, ███    That would

3        be the address, as I said before.

4                "And what years did you live at ███

5                "This is from year" -- he ends up

6        saying, "2001 to 2013."

7                So during that period of time, you

8        would agree his testimony is he used it once

9        or twice, correct?

10               MR. DIAMOND:  Form.

11          A.   So I apologize.  You began reading

12       before I got to the section, and I didn't want

13       to interrupt you.

14          Q.   Okay.

15          A.   I did follow from Line 1 through the

16       end on Page 184, but I did not have a chance

17       to review it on 183, but I have no doubt to

18       question that you were reading from the text.

19          Q.   So the -- so the answer and question

20       was on 22 and 23, "As I said before, perhaps I

21       used it there once or twice, but that's it,"

22       okay?

23          A.   I would agree that's in the text.

24          Q.   And then the last address if we look

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

```
 1        at Page 233, beginning on page -- on Line 22,

 2        he's asked -- he's asked about using herbicide

 3        on this property, and the witness gives an

 4        answer about pesticide.

 5             And then the question starting on 22

 6        is, "Okay.  You answered telling me about

 7        pesticides, but my question had to do with

 8        herbicides, so I'm going to ask you again.  To

 9        the best of your recollection" --

10             And he says, "Once around here, around

11        the grass here."

12             And he says, "One time?"

13             He says, "Once.  That's when I've used

14        it, so I didn't do it again."

15             So that's -- essentially brings us to

16        the conclusion of 2015.

17             Now, would you agree with me that,

18        based on his testimony, we've reviewed maybe

19        approximately ten applications over the course

20        of a thirty-year period, according to his

21        testimony?

22                  MR. DIAMOND:  Form.

23        A.  So --

24                  MR. DIAMOND:  Go ahead.
```

Edwin P. Alyea, M.D.

```
 1             A.    -- sitting here today, I haven't had

 2       the opportunity to add them up as you have,

 3       but as we've gone through these, that sounds

 4       in the general range.

 5       BY MR. PIORKOWSKI:

 6             Q.    And then I also wanted to ask you --

 7       by the way, that general range would be

 8       probably less than your own personal use,

 9       fair?

10                   MR. DIAMOND:  Form.

11             A.    Well, as I sit here today and reflect

12       on that, I would really need to give thought

13       to that because how you apply it, I think,

14       makes a difference as well, from what we've

15       learned, hand sprayer versus a force sprayer,

16       your exposures while you're doing it, so I

17       would be reluctant to compare my own personal

18       history to his.

19       BY MR. PIORKOWSKI:

20             Q.    In terms of frequency though, as I

21       think you described, the frequency of his

22       applications, if he had ten, let's say,

23       applications, or even twelve, over a

24       thirty-year period, that's less than you've
```

Edwin P. Alyea, M.D.

```
 1        had in your own personal use, right?

 2                      MR. DIAMOND:  Form.

 3            A.  Again, sitting here today, I would be

 4        reluctant to make that statement.

 5        BY MR. PIORKOWSKI:

 6            Q.  All right.  On Page 140, beginning on

 7        Line 25 --

 8            A.  140.

 9            Q.  Yes, sir.

10            A.  Back in A?

11            Q.  Back in A, yes, sir.

12            A.  Okay.  I'm on page 140.

13            Q.  Starting on 25, it says, "Okay.  My

14        question is, when you sprayed Roundup in a

15        residential application, did you typically

16        wear gloves?

17                  "Answer:  Yes, normally I did.

18        Usually I did.  Yes, I did, but sometimes I

19        would forget, but almost always I would make

20        sure that I used them.  I tried to take care

21        of myself as much as possible.  I'm an

22        ecologist."

23                  Did I read that correctly?

24            A.  Yes, you read that correctly.
```

Edwin P. Alyea, M.D.

```
 1          Q.   And that would suggest to you that,
 2     perhaps, not every time, but the vast majority
 3     of times, based on his testimony, that he
 4     sprayed Roundup during a residential use, he
 5     was using protective gloves, fair?
 6          A.   Sitting here today, I wouldn't venture
 7     to guess, but on occasion, he must have used
 8     gloves, and on other occasions, he did not.
 9          Q.   Well, his words are "almost always,"
10     right?
11          A.   I agree with you.
12          Q.   █████   ████████████████████████
13          A.   ████████████████████████████████  █
██        ██████████████████████████████████████
██        ██████████████████████████████████████
██        ████████████████████████████████████████
██        ████████████████████████████████████
██        ██████████████████████████
19          Q.   And --
20          A.   -- as one of those subsets.  I'm
21     sorry.
22          Q.   ██████████████████████████████████
██        ████████████████████████████████████████
██        ████████████████
```

Edwin P. Alyea, M.D.

1          A.



REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.





Edwin P. Alyea, M.D.

1          Q.   Well, is it your understanding -- let

2     me just ask your understanding about the

3     underlying facts.



20    BY MR. PIORKOWSKI:

21          Q.   That's fair.

1 ██████████████

2                 MR. DIAMOND:  Form.

3         ██ ████████████████████████████

██ ████████████████████████████████████

██ ████████████████████████████████

██ ████████████

7  BY MR. PIORKOWSKI:

8         Q.  ████████████████████████

██ ██████████████████████████████

██ ████████████████

██      ████████████████████████████

██ ████████████████████████████████████

██ ████████████████████ ████████████████

██ █████████████████ ████████████████████

██ ████████

██      ██████████████████████████

██ ████████████ ████████████████████████

██ ████████████████████████████████

██      ████████████████████████████

20                     MR. DIAMOND:  Form.

21         A.  As I sit here today, I did not -- I

22  was not asked to address that issue.

23  BY MR. PIORKOWSKI:

24         Q.  Did you think about it?



Edwin P. Alyea, M.D.



1          A.    As I sit here today, no, I did not

2     ponder that significantly in this case.

3          Q.

17                         MR. DIAMOND:   Form.

18          A.

22     BY MR. PIORKOWSKI:

23          Q.

Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.

6       Q.   Am I correct that on -- did you agree

7   with the medical oncologist's diagnosis in

8   Mr. Hernandez's case with respect to the type

9   of lymphoma that he had?

10      A.   So I had an opportunity to review the

11   medical record, and I'm just going to refer to

12   my report, that yes, I understood that he had

13   a B-cell lymphoma.  And there was a little bit

14   of debate over nomenclature, but it's a B-cell

15   lymphoma, and I think that's sufficient for

16   understanding what his process is.

17      Q.   Okay.  Is there -- do you have a

18   disagreement at some level with the

19   oncologist, or your view is just it doesn't

20   matter as long as it's a B-cell lymphoma?

21      A.   So my view, as I read it, is it's very

22   consistent with a B-cell lymphoma.  It may

23   also be categorized as a MALT lymphoma.  Those

24   would all be very acceptable diagnoses, and

Edwin P. Alyea, M.D.

1       discussion that I observed in the medical

2       record regarding treatment and prognosis were

3       appropriate to those diagnoses.

4            Q.   So am I correct that Mr. Hernandez has

5       never received treatment for his lymphoma?

6            A.   As I recall, in reviewing his medical

7       record, I see that there was a discussion of

8       treatment options and that to date he has not

9       received treatment for his lymphoma.

10           Q.   Do you consider that presentation of

11      those treatment options to have been

12      appropriate?

13           A.   As I recall reviewing his medical

14      record, as you're well aware, B-cell

15      lymphoma -- low grade B-cell lymphoma is an

16      incurable disease outside of extraordinary

17      measures such as autologous transplantation or

18      allogeneic transplantation, which is what we

19      will do in some cases.

20                So an appropriate discussion, often

21      around a diagnosis of low grade lymphoma, is

22      when and if you should treat and observation

23      is not an unreasonable course to be

24      recommended to patients.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

```
 1                 It's often very difficult in this

 2       country for some people to accept that, but

 3       doing nothing is sometimes the best answer.

 4                 And then, obviously, patients and

 5       their families have significant views of how

 6       they should proceed.

 7            Q.   Do you consider the course of action

 8       of not undertaking treatment to be reasonable

 9       in his case, I'm gathering?

10            A.   As I reviewed his situation, I think

11       that's not unreasonable.

12            Q.   One of the things you mention in your

13       report is that one of the other reasons not to

14       embark on treatment is that he's not having

15       any symptoms related to his lymphoma; is that

16       right?

17            A.   Well, I think, you know, as -- I would

18       have to refer back to the report as to the

19       initial --

20            Q.   Go ahead.

21            A.   -- need for the endoscopy.  We would

22       have to refer to the medical record and

23       whether you attribute whatever led to the need

24       for the endoscopy as to the lymphoma.
```

Edwin P. Alyea, M.D.

```
 1                    The fundamental answer would be that

 2          if he's not having symptoms that you think are

 3          related to the lymphoma, then it's not

 4          unreasonable to consider a course of

 5          observation.  If one is having symptoms, then

 6          one would consider intervening and discussing

 7          what those options would be.

 8              Q.   And is it your understanding at this

 9          point that he's not having symptoms?

10              A.   So it's -- to my understanding, he was

11          not having significant symptoms, and what may

12          have been identified was essentially a

13          bystander effect, as I recall.  I'll refer to

14          the visual results.

15                    (Witness reviews document.)

16                    They revealed evidence of gastritis,

17          and then he had a biopsy, which revealed this

18          process.  Whether those processes are the same

19          or two separate processes is not clear.

20              Q.   Do you have an opinion on that?

21              A.   I do not have an opinion on that.

22              Q.   And I think my question is, since the

23          time of diagnosis, is it your understanding

24          that he's having any symptoms at this point?
```

Edwin P. Alyea, M.D.

 1          A.   In the medical records that have been

 2     made available to me, I do not recall seeing

 3     ongoing symptoms related to this.

 4          Q.   What's the most current information

 5     you have about Mr. Hernandez?

 6          A.   As I sit here today, I don't have that

 7     final date of his medical record.

 8          Q.   Do you know what the most recent date

 9     is that you saw?

10          A.   As I just said, sitting here today, I

11     don't have that in front of me.

12                    MR. PIORKOWSKI:  Do you want to

13     take a break here?

14                    MR. DIAMOND:  Yes.  I'm fine

15     with that.

16                    THE VIDEOGRAPHER:  The time is

17     1:51 p.m.  We're off the record.

18

19          (Recess was taken from 1:51 p.m. to

20     2:06 p.m.)

21

22                    THE VIDEOGRAPHER:  The time is

23     2:06 p.m.  We're back on the record.

24     BY MR. PIORKOWSKI:

Edwin P. Alyea, M.D.

```
 1            Q.   So Doctor, I want to see if there's a

 2       few things we can agree on.

 3            You reviewed the plaintiff's

 4       deposition testimony.  Would you agree with me

 5       that according to the plaintiff's sworn

 6       testimony, he had exposure to pesticides

 7       during his time as an agricultural worker?

 8            A.   In review of his deposition and as

 9       we've done here today, yes.

10            Q.   And would you also agree with me that

11       we know from McDuffie and some of the other

12       articles that you identified that we haven't

13       dug into yet -- that we know that many

14       pesticides increase the risk of developing

15       non-Hodgkin's lymphoma?

16            A.   As we've reviewed earlier briefly,

17       yes, some are associated with it.

18            Q.   And would you also agree with me that,

19       according to Mr. Hernandez's testimony, he

20       didn't know the names of the pesticide

21       chemicals to which he was exposed; is that

22       fair?

23                      MR. DIAMOND:  Form.

24            A.   As we reviewed in the deposition,
```

Edwin P. Alyea, M.D.

```
 1        names were not listed.  In the third amendment

 2        fact sheet we saw names listed, but not of

 3        pesticides.

 4             Q.   Well, actually, you didn't see a

 5        pesticide, right?

 6             A.   As I said, not of the pesticides.

 7             Q.   I'm not talking about glyphosate.  Now

 8        I'm talking about pesticides.

 9             A.   Uh-huh.

10             Q.   According to his testimony, he didn't

11        know the names of pesticide chemicals to which

12        he was exposed; is that fair?

13             A.   As we reviewed his deposition, yes,

14        sir.

15             Q.   Now, because he doesn't know the names

16        of the chemical -- the pesticide chemicals to

17        which he was exposed, we have no way to know

18        whether or not he may have been exposed to one

19        or more of the pesticide chemicals that

20        increased the risk of non-Hodgkin's lymphoma.

21        Is that fair?

22                       MR. DIAMOND:  Form.

23             A.   As we reviewed --

24                       MR. DIAMOND:  I'm sorry.  I'm
```

Edwin P. Alyea, M.D.

```
 1      slow.

 2                      THE WITNESS:  I was trying to be

 3      slower.

 4          A.   As we reviewed his deposition, there

 5      were not specific names mentioned.

 6      BY MR. PIORKOWSKI:

 7          Q.   And so we have no way to know whether

 8      he may or may not have been exposed to

 9      pesticides that increased the risk of

10      non-Hodgkin's lymphoma, true?

11                      MR. DIAMOND:  Form.

12          A.   That is -- I agree with your

13      statement.

14      BY MR. PIORKOWSKI:

15          Q.   And without that information, there's

16      no way for you, or anyone else for that

17      matter, to rule out the possibility that a

18      pesticide to which he was exposed may have

19      caused or contributed to his non-Hodgkin's

20      lymphoma; is that fair?

21          A.   Well, as I assess contributing

22      factors, contributing factors -- a

23      contributing factor is a potential exposure to

24      other agents.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

```
 1              Q.   I'm sorry.  Could you explain what you

 2        mean there?

 3              A.   As I assess contributing factors for

 4        his lymphoma --

 5              Q.   Yes.

 6              A.    -- I referred -- I reviewed data with

 7        respect to glyphosate.  He was, by his report,

 8        exposed to other pesticides.  We do not know

 9        the names of those, so therefore, it's hard

10        for me to know whether they are or not

11        contributing factors for him.

12              Q.   You just can't say on the basis of the

13        information that we have; is that fair?

14              A.   Given the information we have, without

15        the names, I cannot say.

16              Q.   Now, if we go to your report,

17        Exhibit 3 at Page 6, on roughly what's --

18        corresponds with -- do you see on the

19        left-hand side -- I don't know that they're

20        line numbers, but there's kind of a -- little

21        numbers on the left hand side?

22              A.   Yes.

23              Q.   Roughly on 23 -- do you see that?

24              A.   Yes, sir.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

```
 1            Q.   There's a sentence that says, "Three

 2       of the publications adjusted for risks

 3       associated with exposures to other agents such

 4       as pesticides."

 5            Do you see that?

 6            A.   Yes.

 7            Q.   Now, what's the significance of saying

 8       that in your report?

 9            A.   The significance of including that in

10       the report is acknowledging that there are

11       multiple agents that one may be exposed to.

12       And these epidemiologists, in their attempt,

13       are not looking at one agent, but multiple

14       agents, and then they try and take that into

15       account when they're assessing an exposure to

16       an agent.

17            Q.   Now, when you're doing a study looking

18       at exposure to glyphosate, let's say, and

19       non-Hodgkin's lymphoma, is exposure to other

20       herbicides, other pesticides, other

21       insecticides, are those potential confounding

22       factors?

23            A.   As I reviewed the literature in these

24       studies -- and the reason they were often
```

Edwin P. Alyea, M.D.

```
1       included, multiple agents, is yes, they can

2       also be contributing factors or confounding

3       factors, and they're trying to assess

4       exposure.

5           Q.   So in other words, if you -- if you

6       had an agent that was known to cause cancer,

7       and you were investigating a new agent that

8       you didn't know one way or the other whether

9       it caused cancer and there was co-exposure, it

10      might be difficult to tease out whether the

11      agent you were investigating was, in fact, a

12      cause; is that fair?

13                     MR. PIORKOWSKI:  Form.

14          A.   So as a medical oncologist, reading

15      the epidemiology literature, I'm aware in many

16      of the discussions they discuss how to account

17      for different agents.  I would defer to

18      epidemiologists and the numerous people who

19      have opined on the challenges with multiple

20      agents.

21      BY MR. PIORKOWSKI:

22          Q.   And I don't think I asked you earlier.

23               Do you consider yourself an expert in

24      epidemiology?
```

Edwin P. Alyea, M.D.

```
 1              A.   I'm a medical oncologist.  No, I'm not

 2        an epidemiologist, but I do read -- in my

 3        work, I read a number of -- many studies that

 4        look at risk factors for cancer, risk factors

 5        for exposure to agents, and we also look at

 6        risk for -- associated with outcome.

 7              So one of our most important tasks is

 8        to determine how people do and what are the

 9        risk factors, so these are types of studies

10        that we review frequently both in our clinical

11        practice, and as mentioned, I review articles

12        for journals and most recently reviewed a

13        meta-analysis, as an example, about another

14        subject.  So these are familiar areas.

15              Q.   Is -- if one is attempting to study an

16        association between a chemical exposure and

17        non-Hodgkin's lymphoma, in your view, is it

18        important to attempt to control for potential

19        confounding factors such as exposure to other

20        chemicals?

21              A.   In my view, whenever you're performing

22        a study, you try and -- you try and control

23        for other factors when you can, and you

24        acknowledge when there are factors that you
```

Edwin P. Alyea, M.D.

```
1        can't control for in the design of your study.

2             Q.   So an ideal study design, assuming

3        that you could control, you would control; is

4        that fair?

5             A.   In an ideal study design, you have one

6        variable.  Everything else is static, and you

7        know where it is and you assess that and in

8        the most simple design.

9                  Unfortunately, that is the farthest

10       thing from actual practice and requires a

11       great deal of work, and that's why there's

12       often -- and it's not only in this case, but

13       this is throughout medicine, and I'm sure

14       throughout your other worlds, too.

15                 There are differences of opinions

16       because studies can reach conclusions.  They

17       can reach conclusions in the same direction

18       but reach them in different ways, and

19       sometimes there are studies that reach a

20       different conclusion, and it's important to

21       acknowledge both of those.

22            Q.   All right.  So I want to go back to

23       Page 6 of your report where you say, "Four of

24       the six case-control studies showed
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

1       significantly -- showed statistically

2       significant elevated odds ratios for the

3       development of lymphoma in individuals exposed

4       to glyphosate."

5               And then you cite McDuffie, Hardell,

6       De Roos, and Eriksson, correct?

7           A.   Correct.

8           Q.   Then you say, "One study demonstrated

9       a positive association between glyphosate

10      exposure and non-Hodgkin's lymphoma but did

11      not reach statistical significance."

12              And that's Cocco, correct?

13          A.   Correct.

14          Q.   Now, what does a positive association

15      mean to you?

16          A.   Positive association means when

17      there's an overall risk or relative risk, and

18      it is often with 1 being a baseline and a risk

19      above that showing that there is an increased

20      association with that disorder, and the

21      confidence levels fall outside of crossing

22      over 1.

23          Q.   Right.  So I guess that's part of what

24      I'm trying to understand is I've always

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

```
1      understood a positive association to mean a

2      statistically significant finding.

3          A.   Well, I would say, as a reviewer of

4      numerous papers, a lot of people say there's a

5      positive association, but then it's not

6      statistically significant.  And I think the

7      term that I would use in that situation is

8      more of a "trend."

9              It may be in the positive direction,

10     but as you know, when you apply those

11     confidence intervals because of random

12     results, that result does not usually meet

13     what is really an arbitrary barrier of what is

14     the 95 percent confident interval, which is

15     what we use for things, but that is

16     really a -- while it's kind of been agreed

17     upon through the years, it's just a number

18     that people hold to, so that's often how I

19     view that situation.

20         Q.   It's an arbitrary barrier, but one

21     that everybody uses, right?

22         A.   Yes, I mean, there are situations that

23     I've seen where people have tried to adjust

24     that by making arguments for that, so...
```

Edwin P. Alyea, M.D.

```
 1           Q.   I guess my question has to do with --

 2      the term "association" generally means, would

 3      you agree, an increased risk that's

 4      statistically significant.

 5               That's the way the term "association"

 6      is typically used?

 7                         MR. DIAMOND:   Form.

 8           A.   In my interpretation, it would often

 9      be a positive association would mean a linkage

10      between these two items.

11      BY MR. PIORKOWSKI:

12           Q.   And then once you determine if there's

13      an association, then there's a separate

14      question of whether that association is

15      causal; is that fair?

16           A.   So when you have associations, one may

17      use that in enough situations to say that is

18      the cause or that is hypothesis-generating for

19      somebody to go back and delve in another way

20      to say, what -- what is this association.

21           Q.   But that's -- I guess that's -- let me

22      just take a giant step back and ask you if you

23      sort of agree with this approach.

24               In establishing a cause and effect
```

Edwin P. Alyea, M.D.

```
 1          relationship, I've heard it described as a

 2          two-step process.  Step one is demonstrating

 3          an association, which is interpreted to mean a

 4          study or studies that show a statistically

 5          significant increased risk, and the second

 6          step is an analysis of different factors as to

 7          whether that association is causal.

 8                   And as a part of the second step, you

 9          look at things like consistency of the

10          association, the magnitude of the risk,

11          biological plausibility, and other factors

12          such as that.

13                   Is that a familiar construct?

14               A.   So I believe I was trying to, perhaps,

15          allude to that but not as eloquently put as

16          yours, but yes, you go then and take a look at

17          it, and how you reach that result may involve

18          many of those steps or it may involve a lot of

19          one group across a variety of studies in

20          different ways that have different elements

21          all arriving at the same answer.

22               Q.   Now, of the four studies that showed

23          the statistically significant elevated odds

24          ratio -- let me back up.
```

Edwin P. Alyea, M.D.

```
 1                    First of all, all of the studies that
 2         showed an increased odds ratio were all
 3         studies that had a case control study design,
 4         correct?
 5              A.   I would have to refer back to each of
 6         those studies, but as I...
 7              Q.   Why don't you take a look --
 8              A.   Okay.
 9              Q.   -- if you're not sure?
10              A.   To those four?
11              Q.   Yes.  I mean, just the fact that they
12         use the word "odds ratios," by definition
13         means it's a case control study, right?
14              A.   But I just want to be clear --
15              Q.   Sure.
16              A.   -- for each of those.
17              Q.   Please.
18              A.   (Witness reviews document.)
19                    As I've gone through the four here,
20         case control studies.
21              Q.   They're all case control studies,
22         okay.
23              A.   (Witness nodding.)
24              Q.   And I've been told by other folks in
```

Edwin P. Alyea, M.D.

```
 1        the transplant business that those in that

 2        specialty put very little stock in case

 3        control studies; is that true?

 4             A.   As I sit here today, I don't

 5        necessarily believe that to be true.  We look

 6        at a wide variety of studies.  Case control

 7        studies are often ones that are appropriate

 8        for certain circumstances.  Transplantation,

 9        which may have smaller end values, may be ones

10        that are -- case control studies are used a

11        little less often.

12             Q.   Are there a lot of circumstances in

13        the transplantation business where risks get

14        identified through case control studies that

15        pan out to be artifactual?

16             A.   Sitting here today, I can't think of

17        any -- bring any of those to mind.

18             Q.   Fair enough.

19                  And understanding that you're not an

20        epidemiologist but that you use studies on a

21        regular basis in your capacity as a medical

22        oncologist, what do you understand to be, in

23        general, the limitations of case control

24        studies vis-a-vis other types of studies?
```

Edwin P. Alyea, M.D.

1          A.   Well, I think, as a medical

2     oncologist, case control studies, a lot is

3     required to look at how the cases are

4     identified, and particularly, who the control

5     population is that one is identified against

6     because both of those have a significant

7     impact on being able to determine what the

8     perceived rate or association would be for the

9     condition that one is looking at.

10          Q.   So by design, a case control study is

11     a situation where you -- or the design of a

12     case control study is one where you identify

13     patients who have a certain disease or a

14     certain outcome, and then you look at a

15     control population of others who do not have

16     that disease or outcome; is that fair?

17          A.   That is a fair description, yes.

18          Q.   And then you look at those two

19     populations and evaluate their exposures, and

20     then you compare their exposures and get this

21     figure called an odds ratio, right?

22          A.   Well, that would be one way to

23     interpret for exposures or incidents thereof,

24     depending on the article of interest that

Edwin P. Alyea, M.D.

1        you're looking for.

2            Q.   Right.  But the -- like in this case,

3        you're -- whether you're talking about

4        exposure to glyphosate or exposure to some

5        other pesticide, the exposure is the -- you're

6        looking -- you're comparing the exposure in

7        the case population to the exposure in the

8        control population, right?

9            A.   That would be one of the comparisons,

10       yes.

11           Q.   What other limitations are there,

12       generally, about case control studies?

13           A.   Well, other limitations, as, again, a

14       medical oncologist reviewing a study, you look

15       at the power of the study to identify a

16       difference, and that often -- whether the

17       control population and the case population are

18       powered to answer a question.

19               Follow-up is also very important, and

20       compliance with follow-up is very important.

21       You may enroll a large number in the

22       beginning, but if you're not able to follow

23       people over a certain period of time, then the

24       value of that may be different.

Edwin P. Alyea, M.D.

```
 1              Q.   I lost you because the question was

 2        related to case control studies, and you're

 3        not really enrolling people in a case control

 4        study, right?

 5              A.   Well, often you're sequentially

 6        enrolling people as they come through for

 7        things, and I guess --

 8              Q.   Okay.

 9              A.   -- again, power is important.  The

10        period of time in which you enroll somebody,

11        often is important.

12              Q.   Now, of the -- of the four -- the four

13        of the six studies that you say show

14        statistically significant elevated odds ratio,

15        which of those included an adjustment for

16        exposure to other pesticides or herbicides?

17              A.   Well, I'd have to go through and look

18        at each one of these individuals --

19              Q.   Please do.

20              A.   -- and look at the tables associated

21        with them.

22              Q.   Please do.

23              A.   (Witness reviews document.)

24                   So in the McDuffie paper, multivariate
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

1       models were included, exposures to other

2       classes.

3             Q.   And when adjusted for other exposures,

4       what was the result for glyphosate?

5             A.   So the specific reference to

6       glyphosate is in Table 8, which involves days

7       of exposure to the agent.

8             Q.   And what was the odds ratio when it

9       was adjusted, is, I guess, my question?

10            A.   As we're sitting here today, I would

11      have to take a look further back to rereview

12      this as to those odds ratios for the

13      adjustments.

14            Q.   All right.  What's -- next one on your

15      list, Hardell.  Do you have Hardell?

16            A.   (Witness reviews document.)

17                 So in Hardell, Table 5, shows an

18      univariate relationship.  In the multivariate

19      relationship, the value crosses 1.

20            Q.   And what does that mean?

21            A.   That means in the multivariate

22      analysis, it does not maintain a statistical

23      significance.

24            Q.   And by a "multivariate analysis," just

Edwin P. Alyea, M.D.

1        so we're clear on terminology, that would be

2        the analysis that adjusts for other use of

3        other compounds, is that right, in the context

4        of this paper?

5              A.  So I would have to go back and

6        review --

7              Q.  Take a second.

8              A.  -- for that --

9              Q.  Fine.

10             A.  -- but it also can be age.  It can be

11       location.

12             Q.  Sure.

13             A.  It can be a variety of things.

14             Q.  Sure.

15             A.  (Witness reviews document.)

16                 To speak fully to this, as I read it

17       here today, I would need to see what

18       components they included in the multivariate

19       analysis.

20             Q.  Well, let me just see if I can take a

21       step back and just simplify what it means.

22                 Univariate analysis means when you

23       look at that exposure in isolation, the

24       result -- that's the result that you get.

Edwin P. Alyea, M.D.

```
 1         That's what an univariate analysis means,

 2         right?

 3              A.   In my sitting here today, yes, how I

 4         interpret it.

 5              Q.   A multivariate analysis -- we can go

 6         back and look at what was involved in that,

 7         but a multivariate analysis represents the

 8         author's effort to adjust for things that are

 9         potential confounding factors; is that a

10         fair --

11              A.   As we sit here today, yes, and those

12         factors could be wide-ranging factors.  And

13         often, in manuscripts, part of the description

14         is what is included in the multivariate

15         analysis so that the reader can conclude

16         whether factors that they were -- thought were

17         important or not were included in that for

18         analysis.

19              Q.   And would you agree that Hardell is an

20         article that, when you look at glyphosate in

21         isolation, it shows an increased odds ratio,

22         but when you look at it in the multivariate

23         analysis adjusting for other things, the risk

24         is not significantly elevated; is that fair?
```

Edwin P. Alyea, M.D.

1          A.   As we look, again, at Hardell and

2     Table 7, yes, we see a ratio in the

3     multivariate analysis that is not

4     statistically significant, although greater

5     than one.

6          Q.   Okay.

7

8          (Exhibit No. 9 marked for

9     identification.)

10

11    BY MR. PIORKOWSKI:

12         Q.   I know you're looking at your own

13    copy, Doctor, but what I've marked as

14    Exhibit 9, is that the study we've been

15    referring to as Hardell?

16         A.   (Witness reviews document.)

17              Yes, that is the same copy that I've

18    got.

19         Q.   I just wanted the record to be clear.

20    Thanks.

21              Then the next one is De Roos 2003.  Do

22    you have that?

23                   MR. PIORKOWSKI:  Let me mark

24    that also.

Edwin P. Alyea, M.D.

 1

 2                 (Exhibit No. 10 marked for

 3          identification.)

 4

 5          A.    (Witness reviews document.)

 6                 So as we -- as I look at the issue

 7          that's been raised, if we look at Table 3 --

 8          Q.    Yes, sir.

 9          A.    -- and for glyphosate, if you look at

10          the logistical progression --

11          Q.    Right.

12          A.    -- but then the hierarchical

13          regression --

14          Q.    Uh-huh.

15          A.    -- is a number that's still in the

16          positive trend, but the confidence interval is

17          across 1.

18          Q.    What's your understanding of the

19          difference between the logistical progression

20          and hierarchical regression?

21          A.    My understanding, as a medical

22          oncologist and having read the papers, the

23          hierarchical regression is a way they're

24          attempting, in their process, to deal with the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

```
1          issue of multiple pesticides exposures.

2             Q.   And so similar to the Hardell article,

3          this would be another paper that stands for

4          the proposition that when looking at

5          glyphosate in isolation, there's an increased

6          risk of, when adjusting for other potential

7          confounding factors, it doesn't achieve

8          statistical significance; is that fair?

9                         MR. DIAMOND:  Form.

10            A.   So in viewing here today, I would

11         agree on the surface with that suggestion, and

12         I think it would be important for an

13         epidemiologist to help us understand, in the

14         hierarchical regression analysis or in the one

15         that we talked about previously, kind of what

16         the -- how many factors they're looking at,

17         how that affects the ability to see a

18         difference, but that is the -- as is reported

19         in the table.

20            Q.   And as was the case with a number

21         of -- the McDuffie paper, this paper evaluates

22         a variety of different insecticides and

23         herbicides; is that fair?

24            A.   In reviewing the different agents they
```

Edwin P. Alyea, M.D.

```
 1        have listed, I would say -- I would agree with

 2        you.

 3             Q.   And do you see, in the beginning, the

 4        abstract, which does include a discussion of

 5        glyphosate, but it says, "Reported use of

 6        several pesticides was associated with

 7        increased NHL incidence, including

 8        organophosphate insecticides, coumaphos,

 9        diazinon, fonofos insecticides, chlordane,

10        dieldrin, and copper acetoarsenite, and

11        herbicides atrazine, glyphosate, and sodium

12        chlorate, correct, as you read?

13             A.   Yes, sir.

14             Q.   And the subanalysis of these, quote,

15        potentially carcinogenic pesticides suggested

16        a positive trend of risk with exposure to

17        increasing numbers, which is the point you

18        were alluding to earlier, right?

19             A.   Correct.

20             Q.   What -- we didn't talk about --

21        Eriksson 2008, I think, is the last one.

22

23                  (Exhibit No. 11 marked for

24        identification.)
```

Edwin P. Alyea, M.D.

1

2              (Witness reviews document.)

3       BY MR. PIORKOWSKI:

4            Q.   Did you have a chance take a look at

5       that?

6            A.   Yes, sir.

7            Q.   And we were going through these

8       because you had identified them as studies

9       that had shown a statistically significant

10      elevated risk, and you were answering the

11      question of whether there was an adjustment

12      for use of other pesticides and insecticides.

13           A.   Yes, sir.

14                So as we review this publication,

15      which is Eriksson, Table 7, again, identifies

16      a positive odds ratio of 2 for glyphosate with

17      confidence intervals that are above 1.  In the

18      multivariate analysis, the confidence

19      intervals expand over 1.

20           Q.   So if we go back -- so when you

21      identify that three of the publications

22      adjusted for risks associated with exposure to

23      other agents, those are the three papers we

24      just discussed, right?

Edwin P. Alyea, M.D.

```
 1          A.   Correct.

 2          Q.   And each of those three papers found

 3     that there was an increased risk when

 4     glyphosate was looked at by itself, but when

 5     adjusting for other factors such as exposure

 6     to pesticides or insecticides, the risk was

 7     not statistically significant; is that true?

 8          A.   In the three that we have reviewed,

 9     correct.

10          Q.   Now, if we go back to your original

11     six, your original six include Cocco and Orsi,

12     right --

13          A.   Yes, sir.

14          Q.   -- which you said do not -- do not

15     show a statistically significant increased

16     risk, correct?

17          A.   Correct.

18          Q.   Let me ask you, have you -- have you

19     looked at --

20               MR. PIORKOWSKI:  Let's mark this

21     as the next exhibit.

22

23               (Exhibit No. 12 marked for

24     identification.)
```

Edwin P. Alyea, M.D.

```
1

2      BY MR. PIORKOWSKI:

3          Q.   Have you looked at an article -- have

4      you look at what I've marked as Exhibit 12,

5      which is an article by Hohenadel?

6          A.   As I sit here today, no, I do not

7      recall looking at this article.

8          Q.   So if we go back to your -- kind of to

9      your original six studies, we have three of

10     the six that show an increased risk when

11     glyphosate is looked at by itself and not when

12     it's looked at in a multivariate analysis and

13     two that showed no increased risk, period,

14     correct?

15         A.   I believe we'd have to review Cocco as

16     to whether that had a positive trend but did

17     not reach a level of statistical significance

18     while the other did not identify.

19         Q.   But my characterization of the

20     statistical significance of those five studies

21     is correct; is that right?

22         A.   If you could repeat it please, so I

23     could be accurate.

24         Q.   Sure.  So we talked about three of the
```

Edwin P. Alyea, M.D.

 1      six studies that showed an increased risk when

 2      glyphosate was looked at by itself, but not

 3      when it was looked at in a multivariate

 4      analysis, correct?

 5          A.   I agree with you.

 6          Q.   And then we have two studies that did

 7      not show a statistically significant risk of

 8      glyphosate; is that fair?

 9          A.   Correct.

10          Q.   Okay.  And is there -- is there one

11      study you found that had an increased risk

12      that did not -- but did not adjust?

13              Am I missing...

14                  MR. DIAMOND:  Form.

15          A.   As I sit here today, I would have to

16      review that.

17      BY MR. PIORKOWSKI:

18          Q.   Okay.  All right.  Let me move on to

19      something else.

20              Are you doing okay?  You're good?

21          A.   I'm okay.  Thank you.

22          Q.   So on Page 7 of your report, after you

23      talk about the studies, you say,

24      "International organizations have also

Edwin P. Alyea, M.D.

1        identified an increased risk of lymphoma and

2        glyphosate."

3                Do you see that?

4        A.   Yes.

5        Q.   And really what that should say is,

6        "An international organization has

7        identified," true?

8                        MR. DIAMOND:  Form.

9        A.   Well, as I reflect on the

10       international organizations, I was certainly

11       referring to the one document that you -- or I

12       think was also trying to refer to other

13       collective studies, but, perhaps, those are

14       best not referred to as organizations, but

15       studies.

16       Q.   Well, and I think you alluded to this

17       earlier --

18       A.   Yeah.

19       Q.   -- but are you aware of any

20       international organization other than IARC

21       that has made a determination that glyphosate

22       is probably carcinogenic?

23       A.   As I --

24                        MR. DIAMOND:  Form.

Edwin P. Alyea, M.D.

```
 1                    THE WITNESS:  Sorry.

 2          A.   -- as I sit here today, as we

 3     discussed, I am aware of the IARC.  I was also

 4     aware, at the time of writing my report, the

 5     results from the EPA as well as the European

 6     food safety authority.  I have not had an

 7     opportunity to review other analyses of this

 8     issue.

 9     BY MR. PIORKOWSKI:

10          Q.   So would you agree with my original

11     question that this should say, "An

12     international organization has also identified

13     an increased risk of lymphoma in

14     glyphosate"?

15          A.   I would agree with your correction of

16     the grammar.

17          Q.   Did you -- you said you looked at

18     EPA's assessment and their review.

19               Do you have an understanding of how

20     the process that IARC follows is different

21     from the process that EPA follows for coming

22     to its determination?

23          A.   As I sit here today, I did review the

24     categorizations as these organizations have
```

Edwin P. Alyea, M.D.

1      and realize, in the IARC, the designation that

2      they provide of a -- as I recall, a 2A

3      recommendation, and then understanding how the

4      EPA takes its different data to pull together

5      to reach its conclusion.

6           Q.   So I guess I'm asking a little

7      slightly different question.  I'm asking

8      about -- do you understand that EPA is a

9      federal government agency of the United

10     States?

11          A.   I have a general -- understanding of

12     that, yes.

13          Q.   And do you understand that there's a

14     process that federal agencies, such as the

15     EPA, have to follow when they're issuing a

16     statement similar to the ones EPA issued?

17                    MR. DIAMOND:  Form.

18          A.   As I sit here today, I did read the

19     EPA report in its entirety, which, in the

20     preamble, reviews that.

21     BY MR. PIORKOWSKI:

22          Q.   And I'm assuming you're not -- do you

23     have any expertise in government agency

24     procedures or have familiarity with government

Edwin P. Alyea, M.D.

```
1        agency procedures through any other

2        professional work that you've done?

3            A.   No, sir.

4            Q.   Are you aware that when a government

5        agency is going to issue findings, that it's

6        incumbent on them to issue a draft of their

7        findings before those findings become

8        finalized?

9            A.   As I sit here today, I do recall,

10       somewhere in my reading, someone commenting on

11       the draft.  What I would say is I focused on

12       that final report that was there.

13           Q.   Right.  But my -- do you understand

14       that there's a process that EPA is involved

15       with that involves issuing a draft of

16       preliminary findings, publishing that draft in

17       the Federal Register for notice and comment by

18       the world at large, the scientific community,

19       the medical community, the public, industry,

20       anybody who wants to comment has an

21       opportunity to comment?

22               That's followed by another step

23       whereby all those comments have to be

24       addressed by people at the EPA, and so if
```

Edwin P. Alyea, M.D.

```
 1        somebody says, We think this study had too

 2        much loss to follow up, and so you're putting

 3        too much stock in it, they have to address

 4        those kinds of findings.

 5                And then it's only then after this

 6        opportunity for notice and comment that EPA

 7        issues its final decision.

 8                Do you have an understanding of that

 9        process?

10                    MR. DIAMOND:  Form.

11        A.   As I sit here today, I'm generally

12        aware of that process in a variety of areas of

13        my field of a --

14        Q.   Right.

15        A.   -- report being initiated a period for

16        comment, and then production of that.

17                With respect to the timing, the

18        contents of the draft, the feedback for this

19        situation, I do not have familiarity with

20        those documents, but I did review the final

21        declaration.

22        Q.   And I'm not asking you about any

23        details of the drafts or the comments or

24        anything like that.  I'm just trying to
```

Edwin P. Alyea, M.D.

```
1        get a -- whether you understand the process,

2        basically.

3             A.   (Witness nodding.)

4             Q.   Do you -- you're familiar with FDA on

5        any levels like this?

6                  In other words, FDA has a similar --

7        similar requirements.  And I don't know, by

8        virtue of the research you've done, whether

9        you've had a similar experience with FDA.

10            A.   So --

11                      MR. DIAMOND:  Form.  Sorry.  Go

12       ahead.

13            A.   -- in a very distant exposure to

14       processes through the FDA, but I have not

15       been, say, a part of a drug approval or

16       anything like that through that process.

17       BY MR. PIORKOWSKI:

18            Q.   All right.  So by contrast, you

19       understand that IARC is pretty much all behind

20       closed doors and nobody has any basis to

21       challenge their findings, to ask questions, to

22       say did you consider this information,

23       anything of that nature.

24                  Do you understand that that's the
```

Edwin P. Alyea, M.D.

1       nature of the proceeding with IARC?

2                       MR. DIAMOND:  Form.

3           A.   As I sit here today, I am not familiar

4       with their procedure.

5       BY MR. PIORKOWSKI:

6           Q.   Okay.  Now, one of the things I want

7       to ask you about -- and I don't know if you --

8       you said you read Dr. Levine's report but just

9       on Wednesday night, I think?

10          A.   I received it Wednesday night and have

11      had one opportunity to read through it.

12          Q.   One of the things that she points out

13      in her discussion on -- do you have a copy of

14      her report with you?

15          A.   I do not.

16          Q.   You don't, okay.

17          A.   I could only print so much material.

18          Q.   Fair enough.  Give me a moment.

19

20                  (Exhibit No. 13 marked for

21      identification.)

22

23          A.   Seeing the volume of it, I didn't

24      think it was a document that I seem --

```
  1        BY MR. PIORKOWSKI:

  2             Q.   The actual report is only --

  3             A.   Yes, now I --

  4             Q.   It's only 15 pages?

  5             A.   The first part looks familiar.

  6             Q.   Okay.

  7             A.   But again, I only received it

  8        Wednesday --

  9             Q.   That's fair.

 10             A.   -- reviewed it once during a busy

 11        several days of work.

 12             Q.   Well, I am looking at this in lieu of

 13        bringing the whole IARC monograph, which is

 14        500 pages.

 15                  So I want to -- here's what I'd like

 16        to focus you on for a minute is you talked

 17        about the fact that the IARC classified it

 18        as 2A, probable carcinogenic, correct?

 19             A.   Correct.

 20             Q.   But I want to drill down for a second

 21        about what that actually means using IARC's

 22        own terms, okay?

 23             A.   (Witness nodding.)

 24             Q.   So one of the things that they find is
```

Edwin P. Alyea, M.D.

 1        that there's limited evidence in humans for

 2        the carcinogenicity of glyphosate and that the

 3        positive association -- positive association

 4        has been observed for non-Hodgkin's lymphoma.

 5               Is that consistent with your

 6        understanding of what IARC found?

 7                     MR. DIAMOND:  Form.

 8        A.   So I would have to review the IARC

 9        document, or if you would like to refer me to

10        a place within this report.

11        BY MR. PIORKOWSKI:

12        Q.   Oh, I'm sorry.  I thought -- Page 22.

13        A.   I'm sorry if I missed that.

14        Q.   I may have -- my lapse.

15        A.   (Witness reviews document.)

16        Q.   Are you with me?

17        A.   Yes, sir.

18        Q.   You see where she says -- on Page 22,

19        she says, "An IARC monograph published in 2015

20        collected the published epidemiological

21        evidence that was available at the time and

22        found 'limited evidence in humans for the

23        carcinogenicity of glyphosate.  A positive

24        association has been observed for

Edwin P. Alyea, M.D.

1       non-Hodgkin's lymphoma.'"

2                Is that -- did I read that correctly?

3            A.   Yes, sir.

4            Q.   And let's -- assuming that Dr. Levine

5       copied that correctly from the IARC monograph,

6       she goes back and refers to the preamble to

7       the monograph, which is the section of the

8       monograph that provides the definitions of

9       what certain terminology means.

10               Is that consistent with your review of

11      IARC's monograph?

12           A.   Yes, sir.

13           Q.   And when they say "limited evidence of

14      carcinogenicity," the definition for that is,

15      "A positive association has been observed

16      between exposure to the agent and cancer for

17      which a causal interpretation is considered by

18      the working group to be credible, but chance

19      by bias or confounding could not be ruled out

20      with reasonable confidence."

21               Did I read that correctly?

22           A.   Yes, sir, you did.

23           Q.   Is that your consistent -- consistent

24      with your understanding of what IARC's finding

Edwin P. Alyea, M.D.

```
 1      means?

 2                      MR. DIAMOND:  Form.

 3          A.   So my understanding of IARC is the

 4      designation of 2A, which meets the criteria

 5      that they outline for a 2A level of

 6      designation.

 7      BY MR. PIORKOWSKI:

 8          Q.   Right, but what I'm asking is -- they

 9      use the term -- IARC uses the term "limited

10      evidence of -- in humans for the

11      carcinogenicity of glyphosate."

12               That's their words, right?

13                      MR. DIAMOND:  Form.

14          A.   So those are the definitions that they

15      apply to put into the categories that they

16      want to address to give an appropriate level

17      of designation.

18      BY MR. PIORKOWSKI:

19          Q.   Well, limited evidence is what they

20      found with respect to glyphosate.  What I just

21      did is go back to the definition of what does

22      limited evidence mean; is that fair?

23                      MR. DIAMOND:  Form.  If you're

24      representing to him that's what it is, he's
```

Edwin P. Alyea, M.D.

```
1        agreed that he'll accept that.

2        BY MR. PIORKOWSKI:

3             Q.   Yes.  Well, I just want to make sure

4        we're not -- we're on the same page, and I

5        also don't want to confuse you.

6                  So the wording that they use with

7        respect to glyphosate in the glyphosate

8        section is that they found limited evidence in

9        humans for the carcinogenicity of glyphosate,

10       okay?

11                       MR. DIAMOND:  Form.

12       BY MR. PIORKOWSKI:

13            Q.   You understand?

14            A.   Yes.

15            Q.   I'm representing -- I'm representing

16       that to you.

17            A.   I'm following you reading that, yes.

18            Q.   All right.  When you go back to the

19       definition section of what does limited

20       evidence mean, it's saying, "A positive

21       association has been observed between exposure

22       to the agent in cancer for which a causal

23       interpretation is considered by the working

24       group to be credible, but chance bias or
```

Edwin P. Alyea, M.D.

```
1       confounding could not be ruled out with

2       reasonable confidence."

3              Is that --

4       A.   I agree with what you read.

5       Q.   Okay.  And what does that mean to say

6       that "chance bias and confounding cannot be

7       ruled out with reasonable confidence"?

8                        MR. DIAMOND:  Form.

9       BY MR. PIORKOWSKI:

10      Q.   What's your understanding of what that

11      means?

12      A.   As I sit here today, my understanding

13      is very much as we reviewed in the article,

14      univariate association, which was

15      statistically significant.

16             However, when looked in a multivariate

17      analysis, which can be very complicated and

18      has to account for multiple factors and you

19      may be actually even performing a multivariate

20      analysis with so many factors something would

21      never be positive, but it has raised that

22      issue that there are confounding factors.

23      Q.   Why don't we do this?  Before we take

24      another break, what I'd like to do is just
```

Edwin P. Alyea, M.D.

```
 1        have you walk me through the binder and maybe

 2        I can take a look at it on the break.  Just

 3        explain to me sort of what's in there, but do

 4        it on the record.

 5            A.   Okay.

 6            Q.   Is that okay?

 7                 You kind of gave me an overview

 8        before, but I'd just like to walk through it a

 9        little more systematically.

10                      MR. DIAMOND:  I think he has an

11        index he might be able to give you.

12                      MR. PIORKOWSKI:  That's fine.

13        However -- whatever makes sense to do it the

14        most efficient way is fine.

15                      MS. HOVIS:  This is the IARC

16        monograph that says "limited," and then this

17        is the press release that talks about --

18                      MR. PIORKOWSKI:  We'll deal with

19        that.

20                      MS. HOVIS:  Okay.  All right.

21            A.   So walk through --

22        BY MR. PIORKOWSKI:

23            Q.   Yes, sir.

24            A.   -- what's contained within here --
```

Edwin P. Alyea, M.D.

```
 1          Q.   Yes.

 2          A.   -- which is what I have a put

 3     together?

 4          Q.   Yes.

 5                    MR. DIAMOND:  Does that have an

 6     index?

 7                    MR. PIORKOWSKI:  Please give --

 8                    THE WITNESS:  It does not have

 9     an index.

10                    MR. DIAMOND:  What is this?

11                    THE WITNESS:  I did my very best

12     to compile all up -- all myself, so this is

13     references by appearance within the report.

14     BY MR. PIORKOWSKI:

15          Q.   By appearance?

16          A.   By how they appear in the report --

17          Q.   I see.

18          A.   -- by order.  So in case you and I

19     were going through it and you referred to a

20     certain section, I would be able to --

21          Q.   Gotcha.  So first one in the report is

22     the first one in the --

23          A.   Right, rather than alphabetically.

24          Q.   Okay.
```

Edwin P. Alyea, M.D.

```
 1              A.   The second is my report.

 2              Q.   Okay.  Your amended one -- or your

 3         supplemental one or your original one?

 4              A.   This is actually the -- this is

 5         actually the original one, not the

 6         supplemental one.

 7              Q.   Okay.

 8              A.   This is the bibliography that goes

 9         along with it by -- alphabetically.

10              Q.   Okay.

11              A.   This is the bibliography with the

12         abstracts for each of the articles that I've

13         included.

14              Q.   Okay.

15              A.   This is more of the same bibliography

16         without the abstracts attached to it, and then

17         we begin the articles, which are indexed as

18         best I could.

19              Q.   And are all the articles and the

20         bibliography in the binder?

21              A.   To my knowledge, when I assembled this

22         with a colleague, yes.  And that's what's in

23         the white binder.

24                   And at the back of the white binder,
```

Edwin P. Alyea, M.D.

1      because I ran out of hole punches, is the

2      third amended fact sheet tucked into the back

3      whatever-you-call-it pocket.

4           Q.   That's all that's in there?

5           A.   That's all that's in there.

6           Q.   Are this articles highlighted?

7           A.   So I did not highlight any articles.

8      There were a couple where I put a -- just a

9      mark under glyphosate, but I did not highlight

10     any of the articles.

11          Q.   And if it's okay if we take a look at

12     that on the break there?

13          A.   Yes, sure, sure.  Will I get it back,

14     or some form of it?

15          Q.   You will.  I need to --

16          A.   I spent a lot of time on it.

17          Q.   -- I need to -- I need to figure out

18     whether I need to make a copy of it for -- as

19     an exhibit or whether we can just maybe copy

20     the bibliography, and that's really it.

21          A.   Understood.

22                    MR. PIORKOWSKI:  Why don't we go

23     ahead and take a break and we can --

24                    MR. DIAMOND:  Fine.

Edwin P. Alyea, M.D.

```
 1                      THE VIDEOGRAPHER:   The time is

 2         3:05 p.m.  This concludes Tape 3.  We are off

 3         the record.

 4

 5              (Exhibit No. 14 marked for

 6         identification.)

 7

 8              (Exhibit No. 15 marked for

 9         identification.)

10

11              (Recess was taken from 3:05 p.m. to

12         3:29 p.m.)

13

14                      THE VIDEOGRAPHER:   The time is

15         3:28 p.m.  This is the beginning of Tape 4.

16         We're back on the record.

17

18              (Exhibit No. 16 marked for

19         identification.)

20

21         BY MR. PIORKOWSKI:

22              Q.   Doctor, I've handed you what is marked

23         as Exhibit 14.  Could you just identify that

24         for the record?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

```
 1              A.   Yes, sir.  That is the appearance --

 2         references by appearance in the report.

 3              Q.   And could you identify 15, please?

 4              A.   These are the references in

 5         alphabetical order with the abstract included.

 6              Q.   And are the abstracts in Reference

 7         15 -- is that your summary or is that the

 8         abstract from the article itself?

 9              A.   To be clear, these are the abstract

10         from the article itself, so it's downloaded

11         the reference as well as the abstract with the

12         article.

13              Q.   Okay.

14                   MR. DIAMOND:  Here's your

15         originals back for your binder.

16                        THE WITNESS:  Great.

17                   MR. PIORKOWSKI:  If you want

18         to -- if you want to put those back just so

19         we're all...

20              (Witness complying.)

21                   THE WITNESS:  Thank you.

22         BY MR. PIORKOWSKI:

23              Q.   And I'm also going to hand you what

24         I've marked as Exhibit 16.
```

Edwin P. Alyea, M.D.

```
 1              And Exhibit 16 has -- do you see it

 2       has the language of the classification in it,

 3       on the second page, where it tells you what 2A

 4       means?

 5           A.   Yes, sir.

 6           Q.   And where it says, "This is used when

 7       there's limited evidence of carcinogenicity in

 8       humans and sufficient evidence of

 9       carcinogenicity in experimental animals," do

10       you see that?

11           A.   Yes, sir.

12           Q.   We talked previously about what

13       limited evidence meant, right?

14           A.   Yes, sir.

15           Q.   And --

16                MS. HOVIS:  That was the IARC

17       monograph preamble.

18                MR. DIAMOND:  Exhibit 16?

19                MS. HOVIS:  Right.

20       BY MR. PIORKOWSKI:

21           Q.   So let me ask a couple of kind of

22       clean-up questions of things that I skipped

23       over first time around.

24                First of all, you mentioned a couple
```

Edwin P. Alyea, M.D.

1       of times that you had a colleague that helped

2       you work on this; is that right?

3            A.   So I have an administrative assistant

4       in my office who -- I requested that they help

5       me run down articles and help me photocopy

6       them.

7            Q.   Is that the only duties that person

8       had?

9            A.   That is the only duties the person

10      had, other than assembling the binder for me.

11           Q.   And do you pay that person for those

12      duties?

13           A.   Yes, I told him I would pay him for

14      those duties.

15           Q.   On an hourly basis?

16           A.   I just offered a fixed sum for helping

17      because I didn't know how many hours it was

18      going to be.

19           Q.   Have you paid that person yet?

20           A.   I have paid him.

21           Q.   How much did you pay him?

22           A.   I paid him $1,200.

23           Q.   And we talked earlier about your

24      estimated hours and that your rate is $600 an

Edwin P. Alyea, M.D.

1       hour, correct?

2            A.   That's correct, sir.

3            Q.   Do you have a different rate for your

4       deposition?

5            A.   I would have to refer back to the -- I

6       usually have a sheet that has what my hours

7       are and what the deposition rate is, but I

8       believe it's the same.

9            Q.   You believe it's the same?

10           A.   Yeah.

11           Q.   Okay.  So we talked earlier about the

12      fact that you were originally contacted by

13      Elite, and then you were contacted by

14      plaintiff's counsel's office at some point in

15      August or September; is that right?

16           A.   Yes, sir.

17           Q.   And you said that the initial contact

18      was a phone call?

19           A.   Yes, sir.

20           Q.   And what was the next step?  Did

21      you -- were you -- you were asked to review

22      the case, as I understand it?

23           A.   As I recall, I was asked to review the

24      case, and we talked about how to send the

Edwin P. Alyea, M.D.

 1    materials.

 2        Q.   So what was the first step in terms of

 3    your looking at the medical literature on the

 4    issue of glyphosate and its relationship to

 5    NHL?  Did you conduct a medical literature

 6    search?  Did you have somebody else conduct a

 7    medical literature search?  Did they send you

 8    a package of materials, some combination of

 9    those things?

10        A.   So my work process here was first

11    reviewing the medical record, which arrived in

12    written form, and the deposition.  The second

13    step was reviewing the general causation

14    reports and then with that in mind and

15    thinking about the issues and confounding

16    issues, I began to assemble my report.

17             During this process, I looked up the

18    references that we have here, and I did a

19    Google search, a few items such as ████████

20    █ ████████████████████████████████████████████

21    just general searches.

22        Q.   And did you find all of the articles

23    that are in your binder yourself?

24        A.   I found all the articles in the binder

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

```
 1      myself with the exception of one, which I

 2      asked help in finding.  That was sent to me by

 3      the counsel.

 4           Q.   And that's not the one you still

 5      haven't been able to find.  That's a different

 6      one?

 7           A.   That is correct.

 8           Q.   And what -- which article is the one

 9      that you asked them to send?

10           A.   As I recall today, I think it's the

11      Zhang article, but I'm not sure.  I don't

12      recall.  Wasn't there a -- I don't recall.  I

13      think there was one article I couldn't find

14      that you sent me, as I recall, but the rest of

15      them I pulled myself, so.

16                I would have to review the e-mail that

17      it was in, so.

18           Q.   Fair enough.

19                All right.  And then what -- was there

20      a in-person meeting at some point?

21           A.   The first in-person meeting -- today's

22      Friday.  The only in-person meeting was

23      briefly on Wednesday.

24           Q.   And I assume there were a few phone
```

Edwin P. Alyea, M.D.

```
 1      calls in between?

 2          A.   Very few.

 3          Q.   Okay.  How did you know what issues to

 4      address?

 5          A.   Well, when I was asked to review the

 6      case, I knew --

 7                    MR. DIAMOND:  Let me just stop

 8      you for one second.  You don't want to get

 9      into attorney -- expert questions, dialogue,

10      and so I think what you're asking him is a

11      question that's not dependent on anything that

12      was discussed with counsel.

13                    MR. PIORKOWSKI:  Let me clarify

14      that.

15      BY MR. PIORKOWSKI:

16          Q.   Yes.  I'm not asking you about the

17      details of any of your discussions with

18      counsel, but this is a -- you've never done a

19      case like this before, right?

20          A.   I've never done a case like this

21      before, although I --

22          Q.   A case involving a product -- alleged

23      product-exposure injury?

24          A.   The only other time I've been asked to
```

Edwin P. Alyea, M.D.

```
1         opine on an exposure and risk of malignancy

2         was for an insurance company that asked me to

3         assess the risk of developing lymphoma in

4         firefighters.

5            Q.   And -- but how -- well, let me -- let

6         me ask you a couple of different questions.

7                Let's go back to -- let me start with

8         your conclusion.

9                You say at the end of your report that

10        "I conclude, to a reasonable degree of medical

11        certainty, that Mr. Ruben Hernandez's exposure

12        to glyphosate/Roundup is a substantial factor

13        contributing to the development of his

14        lymphoma," correct?

15           A.   That is as read.

16           Q.   And you don't say that his exposure to

17        glyphosate/Roundup is the cause of his

18        lymphoma, correct?

19           A.   That is correct.

20           Q.   And that's because you don't think

21        that, correct?

22                    MR. DIAMOND:   Form.

23           A.   As I sit here today -- and perhaps,

24        this gets to your earlier question, how did I
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

1          approach this, if I might, I approached it by

2          reviewing the medical record, satisfying

3          myself that he had lymphoma, and understanding

4          the diagnosis, the recommendations, the course

5          thereafter.

6                    Then I assessed risk factors or

7          confounding factors for lymphoma, reviewing

8          those, and I believe I've outlined in my

9          report what I believe are the other

10         significant confounding factors.

11                   Then I reviewed glyphosate and its

12         literature and risk of lymphoma to come to my

13         determination of how these factors interplay

14         and his development of lymphoma.

15         Q.   So when you talk about risk factors

16         for -- well, you said you looked at risk

17         factors for lymphoma and other significant

18         confounding factors.

19                   That's what you just said, right?

20         A.   If I were to reapproach that sentence,

21         I would say I thought of what are the risk

22         factors for lymphoma, reviewed his medical

23         record to identify risk factors for lymphoma,

24         assess what their role or possible role might

Edwin P. Alyea, M.D.

1    be in his development of lymphoma.

2         Q.   And when you're talking about the

3    other risk factors, the risk factors to which

4    you're referring are his ████████████████████

5    ████████████████

6         A.   Correct, that is one of them.

7         ██   ████████████████████████████████

8    ██ ████████████████████████████████

9              MR. DIAMOND:  Go ahead.

10        A.   As I read the record, ████████████

11   ██   ████████████████████  ████████████████

12   ██ ██████████████████████████████████████████

13   ██ ██████████████████████████████

14   ██ ██████████████████████████████████████

15   ██ ██████████████████████████████████████

16   ██ ████████████

17   BY MR. PIORKOWSKI:

18        ██   ████████████████████████████████████

19   ██ ██████████████████████████████

20   ██ ████████████████████████

21        A.   I would have to take a look at that at

22   this point.

23        Q.   Do you have that with you?

24        A.   It's in the back of the folder.

```
 1          Q.   Okay.

 2                    MR. DIAMOND:  Do you want him to

 3      look or --

 4                    MR. PIORKOWSKI:  Yes, I do.

 5          A.   (Witness reviews document.)

 6          ████████████████████████████████████

        ██ ████████████████████████████████

        ██ ████████████████████████████████████

        ██ ████████████████████████

10          Q.   Do you if that was a change from the

11      second amended complaint or the second amended

12      plaintiff fact sheet?

13          A.   As we discussed earlier, I have not

14      seen --

15          Q.   Well, you've seen it because I gave it

16      to you, but you haven't other than that,

17      right?

18          A.   Correct.

19          Q.   Fair enough.

20                    So let me go back.

21          ███████████████████████████████████

        ██ ███████████████████████████████

        ██ █████████████    █████████████████

24                    Whether you agree he met the
```

Edwin P. Alyea, M.D.



17          Q.   You didn't evaluate whether his --

18     whether other pesticides could have

19     contributed to his case for the reasons you've

20     already discussed, right?

21                    MR. DIAMOND:  Form.

22          A.   As I reviewed his exposure history, I

23     focused on glyphosate but also, in that

24     review, took into account that many of these

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

1     manuscripts also focused on other items that

2     were there.

3     BY MR. PIORKOWSKI:

4         Q.    And do you have an opinion, to a

5     reasonable degree of medical certainty,

6     whether other compounds that he was exposed

7     to, either herbicides or pesticides, were

8     substantial factors in contributing to the

9     development of his lymphoma?

10                    MR. DIAMOND:  Form.

11        A.    As I sit here today, I have not

12    considered further beyond the glyphosate with

13    respect to his confounding issues with the

14    articles, but I would also say I think we

15    reviewed earlier that there were no specific

16    items to focus on.

17    BY MR. PIORKOWSKI:

18        Q.    No specific exposures that were

19    identified?

20        A.    No specific pesticides to which I

21    could link a chemical compound to -- to then

22    direct my attention.

23        Q.    Now, if we go back to the third

24    amended complaint and his testimony --

Edwin P. Alyea, M.D.

```
 1                       MR. DIAMOND:  Plaintiff fact

 2       sheet or complaint?

 3                       MR. PIORKOWSKI:  Sorry.  I keep

 4       misspeaking.  I'm sorry.

 5                       MR. DIAMOND:  That's okay.  It's

 6       a long day.

 7       BY MR. PIORKOWSKI:

 8            Q.  If we go back to the third amended

 9       fact sheet, plaintiff fact sheet, and his

10       testimony, in his third amended fact sheet, in

11       multiple places, he says that he was exposed

12       to Roundup on a daily basis as a part of his

13       agricultural work, correct?

14            A.  That is correct.

15            Q.  In his testimony, when he's asking to

16       identify any herbicide that he's been exposed

17       to, he's not able to identify any herbicide,

18       including glyphosate, correct?

19                       MR. DIAMOND:  Form.

20            A.  As I recall, we'd have to go back and

21       review those specific words because herbicide,

22       pesticide have been used interchangeably.

23       BY MR. PIORKOWSKI:

24            Q.  Well, right --
```

Edwin P. Alyea, M.D.

```
 1              A.   Not interchangeably, but...

 2              Q.   Actually, I think we covered both of

 3         those -- both of his testimony on both

 4         herbicides and pesticides.

 5                   We can go back and take another look

 6         at it if you want, but do you recall whether

 7         he testified that he was not able to identify

 8         any herbicide to which he was exposed?

 9                        MR. DIAMOND:   Form.

10              A.   So that I understand the question,

11         when you say "identify the herbicide," by name

12         or by --

13              Q.   Yes.

14              A.   -- product category?

15              Q.   By either -- well, what do you mean by

16         "product category"?

17              A.   So my interpretation would be did he

18         name a product or a chemical compound that he

19         was exposed to versus a term that specifies a

20         general group of compounds, such as what you

21         asked me earlier today of herbicide,

22         pesticide, insecticide.

23              Q.   Well, so for example, we talked -- and

24         I'm not going to go over this again.   We
```

Edwin P. Alyea, M.D.

1    already read this into the record, but on Page

2    66 to 67 of his deposition, we talked about --

3    he said -- he was asked, "Any of the time that

4    you sprayed herbicide, was there a name of the

5    herbicide on the container?

6              "The can that they gave us was already

7    prepared.

8              "During any of the time that you

9    sprayed herbicide in agriculte, did you ever

10   learn the name of the herbicide that you were

11   spraying?

12             "I'm telling you again they don't tell

13   us."

14             That was a herbicide, which glyphosate

15   would fall under that category?

16        A.   (Witness nodding.)

17        Q.   I think I read two or three excerpts

18   similar to that, where he was not able to

19   identify, at any point in time, a herbicide to

20   which he was exposed.

21             Do you recall that --

22                  MR. DIAMOND:  Form.

23   BY MR. PIORKOWSKI:

24        Q.   -- testimony?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

```
 1            A.   So --

 2                    MR. DIAMOND:   Form.

 3            A.   So as I recall, when we reviewed

 4       those -- and again, my question back was, were

 5       we talking about the category of herbicide,

 6       which he may know he had been spraying a

 7       herbicide versus a specific herbicide that's

 8       being approached.

 9       BY MR. PIORKOWSKI:

10            Q.   The question's asking him whether he

11       knows the name of this specific herbicide.

12            A.   Right.  So getting to -- you're

13       asking -- I just want to be clear --

14            Q.   Right.

15            A.   -- in my answer.

16                 You're asking for a specific name for

17       a herbicide.  And as we reviewed in his

18       deposition earlier, I do not recall.

19            Q.   Now, would you agree with me that both

20       the information in the third amended plaintiff

21       fact sheet and the information in the

22       deposition can't both be correct?

23                 In other words, it can't be that he

24       recalls that he was exposed to Roundup on a
```

Edwin P. Alyea, M.D.

1      daily basis during his agricultural work, and

2      at the same time that he can't remember the

3      name of any herbicide to which he was ever

4      exposed.  Those two things are incompatible.

5            Would you agree with me?

6                  MR. DIAMOND:  Form.

7      A.  That was a long question.  If I could

8      break it out, to my understanding, these were

9      probably done at two separate times.

10     BY MR. PIORKOWSKI:

11     Q.  What was done?

12     A.  His deposition was done at one time

13     and his plaintiff fact sheet may have been

14     done at another.  I don't know the chronology.

15           So there may have been different

16     recall at different times.  I don't know.  I

17     don't know, but the --

18     Q.  Well, I'm not -- I'm not asking -- I'm

19     not asking you to explain the inconsistency.

20     I'm asking you to acknowledge that there's an

21     inconsistency.

22     A.  In one, Roundup is mentioned; in the

23     other, it is not.

24     Q.  Okay.  And so one or the other version

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

```
1        of that has to be correct, right?

2                        MR. DIAMOND:  Form.

3        BY MR. PIORKOWSKI:

4            Q.   I mean, either he was exposed to

5        Roundup in agricultural work, or he can't

6        recall whether he was ever exposed to

7        Roundup?

8                        MR. DIAMOND:  Form.

9            A.   I guess, as I sit here today, I don't

10       see my job as judging those two but to say

11       that these are there.

12       BY MR. PIORKOWSKI:

13           Q.   And I'm not saying it's your job.

14               As somebody who's here to be objective

15       and impartial, the conclusion may be different

16       if you accept his testimony versus if you

17       accept the plaintiff's amended fact sheet,

18       right?

19                        MR. DIAMOND:  Form.

20       BY MR. PIORKOWSKI:

21           Q.   I mean, in one circumstance his

22       exposure history is extremely significant, and

23       the other situation we don't even know if he

24       has any exposure history; is that a fair
```

 1      summary?

 2                      MR. DIAMOND:  Form.

 3           A.   As I sit here today, I reflect on how

 4      I put his exposure history together, which was

 5      a combination of his deposition and his third

 6      plaintiff fact sheet, which was what was

 7      available to me.

 8      BY MR. PIORKOWSKI:

 9           Q.   But there's nothing in the deposition

10      to put together.

11                  In other words, if he never identifies

12      having used Roundup or been exposed to Roundup

13      in agricultural work, how do you put that

14      together with the amended plaintiff's fact

15      sheet?

16                  That's what I'm trying to understand.

17                      MR. DIAMOND:  Form.

18           A.   Well, again, as I sit here today --

19      and it is a long question, so I want to make

20      sure I answer it correctly -- in the

21      deposition, he -- herbicides are asked about,

22      and there is no specific herbicide that is

23      mentioned.  In the plaintiff fact sheet, there

24      is a specific herbicide mentioned.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

 1      BY MR. PIORKOWSKI:

 2           Q.   I understand that.

 3                All right.  So let me go back to

 4      asking you about -- you talking about the --

 5      that you think Roundup was a substantial

 6      factor contributing to the development.

 7                You didn't use, as we said, the word

 8      "cause" in your report, correct?

 9           A.   That is correct.

10           Q.   ███████████████████████████████

███   ████████████████████████████████████████

███   █████████████████████████

███        ████████████████████████████████

███   █████████████████████████████████████

███        ██   ███████████████████████████████

███   █████████████

███        ██   ████████████████████████

███   █████████████

███             ████████████████   ██████

███        ██   ████████████████████████████████

███   ███████████████████   █████████████████████

███   ███████████████████████████

███   ██████████████████

███        ██   ████████████████████



1

2

3

4

5

6              MR. DIAMOND:  Form.

7

8

9

10

11

12

13

14

15

16

BY MR. PIORKOWSKI:

17      Q.   And is that true across the board?

18           In other words, is there ever a time

19   when you can say something was a cause of

20   somebody's lymphoma --

21              MR. DIAMOND:  Form.

22   BY MR. PIORKOWSKI:

23      Q.   -- as opposed to a contributing

24   factor?

Edwin P. Alyea, M.D.

```
 1                    MR. DIAMOND:  Form.

 2          A.   I think as I think about my personal

 3      practice, there are very few settings where I

 4      can link absolutely an event with what

 5      happens.  There are many associations that are

 6      there, but in terms of an event with a result

 7      that occurs -- so again, back to my statement,

 8      I would say that it is a potential

 9      contributing factor to his developing

10      lymphoma.

11          Q.   And --

12          A.   And this is a hypothetical case that

13      you presented.

14          Q.   Is there -- are there any exposures to

15      viruses, infectious -- other infectious

16      agents, chemicals, that you would consider to

17      be recognized cases of non-Hodgkin's

18      lymphoma?

19                    MR. DIAMOND:  Form.

20          A.   As I sit here today, I would need to

21      think about that in a broader term.

22      BY MR. PIORKOWSKI:

23          Q.   So as you sit here today, you have no

24      opinion?
```

1          A.   As I sit here today, I would need to

2     consider further an answer to that question.

3          Q.



Edwin P. Alyea, M.D.





Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.

```
 1                    MR. DIAMOND:  At the moment I

 2        wasn't sure if you were talking about

 3        something later, but now that we think about

 4        it -- I think about it, that's probably the

 5        only thing that you could mean, but

 6        nonetheless, I didn't analyze it fully at the

 7        time that I said form.

 8                    MR. PIORKOWSKI:  Let me restate

 9        the question to make sure it's clear for the

10        record.

11        BY MR. PIORKOWSKI:

12             Q.    ████████████████████████
```

Edwin P. Alyea, M.D.



REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

1       ███████████████

2            Q.   Fair.

3                 So we talked about the six studies

4       that are cited in your paper and we talked

5       about IARC's report.

6                 Have you evaluated the genotoxicity

7       literature?

8            A.   So I'm not an expert in that area, so

9       I have not reviewed the literature, other than

10      what is mentioned in the general causation

11      reports where it's been mentioned or in

12      reading the EPA report, as I recall.

13                I can't specifically speak to where it

14      is in the European food safety, but I did read

15      that as well.  But I would read those as part

16      of my full understanding of those documents.

17           Q.   So you evaluated, to the extent that

18      regulatory agencies that did a comprehensive

19      review of the literature and you look at those

20      reviews, to the extent that they reviewed

21      genotoxicity studies, you looked at what their

22      review had to say.

23                Is that a fair characterization?

24           A.   So I read those reviews, but I don't

Edwin P. Alyea, M.D.

1      have an opinion on those reviews.

2          Q.   And you're not planning to offer any

3      opinions about genotoxicity studies or the

4      role that that plays in establishing causation

5      in this case?

6          A.   No, sir.

7          Q.   What about mutagenicity studies

8      separate from genotoxicity studies?

9          A.   As I recall in reading those studies,

10     those were also areas that were touched on.

11     And a number of those areas, I did read them,

12     but I will not offer an opinion regarding

13     those.

14                    MR. PIORKOWSKI:  Let's mark this

15     as 17.

16

17              (Exhibit No. 17 marked for

18     identification.)

19

20     BY MR. PIORKOWSKI:

21         Q.   So this is -- so I'm going to hand you

22     a document that I didn't mark.  This exhibit

23     is a table that's taken from another document,

24     so I'm handing you the other document, just so

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

 1      you can appreciate the context of it.  But I

 2      didn't want to clutter the record with this.

 3                      MR. DIAMOND:  Which document is

 4      that?

 5                      MR. PIORKOWSKI:  Please take a

 6      look at it when you have a second.

 7              (Witness reviews document.)

 8      BY MR. PIORKOWSKI:

 9          Q.   For the record, what I handed you is a

10      document published by the Agency for Toxic

11      Substances and Disease Registry, which is part

12      of the US Department of Health and Human

13      Services, and it's a toxicological profile for

14      glyphosate draft for public comment, April

15      2019.

16          A.   (Witness reviews document.)

17              Just reading the forward to kind of

18      get a perspective as to what this is.

19              (Witness reviews document.)

20                      MR. PIORKOWSKI:  I really just

21      marked the table, but I wanted him to have

22      context for what the document was.

23                      MR. DIAMOND:  The table --

24                      MR. PIORKOWSKI:  The table is

Edwin P. Alyea, M.D.

```
 1      actually just a summary and -- it's a summary

 2      of findings of other agencies.  It's not

 3      really -- there's no real question about the

 4      document itself.

 5                  THE WITNESS:  Do you want to

 6      see?

 7                  MR. DIAMOND:  Thank you.

 8           (Brief pause.)

 9      BY MR. PIORKOWSKI:

10           Q.   And Doctor, I'm not going to be asking

11      any substantive questions on the document.  I

12      really just was giving you context for where

13      the table came from.

14           A.   Yes.  No, I was just trying to finish

15      reading who the contributors were to

16      understand where that information came from,

17      so I'll just take one more minute, if you

18      don't mind, sir.

19           Q.   Sure.

20           A.   (Witness reviews document.)

21           Okay.

22           Q.   I'll take that back, but keep the

23      Document 17.

24           A.   Keep the...
```

Edwin P. Alyea, M.D.

```
 1          Q.   Thanks.

 2          A.   I think -- do you have the front

 3     sheet?  Oh, okay.

 4          Q.   Do you see what I've marked as

 5     Exhibit 17?

 6          A.   Yes, sir.

 7          Q.   And I'll represent that this is page

 8     94 and 95 of this document.

 9               (Counsel indicating.)

10               MR. PIORKOWSKI:  Do you want to look

11     at that, David?

12     BY MR. PIORKOWSKI:

13          Q.   Do you see that?

14          A.   Yes, sir.

15          Q.   And I am marking this really just

16     because it's a helpful summary of different

17     findings of different organizations with

18     respect -- who have looked at this evidence

19     and what their conclusion was, okay?

20          A.   Yes, sir.

21          Q.   And I want to -- first question is do

22     you see, on the upper left, it says, "US

23     Environmental Protection Agency"?

24          A.   Yes, sir.
```

Edwin P. Alyea, M.D.

```
 1          Q.   And their classification says,

 2     "Strongest support is for not likely to be

 3     carcinogenic to humans," correct?

 4          A.   May I ask a question?  Is this just a

 5     carcinogenic classification or is this with

 6     respect to a particular item?

 7          Q.   I'm not sure I understand your

 8     question.

 9          A.   Is this table referencing a certain

10     item that they're classifying in each of these

11     areas or is this just the classification

12     schema?

13          Q.   No.  This whole document is about

14     glyphosate.

15          A.   So my question here -- sometimes a

16     document might say, here is our classification

17     schema, here is how we've applied our schema

18     to a particular substance.

19          Q.   No.  This isn't outlining the whole

20     schema.  This is -- this is reviewing the

21     findings of different agencies with respect to

22     glyphosates.

23          A.   Okay.

24          Q.   Okay?
```

Edwin P. Alyea, M.D.

```
 1          A.   Okay.

 2          Q.   Now, is that -- under the

 3    justification, does -- you said you've

 4    reviewed the EPA's review of this issue,

 5    right?

 6          A.   I read the EPA review, yes.

 7          Q.   And we'll take a look at that in a

 8    second, but is this -- does the justification

 9    that appears here seem consistent with your

10    recollection of your review of the EPA's

11    document?

12          A.   Given that I was just handed this

13    document, I would need to compare these --

14    this document with the EPA report to say for

15    certain.

16          Q.   Let's -- let me just ask you.

17               There's a comment about the Australian

18    Pesticides and Veterinary Medicines Authority.

19               Did you take a look at that

20    independently?

21          A.   No, sir, I did not.

22          Q.   There's the European Chemical Agency.

23               Did you look at that?

24          A.   No, I did not.
```

Edwin P. Alyea, M.D.

1          Q.   There's the European Food Safety

2      Authority?

3               Did you look at that?

4          A.   I believe that is the one that I have

5      listed in my references.

6          Q.   There's a joint finding by the Food

7      and Agricultural Organization and World Health

8      Organization joint meeting on pesticide

9      residues from 2016.

10              Did you look at that?

11         A.   I did not.

12         Q.   There's Health Canada reviews from

13     2015 and 2017.

14              Did you look at those?

15         A.   I did not.

16         Q.   And then there's IARC 2017.

17              You've reviewed that, correct?

18         A.   Yes, sir.

19         Q.   And then there's New Zealand's

20     environmental protection agency.

21              Have you reviewed that?

22         A.   I have not.

23

24              (Exhibit No. 18 marked for

Edwin P. Alyea, M.D.

```
 1      identification.)

 2

 3      BY MR. PIORKOWSKI:

 4          Q.   Doctor, I've marked as Exhibit 18 a

 5      document that is entitled, "Glyphosate

 6      Re-evaluation Decision" that's promulgated by

 7      Health Canada in 28 April 2017.

 8              Do you see that?

 9          A.   Yes, sir.

10          Q.   And as I think I understood your

11      testimony, you have not reviewed this,

12      correct?

13          A.   That is correct.

14          Q.   Do you know what conclusion Health

15      Canada reached when they looked at this issue?

16          A.   This was --

17                  MR. DIAMOND:  Form.

18          A.   As of today, this was just handed to

19      me, so I have not reviewed it.

20      BY MR. PIORKOWSKI:

21          Q.   No, I understand that, but I'm

22      asking -- I'm not asking -- I think you

23      already made clear you didn't review it, but

24      that's a different thing than knowing what
```

Edwin P. Alyea, M.D.

1        their conclusion was.

2                You could know what their conclusion

3        was from other sources, and that's what I'm

4        asking now.

5            A.   Sitting here today, I would be

6        reluctant to take other people's words for it

7        without reviewing it myself and the importance

8        of this.

9            Q.   Do you -- do you view EPA and Health

10       Canada as being objective and unbiased

11       agencies whose primary mission is to protect

12       the public health?

13                    MR. DIAMOND:   Form.

14           A.   As I sit here today, I have not given

15       great thought to the issues that you just

16       raised about these organizations.   I know that

17       they are there.   I know they have duties.

18       BY MR. PIORKOWSKI:

19           Q.   Well, you understand that their

20       mission statements are to protect the public

21       health, right?

22           A.   Sitting here today, I have not read

23       their mission statements, but I would be safe

24       to assume that their goal is to do that.

Edwin P. Alyea, M.D.

```
 1                    MR. DIAMOND:  Joe, the judge

 2         made a ruling that the -- the specific

 3         causation expert couldn't even rely upon any

 4         of these studies, and so I just have an

 5         objection to your question just based upon

 6         that as well.

 7                 I think we're kind of getting a little

 8         far afield of things that the judge is going

 9         to actually let in -- in these cases.

10                    MR. PIORKOWSKI:  That may be,

11         but that's a big point of appeal for us,

12         frankly.  I mean, it's a little bit like

13         the -- like --

14                    MR. DIAMOND:  I'll give you

15         leeway, but I'm just saying that it's -- you

16         know, from my perspective, I don't want to

17         spend hours on this -- these issues

18         particularly in -- I don't want to -- I'm just

19         going to say I'm not sure if he hasn't relied

20         on these documents either.

21                    MR. PIORKOWSKI:  No.

22                    MR. DIAMOND:  The summary, I

23         think he said he relied on some of the

24         studies, but not the --
```

Edwin P. Alyea, M.D.

```
 1                      MR. PIORKOWSKI:  Well, the --

 2                      MR. DIAMOND:  But anyway, I

 3         don't want to talk any more about it.  I just

 4         bring it up for your benefit, and let's just

 5         move on.  I'll give you latitude.

 6         BY MR. PIORKOWSKI:

 7             Q.   If it's correct that independent

 8         regulatory agencies around the world have had

 9         independent scientists review this issue in

10         great detail, including conducting a

11         comprehensive review of the epidemiology, the

12         genotoxicity, the mutagenicity, and other

13         relevant science, and with the exception of

14         IARC, they have all concluded that glyphosate

15         is not carcinogenic, does that carry any

16         weight with you?

17                      MR. DIAMOND:  Form.

18             A.   Sitting here today, as I approach this

19         case, I looked at things both suggestive and

20         nonsuggestive of glyphosate -- glyphosate.

21                  The fact that one report from the EPA

22         and the European review that I reviewed, I

23         haven't -- I have not had an opportunity to

24         review the others.  These entities, from my
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

```
 1      perspective, are complex entities.  The people

 2      who they asked to do the reviews, as you

 3      mentioned, may be scientists.

 4              It would be important to understand

 5      the critique of each one of these

 6      organizations, in terms of their independence,

 7      lack of conflict of interest, to be able to

 8      address each one, so I -- I think I would be

 9      remiss to group them all into one category and

10      give them all the same weight.

11      BY MR. PIORKOWSKI:

12      Q.   I'm not asking you to do that.

13              I'm simply saying, you know, as

14      somebody who's offering an opinion that

15      glyphosate is potentially carcinogenic, does

16      the fact that multiple international

17      regulatory agencies have reached the opposite

18      conclusion carry any weight with you?

19                  MR. DIAMOND:  Form.

20      A.   As I have approached this review and

21      have read the two that we have discussed, yes,

22      I have considered their findings, and I have

23      looked directly at the data myself in terms of

24      epidemiologic data.  And even at the end of
```

Edwin P. Alyea, M.D.

1        the EPA result, there is a reference to the

2        epidemiologic data and lymphoma for

3        glyphosate, so yes, I do consider these as I

4        have considered my opinion.

5

6               (Exhibit No. 19 marked for

7        identification.)

8

9        BY MR. PIORKOWSKI:

10            Q.   So this is the EPA's proposed interim

11       registration review decision from April 2019.

12               Is this the document that you reviewed

13       when you made reference to having reviewed the

14       EPA document?

15            A.   Let me take a look and tell you what

16       that is.

17            Q.   Sure.

18            A.   (Witness reviews document.)

19            Q.   Is that the same document?

20            A.   So there are different dates.  The one

21       I have in my binder is Glyphosate Issue Paper:

22       Evaluation OF Carcinogenic Potential, date is

23       September 12, 2016.

24            Q.   Can I see the one you're looking at?

Edwin P. Alyea, M.D.

1       Can I see yours?

2            A.   Sure.

3            Q.   Where did you -- where did you obtain

4       this document?

5            A.   Off of the Internet, as I did all

6       the -- well, you know, looked for them and

7       then printed them.

8            Q.   Since this is different than the

9       version I have, I would like to get a copy of

10      this if we could, all right?

11           A.   Sure.

12                     MR. DIAMOND:  Is it a different

13      date?

14                     MR. PIORKOWSKI:  It's a

15      different date, yes.

16                     MR. DIAMOND:  Just for the

17      record --

18                     MR. PIORKOWSKI:  I think I gave

19      you a copy of this, right?

20                     MR. DIAMOND:  No, I didn't get a

21      copy.

22                     MR. PIORKOWSKI:  I didn't?

23                     MR. DIAMOND:  No.  Thanks.

24           A.   So just while we're doing this, so I

Edwin P. Alyea, M.D.

```
 1      don't get -- I don't lose sight of this --

 2      BY MR. PIORKOWSKI:

 3          Q.   Sure.

 4          A.   There are two pieces of paper here

 5      that are patient information that were

 6      probably in the copier that spit out at the

 7      same time we did this --

 8          Q.   Take them out.

 9          A.   -- so what I'd like to do is take them

10      out and destroy them.

11          Q.   Sure.

12          A.   (Witness complying.)

13          Q.   Don't want any HIPAA violations.

14          A.   Correct.

15              MR. DIAMOND:  Yes.

16          A.   Do you want me to take this article

17      out?

18          Q.   Yes.  Why don't you do that?  Yes.

19              (Brief pause.)

20          A.   I'll dispose of these in a secure

21      manner later.

22          Q.   In the document that I handed you,

23      which is Exhibit --

24          A.   19.
```

Edwin P. Alyea, M.D.

```
1          Q.    -- 19, can you turn to Page 7?

2          A.    Seven?

3          Q.    Yes, sir.

4                And I wanted to just direct your

5     attention to -- at the bottom of the page,

6     where it says, "Comments about EPA's cancer

7     evaluation."

8          A.    That's the next to the last

9     paragraph.

10         Q.    It's -- actually, the last paragraph

11    is the one I was going to --

12         A.    The last paragraph starting with

13    EPA's?

14         Q.    Yes.

15         A.    Okay.

16         Q.    The paragraph starts out and says,

17    "EPA's cancer evaluation is more robust than

18    IARC's evaluation.  IARC's evaluation only

19    considers data that have been published or

20    accepted for publication in the openly

21    available scientific literature.  As a result,

22    IARC only considered a subset of the studies

23    included in EPA's evaluation."

24                Do you have any reason to dispute
```

Edwin P. Alyea, M.D.

```
 1      that?

 2                    MR. DIAMOND:  Form and

 3      foundation.

 4      A.    Well, as I sit here today -- and this

 5      just being presented to me minutes ago and

 6      just having read this minutes ago -- I would

 7      say this is an opinion piece.

 8              So this is someone's opinion that the

 9      EPA evaluation is better than the other

10      because of, as I interpret it, the material

11      that's been used.

12              In the medical literature, we depend

13      on publication and peer review of information

14      to provide an adequate review of the

15      scientific integrity.  We depend on it for

16      review of accuracy of presentation.  We depend

17      on it for presentation of results that reflect

18      the data.  And we also depend on, very

19      importantly, as you see in all these

20      manuscripts, the discussion section, where

21      people try to provide context to the

22      information that they've provided.

23              And the peer review process also takes

24      into account another very important aspect,
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

1       which is addressing conflict of interest that

2       might exist.  So therefore, my interpretation

3       of this sentence, having just handed to me

4       minutes before, is that this is an opinion

5       piece, and I would have to give a lot more

6       thought about this as to how I would approach

7       this.

8       BY MR. PIORKOWSKI:

9            Q.   Well, you were just handed this

10      document minutes ago, but you previously

11      identified another comprehensive EPA review

12      that you have already had time to digest and

13      reflect on, correct?

14           A.   I have read it, yes.

15           Q.   That answer that you just gave me

16      about -- are you saying that you believe that

17      IARC's review was more comprehensive or more

18      appropriate than EPA's review?

19                     MR. DIAMOND:  Form.

20           A.   As I've stated before, I looked at the

21      evidence that was out there.  I looked at -- I

22      view the IARC and I view the EPA as

23      organizations that have interpreted the data

24      that is out there.

Edwin P. Alyea, M.D.

```
1              I have gone back, as evidence, and

2       looked at the primary data and come to my

3       conclusion about the role of glyphosate and

4       risk of lymphoma.

5       BY MR. PIORKOWSKI:

6              Q.   And what's your conclusion?

7              A.   As I mentioned before, is that there

8       is an association between glyphosate and the

9       risk of developing non-Hodgkin's lymphoma and

10      that there is a -- evidence of a dose or

11      exposure of glyphosate that may increase one's

12      risk of lymphoma.

13             Q.   And what are the specific studies that

14      you're relying on for that conclusion?

15             A.   So the specific studies are the ones

16      that we referred to earlier in my report.

17             Q.   So when we reviewed the six studies,

18      two of which showed no statistically

19      significant elevation and three of which

20      showed no increased risk when you did a

21      multivariate analysis, those are the six

22      studies that you're relying on?

23                      MR. DIAMOND:  Form.

24             A.   As we reviewed in my report and I
```

Edwin P. Alyea, M.D.

1      outlined in the causation, it includes those

2      studies, which take an objective response of

3      data that both supports and does not

4      necessarily support that equation to provide a

5      balanced review as well as the meta-analysis

6      that had been performed.

7      BY MR. PIORKOWSKI:

8          Q.   And I'm sorry.  Where does the

9      balanced view come from?

10         A.   That is my use of the word saying that

11     I included studies that both demonstrated a

12     positive association and studies that did not.

13         Q.   And what studies have you identified

14     that show a positive association when

15     adjusting for confounding factors?

16         A.   The studies that we discussed.  They

17     were -- did not reach statistical significance

18     and those with confounding factors.

19         Q.   And beyond those studies, any others?

20         A.   Those are the studies that I've listed

21     my report is what I base my opinion on.

22         Q.   Does a panel of scientists, whose job

23     it is to critically evaluate the medical

24     literature, need to have peer review in order

Edwin P. Alyea, M.D.

```
1        to consider data, in your view?

2                    MR. DIAMOND:  Form.

3        A.   Sitting here today, I have not

4    considered that issue.

5    BY MR. PIORKOWSKI:

6        Q.   Well, when I -- when I asked you about

7    this comment, that EPA's cancer evaluation is

8    more robust, the fact that IARC only

9    considered a subset of the studies included in

10   EPA's evaluation, that's not an opinion piece,

11   that's a fact, right?

12                   MR. DIAMOND:  Form.

13       A.   I'm sorry.  Could you repeat that

14   again, please?

15   BY MR. PIORKOWSKI:

16       Q.   It says, "IARC only considered a

17   subset of the studies included in EPA's

18   evaluation."

19            That's what the document says,

20   correct?

21                   MR. DIAMOND:  Form.

22       A.   As we discussed previously, based on

23   the published or accepted for publication.

24   BY MR. PIORKOWSKI:
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

```
 1            Q.   Right.  But the fact that IARC only
 2       considered a subset of the studies included in
 3       EPA's evaluation, that's a factual matter,
 4       right?
 5                 That's not an opinion.  Either they --
 6       either IARC did only consider a subset of
 7       studies or they didn't only consider a subset
 8       of studies.
 9                      MR. DIAMOND:  Form.
10            A.   As stated here, that was the criteria
11       they used for the information in their
12       evaluation.
13                      MR. DIAMOND:  Joe, again, I want
14       to say that Dr. Alyea's opinions are not being
15       based upon the IARC study or the EPA study or
16       any of these politicized studies.  And the
17       judge has already ordered that the specific
18       causation experts aren't to talk about these
19       things, so I would just ask -- because I don't
20       want to instruct him not to answer, but I
21       would just ask that you wrap it up.
22                      If the judge decides later on that
23       these experts can talk about that, then I
24       would be happy to have a -- set up a
```

Edwin P. Alyea, M.D.

```
 1        deposition at that time, if it's necessary.

 2                    MR. PIORKOWSKI:  I mean, with

 3        all due respect, I still think that some of

 4        these aspects are directly relevant.  And as I

 5        said, that's -- that's a central issue that we

 6        take issue with the judge, and I think is

 7        going to be a big point on appeal.

 8                    MR. DIAMOND:  I understand, but

 9        at this point in the case, he's made rulings,

10        and I think we need to respect those rulings.

11        I understand that Monsanto may feel

12        differently.  And I think, at some point down

13        the road, if the issue then is, in this case,

14        that you would be given time to address that

15        as necessary.

16             I just don't think that now, with a

17        witness who is, of course, not relying on

18        these studies and the judge has said that

19        they're not something that they can actually

20        discuss, that we continue to discuss them.

21                    MR. PIORKOWSKI:  Well, the judge

22        is allowing them to talk about IARC?

23                    MR. DIAMOND:  No, no, no study.

24        The specific --
```

Edwin P. Alyea, M.D.

```
 1                    MR. PIORKOWSKI:  No review,

 2        you're talking about?

 3                    MR. DIAMOND:  What?

 4                    MR. PIORKOWSKI:  No review.

 5                    MR. DIAMOND:  Right.  I mean,

 6        you can talk about the studies referenced, I

 7        guess, but not the -- what I think are termed

 8        sometimes as these summaries or --

 9                    MR. PIORKOWSKI:  Well --

10                    MR. DIAMOND:  And so that's what

11        I'm talking about, so he shouldn't talk about

12        IARC or he shouldn't talk about EPA.

13                    MR. PIORKOWSKI:  Part of it also

14        is that you guys gave him -- or he found these

15        things online, and he's reviewed them, and

16        so --

17                    MR. DIAMOND:  But --

18                    MR. PIORKOWSKI:  -- that gives

19        us a basis to talk about them, whether or not

20        the judge thinks they should be admissible or

21        not, so I should be able to find out how they

22        factor into his opinion.

23                    MR. DIAMOND:  I think -- I think

24        what he said before -- and I'm just -- if I'm
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

```
 1      wrong on this, I apologize, but I think he

 2      said he relied on the studies, not on the

 3      summary by some government agency.

 4              And I think what you're really

 5      asking -- because I don't think he said he

 6      relied on IARC's report, and so if he -- maybe

 7      he can answer.  If he did, I'll -- have at it.

 8      BY MR. PIORKOWSKI:

 9          Q.   Were you the one that found the IARC

10      report and the EPA report?

11          A.   Every report in here, with the

12      exception of, perhaps, one thing, which was

13      not that, I found on my own and retrieved it

14      on my own, printed it.

15          Q.   And what was the purpose in looking at

16      the IARC review?

17          A.   As I approach this case, I wanted a --

18      as broad a view of the issues as possible.

19          Q.   And what did the IARC review provide

20      you with?

21          A.   The IARC review provided me with a

22      prospective from IARC on glyphosate.

23          Q.   And is Mr. Diamond correct that you're

24      not relying in any way on the IARC monograph?
```

Edwin P. Alyea, M.D.

```
 1            A.   As evidenced by my report, I went back

 2        to review the primary data myself.  As we've

 3        already discussed, there are agencies that

 4        have conflicting views about this, so I've

 5        reviewed the data and come to the conclusion

 6        myself.

 7            Q.   And what was your purpose in looking

 8        at EPA's review?

 9            A.   My purpose was the same, which was to

10        understand that this had been reviewed by an

11        organization to read through it to give me a

12        broad perspective.

13            Q.   Is it -- and after reviewing the EPA's

14        conclusion, did you come to the view that they

15        were wrong?

16                 MR. DIAMOND:  Form.

17            A.   So as I sit here today, I'm not sure I

18        would use the term "wrong."  I reviewed their

19        report and -- I reviewed the report, but I

20        based my opinions on the primary evidence for

21        the documents I reviewed.

22                 I did take note of a line in the EPA

23        report at the end that does state that -- and

24        I would -- I don't want to quote it out of
```

Edwin P. Alyea, M.D.

1        context, but we could refer to that particular

2        line.

3        BY MR. PIORKOWSKI:

4             Q.   That states what?

5             A.   About the glyphosate and lymphoma.

6             Q.   States what about glyphosate and

7        lymphoma?

8             A.   I would need to refer directly to it.

9             Q.   Refer to it.

10            A.   (Witness reviews document.)

11                 Would you like me to read it or

12        underline it?

13            Q.   To the extent you thought there was

14        something in there that was relevant, that's

15        what I'm interested in hearing.

16            A.   This is a sentence on Page 140, last

17        paragraph, that states, "In epidemiologic

18        studies, there was no evidence of an

19        association between glyphosate exposure and

20        numerous cancer outcomes; however, due to

21        conflicting results and various limitations

22        identified in studies investigating

23        non-Hodgkin's lymphoma" -- or, as they

24        abbreviate it, NHL -- "a conclusion regarding

Edwin P. Alyea, M.D.

1        the association between glyphosate exposure

2        and risk of NHL cannot be determined based on

3        the available data."

4             Q.   And you interpret that to mean what?

5                      MR. DIAMOND:  Form.

6             A.   Again, as I sit here today, I

7        interpret that in the context of the entire

8        report that -- as they state in here, there

9        are conflicting results and various

10       limitations, and the conclusion regarding an

11       association between glyphosate exposure and

12       risk of NHL cannot be determined based on

13       available data.

14                      MR. PIORKOWSKI:  Why don't we

15       take a break, and hopefully, I'll have one

16       more session.

17                      MR. DIAMOND:  Okay.

18                      THE VIDEOGRAPHER:  The time is

19       4:38 p.m.  This concludes Tape 4.  Off the

20       record.

21

22                 (Recess was taken from 4:38 p.m. to

23       5:01 p.m.)

24

Edwin P. Alyea, M.D.

```
 1              (Exhibit No. 20 marked for

 2       identification.)

 3

 4                    THE VIDEOGRAPHER:  The time is

 5       5:01 p.m.  This is the beginning of Tape 5.

 6       We're back on the record.

 7       BY MR. PIORKOWSKI:

 8          Q.   Doctor, could you go back to

 9       Exhibits 2 and 3, which is your original

10       report and your supplemental report?

11          A.   Yes, sir.

12               I'm sorry, 2 and 3?

13          Q.   I think so.  Is that -- am I correct

14       that that's -- one is -- 2 is your original

15       report and 3 is your supplemental report?

16          A.   Okay.  I need to find that here.

17       We've been using that as reference, so that

18       was kind of mixed in the pile, so yes, I have

19       that now.

20          Q.   Okay.  So when you filed -- when you

21       submitted Exhibit 2, at that point did you

22       intend for that to be your report that

23       contained all your opinions?

24          A.   It was the report written with my
```

Edwin P. Alyea, M.D.

```
 1      opinions.  The references were not to my

 2      satisfaction, as was trying to enter them in

 3      on a technical basis.

 4           Q.   What do you mean by that exactly?

 5           A.   Because my computer at work was not

 6      working properly, so I had to get that

 7      reinstalled on my computer, and that's why you

 8      see in the bibliography it has the abstracts

 9      rather than a bibliography in the subsequent

10      one.

11           Q.   Now, let me direct your attention to

12      Page 4 --

13           A.   Of which one.

14           Q.   Of Exhibit 2.

15           A.   Exhibit 2.

16           Q.   ███████████████████████████████

    ██   ████████████████████████████████

    ██   ████████████████████████████████

    ██   █████████████████████████

20                    MR. DIAMOND:  Which line?

21           A.   I'm sorry, in the last paragraph?

22      BY MR. PIORKOWSKI:

23           Q.   Yes.

24                Do you see the last paragraph starts
```



1      out "past medical history"?

2          A.   Yes, sir.

3          Q.

7          A.   So -- right, so those are two separate

8      issues, one --

9          Q.

Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



```
 1        A.   Yes.

 2        Q.   ████████████████████████

          ███████████████  ███████████████

          ████████████████████████████████

          █████████

 6             Do you see that?

 7        A.   Yes, I do.

 8        Q.   And if you see, in Exhibit 3 --

 9        A.   That's been removed.

10        Q.   -- that sentence isn't there?

11        A.   Yes.

12        Q.   Why is that?

13        A.   I didn't realize that the version

14   actually had that in it.  ███████████████

     ██████████████████████████████████

     ████████████████████████████

     ██████████████████████████████

     ██████████████████████████████

     ████████████████████████████████

     █████████

21        Q.   ███████████████████████

          ████████████████████████

          ████████

24             MR. DIAMOND:  Form.
```

Edwin P. Alyea, M.D.



1   A.

14    (Exhibit No. 21 marked for

15 identification.)

16

17 BY MR. PIORKOWSKI:

18   Q.   I've handed you Exhibit 21, which

19 is -- which is an article authored by

20 Tomasetti and Vogelstein at Hopkins?

21   A.   Uh-huh.

22   Q.   Are you familiar with either of those

23 authors?

24   A.   I am familiar with Dr. Vogelstein's

Edwin P. Alyea, M.D.

```
1      name.  I do not know him, but I know of him.

2          Q.   How do you know his name?

3          A.   I know of his name in research in

4      cancer.

5          Q.   And is he highly regarded researcher

6      in that field?

7                    MR. DIAMOND:  Form.

8          A.   Yes.  Dr. Vogelstein is well-known in

9      the area of cancer.  I'm not in the area that

10     he -- that he is a specialist in, so I do not

11     follow his career closely or his writings

12     closely.

13     BY MR. PIORKOWSKI:

14         Q.   Have you reviewed this paper

15     previously?

16         A.   No, sir, I have not, not to my

17     knowledge.

18         Q.   Were you aware that this paper was

19     cited and discussed in Dr. Levine's report?

20         A.    In Dr. Levine's report that I just

21     received on Wednesday?  I don't recall, as I

22     reviewed it.

23         Q.   I mean, I -- withdraw that.

24              It was your intent to go back and look
```

Edwin P. Alyea, M.D.

```
 1       at the papers that Dr. Levine cited and see

 2       whether they had any bearing on your opinions;

 3       is that fair?

 4           A.   Yes.  I hoped to at a time -- like I

 5       said, I just received it Wednesday night and

 6       read through it.  I have not had an

 7       opportunity to read it in detail or review the

 8       references.

 9           Q.   Right.  You realize I was not -- we

10       didn't provide it on Wednesday night, so...

11           A.   No.  I'm just stating what my fact

12       is.

13                    MR. DIAMOND:  Just for the

14       record, I think it was provided just a week or

15       so ago.

16                    MR. PIORKOWSKI:  It was.  It was

17       a week ago, but that's different than two days

18       ago.  I'm just -- you know, that's when the

19       report was due, so I'm just saying it's not

20       our fault that he got --

21                    MR. DIAMOND:  Nobody's blaming

22       you.  Nobody's blaming you.  I just think it's

23       a relatively short time frame everybody's had

24       to work in.
```

Edwin P. Alyea, M.D.

1    BY MR. PIORKOWSKI:

2         Q.   One of the things that this article

3    talks about is the role of different factors

4    in cancer development, including the relative

5    role of environmental factors, heredity, and

6    random mutations.

7              Is that an area you've given any

8    thought to?

9                   MR. DIAMOND:   Form.

10        A.   Sitting here today, no, I have not.

11   BY MR. PIORKOWSKI:

12        Q.   And having not reviewed this

13   previously, do you have any recollection of

14   what Dr. Levine's report said about this?

15        A.   No, I do not.

16        Q.   ███████████████████████████

    ███  ██████████████

    ███  ██  █████████

    ███  ██  ████████████████████████

    ███  ██████████████████████████

    ███  ████████████████

22       ██  ███████████████████████

    ███  ██████████████████████████

    ███  ██████████████████████████

Edwin P. Alyea, M.D.





Edwin P. Alyea, M.D.



24          BY MR. PIORKOWSKI:

Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.



1

2

3

4

5

6

7           (Exhibit No. 22 marked for

8      identification.)

9

10     BY MR. PIORKOWSKI:

11        Q.

Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



1                    MR. DIAMOND:  Form.

4      BY MR. PIORKOWSKI:



```
 1         ████████████████████████████  ████

 ▪         ████████████████████████████████████

 ▪         ██████████████████████████████

 4         BY MR. PIORKOWSKI:

 5            Q. ██████████████████████████████

 ▪         ███████████████████████████████████

 ▪         █████████████████████  ████████████████

 ▪         ████████████████████████

 ▪              ████  █████████████████████████████

 ▪         ████████████████████████████████

 ▪         ████████████████████████████████

 ▪         █████████████████████████████████

 ▪         ████████████

 ▪              ████  █████████████████████████████████

 ▪         ██████████████████████████████████

 ▪         ███████████████████████████████████

 ▪         ██████████████

 ▪              ████  ██████████  █████████████████

 ▪         ██████  ███████████████████████████

 ▪         █████████████████████████████

 ▪              ████  █████████████████████████████

 ▪         ███████████████████████████████████

 ▪         ████████████████████

 ▪              ████  ██████████████████.
```

Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



1

24          BY MR. PIORKOWSKI:





6      Q.    Sure.

7      A.    Thank you.

8            (Witness reviews document.)

9            Thank you.

10     BY MR. PIORKOWSKI:

11           Q.

Edwin P. Alyea, M.D.





Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



Edwin P. Alyea, M.D.



```
23          Q.   Am I correct you're not offering any

24     opinions in this case about Monsanto or
```

1        Monsanto's conduct; is that right?

2            A.   No, sir.

3            Q.   You're not offering any opinions about

4        warnings that should be on Roundup or --

5            A.   I'm sorry.  What?

6            Q.   Warnings --

7            A.   There's just noise behind --

8            Q.   -- warnings that should be on Roundup

9        or any of that --

10           A.   No, sir.

11           Q.   -- things of that nature?

12           A.   No, sir.

13           Q.   And I think we covered this, but I

14       want to make sure.

15               You're not offering any opinions about

16       the dose of glyphosate that he received either

17       through his agricultural work, allegedly, or

18       through his residential use?

19                    MR. DIAMOND:  Form.

20           A.   Well, as I reflect on the papers that

21       we discussed, there are several papers that

22       demonstrate an exposure history with an

23       increased risk of lymphoma, and those

24       papers -- we have reviewed two of them

Edwin P. Alyea, M.D.

```
 1       regarding days of exposure, and we'd have to

 2       refer to the other one, so there is exposure

 3       data.

 4              I think -- if I recall, when we spoke

 5       about this earlier, is there a blood level or

 6       something like that?  No, I do not know of

 7       that, but there is exposure history that

 8       can -- that is associated with an increased

 9       risk of developing lymphoma.

10       Q.   And based on your understanding of the

11       studies, one of the studies, for example,

12       talks about two days per year of exposure,

13       correct?

14       A.   That is correct.

15       Q.   Okay.  If we look at his residential

16       use, that doesn't rise to the level of two

17       days of exposure over a sustained period of

18       time per year, correct?

19                  MR. DIAMOND:  Form.

20       A.   I would have to reflect back, but as I

21       recall, the math that you added up the number

22       of days he had, could he have had that

23       exposure over several years?  I guess he

24       could, depending on how you parcel out those
```

Edwin P. Alyea, M.D.

```
1        exposures.

2                       MR. PIORKOWSKI:  Give me a

3        minute to review, make sure I don't have

4        anything else.

5                       THE VIDEOGRAPHER:  The time is

6        5:43 p.m.  We're off the record.

7

8             (Recess was taken from 5:43 p.m. to

9        5:44 p.m.)

10

11                      THE VIDEOGRAPHER:  The time is

12       5:44 p.m.  We're back on the record.

13                      CROSS-EXAMINATION

14       BY MR. DIAMOND:

15            Q.   Doctor, I was taking a look at

16       Mr. Hernandez's deposition transcript.  And on

17       Page 72, he states that the -- he states or he

18       discusses the crops he was working on were

19       Roundup Ready.

20                 I don't know if you look at that

21       specifically, but -- and he also states, on

22       Page 111, that the seeds come already

23       modified.

24                 "All of the seed is modified nowadays.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Edwin P. Alyea, M.D.

```
 1        To tell you -- to tell you how it's modified,

 2        Roundup Ready."

 3                      MR. PIORKOWSKI:  I'm sorry?

 4                      MR. DIAMOND:  A different page,

 5        111.

 6                      MR. PIORKOWSKI:  So can you tell

 7        me the page and line numbers?

 8                      MR. DIAMOND:  I'm sorry.  Page

 9        111, Lines 20 to 22.  You want me to go

10        forward?  I'm not waiting for you, am I?

11                      MR. PIORKOWSKI:  No.

12        BY MR. DIAMOND:

13           Q.   So do you understand what Roundup

14        Ready is?

15           A.   I have a general understanding that

16        they're crops that have been modified to be

17        resistant to Roundup exposure.

18           Q.   With the idea being that you can spray

19        Roundup on the crops and everything around the

20        crops, but the crops won't be affected,

21        correct?

22           A.   That it will not affect the crops that

23        are Roundup Ready, but it will affect the

24        other plants around it, yes.
```

Edwin P. Alyea, M.D.

```
1            Q.   And so if Mr. Hernandez was working in

2       fields where the crops that were Roundup

3       Ready, it's a reasonable assumption that he

4       was -- that some of the spraying that he was

5       talking about in his deposition was spraying

6       by Roundup because that's what they spray on

7       Roundup-ready crops?

8                    MR. PIORKOWSKI:  Objection to

9       form.

10           A.   I would presume that would be correct,

11      and it would be logical since if you sprayed

12      it indiscriminately, then if the product was

13      not Roundup Ready, then it would get killed as

14      well.

15      BY MR. DIAMOND:

16           Q.   And so just to make sure, without

17      beating a dead horse, but based upon

18      Mr. Hernandez's deposition testimony, his

19      third amended plaintiff fact sheet, the

20      studies that you looked at, the Eriksson and

21      McDuffie, the general causation expert reports

22      talking about exposure, your -- it's your

23      opinion that Mr. Hernandez had enough exposure

24      to Roundup for Roundup to be a substantial
```

Edwin P. Alyea, M.D.

1      factor in causing his non-Hodgkin's lymphoma,

2      correct?

3                      MR. PIORKOWSKI:  Objection to

4      form.

5          A.   That is correct.

6      BY MR. DIAMOND:

7          Q.   And that's to a reasonable degree of

8      medical certainty, correct?

9          A.   That is to a reasonable degree of

10     medical certainty.

11         Q.   And it's still your opinion that the

12     differential diagnosis that you did remains,

13     at least in your opinion, still valid, that

14     you can still say that -- to a reasonable

15     degree of medical certainty, that Roundup was

16     a substantial factor in causing

17     Mr. Hernandez's non-Hodgkin's lymphoma?

18         A.   That is correct.

19                     MR. PIORKOWSKI:  Objection to

20     form.

21                     MR. DIAMOND:  That's all I have.

22                     MR. PIORKOWSKI:  I have a couple

23     of follow-up questions.

24

Edwin P. Alyea, M.D.

```
 1                      REDIRECT EXAMINATION

 2       BY MR. PIORKOWSKI:

 3            Q.   So Mr. Diamond just referred you to a

 4       section of Mr. Hernandez's deposition, where

 5       he talked about seeds being Roundup Ready,

 6       correct?

 7            A.   Correct.

 8            Q.   Did Mr. Diamond point you to anywhere

 9       in his deposition transcript when -- any of

10       the three days he was deposed, where he

11       actually said, I sprayed Roundup?

12            A.   I was not directed to any area in the

13       deposition for that.

14            Q.   If something is Roundup Ready, the

15       passage -- well, let me -- the passage that he

16       read says, "Is it your belief that the field

17       in this picture is one that was treated with

18       Roundup before the seeds were planted, that

19       the seeds were Roundup Ready"?

20            A.   I'm sorry.  I just turned to --

21                      MR. DIAMOND:  You just need to

22       let us know which lines.

23       BY MR. PIORKOWSKI:

24            Q.   I'm reading the same thing.
```

Edwin P. Alyea, M.D.

1          A.   Page 111?

2                    MR. DIAMOND:   Page 111.   From

3     what line to what?

4          A.   I'm sorry.   I'm behind one step even.

5     Page No. 111.

6     BY MR. PIORKOWSKI:

7          Q.   Sure.

8          A.   Okay.

9          Q.   He was asked -- on Page 111, he

10    says -- he's being asked about the lettuce

11    that he's harvesting, correct?

12         A.   I would -- do you have the passage

13    again?

14         Q.   No -- well, so do you remember in his

15    deposition he talks about harvesting

16    lettuce?

17         A.   I do remember he's harvesting lettuce.

18         Q.   So his hands don't turn black and all

19    of this --

20         A.   Yes, sir.

21         Q.   So harvesting is what you --

22    harvesting is another word for picking the

23    produce, right?

24         A.   I would agree with you.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

```
1          Q.   It's when the produce is fully formed

2     and grown?

3          A.   (Witness nodding.)

4          Q.   At Page 111, Line 18 through 22, he's

5     talking about the seeds for the lettuce that

6     he's harvesting at the end of the harvest,

7     right?

8                    MR. DIAMOND:  Form.

9     BY MR. PIORKOWSKI:

10         Q.   And he's talking about the fact that

11    they're Roundup Ready, meaning at the time of

12    planting, if you apply Roundup, the weeds

13    won't grow, but the crop will still grow,

14    right?

15               Is that your understanding of what

16    that means?

17                    MR. DIAMOND:  Form.

18         A.   Again, I have a general knowledge that

19    plants that are labeled Roundup Ready are --

20    have been genetically modified to be resistant

21    to Roundup, you use Roundup -- when you use

22    them, I'm not as familiar with.

23         Q.   Does it make sense you would use

24    Roundup at the time of the planting, not at
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

```
 1       the time of the harvest?

 2                    MR. DIAMOND:  Form.

 3            A.   Again, I would have to reflect on my

 4       agricultural background for that.  We had

 5       crops where we would spray midseason for weeds

 6       or hoe them out in the old days.

 7       BY MR. PIORKOWSKI:

 8            Q.   But he's harvesting and transporting

 9       goods.  He's not -- his testimony, if you look

10       at Page 186, which is 5B, Page -- Line 13 to

11       16, he's asked this question:  "In any of the

12       time you've worked in the fields, have you

13       participated in spraying the ground with a

14       herbicide before planting?"

15                    And his answer:  "Not I directly."

16                    Did I read that correctly?

17            A.   So you're ahead of me, I'm afraid, so

18       I'm now to the area where I see his answer,

19       "Not I directly."

20                    And you started at -- the question, is

21       that right, right above it?

22            Q.   Yes, sir.

23            A.   (Witness reviews document.)

24                    So I have no reason to doubt that you
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Edwin P. Alyea, M.D.

1        read that.

2              Q.   Well, if he was never involved in

3        spraying at the time of planting, does the

4        fact that the seeds were Roundup Ready allow

5        you to make the inference that he was exposed

6        to Roundup?

7                        MR. DIAMOND:   Form.

8        BY MR. PIORKOWSKI:

9              Q.   Is that a reasonable inference?

10                       MR. DIAMOND:   Form.

11             A.   Again, with the information that I

12       have today, I don't know the times that they

13       would use Roundup, so therefore, I can't speak

14       to that in its entirety.

15             Q.   You can't say one way or the other?

16             A.   Correct.

17             Q.   Do you know from your -- from anything

18       you've read, including the EPA documents or

19       the IARC document, how long the compound of

20       glyphosate stays active after it's sprayed?

21                  In other words, does the molecule

22       remain for days, a week, a month?

23                       MR. DIAMOND:   Form.

24       BY MR. PIORKOWSKI:

Edwin P. Alyea, M.D.

1       Q.   Do you have any opinion on that?

2       A.   I have no opinion on that.

3       Q.   Okay.

4       A.   At this time I cannot recall those or

5   if they were commented upon.

6                 MR. PIORKOWSKI:  All right.  I

7   have no further questions.

8                 MR. DIAMOND:  Read and sign.

9                 THE VIDEOGRAPHER:  The time is

10  5:55 p.m.  This concludes the deposition of

11  Edwin P. Alyea, and we're off the record.

12

13            (Deposition concluded at 5:55 p.m.)

14

15

16

17

18

19

20

21

22

23

24

Edwin P. Alyea, M.D.

1                    CERTIFICATION

2          I, DARLENE M. COPPOLA, a Notary Public, do hereby

3      certify that EDWIN P. ALYEA, III, M.D., after having

4      satisfactorily identifying himself, came before me on

5      the 15th day of November, 2019, in Waltham,

6      Massachusetts, and was by me duly sworn to testify to

7      the truth and nothing but the truth as to his

8      knowledge touching and concerning the matters in

9      controversy in this cause; that he was thereupon

10     examined upon his oath and said examination reduced to

11     writing by me; and that the statement is a true record

12     of the testimony given by the witness, to the best of

13     my knowledge and ability.

14          I further certify that I am not a relative or

15     employee of counsel/attorney for any of the parties,

16     nor a relative or employee of such parties, nor am I

17     financially interested in the outcome of the action.

18          WITNESS MY HAND THIS 18th day of November, 2019.

19

20

21     DARLENE M. COPPOLA           My commission expires:

22     NOTARY PUBLIC                November 11, 2022

23     REGISTERED MERIT REPORTER

24     CERTIFIED REALTIME REPORTER

```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                    Master File No. 2741

 4                  Case No. 3:16-MD-02741-VC

 5

 6     *********************************

 7     IN RE:  ROUNDUP PRODUCTS

       LIABILITY LITIGATION

 8

       _____

 9

       THIS DOCUMENT RELATES TO:

10

       RUBEN HERNANDEZ and MARTHA HERNANDEZ

11     V. MONSANTO COMPANY

       Case No. 3:16-CV-07364-VC

12

       *********************************

13

14

15          I, EDWIN P. ALYEA, III, M.D., say that I have

16     read the foregoing deposition and hereby declare under

17     penalty of perjury the foregoing is true

18     and correct:

19     (as prepared)  (as corrected on errata.)

20

21

22

23

24
```

Edwin P. Alyea, M.D.

1               Executed this _____ day of _____

2        2019, at _____, _____.

3

4

5

6                    _____

7                       EDWIN P. ALYEA, III, M.D.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1                    CORRECTION PAGE

2        DEPONENT:  EDWIN P. ALYEA, III, M.D.

3        DATE TAKEN: NOVEMBER 15, 2019

4        CASE:     ROUNDUP PRODUCTS

                   LIABILITY LITIGATION

5        ************************************************

6        PAGE / LINE / SHOULD READ        REASON

7        _____/_____/_____

8        _____/_____/_____

9        _____/_____/_____

10       _____/_____/_____

11       _____/_____/_____

12       _____/_____/_____

13       _____/_____/_____

14       _____/_____/_____

15       _____/_____/_____

16       _____/_____/_____

17       _____/_____/_____

18       _____/_____/_____

19       _____/_____/_____

20       _____/_____/_____

21       _____/_____/_____

22       _____/_____/_____

23       _____/_____/_____

24
```