# Exhibit 3

1          UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4    _____

                                   )

5    IN RE ROUNDUP PRODUCTS         )

     LIABILITY LITIGATION           )   MDL No. 2741

6                                   )

     _____   )   Case No.

7                                   )   3:16-md-02741-VC

                                   )

8    THIS DOCUMENT RELATES TO:      )

                                   )

9    Carriere v. Monsanto Co.,      )

     Case No. 3:18-cv-05778         )

10                                  )

     _____   )

11

12

13            VIDEOTAPED DEPOSITION OF

14          LAUREN C. PINTER-BROWN, M.D.

15            LOS ANGELES, CALIFORNIA

16          MONDAY, NOVEMBER 18, 2019

17                9:08 A.M.

18

19

20

21

22

23

24

25    Reported by: Leslie A. Todd

Lauren C. Pinter-Brown, M.D.

1          Deposition of LAUREN C. PINTER-BROWN, M.D.,

2     held at the offices of:

3

4

5               BAUM HEDLUND ARISTEI GOLDMAN P.C.

6               10940 Wilshire Boulevard

7               17th Floor

8               Los Angeles, California 90024

9               (310) 207-3233

10

11

12

13

14

15        Pursuant to notice, before Leslie A. Todd,

16    Certified Shorthand Reporter and Notary Public in

17    and for the State of California, who officiated in

18    administering the oath to the witness.

19

20

21

22

23

24

25

Lauren C. Pinter-Brown, M.D.

```
 1                    A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFF:

 4        JENNIFER A. MOORE, ESQUIRE

 5        MOORE LAW GROUP, PLLC

 6        1473 South 4th Street

 7        Louisville, Kentucky 40208

 8        (502) 717-4080

 9

10        YVONNE M. FLAHERTY, ESQUIRE

11        LOCKRIDGE GRINDAL NAUEN, PLLC

12        100 Washington Avenue S.

13        Suite 2200

14        Minneapolis, Minnesota 55401-2179

15        (612) 339-6900

16

17   ON BEHALF OF DEFENDANTS:

18        EMMA C. ROSS, ESQUIRE

19        JOE W. TOMASELLI, JR., ESQUIRE

20        GOLDMAN ISMAIL TOMASELLI BRENNAN &

21          BAUM LLP

22        200 South Wacker Drive

23        22nd Floor

24        Chicago, Illinois 60606

25        (312) 681-6000
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    APPEARANCES (Continued):

2

3    ALSO PRESENT:

4         STEPHANIE NAIFEH, Videographer

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C O N T E N T S

2

3    EXAMINATION OF LAUREN C. PINTER-BROWN, M.D.    PAGE

4         By Ms. Ross                              10, 122

5         By Ms. Moore                                 119

6

7

8

9                    E X H I B I T S

10             (Attached to transcript)

11   PINTER-BROWN DEPOSITION EXHIBITS                PAGE

12   No. 1      Expert Report of Dr. Lauren Pinter-

13              Brown in Support of Specific-

14              Causation on Behalf of Jerald

15              Carriere                            11

16   No. 2      CSI Laboratories, Summary Diagnosis

17              Report for Jerald M. Carriere       21

18   No. 3      Reference List                      27

19   No. 4      Article entitled "Diagnosis and

20              Management of Cutaneous B-cell

21              Lymphoma," by Lauren C. Pinter-

22              Brown, MD                           35

23   No. 5      CSI Laboratories, Summary Diagnosis

24              Report for Jerald Carriere,

25              Reported 10/19/2016                 56

Lauren C. Pinter-Brown, M.D.

```
 1              E X H I B I T S (Continued)

 2              (Attached to transcript)

 3   PINTER-BROWN DEPOSITION EXHIBITS              PAGE

 4   No. 6    Article entitled "Glyphosate use

 5            and associations with non-Hodgkin

 6            lymphoma major histological

 7            sub-types: findings from the North

 8            American Pooled Project," by

 9            Manisha Pahwa, et al.                71

10   No. 7    Article entitled "Non-Hodgkin's

11            Lymphoma and Specific Pesticide

12            Exposures in Men: Cross-Canada

13            Study in Pesticides and Health,"

14            by Helen McDuffie, et al.            71

15   No. 8    Article entitled "Integrative

16            assessment of multiple pesticides

17            as risk factors for non-Hodgkin's

18            lymphoma among men," by A. J.

19            DeRoos, et al.                       74

20   No. 9    Article entitled "Pesticide

21            exposure as risk ractor for non-

22            Hodgkin lymphoma including

23            histopathological subgroup

24            analysis," by Michael Eriksson,

25            et al.                               82
```

Lauren C. Pinter-Brown, M.D.

```
 1              E X H I B I T S (Continued)

 2              (Attached to transcript)

 3    PINTER-BROWN DEPOSITION EXHIBITS              PAGE

 4    No. 10    Article entitled "Glyphosate Use

 5              and Cancer Incidence in the

 6              Agricultural Health Study, by

 7              Gabriella Andreotti, et al.         93

 8    No. 11    Article entitled "Pesticide use and

 9              risk of non-Hodgkin lymphoid

10              malignancies in agricultural

11              cohorts from France, Norway and the

12              USA: a pooled analysis from the

13              AGRICOH consortium," by Maria

14              Leon, et al.                        97

15    No. 12    Article entitled "Exposure to

16              glyphosate-based herbicides and

17              risk for non-Hodgkin lymphoma:

18              A meta-analysis and supporting

19              evidence," by Luoping Zhang,

20              et al.                              103

21    No. 13    Radiology Documentation, Final

22              Report for Jerald M. Carriere,

23              Report last revised on 7/6/2017     112

24

25
```

Lauren C. Pinter-Brown, M.D.



```
 1              E X H I B I T S (Continued)

 2              (Attached to transcript)

 3   PINTER-BROWN DEPOSITION EXHIBITS                PAGE

 4   No. 14    ████████████████████████

     █         ██████████████████████████████████

     █         █████████████████████████

     █         ████████████████████████████████

     █         █████████████████████████         117

 9   No. 15    Table of contents                    124

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Lauren C. Pinter-Brown, M.D.

```
 1            P R O C E E D I N G S

 2            --------------------

 3            THE VIDEOGRAPHER:  We are now on the

 4   record.  My name is Stephanie Naifeh.  I am a

 5   videographer for Golkow Litigation Services.

 6            Today's date is November 18, 2019, and

 7   the time is approximately 9:08 a.m.

 8            This video deposition is being held in

 9   Baum Hedlund Aristei & Goldman, PC, 10940 Wilshire

10   Boulevard, Los Angeles, California 94024, in the

11   matter of Jerald Carriere versus Monsanto Company

12   for the court of the United States District Court,

13   Northern District of California, Case

14   No. 3:16-MD-02741-VC.

15            The deponent is Dr. Pinter-Brown.

16            Will counsel please identify

17   themselves.

18            MS. MOORE:  Jennifer Moore for the

19   plaintiff Jerald Carriere.

20            MS. FLAHERTY:  Yvonne Flaherty for the

21   plaintiff.

22            MS. ROSS:  Emma Ross for the defendants.

23            MR. TOMASELLI:  Joe Tomaselli for

24   Monsanto.

25            THE VIDEOGRAPHER:  The court reporter
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Lauren C. Pinter-Brown, M.D.

 1   is Leslie Todd, and she will now swear in the

 2   witness.

 3              LAUREN PINTER-BROWN, M.D.,

 4          and having been first duly sworn,

 5        was examined and testified as follows:

 6                   EXAMINATION

 7   BY MS. ROSS:

 8        Q    Good morning, Dr. Pinter-Brown.

 9        A    Good morning.

10        Q    Welcome back.  I hope you had a good

11   weekend.

12        A    Sure.

13        Q    I am here today to ask you some

14   questions about Jerald Carriere.  You understand

15   that, right?

16        A    Yes.

17        Q    And this afternoon we'll be talking

18   about another case, Mr. Wooten, correct?

19        A    Correct.

20        Q    Some of the questions I ask you may feel

21   repetitive and that we'll go over some areas that

22   we've covered for another plaintiff, but please

23   just understand I'm not trying to bore you with my

24   questions.  I just need to make sure that you

25   didn't do something different or specific for one

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Lauren C. Pinter-Brown, M.D.

1    of the plaintiffs that you didn't for another.

2            Is that fair?

3        A    Sure.

4        Q    The same rules apply as last Friday,

5    okay?

6        A    Yes.

7        Q    We'll do our best to speak one at a

8    time, right?

9        A    Yes.

10        Q    And if you answer my question, I will

11    assume you understood it.  Is that fair?

12        A    Fair.

13        Q    You understand that this is my

14    opportunity to ask you about your opinions and the

15    bases for those opinions as they relate to

16    Mr. Jerald Carriere, correct?

17        A    Correct.

18            (Exhibit No. 1 was marked for

19            identification.)

20    BY MS. ROSS:

21        Q    I've handed you Exhibit 1 to your

22    deposition.  This is your report in the Carriere

23    case, correct?

24        A    Correct.

25        Q    And the opinions you intend to offer are

Lauren C. Pinter-Brown, M.D.

```
 1   the ones that you disclosed in your written

 2   report, right?

 3        A    That's right.

 4        Q    Sitting here today, you do not intend to

 5   offer any opinions that you did not disclose in

 6   your report, correct?

 7             MS. MOORE:  Objection.

 8             THE WITNESS:  Correct.

 9   BY MS. ROSS:

10        Q    Have you found any errors in your report

11   for Jerald Carriere that need to be corrected?

12        A    I don't believe so.

13        Q    On page 1 of your report, do you see

14   where you state:  "I was retained in this case to

15   assess and provide an opinion on whether

16   Mr. Jerald Carriere's long-term exposure to

17   glyphosate-based formulations was a substantial

18   contributing factor to Mr. Carriere's developing

19   non-Hodgkin's lymphoma"?

20        A    Yes.

21        Q    As we discussed last time, in your view,

22   "long term" means long in the context of the

23   epidemiology studies that you reviewed on Roundup

24   and non-Hodgkin's lymphoma, correct?

25        A    Correct.
```

Lauren C. Pinter-Brown, M.D.

1      Q    "Long term" means longer than the median

2   in the epidemiology studies.  Am I understanding

3   you correctly?

4      A    There were several definitions.  That

5   was one.

6      Q    To determine what counts as long-term

7   exposure, as I think you told us on Friday, you

8   looked to several different epidemiology studies,

9   correct?

10      A    Correct.

11      Q    You looked at AHS, correct?

12      A    Correct.

13      Q    You looked at McDuffie 2001, correct?

14      A    Correct.

15      Q    You looked at Eriksson 2008, right?

16      A    Correct.

17      Q    Those were the three studies you

18   considered to determine whether a plaintiff met

19   criteria for long-term exposure, right?

20      A    Yes.

21      Q    You were retained to assess and provide

22   an opinion on whether Mr. Carriere's exposure to

23   Roundup was a substantial factor contributing to

24   his NHL, correct?

25      A    Correct.

Lauren C. Pinter-Brown, M.D.

1      Q    I take it from your previous answers

2  when we talked about this before, you do not

3  consider there to be a single driver mutation that

4  led to Mr. Carriere's non-Hodgkin's lymphoma,

5  correct?

6           MS. MOORE:  Objection.

7           THE WITNESS:  I don't consider there to

8  be a single contributing factor that led to his

9  non-Hodgkin's lymphoma development.

10  BY MS. ROSS:

11      Q    On a mutational level, was there one

12  mutation that led to Mr. Carriere's non-Hodgkin's

13  lymphoma or were there multiple mutations?

14           MS. MOORE:  Objection.

15           THE WITNESS:  We didn't discuss

16  mutations specifically leading to someone's

17  non-Hodgkin's lymphoma.  I have no way of testing

18  that.

19  BY MS. ROSS:

20      Q    You have no way of testing what specific

21  mutations led to Mr. Carriere's non-Hodgkin's

22  lymphoma?

23      A    To Mr. Carriere's or anyone else's

24  non-Hodgkin's lymphoma.

25      Q    In your view, it is not known what

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    mutations led to Mr. Carriere's DLBCL, leg type,

2    correct?

3              MS. MOORE:  Objection.

4              THE WITNESS:  It's not known by people

5    reading his medical record.  He's a -- he's a

6    person.  He's not a study.  There's really --

7    there's really not a way to check all the

8    mutations in his lymphoma or to assess which ones

9    may have contributed to the development of his

10   lymphoma.

11   BY MS. ROSS:

12        Q    Is it known how many mutations

13   Mr. Carriere needed to develop DLBCL, leg type?

14             MS. MOORE:  Objection.

15             THE WITNESS:  No.

16   BY MS. ROSS:

17        Q    When did Mr. Carriere acquire the

18   mutations that would eventually lead to his DLBCL,

19   leg type?

20        A    I have no idea.

21        Q    You cannot say when any of the mutations

22   occurred that led to his DLBCL, leg type, fair?

23             MS. MOORE:  Objection.

24             THE WITNESS:  That's correct.

25   Particularly since I don't know what they all are.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    BY MS. ROSS:

2        Q    You mentioned that there is not really a

3    way to check all the mutations in his lymphoma or

4    to assess which ones may have contributed.

5             Would gene sequencing Mr. Carriere's

6    tumors help identify the mutations in his genes?

7             MS. MOORE:  Objection.

8             THE WITNESS:  It would identify which

9    mutations his tumor had.

10   BY MS. ROSS:

11       Q    You did not order any genome sequencing

12   on Mr. Carriere, correct?

13       A    No.

14       Q    Why not?

15       A    He's not my patient.

16       Q    Did you see any genome sequencing in

17   Mr. Carriere's medical records?

18       A    No.  Genome sequencing is still

19   primarily a research tool.

20       Q    Often we cannot pinpoint the specific

21   cause of the mutations that lead to cancer,

22   correct?

23             MS. MOORE:  Objection to form.

24             THE WITNESS:  Could you rephrase that,

25   please?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    BY MS. ROSS:

2        Q    Often we cannot pinpoint in an

3    individual case the specific sequence of events

4    that led to the mutations in an individual

5    patient's cancer, right?

6              MS. MOORE:  Objection.

7              THE WITNESS:  In clinical practice when

8    we're dealing with individual patients, that's not

9    something that we do, period.

10   BY MS. ROSS:

11       Q    Is that --

12       A    It's not because -- it's not -- it's not

13   used in clinical practice.

14       Q    Is that true in this case, that we

15   cannot identify the specific sequence of events

16   that led Mr. Carriere to develop mutations that

17   led to his DLBCL, leg type?

18             MS. MOORE:  Objection to form.

19             THE WITNESS:  Figuring out the

20   particular sequence of events would mean that you

21   knew Mr. Carriere was going to have lymphoma

22   before he did.  So that you could follow him

23   sequentially over time until he developed

24   lymphoma.  And of course, we can't predict who's

25   going to have lymphoma, so that's -- it's not

Lauren C. Pinter-Brown, M.D.

```
 1   something that's feasible.

 2   BY MS. ROSS:

 3       Q    It's not feasible to identify the

 4   specific sequence of events that led Mr. Carriere

 5   to develop the mutations that led to his DLBCL,

 6   leg type, correct?

 7            MS. MOORE:  Objection to form.

 8            You can answer if you understand the

 9   question.

10            THE WITNESS:  Why don't you ask it one

11   more time.

12   BY MS. ROSS:

13       Q    Sure.  It's not feasible to identify the

14   specific sequence of events that led Mr. Carriere

15   to develop the mutations that would ultimately

16   manifest in his DLBCL, leg type, correct?

17       A    Well, of course not.  You can't tell

18   who's going to have lymphoma before they have it.

19       Q    Do you have any objective evidence that

20   Roundup caused any of Mr. Carriere's mutations?

21       A    No.

22       Q    Mr. Carriere had a MYC translocation,

23   right?

24       A    He had a MYC translocation in

25   pericardial fluid and in a bone marrow that was
```

Lauren C. Pinter-Brown, M.D.

1    morphologically negative.

2         Q    What is a MYC translocation?

3         A    It's a translocation that juxtaposed a

4    gene called c-myc, which is an oncogene usually

5    next to an IgG genome.

6         Q    What is the clinical effect of a

7    translocation of chromosomes 8 and 14 at the MYC

8    locus?

9         A    I have no idea.

10        Q    Cancer cells carrying the MYC

11   translocation tend to divide quickly.  Why is

12   that?

13        A    I have no idea.  And that's not even

14   true.

15        Q    Tell me what you disagree with in that

16   statement.

17        A    Well, there's a group of people with

18   follicular lymphoma that have a c-myc

19   translocation, and they don't divide fast.

20        Q    Do patients with DLBCL who have a MYC

21   translocation tend to have more rapidly growing

22   cancers and more rapidly dividing cancers?

23        A    No.

24        Q    Mr. Carriere's -- you mentioned that he

25   had pericardial fluid testing done that

Lauren C. Pinter-Brown, M.D.

1    demonstrated a MYC translocation, right?

2        A    Yes.

3        Q    And Mr. Carriere's FISH testing in

4    August 2019 showed a MYC translocation, correct?

5        A    You'll have to tell me which specimen

6    you're referring to in August 2019.

7        Q    What specimen were you referring to when

8    you said that he had a MYC translocation in his

9    pericardial cells?

10       A    What specimen?  The pericardial fluid.

11       Q    Okay.  I -- I thought I said that in my

12   answer, but let me -- or in my question, but let

13   me --

14       A    No, you did not.

15       Q    -- just reask the question.

16       A    Okay.

17       Q    Mr. Carriere's pericardial FISH testing

18   in August of 2019 demonstrated the MYC

19   translocation, correct?

20       A    Correct.

21       Q    Mr. Carriere's pericardial FISH testing

22   in August 2015 showed evidence of gains in BCL2

23   and BCL6, but was negative for the associated

24   translocations, right?

25       A    In 2015?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Lauren C. Pinter-Brown, M.D.

1      Q    I'm sorry, you're right.  I got the year

2  wrong.  Let me try again, okay?

3      A    Okay.

4      Q    Mr. Carriere's FISH testing in

5  August 2019 showed evidence of gains in BCL2 and

6  BCL6, but was negative for the associated

7  translocations, correct?

8      A    I don't have that in my report.  If you

9  show it to me, I can confirm.

10     Q    Okay.

11          (Exhibit No. 2 was marked for

12          identification.)

13 BY MS. ROSS:

14     Q    Exhibit 2 to your deposition is a

15  summary diagnosis report for Jerald Carriere

16  collected on August 7, 2019.

17          Do you see that?

18     A    Sure.

19     Q    And the box at the top gives a summary

20  diagnosis, right?

21     A    Yes.

22     Q    And the -- the first tissue evaluated is

23  the pericardial fluid, right?

24     A    Correct.

25     Q    And there's a summary discussion that

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    continues on the first page.  Do you see that?

2        A    Yes.

3        Q    Near the bottom of that, do you see

4    where it says "FISH analysis performed"?

5        A    Hang on.  Does it go on to say "the bone

6    marrow"?

7        Q    Yes.

8        A    Okay.

9        Q    And then it goes on to say:  "Given the

10   aforementioned, the cell block of pericardial

11   fluid specimen A was forwarded to our" -- and then

12   cytogenics -- "cytogenetics division for triple

13   hit lymphoma FISH testing."

14            Did I read that correctly?

15       A    Yes.

16       Q    "This testing shows evidence of the 814

17   translocation" --

18            That's the MYC translocation, right?

19       A    Correct.

20       Q    -- "and gains of BCL2 and BCL6."  Do you

21   see that?

22       A    Yes.

23       Q    And then on the second page, there is a

24   section entitled "FISH Analysis," right?

25       A    Yes.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Lauren C. Pinter-Brown, M.D.

1        Q     And for the pericardial fluid, it

2    states:  "Positive for IGH/MYC 814 fusion."

3    Right?

4        A     Correct.

5        Q     "And for gain but not rearrangement of

6    BCL6 and BCL2."  Right?

7        A     Yes.

8        Q     Mr. Carriere was positive for gains in

9    BCL6 and BCL2, right?

10       A     Correct.

11       Q     He was negative for the BCL2

12   translocation, correct?

13       A     Correct.

14       Q     That is the t(14;18) translocation,

15   right?

16       A     Mm-hmm.  Yes.

17       Q     Mr. Carriere -- withdrawn.  New

18   question.

19             Do you agree that while some causes of

20   non-Hodgkin's lymphoma are known, in the vast

21   majority of cases, it is not possible to identify

22   an external cause of non-Hodgkin's lymphoma in an

23   individual case?

24             MS. MOORE:  Objection.  Form.

25             THE WITNESS:  I agree that there's many

Lauren C. Pinter-Brown, M.D.

1    risk factors for non-Hodgkin's lymphoma.  And it's

2    often not possible to tell which risk factor is

3    the most important, nor which risk factor led to

4    the development of non-Hodgkin's lymphoma.

5    BY MS. ROSS:

6         Q    In many patients with DLBCL, leg type,

7    their only identifiable risk factor is age,

8    correct?

9              MS. MOORE:  Objection.

10             THE WITNESS:  So far, yes.

11   BY MS. ROSS:

12        Q    Do you agree that no identifying risk

13   factors other than age is understandable because

14   people can accumulate mutations just as they go

15   through daily life?

16             MS. MOORE:  Objection.

17             THE WITNESS:  No -- actually, I'm going

18   to ask you to ask the question again to make sure

19   I answer it properly.

20   BY MS. ROSS:

21        Q    Sure.

22             Do you agree that it's understandable

23   that in many patients we can't identify any risk

24   factors other than age, because people can

25   accumulate mutations just as they go through daily

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1   life?

2        A    I -- I -- I don't agree with you, but I

3   have a problem with your question because

4   you're -- you have two thoughts in it.  So maybe

5   we can break it down to the first part of it and

6   the second part of it, and you can ask it that way

7   if you'd like.  Otherwise, I just can't answer

8   your -- your question in full.

9        Q    All right.  So the first part of the

10  question is, do you agree that it's not

11  surprising, necessarily, that we can't identify

12  any risk factors other than age in many patients

13  with DLBCL, leg type?

14             MS. MOORE:  Objection.

15             THE WITNESS:  No.

16  BY MS. ROSS:

17       Q    The second part of the question was,

18  people as they age can accumulate mutations just

19  as they go through life, right?

20             MS. MOORE:  Objection.

21             THE WITNESS:  They can accumulate

22  mutations, though they're not always significant.

23  BY MS. ROSS:

24       Q    In Mr. Carriere's case, he could have

25  accumulated all the mutations necessary to result

Lauren C. Pinter-Brown, M.D.

1    in DLBCL, leg type just as a result of being

2    alive, right?

3              MS. MOORE:  Objection.

4              THE WITNESS:  It's -- I'm laughing

5    because it's -- it's a funny question.

6              Being alive means that Mr. Carriere both

7    is days older every day; it means he has exposures

8    to more things every day.  It -- it's such a

9    general term, it really is not possible to answer

10   your question.

11   BY MS. ROSS:

12       Q    Could Mr. Carriere have gotten the exact

13   same cancer without ever using Roundup?

14             MS. MOORE:  Objection.

15             THE WITNESS:  I suppose so.

16   BY MS. ROSS:

17       Q    You have seen patients like Mr. Carriere

18   who never used Roundup and who developed DLBCL,

19   leg type, right?

20             MS. MOORE:  Objection.

21             THE WITNESS:  No.  As I explained to you

22   when we spoke on Friday, I've not been in the

23   habit of taking a very detailed exposure history

24   in clinic.  So I really don't know the answer.

25   But perhaps from now on, I'll start asking people

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Lauren C. Pinter-Brown, M.D.

1    if they've used Roundup.

2    BY MS. ROSS:

3        Q    To this point in your clinical practice,

4    you have not asked specifically whether your

5    patients had exposure to Roundup, correct?

6        A    No, I haven't.

7        Q    Do you have any objective test where you

8    can differentiate Mr. Carriere from a patient who

9    did not use Roundup?

10       A    Other than history?

11       Q    Yes, any objective test that --

12       A    Well, history is an objective way that I

13   learn about patients.  So are we including history

14   or not?

15       Q    Apart from taking the patient's medical

16   history, do you have any objective test where you

17   can differentiate Mr. Carriere from a patient who

18   did not use Roundup?

19       A    No.

20            (Exhibit No. 3 was marked for

21            identification.)

22   BY MS. ROSS:

23       Q    I'm handing you Exhibit 3.  This is your

24   reference list in the Carriere case.

25            Your reference list contains all of the

Lauren C. Pinter-Brown, M.D.

1    materials you reviewed and relied on for your

2    opinions about Jerald Carriere, correct?

3         A    Without looking at every single one, I

4    would hope so.

5         Q    Is there anything that you had reviewed

6    at the time that you put together your report and

7    formed your opinions about Jerald Carriere that

8    you did not include in your reference list?

9         A    I don't believe so.

10        Q    Is there anything you have reviewed

11   since you put together your report that you need

12   to add to your reference list in Mr. Carriere's

13   case?

14        A    No.

15             MS. MOORE:  Other than the defense

16   expert reports --

17             THE WITNESS:  I was going to say --

18             MS. MOORE:  -- that were provided after.

19             THE WITNESS:  Yeah.

20   BY MS. ROSS:

21        Q    Are you relying on Monsanto's expert

22   reports for any opinions you're offering?

23             MS. MOORE:  That's not what I said.

24             THE WITNESS:  I looked up their articles

25   cited to see why they cited them.

Lauren C. Pinter-Brown, M.D.

1    BY MS. ROSS:

2         Q    Okay.  Are there any articles that you

3    looked up in Mr. Carriere's case that you are

4    relying on for any opinion you're offering that's

5    not included in Exhibit 3?

6         A    Other than the ones cited by your own

7    defense specialists?

8         Q    Which articles cited by the defense

9    experts did you review?

10        A    If you give me their reports, I'll show

11   them to you.

12             MS. MOORE:  Just are you asking her if

13   she's relying on studies that are cited by the

14   defense experts or if she reviewed them?  Because

15   there's a distinction.

16             MS. ROSS:  There certainly is, and I

17   want to ask it as two separate questions.

18   BY MS. ROSS:

19        Q    So my first question is, are you relying

20   on any -- any references cited in the defense

21   expert reports, and it seems like the answer to

22   that question is no, correct?

23        A    That's correct.

24        Q    With respect to whether you reviewed any

25   of the literature in the defense expert reports, I

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1  take it had it been significant to you in your

2  opinions in this case, you would have provided us

3  with an updated reference list that included

4  those, right?

5      A    I can't answer the question the way that

6  you said it.  What does significant to me mean?

7      Q    What -- okay.  So then I'll -- I'll ask

8  a follow-up, all right?

9      A    Okay.

10      Q    What articles about Mr. Carriere did you

11  review from the defense expert reports?

12      A    Again, if you provide me the reports,

13  I'll point them out to you.

14      Q    But sitting here, there's none --

15  there's nothing that stands out in your mind that

16  you reviewed from the defense expert reports for

17  Mr. Carriere specifically?

18      A    There might have been papers related to

19  smoking that I looked at.

20      Q    And you can't name any particular one

21  sitting here today, right?

22      A    If you show me the report, I will show

23  them to you.

24      Q    But from memory, you don't have any off

25  the top of your mind, correct?

Lauren C. Pinter-Brown, M.D.

1      A    As I told you, I'm not so good with the

2  names and the authors, particularly if I don't

3  know who they are.



13      A    No, I was asked to address the

14  correlation between his non-Hodgkin's lymphoma and

15  Roundup.

18           MS. MOORE:  Objection to form.

Lauren C. Pinter-Brown, M.D.

3          MS. MOORE:  Objection.

4          THE WITNESS:  That's correct.

18          We had a discussion on Friday about the

19     use of the term "cause," right?

20          A     We sure did.

21          Q     And so I will do my best to use the --

22     the terminology that we agreed on, okay?

23          A     Okay.

24          Q     With respect to contributing factors,

25     that's the terminology that you prefer when we're

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1   talking about something that's been associated in

2   epidemiologic literature with the outcome of

3   interest, right?

4              MS. MOORE:  Objection.

5              THE WITNESS:  Yes.

6   BY MS. ROSS:



15             MS. MOORE:  Objection.

16             THE WITNESS:  I sure would.

17   BY MS. ROSS:

24

Lauren C. Pinter-Brown, M.D.

██  ████████████████████████████████████████████████

██  ███████████████████

3              MS. MOORE:  Objection.

4              THE WITNESS:  For the majority of my

5    career, I have not studied ████████████████

6    BY MS. ROSS:

7        Q    Mr. Carriere was diagnosed with DLBCL,

8    leg type in 2016, correct?

9        A    Let me check the year.  Yes.

10       Q    You have published on the diagnosis and

11   management of cutaneous B-cell lymphomas,

12   including DLBCL, leg type, correct?

13       A    Correct.

14       Q    And those publications were

15   peer-reviewed, right?

16       A    I believe so.

17       Q    The purpose of peer-reviewed

18   publications is to communicate your views on a

19   subject to your peers in the medical profession,

20   correct?

21       A    Yes.  And others.

22       Q    You do your best to be accurate in your

23   publications, right?

24       A    I try.

25       Q    In any of your publications, do you list

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Lauren C. Pinter-Brown, M.D.

 1   pesticides as a cause of DLBCL, leg type?

 2        A    I don't remember.  It depends when it

 3   was written and it depends what the content of the

 4   article was.

 5        Q    In any of your publications, do you list

 6   Roundup as a cause or substantial contributing

 7   factor to DLBCL, leg type?

 8        A    Not that I remember.

 9             (Exhibit No. 4 was marked for

10             identification.)

11   BY MS. ROSS:

12        Q    Exhibit 4 to your deposition is an

13   article of yours titled "Diagnosis and Management

14   of Cutaneous B-Cell Lymphoma."

15             Do you see that?

16        A    Yes.

17        Q    On page 1, you give an overview of the

18   different types of cutaneous lymphomas that you're

19   going to talk about in this paper in the

20   introduction, right?

21        A    Correct.

22        Q    Although the clinical presentation of

23   cutaneous B-cell lymphomas compared with cutaneous

24   T-cell lymphomas is more uniform,

25   clinicopathologic correlation is still important.

Lauren C. Pinter-Brown, M.D.

1    Do you agree with that?

2              MS. MOORE:  Objection.

3              Are you reading from the publication?

4    You just handed it to her about five seconds ago.

5    So if there is a line that you're pointing out in

6    the study -- or, I'm sorry, if there's a line that

7    you are referencing in the study, would you point

8    it out to her then?

9              MS. ROSS:  I would be very happy to.

10   BY MS. ROSS:

11        Q    And, Dr. Pinter-Brown, you wrote this

12   publication and you're familiar with it, right?

13        A    It's 2015.  This is not a -- a recent

14   publication.

15        Q    Okay.

16        A    But I wrote it in 2015.  If you think I

17   remember every word in it, you would really be

18   mistaken.

19        Q    If you'll turn with me to the bottom of

20   the first page, there's a paragraph that begins

21   "Although."

22        A    Yes.

23        Q    Okay.  And there you state:  "Although

24   the clinical presentation of cutaneous B-cell

25   lymphomas compared to cutaneous T-cell lymphomas

Lauren C. Pinter-Brown, M.D.

1   is more uniform, clinicopathologic correlation is

2   still important."

3        A    I lost you.  The bottom of the first

4   page?

5        Q    Second paragraph.

6        A    The bottom of the first page -- oh,

7   second paragraph.  Okay, fine.  Okay, fine.

8        Q    I think you were at the -- the next

9   paragraph over?

10       A    Yes, I was.

11       Q    Okay.  And there you state:  "Although

12  they carry names and have some histologic

13  similarities with nodal counterparts, there remain

14  differences not only in presentation and histology

15  but also in natural history, treatment, and

16  outlook."

17            Did I read that correctly?

18       A    Yes, you did.

19       Q    Do you agree with what you wrote there?

20       A    I do.

21       Q    Although DLBCL, leg type shares a name

22  with and has some histologic similarities to its

23  nodal counterpart, there remain differences

24  between DLBCL, leg type and systematic DLBCL?

25            MS. MOORE:  Objection.

Lauren C. Pinter-Brown, M.D.

```
 1              THE WITNESS:  Yes, there's some
 2    differences.
 3    BY MS. ROSS:
 4         Q    On page 837 of this article, will you
 5    turn there with me.  Do you see you have a section
 6    here on "Primary Cutaneous Diffuse Large B-Cell
 7    Lymphoma Leg Type"?
 8         A    Yes.
 9         Q    Do you understand that when I say
10    "DLBCL, leg type," that's the disease that I'm
11    referring to?
12         A    Yes.
13         Q    Do you see where you state in talking
14    about DLBCL, leg type, that it affects the elderly
15    with a median age of 70 years?
16         A    Yes.
17    ████      ████   █████████████████████████████████
18    ████ ██████████████
19         A    Correct.
20         Q    Is there anything unusual at all about
21    his age for primary cutaneous DLBCL?
22         A    No.
23         Q    Is there anything at all unusual about
24    Mr. Carriere's clinical presentation for primary
25    cutaneous DLBCL, leg type?
```

Lauren C. Pinter-Brown, M.D.

1    A    Well, of interest here, since I read my

2  own paper, it says:  "The predominant gender is

3  female," the next sentence.  So he isn't, so I

4  guess that's a little bit -- a little bit out of

5  the norm.  And then when I think about it, a lot

6  of my patients are female.  I had forgotten that

7  fact.

8    Q    With respect to DLBCL, leg type

9  specifically, there's a female preponderance,

10  correct?

11    A    Apparently so.

12    Q    With respect to systemic DLBCL, is there

13  a female preponderance or a male preponderance?

14    A    I think it's very slightly male.  Not by

15  much.

16    Q    You are not Mr. Carriere's treating

17  doctor, right?

18    A    That is correct.

19    Q    You have never provided Mr. Carriere

20  with medical care of any kind, right?

21    A    That's correct.

22    Q    You would defer to Mr. Carriere's

23  treating physicians as to his medical care,

24  correct?

25         MS. MOORE:  Objection.

Lauren C. Pinter-Brown, M.D.

1           THE WITNESS:  I'm not sure I know what

2    you're asking.

3    BY MS. ROSS:

4        Q    Did you have any criticism of the

5    physicians who diagnosed Mr. Carriere's lymphoma

6    or treated him for lymphoma?

7           MS. MOORE:  Objection.

8           THE WITNESS:  No.

9    BY MS. ROSS:

10       Q    You had no role in the diagnosis or

11   treatment of Mr. Carriere's DLBCL, leg type,

12   correct?

13       A    That's correct.

14       Q    You have never physically examined

15   Mr. Carriere for any purpose, true?

16       A    That's correct.

17       Q    Do you agree that there is no physical

18   exam finding that shows Roundup contributed to

19   Mr. Carriere's non-Hodgkin's lymphoma?

██      █      ███████████████████████████

██      ██████████████████████████████████

██      █████████████████████████████████

██      ████████████████████████████████████

██      ███████████████████      ████████████████

25       Q    Would you defer to Mr. Carriere's

Lauren C. Pinter-Brown, M.D.

```
 1    treating physicians who have observed him and

 2    physically examined him as to his current physical

 3    condition?

 4         A    Yes.

 5              MS. MOORE:  Objection.

 6    BY MS. ROSS:

 7         Q    Did you order any diagnostic tests that

 8    would allow you to rule in Roundup as the cause of

 9    Mr. Carriere's non-Hodgkin's lymphoma?

10         A    No.

11         Q    You have not ordered any tests of any

12    kind for Mr. Carriere, correct?

13         A    That's correct.

14         Q    Do you agree there is no medical test or

15    biomarker to show the use of Roundup contributed

16    to Mr. Carriere's non-Hodgkin's lymphoma?

17              MS. MOORE:  Objection.

18              THE WITNESS:  Clarify "medical test,"

19    please.

20    BY MS. ROSS:

21         Q    Is there any test on blood, urine,

22    tissue of any kind that would allow you to

23    determine that Roundup contributed to

24    Mr. Carriere's non-Hodgkin's lymphoma?

25         A    One thing that -- that couldn't be done
```

Lauren C. Pinter-Brown, M.D.

1    clinically that you might consider would be to do

2    glyphosate levels in Mr. Carriere and see if they

3    still persist.  That's not a clinical test.

4         Q    Is there any -- so let's break that up a

5    little bit, all right?

6              Is there any clinical test or biomarker

7    to show that use of Roundup contributed to

8    Mr. Carriere's non-Hodgkin's lymphoma?

9         A    No.

10        Q    You agree that no pathology report,

11   staining or tissue shows that Roundup contributed

12   to Mr. Carriere's non-Hodgkin's lymphoma, correct?

13        A    That's correct.

14        Q    You agree that no genetic marker shows

15   that Roundup contributed to Mr. Carriere's

16   non-Hodgkin's lymphoma, right?

17        A    That's correct.

18        Q    You also mentioned that glyphosate

19   levels could be taken, but would not typically be

20   taken in a clinical setting, right?

21        A    Correct.

22        Q    You did not order any tests to see if

23   Mr. Carriere had glyphosate in his body now,

24   right?

25        A    No.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    Q    Did you see any medical records showing

2    that Mr. Carriere had glyphosate in his body at

3    any point?

4    A    No.  That's not a test we can order in

5    clinic.

6    Q    And you did not order any tests to see

7    if Mr. Carriere had any surfactant in his body at

8    any point, correct?

9    A    That would really not be a test I could

10   order in clinic.

11   Q    Just to be very clear, you did not see

12   any medical record at any point showing that

13   Mr. Carriere had glyphosate in his body, right?

14   A    No.  Nor would I expect to.

15   Q    Have you ever spoken with Mr. Carriere?

16   A    No.

17   Q    You do not know what Mr. Carriere looks

18   like, right?

19   A    Nope.

20   Q    You did not list a telephone interview

21   with Mr. Carriere in -- in your work in this case,

22   right?

23   A    That's correct.

24   Q    In order for you to provide opinions on

25   specific causation, a telephone interview was not

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Lauren C. Pinter-Brown, M.D.

1    necessary, true?

2          A     That's correct.

3                MS. MOORE:   Objection.

4    BY MS. ROSS:

5          Q     Why is that?

6          A     There were no additional questions that

7    I had to ask the patient, and he's not in a

8    physical position for me to ask him questions at

9    the present time.

10         Q     You reviewed Mr. Carriere's extensive

11   medical records, right?

12         A     I reviewed what I -- what I got.

13         Q     I was using your language.  I think you

14   described them as extensive medical records, okay?

15         A     I read what I got.  There may be more

16   that I haven't received.

17         Q     What didn't you receive that you would

18   want to with respect to Mr. Carriere?

19         A     Really nothing.

20         Q     Do you recall approximately how many

21   pages of medical records you reviewed in

22   Mr. Carriere's case?

23         A     Not at all.

24         Q     You also reviewed Mr. Carriere's

25   deposition, right?

Lauren C. Pinter-Brown, M.D.

1        A     Yes.

2        Q     And you had the depositions of all of

3    Mr. Carriere's treating physicians, correct?

4        A     Probably not.

5        Q     Whichever depositions are listed on your

6    reference list for Mr. Carriere are the ones that

7    you reviewed, fair?

8        A     That's correct.

9        Q     Between those depositions, fact sheets

10   and the plaintiff's medical records, did you feel

11   you had all the information you needed to evaluate

12   what caused his lymphoma?

13       A     I feel I have all the information I

14   needed to determine what risk factors he had in

15   the development of non-Hodgkin's lymphoma.

16       Q     Nothing a plaintiff could tell you years

17   after they were exposed to Roundup and developed

18   lymphoma would you -- would tell you whether

19   Roundup caused their lymphoma, true?

20             MS. MOORE:  Objection.

21             THE WITNESS:  No, actually.

22   BY MS. ROSS:

23       Q     In what circumstance would something

24   that a plaintiff told you years after they

25   developed lymphoma help you determine whether

Lauren C. Pinter-Brown, M.D.

1   Roundup caused their lymphoma?

2        A    Well, their exposure history.  If they

3   told me they were never exposed, it's not a risk

4   factor.

5        Q    Apart from a plaintiff telling you they

6   were never exposed to Roundup, can you imagine

7   anything that a plaintiff could tell you that

8   would help you determine whether or not Roundup

9   caused or contributed to their non-Hodgkin's

10  lymphoma?

11            MS. MOORE:  Objection to form.

12            THE WITNESS:  Ask me one more time.  I

13  just want to make sure I understand.

14  BY MS. ROSS:

15       Q    Apart from a plaintiff telling you they

16  were never exposed, can you imagine anything that

17  a plaintiff could tell you years later that would

18  help determine whether or not Roundup caused or

19  contributed to their non-Hodgkin's lymphoma?

20       A    Yes.  Yes, I can.

21       Q    Such as what?

22       A    Their exposure history.  You mentioned

23  never exposed, but perhaps they were exposed and

24  they can elucidate how many times they used it,

25  how many years.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Lauren C. Pinter-Brown, M.D.

```
 1              Just the things we had talked about

 2   earlier when we were determining if somebody has

 3   had a significant exposure.

 4        Q    On the -- the pages are not numbered on

 5   your report, unfortunately, on this one, but if

 6   you turn with me to page 2 of your report.

 7        A    Okay.

 8        Q    Do you see where you state:  "In

 9   conducting an evaluation of Mr. Carriere's case

10   for purposes of opining on specific causation" --

11        A    Yes.

12        Q    -- "I have reviewed Mr. Carriere's

13   extensive medical records"?

14        A    Yes.

15        Q    And then you go on to state that you

16   also reviewed the depositions of Mr. Carriere's

17   primary care physician and his oncologist, right?

18        A    Correct.

19        Q    Did you see any medical record in all of

20   Mr. Carriere's extensive medical records where

21   someone suggested that Roundup contributed to

22   Mr. Carriere's non-Hodgkin's lymphoma?

23        A    No.

24        Q    Did you see anything in the depositions

25   of Mr. Carriere's treating doctors that you
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    reviewed where Mr. Carriere's own physicians

2    diagnosed Roundup as contributing to his

3    non-Hodgkin's lymphoma?

4         A    No.

5         Q    Do you have any objective evidence that

6    Roundup was a substantial contributing factor to

7    Mr. Carriere's leg type DLBCL?

8              MS. MOORE:  Objection.

9              THE WITNESS:  One more time.  Stop the

10   noise.  One more time.

11   BY MS. ROSS:

12        Q    Do you have any objective evidence that

13   Roundup was a substantial contributing factor to

14   Mr. Carriere's DLBCL, leg type?

15             MS. MOORE:  Objection.

16             THE WITNESS:  The objective evidence is

17   his history.

18   BY MS. ROSS:

19        Q    The objective evidence you're referring

20   to is the history that Mr. Carriere reports of

21   having been exposed to Roundup and the extent of

22   his exposure.  Is that what you're saying?

23        A    Correct.

24        Q    What studies are you relying on to say

25   that Roundup is a substantial contributing factor

Lauren C. Pinter-Brown, M.D.

1    for DLBCL, leg type?

2         A    The same ones that look at the increased

3    risk of non-Hodgkin's lymphoma.

4         Q    Did any of those studies look at DLBCL,

5    leg type specifically?

6         A    No, it would be impossible.

7         Q    Do any of the authors of the

8    epidemiology studies that you reviewed in this

9    case say that Roundup causes DLBCL, leg type?

10        A    No, that wouldn't be possible.

11        Q    Do any of the authors in the studies

12   that you reviewed say Roundup causes non-Hodgkin's

13   lymphoma generally?

14        A    The studies suggest that there's an

15   increased risk when people have had significant

16   Roundup -- or glyphosate-based formulation

17   exposure to the development of non-Hodgkin's

18   lymphoma.  Some papers try to break down the

19   subtypes.

20        Q    And even those papers that try to break

21   down the subtypes, in none of those papers do they

22   look at DLBCL, leg type specifically, right?

23        A    That would be impossible.

24        Q    You go on to say that your evaluation

25   included a consideration of other potential risk

Lauren C. Pinter-Brown, M.D.

1    factors for non-Hodgkin's lymphoma.

2         A    Correct.  Somewhere in here.

3         Q    You considered whether Mr. Carriere had

4    other risk factors that could have contributed to

5    his non-Hodgkin's lymphoma, right?

6         A    I did.

7         Q    You ruled out the risk factors

8    Mr. Carriere did not have, right?

9              MS. MOORE:  Objection.

10             THE WITNESS:  It's a double negative.

11   I -- I looked at the risk factors and noted which

12   ones he did not have.

13   BY MS. ROSS:

14        Q    If he did not have a risk factor that

15   you agree is an established risk factor for

16   non-Hodgkin's lymphoma, you didn't have to apply

17   it to his case, right?

18        A    Oh, boy, I don't understand that

19   question at all.  You want to rephrase it or --

20        Q    I'm trying to -- I thought the clearest

21   way to ask it was just to say you ruled out in

22   Mr. Carriere's case the risk factors he didn't

23   have because they did not apply to him, but maybe

24   there's a different way that you would think

25   about.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1              What did you do if you saw a general

2    risk factor for non-Hodgkin's lymphoma and you

3    noted that Mr. Carriere did not have that risk

4    factor?

5         A    I noted it here on this Section 7.

6         Q    Right.  And Section 7 of your report is

7    where you've given analysis of Mr. Carriere's risk

8    factors for developing DLBCL, correct?

9         A    Correct.

10        Q    You did consider whether Mr. Carriere

11   had other attributes besides Roundup use that have

12   been associated with non-Hodgkin's lymphoma in the

13   epidemiologic literature, right?

14        A    Yes.

15        Q    What were Mr. Carriere's other potential

16   risk factors for non-Hodgkin's lymphoma?

17        A    Just his age.

18        Q    You did not ignore something that on its

19   face applied to Mr. Carriere, right?

20             MS. MOORE:  Objection.

21             THE WITNESS:  What?  Maybe -- maybe you

22   can ask that again.

23   BY MS. ROSS:

24        Q    Did you perform a comprehensive review

25   of the literature to determine whether

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1  Mr. Carriere had any other attributes besides his

2  use of Roundup that had been associated in at

3  least some studies with a risk of non-Hodgkin's

4  lymphoma?

5       A    No.  I've been studying lymphomas for

6  over 30 years, and I speak about risk factors over

7  and over again to many groups, and there are

8  certain risk factors that -- that people agree

9  upon.  There are other risk factors that you might

10  find in the literature in one paper or two papers

11  that people don't agree upon, and I did not

12  evaluate those because they're controversial.

13       Q    You evaluated accepted risk factors for

14  non-Hodgkin's lymphoma based on your training and

15  experience as a lymphoma specialist, right?

16       A    That's correct.

17       Q    If there were other potential risk

18  factors that were discussed in an epidemiologic

19  study but had not come up in your years of

20  practice, you would not necessarily have looked at

21  those in detail.  Fair?

22            MS. MOORE:  Objection.

23            THE WITNESS:  No -- you need to repeat

24  it again.  I'm not sure I understand what you're

25  saying.

Lauren C. Pinter-Brown, M.D.

```
 1   BY MS. ROSS:

 2       Q    If there were other potential risk

 3   factors discussed in an epidemiologic study, but

 4   they are something that hadn't come up in your

 5   years of experience, you would not have looked at

 6   those in detail, correct?

 7            MS. MOORE:  Objection to form, vague.

 8            THE WITNESS:  I want to make it clear

 9   to you that all I do in my career for the last

10   30 years is look at papers and go to conferences

11   about lymphomas, and I really make it my job to --

12   to know about things that are in the literature

13   and that are being lectured about, and then I make

14   an opinion for myself whether I agree that there's

15   credibility or not.

16            So of course, there might be something

17   that I missed, but I really make every effort to

18   find information about non-Hodgkin's lymphoma.

19   That is my job.

20   BY MS. ROSS:

21       Q    Are you claiming that Mr. Carriere has

22   no other attributes that put him at increased risk

23   for non-Hodgkin's lymphoma based on epidemiologic

24   data?

25            MS. MOORE:  Objection to form.
```

Lauren C. Pinter-Brown, M.D.

 1            THE WITNESS:  No other risks -- do it

 2   again.

 3   BY MS. ROSS:

 4        Q    Are you claiming that Mr. Carriere has

 5   no other attributes that put him at increased risk

 6   for non-Hodgkin's lymphoma based on epidemiologic

 7   data?

 8            MS. MOORE:  Objection to form.

 9            THE WITNESS:  I'm having trouble

10   answering it because of the "no other risks."

11            Can you clarify that a little bit?

12   BY MS. ROSS:

13        Q    Sure.

14            Are you claiming that Mr. Carriere has

15   no other attributes besides use of Roundup that

16   put him at increased risk for non-Hodgkin's

17   lymphoma based on epidemiologic data?

18            MS. MOORE:  Objection to form,

19   misstates --

20            THE WITNESS:  I just told you --

21            THE REPORTER:  Excuse me.

22            THE WITNESS:  Sorry.

23            MS. MOORE:  Objection to form, misstates

24   her testimony.

25            THE WITNESS:  I just said that his age

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Lauren C. Pinter-Brown, M.D.

1    is a risk factor.

2    BY MS. ROSS:

3        Q    Before we got off on this tangent, we

4    were talking about when Mr. Carriere originally

5    presented.  Do you remember that?

6        A    I will go back and look.

7        Q    Okay.  Let me see if --

8        A    9/2/16.

9        Q    In 2016, Mr. Carriere presented with a

10   lesion on his left leg, right?

11       A    Yes.

12       Q    That lesion was biopsied and showed

13   DLBCL, correct?

14       A    Correct.

15       Q    FISH was not performed on Mr. Carriere's

16   2016 DLBCL skin lesion, right?

17       A    That's correct.

18       Q    Specifically that lesion was not tested

19   for the MYC BCL2 or BCL6 translocations, true?

20       A    That's true.

21       Q    Systemic workup at that time did not

22   show radiographic evidence of involvement

23   elsewhere in his body, right?

24       A    That's correct.

25       Q    A bone marrow biopsy was performed in

Lauren C. Pinter-Brown, M.D.

1  2016, correct?

2      A    Correct.  Well -- yes, correct.

3      Q    Mr. Carriere's 2016 bone marrow biopsy

4  showed a monoclonal population of cells with CLL

5  morphology, right?

6      A    I didn't note that in my report because

7  it's not really significant.  But if you want to

8  show it to me, I'll be glad to look at it.

9      Q    When you say it's not really

10  significant, why is that?

11      A    Because when we're diagnosing lymphomas,

12  even though we have a lot of fancy tests, the

13  bottom line is we have to see it under a

14  microscope.  So we have to see abnormal cells

15  under a microscope.  Things like flow cytometry

16  that may show a small population of cells in the

17  bone marrow, without the absence of seeing those

18  cells in the bone marrow is of undetermined

19  significance.

20      Q    I'll represent to you I think that's

21  exactly what the pathologist thought as well.

22      A    Well, that's good.

23          (Exhibit No. 5 was marked for

24          identification.)

25  BY MS. ROSS:

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1        Q    I'm handing you Exhibit 5 to your

2   deposition.

3        A    Yep.

4        Q    This is Mr. Carriere's 2016 bone marrow

5   biopsy, right?

6        A    It -- yes.

7        Q    And you see in the summary of the

8   diagnosis, there's a description of "Monoclonal

9   B-cell proliferation, 2 percent or slightly more

10  with SLL/CLL features of uncertain significance."

11            Did I read that correctly?

12       A    You did.

13       Q    You have no reason to disagree that that

14  was found, right?

15       A    No.

16       Q    Mr. Carriere's 2016 bone marrow biopsy

17  also showed a population of large B-cells carrying

18  an 814 translocation, right?

19       A    One second.  I may have to correct one

20  word that you said.

21            Okay.  So when you do FISH -- FISH

22  testing, you're not looking at what the -- what

23  the characteristics of the cell are.  So what they

24  say is -- where can we find the FISH?

25            Hang on a second.  I just lost it.

Lauren C. Pinter-Brown, M.D.

1      Q     I think you want page 2.

2      A     When they -- when you're doing FISH

3   analysis, you're looking for a particular

4   chromosome abnormality.  But when you said that it

5   showed a large pop- -- a large cell population, or

6   whatever words you just used, they don't usually

7   characterize what cell population.  And in fact,

8   on his bone marrow there is no large cell

9   population.

10          So, you know, it -- if there would be

11   one and there would be FISH, you might have been

12   able to say that.  But in this -- in this

13   situation, all you have is the positive FISH

14   without morphologic findings.

15      Q     I see.  Okay.

16          So your understanding -- so breaking

17   that up, Mr. Carriere's 2016 bone marrow biopsy

18   showed an 814 translocation on FISH.  Right?

19      A     Correct.

20      Q     But Mr. Carriere's 2016 bone marrow

21   biopsy did not show anything of significance on

22   morphologic findings, right?

23      A     That's correct.

24      Q     Is it your opinion that more likely than

25   not the MYC positive cells in Mr. Carriere's bone

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    marrow in 2016 were the same cancer as his 2016

2    skin lesion?

3            MS. MOORE:  Objection.

4            THE WITNESS:  No, I have no way of

5    knowing that.

6    BY MS. ROSS:

7        Q    And why do you say that?

8        A    Because the cells weren't seen.

9        Q    Okay.  So in your -- and this is -- I

10   just want to understand what your opinion is on

11   this.  All right?

12       A    Sure.

13       Q    In your view, we cannot say one way or

14   another whether the -- whatever cells in his bone

15   marrow expressed 814 in 2016, whether those were

16   related to his skin lymphoma at that time?  Am I

17   understanding you right?

18       A    Yes, because we have no evidence

19   visually that they were there.

20       Q    And I take it from our previous

21   conversation that whether or not those cells were

22   related to his skin lesion of DLBCL, leg type,

23   it's your opinion that in Mr. Carriere's case the

24   MYC translocation by itself was not enough to lead

25   to his DLBCL, leg type, right?

Lauren C. Pinter-Brown, M.D.

1          MS. MOORE:  Objection.

2          THE WITNESS:  There's no chromosomal

3     abnormality that we've identified that leads to

4     diffuse large B-cell lymphoma, leg type or

5     otherwise.

6     BY MS. ROSS:

7          Q    Can you identify any of the mutations

8     that contributed to Mr. Carriere's DLBCL, leg type

9     in 2016?

10          MS. MOORE:  Objection.

11          THE WITNESS:  No.  You've asked me that

12     before, and I said no.

13     BY MS. ROSS:

14          Q    We talked a minute ago about

15     Mr. Carriere's systemic recurrence, right?

16          A    Correct.

17          Q    In August of 2019, Mr. Carriere

18     presented with a systemic recurrence of DLBCL,

19     true?

20          A    Yes.

21          Q    And as we talked about a minute ago,

22     cytology on the pericardial fluid was positive for

23     the MYC translocation, right?

24          A    The -- the fluid was positive for the

25     MYC translocation on FISH.

Lauren C. Pinter-Brown, M.D.

1      Q    Can you point me toward any statement in

2    the medical literature worldwide that says Roundup

3    causes MYC translocations?

4      A    No.

5      Q    Can you point me toward any statement in

6    the medical literature worldwide that says

7    glyphosate causes MYC translocations?

8      A    No.

9      Q    Are there any data anywhere showing that

10    glyphosate or Roundup can cause the MYC

11    translocation, published or unpublished?

12      A    Not that I'm aware.

13      Q    No data in a human, a mouse, a rat, a

14    zebra fish?

15           MS. MOORE:  Objection.

16           THE WITNESS:  I haven't checked all

17    those species.  I just take care of people.

18    BY MS. ROSS:

19      Q    Can you get a MYC translocation without

20    ever using Roundup?

21      A    I really don't know the answer to that.

22      Q    Is it your -- when you say you really

23    don't know the answer to that, is it your opinion

24    that every single instance of lymphoma where

25    there's a MYC translocation, someone was exposed

Lauren C. Pinter-Brown, M.D.

```
 1    to Roundup?

 2             MS. MOORE:  Objection.

 3             THE WITNESS:  No, it means exactly what

 4    I said, I don't know.  We don't take histories of

 5    Roundup.  Roundup is in the dirt.  Roundup is in

 6    the air.  I really don't know what exposures

 7    people have.

 8    BY MS. ROSS:

 9        Q    And whatever the unknown mutations are

10    that may have contributed to Mr. Carriere's DLBCL,

11    leg type, you don't have any data showing that

12    glyphosate or Roundup contributes to any of those,

13    right?

14        A    That's correct.

      ████      ████    █████████████████████████████

      ████    ██████████████████████████████

17             MS. MOORE:  Objection.

18             THE WITNESS:  At what point?

19    BY MS. ROSS:

20        Q    Before Mr. Carriere presented with

21    DLBCL, leg type, ██████████████████████████████

      ████    ████████████████████████████

23        A    Not that I saw.

24        Q    Did you see anything in Mr. Carriere's

25    medical records to indicate that his ███████████████
```

Lauren C. Pinter-Brown, M.D.

██  ███████████████████████████████

2               MS. MOORE:  Objection.

3               THE WITNESS:  No.

4    BY MS. ROSS:

5        Q    If you'll turn with me to page 5 -- or

6    I'm sorry, Section 5 of your report, I want to

7    talk to you a bit about Mr. Carriere's use of

8    Roundup, okay?

9        A    Okay.

10              MS. MOORE:  Before we go there, we've

11   been going about an hour.  Let's take a break.

12              MS. ROSS:  Sounds great.  Short break.

13   Off the record.

14              THE VIDEOGRAPHER:  We are now going off

15   the record.  The time is approximately 9:59 a.m.

16              (Recess.)

17              THE VIDEOGRAPHER:  We are now back on

18   the record.  The time is approximately 10:15 a.m.

19   BY MS. ROSS:

20       Q    Dr. Pinter-Brown, before the break, we

21   were turning to the exposure history you gave for

22   Mr. Carriere in your report, right?

23       A    Yes.

24       Q    In your report you state:  "Mr. Carriere

25   had significant prior exposure to Roundup using

Lauren C. Pinter-Brown, M.D.

1    the product to control weeds on his multiple

2    properties, including his business, rental

3    holdings and personal home, from approximately

4    1977 to 2012."  Correct?

5         A    Correct.

6         Q    Mr. Carriere sprayed Roundup from 1977

7    to 2012, right?

8         A    Approximately.  I think I got that from

9    his deposition.

10        Q    And he stopped spraying Roundup in

11   approximately 2012, right?

12             MS. MOORE:  Objection.

13             THE WITNESS:  I think that -- I think

14   that's what he said, yes.

15   BY MS. ROSS:

16        Q    Did he use any other glyphosate-based

17   herbicides besides Roundup?

18        A    He --

19             MS. MOORE:  Objection.

20             THE WITNESS:  I don't believe he stated

21   that he did.

22   BY MS. ROSS:

23        Q    Mr. Carriere sprayed for approximately

24   15 to 30 minutes approximately every two to four

25   weeks, correct?

Lauren C. Pinter-Brown, M.D.

```
1        A     Yes.

2        Q     Mr. Carriere sprayed weeds on the

3   ground, right?

4        A     That was one of the things he did.

5        Q     Did he ever aim the trigger at himself

6   from what you saw?

7              MS. MOORE:  Objection.

8              THE WITNESS:  It wouldn't have been from

9   what I saw, but he certainly didn't admit to

10  spraying himself, though I -- I'm not sure even if

11  somebody did it accidentally, they would like to

12  admit to that.  But he did say that sometimes he

13  would take the top off and just sort of pour it

14  around, and that sometimes when he poured it

15  around, you know, he would get it on himself.

16  BY MS. ROSS:

17       Q     Did Mr. Carriere follow the labeling

18  instructions for washing his hands if he got it on

19  himself?

20             MS. MOORE:  Objection.

21             THE WITNESS:  Oh, one sec.  I'm not sure

22  in the -- in the deposition that that was

23  addressed very extensively.

24  BY MS. ROSS:

25       Q     Would you expect that Mr. Carriere would
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    have followed whatever labeling recommendations

2    were on the bottle of Roundup that he sprayed?

3         A    As much as he could.  Yeah, I can

4    imagine, however, that sometimes that it may have

5    taken him a while to get to a faucet or something

6    like that.

7         Q    When you state in your report that

8    Mr. Carriere's exposure to Roundup was both

9    intensive and prolonged, greater than 35 years --

10   that's on Section 7 of your report at the very

11   end.

12        A    Yes.

13        Q    When you say "prolonged," you're

14   referring to the number of years Mr. Carriere

15   sprayed Roundup, right?

16        A    Correct.

17        Q    When you say "intensive," that refers to

18   how often Mr. Carriere used Roundup, right?

19        A    It refers to the quantities -- as is

20   stated here in the parentheses, to the quantities

21   and the fact that he didn't use particularly

22   effective barriers.

23        Q    You go on to say:  "Based on the

24   available evidence discussed below" --

25             Do you see that sentence in your report?

Lauren C. Pinter-Brown, M.D.

1          A      Yes.

2          Q      And that evidence is -- is what we

3    talked about on Friday with respect to

4    epidemiology studies looking at exposure to

5    glyphosate-based formulations and non-Hodgkin's

6    lymphoma, right?

7          A      Correct.

8          Q      Your exposure calculations of intensive

9    and prolonged exposure rely on the time of

10   exposure.  Right?

11              MS. MOORE:  Objection.

12              THE WITNESS:  The time of exposure alone

13   puts him into a significant exposure group.  I'll

14   leave it there.

15   BY MS. ROSS:

16         Q      You did not rely on actual absorption

17   for any opinions that you're offering, right?

18              MS. MOORE:  Objection.

19              THE WITNESS:  Could you clarify what

20   you -- yeah, sorry.

21              MS. MOORE:  Objection.  She's not an

22   absorption expert.

23   BY MS. ROSS:

24         Q      Did you calculate an absorbed dose or a

25   systemic dose of glyphosate or Roundup for

Lauren C. Pinter-Brown, M.D.

1   Mr. Carriere?

2        A    This is not within the abilities that I

3   have.

4        Q    And that's true for every plaintiff that

5   you looked at, that you did not calculate an

6   absorbed dose or a systemic dose of glyphosate or

7   Roundup, correct?

8        A    That's correct.

9        Q    You didn't rely on anyone else who may

10  have done that, fair?

11       A    That's correct.

12       Q    I think last time we talked about that

13  you weren't really aware of any particular

14  impurities in glyphosate or Roundup.  Do you

15  recall that discussion?

16            MS. MOORE:  Objection.

17            THE WITNESS:  The discussion had to do

18  with what's in the bottle, you know, and -- and I

19  told you that I know a little bit about what's in

20  the bottle but not to a great degree.  I'm not a

21  person who's focused on the chemistry of

22  pesticides.

23  BY MS. ROSS:

24       Q    And I want to confirm you aren't relying

25  on any particular amount or type of impurity for

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    your opinions about Mr. Carriere, correct?

2         A    Correct.

3         Q    That is true for every plaintiff that

4    you considered, that you are not relying on any

5    type or amount of any particular impurity in

6    Roundup for your opinions, true?

7         A    That's true.

8         Q    You did not disclose an opinion anywhere

9    in your report that Mr. Carriere's risk of

10   non-Hodgkin's lymphoma was increased by a certain

11   amount because of the number of days he sprayed

12   Roundup, right?

13             MS. MOORE:  Objection.

14             THE WITNESS:  That's correct.

15   BY MS. ROSS:

16        Q    You do not disclose an opinion anywhere

17   in your report that Mr. Carriere's risk of

18   non-Hodgkin's lymphoma increased by a certain

19   amount because of either the number of days per

20   year or the number of days total Mr. Carriere

21   sprayed Roundup, true?

22             MS. MOORE:  Objection.

23             THE WITNESS:  That's true.

24   BY MS. ROSS:

25        Q    When you compared Mr. Carriere's

Lauren C. Pinter-Brown, M.D.

1  exposure to Roundup to that reported in the

2  epidemiologic literature, you relied on the data

3  for NHL overall, right?

4       A    Yes.

5            MS. MOORE:  Objection.

6            THE WITNESS:  Primarily.

7  BY MS. ROSS:

8       Q    You looked at subtype data, but you were

9  concerned that the subtypes had small numbers of

10 cases for analysis, correct?

11      A    In some papers, yes.

12      Q    Do you remember that on Friday we

13 started a discussion about Pahwa 2019, the North

14 American pooled project, and whether Pahwa 2019

15 included any new cases relative to McDuffie 2001

16 and De Roos 2003?

17      A    Correct.

18      Q    I'm hoping we don't have to retread all

19 of this water, so let's see if we can summarize

20 some of it.  All right?

21      A    Okay.

22      Q    Do you remember for Pahwa 2019 that

23 there were 113 exposed glyphosate cases?

24           MS. MOORE:  Objection.

25           THE WITNESS:  I absolutely don't

Lauren C. Pinter-Brown, M.D.

1   remember the number.

2   BY MS. ROSS:

3       Q    Okay.  Then we'll -- I wanted to see if

4   we could short-circuit, but we can go through it

5   again.  New question.

6           (Exhibit No. 6 was marked for

7           identification.)

8   BY MS. ROSS:

9       Q    Exhibit 6 to your deposition is the

10  Pahwa 2019 article, right?

11      A    Yes.

12      Q    And if you will turn with me to Table 2.

13  And let me know when you're there.

14      A    Yes.

15      Q    For NHL overall, Mr. Carriere would fall

16  in the "ever exposed" category?

17      A    Correct.

18      Q    And do you see that for NHL overall, the

19  number of ever used glyphosate cases in Pahwa 2019

20  is 113?

21      A    Yes.

22          (Exhibit No. 7 was marked for

23          identification.)

24  BY MS. ROSS:

25      Q    Exhibit 7 is the McDuffie study.  And if

Lauren C. Pinter-Brown, M.D.

1   you will turn with me to Table 2 of the McDuffie

2   study.  Tell me when you're there.

3        A    Yes.

4        Q    Okay.  Do you see that for glyphosate,

5   for NHL overall, the number of exposed cases in

6   McDuffie was 51?

7        A    Okay.

8        Q    That's correct, right?

9        A    Yes.

10       Q    Glyphosate was not associated with an

11  increased risk of NHL overall in either analysis

12  presented in Table 2 of McDuffie, correct?

13            MS. MOORE:  Objection.

14            THE WITNESS:  I'm sorry, repeat your

15  question.

16  BY MS. ROSS:

17       Q    Glyphosate was not associated with an

18  increased risk of NHL overall in either analysis

19  presented in Table 2 of McDuffie, correct?

20            MS. MOORE:  Objection.

21            THE WITNESS:  The risk is 1.26

22  unadjusted, and 1.20 adjusted, I believe.  I have

23  to see if I can read A and B.

24  BY MS. ROSS:

25       Q    In McDuffie 2001 --

Lauren C. Pinter-Brown, M.D.

```
 1              MS. MOORE:  Hold on a second.  She's --

 2    shes reading, and she can't read while you ask a

 3    question too.

 4              MS. ROSS:  That's fine.

 5    BY MS. ROSS:

 6         Q    Let me know when you're ready.

 7         A    Okay.

 8         Q    Did you read the -- the footnotes for

 9    A and B in McDuffie 2001?

10         A    Yes.  The B is adjusted for certain

11    variables but not pesticide exposure.

12         Q    Correct.  So let me ask a follow-up

13    question on that.  Okay?

14         A    Okay.

15         Q    With regard to McDuffie 2001, neither of

16    the odds ratios presented are adjusted for other

17    pesticides, correct?

18         A    Correct.

19         Q    In Table 2 of McDuffie, neither of the

20    odds ratio for exposure to glyphosate and NHL

21    overall are statistically significant, correct?

22         A    Correct.

23         Q    If you'll turn with me briefly to

24    Table 8 of this publication.

25              Do you see that Table 8 of McDuffie
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

 1   gives information on cases exposed for more than

 2   two days per year and for less than or equal to

 3   two days per year of glyphosate use?

 4        A    Yeah.  Wait a minute.  (Peruses

 5   document.)  Okay.

 6        Q    The "Greater than two days" category in

 7   McDuffie 2001 is based on 23 exposed cases,

 8   correct?

 9        A    Correct.

10             (Exhibit No. 8 was marked for

11             identification.)

12   BY MS. ROSS:

13        Q    Exhibit 8 to your deposition is the

14   De Roos 2003 paper.  Right?

15        A    Correct.

16        Q    If you'll turn with me in Table 3 in

17   De Roos 2003.  Do you see that for glyphosate,

18   De Roos 2003 gives the number of exposed cases?

19        A    Yes.

20        Q    And in De Roos 2003, the number of

21   glyphosate exposed cases is 36.  Correct?

22        A    Correct.

23        Q    If you'll turn with me to page 2 of the

24   De Roos article, please.

25             The very -- so the left column, very

Lauren C. Pinter-Brown, M.D.

1   first paragraph talks about exclusion and --

2   exclusion criteria, and that continues into the

3   next paragraph.

4        A    Could you say again where you are?

5        Q    Top of the left-hand column.

6        A    "Only one study"?

7        Q    Yes.

8        A    Okay.

9        Q    De Roos 2003 states:  "Only one study

10  included women.  In this pooled analysis we

11  excluded female cases and controls."

12            Do you see that?

13       A    Yes.

14       Q    De Roos 2003 excluded women from their

15  analysis, right?

16       A    That's what it says.

17       Q    Do you know whether Pahwa 2019 includes

18  female cases?

19       A    I'd have to look at the paper.

20       Q    Sure.

21       A    Hang on, we have to go back and find it.

22       Q    In table -- I may be able to help you

23  with this as I don't think the methods say

24  clearly.

25       A    Oh, well, that's where I would look for

Lauren C. Pinter-Brown, M.D.

1    it.

2         Q    Go to Table 2.

3         A    Okay.

4         Q    And I know these -- we had this

5    discussion last week that the information on the

6    A and B is very small.  But do you see where it

7    says "Adjusted for age and sex"?

8         A    Yes.

9         Q    The Pahwa 2019 analyses were adjusted

10   for sex, among other variables, correct?

11        A    That's what it says.

12        Q    Okay.  With respect to the numbers of

13   cases involved, we just looked at Pahwa 2019,

14   which has 113 glyphosate exposed cases, right?

15        A    That's what you said.

16        Q    Okay.  And McDuffie 2001 has 51

17   glyphosate exposed cases, right?

18        A    You know, it would be a lot easier if --

19   if you could make your point so I don't have to

20   keep looking at this.  Where are you getting the

21   51 from again?

22        Q    Table 2.

23             MS. MOORE:  Objection.

24             THE WITNESS:  Are you going to go back

25   to Table 8 or I'm done with that?

Lauren C. Pinter-Brown, M.D.

1    BY MS. ROSS:

2        Q     You're done with that.

3        A     Okay.

4              MS. MOORE:  Note my objection, because

5    you just went through all of this with all the

6    studies, and now you're asking her, without the

7    studies in front of her, a memory game about the

8    number of cases.  You already asked her these

9    questions.

10             THE WITNESS:  Okay.  So your question

11   is?

12   BY MS. ROSS:

13       Q     When we talked about this last time, you

14   said you didn't remember how many glyphosate

15   exposed cases were in each of the studies, and so

16   you didn't know whether Pahwa 2019 included any

17   new data as compared to McDuffie 2001 and De Roos

18   2003.  Do you recall that?

19       A     You would have to read me my exact

20   answer.  But what I'm going to say to you is, that

21   usually when you're writing a paper such as this,

22   if you were including additional cases, someone

23   wouldn't have to go to such a -- an exhaustive

24   exercise to add up all the numbers.  You would

25   state in your paper that we're including extra

Lauren C. Pinter-Brown, M.D.

1    cases.

2              Is that done somewhere in Pahwa?

3        Q    51 plus 36 is 87, correct?

4        A    Well, I can do the math, but I'm telling

5    you that I wouldn't rely on the numbers in the

6    table because they need to describe it in their

7    methods.  This is not how we read papers.

8        Q    You don't --

9        A    I can add the math up.

10       Q    Okay.

11       A    If you're asking am I capable of adding?

12   Yes, I'm capable of adding.

13       Q    So let me ask that question first, and

14   then we can get to the other, all right?

15       A    Sure.

16       Q    51 plus 36 is 87, right?

17       A    Whatever it is, fine.

18       Q    Okay.

19       A    Okay.

20       Q    Do you dispute my math on that?

21       A    No.

22       Q    I think what I understand you to be

23   saying is you don't know where the extra 26 cases

24   in Pahwa 2019 came from because that's not clearly

25   described in the methods of Pahwa 2019; is that

Lauren C. Pinter-Brown, M.D.

1   right?

2            MS. MOORE:  Objection.  Misstates her

3   testimony.

4            THE WITNESS:  Usually when you write a

5   paper, if you're adding new information, you would

6   include that in your methods because you're trying

7   to assist the person that's looking at your paper

8   to understand, are you -- are you presenting new

9   or different information, how does your paper

10  differ -- differ from some other paper.

11           And it would be really unusual, though

12  it's possible to do what you've done, for someone

13  to -- to take the time to look at all the tables

14  and add up these numbers.  It's just not how you

15  look at peer-reviewed papers.  So you could do

16  that, but I'm saying that when someone writes a

17  paper, if they want to be very clear about the

18  merits of their paper, how -- their methods, where

19  the patients came from, patient -- in this case

20  not patients -- well, sometimes patients -- where

21  the participants came from, you usually state that

22  within the paper because you want it to be obvious

23  to people.

24           So I -- I -- I'm sorry, I wish I had

25  known what my homework was, but I didn't look at

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    Pahwa to see, after we spoke on Friday, whether

2    that is clearly stated in the methods.  You're

3    right the numbers maybe don't add up, but it is up

4    to the authors to describe why that is.

5    BY MS. ROSS:

6         Q    And you don't, sitting here today, have

7    any idea where the additional 26 cases in Pahwa

8    came from, correct?

9         A    They could have -- they could have come

10   from women, but to be honest with you, the author

11   really should include it in the paper, number one.

12             And number two, 26 cases is not like a

13   very exciting number.  Even though it is 26 cases,

14   it's not an enormous amount of new data.

15        Q    From De Roos 2003, we go from 36 cases

16   in De Roos 2003 to an additional 26 cases in Pahwa

17   2019.  Do you consider that difference between 36

18   and 62 to be a substantial difference?

19        A    But that's not what Pahwa does.  Pahwa

20   doesn't just have De Roos.  The whole point of

21   Pahwa is that they're -- they're combining two

22   larger groups, not just De Roos.

23             So I suppose, yes, it's always helpful

24   to have more cases.  Is this an astronomic

25   difference that I would expect would, you know,

Lauren C. Pinter-Brown, M.D.

1  show me something really different, 26 cases?

2  I -- I -- we would need a biostatistician to run

3  the numbers on power, but I have a feeling that

4  26 cases is not a real substantial difference.

5  And if it was, I would have assumed the author

6  would point that out to us because it's a very

7  big -- if statistically that makes a very big

8  difference, it would be an important thing to put

9  in your conclusion why this paper is so different

10  from other papers.

11      Q    To know how those cases affected the

12  numbers, you'd have to know what was different

13  about the 26 cases additional in Pahwa 2019 as

14  opposed to the 36 exposed cases in De Roos 2003,

15  right?

16      A    That would be one thing, but -- but the

17  other would be -- and I'm not sure why you keep

18  bringing up De Roos because this paper is not just

19  about De Roos, but -- Pahwa is the paper I'm

20  referring to.

21          It would be interesting to note if they

22  were different somehow, but more -- more

23  importantly, to when you're assessing the

24  literature, it would be important for a

25  statistician to say that 26 patients makes an

Lauren C. Pinter-Brown, M.D.

1    enormous difference in -- in statistical power.

2        Q    You would defer that question to a

3    biostatistician, correct?

4        A    Absolutely, I would.

5        Q    You do agree that there is new data in

6    Pahwa 2019 that was not reported in either De Roos

7    2003 or McDuffie 2001, right?

8        A    I agree that the Ns are not the same.

9    That's all I can say from looking at a table is

10   that the numbers aren't the same.

11       Q    When you say, "The Ns are not the same,"

12   the number of exposed glyphosate cases in Pahwa

13   2019 is greater than the number that you get when

14   you add De Roos and McDuffie, correct?

15       A    Yes.

16       Q    You can set all of that aside, please.

17       A    Okay.  That was my big question.

18            (Exhibit No. 9 was marked for

19            identification.)

20   BY MS. ROSS:

21       Q    Exhibit 9 to your deposition is the

22   Eriksson 2008 study.  Do you see that?

23       A    Yes.

24       Q    When we last spoke, you told me that you

25   looked at the Eriksson study to see whether high

Lauren C. Pinter-Brown, M.D.

1    exposure to glyphosate was associated with an

2    increased risk of non-Hodgkin's lymphoma.  Do you

3    recall that?

4        A    I did.

5        Q    Eriksson 2008 is a case-control study of

6    exposure to pesticides in Sweden, correct?

7        A    Correct.

8        Q    Does Sweden matter?

9             MS. MOORE:  Objection.

10            THE WITNESS:  Of course it matters.

11   BY MS. ROSS:

12       Q    Does -- why does the location of the

13   study matter?

14       A    Because the patient population and their

15   exposures may be very different.

16       Q    Would you apply a patient population in

17   Sweden and give it the same weight as a patient

18   population in the United States that looked at

19   exposure?

20       A    That can't be answered because you

21   haven't given me the details of the other parts of

22   the material.  So just -- if you're asking me just

23   because something is in Sweden, would I not give

24   it any weight?  The answer is no.

25       Q    I think my question was a little bit

Lauren C. Pinter-Brown, M.D.

1   different.

2        A    Okay.

3        Q    Just because it's -- a study is in

4   Sweden, would you give that less weight or take it

5   into consideration in applying it to someone who

6   lives in the United States and works in the United

7   States?

8             MS. MOORE:  Objection.

9             THE WITNESS:  Well, I've already told

10  you that I read the paper and gave it some

11  consideration.  And I'm in the U.S., so I guess

12  that's a -- that's a concern of mine is people in

13  the U.S.  But --

14            Well, I'll stop there.

15  BY MS. ROSS:

16       Q    Do you see in the abstract of this paper

17  they state:  "Regarding phenoxyacetic acids,

18  highest risk was calculated for MCPA, OR 2.81"?

19       A    Yes.

20       Q    This gets at the importance for

21  adjusting for other pesticides, right?

22       A    That particular sentence doesn't, no.

23  But -- that particular sentence that you just read

24  me is just a fact.

25       Q    The fact that MCPA and other pesticides

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    have been associated with non-Hodgkin's lymphoma

2    has some importance in evaluating the data for

3    glyphosate, correct?

4        A    Correct.

5        Q    You did not comprehensively review the

6    literature to determine whether MCPA was

7    associated with an increased risk of non-Hodgkin's

8    lymphoma, right?

9        A    Correct.

10       Q    You do agree that in the Eriksson study,

11   MCPA was associated with an increased risk of

12   non-Hodgkin's lymphoma.

13       A    That's what it says in this abstract.

14       Q    If you'll turn with me to page 1658 of

15   this publication.  Tell me when you're there.

16       A    I'm there.

17       Q    This one has little type.

18       A    I know, I've taken my glasses off.

19       Q    Near the bottom of the left-hand column,

20   do you see the section on "Statistical Methods"?

21       A    Yes.

22       Q    Do you see where they state:  "In the

23   univariate analysis, different pesticides were

24   analyzed separately and the unexposed category

25   consisted of subjects that were unexposed to all

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Lauren C. Pinter-Brown, M.D.

```
 1    included pesticides"?

 2         A    Yes.

 3         Q    Breaking that down, Eriksson 2008

 4    performed both univariate and multivariate

 5    analyses, right?

 6         A    I'm having trouble finding their

 7    multivariate analysis.

 8         Q    If you'll turn to page 1660 of the

 9    article.  The top of the right column is titled

10    "Multivariate Analysis."  Do you see that?

11         A    Okay.

12         Q    And there they state:  "Since mixed

13    exposure to several pesticides was more a rule

14    than an exception, and all single agents were

15    analyzed without adjusting for other exposure" --

16              That's the univariate analysis we were

17    just talking about, right?

18         A    Yes.

19         Q    -- "a multivariate analysis was made to

20    elucidate the relative importance of different

21    pesticides."  Correct?

22         A    Correct.

23         Q    Eriksson 2008 performed both univariate

24    and multivariate analyses, right?

25         A    Their multivariate -- that's why I was
```

Lauren C. Pinter-Brown, M.D.

1    having trouble with your -- your question.

2              Their multivariate analysis is only, it

3    looks like, related to different pesticides.  So

4    sometimes when we do multivariate analysis, it

5    includes a lot of other different characteristics.

6              But in this particular paper, they're

7    only looking at pesticide exposure.

8         Q    Eriksson did perform a multivariate

9    analysis that looked at the effect of adjusting

10   for other pesticides on their odds ratios for

11   individual pesticides, right?

12        A    That's what this sentence says.

13        Q    And if you'll turn with me to Table 2,

14   please.

15             Do you see that this is the table that

16   gives information on differing periods of exposure

17   to different pesticides?

18        A    Yes.

19        Q    Is this the data in Eriksson 2008 that

20   you relied on for your exposure threshold?

21        A    I looked at methods.  So in the papers

22   that I looked at, when there was a definition of

23   what they considered a higher exposure group, I

24   utilized that.

25             This particular paper may not state

Lauren C. Pinter-Brown, M.D.

1    that.  Some of the other papers do more

2    explicitly.  So wherever I could, I tried to look

3    at the definitions used in the paper and apply

4    that to the patient.  And that's what I told you

5    on Friday as well.

6              So I wasn't really looking at the --

7    the statistics on the table.  I was looking at

8    a priori going into the trial how were they going

9    to define high exposed patients.

10         Q    I see.  Okay.

11         A    So it wouldn't be influenced by the

12    data.

13         Q    So your -- your focus in understanding

14    what counted as high exposure in a study was to

15    try and understand if the authors had an a priori

16    hypothesis in their methods for determining what

17    high exposure would be?

18         A    Correct.

19         Q    With regard to Eriksson 2008, did you

20    see an a priori hypothesis regarding what high

21    exposure would be?

22         A    No, but I did look at the paper.  I

23    mean, you asked me before did I look at Eriksson.

24    Yes, I did, just to get an idea.  But, really,

25    I -- I focused on papers that had a definition of

Lauren C. Pinter-Brown, M.D.

1   high exposure, without looking at the data, and

2   one that I could utilize with the data that was

3   given to me.

4          So, for instance, in the AHS where they

5   talk about type of protective equipment and all

6   that, and they don't exactly tell you how they

7   weight things.  They tell you what the variables

8   were that went into their consideration.  I did

9   not use that particular calculation because I

10  couldn't mimic it.

11     Q    In AHS, when you say, I did not use

12  their particular calculation because you couldn't

13  mimic it, you mean the intensity-weighted exposure

14  days, correct?

15     A    Correct.  The one that has to do with

16  did you wear protective equipment, were you

17  handling it, were you mixing it, were you --

18  because, A, they didn't really explicitly state,

19  that I could see, how they made that

20  determination, even though they probably had some

21  calculation, and mostly because with the data that

22  I have and from these people's recollections, it's

23  very hard to ascertain that.

24     Q    If AHS had separately published their

25  intensity-weighting algorithm and the specifics of

Lauren C. Pinter-Brown, M.D.

1   how they calculated that, that's not something

2   that you looked at, right?

3        A    I didn't look at it because I knew that

4   I wouldn't be able to plug in all the numbers.

5        Q    And with respect to the numbers that you

6   could plug in from AHS, those were the straight-up

7   exposure days as opposed to the intensity-weighted

8   lifetime days, correct?

9        A    Correct.

10        Q    In Table 2 of Eriksson, you are given

11   glyphosate use for less than ten days and greater

12   than ten days, right?

13        A    Correct.

14        Q    And this is -- that is, the data in

15   Table 2 of Eriksson is part of their univariate

16   analysis not adjusted for other pesticides,

17   correct?

18        A    Correct, I think.

19             Hang on.  Let me go into the body of

20   the --

21        Q    There's a footnote --

22        A    -- paper.

23        Q    -- after Table 2 that states what the

24   information in Table 2 is adjusted for, and states

25   that adjustment was made for age, sex, and year of

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    diagnosis or enrollment.

2         A    Okay.

3         Q    Do you see that?

4         A    Yeah, I do.

5         Q    The data --

6         A    With my glasses off.

7         Q    The data in Table 2 of Eriksson is not

8    adjusted for other pesticides, right?

9         A    Correct.

10        Q    For greater than ten days of use, do you

11   see that the number of exposed cases in Eriksson

12   2008 is 17?

13        A    Correct.

14        Q    Ten days in Eriksson means ten days in a

15   lifetime, right?

16        A    I'm assuming so, yes.

17        Q    If you used Roundup for one hour on one

18   day for each of 11 years, you would fall into the

19   greater than ten lifetime days group in Table 2 of

20   Eriksson, right?

21             MS. MOORE:  Objection.

22             THE WITNESS:  I assume so, yes.

23   BY MS. ROSS:

24        Q    Likewise, if you used Roundup for half

25   an hour for each month for a single year, you

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    would fall into that same category, right?

2                MS. MOORE:  Objection.

3                THE WITNESS:  Yep.  Yes.

4    BY MS. ROSS:

5        Q    Table 7 in Eriksson provides odds ratios

6    for glyphosate for both univariate and

7    multivariate analyses.  Do you see that?

8        A    Yes.

9        Q    The odds ratio for glyphosate in the

10   multivariate analysis in Eriksson was not

11   statistically significant, correct?

12       A    That's correct.

13       Q    You mentioned that you looked at studies

14   that -- that explained their methodology for

15   choosing median exposure or different quartiles of

16   exposure, and that you looked at AHS in that

17   regard, right?

18       A    Start over again.

19       Q    Sure.

20            You looked to AHS to see where

21   individuals would fall with respect to the number

22   of days they used glyphosate as compared to the

23   median number of days in AHS, correct?

24       A    No, not -- not with respect to just

25   days.

Lauren C. Pinter-Brown, M.D.

1      Q    You looked at the intensity-weighted

2  lifetime days?

3      A    No.  Their -- their exposure had to do

4  with days and years.

5      Q    Days and years of use.  Okay.  I think I

6  understand what you're saying now.

7           So when we looked at Andreotti, the 2018

8  publication of AHS, on Friday, we looked at the

9  intensity-weighted lifetime days, right?

10     A    I can't remember back to Friday, but

11  I'll --

12     Q    Okay.

13     A    You know, maybe that's true.  We've been

14  looking at a lot of things.

15     Q    I'm trying to -- I'm trying to figure

16  out whether we need to go through the paper again

17  or whether we can summarize, okay?

18     A    Up to you.

19     Q    With respect to Andreotti 2018, do you

20  agree that there are hundreds of cases with more

21  than ten lifetime days of exposure?

22     A    I think we should pull out the paper.

23          (Exhibit No. 10 was marked for

24          identification.)

25  BY MS. ROSS:

Lauren C. Pinter-Brown, M.D.

1    Q    Exhibit 10 to your deposition is the

2  Andreotti 2018 paper, right?

3    A    Yep.  Yes.

4         MS. MOORE:  I mean you just marked at it

5  as Exhibit 10.

6         MS. ROSS:  I'm sorry, Counsel, what was

7  your problem with that?

8         MS. MOORE:  I didn't say it was a

9  problem.  I said you're telling her these are

10  exhibits.  You're marking these as exhibits as you

11  go along.

12         MS. ROSS:  Yes.

13  BY MS. ROSS:

14    Q    I'm, for the record and for the ease of

15  the court reporter and folks looking at this

16  later, just stating what the deposition is as --

17  or what the exhibit is as I hand it to you in case

18  that was confusing to you, Dr. Pinter-Brown.

19    A    All right.

20    Q    You have Exhibit 10 in your hands,

21  correct?

22    A    Correct.

23    Q    And if you would turn with me to

24  supplementary Table 1.

25    A    Okay.

Lauren C. Pinter-Brown, M.D.

1      Q    This table gives us the risk of

2  non-Hodgkin's lymphoma in people with different

3  lifetime exposure days to glyphosate-based

4  herbicides, right?

5      A    Yes.

6      Q    And the first column is the quartile,

7  right?

8      A    Yes.

9      Q    The second column is the number of

10  cases.  Do you see that?

11      A    Yes.

12      Q    And there's a footnote that tells you

13  what the lifetime exposure day cutpoints were for

14  the different quartiles down at the bottom.  Do

15  you see that?

16      A    Yes.

17      Q    Quartile 1 goes up to 13.74 lifetime

18  days of exposure, right?

19      A    Yes.

20      Q    There are some cases in Q1 of Andreotti

21  that have more than ten lifetime days of exposure,

22  correct?

23      A    Correct.

24      Q    All of the cases in quartiles 2, 3 and 4

25  of Andreotti have greater than ten lifetime days

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    of exposure, right?

2        A    Correct.

3        Q    For non-Hodgkin's lymphoma overall,

4    which is the second entry on this table --

5             Do you see that?

6        A    Yes.

7        Q    If we added up Q2, 3 and 4, for

8    non-Hodgkin's lymphoma overall, that would be

9    340 cases.  Do you have any reason to dispute that

10   math?

11       A    It's probably correct.  Do you want me

12   to add it?

13       Q    Sure.

14       A    Okay.  What did you say it was?

15       Q    There are 340 cases in Andreotti

16   quartiles --

17       A    Okay.

18       Q    -- 2, 3 and 4, correct?

19       A    Okay.

20       Q    We can agree that Andreotti 2018

21   includes at least 340 people who had more than ten

22   lifetime exposure days to glyphosate, right?

23       A    Okay.

24       Q    There's no -- you have no reason to

25   dispute that math, true?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1          A     True.

2                Do you want me to keep this out or we're

3     done with it?

4          Q     We're done with it.

5                (Exhibit No. 11 was marked for

6                identification.)

7     BY MS. ROSS:

8          Q     Exhibit 11 is the Leon 2019 study.  Do

9     you see that?

10         A     Yes.

11         Q     The relative risk for DLBCL in this

12    study was 1.36, right?

13         A     Hang on.

14               The relative risk for what?

15         Q     DLBCL.

16         A     Okay.  1.36.

17         Q     Right.

18         A     Sure.

19         Q     The lower bound of the confidence

20    interval is 1.0, right?

21         A     Correct.

22         Q     Do you consider that be statistically

23    significant?

24         A     It's right on the border.

25         Q     Do you know if DLBCL, leg type was

Lauren C. Pinter-Brown, M.D.

1    included in any of the DLBCL cases in Leon 2019?

2         A    I have no idea.  There's no way of

3    knowing.

4         Q    If you'll go with me to Table 2 of Leon

5    2019.

6         A    Okay.

7         Q    This is the table that we talked about

8    on Friday, right?

9         A    If you say so.

10        Q    Okay.  Mr. Carriere falls into the "ever

11   exposed" category for NHL overall in Leon 2019,

12   right?

13        A    I think I'm on the wrong table.  Which

14   table are you on?

15        Q    Table 2, but it goes on several pages,

16   so that the data for glyphosate on page 8 gives

17   NHL overall.

18        A    All right.  Ask your question again.

19        Q    Mr. Carriere falls into the ever-exposed

20   group for NHL overall in Table 2 of Leon 2019,

21   correct?

22        A    Yes.

23        Q    I think before I had you find this page

24   in the table, you were in the text of the article;

25   is that right?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Lauren C. Pinter-Brown, M.D.

 1       A     I don't remember.

 2       Q     Okay.  Page 7 of Leon discusses the

 3   DLBCL findings -- actually, before we go there, if

 4   you'll turn with me to page 3 of Leon 2019.

 5             Do you see there's a description of the

 6   three agricultural cohorts on page 3, right?

 7       A     Right.

 8       Q     And in their description of the

 9   Agricultural Health Study --

10             Are you there with me?

11       A     Yes.

12       Q     Do you see where they state in the top

13   of the right column:  "This study includes

14   linkages until 31 December 2011 in Iowa and 31

15   December 2010 in North Carolina"?

16       A     No.  Okay.  So you're in the column on

17   the right.  You're on page 3.

18       Q     Yep.  Last sentence of the top

19   paragraph.

20       A     Okay.

21       Q     "This study includes linkages until

22   31 December 2011 in Iowa and 31 December 2010 in

23   North Carolina."  Do you see that?

24       A     Yes.

25       Q     You have no basis to disagree with what

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Lauren C. Pinter-Brown, M.D.

1    the authors wrote there, right?

2        A    No.

3        Q    You understand that the Leon study

4    includes data for AHS through 2010 in North

5    Carolina and 2011 in Iowa, right?

6        A    Yes.

7        Q    And on page 7, the authors give their

8    results for DLBCL for each of the three cohorts

9    involved.  Do you see where I am?

10       A    I see the paragraph.

11       Q    Okay.  And they also give the number of

12   exposed cases in each of those cohorts.  Do you

13   see that?

14       A    In that paragraph?

15       Q    Yes.  It states:  "The cohort-specific

16   hazard ratios for ever use of glyphosate in DLBCL

17   were HR, 1.06 in AGRICAN; HR equals 1.67 in CNAP,

18   and HR equals 1.20 in AHS" --

19       A    Yes.

20       Q    -- "based on 28, 100 and 93 exposed

21   cases, respectively."

22            Do you see that?

23       A    Yes.

24       Q    Leon 2019 used 93 exposed cases of DLBCL

25   from the Agricultural Health Study, correct?

Lauren C. Pinter-Brown, M.D.

1       A     I'm trying to find it again.  Yes.

2             Well, hang on, hang on.  Oh, boy.

3             You know, tell me your question again.

4       Q     Sure.

5             Leon 2019 used 93 exposed cases of DLBCL

6    from the Agricultural Health Study, correct?

7       A     No.  I'm not sure that's true in this

8    sentence.  It may be true, but what -- what

9    they're -- okay.  So it's kind of a grammar thing,

10   I think.  So I'm trying to read it here with my

11   glasses off.

12            So the first thing is they're describing

13   AGRICAN, comma, describing CNAP, comma, and

14   describing AHS, based on 28,193 exposed cases.

15      Q     No.  Sorry.  I think it's based on 28,

16   comma, space, 100 and --

17      A     No.

18      Q     -- 93 exposed cases --

19      A     Okay, fine.  If that's the way it is,

20   then that's fine.  It's really hard for me to

21   read.  That's fine.

22      Q     You have no quarrel with the idea that

23   Leon 2019 included 93 exposed cases of DLBCL from

24   the AHS cohort.  Right?

25      A     That's correct.

Lauren C. Pinter-Brown, M.D.

 1        Q    Do you know how many exposed cases of

 2   DLBCL there were in Andreotti 2018?

 3             MS. MOORE:  Objection.

 4             THE WITNESS:  Let's go back and look.

 5   BY MS. ROSS:

 6        Q    Table 2 of the main paper gives the

 7   findings for diffuse large B-cell lymphoma.  Do

 8   you see that?

 9        A    Yes.

10        Q    How many exposed cases of DLBCL were

11   there in Andreotti?

12        A    Why don't you give me a calculator.

13        Q    I unfortunately don't have one with me,

14   but if I add up 28, 23, 30 and 22, I get 103.

15        A    Well, you're much faster than I am.

16   I'm -- I'm not going to sit here and add up the

17   numbers.

18        Q    Okay.  You -- if that --

19             MS. MOORE:  Objection.  Because, I mean,

20   clearly she already had that added up.  I mean --

21   anyway.

22             If -- you already know the answer.  This

23   just seems like a pointless exercise of having her

24   go through studies and tell you what's on the

25   written page.

Lauren C. Pinter-Brown, M.D.

1   BY MS. ROSS:

2       Q    Do you have any reason to disagree with

3   my math there?

4       A    I'm not going to disagree with your math

5   because I'm not going to correct -- I'm not going

6   to sit here and add these numbers up.

7       Q    Okay.

8       A    If you want to give me a calculator, I

9   will.  If you want me to, I will certainly do

10  that.

11      Q    But you can't do that math in your head

12  sitting here?

13      A    No, I really can't.  I guess we

14  discovered another skill I don't have.

15           (Exhibit No. 12 was marked for

16           identification.)

17  BY MS. ROSS:

18      Q    I'm handing you Exhibit 12 to your

19  deposition.  This is the Zhang 2019 study.  Do you

20  see that?

21      A    Yes.

22      Q    This is a study you were relying on to

23  say that Mr. Carriere's exposure to

24  glyphosate-based formulations increased his risk

25  of DLBCL, right?

Lauren C. Pinter-Brown, M.D.

```
 1        A    No.  I told you I relied on my review of
 2   the literature, not on one paper.
 3        Q    Was this one of the papers that you
 4   relied on?
 5        A    It certainly was one of the papers that
 6   I read.
 7        Q    The meta RR for high exposed individuals
 8   using the highest exposure groups when available
 9   in each study was 1.41.
10        A    Are you reading from something specific?
11        Q    Sure.
12        A    Do you want to tell me where it is, so I
13   can follow along with you?
14        Q    I would be happy to.
15        A    Sure.  Where are you reading from?
16        Q    If you go to the abstract of this paper.
17        A    Okay.
18        Q    Are you there?
19        A    Where about in the abstract is it?
20        Q    About halfway down.
21        A    Okay.
22        Q    There's a sentence that starts:  "Using
23   the highest exposure groups when available in each
24   study."
25        A    Okay.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1      Q     Do you see that sentence?

2      A     I do.

3      Q     The meta relative risk in Zhang 2019 was

4   1.41 for what they call high exposure in

5   non-Hodgkin's lymphoma, correct?

6      A     Correct.

7      Q     Does Zhang 2019 contain any data

8   specific to DLBCL, leg type?

9      A     No.  As I said, that's impossible for

10  any study to do.

11     Q     On Friday we had a short discussion

12  about the section of this paper that talks about

13  immunotoxicity.

14           Do you remember that discussion?

15     A     Yes, I do.

16     Q     That section is on page 203 and

17  continues on to page 204, right?

18     A     Correct.

19     Q     And you're there with me now?

20     A     Yes.

21     Q     Okay.  Did you look at -- well, let me

22  back up for a moment.

23           As we discussed on Friday, Zhang 2019 is

24  a meta-analysis and review.  It does not contain

25  new original data, correct?

Lauren C. Pinter-Brown, M.D.

1        A    Correct.

2        Q    With regard to the potential mechanism

3   that you discussed with counsel on Friday, do you

4   see there are several citations given throughout

5   this section of Zhang 2019?

6        A    Yes.

7        Q    You did not look at this data that is

8   cited in Zhang 2019, right?

9             MS. MOORE:  Objection.

10            THE WITNESS:  That's correct.  You had

11   asked me had I ever seen any information about

12   immunosuppression.

13   BY MS. ROSS:

14        Q    Without looking at the data cited in

15   Zhang 2019, you cannot offer an opinion on whether

16   glyphosate-based formulations are associated with

17   immune suppression, correct?

18            MS. MOORE:  Objection.

19            THE WITNESS:  That's correct.

20   BY MS. ROSS:

21        Q    Are you as a lymphoma specialist aware

22   of the animal and human testing that's typically

23   done to evaluate a compound for immune toxicity?

24        A    No.

25        Q    And you have no opinion on what that

Lauren C. Pinter-Brown, M.D.

```
1    data show for glyphosate, correct?

2         A    That's correct.  You had only asked me

3    the question had I read information, and I said,

4    yes, I did.

5         Q    You can set that aside.

6         A    Okay.

7              THE WITNESS:  You know, it would be nice

8    to stand up, I think.

9              MS. ROSS:  Let's take a break.

10             THE WITNESS:  It's been about an hour.

11   It seems like -- my back is killing me.  It's

12   about an hour.

13             THE VIDEOGRAPHER:  We are now going off

14   the record.  The time is approximately 11:03 a.m.

15             (Recess.)

16             THE VIDEOGRAPHER:  We are now back on

17   the record.  The time is approximately 11:21 a.m.

18   BY MS. ROSS:
```

Lauren C. Pinter-Brown, M.D.



13        A     Okay.

14        Q     -- maybe leave the deposition open for

15   this specific issue, okay?

16        A     That would be great.

22             MS. MOORE:   Objection.

Lauren C. Pinter-Brown, M.D.



3    BY MS. ROSS:

10           MS. MOORE:  Objection.  Misstates her

11   testimony.

12           THE WITNESS:  I don't consider it a risk

13   factor.

14   BY MS. ROSS:

18           MS. MOORE:  Objection.

19           THE WITNESS:  That's correct.

20   BY MS. ROSS:

23        A    I don't understand your question.

Lauren C. Pinter-Brown, M.D.



3       A      That's correct.

9              MS. MOORE:   Objection.

11      A    Let's go back.  You don't see the images

12  in my report.  You mean graphically portrayed?

13      Q    You provided a reliance list that

14  describes materials that you relied on in

15  Mr. Carriere's case, including his medical

16  records.

17      A    Correct.

18      Q    And on those records, you have a variety

19  of Bates ranges of specific records that you

20  reviewed, right?

21      A    Yes.

22      Q    There were no CDs --

23      A    No.

24      Q    -- or other images on that, right?

25      A    I -- I looked at the reports.

Lauren C. Pinter-Brown, M.D.



4       A     That's correct.

9       A     Correct.

10            (Exhibit No. 13 was marked for

11            identification.)

, we know from your report

22    was when Mr. Carriere was diagnosed with DLBCL,

23    leg type, correct?

Lauren C. Pinter-Brown, M.D.



1

8        A        Yes.

18               MS. MOORE:   Objection.

19               THE WITNESS:   No.   I -- a lot of times

20      when radiologists say "in retrospect," I take it

21      with a grain of salt because they weren't the

22      person that looked at the original film.   And we

23      have to give some credence to the person that read

24      the original film.   And now they have knowledge

25      that the person that read the initial film doesn't

Lauren C. Pinter-Brown, M.D.

1  have.  So I always take it with a grain of salt.

2  BY MS. ROSS:

3      Q    You take it with a grain of salt, but

4  since you did not review the images yourself, you

5  have no reason to disagree based on your own

6  review that the radiologist here is wrong in that

7  interpretation of those images, right?

8          MS. MOORE:  Objection.

9          THE WITNESS:  I didn't do a review, so

10  I -- I can't say one way or the other.

11  BY MS. ROSS:

12      █    ████████████████████████████████████████

█  ███████████████████████████████████████████████████

█  ███████████████████████████████████████████████

15  You list one of those on your materials list,

16  right?

17      A    It's a known association to me.  I

18  didn't look to see if it was an association.  I

19  merely provided a paper to document what my

20  statement was.

21      █    ████████████████████████████████████████

█  ███████████████████████████████████████████████████

█  ████████████████████████████████████████████

█  ████████████████████████████████████████

25      A    Of course.

Lauren C. Pinter-Brown, M.D.

1     Q     Why does that relationship exist?

2     A     I have no idea.

3           ▮     ███████████████████████████████████

      ▮ █████████████████████████

5     A     Again, I'm so focused.  I don't do ███████

      ▮ ████████████████

7     Q     I take it that the underlying reason for

8     the association between ██████████████████ and

9     non-Hodgkin's lymphoma is not something that you

10    looked into in this case, right?

11          MS. MOORE:  Objection.  Misstates her

12    testimony.

13          THE WITNESS:  No.  I said the underlying

14    reason why there's an association is not known.

15    BY MS. ROSS:

16    Q     Did you look to see whether there were

17    any mechanism data that might explain why there's

18    an association between ████████████████████ and

19    non-Hodgkin's lymphoma?

20    A     There's some hypothesis, but nothing

21    that is proven.  So nothing that is known.

22    Q     What are those hypotheses?

23          ▮     ███████████████████████████████████

      ▮ ████████████████████████     But there's no test to

25    demonstrate that.

Lauren C. Pinter-Brown, M.D.

1      Q    Are you aware of any data that shows

2  that people with a personal history of cancer are

3  more susceptible to Roundup?

4           MS. MOORE:  Objection.

5           THE WITNESS:  I've not seen that in the

6  epidemiologic data.

7  BY MS. ROSS:

████  ████ ████████████████████████████████████████

████  ████████████████████████████████████████████████

████  █████████████████████████████████████████████████

████  ████████████████████████████████████████████

████  ████ ████ ████████████████████████████████

████  ██████████████████████████████████████

████  ████████████

15      Q    You're drawing a distinction between

16  something that is associated with non-Hodgkin's

17  lymphoma and something that is a risk factor for

18  non-Hodgkin's lymphoma?

19      A    Yes, absolutely.

20           MS. ROSS:  Why don't we take a break

21  here.

22           THE WITNESS:  Okay.

23           MS. MOORE:  Why are we taking a break

24  now?  We've only been going about 10 minutes.

25           MS. ROSS:  Because I'm going to see if I

Lauren C. Pinter-Brown, M.D.

```
 1   have any more questions with regard to

 2   Mr. Carriere, and if we can finish up, we will.

 3            MS. MOORE:  Okay.  Great.  Thanks.

 4            MS. ROSS:  You're welcome.

 5            THE VIDEOGRAPHER:  We are going off the

 6   record --

 7            THE WITNESS:  So on a break, I can take

 8   the microphone off.

 9            MR. TOMASELLI:  Yeah.

10            THE VIDEOGRAPHER:  We are going off the

11   record.  The time is approximately 11:31 a.m.

12            (Recess.)

13            THE VIDEOGRAPHER:  We are now back on

14   the record.  The time is approximately 11:44 a.m.

15            (Exhibit No. 14 was marked for

16            identification.)

17   BY MS. ROSS:

18       Q    Dr. Pinter-Brown, Exhibit 14 to your

19   deposition includes information from a pathology

20   report, and then a clinical record on the pages

21   that follow for Mr. Jerald Carriere.

22            Do you see that that's the case?

23       A    Yep.  I'm just reading the clinical

24   report, if I can.  Do I have time?

25       Q    Of course.  Go ahead.
```

Lauren C. Pinter-Brown, M.D.

1       A    (Peruses document.)

2            Sorry to take so long.

3       Q    Take all the time you need.

4       A    (Peruses document.)  Okay.

5       █    ██████████████████████████████████

█   █████████████████████████████    Correct?

7       A    I'm sorry.  Yep.

█       █    ██████████████████████████████████████

█   ████████████████████████████████████████████████

█   █    ██████████████

█   █    █████████████████████████████████

█   ██████████████████████████████████████████████

█   █████████████

14      A    Yes.

█       █    ████████████████████████████████████

█   ███████████████████████████████████████████████

█   ███████

█       █    █████████████

█       █    ████████████████████████████████████████

█       █    ████████████

21           MS. ROSS:  I have no more questions for

22   you with respect to Jerald Carriere, and I

23   appreciate your time today.

24           THE WITNESS:  Okay.  Thank you.

25           MS. MOORE:  I have just a few questions,

Lauren C. Pinter-Brown, M.D.

1   and then we'll take a break.

2            MS. ROSS:  Okay.

3                    EXAMINATION

4   BY MS. MOORE:

9            MS. ROSS:  Object to the form of the

10  question.

14  BY MS. MOORE:

24       Q    And in forming your opinions in this

25  case, can you explain to the jury your methodology

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Lauren C. Pinter-Brown, M.D.

1    in examining the risk factors?  In other words,

2    did you rule in some and rule out others?

3              MS. ROSS:  Object to the form.

4              THE WITNESS:  I -- I did exactly what I

5    do in clinical practice.  Every time I see a new

6    patient -- and this is not my patient but he's new

7    to me -- I go through a list in my head of known

8    and agreed-upon risk factors for non-Hodgkin's

9    lymphoma, and look through the record and ask the

10   patient if they have any of those risk factors.

11             And the purpose in doing that in

12   clinical work is so that you could modify, if you

13   find that somebody had a risk factor, whatever you

14   can modify or help the patient in some way.

15   BY MS. MOORE:

16        Q    And did you apply a similar methodology

17   in forming your opinions in this case?

18        A    Absolutely.

19        Q    Okay.  And were you able to rule in

20   whether there are any risk factors for

21   non-Hodgkin's lymphoma that apply to Mr. Carriere?

22        A    Yes.

23        Q    And what are those?

24        A    The risk factors that he has for

25   non-Hodgkin's lymphoma is age, and a substantial

Lauren C. Pinter-Brown, M.D.

1    contributing risk factor is his extensive exposure

2    to glyphosate-based formulations.

3        Q    So in your opinion, within a reasonable

4    degree of medical certainty, what is the substan-

5    -- what is a substantial factor in Mr. Carriere's

6    case that contributed to him developing

7    non-Hodgkin's lymphoma?

8            MS. ROSS:  Object to the form of the

9    question.

10           THE WITNESS:  His exposure to glyphosate

11   is a substantial contributing factor.

12   BY MS. MOORE:

13       Q    You were asked some questions earlier

14   today about the studies.  And in forming your

15   opinions in this case, did you review

16   epidemiological studies, animal studies and cell

17   studies?

18       A    Yes, I did.

19       Q    And you were asked several questions

20   about the epidemiological studies.

21           In your opinion, did the epidemiological

22   studies that you relied on apply in a case where

23   someone has the subtype cutaneous diffuse large

24   B-cell lymphoma?

25       A    Yes, absolutely.  Because diffuse large

Lauren C. Pinter-Brown, M.D.

1  B-cell lymphoma, leg type is a non-Hodgkin's

2  lymphoma, and in general, it falls within the

3  subtypes of diffuse large B-cell lymphoma.  And in

4  the epi studies, we saw data about the risk of

5  non-Hodgkin's lymphoma, and that's what this

6  patient had.

7          MS. MOORE:  Okay.  Thank you for your

8  time.

9               FURTHER EXAMINATION

10 BY MS. ROSS:

11     Q    A quick follow-up, Dr. Pinter-Brown.

12     A    Sure.

13     Q    You stated that you -- in -- in response

14 to questions from your counsel just now, you

15 stated that you reviewed animal studies in forming

16 your opinions in this case.  Which animal studies

17 did you review in forming your opinions in this

18 case?

19     A    There -- there were a lot of them that I

20 looked at briefly.  I also looked at Dr. Portier's

21 expert opinion and looked at his assessment of

22 animal studies and a table that was included in

23 his expert report.

24     Q    As we've discussed previously, you

25 reviewed materials from Dr. Portier after coming

Lauren C. Pinter-Brown, M.D.

 1    to your own opinions in this case, right?

 2         A    Correct.

 3         Q    With regard to primary data on animal

 4    studies, what primary data on animal studies did

 5    you review in forming your opinions in this case?

 6         A    You want the exact papers?

 7         Q    Yes.

 8         A    Okay.  Then I would -- can I bring in my

 9    binder or --

10              MS. MOORE:  Mm-hmm.

11              THE WITNESS:  I mean there's -- there's

12    quite a lot of them.

13              MS. MOORE:  There's the table of

14    contents.

15              THE WITNESS:  Okay, great, maybe that

16    will help.

17              So here, these are the -- can I hand it

18    or --

19    BY MS. ROSS:

20         Q    Sure, you can hand it to me.

21              MS. MOORE:  Or you can say the authors'

22    name.

23              THE WITNESS:  This is actually just some

24    of them.  But there's a tumor chart that comes

25    from Dr. Portier.  There's a George 2013, George

Lauren C. Pinter-Brown, M.D.

1  2010, and Greim 2015.  There were some others that

2  I looked at briefly also that maybe are not

3  included in this binder but the one that I have at

4  home.

5  BY MS. ROSS:

6      Q    Let's go ahead and mark that table of

7  contents as an exhibit.

8          (Exhibit No. 15 was marked for

9          identification.)

10         MS. MOORE:  Let me see it.

11 BY MS. ROSS:

12     Q    And so that we're clear on what this

13 is -- is the -- the table of contents that we just

14 marked as Exhibit 15, this is what you looked at

15 to -- to figure out quickly what animal studies

16 you reviewed in Mr. Carriere's case, right?

17     A    That's a portion of them.

18     Q    And is this binder something that you

19 put together yourself?

20     A    No.  Someone helped me put it together.

21     Q    This is something that the lawyers

22 helped you put together, right?

23     A    Yes.

24         MS. ROSS:  No further questions.

25         THE VIDEOGRAPHER:  This concludes the

Lauren C. Pinter-Brown, M.D.

1    video deposition of Lauren Pinter-Brown.  The time

2    is approximately 11:52 a.m.

3                    (Whereupon, the deposition of

4                    LAUREN C. PINTER-BROWN, M.D.

5                    was concluded at 11:52 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lauren C. Pinter-Brown, M.D.

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2          The undersigned Certified Shorthand Reporter

3    does hereby certify:

4          That the foregoing proceeding was taken before

5    me at the time and place therein set forth, at

6    which time the witness was duly sworn; That the

7    testimony of the witness and all objections made

8    at the time of the examination were recorded

9    stenographically by me and were thereafter

10   transcribed, said transcript being a true and

11   correct copy of my shorthand notes thereof; That

12   the dismantling of the original transcript will

13   void the reporter's certificate.

14         In witness thereof, I have subscribed my name

15   this date:  November 18, 2019.

16

17                      _____

18                      LESLIE A. TODD, CSR, RPR

19                      Certificate No. 5129

20

21   (The foregoing certification of

22   this transcript does not apply to any

23   reproduction of the same by any means,

24   unless under the direct control and/or

25   supervision of the certifying reporter.)

Lauren C. Pinter-Brown, M.D.

```
 1            INSTRUCTIONS TO WITNESS

 2         Please read your deposition over carefully and

 3    make any necessary corrections.  You should state

 4    the reason in the appropriate space on the errata

 5    sheet for any corrections that are made.

 6         After doing so, please sign the errata sheet

 7    and date it.

 8         You are signing same subject to the changes

 9    you have noted on the errata sheet, which will be

10    attached to your deposition.  It is imperative

11    that you return the original errata sheet to the

12    deposing attorney within thirty (30) days of

13    receipt of the deposition transcript by you.  If

14    you fail to do so, the deposition transcript may

15    be deemed to be accurate and may be used in court.

16

17

18

19

20

21

22

23

24

25
```

Lauren C. Pinter-Brown, M.D.

```
1                      - - - - - -

2                   E  R  R  A  T  A

3                      - - - - - -

4       PAGE LINE CHANGE

5       _____ _____ _____

6       REASON: _____

7       _____ _____ _____

8       REASON: _____

9       _____ _____ _____

10      REASON: _____

11      _____ _____ _____

12      REASON: _____

13      _____ _____ _____

14      REASON: _____

15      _____ _____ _____

16      REASON: _____

17      _____ _____ _____

18      REASON: _____

19      _____ _____ _____

20      REASON: _____

21      _____ _____ _____

22      REASON: _____

23      _____ _____ _____

24      REASON: _____

25
```

Lauren C. Pinter-Brown, M.D.

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2        I,_____, do hereby

 3    certify that I have read the foregoing pages, and

 4    that the same is a correct transcription of the

 5    answers given by me to the questions therein

 6    propounded, except for the corrections or changes

 7    in form or substance, if any, noted in the

 8    attached Errata Sheet.

 9

10    _____

11    LAUREN C. PINTER-BROWN, M.D.          DATE

12

13

14    Subscribed and sworn to

15    before me this

16    _____day of_____,20____.

17    My commission expires:_____

18    _____

19    Notary Public

20

21

22

23

24

25
```