# Exhibit 4

```
 1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2
 3      -------------------------§
        IN RE:  ROUNDUP PRODUCTS  §      Master File No.
 4      LIABILITY LITIGATION      §      3:16-md-02741-VC
                                  §
 5                                §        MDL NO. 2741
                                  §
 6      THIS DOCUMENT RELATES TO: §
                                  §
 7      ANTHONY HARRIS,           §
                                  §
 8          Plaintiff,            §
        vs                        § Case No. 3:16-cv-03199-VC
 9                                §
        MONSANTO COMPANY,         §
10                                §
            Defendant.            §
11      ------------------------- §
12                            - - -
13                      November 12, 2019
14                            - - -
15
             Videotaped deposition of RON SCHIFF, MD, PhD,
16      held at Shook, Hardy & Bacon, LLP, 100 North Tampa
        Street, Suite 2900, Tampa, Florida 33602,
17      commencing at 8:55 a.m., on the above date, before
        Tami Cline, Registered Merit Reporter, Certified
18      Realtime Reporter, and Florida Professional
        Reporter.
19
                            - - -
20
                GOLKOW LITIGATION SERVICES
21       877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
22
23
24
25
```

```
 1    APPEARANCES:

 2      THE MILLER FIRM, LLC
        BY:  BRIAN BRAKE, ESQ.
 3      Attorneys at Law
        108 Railroad Avenue
 4      Orange, Virginia 22960
        540-672-4224
 5      Bbrake@millerfirmllc.com
        Representing Plaintiff
 6
        SHOOK, HARDY & BACON, LLP
 7      BY:  MICHELLE M. FUJIMOTO, ESQ.
        Attorneys at Law
 8      5 Park Plaza, Suite 1600
        Irvine, California 92614-8502
 9      949-475-1500
        Mfujimoto@shb.com
10      Representing Defendant

11

12    ALSO PRESENT:

13      Matthew Allison, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

Ron Schiff, M.D., Ph.D.

```
 1                          - - -

 2                       I N D E X

 3                          - - -

 4     Testimony of:  RON SCHIFF, MD, PhD
```

```
 5     DIRECT EXAMINATION BY MS. FUJIMOTO              6

 6     CROSS-EXAMINATION BY MR. BRAKE               163

 7

 8

 9                     E X H I B I T S

10     SCHIFF EXHIBIT                              PAGE

11     Exhibit 1   Monsanto Company's Notice to Take     6

12                 Oral and Videotaped Deposition of Dr.

13                 Ron Schiff

14     Exhibit 2   Handwritten Notes                    7

15     Exhibit 3   Deposition and Trial Testimony List  11

16     Exhibit 4   Plaintiffs' Rule 26 Expert          14

17                 Disclosures

18     Exhibit 5   Handwritten Notes                   16

19     Exhibit 6   Expert Report                       30

20     Exhibit 7   Expert Report                       34

21     Exhibit 8   Plaintiff Fact Sheet                41

22     Exhibit 9   First Amended Plaintiff Fact Sheet  41

23     Exhibit 10  Second Amended Plaintiff Fact Sheet 41

24     Exhibit 11  Third Amended Plaintiff Fact Sheet  42
```

```
25
```

Ron Schiff, M.D., Ph.D.

```
1                    E X H I B I T S

2      SCHIFF EXHIBIT                                    PAGE

3    Exhibit 12  Article entitled "Medical History,      105

4                Lifestyle, Family History, and

5                Occupational Risk Factors for Diffuse

6                Large B-Cell Lymphoma:  The

7                InterLymph Non-Hodgkin Lymphoma

8                Subtypes Project"

9    Exhibit 13  Prop 65 Warning                         121

10    Exhibit 14  Medical Records                         126

11    Exhibit 15  ███████████████████████████     ████

█              ███████████████████████████

█              ████████████████████████

14    Exhibit 16  Article entitled "Agricultural         142

15                Pesticide use and Risk of

16                t(14;18)-Defined Subtypes of

17                Non-Hodgkin Lymphoma

18    Exhibit 17  Article entitled "Stem Cell            154

19                Divisions, Somatic Mutations, Cancer

20                Etiology, and Cancer Prevention," was

21                marked for identification.)

22

23

24

25
```

Ron Schiff, M.D., Ph.D.

```
 1                         - - -

 2              THE VIDEOGRAPHER:  Good morning.  We are now

 3      on the video record.  My name is Matthew Allison.

 4      I'm a videographer for Golkow Litigation Services.

 5      Today's date is November 12, 2019, and the time is

 6      8:55 a.m.  This is the video deposition -- I'm

 7      sorry, this video deposition is being held in

 8      Tampa Bay, Florida, in the matter of Anthony

 9      Harris vs Monsanto Company, taken in the United

10      States District Court, Northern District of

11      California.  The deponent is Dr. Ron Schiff.

12              Will all counsel please identify themselves

13      for the record.

14              MR. BRAKE:  My name is Brian Brake of The

15      Miller Firm.  I represent Anthony Harris and Julie

16      Harris, who are the plaintiffs in this case.

17              MS. FUJIMOTO:  Michelle Fujimoto of Shook,

18      Hardy & Bacon on behalf of Monsanto.

19              THE VIDEOGRAPHER:  The court reporter is Tami

20      Cline and will now swear in the witness.

21              THE COURT REPORTER:  Would you raise your

22      right hand, please.

23              Do you swear or affirm the testimony you give

24      in this cause will be the truth, the whole truth

25      and nothing but the truth?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ron Schiff, M.D., Ph.D.

```
 1            THE WITNESS:  I do.

 2            RON SCHIFF, MD, PhD, called as a witness by

 3      the Defendant, having been first duly sworn,

 4      testified as follows:

 5                       DIRECT EXAMINATION

 6      BY MS. FUJIMOTO:

 7        Q.   Good morning, Dr. Schiff.  We met before

 8      the -- we started today, and for the record my name

 9      is Michelle Fujimoto, and I represent Monsanto in a

10      lawsuit brought by Anthony Harris.  And you've been

11      designated as an expert witness on plaintiff's

12      behalf; is that correct?

13        A.   That's correct.

14        Q.   And so you understand that I'm here today to

15      take your deposition as an expert witness regarding

16      your opinions related to Anthony Harris.

17        A.   I understand that.

18                          - - -

19            (Exhibit 1, Monsanto Company's Notice to Take

20      Oral and Videotaped Deposition of Dr. Ron Schiff, was

21      marked for identification.)

22                          - - -

23      BY MS. FUJIMOTO:

24        Q.   Okay.  We'll start and I'll mark as Exhibit

25      Number 1 to the deposition the notice of deposition
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ron Schiff, M.D., Ph.D.

```
 1    that we served with respect to today's proceedings.

 2    Have you seen Exhibit 1 before, Dr. Schiff?

 3        A.   I have.  I have my own copy with me.

 4        Q.   Perfect.  And I take it, then, that you saw

 5    the request for production?

 6        A.   Correct.

 7        Q.   And did you bring materials with you that are

 8    responsive to those requests?

 9        A.   I did.

10        Q.   Okay.  And as I understand it, a couple of

11    things that you were kind enough to provide me

12    before the deposition included handwritten notes

13    regarding the time that you have spent on this case;

14    is that right?

15        A.   That is correct.

16                        - - -

17        (Exhibit 2, Handwritten Notes, was marked for

18    identification.)

19                        - - -

20    BY MS. FUJIMOTO:

21        Q.   Okay.  And I'll mark as Exhibit Number 2 to

22    the deposition -- so this is your copy set, and

23    Exhibit 2 looks like it says preprinted "From the

24    Desk of Ira and Lissette."  Do you see that?

25        A.   That's correct.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
1       Q.   Who are Ira and Lissette?

2       A.   Okay.  That one appears only on the first

3    page.  On the third and fifth pages it says "Ron and

4    Cindy Schiff."  Ira and Lissette were two of my

5    front office workers when I was in practice.  I have

6    just recycled and reused their office supplies.

7       Q.   Okay.  So that's the paper that you used to

8    write your notes on?

9       A.   Yes.  I write on whatever is available.

10      Q.   Okay.  And it looks like -- would you confirm

11   for the record that the handwriting on Exhibit 2 is

12   your handwriting?

13      A.   Not all of it.  There are some notes that are

14   made at intervals by my wife, Cindy, who handles the

15   administrative matters for my medical-legal

16   consulting, including billing and collections.

17      Q.   Okay.  And, for example, then, on Exhibit 2,

18   page 3, there's some interlineated, it looks like,

19   handwriting that says "Invoice sent Nancy Miller"?

20      A.   That's correct.

21      Q.   And is that your wife's handwriting?

22      A.   It is.

23      Q.   Okay.  And am I correct, then, that part of

24   the -- well, let's see.  You put here at the top

25   "Wade vs Monsanto."  That's your work in the Wade
```

Ron Schiff, M.D., Ph.D.

1    case, correct?

2        A.   No.   That is what I thought was the named

3    plaintiff in the litigation.   There are, I believe,

4    six plaintiffs listed on the various lines in this

5    document, but some of the material that I got

6    initially indicated that Wade was the plaintiff for

7    all of the cases together, so I just wrote that

8    down.

9        Q.   But that's incorrect?   Is that incorrect?

10       A.   I continue to see materials that do list

11   Wade, et al., and yet are not about him as a

12   plaintiff.   So, you know, I don't know the answer to

13   that.   That's not something that I would be expected

14   to have a lot of interest in.   Christopher Wade is

15   one of the plaintiffs on whom I have done some work

16   in the past that's listed on here, but these are

17   basically all of the Roundup cases adverse to

18   Monsanto that have been submitted to me for review,

19   deposition and potential trial testimony.

20       Q.   All right.   And so each line, to the extent

21   it pertains to a specific plaintiff, references that

22   plaintiff's name?

23       A.   Yes, but there are some that are general or

24   applied to multiple plaintiffs, if I'm reading

25   documents that are not specific to an individual

Ron Schiff, M.D., Ph.D.

1    plaintiff.

2        Q.   And it appears that these time entries run

3    from May 28, 2019, to November 11, 2019?

4        A.   That's correct.

5        Q.   Okay.  And how much -- how many hours have

6    you spent total in the Roundup litigation?

7        A.   I'm coming up with 149 3/4 hours, but that's

8    added up in my head here at the deposition.  I can

9    tell you how I arrived at that number if you'd like,

10   but it may be off by a little bit.

11       Q.   That's fine.  It -- you're -- basically is it

12   correct that the time you've spent on the Roundup

13   litigation is indicated here on Exhibit 2?

14       A.   That's correct.  The first invoice is

15   summarized on page 3.  The second invoice is

16   summarized at the bottom of page 4, and then I added

17   the time spent since the second invoice was

18   submitted, and those are the times on page 5.

19       Q.   Do you have -- and assuming it's about 150

20   hours, what is your estimate as to the total amount

21   of money you have made in the litigation for your

22   testimony?

23       A.   Okay.  I have not been paid for the second

24   invoice yet, so I will say that so far I have

25   received $43,125.

Ron Schiff, M.D., Ph.D.

1    Q.   And how much do you still need to invoice

2    and/or be paid?

3    A.   $26,500 have been invoiced and not yet paid,

4    and then the last page, which I'm going to add up

5    again by itself, 10.5 hours has not been invoiced

6    yet.  That will be invoiced sometime in the second

7    half of this month.

8    Q.   And how much time have you spent on your work

9    specific to Mr. Harris?

10    A.   I'd have to go through here and add all of

11    that up individually.  If you want me to do that, I

12    will.

13    Q.   No.  Is it accurate for us to assume that if

14    I go through this or someone goes through this and

15    notes the reference to Anthony Harris that that will

16    accurately reflect the amount of time you've spent

17    on his case?

18    A.   Yes.  But in addition to that, there will be

19    some preparation for depositions general entries

20    that have been used for my preparing my review of

21    general materials for Mr. Harris and for other

22    plaintiffs.

23                        - - -

24         (Exhibit 3, Deposition and Trial Testimony

25    List, was marked for identification.)

Ron Schiff, M.D., Ph.D.

```
 1                        - - -

 2   BY MS. FUJIMOTO:

 3      Q.   Okay.  One of the other documents that you

 4   produced today and I'll mark as Exhibit Number 3 to

 5   the deposition a list of -- called "Depositions and

 6   Trial Testimony"; is that right?

 7      A.   That's correct.

 8      Q.   Okay.  And this is an updated list of your

 9   deposition and trial testimony over the last four

10   years?

11      A.   It goes back longer than that.  It goes back

12   to July 2014.

13      Q.   Do you recall having your deposition taken in

14   the Christopher Wade vs Monsanto case on October 22,

15   2019?

16      A.   As part of my answer to that question, I'm

17   going to call attention to the fact that you

18   disagreed with me that the overall title of the

19   litigation was Wade vs Monsanto.  That deposition

20   that you're currently referencing was about

21   Mr. Chester Meeks, and yet the title on it that you

22   read out loud is Christopher Wade.  That's exactly

23   what I was referring to.  The plaintiff in that case

24   was the decedent, Chester Meeks and his wife, Flo

25   Ann Meeks.  But, yes, I gave that deposition three
```

Ron Schiff, M.D., Ph.D.

1    weeks ago here in Tampa.

2        Q.   Correct.  And that was October 22, 2019,

3    correct?

4        A.   Exactly.

5        Q.   All right.  And you're saying that your

6    testimony was directed towards Plaintiff Meeks?

7        A.   Correct.

8        Q.   Have you had a chance to review your

9    deposition transcript from that case?

10       A.   No, I have not.

11       Q.   As you sit here today and think back on your

12   testimony at that deposition, do you stand by

13   everything you testified to?

14       A.   I do.  If I'm asked to answer specific

15   questions about what I said in that deposition, I

16   would like to have a copy of it in front of me to

17   refer to.

18       Q.   And, in fact, you have been disclosed or

19   served an expert report in a number of cases related

20   to Roundup plaintiffs, right?

21       A.   That's correct.

22       Q.   How many do you think?

23       A.   I believe that through The Miller Firm I have

24   been involved with six different plaintiffs to one

25   extent or another, and there are two plaintiffs from

Ron Schiff, M.D., Ph.D.

 1    another firm of which I'm aware of one moving ahead.

 2        Q.   And do you -- as you sit here today, do you

 3    stand by all of the opinions and statements made in

 4    the reports that you have served in this litigation?

 5        A.   I do.

 6                         - - -

 7             (Exhibit 4, Plaintiffs' Rule 26 Expert

 8    Disclosures, was marked for identification.)

 9                         - - -

10    BY MS. FUJIMOTO:

11        Q.   I'll mark as Exhibit Number 4 to the

12    deposition Plaintiffs' Rule 26 Expert Disclosures,

13    and you'll see that on page 3 of that exhibit they

14    designated Ron D. Schiff as an expert, and that

15    would be you, correct?

16        A.   That is correct, but I believe that the entry

17    devoted to me, okay, is simply backwards in here,

18    but that's fine.  Page 4 is before page 3, but

19    they're all in there.

20        Q.   And did you review this designation before it

21    was served?

22        A.   Very briefly, but yes.

23        Q.   It looks like all the other designations in

24    the other cases, right?

25        A.   I can't comment on that.  I assume it's

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1    parallel, but I mostly paid attention to mine.

2        Q.   Okay.  Well, the description of your

3    testimony is exactly the same as the description of

4    your testimony in all the other cases you've been

5    involved in, right?

6        A.   I've only given testimony in one other case,

7    and I've written reports in these two cases that are

8    being discussed today.

9        Q.   And they're the same?

10       A.   Yes.

11       Q.   Okay.  And setting aside the -- or other than

12   the invoice, the handwritten invoice notes and the

13   updated testimony list, have you brought anything

14   else with you that was responsive to the request for

15   production?

16       A.   Yes.  I have all of the materials provided to

17   me by counsel.  I have reliance materials, most of

18   which originated with counsel but some of which were

19   produced by me independently.

20            And I want to disclose upfront that I had a

21   telephone conference with Mr. Harris and his wife on

22   October 10.  I took handwritten notes from that

23   conference, and I have those with me as well.  I did

24   not want to overlook that.

25       Q.   Okay.  And are you going to produce those

Ron Schiff, M.D., Ph.D.

```
 1    notes?

 2    A.   I'm happy to.  I have them right here.

 3    Q.   Okay.

 4    A.   I would like the original back, please.

 5    Q.   Sure.  We'll get copies at a break.

 6         MS. FUJIMOTO:  Okay.  We'll mark, once we get

 7    copies, as Exhibit Number 5 Dr. Schiff's

 8    handwritten notes dated October 10, 2019.

 9                        - - -

10         (Exhibit 5, Handwritten Notes, was marked for

11    identification.)

12                        - - -

13 BY MS. FUJIMOTO:

14    Q.   Why did you call Mr. Harris?

15    A.   I was asked to by counsel.

16    Q.   And what was your objective with regard to

17    that call?

18    A.   I wanted to augment the information that I

19    had obtained from reading the medical records,

20    plaintiff's fact sheets and deposition testimony of

21    Mr. and Mrs. Harris.  My specific interest was

22    because he claimed difficulty with memory, and that

23    was a consistent theme in his medical records and

24    his depositions.  I wanted to go over some of the

25    points that I thought would be most likely affected
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1    by any cognitive deficit that he developed as a

2    result of his disease and his treatment.  That was

3    the focus of my questioning.

4        Q.   Which points were those?

5        A.   I'd have to look at my sheet in order to

6    answer that question accurately.

7        Q.   All right.  Do you consider yourself an

8    expert in either neurology or memory loss?

9        A.   The answer to that is I'm a physician board

10   certified in internal medicine, medical oncology and

11   hematology.  Classically we're taught that about

12   75 percent of the information obtainable in an

13   individual patient's case comes from history.  I

14   have to be able not only to elicit historical

15   information but to gauge its reliability.  That's

16   part and parcel of practicing in the field that I

17   practiced for 29 years.  I do not believe that one

18   has to be a neurologist or a psychiatrist in order

19   to judge whether a medical history is accurate.

20       Q.   Sure.  So the question was do you consider

21   yourself an expert in neurology?

22       A.   Again, the answer is no, but to me expertise

23   in that is not required for the purpose that I just

24   described.

25       Q.   Do you consider yourself an expert in

Ron Schiff, M.D., Ph.D.

```
 1     psychiatry?

 2        A.    I have already stated, I believe twice, that

 3     I do not; but I do not believe such expertise is

 4     required in order to take an accurate medical

 5     history.
```

Ron Schiff, M.D., Ph.D.

11     Q.   Well, what other sources of information do

12   you have regarding his exposure to Roundup or

13   glyphosate other than his own reports?

14     A.   We also have his wife's deposition testimony,

15   and we have the outcome of the telephone conference

16   that I had with them, and I did have the Roundup

17   chronology prepared and provided to me by counsel.

18   But I took all of that into consideration when

19   assessing Roundup; however, I'm stopping short of

20   saying that I am able to provide a toxicological or

21   industrial hygiene assessment.  As a medical

22   oncologist and hematologist, my assessment of

23   exposure is much more general than that, but I have

24   still formulated an opinion at that level.

25     Q.   So in terms of the material or information

Ron Schiff, M.D., Ph.D.

 1    that you relied upon regarding Mr. Harris's exposure

 2    to Roundup would include a time line or information

 3    provided to you by counsel, right?

 4        A.    That's correct.

 5        Q.    Okay.   And do you know anything about where

 6    the information came from that provided the basis

 7    for the lawyer's creation of the time line?

 8        A.    I believe that that also came from interviews

 9    of Mr. and Mrs. Harris directly, but --

10        Q.    Okay.

11        A.    -- would have been something that was

12    reviewed by counsel before being provided to me and

13    would represent an independent opinion about the

14    accuracy and reliability of the material disclosed.

15    I applied my own standards of judging accuracy and

16    reliability throughout this entire process.

17        Q.    And so you're presuming that the time line

18    provided to you by lawyers was accurate?

19        A.    That was one of the factors that I have taken

20    into account.

21        Q.    And so then the other source of your

22    information regarding his exposure would be his

23    deposition, right?

24        A.    That's correct.

25        Q.    Your telephone interview?

Ron Schiff, M.D., Ph.D.

1      A.   That's correct.

2      Q.   Did you look at his fact sheets?

3      A.   I did.

▮        ▮       ▬▬▬▬▬      ▬▬▬▬▬▬▬▬▬▬▬

▮        ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮        ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

7      A.   Yes, except that I also read Mrs. Harris's

8  deposition, and I also spoke to her on the

9  telephone.  So I did have multiple sources

10  available.  Again, I was not trying to reconstruct a

11  toxicological or industrial hygiene profile, only to

12  get -- only to get a sense of the broad

13  characteristics of the duration and intensity of his

14  Roundup exposure.

15      Q.   So the -- setting aside the lawyer-created

16  time line and Mr. Harris's information, the sole

17  source of your information about exposure is

18  Mrs. Harris, true?

19      A.   That requires a qualification.  By the time

20  that I held that telephone conversation with Mr. and

21  Mrs. Harris a month ago, Mr. Harris had been asked

22  to consider about his Roundup exposure on multiple

23  occasions by multiple people, so I'm sure that this

24  was a refined and increasingly accurate

25  representation of the duration and the intensity of

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ron Schiff, M.D., Ph.D.

```
 1    his exposure.
```

███      ███     ███████████████████████████████████

███      █████████████████

```
 4        A.    I think he has -- I'm not saying that.  I'm

 5    saying that he has required concentration on it, and

 6    he has discussed this with multiple individuals.  I

 7    can only say what I've been told and what I've read,

 8    and I have taken a very conservative approach in

 9    synthesizing that in order to come up with my

10    estimate of how long he was exposed to Roundup and

11    how intensively.  I have always erred on the side of

12    a conservative approach, and that comes through in

13    my report and it will come through in my deposition

14    testimony today.

15        MS. FUJIMOTO:  Move to strike; nonresponsive.

16    BY MS. FUJIMOTO:

17        Q.    Dr. Schiff, the question, okay -- let me --

18    let me start this again then.

19        We have the lawyer-created time line.  We

20    have information from Mr. Harris, ████████████████
```

███      ████████████████████████  and then what I'm --

```
22    we're left with, in terms of your information about

23    exposure, is the telephone call and deposition of

24    Mrs. Harris, correct or not?

25        A.    That's not correct.
```

Ron Schiff, M.D., Ph.D.

1      Q.    Okay.

2      A.    That is not --

3      Q.    Stop.

4      A.    -- what it's limited.

5      Q.    Okay.  Stop.  Hang on.  So then the question

6   is, what else have you relied upon regarding your

7   understanding of Mr. Harris's exposure to Roundup?

8   What other sources of information?

█   █   ████████████████████

█   ████████████████████

█   ██████   ████████████████

█   ████████████████████

█   ████████████████████

█   ████████████████████

█   ██████████████████████

█   █████████████████

█   ███████████   ███████████

█   ████████████████████

█   ██████████████████████

█   ████████████████████

█   ███████████   ████████████

█   █████████████████████

█   ████   ████████████████

█   █████████████████████

█   █████████████████

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ron Schiff, M.D., Ph.D.

3          MS. FUJIMOTO:  Move to strike; nonresponsive.

4    BY MS. FUJIMOTO:

5       Q.   The question is, setting aside the lawyer

6    time line, Mr. Harris's information, the only other

7    source of information you have regarding his

8    exposure is Mrs. Harris, correct?

9       A.   That is still not correct because you're

10   attempting to discount my judgment in correlating

11   and synthesizing these materials.

12      Q.   I'm not talking about your judgment.  Right

13   now I'm solely limiting the question -- and you've

14   got -- you have talked about your judgment -- about

15   sources of information.  That's what I'm talking

16   about.  When you have facts, you look at certain

17   things.  And I just want to know, setting aside

18   Mrs. Harris, what other sources of information have

19   you reviewed?

20      A.   I reject the notion that Mr. Harris was

21   completely unreliable in reporting his past Roundup

22   exposure.

23          MS. FUJIMOTO:  Move to strike; nonresponsive.

24   BY MS. FUJIMOTO:

25      Q.   That's not my question.  That's not my

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ron Schiff, M.D., Ph.D.

```
 1    question.  My question -- let's try this again.  You

 2    have the lawyer-created time line.  You have

 3    Mr. Harris's testimony, fact sheets and the

 4    telephone call, and then you have Mrs. Harris.  What

 5    other source, other than Mrs. Harris, has provided

 6    you with information about exposure?

 7       A.   You'll notice that I am not parroting back

 8    information from any one specific source.  You have

 9    named all the sources.  You want me to --

10       Q.   Okay.

11       A.   -- agree with what you have just said, and

12    yet that does not permit me to answer the question

13    in an appropriate manner.  So I have given my best

14    explanation for that, but what you will find when

15    you question me further about this is that I am not

16    just giving you what Mr. Harris provided at any one

17    particular time or what Mrs. Harris said in her

18    document.  It's a synthesis of all of those to which

19    my judgment has been applied.

20       Q.   And so you looked at medical records, right?

21       A.   That's correct.

22       Q.   And the word "Roundup" or "glyphosate"

23    doesn't appear anywhere in any of the medical

24    records, correct?

25       A.   That's also correct.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ron Schiff, M.D., Ph.D.

1    Q.   And so there is zero information about

2    Mr. Harris's Roundup exposure in the medical

3    records, true?

4    A.   But there is about the outcome of his Roundup

5    exposure, which is development of lymphoma.

6         MS. FUJIMOTO:   Move to strike; nonresponsive.

7    BY MS. FUJIMOTO:

8    Q.   Am I correct that there is not any reference

9    to Mr. Harris's Roundup or glyphosate exposure in

10   the medical records?

11   A.   Roundup is not mentioned explicitly, nor is

12   glyphosate in any of the medical records that I have

13   reviewed.

14   Q.   And did you review the testimony -- any of

15   the testimony of Mr. Harris's treating physicians?

16   A.   Yes.  Both --

17   Q.   And not one of them provided any testimony

18   and not one of them had information about his

19   exposure to Roundup or glyphosate, true?

20   A.   That's correct.

21   Q.   Okay.  And I'm looking at Exhibit Number 5,

22   which is your handwritten note related to the

23   telephonic interview you had with Mr. and

24   Mrs. Harris.  How long did the interview last?

25   A.   I would estimate that it was between 30 and

Ron Schiff, M.D., Ph.D.

```
 1    60 minutes, but I did not record that and I do not

 2    have an exact recollection of that.

 3        Q.   Is it on your invoice, your handwritten

 4    invoice?

 5        A.   Yes, it is.  I could look at that and provide

 6    you with a more detailed and more precise answer.

 7        Q.   Okay.  Have you ever met Mr. or Mrs. Harris?

 8        A.   I have not.

 9        Q.   And so you have not done any examination?

10        A.   That's correct.

11        Q.   And did you write down on Exhibit 5

12    everything that you asked Mr. and Mrs. Harris about

13    on that telephonic interview?

14        A.   Yes.  I believe that these cover all of the

15    points about which I asked him.

16        Q.   Okay.  And when I look at this, I don't see

17    any reference to any information that he provided

18    about Roundup exposure.  Is that true or am I

19    missing something?

20        A.   Yes, you have missed something.

21        Q.   Okay.  Tell me where -- what it says.

22        A.   It's Item Number 12.

23        Q.   Okay.  And it says, "Details of childhood

24    exposure to Roundup" -- what does that say?  I'm

25    sorry.  Read 12.
```

Ron Schiff, M.D., Ph.D.

1      A.   Item Number 12 says, "Details of childhood

2   exposure to Roundup with father uncertain."  The

3   letter small C with a line over is medical

4   terminology for the word "with."

5      Q.   Okay.  And so during this interview

6   Mr. Harris provided you information about childhood

7   exposure?

8      A.   That's correct.

9      Q.   Okay.

10      A.   Because it was covered in the Plaintiff Fact

11   Sheet and in the Roundup chronology; and I wanted to

12   determine how reliable that information was, and so

13   I inquired about it.

14      Q.   And so what did Mr. Harris say about him

15   being exposed to Roundup as a child?

16      A.   The question had to do with whether he had

17   childhood Roundup exposure when assisting or

18   accompanying his father as the father sprayed

19   Roundup at their residential property.  He does not

20   have a good memory of it one way or the other even

21   though it was listed in the Plaintiff Fact Sheet and

22   I believe made its way into the Roundup chronology.

23         However, in my opinions you will note that in

24   Section 8 under "Conclusion" I state that, "Even if

25   his exposure was largely limited to spraying Roundup

Ron Schiff, M.D., Ph.D.

```
1    at his residences between 2003 and 2010, Mr. Harris

2    has clearly had extensive exposure to Roundup."  And

3    I go from there talking about Roundup exposure

4    causing non-Hodgkin lymphoma.  But the point is

5    that, as I already mentioned and have attempted to

6    emphasize earlier, I am taking and have taken a

7    conservative approach to estimating the extent of

8    Mr. Harris's Roundup exposure.

9        Q.  So did you talk to Mr. Harris in this

10   telephonic interview about his use -- his own

11   personal use of Roundup?

12       A.  Yes, I did.

13       Q.  Okay.  But it's not reflected in these notes?

14       A.  That's because it corroborated what came

15   through in the deposition testimony.

16       Q.  So are all the notes on Exhibit 5

17   inconsistencies?

18       A.  No, not at all.  They are all things that I

19   felt the need to ask about.  I asked about the

20   exposure at the residences.  I got back the same

21   information that I was able to take from the

22   deposition testimony and from the Plaintiff Fact

23   Sheet, and so there was nothing to record.  It's not

24   that what's on the sheet that you're holding in your

25   hand are inconsistencies.  Some of it is new
```

Ron Schiff, M.D., Ph.D.

1    information.

2        Q.   So am I correct, then, on Exhibit 5, your

3    handwritten notes, that you wrote down some things

4    that were consistent with his fact sheet or

5    testimony, but he gave you information about his

6    exposure that was consistent and you chose not to

7    write that down?  Is that what you're saying?

8        A.   May I look at the sheet again, please?

9             For example, my comments about the negative

10   family history were things that also were taken from

11   the medical record and I believe from deposition

12   testimony, although I don't remember that as I sit

13   here today, but I still chose to record that.  That

14   was not strictly seeking new information, nor did it

15   reflect an inconsistency.  I wrote down what I felt

16   was important for my discussion with him.

17       Q.   Okay.  We'll copy that.

18                        - - -

19            (Exhibit 6, Expert Report, was marked for

20   identification.)

21                        - - -

22   BY MS. FUJIMOTO:

23       Q.   We've been talking about this, so let's go

24   ahead and mark it.

25       A.   I have that.

Ron Schiff, M.D., Ph.D.

1    Q.   It's Exhibit Number 6 to the deposition, your

2    expert report dated October 2, 2019, related to

3    Anthony Harris; is that correct?

4    A.   That's correct.

5    Q.   And it looks like at the end of your -- right

6    after your signature -- the pages aren't numbered,

7    but there is a references list with 14 articles; is

8    that right?

9    A.   That's correct.

10   Q.   Okay.

11   A.   Well, articles or book chapters, but yes.

12   Q.   Or book chapters, okay.  Or, actually, no, it

13   goes on to the next page.  There's 32?

14   A.   Okay.  So that's what I was referring to

15   earlier.  The other 18 items I do not have.

16   Q.   I see.

17   A.   I have seen them I believe only in the form

18   of an e-mail, but I did not have that available when

19   I was preparing for today's deposition.  So if I'm

20   asked questions about that, I would ask to see a

21   copy with the remaining 18 reliance materials.  And

22   there are some others that I have generated since

23   then I'm sure.

24   Q.   So your reference list, you've seen and

25   reviewed numbers 1 through 14, and you may have seen

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1    but did not have references Numbers 15 to 32,

2    correct?

3        A.   No.  I considered those references.  I did

4    not rely on them for the purpose of my constructing

5    the report.  Some of them I may rely on today except

6    that I don't remember exactly what's in there, and

7    I'm sure I have some references that go beyond the

8    additional 18 ones.  I'm happy to enumerate and

9    address each of those individually.

10       Q.   Do you have a separate list of literature in

11   addition to the 32 that are listed in your report?

12       A.   I do not.  I have the literature itself.

13       Q.   Okay.  And --

14            MR. BRAKE:  Let's go off the record one

15   second if we can.

16            MS. FUJIMOTO:  Well, let me finish this up,

17   and then we'll go off.

18            MR. BRAKE:  Okay.

19   BY MS. FUJIMOTO:

20       Q.   The deposition and trial testimony that's

21   attached to Exhibit 6, you produced and we've

22   already marked a list that's updated, right?

23       A.   Okay.  That is not what I have as an

24   attachment to my report.  I suspect that I provided

25   that on a different occasion maybe close in time,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1    maybe further apart, to plaintiff's counsel.

2    However, if I provided it before last Wednesday and

3    before October 22, it is incomplete.  The one that I

4    provided today is the complete one.

5        Q.    That was my only question.  So Exhibit 3 is

6    your complete list of deposition testimony to date

7    since 2014, right?

8        A.    That is correct.

9        Q.    Okay.  And then we also have attached your

10   CV, correct?

11       A.    Correct.

12       Q.    And then at the back page is the list of

13   Harris documents relied upon, correct?

14       A.    That's what I do not have, but yes.

15       Q.    What do you mean?  Is that not on the back of

16   your report?

17       A.    It is not.

18       Q.    Okay.  I assume --

19       A.    I declined when you handed me a copy of the

20   report.

21       Q.    All right.

22       A.    If you want me to look at that, that's where

23   I would have to look.

24             And, for the record, I would also not mind

25   seeing my invoice list again so I could tell you

Ron Schiff, M.D., Ph.D.

```
 1    exactly how long I spoke to Mr. and Mrs. Harris by

 2    telephone, because, you're right, it's on there.

 3       Q.   There's your CV.  You're right.  Let me see.

 4    It would be that list.  I'll make sure the copy has

 5    the back page.

 6       A.   No.  This is entirely different.

 7       Q.   Okay.

 8       A.   And now I will tell you I'm getting confused

 9    about the various lists of reliance materials, and I

10    will probably not be able to provide further

11    clarification.  This list here with nine items I saw

12    this morning.  I have never had a copy of that in my

13    possession.  Everything on it is correct, but there

14    is no literature listed whatsoever.

15           MS. FUJIMOTO:  Okay.  Thank you.  So why

16       don't we go off the record and see if we can clear

17       some things up.

18           THE VIDEOGRAPHER:  Going off the record at

19       9:31.

20           (A recess was taken from 9:31 a.m. until

21    9:34 a.m.)

22           THE VIDEOGRAPHER:  We're back on the record.

23       The time is 9:34.

24                        - - -

25           (Exhibit 7, Expert Report, was marked for
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1    identification.)

2                              - - -

3    BY MS. FUJIMOTO:

4        Q.    Okay.   We're trying to work some things out.

5    So what I'm going to do, just so that we have it for

6    the record, is I've marked as Exhibit Number 6 to

7    the deposition a copy of Dr. Schiff's report related

8    to Anthony Harris that we have, that Monsanto had as

9    being produced.   I'm going to mark as Exhibit

10   Number 7 to the deposition the report that

11   Dr. Schiff has in his file, because they are

12   different.

13            And as we walk through it, Dr. Schiff, am I

14   correct -- and we didn't go word for word on the

15   report, but it appears at least from a broader

16   standpoint that your report that we marked as

17   Exhibit Number 7 does not have the list of

18   literature Numbers 15 through 32 and does -- has a

19   not updated deposition and trial testimony list.  Or

20   did you -- you don't even have that, right?

21       A.    That's correct.

22       Q.    You don't even have that in your report.  And

23   then it also -- Exhibit 7, which is your version of

24   your report, does not have your fee schedule or the

25   documents replied upon list -- relied upon?

Ron Schiff, M.D., Ph.D.

```
1       A.    Right.

2       Q.    Okay.

3       A.    That was not produced by me.

4       Q.    Okay.

5       A.    And, again, I only saw that immediately

6    before today's deposition.

7       Q.    Let me ask you, then, and I'll show you --

8    because we'll get at a break the copies.  Excuse me

9    for getting close.  The documents relied upon that

10   was produced to us has medical records, Anthony

11   Harris deposition, Julie Harris deposition, Nayyar

12   Siddique deposition, Amandeep Salhora [sic]

13   deposition.

14      A.    It's correctly Salhotra.

15      Q.    Salhotra.

16      A.    That's a misspelling.

17      Q.    That's -- Pretrial Order 45, Pretrial

18   Order 85, general causation expert reports of Dennis

19   Weisenburger, Christopher Portier, and Beate Ritz,

20   and then the third Amended Plaintiff Fact Sheet.

21   Now, that's what's on Exhibit 6, right?

22      A.    That is correct.  That has been read

23   correctly.

24      Q.    Okay.  And did you review those materials?

25      A.    I have reviewed all of those.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1      Q.   And based on what your -- your memory or as

 2   you sit here, is that -- does that capture all the

 3   documents specific to this case that you relied

 4   upon?

 5      A.   I am sure that there are some reliance

 6   materials from the medical and scientific literature

 7   that pertains strictly to this case and not to any

 8   of the other Monsanto plaintiffs with whom I have

 9   become involved, but, again, I'm happy to enumerate

10   and discuss those upon request.

11      Q.   Do you know what they are as you sit here

12   today?

13      A.   It would take me a couple minutes to locate

14   them, but I can certainly do that.

15      Q.   Okay.  We'll --

16      A.   That's easy.

17      Q.   We'll do that that at a break.

18      A.   Okay.

19      Q.   That way we can make copies that we want when

20   we need to.

21      A.   That's fine.

22      Q.   Okay.  We have a stack here of "need to make"

23   copies.

24           So am I correct, though, that at least as of

25   Exhibit 7, which is the copy of your report that you
```

Ron Schiff, M.D., Ph.D.

1    have, if we look at the opinions and information set

2    forth in the report, not the attachments, is that a

3    fair summary of all the opinions that you intend to

4    offer at the time of trial?

5        A.   No.  The point is that I've listed all of the

6    reliance materials for preparation of my report.

7    However, I expect to be asked questions that go

8    beyond that, and for that reason I have accumulated

9    a modest amount of additional literature, which,

10   again, I'm prepared to discuss upon request.

11       Q.   Doctor, that's not my question.  My question

12   isn't about reliance materials or anything else like

13   that.  My question is, the opinions that you intend

14   to offer in this case, is your report marked as

15   Exhibit 7 -- does that capture all the opinions that

16   you intend to offer?

17       A.   It does not, because I have acquired

18   additional material afterwards responsive to what

19   plaintiff's counsel has provided me, and I have to

20   be able to discuss that as well.  Those were things

21   that came along after the completion of my report.

22   My opinions specifically about Mr. Harris are

23   contained within my report.  And, again, the report

24   that I provided, what I consider my official work

25   product, is the report that continues past the

Ron Schiff, M.D., Ph.D.

```
 1    signature to include 14 references.  Everything else
 2    was appended to it afterwards, although I may have
 3    provided some of it, like my CV and fee schedule, at
 4    an earlier time.  But some of the issues that have
 5    been raised, for example, by plaintiff's experts I
 6    feel that I have to respond to, and that required
 7    obtaining and reviewing additional materials.
 8        Q.   What additional opinions do you intend to
 9    offer that are not otherwise captured in your
10    report?
11        A.   If I am questioned about the opinions that
12    were expressed by plaintiff's expert Dr. Celeste
13    Bello, who is local here in Tampa, I would like to
14    be able to respond to that as well.  Mostly that
15    overlaps with what is already contained in my
16    report, but there are some points there that go
17    beyond that.
18        Q.   What are those points?
19        A.   First of all, it is repeatedly stated that
20    there's no evidence to support that glyphosate-based
21    formulation like Roundup cause primary CNS lymphoma.
22    I disagree with that.
23        Q.   Okay.
24        A.   A statement that Roundup did not cause or
25    contribute to Mr. Harris's CNS lymphoma, the
```

Ron Schiff, M.D., Ph.D.

```
 1    evidence does not support a causal association

 2    between glyphosate-based formulations and the

 3    development of NHL, meaning non-Hodgkin lymphoma, of

 4    any type.  The only known risk factor other than age

 5    for the development of primary CNS NHL is having a

 6    congenital or acquired immunodeficiency syndrome.

 7    The majority of immunocompetent people with primary

 8    CNS NHL have no known risk factors.  The available

 9    data do not support a conclusion that Roundup causes

10    NHL or any of its subtypes.  In that regard, I

11    disagree with IARC's conclusion that glyphosate is

12    probably carcinogenic in humans, as do multiple

13    regulatory agents worldwide.

14         After those points there is -- well,

15    actually, prior to that in the same section of

16    Dr. Bello's report entitled "Opinions Regarding

17    Mr. Harris and the Cause of NHL" -- this is at the

18    very bottom of page 10 of her report -- ███████████

      ███  ████████████████████████████████████████  I'm

20    prepared to discuss that.

21         Then at the end of her report are eight

22    entries that reflect critiques of the opinions of

23    plaintiff's experts.  I don't necessarily feel that

24    it's appropriate for me to read all of those into

25    the record at this time, but if I am asked questions
```

Ron Schiff, M.D., Ph.D.

1    about any of those, I'm happy to indicate whether I

2    agree or disagree with the information provided.

3        Q.   Anything else?

4        A.   That's all that I can think of at the moment.

5    Other things may come up, but that will be driven by

6    your questioning.

7             MS. FUJIMOTO:  Okay.  I'm going to mark as

8        Exhibit Number 8 to the deposition Plaintiff Fact

9        Sheet by Anthony Harris.

10            I'm going to attach as Exhibit 9 to the

11       deposition plaintiff's first amended fact sheet.

12            And I'll mark as Exhibit 10 to the deposition

13       plaintiff's second amended fact sheet.

14                          - - -

15            (Exhibit 8, Plaintiff Fact Sheet, was marked

16   for identification.)

17            (Exhibit 9, First Amended Plaintiff Fact Sheet,

18   was marked for identification.)

19            (Exhibit 10, Second Amended Plaintiff Fact

20   Sheet, was marked for identification.)

21                          - - -

22   BY MS. FUJIMOTO:

23       Q.   Dr. Schiff, your documents relied upon list

24   which was attached to the report that was produced

25   and is attached as Exhibit 6 lists only the Third

Ron Schiff, M.D., Ph.D.

```
 1    Amended Plaintiff Fact Sheet.  First question I have

 2    for you is whether or not you've seen the first --

 3    sorry.  Okay.  Hang on.  I mismarked at least the

 4    copies here.

 5          MS. FUJIMOTO:  Let me just go back and

 6       correct that we have marked as Exhibit 8 Plaintiff

 7       Fact Sheet, 9 the first amended fact sheet.  Okay.

 8       10 is the second amended fact sheet, so we're

 9       okay.  And I'm going to mark as Exhibit 11 the

10       third amended fact sheet.

11                        - - -

12          (Exhibit 11, Third Amended Plaintiff Fact

13    Sheet, was marked for identification.)

14                        - - -

15   BY MS. FUJIMOTO:

16       Q.  So my question to you, Dr. Schiff, is, have

17     you seen and did you review plaintiff's initial fact

18      sheet, the first amended fact sheet, and the second

19      amended fact sheet?

20       A.  No, I have not.  I have not seen those in the

21      past.  The materials provided by plaintiff's counsel

22      included only the Third Amended Plaintiff Fact

23      Sheet, which came to me in a notebook with

24      depositions of Mr. and Mrs. Harris.

25       Q.  And so I take it, then, it's fair to assume
```

Ron Schiff, M.D., Ph.D.

```
 1    that you have not had the opportunity to review each
 2    of the fact sheets and determine whether or not
 3    there are inconsistencies between them?
 4       A.   That's correct.  I have only looked at the
 5    Third Amended Plaintiff Fact Sheet.
 6       Q.   And I take it, then, that you have not
 7    reviewed in order to determine whether there were
 8    any inconsistencies between Mr. Harris's deposition
 9    testimony and what was provided in his first -- in
10    his initial, first and second amended fact sheets?
11       A.   That's correct, because I haven't seen those
12    other documents.
13            I do want to clarify one other point from
14    before, though, even though that's not a pending
15    question but a question from perhaps five minutes
16    ago.  I have taken exception to some of the
17    responses given in the deposition testimony of
18    Mr. Harris's treating bone marrow transplanter.  I
19    have flagged those.  At this moment I cannot say
20    with certainty that there were additional references
21    that I pulled with regard to my concerns about that
22    testimony.  It is possible, but I would like to have
23    the opportunity to address that systematically at
24    some point in this deposition.
25       Q.   What point did you disagree with?
```

Ron Schiff, M.D., Ph.D.

```
 1       A.   Well, there were several, and, you know --

 2   and if you want to go over that now, I'm happy to do

 3   it.  I believe that's what these are.

 4       Q.   Well, okay.  The purpose of today is not to

 5   talk to you about as you go along and develop

 6   additional opinions.  My question -- and what we're

 7   entitled to today -- is as you sit here today what

 8   additional opinions do you have, even those

 9   pertaining to the treating physician, that are not

10   otherwise set forth in your report?

11       A.   Those are exactly the opinions to which I am

12   referring.

13       Q.   Okay.

14       A.   In other words, that there are some things

15   that I have developed between completion of my

16   report and today, which if you want to know what all

17   of my opinions are in anticipation of trial, I would

18   like to have the opportunity to do that.

19       Q.   That's what I'm asking you.

20       A.   That's what I've got.

21       Q.   Okay.  Tell me.

22       A.   Okay.  All right.  I'm going to have to look

23   at these.  This is not many pages out of the

24   hundreds of pages of deposition testimony that I

25   have reviewed.  One has to do with Mr. Harris's
```

Ron Schiff, M.D., Ph.D.

1    prognosis, that that comes from -- which I dealt

2    with in my report but where a different assessment

3    was provided by Dr. Salhotra.

4        Q.   What did Dr. Salhotra opine as to

5    Mr. Harris's prognosis?

6        A.   Eighty percent survival following high-dose

7    chemotherapy and autologous stem cell

8    transplantation.

9        Q.   And what's your differing opinion?

10       A.   Fifty percent.  I have literature on that.

11   That is included in my report.

12       Q.   Okay.

13       A.   I just wanted to call attention to that.

14   Perhaps the statistics are better at Dr. Salhotra's

15   institution.  I can't comment on that.  But I took a

16   look at the literature, and I found some less

17   optimistic data.

18       Q.   But he received his treatment at

19   Dr. Salhotra's institution, right?

20       A.   He did, but I cannot document their outcome

21   statistics.

22       Q.   Okay.  Any other opinions by Dr. Salhotra

23   that you disagree with?

24       A.   Yes.  A statement is made that there is no

25   medical test or medical procedure that can be used

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ron Schiff, M.D., Ph.D.

1    to determine what caused someone's non-Hodgkin

2    lymphoma.  That's an overly broad statement that was

3    given to an overly broad answer which requires

4    clarification.

5       Q.   Well, you testified to that very point in

6    your deposition in the Wade case related to

7    Mr. Meeks, didn't you?

8       A.   I would have to be reacquainted with the

9    exact question and answer to which you're referring.

10      Q.   Okay.  So you don't remember if you said

11   exactly that point?

12      A.   I doubt that -- I strongly doubt, greater

13   than 50 percent likelihood, that I said there is no

14   test available to determine whether anyone's

15   non-Hodgkin lymphoma was caused by a specific cause

16   or contributing factor.  I would not have said that,

17   because there are circumstances in which that is

18   clearly not the case.

19      Q.   Do you recall saying that in your trial

20   testimony in the Pilliod case?

21      A.   I'm sorry, in what case?

22      Q.   Pilliod.

23      A.   I was not involved in that litigation.

24      Q.   Okay.  Oh, I'm sorry.  Yeah.  Did you review

25   Dr. Weisenburger's testimony in that case?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ron Schiff, M.D., Ph.D.

```
 1        A.    No, I did not.

 2        Q.    Do you know Dr. Weisenburger?

 3        A.    I know of him because of his international

 4   reputation as a lymphoma pathologist and lymphoma

 5   reference laboratory pathologist, but I have never

 6   met him nor spoken to him.

 7        Q.    And in that area would you defer to

 8   Dr. Weisenburger's trial testimony as to whether or

 9   not there is a test or method by which one can

10   determine the cause of a particular patient's

11   lymphoma?

12        A.    Not knowing what he said, no.  I would prefer

13   to formulate my own answer to that.

14        Q.    Dr. Weisenburger is at City of Hope in

15   California, right?

16        A.    That's correct.

17        Q.    And, in fact, City of Hope provided a second

18   opinion with regard to Mr. Harris's primary central

19   nervous system lymphoma, correct?

20        A.    That's also correct, regarding the diagnosis

21   and considering the treatment both.

22        Q.    And, in fact, Dr. Weisenburger appears on a

23   couple of the records, right?

24        A.    I would have to look at the pathology reports

25   to make certain of that.
```

Ron Schiff, M.D., Ph.D.

1     Q.   Did -- but you're aware that Dr. Weisenburger

2     has testified in the litigation for plaintiffs on

3     occasion, right?

4     A.   Plaintiffs in general or Mr. Harris, which?

5     Q.   Plaintiffs.  Other plaintiffs.

6     A.   I'm aware of that, yes.

7     Q.   Okay.  Any idea why, if Mr. Harris actually

8     had been evaluated and his information evaluated by

9     Dr. Weisenburger and others at City of Hope in

10    California where he lives, why they would come to

11    Florida to ask you to offer opinions on his behalf

12    rather than just ask Dr. Weisenburger?

13    A.   My understanding is that Dr. Weisenburger is

14    a general causation witness.  I have only read his

15    opinion with regard to general causation.

16    Q.   So you don't know that he actually has

17    testified as to specific plaintiffs?

18    A.   I'm aware that he has, but I have not read

19    any such deposition testimony.

20    Q.   So the question is, do you know why they

21    didn't ask him to offer case-specific opinions

22    regarding Mr. Harris, since he and City of Hope were

23    treaters in that case, why they would come to

24    Florida to ask you?

25    A.   Well, Dr. Weisenburger is not a treating

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1    physician.  He's a pathologist.  He's involved in

2    diagnosis, and certainly he is an expert in areas of

3    causation; but as a pathologist one would not expect

4    him to treat patients with non-Hodgkin lymphoma or

5    any other disease.

6       Q.   All right.  Whether you want to call him a

7    treating physician or not, City of Hope and

8    Dr. Weisenburger were involved in the diagnosis and

9    treatment recommendations for Mr. Harris, correct?

10      A.   Dr. Weisenburger was not involved in the

11   treatment recommendations for Mr. Harris.  As a

12   pathologist, one would not expect him to be.

13      Q.   Was he -- oh, okay.  Well, good.  Was he

14   involved in the evaluation of Mr. Harris's medical

15   records and pathology records and other information

16   regarding his care and diagnosis?

17      A.   The only thing that I know about or could

18   know about is his involvement in the pathology

19   second opinion at City of Hope.  However, I would

20   have to look at the City of Hope pathology reports

21   concerning the brain biopsy and the mediastinal

22   lymph node biopsy and the bone marrow biopsy to see

23   where his name is mentioned.  I have those with me,

24   but I have not flagged those for immediate

25   reference.

Ron Schiff, M.D., Ph.D.

```
1        Q.   Right.  So you know that they were involved.

2     That's my only question.  It's not that complicated.

3        A.   Well, it is.

4             MR. BRAKE:  Let me -- let me object to the

5        form of the question.  That wasn't your question.

6        But you can answer.

7             THE WITNESS:  Yes.  Yes, it is complicated,

8        because I'm sure his name appears as the

9        department head on the pathology reports, but I do

10       not know that he reviewed the material directly.

11       I would like to be able to give you a definitive

12       answer to that which would require you either

13       providing me with those three pathology reports or

14       allowing me the time to find it in the medical

15       records, because I have them and I've read them.

16   BY MS. FUJIMOTO:

17       Q.   Doctor, a definitive answer to what?  Do you

18    remember what my question was?

19       A.   Of course I remember it.  It had to do with

20    whether he was directly involved in the diagnosis,

21    and you also said treatment recommendations for

22    Mr. Harris.

23       Q.   Dr. Schiff, am I correct that in the medical

24    records you reviewed pertaining to Anthony Harris

25    that there are records from City of Hope?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1              MR. BRAKE:  Asked and answered.

 2              THE WITNESS:  That is correct.

 3  BY MS. FUJIMOTO:

 4      Q.  Do you have a recollection that

 5   Dr. Weisenburger's name appears in those medical

 6   records?

 7      A.  I believe I do, but not in the specific

 8   capacity, and it would be limited to the pathology

 9   reports.  It would not be limited -- it would not

10   involve seeing Mr. Harris in the clinic or

11   formulating treatment recommendations or carrying

12   out his treatment.

13              MS. FUJIMOTO:  Move to strike; nonresponsive.

14              THE WITNESS:  That's the question I'm trying

15    to answer.

16  BY MS. FUJIMOTO:

17      Q.  The question is -- and it's one which is

18   completely off center from my question.  Let me try

19   again.

20              The question is:  Does -- to your

21   recollection, does Dr. Weisenburger's name appear in

22   the City of Hope medical records pertaining to

23   Anthony Harris?

24              MR. BRAKE:  Objection.

25              ///
```

Ron Schiff, M.D., Ph.D.

1   BY MS. FUJIMOTO:

2       Q.   That's it.

3           MR. BRAKE:   Asked and answered.

4           MS. FUJIMOTO:   It's asked many times;

5       answered not.

6           MR. BRAKE:   It's been answered many times,

7       but you can answer it again.

8           MS. FUJIMOTO:   It has not been.

9           THE WITNESS:   I maintain that I have answered

10      it many times.  And in order to give you the

11      precise answer that you want, I would like to take

12      the opportunity to locate those three pathology

13      reports if you don't mind.

14  BY MS. FUJIMOTO:

15      Q.   So you don't remember whether or not his name

16      appears?

17      A.   I suspect --

18      Q.   That's the only question.  Do you remember

19      whether Dr. Weisenburger's name appears in the City

20      of Hope medical records pertaining to Anthony

21      Harris?

22      A.   I do not recall.

23      Q.   Yes or no?

24      A.   I do --

25      Q.   Okay.

Ron Schiff, M.D., Ph.D.

```
 1        A.   That's not a yes-or-no question.

 2             MR. BRAKE:  Let him finish.  Please finish.

 3             THE WITNESS:  I do not recall if he

 4        personally reviewed the pathology.

 5   BY MS. FUJIMOTO:

 6        Q.   That's not the question.

 7        A.   That is the only question.

 8        Q.   That's not -- my question is whether his name

 9        appears in the medical records.

10        A.   If his name appeared on the stationery,

11        that's fine.  I'm willing to stipulate that.  That's

12        a lot different than whether he actually looked at

13        the slides.

14        Q.   I didn't ask you if he looked at the slides.

15        I didn't ask you -- I'm not asking you to stipulate

16        to anything.  I'm asking you whether you recall that

17        his name appears in the City of Hope medical records

18        pertaining to Anthony Harris.

19        A.   I'm going to specifically ask to pull out the

20        pathology reports that I have already looked at in

21        order to answer that question.

22        Q.   Okay.  If you need to do that.  And while

23        you're doing that, I will pull out your testimony in

24        Meeks.

25             MS. FUJIMOTO:  Let's go off the record.
```

Ron Schiff, M.D., Ph.D.

```
 1              THE VIDEOGRAPHER:  We're going off the record

 2      at 9:57.

 3              (A recess was taken from 9:57 a.m. until

 4   10:01 a.m.)

 5              THE VIDEOGRAPHER:  We're back on the record.

 6      The time is 10:01.

 7   BY MS. FUJIMOTO:

 8      Q.   All right.  Dr. Schiff, so you had an

 9   opportunity at the break to look through the medical

10   records and in particular those from City of Hope

11   pertaining to Anthony Harris; and, in fact, you were

12   able to locate documents that had Dr. Weisenburger's

13   name on them, correct?

14      A.   I've located two of the three City of Hope

15   second opinion pathology reports.  One was the

16   original brain biopsy.  One was the bone marrow

17   biopsy.  I have not yet located mediastinal lymph

18   node biopsy.  On the two that I have located, the

19   brain biopsy and the bone marrow biopsy,

20   Dr. Weisenburger's name is listed as the laboratory

21   director.  There is no evidence that he is the

22   pathologist who signed out these cases.  That's the

23   distinction I have been trying to make all along,

24   and it's an important one.

25      Q.   You done?
```

Ron Schiff, M.D., Ph.D.

1     A.   I am.

2     Q.   Okay.  So we know that Dr. Weisenburger's

3     name appears in the City of Hope records, right?

4     A.   As the laboratory director --

5     Q.   Okay.

6     A.   -- yes.

7     Q.   All right.  Perfect.  That's all -- that's

8     all I was asking.

9          All right.  So, Doctor, going back to your

10    opinions regarding Mr. Harris and your opinion that

11    his CNS lymphoma was caused by Roundup or his

12    glyphosate use, am I correct that part of that

13    opinion is your reliance on or understanding about

14    his exposure, use and exposure to Roundup?

15    A.   That's correct.

16    Q.   Okay.  And so in terms of Mr. Harris's

17    exposure, use and exposure to Roundup or

18    glyphosate-based products, what is your opinion as

19    to either how many hours, how many times per year or

20    how many total times he used it over his lifetime?

21    A.   That's -- my answer to that is written in my

22    report, which I no longer have in my possession.  I

23    would like to get that back and refer to the

24    relevant section.

25         And it's discussed in two places.  The first

Ron Schiff, M.D., Ph.D.

```
 1    place is the section caused -- section entitled

 2    "Lymphoma Caused By Roundup."  That is Item Number 6

 3    in opinions.  And what I stated there was that,

 4    "Mr. Harris was exposed to Roundup approximately

 5    once per week between 1988 and 1996 when he

 6    accompanied or assisted his father in spraying the

 7    yard at their home.  Subsequently he sprayed Roundup

 8    for once every two weeks to three times weekly at

 9    his own homes between 2003 and 2010.  Mr. and

10    Mrs. Harris have both testified that he did not use

11    personal protective equipment while spraying

12    Roundup.  It is, therefore, my opinion that

13    Mr. Harris's exposure to Roundup has been

14    extensive."

15         In the conclusion section, I already read one

16    time and I will just summarize it very briefly now

17    that it included the qualification, "Even if his

18    exposure was largely limited to spraying Roundup at

19    his residences" -- "residences between 2003 and

20    2010, Mr. Harris has clearly had extensive exposure

21    to Roundup."

22         What I mean by that is -- and I have also

23    said this verbally as part of my deposition

24    testimony today -- that I am willing to take the

25    most conservative assessment possible of his
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1    cumulative Roundup exposure.  As I'm not a

2    toxicologist or an industrial hygiene expert, I have

3    not attempted to calculate quantitatively how long

4    he used it each time and to make multiplications of

5    the duration of spraying per incident versus the

6    time spent spraying.  I leave those to -- leave

7    those to experts who are qualified in that.

8         I have only listed what I can about frequency

9    and duration and years of use.  That's the best I

10   can do with my opinion.

11   Q.   But it's your opinion that however much he --

12   or how often he used Roundup, that it was sufficient

13   to cause his CNS lymphoma?

14   A.   That's correct.

15   Q.   All right.  What is your threshold for how

16   much glyphosate or Roundup exposure is sufficient to

17   cause a person's lymphoma?

18   A.   I can only tell you what my threshold isn't.

19   I can look at the literature that talks about

20   exposure response relationships, and I can cite that

21   in one particular study there was two days per year

22   of exposure, and in another study the cut point was

23   ten lifetime days per exposure.

24        All that I'm saying is that Mr. Harris's

25   exposure tremendously exceeded both of those

Ron Schiff, M.D., Ph.D.

1    arbitrary cutoffs for which data exists in the

2    peer-reviewed medical literature.  I cannot give you

3    a threshold for that because it has not been

4    defined.  I can only look at what has been defined

5    and reported and compare Mr. Harris's exposure with

6    that.

7       Q.   You're talking about the Pahwa study, right?

8       A.   No.  Well, not exclusively.  The Pahwa study

9    is a little bit different, but in this case I'm

10   making reference to, I believe, McDuffie and

11   Eriksson.  And, again, my preference -- and this has

12   been stated before, and it appears in my report -- I

13   would prefer to -- I would prefer to rely on the

14   general causation experts for general causation

15   opinions.  I will, however, attempt to answer any

16   question that you may ask me about any of that.

17      Q.   McDuffie and Eriksson, those data and

18   findings were part of Pahwa, right?

19      A.   They were included, yes.

20      Q.   Okay.  And so is it your opinion that anyone

21   who uses Roundup for more than twice in one year has

22   been exposed sufficiently for it to be a cause of

23   his or her lymphoma?

24      A.   That is a generalization that I am unable to

25   make.  I can only make a point about where the

Ron Schiff, M.D., Ph.D.

```
 1    exposure response cut point was defined for purposes
 2    of those studies.  And there is a higher risk for
 3    those who exceeded two days per year versus those
 4    who had less exposure than that.  I am not trying to
 5    infer any precision beyond that.
 6       Q.   So if you had a plaintiff where you were
 7    asked to look at the records like Mr. Harris and if
 8    that plaintiff told you that they used it only once
 9    per year, would it be your opinion that that use was
10    sufficient to cause lymphoma?
11       A.   That is a completely different situation that
12    is clearly not applicable to Mr. Harris.
13       Q.   I'm asking a hypothetical, Doctor, and you
14    know as an expert -- that's what you do for a
15    living -- that you are obliged to answer
16    hypotheticals, so I'm proposing one to you, that you
17    have a plaintiff who, whether by fact sheet,
18    deposition or a telephone call with you, says, "Hey,
19    I used glyphosate just once a year for a few years."
20    Is that in your mind sufficient to conclude that his
21    lymphoma was caused by his Roundup use?
22            MR. BRAKE:  Let me object to the form of the
23       question.  I don't know what you mean by "few
24       years."
25            THE WITNESS:  Okay.  To my ability to
```

Ron Schiff, M.D., Ph.D.

1       understand the hypothetical which pertains to a

2       hypothetical patient or plaintiff, with one day of

3       Roundup exposure per year of use, I would have to

4       say that for interpreting the risk to that

5       plaintiff, the line of evidence having to do with

6       exposure response in the literature could not be

7       relied upon to give additional information.

8           Most of the studies do not include exposure

9       response and still provide epidemiologic evidence

10      that glyphosate, glyphosate-based formulations,

11      and Roundup caused or contribute to cause -- or in

12      California the terminology, a substantial factor

13      in the causation of non-Hodgkin lymphoma -- with

14      respect to the duration and intensity of the

15      exposure, which is what I was addressing with

16      regard to Mr. Harris, the published exposure

17      response data provided another line of evidence.

18      However, it is not the only line of evidence.  If

19      someone was only exposed one day per year, I could

20      not rely on exposure response data because it does

21      not pertain to them.

22  BY MS. FUJIMOTO:

23      Q.   So what about the plaintiff who reports to

24  you that they used Roundup three times in one year,

25  but that's it, never again?  Under McDuffie is it --

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1    would it be your opinion that the Roundup exposure

 2    that they had was sufficient to cause their

 3    lymphoma?

 4        A.   I would not be willing to lie -- to rely on

 5    exposure response data in that particular setting

 6    for the exact reason that you described.  However,

 7    that's completely not applicable to Mr. Harris

 8    where, even with the most conservative estimates,

 9    far more extensive Roundup exposure is documented.

10        Q.   What amount of exposure would you need to see

11    from a plaintiff in order for you to conclude that

12    it was not sufficient to have caused that person's

13    lymphoma?

14        A.   I cannot come up with a way to bracket the

15    threshold exposure on either the high end or the low

16    end because the literature does not support and

17    attempt to do that.  In this particular case, this

18    particular plaintiff had extensive exposure.  I've

19    offered an opinion about that.  But in terms of the

20    hypotheticals I -- you know, if it was very close to

21    what the cut points were in the published

22    literature, I would probably choose not to rely on

23    the exposure response data for those patients.  I

24    would not choose to rely on that for someone who has

25    had, for example, three lifetime days of exposure to
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ron Schiff, M.D., Ph.D.

1    Roundup all in one year.  I would look at the other

2    evidence but not exposure response.  Here it's much

3    more clear-cut.

4        Q.   So are you saying that if a plaintiff's

5    reported exposure is not supported by the published

6    literature that you wouldn't consider it?

7        A.   No, that's actually not what I said at all.

8    I just said that if the exposure response data could

9    not be interpreted -- well, I'm going to turn that

10   around.  If the individual plaintiff's exposure

11   could not be interpreted with any degree of

12   reliability or certainty with respect to the

13   published exposure response data, I would rely on

14   other lines of evidence concerning the association

15   and causal association of Roundup and non-Hodgkin

16   lymphoma.  I cannot define what would be my minimum

17   amount of glyphosate exposure to trigger the

18   exposure response argument.  I can only go by what

19   appears in the published literature.  Everything --

20       Q.   Well, Pahwa was in the published literature,

21   wasn't it?

22           MR. BRAKE:  I'm sorry.  Were you done with

23      your answer, Doctor?

24           THE WITNESS:  No, I was not, actually.

25           MR. BRAKE:  Please continue.

Ron Schiff, M.D., Ph.D.

 1          THE WITNESS:  If I can remember it.  The

 2     thought is gone.

 3    BY MS. FUJIMOTO:

 4     Q.   Is Pahwa in the published literature?

 5     A.   Of course.

 6     Q.   Okay.  Do you follow that?  Do you rely on

 7    that study?

 8     A.   It's one of the lines of evidence that one

 9    could look at, yes.

10     Q.   But would you rely on it irrespective of what

11    a plaintiff reported to you as exposure?

12     A.   It would contribute to my opinion, yes.

13     Q.   Okay.  And am I correct that under Pahwa they

14    find that there is an increased risk of

15    non-Hodgkin's lymphoma if a person used Roundup more

16    than two times per year, right?

17     A.   Yes, for non-Hodgkin lymphoma overall that

18    conclusion is supported by Table 4.

19     Q.   Right.

20     A.   There are many different types of analysis,

21    and that is obviously not the only thing that goes

22    into determining -- exposure response is not the

23    only factor that goes into determining whether a

24    causal relationship exists.  Where one can extract

25    data from someone's exposure and apply it to the

Ron Schiff, M.D., Ph.D.

1      published literature, it can be helpful.  In my

2      opinion, it's helpful with Mr. Harris.

3          Q.   Right.  And if it's not helpful, you ignore

4      it?

5          A.   If it's not helpful, I would examine the

6      other lines of evidence.  I would not rely on

7      exposure response for people who had zero to

8      two days per year of glyphosate use.

9          Q.   Okay.

10         A.   I would not take a look at that.

11         Q.   And so if you had a plaintiff that reported

12     to you having used Roundup only once a year but

13     having used it for more than three and a half years,

14     would you rely on Table 3 of the Pahwa study or

15     ignore it?  Because that would say that they are not

16     at an increased risk of lymphoma, right?

17         A.   It's really not a question of ignoring it.

18     It's a question of what lines of evidence would I

19     consider relevant in such a circumstance.  I would

20     not rest my argument on the exposure response

21     relationship in a case like that because it defies

22     reason.

23              On the other hand, that is not the only line

24     of evidence that implicates glyphosate or Roundup in

25     the causation of non-Hodgkin lymphoma.  I wouldn't

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1    ignore what was published on it because I would be

 2    familiar with it and I would be prepared to discuss

 3    it, as I am today.  But in point of fact the

 4    argument could be constructed without exposure

 5    response data; but, again, that's not applicable to

 6    Mr. Harris in the slightest.

 7        Q.   So if you had a plaintiff who reported using

 8    Roundup only once a year but had used it more than

 9    three and a half lifetime days, would you rely on

10    Table 5 of Pahwa or ignore it?

11        A.   It would be one of the factors that I would

12    take into consideration.  The point is that one of

13    the things you can do with the meta-analysis, even

14    more than in an individual study, is you could set

15    up a large number of computer-assisted statistical

16    analyses and break down the data in many different

17    ways.  I'm sure that's going to come up during

18    today's discussion, and I'll deal with that as the

19    questions come up.

20         The overarching point is that exposure

21    response is only one element in determining

22    causation.  For some patients exposure response

23    sheds light; on other patients it doesn't.  On

24    Mr. Harris we do get insight into that, and that's

25    really the only point that I keep coming back to.
```

Ron Schiff, M.D., Ph.D.

1      Q.   Well, but Mr. Harris, when you say he had

2      extensive exposure, he certainly had more than three

3      and a half lifetime days of glyphosate use, right?

4      A.   That's correct.

5      Q.   And Table 5 of Pahwa tells us that under

6      those circumstances there is not even an increased

7      risk of NHL, right?  If you look there, you've got

8      it.  Greater than 3.5, the adjusted -- the

9      unadjusted odds ratio is 1.51, but the confidence

10     interval goes all the way down to 0.79 to 2.88, and

11     the adjusted odds ratio is 1.10 with a confidence

12     interval of 0.55 to 2.22, correct?

13     A.   There are many different comparisons and

14     statistical analyses represented in Table 5.

15     Relevant to Mr. Harris is the NHL overall and the

16     diffuse large B-cell lymphoma.

17     Q.   That's what I'm looking at --

18     A.   Okay.  Well, I think --

19     Q.   -- in Table 5.

20     A.   I think it's fair to look at both of those.

21     There are also statistical analyses that are based

22     on adjustments to three specific pesticides other

23     than glyphosate which aren't involved in this; and

24     of course the more characteristics you analyze and

25     the more you break it down, the smaller the numbers

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1    get.  So I would suggest that if you're looking at

 2    an association with NHL overall, the ordinal

 3    statistic with ten lifetime days is modestly

 4    positive but statistically significant, again, for

 5    NHL overall.  And if you look at it for diffuse

 6    large B-cell lymphoma, you will find that it is also

 7    slightly positive and with borderline statistical

 8    significance whether it is adjusted for the three

 9    additional pesticides or not.

10         Now, if we go back up to the NHL overall, the

11    numbers for greater than 3.5 lifetime days of

12    glyphosate use are certainly greater than those for

13    zero to 3.5 days.  They do not approach statistical

14    significance, but the odds ratio is indeed higher.

15         Now I have to call your attention to the end

16    column which has to do with the number of cases in

17    each of those lines.  Let's just say that for

18    patients with ascertainable data those numbers are

19    not large.  They are quite small, and that has to do

20    with why the statistical precision is not as good as

21    we might like.

22         So the point is there are multiple analyses

23    here, and I'm sure the different sides of this

24    litigation will choose different specific analyses

25    to emphasize, and the other side will choose others.
```

Ron Schiff, M.D., Ph.D.

 1    And that's what we're already doing now.

 2    Q.   Okay.  Well, I'll have to beg to differ with

 3    you on that, but we can agree to disagree.

 4         Doctor, is it your testimony --

 5         MR. BRAKE:  Move to strike as not a question.

 6         MS. FUJIMOTO:  Clearly not a question.

 7  BY MS. FUJIMOTO:

 8    Q.   Doctor, so are you -- is it your testimony

 9    that a confidence interval that includes 1.0 or goes

10    below 1.0 is still statistically significant?

11    A.   I would state that if it was 1.0 or slightly

12    below it, I would use the term borderline

13    statistical significance, whereas arbitrarily if the

14    lower bound of the 95 percent confidence interval

15    was 1.01, I don't think anybody would argue that

16    that counts as statistically significant.  I would

17    just make the common sense point that there's not a

18    whole lot of difference between them.

19         But, again, that refers to individual items.

20    I'm trying to look at the totality of the data as

21    specifically regards Mr. Harris, and I would also

22    point out that all of the cut points on here, 3.5

23    lifetime days and the ordinal of ten lifetime days

24    are well below the documented exposure in

25    Mr. Harris's case, which we've already discussed.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1              I don't have statistics for exposure response

 2      above those cut points, but the point is that if you

 3      accept that there is some semblance of an exposure

 4      response relationship documented here, he way

 5      exceeds those, a lot more than 3.5 or even ten

 6      lifetime days.

 7         Q.   And that would tell you why Pahwa doesn't

 8      make sense, right?

 9         A.   That would put the -- that would define for

10      me a limit as to how much one can rely on Pahwa.

11      There is useful data in here, but Mr. Harris is off

12      the charts.

13         Q.   And, Dr. Schiff, so the criticisms or

14      limitations that you just referenced as to Table 5

15      in Pahwa, do you apply those same concerns or

16      limitations to Table 4?

17         A.   Table 4 has to do with frequency of

18      glyphosate handling in terms of days per year of

19      glyphosate use, so it's the same kind of thing.  The

20      statistical -- the multiple statistical analyses are

21      basically the same here although the independent

22      variable in question is different and the

23      independent variable cut point is, therefore,

24      different and so is the ordinal statistic.  But, you

25      know, you could argue that the same pros and cons,
```

Ron Schiff, M.D., Ph.D.

1    the same strengths and limitations apply to this

2    type of statistical analysis in general.

3        Q.   That was my question.

4        A.   And, again, here if we have the cut point

5    being two days per year of glyphosate use or an

6    ordinal of five days per year of glyphosate use, the

7    relevant point is that Mr. Harris's exposure

8    tremendously exceeds both of those.

9        MS. FUJIMOTO:  Move to strike; nonresponsive.

10   BY MS. FUJIMOTO:

11       Q.   Dr. Schiff, so in terms of Mr. Harris's

12   exposure, you took what he told you in the

13   interview, his testimony, fact sheets, whatever, as

14   your information, along with Mrs. Harris and a time

15   line by lawyers prepared by lawyers -- you took that

16   information to base your causation opinion on,

17   right?

18       A.   That's correct.

19       Q.   Okay.

20       A.   I took all the information that I had, and I

21   applied my most conservative judgment to it.

22       Q.   Did you draw an opinion as to whether what

23   Mr. Harris reported about his use and exposure,

24   whether that made sense?

25       MR. BRAKE:  Object to the form of the

Ron Schiff, M.D., Ph.D.

```
 1      question.

 2          THE WITNESS:  About whether it made sense?

 3   BY MS. FUJIMOTO:

 4      Q.  Yes.

 5      A.  Well, it had to do with how many years he

 6   applied the Roundup and how often he applied it.

 7   Those were within the realm of what I could be --

 8   what I would consider to be reasonable frequencies

 9   and durations and consistent with what other

10   plaintiffs in the overall litigation have reported.

11      Q.  Okay.  Did you do any investigation as to

12   where Mr. Harris lived during the times that he says

13   he used Roundup?

14      A.  I paid attention to some of the geographic

15   reference points in Mr. and Mrs. Harris's

16   deposition -- depositions.  However, among all of

17   the things in which I do not claim expertise, I also

18   do not claim expertise in Southern California

19   geography, so I don't know about those things in

20   detail.

21      Q.  So --

22      A.  If you want to ask me about where I grew up,

23   other places that I have lived, including here, I

24   could perhaps give you some insight.  Southern

25   California, no.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1    Q.   Good point.  So you don't know what kinds of

2    weeds either, seasonally or annually, are in areas

3    like Oceanside Vista, San Marcos, and Carlsbad,

4    California, right?

5    A.   Let's just say that that kind of information

6    is not covered on the medical oncology and

7    hematology board certification exams.  I would have

8    no idea about that.

9    Q.   Okay.  That was the question.

10        And so I take it you don't know in terms of

11   the area and areas in which Mr. Harris lived what

12   the average person did with regard to spraying

13   weeds, how often they would do it per year?

14   A.   Well, I can deduce one relatively important

15   point about which I have no specific or factual

16   knowledge, and that is that Southern California is a

17   temperate climate like here.  Perhaps we're a little

18   more subtropical than Southern California; but,

19   nonetheless, there is no period of the year where

20   ice and snow preclude the growth of weeds.

21        Consequently I would suspect that there would

22   be far more months of the year when weeds grow and

23   spraying of weeds is warranted, but that is a

24   nonexpert opinion.  I'm a medical oncologist and

25   hematologist.  I'm not a horticulturist.  I'm not a

Ron Schiff, M.D., Ph.D.

1    weed expert.  That's really all I can really tell

2    you about that.  If Mr. Harris had lived in Alaska,

3    I would tell you that maybe he sprayed Roundup in

4    maybe July and August.  Beyond that I have no

5    insight, nor do I claim any expertise.

6        Q.   But with regards to Southern California,

7    then, that would be speculation on your part?

8        A.   I tried to apply some common sense to it in

9    terms of the months of the year in which there is

10   the potential for weed growth, but I have no more

11   specific information than that.

12       Q.   And you don't have any idea in terms of the

13   areas in which Mr. Harris lived in Southern

14   California what the average Roundup or glyphosate

15   user -- how often they would use it in any given

16   year?

17       A.   I would defer that to a toxicology or

18   industrial hygiene expert.

19       Q.   Have --

20       A.   As repeatedly stated, I am not an expert in

21   those fields.

22       Q.   Have you looked at the Roundup label as -- or

23   any other information about Roundup as to how often

24   it would need to be used depending upon the weed or

25   crops you were applying it to?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1      A.   I'm going to take that question apart into

2      two separate parts.  First, I have looked at the

3      Roundup label, but I have not looked at it with

4      respect to frequency or duration of application.

5      Q.   What did you look at it for?

6      A.   On October 31st I went to my local Lowe's.  I

7      found the Roundup display.  I looked at the

8      resealable product label, and I looked to see what

9      it said about warnings and precautions.

10     Q.   But --

11     A.   Interestingly, it was limited to eye

12     irritation, nothing about lymphoma or anything more

13     serious or more systemic than what if you got some

14     of it in your eyes.

15     Q.   Well, if one were to assume that the EPA, the

16     US EPA, is correct and that glyphosate and Roundup

17     is not a carcinogen and does not cause lymphoma, you

18     would not expect lymphoma to be in the Roundup

19     label, would you?

20     A.   There's two parts to my answer to that

21     question.  One is that the other reason for not

22     putting it in the Roundup label would be that that

23     would be acknowledging Monsanto's recognition that

24     there are more serious risks than eye irritation,

25     but the other reason has to do with the EPA process,

Ron Schiff, M.D., Ph.D.

```
 1    which I regard as an outsider, but I'm certainly

 2    entitled to opinions about that which came up in my

 3    prior deposition in this literature but where I did

 4    not have the opportunity to give a more extensive

 5    answer.  I only hit one high point on that.

 6        Q.   Do you know anything about Prop 65 in

 7    California?

 8        A.   Only the sheet for distribution to the public

 9    that was distributed to me.

10        Q.   Okay.  So the lawyers gave you information

11    about Prop 65?

12        A.   That's correct.  I would not normally seek

13    out regulatory data.

14        Q.   Right.

15        A.   But I did get the one sheet on Prop 65, which

16    I'm turning to right now for reference.

17        Q.   Do you know what Prop 65 is in California?

18        A.   I believe that Prop 65 has to do with the

19    designation by the California Environmental

20    Protection Agency of known or probable carcinogens.

21        Q.   Right.  And were you also provided with the

22    EPA's directive to the State of California telling

23    them that if they required a Prop 65 warning about

24    carcinogenicity on Roundup that it would be

25    considered misleading and would be considered a
```

Ron Schiff, M.D., Ph.D.

1    mislabeling of the product?

2    A.   Okay.  I'm going to now reemphasize another

3    area where I do not claim expertise in this or any

4    other litigation.

5    Q.   First -- and I'll let you give that

6    clarification, but first please answer my question.

7    Were you aware that the US EPA had hold -- had told

8    the State of California that they could not require

9    a Prop 65 warning on Roundup because that would be

10   considered misleading?

11   A.   No.

12   Q.   Do you know that or not?

13   A.   No, I was not aware of that.

14   Q.   Okay.

15   A.   But I would like to give my explanations --

16   Q.   Sure.

17   A.   -- as a more complete answer to that

18   question.

19   Q.   Sure.

20   A.   Okay.  First, I am not an expert in

21   regulatory affairs, not in this nor in any other

22   litigation.  That's not to say that I don't have

23   some degree of interest in it and that I have looked

24   up a little bit about that, but I have two

25   observations.

Ron Schiff, M.D., Ph.D.

1           The Prop 65 warning that I have is

2     March 2018, which is 15 months after the

3     EPA-sponsored review of the carcinogenicity data

4     involving glyphosate, which, in my opinion, is

5     controversial and arguably political.  Having said

6     that, I will also point out that under Prop 65, the

7     breast cancer treatment drug tamoxifen is also

8     considered a carcinogen, and obviously oncologists

9     and their patients are heavily dependent on access

10    to tamoxifen.  So you have to take Prop 65 with a

11    grain of salt.

12          However, in this particular case it was

13    influenced, I assume, by IARC, because that is the

14    first reference it suggests.  The EPA, the FDA, the

15    European Chemicals Agency, the Joint FAO/WHO meeting

16    on pesticide residues, and the National Pesticide

17    Information Center at Oregon State University are

18    also cited.

19          I cannot reconstruct California's

20    decision-making process about this.  I can only look

21    at the three-page document that I was provided by

22    counsel.  But I have tried to give my perspectives

23    on interpreting this matter both positively and

24    negatively.

25          MS. FUJIMOTO:  Okay.  Move to strike as

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1       nonresponsive everything after the answer "no."

2   BY MS. FUJIMOTO:

3       Q.   So, Doctor, let me ask you this -- and we'll

4   get back to Prop 65 in a minute.  But going back to

5   the question about average use in the area in which

6   Mr. Harris lived, you told us earlier that you've

7   reviewed, what, six to eight cases involving Roundup

8   plaintiffs?

9       A.   That's correct.

10      Q.   Okay.  Have any of those reported to you use

11  or exposure that you would consider not sufficient

12  to cause their lymphoma?

13      A.   Not yet.

14      Q.   Okay.  So if you had --

15      A.   None of them --

16      Q.   Let's assume you have 100 people living in

17  the area in which Mr. Harris lived, and assume that

18  they all used it two times per year based on

19  whatever crops and weeds they had.  Would it be your

20  opinion that every single one of them that gets

21  non-Hodgkin's lymphoma, that that lymphoma would be

22  caused by their Roundup use?

23      A.   That's not how the epidemiologic statistics

24  are interpreted.

25      Q.   Right.

Ron Schiff, M.D., Ph.D.

```
 1      A.   First of all --

 2      Q.   So --

 3      A.   And, again, please, I would like the

 4   opportunity to answer these questions.

 5      Q.   Sure.  As long as you answer my question --

 6      A.   Well --

 7      Q.   -- and not something else.

 8      A.   Sometimes I try to, and I'm still not given

 9   the opportunity, like on the last one.

10           In terms of this, the cut point for Pahwa

11   Table 4 is two days.  Zero to two days is the low

12   exposure group.  Greater than two days is the higher

13   exposure group.  And I believe that comes from

14   McDuffie, if I remember that correctly.

15           So the point is that, again, we're talking

16   about a hypothetical that involves 100 people who

17   are right at the cut point, and, again, the lower

18   exposure group is up to two.  The higher exposure

19   group is not two and above.  It's greater than two.

20   But I've already stated repeatedly that if we're

21   going to be discussing about situations that are

22   right at or very close to the cut point, I'm not

23   going to have an opinion.  And Mr. Harris is not in

24   that category because his exposure is much greater.

25           There is a separate point that you raised
```

```
 1    that I have to address now because I'm concerned I

 2    won't get the opportunity to get to address it

 3    later, that looking at the odds ratios, hazards

 4    ratios and risk ratios that define the association

 5    between glyphosate exposure and the risk of

 6    developing non-Hodgkin lymphoma, no one is asserting

 7    that every case of non-Hodgkin lymphoma in someone

 8    who has had Roundup exposure is due to Roundup

 9    exposure.  The most you could take out of it is to

10    estimate a percentage of the lymphoma cases that are

11    likely to due to that -- likely to be attributable

12    to that.  I'm happy to give you a specific example

13    of that based on a relatively easy calculation from

14    one of the meta-analyses to explain -- to illustrate

15    what I'm talking about.

16    Q.   Go for it.

17    A.   Okay.  In Zhang the meta hazard ratio is

18    approximately 1.4.  It's percentage points,

19    hundredths of percentage points -- again, that's

20    hundredths, not hundreds.  It's hundredths of

21    percentage points higher than that.

22         But what that tells me, using round numbers

23    and easy math, is that if you have 100 patients with

24    non-Hodgkin lymphoma -- I'm sorry, if you have 140

25    patients with non-Hodgkin lymphoma, then
```

Ron Schiff, M.D., Ph.D.

```
1    approximately 40 of those reflecting the excess

2    risk, which is 30 percent of the total, would be due

3    to their Roundup exposure.  That's all that I am

4    asserting here, and that's all that anybody ought to

5    be able to assert on the subject.

6         These are relatives, not absolutes.  But you

7    go with the data that's provided with the

8    epidemiology studies.  You analyze it as appropriate

9    in general terms and as applied to the individual

10   plaintiff.  There's no point --

11   Q.   So --

12   A.   -- in continuing to ask me about two days of

13   exposure or 3.5 lifetime days or even ten days --

14   ten lifetime days of exposure because Mr. Harris

15   greatly exceeded that.

16   Q.   All right.  So what you're saying is that if

17   you have a group of 100 patients that used Roundup

18   for, let's say, more than, you know, whatever number

19   you want, ten times per year, 100 times per year,

20   and they got non-Hodgkin's lymphoma, under the

21   current data it's your opinion that you would

22   attribute 40 of those cases of non-Hodgkin's

23   lymphoma to being caused by Roundup?

24   A.   That's all that one can do based on the

25   statistical review of the published literature.
```

Ron Schiff, M.D., Ph.D.

1     Q.   So --

2     A.   The literature -- go ahead.

3     Q.   So is it then fair to say, then, the other 60

4     you could not attribute to Roundup?

5     A.   In absolute terms you really can't say that.

6     It's just that there may be less of a contribution

7     from Roundup or that the Roundup contribution was

8     missed.  Roundup is ubiquitous in the environment,

9     which means that there are people who had exposures

10    less than the cut point but have still been exposed

11    who go on to develop medical complications of their

12    Roundup exposure.

13         So, again here, looking at general causation

14    literature we have to talk in generalities.  It's

15    not that everybody above an arbitrary cut point is

16    going to get the disease and that nobody below it is

17    going to get the disease.  These are relative risks,

18    and relative risk of course is terminology that's

19    routinely used by epidemiologists and

20    biostatisticians.

21    Q.   You make a good point.  Let me ask you about

22    that.  So under Zhang you have these 100 people that

23    used Roundup, got non-Hodgkin's lymphoma, and you

24    had said that under the 1.4 relative risk 40 of them

25    would be attributable to their Roundup use.  So --

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1    but I think what you just said is, though, because

 2    it's a relative risk, there's no way for you to know

 3    which 40 of the 100 actually you would attribute

 4    their NHL to glyphosate or Roundup use, correct?

 5        A.   By the same token you don't know which of

 6    those people you can rule out their glyphosate --

 7        Q.   Right.

 8        A.   -- exposure as a cause.  On top of that, you

 9    have the other line of evidence, which is exposure

10    response.  And, again, Mr. Harris's exposure has

11    broken through the ceiling of those data that deal

12    with exposure metrics in terms of estimating the

13    risk.  So I would certainly decide in favor of the

14    fact that his increased exposure would be associated

15    with an even higher risk without invoking the

16    concept of relative risk proportionality.

17        Q.   Right.

18        A.   You don't need to go there in order to make

19    that point.

20        Q.   Right.  Well, let's do this then.  Let's

21    assume that all 100 people used Roundup in the exact

22    same frequency and amount as Mr. Harris.  Let's

23    assume all of them did.  And under Zhang you would

24    say 40 of them you could attribute to their Roundup

25    use, but there's no way to rule in or rule out any
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1    particular person, right?

 2      A.    That's not strictly correct either, because

 3    Zhang's meta-analysis and any of the other general

 4    causation studies or meta-analyses that we're

 5    looking at are comprised entirely of Anthony

 6    Harris's.  There is a range of exposures in each of

 7    those reports, and all of those are represented in

 8    the statistics and in the calculation of the

 9    association.  Consequently, I would believe that if

10    you did have a population of 100 Anthony Harrises,

11    that well over 30 percent of the cases of

12    non-Hodgkin lymphoma that developed in that group

13    would, in fact, be attributable to Roundup exposure

14    as a substantial factor.

15      Q.    Right.  You just couldn't tell which ones,

16    which 30, right?

17      A.    I am arguing here that 30 is an underestimate

18    of them.

19      Q.    No.  That's fine.  Whether it's 30 or

20    40 percent could be attributable to Roundup, there

21    is no way for you or anyone else to say which one of

22    the 100 would fall within that group of 30 or 40,

23    right?

24      A.    Or maybe it's much higher than 30 or

25    40 percent.  Maybe it's substantially higher,
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

 1    because, again, his Roundup exposure was extensive,

 2    whereas the epidemiology literature analyzes a broad

 3    range of Roundup exposures or glyphosate exposures.

 4    So on that basis I would not care to venture a guess

 5    about a 30 percent or 40 percent population to which

 6    Mr. Harris might fit because he might belong in a

 7    population that's substantially higher.  I don't

 8    know because the epidemiology studies do not define

 9    that.  But the point is you can't apply Zhang or any

10    of these other studies to a population comprised

11    entirely of Anthony Harrises because his exposure is

12    extreme relative to the range represented in each of

13    the individual studies or in the meta-analyses.

14        Q.   So setting aside specific exposures, when you

15    look at the Zhang or 30 to 40 percent that you've

16    told us the epidemiology supports, if you assume

17    those to be accurate and you decide to rely upon

18    that epidemiology, how is it that at 30 to

19    40 percent you're ever able to say to a reasonable

20    degree of medical certainty that it's more likely

21    than not that a particular plaintiff's NHL, like

22    Mr. Harris, was caused by his Roundup use?  How do

23    you rule in or rule out any particular person?

24        A.   Well, I've also dealt with that directly in

25    my report, and the way that, you know, that we go

Ron Schiff, M.D., Ph.D.

1    through that includes a combination of general

2    causation, specific causation and differential

3    etiology.  The way that I dealt with that in the

4    conclusion section of my report has to do with the

5    repetition of his diagnosis, the fact that I have

6    taken a conservative -- well, so there's several

7    elements.

8         Mr. Harris has a history of non-Hodgkin

9    lymphoma.  He has an extensive history of Roundup

10   exposure.  Roundup is a substantial factor in the

11   causation of non-Hodgkin lymphoma.  His exposure is

12   toward the high end relative to the published

13   literature of documented Roundup exposures, and we

14   cannot -- and for which there are also

15   nonepidemiologic sources of evidence implicating

16   Roundup as a substantial factor in causing

17   non-Hodgkin lymphoma.  That's probably not the

18   purpose of why I'm here today, but they have to be

19   taken into account.

20        Last but not least, we cannot identify

21   additional factors in Mr. Harris's case that are

22   known or likely causes of his non-Hodgkin lymphoma.

23   But even if there were, disease is often

24   multifactorial as to causation, and Roundup is still

25   in all at the bottom line a substantial factor.

Ron Schiff, M.D., Ph.D.

1          MS. FUJIMOTO:  Move to strike; nonresponsive.

2   BY MS. FUJIMOTO:

3      Q.   All right.  Let's -- let's do this then.  You

4   practiced oncology and had a clinical practice up

5   until 2015, right?

6      A.   2015, that's correct.

7      Q.   Okay.  And since that time your work has

8   solely been and your income has solely been working

9   as an expert witness in litigation, right?

10     A.   My earned income, yes.

11     Q.   Okay.  And prior to 2015 in your clinical

12  practice, you have previously testified that a large

13  majority of your non-Hodgkin's lymphoma patients --

14  strike that.  Bad question.

15          Am I correct that prior to 2015 a substantial

16  majority of patients you treated with -- for

17  non-Hodgkin's lymphoma had no known cause of their

18  lymphoma?

19     A.   What is also present in the deposition

20  testimony that you're quoting is my discussion of

21  what it means about no known cause.  It was in the

22  context of idiopathic descriptions of etiology and

23  non-Hodgkin lymphoma.  Every disease has a cause.

24  Idiopathic simply means that the cause is not known

25  in this circumstance or the cause is not known in

Ron Schiff, M.D., Ph.D.

1       this case.  It doesn't mean there is no cause.

2              Consequently, it is true at that level of

3       defining it that I was unable to pinpoint the cause

4       of non-Hodgkin lymphoma in the majority of patients

5       that I evaluated and treated during my career in

6       practice.  However, that does not mean that all of

7       those cases of non-Hodgkin lymphoma did not have a

8       cause, because they all did.

9       Q.   Okay.  You're assuming way more than you need

10      to on the question.  That's why I was trying to be

11      specific about no known cause.  So I'm accepting

12      your definition of idiopathic.

13             So confirm for me, Doctor, that when you were

14      in practice as an oncologist, over 80 percent of

15      your non-Hodgkin lymphoma patients had no known

16      cause for their lymphoma.  Yes or no?

17      A.   Can't give that as a yes-or-no answer either.

18      The point is that the answer is it is correct but

19      within the context that I provided in my previous

20      answer.  On top of that, recognition of the lymphoma

21      risks associated with glyphosate and Roundup just

22      coincidentally happened to coincide with the period

23      of time that I retired from clinical practice.

24             So from the standpoint of a practicing

25      medical oncologist and hematologist, the Roundup

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1    business was new.  It was the spring of 2015.

 2    That's when I retired.

 3        Q.   And, Doctor, you know that Roundup has been

 4    on the market since the '70s, right?

 5        A.   That's correct.

 6        Q.   All right.  So let me ask you this:  In the

 7    Wade case on October 22, 2019, the transcript,

 8    page 182:

 9            "Question:  Okay.  So when you say that a

10       substantial majority of the patients you treated

11       with non-Hodgkin lymphoma did not have a known

12       cause of their non-Hodgkin lymphoma, what

13       percentage would you put on substantial majority?

14            "Answer:  I would say over 80 percent."

15            Do you now disabuse that answer or do you

16    stand by that answer?

17        A.   Okay.  Two things:  Number one, it was the

18    Meeks case, not the Wade case.  The Wade case is the

19    caption for all of the, I believe, multidistrict,

20    multiplaintiff litigation, of which Mr. Harris is

21    one plaintiff and Mr. Meeks is -- was another

22    plaintiff.  But I'm relying on the context that I

23    have given to interpret my answer and the way that I

24    have explained it today.

25            In terms of whether I knew the causes of
```

Ron Schiff, M.D., Ph.D.

1    those patients' lymphomas in realtime, what I said

2    then was accurate.  It was the best representation

3    of my memory, and it's what I recall and would

4    answer from scratch today even if not reminded.  The

5    point is that making that statement requires

6    interpretation, and I have tried to provide it.

7        Q.  And let me just state for the record, I'm

8    referring to his deposition on October 22, 2019.

9    The caption is Christopher Wade, et al. vs Monsanto,

10   and I will state that it was not -- you can see on

11   the record it was not an MDL case.  It was in the

12   Circuit Court of the city of St. Louis and the state

13   of Missouri.

14       A.  But the plaintiff was Mr. Meeks.

15       Q.  No question pending.  I'm just stating for

16   the record that it was not an MDL case.  It was a

17   state of Missouri case.

18       A.  Well, I'm not an expert in legal procedure,

19   and that's fine.  But the plaintiff, again, was

20   Chester Meeks and his wife.

21       Q.  But you spent the last --

22           MR. BRAKE:  Is now a good time for a break?

23           MS. FUJIMOTO:  No.

24           MR. BRAKE:  Okay.

25           MS. FUJIMOTO:  I'll finish up my section, and

Ron Schiff, M.D., Ph.D.

```
 1      then we'll take a quick break.

 2  BY MS. FUJIMOTO:

 3      Q.   All right.  In this litigation, have you ever

 4  seen a Roundup plaintiff where you determined that

 5  Roundup was not the cause of their non-Hodgkin

 6  lymphoma?

 7      A.   Not yet.

 8      Q.   Okay.  So you -- every time you've ruled in

 9  Roundup as the cause, right?

10      A.   At the risk of going too far with my answer,

11  I will say that I have only seen plaintiffs who,

12  like Mr. Harris, have had extensive Roundup

13  exposure.  I'm not being sent patients who had

14  two days per year or 3.5 years or up to -- you know,

15  3.5 or ten lifetime days.  I haven't been sent cases

16  like that.  I'm sure they're out there, but those

17  are not the ones that I have been asked to review.

18      Q.   So in your career as an expert witness and

19  your testimony here in this litigation, have you

20  ever seen a Roundup plaintiff where you ruled out

21  glyphosate or Roundup as a cause?

22      A.   Not yet.

23      Q.   All right.

24      A.   But in other medical-legal work that I have

25  done, I have reviewed medical records and I have
```

Ron Schiff, M.D., Ph.D.

```
 1    reviewed supporting documentation, and I have often

 2    times told the attorneys who were retaining me that

 3    they didn't have a case or that the plaintiff was

 4    not a strong plaintiff.

 5         MS. FUJIMOTO:  Move to strike; nonresponsive

 6     after the answer "no."

 7  BY MS. FUJIMOTO:

 8    Q.   So let -- let me make sure I understand, and

 9    I do recall prior testimony on this.  So in your

10    clinical practice prior to 2015, you never told one

11    of your patients that their non-Hodgkin lymphoma was

12    caused by Roundup or glyphosate, correct?  Yes or

13    no?

14    A.   The Roundup lymphoma link was only becoming

15    known at the time that I retired from practice, on

16    top of which my practice was in the city of Tampa.

17    We did not have a rural or agricultural population

18    that became my plaintiffs.  I had no reason to be

19    suspicious of anybody in terms of pesticide

20    exposure.  Obviously if I had known then what I know

21    now, I would have asked relevant questions, but I

22    didn't know it, mostly because the material wasn't

23    available, and so I did not ask.

24    Q.   For whatever reason prior to 2015, did you

25    ever tell a non-Hodgkin lymphoma patient of yours
```

Ron Schiff, M.D., Ph.D.

1    that their non-Hodgkin lymphoma was caused by

2    Roundup or glyphosate?  Yes or no?

3       A.   For the reasons that I have explained, the

4    correct answer is no.

5       Q.   Okay.  And, similarly, you read the

6    depositions of Mr. Harris's treating physicians,

7    right?

8       A.   Yes.

9       Q.   And not one of them told him that his

10   non-Hodgkin -- his central nervous system lymphoma

11   was caused by Roundup or glyphosate, right?

12      A.   I would not really expect treating physicians

13   who are 100 percent clinical to necessarily have

14   formulated opinions about that.  Should they know

15   about it?  Absolutely.

16      Q.   Did you -- in reviewing the treating

17   physician depositions, did you see anywhere where

18   any one of them said, "I told Mr. Harris that his

19   CNS lymphoma was caused by his glyphosate or Roundup

20   use"?

21      A.   No.  The treating physicians did not go into

22   that area and were not experts --

23      Q.   Are you --

24      A.   -- in that aspect of causation.

25      Q.   Are you a member or were you a member of

Ron Schiff, M.D., Ph.D.

```
 1     ASCO?

 2     A.   Yes.

 3     Q.   Okay.  Have you ever seen any publication by

 4   ASCO that says that glyphosate or Roundup causes

 5   non-Hodgkin lymphoma?

 6     A.   I have not.

 7     Q.   Have you seen any practice guidelines or

 8   recommendations or publications by any medical

 9   organization that has concluded that Roundup or

10   glyphosate causes lymphoma of any kind, including

11   NHL?

12     A.   I've never looked for something like that.  I

13   am not familiar in general with any local health

14   department advisories or state or federal guidance

15   on that matter.  But, once again, I retired from

16   practice and allowed most of my organization

17   memberships to lapse right around the time that IARC

18   first publicized the results of its investigation of

19   glyphosate.

20     Q.   If you're here testifying as an expert

21   witness on specific causation, Doctor, don't you

22   think it would be important that whether you're in

23   clinical practice or not for you to keep up with

24   what current medical literature and current medical

25   guidelines say about the very issue that you're
```

Ron Schiff, M.D., Ph.D.

```
1      testifying about?

2      A.    It depends what the expectations are.  Based

3   on my experience of being an active member of ASCO

4   and the American Society of Hematology, from

5   approximately the mid-1980s until approximately the

6   time of my retirement, I had not seen them weigh in

7   on other organic pollutants in the environment,

8   including that.  Those are not sources that I would

9   expect to look at --

10     Q.    So you didn't see those --

11     A.    -- in seeking those information -- in seeking

12  that information.  By the same token, I did have an

13  outsider's curiosity about the proceedings at the

14  EPA, especially in December 2016, and about what

15  other countries besides the United States have done,

16  and have looked into that.

17     Q.    All right.  So you -- so you don't know what

18  medical organizations or ASCO say about the matter,

19  but you do know what the EPA says about it, right?

20     A.    I have a little bit -- I have an outsider's

21  insight into the EPA process.

22     Q.    Well, you're certainly aware that the EPA has

23  reviewed the data and concluded that glyphosate is

24  not a carcinogen, right?

25     A.    As I stated during my deposition in the Meeks
```

Ron Schiff, M.D., Ph.D.

```
 1    case, I had reason to believe that the EPA's opinion

 2    and process have been political in that area, and,

 3    consequently, they fall short of reliability.  I'm

 4    going to reemphasize that I am not an expert on

 5    regulatory affairs, that I am taking an outsider's

 6    view of this particular matter.  I do believe I'm

 7    entitled to my opinion but that I am stipulating

 8    that it is not an expert opinion as such.

 9         Q.  And you're aware that Health Canada says that

10    glyphosate is not a carcinogen either, right?

11         A.  With Health Canada I have no idea of what

12    factors went into their determination.

13         Q.  Are you aware that the European regulatory

14    agency looked at the data and concluded that

15    glyphosate is not a carcinogen?

16         A.  I am aware that there are seven European

17    countries that currently have restricted glyphosate

18    sales, including some extending to the level of a

19    ban.

20         Q.  Are you aware that the European regulatory

21    agencies have concluded that glyphosate is not a

22    carcinogen?

23         A.  I have not --

24         Q.  Yes or no?

25         A.  -- looked directly into the European
```

Ron Schiff, M.D., Ph.D.

```
 1    regulatory agency.  I assume that's associated with

 2    the EU.  The seven countries that I'm looking at

 3    that have or are considering bans or restrictions on

 4    glyphosate sales and use are all members of the EU.

 5      Q.   Are you aware that the Australian regulatory

 6    agency has looked at the data and concluded that

 7    glyphosate is not a carcinogen?

 8      A.   I have to tell you that I'm not familiar with

 9    the Australian data.

10      Q.   And setting aside the proposed bans or bans

11    of glyphosate that you've looked at, isn't it

12    correct, though, that not one of those countries has

13    looked at the evidence and published a conclusion

14    that glyphosate or Roundup causes cancer?

15      A.   I have no idea about the independent

16    investigation done by those countries.  There is a

17    fairly large and important divide between hazard

18    assessment and public policy.  There are some

19    organizations that claim to do both, but IARC, which

20    is limited to the hazard assessment side, very

21    explicitly states that they are not involved in

22    public policy, regulatory decisions, public health

23    recommendations and so on.  Others, however, can

24    consult IARC, and I believe that IARC's monographs

25    are in use worldwide for that exact purpose.
```

Ron Schiff, M.D., Ph.D.

1    Q.    And, in fact, IARC is the only organization

2    that has published a conclusion that glyphosate is a

3    probable carcinogen, right?

4    A.    I don't know the answer to that question

5    because I have not undertaken a look for the

6    universe of organizations that have investigated it.

7    Q.    Did you not think that was appropriate for

8    purposes of offering an expert opinion in this

9    litigation?

10   A.    No, I did not, because I am familiar with

11   IARC and its process as well as what it has

12   published, and I have found no qualifications or

13   limitations to what IARC has written on that, which

14   includes its own recognition of limitations of some

15   of the underlying studies.

16   Q.    So you're aware, then, that IARC also has

17   designated coffee as a probable carcinogen, too,

18   right?

19   A.    I don't know if that designation is current.

20   I do know that at different times caffeine has been

21   investigated as a pancreatic carcinogen and

22   separately as a treatment for pancreatic cancer.

23   Some degree of common sense and independent thought

24   has to be given to each of these matters.  I have

25   applied that in the case of glyphosate, not only

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1    with regard to IARC but with regard to the

 2    underlying literature upon which IARC's opinions

 3    rely.

 4        Q.   Do you know that IARC also classifies hotdogs

 5    and other cooked meats as probable carcinogens?

 6        A.   I can accept that through their inclusions of

 7    nitrosamines.  That's been known for 35-plus years.

 8        Q.   Did you ask Mr. Harris whether he ate hotdogs

 9    or any cooked meats throughout his lifetime?

10        A.   No, because I'm not attempting to rule out

11    multifactorial causation, which is an exercise of

12    futility on its own.

13        Q.   How can you rule in glyphosate if you can't

14    rule out other causes?

15        A.   Because there can be more than one cause.

16    That's the whole principle of multifactorial.  I

17    just --

18        Q.   So there could be other causes of

19    Mr. Harris's NHL, right?

20        A.   In terms of major causes, we have looked at

21    that.  In terms of eating hotdogs and exposures to

22    nitrosamines, those have never been implicated in

23    the causation of lymphoma.  With regard to the IARC

24    investigation, the limited evidence in humans

25    applies to lymphoma.  For hotdogs and other
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1    processed meats and so on, lymphoma is not even part

2    of the discussion.

3        Q.   Did you ask Mr. Harris whether he was a

4    coffee drinker?

5        A.   No, I did not.

6        Q.   Okay.

7            MS. FUJIMOTO:  All right.  We can take a

8    break.  Go off the record.

9            THE VIDEOGRAPHER:  We're going off the record

10   at 11:01.

11           (A recess was taken from 11:01 a.m. until

12   11:10 a.m.)

13           THE VIDEOGRAPHER:  We're back on the record.

14   The time is 11:10.

15   BY MS. FUJIMOTO:

16       Q.   Okay.  Welcome back, Dr. Schiff.  Let's see

17   if there's at least a couple things that we can

18   agree on.  I think we might.  You agree, do you not,

19   that benzene is a recognized cause of non-Hodgkin

20   lymphoma?

21       A.   Yes.  I do want to point out also from the

22   last question right before the break that, like

23   nitrosamines and unlike glyphosate, coffee, caffeine

24   has not been implicated in lymphoma carcinogenesis

25   in particular.  I just wanted to clarify about that.

Ron Schiff, M.D., Ph.D.

1      Q.    Okay.

2      A.    But benzene, yes, I agree with you.

3      Q.    And benzene is a recognized cause of other

4    hemopoietic cancers like some leukemias, right?

5      A.    Myeloid malignancies in particular, yes.

6      Q.    Okay.  And you agree that PCBs, or

7    polychlorinated biphenyls, are a recognized cause of

8    lymphoma as well, right?

9      A.    You know that I agree with that.

10     Q.    Okay.  We know tobacco and other ingredients

11   in cigarettes cause lung cancer, right?

12     A.    Yes.  And other cancers as well, although

13   it's not recognized that they are lymphoma

14   carcinogens.

15     Q.    Okay.  But certainly cigarettes contain

16   things like benzene and benzanthracene and 1,

17   3-Butadiene?

18     A.    Butadiene.

19     Q.    Okay.  Thank you for the pronunciation.

20           Cigarette smoke contains all of those

21   chemicals, right?

22     A.    That's correct.

23     Q.    And those are recognized causes of

24   non-Hodgkin lymphoma, right?

25     A.    No.

Ron Schiff, M.D., Ph.D.

1    Q.   Okay.  Did you ask Mr. Harris anything about

2    his occupational exposure to cigarette smoke?

3    A.   No.  I felt that I didn't need to because I

4    could make some assumptions about that.

5         I did, however, want to point out that in

6    terms of smoking and lymphoma carcinogenesis, there

7    is some data on that.  And it appears the strongest

8    connection is women with follicular lymphoma, and

9    that does not apply to Mr. Harris.  Again, in terms

10   of lymphoma carcinogens in general, the breakdown of

11   the 77 or so carcinogens that are in tobacco smoke

12   as applied to lymphoma I have not ever seen anything

13   about that, and I have been interested.

14   Q.   So the subtype of lymphoma that a person has

15   is important to you in terms of cause?

16   A.   In some cases where data exist.

17   Q.   Okay.  Well, we have data that shows that

18   central nervous system lymphoma is not -- the risk

19   of that is not increased with glyphosate use, don't

20   we?

21   A.   We do not.

22   Q.   Really?  Okay.

23   A.   Yes, we definitely do not, because that is a

24   very rare not subtype of non-Hodgkin lymphoma but a

25   rare presentation of non-Hodgkin lymphoma.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1        Q.   Do --

 2        A.   Still in all most cases of primary central

 3   nervous system non-Hodgkin lymphoma are diffuse

 4   large B-cell lymphoma.  And if you're interested in

 5   the subtype, that is where one has to focus one's

 6   discussion.

 7        Q.   Did you look at the article by James Cerhan,

 8   C-e-r-h-a-n, et al., that was part of the InterLymph

 9   studies?

10        A.   I have some of the InterLymph with me.  I do

11   not believe that I have the Cerhan article.

12        Q.   To the extent the Cerhan article looks at

13   specific subtypes including CNS lymphoma, don't you

14   think that's important to have in forming your

15   opinion?

16        A.   I misspoke.  Cerhan is, in fact, the first

17   author on the InterLymph report that I have dealing

18   with diffuse large B-cell lymphomas.

19        Q.   Okay.

20        A.   So I do have that.

21        Q.   You do?

22        A.   And I did look at it.

23        Q.   Okay.  And so then you know that when they

24   looked at the specific subtypes and looked at

25   selected anatomical sites that they did not find an
```

Ron Schiff, M.D., Ph.D.

1    increased risk of CNS lymphoma, which is what

2    Mr. Harris has, right?  Table 3.

3        A.   All right.  Table 3 covers two full pages.

4    Can I ask where you're looking at on Table 3?

5        Q.   Under CNS, that first column.  See that?

6        A.   Yes.

7        Q.   It's CNS lymphoma.

8        A.   Yes.

9        Q.   Right?

10       A.   Uh-huh.

11       Q.   And if you look all the way, they're looking

12   at different variables, right?

13       A.   Okay.

14       Q.   You see that?

15       A.   Yes.

16       Q.   And what -- at the top do you see the very

17   top variable?

18       A.   I do.

19       Q.   Okay.  Do you see any statistically

20   significant increase in risk?

21       A.   Well, if you're asking me throughout Table 3,

22   I would have to point to first-degree family history

23   of non-Hodgkin lymphoma.

24       Q.   Exactly.

25       A.   And lifetime cigarette exposure 21 to 35

Ron Schiff, M.D., Ph.D.

 1    pack-years.

 2        Q.   Right.  Those are the only instances in which

 3    there was an association between -- hang on.  Let me

 4    make sure we have this.  Let me attach this so that

 5    you have one too.

 6        MS. FUJIMOTO:  I'm going to mark as Exhibit

 7    Number 13 [sic] to the deposition the article by

 8    James Cerhan entitled "Medical History, Lifestyle,

 9    Family History, and Occupational Risk Factors for

10    Diffuse Large B-Cell Lymphoma:  The InterLymph

11    Non-Hodgkin Lymphoma Subtype Project."

12                         - - -

13        (Exhibit 12, Article entitled "Medical History,

14    Lifestyle, Family History, and Occupational Risk Factors

15    for Diffuse Large B-Cell Lymphoma:  The InterLymph

16    Non-Hodgkin Lymphoma Subtypes Project", was marked for

17    identification.)

18                         - - -

19    BY MS. FUJIMOTO:

20        Q.   So you have this article, right?

21        A.   I do.

22        Q.   And is it fair to say that the only

23    historical associations that showed an increase in

24    risk with CNS diffuse large B-cell lymphoma would be

25    family history and certain pack-years of smoking,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1    correct?

2        A.    There are a couple of comments about that.

3    There are no data here whatsoever on pesticides in

4    general or glyphosate in particular.   In addition to

5    that, because of the rarity of primary central

6    nervous system non-Hodgkin lymphoma, there are, as

7    we've commented before, not very many cases accrued.

8    So, you know, the answer to that is, yes, those are

9    the only two things for which positive associations

10   were reported, but they didn't look for everything.

11   And, of course, this was a 2014 publication

12   involving data accrual prior to that year.

13       Q.    Are you aware of any studies that show a

14   statistically significant increase in risk or

15   positive association between glyphosate and CNS

16   lymphoma?

17       A.    I would not expect to because of the rarity

18   of primary CNS non-Hodgkin lymphoma.

19       Q.    So the answer is no, there's not one, right?

20       A.    But the answer is that I wouldn't expect

21   there to be because of the rarity of the disease.

22   You have to take the data that you've got

23   inclusively and cumulatively, and the closest that

24   we have on that is diffuse large B-cell as a group,

25   not a specific anatomic site within diffuse large

Ron Schiff, M.D., Ph.D.

1     B-cell.

2         Q.   So subtypes are important to you only if it

3     supports your causation opinion?

4         A.   No.  Subtypes --

5         Q.   Okay.

6         A.   -- are important to me if there are

7     accessible data.

8         Q.   Okay.

9         A.   If there is data, I will be happy to look at

10    the data.  If there is no data, I'm not about to

11    fabricate it.

12        Q.   Right.  That's my point.  And there's no data

13    showing an increased risk of CNS lymphoma with

14    glyphosate use, right?

15        A.   There's also no data ruling out such an

16    association.  And, again, that's because of the

17    rarity of the sort.  That has nothing to do with my

18    opinions about association and causation at all.  It

19    just has to do with the availability of relevant

20    data.

21        Q.   Okay.  Let's go to page 22 of Exhibit 13

22    [sic] right-hand column almost all the way down that

23    paragraph that starts, "We aimed."  Do you see that?

24        A.   Yes.

25        Q.   Okay.  Then if you go to the second sentence,

Ron Schiff, M.D., Ph.D.

1    it says, "For primary CNS lymphoma" -- that's what

2    Mr. Harris has, right?

3       A.   That's correct.

4       Q.   Okay.  It says, "For primary CNS lymphoma,

5    the only established risk factors are congenital and

6    acquired immunodeficiency (particularly HIV disease,

7    which we included" -- "excluded)."

8            Did I read that correctly?

9       A.   You read it correctly, but that is not --

10      Q.   You disagree with that, right?

11      A.   Sure.  It's -- well, no, I don't disagree

12   with it, but I want to explain that it said

13   established risk factors.  If other risk factors

14   have not been evaluated or if it's not possible to

15   evaluate them because of the low number of

16   applicable cases, you cannot include that on the

17   list.  Everyone knows that in lymphoma

18   immunosuppression is a very strong risk factor, and

19   you don't perhaps need an enormous number of cases

20   for things like congenital or acquired

21   immunodeficiency or immunosuppressive following an

22   organ transplant.  But, again, pesticides, and in

23   particular glyphosate, were not queried by this

24   particular study, the InterLymph study; and,

25   therefore, there are no data to be had one way or

Ron Schiff, M.D., Ph.D.

1    the other.

2        Q.   Right.  So there's no data.  So certainly if

3    one looks at congenital or acquired

4    immunodeficiencies, you would agree with me there

5    are sufficiently strong data -- there are

6    sufficiently consistent data between those

7    established risk factors and the development of CNS

8    lymphoma, right?

9        A.   I would accept both of those as potential

10   causes of CNS lymphoma, neither of which, I must

11   point out, is applicable to Mr. Harris.

12       Q.   Right.  But, no, that's not my question.

13           MS. FUJIMOTO:  Move to strike; nonresponsive.

14   BY MS. FUJIMOTO:

15       Q.   The question is, do you agree that congenital

16   or acquired immunodeficiencies are established risk

17   factors because there are data on a strong increased

18   relative risk and data that is consistent about the

19   increase in risk, right?  That's part of your

20   Bradford Hill analysis that you've already testified

21   in other cases that you use, right?

22       A.   That's correct.

23       Q.   And it's satisfied for immunodeficiencies,

24   right?

25       A.   Those data were not developed or directly

Ron Schiff, M.D., Ph.D.

```
1    analyzed in this report.  Instead there is a

2    citation to a publication from 1999 -- first author

3    is Schabet, S-c-h-a-b-e-t -- called Epidemiology of

4    Primary CNS Lymphoma:  That's from the Journal of

5    Neurooncology.  That's 20 years ago.

6        Q.   My question is, today do you agree or

7    disagree that acquired immunodeficiencies are

8    established risk factors for CNS lymphoma?

9        A.   I agree with that, yes.

10       Q.   All right.  And do you agree that they are

11   established risk factors because they satisfy the

12   Bradford Hill criteria of requiring high increase in

13   risk that is seen consistently in more than one

14   study?

15       A.   And because there are data sufficient to

16   analyze those as risk factors, yes.

17       Q.   Okay.  And we don't have that for glyphosate

18   in CNS lymphoma, do we?

19       A.   Nor do we have data that rules them out by

20   demonstrating the actual hypothesis.  We do have

21   data on diffuse large B-cell as a group.

22       Q.   You've testified previously, in particular in

23   the Lyko vs Motorola case, that toxic chemicals at

24   certain semiconductor plants can cause a rare form

25   of sarcoma; is that correct?
```

```
 1        A.    That's correct.

 2        Q.    So in certain instances occupational exposure

 3   can be attributed to a hemopoietic or solid tumor,

 4   correct?

 5        A.    Also correct.

 6        Q.    And you agree that ionizing radiation from

 7   nuclear radiation is a recognized cause of lymphoma

 8   and other cancers?

 9        A.    In very general terms, yes.

10        Q.    Do you agree --

11              MR. BRAKE:  Hold on.

12        Q.    -- chlorine causes cancer?

13              MR. BRAKE:  Wait.  Whoa.  Whoa.  Wait a

14   second.  Were you finished with your answer?

15              MS. FUJIMOTO:  A responsive answer.

16              MR. BRAKE:  Well, he's entitled to answer

17   your question.

18              MS. FUJIMOTO:  Well --

19              MR. BRAKE:  You're entitled to ask it.  He's

20   entitled to answer it.  If you don't like his

21   answer, you do what you feel you need to do.

22              But, Doctor, you answer the question

23   truthfully to the best of your ability.

24              MS. FUJIMOTO:  Absolutely I agree with that

25   last part.
```

Ron Schiff, M.D., Ph.D.

```
 1              THE WITNESS:  Ionizing radiation was not also
 2         one of the factors looked at either for primary
 3         CNS lymphoma or for diffuse large B-cell
 4         non-Hodgkin lymphoma in general in the InterLymph
 5         study.  So if you ask me about that, I would tell
 6         you that some of the strongest evidence about
 7         radiation and lymphoma, excuse me, comes from
 8         patients who were treated with radiation therapy
 9         for Hodgkin's lymphoma and then went on to develop
10         non-Hodgkin lymphoma.
11              Some of that data has been broken down, and
12         the data that has been broken down indicates that
13         chemotherapy is probably more important than
14         radiation therapy in establishing that risk.
15         Nonetheless, yes, radiation therapy is a
16         recognized risk factor for the development of
17         certain malignancies.
18    BY MS. FUJIMOTO:
19         Q.   And there are data that relate to the
20    connection between radiation exposure and certain
21    lymphomas, not just cancer.  We know cancer but
22    lymphomas too.  And not limited to Cerhan.
23         A.   Well, the answer is definitely, yes, there
24    are associations with ionizing radiation.
25         Q.   Okay.  You also agree that organochlorines
```

Ron Schiff, M.D., Ph.D.

1    can cause cancer?

2        A.   I do.

3        Q.   Okay.  And you know that glyphosate is an

4    organophosphate, right?

5        A.   That's correct.

6        Q.   Do you think --

7        A.   It's a different chemical class.

8        Q.   That's what I was going to ask you.  Do you

9    think it's the same thing as organochlorines?

10       A.   You're asking me there to speculate on

11   mechanism.  And I am sure that there are some common

12   elements in the mechanism, but the point is that it

13   is not clear whether the mechanism is exactly the

14   same between the two classes of chemicals or not.

15       Q.   Do you know what pathway glyphosate works as

16   a weed killer?  Have you heard of the shikimate

17   pathway?

18       A.   Yes.  That's correct.  But that has to do

19   with the effect that it causes for its agriculture

20   use.

21       Q.   Right.

22       A.   It does not have anything to do with the

23   carcinogenesis mechanism as far as we know.  The

24   pathway that you described is present and active in

25   plants but not in animals.  So it would have nothing

Ron Schiff, M.D., Ph.D.

1    to do with Mr. Harris.

2        Q.   Exactly.  All right.  And do you know whether

3    glyphosate or formulated Roundup products have any

4    organochlorines in them?

5        A.   I have never looked into that.  I do not know

6    the answer to that.  I --

7        Q.   Do you know whether glyphosate or Roundup has

8    any benzene in it?

9        A.   I don't know the answer to that either.

10       Q.   Do you know whether glyphosate or Roundup has

11   any PCBs, or polychlorinated biphenyls, in them?

12       A.   Again, I don't know the answer to that.  I'm

13   aware of glyphosate and surfactants undefined being

14   in there.  I don't know about other trace

15   contaminants.

16       Q.   Do you know whether glyphosate or Roundup

17   contains any chemicals that are also present in

18   tobacco or cigarettes?

19       A.   I do not know the answer to that question.

20       Q.   Do you know whether glyphosate or Roundup has

21   any of the same chemicals found in gasoline?

22       A.   I don't know the answer to that.

23       Q.   Did you do anything to evaluate Mr. Harris's

24   potential exposure to any of those chemicals?

25       A.   I have not found anything that indicated he

Ron Schiff, M.D., Ph.D.

1    had extraordinary exposure to any of those.  I'm

2    sure he filled up his car at the gas station, just

3    like everybody else does.  But, for example, he has

4    not worked in the petroleum industry, that I'm aware

5    of, in any capability -- in any capacity, rather.

6         And in terms of some of those other

7    exposures, yes, we already acknowledged as a

8    bartender he would have had secondhand smoke

9    exposure, and I'm not questioning or disputing that.

10   But there is nothing in his history or any of the

11   documents that I've reviewed or my conversation with

12   him that indicated to me that he had other toxic

13   chemical exposures besides what we have already

14   discussed.

15   Q.   So you understand and knew that he worked as

16   a gas station attendant filling up gas tanks when he

17   lived in Oregon?

18   A.   I remember something vaguely about that

19   because in his deposition he pointed out that in

20   Oregon you had to -- there was no such thing as

21   self-service at least at that time.  However, I

22   recall that he held that job only relatively

23   briefly.

24   Q.   So you know that he was exposed to gasoline

25   fumes during his work environment for a certain

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1    period of time.  You just don't know how much?

 2        A.   I don't remember how long.  That's correct.

 3        Q.   All right.  And you also understand that he

 4    worked for many, many, many years as a bartender,

 5    right?

 6        A.   Yes.

 7        Q.   And so it's fair to assume that he was

 8    exposed to cigarette smoke during that time, but you

 9    don't know how much?

10        A.   Well, that's correct.  I don't know exactly

11    how much, but, you know, in bars there's usually

12    ample environmental smoke.

13        Q.   And you know that he worked for a period of

14    time at an auto body shop when he was in San Marcos

15    and in San Diego?

16        A.   I don't remember that.  I certainly don't

17    remember how long he worked there.  Mr. Harris had a

18    lot of different employment situations, and I did

19    not attempt to memorize those.

20        Q.   So if that were the case, he could have been

21    occupationally exposed to a number of chemicals that

22    are in paint products and in solvents, right?

23        A.   That's correct.

24        Q.   You just don't know how much?

25        A.   That's correct.  But what I do recall is that
```

1    for most of his employment the periods of employment

2    were brief.  I do not have any more precise

3    recollection of it than that.

4        Q.   Okay.  And you also know from his fact sheet

5    and testimony that he lived --

6              (Telephone Interruption.)

7              THE VIDEOGRAPHER:  Sorry.

8              MS. FUJIMOTO:  You okay?

9              THE VIDEOGRAPHER:  I don't know.

10             MS. FUJIMOTO:  What's going on?

11             THE VIDEOGRAPHER:  I apologize.  Okay.

12             MS. FUJIMOTO:  Okay.  You okay?

13             THE VIDEOGRAPHER:  Yeah.  I just didn't know

14      what was going on.

15             MS. FUJIMOTO:  All right.

16             THE VIDEOGRAPHER:  Sorry.

17   BY MS. FUJIMOTO:

18       Q.   So, Doctor, did you do anything to evaluate

19    Mr. Harris's potential exposure to chemicals in the

20    areas in which he resided, that he lived all of his

21    life or most of his life?

22       A.   No.  But I am seeing that from his Third

23    Amended Plaintiff Fact Sheet that his employment as

24    a gas station attendant was confined to the year

25    1995, suggesting that it was for a period of months,

Ron Schiff, M.D., Ph.D.

```
 1    not any longer than that.
 2        Q.   Doctor --
 3        A.   And that his employment as a paint preparer
 4    was for one month, from October to November 2016.
 5        Q.   Were you aware that he -- between 1976 and to
 6    the present, but certainly up to his diagnosis, he
 7    lived in Canby, Oregon; Phoenix, Arizona; Oceanside,
 8    California; Vista, California; and San Marcos,
 9    California; and Carlsbad, California?
10        A.   That's correct.
11        Q.   Okay.  Did you do anything to investigate
12    potential exposure to chemicals in those residences
13    or residential areas in which he lived?
14        A.   No, I have not.
15        Q.   Did you know that Oceanside is adjacent to
16    Camp Pendleton, which is a Marine Corps base?
17        A.   I did not know that.
18        Q.   Do you know -- did you know that Camp
19    Pendleton does frequent exercises that involve
20    aircraft and other military equipment?
21        A.   I'm aware of that in general terms at a very
22    basic level.
23        Q.   Do you know what chemicals are emitted from
24    those exercises and the activities that are done at
25    Camp Pendleton?
```

Ron Schiff, M.D., Ph.D.

1      A.   No, I do -- no, I do not, nor do I know the

2   exposure of the nearby population.

3   ███   █████   █████████████████████

███   ██████████████████████████████

███   █████   ███████████████████████

███   █████   █████████████████████████

███   ████████████

███   █████   ██████████

9          MR. BRAKE:  Objection; asked and answered.

10          MS. FUJIMOTO:  Okay.

11          MR. BRAKE:  He just said he didn't know.

12   BY MS. FUJIMOTO:

13      Q.   Fair enough.

14      A.   I have no idea.  I assume environmental

15   monitoring is carried out the same as it is for all

16   nuclear installations.

17      Q.   For sure.  And did -- were you aware that as

18   a result of that monitoring that San Onofre nuclear

19   power plant was shut down in 2013 due to cracks in

20   the structure and radioactive leaks in Unit 3?

21      A.   No, I have never heard about that, nor do I

22   know anything about possible population exposure as

23   a result.

24      Q.   Okay.  Were you aware of any information

25   about concerns about radioactive leaks at San Onofre

Ron Schiff, M.D., Ph.D.

1    dating all the way back to 1977?

2        A.   No.  I have no information about that.

3        Q.   Were you aware that when Mr. Harris lived in

4    Vista that he sued his landlords for exposure to

5    toxic black mold?

6        A.   Yes, I'm aware of that.  I would not

7    associate black mold with lymphoma carcinogenesis,

8    however.

9        Q.   So I take it, then, although you ruled in

10   glyphosate, you had no information upon which to

11   rule out potential residential and occupational

12   exposures to a variety of chemicals that you

13   recognize as causative factors in lymphoma?

14       A.   I cannot rule out every possible chemical

15   exposure that Mr. Harris has had throughout his

16   life.  I can say, however, that he has had extensive

17   glyphosate exposure due to residential use.  It was

18   prolonged.  It was frequent, even at the most

19   conservative estimates, and that I would be inclined

20   to rule that in as a substantial factor in the

21   causation of his non-Hodgkin lymphoma.

22       Q.   Right.  And you're doing that without having

23   any information as to how that might compare to the

24   degree of exposure to other chemical causative

25   factors -- chemicals?

Ron Schiff, M.D., Ph.D.

```
1        A.   That's correct.

2        Q.   Okay.

3             MS. FUJIMOTO:  And I'm going to make a

4        correction on the record.  I marked the Cerhan

5        paper as Exhibit 13, and I skipped one.  So I

6        would like to change that to Exhibit 12, is the

7        Cerhan paper.  And then I'm going to mark as

8        Exhibit 14 -- 13, sorry, a one-page document that

9        is a picture of a Prop 65 warning.

10                          - - -

11            (Exhibit 13, Prop 65 Warning, was marked for

12       identification.)

13                          - - -

14  BY MS. FUJIMOTO:

15       Q.   We talked earlier about Prop 65 being a

16  California-specific statute.  Doctor, have you ever

17  seen this Prop 65 warning?

18       A.   I have not previously.  And I have parked my

19  car in a few garages in California over the years,

20  but I have never seen that.

21       Q.   Well, do you have any information as to

22  whether, under Prop 65, virtually every parking lot

23  and building has this type of warning?

24       A.   I wouldn't know about that.

25       Q.   Okay.  So this --
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

 1      A.    I'm 3,000 miles away.

 2      Q.    Right.  And so I live in California, and this

 3   actually is a picture that I took in my parking

 4   garage at my law office.  It's a nice building and

 5   everything, so -- and it says, "Warning:  Breathing

 6   the air in this parking garage can expose you to

 7   chemicals including carbon monoxide gasoline or

 8   diesel engine exhaust, which are known to the State

 9   of California to cause cancer and birth defects or

10   other reproductive harm.  Do not stay in this area

11   longer than necessary.  For more information, go to

12   www.p65warnings.ca.gov/parking."

13        Doctor, do you have any information about the

14   parking situation for Mr. Harris at any of his

15   residences, including apartments, and/or any of his

16   occupations?

17      A.    I have no knowledge about the parking.  I

18   will also tell you that I have never seen a warning

19   like this in any other place that I have been.  Yes,

20   you might say that in California I merely didn't

21   notice it, but I've parked more frequently for a

22   more prolonged period of time in other locations,

23   including the present state of Florida.  Haven't

24   seen anything like that.

25      Q.    Right.

Ron Schiff, M.D., Ph.D.

```
1      A.   Obviously benzene contains gasoline --

2    gasoline contains benzene.  That was the correct

3    wording, gasoline contains benzene.  And diesel

4    fuel, it contains a small amount of benzene

5    contamination.

6      Q.   So you would -- if a California resident like

7    me or anyone else or anyone on the jury in this

8    case, if they were to say, "Boy, I see these

9    warnings everywhere," would you have any basis upon

10   which to disagree with them or dispute them?

11     A.   Well, yes.  And that answer has to do with a

12   degree, because if you're someone who just pumps

13   their own gas or parks their own car, even if they

14   do those things at average frequencies, that would

15   not constitute extensive or excessive exposure to

16   benzene or any of the other carcinogens herein.

17   That's in contrast to what I have repeatedly

18   described as extensive Roundup exposure throughout

19   Mr. Harris's life or at least at a minimum during

20   the seven-year period that I outlined in my report.

21        MS. FUJIMOTO:  Move to strike; nonresponsive.

22   BY MS. FUJIMOTO:

23     Q.   Dr. Schiff, do you have any information about

24   how much time he spent or anything about the

25   environment of the parking situation at any of
```

Ron Schiff, M.D., Ph.D.

1      Mr. Harris's homes or workplaces?

2      A.    About his parking situation, no; but someone

3      who parks their own car would be considered to have

4      an ordinary degree of exposure, not an excessive,

5      extensive or occupational degree of exposure.

6      Q.    You're assuming that, right?

7      A.    I believe that can go further than

8      assumption.  I mean, a lot of that is common sense.

9      Q.    Sure.

10     A.    But in terms of Mr. Harris's glyphosate

11     exposure, he's not just a guy who eats a bowl of

12     Cheerios a couple of times a week like I do and is

13     exposed to glyphosate therein.  He sprayed Roundup

14     for seven years at least twice a week and may have

15     had more extensive -- at least every two weeks,

16     correctly, and may have had more extensive exposure

17     to that.

18          MS. FUJIMOTO:  Move to strike; nonresponsive

19      after the words "common sense."

20     BY MS. FUJIMOTO:

21     Q.    We can -- Doctor, we can agree that we want

22     to use common sense when we're talking about all the

23     issues today, right?

24     A.    Well, no.

25     Q.    You would agree with that?

Ron Schiff, M.D., Ph.D.

1      A.   Because this warning here --

2      Q.   No?

3      A.   -- makes no distinction between ordinary

4    levels of exposure and extensive exposure like

5    someone who worked in the petroleum industry might

6    have had or someone who loads or drives oil tanker

7    trucks might have had or, for that matter, even

8    though glyphosate is not on this list, someone who

9    personally has sprayed glyphosate over an extended

10   period of time.  So that's different.

11        Yes, it's best to avoid all gasoline and all

12   diesel, but it hasn't been taken out of gasoline

13   yet.  It hasn't been taken out of diesel yet.

14   People are still pumping their own gas.  People are

15   still parking their own cars.  There has to be some

16   sort of a demarcation line, which has not been

17   defined quantitatively.  You wanted me to define it

18   quantitatively in terms of cumulative lifetime

19   glyphosate exposure.  I can't do it for that, and I

20   can't do it for benzene.

21        MS. FUJIMOTO:  Move to strike; nonresponsive.

22   BY MS. FUJIMOTO:

23     Q.   My only question to you was whether we could

24   agree that we want to use common sense.  That's it.

25   And the answer is no?

Ron Schiff, M.D., Ph.D.

1    A.    The answer is of course we want to use common

2    sense.

3    Q.    Okay.

4    A.    But common sense is not reflected in the

5    questioning on this warning.

6        MS. FUJIMOTO:  Okay.  I'm going to mark as

7        Exhibit Number 14 to the deposition a group of

8        medical records pertaining to Mr. Harris, and I'll

9        state for the record that this is just a

10       collection of certain records that I may ask

11       Dr. Schiff about.  He clearly has a fuller set of

12       medical records for which there are a fuller set

13       related to Mr. Harris.

14                        - - -

15       (Exhibit 14, Medical Records, was marked for

16   identification.)

17                        - - -

18   BY MS. FUJIMOTO:

19    Q.    Dr. Schiff, if at any time you feel you need

20   to review your records, feel free to do that, but my

21   goal is that with Exhibit 14 I can direct you to the

22   specific questions that I have.

23    A.    That's very good.

24    Q.    All right.  Exhibit 14 the earliest record

25   that I had for Anthony Harris was literally two

1   pages from █████████████   My question to you,

2   Dr. Schiff, is, do you know whether you had any

3   medical records that predate his CNS lymphoma

4   diagnosis in January of 20 -- January of 2015?

5      A.   I do not.

6      Q.   Okay.  Do you know whether you have this two

7   pages that I had from 2013?

8      A.   I do not have that.

9      Q.   Okay.  And all we see here is that he had

10  ████████████████████████████████████

    █  ████████████████████████

12     A.   I see that.

13     Q.   Okay.  But other than that, you don't have --

14  and even before today you didn't have any

15  information about his prior medical history other

16  than what's in the records from 2015 forward?

17     A.   That is correct.

18     Q.   Okay.  If you would go to -- let's see.  And

19  just so we're clear, my understanding is that in

20  January of 2015 Mr. Harris was diagnosed with

21  central nervous system lymphoma, correct?

22     A.   That's correct.

23     Q.   And you agree with that diagnosis, right?

24     A.   I do.

25     Q.   If you would go to the Bates number 3509.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ron Schiff, M.D., Ph.D.

1    It's about --

2       A.   I have it.

3       Q.   Oh, you got it?  You're quick.

4            All right.  That is a January 16, 2015,

5    report by Dr. Mark Stern, a consulting physician at

6    Tri-City Medical Center, correct?

7       A.   He was the consulting neurosurgeon.

8       Q.   All right.  And there is a history listed

9    under "Findings, Impressions and Recommendations,"

10   right?

11      A.   Yes.

12      Q.   Okay.  And do you see there where Dr. Stern

13   reports, "No history of toxic exposure"?  Do you see

14   that?

15      A.   I do.

16      Q.   He also references a history of

17   ███████████    ████████████████

██   ██   ████████████████████

19   ██   ██████   ████████████████████████████████

██   ████████████████████████████████████████

██   ██████████████████████████

██   ██   ████

██   ██   ████████████████████████

██   ██   ██████████████

██   ██   ██████   ████████████████████████



Ron Schiff, M.D., Ph.D.

███     ████████████████████████████████████████████

███     ████████████████████████

 3      Q.    Did you read his deposition testimony?

 4      A.    I have not seen his deposition testimony.

███     ███   ██████████████████████████████████████

███     ████████████████████████████████████████████

███     ██████

███     ███   ██████████████████████████████████████

███     ████████████████████████████████████████

██     ████████████████████████████████████

██     █████████████████████████████████████████████████

██     ████████████████████████

13      Q.    Okay.

14      A.    I would find that implausible.

15      Q.    And so for Mr. Harris's central nervous

16      system lymphoma, I assume you looked at the

17      pathology reports?

18      A.    Correct.

19      Q.    And the flow cytometry reports?

20      A.    Also correct.

21      Q.    And the reports regarding the

22      immunohistochemical staining?

23      A.    Yes.

24      Q.    And FISH, too, right?  The florescence in

25      situ hybridization?

Ron Schiff, M.D., Ph.D.

1     A.   Also correct.

2     Q.   All right.  And the hematopathology report?

3     A.   Yes.

4     Q.   Okay.  And did you agree with all of the

5    findings in those reports?

6     A.   Well, as reported and also because there was

7    a second opinion on every one of the specimens

8    obtained at Tri-City, that second opinion was done

9    in each case at City of Hope.

10    Q.   Okay.  And did you review -- you didn't

11   review any pathology slides?

12    A.   I did not, because I was concerned that even

13   if I had I would be asked whether I was a

14   board-certified pathologist.

15    Q.   And you're not, right?

16    A.   That's correct, I'm not, although I did look

17   at slides of my patients with hematologic and other

18   malignancies on a regular basis throughout my

19   career.

20    Q.   And so Mr. Harris's tumor, his lymphoma was

21   in his brain, correct?

22    A.   That is correct.

23    Q.   And they -- when they did blood and bone

24   marrow testing, both in terms of blood smears,

25   biopsies of the tumor and of the clots, that they

Ron Schiff, M.D., Ph.D.

```
 1    were all negative, correct?

 2      A.   Also correct.

 3      Q.   So the only place that the lymphoma was found

 4    was in his brain, right?

 5      A.   Yes.

 6      Q.   So at that point it was not metastatic,

 7    correct?

 8      A.   Well, we don't use the term "metastatic" with

 9    regard to lymphoma.  It was in his brain, but there

10    were multiple sites within the brain.

11      Q.   Did you review the second opinions from City

12    of Hope and UCSD?

13      A.   For the pathology reports, yes.

14      Q.   For anything.

15      A.   Yes.

16      Q.   Okay.  And did you find anything in there

17    that you either agreed or disagreed with?

18      A.   Well, I found no reason to disagree with

19    anything concerning the tissue diagnosis of

20    Mr. Harris's primary central nervous system

21    non-Hodgkin lymphoma or the biopsies that were

22    obtained as part of staging.

23           Right now I have in front of me from the

24    documents that you gave me the City of Hope

25    pathology second opinion on the mediastinal lymph
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1      node biopsy from January 21, 2015; and, once again,

2      Dr. Weisenburger's name is listed only as the

3      laboratory director.  He was not the pathologist who

4      reviewed the case.

5         Q.   All right.  So you are looking at Bates

6      Number 3785; is that right?

7         A.   No.  I'm looking at 254 through 256.

8         Q.   Okay.  Yeah.  That's a series.  Can you -- if

9      you look -- if you want to -- I'm going to ask you

10     about some specific findings of that pathology.  So

11     would you go to 3785, please.  It's also dated

12     January 21, 2015, and it says "Pathology Report."

13        A.   All right.  Well, these pages are not in

14     order by Bates number.

15        Q.   Correct.

16        A.   So I'm going to have to hunt for them.

17        Q.   Would you like me to find it for you?

18        A.   Well, or if you could tell me what it's

19     grouped with, but, yes, if you want to find it --

20        Q.   Yes.

21        A.   -- for me that might save time.

22        Q.   Yeah.

23        A.   Please hold on to that because that's what I

24     have as the City of Hope second opinion.

25        Q.   Okay.  All right.  Good.  That's that.  All

Ron Schiff, M.D., Ph.D.

 1     right.  So you had the -- this.  Okay.  This is what

 2     you told me to hold for you.

 3        A.   Okay.

 4        Q.   And this is what I'm going to ask questions

 5     about.

 6        A.   Okay.

 7        Q.   Okay?

 8        A.   All right.  I'm good.

 9        Q.   All right.  And so this is the pathology

10     report for the lymph nodes, right?

11        A.   Yes.

12        Q.   And what is subcarinal?

13        A.   Subcarinal refers to the lymph nodes in the

14     group right where the trachea splits into the right

15     and left main bronchi.  It's in the upper portion of

16     the chest in the center and more toward the front

17     than the back.

18        Q.   Is that different from the mediastinal

19     biopsy --

20        A.   No.

21        Q.   -- you were looking for?

22        A.   No.  Subcarinal lymph nodes are one of the

23     groups of lymph nodes within the mediastinum.

24     There's different terms for different parts of the

25     mediastinum.  Subcarinal is the one that is most

Ron Schiff, M.D., Ph.D.

1    proximal because it's right where the trachea

2    splits.

3        Q.   Okay.  And that biopsy showed granulomatous

4    lymphadenitis, right?

5        A.   That's correct.

6        Q.   And if you go to the comment, it says, "The

7    lymph node architecture is replaced by numerous

8    noncaseating granulomas," correct?

9        A.   Yes.

10       Q.   And down -- three sentences down it says,

11   ████████████████████████████████████████████

     ████████████████████████████████████████████████████

     ████████████████████████████████████  Do you see that?

14       A.   Yes, I do.

15       ███   ████     ██████████████████████████

     ████████████████████████████████████████████

     ████████████████████████

     ███   ████████████████████████████████

     ████████████████████████████████████████████████████

     ████████████████████████████████████████

     ███   █████████

     ███   ████████████████████████████████████

     ████████████████████████████████████  ████

     ████████████████████████████████████████████████

     ████████████████████████████████

Ron Schiff, M.D., Ph.D.



14   A.   But, yes, here it is.

15        MS. FUJIMOTO:  If you don't have it, I have a

16   copy of it for you.

17        MR. BRAKE:  Thank you.

22                    - - -

Ron Schiff, M.D., Ph.D.



2                        - - -

3    BY MS. FUJIMOTO:

Ron Schiff, M.D., Ph.D.



1          The second reason is that there are no

2     experimental or mechanistic data that I'm aware of

3     that provide a basis for concluding that there is a

4     causal connection.

5          Last, but not least, in the InterLymph

6     project, which we have already discussed,

Ron Schiff, M.D., Ph.D.



12          You can either look at Table 2 or the

13     abstract.

21          MS. FUJIMOTO:  Move to strike; nonresponsive.

22     BY MS. FUJIMOTO:

Ron Schiff, M.D., Ph.D.



    A.   Subject to the qualifications that I gave in

11  my last couple of answers, the answer is yes.  It

12  falls short of a causal association.

16    A.   Also correct, subject to the same

17  qualifications that I've mentioned before.

18    Q.   Okay.  If you would go back to Exhibit 14,

19  Doctor, the small collection of medical records

20  pertaining to Mr. Harris.

21    MR. BRAKE:  Do you have a copy of those for

22  me?

23    MS. FUJIMOTO:  I did.  I gave it to you when

24  I marked it.

25    MR. BRAKE:  Oh.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1              MS. FUJIMOTO:  There you go.  Sure.

 2   BY MS. FUJIMOTO:

 3      Q.   And in particular the surgical pathology

 4   report at 213.  Let me know if you need my

 5   assistance finding it.

 6      A.   Yes.  I can't readily find 213.

 7      Q.   All right.

 8      A.   These pages are all out of order.

 9      Q.   All right.  It's kind of towards the back

10   maybe about three-quarters of way through, but I can

11   certainly grab it for you if you'd like.

12      A.   I have it.  213.

13      Q.   Yes.  It's the surgical pathology report from

14   City of Hope?

15      A.   Yes.  That's what I flagged at the beginning.

16      Q.   Okay.

17      A.   But, yes, that's correct.

18      Q.   Right.  And you note this in your report,

19   that in terms of cytogenetics, it was -- that

20   Mr. Harris's tumor was positive for BCL6

21   rearrangement but negative for MYC, IGH and BCL2

22   rearrangements, right?

23      A.   That's correct.

24      Q.   Okay.  And in your materials that you

25   reviewed, have you reviewed the -- do you have the
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1     Brian Chiu, C-h-i-u, paper from 2006?

2         A.   That does not sound familiar.

3             MS. FUJIMOTO:  Okay.  I'm going to mark as

4         Exhibit Number 16 to the deposition -- I'm not

5         sure -- I don't have an extra copy, Brian, but we

6         can share if you need to see it, or he can show it

7         to you.

8                         - - -

9             (Exhibit 16, Article entitled "Agricultural

10    Pesticide use and Risk of t(14;18)-Defined Subtypes of

11    Non-Hodgkin Lymphoma," was marked for identification.)

12                        - - -

13    BY MS. FUJIMOTO:

14        Q.   This is a paper by -- lead author is Brian

15    Chiu, C-h-i-u.  It's called "Agricultural Pesticide

16    Use and the Risk of t(14;18)-Defined Subtypes of

17    Non-Hodgkin Lymphoma."  And you'll see, Dr. Schiff,

18    that Dr. Dennis Weisenburger, who we talked about

19    earlier, is the last noted author on that paper,

20    right?

21        A.   Yes.

22        Q.   And that generally denotes he's the lead guy,

23    right, the last person listed?

24        A.   Well, not necessarily.  That's one of the

25    conventions that used -- that's used, but this could

Ron Schiff, M.D., Ph.D.

```
 1    also have come out of Northwestern University, where

 2    I went to college and did my residency and where

 3    Dr. Grinberg is currently affiliated.

 4        Q.   I don't know what that means, but it is from,

 5    you know, part of the -- some of the authors and

 6    Chiu are from Northwestern.

 7        A.   Correct.

 8        Q.   Right?

 9        A.   That's correct.

10        Q.   And Dr. Weisenburger is from City of Hope,

11    right?

12        A.   Yes.

13        Q.   Okay.

14        A.   The first author listed here is from

15    Northwestern.  That's correct.

16        Q.   All right.

17        A.   I don't know who's the senior author on this.

18    Perhaps it's Dr. Weisenburger.  Perhaps he was

19    responsible primarily for -- yeah.  He reviewed

20    cases and sample collection and preparation.  So,

21    you know, I mean, that's not really for me to break

22    down.

23        Q.   Okay.  Yeah.  Fair enough.  I assume you have

24    not seen Dr. Weisenburger -- Dr. Weisenburger's

25    trial testimony in the Pilliod case where he talked
```

Ron Schiff, M.D., Ph.D.

```
1    about this particular article?

2       A.   That's correct.

3       Q.   Okay.  But if you look at this article now,

4    am I right, Doctor, that BCL2, the gene BCL2, is on

5    chromosome 18?

6       A.   That is correct.

7       Q.   And part of what B cells do is they will take

8    certain things from different chromosomes in order

9    to do their function, fair?

10      A.   Yes.

11      Q.   All right.

12      A.   Talking about B lymphocytes in general, yes.

13      Q.   Right.  Okay.  And if we look at this paper,

14   one of the things that T cells do as part of their

15   function is to take and join the BCL2 gene that's on

16   chromosome 18 and join it to chromosome 14, right?

17      A.   That's not correct at all.

18      Q.   No?  Okay.  Do you know whether the function

19   of T cells is to join the BCL2 chromosome -- on

20   chromosome 18 to immunoglobulin heavy chain genes on

21   chromosome 14?

22      A.   No.  Lymphocytes are not involved in that

23   process.

24      Q.   All right.  And so if the Chiu paper tells us

25   that part of the job of the T-cell function is to
```

Ron Schiff, M.D., Ph.D.

```
 1    enhance immunoglobulin stimulation, that that's

 2    incorrect?

 3       A.   Well, it depends on the context.  If you

 4    could show me where it says that I'd be happy to

 5    look at it and comment on it.  But in point of fact,

 6    while T cells have a lot to do with the -- even with

 7    the function of B lymphocytes and with the

 8    development of certain types of lymphoma, they do

 9    not join.

10       Q.   Okay.  Let's --

11       A.   T-14 and T-18, where did you find that?

12       Q.   Okay.  Page 1367 --

13       A.   I'm on that page.

14       Q.   -- of that exhibit.  Okay.  Down at the

15    bottom right-hand corner, right-hand column down at

16    the bottom.  It says, "The t(14;18) joins the BCL2

17    gene on chromosome 18 to the immunoglobulin heavy

18    chain gene on chromosome 14 resulting in an

19    inhibition of programmed cell death through

20    overexpression of BCL2 gene."

21       A.   Okay.  This is obviously a problem that we've

22    got here, okay?  This has nothing do with

23    T lymphocytes.  The T in t(14;18) refers to a

24    translocation.  This is a molecular process.  A

25    portion of chromosome 18 detaches from the remainder
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ron Schiff, M.D., Ph.D.

```
 1    of chromosome 18 and attaches to a portion of

 2    chromosome 14.

 3        Q.   That's an error, right?

 4        A.   What's an error?

 5        Q.   If that happens.

 6        A.   Well, yes, that's correct.

 7        Q.   Right?

 8        A.   You can call that a mutation or whatever

 9    terminology you want, but there's nothing to

10    indicate that -- you know, this is a small letter t,

11    which means translocation.  It's not a capital T as

12    in T lymphocytes.  The involvement of T lymphocytes

13    is not stated or implied with this.

14        Q.   Okay.  My error and my apologies.  So the

15    translocation that they're recognizing here is a

16    genetic error.  That's not supposed to happen,

17    right?

18        A.   That's correct.

19        Q.   And when it happens, one gets an

20    overexpression of the BCL2 gene, among other things?

21        A.   Also correct.

22        Q.   And if you have an overexpression of BCL2,

23    that's not good, because what it ends up doing is

24    inhibiting the body's natural programmed cell death,

25    right?
```

Ron Schiff, M.D., Ph.D.

```
 1      A.    That's exactly correct.  I do want to point

 2      out while we're on this subject, just in order to

 3      keep this as clear as possible, that there was no

 4      evidence of a BCL2 gene rearrangement in

 5      Mr. Harris's specimens.

 6      Q.    Correct.

 7      A.    So, you know, please proceed with this

 8      questioning, but this is not germane to Mr. Harris

 9      at all.

10      Q.    Well, it's germane to the extent -- if you

11      read this paper, what they tell us is that there was

12      no association between herbicides, which would

13      include glyphosate, and t(14;18)-negative tumors

14      like that found in Mr. Harris.

15      A.    Okay.  First of all, this is a 2006 paper.

16      There is no mention of glyphosate in here

17      whatsoever.  If we're going to be interested

18      specifically in glyphosate, I would like to see the

19      data relative to glyphosate.  The pesticides that

20      were studied in here are listed, but there is no

21      line entry for glyphosate, nor would I expect there

22      to be one.  So this specifically -- this article

23      specifically refers to -- and I'm going to try to

24      get this exactly accurate.

25      Q.    Good.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ron Schiff, M.D., Ph.D.

1      A.   Yes.  This is the risk of t(14;18)-positive

2  non-Hodgkin lymphoma among farmers who used animal

3  insecticides.

4      Q.   Right.

5      A.   Crop insecticides, herbicides and fumigants,

6  okay?  Mr. Harris does not have a t(14;18)-positive

7  non-Hodgkin lymphoma.

8      Q.   Correct.  That's my point.  So let's --

9  let's -- let's walk through this then, see if we can

10  piece it together.

11      A.   Okay.

12      Q.   Now, Chiu paper doesn't give brand names of

13  the pesticides and insecticides and herbicides and

14  fungicides and rodenticides and fumigants that they

15  looked at, right?

16      A.   Nor the chemical name glyphosate.

17      Q.   Right.  So glyphosate is an herbicide, isn't

18  it?

19      A.   Yes, it is.

20      Q.   And in --

21      A.   It's one of many.

22      Q.   In fact, we already talked about glyphosate

23  is an organophosphate, right?

24      A.   That's correct.

25      Q.   And so when you look -- let's go to

Ron Schiff, M.D., Ph.D.

1    page 1366, and it's Table 3.  They do give us very

2    specific data on whether or not there's an

3    association between NHL according to -- let's see.

4    Table 2 talks about all of them.  Table 3

5    specifically lists organophosphates, correct?

6        A.   That's correct.

7        Q.   Right.

8        A.   That's organophosphates as a class.

9        Q.   Right.  And so when you look at the

10   t(14;18)-negative cases of NHL, which includes

11   Mr. Harris, there was no increased risk of NHL,

12   right, with herbicides, or organophosphate

13   herbicides?

14       A.   With organophosphate herbicides as a class.

15       Q.   Correct.  So when Chiu looked at it and

16   they're looking at herbicides, among other things,

17   and specifically organophosphate herbicides, when

18   they saw there was an association with

19   t(14;18)-positive NHL but there was no association

20   with t(14;18)-negative NHL, which is what Mr. Harris

21   has, correct?

22       A.   Here we have to look for coherence with other

23   epidemiologic data having to do with glyphosate and

24   non-Hodgkin lymphoma.  There are, as we've

25   discussed, a number of studies and a number of

1    meta-analyses that have identified a statistically

2    significant association between glyphosate exposure

3    and non-Hodgkin lymphoma.  There is no earthly

4    reason to believe that all of the positive cases

5    were t(14;18) positive.  In fact, this afternoon

6    you're going to try very hard to prove that link to

7    be incorrect.

8         So the point is that I absolutely cannot

9    accept that t(14;18) lymphomas are the only ones

10   that have an increased risk on the basis of

11   glyphosate exposure.  This paper does not make that

12   point.  This paper does not specifically define

13   glyphosate and risks associated with glyphosate.  It

14   cannot be used to answer that question with

15   specificity in this case.

16        MS. FUJIMOTO:  Move to strike; nonresponsive.

17   BY MS. FUJIMOTO:

18   Q.   Doctor, the t(14;18) translocation or

19   rearrangement that they looked at in the Chiu paper,

20   that is a genetic error that because it ends up

21   overexpressing BCL2 gene, that cannot be fixed or

22   apparently isn't fixed by the immune system and are

23   mechanisms by which we can control cell growth?

24   A.   Well, if the mutation is detected it means it

25   has persisted for some time.  However, it does not

Ron Schiff, M.D., Ph.D.

1    mean that it was an inherited mutation.  One would

2    expect that it would be an acquired mutation, which

3    is something different.

4       Q.   Right.

5       A.   And while we cannot correct the mutation

6    itself, we can certainly treat the diseases

7    associated with that mutation.

8       Q.   So am I right that as we live our lives, our

9    cells are constantly replicating and dividing and

10   that there are errors that occur in this -- at the

11   cellular level all the time?

12      A.   Absolutely.

13      Q.   And normally, for most of us hopefully, we

14   have a number of mechanisms, many of which include

15   our immune system, that help either repair the error

16   or do something to keep it in check so that cancer

17   doesn't form, right?

18      A.   That's correct.

19      Q.   And is that part of the reason why age is

20   considered a, quote-unquote, risk factor for most

21   cancers?

22      A.   That's a hypothesized reason, along with

23   general weakness in the immune system.  There could

24   also be, one might speculate, some impairment of DNA

25   repair mechanisms as people get older.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1      Q.   Right.

2      A.   The point is, with regard to specific

3   mutations and specific diseases, the mechanism by

4   which advanced age becomes involved as a risk factor

5   is not clear.  At this point it's probably safest to

6   say that it has not been defined as a causal risk

7   factor.

8      Q.   In part because what we know is that we all

9   have genetic errors or hits that we sustain during

10   our lifetime, but not everyone gets cancer, right?

11      A.   That's correct.

12      Q.   It's just that as we grow older the number of

13   hits and the number of repairs may over time

14   accumulate, and so the risk that maybe one of those

15   errors or mutations might get by our immune system

16   gets higher?

17      A.   Immune system or DNA repair mechanisms.

18      Q.   Okay.

19      A.   That -- what you have described is a

20   hypothesis and, as such, it's a hypothesis that is

21   current.

22      Q.   Okay.  Would you agree that it's generally

23   accepted in the medical community that a certain

24   percentage of cancers are caused by random

25   mutations?

Ron Schiff, M.D., Ph.D.

1      A.   Yes, I agree with that.

2      Q.   Okay.  Do you know what percentage?

3      A.   Yeah.  This is an area that's of interest to

4  me --

5      Q.   Okay.

6      A.   -- because currently that is being assessed

7  as being approximately 80 percent, maybe even

8  higher.  However, in the last century, when I was a

9  medical oncology and hematology fellow, we were

10  taught that 85 percent of cancers weren't

11  environmentally caused.  What I bring to the table

12  on this is that those are not two mutually exclusive

13  mechanisms.  Environmental carcinogens can certainly

14  affect the DNA and cause mutations, and we do have

15  evidence of that in the case of glyphosate.  On top

16  of that, some mutations are presumably strictly

17  spontaneous and do not require an environmental

18  insult.

19      Q.   Doctor, part of the information or articles

20  that you looked at, did any include Tomasetti from

21  2017?  Does that ring a bell?

22      A.   I may have considered something from that,

23  but I don't have it here today.

24      Q.   Okay.

25      A.   It was not in the reliance material.

Ron Schiff, M.D., Ph.D.

1      Q.   All right.  I brought a copy for you.

2           MR. BRAKE:  Thank you.

3           MS. FUJIMOTO:  And we'll mark that as

4      Exhibit 17.  It's in Cancer Etiology, and it's

5      called "Stem Cell Divisions, Somatic Mutations,

6      Cancer Etiology, and Cancer Prevention."  Lead

7      author is Cristian Tomasetti, with Dr. Lu Li and

8      Bert Vogelstein.

9                         - - -

10          (Exhibit 17, Article entitled "Stem Cell

11     Divisions, Somatic Mutations, Cancer Etiology, and

12     Cancer Prevention," was marked for identification.)

13                        - - -

14     BY MS. FUJIMOTO:

15          Q.   You know of Dr. Vogelstein, I assume?

16          A.   Yes.

17          Q.   All right.  And this is from March of 2017.

18               So have you seen this before, Doctor?

19          A.   I'm familiar with it, yes.

20          Q.   All right.  If you go to the first paragraph,

21     it says -- first sentence of the paper, "It is now

22     widely accepted that cancer is the result of the

23     gradual accumulation of driver gene mutations that

24     successfully" -- "successively increase control

25     proliferation."

Ron Schiff, M.D., Ph.D.

```
 1            Do you agree or disagree with that?

 2       A.   I believe that there are other mechanisms of

 3   carcinogenesis besides that, such as alterations in

 4   the regulation of gene expression.  But, you know,

 5   this is the leading current hypothesis.

 6       Q.   So the question, though, is it says it's now

 7   widely accepted.  Do you agree with that, that the

 8   concept that cancer is the result of the gradual

 9   accumulation of driver gene mutations that

10   successively increase cell proliferation, that that

11   is a concept that's widely accepted.  Do you agree?

12       A.   Yes.  But it falls short of saying it's

13   universal, that it is the cause of every cancer.

14       Q.   I didn't say that.

15       A.   I'm just making the distinction.

16       Q.   Right.  We know that not every cancer is

17   based on some random mutation, right?

18       A.   That's correct.

19       Q.   In fact, what they're looking at in this

20   paper is trying to parcel out the role of random

21   mutations versus inherited or heritable mutations

22   and environmental factors, right?

23       A.   That's correct.

24       Q.   Okay.  And it sounds like it's an area of

25   interest for you?
```

```
 1      A.   It is.

 2      Q.   Okay.  And if you take a look, it says -- if

 3  you -- on the first page, which is 1 of 5, and the

 4  right-hand column halfway down, it says, "In this

 5  study we have evaluated cancer incidence in 69

 6  countries, representing a variety of environments

 7  distributed throughout the world and representing

 8  4.8 billion people (two-thirds of the world's

 9  population)."  Do you see that?

10      A.   As a matter of fact, no.  Could you tell me

11  again where that is, please?

12      Q.   Right here.

13      A.   I see it.

14      Q.   Do you see it?

15      A.   I see it.

16      Q.   Did I read that correctly?

17      A.   Yes.

18      Q.   Okay.  And, in fact, after that they

19  reference IARC, right?

20      A.   Correct.

21      Q.   Okay.  And that's one of the organizations

22  that you consider reliable, right?

23      A.   Yes.

24      Q.   Okay.  All right.  And then if you -- I'm

25  trying to do this so we can do it linearly.  Just so
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1    that we see it, they use designations of E mutations

2    for environmental, H for hereditary, and R for

3    random mutations, correct?

4        A.   Yes.

5        Q.   Okay.  And what they found -- and I'm looking

6    actually at the abstract here, but we'll go and look

7    at later statements too.  The abstract says, "The

8    data revealed a strong correlation between cancer

9    incidence and normal stem cell divisions in all

10   countries regardless of their environment.  The

11   major role of random mutations in cancer etiology

12   was supported by an independent approach based

13   solely on cancer genome sequencing and epidemiologic

14   data which suggested that random mutations are

15   responsible for two-thirds of the mutations in human

16   cancers."

17           Did I read that correctly?

18       A.   That's correct.

19       Q.   Okay.  And essentially what they conclude is

20   that because of that strong association, that the --

21   about two-thirds of cancer, at least a majority of

22   cancers, are likely related to random mutations

23   because they cannot be related to either environment

24   or inheritance or heritable factors, right?  Because

25   they saw the correlation irrespective of geography

Ron Schiff, M.D., Ph.D.

1    or environment.

2    A.   Well, okay.  This is my first time reading

3    this in detail.

4    Q.   Okay.

5    A.   I'm familiar with the concept about

6    proportionality with the number of stem cell

7    divisions, which basically means the older you get

8    the more likely you are to get cancer.  We know

9    that, okay?

10        But there are a few things here.  This seems

11   to indicate that -- well, there are a couple of

12   statements that I'm going to read.  This is in the

13   middle column on the first page.  "Determination of

14   the contributions of E, H and R to a cancer type or

15   cancer case is challenging."

16   Q.   Yes.

17   A.   And it goes on to talk about the potential

18   for different contributions by E, H and R.  On

19   page 4 out of 5, the second full sentence in the

20   column on the left says, "However, the actual

21   contribution of R mutations to any particular cancer

22   type cannot be reliably estimated from such

23   correlations."

24        The next point is I do not see that

25   non-Hodgkin lymphoma is one of the examples that

Ron Schiff, M.D., Ph.D.

```
 1    Dr. Tomasetti, Dr. Li and Dr. Vogelstein have

 2    highlighted.  Now, of course I have not been given

 3    the opportunity to review this in detail, so there

 4    might be something about NHL in there that I haven't

 5    gotten to.

 6        Q.   No.  I think it's about cancer generally.

 7        A.   But the other point about this -- the other

 8    point about this is that there is not any clear

 9    statistical or mechanistic intention given to

10    interactions among the environment and either

11    inherited or acquired mutations, because -- and,

12    again, I have not studied this --

13        Q.   Sure.

14        A.   -- in detail.  But in point of fact, we know

15    that a number of substances, carcinogens in

16    particular, are, in fact, mutagens, and they will

17    increase the risk of developing a specific mutation

18    or mutations in general.  And to deny that and to

19    say that the mutations that are responsible for the

20    development of cancer are strictly random and have

21    no influence from environmental exposures does

22    represent an extreme viewpoint.

23             This is obviously a very complicated subject.

24    I would like the opportunity to study it in more

25    detail, which I have not done.  But these are some
```

Ron Schiff, M.D., Ph.D.

```
 1    of my takeaways when trying to look at this and make

 2    sense out of it in the space of five minutes or so

 3    in a deposition.

 4       Q.   Sure.  And so if we go to page 4 of 5, which

 5    you were there, and you go to the left-hand column

 6    about three-quarters of the way down, there is a

 7    statement that says, "First, the data demonstrate

 8    that the correlation between cancer incidence and

 9    the number of stem cell divisions in various tissues

10    cannot be explained by peculiarities of the US

11    population or its environment."

12          Did I read that correctly?

13       A.   That's correct.  That just means that there

14    are similar findings internationally.

15       Q.   Right.  And if you go to the right -- this

16    middle column first full paragraph, they say, "Our

17    results are fully consistent with epidemiological

18    evidence on the fraction of cancers in developed

19    countries that are potentially preventable through

20    improvements in environment and lifestyle."

21          Did I read that correctly?

22       A.   I am not familiar with the statistics on

23    which that is based, but I will say this, that in

24    the text it says that for the US Centers for Disease

25    Control and Prevention estimates of 21 percent of
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ron Schiff, M.D., Ph.D.

1    annual cancer deaths in individuals less than

2    80 years old could be prevented, but the CDC

3    reference that is cited in that location says up to

4    40 percent for each of the five leading US causes.

5    I'm assuming that non-Hodgkin lymphoma is among

6    those and that, without having looked at the raw

7    data, that it might be up to 40 percent.

8         I can research this in the future in further

9    detail.  But, once again, we would point out that

10   the specificity considerations of glyphosate and

11   non-Hodgkin lymphoma are not addressed by anything

12   that we have read together here.

13   Q.   Okay.  On page 4 of 5, middle column, the

14   second full paragraph they say, "Of equal

15   importance, these studies provide a well-defined

16   molecular explanation for the large and apparently

17   unpreventable component of cancer risk that has long

18   puzzled epidemiologists."

19        Did I read that correctly?

20   A.   You did.  But the next sentence says, "It is

21   of course possible that virtually all mutations and

22   all cancers are due to environmental factors, most

23   of which has simply not yet been discovered."

24   Q.   "However, such a possibility seems

25   inconsistent with the exhaustively documented fact

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

1    that about three mutations occur every time a normal

2    cell divides and that normal stem cells often divide

3    throughout life."

4         Did I read that part correctly?

5    A.   You read that correctly.  And that means that

6    we do not know for sure what proportion of mutations

7    have an environmental cause, in other words, are due

8    to a carcinogen or a noncarcinogenic mutagen, which

9    is also implied here.  So the point is this is

10   extremely general.

11        I would love to take a deeper dive into it to

12   see if we can come up with anything about

13   non-Hodgkin lymphoma or the specific exposure

14   situation that we're discussing here today.  This is

15   generalities.  This is something that would be

16   taught in a classroom and would be very, very

17   difficult to apply to evaluating the circumstances

18   of an individual patient or plaintiff.

19   Q.   All right.  You finished on that?

20   A.   I am.

21        MS. FUJIMOTO:  Okay.  Let's take a break.

22        THE VIDEOGRAPHER:  Going off the record at

23   12:29.

24        (A recess was taken from 12:29 p.m. until

25   12:32 p.m.)

Ron Schiff, M.D., Ph.D.

```
 1            THE VIDEOGRAPHER:  We're back on the record.

 2       The time is 12:32.

 3                      CROSS-EXAMINATION

 4    BY MR. BRAKE:

 5       Q.   Doctor, could you please explain your

 6    methodology that you used to conclude that Roundup

 7    was a substantial factor contributing to

 8    Mr. Harris's non-Hodgkin's lymphoma?

 9       A.   Yes.  The methodology is actually exemplified

10    and applied in my report.  As I mentioned earlier in

11    the deposition, I wanted to establish the diagnosis.

12    I wanted to go from the diagnosis to look into

13    staging, treatment, prognosis.  And from there I

14    wanted to take a look at his Roundup exposure, not

15    at the level of a toxicologist or industrial

16    hygienist, but at the level of a medical oncology

17    and hematology clinician.  I wanted to acknowledge

18    the general causation literature concerning the

19    causal association between glyphosate or Roundup and

20    non-Hodgkin lymphoma while preserving my overall

21    reliance on the general causation plaintiff experts

22    to explain that in more detail.
```

███                 ██████████████████████████████

███        ██████████████████████████████████████

███     ██████████████████     ██████████████████████

Ron Schiff, M.D., Ph.D.



19     Q.   Based upon the information that you reviewed,

20     which, as I understand it, are the medical records

21     of Mr. Harris, the depositions of Mr. and

22     Mrs. Harris, and the medical providers, the

23     Plaintiff Fact Sheet, and personal interview, were

24     you able to find any other alternative likely cause

25     of his non-Hodgkin's lymphoma other than his

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Ron Schiff, M.D., Ph.D.

```
 1    extensive use of Roundup?

 2            MS. FUJIMOTO:  Object to form; foundation.

 3            THE WITNESS:  No.  I felt that glyphosate was

 4        the lymphoma carcinogen that stood out.  I did not

 5        identify any others.

 6    BY MR. BRAKE:

 7        Q.   So would you -- would it be clear or accurate

 8    to say that you performed a differential etiology to

 9    determine the cause of his NHL?

10            MS. FUJIMOTO:  Object to form; foundation.

11            THE WITNESS:  Yes, I did.  I actually

12        mentioned that toward the beginning of this

13        deposition, but I did do that.

14    BY MR. BRAKE:

15        Q.   And just so the record is clear, what is your

16    opinion as to the most likely substantial

17    contributing factor to his NHL?

18        A.   That's glyphosate.

19        Q.   Okay.  And I believe you said before you

20    wanted to clear up a couple things that were brought

21    up on direct examination, or not?

22        A.   All that -- all that I'm talking about was

23    there are some things that I would like to respond

24    to, given the opportunity, from Dr. Salhotra's

25    deposition and from Dr. Bello's expert report.
```

Ron Schiff, M.D., Ph.D.

1      Q.   Okay.  We can -- do you think it's important

2    to do that?  Would you like to do that now or --

3      A.   I would defer to the attorneys --

4      Q.   Okay.

5      A.   -- in deciding that.

6      Q.   We can --

7      A.   There were a number of things I disagreed

8    with in Dr. Bello's report.  Some of them I read out

9    loud and referred to, but some I didn't have a

10   chance to get into with --

11     Q.   Okay.  I think we've covered that adequately?

12          MR. BRAKE:  So I have no further questions.

13          MS. FUJIMOTO:  I have nothing further.

14          MR. BRAKE:  Okay.  We're done.

15          THE VIDEOGRAPHER:  This concludes the

16   deposition.  The time is 12:36.

17          (Whereupon, the deposition concluded at

18   12:36 p.m.)

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2          I, Tami Cline, Registered Merit Reporter,

 3     Certified Realtime Reporter, and Florida

 4     Professional Reporter, do hereby certify that,

 5     pursuant to notice, the deposition of RON SCHIFF,

 6     MD, PhD was duly taken on November 12, 2019 at

 7     8:55 a.m. before me.

 8          The said RON SCHIFF, MD, PhD was duly sworn

 9     by me according to law to tell the truth, the whole

10     truth and nothing but the truth and thereupon did

11     testify as set forth in the above transcript of

12     testimony.  The testimony was taken down

13     stenographically by me.  I do further certify that

14     the above deposition is full, complete, and a true

15     record of all the testimony given by the said

16     witness, and that a review of the transcript was not

17     requested.

18

19     _____

20     Tami Cline, RMR, CRR, FPR

21     (The foregoing certification of this transcript does

22     not apply to any reproduction of the same by any

23     means, unless under the direct control and/or

24     supervision of the certifying reporter.)

25
```

Ron Schiff, M.D., Ph.D.

1                            LAWYER'S NOTES

2       PAGE      LINE

3       _____     _____     _____

4       _____     _____     _____

5       _____     _____     _____

6       _____     _____     _____

7       _____     _____     _____

8       _____     _____     _____

9       _____     _____     _____

10      _____     _____     _____

11      _____     _____     _____

12      _____     _____     _____

13      _____     _____     _____

14      _____     _____     _____

15      _____     _____     _____

16      _____     _____     _____

17      _____     _____     _____

18      _____     _____     _____

19      _____     _____     _____

20      _____     _____     _____

21      _____     _____     _____

22      _____     _____     _____

23      _____     _____     _____

24      _____     _____     _____

25