# Exhibit 5

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                      - - -

4

5  IN RE: ROUNDUP PRODUCTS      )

   LIABILITY LITIGATION         )        MDL No. 2741

6                               )

   THIS DOCUMENT RELATES TO: )

7                               )

   Jaime Alvarez Calderon,      )

8                               )

        v.                      )   Case No. 3:19-cv-01630

9                               )

   Monsanto Company.            )

10

11

                      - - -

12

13            Monday, November 11, 2019

14                     - - -

15        Videotaped deposition of CHARALAMBOS

16  ANDREADIS, M.D., held at UCSF, 400 Parnasus,

17  San Francisco, California, commencing at

18  approximately 8:55 a.m., before Gina V. Carbone, a

19  Registered Merit Reporter, California Certified

20  Realtime Reporter, California Certified Shorthand

21  Reporter No. 8249.

22                     - - -

23            GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 971.591.5672 fax

24                 deps@golkow.com

25

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1    APPEARANCES:

 2    For the Defendant Monsanto Company:

 3         ARNOLD & PORTER, ESQUIRE

 4         By:  BERT L. SLONIM

 5         250 West 55th Street

 6         New York, New York 10019

 7         (212) 836-8897

 8         bert.slonim@arnoldporter.com

 9    and

10         ARNOLD & PORTER

11         By:  KATHRYN PODSIADLO, ESQUIRE

12         777 South Figueroa Street, 44th Floor

13         Los Angeles, California 90017

14         (213) 243-4000

15         kathryn.podsiadlo@arnoldporter.com

16

17    For the Plaintiff Jaime Alvarez Calderon

18         GOLDBERG & OSBORNE

19         By:  DAVID J. DIAMOND, ESQUIRE

20         698 East Wetmore Road, Suite 200

21         Tucson, Arizona 85705

22         (520) 879-7168

23         ddiamond@goldbergandosborne.com

24

25    ALSO PRESENT:  JOSEPH MOURGOS, videographer
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1                    I N D E X

2    CHARALAMBOS ANDREADIS, M.D.

3                         INDEX

4    EXAMINATION                              PAGE

5

6    BY MR. SLONIM  ................................8

7

8                    ---o0o---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Charalambos Andreadis, M.D.

```
 1                    EXHIBIT INDEX
 2
 3   EXHIBIT           DESCRIPTION              PAGE
 4   EXHIBIT 1    Curriculum Vitae of              9
                  Charalambos Andreadis, MD
 5
     EXHIBIT 2    Slides entitled What's New in   12
 6                Non-Hodgkin Lymphoma: Focus on
                  Aggressive Lymphomas
 7
     EXHIBIT 3    International Journal of         28
 8                Epidemiology entitled
                  Pesticide use and risk of
 9                non-Hodgkin lymphoid
                  malignancies in agricultural
10                cohorts form France, Norway
                  and the USA: a pooled analysis
11                from the AGRICOH consortium
12   EXHIBIT 4    Health Canada Re-evaluation     55
                  Decision, Glyphosate dated
13                April 28, 2017
14   EXHIBIT 5    Statement from Health Canada    71
                  on Glyphosate dated January
15                11, 2019
16   EXHIBIT 6    ECHA Web page printout          82
                  entitled Glyphosate not
17                classified as a carcinogen by
                  ECHA
18
     EXHIBIT 7    Australian Pesticides and       86
19                Veterinary Medicines Authority
                  article entitled Final
20                regulatory position:
                  Consideration of the evidence
21                for a formal reconsideration
                  of glyphosate dated March 2017
22
23
24
25   //
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1              INDEX OF EXHIBITS (continued)
 2    FOR IDENTIFICATION                           PAGE
 3    EXHIBIT 8     Docket No.                        90
                    EPA-HQ-OPP-2009-0361 entitled
 4                  Glyphosate, Proposed Interim
                    Registration Review Decision
 5                  Case Number 0178 dated April
                    2019
 6
      EXHIBIT 9     Critical Reviews in Toxicology   111
 7                  Review Article entitled Review
                    of genotoxicity studies of
 8                  glyphosate and
                    glyphosate-based formulations
 9
      EXHIBIT 10    HHS Public Access Author         130
10                  manuscript entitled Stem cell
                    divisions, somatic mutations,
11                  cancer etiology, and cancer
                    prevention
12
      EXHIBIT 11    American Cancer Society Web      142
13                  page article entitled Key
                    Statistics for Non-Hodgkin
14                  Lymphoma
15    EXHIBIT 12    A one-page document entitled     155
                    Andreadis Invoice
16
      EXHIBIT 13    Expert Report of Charalambos     158
17                  Andreadis, M.D. M.S.C.E in
                    Support of Specific Causation
18                  on Behalf of Jaime Alvarez
                    Calderon
19
      EXHIBIT 14    Cancer Epidemiology,             166
20                  Biomarkers & Prevention
                    article entitled Non-Hodgkin's
21                  Lymphoma and Specific
                    Pesticide Exposures in Men:
22                  Cross-Canada Study of
                    Pesticides and Health
23
24
25    //
```

```
 1              INDEX OF EXHIBITS (continued)
 2    FOR IDENTIFICATION                          PAGE
 3    EXHIBIT 15    International Journal of         176
                    Environmental Research and
 4                  Public Health article entitled
                    Exposure to Multiple
 5                  Pesticides and Risk of
                    Non-Hodgkin Lymphoma in Men
 6                  from Six Canadian Provinces
 7    EXHIBIT 16    International Journal of         188
                    Environmental Research and
 8                  Public Health article entitled
                    Non-Hodgkin Lymphoma and
 9                  Occupational Exposure to
                    Agricultural Pesticide
10                  Chemical Groups and Active
                    Ingredients: A Systematic
11                  Review and Meta-Analysis
12    EXHIBIT 17    National Cancer Institute       201
                    article entitled Glyphosate
13                  Use and Cancer Incidence in
                    the Agricultural Health Study
14
      EXHIBIT 18    A two-page document entitled    247
15                  Andreadis' Specific Causation
                    Opinion Alvarez vs. Monsanto
16                  9/30/19 Records and Documents
                    Reviewed
17
18                       --o0o--
19
20
21
22
23
24
25
```

Charalambos Andreadis, M.D.

```
1                 EXAMINATION BY MR. SLONIM

2             THE VIDEOGRAPHER:  We are now on the

3    record.  My name is Joseph Mourgos.  I am a

4    videographer for Golkow Litigation Services.

5             Today's date is November 11th, 2019, and

6    the time on the video monitor is 8:55 a.m.  This

7    video deposition is being held in San Francisco,

8    California in the matter of Roundup Products

9    Liability Litigation relating to Jaime Alvarez

10   Calderon versus Monsanto Company for the United

11   States District Court, Northern District of

12   California.  The deponent is Dr. Charalambos

13   Andreadis.

14            Counsel, please voice identify yourselves

15   for the record.

16            MR. DIAMOND:  David Diamond for the

17   plaintiff.

18            MR. SLONIM:  Bert Slonim on behalf of

19   Monsanto.

20            MS. PODSIADLO:  Kathryn Podsiadlo on behalf

21   of Monsanto.

22            THE VIDEOGRAPHER:  Thank you.

23            The court reporter today is Gina Carbone,

24   and she will now administer the oath.

25   //
```

```
 1                CHARALAMBOS ANDREADIS, M.D.,

 2           having been first duly sworn,

 3       was examined and testified as follows:

 4

 5           EXAMINATION BY MR. SLONIM

 6           THE VIDEOGRAPHER:  Please begin.

 7  BY MR. SLONIM:

 8       Q.  Good morning, Dr. Andreadis.  My name is

 9  Bert Slonim; we had a chance to say hello before the

10  deposition began.  With me is my colleague, Kathryn,

11  who you also met.

12           For the record, would you please state your

13  full name and your business address.

14       A.  Charalambos Andreadis.  ████████████████████

██  ███████████████████████████████

16       Q.  And you are a medical doctor; is that

17  correct?

18       A.  Correct.

19       Q.  Going to mark as Deposition Exhibit No. 1 a

20  document that was handed to us by counsel this

21  morning.  It's your curriculum vitae, and this looks

22  like it has a preparation date of November 9th, 2009

23  (verbatim).  We had earlier been provided a CV that

24  was dated February 4th, 2019, but I take it this one

25  is more updated; is that correct?
```

Charalambos Andreadis, M.D.

1      A.  Does it say '09 or '19?

2      Q.  November 9th -- the date on it is November

3   9th.

4      A.  Oh, 2019, yeah.  No, I thought you said

5   2009.

6      Q.  If I did, I misspoke.  Thank you.

7          MR. SLONIM:  Let's mark -- ask the court

8   reporter to mark that as Deposition Exhibit No. 1,

9   please.

10          (Whereupon, Exhibit 1 was marked for

11          identification.

12   BY MR. SLONIM:

13      Q.  Doctor, does this accurately describe your

14   medical practice, your publications, your scientific

15   presentations, and your research interests?

16      A.  Correct.  It does.

17      Q.  When I look through your CV, Doctor, I did

18   not notice any description of any human studies

19   regarding pesticides and cancer.

20          Have you conducted any human studies on

21   that subject, pesticides and cancer?

22      A.  I have not.

23      Q.  Likewise, I did not notice any

24   epidemiologic studies involving pesticides and

25   cancer.

Charalambos Andreadis, M.D.

```
 1              Is it correct that you have not conducted

 2   any such studies?

 3        A.   Correct.

 4        Q.   Have you conducted any studies in animals

 5   regarding pesticides and cancer?

 6        A.   I have not.

 7        Q.   Have you conducted any studies in cells or

 8   test tubes -- these are sometimes called in vitro

 9   studies -- involving pesticides and cancer?

10        A.   I have not.

11        Q.   Have you published any scientific articles

12   regarding pesticides and cancer?

13        A.   Not specifically addressing that question,

14   no.  But mentioning facts.

15        Q.   Which articles have you published that

16   mention pesticides and cancer?

17        A.   Well, general lymphoma studies that -- so,

18   for example, there's a lot of non-peer-reviewed

19   publications here that talk about lymphoma, and they

20   may mention risk factors for lymphoma, so if they

21   do, they would include that.

22        Q.   Testifying under oath today, Doctor, can

23   you identify a single article on your list of

24   publications that specifically talks about

25   pesticides and lymphoma?
```

Charalambos Andreadis, M.D.

 1      A.  Not off the top of my head.  But, like I

 2  said, a lot of these NCCN Guidelines that I've been

 3  involved with tend to mention general risk factors,

 4  so -- nothing that I would have done the research on

 5  myself.

 6      Q.  I'll represent to you that I looked through

 7  at least some of the guidelines, and I did not see

 8  any reference to pesticides and cancer.

 9      Do you think I'm wrong?

10      A.  I can't be sure that it wasn't discussed.

11  That's why I mentioned it.

12      Q.  Have you given any scientific presentations

13  or professional talks regarding pesticides and

14  cancer?

15      A.  Again, I've given talks about general

16  principles in lymphoma, and some of those include a

17  slide or two on pesticides and cancer.

18      Q.  Doctor, given the fact that you have not

19  conducted any human research regarding pesticides

20  and cancer, you haven't conducted any

21  epidemiological research regarding that subject, you

22  haven't conducted any animal studies regarding that

23  subject, you haven't conducted any test tube or cell

24  studies or in vitro studies regarding that subject,

25  and, in fact, you haven't conducted any scientific

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    research of any type regarding pesticides and

2    cancer, isn't it fair to say that you are not an

3    expert regarding pesticides and cancer?

4            MR. DIAMOND:  Form.

5            THE WITNESS:  I'm not an expert in the

6    research regarding pesticides and cancer, but by

7    nature of my profession, I'm familiar with the

8    studies that have been done.  And I'm asked to often

9    give advice to patients and organizations about

10   different risk factors.

11   BY MR. SLONIM:

12       Q.  Have you given any advice to any scientific

13   organizations regarding pesticides and cancer?

14       A.  I have not.

15           (Whereupon, Exhibit 2 was marked for

16           identification.)

17   BY MR. SLONIM:

18       Q.  Doctor, I've marked as Deposition Exhibit

19   No. 2 a slide deck that was provided to us by your

20   counsel entitled "What's New in Non-Hodgkin's

21   Lymphoma:  Focus on Aggressive Lymphomas," and that

22   bears your name on the cover; is that correct?

23       A.  Correct.

24       Q.  Is this a document that you prepared?

25       A.  I believe so.  Yes.  I always have to look

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    through the whole thing.

2            MR. DIAMOND:  Just for the record, I think

3    I was requested by defense counsel that I produce

4    this document which Dr. Andreadis referenced in one

5    of his first depositions.

6    BY MR. SLONIM:

7        Q.  Is this --

8        A.  It looks like a document I prepared.

9    Correct.

10       Q.  Do you recall when you prepared this?

11       A.  I don't, actually.

12       Q.  Do you recall for what purpose you prepared

13   it?

14       A.  I believe this was a talk -- a grand rounds

15   talk I gave at Good Samaritan Hospital down in the

16   Peninsula.

17       Q.  And do you recall when that was?

18       A.  Must be earlier this year.  March, maybe.

19   April.

20       Q.  Do you recall if it was before or after you

21   gave your deposition, which was in July -- on July

22   15th of this year?

23       A.  It was before the deposition.

24       Q.  Who was the audience?

25       A.  It's grand rounds, so it's physicians,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    nurses, sometimes even patients come in for a

2    community hospital.

3        Q.  And how was it presented?  Did you project

4    these slides on a screen?

5        A.  I did.

6        Q.  And do you recall how many people were

7    in -- attended?

8        A.  Must have been around 50.

9        Q.  And is it your best recollection that it

10   included professionals, meaning physicians, as well

11   as nonprofessionals?

12       A.  Correct.

13       Q.  Were you invited to give this presentation?

14       A.  I was.

15       Q.  And who decided on the content of the

16   presentation?

17       A.  The CME, continuing medical education

18   committee, of Good Samaritan Hospital came up with a

19   list of topics that they were interested in, and

20   they specifically asked me about the different

21   lymphomas and also the risk factors that are known

22   for lymphoma.

23       Q.  Did the CME group at Good Samaritan

24   Hospital, did they review your slides for content?

25       A.  They did.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1      Q.   They reviewed them before you gave the

2   presentation?

3      A.   Yes.

4      Q.   To make sure that they were satisfied that

5   the content was appropriate for the audience?

6           MR. DIAMOND:   Form.

7           THE WITNESS:   Correct.

8   BY MR. SLONIM:

9      Q.   Did they have any comments on the slides?

10     A.   Not really.

11     Q.   Did you revise the slide deck subsequent to

12  that talk in -- in other words, that talk was -- you

13  said the talk was given prior to your deposition,

14  which was in July 15th of 2019.

15          Did you add slides or any material to this

16  slide deck subsequent to the deposition?

17     A.   I don't believe so.  I often will reuse

18  some slides in other talks, but this talk hasn't

19  been touched since.

20     Q.   Let me ask you to turn to, please, slide 9.

21  Yeah.

22     A.   This one?

23     Q.   Yes.  So I -- it looks to me like they're

24  not numbered on the printout, unfortunately.  But

25  that slide says, "Why Farmers?"

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

```
 1              Do you see that?

 2         A.  I do.

 3         Q.  Is that a topic you thought to bring into

 4    the talk?  "Why Farmers?"

 5         A.  It's a topic they asked me to talk about.

 6         Q.  They asked you to address why farmers

 7    appear to be at an increased risk of non-Hodgkin's

 8    lymphoma?

 9         A.  Right.

10         Q.  Now, Doctor --

11         A.  Well, they asked -- if I can amend that,

12    they asked me specifically about risk factors.  They

13    asked me specifically about risk factors, and one of

14    the sub-bullets in that was if I can speak to

15    farmers getting lymphoma.

16         Q.  Okay.  And in the middle of the page of

17    this slide 9, you have a graphic that says, "Have

18    you been diagnosed with lymphoma cancer?  We can

19    help."  And it has a picture of a person, a man's

20    chest with what looks like a rash, perhaps a skin

21    T-cell lymphoma, and several different containers of

22    Roundup.  Correct?

23         A.  Uh-huh.  Correct.

24         Q.  Now, that picture, that graphic, you

25    obtained from a plaintiffs' personal injury website;
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    isn't that correct?  Plaintiffs' attorney's personal

2    injury website?

3         A.  I did.  It was actually meant to make fun

4    of lawyers.

5         Q.  Okay.  And you don't disclose on this slide

6    that the source of that graphic was actually from

7    the website of attorneys who were bringing lawsuits

8    against Monsanto with regard to Roundup, do you?

9         A.  I'm sure it was.  There's -- it popped up

10   on Google images, and it was available.

11        Q.  But when you -- when you prepared the

12   slide, the slide doesn't disclose the fact that this

13   came from a plaintiffs' attorney's website, does it?

14        A.  It does not.  No.

15             MR. DIAMOND:  Form.

16   BY MR. SLONIM:

17        Q.  Now, Doctor, you agree with me that farmers

18   have been observed to have an increased risk of

19   non-Hodgkin's lymphoma since at least the 1960s,

20   well before Roundup ever came on the market; isn't

21   that right?

22             MR. DIAMOND:  Form.  Foundation.

23             THE WITNESS:  I'm not sure as to when the

24   data came out that farmers were at a higher risk,

25   because that's something that we've always been

Charalambos Andreadis, M.D.

1    taught in medical school.  So I finished medical

2    school in '98, 1998.  And at the time that I was

3    there, it was passed on as common knowledge that

4    farmers get lymphoma, but I don't know when the data

5    first came out.

6    BY MR. SLONIM:

7         Q.  You didn't research that?

8         A.  No.

9         Q.  So you didn't tell your audience, to whom

10   you delivered this lecture, that farmers had been

11   diagnosed and -- with an increased risk of

12   non-Hodgkin's lymphoma starting in the 1960s, more

13   than a decade before Roundup ever came on the

14   market.  You didn't tell your audience that, did

15   you?

16           MR. DIAMOND:  Form.

17           THE WITNESS:  I did not speak as to the

18   timing of when the risk came out.  And frankly, this

19   slide, including the picture with the hand, was

20   meant to bring up the -- all the litigation that's

21   going around about Roundup rather than express an

22   opinion.  So in my actual talk, I did play down on

23   some of those images.

24   BY MR. SLONIM:

25        Q.  You agree with me that those images are

Charalambos Andreadis, M.D.

1    inflammatory?

2            MR. DIAMOND:  Form.

3            THE WITNESS:  They are things that are on

4    the Web, so they were attention-grabbing.

5    BY MR. SLONIM:

6        Q.  Doctor, did you tell your audience that you

7    had a financial interest in the outcome of

8    litigation involving Roundup?

9            MR. DIAMOND:  Form and foundation.

10           THE WITNESS:  I did not have an interest at

11   that time.

12   BY MR. SLONIM:

13       Q.  So your financial interest developed later?

14       A.  Correct.

15       Q.  You currently have a financial interest in

16   the outcome of Roundup litigation?

17           MR. DIAMOND:  Form.

18           THE WITNESS:  I'm being reimbursed for my

19   work.  I don't know if that constitutes a financial

20   interest.

21   BY MR. SLONIM:

22       Q.  And you're being reimbursed at the rate

23   when you testify at a thousand dollars an hour,

24   correct?

25       A.  Correct.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

 1      Q.  Doctor, what caused farmers to develop an

 2  increased incidence of non-Hodgkin's lymphoma in the

 3  1960s and early '70s before Roundup was ever put on

 4  the market?  What was responsible for that?

 5          MR. DIAMOND:  Form and foundation.

 6          THE WITNESS:  Based on the research that I

 7  have done since, there are several exposures that

 8  farmers get that may predispose them to high risk.

 9  And historically we think of pesticides, herbicides,

10  and so there's other substances that have been

11  tested and come up in the data that I show that also

12  have an association.

13  BY MR. SLONIM:

14      Q.  Other exposures, particularly pesticides

15  and herbicides other than Roundup, correct?

16          MR. DIAMOND:  Form.

17          THE WITNESS:  I'm not -- there's many

18  classes of herbicides and pesticides, and I'm not

19  familiar with all of them, but I do know there are

20  several that have been mentioned as being related to

21  lymphoma.

22  BY MR. SLONIM:

23      Q.  Are you familiar with a pesticide called

24  2,4-D?

25      A.  I am.

Charalambos Andreadis, M.D.

```
 1        Q.  Has that one been associated with an

 2   increased risk of non-Hodgkin's lymphoma?

 3        A.  I'm not sure.

 4        Q.  Are you familiar with a pesticide called

 5   malathion?

 6        A.  I am.

 7        Q.  Has that been associated with an increased

 8   risk of non-Hodgkin's lymphoma?

 9        A.  I believe so.

10        Q.  Was malathion on the market in the '60s and

11   early '70s before Roundup ever came to market?

12            MR. DIAMOND:  Form and foundation.

13            THE WITNESS:  Again, I do not know what was

14   on the market and when.

15   BY MR. SLONIM:

16        Q.  Do you agree -- strike that.

17            But in your slide deck that you prepared

18   here, the only pesticide that you point to is

19   Roundup; isn't that right?

20        A.  Well, I have a table.

21        Q.  Doctor, please answer my question, and

22   we'll come to the table in one minute.

23            My question was:  The only compound you

24   identify on slide 9 is glyphosate, correct?

25            MR. DIAMOND:  Form.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1          THE WITNESS:  It is.  Because that's what

2   was in the news at the time.

3   BY MR. SLONIM:

4       Q.  Okay.  Now, you wanted to tell me about the

5   next page on the table.  Please turn to that.

6       A.  Okay.

7       Q.  And what was it that you wanted to point

8   out to me on this table?

9       A.  Well, so this is a table from the so-called

10  AGRICOH study.  That's the most recent meta-analysis

11  of all the previously performed studies, and as you

12  can see, it's got a list of several insecticides,

13  herbicides, and so glyphosate happens to be on this

14  table.  But they're all presented here.

15      Q.  Okay.  First of all, you agree with me that

16  this is only a portion of the table from the Leon

17  article.  It's actually, the table spans two pages,

18  correct?

19      A.  Correct.  It's what I could fit on the

20  page.

21      Q.  Okay.  So there's actually -- and there's

22  actually more columns that would go to the right

23  where they looked at more subtypes of non-Hodgkin's

24  lymphoma, correct?

25      A.  Correct.  But the main interest was in the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  diffuse large B-cell lymphoma, CLL non-Hodgkin's

2  lymphoma.

3      Q.  Well, you are interested in follicular

4  lymphoma, aren't you?

5      A.  I am, but it's not -- it's not as common as

6  diffuse large B-cell lymphoma.

7      Q.  Well, but Mr. Alvarez has follicular

8  lymphoma, doesn't he?

9      A.  Well, it's unclear what he has, but he

10  probably -- if we had to put a name on it, it would

11  transformed follicular lymphoma.

12      Q.  Okay.  So Mr. Alvarez's initial disease was

13  follicular lymphoma, and during the course of that

14  disease, you believe it transformed into a different

15  type of non-Hodgkin's lymphoma called diffuse large

16  B-cell, correct?

17      A.  We don't have evidence of that specifically

18  because his first presentation was diffuse large

19  B-cell lymphoma.  We often make an assumption in the

20  lymphoma clinical field that, if later on somebody

21  develops follicular lymphoma, that they probably had

22  it at the same time as their original diagnosis.

23  But his first presentation was that of diffuse large

24  B-cell lymphoma; we would have no way of

25  distinguishing it.

Charalambos Andreadis, M.D.

1      Q.  Anyhow, let's focus -- let's focus on the

2  topic at hand, which is what this table tells us

3  about the relationship, if any, between glyphosate

4  and non-Hodgkin's lymphoma.  Okay?

5          The first -- the first column on the

6  left-hand side, column, is labeled "Non-Hodgkin's

7  lymphoid malignancies," correct?

8      A.  Correct.

9      Q.  And if we go down about three-quarters of

10  the way on the left-hand side, it lists glyphosate,

11  correct?

12      A.  Yes.

13      Q.  And then if we go over two columns, that

14  tells us the hazard ratio, correct, for glyphosate

15  and non-Hodgkin's lymphoma?

16      A.  Yes.

17      Q.  And that tells us that the hazard rate is

18  .95, correct?

19      A.  Correct.

20      Q.  So that is a negative finding.  That says

21  that the relation -- that there was no increased

22  risk for people exposed to glyphosate and the

23  development of non-Hodgkin's lymphoma; isn't that a

24  fact?

25          MR. DIAMOND:  Form.

Charalambos Andreadis, M.D.

1            THE WITNESS:  The hazard ratio is less than

2    one which is considered not associated.  But there's

3    a confidence interval which does include numbers

4    higher than one, so it's not --

5    BY MR. SLONIM:

6        Q.  But it's not statistically significant?

7        A.  In this study, no.

8        Q.  So this is a negative finding.  Looking at

9    these data, you would say that the interpretation is

10   that this study does not find an association, a

11   positive association, between exposure to glyphosate

12   and the risk of developing non-Hodgkin's lymphoma,

13   correct?

14           MR. DIAMOND:  Form.

15           THE WITNESS:  That was when they looked at

16   all non-Hodgkin's lymphomas as a group.  But for

17   specific non-Hodgkin's lymphomas, namely, diffuse

18   large B-cell lymphoma, they -- and I believe for CLL

19   for another one of the pesticides, they did find an

20   association.

21   BY MR. SLONIM:

22       Q.  So, Doctor, you've studied epidemiology,

23   right?

24       A.  I have.

25       Q.  You certainly know the fallacy of multiple

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

```
 1   comparisons, don't you?

 2       A.  I do.

 3       Q.  Each time you do a statistic, there's a 5

 4   percent chance that the finding, a positive finding,

 5   may not be a true positive finding but might be a

 6   false positive simply due to the plight of chance;

 7   isn't that correct?

 8       A.  Correct.

 9       Q.  And in this particular study, the authors

10   did 235 statistical comparisons, didn't they?

11       A.  I have not counted the total number.

12       Q.  Well, the authors tell us that in the

13   paper, don't they?  The authors themselves reported

14   that fact, didn't they?

15       A.  I do not remember the exact number.

16       Q.  Did you read the paper?

17       A.  I did.

18       Q.  Were you concerned about the fallacy of

19   multiple comparisons?

20       A.  I was.  A part of the problem, though, is

21   these are not independent comparisons, so that,

22   statistically, the fallacy of multiple comparisons

23   applies when you're looking at, let's say, 20

24   unrelated things.  And then if each one has a 5

25   percent chance of being wrong, then one of the 20
```

Charalambos Andreadis, M.D.

```
 1   will be a wrong conclusion.  But if you're looking

 2   at things that are potentially related, then the

 3   correction is actually a lot stricter than it is.

 4       Q.  If you do 235 multiple comparisons where

 5   each comparison is at an alpha level of .05, so

 6   there's a 95 percent confidence interval that we're

 7   concerned with, the chance of finding one or more

 8   false positives is greater than 99.99 percent; isn't

 9   that a fact?

10           MR. DIAMOND:  Form.

11           THE WITNESS:  I have not done the

12   statistics to know that.

13   BY MR. SLONIM:

14       Q.  You know how to do the statistic, though,

15   don't you?

16       A.  Not for adjusting for multiple related

17   comparisons, I don't.

18       Q.  You take 95 percent, you raise it to the

19   Nth power, which is 235 if there were 235

20   comparisons, and you subtract that number from one.

21   And that will tell you the probability that one or

22   more of your comparisons is a false comparison.

23   That's a mathematical biostatistical fact, isn't it?

24           MR. DIAMOND:  Form.

25           THE WITNESS:  It's a mathematical model,
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    but it is not -- biostatistics is a theoretical

2    science.  And there's many ways to correct for

3    multiple comparisons.  And this one specifically is

4    the strictest one because it assumes independent

5    variables.

6    BY MR. SLONIM:

7        Q.  The authors in the Leon paper did no

8    correction for multiple comparisons; isn't that a

9    fact?  No corrections whatsoever?

10            MR. DIAMOND:  Form.

11            THE WITNESS:  I do not recall if they made

12    any corrections or not, but....

13    BY MR. SLONIM:

14        Q.  Let me ask you this, Doctor:  When you

15    prepared your slide and you reprinted this table,

16    you didn't disclose anywhere that there were 235

17    multiple comparisons, did you?

18        A.  I did not.

19        Q.  And you didn't disclose the fact that

20    there's a well-known statistical fallacy when you

21    use multiple comparisons about false positives;

22    isn't that right?

23        A.  This was not in the purview of the talk.

24            (Whereupon, Exhibit 3 was marked for

25            identification.)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

```
 1   BY MR. SLONIM:

 2        Q.  We've marked as Deposition Exhibit No. 3

 3   the article by Leon and coauthors.  Do you have this

 4   article in front of you?

 5        A.  I do.

 6        Q.  And this is the source article for the

 7   table that you printed on the slide in 10, right?

 8        A.  Correct.

 9        Q.  Turn, please, to page 15 of the article.

10   Direct your attention to the upper left-hand column,

11   the first full paragraph that begins with the word

12   "finally."

13            Do you see that?

14        A.  Yes.

15        Q.  Would you please read aloud that one

16   sentence, and then I'm going to ask you a question

17   about it.

18        A.  "Finally, false-positive associations among

19   our findings might have occurred, given the large

20   number of comparisons (14 chemical groups and 33

21   active ingredients with five cancer outcomes)."

22        Q.  "False positives."  That means a statistic

23   that appears to be positive, but, in fact, it's an

24   artifact of random chance as a result of the

25   multiple comparisons, correct?
```

Charalambos Andreadis, M.D.

 1      A.   Correct.

 2      Q.   That's what a false positive is.

 3           And the authors are disclosing the fact

 4   here that, because they had 14 chemical groups and

 5   33 active ingredients, that's 47 comparisons, that

 6   they ran against 5 outcomes.  47 times 5 is 235.

 7   They're saying that they could have reported false

 8   positives -- had one or more false positives,

 9   correct?

10      A.   Absolutely.  Every study has that chance.

11      Q.   But that was not disclosed in your slide,

12   was it?

13      A.   Well, you're taking my slides out of

14   context.  They were part of a talk.  And during my

15   talk, you were not present to know what I discussed.

16      Q.   Well, did you tell the audience -- did you

17   tell the audience --

18      A.   I told them that the subject is very

19   complicated, and there's a lot of literature one way

20   and there's some literature that points the other

21   way.

22           And for example, I showed them this table

23   to show how many possible compounds are there and

24   what each one can contribute.  So I did not

25   specifically say that I do believe glyphosate -- the

Charalambos Andreadis, M.D.

1    glyphosate results suggest an association.

2        Q.   And, in fact, if you turn to Table 2,

3    please.  And that starts, it looks like, on page 8.

4        A.   Okay.

5        Q.   Let's go through the result for glyphosate.

6             So the first one is whether there's an

7    overall association between glyphosate and

8    non-Hodgkin's lymphoma, and that's a negative

9    finding.  In other words, they did not find a

10   significantly increased risk of non-Hodgkin's

11   lymphoma for people exposed to glyphosate, correct?

12            MR. DIAMOND:  Form.

13            THE WITNESS:  I would say -- I wouldn't

14   call it negative.  I would say they didn't find a

15   statistically significant risk.

16   BY MR. SLONIM:

17       Q.   Okay.  Then the next one they looked at was

18   a type of non-Hodgkin's lymphoma called CLL/SLL,

19   correct?

20       A.   Correct.

21       Q.   And again, they did not find a

22   significantly increased risk with -- in association

23   with glyphosate, correct?

24       A.   Correct.

25       Q.   And then if you look -- go across at

Charalambos Andreadis, M.D.

1  diffuse large B-cell, here they report an increased

2  risk but the confidence interval touches 1, correct?

3  The lower bound of the confidence interval touches

4  1?

5       A.  Correct.

6       Q.  So that's technically not a statistically

7  significant finding, correct?  It's right at the

8  border?

9       A.  I would call it a borderline significant

10  finding.

11       Q.  Okay.  And take a look -- let's keep on

12  going.  Turn the page, please.  And you have to turn

13  now to page-- it continues for a couple pages.  You

14  have to turn to page 10, and about a third of the

15  way down you see glyphosate again?

16       A.  I do.

17       Q.  Okay.  And remember, they said there were

18  five comparisons they looked at, so they looked at

19  non-Hodgkin's overall, they looked at --

20       A.  -- CLL.

21       Q.  They looked at CLL/SLL, they looked at

22  diffuse large B-cell, now they're looking at

23  follicular and MM, correct?

24       A.  Correct.

25       Q.  And again, when you look for glyphosate on

Charalambos Andreadis, M.D.

1    follicular lymphoma, they do not find a

2    significantly increased risk among people that used

3    glyphosate, correct?

4        A.  Correct.

5        Q.  And if you look at MM, multiple myeloma,

6    same thing, did not find a significantly increased

7    risk, correct?

8        A.  Correct.

9        Q.  You didn't report those data about

10   follicular lymphoma and MM to -- in your slides --

11       A.  I actually didn't report any specific data

12   at all.  And as you can tell from the table that I

13   showed, most people wouldn't even be able to read

14   the slide.

15       Q.  Okay.  Now, Doctor, you are a medical

16   oncologist; is that correct?

17       A.  Correct.

18       Q.  So, in other words, in your medical

19   practice, what you do is you treat patients with

20   cancer, correct?

21       A.  Yes.

22       Q.  You're not a pathologist or a

23   hematopathologist, correct?

24       A.  I'm not.

25       Q.  So, in other words, you do not examine

Charalambos Andreadis, M.D.

```
 1   tissue samples under a microscope and determine

 2   whether it's non-Hodgkin's lymphoma and, if so, what

 3   subtype it is, correct?

 4       A.  I do consult with hematopathologists and we

 5   review slides together, so I do look at slides with

 6   them.

 7       Q.  But they're the ones that make the decision

 8   as to, first of all, whether it is non-Hodgkin's

 9   lymphoma or some other disease, and if it is

10   non-Hodgkin's lymphoma, what particular subtype it

11   is, correct?

12       A.  Correct.

13           MR. DIAMOND:  Form.

14   BY MR. SLONIM:

15       Q.  And, Doctor, you're not an animal

16   toxicologist, correct?

17       A.  No.

18       Q.  You don't conduct scientific studies in

19   animals, correct?

20       A.  I don't.

21       Q.  And you don't publish on animal toxicology,

22   correct?

23       A.  I don't.

24       Q.  You don't conduct genotoxicity studies,

25   correct?
```

Charalambos Andreadis, M.D.

 1        A.  I don't.

 2        Q.  Doctor, and you don't conduct mutagenicity

 3   studies, correct?

 4        A.  I don't.

 5        Q.  You're not an environmental exposure

 6   expert, correct?

 7        A.  I'm not.

 8        Q.  You don't perform quantitative analyses to

 9   determine a person's environmental exposure to

10   chemicals and compounds, correct?

11            MR. DIAMOND:  Form.

12            THE WITNESS:  There's no such thing used in

13   clinical practice.  So I don't.

14   BY MR. SLONIM:

15        Q.  You do know that there are specialties,

16   scientific specialties, that deal with calculating

17   environmental exposures?

18        A.  They do, but none of them have been used to

19   perform all the studies that we're reviewing today.

20        Q.  Doctor, you're not an expert on pesticide

21   labels and warnings, correct?

22        A.  I'm not.

23        Q.  You never worked for the EPA or any

24   regulatory agency, correct?

25        A.  I don't.

Charalambos Andreadis, M.D.

```
 1       Q.  You're not qualified to testify about

 2  warnings on Roundup, correct?

 3           MR. DIAMOND:  Form.

 4           THE WITNESS:  I'm qualified inasmuch as the

 5  literature that I read and the medical opinions that

 6  I give.

 7  BY MR. SLONIM:

 8       Q.  So you're qualified to talk about medicine,

 9  but you're not qualified to talk about labeling?

10       A.  Labels, no.

11       Q.  Okay.  Understood.

12           You've never been involved in the

13  manufacture, testing, or marketing of chemical

14  products or pesticides or herbicides; is that

15  correct?

16       A.  I haven't.

17       Q.  Doctor, you're not offering any opinions

18  with regard to the benefits of Roundup, correct?

19       A.  Correct.

20       Q.  You're not going to be telling the jury

21  that Roundup should be taken off the market, are

22  you?

23           MR. DIAMOND:  Form.

24           THE WITNESS:  That's not in my purview.

25
```

1   BY MR. SLONIM:

2       Q.  You're not going to tell the jury that

3   Roundup has no benefits, correct?

4           MR. DIAMOND:  Form.

5           THE WITNESS:  I hope I'm not asked about

6   that question.

7   BY MR. SLONIM:

8       Q.  Doctor, your medical practice is located in

9   San Francisco, correct?

10      A.  Correct.

11      Q.  Do you have any specific data regarding the

12  extent to which farmers in the Central Valley of

13  California are exposed to pesticides?

14      A.  They -- well, the Central Valley is in our

15  catchment area, so I don't have specific data

16  myself; but they're being collected as part of the

17  cancer registry.

18      Q.  You haven't reviewed that as data, have

19  you?

20      A.  No.  I have not.

21      Q.  What cancer registry collects data on

22  pesticide exposures for the Central Valley of

23  California?

24      A.  The California cancer -- the UCSF part of

25  the cancer registry collects our notes on patients

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1   who come to see us, and then we collect data.  So we

2   have risk factor data from the notes, from our

3   interviews on the notes.

4        Q.  But you haven't reviewed any of those data?

5        A.  I haven't reviewed epidemiological data in

6   our catchment area.  No.

7        Q.  Doctor, Mr. Alvarez used Roundup

8   occupationally, correct?

9        A.  Correct.

10       Q.  He did not use Roundup at his home, in

11  other words, as a residential user, correct?

12       A.  I don't think he did.

13       Q.  Is it fair to say that your opinions about

14  non-Hodgkin's lymphoma and pesticides, including

15  Roundup, are limited to occupational use?

16            MR. DIAMOND:  Form.

17            THE WITNESS:  My opinions in this case or

18  in general?

19  BY MR. SLONIM:

20       Q.  Let's take them separately.  Your opinions

21  in this case.

22       A.  Are based on his -- mostly his occupational

23  use.  Correct.

24            In general, I've been asked about a lot of

25  patients about home use, and so I do have opinions

Charalambos Andreadis, M.D.

```
 1    for both.

 2         Q.  What are your opinions about home use?

 3              MR. DIAMOND:  Form.

 4              THE WITNESS:  My opinion about home use is

 5    that, depending on the case, if it involves the

 6    occasional once-a-year spraying of a limited area,

 7    that it probably wouldn't rise to the level of

 8    exposure that has been associated with significant

 9    risk.  But again, every case is different.

10    BY MR. SLONIM:

11         Q.  Well, what's the minimum threshold of

12    residential use where you would say that you thought

13    Roundup caused or contributed substantially to the

14    non-Hodgkin's lymphoma?

15              MR. DIAMOND:  Form and foundation.

16              THE WITNESS:  I don't have a threshold.

17    It's that -- because every -- when I interview new

18    patients, I almost always get a history of

19    exposures, and I ask -- we have a list about

20    occupational exposures and then areas where people

21    grew up and did they grow up on a farm, did they

22    grow up near a farming area, and what pesticides or

23    herbicides they may have been exposed to.  So people

24    always volunteer that they are exposed.  It's

25    almost -- it's unusual that somebody would say, I'm
```

Charalambos Andreadis, M.D.

1   not exposed to anything.

2          And then, depending on the conversation, I

3   may say, well, I don't think that's significant or

4   not.

5   BY MR. SLONIM:

6      Q.   Okay.  So I understand if you're dealing

7   with a farmer, someone who works in an occupation

8   like a groundskeeper or something where they may be

9   occupationally exposed to pesticides.  And I

10  understand that you're offering an opinion in this

11  case about an occupational user.

12         Is it fair to say, though, that your

13  opinions are limited to occupational users as

14  opposed to a homeowner who has a lawn and a garden

15  and, in connection with their own residential use,

16  sprays Roundup?

17         MR. DIAMOND:  Let me just inquire.  Are you

18  asking what I've asked him to give an opinion on in

19  this case?  Because I've only asked him to opine

20  regarding Mr. Alvarez's use.

21         MR. SLONIM:  Just say "form."

22         MR. DIAMOND:  No, because I think we're

23  getting far afield, and I don't think we should be

24  going into a specific causation expert's opinions on

25  things that he's not been asked to opine on in this

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    case.

2           So if you want to ask him questions about

3    general causation issues, I'm going to object and

4    instruct him not to answer.  That's why I -- that's

5    why I bring it up right now.

6           MR. SLONIM:  So if you instruct him not to

7    answer, that's perfectly fine, and I'll move on.

8           MR. DIAMOND:  Okay.

9           MR. SLONIM:  Let me do this --

10           MR. DIAMOND:  Yeah.

11           MR. SLONIM:  Let me ask the question so we

12    have a -- just so I have a clear record.

13           MR. DIAMOND:  Sure.

14           MR. SLONIM:  And then if you instruct him

15    not to answer, we'll abide the instruction.  Okay?

16           MR. DIAMOND:  Fair enough.

17           I just want to bring it up as a courtesy to

18    you as to what I'm thinking.

19           MR. SLONIM:  Okay.

20      Q.  So, Doctor, is it fair to say that the

21    opinions that you are offering about non-Hodgkin's

22    lymphoma and pesticides including Roundup are

23    limited to occupational use and do not encompass

24    home users or residential users of those products?

25           MR. DIAMOND:  Form.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

```
1              THE WITNESS:  The opinion that I'm offering

2    in this case today is specific to Mr. Alvarez.  The

3    opinions that I offer to my patients vary.

4    BY MR. SLONIM:

5         Q.  Well, the opinion in this -- for

6    Mr. Alvarez is simple.  He was an occupational user?

7         A.  Correct.

8         Q.  Okay.  So I understand you are offering an

9    opinion --

10        A.  You said --

11        Q.  But I'm asking a different question.  I'm

12   asking, do you have opinions regarding residential

13   nonoccupational users of Roundup and whether or not

14   that use is linked to an increased risk of

15   non-Hodgkin's lymphoma?

16        A.  I have opinions, yes, that I share with the

17   patients.

18        Q.  And what are those opinions?

19             MR. DIAMOND:  Form.

20             THE WITNESS:  Well, the opinions are that,

21   for most patients, the level of exposure and their

22   other exposures that they have don't really, in my

23   mind, rise to the level of evidence that would

24   suggest an association.

25
```

Charalambos Andreadis, M.D.

1  BY MR. SLONIM:

2      Q.  How much exposure would a residential

3  nonoccupational user of Roundup need before you

4  would say that Roundup caused or substantially

5  contributed to the development of their

6  non-Hodgkin's lymphoma?

7          MR. DIAMOND:  Form and foundation.

8          THE WITNESS:  Well, as I said previously,

9  it's not an absolute.  It's not a black and white.

10  It's a spectrum.  So if somebody tells me that every

11  day for the last 30 years they've been spraying

12  their garden with Roundup, I would say, "Okay, that

13  sounds like a lot."

14          If somebody tells me, "I used it once when

15  I went to a vacation because I didn't want my garden

16  to have weeds," I would say, "That's probably not

17  enough."

18          The studies have established different

19  numbers and averages, if you must, of use among

20  commercial users.  And so generally those are much

21  higher than the use in home users.

22  BY MR. SLONIM:

23      Q.  So if a residential user used Roundup two

24  times a week during the spring growing months for 20

25  or 30 years, is that enough exposure to Roundup

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1   where you would offer an opinion that Roundup caused

2   or substantially contributed to the non-Hodgkin's

3   lymphoma?

4        MR. DIAMOND:  Form and foundation.

5        THE WITNESS:  And, again, my opinion is

6   never black and white.  And the ultimate goal in the

7   patient encounter is the purpose of the opinion.

8        So I don't encourage people to seek legal

9   advice, for example, but I say, "Okay, maybe you

10  have enough exposure that maybe it has caused that."

11  BY MR. SLONIM:

12       Q.  Tell me what methodology you would use to

13  define the exposure threshold for a nonoccupational

14  user to determine whether or not -- or to offer an

15  opinion as to whether or not that user -- that

16  user's non-Hodgkin's lymphoma was associated with

17  glyphosate exposure.

18       MR. DIAMOND:  I'm just going to instruct

19  you not to answer.  If it turns out that the judge

20  feels that that's something appropriate for a

21  specific causation expert witness, then I would be

22  happy to come back and address it at that time.

23  BY MR. SLONIM:

24       Q.  Doctor, are you familiar with the monograph

25  published by an organization called IARC in 2015

Charalambos Andreadis, M.D.

1    regarding glyphosate and cancer?

2        A.  I am.

3        Q.  And you understand that glyphosate is the

4    active ingredient in Roundup; is that correct?

5        A.  Yes.

6        Q.  How did you -- strike that.

7            When did you first learn of the IARC

8    monograph on glyphosate?

9        A.  I actually wasn't familiar with it until I

10   became involved in this case, and then I sat down

11   and reviewed the literature.

12       Q.  And when was that?

13       A.  That must have been early August of 2019.

14       Q.  In other words, you gave a deposition --

15   two depositions as a fact witness involving two of

16   your patients in July of 2019, correct?

17       A.  Correct.

18       Q.  July 15th, 2019, correct?

19       A.  Correct.

20       Q.  At that time, you had not known of the IARC

21   monograph involving glyphosate; is that correct?

22       A.  I had not.

23       Q.  Subsequent to that deposition, you think

24   perhaps in August of 2019 you became aware of it?

25       A.  Well, I became interested in the subject

1  after testifying in two cases, and I started doing

2  some literature searches.  I also was retained to

3  give a specific causation opinion, and so I reviewed

4  some of the general causation reports.

5      Q.  Well, did you learn of the IARC monograph

6  yourself, or did someone give it to you?

7      A.  I looked at it myself.  I -- it wasn't

8  given to me.  No.  I found it myself.

9      Q.  And you believe that was in or about August

10  of 2019?

11      A.  Correct.

12      Q.  And why did you read it?

13      A.  Because I thought it was a nice summary of

14  the studies that have been done, both the genotoxic

15  studies and also the epidemiology studies.  And I

16  used it to find references to read other studies.

17      Q.  You also read expert reports prepared by

18  several plaintiffs' experts; is that correct?

19      A.  Correct.

20      Q.  You read a report prepared by a plaintiffs'

21  expert named Dr. Ritz; is that correct?

22      A.  I believe so, yes.

23      Q.  And a plaintiffs' expert named Dr. Portier?

24      A.  I did.

25      Q.  And another plaintiffs' expert named

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1   Dr. Weisenburger?

2       A.  I'm not sure if I read that report, but I

3   read the deposition.

4       Q.  Did you also read a report prepared by a

5   plaintiffs' expert named Dr. Schustov?

6       A.  I did.

7       Q.  Did you read any other plaintiffs' expert

8   reports that I haven't mentioned?

9       A.  Not unless -- I listed the reports that I

10  read.

11      Q.  Did you read Dr. Nabhan's -- any of

12  Dr. Nabhan's reports?

13      A.  I did.

14          MR. DIAMOND:  Let me just say, those two

15  doctors, Schustov and Nabhan, were in the Hardeman

16  case.  They're actually technically not the

17  plaintiffs' expert in this case.

18          THE WITNESS:  So I read the Hardeman case

19  reports.

20  BY MR. SLONIM:

21      Q.  So how did you select the plaintiffs'

22  expert reports that you read?

23      A.  I didn't select them.  I read what was

24  given to me.

25      Q.  So those reports were given to you?

Charalambos Andreadis, M.D.

```
 1        A.   Uh-huh.

 2        Q.   Have you talked to any of the plaintiffs'

 3   experts about this litigation?

 4        A.   Personally?

 5        Q.   Yes.

 6        A.   No.

 7        Q.   So you've read their expert reports, and

 8   have you read some of their depositions?

 9        A.   Correct.

10        Q.   Did you read any reports prepared by

11   defense experts?

12        A.   I did.

13        Q.   Which ones?

14        A.   I read the report by Dr. Grossbard.  I also

15   read the pathology report; I forget the doctor's

16   name.  Carter?

17             MR. DIAMOND:  Zukerberg.

18             THE WITNESS:  Oh, Zukerberg.  And then I

19   read a toxicology report.

20   BY MR. SLONIM:

21        Q.   Dr. Goodman?

22        A.   Goodman.

23        Q.   And how did you happen to select those

24   reports?

25        A.   Again, they were provided to me.
```

Charalambos Andreadis, M.D.

1      Q.  Did you read any defense epidemiology

2   reports?

3      A.  What does that mean?

4      Q.  Did you read any reports prepared by

5   defense experts who were specifically

6   epidemiologists as opposed to defense experts who

7   may have, in passing or as part of their report,

8   included epidemiology?

9      A.  I don't think I did.

10     Q.  Did you read Dr. Steidl's report?

11     A.  That name sounds familiar.  I don't recall

12   if I read that or not.

13     Q.  Doctor, do you agree with me that, as you

14   think about a subject, a scientific subject, that

15   it's important to think broadly and to take in all

16   relevant scientific aspects of the subject matter as

17   part of forming an opinion?

18          MR. DIAMOND:  Form.

19          THE WITNESS:  I do.

20   BY MR. SLONIM:

21     Q.  In other words, it would not be good

22   scientific form to just read all the studies or

23   opinions or evidence supporting one side of a

24   particular issue and overlook commentary and

25   discussion on the other side; isn't that correct?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

```
 1        A.  It's correct.

 2        Q.  In the field of oncology, for instance,

 3   there are many issues that are controversial, and

 4   people may have opinions, strong opinions, about a

 5   subject, correct?

 6        A.  Correct.

 7        Q.  But other people may have equally strong

 8   opinions and data on the contrary side of that

 9   particular question, correct?

10        A.  Yes.

11        Q.  And as you think about any kind of

12   scientific controversy like that, you would agree

13   with me that to be -- to try to have the best

14   possible view, you should try to take it all into

15   account and then synthesize and form your own

16   opinions, fair?

17        A.  Fair.

18        Q.  In other words, and I think this is a

19   simple proposition, you would agree with me that a

20   scientist should consider all of the available

21   scientific evidence, correct?

22        A.  Correct.

23        Q.  Wouldn't you also agree with me that a

24   scientist should try to maintain an open mind and be

25   willing to change his or her opinion based on
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    additional information that they may not have been

2    aware of or may not have fully considered?

3        A.   Absolutely.

4        Q.   I want you to think about those general

5    concepts as we talk about IARC, in particular.

6             Now, Doctor, in your expert report you

7    state that IARC's assessment was based on a thorough

8    and rigorous investigation by independent

9    researchers in the field.

10            You recall saying that or words to that

11   effect?

12       A.   Yes.

13       Q.   Are you aware of the fact that many

14   scientists around the world have reviewed IARC's

15   assessment and found it to be flawed and incorrect?

16            MR. DIAMOND:  Form.

17            THE WITNESS:  I have seen contradictory

18   reports as well, yes.

19   BY MR. SLONIM:

20       Q.   And, Doctor, you know that the

21   United States Environmental Protection Agency, as

22   well as other regulatory agencies around the world,

23   employ expert toxicologists and epidemiologists and

24   environmental exposure experts and other scientists

25   whose entire job it is to review the safety of

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    pesticides, correct?

2            MR. DIAMOND:  Form.

3            THE WITNESS:  Correct.  I'm not sure of the

4    EPA's reputation nowadays.

5    BY MR. SLONIM:

6        Q.  Well, I understand that you and other

7    people may have some concerns about EPA.  But we'll

8    address those and we'll talk about other regulatory

9    agencies.

10       A.  Okay.

11       Q.  And as a good scientist, you'll maintain an

12   open mind, correct?

13       A.  Correct.

14       Q.  Now, are you aware that, after IARC issued

15   its report in 2015, the regulatory agencies around

16   the world, not just the United States EPA, that they

17   rereviewed and reassessed all of the scientific

18   evidence regarding glyphosate and carcinogenicity?

19           MR. DIAMOND:  Form.

20           THE WITNESS:  I'm sure there was a review.

21   I don't know if all the agencies reviewed all of the

22   studies.  But....

23   BY MR. SLONIM:

24       Q.  Do you know what criteria the worldwide

25   regulatory agencies used in evaluating and

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    reevaluating the scientific evidence regarding

2    glyphosate and cancer?

3        A.  I don't --

4            MR. DIAMOND:  Form.

5            THE WITNESS:  -- know the specific

6    criteria.

7    BY MR. SLONIM:

8        Q.  As you think about this, as a scientist, do

9    you agree that it would be important for you to know

10   the criteria that the regulatory scientists used

11   when they performed their analyses and their

12   reviews?

13           MR. DIAMOND:  Form.

14           THE WITNESS:  I generally look at the

15   criteria for individual studies.  I'm not involved

16   with regulatory work, so I don't really read the

17   regulatory methodology.

18   BY MR. SLONIM:

19       Q.  So let's talk about Health Canada.

20           What criteria did Health Canada utilize to

21   assess glyphosate and cancer?

22           MR. DIAMOND:  Form.

23           THE WITNESS:  I'm not familiar with -- I

24   don't know what you're referring to.

25

Charalambos Andreadis, M.D.

```
 1   BY MR. SLONIM:

 2        Q.  Well, you know Health Canada is similar to

 3   the EPA and the USFDA, and they regulate drugs and

 4   pesticides in Canada, correct?

 5            MR. DIAMOND:  Form.  Foundation.

 6            (Reporter clarification.)

 7            THE WITNESS:  I wasn't aware of that.

 8   BY MR. SLONIM:

 9        Q.  Well, did Health Canada use prespecified

10   objective criteria that they applied to all

11   pesticides when they reviewed glyphosate?

12            MR. DIAMOND:  Form.

13            THE WITNESS:  I'm not familiar with the

14   review.

15   BY MR. SLONIM:

16        Q.  You have no basis to disagree with the

17   criteria that Health Canada used, do you?

18            MR. DIAMOND:  Form.  Foundation.

19            THE WITNESS:  I cannot --

20            (Reporter requests one speaker at a time.)

21            MR. DIAMOND:  And we may just want to make

22   sure we go over that.  I'm going to try to squeeze

23   in, occasionally, objections.  You can still answer

24   the questions unless instructed otherwise.  So it's

25   easier for the court reporter just to pause for a
```

1    second --

2            THE WITNESS:  Okay.

3            MR. DIAMOND:  -- before I get it out.

4            MR. SLONIM:  So let's do this, just so we

5    have a clear record.

6        Q.  Let me repeat the question.  If your

7    attorney has an objection, he's certainly permitted

8    to interpose that, and you're still required to

9    answer unless he specifically instructs you not to

10   answer.  Okay?

11       A.  Okay.

12       Q.  You have no basis to disagree with the

13   criteria that Health Canada utilized when they

14   reviewed and rereviewed the -- whether glyphosate

15   was associated with an increased risk of cancer,

16   correct?

17           MR. DIAMOND:  Form and foundation.

18           THE WITNESS:  I'm not familiar with that

19   review.

20           (Whereupon, Exhibit 4 was marked for

21           identification.)

22   BY MR. SLONIM:

23       Q.  So, Doctor, we were talking about Health

24   Canada, and I've marked as Deposition Exhibit No. 4

25   a document that was prepared by that agency dated

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    April 28th, 2017.  It's entitled "Glyphosate

2    Re-evaluation Decision."

3          Do you have that in front of you?

4          A.  I do.

5          Q.  So do you understand that this was prepared

6    approximately two years after IARC prepared its

7    monograph regarding glyphosate, because IARC's

8    monograph was 2015, correct?

9          A.  Correct.

10         Q.  This is a reevaluation decision.  So, in

11   other words, this is a decision, a document prepared

12   by Health Canada to reevaluate glyphosate after IARC

13   prepared their analysis, correct?

14         MR. DIAMOND:  Form and foundation.

15         THE WITNESS:  Apparently.

16   BY MR. SLONIM:

17         Q.  Okay.  Turn, please, to page 1.

18         A.  Executive summary?

19         Q.  Yeah.  But hold on.  Did the yellow --

20   there's one copy --

21         MR. DIAMOND:  Mine has yellow.

22         MR. SLONIM:  The highlight.  Can we do

23   this --

24         MR. DIAMOND:  Would you like to use that

25   one for him?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1          MR. SLONIM:  Yeah.  Let's mark this as

2    Deposition Exhibit No. 4.

3          MR. DIAMOND:  I'll just take this one.

4          (Whereupon, Exhibit No. 4 was re-marked.)

5    BY MR. SLONIM:

6      Q.  Doctor, let me tell you what happened.  I

7    asked my legal assistant to yellow highlight certain

8    passages so it would be easier for you to find them

9    amidst all the pages.  Apparently they didn't yellow

10   highlight all of the copies.  I apologize for that.

11   But this will make it easier for you to find.

12     A.  Okay.

13     Q.  Just so it's clear, I added the yellow

14   highlighting.  It was not in the original document.

15          Okay.  So if you direct your attention

16   right to the very first page, the very first

17   paragraph.  Do you see that?

18          It states that -- and I quote, "Health

19   Canada's primary objective in regulating pesticides

20   is to protect Canadians' health and their

21   environment."

22          I read that correctly?

23     A.  Correct.

24     Q.  You have no reason to doubt Health Canada's

25   dedication to protecting public health, do you?

Charalambos Andreadis, M.D.

1       A.  I'm not an expert in Health Canada

2   policies.

3       Q.  But you have no reason to doubt that that's

4   their mission stated in --

5       A.  I -- no.

6       Q.  And right on the very first page, right in

7   the middle of the paragraph, Health Canada states

8   its overall findings from their reexamination,

9   correct?

10      A.  Correct.

11      Q.  And the very first bulleted item underneath

12  that overall finding states, and I quote,

13  "Glyphosate is not genotoxic and is unlikely to pose

14  a human cancer risk."

15          Did I read that correctly?

16      A.  Correct.

17      Q.  So is it your understanding that, two years

18  after IARC published its monograph, scientists at

19  Health Canada looked at the available scientific

20  evidence, they reevaluated it, and they reached the

21  conclusion that glyphosate was not genotoxic and was

22  unlikely to pose a human cancer risk?

23          MR. DIAMOND:  Form and foundation.

24          THE WITNESS:  Correct.

25

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

```
 1   BY MR. SLONIM:

 2       Q.  Okay.  Let's move on.

 3           Mr. Alvarez was exposed to Roundup in the

 4   course of his occupation at a winery in California,

 5   correct?

 6       A.  Correct.

 7       Q.  And as part of his job at the winery,

 8   Mr. Alvarez would periodically spray Roundup to kill

 9   weeds on the property, correct?

10       A.  Correct.

11       Q.  Now, Health Canada specifically considered

12   whether people like Mr. Alvarez who were

13   occupationally exposed to Health Canada -- who were

14   occupationally exposed to Roundup -- let me restart

15   that.  I'm so sorry.

16           Health Canada specifically considered

17   whether people like Mr. Alvarez who were

18   occupationally exposed to Roundup had health risks

19   from that exposure; isn't that a fact?

20           MR. DIAMOND:  Form and foundation.

21           THE WITNESS:  I'm not -- again, I don't

22   know what criteria they used and what studies they

23   looked at.

24   BY MR. SLONIM:

25       Q.  Okay.  Turn, please, to page 5.  Direct
```

Charalambos Andreadis, M.D.

1    your attention to the last paragraph.  There's a

2    heading in bold type face; do you see that?

3        A.  I do.

4        Q.  And it states, and I quote, "Occupational

5    risks to handlers are not of concern when used

6    according to label directions."

7            And if you take a look at the next couple

8    of sentences, they explain that risks to

9    occupational handlers were not of concern for all

10   scenarios.  That's what they stated, correct?

11       A.  Correct.

12       Q.  And when the Health Canada scientists

13   assessed glyphosate, according to this document,

14   they considered occupational exposures that resulted

15   from mixing the chemical, from loading the chemical,

16   and from applying the chemical, correct?

17           MR. DIAMOND:  Form and foundation.

18           THE WITNESS:  According to label.

19   BY MR. SLONIM:

20       Q.  According to the label, correct?

21       A.  That's right.

22       Q.  And they also expressly considered the fact

23   that occupational users, like Mr. Alvarez, would be

24   exposed to glyphosate through their skin and through

25   inhalation, correct?

```
 1            MR. DIAMOND:  Form.

 2            THE WITNESS:  Those are the two activities

 3    they looked at, correct.

 4    BY MR. SLONIM:

 5       Q.  They report that right on page 5 on the

 6    bottom of the page, correct?

 7       A.  Yes.

 8       Q.  And their ultimate conclusion was that

 9    occupational risks to handlers are not of concern

10    when glyphosate is used according to the labeled

11    instructions, correct?

12            MR. DIAMOND:  Form.

13            THE WITNESS:  Correct.

14    BY MR. SLONIM:

15       Q.  Now, Doctor, the Health Canada scientists

16    explained that they had reviewed IARC's conclusions

17    that were drawn from animal studies, and they had

18    determined that IARC's conclusions were flawed;

19    isn't that correct?

20            MR. DIAMOND:  Form.

21            THE WITNESS:  I have not seen that here.

22    BY MR. SLONIM:

23       Q.  Turn, please, to page 23.

24            Do you see the subheading that says,

25    "Conclusion"?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1       A.  I do.

2       Q.  Would you read, to yourself, the

3   paragraph that says "overall" and tell me when

4   you've finished reading that.

5       A.  "Overall the IARC concluded that the

6   evidence of carcinogenicity was limited in humans

7   but sufficient in animals.  This conclusion was

8   reached based on statistically increased incidences

9   of tumor findings in four chronic studies in rodents

10  (two in rats and two in mice), as well as results

11  from genotoxicity (mostly in vitro) assays using

12  formulated products.  However, the IARC did not

13  reflect the lack of dose-response relationships or

14  other contextual information (for example

15  background/historical control data, cytotoxicity) in

16  their decision."

17      Q.  So you agree with me that Health Canada

18  scientists criticized IARC's conclusions regarding

19  animal studies, and they found that they were

20  flawed, correct?

21          MR. DIAMOND:  Form.

22          THE WITNESS:  Well, I don't know that it

23  says that they're flawed.  They just are criticizing

24  the findings.

25

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

```
 1   BY MR. SLONIM:

 2       Q.  They're criticizing the findings because

 3   they said that IARC's findings did not reflect --

 4   did not reflect the lack of a dose-response

 5   relationship or other contextual information, for

 6   example, background/historical control data,

 7   cytotoxicity in their decision.

 8           That was what they said, correct?

 9       A.  Right.  So that's a criticism.

10       Q.  Okay.  Fair enough.

11           So, Doctor, I want you to think back and

12   remember that, as we had discussed, that a scientist

13   should keep an open mind --

14       A.  Correct.

15       Q.  -- and should consider all sources of

16   information.

17           At the time that you reviewed the IARC

18   study in probably August of 2019, just within the

19   last several months, I take it you were unaware of

20   the fact that scientists at Health Canada had

21   reviewed the animal data and found that IARC, in

22   their opinion, had failed adequately to deal with

23   the lack of a dose-response relationship and other

24   important contextual information such as historical

25   control and cytotoxicity.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1           That's something that you were not aware of

2   until today, right?

3           MR. DIAMOND:  Form.

4           THE WITNESS:  Well, as I mentioned, I was

5   aware that there were other agencies and other

6   opinions on the matter.  So I was aware of that.  I

7   didn't specifically read a lot of the reports.  Any

8   of the reports.

9   BY MR. SLONIM:

10     Q.  So is it fair to say that these specific

11  criticisms regarding Health Canada scientists'

12  review of the adequacy or inadequacy of IARC's

13  assessment of the animal studies, that's new

14  information to you that you learned the first time

15  today?

16          MR. DIAMOND:  Form.

17          THE WITNESS:  As I mentioned, I have -- I'm

18  aware of contradicting opinions.  And all of these

19  reports, the IARC, this one, any other report, don't

20  provide new data.  They just provide review of

21  existing data.  And so that's really not something

22  that I use to make an opinion.

23          I mostly looked at the IARC report, as I

24  mentioned, for some of the references and discussion

25  of the matter.  But I could have used any report.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    BY MR. SLONIM:

2         Q.   Okay.   Now, Health Canada says that IARC

3    only looked at four animal studies, right?   Two in

4    rats and two in mice?

5         A.   Correct.

6         Q.   Does that refresh your recollection or does

7    that agree with your -- let me rephrase it.

8              Does that agree with your recollection that

9    IARC looked only at two specific animal

10   carcinogenicities -- four animal carcinogenicities?

11             MR. DIAMOND:   Form.

12             THE WITNESS:   I don't recall those details.

13   BY MR. SLONIM:

14        Q.   You don't have any reason to doubt that the

15   Health Canada got it right?

16        A.   If it's mentioned here, no.

17        Q.   Now, turn, please, to page 21, in the

18   middle of the page.

19             Do you see Health Canada says that there

20   were 14 long-term studies of glyphosate toxicity and

21   carcinogenicity in rodents?   Four additional studies

22   in rats and three additional studies in mice.

23             Do you see that?

24        A.   Three in mice.   Correct.

25        Q.   So the Health Canada scientists reviewed

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    information for 14 long-term carcinogenicity studies

2    in rodents, correct?

3            MR. DIAMOND:  Form and foundation.

4            THE WITNESS:  In the publication it says a

5    review by Greim, et al., reviewed the 14.  I don't

6    know what Health Canada reviewed.

7    BY MR. SLONIM:

8        Q.  Well, read the last sentence.  It says,

9    "The PMRA had access to detailed information for

10   these studies."

11           So Health Canada says --

12       A.  Correct.

13       Q.  So Health Canada says that its scientists

14   had access to detailed information for 14 studies,

15   not 4 studies, right?

16       A.  Agreed.

17       Q.  Have you reviewed those 14 studies?

18       A.  No.  And I have not reviewed the 4 either.

19       Q.  So do you have any basis to disagree with

20   Health Canada's assessment that IARC -- that IARC's

21   analysis of the animal toxicity studies did not

22   adequately reflect on the absence of a dose-response

23   relationship?

24           MR. DIAMOND:  Form.

25           THE WITNESS:  Just reading this one section

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1  of an entire document, I see that they mention that

2  they were not -- these studies were not considered

3  acceptable by IARC due to insufficient reporting of

4  the study methods.

5       So to reiterate my point, a lot of these

6  organizations that have their own policy initiatives

7  may look at different variables when they're

8  deciding what's important in that, but ultimately

9  they're all editorializing.  So one opinion doesn't

10  really carry any more weight than any other opinion,

11  in my mind.

12  BY MR. SLONIM:

13     Q.  Okay.  So you're prepared to accept IARC's

14  review based on 14 studies and discount Health

15  Canada's -- on 4 studies and discount Health

16  Canada's analysis based on 14 studies, even though

17  Health Canada had access to the detailed information

18  for those studies?

19          MR. DIAMOND:  Form.

20          THE WITNESS:  I'm not discounting any of

21  these reports and studies.  I'm just saying that

22  people use the studies that they feel are more

23  appropriate to formulate their opinion, and my

24  opinion, again, quotes IARC, but largely quotes

25  independent -- different studies.  I would not even

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    mention IARC when it comes to genotoxicity.

2    BY MR. SLONIM:

3        Q.  Well, we're going to walk through all of

4    it, including genotoxicity.

5        A.  Okay.

6        Q.  Right now let's focus on animal studies.

7            Do you agree that Health Canada's

8    observation that the absence of dose-response

9    relationship in animal studies, that's an important

10   consideration that IARC did not adequately account

11   for?

12           MR. DIAMOND:  Form and foundation.

13           THE WITNESS:  Again, that IARC found -- it

14   didn't meet the eligibility criteria for the IARC

15   review.  That's what the report says.

16   BY MR. SLONIM:

17       Q.  Well, on page -- turn to page 23.

18           They say, "IARC did not reflect the lack of

19   a dose-response relationship."

20           Correct?

21           MR. DIAMOND:  Where are you reading?

22           THE WITNESS:  Oh, however --

23           MR. SLONIM:  Page 23 -- page 23, middle

24   sentence that says "however."

25           MR. DIAMOND:  Oh.

Charalambos Andreadis, M.D.

```
 1              MR. SLONIM:  On animal studies.

 2              THE WITNESS:  The IARC did not reflect the

 3    lack of -- yes.  Yeah, we discussed that.

 4    BY MR. SLONIM:

 5         Q.  So the absence of a dose-response

 6    relationship, that's an important fact in assessing

 7    whether or not there's a causal link between an

 8    exposure and an outcome, isn't there?

 9              MR. DIAMOND:  Form.

10              THE WITNESS:  It's an important fact, yes.

11    BY MR. SLONIM:

12         Q.  And so the absence -- the absence of a

13    dose-response relationship, that's an important

14    consideration, correct?

15              MR. DIAMOND:  Form.

16              THE WITNESS:  It's one of many

17    considerations, but, yes, it is an important one in

18    my mind.

19    BY MR. SLONIM:

20         Q.  And by the way, so look down to the next

21    paragraph down, and the first bulleted item.

22              The scientists at Health Canada wrote, and

23    I quote, "A clear dose-response was not observed for

24    any of the noted tumors."

25              Did I read that correctly?
```

Charalambos Andreadis, M.D.

1      A.  Yes.

2      Q.  That factor militates against the causal

3   relationship between glyphosate and carcinogenicity,

4   doesn't it?

5          MR. DIAMOND:  Form.

6          THE WITNESS:  Again, we would have to know

7   the specific context here, so obviously we're

8   talking about non-Hodgkin's lymphoma, and

9   carcinogenicity is a very broad term.

10          So I don't really know what they looked at.

11   And, therefore, I can't -- I'm not going to take a

12   broad statement and extrapolate it to every single

13   case.

14   BY MR. SLONIM:

15      Q.  Well, they said "for any of the noted

16   tumors," correct?

17      A.  I don't know how many of them were noted to

18   be lymphoma.

19      Q.  Well, when you read the IARC report on the

20   animal studies, did you note how many of them were

21   lymphoma as opposed to other forms of cancer?

22      A.  I looked up some of them, and some of the

23   research has been done on lymphocytes which are the

24   parent cells of lymphoma and are widely available in

25   the blood.

Charalambos Andreadis, M.D.

1         So I specifically looked at some of the

2    lymphocyte-related research.

3         Q.  Let's move on a little bit.

4         Now, after Health Canada published this

5    report on August 28th, 2017, are you aware of the

6    fact that they put it out for commentary including

7    criticisms and objections?

8         MR. DIAMOND:  Form.

9         THE WITNESS:  I would expect that's the

10   case.  Yes.

11   BY MR. SLONIM:

12        Q.  And do you know that after they published

13   this, Health Canada received a number of objections,

14   and that caused their scientists to go back and to

15   rereview for a second time the scientific evidence

16   regarding glyphosate and cancer?

17        Is that something you were aware of?

18        A.  No.

19        (Whereupon, Exhibit 5 was marked for

20        identification.)

21   BY MR. SLONIM:

22        Q.  Okay.  Doctor, we've marked as Deposition

23   Exhibit No. 5 a statement issued by Health Canada

24   earlier this year on January 11th, 2019.

25        Do you have that in front of you?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

```
1        A.  I do.

2        Q.  I'm going to ask you to read aloud the

3   fourth paragraph, it's yellow highlighted, that

4   begins with the words "After a thorough," and then

5   I'm going to ask you some questions about it after

6   you finish reading that paragraph aloud.

7        A.  After-a-thorough --

8            (Reporter clarification.)

9   BY MR. SLONIM:

10       Q.  Read slowly so the court reporter can get

11   it down, please.

12       A.  "After a thorough scientific review, we

13   have concluded that the concerns raised by the

14   objectors could not be scientifically supported when

15   considering the entire body of relevant data.  The

16   objections raised did not create doubt or concern

17   regarding the scientific basis for the 2017

18   re-evaluation decision for glyphosate.

19   Therefore the Department's" --

20       Q.  No -- oh, I'm sorry.  Go ahead.

21       A.  "Therefore, the Department's final decision

22   will stand."

23       Q.  So do you understand that Health Canada has

24   represented to the public that they had conducted a

25   thorough scientific review to assess whether
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

 1   glyphosate is associated with cancer?

 2          MR. DIAMOND:  Form.

 3          THE WITNESS:  I understand that.

 4   BY MR. SLONIM:

 5      Q.  And --

 6          MR. DIAMOND:  Bert, I'm sorry.  Before you

 7   ask another question, would it be okay, as soon as

 8   you finish up this, just to a take a short break, so

 9   we can, about every hour, just to take a short

10   five-minute break?

11          MR. SLONIM:  Let's finish with this

12   document, then we'll --

13          MR. DIAMOND:  Yeah.  As soon as you finish

14   with that document.  I just want to make sure I

15   don't forget to say something about it.

16   BY MR. SLONIM:

17      Q.  Doctor, you have no reason to doubt Health

18   Canada's word when they say they conducted a

19   thorough review?  You don't have any reason to doubt

20   that they did so?

21          MR. DIAMOND:  Form and foundation.

22          THE WITNESS:  Again, I don't place much

23   value in this kind of process because, again, it's

24   reexamination of data that's out there.  But

25   obviously, as an authority on health care, they --

Charalambos Andreadis, M.D.

1    it's an important opinion.  But all these are

2    opinions.

3    BY MR. SLONIM:

4        Q.  So let me ask you to read the sixth

5    paragraph.  It starts on the bottom of the page and

6    then continues over to the next page, please.

7        A.  "Our scientists"?  That paragraph?

8        Q.  Yes.

9        A.  "Our scientists left no stone unturned in

10   conducting this review.  They had access to all

11   relevant data and information from federal and

12   provincial governments, international regulatory

13   agencies, published scientific reports and multiple

14   pesticide manufacturers.  This includes the reviews

15   referred to in the Monsanto" papers -- "in the

16   Monsanto paper."  Sorry.  "Health Canada also had

17   access to numerous individual studies and raw

18   scientific data during its assessment of glyphosate

19   including additional cancer and genotoxicity

20   studies.  To help ensure an unbiased assessment of

21   the information, Health Canada selected a group of

22   20 of its own scientists who were not involved in

23   the 2017 re-evaluation to evaluate the notices of

24   objection."

25             (Reporter clarification.)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    BY MR. SLONIM:

2        Q.  Do you agree that when conducting a

3    scientific assessment for potential carcinogenicity,

4    it's commendable that Health Canada scientists left

5    no stone unturned?

6            MR. DIAMOND:  Form and foundation.

7            THE WITNESS:  Sure.

8    BY MR. SLONIM:

9        Q.  And are you representing to the jury that

10   when you studied the scientific literature regarding

11   glyphosate and cancer, that you left no stone

12   unturned?

13           MR. DIAMOND:  Form.

14           THE WITNESS:  I reviewed several pieces of

15   evidence that I felt were important to me.  I was

16   not asked to be a general causation expert and

17   review all the literature that has to do with

18   glyphosate and lymphoma.  So I reviewed things that

19   I thought were more important.

20   BY MR. SLONIM:

21       Q.  In other words, you did not personally

22   review all of the animal carcinogenicity studies,

23   did you?

24       A.  Of course not.

25       Q.  And you only read a few of the genotoxicity

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    studies, correct?

2        A.   Correct.

3        Q.   And you did not have a team of 20

4    independent scientists to assist you with your

5    review, did you?

6        A.   I did not.

7        Q.   Now, take a look at the last paragraph,

8    please.

9             Health Canada writes, and I quote, "No

10   pesticide regulatory authority in the world

11   currently considers glyphosate to be a cancer risk

12   to humans at levels at which humans are currently

13   exposed."

14            Did I read that correctly?

15       A.   You did.

16       Q.   You agree that that's an accurate

17   statement, right?  You cannot identify any health

18   regulatory agency anywhere in the world that has

19   determined that glyphosate is a risk -- carcinogenic

20   risk to humans?

21            MR. DIAMOND:  Form and foundation.

22            THE WITNESS:  Well, again, that's a media

23   relations report.  I am not familiar with every

24   single agency in the world and their

25   recommendations.  But I believe -- I trust the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    statement.

2    BY MR. SLONIM:

3        Q.  So, Doctor, just a couple more questions,

4    and then we'll take a break.

5            So, again, bearing in mind that you only

6    read the IARC statement a few months ago and you're

7    seeing some information today, for instance, from

8    Health Canada and Health Canada scientist

9    assessments about materials that you have not had

10   the opportunity to personally review yourself, is it

11   fair to say that your opinion about glyphosate might

12   be wrong and that the opinions at the regulatory

13   agencies around the world that glyphosate is not a

14   cancer risk might be right?

15           MR. DIAMOND:  Form and foundation.

16           THE WITNESS:  I'm not offering an opinion

17   on glyphosate in general.  I'm offering a specific

18   opinion.

19           And the truth is, there's many studies that

20   argue one thing or another.  And as scientists and

21   medical professionals, we have to ultimately trust

22   the study that we believe in.

23           So what everybody is doing is offering

24   opinions on the existing literature.  I don't think

25   there's a true answer to the question.

Charalambos Andreadis, M.D.

1    BY MR. SLONIM:

2        Q.   Reasonable scientists, fair-minded

3    scientists looking at this data could reasonably

4    conclude that glyphosate is not carcinogenic; is

5    that fair?

6            MR. DIAMOND:  Form.  Foundation.

7            THE WITNESS:  Again, this is a specific

8    statement that's coming out of a health authority.

9            MR. SLONIM:  Let me try to rephrase it.

10       Q.   Even if your -- even if your personal

11   opinion is that you think glyphosate increases or

12   may increase the risk of non-Hodgkin's lymphoma, is

13   it fair to say that there are responsible

14   scientists, dedicated scientists, looking at the

15   relevant data who reasonably conclude that

16   glyphosate does not present an increased risk of --

17           MR. DIAMOND:  Form and foundation.

18   BY MR. SLONIM:

19       Q.   -- cancer and non-Hodgkin's lymphoma?

20           MR. DIAMOND:  Sorry.  Form and foundation.

21           THE WITNESS:  Yes.  There are scientists

22   who have reviewed data who suggest that.  I think

23   the devil is in the details, so it has to do with

24   the specific risks involved.

25           And as we've seen in a lot of the other

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    studies, it's specific cancers that may be involved,

2    so looking at overall carcinogenicity data that may

3    be the answer to the question.  But, yes, there are

4    scientists on both sides of the debate.

5    BY MR. SLONIM:

6        Q.  Including on non-Hodgkin's lymphoma?

7        A.  Not that was mentioned specifically in this

8    report.  But I'm assuming -- I'm presuming, yes.

9        Q.  You're not saying that -- I mean, Health

10   Canada, for instance -- and we'll look at some

11   others.  But Health Canada says, "Glyphosate is not

12   genotoxic and is unlikely to pose a human cancer

13   risk."

14          You've seen that statement on page 1 of

15   their 2017 report.  And you've seen it reaffirmed as

16   recently as January of 2019 after a team of 20 new

17   scientists at Health Canada rereviewed the data in

18   light of further objections.

19          In light of that, you agree with me that

20   it's fair to say that those scientists might be

21   right and you might be wrong about whether or not

22   glyphosate increases the risk of non-Hodgkin's

23   lymphoma, correct?

24          MR. DIAMOND:  Form and foundation.

25          THE WITNESS:  Absolutely.  There could be

Charalambos Andreadis, M.D.

1    many opinions.

2            MR. SLONIM:  Okay.  Good.  Let's take a

3    break.

4            THE VIDEOGRAPHER:  This is the end of

5    disc 1.  We're off the record at 10:19 a.m.

6            (Recess taken.)

7            THE VIDEOGRAPHER:  We're back on the

8    record.  This marks the beginning of disc No. 2 in

9    the deposition of Dr. Charalambos Andreadis.  The

10   time is 10:28 a.m.

11   BY MR. SLONIM:

12       Q.  So, Doctor, we had -- we were talking about

13   Health Canada before we broke.  I'd like to move on.

14           Let's talk about the European Union.  What

15   criteria did the European Union use to assess

16   glyphosate and cancer?

17       A.  Again --

18           MR. DIAMOND:  Form.  Foundation.

19           Sorry, I took too long.

20           THE WITNESS:  Again, not familiar with the

21   criteria.

22           MR. DIAMOND:  I was napping.

23   BY MR. SLONIM:

24       Q.  Did they utilize prespecified objective

25   criteria that are applied to all pesticides?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1              MR. DIAMOND:  Form.  Foundation.

2              THE WITNESS:  I would presume so.

3    BY MR. SLONIM:

4        Q.  And do you have any disagreement with the

5    criteria they utilized?

6              MR. DIAMOND:  Form.

7              THE WITNESS:  I'm not familiar with them.

8    BY MR. SLONIM:

9        Q.  Have you read the European Union's hazard

10   assessment criteria and the classification labeling

11   and packaging regulation?

12       A.  I have not.

13       Q.  Would that be important to your opinion?

14             MR. DIAMOND:  Form.

15             THE WITNESS:  Not necessarily.

16   BY MR. SLONIM:

17       Q.  You don't know one way or the other?

18       A.  Correct.

19       Q.  Do you agree it's important to have

20   prespecified objective criteria that can be fairly

21   applied rather than assessing carcinogenicity on an

22   ad hoc basis?

23       A.  I think, from a regulatory perspective,

24   it's important to look at the different levels of

25   evidence.  And obviously the risk, there is the risk

Charalambos Andreadis, M.D.

1    to populations.  It's not the risk to individuals.

2            So it all boils down to what is the purpose

3    of your review.  And again, I'm not an expert in

4    regulatory matters or what international agencies

5    recommend.  I'm only here to speak on behalf of this

6    patient.

7            (Whereupon, Exhibit 6 was marked for

8            identification.)

9    BY MR. SLONIM:

10       Q.  I've marked as Deposition Exhibit No. 6

11   the -- a regulatory document issued by the European

12   Union.  It's actually the European Chemicals Agency,

13   has the abbreviation ECHA.

14           Do you have that in front of you?

15       A.  I do.

16       Q.  And do you see that the date of this

17   document is March 15th, 2017?

18       A.  Yes.

19       Q.  And the headline of the document is -- and

20   I'll quote, "Glyphosate not classified as a

21   carcinogen by ECHA."  That's the European Chemicals

22   Agency, which is an agency of the European Union.

23           You see that that's their finding and their

24   announcement, correct?

25       A.  The title.  Yes.

Charalambos Andreadis, M.D.

1       Q.   Now, if you take a look at the first full

2   paragraph, it discusses the risk assessment

3   committee, correct?

4       A.   Yes.

5       Q.   And it states, and I quote, "The Risk

6   Assessment Committee assessed glyphosate's

7   hazardousness against the criteria in the

8   Classification, Labeling and Packaging Regulation.

9   They considered extensive scientific data in coming

10  to their opinion."

11           I take it you do not have any basis to

12  disagree with the hazardous criteria specified in

13  the EU's Classification, Labeling and Packaging

14  Regulation, correct?

15           MR. DIAMOND:  Form and foundation.

16           THE WITNESS:  I do not.

17  BY MR. SLONIM:

18      Q.   And do you agree that it's commendable that

19  the European Union considered, their words,

20  extensive scientific data, in coming to their

21  opinion?

22           MR. DIAMOND:  Form and foundation.

23           THE WITNESS:  I believe that's standard

24  language.

25

Charalambos Andreadis, M.D.

1    BY MR. SLONIM:

2        Q.  And if you look down to the, one, two,

3    three -- it looks like the fourth paragraph, they

4    state, and I'll quote, "The Risk Assessment

5    Committee concluded that the available scientific

6    evidence did not meet the criteria in the CLP

7    Regulation to classify glyphosate for specific

8    target organ toxicity, or as a carcinogen, as a

9    mutagen or for reproductive toxicity."

10            Did I read that correctly?

11       A.  Yes.

12       Q.  So is it your understanding that the

13   European Union, much like the Health Canada

14   scientists, concluded, based on the scientific

15   evidence, that glyphosate was not a carcinogen or a

16   mutagen?

17            MR. DIAMOND:  Form, foundation.

18            THE WITNESS:  Correct.

19   BY MR. SLONIM:

20       Q.  And you're not going to tell the jury that

21   the scientists at the European Union Chemicals

22   Agency got the analysis wrong, are you?

23            MR. DIAMOND:  Form.  Foundation.

24            THE WITNESS:  Again, as I mentioned

25   previously, agencies look at populations.  So they

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

```
 1   look at different cancers, different patient

 2   popu- -- different, not patient populations --

 3   subjects.  Different occupations.

 4          So they're tasked with promoting public

 5   health.  They're not specifically looking at

 6   individual patients, individual diseases.

 7          So I believe that they did a thorough

 8   review, and they're expressing their opinion in this

 9   document.

10   BY MR. SLONIM:

11      Q.  And there are -- sorry.

12      A.  So I'm not telling anybody they're wrong or

13   right.

14      Q.  Okay.  Good.  Thank you.

15          Let's talk about Australia.  What criteria

16   did Australia utilize to assess glyphosate and

17   cancer?

18          MR. DIAMOND:  Form.  Foundation.

19          THE WITNESS:  I'm not familiar with them.

20   BY MR. SLONIM:

21      Q.  Did they utilize prespecified objective

22   criteria that are applied to all pesticides?

23          MR. DIAMOND:  Form.

24          THE WITNESS:  I would hope so.

25
```

Charalambos Andreadis, M.D.

1   BY MR. SLONIM:

2       Q.  Do you disagree with the criteria Australia

3   utilized?

4           MR. DIAMOND:  Form.  Foundation.

5           THE WITNESS:  I'm not familiar with them.

6           (Whereupon, Exhibit 7 was marked for

7           identification.)

8   BY MR. SLONIM:

9       Q.  I've marked as Deposition Exhibit No. 9 --

10          THE REPORTER:  Seven.

11          MR. SLONIM:  I'm sorry.

12      Q.  -- Deposition Exhibit No. 7 a document

13  published by the Australian government, specifically

14  the Australian Pesticides and Veterinary Medicines

15  Authority.  It was published in March 2017, and it's

16  entitled "Final regulatory position:  Consideration

17  of the evidence for a formal reconsideration of

18  glyphosate."

19          Do you have that in front of you?

20      A.  I do.

21      Q.  So you understand that this document, like

22  Health Canada, like the European Union, that this

23  document prepared by the Australian regulatory

24  scientists was prepared approximately two years

25  after IARC published its monograph, correct?

Charalambos Andreadis, M.D.

1      A.  Correct.

2      Q.  And you understand that they reconsidered

3  the scientific evidence about whether or not

4  glyphosate was a possible human carcinogen in light

5  of IARC's monograph, correct?

6           MR. DIAMOND:  Form and foundation.

7           THE WITNESS:  Correct.

8  BY MR. SLONIM:

9      Q.  Turn, please, to page 9.

10          Do you agree with me, right in the middle

11  of the page, the document states that the Australian

12  pesticide authority concluded, and I quote,

13  "Exposure to glyphosate does not pose a carcinogenic

14  or genotoxic risk to humans."

15          That's their statement, correct?

16     A.  Correct.  That sentence.

17     Q.  And they said that that's based on a

18  scientific weight of the evidence, correct?

19     A.  Correct.

20     Q.  And you're not suggesting that the

21  Australian pesticide authority is wrong in their

22  assessment, correct?

23          MR. DIAMOND:  Form.  Foundation.

24          THE WITNESS:  I'm not suggesting they're

25  wrong.  They are -- again, they're saying the weight

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    of the evidence.  So that does not mean all the

2    evidence.

3            MR. DIAMOND:  We're not introducing any

4    testimony from Dr. Andreadis regarding the weight of

5    any of these governmental agencies' reports.

6            So I think you can just assume that, for

7    the purpose of this deposition, he's not being asked

8    to opine on them.

9    BY MR. SLONIM:

10       Q.  So, Doctor, let's talk about the

11   United States Environmental Protection Agency.

12           What criteria did the EPA utilize to assess

13   glyphosate in cancer?

14           MR. DIAMOND:  Objection.  Form.

15   Foundation.

16           THE WITNESS:  I'm not aware of the specific

17   criteria used.

18   BY MR. SLONIM:

19       Q.  Did they utilize prespecified objective

20   criteria that are applied to all pesticides?

21       A.  Again, I don't know.

22       Q.  Do you disagree with the criteria that the

23   EPA utilized?

24           MR. DIAMOND:  Form and foundation.

25           THE WITNESS:  I'm not familiar with the

Charalambos Andreadis, M.D.

 1    criteria.

 2    BY MR. SLONIM:

 3        Q.  Doctor, have you read the EPA's 2005

 4    Guidelines for Carcinogen Risk Assessment?

 5        A.  I would not have read those.

 6        Q.  Wouldn't that be important for your

 7    opinion?

 8            MR. DIAMOND:  Form.

 9            THE WITNESS:  Not really.

10    BY MR. SLONIM:

11        Q.  It's irrelevant to you how the

12    United States EPA assessed whether glyphosate and

13    other chemicals are carcinogenic, is that what

14    you're telling us?

15            MR. DIAMOND:  Form.

16            THE WITNESS:  Well, the EPA does not bear

17    medical facts, so it wouldn't be relevant to my

18    medical opinion.  No.

19    BY MR. SLONIM:

20        Q.  But you understand that EPA employs

21    scientists who are specialists in toxicology,

22    epidemiology, genotoxicity, carcinogenicity, and

23    exposure analysis, and other pertinent subjects in

24    order to assess whether or not a pesticide presents

25    a carcinogenic risk?

Charalambos Andreadis, M.D.

1          MR. DIAMOND:  Form.  Foundation.

2          THE WITNESS:  They do, but ultimately they

3     are a political entity.  They're not a medical

4     entity.

5     BY MR. SLONIM:

6          Q.  Well, but you don't know what criteria they

7     use.  You never read the EPA's 2005 Guidelines for

8     Carcinogen Risk Assessment, did you?

9          A.  I have not.

10         Q.  So you don't know what criteria they

11    considered and how they considered it?

12         A.  I don't know.

13              (Whereupon, Exhibit 8 was marked for

14              identification.)

15         MR. DIAMOND:  Bert, I have a quick

16    question.  I don't want to step on your deposition

17    by any means, but how is it that these studies

18    relate to specific causation opinions?

19              I'm more than happy to let you continue on

20    and ask questions as long as I understand that.  But

21    I think they're really general causation expert

22    issues, and I'm going to ask the witness not to

23    answer them unless you can explain to me why we're

24    really getting into this in this specific causation

25    arena.

Charalambos Andreadis, M.D.

```
 1          If you want to take a break and we can
 2    talk, I'm fine with that.  Again, I'm just trying to
 3    understand that issue.
 4    BY MR. SLONIM:
 5        Q.  Doctor, we've marked as Deposition
 6    Exhibit No. 8 a document prepared by the EPA
 7    published on April 23rd, 2019.
 8          Do you have that in front of you?
 9        A.  I do.
10        Q.  Turn to page 7, please.
11          MR. DIAMOND:  I'm going to end the
12    questioning regarding this, so I'm going to instruct
13    the witness not to answer.
14          I'm more than willing to hear or take a
15    break and talk to you about it, but otherwise, I'm
16    going to instruct him not to continue down this
17    path, what I'm considering general causation expert
18    testimony.
19          Of course, if I'm proven wrong, the judge
20    will tell me, and you'll be entitled to take the
21    deposition of Dr. Andreadis at that time.
22    BY MR. SLONIM:
23        Q.  Doctor, did you write an expert report in
24    this case?
25        A.  I did.
```

Charalambos Andreadis, M.D.

1       Q.  And, Doctor, in your expert report, did you

2   discuss genotoxicity?

3       A.  I've discussed some of the examples I found

4   in the literature, yes.

5       Q.  Did you discuss animal toxicity?

6       A.  Barely.

7       Q.  Did you discuss epidemiological literature?

8       A.  I did.

9       Q.  Did you discuss the IARC publication?

10      A.  I mentioned it, yes.

11      Q.  Doctor, turning back to Deposition Exhibit

12  No. 8, turn, please, to page 7.

13          In the middle of the page, the EPA wrote,

14  and I quote, "The EPA conducted an independent

15  evaluation of the carcinogenic potential of

16  glyphosate and has determined that glyphosate is

17  'not likely to be carcinogenic to humans.'"

18          Did I read that correctly?

19          MR. DIAMOND:  I'm going to just stop again.

20  I've instructed the witness not to answer questions

21  regarding this.  I think he's testified previously

22  that he's relied upon the studies themselves, not

23  the commentary by any of the governmental agencies,

24  and I consider this to be general causation that

25  you're getting into.

Charalambos Andreadis, M.D.

1            Again, I'm willing to have a dialogue with

2   you about that if you'd like.

3            MR. SLONIM:  There's no dialogue.  Your

4   instruction is improper.  If you're instructing the

5   witness not to answer my questions and obstructing

6   my deposition, we will close down the deposition,

7   and we will seek our relief from the Court.

8            You do know that I flew from New York

9   specifically to take this deposition.  If you have

10  an objection, you know what the proper procedure is.

11  You say the word "objection," and it's preserved.

12           But if you are going to instruct the

13  witness not to answer improperly, in violation of

14  the Federal Rules of Civil Procedure, I'd advise you

15  to -- I'd recommend that you reconsider.

16           But if you insist, we'll terminate right

17  now, and we'll just address it with the Court; and

18  we will seek appropriate remedies, including

19  reconvening the deposition at your cost.

20           MR. DIAMOND:  And let's just take a quick

21  break for a bit because I want to take a look again

22  at the judge's order regarding specific causation

23  witnesses and then have a discussion with you about

24  it, if you're willing.  And then we can decide how

25  we want to address this.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

 1          MR. SLONIM:  Let's go off the record.

 2          THE VIDEOGRAPHER:  We're off the record at

 3   10:46 a.m.

 4          (Recess taken.)

 5          THE VIDEOGRAPHER:  We are back on the

 6   record.  The time is 10:52 a.m.

 7          MR. DIAMOND:  Okay.  I was taking a look at

 8   the Court's pretrial order 85 regarding specific

 9   causation.  In the order at page 3 of 9, the Court

10   points out that the specific causation experts will

11   not be repeating the analysis of the general

12   causation experts but, rather, relying on them to

13   rule in glyphosate.

14          The order says a number of other things,

15   but it -- my reading of it is that the Court does

16   not want these specific causation experts to be

17   opining or being asked questions about the general

18   causation issues.  And so that's the basis of my

19   objection.

20          Bert, the last thing I want is for you to

21   travel all the way from New York City out to

22   California, then have to leave early and somehow to

23   impact your deposition, so I'm going to agree to

24   give you latitude within -- and I'll make

25   objections.

Charalambos Andreadis, M.D.

1          MR. SLONIM:  Counsel, you know full well

2     that it is a fundamental precept of the Federal

3     Rules of Civil Procedure and Civil Practice that a

4     witness not be instructed not to answer a question

5     except on grounds of privilege, and that if you have

6     an objection, the correct procedure is to note it on

7     the record and the testimony is taken subject to

8     that objection.

9          Further, the suggestion that this expert

10    witness, Dr. Andreadis, who you are proffering, is

11    not basing his testimony on all kinds of generic or

12    general issues regarding the genotoxicity,

13    epidemiology, regulatory agencies, and the like is

14    absolutely contradicted by the face of the report.

15         Starting on page 9, Dr. Alvarez's -- I'm

16    sorry -- Dr. Andreadis' expert report talks about

17    genotoxicity studies, including a review by Kier and

18    Kirkland, that discusses more than a hundred studies

19    that he recounts.

20         On that same page, he talks about

21    regulatory concentration levels established by the

22    EFSA, that's the European Food Safety Authority.

23         On that same page, he talks about studies

24    done by an investigator called Bolognesi regarding

25    human studies that were conducted in --

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

```
1              THE WITNESS:  Columbia.

2              MR. SLONIM:  -- Columbia, South America.

3              Then turning to page 10, the doctor

4     recounts at length epidemiological studies,

5     including studies performed by Cantor, Hardell,

6     De Roos 2003, De Roos 2005, Eriksson, Cocco, the

7     Agricultural Health Study, a study by Leon published

8     in 2019, and all kinds of other studies.  These are

9     epidemiology studies that apply to populations.

10             Then on page 11, the expert that you're

11    proffering offers opinions and relies on statements

12    made by American cancer centers, as well as cancer

13    associations, regarding exposures to pesticides and

14    risk factors, and quotes the American Cancer Society

15    and the Cleveland Clinic, for instance.

16             On that same page, the expert that you

17    proffer goes on to talk at length about IARC, about

18    what IARC found, about how IARC went about its work,

19    about how IARC working group conducted their

20    reviews, and some of IARC's findings.

21             Then on that same page, the expert's report

22    returns back to epidemiology to talk about

23    dose-response effects and specifically addresses the

24    Eriksson paper and the McDuffie paper.

25             So the notion that your expert is not
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    basing his opinions extensively on subjects that you

2    classify but I do not classify as general is absurd.

3         I'm prepared to go on with the deposition,

4    provided counsel not interfere, not obstruct it, and

5    if you do, and if you instruct the witness not to

6    answer, we will stop the deposition, and we will

7    seek our relief.

8         MR. DIAMOND:  And just to clarify, I'm not

9    objecting to any discussion about the studies.  I

10   think the witness has testified that he relied on

11   the studies and not on the governmental agencies'

12   analysis or interpretation of them.

13        MR. SLONIM:  Are you done coaching the

14   witness?

15        MR. DIAMOND:  I have not started coaching

16   the witness, so I'm not -- I can't be done.

17   BY MR. SLONIM:

18        Q.  Doctor, we were talking about the EPA, and

19   you have a document that we've marked as Deposition

20   Exhibit 8 in front of you and you turned to page 7;

21   is that correct?

22        A.  Correct.

23        Q.  And you understand that the EPA, after IARC

24   came out, had its scientists conduct an independent

25   reevaluation of the scientific evidence, and they

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1   concluded that glyphosate was not likely to be

2   carcinogenic to humans, correct?

3          MR. DIAMOND:  Form.

4          THE WITNESS:  Correct.

5   BY MR. SLONIM:

6      Q.  And they go on in the next sentence to say

7   that the way they reached that assessment was based

8   on a weight-of-the-evidence review of all relevant

9   data in accordance with the agency's 2005 Guidelines

10  for Carcinogen Risk Assessment, correct?

11         MR. DIAMOND:  Form.

12         THE WITNESS:  Correct.

13  BY MR. SLONIM:

14     Q.  And you have no idea of the content and the

15  substance of the EPA's 2005 Guidelines for

16  Carcinogen Risk Assessment, correct?

17         MR. DIAMOND:  Form.

18         THE WITNESS:  I'm not familiar with them.

19  No.

20  BY MR. SLONIM:

21     Q.  The EPA explained that its scientific

22  review was more complete and more robust than

23  IARC's, didn't they?

24         MR. DIAMOND:  Form.

25         THE WITNESS:  According to their report,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

 1   yes.

 2   BY MR. SLONIM:

 3       Q.  For instance, EPA scientists considered 15

 4   animal carcinogenicity studies, while IARC only

 5   considered eight; isn't that right?

 6       A.  That's what is mentioned.  It's also a

 7   discrepancy because a previous report that you

 8   showed me showed that IARC only considered four.

 9       Q.  I think what it said was IARC considered

10   seven, but they determined that three were

11   inadequate so they looked at four.

12          Do you recall that?

13       A.  I don't recall that specifically.  I think

14   it was more like 14.

15       Q.  Health Canada looked at 14.

16       A.  Right.  And then in the Health Canada

17   report they mentioned that IARC only admitted four.

18       Q.  Four.  They looked at seven, but they

19   determined that three did not meet their criteria.

20          Do you recall that?  Does that refresh your

21   recollection?

22       A.  No.  I don't recall that.

23       Q.  Well, the record will be -- the record will

24   stand.  We don't have to take the time now to go

25   back over it.

1            In any event, you understand --

2      A.   Again, I understand.  It's an opinion.

3      Q.   But you understand that it's an opinion

4  based on more -- a more fulsome body of scientific

5  evidence, 15 studies, as compared with fewer studies

6  by IARC, correct?

7            MR. DIAMOND:  Form.

8            THE WITNESS:  It's an opinion by a national

9  agency that is not tasked with examining human

10  health in terms of cancer.

11  BY MR. SLONIM:

12      Q.   Well, how do you know that if you haven't

13  read the agency's 2005 Guidelines for Carcinogen

14  Risk?

15      A.   Have you read them?

16      Q.   When you get a chance to depose me,

17  we'll -- we can discuss that, Doctor.  It's my

18  opportunity to ask you questions to find the basis

19  for your opinions.

20      A.   In my field, the EPA is not considered an

21  authority.

22      Q.   But you don't know -- you have asserted

23  that the EPA was not tasked with examining human

24  health in terms of cancer.

25            Do you wish to reconsider that statement in

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    light of the fact that you don't know what the

2    substance is of the 2005 guidelines?

3        A.  It is my belief that the EPA does not have

4    a reputation of considering human health in terms of

5    cancer.

6        Q.  I see.  So -- and on that basis you would

7    discount their findings?

8        A.  I'm not discounting any evidence.  I'm

9    saying everything has to be examined in light of

10   where it's coming from.

11       Q.  So you're saying that you know better than

12   the EPA scientists about whether glyphosate causes

13   cancer?

14           MR. DIAMOND:  Form.

15           THE WITNESS:  I am saying is, I will

16   consider many different opinions, and the EPA

17   scientists are one of them; but they're not the

18   expert that I would turn to for an opinion on the

19   subject.

20   BY MR. SLONIM:

21       Q.  Okay.  Now, let's talk about genotoxicity.

22   Genotoxicity refers to damage or alteration of the

23   DNA within a cell; is that correct?

24       A.  Correct.

25       Q.  There have been well over a hundred

Charalambos Andreadis, M.D.

```
 1   genotoxicity studies of glyphosate and Roundup;

 2   isn't that right?

 3        A.  I presume so.  I haven't read all of them.

 4        Q.  Well, you read the -- did you read the Kier

 5   and Kirkland article?

 6        A.  I did.  It was a review.

 7        Q.  And they list well over a hundred studies,

 8   don't they?

 9        A.  In my recollection, yes.

10        Q.  In your expert report, Doctor, you only

11   list three genotoxicity studies; is that right?

12        A.  Correct.

13        Q.  Have you read any others besides those

14   three?

15        A.  I have not.

16        Q.  Now --

17        A.  Well, one is a review of, as you mentioned,

18   over a hundred of them.

19        Q.  The only three that you mention

20   specifically are the Aris and Leblanc study in 2010,

21   the Santovito study in 2018, and the Bolognesi study

22   in 2009, correct?

23        A.  And I also mentioned the review by Kier and

24   Kirkland.

25        Q.  Okay.  So you read that review, and you
```

1    read those three specific studies?

2        A.  Correct.

3        Q.  You didn't read the underlying studies

4    themselves, though?

5        A.  No.

6        Q.  Now, you know that the scientists at Health

7    Canada specifically studied whether glyphosate is

8    genotoxic, correct?

9            MR. DIAMOND:  Form.

10           THE WITNESS:  After our discussion today, I

11   do.

12   BY MR. SLONIM:

13       Q.  And you know that the Health Canada

14   scientists specifically concluded that glyphosate,

15   in their words, is not genotoxic, correct?

16       A.  Correct.

17       Q.  Let's take a look at that Health Canada

18   document that was marked as Deposition Exhibit

19   No. 4, please.

20           Turn, please, to page 19.  There's a

21   discussion of genotoxicity that begins on page 19 at

22   the middle of the page; is that right?

23       A.  Yes.

24       Q.  And the second full paragraph states --

25   let's take that sentence by sentence.  It states, "A

Charalambos Andreadis, M.D.

1    large battery of genotoxicity assays conducted

2    according to OECD test guidelines for glyphosate is

3    available."

4             Is that a true statement?

5        A.  Yes.

6        Q.  Are you familiar with the OECD test

7    guidelines?

8        A.  I'm not.

9        Q.  Do you understand that those are standard

10   guidelines for conducting genotoxicity assays?

11       A.  I do.

12       Q.  The next sentence states, and I quote,

13   "Many studies have been replicated several times,

14   and all indicated negative results for

15   genotoxicity."

16            Do you agree that many studies have been

17   replicated repeatedly, and they've indicated

18   negative results for genotoxicity?

19       A.  That is what is mentioned here.

20       Q.  In other words, it may not be every study,

21   but do you have any reason to disagree, based on

22   your review of Kier and Kirkland and the other

23   materials you looked at, that when Health Canada

24   scientists said, "Many studies have been replicated

25   several times, and all indicated negative results

1    for genotoxicity," that is a fair characterization

2    of a large body of genotoxicity studies?

3         A.  Well, I think, as I mentioned in my expert

4    report as well, the word -- and I specifically did

5    mention about Kier and Kirkland, that they reached a

6    conclusion that they didn't find a genotoxicity.

7         I have an objection to the term "negative."

8    It's that couldn't find persistent -- consistent,

9    actually, results of genotoxicity.  "Negative" means

10   that there's no evidence of genotoxicity, which I

11   disagree with.

12        Q.  The Health Canada scientists say that "The

13   IARC assessment did not consider the majority of

14   these studies."

15        In your review of IARC and Kier and

16   Kirkland, is that a fair assessment of IARC?  That

17   they did not consider a majority of the studies that

18   failed to find evidence of genotoxicity?

19        MR. DIAMOND:  Foundation.

20        THE WITNESS:  Without having a list of all

21   the studies that were reviewed, I do believe that

22   Kier and Kirkland was more thorough than IARC.

23   BY MR. SLONIM:

24        Q.  And the last sentence of that paragraph,

25   "IARC scientists say that" -- I'm sorry.  Let me

Charalambos Andreadis, M.D.

1    start over again.

2            In the last sentence of that paragraph,

3    Health Canada scientists criticize IARC for

4    including results from nonmammalian systems, for

5    example, fish and plants, that they did not consider

6    relevant for human health characterization.

7            In your opinion, is that a fair criticism

8    of IARC, that they overemphasized genotoxicity

9    studies involving nonmammalian systems such as fish

10   and plants?

11           MR. DIAMOND:  Form and foundation.

12           THE WITNESS:  I don't know if they

13   overemphasized them, but I definitely didn't place a

14   lot of weight on those studies myself.

15   BY MR. SLONIM:

16       Q.  You agree that those studies are much less

17   relevant than mammalian system studies?

18       A.  To this specific patient, yes.

19       Q.  Take a look, please, at the next paragraph

20   on this same page.  The Health Canada scientists

21   write, and I quote, "The IARC monograph also noted

22   that in several cases, positive results occurred at

23   very high or at toxic dose levels only."

24           Is that a fair characterization of IARC?

25       A.  It is.

Charalambos Andreadis, M.D.

 1       Q.  And Health Canada scientists write in the

 2   next sentence, "It is important to characterize the

 3   relationship of genotoxic results in the context of

 4   observed cytotoxicity."

 5           Let's pause for a second.

 6           Cytotoxicity refers to something that kills

 7   a cell, correct?

 8       A.  Correct.

 9       Q.  But that is not synonymous with

10   genotoxicity, correct?

11       A.  It's not.

12       Q.  But on the other hand, if something, a

13   substance, kills a cell, in the process of the

14   cell's dying, the DNA can become damaged as a

15   consequence of the cellular death, correct?

16       A.  Certain kinds of DNA damage can occur as a

17   result of that, yes.

18       Q.  So the point is, when a scientist is

19   examining cells exposed to high, potentially lethal

20   doses of a substance, they have to be careful to

21   distinguish between possible damage to the DNA

22   that's caused by the substance as contrasted with

23   death of the cell which, in turn, can induce DNA

24   damage as a function of the cellular death process,

25   correct?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1        A.  To some degree, correct.  I believe most of

2    the processes that lead to cell death lead to that

3    through DNA damage.

4            So the two are in a, what's called, causal

5    pathway.  So I think it's hard to distinguish those

6    two.

7        Q.  So let's take a look at the next sentence

8    in light of the discussion that you and I just had.

9            Health Canada scientists write, and I

10   quote, "Positive results at a very -- at very high

11   or toxic dose levels indicate that the genotoxic

12   effects are due to cytotoxicity rather than direct

13   DNA-acting properties of glyphosate formulated

14   products."

15           That's a lot of words, lot of science.

16   Let's see if we can unpack it a little bit.

17           First of all, did I read the sentence

18   correctly?

19       A.  You did.  It is an opinion though.  There's

20   no evidence provided to support that claim.

21       Q.  Well, is the -- as a pure matter of

22   science, you agree that if cells die, or as cells

23   die from any cause, that as a consequence of the

24   cellular death, their genetic material, the DNA,

25   becomes damaged, correct?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1      A.  But there's certain kinds of damage that

2   happen at that point.

3      Q.  So the -- so the point is that scientists

4   who are studying genotoxicity in the context of

5   cells exposed to very high doses or toxic levels of

6   a chemical have to be careful to try to distinguish

7   between direct DNA damage done by the chemical on

8   one hand versus artifactual DNA damage that occurs

9   as a consequence of the cytotoxicity, the death of

10  the cell, correct?

11          MR. DIAMOND:  Form.

12          THE WITNESS:  Well, the bottom line is the

13  chemical kills the cell one way or another.

14          But, yes, to your point, there's -- DNA

15  damage, as I said, is in the causal pathway of cell

16  death.  So whether the chemical directly kills the

17  cell or through DNA damage kills the cell, it's a

18  fine nuance that has to be examined, not clear if

19  there's a really good methodology to do that.

20  BY MR. SLONIM:

21      Q.  But in terms of carcinogenicity, it's all

22  the difference in the world.  If the cell dies and

23  as an artifact of cellular death is DNA damage, that

24  damage cannot be passed on to daughter cells in the

25  form that can be oncogenic or carcinogenic, correct?

Charalambos Andreadis, M.D.

1          MR. DIAMOND:  Form.

2          THE WITNESS:  If the cell dies before it

3    generates other cells, correct.  But sometimes the

4    damage may be enough to generate -- to allow the

5    cell to generate daughter cells, and then some of

6    the cells die.

7    BY MR. SLONIM:

8          Q.  But that's the reason why it's very

9    important to distinguish whether the DNA damage

10   occurs directly and then the cell -- and the cell

11   replicates before cellular death or the cell dies

12   and in the throes of the cellular death, the DNA is

13   damaged, right?

14         A.  But what I'm saying is, theoretically, yes.

15   But practically there may not be a way to

16   effectively distinguish those two things.

17         Q.  You understand that Health Canada

18   genotoxicologists, when they looked at a number of

19   the studies, they felt that the -- to the extent

20   there was genotoxicity at high doses, they felt that

21   was a function of cytotoxicity, not as a function of

22   direct damage to the genetic material of the cells,

23   correct?

24         A.  That was their interpretation.

25         Q.  And when you read the Kier and Kirkland

Charalambos Andreadis, M.D.

1   article, the Kier and Kirkland scientists had

2   exactly the same view, correct?

3           MR. DIAMOND:  Form.

4           THE WITNESS:  Well, they did a thorough

5   review of the evidence, and they suggested that some

6   of the studies were not as compelling as they were

7   reported to be.

8   BY MR. SLONIM:

9       Q.  Well, Kier and Kirkland wrote that there

10  was a -- convincing weight of evidence supports the

11  lack of genotoxic potential for both glyphosate and

12  typical glyphosate-based formulations, right?

13          MR. DIAMOND:  Form.

14          THE WITNESS:  I don't have the paper in

15  front of me.

16          MR. SLONIM:  All right.  Fair enough.

17          THE WITNESS:  But I think I did a pretty

18  good review -- I mean, I summed up their conclusions

19  in my report.

20          MR. DIAMOND:  What number are we on?

21          THE REPORTER:  This will be 9 next.

22          (Whereupon, Exhibit 9 was marked for

23          identification.)

24  BY MR. SLONIM:

25      Q.  So, Doctor, we've been talking about the

Charalambos Andreadis, M.D.

1    Kier and Kirkland article, correct?  Yes?

2        A.  Correct.

3        Q.  And this, of course, is an article that you

4    looked at and referenced in your expert report in

5    this matter, correct?

6        A.  Correct.

7        Q.  And pertinent to the subject that we were

8    just talking about, I think we can just look at the

9    abstract.

10           First of all, before we get there, do you

11   agree with me that this paper reviews scores and

12   scores, well over a hundred, various genotoxicity

13   experiments?

14       A.  Correct.

15       Q.  And taking a look at the bottom of the

16   abstract on the first page, do you see where it says

17   "Reports of positive results for DNA damage"?  It's

18   about the second or third sentence up from the

19   bottom.  "Reports of positive."

20       A.  Oh, the abstract?

21       Q.  Yeah.  You know what, let me --

22       A.  Reports.  Yes, I do.  Sorry.  I was looking

23   at the....

24       Q.  Yeah.  Fair enough.  I should have yellow

25   highlighted it.  I apologize.

1          Let me read a sentence or two and ask you a

2     question about it.

3          So pertinent to what you and I were

4     discussing about distinguishing between DNA damage

5     that's a direct result of the chemical damaging the

6     cellular DNA and genetic damage to the cell that

7     occurs as a consequence of cytotoxicity resulting in

8     cellular death, the authors write, and I quote,

9     "Reports of positive results for DNA damage

10    endpoints indicate that glyphosate and GBFs" -- that

11    stands for glyphosate-based formulations -- "tend to

12    elicit DNA damage effects at high or toxic dose

13    levels, but the data suggest that this is due to

14    cytotoxicity rather than DNA interaction with

15    GBF" -- that stands for glyphosate-based --

16    "activity perhaps associated with the surfactants

17    present in many GBFs."

18          Did I read that correctly?

19    A.   You did.

20    Q.   So it's your understanding that the authors

21    are saying that, to the extent that some

22    genotoxicity studies reported genetic damage to

23    cellular DNA at high or toxic dose levels, in their

24    view, that appeared to be an artifact of the

25    cellular death as opposed to something that

Charalambos Andreadis, M.D.

1    glyphosate -- damage that glyphosate was doing

2    directly to the cellular DNA, correct?

3              MR. DIAMOND:  Form.

4              THE WITNESS:  In their review, yes.

5    BY MR. SLONIM:

6        Q.  And the last sentence of their review, the

7    authors write, and I quote, "Glyphosate and typical

8    glyphosate-based formulations do not appear to

9    present significant genotoxic risk under normal

10   conditions of human environmental exposures."

11             Did I read that correctly?

12       A.  "Of human or environmental exposures."

13   Correct.

14       Q.  Okay.  So to your understanding that the

15   authors of this paper, this review paper, agree with

16   the scientists at Health Canada that, at normal

17   levels of exposure that would be encountered,

18   glyphosate does not present a significant genotoxic

19   risk?

20             MR. DIAMOND:  Form.  Foundation.

21             THE WITNESS:  I agree with that, and stated

22   that in my opinion.

23   BY MR. SLONIM:

24       Q.  Okay.  Now, let's move on.

25             MR. DIAMOND:  Bert, I know it's about an

Charalambos Andreadis, M.D.

1    hour, two hours and 20 minutes in.  If we want to

2    take a five-minute break?

3            MR. SLONIM:  Okay.

4            MR. DIAMOND:  And the other question is, do

5    we want to order sandwiches or if everybody wants to

6    take a break and get their own.

7            I know you probably need a little time off

8    as well, the court reporter.

9            So why don't we go off the record, and we

10   can decide.

11           MR. SLONIM:  Yeah.

12           THE VIDEOGRAPHER:  We're off the record at

13   11:20 a.m.

14           (Recess taken.)

15           THE VIDEOGRAPHER:  We're back on the

16   record.  The time is 11:32 a.m.

17   BY MR. SLONIM:

18       Q.  So, Doctor, we were talking about some of

19   the genotoxicity studies and we had talked about

20   Kier and Kirkland before we broke, so that was the

21   context.

22           Do you recall that?

23       A.  I do.

24       Q.  One of the studies that you discussed in

25   your expert report was a study by an author named

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    Bolognesi published in 2009.

2            Do you recall that?

3        A.   I do.

4        Q.   And that was a study that investigated

5    genotoxicity or potential genotoxicity of residents

6    of a part of the country of Columbia where there was

7    aerial spraying of glyphosate, correct?

8        A.   Correct.

9        Q.   And that was in connection with the

10   eradication of the cocaine-producing plant, the coca

11   plant, correct?

12       A.   Correct.

13       Q.   Now, you agree with me that any genetic

14   abnormalities that those investigators found were

15   transient, correct?

16           MR. DIAMOND:   Form.

17           THE WITNESS:   I believe some persisted for

18   months afterwards.

19   BY MR. SLONIM:

20       Q.   Well, do you recall that they were all gone

21   within four months?

22       A.   Gone or at baseline levels?

23       Q.   Well, yeah.   In other words, there was

24   no -- there was no -- to the extent that they

25   detected that there might be some genetic

Charalambos Andreadis, M.D.

1    abnormality associated with aerial spraying, that it

2    was transitory, and within four months any

3    abnormality had dissipated, was gone, and the

4    subjects were back at baseline?

5         A.   Well, the reason why I make a distinction

6    is the subjects may be exposed to glyphosate or

7    other pesticides in -- just by nature of their

8    living in this area.

9              The acute change was the aerial spraying,

10   so they're showing acute increase, but there may be

11   baseline levels of exposure that were there.

12        Q.   That was the experiment, wasn't it?  The

13   experiment was before and after.  The experiment

14   was -- the experiment was a study where each subject

15   is his or her own control, where you measure the --

16   you take a look at what their baseline cells look

17   like, you then assess them after there was aerial

18   spraying.  You then assess them in a period of

19   several months later.  And you see if there's any

20   permanent evidence of abnormality or if the

21   abnormalities are gone and people are back to

22   baseline.  That's the experiment, correct?

23        A.   That was the experiment, but every

24   experiment has its limitations.  So the limitation

25   is the subjects didn't live in a cell and then

Charalambos Andreadis, M.D.

 1  expose for three months and then back in the cell.

 2  They lived in the real world.  So they may have

 3  exposures in their background, is all I'm saying.

 4       Q.  And they may not have?

 5       A.  And they may not have.

 6       Q.  So you're speculating?

 7       A.  Which is --

 8       Q.  Correct?

 9       A.  -- what scientists do.  Yes.

10       Q.  But the study itself reported that any

11  genetic abnormalities were transient and were gone

12  within four months post-spraying, correct?  That's

13  what the study reported.

14       A.  Back to baseline levels.

15       Q.  And the authors of that study, the

16  Bolognesi study, they specifically stated that no

17  conclusion could be drawn regarding the potential

18  genotoxicity of glyphosate; isn't that a fact?

19       A.  That was their main conclusion, but there

20  were other observations there that were important.

21       Q.  The authors -- the scientists who conducted

22  the study themselves expressly stated that no

23  conclusion about genotoxicity of glyphosate could be

24  drawn, correct?

25       A.  They did, but any authors of any study

Charalambos Andreadis, M.D.

1    cannot overstate their results, so they didn't --

2    they believed the weight of their results was what

3    this conclusion suggests.  But they found -- there

4    were things that they found that were significant.

5    That's what -- I specifically mentioned that it was

6    a negative study in terms of the overall conclusion,

7    but there were some things there that I think were

8    questionable.

9         Q.  So you disagree with the way the authors

10   themselves expressed their own conclusion about

11   their own study, correct?

12        A.  I don't dis- --

13             MR. DIAMOND:  Form.

14             Thank you.

15             THE WITNESS:  I do not disagree with the

16   way they expressed themselves.  I'm pointing out

17   that in a paper, you cannot overstate your results.

18             So they, in general, probably had a

19   specific way of phrasing the results.

20   BY MR. SLONIM:

21        Q.  The authors wrote that the information they

22   presented precluded any conclusion.  Right?  That

23   was their words, "precluded any conclusion"?

24        A.  That is their -- the words that they used.

25        Q.  And "precluded any conclusion," that means

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    that the scientists who conducted the study admitted

2    that it did not provide evidence of genotoxicity,

3    right?  Precluded a conclusion?

4          MR. DIAMOND:  Form.

5          THE WITNESS:  If "precluded a conclusion"

6    means they couldn't reach a definitive conclusion,

7    meaning it was a negative study.  So I think you're

8    misstating the authors' statement.

9    BY MR. SLONIM:

10        Q.  Let's talk about a type of cancer called

11   "lymphoma."

12             Lymphomas are cancers that arise from

13   lymphocytes which are the immune cells; is that

14   correct?

15        A.  Correct.

16        Q.  And let's talk about the function of the

17   immune cells.  The function of the immune cells is,

18   one, to recognize harmful foreign organisms such as

19   bacteria or viruses; and, two, to generate an immune

20   response in order to eliminate those harmful

21   organisms, correct?

22        A.  That's one of the functions, yes.

23        Q.  And in order for the -- those immune cells,

24   those lymphocytes, to carry out their intended

25   function of recognizing and eliminating harmful

Charalambos Andreadis, M.D.

1    organisms such as viruses and bacterias, immune

2    cells inherently undergo constant chromosomal

3    alterations and mutations, correct?

4        A.  They don't.  They undergo alterations and

5    mutations if they encounter something that they're

6    reactive to.  So most of the time the lymphocytes

7    circulate in the blood and are in a kind of, let's

8    say, standby mode, so they don't really do much.

9            Once they encounter something that -- a

10   specific lymphocyte will encounter something that

11   it's very heavily reactive to, then it undergoes

12   what's called a germinal reaction where it will

13   start proliferating and mutating to try and fight

14   the infection better.

15           This mutation, though, is very

16   circumscribed.  It's only in one area of the genome.

17   It's not the whole DNA.

18       Q.  But you agree, I mean, the nature of life

19   on earth is that human beings are constantly exposed

20   to all kinds of potentially harmful bacteria, virus,

21   other kinds of foreign agents, correct?

22           MR. DIAMOND:  Form.

23           THE WITNESS:  Correct.

24   BY MR. SLONIM:

25       Q.  And the function of the immune cells is to

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    try to detect these potentially pathogenic

2    substances to identify them and then to target them

3    for an immune response which hopefully eliminates

4    them.  That's the whole way the immune system is

5    designed by evolution to work, correct?

6         A.  Correct.

7         Q.  Okay.  And as part of that, these immune

8    cells, because they're constantly exposed to all

9    kinds of viruses, bacteria, and all kinds of other

10   pathogens, they inherently have to undergo constant

11   and rapid genetic mutation as an intrinsic part of

12   their evolutionary design, correct?

13        A.  I'm not disagreeing with that.  All I'm

14   saying is, it's one -- so it's not that all the

15   cells in the body are constantly being mutated.

16   It's that we have millions of different lymphocytes.

17             So one of those millions at any given time

18   is undergoing this process.  But it's usually a

19   once-or-twice-in-its-lifetime process, so it's not

20   that all of the lymphocytes in the body are

21   constantly mutating.

22        Q.  And as part of the process, though, of

23   cells replicating, mutating, replicating, mutating,

24   which is part of their normal function, what they're

25   designed to do by evolution, there are mutations

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    that inadvertently can be harmful to the cell and to

2    the whole organism, the human body, correct?

3        A.  Correct.

4        Q.  If mutations occur on unintended portions

5    of the DNA of the B lymphocytes, the B-cells, those

6    B-cells can become cancerous, correct?

7        A.  Correct.

8        Q.  And as those cancerous B-cells reproduce

9    and they spawn daughter cells, those cells can

10   gradually accumulate in parts of the body called

11   "lymph nodes" or in other parts of the body, causing

12   cancer, correct?

13       A.  Correct.

14       Q.  And that type of cancer, when the B-cells

15   mutate in a form that causes daughter cells to

16   replicate and mutate, become clonal, and they lodge

17   in a part of the body, the lymph nodes or elsewhere,

18   that type of cancer is broadly categorized under the

19   medical term of "lymphoma," correct?

20       A.  Yes.

21       Q.  In the United States, approximately 90

22   percent of the newly diagnosed cases of lymphoma are

23   of a subtype of lymphoma that's categorized as

24   non-Hodgkin's lymphoma, correct?

25       A.  Close, yes.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    Q.  And roughly 10 percent would be Hodgkin's

2    lymphoma, and roughly 90 percent, or thereabouts, of

3    newly diagnosed cases would be under the broad term

4    of non-Hodgkin's lymphoma, correct?

5    A.  Correct.

6    Q.  And just by the nomenclature, doctors,

7    scientists that deal with this disease, they often

8    refer to non-Hodgkin's lymphoma as NHL, correct?

9    A.  Correct.

10   Q.  And if I use the term "NHL," you'll

11   understand then, of course, that I'm referring to

12   non-Hodgkin's lymphoma --

13   A.  I would.

14   Q.  -- correct?

15       Now, Doctor, NHL is not a single disease

16   entity, is it?

17   A.  No.  It's multiple.

18   Q.  I mean, actually, there are many variants,

19   many different types of cancer, that are properly

20   categorized under the umbrella term "NHL," correct?

21   A.  Correct.  It's not even -- a lot of the

22   diseases don't have the same pathophysiology.

23   Q.  So I know scientists and doctors who work

24   in this field have different ways of categorizing

25   the disease and that's evolved over time.  But

Charalambos Andreadis, M.D.

1    currently, using the World Health classification for

2    lymphomas, you would agree that more than 60

3    different types of non-Hodgkin's lymphoma have been

4    recognized by doctors and scientists, correct?

5        A.   Correct.

6        Q.   And as you were just alluding to, these

7    different types of NHL, they have different

8    pathophysiology, different epidemiology, etiology,

9    natural history, optimal management, and prognosis,

10   correct?

11       A.   Well, they all share many common features.

12   That's why they're grouped under the umbrella.  But

13   they can have variable causes or variable course or

14   variable response to treatment.  Yes.

15       Q.   And, I mean, that's why doctors work in

16   concert with hematopathologists to try to figure out

17   the particular subtype of the disease and to figure

18   out what its natural history is, to figure out how

19   to treat it, correct?

20            MR. DIAMOND:  Form.

21            THE WITNESS:  Correct.  With pathologists,

22   I would say.  Not all doctors have access to

23   hematopathologists.

24   BY MR. SLONIM:

25       Q.   So the hematopathologists are the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    subspecialists within the broader field of pathology

2    that deal with blood cancers, correct?  The

3    leukemias and the lymphomas, correct?

4         A.  Correct.

5         Q.  So, whereas a pathologist might deal with

6    solid tumors as well as blood tumors, the

7    hematopathologists subspecialize, and they deal

8    specifically with the blood cancers which would

9    include the lymphomas, correct?

10        A.  Correct.

11        Q.  So they're more specialized pathologists?

12        A.  Yes.

13        Q.  Now, so we have this picture of the immune

14   system, these B-cells, the replication and mutation,

15   and if the mutations are pathologic --

16            (Reporter clarification.)

17   BY MR. SLONIM:

18        Q.  -- pathologic, and they occur in the wrong

19   area of the DNA, that can result in clonal expansion

20   of cells, a population that lodges in lymph nodes or

21   other parts of the body and causes lymphoma.  That's

22   the general picture, correct?

23        A.  Correct.

24        Q.  Okay.  And I want to drill down a little

25   bit and talk to you about the mutations themselves

Charalambos Andreadis, M.D.

1    that kick off this insidious process that ultimately

2    results in the lymphoma.

3          The genetic mutations that cause cancer can

4    come from several different sources; they can be

5    inherited, correct?

6        A.  Correct.  Cancer in general, we're talking

7    about now?

8        Q.  Yes.  Well, let's talk about cancer, and

9    then we'll talk about specifically lymphoma.

10          But you agree with me that genetic

11    mutations that predispose or cause cancer in some

12    instances can be inherited, correct?

13       A.  Correct.

14       Q.  In some instances, they can be caused or

15    induced by certain environmental exposures, correct?

16       A.  Correct.

17       Q.  And they can also occur spontaneously and

18    sporadically as a result from DNA replication errors

19    that occur when cells divide, correct?

20       A.  Well, it's hard to distinguish cause No. 2

21    and 3 because environmental exposures are intimately

22    related with what we call spontaneous mutations.

23    There's no way to distinguish those two.

24       Q.  Well, that was where I was going.  There

25    are scientists who have conducted studies to

Charalambos Andreadis, M.D.

1    specifically investigate the extent to which

2    mutations that result in cancer occur as a result of

3    inherited problems, environmental exposures, or DNA

4    replication errors; isn't that true?  There's

5    scientists whose career it is to study those kinds

6    of things.

7        A.  It's very hard to distinguish some of

8    those, yes.  The genetic ones, the ones that are

9    transmissible, obviously with gametes, those are

10   identifiable.  But mutations that accumulate over

11   the course of a person's lifetime are -- they're

12   difficult to ascertain whether they're stochastic or

13   whether -- which means they happen by chance -- or

14   whether they're related to an exposure.  And they're

15   probably related to both.

16       Q.  So you're familiar, undoubtedly, with

17   Dr. Bert Vogelstein from Johns Hopkins?

18       A.  I am.

19       Q.  He's a famous cancer biologist and cancer

20   scientist, correct?

21       A.  Correct.

22       Q.  And fair to say that he's the world's

23   leading expert on kinetic growth of cancer cells?

24            MR. DIAMOND:  Form.  Foundation.

25            THE WITNESS:  Colorectal cancer cells.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    Yes.

2              (Reporter clarification.)

3              THE WITNESS:  Colorectal.

4    BY MR. SLONIM:

5       Q.  And you know that Dr. Vogelstein and his

6    colleagues at Johns Hopkins have published

7    scientific studies where they have investigated and

8    quantified the extent to which different cancers are

9    attributable to inherited, environmental, or random

10   DNA replication errors, correct?

11             MR. DIAMOND:  Form.  Foundation.

12             THE WITNESS:  As I mentioned previously,

13   I'm familiar with the inherited work.  Again, it's

14   very difficult to distinguish environmental

15   exposures from stochastic events.

16   BY MR. SLONIM:

17      Q.  Well, you have read the Tomasetti and

18   Vogelstein article that reports that most cancers

19   are actually a result of random genetic mutations,

20   as opposed to environmental or inherited factors,

21   correct?

22      A.  The random genetic mutations in humans

23   occur in the setting of them living in an

24   environment, so specifically with colon cancer,

25   which is what the research refers to, there's a lot

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    of evidence that things in the diet or the, you

2    know, immediate -- patient's immediate environment

3    increase the risk of developing those mutations.

4         Q.  Well, scientists have looked and quantified

5    the epidemiologic incidence of different kinds of

6    cancer and correlated that with the number of stem

7    cell divisions, somatic mutations, and cancer

8    etiology, haven't they?

9         A.  For certain cancers, yes.  It's a very

10   broad statement.

11        Q.  Okay.  And have you read the Tomasetti and

12   Vogelstein paper on that subject that was published

13   in Science in 2017?  It's a famous paper.

14        A.  I've glanced at it.  I don't know that I

15   can recall the details.

16        Q.  Okay.

17            (Whereupon, Exhibit 10 was marked for

18            identification.)

19            MR. DIAMOND:  Thank you.  All part of one

20   exhibit or two?

21            MR. SLONIM:  Yes.  It's one exhibit.  It's

22   supplemental tables, so that just was printed out

23   separately.

24        Q.  So, Doctor, marked as Exhibit No. 10, a

25   paper published by researchers at Johns Hopkins,

Charalambos Andreadis, M.D.

1    Dr. Tomasetti, Vogelstein, and one author regarding

2    mutations, where they come from, and their role in

3    cancer causation.

4         Have you seen this paper before?

5    A.  I believe so.

6    Q.  Okay.  So the copy that I gave you has some

7    yellow highlighting on it to help direct your

8    attention.

9         But let's start at the abstract and work

10   our way through it and see if we can unpack this and

11   explain -- and you can help us understand some of

12   the terms.

13        So the first sentence states, and I quote,

14   "Cancers are caused by mutations that may be

15   inherited, induced by environmental factors, or

16   result from DNA replication errors."

17        Do you agree with that sentence?

18   A.  Yes.

19   Q.  So those would be the three sources of

20   these mutations that ultimately culminate in the

21   disease that we're discussing, cancer, correct?

22   A.  Well, again, this is -- it's a review of

23   literature.  So it's an opinion piece.

24   Q.  No, it's not a review.  This is a

25   complete -- you're not representing that this paper

Charalambos Andreadis, M.D.

1   is a review, are you?  This is novel scientific

2   research published in Science.

3        A.  This is the author's opinions.  So, yes, so

4   these are theoretical statements.

5        Q.  No, no.

6            Well, let's distinguish between

7   theoretical -- let's distinguish between opinions

8   and scientific research.  This is the -- this is --

9   this paper is the report of scientific study that

10  quantified the amount -- the amount of mutations,

11  stem cell divisions, and the incidence of cancer,

12  and correlated it against epidemiologic and genomic

13  studies, correct?

14            MR. DIAMOND:  Form.

15            THE WITNESS:  What I am saying is this

16  is -- I misspoke.  It's not a review piece.  It's

17  the -- it's a specific study that the authors

18  conducted, and that's their opinion.  So this is not

19  fact.

20  BY MR. SLONIM:

21       Q.  Well --

22       A.  It's an author's opinion.

23       Q.  It's no -- it's no different than any

24  experiment.  This is scien- --

25       A.  This is one experiment, correct.

Charalambos Andreadis, M.D.

1      Q.  It's a scientific investigation where

2   researchers start with a hypothesis, they test the

3   hypothesis, they perform statistical analyses, and

4   they report their results, correct?

5      A.  Correct.

6      Q.  That is the scientific method, correct?

7      A.  Yes.

8      Q.  You understand the scientific method.

9   Start with a hypothesis, conduct an experiment,

10  measure the results, perform statistical analyses to

11  see if the results differ from -- differ from

12  chance, and if so, by how much.  And then to -- and

13  then to report the results in peer-reviewed

14  scientific literature, correct?

15     A.  Correct.  The sentence we read is an

16  opinion.  It's not part of the experiment.

17     Q.  Okay.  The experiment --

18     A.  It's their hypothesis.

19     Q.  The experiment is -- part of the experiment

20  is described in the next sentence:  "We studied the

21  relationship between the number of normal stem cell

22  divisions and the risk of 17 cancer types in 69

23  countries throughout the world."

24          That was the way they went about conducting

25  their study, correct?

Charalambos Andreadis, M.D.

1        A.   Presumably.  That's what is mentioned.

2        Q.   Well, presumably?  Is it a fact that that's

3   what they did, or they didn't?

4        A.   Well, that's what they say they did.

5             MR. DIAMOND:  Form.  Foundation.

6             THE WITNESS:  I do not know the methodology

7   of the paper.

8   BY MR. SLONIM:

9        Q.   You don't have any reason to think that

10   they misrepresented their methodology in the journal

11   Science, do you?

12             MR. DIAMOND:  Form.  Foundation.

13             THE WITNESS:  Again, this is a very big

14   field, and Dr. Vogelstein's reputation is in

15   colorectal cancer.  The word "cancer" in general

16   does not apply to hematopoietic malignancies because

17   they're not epithelial cell derived.

18             So it's a broad statement, a very broad

19   statement.  And if that's what they say they did,

20   that's what they say they did.  The devil is in the

21   details.  You have to look at how many of these

22   cases were lymphoma.

23   BY MR. SLONIM:

24        Q.   Okay.  And they said --

25        A.   Just a general causation on cancer does not

Charalambos Andreadis, M.D.

```
 1   really --

 2       Q.  They said they specifically looked at 17

 3   cancer types, correct?

 4       A.  Which are they?

 5       Q.  Well, do you know?  Do you know if they

 6   looked at -- you are criticizing them for not --

 7       A.  I don't know if they looked at lymphoma or

 8   not.

 9           (Reporter requests one speaker at a time.)

10   BY MR. SLONIM:

11       Q.  Well, I'll represent to you that they did

12   look at non-Hodgkin's lymphoma, and I'll show it to

13   you in due course.

14       A.  Good.

15       Q.  But you don't want to -- you do not --

16   well, let me ask you a different -- let me ask you.

17           Are you representing to the jury -- are you

18   representing to the jury that these authors in this

19   paper did not study non-Hodgkin's lymphoma and the

20   extent to which -- and the extent to which it is

21   caused by random DNA mutations as opposed to

22   environmental exposures?

23           MR. DIAMOND:  Form.

24           THE WITNESS:  I'm representing to the jury

25   that these authors, who are specifically interested
```

1    in nonlymphoma cancers, did a study based on the

2    hypothesis that there's three different etiologies

3    for cancer.  And in the course of that study, they

4    looked at many different cancer types.

5            I'm not aware that one of them is or isn't

6    non-Hodgkin's lymphoma.  And they drew some

7    conclusions that are very sparse in the abstract of

8    the study.

9            So I'm questioning the reason why I'm

10   reading this.

11   BY MR. SLONIM:

12       Q.  They determined, based on overall

13   assessment of all cancers, that, on average, that

14   random mutations are responsible for about

15   two-thirds of human cancers, correct?

16       A.  That's what they say, yes.

17       Q.  Now, obviously, it differs by cancer type.

18   Obviously, a cancer like lung cancer has a close

19   association with an environmental exposure such as

20   cigarette smoking, correct?

21       A.  It does.

22       Q.  Okay.

23       A.  And paradoxically, cigarette smoking does

24   not cause the known identifiable mutations in lung

25   cancer.  It's the non-cigarette smokers who develop

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    the mutations.

2         Q.  But in any event, some cancers are --

3    obviously have a close association to environmental

4    exposures, like lung cancer?

5         A.  Never proven to be through genetics.

6         Q.  Okay.  So you -- you actually dispute the

7    link between cigarette smoking and lung cancer?

8              MR. DIAMOND:  Form.

9              THE WITNESS:  Cigarette smoking is

10   associated with lung cancer, but the commonly

11   identified mutations in lung cancer happen in the

12   nonsmokers.  So the link does not link genetics to

13   cancer.  It's an epidemiological link.

14   BY MR. SLONIM:

15        Q.  Well, take a look, please, at page 4 of the

16   article.

17        A.  Yeah.  It's open.

18        Q.  May I see your copy for a second?

19        A.  Oh, no, I have it.  I'm just looking to

20   find the supplemental data that is mentioned there.

21        Q.  Yeah.

22             So take -- okay, so take a look at -- so I

23   just wanted to point that out to you, that they

24   indicate in their main paper, at page 4, that they

25   report data on specific -- more details and data on

Charalambos Andreadis, M.D.

1    specific types of cancer that they looked at in

2    Supplemental Table 6, correct?

3        A.   Correct.

4        Q.   Okay.  And if you take a look at the last

5    page, I printed out Supplemental Table 6.

6             And so do you see -- and your copy should

7    be yellow highlighted.

8             MR. SLONIM:  Counsel, I'm sorry that yours

9    isn't.

10            MR. DIAMOND:  That's fine.  I can find it.

11   BY MR. SLONIM:

12       Q.   Okay.  But do you see on the cancer type,

13   if you go down just about halfway down the page, you

14   see they have non-Hodgkin's lymphoma?

15       A.   I do.

16       Q.   Okay.  And do you see that the -- that

17   the -- that the E refers to the extent to which

18   environmental exposures are linked to non-Hodgkin's

19   lymphoma; the H indicates the extent to which

20   heredity -- inherited mutations are implicated in

21   non-Hodgkin's lymphoma, and the R indicates the

22   extent to which random mutations, "bad luck"

23   mutations, are implicated in non-Hodgkin's lymphoma?

24            Do you understand that from the table?

25       A.   Yeah.  I'm not understanding the numbers

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    though.  Are they percentages?

2        Q.  Yeah.

3        A.  Are they coefficients?

4        Q.  No.

5            So the numbers add to 100.  So these are

6    percent -- these are percentages reported out as

7    decimals.

8            So 3. -- according to this, when you look

9    at both sexes, 3.9 percent of non-Hodgkin's lymphoma

10   is attributable to mutations from environmental

11   exposures.  .5 percent is from inherited mutations.

12   And 95.6 percent is from random mutations of DNA,

13   "bad luck" mutations as a function of the inherent

14   B-cell biology of mutating rapidly in order to

15   detect and destroy pathogens.

16           That's their data reported in Table 6,

17   correct?

18           MR. DIAMOND:  Form.

19           THE WITNESS:  That's -- yes.  That's what

20   they say.

21   BY MR. SLONIM:

22       Q.  So, Doctor, according to the data in this

23   experiment, this study by Dr. Vogelstein and

24   Tomasetti, out of every hundred cases of

25   non-Hodgkin's lymphoma, 96 of those cases are caused

Charalambos Andreadis, M.D.

1    by "bad luck" mutations when the B-cells divide,

2    correct?

3         A.   That's what is reported.

4         Q.   And according to this data, it's highly

5    likely, more than 96 percent, that Mr. Alvarez's

6    non-Hodgkin's lymphoma is attributable to random

7    mutation as opposed to environmental exposure,

8    correct?

9              MR. DIAMOND:   Form.

10             THE WITNESS:   That is not a correct

11   statement.

12   BY MR. SLONIM:

13        Q.   Okay.   Doctor, you agree with me that

14   non-Hodgkin's lymphoma -- why is that not a correct

15   statement?

16        A.   Because this is a population-based study.

17   We do not know the methodology used here and how

18   these numbers were quantified.   In the field, that

19   is not a widely recognized method of calculating

20   risk, and it applies to populations.

21             So any single patient, let's take

22   Mr. Alvarez, for example, could be in the .039 that

23   got their lymphoma because of environmental

24   exposure.

25        Q.   But it's more likely, more than 96 percent,

1    that it was attributable to a random mutation?

2           MR. DIAMOND:  Form.

3           THE WITNESS:  I have no way that I know of

4    or that I'm familiar with other experts doing

5    studies in to distinguish environment from random.

6    And I believe it's an extrapolation from, as you

7    said, epidemiological studies.

8           So this is not really -- there's no

9    accepted methodology to be able to distinguish those

10   two numbers, because environment ultimately is

11   associated with random effects.

12          (Reporter clarification.)

13          THE WITNESS:  Associated with random

14   effects.

15   BY MR. SLONIM:

16       Q.  So, Doctor, a few more questions about

17   non-Hodgkin's lymphoma, and then we'll take a lunch

18   break.

19          You agree with me that non-Hodgkin's

20   lymphoma is one of the most common cancers in the

21   United States, correct?

22       A.  Correct.

23       Q.  And it accounts for roughly 4 percent of

24   all newly diagnosed cancers, correct?

25       A.  It's the fifth most common cancer, yes.

Charalambos Andreadis, M.D.

1      Q.  And in the United States, the lifetime risk

2   that a man will develop non-Hodgkin's lymphoma is

3   about 1 in 42, correct?

4          MR. DIAMOND:  Form.  Foundation.

5          THE WITNESS:  I'm not sure of the

6   individual's risk.  1 in 42?  That sounds like a

7   very high number.

8          (Whereupon, Exhibit 11 was marked for

9          identification.)

10         MR. SLONIM:  I think this may be in your

11  report.

12         MR. DIAMOND:  11?

13  BY MR. SLONIM:

14     Q.  In any event, we've marked as Deposition

15  Exhibit No. 11 a publication by the American Cancer

16  Society entitled "Key Statistics for Non-Hodgkin's

17  Lymphoma."

18         Do you have that in front of you?

19     A.  I do.

20     Q.  And in the middle paragraph, they state,

21  and I quote, "Overall, the chance that a man will

22  develop non-Hodgkin's lymphoma in his lifetime is

23  about 1 in 42"?

24     A.  Yes.

25     Q.  Okay.  So do you accept that statistic if

Charalambos Andreadis, M.D.

1    the American Cancer Society is reporting it?

2        A.  I do.

3        Q.  Okay.  And let's just explain what that

4    means concretely.

5            What this means is that, if you were to

6    pick a group of a hundred men at random and you

7    followed them medically over the course of their

8    entire lifetime, two of those men would develop

9    non-Hodgkin's lymphoma, correct?

10       A.  Correct.

11       Q.  So, Doctor, Mr. Alvarez could have

12   developed non-Hodgkin's lymphoma simply because it's

13   a common cancer that strikes two out of every 100

14   men; isn't that right?

15       A.  Well, I would argue it's a not a common

16   cancer if it strikes two out of every hundred men.

17   It is a cancer.

18       Q.  Okay.  But Mr. Alvarez --

19       A.  Theoretically, yes, anybody could develop

20   lymphoma.

21       Q.  Okay.  Good.  Thank you.

22           And one more thing, Doctor.  So cancer, all

23   cancer, or certainly most cancer and certainly

24   non-Hodgkin's lymphoma, is a function of age,

25   meaning that, as patients age, the risk of

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    non-Hodgkin's lymphoma increases, correct?

2            MR. DIAMOND:  Form.

3            THE WITNESS:  Specifically for

4    non-Hodgkin's lymphoma, yes, it goes up with age,

5    for some kinds.  Some do not go up with age.

6    Actually, they go down.

7    BY MR. SLONIM:

8        Q.  For follicular lymphoma and for a DLBCL,

9    the two types that may have affected Mr. --

10       A.  They both go up with age.

11       Q.  -- Alvarez, they both go up with age,

12   correct?

13       A.  (Nonverbal response.)

14       Q.  And, I mean, and that makes sense, right,

15   because, as people age, there's an increase in

16   likelihood that random mutations in the B-cells, as

17   those B-cells replicate, can result in cells that

18   are malignant, correct?

19           MR. DIAMOND:  Form.

20           THE WITNESS:  And as they're exposed to

21   environmental toxins, yes.

22   BY MR. SLONIM:

23       Q.  And Mr. Alvarez was ███████████ when he

24   was diagnosed with non-Hodgkin's lymphoma, correct?

25       ███ █████████████████████████████████

Charalambos Andreadis, M.D.

1      █████

█   █████   ████████████████████████████████

█   █████████

█   ████   ██████████

█   ████   ██████████████████████████████████

█   ████████████████████████████████████

█   █████████

█          ██████████████    ████████

█          ██████████████    ████████████

10    BY MR. SLONIM:

11         Q.  He could have developed a non-Hodgkin's

12    lymphoma simply as a result of age; isn't that

13    right?

14         A.  He could have.

15         Q.  Okay.  Good.

16              MR. SLONIM:  Why don't we take a lunch

17    break.

18              MR. DIAMOND:  Okay.  So let's --

19              THE VIDEOGRAPHER:  This marks the end of

20    disc 2.  We're off the record at 12:09 p.m.

21              (Recess taken.)

22              THE VIDEOGRAPHER:  We are back on the

23    record.  This marks the beginning of disc No. 3 in

24    the deposition of Dr. Charalambos Andreadis.  The

25    time is 1:05 p.m.

Charalambos Andreadis, M.D.

```
 1   BY MR. SLONIM:

 2       Q.  So, Doctor, you are, of course, familiar

 3   with Mr. Alvarez's medical records; is that correct?

 4       A.  Correct.

 5       Q.  You'll agree with me that none of his blood

 6   tests indicates the presence of glyphosate or

 7   Roundup in his system; is that right?

 8           MR. DIAMOND:  Form.

 9           THE WITNESS:  We have not tested for that.

10   BY MR. SLONIM:

11       Q.  So the answer is that there are no blood

12   tests that you can point to that says, uh-huh,

13   Roundup or glyphosate is on board, correct?

14       A.  Correct.

15       Q.  And when Mr. Alvarez's cancer is examined

16   under the microscope, there's no feature or

17   characteristic that indicates that glyphosate or

18   Roundup caused or contributed to the cancer,

19   correct?

20       A.  Correct.

21       Q.  And likewise, there are no pathological

22   analyses of Mr. Alvarez's cancer that indicates that

23   glyphosate or Roundup caused or contributed to the

24   cancer, correct?

25       A.  Correct.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1          Q.  There is no genomic signature present in

2     Mr. Alvarez's cancer that indicates glyphosate or

3     Roundup caused or contributed to the cancer,

4     correct?

5          A.  Not specific to glyphosate.

6          Q.  There was genetic testing of Mr. Alvarez's

7     cancer, correct?

8          A.  Correct.

9          Q.  And among the things that that genetic

10    testing indicated or suggested, at least, was that

11    his non-Hodgkin's lymphoma had aberrations of

12    chromosomes that affect the genes known as BCL2 and

13    BCL6, correct?

14         A.  Correct.

15         Q.  But there's no scientific study that

16    reports that chromosomal aberrations of either BCL2

17    or BCL6, or both of those in combination, are

18    indicative of glyphosate or Roundup causing or

19    contributing to a patient's cancer, correct?

20              MR. DIAMOND:  Form.

21              THE WITNESS:  There is no scientific

22    evidence suggesting that the two of them are only

23    present in people exposed to glyphosate.  But

24    obviously it's a very rare occurrence that you have

25    both genes rearranged, and as mentioned earlier,

Charalambos Andreadis, M.D.

1  genetic instability in those cells can be magnified

2  by environmental exposures, so there's an

3  interactive association, in my mind.

4  BY MR. SLONIM:

5      Q.  You can't point to any scientific evidence

6  that says that glyphosate or Roundup causes

7  aberrations specifically of either BCL2 or BCL6,

8  correct?

9          MR. DIAMOND:  Form.

10          THE WITNESS:  Specifically for those, no.

11  BY MR. SLONIM:

12      Q.  There's no medical test or biomarker that

13  demonstrates that Roundup --

14          (Reporter clarification.)

15  BY MR. SLONIM:

16      Q.  There's no medical test or biomarker that

17  demonstrates that Roundup caused or contributed to

18  Mr. Alvarez's non-Hodgkin's lymphoma, correct?

19      A.  Correct.

20      Q.  None of Mr. Alvarez's medical records state

21  that Roundup or glyphosate caused or contributed to

22  his non-Hodgkin's lymphoma, correct?

23      A.  Directly, no.

24      Q.  And, Doctor, in your role as one of

25  Mr. Alvarez's treating medical oncologists, you

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    never made a notation in any medical record stating

2    that Roundup caused or contributed to his

3    non-Hodgkin's lymphoma, correct?

4        A.  Directly, no.

5        Q.  In the course of your care and treatment of

6    Mr. Alvarez, prior to your retention as an expert

7    witness, you never told Mr. Alvarez that Roundup or

8    glyphosate caused or contributed to his cancer,

9    correct?

10       A.  I don't make those statements in general.

11   Correct.

12       Q.  So the answer is no?

13       A.  (Nonverbal response.)

14       Q.  The answer is you never, in your role -- I

15   just want to make sure because there may have been

16   some extra negatives.

17           In your role as Mr. Alvarez's treating

18   physician --

19       A.  Oncologist.

20       Q.  -- prior to your retention as an expert,

21   you never told him that Roundup or glyphosate caused

22   or contributed to his cancer; is that right?

23       A.  I did not.

24       Q.  And since the time you've been retained as

25   an expert in this case, have you told Mr. Alvarez

Charalambos Andreadis, M.D.

1    that Roundup or glyphosate caused or contributed to

2    his cancer?

3         A.  I have not.

4         Q.  And insofar as you have reviewed

5    Mr. Alvarez's medical records and you know

6    personally his other physicians that care and treat

7    him for his non-Hodgkin's lymphoma, is it correct

8    that, to your knowledge, no treating doctor ever

9    told Mr. Alvarez that Roundup or glyphosate caused

10   or contributed to his cancer?

11        A.  Well, I can't say as to what the other

12   doctors told him directly.  It -- sometimes we talk

13   to our patients about things that are not in the

14   medical record.  So I can only say about what I

15   talked to him.

16        Q.  Okay.  But insofar as you're aware, no

17   doctor has ever told him that Roundup caused or

18   contributed to his cancer?

19        A.  As far as I'm aware.

20        Q.  You agree with me, Doctor, that there's no

21   scientifically validated test, procedure, or

22   protocol to tell a doctor what caused a specific

23   patient's non-Hodgkin's lymphoma?

24             MR. DIAMOND:  Form.

25             THE WITNESS:  A specific test, no.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    BY MR. SLONIM:

2         Q.  If you saw a patient with exactly the same

3    medical history as Mr. Alvarez, except that he was

4    not exposed to Roundup, what would you say caused

5    his non-Hodgkin's lymphoma?

6              MR. DIAMOND:  Form.  Foundation.

7              THE WITNESS:  I would do an exhaustive

8    diagnosis, differential diagnosis, as I did in

9    Mr. Alvarez's case and try to identify other

10   factors.

11             It depends -- a lot of it depends on when

12   I'm meeting the patient, if I'm meeting them because

13   they're starting treatment, if I'm meeting them

14   because they're failing existing treatments.  And a

15   lot it depends on how much the patients ask me.  So

16   I don't routinely make it a point to point out what

17   their causes of the lymphoma were.

18   BY MR. SLONIM:

19        Q.  So suppose you had somebody with 100

20   percent precisely the same medical record and

21   medical history as Mr. Alvarez, with one exception:

22   No exposure to Roundup.

23             What would you say caused that patient's

24   non-Hodgkin's lymphoma?

25        A.  I would say I don't know.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

 1      Q.  And why not?

 2      A.  Because other -- other than the exhaustive

 3  risk factors that we've identified, there's some

 4  lymphomas that happen just randomly.

 5      Q.  Now, in -- strike that.

 6          On July 15th, 2019, you gave sworn

 7  deposition testimony about Mr. Alvarez and his

 8  non-Hodgkin's lymphoma, correct?

 9      A.  Correct.

10      Q.  Were you compensated for the time you spent

11  at that deposition?

12      A.  I was.

13      Q.  How much?

14      A.  I was compensated, I believe, for that

15  case, a thousand dollars.

16      Q.  And who paid you?

17      A.  The plaintiff's attorney.

18      Q.  The deposition testimony that you gave on

19  July 15th, 2019 in the Alvarez case, that was given

20  under oath, correct?

21      A.  Correct.

22      Q.  And you testified truthfully and

23  accurately?

24      A.  Yes.

25      Q.  Is that correct?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

 1          You stand by that testimony?

 2      A.  I do.

 3      Q.  And by the same token, you gave testimony

 4  on that same day in the Johansing case, I believe?

 5      A.  I did.

 6      Q.  And that testimony was also given under

 7  oath?

 8      A.  Yes.

 9      Q.  Was it truthful and accurate?

10      A.  It was.

11      Q.  And do you stand by it?

12      A.  I do.

13      Q.  Now, after the July 15th, 2019 deposition,

14  you were asked to work as an expert on behalf of

15  Mr. Alvarez; is that correct?

16      A.  Correct.

17      Q.  When were you asked?  How long after the

18  deposition?

19      A.  Within a couple weeks.

20      Q.  And what did you do after you were retained

21  as an expert in regard to the case?

22      A.  I -- well, I went back in more detail over

23  his medical records because the -- I had met

24  Mr. Alvarez late into his disease course, so I

25  wasn't quite familiar with all of his prelymphoma

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1   history exposures as well as specific lymphoma

2   treatments.

3          So I reviewed his case more thoroughly.

4   And then I did some literature searches and read

5   some opinions about the matter.

6      Q.  Were those the ones we discussed earlier

7   today?

8      A.  Some of them, yes.

9      Q.  What else -- so we discussed a number of

10  things.  We discussed some expert reports, we

11  discussed IARC, we discussed some genotoxicity

12  studies, I assume there are some epidemiology

13  studies, we'll get to those.

14     A.  Right.

15     Q.  You list those in your expert report.

16         Anything else that you --

17     A.  That's pretty much it.  I gave you a

18  thorough list.

19     Q.  And, Doctor, of course, you're getting paid

20  to testify as an expert; is that correct?

21     A.  Correct.

22     Q.  And as I understand it, you're -- how much

23  are you charging per hour to review documents?

24     A.  To review documents, I believe it's 750 an

25  hour.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

```
 1        Q.   And how much are you getting paid to

 2   testify at deposition and trial?

 3        A.   I believe it's a thousand.

 4             (Whereupon, Exhibit 12 was marked for

 5             identification.)

 6   BY MR. SLONIM:

 7        Q.   Doctor, we've marked as Deposition Exhibit

 8   No. 12 an invoice that was provided to us by your

 9   counsel.  Is that how much you've billed so far in

10   this case?

11        A.   Correct.

12        Q.   Can you tell me -- I'm a little confused by

13   the retainer versus the other billings.  In total,

14   how much have you billed in dollars?

15        A.   It would have to be -- well, it's the

16   addition of those two sums.  You want me to do the

17   calculation?

18        Q.   Is it the --

19        A.   So the 5,000 plus this, plus the 13,000.

20        Q.   So without taking a calculator --

21        A.   Maybe 19,000.

22        Q.   -- it looks like maybe just about 19,000,

23   maybe a touch less?

24        A.   Uh-huh.

25        Q.   Correct?
```

Charalambos Andreadis, M.D.

1          And that seems to reflect the time starting

2     on August 7th, 2019; is that correct?

3          A.  Correct.

4          Q.  Through September 30th, 2019, correct?

5          A.  Right.  That was up until the submission of

6     my report.

7          Q.  Okay.  And now we're up to, like, November

8     10th, 2019.

9          Is there additional time that you've

10    accrued but not yet billed?

11         A.  There is, yeah.  I haven't generated an

12    invoice yet.

13         Q.  What's your best estimate of how much

14    time -- let's hold today's deposition aside.

15         What's your best estimate of how much time

16    you have accrued starting on October 1st, 2019

17    through today?

18         A.  I'd say about five, six hours.

19         Q.  At $750 an hour.  So another $8,000 or

20    something, 9,000?

21         A.  No.  That would be --

22         Q.  Oh, did I do it wrong?

23         A.  Five times seven -- it would be probably

24    around 4,000.

25         Q.  Okay.  And for today's deposition you're

Charalambos Andreadis, M.D.

1    charging a thousand dollars per hour?

2        A.   Yes, but I think I have a day max of 5,000.

3        Q.   Okay.

4        A.   I haven't looked at my fee schedule in a

5    while.

6        Q.   Did you spend time preparing for today's

7    deposition?

8        A.   I did.

9        Q.   How much time?

10       A.   That was the five or six hours that I

11   mentioned.

12       Q.   I see.

13            Can you just put that with the exhibits,

14   please.

15            Thank you.

16            Let's move on to discuss epidemiology.  You

17   have -- strike that.

18            Have you reviewed several epidemiology

19   studies regarding glyphosate and cancer?

20       A.   I have.

21       Q.   And are those discussed in your expert

22   report?

23       A.   Yes.

24       Q.   Let's -- by the way, I don't think I marked

25   your expert report.  Let's do that.

Charalambos Andreadis, M.D.

```
 1              (Whereupon, Exhibit 13 was marked for

 2              identification.)

 3              MR. DIAMOND:  If you have an extra copy,

 4    I'll take it.  Otherwise, I'll dig out my own.

 5              MR. SLONIM:  I do.

 6    BY MR. SLONIM:

 7         Q.  So if I -- by the way, Doctor, can you

 8    identify Deposition Exhibit No. 13 as your expert

 9    report?

10         A.  Yes.

11         Q.  And if you turn to page 10, I guess, and

12    continuing on to page 12, there's a discussion of

13    the various epidemiological studies that you looked

14    at or reviewed in connection with this matter; is

15    that right?

16         A.  Yes.

17         Q.  So one of the studies was by an author

18    named McDuffie published in 2001; is that right?

19         A.  Correct.

20         Q.  And you're familiar with that study?

21         A.  Yes.

22         Q.  Do you intend to testify, based on McDuffie

23    2001, that glyphosate is a substantial causative

24    factor for a person such as Mr. Alvarez who exceeds

25    two days per year use of Roundup?
```

Charalambos Andreadis, M.D.

1            MR. DIAMOND:  Form.

2            THE WITNESS:  Two or more days per year.

3   BY MR. SLONIM:

4        Q.  Yes.

5        A.  Yes.

6        Q.  And is that necessary for your methodology?

7   In other words, if that threshold is not met, would

8   you say that the person is not at risk?

9        A.  As I mentioned earlier, I don't really have

10   a set threshold.  So I look at the range of

11   exposures in the different studies, and I also

12   look -- I specifically mention the McDuffie study

13   and the Eriksson study because they try to tease

14   apart whether higher levels of exposure are

15   associated with higher risk.

16            So I think -- so I use those because I

17   think that higher exposure is associated with higher

18   risk.

19        Q.  Well, do you intend to testify that

20   Mr. Alvarez's risk of developing non-Hodgkin's

21   lymphoma more than doubled because he used Roundup

22   for more than the threshold of two days per year

23   noted by McDuffie?

24        A.  I agree with that.  Yes.

25        Q.  And you had mentioned Eriksson 2008.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1  You're, of course, familiar with that study,

2  correct?

3       A.  Correct.

4       Q.  Do you intend to testify, based on

5  Eriksson, that Mr. Alvarez's risk of developing

6  non-Hodgkin's lymphoma more than doubled because he

7  used Roundup for more than the threshold of ten days

8  in a lifetime noted by the Eriksson authors?

9            MR. DIAMOND:  Form.

10           THE WITNESS:  I do.

11 BY MR. SLONIM:

12      Q.  Now, Doctor, you're familiar with

13 confounders, correct?

14      A.  I am.

15      Q.  What's a confounder?

16      A.  A confounder is a factor that's associated

17 with both an exposure and the outcome of interest

18 and, if unaccounted for, may alter the observed

19 effect.

20      Q.  So let's try to make a concrete example to

21 help break this down and explain it.

22           So suppose you wanted to conduct a case

23 control study to investigate whether coffee was

24 associated with an increased risk of cancer.

25           Have that in mind?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1      A.  Yes.

2      Q.  There actually have been studies like that,

3  right?

4      A.  Sure.  There's a study --

5      Q.  We're going to keep this very simple to

6  just try to help define or illustrate a potential

7  confounder.  Okay?

8      A.  Correct.

9      Q.  So you could conduct a case control study

10  investigating coffee and the possible increased risk

11  of cancer by finding patients who had cancer and

12  then questioning them about whether they were coffee

13  drinkers, right?

14      A.  Correct.

15      Q.  And you would also find people who did not

16  have cancer, and you would similarly question them

17  about their coffee consumption, correct?

18      A.  Correct.  Usually they would be matched to

19  the cases.

20      Q.  So the idea is we would have cases; those

21  are the people that had cancer.  You'd have

22  controls; those are the people that don't have

23  cancer.  And then the investigator who wanted to

24  conduct this case control study would ask the same

25  questions of both, people in both groups, asking

1    them about whether they drank coffee and, if so,

2    maybe how much per day, correct?

3        A.  Correct.

4        Q.  And then what the investigators would do is

5    compare whether the cases, that means the people

6    that had cancer, had more exposure to coffee than

7    the controls, which would be the people who did not

8    have cancer, correct?

9        A.  Correct.

10       Q.  And suppose that such a study were

11   conducted, and the investigator found that coffee

12   drinkers had a higher risk of cancer than noncoffee

13   drinkers, and suppose further that people who drank

14   more than two cups per day had more than a twofold

15   risk.

16           Do you have that picture in mind?

17       A.  Yes.

18       Q.  On the basis of that information, the

19   investigator could not conclude that drinking coffee

20   increased the risk of cancer, could he?

21       A.  He could conclude it.  It would have to be

22   questioned as to what was adjusted for and what the

23   rest of the evidence was.

24       Q.  Fair enough.

25           And going back a few years, maybe when

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

```
 1    cigarette smoking was more common --

 2         A.  Uh-huh.

 3         Q.  -- you know, that it was often the case

 4    that people often would have cigarettes and coffee

 5    together so that the -- as you would sip a cup of

 6    coffee, you would smoke a cigarette, correct?

 7         A.  Correct.

 8         Q.  Now that's less common because there's less

 9    cigarette smoking, but that certainly used to be the

10    case, correct?

11         A.  Correct.

12         Q.  So if we conducted this hypothetical study,

13    case control study, a few years ago and we didn't

14    ask people about their cigarette consumption, but we

15    just asked them about their coffee consumption, the

16    finding could be -- the finding about coffee could

17    be confounded because we failed to consider

18    cigarettes as a potential causative factor in the

19    cancer, right?

20         A.  Correct.

21         Q.  So I just -- just using this for purposes

22    of -- to try to illustrate the confounding.  So let

23    me try to go through it one more time just to make

24    sure we've got it clear.

25              In a case control study, the investigator
```

Charalambos Andreadis, M.D.

1    looks at cases, the people that have cancer, and

2    controls, the people that don't have cancer, and

3    goes back and asks them about their exposure to the

4    substance of interest, in this case, hypothetically,

5    it would be coffee, correct?  Yes?

6         A.  Correct.

7         Q.  And you would ask them, first of all,

8    whether they were a coffee drinker or not, and if

9    they were a coffee drinker, you would ask them how

10   many cups per day so you could get a -- so you might

11   be able to get an idea about dose-response, correct?

12        A.  Correct.

13        Q.  And if you conducted that study but did not

14   ask them anything about their smoking habits, and

15   you found that the coffee drinkers had a higher

16   incidence of cancer than the noncoffee drinkers, and

17   you found the gradient such that people that had

18   more than two cups per day had a -- had double the

19   risk of noncoffee drinkers, you might conclude that

20   coffee increased the risk of cancer, but the problem

21   is that the study potentially could be confounded

22   because you failed to ask anything about cigarette

23   smoking, and cigarette smoking could be correlated

24   with coffee consumption, correct?

25             MR. DIAMOND:  Form.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

```
1              THE WITNESS:  That does not make it a

2    negative study.  It just makes it more complicated,

3    but -- yes.  There are --

4    BY MR. SLONIM:

5         Q.  And it makes the finding --

6         A.  The theory is correct.

7         Q.  In other words, the finding -- the trouble

8    is, the study would be perfectly fine, insofar as --

9    insofar as they reported they conducted the study

10   and they accurately -- investigators accurately

11   reported the findings.

12             The weakness, the limitation, or the flaw

13   in this study is that by failing to inquire about

14   cigarette consumption, the study was potentially

15   confounded if cigarette consumption was correlated

16   with coffee consumption.

17        A.  Correct.

18             And that's a general problem for all case

19   control studies, because you can't possibly correct

20   for every possible exposure.

21        Q.  Okay.  So you would agree -- I mean, this

22   is pretty standard epidemiology -- that it's crucial

23   for investigators to properly control for potential

24   confounders; isn't that right?

25        A.  That's correct.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1      Q.   Okay.  So now let's talk about McDuffie

2   2001 again.

3           You agree with me that in McDuffie -- the

4   McDuffie study, that was a case control study,

5   correct?

6      A.   Correct.

7      Q.   And the investigators went back and asked

8   cases and controls about their exposure to

9   glyphosate -- to pesticides, correct, not just

10   glyphosate?

11      A.   Correct.

12      Q.   But the study did not control for

13   confounding attributable to coexposures to other

14   pesticides, did it?

15      A.   I don't have it in front of me right now to

16   see the methodology.

17      Q.   Okay.  Good.

18      A.   But that is my recollection.

19           (Whereupon, Exhibit 14 was marked for

20           identification.)

21           MR. DIAMOND:  What number are we up to?

22           THE REPORTER:  14.

23           MS. PODSIADLO:  14.

24           MR. DIAMOND:  Thanks.

25

Charalambos Andreadis, M.D.

1    BY MR. SLONIM:

2         Q.  So, Doctor, we've marked as Deposition

3    Exhibit No. 14 the McDuffie study.  Is this the

4    study that you had in mind?

5         A.  Yes.

6         Q.  And this is the one that --

7         A.  2001.

8         Q.  This is the one that you referenced and

9    discussed in your expert report, correct?

10        A.  Correct.

11        Q.  Take a look at Table 2, please.

12             This study reports the odds ratios for

13   people that used various pesticides, correct?

14        A.  Correct.

15        Q.  And one of the pesticides listed is

16   glyphosate, the active ingredient in Roundup,

17   correct?

18        A.  Correct.

19        Q.  And they report two different types of

20   adjusted odds ratios.  They report column -- odds

21   ratios in column A and then odds ratios in column B,

22   correct?

23        A.  Correct.

24        Q.  But none of those -- neither of those odds

25   ratios is adjusted for coexposure to other

Charalambos Andreadis, M.D.

 1   pesticides, is it?

 2        A.  It's not.

 3        Q.  All right.  In column A, it's adjusted for

 4   age and province of residence, correct?

 5        A.  Correct.

 6        Q.  And B is adjusted for various medical items

 7   such as history of measles, mumps, cancer, that kind

 8   of thing, and also age and province of residence.

 9            But again, there's no adjustment, no

10   control, for exposure -- coexposure to other

11   pesticides, is there?

12        A.  There isn't.

13        Q.  Now, take a look -- now, this table does

14   not divide it out by days per year of use, correct?

15        A.  Right.

16        Q.  Turn to Table 8.

17            MR. DIAMOND:  Which table?

18            MR. SLONIM:  Eight.

19            MR. DIAMOND:  Thanks.

20            MR. SLONIM:  Page 1161.

21        Q.  And if you take a look, it's about the

22   third group down on the left-hand side, it says

23   glyphosate.  You see that?

24        A.  Glyphosate.

25        Q.  Third one.  Table 8.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

 1       A.   Oh, yeah.  Phosphoric acid, yes.

 2       Q.   And you see they have days per year, they

 3   have unexposed, then they have more than zero and

 4   less than or equal to 2 and then greater than 2?

 5       A.   Correct.

 6       Q.   They give us odds ratios on the right-hand

 7   column?

 8       A.   Yes.

 9       Q.   And the footnote tells us what they

10   adjusted for, correct?

11       A.   Correct.

12       Q.   And they adjusted for age and province of

13   residence.

14            Do you see that?

15       A.   I do.

16       Q.   So again, they did not adjust for

17   coexposures to other pesticides; is that correct?

18       A.   Well, they did not in calculating the

19   absolute number, but this analysis is a comparison

20   of people who have more than two days versus less

21   than two days.

22       Q.   Yes.

23       A.   So there was an internal control in that

24   they were exposed to glyphosate.  So presumably they

25   would have similar degree of exposure to other

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    pesticides.

2        Q.  Of course.

3            So if another pesticide, as an example,

4    malathion, was responsible because people that used

5    glyphosate also used malathion, or people that were

6    exposed to glyphosate were also exposed to

7    malathion, you would not be able to tell from these

8    data whether it was the glyphosate or the malathion

9    that was responsible, correct?

10       A.  So that should have been adjusted for by

11   nature of the analysis which looks at degree of

12   exposure.

13       Q.  No, because of the degree of exposure is

14   the same -- if farmers -- if farmers use both

15   chemicals in similar proportions, then you would --

16   then you would see exactly -- then you wouldn't be

17   able to separate out the results; isn't that right?

18           MR. DIAMOND:  Form.

19           THE WITNESS:  It's partly right, but it's

20   not completely right.  Because, I mean, we can make

21   a lot of theoretical assumptions about different

22   risks, but obviously you're not seeing a

23   dose-response effect for many other chemicals.

24   BY MR. SLONIM:

25       Q.  Well, we're going to come to this in a

Charalambos Andreadis, M.D.

```
 1   second.

 2       A.  And so --

 3       Q.  I'm sorry.

 4       A.  I think it's -- as I said, it's an

 5   internally controlled process where you, you know,

 6   examine more versus less, and you're finding that

 7   more with glyphosate is a higher risk than with

 8   less.

 9       Q.  But in the coffee example, the person

10   that -- the person that drank three cups of coffee a

11   day had a higher risk than the person who drank two

12   cups of coffee, people that drank two cups of coffee

13   a day and so on, and there's a gradient response,

14   and so it looks like the coffee is responsible, and

15   it looks like the days -- the number of cups per

16   day.

17       A.  But --

18       Q.  But the problem -- but the problem that the

19   coffee example illustrates is that the cigarette

20   consumption is -- corresponds to coffee because

21   people that would -- smokers who would smoke

22   cigarettes often did so as they sipped on their

23   coffee.

24           So more coffee equaled more cigarettes, and

25   you could not tell whether you were observing an
```

1  effect from the coffee or the cigarettes.  That's

2  the whole point of confounding, right?

3       MR. DIAMOND:  Form.

4       THE WITNESS:  Actually, in biostatistical

5  literature, looking at a dose effect is a way of

6  avoiding confounding because -- it's not the best

7  way to do it, but it is a way.  Because that way you

8  have to assume that the two factors are colinear,

9  meaning more coffee is associated with more

10 cigarettes, which has not been proven.

11      So saying that the same gradient applies

12 for both factors and that each factor is completely

13 confounded by the other one is a big leap of faith.

14 BY MR. SLONIM:

15    Q.  Farmers that use one product for more than

16 two days a year may use another -- may use a

17 similar -- may use another --

18    A.  Or they may not.

19    Q.  But it makes sense that people then --

20 people that farm intensively, that use one chemical

21 for more than two days per year would farm

22 intensively, and they'd use --

23    A.  That's not necessarily true.  They may

24 prefer one chemical over another.  So they may use

25 one chemical extensively and the other chemical just

Charalambos Andreadis, M.D.

1   a little bit.

2          So I haven't seen any data to suggest that

3   the two factors vary together.

4          (Reporter clarification.)

5          MR. DIAMOND:  Let me get my form objection.

6          THE REPORTER:  You have an objection that I

7   did not get because you can't whisper your

8   objections.  Then he doesn't know you're saying it,

9   so he doesn't know to pause.

10          MR. DIAMOND:  He doesn't need to know.  I

11   was just making it for the record.

12          THE REPORTER:  I know, but I can't -- I

13   can't get what you're doing nonverbally while he's

14   talking.  I can't write that all at the same time.

15          MR. DIAMOND:  Sorry.

16          THE REPORTER:  So I need a pause, like we

17   did before.

18          MR. DIAMOND:  I made a form objection

19   before you began answering that question, except I

20   wasn't able to get it in quite quickly enough.

21          THE REPORTER:  I get what happened.  I just

22   need to let you know that it's not on the record

23   because I can't do that.

24          MR. SLONIM:  If you want a stipulation that

25   there was a form objection that you had tried to

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1  interpose but didn't -- somehow didn't utter it

2  quickly enough, that's fine.

3         MR. DIAMOND:  Okay.  Thank you.

4         THE REPORTER:  Thank you.

5         MR. SLONIM:  Okay.  So --

6         THE REPORTER:  And there was a lot of

7  overlapping speaking, too.  So lots of dashes.

8  BY MR. SLONIM:

9     Q.  In any event, Doctor, this study, the

10  McDuffie study, was not adjusted or controlled for

11  coexposures to other pesticides, was it?

12     A.  The primary analysis --

13         MR. DIAMOND:  Form.  Sorry.

14         THE WITNESS:  The primary analysis was not.

15  But as I mentioned before, I -- and the reason why I

16  put the McDuffie study in my report is not as

17  evidence of a primary association, but as evidence

18  of a dose-response effect.  And I do think the

19  dose-response effect is a way of partially adjusting

20  for other pesticide use.

21  BY MR. SLONIM:

22     Q.  But you agree with me, for instance, when

23  you look at the -- what they -- in column A in the

24  footnote that goes -- that corresponds to the odds

25  ratio column, where they tell us what they were

Charalambos Andreadis, M.D.

1   adjusted for, the only variables they adjusted for

2   were age and province of residence, correct?

3        A.   In reporting the adjusted odds ratio.  But

4   in the study conclusion, which is the odds ratio in

5   and of itself, as I said, part of that is being

6   accounted for.

7        Q.   Now, take a look at the study population,

8   first page.

9            See that this is a study population of men

10  who resided in six Canadian provinces, and they were

11  diagnosed between September 1st, 1991 and December

12  31st, 1994?

13       A.   I'm looking for that.

14       Q.   That's -- starts on the bottom of page 1 --

15  page 1155, and goes to the top of page 1156.

16       A.   Oh, 1155.

17       Q.   Starts on the bottom.  Very bottom.

18       A.   Uh-huh.  Yes.

19       Q.   You see that?  You see how they define that

20  study population?

21       A.   Yes.

22       Q.   Now, you didn't report the fact that these

23  same investigators did a subsequent study on exactly

24  the same population of people where they

25  disentangled the effect of coexposures, did you?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1       A.  I did not because that wasn't the point I

2   was making.

3       Q.  Well, then you're aware of the fact that

4   these investigators that conducted the McDuffie

5   study reported results on the same population in a

6   later paper, and they demonstrated that when you

7   look at glyphosate coexposed with malathion, that

8   all of the increased risk of non-Hodgkin's lymphoma

9   is attributable to malathion.

10      A.  I have not seen that paper.

11      Q.  Did you look for it?

12      A.  It's not quoted in any of the literature I

13  read.

14      Q.  So you didn't take that into consideration,

15  right?  Correct?  You did not take a later paper by

16  the same investigators that disentangled malathion

17  coexposure with glyphosate into consideration when

18  you formed your opinion, correct?

19      A.  Not in offering an opinion on the

20  dose-response effect.  And my patient did not use

21  malathion.

22          (Whereupon, Exhibit 15 was marked for

23          identification.)

24  BY MR. SLONIM:

25      Q.  Marked as Deposition Exhibit No. 15, a

Charalambos Andreadis, M.D.

1    paper by first author Hohenadel, published in 2011.

2    Do you have that paper in front of you?

3        A.  I do.

4        Q.  Do you see that when you compare the

5    authors, that many of the authors on the Hohenadel

6    paper are the same authors that were on the McDuffie

7    paper?

8        A.  Some -- yes.  Some of them are.

9        Q.  Okay.  And do you see in the abstract that

10   these authors write -- and there's some yellow

11   highlighting on the first page.  That although there

12   is a body of literature that had been previously

13   reported involving the effects of exposure to

14   individual pesticides and non-Hodgkin's lymphoma,

15   the impact of exposure to multiple pesticides or

16   specific combinations had not been explored in depth

17   in the prior research?

18       A.  Correct.

19       Q.  Okay.  And do you see that the next

20   sentence they describe the database that they're

21   using, right?  Six-province Canadian study -- case

22   control study conducted between 1991 and 1994.

23           Do you see that?

24   A.  Yes.

25       Q.  And does that start to suggest to you that

Charalambos Andreadis, M.D.

1    it's the same exact database -- I'll go one better.

2    Take a look at -- do you see in section 2.1 where

3    they have the data source?  Do you see that?

4        A.  I do.

5        Q.  And do you see that they describe the data,

6    and they repeatedly reference, provide cites to

7    reference 5, correct?

8        A.  Correct.

9        Q.  Turn to reference 5 on the Hohenadel paper.

10       A.  McDuffie.

11       Q.  McDuffie 2001?

12       A.  Correct.

13       Q.  So what these -- what these investigators

14   did was they went back to the same database that

15   they had previously reported as McDuffie 2001, and

16   they did a further analysis to see if they could

17   disentangle the effects of coexposures to different

18   combinations of pesticides, correct?

19            MR. DIAMOND:  Form.  Foundation.

20            THE WITNESS:  They did the analysis to look

21   if they could look at multiple exposures, not

22   disentangled exposures.

23   BY MR. SLONIM:

24       Q.  Well, now, let's take a look -- let's take

25   a look at Table 4.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

```
 1              MR. DIAMOND:  What page are you on?

 2              MR. SLONIM:  Yeah.  It's page --

 3              MR. DIAMOND:  2226?

 4              MR. SLONIM:  -- 2326.  Do you have that?

 5              MR. DIAMOND:  I do.

 6              THE WITNESS:  I do.

 7  BY MR. SLONIM:

 8       Q.  I'm sorry.  I have the yellow highlighted

 9  copy.

10              But do you see in the fourth row, they

11  report the data for people that were coexposed to

12  malathion and glyphosate, correct?

13       A.  Correct.

14       Q.  And they give us three breakdowns.  They

15  give us the malathion only, the glyphosate only, and

16  the malathion and glyphosate, correct?

17       A.  Correct.

18       Q.  And when people were coexposed to that

19  combination of malathion and glyphosate, they find a

20  statistically significant twofold, slightly more

21  than twofold increased risk of cancer, of

22  non-Hodgkin's lymphoma, correct?

23       A.  Correct.  So glyphosate causes

24  non-Hodgkin's lymphoma.

25       Q.  But when you look -- when you look at
```

Charalambos Andreadis, M.D.

1    glyphosate only, there's no increased risk; isn't

2    that right?

3         A.  It could be as high as 1.55.

4         Q.  It's .92.  And when you look at the

5    malathion only in Table 4, it's almost two.

6         A.  Well, the confidence interval includes

7    higher numbers.  So this doesn't really change

8    anything in the McDuffie paper.  The McDuffie paper

9    also did not find an elevated risk for glyphosate

10   when not adjusted for frequency of use.  So this

11   doesn't really change much.

12        Q.  Let's go through them one at a time, nice

13   and slowly.  What this paper shows is that when

14   users were coexposed to the combination of malathion

15   and glyphosate, there was a significantly increased

16   risk, twofold risk, correct?

17        A.  Correct.

18        Q.  And when users were exposed to glyphosate

19   only, there was no increased risk?

20             MR. DIAMOND:  Form.

21             THE WITNESS:  They could not prove an

22   increased risk.  That doesn't mean there's no risk.

23   BY MR. SLONIM:

24        Q.  The data does not show a significantly

25   increased risk.  The data is below 1.

Charalambos Andreadis, M.D.

```
 1            MR. DIAMOND:  Form.

 2   BY MR. SLONIM:

 3       Q.  The data point is below one.

 4       A.  So the problem with that, this is a small

 5   study that only has 500 cases of lymphoma.  And so

 6   to microanalyze it in 30 different ways, just to

 7   quote an earlier argument of yours, doesn't really

 8   make a lot of sense, so it's probably not powered

 9   enough to look at individual agents on their own.

10       Q.  So what question did I ask?

11       A.  You asked if the study shows that there's

12   no association.  And I do not think it shows that.

13       Q.  I asked whether or not .0 -- the odds ratio

14   of .92, that's an odds -- that's below 1, correct?

15       A.  Correct.

16       Q.  And an odds ratio below 1 means that

17   there's no increased risk, right?

18            MR. DIAMOND:  Form.

19            THE WITNESS:  It could be as high as 1.55,

20   which means an increased risk.  So the study does

21   not -- it's not a negative study.  It just doesn't

22   have -- it doesn't provide proof that glyphosate, in

23   this cohort alone, is associated with a higher risk.

24   BY MR. SLONIM:

25       Q.  It does provide proof that malathion has
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    had a 90 -- has a -- almost a twofold risk and it's

2    statistically significant, right?

3              MR. DIAMOND:  Form.

4              THE WITNESS:  But the subject of this

5    deposition is not malathion.

6    BY MR. SLONIM:

7        Q.  The question, Doctor, is when the McDuffie

8    investigators went back to their database, and they

9    said, "Is it the malathion or is it the glyphosate,"

10   and they teased that out, in Table 4, they showed

11   that the risk was all attributable to the malathion

12   and none attributable to the glyphosate.  That's

13   what Table 4 shows, when it says that malathion is

14   nearly 2 and glyphosate is less than 1, correct?

15             MR. DIAMOND:  Form.

16             THE WITNESS:  That is not a correct

17   statement.  You're implying intent in the

18   investigators going back to reexamine their data.

19   This is collected data that an original group of

20   investigators reported in 2001.

21             Ten years later, some of the same

22   investigators wanted to get another paper out of

23   their data, so they went back and did a different

24   analysis to look at coexposures of pesticides.

25             And in that different analysis, they just

Charalambos Andreadis, M.D.

1    didn't have the evidence that they had in the first

2    analysis to suggest the direct exposure.  But again,

3    this -- the reason why I'm referencing this paper is

4    not because I think it's the best designed study.

5    It's because it shows a dose-response effect.

6    BY MR. SLONIM:

7        Q.  The problem -- the reason that the

8    investigators in the McDuffie study went back, they

9    said, is because the impact of exposure to multiple

10   pesticides or specific pesticides combinations has

11   not been explored in depth previously.

12       A.  Correct.

13       Q.  That's why they went back.

14       A.  So they're doing a separate analysis.

15   They're not reexamining their first analysis.

16       Q.  And when they went back and they looked at

17   the same data, they -- in the same population of

18   people -- these are the same cases and controls,

19   aren't they?

20       A.  They are doing it -- they have a different

21   hypothesis than they had in the first study.  So

22   it's common in medicine, once you have collected

23   data, to do multiple analyses on the collected data

24   in different areas of interest.

25           So this paper is not a rebuke of the first

Charalambos Andreadis, M.D.

1    paper.  They are going to -- they're exploring a

2    different subject which is whether we can find that

3    combinations of pesticides have a higher risk or

4    not.

5        Q.  Right.

6        A.  So they're asking a different question.

7        Q.  And they found that when the people that

8    used glyphosate and malathion were separated out,

9    they found that 100 percent of the increased risk

10   that they observed was attributable to the malathion

11   and none to the glyphosate?

12           MR. DIAMOND:  Form.

13           THE WITNESS:  That's --

14   BY MR. SLONIM:

15       Q.  Correct?

16       A.  -- erroneous.  I do not know where you get

17   the 100 percent.

18       Q.  Well, it goes from 2.0 when -- it goes from

19   2.10 odds ratio, statistically significant, when

20   it's malathion and glyphosate.  When it's glyphosate

21   alone, it's less than 1, not significant.  And when

22   it's malathion alone, it's nearly 2, and it is

23   significant.  Correct?

24       A.  Are we looking at significance or are we

25   looking at --

Charalambos Andreadis, M.D.

```
1        Q.  Both.

2        A.  -- risk?

3        Q.  Both.

4        A.  Well, "significance" means --

5            MR. DIAMOND:  I'm not sure what the

6   question is at the moment, before you answer.

7   BY MR. SLONIM:

8        Q.  Can you answer the question, Doctor?

9        A.  Significance implies statistical

10  significance which means that the -- that there's

11  enough power to make a conclusion.  And none of

12  these really have a high P value, as you can see the

13  P value in the odds ratio is .69.

14           So statistical significance is questionable

15  when you are looking at so many different exposures

16  that can happen at the same time.  So I'm not going

17  to tell you that this has any statistical

18  significance to it.

19           Now, the odds ratio itself has a confidence

20  interval which tells you, within the limit of

21  designing studies like that, you know, what's the

22  chance -- what is the possible range of effects.  So

23  in the combination, malathion and glyphosate, the

24  confidence interval is higher, and, you know, it's

25  1.3 to as high as 3.37.
```

Charalambos Andreadis, M.D.

1          In the case of glyphosate alone, it's

2     lower; it's .54 going to 1.55, with the possibility

3     that there's no effect.

4          Q.   It's not that it's just -- it's not that

5     with glyphosate and malathion combination it's just

6     higher.  It's that the lower bound of the confidence

7     interval is above 1.

8          So the authors are saying that this is not

9     only an increased odds ratio, but it's statistically

10    significant, meaning that there's less than a 5

11    percent probability that it's due to the play of

12    chance; isn't that right?

13         MR. DIAMOND:  Form.

14         THE WITNESS:  For malathion and glyphosate

15    together?

16         MR. SLONIM:  Yes.

17         THE WITNESS:  Yes.

18    BY MR. SLONIM:

19         Q.   And the same thing when they do malathion

20    alone.  They say that the lower bound of the

21    confidence interval is above 1.0, correct?

22         A.   Correct.

23         Q.   And that means that there's less than a

24    5 percent probability that the odds ratio that

25    they're reporting of nearly 2 is due to the play of

Charalambos Andreadis, M.D.

```
1   chance, correct?

2        A.  Correct.

3        Q.  But when they get to glyphosate alone, the

4   number is below 1 and it's not significant?

5        A.  So they cannot prove that glyphosate alone

6   causes -- has an association with lymphoma.

7        Q.  Exactly.  No evidence in this data, when

8   you control for -- when you control for malathion,

9   there's no evidence in the McDuffie population that

10  glyphosate is associated with an increased risk of

11  non-Hodgkin's lymphoma, correct?

12       A.  There is no demonstrable increase in the

13  risk.  I wouldn't say there's no evidence.

14       Q.  Okay.

15           Now, you're familiar with the Eriksson

16  paper, correct?

17       A.  Yes.

18       Q.  And Eriksson also failed to control for

19  coexposures; isn't that right?

20       A.  Correct.

21           MR. SLONIM:  Okay.  Why don't we take a

22  quick break.

23           THE VIDEOGRAPHER:  Going off the record.

24  The time is 1:55 p.m.

25           (Recess taken.)
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

```
 1              THE VIDEOGRAPHER:  We're back on the

 2     record.  The time is 2:04 p.m.

 3              MR. SLONIM:  We're going to mark as the

 4     next deposition exhibit a meta-analysis done by

 5     authors Schinasi and Leon.

 6              (Whereupon, Exhibit 16 was marked for

 7              identification.)

 8     BY MR. SLONIM:

 9        Q.  Doctor, do you have the Schinasi and Leon,

10     the meta-analysis in front of you?

11        A.  Correct.  I do.

12        Q.  And you've looked at this --

13        A.  Yes.

14        Q.  -- previously, correct?

15        A.  Yes.

16              (Reporter clarification.)

17     BY MR. SLONIM:

18        Q.  A meta-analysis is when authors collect

19     data from underlying studies, and then they combine

20     them statistically and do analyses on the combined

21     dataset; is that correct?

22        A.  Correct.

23              (Reporter clarification.)

24     BY MR. SLONIM:

25        Q.  Now, a meta-analysis is only as good as the
```

Charalambos Andreadis, M.D.

1   underlying studies that form the basis for the

2   paper, correct?

3        A.  That's a common saying, yes.

4        Q.  In other words, if there's flaws and

5   limitations in the underlying studies, no matter

6   what kind of statistics are performed, they are

7   handicapped and limited by the flaws and limitations

8   that exist in the underlying studies, correct?

9        A.  To some -- yes.  To a significant degree.

10            However, it's also a way to adjust for the

11   flaws in the individual studies because, unless all

12   flaws were along the same line, the presumption is

13   that some of the studies were flawed one way, some

14   of the studies were flawed another way.  So maybe

15   when you combine them, you eliminate some of the

16   noise.

17        Q.  Maybe?

18        A.  Maybe.

19        Q.  Maybe you put garbage in, you do

20   high-powered statistics on it, and you get garbage

21   out, correct?

22        A.  Not more garbage than the original studies.

23   Hopefully less.

24        Q.  One of the problems that statistics can't

25   correct in a meta-analysis is if the underlying

Charalambos Andreadis, M.D.

1   studies fail to control for confounding, the

2   meta-analysis can't control for confounding,

3   correct?

4       A.   Mostly for bias.  It cannot control for

5   bias.  There's ways to adjust for confounding.  But

6   I do think --

7       Q.   If the underlying studies are confounded,

8   you're saying --

9       A.   Well, as long as they're -- as long as they

10  can get -- depends what kind of analysis it is, if

11  you go back and get the patient level data.

12          So in a case of -- to bring up the coffee

13  and smoking example, if you have the smoking data,

14  you just haven't analyzed it, and you go back and

15  find the original patient level data from all the

16  studies and you actually have enough power to look

17  at confounders, you can do that.  If the data was

18  never collected, you're right, you're not going to

19  collect it as part of a meta-analysis.

20      Q.   Okay.  Doctor, we are speaking over each

21  other sometimes, and I may be -- I may be as much at

22  fault as you are, but we're making the court

23  reporter's job too hard.

24      A.   Okay.  Apologize.

25      Q.   If you try to let me finish my question,

Charalambos Andreadis, M.D.

1    I'll try to let you finish your answer.  Okay?

2         A.  Okay.

3         Q.  Deal?

4         A.  Deal.

5         Q.  Now, of these seven meta -- seven

6    underlying studies that comprise this -- or are

7    analyzed in this meta-analysis, they're listed on

8    page 4513, correct?

9             (Brief interruption.)

10            THE WITNESS:  Which page?

11   BY MR. SLONIM:

12        Q.  Turn to page 4513.

13        A.  4513.  It's a table.

14        Q.  So on Table 5 --

15        A.  Table 5.

16        Q.  Okay.  And you see that in the middle --

17   about the middle of the page, a little above the

18   middle, they give the data for glyphosate?

19        A.  Yes.

20        Q.  And they -- on the right-hand side they

21   list the papers, correct?

22        A.  Correct.

23        Q.  And there are seven papers that they list,

24   correct?  30 through 33, 43, 46, and 63.

25        A.  Correct.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1      Q.  Now, Doctor, you actually, in your expert

2   report at page 10, you tried to list those papers,

3   correct?

4      A.  I did.

5      Q.  But you made a little mistake, which I'm

6   sure was inadvertent.  But you list Cantor, correct?

7      A.  I do.

8      Q.  And you'll notice that Cantor is not in

9   this group of references.  On the other hand, you

10   omit McDuffie, but McDuffie should be there.

11      A.  Okay.  I have to look at the reference.

12      Q.  Take a look and tell me if you agree.

13      A.  (Reading sotto voce) McDuffie should be

14   there.

15         Yes.  I don't see Cantor.

16      Q.  So you got the right number, but it was a

17   little mistake made in the listing of the studies,

18   right?

19      A.  Right.

20      Q.  But here's the important point.  Other than

21   De Roos 2003 and De Roos 2005, none of the studies

22   were adjusted for coexposure to other pesticides;

23   isn't that right?

24      A.  I would have to go back and look at every

25   single one of them.  But I would believe that.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1      Q.  So you would -- okay.  Assuming -- assuming

2    that that's correct, that five of the seven studies

3    were not adjusted for confounding, attributable to

4    coexposure to other pesticides, the Schinasi

5    analysis, the meta-analysis would perpetuate that

6    confounding, correct?

7           MR. DIAMOND:  Form.

8           THE WITNESS:  It would be affected by the

9    confounding.  I don't know that "perpetuate" is the

10   right term.

11   BY MR. SLONIM:

12      Q.  Okay.

13      A.  So some of the papers obviously adjusted,

14   and some did not.

15      Q.  Two adjusted and five did not?

16      A.  Right.

17           So one way to answer the question would be

18   to look and see if the ones that adjusted had a

19   difference in outcomes versus the one that didn't

20   adjust.  And that's why I mentioned the

21   heterogeneity of the studies there.

22      Q.  Now, another issue with Schinasi is that

23   this was published before the Agricultural Health

24   Study in 2018 data was available, correct?

25      A.  The Andreotti study?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

```
 1        Q.  Yes.

 2        A.  Yes.

 3            (Reporter clarification.)

 4            THE WITNESS:  Andreotti, A-N-D-R-E-O-T-T-I.

 5   BY MR. SLONIM:

 6        Q.  So, in other words, the authors had the

 7   benefit of De Roos 2005, which was the earlier data

 8   from the Agricultural Health Study, correct?

 9        A.  Correct.

10        Q.  But because the later data, the more -- the

11   greater follow-up data was not published until 2018,

12   the authors could not incorporate that longer

13   follow-up into this meta-analysis, correct?

14        A.  Correct.

15        Q.  Now, another study that you considered is

16   the Leon 2019 meta-analysis, correct?  We talked

17   about --

18        A.  It's the AGRICOH study.

19        Q.  Yeah, the AGRICOH study.

20        A.  Yes.

21        Q.  We talked about that some this morning.  Do

22   you recall that?

23        A.  I do.

24        Q.  That might have been Exhibit No. 2 or 3,

25   something like that.
```

 1       A.   Probably 2.

 2            MS. PODSIADLO:  Three.

 3            THE WITNESS:  Oh.

 4            MR. DIAMOND:  Naturally.

 5            MS. PODSIADLO:  If I'm correct.

 6            THE WITNESS:  Yeah, 3.

 7            MR. SLONIM:  Let me see if I can find my

 8  copy.  Here we go.

 9       Q.   Now, this study was published in 2019,

10  correct?

11       A.   Correct.

12       Q.   We talked about the -- some of the issues

13  about multiple comparisons and the fact that they

14  did not adjust for multiple comparisons in the

15  study.

16            Do you recall that?

17       A.   I do.

18       Q.   But another thing that they did was they

19  did not -- they incorporated some of the

20  Agricultural Health Study data but not all of it;

21  isn't that right?

22       A.   I think what they did is they did a

23  sensitivity analysis where they didn't examine the

24  patients that had -- sorry.  They eliminated the

25  patients that had no follow-up questionnaires filled

Charalambos Andreadis, M.D.

1    out, if I'm correct.

2        Q.  I don't think that's right.  Take a look,

3    please, at page 12.  And take a look at the

4    paragraph that starts -- the full paragraph on the

5    bottom left and continues over to the top right.

6        A.  Top right....

7        Q.  Starts at the bottom left.  Do you see they

8    start talking about --

9        A.  "Whereas"?

10       Q.  Yes.  "Whereas," they talked about -- they

11   talk about what they did with the AHS study.

12           And if you continue on to the top right.

13   They only -- for some reason, the researchers who

14   put together the Leon 2019 paper only included a

15   portion of the AHS study, right?  They said -- do

16   you see on the top right, it says, "The follow-up

17   time was longer in AHS publication (up to 2012 and

18   2013), and thus more cases were included than in our

19   analysis (130 versus 113 DLBCL cases)."

20           MR. DIAMOND:  And I have the version, for

21   whatever reason, that's highlighted in yellow if

22   you'd like him to look at that.

23           MR. SLONIM:  Sure.

24           THE WITNESS:  That's fine.

25           MR. SLONIM:  He can see it.

Charalambos Andreadis, M.D.

1          MR. DIAMOND:  Okay.

2          THE WITNESS:  I would have to look at the

3    methodology in more detail.  But I do know that the

4    AHS authors were included in this analysis, so they

5    participated in the analysis.  Several of the AHS

6    authors are on this paper.

7    BY MR. SLONIM:

8        Q.  Which ones?

9        A.  Pretty sure Koutros is an author on the

10   latest Andreotti study.  Off the top of my head, I

11   don't remember all of them, but there's a couple at

12   least.

13          So what they -- as I'm reading this

14   paragraph, what they excluded is the farmers who had

15   no information on the frequency of use.

16       Q.  I don't think that's right.  It says the

17   AHS publication included certain farmers but

18   excluded the 1620 farmers with information on every

19   use but who did not report frequency.

20       A.  Right.  So the AHS excluded those.

21       Q.  Okay.  But in terms of the second portion,

22   the next sentence says, "The follow-up term was

23   longer in the AHS publication (up to 2012 and 2013),

24   and thus more cases were included than in our

25   analysis."

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1          So they only included a portion of the

2    2000 -- of the AHS data, correct?

3          MR. DIAMOND:  Form.

4          THE WITNESS:  Correct.  I don't see that as

5    a detriment, though.

6    BY MR. SLONIM:

7      Q.  Well, the AHS study found no increased risk

8    of DLBCL, correct?

9      A.  The -- yes.  But, one of the major

10   criticisms of this study is that the follow-up was

11   not long enough because the feeling in the field is

12   that these cases have a latency period, and you need

13   longer follow-up to expose that.

14         So by eliminating the late cases, if

15   anything, you're biasing against yourself.

16     Q.  But the problem is, you're also reducing

17   the power -- you're reducing the power of the study

18   in the meta-analysis, and you're diluting the

19   significance of the weighting.

20     A.  To some degree, but it's not -- it still

21   was the larger study included.

22     Q.  So they did -- they included some of the

23   AHS data on DLBCL, but they omitted a portion of the

24   DLBCL data, correct?  We're agreed on that?

25     A.  We agree on that.  I'm just questioning as

Charalambos Andreadis, M.D.

1    to what the -- so the methodology is what they --

2    this committee of many different investigators

3    decided on, and as I mentioned, AHS investigators

4    were included in this report.  So I'm assuming the

5    methodology is -- has a justification for it.

6         Q.  So Leon has a shorter follow-up from the

7    AHS cohort, and it looked at fewer DLBCL cases?

8         A.  Okay.

9         Q.  Correct?

10        A.  (Nonverbal response.)

11        Q.  And the question is, do you know what

12   effect that had on the statistic?

13        A.  Again, we're making assumptions.  But the

14   assumption would be, since with longer follow-up you

15   would get more cases, and with more cases you would

16   increase your power, that, if anything, it biased

17   the study to not find an association if there truly

18   was one.

19        Q.  Okay.  You understand, of course, that the

20   AHS study looked at latency, and they found no

21   difference between early cases and late cases?  They

22   examined --

23        A.  The study itself was very limited in terms

24   of its overall follow-up.  It was only -- it was

25   less than a decade so --

Charalambos Andreadis, M.D.

1      Q.  17 years.  It's the longest --

2      A.  The Andreotti update, you're talking about?

3      Q.  Yes.

4      A.  Not the original study.  Well, that wasn't

5   included here.

6      Q.  No, it was included here.  This study --

7      A.  This -- sorry.  The Andreotti update was

8   included here, you're right.

9      Q.  I think it may be confusing as to what

10  we're talking about on the record.  I think you and

11  I understand, but just make sure that somebody

12  reading this will understand.

13     A.  Right.

14     Q.  Okay.

15          So when we're talking about the Leon 2019

16  paper, they incorporated some of the most recent AHS

17  data, but not all of it, correct?

18     A.  Correct.

19     Q.  They had, in particular, for whatever

20  reason, the Leon authors had a shorter period of

21  follow-up by a few years, and they had fewer cases

22  of diffuse large B-cell lymphoma than Andreotti

23  covered in their publication, correct?

24     A.  Correct.

25     Q.  Okay.

Charalambos Andreadis, M.D.

```
 1        A.  But again, that doesn't mean that the

 2   analysis is not valid because of that.

 3        Q.  Now, let's move on to the Andreotti study.

 4   That's the AHS study.  We've talked about it some.

 5            (Whereupon, Exhibit 17 was marked for

 6            identification.)

 7   BY MR. SLONIM:

 8        Q.  So this is the Andreotti study, also known

 9   as the AHS study, that was published in 2018,

10   correct?

11        A.  Correct.

12        Q.  And, of course, you've read this study?

13        A.  Yes.

14        Q.  And you agree that this had a very large

15   number of participants, more than 57,000

16   participants who were selected because they were

17   applying for licenses to work as pesticide

18   applicators; is that correct?

19        A.  Correct.

20        Q.  So all of the subjects in this study are

21   occupational users like Mr. Alvarez?

22        A.  Correct.

23        Q.  And we had talked previously about a

24   retrospective case control study design.

25            Do you recall that discussion?
```

Charalambos Andreadis, M.D.

1      A.  I do.

2      Q.  This is different.  This is a prospective

3   cohort design, correct?

4      A.  Yes.

5      Q.  And what that means is that the

6   investigators enroll a group of subjects at some

7   point in time, and then they follow those subjects

8   forward in time and see what their health is over

9   time and what occupational exposures in the form of

10   pesticides they incurred over that period of time,

11   correct?

12      A.  Correct.

13      Q.  And then what the researchers do is see

14   whether the people that were exposed to the

15   pesticides had a higher risk of non-Hodgkin's

16   lymphoma than the people who were not exposed,

17   correct?

18      A.  Correct.

19          The methodology is not the traditional

20   methodology of a cohort study where you periodically

21   survey the participants for any new exposures and

22   risks.  It was more of a one-time questionnaire

23   followed by a second questionnaire many years later,

24   and about 40 percent of the subjects didn't even

25   answer the second questionnaire.

Charalambos Andreadis, M.D.

1            So it's a very loosely defined cohort

2     study.

3            Q.  So we'll talk about each one of those

4     things.

5            A.  Good.

6            Q.  When you have a prospective cohort design

7     as opposed to a retrospective case control study,

8     you eliminate the potential for recall bias and

9     selection bias that exist with case control study

10    designs, correct?

11           A.  To some degree.  You don't eliminate it.

12           Q.  Well, you certainly eliminate --

13           A.  You decrease it.

14           Q.  Certainly eliminate recall bias, correct?

15    Because there is no recall.  You are recording

16    exposures as the people had the exposure.

17           A.  Well, you're still recording them in this

18    case by questionnaire.  So patients have to report

19    the exposure.  You are not capturing the actual

20    exposures.  But it's less of a recall theoretically.

21           Q.  But you don't have bias because the

22    exposure status is recorded before the patients are

23    diagnosed with disease or nondisease, correct?

24           A.  You don't have evident bias, but you can

25    have built-in bias, as in eliminating, for example,

Charalambos Andreadis, M.D.

1    patients or subjects who have other exposures.

2         Q.  Somehow I'm not -- maybe I'm not being

3    clear in my question.  So I apologize.

4         The problem when you have --

5         A.  You don't have recall bias, is -- no --

6         Q.  Yes.

7         A.  -- that's not recall bias, we're talking

8    about recall.

9         Q.  Yes.  I'm talking about recall bias.

10        So the problem -- one of the problems, an

11   important problem, with a case control study is when

12   you ask the cases, the people who have cancer were

13   they exposed to a pesticide, and you ask the

14   controls who don't have cancer were they exposed to

15   a pesticide, there may be differential recall where

16   the cases are struggling to say, "Why me," and those

17   people may have differential recollection about

18   their exposures compared with the cases who don't

19   have cancer.

20        A.  Correct.

21        Q.  And that's a function of all retrospective

22   case control studies is the possibility of recall

23   bias, correct?

24        A.  Correct.

25        Q.  And one of the advantages of a prospective

Charalambos Andreadis, M.D.

1   cohort study is you don't have that possibility

2   because the exposure status of a participant is

3   recorded before the participant is diagnosed with a

4   disease?

5        A.   Correct.  So you don't have recall bias

6   specifically.

7        Q.   Okay.  That's my point.  You got it

8   correctly.  Good.

9             Another thing that the AHS investigators

10  did in this case was they used validated procedures

11  to measure exposure intensity in quartiles or

12  tertiles, and then they were able to use that data

13  to explore whether there was a gradient in the form

14  of dose-response relationships, correct?

15       A.   Correct.

16       Q.   And the method that they used to assess

17  exposure intensity was very sophisticated.  It did

18  not rely just on the number of days or the number of

19  years of exposure, but it also took into account the

20  method of pesticide application and whether the

21  subject used protective equipment, correct?

22            MR. DIAMOND:  Form.

23            THE WITNESS:  I don't recall the protective

24  equipment part, but I do remember the other aspects.

25

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1   BY MR. SLONIM:

2       Q.   Okay.  And another aspect of the AHS study

3   that distinguishes it from many other studies is,

4   because they had so many participants, more than

5   57,000, they were able to investigate a number of

6   histological subtypes of non-Hodgkin's lymphoma and

7   see whether there might be some effect on a certain

8   subtype but not other subtype of non-Hodgkin's

9   lymphoma, correct?

10      A.   They looked at that, right.  And other

11  malignancies, I believe, too.

12      Q.   And that's important because, in

13  considering the pathogenesis of non-Hodgkin's

14  lymphoma, it's a heterogeneous disease and there

15  could be potentially differing etiologies depending

16  on histological subtype, correct?

17      A.   Agreed.

18      Q.   Another thing that this study had, by

19  comparison to some of the earlier studies, is they

20  were collecting data for more than 20 years,

21  correct?

22      A.   On the follow-up they did.

23      Q.   Okay.  And so --

24      A.   Not on the original.

25      Q.   So potential confounding due to latency

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1   between exposure to the pesticide and the onset of

2   disease could be studied and assessed whether there

3   was a latent effect, correct?

4        A.   Latency in and of itself, yes.  Changes in

5   use were not really documented.

6        Q.   Why?

7        A.   Because this questionnaire -- the original

8   questionnaire, I believe, was administered in the

9   early '90s.  And pesticide use changed over time, so

10  that was not captured.

11       Q.   Yeah.  But 87 percent of the cohort used

12  glyphosate, right?

13       A.   Right, but we don't know to what degree.

14       Q.   Well, but we do know -- we do know that if

15  the argument is that, well, gee, you know, the use

16  of glyphosate increased and the AHS may have somehow

17  overlooked that, the fact of the matter is that 87

18  percent of the subjects in -- that participated in

19  this study were exposed to glyphosate, correct?

20       A.   Right, at some point or another.  I'm

21  saying we don't have the granular, linear data.

22       Q.   But let's talk about latency.

23            So one of -- one possibility is if there's

24  a -- is if there's a latent effect, that if you

25  don't have enough follow-up, you might be

Charalambos Andreadis, M.D.

1    overlooking cancers that occur later, correct?

2        A.  Correct.

3        Q.  And so what the AHS investigators did was

4    they investigated latency by looking at five-year

5    and ten-year lag data and statistically investigated

6    whether or not there was a difference in the

7    incidence of non-Hodgkin's lymphoma, correct?

8        A.  Yes, but I guess -- again, they were

9    limited by the overall length of the follow-up

10   because some people may argue you need 15, you need

11   20, you need 30 years.  So 5 versus 10 is not a big

12   difference.

13       Q.  Well, they had up to 20 years, and they

14   investigated -- and they investigated whether 5-,

15   10-, or 20-year lag data had any effect, right?

16       A.  But they -- I believe the numbers for 20

17   were not as robust, so most of the data was earlier

18   on.  I haven't read this recently, but -- where do

19   you have the analysis for this --

20       Q.  Well, just an example, Table 3.

21          MR. DIAMOND:  What page are you looking at?

22          MR. SLONIM:  Looks like 514.

23          MR. DIAMOND:  Thank you.

24          THE WITNESS:  Oh, Table 2.  Table 3.

25

Charalambos Andreadis, M.D.

1    BY MR. SLONIM:

2        Q.  Table 3, they report 5-year and 20-year lag

3    data, right?

4        A.  Right.  There's 20-year data.

5        Q.  I think -- I actually think in the

6    supplemental data online, they also give a 10-year

7    lag.  But in any event, they didn't see any -- they

8    didn't see any difference in the trend.

9        A.  Right.  So what I was saying is I don't

10   know how many patients had 20-year data --

11       Q.  Well --

12       A.  -- in the system.  You can see the number

13   of cases is very low.

14       Q.  Well, in 20 years?  It's 354 cases.  The

15   354 were non.  I mean, there's a couple of hundred

16   cases in non-Hodgkin's lymphoma, right?  There's 63

17   in the first quartile, 55 in the second quartile.

18   That's over a hundred.  48 in the third quartile is

19   at 150, and 55 in the fourth quartile is 200 cases.

20       A.  Okay.

21       Q.  But you agree with me that this study,

22   unlike any other predecessor study, had the power

23   and the data to perform these kind of sophisticated

24   analysis.

25            The McDuffie -- the McDuffie paper didn't

Charalambos Andreadis, M.D.

1    have enough participants and enough follow-up to do

2    that, nor did Eriksson, nor did any of the other

3    predecessor papers, correct?

4         MR. DIAMOND:  Form and foundation.

5         THE WITNESS:  Again, it's one of the

6    studies that I took into consideration and

7    specifically mention in my report.

8         The main criticism to me for this study is

9    the limited collection of exposure data, the lack of

10   follow-up -- compliance with follow-up

11   questionnaires, and so the lack of the ability to

12   see change over time.

13   BY MR. SLONIM:

14        Q.  So your concern, as I understand it, by the

15   fact when they had the second questionnaire, that

16   they were -- 40 percent of the people did not --

17        A.  Respond.

18        Q.  -- respond.

19        And the way the investigators dealt with

20   that was by using a statistical technique called

21   "imputation," correct?

22        A.  They did, which is as murky as confounding.

23        Q.  You agree with me that imputation is a

24   standard accepted scientific technique for dealing

25   with missing data?

Charalambos Andreadis, M.D.

```
 1            MR. DIAMOND:  Form.
 2            THE WITNESS:  It's a standard -- it's a
 3    technique.  It has several schools of thought as to
 4    how it could be applied, and it's usually applicable
 5    in cases where you have 5, 10 percent missing data
 6    so you can use the data for the 90 percent to
 7    calculate what's missing.  It's not really
 8    acceptable when almost half of your data is missing.
 9    BY MR. SLONIM:
10        Q.  So the investigators that did this study
11    were not stupid, and they conducted sensitivity
12    analyses to investigate whether or not the use of
13    imputation materially affected the outcome; isn't
14    that right?
15            MR. DIAMOND:  Form and foundation.
16            THE WITNESS:  They did a sensitivity
17    analysis, yes.  The -- again, sensitivity analysis
18    means you're not sure about something, so you're
19    trying to prove or disprove it.
20            All I'm saying -- and I'm not questioning
21    the validity of the study.  All I'm saying is that
22    there is no perfect study out there, and this, in my
23    mind, is no better than any other study.
24    BY MR. SLONIM:
25        Q.  But let's go slowly and break it down.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

 1            They didn't perform one sensitivity

 2    analysis; they performed multiple sensitivity

 3    analyses, correct?

 4        A.   They did.

 5        Q.   And the reason -- one of the reasons they

 6    performed those sensitivity analyses was they said,

 7    "Even though we used an imputation procedure that

 8    was a validated imputation procedure, we want to

 9    test to see whether the use of that imputation could

10    have had a material effect on the findings."

11            That was the objective in conducting the

12    sensitivity analysis, correct?

13        A.   It is.  It's a way of correcting for

14    mistakes that you may have made.

15        Q.   Okay.  And take a look, please, at

16    page 512.

17            On the left-hand side -- are you with me on

18    512?

19        A.   Yes.

20        Q.   On the left-hand side, the authors report

21    the results of their sensitivity analyses, correct?

22        A.   Correct.

23        Q.   And do you see towards the bottom the

24    authors write, "To evaluate the impact of using

25    imputed exposure data," do you see that sentence?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1      A.   Yes.

2      Q.   Let's read that sentence.

3           To -- I'll read it, and I quote, "To

4  evaluate the impact of using imputed exposure data

5  for participants who did not complete the follow-up

6  questionnaire, we limited the analysis to 3,698

7  participants who completed both questionnaires,

8  reducing the total number of cancer cases to 4,699."

9           Did I read that correctly?

10     A.   Yes.

11     Q.   They go on to say, "Glyphosate was not

12  associated with non-Hodgkin's lymphoma," and they

13  give the statistics.

14     A.   Correct.

15     Q.   And then they say -- they go on in the next

16  sentence to say, "Finally, when we truncated the

17  follow-up period to 2005 to be concurrent with the

18  latest exposure information, we had even fewer

19  cancer cases.  For NHL -- for NHL the relative risk

20  was 1.04," and they give some more statistics about

21  that, correct?

22     A.   Correct.

23          And I actually believe these are the -- the

24  truncated data as well was used in the

25  meta-analysis.  That's why they didn't use the full

Charalambos Andreadis, M.D.

1    cohort.

2         Q.  Now, that's a good guess, but it doesn't

3    correspond with the years.  They said they used

4    the -- they cut the years at 2012 and 2013 in the

5    Leon paper.  In the truncated analysis here, they're

6    truncating it at 2005.

7              But the authors report, when they used the

8    sensitivity analysis, their findings were not

9    materially changed, correct?

10        A.  Correct.  That decreases the power, right?

11        Q.  Yeah.

12        A.  Because you go from a larger cohort to a

13   much smaller one.

14        Q.  But -- sure, sure.  But what they found

15   was, when they went to the reduced number, they

16   weren't seeing any change in the findings.  The

17   findings were materially the same.

18              MR. DIAMOND:  Form.

19              THE WITNESS:  They did not do a statistical

20   comparison for that.  They're showing the data here.

21              So, yes, the findings were in the same

22   direction, but again, the power is much decreased.

23   Hence the need for a larger study.

24              Again, I'm not disagreeing that this is a

25   valid study, and as I said, it's in my report.  I'm

```
 1   just questioning whether one study alone can prove

 2   one thing or another.  So it's the combination of

 3   the studies that I'm looking at.

 4   BY MR. SLONIM:

 5       Q.  This study was conducted under the auspices

 6   of the National Cancer Institute, the National

 7   Institute of Environmental Health Sciences, the

 8   Environmental Protection Agency, and the National

 9   Institute for Occupational Health and Safety, and it

10   was published in the prestigious Journal of the

11   National Cancer Institute, correct?

12       A.  Correct.

13       Q.  When all was said and done with this study,

14   the authors found -- turn to the last page, please,

15   515.

16       A.  Okay.

17       Q.  Last full paragraph.  First sentence.  "In

18   conclusion, we found no evidence of an association

19   between glyphosate use and risk of any solid tumors

20   or lymphoid malignancies, including NHL and its

21   subtypes."

22           Did I read that correctly?

23       A.  Yes.

24       Q.  And these authors also found -- so

25   regardless of whether we look at NHL overall or any
```

Charalambos Andreadis, M.D.

1    subtype of NHL, these authors found no increased

2    risk associated with occupational use of glyphosate,

3    correct?

4              MR. DIAMOND:  Form.

5              THE WITNESS:  That's what they did.  Yes.

6    BY MR. SLONIM:

7         Q.  And they also looked very carefully at

8    dose-response by quartiles of intensity, correct?

9         A.  They did.

10        Q.  And they found no gradient effect.  They

11   found that higher intensity use was not associated

12   with a greater risk than lower intensity use,

13   correct?

14        A.  In this paper, they did not.

15        Q.  And that's true whether we look at

16   non-Hodgkin's lymphoma overall or any one of its

17   subtypes, including follicular lymphoma and DLBCL,

18   correct?

19        A.  They looked at both.

20        Q.  And they looked at the gradient effect in

21   both, meaning quartiles of intensity, and they found

22   that, in no instance, were users who had a higher

23   intensity of exposure at an increased risk compared

24   with users who had a lower intensity of exposure,

25   correct?

Charalambos Andreadis, M.D.

```
 1        A.   Correct.

 2        Q.   And one more thing, this study carefully

 3   controlled for coexposures to other pesticides,

 4   didn't it?

 5             MR. DIAMOND:  Form.

 6             THE WITNESS:  I believe so.  I don't -- I

 7   haven't seen the information reported.

 8   BY MR. SLONIM:

 9        Q.   Okay.  Take --

10        A.   That was part of the questionnaire.

11        Q.   Take a look, please at page -- so, let's

12   see.  So pick your favorite one.  Take a look at

13   page 513, for example, Table 2, footnote with a

14   double dagger, last sentence.  "All models were

15   adjusted for," page 513.

16        A.   513.

17        Q.   Under the double --

18        A.   Dagger.

19        Q.   -- double dagger, you see that?  It talks

20   about poisson aggression.

21             (Reporter clarification.)

22             MR. SLONIM:  Poisson.

23             THE WITNESS:  P-O-I-S-S-O-N.

24             THE REPORTER:  Thank you.

25
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    BY MR. SLONIM:

2         Q.  Then they talk about the coexposures.

3         A.  Yeah.  They mention some of the other

4    pesticides.

5         Q.  Atrazine, alachlor, metolachlor,

6    trifluralin, and 2,4-D, correct?

7         A.  Correct.

8         Q.  And if you take a look, please, at Table 3

9    on page 515, double dagger --

10        A.  Same things are listed.

11        Q.  -- they also control for those coexposures?

12        A.  Right.

13        Q.  Well, just one more thing.  Remember, we

14   were talking about the lag period, and we talked

15   about the fact that they -- in the main paper they

16   reported on the 5-year and 20-year lag?

17        A.  Yes.

18        Q.  Take a look, please, at the supplemental

19   table that's attached at the end.  Supplementary

20   Table 2.

21             They also reported 10-year lag and 15-year

22   lag, correct?

23        A.  (Nonverbal response.)

24        Q.  So these investigators cracked the data

25   every possible way.  They looked at 5-year lag,

Charalambos Andreadis, M.D.

1    10-year lag, 15-year lag, and 20-year lag, correct?

2            MR. DIAMOND:  Form.

3            THE WITNESS:  They did.

4    BY MR. SLONIM:

5        Q.  They looked at intensity exposure based on

6    quartiles and tertiles, correct?

7        A.  Yes.

8        Q.  They looked at histological subtype,

9    correct?

10       A.  Correct.

11       Q.  And insofar as they had gaps, some gaps in

12   data, they used the validated procedure called

13   "imputation," but they didn't stop there.  They

14   performed sensitivity analyses to assess whether or

15   not the imputation had a material effect on their

16   findings, correct?

17           MR. DIAMOND:  Form.

18           THE WITNESS:  They had big gaps in their

19   data.  40 percent missing data.  And they used

20   methods to try to account for that, but the methods

21   have limitations for that big a number of

22   deficiencies.  So that's a big criticism against the

23   study.

24   BY MR. SLONIM:

25       Q.  And even when you -- even if you limited

Charalambos Andreadis, M.D.

```
 1   the study, it's much, much bigger than any

 2   predecessor study, isn't it, in terms of the number

 3   of participants and the years of follow-up?

 4       A.  It's bigger than the case control studies.

 5   There are other cohort studies, and obviously this

 6   was combined with other studies in the subsequent

 7   meta-analysis.

 8       Q.  Let's move on and talk a little bit about

 9   Mr. Alvarez.

10       ███████████████████████████████████████

11  ██ ███████████████████

12           If you want to take a look at your --

13       A.  I can.  I believe so.  ██████████████

14  ██ ██████████████████████████

15       Q.  Sure.

16       A.  I don't think I have it here, but I will

17   take your word for it.

18       Q.  I hope I'm not -- hope I'm not wrong.

19           MR. DIAMOND:  That's all right.

20   BY MR. SLONIM:

21       Q.  I'm pretty sure about -- pretty sure we're

22   right about that.

23           He's currently ████████████; is that

24   correct?

25       A.  Correct.
```

Charalambos Andreadis, M.D.



REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

```
 1        A.  He did.  Way back when.

 2        Q.  Now, Mr. Alvarez was initially diagnosed

 3   with non-Hodgkin's lymphoma in 2014; is that

 4   correct?

 5        A.  Correct.

 6        Q.  And at that time you were not Mr. Alvarez's

 7   treating oncologist; is that right?

 8        A.  I was not.

 9        Q.  Was that Dr. Umutyan?  Is that how he

10   pronounces his name?

11        A.  Umutyan.

12        Q.  Umutyan.

13            Was Dr. Umutyan Mr. Alvarez's initial

14   treating oncologist?

15        A.  He was.

16        Q.  Is Dr. Umutyan still involved with

17   Mr. Alvarez's care and treatment?

18        A.  More remotely.  I believe he's moved to a

19   different area.  He's got a different local

20   oncologist.

21        Q.  Now, when did you first meet Mr. Alvarez?

22        A.  So let me look at my report.

23            I met him in 2018.

24        Q.  January 25th?

25        A.  January 2018.  Dr. Umutyan actually had
```

Charalambos Andreadis, M.D.

 1    called me before the holidays.  I remember that he

 2    was having issues with his eye, and they did a local

 3    workup at Queen of the Valley, which is the hospital

 4    up in Napa, and then he referred him to see me on

 5    the 25th.

 6         Q.  Did you have any preexisting professional

 7    relationship with Dr. Umutyan?

 8         A.  Yes.  By nature of him being a local

 9    oncologist, he would refer cases here for review.

10         Q.  So he had referred previous patients prior

11    to Mr. Alvarez to you?

12         A.  He did.

13         Q.  Now, going back to 2014, what is your

14    understanding of the symptoms that Mr. Alvarez

15    presented with at or right prior to his diagnosis?

16         A.  The main symptom was this neck tumor that

17    he had that wasn't going away and actually grew to a

18    pretty big size.

19         Q.  And was that lump cancerous?

20         A.  It was.

21         Q.  What type of cancer?

22         A.  It was diagnosed as diffuse large B-cell

23    lymphoma.

24         Q.  So I had a question about that.  We had

25    talked a little bit about this.

Charalambos Andreadis, M.D.

```
1              Was it diffuse large B-cell lymphoma or was
2    it follicular lymphoma that had undergone -- was
3    undergoing transformation to diffuse large B-cell?
4    Was it two different -- was it one cancer or two
5    different cancers, or was it a cancer of one type,
6    follicular, that was transforming to diffuse large
7    B-cell?  I think that exhausts the possibilities.
8        A.  So the -- at the time, they believed it was
9    diffuse large B-cell lymphoma, so the only way to be
10   able to tell that a lymphoma is so-called
11   transformed follicular is to see a component of
12   follicular lymphoma at the same time as the
13   diagnosis of the diffuse large B-cell lymphoma.
14              So absent that, you cannot definitively say
15   it was transformed follicular lymphoma.  So at the
16   time, they believed it was diffuse large B-cell
17   lymphoma.
18       Q.  Now, in your report you describe it, I
19   think, as follicular and DLBCL; is that correct?
20       A.  I believe it subsequently, especially the
21   pathology that we performed here at the time of
22   relapse showed a high-grade follicular lymphoma.
23       Q.  So what's your -- what's your best
24   assessment in terms of, does he have two independent
25   types of non-Hodgkin's lymphoma, or did he have one
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1   that was transformed to another?

2       A.  Well, my -- it's -- like I said, there's

3   no -- the syndromes of the different lymphomas,

4   diffuse large B-cell, follicular, CLL, define --

5   phenomenologically define the disease category, but

6   there's no absolute test that you can say which one

7   it is.

8          So I think he has a -- he obviously has one

9   disease process.  He does not have two different

10  lymphomas.  And that disease process straddles this

11  continuum between follicular lymphoma and DLBCL; so

12  whether you want to call it transformed follicular

13  lymphoma or a high-grade lymphoma, both of those are

14  valid definitions.

15      Q.  Okay.  Was his bone marrow also tested?

16      A.  His bone marrow biopsy at diagnosis did

17  show lymphoma in it.  We never got to review it here

18  to see what type it was, but -- so it was called

19  lymphoma.  It was nonspecific.

20      Q.  Was there investigation done to see whether

21  there was any cerebral or central nervous system

22  involvement?

23      A.  Yes.  He had a spinal tap to show -- to see

24  if there's any lymphoma in the spinal fluid.

25      Q.  And that was?

Charalambos Andreadis, M.D.

```
 1        A.  Negative.

 2        Q.  Okay.  So there was lymphoma present in his

 3   neck and also present in the bone marrow but not

 4   present in the spinal fluid or in the central

 5   nervous system, correct?

 6        A.  Correct.

 7        Q.  And I think you said he was ██ at the time

 8   he was diagnosed?

 9        A.  Correct.

10        Q.  There's nothing particularly notable about

11   that, correct?

12             MR. DIAMOND:  Form.

13             THE WITNESS:  Again, he's on the slightly

14   younger side, but close to the median.

15   BY MR. SLONIM:

16        Q.  And let's talk about his treatment.

17             He was -- as I understand it, he was --

18   after he was diagnosed, he was treated with eight

19   cycles of a therapy called R-CHOP?

20        A.  Yes.  He had eight cycles of chemotherapy.

21        Q.  Okay.  And that consisted of a combination

22   chemo plus immunotherapy, correct?

23        A.  Correct.

24        Q.  And that's a standard -- very standard form

25   of treatment for this type of cancer, correct?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1        A.  The treatment itself is.  The number of

2    cycles is more than we would traditionally give.  So

3    usually --

4        Q.  Usually it's six?

5        A.  -- we do six, so....

6        Q.  Do you know why he was given eight?

7        A.  I'm not sure.  I'm thinking it's because

8    after four, there was some evidence of residual

9    activity, so the local doctor said, "Why not do four

10   more."

11       Q.  He was also treated with four intrathecal

12   injections of methotrexate?

13       A.  Correct.

14       Q.  Where was he administered intrathecal

15   methotrexate?

16       A.  So he was felt to have a high risk for

17   brain involvement, even though the studies were

18   negative, based on the fact that his bone marrow was

19   involved, he had Stage 4 disease, and he had

20   high-risk genetic mutations.  And so it's standard

21   of care to administer prophylaxis in the spinal

22   fluid to prevent a CNS relapse.

23       Q.  I see.  And he completed therapy in 2014?

24   September of 2014?

25       A.  I believe so.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1      Q.  Did he have any unusual notable side

2  effects as a consequence of the eight cycles of

3  R-CHOP and the four intrathecal -- intrathecal

4  injections of methotrexate?

5           MR. DIAMOND:  Form.

6           THE WITNESS:  I wasn't treating him during

7  this time.  Most patients have pretty significant

8  side effects from the treatment.  And again, most of

9  the doctors' notes don't really record all of the

10  different expected side effects.

11           I think the one that I recall reading about

12  was neuropathy.  He had some numbness, tingling,

13  this kind of thing.  But I don't know the extent of

14  the -- of his symptoms.

15      Q.  Do you know if that -- if any neuropathy

16  has persisted, or was it transitory?

17      A.  It's transitory.

18      Q.  So, in other words, he may have had some

19  tingling or numbness while he was being administered

20  drugs like vincristine?

21      A.  Correct.

22      Q.  But then when those therapies stopped, the

23  neuropathy improved and dissipated?

24      A.  Yes.

25      Q.  And is it correct that he remained

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    asymptomatic and in remission through 2017?

2         A.  He did.  And he went back to work.

3         Q.  Okay.  And then did there come a time in

4    January of 2018 when he presented with symptoms that

5    led to your involvement in the case?

6         A.  Right.

7         Q.  And you described that, that he had some

8    kind of a symptom in his eye that led his local

9    oncologist to call you?

10        A.  Yeah.  So he had a mass in his left eye, I

11   believe, that was making his eye close because it

12   was so big.

13             And the oncologist called me.  We decided

14   to do an expedited workup.  He was admitted locally

15   to get some tests done, and then he came here to see

16   me afterwards.

17        Q.  And how did you treat him?  Well, first of

18   all, let me back up.

19             What did you diagnose the condition to be?

20        A.  They had done a local biopsy at Queen of

21   the Valley, and the preliminary report when he came

22   to see me was that it was the same lymphoma.

23             So my visit actually was briefer than the

24   usual initial visit because he had this big tumor in

25   his eye, and so we made plans to admit him.  I

Charalambos Andreadis, M.D.

1    wanted to admit him right away.  He said, "Can we

2    wait a day?  I need to get my things down here."

3            So we admitted him to the hospital for

4    urgent treatment.

5        Q.  And how did you treat him?

6        A.  We gave him high-dose chemotherapy, this

7    regimen called R-DHAOx.

8        Q.  And how did he react to that therapy?  Was

9    it successful?

10           Let me rephrase it.

11           How would you describe his course of

12   treatment that you administered?

13       A.  Complicated.

14           So he -- it's a pretty intensive therapy.

15   Most people have a lot of nausea from it, weight

16   loss, fatigue that can be debilitating.

17

Charalambos Andreadis, M.D.



1

25          (Reporter clarification.)



11      A.   So what happened in the meantime, while

12  this was going on, is we reviewed the slides from

13  his relapse diagnosis here with our

14  hematopathologist, and they raised the question of

15  whether this was more of a high-grade follicular

16  lymphoma, what's called follicular lymphoma

17  grade 3a.

18          There's three grades to it, 1, 2, 3, and

19  then there's A and a B.  Diffuse large B-cell

20  lymphoma is more like a follicular grade 3b, so he

21  was in a 3a category.

22          And even though a lot of physicians treat

23  that as aggressively as diffuse large B-cell

24  lymphoma, because they're very similar, ▮▮▮▮▮

▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   we decided

Charalambos Andreadis, M.D.

1    to go for a more low-grade treatment.  So that's why

2    we switched his treatment to the R-bendamustine.

3        Q.  And how did he respond to that?

4        A.  He tolerated a lot better than the previous

5    treatment, and he was in complete remission when we

6    stopped the therapy.

7        Q.  Complete remission means that, as far as

8    you could tell from tests, the cancer had -- was

9    undetectable?

10       A.  Correct.

11       Q.  But I take it, unfortunately, subsequently

12   there was a return?

13       A.  Yes.  So with more follow-up, and then

14   September of that year, he had enlarging nodes again

15   which were suspicious for a relapse.

16       Q.  And how did you deal with that?

17       A.  He came to see me.  He had a PET scan, and

18   the PET scan showed an abnormal lymph node in his

19   neck again, which is a common area for him to get

20   his lymphomas, neck and eye on the left side for

21   some reason.

22           And then some activity in his intestine.

23   So we sent him for a colonoscopy to make sure there

24   was nothing serious going on in his intestine, and

25   that was negative.

Charalambos Andreadis, M.D.

```
 1              And then he came here for a biopsy of the

 2    lymph node.  We had to do it twice because the first

 3    one didn't work out.  And the second one proved that

 4    he had relapsed with a more aggressive lymphoma.

 5    The diffuse large B-cell lymphoma.

 6         Q.  And again, how did you treat that?

 7         A.  So at this point he was -- he had

 8    progressed through technically three different types

 9    of chemotherapy, the R-CHOP, the DHAOx, and the

10    R-bendamustine, and he was a candidate for this new

11    treatment that had just come online called chimeric

12    antigen receptor T-cell, or CAR T.

13              Do you need me to spell any of that?

14              THE REPORTER:  I'll get it later.  Thanks.

15              THE WITNESS:  Okay.  And so we did a

16    workup, established that he was eligible, and then

17    we treated him with that on May 1st.

18    BY MR. SLONIM:

19         Q.  And how did he tolerate that treatment?

20         A.  It was a -- he had expected complications.

21    He needed to be hospitalized for part of it because

22    of symptoms, but was discharged after about ten

23    days, I would say, from the hospital and did fine.

24              He had a scan in June that showed he was in

25    remission again.  So at the time of writing this
```

1  report, that's the information we had.

2        Unfortunately, since then, he's relapsed

3  again.

4     Q.  Yeah.  I'm going to come back to that in

5  just a second.

6        Did you supervise his CAR T therapy?

7     A.  I did.

8     Q.  Have you, prior to Mr. Alvarez, had you

9  supervised CAR T therapy on other patients?

10    A.  Yes.  I'm the CAR T leader at UCSF for

11 lymphoma.

12    Q.  How many patients would you say -- well,

13 let me -- two questions.

14       When was your first patient, and to date,

15 how many patients have you had through CAR T?

16    A.  My first patient was sometime in 2016 on a

17 clinical trial.  And to date, we've treated probably

18 close to 50 patients.

19    Q.  And how has your -- have you reported your

20 data or compiled your data on how your patients have

21 done?

22    A.  The clinical trials have been published.

23 Our internal data we haven't reported yet.

24    Q.  Okay.  Well, let me just ask you -- try to

25 ask it this way:  How would you describe your

Charalambos Andreadis, M.D.

1   institution's experience with treating lymphoma

2   patients with CAR T?

3        A.   Well, it's a promising technology, and so

4   in terms of the intensity of our -- or the breadth

5   of our experience is, it's good.   In terms of the

6   outcomes that we get, I think we're right along

7   where everybody else is.   So we see a high number of

8   original responses, in the range of 70 to 80

9   percent.

10          But then, unfortunately, about half of

11  those patients will relapse in the first six months.

12       Q.   So let's say over a two- or three-year

13  period, so you've had at least two years of

14  experience with patients.

15          Over two years -- after two years

16  post-CAR T, what's your best estimate of your

17  remission rate?

18       A.   The sustained remission rate?

19       Q.   Yes.

20       A.   Is about 40 percent.

21       Q.   And that's kind of consistent with what

22  other institutions are reporting?

23       A.   That's consistent with what's published.

24       Q.   Right.

25          MR. SLONIM:  They tell me we need to change

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1    the tape, so this is a good time to take a break.

2            MR. DIAMOND:  Yeah.

3            THE VIDEOGRAPHER:  This marks the end of

4    disc 3.  We're off the record at 3:09.

5            (Recess taken.)

6            THE VIDEOGRAPHER:  We are back on the

7    record.  This marks the beginning of disc No. 4 in

8    the deposition of Dr. Charalambos Andreadis.  The

9    time is 3:15 p.m.

10   BY MR. SLONIM:

11       Q.  So, Doctor, can you just remind me, at the

12   time that you prepared your expert report,

13   Mr. Alvarez's status was that he was in -- had a

14   complete response; is that correct?

15       A.  Well, he had a PET scan before the report

16   was filed in, that was done locally at Queen of the

17   Valley, that showed possible progression.  But they

18   were doing a workup to determine if that's the case.

19       Q.  Okay.

20       A.  So I didn't include that in my report

21   because I didn't -- hadn't seen the patient.

22       Q.  Okay.  But there have been further tests

23   that have been done since the time you prepared that

24   report; is that correct?

25       A.  Yes.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1      Q.   And can you tell us what those tests

2   revealed?

3      A.   Yes.  So I recently saw him actually last

4   week again.

5           So the tests -- he had a PET scan that

6   showed some new lung lesions and maybe a new neck

7   lesion, and then a biopsy was done in late September

8   that showed relapse disease, diffuse large B-cell

9   lymphoma.

10     Q.   What would be your plan for his subsequent

11  treatment?  In other words, his treatment going

12  forward.

13     A.   Right.  So the data suggests that at this

14  point there's very little that we can do to help

15  him, but we started him on a different chemotherapy

16  regimen called R-REVLIMID, R-E-V-L-I-M-I-D.  And

17  he's being considered for another CAR T-cell

18  treatment using a different approach.

19     Q.   A different agent?

20     A.   It's -- yes, it's -- because CAR T is

21  targeted to a specific antigen, so he received the

22  CD19 CAR T.  And we are thinking about doing a

23  double CAR T, CD19, CD22.

24     Q.   At this point in time, what is your opinion

25  regarding Mr. Alvarez's prognosis with respect to

Charalambos Andreadis, M.D.

1    his lymphoma?

2         A.   His prognosis is very guarded.

3              So, unfortunately, he's in the 10 percent

4    or less chance of going back in remission at this

5    time.

6         Q.   ███████████████████████████████████████

███  ████████████████████████████████████████████████

███  ████████████████████████████████████████████████

███       ███  ███████████

███       ███  ████████████████████████████████████████

███  ████████████

███       ███  █████████    ███████████████████████

███       ███  ████████████████████████████████████████

███  ████████████████████

███       ███  █████████████

███       ███  █████████████████████████████████

███  ████████████████████████████████████████████████

███  █████████████████████████████████████████

███  █████████████████████████████████████████

███  ███████████████████████████

███       ███  ████████████████████████████████████

███  ████████████████████████████████████████████████

███  █████████████████████████████████████████

███  █████████████████████████████████████████

███  ██████████████████████████    █████████████████

Charalambos Andreadis, M.D.



1      ███████████████████████████ .

2            ██  ████████████████████████████████

██  ████████████████████████████████████

██  ████████████████████████████████████████

██  █████████████████████████████████████████

██  █████████████████████████████████

7            MR. DIAMOND:  Form and foundation.

8            THE WITNESS:  I haven't seen those studies.

9      I've heard different things.

10           █████████████████████████████████████████

██  ███████████████████████████████████████

██  ████████████

██  ███████████████████

██  ██  ████████████████████████████████████

██  ███████████████████████████  --

16           (Reporter clarification.)

17           THE WITNESS:  I have not seen that.

18     BY MR. SLONIM:

19        Q.  Sure, you have.  Do you have the McDuffie

20     paper?

21        A.  It's here somewhere.

22        Q.  Exhibit No. 14.

23        A.  McDuffie.

24        Q.  Table 1 gives information about various

25     conditions and the risk of cancer.  The last item,

Charalambos Andreadis, M.D.

1   Medical History. ███████████████████████

█   ████████████████████████████████████

3        Do you see that?

4   A.  Yeah.  But that's cancer in general.

5   Q.  ████  ████████████████████████████

█   ████████████████████████████████████

█   ████████████████████████████████████

█   ████████████████████████████████████

█   ███████████

10  A.| ████  ████████████████████████████

█   █████████████████████████████████

12  Q.  Right.

13  A.  So you're saying the odds ratio there?

14  Q.  ██████  █████████████████████████

█   ████████████████████████████████████

█   ████████████████████████████████████

█   ████████████████████████████████████

█   ████████████████████  ███████████████

█   ███████████████████████████████████████

█   ██████████████████████████

21       MR. DIAMOND:  Form.

22       THE WITNESS:  Well, this table is using

23  odds ratios inappropriately.  It's a Table 1, which

24  means it shows you baseline characteristics.  And

25  those are supposedly things that they will control

Charalambos Andreadis, M.D.

 1   for, so it's not something that you would use an

 2   odds ratio analysis for.

 3   BY MR. SLONIM:

 4       Q.  But they found -- what they found was when

 5   they -- when they pooled their population of people

 6   that were in this study, ███████████████████████

 ███  ████████████████████████████████████████████

 ███  █████████████████████████████████████████████████

 ███  ████████████████████████████████████████████████

 ███  ███████████████████████████████████████████████

 ███  ████████████████████████████

12       A.  I will agree with you that that's what they

13   found.  That's not common medical knowledge.

14       Q.  Okay.  I mean, there are other studies as

15   well, right?

16       A.  Not that are widely reported.

17       Q.  Doctor, is it correct that you do

18   consulting and research with pharmaceutical

19   manufacturers?

20       A.  Yes.

21       Q.  How many different manufacturers do you do

22   research with where you receive compensation --

23   well, let me rephrase this.

24           Do you do any speaking on behalf of any

25   pharmaceutical manufacturers or any companies?

Charalambos Andreadis, M.D.

```
 1        A.  Very limited.

 2        Q.  Tell us about the speaking that you do.

 3        A.  Limited to the degree that it's -- it was

 4   only actually one occasion I can think of in the

 5   last five years, which is attending a conference to

 6   give a presentation on CAR T-cell research by

 7   Gilead.

 8        Q.  And they make a CAR T-cell product?

 9        A.  Correct.

10        Q.  And you were compensated for that?

11        A.  Yes.

12        Q.  Who was the audience to whom you delivered

13   the talk?

14        A.  Hematologists and oncologists.

15        Q.  Do you receive compensation from other

16   pharmaceutical companies for other types of work?

17   Research, for instance?

18        A.  I get -- I do research funded by companies,

19   and then I do some very selective consultation

20   events with certain companies.

21        Q.  Have you received any compensation from

22   Bayer healthcare company -- Bayer pharmaceuticals?

23        A.  I have.

24        Q.  What do you consult with Bayer about?

25        A.  A new lymphoma treatment they developed
```

Charalambos Andreadis, M.D.

1    called copanlisib, C-O-P-A-N-L-I-S-I-B, and it was

2    what they called an advisory board, a meeting of

3    specialists in the field, to talk about potential

4    uses or further studies that need to be done.

5         Q.  Was it just that one event that you

6    participated in?

7         A.  I believe so.

8         Q.  Do you recall how much you were compensated

9    for that?

10        A.  Not -- I don't directly.  I think it was --

11   I would say it was 5-, 6,000, something to that

12   degree.

13        Q.  Would you agree that Bayer makes important

14   medications for people that have a host of medical

15   conditions, cancer and other conditions?

16        A.  They do.  Aspirin, for one.

17        Q.  Blood thinners for people that have atrial

18   fibrillation and other cardiac conditions?

19        A.  Yes.

20        Q.  Other important medications as well?

21        A.  They do.

22        Q.  Do they make cancer medications as well?

23        A.  I wasn't aware that they were making cancer

24   medications until this drug was FDA approved for

25   lymphoma.

Charalambos Andreadis, M.D.

1       Q.   Do you prescribe it?

2       A.   I have prescribed it.  Yes.

3       Q.   Have you found it useful for your patients?

4       A.   I have.

5       Q.   And have you -- you've consulted for other

6    pharmaceutical companies, Novartis, correct?

7       A.   Correct.

8       Q.   And Gilead, correct?  You mentioned that.

9       A.   Yeah.  So all these are in the CAR T space.

10      Q.   Okay.  And do you find their products

11   important to delivering healthcare to your patients?

12      A.   I do.

13      Q.   And are you compensated for your time

14   consulting for Novartis and Gilead?

15      A.   I have been, yes.

16      Q.   Is it fair to say that, insofar as you've

17   spent time and effort in consulting for companies,

18   that you're entitled to be compensated for your

19   time?

20      A.   Yes.

21      Q.   And there's nothing wrong with that, is

22   there?  I mean, that's -- your time is valuable, and

23   you're entitled to be compensated for your time,

24   correct?

25      A.   Correct.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

```
 1        Q.  And it does not influence the integrity of

 2   the scientific work you do, does it?

 3        A.  It doesn't.  I report -- when I publish

 4   research, I report my conflicts of interest.

 5        Q.  Yes.

 6            Have you done other consulting work in

 7   connection with litigation besides working on this

 8   case?

 9        A.  I actually tend not to do a lot of this

10   kind of work because I find it takes too much time.

11            I did one other case which was a medical

12   malpractice case, I believe, and it was a few years

13   back.  And it was really preparing a report for the

14   plaintiff, for the plaintiffs' lawyers.  It never

15   went to court.

16        Q.  Did that involve an allegation that a --

17   that either a drug or a chemical caused the cancer?

18        A.  No.  It was about care provided at a

19   certain institution, if I remember correctly.  There

20   was no drug or....

21        Q.  And that was, you said, a couple of years

22   ago?

23        A.  A few years ago.  Maybe three or four.

24        Q.  Okay.  And other than that medical

25   malpractice case, are there any other litigations
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1    where you've worked as an expert or as a consultant?

2         A.   Many years back when I was in Philadelphia.

3    It was maybe, I don't know, 12, 13 years ago.

4         Q.   Do you recall what that involved?

5         A.   It was a patient of mine, and I was -- I

6    testified as a kind of disease witness, describing

7    his condition.

8         Q.   Do you know if that case involved any

9    allegation that a drug or a chemical caused the

10   patient's -- or the plaintiff's cancer?

11        A.   It did not.  I believe he was -- I think it

12   was an insurance issue or something like that.

13        Q.   Okay.  Doctor, I'm going to mark as the

14   next deposition exhibit a list that your counsel

15   provided to us entitled "Records and Documents

16   Reviewed."

17             (Whereupon, Exhibit 18 was marked for

18             identification.)

19   BY MR. SLONIM:

20        Q.   The court reporter has marked that as

21   Deposition Exhibit No. 18.

22             Do you have that in front of you?

23        A.   Yes.

24        Q.   Can you tell me, did you prepare that list

25   yourself?

Charalambos Andreadis, M.D.

1      A.  I did.

2      Q.  And how did you know which items?  How did

3  you collect the items that you put on there?

4      A.  I mostly -- well, not mostly.  I went

5  through my -- when I made my report, I kept notes of

6  the references I used, and then I went through the

7  references and just put them all together.  So it

8  was things that I mentioned in my report or took a

9  really, you know, close consideration in my report.

10      Q.  When did you -- did you -- when did you

11  prepare that relative to the time that you prepared

12  your report?

13      A.  The -- I put this together actually this

14  past weekend.  That was November 9, let's say.  And

15  the report was prepared September 30th.

16      Q.  Did you make an effort when you prepared

17  that list to be complete?

18      A.  I did, to the best of my recollection.

19  Again, a lot of the references that I --

20  specifically the study references were little notes

21  that I had in my computer that I looked at.  And

22  frankly, a lot of these reports were reports that I

23  had in my files that I knew I had looked at as well.

24  But that may not be all-inclusive.

25      Q.  Can you remind me, was there a document or

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1   one or more items that you had mentioned that you

2   had inadvertently overlooked?  I think you said

3   something about that at the beginning of the

4   deposition.

5          MR. DIAMOND:  I think I may have said

6   something, if you want me to mention what it was.

7          MR. SLONIM:  Yes, please.

8          MR. DIAMOND:  I think -- I believe I sent

9   him Dr. Weisenburger's general causation report at

10  the same time I sent him the other general causation

11  experts' reports.

12         MR. SLONIM:  And that was not included?

13         MR. DIAMOND:  And that just so happened --

14  when I took a quick look, I didn't see it on there.

15         MR. SLONIM:  Okay.

16         THE WITNESS:  Yeah, it's not included here.

17  BY MR. SLONIM:

18     Q.  Okay.  Thank you.

19         So, Doctor, have you discussed any of the

20  opinions that you have formed in regard to Roundup

21  and glyphosate with any of your professional

22  colleagues?

23     A.  I haven't discussed my opinions.  I've --

24  my coworkers know that I'm involved in this case.

25  Is that what you're asking?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Charalambos Andreadis, M.D.

1      Q.  Yes.  So what I'm really interested in

2   knowing is if you've talked about the substance of

3   anything concerning your opinion about whether

4   Roundup or glyphosate causes or increases the risk

5   of non-Hodgkin's lymphoma, if you've discussed that

6   topic with any of your professional colleagues.

7      A.  I have not.

8      Q.  So, Doctor, I want to go sort of full

9   circle a little bit.

10          You prepared your report based on some of

11   the materials, based on the materials that you've

12   listed on that Deposition Exhibit No. 18.

13          We've talked today, during the course of

14   many hours, about a number of scientific reviews and

15   assessments that perhaps you had not seen, or

16   perhaps you had not thought about exactly in the

17   light that we had the opportunity to discuss them

18   today.

19          Those run a gamut of things, from maybe

20   whether it's multiple comparisons in the Leon paper

21   or confounding and some of the other epidemiology

22   studies, the Andreotti study and what its strengths

23   are and what its limitations are.  You know, the

24   genotoxicity assessments and so on.

25          As you mull that over, is it fair to say

Charalambos Andreadis, M.D.

1    that you're -- that your mind is open and that it

2    would not be possible to opine to a reasonable

3    degree of medical certainty that Roundup causes or

4    contributes to a patient's non-Hodgkin's lymphoma,

5    but rather, even if you hold that view that it

6    could, that the scientific evidence is unsettled

7    enough so that you would not want to state that

8    under oath to a reasonable degree of medical

9    certainty?

10            MR. DIAMOND:  Form.

11            THE WITNESS:  My mind is open, and I've

12   looked at a lot of -- a lot of the literature.

13   Obviously I haven't looked at every single study out

14   there.

15            I think what stands out, you know, in

16   Mr. Alvarez's case is the lack of any other risk

17   factors and the extensive chronic use of glyphosate,

18   which, in my mind, makes it a much stronger, more

19   compelling reason why I put my report together this

20   way.

21            I mean, even if you look at the AHS study,

22   I think the median exposure was 38 days and eight

23   years, and we're talking about 30 years and hundreds

24   of days in his case.  So he's a true outlier in

25   terms of the degree of exposure to the product.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

1        And so for those reasons, I still think

2   that this is a consequential factor in his case, why

3   he developed lymphoma.

4   BY MR. SLONIM:

5       Q.  You would agree that reasonable doctors and

6   scientists looking at this same evidence base could

7   reasonably come to the opposite conclusion; is that

8   fair?

9            MR. DIAMOND:  Form and foundation.

10           THE WITNESS:  I believe there's data that

11  can be interpreted many different ways.  But the

12  weight of the reports suggest that they're, for both

13  kind of causality issues and definitely the

14  epidemiologic issues, suggest that there is an

15  association.

16           MR. SLONIM:  Okay.  Let me confer with my

17  colleague, and we'll see what, if anything, I need

18  to follow up on.

19           THE VIDEOGRAPHER:  We're off the record at

20  3:39 p.m.

21           (Recess taken.)

22           THE VIDEOGRAPHER:  We are back on the

23  record.  The time is 3:47 p.m.

24           MR. SLONIM:  Doctor, I have no further

25  questions.  Thank you.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

```
 1              THE WITNESS:  Thank you.

 2              MR. DIAMOND:  And we will read and sign.

 3              THE VIDEOGRAPHER:  Thank you.  This is the

 4    end of disc No. 4 and today's testimony of

 5    Dr. Charalambos Andreadis.  We are off the record at

 6    3:47 p.m.

 7                   (Ending time:  3:47 PM)

 8

 9                   ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Charalambos Andreadis, M.D.

1          I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2     CCRR, certify: that the foregoing proceedings were taken

3     before me at the time and place herein set forth; at

4     which time the witness was duly sworn; and that the

5     transcript is a true record of the testimony so given.

6

7          Witness review, correction and signature

8     was

9     (X) by code.                    ( ) requested.

10    ( ) waived.                     ( ) not requested.

11    ( ) not handled by the deposition officer due to

12    party stipulation.

13

14         The dismantling or unbinding of the original

15    transcript will render the reporter's certificate null

16    and void.

17         I further certify that I am not financially

18    interested in the action, and I am not a relative or

19    employee of any attorney of the parties, nor of any of

20    the parties.

21         Dated this 14th day of November, 2019.

22

23         _____

                    GINA V. CARBONE

24                  CSR #8249, STATE OF CALIFORNIA

25

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Charalambos Andreadis, M.D.

```
 1                    INSTRUCTIONS TO WITNESS

 2                         Please read your deposition over

 3     carefully and make any necessary corrections.  You

 4     should state the reason in the appropriate space on

 5     the Errata Sheet for any corrections that are made.

 6                         After doing so, please sign the

 7     Errata Sheet and date it.

 8                         You are signing same subject to

 9     the changes you have noted on the Errata Sheet,

10     which will be attached to your deposition.

11                         It is imperative that you return

12     the original Errata Sheet to the deposing attorney

13     within thirty (30) days of receipt of the deposition

14     transcript by you.  If you fail to do so, the

15     deposition transcript may be deemed to be accurate

16     and may be used in court.

17

18

19

20

21

22

23

24

25
```

Charalambos Andreadis, M.D.

```
 1                    - - - - - -

 2                  E  R  R  A  T  A

 3                    - - - - - -

 4    PAGE  LINE  CHANGE

 5    _____  _____  _____

 6    REASON:_____

 7    PAGE  LINE  CHANGE

 8    _____  _____  _____

 9    REASON:_____

10    PAGE  LINE  CHANGE

11    _____  _____  _____

12    REASON:_____

13    PAGE  LINE  CHANGE

14    _____  _____  _____

15    REASON:_____

16    PAGE  LINE  CHANGE

17    _____  _____  _____

18    REASON:_____

19    PAGE  LINE  CHANGE

20    _____  _____  _____

21    REASON:_____

22    PAGE  LINE  CHANGE

23    _____  _____  _____

24    REASON:_____

25
```

Charalambos Andreadis, M.D.

1              ACKNOWLEDGEMENT OF DEPONENT

2

3                  I, _____, do

4    hereby certify that I have read the foregoing pages,

5    and that the same is a correct transcription of the

6    answers given by me to the questions therein

7    propounded, except for the corrections or changes in

8    form or substance, if any, noted in the attached

9    Errata Sheet.

10

11

12

13    _____

14    CHARALAMBOS ANDREADIS, M.D.              DATE

15

16

17

18    Subscribed and sworn to before me this

19    _____day of _____, 20_____.

20

21

22

23

24

25