# Exhibit 9

```
 1              UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

 2

 3

 4

 5   IN RE:  ROUNDUP PRODUCTS     MDL NO. 2741

     LIABILITY LITIGATION        Case No. 3:16-md-02741-VC

 6   _____

 7   Sanders,

 8   -vs-

 9   Monsanto Company

     Case No. 3:16-cv-05752-VC

10

     _____

11

12

13        VIDEOTAPED DEPOSITION OF BRENT STAGGS, MD

14            TAKEN ON BEHALF OF THE DEFENDANT

15      ON NOVEMBER 7, 2019, BEGINNING AT 4:47 P.M.

16               IN LITTLE ROCK, ARKANSAS

17

          APPEARANCES

18

     on behalf of the PLAINTIFFS

19

          Robin L. Greenwald, Esquire

20        WEITZ & LUXENBERG

          700 Broadway

21        New York, NY 10003

          833-319-8582

22        rgreenwald@weitzlux.com

23

24   (Appearances continued on next page.)

25   REPORTED BY:  Shannon S. Harwood, CSR, RPR
```

Brent Staggs, M.D.

```
 1        APPEARANCES (Continued)

 2   on behalf of the PLAINTIFFS

 3        Jackey South, Esquire

          LUNDY, LUNDY, SOILEAU & SOUTH, L.L.P.

 4        501 Broad Street

          Lake Charles, Louisiana 70601

 5        337-439-0707

          jsouth@lundylawllp.com

 6

 7   on behalf of the DEFENDANT

 8        David A. Kerschner, Esquire

          ARNOLD & PORTER

 9        250 West 55th Street

          New York, NY 10019-9710

10        212-836-8214

          david.kerschner@arnoldporter.com

11

12   ALSO PRESENT:  Mr. Randy Schoening, videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Brent Staggs, M.D.

```
 1                    I N D E X

 2                                              PAGE

 3    Direct Examination by Mr. Kerschner          5

 4

 5                       EXHIBITS

 6    Exhibit         Description

 7    1. Notice of deposition                      6

 8    2. Objections to notice of deposition        7

 9    3. Updated CV                                9

10    4. Expert testimony list                     9

11    5. Dr. Staggs' expert report                12

12    6. Materials considered list                13

13    7. Invoice for pathology services, John Sanders   19

14    8. Study by Paz-y-Mino                      31

15    9. Study by Bolognesi                       34

16    10. Study by McDuffie                       79

17    11. Statement from Health Canada-glyphosate  94

18    12. U.S. EPA's 2019 review 8/8/19          100

19    13. Hepsin test to detect developing cancer 111

20    ██████████████████████              ████

21    15. Study by Castillo                      117

22    ██████████████████████              ████

23    17. Study by Wheless                       120

24    18. Study by Nugent                        120

25    19. CV 8/2/19                              137
```

Brent Staggs, M.D.

1                    STIPULATIONS

2

3            It is hereby stipulated and agreed by and

4    between the parties hereto, through their respective

5    attorneys, that the deposition of BRENT STAGGS, MD, may

6    be taken pursuant to agreement and notice and in

7    accordance with the California Rules of Civil Procedure

8    on November 7, 2019, at the Mariott, 3 Statehouse Plaza,

9    Little Rock, Arkansas, before Shannon S. Harwood, CSR,

10   RPR.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Brent Staggs, M.D.

```
 1              THE VIDEOGRAPHER:  We are on the record -- the

 2    audio and video record.  Today's date is November 7th,

 3    2019.  The time is approximately 4:47 p.m.  This is the

 4    videotaped deposition of Brent Staggs, MD.  This is the

 5    case of John D. Sanders, et al versus Monsanto.

 6              My name is Randy Schoening, a videographer

 7    from Little Rock, Arkansas.  Will counsel please make a

 8    record of their appearance?

 9              MS. GREENWALD:  Robin Greenwald for the

10    plaintiffs.

11              MR. KERSCHNER:  David Kerschner for the

12    defendant.

13              THE VIDEOGRAPHER:  Would the witness please be

14    sworn.

15              (Witness sworn.)

16              THE VIDEOGRAPHER:  You may proceed.

17    WHEREUPON,

18                     BRENT STAGGS, MD,

19    after having been first duly sworn, deposes and says in

20    reply to questions propounded as follows, to-wit;

21                    DIRECT EXAMINATION

22    BY MR. KERSCHNER:

23         Q.   Good afternoon, Dr. Staggs.

24         A.   Good afternoon.

25         Q.   As mentioned before, my name is David
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Brent Staggs, M.D.

```
 1   Kerschner.  I know you've been deposed before so I don't

 2   need to go over the rules, but I would just say let's

 3   try and not speak over each other, and for the court

 4   reporter's sake, try and slow down.

 5       A.   Yes, sir.

 6       Q.   Just a housekeeping, I'm going to mark as

 7   Exhibit 1 notice of deposition for Dr. Staggs, Sanders

 8   versus Monsanto case.

 9            (Deposition Exhibit No. 1 was marked for

10   identification and made part of the record.)

11       A.   And it has the right location on it.

12       Q.   (By Mr. Kerschner)  It does.

13            MS. SOUTH:  The one I had didn't.

14            MS. GREENWALD:  Yeah, neither did mine.

15       Q.   (By Mr. Kerschner)  Doctor, are you an expert

16   in pesticides?

17       A.   No, sir.

18       Q.   Are you an expert in determining an

19   individual's exposure to a pesticide?

20       A.   Well, yeah, I'm not sure exactly what you

21   mean.  As a doctor, I read occupational histories all

22   the time and histories of a wide variety.  So I take

23   histories to determine what exposures of a lot of times

24   -- of kinds people have, but if you mean, you know,

25   calculating a dose or something like that, that's not
```

Brent Staggs, M.D.

```
1    something I do.

2         Q.   Do you have any experience determining or

3    calculating how much of a chemical agent can absorb

4    through a person's skin?

5         A.   I don't perform that sort of calculation, no.

6         Q.   What about through a person's clothing?

7         A.   Same answer.

8         Q.   I'm going to mark as Exhibit 2 a document that

9    was produced to us yesterday.

10             MR. KERSCHNER:  And I apologize.  I only have

11   one copy, but you may have it.

12             MS. GREENWALD:  That's fine.

13             MR. KERSCHNER:  This is the objections to the

14   deposition notice.

15             (Deposition Exhibit No. 2 was marked for

16   identification and made part of the record.)

17        Q.   (By Mr. Kerschner)  Have you seen this

18   document before?

19        A.   I don't think so.

20        Q.   Have you brought any documents today with you

21   that were responsive to the requests that are in Exhibit

22   1?

23        A.   Yes.

24        Q.   And what documents are those?

25        A.   Let's see.  I have, well, my report in this
```

1    case, just what was limited to this case.

2         Q.   Yes, this is just for the --

3         A.   Sanders.

4         Q.   -- Sanders case.

5         A.   Right, so my report on the Sanders' case.  I

6    brought an updated CV dated August 2nd, 2019.  That's

7    the latest update.  I brought a list of my testimony

8    over the years.

9         Q.   Okay.  Let's -- do you have copies of those or

10   just one?

11        A.   Well, yeah, I just have one each, but you can

12   have the -- I have my CV --

13             MS. GREENWALD:  So I served those yesterday

14   also and I have copies.  I can give you mine, because I

15   don't --

16             MR. KERSCHNER:  Okay.  I don't think I saw --

17             MS. GREENWALD:  I served them on Julian and

18   Brian yesterday.

19             MR. KERSCHNER:  I don't think I saw the

20   testimony list.  I have the --

21             MS. GREENWALD:  I'll give you mine.

22             MR. KERSCHNER:  -- updated CV, but we can also

23   just make copies at a break or I can take yours.

24             MS. GREENWALD:  You can have mine.

25        Q.   (By Mr. Kerschner)  Okay.  So why don't we

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

1    mark those as exhibits, Doctor.

2         A.   Okay.

3         Q.   Maybe one at a time.  We'll do the updated CV

4    as Exhibit 3.

5              (Deposition Exhibit No. 3 was marked for

6    identification and made part of the record.)

7         Q.   (By Mr. Kerschner)  I'll hand that to you.

8         A.   All right.

9         Q.   And you have an expert testimony list as

10   Exhibit 4.

11             (Deposition Exhibit No. 4 was marked for

12   identification and made part of the record.)

13        Q.   (By Mr. Kerschner)  Other than those two, you

14   didn't bring any documents with you?

15        A.   My understanding they'd all be sent to you

16   electronically, like the papers and things like that

17   that were mentioned in my report and all the billing

18   records, all that.

19        Q.   I notice you have your laptop with you.  Is

20   there something on your laptop that you are reviewing

21   for this deposition?

22        A.   Well, also I have the copies of the medical

23   records, the transcripts of the depositions and the

24   defense reports or at least two that I saw on each --

25   well, two for Mr. Sanders.

Brent Staggs, M.D.

```
 1        Q.   And the versions that you have on your laptop,

 2   do they have any notes or markings or highlights on

 3   them?

 4        A.   No, sir.

 5        Q.   So those are just -- and do you have any

 6   documents on your laptop that you're using for the

 7   deposition that are not included in your materials

 8   considered list for this case?

 9        A.   I don't think so.

10        Q.   Okay.  I have the --

11             MR. KERSCHNER:  Can we just go off the record

12   for a moment just to make sure I have the right

13   documents?

14             MS. GREENWALD:  Have those gone for some

15   reason --

16             THE VIDEOGRAPHER:  Are we going off the

17   record?

18             MR. KERSCHNER:  Yes, please.

19             THE VIDEOGRAPHER:  We're off the record at

20   4:53 p.m.

21             (A recess was taken from 4:53 p.m. to

22   4:54 p.m.)

23             THE VIDEOGRAPHER:  We are back on the record

24   at 4:54 p.m.

25        Q.   (By Mr. Kerschner)  Doctor, if you look at
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

1    what's been marked as Exhibit 2, which were plaintiffs'

2    objections and responses to defendant's document

3    requests, are you with me?

4         A.   Yes, sir.

5         Q.   In No. 3, response to No. 3, it's on the third

6    page, the request reads, "All documents that Dr. Staggs

7    will consider in support of his deposition testimony in

8    this case," and in the response it indicates,

9    "Dr. Staggs' review is ongoing."

10             Do you see that?

11        A.   Yes.

12        Q.   What review is still ongoing as it pertains to

13   the Sanders' case?

14        A.   Well, I don't have anything specific.  That

15   just, to me, refers to medical literature could come out

16   at any time and sort of has come out since I've

17   testified in this litigation and in other types of

18   litigation, you know, ongoing.  So I would leave it

19   open.  If, you know, new information comes out, then I

20   might change or modify my opinions depending on the new

21   information.

22        Q.   But sitting here today, you don't have

23   anything that you know of that exists that you haven't

24   had a chance to review to form your opinions?

25        A.   That's right.

Brent Staggs, M.D.

```
 1        Q.   And then if you look at -- so I'm now going to

 2   mark, which I think you have a copy of, but I have

 3   extras as a copy here, is your expert report and mark

 4   that as Exhibit 5.

 5             (Deposition Exhibit No. 5 was marked for

 6   identification and made part of the record.)

 7             MS. SOUTH:  Oh, I have that.  Thank you.

 8        Q.   (By Mr. Kerschner)  And is this indeed a copy

 9   of your expert report in the Staggs' case?

10        A.   Staggs?  Sanders.

11        Q.   Sanders' case.  Apologize.

12        A.   I'm here too.  I think I just got it wet.

13   Sorry.  It looks like it -- yeah, I'm not used to seeing

14   it on front and back like this, but I think all the

15   pages are here.  Sorry.  You want another copy?  Somehow

16   I've gotten water.  Really getting off to a good start.

17        Q.   I'll ask you, Dr. Staggs, is Exhibit 5 a copy

18   of your report in the Sanders' case?

19        A.   Yes, sir.

20        Q.   And this includes all the opinions you intend

21   to offer at trial in Mr. Sanders' case?

22             MS. GREENWALD:  Objection.  Form.

23        A.   Sure, very generally.  I mean, I get asked

24   that a lot.  Right.  Then my main opinions are about

25   specific causation for Mr. Sanders.  I mean, there's
```

Brent Staggs, M.D.

1    always some question that maybe I don't anticipate that

2    I can try to answer at the time of trial, but yes, my

3    opinions in essence are in this report about specific

4    causation for Mr. Sanders.

5         Q.   (By Mr. Kerschner)  other than questions that

6    you may be asked that you don't anticipate, your

7    opinions as they pertain to Mr. Sanders are in that

8    report; is that correct?

9         A.   Yes.

10             MS. GREENWALD:  Objection.  Form.

11        Q.   (By Mr. Kerschner)  Exhibit 6 is a copy of the

12   materials considered list that was served on us along

13   with your report.

14             (Deposition Exhibit No. 6 was marked for

15   identification and made part of the record.)

16        Q.   (By Mr. Kerschner)  I'll ask you also to take

17   a look at that and confirm that Exhibit 6 is indeed your

18   materials considered list as it pertains to Mr. Sanders'

19   case?

20        A.   Yes, sir, I think so.

21        Q.   And this materials considered list is

22   different from the list you have used in prior cases

23   relating to Roundup, correct?

24        A.   Yeah, to some degree.  You know, the

25   deposition I gave in early 2018, I had a list of

Brent Staggs, M.D.

1    everything I had ever tried to read and I'm -- I can't

2    remember now if I had that same list earlier this year

3    when I testified.  I tried to pare it down a little bit,

4    you know, to things that, you know, I felt were more

5    important.  Of course, I may have missed something or

6    overlooked something, but rather than just include

7    everything that I had ever possibly read.

8        Q.   And did you add -- did you add any articles to

9    this since your deposition in July?

10       A.   I'm not sure.  I mean, I know the Zhang paper

11   is relative -- in 2019 is relatively fresh.  I don't

12   remember if we discussed that at that time or not.

13   There's been -- you know, there's been several that have

14   come out since 2018 early when I testified, but you

15   know, I just -- I don't have all the dates memorized,

16   but so I'm not sure if there's really anything new on

17   this list that I didn't discuss in the last two

18   depositions.

19       Q.   Did you review any of Mr. Sanders' other

20   expert reports -- other experts' reports?

21       A.   I reviewed a report of a doctor -- let me see

22   if he's a doctor or not.  Grossbard.  Yes, a

23   Dr. Grossbard, G-R-O-S-S-B-A-R-D, and then also

24   Zukerberg, who is also a doctor.

25       Q.   And just to be clear, those two are not

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

```
 1   experts for Mr. Sanders, right?

 2       A.   Right.  They appear to be defense reports,

 3   right.

 4       Q.   Have you read any other reports by experts

 5   testifying on behalf of Mr. Sanders', the plaintiffs in

 6   this case?

 7       A.   I don't think so.  I've read -- of course I've

 8   testified about this the last two times as well.  I've

 9   read a lot of the expert reports from kind of the

10   initial phase of Dr. Weisenberger and Nabhan and a wide

11   variety of others Portier.  I haven't re-read those in

12   quite awhile, and I have no idea if any of those guys

13   are involved in this particular case or not.

14       Q.   Let me clarify.  Since your last deposition,

15   have you read any other expert reports for Mr. Sanders

16   or the plaintiffs?

17       A.   No, sir.

18       Q.   Have you reviewed any depositions as they

19   pertain to Mr. Sanders?

20       A.   Just his own deposition.

21       Q.   Have you read any of his physician

22   depositions?

23       A.   His physicians, no, I think just his own

24   deposition is all I remember looking at.

25       Q.   Did you -- and you said that you have here
```

Brent Staggs, M.D.

```
 1   medical records for Mr. Sanders; is that right?

 2        A.   Yes, sir.

 3        Q.   And you reviewed those as well?

 4        A.   I did.

 5        Q.   Did you review any pathology slides --

 6        A.   No, sir.

 7        Q.   -- for Mr. Sanders?  Did you review the

 8   pathology reports?

 9        A.   Yes.

10        Q.   Did you disagree with any of the findings in

11   the pathology reports for Mr. Sanders?

12        A.   No, sir.

13        Q.   Did you speak to any of Mr. Sanders'

14   physicians?

15        A.   No, sir.

16        Q.   Did you review the complaint in this case

17   for -- as it pertains specifically to Mr. Sanders?

18        A.   I don't think so.

19        Q.   Did you look at Mr. Sanders' plaintiff fact

20   sheet?

21        A.   I don't -- I don't remember if I did.

22        Q.   Did you order any of your own medical tests

23   for Mr. Sanders?

24        A.   No, sir.

25        Q.   Going back to your report, how did you go
```

Brent Staggs, M.D.

1    about preparing this report?

2        A.   What do you mean -- well, I mean, I wrote it.

3    I guess you would like what order did I write it in

4    or...

5        Q.   We'll go step by step.  Did you speak to

6    Mr. Sanders before writing this report?

7        A.   I did -- well, I spoke to -- I interviewed him

8    over the phone and I had already started the general

9    parts of the report, so maybe that's what you mean, kind

10   of the format that I followed to create the report.  It

11   wasn't all entirely cohesive.

12           So I -- I had not written reports before in

13   Roundup litigation.  We just -- they weren't required or

14   asked.  So I felt like I should have kind of a general

15   summary of science in the beginning, so I had already

16   started on that when I spoke to Mr. Sanders and I had

17   already read his deposition as well, but -- and read

18   his -- all of his medical records.  So I don't remember

19   if I -- I had probably already had the medical records

20   summary.  In fact, I'm sure I did, because I wanted to

21   have it there to be able talk to him and then kind of

22   make notes in the computer as I talked to him to fill in

23   the section that I already had from his deposition.

24           And then, you know, I think I probably went

25   back -- and, you know, I may not have been completely

Brent Staggs, M.D.

1    done with the science part.  My interview with him

2    didn't affect the -- the science part with the

3    literature, the footnotes, and all that sort of thing.

4         Q.   How many times did you speak to Mr. Sanders on

5    the phone?

6         A.   Just once.

7         Q.   Do you know when it was?

8         A.   Well, this has all been fairly quick.  I don't

9    know which day it was, but I was contacted, you know,

10   three or four weeks prior to my report date of October

11   9th.  So it was a lot of work in a very short period of

12   time, so I probably talked to Mr. Sanders -- you know, I

13   had several clients to talk to, so -- or patients to

14   talk to.  I don't know, but it would have been maybe

15   October 1st or 3rd or something like that.

16        Q.   And who else was on that call?

17        A.   There were attorneys on that call.

18        Q.   Do you recall which attorneys were on that

19   call?

20        A.   I don't remember if any of the counsel here

21   were the ones on the phone or not.  It was -- you know,

22   the variety, some of the different patients had

23   different attorneys, but I don't remember specifically.

24   Some of them were from Nebraska.  You know, I had

25   never -- but -- you know, but the two counsel here were

Brent Staggs, M.D.

```
 1   on the phone I think for at least some of the

 2   depositions -- not deposition, the interviews, but I

 3   don't remember which ones.

 4       Q.   Other than yourself, Mr. Sanders and counsel,

 5   was anyone else on the line?

 6       A.   No, I don't think so.

 7       Q.   Did you ever meet Mr. Sanders in person?

 8       A.   No, sir.

 9       Q.   Did anyone assist you in drafting this report?

10       A.   No, not with the substance.  Because of the

11   short timeframe, I did have them proof read it for me

12   for typographical errors and help them -- help me put

13   the footnotes in and I'm not a great word artist as far

14   as creating documents.  So I had it all pretty well

15   typed and then I just ran it by them for editing

16   purposes.

17       Q.   And just for clarity's sake, when you say

18   "them," are you referring to plaintiffs' counsel?

19       A.   That's right.

20       Q.   So one other document that was provided to us

21   is -- I'll mark as Exhibit 7.  It's the invoice for

22   pathology services re: Sanders, John.

23            (Deposition Exhibit No. 7 was marked for

24   identification and made part of the record.)

25       Q.   (By Mr. Kerschner)  Have you seen this
```

Brent Staggs, M.D.

```
 1   document before?

 2        A.   Sure.

 3        Q.   Did you -- you created this document?

 4        A.   Right.

 5        Q.   And the total invoice is $15,536, correct?

 6        A.   Right.

 7        Q.   And that's up to and including October 11th?

 8        A.   Right.

 9        Q.   What is your hourly rate?

10        A.   My hourly rate is $450 per hour, but I didn't

11   bill that on the hourly rate.

12        Q.   So how did you bill it?

13        A.   I had never done billing like this.  Well,

14   it's kind of unusual to have multiple patients working

15   on -- working on a basic science part of my report, and

16   then I'm talking to each one.  I'm not in any way good

17   at keeping up with hours.

18             So I did the total and there's a lot --

19   voluminous records, so I tried to do a total number of

20   pages of depositions and medical records and then 30

21   seconds a page and then the hourly rate.  So I didn't

22   just think about how many hours I've done because I had

23   no way -- I was up -- it was a short timeframe.  I was

24   up late at night, on the weekends.

25             So first time I've ever done that, but I was
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

```
 1   going to do a minute per page.  I've seen other experts

 2   charge that, but it came out a lot more, so I reduced

 3   it.

 4        Q.   I guess Mr. Sanders' counsel will thank you

 5   for billing them for 30 seconds.

 6             And did you -- other than the time spent

 7   reviewing medical records, did you bill for the time

 8   doing anything else for Mr. Sanders' case?

 9        A.   Well, again, I didn't track it in an hourly

10   way, although I correlated it back to my hourly rate as

11   we mentioned, so no, I just went with the -- because

12   some had drastically more or less records so I just went

13   with that number and -- but, yeah, that was included --

14   that was meant to include all of that time in theory.

15        Q.   So you didn't bill separately, for example,

16   for the time up spent drafting the report?

17        A.   Right.  Again, that's just supposed to be

18   built into that.  That was going to be an easier way I

19   thought to -- to figure -- to come up with a bill rather

20   than trying to figure -- trying to figure out how much

21   time spent generally on the report versus each

22   individual client and back and forth, so you know, and

23   trying to divide out the general time spent, so I just

24   went with that.

25        Q.   Roughly how much time do you think you spent
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

1   reviewing Mr. Sanders' records?

2       A.   Oh, several hours.  He's got -- he's one of

3   the ones that has lots and lots of medical records, so

4   we're talking, you know, 10 to 20 hours, I would think,

5   by the time we -- you know, maybe more.  You know, I

6   talked to him for awhile and I had read his deposition a

7   time or two before I talked to him and then some after

8   that and so probably in that range.

9       Q.   And then roughly how long do you think you

10  spent drafting the report for Mr. Sanders?

11      A.   Well, that's impossible to say because I'm

12  kind of working on -- you know, working on the basic

13  part of it.  I didn't just draft him a report like I do

14  in most cases.  I kind of draft one individual report.

15  The first half of this report is similar for everyone,

16  so I don't know.

17           I mean, when you say drafting the report, the

18  reading of the literature and deciding what to put in,

19  what to put out, and then the creating of the other

20  list.  I don't know.  I mean, hours.

21      Q.   That whole process, reading the literature and

22  drafting the report, when you say hours, is it more than

23  20 hours?

24      A.   Probably.

25           MS. GREENWALD:  Objection.  Form.  Asked and

Brent Staggs, M.D.

1   answered.

2       A.   Probably.

3       Q.   (By Mr. Kerschner)  More than 50?

4       A.   I doubt it.  It's hard to say.

5       Q.   So somewhere between 20 and 50 hours?

6       A.   Maybe.  Right.  I didn't track it in any way.

7       Q.   Have you spent any time on Mr. Sanders' case

8   since October 9th, 2019?

9       A.   Yes.  So over the weekend, I re-read his

10  deposition, not gone back through many of the medical

11  records.  Looked at my own report some for the medical

12  summary on that.

13      Q.   And do you intend to bill for that time?

14      A.   Sure.

15      Q.   Are you going to use your hourly rate?

16      A.   Yes.

17      Q.   So you'll bill for the number of hours spent

18  times your hourly rate?

19      A.   Right.  Probably a couple of hours, two or

20  three.

21      Q.   Going back to your report itself, on page 1,

22  if you look starting in the second paragraph, it says,

23  "I have been a licensed Medical Review Officer since

24  2009 with recertification in 2014."

25           Do you see that?

Brent Staggs, M.D.

```
 1        A.    Right.

 2        Q.    What is a licensed medical review officer?

 3        A.    Oh, an MRO is a federal designation, has to be

 4   a physician who is -- practices in toxicology, and you

 5   get that specific designation to review federal drug

 6   tests for individuals, typically around employment

 7   testing, some court-ordered testing, things like that,

 8   mostly urine tests, some blood, hair testing, things

 9   like that.

10        Q.    And then a couple lines down, you say, "I am

11   the medical director for multiple laboratories,

12   including the largest clinical laboratory in the state

13   of Arkansas, and the Baptist Health Medical Center in

14   Little Rock."

15              Did I read that right?

16        A.    Yes, sir.

17        Q.    Which laboratories are you the medical

18   director for?

19        A.    Well, they're all at the end of my CV, so it's

20   going to be the Baptist Health Medical Center in Little

21   Rock and then Baptist Health North Little Rock and the

22   others shift from time to time.  I think the Baptist

23   Health Eye Center and there's the Arkansas

24   Gastroenterology Laboratory.  I should probably -- did

25   we already mark the CV?
```

Brent Staggs, M.D.

```
 1        Q.   We can -- we can go back to your CV.

 2        A.   Anyway, I think there -- there's typically

 3   about five that I'm in charge of, and they -- from time

 4   to time, we switch them between the partners and myself.

 5   Typically I maintain the two largest hospitals, but

 6   depending on other responsibilities and new partners, we

 7   may shift those.

 8        Q.   And you're also -- one of the places you

 9   mentioned being the medical director is Baptist Health

10   Medical Center in Little Rock, right?

11        A.   Right.

12        Q.   I noticed if I go to your website profile, it

13   doesn't list you as the medical director.  Is there a

14   reason for that?

15        A.   I haven't looked at our website in a long

16   time.  I'm not sure it's been -- I don't -- does it list

17   any medical directorships on there?

18        Q.   I'm not going to -- I don't -- I don't know

19   the answer to that.

20        A.   No, I didn't mean to ask you a question, but

21   you know, we've meant for a long time -- we don't have a

22   lot of use for our website, I suppose, because we -- you

23   know, we get referrals from other physicians, you know,

24   typically contracting with offices and hospitals.  So

25   I'm not sure of the status of our website.  I haven't
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

```
 1   looked at it in years.

 2       Q.   And when did you become the medical director

 3   for the Baptist Health Center?

 4       A.   Little Rock?

 5       Q.   Yes.

 6       A.   Oh, gosh.  Maybe five, six years ago.

 7       Q.   And what does a medical director do?

 8       A.   Well, medical director -- as the medical

 9   director, I'm responsible for all of the testing in the

10   hospital with regard to pathology and laboratory

11   medicine.  So anything from the way the blood is drawn

12   on the floors, ensuring the quality of that, the

13   phlebotomy staff or nursing staff with regard to how

14   they draw, all the way up through the testing process,

15   ensure we have appropriate laboratory equipment,

16   maintain the quality assurance of that, oversee all the

17   inspections that happen from regulatory agencies and

18   then also ensure the quality of the testing on the

19   anatomic side.

20            You know, how -- are the biopsies signed out

21   in a timely fashion appropriately, we have appropriate

22   staging templates on tumor specimens, things like that.

23   It's a wide variety of things.

24       Q.   And do patients come to see you ever to

25   discuss their cancer?
```

Brent Staggs, M.D.

```
1        A.   Well, I wouldn't say they come to see me.  I'm

2    asked, oh, occasionally to -- typically to go either

3    talk on the phone with a patient or I may go up to the

4    floor in the hospital.  The patient who's got an unusual

5    diagnosis or there's something unusual about their

6    particular cancer and the oncologist, more often

7    they'll -- oncologist will discuss it with me and then

8    discuss with the patient.  It's more common for me to

9    see actual patients in other settings than discussing a

10   tumor, but that happens, you know, a few times a year.

11       Q.   But, you know, I can't go on your

12   institution's website or any -- or any -- call them and

13   book an appointment with Dr. Staggs, right?

14       A.   Right.  No.  We don't have -- right, no clinic

15   of any type.

16       Q.   Whereas, you can book an appointment with, for

17   example, an oncologist?

18       A.   Right.

19       Q.   Or a radiation oncologist?

20       A.   Sure.  Well, I would assume so.  That's how

21   they usually make money.

22       Q.   And those are the oncologists and doctors who

23   actually talk to the patients about their cancer, right?

24       A.   Typically, right.

25       Q.   Moving down in your report, going on to the
```

Brent Staggs, M.D.

```
 1    second page, you reference being an lecturer at the

 2    University of Arkansas College of Medicine from 2002 to

 3    2007 in six different areas?

 4        A.   Right.

 5        Q.   Are you with me?  Do any of your lectures

 6    or -- excuse me.  Did any of your lectures discuss

 7    glyphosate or Roundup?

 8        A.   No.

 9        Q.   Did any of them talk about causes of

10    non-Hodgkin's lymphoma?

11        A.   I'm sure they probably did.  I don't remember

12    specifically.  They were -- they're residents and

13    medical students, so I'm sure we talked about, you know,

14    various basic causes of a lot of the different cancers.

15        Q.   Did you put together slide decs or present --

16    or actual physical presentations that accompany these

17    lectures?

18        A.   Oh, yes.

19        Q.   Do you still have those?

20        A.   No.

21        Q.   Do you know if the University of Arkansas has

22    them?

23        A.   I have no idea.  It would surprise me if they

24    did.

25        Q.   You would agree it's important to review all
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

1    relevant data when forming an opinion, right?

2            MS. GREENWALD:  Objection.  Form.

3        A.   Well, everything that I -- I try to get a

4    well-rounded view.  When you say "all," I mean, that's

5    an -- that's an awfully broad term, so right.  I like to

6    review everything I can.  I don't expect that I ever am

7    able to access every piece of data on any one subject.

8        Q.   (By Mr. Kerschner)  In other words, if the

9    data that's available to you and if it's on the relevant

10   topic, you would agree it's important to review that,

11   right?

12       A.   Sure.

13       Q.   If you look on page -- skipping a couple of

14   pages over to page 6 of your report.

15       A.   All right.

16       Q.   Do you see there's a heading called

17   genotoxicity?

18       A.   Right.

19       Q.   And there you discuss the study -- two

20   studies, one by Paz-y-Mino in 2007, correct?

21       A.   Right.

22       Q.   And then the paragraph below, a study by

23   Bolognesi in 2009, correct?

24       A.   Yes.

25       Q.   And then just going to the top of page 7 of

Brent Staggs, M.D.

1    your report, you say, "These two aforementioned studies

2    provide compelling evidence of genotoxic damage to blood

3    cells in individuals exposed to GBHs in their immediate

4    environment."

5            Did I read that correctly?

6        A.   Right.

7        Q.   And you're referring to Paz-y-Mino in 2007 and

8    the Bolognesi study from 2009, correct?

9        A.   Yes.

10       Q.   And then the Paz-y-Mino study, that looked at

11   evidence of chromosomal abnormalities in people living

12   in Ecuador, right?

13       A.   I was thinking -- oh, Paz-y-Mino.  One was

14   Columbia.  Oh, that's Bolognesi.  I think so.  I

15   remember Central America.  I think I just -- I don't

16   have them all memorized, but I'll take your word for

17   that on Ecuador.

18       Q.   And in your report on the paragraph talking

19   about Paz-y-Mino on page 6, you state that, "The authors

20   concluded the exposed group has a significant increase

21   in DNA damage compared to the unexposed controls,"

22   correct?

23       A.   Right.

24       Q.   You did not cite, however, the 2011 follow-up

25   study done by the same authors, right?

Brent Staggs, M.D.

```
 1        A.   No.

 2        Q.   I'm going to mark Exhibit 8.  Make sure I have

 3   the right one.  I do.

 4             (Deposition Exhibit No. 8 was marked for

 5   identification and made part of the record.)

 6        Q.   (By Mr. Kerschner)  If you take a look at the

 7   abstract on the first page, are you with me, Doctor?

 8        A.   Yes, sir.

 9        Q.   This study also looked at evidence of

10   chromosomal abnormalities of people living in Ecuador?

11        A.   I don't know that I've read it, so I'm not --

12   I'm not sure.  I'd have to -- you can represent that to

13   me if you like.

14        Q.   If you would look at the first two sentences

15   of the abstract.

16        A.   The purpose of this study diagnose social,

17   health and genetic aspects of people affected by

18   glyphosate.

19        Q.   And in the first sentence, it references

20   Northeastern Ecuador?

21        A.   Yes.

22        Q.   And then if you look just below it, this

23   actually included 182 blood samples?

24        A.   Right.

25        Q.   Do you know how many blood samples are
```

Brent Staggs, M.D.

1   included in the study that you cited from four years

2   earlier?

3       A.   Blood samples, I'd just have to look.  It says

4   24 exposed individuals, but I don't know how many blood

5   samples.  I'd just have to look at the paper.

6       Q.   And are you aware that this 2011 study looked

7   at the same group of people that were analyzed in the

8   2007 study?

9           MS. GREENWALD:  Objection.  Form.

10      A.   Right.  I'm not sure I've seen this, so -- so

11  no.  I'd just have to read it all to try to correlate it

12  back.

13      Q.   (By Mr. Kerschner) So let me help you.  If

14  you go to page 50 and then there's the very long

15  paragraph on the left-hand side?

16      A.   Right.

17      Q.   And then I'm taking you about 14 lines down,

18  right after the parenthesis 35, that might help guide

19  your eye.

20      A.   The 35.5 micrometers.

21      Q.   No, about four lines below that.

22      A.   Oh, I see it, genotoxic effect.

23      Q.   Yep.  And then the author states, "Two years

24  after the last aerial spraying, none of the studied

25  population had any type of chromosomal alteration."

Brent Staggs, M.D.

```
 1            Do you see that?

 2     A.    Yes.

 3     Q.    And then it says, "Being their normal

 4   karyotype (46, XX), an the percentage of chromosomal

 5   fragility was within normal parameters."

 6            Did I read that correctly?

 7     A.    I think so.

 8     Q.    And just to be clear, you have not -- you have

 9   not seen this study, right?

10     A.    Well, I'm not sure.  I've seen lots of study.

11   I don't remember it right off the top of my head, but so

12   I'm not sure that I've seen it or not.

13     Q.    It's not included on your materials considered

14   list, right?

15     A.    I don't think so.

16     Q.    You didn't include it in forming your opinions

17   in Mr. Sanders' case, right?

18     A.    Probably not.  Again, I don't remember having

19   seen it, but you know, I've seen a lot of them and

20   I'm -- I don't -- I don't concentrate on the -- all the

21   genotoxic -- you know, I read them and kind of accept

22   their findings as we go through, but I'm not the person

23   who would re-analyze something like this.

24     Q.    And then if you look back to your report in

25   the next study, the Bolognesi study.
```

Brent Staggs, M.D.

1      A.   Right.

2      Q.   And, again, you say that, "This study also

3  provides compelling evidence of genotoxic damage to

4  blood cells in individuals exposed to GBHs in their

5  immediate environment."

6      A.   Right.

7      Q.   I'm going to mark Exhibit 9.

8           (Deposition Exhibit No. 9 was marked for

9  identification and made part of the record.)

10     Q.   (By Mr. Kerschner)  This is the Bolognesi

11 study, correct?

12     A.   Right.

13     Q.   And if you take a look at the page ending in

14 995, the last paragraph, second sentence.  Let me know

15 when with me, Doctor?

16     A.   Just a second.

17     Q.   I think it's the last paragraph of the

18 reading.

19     A.   The very last report right above the

20 references?

21     Q.   Paragraph begins with "further studies are

22 needed."  Are you with me?

23     A.   Yes.

24     Q.   The second sentence reads, (as read) The

25 smaller population of subjects recruited in the study

Brent Staggs, M.D.

```
 1   and the small amount of information about the exposure

 2   precluded any conclusions."

 3           Did I read that correctly?

 4       A.   Yes.

 5       Q.   Had you seen that statement before you wrote

 6   your report?

 7       A.   Yes.

 8       Q.   And you chose not to include it in your

 9   report, correct?

10           MS. GREENWALD:  Objection.  Form.

11       A.   Right.  I didn't -- I don't have a lot of the

12   statements in the -- a lot of literature in my report.

13       Q.   (By Mr. Kerschner)  Your report also says, I

14   think you mentioned earlier, that you read expert

15   reports from Dr. Portier and Weisenberger?

16       A.   That's -- yeah, we talked about that earlier,

17   right.

18       Q.   And you mentioned those on page 8 of your

19   expert report.

20       A.   Okay.

21       Q.   Did you read any of Monsanto's expert reports

22   from this litigation?

23           MS. GREENWALD:  Objection.  Form.  Asked -- he

24   already testified about that.

25       A.   Well, I mean, I've seen the two in this case.
```

Brent Staggs, M.D.

```
 1      Q.   (By Mr. Kerschner)  Other than those -- the

 2   two in this case?

 3      A.   You know, I don't remember.  We could check my

 4   earlier deposition testimony and see.  If I have, it

 5   hasn't been recently other than the two we've talked

 6   about.  I may have.

 7           You know, in the beginning, I wanted to -- you

 8   know, I was just getting a general scope of everything.

 9   I wanted to read everything I could.  I may -- I just

10   don't remember.  I may have seen some of the general

11   expert reports from defendants two, three years ago now,

12   but I'm not sure.

13      Q.   So just to be clear, did you -- you

14   specifically mentioned Dr. Portier and Weisenberger in

15   your report here.  Did you reread those for your expert

16   report here?

17      A.   I've read them this year, but no, I didn't --

18   I didn't just reread them right at the time I was

19   writing the report.

20      Q.   Fair enough.  How did you go about determining

21   the cause of Mr. Sanders' non-Hodgkin's lymphoma?

22      A.   Well, the methodology as outlined in my report

23   is -- is essentially a differential diagnosis, or to be

24   more specific about causes, I call it differential

25   etiology.  It's something we've talked about in my
```

Brent Staggs, M.D.

```
 1   training before.  Essentially the same methodology.

 2              We -- when someone has any type of disease, I

 3   determine causation every day really in my practice,

 4   whether it's cause of death or cause of cancers or

 5   causes of other diseases.  You know, first establish

 6   what the disease is, whether that's through microscopic

 7   analysis or laboratory testing, things like that,

 8   clinical examinations sometimes.  That's step number

 9   one.

10              And then determine potential causes that I

11   know of.  And then beyond that, either do further

12   testing or reliance on history, things like that.

13   History and physical is a tenant of medicine to rule in

14   or rule out the possibilities and arrive at a

15   well-reasoned conclusion.

16       Q.   And did you use that same methodology for each

17   of the plaintiffs you're testifying about today and then

18   two weeks from now?

19       A.   Right.  Yeah, it's the same.  I've used the

20   same methodology for years.  My partners -- that's the

21   methodology we've been taught for years and years.

22       Q.   And you mentioned it's called a differential

23   etiology, correct?

24       A.   Right.  You know, I -- I distinguish -- we may

25   be splitting hairs a little bit -- distinguish between
```

Brent Staggs, M.D.

1   differential diagnosis and differential etiology.  It's

2   essentially the same process, which of course grew out

3   of the scientific method, which is kind of the

4   underlying method that could apply to more things than

5   just medicine.

6           Differential diagnosis is basically for

7   medicine, but you know, the difference only being if

8   someone comes to -- the easiest thing to understand, if

9   someone comes with a -- with a cough and a stuffy nose,

10  you know, you could go through a differential of all the

11  things that it could be and maybe arrive at a

12  differential diagnosis that it's the common cold.

13          The differential etiology just might seek to

14  go one step further, if possible, and actually determine

15  exactly what virus that would be.  And that's more

16  common in pathology, because I have, you know, more

17  laboratory testing.  You know, if someone is just --

18  they don't just have a possible blood culture even for

19  strep.  They -- we sub-classify it all the way down to

20  see exactly what it is, and the same thing with

21  anatomic.  You know, very common with cause of death.

22  You know, we have to determine exactly what caused the

23  death, not just heart disease in general, but exactly

24  what, you know, an arrhythmia or myocardial infarction,

25  those type of things.

Brent Staggs, M.D.

```
 1       Q.   And can you tell me any textbooks or

 2   peer-reviewed publications that describe this

 3   differential etiology method?

 4       A.   I guess I don't know of any that don't.  I

 5   mean, all your basic medicine textbooks, you know,

 6   whether it's Harrison's or Cecil's.  I mean, it's one of

 7   the first things you learn in clinical medicine.

 8       Q.   Is that differential diagnosis or differential

 9   etiology?

10       A.   Well, they're essentially the same.  Like I

11   said, you know, to me, etiology just, you know, strives

12   to, you know, find exactly the cause, if possible.

13   Many -- many times it becomes just the same.  It's not

14   possible to find out anything further than just, you

15   know, differential diagnosis.

16            So it's the same process, just you know, in

17   pathology, I'm used to, you know, going all the way to

18   the bottom to find the exact cause, not just generally

19   what's -- you know generally infection say.  You know,

20   like a clinical doctor may say, You have an infection.

21   As a pathologist, I may have tissue to be able to tell

22   you you have staphylococcus aureus infection.

23       Q.   And that's describing different types of

24   infections, right, in the example you just gave, right?

25       A.   Right, in my example, right.
```

Brent Staggs, M.D.

```
 1        Q.   But my question is the actual method of

 2   differential etiology, as you said taking it a step

 3   forward from differential diagnosis, are there any

 4   textbooks or peer-reviewed literature that describe that

 5   process?

 6             MS. GREENWALD:  Objection.  Form.  Asked and

 7   answered.

 8        A.   Right.  To my memory from medical school,

 9   that's exactly the -- exactly the terms that were used,

10   either differential diagnosis or differential etiology.

11   You know, I don't distinguish -- like I said in my

12   report, they're -- they're the same process.  It's just

13   whether you're, again, you know, finding a general cause

14   or you're trying to find the actual specific cause.

15        Q.   Am I right a differential diagnosis is looking

16   at potential infirmities that a person can have and then

17   determining what, in fact, the diagnosed disease

18   condition is that they have?

19        A.   That's right.

20        Q.   Whereas, differential etiology is looking at

21   potential causes of that disease and then determining

22   what the cause is.  Is that my understanding of your

23   method?

24        A.   Oh, no.  Yeah, so I kind of missed over what

25   you said first.  Right.  Just deciding what they're --
```

Brent Staggs, M.D.

```
 1   well, it all depends on your perspective a bit.  You
 2   know, a clinical doctor is going to see a lung mass, so
 3   the person may have a cough and their differential
 4   diagnosis is going to be infection versus, you know,
 5   some other -- you know, it could be broad and they're
 6   going to do perhaps a chest x-ray and see a mass in the
 7   lung.
 8           Well, okay.  Well, then so the pathologist is
 9   going to actually get a piece of the tissue and tell
10   them what the mass -- so their differential diagnosis
11   stopped at there's a lung mass.  Mine goes all the way
12   typically to it is adenocarcinoma or it is fungal
13   infection, something like that.  So it's the -- it's
14   really the same process, it's just, you know, I am on
15   the end where we typically get more specific answers
16   than, say, a family practice doctor.
17       Q.   And when you're getting more specific answers,
18   your getting more specific answers as to what, for
19   example -- in the example you gave, what type of cancer
20   that is, right?
21       A.   Right.
22       Q.   So that's different than figuring out what
23   caused that type of cancer, correct?
24           MS. GREENWALD:  Objection.  Form.
25       A.   Right.  So that's differential diagnosis used
```

Brent Staggs, M.D.

1    for just the diagnosis.  So it's used -- it depends on

2    where you start.  It's a good point too.  So -- right.

3    So if we start from what is causing this person to cough

4    up blood and we do a chest x-ray and the end of the line

5    for the clinician, family practice doctor is the chest

6    mass -- is a mass and the end of the line in my

7    differential is going to be I'm going to see epithelioid

8    cells maybe and is this cancer or not, and then if so,

9    what type of cancer -- going to do my test and determine

10   what kind of cancer it is.  That's where mine stops for

11   that particular examination.

12            And then if the question is what is causing

13   that cancer, that's 'nother now new set of differential

14   diagnosis or differential etiology where you start there

15   and you say, okay, now -- because you have to know what

16   question you're starting with.  Right?  It doesn't -- we

17   don't always go all the way to -- you know, like, on

18   that example, you know, different doctors stop at

19   different places depending on what the question is

20   they're asked.

21       Q.   Right.  And then the latter part of your, I

22   guess, chain of events that you're describing, figuring

23   out the cause, which is the differential etiology as you

24   talk about it, is there a medical textbook or

25   peer-reviewed study that -- that only describes that

Brent Staggs, M.D.

1    portion of your methodology, the differential etiology,

2    determining the cause?

3            MS. GREENWALD:  Objection.  Form.

4        A.   Well, it's the same.  I mean, yeah, you're

5    trying to -- we keep talking around in a circle.

6    It's -- it's the same reasoning concept, but it just

7    arrives at a more specific answer and it depends on the

8    question that you start with.  I don't start with the

9    question of what is causing the cough.

10           (A brief disturbance.)

11           MR. KERSCHNER:  If you pull the door closed,

12   it might be better.

13       Q.   (By Mr. Kerschner)  Right.  And I understand

14   what you're saying that the method of doing this

15   differential is in textbooks that you've read in medical

16   school, but specifically applying it to determining the

17   cause of a cancer, are there any medical textbooks or

18   peer-reviewed literature that you can tell me that

19   specifically does that?

20           MS. GREENWALD:  Objection.  Form.  Asked and

21   answered.

22       A.   Oh, sure.  Well, I mean, again, it's such a

23   general question that it's not like I look up that -- I

24   mean, that methodology is old and tried and true and --

25   right.  You apply it to whatever the question is at hand

Brent Staggs, M.D.

 1    like the scientific method.  It doesn't -- it doesn't --

 2    sort of irrelevant of what the question is.

 3            So no, I don't remember a textbook that says,

 4    okay, here's an example, I'm using it with the cause of

 5    a cancer, but it's just -- to me it's just such common

 6    knowledge that that's -- that's the -- you know, you

 7    work through a differential.  You would -- you would

 8    automatically work through, you know, what is it first.

 9    That's what we have to start with.  What is it and

10    what's your question you're asking and then what are the

11    potential causes.  And then based on the data that you

12    have at hand, what is your conclusion about the cause if

13    you can reach that conclusion.

14            So, yes, I mean, all the medicine textbooks

15    are going to be the place where they discussed that.

16    Some of them may have the hypothetical of what is

17    causing a cancer or some of them may not.  I don't

18    remember that fine detail.

19        Q.   (By Mr. Kerschner)  And how often in your

20    practice are you taking what you call that set -- that

21    extra step and using this methodology to specifically

22    determine the cause of a cancer?

23        A.   Oh, quite a bit.

24        Q.   Roughly what percentage of the patients that

25    you see or the specimens that you see for those patients

Brent Staggs, M.D.

1   are you going to determine the specific cause of their

2   cancer?

3        A.   You know, for cancers, it's a relatively small

4   percentage of my overall practice.  I don't know.  It's

5   very common.  We have a heart transplant service and a

6   kidney transplant service, a variety.  So they have to

7   know what is the cause -- if they get a secondary

8   cancer, is that caused by their immunosuppressive

9   medicines that they're taking or is that just an

10  isolated cancer caused by something else, because it's

11  going to change their therapy quite a bit.

12        The same thing with people that have HIV or

13  Hepatitis C.  Is this being caused by the underlying

14  disease they have, so do we need to change their therapy

15  for that or is this just caused by something else?  So

16  you know, I couldn't tell you a percentage.  Relatively

17  small percentage.

18        I determine causation of disease in that way,

19  you know, every day, but for cancer specifically, we're

20  typically so focused, you know just a garden variety say

21  lung cancer or breast cancer.  We're typically so

22  focused on the treatment part of it, because they've got

23  the cancer now, so it's not -- we're not typically all

24  that worried in the clinical setting about -- we're

25  worried about them living, not about what has caused it

Brent Staggs, M.D.

1    that they were exposed to years before.

2         Q.   And you mentioned situations of transplant or

3    someone has a specific condition like HIV or Hepatitis

4    C.  Outside those specific situations that you're

5    presented with, how often are you taking a biopsy that

6    you're looking at and going to determine what is the

7    cause of this cancer?

8              MS. GREENWALD:  Objection.  Form.

9         A.   Oh, unless the clinician asks me for that.

10   Again, I just gave you a variety of examples.

11   There's -- there's others.  I don't remember them all

12   off the top of my head.  It's not, you know, terribly

13   common.  I look at multiple cancers every day, but I do

14   have -- you know, they'll say, well, they were exposed

15   to, you know, asbestos when they were growing up.  We

16   have a lot of farmers, so I've had the call about, you

17   know, Roundup exposure, you know, do we think that could

18   have been this.  It's usually curiosity for the patient

19   or the oncologist more than anything.

20              So, yes, there are certain instances when I

21   have to do it and then there are certain instances that

22   are curiosity, but of the overall cancers, I would say

23   probably less than 10 percent of the time am I asked

24   what is causing this cancer when it's not a

25   clinically -- going to make a clinically viable

Brent Staggs, M.D.

```
 1    decision.

 2         Q.   And you mentioned that you've gotten calls

 3    about Roundup.  Are those from physicians or from

 4    individual patients?

 5         A.   Physicians.

 6         Q.   And have you been able to tell any of those

 7    physicians that Roundup, in fact, caused their patients

 8    cancer?

 9         A.   Sure.  Well, what I -- typically I don't have

10    the whole exposure history in front of me, but it's been

11    brought up at tumor board, and you know, a lot of things

12    like that have been.  You know, we talk about smoking

13    and asbestos and a lot of the carcinogens that cause

14    cancers.

15              And so, yes, it's been posed to me, you know,

16    this guy was a farmer.  We have a lot of farmers in this

17    state, just like I grew up on a farm and he's worried

18    that that could have caused it, what do you think.  I

19    said, well -- the example I remember most recently

20    several months back, I said, Well, you know, how did he

21    use it?  And they describe a history very much like I'm

22    used to and like I've read in a lot of these patients

23    where he used it in the setting, you know, on hundreds

24    of acres over many years.

25              And I said, Well, in that setting, I don't
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

1    know anything else about him to know about his

2    confounders or anything else, but that would be -- part

3    of the medical literature that I've read would indicate

4    that that -- that very well could be a significant

5    contributing factor.

6        Q.   Other than just based on your general

7    understanding, based on your review of the medical

8    literature, have you ever been given a patient by one

9    of -- by an oncologist, actually looked at their cancer

10   and told that oncologist that, yes, glyphosate or

11   Roundup was the cause of the cancer?

12            MS. GREENWALD:  Objection.  Form.

13       A.   No, I've not had that specific scenario, no.

14       Q.   (By Mr. Kerschner)  Have you ever been asked

15   to do that?

16       A.   Well, I think I just answered no.  Just like a

17   lot of other -- just like I've never had somebody say

18   that for smoking either, but we've discussed them, you

19   know, in a conference setting typically and sometimes an

20   individual phone call.

21       Q.   If you have a patient that asks, How do I you

22   know -- sorry.  If you -- strike that.

23            If you have a patient that asks if you're sure

24   that they have cancer, how -- how do you tell them if

25   you're sure or not?

Brent Staggs, M.D.

```
 1        A.   I'll say I'm sure.  I don't know what you

 2   mean?  What do I do to assure myself?

 3        Q.   What do you -- yeah, what do you tell them

 4   that makes you sure?

 5        A.   That they just have cancer?

 6        Q.   Correct.

 7        A.   Well, in my position, I would -- well, I mean,

 8   that's such a broad question.  I guess I would typically

 9   look at the glass slides, I suppose, if that -- if that

10   was one of my cases.  I mean, it's such an odd question,

11   are you sure I have cancer.  Am I just looking at

12   records?  You know, if somebody just called me off the

13   cuff, then I don't know.  So many things to think about.

14   Yeah, I --

15        Q.   You would have pathology, for example, that

16   could prove?  It you mentioned slides.

17        A.   Well, yeah, I guess.  So many things running

18   through my mind with a broad question like that, do I

19   just have the report, do I just have -- so I mean, I

20   trust other people's reports all the time as we review

21   cases that come in and out for surgery and things like

22   that.

23             So but, yeah, I mean I could review the

24   slides.  I could review their medical records I suppose

25   too if they had a long history of tumors and masses and
```

Brent Staggs, M.D.

```
 1   previous pathology reports.  I would have no reason not

 2   to believe them, so I guess I could assure myself that

 3   way as well.

 4       Q.   So medical records, pathology.  What about

 5   imaging studies?  Is that something else you could use

 6   to indicate to a patient that they have cancer?

 7       A.   Well, I guess I would include -- I don't -- I

 8   know my way around a CT scan or chest x-ray.  I don't

 9   read them.  I'm not a radiology.  I guess I would

10   include that in medical records, but sure, you know, to

11   some degree.  Right.  And then we decide on recurrences,

12   you know.  Initial diagnosis, you know, we always have

13   to have tissue, but we decide on recurrences based on

14   imaging sometimes.

15       Q.   And then if that patient asks you, How do I

16   know you're right that glyphosate caused my

17   non-Hodgkin's lymphoma, what would you tell them?

18           MS. GREENWALD:  Objection.  Form.

19       A.   Well, I would tell them that medical histories

20   are reliable.  We would have to know the history and

21   have to talk about it and we determine -- make medical

22   decisions based on the history all the time.  Right.  We

23   don't have a specific biomarker that we can use, but,

24   you know, how to -- it's the same -- it's the same

25   reasoning we used to say smoking has caused lung cancer
```

Brent Staggs, M.D.

1    or heart disease or asbestos has caused mesothelioma.

2              When we know, you know, based on literature,

3    experimental data, all the things that they are linked

4    together and we know that they are linked together a

5    certain way under certain circumstances and we see that

6    those are fulfilled, and then we go through the

7    differential process of looking at any other possible

8    exposures that we think may or may not be ruled in or

9    out as potential causes and we have to weigh those

10   causes based on their -- you know, their proximity and

11   frequency and regularity of the other exposures to make

12   a reasoned decision.

13        Q.   Am I correct that you would have no pathology

14   slide to show them that could prove to them that

15   glyphosate caused their cancer; is that right?

16        A.   Just like a lot of other cancers and just like

17   smoking causes lung cancer, I can't show them the slide

18   and say, This is how we know.  We know because of your

19   history.

20        Q.   There would be no imaging study that you could

21   show them; am I correct, that glyphosate caused their

22   cancer?

23        A.   Right.  I'm not an imaging guy, but I don't

24   think so.

25        Q.   They had -- there are no symptoms that you

Brent Staggs, M.D.

```
 1    could tell them that are consistent with a cancer caused

 2    by glyphosate or Roundup, correct?

 3         A.   Not that I know of.

 4         Q.   Medical science, would you agree it's

 5    important to know the error rate for a particular test

 6    when you're applying it to a patient?

 7         A.   Well, generally I think I agree with that.

 8    You know, I don't know that any of us think about an

 9    error rate at the individual time we're doing the test

10    like -- but that's part of overall, you know, we try to

11    use tests that have, you know, the best sensitivity and

12    specificity that we can.  Some of them are actually not

13    that good, but it's the only test we got.

14         Q.   No medical science specific test is without

15    some error, right?

16         A.   Sure.

17         Q.   And what is the error rate in your methodology

18    for determining the cause of Mr. Sanders' non-Hodgkin's

19    lymphoma?

20         A.   Well, I don't know that I've ever heard of an

21    error rate, you know, for an individual doctor's

22    application of differential diagnosis to the individual

23    patient.  I've never seen that studied.

24         Q.   So the answer is you don't know what the error

25    rate would be, correct?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

```
 1       A.   I've never seen the study on error rate of a

 2  doctor applying a differential.

 3       Q.   So if you were to opine that Roundup caused 10

 4  different patients' non-Hodgkin's lymphoma, how many

 5  would you get right?

 6            MS. GREENWALD:  Objection.  Form.  Asked and

 7  answered.

 8       A.   Well, I wouldn't give that opinion unless I

 9  felt comfortable that that was -- that that is the

10  significant contributing factor.  You know, often in

11  these discussions, it seems like we get -- we sort of

12  mix up this -- this is the only cause versus this is the

13  significant contributing cause, which is what I'm

14  looking at.

15            So, you know, it takes multiple deleterious

16  mutations over time to cause these cancers like

17  non-Hodgkin's lymphoma.  So someone who has a large

18  exposure to a substance that we know causes or that I

19  believe causes it and many others, I think it's a main

20  stream view at this point, then we include it in their

21  causation.

22       Q.   I'll try and be more specific.  If I gave you,

23  let's say, 10 sets of medical records with Mr. Sanders'

24  exact history, five of them were exposed to Roundup and

25  five were not but you didn't know who was exposed and
```

Brent Staggs, M.D.

1   who wasn't, you couldn't tell me which ones were exposed

2   to Roundup and which were based on the records, correct?

3      A.   There's no occupational history in the

4   records?

5      Q.   Correct.

6      A.   That's a totally different question, but

7   right.  Just based on the -- it sounds like we're just

8   viewing the slides or you're just reviewing other

9   medical records.  Right.  I have to have an occupational

10   history just like -- oh, gosh, in just about every

11   occupational disease we have to have an occupational

12   history to know what the exposures were.

13         Or when I look at a liver biopsy that's

14   damaged and I believe it could be a number of medicines,

15   I have to have the list of medicines that they're --

16   could be taking it in order to determine what the damage

17   to the liver is.  So right, I have to have the

18   appropriate history in this particular case.  We've

19   talked about that.

20      Q.   So just to be clear, you would not be able to,

21   based on just the medical history, tell which patient

22   was exposed to Roundup and which was not, right?

23         MS. GREENWALD:  Objection.  Form.

24      A.   Right.  Without an occupational history, if

25   there is no mention of what he's been exposed to, then

Brent Staggs, M.D.

```
 1   right, just by looking at medical records, I can't

 2   identify a difference between a Roundup caused cancer

 3   and cancer caused by one of the other causes of

 4   non-Hodgkin's lymphoma, and the same is true of

 5   essentially any cancer.

 6        Q.   (By Mr. Kerschner)  And looking at -- if you

 7   examined those patients, there's nothing in the

 8   examination that could tell you which one was exposed to

 9   Roundup and which one was not, correct?

10        A.   Right.  It's only going to be in the history.

11        Q.   And then if you were to look at the actual

12   pathology slides, nothing in those slides could ever

13   tell you if they were exposed to Roundup or not,

14   correct?

15        A.   Correct.

16        Q.   When forming your opinion, does the type of

17   Roundup the individual used matter to you?

18        A.   You mean like the brand name?

19        Q.   Well, do the ingredients of the Roundup that

20   are being used matter?

21        A.   For me as the physician reviewing this, no.

22   You know, I'm aware there's been some discussion in some

23   literature that there may be other components that may

24   be aiding in the causing of cancer.  You know, it

25   appears to boil down to the glyphosate, because some
```

Brent Staggs, M.D.

1  studies just look at glyphosate.  Some just look at --

2  look at the entire commercial formulation of Roundup or

3  something like that.

4       So -- so I guess basically no.  I mean, I've

5  seen a variety of studies, but I'm not the expert who's

6  going to break it down into different chemical

7  components.

8     Q.   So when looking over a patient like

9  Mr. Sanders, the ingredients of the actual product he

10  used are not specifically important to you as long as

11  something in it says glyphosate; is that correct?

12       MS. GREENWALD:  Objection.  Form.

13     A.   I think so.  Right.  And just like in my

14  report, I refer to glyphosate-based herbicides, which

15  seems to be a term that kind of permeates the literature

16  to a degree.  I mean, I'm aware there's other brand

17  names that -- kind of generic Roundup, for lack of a

18  better term.  I remember that from growing up, so right.

19  I'm lumping all of those together.  I'm unable to

20  differentiate it in my position from --

21     Q.   You don't know -- sorry.

22     A.   Yeah, if one glyphosate-based herbicide has

23  something slightly different than another, I've not --

24  I've not made any distinction in that.

25     Q.   You don't know the ingredients of any

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

```
 1   particular Roundup brand, correct?

 2       A.   Well, not memorized.  I've looked at the

 3   labels before.

 4       Q.   Do you know the ingredients for the Roundup

 5   that Mr. Sanders used?

 6       A.   No, I don't have anything like that --

 7       Q.   Do you know the surfactant that was used --

 8            THE REPORTER:  Do you know what?

 9            MR. KERSCHNER:  The surfactant that was used

10   in that Roundup.

11       A.   No, sir.

12       Q.   (By Mr. Kerschner)  Do you know if there are

13   in impurities in there?

14       A.   No.

15       Q.   Do you know the percentage of which it was

16   glyphosate versus other products?

17       A.   I wouldn't know that independently.  If he

18   testified about that, I'd just rely on his testimony.

19       Q.   Do you know what percentage was water?

20       A.   No, I don't remember.  Again, he testified

21   about that.  He's using concentrate and then mixing it

22   with water predominantly, is my memory, so...

23       Q.   Does it matter for your opinions whether or

24   not Roundup made contact with an individual's skin?

25       A.   Well, I mean, yes and no.  That's one route of
```

Brent Staggs, M.D.

1    exposure that I've read about in the literature.

2    Inhalation would be the primary other route of exposure

3    as it is sprayed and aerosolized, but I don't know --

4    you know, I just assess the use and the application.

5           Certainly I recognize when they talk about

6    getting it on their skin, that seems like a -- you know,

7    a significant -- could be a significant part of the

8    exposures as we mentioned.  I've read about that, but

9    either route, but right, I don't -- I don't

10   particularly, like, rule in or rule out a case just

11   because they say they had more or less dermal exposure.

12       Q.   Does it matter how many times the Roundup came

13   in contact with their skin as opposed to when they

14   sprayed it?

15       A.   Well, that's when it usually contacts the

16   skin, when they mix it and spray it.  I guess I don't

17   understand.

18       Q.   Is it your testimony that every time someone

19   sprays Roundup, it definitely contacts their skin?

20       A.   No.

21       Q.   So then does it matter for your opinion how

22   many times it actually contacted their skin when you're

23   forming your opinion?

24       A.   Well, I look at it more about the -- it does

25   matter about my relative concept of their dose.  Of

Brent Staggs, M.D.

```
1    course, as we mentioned, I don't calculate the dose.  So

2    I read the testimony with an eye toward the proximity

3    and frequency and the regularity are the terms I like to

4    use.  So are they spraying it themselves?  Are they

5    around someone else?  Right.  Do they describe it on

6    their skin on a regular basis?

7              You made it sound like I counting up with

8    hashtags every time it touched them or something like

9    that.  So I'm looking more at regularity and frequency,

10   is it, you know, just -- is it once or twice around the

11   yard once a year or is it a commercial applicator using

12   it on a regular basis over many years.  I'm performing a

13   qualitative assessment in that way.  Not -- I don't

14   count it up somehow.

15        Q.   And do you know how many times Roundup

16   actually touched or came in contact with Mr. Sanders'

17   skin?

18        A.   Well, he didn't testify about number -- it

19   sounds like you're asking for a specific number.  Again,

20   I'm not paying attune to exact -- because he's not even

21   going to know.  He used it -- I'm looking at years of

22   exposure.  You know, in the way that he's discussing it,

23   he's talking about getting it on his skin on somewhat of

24   a regular basis, but no, I made no attempt to calculate

25   that other than to read about the fact that it was, you
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

1    know, fairly regular over many years.

2         Q.   So I'm correct in that you do not know how

3    many times Roundup actually came in contact with

4    Mr. Sanders' skin?

5         A.   Oh, I'm not even sure he knows that.  Right.

6    I read his testimony.  I'll rely on him to tell us how

7    many times, but no, I made no attempt to calculate them

8    other than to form a conceptual image of his overall

9    exposure.

10        Q.   Is there a reason you won't just answer my

11   question yes or no if you know how often he contacted

12   his skin?

13             MS. GREENWALD:  Objection.  Form.  It's very

14   argumentative.

15        A.   Well, the reason is because simple answers

16   like that are misleading.  It makes it sound like, you

17   know, no I didn't read it or things like that, to me.

18   When you ask a question that is, you know, carefully

19   worded to try to create an answer, I don't find that

20   type of answer extremely useful to this process.

21             You want to know what I'm going to say at

22   trial and I want you to know that and I want you to know

23   how I arrived at my conclusion.  So asking me about did

24   I calculate a count each time, know exactly how many

25   times, I'm telling you my concept of how I went about

Brent Staggs, M.D.

```
 1   this.  Just for me to say, no, yes, no, that seems

 2   unuseful to me.

 3        Q.   (By Mr. Kerschner)  I understand you may not

 4   think it's useful, but it's going to be a late night if

 5   you don't just answer the -- if you don't answer my

 6   questions and we can -- we have to continue the

 7   deposition if we have to if you're not going to answer

 8   the questions.

 9             Do you have any -- do you know how many times

10   Mr. Sanders specifically inhaled Roundup?

11             MS. GREENWALD:  I just want to object to the

12   preface to that question.  If you're starting in with do

13   you know how many times Mr. Sanders inhaled, that's

14   fine, but I have to object since had you a long lead-in.

15             MR. KERSCHNER:  You're allowed --

16             MS. GREENWALD:  Go ahead.

17             MR. KERSCHNER:  -- to make your objection and

18   I can reask the question.

19        Q.   (By Mr. Kerschner)  do you know specifically

20   how many times Mr. Sanders inhaled Roundup?

21        A.   I did not count how many times he said it.

22   Again, I don't expect that he knows that.  He worked

23   with it for many years.

24        Q.   Does it matter to your opinion whether or not

25   a patient showered directly after using Roundup?
```

Brent Staggs, M.D.

```
 1        A.   Well, to some degree.

 2        Q.   And did Mr. Sanders shower after using

 3   Roundup?

 4             MS. GREENWALD:  Objection.  Form.

 5        A.   Well, I would rely on his testimony.  I don't

 6   remember his specific discussion about showering or not.

 7        Q.   (By Mr. Kerschner)  Did you ask him about it

 8   when you spoke to him?

 9        A.   Well, you know, again, several of these begin

10   to run together, but I don't remember if I specifically

11   asked him showering.  Usually they offered that.  You

12   know, they would -- we talked about -- that was part of

13   what I would talk to them about is when they would get

14   it on them or breathe it, did they -- did they have

15   something available to wash or not, you know, close by,

16   but I don't remember specifically if I asked about

17   showering for him or if he offered that.

18        Q.   Did you ask him how often Roundup came in

19   contact with his skin?

20        A.   Sure.  On a -- I didn't ask him to try to give

21   me a specific number.  I didn't expect that was

22   possible, so I just asked him generally, you know, when

23   you're mixing and applying, how were you exposed?  You

24   know, did it get on your skin?  Did you -- yes.  And he

25   would say, you know, yes, when I did this, it would blow
```

Brent Staggs, M.D.

```
 1   back.

 2           You know, it's a very common theme to all of

 3   the exposures, because we're talking about an

 4   aerosolized product that they have to mix ahead of time,

 5   so yes, I asked him questions like that.  I mean, I

 6   don't have a -- I don't remember exactly the way I

 7   worded each question.

 8      Q.   Does it matter how many -- strike that.

 9           What type of -- what subtype, excuse me, of

10   non-Hodgkin's lymphoma did Mr. Sanders have?

11      A.   Well, I'm not exactly sure.  It didn't have

12   distinctive markers.  The differential consideration

13   that they had based on the protein expression was

14   marginal zone and lymphoplasmacytic lymphoma.  It could

15   be either of those.  They're both a load intermediate

16   grade lymphoma.

17      Q.   You talked earlier about part of one thing you

18   do is you would determine the specific type of cancer a

19   patient has, right?

20      A.   Right.

21      Q.   And the pathology for a certain subtype often

22   will show specific markers that will help you confirm

23   the subtype that the individual has of lymphoma, right?

24      A.   Sometimes.

25      Q.   Different mutations can cause different
```

Brent Staggs, M.D.

```
 1   subtypes of non-Hodgkin's lymphoma; is that correct?

 2        A.   Right.

 3        Q.   And once you've determined the subtype, often

 4   it can be treated differently than a different subtype,

 5   correct?

 6        A.   Yes.

 7        Q.   And some subtypes behave differently than

 8   others, right?

 9        A.   Right.

10        Q.   And it is possible to conduct a study looking

11   at only a specific subtype versus others, right?

12        A.   Sure.  You could.  I mean, it's not as -- you

13   know, just the way you're describing it, it's not just

14   like they had -- they wound up with a differential.

15   It's not always cut and dried as what the subtype is.

16   Very often we're left with B cell lymphoma, and I

17   couldn't give you a percentage, 89 percent of the time

18   we arrive pretty competently at subtype, but there's a

19   significant percentage where we're not sure what the

20   exact subtype is.

21        Q.   Right.  But if you're going to conduct a

22   scientific study, you can conduct a study on patients

23   only with a specific subtype versus others, right?

24        A.   Well, to the agree that you can -- like some

25   of them, you just can't subtype very well, so right, you
```

Brent Staggs, M.D.

1    could try to pull out ones that you were real sure of.

2        Q.   And are there any studies that you rely on

3    show specifically that glyphosate can cause the type of

4    subtype of lymphoma that you think Mr. Sanders has?

5        A.   You know, I don't know that I've -- have the

6    literature memorized in that way with the subtypes.

7    Some of them subtype.  Most of them don't.  They just --

8    you use the entire heading of non-Hodgkin's lymphoma.  I

9    would just have to look back.

10            I think some of them do mention marginals on

11   lymphoma, but they mention almost all the different

12   categories, but I don't remember if that's even what his

13   subtype is.  I mean, he could have a follicular lymphoma

14   that's just not expressing CD10 very well.  Maybe they

15   didn't do the other markers.  It's -- you know, it's --

16   that part is not terribly important for the treatment

17   process.  It's the low grade versus high grade that

18   determines the different treatment, but I don't -- I

19   don't remember the literature in that way.

20       Q.   When you spoke to Mr. Sanders, when did he

21   tell you he started using Roundup?

22       A.   Again, I don't have it all memorized.  Let's

23   see.  You know, to my memory, they all corroborated --

24   and on Mr. Sanders specifically, corroborated what I had

25   already read in his deposition testimony.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

```
 1              So as a young man, as a child really, he began

 2   working at the orchard.  Of course, Roundup was not

 3   available until sometime in the 1970s, so first used

 4   Roundup in the early 1980s.

 5       Q.   And did Mr. Sanders tell you that he wore any

 6   personal protective equipment while using Roundup?

 7       A.   I don't remember that he did.

 8       Q.   Would that impact your opinion if he did?

 9       A.   Well, I mean to some degree.  I mean,

10   certainly if you're entirely walled off from it,

11   perhaps.  You know, they -- typically they tell me what

12   kind of clothes they wore and things like that.  So, you

13   know, whether they have long-sleeved, short-sleeved

14   shirt, that doesn't play into it as much if they wear a

15   suit, then that is probably helpful.  You know, they

16   still -- some exposures that can be had depending on,

17   you know, how they describe, you know, how it got on

18   them.

19              So, you know, certainly I would expect that

20   protective gear might protect you somewhat, but I'm not

21   the expert that would decide really how much protection

22   that offers.

23       Q.   So how did you take into consideration whether

24   or not someone had protective gear when forming your

25   opinion?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

 1      A.   Well, it would matter if -- you know, if they

 2  had relatively small exposures or they said they were

 3  entirely covered up.  It depends on what type of gear to

 4  a degree.  Again, I'm not an industrial hygienist in

 5  that way.  Are they still smelling it?  Are they still

 6  getting it, you know, on their face?  You know, are they

 7  entirely in a positive pressure suit?  So it depends on

 8  little bit on the exact details.

 9          Certainly it would -- it might impact my

10  decision.  It just depends on the specifics of the

11  individual description.

12      Q.   If they were wearing a suit that prevented it

13  from getting into contact with their skin, how would

14  that impact your opinion?

15      A.   Well, it could impact.  I mean, I would assume

16  they would have somewhat of a lesser dose qualitatively

17  speaking.  They would be primarily just inhalational at

18  that point and -- right.  If there's -- if there's less

19  contact with the skin, then there's some less exposure

20  there.

21      Q.   And if they were wearing a suit that protected

22  their skin and a respiratory that protected their

23  inhalation, would you be able to make a determination

24  that glyphosate is what caused their non-Hodgkin's

25  lymphoma?

Brent Staggs, M.D.

```
 1              MS. GREENWALD:  Objection.  Form.

 2         A.   Well, I mean, if they're extremely protected,

 3    you know, probably not.  I've not read any.  You know,

 4    that's a bit outside my scope, but right.  I would -- I

 5    would need to know more maybe from another expert about

 6    are there still routes of exposure based on this

 7    particular set of circumstances.

 8         Q.   (By Mr. Kerschner)  So you're just assuming

 9    that, for example, Mr. Sanders was exposed with

10    glyphosate, correct?

11              MS. GREENWALD:  Objection.  Form.

12         A.   Well, that's right.  I'm not establishing any

13    of the facts in this case.  I assume -- you know, when

14    someone gives me history in the hospital or in this

15    setting, history through deposition or my interview with

16    him that what he's saying is true.  I mean, I base my

17    opinion on -- on what I believe, you know, he's telling

18    me here.

19              I expect the facts to be shown, you know,

20    either here or at the time of trial certainly, and let

21    the jury decide on the facts and I'll -- I may change my

22    opinion depending if the facts change somehow, or you

23    know, I'm not going to prove that he had receipts or

24    didn't have receipts, anything like that.  I don't see

25    that as my role.
```

Brent Staggs, M.D.

1      Q.   (By Mr. Kerschner)  So just to be clear, then,

2   your opinion as it stands in your report is based on

3   Mr. Sanders' spraying without any protective equipment,

4   correct?

5           MS. GREENWALD:  Objection.  Form.

6      A.   I don't remember that he had anything that I

7   thought that significantly impacts his -- you know,

8   various of them had rubber boots, or you know, a long-

9   sleeved shirt, things like that, but no, I don't

10   remember that Mr. Sanders was covered up to a great

11   degree.

12      Q.   (By Mr. Kerschner)  And that is what you used

13   to form your opinion, correct?

14      A.   I think so.  Well, again, I had -- I don't

15   have it all memorized.  I rely on his --

16      Q.   When did Mr. Sanders stop using --

17           MS. GREENWALD:  He was in the middle of

18   answering a question.  Maybe you were finished.  If you

19   were finished, I apologize.

20      A.   Well, no --

21      Q.   (By Mr. Kerschner)  I thought you were.

22   Sorry.

23      A.   -- I was just trying to read.  So we got -- so

24   he wears a -- wears a Tyvek suit and gloves starting in

25   about 2001 he says.

Brent Staggs, M.D.

1      Q.   And how does the Tyvek suit and gloves in 2001

2   impact your opinion?

3      A.   Well, he still has a good deal of exposure

4   before that, so it doesn't impact the overall exposure,

5   but I certainly understand that that lessens his

6   exposure during that time.  Now, whether he could still

7   have inhalational exposure, again, I'm going to rely on

8   his testimony.

9           You're asking me -- it's kind of a memory

10   contest.  I get that.  That happens in this setting.

11   But I base my opinions on intimate knowledge at that

12   time, and I've tried to review it for you, but so if I

13   get a fact wrong or something, feel free to let me know

14   about it, but I'm relying on what he is telling me in

15   testimony and what he told me at the time of the

16   interview, which is all summarized here.

17      Q.   And you can't -- strike that.

18           You don't know how much less glyphosate he

19   would have been exposed to after 2001 when he started

20   wearing the Tyvek suit and gloves versus before,

21   correct?

22      A.   Right.  I'm a physician.  I would expect that

23   opinion to come from some other, like a -- I don't know,

24   a hygienist, I guess, maybe.

25      Q.   Did you review any opinions of any hygienists

Brent Staggs, M.D.

1   who could have told you the answer to that question

2   before forming your opinions?

3       A.   No, sir.

4       Q.   And when did Mr. Sanders stop using glyphosate

5   or what did he tell you?

6       A.   Up until about 2014 it looks like.

7       Q.   And at some point, did he use a different form

8   of Roundup?

9       A.   You mean like a different name brand?  I don't

10  know that I have that level of detail here.  Oh, here we

11  go.  Well, he thought -- he thought a generic product of

12  Roundup was called Honcho, I believe.

13      Q.   And for Honcho, do you have any -- strike

14  that.

15           Do you know the ingredients of Honcho?

16      A.   No, sir.  Just I just know that he believed it

17  was a different form of Roundup.

18      Q.   Do you know if there's a surfactant in it?

19      A.   I don't.

20      Q.   Do you know when using Honcho what the

21  percentage of glyphosate would have been?

22      A.   No, sir.

23      Q.   Do you know the percentage of water?

24      A.   No, sir.

25      Q.   Did Mr. Sanders talk to you about mixing

Brent Staggs, M.D.

```
 1    Roundup?

 2         A.   I think so.  Right.  He had the initial

 3    application where he mixed a 200-gallon tank, went

 4    throughout the orchard, right, on his hands during

 5    mixing, blow back, yes.

 6         Q.   Did he tell you the type of sprayers he used?

 7         A.   Yes.

 8         Q.   What were they, if you know, sitting here?

 9         A.   Well, again, I'm going to rely on his

10    testimony.  Just mentioned, he had -- said he had a

11    200-gallon tank, which I think was either on the back of

12    an ATV or in the back of a pickup, which is kind of a

13    big initial spray that he did.  He talked about the

14    sprayer creating a four-foot circle of spray and talked

15    about how many containers he used.

16              Beyond that one -- oh, he used a backpack

17    sprayer sometimes but he had some back pain with that.

18    So those -- those are my -- I'm glancing over my summary

19    there.  I mean, I discussed that with him, but I don't

20    remember all the details.  I'll rely on his testimony.

21         Q.   And do you know how each different type of

22    sprayer, whether it be backpack or on the back of a cab,

23    impacts the amount of glyphosate that Mr. Sanders would

24    have come into contact with while he was spraying the

25    product?
```

Brent Staggs, M.D.

```
 1              MS. GREENWALD:  Objection.  Form.

 2         A.   Well, yes and no.  I mean, you spray -- the

 3    duration of it is one thing and the amount that you're

 4    spraying.  So when he's spraying hundreds of gallons at

 5    a time, it's my impression that is more exposure than if

 6    you're just going to mix and spray a backpack at a time,

 7    although, you know, there's other factors that go into

 8    that.  But, again, I'm not -- I'm going off his

 9    description of exposures.  I'm not trying to

10    calculate -- I mean, I'm unable to.  That's not

11    something I do.  That's a different expert that would

12    calculate a dose.

13         Q.   Did you ask anyone about the different

14    exposures based on the different types of sprayer before

15    forming your opinions in this case?

16              MS. GREENWALD:  Objection.  Form.

17         A.   No.

18         Q.   (By Mr. Kerschner)  When did -- in your

19    opinion did Roundup cause Mr. Sanders' lymphoma?

20         A.   Well, his lymphoma was diagnosed in May of

21    2014, so that's when it came to clinical.

22         Q.   Right, but --

23         A.   Like --

24         Q.   -- you would agree with me that at some point

25    before then, he began to develop mutations which led to
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

```
 1    his lymphoma, correct?

 2         A.   Right.

 3         Q.   And when did that happen?

 4         A.   Well, it's beyond medical science to know

 5    that.  It's an accumulation of mutations, so that

 6    happens over typically a fairly long period of time.

 7    All the mutations don't just pop up in a day or week or

 8    month, so to speak.  So the mutations were beginning to

 9    be caused, you know, over the period of time while he's

10    using the product, but it's impossible to know, you

11    know, which mutations occurred at which time.

12         Q.   And can you say to a reasonable degree of

13    medical certainty that the initial mutation was caused

14    by Roundup?

15         A.   The initial --

16         Q.   Yes.

17         A.   -- mutation?  No, I don't know which mutations

18    were caused by -- by which exposure and things like

19    that.  That's beyond medical science at this point.

20         Q.   Do you know what specific mutations that

21    Roundup caused in Mr. Sanders that led to his cancer?

22         A.   Right.  It's the same answer.

23         Q.   And that's no?

24         A.   Right.  That's beyond medical science to know.

25    No one knows.
```

Brent Staggs, M.D.

```
 1        Q.   Do you have any -- strike that.

 2             At the time you formed your opinions in this

 3   case, did you have any measurements of Mr. Sanders'

 4   glyphosate levels?

 5        A.   No.

 6        Q.   At any point in time, did you have

 7   measurements of Mr. Sanders' glyphosate levels?

 8        A.   No, sir.

 9        Q.   If you go to -- again, back to your report on

10   page 12 and towards the bottom probably about six or

11   seven -- seven lines up, you say he testified about also

12   using a variety of other chemicals.  Do you see that?

13        A.   Right.

14        Q.   And you said, "He testified about also using a

15   variety of other chemicals for different pests,

16   including Tender, Saminilla, miscible oil, Seven and

17   DelNav."

18             Did I read that right?

19        A.   Right.

20        Q.   And -- and then you say, "He testified most of

21   these chemicals were mixed and sprayed in a similar

22   fashion to Roundup," correct?

23        A.   Right.

24        Q.   And then on the next page at the very bottom,

25   after the little number 2, you say, "I evaluated his
```

Brent Staggs, M.D.

```
 1   risk factors for NHL and find primarily extensive

 2   exposure to GBHs along with exposure to other

 3   pesticides, but with much less frequency and regularity

 4   than GBHs."

 5           Do you see that statement there?

 6      A.   Right.

 7      Q.   And when you reference other pesticides in

 8   that statement, are you talking about the pesticide

 9   exposure you reference on page 12 of your report?

10      A.   Right.

11      Q.   Are there any others?

12      A.   Well, there could.  I mean, there certainly

13   could have been, but I tried to summarize what he --

14   what we talked about and what was in his testimony.  If

15   I missed one -- my memory is they were all in one

16   cohesive section there and I tried to talk to him about

17   those.  I don't remember another one, but you know, if

18   there's another one there I didn't mention, then I would

19   rely on his testimony for that.

20      Q.   So what is Tender?

21      A.   Oh, I don't remember specifically.  I tried to

22   look them all up as best I could as a physician to see

23   if they have a relationship to non-Hodgkin's lymphoma,

24   see, you know, kind of the general characteristics of

25   them, but I don't remember specifically the chemical
```

Brent Staggs, M.D.

1    name or anything like that.

2        Q.   And do you know when Mr. Sanders used Tender?

3        A.   My memory is he didn't have a specific time

4    range on these.  You know, I asked him -- he had that in

5    his testimony about using these others much less than he

6    used the Roundup for various specific applications at

7    various times, but again, I rely on his testimony.  My

8    impression was they were used much less frequently than

9    Roundup was, but no, I don't remember that he described

10   exactly when he used it.

11       Q.   And what did you look at to determine that

12   Tender does not -- could not be the cause of

13   Mr. Sanders' non-Hodgkin's lymphoma?

14       A.   Well, I tried to perform a literature search,

15   primarily looked for the trait, the chemical name and

16   then searched IARC database to see if they have

17   mentioned it anywhere or if I got any literature on

18   PubMed to identify a risk of cancers or non-Hodgkin's

19   lymphoma either one for each of these that I could come

20   across.

21       Q.   Are any papers or on your materials considered

22   list addressing whether or not Tender causes

23   non-Hodgkin's lymphoma?

24       A.   No.

25       Q.   What is Saminilla?

```
 1        A.   Well, it's going to be the same answer for all

 2   of them.  I tried -- I don't remember specifically what

 3   they're all -- whether they're insecticides or

 4   herbicides, as I sit here.

 5        Q.   And do you know the ingredients of any of the

 6   pesticides or that you reference on page 12?

 7        A.   Well, not by memory.  I looked them up at the

 8   time, because typically, in order to get information

 9   like that from IARC, they don't usually have the trade

10   names on there.  So I had the generic names.  Sounds

11   like I'm talking about medicines, but the chemical name

12   is what I would have.

13             So I would have to first search the trade name

14   and find the chemical name and then go to IARC to see if

15   they have anything about it.  Some of them they did.

16   Some of them they didn't.  I don't remember that they

17   really had much specific on these, you know, especially

18   in the way of non-Hodgkin's lymphoma.

19        Q.   Other than IARC, did you look at any other

20   sources to determine whether or not these products had

21   been associated with non-Hodgkin's lymphoma?

22        A.   PubMed.

23        Q.   And for any of them are there papers on your

24   MCL that address whether or not these specific chemicals

25   can cause non-Hodgkin's lymphoma?
```

Brent Staggs, M.D.

```
 1      A.   You know, no.  The short answer is no for all

 2  of them.  The -- you know, there wasn't a lot out there

 3  about the -- we'll get to some other clients that had

 4  some things that had more papers written about them.

 5  For the most part, none of these had a whole lot of

 6  information on them in the medical literature.

 7      Q.   Are you aware that DelNav is an

 8  organophosphate?

 9      A.   Well, that sounds familiar.  Several of them

10  are I think.  Insecticides are organophosphates.

11      Q.   And you would agree that organophosphates have

12  been found to be statistically significant to increase

13  the risks non-Hodgkin's lymphoma?

14           MS. GREENWALD:  Objection.  Form.

15      A.   I didn't come across that.

16      Q.   (By Mr. Kerschner)  I'm going to mark Exhibit

17  10.

18           (Deposition Exhibit No. 10 was marked for

19  identification and made part of the record.)

20      Q.   (By Mr. Kerschner)  Exhibit 10 is a 2001 study

21  by McDuffie, correct?

22      A.   Yes.

23      Q.   And you've seen this before, right?

24      A.   Yes.

25      Q.   And you rely on it, correct?
```

Brent Staggs, M.D.

1      A.   I think so.

2      Q.   If you look on the bottom of page 1158.

3      A.   Okay.

4      Q.   I can give you a better direction in one

5  second.  The last paragraph beginning with table 3.

6      A.   Uh-huh.

7      Q.   And it says, "Exposure to two major chemical

8  classes, carbamates and organophosphates, was

9  statistically significantly associated with NHL."

10     A.   Okay.

11     Q.   Do you see that?

12     A.   Yes.

13     Q.   And then if you look at the next page, which

14  is table 3, in fact, organophosphates in both analyses

15  were statistically significantly associated with

16  non-Hodgkin's lymphoma, correct?

17     A.   Well, that's right.  And now -- well, I guess

18  I'm not sure.  Maybe I -- I don't know.  I certainly

19  looked at malathion and diazinon at different times, but

20  yeah, I don't remember.  Maybe I missed that that was

21  the same.  Maybe I got confused by a specific chemical

22  name or something like that, but yeah, that's right.

23     Q.   So seeing this now, is it -- am I correct that

24  you are -- strike that.

25          You can't -- sitting here right now seeing

Brent Staggs, M.D.

1    this paper, you can't rule out DelNav as a potential

2    cause of Mr. Sanders' non-Hodgkin's lymphoma; is that

3    right?

4              MS. GREENWALD:  Objection.  Form.

5         A.   Well, I would have to look and -- and

6    corroborate what you're telling me as far as what it

7    actually is, you know, the generic or the chemical name.

8    And then -- then right.  Then I would have to go back

9    and look.

10             So there are two things at play.  Number one,

11   is it even a potential cause, and then number two, we're

12   looking at all of his exposures as a whole, his

13   cumulative exposure to everything that could potentially

14   cause non-Hodgkin's lymphoma.  So then I have to make an

15   assessment is it significant in his case.  It's not just

16   significant because it's there.  It would be significant

17   if it's a significant part of his overall exposure.

18             So I would have to dig a little deeper.  Did

19   he just spry it once?  Is it just a couple of times?

20   But it becomes a potential, you know, based on what

21   you're showing me.  Yeah, I remember those.  For some

22   reason maybe I just didn't pick up on it, but so it

23   would be something I would have to look at to be part of

24   the cause.  It doesn't somehow negate any other

25   significant causes that are there, but it could be a

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

1   part of the cause.

2       Q.   And that procedure you just described is not

3   something you did when you formed your opinions in this

4   case, right?

5           MS. GREENWALD:  Objection.  Form.

6       A.   That's right.  The chemical name or the class,

7   for whatever reason, I didn't -- I don't remember

8   picking up on that.

9       Q.   (By Mr. Kerschner)  And while we're on that

10  same table, it also shows --

11      A.   Oh.

12      Q.   Sorry if you put it away -- also shows a

13  statistically significant increase risk for

14  non-Hodgkin's lymphoma with carbamates, right?

15      A.   Where are they?

16      Q.   Oh, if you go to the --

17      A.   Oh, at the top.

18      Q.   -- paragraph -- yeah, sorry.

19      A.   Okay.  Yes.

20      Q.   And, again, you didn't -- did you do any

21  analysis to determine whether or not Mr. Sanders was

22  exposed to any carbamates?

23      A.   Yes, one of these is carbaryl.  I don't

24  remember which one.  You know, I did the PubMed on that

25  and it didn't come up here.  I had it in my own database

Brent Staggs, M.D.

1    the whole time.  I just remember that name, but I don't

2    remember which one of these trade names.

3         Q.   So is it fair to say you did not analyze

4    whichever product is a carbamate whether or not it

5    specifically caused Mr. Sanders' non-Hodgkin's lymphoma

6    when you formed your opinions?

7              MS. GREENWALD:  Objection.  Form.

8         A.   Well, I tried to analyze it, but I didn't come

9    up with -- for whatever reason, this didn't come up when

10   I searched that carbaryl generic name on PubMed or on

11   the IARC.  I didn't come up with this information.

12   That's right.

13        Q.   (By Mr. Kerschner)  Did you look at whether or

14   not -- actually, strike that.

15             Other than what Mr. Sanders told you on the

16   phone, did you look at whether or not Mr. Sanders has

17   any other chemicals that he's currently using or that

18   are stored in his home?

19        A.   Well, I asked him about household use, things

20   like that, yes.  I don't remember that we came up with

21   anything, anything different.  I mean --

22        Q.   Did he mention paraquat to you?

23        A.   What?

24        Q.   The chemical paraquat, P-A-R-A-Q-U-A-T?

25        A.   I don't remember that.  That's a pretty

Brent Staggs, M.D.

```
 1   distinctive sounding word, and if he said it, I missed

 2   it, but it may be in his deposition.  I would rely on

 3   his testimony.

 4        Q.   You didn't do any research specifically on

 5   that product, correct?

 6        A.   Not that I remember.

 7        Q.   What about dicamba, D-I-C-A-M-B-A?

 8        A.   I've looked at that, but I don't remember that

 9   it was in this case.

10        Q.   And what about lorsban, L-O-R-S-B-A-N?

11        A.   That's the one -- I think that's carbaryl I

12   think.  I did look at that, but I -- you know, I mean,

13   it -- I'd just have to, you know, refer back and -- and

14   look to see all the different chemical names.  Right.  I

15   considered -- tried to consider whether they were --

16   could be a cause and then also based on his testimony

17   whether they could be a significant cause based on their

18   frequency and regularities.

19        Q.   So just to be clear, did you consider exposure

20   to lorsban when you formed your opinions?

21        A.   I think so.  I looked up lorsban at least for

22   a couple of these clients, and you know, I just don't

23   have a memory of -- I mean, it could be one of these

24   other.  It could be one of these, but I think it's

25   carbaryl.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Brent Staggs, M.D.

```
1       Q.   You didn't mention lorsban in your report?

2       A.   Right.

3       Q.   Is there a reason you didn't mention it in

4   your report?

5       A.   No, not in particular.  If it's there, then it

6   was just an oversight as far as my list of --

7       Q.   Do you have any recollection of -- of taking

8   into consideration Mr. Sanders' specific lorsban

9   exposure when forming your opinions in this case?

10      A.   I do happen to remember looking at that this

11  weekend, but it's not in my report, yeah.

12      Q.   Was it specific to Mr. Sanders?

13      A.   That's right.

14      Q.   When you looked at it, it was specific to

15  Mr. Sanders?

16      A.   Right.

17      Q.   And since it's not in your report, has your

18  research on lorsban impacted your opinions in this --

19  that you are attempting to give in this case?

20      A.   No.

21      Q.   And what specifically did you look at about

22  lorsban?

23      A.   Well, the same thing.  I tried to see whether

24  or not it was associated with any, you know, literature

25  that indicated that it could cause non-Hodgkin's
```

Brent Staggs, M.D.

```
 1   lymphoma.  And then, you know, I tried to assess, based

 2   on his description of how often he used it, of whether

 3   it could be significant based on the proximity,

 4   frequency and regularity.

 5       Q.   And you said you tried to assess based on his

 6   description of how often he used it.  What did he tell

 7   you?

 8       A.   Well, he lumped these all in a similar

 9   category, which was he used, you know the miscible oil

10   and the others, you know, he would use them from time to

11   time.  Again, I rely on his testimony for that, but

12   that, you know, as I mentioned there, I asked him

13   typically about if they're granular or not, you know,

14   for each one and he would tell me yes or no.  And he

15   indicated I think for all of these, they were mixed

16   and -- and applied in a similar fashion like with a

17   sprayer.  And, you know, my memory is, is that he said,

18   you know, in his testimony and to me that, you know,

19   some of these -- the insecticides were used very little.

20   The other herbicides were used sparingly, especially

21   when Roundup was available.

22       Q.   Right.  But specifically this past weekend

23   when you did this assessment based on his description,

24   what was the description that you were relying on from

25   Mr. Sanders?
```

Brent Staggs, M.D.

```
 1              MS. GREENWALD:  Objection.  Form.

 2         A.   I don't have -- I don't remember specifically.

 3    I'd refer to his testimony.  I've got a lot of facts in

 4    my head.  We can look at it if we need to.  You want me

 5    to try to look it up?

 6         Q.   (By Mr. Kerschner)  But I'm just -- we can get

 7    to his testimony in a few minutes.  When you looked at

 8    it this weekend, you don't -- you don't remember

 9    specifically how much lorsban you thought he applied

10    when he was looking at what he -- strike that.

11              Other than what's in his testimony, you

12    have -- he didn't tell you anything about his lorsban

13    use separate from what he testified to?

14         A.   No, he's very -- he was very consistent with

15    his deposition testimony.  I don't remember anything

16    different.

17         Q.   Are there any other exposures or chemicals

18    that went into your considerations when forming your

19    opinions that we didn't just talk about?

20         A.   Well, not that I remember.  Again, I tried to,

21    you know, go through the deposition and may not have --

22    you know, I wasn't trying to rewrite the deposition here

23    in my report, but I tried to go through the other things

24    that he talked about and I don't remember that there was

25    anything else that I considered.
```

Brent Staggs, M.D.

1      Q.   You actually have experience being on a farm,

2   right?

3      A.   Oh, yes.

4      Q.   You used Roundup?

5      A.   Oh, yes.

6      Q.   On a family farm; is that right?

7      A.   That's right, yeah.

8      Q.   When was the last time you used Roundup?

9      A.   Well, my wife hadn't let me use it in a

10   long -- quite awhile.  Probably, myself, you know, going

11   on 10 years, I would say.

12      Q.   And was that -- were you using it in farming

13   or for garden, personal garden?

14      A.   Oh, well, both.  I mean, we -- I haven't done

15   any of the commercial work on the farm since -- since

16   I -- you know, probably been back in residency or

17   something like that.  Growing up, I worked around

18   tractors and worked on the farm a lot, but -- and

19   applied Roundup, mixed it and all that stuff.  But you

20   know, I've probably sprayed some fence lines and done

21   some things like that maybe 10 or 12 years ago, but my

22   wife is big into the organic movement and all that

23   stuff, so we don't -- I'm not allowed any more.

24      Q.   When you used Roundup, did it work?

25           MS. GREENWALD:  Objection.  Form.

Brent Staggs, M.D.

```
 1      A.   It typically worked pretty well right on

 2  broadleaf weeds.

 3      Q.   (By Mr. Kerschner)  Generally you didn't need

 4  to spray the same area with Roundup every week, right?

 5           MS. GREENWALD:  Objection.  Form.

 6      A.   Oh, well -- well, yes and no.  I mean, the

 7  weeds would grow pretty fast, so not -- the same weed

 8  doesn't come up, but different ones often do.  So it

 9  just depends on how neat and clean you want it to be.  I

10  mean, on the farm, we're just trying to beat down the --

11  so it would usually be very similar to what these men

12  described -- well, not necessarily Mr. Sanders, but the

13  other farmers.

14           You know -- you know, a couple of times a

15  year, just trying to keep it beat back, so fence rows,

16  around the barn, where you park the tractors, and all

17  that sort of thing, and then of course, the fields were

18  sprayed as well, but yeah, I mean it's surprising, you

19  know, how -- how quickly they come back.  I mean, when

20  you're spraying it again a couple months later, you've

21  got a lot of weeds back again.

22           So, you know, there would be some places

23  around the -- around the house, you know, my

24  grandfather, grandmother would want them, you know,

25  quite clean and so we would spray them, you know,
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

1    probably weekly nearly on those areas.

2        Q.    (By Mr. Kerschner)  And you said you sprayed

3    it in the fields, correct?

4        A.    Right.

5        Q.    That was to help the other crops?

6        A.    Well, right.  You've got to get rid of weeds,

7    either use a herbicide or you're out there with a hoe in

8    your hand trying to -- because the weeds will squelch

9    out your crops if you're not careful.

10       Q.    And the use of Roundup helped increase your

11   farm's output, right?

12       A.    I would -- probably so.  I mean, the

13   efficiency more than anything.  I don't -- I wouldn't

14   remember if it -- by output, do you mean like, you know,

15   how many bails of cotton we could have per acre or

16   something, I'm not sure.  It certainly made it easier to

17   get rid of the weeds.

18       Q.    And would you agree that not having Roundup

19   would decrease your farm's output?

20       A.    Well, again, I've never really thought about

21   that.  Certainly increased the efficiency of the

22   operation, but I don't know about the actual -- we

23   farmed the same number of acres either way, before

24   Roundup, after Roundup.  You know, before Roundup, ready

25   seeds and after, but I don't know if it -- it probably

Brent Staggs, M.D.

 1  decreases the workload a little bit, but I don't know

 2  about the output.

 3      Q.   So is it true, then, it lowers your costs if

 4  it's decreasing the workload?

 5      A.   That's hard to say too.  You're buying it, but

 6  you know, I assume that we factored all that in.  My

 7  grandfather took care of all the business side of that.

 8  He just put me to work.  So I would assume so, right.

 9  We were using it for some reason.  You don't want weeds

10  growing up and we can't be out there, you know, hoeing

11  weeds by hand and we have to use herbicides of some type

12  and Roundup was the most common one that I remember

13  especially growing up.  But I'm not sure why the --

14  about all of the finances of it.

15      Q.   And when on a farm, I think you've testified

16  about this before, it's possible you can be exposed to

17  chemicals or agents that are used on a neighboring

18  property, right?

19          MS. GREENWALD:  Objection.  Form.

20      A.   Oh, sure, especially with crop dusters and

21  things like -- you get blow off from, you know, tractor.

22  I mean, you're -- some of those, they're spraying, you

23  know, 20 rows at a time.  And the only thing separating

24  your farm from another farm is either a dirt road or a

25  turn row or something like that, levy.

Brent Staggs, M.D.

```
1        Q.    (By Mr. Kerschner)  Did you ask Mr. Sanders if

2   he was exposed to any agents from neighboring

3   properties?

4        A.    I asked some of the other -- he's on a citrus

5   farm, so I -- you know, I don't know that I thought

6   about that.  The way he described it is kind of an

7   isolated area where the citrus farm was.  I didn't -- I

8   don't know that we discussed that like I did with some

9   of the others who were row cropping when I think about

10  it more commonly, so I'm not sure about that.

11       Q.    Did you rule out to a reasonable degree of

12  medical certainty the impact of other potential

13  chemicals from other properties that you don't know --

14  that you don't know about necessarily?

15            MS. GREENWALD:  Objection.  Form.

16       A.    Rule out things that I don't know about?

17  Well, yeah, I mean, I can only deal with what I know

18  with the information that I'm given.  It's always

19  possible there's other facts that could come from you at

20  this time or at trial and it might change my opinions in

21  some way.  So, no, I haven't tried to rule out what I

22  don't know.

23            MS. GREENWALD:  David, when you have a

24  breaking --

25            MR. KERSCHNER:  Yeah, yeah.
```

Brent Staggs, M.D.

```
 1           MS. GREENWALD:  -- it doesn't have to be right

 2    this second,  but we've been going almost two hours.

 3    Just need to stretch our legs out.

 4           MR. KERSCHNER:  Yeah, fine.  We can take a

 5    break now.

 6           MS. GREENWALD:  Okay.

 7           THE VIDEOGRAPHER:  We are off the record at

 8    6:33 p.m.

 9           (A recess was taken from 6:33 p.m. to

10    6:47 p.m.)

11           THE VIDEOGRAPHER:  We are back on the record

12    at 6:47 p.m.

13       Q.  (By Mr. Kerschner)  When you were first

14    deposed I think in April 2018, you were shown several

15    regulatory agency reports.  Do you recall that?

16       A.  Uh-huh, not really.  I mean, I've seen

17    regulatory agency reports.  I don't remember

18    specifically in that deposition, but I'll believe you.

19       Q.  And in your last deposition that was in July,

20    you indicated that -- that since your deposition, you

21    had reviewed -- you had gone back and read those

22    reports.  Do you remember doing that?

23       A.  No, I don't.

24       Q.  And one of the reports that you were asked

25    about was Health Canada's 2017 reevaluation decision on
```

Brent Staggs, M.D.

1    glyphosate.  Do you remember that?

2        A.   I remember that report.  I don't remember

3    looking at it this year, but I may have.  I remember

4    more in July than I remember now probably.

5        Q.   Are you aware that Health Canada has since --

6    after it published its evaluation, the agency received

7    public objections and that prompted a second independent

8    re-review of the scientific evidence regarding

9    glyphosate's carcinogenicity?

10           MS. GREENWALD:  Objection.  Form.

11       A.   I don't remember that.

12       Q.   (By Mr. Kerschner)  So it's fair to say you

13   did not review Health Canada's 2019 reanalysis?

14           MS. GREENWALD:  Objection.  Form.

15       A.   Not that I remember.  I may have.  I remember

16   Health Canada, but I don't know if it was one or two.

17   As I sit here, I don't -- just don't remember.

18       Q.   (By Mr. Kerschner)  I'll mark Exhibit 11.

19           (Deposition Exhibit No. 11 was marked for

20   identification and made part of the record.)

21       Q.   (By Mr. Kerschner)  And it is front and back.

22       A.   Okay.

23       Q.   Do you recall reviewing the statement -- 2019

24   statement from Health Canada?

25       A.   I'm not -- no, not off the top of my head.

Brent Staggs, M.D.

```
 1        Q.   Can you -- if you go to the -- I think it's

 2   the sixth paragraph.  Give me one second.  The bottom of

 3   the page, it begins with "our scientists."  Are you with

 4   me?  Bottom of the first page?

 5        A.   Yes.

 6        Q.   Can you go ahead and read that aloud?

 7        A.   "Our scientists left no stone unturned in

 8   conducting this review.  They had access to all relevant

 9   data and information from federal and provincial

10   governments, international regulatory agencies,

11   published scientific reports and multiple pesticide

12   manufacturers.  This includes the reviews referred to in

13   the Monsanto Papers.  Health Canada also had access to

14   numerous individual studies and raw scientific data

15   during its assessment of glyphosate, including

16   additional cancer and genotoxicity studies."

17             Still going?

18        Q.   Yes, please.

19        A.   Okay.  "To help ensure an unbiased assessment

20   of the information, Health Canada selected a group of 20

21   of its own scientists who were not involved in the 2017

22   re-evaluation to evaluate the notices of objection."

23        Q.   And you don't have any reason to disagree with

24   what Health Canada said there, right?

25             MS. GREENWALD:  Objection.  Form.
```

Brent Staggs, M.D.

```
 1        A.   I mean, that's their process.  I'm not on

 2   their board or anything.

 3        Q.   (By Mr. Kerschner)  And do you Happen to know

 4   the expertise of the 20 scientists they reference there?

 5        A.   No.

 6        Q.   You agree that when conducting a scientific

 7   assessment for carcinogenicity, it's commendable that --

 8   that Health Canada scientists left no stone unturned,

 9   right?

10             MS. GREENWALD:  Objection.  Form.

11        A.   Commendable?  I mean, I don't know.  Sure.

12   I'm not really in a position to decide whether they're

13   commendable or not.  I don't -- I don't know if they

14   have conflicts or anything like that.  This is just one

15   piece of paper.

16        Q.   (By Mr. Kerschner)  Are you -- did you leave

17   no stone unturned?

18             MS. GREENWALD:  Objection.  Form.

19        A.   Sure.  I tried to, but you know, I'm a

20   physician.  I'm not a regulatory agency.  I have a day

21   job and work 10 hours a day in a hospital and asked to

22   look at this case, you know, among, you know, many

23   others here about, you know, these exposures, you know,

24   specifically.  So, right, I tried to satisfy myself by

25   leaving no stone unturned and talking to the patients
```

Brent Staggs, M.D.

```
 1    and things like that, but they're coming from a

 2    different perspective.

 3         Q.   (By Mr. Kerschner)  What perspective is that?

 4         A.   Well, they're a regulatory agency.  They have

 5    seemingly hundreds of man hours it sounds like that I

 6    don't have and resources and things like that.  I'm not

 7    a one-man regulatory agency.

 8         Q.   You didn't have a team of 20 independent

 9    scientists to help you?

10         A.   Right, or budget or anything.

11         Q.   And if you look, I think, two paragraphs

12    above, those 20 scientists concluded that, "the concerns

13    raised by the objectors could not be scientifically

14    supported when considering the entire body of relevant

15    data."  Are you with me?

16         A.   Yes.

17         Q.   And they also said that, "The objections

18    raised did not create doubt or concern regarding the

19    scientific basis for the 2017 re-evaluation decision for

20    glyphosate.  Therefore, the Department's final decision

21    will stand."

22              Do you see that?

23         A.   I see it.

24         Q.   And do you recall what the department's 2017

25    decision was?
```

Brent Staggs, M.D.

```
 1        A.    I don't.

 2        Q.    And did you go back and review that 2017

 3  decision before you formed your opinions in this case?

 4        A.    No.

 5        Q.    And at your deposition in July, you were also

 6  shown the U.S. EPA's 2019 review.  Do you recall that?

 7        A.    I remember some of that, right.

 8        Q.    In your deposition, you said you had not tried

 9  to access all the studies that the EPA reviewed.  Do you

10  remember that?

11        A.    That's right.  As we discussed it there, you

12  know, the contention was should I have filed a Freedom

13  of Information Act to try to get all their studies.  I

14  wouldn't even know where to start to begin on that sort

15  of thing, so no, I have not -- I have not -- they're

16  not -- at least in my knowledge, not readily available

17  to me so if I have to get them that way, I'm not sure if

18  I'm enable.  I don't even know if they release them.

19        Q.    So just to be clear, you haven't done -- gone

20  and filed a Freedom of Information Act requesting that

21  information, right?

22        A.    I have not.

23             MS. GREENWALD:  Objection.  Asked and

24  answered.

25        Q.    (By Mr. Kerschner)  Have you asked the lawyers
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

1    that you're working with to do it for you?

2        A.    I've asked them to give me everything that

3    they have and I've received that.  No, I don't know that

4    I specifically said file a FOI for the EPA.

5        Q.    And then subsequent to that deposition in

6    August 8th, the EPA issued a news release reiterating

7    its scientific decision that glyphosate is

8    non-carcinogenic, right?

9        A.    I don't know.

10       Q.    Just to back up quickly, if Health Canada

11   initial reporting that they reaffirmed in the 2019 paper

12   was that glyphosate is unlikely to pose human cancer

13   risks, you would disagree with that finding, correct?

14       A.    Yes, I think so.  Again, I'm not in this

15   setting trying to discuss general causation, but it's

16   my -- it's my belief from reviewing the literature

17   that -- that it can cause non-Hodgkin's lymphoma.

18            I should point out too, I guess I'm not

19   aware -- you reminded me on the EPA discussion from

20   previous, you know, this -- there's a difference

21   between -- and I don't know what they're discussing here

22   between glyphosate and food residue, and you know,

23   commercial applicators or exposure or things like that.

24   I'm not -- I don't know if that's what they're talking

25   about or not.  I just don't remember, but we got into

Brent Staggs, M.D.

1    that when we discussed the EPA.  A large part of their

2    discussion at least at some point was just about food

3    residue.

4         Q.   I'm going to mark what I think we're up to 12.

5              (Deposition Exhibit No. 12 was marked for

6    identification and made part of the record.)

7         Q.   (By Mr. Kerschner)  And this is the EPA's

8    August 2019 news release.  Have you seen this before?

9         A.   No, I don't think so.

10        Q.   And then if you go down to the bottom of the

11   first page, the EPA found -- strike that.

12             If you go down to the bottom of the first

13   page, it says, "EPA found - as it has before - that

14   glyphosate is not a carcinogen and there are no risks to

15   public health when glyphosate is used in accordance with

16   its current label."

17             Did I read that correctly?

18        A.   Yes.

19        Q.   Do you agree with the statement from the EPA?

20        A.   Well, no, not -- not on a whole.  Again, it

21   depends a bit on whether they're talking about what's

22   left over in food as a consumer.  It kind of sounded

23   like that up at --up higher when they're talking about a

24   consumer versus when we're actually spraying it.  But --

25   but no, at this point, it's my belief that glyphosate is

Brent Staggs, M.D.

1    a carcinogen.

2        Q.   So you're saying that the EPA scientists and

3    the Health Canada scientists that we just talked about

4    momentarily are wrong and that you know better than they

5    do about glyphosate and non-Hodgkin's lymphoma?

6        A.   Certainly I'm not the EPA.  They have

7    resources I don't have, but IARC found a different

8    finding as well.  And I'm also aware that EPA is a

9    regulatory agency and not just based on health, so they

10   have to find that -- I don't know what their -- you

11   know, what they're looking at as far as the risks.

12            I mean, I'm familiar with that somewhat with

13   OSHA from other litigation I've testified in and they

14   accept a very high level of risk before they, you know,

15   label something as, you know, significant or a

16   carcinogen and things like that.  So I don't know what

17   their definitions are, but yes, I would tend to trust

18   IARC over the EPA.

19       Q.   I didn't ask you about IARC.  I asked you if

20   you think that the -- both the EPA and Health Canada got

21   it wrong and that you got it right?

22            MS. GREENWALD:  Objection.  Asked and

23   answered.

24       A.   Well, again, you're isolating me like I'm the

25   only one making these decisions, but yes, it's my belief

Brent Staggs, M.D.

1    based on my reading that I fall in line with IARC that

2    it is definitely a carcinogen.

3        Q.   (By Mr. Kerschner)  And, therefore, it is your

4    belief that both the EPA and Health Canada in their

5    re-reviews got it wrong, right?

6            MS. GREENWALD:  Objection.  Asked and answered

7    twice.

8        A.   Well, I've described to you that I'm not sure

9    what their, you know, methodologies are.  These are

10   statements pulled out in a press release.  So I don't

11   know if these are risk assessments with a certain risk

12   in mind, things like that, because they have to strike a

13   compromise between industry and health effects, things

14   like that.  I know that.  They're different than IARC in

15   that assessment.

16           So but to the extent that they think

17   absolutely it's not a carcinogen, if that's what they

18   think, I don't know if they mean that at a certain

19   amount in food residue, you know, from this particular

20   document, then yes, I think that would be incorrect.

21       Q.   (By Mr. Kerschner)  So when they say that

22   glyphosate is not a carcinogen and there are no risks to

23   public health, you don't necessarily disagree with that

24   statement?

25           MS. GREENWALD:  Objection.  Form.

Brent Staggs, M.D.

1    Mischaracterizes testimony.

2        A.   I think it is a carcinogen, but when they say

3    not a risk to public health, I don't know what they

4    mean.  In what way?  Are they talking about food

5    residue?  Are they talking about people that spray

6    hundreds of gallons a year, like many of our patients

7    here have?  So it may not be.  I haven't really looked

8    at it in the context of food residue.  It may not pose a

9    threat at that level.

10            So I would have to know the context in which

11   they're discussing that, and then also when they say

12   it's -- it's not a threat to public health, they have a

13   certain threshold in mind of how many -- I'm aware, I've

14   seen tables from OSHA and EPA.  The OSHA tables I saw

15   they -- they consider it's not a significant risk until

16   over one in a thousand people die from whatever the

17   substance is.  Well, that's -- that's much too high of a

18   risk for me, one in a thousand, and that's their current

19   cutoff to my knowledge.  So I don't know if they're

20   coming from that type of a perspective or not.

21       Q.   (By Mr. Kerschner)  And do you have any

22   understanding as to what, if any, cutoffs the EPA uses?

23       A.   I just said I don't know exactly what -- but

24   I'm aware that they are that -- they use rationale like

25   that because they're not just an overriding health

Brent Staggs, M.D.

1   organization like IARC.  They are -- they are having to

2   weigh industry needs versus public health.  So they have

3   to create those thresholds, but I don't know if they're

4   discussing that in this particular document.

5        Q.   And if it is, in fact, that they are talking

6   about spraying and whether or not spraying is a public

7   health and whether or not spraying glyphosate is a

8   carcinogen, you think they got it wrong when they say

9   that it is, in fact, not a carcinogen when it is

10  sprayed, right?

11       A.   Correct.

12       Q.   And same with Health Canada, right?

13       A.   Correct.

14       Q.   On your report back on page 8, there's a

15  statement where you said you have reviewed the

16  conclusions of the regulatory industries like the United

17  States EPA who identify no increased risk of NHL with

18  GBHs use, correct?

19       A.   Right.

20       Q.   And you disagree with them, correct?

21            MS. GREENWALD:  Objection.  Asked and

22  answered.

23       A.   Well, that's right.  And that's -- and that's

24  a good point that you brought that up.  So there in my

25  references, what I reference there is a paper that

Brent Staggs, M.D.

1    discussed.  That's a big part of my knowledge base about

2    how they arrived at a different conclusion and part of

3    the reason why I will disagree, and I've mentioned a lot

4    of those things here.  I just forgot to say that that

5    paper is a description of how that goes.

6         Q.   (By Mr. Kerschner)  And then you say you've

7    reviewed literature detail on the differences between

8    the decisions and processes used to make their

9    conclusions, you're referring to one paper, right?

10        A.   Correct.

11        Q.   And that is the paper cited, which is footnote

12   16 by Benbrook?

13        A.   Right.  It's the only one that I know of that

14   does that, right.

15        Q.   And you understand that Benbrook has worked

16   for plaintiffs in these litigations, right?

17        A.   I'd have to look at -- off the top of -- of my

18   head, no, but if he has that in his conflicts or his

19   paper somewhere, then -- then it's in there.  I don't

20   remember.

21        Q.   Does it impact your opinion --

22        A.   The water fountain is not happy with yours

23   questions.

24        Q.   Does the fact that the author of a paper

25   worked for one of the parties in this litigation impact

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Brent Staggs, M.D.

1    your ability to rely on that paper?

2        A.   Well, not necessarily.  Again, you're saying

3    he served as an expert or he's employed by a law firm?

4        Q.   I'm not going to -- I'm just go to ask you my

5    question again.

6        A.   Well, okay.  There's a difference to me

7    between I'm employed by Monsanto and I write papers, and

8    especially if I don't sign my name to them, and I've

9    wrote papers and now someone has hired me because they

10   liked my opinions.  So I draw a distinction there, but

11   yeah, that's why we have the conflict section so we can

12   evaluate that, but if it's true he's just served as an

13   expert, then no, it doesn't bother me that much.

14       Q.   But if he had been paid for -- paid by

15   plaintiffs' lawyers and had served as an expert prior to

16   writing his paper, would that change your opinions of

17   the paper?

18       A.   Well, no, not -- not at all really, especially

19   this particular paper is just outlining, you know, the

20   methodologic process and kind of the facts of the

21   scenario.  I don't -- I guess I don't perceive a lot of

22   opinion in there or a lot of real original research.  I

23   mean, that's where you kind of get concerned is when

24   someone is being paid a lot of money in one area and

25   they do original influential research somehow, but you

Brent Staggs, M.D.

1    know, just the way that paper is constructed, just to

2    say here's what they looked at, here's what EPA, here's

3    what IARC looked at and here's the kind of conclusions

4    they came to. --

5         Q.   So it doesn't matter to you that at the time

6    he wrote this, he had been paid by plaintiffs' expert --

7    by plaintiffs' lawyers in these cases?

8              MS. GREENWALD:  Objection.  Form.  Asked and

9    answered.

10        A.   Right.  I don't remember what the conflict

11   section says.  I look at all the conflict sections if

12   there -- if there are one there, but no, if you're -- if

13   you want me to believe that he had been paid as an

14   expert prior to writing that, then it doesn't bother me

15   a lot based on the content of the paper and just that

16   fact alone either.  If it -- if he's paid a lot and he

17   writes a bunch of original research, I might have more

18   to think about.

19        Q.   And then later in your report on page 9, the

20   next page towards the end of that first paragraph there,

21   six lines, seven lines up, you write, (as read) Also,

22   the use of other pesticides was controlled by -- was

23   controlled for by several studies and an increase risk

24   still remained.

25              Do you see that?

Brent Staggs, M.D.

```
 1      A.   Yes.

 2      Q.   When you say several studies, how many are you

 3  referring to and were any of them statistically

 4  significant?

 5      A.   Sure.  Well, I discussed all that in previous

 6  depositions.  The 2003, De Roos is the main one that I

 7  remember.  You know, there's -- there's a variety that

 8  have a statistically significant increase.  Some are

 9  controlled.  Some aren't.  I'd just have to look back.

10  You know, Eriksson, Hardell, McDuffie, a variety of

11  those had control for other pesticides, some did not,

12  but to my memory, there's at least two or three.

13      Q.   And you don't know sitting here today which

14  two or three they are?

15      A.   I named De Roos for you and I think it's one

16  of the other authors that I listed there, but I don't

17  have those specific, you know, nuggets memorized.

18      Q.   And if De Roos was not a study where

19  controlling for other pesticides found a statistically

20  significant increased risk, would that change your

21  opinion?

22      A.   No, if I happen to remember wrong, yeah, no,

23  I'm quite confident there's two or three or four studies

24  that controlled for other pesticides and still had a

25  statistically significant increase.  Fairly certain it's
```

Brent Staggs, M.D.

 1    the 2000 De Roos paper is one of them, but right, if I'm

 2    miss remembered that, then no, it doesn't -- I mean, I

 3    have a general impression of the literature that I've

 4    discussed, you know, in the previous depositions and

 5    I'm -- I've relied on that.  It doesn't change my

 6    opinion if it happens not to be De Roos.

 7         Q.   At the time of Mr. Sanders' diagnosis, do you

 8    recall how old he was?

 9         A.   Let's see.  ██████████████  ██████  No,

10    I don't have that memorized.  He wasn't terribly young.

11    ████████████████████████████████  ████████████████

      ██ ████████████████████████████████████████████

13         Q.   And is your opinion on the impact of

14    Mr. Sanders' age at the time of his diagnosis consistent

15    with what you've said in prior testimony about age?

16              MS. GREENWALD:  Objection.  Form.  Go ahead.

17         A.   I think so.  Right.  We've discussed age as a

18    potential risk factor, and my opinions that extrinsic --

19    extrinsic contribution of risk is the primary driving

20    thing for cancer and not just internal errors due from

21    replication on the order of 80 percent or more, 90

22    percent of the risk is driven by external factors, so

23    that -- that leads really me to only one conclusion.

24    It's not just the number, just because you've lived a

25    number of years that you had more opportunity for

Brent Staggs, M.D.

1  exposures since external risk is the primary driving

2  factor for carcinogenics.

3      Q.   As a person ages, their risk of developing

4  cancer will increase, right?

5      A.   Well, not all cancers, but non-Hodgkin's

6  lymphoma is where we are here.  That's right.  But I

7  just discussed it may -- it's not just because of the

8  age.  It's because of the opportunity.

9      Q.   Am I right in your hospital you work with a

10 blood test that can help identify cancer?

11     A.   Right.

12     Q.   It tests Hepsin levels, right?

13     A.   Yeah, you've been doing good research.

14     Q.   And it's a test recommended for anyone with

15 risks of developing cancer, right?

16     A.   Well, not -- it's recommended for anyone.  At

17 this point, it appears to be a very good screening test

18 for most solid tumors and we haven't tested a lot of

19 lymphomas and leukemia yet, but prostate cancer, breast

20 cancer, lung cancer.  It's very good for those.  So any

21 -- it's inexpensive.  It's a blood test, so we recommend

22 it for just general screening, certainly follow up if

23 you've already had a cancer.

24     Q.   I'm going to mark Exhibit 13.

25          (Deposition Exhibit No. 13 was marked for

Brent Staggs, M.D.

1    identification and made part of the record.)

2        Q.   (By Mr. Kerschner)  And this is an article

3    that was written regarding this technology.  Do you

4    recall being interviewed for this by TVH11 for this

5    article?

6        A.   I've been interviewed a number of times.  I

7    don't remember this specifically, but...

8        Q.   And at the bottom of the article, it says, the

9    technology has been recommended for anyone with

10   potential disease risks or anyone with a known tumor,

11   right?

12       A.   Right.  That's sound like what I said.

13       Q.   And then you're quoted saying, (as read) Maybe

14   with a family history as you -- as you age any reason,

15   risk factors then yea it might be worth getting it,

16   right?

17       A.   Yes.

18       Q.   And you recommend this for people who have a

19   family history of cancer, right?

20       A.   Well, as I just said, certainly with a family

21   history of cancer, but it's -- it's good for screening

22   just without them.

23       Q.   And you agree that people with a family

24   history of cancer are at an increased risk of developing

25   cancer, right?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Brent Staggs, M.D.

```
 1              MS. GREENWALD:  Objection.  Form.

 2         A.   Not always.  That's a very broad statement,

 3    but right.  Individuals that are not into medicine, it's

 4    a good statement for them to remember, you know, maybe

 5    I'm at increased risk, but it's certainly not true for

 6    everyone.

 7              Again, the primary driver of cancers are

 8    external risk factors, so we see, you know, a husband

 9    and wife who both have -- or let's say a father and son

10    who both have lung cancer, yet they all smoke -- they

11    both smoked their whole life.  Probably they have no

12    heredity involved in their cancer.  It's probably just

13    all environmental, but there are some cancers that can

14    have a hereditary component.

15         Q.   And you would agree that non-Hodgkin's

16    lymphoma is one of the cancers that can have a

17    hereditary component?

18         A.   In some cases it can, but even that does not

19    obviate external risk factors.  It's very seldom -- in

20    fact, I don't know that it's really proven just about

21    anywhere that just inheriting one gene, you know,

22    abnormal gene from your parents is going to cause you to

23    have a tumor.  It might lower your threshold of

24    developing a tumor for external risk factors.

25         Q.   If someone has a large family history of
```

Brent Staggs, M.D.

```
 1    non-Hodgkin's lymphoma, you certainly can't rule that

 2    out as a potential cause for their lymphoma; is that

 3    right?

 4            MS. GREENWALD:  Objection.  Form.

 5        A.    As one of the causes.  I mean, most cancers

 6    probably have more than one cause in a given individual,

 7    but you know, I'd just have to look at the specifics of

 8    that.  I don't know that I've -- again, I've heard

 9    loosely about heredity of non-Hodgkin's lymphoma.  I

10    tried to look it up, you know, in this litigation.  I've

11    not come across a whole lot of good information on that

12    and haven't had any patients in my practice that I know

13    of where there's just a real strong history like some

14    other cancers can have.

15        Q.    (By Mr. Kerschner)  ███████████████████

      █  ███████████████████████████████

17        A.    I would rely on his records.  I would have to

18    look.  I don't remember.

19        Q.    Go ahead.

20        A.    I'll tell you, I've looked through a lot of

21    these patients before.

22        Q.    Certainly not a test.

23        A.    Well, now, sometimes you make it seem like

24    one.  Yes, I see I noted ██████████ here in one of the

25    notes.
```

Brent Staggs, M.D.

 1       Q.   And did you include ██████ as a potential

 2   cause of Mr. Sanders' non-Hodgkin's lymphoma?

 3       A.   No.

 4       Q.   How did you rule out ██████ as a cause of

 5   Mr. Sanders' non-Hodgkin's lymphoma?

 6       A.   Well, it sounded like from his records his

 7   ███████████████████████ It's not -- to my

 8   knowledge, it's not the ██████ itself.  It's the

 9   ████████████████████████████████████

10   ███████████████████████████████

11   ████████████████████████████████████

12   ████████████   ████████████████████

13   ██████████   ████████████████████

14   ████████████████████ I saw no reason to include

15   that.

16       Q.   And if his ████████████ above the

17   normal level, that would signify it was uncontrolled,

18   right?

19       A.   No.  Almost every ██████ is, to some degree.

20   Try to keep them as low as we can.  I don't know that

21   they stay normal very often.

22       Q.   Right.  But if they -- if the levels are

23   consistently above normal, that would indicate to you

24   that he actually did not have controlled ██████

25   correct?

Brent Staggs, M.D.

```
 1        A.   No, some people are fairly well controlled.  I

 2   mean, they have ███████     It's hard to completely

 3   replace -- ████████████████████████████████████████

     ██ ██████████  so I mean, I would have to look at the

 4

 5   individual level.  I don't remember that they talked

 6   about it to the degree that even made me think that he

 7   was ██████████

 8        Q.   I'll marked Exhibit 14.

 9             (Deposition Exhibit No. 14 was marked for

10   identification and made part of the record.)

11        Q.   (By Mr. Kerschner)  Study by an author named

12   ████████████   Are you with me?

13        A.   Yes.

14        Q.   And you did not consider this study when

15   forming your opinions, correct?

16        A.   I doubt it.  I don't remember having seen

17   this.

18        Q.   And it's not on your materials considered

19   list.  If that's the case, then is it true that you did

20   not consider this when forming your opinions?

21        A.   Probably -- well, I thought you -- I was

22   envisioning you mean have I just ever seen it.  So no, I

23   -- if I've seen it, I certainly didn't consider it for

24   this case.

25        Q.   If you take a look at the abstract, the -- if
```

1    you look under the results, you would agree that this

2    was a meta-analysis derived from 20 published articles

3    involving 35 cohort studies to assess ███████████

▆    ████████████████████████████

5         A.   That's what they say.

6         Q.   Okay.   ████████████████

▆    ██████████████████████████████████

▆    ██████████████████████████████

▆    ██████████

10        A.   Right.

11        Q.   And this study shows a statistically

12   significant increased risk for ████████████████

▆    ████████████████████

14        A.   I think that's what you just read I think.

15        Q.   And you would agree that that's what the study

16   shows?

17        A.   Right.

18        Q.   And do you agree with this finding?

19        A.   Oh, I mean, this is the first time I'm seeing

20   this.  I mean, I've just described to you my

21   understanding of how ██████████████████

▆    █████████████████████   So I mean, I don't have a good

23   reason to agree or disagree.  That's their finding.

24             It's a paper that I don't think I've seen, so

25   I mean, I just -- I have -- you know, I would have to do

Brent Staggs, M.D.

```
1   more research to really decide if I thought this was

2   appropriate or not.

3       Q.   I'll mark another study.

4            (Deposition Exhibit No. 15 was marked for

5   identification and made part of the record.)

6       Q.   (By Mr. Kerschner)  This is 15.  And this is a

7   study by ███████████████

8       A.   Right.

9       Q.   And if you look at the abstract again, this

10  study showed ██████████████████████████

    ██ ███████████████████████████████████

    ██ ██████████████████████████

13      A.   Right.

14      Q.   And, again, you did not include this study

15  when forming your opinions in this case, correct?

16      A.   Correct.

17      Q.   Are there any studies on your materials

18  considered list that show ██████████████████

    ██ █████████████████████████████████████

    ██ ███████████████████████

21      A.   No.

22       ██ █████████████████████████████████

    ██ ████████████████████████

24      A.   Well, as I mentioned before, I'm going to rely

25  on the medical records.  I don't see that I noted that.
```

Brent Staggs, M.D.

```
 1    Right.  I don't see that I have it here as I glance

 2    through my report.

 3         Q.   So you did not consider Mr. Sanders' prior

 4    ██████████████████████████  when you formed your opinions

 5    in this case?

 6         A.   That's right.  I'm not aware that that is a

 7    risk of non-Hodgkin's lymphoma ██████████████████████

 8         Q.   I'm sorry, you're not aware if it's a risk or

 9    you didn't consider whether or not he had it when you

10    formed your opinions?

11         A.   Well, I wouldn't consider it because I

12    didn't -- I'm not aware that that is a risk.  This is

13    15.

14              (Deposition Exhibit No. 16 was marked for

15    identification and made part of the record.)

16         Q.   (By Mr. Kerschner)  Mark as Exhibit 16 a paper

17    by ████████████

18              THE REPORTER:  By who?

19              MR. KERSCHNER:  ████████████

20         Q.   (By Mr. Kerschner)  If you look at the

21    abstract, this one reported 500 -- over 500,000

22    individuals with ██████████████████████████?

23         A.   Okay.  502,490.  Okay.

24         Q.   And the risk ratio for subsequent malignant

25    cancers was -- combined was 1.36.  Do you see that?
```

1      A.   Yes.

2      Q.   And that's statistically significant, correct?

3      A.   Right, according to them.

4      Q.   And then if you take a look at table 2 on page

5   493.

6      A.   All right.

7      Q.   You with me?

8      A.   Yeah.

9      Q.   For people with ██████████████████

10   subsequent non-Hodgkin's lymphoma, what -- they found

11   over 3,000, right?

12     A.   Right, 3,632.

13     Q.   And that was a statistically significant

14   increased risk?

15     A.   Right.

16     Q.   Over 60 percent?

17     A.   Right, yeah, 63.

18     Q.   And you did not include this paper in your

19   opinions, correct?

20     A.   No, I think it very unlikely that we've proved

21   that having ██████████████ is going to increase your

22   risk of non-Hodgkin's lymphoma, but I understand the

23   global findings in this paper.

24     Q.   Marked Exhibit 17.

25          (Deposition Exhibit No. 17 was marked for

```
 1    identification and made part of the record.)

 2         A.   All right.

 3         Q.   (By Mr. Kerschner)  And then look at the

 4    abstract.  This study reported it was a systematic

 5    review based on data from 21 studies.  Are you with me?

 6         A.   I see where results say of the 21 studies.

 7    Okay.

 8         Q.   And if you look at the conclusion, they found

 9    strong consistent evidence indicates that personal

10    history of ███████████████████ is associated with

11    increased risks with developing other malignancies.  Do

12    you see that?

13         A.   Uh-huh.

14         Q.   And if you look at table 3 on page 1691.

15         A.   Table 3.  Okay.

16         Q.   And if you look for non-Hodgkin's lymphoma,

17    following ██████████████, there's a -- again, a

18    statistically significant increased risk?

19         A.   Right.

20         Q.   And this is another paper that you did not

21    include in your analysis, correct?

22         A.   Correct.

23         Q.   I'm going to hand you one more.

24              (Deposition Exhibit No. 18 was marked for

25    identification and made part of the record.)
```

Brent Staggs, M.D.

```
 1        Q.   (By Mr. Kerschner)  And this is a ███████
 2   ██████████████████████  correct?
 3        A.   Yes.
 4        Q.   And if you take a look at table 2 on page
 5   2586.
 6        A.   2586.
 7        Q.   I may have that wrong if you're not finding
 8   it.
 9        A.   The number is just up in the staple.  2586,
10   okay, I've got a table there.
11        Q.   Table 2?
12        A.   Yes.
13        Q.   And it's standardized incidence ratios for
14   developing second primary -- I think I cut it off -- for
15   developing a second primary cancer by type of
16   ██████████████████████, cancer site and time since
17   diagnosis in males?
18        A.   Yes.
19        Q.   And then for non-Hodgkin's lymphoma, again, we
20   see a history of ███████████████████ there's a
21   statistically -- statistically significant risk of
22   developing non-Hodgkin's lymphoma, correct?
23        A.   Right.
24        Q.   And this one is over 50 percent increased
25   risk, right?
```

Brent Staggs, M.D.

```
1         A.   That's right, 54.

2         Q.   And you did not include in your analysis?

3         A.   Well, that's right.  And, of course, it

4    strikes me from these that it's -- they're not saying

5    that ███████████████ causes non-Hodgkin's lymphoma.

6    They're saying patients who can develop a ███████████

7    can also develop other carcinomas.  They're not -- none

8    of these are asserting that this is somehow a causal

9    relationship.  They're just saying there's an

10   association.  You know, I mean...

11        Q.   And does any of the epidemiology that you rely

12   on specifically for glyphosate indicate a cause or is it

13   just do they show an association?

14        A.   No, it's causal, but that's -- right.  That's

15   a different assessment.  We're assessing whether

16   glyphosate is causing cancer.  They're not -- they're

17   assessing -- they're not saying anywhere in here that

18   this ██████████ is causing some other cancer.  They're

19   saying people who have ██████████████ tend to have other

20   malignancies.

21             They're not asserting that that's somehow

22   causal, and so you can calculate the risk the same way,

23   but that's a -- that's a totally different conclusion

24   that they're not drawing.  I guess it's just kind of how

25   you're coming across with this paper.  Look, he's got a
```

1     ████████     you know, why didn't I consider this,

2     because -- I didn't consider it because it's not a

3     cause.

4             If he's sprouting up, you know, more than one

5     cancer, then you know, maybe he is more prone to

6     developing cancers perhaps, but you know, that's what

7     they're trying to say, not that somehow it's causing it.

8         Q.    And the epidemiology papers that you reviewed

9     for glyphosate, aren't they also saying that exposure to

10    glyphosate has been associated with non-Hodgkin's

11    lymphoma in the same way you're calculating risk ratios

12    that you're seeing here?

13        A.    Well, sure, but it's a totally different

14    conclusion.  You're trying to say that they're saying

15    that somehow ████████████ is causing lymphoma.

16    They're saying it's a marker.  Like, it's -- the other

17    papers are saying glyphosate is causing.  They're not

18    saying that it's just there and it just happens to be

19    there.

██            I mean, there's normal tissue beside ever

21    cancer, but we don't say normal tissue causes cancer.  I

22    mean, it's a totally different thought process, but

23    the -- that's the deal is that the statistics can be

24    similar.  So just to throw them out there to a jury --

25    but that's not what they're saying at all in these

Brent Staggs, M.D.

```
 1    papers.  All the 1.2, 1.5, we're not saying because he

 2    has that ███████████ that that thing is now causing

 3    lymphoma, like the papers are all saying glyphosate has

 4    caused lymphoma.

 5         Q.   You mentioned the De Roos paper earlier,

 6    correct?

 7         A.   Right.

 8         Q.   Did that study identify a cause or did it show

 9    an association between glyphosate and non-Hodgkin's

10    lymphoma?

11         A.   No, that is -- that a causal association when

12    you have the increased risk.  That's right.

13         Q.   And how is that different from the

14    association -- the association that is found in the

15    papers I just showed you?

16         A.   Well, the calculation and the number is the

17    same, but scientifically, we're just going to have to

18    disagree here.  Well, read the discussion at the end of

19    these.  They're not -- they're not trying to say

20    ███████████████ is somehow, what, biologically plausible.

21    Bradford Hill.  What is it infiltrating into the body

22    and creating non-Hodgkin's lymphoma somehow?  No.

23              They're saying they're associated, therefore,

24    they're a marker.  If you have a ██████████ maybe you

25    need to be aware you might be more prone to one of these
```

Brent Staggs, M.D.

1   others perhaps, but they're not saying they're causing

2   them somehow.

3        Q.   The De Roos paper that you reference, are they

4   saying that it's biologically plausible in the body for

5   creating non-Hodgkin's lymphoma when referring to

6   glyphosate or are they just showing association?

7        A.   Well --

8             MS. GREENWALD:   Objection.   Asked and

9   answered.

10       A.   -- you have to accumulate the whole body of

11  evidence, you know, with the genotoxicity and all the

12  things that IARC looked at, right.   But you're kind of

13  arguing with me here, but you're not getting it.   I

14  mean, there is nobody in these papers that is saying

15  ████████   is somehow causing -- or ███████████  █

█   ████████████████████████  that they are causing

17  cancer.   They are saying associated with -- in that they

18  are in the patient with another cancer.

19       Q.   I completely understand you're saying that and

20  just -- you sort of -- I asked you about the De Roos

21  paper and then you started talking about genotoxicity

22  and IARC, and I understand there's other data, but I'm

23  focusing specifically on the epidemiology, the human

24  studies that you looked at.

25            They don't show the specific cause.   They are

Brent Staggs, M.D.

```
 1    showing an association in the same context that the

 2    papers on ███████████████████ are doing, right?

 3        A.   Well, they show similar numbers, but that's

 4    what they're attempting to do, right.  That's what the

 5    relative risk is, to say this is causal of this.

 6        Q.   Right.  So there are those papers, the human

 7    data, the epidemiology data on glyphosate as well as the

 8    human epidemiology data that we just looked at on

 9    ███████████████████ are both doing the same thing

10    in that they're showing an association, correct?

11        A.   Yes, except the conclusion is different based

12    on the data and what you're -- and the structure of your

13    study, what you're trying to find there.

14        Q.   But the conclusions in the human epidemiology

15    data relating to glyphosate, any causal -- any specific

16    causal conclusion that you're discussing you would be

17    basing on different types of studies like genotoxicity

18    or animal studies; is that right?

19        A.   I'm still not -- yeah, I'm still not sure

20    we're communicating, but yeah -- well, maybe let's

21    phrase it like this.  Maybe this helps.

22            Epidemiology alone does not say in an

23    individual patient that this caused their disease.  You

24    have to have a physician probably look at that patient

25    and then correlate that patient like -- like I've done
```

Brent Staggs, M.D.

 1   here with a differential diagnosis to decide what causes

 2   that disease.  So but in those papers that are

 3   epidemiology, when you see risks and they're consistent

 4   and they're significant, then you know that it is

 5   causing them to some degree in those patients, but you

 6   can't say -- you can't just hold up a paper like we've

 7   already said and say in every case, no matter what, if

 8   they're exposed.  You have to look at, you know, the

 9   levels of exposure, how they compare, all of those

10   things we've already discussed.  So but -- but yeah, we

11   started off with -- you know, it's -- they're using the

12   same numbers, but you don't apply it in the same way.

13       Q.   Right.  And the way you apply it with

14   glyphosate by doing the additional analysis that you've

15   just described, have you done that for ███████████████

16   cancer?

17       A.   Well, why would I?  Because it is not a cause.

18   They're not saying it's a cause.

19       Q.   So the answer is no, you haven't done it?

20       A.   Well, of course not, because it doesn't --

21   that's not what they're saying.  Now we're back to the

22   same argument before that --

23       Q.   And have you done that type of analysis with

24   ████████████

25       A.   Yes, I told you that I did.  Right.  It

Brent Staggs, M.D.

1 ████████████████████  ██████████████████████

█ ███████████████████████████████████████████

█ ████████████████████████████████████  ██████

█ █████████████████████████████████████████████

█ █████████████████████████

6          It -- it might mean, according to this

7   association, that -- that you might be at risk for other

8   cancers, so that's all it means.  It doesn't mean that

9   ████████████  is somehow causing the lymphoma.

10       Q.   And is it your opinion that the De Roos

11  finding -- the De Roos 2003 paper finding means that, on

12  its own, that glyphosate causes non-Hodgkin's lymphoma?

13          MS. GREENWALD:  Objection.  Form.  Asked and

14  answered.

15       A.   Well, to a degree.  That's what -- because

16  that's the conclusion that you're drawing from that

17  information, because that was what they're looking for

18  is when this is present -- I mean, I understand what you

19  mean by association and you want to split hairs, but

20  that's what we're making a causal assessment with.  In

21  an individual patient, we have to look at all things we

22  talked about.

23          But, yes, when they -- all the papers that

24  have a statistically significant increase, that is what

25  that is saying, that that is causing it in those

Brent Staggs, M.D.

1    patients because that is what we're looking at.  Is this

2    chemical that's there, and they look at other chemicals,

3    is it causing these diseases, not just is it -- does it

4    happen to be there and other diseases pop up.

5        Q.   You said that you reviewed the pathology

6    reports for Mr. Sanders, correct?

7        A.   Right.

8        Q.   Did any of the positive or negative components

9    of his pathology profile tell you that glyphosate was a

10   substantial contributing factor to his non-Hodgkin's

11   lymphoma?

12       A.   Wait.  Are we back -- just the review of the

13   pathology?

14       Q.   Correct.

15       A.   Right.  No, we talked about that earlier.

16   Right.  They don't -- I wouldn't expect them to present

17   in any different way, nothing different on the slide.

18   Right.  No matter -- non-Hodgkin's lymphoma has a

19   variety of causes we discussed.  None of them present in

20   some sort of an odd or unique way that you can identify.

21       Q.   And none of Mr. Sanders' blood tests that you

22   looked at showed that Roundup or glyphosate was present

23   in his system, correct?

24       A.   I didn't see that anybody tested for it.

25       Q.   Can you test for it?

Brent Staggs, M.D.

```
 1        A.    Sure.  I mean, there's other studies that have

 2   blood tests -- blood levels of glyphosate in different

 3   individuals.  You can test for just about anything.  You

 4   just have to be looking for it.

 5        Q.    And none of -- none of the blood tests you

 6   saw, though, showed that glyphosate was in his system at

 7   any time, right?

 8        A.    I'm not trying to be picky with the answer,

 9   but right, they have to be testing for it.  It wouldn't

10   be -- you know, all the blood tests -- you know, to just

11   say it's not there, is not true.  They weren't looking.

12   Just to say it's a CBC, it wasn't there, well, that's

13   not true.  They would have to actually do GCMS or LCMS

14   to specifically try to target that chemical compound.  I

15   don't see that that was done.

16        Q.    And there's no medical tests that were done

17   for Mr. Sanders that show the presence of glyphosate in

18   his system, correct?

19        A.    Not that I've seen.

20        Q.    And you've not seen any genomic analysis that

21   indicates anything pertinent to Roundup or glyphosate in

22   Mr. Sanders, correct?

23        A.    I'm not aware that glyphosate or Roundup or

24   any other chemical have a different genomic mutation

25   signature, you know, apart from one another.  If they're
```

Brent Staggs, M.D.

1   going to cause -- basically, by definition, if they're

2   going to cause, say, marginal zone lymphoma, then they

3   have to produce the mutations that cause marginal zone

4   lymphoma.  So they wouldn't produce some odd and weird

5   different mutations.  You have to have certain mutations

6   to lead to certain types of cancers, so they're going to

7   have similar mutation signatures no matter what the

8   cause to lead to a different -- a given disease.

9        Q.   Right.  I'm just trying to understand based on

10   what you saw in the medical records what there was.  So

11   was there any genomic analysis indicating anything

12   pertinent to Roundup or glyphosate in Mr. Sanders?

13        A.   I've not seen that, but as I've already

14   explained, that is beyond medical science at this point.

15        Q.   And would you agree that a patient with the

16   exact same medical history as Mr. Sanders but was never

17   exposed to Roundup could still have been diagnosed with

18   the exact non-Hodgkin's lymphoma at the exact same time

19   as Mr. Sanders was diagnosed?

20        A.   So hypothetical, I mean, these lymphomas occur

21   in people who aren't exposed to Roundup sometimes,

22   right.

23        Q.   So is the answer, yes, that the exact same

24   lymphoma could have happened in the exact same patient

25   at the exact same time, the only difference is they

Brent Staggs, M.D.

 1   didn't have Roundup?

 2       A.   Well, with the way you say exact same patient,

 3   to me, no.  I mean, I have to -- I ascribe the cause of

 4   his lymphoma to his cumulative exposures as I see them.

 5   Again, they may not have caused every mutation, but they

 6   caused a significant enough that I call -- I call them a

 7   substantial contributing factor.

 8            So no, in this -- in Mr. Sanders, it took the

 9   exposures that he had in order to develop his disease.

10   It's beyond medical science to say if we pull out one

11   exposure, would he still get the disease.  In another

12   hypothetical individual, maybe.  I mean, I would have to

13   look at those individual factors, but for him

14   specifically, all I know is he got the disease, his risk

15   is now a hundred percent, and he had this set of

16   exposures, so then I decide based on that if the

17   exposures are significant or not based on the

18   methodology we've already discussed.

19       Q.   Just so I'm clear on your opinion, you believe

20   that Mr. Sanders could not have -- could not have

21   developed non-Hodgkin's lymphoma but for being exposed

22   specifically to Roundup?  In other words, it's

23   impossible for him to have gotten non-Hodgkin's lymphoma

24   other than having Roundup exposure?

25       A.   Well, that's a slightly different question,

Brent Staggs, M.D.

```
 1   and of course, I don't have a crystal ball.  I don't

 2   know everything, but based on his history, I'm saying

 3   glyphosate was a significant contributing factor to his

 4   development of non-Hodgkin's lymphoma.  I don't know

 5   what would happen without that.  I can't say.

 6        Q.   Right.  And you can't say, then, to a

 7   reasonable degree of medical certainty that if you

 8   removed Roundup, he definitely wouldn't have gotten

 9   non-Hodgkin's lymphoma, right?

10        A.   Right.  I can't say definitely about -- I

11   mean, all of these things, to me, are to a reasonable

12   degree of medical certainty.  Almost nothing in medicine

13   is an absolute a hundred percent.

14        Q.   And is true that Mr. Sanders may have had

15   cancer cells in his body at the time he started spraying

16   Roundup?

17        A.   Well, I doubt it, no.  He didn't have -- the

18   lymphoma didn't sit around for 30 years, no.

19        Q.   So if you did see a patient with the same

20   medical history as Mr. Sanders, but they did not have

21   Roundup exposure and they did have non-Hodgkin's

22   lymphoma, what would be your -- what would be your

23   conclusion as to what caused the lymphoma?

24        A.   Well, I'd have to -- well, again, you present

25   that like an absolute, what would be the cause.  Well,
```

Brent Staggs, M.D.

```
1   there's -- often, there's -- most often, there's not one

2   cause.  Often there's several contributing causes and

3   that's what I try to determine with my analysis.

4           So as I sit here, I'm not sure.  It's not

5   something I thought about.  I'd just have to dig in to

6   the -- to his history and see what else I thought could

7   be significant, because the Roundup is such a huge

8   exposure, it dwarfs the other smaller exposures that we

9   talked about.

10          If everything we talked about is true, there

11  are organophosphates and all that sort of thing and have

12  a risk, then I would have to look at those and -- and

13  he's got a much different set of exposures at that time

14  and I would have to decide are those significant to him

15  or not.

16      Q.   So you didn't do the type of analysis for the

17  other exposures, is that what you're saying?

18      A.   Absolutely not.  That's not what I said.  We

19  talked about that.  You're saying if I pull out

20  glyphosate.  So glyphosate dwarfs the other -- it's

21  much, much more in a qualitative sense than all the

22  other exposures.  We discussed that I didn't necessarily

23  identify risks of non-Hodgkin's lymphoma, but I'm taking

24  your word for it that some of those have a risk based on

25  what you showed me.
```

Brent Staggs, M.D.

```
 1              So that's part of my assessment.  When someone

 2    has a massive exposure over years and years and it

 3    begins to dwarf others, just because you have something

 4    else that has a risk, it could be trivial or

 5    insignificant depending on the overall set of exposures.

 6    So you're now pulling out his largest exposure by far,

 7    so now I would have to go back and look at the other --

 8    others is what you're asking me to see if I think any of

 9    those could be significant, and if so, which ones,

10    because now I have a much more limited set of exposure

11    to consider.

12              So yes, I consider all the confounders that I

13    could, that I could come up with in the way that I do as

14    a physician.  I absolutely did that, but no, I didn't

15    think theoretically if we have -- if we don't have

16    Roundup or any of the others pulled in or out, I didn't

17    try to work every potential hypothetical.  I wait for

18    you to ask me all those.

19         Q.   So what other information would you need about

20    Mr. Sanders to answer that question?

21         A.   Well, quite a bit.  I mean, I would have do a

22    focused examination.  First of all, I don't know that --

23    not saying you're trying to mislead me, but I'd have to

24    look at those other chemicals, because you're saying

25    that I missed something there on a couple of them,
```

Brent Staggs, M.D.

```
 1    although they're used much more sparingly.  So I would

 2    have to look more specifically and probably ask him more

 3    directed questions, okay, now that we just have DelNav

 4    and Seven and a couple of others, I want -- because I

 5    didn't identify a big risk based on the chemical name

 6    and maybe I just missed something, you know, then we're

 7    going to -- instead of just saying I used Roundup

 8    frequently for years and years and I barely used these

 9    others a couple of times here and there, that's my

10    qualitative assessment of those.

11           Then I have to say, well, these three are now

12    your potential exposures, you know, do we think that the

13    way that you used those by them self, now that they're

14    not dwarfed by glyphosate, is significant or not.  So I

15    would have to have more information.  I'd just have to

16    dig in.  It's not something -- I didn't think of all

17    these hypotheticals.

18      Q.   And you didn't ask -- strike that.

19           Are you offering any opinions about on

20    Mr. Sanders' prognosis going forward?

21      A.   No.

22      Q.   Are you offering any opinions about his

23    treatment?

24      A.   No.

25      Q.   The impacts of his treatment?
```

Brent Staggs, M.D.

```
 1        A.   No.

 2        Q.   I'm going to mark just for the record Exhibit

 3   19.

 4             (Deposition Exhibit No. 19 was marked for

 5   identification and made part of the record.)

 6        Q.   (By Mr. Kerschner)  Is that a copy of your CV

 7   dated August 2nd, 2019?

 8        A.   All right.

 9        Q.   And you said that there had been some updates

10   made to this?

11        A.   No, this is the updated one.

12        Q.   Okay.  And since July, are there -- what

13   updates have you made since your last deposition?

14        A.   I'm not sure I know.  No research, teaching,

15   publications, anything like that.  That's usually what

16   you're interested in.  Typically I try to just give it a

17   new date at least once a year just to sort of say that

18   I've looked at it.  It's usually medical directorships.

19             I don't remember now.  I mean, I have just

20   four there.  I did have five.  I can't even remember

21   what the other one was, but one of my partners probably

22   needed some extra directorship or something, so...

23        Q.   Sitting here, you don't know specifically what

24   the changes were?

25        A.   I don't know if there even were any.  I don't
```

Brent Staggs, M.D.

1   remember.  That has been the majority of the changes

2   over the last couple of years.

3       Q.   Other than glyphosate, what IARC monographs

4   have you read?

5           THE REPORTER:  What, I'm sorry?  I didn't hear

6   you.

7       Q.   (By Mr. Kerschner)  Other than glyphosate,

8   what IARC monographs have you read?

9       A.   Oh, quite a number.  I mean, I read any that

10  came across, you know, the malathion and dioxin and of

11  course I've read asbestos and I've read diesel exhaust

12  and smoking.  I've read -- a lot of them are combined

13  monographs.  There's, you know, one that had red meat

14  and a wide variety of things like that.  I've read a lot

15  of them.  Those are the ones that come to mind.

16          I know a lot of the chemicals we've come

17  across here that I'm not familiar with, some of them are

18  lumped together several in one monograph and...

19      Q.   Do you agree with IARC when they say red meat

20  consumption is a carcinogen level 2A?

21      A.   I didn't remember what level it was.  That was

22  part of why we looked at it I think.  I don't know if

23  that came up in this deposition or another one, not this

24  one, but Roundup, so it's not really something I've

25  looked at.  I just read through there because that was

Brent Staggs, M.D.

1   brought to my attention.

2       Q.   Did you agree with that finding?

3       A.   I haven't even thought one way or the other if

4   I agree with it or not.  I just read it.

5       Q.   And what about night shift work?  Did you read

6   IARC's monograph relating to night shift work?

7       A.   I think I did.  Somebody has brought that up

8   before.  Yeah, I just read that too.  I haven't put any

9   thought to whether I like it or not.

10      Q.   And do you agree that night shift work has the

11  same level of carcinogenicity as glyphosate?

12      A.   Well, if it's a 2A then it is, but...

13      Q.   And you agree with IARC's finding there?

14      A.   I haven't put any thought to whether I really

15  like it or not.  I mean, you know, if it's in the same

16  category, then it is.  I mean, that's just a finding.

17      Q.   But it's possible IARC got it wrong there

18  then?

19      A.   I haven't even thought about that.  I don't

20  have an opinion one way or the other.  I just read it

21  once that I know of.

22           MR. KERSCHNER:  Let's go off the record for a

23  minute.  I want to look over a couple of things.

24           THE WITNESS:  Okay.

25           MS. GREENWALD:  Okay.

Brent Staggs, M.D.

```
 1              THE VIDEOGRAPHER:  We're off the record at

 2    7:48 p.m.

 3              (A recess was taken from 7:48 p.m. to

 4    7:56 p.m.)

 5              THE VIDEOGRAPHER:  We are back on the record

 6    at 7:56 p.m.

 7         Q.   (By Mr. Kerschner)  I just want to pull out --

 8    I don't remember what number we marked it -- your prior

 9    testimony list.

10         A.   Oh, it is No. 4.

11         Q.   Okay.  And then starting at 2015 and going

12    forward, looking at this list, are -- other than -- I

13    should actually ask you, what types of products or

14    substances were you testifying about in these cases, if

15    you even recall, giving the full gamut?

16         A.   Well, I probably can't recall all of them, but

17    a majority are relating asbestos exposure, mesothelioma.

18    Some of them are just mesothelioma diagnosis, lung

19    cancer diagnosis, things like that.  There are some

20    cases that involve diesel exhaust, smoking, and then

21    there's a good number of them that are like medical

22    negligence or cause of death or have an autopsy for part

23    of litigation, things like that.

24         Q.   If we just -- looking at the 2015 case, the

25    Van Houten case -- I realize we're looking at different
```

Brent Staggs, M.D.

```
 1   copies --

 2        A.   Oh, yes.

 3        Q.   -- but that's the only 2015 one I have.

 4        A.   Right.

 5        Q.   Was that -- do you know what the exposure

 6   there you're testifying about?

 7        A.   It would have been some kind of asbestos

 8   exposure.  I don't remember what kind of disease the

 9   patient had.

10        Q.   But it was asbestos?

11        A.   I think so, yeah.  Avondale Shipyard is

12   typically an asbestos exposure case.

13        Q.   And -- and then looking at the 2016 cases, do

14   you recall what the exposure that you were testifying

15   about in those -- in any of those cases?

16        A.   Well, you know, I would classify them probably

17   largely on the law firm.  Some of them I recognize.  The

18   Gori law firm is typically asbestos type cases.  They

19   all tend to do occasionally some other type of case, but

20   that's going to be the majority.  So I see the one --

21   about the third one is BNSF that's a railroad to my

22   memory, so that would -- I don't remember if it was

23   asbestos or diesel or -- you want me to just go through

24   all of them?  Is that --

25        Q.   Yeah, I mean, I could ask each one
```

Brent Staggs, M.D.

```
 1    individually, but trying to speed.

 2         A.   Yeah, sure.

 3         Q.   -- figured I would ask you to recall.

 4         A.   I mean, again, so I'm looking at the rest of

 5    them there through 2016 are probably all either

 6    asbestos.  Again, I don't remember the diseases, but

 7    that's the -- you know, the Simmons law firm, Motley

 8    Rice, Peter Angelos, it's largely what they do.  Again,

 9    they might have slipped in some other -- sometimes these

10    firms will have other divisions and they'll send me some

11    other kind of case to look at, but that's largely what

12    they do.

13         Q.   But looking at the 2016 cases, you can't

14    recall specifically if any of them -- the specific

15    product for any of them?

16              MS. GREENWALD:  Objection.  Form.

17         A.   Well, I said asbestos.  Is that what you mean?

18    I don't remember the specific disease.

19         Q.   (By Mr. Kerschner)  Sorry.  Did I say -- I

20    said product.  Apologies.  For -- you know, for those in

21    2016, you don't remember the specific disease at issue?

22         A.   No, I don't.  A majority is going to be

23    mesothelioma, but there's a fair number of lung cancer

24    cases that I've testified in as well, so no, I don't.

25         Q.   And looking in 2017, I realize the list is a
```

```
 1   little longer, but just take a moment and look through

 2   if you can recall if any of these cases are not

 3   asbestos.

 4       A.   Oh, sure.  Okay.  So, again, I base is mostly

 5   on the -- so on the top of page 4, that's a local law

 6   firm.  I was expert for defense --

 7       Q.   So sorry, we have different page numbers, so

 8   can you go by the case name.

 9       A.   Oh.  Oh, it's Potthast or Potthast,

10   P-O-T-T-H-A-S-T.

11       Q.   That's the name of the plaintiff?  I'm with

12   you.  Yep, gotcha.

13       A.   So that's going to -- I don't remember the

14   case, but that law firm -- typically they send me

15   medical malpractice cases, so that was probably -- I

16   have no idea what the facts of that case were.

17            The next one in line, the Guffey would be with

18   -- that would be my same memory of it.  You've gotta

19   go -- and then you remain -- a lot of the others are

20   asbestos.  Down in the middle, the Incrocci I think is

21   how you pronounce it, I-N-C-R-O-C-C-I, again, I don't

22   remember that, but the facts, she was a young lady, but

23   I can't remember exactly.  I think she had a snake bite

24   or something unusual, but that was another medical

25   negligence type case.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Brent Staggs, M.D.

```
 1        Q.   Do you recall what you were testifying about

 2   there?

 3        A.   I think the issue was something about -- I

 4   think she died of a blood clot and there was -- and she

 5   was fairly young.  I don't know if she was 18, 22, and

 6   there was something about -- I think they tried to tie

 7   it back to a snake bite that had happened months earlier

 8   and I can't remember.  You know, my testimony was

 9   largely about coagulation disorders, you know, with my

10   expertise as a hematopathologist and that's as much as I

11   remember.  Something like that.

12        Q.   And just keep going.  Do you recall if any of

13   the others --

14        A.   Oh, okay.

15        Q.   -- were not asbestos.

16        A.   So the last one there, the Ritter versus

17   Marsh, I don't think that's asbestos.  That law firm

18   doesn't send me cases that often, but they -- they do

19   some of both, but I don't -- but I don't remember the

20   facts of that case, and I think everything else for 2017

21   is probably asbestos.

22        Q.   And I've noticed a couple of ones you've

23   picked out are defense cases.  Do you do any defense

24   work other than medical malpractice?

25        A.   Oh, sure.  There's some asbestos defense
```

Brent Staggs, M.D.

```
 1   probably started last year.  So I have a handful of

 2   depositions for defendants in asbestos and then other

 3   than malpractice -- yeah, I mean, they're not all --

 4   some of these I've talked about are not all malpractice

 5   against the doctor.  Sometimes they're just -- the

 6   defendant hired me to do an autopsy or to observe one or

 7   to -- you know, or there's a toxicology issue, you know,

 8   with an employer or something like that.

 9        Q.   In any of the cases -- actually, let's keep

10   going.  2018, are there any non-asbestos cases there?

11        A.   Okay.  Yes, Mr. Whitby in 2018, that was a

12   Roundup case.

13        Q.   Right.  Other than Roundup and asbestos,

14   anything else in 2018?

15        A.   No.  Well, no, it goes to the next page.

16   Sorry.  Not on that page.  Let's see.  There's -- almost

17   at the end of 2018, is Linda Delaney.  I think this was

18   a medical malpractice case.  I mean, it was not asbestos

19   for sure, and I don't remember for sure the facts of

20   that case.

21        Q.   And then 2019, anything here not Roundup

22   related or asbestos?

23        A.   Okay.  Roundup or asbestos.  Okay.  On Richard

24   Harris, I think that's the case I testified at trial.

25   Yes, a few months later.  That was a smoking-related
```

Brent Staggs, M.D.

```
 1    lung cancer case.

 2         Q.   And what was your testimony about there?

 3         A.   That smoking caused lung cancer.  And then I

 4    lost my place now.  A couple pages over, maybe the last

 5    name is Zwetz, Z-W-E-T-Z.

 6         Q.   Carson is the first name?

 7         A.   Right.

 8         Q.   Okay.

 9         A.   That was a child that died.  I think they

10    were -- I think the allegation was the clinic missed

11    something.  The child -- in my opinion, the child choked

12    to death, but they thought -- I think the allegation was

13    maybe he had sepsis that they missed, something like

14    that.

15              And then the next one, Michael Wood is not

16    asbestos, but I -- it escapes me what that was about.

17    Oh, I know.  He -- I think he was the electrocution.  I

18    think I did the autopsy.  He encountered a downed power

19    line, 12,000 volts, so he was an electrocution autopsy

20    and I was hired to help perform the autopsy.

21         Q.   Did you testify as an expert in that case?

22         A.   Uh-huh.

23         Q.   And what was your opinion?

24         A.   Well, cause of death was one issue and the

25    other issue was surrounding how long he could have lived
```

Brent Staggs, M.D.

```
 1    after encountering this downed power line.  So there was

 2    an expert that indicated he could have lived 30 seconds.

 3    My opinion was death was essentially instantaneous

 4    because he was blown back 40 feet.  There's a variety of

 5    things, but so it was really a quibble over 30 seconds.

 6           Other than that, there's the trial for Zwetz

 7    and everything else I think is asbestos or Roundup.

 8      Q.   And you mentioned in -- starting in 2019, some

 9    of your cases were asbestos for the defense?

10      A.   I think starting in 2018, yeah, there was two

11    or three in there.

12      Q.   Do you -- can you point out which ones those

13    were?

14      A.   Oh, sure.  Okay.  Okay.  So Gerald Moore.

15      Q.   Okay.  And when you say you testified for the

16    defense.  Am I correct that your opinion was asbestos

17    did not cause the mesothelioma or whatever the

18    malignancies was?

19      A.   No.  Well, not -- well, I mean, so I've had a

20    variety.  I don't remember that one specifically.  I

21    mostly remember the law firm, but there's been both.  I

22    mean -- I mean, I don't know how much you want to go

23    into my asbestos opinions, but there have been times

24    when I've identified an exposure that I did not think

25    was significant in the cause of an individual's
```

Brent Staggs, M.D.

1    mesothelioma.

2          It is my opinion that virtually all

3    mesotheliomas are caused by asbestos exposure, but given

4    the same methodology where I assess the cumulative

5    exposure and the relative proportions, sometimes I deem

6    that some exposures are insignificant compared to other

7    large exposures.  We've discussed that, but -- and then

8    there's been at least once -- and they had me testify

9    for some reason, that I couldn't identify asbestos

10   exposure based on my reading of the testimony and it was

11   quite a short deposition for that one.

12        Q.   So just specific to the Wood case, do you

13   recall what your testimony was?

14        A.   No.

15        Q.   Any others that you recall were asbestos cases

16   for the defense?

17        A.   So Linda, it's either Guillot or Guillot here,

18   expert for the defense.  That's an asbestos case and

19   then two more down --

20        Q.   Sorry.  Can you just spell the last name so I

21   know.

22        A.   G-U-I-L-L-O-T.

23        Q.   Thanks.

24        A.   I don't remember the specifics, but it's an

25   asbestos case and then the -- skip one, Tyrone Melancon,

Brent Staggs, M.D.

1   it's a defense for the -- expert for the defendant in

2   asbestos.  Ronald Dyer, D-Y-E-R.

3        Q.   That was an asbestos defense case?

4        A.   Right.

5        Q.   Theresa Robinson, same thing.  Charles Steib

6   or Steib.  I think that's all.  I might have missed one.

7             MR. MEDINA:  That's all the questions I have

8   on Mr. Sanders.

9             MS. GREENWALD:  We don't have any questions.

10            MR. MEDINA:  Give me two minutes and then we

11   can go on to Tanner.

12            THE VIDEOGRAPHER:  We're off the record at

13   8:12.

14            (Deposition concluded at 8:12 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                       JURAT

 2         SANDERS VS. MONSANTO COMPANY (ROUNDUP)

 3                  JOB FILE NO. 142718

 4

 5         I, BRENT STAGGS, MD, do hereby state under

 6    oath that I have read the above and foregoing deposition

 7    in its entirety and that the same is a full, true and

 8    correct transcription of my testimony so given at said

 9    time and place, except for the corrections noted.

10

11

12         _____

13              Signature of Witness

14

15         Subscribed and sworn to before me, the

16    undersigned Notary Public in and for the State of

17    Oklahoma by said witness, BRENT STAGGS, MD, on this

18    _____ day of _____, 2019.

19

20

21         _____

22              NOTARY PUBLIC

23              MY COMMISSION EXPIRES: _____

24

25
```

```
 1                    ERRATA SHEET

 2        SANDERS VS. MONSTANTO COMPANY (ROUNDUP)

 3           DEPOSITION OF BRENT STAGGS, MD

 4        REPORTED BY:  SHANNON S. HARWOOD, CSR, RPR

 5        DATE OF DEPOSITION TAKEN:  NOVEMBER 7, 2019

 6                 JOB FILE NO. 142718

 7    PAGE    LINE    IS              SHOULD BE

 8    ____    ____    _____    _____

 9    ____    ____    _____    _____

10    ____    ____    _____    _____

11    ____    ____    _____    _____

12    ____    ____    _____    _____

13    ____    ____    _____    _____

14    ____    ____    _____    _____

15    ____    ____    _____    _____

16    ____    ____    _____    _____

17    ____    ____    _____    _____

18    ____    ____    _____    _____

19    ____    ____    _____    _____

20    ____    ____    _____    _____

21    ____    ____    _____    _____

22    ____    ____    _____    _____

23    ____    ____    _____    _____

24    ____    ____    _____    _____

25    ____    ____    _____    _____
```

Brent Staggs, M.D.

```
 1              C E R T I F I C A T E

 2

 3        I, Shannon S. Harwood, a Certified Shorthand

 4   Reporter, do hereby certify that the foregoing is a true

     and correct transcription of my shorthand notes of proceedings

 5   had in Case Number 3:16-cv-05752-CV heard on the 7th day of

 6   November, 2019, and is only valid with my stamped seal

 7   and my original signature.

 8        I further certify that I am not related to nor

 9   attorney for either of said parties nor otherwise

10   interested in said action.

11        IN WITNESS WHEREOF, I have hereunto set my hand and

12   seal this 8th day of November, 2019.

13

14

15

16

17

18                           _____

19                           Shannon S. Harwood, CSR, RPR

20

21

22

23

24

25
```