Pages 1 - 47

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

| | |
|---|---|
| ELAINE STEVICK and CHRISTOPHER STEVICK,        )<br>                                         )<br>          Plaintiffs,           )<br>                                         )<br>   VS.                                )<br>                                         )<br>MONSANTO COMPANY,                     )<br>                                         )<br>          Defendant.            )<br>_____) | **NO. C 16-02341 (VC)** |
| IN RE:  ROUNDUP PRODUCTS          )<br>LIABILITY LITIGATION              )<br>_____) | **NO. C 16-md-02741 (VC)** |

San Francisco, California
Monday, December 16, 2019

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES</u>**:

For Plaintiffs:

                    THE MILLER FIRM LLC
                    108 Railroad Avenue
                    Orange, Virginia  22960
          BY:  **BRIAN BRAKE**
               **TAYJES SHAH**
               **ATTORNEYS AT LAW**

                    ANDRUS WAGSTAFF PC
                    7171 W. Alaska Drive
                    Lakewood, Colorado  80226
          BY:  **AIMEE WAGSTAFF**
               **ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RDR, FCRR
              Official Reporter, CSR No. 12219

**APPEARANCES**:   (CONTINUED)

For Plaintiffs:

                    WEITZ & LUXENBERG PC
                    700 Broadway
                    New York, New York  10003
        BY:  **KRISTIN B. MILLER**
                **ATTORNEY AT LAW**

                    AUDET & PARTNERS LLP
                    711 Van Ness Avenue
                    San Francisco, California 94102
        BY:  **MARK E. BURTON, JR.**
                **ATTORNEY AT LAW**

                    GOLDBERG & OSBOURNE LLP
                    698 E. Wetmore Road - Suite 200
                    Tucson, Arizona 85705
        BY:  **JOHN OSBOURNE**
                **DAVID J. DIAMOND**
                **ATTORNEYS AT LAW**

For Defendant:

                    WILKINSON WALSH & ESKOVITZ LLP
                    2001 M Street, NW
                    10th Floor
                    Washington, DC  20036
        BY:  **BRIAN STEKLOFF**
                **RAKESH KILARU**
                **ATTORNEYS AT LAW**

                    HOLLINGSWORTH LLP
                    1350 I Street NW
                    Washington, DC 20005
        BY:  **ERIK LASKER**
                **ATTORNEY AT LAW**

PROCEEDINGS

```
 1   Monday - December 16, 2019                        10:03 a.m.

 2                       P R O C E E D I N G S

 3                           ---o0o---

 4        THE CLERK:  Case Numbers 16-CV-2341, Stevick, et al.,

 5   versus Monsanto Company, and 16-md-2741, In Re:  RoundUp

 6   Products Liability Litigation.

 7        THE COURT:  Okay.  I understand Kristen has told you

 8   all not to make your appearances, but I see a couple of new

 9   faces on the plaintiff side.

10     Does anybody want to introduce the new faces?

11        THE CLERK:  Come up to the podium, please, to speak.

12     Thanks.

13        MR. SHAH:  Good morning, Your Honor.  I'm Tayjes Shah

14   with the Miller firm.  I'll be part of the Stevick trial team.

15   I just want to introduce myself, and it's a pleasure to be here

16   before the Court today.

17        THE COURT:  Good morning.

18        MS. MILLER:  Good morning, Your Honor.  Kristin Miller

19   from the law firm of Weitz Luxenberg.

20        THE COURT:  Good morning.

21        MR. OSBOURNE:  Your Honor, I'm John Osbourne with

22   Goldberg & Osbourne out of Arizona, with David Diamond.

23        THE COURT:  Good morning.

24        MR. DIAMOND:  Good morning, sir.

25        THE COURT:  Okay.  So I want to start with the massive
```

**PROCEEDINGS**

1    amount of work that these law firms have been causing our court

2    to have to do to fix your problems, to fix your filing errors.

3    It has been totally unacceptable.

4         We have public servants who work in this courthouse, who

5    are trying their best to maintain a coherent docket in this

6    complicated MDL, and you all are making it a thousand times

7    worse for them.  And our clerk's office has put in -- and my

8    chambers -- have put in hours and hours and hours of work

9    trying to fix your messes, trying to clean up your messes that

10   you have made on the docket.  It is going to stop now.

11        And the next time anybody creates a problem like this,

12   each lawyer involved -- each lawyer whose name is on the

13   pleadings will be sanctioned.  You have my guarantee of that.

14        And I'll just give you some examples of the stuff that's

15   happened recently.  Let's see.  There were some motions to

16   exclude expert testimony filed in ECF by the defense.  They

17   were listed as "Notices."  They were labeled as "Notices"

18   instead of "Motions."  And by labeling them "Motions" is what

19   allows the responsive briefs to be linked to the motions.  And

20   as a result of labeling them "Notices" instead of "Motions,"

21   plaintiffs' counsel was not able to properly file and link

22   their oppositions to the motions.

23        Sealing has been a major problem in this case.  And we got

24   a notification from the Wilkinson Walsh firm at 3:22 p.m. on

25   Friday, December 6th, that several docket entries on the main

**PROCEEDINGS**

1    MDL docket and their corresponding member case dockets

2    contained possible confidential plaintiff information.  And, by

3    the way, this stuff was filed, like, on November 26th and 27th.

4    So this allegedly confidential plaintiff information had been

5    on the dockets for nine to ten days already, but we didn't get

6    a call until late Friday afternoon.

7         Court staff scrambled to lock down those documents, the

8    docket entries indicated in the e-mail by counsel on the main

9    MDL docket, but they didn't have time enough to lock down the

10   docket entries on the member case dockets.  That locking of the

11   documents in the member cases took place the following Monday,

12   December 9th, and took the clerk's office staff several hours

13   to complete.

14        And, again, with respect to sealing, it was later

15   determined by court staff that some of the docket entries that

16   were locked down did not contain any confidential information.

17   Entire docket entries should not have been locked, but only

18   those specific attachments or documents within docket entries

19   should have been locked.

20        Counsel provided a list of specific entries to court staff

21   on Wednesday, December 11th.  It's going to take the clerk's

22   office several days to clean up the dockets and reopen locked

23   entries and documents that counsel should have specified in the

24   initial e-mail.

25        As of December 13th, 2019, defense counsel still had not

**PROCEEDINGS**

1   filed any motions to seal the locked-down documents.

2       Counsel from Wilkinson Walsh, Andrus Wagstaff, Goldberg

3   & Osbourne, and the Miller firm have consistently failed to

4   follow Local Rule 79-5 regarding the filing of proposed

5   redacted documents.

6       Counsel from the Miller firm and Andrus Wagstaff are

7   filing documents with redactions, but not filing a

8   corresponding motion to seal.

9       Counsel with Goldberg & Osbourne filed their oppositions

10  and motions only on the member case dockets, in violation of

11  Pretrial Order Number 1.

12      Counsel with Goldberg & Osbourne have filed a motion to

13  exclude expert witness testimony in Case Number 19-1630 as an

14  administrative motion in ECF and failed to file the motion

15  pursuant to Local Rule 7-2.

16      On November 22, 2019, counsel with Goldberg & Osbourne and

17  Arnold & Porter for Monsanto filed a stipulation in Calderon

18  versus Monsanto -- Alvarez-Calderon versus Monsanto, for the

19  Court to adopt modified deadlines for Dr. Sawyer's deposition

20  and report.  The stipulation was filed without a proposed order

21  for the Court to sign and, as such, was filed by counsel on the

22  docket simply as a stipulation, without any ruling needed.

23  That, of course, caused us -- not -- caused it not to be

24  flagged for us as an action item.  And the failure to file the

25  stipulation without a proposed order violated Local Rule 6-1D.

1          After David Diamond was ordered to appear in person at the

2     case management conference last Thursday, counsel requested

3     that he be allowed to appear telephonically instead and

4     provided a proposed order requesting the Court provide a

5     dial-in phone number.

6          Since the conception of this MDL, any party wishing to

7     appear by phone is required to register with CourtCall,

8     negating the need for the court to set up telephone conference

9     lines for the parties.  And the Monsanto MDL page on the

10    Court's website makes that clear.

11         So particularly with respect to Goldberg & Osbourne, I

12    understand that that firm has hundreds of MDL matters in this

13    MDL.  If you are going to be a lawyer -- this is to all the

14    lawyers.  If you are going to be a lawyer who participates in

15    an MDL, particularly a complex one like this, you need to

16    become an absolute expert in the local rules and in all of the

17    procedures.

18         I know that the local rules and the filing procedures are

19    difficult, but if you are going to participate in a matter of

20    this magnitude, you need to become an absolute expert in it and

21    you need to make sure that your staff becomes an absolute

22    expert in it.

23         And that has not happened.  And it is going to happen now.

24    And if anybody messes up again, they're going to be sanctioned.

25    If anybody messes up on filing in a way that causes a

**PROCEEDINGS**

1   significant amount of additional work for the court staff, they

2   are going to be sanctioned.  And every lawyer who's on the

3   pleadings is going to be sanctioned.

4        So what I'm going to do right now is I'm going to have

5   Kristen hand out to all of the lawyers here a packet of some of

6   the more important rules that you should be expert in, and

7   you're going to sit here in the courtroom and you're going to

8   read them right now.

9        And I'm going to leave.  I'm going to be back in about

10  half an hour.  If you're done reading them before half an hour,

11  start reading them again.  Become an expert.

12       And I will be back out in about half an hour to discuss

13  the case management matters in the Stevick case.

14           **THE CLERK:**  Court is in recess.

15           **THE COURT:**  But I want the lawyers in here reading it.

16  I don't want you leaving.  You're all ordered to stay in the

17  courtroom and read.

18               (Recess taken at 10:12 a.m.)

19               (Proceedings resumed at 10:42 a.m.)

20           **THE COURT:**  Before we proceed with the pretrial

21  matters that we need to discuss for the Stevick case, let me

22  just reiterate that I do understand that, you know, these

23  filing procedures can be very difficult.  It wasn't so long ago

24  that I was a lawyer that I have forgotten how difficult it is,

25  as a lawyer, to be on top of this stuff.  And I understand the

**PROCEEDINGS**

 1    staff is often dealing with the mechanics of the filings.

 2        But nonetheless, I want to reiterate that when you are a

 3    lawyer involved in as weighty and complicated a matter as this,

 4    you need to go way above and beyond the normal case in terms of

 5    familiarizing yourself with the rules and the procedures, and

 6    you need to go way above and beyond in terms of making sure

 7    that your staff is familiar with the rules and the procedures.

 8        And so what I am going to do is I'm going to order all the

 9    lawyers in this case, by the end of the year or prior to their

10    next filing, whichever is sooner, to certify that they have --

11    to file something on the docket certifying that they have

12    undertaken to ensure that both they and their staffs have

13    become fully expert in all of the rules and procedures

14    associated with filings in this case.

15        And that certification should explain what they have done

16    to make sure that they and their staffs have become expert and

17    what they have done to make sure that nothing like this happens

18    again.

19        And I understand that Monsanto may have a filing that's

20    due tomorrow.  And what that means is that the lawyers from

21    Monsanto need to get this done by tomorrow.

22        Did you have something?

23            **MR. STEKLOFF:**  May I say something, Your Honor?

24            **THE COURT:**  I'd rather not talk further about this.

25    If you want to say something in your certification, you can say

PROCEEDINGS

1    it, but I would rather not spend any more time on this issue

2    and move on to the pretrial conference.

3              MR. STEKLOFF:  Okay, Your Honor.

4              THE COURT:  So with respect to the pretrial

5    conference, I did have -- before turning to the matters that

6    the parties flagged in the case management statement, I had a

7    question -- and I think it's a question primarily for Monsanto

8    but -- for both parties.

9         We had time limits in the previous case.  I don't remember

10   what those time limits were.

11        Does anybody want to remind me, Kristen or the parties?

12             MR. BRAKE:  I believe it was 32 hours.

13             THE COURT:  32 hours total or for each side?

14             MR. BRAKE:  I'm sorry.  For each side.

15             THE COURT:  It was 32 hours for each side.

16        That's consistent with your recollection?

17             MR. STEKLOFF:  It is, Your Honor.

18             THE COURT:  Okay.  And so what are the parties'

19   thoughts about -- I have my own thoughts about how that went

20   and whether that was an appropriate time limit or whether that

21   was too much time or not enough time.

22        But do you want to -- Mr. Stekloff, do you want to comment

23   on that?

24             MR. STEKLOFF:  Yes, Your Honor.

25             THE COURT:  Basically, the question is:  How do you

PROCEEDINGS

1   think the next one should go?

2        MR. STEKLOFF:  Your Honor, you also may recall that --

3   I don't remember the exact time, but my recollection is you had

4   to add a little bit of time to the plaintiffs for even their

5   closing argument in Phase 2 because of where they were on time.

6        They had used a lot of their time in Phase 1, were asking

7   for more time in Phase 2.  They were able to then get through

8   Phase 2 with the time they had remaining, but that would not

9   have left them enough time for closing argument.

10       That's generally my recollection.

11       THE COURT:  Okay.

12       MR. STEKLOFF:  My view, Your Honor, is that the 32

13  hours was more than enough.  I think that we didn't -- my

14  recollection is we didn't use even close to all of our time.  I

15  think the plaintiffs could have -- this is in a neutral way --

16  could have been more efficient in Phase 1 and then would have

17  had more time, if they needed it, which I don't think they

18  needed, in Phase 2 or in closing arguments.

19       So we would be fine with a little bit less time, but I

20  don't think -- at a minimum, we think the time limits should

21  be -- remain the same and, also, should not -- Mr. Brake should

22  understand that going in so that he isn't asking for more time

23  at the end.

24       I mean, hearing about the Bradford Hill criteria from all

25  these experts and things, that was where, I think, during the

**PROCEEDINGS**

 1    trial, we had to raise what we thought were some inefficient

 2    presentations of evidence, and I think that could be

 3    streamlined.

 4             **THE COURT:**  Okay.

 5             **MR. BRAKE:**  As I recall, the plaintiffs had a hard

 6    time meeting the 32-hour deadline.  And I sat through the

 7    Hardeman trial, and you could -- I guess you could argue about

 8    whether you spent the time efficiently or not.

 9        As a trial lawyer, you have a lot to deal with just

10    without worrying about time.  And to have the addition of

11    wondering:  Well, golly, gee, am I going to be able to do this

12    or that and the other thing?  And you have the clock on you,

13    it's a lot of, perhaps, unnecessary pressure on a trial lawyer.

14    At the same time, we want to be efficient, of course.

15        So I would advocate for some extra time.  It would be nice

16    to have and not use it than to put the parties in a position

17    where they're not given the full opportunity to try their case

18    and make sure the jury has the information so a just decision

19    can be reached.  So I would advocate for some more time.

20             **THE COURT:**  Okay.  So I'm going to make a decision on

21    that.  I'm telling you that it's not going to be any more time

22    than was given in the last trial.  It may be less.  I'm going

23    to think a little bit more about that.  I may not give you a

24    final number until the pretrial conference.

25        But you should -- why don't you go ahead and operate on

**PROCEEDINGS**

1   the assumption that you may have a little bit less time than

2   you had -- than the plaintiffs had in the previous trial.

3          **MR. BRAKE:**  Yes, sir.

4          **THE COURT:**  And I'll make a final decision on that at

5   the pretrial conference, after I kind of refamiliarize myself

6   with some of the details of the parties' presentations.

7          **MR. BRAKE:**  Yes, sir.

8          **THE COURT:**  So with that, let me pull up your case

9   management statement.

10          Okay.  Dr. Portier has to testify live.  I don't think it

11   would be fair to Monsanto for his deposition -- "deposition," I

12   don't even know if that's quite the right word to describe it.

13   It was kind of preservation trial testimony or remote trial

14   testimony in lieu of live trial testimony.  But it was because

15   of the particular medical circumstance that he was

16   experiencing.  And I think, you know, a year later, with the

17   additional developments in the evidence, it would be -- it

18   would not be fair to Monsanto to require them to live with his

19   video deposition testimony or video testimony from the prior

20   trial.  So he's required -- so if you want to call him, he has

21   to be here live.  And I don't need to hear argument on that.  I

22   don't think that's a close question.

23          Dr. Sawyer -- I had a couple of questions about that.  We

24   had a discussion, maybe at the prior case management

25   conference, about which experts I was going to rule on in

1  Phase 1 and which experts we were going to leave to the trial

2  judges in the Phase 1 cases, or Wave 1 cases, whatever we're

3  calling them.

4       And I don't remember precisely what we discussed other

5  than -- I know that anything relating to causation and, you

6  know, any expert testimony that related to causation, I was

7  going to rule on.

8       What I don't recall is what we discussed regarding, like,

9  exposure experts and some of the other expert testimony.  I

10 can't remember whether I said that I would leave that for the

11 trial judges, or whether I said I would do that myself, or

12 whether I was ambiguous about that.

13      Does anybody remember what we discussed regarding that

14 last time?

15           MR. STEKLOFF:  My recollection, Your Honor, is that

16 you were focused on the case-specific experts in terms of

17 who -- I'm talking in the broader Wave 1 cases, not

18 specifically Stevick --

19           THE COURT:  Yeah.  Not Stevick, yeah.

20           MR. STEKLOFF:  -- that you would rule on.

21      Although I do -- but I will say that I think in terms of

22 Sawyer, he is different -- he is situated differently in the

23 Stevick case than he was in Hardeman.

24      So in Hardeman, I think the plaintiffs did consider

25 calling him in Phase 1.  We then agreed that if we wouldn't

PROCEEDINGS

1    call our exposure expert, who was Dr. Sullivan, they wouldn't

2    call their exposure expert, who was Dr. Sawyer.  So the issue

3    sort of went away.  There was nothing ripe at that time for you

4    to rule on.

5         In the Stevick case, unlike in Hardeman, Dr. Sawyer

6    purports to do a differential diagnosis of Ms. Stevick.

7              THE COURT:  Okay.

8              MR. STEKLOFF:  And so he is being proffered as a --

9    which I realize isn't exactly what you're asking, but I think

10   he is being proffered in this case, and in many of the Wave 1

11   cases, I will tell you, as a case-specific expert.

12             THE COURT:  I see.

13             MR. STEKLOFF:  His methodology changes and his

14   approach changes.  But I do think there is a ripe issue for you

15   to deal with, with respect to Dr. Sawyer.

16             THE COURT:  Okay.

17             MR. STEKLOFF:  Now, with respect to, for example --

18             THE COURT:  So he is -- just to be clear, make sure I

19   understand, he is offered as a specific causation expert in the

20   Stevick case, as well as in a number of the Wave 1 cases?

21             MR. STEKLOFF:  Yes.

22             THE COURT:  Okay.

23             MR. STEKLOFF:  In Stevick, I actually think what he

24   does is a little different than what he has done in many of the

25   Wave 1 cases.

1        In Stevick, he does perform a differential diagnosis.

2        In the Wave 1 cases, to the best of my recollection, he

3    doesn't always purport to do a differential diagnosis of all of

4    the risk factors.  Rather, what he does is, he does an exposure

5    assessment of how much exposure a plaintiff has had based on

6    what they have said about how much they sprayed and maybe

7    acreage and other things.

8        And then he'll offer an opinion about whether that meets

9    certain thresholds, either under the epidemiology or otherwise.

10   But it is often, not in all Wave 1 cases, case-specific, where

11   he's doing a case-specific analysis of a plaintiff.

12       **THE COURT:**  So whether the exposure is enough to rule

13   in RoundUp?

14       **MR. STEKLOFF:**  I would say that's probably a generous

15   reading of -- you know, we've briefed this.  But, yes, I think

16   that is probably what the plaintiffs would say he's doing,

17   whether there is sufficient exposure to meet some threshold

18   that he sets.

19       **THE COURT:**  So then maybe it does make sense -- the

20   reason I was asking is because I was trying to figure out when

21   it makes sense for me to adjudicate the Sawyer motion in the

22   Stevick case.

23       And one of you -- I can't remember which one -- proposed

24   that that motion be adjudicated in connection with the Wave 1

25   motions, which is the subject of -- and Stevick is the subject

1    of a number of the Wave 1 motions also.

2        I think that probably makes sense to do it at that time.

3        **MR. STEKLOFF:** Right. I think -- I mean, Mr. Brake

4    wants to know if he can call Dr. Sawyer, and I think it is --

5    we do require a ruling from you in that regard.

6        Just to give you a little bit of background, we did brief

7    Dr. Sawyer in all three Hardeman, Stevick, Gebeyehou cases

8    prior to the Hardeman trial. You never had to rule on that

9    because they decided not to call him. There were separate

10   sections devoted to him, sort of, broadly.

11       **THE COURT:** Right. But I want it teed up again. I

12   want to put a focus on whatever the -- I'm going to be reading

13   a lot of briefs.

14       **MR. STEKLOFF:** Yes.

15       **THE COURT:** And I don't want anything extraneous in

16   those briefs, and so I want you to, you know, brief Sawyer as

17   it relates to the Stevick case.

18       **MR. STEKLOFF:** Agreed.

19       And that's where we have slightly different proposals on

20   the briefing schedule. But I think we're both in agreement

21   that we need to do that, taking guidance from Your Honor on the

22   last call.

23       **THE COURT:** Okay. And so if -- and what you proposed

24   is Monsanto's reply due January 10th? When is the --

25       **MR. BRAKE:** 29th.

PROCEEDINGS

```
 1            THE COURT:  Hearing on Wave 1 is the 29th?

 2            MR. BRAKE:  If I may, Your Honor, the reason I

 3    suggested an earlier deadline for Sawyer is because if he -- in

 4    the unlikely event, in my opinion, he's not permitted to

 5    testify, that's something I need to know for my trial-planning

 6    purposes, and I'd like to know it earlier rather than later.

 7        And that's -- I understand you've got a lot to do, a lot

 8    to rule on.  It may be more convenient for Your Honor to do

 9    January 29th.  If that's what you tell me to do, that's what

10    we'll do.  But the reason I requested an earlier date was so

11    I'd know as far in advance what I've got to do.

12            THE COURT:  Okay.

13            MR. BRAKE:  That's why I suggested that we have the

14    briefing completed by the beginning of January.

15            THE COURT:  That's fine.

16        But I think given the time crunch that we're dealing with

17    here and that I'm dealing with in terms of all the stuff I have

18    to do --

19            MR. BRAKE:  Yes, sir.

20            THE COURT:  -- I mean, if -- you know, the -- you're

21    not going to get as much notice on these things as you would

22    ideally want to get.

23        An answer may be to push the trial back a small amount if

24    you need some relief in that regard, but we can cross that

25    bridge when we come to it.
```

**PROCEEDINGS**

 1    But I think -- I don't think that I'm currently in a

 2  position to be burning extra midnight oil on these briefs --

 3        **MR. BRAKE:**  Understood.

 4        **THE COURT:**  -- than I'm otherwise going to have to do.

 5    So then Monsanto's moving papers on Sawyer, and we're

 6  talking about in the Stevick case only -- Sawyer has already

 7  been briefed in the Wave 1 cases; correct?

 8        **MR. STEKLOFF:**  Yes.  I don't know --

 9        **THE COURT:**  Or are in the process of being briefed?

10        **MR. STEKLOFF:**  No.  He has been briefed, but we

11  briefed all of the cases in which he's an expert in one brief.

12        **THE COURT:**  Got it.

13    So for the Stevick case, Monsanto's motion regarding

14  Sawyer is due December 27th.

15        **MR. BRAKE:**  That's the proposal from Monsanto.

16        **THE COURT:**  Right.

17    And the plaintiffs' response is due January 3rd.

18    And Monsanto's reply is due January 10th.

19    And there will be a hearing on that in the -- on that

20  January date where we're having the hearing on the Wave 1

21  motions.

22    What was that date again?

23        **MR. STEKLOFF:**  The 29th, Your Honor.

24        **THE COURT:**  29th.  Okay.

25    Next issue, number of jurors.  Just to freak Kristen out,

PROCEEDINGS

1  I was going to propose eight or nine jurors, but I think what

2  happened -- given what happened last time, I think, probably,

3  it would be prudent to go with 10 jurors.

4       I see Mr. Brake cringing a little bit, and I understand

5  why.  And I think you can make an argument that what happened

6  in the last trial was so unusual, and maybe if we adopt the

7  gambler's fallacy, we say, how could that happen two times in a

8  row?

9       On the other hand, there is a lot unusual about this case,

10  including the extraordinary efforts that both sides are

11  undertaking to effect the jury pool.

12       And so I -- I think, probably it would be appropriate to

13  go with ten jurors in the case.

14       Any comment on that?

15          MR. BRAKE:  Nine worked out fine before, but --

16          THE COURT:  Okay.

17          MR. BRAKE:  -- I understand what you're saying.

18          THE COURT:  Okay.  So it'll be ten jurors.

19       And then, let's see.  So the healthcare provider

20  depositions and the witness deposition cuts, the next two items

21  on the case management statement, I gather that everybody is

22  sort of in agreement that the default is to use the approach

23  that was used in the prior trial.

24       If there is something -- but there could be situations

25  where either side asks me to take another look at it.  Right?

**PROCEEDINGS**

1        One is if you think I made a particularly grave mistake in

2    the -- from an evidentiary standpoint, in the prior trial.   And

3    the other is, well, given the way the evidence came in, in the

4    prior trial, it made sense to allow this or to exclude that,

5    but that it doesn't make sense in this trial because we're not

6    anticipating the evidence to come in, in the same way.

7        It sounds like maybe other than those two scenarios, what

8    you're expecting is that we'll do -- we'll do it the way that

9    we did it in the prior trial, with both sides preserving any

10   objections that they made at the prior trial and ensuring --

11   doing whatever they need to do to ensure that those objections

12   are lodged here as well.

13       Is that what I'm sensing from the two of you, based on

14   what you wrote in your case management statement?

15           **MR. BRAKE:**   There's one other category.   Your Honor's

16   ruling was that post-use conduct from Monsanto is inadmissible.

17   In Hardeman, I believe he stopped in 2012.   And Mrs. Stevick

18   stopped using in December of '14.   So I need to make sure that

19   we include anything in that time frame.   That's the major

20   reason I wanted to have another look at this.

21           **THE COURT:**   And that's going to be a potentially

22   significant difference.   Right?

23           **MR. BRAKE:**   Yes, sir.

24           **THE COURT:**   Because all of the IARC stuff.

25           **MR. BRAKE:**   IARC didn't come out until '15.

1          **THE COURT:**  Oh.

2          **MR. BRAKE:**  But there were some discussions about it

3    before.  So I can't tell you every little piece of evidence

4    that we're going to ask Your Honor to admit in that time frame,

5    but I imagine it's going to be fairly substantial.  I've got to

6    go back and look.

7          **THE COURT:**  Okay.  And there may be fights about that

8    material, and this may be one of -- I mean, I wrote a pretty

9    detailed post-trial ruling, kind of explaining why Monsanto

10   wasn't permitted to get in a number of the things that it

11   wanted to get in.

12        And Monsanto may choose for the, you know, chain reaction

13   to work differently in this case than it did in the prior case,

14   and we may need to have discussions about that.

15        But the general philosophy that I articulated for how

16   we're going to approach the deposition testimony in this case

17   and the testimony from the treating physicians and the

18   exhibits, I mean, is that an acceptable general approach for

19   both sides?

20        **MR. BRAKE:**  I'm sorry.  I'm not sure I understand what

21   you're -- you're saying.

22        **THE COURT:**  Sure.  Let me try again.

23        So it seems to me that there are two ways that we could

24   approach these evidentiary questions.  One is to just start

25   from scratch and consider everything, you know, again.  Right?

**PROCEEDINGS**

1    And everybody lodges -- fights and lodges their objections, and

2    everybody asks for a ruling from me, even if I ruled the same

3    way, you know, in the prior trial, and nobody has any reasons

4    to believe that I would rule differently in this trial.  Right?

5         That's one way we could do it.  Right?

6         The other way we could do it is, sort of, have an

7    understanding that at least from a 10,000-foot level, it's

8    going to happen the same way as the last trial.  And there may,

9    of course, be some differences.

10         One difference is, there may be something -- there may be

11    an area where one side or the other believes that I made a

12    particularly significant mistake, and they want me to revisit

13    that for this trial.

14         Another area might be -- another situation might be that

15    the evidence is going to come in differently, so something that

16    was admissible or excludable in the prior trial would not

17    similarly be admissible or excludable in this trial.  And then

18    you've noted that Ms. Stevick used RoundUp for a couple of

19    years after Mr. Hardeman used it.

20         So those are three kind of general areas where it may be

21    necessary to revisit some of the evidentiary rulings.  But

22    other than that, you know, the playbook that the parties and I

23    should be operating under is that, you know, we're going to do

24    it the same way as the last trial.

25         Now, the first question I have is:  Have I articulated

**PROCEEDINGS**

1    that in a clear way?

2              **MR. BRAKE:**  Yes, sir.

3              **MR. STEKLOFF:**  Yes, Your Honor.

4              **THE COURT:**  Okay.  And my view is that we should do it

5    in the latter way.  But I you have any objections to taking

6    that general approach?

7              **MR. BRAKE:**  No objection.

8              **MR. STEKLOFF:**  None from us, Your Honor.

9              **THE COURT:**  Other than --

10             **MR. STEKLOFF:**  There might be another category, which

11   is that maybe we designated something on Phase 2 that we think,

12   understanding and looking in hindsight, we could have

13   designated in Phase 1, or maybe something we didn't

14   designate -- say from a company witness that we might want to

15   now add for context.  But we're not -- the general baseline

16   rule of, "we're not going to re-litigate every ruling you have

17   already made" is both acceptable and in play for pretty much

18   everything, I think.

19             **THE COURT:**  Okay.  And obviously, that's not without

20   prejudice to preserving any objections that you made in the

21   trial last time.  You know, if you don't squawk when something

22   gets admitted in this trial, you're not waiving any objection

23   that you made -- you're not waiving objection to it, if you

24   made that objection in the last trial.

25        But you may want to put something in writing on that just

**PROCEEDINGS**

1    to make the record clear about -- you may want to figure out

2    the appropriate mechanism for ensuring you're not waiving an

3    evidentiary objection.

4            **MR. STEKLOFF:**  Right.  And hopefully, Your Honor,

5    after reviewing this whole thing -- I mean, that's what we

6    tried to do, as well, in the summary judgment and Daubert

7    motions, which was not re-litigate, you know, whether under

8    California law, the standard for failure to warn was met, but

9    put in a filing that preserved that issue for the appellate

10   record.

11           **THE COURT:**  Okay.

12           **MR. STEKLOFF:**  As an example.

13           **THE COURT:**  Okay.  So with that, what do we -- do we

14   need to adopt any deadlines as they relate to the healthcare

15   provider depositions or the deposition cuts overall?

16           **MR. BRAKE:**  We have agreed to deadlines, as outlined

17   in the case management statement.  If they are acceptable with

18   Your Honor, we'll go ahead and use those.

19           **THE COURT:**  Okay.  That sounds good.

20       So -- and it looks like the dates are different for the

21   different categories.

22       So for the healthcare provider depositions, the

23   plaintiffs' designations are due January 6th.

24       Monsanto's counter-designations are due January 13th.

25       Plaintiffs' rebuttal designations due January 17th.

**PROCEEDINGS**

1    And parties have to submit the designations and the

2   testimony to the Court for ruling on January 21st.

3        **MR. BRAKE:**  Yes, sir.  And we would hopefully have a

4   ruling at or shortly after the February 3 pretrial conference.

5        **THE COURT:**  Got it.

6        **MR. BRAKE:**  That would be the goal of that.

7        **THE COURT:**  Got it.

8    And I will certainly do my best.

9    You know, the last -- at the last trial, because of the

10  delay -- largely because of the delays in providing

11  designations and counter-designations to me, I was doing it as

12  we were going.  And I understand how hard that must have been

13  for the lawyers.  And it wasn't terribly easy for me either.

14  So I would love the opportunity to avoid that.

15       **MR. BRAKE:**  Thank you.

16       **THE COURT:**  And then with respect to the deposition --

17  the -- I guess the way to say this is the deposition cuts for

18  all other witnesses.

19   With respect to the deposition cuts for all other

20  witnesses, the plaintiffs' designations are due January 13th.

21   The Monsanto's counter-designations are due January --

22  excuse me, January 21st.

23   The plaintiffs' rebuttal designations are due

24  January 27th.

25   And those designations should be submitted to the Court,

PROCEEDINGS

1    along with the testimony, by January 31st.

2         And what you should do is what I had you do during the

3    trial, which is you should give me a priority list.  You should

4    tell me which -- to the extent I can't get to all of the depo

5    designations, you should prioritize them and tell me what you

6    want to -- want me to turn to first, the order in which you

7    want me to tackle them.  And you should submit that along with

8    the designations and testimony themselves on the dates that we

9    identified.

10        So that's that.

11        The disclosure of additional expert -- I think the only

12   remaining issue is the disclosure of additional general

13   causation experts.  Is that right?

14             MR. STEKLOFF:  Yes, Your Honor.

15             MR. BRAKE:  Yes, sir.

16             MR. STEKLOFF:  The prior topic is just noting that --

17   we're not requiring, for example, which I think is what

18   Mr. Brake really wants to know, is whether he has to bring an

19   economic -- like a damages-type numbers expert.

20        And we're -- basically, I have told him, we will agree to

21   the stipulations as read in Hardeman.  But there may be a few

22   issues which we seek for you to reconsider.

23             THE COURT:  Like what Bayer paid to acquire Monsanto,

24   or something like that?

25             MR. STEKLOFF:  Off the top of my mind, that is the

1    only one that I can think of, which is that we will try to

2    convince you that that should not be read to the jury in the

3    Stevick case.

4         **THE COURT:**  Okay.  Now, with respect to the use of

5    additional general causation experts, I mean, I guess I start

6    at the -- I start with the view that you should -- for this

7    bellwether trial, you should not be allowed to call additional

8    expert witnesses on general causation for the reasons we have

9    already discussed at length.

10        I -- and, you know, we had a fight about whether you

11   should be allowed to call those people in the Hardeman case,

12   and I ruled that you could not.

13        And so the question is:  Why should it be different now?

14        The only thing you seem to offer in the case management

15   statement is that the evidence has -- you know, there is more

16   evidence now.  Right?  The evidence has evolved.

17        And the obvious response to that is:  Why can't the three

18   or so general causation experts who you designated during

19   Phase 1 of -- of the MDL address the new evidence that's come

20   up?

21        I mean, I believe you only called -- if I remember

22   correctly, you only called Mucci at the last trial.  But you

23   did designate two or three general causation experts during the

24   general causation phase of the MDL, any of whom you could have

25   called at the Hardeman trial, and any of whom you could

1  presumably call for this trial.  Right?

2          **MR. STEKLOFF:**  That's correct, Your Honor.

3          **THE COURT:**  So why, in light of that -- in other

4  words, you can go with Mucci again if you want, or you can go

5  with one of those other two, or you can go with all three.

6      Why is that not enough?

7          **MR. STEKLOFF:**  Right.

8          **THE COURT:**  How would you be prejudiced by being

9  limited to those witnesses on the rationale that I gave for

10 limiting you in Hardeman?

11         **MR. STEKLOFF:**  Right.  The prejudice is -- I mean,

12 just to call out specifically what it is, because plaintiffs'

13 counsel has told me why they don't want us to be able to do it.

14     First of all, I think the issue is different than in

15 Hardeman.  In Hardeman, what we were asking you to do in

16 advance of trial was to allow our case-specific experts to

17 opine on general causation issues.  So, for example, like

18 Dr. Levine, you discuss in a more fulsome way the epidemiology,

19 the cultural --

20         **THE COURT:**  But it's the same point; right?  Which is

21 that what I ruled is that you can't bring in any additional

22 general causation experts.

23         **MR. STEKLOFF:**  Yes.  And at that time, you -- part --

24 I think part of the rationale, and part of what the plaintiffs

25 raised was that Dr. Levine, as an example, had not been vetted

1   on her general causation opinions because you had a very long

2   procedure, and you vetted all our experts, like Dr. Mucci, on

3   those opinions.  So there was a sense of, that needs to apply

4   in the trials.

5        The prejudice to us, Your Honor, is that -- and I think

6   this was appropriate at the time -- was that Dr. Mucci was

7   called to testify about epidemiology; Dr. Foster was called to

8   testify about animal studies.  The plaintiffs have made that a

9   theme in their case presentation to the jury and attacked -- I

10  mean, attacked our experts -- I don't mean in a mean way, but

11  criticized our experts for failing to consider all of the

12  evidence.

13       And they have specifically said to me that they were going

14  to fight this both in the Giglio case, where you allowed us to

15  substitute additional experts, because that's part of Wave 1.

16  And I'm sure the thinking here is exactly the same.  They don't

17  want our presentation of the science to evolve.

18       And I will just be blunt.  One of the reasons we want to

19  be able to call these other experts, in addition to

20  availability issues, in addition to evolving science, is so

21  that they can present on all three areas.

22       And I will tell you that all three of those experts were

23  disclosed in Wave 1.  And the plaintiffs failed -- their

24  deadline to file Daubert motions, against any of them was

25  December 10th, and they did not file Daubert motions against

**PROCEEDINGS**

1    them.  So the Wave 1 cases, those experts are going to be able

2    to go and testify about all three areas without their

3    methodology or credentials being challenged.

4         And I think, here, part of the -- I mean, we now have the

5    year deadline.  Part of the goals for the parties is to be able

6    to evolve and change their strategy with respect to -- I think

7    we'll brief this -- but the EPA comes in, other regulatory

8    bodies.  It's the same thing here.  We should be able to evolve

9    our strategy and be allowed to present other experts who can

10   cover, and have offered reports and been deposed on all three

11   areas.

12        And the plaintiffs have very bluntly told me they are

13   happy with the world being stuck in 2017 and don't want to be

14   able to change.  We are going to 2020 for the trial and, three

15   years later, we would like be able to present the science in

16   Phase 1 as we see fit.

17        **THE COURT:**  So these three general causation

18   experts -- what are their names again?

19        **MR. STEKLOFF:**  Dr. Bruce, Dr. Wilner, and Dr. Varrier.

20        **THE COURT:**  Okay.  So they were disclosed as part of

21   the Wave 1 discovery process.  They submitted reports.  Their

22   depositions were taken.

23        And there are no Daubert motions relating to them, but

24   were they disclosed as witnesses in the Stevick case?

25        And, you know, were -- you know, was Mr. Brake and his

**PROCEEDINGS**

1    people involved in taking their depositions?  And how -- how

2    did the disclosure/discovery process work as it relates to the

3    Stevick case?

4              **MR. STEKLOFF:**  They were not disclosed in the Stevick

5    case.  The issues being raised now -- I mean, they can tell you

6    more about their process.  In general, a large number of

7    experts were disclosed on both sides, in general.

8         Monsanto lawyers, and then the plaintiffs' leadership

9    committee split up handling those depositions.  I don't recall,

10   sitting here, specifically.

11        I mean, I think Ms. Wagstaff may have deposed -- maybe

12   not.  But, you know, people, as part of the main firms, deposed

13   all of Monsanto's experts.

14        So I will concede.  I don't think Mr. Brake was there, but

15   certainly --

16             **THE COURT:**  I'm not sure that matters.  But I was just

17   asking.

18             **MR. STEKLOFF:**  I certainly think -- I'm not asking to

19   delve into how they've divided up experts.  But the plaintiffs'

20   leadership committee, certainly, I think, was involved in

21   deciding who was there, in all of cases, to take all of the

22   depositions.

23        And where there are other firms who had -- who are not

24   part of the plaintiffs' leadership committee or plaintiffs'

25   steering committee, I think they largely defer to the

**PROCEEDINGS**

1    plaintiffs' leadership committee and steering committee to lead

2    all of those depositions of our experts.

3         **THE COURT:**  I guess my reaction to everything you have

4    said is that, you know, the idea that the science has continued

5    to develop, that didn't particularly move me.

6         The -- you know -- but, you know, I'm sympathetic to your

7    point that, you know, a litigant has the right to sort of, you

8    know, change their strategy in terms of how things are going to

9    be presented to the jury.

10        And, you know, you -- you feel that it -- the way it was

11   presented to the jury didn't -- didn't go so well last time on

12   this particular -- on this issue that we're discussing.  And

13   you want to -- you know, you want to address what you view as a

14   potential deficiency in your presentation.

15        But I guess the concern I have in response to it is, you

16   know, there is a tremendous amount to do between now and trial.

17   And, you know, only now, in this case management statement that

18   was filed, you know, a week ago, are you making this argument

19   that these new experts should be permitted to testify in this

20   trial.  And the default that we have all been operating under

21   is that for the bellwether trials, it's going to be these

22   general causation experts; right?

23        And, you know, I just -- I don't know how -- in a normal

24   trial, in a regular trial, when we have a trial scheduled for

25   late February, and it's a two-week trial and -- you know, the

1   question comes up in December whether, you know, a different

2   witness should be allowed to be substituted in, I would think,

3   normally, we would say, that's -- you know, that's not a

4   problem.  We're far enough from the trial date.  And maybe

5   that's fine.

6        But in this case, given how much there is to do, and given

7   how much, like, intensive preparation has already gone into

8   this major trial that's going to take place in late February,

9   it seems a little unfair to the plaintiffs to kind of ask at

10  the 11th hour to sub in different general causation experts.

11       **MR. STEKLOFF:**  I'll just say, Your Honor, before

12  Hardeman -- and I'm not -- this is not a complaint, but we were

13  here all through January, even just trying to figure out the

14  scope of the case-specific testimony with Dr. Weisenberger and

15  Dr. Shustov, Dr. Nabhan.  And we dealt with it and we addressed

16  it.

17       Here, they know exactly what Dr. Bruce and Dr. Varrier,

18  and Dr. Wilner will say.  I think some of them have been

19  disclosed in some of the Missouri cases or some California

20  State cases.

21       So as a group -- even Dr. Foster, for example, has updated

22  his report that he -- and has been prepared to testify on all

23  three areas in some of the other cares that were very close to

24  going to trial in Missouri.

25       **THE COURT:**  Doctor, who?

1              **MR. STEKLOFF:**  Dr. Foster, who's one of the experts

2    that you allowed through on animal studies -- or in the -- you

3    assessed Dr. Foster in this Daubert general causation phase

4    here.

5              **THE COURT:**  So Dr. Foster was a general causation

6    expert who focused on animal studies in Phase 1?

7              **MR. STEKLOFF:**  Yes, sir.

8              **THE COURT:**  You're saying he has updated his testimony

9    in some of the Wave 1 cases to address the other prongs?

10             **MR. STEKLOFF:**  Even in some of the other

11   jurisdictions, where they have had notice of that in discovery,

12   his updated opinions.

13        So I think the point is, I think there is less prejudice.

14   They know what these people are going to say.  They have

15   deposed them.  They are trying to lock us into a world

16   three years ago because they like this argument with the jury

17   that our experts should be siloed into one of their -- what

18   they call the "three pillars."  So I think the prejudice is

19   much more severe to us --

20             **THE COURT:**  When you say "locked into a world"

21   of 2017, what you really mean is locked into the approach that

22   you happen to take in 2017.  I mean, the way you say it, it

23   implies that you're not going to be able to present some

24   evidence that developed after 2017.  But that's not the case.

25   Right?

1          MR. STEKLOFF:  I agree.

2          THE COURT:  The existing experts, the experts -- you

3    know, whoever your general causation experts are who

4    participated in Phase 1 are, of course, perfectly free to

5    update their opinions based on evidence that's come in

6    thereafter.

7          MR. STEKLOFF:  I understand that.

8       I'm -- I agree with what you just said.  I mean -- but it

9    also is twofold.  I mean, I presume, for example, our

10   case-specific expert in Stevick can't opine on agricultural

11   health studies and go into the epidemiology.

12      So you're basically saying -- and I agree, it was a

13   conscious approach by Monsanto in 2017 that we can't evolve in

14   what you've described as a bellwether that is meant to provide

15   one meaning -- more information to all litigants moving

16   forward.  And to say that, therefore, because of a strategic

17   decision that was made in 2017 in how to approach bifurcated

18   Daubert proceedings, we can't change?  Especially after

19   Hardeman?

20      In dual respects in that, we -- it basically forces me --

21   and I am very in favor of Dr. Mucci -- but it's basically

22   saying, the only way for you to have anyone come in and talk

23   about the agricultural health study, in your view of the

24   epidemiology, is you have to call Dr. Mucci because you

25   disclosed Dr. Mucci in 2017.

**PROCEEDINGS**

1    And I understand you can say that was a conscious decision

2    back then, and I'm -- to be clear, I want to support Dr. Mucci.

3    She is wonderful.  I thought her testimony in Hardeman was

4    excellent.  But that just doesn't make sense leading into what

5    is supposed to be now -- getting to use your words -- a sort of

6    bellwether case three years later.

7    And I really don't think -- here we are in December --

8    there is as much prejudice to Mr. Brake and his colleagues as

9    we would be prejudiced because they know what they are going to

10   say.

11   They don't like the fact that we want to bring in experts

12   who would cover all three areas, but I don't think we should be

13   precluded from doing so.

14        **THE COURT:**  Mr. Brake?

15        **MR. BRAKE:**  Yes, sir.  Three things to say:  Number 1:

16   This was not the product of some random thing.  This was a

17   conscious decision by Monsanto back when we went to the Daubert

18   proceeding to adopt the strategy which they adopted.  They

19   could have named five or six other people to talk about the

20   three pillars of science, or whatever.  For whatever reason

21   they chose to do it the way that they did it.  And now, they

22   don't want to live with the consequences of that action.

23   That's Number 1.

24   Number 2:  As Your Honor alluded to, here we are two and a

25   half months away from our trial, and Monsanto is telling you,

**PROCEEDINGS**

1    and telling me, "We want to completely change our general

2    causation game plan and testimony at trial."

3         I mean, if that's -- that's not -- Your Honor has pointed

4    out, that's going -- if that's permitted, that's going to --

5         **THE COURT:**  Well, how difficult of a thing is it,

6    really, to adjust to?

7         I mean, you -- you know, you probably -- let's say, you

8    know, you're working already on your opening statement and your

9    closing arguments.  I mean, you know, one of the things that

10   you will say, no doubt, is that:  Look, we brought you experts

11   who were able to look at the totality of the scientific

12   evidence.

13        They brought you experts who were siloed.

14        You know, their presentation is, you know -- the

15   presentation they have given you is not valuable.  We are the

16   only people who have experts who have looked at everything.

17        That's -- you know, you have three months to change your

18   opening statement and your closing argument and focus on

19   something else.

20        **MR. BRAKE:**  Well, not just that, Your Honor.

21        If Your Honor is actually -- I hope that you're not -- if

22   you're actually thinking about letting them do this, I'm going

23   to have to depose these people.

24        I mean, if these people had been disclosed in the initial

25   Daubert proceedings in this case, I would have known they were

1    going to testify, or could testify, in Stevick.  I would have

2    darn well taken their depositions and gone after them.  I

3    didn't do that because I didn't think we would need to.

4         I mean, and the other thing, too, Your Honor, is that, I

5    mean, we, as litigants, rely upon the Court's orders on these

6    matters when we get ready for trial.  And Your Honor said on

7    October 29th with regard to the bellwether cases (reading):

8              "You cannot add general causation experts."

9              And then Your Honor said on February 18th, 2019

10        (reading):

11             "The plaintiffs' Motion in Limine 2 to exclude new

12        general causation experts and opinions is largely

13        granted."

14        And then, as recently as October 7th, Your Honor made

15   clear the limitation on general causation experts was meant to

16   apply to the bellwether cases.

17        **THE COURT:**  That was in the order where I denied your

18   request to apply it to the other cases.

19        **MR. BRAKE:**  Yes, sir.  You let the general causation

20   go forward with new people.

21        With respect to Wave 1, you said, no, of course, the

22   bellwether case is going to stay the same.

23        So, I mean, taken all together, that's a big -- I mean,

24   that's not a minor thing.  That's a big, big, big deal now, two

25   and a half months away from trial, to have that bombshell

1    dropped on us.

2         **THE COURT:**  So the other thing you could be saying --

3    and you haven't quite said it yet -- but you could be saying,

4    and by the way, I would -- I might well move to exclude those

5    experts, if they were offered in the trial that I'm about to

6    embark upon.

7         **MR. BRAKE:**  Well, sure.

8         **MR. STEKLOFF:**  I think the Miller firm has Wave 1

9    cases, Your Honor.  So they had all of the same incentives -- I

10   understand that the incentives might be different for the trial

11   that's next, but they had all the same incentives, one, to

12   depose these people for future trials in which they might

13   testify in cases where they represent clients, and, two, to

14   file Daubert motions in those case.

15        So I do think that the Miller firm is -- they certainly

16   were involved in the process, but I'm almost certain that some

17   of those cases are their clients in the Wave 1 cases.

18        **MR. BRAKE:**  Yes, Your Honor.  But, I mean, there is a

19   difference between a Wave 1 trial that's going to be going to

20   trial, maybe, I don't know, next -- this fall, next fall, and a

21   trial that's going to trial in two and a half months.

22        And I'll just repeat it again.  We rely upon on the

23   Court's ruling when we get ready for things.  And I thought

24   this would have been a five-second discussion on this because

25   Your Honor said, three times, no.

PROCEEDINGS

```
 1        And now, because Monsanto is not happy with the way things
 2   have played out -- I'm not being critical.  They are not happy
 3   with it.  They want to change it now.  I just, in my mind,
 4   didn't think this would be an issue at all, given the Court's
 5   previous rulings.
 6        THE COURT:  All right.  Let me think about it a little
 7   bit.  I think, for now, the parties should operate on the
 8   assumption that the same rules are going to apply as the
 9   Hardeman case.  But I'll think on it a little more and issue an
10   order on this one.
11        MR. BRAKE:  Mr. Burton just brought up a point, if I
12   may, Your Honor.
13        THE COURT:  Sure.
14        MR. BRAKE:  That compounding to the prejudice, which I
15   attempted to articulate before, getting this dropped on us two
16   and a half months away from trial, if we're going to have a
17   32-hour time limit, and then Monsanto has three more experts,
18   that's compounding the, you know --
19        THE COURT:  I was operating on the assumption that
20   they would be subbing out one expert for another and -- but in
21   any event, Monsanto is saying, we want to -- you know, we're --
22   we can present our case in far fewer than 32 hours.
23        So I'm not sure how much of a concern that is.
24        MR. BRAKE:  When I cross-examine them, it comes off my
25   time, obviously.
```

1          **MR. STEKLOFF:**  I can represent that we're not going to

2     put on a bunch of cumulative -- we're going to be efficient and

3     I don't think it would change.

4          We're actually in a worse situation now, which is that we

5     have to call a number of experts.  If you have to take a silo

6     approach, he would have to cross-examine.

7          And what I'm saying is, we would like be able to be both

8     more efficient, but also more strategic in the --

9          **THE COURT:**  So, do you want to -- are you in a

10    position right now to articulate -- if you were given

11    permission to call, you know, new general causation experts,

12    who wouldn't you call?

13         And who would you call?

14         **MR. STEKLOFF:**  I don't know that I am in a position

15    now -- part of it is, I have to go check availability of all

16    these experts.  But I am happy to file something to narrow the

17    scope.

18         **THE COURT:**  Because the implication was -- you know,

19    you called an animal person, if I recall.

20         **MR. STEKLOFF:**  Not Hardeman.

21         **THE COURT:**  An epidemiology person?

22         **MR. STEKLOFF:**  In the Daubert, but not to Hardeman.

23         **THE COURT:**  In Hardeman, you called Mucci.  And you

24    didn't call a toxicology person and you didn't call a mechanism

25    person.

**PROCEEDINGS**

1        **MR. STEKLOFF:**  That's correct, Your Honor.

2        **THE COURT:**  Okay.  I'll give it a little more thought.

3   But the default -- you know, as I said, proceed on the

4   assumption that the restriction continues to apply, and I will

5   give it a little bit of further thought and issue something

6   before the end of the year, just so you --

7        **MR. STEKLOFF:**  And either before --

8        **THE COURT:**  -- are not wondering.

9        **MR. STEKLOFF:**  Before and during -- I thought, if you

10  would like Monsanto to provide more specificity about the

11  experts who we would reserve the right to call -- we might not

12  call someone -- but if we need to narrow the list, so there are

13  fewer experts in play in totality and be more specific?  We are

14  happy to file --

15       **THE COURT:**  That's okay.  I think I have a pretty good

16  understanding of what you're saying.

17       **MR. STEKLOFF:**  Okay.

18       **THE COURT:**  Is there anything else for us to discuss

19  right now?

20       **MR. BRAKE:**  I want to make sure -- I looked at the

21  Court's web page, but the same schedule, the 8:30 to 2:00,

22  Monday, Tuesday, Wednesday, Thursday, dark Friday, that's the

23  same schedule we'll have for Stevick; is that correct?

24       **THE COURT:**  Yes.

25       **MR. BRAKE:**  Okay.  I thought so.  I just wanted to

**PROCEEDINGS**

1    make sure.

2           **THE COURT:**  Okay.  Kristen is looking at it now.

3           **THE CLERK:**  8:00 a.m. for counsel.

4           **THE COURT:**  Oh, yeah.  Right.  Counsel needs to be

5    here at 8:00 a.m., and the jury comes in at 8:30 sharp.

6           **MR. BRAKE:**  Got it.  The only issue -- to comply with

7    the standing order, my understanding is -- so on behalf of

8    Monsanto, we do not -- we similarly, with the approach you

9    discussed earlier, do not intend on Revisiting every motion in

10   limine.

11          There may be either case-specific motions in limine for

12   Ms. Stevick, but I don't -- maybe they already do, but I do

13   think that, regardless, there may be some motions where we say,

14   in light of what happened in Hardeman, we would like you to

15   reconsider, for example, how you treat IARC and other regulator

16   evidence.  We would be appropriately targeted.  But I was

17   wondering if we should set some sort of briefing schedules on

18   those types of issues or if we should just default to the way

19   they are normally treated in advance of a pretrial conference.

20          **THE COURT:**  I thought we had -- I thought we would set

21   motion in limine deadlines already.  No?

22          **MR. BRAKE:**  We did, Your Honor -- I mean, for the

23   three bellwether cases, it was my understanding those motions

24   in limine were for all.

25          **THE COURT:**  Oh, yeah.  But it's -- of course, there

**PROCEEDINGS**

1   has to be the ability of both sides to say, you know, here is

2   why you're ruling on the -- you know, the prior -- on Motion in

3   Limine Number 75 --

4          **MR. BRAKE:**  I got it.

5          **THE COURT:**  -- doesn't apply in this case, or why you

6   need to revisit it, given how the evidence is going to come in,

7   in this case, compared to how the evidence came in, in the

8   prior case.

9          **MR. BRAKE:**  Right. The answer is that the Court has

10  not specifically, for this case, given us deadlines, nor have

11  we agreed.

12       We can do --

13         **THE COURT:**  Why don't you just use the deadlines

14  established in the standing order --

15         **MR. STEKLOFF:**  Okay.

16         **THE COURT:**  -- for that?

17       And I guess what I would -- let's give a little bit of

18  thought to the formatting.

19       I think what would be helpful is if you filed -- I'm sort

20  of thinking out loud here.

21       So maybe this is wrong.  But I think what might be helpful

22  is if you file one document, okay, and you go through all of

23  rulings from Hardeman.  And you -- all the pretrial, you know,

24  the motion in limine rulings from Hardeman, and you either say,

25  you know, preserving all our objections, the parties have

**PROCEEDINGS**

 1  agreed that the same thing should -- you know, the same concept

 2  should apply here, or argument about why it needs to apply

 3  differently for the Stevick trial.

 4      Each side, if you jointly submit one document, kind of

 5  like the jury instructions document that we usually have you

 6  submit.  Right?  One document and it goes through each ruling

 7  from the prior trial and either has a statement that you're

 8  preserving your objections and you don't want to argue any

 9  further about this, or explaining why we need to think about it

10  further as it applies to the Stevick trial.  And you can each

11  have your own section.

12      I think that would be probably be the most helpful format

13  for me.

14      Does that make sense?

15          **MR. BRAKE:**  Yes, sir.

16          **MR. STEKLOFF:**  No objection.

17          **THE COURT:**  Okay.  So that's that.  And that will be

18  due whenever the standing order says it's due.

19          **MR. STEKLOFF:**  Would that be due -- not to complicate

20  things, but the date replies are normally due, or when the

21  pretrial order is normally due?

22          **THE COURT:**  Well, I believe the standing order

23  requires you to file the motion and the opposition at the same

24  time.  If I recall correctly, it's 14 days before the pretrial

25  conference.

PROCEEDINGS

1          Is that right, Kristen?

2               THE CLERK:  Yes.

3               THE COURT:  Yeah.  So that would be how it would work.

4          So it requires you all to exchange stuff in advance.

5               MR. STEKLOFF:  Yeah, I don't think that -- my instinct

6     is, it won't be -- at least from our side -- a ton of

7     re-litigation of our issues.  But we wanted to be able to

8     submit a few.

9               THE COURT:  Anything else we can discuss right now?

10              MR. BRAKE:  I cannot think of anything right now, Your

11    Honor.  Thank you.

12              MR. STEKLOFF:  Same, Your Honor.  Thank you.

13              THE COURT:  Okay.  Thanks.  We'll see you in the new

14    year at some point.

15              MR. BRAKE:  Yes, sir.  Thank you.

16              THE CLERK:  Court is adjourned.

17                   (Proceedings adjourned at 11:37 a.m.)

18                        ---o0o---

19

20

21

22

23

24

25

1                    **CERTIFICATE OF REPORTER**

2            I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4

5    DATE:    Friday, December 20, 2019

6

7

8

9    _____

10          Ruth Levine Ekhaus, RDR, FCRR, CSR No. 12219
              Official Reporter, U.S. District Court