REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# Exhibit A

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1         IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
                       STATE OF MISSOURI
 2
     --------------------------------§
 3   TIMOTHY KANE, et al.,            §
                                      §
 4       Plaintiffs,                  §
                                      § Case No. 1622-CC10172
 5   vs.                              §
                                      §
 6                                    §
     MONSANTO COMPANY,                §
 7                                    §
         Defendant.                   §
 8   -------------------------------- §
 9
                       - - -
10
                  DECEMBER 3, 2019
11                   VOLUME I
12                     - - -
13              ***CONFIDENTIAL***
14
                       - - -
15
         Videotaped deposition of STEPHEN E. PETTY,
16   PE, CIH, CSP, held at Westin Fort Lauderdale
     Beach Resort, 321 North Fort Lauderdale Beach
17   Boulevard, commencing at 9:08 a.m., on the above
     date, before Trina B. Wellslager, Registered
18   Professional Reporter, Certified Realtime
     Reporter, and Notary Public
19
                       - - -
20
              GOLKOW LITIGATION SERVICES
21       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
22
23
24
25
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    APPEARANCES:
 2       WEITZ & LUXENBERG, P.C.
          BY:  JERRY KRISTAL, ESQUIRE
 3       220 Lake Drive East, Suite 200
          Cherry Hill, New Jersey  08002
 4       (856) 755-1115
          jkristal@weitzlux.com
 5       Representing Plaintiffs
 6       LUNDY, LUNDY, SILEAU & SOUTH, L.L.P
          BY:  NADINA ANN BEACH, ESQUIRE
 7       501 Broad Street
          Lake Charles, Louisiana  70601
 8       (337) 439-0707
          dbeach@lundylaw.com
 9
          Representing Plaintiffs
10
          HOLLINGSWORTH, LLP
11       BY:  JOHN M. KALAS, ESQUIRE
          GRANT HOLLINGSWORTH, ESQUIRE
12       1350 I Street, Northwest
          Washington, DC  20005
13       (202) 898-5800
          jkalas@hollingsworthllp.com
14
          Representing Defendant Monsanto Company
15
16    ALSO PRESENT:
17       Daniel Ragland, Videographer
18
19
20
21
22
23
24
25
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1                    - - -
                   I N D E X
 2                    - - -
 3                 VOLUME I
                                                    Page
 4   Testimony of:  STEPHEN E. PETTY, PE, CIH, CSP
 5       DIRECT EXAMINATION BY MR. KALAS            6
 6
 7
                 PETTY EXHIBITS
 8
     No. 1      Edwin Charlie Crabtree, Jr., Roundup®
 9              Exposure Calculation Results         6
     No. 2      Thomas Dela Cruz Roundup® Exposure
10              Calculation Results                  7
     No. 3      Angela Dyer Roundup® Exposure
11              Calculation Results                  7
     No. 4      Rosita Haynes Roundup® Exposure
12              Calculation Results                  8
     No. 5      Timothy Kane Roundup® Exposure
13              Calculation Results                  8
     No. 6      Ron Ramirez Roundup® Exposure
14              Calculation Results                  8
     No. 7      Mr. Edwin Charlie Crabtree, Jr.'s
15              Interview Summary Sheet              9
     No. 8      Mr. Thomas Dela Cruz Interview
16              Summary Sheet                        9
     No. 9      Mrs. Angela Dyer's Interview Summary
17              Sheet                               10
     No. 10     Mrs. Rosita Haynes' Interview Summary
18              Sheet                               11
     No. 11     Mr. Timothy Kane's Interview Summary
19              Sheet                               11
     No. 12     Mr. Ron Ramirez Interview Summary
20              Sheet                               12
     No. 13     Factual Summary and Expert Opinions
21              Base Report of Mr. Stephen E. Petty,
                PE, CIH, CSP                        12
22   No. 14     Stephen E. Petty, PE, CIH, CSP
                Roundup® Cases Materials Considered 14
23   No. 15     Mr. Stephen E. Petty, PE, CIH, CSP
                Curriculum Vitae                    17
24
25
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1                    PETTY EXHIBITS (CONTINUED)
      No. 16    Summary of Expert Witness
2               Cases-Stephen Petty                      17
      No. 17    EES Group Invoice Dated 11/30/19         24
3     No. 18    Defendant Monsanto Company's Notice
                of Videotaped Deposition of Stephen
4               Petty, PE, CIH, MBA                      25
      No. 19    Transcript of Deposition of Thomas
5               Mike Dela Cruz                           89
      No. 20    E-mail Thread from Christina
6               Merkelbach to Chris Portier
                10/19/17                                162
7     No. 21    Transcript of Deposition of
                Christopher J. Portier, Ph.D.,
8               4/16/18                                 167
      No. 22    Transcript of Deposition of Angela
9               Carpenter Dyer, 2/15/18                 172
      No. 23    Table 1.4, Carcinogens in Cigarette
10              Smoke                                   181
      No. 24    Roundup® Labels                         191
11    No. 25    Pictures of Spray Equipment             203
      No. 26    Glyphosate Biomonitoring for
12              Farmers and Their Families: Results
                from the Farm Family Exposure Study
13              Research Article, MONGLY00368830-
                MONGLY00368835                          230
14    No. 27    Toxicological Profile for
                Glyphosate, Draft for Public
15              Comment, March 2019                     230
      No. 28    Fundamental and Applied Toxicology
16              16, 725-732 (1991) Glyphosate Skin
                Binding, Absorption, Residual
17              Tissue Distribution and Skin
                Contamination Article                   273
18    No. 29    Glyphosate IARC Monograph               269
      No. 30    Transcript of Deposition of Timothy
19              Kane, 8/8/19                            287
      No. 31    United States Environmental
20              Protection Agency Memorandum,
                4/3/09                                  344
21
22
23
24
25
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1

2                  - - - - - -

3          THE VIDEOGRAPHER:  We are now on the record.

4     My name is Daniel Ragland.  I am the videographer

5     from Golkow Litigation Services.  Today's date is

6     December 3rd, 2019, and the time is 9:08 a.m.

7     The video deposition is being held in Fort

8     Lauderdale, Florida, in the matter of Timothy

9     Kane, et al., versus Monsanto Company for the

10    Circuit Court of the City of St. Louis, State of

11    Missouri.  The deponent is Stephen E. Petty.

12         Counsel will be noted on the stenographic

13    record.  Will counsel please identify themselves.

14         MR. KRISTAL:  Jerry Kristal, Weitz &

15    Luxenberg, on behalf of the Kane group

16    plaintiffs.

17         MS. BEACH:  Nadina Beach, Lundy, Lundy,

18    Soileau & South, on behalf of the plaintiffs.

19         MR. KALAS:  John Kalas, Grant Hollingsworth,

20    on behalf of Monsanto Company.

21         THE VIDEOGRAPHER:  The court reporter is

22    Trina Wellslager and will now swear in the

23    witness.

24         THE COURT REPORTER:  Will you raise your

25    hand, please?

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1              Do you swear to tell the truth, the whole

2       truth, and nothing but the truth, so help you

3       God?

4              THE WITNESS:  I do.

5              STEPHEN E. PETTY, PE, CIH, CSP, called as a

6       witness by the Defendant, having been first duly

7       sworn, testified as follows:

8                     DIRECT EXAMINATION

9    BY MR. KALAS:

10      Q.   Good morning, Mr. Petty.

11      A.   Good morning, John.

12      Q.   Good to see you again.  I assume if you need

13   a break, you'll let me know today, right?

14      A.   Sure.

15      Q.   And if you answer a question, I'm going to

16   assume you understand it, okay?

17      A.   Okay.

18      Q.   All right.  So you produced a good amount of

19   documents over the past few days in anticipation of

20   this deposition, so I'm going to get those into the

21   record right now.

22           (Petty Exhibit 1 was marked for

23   identification.)

24   BY MR. KALAS:

25      Q.   The first document I'm marking as Exhibit 1
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    is titled Edwin Charlie Crabtree, Jr., Roundup®

2    Exposure Calculation Results.  If you'd take a look

3    at that for a moment.

4        A.   All righty.

5        Q.   Is that a current copy of the Roundup®

6    calculation results you had for Edwin Crabtree?

7        A.   I believe so, yes.

8        Q.   Okay.  I'm going to mark as Exhibit 2 Thomas

9    Dela Cruz Roundup® Exposure Calculation Results.

10           (Petty Exhibit 2 was marked for

11   identification.)

12   BY MR. KALAS:

13       Q.   Is that a current copy of the Roundup®

14   Calculation Results you have for Mr. Dela Cruz?

15       A.   It looks to be.

16       Q.   Okay.  I'm going to mark as Exhibit 3 a

17   document entitled Angela Dyer Roundup® Exposure

18   Calculation Results.

19           (Petty Exhibit 3 was marked for

20   identification.)

21       A.   Thank you.

22   BY MR. KALAS:

23       Q.   Is that a current copy of the Roundup®

24   exposures you had for Ms. Dyer?

25       A.   Looks to be, yes.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.    Okay.  I'm going to mark as Exhibit 4 a

 2   document entitled Rosita Haynes Roundup® Exposure

 3   Calculation Results.

 4              (Petty Exhibit 4 was marked for

 5   identification.)

 6        A.    Thank you.

 7   BY MR. KALAS:

 8        Q.    If you'd take a look at that, please.

 9              Is that a current copy of the Roundup®

10   Exposure Calculations you had for Ms. Haynes?

11        A.    Looks to be, yes.

12        Q.    Okay.  I'm going to mark as Exhibit 5 a

13   document entitled Timothy Kane Roundup® Exposure

14   Calculation Results.

15              (Petty Exhibit 5 was marked for

16   identification.)

17   BY MR. KALAS:

18        Q.    Is that a current copy of the Roundup®

19   Exposure Calculations you had for Mr. Kane?

20        A.    Looks to be, yes.

21              (Petty Exhibit 6 was marked for

22   identification.)

23        Q.    I'm going to mark as Exhibit 6 a document

24   entitled Ron Ramirez Roundup® Exposure Calculation

25   Results.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.    Thank you.

 2    BY MR. KALAS:

 3        Q.    Is that a current copy of the Roundup®

 4    Exposure Calculations you have for Mr. Ramirez?

 5        A.    It looks to be, yes.

 6        Q.    Okay.

 7              MR. KRISTAL:  No further questions.

 8              (Petty Exhibit 7 was marked for

 9    identification.)

10    BY MR. KALAS:

11        Q.    I'm going to mark as Exhibit 7 a document

12    entitled Edwin Charlie Crabtree Interview Summary

13    Sheet.  Take a look at that, please.

14              (Petty Exhibit 7 was marked for

15    identification.)

16    BY MR. KALAS:

17        Q.    Is that a current copy of your telephone log

18    for your interview with Mr. Crabtree?

19        A.    Looks to be, yes.

20        Q.    Okay.  I'm going to mark as Exhibit 8 a

21    document entitled Thomas Dela Cruz Interview Summary

22    Sheet.

23              (Petty Exhibit 8 was marked for

24    identification.)

25    BY MR. KALAS:
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1       Q.   Is that a current copy of your telephone log

 2   for your interview with Mr. Dela Cruz?

 3       A.   Yes, it appears to be, yes.

 4       Q.   Okay.  I'm going to mark as Exhibit 9 a

 5   document entitled Angela Dyer's Interview Summary

 6   Sheet.

 7            (Petty Exhibit 9 was marked for

 8   identification.)

 9            MR. KRISTAL:  There were two typos.  I

10       brought a copy.

11            MR. KALAS:  Okay.

12            MR. KRISTAL:  Minor typos that don't affect

13       anything, just for being -- trying to correct on

14       Page 3 of the Dyer.  Under work activities.

15            MR. KALAS:  Uh-hum.

16            MR. KRISTAL:  It should be "cashier for

17       groceries and placed products on the shelf," not

18       "faced."

19            MR. KALAS:  Okay.

20            MR. KRISTAL:  And then on Page 4, the Dyers

21       had a huge, huge picture.  So they purchased a

22       43-acre frame.  It should be "farm."

23            MR. KALAS:  Ah.  Got it.  Okay.

24            MR. KRISTAL:  Not frame, or frame, whatever

25       the word was.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1          MR. KALAS:  Got it.  Okay.

 2          MR. KRISTAL:  Do you want to mark the

 3     corrected one now?  Or which one --

 4          MR. KALAS:  The record's -- the record's

 5     fine.

 6          MR. KRISTAL:  The record's fine?  Okay.

 7          MR. KALAS:  Yeah.

 8   BY MR. KALAS:

 9     Q.   So let me just ask a question.  Is this a

10   current copy, with those two corrections, of your

11   telephone log for your interview with Ms. Dyer?

12     A.   With the corrections, it is, yes.

13     Q.   Okay.  Let me mark as Exhibit 10 a document

14   entitled Rosita Haynes' Interview Summary Sheet.

15          (Petty Exhibit 10 was marked for

16   identification.)

17   BY MR. KALAS:

18     Q.   Is this a current copy of your telephone log

19   for your interview with Ms. Haynes?

20     A.   Yes.

21     Q.   Okay.  I'm going to mark as Exhibit 11 a

22   document entitled Timothy Kane's Interview Summary

23   Sheet.

24          (Petty Exhibit 11 was marked for

25   identification.)
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.    Yes.

 2    BY MR. KALAS:

 3        Q.    Is this a current copy of your telephone log

 4    for your interview with Mr. Kane?

 5        A.    It is.

 6        Q.    Okay.  I'm going to mark as Exhibit 12 a

 7    document entitled Ron Ramirez Interview Summary

 8    Sheet.

 9              (Petty Exhibit 12 was marked for

10    identification.)

11    BY MR. KALAS:

12        Q.    Is this a current copy of your telephone log

13    for your interview with Mr. Ramirez?

14        A.    Yes.

15              (Petty Exhibit 13 was marked for

16    identification.)

17        Q.    Okay.  I'm going to mark as Exhibit 13 a

18    document entitled Factual Summary and Expert

19    Opinions Based Report, Timothy Kane, et al., versus

20    Monsanto Company.  And that's a document you brought

21    with you today?

22        A.    It is.

23        Q.    Okay.  And what is that document?

24        A.    This is the updated factual summary and

25    expert opinions report that applies to all six
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    plaintiffs.

 2       Q.   Okay.  Are there any opinions sitting here

 3    today that you intend to offer at trial that are not

 4    contained in that document?

 5       A.   Could be.  I mean, my opinions would be a

 6    summary of this plus all my prior deposition

 7    testimony.

 8       Q.   Okay.

 9            MR. KRISTAL:  Well, plus whatever's

10       contained in the --

11            THE WITNESS:  Yeah.

12            MR. KRISTAL:  -- first 12 exhibits.

13            MR. KALAS:  Correct.  So.  But he wasn't

14       done.  So I'm sure he was going to get there.

15       A.   Yeah.  It would anything that's been

16    produced or that I've testified to in prior

17    depositions as well as anything that's been produced

18    or I opine on today during today's deposition.

19    BY MR. KALAS:

20       Q.   Okay.  So let me make sure I understand the

21    contours.  The issues you intend to opine upon are

22    contained in Exhibits 1 through 13 in addition to

23    any testimony you've given at previous depositions

24    or you give at this deposition, correct?

25       A.   Or documents that have been produced that
```

```
 1      I've commented on at those depositions.

 2          Q.   Understood.  Okay.  Thank you.

 3               (Petty Exhibit 14 was marked for

 4      identification.)

 5          Q.   I'm going to mark as Exhibit 14 a document

 6      entitled --

 7               MR. KRISTAL:  Before you -- just --

 8               MR. KALAS:  Yes.

 9               MR. KRISTAL:  There was one typo --

10               THE WITNESS:  Oh, yeah.

11               MR. KRISTAL:  -- in the report Exhibit 13.

12      BY MR. KALAS:

13          Q.   All right.  Why don't you tell us what that

14      is, Doctor.

15               MR. KRISTAL:  All right.

16          A.   If I could draw your attention to Page 47 --

17      BY MR. KALAS:

18          Q.   Okay.

19          A.   -- of this Exhibit 13.

20          Q.   Okay.

21          A.   Okay.  There was a -- it's been corrected.

22          Q.   Okay.

23          A.   So I can leave this with you.  The best way

24      to show you is that I deleted some extraneous text

25      that wasn't --
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Okay.

 2      A.   It wasn't part of the original quote, it

 3   just got in there, so.

 4      Q.   Why don't you do it in the document that's

 5   been marked as -- well, actually, you know what,

 6   I'll mark 16.

 7      A.   It's been deleted in this, so...

 8      Q.   Okay.  I'll mark 16 where you --

 9      A.   I didn't know which version you would have

10   by the time we got here, so.

11           MR. KRISTAL:  It's already been deleted.

12           MR. KALAS:  It's already been deleted.  We

13      don't need that.  All right.

14   BY MR. KALAS:

15      Q.   So this is a correct copy of your report,

16   right?

17      A.   Yeah, I apologize.  Yeah.

18      Q.   Okay.

19      A.   Absolutely.

20           (Petty Exhibit 14 was marked for

21   identification.)

22   BY MR. KALAS:

23      Q.   All right.  Exhibit 14 is a document

24   entitled Stephen E. Petty Roundup® Cases Materials

25   Considered, Kane v. Monsanto Company.
```

```
 1              Is this a copy of your current materials you

 2    considered list?

 3       A.   I need to check.

 4       Q.   Sure.

 5       A.   Because I think that I provided one

 6    additional copy.

 7              MR. KRISTAL:  That's -- I handed that to

 8       him.

 9              THE WITNESS:  Oh, this was handed to him?

10              MR. KRISTAL:  Yes.

11              THE WITNESS:  Okay.

12       A.   I just want to check against Exhibit 13.

13    BY MR. KALAS:

14       Q.   Yep.

15       A.   If you'll give me a sec.

16       Q.   Go ahead.

17       A.   Yes, it is current.  This one that you've

18    handed me, Exhibit 14, is the most current.

19       Q.   Okay.  And then other than the documents

20    I've just marked, have you brought any other

21    documents in response to our notice of deposition in

22    this case?

23       A.   I have.

24       Q.   Okay.  What did you bring?

25       A.   I brought a -- three copies of the CV:  One
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    for you, one for plaintiff's counsel, and one for

 2    marking.

 3        Q.   Okay.

 4        A.   I brought an updated list of cases that I've

 5    worked on and testified in.

 6        Q.   Okay.

 7        A.   And I brought a cop- -- the original and a

 8    copy of the admin file.

 9        Q.   Okay.  Perfect.

10             So can I take a look at those, please?

11        A.   Sure.

12        Q.   All right.  So let's start with your CV.

13    I'm going to mark that as Exhibit 15.

14             (Petty Exhibit 15 was marked for

15    identification.)

16        A.   Thank you.

17    BY MR. KALAS:

18        Q.   That's a current copy of your CV as it

19    stands today?

20        A.   It is.

21        Q.   Okay.  I'll mark as Exhibit 16 your summary

22    of expert witness cases.

23        A.   Where I've been disclosed, yes.

24        Q.   Where you've been disclosed.  Thank you.

25             (Petty Exhibit 16 was marked for
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    identification.)

 2         A.   Thank you.

 3    BY MR. KALAS:

 4         Q.   Yep.

 5              Then I'm going to mark as 17 -- oh, you had

 6    an admin file.  Where did it go?

 7         A.   I did.

 8              MR. KRISTAL:  I'm trying to see which is the

 9         original?  This is a copy.

10              THE WITNESS:  That's copies.  You can verify

11         that that's a copy of the original if you want.

12    BY MR. KALAS:

13         Q.   Okay.  So this is the original?

14         A.   Yeah.

15         Q.   Okay.  I'm not going to take that.  I'll

16    take the copy.

17              All right.  And the admin file is here,

18    okay.

19              Now, you signed a separate -- I'm looking at

20    the -- let me mark it.  And I only have one copy, so

21    I'm going to ask you some questions, and if you need

22    to work off that, please do.

23         A.   Okay.

24         Q.   It looks like you signed a separate retainer

25    agreement in the Kane case.  Is that your practice
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    every time a new matter in a serial litigation walks

 2    in the door, so to speak?

 3        A.   Well, I don't know how to answer that

 4    question.  I could answer the question with respect

 5    to why I did it in this case.

 6        Q.   Sure.  Well, let me ask --

 7        A.   But as opposed to whether or not that's --

 8        Q.   Why did you do it in this case?  And then I

 9    may follow up.

10        A.   In this case, I did it primarily because my

11    original retention agreement was with Levin

12    Papantonio.  And what was happening was all the

13    invoicing, et cetera, was going to Levin Papantonio

14    and I was working primarily for Weitz Luxenberg.

15            So just to have a more direct path for

16    invoicing, et cetera, I went ahead and executed an

17    agreement directly with Weitz Luxenberg.

18        Q.   Now, is this agreement with Weitz &

19    Luxenberg meant to only apply to the Kane case or

20    across the Roundup® litigation generally?

21        A.   I still -- if I'm working on the federal

22    cases or the previous 14 cases, I would still

23    invoice under the Levin Papantonio agreement.

24        Q.   How about going forward?

25        A.   I'm not sure I can comment on things that I
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    haven't disclosed going forward.

2        Q.   Okay.  So going forward, do you -- well, let

3    me ask this:  My question was a little more

4    specific, which is is this retainer agreement meant

5    to only apply to the Kane matter, because the third

6    paragraph says as a consultant in the Kane, et al.,

7    matter, or is it meant to apply to all litigation

8    consulting with the Weitz & Luxenberg firm in

9    Roundup® litigation going forward?

10           MR. KRISTAL:  Object to the form.

11       A.   It's meant to -- at least from my

12   perspective, it's meant to apply to the six Kane

13   cases that we're here to talk about today.

14   BY MR. KALAS:

15       Q.   Okay.  All right.  Because --

16           MR. KALAS:  Well, then, in that case, Jerry,

17       you asked to get it in writing that I wouldn't

18       need the retainer agreement each time, but if

19       it's only for the Kane cases, then I will need it

20       next time, if there is one.

21           MR. KRISTAL:  I'm not sure what you just

22       said, but if you make the proper request, you'll

23       get the right document.

24           MR. KALAS:  Cool.  Thanks.

25   BY MR. KALAS:

1      Q.   Now you have invoiced so far $45,000 or so

2    on the Kane case, right?

3      A.   Correct.

4      Q.   Okay.  And you sent that invoice on November

5    30th, 2019, right?

6      A.   No --

7      Q.   Or at least you dated it.

8      A.   No, I -- I think that's as of the end of the

9    month.  But I think, in fact, it was prepared

10   yesterday.

11     Q.   Prepared yesterday?

12     A.   So it was in today's mail.

13     Q.   Okay.  And so the invoice that you prepared

14   yesterday that was in today's mail, that invoice

15   covers all of your work on this case up to

16   yesterday, correct?

17     A.   Correct.

18     Q.   Okay.  Does it account for any prep time you

19   spent yesterday preparing for this deposition?

20     A.   No, it would not.

21     Q.   Okay.  How long did you spend yesterday

22   preparing for the deposition?

23     A.   I think -- well, it was more than just

24   preparing for the deposition.  I reviewed an

25   additional 25 or 30 documents.

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Okay.

 2      A.   And that's why the materials-considered list

 3   was revised.

 4      Q.   Okay.

 5      A.   So it wasn't so much as prepping as it was

 6   continued work on the Kane cases.  But it was six,

 7   seven hours.

 8      Q.   Six or seven hours, okay.

 9           And that would have been at a rate of $385

10   an hour?

11      A.   It would.

12      Q.   Okay.  So six hours times 385 would be an

13   additional $2,000 or so on this invoice?

14      A.   2500 or so, yeah.

15      Q.   Okay.  And how much are you billing each day

16   for this deposition time?

17      A.   It's -- it's a running clock.

18      Q.   Yep.

19      A.   And from the time I -- I show up till -- if

20   it's four hours on the running clock, then it's

21   3,000.  If it's eight hours, it's 5,000.  And then

22   it starts over at eight hours and one minute.

23      Q.   Okay.  I missed that last part.  After eight

24   hours, what happens?

25      A.   Then we go to the next four-hour block.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1        Q.   Okay.  So if we start today at -- you got on

2    property about 8:45, right?

3        A.   Or something, 8:30, about that.

4        Q.   Okay.  And then if we do go past 4:30 today,

5    your time for today will be -- because it goes 3,000

6    to 5,000.  What's the next four-hour block?

7        A.   3,000.

8        Q.   Okay.  So it will be 8,000 for today if we

9    go past 4:30?

10       A.   No.  We have to -- I have to think of the

11   math, but if we went past 4:30, it would be 8,000

12   plus the next -- if we went past it, we would have

13   the next block of 3,000 start to kick in.

14       Q.   Okay.  So I'm not understanding that.  Let's

15   go to Page 2.  Maybe I'm dense.

16            You charge $3,000 for up to four hours,

17   right?

18       A.   Right.

19       Q.   For up to -- for greater than four hours and

20   below eight hours, you charge $5,000?

21       A.   Correct.

22       Q.   And you don't bill the 3,000 in addition to

23   the 5,000 --

24       A.   No.

25       Q.   -- it's just 5,000?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   Well, it's just a block of 5,000 for the

 2   first eight hours.

 3      Q.   Got it.

 4           And then for the 8- to 12-hour period, it

 5   would be an additional 3,000?

 6      A.   That's correct.

 7      Q.   So it would be $8,000?  5,000 plus 3,000?

 8      A.   No, it would be 8,000 plus 3,000.

 9      Q.   Okay.  So it would be $11,000?

10      A.   Correct.

11      Q.   Okay.  So $11,000, if we go past 4:30 today

12   and $11,000 if we go greater than eight hours

13   tomorrow, correct?

14      A.   Correct.

15      Q.   Okay.  Now I understand.

16           I'll mark that as 17.

17           (Petty Exhibit 17 was marked for

18   identification.)

19           MR. KALAS:  Okay.  Let's go off the record

20      for a second and just get all set up.

21           THE VIDEOGRAPHER:  The time is 9:27.  We're

22      going off the record.

23        (Recess from 9:27 a.m. until 9:29 a.m.)

24           THE VIDEOGRAPHER:  The time is 9:29 a.m.  We

25      are back on the record.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1   BY MR. KALAS:

 2       Q.   Okay.  Mr. Petty, you have one more document

 3   in front of you.  Is that your Notice of Deposition?

 4       A.   It is.

 5       Q.   Okay.  I'm going to mark that as Exhibit 18.

 6       A.   Here you go.

 7            (Petty Exhibit 18 was marked for

 8   identification.)

 9   BY MR. KALAS:

10       Q.   Thank you.

11            And all the documents we just marked, 1

12   through 17, were the documents that you prepared

13   and/or brought today that were responsive to this

14   notice of deposition, correct?

15       A.   That's correct.

16       Q.   Okay.  Now, if we go back to your

17   materials-considered list --

18       A.   By the way, there's a typo on this, but just

19   for future reference.

20       Q.   Oh, what's that?

21       A.   On the notice it says MBA, but that's --

22   well, I do have an MBA, but it should be PE, CIH,

23   CSP.

24       Q.   Okay.  We'll take the MBA off and put a CSP

25   on.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1            MR. KRISTAL:  You don't have to take that

 2      off.

 3            THE WITNESS:  You don't have to.

 4            MR. KRISTAL:  Mr. Petty is -- does have an

 5      MBA, but he's not just an MBA.

 6    BY MR. KALAS:

 7      Q.   Okay.  Go to 14, please.

 8      A.   14?

 9      Q.   Yeah.

10      A.   All right.

11      Q.   Okay.  Now, are there any documents you have

12    reviewed regarding glyphosate or Roundup® that are

13    not on this list?  In other words, documents you

14    reviewed but you decided not to use as part of your

15    opinions.

16      A.   Not that I know of.

17      Q.   Okay.  Have you received any depositions or

18    trial transcripts prior to this deposition in the

19    Roundup® litigation that are not on this list even if

20    you haven't relied on them?

21      A.   For this matter?

22      Q.   For Roundup®.  Not for Kane, for Roundup®

23    generally.

24      A.   I don't know if I can -- no, I don't believe

25    I have, actually.  I was thinking about nondisclosed
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    cases, but --

2        Q.   Okay.  So I'm asking not -- I'm asking about

3    generally.  Is there a deposition transcript you've

4    read in the Roundup® litigation taken about -- taken

5    of anybody, of another expert, a fact witness, what

6    have you, that is not on that list?

7        A.   I don't believe so.

8        Q.   Okay.  Have you reviewed any summaries about

9    plaintiffs' exposures, plaintiffs' use of Roundup®,

10   plaintiffs; depositions prepared by counsel in the

11   Roundup® litigation?

12           MR. KRISTAL:  Objection.

13           Don't answer.  That would be a privileged

14       communication.

15   BY MR. KALAS:

16       Q.   Have you reviewed any documents --

17           MR. KRISTAL:  If there is such a thing.

18   BY MR. KALAS:

19       Q.   Have you reviewed any documents to assist

20   you in understanding the exposure profiles of

21   plaintiffs that are not on that list?

22           MR. KRISTAL:  Anything except anything we

23       may have sent to you, the attorneys.

24           MR. KALAS:  I'm just asking about any

25       documents --

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1            MR. KRISTAL:  I understand.  And I'm asking

 2      him --

 3            MR. KALAS:  Okay.  So --

 4            MR. KRISTAL:  -- or instructing him to

 5      answer the question so that there's no violation

 6      of any privilege.

 7            MR. KALAS:  I want to create a record, then.

 8            MR. KRISTAL:  The records being created.

 9            MR. KALAS:  Let me create my record, Jerry.

10      BY MR. KALAS:

11         Q.   I'm going to ask a question.  If you're

12      instructed not to answer, that's fine, we'll move

13      on.

14            MR. KRISTAL:  I didn't instruct him not to

15      answer.  I instructed him not to answer if the

16      communication was from the attorneys.  He can

17      answer the question with that caveat.

18      BY MR. KALAS:

19         Q.   Mr. Petty, have you reviewed any summaries,

20      regardless of the providence, prepared by anybody

21      regarding plaintiffs' exposure histories to Roundup®?

22            MR. KRISTAL:  Okay.  Only answer the

23      question with respect to something that didn't

24      come from and was prepared by the attorneys.

25         A.   Then the answer would be other than
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    depositions, no.

2    BY MR. KALAS:

3        Q.   Okay.  Now let me ask the question prepared

4    by attorneys, and he can instruct you not to answer

5    and we're going to note it.

6            Have you reviewed any summaries of

7    plaintiffs' exposure or dose histories prepared by

8    the attorneys in preparation for reaching your

9    opinions in this case?

10           MR. KRISTAL:  I will instruct you not to

11       answer.

12           MR. KALAS:  Okay.

13           MR. KRISTAL:  You're talking about in the

14       Kane group?

15           MR. KALAS:  I'm asking the Kane group first,

16       then I can ask generally, but --

17           MR. KRISTAL:  Well, I don't think you can

18       ask generally, we're here for Kane, but I gave

19       him an instruction and --

20           MR. KALAS:  You gave him the instruction, so

21       we'll move on.

22           MR. KRISTAL:  (Nodding head.)

23   BY MR. KALAS:

24       Q.   Are there any -- let me ask for Kane

25   specifically.  Have you reviewed any summaries of

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    plaintiffs' exposure histories prepared by any

 2    attorneys in the Kane matter?

 3         MR. KRISTAL:  And I would instruct you not

 4      to answer that.

 5         MR. KALAS:  Okay.  So we'll note that.

 6         MR. KRISTAL:  So noted.

 7   BY MR. KALAS:

 8      Q.   All right.  When did you first hear of

 9   glyphosate?

10      A.   It's been years ago.  I don't -- I just

11   don't recall.

12      Q.   Okay.  How many years?  Can you give me an

13   estimate?

14      A.   I just -- I know that I put -- I don't know

15   if I testified before that I helped put together the

16   first database way back in the day.

17      Q.   Uh-hum.

18      A.   '79, '80 time frame.  We had pesticides in

19   there.  I don't know if it was in that or not.

20      Q.   Okay.  So it could have been as early as

21   1980?

22      A.   It could have been.

23      Q.   Okay.  Prior to becoming involved in this

24   litigation, you had not ever published anything on

25   glyphosate, right?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.    Correct.

 2      Q.    Okay.  And after becoming involved in this

 3  litigation you still have not published anything on

 4  glyphosate, correct?

 5      A.    That is true.

 6      Q.    Okay.  Now, this is your eighth deposition

 7  day in the Roundup® litigation, true?

 8      A.    That's correct.

 9      Q.    Okay.  Is there any previous testimony that

10  has occurred to you since the last time we got

11  together that you've given that you want to amend

12  that you hadn't previously amended?  I know we

13  talked about the Winston issue last time.

14          MR. KRISTAL:  Objection to form.

15      A.    No, I think I've sent in -- other than I've

16  sent in light typo corrections to each of the

17  depositions.  I don't know if you've seen those or

18  not.  But in reviewing the deposition transcripts,

19  I've sent in corrections.

20  BY MR. KALAS:

21      Q.    Yes.

22          Are there any previous statements in reports

23  or notes that you've served that you want to amend

24  that you've not previously amended?

25          MR. KRISTAL:  Objection.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1     A.   It was brought to my attention in a couple

 2   of calculations that there may have been some

 3   mistakes, and so I went and redid the calculations,

 4   and it changed the numbers like two -- two percent.

 5   BY MR. KALAS:

 6     Q.   For which case, sir?

 7     A.   I'm trying to think back.

 8          I think it would have been -- it would have

 9   been in the federal cases, I'm pretty sure.

10     Q.   Okay.  Have you provided those revised

11   calculations to anybody?

12     A.   To counsel, yes.

13     Q.   Okay.  Do you know if counsel's provided

14   them to us?

15     A.   I don't know the answer to that question.

16     Q.   Okay.  So to the extent those haven't been

17   provided, we'd like to request them.  And we may

18   move -- we reserve all the relief that's available.

19          Now, you provided an updated testimony list

20   today and that is Exhibit 15, right?

21     A.   No, I think it's 16.

22     Q.   16, I'm sorry.

23          Okay.  Now, the list from last time I had

24   went through a case called Gonzalez, defendants

25   blank.  The defendants aren't actually blank, there
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    was just nothing filled in on it.  That was on Page

 2    29.

 3         A.   Okay.

 4         Q.   With the Black law firm?

 5         A.   Correct.

 6         Q.   Okay.  How many cases have you added since

 7    then?

 8         A.   I don't write this up, so...

 9         Q.   Can I take a look at it?

10         A.   So I really don't know how to answer that

11    question --

12         Q.   Okay.

13         A.   -- other than looking at an old one and a

14    new one.  My admin folks do that.

15         Q.   Got it.

16              Okay.  It looks like the one that's added

17    here on Page 29 is the federal cases in Roundup®.

18              Have you given any other depositions since

19    the last time we got together?

20         A.   No.

21         Q.   Okay.  All right.

22              MR. KRISTAL:  Also note my -- you've changed

23         my name on the sheet.  Mr. Christoph.

24              THE WITNESS:  Oh, yeah, that's right.

25              MR. KRISTAL:  That's all right.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1              THE WITNESS:  I hope you forgive that.  20

 2      lashes.

 3   BY MR. KALAS:

 4      Q.   Now, about how many -- I went through this

 5   list and I counted up the number of times you've

 6   testified for the plaintiffs and the number of times

 7   you've testified for the defendants.

 8              And working off Exhibit 16 and adding one

 9   added in for the plaintiff for your new entry, I

10   have 205 times for the plaintiff and 14 times for

11   the defendant.  Does that sound about right based on

12   the list?

13              MR. KRISTAL:  Objection.

14      A.   Where -- where I've been disclosed.  The

15   number would be absolutely opposite where I haven't

16   been disclosed.

17   BY MR. KALAS:

18      Q.   Okay.  But where you've been disclosed,

19   you've testified 205 times for the plaintiff and 14

20   times for the defendant; does that number sound

21   right?

22              MR. KRISTAL:  Objection.

23      A.   I don't know.  I haven't added them up.

24   Whatever it is, it is.

25   BY MR. KALAS:
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Okay.  So the document 16 will speak for
 2   itself?
 3      A.   With respect to disclosed litigation cases.
 4      Q.   Okay.  And you've testified for lots of
 5   firms involved in the Roundup® litigation, right?
 6      A.   I don't know that to be true.
 7      Q.   Okay.  Have you testified for the Baron &
 8   Budd law firm?
 9      A.   For Roundup®?
10      Q.   I'm asking if you've testified for the Baron
11   & Budd law firm in your career.
12      A.   Oh, I thought you said I have participated
13   in ones for Roundup®.
14      Q.   No, I said you've testified for lots of
15   firms involved in the Roundup® litigation, sir.
16           So anyway, that's the way.  Have you
17   testified --
18      A.   I don't know all the firms that are involved
19   in Roundup® litigation, so I wouldn't know how to
20   answer that question.
21      Q.   Have you testified for the Baron & Budd law
22   firm, sir?
23      A.   A long time ago, yes.
24      Q.   Okay.  Are ave you aware they have brought
25   lawsuits regarding Roundup®?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.   I was not aware of that.

 2        Q.   You have testified for the Wagstaff &

 3   Cartmell law firm, sir?

 4        A.   With respect to Roundup®?

 5        Q.   No, sir.  Have you testified in cases for

 6   the Wagstaff & Cartmell law firm?

 7        A.   I don't believe I have.

 8        Q.   Okay.  Are you aware they've brought

 9   lawsuits regarding Roundup®?

10        A.   I'm not.

11        Q.   Have you testified for the Levin Papantonio

12   firm?

13        A.   I have.

14        Q.   Are you aware they have brought --

15        A.   In sealed litigation.

16        Q.   Are you aware they have brought lawsuits

17   regarding Roundup®?

18        A.   I am, because I had my first retention

19   agreement with them.

20        Q.   Right.

21             Have you testified for the Motley Rice firm,

22   sir?

23        A.   Actually, I think I have -- I don't know

24   that I've ever testified.  I've been deposed.  But I

25   don't think I've ever testified in trial for them.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1        Q.   Okay.  When I say testified, I mean at

2   deposition or trial.  So let me -- let me ask it

3   that way.

4        A.   Okay.  Well, that --

5        Q.   Have you ever testified for the Motley Rice

6   firm, sir?

7        A.   I've been deposed by them.

8        Q.   By them or were you defended by them?

9        A.   Or -- I mean on behalf of a case I was

10  working on for them.

11       Q.   And are you aware they've brought lawsuits

12  in the Roundup® litigation?

13       A.   I was not.

14       Q.   Okay.  Have you testified for the Anapol

15  Weiss firm, sir?

16       A.   I think I did once, yes.

17       Q.   Okay.  Are you aware they've brought

18  lawsuits in the Roundup® litigation?

19       A.   I was not aware of that.

20       Q.   Have you testified for the Lanier law firm,

21  sir?

22       A.   Unless you can show me, I don't think so.

23       Q.   Okay.

24       A.   But...

25       Q.   I'll show you.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1              Go to Page 13.  Well, it's at 13 on the old

 2   copy, it may not be on that copy, but I can help you

 3   find it if it's not.

 4      A.   It should be.

 5      Q.   It's second one down on my copy, Gene

 6   Egdorf, Lanier law firm, Bates v. Shintech, vinyl

 7   chloride.

 8      A.   Yeah, I never testified for them.

 9      Q.   You never testified for them.  But you were

10   disclosed in that case, right?

11      A.   Apparently.

12      Q.   Okay.

13      A.   I think it settled before I did any work on

14   that case.

15      Q.   Okay.  Are you aware the Lanier law firm has

16   brought suits in the Roundup® litigation?

17      A.   I am not.

18      Q.   Have you testified for the Simmons Hanly

19   Conroy firm, sir?

20      A.   I have.

21      Q.   Are you aware they've brought lawsuits in

22   the Roundup® litigation?

23      A.   Technically, yes, because I -- I -- I

24   decided not to do their Roundup® cases.

25      Q.   Okay.  Why did you decide not to do their
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    Roundup® cases?

2        A.   Workload.

3        Q.   Okay.

4        A.   And I'm trying to retire.

5        Q.   You've told me that.

6             You're not an expert in weed science, right?

7             MR. KRISTAL:  Objection to form.

8        A.   Well, I'm a chemical engineer, so.  I

9    haven't focused on that, but I certainly am a very

10   well-respected chemical engineer.  So to the extent

11   that there is chemistry involved, then I would have

12   some knowledge of that.  Like I commented on length

13   here on surfactants.  Because chemical engineers

14   certainly understand surfactants.

15   BY MR. KALAS:

16       Q.   Do you understand what weed scientists do?

17       A.   It would depend on what aspect of weed

18   science they're looking at.

19       Q.   Okay.  They advise on crops and types of

20   methods to help crops grow better, right?  It's --

21       A.   It's --

22       Q.   Do you work on that?

23            MR. KRISTAL:  What's the question?

24   BY MR. KALAS:

25       Q.   Do you work on helping crops grow better?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.    My own.  I garden.

 2      Q.    Okay.

 3      A.    I've been a gardener and --

 4      O.    Okay.

 5      A.    -- perpetuated seeds from my

 6  great-grandmother's for 40 years, so...

 7      Q.    Have you published a -- have you published a

 8  peer-reviewed paper on weed science?

 9      A.    I have not.

10      Q.    Okay.

11      A.    In fact, I was showing Jerry some seeds I

12  perpetuated in my office last night.

13      Q.    Now, going back to your materials-considered

14  list, which is Exhibit 14, tell me how you came

15  about selecting the documents you relied on on that.

16      A.    It's going to be a long answer.

17            Some of the documents I did receive from

18  counsel.  But initially I -- I took a lot of the

19  documents for the Right to Know site.  There were

20  other publicly available sites where I could get

21  documents.  Then I also did a detailed review

22  through the AIHA web portal.  I get access to a lot

23  of journals from that portal, being a member of

24  AIHA.  So I did a complete search of -- of that.

25            I also maintain libraries with tens of
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    thousands of documents, so I searched those.  I have

2    MSDS library, labels library.  So I searched those.

3           I also sought difficult-to-find books, like

4    the MCA hundred-year anniversary journal.  I went

5    through the library system, I think there's six in

6    the United States, and found a copy of that

7    independently.

8           And then most recently, I just found a

9    website that had another 30 or 40 yesterday

10   documents regarding communications between Monsanto

11   and Intertek as well as journals.

12          So it's a combination of my own, and then I

13   also looked at my industrial hygiene library.  So

14   it's a combination of materials I had, materials I

15   was provided, and materials I went out and got.

16      Q.   Okay.  Let me break that down a little bit.

17   You mentioned a website you found yesterday.  Which

18   website's that?

19      A.   It's a -- there are multiple websites that

20   I've got notes to, and they're just sites where

21   publicly available information on the various

22   documents from the various trials.  One is Right to

23   Know.  One is a -- ultimately, I think, it's a law

24   firm that maintains a site, list documents.

25      Q.   Baum Hedlund?

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1        A.    I think so.

2        Q.    Uh-hum.

3        A.    So I watch those.

4        O.    Okay.

5        A.    And I -- I pulled documents there I haven't

6    seen before.

7        Q.    Okay.  Did you go to the industry documents

8    website at UCSF too?

9        A.    I'm not sure -- I did get some doc -- some

10   videos that I --

11       Q.    That's UC Davis, though?

12       A.    Yeah, that's Davis.

13       Q.    Yeah.

14       A.    I don't think I've gone to UCSF.

15       Q.    Let's go to the Baum Hedlund website.  How

16   did you find the Baum Hedlund website?

17       A.    Probably ultimately through Google, I

18   assume.

19       Q.    And do you know any attorneys at Baum

20   Hedlund?  Do you know any of them?

21       A.    I do not.

22       Q.    Never met Brent Wisner?

23       A.    Never.

24       Q.    Never met Bijan Esfandiari?  I think I

25   pronounced that right.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.    No.

 2      Q.    It's E-S-F-A-N-D-I-A-R-I.

 3      A.    The answer is no.

 4      Q.    Okay.  Michael Baum?

 5      A.    Nope.

 6      Q.    Okay.  How did you use the Baum Hedlund

 7   website?  Tell me about your process when you went

 8   on it.  What were you looking for?  What did you

 9   find?

10      A.    I looked for -- well, it's updated all the

11   time.

12      Q.    Um-hum.

13      A.    So I constantly search -- I occasionally

14   will look at it again, and if there's new documents,

15   I'll look at them and see if they're relevant to the

16   areas in which I might testify, which is exposure to

17   warnings.

18      Q.    Okay.

19      A.    And then I'll cross that to see if I already

20   have them.

21      Q.    Did you read any depositions on the website?

22      A.    I don't recall reading any depositions from

23   that website.

24      Q.    Did you read any trial testimony on that

25   website?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.   I think there was -- I don't know what you

 2   mean by trial testimony.  There's documents that are

 3   submitted as part of the trial activities.

 4        Q.   Well, I mean trial testimony, sir, a

 5   transcript like we're taking today.  Did you read

 6   any of that?

 7        A.   No, I don't recall seeing trial testimony.

 8        Q.   And --

 9        A.   I mean, there's been expert reports and

10   motions and things like that that are on there.

11        Q.   Did you read expert reports?

12        A.   I think there's one that I saw.

13        Q.   Which one?

14        A.   There was a Severnak exposure report done by

15   -- I'm trying to remember who.

16        Q.   Stevick?

17        A.   Stevick.

18        Q.   Okay.

19        A.   See, I don't even know how to pronounce the

20   name.

21        Q.   Was that the plaintiff's or the defendant's

22   exposure report, if you can remember?

23        A.   I think it was a plaintiff's exposure

24   report.

25        Q.   So you read Dr. Sawyer's exposure report?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   From that case, yes.

 2      Q.   Okay.

 3      A.   It was online.

 4      Q.   Okay.  Is that on your materials-considered

 5   list?

 6      A.   I don't know.

 7      Q.   Okay.  How about the U.S. Right to Know

 8   site.  When's the first time you went to the U.S.

 9   Right to Know site?

10      A.   Probably before -- right after I was

11   retained but before I did any work.

12      Q.   Okay.  And --

13      A.   So maybe four years ago, three years ago,

14   four years ago.

15      Q.   Okay.  And tell me about what you found on

16   the U.S. Right to Know site, sort of your process

17   when you're on there.

18      A.   I'm just simply looking for documents that

19   would be relevant to my analysis of warnings or

20   exposure.

21      Q.   Okay.  Have you ever spoken to anybody who

22   works at U.S. Right to Know?

23      A.   No.

24      Q.   Okay.  Do you know who works at U.S. Right

25   to Know?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   It's not coming to me off the top of my

 2   head, but they're listed on their website.

 3      Q.   Do you know how U.S. Right to Know gets the

 4   documents that they post?

 5      A.   I assume through public sources.

 6      Q.   Do you know that they have been given

 7   documents by the plaintiff's attorney in the

 8   litigation?

 9      A.   I'm not certain I know how all that comes

10   about.  They're just out there publicly.

11      Q.   Have you ever heard the term "Monsanto

12   papers"?

13      A.   No, not necessarily.

14      Q.   You've never heard that term on the U.S.

15   Right to Know site or the Baum Hedlund site?

16      A.   Maybe it's there, but I'm more interested in

17   the documents themselves I guess.

18      Q.   Okay.  And you've incorporated those

19   documents -- some of those documents you found into

20   your report, right?

21      A.   Sure.  I -- well, I -- I -- in some case I

22   guess the answer is, yes, some of those I have.

23      Q.   Okay.  And you've incorporated some of the

24   documents you found into your testimony, right?

25           MR. KRISTAL:  Objection to the form.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.   I don't know how to answer that.  I don't

 2    know whether you -- you or anybody else asked a

 3    specific question about a specific document and --

 4    and the opinion that I have.  I mean, I've testified

 5    now coming up on eight days, but whether or not a

 6    given document that I commented on was asked about

 7    in deposition, I couldn't tell you.

 8    BY MR. KALAS:

 9        Q.   Sure.

10             Are you aware that the documents that are

11    posted on U.S. Right to Know and/or the Baum Hedlund

12    website have been posted to the EPA's public docket?

13        A.   I don't -- I don't know.  I just don't

14    recall.

15        Q.   Okay.  Are you aware that EPA -- well,

16    strike that.  Let me ask it a better way.

17             If EPA has had those documents posted to

18    their public docket, then the agency has awareness

19    of the same claims and opinions that you've

20    incorporated into your report, right?

21             MR. KRISTAL:  Objection.  Foundation.

22        A.   No, not necessarily.  I don't think the EPA

23    has -- has necessarily done the same analysis I've

24    done.  They don't have the MCA hundred-year history.

25    They don't have some of the stuff I've gotten from
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1    AIHA necessarily.

2    BY MR. KALAS:

3        Q.   Well, I'm asking specifically about the

4    documents from the Baum Hedlund and U.S. Right to

5    Know website.  So if those documents have been

6    posted to the EPA docket, then EPA has knowledge of

7    the same claims and opinions that you're opining on,

8    right?

9            MR. KRISTAL:  Objection to form.

10       A.   I -- I don't know that to be true.

11   BY MR. KALAS:

12       Q.   Okay.

13       A.   I don't know that they've seen my report.

14       Q.   Okay.  EPA typically rely on E-mails sent in

15   internal company communications for each scientific

16   decisions?

17           MR. KRISTAL:  Objection.

18       A.   I don't know what they rely on internally.

19   BY MR. KALAS:

20       Q.   Sure, okay.

21           Let me ask you this.  You mentioned reading

22   Dr. Sawyer's report in the Stevick case.  Have you

23   read any expert reports of any other plaintiffs'

24   experts in this case, ever?

25       A.   I'm not sure I've seen a complete listing of
```

1    those.  I know in this particular report I commented

2    on the length, on a paper written by a Monsanto

3    expert.  But whether they're an expert in litigation

4    or not, I don't know.

5       Q.   Okay.  So my question's a little different.

6    Have you ever read any expert reports of Dr. Sawyer

7    in the Roundup® litigation beyond the Stevick one?

8       A.   No.

9       Q.   Okay.  Have you ever read any expert reports

10   of Dr. Benbrook in the Roundup® litigation?

11      A.   If I have, they'd be listed.

12      Q.   Okay.  Have you ever been sent any expert

13   reports of Dr. Benbrook that you chose not to rely

14   on but still saw?

15      A.   No.  If I were sent reports, they would have

16   been listed.

17      Q.   Have you ever read any reports by Dr.

18   Portier in the Roundup® litigation?

19      A.   It's the same answer.  If I've been sent

20   them, they would be listed.

21      Q.   Okay.  Have you ever read any deposition

22   transcripts of Dr. Sawyer in the Roundup® litigation?

23      A.   I don't believe so.

24      Q.   Have you ever read any trial transcripts of

25   Dr. Sawyer in the Roundup® litigation?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.    I don't believe so.

 2        Q.    Have you ever read any deposition

 3   transcripts of Dr. Benbrook in the Roundup®

 4   litigation?

 5        A.    Not to my knowledge.

 6        Q.    Have you ever read any trial transcripts of

 7   Dr. Benbrook in the Roundup® litigation?

 8        A.    Not that I can recall.

 9        Q.    Okay.  Going back to Exhibit, sorry, 13,

10   it's a big one.

11        A.    Oh, okay.

12        Q.    Has anyone entered any text into that

13   document besides yourself?

14        A.    My admin probably has if they found a typo

15   or something like that.  But, yeah.

16        Q.    Okay.  Other than your admin, has anybody

17   else entered any text into that document besides

18   yourself?

19        A.    No.  Unfortunately it's all mine.

20        Q.    Okay.  Going back to some of the E-mails you

21   --

22        A.    I should correct that.  I mean, if I pasted

23   in text from some other document, I --

24        Q.    Sure.

25        A.    -- pasted in a PowerPoint slide, obviously I
```

```
 1     didn't type that in.

 2        Q.   Right.

 3        A.   So -- but to the extent that things were

 4     typed in or inserted, I -- I was the one that did

 5     that.

 6        Q.   Have you ever interviewed any of the authors

 7     of the E-mails you evaluated in Exhibit 13?

 8             MR. KRISTAL:  Will you make them available?

 9             MR. KALAS:  Will you make the plaintiffs

10        available when we -- when he has his record --

11        off-the-record interviews?

12             MR. KRISTAL:  Maybe --

13             MR. KALAS:  Okay.

14             MR. KRISTAL:  -- if you request --

15             MR. KALAS:  Let's ask the question.

16             MR. KRISTAL:  You have a deposition of all

17        those people.

18             MR. KALAS:  So do you.

19             MR. KRISTAL:  (Nodding head.)

20     BY MR. KALAS:

21        Q.   Did you interview any of the authors of the

22     E-mails you evaluated?

23        A.   I don't believe so, or I would have produced

24     them.

25        Q.   Did you -- have you ever spoken to any of
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1    the authors of the E-mails you evaluated?

 2        A.    No, I don't believe so.

 3        Q.    Do you know any of the authors on the

 4    E-mails you evaluated?

 5        A.    In what sense?

 6        Q.    Do you know them professionally?  Have you

 7    seen them at conferences?

 8        A.    I don't know how to answer that question.

 9    But I -- I'm not, like, personal friends with them

10    that I know of.  I mean, I've been to a lot of

11    conferences in 40 years.

12        Q.    Did you interview any of the authors of the

13    articles you evaluated?

14        A.    I think it's the same answer.

15        Q.    Well, articles are different than E-mails.

16    So I'm asking that question.

17        A.    I think it's the same answer.

18        Q.    No?

19        A.    No, not to my knowledge, no.

20        Q.    Have you ever spoken to any of the authors

21    of the articles you evaluated in Exhibit 13?

22        A.    I don't believe so.

23        Q.    Okay.  Now, you did interview Mr. Kane,

24    right?

25        A.    I did.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.    Okay.  And that was -- your interview notes

 2     were marked, and we'll get to those in a bit.

 3              Did you inspect any of the properties where

 4     Mr. Kane applied Roundup®?

 5        A.    I did not.

 6        Q.    Okay.  Did you -- let me ask this for all

 7     six plaintiffs, maybe we can move along.  You

 8     interviewed all six plaintiffs, right?

 9        A.    Correct.

10        Q.    Okay.  Did you inspect any of the properties

11     where they applied Roundup®?

12        A.    I did not.

13        Q.    Okay.  And Mr. Kane, did you inspect the

14     property where Mr. Kane may have been exposed to

15     Roundup® through the piping?

16        A.    I did not.

17        Q.    Okay.  Did you inspect any of the equipment

18     plaintiffs used when they were exposed to Roundup®?

19        A.    I don't even know if it still exists.  I

20     mean, that's why I wouldn't do an inspection because

21     conditions have changed.

22        Q.    Okay.  So my question is not whether or

23     know -- whether or not you know if it exists.  My

24     question is:  Did you inspect any of the equipment

25     plaintiffs used when they were exposed to Roundup®?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1      A.   I did not.

2      Q.   Okay.  Did you inspect any of the clothing

3   and/or PPE plaintiffs wore when they were exposed to

4   Roundup®?

5           MR. KRISTAL:  Objection to form.

6      A.   I -- I've not been to their site, so I don't

7   know -- I don't have a time machine, so I don't know

8   how I'd go back in time and do that --

9   BY MR. KALAS:

10     Q.   Well, nobody -- nobody sent you in the mail

11  like their boots or anything like that to look at?

12     A.   From 20 years ago or 10 years ago, no.

13     Q.   Okay.  Did you ask any of the plaintiffs

14  what advertisements they saw for Roundup®?

15     A.   I think I would ask them if they recalled

16  being -- I would ask them -- well, sometimes they

17  would say, "I always thought Roundup® was safe."

18  You'll see that statement a lot.  And -- and I will

19  ask them what's their basis for that.  And so to the

20  extent that -- that they've answered that question

21  that way, if it came up, it would come up in that

22  context.  Other than that, it wouldn't come up.

23     Q.   Okay.  So if plaintiffs had told you they'd

24  seen advertisements for Roundup®, you would have

25  noted that in your telephone logs?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.    I would have.

 2        Q.    Okay.  Did you interview any of plaintiffs'

 3    supervisors or co-workers?

 4        A.    I did not.

 5        Q.    Did you review any employment records of

 6    plaintiffs other than those marked at their

 7    depositions?

 8        A.    It would have been just whatever was

 9    provided as attachments to the depositions.

10        Q.    So the answer to that question is no, no,

11    right?

12              MR. KRISTAL:  The answer to the question was

13        what it was.

14    BY MR. KALAS:

15        Q.    All right.  So let me ask it again because

16    I -- because it wasn't clear.  Did you review any

17    employment records of plaintiffs other than those

18    marked at the depositions?

19              MR. KRISTAL:  Asked and answered.

20        A.    Other than what was provided at the

21    depositions, I'm not aware of any --

22    BY MR. KALAS:

23        Q.    Okay.

24        A.    -- that I reviewed.

25        Q.    Okay.  Did you determine whether plaintiffs
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    used other products that contained cancer warnings?

2        A.    I certainly tried to -- that's why I go

3    through the detailed employment history, I mean,

4    because I'm asked basically to determine the Roundup®

5    exposure.  That's my scope.  But as an industrial

6    hygienist, I want to look at their entire employment

7    history.  So I try to go through that to see what

8    other environmental factors or stressors they might

9    have been exposed to.  And so in that sense, I will

10   list those where they exist.  Did I go out and look

11   to whether or not they're classified as carcinogens

12   or not, probably not, but at least I did list -- I

13   did seek other information and other environmental

14   stressors or factors.

15       Q.    Okay.  My question doesn't go as much to

16   medical causation as it goes to warnings, and you're

17   a warnings expert, right?

18       A.    Correct.

19       Q.    Okay.  So did you ask plaintiffs in your

20   interviews whether they used other products that

21   contained warnings on the label, cancer warnings?

22       A.    I -- I just -- when it came to the warnings

23   -- I -- I don't know that it -- I'm trying to think

24   back.  Yes, I did ask them questions on were you

25   ever provided any training or have any knowledge on

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1   chemical hazards to which you were exposed.
 2      Q.   Sure.
 3      A.   So I did ask that question.
 4      Q.   Okay.  Again, my question is getting at
 5   something different, and maybe I'm asking it poorly.
 6   There are products found in people's homes that
 7   contain cancer warnings on them, true?
 8      A.   I don't know how to answer that.
 9      Q.   Okay.
10      A.   Maybe in some cases there are and some cases
11   there aren't.
12      Q.   So my ironing board at home, right, my
13   ironing board has a Proposition 65 cancer warning on
14   it, okay?
15      A.   Okay.
16      Q.   Okay.  My -- actually, I wish I could mark
17   it, my -- I was making some White Castle hamburgers
18   for my kids the other day, and it has a cancer
19   warning on it.  It's pretty crazy.  So there are
20   cancer warnings on lots of products in homes,
21   correct?
22      A.   I don't know how to answer that question.
23   I'm sure there's some.  I -- you know, if you ask me
24   for a specific example, then I would say, yeah, I
25   agree with you it's there.  I don't know how to
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    answer that question.

2        Q.   Well, my question is just did you -- did you

3    ask plaintiffs what other products they used?

4    Did -- did this question get asked, and if it

5    didn't, that's fine.  Did you ask --

6        A.   Well, I answered that question.

7        Q.   Well, I didn't finish my question.

8        A.   No, but you're asking the same question over

9    and over again, and I gave you the answer.  But if

10   you want me to give you the same answer --

11       Q.   I want to know if this specific question was

12   asked, and if it wasn't, that's fine.  Did you ask

13   plaintiffs, "Do you have other products in your home

14   that contain cancer warnings"?

15       A.   I don't know if I asked them that specific

16   question, but it was wrapped around the question of

17   have you -- have you -- it was the -- it's the final

18   set of warnings questions where I asked, "Have you

19   received any training or any warnings on -- on any

20   chemicals or haz- -- hazardous materials you've been

21   exposed to?"  When they answer that question, I get

22   the response.

23       Q.   Okay.  So when you ask the question --

24       A.   So that's a subset of that, if you will.

25       Q.   I think I understand.  So when you ask the

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    question, "Have you received any training or any

 2    warnings on any chemicals or hazardous materials

 3    that you've been exposed to," if the plaintiff says

 4    no, then the assumption is they don't have any

 5    chemicals they're exposed to with warnings on them,

 6    right?

 7         MR. KRISTAL:  Objection to form.

 8    A.   No, it's not that assumption at all.  It's

 9    just that they can't recall any at that time.

10    BY MR. KALAS:

11    Q.   Got it.  So they can't recall any.  So that

12    doesn't mean there aren't products that they're

13    exposed to with cancer warnings on them, right?

14    They just can't remember any?

15    A.   I guess it's a hypothetical, but I guess

16    theoretically that could be the case.

17    Q.   Okay.  Now, you're not going to be offering

18    a specific causation opinion regarding any of the

19    plaintiffs in this case, right?

20    A.   That is correct.

21    Q.   Okay.  And just to be clear, in lay terms

22    what that means is you won't say Roundup® caused any

23    of the plaintiffs' NHL, right?

24    A.   That's correct.

25    Q.   Okay.  And because you're not offering a
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    specific causation opinion, you won't get up there

 2    and tell the jury that the only risk factor the six

 3    plaintiffs had in common was Roundup®, correct?

 4        A.   Well, it depends on the interview and the

 5    individual.  If there -- if there aren't others that

 6    I haven't identified, any other risk factors, then I

 7    might say that, but it just depends on the

 8    individual interview.

 9        Q.   Okay.  So you might say I haven't identified

10    any other risk factors, but I haven't -- but I'm --

11    let me make sure I understand.  Let me back up and

12    ask a foundational question.

13             You're not an oncologist, right?

14        A.   No.

15        Q.   Okay.  You're not going to be opining upon

16    genetic predispositions in any of the plaintiffs to

17    NHL, right?

18        A.   That's correct.

19        Q.   Okay.  You're not a epidemiologist, right?

20        A.   No, I'm qualified to testify in

21    epidemiology.  I may not be in this -- we've this

22    had question --

23        Q.   Right.

24        A.   -- and answer before.  But certainly through

25    my CIH examination as well as my formal training at
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    Ohio State, I had training in epidemiology.
 2        Q.   You have training --
 3        A.   And I've been tested on it.  So -- but I
 4    think in this -- so I'm not going to preclude myself
 5    if in cross I was asked some question about
 6    epidemiology.  You know, like -- like I'll probably
 7    comment on as part of warnings the -- the Broad
 8    Street well and the Snow stuff, who's the godfath-
 9    -- the father of epidemiology on -- on why we want
10    to warn before we have perfect information.
11        Q.   That was my Game of Thrones joke last time.
12        A.   Yeah.
13        Q.   John Snow.
14        A.   Yeah.
15        Q.   Yeah.
16        A.   So, I mean, from an industrial hygiene --
17             MR. KRISTAL:  We're spending way too much
18        time if we're now recalling prior jokes that were
19        told in prior deps.
20        A.   I'm just saying that -- that I'm sure they
21    have epidemiologists that are designated for that
22    purpose, but I'm not going to preclude myself if, in
23    fact, there's a scenario where -- from an industrial
24    hygiene standpoint I need to add epidemiology.
25    BY MR. KALAS:
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Well, what I'm trying to get at is this

 2   question, and maybe I'll just ask it directly.  Are

 3   you going to sit up on the stand and tell the jury

 4   at the Kane trial that the only thing these six

 5   plaintiffs had in common was that they were exposed

 6   to Roundup®, ergo, Roundup® was the cause of their

 7   NHL?

 8      A.   I am not ever going to give a specific

 9   causation.

10      Q.   Okay.  So --

11      A.   I'm qualified by the Courts to give general

12   causation, but I doubt that I'll be offered up in

13   that sense either.

14      Q.   So because you aren't going to give a

15   specific causation opinion, the statement I just

16   made is something you're not going to say on the

17   stand, correct?

18      A.   Well, the -- the -- you made multiple

19   statements.  That's why I'm hesitating.  The second

20   part of that statement I would agree with.  The

21   first part I'm not sure I agree with.

22      Q.   Okay.  So let me say the statement again,

23   and I just want to know if you're -- if you're

24   planning on saying it.  If you're not, we'll move

25   on.  If you are, we need to --
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   Well, it's a compound -- it's a compound

 2    statement.  That's the issue.

 3      Q.   Will you sit on the stand and tell the jury

 4    at the Kane trial the only thing the six plaintiffs

 5    had in common was they were exposed to Roundup®,

 6    therefore, Roundup® was the cause of their NHL?

 7           MR. KRISTAL:  Objection.  Form.

 8      A.   Well, I'm not going to -- I'm not going to

 9    opine on the cause of their disease.

10    BY MR. KALAS:

11      Q.   Okay.  So you won't --

12      A.   There may --

13      Q.   -- say the second part?

14      A.   Yeah, I'm not going to say that.

15      Q.   Okay.  So --

16      A.   The first part, if I went through all six

17    and I said, you know, the only common environmental

18    stressor or factor from an industrial hygiene

19    standpoint is Roundup®, if that's what shows up when

20    you look through all six interviews, then I -- I

21    would say that.

22      Q.   Okay.  The only common environmental

23    stressor is Roundup®, but --

24      A.   If -- if that's the case.  I'd have to go

25    through and list all the stressors that I've
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1   identified and -- and see if that's true.  But if it

2   were true, I would say that.

3       Q.   Would you opine at trial that the only risk

4   factor each plaintiff had for NHL was Roundup®, or

5   would you defer to the other experts on that?

6           MR. KRISTAL:  Object to the form.

7       A.   My testimony would be limited to the

8   information that I have knowledge on which would be

9   through the interviews with respect to the -- and it

10  would be from an industrial hygiene standpoint.

11      Q.   Well, I need to understand, though, because

12  we're in Missouri, and we don't have reports

13  technically.  I need to understand if the statement

14  will come out of your mouth.  Because if it's not,

15  then we're good.  Will you opine --

16      A.   Is that like I'm going to say that as

17  opposed to out of my mouth?

18      Q.   Yes.

19          MR. KRISTAL:  Unless it's coming out of some

20      other orifice.

21  BY MR. KALAS:

22      Q.   Will you opine at trial that the only risk

23  factor each plaintiff had for NHL was Roundup®?

24          MR. KRISTAL:  I got Trina to smile.

25      A.   From an industrial hygiene standpoint and

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    from my interviews, if that's the case, then I
 2    would.
 3    BY MR. KALAS:
 4        Q.   Okay.  Now, you say "from an industrial
 5    hygiene standpoint," and I've seen you say that in
 6    the PFOA litigation a lot.
 7        A.   Right.
 8        Q.   You can't say that each plaintiff you have
 9    looked at did not have some genetic predisposition
10    to NHL, correct?
11        A.   I can't because I'm not the medical doctor.
12        Q.   Okay.
13        A.   I'm not doing -- I'm not doing the
14    examination of the patients.  I'm looking at this
15    from an industrial hygiene standpoint.
16        Q.   You're not going to opine on the
17    contribution of lifestyle factors to plaintiffs'
18    NHL?  You can't eliminate that as a potential risk
19    factor, right?
20        A.   Well, if we included, for instance, smoking.
21        Q.   Okay.
22        A.   Then -- and -- and they don't -- aren't all
23    smokers, then obviously that's not a common factor
24    for all six.
25        Q.   Well, my question is -- let me ask you a
```

```
 1    hypothetical.

 2        A.    So that's a lifestyle -- I mean --

 3        Q.    Let -- let me ask you a hypothetical.

 4        A.    That question has gradations, different

 5    answers.

 6        Q.    There are a coup- -- there are a couple of

 7    exposures in the world that have been strongly

 8    associated with lung cancer, right?  Cigarettes are

 9    one?

10        A.    Sure.

11        Q.    Okay.  Ex- -- exposure to diesel exhaust is

12    another?

13        A.    Sure.

14        Q.    Okay.  Let's say I brought a lawsuit with

15    six plaintiffs, right, three of them smoked, okay?

16    Three of them were exposed heavily to diesel, okay?

17    With me so far?

18        A.    Not -- not from an industrial hygiene, but

19    go ahead.  I'll -- I don't know what you mean by

20    "heavily."  It's very difficult to measure exposure

21    to diesel exhaust.

22        Q.    Okay.

23        A.    So I don't even know how you measure that.

24        Q.    Let's say that they fell into a cohort of

25    people in epidemiology studies that showed strongly
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    statistically significant results for lung cancer --

 2         A.   Okay.

 3         Q.   -- okay?

 4              All six of them ate McDonald's hamburgers,

 5    okay?

 6         A.   Okay.

 7         Q.   I bring a lawsuit, and I say these six

 8    people have lung cancer because they ate McDonald's

 9    hamburgers.

10         A.   Okay.

11         Q.   Okay.  It would be true in those six

12    plaintiffs, for instance, the only risk factor,

13    assuming McDonald's hamburgers were a risk factor,

14    they have in common is McDonald's hamburgers, even

15    though three of them smoked and even though three of

16    them were heavily exposed to diesel, right?

17              MR. KRISTAL:  So in your hypothetical McDon-

18         -- eating McDonald's is a risk factor for lung

19         cancer?

20              MR. KALAS:  In the hypothetical.

21              MR. KRISTAL:  Are you asking his --

22              MR. KALAS:  I'm asking -- I'm asking if that

23         would be the case in that hypothetical.

24         A.   I don't -- I don't know.  I mean, what I'm

25    -- what I'm -- I think I've -- you're trying to
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    bracket where I would testimony -- testify, and I

 2    think I've done that.  I said I would bracket my

 3    testimony in that dimension based on the interviews

 4    and based on industrial hygiene knowledge where part

 5    of what we have to know is we have to know that

 6    there is some association with a particular

 7    environmental stressor or factor and potentially

 8    that disease.  We don't have to say it caused it.

 9    Because remember, we're looking at the word "may."

10    It may.  That's because we're on the front end of

11    the process.  We're supposed to protect anticipating

12    there could be a problem.

13            So our knowledge, the reason we're tested 40

14    percent on toxicology on the CIH exam is because we

15    have to have that -- if we're taking the world -- in

16    the real -- when I am outside of litigation and

17    going out to a situation where somebody's feeling

18    bad or sick or whatever, I have to take the world of

19    things that could be affecting them and winnow it

20    down.  So we do have to have that knowledge, and

21    that's why in the industrial hygiene interviews that

22    I do I'm listing a series of environmental factors

23    or stressors.  And certainly I know whether or not

24    those are associated with certain diseases.  Whether

25    -- I'm not going to say that they definitely caused
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    it or not, but I certainly have to know that

 2    association.

 3    BY MR. KALAS:

 4        Q.   Is it possible for six people -- well, let

 5    me ask if you're going to defer on this opinion

 6    rather than asking you if it's possible.  Will you

 7    defer on the opinion about whether or not it's

 8    possible for six people to be exposed to Roundup® and

 9    none of the six to have had their Roundup® cause --

10    or have their Roundup® cause their NHL?

11             MR. KRISTAL:  Objection.

12        A.   I'm not going to give an opinion on specific

13    causation.

14    BY MR. KALAS:

15        Q.   So you will defer on that opinion?

16        A.   On specific causation I will.

17        Q.   Okay.  Now, context is important --

18        A.   In fact I'm precluded.  It's not even -- I'm

19    not allowed to.  I'm not a medical doctor.

20        Q.   Context is important when interpreting

21    documents, correct?

22        A.   It's a factor.

23        Q.   Okay.  For instance, take the phrase "I need

24    a break."  That can mean a couple of things in a

25    document, right?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1            MR. KRISTAL:  Objection to form.

 2       A.   I guess.  I don't know.

 3   BY MR. KALAS:

 4       Q.   Okay.  It could mean somebody wants a rest,

 5   right?

 6       A.   I guess.

 7       Q.   It could mean somebody wants some help,

 8   right?

 9            MR. KRISTAL:  It depends on how "break" is

10       spelled.  You might want a car part.

11       A.   I -- I don't know how to answer that

12   question.  I don't -- I don't know.

13   BY MR. KALAS:

14       Q.   "I need a break" as in I got my big break,

15   okay?  Have you ever heard that, "I got my big

16   break"?

17            MR. KRISTAL:  That would be a big truck.

18       No, I'm --

19   BY MR. KALAS:

20       Q.   Big break, breaking into Hollywood, you

21   know, something like that?  You've never heard that?

22       A.   Oh, I guess.  I guess, yeah.

23       Q.   Okay.  And whether "I need a break" means

24   somebody wants a rest or somebody needs some help or

25   a leg up depends on the context, right?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   I guess to some degree.  I don't know.

 2      Q.   Okay.

 3      A.   I mean, I -- it's such a hypothetical, and

 4   it's so broad I don't even know how to answer that

 5   question.

 6      Q.   Sure.  Taking the phrase without any context

 7   makes interpretation very difficult, doesn't it?

 8      A.   It depends on the phrase.

 9      Q.   Sure.  And the same thing can happen when

10   you're reading an E-mail, right?

11           MR. KRISTAL:  Objection to form.

12      A.   It has a "yes" or a "no" answer to it.

13   BY MR. KALAS:

14      Q.   Okay.  For instance, I could get an E-mail

15   from one of my colleagues that says, "I shot a

16   deer," and if my co-worker is a photographer, you'd

17   take that E-mail one way, right?

18           MR. KRISTAL:  Objection to form.

19      A.   I don't know how to answer that question

20   because maybe it does, maybe it doesn't.

21   BY MR. KALAS:

22      Q.   Okay.  And if my co-worker's a hunter, you

23   might take it another way, right?

24           MR. KRISTAL:  Same objection.

25      A.   I don't know.  Maybe the hunter took a
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    picture.

 2    BY MR. KALAS:

 3        Q.   Maybe, right?  It's really hard to look at a

 4    cold piece of paper and really know what anybody's

 5    thinking, isn't it?

 6             MR. KRISTAL:  Objection.

 7        A.   I don't know that that's true.

 8    BY MR. KALAS:

 9        Q.   Okay.  And so you'd agree that it would be

10    appropriate for somebody evaluating the corporate

11    conduct of a company based on cold E-mails to

12    consider the context around the E-mails, right?

13             MR. KRISTAL:  Objection to form.

14        A.   It -- it depends on the E-mail.

15    BY MR. KALAS:

16        Q.   Okay.  And you agree that would be

17    appropriate for someone evaluating the corporate

18    conduct of a company to consider the actual actions

19    a company took rather than simply relying on what

20    was written by a single employee, right?

21             MR. KRISTAL:  Objection to form.

22        A.   Well, in some cases yes, some cases no.  It

23    just depends on what's being said and -- and what

24    the context is --

25    BY MR. KALAS:
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.    Sure.  So there are --

 2        A.    -- and what their responsibilities are.

 3        Q.    So there are some cases in your opinion

 4   where it is appropriate to consider the actual

 5   actions the company took rather than what was

 6   written by a single employee, right?

 7             MR. KRISTAL:  Objection.  I have no idea

 8        what you're asking.

 9        A.    I have the same answers I just gave you.

10   BY MR. KALAS:

11        Q.    Well, you said sometimes yes and sometimes

12   no.  So my question are -- my question, then, as a

13   follow-up was, there are cases where in your opinion

14   it's appropriate to consider the actual actions a

15   company took rather than what was written by a

16   single employee?

17             MR. KRISTAL:  Same objection.

18        A.    Well, I -- I think that in -- in my report

19   I've done both of those things.

20   BY MR. KALAS:

21        Q.    Okay.  So you -- you think you've done both

22   those things, and that's important, right, not to

23   just look at the E-mail but to see what was done?

24             MR. KRISTAL:  Objection to the form.

25        A.    In part the answer can be yes or no.  It
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    depends on who it is and what they're saying and --

 2    and to what extent that E-mail covers the subject.

 3    BY MR. KALAS:

 4        Q.   Sure.  So where -- where's the rubric I can

 5    find or the sort of order of operations where it

 6    does matter what somebody did, or it doesn't matter

 7    what somebody did?  Where is that methodology that I

 8    can look at?

 9            MR. KRISTAL:  Objection to form.

10        A.   The methodology is compare and contrast.

11    It's the underlying methodology of all

12    methodologies.

13    BY MR. KALAS:

14        Q.   Okay.

15        A.   It's the root.  My -- my methodology is --

16    is, as I've testified to multiple times, all

17    methodologies, root methodologies to compare and

18    contrast information, and that's what I do here.

19        Q.   What's the error rate on your methodology?

20        A.   I'm comparing -- it -- it's not applicable

21    to comparing and contrasting documents.

22        Q.   So there is no applicable error rate to your

23    methodology?

24        A.   Not in comparing statements --

25        Q.   Okay.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   -- because there's not numerics.

 2      Q.   Okay.  Can people mis- -- misspeak in an

 3    E-mail?

 4      A.   No, because it's written.  They're not

 5    speaking.

 6      Q.   Okay.  Can people mis- -- miswrite?  Can

 7    they say something that they don't mean to say in an

 8    E-mail?

 9      A.   I don't know how to answer that.

10      Q.   Okay.

11      A.   I can't get in their minds.  I mean, I -- as

12    I've said multiple times, I'm not in their minds.

13    All I can do is compare and contrast what they

14    write.

15      Q.   Can people write down bad ideas that never

16    get carried down in an E-mail -- carried out in an

17    E-mail?

18      A.   I don't try to look at it as bad or good.

19    It's the words they write.  I mean, I'm not in their

20    minds, again, knowing whether they've written

21    something they think's bad or they think something's

22    good.  It's what they wrote.

23      Q.   Can --

24      A.   Again, I -- I'm -- I'm not in their minds,

25    but I'm doing my -- my methodology is very
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1     straightforward and very basic and very simple.

 2     It's to take documents, compare them to either what

 3     they've written and how they'll behave in terms of

 4     -- or what the Government says they should do or

 5     what somebody like FAO says they should do and what

 6     they actually do in the documents, compare the

 7     documents, are they the same --

 8          Q.   Well, the documents --

 9          A.   -- or are they different.

10          Q.   A document's not an action, is it?  A

11     document is something somebody wrote.  What they do

12     might be something completely different than what

13     they wrote; isn't that right?

14               MR. KRISTAL:  Objection to form.

15          A.   I don't know how to answer that question

16     because what we're left with is the actual

17     documents.  I have to rely on documents.

18     BY MR. KALAS:

19          Q.   Okay.

20          A.   I can't rely on what's in their mind.  In

21     fact, I would be precluded from doing that.  So I

22     don't.  I rely on the documents themselves.  These

23     are the things that they've indicated in writing

24     where they're at, and I compare it to -- and when

25     you get a lot of those and you compare it to what
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    other documents they've written they will do versus
 2    what they did, you make that comparison and you say,
 3    okay, they didn't -- they're saying they didn't
 4    comply with what they said they'd comply with.
 5        Q.   We're going to be in St. Louis for this
 6    trial, right?
 7        A.   Right.
 8        Q.   Monsanto is in St. Louis, right?
 9        A.   I don't know if they're still in St. Louis
10    or -- city or not.  They're in the area certainly.
11        Q.   They're in the area, right?  They're --
12    they're local?
13        A.   Sure.
14        Q.   Okay.
15        A.   Well, I mean, part -- part of them are.
16    They're all over the place.
17        Q.   Okay.  The -- the folks who you -- who
18    you've read their E-mails, Donna Farmer, Bill
19    Heydens,          , they're local folks, right?
20            MR. KRISTAL:  Objection to form.
21        A.   No, I -- well, some of them are, but some of
22    them are in Europe and --
23    BY MR. KALAS:
24        Q.   Okay.
25        A.   -- and other places.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.   Okay.  How about the local folks.  Wouldn't

 2     it be easier to just ask them what they meant in an

 3     E-mail instead of bringing you in to read their

 4     E-mails to the jury?

 5            MR. KRISTAL:  Objection.  If you're not

 6         going to be asking really meaningful questions,

 7         we can get the Judge Norton on the phone.

 8            MR. KALAS:  These are extremely meaningful.

 9            MR. KRISTAL:  Yes, I'm sure they are in your

10         mind.  We can get Judge Norton on the phone.

11         These are, in my opinion, not meaningful and a

12         waste of time.  Your -- your question is

13         "Wouldn't it be easier to just ask them what they

14         meant in an E-mail instead of bringing you in to

15         read their E-mails to the jury?"

16            MR. KALAS:  Yeah.

17            MR. KRISTAL:  Okay.

18     BY MR. KALAS:

19        Q.   Can you answer that?

20            MR. KRISTAL:  There are lots of assumptions

21         in there that are completely incorrect.

22            But go ahead.

23        A.   No, I don't think so.

24     BY MR. KALAS:

25        Q.   Okay.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   I mean, not in context with all the analysis

 2    I've done on --

 3      Q.   Sure.

 4      A.   -- the warnings history from the 1800s

 5    forward.

 6      Q.   Sure.  Sometimes people write down a

 7    conclusion in an E-mail they later disagree with

 8    after reviewing all the evidence, right?

 9      A.   I don't know.

10      Q.   Okay.

11      A.   Could or could not.  I don't know.

12      Q.   Sometimes people misremember and write

13    things down that didn't happen in E-mails?

14           MS. BEACH:  Are we going to spend much more

15      time asking him what he thinks about what other

16      people might think?

17           MR. KALAS:  Well, that's what his whole

18      report's about.  So, yeah, I am going to spend

19      time.

20           MR. KRISTAL:  We don't think his whole

21      report --

22           MR. KALAS:  Okay.

23           MR. KRISTAL:  -- is about that in the

24      slightest.

25    BY MR. KALAS:
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.    You can answer the question, sir, if you

 2     understand it.

 3        A.    I'm not sure I do.

 4        Q.    Okay.

 5        A.    If you could repeat otherwise.

 6        Q.    Do sometimes people misremember and write

 7     things down that didn't happen in E-mails?

 8              MR. KRISTAL:  Objection to form.

 9        A.    You keep asking me if I know what's in their

10     minds, and I'm here to tell you I do not know what's

11     in people's minds.  I -- all I can rely on are

12     documents, and that's what I've relied on.  To the

13     extent that I've relied on either E-mails or things

14     they've written, that's what I can rely on.

15     BY MR. KALAS:

16        Q.    Well, what's the --

17        A.    I can't rely on what's in their minds.

18        Q.    What's the process you go through to make

19     sure -- to make sure that what they wrote in an

20     E-mail actually happened?  Like how do you go and

21     fact check that?

22              MR. KRISTAL:  Objection to form.

23        A.    How do I fact check that?  Well, you have

24     repeated examples, for example, of similar

25     statements or similar information.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    BY MR. KALAS:

 2        Q.    One of the best ways to find out what

 3    someone meant in an E-mail is to ask them, right?

 4            MR. KRISTAL:  Oh, God.  Objection.

 5        A.    No.  As an expert --

 6    BY MR. KALAS:

 7        Q.    Okay.

 8        A.    -- what I rely on is I rely on the

 9    documents.

10        Q.    Now, one of the things that's been brought

11    up a bunch in this litigation is the idea that if we

12    really want to know the truth about what Monsanto

13    scientists thought we need to read their E-mails in

14    realtime.  Have you heard somebody say that?

15            MR. KRISTAL:  Objection to form.

16        A.    Read their E-mails in realtime?  I've tried

17    to be very careful whenever I've cited an E-mail,

18    which is only a portion of this report.  I mean,

19    I've gone back and cited papers, records from MCA

20    where Monsanto was involved in warnings and

21    development of warnings back in the '50s and '60s.

22    So -- so I've always tried on the E-mails to

23    indicate what the date of those E-mails are, I

24    guess.

25        Q.    All right.  In your report, Exhibit 13, I
```

Confidential - Stephen E. Petty, PE, CIH, CSP

 1    believe it's 13, have you seen an E-mail where

 2    somebody from Monsanto writes this very sentence,

 3    this specific sentence.  We know Roundup® causes

 4    cancer?  Have you seen that E-mail?

 5        A.   I don't know if I've seen those exact words,

 6    but I've seen they said that they don't know the

 7    answer to that, that they haven't done the testing

 8    to know, to that effect.

 9        Q.   Okay.  So just to be clear, you've seen

10    E-mails where they say they don't know whether or

11    not Roundup® causes cancer, right?

12        A.   Well, it's -- it's more subtle than that.

13    It's something to the effect of we look -- we think

14    we're okay on glyphosate, but we're not so sure

15    about Roundup® --

16        Q.   Okay.

17        A.   -- something to that effect.

18        Q.   But just to be clear, you have never seen an

19    E-mail where somebody at Monsanto admits, "We know

20    Roundup® causes cancer," true?

21        A.   I don't know that I've seen that explicit

22    statement in an E-mail.

23        Q.   Okay.

24        MR. KRISTAL:  But if they did say that,

25    you'd have to ask them what they meant, right?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    BY MR. KALAS:

 2        Q.   Have you seen an E-mail where somebody says

 3    in a -- in a statement, this exact statement, "We

 4    plan to hide the fact Roundup® may cause cancer"?

 5        A.   I think it's different than that.  I

 6    think -- I think the context of reading all the

 7    correspondence associated with the documents that

 8    were either critical of in terms of their reviews of

 9    other people's papers that suggested that or in

10    context with helping prepare and fund the Intertek

11    papers that went in right before the EPA SAP

12    meetings occurred or the equivalent Euro- --

13    European meetings occurred where those papers were

14    developed and edited to show that it didn't, to

15    selectively take the science that direction.

16    There's certainly an effort on Monsanto's part to

17    push the science that says it doesn't as opposed to

18    being transparent about what the science said.

19        Q.   Okay.  So my question --

20        A.   And that's -- that's -- if you read the

21    dozens and dozens and hundreds of pages of E-mails

22    to that effect, which I've done --

23        Q.   Sure.

24        A.   -- you -- you -- you can then show through

25    those E-mails that Montan- -- what Monsanto's intent
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    was through those documents.

 2        Q.   Absolutely, absolutely.  I totally

 3    understand.  And I understand your opinions.

 4             My question was really narrow, though, and I

 5    don't know if you answered it, which is, have you

 6    ever seen a statement in an E-mail that you've

 7    reviewed or any other document Monsanto produced

 8    where they say, "We plan to hide the fact Roundup®

 9    may cause cancer"?  Have you seen that statement in

10    black and white?

11        A.   I don't know.  I've read so many E-mails,

12    I -- I don't recall one way or the other.

13        Q.   Wouldn't you remember that if you'd read it?

14        A.   I don't know.

15        Q.   Okay.

16        A.   I didn't write down -- I didn't put in the

17    report every statement and every E-mail.  This thing

18    would be much bigger than it already is.

19        Q.   All right.  A few more questions, then we'll

20    take a break.  IARC classifies what IARC believes to

21    be carcinogenic hazards, right?

22        A.   Sure.

23        Q.   And we talked about there's a difference

24    between hazard and risk at the last deposition.  You

25    agree with me that you cannot have a risk without a
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    hazard, right?

 2        A.   Well, I -- I think that's where my criticism

 3    of EPA and others were, as well as Monsanto, is that

 4    their -- you can have hazards, and if you eliminate

 5    the pathways and the risk assessment by just saying

 6    we're not going to consider those, we just decided

 7    we're not, then your risk is low.  So there can be

 8    hazards.  Let me give you an example.

 9         The EPA assumes in their risk there is no

10    dermal hazard, no dermal pathway.  It's based on

11    acute studies.  Yet, we have subchronic studies that

12    show there is a hazard.  So the answer to your

13    question is, yeah, you -- you can have hazards

14    and -- and not have the risk if you assume away the

15    pathway.

16        Q.   Well, my question was broader than just

17    glyphosate, just generally.

18        A.   Well, I'm giving you a much broader than

19    glyphosate.

20        Q.   Okay.  So -- okay.

21        A.   I mean, I'm a -- I'm an expert in risk

22    assessment.

23        Q.   So you can have hazards but not risk if you

24    eliminate essentially the exposure to the hazard?

25        A.   Well, that -- that's where all the -- the
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    games are played, frankly, in risk assessment.

2       Q.   Sure.

3       A.   Because, remember, I -- I spent a day with

4    training the risk assessors in the state of Ohio on

5    the methods people use to minimize their risks,

6    and -- and part of that training was pay close

7    attention to the pathways and see which ones are

8    eliminated.  And the standard statement is if you --

9    if you eliminate all the pathways that have risk,

10   you eliminate the risk.

11      Q.   Got it.  Likewise, you cannot have --

12      A.   But there can still be hazards.

13      Q.   Absolutely.

14      A.   I mean, they just -- they just decided to

15   assume them away.

16      Q.   Likewise, you can have -- you cannot have a

17   risk -- well, strike that.

18           You cannot have causation without risk,

19   right?  In other words, you need to be at risk for

20   something to cause an injury, true?

21           MR. KRISTAL:  Objection.

22      A.   You need to be at risk?

23           Well, it depends if you're talking about it

24   from a -- a -- if you're looking at it from a risk

25   assessment standpoint, then the answer could be no

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    if -- if they assume away the risk.  The practical

 2    side of it is that if -- if -- if you're hurt from

 3    something, then certainly there was a risk, but

 4    that's different and distinctly different from the

 5    risk assessment process which with real people

 6    involved and the pathways and whether or not they're

 7    going to consider them or not and to the extent that

 8    they consider them.

 9    BY MR. KALAS:

10        Q.   Let me ask you this:  Could there be a

11    situation where IARC correctly labels a chemical as

12    a carcinogenic hazard and EPA correctly labels that

13    same chemical as not being a carcinogenic risk at

14    the levels people are exposed do?  Could that

15    hypothetical situation exist?

16             MR. KRISTAL:  Objection.

17        A.   I don't know how to answer that question

18    because I -- I -- I've not done that analysis.  So I

19    have no way of having an opinion.

20    BY MR. KALAS:

21        Q.   I'm not asking about glyphosate.  I'm just

22    asking generally.  You've got no opinion on that

23    generally?

24        A.   In my profession I would never offer that

25    kind of broad opinion because I would want to look
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    at the specific situation and have knowledge on it

 2    to give you an answer.

 3         Q.   Okay.  So if you can't answer it, that's

 4    fine.

 5         A.   Well, I wouldn't as a professional answer a

 6    question I don't have a basis for providing you the

 7    information on.

 8              MR. KALAS:  All right.  Let's take a break.

 9              THE VIDEOGRAPHER:  The time is 10:34.  We're

10         going off the record.

11              (Recess from 10:34 a.m. until 10:44 a.m.)

12              THE VIDEOGRAPHER:  The time is 10:44 a.m.

13         We are back on the record.

14    BY MR. KALAS:

15         Q.   Mr. Petty, let's take a look at Mr. Dela

16    Cruz' case, okay?

17         A.   Sure.

18         Q.   Okay.  Mr. Dela Cruz is ███ right?

19              And feel free to rely on your notes as you

20    need to.

21         A.   Yeah.  They're in there somewhere.  I had

22    them organized, but then they got all scrambled.

23         Q.   So here's your interview summary.

24         A.   And then the calcs were hopefully right

25    behind them.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   There you go.  Okay.

 2           And I'll also mark as Exhibit 19, just so we

 3   have it, his deposition.

 4      A.   Okey dokey.

 5           (Petty Exhibit 19 was marked for

 6   identification.)

 7   BY MR. KALAS:

 8      Q.   All right.  So Mr. Dela Cruz is█████ right?

 9      A.   Correct.

10      Q.   Okay.  And he lives in Hawaii?

11           MR. KRISTAL:  In three more days.

12      A.   I was going to say.  Yes, he I understood --

13   well, last time I talked to him, he did, yes.

14   BY MR. KALAS:

15      Q.   Okay.  And he's currently a correctional

16   officer, right?

17      A.   I think he's actually a supervisor now, but

18   he works in the corrections unit.

19      Q.   Okay.  When he was younger, he worked as a

20   weeder in sugarcane fields, right?

21      A.   Yes.

22      Q.   All right.  And he did that for 15 years,

23   right?

24      A.   Slightly more than that, but, yeah.

25      Q.   Okay.  And you interviewed him on November
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    15th, 2019, correct?

 2        A.   I did.

 3        Q.   Okay.  Spoke for about an hour and 10

 4    minutes, right?

 5        A.   Yes, sir, I did.

 6        Q.   And there were four people on the call,

 7    correct?

 8        A.   Well, at least part of the time.  But, yes.

 9        Q.   Okay.  At least part of the time.  What do

10    you mean by that?

11        A.   Sometimes the -- the legal counsel reps are

12    on and sometimes -- I mean, I don't know that

13    they're always there.

14        Q.   Okay.

15        A.   Because when I end the conversation,

16    sometimes there will be one there and not both.

17        Q.   Do you recall from this particular interview

18    whether anybody dropped off during this call?

19        A.   I just don't recall for sure.  I just

20    indicate when we first start and I ask who's there.

21        Q.   Sure.

22             So there were four people on the call when

23    you started, right?

24        A.   Correct.

25        Q.   Two of them were individuals from the Weitz
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1     & Luxenberg firm, correct?

 2        A.   Correct.

 3        Q.   And you don't know if those are attorneys,

 4     paralegals, some other support staff, right?

 5        A.   I should know that, but I don't recall off

 6     the top of my head.

 7        Q.   Okay.  And the Weitz & Luxenberg firm is

 8     Mr. Kristal's firm, correct?

 9        A.   I don't know that he owns it, but he works

10     there.

11             MR. KRISTAL:  It's not so.  I wouldn't be

12        sitting here if that were the case.

13     BY MR. KALAS:

14        Q.   And then you were on the call, correct?

15        A.   I was.

16        Q.   Okay.  And Mr. Dela Cruz was on the call,

17     correct?

18        A.   He was.

19        Q.   Nobody else, to your knowledge, was on the

20     call, right?

21        A.   That's correct.

22        Q.   Okay.  Now, you had this call with Mr. Dela

23     Cruz after he was deposed under oath, right?

24        A.   Correct.

25        Q.   And you had this call with Mr. Dela Cruz
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    after he filled out his plaintiff fact sheet under a

2    penalty of perjury, correct?

3        A.    Correct.

4        Q.    Now, when you had this call with Mr. Dela

5    Cruz, he was not under oath like he is at

6    deposition, right?

7        A.    Well, he wasn't under oath.  I've never done

8    an interview under oath in the thousands I've done.

9        Q.    Okay.  So at the dep -- at the interview,

10   you did here, Mr. Dela Cruz was not under oath,

11   correct?

12       A.    I guess that's -- I mean, it was just him

13   and I pretty much on the phone.

14       Q.    Okay.  There wasn't a court reporter sitting

15   there with Mr. Dela Cruz taking down a transcript,

16   right?

17       A.    That's correct.

18       Q.    And, in fact, you quite candidly note in

19   your call notes that the call notes are not an

20   official transcript, right?

21       A.    They're not a transcript.

22       Q.    Okay.  And who took the notes on this call?

23       A.    I did.

24       Q.    Okay.  Now, did the folks from Weitz &

25   Luxenberg speak at all on the call?

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.   Sure.  When we started, they introduced me

 2    to Mr. Dela Cruz, and then they'd go on mute.  And

 3    then they -- there was some conversation at the end

 4    thanking everybody, and that's pretty much it.

 5        Q.   Okay.  So you don't recall them asking any

 6    questions on this call?

 7        A.   I don't recall that.

 8        Q.   Okay.  Was anyone from Monsanto, to your

 9    knowledge, asked -- well, strike that.

10             Were any experts from Monsanto or Monsanto

11    attorneys invited to be present for this call, to

12    your knowledge?

13        A.   I don't know how to answer that question.

14        Q.   Okay.

15             MR. KRISTAL:  And we'd be happy to entertain

16        a request as soon as you allow us to be on calls

17        with your clients.

18             MR. KALAS:  Okay.

19    BY MR. KALAS:

20        Q.   Did you invite any attorneys or experts from

21    Monsanto to attend personally?

22        A.   I don't even know who they are, so how do

23    I --

24        Q.   Okay.  But you know Mr. Upshaw, right?

25        A.   Mr. Upshaw?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Tony Upshaw?  He's deposed you before in the

 2   Winston matter.

 3      A.   I thought you said any of the experts on the

 4   other side.

 5      Q.   I said attorneys or experts.

 6      A.   No, I wouldn't do that.

 7      Q.   Okay.

 8      A.   I have no arrangement with you.  My

 9   arrangement's with this firm.  They set up the calls

10   and --

11      Q.   Understood.

12           Now, we've discussed this in the past, but I

13   need to ask about Mr. Dela Cruz.  Since we've

14   discussed it in the past, did you tape record this

15   conversation?

16      A.   No.

17      Q.   Okay.  Why not?

18      A.   Never have.  Never have in 20 years.

19      Q.   Okay.  And this wasn't -- now, there are

20   standard questions you ask in these interviews,

21   right?

22      A.   There's an outline that I start from.  I

23   think I provided that to you folks.

24      Q.   Okay.

25      A.   And then depending on -- I mean, there's
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    always different numbers of job positions and -- so

2    there's a framework that I start from.

3        Q.   Okay.

4        A.   And then it depends on what I learn and

5    hear.

6        Q.   And you've provided that in the litigation,

7    correct?  The framework?

8        A.   Sure.

9        Q.   Okay.  And so Mr. Kristal has it as well,

10   right?

11       A.   Yeah, I assume from -- as a copy to one of

12   the depositions, yeah.

13       Q.   Okay.  Now, this wasn't the first time

14   individuals from the Weitz & Luxenberg firm had been

15   on an interview call that you had with a plaintiff,

16   right?

17       A.   That's true.

18       Q.   Okay.  How do you know the attorneys from

19   Weitz & Luxenberg didn't discuss the questions you

20   were going to ask and how to answer those questions

21   with Mr. Dela Cruz before your call?

22       A.   I don't know how to answer that question.

23   I -- I've -- I've not seen attorneys do industrial

24   hygiene interviews the way I do them, ever.

25       Q.   Okay.  But they know what questions you're

Confidential - Stephen E. Petty, PE, CIH, CSP

1    going to ask at least generally.  So how do you know

2    they didn't tell Mr. Dela Cruz Mr. Petty's going to

3    ask you these questions, here is how you should

4    answer them; how do you know that conversation

5    didn't take place?

6        A.   How do I know something that I don't know?

7        Q.   If you don't know, then that's an answer --

8    that's an appropriate answer.

9        A.   No, you just asked me do I know something I

10   don't know.  I don't know how to answer that

11   question.

12       Q.   Okay.  So you don't know whether or not that

13   conversation took place with Mr. Dela Cruz is the

14   answer?

15           MR. KRISTAL:  The conversation where we told

16       our lawyers [sic] what to say in an interview,

17       that's what you're asking?

18           MR. KALAS:  No, I'm asking him if he -- let

19       me start over from the beginning and make it

20       clear.

21       A.   I don't know how I would know what I don't

22   know.  I'm having a hard time with this.

23   BY MR. KALAS:

24       Q.   Okay.  My question is do you know whether or

25   not attorneys from the Weitz & Luxenberg firm had a

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    call with Mr. Dela Cruz prior to your call to tell

 2    him the questions that might be coming and the

 3    potential answers he may want to give?

 4         MR. KRISTAL:  Right.  So you're asking if we

 5       were suborning perjury.

 6    BY MR. KALAS:

 7       Q.   I'm just asking if you know.

 8         MR. KRISTAL:  No, I understand that.  It's a

 9       ridiculous question.  It's like saying to your

10       experts do you know if Monsanto spoke with

11       somebody and told them what to say?

12         MR. KALAS:  Those questions happen quite an

13       awful lot.

14    BY MR. KALAS:

15       Q.   So I'm just asking.

16         MR. KRISTAL:  I don't think that question

17       has ever been asked.

18         MR. KALAS:  Okay.

19    BY MR. KALAS:

20       Q.   Do you know?

21         MR. KRISTAL:  Do you know if we were

22       suborning perjury or false testimony?

23         MR. KALAS:  Jerry, you will have a chance --

24       Jerry, you will have a chance to ask questions.

25         MR. KRISTAL:  It's a ridiculous question.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1            MR. KALAS:  Jerry, you will have a chance to
 2       ask questions.
 3            MR. KRISTAL:  I know, but it's wrong, and I
 4       have a chance to do a -- make objections.  And
 5       the objection is it's a ridiculous question.
 6  BY MR. KALAS:
 7       Q.   Mr. Petty, do you know if there was a prep
 8  call with Mr. Dela Cruz regarding his exposure
 9  interview prior to your call conducted by the
10  attorneys?
11       A.   I don't know one way or the other.
12       Q.   Okay.  Turning back to Mr. Dela Cruz, he was
13  diagnosed with NHL at the age of ██, right?
14       A.   That looks to be the case, yes.
15       Q.   Okay.  And what subtype of NHL does he have?
16       A.   I don't know.
17       Q.   Okay.  Well, you know NHL is not just one
18  disease, right?
19       A.   Well, I'm not the medical person here.  I
20  know there are subtypes of it, but --
21       Q.   Okay.
22       A.   I'm more interested -- the reason I ask this
23  question is I want to know about when the diagnosis
24  occurred because generally we don't calculate
25  exposures after that point in time.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.   And since you don't know what subtype of NHL

 2    Mr. Dela Cruz has, you're not going to tell the jury

 3    that all the plaintiffs have the same subtype of

 4    NHL, right?

 5        A.   I would only tell the jury what I was told

 6    in my interview.

 7        Q.   Okay.  Were you told on the interview what

 8    subtype of NHL Mr. Dela Cruz has?

 9        A.   I think I answered that question.

10        Q.   And the answer is no?

11        A.   Correct.

12        Q.   So you cannot say that all the plaintiffs in

13    this case, the six plaintiffs, have the same subtype

14    of NHL, true?

15        A.   I'd have to look at them, but I don't

16    believe that's the case.

17        Q.   Okay.  You're not going to tell the jury

18    that all of the plaintiffs have a subtype of NHL

19    that has been shown in the literature to be caused

20    by Roundup® exposure, correct?

21        A.   I'm not a specific causation expert.

22        Q.   Well, that's a general causation question

23    more, which is are you going to tell them --

24        A.   No, no, no.

25        Q.   We don't have to quibble.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1      A.    No, it's not a general causation question

2    because you're sneaking up on what I know -- would I

3    diagnose these in each of these individuals.  And

4    I'm precluded from it and I wouldn't.

5      Q.    Okay.  So my question is just if the answer

6    is no because you believe it's specific causation,

7    we can move on.

8            Are you going to tell the jury that all the

9    plaintiffs have a subtype of NHL that has been shown

10   to be caused by Roundup® exposure?

11     A.    Try that question again.

12     Q.    Are you going to tell the jury that all the

13   plaintiffs have a subtype of NHL that has been shown

14   to be caused by Roundup® exposure?

15     A.    I look at that as a specific causation

16   issue.

17     Q.    So the answer is no?

18     A.    Well, I've told you over and over again, I'm

19   not a specific causation expert.  I'm precluded from

20   it.  I'm not a medical doctor.

21     Q.    Okay.  Now, when Mr. Dela Cruz applied

22   Roundup®, he applied using a pressurized backpack

23   sprayer in sugarcane groves, correct?

24     A.    Correct.

25     Q.    Okay.  He never used Roundup® at home for

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    personal use, right?

 2        A.   If he did -- no.  No, he didn't.

 3        Q.   Okay.  And Mr. Dela Cruz stated that he was

 4    never given written directions regarding Roundup® by

 5    his employer, right?

 6        A.   If you want to show me the line that you're

 7    quoting, I'll look at it and I'll give you --

 8        Q.   Sure.  Go to Page 25 of Exhibit 19.

 9        A.   Okay.

10             Wow.  I'm sorry.  It's just between the poor

11    lighting and -- and data text and small text.

12             MR. KRISTAL:  Yeah, this is putting a

13        capital C on condensed transcript.

14        A.   Which page are you looking at?

15    BY MR. KALAS:

16        Q.   Page 25.

17        A.   Okay.  I'll get there.

18             Old age and eyesight.

19        Q.   Line 24.

20        A.   Okay.

21        Q.   "Question:  Was there ever a time when your

22    employer gave you any written directions about how

23    to use Roundup®?

24             "Answer:  No."

25        A.   Okay.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1       Q.   Did I read that correctly?

2       A.   You read those words correctly.

3       Q.   Do you agree that Mr. Dela Cruz stated at

4   deposition under oath he was never given written

5   directions regarding Roundup® by his employer?

6            MR. KRISTAL:  Don't answer -- don't answer

7       that question.  If you want to call the judge, go

8       ahead.  You just read him his sworn testimony and

9       asked if you -- asked if you read it correctly,

10      and he said yes.  Now you asked him do you agree

11      he said that at his deposition.

12           Don't answer the question.

13           MR. KALAS:  Well, I'll rephrase it if it's

14      so objectionable.  I'm confused why it is.

15  BY MR. KALAS:

16      Q.   Do you agree that Mr. Dela Cruz has stated

17  that he has -- was never given written directions

18  regarding Roundup® use by his employer?

19           MR. KRISTAL:  Don't answer the question.

20           MR. KALAS:  Don't answer the question?

21           MR. KRISTAL:  That's right.

22           MR. KALAS:  Okay.  Let's mark that.

23           MR. KRISTAL:  Mark it.  Mark it.

24           MR. KALAS:  Jerry, we will come back.

25           MR. KRISTAL:  We will not come back on that.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1              MR. KALAS:  Yes, we will.  Yes, we will.

 2              MR. KRISTAL:  You just asked him --

 3              MS. BEACH:  I just remembered you from that

 4      trip to Virginia.  Wow.

 5              MR. KRISTAL:  John, I don't want to fight

 6      with you.  I'm trying to save time.

 7              MR. KALAS:  Jerry --

 8              MR. KRISTAL:  You asked him did he testify

 9      at his deposition, here's the question, here's

10      the answer.  And then to ask do you agree that he

11      said that at his deposition is absurd.  You just

12      read from his deposition.

13              So don't answer that question because we're

14      getting into the realm of harassment.

15              MR. KALAS:  I'm going to --

16              MR. KRISTAL:  You can mark it or do whatever

17      you want.

18              MR. KALAS:  I'm going to note that you are

19      obstructing the deposition in violation of the

20      Missouri Rules of Professional Responsibility and

21      you are making inappropriate objections, and we

22      will mark it.

23              MR. KRISTAL:  So noted.  So marked.

24      BY MR. KALAS:

25          Q.   Now, Mr. Dela Cruz said he thought he used
```

1    Roundup® because the name Roundup® was painted on the

2    barrels at the sugarcane farm, right?

3        A.    In part.

4        Q.    What other -- what other reasons did he

5    think he used Roundup® beyond the name being painted

6    on the barrels?

7        A.    I recall from his deposition testimony,

8    going towards the back again, that that series of

9    questions was asked over and over again, and he --

10   he -- it was his understanding over and over again

11   that he was pretty -- he was certain that there was

12   Roundup®.

13       Q.    Okay.  But what was that based on, was my

14   question.

15       A.    Well, we could go through the deposition,

16   but that question was asked multiple times in the

17   deposition, and I'm just -- I'll refer you back to

18   it.  But if you want to go back through it, I can

19   try to find the times he answered that in there.

20       Q.    Well, I think I've -- I think I've picked it

21   out for you.  Let's go to Page 137.

22            Let me know when you're there.

23       A.    Okay.  I'm there.

24       Q.    And it states at Page 137, line 3:  "The

25   barrels you said you saw labeling on it that said

Confidential - Stephen E. Petty, PE, CIH, CSP

1    Roundup®?

2            "Answer:  Yes.

3            "Question:  Was it like a sticker or was it

4    spray-painted on?

5            "It was -- it was painted on the barrel."

6            Did I read that correctly?

7    A.   Yes.  I believe so.

8    Q.   Okay.  Are there any other deposition

9    excerpts where Mr. Dela Cruz described the labeling

10   of Roundup® being affixed to the barrels in any way

11   other than painted on?

12   A.   I'd have to read the deposition to answer

13   your question.

14   Q.   Okay.

15   A.   That's what I was referring to.

16   Q.   Okay.  You have read the deposition,

17   correct?

18   A.   I agree.

19           MR. KRISTAL:  Do you think this is a memory

20       test?  It's a 200-and-something-page deposition.

21           MR. KALAS:  Okay.

22           MR. KRISTAL:  270 pages, and there are six

23       plaintiffs.

24   A.   If you're asking me is there other

25   descriptions of those barrels, et cetera, and his

Confidential - Stephen E. Petty, PE, CIH, CSP

1    recollection of it being Roundup®, there are.

2    BY MR. KALAS:

3        Q.   Okay.

4        A.   And I've answered that question before and I

5    told you -- I asked you, do you want me to go

6    through his deposition and try to identify those.

7        Q.   Is there any testimony or anything you found

8    out in your interview that suggests there was a

9    sticker affixed to the barrels that said Roundup® up

10   on it?

11           MR. KRISTAL:  Object to the form.

12       A.   Same answer.  I'd have to go through this to

13   answer that question.

14   BY MR. KALAS:

15       Q.   Okay.  Well, he was asked directly was there

16   a sticker on it, correct?

17       A.   Well, if you want to show me that, then

18   we'll --

19       Q.   Line 6.

20       A.   Of what page?

21       Q.   The page you're on, sir, 137.

22       A.   I'm on Page 237.

23       Q.   137 was what we were reading from, sir.

24   137.

25       A.   Just be kind and tell me what page you're on

Confidential - Stephen E. Petty, PE, CIH, CSP

1    and we'll do well.

2        Q.   137, line 6.

3        A.   I've been around way too long.  Kindness

4    goes a long way.

5        Q.   137, line 6, please.

6             He was asked directly:  "Was it like a

7    sticker or was it spray-painted on?

8             "Answer:  It was -- it was painted on the

9    barrel."

10            Did I read that correctly?

11       A.   You read that language correctly.

12       Q.   Sitting here, can you recall any evidence in

13   this case where Mr. Dela Cruz states that it was not

14   painted on, but instead was affixed with a sticker?

15            MR. KRISTAL:  Absent having Mr. --

16            MR. KALAS:  Don't answer for him, Jerry.

17       Jerry.  Jerry, it is an inappropriate objection.

18       It is an inappropriate objection.  Let him answer

19       the question.

20            MS. BEACH:  Hey, chill out.  Bring your

21       volume down or we'll all start yelling at each

22       other and then we can cancel this whole thing.

23            MR. KRISTAL:  Absent having him read the

24       entire deposition, you're asking him if, from

25       memory, does he recall that?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1              MR. KALAS:  Yes, sir, which I asked him.

 2              MR. KRISTAL:  Then it's a very simple

 3         question.  It's a very simple answer.

 4         A.   I would have to go back through to answer

 5    that question.

 6    BY MR. KALAS:

 7         Q.   Okay.  So my question is from memory sitting

 8    here right now, do you recall that?

 9         A.   I recall other discussions about what he

10    recalled on those labels, but I don't recall

11    specifically what was said.

12         Q.   Okay.  Tell me, have you done any research

13    into whether or not Monsanto has sold Roundup® in

14    55-gallon painted drums with no label affixed as a

15    sticker?

16         A.   I have not done that research.

17         Q.   Have you done any research to see if

18    Monsanto has ever sold Roundup® to agricultural

19    concerns with no label affixed?

20         A.   I don't know the answer to that question.

21         Q.   Mr. Dela Cruz was not trained on how to

22    spray pesticides, right?

23         A.   No, I don't agree with that.  He was -- he

24    was trained by the people that did it before him.

25         Q.   Okay.  Go to Page 171, Line 16 -- or
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1     actually let's start at Line 11.

2            "Question:  Did you ever get any sort of

3     training from your employer on, okay, we're going --

4     you're going to go to a day or two worth of classes,

5     then we're going to put you in the field, or was it

6     learning on the go?

7            "Just learn on the go."

8            Did I read that correctly?

9     A.    I'm still trying to find it.

10    Q.    171, 11 to 15, sir.

11    A.    Go ahead and ask the question again.  I'm

12    there.

13    Q.    Did Mr. Dela Cruz testify at deposition,

14    "Question:  Did you ever get any sort of training

15    from your employer on, okay, we're -- you're going

16    to go to a day or two worth of classes, then we're

17    going to put you in the field, or was it learning on

18    the go?

19           "Answer:  Just learn on the go."

20           Did I read that correctly?

21    A.    You read those words correctly.

22    Q.    Okay.  Next question.

23           "Question:  And do you recall who did train

24    you or which people educated you on how to do this?

25           "Answer:  Nobody really trained me.  I just

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    watched them.  Like I said, I was like the young

 2    local boy in the gang.  They were all Filipino men

 3    that spoke only Filipino, so I was kind of like an

 4    outcast when I got there, so nobody really trained

 5    me, I just had to watch.

 6           "And after seeing me work for a while, then

 7    they had some trust in me, and then that's how we

 8    developed a relationship.  But as far as starting,

 9    they could care less about me."

10           Did I read that correctly?

11       A.   Looks like you read those words correct.

12       Q.   Okay.  Can you recall, sitting here, any

13    other depositions passages or anything Mr. Dela Cruz

14    told you in your interviews where he discussed

15    formal training on how to spray pesticides?

16       A.   I'd have to go through the deposition to

17    answer that question.

18       Q.   Okay.  So sitting here right now based on

19    memory, you cannot?

20       A.   I can't answer that question one way or the

21    other.

22       Q.   Okay.  Mr. Dela Cruz never saw the label for

23    Roundup®, right?

24       A.   He said he did not see a label on the drums.

25    That doesn't mean it wasn't there, it just means he
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1    didn't see it.

 2       Q.   Okay.

 3       A.   That's what he told me.

 4       Q.   Mr. Dela Cruz, when he spoke to you, said he

 5    never saw a label for Roundup®?

 6            I'm not asking whether or not it was there,

 7    I'm asking whether he saw it.

 8       A.   No, he said he did not see a label on the

 9    drum.

10       Q.   Okay.  Did he see a label for Roundup® at

11    any other time?

12       A.   That's all he told me.  That's all I got

13    from him in the interview.

14       Q.   Do you recall, sitting here, whether he told

15    you that he saw any advertisements for Roundup®?

16       A.   Whatever he told me is listed here.

17       Q.   Okay.  Did he ever see an MSDS for Roundup®?

18       A.   I believe the answer is he did not see an

19    MSDS for Roundup®.

20       Q.   Okay.  And you haven't talked to anybody at

21    his employers who said that Mr. Dela Cruz

22    misremembers and he did see the labeling, right?

23       A.   Well, there's a compound question there.

24       Q.   Well, earlier you told me you hadn't spoken

25    to anybody at his employer, so hopefully this is an
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    easy one.

 2            Since you haven't talked to anybody at his

 3    employer, you haven't talked to anybody who he

 4    worked with who said he did see the labeling?

 5    A.    No --

 6            MR. KRISTAL:  You mean since the question

 7       was asked and during the break, did Mr. Petty

 8       call one of Mr. Dela Cruz' employer?

 9            If he didn't speak to any employer, then the

10       answer is obvious.

11            MR. KALAS:  That is the third inappropriate

12       objection.

13            MR. KRISTAL:  Right.  And you're asking

14       questions that have already been answered.

15            MR. KALAS:  Jerry, Jerry, please just object

16       to form and we'll move on.

17            MR. KRISTAL:  And if you would ask questions

18       rather than filling up space.  We all know you're

19       an intelligent guy.  We all know you can ask

20       questions all day long.

21    BY MR. KALAS:

22    Q.    Have you seen any evidence that suggests

23    that Mr. Dela Cruz misremembered and he did see

24    labeling for Roundup®?

25    A.    The only information he gave me is that he
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    did not see labeling on the drum.

2       Q.   Okay.  How would a change in warnings on

3    Roundup® have reached Mr. Dela Cruz if he never saw

4    the warnings in the first place?

5            MR. KRISTAL:  Object to the form.

6       A.   How would a change in warnings?

7            Ask the question again.

8    BY MR. KALAS:

9       Q.   How would a change in the text of the

10   warnings, not the size or the placement, the text of

11   the warnings, have reached Mr. Dela Cruz if he never

12   saw the warnings for Roundup® in the first place?

13           MR. KRISTAL:  Object to the form.

14      A.   I don't know how to answer that question.

15   BY MR. KALAS:

16      Q.   Okay.  Now, when Mr. Dela Cruz applied

17   Roundup®, he held a job description known as knapsack

18   sprayer, correct?

19      A.   Correct.

20      Q.   Okay.  And what he'd do in that job is he'd

21   spray the ground and weeds at a fan setting with a

22   two-and-a-half-foot wand held about eight to ten

23   inches off the ground, right?

24      A.   Spray the ground?  I think he was spraying

25   the weeds.

Confidential - Stephen E. Petty, PE, CIH, CSP

1    Q.   The weeds on the ground, sir.

2    A.   You said he sprayed -- your specific

3    question was he sprayed the ground.

4    Q.   Okay.  You're right.  I will -- I will reask

5    it.  That is --

6    A.   I'm trying to pay attention --

7    Q.   I want to be precise.

8    A.   I'm trying to pay attention to what you're

9    saying.

10   Q.   What Mr. Dela Cruz would do in his job is

11   he'd spray the weeds on the ground at a fan setting

12   with a two-and-a-half-foot wand held about eight to

13   ten inches off the ground, correct?

14   A.   If you want to show me -- are you citing his

15   deposition testimony?  I assume you are.

16   Q.   Yes, sir, I am.

17        Do you not recall that, and so we should go

18   to the depo?

19   A.   Yeah, let's go to the depo.

20   Q.   Okay.

21        THE VIDEOGRAPHER:  Five minutes.

22        MR. KALAS:  Five minutes, okay.

23   BY MR. KALAS:

24   Q.   Let's go to Page 70.

25   A.   All right.  I'm there.

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.   Okay.  Starting at 70, Line 9.

 2             "And when you were" -- "Question:  And when

 3     you were spraying the weeds, were you trying to

 4     clear large areas or were you trying to target

 5     little weeds within the crop?

 6             "Answer:  I would go between the rows of the

 7     cane and just spray the ground, spray the weeds.  If

 8     there were weeds in the middle of the cane row, I

 9     would hook it up with my feet, step it flat on the

10     ground, and spray it and continue going."

11             Moving on to Page 7- -- or, excuse me.  Did

12     I read that correctly?

13        A.   Yes.

14        Q.   Moving on to Page 71.

15        A.   71, okay.

16        Q.   Okay.  Line 6:  "And how long was the wand?

17             "I don't know.  Maybe two-and-a-half feet."

18             Did I read that correctly?

19        A.   Yes.

20        Q.   Okay.  Moving on to Line 8.

21             "And how close would you go to the area you

22     were spraying, like the nozzle to the weed?  What

23     was the distance?  About a foot it looks like you're

24     showing?

25             "Answer:  No, maybe about ten to -- eight to
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    ten inches off above the ground, so like it will fan

 2    out.  So you'd spray it from cane stalk to cane

 3    stalk and continue walking up and down the rows --

 4    rows of cane."

 5            Did I read that correctly?

 6       A.   Yes.

 7       Q.   Okay.  Does that refresh your recollection

 8    that what Mr. Kane would do -- or, excuse me, Dela

 9    Cruz would do in that job is he'd spray the weeds at

10    a fan setting with a two-and-a-half-foot wand held

11    about eight to ten inches off the ground?

12       A.   The words are there, but the initial -- on

13    Page 70, he's not necessarily say -- I mean, for

14    that, you've got two disjointed statements.  So the

15    words are the words.

16       Q.   Okay.  Is there anything Mr. Dela Cruz told

17    you in his interview that suggests he sprayed in

18    some other manner than what I've just read to you

19    when he talked about it under oath?

20       A.   I'm interested in the distance from the

21    nozzle to his face, so that's the question I asked.

22    I asked a different question.

23       Q.   The distance from his nozzle to his face.

24    Okay.

25       A.   Yes.
```

tran

```
 1      Q.   So he had a two-and-a-half-foot wand, right?

 2           Correct?

 3      A.   Right.

 4      Q.   With a nozzle at the end, right?

 5      A.   Right.

 6      Q.   And he testified that he held that wand

 7  eight to ten inches off the ground, right?

 8      A.   Well, he testifies about the wand "I don't

 9  know, maybe."  So it's not as definitive as you

10  suggest.

11      Q.   Well, look at Line 9, sir.

12      A.   Well, I'm looking at -- I'm looking at --

13  I'm looking at 70 and I'm looking at 71 in total.

14      Q.   Okay.  So look at 71, Line 9.

15      A.   Okay.

16      Q.   He was asked what the relationship is

17  between the nozzle and the weed, what the distance

18  was.  Do you see that?

19      A.   Yeah.

20      Q.   Okay.  And he says, eight to ten inches

21  above the ground, right?

22      A.   Okay.

23      Q.   Do you agree with that?

24           MR. KRISTAL:  Do you agree that that's what

25      he said at his deposition?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   I don't disagree with the words.

 2   BY MR. KALAS:

 3      Q.   Okay.  So if he did hold the nozzle eight to

 4   ten inches off the ground, how far would that have

 5   been from his face?

 6      A.   Well, it's indeterminant because he's saying

 7   he's holding the nozzle a foot away from the -- the

 8   weed.  Then he says eight to ten inches off the

 9   ground.  So you've got two -- two sets of numbers

10   there.

11      Q.   Let's assume it's a foot off the ground.

12   How far would that be from his face?

13      A.   Well, what he told me was -- what he told me

14   was on average, it was about three to four feet from

15   the nozzle to his face.

16      Q.   Three to four feet from the nozzle to his

17   face.

18           And did you carry out any experiments to see

19   how far away from somebody's face a

20   two-and-a-half-foot wand would be held a foot off

21   the ground?

22      A.   Experiments?  I mean, I've done --

23      Q.   Or calculations.

24      A.   I've done --

25           MR. KRISTAL:  I think we're running out of
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1        tape.

2              MR. KALAS:  I know.

3        A.   I've done hundreds of areas.  And the

4    distance, typically the distance, if you're just

5    applying something from your hand out is one to

6    three feet.  So the fact that he's three to four

7    feet -- because you bend your hand from time to time

8    as you're using equipment.

9              So the fact that he said three to four feet

10   to me was consistent with what I hear over and over

11   again.

12             MR. KALAS:  Let's change the tape.

13             THE VIDEOGRAPHER:  The time is 11:15.  We're

14       going off the record for a media change.

15             (Recess from 11:15 a.m. until 11:17 a.m.)

16             THE VIDEOGRAPHER:  This is Media No. 2 of

17       the deposition of Stephen Petty.  The time is

18       11:17 a.m.  And we're back on the record.

19   BY MR. KALAS:

20       Q.   Mr. Petty, you're aware that there's been

21   biomonitoring studies of backpack sprayers just like

22   Mr. Dela Cruz, right?

23       A.   Perhaps.

24       Q.   Okay.  Have you seen a backpack sprayer

25   study that has measured an absorbed dose using
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    biomonitoring greater than .01 milligram per

2    kilogram per day?

3        A.   Show me what you're referring to and I'll

4    comment on it.

5        Q.   I'm asking if you've seen one, sitting here

6    today that you can recall, a biomonitoring study in

7    backpack sprayers that has measured an absorbed dose

8    greater than .01 milligram per kilogram per day.

9        A.   I have a detailed review of the Solomon 2016

10   paper.  The difficulty with that paper is, of

11   course, Monsanto manipulated all the data in it, in

12   the -- you have to go to the supplemental material,

13   and even there, you can't tell necessarily where the

14   data come from.  So --

15       Q.   Well, like --

16       A.   -- I don't necessarily know which of those

17   are five-gallon backpack, but I -- but I'm very

18   critical of how that data were manipulated.

19       Q.   Sure.

20       A.   And I assume you've read it.

21            And it's no surprise when you -- in some of

22   these studies -- here's what they do in some of

23   these studies.  I'll make it real simple.

24            They have someone pee in a bottle.

25       Q.   Um-hum.

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.    And they have -- they have a pint.

 2      Q.    Um-hum.

 3      A.    Somebody else it's a quart.  Who knows.

 4   Half a quart.

 5            They don't -- they don't send it to a lab to

 6   measure the glyphosate in it.  What they did here is

 7   they said we're going to assign a value per unit

 8   volume to that and that's what their exposure is.

 9   We're going to assign it.

10            And not only we're going to assign it, we're

11   going to assign a value that's half the detection

12   level, half the ability of our instrument to measure

13   a value.  We're just going to assign it.

14            So what happens?  You're going to end up

15   with low values.  And the reason you end up with low

16   values is because, first of all, you didn't actually

17   measure anything, you just assigned a value to it,

18   and you assigned a very low value, half of what the

19   instrument could even read, the lab instrument.

20            So when you look at Solomon's work, it says,

21   whoa, look at all these low values.  Well, you've

22   got to get into the details to figure out why.

23      Q.    You know, that's really interesting.  And I

24   rarely agree with you.

25            Did you go and read all the studies cited by
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    Solomon, the primary literature, to see what those

 2    values actually were in the primary literature

 3    rather than relying on a review paper?

 4              MS. BEACH:  Can you not yell at the witness?

 5              MR. KRISTAL:  Object to the form.

 6              MS. BEACH:  You're getting loud.

 7         A.   The truth of the matter is the ones that

 8    were available, I did.

 9    BY MR. KALAS:

10         Q.   Okay.

11         A.   I tried to.  But most of them aren't.

12         Q.   Most of them aren't?

13         A.   No.

14         Q.   Our experts have every one of them but one.

15    Did Mr. Kristal not send you all of those?

16              MR. KRISTAL:  Object to the form.

17         A.   Well, what we don't have, which is what I

18    care about, the exposure part, is you have to go to

19    the supplemental material.  Didn't come with the

20    paper.

21    BY MR. KALAS:

22         Q.   Right.  But there is --

23         A.   And then you go to -- let me finish, please.

24         Q.   Sure.

25         A.   You're very rude.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Okay.

 2      A.   But other than that, you're okay.

 3           But then you go to the supplemental material

 4   and what you realize is there's this entire massive

 5   data reduction, so that the data and the

 6   supplemental material are just data that have

 7   already been manipulated.

 8      Q.   Did you go and pull the Johnson paper from

 9   PubMed and read it?

10      A.   I did pull the Johnson.

11      Q.   Did you go and pull the Levy paper from

12   PubMed and read it?

13      A.   I don't know if I pulled that one.

14      Q.   Did you go and pull the Jauhienien paper

15   from PubMed and read it?

16      A.   What I cared about was the data that were

17   used in the exposure analysis.

18      Q.   Right.  Those papers all have primary

19   exposure data in it.

20           Did you read the Jauhienien paper?

21      A.   And that's what's plotted here.

22      Q.   Yes, sir.  But you said that it was

23   manipulated by Monsanto.  Right?  That's what you

24   testified to a minute ago.

25      A.   The data that were attached are acknowledged
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    by the author that he received that data corrected

 2    according to the methodology that he listed in his

 3    paper.  He received that data.  He did not -- he

 4    doesn't say he did the analysis.  He plotted the

 5    data.

 6        Q.   Okay.  Solomon paper.  It has citations at

 7    the back of it, right?

 8        A.   Sure.

 9        Q.   Okay.  Did you go to the citations cited by

10    Dr. Solomon to look at the data prior to Dr. Solomon

11    touching the data?

12        A.   Some of them.

13        Q.   Okay.  And my question is, did you look at

14    any of the backpack sprayer studies prior to Dr.

15    Solomon touching them?

16        A.   I believe there's one.

17        Q.   Okay.  Which one?

18        A.   I don't recall.

19        Q.   Did you look at the Bleak study?

20        A.   I may have, I just don't recall.

21        Q.   Okay.  Now, based on your recollection here,

22    of the primary data you did get to, which of those

23    had a biomonitoring dose higher than .01 mg per kg

24    per day?  If you can recall any.

25        A.   I don't know, there's so many flaws.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    They're not measuring urine, they're measuring

2    feces.  They're measuring people that weren't nece-

3    -- they don't have control over.  They're measuring

4    children and wives along with the applicator.  So we

5    don't even know what their exposures were.

6           The -- the data are -- are flawed at many

7    levels.  And I was just trying to explain to you

8    some of those levels.  But the fact that they're low

9    doesn't surprise me based on the fact they're only

10   measuring urine.  And in many cases, they're

11   assigning the value to those values.  And in most

12   cases, they don't have good control on what the

13   person was actually doing.

14          I mean, you look at those studies and they

15   can't say they sprayed X amount of hours with this

16   product under these conditions.  You don't have that

17   information.  You have no idea if they sprayed two

18   minutes or five hours or whatever.

19   Q.   Did you -- now, you looked at wetting events

20   in your exposure assessment, right?

21   A.   Wetting?

22   Q.   Wetting events.

23   A.   Yes.

24   Q.   Okay.  Is there a study in the peer-reviewed

25   literature that measures glyphosate exposure or dose

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    using wetting events as a metric?

 2            MR. KRISTAL:  Objection to form.

 3        A.   Well, I've cited some of them.

 4    BY MR. KALAS:

 5        Q.   Glyphosate, sir.

 6        A.   Yes.

 7        Q.   Glyphosate.  Okay.

 8        A.   Have you read this?

 9        Q.   I have read it.  A couple of times,

10    actually.

11            Which --

12        A.   I don't know how you could have because you

13    just got it like two days ago.

14        Q.   Well, I had the -- I've read the revised

15    version one.

16        A.   This one?

17        Q.   Yes, sir.

18            Going back to the wetting events, which

19    study in here uses wetting events as a metric for

20    glyphosate exposure per dose?

21            MR. KRISTAL:  By the way, it's wetting with

22        two Ts, not like someone getting married.

23        A.   What do you mean, what study uses -- you

24    have to look at the skin area as wet in order to get

25    a dermal dose.  So I'm not sure what you're asking
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    me.

 2            I mean, any study that were to look at

 3    dermal would have to look at the skin area that was

 4    wetted.

 5    BY MR. KALAS:

 6        Q.   Well, your metric is wetting events in your

 7    exposure summary on Exhibit -- I believe it's 2,

 8    correct?

 9            MR. KRISTAL:  Objection to form.

10        A.   No.

11    BY MR. KALAS:

12        Q.   Okay.  So let's go back to 2.

13        A.   No, these are times spraying.  I haven't

14    calculated the dermal times.

15        Q.   Okay.

16        A.   I've done filling events, mixing events,

17    spraying events.  I've not done wetting events.

18        Q.   Okay.  So you've done --

19        A.   That's why I'm confused.

20        Q.   Okay.  So if I go back to Exhibit 8 --

21            MR. KRISTAL:  I'm thinking you need an event

22        planner.

23    BY MR. KALAS:

24        Q.   If we go back to Exhibit 8.

25        A.   Okay.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.    Page 10.

 2        A.    I am there.

 3        Q.    Which study measures dermal exposures in

 4   doses for glyphosate using percent area wet and

 5   percent time wet?

 6              MR. KRISTAL:  Object to the form.

 7        A.    Well, ultimately, Monroe in the 2000, they

 8   looked at -- they don't tell you, that's the

 9   interesting thing.  When you go back and you back

10   out, they don't list it, but they're using a flux.

11   BY MR. KALAS:

12        Q.    Okay.

13        A.    And they're getting a dose and you can back

14   out the skin area.  Turns out it's like the fraction

15   of a hand.

16              So you have -- dermal is quite

17   straightforward, frankly.  You have to have a flux.

18   The amount of time material that passes through a

19   given skin area in a given time, usually they use

20   the term it's centimeter -- milligrams per

21   centimeter squared per hour.

22              So then you have to know the skin area

23   that's wetted, and then you have to know the time

24   that it's wetted.  And you multiply those three

25   times together, and you end up with the
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    milligrams --

 2        Q.   How much --

 3        A.   -- for that given scenario.  So you have to

 4    know the area wetted and the time it's wetted.

 5        Q.   How much skin needs to be wetted and how

 6    many times does that skin need to be wetted for an

 7    exposure to glyphosate to cause NHL?

 8             MR. KRISTAL:  Object to the form.

 9        A.   I've not done the dermal dose calculation.

10    BY MR. KALAS:

11        Q.   How much glyphosate is absorbed on a typical

12    wetting event?

13             MR. KRISTAL:  Objection, form.

14        A.   Listen, I don't know how you describe a

15    typical wetting event.  You can look at --

16    BY MR. KALAS:

17        Q.   Well, let's --

18        A.   It is -- it is whatever they are -- whatever

19    the person's recollection, or personal protective

20    equipment, or lack thereof, or how they applied it.

21    It's different for each individual for each

22    different activity oftentimes.

23             So it depends on who I've interviewed and

24    what -- and what their recollections are of what

25    skin areas got wetted.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1      Q.    Let's go to Page 10.

2      A.    Okay.

3            MR. KRISTAL:  Of.

4            MR. KALAS:  Of Exhibit 8.

5            MR. KRISTAL:  Thank you.

6            MR. KALAS:  Um-hum.

7      A.    Dela Cruz.

8    BY MR. KALAS:

9      Q.    How much glyphosate was absorbed when Mr.

10   Dela Cruz filled, hauled, and dumped five-gallon

11   Roundup® buckets?

12     A.    I haven't done that calculation.

13     Q.    And you haven't done it for any of the

14   plaintiffs in this case, right?  You're deferring on

15   that to Dr. Sawyer or another expert?

16           MR. KRISTAL:  Objection.

17     A.    As I've said to you before, I initially was

18   not going to do doses, then I'd subsequently done a

19   really detailed -- I mean, I wrote one of the

20   seminal papers on how to do dermal absorption along

21   with Mark Nichols at Berkeley.

22           But all you need to do is determine a flux,

23   whatever flux you're going to use, and then multiply

24   it by the skin area and the time.  And then here you

25   also have to look at post-dermal, which is the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    longer time, which is how long does it stay on the

2    skin till they've showered.

3         So I've not done those calculations, but I'm

4    setting on doing this industrial hygiene interview

5    as if I'm setting the table so I could.  All I've

6    done to make it easier for everyone was to go ahead

7    and look at the total times of either mixing,

8    spraying, or cleaning, what those times are in total

9    and how many events there are in total.

10        But I haven't -- I haven't gone through and

11   calculated the total dermal time or total a

12   post-dermal time, and I haven't calculated a dose

13   yet.  And I've said that in the last seven days of

14   depositions.

15   BY MR. KALAS:

16   Q.   Right.  So I'm asking for the Kane cases.

17   You haven't done it in the Kane cases either?

18   A.   Well, no.  I would have given it to you if I

19   had.

20   Q.   Okay.  You've described the Nicholas paper

21   you wrote a few times in the time we've spent

22   together as a seminal paper.  Who has described it

23   as a seminal paper in the literature other than

24   yourself?

25   A.   It was just reviewed by NIOSH, and they --

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    they cited it.

 2    Q.   Okay.  NIOSH cited it.  Did they describe it

 3    as a seminal paper?

 4    A.   It came out in 2000 and -- well, it was,

 5    because there was -- there was -- defense went after

 6    it.  There was a 24-page letter to the editor and

 7    there was a quibble went back.

 8         You're the first one to ever ask questions

 9    on that because basically in their letter to the

10    editor, they lied, and I pointed it out.  And nobody

11    has come back on us about that paper.

12    Q.   Well, my question isn't whether or not the

13    science is correct in it.  You've described it using

14    an adjective, seminal.

15    A.   Yeah, it's a peer-review -- it was the first

16    time --

17    Q.   Okay.

18    A.   -- that a peer-reviewed paper had been done

19    for benzene and complex materials, not only during

20    the application time, but in the post-application

21    time.  And there were two large federal Daubert

22    challenges to both of those areas, both denied.

23    Q.   But who -- sorry.

24    A.   And so the seminal defense has never been

25    done before.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1     Q.   Okay.  So when you use the word "seminal" to

 2   describe it, you mean it was novel, not that it's

 3   been described as important by somebody else?

 4        MR. KRISTAL:  Objection to form.

 5     A.   Well, it was important, because in complex

 6   hydrocarbons, the rate at which benzene evaporates

 7   from materials on your skin was -- and how that

 8   affects the flux had not been developed before.

 9        So the post-dermal aspect was novel.  There

10   was some literature on application time and there

11   was simple equations that just assumed a percent

12   absorbed.  But to actually develop the flux

13   equations for both application time and

14   post-application time was novel.

15     Q.   When Mr. Dela Cruz applied Roundup®, he'd

16   wear jeans, rubber boots with socks, a long-sleeved

17   shirt, and cotton gloves, correct?

18     A.   If you want to show me where you're citing

19   that from, I'll agree to it or not agree to it.

20   Show me the text.

21     Q.   Page 78 of his deposition.  Line 20.  Let me

22   know when you're there.

23     A.   Like I said, I'm having a hard time reading

24   this, but that's just me.

25        Go ahead.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1          MR. KRISTAL:  Yeah, could you just ask
 2     whoever is copying these to -- if they could
 3     print out an actual condensed version as opposed
 4     to putting a regular version four pages to a
 5     page, it comes out much more legible.
 6          THE WITNESS:  It's a combination of the
 7     lighting in here is poor, so it's --
 8          MS. BEACH:  It's mood lighting.
 9  BY MR. KALAS:
10     Q.   Line 20.
11     A.   Go ahead.  I can see it, but it's --
12     Q.   States:  "Yeah, so what kind of clothes --
13  and I'll talk more about clothes in a little bit --
14  but just initially?
15          "Answer:  Yeah, so we had like jeans, blue
16  jeans, rubber boots and long-sleeved shirt, and the
17  long-sleeved shirt was to protect us from getting
18  cane -- cut by the cane leaves.  We had a hard
19  helmet.  Everyone would configure their own wire
20  mask that would fit around their hard helmet so
21  their face wouldn't get scratched and that would --
22  and gloves, and that would be our attire for the
23  gloves.
24          "Did the -- did your employer provide the
25  rubber boots?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1              "Answer:  No."

 2              Okay.  Did I read that correctly?

 3     A.    You did.

 4     Q.    Okay.  Do you agree Mr. Dela Cruz wore

 5     rubber boots when he applied Roundup®?

 6     A.    I agree those are the words that were said.

 7     I don't know what that means, necessarily whether

 8     they were canvas on top, rubber on the bottom.

 9     Q.    Okay.  Did you ask him?

10     A.    I did not.  I -- I -- I cut through all of

11     that, as I've said to you before in the deposition.

12     Q.    Sure.

13     A.    I'm looking at what gets wetted, and there

14     are -- as I've indicated in my report, there are all

15     kinds of ways that you would -- that skin gets

16     wetted that you wouldn't think would get wetted.

17     Like you can wear PPE gloves, and if you take them

18     off and then you put them back on, it breaks, or if

19     you lift your hand up and it runs through the cuff,

20     there are all sorts of ways that skin could get

21     wetted you wouldn't think.

22              So I do ask about the PPE or the clothing.

23     I try to.  But I'm interested in ultimately the

24     dermal is associated with the skin areas that get

25     wetted and for how long?  Regardless of the
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

 1   clothing, regardless of the PPE, you cut to the

 2   chase because you say with all of that layers,

 3   whatever's there or not there, what portion of skin

 4   gets wetted.  Then I don't have to worry about all

 5   of those questions.

 6        Q.   Regardless of the PPE worn by an applicator,

 7   no matter what they wear, it's been your experience

 8   in the Roundup® litigation that areas of the skin

 9   will get wetted, correct?

10        A.   Some areas, and the reason that that is, as

11   I've indicated in my report, it takes -- with the

12   aerosol -- small -- smallest aerosol size is the

13   particles coming out of the sprayers will stay in

14   the air for six to eight minutes to fall 6 feet.

15   And there's literature from -- that I've cited from

16   universities that -- that the aerosol particles not

17   only will stay suspended but they can move as far as

18   880 meters.  So it's -- the problem with the PPE is

19   that you still have this -- the potential for

20   getting wetted from the fact that there's aerosols

21   in the air.

22        Q.   Sure.  You're not going to tell the jury

23   that had any of the plaintiffs in this case worn the

24   PPE you think that's appropriate for Roundup® that

25   they would not have gotten wetted skin, in other

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    words, they would have had a 100 percent no wetting?

 2         MR. KRISTAL:  Objection to form.

 3    A.   Well, that's -- that's a -- that has a yes

 4    or a no answer to it.  If -- if you want to go to

 5    Level A, I can tell you you're not going to get any

 6    skin wetted.  If you want to go to Level B, probably

 7    not.  You go to Level C, yeah.  So it depends on the

 8    PPE that's being worn and then also the

 9    effectiveness.

10         But remember, from an industrial hygiene

11    standpoint, one of the points I want to make over

12    and over again is it's the least desirable method of

13    protecting people.  Least.  There's a thing called

14    hierarchy of controls.  Starts with take the bad

15    material out of the product.  Second is engineering

16    controls.  You do it inside of contained vessels in

17    a way you don't expose people.  Third is

18    administrative controls, which means you keep the

19    person out of the area where the hazard exists.  And

20    last and least desirable is PPE because -- and

21    particularly in humid and warm climates it just

22    doesn't get worn properly because it's

23    uncomfortable.

24         So when you -- when you talk about this,

25    you're -- your shortcut from -- from an industrial
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    hygiene standpoint.  I'm more critical of the

 2    product for not taking like the POEA out earlier

 3    knowing that it tends to cause skin irritation.

 4    They knew this in the '80s.  Replace it with a

 5    different surfactant.  That's the first thing you

 6    do, substitute out the -- the product that's of

 7    concern.

 8          So those are the sorts of opinions I'm going

 9    to have about protecting workers.  I'm not going to

10    limit myself to simply will PPE do the job or not.

11    I'm hoping I never get to PPE because PPE is the

12    protection of last resort.

13    BY MR. KALAS:

14        Q.   Are you going to tell the jury you think

15    Roundup® should be withdrawn from the market?

16        A.   I -- I may -- I won't say that.  I'm going

17    to say that they were not transparent with what they

18    knew and -- and specifically in terms of limiting

19    the potential hazards to individuals as well as

20    adequately warning them.  Those are going to be my

21    opinions.

22        Q.   Okay.  Are you going to tell the jury that

23    the cotton Mr. Dela Cruz wore was zero percent

24    effective in reducing glyphosate exposure to the

25    skin?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   I'm not going to comment on that one way or

 2   the other.  I'm going to comment on what percent of

 3   the skin area was wetted.

 4      Q.   Okay.  In fact, you are aware scientists

 5   have studied how much cotton can prevent glyphosate

 6   from getting to the skin, right?

 7      A.   Well, yes and no, but as soon as you sweat,

 8   you get a big dose back again.

 9      Q.   Okay.  Have scientists studied it, sir?

10      A.   They've studied it, but the results are not

11   encouraging.

12      Q.   Okay.

13      A.   And they certainly don't show -- they

14   certainly don't show it's really PPE.

15      Q.   Have they found that cotton clothing is 50

16   to 90 percent effective in reducing skin exposures?

17           MR. KRISTAL:  Objection, form.

18      A.   With the limitations of -- I don't know I

19   don't remember the numbers exactly.

20   BY MR. KALAS:

21      Q.   Okay.

22      A.   I can't comment on that.

23      Q.   You'd defer to the studies?

24      A.   I'd defer to whatever the studies say they

25   say.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.   Now, Mr. Dela Cruz used a 4- to 5-pound

 2   backpack sprayer, and he refilled it 30 to 40 times

 3   a day, right?

 4        A.   Correct.

 5        Q.   Okay.  And he was doing what's known as

 6   burn-down spraying, correct?

 7        A.   I -- well, I thought he was just spraying

 8   generally, he may have done some of that, but

 9   generally he would -- the burn down -- the burn down

10   there is where you -- you cut the crop and burn it.

11   I mean, I worked over there.  I worked in the

12   pineapple fields.

13        Q.   So we'll -- we'll get to that in --

14        A.   So I -- so I -- let me finish.  You like to

15   cut me off.

16             So even the pineapple fields once we were

17   done they would spade them or whatever, and then

18   they burn them, and they burn the cane fields the

19   same way.  So I -- when you say burn, I -- I think

20   of burning the fields.  But I thought he was going

21   up and down the rows spraying weeds.  That's my --

22        Q.   He wasn't spot spraying, he was spraying the

23   entire row in a -- in a -- basically a -- he held

24   his trigger down the entire time as he walked up and

25   down the rows.  Do you remember he testified to
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    that?

 2        A.   The entire time?

 3        Q.   Yes, sir.

 4        A.   I don't know if he did it the entire time,

 5    but he was -- his goal was to spray weeds.

 6        Q.   Okay.  It's not important, and the testimony

 7    will speak for itself.

 8             If he got --

 9             MR. KRISTAL:  Oh, boy.

10    BY MR. KALAS:

11        Q.   -- Roundup® on his face or hands, he'd rinse

12    them off, right?

13        A.   Well, yes and no.  He said that there was a

14    little cup of water, but they didn't have a lot of

15    water out there.  And I can tell you that having

16    worked in the pineapple fields, you had like a

17    gallon jug for the whole eight hours, and you went

18    through most of it, because we used to walk ten

19    miles a day.

20        Q.   Okay.

21        A.   And it was brutally tough work.

22        Q.   Let's go to Page 158 to see what he said

23    under oath so you aren't just relying on your

24    recollection here.  Line 11 --

25        A.   1 --
```

```
 1        Q.    58, sir, line 11.  "Question" --

 2        A.    I'm not there yet.

 3        Q.    Okay.

 4        A.    I'll tell you when I'm there.  Be patient.

 5   I'm there now.  Go ahead.

 6        Q.    "Question:  Then as I understand what you're

 7   saying, if it was on your hands, you'd wash them.

 8   If it was on your face, you'd wash it.  But if it

 9   was on your back or someplace else, you would just

10   ride out the day.

11             "Answer:  What I mean wash, it's not a wash.

12   It's rinse.

13             "Question:  Rinse, because?

14             "Answer:  Because we don't have soap."

15             Did I read that correctly?

16        A.    That was my recollection, too, it's not

17   truly a cleaning up, it's just sort of a --

18        Q.    Have you seen literature that says immediate

19   rinsing with water alone reduces exposure to Roundup®

20   by 90 percent?

21        A.    I mean, I think I've seen studies that talk

22   about that, but it depends on the circumstances.

23   And I don't think this reflects those same

24   circumstances.

25        Q.    Did you review the Johnson study, Johnson
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1    2005?  You can look at your materials considered

2    list if you'd like.

3        A.   Johnson 2005 you're saying?

4        Q.   Yes, sir.

5        A.   What's the name of the study again?  I have

6    a 2005 168 exhibit number, but I don't have the

7    authors.

8        Q.   The name of the study is "Operator exposure

9    when applying amenity herbicides by all-terrain

10   vehicles and controlled droplet applicators."

11       A.   Okay.  Keep looking.  I mean, if you have

12   the paper and you want to ask me questions, that

13   would be a quicker way because I've got 630 exhibits

14   to try to go through.  If you want me to go through

15   all 630 and see if I can find --

16       Q.   What number are you up to?

17       A.   200.

18       Q.   All right.  Well, let me ask you this.  Do

19   you recall -- well --

20       A.   You don't want me to go over it?  That's

21   fine.

22       Q.   That's fine.

23            Have you -- can you recall -- it's fair to

24   say if it's not on your MCL you did not consider it?

25            MR. KRISTAL:  I think you asked that
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      backwards.

 2  BY MR. KALAS:

 3      Q.   Is it fair to say that the Johnson study is

 4  not on your MCL you did not consider it?

 5      A.   That would be fair.

 6      Q.   Okay.  Is it fair to say that if any of the

 7  studies cited in Solomon are not in your -- on your

 8  MCL you did not consider them?

 9      A.   I believe that would be true.

10      Q.   Okay.  Mr. Dela Cruz is a ▮▮▮▮▮▮, correct?

11      A.   Well --

12      Q.   Go ahead.

13      A.   Not consider him in the sense that I

14  considered him, but to the extent that the data from

15  them were used by Solomon and the way he used them

16  in the -- in the supplemental material.

17      Q.   Well, you -- if they're not on your MCL, you

18  haven't read them in forming your opinions in this

19  case, right?

20      A.   Well, if I haven't read them, then I haven't

21  given an opinion on them.  I don't know that I've

22  given opinions on any of those studies.

23      Q.   Right.  That's my question.  There are --

24  there are -- the reason I'm asking the question --

25      A.   I mean, how would I give opinions on
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    something I haven't looked at it.

2        Q.   Well, the reason I'm asking the question,

3    there are materials on your materials considered

4    list, Exhibit 14, that you don't write about in the

5    text of Exhibit 13, true?

6        A.   Well, there are -- there are studies that

7    I've read that I don't put in the text of that,

8    period --

9        Q.   Right.  So if any --

10       A.   -- that I've actually read.

11       Q.   Right.  So my question is:  If they're not

12   on Exhibit 14, you did not read them in preparing

13   your opinion in this matter, correct?

14       A.   Well, the only distinction I'm trying to

15   make is that -- for instance, when I looked at

16   Solomon, I would have -- they -- he references the

17   individual studies and then provides the data from

18   those studies.

19       Q.   Well, that's what -- you said the data was

20   manipulated.  So my question is:  Did you go to the

21   studies --

22       A.   Well, some of it was.  Some of it was.  What

23   you can't tell is you can't tell which data was and

24   wasn't.  They don't tell you.

25       Q.   But did you go to the studies to check it?

Confidential - Stephen E. Petty, PE, CIH, CSP

1    That's my question.

2        A.   Some of them I did.

3            MR. KRISTAL:  Objection.

4    BY MR. KALAS:

5        Q.   Okay.  But which -- but my question is --

6    my -- my follow-up to that, then, is the one --

7        A.   I mean, Aquavella, I remember chasing his

8    study.

9        Q.   Right.  So the ones that you did go and

10   verify are on your materials considered list from

11   Solomon, and the ones that you did not go and verify

12   from Solomon are not on your materials considered

13   list, correct?

14       A.   Well, I don't know what you mean by

15   "verify."  I mean, I'm relying on my criticisms on

16   Solomon on the data that Solomon relied on.

17       Q.   Okay.  If a document is not on your

18   materials considered list, you do not read it in

19   forming your opinions in this case, true?

20       A.   That is true.

21       Q.   Okay.  Mr. Dela Cruz is a ▮▮▮▮▮▮, correct?

22       A.   I think I read in his deposition something

23   to that effect.

24       Q.   Are you aware ▮▮▮▮▮▮ is associated with

25   NHL?

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   I don't know one way or the other, no.

 2      Q.   Okay.  Mr. Dela Cruz testified that he was

 3   exposed at least monthly to sugarcane burn-down

 4   fires, right?

 5      A.   I guess the answer is sort of yes and no.

 6   He said, yeah, there was fires, but he always said

 7   that -- said most of the time they were far away.

 8      Q.   Okay.  Do you recall that he testified that

 9   it was monthly that he could smell the smoke from

10   the fires?

11      A.   Whatever the testimony is it is.

12      Q.   Okay.  Go to Page 147, Line 16.  Are you

13   there?

14      A.   I am not.

15      Q.   Okay.

16      A.   I will tell you.

17      Q.   Okay.

18      A.   Okay.  I'm there.

19      Q.   Okay.  Do you see 147, Line 16 he testified

20   "Do you -- or "Question:  Do you have a sense of how

21   often you'd smell it burning?

22           "Answer:  No, I don't know.  I don't have a

23   sense how much, but I would -- I mean, even now if

24   somebody's burning fire, I can smell it.  It's not

25   like every -- it's not like every day, but I
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    remember smelling the smell.

 2              "Question:  Would you say at least every

 3    month you would smell it?

 4              "Answer:  Yeah, probably."

 5              Did I read that correctly?

 6        A.   I believe so, yes.

 7        Q.   Does that refresh your recollection that

 8    Mr. Dela Cruz stated in his deposition that he was

 9    exposed to smelling burn-down fires at least

10    monthly?

11        A.   He doesn't say at least monthly.  He said

12    probably.  So I don't know that it's at least

13    monthly.  When he was asked the question of at least

14    monthly, he said probably.

15        Q.   Okay.  So --

16        A.   We don't know for sure.  He's just -- he's

17    not certain about that, but he didn't disagree he

18    just, maybe.

19        Q.   So when somebody says "probably" in your

20    telephone logs -- I went through your telephone

21    logs.  I don't remember -- maybe I'm forgetting

22    somebody saying "probably."  Do you note down when

23    they say "probably" as opposed to "certainty"?

24        A.   Typically not because I'm -- I'm looking for

25    quantitation.  I mean, at the end of the day, I
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    can't multiply probably by anything and get an

 2    accurate number.  So I am trying to at least get a

 3    range of values.  I mean, I've written in my

 4    textbook what those definitions are.

 5       Q.   Those burn-down fires, would they have

 6    contained PAHs?

 7       A.   I don't know.  Don't know.

 8       Q.   Does fire from smoke -- or smoke from fire

 9    contain PAHs?

10       A.   It really depends on what's being combusted

11    and the extent that you're short oxygen.

12       Q.   Have you reviewed the composition of the

13    combustion materials in sugarcane fires to determine

14    whether or not PAHs are emitted from those fires?

15       A.   I've not.

16       Q.   Okay.  Are PAHs associated with NHL?

17       A.   I'm not sure.

18       Q.   Okay.

19            MR. KALAS:  Let's go off the record.

20            THE VIDEOGRAPHER:  The time is 11:50.  We're

21       going off the record.

22            (Recess from 11:50 a.m. until 11:51 a.m.)

23            THE VIDEOGRAPHER:  The time is 11:51 a.m.

24       We're back on the record.

25    BY MR. KALAS:
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1        Q.   Okay.  Mr. Dela Cruz drove a semi truck,

2    right?

3        A.   Yeah.

4        Q.   He was exposed to diesel fuel three to four

5    times a week refueling that truck, correct?

6        A.   Yeah, that would be minimal exposure, but

7    yes.

8        Q.   Now, one of the opinions that I believe

9    you're going to offer, and tell me if you're not, is

10   that Monsanto had a duty to warn consumers about the

11   alleged carcinogenic properties of Roundup®, right?

12       A.   Sure.  It would have been required in the

13   MSDS.

14       Q.   Okay.  And --

15       A.   And because there's three -- three agencies

16   where you just have to list whether it's listed as a

17   carcinogen or not, and it's IARC, NTP and EPA.

18       Q.   Okay.  And when was that warning triggered,

19   what time period?

20       A.   The cancer warning?

21       Q.   Yes, sir.

22       A.   Well, it could have been triggered as early

23   as the mouse study.

24       Q.   Okay.  So that would have been the 1983

25   mouse study?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1       A.   Could have been.

 2       Q.   Okay.  Well, you say could have been.  Are

 3   you offering that opinion to a reasonable degree of,

 4   I guess, toxicological certainty?  I don't know.

 5   How do you phrase it?  Industrial hygiene certainty?

 6       A.   From an industrial hygiene standpoint where

 7   you say it may?

 8       Q.   Yeah.

 9       A.   Yeah, then if it -- it may cause cancer,

10   that would be a situation where at least when that

11   word came out that would have been the appropriate

12   warning.

13       Q.   Okay.  So you believe it was triggered as

14   early as 1983?

15       A.   It could have been, yes.

16       Q.   Okay.  Now, first of all, outside of

17   litigation --

18       A.   If you're being fully transparent, you tell

19   people, hey, we've got this mouse study.  We don't

20   really know whether it's right or not, but it did

21   show tumors.

22       Q.   Outside of the litigation, have you ever

23   told a company they have to warn about a hazard of a

24   chemical?

25       A.   Oh, I'm certain I have.  We do industrial
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    hygiene reviews, and if we find things, then we

2    report those and say you need to let people know.

3        Q.   Okay.  Can -- well, can you give me an

4    example of that product?

5        A.   Yeah.  I mean, I think one time I was

6    doing -- just one that jumps up to me is we were

7    doing -- they were associated with making contact

8    lenses or something like that and there was

9    formaldehyde and there were other -- I don't

10   remember all the organics because we did a TO-15,

11   but there were other organics that we measured and

12   we said, yeah, you've got to warn about those.  But

13   we -- more importantly what we did was we -- we

14   worked with them on how to eliminate that hazard.

15       Q.   Okay.

16       A.   I mean, that's the more important aspect of

17   it because past exposure we can't do anything about.

18   We're now coming in after the fact.

19       Q.   Did you consult all the data on formaldehyde

20   levels on this contact len plant -- lens plant when

21   you said the company had a duty to warn?

22       A.   Did I do what?

23       Q.   It was a contact lens plant, right, or was

24   it just a contact lens product?

25       A.   It was a developmental laboratory.  So it

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    wasn't really a manufacturing.  It was different.

 2    It was a laboratory.

 3        Q.   Okay.

 4        A.   And the -- the -- as I recall it, it was the

 5    GC-MS that as part of their lab analysis process

 6    that was -- we traced it ultimately I think to the

 7    GC-MS, but...

 8        Q.   Did you consult all the data on formaldehyde

 9    exposures in that laboratory when you said the

10    company had a duty to warn the workers in the

11    laboratory?

12        A.   I don't know what you mean by "all."  I

13    doubt it because there's a universe of material.  I

14    couldn't possibly know everything that's out there.

15        Q.   Okay.

16        A.   I mean, I --

17        Q.   So how --

18        A.   -- don't know anybody on anything that knows

19    all.

20        Q.   So when -- so when did it reach enough

21    critical mass to tell the lab they had a duty to

22    warn?  How much data did you need?

23            MR. KRISTAL:  Object to form.

24        A.   How much data did I need?

25    BY MR. KALAS:
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1       Q.   Yes, sir.

 2       A.   Whatever the lab results were we compared

 3   those to various levels, both -- we -- we don't

 4   limit ourselves -- no reputable industrial hygienist

 5   limits themselves to -- to OSHA or EPA necessarily

 6   because their -- their data are lagging.  So we'll

 7   look at the California standards, we'll look at the

 8   German standards, we'll look at -- at those.  And

 9   then we'll look at half of that level, the so-called

10   action level.  So typically that's how we would go

11   about it.

12            And even -- even OSHA today has a -- a

13   statement out that says don't -- don't rely on us

14   only.

15       Q.   And how did you determine that the data

16   supported a duty to warn?  In other words, when you

17   looked at the data from this lab, the monitoring

18   data, what levels were you looking at to determine

19   whether or not a duty to warn existed?

20            MR. KRISTAL:  Objection to form.

21       A.   It's my obligation as an industrial

22   hygienist.  The reason we were there is people were

23   complaining, they were having health effects.

24   BY MR. KALAS:

25       Q.   So it was above some level that was set by
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1   CAL EPA or by the Germans or --

 2       A.   Not necessarily.  But if it causing your --

 3   the problem you have if you have an intermittent

 4   exposure is that oftentimes by the time you measure

 5   it, you don't find it at the same level, or maybe

 6   you're not there during that process.  And so -- but

 7   if you do find it and it's causing health -- I mean,

 8   the first thing I do when we go to these places is

 9   do the interview.  I mean, remember I said our -- we

10   don't know when we come in what -- what's causing it

11   necessarily.  I mean, I've found everything from

12   radiation to heat stress to mold to bacteria to

13   chemicals.

14         An so you do an interview and you try to

15   figure out -- you do the interview of the people

16   that are impacted along with their supervisors or

17   whoever brought you in, and then you do an

18   inspection of the facility.  And the combination of

19   that with your knowledge, then you try to figure

20   out, okay, this is what I want to sample for.  And

21   then you sample to verify your hypothesis that

22   that's maybe what's making them feel bad.

23       Q.   Do you believe there's a duty to warn of a

24   carcinogenic hazard when it has not been shown that

25   humans are exposed to a high enough level of that
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    hazard to cause a carcinogenic risk?

 2          MR. KRISTAL:  Objection to the form.

 3     A.   Well, I think that depends on -- I'm more of

 4    the Snow mentality on that, and as I've cited in my

 5    report, the industrial hygienist is in a unique role

 6    in that we're supposed to anticipate and rec- --

 7    recognize potential hazards.  In other words, we're

 8    not supposed to wait until we have statistical

 9    significance to begin to warn and protect, because

10    our experience is that data developed over time --

11    and it's better to be safe than not safe.  And so we

12    err on the side of public health and safety.

13          And -- and if there's data out there that

14    suggests it's a potential carcinogen we would say we

15    need to -- because what we want to do is let the

16    person have the choice.  In other words, if we tell

17    them this is the literature and this is the

18    potential carcinogen, it's not fully flushed out, we

19    now give the worker or the individual a choice.

20    Without that knowledge, knowledge is what causes

21    workers and people to take less risks.

22          It's a -- it's a standard concept in

23    industrial hygiene and public health and safety.

24    And so we give the individual that knowledge so they

25    can make a choice.  We're not going to be judge and
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    jury to that person nor should the employer be, nor

 2    should the manufacturer be.  Give them the

 3    information.  If it's one chance in a million, let

 4    them make that choice.  If they want to keep using

 5    it, fine.  You've done -- you've done your duty.

 6    But at least they are in a position to say, no, I

 7    don't want to do that.

 8          But if they don't have that information --

 9    and we know also from warnings history in the '50s

10    that the word cancer is particularly -- and I've

11    talked about that in my report in Section 5, the --

12    the fact that certain key words draw attention to an

13    end user who oftentimes is blue collar, not highly

14    educated, certain words and the word cancer is a

15    word that employees and workers and individuals

16    notice right away.  And if you put on there "may

17    cause cancer," they're going to notice that if you

18    put it prominently.

19          And so that word will make them pay more

20    attention to the warnings, if you will.  And -- and

21    what's important about that is now they know, okay,

22    we're not saying for sure, but from an industrial

23    hygiene standpoint, again, we have to look at things

24    that may cause the health effect.  You've been

25    warned, and you have a choice.  And so that's all --
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    and then we also know that even if they continue to

 2    use it, with that warning they're going to be -- the

 3    literature is full of information that says that if

 4    people that are warned -- I can go back into the

 5    Davis paper in '29, people that are warned make a

 6    much stronger effort to protect themselves or change

 7    the process so that they're -- it's not as hazardous

 8    to them if they're warned versus not warned.  So

 9    that's where we come from.  We come at it from

10    protecting public health and safety.

11    BY MR. KALAS:

12        Q.   Is it your belief that arsenic is a human

13    carcinogenic hazard?

14        A.   I'd have to go look.  It's certainly hazard.

15    I'd have to go and look and see whether -- I mean,

16    I -- what I always do when I'm involved with a given

17    substance is I'll go through my standard sets of

18    references to look and see what the health data say

19    about that -- that substance.

20        Q.   So your belief is formaldehyde is a human

21    carcinogenic hazard?

22        A.   There are indications that it is.  The

23    biggest problem with formaldehyde now is that the

24    levels that are -- we're to warn to how are in some

25    cases close to background levels.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1            THE REPORTER:  Are what?

 2            THE WITNESS:  Close to background levels.

 3     A.   But, yeah, formaldehyde is a big problem for

 4     us.  I have nine patents on HVAC systems.  So

 5     there's a -- and I'm -- I'm a member of ASHRAE.  I

 6     think we talked about this, but maybe not.  It's a

 7     weird acronym, American Society of Heating,

 8     Refrigeration and Air Conditioning Engineers.

 9     Probably the biggest society in the United States.

10            And the big debate in the technical

11     community now is you have ASHRAE 91, which is the

12     energy efficiency standards, which are the one to

13     tighten buildings down.  And then you have 62, which

14     is the indoor air quality standard.  And the problem

15     is that if you don't have enough dilution of

16     contaminants, they build up inside homes and --

17     without scrubbing the stuff.  And most -- and so the

18     issue of formaldehyde is front and center, and I've

19     done multiple projects on formaldehyde.

20            MR. KALAS:  Motion to strike everything

21        after "There are indications that it is."

22     BY MR. KALAS:

23     Q.   Are you aware bananas contain formaldehyde?

24     A.   I don't know if I am or not.  But I recall

25     that it wouldn't surprise me necessarily.  But these
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    questions are asked all the time, and there's a huge

 2    difference between background levels in some cases

 3    and industrial hygiene levels of concern.  So they

 4    can be factors of a thousand to a million.  So that

 5    makes a difference.

 6       Q.   Well, to give consumers a choice, even if

 7    it's one in a million, should bananas come with a

 8    warning that they contain formaldehyde which can

 9    cause cancer?

10          MR. KRISTAL:  Objection to form.

11       A.   It depends if it got there by somebody

12    spraying a herbicide or pesticide was in that and it

13    got added versus whether it's background.  I don't

14    know how to answer that question.

15    BY MR. KALAS:

16       Q.   Okay.  Do carrots contain formaldehyde?

17       A.   I don't know the answer to that question.

18       Q.   If carrots do contain naturally occurring

19    formaldehyde, should the farmers warn the people who

20    eat the carrots that carrots may contribute to their

21    cancer burden?

22       A.   If it's -- if it's something that's been

23    added to them that causes that, then yeah.

24       Q.   Okay.  So you don't think people should have

25    the right to know that you should avoid this
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    naturally occurring carcinogen in the carrots?

2         MR. KRISTAL:  Objection to form.

3    A.   I don't know that that's the case.  I don't

4    even know how to answer that question.

5    BY MR. KALAS:

6    Q.   Okay.  Do you believe acrylamide is a human

7    carcinogenic hazard?

8    A.   I believe it is but, yeah, I'd have to check

9    but I think it is.

10   Q.   Okay.  Coffee contains acrylamide, right?

11   A.   I thought that the decaffeination process at

12   one time was where it came from.  But I don't know.

13   I -- it's been a long time since I've looked at

14   that.  So I don't know.

15   Q.   Assuming coffee contains acrylamide, do you

16   think it should come with a warning that coffee

17   causes cancer?

18   A.   It depends on --

19        MR. KRISTAL:  Objection to form.

20   A.   I don't know.  I haven't looked at -- I

21   haven't looked at that enough to know how to answer

22   that question, to be honest with you.

23   BY MR. KALAS:

24   Q.   Have you ever encountered a situation

25   outside of litigation where you've said a company

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    should warn about an alleged adverse effect when EPA

 2    has specifically said it would be mislabeling if the

 3    company did warn about that effect?

 4         MR. KRISTAL:  Objection to form.

 5      A.   Under that narrow question, probably not.

 6    I've certainly warned people on hazardous situations

 7    multiple times outside of litigation, but not

 8    specifically with something where EPA said not to

 9    warn or something.

10    BY MR. KALAS:

11      Q.   Okay.  You've heard of Dr. Portier, right?

12      A.   I know the name, yes.

13      Q.   Okay.  He's an expert for plaintiffs in

14    litigation?

15      A.   I believe so, yes.

16      Q.   Okay.  I'm going to mark as Exhibit 20 an

17    E-mail Dr. Portier produced.

18           (Petty Exhibit 20 was marked for

19    identification.)

20    BY MR. KALAS:

21      Q.   I assume you haven't seen this document

22    before, right?

23      A.   I have not seen it.

24      Q.   Okay.  And do you see that this is an E-mail

25    from 2017?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   It appears to be, yes.

 2      Q.   Okay.  And do you see Dr. Portier's

 3    E-mailing somebody named Christina Merkelbach?

 4      A.   Okay.

 5      Q.   Okay.

 6      A.   I guess so.

 7      Q.   Okay.  And October 2017 is after the IARC

 8    evaluation, right?

 9      A.   Okay.

10      Q.   Is that true?

11      A.   Yeah.  I mean, the IARC evaluation was in

12    '15 -- or the decision was in '15.

13      Q.   Okay.  And --

14      A.   2015, I should say.

15      Q.   -- 2017 is also after EPA had looked at

16    glyphosate in their OPP report from 2016 and said

17    there was evidence of non-carcinogenicity, correct?

18      A.   Who said that?  I'm sorry.

19      Q.   EPA.

20           MR. KRISTAL:  Object to form.

21      A.   I mean, I -- I really have not followed all

22    of that.

23    BY MR. KALAS:

24      Q.   Okay.

25      A.   I mean, I've looked at the risk assessment
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    associated with some decisions made, but I'm really

2    the exposure warnings guy.

3        Q.   Okay.  And do you see that in the second

4    E-mail here it says, "Dear Mr. Portier, thank you

5    very much for your time.  Could you please send me a

6    picture that we are allowed to print along with the

7    interview"?

8            MR. KRISTAL:  Where are you?

9            MR. KALAS:  Second E-mail on the first page.

10       A.   Second -- I don't know where you're at.

11   BY MR. KALAS:

12       Q.   I'm right here, sir.  The 20 -- 19th of

13   October, 2017 --

14       A.   Oh, yeah.

15       Q.   -- 1:14 p.m.

16       A.   Super.  Thank you.

17       Q.   All right.  So it says in the light-colored

18   print, "Dear Mr. Portier, thank you very much for

19   your time.  Could you please send me a picture that

20   we are allowed to print along with the interview?

21   Here are my questions.  If possible, short answers

22   will do."

23            Did I read that correctly?

24       A.   Appeared to, yes.

25       Q.   Okay.  And then if you go down to the one,

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    two, three, third question, it says, "How big do you

 2    estimate the risk?  Can it be compared to getting

 3    cancer through smoking?"  And the response is, "I

 4    don't know the answer to this because I have not

 5    done these calculations nor has anyone else because,

 6    with the exception of IARC, who do not calculate

 7    risk, no other groups have argued it is a

 8    carcinogen."

 9         Did I read that correctly?

10    A.   It looks like you have.

11    Q.   Okay.  Do you agree with that statement that

12    as of October of 2017 no other groups argued

13    glyphosate was a carcinogen but IARC?

14         MR. KRISTAL:  Objection to form.

15    A.   I don't have an opinion one way because I

16    just don't -- I'm not -- I don't follow that

17    literature.  So I don't have the knowledge to know

18    one way or the other.

19    BY MR. KALAS:

20    Q.   Do you agree with the statement made here in

21    this E-mail that IARC does not calculate risk?

22    A.   I don't know.  I haven't looked at -- I just

23    don't know the answer to that question because I've

24    not -- I've not done anything with IARC on risk

25    assessment.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.   As of October, 2017, was there anyone who

 2   had done the calculations for the potential risk of

 3   NHL from glyphosate that you're aware of?

 4        A.   2017?

 5             MR. KRISTAL:  Object to form.

 6        A.   I'm not sure.  I don't -- I just don't

 7   recall.  I know that I saw the risk from 20, I want

 8   to say, 18 I saw a risk.

 9   BY MR. KALAS:

10        Q.   Okay.  And when was -- who did that?

11        A.   EPA, which I disagreed with.

12        Q.   U.S. EPA?

13        A.   Yes.

14        Q.   Well, they stated that it's not a

15   carcinogenic risk at levels humans are exposed to,

16   right?

17        A.   No, no, no, no.  No, that's not -- not what

18   I'm talking about.

19        Q.   Which EPA?

20        A.   U.S. EPA.

21        Q.   Okay.

22        A.   They did an appreciate risk assessments are

23   done for both carcinogenic and non-carcinogenic

24   risks.

25        Q.   Right.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1      A.    So this risk was for both.

2      Q.    Yeah.

3      A.    And my criticism is that they assumed there

4   wasn't a carcinogenic risk and they assumed there

5   was no dermal exposure pathway and they assumed

6   there was no inhalation pathway and they assumed the

7   only pathway was ingestion.  So as a consequence,

8   they get a very low risk.  And I said to myself,

9   well, no surprise, you assume away all the pathways,

10  you don't have much risk.

11     Q.    Okay.

12     A.    So -- but those were the pathways not only

13  for carcinogenic 96 risk but for non-carcinogenic

14  risk.  And -- and there can be materials that have

15  both, but typically in a risk assessment, if it's a

16  carcinogen, you put it in the carcinogenic bin even

17  though it may have a non-carcinogenic hazard.

18     Q.    I want to ask you about something else

19  Dr. Portier said and see if you agree with it or

20  not.  I'm going to mark as --

21     A.    Are we -- we done with this already?

22     Q.    Yeah, you can put it aside.

23           Marked as Exhibit 21 is deposition

24  transcript from April 16, 2018.

25           (Petty Exhibit 21 was marked for
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    identification.)

 2            MR. KRISTAL:  Thank you.

 3            MR. KALAS:  Uh-hum.

 4    BY MR. KALAS:

 5       Q.  And this is not a deposition you've read

 6    before, right?

 7       A.  I don't think I've read any of his

 8    depositions.

 9       Q.  Okay.

10       A.  I think I've answered that question before.

11       Q.  Okay.  Go to Page 77 of this.

12            MR. KRISTAL:  You may have read it in the

13       last hour.

14    BY MR. KALAS:

15       Q.  Speed reader?

16       A.  Yeah, but not that fast.

17            MR. KRISTAL:  What page?

18            MR. KALAS:  Page 77.

19       A.  I'm there.

20    BY MR. KALAS:

21       Q.  Okay.

22       A.  I like this type better.

23       Q.  Thank you.

24            It says, "Question:  Just so I understand, I

25    under-" --
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1            MR. KRISTAL:  What line?

 2            MR. KALAS:  Line 9.  I'm sorry.

 3            MR. KRISTAL:  Thank you.

 4    BY MR. KALAS:

 5      Q.   Okay.  "Question:  Just so I understand, I

 6    understand it's rare to find that sort of thing, but

 7    in the case of glyphosate, no one has identified

 8    that?  In the case of glyphosate, no one really

 9    thought it was carcinogenic until after the IARC

10    review, hence, no one would have been studying the

11    mechanism of it in very great detail, so no."

12            Did I read that correctly?

13      A.   You're asking me is that the words that are

14    there on the page?

15      Q.   Yes, sir.

16      A.   Yeah, those are the words.

17      Q.   Okay.  Do you agree with Dr. Portier's

18    statement on the record in this deposition that no

19    one really thought glyphosate was carcinogenic until

20    after the IARC review?

21            MR. KRISTAL:  Objection.  Foundation.

22      A.   I -- I don't have an -- I'm not a

23    toxicologist.  So -- and I'm not a causation expert.

24    So I -- I don't have a -- I'm really boring on that.

25    It's not my area of expertise.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1    BY MR. KALAS:

 2        Q.   But you're the warnings expert, correct?

 3        A.   I am the warnings expert.

 4        Q.   Okay.  If no one knew it was carcinogenic,

 5    how could they warn it was carcinogenic?

 6             MR. KRISTAL:  Objection.

 7        A.   Well, we had some mouse studies early on.

 8    That's what I talked about that indicated in '83

 9    that -- and, in fact, there was a big back and forth

10    with the EPA on that for quite some time, two or

11    three years.

12    BY MR. KALAS:

13        Q.   So you disagree with Dr. Portier, then, that

14    no one knew prior to 2015 glyphosate was

15    carcinogenic?

16        A.   I don't know what context he's answering

17    this question in.  So I don't know.  I -- I don't

18    know -- I don't have any idea what was in his mind

19    when he was answering this question.  So I don't

20    know.

21        Q.   You need -- you need more context than

22    plucking one statement out and excerpting it and

23    drawing conclusions about it?

24        A.   I don't know about that.  I just -- I'm --

25    I'm not in that area of expertise.  I'm just telling
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    you from an industrial hygiene standpoint in the '83
 2    timeframe before the back and forth, the appropriate
 3    thing to have done at that time was to warn that
 4    it's a potential carcinogen.  That's all I'm telling
 5    you, from an industrial hygiene standpoint.
 6        Q.   All right.  Let's move to Ms. Dyer if you
 7    still have the energy and you're not starving.
 8             MR. KRISTAL:  Thought we'd stop about 12:30
 9        for lunch?
10             MR. KALAS:  Sure.  We can stop with Ms. Dyer
11        at 12:30.
12        A.   Are we done with Mr. Dela Cruz?
13    BY MR. KALAS:
14        Q.   We are done with Mr. Dela Cruz, although,
15    again, I may come up with something for tomorrow.
16    But, yes, we're done.
17             THE WITNESS:  What time is it?
18             MR. KRISTAL:  12:15.
19             THE WITNESS:  Okay.  That's fine.
20             MR. KRISTAL:  The next portion of the
21        questions may have dire consequences.
22             You're getting all these, right?
23             MR. KALAS:  You should get a residency up in
24        the Catskills?
25             MR. KRISTAL:  What makes you think I
```

```
 1    haven't.

 2          (Petty Exhibit 22 was marked for

 3    identification.)

 4    BY MR. KALAS:

 5     Q.   Marked as 22 her depo.  I apologize for the

 6    type case at the beginning, so I don't get the

 7    teasing about it from learned counsel.

 8          All right.  Okay.  So Ms. Dyer is ■,

 9    correct?

10     A.   I don't know.  I guess we can look at it if

11    you can get this stuff out.

12     Q.   Yeah, I need her phone notes and --

13     A.   It's all messed up here.

14     Q.   All right.  Ms. Dyer is ■

15     A.   Yes.

16     Q.   Okay.  She lives in Texas?

17     A.   Yes.

18     Q.   And she's a nurse, right?

19     A.   Or she was.  I don't know if she's still --

20    she -- she has historically worked as a nurse, yes.

21     Q.   Okay.  And you interviewed Ms. Dyer on

22    November 11th, 2019, correct?

23     A.   I did.

24     Q.   You spoke for a little more than two hours?

25     A.   Yes, I did.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.    Okay.  And there were four people on the

 2   call, right?

 3        A.    Yes.

 4        Q.    Okay.

 5        A.    At least initially.

 6        Q.    Okay.  Two individuals from Weitz &

 7   Luxenberg where Mr. Kristal works?

 8        A.    That's what he tells me.

 9        Q.    You, correct?

10        A.    Yes.

11        Q.    And Ms. Dyer, correct?

12        A.    Yes.

13        Q.    Nobody else was on the call to your

14   knowledge, correct?

15        A.    Not to my knowledge.

16        Q.    Okay.  Now --

17        A.    I mean, I do ask at the beginning who's on

18   the phone, so that's who identified themselves.

19        Q.    Now, you have this call with Ms. Dyer after

20   she was deposed under oath, right?

21        A.    I did.

22        Q.    Okay.  And you had this call with Ms. Dyer

23   after she filled out her plaintiff's fact sheet

24   under the penalty of perjury, correct?

25        A.    I had it after she filled out the fact
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8535-3   Filed 12/24/19   Page 175 of 374

Confidential - Stephen E. Petty, PE, CIH, CSP

1    sheet, yes.

2        Q.    Okay.  And when you had this call with

3    Ms. Dyer, she wasn't under oath, correct?

4        A.    I guess not.

5        Q.    Okay.

6        A.    I don't have that capacity.

7        Q.    Okay.  And there wasn't a court reporter

8    sitting there with Ms. Dyer taking down a

9    transcript, right?

10       A.    That's correct.

11       Q.    Okay.  And the call notes that you have here

12   are not meant to be a transcript of your

13   conversation, correct?

14       A.    They -- they are meant to accurately reflect

15   what was said during the conversation, but they are

16   not technically a transcript.

17            MR. KRISTAL:  Despite the fact that it was a

18       perfect conversation.

19   BY MR. KALAS:

20       Q.    Who -- who took notes on the call?

21       A.    I did.

22       Q.    Okay.  And did the folks from

23   Weitz & Luxenberg, Ms. Hall and Ms. Hansson, speak

24   on the call?

25       A.    Well, they did at the beginning and the end

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    as I recall.  Whether they -- there's very -- I

 2    can't say that they've never ever said a word during

 3    these interviews, but it's minimal.

 4        Q.   All right.  And, again, no one from

 5    Monsanto, either an expert on or an attorney, was

 6    present on this call, correct?

 7        A.   Not to my knowledge.  I guess they were

 8    quiet.

 9        Q.   You didn't invite any attorneys or experts

10    from Monsanto to participate in the call personally,

11    correct?

12        A.   I don't even know how I would do that.

13        Q.   Okay.  And, again, you did not tape record

14    this conversation with Ms. Dyer, correct?

15        A.   I did not.

16        Q.   Okay.

17        A.   I did the same way I've than done interviews

18    for 20 years, several thousand of them probably.

19        Q.   Okay.  And you do not know what

20    conversations Ms. Dyer had with her attorneys

21    regarding this interview prior to the interview,

22    correct?

23        A.   Question again?

24        Q.   You do not know the content of the

25    conversations Ms. Dyer had with her attorneys prior
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    to this interview regarding the subject matter of

 2    this interview, correct?

 3        A.   Well, that goes to how would I know

 4    something I don't know.

 5        Q.   Exactly.

 6             Okay.  Turning back to Ms. Dyer, she was ▮

 7    when she was diagnosed with NHL, correct?

 8        A.   Yes.

 9        Q.   Okay.  And is that a form of B- or T-cell

10    lymphoma?

11        A.   I don't know.  That's just what she told me.

12    That's what she told me on the phone.

13        Q.   Okay.  Is it the same disease as Mr. Dela

14    Cruz' lymphoma?

15             MR. KRISTAL:  Objection.

16        A.   I'd have -- I'd have to go back and check

17    records.  I don't know the answer to that question

18    off the top of my head.

19    BY MR. KALAS:

20        Q.   Okay.  How is double-hit lympho- -- lymphoma

21    treated?

22             MR. KRISTAL:  Objection to form.

23        A.   I'm not a physician.  So I wouldn't be in a

24    position to answer that question.

25    BY MR. KALAS:
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.   Do you know if it would be treated the same

 2   as Mr. Dela Cruz' lymphoma?

 3             MR. KRISTAL:  Objection.  Just in case it's

 4        not exceedingly clear, we're not offering Mr.

 5        Petty to talk about anybody's treatment for their

 6        NHL.

 7        A.   I'm not a physician, so I couldn't -- I

 8   couldn't offer treatment to someone.

 9   BY MR. KALAS:

10        Q.   How does double-hit lymphoma look under a

11   microscope?

12        A.   Even if I saw it, I wouldn't recall off the

13   top of my head because that wasn't my area of focus.

14   I mean, I'm not the treating physician.

15        Q.   Do you know if it would look the same or

16   different from Mr. Dela Cruz' lymphoma?

17        A.   I don't know how to answer that question.

18        Q.   Okay.  Same answer for the other plaintiffs,

19   you wouldn't know how to answer that question?

20        A.   No, I'm not a treating physician.

21        Q.   Okay.  What study out there in the published

22   literature associates glyphosate exposure with

23   double-hit lymphoma as a subtype?

24        A.   I'm not the causation expert.

25        Q.   Okay.  Now, Ms. Dyer ███████████████████,
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    correct?

 2    A.   Approximately, yes.

 3    Q.   Okay.  ███████████████████████████

      █  ████████████████████

 5    A.   Oh, I don't know about that.  Certainly

 6    █████████████████████████████████████████

      █  ███████████████████████████████████████

      █  ███████

 9    Q.   Okay.  That's fine.  Formaldehyde's in

10    █████████████  is it not?

11    A.   I don't know.  I'd have to look.  I'm not

12    prepared here to give you a list of what the -- the

13    toxins are in ████████████.  I mean, if I

14    answered it, I would be speculating because I

15    haven't sat down and looked at that recently.

16    Q.   Okay.  I'll put a pin on that.

17    A.   I mean typically what we look at from an

18    industrial hygiene standpoint is what's the general

19    causation of █████████████████████████████

      █  ████████ --

21    Q.   Okay.

22    A.   -- for example.

23    Q.   Have you reviewed the epidemiology on the

24    association of ████████████  with Non-Hodgkins

25    Lymphoma?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    A.   I am not the causation expert in this case.

2    Q.   Okay.  So you said ███████████████████████

     ████████████████████, and you know that?

4    A.   Right.

5    Q.   But you don't know whether or not ████████████

     ████████████████████████████████████, true?

7    A.   True, because I've looked at the -- I've

8    specifically looked at the █████████████████████

     ████████████████████████, so I'm very versed with that.

10   Q.   ████████████████████████████, no question,

11   right?

12   A.   I'm not -- I'm not the epidemiologist and

13   the causation expert.  So I'll leave that answer to

14   somebody else.  I'm not here to opine on that one

15   way or the other.

16   Q.   Okay.  Okay.  ████████████████████████████

     ███████████████████████████████████████████████████████

     ███████████████████████████████████?

19        MR. KRISTAL:  Objection to form.

20   A.   I believe so.  ████████████████.  But I'm

21   pretty sure that's true.

22   BY MR. KALAS:

23   Q.   Despite those warnings on ████████████████

     ████████████████, ████████████████████████, correct?

25   A.   Apparently, yes.

```
 1      Q.   Okay.  Did you ask Ms. Dyer why ████████

   █    ███████████████████████████████████████

   █      ████████  but would have heeded a warning regarding

 4   health hazards of Roundup®?

 5           MR. KRISTAL:  Objection to form.

 6      A.   Not necessarily.  But my opinion is

 7   different than that.  My opinion isn't -- isn't

 8   whether or not they heeded them necessarily, it's

 9   were they given them.  And -- and then were they

10   allowed to make a choice.  As I talked to you

11   before, give the individual a choice, and then at

12   that point it's up to them on -- on whether or not

13   they -- they take action.  But what we do know for

14   materials that in general are hazardous is overall

15   people tend to protect themselves better if they're

16   informed as opposed to not being informed.

17   BY MR. KALAS:

18      Q.   But you can't offer any insight from using

19   your expertise as to why Ms. Dyer would not have

20   followed a warning regarding health effects of

21   ████████  but would follow a warning regarding

22   health effects of Roundup®; that's outside your

23   aegis?

24           MR. KRISTAL:  Objection to form.

25      A.   No.  I just don't know what's in her head.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1    I mean, you asked a specific question.  I didn't ask

2    her that question about why she did or didn't

3    continue ███████████████.  I'm -- I'm simply

4    interested in looking at -- at other factors and

5    trying to -- to ask -- that's why I go through the

6    whole employment thing is to look at other factors

7    that might affect their health and that's one of the

8    series of questions I ask and that's the information

9    she provided.

10       Q.   Okay.

11       A.   I didn't try to get into her head.

12       Q.   Sure.

13            MR. KALAS:  Let's stop for lunch.

14            THE VIDEOGRAPHER:  The time is 12:25 p.m.

15    We're going off the record.

16            (Recess from 12:25 p.m. to 1:36 p.m.)

17            THE VIDEOGRAPHER:  The time is 1:36 p.m.  We

18    are back on the record.

19    BY MR. KALAS:

20       Q.   Mr. Petty, did you have a good lunch?

21       A.   Yes, sir, I did.  How about you?

22       Q.   It was pretty good.  Thank you.

23            I'm marking as Exhibit 23 a table.

24       A.   Okay.

25            (Petty Exhibit 23 was marked for
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1     identification.)

 2           MR. KALAS:  I only have one copy of this.

 3     BY MR. KALAS:

 4     Q.    If you go to the back page of Exhibit 23,

 5     you see that this is taken from an IARC monograph on

 6     Tobacco Smoke and Involuntary Smoking?

 7     A.    Okay.

 8     Q.    Okay.  And do you see the title of this

 9     table on the first page?

10     A.    Okay.

11     Q.    Can you read the title of this table into

12     the record, please?

13     A.    "Carcinogens in Cigarette Smoke."

14     Q.    Okay.  I want to ask you about a few of

15     these carcinogens in cigarette smoke.  If you go

16     down on the first page under polynuclear aromatic

17     hydrocarbons.  Well, just a foundational question.

18     Polynuclear aromatic hydrocarbons are the PAHs that

19     we were talking about earlier, correct?

20     A.    Or also known as PNAs, but yeah.

21     Q.    Okay.  And if you go to the fifth one,

22     benzo- --

23     A.    You have at least a chemical engineer in the

24     room, one.

25     Q.    If we go to the fifth one, benzo[a]pyrene.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    Do you see that one?

2       A.   I do.

3       Q.   Okay.  Is it true that benzo[a]pyrene is in

4    cigarette smoke?

5       A.   Looks to be in very, very low levels, yes.

6       Q.   Okay.  And is benzo[a]pyrene classified as a

7    probable carcinogen by IARC?  Probable human

8    carcinogen by IARC?

9       A.   I -- I don't know if -- I don't know off the

10   top of my head.  I suspect it is.  I mean, it's --

11   whenever I did risk assessments in the '90s, the two

12   components that we looked at were benzo[a]pyrene and

13   benzenes.

14      Q.   Okay.  Do you --

15      A.   Those tended -- those tended to drive risk

16   assessments.

17      Q.   Do you see this column right here I'm

18   pointing at, sir, that says IARC group?

19      A.   Oh, I see.  So they've already said what it

20   is.

21      Q.   Yep.

22      A.   So it's in a benzo[a]pyrene is in -- this is

23   the first time I've seen this document.

24      Q.   Sure.

25      A.   It's a 2A.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1       Q.   Okay.  And that's a probable human

 2  carcinogen, right?

 3       A.   Correct.

 4       Q.   Okay.  And do you believe that the

 5  benzo[a]pyrene is associated with lymphatic cancer?

 6            MR. KRISTAL:  Objection.  Asked and

 7       answered.

 8       A.   I'm -- I'm not sure on all the things it's

 9  associated with.

10  BY MR. KALAS:

11       Q.   Okay.  Every time Ms. Dyer ▮▮▮▮▮▮▮▮

    ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    ▮ ▮▮▮▮▮▮▮▮▮▮

14            MR. KRISTAL:  Objection.  Beyond the scope.

15       A.   I haven't done that analysis.  I don't know

16  how to answer that question.

17  BY MR. KALAS:

18       Q.   Well, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ right?

19       A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    ▮ ▮▮▮▮▮▮▮

24       Q.   Well, assuming that the levels of

25  carcinogens in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
```



1 ████████████████ ████████████████████

█ ██████████████████████████████████████

█ ██████████████████████████████

4          MR. KRISTAL:   Objection.

5      A.   Probably more likely than not, but I don't

6 know.  I don't know what her -- ████████████████

█ ██████████████████████████████████████████

█ █████████████████████████████   I just don't

9 know.

10 BY MR. KALAS:

11     Q.   Okay.  And when somebody █████████████████

█ █████████████████████████████████████████

█ █████████████████████████████

14          MR. KRISTAL:   Objection.

15     A.   ████████

16 BY MR. KALAS:

17     Q.   Yes, sir.  Well, ████████████████████

█ █████████████████████.

19     A.   I was going to say.

20          Some of the chemicals probably are absorbed.

21     Q.   Okay.  And that would go to the bone marrow

22 as well, right?

23          MR. KRISTAL:   Objection, form and scope.

24     A.   I don't know.  It depends.  Depends on the

25 contaminant and -- I don't know how to answer that

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1   question.

 2   BY MR. KALAS:

 3       Q.   ████████████████████████████████████

 ▌   ██████████████████

 5       A.   You guys have scrambled this for me.

 6            Pardon me.  I have to find it.

 7       Q.   Yep.

 8       A.   All righty.  Bear with me.  The question

 9   again?

10       Q.   ███████████████████████████████████

 ▌   ██████████████

12       A.   Yes.

13       Q.   Okay.  And ███████████████████████████

 ▌   ████████████████████████████████████████████

 ▌   ██████ right?

16       A.   Yes.  During that time period, yes.

17       Q.   Okay.  So ████████████████████████████

 ▌   ████████████████████████?

19       A.   Yeah.

20       Q.   Okay.  ██████████████████████████████

 ▌   ██████████████████████████████████████████

 ▌   ████████████████████████████ right?

23            MR. KRISTAL:  Objection to form.

24       A.   That's not how I characterize it, but go

25   ahead.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    BY MR. KALAS:

 2        Q.   Okay.   ████████████████████████████████

 3    ██████████

 4             MR. KRISTAL:  Hopefully not.

 5        A.   ███████████████████████████████████

 6    ██ ██████████████

 7    BY MR. KALAS:

 8        Q.   █████████████  ████████████████████████

 9    ██ █████████████████████

10        A.   I'm just trying to -- assuming that those

11    ████████████████████████████████████████████████,

12    yes.

13        Q.   Okay.   ██████████████████████   Fair

14    enough.

15             And there are 365 days in a year, right?

16        A.   Three of the four years, there are.

17        Q.   And one year has 366, true?

18        A.   Correct.

19        Q.   Okay.  So if it was a 365-day year, ███████

20    ██ ████████████████████████████████████████████

21    ██ ██████████ true?

22             MR. KRISTAL:  Objection.

23        A.   I don't know.  I'd have to do the math.

24    Whatever the math is.

25    BY MR. KALAS:
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   365 times 20, sir.

 2      A.   Yeah, but I don't trust your calculator.

 3      Q.   Okay.

 4      A.   365 times -- you're saying 20?

 5      Q.   Yes, sir.

 6      A.   ███████████████████████ right?

 7      Q.   Yes, sir.

 8      A.   I get 7300 as well.

 9      Q.   Okay.  ████████████████████████

███  ████████████████████████████████████████

███  ████████████████████████████ right?

12      A.   Something like that.

13      Q.   Okay.  Did she have 73,000 exposure events

14  to glyphosate over the course of her lifetime?

15      A.   I'm estimating exposure events were

16  between -- around 7 to 9,000.  So same order of

17  magnitude, different -- different materials.

18      Q.   All right.  You said the same order of

19  magnitude.  7 to 9,000 is about one order of

20  magnitude below 73,000, correct?

21      A.   It's in the thousands, but, yeah, okay,

22  that's fine.

23      Q.   Okay.  And you have no reason to disagree,

24  sitting here today, that the carcinogens listed on

25  this table by IARC actually are present in ████████
```

1      ███████████?

2            MR. KRISTAL:  Objection.

3      A.   I would -- I would -- before I answer that

4      question, I would want to go back and do my own

5      research.  It's one document, I just --

6      BY MR. KALAS:

7      Q.   Okay.

8      A.   You know, it's -- I'm not going to make a

9      global agreement to a single paper.

10     Q.   Well, I'm not asking you to agree, I'm

11     asking you whether or not you would disagree sitting

12     here today.  So my question -- I'll ask it again

13     because it's a little bit different of a question.

14           I'm not asking you to adopt these as your

15     list of carcinogens in ████████    I want to make

16     that very clear.  What I'm asking you is do you have

17     any reason to disagree with IARC that these

18     carcinogens are present in ████████  sitting here

19     today?

20           MR. KRISTAL:  Objection.

21     A.   I don't have any reason to agree or

22     disagree.

23     BY MR. KALAS:

24     Q.   Thank you.

25           Okay.  Now, Ms. Dyer used Roundup® at her

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1     residence and at a family farm, correct?

 2         A.   Well, it was a combination of home and

 3     family farm.  One of the homes was a family farm and

 4     one of the homes was off site.  And then there was a

 5     little bit of time at her father's home.  So there's

 6     really -- it's not that simplified.

 7         Q.   Okay.  So --

 8         A.   Whatever I've written down here is what it

 9     is.

10         Q.   Okay.  So one of the places she applied

11     Roundup® was a family farm slash residence, correct?

12         A.   Correct.

13         Q.   One of the places she applied Roundup® was a

14     residence, correct?

15         A.   I believe so.  Her father's home, if that's

16     what you're referring to.

17         Q.   Okay.  Well, actually, I was referring to

18     the third place she applied when I said that.  But

19     then she also applied at her father's home, correct?

20              She applied three places, right?

21              One had -- let me break it down and make

22     this simple.  She applied at one mixed farm and

23     residence, right?

24         A.   Correct.

25         Q.   Okay.  Then she applied at her father's
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    house, right?

 2         A.   Correct.

 3         Q.   And then she applied at a third house,

 4    right?

 5         A.   I thought it was a farm down the street.

 6         Q.   Okay.  A farm down the street, okay.  Thank

 7    you.

 8              So at her deposition, she provided some

 9    pictures of products that she believed she applied

10    on the farm, right?  Do you remember that?

11         A.   I believe so, yes.

12         Q.   Okay.  I'm going to mark that as Exhibit 24.

13              (Petty Exhibit 24 was marked for

14    identification.)

15    BY MR. KALAS:

16         Q.   There you go.

17              And then she also provided pictures of some

18    of the tractors and/or spray equipment that was used

19    at the various places where Roundup® was applied.  Do

20    you recall that?

21         A.   I do.

22         Q.   Okay.  I'm going to mark that as Exhibit 25.

23              (Petty Exhibit 25 was marked for

24    identification.)

25    BY MR. KALAS:
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Here you go.

 2           And does Exhibit 24, to your understanding,

 3      represent at least some of the Roundup® products that

 4      Ms. Dyer applied when she used Roundup®?

 5      A.   I believe so, yes.

 6      Q.   Okay.  And does Exhibit 25 represent the

 7      spraying equipment that Ms. Dyer used at least some

 8      of the time to apply Roundup®?

 9      A.   Well, portions of the exhibit do.

10      Q.   Okay.

11      A.   Portions of the exhibits are pictures of

12      people standing by tractors, so...

13      Q.   Right.  That was her husband, right?  I

14      believe?

15      A.   Right.

16      Q.   Okay.  And have you reviewed any other

17      images of spray equipment Ms. Dyer used to apply

18      Roundup®?

19      A.   I have not.

20      Q.   Okay.  Have you reviewed any other images of

21      Roundup® products that Ms. Dyer applied?

22      A.   Other images?  No, I haven't seen other

23      images.

24      Q.   Okay.  Let's go to page -- her depo, which I

25      believe is Exhibit 22.  It should be at the bottom
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    of your pile.

 2            Okay.  So if we go to Page 153.

 3      A.   Okay.

 4      Q.   Okay.  And carrying over to 154.

 5            If you go to 153 it states at Line 14:

 6    "Before you moved to the first of your farms in

 7    Purdon, had you ever used Roundup® before?

 8            "Answer:  Yes.

 9            "Okay.  When and where?

10            "Answer:  At my dad's."

11            Okay.  And then moving to Page -- or did I

12    read that correctly?

13      A.   Those specific words?

14      Q.   Yes, sir.

15      A.   Yes, I believe so.

16      Q.   All right.  And moving to Page 154, it

17    states, Line 12, "Question:  Okay.  So sometime in

18    the late '80s, would you use Roundup® at your

19    father's home?

20            "Answer:  Very little.

21            "Question:  Okay.  When you say very little,

22    about how many times a year?"

23            And she states:  "Just with my dad.  I might

24    carry the bottle or something like that."

25            Do you see that?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.    Uh-hum.

 2        Q.    Okay.  Then moving on, it states, on Page

 3   155, Line 9:  "When you say occasionally, once a

 4   month?  Less than once a month?

 5              "Answer:  Once a year.

 6              "Question" --

 7        A.    Where are you at?

 8        Q.    Page 155, Line 9.

 9        A.    Okay.

10        Q.    Okay.  And now to Line 12:  "Once a year?

11   Okay.  And how often would you carry the bottle

12   during this period in the late '80s?

13              "Answer:  That one time a year."

14              Did I read that correctly?

15        A.    Yeah.

16        Q.    Okay.  Is that consistent with your

17   understanding of how often Ms. Dyer applied Roundup®

18   at her father's house, one time a year?

19              MR. KRISTAL:  Object.  Object to form.

20        A.    I think it's more than what I -- what she

21   told me, actually.

22   BY MR. KALAS:

23        Q.    Okay.  So at deposition, she stated she

24   applied one time a year, and she told you something

25   different?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.   Well, she's -- it's different in the sense

 2   she said there was four total events.

 3        Q.   Okay.

 4        A.   So I don't know if it's different or not,

 5   but the questions are different.

 6        Q.   Okay.  Okay.  So four total events, and if

 7   that were spaced over four times, it would be once a

 8   year?

 9        A.   Correct.

10        Q.   Okay.  So we are in agreement that she

11   applied very rarely at her father's house?

12        A.   I don't make terminology like that, I

13   just -- whatever they are, they are.

14        Q.   Okay.  Go to Page 157.

15        A.   All right.

16        Q.   Or actually, excuse me, let's -- let me

17   direct your attention first to 155, 16 through 19 --

18   or 20.  Do you see here that they're now changing

19   the subject to the home in Purdon?

20        A.   Okay.

21        Q.   Okay.  Then if we go to 156, Line 12.

22        A.   Okay.

23        Q.   It states:  "Where on -- I mean, how often

24   would you use Roundup®?

25             "Answer:  On that place, about three or four
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    times a week.

2              "Question:  Would it change seasonally?

3              "Answer:  Yes.

4              "Question:  Okay.  Was it three or four days

5    a week the high amount or the -- was that the most

6    frequent you would use it during the course of the

7    year, three to four times a week?

8              "Answer:  In the growing season, like in

9    March through, say, June, I would probably use it

10   three times, you know, three, four times a week,

11   depending on the weather, now, if it rained, if the

12   wind was high, you know, you couldn't do anything

13   with it.

14             "Question:  In nongrowing months, how often

15   would you use it?

16             "Answer:  Nongrowing months, sometimes you

17   wouldn't use it at all."

18             Did I read that correctly?

19      A.   Yep.

20      Q.   Okay.  Is it your understanding that the

21   maximum amount of times Ms. Dyer used Roundup® on her

22   farm in Purdon during the growing season was three

23   to four times a week?

24      A.   No.

25      Q.   Okay.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1      A.    Because she uses the word "usually."

2      Q.    Okay.

3      A.    That doesn't mean maximum.

4      Q.    Okay.  So what's the maximum, sir?

5      A.    I don't know what the maximum is.

6      Q.    Okay.  Did you find out a different maximum

7   in your interview?

8      A.    No.  I always ask on average --

9      Q.    Okay.

10      A.    -- during the year, during the season,

11   during the month, on average, what would the range

12   be.

13      Q.    And she told you as well three to four times

14   a week, right?

15      A.    Well, let me look.  One question at a time.

16            No, she said one to two events or days per

17   week.

18      Q.    Okay.  So was it your understanding then

19   that three to four times a week was a maximum?

20      A.    No.

21            MR. KRISTAL:  Objection.

22   BY MR. KALAS:

23      Q.    Okay.

24      A.    No, it doesn't say it's the maximum.  There

25   is no word "maximum" there.  It just says "usually."

Confidential - Stephen E. Petty, PE, CIH, CSP

1    Well, "usually" to me is more like an average than

2    it is -- that's a typical value, not a maximum.

3        Q.    Okay.  Go to Page --

4        A.    My recollection of reading this is that I

5    underestimated her exposure.

6        Q.    Okay.  Let's go to Page 165 to 166.

7              Do you recall that Ms. Dyer stated that she

8    always wore rubber gloves when mixing Roundup®?

9        A.    Where are you at again?  I'm sorry.

10       Q.    165 to 166.

11       A.    I see some language about rubber gloves on

12   165.

13       Q.    So I asked what you recalled, and now you're

14   refreshing your recollection, so let me ask again.

15   Did Ms. -- or a different way.

16             Did Ms. Dyer testify that she always --

17       A.    It's not what I recall.  You were asking me

18   to go to a page, and I assumed you were asking me to

19   look through -- at what the language was.

20       Q.    That's fine.

21             Is it your understanding that Ms. Dyer

22   always wore rubber gloves when mixing Roundup®?

23       A.    I don't know.  I have to look at the other

24   locations as well to answer that question.  Okay?

25       Q.    So let's stick with the location that we're

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    talking about on 165 and 166.

 2            Is it your understanding that at one -- at

 3    the --

 4        A.   I appreciate that.  My interviews are

 5    different, and I've tried to tell you this.

 6    Regardless of the PPE clothing, et cetera, I'm

 7    interested in what portion of the time did those

 8    skin areas get wetted and what portion gets wetted,

 9    regardless of what's worn.

10            Because there are all sorts of ways, and you

11    can -- rubber gloves are almost a meaningless term,

12    because you need to know whether -- what the rubber

13    is.  Is it latex?  Is it natural rubber?  Is it

14    Buna-N?  Is it nitrile?

15        Q.   Did you ask Ms. Dyer to see what rubber

16    gloves if she still had them so you could tell what

17    fabric they were?

18        A.   No, because that's the point, I'm -- I have

19    much less interest in that.  I have interest in her

20    exposure, which is how much gets on her hands.

21        Q.   So did Miss -- did Ms. Dyer testify, when

22    she was asked "Did you wear any protective equipment

23    when using Roundup®," just generally, it wasn't tied

24    to any location, did she testify that she always

25    wore rubber gloves whenever she mixed anything?
```

```
 1        A.    Point me where you're trying -- you're

 2    asking me a question based on some testimony, and

 3    I'm trying to see if I'm reading the testimony the

 4    same way you are.

 5        Q.    So question, Line 12, "Did you ever wear any

 6    protective equipment when using Roundup®?

 7              "Answer:  Well, I didn't think I had to, but

 8    I always wear just rubber gloves whenever I mix

 9    anything.  I don't care what I'm doing.  I don't

10    like to get anything on my hands.  I'm one of those.

11    I'm a nurse, so I don't like to get anything on my

12    hands.  So, yes, but, you know, I didn't wear any

13    other kind of protective thing because I didn't

14    think I needed to."

15              Did I read that correctly?

16        A.    I believe so, yes.

17        Q.    Okay.  Do you have any understanding from

18    your interview with Ms. Dyer or anything else that

19    she did not always wear rubber gloves when mixing

20    Roundup®?

21        A.    I'd have to go through the deposition to

22    answer that question.  I don't remember off the top

23    of my head, but --

24        Q.    Did you write it in your notes that she

25    stated I did not always wear rubber gloves when
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    mixing Roundup®?

2        A.   I'm looking, again, if you look at the

3    mixing scenarios in my interview, we're trying to

4    cut to the chase because my expertise is in

5    exposure, right?

6        Q.   Uh-hum.

7        A.   And if you go to, for example, let's pick a

8    page, home/farm mixing on Page 17 of my interview

9    with Ms. Dyer.

10       Q.   Yeah.

11       A.   And she's indicating that only about two

12   percent of the time does she recall getting her

13   hands wet, which is very low.

14       Q.   Okay.

15       A.   So it's not inconsistent with the fact that

16   she tried to keep her hands clean.

17       Q.   Okay.  My question was different.

18       A.   I know it's different, but that's what I

19   care about.  I'm doing the exposure analysis, not a

20   PPE.

21       Q.   Well, I appreciate that, Mr. Petty, I really

22   do appreciate that you and I may care about

23   different things.  But my question is --

24       A.   It's not that I don't care about PPE, it's

25   just ultimately on the exposure side for dermal,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    whether it's PPE or not PPE, or if it's clothes and

2    not PPE, or if it's bare skin, what ultimately

3    matters from an exposure standpoint is what gets on

4    your skin.

5        Q.   Again, my question is whether or not you

6    have uncovered any information contradictory to the

7    testimony that I read to you that she always wore

8    rubber gloves when mixing Roundup®.

9             If the answer is "I can't recall," it's "I

10   can't recall."

11       A.   I just, without going through it, I don't

12   know if she said any other statements about PPE.  I

13   just don't know.

14       Q.   Okay.

15       A.   Like I said, what matters is what gets to

16   the skin.

17       Q.   The literature is clear that rubbing gloves

18   when mixing reduces exposure in some amount.  We may

19   disagree about what amount, but in some amount.

20            MR. KRISTAL:  Objection to form.

21       A.   No.

22   BY MR. KALAS:

23       Q.   It is not clear.  Okay.

24       A.   It is not clear because it depends on the

25   material.  Latex is, in most cases, worse than no

Confidential - Stephen E. Petty, PE, CIH, CSP

1    gloves because it traps dermally, it traps the

2    material against your skin.

3        Q.   Okay.

4        A.   Versus, say, nitrile, which would be a

5    better material.

6             So when you say rubber, it's such a generic

7    term as to not have meaning from an industrial

8    hygiene standpoint.  You have to specify the

9    material.  And we don't know what that material is

10   because it wasn't asked in the deposition.

11            So to make a blanket statement that it

12   always reduces the exposure I don't think is true.

13   Depends on the condition of the gloves, how they're

14   worn and whether or not they get cracked.

15            So there's a whole bunch of parameters that

16   affect that, along with the type of material.

17       Q.   I'll mark as Exhibit 26 an article entitled

18   Aquavella, 2004.

19            (Petty Exhibit 26 was marked for

20   identification.)

21       A.   This is where they're just measuring from

22   urine, right?

23   BY MR. KALAS:

24       Q.   If you go to Page 325.

25       A.   Am I correct, is this the exposure based on

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1   measurement in the urine?

 2      Q.   Take a minute to read the article if you

 3   haven't seen it in a while.

 4           Okay.  If we go down --

 5      A.   I haven't finished.  If you are going to

 6   give me the time to read it, I want to read the

 7   whole thing.

 8      Q.   All right.  Go ahead.

 9      A.   I'll let you know when I'm ready.

10      Q.   Okay.

11      A.   Okay.  I think I'm ready.

12      Q.   Okay.  Go to article -- Page 325.

13      A.   325?

14      Q.   Yes, sir.  Last page.

15           In the second-to-the -- second line of the

16   last paragraph, it states --

17           MR. KRISTAL:  Which column?

18           MR. KALAS:  Last paragraph in the whole

19      article.

20           MR. KRISTAL:  Oh, okay.

21   BY MR. KALAS:

22      Q.   It states:  "For farmers, the use of rubber

23   gloves when mixing and loading pesticides or when

24   repairing equipment was associated with measurably

25   reduced urinary concentrations."
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1              Did I read that correctly?

 2      A.    You read the words.  Yeah, that's what the

 3   words say.

 4      Q.    Do you have any reason to disagree with the

 5   conclusions of the authors in this study that the

 6   use of rubber gloves was associated with measurably

 7   reduced urinary concentrations of glyphosate?

 8      A.    I do.

 9      Q.    You do have a reason to disagree with them,

10   okay.  So what -- what reasons?

11      A.    The reasons that I just told you.

12      Q.    Okay.  I'm asking about the conclusions on

13   the data in this study.  So let's look at the data

14   in this study.  Let's go to page --

15      A.    The data are based only on urine, so I first

16   have a problem with that in the sense that they're

17   only looking at the exposure from a urine

18   standpoint.

19      Q.    But the same problem would be in the group

20   without rubber glove use and the group with rubber

21   glove use, the voiding levels, correct?

22      A.    Not necessarily.  We don't know unless we

23   have the data.

24      Q.    Okay.  Have you asked Mr. Kristal to send

25   you the raw data for this study?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.    The raw data?  No.

 2        Q.    Okay.  So let's look at what the author

 3   said.

 4              This wasn't written just by Monsanto folks,

 5   either, right?  Let's go to the first page.

 6              There were authors of this study from the

 7   School of Public Health at the University of

 8   Minnesota, right?

 9        A.    Sure.

10        Q.    There are authors on this study from the

11   Rollins School of Public Health at the Emory

12   University, correct?

13        A.    Authors or a author?

14        Q.    An author.

15        A.    Okay.  They're not authors.

16        Q.    Okay.  Is that correct?

17        A.    Looks to be one of them is now associated

18   with that school, yes.

19        Q.    Okay.

20        A.    At the time of the publication.

21        Q.    If you go to the right-hand column on 321.

22   Let's go back to 321.

23        A.    But we also have exponent in there, right?

24        Q.    We do have exponent.

25        A.    You didn't cover them.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.    Okay.  This was -- this was actually

 2     published in the Environmental Health Perspectives,

 3     was it not?

 4      A.    Yeah, but isn't exponent on there as well?

 5     I mean, you've covered all these people --

 6     companies, I thought you were going to finish

 7     covering the authors.

 8      Q.    Do you want to depose me?

 9      A.    I'm just asking --

10      Q.    Okay.

11      A.    -- if you're going through this

12     systematically to be complete.

13      Q.    Okay.  So let me ask you the questions I'm

14     going to ask.

15            MR. KRISTAL:  I'd like to depose you.

16            MR. KALAS:  I bet.

17     BY MR. KALAS:

18      Q.    This was published in Environmental Health

19     Perspectives, right?

20      A.    Okay.

21      Q.    That is the journal of the National

22     Institute of Environmental Health Sciences, correct?

23      A.    If you could point me out where they're

24     associated with.

25      Q.    It's not on this article, so if you don't
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    know, that's okay.

2           Do you know whether or not it's the journal

3    of the National Institute of Environmental Health

4    Sciences?

5       A.   I've looked at a lot of their articles, but

6    I don't recall off the top of my head one way or the

7    other.

8       Q.   Okay.

9       A.   So I can't answer that question.

10      Q.   So if you go to the right-hand column of the

11   first page, it states in the first full sentence,

12   the bottom of that paragraph, it states, "The

13   Institutional Review Board of the University of

14   Minnesota approved this study protocol."

15          Did I read that correctly?

16      A.   Where are we at?

17      Q.   Right here, sir.

18      A.   Just give me column, paragraph, and

19   sentence.

20      Q.   Top paragraph, it's only half a paragraph,

21   last sentence on the right side.

22      A.   Well, that's what those words say.  I don't

23   know what they mean, really.

24      Q.   Okay.  So you don't know what an

25   Institutional Review Board is?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    A.   Well, no, but that has to do generally with

2    whether you're going to do human subjects.

3    Q.   Okay.  And did the Institutional Review

4    Board approve the use of human subjects for this

5    study?

6    A.   Well, in context with the study, not -- I

7    don't think they were going to allow them to just

8    dose people with chemicals.  That's pretty much not

9    allowed anymore.

10    Q.   Okay.  Let's go --

11    A.   You've got the Stockholm protocols.

12    Q.   Let's go to Table 1.

13    A.   Okay.

14    Q.   Do you see that in the characteristics of

15    the applicators, glove changes?  Do you see the

16    glove changes entry on Table 1?

17    A.   Sure.

18    Q.   Is it true that ten of the applicators in

19    this study did not wear gloves?

20    A.   That's what it says.

21    Q.   Okay.  If we go to Table 2 --

22    A.   But are you going to go through the rest of

23    that, or just the -- all you care about is the first

24    line?

25    Q.   Well, we're talking about gloves, so that's

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    what I wanted to ask about.  So let's go to Table 2.

2        A.   Well, I mean, there are -- there is -- yeah,

3    we are talking about gloves, and there's changing

4    them, change when worn out, change them each time.

5    Isn't that about gloves?

6        Q.   Sir, I'd like you to focus on the questions

7    I'm asking, and Mr. Kristal or Ms. Beach can ask you

8    questions later on if they want to clean up

9    anything.

10       A.   Well, you started this with glove changes.

11       Q.   Sir --

12       A.   Then you -- then you take one sentence out

13   of the whole paragraph.

14       Q.   Sir, you're being very argumentative, and

15   I'm just trying to ask you to focus on some data in

16   this study, so --

17           MR. KRISTAL:  Well, I don't think Mr.

18       Petty's being argumentative at all.  He's trying

19       to follow you.  And you seem to be switching

20       things.

21   BY MR. KALAS:

22       Q.   Let's go to Table 2.

23       A.   Okay.

24       Q.   They ask about whether people wear rubber

25   glove use when mixing or loading pesticides.  Do you

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    see that?

 2        A.   What table are you on?

 3        Q.   Table 2, sir.

 4        A.   Okay.  There at the top.

 5        Q.   And is it true that 14 of the 48 subjects in

 6    this study did not use rubber gloves when mixing or

 7    loading pesticides?

 8        A.   That's what it says.

 9        Q.   Okay.  If you go down to the

10    fourth-to-the-last entry, "Pesticide spills during

11    mixing," is it true that 7 of the 48 applicators had

12    observed pesticide spills in this study?

13        A.   That's what it says.

14        Q.   Go down to "Pesticide spills during

15    applying," is it true that 8 out of the 40

16    applicators had observed pesticide spills while

17    applying?

18        A.   For that day, I guess that's right.  This is

19    all for the one day that they're being observed.

20        Q.   Well, in fact, they actually observed them

21    over five days.  Do you see that in Table 3?

22        A.   Okay.  But it's not -- that's not like their

23    career on the farm.

24        Q.   Okay.  Did they observe them for five days

25    in this study, not one day?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.    A few number of days, yes.

 2        Q.    Okay.

 3              THE VIDEOGRAPHER:   Five minutes left.

 4              Okay.

 5   BY MR. KALAS:

 6        Q.    Do you -- go to Table 2.  Do you see in the

 7   second-to-last entry, they have skin contact with

 8   pesticides?  Do you see that?

 9        A.    Yes.

10        Q.    And is it true that 15 of the 48 applicators

11   had observed skin contact with pesticides?

12        A.    That's what it says with the limitations of

13   simply the days the observer was there.

14        Q.    And if we go to 323, the last paragraph,

15   right-hand column, it states, "The maximum urinary

16   concentration for a child, 29 parts per billion, was

17   for a teenage boy who actively assisted his father

18   with the mixing and application.  The boy's father

19   had the highest urinary concentration among

20   applicators.

21              "The field notes documented long periods

22   spent by the father repairing the boom sprayer and

23   evidence of spills while mixing and loading.  The

24   use of protective gloves was not observed for father

25   or son during mixing or loading or during the
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    repairs.  The father was also observed to smoke

2    cigarettes while repairing the boom sprayer."

3          Did I read that correctly?

4      A.   You read those words, yes.

5      Q.   Okay.  And if you go to the next sentence,

6    it says, "The maximum systemic dose for farmer

7    applicators was estimated to be .004 milligrams per

8    kilogram and the distribution of values was highly

9    skewed."

10         Did I read that correctly?

11     A.   That's what the words say.

12     Q.   Okay.  Is it correct that in this study, the

13   authors observed a dose of .004 milligrams per

14   kilogram in a farmer who spent time repairing the

15   boom sprayer, who had evidence of spills while

16   mixing and loading, who did not wear protective

17   gloves during mixing, loading or during the repairs,

18   and who smoked cigarettes while repairing the boom

19   sprayer?

20     A.   I'd have to go through it and see.

21     Q.   Well, just to help you, if you go to the

22   first paragraph we read --

23     A.   I'm trying to see which -- where the data

24   are tied to the father.

25     Q.   It's the data that -- if you go to the

Confidential - Stephen E. Petty, PE, CIH, CSP

1    paragraph before we read, it states that, in the

2    second sentence, "The boy's father had the highest

3    urinary concentration among the applicators."  Do

4    you see that?

5        A.   Yeah, I see that, I just don't see the data.

6        Q.   Okay.  And then it says, the maximum dose

7    for the farmer applicator was estimated to be .004

8    mgs per kg, right?

9        A.   Well, you can read the words all day long.

10   I'm going to agree with you that's what the words

11   say, but I don't necessarily agree that that's the

12   proper way to measure a dose.

13       Q.   Okay.

14       A.   And so you can -- if you want me to agree

15   that that's what the words say on this paper, then

16   that's fine.  I don't necessarily agree that the

17   study is well done, nor do I agree that it reflects

18   on -- we don't even know what kind of gloves are

19   being worn here.  We don't know if they were told

20   ahead of time.

21            You know, when you -- when you -- I know

22   from sampling people that when they know you're

23   coming, they tend to behave better.

24       Q.   Okay.

25       A.   So --

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1        Q.   Is smoking a cigarette while repairing a

 2   boom sprayer with no gloves behaving well while

 3   applying pesticides?

 4           MR. KRISTAL:  Depends on whether you were

 5       warned about them.

 6           MR. KALAS:  Jerry, I would love the day I

 7       get to depose you.  It's not coming yet.

 8           MR. KRISTAL:  So would I.

 9        A.   I -- I don't have a comment on that one way

10   or the other.

11           MR. KALAS:  All right.  Let's change the

12       media real quick.

13           THE VIDEOGRAPHER:  This is the end of Media

14       No. 2.  The time is 2:17 p.m.  Going off the

15       record.

16           (Recess from time 2:17 p.m. until 2:21 p.m.)

17           THE VIDEOGRAPHER:  This is Media No. 3 in

18       the deposition of Steven E. Petty.  The time is

19       2:21 p.m.  And we're back on the record.

20   BY MR. KALAS:

21        Q.   Going down to the discussion section, 324.

22        A.   324.  Oh, we're still back on 26?

23        Q.   Yeah.

24        A.   Okay.

25        Q.   Last paragraph on that page, the second
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    sentence, it states, "The vapor pressure of

 2    glyphosate is extremely low.  Glyphosate is usually

 3    formulated as the isopropylamine salt which has a

 4    vapor pressure of 1.10 times 10 to the negative 8."

 5          Do you see that?

 6    A.    I do.

 7    Q.    Do you disagree that the vapor pressure of

 8    glyphosate is extremely low?

 9    A.    I don't know about extremely, but it's

10    relatively low.  As a chemical engineer, it's

11    relatively low.

12    Q.    Okay.  Moving on, it states "Inhalation of

13    spray droplets was found to be a minor of glyphosate

14    exposure in a study in Finland, Jauhienien, et al.,"

15    that's J-A-U-H-I-A-I-N-E-N, "1991, leaving dermal

16    contact as the primary route of exposure."

17          Did I read that correctly?

18    A.    You did.

19    Q.    All right.  Do you disagree that the

20    Jauhienien study found that inhalation of spray

21    droplets was a minor route of glyphosate exposure?

22    A.    I'm not sure how to answer that question.  I

23    mean, that may be what they found.  I mean, I have

24    opinions about that and I've talked about it through

25    other studies as well in my report.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.   Well, you don't talk about the Jauhienien

 2   study in your report.  So I'm asking if you disagree

 3   with that study.

 4        A.   In what sense?  I mean, it's such a broad

 5   question.  I mean, do you want me to respond to

 6   certain words that are said here?  Or do you want to

 7   get the study out and ask me if there's certain

 8   elements that I disagree with?

 9        Q.   I'm asking if you disagree with the

10   conclusion of the Jauhienien authors that inhalation

11   of spray droplets was found to be a minor route of

12   glyphosate exposure in their study.

13        A.   I think the literature as a whole says that

14   the dominant pathway is dermal.

15        Q.   Okay.

16        A.   But whether it's minor?  What constitutes

17   minor?

18             I mean, it's -- the next highest likely

19   route of exposure is inhalation of aerosol droplets.

20   So if I had to categorize them, it would be dermal,

21   based on the literature, and then inhalation.  Using

22   the word "minor" -- if they had said in this paper

23   they show it being 10 percent, 20 percent, whatever

24   it is, fine.

25             But the word "minor" to me doesn't mean
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1     anything other than it's less than dermal.

 2         Q.   Let's go keep going.  It says, "Glyphosate

 3     is soluble in water and has low affinity for organic

 4     materials, such as skin."

 5              Do you agree glyphosate is soluble in water?

 6         A.   It depends on its form.

 7         Q.   Do you believe glyphosate formulate as an

 8     isopropylamine salt is soluble in water?

 9         A.   It has some solubility, more solubility in

10     the acid form.

11         Q.   Okay.  Do you agree that glyphosate has low

12     affinity for organic materials, such as skin?

13         A.   You know, appreciate you're asking a

14     chemical engineer generic questions.  And we like --

15     I mean, when we talk about solubility, we just

16     specify what it is relative to something else.

17         Q.   Okay.  This is --

18         A.   I mean, there are some standards as to

19     what's considered a standard solubility.  So, you

20     know, when you say it's low or high or whatever,

21     it's hard to answer that question.

22         Q.   If it's a question you can't answer as

23     asked, it is always fine to say, I can't answer that

24     question as asked.  I have no problem you answering

25     with that.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.    Well, you can answer it in part, but you

 2   can't answer it in total.

 3        Q.    Okay.  So if you need to qualify your

 4   answer, do that.

 5        A.    Which I did.

 6        Q.    Okay.  Do you agree glyphosate has a low

 7   affinity for organic material such as skin?

 8        A.    Yes and no.

 9        Q.    Okay.  What part of that don't you agree

10   with?

11        A.    It depends on whether it's what I would call

12   virgin skin or degraded skin and whether the -- that

13   the skin has been degraded, then, you know -- it's

14   still a -- it's a -- you can see factors of four to

15   -- see, I like to look at numbers.

16            And if you associate the dermal flux through

17   skin, at a virgin skin of one, then you say, well,

18   through degraded skin, it can be factors of 22

19   higher.

20            And the reason that that's true is because

21   you're defatting the surface of the stratum corneum,

22   and that allows the material to pass much quicker.

23            So when you ask that generic question about

24   skin, you've got to look at the condition of the

25   skin with respect -- at least from my perspective
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    looking at dermal exposure analysis.

2       Q.   Did you ask Ms. Dyer if she had any

3    degradation of her skin?

4       A.   I didn't.

5       Q.   Did you ask --

6       A.   I wasn't doing -- I wasn't doing a dermal

7    dose calculation.

8       Q.   Did you ask any of the plaintiffs in this

9    case whether they had any degradation of their skin?

10      A.   I didn't, but I would -- when I do analysis,

11   I do the analysis with undegraded skin and with

12   degraded skin and provide a range and do a Monte

13   Carlo with that.  So I incorporate the entire

14   spectrum.

15      Q.   But you didn't ask those questions in this

16   case, so you could not do that analysis even if you

17   were asked to do it with the information you have

18   right now?

19      A.   Well, no, because in a laboratory setting

20   with virgin skin, it's com- -- if somebody's using a

21   product over and over again, multiple days in a row,

22   the skin's going to get degraded.  We know that from

23   the literature.

24           So what -- they're -- they're not going to

25   be able to tell me what's the degree of degradation

Confidential - Stephen E. Petty, PE, CIH, CSP

1    of your skin.  What I can do instead, though, is

2    look at the data, the flux data for pristine skin

3    and then look at it for degraded skin and say, well,

4    the values have got to be in this range.  And that's

5    what I do, traditionally.

6        Q.    What study of glyphosate has multiple days

7    of exposure that shows that the skin is he degraded

8    following multiple days of repeated exposure to

9    glyphosate?

10       A.    We see some of it back in the data coming

11   out of California where you have these pesticide

12   workers who were reporting degraded skin.

13       Q.    Okay.  Which -- which study is that, sir?

14       A.    It's in my report.  It's that data, the 400

15   cases of workers who are showing skin irritation or

16   degraded skin.

17       Q.    Okay.  Going back to --

18       A.    We also have -- I also cite studies in here,

19   by the way on flux, the change in flux with

20   glyphosate with degraded skin.

21       Q.    Okay.  Going back to the question that

22   started this all off, do you agree --

23           MR. KRISTAL:  Please state your name?

24           MR. KALAS:  Ha.

25   BY MR. KALAS:

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1       Q.    Exhibit 26.  Do you agree --

 2             MR. KALAS:   That was a good one.

 3       A.    Two.  We've got two good ones.

 4    BY MR. KALAS:

 5       Q.    Do you agree that the use of rubber gloves

 6    when mixing and loading pesticides or when repairing

 7    equipment was associated -- or let me back it up and

 8    ask it more broader.  Strike that.

 9             Do you agree that the use of rubber gloves

10    when mixing and loading pesticides or when repairing

11    equipment may be associated with reduced urinary

12    concentrations of those pesticides?

13       A.    May?

14       Q.    Depending on the type of rubber gloves.

15       A.    All right.  Here's the answer:  On paper,

16    you would expect if somebody were wearing the proper

17    rubber gloves that you -- and -- that you would

18    expect if that was always the barrier to the skin,

19    you would expect to have lower exposure.

20             The problem with making -- so in theory, you

21    would expect that.  The problem in reality is that

22    the gloves that -- and I cite this in here -- if the

23    wrong glove type is used, if the material -- if the

24    gloves are reused and they're taken off and

25    reapplied and you get the material inside the
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    gloves, if they crack or are degraded in a way that

2    they're not protective or as protective, then there

3    are scenarios where it can be as bad as no gloves.

4         But I'm here to say that theoretically, you

5    would think that they would.  But when you start to

6    look at the practical elements of gloves in the

7    field, what the literature suggests is they're not

8    really that -- they cannot -- there are many, many

9    examples where they're not as effective as you would

10   otherwise think.

11   Q.   Okay.  Does that mean that your criticisms

12   that Monsanto should have warned people to wear

13   chemically resistant gloves may not have resulted in

14   any reduced exposure to those people depending on

15   doffing and donning practices?

16   A.   Well, my -- my criticism in that dimension

17   when you say chemically protective gloves is that

18   that's my criticism.  If I tell that to you, what do

19   you go buy?  And I'll -- you don't have to answer

20   the question.  But I'll say, okay, go to the store

21   and buy chemically protective gloves.  You're like,

22   well, I don't really know which material to buy.  I

23   could buy latex, I could buy nitrile, I could wear

24   synthetic rubber, natural rubber, nitron -- viton.

25        So my criticism is the manufacturer has as

```
 1    much information about the product as anybody, so

 2    they're in a position to know what the best glove

 3    material is.  So specify it.  Don't say chemically

 4    protective, say wear nitrile gloves.

 5         Q.   So let me play this out.  If Monsanto had

 6    put --

 7         A.   That's actionable.

 8         Q.   If Monsanto had put on Roundup® labels,

 9    every Roundup® label under the sun, wear chemically

10    protective gloves, in your opinion, that would be

11    insufficient to advise people as to how to protect

12    themselves from Roundup®?

13              MR. KRISTAL:  Objection.

14         A.   I've written that in -- I've written in

15    dozens of reports that if -- on warnings that if you

16    don't specify the material, compatibility of

17    material, that that warning is deficient because

18    it's not actionable.

19              If the -- and there's lots of literature

20    that talks about the warning has to be actionable.

21    Chemically protective, you can't go into Lowe's or

22    Home Depot and say give me a chemically protective

23    glove.  Now, they might give you one, but they're

24    going to randomly pick it because they don't know

25    the compatibility.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1            You know, you're going to pick a different

 2     material for an acid base versus an organic.

 3     There's -- there's compatibility charts that exist.

 4     And even I don't memorize all those, but I can look

 5     them up.

 6        Q.   And if --

 7        A.   And then what I would do is I would write on

 8     that warning wear, in this case perhaps, wear

 9     nitrile gloves.  Don't wear chemically protective

10     gloves, wear nitrile gloves.

11        Q.   I have a question that just occurred to me

12     right now.  And it's sort of out of left field, but

13     I'm going to ask it anyway.

14            Have you undertaken the exercise of writing

15     down the warning that Roundup® products should have

16     had in your view?

17        A.   Yes and no.  If you look at my really

18     detailed -- I -- if you looked at the hundreds of

19     pages, look at the MSDSs, for example, and I write

20     down what the warnings are, you'll find in many

21     cases, if I think the warning's okay, I don't

22     criticize it.

23        Q.   Okay.

24        A.   I only criticize the ones I have issues

25     with.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1      Q.   So I'm not asking -- sorry.

2      A.   There are portions of the warnings that I

3   agree with.  For instance, if they say -- it's hard

4   to disagree with something that says -- you know, if

5   somebody says use the product where there's adequate

6   ventilation.  That's completely meaningless.

7           But if they say wear -- wear respiratory

8   protection if you exceed the action level for this

9   constituent, it's a little hard for the user to use

10  it, but technically that's a good warning.

11     Q.   What parts of the Monsanto label are

12  adequate as far as warnings go, in your opinion?

13     A.   Well show me a label and ask me a specific

14  question and --

15     Q.   Okay.

16     A.   I mean, I don't know how to answer that

17  question.

18     Q.   Well, let me ask a -- let me go back to the

19  first question, which I don't know -- I'm not sure

20  if I understand your answer, let me put it that way.

21          Have you taken a Roundup® label, --

22     A.   Uh-hum.

23     Q.   -- any of the Roundup® products, and

24  basically mocked out the warning for that product as

25  you would have written it had you been the
```

```
1    industrial hygienist at Monsanto?

2       A.   No, because I'm not hired by Monsanto to do

3    that.  But I have indicated on the labels and the --

4    where I think there are deficiencies, and where

5    there aren't, I'm silent.

6       Q.   Okay.  So you --

7       A.   So by difference, you can clearly see those

8    areas where I'm not critical.

9       Q.   But have you taken where you think there is

10   -- sorry.

11      A.   And I've gone the extra step of saying --

12   I've gone the extra step on saying the language that

13   I don't think's adequate, this is why it's not

14   adequate.  This is what it should say.

15      Q.   Okay.  Going back to the gloves, had

16   Monsanto listed wear, let's say -- what glove do you

17   think is most effective at repelling isopropylamine

18   salt?

19      A.   I'm not certain, to be honest with you.  I

20   have not done that compatibility, but I think

21   it's -- I think it's nitrile.

22      Q.   Okay.  That's what I thought you'd say.

23   So -- okay.  Nitrile.

24           If Monsanto had written on the label wear

25   nitrile gloves when mixing, loading, applying
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    Roundup®, would that have been an adequate warning

2    with no doffing and donning instructions?

3           MR. KRISTAL:  Objection.

4    A.   For just the gloves?

5    BY MR. KALAS:

6    Q.   Yes, sir.

7    A.   As opposed to all the other things that need

8    to be warned about?

9    Q.   Yes, sir.  But I'm just asking about the

10   gloves right now.

11   A.   If they'd have said wear nitrile -- you have

12   to also say wear nitrile gloves, and I think the

13   additional portion of that warning should be don't

14   reuse and if you observe any wetting of the skin,

15   discard and replace.

16   Q.   Is there a pesticide product on the market

17   that you can point me to that specifies the material

18   of glove to be worn on the label in addition to

19   stating don't reuse, and if you observe any wetting

20   of the skin, discard and replace these gloves?

21   A.   I wouldn't know how to answer that question

22   because I haven't looked at all the labels of all

23   the pesticides.

24   Q.   Okay.  Did Ms. Dyer --

25   A.   But I will tell you that if they had

Confidential - Stephen E. Petty, PE, CIH, CSP

 1    specified the material, I would not have been

 2    critical of their glove protection PPE.  I wouldn't

 3    have.

 4        Q.   Did Ms. Dyer tell you about any spill or

 5    splash incidences while using Roundup®?

 6        A.   I don't recall in the interview that she --

 7    she specifying a specific spill incident.

 8        Q.   Okay.  Ms. Dyer worked as a nurse for many

 9    years, right?

10        A.   Let me just crosscheck.

11        Q.   Sure.

12        A.   See if I've got it.

13             I'm looking at Pages 5 through 9 of my

14    interview, just so you know where I'm at.

15             So it looks like from mid '97 to probably

16    around 2015, in some capacity she worked as a nurse,

17    yes.

18        Q.   Okay.  During the course -- did she work in

19    hospital settings when she was a nurse?

20        A.   For portions of the time, she did, yes.

21        Q.   Okay.  During the course of her career, did

22    some of the hospitals that she worked at use

23    ethylene oxide to clean equipment?

24        A.   I don't know.

25        Q.   Okay.  Did you ask her that?

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1        A.   I did not ask her that.  Well, I asked her

2    what other product -- I did ask her at each

3    location, what products were you exposed to.

4        Q.   Okay.

5        A.   And she would tell me if she could recall

6    things, or otherwise, she would say I don't really

7    recall being exposed to having any chemical

8    exposures.

9        Q.   Did you have any understanding of whether or

10   not she understood your question to refer to gases

11   used to clean equipment?

12       A.   I don't know how to answer that.  I asked

13   her in general, and then I would follow up if she

14   indicated there was any particular chemical or

15   stressor, then I would follow up with it.

16            (Petty Exhibit 27 was marked for

17   identification.)

18       Q.   All right.  I'm going to mark as Exhibit 27

19   the ATSDR evaluation of glyphosate.

20            MS. BEACH:  Let's see if this still works.

21            MR. KALAS:  I'll hand it to him from now on.

22   BY MR. KALAS:

23       Q.   Okay.  Have you reviewed this document, sir?

24       A.   I don't know if I have.

25       Q.   Okay.  ATSDR is one of the go-to sources for
```

1    industrial hygienists to get toxicological

2    information about substances, right?

3       A.    It has a yes or a no component to it.  I

4    mean, they're a -- they're a -- kind of a research

5    arm, they're not under the same umbrella as OSHA,

6    for example, but they're a research arm that

7    provides guidance documents --

8       Q.    Okay.

9       A.    -- for consideration to OSHA.  So there are

10   many times where they produce reports that aren't

11   adopted or aren't used for a host of reasons.  But

12   they are sort of a -- you certainly can look at

13   their profiles, but if you're going to go -- it

14   depends on whether you are looking for regulatory

15   information or nonregulatory information.

16      Q.    Okay.  Have you -- have you referred over

17   the course of your career to ATSDR profiles both

18   outside of litigation and within litigation?

19      A.    Sure.

20      Q.    Okay.

21      A.    I'm probably -- I'm pretty sure I have.

22      Q.    And do you see that the head of ATSDR on

23   page Roman Numeral little iv is a CIH like yourself?

24      A.    You're talking about Breysse, Breysse, or --

25   is that what you're --

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.    Yeah, Patrick Breysse.

 2        A.    Okay.

 3        Q.    Do you see that?

 4        A.    Yes, I do.

 5        Q.    Okay.  I just want to ask you about some of

 6    the conclusions in this document and see whether or

 7    not you agree with them.

 8              Go to Page 108.

 9              Are you there?

10        A.    I am.

11        Q.    Okay.  We're under --

12        A.    I'm sorry, yeah.

13        Q.    -- toxicokinetic section of this document.

14        A.    Okay.

15        Q.    It states in the first bullet point,

16    "Glyphosate is readily absorbed from the

17    gastrointestinal tract.  Very little glyphosate is

18    absorbed through the skin.  It is assumed that

19    glyphosate is readily absorbed from the respiratory

20    tract."

21              Did I read that correctly?

22        A.    You did.

23        Q.    Okay.  Do you agree with this ATSDR document

24    that very little glyphosate is absorbed through the

25    skin?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1       A.    I don't know how to comment on that.    I

 2   would comment on it only from the standpoint of what

 3   -- and, in fact, it's sort of a throwaway sentence,

 4   because we don't know what that rate is.

 5       Q.    Okay.

 6       A.    Compared to what?   I mean, what I've done in

 7   my review of the dermal studies is look at the

 8   actual fluxes for the -- and both for what I call

 9   virgin skin or degraded skin, and look at what those

10   rates are.

11           Now, to say that very little is absorbed, I

12   think it has to do with the skin area involved,

13   length of time involved.   I mean, it's not -- I

14   just -- I wouldn't make a blanket statement like

15   that.

16       Q.    Okay.  So you would --

17       A.    Because I don't know what the comparison --

18   it's saying it's very little glyphosate is absorbed

19   through the skin.  And in comparison to what?   I

20   just don't have a comparative there.

21           It's -- it's -- it could be true or it could

22   be false, it's -- there's nothing it compares

23   something to.  What is it comparing the glyphosate

24   transfer rate to?

25       Q.    Okay.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   It's just saying very little.

 2      Q.   Am I correct --

 3      A.   You know, you can have -- you can have --

 4   you can have toxins like CA that are parts per

 5   billion and it doesn't take much.

 6      Q.   Am I correct, sir, that the ATSDR, which is

 7   a part of the United States Department of Health and

 8   Human Services, stated this year in the

 9   toxicological profile for glyphosate that very

10   little glyphosate is absorbed through the skin?

11           MR. KRISTAL:   Objection.   It misstates

12      facts.

13      A.   Well, if you're saying that this report

14   written by whoever has those words in it, I'm not

15   going to disagree that those words are there.   But

16   if you ask me whether I agree with it or not, I have

17   a hard time agreeing with it because it's just a

18   generic kind of -- I hate to use the word throwaway

19   statement because it's not -- you don't know what

20   they're comparing it to.

21   BY MR. KALAS:

22      Q.   All right.   Let's go to the next bullet.

23   "Absorbed glyphosate is readily distributed via the

24   blood, but does not accumulate in any particular

25   organ or tissue."
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1          Did I read that correctly?

2          THE REPORTER:  Organ or what?

3          MR. KALAS:  Tissue.

4     A.   You read those words correctly, yes.

5  BY MR. KALAS:

6     Q.   Okay.  Do you agree absorbed glyphosate is

7  readily distributed via the blood?

8     A.   I don't know.  Again, certainly once it gets

9  to the blood, it's distributed.  I mean, that's sort

10  of a truism.

11          Again, it's kind of a generic statement that

12  has little meaning, really.

13     Q.   Do you agree with the ATSDR that glyphosate

14  does not accumulate in any particular organ or

15  tissue?

16     A.   Well, there's -- again, there's data -- what

17  you want to look at is the rate of bioaccumulation

18  and see what the rates are.  Again, this is just --

19  this reminds me as sort of a front-end paragraph

20  that's just got some generalities in it, but it's

21  not tied to -- appreciate, I worked in National Labs

22  for -- you know, and I was director of a lab,

23  eminent lab at Columbia, and I worked for Batelle

24  and I worked at National Labs at Northwest.

25          People write stuff all the time and it

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    doesn't mean it's necessarily right, but it doesn't

2    mean that it's a hundred percent wrong.  It's just

3    if you ask me, being a dermal expert, about some of

4    these statements, they're so generic as to be almost

5    -- I mean, you can ask me if that's what the words

6    are and I'll say yes.

7            But if you ask me -- it would be better to

8    say here, you know, whatever the rates are.  We've

9    seen rates of bioaccumulation that are one to two

10   percent, or whatever they are in whatever tissue and

11   for how long.  But -- but just to make a generic

12   statement like that doesn't -- doesn't have any real

13   meaning because then you can't compare it to

14   something else.

15       Q.   Do you believe glyphosate accumulates in any

16   particular organ or tissue?

17       A.   There's some evidence that it does, at least

18   for some amount of time, yes.

19       Q.   All right.

20       A.   I put it in my report.

21       Q.   Okay.  So you disagree with the ATSDR that

22   glyphosate does not accumulate in any particular

23   organ or tissue?

24            MR. KRISTAL:  Objection.

25       A.   That's not what I said.  I don't even know

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    what this sentence means when it says "particular

 2    organ or tissue."

 3    BY MR. KALAS:

 4        Q.   Okay.

 5        A.   So they seem to be saying that there's some

 6    particular organ or tissue.  It's poorly worded.

 7    That's all I'm saying.  Why not tell the reader what

 8    you know.  This is sort of like when I do

 9    interviews.  If I'm going to do calculations or I'm

10    going to do comparisons, I have to have numerical

11    values for compare one to the other.

12             This doesn't give me that.  So I can't take

13    this and go compare it to something else.

14        Q.   If you go to the last bullet point, it

15    states that "Approximately two-thirds of an oral

16    dose of glyphosate is excreted in the feces as

17    unabsorbed parent compound.  Most absorbed

18    glyphosate is rapidly secreted in the urine as

19    parent compound."

20             Did I read that correctly?

21        A.   You did.  You read the words correctly.

22        Q.   Okay.  Do you disagree with the ATSDR

23    toxicological profile for glyphosate that most

24    absorbed glyphosate is rapidly excreted in the urine

25    as parent compound?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1            MR. KRISTAL:  Objection.  You keep saying
 2      it, and this is not what you say it is.  This is
 3      a draft, as it says on every single page.
 4   BY MR. KALAS:
 5      Q.   Do you disagree with it, sir?  It would be
 6   -- it would be -- well, let me back up and ask you a
 7   question about that statement.
 8            Would it be inappropriate to interpret a
 9   draft as the final conclusion of scientists?
10      A.   Well, I'll tell you, the EPA exposure
11   factors handbooks were never finalized, and they
12   were used in risk assessments for decades.
13      Q.   Okay.  So you --
14      A.   So the answer is I can give you examples in
15   science where they are.
16      Q.   Okay.  So let me ask you about this
17   document, then.
18      A.   But on the other hand, it's still a draft,
19   so it's still subject to comments and reviews.
20      Q.   Okay.
21      A.   But you asked me a question, do you ever see
22   drafts that are used, and of course you do.
23      Q.   Okay.  So let me ask you this question.  Do
24   you agree with the statement made in the
25   Toxicological Profile for Glyphosate, Draft for
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Public Comment, March 2019 by the ATSDR, that most

2    absorbed glyphosate is rapidly excreted in the urine

3    as parent compound?

4         MS. BEACH:  I'll object to the form.  You're

5         misstating what it says that was talking about an

6         oral dose.  It doesn't say everything that's

7         absorbed, it's talking about an oral dose.

8         MR. KALAS:  Okay.  Because that's -- the

9         oral dose is excreted as unabsorbed, Ms. Beach,

10        and the absorbed is what gets through the GI

11        tract and into the bloodstream, so that's what

12        I'm asking about.  And I'll ask it again.

13   BY MR. KALAS:

14        Q.   Do you agree that most absorbed glyphosate

15   is rapidly excreted in the urine as parent compound?

16        MR. KRISTAL:  Objection.

17        A.   Well, the Wester study suggests otherwise.

18   BY MR. KALAS:

19        Q.   So you disagree with that statement?

20        A.   There's data to suggest that that may not be

21   accurate.

22        Q.   Okay.

23        A.   It's not that I -- I'm just saying there's

24   -- there's data that suggests otherwise.

25        Q.   Okay.  Let's go to Page 110.

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.    110?

 2        Q.    Yes, sir.

 3        A.    I am there.

 4        Q.    Okay.  And the first paragraph starts "In

 5    vitro studies."  Do you see that?

 6        A.    Yes.

 7        Q.    Okay.  And about the middle of the

 8    paragraph, and do you see they have the Wester 1991

 9    study when they finished this document?

10        A.    Yes.

11        Q.    Okay.  So the ATSDR had looked at Wester

12    1991 before writing this, right?

13        A.    Well, some -- there's probably multiple

14    people writing this and they may even be

15    contractors.  We don't know who wrote it.

16        Q.    Okay.  Well, let's look at --

17        A.    So it's not -- I've written these kind of

18    reports for governmental agencies, including EPA,

19    and you have multiple authors writing different

20    sections.  The suggestion that one person writes

21    this entire report, I think is speculation.

22        Q.    All right.  Well, let's put a pin in Page

23    110 and let's clear that up.  Okay?  We'll come back

24    to Page 110.  Let's clear up the provenance of this.

25    Can you just hold on to Page 110?  Put a dog ear or
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   something so you can find it.

2          Let's go to page Roman Numeral VI.

3      A.   I mean, appreciate I haven't read this

4   before.

5      Q.   Okay.  Let's go to page Roman Numeral VI.

6   That's why I'm trying to help out.

7      A.   I'm sure.

8      Q.   Do you see that the lead author or lead

9   contributor of this paper is an M.D., Ph.D. by the

10  name of Hannah Pohl, P-O-H-L?

11     A.   Sure.

12     Q.   Okay.  And where does she work?

13     A.   It looks like -- well, it doesn't say for

14  sure, but everybody is list- -- it looks like it's

15  ATSDR.

16     Q.   Okay.

17     A.   I mean, it doesn't say explicitly, but

18  you've got two different organizations listed here.

19  I'm assuming in the columns, but that's an

20  assumption on my part.

21     Q.   Okay.  And there are nine individuals listed

22  with ATSDR affiliations and four individuals listed

23  with Syracuse research corporation affiliations,

24  correct?

25     A.   Sure.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1      Q.    Okay.

2      A.    Not unusual.

3      Q.    So nine of the 13 contributors to this were

4   government scientists, right?

5      A.    Okay.

6      Q.    Didn't work for Monsanto, right?

7      A.    I don't know if they ever worked for

8   Monsanto or not.

9      Q.    Didn't work for --

10     A.    I don't know I don't know the answer to

11   those questions.

12     Q.    Didn't work for Monsanto when they wrote

13   this, right?

14     A.    Apparently not.  But that was -- that's a

15   different question.

16     Q.    Okay.  It was.  That's why I asked it.

17           These scientists -- well, let's go down to

18   peer review --

19     A.    You call them scientists, but most of --

20   most of them are physicians it looks like, but maybe

21   it's --  I don't know what their backgrounds are.

22     Q.    Physicians can be scientists, right?

23     A.    They're usually doctors.  We call them

24   doctors as opposed to scientists.

25     Q.    Okay.  Let's go down to peer reviewers.

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.    Okay.

 2        Q.    Do you see that there were three peer

 3    reviewers for the first round?

 4        A.    Okay.

 5        Q.    And four peer reviewers for the second

 6    round?

 7        A.    Okay.

 8        Q.    Okay.  And all those peer reviewers were

 9    academics, right?

10        A.    That appears to be the case.

11        Q.    Okay.  Dr. De Roos was peer reviewer of this

12    document, right?

13        A.    Yeah.

14        Q.    Okay.  And Dr. De Roos of course is an

15    author on two of the -- or actually three of the

16    epidemiological studies on glyphosate, right?

17        A.    I don't know.  I don't know the answer to

18    that.

19        Q.    Okay.  Dr. Eastmond was on this document,

20    right?

21        A.    Okay.

22        Q.    He peer reviewed it and -- correct?

23        A.    It says he's a peer reviewer.

24        Q.    Dr. Eastmond has been on multiple IARC and

25    JMPR working groups.  Are you aware of that?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1      A.   No, not necessarily.

 2      Q.   Okay.  And then we also have a professor at

 3   the Universidade Estadual do Centro-Oeste in Brazil;

 4   is that right?

 5      A.   Your Portuguese is --

 6      Q.   Mal.  And that's Spanish, I know.

 7      A.   Yes.  I believe so.  I believe you are

 8   correct.

 9      Q.   We have a professor of pharmacology and

10   toxicology at the University of Georgia, James

11   Bruckner, correct?

12      A.   Correct.

13      Q.   Okay.  And finally we have a professor of

14   family medicine and public health at UCSD, James

15   Mills, correct?

16           It's number three on that page.

17      A.   Yes.  Yeah, I see it.

18      Q.   All right.  And so going back to the

19   statement you made earlier, there are many

20   governmental scientists and academics who worked on

21   this ATSDR toxicological profile for glyphosate,

22   correct?

23      A.   Correct.

24      Q.   Okay.  Now, going to Page 110, middle of the

25   page, it states, "Undiluted application" -- sorry.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Middle of that first paragraph.

2            "Undiluted application to human skin samples

3    at doses ranging from 15.4 to 154 micrograms per

4    centimeters squared resulted in zero to .4 percent

5    dermal absorption over eight hours post application.

6    Dermal absorption of glyphosate from aqueous

7    dilutions of test substances, 120th or 132nd, second

8    test substance to water during 16 hours post

9    application was less than or equal to 2.2 percent."

10           Did I read that correctly?

11    A.    I think so.  You tripped over it.

12           But anyway, the words are the words.

13    Q.    Okay.  Do you disagree that the absorption

14    after 16 hours of glyphosate formulations that are

15    diluted was less than or equal to 2.2 percent in the

16    Wester study?

17           MR. KRISTAL:  Objection.

18    A.    Well --

19           MR. KRISTAL:  Objection.

20    A.    I think it's an oversummarization of the

21    Wester work.  If you want to see a more thorough

22    review of that, you can read any report where I

23    spend several pages on it.  But that's not the total

24    picture of the Wester work by that one sentence.

25    BY MR. KALAS:

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1       Q.   So you disagree that ATSDR has presented the

 2   total picture of the Wester work in that one

 3   sentence.  Is that what your testimony?

 4       A.   That's not what I said.

 5            MR. KRISTAL:  You've left off the next two

 6       sentences which are talking about the same thing.

 7   BY MR. KALAS:

 8       Q.   Okay.  Is that your testimony?

 9            MR. KRISTAL:  Objection.

10       A.   No.  No, it isn't my testimony.  My

11   testimony is my testimony.

12   BY MR. KALAS:

13       Q.   All right.  And let's go to the next page.

14            MR. KRISTAL:  I've asked you to read the

15       next two sentences.

16            MR. KALAS:  You can ask him about it, Jerry,

17       on your time.

18            MR. KRISTAL:  I understand why you don't

19       want to do it.

20   BY MR. KALAS:

21       Q.   Okay.  Let's go.  To the next page, please.

22       A.   Okey-doke.

23       Q.   Okay.  This is what I think you were talking

24   about on bioaccumulation, although I could be wrong.

25   They discuss the Brewster study here, right?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.    Where are you at again?

 2      Q.    Top paragraph.

 3      A.    Okay.

 4      Q.    Do you see they discuss the Brewster study?

 5            MR. KRISTAL:  Top paragraph on 111?

 6            MR. KALAS:  Yeah, 111, above dermal

 7      exposure.

 8      A.    Okay.  I see -- let's see, the second full

 9      sentence, okay.  I see where it says Brewster.

10      BY MR. KALAS:

11      Q.    Okay.  And do you see where they're

12      discussing the Brewster study?  In the

13      second-to-last sentence they state, "Radioactivity

14      in bone peaked at six hours post dosing, 4.7 percent

15      of the administered dose, and remained at 1.7

16      percent at 96 hours post dosing"?

17      A.    Right.

18      Q.    "The tissue-to-blood ratio for bone

19      increased with time suggesting a slower elimination

20      from bone compared to blood."

21            Did I read that correctly?

22      A.    Appeared to, yes.

23      Q.    Okay.  Do you agree with that statement?

24      A.    I'd have to go and look at the study to be

25      able to -- if that's what it says in the study, then
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    I would agree with it.  I haven't looked at the

2    study.

3        Q.   If a compound has a slower elimination from

4    a given tissue than another tissue, does that mean

5    the compound is bioaccumulating or does that mean

6    the compound is exiting the body slower from that

7    tissue?

8            MR. KRISTAL:  Objection to form.

9        A.   Well, it depends on the phase and what

10   you're looking at.  It's bioaccumulating for a while

11   and then it's dissipating afterwards.

12       Q.   Okay.  And --

13       A.   It's building up and then it's dissipating.

14       Q.   Have you seen any data point that suggests

15   glyphosate bioaccumulates in the bone marrow as

16   opposed to the bone?

17       A.   I'd have to look at my report on what I have

18   on all the bioaccumulation studies I've cited.

19   Whatever's in there is in there.

20       Q.   So you stand by what you state in your

21   report, and if it's not in there, you don't have an

22   opinion?

23       A.   Well, I have an opinion based on all the

24   questions and answers today and in the previous

25   depositions as well.

Confidential - Stephen E. Petty, PE, CIH, CSP

1      Q.    Does glyphosate bioaccumulate in the bone

2   marrow?

3      A.    Well, let's start looking.

4      Q.    Okay.

5      A.    It certainly does for a while.

6      Q.    In the bone marrow?  Not the bone, bone

7   marrow.

8      A.    So are you -- are you calling the bone

9   marrow blood or are you calling it bone?

10     Q.    I'm ask -- well, let me ask a more

11  foundational question because --

12     A.    I mean, that's a -- an interesting question

13  because --

14     Q.    It's the only type I ask.

15     A.    Yeah.

16     Q.    Let me ask a more -- let me ask a more

17  foundational question.  Do you understand there's a

18  difference between the bone marrow and the bone?

19     A.    Certainly.  Well, I guess it has a yes and a

20  no answer to it.

21     Q.    Okay.

22     A.    The bone marrow is typically in the center

23  of the bone and it's a subset of the bone system.

24     Q.    Is it a separate tissue from the bone?

25     A.    It's contained within the bone.

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Okay.  So it's your statement that the bone

 2   marrow is a subset of the bone?  That's your

 3   understanding?

 4        MR. KRISTAL:  Objection.

 5      A.   It's -- it depends on how fine you want to

 6   split the baby.  I always say, no, we're not going

 7   to make a -- nine women are not going to make a baby

 8   in one month.

 9   BY MR. KALAS:

10      Q.   So my --

11      A.   So my question --

12      Q.   Go ahead.

13      A.   My comment is that simply here -- why I'm

14   saying that is the bone contains the bone marrow.

15   Now, would some people call that a separate

16   subsystem within the bone?  Perhaps.  But the bone

17   marrow is where, obviously, red blood cells are

18   made, et cetera.

19      Q.   Is my brain a subset of my skull?

20        MR. KRISTAL:  Are you him asking

21   specifically about your brain?

22        MS. BEACH:  I think it would be better if

23   it's a subset of your head.

24        MR. KALAS:  No, I'm asking the question I

25   asked.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.   I don't know how to answer that question.

 2   I'm not here as a physiology expert.

 3   BY MR. KALAS:

 4        Q.   Are you here as a toxicokinetics expert?

 5        A.   Not really.

 6        Q.   Okay.  Then, we'll move on.

 7        A.   I mean, I can comment on toxicology from an

 8   industrial hygiene standpoint.  But if you want to

 9   slice the baby thinner and thinner, at some level

10   I'm not going to be an expert.

11        Q.   Okay.

12        A.   But from an industrial hygiene standpoint in

13   toxicology, I am.

14        Q.   Okay.  Let's go to page --

15             MR. KALAS:  Well, okay, did you not want --

16        if he's not really the toxicokinetics expert,

17        then I'll ask Dr. Sawyer the questions.  We'll

18        keep going.

19             MR. KRISTAL:  Well, he was about to look

20        through his study to answer your question about

21        bone marrow.

22             MR. KALAS:  I will with- --

23             MR. KRISTAL:  If you're withdrawing --

24             MR. KALAS:  I will withdraw the question if

25        he is deferring expertise.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1              MR. KRISTAL:  I don't think he's deferring

 2         expertise.

 3              MR. KALAS:  Well, the record's going to

 4         stand for itself, and I guess we'll have to work

 5         that out.

 6              THE WITNESS:  Well, it's not, because I've

 7         testified in many CA cases about this concept of

 8         bioaccumulation and biodegradation.

 9              And even as it's diminishing, usually you

10         have what they call a half-life.  So in five

11         half-lives, which is two to the fifth, you still

12         have 3 percent, or 1/32 of the material left.

13    BY MR. KALAS:

14         Q.   Okay.  Have you -- have you --

15         A.   So --

16         Q.   Sorry.

17         A.   The question is a bioaccumulation, typically

18    the way bioaccumulation works is it accumulates for

19    a period of time and then you get to a saturation

20    and then it starts to decay.  It's just a question

21    of what these time frames are.

22         Q.   Have you reviewed any pharmacokinetic

23    studies on glyphosate that looked at levels of

24    glyphosate in the bone and bone marrow

25    simultaneously?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1       A.   I don't know without looking -- looking at

 2    the studies that I've looked at.

 3       Q.   Okay.  You'd have to look at the actual

 4    studies and not your report?

 5       A.   No, I can look at the report.

 6       Q.   Go to your report and tell me where you

 7    talked about bioaccumulation in bone marrow as

 8    opposed to the bone?

 9       A.   I've testified on this for an hour or two

10    before, but we'll find it again.

11       Q.   Okay.

12       A.   I'm on page 181 and 182.

13            MR. KRISTAL:  181 and 182.

14    BY MR. KALAS:

15       Q.   All right.  And so 181 and 182.  And this

16    section is entitled "Monsanto's claims that Roundup®

17    does not bioaccumulate."

18            Is this the section of your report where you

19    --

20       A.   This is where I talk about some of the

21    studies that suggest otherwise.

22       Q.   Okay.  So let's look at what these studies

23    are.  You have Kruger 2014 cited.  "Detection of

24    Glyphosate Residues in Animals and Humans."  And

25    that is referenced in the Food Democracy Now and
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    Detox Project website, right?

 2        A.   Correct.

 3        Q.   Okay.  Have you read the Kruger study?

 4        A.   I have.

 5        Q.   Okay.  And how much glyphosate was in the

 6    bone marrow of humans in that study?

 7        A.   I don't recall off the top of my head.

 8        Q.   Okay.  Do you know if they even looked at

 9    bone marrow in that study, off the top of your head?

10        A.   I do not know off the top of my head.

11        Q.   Okay.  And the citation, the general

12    citation here, for 102 through 104 is 196S, right?

13        A.   Yes.

14        Q.   Okay.  What is Food Democracy Now?

15        A.   I don't know.  I was more interested in

16    going to the original papers, that's why I listed

17    them down below.

18        Q.   Okay.  You were more interested in going to

19    the original papers.

20             Again, going back to the Solomon study, have

21    you gone back to all the original papers cited by

22    the Solomon study?

23             MR. KRISTAL:  Objection.  Don't answer that.

24        You've already been asked that about six times.

25    BY MR. KALAS:
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Okay.  And you didn't finish going through

 2   your MCL.  Do you know sitting here if you have gone

 3   back to all the papers cited in the Solomon study?

 4           If you don't know, then that's fine.  Do you

 5   know?

 6      A.   I think I've already answered that question.

 7      Q.   And the answer is you don't know without

 8   looking at your MCL, correct?

 9      A.   I mentioned some of them and I provided the

10   list of how they were referenced.  The vast majority

11   of them were Monsanto internal studies.

12      Q.   Okay.

13      A.   So, you know, I looked at what I could

14   readily get available to me.  Believe me, I've

15   looked at hundreds and hundreds of documents.

16           But I do try to go back, as best I can, to

17   see what I can learn from the original work, and

18   that's what I did here.  That's all I'm saying.  I'm

19   not going to rely on just the summary.  I'm going to

20   try to see what they're referring to.

21      Q.   Okay.  Now let's go back --

22      A.   And I think I've been transparent that way.

23           MR. KRISTAL:  It's also in the report on the

24      bottom of 77, top of 78.

25           MR. KALAS:  Jerry.  Jerry, I'm not done on
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        this page, so...
 2             MR. KRISTAL:  On which page?  Oh, I'm sorry.
 3        I apologize.  I thought you were moving on to
 4        another document.
 5             MR. KALAS:  Okay.  And I'd appreciate it
 6        again if you let the doctor answer the question.
 7             MR. KRISTAL:  Well, he could spend an hour
 8        going through the report, looking for the
 9        sections where he talks about bone marrow or I
10        can expedite it.  If you'd rather have me not
11        expedite, then we'll take as long as is needed.
12    BY MR. KALAS:
13        Q.   If you go to -- back to page 182, the Food
14    Democracy Now website or report that you're relying
15    on states --
16        A.   No, I'm not relying on their report, I'm
17    relying on the documents that they -- that they
18    cite.
19        Q.   Okay.  So let's see what they say here about
20    it.  They say, "Despite Monsanto's repeated claim
21    that glyphosate does not bioaccumulate, this 2014
22    study found glyphosate residues in multiple organs
23    of slaughtered cows including intestine, liver,
24    muscles, kidney, and spleen."
25             Did I read that correctly?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1       A.   Yeah.

2       Q.   Do they discuss bone marrow?

3       A.   I do not see that they did.

4       Q.   Do they discuss bone marrow there?

5       A.   Did who discuss where?  What are you

6    referring to when you ask that?

7       Q.   196S, which you have excerpted in your

8    report.

9       A.   Right.

10      Q.   They're discussing the Kruger study,

11   correct?

12      A.   Well, the statement you just read came out

13   of this Monsanto background.

14      Q.   It did.

15      A.   103, right, see the superscripts?

16      Q.   Okay.  So the statement I just read came

17   from Food Democracy Now, and the Detox Project write

18   that.  And then I read the underlined statement that

19   you underlined here, sir.

20      A.   That's right.

21      Q.   Okay.  Do they discuss bone marrow there?

22      A.   In that paragraph?

23      Q.   Yes, sir.

24      A.   I don't see the word "bone marrow" in that

25   paragraph.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1       Q.    Okay.

2       A.    But it's in other places.

3       Q.    Okay.  Did the Wester '91 study look at bone

4    marrow?

5       A.    Wester '91.  If you have it there, why don't

6    you let me look at it and I'll let you know.

7       Q.    Okay.  Give me a second and I'll get it.

8             Okay.  Go to page 729, please.

9             Okay.  Right paragraph states, "Two monkeys

10   from each topical dose level, total of four monkeys,

11   were euthanized after the seven-day excretion

12   period, and tissues were assayed for 14C content.

13   No radioactivity was detected in spleen, ovaries,

14   kidney, brain, liver, abdominal fat, bone marrow,

15   upper spinal column, or central nervous system

16   fluid."

17            Did I read that correctly?

18      A.    You read those words, yes.

19      Q.    Did the authors of Wester '91 look for

20   radioactivity in the bone marrow of the monkeys?

21      A.    That's what I'm trying to figure out, which

22   studies that applies to.  I don't think they did it

23   in all of them.

24      Q.    They say the topical doses, right?  That's

25   where you talk about the feces?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.    Just let me have a chance to read it,

 2    please.

 3        Q.    Okay.  Can I ask a question yet or are you

 4    still reading?

 5        A.    Yeah, I'm just about done.  So go ahead.

 6        Q.    Okay.

 7        A.    Thanks for the time.

 8        Q.    Yeah.  Did the authors of Wester '91 look

 9    for radioactivity in the bone marrow of the monkeys?

10        A.    For some of them they did.

11        Q.    Did they find any?

12        A.    They're saying they did not find at least at

13    the detection limit, that's right.

14        Q.    Okay.  If you can go back to the ATSDR

15    document, sir.  It's this one.

16        A.    Okay.

17              MR. KRISTAL:  You don't want to go to the

18        other sections of the report?

19              MR. KALAS:  If you want to go there, that's

20        fine, Jerry, but I've got to move on.

21    BY MR. KALAS:

22        Q.    Page 117.  Let me know when you're there.

23    You're looking at Wester still.  I'm sorry.

24        A.    I am because I haven't finished it.

25        Q.    Okay.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1       A.   Alrighty.  I'm back to the other document

 2   you want me to look at.

 3       Q.   Okay.  Page 117 of the ATSDR document.

 4            Okay.  Do you see biomarkers of exposure?

 5       A.   Okay.

 6       Q.   Okay.

 7       A.   117?

 8       Q.   Yes, sir.

 9       A.   Yes, I'm there.

10       Q.   Okay.  Do you see the last sentence there?

11   It states, "Meaningful quantification of exposure

12   would require analysis of blood and/or urine within

13   hours following exposure."

14            Did I read that correctly?

15       A.   That's what those words say.

16       Q.   Do you agree with that statement from the

17   ATSDR Toxicological Profile for Glyphosate Draft for

18   Public Comment?

19       A.   Not necessarily, because I think you also

20   have to look at the feces.

21       Q.   Okay.  ATSDR --

22       A.   Potentially.

23       Q.   Sorry.  ATSDR does not say that, correct?

24       A.   Not in that sentence.

25       Q.   Okay.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.   They say elsewhere that it shows up in the

 2   feces.

 3        Q.   Okay.  Well, they say that unabsorbed

 4   glyphosate shows up in the feces elsewhere, right?

 5   They don't say absorbed glyphosate shows up in the

 6   feces.

 7        A.   Well, if they're -- that's an interesting

 8   distinction because that's not the distinction made

 9   in Wester by itself.

10        Q.   Okay.  But I'm asking about what ATSDR says,

11   I'm not asking about what the Wester authors say.

12        A.   Well, I'm going back to the original work.

13        Q.   Okay.

14        A.   That's what they're citing.

15        Q.   So I'm asking -- you stated, though, sir,

16   with all due respect, you stated that they say

17   elsewhere it shows up in the feces, and I'm asking

18   what context they say it in.  Do they say it

19   regarding unabsorbed glyphosate or absorbed?

20        A.   Let me go back and look.

21        Q.   Okay.

22        A.   Well, I'm reading 110, and it says, the last

23   two sentences, "12-hour in vivo application of the

24   test substance diluted 1 to 29 with water

25   concentrations of 200 -- 25 or 270 microgram per
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    centimeters squared resulted in seven-day recoveries

 2    of .8 and 2.2 of the applied dose respectively in

 3    the urine and 3.6 to 0.7 percent respectively in the

 4    feces."

 5        Q.   Okay.

 6        A.   "These results indicate that approximately 3

 7    to 4 percent of the applied dose has been absorbed."

 8        Q.   Okay.  So where does ATSDR state --

 9        A.   So they're saying it's been absorbed.

10        Q.   Okay.  Where does ATSDR state for biomarkers

11    of exposure that one should look at the feces?

12        A.   What do you mean?

13        Q.   Well, biomarkers.  You understand what a

14    biomarker is, right?

15        A.   Right.

16        Q.   Okay.  What's biomarker?

17        A.   It's a material that represents, if you

18    will, a contaminant -- it can be a -- usually it's

19    an oxidative degradation product that shows up.

20        Q.   Okay.  That's how we measure dose in

21    biomonitoring studies, right, with biomarkers?

22        A.   And that's such a complicated science.  I

23    mean, the problem with biomarkers is still that the

24    degradation pathways and all the degradation

25    byproducts are still being developed as we speak.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.    Okay.  Does ATSDR ever state that the feces

 2    is an appropriate biomarker for glyphosate

 3    excretion?

 4            MR. KRISTAL:  Objection to form.

 5        A.    They're saying that -- in this study it

 6    shows up in the feces.  That's all I'm saying.

 7    BY MR. KALAS:

 8        Q.    Okay.  So going back to the biomarker

 9    section that we were looking at earlier on Page 117.

10        A.    Right.

11        Q.    Okay.  I am correct for biomarkers of

12    exposure the word "feces" does not appear, correct?

13        A.    It doesn't.  But look at the topical

14    sentence, it's saying that the MPA has been measured

15    in blood and urine.  So they're not even saying if

16    it's been measured in the feces.

17        Q.    Exactly.  It hasn't, right?  In humans.

18            MR. KRISTAL:  Objection.

19        A.    Well, I'm not -- I'm not sure what you're

20    saying.  I'm saying from an exposure standpoint, if

21    you're not accounting for part of the balance of the

22    body system, then you may not be measuring all the

23    biomarker concentrations.

24    BY MR. KALAS:

25        Q.    Let's keep going.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.    The fact that -- they're saying right there,

 2   we didn't look at the feces, so they didn't see

 3   anything.  I mean, of course not.

 4      Q.    Okay.  If we go to page 135.

 5      A.    Okay.

 6      Q.    Transformation and degradation.  Let me know

 7   when you're there.

 8      A.    I'm there.

 9      Q.    Okay.  It states, first sentence,

10   "Glyphosate is readily and completely degraded in

11   the environment mainly by micro-bioprocesses."

12            Did I read that correctly?

13      A.    Microbial, yes.

14      Q.    Microbial, yes.  Did I read that correctly

15   though, other than mispronouncing the words?

16      A.    You said micro-bio something, but yeah.

17      Q.    Okay.

18      A.    Microbial.

19      Q.    Okay.  Do you disagree with the statement by

20   the ATSDR in their draft for public comment that

21   glyphosate is readily and completely degraded in the

22   environment mainly by microbial processes?

23      A.    It has a yes or a no component to it.  Under

24   FIFRA and under -- remember, I'm looking at it from

25   a warning standpoint.  I'm looking at this issue
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    from a warning standpoint.

 2           Under FIFRA, you're not allowed, with a few

 3    exceptions, to use -- to say that your product

 4    biodegrades.  In fact, they were sued in France over

 5    it and paid a significant fine.  And then the same

 6    with New York state that said you can't use

 7    biodegrade, you can't say that this product

 8    biodegrades.  And they were similarly fined and

 9    ordered to cease and desist.

10           So from a warning standpoint, it's giving an

11    implied -- it's implying a level of safety that --

12    that the regulatory agencies have said flat out,

13    you're not to do that.

14           So from the standpoint of where I'm going to

15    testify, I'm looking at it from the standpoint

16    primarily on this biodegradation aspect, the degree

17    to which it biodegrades or doesn't biodegrade is

18    less material than the fact that they're not allowed

19    to say that as part of their labeling.

20      Q.   Okay.  I think I understand what you're

21    going to testify to.

22           So you believe that it was a violation of

23    FIFRA regulations for Monsanto to say --

24      A.   FIFRA, State of New York, country of France,

25    et cetera.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1      Q.    You believe it was a violation to state

2    glyphosate biodegrades, right?

3      A.    Yes, that's my primary point of emphasis.

4      Q.    You're not offering an opinion as to whether

5    or not glyphosate actually does biodegrade?

6      A.    Well, there's literature to suggest it

7    doesn't.  But, more importantly, I'm not limiting my

8    opinions just to glyphosate, because people don't

9    apply just glyphosate, they apply Roundup®.

10     Q.    Okay.

11     A.    And when you look at the degradation of

12   Roundup® as a product where it contains surfactants

13   that have long -- much longer lived periods of time

14   and you've got heavy metals in them, they don't

15   biodegrade.

16     Q.    So, again, going back to my question, I'm

17   not sure if you answered it, and maybe you did and

18   I'm just slow, but do you agree or disagree or can

19   you not answer the question as stated that

20   glyphosate is readily and completely degraded in the

21   environment mainly by microbial processes?

22     A.    I think there's literature that suggests

23   that it's -- it's not instantaneous.  It has -- it

24   doesn't degrade in -- you know, overnight.

25     Q.    Okay.  Let's go to page --

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   So it's --

 2      Q.   Sorry.

 3      A.   When you make a statement like that, there's

 4    a whole bunch of dimensions where, as an industrial

 5    hygienist warnings expert, where it has issues.

 6    First of all, people don't apply glyphosate, they

 7    apply the product.  So you've got to look at the

 8    degradation of the product.

 9         But even if you just whittle it down to

10    glyphosate as one of the ingredients, it's not

11    instantaneous that it degrades, and it's a question

12    of how long -- remember, I made this point on

13    bioaccumulation as well.

14         The question is, and what would have been

15    more proper here is, the studies show biodegradation

16    rates of the half-life of X number of days or hours

17    or weeks or years, then we can work with that and we

18    can make some statement as to whether that's long or

19    short or whatever.

20         But these are statements that are made with

21    no data -- no data shown within the text.  And so,

22    you know, it's hard to form an opinion on that in

23    that context.

24      Q.   Given that a lot of what you're relying on

25    as publicly available science -- science disagreed
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    with some of the statements made by ATSDR in this

 2    document --

 3       A.   At least in part.

 4       Q.   Okay.  Are you going to comment on this

 5    draft on the docket in order to tell ATSDR that you

 6    disagree with some of the statements they're making

 7    in this?

 8            MR. KRISTAL:  Objection to form.

 9       A.   I haven't thought about it.

10    BY MR. KALAS:

11       Q.   Okay.

12       A.   I write a thousand pages a month, so --

13       Q.   But this is important, right?  This is human

14    health that's at stake?

15       A.   There are many things that are important.

16       Q.   Okay.

17       A.   My family's important before this, believe

18    it or not.  So, you know, I have priorities,

19    especially as I say, I'm closer to the end than the

20    beginning.

21       Q.   Okay.  Do you need a break or can we do one

22    more document?

23       A.   I'm fine.  Whatever -- whatever you guys

24    want to do.

25       Q.   Okay.  Let's look at --
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   It's really up to the court reporter.

 2           MR. KALAS:  Are you okay, ma'am?

 3           THE COURT REPORTER:  Yeah.

 4   BY MR. KALAS:

 5      Q.   Let's look at Exhibit 29, the IARC

 6   monograph.  You've seen this document before, right?

 7           (Petty Exhibit 29 was marked for

 8   identification.)

 9      A.   Yes.  And I want to go back on my testimony

10   on 27.

11   BY MR. KALAS:

12      Q.   27.  Which -- you have to remind me.

13      A.   I have to check.  I may have seen this.  I'm

14   just not sure.

15      Q.   Okay.

16      A.   If it's in the list of exhibits, then I've

17   seen it.

18      Q.   Okay.  Let's go to page 41.  IARC states in

19   this document, left-hand column.

20      A.   On 41?

21      Q.   Or excuse me.  Right-hand column.

22      A.   Okay.

23      Q.   Absorption, 4.1.2.  Are you there?

24      A.   4.1.  Yes, I am.

25      Q.   Okay.  It states in the second sentence of
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    the first paragraph, "Inhalation of glyphosate is

 2    considered to be a minor route of exposure in humans

 3    because glyphosate is usually formulated as an

 4    isopropylamine salt with a very low vapor pressure."

 5             Did I read that correctly?

 6    A.    You read it correctly.

 7    Q.    Do you agree with IARC that inhalation of

 8    glyphosate is considered to be a minor route of

 9    exposure in humans?

10    A.    Well, I disagree with that sentence because

11    -- not because the sentence is wrong, but because

12    it's an incomplete view of the exposure pathway.

13             The inhalation pathway, while it's true that

14    the vapor pressure of glyphosate itself is

15    relatively low, that's not -- and I've been in many

16    depositions where I've had to talk about aerosols

17    versus vapor pressure for exposure.  And the route

18    of exposure here in inhalation is due to -- it's not

19    only due to the aerosols or the droplets, but it's

20    due to the smallest droplets, because those are the

21    ones that get to the deep lung.

22             And so this sentence is -- again, and I'm

23    not sure I agree with the root word "minor."  I

24    would say that it's probably the second-most likely

25    pathway after dermal.  I would agree that dermal
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1    tends to be more than inhalation.  Whether that's

2    minor or not minor, if I'm doing an exposure

3    assessment, that's the second one I'm looking at in

4    terms of pathways as opposed to intravenous or

5    ingestion.

6        Q.   Let's keep going --

7        A.   And then --

8        Q.   Sorry.

9        A.   No, I want to finish.

10       Q.   Yeah, I'm sorry.

11       A.   And then where it says -- it's implying here

12   that the -- that because it's one sentence, and I'm

13   reading the English, that the inhalation is

14   considered a minor route of exposure because of the

15   low vapor pressure.  Well, I wouldn't disagree that

16   the inhalation route of exposure from vapor pressure

17   is low, but the inhalation route of exposure that is

18   of concern is the aerosol.  So the statement in fact

19   is true, but it's misleading.

20       Q.   All right.  Let's go to the bottom of 41,

21   the first -- or the last paragraph on 41.  It

22   states, "Small amounts of glyphosate can be absorbed

23   after dermal exposures in humans in vitro.  For

24   example, when an aqueous solution of 1 percent

25   glyphosate was applied in an in vitro human skin
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    model, only 1.4 percent of the applied dose was

 2    absorbed through the skin."

 3          Did I read that correctly?

 4    A.    You did.

 5    Q.    Do you agree with IARC that small amounts of

 6    glyphosate can be absorbed after dermal exposures in

 7    humans in vitro?

 8    A.    I don't agree or disagree with it.  First of

 9    all, I think that the work they're citing, it looks

10    like they're citing Wester, but I'm not sure if

11    they're tying the 1 to 1.4 percent to Wester or not.

12          I think Wester just -- we just showed in the

13    ATSDR that it was 3 to 4 percent.  So I'm a little

14    confused without going back and cross-checking what

15    they're referencing.

16          And then in terms of small amounts, well, we

17    know from the TNO work that Monsanto themselves was

18    concerned about rates that were 3 percent or more.

19    And when the TNO study came out with rates as high

20    as 10 percent, they killed the study.

21          So, you know, this is -- I don't think this

22    is an attempt to be a complete -- it certainly is

23    not a review of the dermal studies to the extent

24    that I've done where I've spent probably 30 pages of

25    looking at the dermal studies, you know, from as far
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1   back as I could find them to most recently, and I

 2   don't think this reflects that.

 3           So it's -- it's sort of a quick summary and

 4   so I don't think it reflects the literature

 5   necessarily in total.

 6           (Petty Exhibit 28 was marked for

 7   identification.)

 8     Q.   Okay.  Go back to Exhibit 28, which is

 9   Wester, please.  Page 728.

10     A.   Okay.

11     Q.   Last sentence on that page.

12     A.   728?

13     Q.   That starts "Since."  Are you there?

14     A.   Yes.

15     Q.   Okay.  The authors of Wester state, "Since

16   all of the IV-administered doses, Table 3, were

17   excreted in urine, the percutaneous absorption of

18   glyphosate is estimated to be .8 to 2.2 percent of

19   the applied dose."

20           Did I read that correctly?

21     A.   For IV.  That's not dermal.  That's IV.

22     Q.   Sir, all due respect, I asked you if I read

23   it correctly.  So let me ask it again.

24     A.   Oh, you just want to know if you read the

25   words?  Well, you don't have to ask me those
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    questions.  I can tell you that if the documents

 2    have words in them and you're just going to read the

 3    documents, I'll say that you read the words.

 4       Q.   Let me ask -- let me ask the question, and

 5    please try to answer the questions as opposed to the

 6    question you want to answer.

 7       A.   No, I just -- I think it's a waste of time,

 8    but that's your choice to ask me whether or not what

 9    is written here is what is written here.

10       Q.   Last sentence of Wester 728, "Since all of

11    the IV-administered doses, Table 3, were excreted in

12    urine, the percutaneous absorption of glyphosate is

13    estimated to be .8 to 2.2 percent of the applied

14    dose."

15            Did I read that correctly?

16       A.   Did you read those words correctly?  It

17    appears you read those words correctly as you parsed

18    the document.

19       Q.   Thank you, sir.

20            Do the authors of Wester state anywhere in

21    this paper that they estimated dermal absorption to

22    be 3 to 4 percent?

23       A.   Well, if you look at the Table 4 and you

24    look at the urine and feces, and we can discuss

25    about the unaccounted, which usually goes into the
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    dermal, but if you look at dose D, 3.6 plus .8, if I

 2    look at that and I do the math, it's 4.4.  If I look

 3    at the other side, I've got 2.2 and .7, that's

 4    2.that's9, awfully close to 3.

 5           So if I look at ATSDR and they say 3 to 4

 6    percent, I think they're just rounding those numbers

 7    of 2.9 and 4.4.

 8       Q.   Let me ask you this.  Do you think the

 9    authors of Wester didn't know how to add?

10       A.   What do you mean?

11       Q.   Well, you just added .8 to 3.6 for me,

12    right?  To come up with --

13       A.   You just asked me where the 3 and the 4 came

14    from.

15       Q.   I asked you where the authors of Wester

16    stated, okay, I asked where they stated that there

17    was greater than 2.2 percent dermal absorption, and

18    you added up the table for me.  So my question is --

19       A.   That's where they stated it, in that table.

20       Q.   Okay.  Did the authors in Wester ever add

21    those up to state that the dermal absorption was 4.4

22    percent in their text?

23           MR. KRISTAL:  How small do you want to make

24       the head of the pin?

25           MR. KALAS:  Well, I'm just asking what you
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      did.

 2              MR. KRISTAL:  In the text itself.

 3      A.   In the text itself?

 4   BY MR. KALAS:

 5      Q.   I'm asking what the authors stated, sir.

 6   Did they state --

 7      A.   They stated in the table exactly what the

 8   values are, and so when you asked me where does

 9   ATSDR get the 3 to 4 percent --

10      Q.   I didn't ask that, though.  That's not what

11   I asked.  You're not listening to my question, with

12   all due respect.

13      A.   No, no, it -- no, and it was a follow-up to

14   the question where you were asking me about in IARC,

15   and I said -- and you asked me if I agreed with this

16   of this 1 to 1.2, and I said, well, it's

17   inconsistent with the 3 to 4 percent we just touched

18   on and it seems to be inconsistent with Wester, and

19   so that's where we ended up here.

20      Q.   Did Mr. Kristal send you the deposition of

21   Dr. Daniel Bucks in this litigation?

22      A.   No.

23      Q.   Do you know who Dr. Daniel Bucks is?

24      A.   I do not.

25      Q.   Are you aware that Dr. Bucks's work was
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    cited by the Wester authors in that paper?

 2        A.   I just don't recall.

 3        Q.   Okay.  Take a look at the back and tell me

 4    if you see the name Bucks in the citation.

 5             MR. KRISTAL:  Could be a while there.  A

 6        million bucks.  Just kidding.

 7        A.   Are you saying as part of the references?

 8    BY MR. KALAS:

 9        Q.   Yes, sir.  As part of the references is

10    there work by Dr. Bucks cited?

11        A.   He's the fourth author of one paper.

12        Q.   Okay.  Are you aware Dr. Bucks worked in the

13    lab where the monkey studies took place?

14        A.   I don't know one way or the other.

15        Q.   Okay.  Are you aware Dr. Bucks observed the

16    monkeys placing their fingers into their mouth in

17    the course of the study?

18             MR. KRISTAL:  He testified to that.

19             MR. KALAS:  Are you saying he perjured

20        himself, Jerry?

21             MR. KRISTAL:  It certainly appears to be

22        that way, unless he's completely misremembering.

23             MR. KALAS:  That's an interesting

24        allegation.  I hope you have something to back

25        that up with.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1            But let me ask --
 2            MR. KRISTAL:  Other than the ridiculousness
 3       of it.
 4            MR. KALAS:  Okay.
 5            MR. KRISTAL:  He just happened to be in the
 6       lab on the day when the monkey was touching his
 7       stomach and putting it in his mouth 40 years ago?
 8       I ain't buying it.  Let's put it that way.
 9            MR. KALAS:  Well, I won't pick you for a
10       jury.
11            MR. KRISTAL:  If that's what you're
12       resting -- if that's what you're resting your hat
13       on, we're in good shape.
14  BY MR. KALAS:
15       Q.   Let me ask you the question.  Let me ask you
16  the question.  Are you aware Dr. Bucks testified
17  that he saw monkeys touching their bellies and then
18  touching their mouths in that study?
19       A.   You have this tendency to ask me questions,
20  follow-up questions, which you have the answer to.
21  I've told you I haven't seen his deposition, so how
22  would I know what he said in his deposition.
23       Q.   Okay.  Let's go back to IARC.  Would you
24  like -- well, let me ask you this.  Would you like
25  Mr. Kristal to send you that deposition so you can
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1   see all the evidence here?

2      A.   That's up to him.

3      Q.   Okay.  Let's go to page 42 of the IARC

4   monograph.  It states in the top left-hand column,

5   "In vitro studies using human skin showed that

6   percutaneous absorption of a glyphosate-based

7   formulation was no more than 2 percent of the

8   administered dose over a concentration range of .5

9   to 154 micrograms per centimeters squared and a

10  topical volume range of .014 to .14 milliliters per

11  centimeter squared."

12          MR. KRISTAL:  Where are you --

13     A.   Counsel, I didn't want to interrupt you, but

14  could you tell me the document, the page, the

15  paragraph?

16  BY MR. KALAS:

17     Q.   I said we're back on the IARC monograph, top

18  left column.

19     A.   You said that?

20     Q.   I did.

21     A.   Top left column.

22     Q.   Yeah, it said right there.

23     A.   What page?

24     Q.   Page 42, I said.

25     A.   Okay.

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Sorry.  Sometimes I can talk into my hand.

 2      A.   I'm not trying to be difficult, I just --

 3      Q.   No, I --

 4      A.   I didn't want to interrupt you while you're

 5   talking, but I don't know where you're at.

 6      Q.   That's fine.  We need to all be at the same

 7   place.

 8      A.   I just didn't want to interrupt you while

 9   you're talking.

10      Q.   Appreciate the courtesy.

11           Top left column of the --

12      A.   I'm there.

13      Q.   Okay.  It states, "In vitro studies using

14   human skin showed that percutaneous absorption of a

15   glyphosate-based formulation was no more than 2

16   percent of the administered dose over a

17   concentration range of .5 to 154 micrograms per

18   centimeters squared and a topical volume range of

19   .014 to .14 milliliters per centimeter squared.

20           "In addition, very little glyphosate, less

21   than or equal to .05 percent of the administered

22   dose was sequestered in the stratum corneum after

23   dermal application."

24           Did I read that correctly?

25      A.   You read it correctly, but I don't agree
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    with it.

2        Q.   Oh, you knew what my next question was going

3    to be.

4             Let's start with the last part of it.

5        A.   Just read my report, then you'll know why I

6    don't agree with it.

7        Q.   Well, let me start with the last part first.

8             "In addition, very little glyphosate."  That

9    sentence.  Are you there?

10       A.   Okay.

11       Q.   Okay.  Do you agree with the conclusion of

12   the IARC monograph that very little glyphosate is

13   sequestered into the stratum corneum after dermal

14   application?

15       A.   I think that statement is difficult to prove

16   looking at the data.  By that I mean, go back to

17   Wester, Table 4, what's reported is for the two

18   dermal test situations, Doses C and D, their

19   reporting finding the glyphosate in either the

20   urine, the feces surface washes, contaminated

21   solids, and the total is anywhere from 76.5 to 81.8.

22            And so you have a large unaccounted for.

23   You have upwards of 19 to 23 percent.  So it's not

24   clear to me that we know where that's at.

25       Q.   Go to Table 2.

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1      A.   Table 2 is a different set of tests.

2      Q.   Go to Table 2, please.

3      A.   Sure.

4      Q.   Is there a value over .05 percent in Table 2

5   for partitioning to the stratum corneum using human

6   skin?

7      A.   This is powdered -- this test is complete

8   bogus.

9      Q.   I'm just asking the numbers, sir.

10     A.   It's powdered human skin.

11          MR. KRISTAL:  You said human stratum corneum

12      and Mr. Petty is pointing out that it's powdered

13      human stratum corneum.

14   BY MR. KALAS:

15     Q.   Okay.  But the --

16     A.   The study -- as I've said in my review at

17   length, the studies that are most relevant are the

18   dermal studies in this study, to people getting it

19   on their skin.  But to take powdered skin and then

20   run tests on it is -- that's not reflective of human

21   skin necessarily.

22     Q.   Is this a peer-reviewed study?

23     A.   You know what?  It may be, but I'll tell you

24   a true story about peer-reviewed studies.

25     Q.   I just asked about the study --
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        A.   No, no, no, because you're making the

 2    implication that peer reviewed has some substance.

 3        Q.   But Mr. Kristal -- I don't mean to argue

 4    with you, sir.

 5        A.   No, no, no, you just asked me -- let me

 6    just --

 7        Q.   I asked you is it a peer-reviewed study?

 8    Yes or no or I don't know.

 9             MR. KRISTAL:  Or you can give whatever

10        answer he wants and then after he's done, you can

11        do whatever you want.

12    BY MR. KALAS:

13        Q.   Okay.

14        A.   You like to cut me off when you don't like

15    the answer.

16        Q.   I just don't need the story time.

17             MR. KRISTAL:  So let Mr. Petty finish and

18        then you can move --

19             THE WITNESS:  No, it's not story time, it's

20        true --

21             MS. BEACH:  One of you guys at a time.

22        You're annoying me, you're probably driving her

23        insane.

24             THE WITNESS:

25        A.   I've been asked on multiple occasions to
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1     peer review dermal studies numerous times.  Mark

 2     Nicas has as well.  We peer reviewed a study where

 3     we wrote the study has -- is so bad, and that's

 4     unusual, that it shouldn't be published.

 5            It got published.  The editor called us,

 6     wrote us, and said we'll take your comments into

 7     consideration, and they published it as a

 8     peer-reviewed paper.  So -- and we also know what

 9     peer-reviewed papers look like when we look at all

10     the Intertek stuff.

11            So I'm just here to tell you that the

12     concept of doing peer reviewing on its surface

13     should make -- you wouldn't think that it would

14     imply a better quality paper.  That is not always

15     the case, and I have firsthand evidence of that.

16     Q.   Motion to --

17     A.   And so when you suggest that this -- somehow

18     that this is peer reviewed that that has some

19     meaning, I don't agree with that.

20     Q.   Motion to strike as non-responsive.

21            Is this a peer-reviewed study?

22     A.   You can't tell without going back and

23     looking at what the requirements are of this

24     journal.

25     Q.   Okay.  Going on the IARC monograph, right
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
1     column, last sentence before "Distribution," or last

2     paragraph before "Distribution."

3         A.   So are we done with the upper left?

4         Q.   Yes, we're on the right column.

5         A.   Okay.

6         Q.   "In monkeys" -- the sentence states, "In

7     monkeys given glyphosate by dermal application

8     percutaneous absorption was estimated to be between

9     1 and 2 percent of the administered dose."

10         Did I read that correctly?

11         A.   I apologize.  Where are you?  Oh, there you

12    are.

13         Q.   Right there.  Yeah.

14         A.   The last -- the third paragraph.

15         Q.   Yeah, right column.  Do you need me to read

16    it again?

17         A.   I don't -- there wasn't a question, so

18    you're fine.

19         Q.   Okay.  Did I read it correctly then?

20         A.   Then read it again.

21         Q.   Okay.  "In monkeys given glyphosate by

22    dermal application percutaneous absorption was

23    estimated to be between 1 and 2 percent of the

24    administered dose."

25         Did I read that sentence correctly?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.    You read it correctly.

 2      Q.    Do you agree with that sentence in the IARC

 3   monograph?

 4      A.    I think it misrepresents the Wester results.

 5      Q.    Okay.  Let's go to page --

 6      A.    I said it's not that it doesn't represent

 7   some of the Wester results, but those results that I

 8   think are most relevant aren't represented by those

 9   numbers.

10      Q.    Let's go to Page 45.  Last sentence before

11   "Mechanisms of person genesis," on the left column.

12   Let me know when you're there.

13      A.    Last sentence?

14      Q.    Uh-hum.  It starts, "Overall."

15      A.    Oh, okay.  Okay.  I get it.  I'm there.

16      Q.    Okay.  It states, "Overall systemically

17   absorbed glyphosate is not metabolized efficiently

18   and is mainly excreted unchanged into the urine."

19            Did I read that correctly?

20      A.    You read those words, yes.

21      Q.    Do you agree with that statement in the IARC

22   monograph?

23      A.    It depends on -- the statement could be true

24   if it was IV injection, but it's necessarily true

25   with dermal application.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Okay.

 2      A.   So it's not that it's untrue, but it's

 3   incomplete.

 4      Q.   Okay.  All right.  Why don't we take a quick

 5   break.

 6           MR. KRISTAL:  Sure.

 7           THE VIDEOGRAPHER:  The time is 3:50 p.m.

 8   We're going off the record.

 9           (Recess from 3:50 p.m. to 4:05 p.m.)

10           THE VIDEOGRAPHER:  The time is 4:05 p.m.

11   We are back on the record.

12   BY MR. KALAS:

13      Q.   All right.  Let's turn to Mr. Kane, okay?

14      A.   Super.

15      Q.   I'm going to mark as Exhibit 30 his depo.

16           (Petty Exhibit 30 was marked for

17   identification.)

18           MR. KALAS:  I only have one copy.

19   BY MR. KALAS:

20      Q.   All right.  If you can pull out your phone

21   log and your exposure calculations for Mr. Kane and

22   just have those handy, please.

23      A.   I'm there.

24      Q.   All right.  Mr. Kane is ███ correct?

25      A.   Yes.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Okay.  And he lives in the St. Louis area,

 2   correct?

 3      A.   Correct.

 4      Q.   Okay.  And up until 2006 or so, he was a

 5   plumber that worked at generally industrial sites it

 6   seems like, right?

 7      A.   Well, certainly a good portion of the time

 8   was at industrial sites, that's true.

 9      Q.   Okay.  And you interviewed Mr. Kane on

10   November 11, 2019?

11      A.   I did.

12      Q.   And you spoke with him for a little more

13   than two hours?

14      A.   Yes.

15      Q.   Okay.  There were three people on the call,

16   right?

17      A.   Correct.

18      Q.   There was an attorney, or at least a

19   representative from Weitz & Luxenberg, which is

20   Mr. Kristal's firm, right?

21      A.   Correct.

22      Q.   Okay.  And then you were on the call, right?

23      A.   I was.

24      Q.   And Mr. Kane was on the call, right?

25      A.   Correct.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
1      Q.   Okay.  Nobody else was on the call to your

2   knowledge, correct?

3      A.   Not to my knowledge.

4      Q.   Okay.  Now, you have this call with Mr. Kane

5   after he was deposed under oath, right?

6      A.   Yeah, my interview was after he was deposed,

7   that's correct.

8      Q.   Okay.  And you had this call with Mr. Kane

9   after he filled out his plaintiff fact sheet,

10   correct?

11      A.   I believe so, yes.

12      Q.   Okay.  And when you had this call with Mr.

13   Kane, he wasn't under oath like he is at -- like he

14   was at deposition, true?

15      A.   I guess that's true.

16      Q.   And there wasn't a court reporter sitting

17   there with you and Mr. Kane taking down a

18   transcript, right?

19      A.   Yes, that's true.

20      Q.   Okay.

21      A.   I mean, that's the same -- same questions

22   and answers for all of these.

23      Q.   I understand, but I need to march through

24   them.

25           MR. KRISTAL:  No, you don't.  You could ask
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        him one question.  This is a joint deposition.

 2             MR. KALAS:  I'm going to march through them.

 3             MR. KRISTAL:  That's a different thing than

 4        saying I have to march through.

 5   BY MR. KALAS:

 6        Q.   And, in fact, you note in your call notes

 7        that the phone log here is not a transcript of the

 8        phone conversation, right?

 9        A.   Correct.

10        Q.   Okay.  And who took the notes on your call

11        with Mr. Kane?

12        A.   I did.

13        Q.   Okay.  And did the gentleman from the

14        Weitz & Luxenberg firm speak on the call?

15        A.   My answer is similar to before.  Most of the

16        conversation would be introductions and then

17        goodbyes.  I can't say he never said anything, but

18        99.99 percent of the conversation was me.

19        Q.   Okay.

20        A.   After -- you know, after the

21        introductions --

22        Q.   And did you personally ask any attorneys or

23        experts from Monsanto to attend your call with

24        Mr. Kane?

25        A.   I wouldn't even know how to do that.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Okay.

 2      A.   I didn't set up the thing.  I mean, I didn't

 3   set up the interview.

 4      Q.   Okay.  And you didn't tape record this

 5   conversation with Mr. Kane, correct?

 6      A.   That's correct.

 7      Q.   Okay.  And you don't know what conversations

 8   Mr. Kane may or may not have had with his attorneys

 9   prior to the call regarding the subject matter of

10   your call, correct?

11      A.   I can't know what I don't know.

12      Q.   Now, Mr. Kane was diagnosed with NHL in

13   April of 2014 when he was ■, correct?

14      A.   He told me March or April, but in that

15   timeframe.

16      Q.   Okay.  And you note here that he was

17   diagnosed with a disease called Waldenstrom's or

18   Waldenstrom's macroglobulinemia, correct?

19           MR. KRISTAL:  If you say so.

20      A.   I believe so, yes, that's what he told me.

21   BY MR. KALAS:

22      Q.   Okay.  And you state it's a form of NHL,

23   right, in your call notes?

24      A.   That's -- that's what he indicated it was a

25   form of NHL.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.    Okay.  So you learned that from Mr. Kane?

 2        A.    Yeah.  I mean, I'm writing down what he's

 3   telling me.

 4        Q.    Okay.  Is -- is Waldenstrom's macro- --

 5   well, let me ask you this.  Can I call Waldenstrom's

 6   macroglobulinemia "WM" from now on so I don't have

 7   to get that mouthful out every time?

 8        A.    Sure.

 9        Q.    Okay.  Is WM a form of B-cell or T-cell

10   lymphoma?

11        A.    I don't know.

12        Q.    Do you know if it's the same disease that

13   Mr. Dela Cruz has?

14        A.    I doubt it, but I don't know for sure.

15   Again, my -- my reason for the date of disease and

16   the date of -- is the date of diagnosis because I'm

17   going to look at that for doing calculations.

18        Q.    Do you know if it's the same disease that

19   any of the other plaintiffs have in the Kane suit?

20        A.    I'd have to look at them to see.

21        Q.    Do you know how WM is treated?

22        A.    I'm not a physician, so...

23        Q.    Do you know if it's treated the same as the

24   other forms of lymphoma the other plaintiffs have in

25   the Kane suit?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1        A.   I'm not his physician.  So, I -- I mean,

2   I've read in the deposition the treatment the

3   various people have had, et cetera, but I'm not --

4   so when you ask me that question, I may have some

5   knowledge, but it's not my area of expertise.  So I

6   have no opinions.  I -- I mean, if they've indicated

7   that they've had chemo or whatever, then I would

8   know that based on the deposition testimony.  But

9   beyond that, I'm not making any decisions on what

10  the right treatment is or isn't for these various

11  disease -- you know, forms of NHL.

12       Q.   Do you know how WM looks under a microscope?

13       A.   No, not specifically.

14       Q.   Okay.  Do you know if it looks the same

15  under a microscope as the other plaintiffs with NHL?

16       A.   I don't know the answer to that question.

17       Q.   Okay.  What study in the published

18  literature have you read that associates glyphosate

19  with WM?

20       A.   I'm not the causation expert.  So I wouldn't

21  have an opinion on that one way or the other.

22       Q.   All right.  Now, Mr. Kane was exposed to

23  Roundup® at his workplace and at his home, correct?

24       A.   Correct.

25       Q.   Okay.  And starting with the home usage, he
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    first used a product called Ortho Weed B Gon, right?

 2        A.   Yes.

 3        Q.   Okay.  And you said in your call notes that

 4    he didn't recall being dermally exposed to Weed B

 5    Gon, right?  That's on Page 10.

 6        A.   Page 10.

 7        Q.   Top of the page under "Pesticide use

 8    location No. 2."

 9        A.   Oh, yeah, yeah.  That's what he said.  You

10    know, I don't know if he just didn't recall or if it

11    was too far back.  I don't know.  That's what he

12    told me.

13        Q.   Okay.  So do you believe that Mr. Kane had

14    no dermal exposure to Weed B Gon based upon what he

15    told you?

16        A.   I think it's highly unlikely it was zero.

17        Q.   Okay.  What sort of sprayer did he use to

18    spray Weed B Gon?

19        A.   I do not know.

20        Q.   Okay.  Now, Mr. Kane at his residence in --

21    I guess it was -- I think the first residence was in

22    Alton, that residence had about an acre of property,

23    right?  Excuse me.  Let me rephrase that.

24        A.   I'm just trying to find --

25        Q.   Yeah.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   I don't see Alton.  That's where I'm

 2   confused, but...

 3      Q.   Okay.  So if you look --

 4      A.   What I'm seeing as --

 5      Q.   Godfrey.

 6      A.   -- home is Godfrey.

 7      Q.   You're right, Godfrey, not Alton.  So let

 8   me --

 9      A.   That's why I was hesitating.

10      Q.   Let me ask the question again.  Mr. Kane

11   described the property at Godfrey, Illinois, as an

12   acre, and then in addition, they had a valley and a

13   creek which made it total an acre and a half or an

14   acre and three-quarters.  Do you recall that?

15      A.   Not specifically, but I know there were

16   questions in that dimension in his deposition.

17      Q.   Okay.  So let's go to Page 112 of his

18   deposition.  I got you the good print one this time.

19   So --

20      A.   And you turned the lights up.  So thank you.

21           I am there.

22      Q.   Okay.  And if you go to line 15, "Question:

23   How big was the lot?

24           "Answer:  We had an acre, and then we had a

25   valley below that and a creek, so acre and a half,
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    maybe an acre and three-quarter with everything that

 2    I Roundup®'ed."  Did I read that correctly?

 3        A.   Yes.

 4        Q.   Okay.  Did you find out any information that

 5    led you to believe that Mr. Kane's property in

 6    Godfrey, Illinois, differed in size from what he

 7    testified to in deposition?

 8        A.   It was not of primary interest to me.

 9        Q.   Okay.

10        A.   I was interested in the exposure details.

11        Q.   Okay.  And at deposition he said that he

12    sprayed the property, if we go to page -- actually,

13    let's just go to the page.  Go to Page 121, Line 22.

14        A.   Okay.

15        Q.   Or, excuse me.  I'm sorry.  I took you to

16    the wrong page.  Let's go to 122.

17        A.   122?

18        Q.   Yep.

19        A.   All righty.  I'm there.

20        Q.   Okay.  Line 3.

21        A.   Okay.

22        Q.   It states, "Question:  Now, let me ask you

23    this:  When you sprayed these 30 -- you say 30 times

24    out of 52 weeks, did you spray each of the areas

25    that you testified about earlier or just certain
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    spot areas?

 2            "Answer, it would be maybe this week would

 3    be this and then the next week something else was

 4    coming up, but I would not treat all the places

 5    every week."

 6            Did I read that correctly?

 7    A.   It appears to be, yeah.

 8    Q.   Okay.  And then moving down that page to

 9    Line 22, it states, "Okay.  So these 30 times, more

10    or less, you used Roundup® per year, you did not

11    spray all seven areas every time, correct?

12            "Answer:  Correct."

13            Did I read that correctly?

14    A.   Yes.

15    Q.   Okay.  Did you uncover any information that

16    led you to believe Mr. Kane sprayed more than 30

17    times a year at his property in Godfrey?

18    A.   I'd have to look at the calculations --

19    Q.   Go for it.

20    A.   -- and see what they would -- they would add

21    up to.  But if you look at my interview on Page 11,

22    that's the basis for it.

23    Q.   Okay.  So did you uncover any --

24    A.   And I -- I went about it differently than

25    the deposition went about it.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.    Okay.

 2      A.    I defined the season and then how many days

 3   or events a week, and then, as he suggested in his

 4   deposition, he rotated between these three areas --

 5      Q.    Okay.

 6      A.    -- one time a week.  So then I would take

 7   that information and develop the calculations.

 8      Q.    All right.  So you had in your calculations

 9   here mid March through late October, right?

10      A.    Yes.

11      Q.    Okay.  And that is about -- I don't know

12   how --

13      A.    We can go to the calculations and make it

14   easy on you.  Let me get you to a page.

15      Q.    Okay.

16      A.    It looks like it begins -- the best place to

17   go -- it actually begins on the bottom of 4, but 5

18   is where the numbers start.

19      Q.    I see here.  So you have him spraying three

20   times a week seven and a half months a season,

21   right?

22      A.    Correct.

23      Q.    Okay.  And there's 4.3 weeks in a month,

24   right?

25      A.    Correct.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.    So his total spray events would have been

 2   about 90 in the season, correct?

 3      A.    Correct.

 4      Q.    By your calculations?

 5      A.    Well, by the information he provided me when

 6   I went about it in a little more detailed fashion

 7   than was done in his deposition.

 8      Q.    So in his deposition he testified when asked

 9   how many times he sprayed he said 30 times, but when

10   you spoke to him, he said 90 times.  Is that true?

11      A.    No.

12      Q.    Okay.

13      A.    None of that's true.  He said -- he said if

14   you look on Page 121, you're ask -- somebody's

15   asking him how many times a year, and he said per

16   year maybe 30.  So he's not sure.

17      Q.    Well, how did you get from 30 to 90?

18      A.    Because I went about it differently.

19      Q.    So tell me what questions you asked to

20   elicit an answer that tripled the number of exposure

21   days.

22      A.    Simple.  I asked a more detailed set of

23   questions to -- there in the interview.

24      Q.    So -- Okay.  So we have a transcript of what

25   was asked at deposition.  He said 30 times?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1       A.    No, he did not.  He did not say 30 times.  I

 2   just went over that testimony.  Perhaps.

 3       Q.    Okay.  He said perhaps 30 times?

 4       A.    He's not sure.

 5       Q.    Okay.  And then he --

 6       A.    He did not say 30 times.

 7       Q.    Okay.  Sir, the rec- -- the deposition's

 8   going to speak for itself.

 9       A.    It certainly will.

10       Q.    My question is more about your interview.

11   My question --

12       A.    No it wasn't.  It was the 30 times we just

13   went over.

14       Q.    My question is how you got him to 90 times.

15   What questions did you ask him?

16             MR. KRISTAL:  Objection.

17       A.    They're right here.

18             MR. KRISTAL:  Mischaracterizes testimony.

19   BY MR. KALAS:

20       Q.    Okay.  So tell me --

21       A.    On Page 11 of my interview --

22       Q.    Okay.

23       A.    -- I asked him what years he was at that

24   location.  He gave me the years, which equates into

25   16 seasons.  I asked him what a season consisted of.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    I asked him on average during a season how many days

 2    or events a week do you spray?  He said three.  And

 3    then I asked him -- he had mentioned that he sprayed

 4    three different areas and that each of those was

 5    sprayed about one time a week.

 6       Q.   Okay.  So those are the only questions you

 7    asked him, and he told you 90?

 8            MR. KRISTAL:  Objection.

 9       A.   He didn't tell me 90.  I used that data to

10    calculate those values.

11    BY MR. KALAS:

12       Q.   He told you data that added up to 90?

13       A.   I didn't add.  It actually multiplied.

14       Q.   Fair enough.  Mr. Kane in response to those

15    questions you just listed for us gave you data that

16    multiplied up to 90 days per year, correct?

17       A.   Ballpark, yes.

18       Q.   Okay.  And he testified when he was under

19    oath at deposition that it was 30 times per year

20    probably, correct?

21       A.   No.  He said maybe.

22       Q.   Maybe?

23       A.   That's -- that's a little less certain.

24       Q.   Okay.  That's fine.  So it tripled once we

25    asked the right questions.  Let's keep going.  When
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    under oath --

 2              MR. KRISTAL:  Objection to the commentary.

 3    BY MR. KALAS:

 4        Q.   When under oath at deposition, Mr. Kane was

 5    specifically asked whether he got Roundup® on his

 6    skin.  Do you remember that?

 7        A.   Show me where -- what you're referring to.

 8        Q.   Okay.  129, line 12.

 9        A.   129.

10        Q.   Are you there?

11        A.   Yes.

12        Q.   Okay.  "Question:  Do you recall any

13    instances in which you were applying the Roundup® at

14    your property that you got it on any area of your

15    skin?

16              "Answer:  I mean, I don't recall

17    specifically, but I'm sure you did.

18              "Question:  But there's no specific instance

19    that sticks out to you, right?

20              "Answer:  Correct."

21              Did I read that correctly?

22        A.   You read those words correctly.

23        Q.   Okay.  So when Mr. Kane was under oath at

24    deposition, he could not remember one specific

25    instance when he got glyphosate or Roundup® on his
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    skin when applying, right?

 2        A.   That's not a surprise.  If you asked a

 3    specific incidence.  But he's not indicating he

 4    didn't get it on his skip.  You're asked about if he

 5    remembers a date, hour, whatever.  You're saying

 6    specific.  That's a different question than did you

 7    get it on your skin and what portions of the skin

 8    and how often.  There's -- there's no way that this

 9    set of questions is nearly as thorough as what I go

10    through.

11        Q.   At deposition, when he was under oath, did

12    you see any evidence that Mr. Kane could remember a

13    specific incidence, ever, when glyphosate got on his

14    skin?

15        A.   I've just answered that question.

16        Q.   Well, I'm not sure that you did.  So can you

17    answer the question?

18        A.   I'll just -- whatever my answer was before

19    is the answer I gave.

20        Q.   You said that's not a surprise.  I'm not

21    sure if that's an answer or not.  So --

22        A.   Yeah, it's not a --

23        Q.   I'm not --

24        A.   -- it's not a surprise.  You want me to say

25    the same thing I just said?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.   Well, I'm asking whether what you saw, not

 2    whether or not it was surprising to you.

 3             MR. KRISTAL:  He said that's not a surprise.

 4        If you ask a specific instance, he's not

 5        indicating he didn't get on his skin.

 6             MR. KALAS:  Okay.  So --

 7             MR. KRISTAL:  You asked if he remembers a

 8        date, hour, whatever.  There's much more to the

 9        answer than that's not a surprise.

10    BY MR. KALAS:

11        Q.   Let me -- let me ask the question and see if

12    you can focus on what I'm asking, because I'm asking

13    what you saw in the evidence when you were reviewing

14    the case, not about what Mr. Kane said, okay?  So

15    that's what my question's about, what you saw.

16        A.   What I saw what?

17        Q.   So let me ask you.

18             MR. KRISTAL:  Listen to the question.

19        A.   I'm not -- I don't know what you're saying

20    about what I saw.  I wasn't there.

21    BY MR. KALAS:

22        Q.   At deposition when Mr. Kane was under oath,

23    did you, Mr. Petty, see any evidence that Mr. Kane

24    could remember a specific incidence ever when he got

25    glyphosate on his skin?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   Same answer.

 2      Q.   Please repeat your answer.

 3      A.   It is the same answer.  It's not a surprise

 4   that he doesn't remember a date, hour, minute of a

 5   specific incident.  But if you ask them -- the

 6   question wasn't asked, you get it on your skin?

 7      Q.   All right.  So after you got to sit down

 8   with Mr. Kane and have a phone conversation, he all

 9   of a sudden remembered 35 to 40 percent of the time

10   having wet feet, right?

11           MR. KRISTAL:  Objection to form.

12      A.   The question again?  What was your question?

13   BY MR. KALAS:

14      Q.   After you got to sit down with Mr. Kane, he

15   all of a sudden remembered that he had 35 to 40

16   percent wetting on his feet when applying Roundup®,

17   right?

18           MR. KRISTAL:  Objection to form.

19      A.   He didn't all of a sudden.  The -- the

20   answer is that I didn't have his deposition when I

21   interviewed him.  I got it after I interviewed him.

22   So whatever he told me he told me.  And the

23   suggestion that somehow or other I -- I talked him

24   in to saying something is just patently false.

25   BY MR. KALAS:
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.   Well, what did you ask him to elicit the 35

 2   to 40 percent wetting of the feet when you had your

 3   interview with him?

 4             MR. KRISTAL:  Asked and answered.

 5             MR. KALAS:  No, it's about his feet, Jerry.

 6             MR. KRISTAL:  It's been asked and answered a

 7        million times Mr. Petty what the questions he

 8        asked.  But if you want to hear it again --

 9             MR. KALAS:  No, I -- I --

10        A.   You want to hear my general questions that I

11   ask of every scenario?

12   BY MR. KALAS:

13        Q.   Okay.  So I want to make sure before you

14   state it, this is going to apply to every scenario

15   you would ask in the Roundup® litigation, correct?

16        A.   By and large.

17        Q.   Okay.  So go ahead and tell me.

18        A.   I will ask them, first of all, do you recall

19   ever getting any of these body areas wet with the

20   product, and then I'll start through a whole series

21   of -- of areas.  I don't list the ones that he says

22   he didn't get wet.  So there's -- I think you would

23   see it in the baseline interview form where there's

24   more areas listed.  And so I'll just say, do you

25   remember ever at any point in time getting some
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    portion of your skin on those skin areas wet, and

 2    I'll go through hands, wrists, forearms, upper arms,

 3    neck, face, chest, back, legs, ankles, feet.  Yes or

 4    no?  They say yes or no, whatever their answer is.

 5    And I'll say, okay, for each of those areas, let's

 6    talk about not how often it happened but what

 7    portion of that skin area got wet or what range of

 8    portions of skin area got wet as best you can

 9    recall.

10          And you'll see in some of these interviews

11    they don't recall, and that's what I put down.  But

12    in this case they'll say -- you know, they may ask

13    me, well, how do I define that?  I said, well, if

14    one entire hand got completely wetted, then that's a

15    100 percent of one hand or 50 percent of two hands

16    if this hand didn't get any wetting.  And we walk

17    through each of the skin areas in terms of percent

18    area that was wet or range of percent areas.

19          Then I say, okay, let's move to a different

20    dimension, and that is it may -- may not have gotten

21    wetted every time.  May have gotten wetted a portion

22    of the time, or it may have gotten wetted all the

23    time.  Can you give me a range or a percent of the

24    times that the skin gets wetted.  And we walk

25    through each of those skin areas and answer those
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    questions.
 2            Then when I'm done with that, I say, well,
 3    there's exposure not only when you apply it, when it
 4    first gets on the skin, but if it stays on your skin
 5    until you clean up, there's still potential
 6    exposure.  And I say, did it stay on your skin for
 7    any amount of time after you applied it?  Yes or no?
 8    And then I'll say, how long might it have been until
 9    you washed that skin with soap and water, and they
10    give me a range of times.  And I write that down for
11    each of the skin areas.  And then I repeat that
12    process for each of the activities.
13       Q.   Are you done with your answer?
14       A.   I am.
15            MR. KALAS:  Okay.  Let's change the media?
16            THE VIDEOGRAPHER:  This is the end of Media
17       No. 3.  The time is 4:30 p.m.  We're going off
18       the record for a media change.
19            (Recess from 4:30 p.m. until 4:32 p.m.)
20            THE VIDEOGRAPHER:  This is Media No. 4 in
21       the deposition of Stephen V. Petty.  The time is
22       4:32 p.m.  We're back on the record.
23    BY MR. KALAS:
24       Q.   Okay.  Going back to Mr. Kane's deposition,
25    going to Page 130.  Let me know when you're there.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1         A.    I'm there.

 2         Q.    Okay.  Mr. Kane was asked how he mixed

 3    Roundup®, right?

 4         A.    Okay.

 5         Q.    And he talked about how he poured the

 6    concentrate into a sprayer using a funnel, correct?

 7         A.    Okay, yeah.

 8         Q.    Okay.  And is that your understanding of how

 9    he mixed Roundup® as well from your interview?

10         A.    I was uncertain one way or the other.

11         Q.    Okay.  You didn't ask about whether he used

12    a funnel to control spills or splashes?

13         A.    Again, I'm interested in the ultimate end

14    point, how much gets on the skin.

15         Q.    Okay.  And then he was asked under oath here

16    at deposition at Page 132, Line 21 he was asked, "Do

17    you recall any instances when you were mixing the

18    Roundup® concentrate that you got it on your skin?"

19               And he answered, "I do not recall specific

20    times."  Do you see that?

21         A.    Where are we at?

22         Q.    Page 132, Line 21.

23         A.    Oh, I'm thinking about 130 where he's --

24         Q.    Right.  Sorry.  I moved over.  I apologize.

25         A.    Yeah, but 130 is a different response.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Right.  So I'm at 132 now.

 2      A.   So you don't want to go on 130, right?

 3      Q.   Well, you're looking at 133?

 4      A.   No, I'm looking at 130, do you recall any

 5  instance where either mixing" --

 6      Q.   Right.

 7      A.   -- the Roundup® or --

 8      Q.   Right.  And he said --

 9      A.   -- lines 3 through 8.

10      Q.   And he said no to that answer, right?

11      A.   No, but the answer is complex because

12  there's an "and" statement there.

13      Q.   Right.  So I'm going --

14      A.   And had some sort of skin irritation.

15      Q.   Okay.  So I'm going to a different question,

16  sir.

17      A.   I understood what you're doing.

18      Q.   Well, I don't know if you do.  So that one

19  had an "and," but now I'm going to something

20  different.  So go to Page 132, Line 21.  Are you

21  there?

22      A.   Yes.

23      Q.   Okay.  He was asked, "Do you recall any

24  instances when you were mixing the Roundup®

25  concentrate that you got it on your skin?"
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1          And he answered, "I do not recall specific

 2     times."

 3          Did I read that correctly?

 4     A.   You did.

 5     Q.   Okay.  And he couldn't remember any specific

 6     times.  That doesn't mean it didn't generally

 7     happen, but he couldn't remember a specific time at

 8     deposition, right?

 9          MR. KRISTAL:  Objection to form.  Why don't

10        you read the rest of the deposition.  You can go.

11        I was being facetious, but we'll go over it when

12        it's my turn to ask questions.

13     A.   If you're asking what are -- are those the

14     words that are there, those are the words that are

15     there.

16     BY MR. KALAS:

17     Q.   Okay.  But after you got to sit down with

18     Mr. Kane, he all of a sudden remembered both hands

19     and both wrists were wet a 100 percent of the time

20     when he was mixing Roundup® concentrate, right?

21        MR. KRISTAL:  Object to form.

22     A.   A portion of the -- a portion of the skin, a

23     small portion of it, yes.

24     BY MR. KALAS:

25     Q.   A 100 percent of the time?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   A portion of it, yeah.

 2      Q.   Okay.  How do you -- how do you rectify

 3   that?  He said he couldn't remember one time at

 4   deposition where he got Roundup® on his skin when

 5   mixing, but he told you that he remembered every

 6   time he mixed Roundup® that got on his skin.

 7           MR. KRISTAL:  Objection to form.

 8   BY MR. KALAS:

 9      Q.   How do you jive those two statements by

10   Mr. Kane?

11           MR. KRISTAL:  Object to the form.

12      A.   Well, I'd have to look --

13           MR. KRISTAL:  Misstates the evidence as to

14      what the deposition say.

15      A.   Yeah, it's -- we'd have to go through the

16   whole deposition to look at all the times he's asked

17   about dermal.

18   BY MR. KALAS:

19      Q.   Okay.  How do you rectify the statement at

20   132:21 through 24 of his deposition with the hundred

21   percent time wet in your exposure assessment?

22      A.   The first thing I -- I do is it's a repeated

23   question from 130, and that question asked whether

24   he had skin irritation associated with it on his

25   skin.  There was an "and" statement there.  So he's
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    thinking is it causing an irritation when he's asked

2    that question.

3        Q.    You got in Mr. Kane's head, and you know

4    that?

5        A.    No.  I'm looking at the words.  There's an

6    "and."

7        Q.    Okay.  So you -- you know what Mr. Kane's

8    thinking when he answered 132:21 to 24?

9        A.    I don't know what he's thinking.  I'm

10   assuming he heard the words.

11       Q.    Okay.  So I'm asking about 132, sir, not

12   130.  So at 132:21 to 24, how do you explain that

13   answer and then his answer to you?

14       A.    I don't explain it because it's a -- it's a

15   parsing of the testimony, first of all; and,

16   secondly, it's -- it's -- in that sense it's a

17   parsing of the actual testimony, so it's not an

18   accurate representation of it.

19       Q.    Okay.

20       A.    And, secondly, I'm asking much more detailed

21   questions than are ever asked in these depositions.

22       Q.    So you believe --

23       A.    We talked about that before.

24       Q.    You believe the question, "Do you recall any

25   instances when you were mixing Roundup® concentrate

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1     that you got it on your skin," is not a detailed

2     enough question to ask somebody if they got Roundup®

3     on their skin?

4          MR. KRISTAL:  Objection.

5       A.   Well, that's -- you keep referring to

6     something as if that's the absolute statement of the

7     deposition, and not only that, we're just talking

8     about the mixing process right here.  So -- and

9     there's -- there's other additional information

10    where he has a different response.  So you --

11    whoever took this deposition didn't take the time to

12    clarify it.

13    BY MR. KALAS:

14      Q.   Okay.

15      A.   The conflicting testimony.

16      Q.   If that's -- if that's your testimony,

17    that's fine.  Let me ask you this:  Did you find any

18    statements in the deposition when Mr. Kane was under

19    oath when he stated that he got Roundup® on his hands

20    and wrists every time he mixed Roundup®?

21      A.   On some portion of his skin, those questions

22    weren't asked.

23      Q.   I asked if you saw it in the depo, not

24    whether or not they were asked?

25      A.   I'd have to read through the whole depo to
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    answer that question.

 2        Q.   Okay.  Do you recall the plaintiffs'

 3    attorneys asking Mr. Kane those questions when he

 4    was under oath at deposition?

 5        A.   I'd have to read through it.

 6        Q.   Well, go to the back and see what the

 7    plaintiffs' attorneys asked.  Let's look.  It starts

 8    at Page 286, and it finishes at Page 294.

 9        A.   All right.  I see some test- -- testimony I

10    see with regards to questions on dermal are on Page

11    298 and 299.

12        Q.   Right.  And that's not the plaintiffs'

13    attorneys asking questions, is it?  That's

14    Mr. Larson asking the questions?

15        A.   Right.

16        Q.   Correct?

17        A.   That's some additional questions on the

18    dermal.

19        Q.   Right.  Do you see Mr. Larson is counsel for

20    the defendant on Page 5?

21        A.   Okay.

22        Q.   So my question was, did you find any

23    statements under oath when Mr. Kane was asked by his

24    attorneys how often he got Roundup® on his hands and

25    wrists when he mixed Roundup®?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1              MR. KRISTAL:  Are you saying why didn't we

 2       do your work for you?

 3              THE REPORTER:  What?

 4              MR. KALAS:  I'm saying --

 5              MR. KRISTAL:  I'm asking if he is asking

 6       whether the plaintiff's attorney should have done

 7       the work for them.

 8    BY MR. KALAS:

 9       Q.   Do you understand my question?  Did the

10    plaintiffs' attorney ask those questions?

11       A.   I don't see evidence that there were dermal

12    questions asked by them.

13       Q.   Okay.

14       A.   But that's -- they normally don't.

15       Q.   Okay.  So my question, then, is -- well,

16    strike that.

17              You note also in your notes that Mr. Kane

18    would take 45 minutes to spray the valley behind his

19    house, right?  This is --

20       A.   Page 11.

21       Q.   Page 11, sir.

22       A.   He said about half an hour for the

23    landscaping trees and edging, about a half hour for

24    the pool area and the backyard, and about 45 minutes

25    for the valley where the kids played.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1       Q.   And when Mr. Kane was deposed, he was asked

2   how long it would take him to spray the valley.  Do

3   you remember that?

4       A.   Not specifically, but if you want to show it

5   to me, I can.

6       Q.   I will.

7       A.   I'm sure you will.

8       Q.   If you go to Page 123, Line 18 --

9       A.   Which page now are you on?

10      Q.   Page 123, Line 18.

11           MR. KRISTAL:  What page?

12           MR. KALAS:  123, Jerry.

13  BY MR. KALAS:

14      Q.   Let me know when you're there, Mr. Petty.

15      A.   I'm there.

16      Q.   Okay.  It states, "And when you sprayed that

17  valley and creek area for poison ivy, about how many

18  times per year did you spray that area?

19           "Answer:  That was a little more often,

20  maybe 15.

21           "Question:  And was that spot spraying, or

22  were you spraying the entire area?

23           "Answer:  I'd spray the entire area.

24           "About how long would it take you?

25           Answer:  "10 to 15 minutes."
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1              Did I read that correctly?

 2      A.   You did.

 3      Q.   Okay.  Now, you asked Mr. Kane that specific

 4   question about how long would it take him to spray

 5   the valley, right?

 6      A.   Well, the questions are slightly different

 7   but close.  I asked him about the valley where the

 8   kids played.  He said about 30 minutes.  This says

 9   valley and creek area for poison ivy.

10      Q.   All right.

11      A.   So they're limiting it to the area for

12   poison ivy I guess.

13      Q.   So you said valley where kids played, and

14   you said 45 minutes on average, not 30 minutes on

15   average, right?

16      A.   45, yes.

17      Q.   Okay.  And so --

18      A.   Yeah, I misspoke there.  So, I mean, you

19   have to look at the specific language in the

20   questions.

21      Q.   Okay.  Let me ask you this:  Do you believe

22   that the area where the kids played in the valley

23   was different than the area where he sprayed for

24   poison ivy?  Did you try to elucidate that?

25      A.   I had no reason to.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.   Okay.  So when you asked Mr. Kane how long

 2    it took him to spray the valley, as you said where

 3    the kids played, he told you 45 minutes, right?

 4        A.   Correct.

 5        Q.   And when Mr. Kane was asked how long it

 6    would take him to spray the valley where the poison

 7    ivy grew, in deposition when he was under oath, he

 8    said 10 to 15 minutes, right?

 9        A.   Correct.

10        Q.   Okay.  Let me ask you this.  When the jury's

11    sitting there in the courtroom trying to figure out

12    how to make heads or tails of all this, how will you

13    explain to the jury why your results from your

14    interviews of Mr. Kane consistently contradict Mr.

15    Kane's testimony under oath in a single direction

16    towards higher exposure?  How would you explain

17    that?

18             MR. KRISTAL:  Objection to form.  Misstates

19        the evidence.

20        A.   Yeah, I -- I disagree with your -- your

21    pretextual comment on -- on the question.

22    BY MR. KALAS:

23        Q.   Okay.  Let's go to ███████████.  Now, Mr.

24    Kane applied there once a week in the spring to

25    early fall, correct?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1      A.    Yes.

2      Q.    Okay.  If you'd go to Page 137, Lines 6

3    through 8, it states, "Question:  Do you recall any

4    specific instance of getting it on your skin?

5           "Answer:  I do not."

6           Did I read that correctly?

7      A.    You read those words correctly, but I think

8    it follows from the previous question and answer.

9      Q.    Okay.  So you again are getting into how

10   Mr. Kane interpreted the questions, and your belief

11   is because he was asked about skin irritation prior

12   to whether he remembered getting any on his skin at

13   all he was thinking about skin irritation.  That's

14   your surmise here?

15          MR. KRISTAL:  Objection.  You left out the

16      specific instance words.

17     A.    No, that's not true at all.  And you're just

18   putting words in my mouth, but that's not what I

19   said at all.

20   BY MR. KALAS:

21     Q.    Okay.  So my question was whether I read it

22   correctly.  So let me ask that again, because I'm

23   not sure if you answered it.  "Question" --

24     A.    I actually did, but -- but we can ask it

25   again because we've got lots of time.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1       Q.    Okay.  So you said I read the words

 2    correctly, but, "I think it follows from the

 3    previous question and answer."  So what do you mean

 4    by that?

 5       A.    So do you want me to answer the first

 6    question again?

 7       Q.    No.  What do you mean by so you think it

 8    follows?

 9       A.    Because you said I didn't say it.  Now

10    you're disagreeing?

11       Q.    You answered that question.

12       A.    Okay.  Next question.

13       Q.    What do you mean by, "I think it follows

14    from the previous question and answer"?

15       A.    Because the questions are adjacent to each

16    other.

17       Q.    Uh-hum.

18       A.    So the question that's being asked is did

19    you get it on your skin that caused a skin

20    irritation.  He says -- so he's associating the

21    answer to that question with skin irritation.

22       Q.    Okay.

23       A.    Then he's asked do you recall a specific

24    instance.  Well, if you asked me or almost anybody

25    do you recall the day or the hour that something
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1    happened, it's very difficult to do that.  When you

2    say specific instance, you're asking the question --

3    if it had just asked an instance, that would be a

4    different question.  But when you put the word,

5    qualifier specific in there as a questioner, you're

6    asking do they remember a date, time, hour, whatever

7    where that happened.  I think it's hard for most

8    people to do that.

9        Q.   How do you know Mr. Kane interpreted that

10   question that way?  Did you ask him that?

11       A.   I only interpret things based on the written

12   word.

13       Q.   Okay.

14       A.   And I've talked to you many, many times

15   about that.  I'm not in anybody's mind.  All I can

16   look at, all I'm left with is the written word.

17       Q.   All right.  So let's compare and contrast,

18   okay?

19       A.   Okay.

20       Q.   So at deposition he stated he did not recall

21   a specific instance of getting glyphosate on his

22   skin when applying at ██████████, right?

23       A.   Okay.

24       Q.   Okay.

25            MR. KRISTAL:  Objection.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1    BY MR. KALAS:

 2        Q.   Let's contrast to your exposure.

 3        A.   What -- what was your question again?

 4        Q.   At deposition he stated he did not recall a

 5    specific instance of getting glyphosate on his skin

 6    when applying at ███████████.

 7             MR. KRISTAL:  Objection.

 8    BY MR. KALAS:

 9        Q.   Correct?

10        A.   I don't know about glyphosate.  I think

11    we're talking about Roundup®.

12        Q.   Okay, Roundup®?

13        A.   I don't think --

14        Q.   It's fine.  Well --

15        A.   Well, it's not fine because it's a different

16    question.

17        Q.   Okay.  I'll ask it with Roundup® so that

18    we're clear for the record.

19             At deposition Mr. Kane stated he did not

20    recall a specific instance of getting Roundup® on his

21    skin when applying Roundup®, correct?

22        A.   Correct.

23        Q.   Okay.  And then when you spoke to Mr. Kane,

24    he remembered that both feet were wet 40 percent of

25    the time when he applied Roundup® at ███████████,
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    true?

2        A.   Let me go to that.  Yes.  And he made the

3    point to me that he specifically remembers it

4    because he was wearing flip-flops.

5        Q.   Okay.  Now, you discussed in your notes that

6    Mr. Kane worked as a pipefitter contractor at Slay

7    Industries, right?

8        A.   Where are you citing my interview at?  Just

9    help me get there.

10       Q.   I'm going to his occupational history, sir.

11       A.   Okay.

12       Q.   And I believe it is page -- I may not use

13   Slay specifically but hold on.  Yeah, here it is.

14   "Pesticide use Location 1," Page 6.

15       A.   Page 6?

16       Q.   Yeah, top of it.

17       A.   Yeah.

18       Q.   Okay.  So let me ask it again.  You

19   discussed in your notes that Mr. Kane worked as a

20   pipefitter contractor at Slay Industries, right?

21       A.   Correct.

22       Q.   Okay.  But he also worked as a pipefitter

23   contractor at the J.D. Streett Company, correct?

24       A.   He did.

25       Q.   Okay.  And he worked there off and on for 15

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    to 20 years, right?

 2         A.   Where?  Where would you -- where is where

 3    that you're referring to?

 4         Q.   He worked at J.D. Streett off and on for 15

 5    to 20 years, correct?  And if don't recall, we can

 6    go to the depo.

 7         A.   Well, I've got him from around '95 on Page 4

 8    to 2006, '7 timeframe.

 9         Q.   Okay.  Go to Page 150.  I don't think we're

10    that far off from each other.

11         A.   Yeah.

12         Q.   Go to Page 150, Line 11.  "Question:  How

13    long did you do work for J.D. Streett?

14              "Answer:  My dad had the account.  I took

15    that over.  So 20 years plus would be my guess.

16    Maybe 15."

17              Did I read that correctly?

18         A.   Yes.

19         Q.   Okay.  Now that we've reviewed that

20    testimony, do you agree that Mr. Kane worked at the

21    J.D. Streett site for a period of 15 to 20 years off

22    and on?

23         A.   I do, but you started the question by saying

24    20 years.  That's the only reason that -- when we

25    started this sequence of questions, I was checking
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1    my notes to see what he -- what he told me.

2         Q.   Right.  And what'd he do there -- or one of

3    the things that he had to do there is crack a pipe,

4    right?

5         A.   Crack a pipe?

6         Q.   Yes, sir.

7         A.   I don't think he was cracking pipes.

8         Q.   Well, unintentionally cracking pipes.  Would

9    he unintentionally crack pipes at the J.D. Streett

10   site?

11        A.   No, no.  He would might -- he might take

12   flanges loose or something, but you wouldn't crack a

13   pipe.  You wouldn't --

14        Q.   Well, let's look -- let's look at the

15   testimony.  Go to Page 150.

16        A.   I'm just telling you how it works in a

17   refinery or a chemical process plant.

18        Q.   Let's look at Page 150, Line 24.

19        A.   150, line 24?

20        Q.   Yes, sir.  "Question:  And so where were

21   there times that you would -- would you have to

22   crack pipes on occasion just like you did at the

23   refinery?

24             "Answer:  Yes.

25             "Question:  And so were there times in which
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    the -- you know, you'd crack a pipe, and there would

2    be some vapor or fumes or maybe some residue of some

3    of these gasoline products?

4           "Answer:  Yes."

5           Did I read that correctly?

6     A.   You read the words correctly.

7     Q.   Okay.  And so would Mr. Kane in his

8    recollection be exposed to fumes at the J.D. Streett

9    site from time to time?

10    A.   Perhaps.

11    Q.   Okay.  Did you look into, in the course of

12   your exposure assessment, what the J.D. Streett

13   Company handles?

14    A.   I did not.

15    Q.   Are you aware they handle antifreeze?

16          MR. KRISTAL:  Objection.

17    A.   I just answered the question.  So why do you

18   ask subsequent questions when I just said I don't

19   know what they did, then you go through and ask me a

20   bunch of specific questions?

21   BY MR. KALAS:

22    Q.   Are you aware that --

23    A.   I don't understand that.

24    Q.   Are you aware they handle antifreeze?

25          MR. KRISTAL:  Objection.

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1   BY MR. KALAS:

 2       Q.   See, I'm just trying to help out here and

 3   educate you about J.D. Streett.  Are you aware they

 4   handle antifreeze?

 5            MR. KRISTAL:  And the next time that Mr.

 6       Petty gets educated by you will probably be

 7       never.

 8       A.   I need to take you into a chemical plant.

 9            I said I don't -- I did not know what

10   products they handled other than he mentioned there

11   was -- there was gasoline products --

12   BY MR. KALAS:

13       Q.   Okay.

14       A.   -- present at this site.

15       Q.   Okay.  Given that they handled petroleum

16   products at the site, would Mr. Kane potentially

17   have been exposed to benzene at the J.D. Streett

18   plant when he was exposed to those vapors or fumes?

19       A.   That's got a yes or a no answer.

20   Hypothetically perhaps but very low levels,

21   especially in those days.  By the mid' '90s,

22   especially with the advent of HazCom in '87 and '93,

23   my experience in doing dozens of refinery and

24   chemical plant cases is that by '95 there was good

25   process -- relatively good process work done to make
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    sure the lines were emptied and cleared.

2        Q.   Okay.  But --

3        A.   So is there -- is there -- you know, the

4    reason it's a yes or no answer, it goes to this

5    hypothetical.  If you asked me as an engineer or say

6    Jerry's a mathematician -- I know he's not -- and

7    you ask me if we halve the distance from me to that

8    wall and we halve it again, we halve it again, we

9    halve it again, do I ever get to the wall if I do

10   that forever.  The mathematician says no.  Engineer

11   says, yes, close enough.  So that's my answer.

12        Yes, theoretically there's some small --

13   perhaps small amount of benzene, but based on my

14   experience in doing many, many cases in chemical

15   process plants, by 1995, process has gotten much

16   better about making sure the lines were cleared.

17   Were they cleared a 100 percent of the time?  Of

18   course not.  But it was much better than, say, the

19   '70s and '80s.

20        Q.   Did he wear a ventilator when he was working

21   at J.D. Streett?

22             MR. KRISTAL:  Objection.  I think you

23        misstated that.  Did you mean respirator?

24             MR. KALAS:  Yes.  Thank you, Jerry.

25             MR. KRISTAL:  Sure.

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    BY MR. KALAS:

 2        Q.   Was he wearing a respirator when he was

 3    working at J.D. Streett?

 4        A.   If you look at my notes, he said that he --

 5    he's not specific in my -- in my interview he wasn't

 6    specific about J.D. Streett, but he did say he wore

 7    a respirator during that timeframe two or three

 8    times for about an hour each time.

 9        Q.   Okay.

10        A.   And then he also wore one when he was

11    working at the Shell, ConocoPhillips facility when

12    he was told to wear one.

13        Q.   Would he have had any dermal exposures to

14    benzene when handling the pipes?

15             MR. KRISTAL:  Where?

16             MR. KALAS:  At J.D. Streett.

17        A.   It's -- it's the same sort of answer that I

18    just gave you about the inhalation exposure in the

19    sense that by the mid '90s industry had gotten a lot

20    better about making sure they cleared these pipes.

21    Now, is that to say there' zero exposure?  Probably

22    not.  But it's probably pretty low.

23    BY MR. KALAS:

24        Q.   Would he have been exposed potentially to

25    benzo[a]pyrene in the J.D. Streett plant?
```

```
1      A.   I don't know.

2      Q.   Would he have been exposed to ethylene oxide

3    in the J.D. Streett plant?

4      A.   I was looking to see what he told me.  He

5    indicated in his interview to me that -- that --

6    that he didn't recall being told of any specific

7    chemicals and their hazards at the refineries other

8    than when he was told when in an area you've got to

9    wear certain PPE.

10      Q.   Given the chemicals --

11      A.   So I -- I don't -- he didn't indicate to me

12    that he knew of specific chemicals.

13      Q.   Given the chemicals that were handled in the

14    J.D. Streett plant, do you know if gasoline, for

15    instance, would he have been exposed to levels of

16    ethylene oxide in that plant?

17      A.   I don't know.

18      Q.   How about is 1,3-butadiene?

19      A.   Butadiene?

20      Q.   Yeah.  I'll get it right.

21      A.   Need a chemical engineer.

22           I think it -- I think 1,3-butadiene is made

23    to -- used to make styrene.  I -- I just don't know.

24      Q.   How about MTBE?

25      A.   I did my undergraduate thesis on MTBE.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.   I know you did.  That's why I'm asking.

 2        A.   By '95 -- MTBE was eliminated pretty much in

 3    '99 -- potentially, but it was probably minimal

 4    because it was at the tail end of the era of MTBE.

 5        Q.   Did you do any quantification of Mr. Kane's

 6    potential chemical exposures from working in the

 7    refineries in St. Louis?

 8        A.   I did not, but I've done many, many -- I was

 9    -- I did the Sugar Creek refinery cases.  I did the

10    -- I did the -- what's the other refinery there he

11    mentioned?  I can't recall the name.

12        Q.   ConocoPhillips or Shell?

13        A.   Well Shell, ConocoPhillips are all the

14    same --

15        Q.   Yeah.  So we mentioned that.

16        A.   -- the Sugar Creek refinery.  But there's

17    another one south of there that had a lot of

18    groundwater issues.  But then I -- I did the -- I

19    actually was on site and did a lot of the sampling

20    of homes -- of a home -- multiple homes, in Sugar

21    Creek.  So, I mean, I'm familiar with the facilities

22    and all that.  I'm familiar with the Shell's

23    historic benzene exposure study.  I'm familiar with

24    all the groundwater issues, and I've been involved

25    in class actions there.  So, I mean, I am familiar
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    with what has gone on in those areas over time.  But

 2    this is -- this is all kind of late in the process,

 3    if you will.

 4        Q.   Now, it's your testimony that his exposures

 5    to these petroleum products would have been minimal,

 6    correct, based on what you found out from him?

 7        A.   Given what I know from my detailed

 8    experience in doing benzene and other chemical plant

 9    cases and knowing what I know about the

10    implementations of those regulations, particularly

11    HazCom, through the '80s and into the '90s, what

12    happened until the early to mid -- early '90s was

13    that workers would still even clean their hands with

14    benzene in refineries.

15            After '95 or so, after '94, '95, that

16    stopped.  And worker after worker I've interviewed

17    said things changed big time in the mid '90s.  So

18    that's why I made the statement I make about there

19    was an increased knowledge and training, if you

20    will, in these facilities about making sure that you

21    -- for -- for instance, if you're doing a shutdown

22    or whatever to repair or replace a section of

23    equipment or plumbing, to make sure that it's

24    properly cleared.  And does that mean it happens a

25    hundred percent of the time?  No.  But it -- it --
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1   if you look at what went on in the '70s and '80s and

 2   up to the early '90s, it changed dramatically.

 3   That's all I'm saying.

 4       Q.   Let's go to Page 175 and what Mr. Kane

 5   recalled.  Page 175, Line 15.

 6       A.   175?

 7       Q.   Yes, sir.

 8       A.   I'm there.

 9       Q.   Mr. Kane was asked, "Would you say that

10   while working for J.D. Streett and you were, you

11   know, cracking pipe that you caught more petroleum

12   product over your career than Roundup®?

13            "Answer:  I probably, probably, because, you

14   know, I did some work at the refinery, I did some

15   work at J.D. Streett, and then you know Slay.  So

16   the proportion of being around petroleum products is

17   higher than Roundup®."

18            Did I read that correctly?

19       A.   I'm trying to catch up to you.  So you start

20   with the first Q and A on the bottom of Page 175 --

21       Q.   Yes, sir.

22       A.   -- is where you started?

23       Q.   Do you want me to read it again?

24       A.   No, no, you don't have to.  I'm just

25   catching up to you.  I just -- I reject the question
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
1    cracking the pipe.  I'm sorry.  Cracking the pipe is

2    like you went and you put a crack in a pipe.  That's

3    not what happens in any of these facilities.  They

4    have flanges, you take the flanges loose, you blind

5    them, you put a blanket.  The attorney who's asking

6    this question doesn't understand refineries or

7    chemical plants.  So there's -- when they -- I think

8    that the deponent understands that because -- but

9    I'm just telling you you don't go in, and you don't

10   crack the pipe.

11       Q.   Let me ask the question again --

12       A.   So --

13       Q.   -- because I'm not sure if you answered --

14       A.   No.  No, I'm just --

15       Q.   -- the question.

16       A.   -- getting to this -- this question.

17       Q.   Okay.

18       A.   And you -- you asked me about that cracking

19   issue before, it just strikes me as such an odd term

20   as a chemical engineer.

21       Q.   It was a term used by Mr. Kane, but that's

22   fine.  Let me ask --

23       A.   No.  No, actually he was asked the question,

24   and he -- he -- he agreed to it because that

25   question was asked.  But it's --
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.   If you read the depo, he uses it first, but
 2   we're arguing now, and we don't need --
 3        MR. KRISTAL:  Yeah, I don't think he's
 4     talking about physically cracking the pipe.
 5        MR. KALAS:  Sure.
 6        MR. KRISTAL:  I think we're all talking
 7     about --
 8        THE WITNESS:  The same thing.
 9        MR. KALAS:  I've got it.
10   BY MR. KALAS:
11        Q.   So let me ask the question again.
12   "Question" --
13        MR. KRISTAL:  He'd be fired if goes around
14     cracking pipes.
15   BY MR. KALAS:
16        Q.   Does the document say when you -- "Would you
17   say that while you were working for J.D. Streett and
18   you were, you know, cracking pipe that you caught
19   more petroleum product over your career than
20   Roundup®®?
21        "Answer:  Probably, probably, because, you
22   know, I did some work at the refinery.  I did some
23   work at J.D. Streett and then, you know, Slay.  So
24   the proportion of being around petroleum products is
25   higher than Roundup®."
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1              Did I read that correctly?

2       A.    You read it correctly.

3       Q.    Did you uncover anything in your exposure

4    assessment of Mr. Kane that led you to believe that

5    the proportion of being around petroleum products

6    was not higher than being around Roundup® for Mr.

7    Kane?

8              MR. KRISTAL:  Object.

9       A.    Not necessarily, but it's a meaningless

10   statement.

11   BY MR. KALAS:

12      Q.    Okay.

13      A.    I mean, I can be -- I can be around

14   petroleum products today that are down at the Fort

15   Lauderdale airport.  That doesn't mean I'm exposed

16   to them.

17      Q.    Okay.  Now, while working at Slay, Mr. Kane

18   remembered two instances of getting Roundup® on his

19   skin, right?

20      A.    Where, at Slay?

21      Q.    Uh-hum.

22      A.    Oh, as far as the two major incidents with

23   the -- the piping and the barge vessels as well as

24   the --

25      Q.    Okay.  Well, he actually only remembered two

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    specific incidences of getting Roundup® on his skin

2    while working at Slay.  Do you recall that?

3       A.   Not necessarily.

4       Q.   Okay.  So let's go to Page 177, Line 3.

5       A.   Okay.

6       Q.   "Question:  Are there any other times that

7    you recall working for Slay Industries that you

8    recall getting Roundup® on your skin?

9            "Answer:  Those are my two specifics, but

10   specific vivid memories, but it was around, just

11   like at the other plants, there was a residual, but

12   I don't have any direct recollection of," dot, dot,

13   dot.

14           Did I read that correctly?

15      A.   You read those words correctly, yes.

16      Q.   So at deposition, Mr. Kane testified that he

17   only could remember two specific incidences when he

18   got Roundup® on his skin at Slay, right?

19           MR. KRISTAL:  You skipped over where he

20      talks about getting it on his hands.  Was that

21      intentional?

22           MR. KALAS:  I'm just asking the question.

23           MR. KRISTAL:  I understand, you're just

24      asking the questions, but you're making it

25      sound --

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1            MR. KALAS:  Well, Jerry, if you want to ask

 2       questions, you'll get a chance.

 3            MR. KRISTAL:  You're making it sound like

 4       something that it isn't.  Which I understand.

 5       A.   I mean, if you -- if you -- if you want to

 6   parse the deposition and you want to ask me if

 7   that's what those words say, then I will agree that

 8   that's what those words say.

 9   BY MR. KALAS:

10       Q.   Okay.  Go to Page 298 to 299, please.

11       A.   Okay.  I'm there.

12       Q.   Do you see there that Mr. Kane was asked

13   about whether or not he could remember any other

14   specific incidences, specific incidences when he got

15   Roundup® on his skin?

16            MR. KRISTAL:  Can you give us a line?

17   BY MR. KALAS:

18       Q.   So starting at -- it's a long paragraph, so

19   it starts --

20       A.   Since -- all right, go ahead.

21       Q.   -- 298, 17, all the way down to 301.  So if

22   you'd read that to yourself.

23            MR. KRISTAL:  You don't want on the record

24       what was actually said?

25            MR. KALAS:  I can read it on the record.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      It's very long.

 2              MR. KRISTAL:  Why don't you do that.

 3              MR. KALAS:  You can read it on the record.

 4              MR. KRISTAL:  I understand.

 5              MR. KALAS:  Use your time.

 6              MR. KRISTAL:  We all understand what's going

 7      on.

 8              MR. KALAS:  Okay, Jerry.  Thank you.

 9      A.    Yeah, see, here, we're talking about the

10      flange.  Which is why -- I'm just trying to get the

11      language right.  But the language that I recall from

12      this deposition was the answer on 299, which says --

13      BY MR. KALAS:

14      Q.    Okay.

15      A.    -- "They were most vividly specific" --

16      "They were the most vividly specific, but once

17      again, I wasn't concerned about Roundup®, so I

18      remember those two, but I used it at home and we

19      were working around it, I didn't consider it a

20      harmful product, so I didn't pay much attention to

21      it."

22      Q.    Okay.

23      A.    What he's saying basically there is he's

24      not -- he's not saying that he -- he's saying he

25      worked around it, but he's not ruling out that he
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    had additional dermal exposure.

 2        Q.   Sure.  So we went through this entire

 3    deposition -- well, we didn't go through the entire,

 4    but we went through portions of this deposition, and

 5    he recalled, in the passages, we read two instances

 6    when Roundup® got on his specific skin, correct?

 7        A.   Well --

 8             MR. KRISTAL:  Two specific instances,

 9        because he wasn't that specific.

10             MR. KALAS:  Gary -- Jerry -- Gary.

11             MR. KRISTAL:  You keep misstating the

12        testimony.  So every time you do that, I'm going

13        to correct you.

14             MR. KALAS:  Okay.  Why don't you just object

15        to form and move on.

16             MR. KRISTAL:  Because I think it's a

17        misleading record.

18             MR. KALAS:  Okay.

19        A.   Question, please.

20    BY MR. KALAS:

21        Q.   I forgot my question with Jerry testifying.

22    Hold on.

23             So we went --

24             MR. KRISTAL:  You're testifying, too, and I

25        was correcting your testimony because it's not
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    accurate.

2   BY MR. KALAS:

3    Q.   In the portions of this deposition we went

4   through, Mr. Kane recalled two specific instances

5   when he got Roundup® on his skin, correct?

6    A.   I don't think that's true because we -- we

7   talked about the specific ones at home and then

8   we -- what he's talking about here is a follow-up.

9   He uses the words explicitly "vividly specific."

10    Q.   Okay.  Which gets -- sorry.

11    A.   So -- and the vividly specific, my

12   recollection from the deposition was there were two

13   incidents he recalled specifically.  In fact, he

14   told me those independently in -- in my interview.

15    Q.   And after your interview, you had increased,

16   based on your exposure assessment, the number of

17   exposure incidences to over a hundred events of skin

18   contact for Mr. Kane, correct?

19    A.   I'm not surprised because I asked specific

20   questions.

21    Q.   Okay.  Is it your opinion EPA does not

22   regulate surfactants?

23    A.   You'd have to give me a context.

24    Q.   Does EPA maintain any regulatory oversight

25   over surfactants used in pesticide products?

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   It's kind of a yes or a no.  I mean, it's --

 2   it's a -- it's the same situation in that they

 3   review the information that's provided to them and

 4   they act on that information.  Because the applicant

 5   has the responsibility to provide them with a

 6   transparent record of what's known about those

 7   materials.

 8      Q.   So --

 9      A.   So including the literature, when you read

10   -- read the regulations.  So, yes, they regulate it,

11   but the -- from an industrial hygiene standpoint,

12   the difficulty with that is it's still based on the

13   adequacy of the information they receive.

14      Q.   So that was a very long answer to what I

15   hoped was a very simple question.

16           Does EPA, as part of their mandate, have any

17   regulatory role as to surfactant ingredients in

18   pesticide products?

19           I'm not asking about the information they

20   get, I'm just asking about their role.

21           MR. KRISTAL:  Object to form.

22      A.   It's sort of a yes and a no answer again.

23   Their primary emphasis, both for historic reasons

24   and continuing, and when you read the regulations,

25   their primary emphasis is on the active ingredient.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1              Do they have regulatory responsibility for

 2    the other ingredients?  Yes, but it's not an area of

 3    focus.

 4    BY MR. KALAS:

 5       Q.   Okay.  I'm going to mark a document as

 6    Exhibit 31 that EPA put out.

 7              (Petty Exhibit 31 was marked for

 8    identification.)

 9    BY MR. KALAS:

10       Q.   Have you seen this document before?

11       A.   No.

12       Q.   Okay.  This is dated April 3rd, 2009, right?

13       A.   Yeah.

14              I have a question for you.  Well, it looked

15    like an original to me.  Maybe it's not, just

16    because it's done in color.  I'm sorry, I just

17    didn't want you to hand off your original.

18       Q.   Sure.

19              Is this dated April 3rd, 2009?

20       A.   It is.

21       Q.   And is the subject of this memorandum on EPA

22    letterhead, Alkyl Amine Polyalko- -- or

23    Polyalkoxylates (JITF CST 4 Inert Ingredients).

24    Human Health Risk Assessment to Support Proposed

25    Exemption from the Requirement of a Tolerance When
```

```
 1    Used as Inert Ingredients in Pesticide Formulations?

 2        A.   That's what the words say.

 3        Q.   Okay.  And do you see that this is from

 4    eight scientists at EPA?  Or, excuse me, seven

 5    scientists at EPA?

 6        A.   It's from seven individuals.

 7        Q.   And there's an industrial hygienist who is

 8    on the "from" line, correct?

 9        A.   Yeah, but I can make you an industrial

10    hygienist tomorrow by going on one project and

11    signing you up with AIHA.  But there's almost no --

12    there's a huge gap between calling yourself an

13    industrial hygienist and a CIH.  It's sort of like

14    engineer and professional engineer, where you have

15    to have a degree in engineering to be called an

16    engineer.

17        Q.   Do you know what --

18        A.   So the qualifications for industrial

19    hygienist, putting that title on, we've done it in

20    my company where we have technicians or appropriate

21    people that will follow me and then they become a

22    member of AIHA.  And under that, if you do that, you

23    then are -- can call yourself an industrial

24    hygienist.

25             You don't -- there are no other
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1     requirements.

 2         Q.   Do you know what Mr. Lloyd's or Dr. Lloyd's

 3     qualifications are?

 4         A.   I don't.  I'm just saying that he's not

 5     referring to himself as a CIH.  That's all I'm

 6     saying.

 7         Q.   Okay.

 8         A.   And there's a big gap between calling

 9     yourself an IH and a CIH.

10         Q.   All right.  Now, this document discusses a

11     class of compounds called altea amine

12     polyalcoxalates, correct?

13         A.   Alkoxylates, yeah.

14             MR. KRISTAL:  They use the term AAPs.

15         Perhaps that would be easier.

16             MR. KALAS:  Probably would be.

17         A.   Okay.

18     BY MR. KALAS:

19         Q.   And --

20         A.   Structure here on Page 9.

21         Q.   Okay.  And is POEA part of this class of

22     AAPs?

23         A.   Short of -- unless you can show it to me,

24     short of -- I haven't read -- seen this document

25     before.  So I would have to look at the chem
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    abstracts number and go and see if they refer to it

 2    that way.

 3        Q.   Well, maybe -- I think I have a way to

 4    short-cut it for you.

 5             If we go to Page 58 -- or, excuse me,

 6    actually, let's go to Page 10.  I'm sorry.

 7        A.   Well, they have listed MON 0818, which I

 8    know is POEA.

 9        Q.   Right.

10             And go to Page 10.  They talk about MON

11    0818, correct?

12        A.   Yes.

13        Q.   And they talked about the fact, above that,

14    that chemicals -- this is one of the chemicals for

15    which toxicity data were submitted to EPA, right?

16        A.   I'm trying to find where you're saying that.

17        Q.   The sentence right above the bullet point is

18    MON 0818.

19        A.   Okay.

20        Q.   Okay?  And do you see the CAS number in

21    Table 3.3, that first one?  Is that the CAS number

22    for MON 0818?

23        A.   Abstract service.

24             I'd have to check in my report, but I've got

25    them both listed in my report.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      Q.   Okay.  Now --

 2      A.   I would assume so, but I'd want to check.

 3      Q.   -- looking at that bullet point, MON 0818,

 4   it says EPA has in their database something called

 5   an Ames test, right?

 6      A.   Yes.

 7      Q.   And an Ames test is a test on mutagenicity,

 8   correct?

 9      A.   I'm -- I mean, I don't claim to be an expert

10   in that area, so whatever I would say about it would

11   be getting close to speculation.

12      Q.   Is an Ames test an OECD guideline test?  Do

13   you know that?

14      A.   I don't know.

15      Q.   Is it an EPA guideline test that's to be

16   submitted with pesticide registration packages?

17      A.   It wouldn't surprise me.  I mean, I'm

18   familiar with the concept of doing Ames testings.

19   But I can't tell you off the top of my head.

20           I am interested in what they're saying

21   they're testing, though, with the areas that I'm an

22   expert in, which is the dermal.

23      Q.   Okay.  So EPA has acute oral and dermal

24   testing on POEA, right?

25      A.   Right.
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    Q.   It has eye and skin irritation studies on

2    POEA, right?

3    A.   Well, it says that.  We don't know what

4    exactly they are.

5    Q.   Okay.

6    A.   Because I've seen it somewhere else.

7         I haven't seen this document before.

8    Q.   Okay.  Is this a document you would have

9    liked to have seen?

10   A.   Kind of got a truism, you always want to see

11   as much you can, but you're limited on the material

12   you can see at any point in time.

13   Q.   Well, I'm -- let me ask you this.  We went

14   through very early --

15   A.   What troubles me is -- let me ask you -- let

16   me say it this way.

17   Q.   Okay.

18   A.   POEA has been used since '74.

19   Q.   Uh-hum?

20   A.   What I don't -- what I'd be more interested

21   in is is the first time that this risk assessment is

22   being done on POEA in 2009?

23   Q.   Have you looked to find that out?

24   A.   That's the more interesting question.

25   Q.   Well, have you looked to find that out?

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1      A.   I have looked to see what data exists on

 2   POEA.

 3      Q.   Okay.

 4      A.   I don't know the answer about the risk

 5   assess -- but here, let me finish my question.

 6      Q.   I'm not talking.

 7      A.   There's two things.  If the first time they

 8   did this, this is not impressive.  The second thing

 9   is, if they're basing this all on acute studies,

10   then there's -- then that's not impressive, either,

11   because as you go through all my dermal analysis,

12   you'll find that in most of these studies, the

13   irritation doesn't show up until the end of the

14   first week or the end of the second week.

15           Well, an acute study ends in basically about

16   a day or less.  So those are subchronic studies when

17   they're out, you know, a week or two weeks.

18      Q.   What's --

19      A.   And so the problem is that if EPA is basing

20   their risk assessment, and which they have in the

21   risk assessment I just reviewed and do have in my

22   reliance materials for glyphosate, if they're basing

23   it only on acute studies, then there's -- there's

24   something going wrong in the process because we have

25   all these incidences goings back into the '80s with
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    people having dermal irritation issues, we have

2    dermal studies from the '80s showing at the

3    subchronic level problems, and yet their citing, I

4    have looked this up, consistently Monsanto cites a

5    rat study that's an acute study, not a subchronic

6    study.  And they know full well they have subchronic

7    studies that show skin irritation beyond a day.

8         So that's what -- remember when I talked

9    before about risk assessment, knowing the pathways

10   and knowing what goes into them.  I haven't had a

11   chance to fully review this.

12   Q.   Okay.

13   A.   But when I see that it's based on acute

14   studies and I know there are subchronic studies that

15   show problems and acute studies that don't with

16   respect to dermal, then if they're going to waive

17   the pathway on dermal because of acute studies but

18   not consider the subchronic studies, I think it's a

19   flawed risk assessment.

20   Q.   Okay.  Motion to strike as non-responsive.

21        Sir, we went through very early in the

22   deposition all of the sources you went to to look

23   for information on glyphosate and/or Roundup®.  Did

24   you go to the EPA's public docket for glyphosate?

25   A.   I have.

```
 1        Q.   Okay.  You didn't see this document on that

 2    docket?

 3        A.   I don't know if I didn't see it or I didn't

 4    download it.

 5        Q.   Why would --

 6        A.   I didn't download everything that's on their

 7    docket.

 8        Q.   Did you ask Mr. Kristal to send you

 9    everything on EPA's public docket so you could see

10    the full wealth of information on there, on the

11    website?

12        A.   No, because I'm an exposure warnings expert.

13        Q.   Okay.  And you have --

14        A.   I'm not -- I'm not the toxicologist, I'm not

15    doing the cancer stuff.  So a huge portion of that

16    material is not relevant to me.

17        Q.   You have strong opinions in your report

18    regarding POEA, true?

19        A.   From -- from the standpoint -- from an

20    industrial hygiene standpoint and a -- and looking

21    at the definition of what constitutes an active

22    ingredient, absolutely, yes.

23        Q.   And despite the fact that you came with

24    strong opinions in your report regarding POEA, you

25    did not look to see if EPA had done a risk
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    assessment on POEA, true?

 2        A.   I did not look at the risk on POEA, but I

 3    did look at the risk assessment FOR glyphosate and

 4    Roundup® that was done in 19 -- and they only

 5    considered acute pathways.

 6        Q.   Are you aware that --

 7        A.   And that's what they've done here as well.

 8        Q.   Are you --

 9        A.   And so the results are not impressive.

10        Q.   I thought you didn't -- hadn't read this.

11    How do you know what they did?

12        A.   They just said here that they used acute

13    studies.

14        Q.   We didn't finish the list yet, sir.  How do

15    you know that they didn't?

16        A.   They took on dermal.  They said they used

17    acute rabbit data.

18        Q.   Are you aware that POEA has for decades been

19    on the EPA list of approved inerts?

20        A.   And the -- I guess the answer is and -- it's

21    kind of a, okay.

22        Q.   Okay.

23        A.   Does that make it right?  No.

24        Q.   Are you aware that -- sorry.  Are you done?

25        A.   Again, the question is did -- I'm always
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    looking at the trans- -- the whether or not

 2    DuPont --

 3        Q.   This isn't CA, man.

 4        A.   Hey, you've misspoke a few times today too.

 5    Give me a break.

 6             MR. KRISTAL:  We'll give you the first one

 7        at 5:26.

 8        A.   The -- if you look at the history of

 9    Monsanto and whether or not they were fully

10    transparent with what they knew, that's where my

11    criticisms lie, because I'm looking at standards of

12    care.  And I've tried to illustrate that as best I

13    can in multiple dimensions.

14    BY MR. KALAS:

15        Q.   Are you aware that the basis for EPA's

16    approval of inerts are on that EPA list of approved

17    inerts?

18             MR. KRISTAL:  Objection to form.

19        A.   It's not a surprise.  The question is

20    whether or not -- whether or not the information --

21    whether it's on EPA's list or whether -- I'm looking

22    at this information simply from a standpoint of is

23    the public being provided with fully transparent

24    information about the hazards of this product or

25    potential hazards from an industrial hygiene
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    standpoint.

2         And I think it's clear in reviewing dozens

3    if not hundreds of documents that that's not the

4    case.  And I've illustrated that in this 600-page

5    report.

6    BY MR. KALAS:

7        Q.   EPA has a dermal sensitization study on

8    glyc- -- on POEA, true?

9        A.   It could.

10       Q.   It's not a could, sir, it's right here in

11   black and white.

12       A.   Right.  Right.

13       Q.   They do, right?

14       A.   That's what they said.

15       Q.   Okay.  EPA has an in vivo mouse micronucleus

16   assay on POEA, correct?

17            MR. KRISTAL:  Objection.

18   BY MR. KALAS:

19       Q.   Page 10.

20       A.   Where are you at?

21       Q.   Page 10 bullet point on MON 0818.

22       A.   Okay.

23       Q.   EPA has an in vivo mouse micronucleus assay

24   on POEA, correct?

25       A.   Okay.

Confidential - Stephen E. Petty, PE, CIH, CSP

```
1       Q.    That's another type of genotoxicity study,

2    right?

3       A.    Okay.  I mean, I'm not a genotoxicologist.

4       Q.    Okay.  Do you know if that's an OECD

5    guideline study?

6       A.    It's not my area of expertise.

7       Q.    Okay.  You mentioned subchronic studies on

8    dermal effects of POEA.  Is there an OECD guideline

9    study for subchronic effects of dermal exposure to

10   surfactants?

11      A.    An OECD guideline on...

12            The OECD guidelines are on how to conduct

13   dermal studies.

14      Q.    Right.  Is there one for a subchronic study

15   of longer than a day?

16      A.    Oh, yeah, they've run tests out to 24 hours.

17      Q.    Okay.  That's a day.

18      A.    No, it's a --

19      Q.    Is there a study for --

20      A.    Typical workers don't work 24 hours.  They

21   work eight-hour shifts or six -- at most 12.

22      Q.    Is there an OECD guideline for a subchronic

23   study longer than a day under the OECD guidelines

24   for dermal exposure to inerts?

25      A.    I'd have to look and see the timeframe on
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    that.

2        Q.   Okay.

3        A.   They certainly -- there are studies that

4    claim they're following the OECD guidelines that

5    have data for no longer than that.

6        Q.   Okay.

7        A.   As I show in my report.

8        Q.   EPA also has a four-week and a 13-week

9    feeding study on POEA, correct?

10            MR. KRISTAL:  Objection.

11       A.   You said a four-week and a three-month

12   rat --

13   BY MR. KALAS:

14       Q.   I said a 13-week, but three months.

15       A.   That's why I was confused.

16       Q.   Well, we'll clarify it later, but I'll ask

17   it the way it's listed there.

18            The EPA has a four-week and a three-month

19   feeding study on POEA, correct?

20       A.   I'm just trying to -- you told me where we

21   were at, and when you asked me that question, it

22   didn't make sense with what the words were.  That's

23   all I'm telling you.

24       Q.   Okay.

25       A.   Those words say they had a four-week and a

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    three-month rat diet study.

2        Q.   If you go to the last line of Page 11.

3            Then I'm going to loop back to a couple of

4    other questions, but first we'll ask my -- there is

5    no evidence that AAPs are mutagenic or clastogenic.

6            Did I read that correctly?

7        A.   Where are you at?

8        Q.   Last line, sir, of the whole page.

9        A.   That's what those words say.

10       Q.   Okay.  And I think --

11       A.   I'm not an expert in that area, so you can

12   ask me those questions all day long.

13       Q.   I was going to ask the next question.  I

14   take it you have no opinion about whether or not you

15   agree or disagree with EPA on that one?

16       A.   I think I've answered the questions in that

17   dimension all day long.

18       Q.   Yeah.  But I'm asking about your agreement

19   with EPA here.

20       A.   But I -- if it's in general, how would it be

21   different with EPA?

22       Q.   So you don't disagree or and you don't agree

23   with EPA's statement there, correct?  You have no

24   opinion?

25       A.   I'm not offering expertise in that area.

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        Q.    Okay.  Looping up to the third-to-the-last

 2     sentence, it states, "The AAPs are not acutely toxic

 3     by the oral and dermal routes of exposure or via

 4     inhalation under normal use conditions, i.e. maximum

 5     25 percent in pesticide end-use products in

 6     nonrespirable droplet sizes."

 7              Did I read that correctly?

 8        A.    You did.  And that's my point.  That they're

 9     only looking at the acute toxicity.

10        Q.    Okay.  My question was whether I read it

11     correctly.

12              Did I read it correctly?

13        A.    Are we going to -- are you going to ask me

14     all day long to -- if you read words out of a

15     document right?

16        Q.    Did I read that sentence correctly, sir?

17        A.    If you're asking me if that's what the words

18     on this page say, I will say that.  I will say that

19     the words on whatever page that are here, if you

20     want to read them, there are words on this page

21     that's going to represent that that's the right

22     words.

23        Q.    Is there a glyphosate formulation that you

24     have seen Monsanto sell that has a level of AAPs in

25     it greater than 25 percent?
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1              MR. KRISTAL:  Objection to form.

 2       A.   It's -- it's unknown because the

 3  formulations have unlisted ingredients.

 4  BY MR. KALAS:

 5       Q.   Okay.  You have a lot of ingredients listed

 6  in here where you actually have figured out how much

 7  surfactant is in --

 8       A.   A small fraction.

 9       Q.   Okay.  Have you seen any greater than 25

10  percent?

11       A.   Again, the same answer.  I have -- that's

12  one of my biggest criticism from an industrial

13  hygiene standpoint is how do I protect against

14  unknown ingredients.  So I don't know what they are.

15       Q.   Have --

16       A.   So I can't answer the question.

17       Q.   My question isn't what you know, my question

18  is what you've seen.  They are two separate things.

19              Have you seen any formulated products with

20  AAPs greater than 25 percent sold by Monsanto?

21       A.   And I -- and I don't think you're

22  understanding my answer.  I've got a number of

23  products that I've seen that I don't know what's in

24  them.  I've got some I've seen that they list some

25  of what's in them.  So I don't know how to answer
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    that question when the ingredients are not listed.

2       Q.   For the products where you know what's in

3    them, have you seen any levels of AAPs greater than

4    25 percent?

5            MR. KRISTAL:  Objection to form.

6       A.   We don't have -- I don't have complete

7    formularies of those products.

8    BY MR. KALAS:

9       Q.   Are you aware that Mr. Kristal has -- and

10   other law firms in the glyphosate litigation have

11   requested on numerous occasion confidential

12   statements of formulas for the herbicide products

13   sold by Monsanto?

14           MR. KRISTAL:  Objection to form.

15      A.   How would I be privy to their

16   correspondence?

17   BY MR. KALAS:

18      Q.   Has Mr. Kristal or any other attorneys in

19   the glyphosate litigation sent you any of the

20   confidence statements of formulas produced by

21   Monsanto in the litigation?

22      A.   What I've been sent, I've listed.

23      Q.   Okay.  If they have confidential statements

24   of formulas for glyphosate products, would you like

25   to see those?

```
 1        A.   It's not going to change my opinions all

 2   that much.

 3        Q.   I had a feeling that would be the case.

 4        A.   I mean, more is always better.  It's one

 5   those -- those questions that has a yes and a no

 6   component to it.

 7        Q.   Okay.

 8        A.   I mean, my primary focus is on exposure and

 9   warnings.  Very few of your questions have anything

10   to do with exposure or warnings.

11        Q.   Okay.  Let me ask you this.  Let's go to

12   Page 69 of this document.

13        A.   Which one are we looking at?

14             MR. KRISTAL:  If we're going to do more on

15        this document and you need time to read -- skim

16        through it, you haven't even done that, but

17        whatever you need to do, if you feel you need to

18        do to answer questions.

19   BY MR. KALAS:

20        Q.   No, I just want to know if you agree with

21   one sentence, but if you need to look at

22   something -- if you need to look at it, I'm not

23   going to tell you no.

24             MR. KRISTAL:  He has before 94 pages.

25             MR. KALAS:  I marked it.  Well, he should
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1        have had it a long time ago, Jerry.

 2             MS. BEACH:  For what purpose?

 3             MR. KRISTAL:  And the next time you tell me

 4        how to practice law will be the last.  So don't

 5        tell us what he should or shouldn't have had.

 6             MR. KALAS:  Okay.

 7        A.   I mean -- I mean, I've -- you know, with

 8   respect -- you know, like I said, I haven't seen

 9   this before, but I read 4 point -- as I skim through

10   this, I read 4.2.4, dermal absorption.  That's going

11   to draw my attention because I'm a dermal expert.

12   BY MR. KALAS:

13        Q.   Okay.

14        A.   There are no dermal absorption data on the

15   AAPs.

16        Q.   Okay.

17        A.   So it says, "However, data on the

18   functionality and similar" -- "structurally similar

19   surfactants suggest that the dermal absorption of

20   the AAPs is likely to be low."

21             Well --

22        Q.   Let me ask you --

23        A.   That's pretty weak science, I'll just leave

24   it at that.

25        Q.   Let me ask you this.  Do you -- are you
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

 1    going to tell the jury that anyone has concluded

 2    worldwide that inert ingredients in and of

 3    themselves cause cancer?

 4        A.   You asked me that question already.

 5        Q.   I don't think I did, actually.

 6        A.   Yes, you did.

 7        Q.   Okay.

 8        A.   I have a very good memory.

 9        Q.   Okay.  I'm asking it not what you're going

10    to say.  I'm asking whether anyone has concluded.

11    Are you going to tell the jury whether anyone has

12    concluded worldwide that inert ingredients in and of

13    themselves cause cancer?

14        A.   I'm not sure I would know how to answer that

15    question because I don't know that I've looked at

16    every document that's out there.

17        Q.   Okay.  That's fine.

18        A.   So if you read this dermal section, you can

19    see -- this is a risk assessment.  And -- and what

20    counts on a risk assessment is the assumptions on

21    the pathways and then what is considered in terms of

22    the data.

23             So in dermal, we're limited to acute, which

24    is not subchronic.  And they've also limited it with

25    presumptions or assumptions about the rate of dermal

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1    absorption, 1.1 percent.

 2           So when you start to run a risk assessment

 3    and you limit -- you're not looking at acute,

 4    subchronic, and chronic data for dermal, most of the

 5    data that we have that show dermal irritation

 6    effects are not acute, they're subchronic or

 7    chronic.

 8           So when you risk away that, you basically

 9    delete those risk pathways from consideration and

10    you don't account for that risk, and consequently

11    your overall risk is going to be low, lower.

12           And -- and I -- and I don't know how to say

13    that more than I've said it multiple times.

14    Q.    Motion to --

15    A.    The question on looking at this document is

16    -- and they've made the same -- generally they've

17    made the same assumptions on dermal that were made

18    in the most recent one in 2018.

19    Q.    Motion to strike as non-responsive.  There

20    was no question pending.

21           If you go to Page 69, please.

22    A.    Okay.  69?

23    Q.    Yep.

24    A.    Okay.  I'm there.

25    Q.    The last sentence.  "Considering what is
```

Confidential - Stephen E. Petty, PE, CIH, CSP

1    already known about these specific compounds and

2    other long-chain, fatty-acid compounds along with

3    the lack of structural alerts for carcinogenicity,

4    chronic toxicity, or genotoxicity, HED, Health

5    Effects Division, has no specific concerns regarding

6    chronic exposures other than those identified in the

7    subchronic toxicity studies for this cluster."

8        Did I read that correctly?

9    A.   You're asking me if you read those words?

10   Those are -- yeah, that's what those words say.

11   Q.   Okay.  Is there any regulator that you're

12   aware of, sitting here today, who has determined

13   that surfactants used in Roundup® products are

14   carcinogenic?  Regulator.

15   A.   I'm not a cancer expert.  So you're asking

16   somebody who is an exposure and a warnings expert

17   questions about cancer studies.

18   Q.   Well, for reg -- let me -- go ahead.

19   A.   So it's really not appropriate because I'm

20   not here for that.

21   Q.   If a regulator did decide inerts were

22   carcinogenic, inerts that were used in Roundup® were

23   carcinogenic, you would testify that Monsanto should

24   tell people that the Roundup®'s inerts are

25   carcinogenic according to such-and-such regulator,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

1    right?

2        A.   It's pure speculation.  I don't know what I

3    would say.  It's a speculative scenario and it's a

4    speculative answer.  So it depends on context and

5    what I was asked to do.

6        Q.   So if there is a situation where a regulator

7    would say a -- an ingredient in a pesticide product

8    is carcinogenic, and you would say it's appropriate

9    for a company not to warn about that?

10       A.   No, I would never say that.

11       Q.   Okay.

12       A.   I would assume that they would warn about

13   it.

14       Q.   Okay.  So my question is is there any

15   regulator who has stated that the inerts in Roundup®

16   are carcinogenic so as to trigger an obligation to

17   warn via that regulatory process?

18       A.   But --

19            MR. KRISTAL:  Objection to form.

20       A.   You just -- you just crawled around to the

21   same question.  I'm not -- I'm not the cancer

22   expert.

23   BY MR. KALAS:

24       Q.   I'm just asking --

25       A.   So I haven't had -- you can ask me the

Confidential - Stephen E. Petty, PE, CIH, CSP

1    hypothetical if it was.

2        Q.    But I'm not asking that.  I'm asking if you

3    are aware --

4        A.    But you can't ask me if I reviewed the

5    literature on the carcinogenicity of -- of inerts

6    and the active ingredients in pesticides.  That's

7    what I'm not here for.

8        Q.    My question is whether you are aware of any

9    regulator triggering the duty to warn via the

10   classification of carcinogenicity for inerts.  Are

11   you aware of that?

12          MR. KRISTAL:  Objection to form.

13       A.    Same answer.  I'm not reviewing the

14   literature on carcinogenic studies.

15          MR. KALAS:  Okay.  I think we're done for

16       the day.

17          THE VIDEOGRAPHER:  This is the end of Media

18       No. 4.  The time is 5:41 p.m.  We're going off

19       the record.

20          (Whereupon, the deposition concluded at

21   5:41 p.m.)

22

23

24

25

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1              C E R T I F I C A T E

 2          I, TRINA B. WELLSLAGER, Registered

 3    Professional Reporter, Certified Realtime Reporter,

 4    and Notary Public, do hereby certify that, pursuant

 5    to notice, the deposition of STEPHEN E. PETTY, PE,

 6    CIH, CSP, was duly taken on December 3, 2019, at

 7    9:08 a.m. before me.

 8          The said STEPHEN E. PETTY, PE, CIH, CSP, was

 9    duly sworn by me according to law to tell the truth,

10    the whole truth and nothing but the truth and

11    thereupon did testify as set forth in the above

12    transcript of testimony.  The testimony was taken

13    down stenographically by me.  I do further certify

14    that the above deposition is full, complete, and a

15    true record of all the testimony given by the said

16    witness, and that a review of the transcript was

17    requested.

18                    Trina B. Wellslager

19    _____

20    Trina B. Wellslager, RPR, CRR

21    (The foregoing certification of this transcript does

22    not apply to any reproduction of the same by any

23    means, unless under the direct control and/or

24    supervision of the certifying reporter.)

25
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully

 5      and make any necessary corrections.  You should

 6      state the reason in the appropriate space on the

 7      errata sheet for any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10      and date it.  It will be attached to your

11      deposition.

12

13           It is imperative that you return the

14      original errata sheet to the deposing attorney

15      within thirty (30) days of receipt of the deposition

16      transcript by you.  If you fail to do so, the

17      deposition transcript may be deemed to be accurate

18      and may be used in court.

19

20

21

22

23

24

25
```

Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1                    - - - - - -

 2                  E  R  R  A  T  A

 3                    - - - - - -

 4     PAGE   LINE   CHANGE

 5     ____   ____   _____

 6        REASON: _____

 7     ____   ____   _____

 8        REASON: _____

 9     ____   ____   _____

10        REASON: _____

11     ____   ____   _____

12        REASON: _____

13     ____   ____   _____

14        REASON: _____

15     ____   ____   _____

16        REASON: _____

17     ____   ____   _____

18        REASON: _____

19     ____   ____   _____

20        REASON: _____

21     ____   ____   _____

22        REASON: _____

23     ____   ____   _____

24        REASON: _____

25
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
1                    ACKNOWLEDGMENT OF DEPONENT

2

3          I, _____, do hereby

4     acknowledge that I have read the foregoing pages, 1

5     through 359, and that the same is a correct

6     transcription of the answers given by me to the

7     questions therein propounded, except for the

8     corrections or changes in form or substance, if any,

9     noted in the attached Errata Sheet.

10

11

12    _____    _____

13    STEPHEN E. PETTY, PE, CIH, CSP                   DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    ____ day of _____, 20___.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24

25
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Stephen E. Petty, PE, CIH, CSP

```
 1                        LAWYER'S NOTES

 2     PAGE   LINE

 3     _____  _____   _____

 4     _____  _____   _____

 5     _____  _____   _____

 6     _____  _____   _____

 7     _____  _____   _____

 8     _____  _____   _____

 9     _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____

25
```