| | |
|---|---|
| **WILKINSON WALSH + ESKOVITZ LLP**<br>Brian L. Stekloff (*pro hac vice*)<br>(bstekloff@wilkinsonwalsh.com)<br>Rakesh Kilaru (*pro hac vice*)<br>(rkilaru@wilkinsonwalsh.com)<br>2001 M St. NW<br>10th Floor<br>Washington, DC 20036<br>Tel:   202-847-4030<br>Fax:   202-847-4005 | **ARNOLD & PORTER KAYE SCHOLER**<br>William Hoffman (*pro hac vice*)<br>(William.Hoffman@arnoldporter.com)<br>601 Massachusetts Avenue, N.W.<br>Washington, DC 20001<br>Tel: 202-942-6915<br>Fax: 202-942-5999 |
| **HOLLINGSWORTH LLP**<br>Eric G. Lasker (*pro hac vice*)<br>(elasker@hollingsworthllp.com)<br>1350 I St. NW<br>Washington, DC 20005<br>Tel: 202-898-5843<br>Fax: 202-682-1639 | **COVINGTON & BURLING LLP**<br>Michael X. Imbroscio (*pro hac vice*)<br>(mimbroscio@cov.com)<br>One City Center<br>850 10th St. NW<br>Washington, DC 20001<br>Tel: 202-662-6000 |

*Attorneys for Defendant*
*MONSANTO COMPANY*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No. 3:16-md-02741-VC |
| *Carriere v. Monsanto Co.*, 3:18-cv-05778<br>*I. Hernandez v. Monsanto Co.*, 3:16-cv-05750<br>*Johansing v. Monsanto Co.*, 3:16-cv-05751<br>*Sanders et al. v. Monsanto Co.*, 3:16-cv-05752<br>*Wooten v. Monsanto Co.*, 3:17-cv-01735<br>*Calderon v. Monsanto Co.*, 3:19-cv-01630<br>*Harris v. Monsanto Co.*, 3:16-cv-003199<br>*R. Hernandez v. Monsanto Co.*, 3:16-cv-07364<br>*Perkins v. Monsanto Co.*, 3:16-cv-06025<br>*Dickey et al. v. Monsanto Co.*, 3:16-cv-04102<br>*Domina v. Monsanto Co.*, 3:16-cv-05887<br>*Janzen v. Monsanto Co.*, 3:19-cv-4103<br>*Pollard v. Monsanto Co.*, 3:19-cv-4100<br>*Tanner v. Monsanto Co.*, 3:19-cv-04099 | **MONSANTO COMPANY'S REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF SPECIFIC CAUSATION EXPERTS CHARALAMBOS ANDREADIS, CLAYTON SMITH, EDWIN ALYEA, BARRY BOYD, LAUREN PINTER-BROWN, RON SCHIFF, AND BRENT STAGGS IN WAVE ONE CASES ON *DAUBERT* GROUNDS**<br><br>Hearing date: January 29, 2020<br>Time: |

**INTRODUCTION**

Plaintiffs' numerous oppositions can be summed up with the last line from their joint opposition to Monsanto's motion: "because the experts here *followed the same methodology as those previously addressed by the Plaintiffs' Bellwether experts*, Monsanto's Motion should be denied." Pls.' Joint Opp'n Br., at 4. Plaintiffs thus believe this litigation has turned into a box-checking exercise—so long as their experts are trained to check the right boxes, they should not be subject to meaningful *Daubert* scrutiny.

As such, Plaintiffs first direct their experts to check the differential diagnoses box, without regard to whether the experts are familiar with that terminology or have used that type of analysis in the past. Next, Plaintiffs direct their experts to check the boxes for relying on the opinions of the general causation experts and for finding their exposure exceeds two days per year or ten lifetime days. With these boxes duly checked, Plaintiffs' experts proceed to rule in NHL with no further analysis. Finally, Plaintiffs direct their experts to check the "substantial causative factor" box, no matter the individual Plaintiff's age, medical and social histories, family medical history, exposure to other carcinogens, or other risk factors.

In the rare instance the experts concede there are plausible alternative risk factors at issue, Plaintiffs' experts either rationalize that concession by assuming that the Plaintiff's NHL must have been "multicausal" in origin, *see, e.g.*, Ex. 1 to Def's Opening Br., Boyd (*Perkins*) Dep. 80:7–18, or conclude the risk factor made the Plaintiff "particularly susceptible" to developing NHL from glyphosate exposure, *see, e.g.*, Ex. 14 to Def.'s Opening Br., Pinter-Brown (*Johansing*) Rep., at 14. Neither explanation can be reconciled with the "differential diagnosis" method these experts purport to be applying because no alternative risk factor can ever move them off of their pre-determined conclusion. This robotic, outcome-driven exercise, in which every expert simply regurgitates "what the judge put in his order," Ex. 7 to Def.'s Opening Br., Smith (*Alvarez*) Dep. 194:23–195:114, falls well short of the rigorous scientific inquiry envisioned by *Daubert*.

Critically, in their frenzy to check the boxes they believe this Court laid out for them, Plaintiffs misconstrue the legal principals governing their experts' testimony. Their experts consistently failed to begin their analysis with a *comprehensive* list of risk factors and alternative potential causes

relevant to each Plaintiff, as required. They also repeatedly failed to provide a scientifically sound explanation for casting aside other potential risk factors and causes. Finally, and perhaps most crucially, the vast majority of the experts did not assess idiopathy *at all*. Plaintiffs either forgot to include an "idiopathy" box on their checklist or misread the Court's prior orders. Either way, this fatal omission requires exclusion. These experts are not providing an "artful" analysis that must be tolerated in this Circuit; they are manufacturing flawed, formulaic opinions that do not meet the requirements of Rule 702 or *Daubert*.

I. **Dr. Smith Did Not Understand the "Terminology" of Differential Diagnosis Because He Had Never Before Engaged in This "Purely Subjective Exercise" and Questioned Its Validity.**

Plaintiffs' attempt to rehabilitate Dr. Smith's damaging testimony—that he did not even know the terminology related to differential diagnosis—by claiming that he only took issue with the "terminology," Pls.' Alvarez Opp'n Br., at 13, misses the point: Dr. Smith's testimony shows that he did not understand the "terminology" because he has never used this methodology in medical practice, Ex. 7 to Def.'s Opening Br., Smith (*Alvarez*) Dep. 194:4–7 ("Q. Now, in -- in Mr. Alvarez's case, this isn't a differential diagnosis, at least not as you've ever heard it before, right? A. Correct."), and was instructed by Plaintiffs' counsel as to what methodology he should apply to this case, *id.* at 190:19-24. Dr. Smith's issues with the "terminology" of differential diagnosis are symptoms of deeper problems with his use of this "methodology"—namely, that he did not understand it and disagreed with its use. Further, Plaintiffs did not even attempt to address Dr. Smith's admissions that the methodology he used has no known error rate and "was a purely subjective exercise." *Id.* at 201:12–16. Dr. Smith's testimony exemplifies Plaintiffs box-checking approach to causation experts; the Court should not permit Plaintiffs to launder their made-for-litigation methodology through the credentials of a witness who had never heard of or applied that methodology prior to this litigation, and who candidly admits the methodology does not meet basic *Daubert* criteria.

II. **Plaintiffs Misconstrue the Legal Principles Applicable to Their Experts' Testimony.**

Plaintiffs' Joint Response misconstrues Monsanto's arguments and ignores binding precedent. Plaintiffs insist their experts need not "consider every potential risk factor" when conducting a differential diagnosis. Pls.' Joint Opp'n Br., at 3. But the first step of a reliable differential diagnosis

1  indisputably requires an expert to "compile a comprehensive list" of possible causes. *Clausen v. M/V*
2  *New Carissa*, 339 F.3d 1049, 1057–58 (9th Cir. 2003); *see id*. at 1958 (expert must first "rule[] in *all*
3  of the potential hypotheses that might explain a patient's symptoms") (emphasis added). Indeed, an
4  expert's list must include even "rare" possible causes in order to ensure that, when the expert evaluates
5  and "rules out" potential causes on the list during the second step of the differential diagnosis, rare—
6  but nonetheless possible—causes "are not overlooked." *See id*.

7  Resisting this conclusion, Plaintiffs suggest that *Wendell v. GlaxoSmithKline, LLC,* 858 F.3d
8  1227, 1237 (9th Cir. 2017), stands for the proposition that experts need not "consider every potential
9  risk factor" in order for their opinions to be admissible. But *Wendell* affirms that, at the first step of
10 a differential diagnosis, an expert must "assume[] the pertinence of *all* potential causes." 858 F.3d at
11 1234 (emphasis added). Although Plaintiffs attempt to twist its meaning, the passage they quote on
12 page 3 of their Joint Opposition Brief concerns the *second* step of a reliable differential diagnosis—
13 when an expert examines each potential cause on the "comprehensive" list and determines which is
14 the most likely cause. At that second step, an expert need not definitively "rule out" all potential
15 causes but one, so long as the expert has a sound basis for concluding that one particular cause is "the
16 most likely." *Id.*; *see also Cooper v. Takeda Pharm. Am., Inc.*, 239 Cal. App. 4th 555, 577 (2015)
17 (concluding that an expert need not definitively exclude all other possibilities before expressing an
18 admissible opinion).

19 Neither *Wendell* nor *Cooper* excuses the failure of Plaintiffs' experts to "rule in" relevant risk
20 factors at the first step of their analyses and "take serious account of other potential causes" of NHL.
21 *Clausen*, 339 F.3d at 1058; *see* Def.'s Opening Br., at 11–18. Indeed, courts routinely bar expert
22 testimony where the expert does not properly inquire about, and investigate, alternative potential
23 causes. *See, e.g.*, *Zellars v. NexTech Ne., LLC*, 895 F. Supp. 2d 734, 742, 747 (E.D. Va. 2012) (expert
24 was unreliable because she "failed to inquire about or investigate" other potential causes during the
25 first step of a differential diagnosis); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 763 n.33 (3d Cir.
26 1994) (expert was unreliable because he "conceded that there were many possible causes" but chose
27 to "base his diagnosis on the information he had available at the time" rather than "gather[ing] . . .
28 information on these alternative possibilities"); *see also Nelson v. Matrixx Initiatives*, No. C09-02904

1  WHA, 2012 WL 3627399, at *10 (N.D. Cal. Aug. 21, 2012) (expert was unreliable because the expert
2  "did not inquire into an important discrepancy" in plaintiff's medical history); *see generally Clausen*,
3  339 F.3d at 1058 (expert may be unreliable if she "neglects to consider" a potential cause).

4  Perhaps recognizing this serious problem, Plaintiffs attempt to justify their experts' failure to
5  "rule in" and fully consider all relevant risk factors. For instance, Plaintiffs suggest that Dr. Pinter-
6  Brown did not need to "rule in" and consider Harley Wooten's ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
7  ▇▇▇▇ r because "Monsanto did not ask Dr. Pinter-Brown one question about ▇▇▇▇▇▇
8  ▇▇ at her deposition." Pls.' (Johansing, Carriere, and Wooten) Opp'n Br., at 11. But deposition
9  questions (and answers) are irrelevant when assessing whether an expert reliably "ruled in" all
10 relevant risk factors. *See Nelson*, 2012 WL 3627399, at *9 (rejecting assertion that expert considered
11 age as a possible cause, because expert's report "d[id] not indicate that age was considered as part of
12 the differential diagnosis" and an expert's report "must lay bare . . . the basis for [the expert's]
13 opinions"). Similarly, Plaintiffs claim Dr. Alyea was not required to "rule in" Ruben Hernandez's
14 ▇▇▇▇▇▇▇▇▇▇—a known risk factor for NHL—because Dr. Alyea did not believe Mr.
15 Hernandez's ▇▇▇▇▇▇▇▇▇▇▇ was accurate. Pls.' (*Hernandez*) Opp'n Br., at 5–7. That
16 argument fails because Dr. Alyea is not an expert in ▇▇▇▇▇▇. *See Nelson*, 2012 WL 3627399
17 at *12 (when applying a differential diagnosis, an expert's "clinical judgment does not provide an
18 adequate basis for an opinion on an issue foreign to [an expert's] clinical practice").

19 Plaintiffs' experts also failed to reliably conduct the second step of the differential diagnosis.
20 Although Plaintiffs' experts need not "definitively exclude all possibilities other than the defendant's
21 . . . product," Pls. Joint Opp'n Br., at 3 (citations omitted), they must "use[] scientific methods and
22 procedures" in order to determine that one cause was "the most likely." *Clausen*, 339 F.3d at 1058.
23 Plaintiffs' experts, by contrast, are unable to explain why Roundup is a more likely cause than other
24 significant risk factors, and thus wrap their un-scientific conclusions in broad platitudes and
25 speculation. *See* Def.'s Opening Br., at 12 (Dr. Boyd stating NHL is "multicausal" but failing to
26 explain why Roundup exposure is a more likely cause than four decades of morbid obesity); *id*. at 15
27 (Dr. Pinter-Brown conceding relevance of other risk factors, but claiming those risk factors made it
28 easier for Roundup exposure to cause NHL while failing to explain why Roundup exposure was the

most likely ultimate cause). Because Plaintiffs' experts did not explain why Roundup exposure is the most likely cause, they are unreliable. *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1311 (11th Cir. 2014) (an expert is unreliable if the expert is "unable to determine the relative risk" of each potential cause).

Finally, Plaintiffs insist that their experts "need not exclude idiopathy" at the second step in order to render reliable opinions. In essence, Plaintiffs claim that, because their experts "followed the same methodology"—a differential diagnosis—as prior experts in this Court's bellwether trials, Monsanto's arguments regarding "idiopathy" are a mere "rehash." Pls. Joint Opp'n Br. at 3–4. Not so. Just as "an expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis," *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005), Plaintiffs cannot ignore idiopathy simply because their Wave One experts, like prior experts, performed differential diagnoses. The Court has made clear that each "expert must have a way to differentiate Roundup users who developed NHL because they used the product from Roundup users who would have developed NHL regardless." Pretrial Order No. 85, at 4 (Feb. 24, 2019), ECF No. 2799. It is true that the Court concluded the bellwether experts had "provided a basis for their conclusions that the [bellwether] plaintiffs f[e]ll into the category of Roundup users who developed NHL" because they used the product. *Id.* at 6. Under Plaintiffs' interpretation of this finding, the issue of idiopathy is resolved for all future Plaintiffs in this litigation.

Accordingly, most of the Wave One experts ignore this factor altogether—never mentioning it in their expert reports and failing to raise it at their depositions. For instance, Dr. Smith never addressed idiopathy in his report on Mr. Alvarez, and Dr. Pinter-Brown never addressed idiopathy in any of her three expert reports. Such an outcome is absurd and turns the science—which still shows the vast majority of NHL cases have no known cause—on its head. This striking omission, consistent across a multitude of Wave One Plaintiffs, is another manifestation of the flawed formula Plaintiffs have instructed their experts to follow. The Court should not allow these experts to disregard the most basic requirements for a reliable differential diagnosis. Rather, the Court must exclude them for failing to meet *Daubert*'s reliability requirements.

## CONCLUSION

The Court should reject Plaintiffs' attempts to transform the *Daubert* procedure into a formulaic exercise devoid on meaningful rigor or reliability, and should grant Monsanto's motion to exclude these specific causation experts. Further, the Court should grant summary judgment in Monsanto's favor because Plaintiffs have failed to present at least one admissible expert opinion to support specific causation in each of their cases.

DATED: December 23, 2019

Respectfully submitted,

*/s/ Michael X. Imbroscio*

Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
COVINGTON & BURLING LLP
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonwalsh.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonwalsh.com)
WILKINSON WALSH + ESKOVITZ LLP
2001 M St. NW, 10th Floor
Washington, DC 20036
Tel: 202-847-4030
Fax: 202-847-4005

William Hoffman (*pro hac vice*)
(William.Hoffman@arnoldporter.com)
ARNOLD & PORTER KAYE SCHOLER
601 Massachusetts Avenue, N.W.
Washington, DC 20001
Tel: 202-942-6915
Fax: 202-942-5999

Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
HOLLINGSWORTH LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

Attorneys for Defendant
MONSANTO COMPANY

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 23rd day of December, 2019, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ Michael X. Imbroscio