# EXHIBIT 3

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: ROUNDUP PRODUCTS
     LIABILITY LITIGATION
5
     This document relates to:        Case No.
6                                MDL No. 3:16-md-2741-VC

7    Jerald Carriere

8        vs.                     Case No. 3:18-cv-05887

9    Monsanto Company

10   _____

11

12

13            VIDEOTAPED DEPOSITION OF

14                 JERALD CARRIERE

15

16            Tuesday, July 16, 2019

17            9:43 A.M. TO 5:09 P.M.

18

19            Torrance, California

20

21

22

23           Golkow Litigation Services
         877.370.3377 ph-917.591.5672 fax
24               deps@golkow.com

25

JERALD CARRIERE

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: ROUNDUP PRODUCTS
     LIABILITY LITIGATION
5
     This document relates to:
6
     Jerald Carriere
7
          vs.                        Case No.
8                         MDL No. 3:16-md-2741-VC
     Monsanto Company
9

10   _____

11

12

13                   VOLUME 1

14           VIDEOTAPED DEPOSITION OF

15              JERALD CARRIERE,

16

17   taken at the offices of Law Offices, 3620 Pacific

18   Coast Highway, Suite 200, Torrance, California, on

19   Tuesday, July 16, 2019, at 9:43 A.M., before Lori

20   Byrd, Registered Professional Reporter, Certified

21   Realtime Reporter, Certified LiveNote Reporter,

22   Realtime Systems Administrator, Kansas Certified

23   Court Reporter 1681, and Certified Shorthand

24   Reporter in and for the State of California 13023.

25

JERALD CARRIERE

```
 1    APPEARANCES:

 2

 3         For the Plaintiff:

 4              LOCKRIDGE GRINDAL NAUEN P.L.L.P.
                BY:  YVONNE M. FLAHERTY, ESQUIRE
 5              100 Washington Avenue South
                Suite 2200
 6              Minneapolis, Minnesota  55401-2179
                   Phone 612-339-6900
 7                 Fax 612-339-0981
                   E-mail ymflaherty@locklaw.com
 8

 9         Also for the Plaintiff:
           Via Mobile Phone Speakerphone
10         from Remote Location:

11              MOORE LAW GROUP, PLLC
                BY:  JENNIFER MOORE, ESQUIRE
12              1473 South 4th Street
                Louisville, Kentucky  40208
13                 Phone 502-717-4080
                   E-mail jennifer@moorelawgroup.com
14

15
           For Defendant Monsanto:
16
                SHOOK, HARDY & BACON L.L.P.
17              BY:  H. GRANT LAW, ESQUIRE
                One Montgomery Tower
18              Suite 2600
                San Francisco, California  94104-4505
19                 Phone 415-544-1900 or 415-544-1946
                   Fax 415-391-0281
20                 E-mail hlaw@shb.com

21

22    LEGAL VIDEOGRAPHER:

23              ANIA BILINSKA

24    ALSO PRESENT:

25              NO ONE
```

JERALD CARRIERE

1    so you know, no surprises, I have Google satellite

2    views of the properties that appear to be

3    associated --

4         A.   Oh, cool.  Good.

5         Q.   Which will be really helpful to everyone --

6              (SIMULTANEOUS SPEAKING)

7         A.   Yeah, absolutely.  Absolutely.  I'm glad

8    you have them.

9    BY MR. LAW:

10        Q.   So let's go to that one, which is the one

11   on 171st Street.  Right?  I think it's --

12        A.   Yeah.  Well, actually -- okay.  Let's go to

13   171st Street.

14             You know, I kind of have it backwards.

15             Okay.  In '77 I opened up Carriere Car

16   Company on Hawthorne Boulevard.

17        Q.   Let me go back --

18        A.   Yeah, let's kind of reiterate on that.

19             And that -- do you have a Google on that?

20        Q.   I don't think I got -- did I get an

21   exact -- oh, 15637 --

22        A.   Yeah, it was about 3 acres, 2 acres.

23        Q.   I have a 15301.

24        A.   15301.  Okay, that's my other lot.

25        Q.   Possibly at a lunch break, I could get

JERALD CARRIERE

1    that.  It's a couple of things of saving documents

2    and so forth.  I'll try to get --

3        A.    If you need it.

4        Q.    Yeah.

5            Well, I'll ask you -- I don't think I had

6    asked you.

7            Did you do yard work or any type of

8    pesticide spraying at the car dealership, at

9    Carriere?

10       A.    Yes.

11       Q.    All right.

12           For the 171st Street, I have, actually, two

13   addresses on 172nd street.

14       A.    72nd Street [sic].  Yeah, that's right.  I

15   had two houses on that street.

16       Q.    Okay.  4437 and 4427?

17       A.    Right.

18       Q.    Okay.  Let's -- I got one.

19       A.    Yeah.

20       Q.    Let's start with the lower number, 4427.

21   We'll mark that as Exhibit 2.

22       A.    Okay, I bought that one first.

23           MS. FLAHERTY:  Let's just wait until we

24   have a question.

25           THE WITNESS:  I'm sorry.  I'm sorry.  I

JERALD CARRIERE

1    just ...

2             (DEPOSITION EXHIBIT 2 MARKED FOR

3             IDENTIFICATION)

4             THE WITNESS:  Okay.  These are the

5    houses --

6             MS. FLAHERTY:  Wait until there's a

7    question.

8             THE WITNESS:  Yes, ma'am.

9    BY MR. LAW:

10       Q.   Okay.  I'll represent to you that this is

11   what Google told me 4427 West 172nd Street is where

12   the red dot is.  Do you see that?

13            MS. FLAHERTY:  (Coughing) Excuse me.

14       A.   Yes, I see that.

15   BY MR. LAW:

16       Q.   Does that look like the house that you

17   owned?  Or still own?

18       A.   I sold it.  And yeah, that's what it looked

19   like.

20       Q.   You said, I think you owned it just for a

21   couple years?

22       A.   Hmmm, a little longer than that.

23       Q.   I had down '87 to '89.

24            Do you think it's longer?

25       A.   Yeah, it's about right, I guess.  I can't

1   remember.

2       Q.   What did you do with that property?

3       A.   Well, in those particular years, those

4   properties are, like, 50-by-150.  And they were

5   zoned R2, and developers were coming in and getting

6   R3 zoned.  So they were tearing them down and

7   building two or three units on them, developing

8   them.

9            So I kind of bought it in hopes that a

10  developer would buy it from me.

11      Q.   So there's -- it looks like there's at

12  least two structures on that lot, kind of an

13  orangish one and then a larger gray one.

14           Do you see that?

15      A.   Uh-huh.

16      Q.   In case the jury's reading along, if you'd

17  turn around and hold that up to the camera, and give

18  her a few seconds to zoom in on it.

19      A.   I don't know quite how to do this.  Right

20  here, this property --

21           THE VIDEO OPERATOR:  I'm sorry.  Could you

22  just hold it closer to your face --

23           MR. LAW:  Yeah, let's do that first, just

24  to get a good single shot, and then we'll describe

25  it a little bit more.

JERALD CARRIERE

1        A.    (Holding up Exhibit 2)

2   BY MR. LAW:

3        Q.    Okay.  And with your counsel's permission,

4   can you draw a line around the perimeter of that

5   property?

6              MS. FLAHERTY:  That's fine.

7        A.    (Marking)

8              Same shot?

9   BY MR. LAW:

10       Q.    Yeah, let's do that.  Thank you.

11       A.    (Holding up Exhibit 2)

12             THE VIDEO OPERATOR:  It is a little hard to

13   see the circle.  Do you want a Sharpie?

14             MR. LAW:  Do you want to hold it up a

15   little forward?  I know it's not a great --

16             THE VIDEO OPERATOR:  It's just very faint

17   because of --

18             MR. LAW:  That's okay.  It will be a marked

19   exhibit as well.  That's fine for now.  Thank you.

20             THE WITNESS:  Okay.

21   BY MR. LAW:

22       Q.    And do you recognize any of the structures,

23   as you look down on that lot, as being ones that

24   were there in that '87 to '89 time frame?

25       A.    Pretty much.

JERALD CARRIERE

1     Q.    Where there's a kind of a tan one that's a

2    little smaller than the gray one.

3           Were both those buildings there?

4     A.    Yes.

5     Q.    And can you describe what type of buildings

6    those are?

7     A.    The front one is two-bedroom, one bathroom,

8    about 800 square feet.

9           The back one is a converted garage, two-car

10   garage with a bathroom, what they would call a

11   studio.

12          And behind that it's just junk cars and

13   weeds and rubbish.

14    Q.    I take it none of the junk back there is

15   yours?

16    A.    No.

17    Q.    You see a mostly dirt lot back there?

18   There's some vegetation, but --

19    A.    Yeah, mostly dirt.

20    Q.    All right.  When you owned that property,

21   in the back yard, let's say -- let's just say -- was

22   there roughly the same square footage of either dirt

23   or vegetation as we see here?

24    A.    Roughly.

25    Q.    In other words, there weren't any other

JERALD CARRIERE

1    buildings or other --

2        A.    No.

3        Q.    -- constructions that would cover up that

4    part of the lot.  Correct?

5        A.    Correct.

6        Q.    And in the two or three years that you

7    owned that building, can you describe what type of

8    vegetation was back there?

9        A.    Weeds.

10       Q.    Was there ever a planted turf or lawn?

11       A.    Somewhat.  Somewhat.

12       Q.    Was it there when you got it?

13       A.    Yes.

14       Q.    And did you plant any lawn back there?

15       A.    I tried to.

16       Q.    And what went wrong?

17       A.    Tough soil.  And no one would take care of

18   it but me.

19       Q.    All right.  You had rental tenants the

20   whole time?

21       A.    I had tenants and they were supposed to be

22   responsible for the landscaping, but they never did.

23       Q.    All right.  And during the time that you

24   owned and managed that property, did you do weed

25   control using herbicides?

JERALD CARRIERE

Page 88

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | What brands of herbicides did you use? |
| 3 | A. | Roundup. |
| 4 | Q. | Did you use any other brands? |
| 5 | A. | No. |
| 6 | Q. | Do you recall the brand, the specific brand |

7  name of Roundup that you used?

8      A.   I do.

9      Q.   What was that?

10      A.   Roundup.

11      Q.   Okay.  And so did -- no other words, like

12  "Roundup for" any specific purpose or anything like

13  that?

14      A.   I just remember Roundup.

15      Q.   And during the time that you were spraying

16  in the backyard, what type of container -- Roundup

17  containers did you use?

18      A.   What type of container ... just the

19  (indicating) gallon spray bottle.

20      Q.   Okay.  And the gesture you're using with

21  your hands suggests that it was, like, a single

22  bottle with a trigger handle that you squeezed like

23  you are --

24      A.   Correct.

25      Q.   -- spraying -- washing a window with

JERALD CARRIERE

1    Windex.

2        A.    Correct.

3        Q.    I think that's sometimes called a trigger

4    spray.  Does that sound -- do you agree with that?

5        A.    I'll go with that.

6        Q.    All right.  And do you know whether it was

7    a standard blend, or a concentrate, versus -- well,

8    let me ask a different question.

9              Was it the type of product where you would

10   just spray it straight out of the bottle without

11   having to do any mixing?

12             MS. FLAHERTY:  Object to the form.

13             But go ahead.  You can answer.

14   A.    Straight out of the bottle.

15             Sometimes I would pour it, too.

16   BY MR. LAW:

17       Q.    And what do you mean by you would pour it?

18       A.    I'd take the top off and pour it.

19       Q.    For what purpose?

20       A.    Just if it was a big hunk of weeds, I'd

21   just pour it all over it.

22       Q.    About how many times did you visit the

23   property during those three -- approximately three

24   years where you sprayed for weeds?

25       A.    I would visit it quite often, every two

JERALD CARRIERE

1    weeks in the beginning; and less as time went on.

2        Q.    When you say you went out every --

3    beginning at the -- every two weeks, did you use

4    herbicide on those occasions?

5        A.    Yeah.

6        Q.    And at the time you used the Roundup, did

7    you have any understanding that the actual death of

8    the plant would take more than a week or so?

9        A.    No.  I didn't have any understanding how

10   long it would take.

11       Q.    Did you read any of the directions or

12   instructions on the bottle?

13       A.    I read it all.

14       Q.    What is your best recollection about what

15   the directions and instructions on that Roundup

16   bottle stated?

17       A.    That it kills weeds.

18       Q.    Do you recall any instructions as to how to

19   spray the weeds?

20       A.    Just spray the weeds.

21       Q.    Do you recall any directions or

22   instructions as to how often to spray the weeds?

23       A.    No.

24       Q.    So the decision to spray on your visits was

25   yours?

JERALD CARRIERE

1     A.   Yes.

2     Q.   Did you ever attempt to kind of time how

3   long it took between the first application of

4   Roundup and the point that the weed was dead?

5     A.   No.

6     Q.   Did you use any protective clothing when

7   you sprayed on this property?

8     A.   No.

9     Q.   So you -- I'd like to expand a little more

10  on your comment about initially visiting every two

11  weeks.

12         At some point I take it that the visits

13  were less frequent?

14    A.   Yes.

15    Q.   And how would you best describe the

16  interval of visits between the initial time you were

17  visiting for every other week 'til the time you sold

18  the property?

19    A.   Well, in the beginning, I wanted to get it

20  as much under control as I could, so it was often.

21         After a few months, I found out that it

22  wasn't working quite as well as I had hoped, and I

23  didn't spray it as much, or pour on it as much.

24         I tried to control it the best I could, but

25  it was a pretty -- a pretty difficult thing to stop.

JERALD CARRIERE

1    Q.   Can you give me an estimate of the

2  percentage of the surface area that you see

3  behind -- essentially in the backyard behind the

4  gray house, that you applied herbicide to?

5    A.   Oh, I'd say 50 feet wide by 75 feet long.

6    Q.   And how would you express that as to how

7  much of that -- what percentage of that allotted

8  itself -- because I don't know what the actual foot

9  dimensions are, so ...

10   A.   I -- close to half of it.

11   Q.   And would that be the perimeter half?

12   A.   Both the perimeter and the inside.

13   Q.   So what part -- what parts of that back lot

14  were you not spraying?

15   A.   I pretty much sprayed it all.

16   Q.   What was your intent in spraying all of it?

17   A.   Well, I wanted to get the weeds under

18  control so I could either build the lawn back there

19  for the tenants.  Or in the back of my mind, I was

20  thinking perhaps that I would develop it.

21   Q.   Do you have an estimate of what portion of

22  each bottle of Roundup that you used would be poured

23  out as opposed to sprayed?

24   A.   For each time?

25   Q.   Right.  If there's an average that you

JERALD CARRIERE

1    could come up with.

2         A.    The whole bottle.

3         Q.    That sometimes you'd pour a whole bottle

4    out?

5         A.    Oh, yeah.

6         Q.    And then sometimes you'd spray and

7    sometimes you'd pour --

8         A.    By the time I was done, the whole bottle

9    was gone.

10        Q.    All right.  Did you ever use a whole bottle

11   in a single application?

12        A.    Yeah.

13        Q.    Did you ever use more than one bottle in

14   one trip, one visit?

15        A.    Not that I remember.

16        Q.    And so when you were using one bottle and

17   pouring it, would it be fair to say that you were

18   concentrating on hot spots?

19        A.    Yeah.

20        Q.    You would agree you can't cover that whole

21   backyard with one bottle if you're just pouring it.

22   Correct?

23        A.    Right.

24        Q.    And the hot spots that you were addressing,

25   were those in any particular part of that backyard?

JERALD CARRIERE

```
 1      A.   Not really.

 2      Q.   At any point did you have someone come out,

 3   or yourself, just cut the grass -- just cut the

 4   weeds down?

 5      A.   That was the -- the renter's

 6   responsibility.  He was in charge of the

 7   landscaping.

 8      Q.   Did they ever mow it --

 9      A.   They tried.  They tried.  They had some

10   kids and they tried to make a little area for them.

11           What date did you take this picture?

12      Q.   Yesterday.

13      A.   Really?

14      Q.   I didn't take it yesterday.  I printed it

15   off yesterday.  So I can't tell you when it was

16   taken.

17      A.   That's funny, because I sold -- I sold it a

18   long time ago, and he was going to develop it.  I

19   haven't been by there.

20           MS. FLAHERTY:  Let's wait until we have a

21   question.

22           THE WITNESS:  Yeah, I'm sorry.  I'm sorry.

23   I was just thinking out loud.

24   BY MR. LAW:

25      Q.   When you used the Roundup in the backyard
```

JERALD CARRIERE

1  during that three-year period, did you ever wear

2  gloves?

3     A.   No.

4     Q.   When you used the Roundup in the backyard

5  and you poured it, were you careful not to splash

6  any of the liquid on yourself?

7     A.   Yeah, I was careful --

8          MS. FLAHERTY:  Object to the form.  Go

9  ahead.

10 BY MR. LAW:

11    Q.   Did you in any event ever end up spilling

12 any Roundup on any exposed skin on your body?

13         MS. FLAHERTY:  Object to the form.

14         You can answer.

15    A.   Say again?

16 BY MR. LAW:

17    Q.   Yeah.  During the times where you poured

18 Roundup out in that backyard, did you ever spill any

19 on yourself?

20    A.   Yeah.

21    Q.   And how many times did that happen?

22    A.   I don't remember.

23    Q.   Did it ever get on your -- directly on your

24 skin?

25    A.   Yeah.

JERALD CARRIERE

1    Q.    On what part of your body?

2    A.    My hands, my legs.

3    Q.    In the times that it got on your legs, were

4  you wearing long pants?

5    A.    Most of the time.

6    Q.    Were you -- the times that it got on your

7  legs, were you wearing shoes and socks?

8    A.    Most of the time.

9    Q.    The times that you got it on the skin of

10  your legs, was that ever a time when you were

11  wearing shorts?

12    A.    Yes.

13    Q.    The times that you got it on your legs, was

14  it ever a time when you were wearing long pants?

15    A.    Yes.

16    Q.    And I take it then in those instances it

17  soaked through the fabric?

18    A.    Yes.

19    Q.    Do you know what a Tyvek suit is?

20    A.    No.

21    Q.    It's like a white, papery, overall.  You

22  sometimes see people wear it in crime scenes.

23    A.    Yeah, I've seen them.

24    Q.    Okay.  Have you ever worn one of those?

25    A.    No.

JERALD CARRIERE

1                THE WITNESS:  Can we get a masseuse in

2    here?

3                MS. FLAHERTY:  Yeah, why don't we -- when

4    you get to a good spot.  I think we've been going

5    again for another hour, roughly?

6                MR. LAW:  Yeah.  Let's finish this property

7    and we'll work through.

8                MS. FLAHERTY:  Okay.

9    BY MR. LAW:

10       Q.   Do you have an estimate of the -- well, let

11   me back up.

12            If you added up the total amount of Roundup

13   that you either sprayed or poured, what ratio would

14   have been -- of the total volume, would have been

15   poured versus sprayed?

16       A.   I have no idea.

17       Q.   Can you tell -- say whether it was more

18   50/50?  Or some -- at least some --

19       A.   No, I wouldn't have any idea.

20       Q.   And in the -- during the time frame that

21   you owned it, do you have -- the property, do you

22   have an estimate of how many bottles you went

23   through per year?

24       A.   No.

25       Q.   Can you bracket it in terms of more than

JERALD CARRIERE

1    one, but less than another number?

2        A.    I wouldn't have any idea at all.

3        Q.    When you did spray the Roundup --

4        A.    Uh-huh.

5        Q.    -- did you point it directly at the

6    vegetation that you wanted to kill?

7        A.    Yes.

8        Q.    Was there any -- any plants or other

9    vegetation in that backyard that you were trying to

10   spare?

11       A.    A little bit, yeah.

12       Q.    And were you careful to work around that

13   area and not spray directly on those plants?

14       A.    As careful as I could be, yeah.

15       Q.    Was there a tree or trees on that property

16   when you owned it?

17       A.    Yeah.   Uh-huh.

18       Q.    Is that -- we see one in the upper right

19   corner.

20             Is that the same one?   Although maybe a

21   little older?

22       A.    Yeah.   There was a tree there.

23       Q.    And do you know what kind of tree that is?

24   Or was?

25       A.    No.

JERALD CARRIERE

1      Q.   Do you know if that backyard was used for

2  any business purpose?

3           MS. FLAHERTY:  Object to the form.

4           You can answer.

5  BY MR. LAW:

6      Q.   During the time you owned it.

7      A.   I don't know.

8      Q.   Okay.  And by that "business" I mean, for

9  example, if somebody worked on repairing machinery

10  back there, or -- it doesn't look like you can get a

11  car back there, but maybe --

12     A.   I -- I don't know.

13          MS. FLAHERTY:  Object to the form.

14          Go ahead.

15  BY MR. LAW:

16     Q.   Okay.  So let's go to the front yard of

17  that property.  And you see it looks like pretty

18  much a dirt lot there.

19     A.   Uh-huh.

20     Q.   Is that a yes?

21     A.   Yeah.

22     Q.   And did you use any herbicides on that

23  front yard?

24     A.   Yes.

25     Q.   And did you use them in the same manner

JERALD CARRIERE

1    that you told me about, that you used in the

2    backyard?

3        A.    Yes.

4        Q.    Aside from a lawn, did you ever plant

5    any -- any trees or other vegetation?

6        A.    Yes.

7        Q.    What did you do?

8        A.    Oh, we planted some flowers, and a little

9    hedge.  You know, just trying to spruce it up a

10   little bit.

11           MR. LAW:  Okay.  I think that's what I have

12   for this property, but we're about to take a break.

13   And I might have some follow-ups, but I think we're

14   essentially done.  Thank you.

15           THE WITNESS:  Thank you.

16           THE VIDEO OPERATOR:  We are now going off

17   the video record.  The time is approximately

18   12:12 P.M.

19

20           (LUNCH RECESS TAKEN AT 12:12 P.M.)

21

22

23

24

25

JERALD CARRIERE

1          AFTERNOON SESSION

2              1:30 P.M.

3          THE VIDEO OPERATOR:  We are now back on the

4    video record.  The time is approximately 1:30 P.M.

5    BY MR. LAW:

6      Q.    Okay.  Welcome back.

7      A.    Thank you.

8      Q.    I've got a couple of wrap-up questions on

9    Exhibit 2.

10          First of all, we got a better pen, a red

11   one.

12          If I could ask you to just recircle the

13   perimeter of that, just so that shows up a little

14   bit better when we make copies.

15     A.    (Marking)

16     Q.    Okay.  So do you know how many square feet

17   that lot is?

18     A.    150 by -- or 155-by-50.

19          MS. FLAHERTY:  And just so we're clear,

20   we're talking about the lot on Exhibit 2?

21          MR. LAW:  Correct.

22          MS. FLAHERTY:  Okay.

23   BY MR. LAW:

24     Q.    And we talked about the -- the backyard and

25   the front yard areas where --

JERALD CARRIERE

1          Are there any driveways or paved areas that

2    you sprayed with Roundup?

3          A.   Yes.

4          Q.   Where would those be?

5          A.   That would be on the right side of the

6    house, looking from the front street.

7          Q.   Where the cars are parked?

8          A.   Yeah.

9          Q.   And where in that driveway stretch did you

10   spray?

11         A.   Back to where the other house shows.

12         Q.   Is that basically the run up the driveway?

13         A.   Correct.

14         Q.   Any other parts of that lot that we haven't

15   covered?

16         A.   Whatever -- where weeds were.   [inaudible]

17              (REPORTER REQUESTED CLARIFICATION)

18         A.   Weeds were.

19   BY MR. LAW:

20         Q.   Did this property have any decks?

21         A.   Any who?

22         Q.   Decks?

23         A.   Not to my knowledge.

24         Q.   And when you would visit the property and

25   spray with Roundup, approximately how much time

JERALD CARRIERE

1   would you spend actually applying the Roundup?

2       A.   15 to 30 minutes.

3       Q.   And would you typically cover some, or all

4   of the areas that you've described?

5       A.   Some.

6       Q.   So you indicated that your visits became

7   less frequent after the first initial visits.

8            Can you tell us approximately how often you

9   would visit the property after that?

10           MS. FLAHERTY:  Object to the form.

11           But go ahead.

12      A.   At least once a month.

13   BY MR. LAW:

14      Q.   And are you able to give me a yearly

15   average?

16      A.   12 times.

17      Q.   And of those 12 times per year, how many

18   times did you actually apply Roundup?

19      A.   Most every time.

20      Q.   And can you give me an average amount of

21   quantity of Roundup that you would use on each

22   visit?

23      A.   No.

24      Q.   Now, that -- that backyard has fences.

25   Correct?

JERALD CARRIERE

```
 1      A.    Correct.

 2      Q.    And is it -- has the wind ever been enough

 3   back there to kick up dust?

 4            MS. FLAHERTY:   Object to the form.

 5   BY MR. LAW:

 6      Q.    To your knowledge?

 7      A.    Not to my knowledge.

 8      Q.    Was there any mulch or woodchips on the

 9   lot?

10      A.    We applied fertilizer.

11      Q.    In what parts of the lot?

12      A.    The parts we wanted grass to grow.

13      Q.    And where on the lot, generally, would that

14   be?

15      A.    The barren spots.

16      Q.    That we see in this exhibit?

17      A.    Uh-huh.

18      Q.    So basically more towards the center?

19      A.    More -- you know, the center, the rear,

20   sides.

21      Q.    Did you grow any shrubs on this lot?

22      A.    There were a few growing.

23      Q.    Do you know what type?

24      A.    I don't.

25      Q.    And would you agree that when you did use
```

JERALD CARRIERE

1    the spray bottle, that the spray came out more like

2    a droplet than a mist?

3         MS. FLAHERTY:  Object to form.

4         But go ahead.

5    A.   No, I wouldn't agree with that.

6    BY MR. LAW:

7    Q.   How would you describe the way the liquid

8    came out?

9    A.   Well, it depends.  You know, it was -- when

10   you sprayed, you'd have to build up the pressure.

11        When you poured it, it just came out.

12   Q.   But when you did spray it, did it come out

13   more like a droplet or a mist?

14   A.   When you sprayed it, it came out like a

15   mist.

16   Q.   So we talked earlier about how you -- there

17   were some plants in the backyard that you wanted to

18   keep.  Correct?

19   A.   Yes.

20   Q.   And were you successful in keeping the

21   Roundup off those plants and keeping them alive?

22   A.   Some.

23   Q.   What do you mean by that?

24   A.   Some of them were kept alive.

25   Q.   And some died?

JERALD CARRIERE

```
1       A.    Correct.

2       Q.    And do you know whether that -- if that was

3   because of the Roundup?  Or perhaps something like,

4   you know, not having water?

5             MS. FLAHERTY:  Object to form.

6       A.    Mother nature, you know ...

7   BY MR. LAW:

8       Q.    You just don't know?

9       A.    Not really.

10      Q.    Okay.  Did you have a preference for the

11  type of weather that you would prefer, or use, when

12  you used Roundup?

13      A.    Did I have a weather ...

14      Q.    In other words, did you prefer an overcast

15  day?  A sunny day?

16      A.    Oh, not really.

17      Q.    Do you know what type of weeds you were

18  spraying at this address?

19      A.    I was told that they were crabgrass, kikuyu

20  grass, dandelions.  That's the three that I was

21  told.

22      Q.    Did you ever form an impression as to

23  whether the Roundup would kill a particular weed on

24  the first try or not?

25      A.    Not completely, but they did kill them.
```

JERALD CARRIERE

1    But it wasn't one try and they were gone.

2        Q.   Okay.  And what I want to distinguish is,

3    you've got an initial weed and you spray it.  And

4    that weed may die but there might be other weeds

5    that kind of come out from the cracks, potentially

6    based on seeds that are already there.

7        A.   Uh-huh.

8        Q.   So do you have that distinction in mind?

9             MS. FLAHERTY:  Object to the form.

10            But go ahead.

11       A.   No, I didn't have that distinction in mind.

12   BY MR. LAW:

13       Q.   Okay.  So when you had to give successive

14   applications, it could have been because just

15   additional weeds were growing up in the same area?

16            MS. FLAHERTY:  Same objection.

17       A.   Yeah.

18   BY MR. LAW:

19       Q.   At some point did you think you had killed

20   all the weeds in the backyard?  Or the front yard?

21   Or did they just kind of keep coming back?

22            MS. FLAHERTY:  Object to the form.

23            THE WITNESS:  Do you want me to answer it?

24            MS. FLAHERTY:  Yeah, you can answer.

25       A.   Say again?

JERALD CARRIERE

Page 108

```
 1   BY MR. LAW:
 2       Q.   Yeah.  At some point did you succeed in
 3   killing off the weeds that you wanted to take care
 4   of in your backyard?  Or front yard?
 5       A.   Yes.
 6       Q.   About how long into your ownership did that
 7   happen?
 8       A.   It was a constant battle.
 9            THE VIDEO OPERATOR:  Just try not to cover
10   up the microphone.
11            THE WITNESS:  I'm sorry.
12            (Repositioning Microphone)
13            It was a constant battle.
14            (Repositioning Microphone)
15            How's that?
16   BY MR. LAW:
17       Q.   When you say it was a constant battle, did
18   you at some point succeed in getting rid of all the
19   weeds?
20       A.   No.
21       Q.   Did you ever mow any of the lawn that you
22   had --
23       A.   Yes.
24       Q.   -- on that lot?
25            Did you ever use a weed whacker?
```

JERALD CARRIERE

1      A.   Yes.

2         Q.   And I think you said you used some

3    fertilizer?

4      A.   Yes.

5         Q.   If you could give -- quantify the amount

6    that you used over the time frame that you owned the

7    property, would you be able to do that?

8      A.   I really couldn't say how much I used.

9         Q.   Do you know if they typically come in

10   50-pound bags?

11     A.   Yeah.  Yeah.

12        Q.   Any estimate of number of bags that you

13   bought and used over the years that you had that

14   property?

15     A.   Yes.  There were a number.

16        Q.   Now we're going to try to get to that

17   number.  Is that --

18     A.   Well, here's -- you know, I had other

19   properties that I'm using it on.  So I didn't, like,

20   say:  Okay, this was for 172nd Street; this was

21   for -- you know, it's --

22        Q.   That's fair.  Any estimate, if you could

23   count up the bags that were opened up and spread on

24   that property, about how many you deployed?

25     A.   I'd be guessing.

JERALD CARRIERE

Page 111

```
 1    BY MR. LAW:

 2        Q.   Was it within the last five years?

 3        A.   Yes.

 4        Q.   Was it within the last year?

 5        A.   No.

 6        Q.   Have you used it since filing your lawsuit?

 7        A.   Since when?

 8        Q.   Since filing your lawsuit.

 9        A.   No.

10        Q.   Do you have in your possession any clothing

11    that you have worn in the past while using Roundup?

12        A.   No.

13        Q.   Did you ever make it a practice to wash

14    your clothes after applying Roundup?

15        A.   No.

16        Q.   The times that you spilled Roundup onto

17    your skin, do you have any estimate as to what --

18    the amount of volume that actually contacted your

19    skin?

20             MS. FLAHERTY:  Object to the form.

21             Go ahead.  You can answer.

22        A.   I don't know.

23    BY MR. LAW:

24        Q.   Would you characterize it as a splash?

25             MS. FLAHERTY:  Object to form.
```

JERALD CARRIERE

Page 112

1           Go ahead.

2      A.   They were splashes.

3  BY MR. LAW:

4      Q.   And would there be something in particular

5  you'd be doing that could potentially cause the

6  Roundup to get on you as opposed to on the weeds

7  you're trying to kill?

8      A.   Something I was doing?

9      Q.   Yeah.

10      A.   No.

11      Q.   You'd have to unscrew that trigger handle.

12  Right?

13      A.   Yes.

14      Q.   Did it ever happen while you were

15  unscrewing it?

16      A.   Yes.

17      Q.   Did it ever happen while you were pouring

18  it?

19      A.   Yes.

20      Q.   And when it spilled when you were pouring

21  it, did it ever get on either of your hands?

22      A.   Yes.

23      Q.   And can you describe, like, what you would

24  be doing that could cause the Roundup coming out of

25  the neck of the bottle to then get on either --

JERALD CARRIERE

1    either one of your hands?

2        A.    Just happened.  Accident.

3        Q.    And the weeds that you were spraying, were

4    they typically pretty low to the ground?

5        A.    Most of them.

6        Q.    Were there any that were, let's say, above

7    the knee level?

8        A.    Yes.

9        Q.    What types of weeds were those?

10       A.    I don't know the name of them, but they're,

11   like -- you know, they have flowers growing out of

12   them.

13       Q.    Did you ever apply it to ivy?

14       A.    Yes.

15       Q.    On that property?

16       A.    Yes.

17       Q.    And where was the ivy growing?

18       A.    Around the fringes of the fence.

19       Q.    When you say "fringes," are you talking

20   about the base?

21       A.    Yeah.

22       Q.    Now, the times that you were out on that

23   property, was there any -- were the tenants ever out

24   there with you?

25       A.    Yeah.

JERALD CARRIERE

Page 114

1      Q.    And as best you can recall, can you tell me

2   the names of the tenants that you had on that

3   property?

4      A.    Vladimir.

5      Q.    Last name?

6      A.    I don't know his last name.

7      Q.    Are you in contact with any of the tenants

8   from that property?

9      A.    No.

10          MR. LAW:  Okay.  We're going to move on to

11   what we'll mark next as Exhibit 3, which is the

12   Google overhead of 4437 West 172nd Street.

13          Is that a property that you owned in the

14   past?

15      A.    Yes.

16          (DEPOSITION EXHIBIT 3 MARKED FOR

17          IDENTIFICATION)

18          THE WITNESS:  Do you want this?

19          MS. FLAHERTY:  No.  He gives a copy to me.

20   It's two pages.

21   BY MR. LAW:

22      Q.    Do you recognize this property?

23      A.    I do.

24          MS. FLAHERTY:  Don't draw on it until he

25   asks you to.

JERALD CARRIERE

```
 1              THE WITNESS:  I'm not ready to draw.

 2         But your counsel is very helpful.

 3  BY MR. LAW:

 4     Q.   Could you draw a circle in that red ink

 5  around that property.

 6     A.   (Marking)

 7              MS. FLAHERTY:  I said don't draw.

 8         (LAUGHTER)

 9     A.   (Marking)  Okay.

10  BY MR. LAW:

11     Q.   All right.  That lot looks, size-wise,

12  identical to the other property we just talked

13  about.

14     A.   Exactly.

15     Q.   Okay.  But it has a lot more buildings on

16  it.

17     A.   Right.

18     Q.   How many of those buildings were there when

19  you owned this property?

20     A.   Two.

21     Q.   Which ones?

22     A.   The first two from the street.

23     Q.   So the first one would be the one that

24  actually has the marker dot on it?

25     A.   Yeah.
```

JERALD CARRIERE

1      Q.    And then the one behind it?

2      A.    Correct.

3      Q.    Is it the one that appears to drop below

4    two roofs?  Or is it the next flat roof?  Or

5    maybe -- why don't you go ahead and circle it.

6      A.    No -- I'll just put 1 and 2.  Okay.  Those

7    are the first two.

8      Q.    And if you would hold that up for the

9    camera, maybe at chest level, and see if they can

10   zoom in.

11     A.    (Holding up Exhibit 3)

12     Q.    And there's some kind of a peaked roof

13   building in between those.

14           Do you know what that is?

15     A.    No, I don't.  I assume it's another

16   dwelling.

17     Q.    Is this -- to your knowledge, is this lot

18   zoned for this many buildings?

19     A.    No.

20     Q.    No, you don't know?  Or --

21     A.    No, it's not zoned for that many buildings.

22   It's zoned for two buildings.  Two residential

23   buildings.

24           They probably built those as garages and

25   then converted them.

JERALD CARRIERE

Page 117

1      Q.    So when you owned this property, what was

2   between building 1 and building 2?

3      A.    Okay.   It was a building, and then it was

4   like a deck and then another building.

5      Q.    So where that peaked roof is between 1 and

6   2 used to be a deck?

7      A.    Yes.

8      Q.    And when did you first acquire this

9   property?

10      A.    In the '80s.

11      Q.    How long did you own it?

12      A.    Oh ...

13        I think I sold it in the '90s.

14      Q.    During that time did you add any

15   structures?

16      A.    No.

17      Q.    And let's just take building number 2,

18   working our way towards the rear fence.

19        Can you describe what the terrain of that

20   part of the lot was like when you owned it?

21      A.    It was just barren land.

22      Q.    Was it similar to the -- the other lot that

23   you had, in terms of --

24      A.    Yes.

25      Q.    So it had some vegetation, but it also had

JERALD CARRIERE

1    exposed dirt --

2        A.   Right.  Right.

3        Q.   And I -- I think I understand, buildings

4    1 and 2 were rental units?

5        A.   Yes.

6        Q.   And did you use any herbicides on this

7    property?

8        A.   Yes.

9        Q.   And maybe it will save some time, I'll ask

10   you:  Did your application use of Roundup, in terms

11   of amount used and frequency of visits, was it

12   similar to the pattern that you had in the other

13   property?

14       A.   Yes.

15       Q.   Did -- to your knowledge or recollection,

16   did it differ in any way that you can think of?

17       A.   No.

18       Q.   So it's still around once a month?

19       A.   Uh-huh.

20       Q.   Yes?

21       A.   Yes.

22       Q.   And using the application the same way,

23   sometimes pouring it, sometimes spraying it?

24       A.   Yes.

25       Q.   And as to the specifics of which times you

JERALD CARRIERE

1   actually spilled it -- the product on you, and which

2   times you didn't, that's not something that you can

3   recall today.   Correct?

4       A.   No, huh-uh.

5       Q.   Is that correct?

6       A.   Correct.

7       Q.   Did you identify a property on Denker?

8       A.   Uh-huh.

9       Q.   And is that 14802?

10      A.   Uh-huh.

11      Q.   Is that yes?

12      A.   That's my property.

13      Q.   When did you purchase that?

14      A.   Around 1990.

15           MR. LAW:  So we'll mark the next map as

16  Exhibit 4.

17           (DEPOSITION EXHIBIT 4 MARKED FOR

18           IDENTIFICATION)

19  BY MR. LAW:

20      Q.   How long did you own this property?

21      A.   I own it today.

22      Q.   And it is the lot that this house sits in

23  the center of the --

24      A.   Yes.

25      Q.   -- of the images?

JERALD CARRIERE

1      A.    Uh-huh.

2      Q.    Okay.  And just to keep consistent, can you

3   draw a line around the perimeter of that lot?

4      A.    (Marking)

5      Q.    You're looking at page 2, so I might as

6   well ask.

7      A.    Okay.

8      Q.    Does that look like a front view of the

9   property?

10     A.    Correct.

11     Q.    Do you know the square footage of the lot,

12   or at least the dimensions?

13     A.    I think it's 55-by-170.

14     Q.    And as you look down on that house, does

15   the -- does the building look like it's roughly the

16   same size as when you first purchased it?

17     A.    Yes.

18     Q.    And have you put any additions on?

19     A.    No.

20     Q.    If you look in the back corner, is that

21   some kind of an outbuilding?

22     A.    Storage.

23     Q.    And if you look in the upper right corner

24   of that, there's kind of a black spot there.

25           Do you know what that is?

JERALD CARRIERE

1      A.   (Perusing document)   That's a trampoline.

2      Q.   And do you have tenants in that building?

3      A.   Yes.

4      Q.   And have you had tenants in that building

5   since you purchased it?

6      A.   Yes.

7      Q.   And then it looks like there's a couple --

8   two, or maybe even three, blue tent tops or tarp

9   tops.

10     A.   Uh-huh.

11     Q.   Do you know what those are?

12     A.   One they use as a sun patio.   And the other

13  one was one of these round swimming pools.

14     Q.   Let me circle back to the other two

15  properties.

16          At any time when you owned the properties

17  on 172nd Street, did any of your tenants actually

18  use Roundup in the yards?

19     A.   Yes.

20          MS. FLAHERTY:   Object to the form.

21  BY MR. LAW:

22     Q.   And how often would that happen?

23     A.   That, I don't know.

24     Q.   Was it -- was there Roundup stored on site

25  for people to use?

JERALD CARRIERE

1     A.   Yes.

2       Q.   And was it always in that same

3   squeeze-handle applicator-type of container?

4     A.   To my knowledge.

5       Q.   Were you always the purchaser?

6     A.   No.

7       Q.   Sometimes the tenants bought it?

8     A.   Uh-huh.

9       Q.   Yes?

10    A.   Yes.

11      Q.   Okay.   Same question with this property.

12   Did the tenants ever apply Roundup to this property,

13   to your knowledge?

14    A.   Yes.

15      Q.   How often, if you know?

16    A.   I don't know.

17      Q.   Did you supply the Roundup or did they get

18   it themselves?

19          MS. FLAHERTY:   Object to the form.

20          Go ahead.

21    A.   Sometimes I supplied it; sometimes they

22   supplied it.

23   BY MR. LAW:

24      Q.   Can you give me an approximation of how

25   many tenants -- or how many lease agreements or

JERALD CARRIERE

Page 124

1    A.    Just in case there was a -- she was -- she

2    was under 18 when my daughter moved in with me.

3    When I -- when I had cancer, my daughter came up and

4    took care of me.

5          And so we had to, you know, kind of let him

6    know that, since she's under 18, that if there's

7    anything legally has to be done, that he would be

8    the person responsible.

9    Q.    Did he have any legal power of attorney or

10   anything like that?

11   A.    No.  Huh-uh.

12   Q.    And what's his name?

13   A.    Will Cato.

14   Q.    Can you spell the last name?

15   A.    I don't know how you spell the last name.

16         I don't know how you spell it.  C-A-T-O, I

17   believe.  Or K-A-T-T-O.

18   Q.    How old is he?

19   A.    35-ish.

20   Q.    And you say he's a friend of the family?

21   A.    Yes.

22   Q.    And just generally speaking, what type of

23   weeds were you trying to control on this property?

24   A.    Crabgrass, dandelions ... I keep on losing

25   the name of the other grass.  I can't think of the

JERALD CARRIERE

Page 125

```
 1    name of ... kikuyu grass.
 2         Q.   And this property has a pretty bear spot in
 3    the middle.
 4              Do you see that?  In the backyard?
 5         A.   Yeah, it's a big piece of property.
 6         Q.   Is that something that has been barren
 7    while you've owned it, that area?
 8         A.   Well, it doesn't show up very good here,
 9    but it's not barren.  It's green.
10         Q.   And you --
11         A.   Depends on what time of year.
12         Q.   Okay.
13         A.   But it's a play area for kids.  You know,
14    soccer, baseball, whatever they want to play.
15         Q.   So is it actually -- is there grass growing
16    in this picture?
17         A.   Yeah.
18         Q.   It's just a little dead --
19         A.   Yeah, there's grass there.  It's just not
20    green.
21         Q.   So for the areas that have grass, would it
22    be accurate that you made your best attempt not to
23    get Roundup on it?
24         A.   No.
25         Q.   No, you -- what do you mean by that?
```

JERALD CARRIERE

1     A.    I didn't make any attempt not to get

2  Roundup on it.

3     Q.    I mean, you tried to target weeds.

4  Correct?

5     A.    Yeah.

6     Q.    And you wanted to avoid getting it on

7  actual grass that you wanted to keep.  Correct?

8     A.    I didn't -- you know, I would just spray

9  it.  I didn't care if it got on a little grass or

10  not.

11     Q.    Okay.  In terms of where you sprayed it,

12  did you generally confine that to the perimeter of

13  the property?

14     A.    No.

15     Q.    So you would agree if you sprayed Roundup

16  in the middle of that back lawn, it would probably

17  kill the lawn.  Agreed?

18     A.    No.

19     Q.    And why do you disagree?

20     A.    Because it won't.

21     Q.    Do you understand that this Roundup was the

22  type of Roundup that doesn't kill lawn but only

23  targets weeds?

24     A.    Yeah.

25     Q.    And is that true for all the prior

JERALD CARRIERE

Page 127

1      properties, that you used it?

2          A.   That's what it said.

3          Q.   So this is the lawn-friendly Roundup?

4          A.   I don't know about "friendly," but it said

5      that it doesn't kill grass.

6          Q.   And that would be true for the 172nd Street

7      properties as well, in terms of the product that you

8      used?

9          A.   I used the same product.

10         Q.   All right.  So your recollection is this is

11     the type of product that you could spray on the

12     dandelion in the middle of the lawn and it would

13     kill the dandelion and not the lawn.

14         A.   Yeah, you could spray it all over.  You

15     know, you didn't have to be careful with it.

16         Q.   Got it.

17              Is that true for all the properties that

18     you have owned and managed?

19         A.   Pretty much -- I mean, I didn't spray it on

20     roses, you know.  But I sprayed it on most

21     everything.

22              You know, you could use it, plenty of it,

23     and it didn't kill the -- it only killed the weeds.

24         Q.   Yeah, okay.  Is that also true for the

25     property that you own currently, that you live in?

JERALD CARRIERE

1      A.    Yeah.

2      Q.    In terms of the Roundup that you had been

3   using --

4      A.    Yeah, but I'm much more careful at my

5   house.

6      Q.    Sure.  But in terms of the type of Roundup,

7   it was -- it's always been the type of Roundup that

8   is compatible with lawns.  Correct?

9      A.    To my knowledge.

10     Q.    All right.  So while we're on that topic,

11  I'll get my addresses right.

12           6406 Seal Point, that's your house?

13     A.    Correct.

14     Q.    And that's somewhat of a duplex?

15     A.    Uh-huh.

16     Q.    Or just -- it is a duplex?

17     A.    It's -- they categorize it as a townhouse.

18     Q.    It's two connected --

19     A.    One wall connects.

20     Q.    Pardon?

21     A.    One wall connects.

22     Q.    A common wall?

23     A.    Yeah.  And it --

24     Q.    It looks like side-by-side --

25     A.    The developer categorized it as a

JERALD CARRIERE

1    Q.    Do you know what his cause of death was?

2    A.    No.

3    Q.    Do you know if he ever used Roundup for his

4    portion of the property?

5    A.    Yes.

6    Q.    And in terms of the times that you used

7    Roundup on Seal Point, did you use it in generally

8    the same manner as you described on the other

9    properties, in terms of where you sprayed, and what

10   kind of clothing you wore, and that sort of thing?

11   A.    I used it with very casual clothing on.

12   Shorts and T-shirt, no shoes, no gloves.

13         Blair[phonetic] was his last name.

14   Q.    Blair being the prior occupant?

15   A.    Yeah.

16   Q.    Is that a last name or first name?

17   A.    That's his last name.

18         But yeah, I used it, you know, like when I

19   was barbecuing, you know, I'd spray.  My wife would

20   be planting and fertilizing.  And kids would be

21   running around in the swimming pool and, you know.

22         MR. LAW:  Okay.  Well, we've been going an

23   hour, almost an hour.  Why don't we take five, ten

24   minutes?

25         MS. FLAHERTY:  Okay.

JERALD CARRIERE

1          THE VIDEO OPERATOR:  We are now going off

2    the record.  The time is approximately 2:23 P.M.

3          (RECESS TAKEN FROM 2:23 TO 2:37 P.M.)

4          THE VIDEO OPERATOR:  We are now back on the

5    video record.  The time is approximately 2:37 P.M.

6    BY MR. LAW:

7      Q.    Okay.  Mr. Carriere, have we covered

8    basically your habits in terms of when you applied

9    Roundup with respect to this house on Seal Point?

10     A.    Some of them.

11     Q.    Are there any others that I didn't cover?

12     A.    On that particular property?

13     Q.    Right.

14     A.    Just my wife and I used to garden there,

15   and use it there as our -- as a hobby.

16     Q.    Okay.  And used it to target weeds?

17     A.    Absolutely.

18     Q.    Was there any ivy on this property?

19     A.    Yeah, there's ivy here and there.  There's

20   several different types of plants.

21     Q.    Okay.  And what were the -- I don't

22   remember if I asked you for this property:  What

23   were the type of weeds you were targeting on 6406

24   Seal Point?

25     A.    Well, weeds, number one.  I'm not a -- I

JERALD CARRIERE

```
 1   don't know the names of them.  You know.  And grass
 2   where it didn't belong.  And basically that's it.
 3          My wife likes to do roses.  That was her
 4   favorite.  And so she kept most of the garden for
 5   roses.
 6      Q.   (Perusing documents)  Okay.  Any other type
 7   of weed control that you did on this property?  You
 8   or your wife?
 9      A.   We -- we did whatever it took to control
10   the weeds, yeah.
11      Q.   Have you owned a piece of property at 33500
12   Oak Drive?
13      A.   33500 Oak Drive.  In what city?
14      Q.   Hemet.
15      A.   Hemet.
16      Q.   It was like a ranch or a farm?
17      A.   Yeah, uh-huh.  I owned it for a short
18   period of time --
19          MS. FLAHERTY:  Just wait 'til we have a
20   question.
21          THE WITNESS:  Okay.
22   BY MR. LAW:
23      Q.   When did you acquire that property?
24      A.   I'm going to say, like, '05.
25      Q.   How long did you own it?
```

JERALD CARRIERE

Page 145

```
 1      A.   It's 15301 Hawthorne Boulevard, Lawndale.

 2      Q.   Well, I got that, too.

 3      A.   Okay.

 4      Q.   They both came up under your name and it's

 5  just slightly different --

 6      A.   Okay.  I think the back piece, I think is

 7  on 153rd street.

 8      Q.   Yeah.  And that was going to be where some

 9  of these questions go, is that these different

10  addresses popped up.

11      A.   Yeah.

12      Q.   Two different buildings on the same

13  property -- or basically in the same area.

14           So let's stick with the first one,

15  Exhibit 9.

16           Do you see the building that corresponds

17  with that at -- on 153rd?

18      A.   Yeah.

19      Q.   Did you ever work out of that building?

20      A.   Yes.

21      Q.   What does that correspond to, that

22  building?

23      A.   Correspond to as far as what?

24      Q.   The name of it.  What was the name of that

25  company?
```

JERALD CARRIERE

1      A.   Carriere Car Company.

2           MR. LAW:  Okay.  It probably makes sense to

3    just mark the next one as number 10, and we can go

4    back and forth on it.

5           We'll mark that one as number 10, and this

6    would be 15301 Hawthorne, two pages.

7           (DEPOSITION EXHIBIT 10 MARKED FOR

8           IDENTIFICATION)

9           THE WITNESS:  These are old pictures, huh?

10          MR. LAW:  They were fresh off the computer

11   yesterday.

12          THE WITNESS:  Okay.

13          MR. LAW:  So I can't speak to how long ago

14   they were taken, other than probably not terribly

15   long ago.

16   BY MR. LAW:

17     Q.   But why do you think they're old?

18     A.   Well, it's just things have been changed

19   there.  But it doesn't matter.  The plot is the

20   same.

21     Q.   Okay.  Can you draw -- well, let me ask you

22   a preliminary question:

23          These two addresses, do they still cover

24   the same sort of legal piece of property?

25     A.   Yeah.

JERALD CARRIERE

1    Q.    All right.  So would you draw a -- a line

2    around the perimeter of that property.

3    A.    (Marking)

4    Q.    And hold it up to the camera, sir.

5    A.    (Holding up Exhibit 10)

6    Q.    May I see it when you're ready?

7    A.    (Proffering document)

8    Q.    (Perusing document)

9          (Proffering document)

10          So that second address, the 15301, shows up

11   in kind of a smaller, little rectangle.

12          Do you see that where the pin dot is, on

13   Exhibit 10?

14   A.    Yeah.

15   Q.    What building is that?

16   A.    That's a garage.

17   Q.    And it looks like there's a couple other

18   roof-like structures there.  Can you --

19   A.    Both of those are garages also.

20   Q.    How about in the -- if we move one square

21   over to the square that has all the cars in it.  You

22   see a couple of roofs there.

23          What are those?

24   A.    A square which way?

25   Q.    This area here, as you get towards --

JERALD CARRIERE

1    (indicating) if you look at the main lot where

2    the --

3        A.    Those are cars that are in for service, or

4    being worked on.

5        Q.    Okay.  But these roofs, this sort of

6    brownish one at the top, and the silver one at the

7    bottom, are those service bays?

8        A.    Those are sales offices.

9        Q.    Gotcha.

10            Now, did you apply Roundup anywhere on this

11   property?

12       A.    Yes.

13       Q.    What parts of this property?

14       A.    The entire property.

15       Q.    And was that to get weeds that were coming

16   out of cracks in the concrete?

17       A.    Yeah.

18       Q.    Or the asphalt?

19       A.    Right.

20       Q.    Was there any shrubbery or other trees, or

21   any kind of plant that you actually wanted to grow

22   on this property?

23       A.    No.

24       Q.    So this was -- if something green popped

25   up, it was a weed?

JERALD CARRIERE

Page 149

1      A.   Right.

2      Q.   **During the years that you operated and**

3  **owned this dealership, how many times did you apply**

4  **Roundup?**

5           **If we could get a monthly average, it would**

6  **probably be the easiest way to start.**

7      A.   Once or twice a month.

8      Q.   **And --**

9      A.   But see, you don't show the whole property

10  here.

11     Q.   **Okay.  What am I missing?**

12     A.   This goes all the way over to here

13  (indicating).  This is the smaller portion.

14          The bigger portion is over here.  It goes

15  all the way back to here.  So it goes -- there's a

16  whole another piece, like this (indicating) that

17  goes here.

18     Q.   **Okay.  Can you turn that towards the**

19  **camera, please.**

20     A.   (Holding up Exhibit 10)

21          MS. FLAHERTY:  I think you have it

22  upside-down.

23  BY MR. LAW:

24     Q.   **All right.  So in terms of the additional**

25  **real estate that I didn't cover there, does it just**

JERALD CARRIERE

1   extend to the extent of that red line, or does it go

2   farther?

3       A.   It's the exact amount like this, only over

4   here.

5       Q.   So --

6       A.   There's an acre here, and an acre here.

7       Q.   I gotcha.  All right.

8            Well, let me just get -- look at that.  And

9   maybe at our next break, I can get a better picture.

10  Thanks for pointing that out.

11           So if you go to that area that is not

12  covered, and you were to just continue on, would it

13  end in -- would the property line end in a wall, or

14  a street, or an alley?  Some -- anything like that?

15      A.   It ends in an alley.  And there's no

16  buildings on it.  It's a straight lot with ...

17      Q.   Well, okay.

18           So with your counsel's permission, I'd just

19  like to -- because this will just speed things along

20  at the next break.

21           I'd like to show you what looks like a

22  pulled-away version.  And if you could just give me

23  some idea where that property terminates, then at

24  the break, I'll know how much to blow it up so I

25  don't lose it.

JERALD CARRIERE

1    lot.

2         MR. LAW:  Why don't we go off the record.

3         THE VIDEO OPERATOR:  We are now going off

4    the video record.  The time is approximately

5    3:01 P.M.

6         (OFF RECORD DISCUSSION 3:01 to 3:04 P.M.)

7         THE VIDEO OPERATOR:  We are now back on the

8    video record.  The time is approximately 3:04 P.M.

9    BY MR. LAW:

10        Q.   Okay.  So we took a look on and off the

11   record and, hopefully, identified the larger lot,

12   and we'll have a copy to talk about after the next

13   break.  But just a couple of preliminary questions.

14             You identified that there is a -- there is

15   an open lot as part of that property.  Correct?

16        A.   Correct.

17        Q.   And did you apply Roundup on that lot?

18        A.   No.

19        Q.   So the Roundup used was limited to weeds

20   that were coming through the asphalt.  Correct?

21        A.   Correct.

22        Q.   Did anyone -- any of your employees use --

23   apply Roundup as well?

24        A.   Yes.

25        Q.   And was it the same type of Roundup you

JERALD CARRIERE

Page 153

1    were using at your other properties?

2        A.    Yes.

3            THE WITNESS:  (Moving in chair)  When you

4    get old, it's like that.

5            They should have lounge chairs for us,

6    right?  With vibrators and heaters.  And a masseuse.

7            THE REPORTER:  There you go.

8    BY MR. LAW:

9        Q.    Okay.  Have you ever owned a property at

10   699 West Ninth Street?

11       A.    699 -- 699 Ninth Street.  San Pedro?

12       Q.    San Pedro.

13       A.    No.

14       Q.    Do you recognize the address?

15       A.    I recognize the area.

16           MR. LAW:  So I'll go ahead and mark as

17   Exhibit 11.  Again, this is just another property

18   that shows up in some connection with your name.

19           So I'll just ask you to take a look at it

20   and see if it refreshes your recollection.  It shows

21   up on the search as something called L.A. Vice

22   Motors, and I don't know what that means.

23           (DEPOSITION EXHIBIT 11 MARKED FOR

24            IDENTIFICATION)

25   BY MR. LAW:

JERALD CARRIERE

1      Q.    Aside from the landscaper who comes out to

2   your home currently, have you employed gardeners or

3   landscapers at any other properties?

4      A.    Yes.

5      Q.    Which ones?

6      A.    My home.  Or homes.

7      Q.    Which addresses are those?

8      A.    You have them.

9      Q.    The ones we already covered?

10     A.    Yeah.

11     Q.    Just, we've been through a lot --

12     A.    Seal Point Court.

13     Q.    Right.

14     A.    And Greenwood.

15           THE REPORTER:  Is Greenwood one word?

16           THE WITNESS:  Yes.  In Torrance.

17   BY MR. LAW:

18     Q.    Did we talk about Greenwood?

19     A.    No.

20     Q.    Okay.  So I don't have that.  So let's talk

21   about it.

22           What is the address on Greenwood, full

23   address?

24     A.    22516 Greenwood Avenue, Torrance, 90505.

25     Q.    When did you first acquire that property?

JERALD CARRIERE

1      A.    1978.

2      Q.    And do you still own it?

3      A.    No.  It's sold.

4      Q.    When did you sell it?

5      A.    Approximately 2008.

6      Q.    Do you know how big the lot is?

7      A.    Approximately 60-by-130.

8      Q.    And did you also apply Roundup to control

9   weeds on this property?

10     A.    Yes.

11     Q.    Did you apply it in the same manner as you

12  described for the other properties?

13     A.    Well, that was the first house that we

14  bought.  And it was in pretty bad shape.  And, you

15  know, my wife always wanted to have a garden.

16          So we -- we really tore up the whole

17  backyard, front yard, driveway, and, you know,

18  started there.  And applied a lot of Roundup, you

19  know, throughout the driveway, throughout all the

20  walkways.

21          Then we planted new grass, put in a

22  sprinkler system, built a nice garden in the

23  backyard, patio.  And that was our hobby.  So we

24  would work on it every weekend.

25     Q.    In the initial work that you did on the

JERALD CARRIERE

1    house to -- did you apply more Roundup in that time

2    frame than once you got things set up?

3        A.    Yeah.

4        Q.    About how long did it take to get set up?

5        A.    Couple years.

6        Q.    Do you have an estimate as to how much

7    Roundup you used in the first year of ownership of

8    that house?

9        A.    No.  Bottles of it.

10       Q.    The same type of bottles with the trigger

11   handles?

12       A.    Yeah.

13       Q.    And this was the Roundup that you were able

14   to spray on the lawn itself too?

15       A.    Yeah, you could spray it or pour it.

16       Q.    All right.  And I apologize.  I did not

17   write down what year you bought that house.

18       A.    '78.

19       Q.    So you had it, it looks like, 30 years?

20       A.    No.  I sold it in '88.

21       Q.    Oh, I'm sorry.  I heard 2008.  All right.

22   Let me ask it again.

23             So you owned that house from 1978 to 1988?

24       A.    Correct.

25       Q.    On any of the properties that we've covered

JERALD CARRIERE

Page 158

1   so far, did you use any herbicides that were not

2   Roundup?

3       A.   Not to my knowledge.  I can't think of a

4   name.

5       Q.   Did you ever use any insecticides outdoors

6   on any of your properties?

7       A.   Yes.

8       Q.   What type of insecticide, if you know?

9       A.   I don't know their names.

10      Q.   Did you use it on all your properties?

11      A.   Not all of them.

12      Q.   Do you recall which ones you used it on?

13      A.   Not really.

14      Q.   Do you recall what types of bugs you were

15   going after?

16      A.   All of them.

17      Q.   Let's -- for outdoor use?

18      A.   Yeah.  Ants, bugs, spiders.  You know, all

19   of them.

20      Q.   How about indoor use, did you use

21   insecticides indoors for any of your properties?

22      A.   Tried not to.

23      Q.   Now, have you used any rodenticides on any

24   of your properties?

25      A.   No.  Are you talking about for mice?

JERALD CARRIERE

1    Q.    Yeah, any actual animals as opposed to an

2    insect?

3    A.    No.

4    Q.    Any other properties that you have owned

5    that we haven't covered?

6    A.    No.  Not that I can think of.

7    Q.    I'm going to run a couple of herbicide

8    names by you and see if any of them refresh your

9    recollection as to whether or not you have used them

10   in the past.  Okay?

11   A.    Okay.

12   Q.    The first one's called Eraser.

13   A.    No.

14   Q.    Buccaneer?

15   A.    No.

16   Q.    Envy.

17   A.    No.

18   Q.    Halex GT?

19   A.    No.

20   Q.    Flexstar GT.

21   A.    No.

22   Q.    Credit 41 Extra.

23   A.    No.

24   Q.    So without knowing the actual name, is it

25   your testimony that you probably have used some

JERALD CARRIERE

1    non-Roundup herbicides in the past?

2        A.   No.

3        Q.   You don't think you ever have?

4        A.   I'm not sure.

5        Q.   For any of the rental properties that you

6    owned, did you personally do any house cleaning?

7        A.   Yes.

8        Q.   And how -- would you typically do that when

9    somebody moved out?  Or would you sometimes do that

10   while they were still occupying the premises?

11       A.   Usually when they moved out.

12       Q.   And what kinds of cleaning materials did

13   you use when you did that move-out cleanup?

14       A.   Pretty much your standard cleaning

15   materials.

16       Q.   And what would those be?

17       A.   Clorox, Ajax, 409.  Just -- SOS, you know,

18   just your regular stuff.

19       Q.   Did you use any products specifically to --

20   such as Tilex that is targeted towards cleaning,

21   like, shower doors?

22       A.   I didn't really use that.

23       Q.   How about any product specifically meant

24   for porcelain or toilets?

25       A.   Not to my knowledge.

JERALD CARRIERE

1     A.    Paragraph 14.  What page is that?

2     Q.    I think it was 6.

3     A.    It says 2008.

4     Q.    Right.

5     A.    And you're worried about 2005 or 2008?

6     Q.    I'm trying to understand why they're

7     different.

8     A.    Error.

9     Q.    Okay.  Which one is an error?  The fact

10    sheet, or the --

11    A.    I'm not sure.

12    Q.    -- or the complaint?

13    A.    I'm not sure.  I can't remember back that

14    far.  You know, I -- my memory is shot, you know.

15          It's -- I was under a lot of chemo-- what

16    they call chemo cocktails, which is chemo, plus a

17    lot of other high-powered medication that they --

18    you know, their treatments are four and a half hours

19    apiece, five hours apiece, six times every three

20    weeks.  You just -- you don't remember anything.

21    Q.    Okay.  Whether it was 2005 or 2008, do you

22    have a recollection of why you decided to stop using

23    Roundup?

24          MS. FLAHERTY:  I'm going to object to the

25    form.

JERALD CARRIERE

Page 182

```
 1              But you can answer.

 2              You can answer.

 3       A.    You know, I just don't remember.

 4   BY MR. LAW:

 5       Q.    Okay.

 6       A.    I do not remember.  I don't even know what

 7   happened in 2008 or ...

 8              MR. LAW:  And, Counsel, it would probably

 9   be easiest if I could impose on you to take your

10   copy of his signed fact sheet, because I don't have

11   a hard copy and we can mark it as an exhibit.

12              MS. FLAHERTY:  I don't have one that

13   doesn't have my writing on it.  I have the signature

14   page.

15              MR. LAW:  That's it.

16              MS. FLAHERTY:  Okay.  (Proffering document)

17              MR. LAW:  We're going to mark this as 14.

18              (DEPOSITION EXHIBIT 14 MARKED FOR

19              IDENTIFICATION)

20   BY MR. LAW:

21       Q.    That signature page, is that your

22   signature?

23       A.    What is this?

24       Q.    You signed it, so I'm asking you.

25       A.    I'm asking you.  You're the lawyer.  What
```

JERALD CARRIERE

1  is this?

2      Q.   It is a declaration that the information in

3  your fact sheet is true and accurate as of

4  January 9th, I believe, 2009 -- or 2019.

5      A.   I don't agree with this.

6      Q.   What don't you agree with?

7      A.   I don't agree with whatever it's supposed

8  to say.  It doesn't say anything except my signature

9  and a date.  Not -- you know, I can't agree with

10 anything on here.

11     Q.   Do you recall reviewing and signing that in

12 connection with filling out the information on a

13 personal fact sheet?

14     A.   I understand where you're going.  But I'm

15 not going to agree with this.  I don't know what

16 you're trying to prove here.

17          But like I told you, my memory is shot.

18 And I don't know in -- I don't even remember your

19 first name, you know.  My memory is completely shot.

20 And I don't -- I don't remember back that far.

21          What are you trying to establish here?

22     Q.   I'm trying to establish that the

23 information you provided in your fact sheet was

24 reviewed and signed in a declaration that it was

25 true and accurate.

JERALD CARRIERE

1      Q.    Dr. Dinsmore?

2      A.    -- Dr. Dinsmore said.

3      Q.    When were you first diagnosed with

4   glaucoma?

5      A.    '96.

6      Q.    And in your experience, or your perception,

7   has the glaucoma affected your vision?

8      A.    Yes.

9      Q.    In what way?

10      A.    I -- I can't see as clear or as far.   And

11   at night, it affects your vision.

12      Q.    Are you able to drive?

13      A.    Yes.

14      Q.    Your license is in good standing?

15      A.    Yes, uh-huh.

16      Q.    In terms of progression, how has it

17   progressed since 1996?

18      A.    Not much.

19      Q.    And has anyone from the Wolstan medical

20   group suggested the cause for the glaucoma?

21      A.    No.

22      Q.    So the next doctor listed is Jenny Ru, R-U.

23            And do you know Dr. Ru?

24      A.    I do.

25      Q.    Is she your primary oncologist?

JERALD CARRIERE

1      A.    Yes.

2         Q.    And was she involved in the initial

3    diagnosis of your lymphoma?

4      A.    Yes.

5         Q.    And are you still seeing her?

6      A.    I am.

7         Q.    When was the last time you had an

8    appointment with Dr. Ru?

9      A.    Had an appointment?  Or saw her?

10        Q.    Saw her.

11     A.    It's been about five months.

12        Q.    What was the purpose of the last visit?

13     A.    General checkup.

14        Q.    What kind of report did Dr. Ru give you?

15     A.    She gave me a clean bill of health.

16        Q.    And what do you understand that to mean?

17     A.    That means that I don't have cancer.

18        Q.    Had she given you the clean bill of health

19    before your last checkup?

20     A.    Had she given me the clean bill of health

21    before my last checkup -- no.

22        Q.    But that was your first appointment, where

23    she gave you the all clear?

24     A.    No.  No.

25        Q.    Okay.  Then I probably asked the question

JERALD CARRIERE

Page 202

1    poorly.

2         A.   I go every six months.  And before I go, I

3    take a blood test, and then I take a scan.

4              And when I'm done with those two things, I

5    meet with her and she goes over them, and that's

6    when she gives me the clean bill of health.

7         Q.   Okay.  And did she give you a clean bill of

8    health in the visit prior to the last one?

9         A.   Yes.

10        Q.   And how about the visit prior to that?

11        A.   I'm not sure.

12        Q.   Do you have an estimate of how long Dr. Ru

13   has given you a clean bill of health?

14        A.   I don't.

15        Q.   Has Dr. Ru discussed with you the

16   possibility that the cancer could come back?

17        A.   Yes.

18        Q.   Did she give you an estimate of the

19   percentage possibility that it could come back?

20        A.   Yes.

21        Q.   And what was her estimate?

22        A.   Approximately 20 percent chance that it

23   will come back.

24        Q.   Did she give you any information as to how

25   treatable, or not treatable, it would be if it came