# EXHIBIT 1



## Planet Depos®
### We Make It *Happen*™

**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS**

# Transcript of William Sawyer, Ph.D.

**Date:** September 15, 2019
**Case:** Roundup Products Liability Litigation, In Re

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8570-4   Filed 12/27/19   Page 3 of 47
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.                    1 (1 to 4)
Conducted on September 15, 2019

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                    MDL No. 2741
                 Case No. 3:16 md 02741 VC
 4

 5   IN RE:  ROUNDUP PRODUCTS LIABILITY
     LITIGATION
 6
     This document relates to:
 7   Giglio v. Monsanto Co., et al.
     Case No. 3:16 cv 05658 VC            /
 8

 9

10      CONFIDENTIAL   PURSUANT TO PROTECTIVE ORDERS

11           VIDEOTAPED DEPOSITION OF:

12              WILLIAM SAWYER, Ph.D.

13               Pages 1 to 177

14           Sunday, September 15, 2019

15            7:39 a.m.   11:55 a.m.

16
            Sanibel Harbour Marriott Resort and Spa
17             17260 Harbour Pointe Drive
               Jasmine Conference Room
18             Fort Myers, Florida 33908

19

20
            STENOGRAPHICALLY REPORTED BY:
21        NANCY E. PAULSEN, CRR, CRC, RPR, FPR, RSA

22

23

24

25
```

---

**Page 2**

```
 1                   APPEARANCES:

 2
     On Behalf of the Plaintiff
 3
         JESSICA T. SIZEMORE WETZEL, ESQUIRE
 4       Gomez Trial Attorneys
         655 West Broadway
 5       Suite 1700
         San Diego, California  92101
 6       619 237 3490
         Jessica@thegomezfirm.com
 7

 8

 9   On Behalf of the Defendants

10       JOHN M. KALAS, ESQUIRE
         GRANT W. HOLLINGSWORTH, ESQUIRE
11       Hollingsworth, LLP
         1350 I Street, NW
12       Washington, DC  20005
         202 898 5800
13       Jkalas@hollingsworthllp.com
         Ghollingsworth@hollingsworthllp.com
14

15

16   Also Present:

17       Dolores Sherman, Videographer

18

19

20

21

22

23

24

25
```

---

**Page 3**

```
 1                   I N D E X

 2   Deponent                              Page

 3   William Sawyer, Ph.D.

 4   DIRECT EXAMINATION BY MR. KALAS          6

 5   CROSS EXAMINATION BY MS. SIZEMORE WETZEL 163

 6   REDIRECT EXAMINATION BY MR. KALAS       168

 7

 8   CERTIFICATE OF REPORTER                 176

 9   CERTIFICATE OF OATH                     177

10

11               E X H I B I T S

12   No.        Description                 Page

13   Exhibit 1   Notice of Deposition...............   7

14   Exhibit 2   Opposition in Response to the       7

15               Notice............................

16   Exhibit 3   Updated CV........................   7

17   Exhibit 4   Sawyer's file.....................   8

18   Exhibit 5   Report from August 20..............   8

19   Exhibit 6   Study.............................  66

20   Exhibit 7   Hand drawn table..................  69

21   Exhibit 8   Eriksson study....................  78

22   Exhibit 9   McDuffie study....................  85

23   Exhibit 10  Transcript of Giglio from August   91

24               29................................

25   Exhibit 11  Giglio's deposition from March 22...  98
```

---

**Page 4**

```
 1   Exhibit 12  Giglio deposition of March 21........ 103

 2   Exhibit 13  Roundup label...................... 106

 3   Exhibit 14  Roundup label...................... 110

 4   Exhibit 15  Global Syn Turf website image........ 123

 5   Exhibit 16  Letter from EPA to Registrant........ 128

 6   Exhibit 17  Press release...................... 136

 7   Exhibit 18  Label recommendations............... 148

 8   Exhibit 19  Study.............................. 157

 9   Exhibit 20  Cancer Risk Assessment from.......... 159

10               June 20, 1990

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.                     2 (5 to 8)
Conducted on September 15, 2019

---

**Page 5**

1     (Marked Deposition Exhibits 1, 2 and 3.)
2     THE VIDEOGRAPHER:  We're now on the record.
3  Here begins Tape Number 1 in the videotaped
4  deposition of Dr. William Sawyer, Ph.D., in the
5  matter of Roundup Products Liability Litigation in
6  the United States District Court, Northern District
7  of California, Case Number 3:16-ND-02741-VC.
8     Today's date is September 15th, 2019.  The
9  time now is 7:39 a.m.  The videographer is Dolores
10  Sherman, representing Planet Depos.  This
11  videotaped deposition is taking place in Fort
12  Myers, Florida.  The court reporter today is Nancy
13  Paulsen.
14     If I could please have counsel introduce
15  themselves for the record and whom they are
16  representing, followed by the court reporter
17  swearing in the witness.
18     MS. SIZEMORE-WETZEL:  Good morning, Jessica
19  Sizemore on behalf of the plaintiffs.
20     MR. KALAS:  John Kalas and Grant Hollingsworth
21  on behalf of the defendant, Monsanto.
22     THE COURT REPORTER:  Would you raise your
23  right hand, please.
24     Do you swear or affirm the testimony you are
25  about to give will be the truth and nothing but the

---

**Page 6**

1  truth?
2     THE WITNESS:  I do.
3  THEREUPON,
4     WILLIAM SAWYER, Ph.D.,
5  having been duly sworn to tell the truth, was examined
6  and testified as follows:
7     DIRECT EXAMINATION
8  BY MR. KALAS:
9     Q.  Good morning, Dr. Sawyer.
10     **A.  Good morning.**
11     Q.  Good to see you again.
12     **A.  Been awhile.**
13     Q.  It has been.
14     You told me before we started that you're
15  fighting a virus.  Are you able to proceed today?
16     **A.  Yes.**
17     Q.  Okay.  If you need a break for any reason, at
18  any time, please let me know, and we'll take a break
19  right then, as long as we're not in the middle of a
20  question, okay?
21     **A.  Very good.**
22     Q.  Okay.  Now, the videographer announced that
23  this was -- deposition was taking place in In re:
24  Roundup Products Liability.  Do you understand that this
25  deposition concerns a plaintiff by the name of Emanuel

---

**Page 7**

1  Rich Giglio?
2     **A.  Yes.**
3     Q.  Okay.  And that's who we're going to be
4  talking about today; right?
5     **A.  Yes.**
6     Q.  Okay.  So first thing I would like to mark is
7  your Notice of Deposition as Exhibit 1.
8     Have you seen this document before, sir?
9     **A.  Yes.**
10     Q.  Okay.  And then just prior to this deposition,
11  going on the record, your counsel, Ms. Sizemore, gave me
12  Exhibit 2.  Have you seen this document before, sir, the
13  Opposition in Response to the Notice?
14     **A.  No.  However, I was questioned by Attorney**
15  **Sizemore with respect to these items.**
16     Q.  Okay.  And Ms. Sizemore, prior to the
17  deposition starting, provided me with Exhibit 3, which
18  is an updated CV.  Is this your most current CV, sir?
19     **A.  Yes.**
20     Q.  Okay.  Can you tell me if there is any
21  substantive changes you have put in that since the last
22  CV that you've provided in this litigation?
23     **A.  No.**
24     Q.  Okay.  In addition to Exhibit 3, are there any
25  other documents you brought today responsive to

---

**Page 8**

1  Exhibit 1, the Notice of Deposition?
2     **A.  Yes.**
3     Q.  Okay.  And do you have those with you right
4  now?
5     **A.  Yes, I have the -- my report from August 20th.**
6     Q.  Okay.
7     **A.  And then some -- deposition, plaintiff fact**
8  **sheets, some pieces from defendant's reports, that's**
9  **defendant's expert reports, and some other items.**
10     Q.  Okay.  May we mark that and copy it and return
11  it to you?
12     **A.  Sure.**
13     Q.  Okay.  So let's mark that as Exhibit 4.
14     (Marked Deposition Exhibit 4.)
15  BY MR. KALAS:
16     Q.  And you said that your expert report is in
17  there?
18     **A.  That's in a separate document.**
19     Q.  Okay.  But you have a copy of your expert
20  report with you?
21     **A.  Yes.**
22     Q.  Just not marked as Exhibit 4?
23     **A.  That's right.**
24     Q.  Okay.  Then I'll mark your expert report as
25  Exhibit 5.

---

Transcript of William Sawyer, Ph.D.

Conducted on September 15, 2019

3 (9 to 12)

---

**9**

1        (Marked Deposition Exhibit 5.)
2   BY MR. KALAS:
3        Q.  There you go, sir.
4        Does this appear to be a true and correct copy
5   of your expert report in this matter, sir?
6        **A.  Well, without reading the whole thing, it**
7   **does.**
8        Q.  Okay.  I just asked if it appeared to be.  So
9   if there is anything, as we're going through it today,
10  that doesn't appear to be true and correct, please point
11  that out to us, okay?
12       **A.  Okay.**
13       Q.  Now, did you bring any billing records or
14  invoices in this matter today?
15       **A.  No, I haven't submitted an invoice --**
16       Q.  Okay.
17       **A.  -- in this matter yet.**
18       Q.  Can you estimate for us about how many hours
19  you've spent on the Giglio matter?
20       **A.  I would only -- could only approximate**
21  **somewhere between 20 and 30 hours.**
22       Q.  20 and 30 hours.
23       And in this matter, do you intend to invoice
24  at your customary rate of $650 an hour?
25       **A.  Yes.**

---

1        So from August 12th to today, September 15th,
2   have you testified in any trials or depositions?
3        **A.  Yeah, last week, there was -- Hellman versus**
4   **Lithko, which was a case from Missouri.  And then**
5   **Thompson versus Crescent Hotel.**
6        Q.  Okay.
7        **A.  And that was an alcohol case.  The other case**
8   **was a combined marijuana and potential opiate matter.**
9        Q.  Okay.  And are those the only two cases you
10  can recall testifying in between August 12th and today?
11       **A.  Yes.**
12       Q.  Okay.  And were those depositions or trial
13  testimony?
14       **A.  Deposition.**
15       Q.  Okay.  And in the Lithko case, were you
16  testifying on behalf of plaintiffs or defendants?
17       **A.  Lithko was a plaintiff case.**
18       Q.  Okay.  And in the Thompson case, was that on
19  behalf of plaintiffs or defendants?
20       **A.  Defendant.**
21       Q.  Okay.  Now, you have testified in many
22  previous Roundup cases, both at deposition and trial;
23  right?
24       **A.  11.**
25       Q.  Okay.

---

**0**

1        Q.  Okay.
2        MR. KALAS:  And, Ms. Sizemore, we would ask
3   when invoices are submitted, that you would provide
4   them to us, please.
5        MS. SIZEMORE-WETZEL:  No problem.
6   BY MR. KALAS:
7        Q.  Okay.  In addition, did you bring a list of
8   prior testimony today for the past four years?
9        **A.  No, I didn't see it on the demand list.**
10       Q.  Okay.  Have you testified since your last
11  deposition in any depositions or trials?
12       And let me strike that, that was a poor
13  question.
14       Have you testified, since your last deposition
15  in the Roundup litigation, which was, I believe, the
16  Winston case, August 12th, in any depositions or trials?
17       **A.  Yes.**
18       Q.  Okay.  Can you tell me what those depositions
19  or trials concerned and -- well, let's start with that.
20       How many of them were there?
21       **A.  Well, I think it was Gordon versus Monsanto.**
22       Q.  Okay.  And that was in July.  So the Winston
23  one actually was after.
24       **A.  Oh, it was?**
25       Q.  Yes.

---

**2**

1        **A.  Depositions in total.**
2        Q.  11 depositions in total.
3        So I have a list here of the Johnson case.  Do
4   you recall testifying in deposition in that case?
5        **A.  Twice.**
6        Q.  Okay.  And then you testified at trial as well
7   in that case; right?
8        **A.  Yeah.  I didn't count trial, though, I just**
9   **counted depositions.**
10       Q.  Okay.
11       **A.  11.**
12       Q.  So you testified in deposition in the Johnson
13  case; true?
14       **A.  Yeah.**
15       Q.  And then you testified in trial in the Johnson
16  case; true?
17       **A.  Yeah.**
18       Q.  Okay.  You testified in the Jeff Hall case at
19  deposition; true?
20       **A.  Twice.**
21       Q.  Okay.  You testified in the Stevick case at
22  deposition; right?
23       **A.  Yes.**
24       Q.  You testified in the Pilliod case at
25  deposition; true?

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

4 (13 to 16)

Conducted on September 15, 2019

---

**3**

1    A.  Yes, but I forget how many times.  It may have
2    been -- it may have been more than one.  I don't
3    remember.
4    Q.  And then you testified at that trial as well;
5    right?
6    A.  Yes.
7    Q.  Okay.  You testified in the Cazier case at
8    deposition; right?
9    A.  Yes.
10   Q.  You testified in the Lamb case at deposition;
11   right?
12   A.  Lamb and Cohen, and I think that was twice.
13   Q.  Okay.  You testified in the Gordon case at
14   deposition; right?
15   A.  Yes.
16   Q.  And testified in the Winston case at
17   deposition; right?
18   A.  Yes.  That one may have been more than once.
19   Q.  Okay.  And when you say more than once or
20   twice, you mean that the depositions went more than one
21   day; right?
22   A.  Right.
23   Q.  You don't mean that there were separate
24   depositions.  They were just continued from day to day?
25   A.  Correct.

**4**

1    Q.  Okay.  And you testified under oath in those
2    cases, both at trial and deposition; right?
3    A.  Yes.
4    Q.  And you stand by your testimony in those
5    cases?
6    A.  I do.
7    Q.  Okay.  And you've been disclosed as well in
8    the Wade, Kane, and Moore cases.  Were you aware of
9    that?
10   A.  Yes.
11   Q.  And do you expect that you will be deposed in
12   those cases as well, assuming Monsanto asks?
13   A.  Unless a miracle happens and you guys decide
14   not to depose me.  I don't -- I don't see that
15   happening.
16   Q.  Okay.  Do you know of any other expert in the
17   Roundup litigation who has been disclosed in as many
18   cases as you?
19       MS. SIZEMORE-WETZEL:  Objection, form.
20       THE WITNESS:  I haven't -- never checked on
21   that.  I don't know.
22   BY MR. KALAS:
23   Q.  Okay.  Do you know of any other expert in the
24   Roundup litigation who has consulted on as many cases as
25   you?

**5**

1        MS. SIZEMORE-WETZEL:  Same objection.
2        THE WITNESS:  I have no idea.
3    BY MR. KALAS:
4    Q.  Okay.  Now, I don't have all your billing
5    records here with me, and we don't have any today.  It
6    is fair to say that you've spent an awful lot of time
7    over the past few years looking at Roundup cases, isn't
8    it?
9    A.  I have evaluated over 20 different individual
10   cases now.
11   Q.  Okay.
12   A.  Which compose well over 20,000 pages.
13   Q.  20,000 pages of documents review?
14   A.  Documents.
15   Q.  Got you.
16   A.  Yeah.
17   Q.  And is it fair to say you've spent over a
18   thousand hours working on Roundup cases?
19   A.  I have no idea.
20   Q.  Okay.  In this case, you said you spent 20 to
21   30 hours; right?
22   A.  Yes.
23   Q.  Okay.  And in the earlier cases, when you were
24   first getting up to speed on the general data on
25   Roundup, you actually had spent longer on those cases,

**6**

1    cases like the Johnson case; right?
2    A.  Much more.
3    Q.  Okay.  And you bill at an hour -- hourly rate
4    today of $650; right?
5    A.  Correct.
6    Q.  And that rate's gone up since you started
7    testifying in Roundup cases; right?
8    A.  It has.
9    Q.  It was originally $460 an hour?
10   A.  490 I thought.
11   Q.  490, okay, my mistake.
12       Is it fair to say you've billed over half a
13   million dollars on Roundup cases by this point?
14   A.  I have no idea.
15   Q.  Okay.  How much did TSAC bill -- or, excuse
16   me, how much did T -- TSAC.
17       How much did TCAS, pardon me, sir, make as a
18   corporation in 2018?
19       MS. SIZEMORE-WETZEL:  Object to --
20   BY MR. KALAS:
21   Q.  As far as gross income?
22       MS. SIZEMORE-WETZEL:  Object to form.
23       THE WITNESS:  I just saw that recently.  And
24   there is a line A and then there is a line G or
25   something, and then there is a profit/loss line.

---

Transcript of William Sawyer, Ph.D.

5 (17 to 20)

Conducted on September 15, 2019

---

**7**

1    So which line do you want?
2  BY MR. KALAS:
3    Q.  I'm just asking about the gross income, sir,
4  before business expenses are put in or write-offs or
5  anything, just how much money the business took in.
6    **A.  I think total receipts, but that doesn't**
7  **really mean much because I pay health insurance, dental**
8  **insurance, SEP IRA at 20 percent, office rental, and**
9  **et cetera, et cetera, to my employees.**
10   **I think around 950,000, somewhere in there.**
11   Q.  Okay.  So just so I'm clear, the gross income
12 figure that I asked about was $950,000?
13   **A.  For the company, yeah.**
14   Q.  For the company.
15   **A.  Yeah.**
16   Q.  And about how much of the company's business
17 was Roundup cases last year?
18   **A.  I -- I don't know.**
19   Q.  Was it more than 10 percent?
20   **A.  Oh, for certain.**
21   Q.  Was it more than 20 percent?
22   **A.  Yes.**
23   Q.  Was it more than 30 percent?
24   **A.  I would -- I would have to approximate at**
25 **least that, yeah.**

---

**8**

1    Q.  At least 30 percent?
2    **A.  Yeah.**
3    Q.  Could it have been as high as 40 percent?
4    **A.  Could be.**
5    Q.  Okay.  Half the business?
6    **A.  Probably not.**
7    Q.  Okay.  So somewhere between around 40 percent?
8    **A.  Approximately 30 to 40 percent.**
9    Q.  30 to 40 percent.
10   **A.  Yeah.**
11   Q.  So of that income -- well, let me ask you
12 this.  Do you bill all your clients at the same rate?
13   **A.  Yes.**
14   Q.  Okay.  So of that $950,000 income, it's your
15 estimation that somewhere between 3 and 400,000 of that
16 income came from Roundup cases?
17     MS. SIZEMORE-WETZEL:  I'll object to form.
18     THE WITNESS:  That's an approximation, yes.
19 BY MR. KALAS:
20   Q.  Okay.  And that's for the year 2018?
21   **A.  Yes.**
22   Q.  And, of course, you were working on Roundup
23 cases before that as well; right?
24   **A.  Yes.**
25   Q.  Okay.  In 2019 so far, how much of TCAS'

---

**9**

1  business has been Roundup cases, as far as gross income?
2    **A.  I would say probably about the same**
3  **percentage.**
4    Q.  Okay.  About 40 percent?
5    **A.  30 or 40 percent probably.**
6    Q.  Okay.  So let's look at Exhibit 5, your
7  report.  Now, this report that you submitted in this
8  case builds off the previous reports you've done in the
9  cases we've just talked about; right?
10   **A.  Yes.**
11   Q.  Okay.  How long did it take you to put this
12 report together?
13   **A.  I'm thinking 20 to 25 hours.**
14   Q.  Okay.  So all of the time you have invoiced
15 thus far -- or excuse me, strike that.  Let me ask it
16 again since you haven't submitted an invoice.
17   All of the time you estimated you have spent
18 on this case thus far has been spent on putting together
19 this report?
20   **A.  That's majority.  There is some hours in**
21 **preparation.  Read -- I read the deposition of**
22 **Mr. Giglio from August 28th, I think it was, his third**
23 **deposition.  I had a brief meeting yesterday evening**
24 **with Attorney Sizemore.  So there is a few little things**
25 **beyond this.**

---

**20**

1    Q.  Okay.  So if the report was 20 to 25 hours and
2  you had the few little things besides that, is 30 hours
3  a fair number to say, as far as how much time you spent
4  on this case so far?
5    **A.  It could be.  I mean, I just don't know for**
6  **sure.**
7    Q.  Okay.  Now, like other reports, you talked to
8  Mr. Giglio prior to putting this report into final form;
9  right?
10   **A.  Yes.**
11   Q.  Okay.  And like other reports, you did not
12 record that discussion with Mr. Giglio with either audio
13 recording or video recording; right?
14   **A.  No.  I had -- in the case of Mr. Giglio, I**
15 **think I had Jen Clark on the line taking all the**
16 **information down into my draft report.**
17   Q.  Right.  And you and I have spent a lot of time
18 together, so I understand your process, which is if I --
19 and I'll put it on the record here.  You have an
20 associate, Jen Clark or somebody else from your office,
21 on the line to take notes while you have the
22 conversation with plaintiff; right?
23   **A.  Well, they actually take it right down into my**
24 **MS Word file.  It's far more efficient than her trying**
25 **to decipher my, what she calls, Bill scribbles.**

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

Conducted on September 15, 2019

6 (21 to 24)

**Page 21**

1    Q.  Bill scribbles, yep.
2        So -- but it's true, I just want to make sure
3  the record's clear for everybody here, it's true you
4  don't record these conversations with plaintiff on a
5  tape or via videoconference?
6    **A.  No, I have no use for that.**
7    Q.  Okay.  Now, in every case in the Roundup
8  litigation you've submitted a report in, you've had one
9  of these conversations with plaintiffs before submitting
10  your report; right?
11    **A.  Yes.**
12    Q.  Okay.  And you know -- or at least I shouldn't
13  assume facts.
14        Has it happened in the Roundup litigation or
15  other cases that you've worked on that sometimes the
16  plaintiff tells you something in these interviews that's
17  not exactly consistent with some of their testimony from
18  deposition?
19    **A.  That can happen, yes.**
20    Q.  Okay.  And we actually have that situation in
21  this case where Mr. Giglio first testified he did not
22  use Roundup residentially, later modified that in his
23  interview with you and in his subsequent deposition;
24  right?
25        MS. SIZEMORE-WETZEL:  Object to form.

**Page 22**

1        THE WITNESS:  No, that's incorrect.
2  BY MR. KALAS:
3    Q.  That's incorrect.  Okay.  Explain to me where
4  I'm off there.
5    **A.  Well, there is a personal fact sheet one,**
6  **which did indicate residential use.  That fact sheet was**
7  **from November 2nd, 2018.  And then he modified that fact**
8  **sheet on March 21st, '19, approximately eight days after**
9  **the procedure for his treatment of lymphoma.  And then I**
10  **interviewed him on August 14th, 2019, and he then**
11  **submitted a third fact sheet on August 15th, 2019.**
12        **So he initially disclosed residential**
13  **exposure.  In February -- on March 21st, 2019, he did**
14  **not disclose residential exposure.  And then he referred**
15  **it back to residential disclosure on August 15th, 2019.**
16  **The only difference was he decreased the quantity of**
17  **time that he sprayed residential to 6 out of 12 months.**
18    Q.  I understand that record.  My question
19  was a little more narrow, sir, which is at deposition,
20  Mr. Giglio did not -- excuse me, Giglio did not report
21  residential use in his March deposition.  Later, he
22  spoke to you in August, reported residential use.  And
23  then he reported residential use in his August
24  deposition.
25        Is that -- is that a fair statement, sir?

**Page 23**

1        MS. SIZEMORE-WETZEL:  Just object to form.
2        THE WITNESS:  Can you repeat that?
3  BY MR. KALAS:
4    Q.  Sure.
5    **A.  I just didn't comprehend it all.**
6    Q.  I'm asking about the deposition transcripts as
7  opposed to any point of fact sheets here.  Okay?
8    **A.  I see.**
9    Q.  Okay.  So is it true that the timeline, the
10  way things happened here was that in the March
11  deposition, Mr. Giglio did not report residential use,
12  then in the August interview with you, he did report
13  residential use, and then in his August deposition he
14  then recounted residential use; is that a fair
15  description of the timeline?
16        MS. SIZEMORE-WETZEL:  Same objection.
17        THE WITNESS:  It might be.  The problem is I
18  can't remember without going to his March
19  deposition --
20  BY MR. KALAS:
21    Q.  Okay.
22    **A.  -- as to whether or not he was asked about it.**
23    Q.  Okay.  Well, we'll just let the record speak
24  for itself on that, since we're under limited time here.
25        You do know that in these depositions with me

**Page 24**

1  or with one of my colleagues, you'll be asked about the
2  conversations you had when putting together your report
3  with plaintiffs; right?
4    **A.  Well, certainly.**
5    Q.  Okay.  And you're aware -- or let me ask it a
6  different way.
7        Are you aware that very often, someone like me
8  will raise the question, and this is sort of a
9  hypothetical question, well, what did you ask the
10  plaintiff before they gave that answer?
11        Are you aware that those types of questions
12  may be asked?
13    **A.  Certainly.**
14    Q.  Okay.  And despite the fact that you are aware
15  of that, it's your practice in this litigation not to
16  record via audio the conversations you have with
17  plaintiffs in order to clear up those type of questions?
18    **A.  I don't understand the questions.**
19    Q.  Sure.
20        You ask plaintiffs questions, and then take --
21  have Jen Clark or somebody else in your office take the
22  notes down while you're having that conversation; right?
23    **A.  Yes.**
24    Q.  And then I will ask, from time to time, what
25  did you ask plaintiff to elicit that answer; you're

Transcript of William Sawyer, Ph.D.

7 (25 to 28)

Conducted on September 15, 2019

---

25

1 aware I'm going to ask those sorts of questions?
2    **A. That's the part I don't understand. What I**
3 **asked --**
4    Q. Sure.
5     For instance, for instance, you talk about, in
6 the deposition, an inventory, a chemical inventory;
7 right?
8    **A. Yes.**
9    Q. Or, excuse me, in your report.
10     You're aware I may ask how did you come up
11 with that list; right?
12    **A. Correct.**
13    Q. Okay. So my question is, why not just tape
14 record these conversations to clear up any issues as far
15 as how you came to the answers you got from plaintiffs?
16 Why not just tape record them?
17    **A. I don't even have a tape recorder. I --**
18    Q. Okay.
19    **A. I don't think I have any purpose for it,**
20 **really.**
21    Q. Have you explored, in the interest of
22 transparency, purchasing a tape recorder so that
23 everybody in the litigation could know exactly what you
24 ask people to elicit the answers they give to you?
25     MS. SIZEMORE-WETZEL: Object to form.

---

26

1     THE WITNESS: No. And, you know, you're
2     totally welcome to ask me what I asked them.
3 BY MR. KALAS:
4    Q. And we have to rely on your memory; right?
5    **A. Yes.**
6    Q. And we have to rely on your word as an expert
7 who is getting paid $650 an hour for his professional
8 time; right?
9    **A. Yes.**
10    Q. Okay. Now, it's true that if you recorded
11 these conversations, there wouldn't be any question on
12 my end about what you asked and what plaintiff said;
13 right?
14    **A. I suppose.**
15    Q. Okay. Now, on these interviews with
16 plaintiffs, are the attorneys sometimes on the calls?
17     And I'm talking generally in the Roundup
18 litigation, have the attorneys been present on some of
19 these calls?
20    **A. I think it's possible. Not on this call.**
21    Q. Okay.
22    **A. But -- and in general, no, they're not. But**
23 **it's possible.**
24    Q. Okay. And in the Roundup litigation, have the
25 attorneys ever spoken on the calls that you've had with

---

27

1 plaintiffs?
2    **A. I don't recall.**
3    Q. Okay.
4    **A. In fact, I'm not even certain that attorneys**
5 **have been on the call.**
6    Q. Okay. You don't recall -- if we had a tape
7 recording, we would know one way or another; right?
8     MS. SIZEMORE-WETZEL: Object to form.
9     THE WITNESS: Well, yes. I can tell you when
10    I perform an interview, there is no intervention by
11    attorneys. I -- I don't operate that way.
12 BY MR. KALAS:
13    Q. Now, you usually conduct these interviews
14 after plaintiffs get involved in litigation; right?
15     In other words, you don't conduct these
16 interviews before plaintiffs have brought their lawsuit?
17 At least in the Roundup litigation.
18    **A. I don't -- I don't think I've conducted any**
19 **interviews pre litigation, no.**
20    Q. Okay. And -- so these interviews are
21 conducted after plaintiffs have sued someone,
22 specifically my client, for money; right?
23    **A. Yes.**
24    Q. Okay. Now, in all your years doing this, I
25 know you have a lot of experience with -- provided an

---

28

1 updated resume, I know you've been working as a forensic
2 toxicologist for decades. In all your years of doing
3 this, have you ever had someone lie to you or at least
4 misremember something in an interview?
5    **A. I can't --**
6     MS. SIZEMORE-WETZEL: Object to the form of
7    the first part of the question.
8     THE WITNESS: I can't think of a specific
9    example, but it's possible.
10 BY MR. KALAS:
11    Q. Okay. So you think that -- well, let me ask
12 you this. How many interviews would you estimate you've
13 conducted over the course of your career acting as a
14 forensic toxicology expert witness in litigation of
15 plaintiffs?
16    **A. Plaintiffs or defendants?**
17    Q. Plaintiffs.
18    **A. Hundreds.**
19    Q. Hundreds.
20     And you can't think of a single situation
21 where somebody didn't tell you the truth?
22    **A. I can think of a defense case in which that**
23 **happened, in which the plaintiff was not truthful. I**
24 **can think of one case in Montana. But it's not -- not**
25 **usual.**

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS
Transcript of William Sawyer, Ph.D.
Conducted on September 15, 2019

8 (29 to 32)

29

1    Q.  Okay.  So my question was slightly more
2  narrow.  I wasn't asking about defense cases.
3       In the hundreds of cases where you've
4  interviewed plaintiffs for litigation purposes, you
5  can't think of a single instance where somebody didn't
6  tell you the truth sitting here today; is that true?
7    A.  I can't think of any, no.
8    Q.  Okay.  What do you do in these interviews, or
9  even after the interviews, to make sure that in these
10 hundreds of cases, plaintiffs were telling you the
11 truth?
12   A.  What I look for is discrepancies.
13   Q.  Please elaborate on that.
14   A.  Significant discrepancies.
15      In other words, if I have a medical record and
16 a deposition or two depositions or three depositions,
17 and interrogatories or the plaintiff fact sheets, I look
18 at all of the documents and look for consistency.
19      And one thing I look for is, an example in
20 this case, where a plaintiff, in this case Mr. Giglio,
21 gives a response that's not cookbook.  For example, in
22 this case, he gave me a range of 15 to 30 years, I used
23 22.5 as a mean.  And he told me 6.5 years, yet he
24 testified 6 years at 20 times.
25      That's inconsistent, but it's very close.

30

1  Which is a good thing.  It tells me that he's actually
2  thinking and trying to answer it the best he can as
3  opposed to some type of cookbook response that an
4  attorney or somebody told him to give.  So I looked for
5  things like that, and that's what I see in this case
6  with Giglio, actually.
7       I also look for potential reasons why a person
8  would be so inconsistent in one deposition to the next
9  or in plaintiff fact sheet number one versus two.  In
10 this case, I looked at his deposition and -- and
11 actually dug deeper.



19      I checked all that out to see if he's telling
20 the truth.
21
22 That's what he claimed.  And I checked that out and it
23 looks like that is true.
24      He -- he initially said he had residential
25 exposure and that during that time, he didn't feel well,

3

1  he forgot that.  When I questioned him on -- I think it
2  was August 14th, 2019, I do recall that there was a
3  discrepancy in the records I had reviewed.
4       And -- and I asked him for -- I didn't point
5  out a discrepancy, I questioned him, and learned that
6  there was actually residential exposure.  I may have
7  pointed out to him after he said that that that was
8  discrepant with his March disclosure.
9       But, yeah, I didn't find any evidence of, you
10 know, malingering or -- and that's something I look for
11 is malingering or untruthfulness or the purpose of
12 litigation.  I just didn't see it there.  There was
13 reasonable explanations of what he -- he did, so.
14   Q.  Okay.  One follow-up question on that, which
15 is what do you do when you have a record, like a medical
16 record, for instance, in a lawsuit that contradicts what
17 plaintiff tells you after they file the suit?  What do
18 you do in that situation?
19   A.  Well, my --
20      MS. SIZEMORE-WETZEL:  I'll object to form.
21      THE WITNESS:  My rule is to, wherever
22   possible, rely on deposition testimony.
23 BY MR. KALAS:
24   Q.  Okay.  Okay.
25   A.  That's my general rule.  And that's what I try

32

1  to do.  So if I find something in the medical record, I
2  always look to see if the question was asked in
3  deposition and if there was any elaboration on it.
4  Sometimes medical records have a higher error rate since
5  the induction of the boilerplate language.
6       Since the Affordable Care Act, medical records
7  are created and generated and basically spit out by a
8  computer in a boilerplate fashion.  Nurses -- some
9  nurses spend almost full-time just sitting at a
10 computer, removing the boilerplate response and putting
11 the correct response in.
12      And I've run through -- run into that a lot
13 with medical records where a person is being treated for
14 severe respiratory depression from opiates, not even
15 breathing, and yet the medical record states "No
16 wheezing, unlabored breathing."
17      It's like -- and we have eight people
18 testifying to just how severe it was and this person
19 died of respiratory depression.  And it's because of
20 this boilerplate -- point -- boilerplate approach that's
21 used in medical records.
22      So I do see errors in medical records
23 sometimes for that reason.  And again, that's why the
24 deposition is always important to fall back on and
25 proof.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

9 (33 to 36)

Conducted on September 15, 2019

---

33

1     Q. All right. So I just want to make sure I
2 understand the methodology there. So when you have a
3 deposition -- a medical record that may have been
4 written before a lawsuit was brought, that reports a
5 patient history, for instance, and then you have
6 contradictory testimony in a deposition that is given
7 after plaintiff has brought a lawsuit for money, it's
8 your practice to rely on the plaintiff's testimony as
9 opposed to the medical record, generally?
10     **A. No. No. That's not right.**
11     Q. Okay.
12     **A. That's not what I intended to say. It's that**
13 **when I see such discrepancies, of course I look at all**
14 **of the medical records and all of the deposition**
15 **testimony from witnesses -- the physicians, the nurses,**
16 **other -- other witnesses -- and try to determine and**
17 **look at old medical records to see if that same history,**
18 **for example, is current in other medical records, or is**
19 **it just a red herring in one.**
20     **I had a case recently where this occasional**
21 **marijuana smoker, in the medical record, was well**
22 **documented that he occasionally smoked a marijuana**
23 **cigarette. There was one medical record that said**
24 **"daily smoker."**
25     **And what happened was that the person entered**

---

34

1 **it in under cigarette smoking as a daily smoker. And I**
2 **checked with all the prior medical records, the**
3 **deposition testimony, and witnesses, and it was a red**
4 **herring.**
5     Q. Okay. So if you have multiple medical records
6 reporting something in the patient's history that the
7 patient later contradicts in deposition, you might
8 refer -- or defer in that case to the medical records?
9     **A. Well, yeah, I mean, I would certainly review**
10 **all the medical records to see what I could ascertain,**
11 **but my point about the Affordable Care Act and the**
12 **boilerplate language of it being automatically generated**
13 **is the point where I said I see errors more often than**
14 **not.**
15     Q. All right. Let's look at your report. Is it
16 true that this report -- well, let me back up and ask a
17 question before that. Strike that.
18     Since you've submitted this report, Mr. Giglio
19 has been deposed, and in addition, Monsanto has
20 submitted their expert reports. So I'm going to ask you
21 about those things after I ask you this question.
22     Is it true that your report that you submitted
23 on August 20th contains all of your opinions you
24 intended to offer in this case up to and through August
25 20th?

---

35

1     **A. Probably not, because I've only, at this**
2 **point, have been afforded time to review a portion of**
3 **the defendant's expert report authored by --**
4     Q. Dr. LeBeau?
5     **A. I'm going to butcher his name.**
6     Q. LeBeau?
7     **A. LaBelle [sic].**
8     Q. LeBeau.
9     **A. And I briefly looked at Dr. Foster, I think**
10 **his name is.**
11     Q. Okay.
12     **A. But only very briefly.**
13     **And the problem is these reports were just**
14 **issued about, I think about eight days ago, and I didn't**
15 **even receive them until about five days ago.**
16     Q. So I'm not trying to cut you off. My question
17 was really very different from what you just answered.
18 My question was about up to the period of August 20th.
19 So Monsanto's reports were submitted September 3rd.
20     So my question is up to the period of August
21 20th, did your report in this case contain all of the
22 opinions you intended to offer as of August 20th?
23     **A. Yes, but what I --**
24     Q. Okay.
25     **A. -- was getting at is that these new reports**

---

36

1 **that I received after production of my report does not**
2 **afford a sufficient time to be certain that there aren't**
3 **any additional opinions or changes in opinion.**
4     Q. So let's -- I'm going to pick that up. I want
5 to make sure the record is clean, though. So I'm going
6 to get to Dr. LeBeau and the other reports, I'm going to
7 get to Mr. Giglio's August 29th depo.
8     But just so we have a clean record, is it true
9 that your report submitted August 20th contained all of
10 the opinions you intended to offer in this case up to
11 that date?
12     **A. Yes.**
13     Q. Okay. Now, Mr. Giglio had a second deposition
14 on August 29th. You are aware of that?
15     **A. Yes.**
16     Q. Okay. Have you reviewed that deposition?
17     **A. Yes.**
18     Q. Has that deposition changed the opinions you
19 offered in your report of August 20th in any way?
20     **A. Yes.**
21     Q. Okay. How have your opinions changed based
22 upon Mr. Giglio's subsequent deposition?
23     **A. That based on his third deposition, his total**
24 **exposure days, rather than 7.3 exposure days, is reduced**
25 **to 6.2 exposure days.**

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

Conducted on September 15, 2019

10 (37 to 40)

37

1    Q.   Okay.  And so if that -- if you can go to
2  Exhibit 5, sir, just so we can be clear, and we go to
3  page -- find your exposure day table.
4         If you go to page 43.
5         Okay.  Is the figure you intend to change in
6  the residential row, mean exposure days, and that would
7  change from 7.3 to 6.2?
8    A.   Yes.
9    Q.   Okay.  And I see you are making that change in
10  there, which is what I was going to ask you to do.
11  Thank you.
12    A.   Well, let me do it in a marked copy.  Page
13  40 --
14    Q.   43.  Oh, you are doing it in your copy.  Yeah,
15  if you can do it in the marked copy, please.
16         Okay.  Let me take it the basis for that is the
17  testimony about six times a year in 20 years?
18         MS. SIZEMORE-WETZEL:  Object to form.
19         THE WITNESS:  Not quite.
20  BY MR. KALAS:
21    Q.   Okay.  What's the basis for the change?
22    A.   I need that back.
23         The basic change is that he had previously
24  stated 6 events per year.  I'm sorry.  6.5 applications
25  per year.  That's what he told me.  And average duration

38

1  was -- he said 15 to 30 minutes, which is a 22.5 mean.
2  So instead of 22.5 minutes and 6.5 minutes, he testified
3  in August, I think it was in August, 29th, '19, he had
4  said that the events were 6 events per year at 20
5  minutes.
6    Q.   Okay.
7    A.   Oh, and one other thing.  He said over 25
8  years, where I was told 24 years.  And so he was very
9  close, but slightly different, which is interesting,
10  because it's not a canned answer, it would appear he was
11  thinking and trying to answer the question as accurately
12  as possible.
13    Q.   Sure.
14    Q.   Okay.  So your years went from 24 to 25 on
15  Table 7, and your events per year went from 6.5 to 6,
16  and then your hours, I can't do the math, but it's
17  essentially 20 times, the events per year times year;
18  right?  20 minutes times the 6 events per year, times 25
19  years would give you your mean hours; correct?
20    A.   Yes.
21    Q.   Okay.  All right.  Now, other than that change
22  to your report, did anything else substantively change
23  in your opinions based off Mr. Giglio's supplemental
24  deposition in August?
25    A.   He was a little more descriptive regarding the

39

1  ████████████████████████████████████
2  addresses.
3    Q.   Okay.
4    A.   And in that sense, he described, for the first
5  two addresses, the edges of the walkways and driveways.
6  And at ████████, fence line where lawn mower was not
7  able to effectively control the grass.  And he also
8  explained in a bit more detail the 2008 or 2009
9  synthetic turf in the front yard.  And in 2011 or '12
10  being installed in the rear yard.
11         And that, in conjunction with some of the --
12  what I've read in defense expert's reports, leads me to
13  believe that it's possible that I have overestimated his
14  residential exposure.
15         I think I may change my opinion to the point
16  where I'm going to say that any exposure he had
17  residentially is simply added to his occupational
18  exposure, rather than get into a nitpicking match for
19  the next two hours over what the exact number is.
20    Q.   Okay.  So -- lost that.  It's all right, I got
21  this.
22         Okay.  And that essentially was what you were
23  doing previously, right, you were adding together his
24  residential and his occupational exposure to come up
25  with your opinion; right?

40

1    A.   Yes, the 15.6 exposure days from occupational
2  plus 7.3 residential gave a total mean exposure days of
3  23.
4         But what I'm getting at is I prefer just to
5  state that whatever his exposures were from his
6  residential years, that was additive to the 15.6.  And
7  rather than arguing over that 6.2, maybe that 6.2 was a
8  slightly lower number, since it was primarily edge
9  spraying.
10    Q.   Sure.
11    A.   I -- I think it's reasonable.  And for me to
12  be very conservative, to the degree where there is no
13  disagreement between defendants with respect to my
14  calculation, I think defendants would have a hard time
15  disagreeing that there was some exposure over the years
16  of residential exposure, that the exposure was not zero.
17    Q.   Okay.  And your best conservative estimate of
18  that, as you told us before, is going to be 6.2, and
19  then your best conservative estimate of his occupational
20  use is 15.6.  And that best conservative estimate today
21  is 21.8, that -- that's what you're telling me, of 21.8
22  total mean exposure days?
23    A.   Yes, but I'm going beyond that.  I'm stating
24  that it could be less than 6.2.
25    Q.   Could be less, but not 0; somewhere between 0

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.                    11 (41 to 44)

Conducted on September 15, 2019

---

**41**

1  and 6.2?
2      A.  Yes.
3      Q.  Got it.  Okay.  I got it.
4      Okay.  Any other substantive changes to your
5  opinion?  And by substantive, I don't mean you got more
6  information, but substantive changes as to exact, like,
7  the things you're going to tell the jury about as far as
8  Mr. Giglio's increased alleged risk to gly- -- NHL from
9  glyphosate?
10     A.  No.
11     Q.  Okay.  And you said earlier that you are still
12  reviewing Dr. LeBeau and Dr. Foster's reports; right?
13     A.  Yes.
14     Q.  Okay.  Do you have any opinion -- rebuttal
15  opinions today sitting here regarding those reports?
16     MS. SIZEMORE-WETZEL:  Object to form.
17     THE WITNESS:  Yeah, I only -- only looked at
18  Dr. LeBeau's report last night, and I didn't even
19  read it all, only pieces of it.  I -- I think it's
20  premature for me to attempt to provide opinions
21  when I haven't fully reviewed it.
22     MR. KALAS:  Okay.  I'll make a record now that
23  to the extent Dr. Sawyer, who -- well, let me make
24  a record here first.
25     The reports were served 12 days ago on

**42**

1  September 3rd.  To the extent Dr. Sawyer has not
2  reviewed those reports within the 12 days, that is,
3  in our opinion, not Monsanto's fault, I guess, for
4  lack of a better term.
5      And to the extent he has rebuttal opinions to
6  the experts, we would request additional deposition
7  time to explore those after he has had time to
8  review them.  For today, we'll move on.
9  BY MR. KALAS:
10     Q.  Okay.  Now, in the past, you have conducted a
11  UK-POEM model on plaintiff's exposures and doses in
12  Roundup cases; right?
13     A.  Yes.
14     Q.  Okay.  And you didn't do that in this case;
15  correct?
16     **A.  No, the methodology didn't really fit this**
17  **case.  He was not blanket spraying fixed areas, but**
18  **primarily using a very high application rate among**
19  **certain perimeter areas with double and triple coating.**
20     **So it really doesn't fit the -- the POEM**
21  **methodology.**
22     Q.  Okay.  And am I correct that nowhere in your
23  report that was served on August 20th have you disclosed
24  a plaintiff-specific -- and by plaintiff-specific, I
25  mean specific to Mr. Giglio -- milligram per kilogram

**43**

1  absorbed dose?
2      **A.  No.  I -- I provided a dosage in exposure days**
3  **which is the generally accepted method in the literature**
4  **for dose calculation of glyphosate exposure.  Nowhere in**
5  **the literature under any -- is there any human study**
6  **evidence with respect to dose calculations for cancer**
7  **risk.**
8      **I know that Dr. LeBeau attempted to use the**
9  **California 1.1 milligram per day, but he erroneously**
10  **referred to that as the IARC method, which is incorrect.**
11  **The 1.1 is an animal-derived cancer slope, which you and**
12  **I both know can't be used in -- in a human cancer**
13  **assessment.  That was even ruled upon in the Johnson**
14  **case.**
15     Q.  Okay.  So I want to -- I want to back up here.
16  My question was a little more narrow, which is, again,
17  you -- you haven't disclosed a plaintiff-specific,
18  Giglio-specific milligram per kilogram absorbed dose in
19  this case; right?
20     **A.  No, but I have used and provided a dose based**
21  **on the generally accepted exposure days as used in the**
22  **human epidemiologic studies for glyphosate.**
23     Q.  Right.  That was the other thing I was going
24  to ask about is you said that there's nowhere in the
25  literature where somebody has calculated milligram per

**44**

1  kilogram doses in human studies, and -- and when you
2  said the literature, you were referring to the
3  epidemiological literature; true?
4      **A.  No.  Your question is misunderstood.  I said**
5  **that the literature -- nowhere in the literature is a**
6  **human dose calculated in units of milligram per kilogram**
7  **body weight with respect to cancer.**
8      Q.  Got it.
9      So there are studies, for instance, in the
10  literature that look at exposure to people and absorbed
11  doses of people in milligrams per kilograms?  We've
12  talked about those before?
13     **A.  Yes.  But -- but not for the assessment of**
14  **cancer, simply dosages among applicators.**
15     Q.  Okay.  Now, the regulatory levels that you --
16  you mentioned Dr. LeBeau talking about the CalEPA level,
17  but there's also some other regulatory levels that we've
18  talked about, the European Union, AOEL, the EPA RFD.
19  All of those levels are expressed as either milligrams
20  or milligram per kilogram; correct?
21     **A.  Yes, as --**
22     MS. SIZEMORE-WETZEL:  Object to form.
23     THE WITNESS:  -- as I've testified in every
24  deposition, none of those are for cancer, they're
25  for reproductive effects in animals.  And it --

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS
Transcript of William Sawyer, Ph.D.                12 (45 to 48)
Conducted on September 15, 2019

**45**

1    it's fine to compare a dose to one of those, just
2    to gauge to see where it falls, but it certainly
3    has no bearing on cancer.
4        It's not -- those values are not designed for
5    protection of cancer.
6  BY MR. KALAS:
7    Q.  Well, that's not necessarily true about the
8  CalEPA value.  The CalEPA value is intended by the State
9  of California to be protective of cancer; is that right?
10        MS. SIZEMORE-WETZEL:  Object to form.
11  BY MR. KALAS:
12    Q.  Whether or not you agree with their
13  methodology, that is the intent?
14        MS. SIZEMORE-WETZEL:  Same objection.
15        THE WITNESS:  I didn't give any opinion about
16    agreeing or disagreeing with the methodology.  I
17    said the methodology in that value is derived from
18    animals, it's an animal slope cancer, and it cannot
19    be used in the prediction of cancer.  It's not --
20    not possible.  It's only used in a regulatory
21    sense.
22  BY MR. KALAS:
23    Q.  All right.  So I want to make sure I
24  completely understand what you're saying here, because
25  it's slightly unclear.  It's your opinion that the

**46**

1  California no significant risk level for cancer does not
2  accurately predict human cancer, that's your opinion?
3        MS. SIZEMORE-WETZEL:  Objection, form.
4        THE WITNESS:  That's correct.  It's not
5    designed as a determinant for threshold of cancer.
6  BY MR. KALAS:
7    Q.  So why does the State of California put it
8  out?  Do you have an opinion on that?
9        MS. SIZEMORE-WETZEL:  Object to form.
10        THE WITNESS:  It's a regulatory limit.
11  BY MR. KALAS:
12    Q.  Okay.  Why is a regulatory limit set for a no
13  significant risk level for cancer?  Do you have an
14  opinion on that?
15        MS. SIZEMORE-WETZEL:  Same objection.
16        THE WITNESS:  It's based upon an animal study,
17    what we call a carcinogenic slope factor.
18  BY MR. KALAS:
19    Q.  Okay.
20    **A.  Designed for risk -- regulatory risk**
21  **evaluations.**
22    Q.  Okay.  And what is the purpose of a
23  carcinogenic slope factor that's set by a regulatory
24  agency?
25    **A.  As a determinant of cancer.**

**47**

1    Q.  Okay.  And what does it mean to have a dose in
2  humans below that slope factor as far as a regulatory
3  scheme?
4    **A.  That would be acceptable under the regulatory**
5  **scheme.**
6    Q.  Okay.  So a dose to Mr. Giglio or any other
7  plaintiff below the regulatory scheme level would be
8  acceptable under that regulatory scheme?
9        MS. SIZEMORE-WETZEL:  Object --
10  BY MR. KALAS:
11    Q.  Correct?
12        MS. SIZEMORE-WETZEL:  Object to form.
13        THE WITNESS:  If the dose were calculated
14    accurately, that would be true.
15  BY MR. KALAS:
16    Q.  Okay.  And you have not calculated a milligram
17  dose for Mr. Giglio; correct?
18    **A.  No, but I did look at the tremendous flaws in**
19  **Mr. LeBeau's --**
20    Q.  Dr. --
21    **A.  -- calculation.**
22    Q.  Dr. LeBeau.
23    **A.  Dr. LeBeau, yes.**
24    Q.  Yes, okay.
25        And you said that you haven't had time to come

**48**

1  up with those opinions completely yet, so we'll table
2  that.  But let me back up.  Do you have any opinion
3  you're going to tell the jury that Mr. Giglio's absorbed
4  dose exceeded the CalEPA risk level?
5    **A.  Yes, if he had calculated all of the surfaces**
6  **of exposure of the body and used the correct penetration**
7  **and dermal slope factors, yes, it would have exceeded**
8  **that value.**
9    Q.  You've done that calculation?
10    **A.  Not on paper.  I've done it crudely.**
11    Q.  Okay.  So you haven't done that calculation as
12  part of your expert opinion?
13    **A.  I haven't --**
14        MS. SIZEMORE-WETZEL:  Object to form.
15        THE WITNESS:  Not yet.  I --
16  BY MR. KALAS:
17    Q.  Okay.
18    **A.  -- only worked on this last night.**
19    Q.  Okay.  Am I correct that you had the
20  information available to you to do that calculation
21  prior to August 20th?
22    **A.  No.**
23    Q.  You did not have that information.
24        What new information did you get after August
25  20th that would have allowed you to do such an

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

Conducted on September 15, 2019

13 (49 to 52)

---

49

1 absorption in milligrams per kilograms that you could
2 not do before August 20th?
3     **A.  The calculation, the methodology, which is**
4 **generally accepted, is the POEM methodology.  And the**
5 **problem with using that methodology in this case,**
6 **because of the way this -- the way the treatments were**
7 **performed, would grossly underestimate the actual**
8 **exposure, and, therefore, it would not be an accurate**
9 **representation, it would be an underacc- -- inaccurate**
10 **underestimation.**
11     Q.  Okay.
12     **A.  And Mr. -- or Dr. LeBeau did not take into**
13 **account contact areas and the increased POEM --**
14     Q.  So --
15     **A.  -- application dose factor.**
16     Q.  Okay.  So I can tell you're getting a little
17 tired.  We're going to take a break after this question
18 request.
19         My question is very different than what you
20 just answered.  My question was what new information did
21 you get after August 20th that would have allowed you to
22 conduct a milligram per kilogram dose assessment that
23 you could not do or you did not have before August 20th?
24     **A.  Nothing new except I reviewed the approach**
25 **that Dr. LeBeau used and found that it was flawed.**

---

50

1     Q.  Okay.  So you have a criticism of Dr. LeBeau's
2 report, but you could have done the milligram per
3 kilogram assessment with the information you had from
4 Mr. Giglio prior to August 20th; correct?
5     **A.  I could have, but it would have been wrong,**
6 **because it would have used methodology that didn't**
7 **account for the differences in his application**
8 **methodology.**
9     Q.  Okay.  So last question -- I know I said take
10 a break, and I then asked two more questions.  Last
11 question.  So you could have done a dose assessment --
12 or strike that.
13         So you have not done a milligram per kilogram
14 dose assessment of Mr. Giglio to compare his dose to the
15 CalEPA NSRL even though you had the information to do so
16 prior to August 20th; correct?
17     **A.  Correct.  Because the methodology would not**
18 **have been appropriate for the means in which he applied**
19 **in this case.  It would have been an inappropriate,**
20 **erroneous methodology.  And, therefore, I chose not to**
21 **use it.**
22     MR. KALAS:  All right.  Let's go off the
23     record.
24     THE WITNESS:  I don't need a break yet.
25     MR. KALAS:  You sure?

---

5

1     THE WITNESS:  I'm sure.
2     MR. KALAS:  Okay.  You say that.  Okay.  You
3     tell me when you need one.  Okay?
4     THE WITNESS:  Sure.
5 BY MR. KALAS:
6     Q.  Now, we talked about these regulatory levels
7 being set as mgs for kgs or mgs.  Those are intended by
8 the regulators to be protective of human health
9 endpoints; right?
10     MS. SIZEMORE-WETZEL:  Object to form.
11     THE WITNESS:  No, only -- only the California
12     value is designed to be protective of cancer.  The
13     others are protective of noncancer endpoints, and
14     it would be an incredibly wrong and unacceptable,
15     generally unacceptable method to apply a noncancer
16     endpoint in evaluating cancer risk.  You know,
17     that's Toxicology 101.
18         None of those other values that he cited --
19     when I say "he," that's Dr. LeBeau -- are intended
20     for cancer, they're noncancer endpoints of animal
21     reproductive abnormalities.
22 BY MR. KALAS:
23     Q.  All right.  So I know I go fast, and -- and
24 sometimes my questions are hard to follow.
25         My question was very different from the

---

52

1 question you answered.  My question was that the
2 regulatory levels that are set in milligrams per
3 kilogram or milligrams are intended to be protective of
4 human health endpoints, not just cancer.  I said human
5 health endpoints.  Is that true?
6     **A.  No, they are designed only for noncancer**
7 **endpoints.**
8     Q.  Okay.  Do you consider reproductive effects to
9 be a human health endpoint?
10     **A.  That's a noncancer endpoint.**
11     Q.  Okay.  Is that a human health endpoint, sir?
12 I'm not asking about cancer.  I'm just asking about
13 health.
14     **A.  No, I can't answer it that way because in**
15 **toxicology and in public health, there are two things,**
16 **there's noncancer endpoint and cancer endpoint.**
17     Q.  Okay.  So you have an issue with the
18 terminology "human health endpoint"?
19     **A.  You have to define it just as EPA and World**
20 **Health Organization, Australia Health, all of --**
21 **worldwide, they're always defined as either noncancer or**
22 **cancer endpoint because the methodology and the approach**
23 **is entirely different.**
24     Q.  Okay.  Are the noncancer endpoints also health
25 endpoints?

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC   Document 8570-4   Filed 12/27/19   Page 16 of 47

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

14 (53 to 56)

Conducted on September 15, 2019



53

1    A.  They are for noncancer endpoints, which have
2  no bearing on cancer.  And a good example is benzene has
3  a noncancer endpoint in the 50 to 100 PPM range before
4  one experiences any neurological effects.  Yet, the
5  cancer protection endpoint under NIOSH, the REL is 0.1
6  PPM.  That's -- that's nearly a hundred or a thousand
7  times lower.
8        There is a world of difference between a
9  cancer endpoint and a noncancer endpoint.
10  Q.  Understood, sir.
11      And the Cal NSRL is a cancer endpoint?
12  A.  It is, yes.  Yes.
13  Q.  Now, none of those endpoints, whether they are
14  cancer or noncancer, are expressed as days per year;
15  right?
16  A.  For glyphosate.
17  Q.  Yes.
18  A.  Correct.
19  Q.  I'm sorry, for glyphosate.
20      None of those endpoints for glyphosate we just
21  talked about, the EU level, the Cal level, the EPA
22  levels, none of those endpoints, whether cancer or
23  noncancer, are expressed as days per year; true?
24  A.  Correct.
25  Q.  Okay.  And what it mean -- well, strike that.

54

1        Now, in the agencies that have set noncancer
2  endpoints for glyphosate but not cancer endpoints for
3  glyphosate -- and spe- -- I'll give you some specific
4  agencies like the EU EFSA or the US EPA, those agencies
5  have only set noncancer endpoints for glyphosate; right?
6  A.  That's right.
7  Q.  Okay.  They have looked at cancer data on
8  glyphosate; right?
9  A.  Yes.
10  Q.  Okay.  And they've determined that glyphosate
11  does not pose a cancer risk; right?
12  A.  Correct.
13  Q.  Okay.  Now, a few other things just generally.
14  I'm -- like previous cases, are you not offering any
15  opinions here as far as doing a differential diagnosis
16  of the cause of Mr. Giglio's cancer?
17      And let me -- let me be very specific on that
18  question while you are considering it.  What I mean by
19  differential diagnosis is you have not gone through the
20  process of ruling in every potential cause of NHL he may
21  have been exposed to throughout his life and then ruling
22  out every cause but glyphosate; is that true?
23  A.  Well, my opinion is specific with respect to
24  his dose and exposure to his -- and I have also looked
25  very carefully and very deep to see if I could find any

55

1  environmental or chemical exposures that could explain
2  his NHL.
3        I have also looked at
4
5
6
7
8
9
10
11
12
13
14      I mean, I -- I am prepared to state that I --
15  I have looked hard and deep and found no other
16  reasonable causative factor outside of glyphosate beyond
17  random chance.
18  Q.  Okay.  So, again, in previous cases -- and if
19  you're changing now, that's why we have the deposition.
20  So previous cases you have deferred to the medical
21  doctor for the specific causation opinion as to ruling
22  in all possible causes and ruling out other causes.
23      Am I correct in understanding that in this
24  case, you have taken that on and are now going to be
25  telling the jury that you have ruled in all the other

56

1  causes -- ruled in all potential causes and ruled out
2  all but glyphosate, which would be a contrary practice
3  to your previous cases?
4        MS. SIZEMORE-WETZEL:  Object to the form of
5        the question.
6        THE WITNESS:  With the exception of possible
7        hereditary, genetic influences, which I don't think
8        there are any, but I -- I would rather defer that
9        to the oncologist expert.  I -- I think that would
10        be reasonable.
11        But I have -- I should point out in this case,
12        I had a little more lead time in this case to do my
13        work as opposed to some of the cases.
14  BY MR. KALAS:
15  Q.  Well, I won't get involved in that, but -- let
16  me -- let me make sure the record is clear here.
17      Am I correct you are deferring to the
18  oncologist to rule out potential genetic causes of
19  Mr. Giglio's NHL?
20  A.  Yeah, even though
21
22
23
24
25

Transcript of William Sawyer, Ph.D.

15 (57 to 60)

Conducted on September 15, 2019

---

57

1 [redacted]

2    Q.  Okay.  And am I correct as well you said
3 that -- other than random chance.  You have not gone
4 through the process of ruling out random chance as the
5 cause of Mr. Giglio's NHL as well; right?

6    A.  Well, I would defer that to our medical
7 epidemiologist --

8    Q.  Okay.

9    A.  -- in terms of the primary studies involved in
10 this case.

11    Q.  Okay.  So -- just so I'm very clear here, you
12 have not gone through the process, then, of ruling out
13 every other potential cause you consider may have
14 contributed to Mr. Giglio's NHL since you have not ruled
15 out personally random chance or genetic effects; true?

16    MS. SIZEMORE-WETZEL:  Object to form.

17    THE WITNESS:  Well, when I say random,
18    I'm referring to the background rate of NHL, and --
19    and specifically DLBCL, which is what Mr. Giglio --
20    Giglio was diagnosed at age 62 with his stage IV
21    malignancy.

22 BY MR. KALAS:

23    Q.  Sure.  And people are diagnosed with DLBCL at
24 age 62 who have never touched Roundup in their lives;
25 right?

---

58

1    A.  Certainly.  And that -- and that's where I'm
2 deferring to the medical epidemiologist with the more
3 than doubling of the risk in some of the studies --

4    Q.  Okay.

5    A.  -- with respect to glyphosate, the design of
6 those studies, McDuffie study, for example, who did
7 break the groups into different age brackets and so on.

8    I -- I'm not going to handle the
9 epidemiological aspects.  I defer that to the medical
10 epidemiologists in this matter.

11    Q.  Right.  As far as you go on the epidemiology,
12 if I understand you correctly, is just the dose aspects
13 of the epidemiology and whether or not the plaintiff
14 fits into the dose brackets within the epidemiology;
15 true?

16    A.  That's correct.

17    Q.  Okay.  Now, you have no opinion about
18 Mr. Giglio's prognosis; right?

19    A.  No.

20    Q.  Okay.  You have no opinion about his course of
21 care; right?

22    A.  No.

23    Q.  Okay.  And, again, in previous cases, you have
24 stated that other than explaining toxicological terms,
25 you have no opinions regarding Monsanto's corporate

---

59

1 conduct or ethics.  Is that the same case here?

2    A.  Yes.

3    Q.  Okay.  Now, if we go back to page 43 -- you
4 need a break now?

5    A.  No.

6    Q.  Okay.  If we go back to page 43 of your
7 report, this is your exposure day calculation, which has
8 now been modified to 21.8; right?

9    A.  Yes.

10    Q.  Okay.  And that's using eight-hour exposure
11 days; right?

12    A.  Yes, it is.

13    Q.  Okay.  And that number, 21.8, is based off
14 your best conservative estimate of his personal and
15 occupational use; right?

16    A.  Yes.

17    Q.  Okay.  Now, in order to come up with that
18 number, did you review any other material beyond his
19 depositions, Mr. Giglio's depositions, and exhibits to
20 those depositions, and your phone interview with
21 Mr. Giglio?

22    A.  Plaintiff fact sheets.

23    Q.  Okay.  Those were exhibits to the depos,
24 but --

25    A.  Okay.

---

60

1    Q.  Yeah.

2    Now, it's true -- well, strike that.

3    Now, it's true, isn't it, that exposure and
4 dose are separate concepts?

5    A.  Yes.

6    Q.  Okay.  And exposure is essentially your
7 potential dose; right?

8    A.  Yes.

9    Q.  Okay.  But in order to be toxicologically
10 relevant to cancer, that exposure needs to get into your
11 body and create an absorbed dose; right?

12    A.  Yes.

13    Q.  Okay.  And, again, just so the record is
14 clear, the way you measured dose here to compare it to
15 the epidemiological studies was days per year; right?

16    A.  Yes.  And compared to studies in which the
17 workers generally wore long pants and very often long
18 sleeves, and here we have a gentleman in shorts.

19    Q.  And, in fact, if you go to page 41 of your
20 report, you state, "Determination of exposure days" --
21 this is at calculation of exposure day section.

22    You state "Determination of exposure days is
23 necessary for comparison to human epidemiological
24 studies.  The exposure day facilitates toxicological
25 dose calculations by providing a uniform basis for

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Transcript of William Sawyer, Ph.D.
Conducted on September 15, 2019

---

61

1 expressing glyphosate exposure factors in a comparative
2 manner to those of the peer reviewed human
3 epidemiological study. An exposure day is a unit of
4 spray applicator exposure duration defined as one
5 exposure day equals eight hours of spray application."
6      Did I read that correctly?
7      **A. Yes.**
8      Q. And then you cite to the Eriksson study for
9 that; right?
10      **A. Yes.**
11      Q. Okay. Now, you would agree with me that all
12 exposure days may not be created equal; right?
13      **A. Yes. The --**
14      MS. SIZEMORE-WETZEL: Object to form.
15      THE WITNESS: The exposures of Mr. Giglio were
16 unusual in that they were higher than the usual
17 exposure days.
18 BY MR. KALAS:
19      Q. And you know that how?
20      Well, strike that. It's a bad question.
21      It's your opinion his exposure days were
22 higher as far as absorbed dose even though you have not
23 calculated an absorbed milligram per kilogram dose for
24 Mr. Giglio; correct?
25      **A. Correct. I have used the generally accepted**

---

62

1 **studies --**
2      Q. Okay.
3      **A. -- which I have cited throughout my report**
4 **that show a higher dose for those wearing shorts and**
5 **with direct skin contact, and that the fact that he was**
6 **not wearing jeans or long sleeves increased his actual**
7 **contact dermal exposure by, rather than 20 percent, a**
8 **hundred percent.**
9      Q. But you don't know the actual milligrams
10 specifically that Mr. Giglio actually absorbed of
11 glyphosate?
12      **A. And neither do the epidemiologic studies.**
13      Q. Okay. You can't tell the jury specifically
14 that Mr. Giglio absorbed more than the CalEPA levels of
15 1.1 milligram per day? You can't specifically say that?
16      MS. SIZEMORE-WETZEL: Object to form.
17      THE WITNESS: If I were to use and correct
18 Dr. LeBeau's flawed methodology, it would actually
19 exceed the Cal 1.1 milligram per kilogram per day.
20 BY MR. KALAS:
21      Q. Okay. But you haven't done those
22 calculations?
23      **A. I punched some things in my computer last**
24 **night, but I haven't formally prepared a document yet.**
25      Q. Okay.

---

63

1      MR. KALAS: Again, if something is prepared,
2 we ask for additional time, and we reserve the
3 right to strike it.
4      MS. SIZEMORE-WETZEL: I'm just -- I'll put on
5 the record that we'll meet and confer on that
6 issue.
7      MR. KALAS: Okay.
8 BY MR. KALAS:
9      Q. So let's go to where you looked at the epi on
10 page 45. And, actually, it may be easier to start on
11 page 48, because you have a table there of the epi
12 studies.
13      Okay. Are you at the table?
14      **A. Yes.**
15      Q. Okay. And you have five studies listed here;
16 right?
17      **A. Yes.**
18      Q. Okay. Now, two of those studies are
19 meta-analyses or pooled analyses; right?
20      **A. Yes, but from different groups.**
21      Q. Okay. And those studies you report as being
22 ever use; right?
23      **A. Yes.**
24      Q. Okay. And so there is no dose metric in those
25 studies other than you were exposed, or you weren't?

---

64

1      **A. That's right.**
2      Q. Okay. And you've been very clear, even five
3 minutes ago, that you're not here to talk about general
4 epidemiology opinions, just the dose metrics within
5 epidemiology studies; right?
6      **A. Yes.**
7      Q. Okay. And so you would defer to plaintiff's
8 epidemiology expert, I think it's Dr. Ritz and perhaps
9 Dr. Portier in this case, generally as to the
10 significance of these ever/never studies; right?
11      **A. Yes.**
12      Q. Okay. So additionally, these studies Leon
13 Zane, these pooled and meta-analyses, are actually
14 studies of studies in lay terms; right? They're not
15 primary data, they combine data; right?
16      **A. Yes. But I -- as I've said, it's not just a**
17 **com- -- combination. McDuffie and Eriksson also**
18 **includes French and Swedish studies.**
19      Q. Sure. I just -- I want to make sure we're
20 clear about what a meta-analysis and a pooled analysis
21 are. They are not primary studies, they are
22 combinations of data?
23      **A. Correct.**
24      Q. Okay. Now, let's go back to the other three
25 studies here that you have above this, McDuffie,

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

17 (65 to 68)

Conducted on September 15, 2019

---

**65**

1 Eriksson, and Andreotti. Are you looking at those in
2 the table?
3 **A. Okay.**
4 Q. Those are the only three studies that you're
5 aware of that look at dose metrics in the
6 epidemiological literature; right?
7 **A. Well, I can't toss out the ever/never use**
8 **studies. That still is of some significance.**
9 Q. Okay. But you haven't looked at all the
10 ever/never use studies; right?
11 **A. I'm sorry?**
12 Q. You haven't looked at all of the ever/never
13 use studies; correct?
14 **A. Well, I have looked at another one, which**
15 **looking here in my document list, it's another newer**
16 **study that came out.**
17 Q. Pahwa?
18 **A. I'm sorry.**
19 Q. Pahwa?
20 **A. Hmm.**
21 Q. P-A-H-W-A?
22 **A. Not the one that I was thinking of, but --**
23 Q. Okay. So what's the one you're thinking of,
24 sir?
25 **A. Well, it's the newest pooled study.**

**66**

1 Q. Okay. So it's, again, a study of studies;
2 right?
3 **A. Yeah, but it had one other group that was**
4 **different.**
5 Q. But am I correct that the three primary
6 studies that you're relying on to talk about
7 Mr. Giglio's dose and compare his dose to the
8 epidemiological studies are McDuffie, Eriksson, and
9 Andreotti?
10 **A. Yes.**
11 Q. Okay. So let's look at Andreotti first.
12 MS. SIZEMORE-WETZEL: Thank you.
13 MR. KALAS: Um-hum (affirmative).
14 (Marked Deposition Exhibit 6.)
15 BY MR. KALAS:
16 Q. We've marked it as Exhibit 6.
17 And we've looked at this study before; right,
18 sir?
19 **A. Oh, yes.**
20 Q. Okay. And you state on page 46 of your
21 report -- let's find the quote -- that Mr. Giglio fits
22 into the second quartile of the Andreotti study; right?
23 That's Table 8?
24 **A. Yeah.**
25 Q. Okay. That's lifetime days of glyphosate use,

**67**

1 and for him 13.75 to 38.74; right?
2 **A. Yes.**
3 Q. Okay. And that's from all of his residential
4 and occupational use from 1990 through 2015; right?
5 **A. Yes.**
6 Q. Okay. So let's go to supplemental Table 1,
7 and let's -- this is the second page of the supplemental
8 tables. And let's look at the figure for NHL in the
9 second quartile of days of use. Let me know when you're
10 there.
11 NHL is on the second page of that table, sir.
12 **A. Okay.**
13 Q. Do you see that second entry?
14 **A. Yes.**
15 Q. Okay. And for quartile two, it says there is
16 117 cases, and it has an odds ratio -- or excuse me,
17 relative risk, since this is a cohort study. It has a
18 relative risk of .87 with a confidence interval of .66
19 to 1.14; right?
20 **A. Yes.**
21 Q. Okay. And Mr. Giglio fits into that
22 population as far as exposure days go; right?
23 **A. Yes.**
24 Q. Okay. And that number .87 is lower than 1;
25 right?

**68**

1 **A. Yes.**
2 Q. That means that they found more NHL in people
3 who didn't use glyphosate as opposed to people with the
4 similar number of exposure days to Mr. Giglio in this
5 study; right?
6 **A. No. It means that statistically, the**
7 **confidence interval ranged from .66 to 1.14.**
8 Q. Okay. But the actual point estimate, the
9 actual data that they had showed that there was 87
10 percent -- well, excuse me. There was .87 cases of NHL
11 in people who used glyphosate for as many days as
12 Mr. Giglio as for every one case in people who did not
13 use it, glyphosate; correct?
14 **A. No.**
15 Q. That's not what the actual data showed here?
16 **A. No. It shows that there was no significant**
17 **change from the expected value of 1.**
18 Q. Okay. So what does that mean to have no
19 significant change?
20 **A. That, in this case, in this particular study,**
21 **there was no indication of increased NHL above that**
22 **expected as seen in the control population.**
23 Q. Okay. So I'm going to mark as Exhibit 7 --
24 I'm going to just put this on a piece of paper here so
25 we can follow it.

---

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS
Transcript of William Sawyer, Ph.D.          18 (69 to 72)
Conducted on September 15, 2019

---

**69**

1          (Marked Deposition Exhibit 7.)
2    BY MR. KALAS:
3      Q.  So Mr. Giglio fits into the Andreotti NHL Q2
4    days.  And that point estimate is .87; correct?
5      **A.  Yes.**
6      Q.  Okay.  So I'm marking as Exhibit 7 a piece of
7    paper I have here.  Okay?  Do you see that?  And you see
8    I have 1 here for confident -- for point estimates, and
9    I have 0 to 2.5 down there?
10     **A.  Yes.**
11     Q.  Okay.  And I'm going to put this on the -- put
12   that point estimate on this table and just see if you
13   agree with me where it goes.  So for the NHL Q2 days
14   from supplementary Table 1, Mr. Giglio falls right here
15   on the side of 1.
16       Do you agree with that, as far as the point
17   estimate of .87?
18     **A.  No.  I'm going to mark the range as**
19   **something that I --**
20     Q.  Mark the range, please, sir.
21       Okay.  Do you want to draw a line through that
22   just so it's clear?  Perfect.
23     **A.  (Complies.)**
24     Q.  Okay.  May I see that back?
25     **A.  This -- this is the correct way of identifying**

---

**70**

1    **it.**
2      Q.  Okay.  I want it to be correct, sir.
3        Now, Mr. Giglio also has, as a subtype, a
4    B-cell lymphoma; right?  His DLBCL?
5      **A.  Yes.**
6      Q.  Okay.  So if you go to non-Hodgkin's lymphoma
7    B-cell.  Let me know when you're there.
8      **A.  Yes.**
9      Q.  Okay.  The quartile 2 group is .8; correct?
10     **A.  No.**
11     Q.  It's not .8 for NHL B-cell?  It's right below
12   NHL.
13     **A.  No, he's -- he's DLBCL.**
14     Q.  Okay.
15     **A.  That's wrong.**
16     Q.  And we're going to get to that, sir, but he is
17   also B-cell; correct?  He would fit into that group?
18     **A.  Yeah, the way you're going at this is**
19   **really -- what's the word -- in a kind way, I'll say**
20   **that you're really not using the data properly or**
21   **inflaming the result in -- in such a way that it's not**
22   **really representative.  You should be using just the**
23   **DLBCL.**
24     Q.  Okay.  Well, we'll get to that.
25       But, sir, does -- does Mr. Giglio have a

---

**7**

1    B-cell lymphoma?
2      **A.  Yeah, he also has non-Hodgkin's lymphoma, but**
3    **we know that he actually has DLBCL and that's what we**
4    **should be looking at.**
5      Q.  Okay.  So does he -- okay.  So you -- it's
6    your opinion that we shouldn't look at any NHL data for
7    dose because --
8      **A.  No.**
9      Q.  -- he only has DLBCL?
10     **A.  No.**
11       MS. SIZEMORE-WETZEL:  Object to form.
12       THE WITNESS:  No.  I said when available, when
13   there is information available, it's best to look
14   at DLBCL.  And I think it's also -- it's also
15   reasonable to look at non-Hodgkin's lymphoma in
16   general as you did, I agree with that, but what I'm
17   saying is now you're going into subtypes.
18       And we could -- we could also look at marginal
19   zone and --
20   BY MR. KALAS:
21     Q.  Does he have --
22     **A.  -- follicular and --**
23     Q.  Does he have marginal zone lymphoma?
24     **A.  No.**
25     Q.  Does he have a B-cell lymphoma, sir?  Simple

---

**72**

1    question.  Does Mr. Giglio have a B-cell lymphoma?
2      **A.  Yes, a diffuse, large B-cell lymphoma.**
3      Q.  So --
4      **A.  So -- so what I'm saying is I think you're**
5    **putting subtypes in that -- putting in that lar- --**
6    **non-Hodgkin's lymphoma B-cell is incorrect.  I think you**
7    **should be showing the NHL, which you did correctly, and**
8    **I think you should be showing the DLBCL.**
9      Q.  Okay.  So how should I note B-cell lymphoma on
10   this chart, then?
11     **A.  As DLBCL.**
12     Q.  No, but how should I note the B-cell data?
13   What would you agree with?
14     **A.  I wouldn't.**
15       MS. SIZEMORE-WETZEL:  I'm going to object to
16   the form of the question.
17   BY MR. KALAS:
18     Q.  Okay.  So is it fair to write "Will not plot"?
19     **A.  I would say plot it, and I'll cross it out**
20   **with an X.**
21     Q.  Okay.  So I'm going to plot it, you tell me
22   that it's correct, and then you can cross it out with an
23   X.
24     **A.  Okay.**
25     Q.  You do agree with me, though, sir, that

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

Conducted on September 15, 2019

19 (73 to 76)

---

73

1 Mr. Giglio does have a B-cell lymphoma; correct? You
2 will agree with that?
3 **A. Right. But we also know that it's more than**
4 **that. In many cases and the death -- death certificates**
5 **and so on don't always specify subtypes. And in this**
6 **case, we have pathology data. We know what he had.**
7 **So --**
8 Q. So here you go. You can cross out the B-cell
9 figure.
10 Okay. Now, we'll put on the NHL DLBCL.
11 MS. SIZEMORE-WETZEL: And I don't want to
12 interrupt, but I'm just going to object to
13 Exhibit 7 to preserve.
14 MR. KALAS: Okay.
15 BY MR. KALAS:
16 Q. Now, the DLBCL figure, of course, is 1.24;
17 right?
18 **A. It is.**
19 Q. But --
20 **A. -- with a range of .7 to 2.2.**
21 Q. Okay. And that is not statistically
22 significant; right?
23 **A. Correct.**
24 Q. Okay. Remind me again what that means to you.
25 **A. It means that the true value is somewhere**

---

74

1 **between 1.24 and 2.2. Or, I'm sorry, .7 and 2.2.**
2 Q. Okay. Do you agree with how I've plotted the
3 DLBCL, sir?
4 **A. John, you're a very good plotter.**
5 Q. Thank you.
6 All right. Now, in addition, the Andreotti
7 study also has intensity-weighted days; right?
8 **A. Yes.**
9 Q. Okay. And if we go back to your report, you
10 didn't calculate any intensity-weighted days, right, for
11 Mr. Giglio?
12 **A. I had no generally accepted methodology to do**
13 **such.**
14 Q. Okay. So let's just read in, then, the
15 intensity-weighted days for NHL. And you would defer to
16 an expert in epidemiology or in -- well, strike that.
17 Let's look at the NHL figures for
18 intensity-weighted days. Are there any NHL figures
19 above 1 on intensity-weighted days?
20 **A. Not that's significantly --**
21 Q. Okay.
22 **A. -- proven. I mean, there is -- there is a**
23 **1.03 of Q3, but that's not --**
24 Q. Okay. I'm looking at NHL, sir.
25 **A. I think I am, too, on Table 3, page 542.**

---

75

1 Q. Table 2, sir. You're looking at lag.
2 **A. Oh, I thought I had that page open. Okay.**
3 **Let me see.**
4 **Okay. You are correct.**
5 Q. Okay. And are there any NHL figures above 1?
6 **A. No.**
7 Q. Okay. Now, you don't know which of those
8 quartiles Mr. Giglio falls in, right, since you have not
9 calculated his intensity-weighted day?
10 **A. No.**
11 Q. Okay. But we do know that that point estimate
12 for his intensity-weighted day in NHL is going to be
13 somewhere between .83 and .88; correct?
14 **A. No. It would be somewhere between .59 and**
15 **1.2.**
16 Q. Okay. Between --
17 **A. And that's the confidence interval.**
18 Q. The confidence interval. I -- I specifically
19 asked about point estimate, sir.
20 **A. Well, you can't say that he would be between**
21 **those numbers, no.**
22 Q. So when I plot on something like Exhibit 7, we
23 don't use a point estimate with a red dot and then put
24 the range around it?
25 **A. That's my whole point, have to use the range.**

---

76

1 Q. Okay.
2 **A. Yes.**
3 Q. So here's what I'm going to -- would you agree
4 with putting a point estimate with a larger dot between
5 .83 and .88 with a range from .59 to 1.2?
6 **A. Yes.**
7 Q. Okay. So I'm going to do that. Okay.
8 Okay. Do you agree with what I just did here?
9 **A. Let's see. I do except, you know, before I**
10 **said you were a really good plotter.**
11 Q. I know. I know.
12 **A. You made your red dot too big, and that kind**
13 **of --**
14 Q. Oh, the red dot's too big, and --
15 **A. Yeah.**
16 Q. -- and the reason you don't want the red dot
17 to -- I was trying to capture .83 to .88 there.
18 **A. I see why, but the other problem is it can be**
19 **misleading to the --**
20 Q. Okay.
21 **A. -- viewer.**
22 Q. Okay. From --
23 **A. I think you should white that out and fix it.**
24 Q. Okay. So let's just, since I already made a
25 mistake on Exhibit 7, let's just go through the other

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

Conducted on September 15, 2019

20 (77 to 80)

---

77

1 figures here, okay? And then maybe we'll clean it up in
2 time for trial. I'm going to mark -- leave Exhibit 7
3 right here.
4     It's true, isn't it, that for non-Hodgkin's
5 lymphoma B-cell figure, the group that Mr. Giglio would
6 fall in here, he would be between .76 and .88 for his
7 point estimate with a confidence interval range of .55
8 to 1.21; right?
9     **A. Correct, but it would be inappropriate to show**
10 **that to the jury when we have the actual, more**
11 **descriptive large -- diffuse large B-cell lymphoma data**
12 **available.**
13     Q. Okay. And we're getting there next. It's
14 true that for diffuse large B-cell lymphoma, his figure
15 that he fits into would be somewhere between .94 and
16 1.13 with a confidence interval range of .49 to 2.17;
17 right?
18     **A. That's right.**
19     Q. Okay. Now, were any of the figures we just
20 talked about in the Andreotti study statistically
21 significant?
22     **A. No. But I would make the point if you are**
23 **going to show this to the jury, I think you need to**
24 **include the DLBCL on your chart.**
25     Q. Sure.

---

78

1     And you stated in your report that the
2 Agricultural Health Study did not find a statistically
3 elevated risk of NHL; right?
4     **A. That's correct.**
5     Q. Okay. And you agree with that, that this
6 study does not show a significantly elevated risk for
7 people with the same exposure characteristics as
8 Mr. Giglio?
9     MS. SIZEMORE-WETZEL: Object to form.
10     THE WITNESS: As I've testified in the past 11
11 deposition sessions and two trials, yes.
12 BY MR. KALAS:
13     Q. Okay. Let's move to the Eriksson study. Now,
14 we've gone over this many times. Mark it as Exhibit 8.
15     (Marked Deposition Exhibit 8.)
16 BY MR. KALAS:
17     Q. But you believe Mr. Giglio also fits within
18 the exposure or dose profile in this study; right?
19     MS. SIZEMORE-WETZEL: Thank you.
20     THE WITNESS: Yes.
21 BY MR. KALAS:
22     Q. Okay. And this study, which we've marked as
23 Exhibit 8, you agree again with me this study in its
24 dose evaluation does not control for exposures to other
25 pesticides; right?

---

79

1     **A. Correct.**
2     Q. Okay. But the Andreotti study does in its
3 dose evaluations; correct?
4     **A. Yes.**
5     Q. Okay. Now, there is only one figure regarding
6 dose that Mr. Giglio fits in here; right? And that's
7 the greater than ten days of use?
8     MS. SIZEMORE-WETZEL: I'll object to the form
9     of the question.
10 BY MR. KALAS:
11     Q. And I'm -- if you want to see what you wrote
12 about it, sir, it's on page 45 of your report.
13     **A. Well, to answer your question, he fits into**
14 **two different dose schemes. He's -- obviously fits into**
15 **the ten days of exposure or less, and also, greater than**
16 **ten days. Two different criterias.**
17     Q. Okay. But you wouldn't -- you wouldn't, when
18 you're designing an epidemiology study, put somebody in
19 both? You're separating them between people who are
20 exposed to ten days or less or greater than ten days;
21 right?
22     **A. Correct. But he reaches -- exceeds the**
23 **threshold of both of those parameters.**
24     Q. I understand what you're saying. I understand
25 why you're trying to be very precise here.

---

80

1     It's true that if Mr. Giglio were somebody who
2 was included in the Eriksson study as a case, he would
3 fall into the greater than ten days group? Right?
4     **A. Yes. And you would have to mark that as -- on**
5 **your little chart thingy that his odds ratio was 2.36,**
6 **with the correct confidence interval.**
7     Q. Right. And we're going -- I'm going there.
8 Okay?
9     So he would fall into the group that's 2.36
10 with the 1.04 to 5.37 confidence interval; right?
11     That's in Table 2.
12     **A. Yes.**
13     Q. Okay. And that's statistically significant;
14 right?
15     **A. Yes.**
16     Q. Okay. Not controlled for other pesticides,
17 but statistically significant; true?
18     **A. Yes.**
19     Q. Okay. And I know you pointed out that where
20 we have subtype data, we should look at it, so let's
21 look at Table 3 real quick. This is not dose data, this
22 is just ever/never data; right?
23     **A. Yes.**
24     Q. But for B-cell generally, the odds ratio is
25 1.87; right?

---

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS
Transcript of William Sawyer, Ph.D.    21 (81 to 84)
Conducted on September 15, 2019

---

**81**

1    A.  Yes.
2    Q.  Okay.  Almost statistically significant, but
3  not quite; right?
4    **A.  Yeah.  .998.  Okay.**
5    Q.  Right.  But you told me just a few minutes ago
6  that we shouldn't look at that when we have DLBCL data;
7  right?  That would be unfair.
8       So let's look at the DLBCL data.
9    **A.  Um-hum (affirmative).**
10   Q.  That's 1.22; right?
11   **A.  Correct.**
12   Q.  And that confidence interval is .44 to 3.35;
13  right?
14   **A.  Correct.  There is 239 cases versus 819, so**
15  **that obviously, the statistical power is weaker.**
16   Q.  Sure.  Just like in the Andreotti study, the
17  statistical power was weaker for the DLBCL data than the
18  B-cell data; right?
19   **A.  Yes.**
20   Q.  Okay.  So you're the dose guy, don't want to
21  take you outside your range, unlike Andreotti, this is a
22  statistically significant dose for the group he falls
23  into; right?
24   **A.  Yes.**
25   Q.  Okay.  Let's move on to McDuffie.  This is the

---

**82**

1  third of the three we talked about.  Now, if you would
2  look at what you wrote in your report about McDuffie on
3  page 45, you state that Mr. Giglio's exposures can be
4  compared to this study.  Do you see that on page 45?
5    **A.  Yes.**
6    Q.  Okay.  And if we go back to the days of use on
7  page 43, we've now changed that to 21.8 days from 1990
8  to 2014; right?
9    **A.  I lost you there.**
10   Q.  Go to page 43.
11   **A.  40 -- oh, you're in my report.**
12   Q.  Yeah.
13   **A.  Okay.**
14      **Okay.**
15   Q.  Okay.  And so we're at 21.8 days from 1990 to
16  2014, a period of 25 years; correct?
17   **A.  Yes.**
18   Q.  Okay.  And that is, on average, one exposure
19  day a year, isn't it?
20   **A.  I'm not sure what you mean.**
21   Q.  Okay.  So there is 25 years, there is 21.8
22  exposure days.  25 divided by 21.8 is -- excuse me, 21.8
23  divided by 25 is about .9 days a year exposure days;
24  right?
25   **A.  No, that's -- I don't understand what you're**

---

**83**

1  doing.  That's not how the methodology works.
2    Q.  Okay.
3    **A.  It's the cumulative exposure.**
4    Q.  Okay.  So my question, sir, is how many
5  exposure days per year did Mr. Giglio have?
6       If I divide 25 years by 21.8, do I get
7  approximately .9 days a year?
8       MS. SIZEMORE-WETZEL:  I'm going to object to
9    the form of that question.
10      THE WITNESS:  Mathematically, yes, but it
11   means nothing.
12 BY MR. KALAS:
13   Q.  Okay.  It means nothing.  Well, it may mean
14  something to McDuffie.  Let's go back to page 45.  Am I
15  correct that McDuffie measured dose -- page 45 of your
16  report.
17      Am I correct that McDuffie measured dose not
18  as days total, but days per year?
19   **A.  Yes, but it only -- it did not require 25**
20  **years of -- of that, but --**
21   Q.  Okay.
22   **A.  Just one -- one event more than two days per**
23  **year.**
24   Q.  Okay, my question was different, sir.  And
25  we'll look at how McDuffie did that in a minute.  But my

---

**84**

1  question is different.
2       Did McDuffie measure dose by days or days per
3  year?
4    **A.  Days in a given year.**
5    Q.  Okay.  And Mr. Giglio, as we stated before,
6  was exposed to glyphosate on average of one day per
7  year.  And you state here that the -- in looking here at
8  your report, page 45, "The study revealed that
9  glyphosate exposures between 0 and less than or equal to
10  two days per year had an NHL odds ratio of 1.0 while
11  exposures greater than two days per exposure year had
12  NHL odds ratio of 2.2."
13      Do you stand by that?
14      MS. SIZEMORE-WETZEL:  I'm going to object to
15   the form of the question as compound.
16      THE WITNESS:  There is several problems with
17   your question.
18 BY MR. KALAS:
19   Q.  I did not ask about problems, sir, I asked if
20  you stand by that statement in your report.
21      MS. SIZEMORE-WETZEL:  Same objection.
22      THE WITNESS:  Because it's a twisted question.
23  You divided his residential exposures and lumped it
24  in with his occupational exposures to come up with
25  your average of .9.  That's wrong.

---

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

Conducted on September 15, 2019

22 (85 to 88)

---

**85**

1  And it's wrong to insinuate that McDuffie
2  would require an average of two days per year for
3  25 continuous years.  That's all stuff that you
4  made up.
5  BY MR. KALAS:
6  Q.  All right.  So let's -- let's --
7  **A.  It's a self-proclaimed approach.**
8  Q.  Let's look at Exhibit 9.
9  (Marked Deposition Exhibit 9.)
10 BY MR. KALAS:
11  Q.  Which is the McDuffie study.  And read what
12 they said about the dose levels.
13  MS. SIZEMORE-WETZEL:  Do you have another copy
14 of that?
15  MR. KALAS:  Yeah, sorry.
16  MS. SIZEMORE-WETZEL:  Thank you.
17  MR. KALAS:  Um-hum (affirmative).
18 BY MR. KALAS:
19  Q.  So let's go to page 1157.  1157, sir.
20  Okay.  And do you see on page 1157, right-hand
21 column, last paragraph, the authors state "We created
22 dose response levels based on days per year of
23 personally mixing or applying selected herbicides,
24 insecticides, fungicides, and fumigants."
25  Did I read that correctly?

**86**

1  **A.  Yes.**
2  Q.  Okay.  Let's go to page 1160.  You see the
3  left-hand column.  First full paragraph.  Starts Table
4  8.  Let me know when you're there.
5  Are you there?
6  **A.  To Table 8?**
7  Q.  It says Table 8 in the left-hand column, first
8  full paragraph.
9  **A.  Yeah.**
10  Q.  It says, "Table 8 shows the frequency of
11 exposure to selected individual herbicides,
12 insecticides, fungicides, and fumigants, stratified by
13 the average number of days per year of exposure."
14  Did I read that correctly?
15  **A.  Yes.**
16  Q.  Did the authors in McDuffie refer to maximum
17 days per year or average days per year?
18  **A.  Average.**
19  Q.  Okay.  And if we go back to your report, using
20 your exposure-day metric that you used for Mr. Giglio of
21 an average of .9 days per year, would it fit into the 0
22 to 2 -- or 2 or less days per year on average days per
23 year of exposure; true?
24  MS. SIZEMORE-WETZEL:  Object to form.
25  THE WITNESS:  No.  His occupational exposure

**87**

1  was greater than two days per year.
2  BY MR. KALAS:
3  Q.  Okay.  Now, you are referring to his
4  occupational exposure, but if he were falling into the
5  McDuffie study, they don't just refer to occupational
6  exposure, they just ask people about exposures.
7  So my question is in the McDuffie stuff, if he
8  were in the population of McDuffie study, his average
9  days per year would be one; true?
10  MS. SIZEMORE-WETZEL:  Object to the form.
11  THE WITNESS:  No.
12 BY MR. KALAS:
13  Q.  No.  Okay.
14  So where does it say in the McDuffie study
15 that they're using a maximum days per year instead of an
16 average days per year?  Where it should -- show me in
17 your report where you talk about that or show me in the
18 McDuffie study where they say that.
19  MS. SIZEMORE-WETZEL:  I'm going to object to
20 the form.
21  THE WITNESS:  McDuffie, unlike Eriksson, did
22 not use a, quote, working day.  And the Table 7
23 results of my report are based on working days,
24 eight hour -- eight hours of exposure.
25 BY MR. KALAS:

**88**

1  Q.  So, sir, my question --
2  **A.  Your question here is not --**
3  Q.  My question wasn't about that.
4  **A.  Don't interrupt.**
5  Q.  Don't --
6  **A.  The questionnaire in this study did not base**
7  **it upon a working day, a full eight hours of work.  They**
8  **talk about ten hours per year or more of exposure to**
9  **pesticides in their methodology section, under the**
10  **questionnaire.**
11  Q.  Okay.  My questions for you, sir, is you did
12 use a working day as your days per year; right?
13  **A.  Eight hours of --**
14  Q.  And that averaged --
15  **A.  -- spraying.**
16  Q.  And that averaged out -- I have two more
17 simple questions, we'll take a break.
18  That averaged out to .9 working days a year
19 over the course of 1990 to 2014; true?
20  MS. SIZEMORE-WETZEL:  Object to form.
21  THE WITNESS:  Yes, but not for the
22 occupational period of 2010 to 2014.
23 BY MR. KALAS:
24  Q.  And -- and somebody who, on average, was
25 exposed to one day per year in the McDuffie study had an

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

23 (89 to 92)

Conducted on September 15, 2019

89

1  odds ratio for NHL of 1; correct?
2    **A.  No.  That's not a eight-hour --**
3    Q.  Okay.
4    **A.  -- working day.  Rather, the criteria that was**
5  **used was ten hours per year or more of exposure.**
6    Q.  Okay.  Ten hours per year or more of exposure
7  you said?
8    **A.  That's what it says in black and white.**
9    Q.  Okay.  What is the odds ratio for somebody
10  exposed to between zero and two hours -- two days per
11  year in the McDuffie study?
12    **A.  Insignificant.**
13    Q.  What is the answer, sir?
14    **A.  I would have to look it up.**
15    Q.  Okay, let's read your report.  Your report
16  says it's one; right?
17    **A.  That's what I said, insignificant.**
18    Q.  All right.
19    MR. KALAS:  Let's go off the record.
20    THE VIDEOGRAPHER:  This concludes Disk 1 of
21  the deposition of Dr. Sawyer.  The time now is
22  9:33.  We're going off record.
23    (Recess taken from 9:33 a.m. to 9:48 a.m.)
24    THE VIDEOGRAPHER:  We're back on record,
25  continue the deposition of Dr. Sawyer onto Disk 2.

90

1  BY MR. KALAS:
2    Q.  Dr. Sawyer, I want to go back to your report
3  and talk a little bit about how Mr. Giglio was exposed
4  to Roundup products.  Let's start with the product
5  Mr. Giglio used when applying.
6    You agree, if we go to pages 28 and 29 of your
7  report, you agree that Mr. Giglio testified that he
8  mainly used a premixed container that came with an
9  attached hose and sprayer?
10    **A.  Yes.**
11    Q.  Okay.  And what that means is that he did not
12  mix or load concentrated Roundup into a diluted form;
13  right?
14    **A.  Yes.**
15    Q.  Okay.  Now let's start with his residential
16  use and then we'll pick up his occupational use; is that
17  okay?
18    **A.  Yes.**
19    Q.  Okay.  So you haven't visited any of the
20  residences where Mr. Giglio sprayed Roundup; right?
21    **A.  No.**
22    Q.  Okay.  You are aware Dr. LeBeau did; right?
23    **A.  Yes.**
24    Q.  Do you intend to visit those residences before
25  trial?

9

1    **A.  Uncertain.**
2    Q.  Okay.
3    MR. KALAS:  If you do visit those residences
4  and your opinions change in any way, we would
5  request again for a continued deposition of
6  Dr. Sawyer.
7  BY MR. KALAS:
8    Q.  Now, you're aware that Mr. Giglio testified at
9  his most recent deposition that he used Roundup to edge
10  his sidewalks and walkways and around his driveway at
11  his residence; right?
12    And I can -- you know what, why don't I mark
13  the transcript, that will probably be easier.  Let's
14  mark this Exhibit 10, his transcript from August 29th.
15    (Marked Deposition Exhibit 10.)
16  BY MR. KALAS:
17    Q.  Here you go, sir.
18    **A.  Thank you.**
19    Q.  You've -- this is a transcript you've reviewed
20  of Mr. Giglio?
21    **A.  Yes, I have summarized some of that**
22  **information last night.**
23    Q.  Okay.  And that's part of Exhibit 4, your
24  summary; right?  So we have that marked?
25    **A.  Yes, it's marked.**

92

1    Q.  Okay.  So if we go to page 24.  Or, actually,
2  let's go to page 23 first of this deposition.
3    Mr. Giglio testified that, moving into a home,
4  at line 6 through 10, he used it to edge the sidewalks,
5  walkways, and along the driveway where grass and weeds
6  were growing along the edge.  Do you see that?
7    **A.  Yes, I stated that earlier this morning.**
8    Q.  And that's --
9    **A.  Edging, yes.**
10    Q.  And that's consistent with what he told you as
11  well in your conversations; right?  Or conversation?
12    **A.  Yes.**
13    Q.  Okay.  And you agree that he applied for
14  approximately 20 minutes every other month; right?  We
15  talked -- went through your day calculations based on
16  that; right?
17    **A.  Yes.**
18    Q.  Okay.  And Mr. Giglio testified to washing if
19  an excessive amount of glyphosate got on him.  Do you
20  recall that?
21    **A.  He testified that he directly contacted**
22  **Roundup on the skin of his arms, legs, and hands.  He**
23  **would not wash immediately unless it was a windy day and**
24  **he received an excessive exposure.**
25    Q.  Okay.  So when Mr. Giglio received an

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Transcript of William Sawyer, Ph.D.

24 (93 to 96)

Conducted on September 15, 2019

---

93

1 excessive exposure, he would wash immediately; correct?

2    **A. Yes. But that -- applicators don't understand**

3 **that exposure occurs beyond being soaked with it. There**

4 **is levels of exposure that applicators don't necessarily**

5 **feel or see that is still significant.**

6    Q. All right. So I want to -- I want to break

7 that up a little bit and make sure I understand.

8      You agree that if Mr. Giglio felt,

9 quote/unquote, soaked with Roundup, he would wash

10 himself; correct?

11    **A. Yes.**

12    Q. But when he did not feel soaked with Roundup,

13 he did not immediately wash him; correct?

14    **A. Yes.**

15    Q. Okay. Now, you agree that Mr. Giglio between

16 1990 and 2010 used Roundup for about two hours a year;

17 right?

18    **A. From what years?**

19    Q. 1990 to 2010, sir.

20      Can you just reflect for the record what

21 you're doing, please?

22    **A. Calculating.**

23    Q. Okay. Again, you're using, I see a 7.3

24 figure, and that's not what you use now; right?

25    **A. About 2.48 hours.**

---

94

1    Q. Okay. So his testimony is that he used

2 Roundup, we just went over this, 20 minutes every other

3 month; right?

4      And we can look at that, let's go to page 45.

5    **A. So about two hours.**

6    Q. Okay. So you agree that from 1990 to 2010,

7 Mr. Giglio used Roundup two hours a year; correct?

8    **A. Or less, as I said earlier.**

9    Q. Or less.

10    **A. Somewhere between zero and -- above zero and**

11 **that value, yes.**

12    Q. And when he did this, he would wear a T-shirt,

13 socks, and sneakers; right?

14    **A. Yes.**

15    Q. Okay. And in his depositions, at least, he

16 has not testified to any specific spill incidences

17 during that time period; right?

18    **A. Yes.**

19    Q. Okay. And you're not aware of any specific

20 spill incidences that Mr. Giglio has reported outside of

21 his deposition in your conversations; right?

22    **A. No.**

23    Q. Okay. Now, he doesn't report in his

24 depositions any leaking equipment during this

25 residential use; correct?

---

95

1    **A. Yes.**

2    Q. I -- I'm correct?

3    **A. Yes.**

4    Q. Okay. And he didn't report to you any leaking

5 equipment during the residential use; correct?

6    **A. No.**

7    Q. Okay. Now let's turn to the occupational use.

8 Now, according to your report, this spanned from 2010 to

9 2014; right?

10    **A. Yes.**

11    Q. Okay. And just so the jury's very clear about

12 this, the way Mr. Giglio testified that he would spray

13 Roundup as part of his job is he would spray the

14 perimeter of the areas where he would lay down

15 artificial turf between two and three times; right?

16    **A. Yes.**

17    Q. Okay. And so just so we're clear, on page 27,

18 you have a chart here, and I realize this is taken from

19 Mr. Giglio's deposition, but we have a chart here of the

20 total amount of turf installed by Mr. Giglio and it's

21 about 90,000 square feet; right?

22    **A. Yes.**

23    Q. You're not going to testify to the jury

24 that he sprayed Roundup over two 90,000 square feet,

25 right? Just the perimeter of 90,000 square feet?

---

96

1    **A. Correct. But I will probably bring with me a**

2 **puzzle with the appropriate number of pieces in it**

3 **representing each job he did and showing that**

4 **mathematically, it wasn't just the perimeter of the**

5 **rectangle of 87,000 acres he sprayed.**

6    Q. Not acres, sir.

7    **A. Square feet, I'm sorry. Thank you.**

8      **But rather the perimeter around each of all**

9 **those little puzzle pieces.**

10    Q. Right, I understand what you're saying. So

11 you're saying that not every piece of turf was square or

12 rectangle, it may have had juts in and out and that sort

13 of thing?

14    **A. Yes, because in the report of Joseph DeTomaso,**

15 **he made a calculation of the perimeter of a rectangle of**

16 **87,574 square feet rather than all the individual little**

17 **pieces in it.**

18    Q. I understand.

19    **A. And came up with a false value.**

20    Q. Okay. Now, to be fair, sir, I don't know if

21 you've ever seen some of this artificial turf put in,

22 but what happens is they purchase a large rectangle of a

23 given square footage, and then they cut it out; right?

24    **A. Yes, but that's not the point.**

25    Q. Well --

---

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

25 (97 to 100)

Conducted on September 15, 2019

**97**

1  A. He didn't do just one property at 87,000
2  square feet and spray three times around that perimeter.
3  Every little job he had, he sprayed around the
4  perimeter.
5  Q. I understand, but my point that I want to see
6  if you agree with is that he probably did not lay 87,000
7  square feet because he cut portions of that 87,000
8  square feet out; right? It's probably something less
9  than that.
10  MS. SIZEMORE-WETZEL: Just object to form.
11  THE WITNESS: I'm not sure.
12  BY MR. KALAS:
13  Q. Okay. Fair enough.
14  A. I'm not really sure how he ordered or cut, so.
15  Q. Right. You didn't ask him that in your
16  interview of him; right?
17  A. I didn't ask if he reused the scrap. I -- I
18  really don't know.
19  Q. Okay. That's fair. That's fair. I don't
20  mean to be critical.
21  All right. Now, the width of this perimeter
22  spraying, it's true Mr. Giglio testified would be about
23  2 to 3 inches. Do you remember that?
24  Let me see if I can help you. We'll mark as
25  Exhibit 11 his deposition from March 22.

**98**

1  (Marked Deposition Exhibit 11.)
2  MS. SIZEMORE-WETZEL: Thank you.
3  MR. KALAS: Thank you.
4  BY MR. KALAS:
5  Q. If you go to page 23 of the deposition I just
6  handed you, sir.
7  Lines 17 to 21, he -- it states:
8  "Question: And was there a particular width
9  of the swath you were attempting to soak at the
10  perimeter of where you intended to place the turf?
11  "Answer: It was lineal, but the width was
12  probably only 2, 3 inches."
13  Did I read that correctly?
14  Did I read that correctly, sir?
15  A. Yes.
16  Q. Okay. Do you have any reason to disagree with
17  the width of the area he would, quote/unquote, soak?
18  A. Well, maybe. On page 22 --
19  Q. Okay.
20  A. -- the question is: "Would you hold the
21  Roundup with your left hand, spray with your right?
22  "Yes.
23  "And how far off the ground would your face be
24  at the time you were spraying Roundup along the
25  perimeter where you intended to place turf?

**99**

1  "Probably 2 feet."
2  Q. Okay. That has to do with how far off the
3  ground he testified his face was, but it doesn't have to
4  do with how large the piece of ground he was applying to
5  was; right?
6  A. Well, it does.
7  Q. Okay. I'm very interested to see how.
8  A. See, with the electric sprayer, and if you've
9  read the deposition of the witness in the case, you
10  would have seen him testify, with the electric sprayer,
11  at close proximity ranges, it bounces back.
12  Q. Okay. You're, again, talking, though, about
13  the exposure to Mr. Giglio, which we will get to. I am
14  focused here on the size of ground he was applying to.
15  Am I correct that the size of ground he was
16  applying to on the perimeter was 2 to 3 inches wide,
17  based on his testimony?
18  A. That is true, yes.
19  Q. Okay. Thank you.
20  A. Yes. Okay.
21  Q. Okay. Now, he also states, and you talk about
22  this on your report at page 25, that he sprayed about
23  700 square feet of turf -- turf per gallon of Roundup.
24  Do you remember that?
25  A. Yeah, he estimated that he sprayed one gallon

**00**

1  of Roundup for every 700 square feet of turf he
2  installed, yes.
3  Q. Okay. And in your report, at the
4  second-to-last -- or the last full paragraph here, the
5  last line states "Mr. Giglio," what we were just talking
6  about, "estimates that he sprayed one gallon of Roundup
7  for every 700 square feet of turf he installed, and this
8  estimate was confirmed by the turf manufacturer."
9  What does that second clause mean? How was it
10  confirmed by the turf manufacturer? Did you speak to
11  the turf manufacturer?
12  A. No. He claimed that he did as part of his
13  training.
14  Q. Okay. I understand.
15  So when you say the estimate was confirmed by
16  the turf manufacturer, that estimate wasn't confirmed to
17  you, it was confirmed to Mr. Giglio?
18  A. That's right.
19  Q. You have not spoken to the turf manufacturer?
20  A. No, but I did reference deposition page 27, 11
21  through 14.
22  Q. Okay. Again, you have not spoken to the turf
23  manufacturer?
24  A. No, but I referenced his testimony.
25  Q. Got it.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.                    26 (101 to 104)

Conducted on September 15, 2019

---

0

1        And you don't know personally, you have no
2   personal knowledge that the turf manufacturer actually
3   calls for the application of Roundup when installing
4   turf; right?
5        A.  No.  It -- my report is what it is.  I -- I
6   have referenced his deposition and confirmed what he
7   said in telephone interview.
8        Q.  Okay.  That's fine.
9        Now, Mr. Giglio wore what you described on
10  page 29 as rubber gloves when applying Roundup
11  occupationally; is that correct?
12       A.  It should be neoprene.  I'm looking to see
13  where that entry is.
14       Q.  Yeah, so that's what I was getting at, so --
15       A.  What line number --
16       Q.  Well, in your report, you have it at the last
17  full paragraph before "residential use," and you wrote
18  residential -- or, excuse me, rubber gloves.
19       A.  Yes.  But I can say as a toxicologist, my
20  opinion in this case all along has been neoprene gloves.
21       Q.  Okay.
22       A.  So I am not suggesting he was wearing an
23  impermeable glove in any way.
24       Q.  Okay.  So he wore neoprene gloves, not rubber
25  -- not -- well, strike that.

---

02

1        Specific type of glove he was wearing was
2   neoprene?
3        A.  Right.  Rubber is just a general term and it
4   really --
5        Q.  I understand.
6        A.  More specifically, it was neoprene.
7        Q.  Okay.  That's what this depo is for, you know,
8   to figure that stuff out.
9        So what is neoprene?
10       A.  A synthetic that is immune to permeability of
11  most organic solvents.
12       Q.  Okay.  Is it immune to permeability of water?
13       A.  Yes.
14       Q.  Is it generally immune to permeability of
15  water-based mixtures?
16       A.  Yes.
17       Q.  Now, it's true that the use of gloves, like
18  neoprene gloves, have been shown in the literature to
19  reduce exposures to Roundup; right?
20       A.  Yes.
21       Q.  Okay.  Now, he said also in this deposition --
22  or in his deposition that he wore a T-shirt, work boots,
23  shorts, and occasionally sunglasses when applying
24  Roundup occupationally; right?
25       A.  Yes.

---

03

1        Q.  Okay.  Now, in your report, you talk about the
2   fact, here on page 29, that he would get Roundup spray
3   on the back of his legs.  Do you see that in the
4   second-to-last line?
5        A.  I do.
6        Q.  Okay.  Now, that seemed odd to me.  So I went
7   to the depo of Mr. Giglio -- Giglio, excuse me, to see
8   the citation you had there.  And I'm wondering if that
9   may be something we want to revisit.  Because if you
10  mark as Exhibit 12 his March 21 depo.
11       (Marked Deposition Exhibit 12.)
12  BY MR. KALAS:
13       Q.  Here you go, sir.
14       MS. SIZEMORE-WETZEL:  Thank you.
15       MR. KALAS:  Um-hum (affirmative).
16  BY MR. KALAS:
17       Q.  And we go to the page you're citing, page 59,
18  -- and you have it in here as March 22, but there is no
19  page 59 on March 22, so I presumed you meant March 21.
20       And the language you're citing at 59, 5 to 11
21  is:
22       "Question:  Do you remember anything where it
23  spilled on other parts of your body?
24       "Answer:  It would spray -- I would get
25  backspray on my legs.

---

04

1        "Question:  On the occasions where you would
2   get backspray on your legs, what would you do?
3        "I don't recall doing anything."
4        Did I read that correctly?
5        A.  Yes.
6        Q.  Okay.  So when you say spray on the back of
7   his legs, did you mean backspray there, as opposed to
8   spray on the physical back of the legs?
9        A.  That is an error I made.
10       Q.  All right.
11       A.  Or I misread that.
12       Q.  All right.  And backspray would actually -- if
13  he is applying it the way you describe it, sort of
14  hunched over, holding the wand in front of him while
15  walking this perimeter, that would essentially mostly
16  happen to the front of the legs, not the back of the
17  legs; correct?
18       A.  Yeah.  As I stated, the electric sprayer puts
19  out sufficient pressure and the ricochet effect when
20  it's in the -- in the non-dispersed mode.
21       Q.  Okay.  But again, the front of the legs, not
22  the back of the legs?
23       A.  Right.
24       Q.  Okay.  Now, finally, as far as his PPE goes,
25  if you look at footnote 73, you claim that Mr. Giglio

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.          27 (105 to 108)

Conducted on September 15, 2019

---

**05**

1 told you he meant canvas sneakers when he said work
2 boots at his deposition; right?
3    **A. I'm sorry, where are you?**
4    Q.  So if you look at footnote 73 of your report,
5 page 29, you state "During his March 21 deposition,
6 Mr. Giglio agreed he wore work boots. Monsanto's
7 attorney did not follow up on the meaning of work boots.
8 When asked during the August 14, 2019, interview,
9 Mr. Giglio described canvas sneakers as his work boots."
10    Did I read that correctly?
11    **A. That's right.**
12    Q.  Okay.  And again, you have no audio recording
13 of that conversation where he told you canvas sneakers
14 meant work boots; right?
15    **A. No, but that's specifically what he said.**
16    Q.  Okay.  And in his August 29th deposition, did
17 he or did his attorneys clean that up as to his
18 occupational use as far as explaining that he meant
19 canvas sneakers when he said work boots when he was
20 applying it occupationally?
21    **A. I don't know that anyone asked that question.**
22    Q.  Okay.  Well, you stated the Monsanto attorney
23 didn't follow up.  Did Mr. Giglio's attorneys follow up
24 to clarify that?
25    **A. I don't think so.**

**06**

1    Q.  Okay.  Let's mark as Exhibits 13 and 14, two
2 Roundup labels.  Mark this as 13.
3        (Marked Deposition Exhibit 13.)
4    MS. SIZEMORE-WETZEL:  Thank you.
5    MR. KALAS:  Um-hum (affirmative).
6    Mark this as 14.
7        (Marked Deposition Exhibit 14.)
8    MR. KALAS:  Yeah.
9 BY MR. KALAS:
10    Q.  All right.  Now, I just want to ask you a few
11 questions about these labels.  Let's start with
12 Exhibit 13.  Is this one of the products you believe
13 Mr. Giglio might have used, Roundup Weed & Grass Killer
14 III?
15    **A. Yes.**
16    Q.  And -- did I give you my highlighted copy?  I
17 don't know.  Hold on.
18    **A. Yeah.**
19    Q.  Yeah.  Sorry.  That's all right, you can work
20 off it, I know where I'm going.
21    Let the record reflect I gave him my
22 highlighted copy.  I apologize.
23    If we go to --
24    MS. SIZEMORE-WETZEL:  Do you want to switch
25 them out, Counsel?

**07**

1        MR. KALAS:  Yeah.  That would be good,
2    actually.
3        (Remarked Deposition Exhibit 13.)
4 BY MR. KALAS:
5    Q.  There you go.
6    If you go to page 329 on the Bates numbers.
7 Well, let me ask the foundational question.  Does this
8 appear to be a true and correct label for Roundup
9 Ready-to-Use from 2013?
10    I know it's small.  Apologize for that.
11    **A. I think the second-to-last page, there may be**
12 **a date there.**
13    Q.  Yes, right beneath C, Monsanto Company, bottom
14 left -- or next to C Monsanto Company, bottom left, it
15 says 2013 Monsanto Company.  Do you see that?
16    **A. Monsanto Company.**
17    Q.  Right there, sir.  (Indicating.)
18    **A. Yeah, I do.  Pretty small print.  Okay.**
19    Q.  And this is contemporaneous with when he would
20 have been using it; right?  Mr. Giglio?
21    **A. Yeah.**
22    Q.  Okay.  So let's look at page 329.
23    **A. Not -- not necessarily throughout the entire**
24 **period, but certainly --**
25    Q.  Occupationally at least?

**08**

1    **A. During this -- the year 2013.  I don't know**
2 **about 2010, '11, '12.**
3    Q.  Okay, sure.  So let's look at this.
4    Is it true on the left-hand column, underneath
5 "When to apply," it states "Spray when air is calm to
6 prevent drift to desirable plants."  Do you see that?
7    It's right -- I'll show you where I'm looking,
8 right there (indicating).
9        MS. SIZEMORE-WETZEL:  Which page are you on?
10        MR. KALAS:  329, Counselor.
11 BY MR. KALAS:
12    Q.  Are you using your camera to magnify?  Okay.
13    **A. Okay, the left column under "Directions of**
14 **Use."**
15    Q.  Yes, sir.  It says "When to apply"?  Do you
16 see that?
17    **A. Yes.**
18    Q.  Okay.  And it says "Spray when winds" --
19 "wind" -- excuse me, strike that.
20    "Spray when air is calm to prevent drift to
21 desirable plants."
22    Did I read that correctly?
23    **A. Yes.**
24    Q.  Okay.  Is it your understanding that
25 Mr. Giglio did not always spray when the air was calm?

---

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS
Transcript of William Sawyer, Ph.D.                    28 (109 to 112)
Conducted on September 15, 2019

---

09

1    A.  Yes, but he was not concerned about other
2  plants because of his close proximity to the ground.
3    Q.  Okay.  My question is is it your understanding
4  that he did not always spray when the air was calm?
5    A.  Correct.  But not -- not that he was concerned
6  about health warnings.  He was concerned about other
7  plants.  And if there wasn't other foliage of concern,
8  then this wouldn't apply.
9    Q.  Okay.
10   A.  This is not a health warning by any means.
11 It's a warning to protect other foliage.
12   Q.  Again, my question is not about his reasons
13 for not following it.  My question is simply did
14 Mr. Giglio only spray when the wind was calm?  Or are
15 you going to tell the jury that he sprayed when the air
16 was not calm?
17   A.  Yeah, because it was his understanding that
18 that could harm other foliage, not him.
19   Q.  Okay.  So if you turn to the precautionary
20 statement, sir, that's on the right-hand column there,
21 do you see the precautionary statements?
22        You're looking at Spanish.  There you go.
23   A.  Yeah, I was having trouble reading Spanish.
24        Yes.
25   Q.  And do you see it says "Caution"?

---

1    So this is a label from 2015, which I believe
2  is on the back end of when he might have been applying;
3  correct?  Or is it post application?
4    A.  Well, it's post cancer diagnosis.
5    Q.  Okay, post cancer diagnosis.  And is it post
6  application?
7    A.  And very little application at that point.  I
8  didn't even include it in my calculations.
9    Q.  All right.  Well, if you didn't include it,
10 then we'll skip this because we have limited time.  So
11 we'll move on to something else.
12        Now, if you go to page 31 of your report, you
13 put together Table 6 here; right?
14   A.  Yeah.
15   Q.  Okay.  And this carries on eight pages,
16 through page 38; right?
17   A.  Yes.
18   Q.  Okay.  How did you go about putting this
19 inventory of substances together?  How did you come up
20 with the list?
21   A.  I think through photographs.
22   Q.  Photographs.  Photographs you took?
23   A.  I don't know.  I don't remember.  No, I didn't
24 take any photos.  But I don't know, I get these cases
25 mixed up, actually, in terms of whether I was given a

---

0

1    A.  Yes.
2    Q.  Okay.  And it says "Causes moderate eye
3  irritation.  Avoid contact with eyes and clothing" --
4  "or clothing.  Wash thoroughly with soap and water after
5  handling."
6        Did I read that correctly?
7    A.  Yes.
8    Q.  Okay.  Did Mr. Giglio always avoid contact
9  with clothing?
10   A.  No.
11   Q.  Okay.  Did Mr. Giglio always wash thoroughly
12 with soap and water after handling glyphosate?
13   A.  No.
14   Q.  Okay.  So let's look at another label.  That's
15 the gold one I marked.  And there was some confusion I
16 had about whether Mr. Giglio used 365 or this product,
17 "Extended Control," because 365 has a black label and
18 this has a gold, and he refers to gold labeling.
19        Do you believe this could have been one of the
20 products that Mr. Giglio used, this Extended Control?
21   MS. SIZEMORE-WETZEL:  Object to form.
22   THE WITNESS:  Based on the testimony, yes.
23 BY MR. KALAS:
24   Q.  Okay.  So let's look at the statements here.
25 And happily, I printed a little bit bigger for you.

---

2

1  list or photographs.
2    Q.  Who would have given you a list?  The
3  attorneys or Mr. Giglio?
4    A.  Counsel.
5    Q.  Counsel would have given you a list.
6    A.  Yeah.
7    Q.  Do you know -- do you have that list still?
8    A.  Well, electronically, I would, but I would
9  imagine that's on my -- my list of documents.
10   Q.  Well, I'm not sure that it is.  So let's go to
11 that and make sure that that list is on there.
12        Did you write your documents that you referred
13 to?  Did you write the list of documents?  Or did -- did
14 the attorneys put it together for you?
15   A.  Umm.
16   Q.  I'm not casting any aspersions there.  That
17 happens pretty commonly, so.
18   A.  What I did was I took the prior previously
19 disclosed list.
20   Q.  Okay.
21   A.  And then added to it anything new in this
22 case.  And I did that by making sure that Jen Clark had
23 all of my electronic documents, and I also provided her
24 with all of the PDFs of any new studies or new Monsanto
25 documents that I can.

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

29 (113 to 116)

Conducted on September 15, 2019

---

**3**

1  Q. Okay.
2  A. That's why I'm saying that there should be, on
3  page 180, under "New Materials."
4  Q. Yep, I'm looking -- I'm looking --
5  A. Yeah, here we go, item 7 on page 180. It's
6  there.
7  Q. Okay. So "Images From Site Inspection."
8  A. Yes.
9  Q. Now, you wrote this report before Dr. LeBeau's
10 site inspection; right? Or, excuse me. You wrote this
11 report the same day as Dr. LeBeau's site inspection;
12 right?
13 A. You mean finished the report?
14 Q. Yeah.
15 A. On August 20th?
16 Q. Yes, sir.
17 A. Yeah.
18 Q. Okay. And whose images did you receive from
19 the site inspection?
20 A. I think those were images obtained from
21 someone from the law firm.
22 MR. KALAS: Okay. So we would like to request
23 those images, please, since they are not publicly
24 available and not produced. We provided
25 Dr. LeBeau's images.

**4**

1  MS. SIZEMORE-WETZEL: Yeah, let's meet and
2  confer on that issue because I need to figure out
3  where they came from.
4  BY MR. KALAS:
5  Q. Likewise, 13, "Photographs as supplied by
6  Mr. Giglio," are those more photographs you may have
7  used to put that list of substances together?
8  A. I don't think so. I think that might have
9  been photographs -- I know what that was. I asked him
10 in -- specifically in the interview if he had any
11 photographs of his --
12 Q. Turf?
13 A. -- turf --
14 Q. Yeah.
15 A. -- before and after, and that's what I
16 included in the report.
17 Q. Okay, so we have those?
18 A. Yes.
19 Q. Okay.
20 A. There is only two.
21 MR. KALAS: Okay. So we would just like to
22 request 7, then, please.
23 MS. SIZEMORE-WETZEL: I think those are in the
24 report, are they not?
25 MR. KALAS: The photo -- the images from the

**5**

1  site inspection?
2  THE WITNESS: Those two are not.
3  MS. SIZEMORE-WETZEL: Oh, no. Sorry. Yeah.
4  I'm sorry.
5  BY MR. KALAS:
6  Q. Okay. So we'll come back to that, Doctor.
7  So you put that list together, you think based
8  on those images from the site inspection?
9  A. Yes.
10 Q. Okay. So you were under a bit of a time
11 crunch putting that list together, then; right?
12 A. Well --
13 Q. Since the site inspection happened the same
14 day.
15 A. Well, the site inspection, I didn't receive
16 that -- I don't know if I ever received that, really.
17 Q. Well, you received the images of the site
18 inspection on or before August 20th, since they ended up
19 in your report; right?
20 A. No, no, I'm saying I don't think I ever
21 received Dr. LeBeau's site inspection images.
22 Q. Okay, they were included with his report, so
23 you should talk to your counsel about that.
24 A. Well, no, I think the problem is, it's a big
25 PDF, and I've only had the first tiny section of it last

**6**

1  night, I haven't -- I haven't read that far into it.
2  Q. So my question is a little different, which is
3  you received images of the site inspection of
4  Mr. Giglio's home the same day your report was due, from
5  your counsel?
6  A. No, no, no, I did -- I didn't receive them. I
7  received images or whatever with LeBeau's report, which
8  was received about five days ago.
9  Q. Okay. So what is entry 7 on "New Materials
10 Considered" on page 180?
11 A. That's the photographs that I received from
12 the law firm.
13 Q. Okay. That's what I'm getting after. Because
14 it says "Images from site inspection." Do you see that
15 on page 180?
16 A. Right. But I'm trying to explain that's not
17 Dr. LeBeau's.
18 Q. I know. I know. You got images from the law
19 firm of the site inspection; correct?
20 A. Yeah, we already established that.
21 Q. Okay.
22 A. Yeah.
23 Q. So what I'm trying to establish is the
24 timeline, which is you received those the same day your
25 report was due; correct?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

30 (117 to 120)

Conducted on September 15, 2019

**7**

1    A.  I don't think so, no.
2    Q.  Okay.  So you think there was a previous site
3  inspection carried out by the attorneys of Mr. Giglio's
4  home?
5    A.  Yes.
6    Q.  Okay.  And you received images of that?
7    A.  Yes.
8       MR. KALAS:  Okay.  So that's what I want.
9  BY MR. KALAS:
10    Q.  Okay.  So I noted on a lot of these products
11  on page 31 to 38 you didn't list all the ingredients in
12  them.  For instance, on the first page, A/C Pro
13  Professional Refrigerant, Armor All Protectant,
14  et cetera, et cetera.  Is that right?
15    A.  Yeah, there -- there are no -- no hazardous
16  ingredients.
17    Q.  Okay.  But you didn't list the ingredients the
18  way you did on some of the other products; right?
19    A.  Yeah, if it wasn't hazardous, why list it.
20    Q.  Okay.  All right.  That was the way -- that
21  was your methodology in putting this together?
22    A.  Yeah.
23    Q.  Okay.  How did you come to the conclusion --
24  we'll take the first one, for example, A/C Pro
25  Professional Formula Refrigerant, that there was nothing

**8**

1  hazardous in it and it was not carcinogenic?
2    A.  Because it was composed of a fluoro- --
3  fluoro- -- a fluorocarbon refrigerant that I'm familiar
4  with and is not hazardous --
5    Q.  Okay.
6    A.  -- and is of -- is of no toxicological
7  interest.
8    Q.  And for each and every one of these substances
9  where you didn't list the ingredients, did you rely on
10  your professional experience to determine they were not
11  hazardous, or did you conduct a literature review on the
12  ingredients in each one of those?
13    A.  No.  No, I didn't.  I -- I used my
14  professional judgment.  For example, Prestone
15  concentrate antifreeze, it's the fourth one from the
16  bottom.
17    Q.  Okay.
18    A.  That would have been a complete waste of the
19  client's time and money for me to research ethylene
20  glycol.  I am extremely familiar with the toxicity of
21  ethylene glycol, and it would be a total waste of time
22  to consult the literature.
23    Q.  Okay.  And you're positive, you stand behind
24  each and every one of these comments that you believe
25  they are not carcinogenic, that these substances aren't

**9**

1  probably human carcinogens, and they don't have hazards
2  in their MSDS; you stand behind this entire chart?
3    A.  With the exception of certain substances such
4  as crystalline silica in concrete, --
5    Q.  Okay.
6    A.  -- which has no capacity to reach the bone
7  marrow and cause NHL.  It's strictly a lung carcinogen.
8  And, you know, if there were carcinogens that simply had
9  no propensity whatsoever, in other words, for example,
10  the claim that asbestos can cause NHL, I wouldn't waste
11  my time putting asbestos on here.
12    Q.  Okay.  So this chart on Table 6, just so the
13  jury is clear when you talk about it, it's not actually
14  talking about the fact that all of these substances
15  where you said were noncarcinogenic are, in fact,
16  noncarcinogenic, they're just not associated with NHL,
17  in your opinion?
18    A.  Well, yeah, I have two categories, known to
19  cause NHL or probable human carcinogens.
20    Q.  Okay.
21    A.  That's the 2A.
22    Q.  So I want to be clear, then.  I want to be
23  really clear.  There are -- you stand behind the fact
24  that every single one, every single one of these
25  compounds where you put no, no, noncarcinogenic and did

**20**

1  not list the ingredients are, in fact, not carcinogenic,
2  not known to cause NHL, and are not probable human
3  carcinogens; you stand behind that?
4    A.  Except for one, methylene chloride, which is
5  actually a 2A --
6    Q.  Okay.
7    A.  -- and I have it as a 2B --
8    Q.  Right.  And that's --
9    A.  Possible.
10    Q.  -- because you've looked at an old IARC
11  monograph, and IARC has since upgraded it?
12    A.  I actually -- I think the problem there was
13  that product actually had it listed as MSB -- MSDS, it's
14  a 2B, and I didn't take the time to check the latest
15  upgrade.
16    Q.  Okay.  And IARC, in fact, updated that based
17  off non-Hodgkin's lymphoma data, didn't they?
18    A.  Yes, they did.
19    Q.  Okay.
20    A.  Correct.
21    Q.  And so Mr. Giglio had a product in his home,
22  the Zip Strip Remover, that has been classified as a 2A
23  carcinogen by IARC for NHL; right?
24    A.  He did, but -- yeah.  And that -- I saw that
25  and had some concern about that.  So I called Mr. Giglio

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.                    31 (121 to 124)

Conducted on September 15, 2019

---

**2**

1  at 5:56 p.m. yesterday evening after I noted that
2  finding in the report of --
3      Q.  Dr. LeBeau?
4      A.  -- Dr. LeBeau.  And I asked him one question.
5  I asked him how often and how frequently, and please
6  explain how he used the product called -- started with a
7  Z.
8      Q.  Zip Strip?
9      A.  Zip Strip premium paint and finish remover.
10     His answer was he had never used it, that it
11 was in a box he received of theatrical props, which he
12 was given a box of paints because he was painting props
13 for use in some kind of church production.  And that Zip
14 Strip was in the box, he never used it, and he has never
15 stripped furniture, et cetera, so.
16     Q.  You didn't record that conversation; right?
17     A.  No, I did not.
18     Q.  He didn't tell you that --
19     A.  I recorded it on paper (indicating).
20     Q.  Okay.  He didn't tell you that under oath, did
21 he?
22     A.  I don't know how to swear people under oath.
23     Q.  Okay.  It's true you saw in Dr. LeBeau's
24 report that there is a warning for non-Hodgkin -- or
25 cancer on the Zip Strip product; right?

---

**22**

1      A.  I'm sorry.
2      Q.  There is a warning for cancer on the Zip Strip
3  product, you saw that?
4      A.  There is, and I --
5      Q.  Okay.
6      A.  -- included that in my report as a 2B when, in
7  fact, it should be a 2A.
8      Q.  And you saw, of course, that there are other
9  products Mr. Giglio did use in the course of his work
10 that had cancer warnings on them; right?
11     A.  Yes, but they are irrelevant to the matter at
12 hand.
13     Q.  Okay.  But let me just make sure it's clear,
14 because I think a jury will decide what's relevant, not
15 you.
16        It's true, isn't it, that Mr. Giglio used
17 products in the course of his work with cancer warnings
18 on them; --
19     MS. SIZEMORE-WETZEL:  Object to the form.
20 BY MR. KALAS:
21     Q.  -- right?
22     MS. SIZEMORE-WETZEL:  Sorry.
23     MR. KALAS:  That's okay.
24     THE WITNESS:  Yes, but irrelevant to this
25 assessment, and also your assumption that he used

---

**23**

1  them is not necessarily true; and more importantly,
2  none of them had any relevance to his NHL.
3      (Marked Deposition Exhibit 15.)
4  BY MR. KALAS:
5      Q.  All right.  Mark as Exhibit 15 an image.  I'll
6  represent to you, sir, I printed this from the Global
7  Syn-Turf website.  Global Syn-Turf is where Mr. Giglio
8  got his turf for most of his occupational use; right?
9      A.  Yes.
10     Q.  Okay.  And Global Syn-Turf, he testified at
11 his deposition that part of the process of installing
12 the turf involved putting out silica sand; right?
13     A.  Yes.
14     Q.  Okay.  And, in fact, you saw purchase receipts
15 for silica sand; right?
16     A.  Yes.
17     Q.  Okay.  You have no doubt that Mr. Giglio used
18 silica sand as part of his work?
19     A.  Correct.
20     Q.  Okay.  Do you see in Exhibit 15 on the
21 left-hand column -- or left-hand side the picture of the
22 back side of this bag?
23     A.  Yes.  And it's completely irrelevant to NHL.
24     Q.  Okay.
25     A.  It's talking about crystalline silica in the

---

**24**

1  lung.
2      Q.  Do you see the picture, sir?
3      A.  Yes.
4      Q.  Okay.  Can you read into the record the top
5  statement above "Do not breathe this product"?
6      A.  I can't.  It's a total blur even when
7  magnified.
8      Q.  Okay.  Well, let me try to read it and see if
9  you agree I read it correctly.  Does the top bag on the
10 left side state "This bag contains crystalline
11 silica" --
12     A.  Wait, wait.  I can't --
13     Q.  Okay.
14     A.  Take a look at that.  Maybe you gave me a
15 defective copy.
16     Q.  No, I didn't.  I'm looking right here, sir.
17 Right there.
18     A.  Oh, I was looking at the fine print below
19 that.  Thank you.
20     Q.  No.  No.  It's a big warning.
21     A.  Oh, okay.  Go ahead.
22     Q.  Says "This bag contains crystalline silica,
23 known to the State of California to cause cancer."
24        Did I read that correctly?
25     A.  Yes, it's a respiratory cancer.

---

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

32 (125 to 128)

Conducted on September 15, 2019

---

25

1    Q.   Okay.
2    A.   **It doesn't make it past the lung into the bone**
3    **marrow, sir.**
4    Q.   Sir, so I'm correct, though -- well, let me
5    ask you this.  Are you going to offer an expert opinion
6    that Mr. Giglio was more concerned with NHL than
7    respiratory cancer?
8        MS. SIZEMORE-WETZEL:  Object to form.
9        THE WITNESS:  No.  What I'm stating as a
10       toxicologist, I'm not speculating on matters of
11       what someone was thinking.
12   BY MR. KALAS:
13   Q.   Sure.
14   A.   **I'm here to objectively provide a**
15   **toxicological assessment of the products he was exposed**
16   **to, and that product has nothing to do with NHL.**
17   Q.   Is it --
18   A.   **Nothing.**
19   Q.   Are you going to offer any expert opinion in
20   this case that Mr. Giglio would not have used Roundup if
21   it had warned of NHL?
22       MS. SIZEMORE-WETZEL:  Object to form.
23       THE WITNESS:  No.  That's not something I --
24       I'm not trying to read into a person's mind and
25       testify what they're thinking, no.

---

26

1    BY MR. KALAS:
2    Q.   Okay.
3    A.   **Of course not.**
4    Q.   Okay.  If that's not what you're talking
5    about, we can move on.  So you're not -- you will
6    stipulate right now you will not tell the jury he would
7    not have used Roundup if it had warned of NHL?
8        MS. SIZEMORE-WETZEL:  Same objection.
9        THE WITNESS:  He might tell you that, but I'm
10       certainly not.  I'm -- that's not my role as an
11       impartial expert.  I'm here to tell you what can
12       cause NHL and what can't.  And this bag is not --
13       cannot cause NHL.  It causes lung cancer --
14   BY MR. KALAS:
15   Q.   Now, of course, that bag --
16   A.   **-- and sil- --**
17   Q.   Go ahead, I'm sorry.
18   A.   **And silicosis.**
19   Q.   Okay.  And that bag of cement with the
20   crystalline silica in it, crystalline silica is a group
21   1 IRAC carcinogen, not 2A; correct?
22   A.   **That is correct.**
23   Q.   Okay.  So let's move on, then, to Roundup.
24       Well, let me back up.
25       You did not do an exposure assessment of all

---

27

1    the places Mr. Giglio may have been that are associated
2    with NHL; right?  And by that I mean all the exposures
3    he may have had in those places.
4        MS. SIZEMORE-WETZEL:  I'll object to form.
5        THE WITNESS:  I'm not really clear what you
6        mean by "places."
7    BY MR. KALAS:
8    Q.   Well, so it's -- for instance, he lived in the
9    San Joaquin Valley; right?
10   A.   **Correct.**
11   Q.   And the San Joaquin Valley is an agricultural
12   area?
13   A.   **Yes.**
14   Q.   And they've had issues as well with things
15   like arsenic and TCE and PERC contamination of their
16   water supplies; right?
17   A.   **I'm not familiar with those --**
18   Q.   Okay.
19   A.   **-- studies, no.**
20   Q.   You didn't look into that?
21   A.   **I'm not -- I'm not familiar with any public**
22   **water supply studies in that area.**
23   Q.   Did you research it?  Did you look into it?
24   A.   **No, I -- I did not.**
25   Q.   Okay.  So one thing you didn't consider in

---

28

1    your exposure assessment is perhaps water supplies or
2    environmental exposures that he may have had while
3    living in New Jersey or in the San Joaquin Valley?
4    A.   **No.**
5    Q.   Okay.  So I'm going to mark as Exhibit 16,
6    shift gears here a bit, a letter.
7        (Marked Deposition Exhibit 16.)
8        MS. SIZEMORE-WETZEL:  Thank you.
9    BY MR. KALAS:
10   Q.   Have you seen this letter before, sir?
11   A.   **Yes.**
12   Q.   Okay.  And you see that it says at the top
13   "Dear Registrant," and it's on EPA letterhead?
14   A.   **Yes.**
15   Q.   Okay.  I just want to ask you a few questions
16   about what's written in this letter, but let me lay a
17   little foundation here.
18       You have talked about before that you've
19   worked on chemical labeling issues in your career;
20   right?
21   A.   **I have.  I have prepared MSDS sheets, --**
22   Q.   Okay.
23   A.   **-- yes.**
24   Q.   Okay.  And you have interacted, in fact, with
25   EPA-regulated chemicals while doing that; right?

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

---

29

1     A.  Yes.
2     Q.  Okay.  So it says here, start at the top --
3  this is -- this is dated August 7th, correct, of this
4  year?
5     A.  Yes.
6     Q.  Okay.  And it states "Dear Registrant:  We are
7  writing to you concerning label and labeling
8  requirements for products that contain glyphosate."
9        Did I read that correctly?
10    A.  Yes.
11    Q.  Okay.  Moving on, it states "On July 7, 2017,
12  California listed glyphosate as a substance under
13  Proposition 65 based on the International Agency For
14  Research on Cancer's classification of the pesticide as
15  'probably carcinogenic to humans.'
16       "EPA disagrees with IRAC's assessment of
17  glyphosate.  EPA scientists have performed an
18  independent evaluation of available data since the IARC
19  classification to reexamine the carcinogenic potential
20  of glyphosate and concluded that glyphosate is not
21  likely to be carcinogenic to humans."
22       Did I read that correctly?
23    A.  Yes.
24    Q.  Do you have any reason to disagree with EPA's
25  statement they had performed an independent evaluation

---

30

1  of the available data since the IARC classification to
2  reexamine the carcinogenic potential of glyphosate?
3        MS. SIZEMORE-WETZEL:  Object to form.
4        THE WITNESS:  Yes, I evaluated that, evaluated
5     all the animal studies, and reported on that in the
6     Johnson depositions.
7  BY MR. KALAS:
8     Q.  Okay.  My question was different, sir.  It
9  wasn't about your opinion.  It's about what EPA did and
10  whether you have a reason to disagree with their
11  statement about what they did.  So I'll ask it again.
12       Do you have any reason to disagree that EPA
13  has performed an independent evaluation of the available
14  data since the IARC classification to reexamine the
15  carcinogenic potential of glyphosate?
16    A.  So --
17       MS. SIZEMORE-WETZEL:  Same objection.
18       THE WITNESS:  -- are you asking me if I agree
19    that they performed an independent assessment?
20  BY MR. KALAS:
21    Q.  I'm asking if you have an expert opinion
22  disagreeing that EPA did what they said they did.
23    A.  You're asking me if I disagree that -- I agree
24  that they carried out an evaluation, or I disagree that
25  they carried out an evaluation?  I'm not --

---

3

1     Q.  Yeah, that's what I want to know.  Are you
2  going to come to trial and tell the jury that you
3  disagree that EPA performed an independent evaluation of
4  the available data since the IARC classification?
5     A.  At this point in time, I need to consult my
6  reference list, because I forget what date they carried
7  out the evaluation and what date FIFRA filed their
8  review objections.  And I -- I just don't remember what
9  year that was.
10    Q.  Okay.  So let's see if we can't work through
11  that together.  If you go to your reference list, sir.
12    A.  I'm in it.
13    Q.  311.
14    A.  Yeah, I see it.
15    Q.  Okay.  You see that's after the IARC
16  assessment?
17       IARC assessment was 2015, sir.
18    A.  I do see that.
19    Q.  Okay.  So do you have any reason to
20  disagree -- again I'll ask -- or let me strike that and
21  ask it correctly.
22       Are you going to offer an expert opinion that
23  you disagree that EPA performed an independent
24  evaluation of available data since the IARC
25  classification to examine the carcinogenic potential of

---

32

1  glyphosate?
2     A.  I -- I would agree they did, but I would defer
3  aspects to that regarding the -- how independent it was
4  or unlikely to have been influenced by industry.  I'll
5  defer that to Dr. Benbrook.
6     Q.  Okay.  So you have no expert opinion on
7  influence by industry on EPA's evaluation?
8     A.  As a toxicologist, no, I have a great deal of
9  information as to the errors and omissions in that
10  analysis, but I am not here to speak on the -- the mind
11  or the thoughts of EPA or how they were influenced.
12    Q.  Or if they were influenced?
13    A.  I'm going to say or how they were influenced.
14    Q.  Okay.
15    A.  And defer that to Charles.
16    Q.  You don't -- you don't have an expert opinion
17  if they were influenced; correct?
18    A.  I defer that to Charles Benbrook.
19    Q.  Okay.  So let's move on to the next paragraph.
20  It states "On February 26, 2018, the United States
21  District Court for the Eastern District of California
22  issued a preliminary injunction enjoining California
23  from enforcing the State warnings requirements involving
24  the pesticide glyphosate's carcinogenicity, in part on
25  the basis that the required warning statement is false

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.                    34 (133 to 136)

Conducted on September 15, 2019

---

**33**

1  or misleading."
2      Did I read that correctly?
3      A. Yeah.
4      Q. Any reason to agree or disagree or offer an
5  expert opinion on what that court decision said?
6      A. I have no information to offer on that.
7      Q. Okay. Let's move on, paragraph 4 -- or,
8  excuse me, the next paragraph. It states "Given EPA's
9  determination that glyphosate is 'not likely to be
10 carcinogenic to humans,' EPA considers the Proposition
11 65 warning language based on the chemical glyphosate to
12 constitute a false and misleading statement.
13     "As such, pesticide products bearing the
14 Proposition 65 warning statement due to the presence of
15 glyphosate are misbranded pursuant to section 2(q)(1)(A)
16 of FIFRA and as such do not meet the la-" -- "the
17 requirements of FIFRA."
18     Did I read that correctly?
19     A. Yes.
20     Q. Okay. And you agree that EPA regulates
21 pesticides under the FIFRA scheme; correct?
22     A. Yes.
23     Q. And that includes the label on
24 pesticides; right?
25     A. Yes.

**34**

1      Q. Okay. Let's go to the next page on the back
2  of this. Looking at that paragraph there that carries
3  over from the previous page, it states, first full
4  sentence, "Therefore, EPA will no longer approve
5  labeling that includes the Proposition 65 warning
6  statement for glyphosate-products.
7      "The warning statement must also be removed
8  from all product labels where the only basis for the
9  warning is glyphosate, and from any materials considered
10 labeling under FIFRA for those products."
11     Did I read that correctly?
12     A. Yes.
13     Q. Okay. Now, going back to your experience on
14 chemical labeling issues with EPA-regulated products, is
15 it true, based on the statement I just read, that EPA
16 has stated in this letter that they would not approve a
17 glyphosate label -- glyphosate-based herbicide label
18 with the cancer warning on it even if a registrant wants
19 it?
20     MS. SIZEMORE-WETZEL: Object to form.
21     Go ahead.
22     THE WITNESS: That -- that I'll defer to
23  Dr. Benbrook.
24 BY MR. KALAS:
25     Q. Okay. So --

**35**

1      A. Because that -- that calls for an opinion
2  someone outside of toxicology.
3      Q. Okay. So you have worked on these sorts of
4  labels in your career; right?
5      A. Yes.
6      Q. Okay. If you read this letter while working
7  on one of those labels, would you take it to mean that
8  EPA would not approve a label warning of cancer?
9      MS. SIZEMORE-WETZEL: Object to form.
10     THE WITNESS: It's confusing because
11 Proposition 65 is a California governing entity,
12 and California carried out an independent
13 assessment, I understand. But I am not prepared to
14 fully research that, and I -- I believe that's
15 being handled by Dr. Benbrook.
16 BY MR. KALAS:
17     Q. All right. And when California carried out
18 that independent assessment we just talked about, they
19 set a NSRL of 1.1 milligram per day; right?
20     A. Yes.
21     Q. And are you aware in the biomonitoring of any
22 person ever applying Roundup in any application scenario
23 whether urinalysis has indicated 1.1 milligrams per day?
24     MS. SIZEMORE-WETZEL: Object to form.
25 BY MR. KALAS:

**36**

1      Q. And I'm specifically asking about urinalysis,
2  sir.
3      A. Urine analysis, no, and that's because the
4  primary excretion is not just through the urine.
5      Q. Okay. And that's -- but your answer is no to
6  that? All of those studies that have looked at urine,
7  none of them have detected 1.1 milligram a day; correct?
8      A. That's correct, and that's because not all of
9  it is excreted through the urine.
10     Q. Sure. And we've talked about that before.
11     All right. To clear up this CalEPA issue you
12 just brought up, I am marking as Exhibit 17 a press
13 release.
14     (Marked Deposition Exhibit 17.)
15 BY MR. KALAS:
16     Q. And you see at the top of this, it says "An
17 official website of the US government, EPA"?
18     A. Yes.
19     Q. Most of this is duplicative of the letter we
20 just looked at, but I just want to ask you a couple of
21 things about the statement.
22     If you go to the second paragraph, and they're
23 quoting the EPA administrator here, do you see that?
24     A. Yes.
25     Q. Okay. What does the EPA administrator do?

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8570-4   Filed 12/27/19   Page 37 of 47
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS
Transcript of William Sawyer, Ph.D.          35 (137 to 140)
Conducted on September 15, 2019

**37**

1    A.  I defer that to Charles Benbrook.  He has a
2  better understanding of the administration --
3    Q.  Okay.
4    A.  -- department.
5    Q.  It's true that the EPA administrator is the
6  head of the agency; correct?
7    A.  Possible.  I'm not certain.
8    Q.  Okay.  In 35 years or 40 years of working with
9  EPA-related products, you don't know who is in charge of
10  the agency?
11    A.  I don't pay much attention to the politics
12  and --
13    Q.  Okay.
14    A.  -- the elected officials, appointed officials,
15  et cetera.
16    Q.  Well, let's talk about that for a second.
17  It's true that glyphosate has been approved by EPA since
18  1974; right?
19    A.  Yes.
20    Q.  Okay.  And it's true EPA has never said, like
21  IARC, that glyphosate is probably carcinogenic; right?
22    A.  At one point I think there was a decision that
23  it was, but it was quickly reversed.
24    Q.  It was quickly reversed.
25        And that fact that EPA has instead said that

**38**

1  it's not carcinogenic has been true throughout both
2  Democratic and Republican administrations; right?
3        MS. SIZEMORE-WETZEL:  Object to the form.
4        THE WITNESS:  I don't know.  I don't get
5    involved with politics at all.
6  BY MR. KALAS:
7    Q.  Okay.  Well, the 2016 EPA document you
8  referred to at 311 on your -- on your materials
9  considered list, which was after the IARC review, that
10  was written in 2016.  Who was the president in 2016?
11    A.  A Democrat.
12    Q.  What was his name?
13    A.  Obama.
14    Q.  And EPA has never required labeling glyphosate
15  as carcinogenic; right?
16    A.  No.
17    Q.  So let's read what this document says.  We got
18  off topic here.  Second paragraph, first line, it
19  says -- and this is quoting the EPA administrator -- "It
20  is irresponsible to require labels on products that are
21  inaccurate when EPA knows the product does not pose a
22  cancer risk."
23        Did I read that correctly?
24    A.  Yes.
25    Q.  Okay.  Do you agree that it is irresponsible

**39**

1  to include warnings on products that are inaccurate?
2    A.  Yes.
3    Q.  Okay.  Then if we go down to the bottom of
4  this paragraph, it states in the last sentence "EPA's
5  notification to glyphosate registrants is an important
6  step to ensuring the information shared with the public
7  on a federal pesticide label is correct and not
8  misleading."
9        Did I read that correctly?
10    A.  Yes.
11    Q.  Do you believe that warning information on
12  labels should be correct and not misleading?
13    A.  Yes, but I disagree in this case with the --
14  the decisions.
15    Q.  Okay.  And, you know, the jury is going to
16  hear a lot about what you alluded to from Dr. Benbrook
17  about Monsanto and EPA's interaction.  So let me make
18  sure this is crystal clear in -- in our understanding
19  here.  EPA is not isolated in their opinion that
20  glyphosate doesn't cause cancer; right?
21        MS. SIZEMORE-WETZEL:  Object to form.
22        THE WITNESS:  Correct.  Although there are at
23    least, I think, five other countries who have
24    banned its use.
25  BY MR. KALAS:

**40**

1    Q.  Okay.  And you don't know if those are
2  political or regulatory decisions; right?  You talked
3  about the politicians, you don't get involved in that.
4    A.  I haven't researched it.
5    Q.  Okay.  You are aware, though, of course, that
6  the Australian regulatory agency believes glyphosate
7  does not cause cancer; right?
8    A.  Yes, but Austria does.
9    Q.  Okay.  And, again, you're not sure if that's
10  political or regulatory; right?
11    A.  I am not certain.
12    Q.  Okay.  You're aware that the Australian
13  decision is regulatory; right?
14    A.  I haven't researched that.
15    Q.  Okay.  You're aware the Canadians don't
16  believe glyphosate causes cancer; right?
17        MS. SIZEMORE-WETZEL:  Object to form.
18        THE WITNESS:  I haven't researched that.
19  BY MR. KALAS:
20    Q.  You're aware that the Japanese don't believe
21  glyphosate causes cancer; right?
22    A.  Again, I have not reviewed any of the
23  regulatory information from --
24    Q.  You're --
25    A.  -- Japan Health.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC Document 8570-4 Filed 12/27/19 Page 38 of 47
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS
Transcript of William Sawyer, Ph.D.                    36 (141 to 144)
Conducted on September 15, 2019

4

1    Q. You're aware the Koreans don't believe
2  glyphosate causes cancer; right?
3    **A. Not aware of any regulatory information. Have**
4  **not researched that.**
5    Q. All right. But at bottom, you agree that EPA
6  is not alone on some island saying glyphosate doesn't
7  cause cancer; there are other countries across the world
8  who also believe that?
9       MS. SIZEMORE-WETZEL: Object to form.
10      THE WITNESS: That's true, and there are also
11   at least five countries that believe it does.
12 BY MR. KALAS:
13   Q. Okay. And, again, you're not sure if that is
14 political or regulatory; right? You don't know if
15 politicians got involved in that decision?
16   **A. No, nor -- nor do I -- nor can I tell you that**
17 **politicians aren't involved in this decision.**
18   Q. Fair enough.
19      And you don't know if those bans in those
20 other countries have anything to do with cancer or some
21 other health endpoint that's noncancer; right?
22   **A. I haven't researched that.**
23   MR. KALAS: Okay. All right. Can we go off
24   the record? I want to organize my notes for the
25   limited time I have. Thank you.

42

1      MS. SIZEMORE-WETZEL: Of course.
2      THE VIDEOGRAPHER: 10:52. We're going off
3  record.
4      (Recess taken from 10:52 a.m. to 11:07 a.m.)
5      THE VIDEOGRAPHER: 11:07. We're back on
6  record.
7  BY MR. KALAS:
8    Q. Doctor, you mentioned before we went off for
9  break, I just want to clean up a couple things. You
10 mentioned you had a call with Mr. Giglio last night.
11 Other than your call to ask him that single question
12 last night and the call you had with him on August 14th,
13 have you spoken to Mr. Giglio any other times?
14   **A. No. However, this -- I want to make a note**
15 **that you have an arrow on this tab and my phone call on**
16 **the back. Just -- just so you guys don't miss it.**
17   Q. And that's part of Exhibit 4, right, --
18   **A. It is.**
19   Q. -- that's going back in your blue folder?
20   **A. Yes.**
21   Q. All right. All right. Another thing you
22 talked about, I guess, just briefly was this idea of the
23 bone marrow; right? You talked about bone marrow and
24 lymphocytes?
25   **A. Yes.**

43

1    Q. Okay. Now, the bone marrow and the bone are
2  different tissues; right?
3    **A. Yes.**
4    Q. Okay. Can you -- do -- do lymphocytes mature
5  in the bone, or do they mature in the bone marrow?
6    **A. Well, they are formed in the bone marrow.**
7    Q. Okay. And so the bone, when somebody is doing
8  a toxicokinetic study, if they look at the bone and the
9  bone marrow, those are -- those are separate tissues if
10 they happen to actually look at both of those things;
11 right?
12   **A. Yeah, they can be described as separate**
13 **tissues.**
14   Q. Okay.
15   **A. Yeah.**
16   Q. And for lymphocytes, the tissue we would be
17 actually concerned with is the bone marrow and not the
18 bone, right, if we had data on both?
19   **A. Yes, with the qualification that the bone**
20 **marrow is in the bone.**
21   Q. Right. But they actually -- there is a
22 compartment that the bone marrow stays in; right? It
23 doesn't interact, for instance, with the outside of the
24 bone?
25   **A. Well, the osteoplast and the continued, let's**

44

1  **say, eating away of the bone by the osteocytes is**
2  **occurring in tandem with the operations of the bone**
3  **marrow contained within.**
4    Q. Right. I worked on this phosphate litigation
5  for many years. So I understand osteoclast, osteoblast.
6  The bone is constantly remodeling.
7    **A. I'm not surprised. You seem to know a lot of**
8  **sci- -- what is your BS in?**
9    Q. History.
10   **A. I would never have guessed that.**
11   Q. But let's back up for a second because it's
12 not about me.
13      I'm correct, aren't I, that the cancer of the
14 bone --
15   **A. But you let -- you let me ask a question just**
16 **there.**
17   Q. I know I did. It's the only one you'll ever
18 get.
19      I'm correct cancer of the bone is an
20 osteosarcoma usually; right?
21   **A. Yes.**
22   Q. Okay. And cancer of the lymphocytes is
23 non-Hodgkin's lymphoma; right?
24   **A. Yes.**
25   Q. Okay. And that is located in the lymphatic

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.     37 (145 to 148)

Conducted on September 15, 2019

---

45

1  system, which includes the bone marrow, spleen, thymus,
2  et cetera; correct?
3      **A.  Yes.**
4      Q.  Okay.  Now, you talked earlier, I think you
5  used benzene as an example when we were talking about
6  dose.  And it's true, isn't it, that in -- in the real
7  world, there are different PPE requirements, and by PPE,
8  I mean personal protective equipment, requirements for
9  handling benzene-containing products depending on the
10 concentration of benzene in them; right?
11     **A.  Yes.**
12     Q.  Okay.  And so, for instance, when I go to the
13 gas station, it's not a requirement that I wear a
14 chemically resistant glove; right?
15     **A.  No.  Nor is it an IDLH with a self-contained**
16 **breathing apparatus required.**
17     Q.  Right.  Exactly.  But if I'm handling bulk
18 amounts of benzene, those types of PPE may be required;
19 right?
20     **A.  Yes.**
21     Q.  Okay.  And in the case of glyphosate, I
22 understand you may not agree with it, but in the case of
23 glyphosate, much of the PPE requirements have come out
24 of acute toxicity concerns, specifically as to eye and
25 skin irritation; right?

---

46

1      **A.  Yes.**
2      Q.  Okay.  And the PPE, for instance, for a
3  concentrated glyphosate product that is sold in the
4  United States, may be different than the PPE for a
5  ready-to-use product; right?
6          MS. SIZEMORE-WETZEL:  I'll object to form.
7          THE WITNESS:  I'm a little confused because
8      I'm thinking in terms of labels that I've read on
9      many different Roundup products.
10 BY MR. KALAS:
11     Q.  That's exactly what I'm getting at, sir, so.
12     **A.  I mean, the --**
13     Q.  So, for instance -- let me give you a concrete
14 example.
15     **A.  Let me finish.**
16     Q.  Okay.
17     **A.  There is a difference in labels, but based on**
18 **my research of the letters of submission to**
19 **registration of the label to EPA, it has to do with**
20 **reentry, whether -- when entry occurs after spraying**
21 **agricultural crops.**
22     Q.  Right. But the -- fair. But my question is
23 directed slightly different.
24         It's true, isn't it, that, for instance,
25 handling concentrated product calls for wearing gloves

---

47

1  on many Roundup labels, while handling ready-to-use
2  product does not call for wearing gloves; right?
3          MS. SIZEMORE-WETZEL:  I'll -- I'll object to
4      form.
5          THE WITNESS:  I -- you know, I -- I don't want
6      to guess.
7  BY MR. KALAS:
8      Q.  Okay.  If you don't want to guess, if you
9  can't recall.
10     **A.  The problem is I really need to go to my**
11 **archive file, which is now I think about three**
12 **file boxes, and pull out the MSDSs I'm thinking of that**
13 **require gloves and look at the registration letter to**
14 **EPA.  I just can't -- I can't remember if the reason was**
15 **due to the concentration or due to other reasons.**
16     Q.  Okay.  Well, let's -- let's back it up and
17 just ask it a different way.  Which is, it's true, isn't
18 it, that for certain concentrate products, there are
19 higher levels of PPE called for than in dilute products?
20         And by higher levels, I mean gloves, that sort
21 of thing.  That part's true?
22     **A.  I believe so.**
23     Q.  Okay.  And you talk about, on page 57 of your
24 report, labeling recommendations, it's Table 14.  Do you
25 see that?

---

48

1      **A.  Yes.**
2      Q.  Okay.  And you're taking those bullets from
3  the document I'm marking as Exhibit 18.
4         (Marked Deposition Exhibit 18.)
5  BY MR. KALAS:
6      Q.  Is that correct?
7      **A.  It is.**
8      Q.  Okay.
9          MS. SIZEMORE-WETZEL:  Thank you.
10 BY MR. KALAS:
11     Q.  And that's from label recommendations, which
12 is part 3 here; right?
13     **A.  Yes.**
14     Q.  Okay.  And those recommendations are derived
15 from calculations using what you've described as the
16 generally accepted UK-POEM model; right?
17     **A.  Yes.**
18     Q.  Okay.  Do you believe that those
19 recommendations that you have on Table 14 of your report
20 are directly applicable to Mr. Giglio?
21     **A.  I do, except for the concentrate being only**
22 **applicable to protective gloves where you see the yes,**
23 **when mixing.  Wherever you see notes "when mixing," that**
24 **would not be applicable to Mr. Giglio.  However, the**
25 **other entries are applicable because they're based upon**

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

38 (149 to 152)

Conducted on September 15, 2019

---

49

1  the diluted spray exposure analyses conducted by
2  Monsanto.
3      Q.  Okay.  So let's -- let's break that down.  Did
4  Mr. Giglio -- let's look at the condition table here
5  first.
6          Did Mr. Giglio -- Giglio handle or apply
7  concentrate?
8      A.  No, I said he did not, and, therefore, the
9  items that are noted "when mixing" do not apply to him.
10     Q.  Okay.  So the "when mixing" is on the right,
11 so I'm focused more on the left-hand row here where it
12 says "When handling or applying concentrate," in your
13 Table 14, "protective gloves, face protection."  Do you
14 see that?
15     A.  Right.
16     Q.  Okay.  He didn't apply -- handle or apply
17 concentrate; right?
18     A.  Correct.
19     Q.  Okay.  So we can cross that out for him as
20 what his exposure scenario was; correct?
21     A.  That's correct.
22     Q.  Okay.  And he didn't spray through an
23 ultra-low-volume application and mist blower equipment;
24 right?
25     A.  Correct.

---

50

1      Q.  Okay.  So can we cross this out as well,
2  because that's not him?
3      A.  I'm not sure.  I don't -- because it's -- I'm
4  not sure what it's -- I would have to research that
5  further.  "Ultra-low-volume application."
6      Q.  Okay.  Well, let's look at the third one.  The
7  third row is what most closely describes Mr. Giglio;
8  right?  Which is a low-volume knapsack sprayer, that's
9  the closest to him?
10     A.  Yes.
11     Q.  Okay.  So would you agree with focusing on the
12 PPE recommendations in your Table 14, would you agree to
13 focusing on that row as applied to Mr. Giglio?
14     A.  Yes, but I -- again, I would have to check the
15 document and see what's the description of
16 ultra-low-volume application is.
17     Q.  Okay.  Well, we have the document here.  So as
18 we're going, if you need to look at that, you tell me.
19         But let's start with the knapsack spraying.
20 Let's look at the parameters for this POEM model on page
21 237.
22         Can you go to 237, please?
23     MS. SIZEMORE-WETZEL:  This is on Exhibit 18?
24     MR. KALAS:  Yes.  Bates 237.
25     MS. SIZEMORE-WETZEL:  (Nods head

---

5

1  affirmatively.)
2         THE WITNESS:  Okay.
3  BY MR. KALAS:
4      Q.  Are you there?
5      A.  Yes.
6      Q.  Okay.  Now, first of all, the assumed
7  concentration of glyphosate for these application models
8  is 360 grams per liter; right?
9         It's in the concentration row.
10     A.  Well, that's -- that's the concentrate, not of
11 the spray.  That's before it's diluted.
12     Q.  Okay.  So the assumed concentration is 360
13 grams per liter; right?
14     A.  Right.  But we're not -- we're not dealing
15 with that in this case.
16     Q.  Okay.  Well, I'm looking at "Estimation of
17 worker exposure," considering a worst-case scenario for
18 each of them in the document you cite, sir.  And they
19 don't talk about dilution there; right?
20     A.  Later, it is all about dilution later.
21     Q.  Okay.
22     A.  This has to do with the mixing or applying the
23 concentrate.
24     Q.  Okay.  So right here, in the S -- this is
25 taken from the summary of the document.  It states

---

52

1  "Concentration, 360 grams per liter."  Right?
2      A.  Yeah, that's the starting amount before
3  dilution.
4      Q.  Okay.  And the amount that Mr. Giglio sprayed
5  had about, give or take, 20 grams per liter in it;
6  right?
7      A.  Say again?
8      Q.  The amount Mr. Giglio sprayed using a
9  2 percent formulation had, give or take, 20 grams per
10 liter in it of glyphosate; right?
11     A.  Approximately.
12     Q.  Okay.  And then on the application dose for
13 handheld applicators, it says 5 liters per hectare.  Do
14 you see that?
15     A.  Yes, although his liter per hectare was far
16 higher than that.
17     Q.  Right, that's what you say.  But this one here
18 used 5 liters per hectare; right?
19     A.  Yes.
20     Q.  And you say his liters per hectare were far
21 higher; right?
22     A.  Far higher.
23     Q.  Okay.
24     A.  He was double or tripling his applications and
25 putting it on in such a way to soak and keep the soil

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

Conducted on September 15, 2019

---

53

1  wet.

2  Q. Okay.

3  A. Very heavy application.

4  Q. Okay, sir. Now, 5 liters is equivalent to

5  about one and a third gallons; right?

6  A. Yes.

7  Q. Okay. And the workload here is one hectare a

8  day; right?

9  A. Yes.

10  Q. Okay. Have you converted the square footage

11  of -- that Mr. Giglio said he applied to to hectares?

12  A. No, this is exactly why I didn't apply the

13  POEM method. The POEM method is not representative of

14  somebody soaking the soil in a perimeter around a given

15  area. It's a completely different application.

16  Q. Sir, with all due respect, you didn't answer

17  my question.

18       My question was very simple, which is did you

19  convert the square footage that Mr. Giglio said he

20  applied to to a hectare?

21  A. No, that would be inappropriate because he

22  didn't blanket spray, he, rather, soaked the soil around

23  the perimeter with double or triple applications.

24  Q. Okay. Got it.

25       So I did, I was curious when I looked at this

---

54

1  last night, and I put it in Google. And 1 hectare --

2  I'm showing you my computer here -- according to Google,

3  equals 107,639 square feet. Do you disagree with that

4  figure at all?

5  A. No, I have used that figure in other POEM

6  applications.

7  Q. Okay. So 107,639 square feet is more than the

8  entire amount of square footage of turf Mr. Giglio said

9  he laid down in five years; right?

10  A. Yes.

11  Q. Okay. And again, Mr. Giglio, you've been

12  quite clear, was spraying the perimeter of that turf,

13  not all over that turf; correct?

14  A. Yes.

15  Q. Okay.

16  A. That's the whole point that you're mixing

17  apples and oranges here.

18  Q. Okay.

19  A. That he didn't -- he didn't spray in the

20  fashion that the UK-POEM models designed for at all.

21  Q. Well, with all due respect, sir, you're

22  relying on the PPE called for from the POEM model in

23  your report; right?

24  A. No.

25  Q. You're not?

---

55

1       So Table 14 is not PPE that you are relying on

2  that you're going to tell the jury about that Mr. Giglio

3  should have worn based on statements by Monsanto because

4  the POEM model does not apply to Mr. Giglio?

5  A. No, I'm relying on -- you're misrepresenting

6  my report. I am relying on the actual spray measured on

7  the gauze pads that were on -- affixed to the bodies of

8  the sprayers, and measuring the amount of spray that

9  impacted their body resulted in warnings.

10  Q. Okay, so you're --

11  A. And in our case, Mr. Giglio was more impacted

12  than that in this study because of his low-to-the-ground

13  position. The POEM model is designed for upright,

14  standing people, not people who are down on their hands

15  and knees.

16  Q. You know, I was thinking about that last

17  night. Can you stand up and -- I'll hold two pieces of

18  paper up for you. Can you stand up and lean over and

19  show us exactly how he was applying -- two pieces of

20  paper, 11 inches each, so that would be 22 inches, you

21  would be a little bit above it. I just want to see what

22  2 feet looks like on video. Because it just seems to me

23  like that might hurt somebody's back.

24       So let's -- let's see how that looks and make

25  sure he's actually 2 feet. Do you mind doing that for

---

56

1  me, sir?

2  A. No, I'm not going to do that.

3  Q. You're not going to do that.

4       MR. KALAS: Okay. Grant, can you -- you know

5  what, this isn't in court. We'll do that in court.

6  BY MR. KALAS:

7  Q. 2 feet seems awfully low to me, though. So

8  let's keep going.

9  A. I suggest you have the plaintiff demonstrate.

10  Q. Okay.

11  A. Rather than me try to guess what he did.

12  Q. Well, the plaintiff has cancer and you don't,

13  so I thought I would ask you.

14       Let's keep going, sir. The hectare, the

15  hectare spraying is every day in the POEM model; right?

16  Now, I know you say you're relying on the skin surface

17  area, but I'm correct that the hectare spray area is

18  what the POEM model relies on for that PPE requirement

19  you're talking about; right?

20  A. No. The POEM model was a calculation of dose.

21  Q. Okay.

22  A. What I'm relying on is the actual measurements

23  from the various areas of the body conducted using a

24  non-CDA sprayer, such as used by Mr. Giglio. And that's

25  what the document MONGLYO659236 did. And I relied on

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

40 (157 to 160)

Conducted on September 15, 2019

---

57

1  that data in my opinions in my report.
2      Q.  So did you, in those Cal or Cramer studies,
3  did you look at the actual absorbed dose estimated by
4  those individuals?
5      A.  I used Table 5, "Surface Area of the Body
6  Parts."
7      Q.  All right, and we've talked about the fact
8  that exposure is not dose; correct?
9      A.  Correct, but --
10     Q.  Did you look at the absorbed doses calculated
11 by those individuals?
12     A.  I used the doses that were recorded in the
13 study times the dermal penetration reported in the
14 literature for jeans, for example, of 20 percent dermal
15 penetration.
16     Q.  Let's mark as --
17     A.  I mean, clothing penetration, rather.
18     MR. KALAS:  Let's mark as Exhibit 19 this
19 document.  Oh, sorry, that's yours.
20     MS. SIZEMORE-WETZEL:  Thank you.
21     MR. KALAS:  Is that it?  Yeah.
22     (Marked Deposition Exhibit 19.)
23 BY MR. KALAS:
24     Q.  Let's go to the estimation of the dose, which
25 is on 569.  This is a summary, 569.  This is about the

---

58

1  same POEM model; right?
2      I'm going to 569, sir, on the Bates numbers.
3      And do you see that it says, "In addition,
4  results obtained from the glyphosate monitoring studies
5  show that passive dosimetry estimates are one order of
6  magnitude greater than those estimated biologically;
7  therefore, estimates calculated based on the POEM model
8  should be considered as highly conservative for
9  glyphosate, at least ten times too high."
10     Did I read that correctly?
11     A.  You did, but that's the disagreement with a
12 peer-reviewed published study I've previously included
13 in my report that actually verified the POEM and the
14 German model for accuracy and reliability.
15     Q.  And I'm correct that the PPE requirements
16 you're talking about here in your report on Table 14 are
17 based on UK-POEM estimates by Monsanto.  When you say
18 Monsanto stated it, they're not basing it off 5.3,
19 they're basing it off the POEM estimates that the
20 internal documents written before this litigation even
21 started say overestimate exposure; right?
22     MS. SIZEMORE-WETZEL:  Object to form.
23     THE WITNESS:  That paragraph on page 569
24 states that.  However, that's not consistent with
25 that study by independent scientists in the

---

59

1  generally accepted literature.
2  BY MR. KALAS:
3      Q.  Okay.
4      A.  Study of which I have already cited.
5      Q.  We've talked about that before, so we'll stop
6  on that.
7      One last thing and then I'll reserve my time.
8      (Marked Deposition Exhibit 20.)
9  BY MR. KALAS:
10     Q.  I'm marking as Exhibit 20 a document you cite
11 in your report.  I would like you to turn to page 388 of
12 this document.
13     You recall reviewing this document in
14 preparing your report?
15     A.  Yes.
16     Q.  Okay.  And 388, this is a letter from the EPA
17 from 1981; correct?
18     A.  Yes.
19     Q.  Okay.  And it says, "Subject: Response to
20 further information concerning dioxane as an impurity of
21 Roundup herbicide."  Right?  You see that?
22     A.  Yes.
23     Q.  Okay.  And it says, "Background information:
24 On November 17, 1980, Monsanto Company informed the EPA
25 that the present surfactant used in Roundup herbicide

---

60

1  contained a trace impurity low levels of dioxane."
2      Did I read that correctly?
3      A.  Yes.
4      Q.  Okay.  That's what a registrant is supposed to
5  do, right, tell EPA when something like that happens?
6      A.  Yes.
7      Q.  Okay.  You aren't going to tell the jury that
8  Monsanto hid from EPA their trace levels of 1,4-dioxane
9  in Roundup; right?
10     A.  No.
11     Q.  Okay.  And then if you go down to the
12 discussion and recommendation, halfway through that
13 paragraph it states "This level of dioxane is not
14 expected to pose a hazard with respect to applicator
15 exposure as the TLV for workplace exposure set by the
16 ACGIH is 25 PPM."
17     Did I read that correctly?
18     A.  Yes.
19     Q.  Okay.  Moving on to the back of this letter
20 from EPA.
21     A.  However, it is a 2B carcinogen.
22     Q.  That EPA has -- sorry.
23     A.  Just -- just as some of the chemicals you're
24 going to tell the jury that were in the garage of
25 Mr. Giglio added to his malignancy, I'm going to tell

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8570-4 Filed 12/27/19 Page 43 of 47
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS
Transcript of William Sawyer, Ph.D.
41 (161 to 164)
Conducted on September 15, 2019

6

1 the jury that certainly under the generally accepted
2 scientific methodology, other carcinogens that can also
3 cause hematological malignancies, hematopoietic
4 malignancies should also be considered as additive.
5    Q.  Okay.  So let's go to the back of this page,
6 and it states, in the last paragraph, it states "In
7 summary, it is the conclusion of this reviewer that an
8 unreasonable adverse effect is unlikely to result from
9 dioxane as a contaminant of this formulation at the
10 reported levels."
11    Did I read that correctly?
12    A.  Yes, if that were the only chemical present
13 mixed with water, that would be true.
14    Q.  Okay.  But EPA, when they do their risk
15 assessment on glyphosate that we talked about today,
16 that you reviewed, they are aware that 1,4-dioxane is in
17 that mixture; right?
18    A.  Yes.
19    Q.  And they still believe it is not a
20 carcinogenic risk; correct?
21    MS. SIZEMORE-WETZEL:  I'll object to the form
22 of the last two questions.
23    THE WITNESS:  I think that you are correct,
24 because EPA does not list glyphosate as a
25 carcinogen, so there is no -- no additivity.

62

1 BY MR. KALAS:
2    Q.  Thank you, sir.
3    And you are aware today that the level in
4 Roundup is less than 10 parts per million of
5 1,4-dioxane, and that's regularly checked by
6 manufacturing; correct, sir?
7    A.  I would have to research that.
8    Q.  Okay.  You haven't researched the levels of
9 1,4-dioxane today in Roundup?
10    A.  Well, I don't know about today.  I mean, I've
11 been here since 7:30 this morning.
12    Q.  How about when Mr. Giglio was using it?
13    A.  I would have to consult the latest figures.  I
14 am not familiar with 10 PPM as being the current -- or
15 the -- or the amount during the era of 1990 to 2014.
16    Q.  Okay.  Well, we'll let the record speak for
17 itself, and I'll reserve my time.
18    MR. KALAS:  How much time do I have left, just
19 so I know?
20    THE VIDEOGRAPHER:  We've been recording an
21 hour and 30 minutes, so.
22    MR. KALAS:  Well, that's on the second tape,
23 right?
24    THE VIDEOGRAPHER:  Yeah, but that's total, not
25 including the break, so -- well, no.  No, that's

63

1 right, an hour and 30.
2    MR. KALAS:  Right, hour 30, plus hour and 54,
3 so I've got six.  Okay.
4    CROSS-EXAMINATION
5 BY MS. SIZEMORE-WETZEL:
6    Q.  Okay.  Dr. Sawyer, you were asked a little bit
7 about the methodology that Dr. LeBeau used in
8 calculating exposure.  Do you recall those questions?
9    A.  I do.
10    Q.  The dose calculation methodology that
11 Dr. LeBeau used, why did you not perform your analysis
12 in that way?
13    A.  His dose methodology is not consistent with
14 the generally accepted studies specific to applicators
15 applying glyphosate in that he failed to include all of
16 the areas of the body that receives exposure, as
17 documented in Monsanto's own study that we just talked
18 about showing the -- the torso and the forearms, even
19 other parts of the body.
20    There is numerous areas that add up to 8,000
21 or more square centimeters.  He only used, as I recall,
22 about 2,000 square centimeters of surface that was
23 exposed.
24    He also failed to use the critical information
25 that is available only in the POEM method with respect

64

1 to exposures that have been performed using the POEM and
2 then tested and verified to be within the known rate of
3 error.
4    And I understand that he chose not to use the
5 POEM because it simply is not applicable in this matter
6 due to Mr. Giglio's application procedures, which differ
7 vastly from that of the POEM.
8    However, because he selectively only used
9 certain parts of the body, inconsistent with the
10 generally accepted literature, and chose what we call
11 exposure, potential dermal exposures, that is the amount
12 that lands on clothing or lands on the skin, and he
13 cherry-picked those from studies of very low exposure,
14 and then applied a low dermal exposure -- or a low
15 dermal absorption factor, he arrived at erroneously low
16 results.
17    But more importantly, the calculations he made
18 are no value anyway, because there is nothing to compare
19 them to.  There is -- the values he used are all
20 regulatory limits based on animals, and causation cannot
21 be determined based on animal studies alone and
22 regulatory limits.  Federal courts have excluded such
23 methodologies in the past because they are not generally
24 accepted in the field of toxicology and science.
25    Rather, one has to determine cancer causation

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**65**

1  based on comparison to that in human occupational or
2  human epidemiological exposures and determine whether
3  the person falls within and above the threshold of such
4  studies.
5      Q.  When you mentioned the POEM method and said
6  Mr. Giglio's application method is different, what did
7  you mean by that?
8      A.  The POEM method uses what's called the
9  exposure rate, application dose, for example, an
10  application dose of 5 liters per hectare being very
11  common.
12      Mr. Giglio did not often broadcast spray the
13  acreage, but rather very often positioned himself low to
14  the ground, and using his own term, soaked the soil with
15  glyphosate with the understanding that this would
16  prevent the emergence of plants following the
17  application of the turf, causing the mat to pop up off
18  the ground from the emerging plants.
19      But in doing so, his upper body and head and
20  breathing zone were in closer proximity to the area
21  being treated than if he were standing.
22      Plus he used an electronic unit in his
23  commercial applications that produces a bounceback of
24  the spray onto the body.
25      Q.  And Mr. Giglio, did he describe contact that

**66**

1  the Roundup actually made with his legs?
2      A.  Yes.
3      Q.  And what do you recall about that?
4      A.  That he did have common contact with his legs.
5      Q.  I want to talk a little bit about -- or follow
6  up a little bit about the questions you were asked in
7  the McDuffie study, which is marked as Exhibit 9, if you
8  need to refer to that.
9      With regard to McDuffie, how were average days
10  per year quantified?
11      MR. KALAS:  Did you say quantified?
12      MS. SIZEMORE-WETZEL:  Quantified.
13      THE WITNESS:  Ten hours per year.
14  BY MS. SIZEMORE-WETZEL:
15      Q.  And with regard to the two days per year, did
16  it require a minimum number of years?
17      A.  No.
18      Q.  So looking at Mr. Giglio's occupational
19  exposure alone, did he meet the threshold for the
20  McDuffie study?
21      A.  Yes, at 15.6 exposure days, at eight hours per
22  day, that's 124.8 hours, divided by four years, which is
23  31.2 hours per year during his occupational exposure
24  years.
25      And that is clearly about three times above

**67**

1  the ten-hour-per-year threshold in McDuffie.
2      Q.  And is that also above the two-days-per-year
3  threshold?
4      A.  Yes.
5      MR. KALAS:  Objection to form on that one.
6  BY MS. SIZEMORE-WETZEL:
7      Q.  Does the 20 additional years of residential
8  exposure that Mr. Giglio had somehow decrease his risk
9  based on the McDuffie study?
10      A.  No.  And I pointed out early in this
11  deposition this morning that his exposure during those
12  years varied somewhere between a mean exposure
13  cumulative days of 0, above 0, and up to 6.2.  And
14  certainly that the residential exposure years added to
15  his overall risk.
16      And I'm not quantifying the exact number, I'm
17  giving you a range, with respect to his residential
18  exposure years.
19      Q.  So with regard to Mr. Giglio's residential
20  exposure, is it fair to say that those residential
21  exposure days are additive to the risk already imposed
22  by his occupational exposure?
23      MR. KALAS:  Object to form.
24      THE WITNESS:  Yes, or it could be ignored in
25      its entirety and it would still make no difference

**68**

1  because his occupational exposure dose in exposure
2  days is in far excess of all thresholds of both
3  McDuffie and Eriksson studies.
4  BY MS. SIZEMORE-WETZEL:
5      Q.  And your estimates for -- or calculations for
6  both occupational and residential exposure for
7  Mr. Giglio, were they both conservative estimates?
8      MR. KALAS:  Objection to form and compound.
9      THE WITNESS:  Yes.  In fact, I did not include
10  any of his occupational exposure time from 2009, at
11  which time, at some point in the year, he was
12  trained and began using it.  And I did not have
13  exact dates, so I completely ignored that exposure.
14  BY MS. SIZEMORE-WETZEL:
15      Q.  And you also did not include any occupational
16  exposure for 2015; is that correct?
17      MR. KALAS:  Object to form.
18      THE WITNESS:  Correct.
19      MS. SIZEMORE-WETZEL:  I don't have any further
20  questions.  Thank you.
21      MR. KALAS:  Okay.  A few follow-ups.
22      REDIRECT EXAMINATION
23  BY MR. KALAS:
24      Q.  All right.  You mentioned that using animal
25  data to calculate a human cancer risk is not generally

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.

43 (169 to 172)

Conducted on September 15, 2019

---

**69**

1 accepted; right?
2    A. It's a prong of Bradford Hill. It's called
3 experimental data. It is one of the many prongs of
4 Bradford Hill, but it is not in itself a standalone
5 means of determining causation.
6        And if you go all the way back to, oh, I think
7 a case in Texas with DuPont, a federal court determined
8 that causation could not be determined simply on animal
9 studies.
10    Q. I understand, sir. My question isn't going to
11 that.
12        But you said it was not generally accepted.
13 Is that what you mean, it's not generally acceptable to
14 use animal data to calculate human cancer risks?
15    A. For the purpose of causation, that's correct.
16    Q. Okay. But it is generally accepted by the
17 State of California to calculate human cancer risks
18 using animal data; right?
19    A. Not for the purpose of causation, no, it's
20 not.
21    Q. Okay.
22    A. That is a regulatory value.
23    Q. Sir, is risk the same as causation?
24    A. No.
25    Q. Okay. Is it generally accepted by the State

---

**70**

1 of California to use animal data to calculate human
2 cancer risks?
3        MS. SIZEMORE-WETZEL: Object to form.
4        THE WITNESS: Yes, and EPA as well, and animal
5    data is used in risk assessment.
6 BY MR. KALAS:
7    Q. Okay.
8    A. But not in a causation analysis.
9    Q. The application technique Mr. Giglio talked
10 about, we talked about the 2 foot and how he -- you
11 talked about the bounceback from that, and that's from
12 the occupational use.
13        Did you ask or do you know if he applied that
14 way, leaning over, residentially as well?
15    A. He did not.
16    Q. Okay. Now, you just, with counsel for
17 plaintiff, just went back to the McDuffie data. So I
18 want to -- I want to understand your testimony there.
19        So up until he started applying
20 occupationally, it's your testimony that he had
21 somewhere between 0 and 6.2 days of glyphosate use;
22 right?
23    A. Yes.
24    Q. Okay. And 6.2 days of glyphosate use would be
25 less than ten days in the Eriksson study, using the

---

**7**

1 eight-hour day from that study; right?
2    A. It would be greater than one day, but less
3 than ten day.
4    Q. Right. And so it would be in the
5 less-than-ten-days group in the Eriksson study; right?
6    A. Yes, but still in the significant range.
7    Q. But not statistically significant; correct?
8 That's not a statistically significant figure in the
9 Eriksson study, the 1.69; right?
10        It's page -- it's the third page, sir, Table
11 2.
12    A. Yes. Correct.
13    Q. Okay. And it would not -- he would not be at
14 a statistically significant increased risk or even any
15 increased risk in the McDuffie study because his average
16 use would be zero to two days per year; right?
17    A. Correct.
18    Q. And he would not be at an increased risk in
19 the Andreotti study because he would be in quartile 1
20 for NHL; correct?
21    A. Correct.
22    Q. So it's your opinion based on the human
23 epidemiology to which you apply Mr. Giglio's exposure
24 dates that up until he used Roundup occupationally, the
25 way he used Roundup did not increase his risk, at least

---

**72**

1 according to the epidemiology, in a significant manner;
2 correct?
3        MS. SIZEMORE-WETZEL: Object to form.
4        THE WITNESS: In a vacuum, ignoring the
5    occupational exposure, and relying only on those
6    two studies and not consulting the other studies,
7    whichever are ever/never or greater than one day,
8    if I were to -- under that hypothetical, that would
9    be correct.
10 BY MR. KALAS:
11    Q. Okay. And last question on the McDuffie
12 study, and then unless your counsel has more questions,
13 we'll stop. Did the McDuffie study parse the data
14 between occupational and residential use to reach their
15 average days per year the way you just did with counsel?
16        MS. SIZEMORE-WETZEL: Object to form.
17        THE WITNESS: No, but they did not require 25
18    years of continuous exposure, either.
19 BY MR. KALAS:
20    Q. You don't require 25 years of continuous
21 exposure to come up with a causation opinion, do you?
22    A. I don't decide anything, I just review and
23 rely on what's been published and generally accepted.
24 And he clearly meets that requirement. He has four
25 years of exposure at nearly 30 hours a year, which is

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

Transcript of William Sawyer, Ph.D.                    44  (173 to 176)

Conducted on September 15, 2019

---

73

1 far above the threshold of the McDuffie and Eriksson
2 studies.
3    Q.  But the McDuffie and Eriksson study, just to
4 be clear, does not break out the occupational and
5 residential use in order to create a greater than two
6 years of exposure figure the way you just did; right?
7    A.  The McDuffie study is based on mailed-out
8 questionnaires.  And I don't believe the -- there was
9 any specificity for residential versus occupational.
10   Q.  Okay.  I have no further questions if you're
11 done with your answer.  Are you done with your answer?
12   A.  On page 1658.
13   Q.  Okay.
14   A.  Paragraph under "Assessment of Exposure," it
15 is stated in the Eriksson study --
16   Q.  You are looking at Eriksson, I was asking
17 about McDuffie.  So are you done with your answer about
18 McDuffie, sir?
19   A.  No.
20   Q.  Okay.
21      That's it.
22   A.  Well, in the questionnaire section, --
23   Q.  Yes, sir.
24   A.  -- in the right-hand column, first full
25 paragraph, about halfway through.

---

74

1    Q.  Okay.
2    A.  It states that "To control for the effects of
3 other variables known or suspected to be associated with
4 NHL, after conducting an extensive literature review,
5 used the postal questionnaire to capture demographic
6 characteristics, anecdotal medical history, family
7 history of cancer, detailed lifetime job history, and
8 occupational exposure history to selected substances,
9 accidental pesticide spills and use of protective
10 equipment as well as details of cigarette smoking.
11      "A telephone questionnaire characterized
12 exposure to individual pesticides.  Pesticides data were
13 collected and sample levels beginning with the broadest
14 categories."
15      So they didn't collect information on
16 occupational exposure history.
17   Q.  Okay.  My question was different, sir.
18   A.  I don't think so.  You asked me if they
19 separated residential from occupational.
20   Q.  Yes.  Did they separate residential from
21 occupational use in the results they presented in this
22 study?
23   A.  Okay.
24   Q.  That is my question, the way you just did.
25   A.  Okay.  Okay.  They did collect information.

---

75

1 But in terms of segregating it in the results sections,
2 they did not.
3    Q.  Okay.
4       MR. KALAS:  Thank you.  I don't have any
5 questions unless your counsel does.
6       MS. SIZEMORE-WETZEL:  No, I'm okay.
7       MR. KALAS:  Okay.
8       MS. SIZEMORE-WETZEL:  No more questions.
9 Thank you.
10      MR. KALAS:  All right, before we go off the
11 record, I would just like to designate the
12 deposition as confidential pursuant to protective
13 orders.
14      I have nothing else.
15      THE VIDEOGRAPHER:  This concludes the
16 deposition of Dr. Sawyer.  The time now is 11:54.
17 We're going off record.
18      (This deposition was concluded at 11:55 a.m.
19 Reading and signing were waived.)
20
21
22
23
24
25

---

76

1          CERTIFICATE OF REPORTER
2
3
4    STATE OF FLORIDA          )
5    COUNTY OF LEE             )
6
7    I, Nancy E. Paulsen, CRR, CRC, RPR, FPR, RSA
8 certify that I was authorized to and did
9 stenographically report the deposition of William
10 Sawyer, Ph.D. and that the foregoing pages are a true and
11 complete record of my stenographic notes taken during
12 said deposition.
13
14   I further certify that I am not a relative,
15 employee, attorney, or counsel of any of the parties,
16 nor am I a relative or employee of any of the parties'
17 attorneys or counsel connected with the action, nor am I
18 financially interested in the action.
19
20   Dated this 17th day of September, 2019.
21
22
23
24       Nancy E. Paulsen, CRR, CRC, RPR, FPR
25

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8570-4   Filed 12/27/19   Page 47 of 47
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS
Transcript of William Sawyer, Ph.D.
Conducted on September 15, 2019
45 (177 to 180)

```
                                          77
1              CERTIFICATE OF OATH
2
3
4    STATE OF FLORIDA          )
5    COUNTY OF LEE             )
6
7       I, the undersigned authority, certify that
8    William Sawyer, Ph.D. personally appeared before me on
9    September 15, 2019, produced a Florida driver's license
10   for identification, and was duly sworn.
11
12      WITNESS my hand and official seal this 17th day of
13   September, 2019.
14
15
16
17
18
19      Nancy E. Paulsen, CRR, CRC, RPR, FPR
20      Notary Public
21      State of Florida at Large
22      My Commission Number:  FF919677
23      Expires:  September 17, 2019
24      (Transcript digitally signed through
25          VeriSign)
```