# EXHIBIT 6

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA
                      FOR THE COUNTY OF ALAMEDA
 2
     -------------------------------?
 3   COORDINATION PROCEEDING          ? JCCP NO. 4953
     SPECIAL TITLE (Rule 3.550)       ?
 4                                    ?
                                      ?
 5   ROUNDUP PRODUCTS CASES           ? Case No. RG17862702
     _____     ?
 6                                    ?
                                      ?
 7   THIS DOCUMENT RELATES TO:        ?
                                      ?
 8   Alva Pilliod, et al. v. Monsanto ?
     Company, Case No. RG17862702     ?
 9                                    ?
     ------------------------------- ?
10      - - -
11
12                              - - -
13              WEDNESDAY, FEBRUARY 6, 2019
14                          - - -
15          CONFIDENTIAL - SUBJECT TO FURTHER
                    CONFIDENTIALITY REVIEW
16
                                - - -
17
18
            Videotaped deposition of WILLIAM R. SAWYER,
19      PhD, held at Sanibel Island Beach Resort,
        1231 Middle Gulf Drive, Sanibel, Florida,
20      commencing at 8:09 a.m., on the above date,
        before Kelly J. Lawton, Registered Professional
21      Reporter, Licensed Court Reporter, and Certified
        Court Reporter.
22
                                - - -
23
                  GOLKOW LITIGATION SERVICES
24         877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
25
```

## Page 2

APPEARANCES:

THE MILLER FIRM, LLC
BY: JEFFREY TRAVERS, ESQUIRE
The Sherman Building
108 Railroad Avenue
Orange, Virginia 22960
(540) 672-4224
JTravers@millerfirmllc.com
Representing Plaintiffs

HOLLINGSWORTH, LLP
BY: JOHN M. KALAS, ESQUIRE
1350 I Street, NW
Washington, D.C. 20005
(202) 989-5800
jkalas@hollingsworthllp.com
Representing Defendant Monsanto Company

BARTLIT BECK, LLP
BY: STEVEN E. DERRINGER, ESQUIRE
Courthouse Place
54 West Hubbard Street
Chicago, Illinois 60654
(312) 494-4415
Steven.Derringer@BartlitBeck.com
Representing Defendant Monsanto Company

ALSO PRESENT:
MATTHEW ALLISION, Videographer

## Page 3

---
INDEX
---

Testimony of: WILLIAM R. SAWYER, PhD

DIRECT EXAMINATION BY MR. KALAS................ 7
CROSS-EXAMINATION BY MR. TRAVERS............... 320
REDIRECT EXAMINATION BY MR. KALAS.............. 336
RECROSS EXAMINATION BY MR. TRAVERS............. 344

E X H I B I T S
(Attached to Transcript)

WILLIAM R. SAWYER PhD DEPOSITION EXHIBITS       PAGE
Exhibit 1    Amended Notice of Videotaped        7
             Deposition of Dr. William R.
             Sawyer, PhD
Exhibit 2    Plaintiff Alva and Alberta          7
             Pilliod's Objections and Responses
             to Defendant Monsanto Company's
             Document Requests to Amended Notice
             of Videotaped Deposition of Dr.
             William R. Sawyer, PhD
Exhibit 3    February 5, 2019 E-mail with        8
             Attachment
Exhibit 4    Toxicology Consultants & Assessment  9
             Specialists, LLC January 28, 2019
             Invoice
Exhibit 5    William R. Sawyer, Ph.D. Trials and  9
             Depositions - Past Five Years
Exhibit 6    January 14, 2019 Expert Report of   12
             William R. Sawyer, PhD
Exhibit 7    Photographs                         141

## Page 4

E X H I B I T S
(Attached to Transcript)

WILLIAM R. SAWYER, PhD DEPOSITION EXHIBITS       PAGE
Exhibit 8    Deposition Transcript of Alva       157
             Pilliod

Exhibit 9    National Cancer Institute SEER      176
             Cancer Statistics Review 1975-2011
Exhibit 10   Publication of the International     217
             Union Against Cancer Publication -
             Pesticide Exposure as Risk Factor
             for Non-Hodgkin Lymphoma Including
             Histopathological Subgroup Analysis
Exhibit 11   AACR Journal Publication - Cancer   248
             Epidemiology, Biomarkers &
             Prevention - non-Hodgkin Lymphoma
             and Specific Pesticide Exposures in
             Men:  Cross-Canada Study of
             Pesticides and Health

Exhibit 12   Article - Glyphosate Use and Cancer 268
             Incidence in the Agricultural
             Health Study

Exhibit 13   Materials Brought to Deposition by  278
             William R. Sawyer, PhD
Exhibit 14   National Cancer Institute - Harms   278
             of Cigarette Smoking and Health
             Benefits of Quitting
Exhibit 15   Environmental Protection Authority  297
             - Risk Assessment Methodology for
             Hazardous Substances - How to
             Assess the Risk, Cost and Benefit
             of New Hazardous Substances for Use
             in New Zealand

Exhibit 16   Review Article - Glyphosate in the  303
             General Population and in
             Applicators:  A Critical Review of
             Studies on Exposures

## Page 5

E X H I B I T S
(Attached to Transcript)

WILLIAM R. SAWYER, PhD DEPOSITION EXHIBITS       PAGE
Exhibit 17   Review Article - Glyphosate         308

             Toxicity and Carcinogenicity:  A

             Review of the Scientific Basis of

             the European Union Assessment and

             Its Differences with IARC
Exhibit 18   DTL Laboratories Study - Glyphosate  315

Page 6

1           ---
2       THE VIDEOGRAPHER:  Good morning.  We are now
3   on the record.  My name is Matthew Allison.  I am
4   a videographer for Golkow Litigation Services.
5   Today's date is February 6th, 2019, and the time
6   is 8:09 a.m.
7       This video deposition is being held in
8   Sanibel, Florida in the matter of Pilliod, et al,
9   versus Monsanto Company, et al, for the Superior
10  Court of the State of California.
11      The deponent is Dr. William Sawyer.
12      Will counsel please introduce themselves
13  beginning with the plaintiff's counsel.
14      MR. TRAVERS:  Jeffrey Travers from The Miller
15  Firm on behalf of the plaintiffs.
16      MR. KALAS:  John Kalas from Hollingsworth,
17  LLP, on behalf of Monsanto.
18      MR. DERRINGER:  Steve Derringer, Bartlit
19  Beck, Chicago, on behalf of Monsanto.
20      THE VIDEOGRAPHER:  And the court reporter is
21  Kelly Lawton and will now swear in the witness.
22      THE COURT REPORTER:  Doctor, would you please
23  raise your right hand.
24      Do you swear or affirm the testimony you're
25  about to give will be the truth, the whole truth,

Page 7

1   and nothing but the truth?
2       THE WITNESS:  Yes, I do.
3       THE COURT REPORTER:  Thank you.
4       WILLIAM R. SAWYER, PhD, called as a witness
5   by the Defendants, having been first duly sworn,
6   testified as follows:
7           DIRECT EXAMINATION
8   BY MR. KALAS:
9       Q.  Good morning, Dr. Sawyer.
10      A.  Good morning.
11      Q.  How are you today?
12      A.  Very good.
13      Q.  Good.
14      So I know you've been deposed many times, but
15  if you need a break at any time today, let me know,
16  and we'll take a break, okay?
17      A.  Certainly.
18      Q.  Okay.  I'm going to mark as Exhibits 1 and 2
19  your notice of deposition and the Pilliod's
20  objections and responses to the notice of deposition.
21      (Sawyer Exhibit 1 was marked for
22  identification.)
23      (Sawyer Exhibit 2 was marked for
24  identification.)
25      MR. KALAS:  I've only got one extra.  I had

Page 8

1   to print them last night.
2       MR. TRAVERS:  Okay.  Yeah, that's fine.
3       MR. KALAS:  I assume you've seen them.
4       MR. TRAVERS:  Yeah.
5   BY MR. KALAS:
6       Q.  Anyway, have you seen these documents before,
7   sir?
8       A.  Yes.
9       Q.  Okay.  And you see that we, Monsanto,
10  requested that you produce some documents in your
11  notice of deposition?
12      A.  Correct.
13      Q.  Okay.  And we received an e-mail from
14  Mr. Travers last night, and I'll mark the e-mail as
15  Exhibit 3.
16      (Sawyer Exhibit 3 was marked for
17  identification.)
18  BY MR. KALAS:
19      Q.  And what Mr. Travers said in this e-mail is:
20  Attached is the updated deposition list and recent
21  invoice.
22      Did I read that first sentence correctly?
23      A.  Yes.
24      Q.  And I'll mark as Exhibits 4 and 5 the
25  documents that were attached to the e-mail, which is

Page 9

1   an invoice in reference to Alberta and Alva Pilliod
2   and trials and depositions past five years.
3       (Sawyer Exhibit 4 was marked for
4   identification.)
5       (Sawyer Exhibit 5 was marked for
6   identification.)
7   BY MR. KALAS:
8       Q.  And starting with Exhibit 4, does this appear
9   to be your most recent invoice issued in the Pilliod
10  case?
11      A.  Yeah, it is.
12      Q.  And then Exhibit 5, is this a full and
13  complete list of trials and depositions you have --
14  testimony you have given in the past five years?
15      A.  It is.
16      Q.  Okay.  Now, going back to Exhibit 3, which is
17  the e-mail from Mr. Travers, he also mentioned some
18  additional materials he was sending along.  He sent a
19  Dropbox of photographs that you reviewed.
20      And you have reviewed some photographs in
21  this case, right?
22      A.  Yes.
23      Q.  Okay.  And then he also sent along a citation
24  to an article called Abukari.  And is Abukari,
25  A-b-u-k-a-r-i, another article that you have reviewed

Page 10

1 since you produced your expert report in this case?
2     A.  It is.
3     Q.  Okay.  And then he sent along a -- two links
4 to a super fund site assessment and a summary of --
5 and I believe this is a typo -- he wrote ASTRD health
6 study, but I think that should be ATSDR health study?
7     A.  That's right.
8     Q.  And beyond the Abukari article, the
9 photographs, two links Mr. Travers sent along in
10 Exhibit 3, and the study cited in Dr. Phalen's expert
11 report, beyond that set of materials, are you relying
12 on any other materials beyond that set of materials
13 and the citations in your report for your testimony
14 in the Pilliod case?
15     A.  It's possible there could be a study in one
16 of these two binders --
17     Q.  Okay.
18     A.  -- that was not referenced in Dr. Phalen's
19 report.  But without going through one by one and
20 matching them up to his reference list, which I have
21 right here, I can't say that I'm absolutely certain.
22 There could be one in here.
23     Q.  Okay.  So at the time you served your report
24 in the Pilliod case on January 14th, am I correct
25 that that report contained all the materials you

Page 11

1 intended to rely upon at that point?
2     MR. TRAVERS:  I'm going to object.  When we
3 started with the report, we're incorporating all
4 of his previous testimony and reliance lists from
5 the MDL and Johnson and Hall and Stevick.
6     MR. KALAS:  So, Mr. Traverse, A, that
7 question was directed at Dr. Sawyer, not you.
8 That is an improper objection, a coaching
9 objection.
10 BY MR. KALAS:
11     Q.  I will ask again.
12     Dr. Sawyer, at the time you served your
13 expert report in the Pilliod case, did the report in
14 Pilliod contain all of the materials you intended to
15 rely upon in the Pilliod case?
16     MR. TRAVERS:  Same objection.
17     THE WITNESS:  I'm trying to figure out the
18 question.
19     MR. KALAS:  Sure.
20     THE WITNESS:  No.  I mean, there are -- as I
21 reviewed hundreds of Monsanto internal documents
22 and studies and things that have been previously
23 provided on my reference list, which my
24 understanding were also made known to counsel in
25 this case.

Page 12

1 BY MR. KALAS:
2     Q.  Okay.  So let's mark as Exhibit 6 your
3 report.
4     (Sawyer Exhibit 6 was marked for
5 identification.)
6 BY MR. KALAS:
7     Q.  And if you look at the first page, this is a
8 report -- let me ask that first.
9     This is the report that you produced and
10 served in the Pilliod case, correct?
11     A.  Yes.
12     Q.  And if you look at the first page, it states:
13 Based upon the information provided and application
14 of generally accepted toxicological, methodology and
15 reference sources as cited herein, I have stated my
16 opinions in this matter.
17     And then you list eight bullet points:
18 Plaintiff Fact Sheets for Alva and Alberta Pilliod,
19 Medical Records for Alva and Alberta Pilliod,
20 Deposition of Robert Fisher, Deposition of Alva
21 Pilliod, Deposition of Alberta Pilliod, Photographs
22 from Alva and Alberta Pilliod, Numerous peer-reviewed
23 generally accepted studies (as referenced and
24 footnoted), Monsanto company documents (as
25 referenced).

Page 13

1     Did I read that correctly, sir?
2     A.  Yes.
3     Q.  So on -- in your report, you claim that you
4 have referenced your sources as cited herein, and you
5 state that the studies are referenced and footnoted
6 in your report and the Monsanto Company documents are
7 referenced.
8     So my question is:  Are there any other
9 materials beyond what is referenced and cited in this
10 report, Exhibit 6, and what is referenced in
11 Mr. Travers' e-mail, Exhibit 3, that you intend to
12 rely upon in this case?
13     MR. TRAVERS:  Objection.  Asked and answered.
14 It's almost the same exact question.
15     THE WITNESS:  Yes.  The reference list I
16 provided in the Stevick matter, which was a
17 reference list that was beyond just the items in
18 the reports, but items that I've reviewed as part
19 of this case.
20 BY MR. KALAS:
21     Q.  Okay.  So your work on the Stevick matter
22 was -- you incorporated that work as part of this
23 case, right?
24     A.  Yeah.  As far as -- as far as the full gamut
25 of references and materials I have reviewed, yes.

Page 14

1 Q. And your work on the Peterson Hall case, the
2 Jeff Hall case, did you incorporate that work into
3 this case?
4 A. Yes.
5 Q. And your work on the D. Johnson case, did you
6 incorporate that work into this case?
7 A. Yes.
8 Q. And your work just generally on evaluating
9 glyphosate, did you incorporate that work into this
10 case?
11 A. Yes.
12 Q. And all that work has been done on behalf of
13 The Miller Firm, correct?
14 A. Yes.
15 Q. And those five things combined -- so the
16 general work, the Johnson case, the Hall case, the
17 Stevick case, and the Pilliod case -- among those
18 five cases, have you invoiced more than $300,000 on
19 those five cases?
20 A. I don't know. I haven't added up the work,
21 but I know I have hundreds of hours in so it's very
22 possible.
23 Q. How about more than $400,000?
24 A. No. Now, I can say I did receive a W -- the
25 things that come in the mail that tell you how

Page 15

1 much -- is it W-10? W-9? I don't know what it's
2 called. And I know I received one from The Miller
3 Firm, and it was for around 140 or 150,000.
4 Q. And you have also -- and that was for the
5 year of 2018, right?
6 A. That's right.
7 Q. And you invoiced in 2017 as well, right?
8 A. I think so, but I really can't even speculate
9 on --
10 Q. Sure.
11 A. -- how much work I did in '17. I don't know.
12 Q. So it's your estimate in the year 2018 you
13 received a W2 or some tax form --
14 A. W2, thank you.
15 Q. -- for approximately $140,000 invoiced to The
16 Miller Firm?
17 A. It was, I think, between 140 and 150 is what
18 I recall.
19 Q. Have you invoiced any other law firms in the
20 glyphosate litigation for your work on glyphosate?
21 MR. TRAVERS: I'm going to object. Make sure
22 you're not --
23 MR. KALAS: I'm not asking about a case. I'm
24 just asking if he's invoiced any other law firms.
25 THE WITNESS: Not that I have been disclosed

Page 16

1 as an expert in, no.
2 BY MR. KALAS:
3 Q. Not my question, sir.
4 Have you invoiced any other law firms for
5 work on glyphosate cases? I'm not asking what case;
6 I'm not asking what jurisdiction; just have you.
7 A. I don't think I can answer that because if
8 I'm retained as a -- a consultant, there may be some
9 legal things I don't understand. I'm not a lawyer.
10 MR. KALAS: Are you instructing --
11 THE WITNESS: I'm not going to take a chance
12 on answering that.
13 MR. KALAS: Are you instructing him not to
14 answer the question?
15 MR. TRAVERS: I mean, if he's got
16 relationships with other law firms, I can't, you
17 know, state on their behalf. I mean --
18 THE WITNESS: I would have to check with the
19 client.
20 BY MR. KALAS:
21 Q. All right. Let me ask you this. If I asked
22 you that question in front of the jury in Oakland in
23 March, and I asked: Dr. Sawyer, how much money have
24 you invoiced to other law firms beyond The Miller
25 Firm on glyphosate cases, would you tell the jury

Page 17

1 that you can't answer that?
2 MR. TRAVERS: Objection. That's a legal
3 question. He's got no basis to -- he's got no
4 basis to answer that. That would be a matter we
5 would argue in front of the judge before his
6 testimony.
7 THE WITNESS: To make things simple, I think
8 I can say an amount, and the amount would be
9 $115,000.
10 BY MR. KALAS:
11 Q. $115,000 to other law firms?
12 A. Yes.
13 Q. Now, how much have you invoiced -- how many
14 separate cases have you looked at for The Miller
15 Firm?
16 MR. TRAVERS: Objection. He's not disclosing
17 all the cases.
18 MR. KALAS: I'm just asking how many separate
19 cases. I'm not asking which cases.
20 MR. TRAVERS: Actually, I'm going to instruct
21 him not to answer. He can testify about the
22 cases he's been disclosed in. He's not going to
23 testify about work he's not -- about cases he's
24 not been --
25 MR. KALAS: Sure.

Page 18

1   BY MR. KALAS:
2       Q.  So when we're in Oakland in March and I ask
3   you:  Do you remember in your deposition when I asked
4   you how many separate cases you have looked at for
5   The Miller Firm in glyphosate litigation, will you
6   tell the jury that the attorney instructed you not to
7   answer that question?
8       MR. TRAVERS:  Objection.  That is not a
9   proper question for the witness.  It's going to
10  be an argument in front of the judge.  He can't
11  answer that.  You know that.
12      MR. KALAS:  Will you stop testifying, Jeff,
13  and let him.
14      MR. TRAVERS:  I'm not testifying.  You're
15  asking him about a legal matter that will be
16  argued in front of the judge.  He's not a lawyer.
17  BY MR. KALAS:
18      Q.  Will you tell the jury that you were
19  instructed not to answer that question, sir?
20      MR. TRAVERS:  Same objection.
21      THE WITNESS:  As a toxicologist, I have
22  reviewed some cases, and one of them, you know,
23  is Peterson.  I recommended that they turn that
24  case down.  I didn't -- based on my review, the
25  exposure was insufficient, the dose was

Page 19

1   insufficient, and I advised that they don't
2   comport with it.
3   BY MR. KALAS:
4       Q.  And when you advised The Miller Firm --
5       MR. TRAVERS:  I'm going to claw that back as
6   privileged, but --
7   BY MR. KALAS:
8       Q.  To your knowledge, has the Peterson case been
9   dismissed?
10      MR. KALAS:  And we would object to that
11  clawback.
12      MR. TRAVERS:  Well, I'm clawing back.  You
13  can go through the proper protocol to challenge
14  the privilege on that.  But I'm clawing that back
15  now, and I'm instructing him not to answer
16  anymore questions about Peterson.
17      MR. KALAS:  He's a retained expert witness.
18  He's not inclined.  You can't claw it back
19  anyway.
20      MR. TRAVERS:  I am.  Yes, I can.  You can
21  bring it back.
22  BY MR. KALAS:
23      Q.  Dr. Sawyer, to your knowledge, has the
24  Peterson case been dismissed by The Miller Firm?
25      MR. TRAVERS:  Do not answer anymore questions

Page 20

1   about Peterson.
2       THE WITNESS:  I don't know.  I can't answer
3   that.
4   BY MR. KALAS:
5       Q.  Okay.  You have given several days of
6   deposition in this litigation, correct?
7       A.  I have given several litigation -- what?
8       Q.  Several days of deposition in this
9   litigation, correct?
10      A.  I think we're up to about seven.
11      Q.  Okay.  You gave two days of deposition in the
12  Johnson case, right?
13      A.  Right.
14      Q.  You gave two days of deposition in the Hall
15  case, right?
16      A.  Correct.
17      Q.  You gave a day of deposition in the Stevick
18  case, right?
19      A.  Correct.
20      Q.  You testified at trial in the Johnson case,
21  right?
22      A.  Yes.
23      Q.  And all that testimony was given under oath,
24  right?
25      A.  Yes.

Page 21

1       Q.  Okay.  And you told the truth and testified
2   accurately?
3       A.  Yes.
4       Q.  And you stand by all of that testimony?
5       A.  I do.
6       Q.  Okay.  Now, we saw in the deposition in
7   December that Mr. Derringer took that substantial
8   portions of your report in the Stevick case were
9   identical to your report in the Johnson case.
10      Do you remember that?
11      A.  Yes.
12      Q.  Okay.  And there are many similarities
13  between this report and the report in the Stevick
14  case, right?
15      A.  Yes.
16      Q.  How long did it take you to put together the
17  report in the Pilliod case?
18      A.  Well, the initial phone call and review of
19  plaintiff's data, partial review of medical records,
20  2.53 hours; continue reviewing exposure data,
21  download Google Earth images, telephone interviews
22  with the Pilliods, et cetera, 4.55 hours; reviewed
23  the deposition of Alberta Pilliod and various
24  photographs of Alva and Alberta, begin report
25  preparation, 2 hours, 21 minutes.

Confidential - Subject to Further Confidentiality Review

Page 22

1    I could go on and on, but the total is,
2  including a lot of other details here, about
3  30.47 hours.
4    Q.  Okay.  And did you write this entire thing
5  yourself?
6    And by "this entire thing," I mean Exhibit 6,
7  your report?
8    A.  My assistant toxicologist worked with me on
9  the Page 18-19 on the POEM modeling.
10   Q.  Okay.
11   A.  Otherwise, yes.
12   Q.  And when you write, do you sit at a computer
13 and type?  Do you dictate?  How do you write?
14   A.  It's a combination of what Jen Clark refers
15 to as, quote, bill scribbles, unquote, as well as my
16 direct work on MS Word.  So a combination of both.
17 Mostly my own typing, but, yes, some bill scribbles.
18   Q.  And some of it also is taken in the course of
19 your conversations with the plaintiffs, right?
20   A.  Yeah.  Minimal.
21   Q.  Okay.  And that's taken down by Jen Clark?
22   A.  Yeah.
23   Q.  Now, how did you choose what documents to
24 review in writing your report in Pilliod?
25   A.  I don't understand.

Page 23

1    Q.  Well, so obviously you've written multiple
2  reports now in this litigation.  But when you sat
3  down to write the Pilliod report, and perhaps when
4  you sat down to write your initial report in this
5  litigation, how did you choose what studies to
6  review, what internal company documents to review?
7    Tell me about that process.
8    A.  I -- I don't know where to start.
9    Q.  Okay.  Did you do a research of PubMed?
10   A.  A search of what?
11   Q.  PubMed or Google Scholar for scientific
12 articles on glyphosate.
13   A.  Not initial.
14   Q.  Did you initially ask for all studies on
15 certain subject areas that were produced in the
16 litigation?
17   A.  No.  I think my -- my initial step was, if
18 you look at the invoice, first spoke with Attorney
19 Traverse just to get a general background on
20 information on the case, and then I reviewed the Alva
21 and Alberta information that had already been
22 assembled, and I began reviewing the deposition of
23 Robert Fisher, M.D., and began reviewing medical
24 records with respect to any information on exposure,
25 reviewed it down -- downloaded Google Earth imagery,

Page 24

1  and had a telephone interview with the Pilliods.
2    I began to familiarize myself with the case,
3  try to understand the history of the exposures, the
4  nature of the exposures, information regarding the
5  Pilliods, how they lived, how they applied it, where
6  they applied it.  Now, I really had to understand the
7  overall scope of the matter before I started
8  researching studies.
9    Q.  My question was a little bit different, but
10 maybe we'll come back to that.
11   Let me ask you this about Exhibit 6:  This
12 report contains all your opinions regarding the
13 Pilliods and their case, right?
14   A.  All of my opinions?
15   Q.  Yes, sir, Exhibit 6.
16   A.  No.
17   Q.  Okay.
18   A.  No, I have -- in response to reviewing doctor
19 Phalen's report, I have some additional opinions
20 based on studies that he referenced that I've
21 reviewed.
22   Q.  Okay.  Well, I'll get to that in a minute,
23 but let me ask you this:  You have not served any
24 other report or supplemental report beyond Exhibit 6,
25 right?

Page 25

1    A.  No.
2    Q.  Okay.  And as of now, do you have any intent
3  to serve a supplemental report?
4    A.  I haven't been asked to.  I don't know what
5  the rules are on that.  It may be untimely.
6    Q.  Let me ask you this:  At the time -- so on
7  January 14th, prior to Dr. Phalen serving his report,
8  did the Exhibit 6 contain all the opinions you
9  intended to offer in the Pilliod case?
10   A.  Yes.
11   Q.  Okay.  And up to January 14th, had you
12 conducted a site visit of the properties where the
13 Pilliods applied glyphosate-based herbicides?
14   A.  I didn't understand.
15   Q.  Up to January 14th, 2019, had you conducted a
16 site visit of the properties where the Pilliods
17 applied glyphosate-based herbicides?
18   A.  No.  I thought you implied I had.
19   Q.  No.  I was just asking if you had done so.
20   A.  No.
21   Q.  And do you have any intentions to conduct
22 site visits after this?
23   A.  I suspect so, prior to -- just prior to
24 trial.
25   MR. KALAS:  To the extent Dr. Sawyer intends

Page 26

1    to offer additional opinions based on that site
2    visit, we would reserve the right to -- for any
3    appropriate relief.
4    BY MR. KALAS:
5        Q.  Now, let me ask you about Mr. Phalen.  You
6    said you have some additional opinions after
7    reviewing Mr. Phalen's report.
8        What are those, sir?
9        MR. TRAVERS:  Objection.  Vague.
10       THE WITNESS:  I don't have exact opinions for
11   Dr. Phalen.  I don't intend to be testifying
12   regarding Dr. Phalen.  I think that would be a
13   cross-examination matter.
14       What I have, as I said earlier, were the
15   opinions based on studies that he referenced.
16   BY MR. KALAS:
17       Q.  Okay.  Which studies that he referenced do
18   you have initial new opinions on?
19       A.  Well, I have studies with me.
20       Q.  Okay.  We'll take a look at those at break,
21   and then I'll decide whether or not I need to ask you
22   questions, okay?
23       A.  Certainly.
24       Q.  Now, at your last deposition, Mr. Derringer
25   went through your report with you and struck some

Page 27

1    lines in it -- or you struck some lines in it.
2        Do you remember that?
3        A.  I did.
4        Q.  And you told Mr. Derringer at that deposition
5    that you would strike any portion of your report that
6    went to the state of mind or motive of Monsanto.
7        Do you remember testifying to that?
8        A.  Well, I thought I used the word "intent," but
9    maybe it means the same thing.
10       Q.  Okay.  Do you agree that you would strike any
11   portion of your report that goes to the intent or
12   motive of Monsanto?
13       A.  I probably would want to see such examples.
14   I don't think there are any in this report.
15       Q.  Okay.
16       A.  I was very careful not to provide opinions of
17   intent of the various memos and communication.
18       Q.  Okay.
19       A.  I specifically stated, I believe, that I
20   would certainly be willing to answer questions
21   regarding what certain terms mean that only a
22   toxicologist would be able to explain to a jury.
23       Q.  You will define terms for the jury?
24       A.  Sure.
25       Q.  Okay.  But will you stipulate in this case

Page 28

1    that you will not offer any opinion regarding intent
2    or corporate ethics or read into memos and provide
3    opinions on intent?
4        MR. TRAVERS:  Object to the form.  Misstates
5    his testimony.
6        THE WITNESS:  I think that troubles me a
7    little because it's a bit of a -- asking me about
8    a legal opinion.
9        I can tell you, I do not intend to stipulate
10   not to read into memos and offer opinions of what
11   the intent of the memo means.  That's not what
12   I'm here for.  That is something the jurors would
13   do.
14       If there's a problem understanding the memo
15   in terms of the -- and I think I used it in my
16   report previously -- the word pharmacokinetics.
17   The jury is not going to understand what that is.
18   I would explain that.  I would explain what ADME
19   is if asked.
20       So -- so there's a fine line here between
21   describing scientific terminology versus
22   second-guessing the intent of the memo.  So I'm
23   not going to second-guess the intent of the memo.
24       So if you're asking, I stipulate to that.
25   ///

Page 29

1    BY MR. KALAS:
2        Q.  Okay.  Okay.  Just so I understand, so you
3    won't be offering opinions regarding the intent of
4    what the writer of the memo meant, correct -- or
5    strike that.  Let me ask that better.
6        You won't be offering opinions regarding the
7    intent of the writer of a memo, correct?
8        MR. TRAVERS:  Objection.  Asked and answered.
9        THE WITNESS:  Same answer, yes.
10   BY MR. KALAS:
11       Q.  Okay.  And you won't be offering opinions
12   regarding ethical corporate conduct, correct?
13       MR. TRAVERS:  Objection.  Misstates his
14   testimony.
15       THE WITNESS:  Only ethics with respect to
16   what a toxicologist is charged to do.
17   BY MR. KALAS:
18       Q.  Okay.
19       A.  I could answer questions about that.
20       As far as corporate, that's not part of my
21   expertise.
22       Q.  Now, you're not an oncologist, right?
23       A.  No.
24       Q.  And you are not a neurologist, correct?
25       A.  No.

Page 30

1    Q.  You are not going to be offering any expert
2  opinion on the prognosis of Mr. Pilliod, right?
3    A.  No, none.
4    Q.  You are not going to be offering any expert
5  opinion on the prognosis of Mrs. Pilliod, right?
6    A.  No.
7    Q.  You are not going to be offering any expert
8  opinion on the treatment of Mr. Pilliod, right?
9    A.  No.
10    Q.  You are not going to be offering any expert
11  opinion on the treatment of Mrs. Pilliod, right?
12    A.  No.
13    Q.  You won't be offering testimony contrary to
14  Dr. Nabhan's that Mr. Pilliod's lymphoma is unlikely
15  to recur, right?
16    A.  No.
17    Q.  You won't be offering testimony contrary to
18  Mrs. Pilliod that she currently has no evidence of
19  her disease, right?
20    A.  No.
21    Q.  You're not going to tell the jury that Mr. or
22  Mrs. Pilliod currently have reduced life
23  expectancies, right?
24    A.  No.
25    Q.  Now, you previously taught courses in

Page 31

1  epidemiology, right?
2    A.  A portion of the medical epidemiology course,
3  yes.
4    Q.  And you previously taught some courses in
5  toxicology as well, right?
6    A.  Yes.
7    Q.  And when did you stop teaching those courses?
8    A.  Approximately -- it must have been around
9  2000 -- probably 2009.
10    Q.  Okay.  Now, you previously testified, I
11  think, in the Johnson deposition that you first came
12  to the conclusion that glyphosate caused NHL in the
13  1990s, right?
14    MR. TRAVERS:  Objection.  Misstates his
15  testimony.
16    THE WITNESS:  Yeah, that's not accurate.
17  BY MR. KALAS:
18    Q.  Okay.
19    A.  What I stated was I had followed the
20  literature -- the toxicological and epidemiological
21  literature -- and I remember testifying specifically.
22  I said I remembered actually being consulted from a
23  firm in Texas regarding a glyphosate case in the
24  1990s.  And at that time I remember reviewing the
25  Hairy Cell Leukemia study and some other of the

Page 32

1  earlier epidemiological studies, and my opinion was
2  that it sure looks like, it probably is, a
3  carcinogen, but I didn't think there was sufficient
4  epidemiological study data at that time.
5    Q.  Okay.  So let me make sure that we have this
6  correct on the record.
7    In the 1990s, you believe that it sure looked
8  like glyphosate was a carcinogen, correct?
9    A.  Yeah.  There was certainly information
10  suggesting that, but I didn't feel at that time there
11  was enough combined data to provide a conclusive
12  opinion.
13    Q.  Okay.  Now, at the time you're teaching your
14  students, did you ever tell them you believed
15  glyphosate caused NHL?
16    A.  As part of my teaching, I never discussed
17  glyphosate.  I did teach the mechanisms and the
18  treatment for organic phosphate poisoning and the
19  measurement of acetylcholinesterase which any
20  hospital laboratory can do on a stat basis.  And if
21  that drops below 25 percent inhibition, render the
22  treatment and the antidote and that type of thing.
23    But that was the only organic phosphate
24  aspects that I taught.  I didn't speak at all on
25  glyphosate, just other acute organophosphates such as

Page 33

1  Dursban and other common organic phosphates that
2  regularly appear in emergency room settings.
3    Q.  You understand glyphosate is not an organic
4  phosphate, right?
5    A.  No, I'm sure it is an organic phosphate.
6    Q.  You haven't reviewed the report of Dr. Foster
7  where he discusses exactly why chemically it is not
8  an organic phosphate?
9    A.  Structurally, via chemistry, it is an organic
10  phosphate, and there are numerous documents that
11  state that.
12    Q.  Okay.  Not my question, sir.
13    Have you reviewed the report of Dr. Foster
14  where he states that it is not an organic phosphate
15  and explains why?
16    MR. TRAVERS:  Objection.  Misstates Foster's
17  testimony.
18    THE WITNESS:  I have not, and, you know, I
19  respect his outlier opinion.  Everyone has
20  different opinions.  But structurally, it is an
21  organic phosphate; it just doesn't behave in a
22  manner that's typical of most organic phosphates.
23  BY MR. KALAS:
24    Q.  Have you reviewed the U.S. EPA OPP report
25  where they discuss the fact that glyphosate is

Page 34

1 chemically not an organic phosphate but a different
2 type of compound altogether?
3    A. Objection. Misstates the OPP report.
4    THE WITNESS: I would need to see that report
5 in front of me. I'm not going to second-guess on
6 that. It's not what I recall. And if you want
7 to show me the report, I'll answer the question.
8 BY MR. KALAS:
9    Q. Have you reviewed the IARC monograph where
10 they discuss the chemical structure of glyphosate and
11 do not state that glyphosate is an organic phosphate?
12    MR. TRAVERS: Objection. Misstates the IARC
13 report.
14    THE WITNESS: I have.
15 BY MR. KALAS:
16    Q. Okay. And did you see in the IARC report
17 where they state it's an organophosphate?
18    A. They don't state either way.
19    Q. They don't state it's an organophosphate?
20    A. No. They don't state it's not either.
21 That's kind of a trick question.
22    Q. Doctor, did you ever tell your students you
23 believe glyphosate causes NHL?
24    A. Again, I'll tell you, I never discussed
25 glyphosate with my students.

Page 35

1    Q. Okay. Now, from the time you came to the
2 conclusion that there was suggestive evidence that
3 glyphosate causes NHL in the mid 1990s and the time
4 you were retained by the plaintiffs in the Roundup
5 cases, did you tell anybody else that you believed
6 that there was some evidence glyphosate could cause
7 NHL?
8    MR. TRAVERS: Objection. Compound.
9    THE WITNESS: No. And the reason being, I
10 was only consulted on one case of glyphosate
11 malignancy up until the time I was contacted by
12 The Miller Firm.
13    So the answer is no, no one asked me since
14 the 1990s.
15 BY MR. KALAS:
16    Q. Okay. Did you ever publish any articles on
17 the relationship between Roundup and NHL between the
18 time you came to the conclusion there was suggestive
19 evidence of carcinogenicity in the 1990s and the time
20 you were retained by plaintiffs in this case?
21    A. No.
22    MR. TRAVERS: I'm going to object to the
23 question. It misstates his prior testimony.
24 BY MR. KALAS:
25    Q. Did you ever present at any scientific

Page 36

1 conference on the potential association of glyphosate
2 and NHL from the time you came to believe there was
3 suggestive evidence of carcinogenicity in the mid
4 1990s and the time you were retained by plaintiffs in
5 the glyphosate cases? Let me get the question out.
6    MR. TRAVERS: Objection. Misstates his
7 testimony. Compound question.
8    THE WITNESS: If you break the question down,
9 maybe I can approach it.
10 BY MR. KALAS:
11    Q. I don't think it's compound. I'll ask it
12 again, and if it still needs to be broken up, please
13 tell me where.
14    Did you ever present at any scientific
15 conference on the potential association of glyphosate
16 in NHL from the time you came to believe there was
17 suggestive evidence of carcinogenicity in the 1990s
18 and the time you were retained in the glyphosate
19 cases?
20    MR. TRAVERS: Same objection.
21    THE WITNESS: No.
22 BY MR. KALAS:
23    Q. Okay. When you came to believe in the mid
24 1990s that there was suggestive evidence that
25 glyphosate might cause NHL, did you think there were

Page 37

1 people out there using Roundup who could be getting
2 NHL from their use of Roundup?
3    MR. TRAVERS: Objection. Misstates his
4 testimony.
5    THE WITNESS: I did.
6 BY MR. KALAS:
7    Q. Did you call up EPA when you came to that
8 conclusion and tell them that you're a Ph.D.
9 toxicologist and this is your conclusion and they
10 need to do further investigation?
11    MR. TRAVERS: Objection. Compound.
12    THE WITNESS: There is no EPA. That was not
13 a slide in the conference I went to, meaning
14 there's no phone number you can just call the
15 EPA. There's hundreds of offices. And there's
16 no simple way to do such a thing.
17 BY MR. KALAS:
18    Q. That's a great point. There is an office
19 called the EPA Office of Pesticide Programs, right?
20    A. Yes.
21    Q. And they are the folks who regulate
22 glyphosate, right?
23    A. Yes. However, their expertise is primarily
24 the animal models, which they were working on at that
25 time.

Page 38

1    Q.  They actually have evaluated the epidemiology
2  as well on glyphosate, right?
3    A.  I don't believe so, way back.  I think at
4  that point they were working on the initial animal
5  models.
6    Q.  You reviewed the EPA OPP report, right?
7    A.  Yes.
8    Q.  And they talk about epidemiology for about
9  20 pages in that document, don't they?
10    A.  Well, that's 25 years later.
11    Q.  Okay.  So my question is:  Did you call the
12  EPA OPP group, Office of Pesticide Programs, and tell
13  them:  I'm a Ph.D. toxicologist, and I'm concerned
14  that glyphosate might cause cancer before you were
15  retained in the glyphosate cases?
16    A.  No.  There was insufficient data to reach
17  that conclusion.
18    Q.  Okay.  You believed people's health were at
19  risk, but you were worried there was insufficient
20  data.
21    So when people's health is at risk and
22  there's insufficient data, do you believe that the
23  regulators then should have waited for sufficient
24  data?
25    MR. TRAVERS:  Objection.  Form.

Page 39

1    THE WITNESS:  I can't answer that.  I don't
2    know what you're talking about, really.
3  BY MR. KALAS:
4    Q.  So in the mid 1990s, you would agree there
5  was insufficient human data to conclude glyphosate
6  caused NHL?
7    MR. TRAVERS:  Objection.  Misstates his
8    testimony.
9    THE WITNESS:  To rank it as a probable
10    carcinogen, I don't think the evidence was there.
11    I think when I first looked at this, it was 19 --
12    well, let's see -- 94, I think.
13  BY MR. KALAS:
14    Q.  Okay.  So when was there enough evidence in
15  the human data for a Ph.D. scientist like yourself to
16  conclude glyphosate causes NHL in people?
17    A.  What date?
18    Q.  Yes, sir.
19    A.  I can't answer that.
20    Q.  Okay.  So it wasn't in the mid 1990s, right?
21    A.  No.
22    Q.  So you've reviewed many epidemiology studies
23  in this case.  In the Stevick report, I think you
24  discuss six; in this report, you discuss three.
25    At what point was the human epidemiology

Page 40

1  sufficient in your opinion to conclude glyphosate
2  causes NHL in people?
3    MR. TRAVERS:  Objection.  Asked and answered.
4  Compound question.
5    THE WITNESS:  I'm not sure.  I would have to
6    do a full review of all epidemiological studies,
7    and I've deferred that in this case to the
8    epidemiologists.  I have not taken on that task.
9  BY MR. KALAS:
10    Q.  Okay.  So after reviewing all the
11  epidemiology studies, when you come and testify to
12  the jury in March out in Oakland, you are going to
13  tell them you are not sure when the human data was
14  sufficient to warn people that glyphosate could cause
15  NHL, right?
16    MR. TRAVERS:  Objection.  Asked and answered.
17  It's compound.
18    THE WITNESS:  I'm simply going to say that as
19    I've been testifying in this -- in these cases
20    all along, that I have deferred that work to a
21    group of epidemiologists.  I have not been able
22    to do that.
23    I am biting off a lot as it is in this
24    assessment with respect to dose calculation,
25    exposure, dose contact, penetration through

Page 41

1  clothing, dermal absorption, mechanism of
2  carcinogenesis, genotoxicity, and a whole bunch
3  of issues.  And for me -- for you to be pressing
4  me into reviewing all the epidemiological data
5  is, you know, quite frankly, very unfair.  That's
6  what I'm going to tell the jury.
7  BY MR. KALAS:
8    Q.  Okay.  Going back to the time you
9  concluded -- now, it's true, though, you have come to
10  a causation opinion with regard to the Pilliods based
11  on the epidemiology studies, right?
12    A.  Based on dosage, yes.
13    Q.  So when was the dosage information in the
14  epidemiology studies sufficient to conclude that
15  glyphosate was causing NHL in people?
16    MR. TRAVERS:  Objection.  Asked and answered.
17    MR. KALAS:  It's a different question, Jeff.
18    MR. TRAVERS:  It's the same.  Same concept.
19    THE WITNESS:  That would require me to review
20    the entire gamut of epidemiological studies, and
21    I have only focused on the epi studies which have
22    some metric for dose assessment.
23  BY MR. KALAS:
24    Q.  Okay.  So when was the epidemiology data
25  sufficient in the dose assessment studies, just

Page 42

1 taking that set of studies by -- in and of
2 themselves, to conclude that glyphosate caused NHL in
3 people?
4     MR. TRAVERS: Objection. Asked and answered.
5     THE WITNESS: Well, the problem is I can't
6 answer that because that would require me to look
7 at all of the data and make a determination,
8 first of all, at what point in time was there
9 sufficient epidemiologic data to conclude that
10 glyphosate is a probable human carcinogen, and I
11 have not undertaken that task. I would defer
12 that to the epidemiologists in this matter.
13 BY MR. KALAS:
14 Q. Well, let's talk about the studies you
15 reviewed.
16     You've reviewed the Eriksson study, right?
17 A. Yes.
18 Q. You've reviewed the Andreotti study, right?
19 A. Yes.
20 Q. You've reviewed the McDuffie study, right?
21 A. Correct.
22 Q. And those are the three studies you're
23 testifying about in this case, right?
24 A. Yes.
25 Q. You are not going to testify about any other

Page 43

1 epidemiology studies in this case, right?
2     MR. TRAVERS: Objection.
3     THE WITNESS: To answer your question, I did,
4 on Page 113, refer to some additional
5 epidemiologic studies regarding latency
6 estimates.
7 BY MR. KALAS:
8 Q. Okay. And that's De Roos 2005?
9 A. Yes.
10 Q. Correct?
11     And that's a glyphosate epidemiology study
12 from the agriculture health study?
13 A. Yes.
14 Q. And all those other studies referenced on
15 Table 16 are not specifically glyphosate studies
16 beyond Eriksson and McDuffie, correct?
17 A. That's correct.
18 Q. So the four epidemiology studies on
19 glyphosate referenced in your report that you intend
20 to tell the jury about in Pilliod are De Roos 2005,
21 Andreotti 2018, McDuffie 2001, and Eriksson 2008,
22 correct?
23 A. Yes, but that's not all of them. There are
24 studies that aren't in my report that were referenced
25 by Dr. Phalen.

Page 44

1 Q. Okay. So there are additional epidemiology
2 studies that you have reviewed on glyphosate?
3 A. That were referenced by Dr. Phalen. I have
4 looked at some of those studies, yes.
5 Q. So you have looked at, for instance, the
6 Hardell 1999 study, right?
7 A. I don't recall.
8 Q. All right. Well, strike that. Let me see if
9 we can figure this out a different way.
10     In the mid 1990s, you believe there was
11 suggestive evidence that glyphosate caused NHL. And
12 at some point prior to the disclosure of your opinion
13 in the Johnson case, you believed there was
14 sufficient evidence in the human data to conclude
15 glyphosate caused NHL.
16     What changed?
17     MR. TRAVERS: Objection. Misstates his
18 testimony.
19     THE WITNESS: Nothing changed. It's just at
20 that point in time, there had been additional
21 literature accumulated, and much of that
22 literature was laid out in the review format in
23 the IARC document, which was very helpful.
24 BY MR. KALAS:
25 Q. So -- so were you able to come to a

Page 45

1 conclusion prior to the IARC monograph in March 2015
2 that glyphosate caused NHL?
3 A. I hadn't made a thorough review at that point
4 in time, so I don't know.
5 Q. Are you aware of any reputable scientist in
6 the literature on your hundreds of hours of review in
7 this case who had come to the conclusion that
8 glyphosate caused NHL prior to the IARC monograph?
9 A. I don't know. I have no -- no way of
10 answering that.
11 Q. Okay.
12 A. I would have to perform such a survey.
13 Q. Now, when you came to the conclusion in the
14 mid 1990s that glyphosate was suggestive for NHL, did
15 you contact anybody from NIOSH to let them know that
16 you thought glyphosate could cause NHL?
17 A. No. That is a ridiculous question. It was
18 already published in the peer-reviewed literature
19 that that was a possibility. Why would I contact
20 somebody to tell them to read a paper by so-and-so?
21 It doesn't make any sense.
22 Q. So regulators have access to the
23 peer-reviewed literature?
24 A. Of course they do.
25 Q. And regulators keep up on the peer-reviewed

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 46

1  literature on compounds they are supposed to
2  regulate, correct?
3      MR. TRAVERS:  Objection.  He had no way of
4  knowing what regulators --
5      MR. KALAS:  Well, he just said he did know,
6  Jeff.  So I'm asking him about that.
7      MR. TRAVERS:  You are asking him what --
8  you're asking him what the regulators did in this
9  case?
10     MR. KALAS:  You can answer the question if
11 you understand it, sir.
12     THE WITNESS:  I can answer it this way.
13     I worked for the government for five years.
14 Many, many different types of toxic exposures
15 came across my desk.  And as a government
16 regulator, I kept up to date on the human
17 studies.
18     And I can't speak for another department, but
19 I can tell you what I did.
20 BY MR. KALAS:
21     Q.  Okay.  So it was your belief that the
22 scientists at NIOSH would have been keeping up on the
23 glyphosate epidemiology data, and that's why you
24 didn't call them, correct?
25     MR. TRAVERS:  Objection.  That is not -- that

Page 47

1  doesn't reflect his testimony at all.
2      THE WITNESS:  Again, this is a strange
3  question I don't understand.
4  BY MR. KALAS:
5      Q.  Why did you not call the scientists at NIOSH
6  to tell them that you believed glyphosate had
7  suggestive evidence for NHL?
8      A.  It was already published in the peer-reviewed
9  literature.
10     Q.  And how about OSHA?  Did you call anyone from
11 OSHA in the mid 1990s or up to the point when you
12 were retained by the plaintiffs in this case to tell
13 them that you believed glyphosate could cause NHL?
14     A.  No.  They would think I was some kind of nut,
15 because that's what they're tasked to do.  They are
16 regulators.  They keep abreast of literature and
17 toxicological findings.  Why would I make a call
18 to -- to flag them that some studies have been
19 published?  That's just -- really doesn't make any
20 sense.
21     Q.  Understood.
22     Has OSHA stated that they believe as an
23 agency glyphosate is a human carcinogen?
24     A.  I don't believe so.
25     Q.  Has NIOSH stated as an agency they believe

Page 48

1  glyphosate is a human carcinogen?
2      A.  I really haven't followed up to see what --
3  if anything new has been published by NIOSH.  I can't
4  answer that.  I don't know.
5      Q.  Did you contact the American Society of --
6  well, strike that.  Let me back up and ask a
7  foundational question.
8      Have you heard of the American Society of
9  Hematology?
10     A.  Yes.
11     Q.  What is the American Society of Hematology?
12     A.  I believe it's a group similar to the
13 American Pediatric Association or many of these other
14 groups that specialize in both prevention --
15 preventive medicine and treatment of diseases that
16 fall into their area of expertise.
17     Q.  And hematologists are the doctors that work
18 at preventing and treating non-Hodgkin lymphoma,
19 right?  Hematologists and oncologists?
20     A.  Yes, I would say both.  Yes.
21     Q.  And did you contact the American Society of
22 Hematology to let them know that you believe Roundup
23 has suggestive evidence for NHL between when you came
24 to that conclusion in the mid 1990s and when you were
25 retained by plaintiffs in this litigation?

Page 49

1      A.  No.  Again, it was already published in the
2  generally accepted peer-reviewed literature.  And to
3  be running around trying to alert every agency that
4  something was published in the literature would be
5  kind of silly.
6      Professionals review studies.  I review --
7  there's weeks where I'll review a hundred studies in
8  one week.
9      Q.  And did you contact any professional
10 organization of cancer doctors to let them know that
11 you believed glyphosate had suggestive evidence for
12 NHL in the mid 1990s?
13     A.  There's probably thousands of physicians in
14 this country.  Are you asking if I went on some kind
15 of mass phone call campaign?
16     Q.  I'm just asking if you told one.
17     A.  I'm not sure I understand the question.
18     Q.  Did you call one doctor in this country up
19 between when you came to the conclusion in the mid
20 1990s that glyphosate had suggestive evidence of NHL
21 and when you were retained by The Miller Firm in
22 glyphosate litigation?  Did you call one doctor in
23 this country to tell them you believed glyphosate
24 caused NHL?
25     MR. TRAVERS:  Objection.  Misstates his

Page 50

1   testimony.
2       THE WITNESS: Could you read back the
3   question?
4       MR. KALAS: Sure. I'll repeat it.
5   BY MR. KALAS:
6   Q.  You can strike that, and I'll repeat the
7   question.
8       Between the time you came to the conclusion
9   in the mid 1990s there was suggestive evidence
10  between glyphosate exposure and NHL and when you were
11  retained by The Miller Firm in glyphosate litigation,
12  did you call one doctor in this country or in the
13  world to tell them you believed glyphosate could
14  cause NHL?
15  A.  I can't answer that question. It's not
16  correct. I did not make that conclusion. I said
17  that it was published in the generally accepted
18  peer-reviewed literature.
19  Q.  And you read that?
20  A.  Yes. I read it, along with thousands and
21  hundreds of thousands of other scientists, yes.
22  Q.  So did you tell anybody? Did you do call any
23  doctor and say, hey, I read this article that
24  glyphosate called cause NHL; this is important;
25  people should know.

Page 51

1       Did you do -- did you tell anybody that?
2       MR. TRAVERS: Objection. Asked and answered.
3       THE WITNESS: I don't recall.
4   BY MR. KALAS:
5   Q.  Okay.
6   A.  I don't know. I may have spoken with
7   Dr. Carlberg about it. I don't know.
8   Q.  Have you put anything on your website
9   about --
10  A.  I may have spoken with Dr. Wolfson about it,
11  but I don't remember for sure.
12  Q.  Okay. And Dr. Carlberg and Dr. Wolfson are
13  two other individuals who act as expert witnesses in
14  litigation, right?
15  A.  No.
16      MR. TRAVERS: Objection.
17      THE WITNESS: Dr. Carlberg is a family
18      practice physician.
19  BY MR. KALAS:
20  Q.  Okay.
21  A.  Dr. Michael Wolfson is an occupational
22  medicine physician, and he has worked in forensic
23  matters.
24  Q.  Where is Dr. Carlberg a family medicine
25  physician?

Page 52

1   A.  Skaneateles, New York.
2   Q.  And he is your personal physician or he was?
3   A.  Actually, he and she.
4   Q.  Okay. Were your personal physicians?
5   A.  Still are.
6   Q.  Still are. Okay.
7       And you're not positive whether or not you
8   talked to them about it; you just think you might
9   have?
10      MR. TRAVERS: Objection. Asked and answered.
11      THE WITNESS: I think I may have discussed it
12      with Dr. Wolfson back when I was contacted by
13      Reich and Binstock.
14      As far as the Carlbergs, I'm not sure. It's
15      been too long. I don't know.
16  BY MR. KALAS:
17  Q.  And did you and Dr. Wolfson decide to present
18  on your suspicion to any groups of oncologists or
19  hematologists in this country?
20  A.  No. I think that would be out of place. I
21  mean, the generally accepted literature presented
22  some statistically significant findings. However, at
23  that point in time, there was an insufficiency to
24  draw a conclusion of probable carcinogenesis, and it
25  would be inappropriate to go on such a campaign as

Page 53

1   you're suggesting.
2   Q.  Okay. Have you put anything on your website
3   about Roundup?
4   A.  No.
5   Q.  Have you put anything on your website about
6   glyphosate?
7   A.  No.
8   Q.  Have you put anything on your website about
9   your conclusion that glyphosate-based herbicides can
10  cause NHL?
11  A.  No.
12  Q.  Okay. Now, if we can look at Exhibit 5 real
13  quick, and that's the list of testimony, sir. I'm
14  correct that since February 6th, 2018, you've
15  testified in trial or at deposition 21 times, right?
16  And I'm counting Dwayne Johnson as two days because
17  you have two days listed here.
18      So 21 separate days?
19  A.  Rene is listed twice.
20  Q.  Rene is listed twice; three and five. Okay.
21      And those weren't -- those weren't separate
22  days of depositions?
23  A.  No.
24  Q.  Okay. So that's a -- so that's an error. So
25  we'll strike one of those.

Page 54

1     So let me re-ask it. I'm correct that since
2 February 6th, 2018, in the past -- so in the past
3 year, you have testified on 20 separate days at trial
4 or in deposition, right?
5     A. February what year?
6     Q. February 6th, 2018. So that's a year ago
7 today.
8     A. Well, it looks like three out of those 16
9 were the Monsanto cases.
10     Q. Okay. That wasn't my question, and 16 wasn't
11 a number I asked about. So let me ask it again, and
12 hopefully we can get on the same page.
13     I'm correct that since -- in the past year,
14 since February 6th, 2018, you have testified on 20
15 separate days as an expert witness?
16     A. Yes.
17     Q. Okay.
18     A. However, some of those cases were repeated
19 more than once.
20     Q. Yes, sir.
21     Now, that is a little less than twice a
22 month, right?
23     A. Yes.
24     Q. Okay. And that's -- and I counted it up, but
25 you can check. I counted 15 times testifying for

Page 55

1 plaintiffs and five times testifying for the
2 defendant; is that correct?
3     A. No, that's not accurate because, out of those
4 20, two of those were Rene, same case twice; and I
5 think there was a repeat with one of the Monsanto
6 cases as well as.
7     Q. I should mention that I'm counting today,
8 too. So from February 6th, 2018, to February 6th,
9 2019, in your "retained by" column, there would be 15
10 for plaintiff and five for defendant, right?
11     A. Not 15 different cases, no.
12     Q. But 15 different days of testimony, sir?
13     A. Right.
14     Q. Okay. And of those five cases where you
15 testified for the defendant, how many of those were
16 criminal cases?
17     A. One.
18     Q. Okay. And that was the Foss case?
19     A. Yes.
20     Q. And of the other four cases where you
21 testified for the defendant, were any of those
22 product liability or personal injury cases?
23     A. Yes.
24     Q. Which one or ones?
25     A. Well, there was 19.

Page 56

1     Q. Okay. And that's the Dorvil/Academy Bus
2 case?
3     A. Yes.
4     Q. Any others?
5     A. Well, 17 was -- was a death case.
6     Q. But that was a criminal case, sir, right?
7     A. Yeah. Heroin death.
8     Q. So was Eleazar Paz personal injury or product
9 liability case?
10     A. No. That was an administrative law case of
11 employment.
12     Q. Okay. Was Benefield v. Benefield a personal
13 injure or product liability case?
14     A. In part. There was -- a child had been
15 allegedly poisoned by one of the parents.
16     Q. Understood.
17     So it was a poisoning case arising out of
18 some sort of domestic dispute?
19     A. Correct.
20     And Yarborough, interestingly enough, that
21 also was a child who was a very young child, only
22 2 years old at the time, was overdosed by the
23 estranged mother with diphenhydramine.
24     Q. So of the cases where you've testified for
25 the defendant in the past year, the only one where it

Page 57

1 involved an individual coming into court and saying
2 this company's product or this company's action hurt
3 me is the Dorvil/Academy Bus case, right?
4     A. Yes. However, there were a fair number of
5 other defendant cases during that period of time that
6 settled prior to my deposition but following my
7 report production.
8     Q. But as far as cases where you offered
9 testimony, the only one of those types of cases was
10 the Dorvil/Academy Bus case, right?
11     A. Right.
12     Q. Okay. And how many cases in the past year
13 did you testify in for plaintiffs where somebody came
14 into court -- or how many days -- strike that. Let
15 me re-ask it.
16     How many days of separate testimony have you
17 offered in the past year on behalf of plaintiffs
18 where somebody comes into court and says this
19 company's product or this company's actions have hurt
20 me?
21     MR. TRAVERS: Objection. Form.
22     THE WITNESS: Five. But of those five, four
23 of them are Monsanto cases.
24 BY MR. KALAS:
25     Q. Okay. And is the other one United

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Subject to Further Confidentiality Review

Page 58

1 Technologies?
2     A.   Yes.
3     Q.   Now, you're missing another case where you
4 testified that a company's product hurt someone,
5 aren't you?
6     A.   I'm looking.  I don't think so.
7     Q.   You went under oath in a deposition on
8 August 20th, 2018, didn't you, in a case involving
9 formaldehyde flooring?
10     A.   I did.  I don't see it on here.
11     Q.   It's not on here, sir.
12     A.   No.
13          Yeah, I don't think Jen put it down because
14 the deposition was not completed.
15     Q.   But that is another case where you testified
16 on behalf of plaintiffs who claimed that a company's
17 product injured them, right?
18     A.   I'm not sure if that's the case because the
19 deposition was never completed.
20     Q.   Okay.  You went under oath in that
21 deposition, right?
22     A.   I terminated the deposition.
23     Q.   But at the beginning of the deposition, you
24 sat down and you said you were going to tell the
25 truth, right, under oath?

Page 59

1     A.   Well, of course, yeah.  Yeah.
2     Q.   And there was a court reporter there, like
3 there is here today, right?
4     A.   Yes.
5     Q.   Okay.  And if we were having a list of your
6 depositions in the past five years that began, you
7 would include it on that list, right?
8     A.   Yes.
9     Q.   And so I'm correct, in the past year, you've
10 testified, or at least gone under oath, in deposition
11 in at seven cases -- or seven days of testimony --
12 let me strike that and start it over.
13          I'm correct in the past year, you've given
14 seven days of testimony at either trial or deposition
15 in cases where people claim that either a company's
16 actions or a company's products have hurt them,
17 right?
18          MR. TRAVERS:  Objection.  Form.
19          THE WITNESS:  Sort of, yes, but four out of
20     the seven were Monsanto.
21 BY MR. KALAS:
22     Q.   And of those seven days where you gave
23 testimony, six were on behalf of the plaintiffs,
24 correct?
25     A.   Yes.

Page 60

1     Q.   Okay.  Now, how many different cases are you
2 consulting on right now?
3     A.   Many.
4     Q.   Can you give me an estimate?  Is it more than
5 ten?
6     A.   Yes.
7     Q.   More than 20?
8     A.   That, I don't know.  Probably between 10 and
9 20.
10     Q.   Between 10 and 20 cases.
11          Over the course of a year, how many different
12 law firms do you usually receive payment from?
13     A.   Well, perhaps 20.
14     Q.   If you can estimate, how many different
15 attorneys across all your cases did you meet with
16 over the course of 2018?
17          MR. TRAVERS:  Objection.  Form.
18          THE WITNESS:  Only a few more than on this
19     list.
20 BY MR. KALAS:
21     Q.   So you estimate over the course of 2018, you
22 might have met with 25 attorneys?
23          MR. TRAVERS:  Objection.  Misstates his
24     testimony.
25          THE WITNESS:  No.  Again, we have repeats

Page 61

1 here.  Rene is a repeat.  Monsanto ones have
2 always been with The Miller Firm.  I would say
3 under 20.
4 BY MR. KALAS:
5     Q.   Okay.  Now, testifying as a forensic
6 toxicologist is your job, right?
7     A.   That's what I was trained to do.
8     Q.   You are a professional witness?
9     A.   No.
10          MR. TRAVERS:  Objection.  Form.
11          THE WITNESS:  No.  That would be grossly
12     incorrect.  I was trained in forensic toxicology
13     in the State toxicology department at the medical
14     center in Indianapolis.
15          One hundred percent of our work in that
16     department was litigation-related work, either
17     criminal or civil.  Generally, criminal in that
18     case.
19          But forensic toxicologists, by nature of
20     their training and work, largely or completely
21     handle litigation matters.
22 BY MR. KALAS:
23     Q.   Okay.  So you are a professional at handling
24 litigation matters?
25     A.   No.  I'm a forensic toxicologist.

Page 62

1    Q.   And forensic toxicologists, by nature of
2   their work, are professionals at handling litigation
3   matters, correct?
4       MR. TRAVERS:  Object to form.
5       THE WITNESS:  Yes.  The word forensic, Latin
6   root is "to debate."  Things that are of debate
7   in litigation are what forensic toxicologists are
8   trained to do, and to ascertain the evidence to
9   give a correct and accurate opinion.
10  BY MR. KALAS:
11      Q.   What percent of your time professionally is
12  spent preparing for or providing expert opinions or
13  testimony?
14      MR. TRAVERS:  Objection.  Vague.
15      THE WITNESS:  You asked me, really, three
16  questions in one.
17  BY MR. KALAS:
18      Q.   Okay.  So I'm asking about preparing or
19  providing expert opinions or testimony.  So let me
20  ask it maybe in a more global manner.
21      What percent of your time is spent on
22  litigation-related matters?  And I'm asking about
23  your professional time.
24      A.   Either criminal or civil, nearly all of them.
25      Q.   And if tomorrow, hypothetically, the U.S.

Page 63

1   court system decided that they had no further need
2   for expert witnesses, expert witnesses would not be
3   allowed in court, how would you fill your
4   professional time?
5       MR. TRAVERS:  Objection.  Form.
6       THE WITNESS:  Well, I have a boat, and I
7   would probably be on it.
8   BY MR. KALAS:
9       Q.   Okay.
10      A.   A little more than I am now.
11      Q.   What percent of your income would go away if
12  courts no longer had a need for experts?
13      MR. TRAVERS:  Objection.  Form.  Vague.
14      THE WITNESS:  I don't know.  I can't really
15  answer that for sure.
16  BY MR. KALAS:
17      Q.   It would be more than 50 percent if courts no
18  longer needed experts?
19      MR. TRAVERS:  Objection.  Vague.
20      THE WITNESS:  I can't answer that.  I don't
21  know.
22  BY MR. KALAS:
23      Q.   Okay.  One more question, and we'll take a
24  break.
25      Have you ever taken -- well, actually, yeah,

Page 64

1   one more question and we'll take a break.
2       Have you ever taken a class on persuasive
3   speaking?
4       A.   On what?
5       Q.   Persuasive speaking.
6       A.   Never.
7       MR. KALAS:  Okay.  Let's take a break.
8       THE VIDEOGRAPHER:  We're going off the record
9   at 9:21.
10      (Recess from 9:21 until 9:29 a.m.)
11      THE VIDEOGRAPHER:  We are back on the record.
12  The time is 9:29.
13  BY MR. KALAS:
14      Q.   Doctor, in the mid 1990s, after you came to
15  the conclusion that there was suggestive evidence
16  that glyphosate caused NHL, how many times did you
17  use glyphosate-based herbicides personally?
18      A.   I don't know.
19      Q.   More -- how many times a year did you use
20  glyphosate-based herbicides on average on your
21  property here in Florida?
22      A.   Here in Florida, it would have started in
23  2003, and I would say three times a year.
24      Q.   Okay.  And how many times per year did you
25  use it on your property up in New York, use Roundup

Page 65

1   on your property up in New York?
2       A.   Seasonally.
3       Q.   So by seasonally, does that mean once every
4   three months or --
5       A.   Well --
6       Q.   It can mean a lot of different things.
7       A.   You have to understand, Skaneateles, New
8   York, there was usually snow on the ground from
9   Halloween until -- some years, even until mid to late
10  April.
11      Q.   Okay.
12      A.   We were right in the snow belt.
13      But, yeah, during the summer months, I used
14  it, I would say, twice.
15      Q.   So from the time you came to the conclusion
16  that glyphosate had suggestive evidence of
17  carcinogenicity in the mid 1990s, you continued to
18  use glyphosate-based herbicides two to three times a
19  year, right?
20      A.   Yes, yes, and I explained that in the Johnson
21  case already in terms of the precautions I took
22  knowing that it had potential carcinogenic
23  properties.
24      I made modifications to my sprayers.  Well,
25  when I did initially get it on my legs, I was

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 66

1 outraged and immediately washed my legs with soap,
2 went into the pool, in fact, and ultimately changed
3 my sprayer head.
4   Q.   Since you were retained by The Miller Firm in
5 the glyphosate litigation, have you used Roundup?
6   A.   I have.
7   Q.   Do you continue to use Roundup today?
8   A.   Less frequently.  And you may know, if your
9 detectives have looked at my yard, I have huge piles
10 of mulch, about 8 feet high.  So I have been mulching
11 heavier over the past -- well, really, the past
12 several years since I updated myself somewhat on the
13 epidemiology and the IARC decision, I have been more
14 careful than ever.  But I am trying to get away from
15 it totally, but I still use it in some local spots.
16 But I am primarily depending on mulch.
17   Q.   If I went over to your house today after the
18 deposition and I took a look around, would I find a
19 bottle of Roundup?
20   A.   I know there is some diluted Roundup in the
21 tank of the sprayer.  I don't know whether I actually
22 have any on hand.  I don't think so.
23   Q.   You still have some diluted Roundup in the
24 tank of your personal sprayer?
25   A.   Oh, yes.  Yeah.  I know that because I saw it

Page 67

1 when I was getting into my vehicle.
2   Q.   Now, you're offering a specific causation
3 opinion regarding the Pilliods in this case, right?
4   A.   Yes.
5   Q.   Okay.
6   A.   Well, let's be very careful with that because
7 there's been a lot of confusion in the past.
8     Specific causation, yes, but not in every
9 aspect.  I'm focusing on dose.
10   Q.   Okay.  And -- and the entire contours of your
11 specific causation opinion, if I understand
12 correctly, the distinction you are trying to draw is
13 based on the human epidemiological data for days per
14 year or lifetime days of exposure, correct?
15   A.   Well, I have also calculated a milligram per
16 kilogram evaluation -- or, a milligram per day dosage
17 just for comparison to that of other applicators, not
18 to compare to noncancer effect regulatory values.
19     That would be inappropriate because this is a
20 cancer assessment, not a birth defect matter.
21   Q.   I understand.
22     So -- so I think you have testified
23 previously that if we want to compare apples to
24 apples for cancer outcome, what we need to look at
25 are exposure days, right?

Page 68

1   A.   In part.  It is also possible to look at the
2 dosage and compare that to other applicators that
3 have been published in the peer-reviewed literature.
4   Q.   Right.
5     But none of the epidemiology studies contain
6 milligrams per kilogram dosage in it on NHL, right?
7   A.   No.  However, there are epidemiological
8 studies that -- not epidemiological; I'm sorry.
9     There are peer-reviewed studies that have
10 evaluated the dose in milligram per day or milligram
11 per kilogram body weight for applicators with PPE --
12 that's protective personal equipment -- and without
13 PPE.
14   Q.   Right.
15   A.   And it is reasonable to take the dosage from
16 Mr. and Mrs. Pilliod and compare that to what's in
17 the peer-reviewed literature.
18   Q.   Understood.
19     And those studies you're referring to are
20 studies like Acquavella 2004, and I guess all of
21 those studies summarized in Solomon 2016, and
22 basically the biomonitoring and passive dose symmetry
23 studies, right?
24   A.   Well, I don't totally agree with that.
25   Q.   Okay.  So -- so let's get back to that in a

Page 69

1 minute.  Let's focus on the epidemiology of NHL
2 aspect for a second.
3     If you had someone with greater than two days
4 of exposure a year to glyphosate who got NHL, would
5 you automatically say that glyphosate caused or
6 substantially contributed to their NHL?
7   A.   I would have to carefully evaluate that and
8 determine how many years it was two days per year
9 over how many years and make comparisons to the
10 generally accepted literature.
11   Q.   Okay.  So why would you need to know how many
12 years it was more than two days per year to make that
13 evaluation?
14   A.   Well, I think that some of the studies -- in
15 fact, I think one or two of the epidemiological
16 studies include a metric that categorized a number of
17 exposures per year over a given period of time.
18   Q.   Okay.  Which study are you referring to, sir?
19   A.   Okay.  Eriksson, et al, 2008.
20   Q.   Okay.  And that's greater than ten days of
21 lifetime use, right?
22   A.   Yes.
23   Q.   Okay.  So -- and then McDuffie has greater
24 than two days per year of use, right?
25   A.   Yes.

Page 70

1    Q.  Okay.  So my question is:  If you have
2  somebody come in with greater than two days per year
3  of use who gets NHL -- and that's use of
4  glyphosate-based herbicides -- would you
5  automatically say that that person got NHL or --
6  strike that.  Let me start over.
7       If you have somebody who comes into your
8  office with greater than two days per year of use of
9  glyphosate-based herbicides who has NHL, would you
10  automatically say glyphosate caused or substantially
11  contributed to that person's NHL?
12       MR. TRAVERS:  Objection.  Asked and answered.
13       MR. KALAS:  It hasn't been answered yet.
14       THE WITNESS:  Well, I think I would have to
15  go a bit further and look at McDuffie, for
16  example, with respect to the definition of
17  pesticide exposure, which discriminated, A,
18  between incidental, bystander, and environmental
19  exposure as compared with more extensive
20  exposure; and, B, between cases and controls was
21  the cumulative total of ten hours per year to any
22  combination of pesticides.
23       The screening question and the
24  post-questionnaires were used to trigger
25  telephone interviews among these cumulative

Page 71

1  exposures of ten or greater hours per year to any
2  combination of herbicides, insecticide,
3  fumicides, blah, blah, blah.
4       So I think I would have to look closely at
5  the definitions in these two studies, and I would
6  also want to compare -- I'd want to compare the
7  dose that was received to that of studies such
8  as -- I would probably want to consider the
9  Machado-Neto, et al, study and others that have
10  assessed exposures under different levels of
11  personal protective equipment.
12       So the evaluation would be a bit more
13  involved than just saying two days.  That is an
14  oversimplification and really a false view of
15  what the toxicologist would need to do to assess
16  the scenario you have presented.
17  BY MR. KALAS:
18    Q.  You would think if somebody said that
19  glyphosate caused NHL just because somebody was
20  exposed to it for more than two days per year, in and
21  of itself, you would think that that would be an
22  oversimplification of the issues?
23       MR. TRAVERS:  Objection.  Compound.
24       THE WITNESS:  From a toxicologic standpoint,
25  there is a bit more to the assessment with

Page 72

1  regards -- with regards to PPE or their lack of.
2       Accidental mishaps, misuse of the product,
3  et cetera.
4  BY MR. KALAS:
5    Q.  Okay.  So somebody could fit the
6  characteristic, then, of greater than two days per
7  year of glyphosate used, and you could still come to
8  the conclusion, and a reasonable scientist could
9  still come to the conclusion, that glyphosate did not
10  cause their NHL, right?
11    A.  Well, I would have to consider also whether
12  there was greater or equal to ten hours per year and
13  also look at the range of years of exposure.
14    Q.  Sure.
15       And I'm just asking to focus on the two --
16  greater than two days per year point here.
17       If somebody said, okay, I have somebody who
18  was exposed to greater than two days per year of
19  glyphosate, and they have NHL.  I still don't think
20  that glyphosate caused their NHL.
21       Based on some of that other information you
22  discussed, that could be a reasonable conclusion,
23  right?
24       MR. TRAVERS:  Objection.  Vague.
25       THE WITNESS:  I don't understand the

Page 73

1  question.  I need other information.
2  BY MR. KALAS:
3    Q.  Sure.
4       So you mentioned that you need to know
5  whether or not they're exposed to greater than ten
6  days -- ten hours a year, right?
7    A.  Yes.
8    Q.  And you need to know how they compare to the
9  mgs per kg doses and applicators, right?
10    A.  Yes.
11    Q.  So that is additional information beyond
12  greater than two days per year, right?
13    A.  Yes.
14    Q.  So you would agree with me that a reasonable
15  scientist, after reviewing that additional
16  information, could conclude that even though somebody
17  was exposed to glyphosate for greater than two days
18  per year, the glyphosate still wasn't a cause or
19  substantial contributing factor to their NHL, right?
20       MR. TRAVERS:  Objection to form.
21       THE WITNESS:  I would really need to
22  carefully assess the specific individual with
23  respect to dose and milligram per day, which
24  requires knowledge of protective personal
25  equipment, the type of application, whether it

Page 74

1 was CDA or aerosol, really the type of equipment
2 they were using, whether they were walking
3 through -- in shorts through deep weeds, whether
4 they had hoses blow off and spray them every time
5 they used it.
6     There's a lot of factors to look at, and
7 you're trying to get a yes or no out of
8 something. I just can't answer that without
9 preparing an assessment.
10 BY MR. KALAS:
11 Q. Right, absolutely. And I completely
12 understand.
13     But the reason you prepared that assessment,
14 if I'm understanding you correctly, is that greater
15 than two days per year of glyphosate use in and of
16 itself is not enough to conclude that glyphosate use
17 caused or substantially contributed to someone's NHL.
18     You, Dr. Sawyer, need more information,
19 right?
20 A. Yes.
21 Q. And a reasonable scientist like yourself
22 could conclude that even though somebody has greater
23 than two days per year of glyphosate use, glyphosate
24 still did not cause or substantially contribute to
25 their NHL based on some of that other information

Page 75

1 you've discussed?
2     MR. TRAVERS: Objection. Vague.
3     THE WITNESS: I can't speak on someone else.
4 I mean, I just -- I'm very uncomfortable offering
5 an opinion as to someone else's procedure in
6 terms of their assessment.
7     MR. KALAS: Sure.
8 BY MR. KALAS:
9 Q. You could conclude that somebody who is
10 exposed to glyphosate for greater than two days per
11 year and gets NHL did not get it from glyphosate or
12 did not have glyphosate substantially contribute to
13 that NHL, right?
14 A. Could I conclude such a thing?
15 Q. Yes.
16 A. Yes.
17 Q. Likewise, in somebody who's used glyphosate
18 for ten days or more in their life, could you
19 conclude that glyphosate did not cause or
20 substantially contribute to their NHL based on that
21 other information we've discussed?
22     MR. TRAVERS: Objection. Vague.
23     THE WITNESS: Again, I would have to make
24 calculations.
25     So if they had someone who was wearing PPE,

Page 76

1 as in some of the studies I have, impermeable
2 pants, impermeable boots, face shield, neoprene
3 lawn gloves, using a specific type of equipment,
4 et cetera, the dose would be much lower, and it
5 would have an impact on the results.
6     So it's possible. I mean, I just --
7 without doing a specific analysis on an
8 individual basis, that becomes very difficult to
9 understand.
10     MR. KALAS: I understand.
11 BY MR. KALAS:
12 Q. So in your mind it's possible that somebody
13 could be exposed to glyphosate for greater than ten
14 days, get NHL, and it's possible for you to conclude,
15 based on intensity data like PPE use, mgs per kg
16 absorbed per day, that the glyphosate did not cause
17 or substantially contribute to their NHL, right?
18 A. It's possible.
19 Q. Okay. Now, it's your opinion in the case of
20 the Pilliods that glyphosate use -- and I want to
21 make sure I get this right -- was a significant
22 factor contributing to their development and
23 subsequent diagnosis of non-Hodgkin lymphoma, right?
24 A. Yes.
25 Q. Okay. And can you list all of the

Page 77

1 information that you deemed necessary to review to
2 reach that conclusion?
3     MR. TRAVERS: Objection. Vague.
4     THE WITNESS: All right. Remember, I'm only
5 addressing specific cases as per Page 117.
6     MR. KALAS: Okay.
7     THE WITNESS: With respect to quantitative
8 evaluation of exposure dose and duration.
9     MR. KALAS: Okay.
10     THE WITNESS: As I said in my last paragraph,
11 on the basis of dose and duration that the
12 Roundup was a significant factor contributing to
13 the development and subsequent diagnosis of
14 non-Hodgkin lymphoma.
15     So what I am not doing in this case, I am not
16 performing a differential diagnosis with respect
17 to other potential confounding factors. That is
18 deferred to the hematologists and oncologists.
19 BY MR. KALAS:
20 Q. So let me make sure I understand that, and
21 then I want to come back to what you first said.
22     So you have not considered other confounding
23 factors for the purposes of your expert opinion as to
24 the cause of the Pilliods' NHL diagnoses, correct?
25 A. Yeah, I deferred that. Even though I have

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 78

1 listed some historical things in my report on Page 1
2 in terms of health factors, family history, and then
3 I think on Page 7 again, Alva, I have briefly
4 summarized health factors: family history, alcohol,
5 tobacco, employment history. Those are items that
6 are deferred to the oncologists in this case.
7 Environmental factors -- the only
8 environmental factor that I have looked at that I
9 think was more appropriate for the toxicologist is
10 this concern of defendants that the Lawrence
11 Livermore Laboratory Superfund site six miles away
12 could be a contributing factor. So I did look at
13 that.
14 I think that's really the only factor that
15 I've actually evaluated. I am not -- have not
16 evaluated the smoking history or Hepatitis A which
17 occurred in the 1970s. I'm deferring that to the
18 oncologists.
19 BY MR. KALAS:
20 Q. Okay. What other potential confounding
21 factors are you -- or let me put that in plain
22 English.
23 What other potential exposures or health
24 effects associated with NHL are you deferring to the
25 oncologists?

Page 79

1 A. Well, any possibilities.
2 Q. Okay.
3 A. The only one I'm commenting on is the
4 supposed exposure to the Superfund site.
5 Q. Okay. Now, you state that glyphosate was a
6 significant factor contributing to the development
7 and subsequent diagnosis of non-Hodgkin lymphoma in
8 Mr. and Mrs. Pilliod, right?
9 A. Yes.
10 Q. What does the word "significant" mean to you
11 as a toxicologist?
12 A. It means that there is human epidemiologic
13 data that is statistically significant at the
14 95 percent level of confidence and that, for example,
15 if this were an opinion regarding an animal
16 carcinogen or a possible carcinogen, I wouldn't -- I
17 wouldn't be using the word "significant." It would
18 be scientifically unfounded.
19 But with a carcinogen that is of probable
20 category and documented with sufficient human
21 epidemiologic evidence, the word "significant" is
22 scientifically appropriate.
23 Q. Okay. So I just want to make sure I
24 understand how you are not using that word, too. You
25 are not trying to apportion some percentage of the

Page 80

1 cause of the Pilliods' NHL to glyphosate when you use
2 the word "significant," right?
3 A. No. I'm deferring that to the
4 epidemiologist.
5 Q. Okay. So if you are deferring that to the
6 epidemiologist --
7 A. However --
8 Q. Okay. Sorry. I didn't know you weren't
9 done.
10 A. However, the dose -- and as I said at the top
11 paragraph of Page 117, stated exposure, dose, and
12 duration -- is what I specifically looked at. And
13 clearly the dose and duration that renders both Alva
14 and Alberta in the upper quartile of exposure is
15 significant.
16 Q. Okay. But you didn't compare that dose, for
17 instance, to those other factors that you deferred to
18 the oncologists. So you didn't compare to dose of
19 the glyphosate-based herbicides, to, for instance,
20 their exposure dose to benzines from solvents in
21 their garage or something like that?
22 A. No. But nonetheless, even if there were
23 hypothetically some benzine exposure, which there is
24 no evidence of, the -- hypothetically, even if there
25 were, there's still significant contribution from

Page 81

1 this exposure based on the exposure dose and
2 duration.
3 Q. Okay. So -- so when you're out in Oakland
4 and you're testifying in front of the jury, then
5 you'll explain that significant contribution is not
6 meant to apportion some percentage of the
7 quote/unquote, etiology of their NHL, but instead,
8 it's just meant to put forth that you believe they
9 were fit into the human epidemiology?
10 A. Certainly.
11 Q. Okay. So you mentioned that you're not
12 performing a differential diagnosis with respect to
13 other confounding factors, and I guess what do you
14 mean by the term "other confounding factors"?
15 A. Well, for example, if -- for example, if one
16 were to pose the question that isn't it true that
17 there is some study out there that shows that school
18 teachers have a higher incidence of NHL, I would
19 defer that to Dr. Weisenburger or the oncologist.
20 I have not been asked to include every aspect
21 of this case in my report. It would be overwhelming.
22 Q. So that -- and the oncologist is Dr. Nabhan,
23 right?
24 A. Yes.
25 Q. And have you spoken to Dr. Weisenburger or

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 82

1 Dr. Nabhan regarding this case, the Pilliod case?
2    A.   No.
3    Q.   So other confounding factors would include
4 personal health history, correct?
5    A.   Yes.
6    Q.   And other confounding factors would be
7 environmental exposures, correct?
8    A.   Yes.
9       MR. TRAVERS:  Objection.  Vague.
10      THE WITNESS:  Yes, however, I do -- again
11 state that that really falls into the realm of
12 the toxicologist with respect to a Superfund
13 site.
14      MR. KALAS:  Sure.
15      THE WITNESS:  It's something I've had many
16 years of experience with in the government with
17 21 Superfund sites near Syracuse, New York.
18 BY MR. KALAS:
19   Q.   Allied Signal.  We talked about that.
20   A.   Oh yes.
21   Q.   Yeah.
22   A.   I've done direct monitoring and health risk
23 assessments on them and so on.  And I think that I'd
24 be the best one to answer questions about the
25 Superfund site that I believe -- and I haven't read

Page 83

1 this, but I believe that defendants have interjected
2 into this case.
3    Q.   Okay.  So outside of the Superfunds --
4 outside of the Lawrence Livermore Superfund site, you
5 aren't opining on any other -- or you haven't
6 evaluated any other confounding factors as it relates
7 to environmental exposures?
8    A.   Correct.  Haven't found any.  There aren't
9 any.
10   Q.   And you haven't reviewed any other
11 confounding factors as it relates to occupational
12 risks.  So you mentioned school teachers or service
13 in the military or anything like that?
14   A.   No.  I'm not -- I am not addressing that.
15 It's beyond my time limitation.  As you know, this
16 report was submitted on the eleventh hour on January
17 14th.
18   Q.   It's a tight schedule.  I appreciate that.
19   A.   It was a huge struggle to get this out on
20 time.
21   Q.   And you are not considering the confounding
22 factor of age as well in your assessment, correct?
23   A.   I -- I believe I may have mentioned it in the
24 report, but I'm deferring that.  I'm not conducting
25 the differential diagnosis on the -- the age.

Page 84

1    Q.   Okay.
2    A.   Or -- I may have commented in the document
3 that studies were age adjusted and bracketed.  I may
4 have -- I don't know if it's in this report.  I know
5 I mentioned that in the Stevick report.  But I'm
6 not -- I'm not planning on providing a differential
7 diagnosis with respect to age.  I think that's best
8 handled by the oncologists.
9    Q.   Okay.  And you made --
10   A.   And Dr. Weisenburger as well and the
11 epidemiologists in terms of the design of the studies
12 that analyzed groups of individuals and age-matched
13 fashion.
14   Q.   That's the McDuffie study you are referring
15 to, right?
16   A.   Yes.
17   Q.   And -- and we'll get to the epidemiology in a
18 bit, but if I understand correctly, summing up sort
19 of this -- this last five to ten minutes of
20 questioning, you were deferring to the oncologists
21 and/or Dr. Weisenburger, the pathologist, for the
22 evaluation of confounding factors that could also be
23 related to NHL in the history of
24 Mr. and Mrs. Pilliod, save for their potential
25 exposures to risk factors from the Lawrence Livermore

Page 85

1 site, correct?
2    A.   Yes.
3    Q.   Okay.  Now, you mentioned that your
4 quantitative -- your specific causation opinion is
5 based on dose and duration, right?  You cited that
6 language to me on 117?
7    A.   Yes.
8    Q.   So what information do you need to glean from
9 the Pilliods to evaluate their dose and duration?
10   A.   Well, their multiple address locations and
11 historically the dates of those properties and the
12 dates in which they used Roundup on those properties;
13 quantity of Roundup used; and the percent of that
14 Roundup that was used by Mrs. versus Mr.; and the
15 application device used; the personal protective
16 equipment used; and the quantity of hectare applied
17 over a given amount of time; and the strength and
18 formulation of the Roundup used.
19       These are all multiple factors that go into
20 the calculation.
21   Q.   And these are all important to calculating
22 your dose using UK POEM model, correct?
23   A.   Yes.
24   Q.   And they're also important in evaluating
25 their exposure history generally in comparing them to

Page 86

1  applicators in the epidemiology studies, correct?
2      A.  That's right.
3      Q.  Is there any other information beyond what
4  you have listed there that you find important to
5  that -- to either of those things?
6      A.  Information in calculating the dose or
7  calculating the additional hazards based upon the
8  formulation?
9      Q.  No, information important to reaching your
10  specific causation opinions beyond what you listed
11  there.
12      A.  I think I said duration of spray time.
13  The -- really, the active substance concentration,
14  the milligram per mill.  I have already spoken about
15  the number of hectares applied given the duration of
16  time and also whether or not the individual performed
17  manual mixing or not.
18      I believe -- there could be other minor
19  things.  What comes to mind.
20      Q.  Okay.  Now, as far as the medical history of
21  the Pilliods, was everything you considered relevant
22  listed on Pages 1 through 9 of your report?
23      A.  Relevant to the dose calculation?
24      Q.  Relevant to your specific causation opinions,
25  sir.  And I should couch that so you make sure you

Page 87

1  are answering the right question.
2      Let me strike that previous question.
3      Was everything you considered relevant
4  specific to the Pilliods' medical history for your
5  specific causation opinion listed at Pages 1 through
6  9 of your report?
7      A.  Yes, but there was more that I relied on.
8  For example, my phone interview and --
9      Q.  But you wrote down what you found relevant
10  from the phone interview, right, as far as medical
11  history goes?
12      A.  Correct.
13      Q.  And you wrote that down in Pages 1 through 9
14  of your report, right?
15      A.  Yes.  I should point out what comes to mind
16  on Page 11.
17      I recently learned that Figure 1 on Page 11
18  is incorrect, that that is not the sprayer that was
19  used with Roundup in it.
20      Q.  Right.  This is -- this is a sprayer that
21  looks like what he used, but he no longer has the
22  sprayer that he used, correct?
23      A.  That's right.
24      Q.  Okay.  And so you have not examined the
25  sprayer that the Pilliods used because they no longer

Page 88

1  have it, correct?
2      A.  That's right.
3      Q.  So you won't be offering any opinions at
4  deposition -- or, excuse me, at trial that you have
5  observed any leakage in the sprayer that the Pilliods
6  used, correct?
7      A.  That's right, that I did not personally
8  observe such.
9      Q.  Now, did the Pilliods report in their medical
10  history cracked skin at any point?
11      A.  I don't believe there was any -- any
12  information on it either way.
13      Q.  Okay.
14      A.  It was simply never discussed.
15      Q.  And they didn't discuss that with you in your
16  phone calls with them either, right?
17      A.  No.
18      Q.  And they didn't discuss having damaged skin
19  in your phone calls with you or at deposition, right?
20      A.  No.
21      Q.  Mr. Pilliod did discuss at his deposition
22  that he has many instances of skin cancer, right?
23      A.  Yes.
24      Q.  And Mr. Pilliod was careful to wear clothing
25  so as not to expose his skin to the sun, right?

Page 89

1      A.  That's right.
2      Q.  And so when he wore -- when he applied
3  Roundup, he would wear long pants, right?
4      A.  Yes, as in Figure 1.  Long-sleeved shirt,
5  jeans.
6      Q.  So what he's wearing in Figure 1 is about
7  what he wore when he applied Roundup, correct?
8      A.  That's correct.
9      Q.  Except he does not have a wide-brimmed hat on
10  in Figure 1, right?
11      A.  Correct.  But I should point out, I
12  learned -- I think it was on Page 37 of his
13  deposition, he was asked:  Have you ever worn gloves?
14  Not do you routinely or whatever.  He said:  Have you
15  ever worn gloves while applying Roundup?  And he
16  answered yes.
17      Q.  So he wore gloves at times when he applied
18  Roundup, right?
19      A.  It could be times.  It could be once.  We
20  don't know.  But he did -- with respect to the
21  question "ever wear gloves," the answer is yes, he
22  did wear gloves at some point in time.
23      Q.  Okay.  And so when you stated in your report
24  that the Pilliods never wore gloves, Mr. Pilliod
25  reported at points wearing gloves?

Page 90

1    A.  Yeah, Page 37 Pilliod deposition.

2    Q.  Now, going back to this picture on Page 11,
3  in addition to the lack of gloves, Mr. Pilliod also
4  reported wearing a wide-brimmed hat when he applied
5  glyphosate, right?

6    A.  That's correct.

7    Q.  And he's not wearing a wide-brimmed hat in
8  this picture, right?

9    A.  Doesn't appear to.

10   Q.  Okay.  So if you were drawing a picture of
11 what Mr. Pilliod wore, we would add a hat here,
12 right?

13   A.  Yeah.

14   Q.  Did you ask Mr. Pilliod or Mrs. Pilliod when
15 you spoke to them on the phone how often Mr. Pilliod
16 wore gloves?

17   A.  No.  He simply stated he didn't wear gloves.

18   Q.  You didn't on your phone interview, but you
19 saw in his deposition that he stated he did
20 sometimes, right?

21   A.  I wouldn't say sometimes.  Let me -- maybe we
22 should go to the exact wording.  It was -- his answer
23 was "yes."  He gave no description of how often.

24      THE VIDEOGRAPHER:  John, I have about five
25 minutes left.

Page 91

1      MR. KALAS:  Okay.

2  BY MR. KALAS:

3    Q.  Your phone conversation with Mr. Pilliod was
4  after his deposition, right?

5    A.  Yes.

6    Q.  And you had reviewed his deposition prior to
7  that phone conversation, right?

8    A.  Yes.

9    Q.  So did you follow up in your phone
10 conversation and ask him:  How often did you wear the
11 gloves?

12   A.  No.  As I recall, I simply asked:  Did you
13 wear gloves when mixing or applying the Roundup?

14   Q.  Okay.

15   A.  And his answer was no.

16      Now, I do want to point out that I noted
17 during my interview his memory was -- and from a -- I
18 don't want to say a neurological perspective, but
19 just from an interview perspective, he was not as
20 sharp as his wife.  She seemed to have a much
21 clearer, sharp memory of details than Mr. Pilliod.
22 He was struggling a bit trying to remember things.

23   Q.  Okay.  Mr. Pilliod generally had a layer of
24 material between glyphosate and his skin, right?

25   A.  He has a lighter?  What.

Page 92

1    Q.  A layer of material, usually cotton, between
2  glyphosate and his skin, correct?

3      MR. TRAVERS:  Objection.  Vague.

4      THE WITNESS:  He wore the clothing, jeans and
5  cotton long-sleeved shirt, which has been heavily
6  assessed in the peer-reviewed studied
7  literatures.  And I can point you to the studies
8  that document the exposure contact rate and the
9  permeability through such fabrics at 22.9 percent
10 permeability.

11     Now, the model I use, the POEM model I used,
12 it's even a lower permeability which
13 underestimates the dose.  But if you want to do
14 that, I can show you those numbers.

15     But he wore clothing that is highly
16 consistent with that in POEM model as well as in
17 peer-reviewed studies that have been assessed.

18 BY MR. KALAS:

19   Q.  You are not going to tell the jury that his
20 cotton clothing offered no protection to glyphosate,
21 are you?

22   A.  Of course not.

23   Q.  It offered some protection?

24   A.  Yes, and I can even give them the permeation
25 percentage.

Page 93

1    Q.  Wearing clothing on his -- covering his skin
2  reduced his direct contact with glyphosate, true?

3    A.  Yeah.  It reduced it at approximately 20 --
4  well, 22.9 percent made it through the fabric.
5  However, the POEM model that I used underestimated
6  how much actually went through the fabric based on
7  that 22.9 percent value from a published experimental
8  peer-reviewed study.

9    Q.  So it's your opinion based on the published
10 peer-reviewed literature that cotton is 77 percent
11 effective -- or 77.1 percent effective in preventing
12 glyphosate permeation?

13     MR. TRAVERS:  Objection.  Form.

14     THE WITNESS:  That's what is generally
15 accepted.

16     Now, the POEM model used 18 percent
17 protection or 20 percent protection depending
18 whether looking at the trunk or the legs.  But
19 the peer-reviewed literature shows approximately
20 the same figure, a little bit better protection
21 according to the study at 22.9 percent, for an
22 individual wearing such clothes.

23     And it varied somewhat depending on how much
24 the person is sweating.

25 ///

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 94

1  BY MR. KALAS:
2      Q.   And when you say 22.9 percent, what that
3  means is 22.9 percent of the applied glyphosate was
4  able to permeate the cotton?
5      A.   Yeah.  Makes it to the skin.
6      MR. KALAS:  Let's go off the record and
7  change the tape.
8      THE VIDEOGRAPHER:  Going off the record at
9  10:16.
10      (Recess from 10:16 until 10:22 a m.)
11      THE VIDEOGRAPHER:  We're back on the record.
12  The time is 10:22.
13  BY MR. KALAS:
14      Q.   Doctor, I'm correct you have never met the
15  Pilliods in person?
16      A.   Correct.
17      Q.   You have not examined them?
18      A.   No.
19      Q.   And you have spoken to both
20  Mr. and Mrs. Pilliod on the phone, right?
21      A.   Yes.
22      Q.   And you spoke to them, I believe, on
23  January 8th and January 11th, correct?
24      A.   Yes.  And I had Jen call them again to verify
25  a property location after that, I believe on

Page 95

1  January 12th or 13th.  I was having difficulty with
2  Google Earth positively identifying one of the
3  properties.
4      Q.   Okay.  So you've spoken to them twice, and
5  Jen Clark has spoken to them once, correct?
6      A.   Yeah.  Well, Jen was on all the calls.  She
7  took everything down as we went through it.
8      Q.   But she did not speak on the those first two
9  calls, right?  It was you asking the questions?
10      A.   Yes.
11      Q.   So on the two calls you were on, was
12  Mr. Pilliod on both of those or just one?
13      A.   He was on the first call.  Now, the second,
14  call, I seem to recall he had to go in for a
15  procedure, a medical procedure, and that -- yeah, he
16  would not be available for our follow-up call.
17      Because I remember asking her, if we have to
18  follow up with anything else, and she warned me, said
19  that it would be hard to catch her, that she had to
20  take him into some clinic and after that he probably
21  would be in bed.
22      And I don't know exactly what the procedure
23  was, but I think he was only on the first call.
24      Q.   Was it related to his cancer?
25      A.   Yes.

Page 96

1      Q.   Which?  His NHL or his skin cancer?
2      A.   NHL.
3      Q.   Okay.  How about Mrs. Pilliod?  She was on
4  both calls?
5      A.   Yeah, three calls.  Three calls.  Two calls,
6  and then, as I said, the third call was somewhere
7  around the 12th or 13th.
8      Q.   And the third call you weren't on?
9      A.   Correct.
10      Q.   So I'm just asking about what you have
11  personal knowledge of.
12      So personally you were on two calls with
13  Mrs. Pilliod, one on January 8th and one on
14  January 11th, right?
15      A.   Yes.
16      Q.   And personally you were on one call with
17  Mr. Pilliod on January 8th, right?
18      A.   Yes.
19      Q.   Anybody else on those calls?
20      A.   That's a good question.
21      Q.   Beyond Jen Clark?
22      A.   No, I'm just trying to remember if any
23  attorneys were on the line.  I don't -- I don't think
24  so.
25      MR. TRAVERS:  Just state for the record, I

Page 97

1  believe I was on the first call.
2      THE WITNESS:  Were you?  Okay.
3      And I don't remember him saying anything.
4      MR. KALAS:  I don't want to know what
5  Mr. Travers said or what you asked Mr. Travers.
6      THE WITNESS:  I don't think he said anything,
7  actually.  That's why it was hard to remember if
8  he was on the call.
9  BY MR. KALAS:
10      Q.   How long did each of these calls go?
11      A.   The first call, I'm thinking 30 minutes.
12  Most of the information that they provided was what I
13  already had in draft form from the depositions and
14  the medical records.  There wasn't really much new at
15  all.
16      Q.   Okay.  And how long was the second call?
17      A.   Perhaps 5 minutes.  It was -- it was
18  discussing the properties, trying to identify the one
19  property that Google Earth did not positively
20  identify and did not seem to match the description
21  they provided.
22      Q.   Okay.
23      A.   Which turned out to be the case; that Google
24  Earth label was incorrect.
25      Q.   Understood.

Page 98

1   Who took the notes on these calls?
2   A.   Jen.   She just typed down things that were
3   new and relevant.
4   Q.   And those were incorporated into your report?
5   A.   Yes.
6   Q.   And what questions did you ask on the
7   January 8th call?
8   A.   At this point, it's hard to say, because I've
9   integrated new information with what I already had
10   from the depositions and some information that was in
11   the medical records.   What I -- and what I did was
12   basically went through all that information and asked
13   questions from it.   And then -- yeah, I mean, I just
14   don't remember all the questions I asked.
15   Q.   And you don't have a record of the questions
16   you wrote out ahead of the call or anything like
17   that?
18   A.   No, because that's not how we did it.   I
19   already had prepared the exposure section from the
20   depositions as well as the medical records, and I --
21   as I went through that, I had just highlighted things
22   that I wanted to ask and ask perhaps in more details.
23   Q.   Now, in the past, you've utilized -- and by
24   "in the past," I mean in previous litigations you
25   have worked on -- you've utilized a standard

Page 99

1   questionnaire for plaintiffs in those cases.
2   Do you have the standard questionnaire for
3   these cases?
4   A.   No.   And the problem with that is these cases
5   differ tremendously, you know, in terms of whether a
6   person was using a double-boom tractor sprayer,
7   John Deere, versus whether a person is using a
8   self-prepacked package sprayer versus a backpack.
9   There's a lot of possibilities and variabilities.
10   And so what I found works best is to, first,
11   rather than spending a half day writing questions and
12   hours and hours on the telephone, was to extract all
13   the possible information that's in the deposition and
14   medical records and summarize that.
15   And then, from that, use that as a template
16   to expand on areas that are either unclear or -- or
17   absent.   And that's what I did in this case.
18   Q.   Okay.   So sitting here right now, you don't
19   recall any specific questions you asked of the
20   Pilliods on January 8th call?
21   A.   Well, no, I did.   I remember I -- I learned
22   things as we went.
23   For example, there was a property that had no
24   structure on it, and I asked, well, how did you
25   dilute your sprayer?   And the answer was that, oh, we

Page 100

1   took some gallon bottles of water with us.
2   And, you know, things -- as I spoke to them
3   in more detail, I learned more and more, and that
4   triggered more questions.
5   Q.   Now, beyond how did you dilute your sprayer,
6   was there any other information you asked about of
7   the Pilliods that you believed was not specific --
8   sufficiently covered in the deposition?
9   A.   Oh, absolutely.   An important area was I had
10   for each property an aerial view on Google Earth, and
11   I could either zoom out or zoom in with a computer
12   using my Google Earth account.   And I asked specific
13   questions about where they sprayed and where they
14   didn't spray.
15   And that was critical in determining, for
16   example, on the property at ███████ where
17   spraying occurred and didn't occur so I could
18   calculate the number of hectares covered.
19   Q.   So, for instance, on ███ Street, you stated
20   on Page 4 of your report that they sprayed over the
21   entire property once a month, right?
22   A.   Yeah.   But I -- I did ask more detail about
23   that.
24   Q.   Okay.   So what detail did you learn about
25   spraying on that property?

Page 101

1   A.   That it was necessary to -- I think the word
2   she used was spot spray.   In other words, the entire
3   surface was not covered in weeds.   There were areas
4   of basically soil -- exposed soil versus areas of
5   weeds.
6   And so it was a selective spraying.
7   Q.   So they did spot spraying on ███ Street,
8   not bush hogging as used in other cases?
9   A.   Correct.
10   Q.   And likewise on ███████, that was spot
11   spraying as well, right?
12   A.   Yes.
13   Q.   And likewise on ██████ that was spot spraying
14   as well?
15   A.   Yes.
16   Q.   And ████ is where they did the majority of
17   their spraying, right?
18   A.   Yes.
19   Q.   About 70 percent of the gallons they sprayed
20   they estimated was sprayed at █████ correct?
21   A.   And that was in part due to the long duration
22   of time.
23   Q.   Sure.
24   And as far as ██████ goes, they owned the
25   property for four years, right?

Page 102

1    A.  Right.
2    Q.  And at that property they sprayed
3  approximately a one-acre portion of it, right, at the
4  top of the ridge?
5    A.  Well, I'm showing .34 hectares.
6    Q.  Okay.  And what is .34 hectares?
7    A.  I'm sorry.  I'm wrong.  .14 hectares.
8    Q.  And how many acres is .14 hectares?
9    A.  I would have to get my conversion sheet out.
10  I don't remember.
11   Q.  Okay.  We'll come back to that.
12   A.  But the difference was with ███,
13  ███ was very overgrown when they purchased the
14  property and had a greater extent of contact with the
15  spray material due to the height of the weeds.
16       Her husband cut these weeds down to a lower
17  height manually, but as she explained, when she
18  walked through, she was in contact with the treated
19  growth.  So that property was a little different in
20  that it was in terrible condition when they received
21  it, and it took them some time to get it under
22  control.
23   Q.  Now, you reviewed some pictures the Pilliods
24  produced in this case, right?
25   A.  Yes.

Page 103

1    Q.  And you saw the picture of Mr. Pilliod riding
2  the weed eater lawnmower, right?
3    A.  Yes.
4    Q.  And that weed eater lawnmower cut the weeds
5  down to approximately a height of two inches or so,
6  correct?
7    A.  Not at first.  What she explained was at
8  first he actually had to cut with a saw and other
9  equipment because it was beyond what that machine
10  could handle.  So he did a lot of this manual stuff
11  first.
12   Q.  So initially, in 2001, it was necessary to
13  cut with the saw and other equipment, right?
14   A.  Yeah.
15   Q.  And after the property started having
16  maintenance by the Pilliods on it, it was no longer
17  necessary to use the saw and other equipment and they
18  could use the weed eater, right?
19   A.  Yeah, I think that is pretty accurate.
20   Q.  And when they used the weed eater, the brush
21  was not high enough to get this sort of incidental
22  exposure from walking through the weeds, right?
23   A.  That's right.  And let me just qualify that.
24  I didn't include that incidental exposure in the
25  calculations.

Page 104

1    Q.  And when you talk to the jury about the
2  incidental exposure, if you do, you are going to
3  mention to them that it probably only happened in
4  2001, right?
5    A.  Right.
6    Q.  Now, did you visit -- strike that.
7       Did you -- strike that.
8       You've reviewed some of the spraying
9  equipment that the Pilliods took pictures of -- let
10  me ask that better.  Strike that.
11       You have reviewed pictures of some of the
12  spraying equipment that the Pilliods had in their
13  shed at the ███ Road property, correct?
14   A.  Yes, except the actual pump sprayer,
15  pressurized sprayer, I don't believe was included in
16  that picture.
17   Q.  Right.  And they used that pump sprayer
18  approximately 15 percent of the time, right?
19   A.  Yes.
20   Q.  Okay.  85 percent of the time, they used
21  premixed glyphosate, usually Roundup ready to use
22  weed and grass killer with an active ingredient
23  level, I think you stated in your report, of
24  2 percent?
25   A.  That's right; 2 percent.

Page 105

1    Q.  So in addition to the Roundup bottles that
2  the Pilliods produced pictures of to you, did you ask
3  for pictures or videotapes of any other chemicals on
4  the ███ road premises that the Pilliods might have
5  been exposed to?
6    A.  I didn't.  When I took on this work on
7  January 4th, I believe I discussed with counsel that
8  I would limit my work to dose calculation and general
9  causation, that I would not have sufficient time to
10  adequately perform differential diagnosis from such.
11       So, no, I didn't, for that reason, because
12  there -- again, there just wouldn't have been time to
13  work that up.
14   Q.  You agree that some expert for plaintiffs
15  should consider other household exposures that might
16  be associated with NHL in reaching their specific
17  causation opinions, right?
18       MR. TRAVERS:  Objection.  Form.
19       THE WITNESS:  My understanding, that is being
20    done, that the differential diagnosis is being
21    performed based on information in the deposition
22    and medical records and so on.
23  BY MR. KALAS:
24   Q.  Okay.  But my question is somebody should
25  address that issue?

Page 106

1    A.  Well, I think it is being issued --
2  addressed.
3    Q.  And the reason somebody should address that
4  issue is because there is certain household exposures
5  beyond Roundup that have been associated with NHL,
6  right?
7    MR. TRAVERS:  Objection.  Vague.
8    THE WITNESS:  That's possible.
9  BY MR. KALAS:
10    Q.  Okay.  And, for instance, we have talked in
11  previous depositions about other pesticides that
12  people might be exposed to that have been associated
13  with NHL, right?
14    A.  Yes.
15    Q.  And we've talked in previous depositions
16  about certain solvents and paint thinners that have
17  compounds in them that have been associated with NHL,
18  right?
19    MR. TRAVERS:  Objection.  Vague.
20    THE WITNESS:  Yes, but as per my response in
21  the Daubert motion in Stevick, that's utter
22  nonsense in terms of WD-40 at .01 percent benzine
23  content in a sealed can sitting in a garage and a
24  woman walking past it.  Some of those things are
25  clearly designed to be nothing more than

Page 107

1  inflammatory and confusing when, in fact, there
2  is no substance to the possibility.
3    So, you know, if somebody -- someone used
4  Dieldrin and DDT indoors in their home, yes, that
5  could be a real problem.  But having a can of
6  WD-40 in the garage is inconsequential.
7  BY MR. KALAS:
8    Q.  It's true that there are certain solvents
9  that are found in garages all over this country that
10  are associated with NHL, right?
11    MR. TRAVERS:  Objection.  Vague.
12    THE WITNESS:  Not commonly.  I'm thinking my
13  own workshop -- I have a very extensive workshop.
14  I can't think of any NHL carcinogens in there
15  other than Roundup.
16  BY MR. KALAS:
17    Q.  How about Liquid Wrench?  Has Liquid Wrench
18  had hematologic cancer cases brought against the
19  manufacturers of that product?
20    A.  I worked on a defense case, actually, for a
21  manufacturer out of Jacksonville, Florida, who
22  supplied the light Naphtha for some of those
23  products, the benzine content, as I recall, post
24  benzine formulation in the 1980s was less than either
25  .1 or .01 percent.

Page 108

1    Q.  How about before?
2    A.  No, not -- no, I have that wrong.  Less than
3  .1 or .01 PPM, which is the part per billion range.
4  It is just nonsense.  There's no significant benzine
5  in those products.
6    Q.  Benzine is an impurity in Liquid Wrench,
7  right?
8    A.  Yeah.  But for the past 35 years, it's been
9  removed.
10    Q.  And benzine is an impurity in WD-40 or has
11  been?
12    A.  Not to a level of any significance in the
13  past 35 years.
14    Q.  Right.  Because a level of .01 PPM is not
15  significant in your view?
16    A.  Of course not.  How could .01 PPM inside a
17  can produce an air level that would produce a 1 or 2
18  part per million chronically for 10 or 20 years to be
19  consistent with the benzine causation studies.
20    Q.  Dose of impurities matters to you?
21    A.  Absolutely.
22    Q.  Okay.  So when the Pilliods applied at the
23  ████ Road property, they applied for about an hour
24  at a time, right?
25    A.  At which property?  I'm sorry.

Page 109

1    Q.  The ████ Road property?
2    A.  Yes.  That's right.
3    Q.  And at all their properties, they stated that
4  they used -- or let me break it down.
5    Let's go to Table 1 -- or I think it's
6  Table 1, but let's be sure here.
7    Let's go to Table 3 in your report.
8    A.  Page number?
9    Q.  Page 12.
10    A.  Okay.
11    Q.  At all of their properties, they reported
12  applying for nine months of the year, right?
13    A.  Yes.
14    Q.  And so during these nine months of the year,
15  the majority of the spraying was done by Alva
16  Pilliod, right?
17    A.  Correct.
18    Q.  About 75 percent of the spraying?
19    A.  Yes.
20    Q.  And the majority of the sprayed product, I
21  think we established, was a premixed product, right?
22    A.  Yes.
23    Q.  And that means there was no mixing or loading
24  going on on the part of the Pilliods, right?
25    A.  Yes.

Page 110

1  Q.  And when there was mixing or loading,
2  Mr. Pilliod did that, right?
3  A.  Yes.
4  Q.  Now, I'm correct Mr. Pilliod did not report
5  any leakage of his sprayer when spraying, right?
6  MR. TRAVERS:  Object to the form.
7  THE WITNESS:  I need to check that.  I don't
8  know.
9  BY MR. KALAS:
10  Q.  Sure.  Check it.
11  A.  Interesting.  On Page 9, Paragraph 2.
12  Q.  Okay.
13  A.  Line 3.  Occasionally he wore gloves.  So I
14  did catch that in the original deposition.
15  Q.  Okay.  Great.
16  So we agree that Mr. Pilliod sometimes wore
17  gloves, right?
18  A.  Yeah.
19  Q.  So did Mr. Pilliod report any leakage of his
20  sprayer when spraying?
21  A.  Paragraph 2 on Page 9, last two sentences
22  does indicate direct contact with, quote, maybe half
23  a cup, unquote, of Roundup, but it's unclear whether
24  any of that at all was due to leakage.  From my
25  understanding, it was spilling.

Page 111

1  Q.  Right.  And the sentence before that says it
2  happened when he was mixing?
3  A.  Right.  Right.  So I -- I don't -- I don't
4  know of any testimony, and I think if I did ask him if
5  there was leakage.  And certainly if there had been,
6  I would have noted that.  I don't believe so.
7  Q.  Okay.  And likewise, for Mrs. Pilliod, she
8  did not report any leakage of her sprayer when
9  spraying, correct?
10  A.  I seem to recall her stating her hand would
11  get wet after awhile.  Let me see what I can find on
12  that.
13  Q.  Okay.  And that's on Page 5, bottom
14  paragraph, I think you're referring to.
15  Third line of that bottom paragraph where
16  she -- it states she estimates that approximately 20
17  times she got the spray on her hands due to
18  carelessness, wind, and/or mist?
19  A.  Right.  That's it.  Yeah.  Yeah.
20  Q.  But she did not report any leakage from her
21  sprayer, correct?
22  A.  No.
23  Q.  Okay.  So neither of the Pilliods reported
24  leakage from their sprayers over the course of their
25  use of Roundup?

Page 112

1  A.  I believe that's true.
2  Q.  And they didn't tell you anything different
3  in your phone conversations with them, right?
4  A.  No.
5  Q.  Now, Mr. Pilliod, going back to Page 9, did
6  report some spillage when mixing, right?
7  A.  Yes.
8  Q.  Now, on average, Mr. Pilliod and Mrs. Pilliod
9  might apply glyphosate 40 times a year according to
10  their testimony, right?
11  A.  I'm looking at Page 22 --
12  Q.  Okay.
13  A.  -- the table.  It's a bit of a complex
14  question because of the --
15  Q.  Right, and I know it's a complicated usage
16  history.
17  A.  It depends on the vintage.
18  Q.  So let's take the period from 1982 until
19  2000, okay?  From 1982 until 2000, the Pilliods would
20  be exposed to glyphosate 36 times a year, right?
21  A.  Yes.
22  Q.  And then during the period of 2001 to 2004,
23  they owned the ▇▇▇ property and the ▇▇▇
24  property, right?
25  A.  Right.

Page 113

1  Q.  And during that time period, they might be
2  exposed 108 times per year, correct?
3  A.  How many times a year?
4  Q.  108, sir.
5  In other words, they testified they applied
6  Roundup every third day.
7  I'm adding 72 plus 36 there.
8  Q.  During what year are you specifically --
9  Q.  So for 2001 to 2004, they testified that they
10  would have applied Roundup 108 days per year, 36 days
11  at ▇▇▇ 72 days at ▇▇▇
12  A.  Yeah.  It's just -- I'm troubled by this
13  typo, I think.
14  Q.  Where you wrote 1982 until 2000?
15  A.  Yeah.
16  Q.  In the left column you have 1982 to 2012,
17  right?
18  A.  Yeah.
19  Q.  And elsewhere in your report you have 2012,
20  right?
21  A.  Yeah.  It's a typo.
22  Yeah.  Okay.
23  Q.  All right.  And then for the period 2004 to
24  2007, again, it would be 72 days per year.  That's
25  ▇▇▇ plus ▇▇▇, right?

Page 114

1    A.   Yeah.
2    Q.   And then for 2008 to '10, they have ████,
3    ████████ and ███ so that would be, again, 108
4    days per year, right?
5    A.   Right.
6    Q.   And then 2011, it would be, again, 72 days
7    per year, right?
8    A.   Yeah.
9    Q.   And then in 2012 we're back to 36 days per
10   year, right?
11   A.   In 20 --
12   Q.   '12.
13   A.   -- 11?  Or '12?
14   Q.   '12.  Just ████
15   A.   In 2012, 36.
16   Q.   If we averaged all those days per year used,
17   divided it by the number of the years, we would come
18   up with a number somewhere between 40 and 50 days per
19   year, right?
20   A.   Well, I would have to do the math, but it
21   sounds about right.
22   Q.   And so what that means is if they were
23   applying Roundup 15 percent of the time and -- or,
24   excuse me -- applying super concentrate 15 percent of
25   the time, it would mean that Mr. Pilliod would mix

Page 115

1    that super concentrate someplace around seven to
2    eight times per year, right?  Because 15 percent of
3    50 is 7.5?
4    A.   Okay.
5    Q.   Do you agree with that?
6    A.   It looks -- it looks correct, yeah.
7    Q.   Now, when he reports his spillage on Page 9,
8    did he report to you in your interview or in his
9    deposition whether the spillage would happen before
10   or after the super concentrate was mixed together?
11   A.   My understanding, it was the concentrate.
12   Q.   And where did you get that understanding
13   from?
14   A.   In speaking to him, that he would -- he
15   described the device he mixed it in, and I can't
16   remember what it was.  When I say "mixed it in," what
17   he poured it into to measure it.
18   Q.   He produced some pictures of a bottle of
19   super concentrate with the cap on.
20   A.   The cap.  Yeah, it might have been that red
21   cap.  I would have to look at the pictures to review.
22   Q.   So you believe the spillage occurred before?
23   A.   That's what he explained, yeah.  Once he put
24   it -- because once he put it in there, it was mixed
25   in that container that he used.

Page 116

1    Q.   Okay.
2    A.   In other words, he didn't have a separate
3    intermediary container.
4    Q.   Now, he -- you state in your report that this
5    spillage happened every two weeks, right?
6    A.   That's what he said, yeah.
7    Q.   Now, if he was only mixing seven to eight
8    times per year, how would it happen every two weeks?
9         MR. TRAVERS:  Objection.  Form.
10        THE WITNESS:  Mathematically, that couldn't
11   be.
12        MR. KALAS:  Okay.
13        THE WITNESS:  But, again, this is not a
14   matter for me to second-guess.  It's simply what
15   the facts in the case as presented to me are,
16   that he -- but, again, in my calculations, I
17   didn't include spillage.
18   BY MR. KALAS:
19   Q.   In your POEM model, you did include exposure
20   mixing/loading, right?
21   A.   Yeah, but not spillage.
22   Q.   But the exposure --
23   A.   I added nothing extra for spillage.
24   Q.   I understand that, sir, but the POEM model,
25   the way it's derived, the mixing/loading exposure

Page 117

1    does include incidental spillage, correct?
2    A.   Yes, but I do have to point out that he
3    referred to -- without looking at my deposition, I
4    think he said about a half a cup.  That's -- that's a
5    very substantial amount of spillage.  The POEM model
6    doesn't generally include, you know, 4 ounces of
7    spillage every two weeks.  That's --
8    Q.   Well, the cap -- the instructions for mixing
9    super concentrate call for mixing 2.5 ounces, right?
10   A.   That's right.
11   Q.   So half a cup of would be 2.5 ounces would be
12   1.25 ounces, not 4 ounces, correct?
13        MR. TRAVERS:  Objection.  Form.
14        THE WITNESS:  Well, he said half a cup, I
15   thought he said.
16   BY MR. KALAS:
17   Q.   Well, my question, is, sir, is do you
18   believe Mr. -- let me ask a foundational question.
19        Do you believe Mr. Pilliod followed the label
20   instructions for mixing and loading Roundup super
21   concentrate?
22   A.   He said he did.
23   Q.   Okay.
24   A.   But like I said, I did not include any extra
25   exposure for these excessive spills.  Obviously,

Page 118

1 spilling that much every two weeks is -- is
2 noteworthy but not included in my calculations.
3       So I -- so let's assume hypothetically that
4 he's incorrect about the amount he spilled and how
5 often. It doesn't affect my work at all.
6    Q. Okay. But just so I understand what you
7 asked him about, you did not ask him whether he meant
8 half a cup of the 2.5 ounces on the label
9 instructions for super concentrate or half a cup as
10 far as an 8-ounce cup. You didn't follow up on that
11 issue, correct?
12       MR. TRAVERS: Objection. Vague. Objection.
13    Form.
14       THE WITNESS: No. I just took down the
15    information as given.
16       MR. KALAS: Okay.
17       THE WITNESS: Now, what I should do is look
18    to see if that was from the deposition or my
19    interview, the half a cup quantity, that is.
20       Let me look.
21 BY MR. KALAS:
22    Q. Were you done for your answer there? I'm
23 sorry.
24    A. No. I'm just looking to see if the half a
25 cup quantity was from my interview or the deposition.

Page 119

1    Q. Oh, okay. I understand.
2    A. I believe -- because I have maybe half a cup
3 in quotes, I believe that's out of his deposition,
4 but I would have to check the deposition.
5    Q. Okay. But -- but in your personal interview,
6 just so the record is clear, you did not follow-up on
7 whether he meant half a cup of the 2.5 ounces for
8 premix or half a cup as far as an 8-ounce cup, right?
9    A. I did not. I just found it to be evident of
10 spillage.
11    Q. Okay.
12    A. And I at that point knew that I was not going
13 to try to quantitate that amount of spillage to a
14 dose because it would just be too unreliable.
15    Q. Okay. And likewise when you saw that he
16 characterized that spillage as happening every two
17 weeks, you did not follow-up with him to find out how
18 he could spill every two weeks if he was not mixing
19 or loading every two weeks under his reported use
20 history?
21       MR. TRAVERS: Objection.
22 BY MR. KALAS:
23    Q. Right?
24    A. At that stage, I couldn't make that
25 connection.

Page 120

1    Q. Okay.
2    A. I did not have enough quantitative data to
3 chart out, as I did in Page 22, with days per year.
4 It would have been premature. I just didn't have
5 enough information to -- to realize that yet.
6    Q. Sure. And I'm not casting any aspersions.
7 I'm just trying to get the facts here.
8       So based on his reported use history, you
9 won't tell the jury that you've concluded that he
10 spilled on his hands -- or spilled on his legs, feet,
11 and arms every two weeks, correct?
12    A. No, no. My intent is just to report that he
13 did encounter spillage, but I'm not going to --
14 nowhere in my report have I attempted to quantitate
15 that spillage.
16    Q. I understand.
17       Now, he reports spillage on his legs, feet,
18 and arms in that mixing process, however often it
19 happened, right?
20    A. He did.
21    Q. And his legs, feet, and arms were all covered
22 with cotton, right?
23    A. Right.
24    Q. And that cotton would have protected at a
25 level of 77.1 percent, correct?

Page 121

1    A. Yes.
2    Q. Okay. Now --
3    A. Although -- although it would lower the
4 milliliter/hour off scale if I included that in the
5 dosage. I mean, remember, the milliliter of contact
6 to the skin per hour is a very low number.
7    Q. Right. According to the Johnson study, it's
8 less than 1 milliliter per hour, right?
9    A. That's right.
10    Q. Now, the devices that the Pilliods used to
11 apply Roundup that you were able to see, so the
12 premix bottles and the mix -- or the pump sprayer on
13 Page 11 that is similar to what they put the Roundup
14 super concentrate in, all those devices would put out
15 a fairly concentrated stream of glyphosate on the
16 target weed, right?
17       MR. TRAVERS: Objection. Form.
18       THE WITNESS: Well, I had no opportunity to
19    use the pump sprayer, so I don't know what kind
20    of nozzle was on there.
21       Now, I am familiar with the commercially
22    produced 1 gallon -- or it might be 1.1 gallon, I
23    forget -- prepackaged hand/thumb sprayer. That's
24    an interesting device because it puts out an
25    aerosol without a sufficient wand length.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 122

1 For example, most backpack sprayers have a
2 22-inch wand, and you are able to direct that
3 down near the ground away from the body. But
4 with the handheld commercially available package,
5 the spray is coming out not far from the hand and
6 it has that propensity to drift onto the body.
7 BY MR. KALAS:
8 Q. Am I correct that when you use that
9 commercially available sprayer, the spray comes out
10 in a stream?
11 A. An aerosol stream. Not a direct solid
12 stream, no. It's an aerosol stream.
13 Q. Can you explain -- well, strike that.
14 Now, I'm correct the Pilliods reported they
15 did not spray on windy days, right?
16 MR. TRAVERS: Object to the form.
17 THE WITNESS: Well, we have dual testimony.
18 She stated that there were times where the wind
19 would come up. She tried to plan to spray on
20 non-windy days, but occasionally the wind would
21 come up and cause drift to impact her.
22 BY MR. KALAS:
23 Q. Okay. If you turn to Page 5 of your report,
24 you state in the second sentence of that first full
25 paragraph: She tried to avoid spraying on real windy

Page 123

1 days or when it was wet or rainy outside.
2 Did I read that correctly?
3 A. That's correct. She tried to avoid but was
4 not 100 percent successful because the wind
5 occasionally came up while they were working.
6 Q. And she -- in the next sentence, she
7 states -- or you state: While she believes the
8 package label specified that the product shouldn't be
9 used on windy days, to her, it was just common sense.
10 Did I read that correctly?
11 A. Yes.
12 Q. Do you agree it's common sense not to apply
13 Roundup on windy days?
14 A. Well, I do, because I know it's a carcinogen.
15 Now, to a person who believed it was
16 harmless, you know, it doesn't really have a -- a
17 terribly -- it doesn't stain in the clothing or have a
18 terribly offensive odor. So if it had the toxicity
19 of water, why not.
20 Q. What would happen to my nontarget plants if I
21 sprayed it on a windy day?
22 A. You would just use more -- take more material
23 to do the same amount of work.
24 Q. No, sir. What would happen to my nontarget
25 plants, the plants I wanted to live, if I sprayed on

Page 124

1 a windy day?
2 MR. TRAVERS: Objection. Vague.
3 THE WITNESS: Well, for three of her
4 properties, there were no nontarget plants.
5 BY MR. KALAS:
6 Q. Well, I'm just asking generically. If I'm
7 out there and I'm spraying in a flower bed around
8 some roses and I spray on a windy day, what could
9 happen to my roses?
10 MR. TRAVERS: Objection. Vague.
11 THE WITNESS: Certainly, depending on the
12 type of plant -- I can't speak on behalf of the
13 rose; I'm not a plant scientist -- but I know
14 that there are plants that are highly
15 susceptible; other plants, especially trees, that
16 are less susceptible.
17 BY MR. KALAS:
18 Q. Glyphosate is a broad spectrum herbicide,
19 correct?
20 A. Yes.
21 Q. And what broad spectrum means is it kills
22 most plants?
23 A. Well, if it's on the leaf, but if the trunk
24 of the tree is sprayed, for example, it won't hurt
25 it.

Page 125

1 Q. But if I spray on a windy day, I might kill
2 plants I don't mean to kill, right?
3 MR. TRAVERS: Objection. Vague. Asked and
4 answered.
5 THE WITNESS: If there were such plants.
6 BY MR. KALAS:
7 Q. Okay. And you would agree that someone who
8 is not even knowledgeable about the toxicological
9 issues you've raised about glyphosate still might not
10 spray on a windy day because of common sense?
11 A. Right. But three out of her four properties
12 were -- didn't have active gardens. Now, her
13 property that she lived at 30 years does have
14 specific grass growing that's intentional, specific
15 flowers and other vegetation that she certainly would
16 not want to over spray.
17 Q. Now, you would agree with me that
18 Mrs. Pilliod's testimony was that the Pilliods tried
19 to avoid spraying on real windy days, right?
20 A. Right. She tried, yes.
21 Q. And you agree with me that it's
22 Mrs. Pilliod's testimony that the Pilliods tried to
23 avoid spraying when it was wet or rainy outside,
24 right?
25 A. Correct. Correct. But as we know, there

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 126

1 were times where it would blow back onto her hand and
2 onto her body.
3 Q. How do we know that, sir?
4 A. It's in her testimony.
5 Q. She said that she got glyphosate on her hands
6 approximately 20 times due to carelessness, wind,
7 and/or mist?
8 A. There you go.
9 Q. Okay. So how many -- what portion of that
10 was due to wind and/or mist and which portion was due
11 to carelessness?
12 A. 39.356 percent -- I don't know. What kind of
13 question is that?
14 Q. And she says that that happened 20 times,
15 right?
16 A. Right.
17 Q. And she applied Roundup for 30 years, right?
18 A. Yes.
19 Q. So less than one time per year, she got
20 Roundup on her hands, right?
21 MR. TRAVERS: Objection. Form.
22 THE WITNESS: No, that's not true. Every
23 time she used it, she received a -- an amount of
24 Roundup on her hand, as per the peer-reviewed
25 generally accepted studies that actually assessed

Page 127

1 exposure by individuals wearing neoprene gloves
2 with cotton gauze on their gloves and measuring
3 on the average how many mills per hour impacted
4 those portions.
5 So to say no is incorrect.
6 Now, if you were to ask me that same question
7 and say -- and say that, due to carelessness,
8 wind, or mist received an amount that she was
9 aware of as being wet, I would say you're right.
10 BY MR. KALAS:
11 Q. All right. So let me ask it this way:
12 According to Mrs. Pilliod, she got Roundup spray on
13 her hands less than one time per year from her
14 Roundup use, according to her own testimony, true?
15 MR. TRAVERS: Objection. Asked and answered.
16 THE WITNESS: Yes, that she was aware of
17 because it was visible or wet.
18 BY MR. KALAS:
19 Q. Okay.
20 A. But the insidious part is that users of
21 Roundup accumulate aerosol droplets on their skin
22 that they are not aware of. And if you do laboratory
23 testing by putting gauze patches on the various parts
24 of the body and then send the applicator out and then
25 take those gauze patches to the lab, they give

Page 128

1 reliable estimates of how much what we call dermal
2 exposure occurs.
3 Now, that's not the amount that makes it
4 through the clothing and into the blood, but it is a
5 measure of how much impacts the surfaces of the body,
6 whether it be the trunk or the lower legs, hands, and
7 so on.
8 And that's -- and the Monsanto documents. I
9 have Monsanto documents with me that show that as
10 well.
11 Q. Okay.
12 A. As the published studies do too.
13 Q. So -- so I'm also correct that those
14 published studies on passive dose imagery, on
15 biomonitoring, were not able to detect Roundup
16 residues in many of the test subjects, right?
17 A. In the biomonitoring studies, but there are
18 several reasons why those studies are unreliable.
19 Q. What does it mean to be below the limit of
20 detection in a biomonitoring study?
21 A. Well, for example, in a Monsanto study, for
22 example, with the detection limit of .07 PPM with
23 measurements up to 800 times higher than that, it
24 gives a range of from the highest recorded value to
25 the limit of detection at which the laboratory

Page 129

1 instruments simply can't see anything below.
2 Q. So if I understand correctly, what limited
3 detection means in a biomonitoring study is that
4 there is a lower threshold below which the laboratory
5 instruments cannot detect the test compound?
6 A. Yes. And I could state that as being a
7 licensed laboratory director for many years. It's
8 not an undetected -- it's not a nonpresent amount.
9 It means simply that that is the cutoff point where
10 the instrument can no longer determine whether the
11 compound is there or not.
12 Q. I understand.
13 So -- so what a limit -- so what it means
14 when you have a test subject below the limit of
15 detection in a biomonitoring study is that the level
16 of the test compound in the fluid you're evaluating
17 is either below that -- below the limit of detection
18 but greater than zero, or perhaps zero?
19 A. Yeah. It could be anywhere between zero and
20 up to that limit of detection.
21 Q. Okay. And there are many test subjects in
22 the glyphosate biomonitoring below the limit of
23 detection, right?
24 A. That's right.
25 MR. TRAVERS: Objection. Vague.

Page 130

1  BY MR. KALAS:
2      Q.  Now, we talked about -- or Mr. Derringer
3  talked about this with you, the Stevick case some,
4  but when you are applying Roundup in a spot spray
5  manner on a property, you are not holding your
6  trigger on the wand the entire time you're spraying,
7  right?
8      A.  Of course not.
9      Q.  And the Pilliods, like Mrs. Stevick, were not
10  holding their finger on the trigger the entire time
11  they were spraying, at least at ████, ████, and
12  ████████, correct?
13      A.  Yeah.  And that's standard practice for any
14  backpack or hand-held aerosol sprayer.  It's very
15  different than a tractor-mount sprayer that would run
16  continuously.
17      Q.  So you are not going to tell the jury in
18  Oakland that the Stevicks were continuously spraying
19  for an hour at any of these properties?
20      A.  Of course not.
21      Q.  And in the Stevick case, I believe you
22  reported that it took 12.7 minutes holding a trigger
23  continuously to spray one gallon of Roundup, correct?
24      MR. TRAVERS:  Objection.  Form.  Different
25  equipment.

Page 131

1      THE WITNESS:  For that particular pressurized
2  pump unit -- and I also noted that the spray --
3  and I think I already explained this -- that the
4  spray had, when I looked under my magnifying lamp
5  on my workbench, showed that the sprayer head --
6  and you guys probably already had it analyzed as
7  well -- you know that her sprayer head was eaten
8  out and eroded and also contained extraneous
9  material on it, creating a very unusual spray
10  pattern.  In fact, it squirted out, off to one
11  side, not only down but to one side.  It was a
12  very -- very worn out and very unkempt spray
13  head.
14  BY MR. KALAS:
15      Q.  Can you calculate how long it would take to
16  spray a ready-to-use container of Roundup that the
17  Pilliods used 85 percent of the time?
18      A.  The prepackaged?
19      Q.  Yes, sir.
20      A.  Only based on my own experience.  I can't
21  refer to any published documents.
22      Q.  Okay.  And you haven't done, like, a timed
23  hold of the trigger to find out how many minutes it
24  would take?
25      A.  Well, I can say from my own experience, I

Page 132

1  once -- this is before my mom passed away -- or,
2  after, I mean, actually.
3      She had a patio, and she had a Roundup
4  self-contained sprayer with the long stringy hose.
5  And I used that.  And what I found is that you can
6  only pump that darn thing so much before your hand
7  gets tired.  It's not a matter of just holding it
8  out.  You have to keep pumping, pumping, pumping.
9  Finally, I just had to say, let's take a break for a
10  minute and let the hand recover.
11      So I don't know.  I can't answer the duration
12  in minutes because I haven't done a time process.
13  But it's -- you know, that equipment's not -- it's
14  not designed for continuous use.  It's designed for
15  spot spraying.
16      Q.  Did you ask the Pilliods how long they would
17  spray before their hand would get tired?
18      A.  No, it's not necessary.  I know what the
19  duration of their event was.  I know what the hectare
20  amount was.  I know how much material was used.  And
21  the POEM model takes all that into account in the
22  calculation.
23      Q.  Okay.  But when you're calculating the POEM
24  model and you include an hour of spraying, you're not
25  going to tell the jury that they sprayed continuously

Page 133

1  that entire hour; you are going to tell them that
2  they would spray a spot, move on, spray another spot,
3  correct?
4      A.  Right.  That input in POEM, if you read the
5  model and understand the model, you will see that's
6  not intended to be a number of continuous spray time.
7  It's a matter of the event time.  And then you also
8  have to include the milligram per mil concentration,
9  the amount used, the amount of hectare covered.
10      Q.  Now -- go ahead.  I'm sorry.
11      A.  I'm sorry.  That's all.
12      Q.  Okay.  Now, Mr. Pilliod reported washing his
13  hands if he got any glyphosate on his hands, right?
14      A.  Yes, although I believe he said there was a
15  time delay depending on where they were.
16      Q.  Okay.  And washing is effective in
17  removing -- strike that.
18      Washing is effective in removing a majority
19  of dermally exposed glyphosate according to the
20  published peer-reviewed literature, right?
21      MR. TRAVERS:  Objection.  Vague.
22      THE WITNESS:  If -- if -- if washed correctly
23  within a reasonable period of time.  Absorption
24  occurs quickly.  One has to take account into
25  time from exposure to washing.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED



Page 134

1 BY MR. KALAS:
2   Q.  How long are you going to tell the jury
3 Mr. Pilliod went between exposure to glyphosate and
4 washing his hands?
5   A.  Again, there's already testimony.  I'm not
6 going to recreate anything.  There's already
7 testimony that the Pilliods used, in some cases,
8 grass or leaves or dirt to wash their hands when
9 water wasn't available.
10   Q.  Well, that was at ████ for four years,
11 right?
12   A.  I'm sorry?
13   Q.  That was at ████ for four years, right?
14   A.  Right.
15   Q.  So at ████ where they applied for 30 years,
16 how long will you tell the jury Mr. Pilliod went
17 between exposed to glyphosate on his hands and
18 washing his hands?
19     MR. TRAVERS:  Objection.  Vague.
20     THE WITNESS:  I won't.  I'll let the
21   witnesses speak to the jurors themselves.  I'm
22   not going to try to recreate their testimony.
23 BY MR. KALAS:
24   Q.  So you don't know if he washed his hands five
25 minutes after he got Roundup on it at ████ r five

Page 135

1 hours after he got Roundup on it at ████
2     You didn't ask him that?
3     MR. TRAVERS:  Objection.  Vague.
4     THE WITNESS:  I did.  And it depended on
5   where they were.
6 BY MR. KALAS:
7   Q.  So at ████ how long would he go between
8 getting Roundup on his hands and washing them?
9   A.  I don't recall.
10   Q.  You didn't write that down in your report?
11   A.  I don't think I asked.
12   Q.  Okay.  So you don't recall asking that
13 question?
14   A.  I don't think I asked at that location,
15 because I -- I know there's water; there's a hose;
16 there's a swimming pool.  There's all kinds of
17 possible ways to rinse.  I didn't ask.
18   Q.  So you -- go ahead.
19   A.  I was more interested in the properties where
20 I knew there was no water, what was the procedure.
21   Q.  So you expect that, at ████, washing
22 occurred fairly soon after exposure because of the
23 availability of the water, correct?
24     MR. TRAVERS:  Objection.  Vague.
25     THE WITNESS:  No, I can't say I assumed

Page 136

1 anything.  I didn't -- first of all, I did not
2 add extra dosage from such occurrences.  It's not
3 something I tried to quantitate.  It would be
4 too unreliable to try to quantitate these
5 variable amounts of spillage or leakage or
6 whatever onto the hand.
7     You're taking me down a dark road and -- and,
8 you know, that's just going to manufacture more
9 uncertainties, so I'm staying away from it.  I
10 didn't include that in the calculation.
11 BY MR. KALAS:
12   Q.  Sir, I just want to understand what you are
13 going to tell the jury.
14     So am I correct you're not going to put a
15 time period on how long after Mr. Pilliod was exposed
16 to glyphosate at ████ to when he washed his hands?
17   A.  No, but I do understand he did have direct
18 spillage on his hands, arms, and legs.
19   Q.  Okay.  And you testified previously today
20 that if washing occurs relatively soon, it is
21 effective at removing the majority of the dermally
22 exposed glyphosate, correct?
23   A.  Yeah, if washing occurs certainly within five
24 or ten minutes.  Once we get out to an hour, the
25 studies do document, you know, some significant

Page 137

1 absorption.
2   Q.  And you don't know how soon after at ████
3 Mr. Pilliod washed his hands?
4   A.  No.
5   Q.  Okay.
6   A.  No.  I think that's something that you can
7 ask him directly.
8   Q.  Same question for ████.  ████ had running
9 water, right?
10   A.  Yes.
11   Q.  And you don't know how soon after Mr. Pilliod
12 had dermal exposure at ████ that he washed his
13 hands, right?
14   A.  Correct.
15   Q.  Same question for ████████
16 has running water, right?
17   A.  It did, but then there is some confusion
18 regarding access to the water.
19   Q.  Okay.  You have seen Google Earth pictures of
20 the house, right?
21   A.  Yes.
22   Q.  There's an actual house on the property,
23 correct?
24   A.  Right, but I believe that was rented.
25   Q.  The ████████ did they testify

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 138

1 that they had no access to running water at that
2 property, the Pilliods?
3    A.  No.
4    Q.  Okay.  So at the [redacted] property, you
5 are not going to tell the jury how soon after
6 Mr. Pilliod was exposed to Roundup dermally that he
7 washed his hands?
8    A.  I'm not going to tell the jury how long the
9 duration was for any of these.  I'm going to tell the
10 jury that there was direct exposure to the hands,
11 legs, and forearm from spillage and that I did not
12 account for that and include it in my calculations.
13    Q.  But one uncertainty in the POEM model that
14 you calculated is how much of the dermally exposed
15 glyphosate you included in the POEM model was washed
16 off soon after they were exposed, right?
17    MR. TRAVERS:  Objection.  Misstates the
18 evidence.
19    THE WITNESS:  I didn't understand the
20 question.
21 BY MR. KALAS:
22    Q.  Sure.
23    The POEM model assumed -- in your POEM model,
24 you assumed, I believe, 32.35 milliliters per hour of
25 exposure to the formulated substance, right, or

Page 139

1 milliliters per day, at least for Alberta?  For Alva,
2 you assumed 17 milliliters per day.
3    A.  I have bifocal contacts.
4    Q.  No, I understand.
5    A.  It's like restaurant light.
6    Q.  I know.
7    A.  I think, to answer the question, the
8 difference is if you look at Alva versus Alberta, for
9 Alberta, with respect to mixing/loading, I have zero
10 milligram per day, zero exposure.
11    Q.  And I'm looking at the dermal exposure during
12 spray application section in both of them; and in
13 both of them, you have a variable called total dermal
14 exposure to spray.
15    Do you see that?
16    A.  Right.
17    Q.  And for Alva, it is 17 milliliters a day.
18    A.  That's right.
19    Q.  Okay.  And for Alberta, it's
20 32.35 milliliters per day, right?
21    A.  Right, but that's spray.  That's not mix and
22 load spillage.
23    Q.  Right.  Well, actually, you do have mix/load
24 on absorbed dermal dose for Alva, right?
25    A.  Yeah, but that is a different number.  That's

Page 140

1 further down.
2    Q.  So my question is only as far as handwashing
3 goes.  How does the POEM model account for the
4 Pilliods washing of a portion of these milliliters
5 per day from their hands after exposure?
6    A.  Well, in part, because the duration of
7 spraying took one hour, and there's no assumption of
8 any handwashing during that one hour.
9    Q.  Yes, sir.  I understand.
10    But glyphosate is not immediately absorbed,
11 right?  It's not like there's a hole in your skin and
12 it just falls in?
13    A.  No, but we can look at the curves.  The --
14 the curves show that the majority of the absorption
15 is in the first one to three hours.
16    Q.  Right.  If you look at Neilson 2009, in fact,
17 it's an absorption that takes place, over, I believe,
18 eight hours total or something like that?
19    A.  Right.  But it -- it falls off considerably
20 after three hours.
21    Q.  So if the Pilliods washed their hands within
22 that first hour -- or if Mr. Pilliod would.  Let's
23 stick with him because we were talking about him.
24    If Mr. Pilliod washed his hands within that
25 first hour, how does the POEM model account for the

Page 141

1 handwashing that reduces the amount of glyphosate on
2 the surface of the skin?
3    A.  I'll have to research that.  I'm not sure.
4    Q.  Okay.  Sitting here right now, you're not
5 sure if there's a variable for that in the POEM
6 model, right?
7    A.  That's correct.
8    Q.  Now, did you review the labels of the
9 products in the Pilliods' shed?
10    A.  In some of them where I could zoom in and
11 read, but for the most part, I couldn't read them.
12    Q.  Okay.  So I'm going to mark as Exhibit 7 a
13 document that was previously marked as Exhibit 7 at a
14 deposition of the Pilliods.  I believe this would
15 have been the deposition of Alberta.  This was on
16 December 20th.  Yes, Alberta.
17    (Sawyer Exhibit 7 was marked for
18 identification.)
19    MR. KALAS:  So here's the marked copy.
20 BY MR. KALAS:
21    Q.  And I have flagged a page I would like to
22 look at here.
23    Have you seen these before, this -- these
24 labels and pictures before?
25    A.  Well, I don't know.  So many images.  I -- I

Page 142

1 don't remember.
2    Q.   Okay.
3    A.   It's just -- it's -- I -- I'm thinking these
4 are blown up differently than what I have.
5    Q.   Okay.
6    A.   Because I don't remember them being the
7 images I have blown up like this.  So that's what's
8 confusing.
9    Q.   Do you see the first page of this document
10 that I marked as Exhibit 7?
11    A.   Yes.
12    Q.   And do you see this was marked as Exhibit 7
13 in Pilliod 12/20/18?
14    A.   Yeah, and I have that.  I have that one.
15 What I'm getting at is the labels --
16    Q.   Sure.
17    A.   The one you have the tab on, I think I
18 remember looking at this, but I don't remember it
19 being in the original form blown up like this is what
20 I'm saying.
21    Q.   Well, hopefully, it makes it a little easier
22 to read.
23        Do you see that this is a bottle of weed and
24 grass killer that is labeled Roundup weed and grass
25 killer, ready-to-use?

Page 143

1    A.   Yes.
2    Q.   Okay.  And you have no reason to dispute that
3 this is one of the bottles that the Pilliods produced
4 as part of their production of Roundup products found
5 at their house?
6    A.   No.
7    Q.   And if you look at the portion of this label
8 I have highlighted in the "Caution" section -- do you
9 see the caution section down there, just above the
10 first aid box?
11        MR. TRAVERS:  For the record, is that your
12 highlighting on it?
13        MR. KALAS:  It is my highlighting on it to
14 help out here.
15        THE WITNESS:  I do.
16 BY MR. KALAS:
17    Q.   And I'm just going to read that into the
18 record.
19        It says:  Caution:  Causes moderate eye
20 irritation.  Avoid contact with eyes or clothing.
21 Wash thoroughly with soap and water after handling.
22        Did I read that correctly?
23    A.   Yes.
24    Q.   Now, if you go back to Page 5 of your expert
25 report -- and that is the discussion of

Page 144

1 Ms. Pilliod -- bottom paragraph, third to last line,
2 you wrote:  She would not wash her hands unless it
3 was a lot of spray.  She generally just wiped her
4 hands off in the dirt.
5        Did I read that correctly?
6    A.   Yes.
7    Q.   Now, given the fact that Mrs. Pilliod
8 reported in her deposition under oath that she did
9 not wash her hands after using glyphosate, even
10 though it was called for on this label of a product
11 that they produced, do you have any opinion as to
12 whether she would have worn additional protective
13 equipment had the label called for it?
14        MR. TRAVERS:  Objection.  Compound.  Outside
15 the scope of his expert testimony and misstates
16 her evidence.
17        THE WITNESS:  I hate to say it, but you're
18 asking me to -- you're asking me an intent
19 question, which now you want the intent but you
20 don't want me talking about intent regarding
21 Monsanto people.
22 BY MR. KALAS:
23    Q.   I'm just asking you if you have an opinion.
24 If you have no opinion, that's okay.
25    A.   That is an intent question, and I don't think

Page 145

1 I could really read into that and --
2    Q.   Okay.
3    A.   -- understand her intent.
4    Q.   So if I understand correctly, at trial in
5 March, you will tell the jury that you have no expert
6 opinion as to whether or not Mrs. Pilliod would have
7 worn additional protective equipment had the label
8 for Roundup called for it?
9        MR. TRAVERS:  Objection.  Form.
10        THE WITNESS:  I can only speak on facts in
11 the case.  And she said in her -- I don't know if
12 it was in her testimony, but I know it's in my
13 report, either from the interview or testimony,
14 that she thought it was as harmless as -- she
15 said water.  It was her understanding that it was
16 a harmless material.
17 BY MR. KALAS:
18    Q.   Going off the facts in the case, this label
19 right here had in big block letters "Caution" on it,
20 right?
21    A.   Yes.
22    Q.   And it said:  Caution.
23        And then the third sentence there says:  Wash
24 thoroughly with soap and water after handling.
25 Right?

Page 146

1    A.  Yeah.
2        Now, I can give you a professional opinion
3    regarding the label.  I have prepared MSDSs in the
4    past.  I have expertise in the area of safety data
5    sheets and material safety data sheets.
6        And the large, bold print is good.  That is
7    correct.  However, this statement refers to eye
8    irritation and avoiding contact with the eyes or
9    clothing.  Then it says wash thoroughly with soap and
10   water after handling.  That is not an acceptably
11   clear statement in terms of washing hands.  It has an
12   implication of eyes or clothing.
13       Q.  How would I handle this bottle?  Would I
14   handle it with my hands?
15       A.  Yes, but this should say wash hands
16   thoroughly with soap and water.
17       Q.  Okay.  So your -- so your big, I guess,
18   dispute with the warning on this label is that you
19   think Monsanto should have said wash hands thoroughly
20   with soap and water after handling instead of wash
21   thoroughly with soap and water after handling.
22       Is that right?
23       MR. TRAVERS:  Objection.
24       THE WITNESS:  Yeah, and that is the standard.
25   OCED and other international organizations for

Page 147

1    the preparation of safety data sheets requires
2    specific warnings to the part of the body,
3    whether it be the eye, the hand, mouth.  It
4    really should include hands.  And that's -- I can
5    provide documents to show that.
6    BY MR. KALAS:
7        Q.  What other body part could somebody handle a
8    Roundup bottle with beyond their hands?
9        A.  Well, in this case, what's being referred
10   to is the -- let me just read that again.
11       Yeah, causes moderate eye irritation.  Avoid
12   contact with eyes or clothing.  Wash thoroughly with
13   soap and water after handling.
14       Wash what?  The eyes and clothing?  Or the
15   hands?
16       MR. KALAS:  Motion to strike.
17   BY MR. KALAS:
18       Q.  My question was:  What body part other than
19   the hands does somebody handle a Roundup bottle with?
20       MR. TRAVERS:  Objection.  Asked and answered.
21       THE WITNESS:  Hands.
22   BY MR. KALAS:
23       Q.  Now, given the fact that Mrs. Pilliod reports
24   not adhering to the caution language on this label,
25   you won't be offering an expert opinion to state that

Page 148

1    Mrs. Pilliod would have always followed the
2    directions on a Roundup label, correct?
3        MR. TRAVERS:  Objection.  Grossly misstates
4    her testimony.  Not even remotely accurate.
5    BY MR. KALAS:
6        Q.  I'm just asking if you're going to offer an
7    opinion on what Mrs. Pilliod would have done?
8        MR. TRAVERS:  Objection, asked and answered.
9        THE WITNESS:  I have already gone through
10   that.
11   BY MR. KALAS:
12       Q.  Okay.  My question was different earlier
13   about protective clothing.
14       So my question this time is:  Will you be
15   offering an expert opinion that Mrs. Pilliod would
16   have always followed the directions on a Roundup
17   label?
18       MR. TRAVERS:  Objection.  Form.
19       THE WITNESS:  That's a question for her, not
20   for an expert.
21   BY MR. KALAS:
22       Q.  Okay.  So you don't be offering that opinion?
23       MR. TRAVERS:  Objection.  Asked and answered.
24       THE WITNESS:  Not in that format.
25   ///

Page 149

1    BY MR. KALAS:
2        Q.  Okay.  Now, you haven't been asked to offer
3    an expert opinion on the particular Roundup label we
4    were just looking at in Exhibit 7, right?
5        And by "asked," I mean by The Miller Firm.
6        A.  Well, I know we did speak about the lack of
7    cancer hazard warning on the label.  In general, I
8    have been asked about the label, yes, but not
9    specifically that one line on the label.
10       Q.  Do you have a section in your report that
11   discusses labeling of Roundup and specifically,
12   warnings?
13       A.  I have discussed the label but in -- with
14   respect to the failure to include other ingredients
15   on the label, for example, on Page 39.
16       Q.  Right.
17       Do you have any portion of your report,
18   though, that is a section or a paragraph where you
19   disclose your opinion about the caution language on
20   the Roundup label?
21       A.  No.
22       Q.  Okay.  Have you ever communicated in any way
23   with the EPA Office of Pesticides Programs to tell
24   them that Monsanto's caution language should be
25   changed to mention hands specifically?

Page 150

1  A. No.
2  Q. Okay. Now, Mrs. Pilliod also reported using
3  a lotion called Skin So Soft, right?
4  A. Yes.
5  Q. Now, I looked that up, and there's multiple
6  Skin So Soft products.
7     Did you ask her specifically which Skin So
8  Soft product she used?
9  A. No.
10  Q. Now, you won't be arguing to the jury that
11  the specific hand cream she used enhanced the
12  absorption of glyphosate because you don't know what
13  that specific hand cream was, right?
14     MR. TRAVERS: Objection. Form. Compound.
15  It's not arguing to the jury.
16     THE WITNESS: I would explain that it is
17  generally accepted and established in the
18  literature that hand creams enhance dermal
19  absorption.
20  BY MR. KALAS:
21  Q. Now, but you don't know -- you will be honest
22  with the jury and tell them you don't know what
23  specific hand cream she used, right?
24  A. Right.
25  Q. You will be honest with the jury and tell

Page 151

1  them you don't know the specific formulation of the
2  hand cream she used, right?
3  A. Right.
4  Q. You will be honest with the jury and tell
5  them you don't know the lipid concentration in the
6  hand cream she used, right?
7  A. That's where we get a little trouble. The
8  hand creams are designed to moisten the hand. They
9  are designed to emulsify the hard keratin so it can
10  absorb hydrophilic substances such as glyphosate.
11  And by nature of design, hand creams increase dermal
12  absorption.
13     So the fact that we don't know what brand it
14  was is irrelevant.
15  Q. Okay. And I appreciate that answer, sir, but
16  my question was a little bit different.
17  A. Oh.
18  Q. Okay.
19     You'll be honest with the jury and tell them
20  you don't know the lipid concentration in the hand
21  cream she used, right?
22  A. No.
23  Q. Okay. Now, in your report, you cite to an
24  article on 2,4-D and hand creams, right, or skin
25  creams?

Page 152

1  A. What page?
2  Q. 108, sir.
3  A. Okay.
4  Q. And that is the Brand article?
5  A. Yes.
6  Q. Okay. And then you also cite to an article
7  on industrial solvents by Korinth, right?
8  A. Yes.
9  Q. And neither of these articles are on
10  glyphosate, right?
11  A. Correct.
12  Q. And 2,4-D is not glyphosate, true?
13  A. Correct.
14  Q. Glyphosate is not an industrial solvent,
15  true?
16  A. Correct.
17  Q. Okay. Do you have any articles in the
18  peer-reviewed literature that you can cite me to to
19  suggest that Skin So Soft or skin creams like Skin So
20  Soft enhance the absorption of glyphosate in
21  particular?
22  A. I can based upon the science, and that is
23  that it is a moisturizing cream designed to increase
24  the permeability of the keratin. And the keratin is
25  what blocks hydrophilic substances such as

Page 153

1  glyphosate. Glyphosate, as you know from your own
2  expert, is a hydrophilic substance. It's one of the
3  few things that we agree on.
4  Q. Now, sir, my question was slightly different.
5     I understand that you're going to cite an
6  article regarding 2,4-D, and you are going to cite an
7  article regarding industrial solvents and increased
8  permeability from skin cream.
9     But what I was trying to get at -- and I
10  apologize if I didn't ask it artfully -- can you cite
11  to me any article in the literature that suggests
12  that skin creams enhance the absorption of glyphosate
13  in particular?
14  A. I think the best I can do is refer to the
15  Bommannan study in which a substance ethanol and how
16  that enhances the pull and drag effect of other
17  substances. I cannot provide a study specific to
18  glyphosate, but I can refer to studies that show
19  chemicals in that class based on their hydrophilic
20  nature.
21  Q. Okay.
22  A. Can be increased.
23  Q. Okay. I understand, sir.
24     So when you are talking to the jury, you will
25  tell them that other chemicals that are hydrophilic

Page 154

1 have been shown to have enhanced absorption due to
2 skin creams but that you cannot find an article on
3 glyphosate in particular to show that fact, right?
4    A.  I intend to do some more looking to answer
5 your question to see if there is such a study
6 specific to glyphosate, but I don't think that has
7 been performed due to the toxic nature of glyphosate.
8 It would be unacceptable to intentionally dose a
9 human with glyphosate using skin creams.
10    Q.  Well, you cite in-vitro studies here, don't
11 you?  Korinth is an in-vitro study?
12    A.  True.
13    Q.  You could do it with an in-vitro methodology,
14 right?
15    A.  I'll look, but I don't think it's been
16 assessed.
17    Q.  Okay.  So just so I understand and the record
18 is clear, sitting here today, the trial were today,
19 you will tell the jury that you've seen enhanced skin
20 absorption with other compounds that you believe to
21 be hydrophilic like glyphosate, but you have not seen
22 enhanced skin absorption in the literature with
23 glyphosate in particular and skin creams?
24    A.  Yeah, and then I'm going to state, therefore,
25 this is something that should have been evaluated by

Page 155

1 Monsanto.
2    Q.  Okay.  And that is -- that is a statement of
3 what the corporation should have done, right?
4    A.  No.  That's a toxicological statement.
5    Q.  So you're not --
6    A.  This is a matter of increased toxicity in
7 people who use skin cream.  There is literature
8 showing for other similar types of chemicals.  It
9 increases the absorption and therefore, as part of
10 the safety evaluation normally carried out by
11 toxicologists, certainly the skin cream effect should
12 have been assessed by Monsanto.
13    Q.  You're testifying for a good portion of your
14 report here about in-vitro dermal absorption studies,
15 right?
16    A.  Yes.
17    Q.  Have you undertaken in your lab in New York
18 or anywhere -- or here in Florida or anywhere else an
19 in-vitro skin absorption study on the effect of skin
20 creams on glyphosate absorption?
21    A.  No.
22    Q.  Are you capable of doing that?
23    A.  No.  I'm not a percutaneous absorption
24 laboratory director.  I directed a number of
25 laboratories but not a specific percutaneous

Page 156

1 absorption laboratory.
2    Q.  Sir, if we can go back to Exhibit 7, please.
3    A.  Is that the report?  No.  Oh, that's the --
4    Q.  The pictures.
5       And if we go back to the tabbed page.
6    A.  Yes.
7    Q.  And do you see the "When to Apply" section of
8 this label?
9    A.  Yes.
10    Q.  And do you see the third bullet point there?
11    A.  Yes.
12    Q.  Okay.  And I'm going the read that and let me
13 know if I read it correctly.
14       It states:  Spray when air is calm to prevent
15 to drift to desirable plants.
16       Did I read that correctly?
17    A.  Yes.
18    Q.  I'm correct that the label on Roundup weed
19 and grass killer ready-to-use circa 2003 advised
20 users to apply when the air is calm, right?
21    A.  Yes, although it began from a material safety
22 data sheet perspective.  The warning is somewhat
23 misleading in that it does not state that the reason
24 for this is to reduce human exposure.  It's to reduce
25 damage to other plants.

Page 157

1    Q.  Now, sir, at his deposition -- I'll mark
2 it -- I'll mark it as Exhibit 8, Mr. Pilliod's
3 deposition.
4       (Sawyer Exhibit 8 was marked for
5 identification.)
6 BY MR. KALAS:
7    Q.  At his deposition, on Page 147, Mr. Pilliod
8 was asked some questions by Mr. Hoke from The Miller
9 Firm.
10       Do you see that?
11    A.  Okay.
12    Q.  And I'm at the bottom of Page 149, Line 24,
13 okay?
14    A.  Yes.
15    Q.  And it states, Question -- and this is
16 Mr. Hoke speaking: I'll represent for the record
17 that these are pictures of bottles of Roundup that
18 were by your shed; is that correct?
19       Answer:  Yes.  They were in the shed, and I
20 cleaned it out.
21       Question:  And are those -- and those are the
22 bottles that you found in your house by the shed?
23       Answer:  Yes.
24       Question:  Okay.  And did you use -- did you
25 end up using those bottles of Roundup?

Page 158

1    Answer: No. I used parts of them many years
2  ago.
3    Question: Okay. And then you stopped?
4    Answer: Yeah. Then I got worried.
5    Question: Worried there might be a link
6  between Roundup and cancer?
7    Answer: Yes.
8    Did I read that correctly?
9  A. Yes.
10  Q. And this is testimony you reviewed, right?
11  A. Yes.
12  Q. Okay. And these are -- these Roundup bottles
13  that Mr. Hoke is discussing is what we have discussed
14  in Exhibit 7, right?
15  A. Right.
16  Q. Now, did you look at the date of the labels
17  on the Roundup bottles that Mr. Pilliod said he
18  stopped using when he got worried about cancer?
19  A. No.
20  Q. Okay. Did you see that all the labels on the
21  products found in Mr. Pilliod's shed dated from the
22  2000s?
23  A. No.
24  Q. Now, Mr. Pilliod testified he stopped using
25  Roundup in 2012, right?

Page 159

1  A. Yes.
2  Q. Okay. And Mr. Pilliod testified that he used
3  Roundup approximately 30 to 40 times a year
4  personally, right?
5  A. Yes.
6  Q. Okay. If Mr. Pilliod used Roundup 30 to 40
7  times a year personally, how could he still have
8  partially used Roundup bottles from the 2000s in his
9  shed that he stopped using when he got worried about
10  the risk of cancer?
11    MR. TRAVERS: Objection. Outside the scope
12  of an expert opinion.
13    THE WITNESS: I don't know. I think you --
14  you'd have to ask him.
15    MR. KALAS: Let's go off the record.
16    THE VIDEOGRAPHER: Going off the record at
17  11:54.
18    (Recess from 11:54 a.m. until 12:03 p.m.)
19    THE VIDEOGRAPHER: We are back on the record.
20  The time is 12:03.
21  BY MR. KALAS:
22  Q. Okay. Dr. Sawyer, I appreciate you coming
23  back.
24    So because you did not do a differential
25  diagnosis regarding Mr. Pilliod, I'm correct that you

Page 160

1  did not go through the process of ruling in all the
2  potential risk factors Mr. Pilliod had for NHL and
3  then ruling out all the glyphosate exposure as the
4  cause of his disease, right?
5  A. Correct.
6  Q. And so you can't tell the jury, because you
7  did not go through that process, that Mr. Pilliod
8  would not have gotten NHL had he not been exposed to
9  Roundup?
10    MR. TRAVERS: Objection. Form.
11    THE WITNESS: I'm not intending on providing
12  that testimony. What my intent is, is that the
13  dosage received was significant enough to cause
14  or contribute to the development of her NHL.
15  BY MR. KALAS:
16  Q. I'm speaking about Mr. Pilliod here.
17  A. Both, actually.
18  Q. Okay.
19  A. The only other thing I want to point out, in
20  my report, Page 6, second paragraph, I answered your
21  question about handwashing or washing after she was
22  done in the episodes, you know, or sprayed durations
23  were generally an hour or more.
24    But on Page 6, second paragraph, I did
25  include in my report a statement about she would wash

Page 161

1  up (not a shower) when she went back into the house,
2  although not necessarily right after she used
3  Roundup.
4    So my statement of one hour or so of spraying
5  doesn't mean she washed up at, you know, 1.0 hours.
6  It could have been some time later.
7  Q. And you just don't know what that time is?
8  A. Right.
9  Q. So you -- you then haven't reached an
10  opinion, though, about whether or not Mr. Pilliod
11  would still have gotten NHL if he had never been
12  exposed to Roundup a day in his life, right?
13    MR. TRAVERS: Objection. Asked and answered.
14    THE WITNESS: That's correct.
15  BY MR. KALAS:
16  Q. And, in fact, you haven't reached an opinion
17  about whether or not Mr. Pilliod would have been
18  diagnosed with NHL on the exact same day he was
19  diagnosed if he had never been exposed to Roundup,
20  right?
21    MR. TRAVERS: Objection. Form.
22    THE WITNESS: Correct. I'm deferring that to
23  the oncologist and other appropriate experts.
24  BY MR. KALAS:
25  Q. And likewise for Mrs. Pilliod you did not

Page 162

1  through the process here of ruling in all the
2  potential risk factors for NHL that Mrs. Pilliod had
3  and then ruling out all the glyphosate exposure,
4  right?
5      A.  Correct.  Again, I'm only providing specific
6  causation with respect to the dose duration was
7  sufficient to render her at an increased risk of NHL
8  which caused or contributed to her ultimate NHL
9  diagnosis.
10     Q.  And you can't tell the jury that Mrs. Pilliod
11  would not have gotten NHL had she not been exposed to
12  Roundup?
13         MR. TRAVERS:  Object to the form.
14         THE WITNESS:  Correct.
15  BY MR. KALAS:
16     Q.  So you can't tell the jury that Mrs. Pilliod
17  would not have been diagnosed with NHL on the exact
18  same day she was diagnosed with NHL if she had never
19  been exposed to Roundup?
20     A.  Again, I'm deferring that to Dr. Nabhan and
21  other experts.
22     Q.  And you can't tell the jury how much you
23  believe Roundup contributed to the Pilliods' NHL,
24  right?
25         MR. TRAVERS:  Objection.  Form.

Page 163

1         THE WITNESS:  Again, I have deferred that to
2     the epidemiologists and oncologists.
3  BY MR. KALAS:
4     Q.  So you can't exclude the possibility under
5  the evaluation you conducted that Roundup exposure
6  had a negligible level of contribution to their NHL?
7         MR. TRAVERS:  Object to form.
8         THE WITNESS:  Oh, no, I can opine.  It
9     certainly had a significant contribution.  It is
10     not negligible.
11  BY MR. KALAS:
12     Q.  What does significant mean?  What percentage,
13  sir?
14     A.  It is not a percentage.  It means that
15  95 percent level of confidence, her being in the
16  upper fourth quartile of exposure compared to
17  applicators in published studies, she was at a
18  significantly elevated risk of NHL based upon her
19  exposure dose.
20     Q.  Okay.  So of all the things that caused
21  Ms. Pilliod's NHL, you admit or agree that they could
22  have been -- well, strike that.
23         And I'm correct in this case you have not
24  opined that glyphosate exposure was the sole cause of
25  Mr. Pilliod's NHL, right?

Page 164

1     A.  I have not.  I have said significantly
2  contribute to -- caused or significantly contributed
3  to.
4     Q.  But I'm correct that you're deferring the
5  opinion on what other things contributed to his NHL
6  to other experts, right?
7     A.  Yes, as well as the differential diagnosis
8  and given your question regarding the percentage.
9     Q.  There's nothing unusual about a 69-year-old
10  man being diagnosed with NHL, right?
11     A.  No, and I stated that in my report.
12     Q.  It happens every day in this country, right?
13     A.  Yes.  Although it is interesting both husband
14  and wife both developed the NHL.
15     Q.  Now, in the past, you have mentioned you are
16  aware that NHL is actually a collection of multiple
17  different types of diseases, right?
18         MR. TRAVERS:  Object to the form.
19         THE WITNESS:  Well, there are different forms
20     of NHL, yes.
21  BY MR. KALAS:
22     Q.  There's actually dozens of different diseases
23  collected under the umbrella and terminology of NHL,
24  right?
25         MR. TRAVERS:  Object to the form.

Page 165

1         THE WITNESS:  Dozens.
2  BY MR. KALAS:
3     Q.  Right.
4         And Mr. and Mrs. Pilliod, do they have the
5  same type of NHL?
6     A.  No.  But I'm going to defer that to Dr.
7  Nabhan.
8     Q.  They have different diseases, as reported in
9  your expert report, right?
10     A.  Yes.  Again, I'm not testifying as to the ICD
11  code classification of either of their NHLs and/or
12  the expected frequency.
13     Q.  So since you are deferring to Dr. Nabhan,
14  Dr. Weisenburger, and others on the classification of
15  their NHLs, you won't tell the jury that the Pilliods
16  both have the same disease as your support for your
17  conclusion that glyphosate caused their NHL, right?
18         MR. TRAVERS:  Objection.  Form.
19         THE WITNESS:  No.  Only that they both have
20     NHL.  I'm not -- I'm not -- I haven't worked up
21     the ICD code subtypes or any of that in my
22     report.
23     Q.  Did you review the reports of either
24  Dr. Bello or Dr. Levine in this case?
25     A.  Dr. --

Page 166

1  Q.  Bello, B-e-l-l-o?
2  A.  No.
3  Q.  Or Levine?
4  A.  I've heard of Dr. Levine.  I don't think
5  I've -- I haven't reviewed anything, no.
6  Q.  Those are some oncologists who offered expert
7  opinions in the Pilliod case.
8     Were you aware of that?
9  A.  Retained by which -- by who?
10  Q.  By Monsanto, sir.
11  A.  Okay.  No, I haven't -- I've come across the
12  name Dr. Levine, but I haven't read anything.
13  Q.  So you did see in their reports where they
14  talked about the fact that there are examples in the
15  peer-reviewed literature where married couples or
16  couples who lived together had both gotten NHL,
17  right?
18     MR. TRAVERS:  Object to form.
19     THE WITNESS:  That makes sense if there's an
20  environmental or exogenous exposure trigger, then
21  sure.
22  BY MR. KALAS:
23  Q.  And you did see the fact that those articles
24  included couples who both got NHL before Roundup was
25  even on the market, right?

Page 167

1  A.  Right.  But as you -- as you stated, Roundup
2  is not the only cause of NHL.
3  Q.  Right.
4     And, in fact, there are 70,000 new cases of
5  NHL diagnosed every year in this country, right?
6     MR. TRAVERS:  Object to the form.
7     THE WITNESS:  I have not really worked that
8  up since the Johnson report.  I'd have to go back
9  and look at the statistics.
10  BY MR. KALAS:
11  Q.  Now, you agree that two people living in the
12  same household -- if there were 70,000 cases
13  diagnosed each year, two people living in the same
14  household might both get NHL by chance, right?
15     MR. TRAVERS:  Object to the form.
16     THE WITNESS:  You know, I can answer yes,
17  but, again, I'm deferring that.  It's not -- it's
18  a specific causation area that I'm not addressing
19  in my report or testimony.
20  Q.  And I know you aren't addressing other risk
21  factors, but you mentioned that married couples might
22  have the same environmental exposures.
23     Mr. and Mrs. Pilliod shared other
24  environmental exposures that might be associated with
25  NHL beyond Roundup, right?

Page 168

1  A.  Is that a hypothetical?
2  Q.  No.  I'm asking if you know.
3  A.  No, they didn't.
4  Q.  Okay.  Mr. and Mrs. Pilliod ███████████
5  ████████████████████
6  A.  Well, that's -- I'm not including that under
7  environmental.
8  Q.  Okay.  So Mr. and Mrs. Pilliod ████████
9  ████████████
10  A.  Yes.
11  Q.  Mr. and Mrs. Pilliod both shared the same
12  diet, right?
13  A.  I didn't question them on that, so I'd have
14  to defer that.
15  Q.  Mr. and Mrs. Pilliod ██████████████
16  ██ ███
17  A.  ████████████████████████████
18  ██ ████████████████████████
19  ██ ██████████████████████████████
20  ██
21     MR. TRAVERS:  Objection.  Form.
22     THE WITNESS:  Again, I can -- I can look and
23  answer that, but, again, it's not part of my
24  specific causation analysis.
25  ///

Page 169

1  BY MR. KALAS:
2  Q.  Well, let me ask this, and we can maybe
3  short-circuit it.  When you mentioned the fact that
4  Mr. and Mrs. Pilliod -- or strike that.
5     If you mentioned the fact that
6  Mr. and Mrs. Pilliod both have a form of NHL to the
7  jury, will you make sure to also mention to the jury
8  that they had other exposures, be it health
9  exposures, environmental exposures, genetic
10  exposures, that they shared beyond Roundup exposure?
11     MR. TRAVERS:  Objection to form.  Compound.
12     THE WITNESS:  No.  It's getting into specific
13  causations that I'm not addressing.
14  BY MR. KALAS:
15  Q.  So you won't tell the jury ████████████
16  ██████████████████  You will keep that from the jury?
17     MR. TRAVERS:  Objection.  Form.
18     THE WITNESS:  No, of course not.  If I was
19  asked that.
20     But it's not -- see, I'm damned if I do
21  either way.  If I were to answer that question
22  yes, then you would file a motion saying Sawyer's
23  going to speak on specific causation when he said
24  he wasn't.
25     You know, I don't know what you're --



Page 170

BY MR. KALAS:

2    Q.   Well, what I'm trying to understand, sir,

3 and -- you know, let me back up here for a second.

4    A.   I'm not speaking on specific causation.

5    Q.   Let me back up here for a second.

6        You are going to try to be up-front with the

7 jury, right?

8    A.   Of course.

9    Q.   You're going to try to be honest with the

10 jury, right?

11    A.   As I am with you.

12    Q.   And when you -- if you mention to the jury in

13 your direct testimony that both Mr. and Mrs. Pilliod

14 have NHL and that's interesting because they're

15 married, will you also mention that they shared other

16 co-exposures beyond Roundup?

17        MR. TRAVERS:  Objection.  Vague.

18        THE WITNESS:  You know, I made that comment

19    about interesting.  I don't need to include that

20    in my testimony to the jury.

21 BY MR. KALAS:

22    Q.   So will you stipulate today that you will not

23 tell the jury that you find it interesting from a

24 toxicological point of view for your specific

25 causation opinion that both Mr. and Mrs. Pilliod have

Page 171

1 NHL?

2        MR. TRAVERS:  Objection.  That's an issue for

3    the lawyers, and it may come up in

4    cross-examination.

5        THE WITNESS:  I really don't know how to

6    answer that.  I mean, it's --

7        MR. KALAS:  Okay.

8        THE WITNESS:  If it's a legal issue, then

9    I -- all I can tell you is what I keep telling

10    you over and over again.  Addressing the dose

11    duration with respect to significant increased

12    risk of causing or contributing to NHL.  That is

13    my specific causation opinion.

14 BY MR. KALAS:

15    Q.   Okay.  So the fact that both

16 Mr. and Mrs. Pilliod have NHL does not play into your

17 specific causation opinion as to whether or not

18 they -- their NHL has a shared etiology?

19    A.   I'd have to defer that to Dr. Nabhan.  What I

20 will state is that they both shared an -- a similar

21 high exposure, fourth quartile exposure, to a

22 probable carcinogen named glyphosate.  That, I will

23 explain to the jury, that they both experienced that.

24        Beyond that, it's -- I'm not addressing these

25 questions you're asking me.

Page 172

1    Q.   Okay.  So you won't tell the jury that they

2 were also -- ████████████████████████

3 ██ ████████████████████████████████

4        MR. TRAVERS:  Objection.  Form.

5        THE WITNESS:  ████████████████████████

6 ██ ████████████████████████████

7 ██ ██████████████████████████████████

8 ██████████████████████████████████████

9 BY MR. KALAS:

10    Q.   ████████████████████████████████

11 ██ ████████████████████████████████████

12 ████████████████████████████████

13        MR. TRAVERS:  Objection.  Asked and answered.

14        THE WITNESS:  I will certainly do that if

15    asked in cross-examine.  Whether in direct

16    examine I'm to get into those areas is up to the

17    attorneys.  I -- so I can't answer that.  I think

18    we'd have to ask the trial attorney that.

19 BY MR. KALAS:

20    Q.   Well, you would want the attorneys to make

21 the jury aware of that, right?  ████████████████

22 ██████████████████████

23        MR. TRAVERS:  Objection.

24        THE WITNESS:  Of course.  They are going to

25    be aware of that.

Page 173

1        MR. KALAS:  Okay.

2        THE WITNESS:  I'm sure.

3 BY MR. KALAS:

4    Q.   Now, there's nothing unusual about a

5 71-year-old woman being diagnosed with NHL, right?

6    A.   No.  And I have a brief section on that in my

7 report.

8    Q.   And that in fact happens every day in this

9 country as well, right?

10    A.   Yes.

11    Q.   Now, in your Stevick report, you have a table

12 that you lifted from the SEER data of -- of new NHL

13 cases by age.

14        Do you recall that?

15    A.   Yes, I do.

16    Q.   Okay.  And you did not include that in this

17 report, right?

18    A.   Well, I was not addressing the specific

19 causation, so, no, I didn't.  However, I still

20 included a brief paragraph regarding the age factor.

21        Let me see if I can find it.

22    Q.   I believe, sir, you are referring to Page 24,

23 paragraph in the middle of the page, it starts the

24 "Study by McDuffie"?

25    A.   Yeah, that it.  Right.  I say that it should

Page 174

1  be noted that Mr. and Mrs. Pilliod's advanced age of
2  69 and 71 respectively at the time of diagnosis
3  places them in the highest risk for lymphoma.
4      So that chart you're referring to shows the
5  same thing.
6      Q.  Right.
7      A.  And I included a statement about that in this
8  report.
9      Q.  Right.
10     So my question is:  Why did you cut the chart
11 out of this report?
12     A.  Because I'm not addressing specific causation
13 with respect to smoking or age, and I'm not
14 addressing that in this report because I was
15 contacted on January 4th, I think ten days before
16 this report was due, and I -- I had to limit my scope
17 to that of the dose calculation and general
18 causation.
19     Q.  So you didn't cut that out of your report
20 because you didn't think the jury should see that
21 graphic that you included in your Stevick report?
22     A.  Oh, no.  Not at all.  In fact, I assume that
23 that graphic will be shown to the jury.
24     Q.  And you consider that graphic to be reliable,
25 right?

Page 175

1      A.  Yes.  It's SEER registry data, yeah.
2      Q.  And you would have no problem with the jury
3  evaluating that graphic as a part of the evaluation
4  causes of the Pilliod's case?
5      A.  Of course not.  I stated on Page 24 the
6  summary of that graphic.
7      Q.  Okay.  And you want the jury to consider the
8  fact that Mr. and Mrs. Pilliod were in the age group
9  that has the highest amounts of lymphomas diagnosed
10 every year in this country, right?
11     A.  Yeah.  That's a fact in this case.
12     Q.  And you want the jury to consider the fact
13 that a majority of the lymphomas are attributed to
14 idiopathic causing, right?
15     MR. TRAVERS:  Objection.  Form.
16     THE WITNESS:  That, I'm going to defer.  I'm
17 not prepared and have not addressed that in my
18 report.
19 BY MR. KALAS:
20     Q.  And you are going to tell the jury that
21 Mr. Pilliod got -- did not get his lymphoma from an
22 idiopathic cause, right?
23     MR. TRAVERS:  Objection.  Form.
24     THE WITNESS:  I am not addressing that at
25 all.  I have not addressed that in my report, and

Page 176

1  it's deferred.
2  BY MR. KALAS:
3      Q.  And you are not going to tell the jury that
4  Mrs. Pilliod did not get lymphoma from an idiopathic
5  cause, right?
6      MR. TRAVERS:  Objection.  Form.
7      THE WITNESS:  Same answer.  I defer that to
8  experts I've already stated:  oncologists,
9  epidemiologists, Dr. Weisenburger.
10 BY MR. KALAS:
11     Q.  And for the age group Mr. Pilliod was in, the
12 incidence rate for NHL is about 100 per 100,000
13 persons in years.
14     Have you seen that data?
15     A.  If we go back to my Johnson report for very
16 specific types of malignancy, I -- I have some of
17 that data.  I may have the overall data too in
18 Johnson, but I don't have it with me and I don't
19 remember the exact numbers.  But I believe it is in
20 my Johnson report.  Of course he was much younger, so
21 it was a lower number.
22     (Sawyer Exhibit 9 was marked for
23 identification.)
24 BY MR. KALAS:
25     Q.  I'll mark as Exhibit 8 -- or, excuse me, I

Page 177

1  think we're at Exhibit 9 -- a SEER incidence data for
2  NHL.
3      Does this appear to be the type of SEER data
4  that you rely on in your Stevick report and in your
5  discussion in the Pilliod report?
6      A.  What I would do -- and have done in this
7  case, so I'm not sure why we're even talking about
8  this -- if I were performing a full specific
9  causation report, I would use this chart as well as
10 the chart specific to Mr. and Mrs. Pilliod's specific
11 ICD classification.
12     Q.  Okay.  So starting with this chart, which is
13 a chart that looks at NHL generally, are you aware of
14 any epidemiology study in the published literature
15 that places the incidence rate for glyphosate
16 exposure in NHL as high as the incidence rate in this
17 SEER NHL data for a white male in Mr. Pilliod's age
18 group?
19     MR. TRAVERS:  Objection.  Form.  Compound.
20     THE WITNESS:  No.  However, the glyphosate
21 studies -- and, again, I'm really resisting
22 testifying about this, because it's not in my
23 report; it's not part of my intent in this
24 case -- but certainly the epidemiological studies
25 show, you know, 1.5, 1.6, up to doubling of the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 178

1 risk.
2 BY MR. KALAS:
3    Q.  Okay.  Are you --
4    A.  On age-matched control basis.
5        So irregardless of what these numbers are,
6 the risk is still significantly enhanced from the
7 glyphosate.
8    Q.  I'm correct the rate of NHL in the U.S. has
9 held steady since the mid 1990s, right?
10    A.  I know, again, in Johnson I did address that.
11 But I don't remember --
12    Q.  Okay.
13    A.  -- the specifics.
14        But I'm not intending on testifying to these
15 questions you're asking.
16    Q.  Okay.  So let me ask you this:  Are you going
17 to tell the jury that there has been some increased
18 rate of NHL in this country since the use of
19 glyphosate began increasing in the mid '90s?
20        MR. TRAVERS:  Objection to form.
21        THE WITNESS:  It's not in my report.  It's
22    not part of my testimony in this case.
23 BY MR. KALAS:
24    Q.  Okay.  So you don't intend to tell the jury
25 that there's an epidemic of NHL in this country

Page 179

1 associated with glyphosate use, right?
2        MR. TRAVERS:  Objection to form.
3        THE WITNESS:  I have no opinion.
4        THE VIDEOGRAPHER:  John, you have about four
5    minutes.
6        MR. KALAS:  Okay.
7 BY MR. KALAS:
8    Q.  Had Mr. Pilliod not been exposed to
9 glyphosate, would you have any opinion about what
10 caused his NHL?
11    A.  I haven't addressed that.
12    Q.  Okay.  If Mrs. Pilliod had not been exposed
13 to glyphosate, would you have any opinion about what
14 caused her NHL?
15    A.  I have not addressed that.  I have no
16 opinion.
17    Q.  Now, you do agree because you do mention it
18 in your report in that paragraph we looked at that
19 age is one of the top risk factors for NHL, right?
20    A.  Yes.
21    Q.  Okay.
22    A.  But it's compounded --
23    Q.  And you --
24    A.  -- by the glyphosate exposure.
25    Q.  And you can't say how much it's

Page 180

1 been compounded; you'd defer that to Dr. Nabhan and
2 Dr. Weisenburger?
3    A.  That's right.
4    Q.  Okay.  Now, I'm correct you did not review
5 the pathology of Mr. Pilliod's lymphoma?
6    A.  That's correct.
7    Q.  And Dr. Weisenburger, plaintiffs'
8 pathologist, has reviewed, correct?
9    A.  I only glanced at his deposition.  I'm not
10 sure.
11    Q.  Okay.  Do you disagree with anything he said?
12    A.  Dr. Weisenburger?  I have only read a small
13 portion of his deposition due to time constraints so
14 I'm not sure.
15    Q.  You would defer to Dr. Weisenburger on what
16 the pathology slides showed, right?
17    A.  I haven't looked at the slides or the
18 pathology results.  Now, maybe I did look at the
19 pathology results.  I need to check the report here.
20 I always do, but I don't think I did in this one.
21    Q.  Well, you are not a human pathologist, right?
22    A.  No.  I've been trained through medical school
23 all the way through pathology.  I had the third
24 highest grade out of 150 students in pathology.  I
25 loved it.

Page 181

1        I really am interested in pathology and did
2 well with it, and I use it on a day-to-day basis as a
3 toxicologist.  But I'm not a pathologist.
4    Q.  And Dr. Weisenburger is?
5    A.  Yes.
6    Q.  And you'd defer to him about what pathology
7 slides are capable of causing -- showing regarding
8 the etiology of the Pilliods' NHL, right?
9    A.  Say again.
10        MR. TRAVERS:  Objection.
11 BY MR. KALAS:
12    Q.  You would refer to Dr. Weisenburger about
13 what pathology slides are capable of showing
14 regarding the etiology of the Pilliods' NHL, right?
15    A.  Yes, yes.  I thought I heard you say
16 Dr. Pilliod.
17    Q.  Sorry.
18    A.  I totally understand.
19    Q.  Do you know if there's anything unusual about
20 the shape of cells in either Mr. or Mrs. Pilliod's
21 pathology that pointed to glyphosate-based herbicides
22 as a cause?
23    A.  Again, I don't believe I assessed the
24 pathology in that detail.  On Page 2 of my report and
25 Page 3, I do refer to Mrs. Pilliod's diagnosis, and I

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 182

1  think the closest I got to the biopsy was that it was
2  CD-19 and CD-20, et cetera.
3      This was negative for CD.  Findings were
4  consistent with diffuse large cell B-cell lymphoma.
5      I really didn't find it necessary to go any
6  further.  It just simply confirms to me that she did
7  have a B-cell lymphoma diagnosis, okay?  So that's
8  all I need to know to continue my dose calculation.
9  I didn't need to get into the details that you're
10 asking me.
11     MR. KALAS:  All right.  Let's break here.
12     THE VIDEOGRAPHER:  Going off the record at
13 12:30.
14     (Recess from 12:30 until 1:22 p m.)
15     THE VIDEOGRAPHER:  We are back on the record.
16 The time is 1:22.
17 BY MR. KALAS:
18     Q.  Doctor, it's true that none of Mr. Pilliod's
19 treating physicians identified either -- or
20 identified glyphosate-based herbicide exposure as a
21 cause of his lymphoma, right?
22     MR. TRAVERS:  Objection to form.
23     THE WITNESS:  You know, I didn't actually
24 specifically look for that, but my goal was to
25 get through the medical records and pick out any

Page 183

1  piece of exposure information related to exposure
2  history.  I really didn't zero in on that, so I
3  don't know.
4  BY MR. KALAS:
5      Q.  Did you note in your report that any of
6  Mr. Pilliod's treating physicians attributed his
7  exposure to glyphosate-based herbicides as a cause of
8  his lymphoma?
9      A.  Again, I don't know.
10     Q.  Okay.  Do you recall, sitting here today, any
11 physicians who treated Mr. Pilliod attributing his
12 lymphoma to glyphosate-based herbicide exposure?
13     A.  I don't, but I didn't specifically look for
14 that.
15     Q.  And, likewise, same question for
16 Mrs. Pilliod.
17     Do you recall sitting here today any of
18 Mrs. Pilliod's treating physicians attributing her
19 lymphoma to glyphosate-based herbicide exposure?
20     A.  I don't, but I didn't specifically look for
21 that information.
22     Q.  And you didn't talk to Mr. or Mrs. Pilliod's
23 physicians, right?
24     A.  No.
25     Q.  And the reason you didn't talk to Mr. or Mrs.

Page 184

1  Pilliod's physicians is you did not consider that
2  essential in reaching your exposure calculations?
3      A.  Correct.  I -- I -- in fact, there was
4  actually very little exposure information in the
5  medical records, but I thought it would be wise to,
6  you know, extract every possible piece of
7  information.
8      Q.  And you haven't contacted Mr. and Mrs.
9  Pilliods' physician to tell them you believe Roundup
10 or glyphosate-based herbicide exposure was a
11 significant factor in that NHL, right?
12     A.  No.  I wouldn't do that.  I would prefer
13 that, you know, each physician, based upon their
14 training and experience and skill, would arrive at
15 their own decision.  I wouldn't want to influence
16 them.
17     Q.  Okay.  Now, it's true, though, that
18 Mr. and Mrs. Pilliods' physicians treat other people
19 besides the Pilliods with hematologic cancers
20 including lymphoma, right?
21     A.  Yeah.
22     Q.  And some of those other people might be using
23 Roundup, right?
24     MR. TRAVERS:  Objection.  Form.
25     THE WITNESS:  Very possible.

Page 185

1  BY MR. KALAS:
2      Q.  Okay.  And you have not contacted Mr. and
3  Mrs. Pilliods' treating physicians to tell them that
4  they should alert their other patients to cease their
5  use of Roundup, right?
6      A.  No.  No, that would be improper for me to
7  contact other physicians and influence their opinion.
8  That could be -- that could potentially affect this
9  case.  I think that they need to be independent and
10 not having people calling them, influencing them.
11     Q.  Well, you believe human health is at stake
12 when it comes to Roundup exposure of lymphoma, right?
13     A.  Yes.
14     Q.  And you, if you contacted Mr. and Mrs.
15 Pilliods' physicians, could perhaps stop someone in
16 your opinion from getting lymphoma if they're using
17 Roundup, right?
18     A.  No.
19     MR. TRAVERS:  Object to form.
20     THE WITNESS:  If I were to do that, I would
21 have to contact all the physicians in the
22 worldwide, wherever the stuff is used.  I mean,
23 that's -- that's basically what you're asking, if
24 I've made some kind of public announcement to all
25 physicians throughout the world.  It's -- no,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 186

1    it's just a ridiculous question.
2    BY MR. KALAS:
3    Q.  Okay.  So you haven't put anything in the
4    peer-reviewed literature where the world's physicians
5    could review it stating that you believe Roundup is
6    causing lymphoma in people?
7    A.  No.  That's up to international agencies such
8    as IARC.  It's already been done.
9    Q.  You're a Ph.D. toxicologist, though, right?
10   A.  IARC has Ph.D. toxicologists as well.
11   Q.  You have reviewed some documents in this
12   litigation that IARC was not able to review, right?
13   A.  Yes.
14   Q.  You have reviewed internal Monsanto Company
15   documents, for instance, right?
16   A.  Correct.  I can't talk about them.  They're
17   stamped -- what is the word?  It starts with a "P."
18   Not proprietary.
19   Q.  Privileged and confidential, sir?
20   A.  Protected.
21   Q.  Well, you are aware, of course, that your
22   expert report has been filed on various dockets in
23   court cases, right?
24       MR. TRAVERS:  Object to the form.
25       THE WITNESS:  I think it may have been used

Page 187

1    in Monsanto cases and not -- I have not given it
2    out to anyone.  If that's the case, the attorneys
3    have.
4    BY MR. KALAS:
5    Q.  Have you made any efforts to determine what
6    information is now public so you can alert the world
7    physicians to the fact that you, an expert forensic
8    toxicologist, believe Roundup causes NHL?
9    A.  Again, I cannot release protected documents.
10   That's crazy.
11   Q.  Well, my question is:  Have you made an
12   effort to determine what information is still
13   protected so you could report on the unprotected
14   information, sir?
15   A.  No.  I'm not on a campaign to alert the world
16   of the dangers of Roundup.  I'm not in that capacity.
17   That would be something perhaps the news media would
18   do.  I mean, I -- just don't understand how -- what
19   you're asking me to do, how I could actually even
20   accomplish that.
21       MR. TRAVERS:  I just wanted to state for the
22   record, are you waiving confidentiality claims on
23   this report?
24       MR. KALAS:  We are not waiving
25   confidentiality claims on this report.  I will

Page 188

1    note that for the record you have challenged our
2    confidentiality claims on many of Dr. Sawyer's
3    assertions in his reports and many of the
4    assertions are now public.  And so to the extent
5    that report is lifted from other reports, to the
6    extent that information has been made public, for
7    instance, in the Johnson report, then --
8        MR. TRAVERS:  Are you waiving confidentiality
9    claims in the Johnson report?
10       MR. KALAS:  No, sir.  We're not waiving any
11   confidentiality claims we've asserted.  My
12   question is whether he's made an effort to
13   determine what is still confidential and what is
14   not, and he already answered that.
15       MR. TRAVERS:  Okay.  I just wanted to clarify
16   for the record.  It sounded like you were waiving
17   the confidentiality.
18       MR. KALAS:  Did those words come out of my
19   mouth, Jeff?
20       MR. TRAVERS:  No.  Just implied in your
21   questions.
22       MR. KALAS:  Okay.  Okay.
23       MR. TRAVERS:  I just wanted to clarify for
24   the record.
25       THE WITNESS:  Do I have permission to release

Page 189

1    the $500,000 check?
2        No.  That's ridiculous.
3    BY MR. KALAS:
4    Q.  What $500,000 check are you referring to?
5    A.  A -- A -- what is it, American Pediatric
6    Association?
7    Q.  I don't know what you are talking about, sir.
8        Did you receive a $500,000 check from the
9    American Pediatric Association?
10   A.  No, but Monsanto did.
11   Q.  Monsanto received a check for $500,000 to the
12   American Pediatric Association?
13   A.  From them.  It was sent back.
14   Q.  Okay.  So you're referring to the fact that
15   the American Association for Pediatrics returned a
16   check for $500,000 to Monsanto.
17       Is that your testimony?
18   A.  That's true.
19   Q.  So what does that have to do with your
20   toxicological assessment in this case?
21   A.  It's marked -- the check is marked under
22   protective order.
23   Q.  Okay.  Sir, my question is:  What does that
24   have to do with your toxicological assessment in this
25   case?

Page 190

1    A. John, that's what I'm asking you. Why are
2 you asking me questions about alerting physicians and
3 the news media or whatever? I don't understand your
4 question.
5    Q. All right. Well, let me ask you a direct,
6 simple question: Does the purported return of a
7 $500,000 check to Monsanto from the American
8 Association of Pediatrics have anything to do with
9 the opinions you intend to offer in the Pilliod v.
10 Monsanto case?
11    A. No. No.
12    Q. Okay. So let's move on and talk about your
13 opinions in this case.
14    Dr. Sawyer, I want to make sure we use our
15 remaining time effectively.
16    If I understand correctly from the billing
17 records that we looked at earlier, you were first
18 contacted on this case, the Pilliod case, on
19 January 4th by The Miller Firm, right?
20    A. Based on my invoice, it appears that way.
21    Q. And you had ten days to prepare a report
22 here?
23    A. From the time I started, yes. It's possible
24 -- and I -- it's possible that I may have spoke with
25 one of the attorneys from The Miller Firm prior to

Page 191

1 January 4th on a brief conversation and did not
2 include that on the invoice. That's possible. But I
3 started working January 4th.
4    Q. So you had ten days to complete your work
5 from the time you started until the time your report
6 was due, right?
7    A. Yes.
8    Q. And you've testified this morning and -- and
9 that what you did here as far as specific causation
10 is not as comprehensive as some of the other opinions
11 you have offered in other Roundup cases, right?
12    A. That's right.
13    Q. And in other cases you've opined that
14 glyphosate, for instance, induced or substantially
15 contributed to somebody's NHL, right?
16    A. Well, I did in this case. I said it
17 contributed or caused or significant -- it
18 significantly caused or contributed.
19    Q. Yes, sir.
20    In this case, you stated on Page 117 that
21 this was a significant factor contributing to their
22 development and subsequent diagnosis of non-Hodgkin
23 lymphoma.
24    Do you see that?
25    A. Yes.

Page 192

1    Q. Okay. And in other cases, you have stated,
2 for instance, you believe glyphosate exposure induced
3 someone's non-Hodgkin lymphoma.
4    Do you recall stating that in the D. Johnson
5 case, for instance?
6    A. Yes.
7    Q. And in other cases, you have testified that
8 glyphosate substantially contributed to somebody's
9 non-Hodgkin lymphoma.
10    Do you recall testifying to that in the
11 Stevick case?
12    A. Yes.
13    Q. And this -- and in this case, you stated
14 significant factor contributing, which is different
15 language, right?
16    MR. TRAVERS: Objection to form.
17 Mischaracterizes his opinion.
18    THE WITNESS: Yes.
19 BY MR. KALAS:
20    Q. And you stated earlier -- and I want to make
21 sure I understand this precisely. You stated earlier
22 that the selection of the term "significant," that
23 there's a 95 percent level confidence of Mrs. and
24 Mr. Pilliod fitting into the exposure groups that
25 have a significant increased risk in the epidemiology

Page 193

1 studies.
2    Do I understand that correctly?
3    A. Yes.
4    Q. And what that essentially means, if I
5 understand that correctly, is that you've reviewed
6 some epidemiology studies -- and we'll get to which
7 ones here in a second -- with dose response data that
8 you believe are statistically significant at the
9 95 percent confidence interval, right?
10    A. Yes.
11    Q. And you believe that the Pilliods shared the
12 characteristics of the individuals evaluated in that
13 study as far as glyphosate exposure, right?
14    A. Yeah. They actually exceed those
15 characteristics with respect to their exposure dose.
16    Q. And so, in other words, what you have done
17 here, if I -- if I'm following this correctly -- and
18 I'm not -- let me preface this. I should just say
19 I'm not -- I don't mean to criticize your report. I
20 know you had a short period of time.
21    But what you have done here is you have ruled
22 in glyphosate as a contributing factor or potential
23 contributing factor based on their similarities and
24 characteristics to other applicators in the
25 epidemiology studies, right?

Page 194

1  A. Yeah.
2      MR. TRAVERS: Objection to form. Compound.
3      THE WITNESS: It is clearly a contributing
4  factor, even if there were other risk factors
5  that I did not rule out.
6  BY MR. KALAS:
7  Q. Sure.
8  A. I'm deferring those to the other experts to
9  rule in or rule out, the different factors.
10  Q. I got it.
11      So as far as what you're going to tell the
12  jury and what -- the contours of your specific
13  causation opinion are here is you have been able to
14  rule in glyphosate as a contributing factor to the
15  plaintiffs' non-Hodgkin lymphoma, but you have not
16  undertaken the exercise of ruling out other
17  contributing factors to the Pilliods' non-Hodgkin
18  lymphoma?
19  A. Right.
20  Q. Okay.
21  A. I have deferred those to the other experts.
22  Q. Okay. Now, what studies did you rely on
23  specifically to rule in glyphosate as a potential
24  contributing factor to Mr. and Mrs. Pilliods'
25  non-Hodgkin lymphoma?

Page 195

1      MR. TRAVERS: Objection. Vague.
2      THE WITNESS: Well, primarily, the only two
3  that provided a metric for dose exposure was that
4  of Eriksson 2008 and McDuffie, et al, 2001. And
5  those two studies are what I used with respect to
6  days of exposure in determining that both of
7  these Pilliods were in the upper quadrant of
8  exposure range.
9  BY MR. KALAS:
10  Q. Okay. And I'm correct -- well, strike that.
11      Are there any other epidemiology studies that
12  look at dates of exposure that you reviewed?
13  A. Oh, yeah. I think I also referenced the
14  Agricultural Health Study.
15  Q. And that's Andreotti 2018?
16  A. Let me see. Yes.
17  Q. Okay. Are there any other studies beyond
18  those three that you relied on to specifically rule
19  in glyphosate as a potential contributing factor to
20  Mr. and Mrs. Pilliods' non-Hodgkin lymphoma?
21      MR. TRAVERS: Objection. Form.
22      THE WITNESS: Well, I would have to answer
23  that -- redo the question, omitting the word
24  "potential."
25  ///

Page 196

1  BY MR. KALAS:
2  Q. Okay. I'll redo the question omitting the
3  word "potential."
4      Are there any other studies beyond those
5  three -- Eriksson, McDuffie, Andreotti -- that you
6  relied on to specifically rule in glyphosate as a
7  contributing factor in Mr. and Mrs. Pilliods'
8  non-Hodgkin lymphoma?
9  A. No. And the reason is these are the only
10  studies that provide some metric of dose. And there
11  are many other epidemiological studies which the
12  epidemiology experts in this case are handling, but
13  those studies do not include any metric of dose and,
14  therefore, I couldn't use those.
15  Q. Understood.
16  A. It's not that I just cherry-picked these
17  three. I'm using three because they are the only
18  three that provide a metric for a dose comparison.
19  And my task in this case with respect to specific
20  causation is to determine whether or not the dose was
21  significant; that is, in line with studies that, at a
22  95 percent level of confidence, show a significantly
23  increased risk of NHL. And there are two studies
24  that do, one study did not, but it still was a metric
25  so I included it. I didn't cherry-pick.

Page 197

1      And I'm using those studies as a basis for
2  dose comparison.
3  Q. Yes, sir. And I did not mean to imply you
4  were cherry-picking anything. So I hope you didn't
5  get that from my question.
6      Just so once again I completely understand
7  the contours of your opinion, you did not undertake
8  the same task as far as ruling in other potential
9  causes of exposure to the Pilliods based on the lack
10  of time that you had to put together this report,
11  right?
12      MR. TRAVERS: Objection. Form.
13      THE WITNESS: Well, I think to go back a
14  step, when I first spoke with counsel on this
15  case and they asked me to -- if I would be
16  interested in -- or had time to look at it, I
17  remember stating that, look, I don't have time to
18  do a full specific causation analysis.
19      And it was agreed upon that I would only
20  address the dose with respect to specific
21  causation. And other experts were handling the
22  other aspects of ruling in, ruling out potential
23  confounders.
24  BY MR. KALAS:
25  Q. So let me couch that in forms of dose, then.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 198

1    You did not undertake the task for other
2  exposures the Pilliods had as far as calculating the
3  dose to those exposures in order to rule in and/or
4  rule out the contribution of those exposures to their
5  NHL, right?
6    A.  No.  I was -- in fact, I was told that that
7  could be handled or would be or was already handled
8  by the pathologists, ███████████████████
9  ███ ████████  And that I would not be addressing those
11  issues.
12    Q.  You reviewed Dr. Weisenburger's deposition,
13  you stated, in this case?
14    MR. TRAVERS:  Objection.  Misstates his
15  testimony.
16    THE WITNESS:  Only a small portion of it.  In
17  the middle of the deposition, ██████████████ I did
19  look at some of that.
20  BY MR. KALAS:
21    Q.  Okay.  You don't know whether or not
22  Dr. Weisenburger has any expertise in dose
23  reconstruction, do you?
24    MR. TRAVERS:  Objection.  Form.
25    THE WITNESS:  I -- I don't -- I've never

Page 199

1  worked with him personally, so I don't know.
2  BY MR. KALAS:
3    Q.  Okay.  And same question for Dr. Nabhan.  You
4  don't know if Dr. Nabhan has any expertise in dose
5  reconstruction, do you?
6    MR. TRAVERS:  Objection.  Form.
7    THE WITNESS:  I -- I can't answer that.  I
8  have no information.
9  BY MR. KALAS:
10    Q.  Okay.  And in order to know whether or not a
11  compound that can generally cause NHL specifically
12  caused NHL in an individual, one needs to ascertain
13  what the dose of that compound the individual was
14  exposed to, right?
15    MR. TRAVERS:  Objection.  Form.
16    THE WITNESS:  Yes.  But I do -- I can say
17  from my incomplete review of Dr. Weisenburger's
18  deposition, I believe he was assessing with
19  respect to pack years and was addressing dose
20  from what I recall.
21  BY MR. KALAS:
22    Q.  Okay.  But you don't know his qualifications
23  for that?
24    A.  Well, he's a pathologist.  He's highly
25  qualified to do that.

Page 200

1    Q.  Okay.  So, once again, you know he's a
2  pathologist.
3    Do you know his training?
4    A.  No.
5    Q.  Now, as to those three epidemiological
6  studies we mentioned here -- Eriksson, McDuffie, and
7  Andreotti -- am I correct that you won't be offering
8  any opinions on the design of those studies?
9    MR. TRAVERS:  Objection.  Form.
10    THE WITNESS:  Not beyond what's in my report.
11    MR. KALAS:  Okay.
12    THE WITNESS:  The only thing I commented on
13  was that there was age group stratification in
14  the McDuffie study.
15  BY MR. KALAS:
16    Q.  And you also mentioned that the McDuffie and
17  Eriksson study are case-controlled and the Andreotti
18  study is a cohort study, right?
19    A.  Yes.
20    Q.  And beyond those issues, the age
21  stratification in Eriksson -- or in McDuffie and the
22  case-controlled versus cohort point, do you intend to
23  offer any other opinions at trial regarding the
24  design of those studies?
25    A.  Not beyond what's in my report, no.

Page 201

1    Q.  And so when you come in and talk to the jury
2  in Oakland, you're going to tell them, if asked, that
3  you have not evaluated for the purposes of your
4  expert opinion whether the designs of the
5  epidemiology studies -- Eriksson and McDuffie and
6  Andreotti -- are all equally reliable, correct?
7    MR. TRAVERS:  Objection.  Form.
8    THE WITNESS:  Well, no.  I mean, with respect
9  to reliability, I'm going to state just as I did
10  in my report that there is, for example, McDuffie
11  an odds ratio of 2.12.  The lower confidence
12  limit was 1.20.  That was greatly exceeded so it
13  was a statistically significant finding at the
14  95 percent confidence interval.
15    You know, that's in my report.
16    As far as Eriksson, same thing in my report.
17    As far as Andreotti 2018, I'm only comparing
18  with respect to the lifetime days of glyphosate
19  use in quartiles.
20    You will note that I'm not addressing a
21  comparison of Mr. or Mrs. Pilliod's dose
22  concentration in milligram her kilogram body
23  weight to that of Andreotti, and there's a reason
24  that I'm not making that comparison.  And that is
25  I have a whole file showing how defective that

Page 202

1 study was.
2     MR. KALAS:  Okay.
3     THE WITNESS:  It's highly unreliable with
4 respect to biomonitoring aspects.
5 BY MR. KALAS:
6     Q.  So let me unpack that.  There's a lot in
7 there.
8         You understand that there's a lot of things
9 that go into an epidemiology study.
10        For instance, there's the design of the
11 questionnaire, right?
12     A.  Yes.
13     Q.  And there is ascertaining outcomes and how
14 the study authors are going to ascertain outcomes,
15 right?
16     A.  Yes.
17     Q.  There's whether or not the study authors use
18 proxy respondents, right?
19     A.  Yes.
20     Q.  There's whether or not the study authors
21 conduct their interviews via phone versus written
22 questionnaire, right?
23     A.  Yes.
24     Q.  And so on and so forth, right?
25     A.  Right.

Page 203

1     Q.  And you are not going to come in and tell the
2 jury that the design aspects of the studies are
3 equally reliable as to those sorts of things; you're
4 going to defer to the epidemiologists on that, right?
5     A.  I am.
6     MR. TRAVERS:  Objection.  Asked and answered.
7     THE WITNESS:  I am.
8     The only point I'm making is you will note in
9 my report on Agricultural Health Study, I only
10 use the lifetime date of glyphosate use quartiles
11 in my assessment and not the biomonitoring data.
12 BY MR. KALAS:
13     Q.  So what you are stating is you decided not to
14 use the intensity weighted data in the Agricultural
15 Health Study because you believe the design of the
16 intensity weighing is deficient, right?
17     MR. TRAVERS:  Object to the form.
18     THE WITNESS:  No.  No.  I'm explaining that
19 the biomonitoring results in milligram per
20 kilogram body weight are incorrect because it's
21 based upon the assumption of 100 percent urinary
22 excretion.  In addition to that, there are a
23 number of errors that have been reported and --
24     MR. KALAS:  Well --
25     THE WITNESS:  -- with respect to the

Page 204

1 ascertainment of the urine samples and the
2 various biomonitoring data.
3 BY MR. KALAS:
4     Q.  Well, okay.  But the Agricultural Health
5 Study has data just on lifetime days, just like the
6 McDuffie and Eriksson studies, right?
7     A.  Yes.
8     Q.  And that data is not dependent on urinary
9 excretion, right?
10     A.  Right.
11     Q.  So as to -- the only data that you claim is
12 dependant on urinary excretion is the intensity
13 weighing data, correct?
14     MR. TRAVERS:  Objection.  Form.
15     THE WITNESS:  Well, and -- and the actual
16 numerical values are much lower dose levels than
17 actual, because it assumes 100 percent urinary
18 excretion, which is not the case.
19 BY MR. KALAS:
20     Q.  We're going to look at the Agricultural
21 Health Study in a bit, but is it your testimony now
22 that your recollection that the Agricultural Health
23 Study authors report mgs per kg data in the Andreotti
24 study?
25     A.  I may be confusing that with Solomon.

Page 205

1     Q.  Yes, sir.
2         The Andreotti study is a -- is a study of
3 exposure to glyphosate and NHL incidence in the
4 Agricultural Health Study, correct?
5     A.  Yes.
6     Q.  And the Andreotti study has both a lifetime
7 days analysis, correct?
8     A.  Right.
9     Q.  And an intensity weighted lifetime days
10 analysis, correct?
11     A.  Yes.
12     Q.  And the intensity weighted lifetime days
13 analysis is based off of peer-reviewed, verified
14 metrics that have appeared in the published
15 literature over the years, correct?
16     MR. TRAVERS:  Objection.  Form.
17     THE WITNESS:  Depends on which metrics you
18 are referring to.
19 BY MR. KALAS:
20     Q.  So we'll get to that in a bit.
21         But beyond the intensity weighing
22 methodology, do you have -- are you going to tell the
23 jury whether -- strike that.
24         Beyond the intensity weighing metric, which
25 you are discussing, are you going to tell the jury

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 206

1  that you have not evaluated for the purposes of your
2  expert opinion whether the designs of the
3  epidemiology studies you discussed are equally
4  reliable beyond what's discussed in your report?
5        MR. TRAVERS: Objection. Asked and answered.
6        THE WITNESS: I'm relying on our
7  epidemiologists to assess the design and
8  reliability of the epidemiology studies by
9  McDuffie and Eriksson, as well as the Andreotti
10  2018 study.
11  BY MR. KALAS:
12    Q.  Okay.  And that's something you did not
13  evaluate in reaching your opinion?
14    A.  No.  My understanding is the epidemiologists
15  have covered that in-depth.  And, in fact, I did read
16  some of the work that's been performed on that by
17  Dr. Portier in his submissions in the federal Daubert
18  case.
19    Q.  Okay.  Now, you agree the jury should keep in
20  mind when evaluating epidemiology studies that you
21  discussed in your report whether the design of each
22  study is equally reliable, right?
23        MR. TRAVERS: Objection.  Form.
24        THE WITNESS: I don't understand the part
25  about the jurors.

Page 207

1  BY MR. KALAS:
2    Q.  So you're deferring about testimony regarding
3  the design of these studies beyond the limited things
4  you opine about in your report to the
5  epidemiologists, right?
6    A.  Yes.
7    Q.  But the jury -- you agree the jury should pay
8  attention to what the epidemiologists have to say
9  about the design of these three studies when the
10  epidemiologist testifies, right?
11    A.  Of course.
12    Q.  Because design of a study can influence the
13  results of a study, right?
14    A.  Yes.
15    Q.  And the jury should keep in mind issues like
16  power of a study when evaluating these studies,
17  right?
18        MR. TRAVERS: Objection to form.
19        THE WITNESS: Type 2 error, yes.
20  BY MR. KALAS:
21    Q.  Type 1 error, correct?
22    A.  I'm sorry?
23    Q.  And Type 1 error, correct?
24    A.  And Type 1, yes.
25    Q.  And when you discuss the epidemiology studies

Page 208

1  in your report, you agree that you did not do what a
2  trained epidemiologist would do in evaluating these
3  studies, specifically, you did not fully evaluate the
4  strengths and weaknesses of the designs of these
5  studies in reaching your expert opinion, correct?
6        MR. TRAVERS: Object to the form.
7        THE WITNESS: Yes, I'm the toxicologist.  The
8  epidemiologist, that's their job, and they will
9  do that.
10  BY MR. KALAS:
11    Q.  Okay.
12    A.  Toxicologists routinely rely on these types
13  of studies.  And having very well-trained,
14  experienced epidemiologists in this case will fulfill
15  that requirement.
16    Q.  Okay.  Now, starting at the top of Page 22,
17  you have the header:  Pilliod glyphosate exposure
18  compared to three epidemiological studies.
19        Do you see that?
20    A.  Yes.
21    Q.  And I'm correct, then, that you do not intend
22  to offer to the jury on direct any opinions about
23  epidemiology studies that you did not discuss either
24  here or in your latency table, correct?
25    A.  That's right.  They're being handled by our

Page 209

1  epidemiologists.
2    Q.  Now, in your previous expert report in
3  Stevick, you discuss six epidemiology studies, right?
4    A.  I think so.
5    Q.  Why did you cut the other three from this
6  report?
7    A.  As I recall, they did not offer any dose
8  metrics.
9    Q.  Okay.  Now, starting with the Andreotti
10  study, what are some of the strengths of the
11  Andreotti study that you observed when evaluating
12  lifetime days of exposure in it?
13    A.  Well, then statistically it was broken into
14  quartiles or terciles, which gives a statistical
15  basis.  And in this case the Pilliods were greater
16  than the highest value of the fourth quartile, which
17  does one thing.  It tells me that their exposure was
18  similar to that of applicators.
19    Q.  And the applicators -- well, strike that.
20        Of the three studies you evaluated, I'm
21  correct that the Andreotti study has the greatest
22  number of exposed cases, right?  Of exposed NHL
23  cases, correct?
24    A.  Yes.
25    Q.  Okay.  And having the greatest number of

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 210

1  exposed NHL cases necessarily gives a study
2  additional power compared to the other two, correct?
3     A.   Not necessarily.  I'd have to say that it
4  depends on how many individual comparisons are made.
5  In other words, if you compared one -- if you
6  compared people who are 18 to 20 and then 20 to 22
7  and 22 to 24 and break it up into numerous segments,
8  then the power error -- the Type 2 error could go up;
9  the power could go down.  Whereas if -- so there's
10 design factors within an epidemiological study that
11 go beyond just the gross number of subjects.
12    So to make a long story short, I would defer
13 that to the epidemiologists.
14    Q.   Okay.  Now, you do mention that the Andreotti
15 study is a cohort study; and you mention that the
16 Eriksson and McDuffie studies are AHS -- or excuse
17 me -- case-controlled studies, right?
18    A.   Yeah.
19    Q.   And can you just put into whatever language
20 you deem appropriate what the difference is between a
21 cohort and case-controlled study?
22    A.   Well, basically in the Andreotti study, there
23 was 54,251 licensed pesticide applicators, and they
24 were followed and -- I think through 2012.  Whereas
25 in the case-controlled studies -- this was done after

Page 211

1  the fact.  And the number of lymphoma cases in
2  Sweden, for example, from 1992 to 2002 was assessed,
3  and that information was ascertained on each case.
4     So the design of the -- of the McDuffie and
5  Eriksson case-controlled studies is very different in
6  that it's -- cancer has already occurred, and then
7  one is going back to ascertain data from those
8  people.
9     Q.   And you've -- as a forensic toxicologist,
10 you've probably run across this many times.
11    One disadvantage of going back and
12 ascertaining exposure data from people is that
13 memories are sometimes faulty, right?
14    MR. TRAVERS:  I just want to make an
15 objection.  I don't think we've established he's
16 not going to be testifying -- giving an expert
17 opinion about detailed -- detailed opinions about
18 the design of the studies.
19    MR. KALAS:  Object --
20    MR. TRAVERS:  Now you're just going through
21 and asking about the designs of all these
22 studies.
23    MR. KALAS:  So I'm going to mark for the
24 record the speaking objection.  It's
25 inappropriate under the California Rules of

Page 212

1  Procedure.  I would appreciate it if you stop
2  coaching the witness, Jeff, and let him answer
3  the question.
4     MR. TRAVERS:  I'm not coaching.  I'm just
5  making an objection.
6     THE WITNESS:  Dear John, I am not going to be
7  testifying as to the details of the
8  epidemiological studies beyond what's in my
9  report.
10    And I really mean that.  It's deferred to the
11 epidemiologists.  And I'm not prepared to answer
12 those questions today.
13 BY MR. KALAS:
14    Q.   I'm asking about your experience as a
15 forensic toxicologist.  When you go back and ask
16 people, as a forensic toxicologist, what their
17 exposures were, are their memories always perfect?
18    MR. TRAVERS:  Objection.  Form.
19    THE WITNESS:  No.
20 BY MR. KALAS:
21    Q.   Okay.  And sometimes people can misremember
22 things, right?
23    A.   Of course.  That's -- that's always, you
24 know, a weakness in any study.
25    Q.   Well, in the cohort study, what they do is

Page 213

1  they track people going forward, right?
2     A.   Correct.
3     Q.   So the lack of memory is not as big of a
4  problem in a cohort study, right?
5     MR. TRAVERS:  Objection.  Form.
6     THE WITNESS:  Generally, that's true.
7  BY MR. KALAS:
8     Q.   Okay.  And you mentioned that the AHS study
9  followed people through 2012, right?
10    A.   Right.
11    Q.   Okay.  And glyphosate was released to the
12 market in 1974, right?
13    A.   Yes.
14    Q.   And so the AHS study has 38 years of exposure
15 data on glyphosate, correct?
16    MR. TRAVERS:  Objection.  Form.  Misstates
17 the study.
18    THE WITNESS:  You know, I would think I need
19 to defer that to the epidemiologists.  I'm not
20 sure of the years --
21 BY MR. KALAS:
22    Q.   Okay.
23    A.   -- with respect to that study.
24    Q.   You haven't compared the years of exposure to
25 glyphosate in the Agricultural Health Study versus

Page 214

1 the McDuffie and Eriksson studies, right?
2    A.  I'm sorry?
3    Q.  You haven't compared the years of exposure or
4 the potential years of exposure to glyphosate in the
5 Agricultural Health Study, the Andreotti study, as
6 compared to the Eriksson or McDuffie studies?
7    A.  Well, I have.  And in the Eriksson study was
8 1999 to 2002 NHL cases.
9    Q.  Well, not to cut you off, sir --
10    MR. TRAVERS:  I think he's still going.
11 BY MR. KALAS:
12    Q.  That is not the --
13    MR. TRAVERS:  You just cut him off.
14 BY MR. KALAS:
15    Q.  -- not the years of exposure, sir.  It's when
16 they did the questionnaire, right?
17    MR. TRAVERS:  Move to strike the testimony of
18 counsel.  You did cut him off.
19    THE WITNESS:  No.  That was the years -- what
20 I said earlier, about five minutes ago, that was
21 the period of time in which NHL cases were
22 counted.  And then, of course, they had to go
23 back in time --
24 BY MR. KALAS:
25    Q.  Right.

Page 215

1    A.  -- to ascertain the data.
2    Q.  Right.
3    A.  So maybe I'm misunderstanding your question.
4        Are you asking me what years they ascertained
5 data?
6    Q.  I'm just asking if you have compared.  Have
7 you compared the number of years somebody could have
8 potentially been exposed to glyphosate in the
9 Andreotti study as opposed to the number of years
10 somebody could have potentially been exposed to
11 glyphosate in the Eriksson or McDuffie studies?
12    A.  Are you asking me the number of years,
13 meaning date-wise from like 1974 to --
14    Q.  Yes, sir.
15    A.  --to 1999?
16    Q.  Yeah.  Have you compared that data?
17    A.  I reviewed the studies thoroughly.  So, yes,
18 I would have seen that.
19    Q.  And you agree, then, that the Andreotti study
20 contains the most years of potential glyphosate
21 exposure in their study population, right?
22    MR. TRAVERS:  Objection to form.  If he's
23 going to be asked specific questions about the
24 study, I think we need a copy of the study in
25 front of him.

Page 216

1    MR. KALAS:  He already said it's 38 years.
2    MR. TRAVERS:  No.
3    MR. KALAS:  Yeah, he did.  Go read it.
4    MR. TRAVERS:  Anyway, I object to asking him
5 detailed questions about the study without it in
6 front of him.
7    THE WITNESS:  To the best of my memory, I
8 just -- I reviewed these studies in some detail
9 back, I think, when I was preparing the -- I
10 think it was the Hall report.  And I just don't
11 recall the details.
12 BY MR. KALAS:
13    Q.  So when you were preparing your report in the
14 Pilliod case, you did not review the Eriksson,
15 Andreotti, or McDuffie studies in detail?  You
16 reviewed them in detail prior to preparing your
17 report in this case?
18    A.  Oh, yes.  And you will note that much of the
19 paragraph structure here in that section is very
20 similar to that of the Hall report.
21    Q.  Now, in the Hall report, you discuss these
22 studies in the context of a latency analysis, right?
23    A.  Yes.
24    Q.  And here, you're discussing these studies in
25 the context of a dose response analysis, correct?

Page 217

1    A.  Yes.
2    Q.  And so I know we talked about the Eriksson
3 study and the context of latency last October, but I
4 want to just mark it and go through it here quickly
5 to discuss the dose response figures.
6    (Sawyer Exhibit 10 was marked for
7 identification.)
8 BY MR. KALAS:
9    Q.  So I will mark as Exhibit 10 the Eriksson
10 study.
11    All right.  Now, one thing you mentioned last
12 October is that the only odds ratios in this study
13 that control for other exposures are listed in Table
14 VII, right?
15    MR. TRAVERS:  Objection.  Vague.  Misstates
16 his testimony.
17 BY MR. KALAS:
18    Q.  I see you're on your phone there.  Can you
19 tell us for the record what you're doing?  Oh,
20 turning the flashlight on?
21    A.  Yeah.  This is small print.
22    Q.  Yeah.
23    A.  All right.  Now, the answer is on Page 1658
24 under "Assessment of Exposure."
25    Q.  Okay.  I'm on 1658.

Page 218

1    A.  Organic solvents, for example.
2    Q.  So my question is --
3    A.  Smoking habits, medications.  There's a
4 number of factors here that were ascertained --
5    Q.  Yes, sir.
6    A.  -- on Table VII.
7    Q.  Yes, sir.
8      Yeah.  So my question in Table VII is of all
9 the tables presented in this study, is Table VII the
10 only table presented that controls for exposure to
11 other compounds?
12    A.  It's the only table.
13    Q.  Okay.
14    A.  I don't know that that means that it's the
15 only thing they controlled for.  I mean, they did
16 match controls and so on.  So they obviously took
17 into consideration these other factors that were in
18 the methodology protocol on Page 1658.
19    Q.  So let's be clear here.  If you look at Table
20 VII, it says "Multivariate Analyses Including Agents
21 According to Specified Criteria, See Text."
22      Do you see that in the title?
23    A.  Yes.  Right.
24    Q.  And then at the bottom of that table, it says
25 adjustment was made for age, sex, and year of

Page 219

1 diagnosis or enrollment.
2      Right?
3    A.  Uh-huh.  Yes.
4    Q.  Okay.  And then if we go to Page 1660 and we
5 go to multivariate analysis in the top right-hand
6 column, it states:  Since mixed exposure to several
7 pesticides was more rule than an exception and all
8 signal agents were analyzed without adjusting for
9 other exposure, a multivaried analysis was made to
10 alleviate the relative importance of different
11 pesticides.
12      Did I read that correctly?
13    A.  Yes.
14    Q.  Okay.  And so the only analysis in this study
15 that controls for the influence of other pesticides
16 is presented in Table VII, correct?
17    A.  Yes.
18    Q.  Okay.  And for glyphosate, for ever and ever
19 exposure, the odds ratio went from 2.02 with a
20 confidence interval of 1.1 to 3.71 to 1.51 with a
21 confidence interval of .77 to 2.94, right?
22    A.  Yes.
23    Q.  And the multivariate confidence interval is
24 not statistically significant, right?
25    A.  Right.

Page 220

1    Q.  And what that means is we cannot say on the
2 multivariate ever and ever number that every exposure
3 to glyphosate is a significant factor contributing to
4 NHL based on the data in this study, right?
5      MR. TRAVERS:  Objection to form.
6      THE WITNESS:  Well, I think your wording
7    was -- did you say "ever"?
8 BY MR. KALAS:
9    Q.  Yes, sir.  Ever.
10    A.  I think so.
11    Q.  And that's because -- and I think you've
12 testified to this before -- that controlling for
13 confounders is important if you can do it, right?
14    A.  Right.
15    Q.  And that's equally important for dose
16 response data as latency data, right?
17      MR. TRAVERS:  Objection to form.
18      THE WITNESS:  I'm not sure.
19 BY MR. KALAS:
20    Q.  Well, if you could control for confounders in
21 dose response data -- and by confounders, I mean
22 other substances that you suspect are associated with
23 NHL -- that would make your study a better study than
24 if you could not control for confounders, correct?
25    A.  Right.

Page 221

1    Q.  And that's because there's lots of things
2 people are exposed to that you believe are implicated
3 in the causation of NHL, right?
4      MR. TRAVERS:  Objection to form.
5      THE WITNESS:  Yes.
6 BY MR. KALAS:
7    Q.  Okay.  And so if we go to Table 2, which is
8 the data you present in your report, or where you
9 derive the data you present in your report, Table 2
10 states:  Exposure to various herbicides.
11      Do you see that?
12    A.  Table 2?
13    Q.  Yes, sir.
14    A.  Not yes.
15    Q.  1659.
16    A.  Oh, you said in my report.
17    Q.  I'm sorry.  That was poorly worded.
18      I'm referring to the data you present in your
19 report in your epidemiology section.  That's derived
20 from Table 2 of the Eriksson study, correct?
21    A.  Yes.
22    Q.  And the data you present in Exhibit 6, your
23 expert report, is the greater than 10 days glyphosate
24 data with an odds ratio of 2.36 and a confidence
25 interval of 1.04 to 5.37, correct?



Page 222

1    A.   Could you repeat that?

2    Q.   The data you present in your report in

3  support of your significant contributing factor

4  opinion is the odds ratio of 2.36 with a confidence

5  interval of 1.04 to 5.37 for greater than 10 days of

6  use, correct?

7    A.   Yes.

8    Q.   Okay.  Now, if we go to -- well, let me back

9  up.

10       Does this data in Table 2 control for other

11  pesticide exposures?

12    A.   I don't believe so.

13    Q.   Okay.

14    A.   But it does show a dose response

15  relationship.

16    Q.   And, if you recall, the authors of this study

17  said exposure to several pesticides was more rule

18  than an exception.

19       Do you remember them saying that on 1660?

20    A.   Yeah.

21    Q.   So as a rule, as opposed to an exception, one

22  would expect the glyphosate exposed individuals to

23  also be exposed to other pesticides, right?

24    A.   Some of the people, yes.  Not all of the

25  subjects, but some.

Page 223

1    Q.   And for every pesticide in Table 2 other than

2  greater than 32 days of other herbicides, is the odds

3  ratio greater than 1?

4    A.   In Table 2?

5    Q.   Yes, sir.

6    A.   Yes.

7    Q.   Okay.  And what that means is if the authors

8  found, based on the odds ratio, that individuals of

9  exposure to MCPA were at a greater risk of NHL than

10  individuals not exposed to MCPA, right?

11    A.   Well, no, because that's very different.

12  Here, with a greater dose, greater than 32 days, the

13  relationship became insignificant.

14    Q.   Okay.  The --

15    A.   It's the opposite.  It's not dose response

16  there.

17    Q.   Well, that's because they only had six cases

18  and four controls, right?

19       MR. TRAVERS:  Objection.  Move to strike.

20  BY MR. KALAS:

21    Q.   It was greater than 1, but the confidence

22  interval was very wide, right?

23    A.   Well, no.  The -- the confidence interval is

24  wide, but the fact is the odds ratio went way down

25  with increased exposure.

Page 224

1    Q.   Well, it's possible that the actual odds

2  ratio for greater than 32 days is 5.96, right, using

3  that confidence interval?

4    A.   Well, again, that's true, but the less than

5  32 days had a maximum confidence interval 10.5.  So

6  it's backwards.  There's no sign of any dose response

7  there; that's for sure.

8

Page 225

1

Page 226



13    A.   Throughout a lifetime, excluding basal-cell
14  carcinoma, around 25 to 30 percent of the population
15  anticipate cancer.
16    Q.   And if you include basal-cell carcinoma,
17  nearly half of the population will get cancer?
18    A.   That's right.  That's why I'm saying --
19    Q.   Right.
20    A.   -- this is not really unusual.
21    Q.   Cancer is not an unusual disease?
22    A.   No.  No.  What one looks at is the SEER
23  registry and the incidence rates for specific types
24  of cancer.
25    Q.   And you haven't been able to find an

Page 227

1  incidence rate in glyphosate-exposed population for
2  non-Hodgkin's lymphoma that's higher than the
3  background incidence rate, right?
4       MR. TRAVERS:  Objection to form.
5       THE WITNESS:  Yeah.  Right here, for example.
6  BY MR. KALAS:
7    Q.   Okay.
8    A.   In Eriksson.
9    Q.   So let's look back to Eriksson.  If you go
10  back to Table 2, exposure of various herbicides, do
11  you believe that all of these herbicides cause NHL
12  that are listed in Table 2?
13    A.   No.  As I stated, MCPA is not a known or
14  probable human carcinogen.  And in Table 2 shows with
15  increasing exposure lower OR and lower confidence
16  interval at the upper end.  I mean, that's not
17  consistent with a carcinogen.
18    Q.   So let's look at the MCPA data.  If you look
19  at the MCPA ever and ever data, the odds ratio is
20  2.81 with a confidence interval of 1.27 to 6.22,
21  right?
22    A.   Yeah.
23    Q.   Okay.  And it's your opinion based on that
24  data that MCPA is not a known or probable human
25  carcinogen, right?

Page 228

1    A.   No, it's not based on that data.  It's based
2  upon the generally accepted documentation compiled by
3  various agencies.  For example, IARC.  IARC does not
4  consider MCPA as a probable or known human
5  carcinogen.
6    Q.   So a juror shouldn't just look at an odds
7  ratio of 2.81 with a confidence interval of 1.27 to
8  6.22 and automatically say that causes cancer, that
9  causing NHL, right?  They need to look at more data?
10    A.   Yeah.  Just as in this case, the
11  epidemiologists have looked at the full body of human
12  epidemiologic data.  And that is looked at with a
13  strength -- in terms of the strength of the
14  association, its consistency, its coherence, dose
15  response, the mechanisms which the toxicologists
16  usually handle, and some other factors.
17       It's -- there's more to it than just looking
18  at the single prong of the Bradford-Hill criteria and
19  making a judgment on that only.
20    Q.   Okay.
21    A.   One has to look at the full scope, including
22  experimental models, animal models.  There's just --
23  you're oversimplifying the process here by directing
24  me just to that 2.81 odds ratio and asking if a juror
25  should use that to make their decision.

Page 229

1    Q.   Well, okay.  So is there an odds ratio for
2  glyphosate exposure that is higher than 2.81 with a
3  statistically significant confidence interval that
4  you've reviewed?
5    A.   Well, we have in the same table a 2.36.
6    Q.   Right.
7    A.   With a lower bound of 1.04 and an upper bound
8  of 5.37.  And that is in conjunction with a lower
9  dose, which shows a lower odds ratio.
10    Q.   So you pointed me to the greater than ten
11  days figure, which is in your report.
12       Am I correct that the odds ratio of 2.636 is
13  lower than the MCPA odds ratio of 2.81?
14    A.   Right, but that doesn't matter.  That's not
15  how these are evaluated.  It's based upon not just
16  the single odds ratio number but whether there's a
17  dose response, whether there's a mechanistic
18  explanation, whether there are animal studies,
19  experimental models, that support the particular
20  agent that can cause NHL.
21       There's -- there's numerous factors here one
22  has to consider in determining whether a compound is
23  carcinogenic.
24    Q.   So if MCPA does not cause NHL, how did the
25  phosphorous find an odds ratio of 2.81 with a

Page 230

1  confidence interval of 1.27 to 6.22 for MCPA?
2      MR. TRAVERS: Objection to form.
3      THE WITNESS: I'd have to defer that to the
4  epidemiologist. I could speculate, but I would
5  rather not.
6  BY MR. KALAS:
7      Q. Which of the compounds evaluated in the
8  Table 2 do you believe -- well, strike that.
9      Now, if the MCPA is not associated with NHL,
10  the fact that we're seeing an odds ratio of 2.81
11  that's statistically significant suggests some sort
12  of bias in that figure, right?
13      MR. TRAVERS: Objection to form.
14  BY MR. KALAS:
15      Q. Or confounding?
16      A. No. In fact, I think part of the proof is
17  that when we look at all these herbicides in Table 2,
18  the only one that shows a dose response relationship
19  is glyphosate. None of the others.
20      Q. So my question, though, is how we achieve the
21  2.81 figure for MCPA if you believe it doesn't cause
22  NHL. So how does -- or strike that.
23      Does the fact that there is a 2.81 odds ratio
24  for MCPA with a statistically significant confidence
25  interval of 1.27 to 6.22 suggest confounding or bias

Page 231

1  in that figure?
2      MR. TRAVERS: Objection to form.
3      THE WITNESS: No, we don't know. What we
4  know is that less than 32 days showed a higher
5  odds ratio over double that of exposure greater
6  than 32 days.
7      So you have to look at the whole set of data,
8  not just that one 2.81 number. That is just an
9  incorrect approach.
10  BY MR. KALAS:
11      Q. So why don't we know what causes that 2.81
12  figure?
13      A. Well, we know from working with
14  epidemiologists, we don't have answers to everything.
15  This is -- you know, the best approach is to perform
16  such a study, but you are never going to answer every
17  detail in a study.
18      Q. What information could help us figure out
19  that that 2.81 figure is, in fact, a figure that
20  reflects a true increased risk from MCPA or some sort
21  of a false positive?
22      A. Additional studies.
23      Q. Okay.
24      A. And meta analysis.
25      Q. Would a multivaried analysis help us as well

Page 232

1  when controlling for other pesticides?
2      A. I'd have to defer that to an epidemiologist,
3  because this is not a very large number of subjects.
4  And when one further reduces, the Type 2 error
5  increases. So it's -- you know, the way you pose
6  that question with the multivariate and help to
7  determine that, because of the smaller number of data
8  to work with, I don't know.
9      Q. So what happened in this study is when they
10  did a multivaried analysis on that MCPA figure, they
11  found that the odds ratio went from 2.81 to 1.88,
12  right?
13      A. That's right.
14      Q. And it was no longer statistically
15  significant, right?
16      A. Right.
17      Q. And, likewise, for glyphosate, when they did
18  a multivaried analysis of the odds ratio for
19  glyphosate, it went from 2.02 to 1.51, right?
20      A. It did.
21      Q. And it was no longer statistically
22  significant, right?
23      A. Yes.
24      Q. Are you prepared to tell the jury that had
25  the authors of this study controlled for other

Page 233

1  pesticide exposures, the greater than ten-day figure
2  in the Table 2 would have still been statistically
3  significant?
4      MR. TRAVERS: Objection to form.
5      THE WITNESS: We don't know. You can't
6  answer that. All we can say is if there is, out
7  of all of them, that's the only one that shows a
8  dose response relationship, which tells us
9  something.
10  BY MR. KALAS:
11      Q. And are you prepared to tell the jury that
12  the data which still shows dose response relationship
13  after controlling for overexposures to different
14  pesticides?
15      MR. TRAVERS: Objection to form.
16      THE WITNESS: Based on the fact that the
17  glyphosate odds ratio difference between less
18  than ten days and greater than ten days is over
19  double, it's more likely than not the
20  multivariate would have not have diminished that
21  confidence interval lower value to a value less
22  than 1.
23      But, I mean, I can't make that calculation.
24  That's -- I'd have to defer that to the
25  epidemiologists.

Page 234

1 BY MR. KALAS:

2    Q. Well, I'm not asking if it were to reduce to

3 less than 1.

4      I'm asking, sir, if you could state to a

5 reasonable degree of scientific certainty that if the

6 exposure to other pesticides has been controlled for

7 in Table II, that the greater than ten days figure

8 would still be higher than the less than ten days

9 figure.

10     MR. TRAVERS: Objection to form.

11     THE WITNESS: I believe it would be. Like

12 you say, the difference is over twice. The value

13 on -- between the two doses, of less than ten-day

14 and greater than ten-day, it's a pretty big

15 margin to work with.

16     So probably would remain significant.

17 BY MR. KALAS:

18    Q. Okay. So you're scientifically certain --

19 reasonable degree of scientific certainty that that

20 would happen?

21     MR. TRAVERS: Objection. Asked and answered.

22     THE WITNESS: Well, maybe I should rephrase

23 my last answer.

24     If asked before the jury, I'm going to defer

25 it to the epidemiologist.

Page 235

1 BY MR. KALAS:

2    Q. Okay.

3    A. You -- it's like you're going to a surgeon

4 because you have an appendicitis. But now you are

5 going to go talk to the podiatrist about an opinion

6 on your appendicitis. I mean, I don't understand

7 what's going on here. Why -- I'm not going to talk

8 about this.

9    Q. Okay.

10    A. It's not my -- I'm a toxicologist. I have

11 taught a portion of an epidemiology course for many

12 years. I used epidemiology. But I'm not an

13 epidemiologist.

14    Q. So let's go to your report at Page 23. And

15 you state in the last sentence regarding Eriksson

16 before the bullet: The association of glyphosate

17 exposure with non-Hodgkin's lymphoma followed a dose

18 response pattern with an odds ratio of 1.69 for ten

19 days of exposure or less and 2.36 for greater than

20 ten days of exposure.

21     Did I read that correctly?

22    A. Yeah, and that's right -- that's what is in

23 the report.

24    Q. Okay. And when you're talking to the jury,

25 you're going to tell the jury that figure was

Page 236

1 not controlled for other pesticides, right?

2    A. That's true.



14    Q. Okay. And you're going to tell the jury that

15 you defer to the epidemiologist about whether or not

16 that figure would still represent -- reflect a dose

17 response if the authors of Eriksson had controlled

18 for the other exposures and health factors, correct?

19     MR. TRAVERS: Objection to form.

20     THE WITNESS: Yes, but I don't know that

21 anyone can answer that question.

22 BY MR. KALAS:

23    Q. It's unknown?

24    A. That last question is unknown.

25     MR. KALAS: Okay. Let's take a break.

Page 237

1     THE VIDEOGRAPHER: Going off the record at

2 2:30.

3     (Recess from 2:30 until 2:40 p.m.)

4     THE VIDEOGRAPHER: We are back on the record.

5 The time is 2:40.

6 BY MR. KALAS:

7    Q. Okay. Doctor, going back to your expert

8 report, Page 23, you state that -- well, strike that.

9     Okay. You state that Mr. and Mrs. Pilliod

10 fall into the greater than ten days exposure group in

11 the Eriksson study, right?

12    A. Yes.

13    Q. Okay. And the Eriksson study, the only data

14 we have on dose is exposure days, right?

15    A. Correct.

16    Q. And when we're comparing apples to apples, we

17 need to compare the exposure dates of the Pilliods to

18 the exposure days in epidemiology studies, correct?

19    A. Yes.

20    Q. But it is true that the Eriksson study does

21 not give us any information on the actual amount

22 applied by the individuals who were studied in the

23 Eriksson study, right?

24    A. That's right.

25    Q. Okay. And so a farmer, for instance, could

Page 238

1  apply glyphosate once a month, but he could apply
2  dozens of gallons of Roundup in one full-day
3  application over a field, right?
4      A.  Right.
5      Q.  And those applicators, this hypothetical
6  farmer I mentioned, would have applied for a matter
7  of hours continuously as opposed to spot spraying for
8  a single hour, right?
9      A.  That's right.
10     Q.  And they would be -- potentially be exposed
11  to a much greater volume of Roundup than the
12  plaintiffs in this matter, right?
13         MR. TRAVERS:  Objection to form.
14         THE WITNESS:  No.  Actually, that's not true,
15  and I can pull out the studies right now and show
16  you.  The tractor-mounted sprayer, farmers
17  putting down 150 gallons covering 500 acres or
18  whatever, their daily dose is not much different
19  than that of a backpack sprayer.
20  BY MR. KALAS:
21     Q.  Okay.  So how about a backpack sprayer and a
22  amenity horticulture, somebody working in a amenity
23  horticulture setting where they're walking around a
24  city park, something like that, using a backpack
25  sprayer.

Page 239

1      They might apply for hours, right?
2      A.  Well, they may apply for seven hours, sure.
3      Q.  Right.
4      And that would be longer than the Pilliods,
5  right?
6      A.  Yeah.  But keep in mind, rather than greater
7  than 10 days, we're 100 to 500 times above that.
8      So the little discrepancy between a backpack
9  sprayer, home gardener, and a tractor-mounted
10  sprayer, the magnitude of difference between those
11  application processes is very minimal.  And the
12  exposure in this case is so far beyond ten days that
13  that becomes irrelevant.
14     Q.  Well, I guess what I'm trying to get at, sir,
15  and -- and perhaps we can come to a point of
16  agreement -- is that an exposure day in and of itself
17  only tells us that that person was exposed to
18  glyphosate in that day.  It does not tell us how much
19  glyphosate they were exposed to in that day, right?
20     A.  That's true.
21     Q.  And a farmer, depending on the method of
22  application, could be exposed to much more glyphosate
23  in a day than a residential applicator like the
24  Pilliods'?
25     A.  Not much.  I can show you the data.  There is

Page 240

1  a difference, but it's not much more than -- it's way
2  under an order of magnitude.  Way under.
3      Usually two times more or five times more,
4  but not enough that could impact that.
5      Q.  And a professional applicator working in a
6  right-of-way, working in amenity horticulture could
7  be exposed to much more glyphosate in a day than
8  somebody like the Pilliods, correct?
9      MR. TRAVERS:  Objection to form.
10     THE WITNESS:  No.  Actually, a backpack
11  sprayer without personal protective gear has an
12  exposure much higher than a tractor-mounted
13  sprayer who sprays all day.
14  BY MR. KALAS:
15     Q.  Right.  I'm asking to compare a backpack
16  sprayer to the Pilliods, a professional backpack
17  sprayer who has a -- who is a professional pesticide
18  applicator could potentially have much more exposure
19  in a day than somebody like the Pilliods, right?
20     MR. TRAVERS:  Objection.  Form.  Vague.
21     THE WITNESS:  Not -- not above a factor of
22  ten.
23  BY MR. KALAS:
24     Q.  So ten is 1,000 percent more, right?
25     A.  Yes.  But here we're dealing with a factor of

Page 241

1  at least 1,000 days versus ten days.  It's a hundred
2  times higher.
3      Q.  Yes, sir.
4      I'm just trying to understand the limits and
5  the -- what an exposure day can tell us and what an
6  exposure day cannot tell us.
7      So you would agree with me that an exposure
8  day can tell us somebody was exposed to glyphosate in
9  that day, right?
10     A.  Yes.  McDuffie used a ten-hour per year,
11  which is defined a little better.
12     Q.  Right.
13     But an exposure date cannot tell us, as a --
14  as a volume amount how much glyphosate somebody used
15  in a particular day, right?
16     A.  No.  But we know in this case, in the Pilliod
17  case, they were at least an hour.  And if we went to
18  the extreme end of that of an applicator at seven
19  hours, that's still under a difference of tenfold.
20     Q.  Right.
21     But under your calculations, amenity
22  horticulture is people who are using backpack
23  sprayers are exposed to approximately an order of
24  magnitude more glyphosate in a typical exposure day
25  than a home garden user, right?

Page 242

1    MR. TRAVERS:  Objection to form.  Misstates
2  his testimony.
3    THE WITNESS:  No, that's not exactly what I
4  said.  What I said was there's a huge difference.
5  You could actually have a professional applicator
6  working seven hours -- and I could show the
7  tables -- with lower exposure than that of a --
8  that is, if that person is wearing PPE -- a lower
9  exposure than a home gardener working for one
10  hour.
11 BY MR. KALAS:
12    Q.  Okay.
13    A.  Because of the difference in PPE.
14    Q.  Okay.  Sir, what tables are you relying on
15 for that?
16    A.  Oh, a bunch of stuff.
17    Q.  Okay.
18    A.  It's all studies from -- that Phalen relied
19 on.
20    Q.  So what studies are you relying on, sir?  Can
21 you just read the names out.
22    A.  Okay.  The first one is I already mentioned
23 this, Machado-Nato 2000.
24    Q.  Okay.
25    A.  Then that's a dup.

Page 243

1    Then the next one is the Health and Safety
2  Report, Worker Health and Safety Branch, Exposure of
3  Herbicide Handlers in the Caltrans Vegetation Control
4  Program.
5    Q.  Okay.
6    A.  April 27th, 1995.
7    Q.  Sir, are these all the studies that were
8  cited in the Solomon report --
9    MR. TRAVERS:  I think he's still going.
10    MR. KALAS:  -- that you're using?
11    MR. TRAVERS:  Do you want --
12    MR. KALAS:  Well, he's reading out loud the
13  studies cited in the Solomon article.
14    MR. TRAVERS:  No, he's answering your
15  question.  You asked him what studies he relied
16  on, so let him finish.
17    If you want to retract the question, fine.
18  But if you are not going to retract it, then let
19  him finish.
20    MR. KALAS:  Well, maybe he could have
21  produced this on his materials considered list.
22    THE WITNESS:  Whoa, whoa, I just got the
23  report from you from Phalen.
24    MR. KALAS:  My question is --
25    THE WITNESS:  I just finished reading this

Page 244

1  last night.
2    MR. TRAVERS:  You've got to either retract
3  the question or let him finish.
4    MR. KALAS:  Don't tell me how to ask my
5  questions, Jeff.
6    MR. TRAVERS:  But you are cutting him off.
7  That's not appropriate.
8  BY MR. KALAS:
9    Q.  Dr. Sawyer, are you just relying on the --
10    MR. TRAVERS:  You are cutting him off.  He is
11  in the middle of answering and you just cut him
12  off because you don't like his answers.
13    MR. KALAS:  I don't have any problem with his
14  answers.
15    MR. TRAVERS:  Then let him answer.  Let him
16  continue.
17  BY MR. KALAS:
18    Q.  Dr. Sawyer, can you hand me that Redwell,
19  please.  I will withdraw the question.  Can you hand
20  me the Redwell --
21    A.  As -- as usual, please try to keep it in the
22  same order.
23    Q.  Yes, sir.
24    A.  Thank you.
25    Q.  So are the studies you're relying on for your

Page 245

1  opinion that professional applicators and farmers are
2  exposed to similar amounts as home garden users in
3  the manilla folder labeled Dermal Exposure Rates,
4  Body Areas, and Penetration?
5    A.  I think some are.
6    Q.  Okay.  The studies in this are Machado-Neto,
7  correct?
8    A.  Yes.
9    Q.  Edmiston, which is the Caltrans study,
10  correct?
11    A.  Yes.
12    Q.  And Johnson 2005, correct?
13    A.  Yes.
14    Q.  And Layvi, 1992, correct?
15    A.  Yes.
16    Q.  Okay.
17    A.  And I may have other studies in these two
18  folders.
19    Q.  We'll look at those other studies on the next
20  break.
21    And those studies you rely on for your
22  epidemiologic exposure opinions to the McDuffie
23  study, right?
24    A.  Yes.
25    Q.  What are you going to tell the jury about the

Page 246

1  McDuffie study?
2     A.  Well, that is the Canadian case-controlled
3  study that investigated NHL on a dose response level
4  basis.  A metric of cumulative -- well, being an
5  incidental bystander in environmental exposure as
6  compared with more intensive exposure; and, B,
7  between case controls and was a cumulative total ten
8  hours per year.
9     Q.  Okay.  Now, this article, the McDuffie study,
10  is in the peer-reviewed literature, right?
11     A.  Yes.
12     Q.  And you argued this study -- you used -- one
13  of the arguments you make about this study is that it
14  controls for the increased risk for aging since
15  individuals in the study are age-matched, right?
16     A.  Yes.
17        MR. TRAVERS:  Objection to form.
18  BY MR. KALAS:
19     Q.  And I'm correct that articles in the
20  peer-reviewed literature are generally considered
21  reliable by Ph.D. toxicologists like yourself, right?
22     A.  I don't understand the question.
23     Q.  Peer-reviewed literature is one of the places
24  that a Ph.D. toxicologist like yourself goes to find
25  out what new science is out there on compounds you're

Page 247

1  interested in, right?
2     A.  Well, the body of peer-reviewed literature,
3  yes.  I mean, it's -- every study is weighted and has
4  different qualitative value --
5     Q.  Yes, sir.
6     A.  -- in terms of its number of subjects and
7  design and that type of stuff, as we talked about
8  with Eriksson.
9     Q.  Okay.  But the peer-reviewed literature is
10  one of the sources you go to when evaluating the
11  toxicology evidence of a substance, right?
12     A.  Of course.
13     Q.  And you consider a body of peer-reviewed
14  literature to be a reliable place to go to for that
15  information?
16     A.  Of course.
17     Q.  Okay.  So you think that the McDuffie study
18  is a reliable study, right?
19     A.  Yes.
20     Q.  And you think the jury should seriously
21  consider the data in this study, right?
22        MR. TRAVERS:  Objection to form.
23        THE WITNESS:  Well, I think the jury needs to
24  consider the totality of all of the epidemiologic
25  studies.  Again, I'm only picking these three

Page 248

1  studies because they provide an exposure metric.
2  BY MR. KALAS:
3     Q.  So this is one of the studies you think the
4  jury should seriously consider the data from,
5  correct?
6        MR. TRAVERS:  Objection to form.
7        THE WITNESS:  With respect to exposure
8  metric, for sure.
9  BY MR. KALAS:
10     Q.  Okay.  So I'm going to mark this study as
11  Exhibit 11.
12        (Sawyer Exhibit 11 was marked for
13  identification.)
14  BY MR. KALAS:
15     Q.  Okay.  Now, if you look at Table 2 of this
16  study, once again, it's the small print -- or excuse
17  me, Table 1 of this study.  It's on Page 1157.
18        Do you see the medical history section of
19  Table 1?
20     A.  Yes.
21     Q.  Okay.  And do you see the previous cancer
22  line entry there?
23     A.  Yeah.
24     Q.  Okay.  And for individuals with previous
25  cancer, what the authors of the study found is that

Page 249

1  they had an odds ratio of 2.43 with a confidence
2  interval of 1.71 to 3.44, right?
3     A.  Yes.
4     Q.  Okay.  And what's it mean to have an odds
5  ratio of 2.43?
6     A.  It's doubling of the risk.
7     Q.  In fact, it means that 143 percent -- or
8  strike that.
9        It means that there was 143 percent increased
10  risk of NHL in this population from having the
11  previous history of cancer, right?
12     A.  Yes.
13     Q.  Okay.  And that was a statistically
14  significant increased risk, right?
15     A.  Yes.
16     Q.  Which means that the authors were 95 percent
17  sure that the increased risk of previous cancer
18  was -- sorry.  I'll ask again.
19        The confidence interval means that the
20  authors were 95 percent sure that the increased risk
21  was between 71 percent and 244 percent, right?
22        MR. TRAVERS:  Objection to form.
23        THE WITNESS:  I'll try to shut this ringer
24  off.
25        Okay.

Page 250

BY MR. KALAS:

Q. Do you need me to ask it again?

A. Well, I'm trying to look -- yeah.

Q. Okay. Would you agree with me that in the McDuffie study population a previous history of cancer was a significant risk factor for NHL, right?

A. Yes.

Q. Okay. Now, the odds ratio for a previous history of cancer, a previous personal history of cancer, is higher than the 2.12 figure that you cite to in Table VIII, right?

MR. TRAVERS: Objection to form.

THE WITNESS: Did you say 2.42 or --

BY MR. KALAS:

Q. 2.12, sir.

A. 12, yes.

Q. Yes, sir.

The 2.43 figure for a previous history of cancer is higher than the 2.12 figure you cite to in Table 8, right?

A. Yeah, it is.

Q. Okay. Now -- and the odds ratios in Table 8 are controlled for age and province of residence, right?

A. Yes.

Page 251

Q. Okay. They are not controlled for a previous personal history of cancer, right?

A. Right.

Q. Okay. Now, Dr. Sawyer, if the only epidemiology study you had in the world was McDuffie regarding dose response in someone who was 70 years old with personal history of cancer and greater than two days a year of glyphosate use came to you and said what caused my NHL, what would you tell them?

MR. TRAVERS: Objection to form.

THE WITNESS: If the only thing that I had to rely on was what?

BY MR. KALAS:

Q. The only epidemiology study with dose response data that you had was the McDuffie study. And someone came in to see you who was 70 years old with a personal history of cancer and greater than two days a year of glyphosate use, and they asked you what caused my NHL, what would you tell them?

MR. TRAVERS: Objection to form.

THE WITNESS: Well, I think what I would state is that with respect to -- you're asking specifically with respect to family -- not family, rather previous cancer at 2.43 odds ratio, and I think you also said with an age of

Page 252

71?

BY MR. KALAS:

Q. I said 70.

A hypothetical person who's 70 and greater than two days a year of glyphosate use and a previous history of cancer. And the only study you had was this.

What would you tell them caused their NHL?

MR. TRAVERS: Objection to form.

THE WITNESS: Well, again, this is going to take a minute here, because this is really beyond what was in my report and what I was prepared to answer.

BY MR. KALAS:

Q. Well you evaluated the McDuffie study, right?

A. Yeah. But I deferred the -- that very question you just asked me to the epidemiologist in this case.

Q. Okay. So you would defer the question to the epidemiologist in this case whether a personal history of cancer is a potential causative factor for NHL, right?

A. Yeah. I mean, we know it is based on the study. The question is: How does that, in a differential diagnosis process, work? Because we

Page 253

still have the increased risk of the glyphosate on top of that for somebody who did have a prior malignancy.

We also have the difference in terms of the type of malignancy. Was it a simple skin cancer that was removed and would have no bearing on a future risk of lymphoma? Or was it someone who had a metastatic malignancy and received radiation, which causes NHL? So one would have to differentiate that, and that's not my role in this case.

Q. So if -- so if I understand you correctly, one thing you would like more information on is what type of cancer the previous cancers were, right?

A. Well, certainly. If that person received a cyclophosphamide treatment, cyclophosphamide is a drug. One of the toxic properties of the chemotherapy cyclophosphamide is to induce lymphoma, especially a highly malignant form that is worse than the original. And the same goes for radiation exposure for radiological treatment.

So I'd want to know if Mr. and Mrs. Pilliod underwent radiological treatment, cyclophosphamide treatment, immunotherapy treatment, all of those things. It's all part of differential diagnosis, which I'm not handling in this case.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 254

1   Q. Right.
2     But we do know, based on this study, that in
3  the McDuffie population, previous cancer is a
4  potential causative factor for NHL, right?
5   A. Yes, and that -- and that is because some of
6  those people did receive radiation and
7  cyclophosphamide and other agents that caused NHL.
8   Q. How do you know that without knowing what
9  type of cancer they had?
10   A. Based on the number. Based on the number of
11  subjects of 517, I think, subjects. And as you
12  stated earlier that NHL -- or not NHL -- cancer
13  occurs in -- what did you say? 30 percent? I said
14  25 to 30, and you agreed.
15     So obviously some of those people would have
16  had serious forms of cancer that would require chemo
17  or radiation.
18     In the present case, I don't believe either
19  of the Pilliods received chemo or radiation prior to
20  developing NHL.
21   Q. You would want the jury to -- well, strike
22  that.
23     Now, if we go to Table 8 in the study where
24  you derive your dose response number from, did the
25  authors in this study control in Table 8 for other

Page 255

1  pesticide use?
2   A. Hang on. I'm trying to get my thing working
3  here.
4     There.
5     I'm sorry. Table 8, what?
6   Q. Did the authors in this study control for
7  other pesticide use in their dose response evaluation
8  in Table 8?
9   A. Yes.
10   Q. Okay. Show me where they controlled for
11  other pesticides exposure in Table 8.
12   A. I can't, but I can read you the statement --
13   Q. Okay.
14   A. -- that states that: Models that included
15  the time variable "days per year" and stratification
16  for age and province of residence were also assessed
17  for the individual herbicide compounds bromoxynil,
18  2,4,-DB, diallate, MCPA, trallate, and treflan. No
19  significant associations were found.
20   Q. Okay. Now, if you look at the bottom, sir,
21  do you see the OR and the little A?
22   A. No. Hang on. This thing shut off again.
23   Q. Bottom of this, OR -- OR with the little
24  Footnote A?
25   A. Yes.

Page 256

1   Q. Okay. It says: ORs calculated with strata
2  for the variables age and province of residence?
3   A. Yes.
4   Q. So the authors stated that they calculated
5  their strata with variables for other exposures?
6   A. Yes.
7   Q. Where do they say that in Footnote A?
8   A. With the mounds that included time variable
9  days per year.
10   Q. I don't see time variables days per year in
11  Footnote A. You are referring to the statement at
12  the top, right?
13   A. Yes.
14   Q. We'll come back to that.
15     In the Footnote A, do they state that they're
16  controlling for strata for variables, other pesticide
17  exposures?
18   A. Yes.
19   Q. Where do say other pesticide exposures in
20  Footnote A?
21   A. I don't see where Footnote A is connected.
22   Q. Okay. So you see the little A here, sir?
23   A. Yeah, but I don't see it at the top.
24   Q. And do you see OR with a little A next to it
25  here in the top right-hand column?

Page 257

1   A. Hang on. I have to turn this on again. It
2  keeps shutting off. I need to -- on. Okay.
3     So --
4   Q. Do you see OR with a little A here in the top
5  right?
6   A. No. That's what I'm not finding. In the
7  top --
8     Oh, okay. OR. I got you.
9   Q. Okay. And then Footnote A says: OR is
10  calculated with strata for the variables age and
11  province of residence.
12     Right?
13   A. It is, but it doesn't mean that the statement
14  at the beginning is wrong.
15   Q. Now, the statement at the beginning, in fact,
16  means that the authors calculated the dose response
17  data for those compounds and is not presented in this
18  table because they did not find anything
19  statistically significant, right?
20    MR. TRAVERS: Objection to form.
21    THE WITNESS: Okay. Yes.
22  BY MR. KALAS:
23   Q. So do the authors report controlling for
24  other pesticide exposures in Table 8?
25   A. No, it doesn't look like they did.

Page 258

1    Q.  Do the authors report controlling for
2   personal history of cancer in Table 8?
3    A.  No.
4    Q.  And as we've discussed before, the odds ratio
5   for glyphosate for greater than two days is lower
6   than the odds ratio for personal history of cancer,
7   right?
8       MR. TRAVERS:  Objection to form.
9       THE WITNESS:  Correct.  But most cancers, not
10  all cancers, are treated with chemo or radiation.
11  Many are -- the most common cancer is skin
12  cancer, which is simply removed.
13  BY MR. KALAS:
14   Q.  And you haven't reviewed the epidemiology
15  data that suggests that certain forms of skin cancer
16  are associated with an increased risk of
17  non-Hodgkin's lymphoma, right?
18   A.  Well, it certainly is depending on if there's
19  chemotherapy involved or radiation.
20   Q.  And you haven't reviewed the epidemiology
21  data on whether skin cancers are associated with NHL
22  risk irrespective of chemotherapy or radiation,
23  right?
24   A.  I'm sorry, I didn't hear all that.
25   Q.  You haven't reviewed the epidemiology data on

Page 259

1   whether skin cancers are associated with NHL risks
2   irrespective of chemotherapy or radiation, right?
3    A.  No.
4    Q.  Okay.  And because they didn't control for
5   personal history of cancer in this dose response
6   evaluation, it's entirely possible that some or all
7   of the cancers attributed -- that you attribute to
8   glyphosate exposure in the greater than two days
9   group could have instead been associated with a
10  personal history of cancer, right?
11      MR. TRAVERS:  Objection to form.
12      THE WITNESS:  No, not likely.  The Pilliods
13  did not have any treatment --
14  BY MR. KALAS:
15   Q.  So I'm asking about the --
16   A.  -- or carcinogens.
17   Q.  Sir, with all due respect, I'm asking about
18  the Eriksson study group, not the Pilliods.
19      In the Table 8 figure here for glyphosate for
20  greater than two days exposure, because they did not
21  control for personal history of cancer in Table 8,
22  it's entirely possible that some or all of the
23  cancers, if you attribute to glyphosate exposure in
24  this particular study population, could have instead
25  been associated with personal history of cancer,

Page 260

1   correct?
2       MR. TRAVERS:  Objection to form.
3   BY MR. KALAS:
4    Q.  Excuse me, the McDuffie group.  The McDuffie
5   study.
6    A.  To some extent, yes.
7    Q.  Okay.  And you don't know when you're --
8   well, strike that.
9       And you'll tell the jury, if I ask you about
10  that at trial, that you don't know how much of the
11  dose response data in this study could be attributed
12  to a personal history of cancer as opposed to
13  glyphosate exposure, right?
14      MR. TRAVERS:  Objection to form.
15      THE WITNESS:  I'm probably going to answer
16  it:  From January 4th to date in my report and in
17  my testimony in this deposition, I'm deferring
18  those questions to the epidemiologist.
19  BY MR. KALAS:
20   Q.  Okay.  So let me rephrase that.
21      You will tell the jury, if I ask you about it
22  at trial, that you don't have an expert opinion about
23  how much of the dose response data in Table 8 can be
24  attributed to a personal history of cancer in the
25  McDuffie study population as opposed to glyphosate

Page 261

1   exposure?
2       MR. TRAVERS:  Objection to form.  Asked and
3   answered.
4       THE WITNESS:  Yes, I'm going to defer it.
5   BY MR. KALAS:
6    Q.  And you will also tell the jury if I ask you
7   that you do not have an expert opinion about how much
8   of the dose response data for greater than two days
9   exposure for glyphosate can be attributed to other
10  pesticide exposures as opposed to glyphosate.
11      You'll defer that as well?
12   A.  Well, yeah.  I'd defer that to the
13  epidemiologist.
14   Q.  Okay.  So now you claim the Pilliods'
15  exposures match the exposures of the individuals in
16  the McDuffie study, right?
17   A.  Higher, actually.
18   Q.  Right.
19      They fall within the greater than two days a
20  year group?
21   A.  Yes.
22   Q.  Now, the Pilliods match this minimum of three
23  days figure in 1982 when they first used glyphosate,
24  right?
25   A.  Yes.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED



Page 262

1    Q.  Did you do an exposure calculation in
2  milligrams per kilogram for the Pilliods after their
3  first three uses of glyphosate?
4       MR. TRAVERS:  Objection to form.
5       THE WITNESS:  I don't understand.
6  BY MR. KALAS:
7    Q.  In other words, if they were at an increased
8  risk of NHL based on the data in McDuffie for three
9  days of exposure in a single year, did you do an
10  exposure calculation of how much glyphosate the
11  Pilliods were exposed to in those first three days to
12  place them at a greater risk?
13    A.  Well, I did a -- performed a per event day
14  analysis for both of them at a single property.
15    Q.  Yeah, you did that for the ██████ property,
16  right?
17    A.  Yes.
18    Q.  So you didn't do that at the ██████ property,
19  right?
20    A.  No, it would have been -- it would have been
21  lower.
22    Q.  It would lower -- their exposures would have
23  been lower at the ██████ property than the ██████
24  property?
25    A.  That's correct.

Page 263

1    Q.  Their exposures would have been lower at the
2  ██████ property than the ██████ property, correct?
3    A.  Yes.
4    Q.  Their exposures would have been lower at the
5  ██████ property than the ██████ property,
6  correct?
7    A.  On a per day, yes.
8    Q.  And a majority of their exposures took place
9  at the ██████ property, right?
10    A.  Yes.
11    Q.  Why did you not calculate an exposure for the
12  Pilliods at the ██████ property where the majority of
13  their exposures occurred?
14    A.  Well, I started to and decided it would be
15  unreliable because, in speaking with them, there were
16  so many areas that were sprayed versus not sprayed,
17  it was impossible to map it out and convert it to
18  hectares.
19       So I took the most simple location where
20  there was nothing, as I recall, but a driveway, and
21  it was a very easy calculation, an accurate
22  calculation, to convert the dimension of that
23  property minus the driveway, I think it was, to a
24  hectare number.
25       And there was no way that could be done where

Page 264

1  their property they live on with a concrete pool deck
2  and the swimming pool.  And then sometimes they
3  sprayed a certain area around the pool, and they also
4  sprayed in between lines on the pool deck.  And they
5  didn't spray the grass area to the left of the
6  driveway, but they did spray all around the perimeter
7  of that fence and along the driveway.
8       You know, it was just so complicated, there
9  was no way to manually draw that on the aerial image
10  and calculate hectares.  When your expert goes out
11  there, you'll understand.  It was very difficult to
12  assess the area of spray at that property.
13    Q.  You agree that the per day exposure to
14  Mrs. Pilliod at the ██████ property would have been
15  below the .08429 mgs per kg per day exposure you
16  calculated for ██████?
17    A.  Yes.
18    Q.  You agree that the mgs per kg per day
19  exposure to Mr. Pilliod would have been below the
20  .1428 mgs per kg per day exposure you calculated for
21  ██████?
22    A.  Yes.
23    Q.  Okay.  And you agree Mrs. Pilliod's exposure
24  in your calculation for ██████ is below the .1 mgs
25  per kg per day acceptable operator exposure level you

Page 265

1  note in your report, right?
2    A.  Yeah.  And note that I only used that value,
3  and I made that clear, not as a risk comparison but
4  to show that she is in the range of a -- of an
5  exposed applicator.  That's the only purpose of that.
6  It's a noncancer value.  That's not a value to
7  compare dose to for cancer.
8    Q.  Okay.  And do you know whether Mr. Pilliod's
9  dose per day would have been higher than .1 mgs per
10  kg per day at ██████ had you calculated that dose?
11    A.  No.  And for the sake of this discussion, I
12  will tell you it may have been lower.  And so what?
13  It shows that he's in the range of an applicator.
14  It's not that the -- that the applicator exposure
15  limit is a predictor of the cancer.  That is
16  completely incorrect.
17       And making any comparisons of dose to a
18  noncancer endpoint in this case is erroneous.  You
19  can't use a noncancer endpoint, and even the EPA
20  states that very clearly in their rules.  You can't
21  use a noncancer endpoint as a predictor or marker of
22  cancer.
23    Q.  Doctor, do you believe that the first three
24  uses of glyphosate by Mr. Pilliod in 1982 put him at
25  an increased risk of 112 percent for NHL based on the

Page 266

1  data in McDuffie?
2      MR. TRAVERS:  Objection to form.
3      THE WITNESS:  No.  I think McDuffie required
4  equal or greater to ten hours per year.
5  BY MR. KALAS:
6      Q.  Okay.
7      A.  So no.
8      Q.  So let me rephrase that question, then.
9      Do you believe Mr. Pilliod was only applying
10  at ███ in 1982, right?
11     A.  Yes.
12     Q.  And he was applying for one hour at a time,
13  right?
14     A.  Yes.
15     Q.  So do you believe Mr. Pilliod's first ten
16  uses of glyphosate at ███ put him at 112 percent
17  increased risk for NHL based on the data in McDuffie?
18     MR. TRAVERS:  Objection to form.
19     THE WITNESS:  Well, I think that we decided
20  that he used that nine months a year.  So 36 days
21  exposure per year, 4 days per month --
22     So you're asking me did his exposures --
23     Q.  1982.
24     A.  -- the first ten --
25     Q.  Yes, sir.

Page 267

1      A.  -- the first ten days.
2      Q.  So ten hours of exposure.
3      A.  Well, first ten days.
4      Q.  Did that put him at an increased risk based
5  on the data in McDuffie?
6      A.  Yes.
7      Q.  Okay.  Did you calculate the dose Mr. Pilliod
8  had at ███ or the first ten days of use or ten
9  hours of use in 1982?
10     MR. TRAVERS:  Objection to form.
11     THE WITNESS:  No.  I assessed the property at
12  ████████.  So, no, I did not include
13  the dose calculations to that property, because
14  it was next to impossible to calculate the
15  hectares that glyphosate was applied to due to
16  the numerous irregular areas that were sprayed
17  versus unsprayed.
18  BY MR. KALAS:
19     Q.  Do you believe that -- or strike that.
20     Can you tell the jury -- strike that.
21     So you won't be able to tell the jury how
22  many milligrams of exposure Mr. Pilliod had in those
23  first ten hours of exposure?
24     A.  No.
25     Q.  You won't be able to tell the jury how many

Page 268

1  milligrams of exposure Mrs. Pilliod would have had in
2  her first ten hours of exposure?
3      A.  No.  I only focused on that one property as
4  an example.
5      Q.  And you believe you weren't able to calculate
6  that number because the ███ property spraying was
7  very difficult to quantify in hectare terms?
8      A.  It looked like crescent moons and swiss
9  cheese on a piece of paper.  There was no reasonable
10  way to accurately calculate it.  It would be deemed
11  unreliable.
12     Q.  Okay.  And so you don't know -- well, strike
13  that.
14     Now, you classified the Pilliods into the
15  quartiles in the Agricultural Health Study, right?
16     A.  Yes.
17     Q.  Okay.  And that's from the Andreotti study,
18  right?
19     A.  Yes.
20     Q.  And we'll mark that study as Exhibit 12.
21     (Sawyer Exhibit 12 was marked for
22  identification.)
23     MR. KALAS:  Here you go.
24  BY MR. KALAS:
25     Q.  And if we look at Exhibit 12 and we go to

Page 269

1  Supplementary Table 1 -- Supplementary Table 1.  You
2  got it, yep.
3      And we look at Supplementary Table 1 is
4  lifetime days of glyphosate use, right?
5      A.  Yes.
6      Q.  And if we want to compare apples to apples to
7  the McDuffie study and the Eriksson study, we should
8  look at this table, right?
9      MR. TRAVERS:  Objection to form.
10     THE WITNESS:  Table 1?
11     Q.  Yes, sir, supplementary Table 1?
12     A.  Well, wait a minute.
13     Q.  And if you don't have the supplementary
14  tables on your personal copy, take a look at
15  Exhibit 12, please.
16     Are you there?
17     A.  Yeah.
18     Q.  And Supplementary Table 1 is type of cancer
19  incidence in relation to lifetime days use of
20  glyphosate use in the Agricultural Health Study,
21  right?
22     A.  Right.
23     Q.  And what you have been comparing the Pilliod
24  to are lifetime days of use in the Eriksson and
25  McDuffie study, right?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Subject to Further Confidentiality Review

Page 270

1    A.  Right.
2    Q.  So if we want to compare apples to apples, we
3  should look at this table in comparison to those
4  tables, right?
5    A.  Right.
6    Q.  And the Pilliods, you stated, fit into
7  Quartile 4 for non-Hodgkin's lymphoma, right?
8    A.  Yes.
9    Q.  So let's go to non-Hodgkin lymphoma.  It's on
10  the backside of Supplementary Table 1.
11    A.  I have it.  I'm familiar with this.
12    Q.  And for the Pilliod group for non-Hodgkin
13  lymphoma, the relative risk is .8, right?
14    A.  For the --
15    Q.  Quartile 4, sir.
16    A.  Quartile 4, yes, it is.
17    Q.  And what that means in lay terms is that the
18  individuals in Quartile 4 were 20 percent less likely
19  to get non-Hodgkin lymphoma than the people who had
20  never been exposed to glyphosate, right?
21       MR. TRAVERS:  Objection to form.
22       THE WITNESS:  Yes.
23  BY MR. KALAS:
24    Q.  And everybody in Quartile 4 was exposed to
25  glyphosate for 109 days or more in the study, right?

Page 271

1    A.  Well, no, wait a minute.  No.  That -- my
2  last answer is incorrect.  That's not what it means.
3    Q.  So let me ask the question I just asked and
4  we'll come back to that.
5    A.  No, no.  Let me answer the question, please.
6    Q.  Okay.  If you have something to add, go
7  ahead.
8    A.  You asked me if the -- three-quarters of the
9  rate -- of expected rate.  No, that's not true.  This
10  was a confidence interval -- the top of the page
11  isn't marked, but I think the confidence interval
12  is -- it looks like it's .72 to 1.26.
13    Q.  I believe you are looking at the table for
14  lymphohematopoietic cancer.  I'm looking at the
15  non-Hodgkin lymphoma table, sir.
16    A.  Oh, yeah.  The rate -- okay.  So .23.  I'm
17  sorry.  That's what I looked at originally.  I think
18  the range -- the confidence interval is .23 to 1.93.
19    Q.  No, sir.  You are looking at Hodgkin
20  lymphoma.
21    A.  Oh, now, here we go.  I'm sorry.
22       So, again -- I'll try it again.  Q4.
23  Confidence interval .6 to 1.06.
24    Q.  Right.  And we're going to get to the
25  confidence interval next but --

Page 272

1    A.  So that means that the range was somewhere in
2  between there.  We can't say that it's really .44.
3  Because it's not statistically significant.
4    Q.  Well, sir, I didn't -- I didn't mention .44.
5       Let me -- let me start over with the
6  Quartile 4, and then we'll get to that.
7       Everybody in Quartile 4 were exposed to
8  109 days or more of glyphosate use, right?
9    A.  Yes.
10    Q.  And the quartiles are down at the bottom.
11    A.  No, I was just looking at the labeling here.
12       The number of cases are -- and trend.  Okay.
13       Go ahead.
14    Q.  And that's the group you believe the Pilliods
15  fit in, the greater than 109 days, right?
16    A.  Yes.
17    Q.  Okay.  And the relative risk is .8 here,
18  right?
19    A.  Yes.
20    Q.  And that means that in this study
21  population -- and I'm not asking what the true number
22  is.  I'm just asking in the study population they saw
23  20 percent less cases of NHL in the Quartile 4 group
24  greater than the 109 days exposure to glyphosate than
25  in the group that had never been exposed to

Page 273

1  glyphosate, right?
2       MR. TRAVERS:  Objection to form.
3       THE VIDEOGRAPHER:  Gentlemen, we have five
4  minutes.
5       THE WITNESS:  Yes.
6  BY MR. KALAS:
7    Q.  And then they have a 95 percent confidence
8  interval, which you pointed me to, and that's .6 to
9  1.06, right?
10    A.  Yes.
11    Q.  And what that means is the authors are
12  95 percent sure that individuals with 109 days
13  exposure to glyphosate are -- have between a
14  40 percent less likely chance and a 6 percent more
15  likely chance to get NHL from glyphosate exposure as
16  opposed to people who have never been exposed?
17    A.  Right.
18       MR. TRAVERS:  Objection to form.
19       THE WITNESS:  Right.  That the true value is
20  between .6 and 1.06.
21  BY MR. KALAS:
22    Q.  And .6 means 40 percent less likely, right?
23    A.  Yeah.  And 1.06 is 6 percent.
24    Q.  More likely?
25    A.  More likely.



Page 274

1    Q.  Yes, sir.

2    A.  Right.

3    Q.  Now, this study is different from the

4  McDuffie and Eriksson studies in that it controls for

5  other exposures like other pesticides when conducting

6  its analysis of exposure days and NHL, right?

7        MR. TRAVERS:  Objection to form.

8  BY MR. KALAS:

9    Q.  And you can look at the bottom here of the

10  table if you want to see what they controlled for.

11        It states -- I'll wait for you to get your

12  flashlight on.

13

Page 275

15    Q.  And, as you've stated before, there are other

16  pesticides associated with NHL, like DDT, right?

17    A.  Yes.

18    Q.  And this study controlled for certain

19  pesticides that the authors believed might be

20  associated with NHL, right?

21        MR. TRAVERS:  Objection to form.

22        THE WITNESS:  Yes.

23  BY MR. KALAS:

24    Q.  And the authors of the McDuffie and Eriksson

25  study, when conducting their dose response data, did

Page 276

1  not control for other pesticides that might be

2  associated with NHL, right?

3        MR. TRAVERS:  Objection to form.

4        THE WITNESS:  That's true.  But Eriksson did

5  compare dose responses between different

6  herbicides, and the only one that showed a dose

7  response was glyphosate.  And glyphosate is by

8  far the most commonly used one.

9        So Eriksson study, even though it didn't

10  do the direct comparisons accounted for in

11  Agricultural Health Study, Eriksson did state

12  that glyphosate is -- is a wide-spread herbicide.

13  And in that table we looked at in Eriksson,

14  the -- the number of different herbicides may

15  have been impacted from the glyphosate.  As

16  opposed to them affecting the glyphosate outcome,

17  the glyphosate was impacting the other

18  herbicides.

19  BY MR. KALAS:

20    Q.  Right.  We can't tell in Eriksson because

21  they did not control for other pesticides?

22    A.  Well, I think we can tell because of the dose

23  response relationship.

24    Q.  Okay.  But when you're talking to the jury,

25  you will tell them the only study on earth we have to

Page 277

1  look at the lifetime days -- effective lifetime days

2  of exposure to glyphosate that controls in its design

3  for the effect of other pesticides exposures that

4  might cause NHL is Andreotti, right?

5        MR. TRAVERS:  Objection to form.

6        THE WITNESS:  No.  I keep stating this over

7  and over.  I'm only going to explain to the

8  jurors that I used these three studies because

9  they offered a metric so I could determine

10  whether or not the Pilliods' exposures were in

11  line with that of applicators, okay?

12        And we have -- in this study, we have more

13  applicators than any other study.  I think

14  there's -- I want to say it was about 15,000 --

15  yeah, 54,251 applicators.

16        THE VIDEOGRAPHER:  We need to go off the

17  record.  Off the record at 3:33.

18        (Recess from 3:33 until 3:45 p.m.)

19        THE VIDEOGRAPHER:  We're back on the record.

20  The time is 3:45.  This is Media Unit Number 4.

21        MR. KALAS:  I'm going to just state for the

22  record that we're going to mark as Exhibit 13

23  Dr. Sawyer's folders that he brought to the

24  deposition.

25        Mr. Travers is going to provide us with a



Page 278

1  copy of those folders and the court reporter a
2  copy as well after the deposition, minus the
3  expert report in this case which we have already
4  marked as Exhibit 6.
5      Do you agree to that, Jeff?
6      MR. TRAVERS:  Yes.
7      MR. KALAS:  So I'm going to mark as Exhibit
8  14 a document from NIH.
9      (Sawyer Exhibit 13 was marked for
10  identification.)
11      (Sawyer Exhibit 14 was marked for
12  identification.)
13  BY MR. KALAS:
14



Page 282

Page 283

Page 284

19    Q.  Okay.  And you've opined previously that PAHs
20  are associated with NHL, right?
21    A.  Yes.
22    Q.  And how many exposure days to PAHs did the
23  Pilliods have via their use of Roundup?
24    A.  None.
25    Q.  Okay.  All right.  Now, you calculated a

Page 285

1  retrospective dose for the ▮▮▮▮ property on Pages
2  18 and 19 using the POEM model, right?
3    A.  I did.
4    Q.  And that's Pages 18 and 19 of your report?
5    A.  Yes.
6    Q.  And I'm correct that none of your exposure
7  calculations in this case are based on any dietary
8  exposures, right?
9    A.  Correct.
10    Q.  And you won't be opining that the Pilliods
11  were at any increased risk above background from
12  dietary exposures to glyphosate residues, right?
13    A.  Yeah, I have no information on that.
14    Q.  Now, there are some changes in your model in
15  this case from the Stevick case, right?
16    A.  Yes.
17    Q.  And one thing you did in the Stevick case
18  that you did not do in this case is calculate the
19  POEM model using a 1 percent or 10 percent dermal
20  absorption figure, right?
21    A.  Yes.
22    Q.  Why did you just use a 3 percent dermal
23  absorption figure in this case?
24    A.  It's more mid range, and I simply didn't have
25  time to carry out any further calculations.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 286

1    Q.   Okay.  So you used a 3 percent dermal
2   absorption figure because you only had ten days to
3   calculate these figures?
4    A.   Well, I primarily did it because it's mid
5   range, and I did not have -- I was right down to the
6   wire on finishing this report and eliminated steps
7   that were not essential.
8    Q.   Okay.  And you state the 3 percent is a mid
9   range dermal absorption figure for glyphosate, right?
10   A.   Yes.
11   Q.   And is there a human in-vitro skin study you
12  can point me to with a 3 percent dermal absorption
13  figure?
14   A.   Yes, if we include the portion that remained
15  in the epidermis under the OCED guidelines and add
16  that to it, yes.
17   Q.   Can you point me to a human in-vitro skin
18  study that reported a 3 percent absorption figure in
19  its study results?
20       MR. TRAVERS:  Objection to form.
21       THE WITNESS:  Close but not quite 3.  And
22       that's because the studies omitted and deviated
23       from the policy of adding in the portion
24       remaining in the epidermis.
25  ///

Page 287

1   BY MR. KALAS:
2    Q.   So I'm correct, then -- you state close but
3   not quite 3.
4        I'm correct that there is not a study where
5   the study authors reported a 3 percent absorption
6   figure for glyphosate, right?
7    A.   Well, there are.  There's the -- I think we
8   have a primate study or a rat study that exceeded
9   3 percent.
10   Q.   That's a good point.  I didn't couch that the
11  way I couched the first few questions.
12       I'm correct when you state close but not
13  quite 3 that there is not a human in-vitro study
14  that -- where the study authors report a 3 percent
15  absorption figure for glyphosate, right?
16   A.   Right, but the --
17       MR. TRAVERS:  Objection to form.
18       THE WITNESS:  The triple pack methodology,
19       which is a generally accepted approach, requires
20       the -- the human in-vitro as well as the invivo
21       primate.  And, you know, it's not proper
22       methodology to throw out all the other studies
23       and just rely on the human in-vitro.
24  BY MR. KALAS:
25   Q.   Right.

Page 288

1        You believe it's not proper methodology to
2   rely on human data.  You would like to look at the
3   rat data, too?
4        MR. TRAVERS:  Objection to form.  Misstates
5   what he just said.
6        THE WITNESS:  That's not true.  If you were
7   to look at my report, I state the guidelines and
8   where they come from.  I didn't write -- I didn't
9   write the guidelines.  They are standard
10  methodologies that -- for triple pack that have
11  to be followed.
12       And, in a sense, Monsanto started off on the
13  right track by following the triple pack
14  methodology, but more recently seem to have
15  abandoned that and only chosen to use the Davies
16  studies from DTL because they are more favorable
17  to their position in litigation.
18  BY MR. KALAS:
19   Q.   So we'll get to all that, sir, but let's
20  stick with the POEM model for now.
21       You only calculated the model here in the
22  calculations for ████ right --
23   A.   Yes.
24   Q.   -- as we discussed earlier?
25       And the product you used in calculating this

Page 289

1   was super concentrate, right?
2    A.   Yes.  At 431 milligram per mil.
3    Q.   And I'm correct the Pilliods only used super
4   concentrate about 15 percent of the time, right?
5   One-five.
6    A.   Yes.
7    Q.   And at 85 percent of the time, they in fact
8   used the premix instead, right?
9    A.   Yeah, at 2 percent.
10   Q.   Right.
11       And that means that the 45 gallons they
12  sprayed at ████ that you report on Page 12 of
13  your report, about 7 of your gallons was diluted
14  super concentrate, right?
15   A.   Yes, but I should point out:  Where that has
16  a significant impact is on mixing with respect to the
17  dermal exposure during spray.  It's not the super
18  concentrate that's used, but it's diluted at, as I
19  recall, two and a half ounces per gallon.
20   Q.   Yes, sir.
21   A.   And that brings it down to, I think,
22  around -- I forget -- is it --
23   Q.   It's approximately 1 percent, correct, sir?
24       MR. TRAVERS:  Objection to form.
25       THE WITNESS:  No, I think that's -- I think

Page 290

1  that's 2 percent.
2  BY MR. KALAS:
3  Q.  Okay.
4  A.  In other words, it's the same as the
5  prepackaged.
6  Q.  Okay.  So --
7  A.  So where the impact would be with respect to
8  using super concentrate, it would increase the dermal
9  exposure on the hands.  In this case, it's currently
10  a 10 mil per hour, that hands are -- I'm sorry, not
11  that value.  The mix load value, which is currently
12  at -- oh, where is it?
13  Q.  It's in Mr. Pilliod's calculations.
14  A.  I've got to turn my light on here.
15  Yeah.
16  Q.  Okay.
17  A.  Absorbed dose of 1.29.  Okay.
18  So his total dose was 11.2 not counting the
19  mix load.
20  Q.  Okay.  So --
21  A.  And now he's picking up another 1.2 milligram
22  from the mix load.  Now, if that weren't super
23  concentrate, that 1.29 would be a somewhat lower
24  number.
25  Q.  In fact, there would be no mix loading like

Page 291

1  you calculated for Mrs. Pilliod?
2  A.  Oh, yeah, if he used the --
3  Q.  The premix?
4  A.  -- the premix.
5  Q.  Yes, sir.
6  A.  So we're looking at 1.2 -- 11 -- so we're
7  looking at roughly a 10 percent differential.
8  Q.  So I'm just trying to understand here.  The
9  calculation you did for Mr. Pilliod, because it
10  includes mix loading, does not represent the typical
11  application day even at the ███████ property?
12  A.  No.  It represents the worst case at that
13  property, when he used the -- the super concentrate.
14  But the differential is only going to be 10 percent.
15  Q.  Yes, sir.
16  A.  Even though I'm using strong words like
17  "worst case," which is scary and a very emotional
18  word, when he did use the super concentrate, it was
19  only 10 percent lower.
20  Q.  And worst case is a term that is used often
21  by occupational health folks who calculate these sort
22  of doses?
23  A.  Right.
24  Q.  And regularly calculate worst case exposure
25  scenarios, right?

Page 292

1  A.  Right.
2  But there's a difference between a worst case
3  and one that's presented to the court as an erroneous
4  case.  So.
5  This is a worst case.  It's correct, but it's
6  a worst case.
7  Q.  So it's your expert opinion that on no day
8  the Pilliods applied was Mr. Pilliod exposed to more
9  than .143 mix per kg per body weight per day?
10  MR. TRAVERS:  Objection to form.  Misstates
11  his prior testimony.
12  BY MR. KALAS:
13  Q.  Because this is worst case.
14  A.  Well, the worst case, the actual value, the
15  absorbed dose would be --
16  Q.  You were at 13 mgs per day.
17  A.  Predicted exposure, near the bottom of the
18  page.
19  Q.  Yes, sir.
20  A.  Total absorbed dose, 12.95-milligram per day.
21  That is the worst case.
22  Q.  Right.
23  And I was referring to the bottom figure
24  there, the mgs per kg figure.
25  A.  Oh, yeah.

Page 293

1  Q.  It's your testimony that on a day when
2  Mr. Pilliod was exposed to the most glyphosate he was
3  exposed to on any day in his application history, he
4  was exposed to .143 mgs per kg per day?
5  A.  That's correct, but I have to qualify that,
6  that that does not include his, you know, one-half
7  cup spillage.
8  So, I mean, we talked about this earlier,
9  that there was no really good way to quantitate his
10  spillage because it -- it seemed rather excessive,
11  but yet I couldn't really quantitate it.
12  Q.  And it's your opinion that on the day with
13  the absolute highest exposure that you were able to
14  calculate for Mrs. Pilliod, she was exposed to .0843
15  mgs per kg per day, right?
16  A.  That's right.
17  Q.  And the limit dose in rodent studies is
18  typically 1,000 milligrams per kilogram per day,
19  right?
20  MR. TRAVERS:  Objection to form.
21  BY MR. KALAS:
22  Q.  Do you want me to ask it again?
23  A.  No.  I'm thinking.  The -- are you referring
24  to a mid range dose?
25  Q.  No, sir.  I'm referring to a maximum

Page 294

1  tolerated dose in a rodent study for carcinogenicity.
2      MR. TRAVERS: Objection to form.
3  BY MR. KALAS:
4      Q. And typically the maximum tolerated dose in a
5  rodent study for carcinogenicity is approximately
6  1,000 milligrams per kilogram.
7      A. No, I realize that but --
8      Q. Is that true?
9      A. It is, but I'm trying to understand what that
10 would have to do with this.
11     Q. Okay. So I'll get to there. But is it true
12 that the typical maximum tolerated dose in a rodent
13 carcinogenicity study is 1,000 milligrams per --
14     MR. TRAVERS: Objection to form.
15     THE WITNESS: Without causing acute systemic
16     toxicity and death, yeah.
17 BY MR. KALAS:
18     Q. Okay. And I'm correct that .143 milligrams
19 per kilogram per day is approximately 7,000 times
20 lower than 1,000 milligrams per kilogram per day?
21     A. Yeah. So?
22     MR. TRAVERS: Objection to form.
23 BY MR. KALAS:
24     Q. And I'm correct that .0843 milligrams per
25 kilogram per day is approximately 12,000 times lower

Page 295

1  than 1,000 milligrams per kilogram per day?
2      A. That's right.
3      Q. Now, you used the UK predictive operator
4  model that is applied to commercial applicators when
5  you calculated the Pilliods' risks, right?
6      MR. TRAVERS: Objection to form.
7      THE WITNESS: No. I used home garden.
8  BY MR. KALAS:
9      Q. Are you aware there's an amateur applicator
10 model using the UK POEM that is different than the
11 home garden application model?
12     MR. TRAVERS: Objection to form. Misstates
13     the evidence.
14     THE WITNESS: The home garden is the accepted
15     methodology for people in this case.
16 BY MR. KALAS:
17     Q. So I asked if you were aware if there's an
18 amateur applicator model. Are you aware that there's
19 a POEM amateur applicator model?
20     MR. TRAVERS: Objection. Asked and answered.
21     THE WITNESS: Yes.
22 BY MR. KALAS:
23     Q. You are aware, sir?
24     Did you evaluate whether or not the amateur
25 applicator model could be used in this case?

Page 296

1      A. No. This would -- I evaluated to the extent
2  that this is the appropriate model to use.
3      Q. The Pilliods are amateur applicators, true?
4      A. They are not applicating in the sense of --
5  that's more similar to commercial applicators. They
6  are home garden applicators.
7      Q. Are the Pilliods professional pesticide
8  applicators?
9      MR. TRAVERS: Objection to form.
10     THE WITNESS: No. And the method you are
11     referring to is more similar to that.
12 BY MR. KALAS:
13     Q. Okay. The amateur applicators -- strike
14 that.
15     Are the Pilliods amateur applicators of
16 glyphosate? In other words, do they not apply
17 glyphosate as their job?
18     A. No. But after 1,500 days of application,
19 they probably became rather skilled.
20     Q. Now --
21     A. I can't say they're new at it.
22     Q. You claim in your report the POEM model has
23 been validated, right?
24     A. It has.
25     Q. And you cite to a document by the New Zealand

Page 297

1  EPA in that report, right?
2      A. I do.
3      MR. KALAS: I'm marking that as Exhibit 15.
4      (Sawyer Exhibit 15 was marked for
5      identification.)
6  BY MR. KALAS:
7      Q. Is this the document that you reviewed that
8  you cited as validating the POEM model?
9      A. Yes.
10     Q. And this is a draft document, right, not a
11 final guidance document?
12     A. That's right. I stated that in my report.
13     Q. Yes. I'm not stating you didn't.
14     Now, if you turn to Page 42, please, and you
15 look at Section B.4.8, this document that you cited
16 as support for your opinion that the POEM model is
17 validated states in the last paragraph of B.4.8: The
18 UK POEM model, described further in section B.8, can
19 also be used to assess the risk to commercial
20 operators. However, as it has fewer options for
21 operator PPE, the EPA has decided not to use it when
22 conducting the risk assessment.
23     Did I read that correctly?
24     A. Yes.
25     Q. So I'm correct that the New Zealand EPA

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 298

1  decided not to use the POEM model in the strata
2  document to assess the risks to commercial operators
3  of pesticide application equipment?
4      MR. TRAVERS:  Objection no form.
5      THE WITNESS:  Yeah.  And that's because the
6  variables on the tractor-mounted sprayers and
7  some of the variables are not included in that
8  model.  However, the home garden model is
9  recommended for home gardeners.
10 BY MR. KALAS:
11     Q.  So they don't mention tractor sprayers.  They
12 mention operator PPE here, right?
13     A.  Yeah, that too.  Yep.
14     Q.  So that's what they mention.  "Tractor" is
15 not in that paragraph?
16     A.  No, but I'm familiar with the model, and that
17 are some variables that are not in that model.
18     Q.  Have you assessed the Pilliods' exposures
19 using the models that the New Zealand EPA did decide
20 to use for commercial applicators?
21     A.  No.  They are not commercial applicators.
22 They're home garden users.
23     Q.  Okay.  They are amateur applicators, right?
24     A.  No.  They are not amateur applicators that
25 are one step away from being professional

Page 299

1  applicators.  They are home gardeners.
2      Q.  So let's go -- the UK POEM is a regulatory
3  model, right?
4      MR. TRAVERS:  Objection to form.
5      THE WITNESS:  Yes.  And it has been assessed
6  quantitatively and has been shown to actually
7  slightly underestimate the actual dose.  And I
8  have some studies -- peer-reviewed studies that
9  document that.
10 BY MR. KALAS:
11     Q.  We'll look at that study.
12     But let's look at Page 54.  While you are
13 turning there, I'm correct that regulatory models
14 sometimes build in things called protective factors,
15 right?
16     A.  Yes.
17     Q.  And what that means in the context of dose is
18 sometimes these models will overestimate doses,
19 right?
20     A.  They can sometimes.  This one doesn't based
21 on some other documents I have.
22     Q.  All right.  So let's look at B.8.3 on Page 54
23 in the New Zealand EPA document that you cite.  It
24 states:  The UK POEM model allows for personal
25 protective equipment to be worn by home users of

Page 300

1  pesticides.  However, as not all non-professionals
2  will wear the correct PPE, it is assumed that none is
3  worn.
4      The model also assumes that the pesticides
5  are sprayed uniformly around the garden in a
6  dispersive manner rather than as spot treatments.
7  This might result in the risk quotients for spot
8  treatments using this method being unrealistically
9  high.
10     Did I read that correctly?
11     A.  Yes.
12     Q.  Do you disagree with that statement of the
13 New Zealand and the document you cite?
14     A.  Well, with the PPE, I think you're wrong,
15 because the model is correct for the Pilliods because
16 they had no PPE at all except on occasion -- once, on
17 occasion, the -- Mr. Pilliod would wear gloves.  But
18 other than that, there was no PPE.
19     In terms of the dispersive manner, at the
20 location I chose, which was ███████████, for
21 the most part, at least for the first year, they were
22 not spot spraying.  They were uniformly spraying in a
23 carpet -- carpet-bombing manner because it was so
24 overgrown.
25     Q.  Okay.

Page 301

1      A.  So I think that my worst case calculation is
2  accurate.
3      Q.  Okay.  You agree that for the vast majority
4  of the time, at all of the properties the Pilliods
5  applied, they were applying in a spot treatment
6  manner?
7      A.  Not all the time, no.  I said at that
8  particular property -- and I learned this by my phone
9  conference as well -- that it was heavily overgrown,
10 and it required multiple trips just to cover the area
11 because they had to go back and forth and cover
12 the -- you know, the entire areas as opposed to spot
13 treatment, which they eventually got to spot
14 treatment.  But it took time.
15     Q.  Yes, sir.  You stated in your previous answer
16 that at least for the first year they were
17 quote/unquote carpet bombing the ███████ property?
18     A.  That's right.
19     Q.  And so that was one year of application out
20 of four years at ███████ right?
21     A.  Yes.
22     Q.  So for the other three years at ███████
23 were they applying in a -- more of a spot treatment
24 manner?
25     A.  Yes.  But my calculation, as I said, was the

Page 302

1 worst case.
2 Q. Yes, sir. And --
3 A. It's like you don't understand that. That
4 first year, that first year -- especially the first
5 six months, that number that I calculated using the
6 POEM is dead accurate.
7 Q. Yes, sir.
8 So for three of the four years at ████████
9 they're applying in a spot treatment manner, correct?
10 A. Yes.
11 Q. And all of their other properties -- ████
12 ████████, ████ -- they are applying in a spot
13 treatment manner, correct?
14 A. Yes.
15 Q. So you agree, for a vast majority of the
16 time, the Pilliods applied glyphosate, they were not
17 applying in a dispersive manner but rather were
18 applying in a spot treatment manner, correct?
19 A. Right. But I didn't -- I didn't model those
20 other properties.
21 Q. The exposure you chose to model represents
22 the potential exposure at a single property where the
23 Pilliods exposed glyphosate -- or applied glyphosate,
24 right?
25 A. Yes.

Page 303

1 Q. And the exposure that you chose to model
2 represents the potential worst case exposure in a
3 single year at that single property, correct?
4 A. That's right.
5 Q. The figures you chose to model in the UK POEM
6 model do not represent the average exposure on a
7 typical application day when the Pilliods applied
8 glyphosate throughout their course of applying
9 glyphosate?
10 A. I never said it did. Where in my report do
11 you see that?
12 Q. Okay. Now, going back to the figures in your
13 report, you calculate a figure .143 mgs per kg per
14 day of exposure for Alva Pilliod at ████████ right?
15 A. Yes.
16 Q. Okay. What biomonitoring or passive dose
17 symmetry study contains an absorbed dose level of
18 .143 mgs per kg per day in the literature you
19 reviewed?
20 A. Did you say biomonitoring?
21 Q. Or passive dose symmetry, sir.
22 A. Oh, yeah, passive dose symmetry. Yeah, I can
23 show you some.
24 Q. Well, let me mark a study. It's Exhibit 16.
25 (Sawyer Exhibit 16 was marked for

Page 304

1 identification.)
2 BY MR. KALAS:
3 Q. By Solomon, et al -- or just Solomon; pardon
4 me.
5 And if you could turn to to --
6 A. I think -- did I pick this -- I had 14.
7 Q. Yes, sir.
8 A. I just have 6 here.
9 Q. Yes, sir?
10 A. I just picked that up by accident.
11 Q. And if you could turn to 16, Exhibit 16, and
12 you look at the supplemental tables on this study.
13 Dr. Solomon discusses the Cowell and Steinmetz study,
14 the Johnson study, the Machado-Neto study, the
15 Edmiston study, in addition to some other studies
16 that were included in your folders that we marked as
17 Exhibit 13, right?
18 A. Yes.
19 Q. Okay.
20 MR. TRAVERS: I'm just going to state for the
21 record, I'm going to object to this paper as
22 incomplete because it does not have the
23 expression of concern issued by the editor
24 because the authors failed to adequately disclose
25 his conflict of interest with Monsanto.

Page 305

1 MR. KALAS: Sure. Let's look at the
2 declaration of interest here real quick.
3 BY MR. KALAS:
4 Q. Do you see the declaration of interest on
5 Page 26, sir?
6 A. Page 26?
7 Q. Yes, sir. Supplementary data to the main
8 text.
9 A. Yes, I have read this.
10 Q. And the third sentence of the declaration of
11 interest states: Keith R. Solomon previously served
12 as an independent consultant for the Monsanto Company
13 on the European Glyphosate Task Force.
14 Did I read that correctly?
15 A. Yes.
16 Q. And moving on to the second paragraph, it
17 states in the second sentence of that second
18 paragraph: Funding for this evaluation was provided
19 by the Monsanto Company, which is the primary
20 producer of glyphosate and products containing this
21 active ingredient.
22 Did I read that correctly?
23 A. Yes.
24 Q. Now, if you go up to the table here on 26,
25 Figure 3, do you see the measured exposure range for

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 306

1  biomonitoring under "Operator Exposure"?
2      A.  Yes.
3      Q.  And the highest number in the range for
4  biomonitoring is .004 mgs per kg per day, correct?
5      A.  Yes.
6      Q.  And the highest exposure number for passive
7  dose symmetry is .064 mgs per kg per day, right?
8      A.  Yeah.  And that's essentially the same as
9  Mrs. Pilliod.
10     Q.  Okay.  Mrs. Pilliod is at .084 mgs per kg?
11     A.  I say essentially the same.  It's very close.
12     Q.  It's not the same, though, right?
13     A.  Not exact, but it's pretty close.
14     Q.  So both of the doses you calculated for
15  Mr. and Mrs. Pilliod are not reported in this
16  literature review of glyphosate in the general
17  population and in applicators, right?  Both the doses
18  you calculated exceed any measured dose in this
19  literature review?
20         MR. TRAVERS:  Objection to form.
21         THE WITNESS:  Well, that's true.  But in the
22     supplement, some of the numbers are wrong.
23  BY MR. KALAS:
24     Q.  Okay.  Have you written the journal critical
25  review to toxicology to tell them some of the numbers

Page 307

1  are wrong in the Solomon article?
2      A.  No.
3      Q.  Have you written Dr. Solomon to tell him he
4  needs to revise his article because some of the
5  numbers are wrong in his supplement?
6      A.  No.  In fact, I only pulled some of these
7  articles in the last couple of days after I received
8  Dr. Phalen's report.
9      Q.  Okay.
10     A.  So I haven't had time to call Dr. Solomon
11  yet.
12     Q.  Do you intend to call Dr. Solomon and tell
13  him the numbers are wrong in his article?
14     A.  No.  I think that would actually be -- if
15  he -- I don't know if he's testifying in this case or
16  not.  I don't think it would be appropriate to
17  interfere with litigation if he is.
18         MR. KALAS:  Can we go off the record real
19     quick?  I need to find something.
20         THE VIDEOGRAPHER:  Going off the record at
21     4:21.
22         (Recess from 4:21 until 4:24 p.m.)
23         THE VIDEOGRAPHER:  We're back on the record
24     at 4:24.
25  *///*

Page 308

1  BY MR. KALAS:
2      Q.  Doctor, I'm marking as Exhibit 17 an article
3  by Tarazona, et al.
4         (Sawyer Exhibit 17 was marked for
5  identification.)
6  BY MR. KALAS:
7      Q.  Have you seen this article before, sir?
8      A.  No.
9      Q.  And this is an article that's entitled
10  "Glyphosate toxicity and carcinogenicity:  a review
11  of the scientific basis of the European Union
12  assessment and its differences with IARC."
13         Did I read that correctly?
14     A.  Yes.
15     Q.  And this is published in the peer-reviewed
16  literature, correct?
17     A.  Yes.
18     Q.  And if you look at the bottom left-hand
19  corner, it says that both the authors of this article
20  work in either the European Food Safety Authority or
21  the Federal Institute for Risk Assessment in Germany,
22  right?
23     A.  Yes.
24     Q.  And if we go to Page 2736 in this article, do
25  you see Table 8?

Page 309

1      A.  Yes.
2      Q.  Okay.  And what they report in Table 8 are
3  ADI, RfD, and AOE levels for glyphosate, right?
4         And it's the right-hand column.
5      A.  Okay.
6      Q.  Okay.  And if you look at the second column,
7  relevant endpoints, the critical endpoint for these
8  three values is the rabbit NOAEL, right?
9      A.  On chronic dietary series?
10     Q.  Yes, sir.  The relevant endpoints mgs per kg
11  per body weight per day.  Critical endpoint, rabbit
12  NOAEL, chronic non-dietary toxicity.
13         Do you see that?  To the right of that and
14  then down a little bit, the very bottom of the second
15  column.
16     A.  The Table 8?
17     Q.  Yes, sir.  Beneath that, it says maternal and
18  developmental, also relevant for short-term
19  exposures).
20         I'll hold up where I'm looking at, sir.
21     A.  Critical endpoint, rabbits.
22     Q.  Yes.
23     A.  Okay.
24     Q.  Do you see that?
25     A.  Yes.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Subject to Further Confidentiality Review

Page 310

1    Q.   And the dose that they have there for the
2   critical endpoint is 50 mgs per kg per day, right?
3    A.   Right.
4    Q.   And NOAEL stands for no observed adverse
5   effect level, right?
6    A.   Yes.
7    Q.   So the European regulators, in doing their
8   safety assessment, observed maternal and
9   developmental issues in rabbits at the next dose
10   above 50 milligrams per kilogram per day, right?
11    A.   That's right.  I'm familiar with that, yeah.
12    Q.   And if you look at the next column, they
13   apply something called an uncertainty factor to that,
14   right?
15    A.   That's right.
16    Q.   And an uncertainty factor is something that
17   regulators apply to be protective of public health,
18   right?
19    A.   Yes.
20    Q.   And the reason they applied that is they know
21   there are differences between animal models and
22   people, right?
23    A.   Yes.
24    Q.   And so they apply a factor of ten or a factor
25   of a hundred to protect against potential biological

Page 311

1   differences which would make people more susceptible
2   to any effects, right?
3    A.   Yes.
4    Q.   And here in the EU, they applied a
5   hundred-fold uncertainty factor, right?
6    A.   Yes.
7    Q.   And what that means is they took the NOAEL
8   dose of 50 milligrams her kilogram per day, and then
9   they applied that to people by reducing the
10   acceptable dose in people to a hundred times lower
11   than that, right?
12    A.   Yes.  So .5.
13    Q.   Right.
14        And then for operators, they reduced that
15   again by five, right?
16    A.   Yes.
17    Q.   And that's the AOEL, right?
18    A.   Right.
19    Q.   And that's the AOEL you cite in your report,
20   right?
21    A.   Again, I only cite that for the purpose of
22   showing that the dose levels that calculated for the
23   Pilliods are near the AOEL.
24    Q.   Okay.
25    A.   Meaning that they are in a range of that of

Page 312

1   an applicator.  It is not possible, and it's
2   completely inappropriate, to compare a dose in a
3   cancer assessment to an AOEL or any other noncancer
4   endpoint.
5    Q.   Yes, sir.
6    A.   It's improper, unacceptable science.
7    Q.   And the AOEL which you used for that limited
8   comparison in your report is 500 times below the
9   level where these European regulators last saw no
10   effect from glyphosate in a maternal toxicity study
11   in rabbits, right?
12    A.   Yes, but your line of questioning is
13   extremely misleading, especially for a jury to hear
14   that.
15        That is a differential between an animal
16   sensitivity and humans, and we call that a conversion
17   factor.  An animal to human conversion factor.  If we
18   gave the same dose to a bunny rabbit that we gave to
19   a human, the effect would be very different.
20        And so that's part of that conversion.
21        There's also the uncertainty, in going from
22   an animal to a human on top of that.
23        But this has nothing to do with cancer.  It
24   can't be used to compare cancer causation assessment.
25    Q.   Well, I'm correct, sir, that the European

Page 313

1   regulators at EFSA and BfR came to the conclusion
2   that glyphosate did not cause cancer, right?
3    A.   That's right.  So this is a noncancer
4   assessment.
5    Q.   Yes, sir.
6        And so they did not set an acceptable dose
7   level for cancer because they don't believe it caused
8   cancer, right?
9    A.   Right.
10    Q.   So the acceptable level that they set was for
11   the first health effect they saw, right?
12        MR. TRAVERS:  Objection to form.
13        THE WITNESS:  You know, I think you asked --
14   did you say European Union?  I think France is
15   part of the EU now, isn't it?
16   BY MR. KALAS:
17    Q.   Sir, I stated the European regulators, EFSA.
18    A.   Didn't France just recently ban glyphosate?
19    Q.   Well, sir, my question is about the EFSA
20   regulators right here in this article.
21        And you have reviewed the EFSA report, right?
22    A.   Right, but I think France is part of that
23   group.
24    Q.   Well, sir --
25    A.   So I don't know that this -- so this may be

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 314

1 outdated is my point.

2     Q.   Okay.  So at the time this article was

3 written in the peer-reviewed literature, the EFSA

4 regulators did not believe glyphosate caused cancer,

5 right?

6         MR. TRAVERS:  Objection to form.  Misstates

7     the conclusion.

8         THE WITNESS:  All I can say based on this

9     document is that it was developed for noncancer

10     toxicity endpoints, and that cannot be used in

11     the current assessment.  It would be extremely

12     misleading and confusing for any layperson to be

13     presented with this.  This is for noncancer, not

14     cancer effects.

15 BY MR. KALAS:

16     Q.   The regulators in Europe set the acceptable

17 operator exposure level 500 times below the dose

18 level where they believe the last no effect data

19 point was seen in the chronic studies, correct?

20         MR. TRAVERS:  Objection to form.  Misstates

21     the evidence.

22         THE WITNESS:  Yes.

23         And, again, if we go back to the elephant

24     study that was formed in the 1950s -- it will

25     never be performed again -- a dose of a certain

Page 315

1 drug was given to a human without any effect.  It

2 was going to an elephant.  The elephant went into

3 convulsions and seizures and died in ten minutes.

4         Because of the small animal being less

5 sensitive than the human, that's part of that

6 conversion factor.  That's very well-known in

7 science, and it's not just the safety factor.

8 There is a conversion factor in there from small

9 animal to a human, and there's always a

10 variability that accounts for the other portion

11 of the factor.

12         But this has nothing to do with cancer.

13 BY MR. KALAS:

14     Q.   Sir, I'm going to mark as Exhibit 18 a study

15 conducted by Monsanto -- or by the DTL Laboratories

16 on behalf of Monsanto.

17         (Sawyer Exhibit 18 was marked for

18     identification.)

19 BY MR. KALAS:

20     Q.   And this is a study you've reviewed, right?

21     A.   Yes, I'm familiar with it.

22     Q.   And you did not review the three studies by

23 Smith conducted at the DTL Laboratories, right?  You

24 just reviewed Davies studies, correct?

25     A.   Well, I have to check my report.  I don't

Page 316

1 remember.

2     Q.   In your Table 8 -- or Figure 8, you do not

3 report any studies by Smith at the DTL Laboratories,

4 sir.

5     A.   Okay.  I must not have them, then.

6     Q.   Okay.  So you argue that these DTL studies

7 fail to comply with OECD regulations, right?

8     A.   Right.

9     Q.   And you discuss that at Pages 63 and 64 of

10 your report, right?

11     A.   Yes.

12     Q.   Okay.  And that's because you claim they did

13 not count the tape stripping as called for in the

14 OECD guidance documents, right?

15     A.   Yes.  And also they did not maintain fresh

16 human skin five degrees centigrade within five days

17 but rather they baked it and froze it.

18     Q.   Okay.  So let's start with the OECD guidance

19 documents.  You claim that the OECD guidance

20 documents call for counting tape strips three through

21 five as bioavailable in a study like this, right?

22     A.   Yes.

23     Q.   Okay.  And you've said again and again that

24 following OECD guidelines is important, right?

25     A.   Yes.

Page 317

1     Q.   Now, if you turn to Page 13 of this study,

2 which is Bates Number 740, Section 2.2, the authors

3 cite regulatory guidelines and guidance documents.

4         Let me know when you're there.

5     A.   Yeah.

6     Q.   And they cite OECD Guideline 428, right?

7     A.   Yes.

8     Q.   OECD Guidance Document 28, right?

9     A.   Yes.

10     Q.   OECD Guidance Note 156, dermal absorption,

11 right?

12     A.   Yes.

13     Q.   And that is the one you discussed in your

14 report regarding tape stripping, correct?

15     A.   Yes.

16     Q.   And EFSA Panel on Plant Protection Products

17 and their Residues Guidance on Dermal Absorption

18 (2012), right?

19     A.   Yes.

20     Q.   Okay.  And if you go to justification for the

21 test system, in the next section, it states:  This is

22 a valid system for determining dermal absorption

23 across human skin in-vitro and its reliability has

24 been demonstrated (OECD 428, 2004).

25         Reliability of results obtained in the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 318

1 reported study has been demonstrated at these
2 laboratories by the methods specified in the guidance
3 documents in Section 2.2.
4     Did I read that correctly?
5     A.  Yes.
6     Q.  So the authors claim of this study that they
7 followed the OECD guidance note on dermal absorption
8 that you cite in your report at Page 64, right?
9     A.  Yes.
10    Q.  Okay.  And if you turn to Page 23, Bates
11 Number 750, starting with the first full paragraph,
12 it states:  In this study, and for the formulation
13 concentrate only, the dermal absorption of glyphosate
14 avid at 12 hours was less than 75 percent of the 24
15 hours absorbed dose reaching the receptor fluid at
16 this time.  Therefore, the bioavailable dose,
17 following EFSA guidance, excludes the first two tape
18 strips and bioavailability has been calculated from
19 the receptor plus remaining skin (following tape
20 stripping) plus tape strips three through five.
21    Did I read that correctly?
22    A.  Yes.
23    Q.  So the authors state that they did count tape
24 strips three through five in the DTL studies, right?
25    MR. TRAVERS:  Objection to form.

Page 319

1     THE WITNESS:  I'm looking at Page 30.
2     MR. KALAS:  Yes, sir.
3 BY MR. KALAS:
4     Q.  Page 30, at the bottom of Table 2, do you see
5 the figure that states bioavailable?
6     A.  Yes.
7     Q.  And it states:  Receptor fluid plus remaining
8 skin plus tape strips three through five, right?
9     A.  Yeah.  I remember -- I thought I added --
10 some of these, I added them up, and it didn't come
11 out.  Let me just try it.
12    Okay.
13    Q.  So the authors state they did count tape
14 strips three through five in their study, right?
15    A.  In this one, they did.
16    Q.  Okay.  In the DTL studies -- we don't have
17 time to go through all the DTL studies, but do you
18 agree that at least in this DTL study, the authors
19 did comply with OECD regulations regarding tape
20 stripping?
21    A.  It appears that way.
22    Q.  And now that you've seen that, if asked, you
23 will tell the jury that at least in the Davies 2017
24 study the DTL studies complied with OECD guidelines
25 for tape stripping and dermal absorption studies,

Page 320

1 right?
2     A.  I'm going to check this further here because
3 I remember --
4     Q.  Okay.  I'll withdraw the question and reserve
5 my time.
6     MR. KALAS:  How much time?
7     THE VIDEOGRAPHER:  You've got nine minutes.
8     MR. KALAS:  Nine minutes?  Okay.
9         CROSS-EXAMINATION
10 BY MR. TRAVERS:
11    Q.  Well, let's -- I've got some follow-up
12 questions for you.  Let's start off where John left
13 off, on the DTL.
14    If you could go to Page 72 of your report,
15 the first full paragraph.  Do you see that
16 bioavailability?
17    A.  Yes.
18    Q.  And you write:  The bioavailability of
19 glyphosate acid from the spray dilution is the sum of
20 the receptor fluid dose at 24 hours plus the amount
21 remaining in the skin following tape stripping and
22 tape strips three to five.  That was .162 percent of
23 the applied dose.
24    Do you see that?
25    A.  Yes.

Page 321

1     Q.  So that accurately reflects what was in the
2 study, correct, that we just looked at?
3     A.  Yes, I think so.  It was on Page 23, was it,
4 or Page 30?
5     Q.  Let's see.  That was --
6     MR. KALAS:  Which page are we going to, 23 or
7 30?
8     THE WITNESS:  I think it's 30.
9     MR. KALAS:  Okay.
10    THE WITNESS:  Tape strip one, two.
11 BY MR. TRAVERS:
12    Q.  So it's safe to say you did consider all that
13 data in your report, correct?
14    MR. KALAS:  Objection to form.
15    THE WITNESS:  Yes.
16 BY MR. TRAVERS:
17    Q.  We'll move on.
18    I just had a follow-up on a question
19 Mr. Kalas asked earlier, suggested that in ruling in
20 glyphosate, you only looked -- you only considered
21 three studies.
22    But isn't it true that you also have a
23 general causation opinion in this case?
24    A.  Yes.
25    Q.  And was that general causation opinion based



Page 322

1  just on three studies?

2      A.  No.

3          MR. KALAS:  Objection to form.

4          THE WITNESS:  No, not at all.

5  BY MR. TRAVERS:

6      Q.  And you looked at the entirety of the data in

7  coming to your general causation opinion; is that

8  correct?

9      A.  Yes.

10         MR. KALAS:  Objection to form.

11         THE WITNESS:  I have with respect to the

12  mechanism of carcinogenicity, mutagenesis,

13  co-formulates and agitants, co-contaminants, and

14  other factors.

15         Enhanced dermal absorption too through the

16  use of skin cream.

17  BY MR. TRAVERS:

18     Q.  And you were asked earlier if there were any

19  studies looking at glyphosate specifically with

20  moisturizers -- the absorption of glyphosate with

21  moisturizers.

22         Do you recall that?

23     A.  Yes.  And during the break I did a little

24  research, and certainly Wester and Maibach

25  demonstrated that moisturizing type materials -- any

Page 323

1  material, whether it be lipid or solvent or other

2  material that moistened the tissue, and even wet

3  gauze for that matter -- significantly increased

4  dermal absorption to glyphosate.

5         That's a textbook article written -- a

6  textbook chapter written by Wester and Maibach.

7      Q.  And that was a 1995 textbook chapter called

8  "Penetration Enhancement by Skin Hydration"?

9      A.  That's correct.

10     Q.  Let's see.  I'd like to go to the McDuffie

11  study.  I didn't write down the exhibits but --

12     A.  Okay.  McDuffie.

13     Q.  And the front of it looks like that.

14     A.  I should have had an exhibit number, really.

15     Q.  I should have written that down.

16     A.  I kept them in order.

17         Oh, here it is.  Yeah.  This is McDuffie.

18     Q.  All right.  I'd like to first direct you to

19  Table 1.

20     A.  Okay.

21     Q.  And about midway down, they looked at smoking

22  history.

23         Do you see that?

24         MR. KALAS:  Objection to form.

25         THE WITNESS:  In the lower paragraph?

Page 324

1  BY MR. TRAVERS:

2      Q.  In the -- yeah, in the Table 1.

3      A.  In the table itself?

4      Q.  Yeah.

5      A.  Oh, I'm not -- I'm on the wrong table.  Yeah,

6  okay.



Page 326

11      MR. KALAS:  Same objection.
12      THE WITNESS:  Yes, it does.  And the impact
13   between the two numbers was a 1.26 versus a 1.20.
14   BY MR. TRAVERS:
15      Q.  And is that a large impact, or how would you
16   quantify that impact?
17      MR. KALAS:  Objection to form.
18      THE WITNESS:  That was statistically
19   insignificant.
20   BY MR. TRAVERS:
21      Q.  Thank you.
22

Page 327

Page 328

24   BY MR. TRAVERS:
25      Q.  I'm through with that document.

Page 329

1       If we can go back to the McDuffie study
2    again, I have one more question about that.
3       A.  Okay.
4       Q.  And I want to go to Table 2, 1158.  It's the
5    last table we were on.
6       A.  Yeah, I have that.
7       Q.  What's the odds ratio for MCPA in this study?
8       A.  1.08 on the strata for variables of age and
9    providence, and then the adjusted CTA is 1.10.
10          Essentially the same.
11      Q.  And that's all.
12          Now, you had been asked some questions about
13   the labeling on the bottle.
14      A.  Yes.
15      Q.  And that's Exhibit 7.
16      A.  Yeah, I have that.
17      Q.  I wanted to go to the page -- yeah, I want to
18   go to the page the defense counsel was looking at
19   earlier.  I think it was the --
20          MR. KALAS:  You are looking at the one I had
21   tabbed?
22          MR. TRAVERS:  Yeah.
23          MR. KALAS:  Okay.
24   BY MR. TRAVERS:
25      Q.  I've got a few questions about this.

Page 330

1    Looking at -- there's a few -- there's four
2  illustrations on the top of this label.
3    Do you see those?
4  A.  Yes.
5  Q.  And they show someone with bare hands
6  handling and spraying the bottle; is that correct?
7    MR. KALAS:  Objection.  Leading,
8  mischaracterizes the picture.  The document
9  speaks for itself.
10 BY MR. TRAVERS:
11 Q.  Can you describe for the jury what those top
12 pictures are showing?
13 A.  Yeah.
14   MR. KALAS:  Objection.  Two questions are
15 pending now.  Do you withdraw the previous
16 question?
17   MR. TRAVERS:  Yeah, I'll withdraw the
18 previous question.
19   MR. KALAS:  Okay.
20 BY MR. TRAVERS:
21 Q.  Can you explain to the jury what the images
22 are showing?
23   MR. KALAS:  Objection.  Calls for an expert
24 opinion outside the scope of his expertise.
25   MR. TRAVERS:  You guys opened the door.  You

Page 331

1  guys opened the door.
2    So go for it.
3    THE WITNESS:  Yeah.  First, I can tell you I
4  have prepared and written MSDS sheets and labels
5  such as this.  It is in my area of expertise.
6    And what I see is a bare hand clearly showing
7  the nail outlines.  No glove.  And Figure 2 and 4
8  are especially alarming because it instructs the
9  person to actually touch the wet nozzle tip with
10 their bare fingers and hands and not wear gloves.
11 BY MR. TRAVERS:
12 Q.  Okay.  Do these images adequately warn
13 consumers about the risks of glyphosate?
14   MR. KALAS:  Objection.  Calls for an opinion
15 on warnings as to a generic consumer.  Outside
16 the scope of expert opinion.
17   THE WITNESS:  No.  The -- they're actually in
18 conflict.  There's a warning below.  It says:
19 "Caution."  Big, correct letters.  However, the
20 caution says avoid contact with eyes or clothing,
21 wash thoroughly with soap and water after
22 handling.  And yet the photo above -- the image
23 above shows a bare hand adjusting a wet nozzle.
24 BY MR. TRAVERS:
25 Q.  And --

Page 332

1    MR. KALAS:  I'm going to just state a further
2  objection to that question and answer that the
3  document speaks for itself.
4  BY MR. TRAVERS:
5  Q.  And would the -- and you testified -- all
6  right.
7    If there's a warning to wear gloves on this
8  bottle, would that reduce a person's exposure to
9  glyphosate?
10   MR. KALAS:  Objection to form.  Calls for
11 speculation.
12   THE WITNESS:  No, no speculation.  It would.
13   And it's based upon the POEM modeling.  We
14 talked about showing the differential between
15 gloves versus no gloves.  Certainly, it would
16 reduce.  It would reduce by at least 10 percent.
17 BY MR. TRAVERS:
18 Q.  Is there a -- do you see any problems with
19 the type of sprayer that's being used -- shown on
20 this bottle?
21   MR. KALAS:  Objection.  Vague.  Calls for
22 speculation.  Calls for an opinion outside the
23 scope.
24   THE WITNESS:  Yes, I do.
25   MR. KALAS:  And leading.

Page 333

1  BY MR. TRAVERS:
2  Q.  And what -- and what problems do you see with
3  that sprayer?
4    MR. KALAS:  Objection to form.
5    THE WITNESS:  There is no wand, thus, the
6  dispersing spray has a very high likelihood of
7  impacting the leg, as when one holds the sprayer,
8  even with the arm straight down, it would only be
9  slightly below the waist level, as opposed to a
10 wand sprayer that can actually be down in direct
11 contact with the weeds.
12   That's really a defective sprayer.
13 BY MR. TRAVERS:
14 Q.  And let's see.
15   And it says it's rain proof in one hour.
16   Do you see that?
17   MR. KALAS:  Objection to form.
18   THE WITNESS:  Yes.
19 BY MR. TRAVERS:
20 Q.  Would that suggest the Roundup dries
21 within -- in one hour?
22   MR. KALAS:  Objection to form.  Calls for
23 speculation.  Leading.
24   THE WITNESS:  Not dries but absorbed.  So the
25 material washed off after one hour, wouldn't be

Confidential - Subject to Further Confidentiality Review

Page 334

1  needed.
2  BY MR. TRAVERS:
3      Q.  And so -- and what do you think of this
4  little -- you see this image, what looks like a kid
5  and a pet that says people and pets may enter treated
6  area after spray is dried?
7      MR. KALAS:  Hold on.
8      Object.  Document speaks for itself.  Calls
9  for speculation as to what the picture
10  represents.  Outside the scope of expert opinion.
11     THE WITNESS:  I sure wouldn't let my grandson
12  or doggie walk on that after it's dry, but the
13  picture of a doggie . . .
14  BY MR. TRAVERS:
15     Q.  Then let's see.
16     It says -- then it has a section of "When to
17  Apply."  Do you see the bullet point that says:
18  Spray when air is calm to prevent drift to desirable
19  plants?
20     Do you see that?
21     A.  Yes, I do.
22     Q.  Is there anywhere on this label where it says
23  spray when it's calm to prevent drift to humans or to
24  yourself?
25     MR. KALAS:  Objection to form.  Document

Page 335

1  speaks for itself.  Outside the scope.
2      THE WITNESS:  No, it does not.  And that is,
3  again, misleading.  It indicates that the spray
4  can harm desirable plants but has no warning
5  whatsoever regarding human contact with the drift
6  or the aerosol.
7  BY MR. TRAVERS:
8      Q.  And then you have -- under "How to Apply," it
9  says:  When spot treating around desirable plants,
10  shield plants from drift with a sheet of cardboard or
11  plastic.
12     Do you see that?
13     A.  I do.
14     Q.  Is there anywhere in this label where it says
15  to shield yourself from the drift with cardboard or
16  plastic?
17     A.  No.
18     MR. KALAS:  Objection to form.
19  BY MR. TRAVERS:
20     Q.  And do you see a warning for cancer on this
21  label?
22     A.  No, there is no cancer hazard warning.
23     MR. KALAS:  Objection.  Document speaks for
24  itself.
25  ///

Page 336

1  BY MR. TRAVERS:
2      Q.  If you were -- if you were to advise someone
3  on how to safely use Roundup, would you tell them
4  that they should just follow this label?
5      MR. KALAS:  Objection to form.  Calls for
6  speculation as to a generic person.
7      THE WITNESS:  So my opinion within a
8  reasonable toxicological certainty, as one who
9  has prepared labels and MSDSs for corporations of
10  products, I find this to be an insufficient and
11  misleading label.
12  BY MR. TRAVERS:
13     Q.  And I think that's all the questions I have.
14     MR. KALAS:  Okay.  A few follow-ups.
15     REDIRECT EXAMINATION
16  BY MR. KALAS:
17     Q.  Let's go to this picture of the label to
18  start with.
19     First of all, when was the last time you
20  prepared an MSDS for an herbicide?
21     A.  Never an herbicide.  I've prepared them for
22  solvents and sprays and flammable solvents, library
23  book binder glue and things of that sort.
24     Q.  Okay.  So you've never written an MSDS on
25  behalf of a corporation for a herbicide that's sold

Page 337

1  to consumers?
2      A.  Not an herbicide, but the principles are all
3  outlined in the registry to follow.  And as a
4  toxicologist, I am intimately familiar with the
5  chemical properties and toxicological effects of
6  glyphosate.
7      Q.  When is the last time you wrote a product
8  label for an herbicide?
9      A.  I've never written a product label for an
10  herbicide, but I have for other chemical products for
11  our industry.
12     Q.  When is last time you drew pictures or
13  approved pictures that appeared on an herbicide
14  label?
15     A.  I didn't catch a few of your words.
16     Q.  When was the last time you drew pictures or
17  approved pictures that appeared on an herbicide label
18  for how to apply the herbicide?
19     A.  I already said I have not worked on herbicide
20  labels or material safety data sheets specific to
21  herbicides.
22     Q.  Has the EPA asked you to review herbicide
23  labels?
24     A.  Have I worked specifically for EPA?
25     Q.  Yeah.  Has EPA asked you to review herbicide



Page 338

1  labels?
2  A.  No.  I have done work for corporations.
3  Q.  Has the EPA asked you to review herbicide
4  MSDSs?
5  A.  Again, I have never worked on any work for
6  EPA.
7  Q.  Have you ever been -- well, strike that.
8  If you go to Image 2 on this label, first
9  bullet point -- do you see the first bullet point?
10  A.  I do.
11  Q.  Okay.  Can you read that into the record,
12  please.
13  A.  Paint sprayer away from body.
14  Q.  It says point sprayer away from body,
15  correct?
16  A.  Okay.  It looked like paint, but you're
17  right; it's point.  There's a --
18  Q.  And that --
19  A.  -- white line under the letter.  Okay.
20  Q.  And that statement's on this label that the
21  Pilloids produced in this litigation, correct?
22  A.  Yes.
23  Q.  Okay.  And you mentioned that the individuals
24  who used this were told to adjust the nozzle after
25  spraying.

Page 339

1  Do you remember testifying to that?
2  MR. TRAVERS:  Objection.  Misstates his
3  testimony.
4  THE WITNESS:  I'm sorry, repeat.
5  BY MR. KALAS:
6  Q.  I believe that when Mr. Travers was asking
7  you questions, you testified that the individuals
8  using this were told to adjust the nozzle after
9  spraying.
10  Do you remember that?
11  MR. TRAVERS:  Objection.
12  THE WITNESS:  I don't remember the part about
13  told to, but in practice, that nozzle is
14  constantly adjusted depending whether you are
15  shooting at a single weed or a larger area.
16  BY MR. KALAS:
17  Q.  Okay.  And right here in Image 3, it says:
18  Adjust nozzle.
19  Right?
20  A.  Yes.
21  Q.  And then in Image 4, it says:  Press and hold
22  button on sprayer to begin spraying.
23  Right?
24  A.  Yes.
25  Q.  So the pictures on the label that you were

Page 340

1  discussing suggest adjusting the nozzle prior to
2  spraying, right?
3  MR. TRAVERS:  Objection to form.
4  THE WITNESS:  No.  No.  That adjustment is
5  performed throughout the period of spraying
6  depending on whether one wants to fan a larger
7  spray versus a direct foam stream to a single
8  weed.
9  BY MR. KALAS:
10  Q.  Is there a fifth image that says continue to
11  adjust nozzle after spraying to adjust for what
12  you're applying it to?
13  MR. TRAVERS:  Objection to form.
14  THE WITNESS:  No.  But the way you are
15  implying it, one would have to go to Lowe's and
16  buy another container of it before adjusting for
17  the next weed.  One has to constantly make
18  adjustments while using it.
19  BY MR. KALAS:

Page 341

Page 342

1 ████████████████████████████

2 ████████████████████████

3 ██████████████████

4     Did I read that correctly?

5     A. Yes.

6     Q. And so when the authors of this study

7 adjusted for exposures to other pesticides and all

8 other covariates that were statistically significant

9 in their study, they still found that there was an

10 odds ratio of 2.2 for having a previous cancer and

11 the risk of NHL, right?

12     I'm looking at Table 6.

13     A. I don't see that in Table 6.

14     Q. Do you see Table 6, titled Table 6, "Most

15 parsimonious model: Conditional logistic regression

16 analyses that contained major chemical classes of

17 pesticides and important covariates P less than .05"?

18     A. Yes. But I don't see the --

19     Q. Okay.

20     A. -- the prior cancer -- oh, no, I do see prior

21 cancer now.

22     Q. And prior cancer and odds ratio of 2.2?

23     A. Yeah.

24     Q. So even under their model that adjusted for

25 all these other risks that seemed significant, they

Page 343

1 found 120 percent increased risk of cancer in their

2 study population of NHL in their study population in

3 people who had a previous cancer diagnosis, right?

4     A. Yes. But, again, that has to be looked at by

5 Dr. Nabhan, for example, with respect to what type of

6 prior cancer results in an increased risk of a second

7 cancer, specifically NHL.

8     And I think we're going to find that previous

9 cancers that were treated with radiation or

10 cyclophosphamide or high dose immunosuppressants or

11 other agents that are known to cause NHL.

12 ████████████████████████████

    ██████████████████████████

    ██████████████████████

17     Q. Okay. Now, you have not --

18     MR. TRAVERS: I think your time is up.

19     Do you want one more question?

20     THE VIDEOGRAPHER: We're at about seven

21 hours.

22 BY MR. KALAS:

23     Q. You have not reviewed the Hohenadel study

24 that contains adjusted data for other pesticide

25 exposures for glyphosate using this same dataset,

Page 344

1 right?

2     A. I have not. I'm relying on the

3 epidemiologist in this matter to handle that.

4     MR. KALAS: Okay. I'm going to state for the

5 record that we designate this deposition as

6 confidential under the terms of the protective

7 order.

8     And I will just note once again that

9 Mr. Travers is going to take what has been marked

10 as Exhibit 13 and provide counsel for the defense

11 and the court reporter with a copy of that, and

12 Dr. Sawyer will keep his original copy with the

13 understanding that his expert report will be

14 removed from it.

15     MR. TRAVERS: Yeah.

16     MR. KALAS: All right. Anything else?

17     MR. TRAVERS: Actually, I'll do two quick

18 follow-ups.

19     RECROSS EXAMINATION

20 BY MR. TRAVERS:

21     Q. Do you see the McDuffie study again?

22     A. By the way, that was the name of my first

23 boat.

24     Q. We'll go to Page 1160. Defense counsel

25 brought up an interesting point. It has --

Page 345

1 Table 6 --

2     A. Okay.

3     Q. -- shows -- defense counsel brought up the

4 point that there's an increased risk for use of

5 dicamba and non-Hodgkin's lymphoma.

6     Do you recall that?

7     A. I do.

8     Q. Do you know -- are you aware that Monsanto

9 manufactures dicamba?

10     A. I'm aware.

11     MR. KALAS: Objection to form.

12 BY MR. TRAVERS:

13     Q. Do you know if there's a cancer warning on

14 dicamba label manufactured by Monsanto?

15     MR. KALAS: Objection to form. Calls for

16 speculation. Outside the scope of his expert

17 opinion. And completely irrelevant unless you

18 are going to put forward information that the

19 Pilliods were exposed to dicamba.

20     THE WITNESS: There is not, and worse yet,

21 that's for a future GMO.

22     MR. TRAVERS: That's all the questions I

23 have.

24     MR. KALAS: All right. Off the record.

25     THE VIDEOGRAPHER: This concludes the

Page 346

1 deposition. The time is 5:11.

2     THE COURT REPORTER: Sir, are you ordering a

3 copy?

4     MR. TRAVERS: Yes.

5     THE COURT REPORTER: Do you want it rushed?

6 They have a three-day rush. Do you want it

7 expedited, or do you just want regular delivery,

8 which is two weeks?

9     MR. TRAVERS: I think expedited.

10     THE COURT REPORTER: Do you want the

11 three-day as well?

12     MR. TRAVERS: Yeah, that's good.

13     THE COURT REPORTER: And do you want a rough

14 draft?

15     MR. TRAVERS: I don't need a rough.

16     THE COURT REPORTER: Okay. Thank you.

17     (Whereupon, the deposition concluded at

18 5:11 p.m.)

19

20

21

22

23

24

25

Page 347

1       C E R T I F I C A T E

2

3     I, KELLY J. LAWTON, Registered Professional

4 Reporter, Licensed Court Reporter, and Certified

5 Court Reporter, do hereby certify that, pursuant to

6 notice, the deposition of WILLIAM R. SAWYER, PhD was

7 duly taken on February 6, 2019, at 8:09 a.m. before

8 me.

9     The said WILLIAM R. SAWYER, PhD was duly

10 sworn by me according to law to tell the truth, the

11 whole truth and nothing but the truth and thereupon

12 did testify as set forth in the above transcript of

13 testimony. The testimony was taken down

14 stenographically by me. I do further certify that

15 the above deposition is full, complete, and a true

16 record of all the testimony given by the said

17 witness.

18

19     _____

20     KELLY J. LAWTON, RPR, LCR, CCR

21

22     (The foregoing certification of this

23 transcript does not apply to any reproduction of the

24 same by any means, unless under the direct control

25 and/or supervision of the certifying reporter.)

Page 348

1       INSTRUCTIONS TO WITNESS

2

3

4     Please read your deposition over carefully

5 and make any necessary corrections. You should state

6 the reason in the appropriate space on the errata

7 sheet for any corrections that are made.

8

9     After doing so, please sign the errata sheet

10 and date it. It will be attached to your deposition.

11

12     It is imperative that you return the original

13 errata sheet to the deposing attorney within thirty

14 (30) days of receipt of the deposition transcript by

15 you. If you fail to do so, the deposition transcript

16 may be deemed to be accurate and may be used in

17 court.

18

19

20

21

22

23

24

25

Page 349

1       - - - - - -

2       E R R A T A

3       - - - - - -

4 PAGE LINE CHANGE

5 ____ ____ _____

6   REASON: _____

7 ____ ____ _____

8   REASON: _____

9 ____ ____ _____

10   REASON: _____

11 ____ ____ _____

12   REASON: _____

13 ____ ____ _____

14   REASON: _____

15 ____ ____ _____

16   REASON: _____

17 ____ ____ _____

18   REASON: _____

19 ____ ____ _____

20   REASON: _____

21 ____ ____ _____

22   REASON: _____

23 ____ ____ _____

24   REASON: _____

25

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Confidential - Subject to Further Confidentiality Review

Page 350

1       ACKNOWLEDGMENT OF DEPONENT

2

3     I, WILLIAM R. SAWYER, PhD, do hereby

4 acknowledge that I have read the foregoing pages, 1

5 to 351, and that the same is a correct transcription

6 of the answers given by me to the questions therein

7 propounded, except for the corrections or changes in

8 form or substance, if any, noted in the attached

9 Errata Sheet.

10

11

12 _____     _____

13 WILLIAM R. SAWYER, PhD        DATE

14

15

16

17

18 Subscribed and sworn to before me this

19 \_\_\_\_ day of _____, 20\_\_\_.

20 My Commission expires: _____

21

22 _____

    Notary Public

23

24

25

---

Page 351

1        LAWYER'S NOTES

2 PAGE  LINE

3 \_\_\_\_ \_\_\_\_ _____

4 \_\_\_\_ \_\_\_\_ _____

5 \_\_\_\_ \_\_\_\_ _____

6 \_\_\_\_ \_\_\_\_ _____

7 \_\_\_\_ \_\_\_\_ _____

8 \_\_\_\_ \_\_\_\_ _____

9 \_\_\_\_ \_\_\_\_ _____

10 \_\_\_\_ \_\_\_\_ _____

11 \_\_\_\_ \_\_\_\_ _____

12 \_\_\_\_ \_\_\_\_ _____

13 \_\_\_\_ \_\_\_\_ _____

14 \_\_\_\_ \_\_\_\_ _____

15 \_\_\_\_ \_\_\_\_ _____

16 \_\_\_\_ \_\_\_\_ _____

17 \_\_\_\_ \_\_\_\_ _____

18 \_\_\_\_ \_\_\_\_ _____

19 \_\_\_\_ \_\_\_\_ _____

20 \_\_\_\_ \_\_\_\_ _____

21 \_\_\_\_ \_\_\_\_ _____

22 \_\_\_\_ \_\_\_\_ _____

23 \_\_\_\_ \_\_\_\_ _____

24 \_\_\_\_ \_\_\_\_ _____

25