# EXHIBIT 16

William R. Sawyer, Ph.D.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS | § MDL No. 2741 |
| LIABILITY LITIGATION | § Case No. 3:16-md-02741-VC |
| _____ | § |
| | § |
| This document relates to: | § |
| | § |
| Dickey v. Monsanto Company | § |
| Case No. 3:19-cv-04102-VC | § |
| _____ | § |

- - -

Thursday, November 14, 2019

- - -

Videotaped deposition of WILLIAM R. SAWYER,
Ph.D., held at South Seas Resort, 5400 Plantation
Road, Captiva, Florida 33924, commencing at
9:02 a.m., on the above date, before Susan D.
Wasilewski, Registered Professional Reporter,
Certified Realtime Reporter, Certified Realtime
Captioner, Florida Professional Reporter

- - -

GOLKOW LITIGATION SERVICES

877.370.3377 ph | 917.591.5672 fax

deps@golkow.com

William R. Sawyer, Ph.D.

Page 2

```
 1    APPEARANCES:
 2    WEITZ & LUXENBERG
      BY:  JERRY KRISTAL, ESQUIRE
 3      jkristal@weitzlux.com
        220 Lake Drive East, Suite 210
 4      Cherry Hill, New Jersey 08002
        Phone:  (856) 755-1115
 5      Representing Plaintiffs
 6
 7
 8    NELSON MULLINS RILEY & SCARBOROUGH LLP
      BY:  ERIC A. PAINE, ESQUIRE
 9      eric.paine@nelsonmullins.com
        1320 Main Street
10      Columbia, South Carolina 29201
        Phone:  (803) 255-5518
11      Representing Defendant Monsanto Company
12
13
14    WILKINSON WALSH & ESKOVITZ
      BY:  CALI COPE-KASTEN, ESQUIRE
15      ccope-kasten@wilkinsonwalsh.com
        2001 M Street, NW, 10th Floor
16      Washington, D.C. 20036
        Phone: (856) 755-1115
17      Representing Defendant Monsanto Company
18
19
20    ALSO PRESENT:
21    MATTHEW ALLISON, Videographer
22
23
24
25
```

Page 4

```
 1              E X H I B I T S
 2            (Attached to transcript)
 3    WILLIAM R  SAWYER, Ph D  DEPOSITION EXHIBITS    PAGE
 4
      Exhibit 7   Report of the Advisory Group to       42
 5                Recommend Priorities for the IARC
                  Monographs during 2020-2024
 6
      Exhibit 8   Medical Record                        57
 7                Confidential-Dickey-RDickey-
                  LaurelMC-000129
 8
      Exhibit 9   Medical Record                        58
 9                Confidential-Dickey-RDickey-
                  UNMC-MD-000005 through 8
10
11    Exhibit 10  Herbicide Application Handbook -       79
                  Excerpted Pages
12                MONGLY07297384, MONGLY07297403
                  through 7297405, MONGLY07297407,
13                MONGLY07297424, MONGLY07297425 and
                  MONGLY07297443
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                ---
 2              I N D E X
 3                ---
 4    Testimony of:  WILLIAM R  SAWYER, Ph D     Page
 5    DIRECT EXAMINATION BY MR  PAINE            6
 6    CROSS-EXAMINATION BY MR  KRISTAL           76
 7    REDIRECT EXAMINATION BY MR  PAINE          81
 8
 9
10            E X H I B I T S
11          (Attached to transcript)
12    WILLIAM R  SAWYER, Ph D  DEPOSITION EXHIBITS    PAGE
13    Exhibit 1  Monsanto Company's Notice to Take     7
                 Oral and Videotaped Deposition of
14               Dr  William Sawyer
15    Exhibit 2  October 9, 2019 Report from           7
                 Toxicology Consultants & Assessment
16               Specialists, LLC
                 Omitting Appendix A:  Documents
17
      Exhibit 3  October 9, 2019 Report from           9
18               Toxicology Consultants & Assessment
                 Specialists, LLC
19               Including Appendix A:  Documents
20    Exhibit 4  Appendix F - Mr Robert (Bob)         16
                 Dickey's Interviews
21
      Exhibit 5  Appendix G - Exposure Summary        16
22               Information and Calculations based
                 on Information from Mr  Robert (Bob)
23               Dickey's Interviews
24    Exhibit 6  Handwritten List of Herbicides       28
25
```

Page 5

```
 1                ---
 2          THE VIDEOGRAPHER:  Good morning.  We are now
 3    on the record.  My name is Matthew Allison.  I am
 4    a videographer for Golkow Litigation Services.
 5    Today's date is November 14th and the time is
 6    9:02 a.m.
 7          This video deposition is being held in
 8    Captiva, Florida, in the matter of Robert Dickey
 9    vs. Monsanto Company, taken in the United States
10    District Court, Northern District of California.
11    The deponent is Dr. William Sawyer.
12          Will all counsel please introduce themselves
13    for the record?
14          MR. KRISTAL:  Jerry Kristal from Weitz &
15    Luxenberg on behalf of Robert Dickey.
16          MR. PAINE:  I'm Eric Paine from Nelson
17    Mullins Riley & Scarborough on behalf of
18    Monsanto.
19          MS. COPE-KASTEN:  Cali Cope-Kasten from
20    Wilkinson Walsh & Eskovitz also on behalf of
21    Monsanto.
22          THE VIDEOGRAPHER:  The court reporter is
23    Susan Wasilewski and will now swear in the
24    witness.
25          THE COURT REPORTER:  Would you raise your
```

2 (Pages 2 to 5)

William R. Sawyer, Ph.D.

**Page 6**

1  right hand?
2      Do you solemnly swear or affirm the
3  testimony you're about to give will be the truth,
4  the whole truth, and nothing but the truth?
5      THE WITNESS: I do.  Thank you.
6      THE COURT REPORTER:  Thank you.
7      WILLIAM R. SAWYER, Ph.D., called as a
8  witness by Defendant Monsanto Company, having been
9  duly sworn, testified as follows:
10      DIRECT EXAMINATION
11  BY MR. PAINE:
12    Q.  Good morning, Doctor.
13    A.  Good morning.
14    Q.  Would you give us your full name for the
15  record?
16    A.  William Robert Sawyer.
17    Q.  Very good.  Dr. Sawyer, I know you've given
18  a number of depositions before.  In fact, you and I
19  have taken depositions together before, so given the
20  time circumstances, I'm going to kind of cut to the
21  chase today.  Again, I know you know the drill, but
22  just so we're clear, any question I ask that's
23  unclear or makes no sense to you, if you would ask
24  me to repeat it or rephrase it, I'll be happy to do
25  that.

**Page 7**

1      I know you know the drill, too, that your
2  answers have to be verbal rather than just a nod of
3  the head or a shake of the head.  Okay?
4    A.  Yes.
5    Q.  Okay.  Very good.
6    (Sawyer Exhibit 1 was marked for identification.)
7    (Sawyer Exhibit 2 was marked for identification.)
8  BY MR. PAINE:
9    Q.  I've marked -- premarked two exhibits and
10  handed them to you just before we went on the
11  record.  Note -- Exhibit 1 is the notice to take
12  your deposition.  Have you had a chance to review
13  that before today?
14    A.  Yes.
15    Q.  Okay.  And have you brought anything with
16  you in responses to the document requests in the
17  notice?
18    A.  Yes.
19    Q.  Okay.  And is that in the Redweld in front
20  of you?
21    A.  Yes.
22    Q.  All right.  I don't want to take a lot --
23    MR. KRISTAL:  Maybe we should stop now.
24  We've got three yeses in a row.
25    MR. PAINE:  I stipulate.

**Page 8**

1  BY MR. KRISTAL:
2    Q.  Bear with me just a little longer, though,
3  despite Counsel's suggestion.  I'll take a look at
4  that at the break but, basically, is that your file
5  for Mr. Dickey's case?
6    A.  It is.  It is for the Dickey, et al., case,
7  which includes seven plaintiffs.
8    Q.  Okay.  So that includes not just
9  Mr. Dickey's case, but all seven individuals that
10  we're going to depose you about over today and
11  tomorrow; is that right?
12    A.  Yes.
13    Q.  Okay.  Very good.  And again, I'll take a
14  look at that when we take a -- take a break.
15    If you would, though, look at Exhibit 2,
16  please, which is a copy of your report for
17  Mr. Dickey's case, and let me just direct your
18  attention to page 143 of that report, please.
19    A.  143?
20    Q.  Yes, sir.
21    A.  Okay.
22    Q.  Actually, my mistake.  144, please.
23    A.  Okay.
24    THE VIDEOGRAPHER:  Can we go off the record
25  just for a second?

**Page 9**

1    MR. PAINE:  Sure.
2    THE VIDEOGRAPHER:  We're going off the
3  record at 9:05.
4    (Recess from 9:05 a.m. until 9:07 a.m.)
5    THE VIDEOGRAPHER:  We're back on the record.
6  The time is 9:07.
7  BY MR. PAINE:
8    Q.  All right.  Doctor, we're back on the
9  record, and during the break we figured out that
10  what I handed you as Exhibit 2 is your written
11  report but it stops short of Appendix A, which has
12  some materials considered for this case and others.
13  Is that correct?
14    A.  Yes.
15    Q.  Okay.  And what I wanted to do is ask you
16  to refer to your copy of the report, which I'll mark in
17  a moment as Exhibit 3, instead.  I ask you to look
18  at page 143.
19    (Sawyer Exhibit 3 was marked for identification.)
20  BY MR. PAINE:
21    Q.  Do you see the section New Documents
22  Reviewed?
23    A.  Yes.
24    Q.  And does that list several documents that
25  you reviewed specific to Mr. Dickey's case?

William R. Sawyer, Ph.D.

| Page 10 |
| --- |

1    A.  As -- yes, as of October 9th.
2    Q.  Okay.  Have you reviewed any additional
3    materials pertinent to Mr. Dickey's case
4    specifically since you prepared your report
5    October 9?
6    A.  Yes.  I believe the majority of those were
7    turned over to your firms on Monday.
8    MR. PAINE:  Okay.  For some reason those
9    have not made their way to me, so would you --
10    MR. KRISTAL:  Yeah.  We sent a Dropbox by
11    e-mail and a separate e-mail.  I added two
12    other -- I think it went to -- I can check but
13    I'm pretty sure it was Julie Hunt and Brian
14    Steklof.
15    MR. PAINE:  Okay.  All right.  Like I said,
16    that -- excuse me.  I think Cali just helped me
17    clear that up.
18    A.  Yeah, I read that the notice requested three
19    days, so I worked very hard to get those out on --
20    almost all of them on Monday.  There was a few
21    stragglers but --
22    Q.  Okay.  All right.  Just -- I think I can
23    clear this up again.  Thank you for that.  What we
24    did receive on Monday were a couple new documents
25    that I don't think were specific to Mr. Dickey.  One

| Page 11 |
| --- |

1    was an IART priorities list and another dealt with
2    pediatric exposures.  Does that sound familiar?
3    A.  Yes, that -- that's true but I think the
4    Dropbox contained about 29.
5    MR. KRISTAL:  27.
6    A.  27.
7    Q.  Okay.  All right.  We'll sort that out.
8    MR. KRISTAL:  There was nothing -- if I
9    understand how you are using the term
10    Dickey-specific, there was nothing
11    Dickey-specific.  They were general articles.
12    Obviously, they, in part, informed Dr. Sawyer's
13    opinions in general in the Dickey case, but it
14    wasn't as if it was a Dickey calculation or
15    something like that.
16    MR. PAINE:  Okay.  Thank you for that.
17    That's exactly what I was trying to get to.
18    MR. KRISTAL:  They were all general -- I
19    think they were all published articles or
20    abstracts, or things like that.
21    MR. PAINE:  Okay.
22    BY MR. PAINE:
23    Q.  And, Doctor, does that fit your
24    recollection, that they weren't specific to
25    Mr. Dickey in the sense of being medical records or

| Page 12 |
| --- |

1    calculations or anything like that for Mr. Dickey's
2    case?
3    A.  That is correct.
4    Q.  Okay.  All right.  Great.  Thank you both
5    for clearing that up, and we'll visit some of those
6    additional materials as we go.
7    But, Doctor, your report for Mr. Dickey's
8    case specifically, I take it, contains and reflects
9    your opinions that you intend to offer at trial for
10    Mr. Dickey's case; is that right?
11    A.  Yes.
12    Q.  Okay.  And your report was dated October 9,
13    2019, correct?
14    A.  Yes.
15    Q.  And you had the information that you needed
16    to formulate your opinions concerning Mr. Dickey's
17    case specifically at the time or before the time you
18    prepared this report on October 9, correct?
19    A.  Yes.
20    Q.  Have you ever spoken with Mr. Dickey?
21    A.  No.
22    Q.  Have you reviewed Mr. Dickey's deposition?
23    A.  Yes.
24    Q.  And did you do that before you prepared your
25    report?

| Page 13 |
| --- |

1    A.  Yes.
2    Q.  All right.  Have you participated in any
3    interviews or other discussions with Mr. Dickey even
4    if you didn't question him or speak with him
5    directly?
6    A.  Yes.
7    Q.  And what have you participated in, please?
8    A.  Two -- well, not participated.  I relied on
9    two interviews by Mr. Petty.
10    Q.  Okay.  And those were detailed in
11    Mr. Petty's report, correct?
12    A.  Yes.
13    Q.  All right.
14    A.  And I have referenced with footnotes in my
15    report as well.
16    Q.  Okay.  But just to be clear, you relied on
17    Mr. Petty's notes and information from his
18    interviews with Mr. Dickey, but you didn't
19    participate in those interviews yourself, correct?
20    A.  Correct.  He had been thoroughly deposed and
21    interviewed twice and I didn't feel it was necessary
22    in this case to interview him.
23    Q.  Okay.  And you've kind of anticipated my
24    next question.  I know from time to time you've
25    spoken directly with other plaintiffs in the Roundup

4 (Pages 10 to 13)

William R. Sawyer, Ph.D.

Page 14

1   litigation. And was the reason that you didn't
2   speak with Mr. Dickey directly because you had what
3   you thought was the information you needed to
4   prepare your opinions from his deposition, from his
5   fact sheets, and from the interview notes from
6   Mr. Petty's interview?
7       A.  That's accurate, yes.
8       Q.  Do you have any plans to speak with
9   Mr. Dickey before trial?
10      A.  Not at this time.
11      Q.  So you've reviewed his plaintiff's fact
12  sheet, correct?
13      A.  Yes.
14      Q.  And I noticed in the appendix to your report
15  it made mention of medical records. Just briefly,
16  can you summarize for me the medical records that
17  you've reviewed for Mr. Dickey's case? And I'll try
18  to make that a little easier. Was there -- did you
19  review what you understood to be the entire
20  collection of his available medical records, or just
21  specific medical records for Mr. Dickey?
22      A.  Just specific records that gave me a -- an
23  understanding of what type of lymphoma he had, in
24  this case it was follicular, confirmation that there
25  was pathology performed and what the pathology

Page 15

1   showed, a little information as well on -- I believe
2   on his negative smoking history, other information
3   with respect to previous malignancies, such as skin
4   cancer, and any information regarding exposure
5   factors that were in the medical records.
6           I did not assess the medical records in the
7   same -- from the same viewpoint that the medical
8   oncologist would.
9       Q.  Gotcha.
10      A.  I was looking for specific information
11  relevant to a toxicologist, and especially with
12  respect to exposure assessment.
13      Q.  And let me explore that just a little bit.
14  What information did you find, if any, in his
15  medical records that was relevant to you from a
16  toxicological exposure assessment perspective?
17      A.  ▮▮▮▮▮▮▮▮▮▮▮ the type of NHL, well,
18  confirmation that he even had NHL, and the type of
19  NHL, which was a large B-cell lymphoma but it was
20  the follicular type, family medical history, but I
21  should say I really am deferring any inherent
22  genetic possibilities to be assessed by the medical
23  oncologist rather than I.
24      Q.  All right. Fair enough. In your review of
25  the medical records for Mr. Dickey, did you find any

Page 16

1   reference or indication in those records to suggest
2   to you that any of his treating doctors found or
3   indicated that Roundup was in any way responsible
4   for his development of non-Hodgkin lymphoma?
5       A.  No, I didn't find any information suggesting
6   either way.
7       Q.  Have you reviewed any other depositions in
8   this case besides Mr. Dickey's deposition?
9       A.  No.
10      Q.  Are you relying on Mr. Dickey's deposition
11  testimony for your opinions in this case?
12      A.  Yes.
13      Q.  Are you aware of any information that
14  conflicts with Mr. Dickey's recounting of his
15  exposure to Roundup, either in his medical records
16  or, more specifically, in his fact sheet or in his
17  interview notes from speaking with Mr. Petty?
18      A.  No.
19  (Sawyer Exhibit 4 was marked for identification.)
20  (Sawyer Exhibit 5 was marked for identification.)
21  BY MR. PAINE:
22      Q.  All right. Doctor, let me do this. I'm
23  going to mark and hand you two exhibits. Exhibit
24  Number 4 is Appendix F from Mr. Petty's report, and
25  Exhibit Number 5 is Appendix G from Mr. Petty's

Page 17

1   report pertaining to Mr. Dickey.
2           Doctor, let me explain. You've seen
3   Mr. Petty's report, I take it?
4       A.  Yes.
5       Q.  And it's certainly voluminous, so just to
6   cut down on a little bit of volume, I've only
7   brought with me what I understood were the pertinent
8   parts of his report that pertain to Mr. Dickey, and
9   have you reviewed his Appendix F and Appendix G that
10  I've marked as Exhibits 4 and 5 before?
11      A.  I have.
12      Q.  Okay. Very good. And did you rely on the
13  information Mr. Petty captured in Appendix F and
14  Appendix G pertaining to Mr. Dickey for your own
15  opinions in this case?
16      A.  Yes.
17      Q.  Okay. Have you ever spoken with Mr. Petty
18  about Mr. Dickey's case?
19      A.  No. I've spoken with him before but not
20  specific to this case.
21      Q.  Okay. Aside from voice-to-voice
22  communications, have you had any other
23  communications with Mr. Petty about Mr. Dickey's
24  case other than your review of his Appendix F and
25  Appendix G?

William R. Sawyer, Ph.D.

Page 18

1    A. No, none.
2    Q. Let's take a look at Appendix F, please,
3  which is, again, Exhibit 4. Is it your
4  understanding that this is Mr. Petty's interview
5  summary sheet from his discussion with Mr. Dickey?
6    A. Yes.
7    Q. Okay. And have you reviewed things like
8  Appendix F for other cases that Mr. Petty has worked
9  on?
10    A. Yes.
11    Q. Okay. Is this essentially Mr. Petty's sort
12  of standard format for capturing his interview
13  information when he speaks with a Roundup plaintiff?
14    A. Yes.
15    Q. Do you know what precise questions Mr. Petty
16  asked of Mr. Dickey?
17    A. No.
18    Q. And do you know what precise answers
19  Mr. Dickey gave in response to the questions
20  Mr. Petty asked him?
21    A. No. I would have -- obviously, have to
22  defer that question to Mr. Petty.
23    Q. Okay. You haven't seen any additional raw
24  notes or other materials reflecting or taken of
25  Mr. Petty's interview with Mr. Dickey, correct?

Page 19

1    A. No, I have not.
2    Q. Okay. Do you know if there were additional
3  questions that you, Dr. Sawyer, would have asked of
4  Mr. Dickey had you been conducting the interview
5  that Mr. Petty didn't ask? Is there any way for you
6  to know that?
7    A. No.
8    Q. From your review of Appendix F by Mr. Petty
9  here, can you tell if there are things that you
10  would like to know, again, had you been conducting
11  Mr. Dickey's interview that are not reflected in
12  Appendix F?
13    A. No. He was very thorough.
14    Q. Do you know if Mr. Petty reviewed any other
15  case-specific materials about Mr. Dickey's case to
16  form the factual basis of his case-specific opinions
17  other than what's captured here in Appendix F and
18  Appendix G?
19    A. I don't recall. I don't know if that was
20  stated or not.
21    Q. Okay. Do you know if Mr. Petty read
22  Mr. Dickey's deposition?
23    A. I would, again, have to review the Petty
24  reports to determine that. I don't recall.
25    Q. Okay. And, Dr. Sawyer, having done what

Page 20

1  you've done for a number of years as a forensic
2  toxicologist, would you expect that somebody in
3  Mr. Petty's position would in fact review the
4  deposition given by Mr. Dickey as part of his
5  preparation of his report and the formulation of his
6  opinions?
7    MR. KRISTAL: Objection.
8    A. Can you repeat the question? Because I
9  don't understand it.
10    Q. Sure. And that's fair. You're doing
11  exactly what I asked you to do. If I ask a bad
12  question, I'll be happy to repeat it.
13    Would you have expected that Mr. Petty would
14  review Mr. Dickey's deposition before formulating
15  his opinions in this case?
16    MR. KRISTAL: Objection.
17    A. Difficult question because I almost have to
18  read the mind of Mr. Petty. I can speak for myself,
19  how I proceed, but I -- it is -- I don't know if
20  it's reasonable for me to speculate on someone
21  else's mode of extracting information.
22    It's possible that Mr. Petty chose to be
23  independent of what was already testified to and
24  read that at a later time point. I do know that the
25  deposition was taken about 10 days prior to

Page 21

1  Mr. Petty's first interview, so it's possible that
2  the transcript was ready. It's just difficult for
3  me to speculate on his methodology. He may have
4  wanted -- he may wish to have been blind to any
5  facts in the case prior to questioning, or perhaps
6  he read the July 16th deposition in advance. I
7  don't even know the answer to that.
8    Q. Do you know if Mr. Petty reviewed
9  Mr. Dickey's plaintiff fact sheet before he
10  formulated his opinions and rendered his report in
11  this case?
12    A. No, I do not.
13    Q. I'm sorry?
14    A. I do not know for sure.
15    Q. Did Mr. Petty conduct or take a chemical
16  inventory in Mr. Dickey's case?
17    A. I don't recall.
18    Q. Just looking through Appendix F and
19  Appendix G, do you -- do you see anything that looks
20  to you like a chemical inventory that Mr. Petty may
21  have taken for Mr. Dickey's case?
22    A. No.
23    Q. And I take it from you not having spoken
24  with Mr. Dickey directly at any point, you didn't do
25  a complete chemical inventory of what may have been

6 (Pages 18 to 21)

William R. Sawyer, Ph.D.

Page 22

1  on his property at any point in time; is that also
2  correct?
3      A.  No.  I reviewed the deposition.  There was a
4  rather extensive section in the deposition relative
5  to not just different types of Roundup but other
6  things, such as Cobra and other types of herbicides
7  and when they were used and whether there was skin
8  contact and so on.
9      Q.  Sure.  And I'm glad you brought that up.  So
10  you did talk about, in your report, what chemicals,
11  specifically herbicides, Mr. Dickey used in his
12  farming operations over a number of years, right?
13      A.  Yes, I mentioned some of the more
14  significant ones, but there were actually, I think,
15  a total of 17 different chemicals.
16      Q.  Okay.  And my question was a little bit
17  different, or let me clarify my question.  Beyond
18  those herbicides that were listed in the report that
19  you've talked about, that came from Mr. Dickey's
20  deposition, right?
21      A.  Yes.
22      Q.  Okay.  You didn't -- you don't otherwise
23  have any kind of chemical inventory of other
24  substances that were used on or around or by
25  Mr. Dickey over the years, correct?

Page 23

1      MR. KRISTAL:  Object to form.
2      A.  No.  All I have is the 16 different
3  herbicide chemicals, plus the generic use of
4  granular insecticides, which totals 17.
5      Q.  So, for instance, neither you nor Mr. Petty
6  conducted a site inspection of any of Mr. Dickey's
7  properties, correct?
8      MR. KRISTAL:  Objection.
9      A.  I have not.
10      Q.  Okay.  And are you aware of any site
11  inspection conducted by Mr. Petty?
12      A.  No.
13      Q.  Is it possible for you as a toxicologist to
14  do a complete and thorough exposure analysis of the
15  chemicals to which Mr. Dickey may have been exposed
16  if you don't have a complete chemical inventory for
17  him?
18      MR. KRISTAL:  Objection to form.
19      A.  Under that hypothetical, and hypothetically,
20  depending on what it -- what would be in that
21  chemical inventory you're referring to, that's
22  possible; but I relied on his memory in deposition
23  under oath, and as I said, there was a fairly
24  extensive section of the deposition specific to that
25  issue.

Page 24

1      Q.  Now, Mr. Petty did not do any calculations
2  of absorbed dose of Roundup or any of its
3  ingredients for Mr. Dickey in his report, correct?
4      A.  Yes; however, he did point out that there is
5  continued absorption depending on the latent period
6  between exposure and bathing.
7      Q.  Right.  But as far as actual absorbed dose,
8  he didn't calculate that for Mr. Dickey, correct?
9      A.  No.
10      Q.  And I'm sorry.  That's one of those where I
11  think I'm asking a negative question and asking if
12  you agree with it.
13      Mr. Petty did not calculate any absorbed
14  dose of glyphosate for Mr. Dickey, did he?
15      A.  Correct.
16      Q.  And did you, in your report, calculate any
17  absorbed dose of glyphosate or any ingredient of
18  Roundup for Mr. Dickey's case?
19      A.  No.  I calculated the dose metric based on
20  the generally accepted peer-reviewed methodology of
21  time-weighted exposure days in comparison to the
22  glyphosate epidemiologic studies that provide
23  exposure days as a dose metric.
24      Q.  Okay.  And I understand that.  You
25  essentially counted exposure days and number of

Page 25

1  hours per days to arrive at the same conclusions and
2  adopted the conclusions that Mr. Petty calculated
3  for exposure days, right?
4      MR. KRISTAL:  Object to the form.
5      A.  Yes.  I relied on Mr. Petty's exposure hour
6  analyses.
7      Q.  Okay.  But neither you nor Mr. Petty ever
8  calculated absorbed dosages in terms of milligrams
9  per kilogram for any period of time for any of
10  Mr. Dickey's exposures, correct?
11      A.  Correct.  As the human studies are not based
12  on milligram per kilogram, but, rather, calculating the
13  time-weighted exposure days, thus, calculating the
14  milligram per kilogram per day dosage is not the
15  only means of assessing systemic exposure in this
16  matter.
17      Q.  Dr. Sawyer, have you ever spoken with any of
18  Mr. Dickey's doctors?
19      A.  No.
20      Q.  Have you ever spoken with any of
21  Mr. Dickey's other expert witnesses in this case?
22      A.  It's possible.  I would have to know who
23  they are.
24      Q.  Well, let me --
25      A.  But I never spoke to them regarding this

7 (Pages 22 to 25)

William R. Sawyer, Ph.D.

Page 26

1  case.
2      Q.  That's -- okay.  That's -- that's fair and a
3  better answer than my question deserves.  So you
4  haven't spoken with any other experts in this case
5  about Mr. Dickey's case specifically; is that
6  correct?
7      A.  That is correct.
8      Q.  Okay.  And I think we've just talked about
9  this or established this, but you didn't
10  independently calculate exposure days for
11  Mr. Dickey, you relied on Mr. Petty's calculations,
12  right?
13      A.  Yes.
14      Q.  And you did not rule out other possible
15  causes or contributing factors to Mr. Dickey's
16  non-Hodgkin lymphoma other than addressing Roundup,
17  correct?
18      A.  No.  I did review, of course, the other
19  chemicals that he used on the farm and considered
20  that in my opinion and assessed whether any of them
21  were carcinogenic and if so, what class and whether
22  they are capable of inducing NHL.
23      Q.  Can you direct me in your report to where
24  you talk about whether any of the other products
25  Mr. Dickey used were potentially carcinogenic or

Page 27

1  not?
2      A.  It appears the only entry I have is on
3  page 5, last paragraph, and that is with respect to
4  an overview of some of the additional products he
5  used.
6      Q.  Okay.  Well, let's -- and you've been
7  looking through your report on your computer?
8      A.  Yes.
9      Q.  Okay.  All right.  So let's go to that
10  page 5 that you mentioned, and at the bottom of
11  page 5 there is a section that says Type of Roundup
12  Products Used, and below that you talk about
13  Mr. Dickey began farming full-time in 1962, and then
14  it says he used 2,4-D until about the mid '70s and
15  then tried some newer products, atrazine, Lasso,
16  Dual Mag II, Prowl, Assure, et cetera, before using
17  Roundup, right?
18      A.  Yes, and the "et cetera" refers to the other
19  products totaling 16, plus granular pesticide -- or
20  granular insecticides.
21      Q.  Okay.  And how you got to 16, I take it, was
22  looking at his fact sheet and his deposition
23  testimony?
24      A.  Yeah, the combination.
25      Q.  Okay.  Okay.  So the list that I have -- and

Page 28

1  do you have an independent list of this?  As I run
2  through them, just let me know if these match up
3  with your recollection: 2,4-D, Beacon, Liberty --
4      A.  Wait a minute.
5      MR. KRISTAL:  Whoa, whoa, whoa.
6      MR. PAINE:  Sure.  You know what, rather
7  than running through 15 -- a list of 15 or 16
8  different chemicals --
9      MR. KRISTAL:  I didn't mean to stop you but
10  Dr. Sawyer wanted to follow along.  I don't think
11  he's memorized it.
12      MR. PAINE:  Yeah, I may -- that's what I
13  wanted to short-circuit because the list is
14  fairly long.
15      MR. KRISTAL:  Yeah.
16      A.  Oh, I know where it is.  It's in the folder
17  labeled "Herbicides."  Okay.
18      Q.  There you go.  Okay?
19      A.  Yeah.
20      Q.  Okay.  So you've got a handwritten list?
21      A.  I do.
22      Q.  Okay.  And that's based on review of his
23  fact sheet and deposition?
24      A.  Yes.
25      (Sawyer Exhibit 6 was marked for identification.)

Page 29

1  BY MR. PAINE:
2      Q.  Okay.  And if I could, Doctor, just so,
3  again, we're all literally working off the same
4  page, let's stick Exhibit 6 on this.
5      A.  If you can read it.  It's Bill's scribbles,
6  is what Jen in my office refers to it.
7      Q.  I was going to say Bill's scribbles are
8  better than Eric's scribbles, so I'll take yours.
9  The most important thing is you can read them,
10  though, right?
11      A.  Usually.
12      Q.  Let's just see if they match up with my
13  list.  So my list from his deposition fact sheet,
14  et cetera, includes 2,4-D?
15      A.  Yes.
16      Q.  Beacon Liberty?
17      A.  Yes.
18      Q.  Or were those two separate substances,
19  Beacon and Liberty?
20      A.  No, I think Liberty is a glufosinate,
21  g-l-u-f-o-s-i-n-a-t-e, different chemical.
22      Q.  Okay.  A different chemical than Beacon?
23      A.  Than Beacon?  Yeah.  I think Beacon was
24  2,4-D, actually.
25      Q.  Okay.  Next on my list is -- this is in your

8 (Pages 26 to 29)

William R. Sawyer, Ph.D.

Page 30

1    report, too, was Dual Mag II?
2        A.  Yes.  That's a Syngenta product, yeah,
3    metolachlor, m-e-t-o-l-a-c-h-l-o-r.
4        Q.  All right.  And then is Harness on your
5    list?
6        A.  Yes, which is Roundup.
7        Q.  You also listed in your report, and I assume
8    on your list too, atrazine?
9        A.  Yes.
10       Q.  Bicep, B-i-c-e-p?
11       A.  Yes.  That's atrazine mixed with
12   metolachlor.
13       Q.  Okay.  Banvel, B-a-n-v-e-l?
14       A.  Yeah.  That's dicamba.
15       Q.  Treflan?
16       A.  Yeah, which is trifluralin,
17   t-r-i-f-l-u-r-a-l-i-n.
18       Q.  You had this on your -- in your report as an
19   example:  Prowl, P-r-o-w-l.
20       A.  Yeah.  It's to keep those terrible weeds
21   from prowling around.  It contains pendimethalin,
22   p-e-n-d-i-m-e-t-h-a-l-i-n.
23       Q.  You had this -- it's not actually on there.
24   Another one I had listed was Pursuit.
25       A.  Yes.

Page 31

1        Q.  That's to catch the prowling weeds?
2        A.  Right, and imazethapyr,
3    i-m-a-z-e-t-h-a-p-y-r.
4        Q.  All right.
5        A.  Et cetera, because it has a whole bunch of
6    methyl and other oddball groups attached to it.
7        Q.  Okay.  Do you have Cobra on your list as a
8    substance that Mr. Dickey used?
9        A.  Yeah.  I wish it was off my list.  That's
10   not something I want to mess with, a Cobra.
11       Q.  What's Cobra?
12       A.  It's quite a catchy name.  It's lactofen,
13   l-a-c-t-o-f-e-n, which contains naphthalene, and I
14   should state, just for the record, naphthalene is in
15   the solvent that carried it.  I don't know if that
16   product is even made anymore, but it was an older
17   product that used a -- what shall we say -- a light
18   naphtha solvent carrier.
19       Q.  You had this in your report as an example
20   and I assume on Exhibit 6 as well, Assure?
21       A.  Yes.
22       Q.  And Lorsban was another?
23       A.  Yes.
24       Q.  And Pounce?
25       A.  Yes.  I pounced right on that one.

Page 32

1        Q.  Okay.  And what did you pounce on with the
2    Pounce?  What's in Pounce?
3        A.  Permethrin, p-e-r-m-e-t-h-r-i-n.
4        Q.  And may I just see Exhibit 6?
5        A.  Sure.
6        Q.  See if there is anything on your list and my
7    list that are different.
8            Okay.  Let me just ask you a couple things
9    here.  There are two entries there that have an M in
10   the left -- to the left of the entry and the M is
11   circled.  What does that mean?
12       A.  Rather than handwriting out the name of the
13   manufacturers as I did with Syngenta and others, I
14   simply wrote an M indicating produced by Monsanto.
15       Q.  Okay.  All of those substances on Exhibit 6
16   to your deposition were materials or substances that
17   Mr. Dickey used in his farming operations at some
18   point between 1962 and when he stopped farming in or
19   around 2003, is that your understanding?
20       A.  Yes.
21       Q.  Okay.  And you note in your report that he
22   applied these occupationally using a hand sprayer,
23   field sprayer, bean bar sprayer, and by commercial
24   application.  So those were the same methods that
25   Mr. Dickey would have used to apply Roundup; is that

Page 33

1    right?
2        A.  Yes.
3        Q.  Now, you didn't do any further analysis in
4    your report of Mr. Dickey's exposure days or
5    cumulative exposure or any kind of absorbed dose of
6    any of those substances, correct?
7        A.  No.
8        Q.  No, I'm not correct, or no, you didn't do
9    that?
10       A.  No, I didn't.  I simply assessed for
11   potential carcinogenicity, classification such as a
12   C or a 2A, 2B carcinogen, and whether or not the
13   subject chemical had the propensity to induce NHL.
14       Q.  Okay.  And, Doctor, if we could go back to
15   Exhibit 3 again, which is the copy of your report
16   with the materials considered list on it -- I didn't
17   actually mark it.  I've got a -- I can do that right
18   now.
19           But if you would go back to page 143, to
20   your materials considered list for this case, my
21   question to you is that materials considered list
22   doesn't contain any of the labels or other
23   information about any of these 16 or 17 other
24   substances, does it?
25       A.  No.

William R. Sawyer, Ph.D.

Page 34

1    Q.  So are there other references that should be
2  included in your materials considered list for the
3  substances that are on Exhibit 6 that Mr. Dickey
4  used in his farming operations?
5    A.  No, I don't believe so.  I mean there is
6  Material Safety Data Sheets that I downloaded to aid
7  in the deposition, but those were not the basis of
8  my determination that these additional chemicals
9  were incapable of producing his NHL.
10   Q.  Okay.  So tell me what the basis was when
11 you prepared your report and your opinions in this
12 case, that are in your report dated October 9, that
13 none of the chemicals on Exhibit 6 were capable of
14 inducing non-Hodgkin's lymphoma -- non-Hodgkin
15 lymphoma.
16   MR. KRISTAL:  Objection.
17   A.  Well, number one, many of these chemicals I
18 had previously evaluated and referenced in other
19 Plaintiff vs. Monsanto Roundup reports that I
20 produced previously in the past and I've been
21 deposed on.
22       With some of the -- well, not some but other
23 chemicals that I have not previously assessed as
24 part of the Monsanto assessments, I reviewed and
25 determined whether or not the compounds were

Page 35

1  classified carcinogens and if so, at what class and
2  whether or not there was any evidence of the subject
3  chemical inducing non-Hodgkin's lymphoma.
4       And since the time of my report, I have
5  downloaded some labels and MSDSs, or now called SDS,
6  Safety Data Sheets, to speed things along in the
7  deposition as it provides the full chemical name and
8  the percentages and other information.
9    Q.  And did you produce those in advance of
10 today's deposition?
11   A.  No.
12   Q.  And you understand this is my only chance to
13 talk to you about this case, right?
14   A.  Yes.
15   Q.  So when you prepared your report on
16 October 9, 2019, had you downloaded those Material
17 Safety Data Sheets or labels that you are referring
18 to now?
19   A.  Many of them, because I've used them in
20 other tables in my prior reports of Plaintiffs vs.
21 Monsanto with respect to Roundup.
22   Q.  So I would need to go back and look through
23 all your prior reports and depositions to find out
24 which ones match up with what's on Exhibit 6 for
25 Mr. Dickey's case?

Page 36

1    A.  No, I didn't say that.  I previously have
2  assessed many of these chemicals and I have produced
3  simply labels or Safety Data Sheets to help move
4  along this deposition, not to impair it.
5    Q.  Did you evaluate whether any of the
6  coingredients in any of the formulations on
7  Exhibit 6 might contain carcinogenic substances or
8  represent carcinogenic substances?
9    A.  I did, and, for example, I mentioned the
10 fact that Lasso, which alachlor, a-l-a-c-h-l-o-r,
11 contains naphthalene as the carrier solvent, and
12 although alachlor is not a listed carcinogen,
13 naphthalene is a potential carcinogen, but it is not
14 associated and has never been associated with NHL
15 and is not a probable human carcinogen.
16   Q.  Do you have a list somewhere of which of
17 those substances were used with or formulated with
18 surfactants?
19   A.  No.
20   Q.  Do you know what, if any, surfactants were
21 used in any of those substances listed on Exhibit 6?
22   A.  The only one I found any detail on is for
23 Roundup in a handbook published by Monsanto which
24 states that droplet sizes will vary, so the use of
25 antidrift agent is recommended, usually based upon

Page 37

1  ounces per 100 gallons.  The name of the surfactant
2  is not provided by Monsanto but it is recommended to
3  reduce drift.  That's the only information I have on
4  additional surfactants.
5    Q.  Okay.  So the answer to the question about
6  whether you know what, if any, surfactants were used
7  in any of the formulations listed on Exhibit 6
8  beyond Roundup is no?
9    A.  Correct.
10   Q.  And, Doctor, you said that as part of, you
11 know, the Roundup litigation I guess as a whole,
12 you've looked at a number of these substances over
13 time that are listed on Exhibit 6 and researched or
14 evaluated their carcinogenic potential in the past,
15 right?
16   A.  Yes.
17   Q.  Okay.  And I take it part of that review was
18 looking at how IARC has classified those substances,
19 correct?
20   A.  IARC, yes; NTP, yes; EPA, yes; and in some
21 cases, human epidemiological studies as well.
22   Q.  Okay.  And aside from the naphthalene
23 carrier you mentioned, were any of the active
24 ingredients or coingredients in any of the
25 formulations listed on Exhibit 6 potential

William R. Sawyer, Ph.D.

Page 38

1    carcinogens?
2        A.  Potential or human?
3        Q.  Well, let's say human.  That's probably a
4    better question.
5        A.  Potential human or possible human?
6        Q.  Well, let's see how it's listed.  Were any
7    of those listed in either Category 1 or Category 2,
8    either 2A or 2B, by IARC?
9        A.  2B, yes.
10       Q.  Okay.  Were any of them listed in Category 3
11   by IARC?
12       A.  Yes.
13       Q.  Okay.  And Category 3 means insufficient
14   information to make an assessment for human
15   carcinogenicity; is that right?
16       A.  That is correct.  For example, permethrin in
17   the Pounce.
18       Q.  They can't classify that as yet, right?
19       A.  It's -- yeah.  The EPA subcommittee
20   concluded negative carcinogenicity; however, IARC
21   stated insufficient data available.
22       Q.  Now, Dr. Sawyer, in your opinion, was
23   glyphosate a human carcinogen before 2015, when IARC
24   classified it in 2A?
25           MR. KRISTAL:  Objection to form.

Page 39

1        A.  I'm not sure if you're asking is it my
2    opinion that it was a carcinogen at that point in
3    time, or are you asking me a regulatory question as
4    to what its classification was at that point in
5    time.
6        Q.  Well, let me clarify.  I'm not asking you a
7    regulatory question.  I'm asking you, Bill Sawyer,
8    would you say that glyphosate was a human carcinogen
9    before IARC classified it as a probable human
10   carcinogen in 2015?
11       A.  I'm still not clear of the question.
12       Q.  Sure.  You've testified that Roundup,
13   glyphosate in Roundup, was a substantial
14   contributing factor to cancer in certain individuals
15   who have used it, right?
16       A.  Yes.
17       Q.  Okay.  And this case is actually a perfect
18   example of what I'm trying to establish, because
19   Mr. Dickey's cancer was diagnosed before 2015,
20   right?
21       A.  Yes.
22       Q.  Okay.  So I take it you will say that a
23   substance that is capable of causing human cancer is
24   capable of causing human cancer regardless of the
25   time when IARC gets around to classifying it as

Page 40

1    such, right?
2        A.  That's correct.
3        Q.  Okay.  So simply because IARC hasn't decided
4    yet whether there is sufficient information to
5    classify something as carcinogenic, doesn't
6    determine whether the substance itself is capable of
7    causing human cancers, right?  It either is or isn't
8    a carcinogen, it doesn't depend on what IARC calls
9    it, right?
10       A.  Could you make -- I feel like I'm guessing
11   at what you're asking me.
12       Q.  Sure.  Let me come at it from a slightly
13   different direction.  A substance doesn't suddenly
14   go from being noncarcinogenic to carcinogenic
15   depending on the IARC label, right?  It either has
16   the properties of inducing human cancers or it does
17   not have the properties of inducing cancers
18   regardless of what IARC calls it, correct?
19       A.  Correct.  I mean, smoking cigarettes in the
20   1800s was still carcinogenic, even though it hadn't
21   been declared yet.
22       Q.  Gotcha.  And IARC, to this day, continues to
23   carry on with its purpose of evaluating different
24   substances for potential human carcinogenicity,
25   right?

Page 41

1            MR. KRISTAL:  Unless Monsanto has its way in
2    trying to get the US government to defund it.
3    I'm joking.  Keep going.
4            MR. PAINE:  Move to strike because you know
5    I have to.
6            MR. KRISTAL:  No, no, no, and I apologize.
7        A.  Yes.
8            MR. PAINE:  So could you repeat the last
9    question, please?
10       A.  Now, I don't feel bad.  My memory is never
11   perfect either, when I ask you to repeat the
12   questions.
13       Q.  That's why we have Susan here.
14           MR. KRISTAL:  Something IARC continues to
15   evaluate, but go ahead.
16           THE COURT REPORTER:  "And IARC, to this day,
17   continues to carry on with its purpose of
18   evaluating different substances for potential
19   human carcinogenicity, right?"
20       A.  Yes.
21       Q.  And you would expect that as time goes on,
22   IARC will continue to identify additional Category 3
23   known human carcinogens and additional Category 2A
24   probable human carcinogens, right?
25           MR. KRISTAL:  Object to form.

11 (Pages 38 to 41)

William R. Sawyer, Ph.D.

Page 42

1    A.  You better ask me again.  I'm not clear.
2    Q.  Sure.  You don't think IARC is done with
3  identifying Category 3 and Category 2A definite and
4  probable human carcinogens, right?
5    A.  Correct.
6    (Sawyer Exhibit 7 was marked for identification.)
7  BY MR. PAINE:
8    Q.  Doctor, I've marked and I'm handing you
9  Exhibit 7 to your deposition, a copy of a document
10  that was produced to us recently, as we've discussed
11  earlier today.  This is the IARC Monographs on the
12  Identification of Carcinogenic Hazards to Humans,
13  Report of the Advisory Group to Recommend Priorities
14  for the IARC Monographs during 2020 through 2024.
15    Have you -- you've seen this document
16  before, right?
17    A.  Yes.
18    Q.  Okay.  And this is essentially a list of a
19  number of substances that IARC is going to look at
20  to make some determinations about how to classify
21  these substances over the next four to five years,
22  right?
23    A.  Yes.
24    Q.  Okay.  One of the substances they are
25  looking at is atrazine, right?

Page 43

1    A.  Yes.
2    Q.  Okay.  And we can actually look at the
3  section on atrazine, which I think is -- begins on
4  page 27, so would you turn to that with me, please.
5    A.  Okay.
6    Q.  Okay.  And atrazine is one of the substances
7  or herbicides that Mr. Dickey used in his farming
8  operations for a number of years, right?
9    A.  Yes.
10    Q.  Okay.  And here on page 27 of Exhibit 7,
11  IARC discusses the status of atrazine, where it says
12  in the first paragraph:  Atrazine was previously
13  reviewed by the IARC Monograph programme (IARC 1991,
14  1999a).  The most recent IARC evaluation was not
15  classifiable as to its carcinogenicity to humans
16  (Group 3), on the basis of sufficient evidence of
17  carcinogenicity in experimental animals, and strong
18  evidence that the mechanism by which atrazine
19  increases the incidence of mammary gland tumors in
20  Sprague-Dawley rats is not relevant to humans.  The
21  2014 Priorities Advisory Group assigned atrazine a
22  medium priority (IARC 2014).
23    Did I read all that correctly?
24    A.  Okay.
25    Q.  Okay.  And then if we go down to the section

Page 44

1  that says Cancer in Humans, the second sentence
2  reads:  The United States National Cancer Institute
3  Agricultural Health Study found suggestive
4  associations with non-Hodgkin lymphoma, multiple
5  myeloma, and cancers of the bladder and lung among
6  applicators, but none were statistically
7  significant.
8    Right?
9    A.  Yes.
10    Q.  I read all that correctly?
11    A.  Yes.
12    Q.  Going a little further down on page 28 it
13  says:  Cancer in Experimental Animals.  Which
14  atrazine was evaluated in 1999 (IARC 1999a) there
15  was sufficient evidence in experimental animals for
16  carcinogenicity of atrazine.
17    Correct?
18    A.  Yes.
19    Q.  And then under Mechanistic Evidence, I won't
20  read this in its entirety, but they talk about
21  studies that have provided some new insights into
22  the carcinogenic and genotoxic activity of atrazine
23  and then concludes that it has been linked to DNA
24  double-strand breaks and activation of DNA damage
25  checkpoints.  Correct?

Page 45

1    A.  Yes.
2    Q.  Okay.  So have you independently evaluated
3  the information cited by IARC, and I don't mean the
4  prior IARC materials but the studies themselves, for
5  atrazine?
6    A.  I have in the past, not recently.
7    Q.  Do you agree that IARC should continue to
8  review the data on atrazine to see if it's a
9  probable or known human carcinogen?
10    A.  Yes.
11    Q.  And you yourself have relied on the
12  Agricultural Health Study for your opinions
13  regarding glyphosate, correct?
14    A.  Yes.
15    Q.  That's one of the studies that the -- that
16  IARC mentions as finding possible associations with
17  non-Hodgkin lymphoma, right?
18    A.  It is; however, to my knowledge, the
19  relationships have been nonsignificant at this
20  stage.
21    Q.  So what to you -- pardon the pun, if you
22  will -- is the significance of those results being
23  nonsignificant when it comes to atrazine's potential
24  for human carcinogenicity?
25    A.  Well, under the weight of evidence and the

12 (Pages 42 to 45)

William R. Sawyer, Ph.D.

Page 46

1    Bradford Hill criteria that I follow, I look at not
2    only the odds ratio or his risk ratio, which was
3    elevated in one of the studies, but it was not
4    statistically significant at the 95 percent
5    confidence interval.
6        I also looked to see if the studies on
7    atrazine are consistent with one another, which they
8    are not.
9        Also, coherence, that is if we look at
10   atrazine exposure among farmers versus atrazine
11   exposure among factory workers, do they both reach
12   the same endpoint, and that information is not
13   available.
14       Also the mechanism, plausible mechanism,
15   which there appears to be a plausible mechanism with
16   respect to mutagenetic actions.
17       Also consider temporality, that is the
18   latent period, which is unknown for this particular
19   chemical, and the sum of the available studies with
20   respect to weight of evidence, and I think the IARC
21   summary you read is consistent with my opinion that
22   more studies are needed do draw conclusions.
23       Q.   Now, if IARC ultimately determines that
24   atrazine is either a probable or a definite human
25   carcinogen, would you then say or will you then say

Page 47

1    that atrazine is also carcinogenic in humans?
2        A.   If there was sufficient study evidence to
3    support that, but so far the studies are not
4    significant at the 95 percent confidence interval
5    and are lacking with respect to a number of the
6    Bradford Hill criteria factors.
7        Certainly, if more study evidence comes in
8    and that changes, of course the answer would be yes,
9    but as it stands now, the study evidence is
10   insufficient.
11       Q.   Do you know -- and going back to Exhibit 6,
12   so we're done with IARC at the moment, but going
13   back to Exhibit 6, the list of herbicides and other
14   chemicals that Mr. Dickey used in his farming
15   operation, do you know if the manufacturers of any
16   of those other chemicals conducted long-term animal
17   carcinogenicity studies on their ingredients?
18       MR. KRISTAL:  You mean formulate the product
19   or individually, or any of those?
20       MR. PAINE:  Either.
21       MR. KRISTAL:  Object to form.
22       A.   I just can't recall whether -- you know, I'm
23   pretty sure I have summaries of 2,4-D bioassays, but
24   I just can't say with certainty what I have seen in
25   the past on long-term bioassays for carcinogenicity

Page 48

1    on the 2B rated chemicals, such as 2,4-D, or even
2    chlorpyrifos for that matter.  It's just -- I just
3    don't recall.
4        Q.   Now, in your report on page 4 you indicate,
5    and I think you told me earlier today, that
6    Mr. Dickey had a follicular type NHL large B-cell
7    lymphoma, correct?
8        A.   Yes.
9        Q.   That's your understanding?
10       A.   Yes.
11       Q.   And what's the significance to you of
12   that -- of him having that particular subtype of
13   NHL?
14       A.   Well, it's not the most common type as would
15   be diffuse large B-cell.  The human epidemiologic
16   studies would have less ability to specifically
17   identify any of the many subtypes of NHL that occur
18   on a lower frequency, but with respect to the
19   specific power of the epidemiologic studies to
20   measure and accurately determine the incidence of
21   follicular lymphomas, I would differ that to the
22   epidemiologist as I am primarily using the human
23   epidemiologic studies which have dose metrics for my
24   purpose of dose calculations in determining whether
25   or not a plaintiff sustained exposures that are

Page 49

1    consistent, that is above the thresholds of the
2    various human epidemiologic studies.  That is my
3    focus and purpose.
4        So if we're going to get into questions
5    regarding the metaanalyses, the study designs, the
6    type 2 error, that is the power to be able to detect
7    a change when it's really there, I would defer those
8    specifically to the epidemiologist as I am not
9    handling every aspect of this case.  That's not
10   my -- not what I was asked to do.  I'm a
11   toxicologist and I'm looking at very specific issues
12   in this case.
13       Q.   Sure.  Understood.  And it's not my
14   intention to go deep into this with you, but let me
15   ask you one question.  Are you aware of any
16   epidemiologic study that has found a statistically
17   significant increased risk of follicular lymphoma
18   for patients or subjects exposed to glyphosate?
19       A.   No.
20       Q.   Did -- your report goes on to say:  Bone
21   marrow core biopsy aspirate and particle sections
22   revealed normal cellular bone marrow with and
23   trilineage hematopoiesis.
24       Did I read that correctly?  It's page 4.
25       A.   I am going to check, but I have found you in

13 (Pages 46 to 49)

William R. Sawyer, Ph.D.

Page 50

1  the past to be a very good reader.
2  Q.  Thank you.  My mother and my third grade
3  teacher would be very pleased to hear that.
4  A.  All right.  So page 4, paragraph --
5  Q.  Yeah, page 4.  I'll just cut to the chase.
6  Based on your review and what you have in your
7  report, did Mr. Dickey have evidence of non-Hodgkin
8  lymphoma in his bone marrow?
9  A.  I really think I should defer that to the
10 pathologist.  I don't think so but I'd rather defer
11 that because although I've had pathology through the
12 medical school as part of my training, I use
13 pathology as a toxicologist, I'm not a pathologist,
14 and I believe there may be one in this case that
15 would be best off answering that question.
16 Q.  Okay.  Well, just because you mentioned it
17 in your report, and you have that statement about
18 his bone marrow in there that says revealed normal
19 cellular bone marrow with trilineage hematopoiesis,
20 are you able to say whether he had evidence of NHL
21 in his bone marrow?
22 A.  Well, based on what I've read, no, but what
23 I'm getting at, the pathologist who may have looked
24 at the slides or at least examined the reports of
25 whoever read the slides would be able to more

Page 51

1  thoroughly answer that question than I.
2  Q.  Okay.  Fair enough.
3  A.  I have not read the slides.
4  Q.  Okay.  Okay.  Let's talk a little bit about
5  the exposure analysis.  On page 7 of your report,
6  there's a table there, Total Time Hours Per
7  Spraying.  It's got the numbers 4983 for low, 6373
8  for high, with a midpoint of 5678.  That's adopted
9  or pulled over from Mr. Petty's report, right?
10 A.  Yeah.  That's actually, on page 7, an image
11 right from his report.
12 Q.  Okay.  That's what I thought.  And then
13 below that, where you talked about minimum of 622.9
14 exposure days -- and I'm skipping around -- a
15 maximum of 796.6 exposure days, and a mean of 709.8
16 exposure days, that also comes from Mr. Petty's
17 report, right?
18 A.  Well, indirectly.  In other words, I
19 converted the total hours to eight-hour exposure
20 days in keeping with Eriksson 2008.  Let me check
21 that date.  Yeah, 2008.
22 Q.  Okay.  So other than your converting
23 Mr. Petty's numbers in the table by dividing by
24 eight hours, did you otherwise check Mr. Petty's
25 work to see if his calculations were correct?

Page 52

1  A.  No, actually.  I relied on Mr. Petty's
2  analysis.
3  Q.  Now, on page 6 of your report, this is right
4  under Time Frame of Exposure, you say:  Mr. Dickey
5  reported his exposures to the Roundup product
6  occurred from mid '70s, 1975, through the 2002
7  farming season on an occupational basis, although he
8  continued to use it residentially after 2002.
9     Did I read that correctly?
10 A.  Yes.
11 Q.  Okay.  And Mr. Petty didn't include
12 residential use in his exposure calculations; is
13 that correct?
14 A.  Yes.
15 Q.  Okay.  And did you make any adjustments for
16 residential use and potential exposure in
17 Mr. Dickey's case?
18 A.  No, no, just qualitatively that there was
19 certainly additional exposure that I did not account
20 for.
21 Q.  Okay.
22 A.  So my calculation of exposure days would be
23 an underestimate.
24 Q.  Okay.
25 A.  Would be conservative.

Page 53

1  Q.  And so that may be the answer to my next
2  question, which was why would you not count
3  residential exposures in Mr. Petty's case?
4  A.  Based upon my --
5     MR. KRISTAL:  In Mr. Dickey's case.
6     MR. PAINE:  I'm sorry.  Thank you.  I'll
7  rephrase.
8  Q.  Why would you not count residential
9  exposures in Mr. Dickey's case?
10 A.  Based on my review, the majority of his
11 exposures were occupational, and the quantity of
12 exposure days is so far off scale compared to the
13 dose metrics in the studies that the small amount of
14 exposure days that the residential exposures would
15 have added would really have no significant impact
16 in determining whether or not Mr. Dickey's exposures
17 exceeded the thresholds of the various human
18 epidemiologic studies because he exceeded those
19 thresholds by a factor of 62 to 120 times already.
20 So it really would not have added any significant
21 information to the analysis.
22    And I prefer to remain on the conservative
23 side anyway in these assessments, and be able to
24 state that my calculation is conservative and is in
25 no way an inflated overestimate.

William R. Sawyer, Ph.D.

Page 54

1    Q.  At what point beyond the epidemiologic
2  studies' threshold does additional exposure become
3  insignificant, in your opinion?
4    A.  Well, certainly when an individual is a
5  magnitude of order above a given threshold, that
6  would be the case, and there's no -- it's really a
7  mathematical percentage.  I mean, if a person is
8  10 times above all of the threshold levels of the
9  studies and the residential exposure is only going
10  to add a few percent more to the total, it just
11  mathematically is -- it becomes a common sense
12  issue.
13    Q.  So that's my question.  At what point
14  mathematically does it become inconsequential?  Is
15  it 10 times the epidemiologic study threshold for
16  increased risk?
17    A.  No.  It's simply once a person is above the
18  thresholds of the studies, and in the third tertile
19  and fourth quartile of the Agricultural Health
20  Study, it -- the value would be beyond any of the
21  quantitative dose metrics and simply a greater than
22  value.  In other words, there wouldn't be any other
23  dose metrics available to compare it to.
24    Q.  Do you agree that -- sorry.  Strike that.
25      Did you know that Mr. Dickey kept and raised

Page 55

1  livestock as part of his farming operations?
2    A.  I don't recall that but it's possible it was
3  in the deposition.
4    Q.  Okay.  Do you know that he worked with
5  cattle and hogs and had hands-on experience with
6  those animals?
7    A.  I really don't recall.
8    Q.  And to be fair, your report doesn't talk
9  about any exposures to or work with livestock as
10  part of your analysis or opinions in Mr. Dickey's
11  case, correct?
12    A.  No.  The only thing I noted was in his
13  deposition he did admit to using some insecticide
14  granules, but it was unclear whether that was
15  agricultural plants or whether he had used a rope
16  drip method for cattle to walk under.  It's really
17  not clear to me which -- what the purpose of the
18  granular insecticides were for.
19    Q.  Now, you're aware that data has been
20  published in the peer-reviewed scientific literature
21  reporting associations between livestock farming or
22  animal husbandry and increased risks of
23  non-Hodgkin's lymphoma, right?
24      MR. KRISTAL:  Object to form.
25    A.  I am.  I reviewed a study on that many years

Page 56

1  ago, actually, that found a general relationship.
2  Of course, it didn't -- didn't include analyses of
3  confounding use of Roundup.
4    Q.  Do you recall what confounding factors were
5  analyzed in that study, if any?
6    A.  I really don't.  It's possibly smoking but
7  I'm not sure.
8    Q.  Do you remember the authors or where that
9  article in particular was published?
10    A.  No.
11    Q.  Among the literature relating to or
12  discussing possible associations between livestock
13  farming and an increase of non-Hodgkin's lymphoma,
14  it's been suggested that exposure to animal
15  pathogens may be the mechanism for increased risk.
16  Are you aware of that?
17      MR. KRISTAL:  Object to form.
18    A.  I think I recall that from that particular
19  study.  I think that's -- I think that hypothesis is
20  correct in terms of being in the study but not
21  proven, but it should also be noted that farmers who
22  raise livestock have a lot of fences which are
23  sprayed to keep the live electric wire functional,
24  and when I say sprayed, sprayed with herbicides, so
25  there's, again, the potential confounder of the

Page 57

1  study you're referring to with glyphosate which was
2  not assessed.
3      MR. PAINE:  Move to strike the answer beyond
4  the first sentence of the response.
5    (Sawyer Exhibit 8 was marked for identification.)
6  BY MR. PAINE:
7    Q.  Doctor, I'm going to mark as Exhibit 8 to
8  your deposition a page from Mr. Dickey's medical
9  records and ask you to take a look at that and tell
10  me if you happened to have run across that
11  particular record in your review of Mr. Dickey's
12  case?
13    A.  Well, it looks like he was on Flagyl, which,
14  of course would be effective against Clostridium,
15  which is a well-known GI infection that causes
16  terrible diarrhea.
17    Q.  Okay.  And, Doctor, my question was very
18  simple.  Did you run across that record in your
19  review of Mr. Dickey's case materials?  Does that
20  look familiar to you at all?
21    A.  No.
22    Q.  Okay.  Let me just call your attention to a
23  couple things.  These are records from 2006.  Do you
24  see that?
25    A.  I do.

15 (Pages 54 to 57)

William R. Sawyer, Ph.D.

Page 58

1    Q.  Okay.  And in the entry for 6/30/06, near
2  the top third of the page, do you see where it says
3  in the -- beginning in the third line of the
4  narrative:  He does work around livestock and was
5  power washing before he became ill.
6        Did I -- did I read that correctly?
7    A.  Yes.
8    Q.  Okay.  And then down in the bottom section
9  there, the last entry is dated 7/18/06.  Do you see
10  that one?
11    A.  No.  Actually, 7/18/06?
12    Q.  Right.
13    A.  Now I do, yes.
14    Q.  Okay.
15    A.  Yes.
16    Q.  And the fourth line there reads -- there is
17  a sentence that begins:  He did work with cattle
18  that had an outbreak of salmonella.
19        Did I read that correctly?
20    A.  Yes.
21    (Sawyer Exhibit 9 was marked for identification.)
22  BY MR. PAINE:
23    Q.  Okay.  Let me hand you what I'm marking as
24  Exhibit 9 to your deposition, which is another one
25  of Mr. Dickey's medical records.  This one is dated

Page 59

1  for a consultation -- date of consultation is
2  11/3/2008.  Do you see that?
3    A.  Yes.
4    Q.  Okay.  And this contains a history of
5  present illness, which is a common thing you see in
6  medical records, right?
7    A.  Yes, but if you wish me to save you the time
8  doing this, I'm not evaluating microbiological
9  causation with respect to his NHL.  I would fully
10  defer that to the medical oncologist and
11  pathologist.
12    Q.  All right.  You beat me to the punch.  Let's
13  do this.  It is very close to 10:30.  You had
14  requested we take a break so you can take a phone
15  call at 10:30.  Let's stop now and we'll resume when
16  you're ready.
17        THE VIDEOGRAPHER:  We're going off the
18  record.  The time is 10:26.
19        (Recess from 10:26 a.m. until 10:49 a.m.)
20        THE VIDEOGRAPHER:  We're back on the record.
21  The time is 10:49.
22  BY MR. PAINE:
23    Q.  Welcome back, Doctor.
24    A.  Thank you.
25    Q.  Ready to answer a few more questions?

Page 60

1    A.  Yes.
2    Q.  Okay.  Very good.  When did the first
3  malignant cell appear in Mr. Dickey's body?  Sorry.
4  Withdraw the question.
5        Since he had a history of prior cancer,
6  right?  So let me ask this.  When did the first
7  non-Hodgkin's lymphoma cell appear in Mr. Dickey's
8  body?
9    A.  Well, we know that the first clinical sign
10  was in November of '08, when he noticed a small bump
11  on the right side of his neck; however, in
12  carcinogenesis, there is a process which is based on
13  doubling time, which results in various latency
14  periods, which, with lymphoma, are quite variable.
15        And chemical carcinogens, such as, in an
16  extreme case, would be asbestos and mesothelioma,
17  which can often take 35 years before the clinical
18  apparent condition arrives, and in some cases with
19  hematopoetic malignancies, such as lymphoma, the
20  latency period can be very short, as discussed in
21  the later part of my report.
22        So it's not possible to really determine
23  when the first malignant cell existed within
24  Mr. Dickey.  It's beyond the realms of current
25  science.

Page 61

1    Q.  Is there any way you can identify the year
2  when the first malignant cell for non-Hodgkin
3  lymphoma appeared in Mr. Dickey's case?
4    A.  No.
5    Q.  Any way you can identify a particular month
6  when the first non-Hodgkin's lymphoma malignant cell
7  appeared in Mr. Dickey?
8    A.  No.
9    Q.  So if I understand correctly, there is no
10  scientifically validated test, method or procedure
11  where a person, doctor, toxicologist, physician, you
12  name it, could identify when the first non-Hodgkin
13  lymphoma cell appeared in a particular patient like
14  Mr. Dickey, correct?
15    A.  Correct.
16    Q.  Do you agree that cancer cells, including
17  non-Hodgkin lymphoma cells, are clonal cells?
18    A.  Yes.
19    Q.  So the non-Hodgkin lymphoma in Mr. Dickey's
20  case consisted of a grouping or a body of clones of
21  the first malignant cell, is that your
22  understanding?
23    A.  Yes.
24    Q.  Now, Mr. Dickey used Roundup formulations on
25  his farm from mid May to August or September each

16  (Pages 58 to 61)

William R. Sawyer, Ph.D.

Page 62

1 year from approximately 1975 to 19 -- to the 2002
2 farming seasons.  Is that your understanding?
3    A.  Yes.
4    Q.  And you accept that as correct, I take it?
5    A.  I am relying on Mr. Dickey's interview from
6 July 26th to August 28th -- or and August 23rd, page
7 522.
8    Q.  Of Mr. Petty's report?
9    A.  Yes.
10    Q.  Okay.  Thank you.  So for that period, from
11 mid May to August or September each year, is
12 approximately four-and-a-half, say five months,
13 right?
14    A.  Yes.
15    Q.  Okay.  So for approximately seven months
16 each year Mr. Dickey was not applying Roundup
17 formulations in his farming operations; is that
18 right?
19    A.  Yes.
20    Q.  Can you say to a reasonable degree of
21 scientific certainty that there was any amount of
22 glyphosate present in Mr. Dickey's body when the
23 first non-Hodgkin lymphoma malignant cell appeared?
24    A.  No.
25    Q.  Mr. Dickey was diagnosed with non-Hodgkin

Page 63

1 lymphoma in late 2008, which was approximately six
2 years after he used -- he last used Roundup,
3 correct?
4    A.  Yes.
5    Q.  Can you say to a reasonable degree of
6 scientific certainty that the first non-Hodgkin
7 lymphoma malignant cell appeared in Mr. Dickey's
8 body during one of the years that he was actually
9 exposed to a Roundup formulation as opposed to
10 during one of the six years between his last
11 exposure to Roundup and his diagnosis?
12       MR. KRISTAL:  Objection to form.
13    A.  No, but to reasonable toxicological
14 certainty, during the years 1975 to 2002 he was
15 undergoing genetic damage from the use of the
16 product, and the genetic damage does not necessarily
17 result in the production of malignant cells at the
18 instant time of damage, but, rather, is a cumulative
19 process, and there is a known latent period with
20 respect to all chemical carcinogens.  As I said,
21 that latency period varies depending on the
22 chemical.
23    Q.  Now, is there any objective fact, medical
24 record, lab test, imaging study, or any objective
25 data that you can point to in Mr. Dickey's case to

Page 64

1 show that he was experiencing genetic damage from
2 exposure to Roundup during the years 1975 to 2002?
3    A.  Yes.  I can point to the various human
4 in vitro and human epidemiological and animal
5 studies that document micronucleus, chromosomal
6 damage, impaired DNA repair mechanisms, and other
7 forms of genetic damage, among glyphosate
8 applicators and other studies consistent and
9 coherent with that of the human studies that show
10 genetic damage.
11    Q.  So, Doctor, my question, and I'll repeat it
12 or rephrase it if it wasn't clear:  Is there any
13 objective fact in Mr. Dickey's case, in his medical
14 records, in his lab tests, in his pathology, in his
15 imaging studies, anything at all where you can show
16 me objective evidence that any of those that you
17 just mentioned, the micronuclei, the chromosomal
18 damage, the impaired DNA repair mechanisms, or other
19 genetic damage, was present in Mr. Dickey's body
20 during the years that he used glyphosate between
21 1975 and 2002?
22    A.  No, since there was no reason to run such
23 tests as it was not known to Mr. Dickey that he was
24 exposing himself to a carcinogen during that era.
25    Q.  Do you have any evidence of any of those

Page 65

1 mechanisms specific to Mr. Dickey, specific to
2 Roundup, in either his medical records, test
3 results, imaging studies, or pathology?
4    A.  Pre or post diagnosis?
5    Q.  At any point?
6    A.  Prediagnosis, no, there was no reason to run
7 such tests.  Postdiagnosis, possibly, and I would
8 defer that to the medical epidemiologist and the
9 pathologist who read the slides and assessed
10 potential genetic factors and the actual CD20
11 positive diagnosis.
12    Q.  Now, Doctor, are you aware of any lab
13 values, pathologic findings, imaging study results
14 or objective tests whatsoever that are different in
15 patients exposed to Roundup who develop
16 non-Hodgkin's lymphoma compared to patients who are
17 not exposed to Roundup and develop non-Hodgkin
18 lymphoma?
19    A.  Yes.  There can be precursor changes that
20 the medical oncologist or even treating physician
21 would look at, such as shifts in white cell count,
22 abnormal immature lymphocytes, and other
23 hematological measurements, but again, I would refer
24 that to the medical hematologist or the -- yeah, the
25 medical hematologist or oncologist.

17 (Pages 62 to 65)

William R. Sawyer, Ph.D.

Page 66

1    Q.  Okay.  And fair enough if you want to defer
2    to them, that's fine, but let me -- let me just
3    again clarify my question to make sure I'm asking it
4    correctly and you understand what I'm asking.
5        Is there any test result, imaging finding,
6    pathologic finding, that is unique to patients who
7    develop non-Hodgkin lymphoma after exposure to
8    Roundup compared to patients who have not been
9    exposed to Roundup and develop non-Hodgkin lymphoma?
10   A.  No.  No.  In that case, the answer is no.
11   The precursors I spoke of would be relative to
12   lymphoma in general, not just those who were induced
13   by Monsanto Roundup.
14   Q.  Now, in your report you've ultimately given
15   the opinion that Roundup was a substantial
16   contributing factor to Mr. Dickey's development of
17   non-Hodgkin lymphoma, correct?
18   A.  That's correct.
19   Q.  Let me focus on the word substantial.  What
20   is your basis for saying that glyphosate in Roundup
21   or Roundup itself in any way, shape or form, was a
22   substantial contributing factor to Mr. Dickey's
23   non-Hodgkin lymphoma?
24   A.  At the dose level that he received, that is
25   greater than 10 days of time-weighted eight-hour

Page 67

1    10-day exposures, the studies -- at least two
2    studies I'm aware of reveal odds ratios greater than
3    2 that his risk would be more than doubled, but I
4    want to flag that it's not necessary to have a
5    doubling of risk to have sustained an increased --
6    increase, but in this case certainly there is
7    evidence of more than doubling of the risk.
8    Q.  Now, that's risk, correct, in those
9    epidemiologic studies, right?
10   A.  Attributable risk, yes.
11   Q.  Attributable risk or odds ratios?
12   A.  Attributable risk.
13   Q.  Okay.
14   A.  Attributable directly to his years of
15   application of Roundup.
16   Q.  Define attributable risk for me.
17   A.  How much risk is attributable to a specific
18   component, such as attributable to working with
19   benzene at 20 part per million years.  There is an
20   actual attributable risk number for that based upon
21   the studies, as opposed to background risk.
22       And in this case we know what the background
23   risk level is in the studies, in the control groups,
24   and we know that at the highest thresholds of those
25   studies, which would be greater than 10 days of

Page 68

1    exposure, the attributable risk would be greater
2    than a factor of two.
3    Q.  Dr. Sawyer, would you identify for me those
4    studies that report attributable risks for exposure
5    to glyphosate as a -- for non-Hodgkin lymphoma, can
6    you do that?
7    A.  Well, the -- each study in itself refers to
8    association.  To determine causation attributable
9    risk, one has to look at all of the studies
10   combined, along with the experimental data, that is
11   the animal studies, the specificity of the outcome,
12   which in this case is NHL, the coherence of
13   different studies from different locations resulting
14   in the same endpoint, the strength of the
15   association, as I pointed out, greater than 2 and
16   being statistically significant, a postulated
17   mechanistic cause, which in this case is the
18   generally accepted genetic damage, which is even
19   accepted by ATSDR now, and the use of experimental
20   animal studies.
21       And when one considers the general causation
22   of the epidemiologic evidence and all of the
23   Bradford Hill factors I just mentioned, it's been
24   determined by IARC, it's been determined by other
25   experts in this case, that -- and the

Page 69

1    epidemiologist, that there is sufficient evidence
2    with respect to general causation that glyphosate,
3    that is Roundup, at levels exceeding the thresholds
4    of the dose metric studies, does cause NHL.  So that
5    is the attributable risk.  It's the sum of all of
6    the evidence and the weight of evidence in making
7    that determination, not just one study.  One study
8    only provides an association, whether there is a
9    significant association or not.  One has to go
10   through the Bradford Hill criteria and the weight of
11   evidence to determine whether there is actually
12   causation.
13   Q.  Okay.  So, Doctor, my question is
14   specifically about Mr. Dickey's case.  Okay?  So
15   when you told me that he -- his use of Roundup was a
16   substantial contributing factor to his personal
17   development of non-Hodgkin lymphoma.
18   A.  Yes.
19   Q.  Is there anything you can point me to in his
20   case beyond the number of days of his exposure that
21   allows you to say in his case that it's a
22   substantial contributing factor?
23   A.  Yes.
24   Q.  And what fact, data, medical record, test
25   result, imaging study, pathologic study, whatever,

18 (Pages 66 to 69)

William R. Sawyer, Ph.D.

Page 70

1    is it that you can point to in Mr. Dickey's case
2    that allows you to say Roundup was a substantial
3    contributing factor to his non-Hodgkin's lymphoma?
4         MR. KRISTAL:  Object to form.
5    A.  As a toxicologist, I focused on whether
6    there are other reasonable confounding factors and
7    causes. ████████████████████████████████
      ██
      ████████████████████████████████
      ██
11        The other chemicals he's worked with are not
12   2A carcinogens that -- when I say 2A, a probable
13   human carcinogen that has been shown to or
14   demonstrated to cause NHL.  Only the Monsanto
15   glyphosate -- or I shouldn't say Monsanto.  Only the
16   glyphosate and Roundup mixture has been demonstrated
17   of the 16 different chemicals he used to have that
18   pro███
      ██
      ████████████████████████████
      ██
      ██████████████████████████████
      ██
                           But based upon my
24   review as a toxicologist, I have not found any other
25   causes from a chemical standpoint of his NHL.

Page 71

1    Q.  Is there any scientifically validated test,
2    method, or procedure that would allow you to say
3    that Roundup was a certain percentage responsible
4    for the development of Mr. Dickey's non-Hodgkin
5    lymphoma?
6    A.  I don't understand.
7    Q.  Sure.  When you said substantial, to me that
8    just sort of evokes some idea of a percentage or
9    some composition, some component part of a whole.
10        Is there any scientifically validated test,
11   method, or procedure that would allow you to say
12   that Roundup exposure was 80 percent versus 20
13   percent, or 99 percent versus 1 percent, or whatever
14   the number is, responsible for his development of
15   non-Hodgkin lymphoma?
16        MR. KRISTAL:  Object to form, and the
17   predicate.
18   A.  The closest I can come to answering that is
19   referencing Eriksson 2008 and McDuffie 2001, in
20   which Eriksson 2008 found a risk -- an odds ratio,
21   rather, for 10 days of exposure -- I should say
22   greater than 10 days of exposure of I think 2.36.
23   So that's more than doubling.
24        McDuffie 2001, with exposures greater than
25   two days of exposure per year, had an NHL odds ratio

Page 72

1    of 2.12.
2         So I'm back again stating that this business
3    of doubling the risk is substantial, and that's the
4    best I can do in answering your question.
5    Q.  Okay.  And just to close this out, I realize
6    we're getting short on time, but Eriksson and
7    McDuffie and other studies are epidemiological
8    studies done on populations, right?
9    A.  Yes.
10   Q.  Okay.  They don't provide us data on the
11   individual circumstances of a patient's development
12   of non-Hodgkin's lymphoma, right?
13   A.  Correct.
14   Q.  People get non-Hodgkin lymphoma diagnosed
15   just about every day who have never used Roundup,
16   correct?
17   A.  Yes.
18   Q.  And non-Hodgkin lymphoma was occurring in
19   patients before glyphosate was ever invented, right?
20   A.  Yes.
21   Q.  And we wouldn't eliminate non-Hodgkin
22   lymphoma from the planet by simply eliminating
23   glyphosate, would we?
24   A.  Correct.
25   Q.  So Roundup, or glyphosate, exposure is not

Page 73

1    necessary for non-Hodgkin lymphoma to occur in the
2    population, is it?
3    A.  Correct, just like cigarette smoking is not
4    the only cause of lung cancer.
5         MR. PAINE:  Move to strike beyond "correct"
6    in that answer.
7    Q.  Doctor, is there any objective fact, data,
8    medical record, test results, imaging study, you
9    name it, in Mr. Dickey's case that indicates to you
10   that his non-Hodgkin lymphoma was diagnosed at a
11   more advanced stage or is associated with a worse
12   prognosis because of his exposure to Roundup than it
13   would have been had he not been exposed to Roundup?
14        MR. KRISTAL:  Objection to the form.
15   A.  I would have to defer that to the medical
16   oncologist.  That's -- I'm not really prepared to
17   answer that.  I believe that's not my role.
18        MR. PAINE:  Okay.  Let's do this.  That's
19   basically the end of my questions now, with the
20   asterisk by that about the Dropbox materials
21   that at least I haven't seen yet.  I know we're
22   trying to sort that out.
23        MR. KRISTAL:  I just sorted it out.
24        MR. PAINE:  Okay.  You've sent those to us
25   now?

William R. Sawyer, Ph.D.

Page 74

1    MR. KRISTAL: The paralegal -- no. It had
2  been sent to you on Monday --
3    MR. PAINE: Okay.
4    MR. KRISTAL: -- November 11th, as per our
5  agreement by Matthew Hans, who is our paralegal,
6  sent to Brian and Julie. I want to check Cali's
7  list again, because the study that I told her to
8  look for, which was one I remembered by name, is
9  in fact on the list that was sent. So maybe she
10  either missed it --
11    MR. PAINE: Okay.
12    MR. KRISTAL: So the study -- you have the
13  complete list as of November 11th, as well as
14  what Dr. Sawyer brought today, and including the
15  IARC update and the study from Paraguay.
16    MR. PAINE: Okay. Just let me state my
17  position on it, and I accept what you're saying.
18  So assuming it was sent, as you said, and we just
19  missed it, then we'd be done. I haven't seen it
20  yet myself. I want to go back and look at it,
21  obviously, and if for some reason we don't have
22  that or didn't receive that, I'm just going to
23  kind of earmark the deposition for potentially
24  additional time if there is something I want to
25  ask him about what's on that list, if I haven't

Page 75

1  seen it. If we got it --
2    MR. KRISTAL: If you give me your e-mail
3  address, I will forward to you the e-mail that
4  was sent to Brian and Julie. You can open up the
5  PDF.
6    MR. PAINE: Okay.
7    MR. KRISTAL: And I have a feeling it's the
8  same list that Cali and I were looking at a half
9  hour ago.
10    MR. PAINE: Okay. All right.
11    MR. KRISTAL: But we can do that. Give me
12  your e-mail, I'll send it. It's not a secret.
13    MR. PAINE: We'll get it sorted out
14  afterwards and that's fine. That's fine.
15    Okay. Thank you, Doctor. I appreciate you
16  bearing with me and answering my questions today.
17  We've got a couple more of these but we'll do
18  them on a different record.
19    MR. KRISTAL: Yeah. Right. And let me ask
20  some questions now.
21    MR. PAINE: Sure. I'm sorry, Jerry. That
22  was rude of me.
23    MR. KRISTAL: That's okay. We do need to
24  just get a time check so that we can calculate
25  Monsanto's time here.

Page 76

1    THE VIDEOGRAPHER: About 28 minutes from
2  this last --
3    MR. KRISTAL: 28 minutes? Okay. So I have
4  11:19. So that's -- that's 28 minutes and we
5  were 82 minutes before. Okay. So there is 110
6  minutes expired thus far and I will ask a couple
7  of questions.
8        CROSS-EXAMINATION
9  BY MR. KRISTAL:
10    Q. You were asked questions at the beginning of
11  the deposition about what Mr. Petty did or didn't
12  do. Do you know specifically what Mr. Petty was
13  asked to do in this particular case?
14    A. No.
15    Q. Okay. The list -- you said there were 16
16  plus the insecticide that you had handwritten. Is
17  that also -- are those, except, for the insecticide
18  I think listed on page 5 of your report, 2,4-D,
19  Beacon, Liberty, Dual II Mag, Harness, atrazine,
20  et cetera?
21    A. Yeah, and not the word et cetera.
22    Q. Well, it's not even -- the et cetera is in
23  the lower -- that's why I'm asking. You were
24  looking at this paragraph --
25    A. Right.

Page 77

1    Q. -- on page 4, but do you actually list all
2  of them up above?
3    A. Oh, I see. Yes.
4    Q. Okay.
5    A. Yeah. Very good.
6    Q. All right. So it was in your report?
7    A. Yeah.
8    Q. All right. With respect to conducting a
9  site inspection of Mr. Dickey's premises now, in
10  2019, to look for whatever chemicals may be there
11  now, is there any way to tell whether or not those
12  chemicals were there prior to his diagnosis in 2008?
13    A. No.
14    Q. So just because the fact that a chemical
15  happens to be at his home or on his premises in
16  2019, does that say anything as to whether that same
17  chemical was present or used prior to his diagnosis?
18    A. No.
19    Q. Okay. You looked at -- okay. Exhibit 7,
20  the IARC document that was listed, you had put that
21  on your materials considered list that was sent to
22  Monsanto, and if you would turn to page 103, does
23  that reference glyphosate and whether or not IARC is
24  changing its evaluation of glyphosate that had been
25  conducted in 2015 as of 2019?

20 (Pages 74 to 77)

William R. Sawyer, Ph.D.

Page 78

1     A.  Correct.
2     Q.  And does IARC say based on study -- what
3   does IARC say in terms of whether it is or isn't
4   going to change its evaluation in 2019 looking back
5   at the studies that have been done since its
6   evaluation in 2015?
7     A.  That there is no intention or plan to change
8   the current classification.
9     Q.  Okay.  You had looked at some document that
10  was not marked regarding -- I think you mentioned
11  drift, or drift something or other, drift additive.
12    A.  Yes.
13    Q.  Do you have that with you?  I'd just like to
14  mark it so we have a reference to what you referred
15  to.  I believe it would be marked as 10; is that
16  correct?
17        MR. PAINE:  Here you go.
18        MR. KRISTAL:  Thank you.
19        MR. PAINE:  Sure.
20    A.  Yes, the Herbicide Application Handbook
21  prepared by Monsanto, which is actually specific to
22  various types of Roundup on page 3.  I didn't print
23  the entire booklet.
24    Q.  Okay.  But that booklet is something you're,
25  in part, relying on?

Page 79

1     A.  Yes.
2     Q.  Okay.  And does that have a MONGLY number?
3   Let me just read the first number -- the Bates
4   number.  It's MONGLY07297384.
5      (Sawyer Exhibit 10 was marked for identification.)
6   BY MR. KRISTAL:
7     Q.  You were asked questions about whether or
8   not if there was no Roundup in the world or whether
9   Roundup was necessary for there to be NHL in the
10  world, and you analogized the cigarette smoking.
11  Does the fact that if there was no Roundup in the
12  world and there would still be non-Hodgkin lymphoma
13  in the world mean that, A, Roundup is not capable of
14  causing NHL?
15    A.  No.
16    Q.  And does it mean that, in your opinion, to a
17  reasonable degree of scientific certainty,
18  Mr. Dickey's Roundup exposure was a substantial
19  contributing factor to the development of his NHL?
20    A.  No.
21        MR. KRISTAL:  Okay.  That's all I have.
22        MR. PAINE:  We're done with that one.
23        MR. KRISTAL:  Okay.  Good.
24        THE VIDEOGRAPHER:  This concludes the --
25        THE WITNESS:  I have a question with the

Page 80

1   documents.  Are we going to -- because there is
2   different cases here, are we going to use
3   continuing exhibit numbers or new exhibit
4   numbers?
5        MR. PAINE:  Why don't we go off the video
6   record and that's a good question and we'll get
7   that on the steno record so we have it for the
8   record of what we do.
9        THE VIDEOGRAPHER:  This concludes the
10  deposition.  The time is 11:22.
11    (The following is on the stenographic record only.)
12        MR. KRISTAL:  By consent, we are reopening
13  the stenographic record in the Dickey deposition
14  so that Dr. Sawyer can clarify something he said
15  during the deposition.
16        Is that okay?
17        MR. PAINE:  That's fine.
18        THE WITNESS:  Yes.  I was asked what
19  chemical formulation is in Beacon, and I stated I
20  think 2,4-D, which was incorrect.  It was
21  actually a sulfuryl compound, not 2,4-D.
22        MR. KRISTAL:  Okay.
23        MR. PAINE:  Sorry.  I do want to ask one
24  question.
25        MR. KRISTAL:  Yeah.

Page 81

1           REDIRECT EXAMINATION
2   BY MR. PAINE:
3     Q.  What's a sulfuryl compound?
4     A.  It's an interesting herbicide that operates
5   by a totally different mechanism, using a very
6   complex sulfuryl chemical, but it is not a
7   carcinogen, there is no evidence of it being a
8   carcinogen.
9        MR. PAINE:  Okay.  That's it.
10    (Recess from 11:30 a.m. until 11:34 a.m.)
11        MR. KRISTAL:  When Exhibit 3 was marked, the
12  full Dickey report, there was a question about
13  whether or not the materials considered list as
14  one of the appendices was what Dr. Sawyer is
15  relying on.  We've had discussions that there was
16  an updated materials considered list sent to
17  Monsanto counsel Monday evening, so that is the
18  more complete list.
19        Counsel here today was sent by e-mail that
20  list because it was sent to other Monsanto
21  counsel.  We can check with Cali when she's back,
22  but I think she has that list here.  So I just
23  want to make sure it's clear that there is an
24  updated materials considered list in addition to
25  what's in Exhibit 3.

21 (Pages 78 to 81)

William R. Sawyer, Ph.D.

## Page 82

1    (Whereupon, the deposition concluded at
2    11:35 a.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 84

1                INSTRUCTIONS TO WITNESS
2
3
4        Please read your deposition over carefully
5    and make any necessary corrections.  You should
6    state the reason in the appropriate space on the
7    errata sheet for any corrections that are made.
8
9        After doing so, please sign the errata sheet
10    and date it.  It will be attached to your
11    deposition.
12
13        It is imperative that you return the
14    original errata sheet to the deposing attorney
15    within thirty (30) days of receipt of the deposition
16    transcript by you.  If you fail to do so, the
17    deposition transcript may be deemed to be accurate
18    and may be used in court.
19
20
21
22
23
24
25

## Page 83

1            C E R T I F I C A T E
2        I, SUSAN D  WASILEWSKI, Registered
3    Professional Reporter, Certified Realtime Reporter,
4    Certified Realtime Captioner, and Florida
5    Professional Reporter, do hereby certify that,
6    pursuant to notice, the deposition of WILLIAM R
7    SAWYER, Ph D , was duly taken on Thursday,
8    November 14, 2019, at 9:02 a m , before me
9        The said WILLIAM R  SAWYER, Ph D , was duly
10    sworn by me according to law to tell the truth, the
11    whole truth and nothing but the truth and thereupon
12    did testify as set forth in the above transcript of
13    testimony  The testimony was taken down
14    stenographically by me  I do further certify that
15    the above deposition is full, complete, and a true
16    record of all the testimony given by the said
17    witness, and that a review of the transcript was
18    requested
19
20    _____
21    Susan D  Wasilewski, RPR, CRR, CCP
22    (The foregoing certification of this transcript does
23    not apply to any reproduction of the same by any
24    means, unless under the direct control and/or
25    supervision of the certifying reporter )

## Page 85

1                ------
2                E R R A T A
3                ------
4    PAGE  LINE  CHANGE
5    ___  ___  _____
6        REASON: _____
7    ___  ___  _____
8        REASON: _____
9    ___  ___  _____
10        REASON: _____
11    ___  ___  _____
12        REASON: _____
13    ___  ___  _____
14        REASON: _____
15    ___  ___  _____
16        REASON: _____
17    ___  ___  _____
18        REASON: _____
19    ___  ___  _____
20        REASON: _____
21    ___  ___  _____
22        REASON: _____
23    ___  ___  _____
24        REASON: _____
25

22 (Pages 82 to 85)

William R. Sawyer, Ph.D.

Page 86

1        ACKNOWLEDGMENT OF DEPONENT
2
3        I, _____, do hereby
4    acknowledge that I have read the foregoing pages, 1
5    through 85, and that the same is a correct
6    transcription of the answers given by me to the
7    questions therein propounded, except for the
8    corrections or changes in form or substance, if any,
9    noted in the attached Errata Sheet
10
11
12    _____    _____
13    WILLIAM R  SAWYER, Ph D              DATE
14
15
16
17
18    Subscribed and sworn to before me this
19    ____ day of _____, 20____
20    My Commission expires: _____
21
22    _____
         Notary Public
23
24
25

Page 87

1            LAWYER'S NOTES
2    PAGE  LINE
3    ____  ____  _____
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25

23 (Pages 86 to 87)