# EXHIBIT 21

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8570-24   Filed 12/27/19   Page 2 of 13

William R. Sawyer, Ph.D.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | § MDL No. 2741 § Case No. 3:16-md-02741-VC |
| This document relates to: | § § § § |
| Tanner v. Monsanto Company Case No. 3:19-cv-04099-VC | § § § § |

- - -

Friday, November 15, 2019

- - -

Videotaped deposition of WILLIAM R. SAWYER, Ph.D., held at South Seas Resort, 5400 Plantation Road, Captiva, Florida 33924, commencing at 2:51 p.m., on the above date, before Susan D. Wasilewski, Registered Professional Reporter, Certified Realtime Reporter, Certified Realtime Captioner, Florida Professional Reporter

- - -

GOLKOW LITIGATION SERVICES

877.370.3377 ph | 917.591.5672 fax

deps@golkow.com

William R. Sawyer, Ph.D.

## Page 2

```
 1    APPEARANCES:
 2    WEITZ & LUXENBERG
      BY: JERRY KRISTAL, ESQUIRE
 3        jkristal@weitzlux.com
      220 Lake Drive East, Suite 210
 4    Cherry Hill, New Jersey 08002
      Phone: (856) 755-1115
 5    Representing Plaintiffs
 6
 7
 8    WILKINSON WALSH & ESKOVITZ
      BY: CALI COPE-KASTEN, ESQUIRE
 9        ccope-kasten@wilkinsonwalsh.com
      2001 M Street, NW, 10th Floor
10    Washington, D.C. 20036
      Phone: (856) 755-1115
11    Representing Defendant Monsanto Company
12
13
14    ALSO PRESENT:
15    MATTHEW ALLISON, Videographer
```

## Page 3

```
          ---
          I N D E X
          ---
 4    Testimony of: WILLIAM R SAWYER, Ph D     Page
 5       DIRECT EXAMINATION BY MS COPE-KASTEN    5
 6       CROSS-EXAMINATION BY MR KRISTAL        36
 7
 8
 9            E X H I B I T S
10         (Attached to transcript)
11    WILLIAM R SAWYER, Ph D DEPOSITION EXHIBITS   PAGE
12    Exhibit 1  Monsanto Company's Amended Notice to    5
                 Take Oral and Videotaped Deposition of
13               Dr William Sawyer
14    Exhibit 2  October 9, 2019 Report from Toxicology  7
                 Consultants & Assessment Specialists,
15               LLC
```

## Page 4

 THE VIDEOGRAPHER: Good afternoon. We are now on the record. My name is Matthew Allison. I am a videographer for Golkow Litigation Services. Today's date is November 15th, 2019, and the time is 2:51 p.m.
   This video deposition is being held in Captiva, Florida, in the matter of Frank Tanner vs. Monsanto Company for the United States District Court, Northern District of California.
   Will all counsel please state their appearance for the record.
   MR. KRISTAL: Jerry Kristal, Weitz & Luxenberg, for Frank Tanner.
   MS. COPE-KASTEN: Cali Cope-Kasten from Wilkinson Walsh & Eskovitz on behalf of Monsanto.
   THE VIDEOGRAPHER: The court reporter is Susan Wasilewski and will now swear in the witness.
   THE COURT REPORTER: Will you raise your right hand?
   Do you solemnly swear or affirm the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?
   THE WITNESS: I do.

## Page 5

   THE COURT REPORTER: Thank you.
   WILLIAM R. SAWYER, Ph.D., called as a witness by Defendant Monsanto Company, having been duly sworn, testified as follows:
           DIRECT EXAMINATION
BY MS. COPE-KASTEN:
   Q. Good afternoon, Dr. Sawyer.
   (Sawyer Exhibit 1 was marked for identification.)
   Q. I am handing you what has been marked as Exhibit 1 to your deposition in Mr. Tanner's case. This is your notice of deposition for Mr. Tanner's matter. Have you had a chance to review this document?
   A. Yes.
   Q. I understand that you brought some documents with you today in response to this notice of deposition.
   A. Yes.
   Q. Are those the materials that we have discussed earlier today?
   A. Yes.
   Q. Is there anything that you have brought for Mr. Tanner's case other than what we've already discussed today?
   A. No.

William R. Sawyer, Ph.D.

Page 6

1  Q. In forming your opinions in Mr. Tanner's
2  case, did you meet or speak with Mr. Tanner's
3  counsel?
4  A. Yes.
5  Q. Who did you meet or speak with?
6  A. Jerry Kristal.
7  Q. Did you meet with him or speak on the phone?
8  A. Met with him.
9  Q. How many times?
10 A. Just once regarding this case.
11 Q. Was that the meeting earlier this week on
12 Wednesday?
13 A. Yeah. That was Wednesday for about three
14 hours, and it was regarding the seven plaintiffs in
15 the matter at hand.
16 Q. Have you met Mr. Tanner?
17 A. No.
18 Q. Have you spoken with Mr. Tanner?
19 A. I have not. Yes, I have. I interviewed
20 him.
21 Q. Tell me about that interview. When did it
22 take place?
23 A. October 9th, 2019.
24 Q. I am handing you what has been marked as
25 Exhibit 2 to your deposition. That's your report in

Page 7

1  this case.
2  (Sawyer Exhibit 2 was marked for identification.)
3  BY MS. COPE-KASTEN:
4  Q. Did you author this report?
5  A. Yes.
6  Q. Does it contain all of the general causation
7  opinions you intend to offer at trial for
8  Mr. Tanner?
9  A. Yes.
10 Q. Does it contain all of the case-specific
11 opinions you intend to offer for Mr. Tanner?
12 A. Yes.
13 Q. Did you have sufficient information to reach
14 all of the conclusions that you wanted to reach in
15 this case?
16 A. Yes.
17 Q. This report is dated October 9th, 2019.
18 A. It is.
19 Q. Your interview with Mr. Tanner was on the
20 same day that you submitted this report?
21 A. That's right.
22 Q. How long did you speak to Mr. Tanner on
23 October 9th?
24 A. I don't recall.
25 Q. Do you have a ballpark? Was it a long time,

Page 8

1  short time?
2  A. I really don't remember. I was under --
3  under the gun time-wise on the deadline and it was a
4  long day, so I really don't remember.
5  Q. Do you remember the substance of your
6  conversation with him?
7  A. Well, I specifically do remember asking him
8  questions regarding any prior history of HIV or
9  AIDS, Crohn's disease, rheumatoid arthritis,
10 hepatitis B or C, prior malignancies,
11 chemotherapies, organ transplants, immunosuppressive
12 pharmaceuticals, ulcerative colitis, or long-term
13 prednisone use, which was negative.
14    I did ask him about smoking, if he had ever
15 smoked cigarettes or tobacco, and if so, did he ever
16 smoke more than 100 cigarettes in a lifetime, which
17 is the CDC threshold for a smoker. I also asked him
18 regarding his use of tobacco or drugs of abuse, and
19 with respect to his exposure history, there may have
20 been some questions to fill in the gaps, but I
21 recall primarily working off of the deposition
22 testimony and the plaintiff fact sheet. I don't
23 know that I had to ask him many questions regarding
24 his exposure history because it was reasonably well
25 compiled in the deposition.

Page 9

1  Q. When you asked Mr. Tanner about his prior
2  medical conditions, did you ask him about those
3  because that information was not clear from his
4  medical records, or that was just the route that you
5  chose to get that information?
6  A. I generally ask those questions when I
7  interview a person, whether or not the information
8  is already in the record, just to be certain, and a
9  lot of times it's very difficult to find answers to
10 all of these questions in the medical records and
11 it's more expedient to just ask.
12 [REDACTED]

William R. Sawyer, Ph.D.

Page 10

[redacted]

Page 11

[redacted]

...hat this line that's under History of Tobacco, Alcohol and Drug Use on page 5, we can just strike that, that doesn't apply to Mr. Tanner's case?
 A. That's correct.
 Q. You did not rely on an exposure calculation by Mr. Petty with respect to Mr. Tanner, did you?
 A. No. He did not assess Mr. Tanner, to my knowledge.

Page 12

 Q. As a result, you performed your own exposure days calculation for Mr. Tanner?
 A. That's right.
 Q. That exposure calculation appears in Table 2 on the bottom of page 7 of your report?
 A. Yes, both Table 1 and 2, actually.
 Q. Can you walk me through your exposure calculations in Tables 1 and 2 for Mr. Tanner?
 A. Yes. It's simply that he initiated his exposures to Roundup in 1984, he used Roundup concentrate once per week for approximately 10 minutes, he typically sprayed with a 3.5 gallon backpack sprayer, and his exposure was residential and occupational.
    He used to control weeds and maintain lawns on estates in the Pasadena and Los Angeles area. And then in 2001 to '06, sprayed every two weeks 30 minutes to three hours, used a two-and-a-half gallon container, about 25 to 70 gallons of Roundup over 7- to 10-acre parks.
    He also used a three-and-a-half gallon backpack sprayer or a 35-gallon electric sprayer, and this was occupational use or industrial turf and ornamental. The purpose was to control weeds in Los Angeles County parks, and that information

Page 13

results in Table 2.
    Once a week at 10 minutes, so per year that would be roughly 520 minutes, and over 16 years, that would be roughly 138 hours, which is 17.38 hour time-weighted days.
    And then from 2001 to 2006, he used it once every two weeks for 30 minutes to three hours, had 105-minute average times 27 30-minute -- which equals 27 30-minutes per year, divided by 60 minutes equals 45.5 hours, over five years equals 227.5 hours, which is equivalent to 28.4 time-weighted eight-hour working days.
    So the sum would be 45.6 average lifetime exposure days.
 Q. Why did you choose to average the 30-minutes to three-hours window of spraying from 2001 to 2006?
 A. Just to obtain a midpoint value.
 Q. Do you know how often Mr. Tanner sprayed at 105 to 180 minutes during that period?
 A. Yes.
 Q. How often?
 A. On the average, 105 minutes.
 Q. My question might not have been clear. I understand that you averaged that time period to being a 105-minute average. Do you know how often

William R. Sawyer, Ph.D.

Page 14

1  in actuality he sprayed for 30 minutes versus 105
2  minutes versus three hours, or anywhere else along
3  that spectrum?
4      A.  No.  I simply used a midpoint value.
5      Q.  If Mr. Tanner regularly sprayed for only
6  30 minutes and occasionally sprayed at 105 to 180
7  minutes, you would agree with me that your exposure
8  days estimate could potentially be lower?
9      A.  So what?  It would be 14 hours -- 14
10 exposure days lower, which would be 31 exposure
11 days; still three times above the threshold, so it
12 doesn't really matter.
13     Q.  Just to clarify, the answer to that is yes,
14 it could be lower but you don't believe that it
15 would matter even if it were lower?
16     A.  No.  No, I didn't say that.  It's not my
17 belief.  It's a mathematical truth that if we use
18 30 minutes rather than 30 minutes to three hours, if
19 we took the worst case -- well, it would be the best
20 case for him, actually, less exposure, but if we
21 took the lowest value possible, the 30 minutes, that
22 would roughly subtract off about 14 exposure days,
23 thus, the grand total would be about 34 exposure
24 days.  So it's just not important.  It's not a
25 relevant issue here.  He's already exceeding the

Page 15

1  greater than 10-day threshold of the studies.
2      I don't -- I don't disagree.  It could be
3  more towards the 30, it could toward -- more towards
4  the three hours.  Either way, it's still well above
5  the greater than 10-day threshold.
6      Q.  Do you recall Mr. Tanner testifying that he
7  worked for a couple of years on his father's
8  livestock farm?
9      A.  I do recall farm work.  I don't know if it
10 was livestock, I'm not sure, but, yeah, I do recall
11 the farm, farm work.
12     Q.  Are you aware of studies comparing livestock
13 farming and the risk of developing non-Hodgkin's
14 lymphoma?
15     A.  As I said in earlier depositions, I --
16 yesterday, I do recall the study and I think it was
17 somewhere in the Southeast US, I'm not sure, and
18 there -- I believe there was an association between
19 livestock farming and NHL.
20     I don't know how significant it was or if
21 it's been shown to be coherent through other types
22 of studies.  I really don't -- I haven't looked at
23 the study in many years, but I believe there is one.
24     Q.  Fair to say that you did not attempt to
25 determine what impact livestock farming may have had

Page 16

1  on Mr. Tanner's risk for developing non-Hodgkin's
2  lymphoma?
3      A.  No, and I would certainly defer that to an
4  infectious disease or medical ep -- medical
5  oncologist to evaluate since it is not a
6  toxicological matter but purely an infectious
7  disease or microbiological assessment, but even if
8  that were a reasonable risk factor, there still
9  would be, in this case, added to that risk the
10 Roundup exposures based on the studies that I'm
11 relying on.
12     Q.  Do you recall Mr. Tanner's testimony in his
13 deposition that he at least occasionally sprayed
14 other pesticides between 1961 and 1975, not
15 including Roundup?
16     A.  He was a licensed applicator, but -- he did
17 use several but wasn't able to recall the details.
18     Q.  Is it accurate to say that you do not know
19 which other pesticides Mr. Tanner sprayed at that
20 time?
21     A.  Weed oil, he said very rarely.
22     Q.  Any others in addition to weed oil?
23     A.  No.
24     Q.  To the extent that Mr. Tanner did spray
25 other pesticides between 1961 and 1975, those are

Page 17

1  not reflected in your assessment of any risks
2  Mr. Tanner may have had for non-Hodgkin's lymphoma
3  from other chemical exposures?
4      MR. KRISTAL:  Objection.
5      A.  Did you start out your question with the
6  word "if"?
7      Q.  I started out with the word "to."  To the
8  extant that Mr. Tanner had exposure.
9      A.  To the extent that he had -- see, that's the
10 part I don't understand.  Are you asking me to
11 assume hypothetically that he had exposure to
12 pesticides?
13     Q.  Let me break it down into separate
14 questions.
15     You just read in Mr. Tanner's deposition
16 that he testified that he occasionally sprayed
17 pesticides between 1961 and 1975, right?
18     A.  Right.
19     Q.  He said that he could not remember what the
20 brands were of those, correct?
21     A.  Correct.
22     Q.  Weed oil was one thing that you were able to
23 name that he used during that time period?
24     A.  Yes.
25     Q.  From his testimony that he used pesticides

William R. Sawyer, Ph.D.

Page 18

1  plural and could not remember the brands plural, is
2  it your understanding that Mr. Tanner was recalling
3  spraying more than one type of pesticide at that
4  time?
5      A.  Yes, during that duration, yes.
6      Q.  You did not take into account in assessing
7  Mr. Tanner's risks from other chemical exposures
8  what any of those pesticides might have been because
9  you don't know what they were, correct?
10         MR. KRISTAL:  Objection.
11     A.  If I understand your question right, that's
12  true.  We don't have any further information and he
13  was unable to provide me with any specific
14  information during the interview.
15     Q.  And -- but it's not your intention to tell
16  the jury that he did not have exposure to other
17  pesticides, you just don't know one way or the
18  other, right?
19     A.  Correct.
20     Q.  You specifically mentioned his testimony
21  that he used weed oil.  What is weed oil?
22         MR. KRISTAL:  Back in those days?
23         MS. COPE-KASTEN:  (Nodding head.)
24     A.  Donations from --
25         MR. KRISTAL:  I'm making a bad legal

Page 19

1  cannabis joke.
2         THE WITNESS:  Oh, you're thinking of that
3  weed oil.
4     A.  Well, it's not CBD oil.
5     Q.  What is it, your understanding, that weed
6  oil is as a pesticide?
7     A.  I believe what he's referring to, and it
8  hasn't been used in years because of its toxicity,
9  and that is light naphtha, which in fact does kill
10  weeds and grass.
11     Q.  Do you know with certainty that that's what
12  he's referring to when he says weed oil?
13     A.  Not with certainty because it's not
14  normally -- normally they're a little more
15  descriptive with it, but back in that era of time,
16  that would make sense, but it's really a slang name
17  that he's using.
18     Q.  If the product that he was using was light
19  naphtha, do I understand from prior testimony you
20  have given that you do not believe that to be a
21  probable or definite human carcinogen?
22     A.  Correct.  And it contains naphthalene, which
23  is an animal carcinogen, possible human carcinogen,
24  not associated with NHL.
25     Q.  Mr. Tanner testified that the weed oil left

Page 20

1  a tar on the soil.  Do you know what that refers to?
2     A.  That would be consistent with light naphtha
3  simply because the volatility is not very high, it
4  takes time to evaporate, and eventually can leave a
5  -- enough of a residue that airborne particulate
6  matter can stick to it and cause a visible dirty
7  coating on plants and leaves and other objects
8  sprayed, so that would be -- that would be an
9  appropriate description.
10    Q.  You understand that Mr. Tanner had a
11  landscaping business?
12    A.  Yes, and I referred to that as the
13  occupational work he did with -- in 2000 -- well,
14  really, before then, but increased it in 2001 to
15  2006.
16    Q.  The reason that his business increased
17  between 2001 and 2006 was because he received some
18  contracts from the Los Angeles Sanitation
19  Department?
20    A.  Exactly.
21    Q.  I want to break down Mr. Tanner's exposure
22  periods as you have broken them down in your report,
23  from 1984 to 2001, and then separately from 2001 to
24  2006.
25        Do you know what personal protective

Page 21

1  equipment Mr. Tanner was wearing between 1984 and
2  2001 at the time that he sprayed Roundup?
3     A.  Long sleeves and gloves.
4     Q.  Are you aware that Mr. Tanner attended
5  regular pesticide applicator training courses?
6     A.  Yes.
7     Q.  That's because he had a pesticide applicator
8  license?
9     A.  He did.
10    Q.  As part of those applicator training
11  courses, Mr. Tanner was advised to wear a Tyvek suit
12  when spraying pesticides.  Do you recall that?
13    A.  I do.
14    Q.  Are you aware that Mr. Tanner regularly did
15  wear a Tyvek suit when spraying pesticides?
16    A.  Eventually, that's true.
17    Q.  When is it your understanding he began
18  wearing a Tyvek suit to spray Roundup?
19    A.  I'm not finding it but I believe it was when
20  he accepted the contracts, and he spoke of at the
21  County properties there was a place to discharge the
22  Tyvek suits and wash up at the County facilities,
23  and he stated -- actually, he said -- he stated that
24  he used the Tyvek suits often from 1984 to 2000, and
25  then he said, "I should have said I used them

William R. Sawyer, Ph.D.

Page 22

1  rarely, because I do recall that if there was a very
2  short time of spring, I might not have suited up
3  with a Tyvek suit."
4       And then that's on page 91 of the
5  deposition. And then on line 23 he stated -- the
6  question was: So what you're telling me is if a job
7  wasn't a large job, you might not have suited up?
8       And he said yes, and then that would be true
9  because he was only doing, from 1984 to 2001,
10 10-minute jobs once a week, so that is consistent
11 with his exposure frequency in Table 1.
12      So I would -- my opinion, based on what I've
13 read, is that he was fully suiting up between the
14 years 2001 and 2006.
15   Q. I want to direct your attention to page 44,
16 starting at line 19. Mr. Tanner was asked: And
17 prior to getting the license in roughly 2001, did
18 you take measures to protect yourself from
19 pesticides such as those you mentioned, the Tyvek
20 suit, the rubber boots, the face shield, is that
21 something you did throughout your landscaping
22 career, or later?
23      Mr. Tanner's answer was: It was completely
24 done from when I got the license, the applicator
25 license. Always wore the suit, every time, without

Page 23

1  exception. From 1961, when I started Flora
2  Landscaping, until 19 -- approximately 1975, I would
3  use it sparingly.
4       Did I read that correctly?
5    A. Yes. So we have three definitions: One is
6  he used it all the time; the other one he used it
7  sparingly; and then the later one that I pointed out
8  is that he only used it on the longer jobs, didn't
9  use it on the short jobs, which is -- correlates
10 with 1984 to '01, where he only worked 10 minutes
11 once per week, and he said he would not wear the
12 suit unless it was a longer job.
13      So it is what it is. My opinion is, based
14 on what he said, he didn't wear the suit frequently
15 until he started doing the longer jobs, and his jobs
16 were only once a week at 10 minutes until 2001.
17      I don't -- I'm not the judge or the jury,
18 but it would appear to me that he did wear a Tyvek
19 suit but not frequently until the later years.
20   Q. It is your opinion that between 2001 and
21 2006, he was consistently wearing the Tyvek suit for
22 Roundup spraying jobs?
23      MR. KRISTAL: Objection.
24   A. Based upon his testimony, yes.
25   Q. In addition to the Tyvek suit during that

Page 24

1  time, he also wore rubber boots to spray Roundup?
2    A. Yes.
3    Q. In addition to a Tyvek suit and rubber
4  boots, he also wore a face shield during that time?
5    A. He did, but I'm not sure of the frequency.
6  Let me check. Well, he stated he wore it, so I'll
7  assume it was all the time.
8    Q. What is the impact on dermal absorption of
9  Roundup from wearing a Tyvek suit, rubber boots, and
10 a face shield when spraying?
11   A. It depends on the type of Tyvek suit,
12 whether it's a dust suit or an actual
13 chemical-resistant suit. He doesn't explain what
14 type of Tyvek suit he was wearing, so I really can't
15 be very specific in answering that.
16   Q. Can you give me an answer for each of the
17 two types of suits? If it was a dust suit, what
18 would the impact be on dermal absorption of Roundup
19 from wearing a Tyvek dust suit, a face shield, and
20 rubber boots when spraying Roundup?
21   A. It can pass through the dust suit. The face
22 shield is protective of the eyes especially. And
23 the third thing I think you asked was rubber boots?
24   Q. Uh-huh. Yes.
25   A. Less than one percent penetration.

Page 25

1    Q. Do you know what the percentage of
2  penetration is for a Tyvek dust suit?
3    A. No, but it is permeable. It's designed to
4  allow vapor movement and air, but the pore size is
5  small enough to block particulate.
6    Q. If what he was wearing was a Tyvek
7  chemical-resistance suit in addition to a face
8  shield and rubber boots, what would the impact be on
9  his dermal absorption of Roundup when spraying?
10      MR. KRISTAL: Objection.
11   A. If the gloves were such that the sleeves of
12 the Tyvek suit hindered the gloves, or if the gloves
13 were taped, and the same with the boots, it would
14 provide nearly 100 percent protection, except for
15 the exposed upper neck and face and head and a
16 slight amount from -- well, an inconsequential
17 amount through inhalation with a face shield.
18   Q. You would agree with me that there is no
19 difference in the number of exposure days Mr. Tanner
20 had to Roundup regardless of the type of Tyvek suit
21 he was wearing?
22   A. I'm sorry. I don't understand the question.
23   Q. If Mr. Tanner was wearing a Tyvek dust
24 suit --
25   A. Yes.

7 (Pages 22 to 25)

William R. Sawyer, Ph.D.

Page 26

1  Q.  -- he would have 45.6 exposure days to
2  Roundup, correct, that's what you calculated?
3  A.  Yes.
4  Q.  If Mr. Tanner were wearing a Tyvek
5  chemical-resistance suit, he would still have 45.6
6  lifetime average exposure days to Roundup?
7  A.  No.  I think if throughout the history, from
8  '84 to '06, he was wearing a chemically resistant
9  suit with gloves on, taped and sealed, both his
10 ankles and lower arms, with a face shield, his
11 exposure would be negligible and outside of the
12 range of the human studies.  The human studies
13 aren't designed for somebody who is protected to
14 that degree, with the sleeves taped to the gloves
15 and the ankles taped to the chemically resistant
16 Tyvek suit.
17     I can say that's really an impossibility in
18 southern California, to wear a chemically resistant
19 Tyvek suit outdoors for three hours.  He would end
20 up in hyperthermia, possibly malignant hyperthermia.
21 It would be -- it would be probably a
22 hospitalization each time.  I mean, that's just --
23 it's just not reasonable that a person can be in a
24 chemically resistant suit because they are
25 nonbreathable and the heat in southern California in

Page 27

1  the summer, that just wouldn't work.  It's not
2  even -- it's just not possible to do that, unless he
3  had -- if, you know, constantly replenishing with
4  fresh ice and so forth under the suit.
5  Q.  Based on that understanding, is it your
6  belief that Mr. Tanner was likely wearing a Tyvek
7  dust suit when he was spraying Roundup?
8  A.  Well, they are designed for comfort and
9  breathability, the Tyvek 400 suit, for example.
10 That's possible.
11 Q.  Are there more than two types of Tyvek
12 suits?
13 A.  Oh, yes.  There's numerous, many different
14 models.
15 Q.  And you don't know which one Mr. Tanner was
16 wearing?
17 A.  No, but I can rule out chemically resistant
18 sealed at the sleeves and ankles in the summer heat
19 for three hours with a 40-pound backpack sprayer on
20 his back walking around.  It would be rather
21 unlikely due to heat exhaustion.
22 Q.  Would it be -- I'm not that familiar with
23 the chemically resistant suits.  Would it be
24 possible for him to wear a Tyvek chemically
25 resistant suit outdoors in California under the

Page 28

1  conditions you just described if his gloves and
2  boots were not taped to the suit?
3  A.  No, because the sleeves are tight elastic
4  and allow -- still allow very little air movement,
5  but the rule is under OSHA B, and I think OSHA A
6  certification under HSWA, which I've been certified
7  for many times, to prevent chemical entry one must
8  tape the end of the sleeve around the glove and seal
9  it, and the same with the ankle and the rubber boot,
10 and it's just to be certain there is no infiltration
11 of chemicals, so a safety issue.
12 Q.  Did you review any medical records in
13 Mr. Tanner's case?
14 A.  Just limited medical records on his
15 diagnosis from City of Hope Medical Center with
16 respect to his diagnosis and pathology as stated in
17 my report on page 8.
18 Q.  Do you know whether Mr. Tanner had
19 follicular lymphoma or diffuse large B-cell
20 lymphoma?
21 A.  DLBCL as per the pathology assessment and
22 the immunohistochemical analyses performed.
23 Q.  Do you recall whether Mr. Tanner was
24 initially diagnosed with DLBCL at the time of his
25 non-Hodgkin's lymphoma diagnosis?

Page 29

1  A.  Well, immunohistochemical stains showed
2  lymphoid aggregates composed of T cells and B cells.
3      And then the hematopathology assessment
4  revealed DLBCL, but I, without looking deeper into
5  the records, I don't know the dates or the time span
6  in between initial assessments versus the final
7  pathology assessment.
8  Q.  Do you recall Mr. Tanner testifying that he
9  used fertilizers as part of his landscaping
10 business?
11 A.  I did.  It's in his deposition.  He talks
12 about a nitrogen fertilizer, as I recall.
13 Q.  Did you take into account any potential
14 genotoxic or carcinogenic effect from any of the
15 fertilizers Mr. Tanner may have used when coming to
16 your conclusions in this case?
17    MR. KRISTAL:  Object to form.
18 A.  I did.  There are -- there is no genotoxic
19 or carcinogenic potential from organic fertilizers,
20 unless they are contaminated with plutonium or
21 uranium, thorium, isotopes, nuclear fuel.
22 Q.  Do you know whether his were?
23 A.  Let's hope not.
24    MR. KRISTAL:  Giving new meaning to mushroom
25 cloud.

William R. Sawyer, Ph.D.

Page 30

1  MS. COPE-KASTEN: Could we go off the record
2  for just a moment?
3  THE VIDEOGRAPHER: We're going off the
4  record at 3:47.
5  (Recess from 3:47 p.m. until 3:49 p.m.)
6  THE VIDEOGRAPHER: We're back on the record.
7  The time is 3:49.
8  BY MS. COPE-KASTEN:
9  Q. On page 5 of your report you have a section
10 entitled Family Medical History.
11 A. Okay.
12 [REDACTED]
13 [REDACTED]
14 A. Yes, I'm aware of that.
15 Q. Between 1961 and 1975, Mr. Tanner used
16 personal protective equipment called a rain suit.
17 Do you know what a rain suit is?
18 A. That's a vague description. It can be,
19 among outdoor workers, a yellow -- typically yellow
20 suit with a hood, long sleeves, long pants, that is
21 designed to keep a person dry, basically.
22 Q. If he wore that rain suit when spraying
23 pesticides, what type of protection would the rain
24 suit offer?
25 A. I really can't say. I would have to have

Page 31

1  more specifics on the suit, and it's a vague
2  description. I'm not sure.
3  Q. Take a look around page 45 of his deposition
4  and see if that provides you with enough information
5  to answer it.
6  A. He states on page 45, line 17, question:
7  What's a rain suit?
8  Answer: Well, to protect yourself from
9  rain.
10 Okay is the question.
11 Answer: Basically, just plastic covers that
12 would -- where any liquid would be shielded from.
13 Question: Essentially, they cover the body?
14 Answer: Yes.
15 Was there head covering also or a face
16 covering?
17 Yes.
18 And would you use these rain suits when you
19 applied pesticides then, right?
20 Answer: Yes.
21 Okay. And then you said from 1961 through
22 '75 is when you used the rain suits, if I understand
23 correctly. Did you use something else in 1975, or
24 did something else change?
25 Answer: 19 --

Page 32

1  Question: Or is that when you were in the
2  office, from 1975 to 1984?
3  I was in the office.
4  Okay.
5  So I had no contact with any chemicals.
6  When you started working in the field again
7  in 1984, did you go back to using the rain suits or
8  did you use something else?
9  Answer: No.
10 The Witness: I used Tyvek.
11 Q. Does that give you any further information
12 about what level of protection a rain suit would
13 have provided Mr. Tanner from dermal absorption of
14 any substances he was spraying?
15 A. It could be reasonably effective, it depends
16 on the design and the ventilation aspects of the
17 suit. It may have multiple cuts and flaps for
18 ventilation. It may be two-piece. There is a lot
19 of ifs, so a photo of it would be helpful.
20 Q. I want to direct you to page 75 of
21 Mr. Tanner's deposition. Starting around line 13,
22 he's talking about horticultural oils that he used
23 to get rid of aphids and mites, m-i-t-e-s, around
24 his home.
25 A. Yes, I see that.

Page 33

1  Q. Is that also consistent with the light
2  naphtha that you were talking about earlier?
3  A. No. Actually, that is an oil that is still
4  used. It's used very commonly in California, for
5  example. It's generally used on a seasonal basis to
6  kill bugs and it's a very -- a completely harmless
7  paraffin type oil, paraffin-based oil, that's
8  sprayed onto the various fruit trees and it's
9  harmless to the tree but suffocates the larvae and
10 the various bugs. So that's not an oil that would
11 be sprayed on grass or weeds. It's strictly a
12 treatment that's commonly used even today for fruit
13 trees.
14 Q. Would it be considered an insecticide?
15 A. I don't believe it is. It's not an
16 insecticide. It's a harmless paraffinic type oil.
17 Q. I'm going to direct you to the page right
18 above that, page 74 from Mr. Tanner's deposition.
19 A. One other point to answer your question. I
20 did specifically evaluate that type of oil recently
21 in one of the Monsanto cases. It was in my report,
22 the name of the oil, the ingredients, the toxicity
23 rating, and so on, and, unfortunately, I don't
24 remember which plaintiff it was.
25 Q. Do you remember the name of the product

9 (Pages 30 to 33)

William R. Sawyer, Ph.D.

Page 34

1  itself?
2  A. I don't.
3  Q. On page 74 of Mr. Tanner's deposition he
4  talks about Ronstar, R-o-n-s-t-a-r, Pre-Emergent.
5     Are you familiar with Ronstar Pre-Emergent?
6  A. No. That's the first time I've seen that,
7  actually.
8  Q. Do you know what the active ingredient is in
9  Ronstar?
10 A. No.
11 Q. When Mr. Tanner began spraying for the Los
12 Angeles County park system in 2001, he began using
13 an adjuvant called Foam A. Are you familiar with
14 Foam A?
15 A. No.
16 Q. You told me earlier that you have read
17 Mr. Tanner's deposition. Have you read any other
18 depositions in Mr. Tanner's case?
19 A. No, just Mr. Tanner's deposition.
20 Q. Have you performed a site inspection of any
21 of the properties on which Mr. Tanner alleges that
22 he sprayed Roundup?
23 A. No.
24 Q. Have you performed a chemical inventory of
25 Mr. Tanner's home?

Page 35

1  A. No.
2  Q. Aside from any chemicals that are identified
3  in Mr. Tanner's deposition or plaintiff fact sheet,
4  are you aware of what other chemicals Mr. Tanner was
5  exposed to in the course of his landscaping
6  business?
7  A. No.
8  Q. Are you aware of what chemicals Mr. Tanner
9  was exposed to in and around his home and his own
10 property, aside from those that are identified in
11 his deposition or plaintiff fact sheet?
12 A. No, nothing more than what was in the
13 deposition and fact sheet.
14 Q. Did you conduct a absorbed dose for
15 Mr. Tanner?
16 A. No, I did not perform a POEM calculation
17 with respect to milligram per kilogram per day dose,
18 but, rather, calculate the dose assessment in the
19 units of exposure days as per the US -- not the
20 US -- the generally accepted peer-reviewed
21 epidemiological studies that offered a dose metric.
22    MS. COPE-KASTEN: Can we go off the record?
23    THE VIDEOGRAPHER: Going off the record at
24 4:02.
25    (Recess from 4:02 p.m. until 4:05 p.m.)

Page 36

1    THE VIDEOGRAPHER: We're back on the record.
2  The time is 4:05.
3    MS. COPE-KASTEN: Dr. Sawyer, thank you for
4  your time today. I don't have any further
5  questions for you.
6       CROSS-EXAMINATION
7  BY MR. KRISTAL:
8  Q. Very briefly, if you could please turn to
9  Mr. Tanner's report, page 7. It's Exhibit 2.
10    THE VIDEOGRAPHER: Mr. Kristal, could you
11 put your mic on?
12    MR. KRISTAL: Thank you. I will put my mic
13 on so I can be heard.
14 Q. If you would turn to Exhibit 2, page 7,
15 please, and look at Table 2, the 2001 to 2006 row.
16 Do you see that?
17 A. Yes.
18 Q. I'm not sure I heard you correctly or you
19 may have misspoken, but if we used the 30-minute
20 time frame instead of the 105-minute average to
21 calculate exposure days, is that about 30 percent of
22 the total number? In other words, instead of using
23 105, if we use 30, the ultimate number would be
24 reduced by about 70 percent?
25 A. Let's see. I was using 105 minutes.

Page 37

1  Q. Right.
2  A. So it would be roughly a differential of --
3  Q. Thirty minutes is about 30 percent of 105
4  minutes?
5  A. Yeah. I was going to say about 31 percent,
6  yeah.
7  Q. Okay. So if you wanted to use the 30-minute
8  low end, you would multiply 28.4 exposure days by
9  31 percent and get the number of exposure days using
10 the 30-minute time frame?
11 A. Yes.
12 Q. Okay.
13 A. Which would be roughly nine exposure days.
14 Q. Okay. So if he had nine exposure days
15 during the 2001 to 2006 period, and 17.3 during the
16 1984 to 2001, his lifetime exposure days would be
17 26.3?
18 A. Correct.
19 Q. And how does that compare to the highest
20 exposure metric and exposure days from the
21 epidemiological studies showing an increased risk?
22 A. A factor of approximately 2.6 above the
23 upper threshold value of greater than 10 days. And
24 I should also add even if I were to eliminate
25 completely and assume zero exposure from 2001 to

10 (Pages 34 to 37)

William R. Sawyer, Ph.D.

Page 38

1   2006, we would still have 17.3 exposure days from
2   1984 to 2001, which is also in great excess of even
3   the highest threshold value in the generally
4   accepted peer-reviewed studies.
5       Q.  And what would your opinion be to a
6   reasonable degree of scientific certainty as to
7   whether or not his cumulative Roundup exposure was a
8   substantial contributing factor to the development
9   of his non-Hodgkin lymphoma if the exposure days
10  were 17.6?
11      A.  It would not change the finding that to a
12  reasonable toxicological certainty, his excess of
13  10 exposure days per year resulted in an increase of
14  substantial contributory risk of contracting NHL.
15      Q.  Whatever other chemicals Mr. Tanner may have
16  been exposed to, does that affect the number of
17  exposure days of Roundup that he had in his
18  lifetime?
19      A.  No.  The contribution from the Roundup is a
20  substantial factor in the development of his
21  lymphoma.  Even if there had been other
22  contributors, they still add together and increase
23  overall risk of developing the disease.
24      Q.  And if Mr. Tanner had any exposure to
25  livestock, does that in any way change his total

Page 39

1   lifetime exposure days to Roundup?
2       A.  No.
3           MR. KRISTAL:  I have no further questions.
4           THE VIDEOGRAPHER:  This concludes the
5   deposition.  The time is 4:10.
6           (Whereupon, the deposition concluded at
7   4:10 p.m.)

Page 40

1                C E R T I F I C A T E
2           I, SUSAN D  WASILEWSKI, Registered
3   Professional Reporter, Certified Realtime Reporter,
4   Certified Realtime Captioner, and Florida
5   Professional Reporter, do hereby certify that,
6   pursuant to notice, the deposition of WILLIAM R
7   SAWYER, Ph D , was duly taken on Friday,
8   November 15, 2019, at 2:51 p m , before me
9           The said WILLIAM R  SAWYER, Ph D , was duly
10  sworn by me according to law to tell the truth, the
11  whole truth and nothing but the truth and thereupon
12  did testify as set forth in the above transcript of
13  testimony   The testimony was taken down
14  stenographically by me   I do further certify that
15  the above deposition is full, complete, and a true
16  record of all the testimony given by the said
17  witness, and that a review of the transcript was
18  requested
19
20  _____
21  Susan D  Wasilewski, RPR, CRR, CCP
22  (The foregoing certification of this transcript does
23  not apply to any reproduction of the same by any
24  means, unless under the direct control and/or
25  supervision of the certifying reporter )

Page 41

1              INSTRUCTIONS TO WITNESS
2
3
4           Please read your deposition over carefully
5   and make any necessary corrections.  You should
6   state the reason in the appropriate space on the
7   errata sheet for any corrections that are made.
8
9           After doing so, please sign the errata sheet
10  and date it.  It will be attached to your
11  deposition.
12
13          It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the deposition
16  transcript by you.  If you fail to do so, the
17  deposition transcript may be deemed to be accurate
18  and may be used in court.

William R. Sawyer, Ph.D.

Page 42

```
 1          ------
 2          E R R A T A
 3          ------
 4   PAGE  LINE  CHANGE
 5   ____  ____  _____
 6      REASON: _____
 7   ____  ____  _____
 8      REASON: _____
 9   ____  ____  _____
10      REASON: _____
11   ____  ____  _____
12      REASON: _____
13   ____  ____  _____
14      REASON: _____
15   ____  ____  _____
16      REASON: _____
17   ____  ____  _____
18      REASON: _____
19   ____  ____  _____
20      REASON: _____
21   ____  ____  _____
22      REASON: _____
23   ____  ____  _____
24      REASON: _____
25
```

Page 43

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3        I, _____, do hereby
 4   acknowledge that I have read the foregoing pages, 1
 5   through 42, and that the same is a correct
 6   transcription of the answers given by me to the
 7   questions therein propounded, except for the
 8   corrections or changes in form or substance, if any,
 9   noted in the attached Errata Sheet
10
11
12   _____   _____
13   WILLIAM R  SAWYER, Ph D            DATE
14
15
16
17
18   Subscribed and sworn to before me this
19   ____ day of _____, 20___
20   My Commission expires: _____
21
22   _____
         Notary Public
23
24
25
```

Page 44

```
 1        LAWYER'S NOTES
 2   PAGE  LINE
 3   ____  ____  _____
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25
```