# EXHIBIT 22

William Sawyer, Ph.D.

Page 1

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

CHRISTOPHER WADE, et al,

       Plaintiffs,

   vs.               CASE NO. 1722-CC00370

MONSANTO COMPANY, et al,

       Defendants.
_____/

VIDEOTAPED
DEPOSITION OF:    WILLIAM SAWYER, PH.D.

DATE TAKEN:      November 5, 2019

TIME:           8:05 a.m. to 5:11 p.m.

PLACE TAKEN:     South Seas Island Resort
                 5400 Plantation Road
                 Captiva, FL  33924

TAKEN BY:       Attorneys for Defendants

REPORTED BY:     Deborah M. Bruns
                 Florida Professional Reporter

William Sawyer, Ph.D.

| | Page 2 |
|---|---|

```
 1    APPEARANCES:
 2
 3    For the Plaintiffs:
 4      Jeffrey A  Travers, Esquire
        The Miller Firm, LLC
 5      108 Railroad Avenue
        Orange, VA  22960
 6      Phone:  540-672-4224
        Email: Jtravers@millerfirmllc com
 7
 8    For Defendant Monsanto Company:
 9      John M  Kalas, Esquire
        Daniel J  Murner, Esquire
10      Hollingsworth, LLP
        1350 I Street, N W
11      Washington, DC  20005
        Phone:  202-898-5848
12      Email: Jkalas@hollingsworthllp com
13
14    For Defendant Osborn & Barr:
15      John F  Cowling, Esquire
        Armstrong Teasdale
16      7700 Forsyth Boulevard
        St  Louis, MO  63105
17      Phone:  314-795-9510
        Email:  Jcowling@atllp com
18
19
      ALSO PRESENT:
20
      Videographer LaJuana Pruitt
21
22
23
24
25
```

| | Page 3 |
|---|---|

```
 1           I N D E X
 2    TESTIMONY OF WILLIAM SAWYER, PH.D.
 3      Examination by Mr. Cowling.....................  7
 4      Examination by Mr. Kalas......................  12
 5      Examination by Mr. Travers....................  294
 6      Further Examination by Mr. Cowling............. 301
 7      Further Examination by Mr. Kalas............... 308
 8    ERRATA SHEET.........................................  310
 9    CERTIFICATE OF OATH..................................  311
10    CERTIFICATE OF REPORTER.............................  312
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

| | Page 4 |
|---|---|

```
 1              INDEX OF EXHIBITS
 2    Exhibit
      No      Description              Page
 3
 1      Notice of Deposition           12
 4
 2      Plaintiffs' Objections to Defendants'    13
 5      Document Requests and Response to the
        Amended Notice of Videotaped Deposition
 6      of Dr  William Sawyer
 7    3   Curriculum Vitae              14
 8
 4      Invoice dated 10/14/19         14
 9
 5      Invoices dated 9/3/19          14
10
 6      Dr  Sawyer Reliance List        19
11
 7      Caballero vs  Monsanto Appendix A    19
12
 8      Email chain re: Wade Expert Deposition  23
13    dates
14    9    Prasad Study                40
15    10   Plaintiff Fact Sheet - Wade     89
16    11   Deposition of Christopher Wade     94
17    12   Lavy study                 100
18    13   Machado-Neto study          102
19    14   Operator exposure risk assessment for  124
         MON 2139 under European use conditions
20
21    15   Roundup® Pro Concentrate Complete    144
         Directions for Use
22    16   Dr  Sawyer's report re: Ashelman     148
23    17   Dr  Sawyer's report re: Batiste     148
24    18   Dr  Sawyer's report re:  Meeks      148
25    19   Dr  Sawyer's report re: Stauffenberg  148
```

| | Page 5 |
|---|---|

```
 1              INDEX OF EXHIBITS
                   (Continued)
 2
      Exhibit   Description           Page
 3
 4    20   Dr. Sawyer's report re:  Wade     148
 5    21   Andreotti study             158
 6    22   Ericksson study             159
 7    23   Nair study                212
 8    24   Dr. Sawyer's October 21, 2019 amendment  222
         to Russo/Perkins report
 9
      25   Plaintiff Fact Sheet - Batiste     224
10
11    26   Deposition of Bryce Corey Batiste    224
12    27   Roundup® Concentrate Plus label     258
13    28   Johnson study              271
14
15
16
17
18
19
20
21
22
23
24
25
```

William Sawyer, Ph.D.

## Page 6

1    THE VIDEOGRAPHER: We are now on the record  My
2  name is LaJuana Pruitt  I'm a videographer with Golkow
3  Litigation Services  Today's date is November the 5th,
4  year 2019, and the time is 8:05 a m  My clock went
5  back, but I did change it, and it says 9:00
6      This video deposition is being held in Captiva
7  Island in Florida, taken in the matter of Christopher
8  Wade versus Monsanto Company, case number 1722-CC00370,
9  to be heard before the Circuit Court of the City of St
10  Louis, State of Missouri  Our deponent is William
11  Sawyer
12      Will counsel please introduce themselves beginning
13  with plaintiffs' counsel
14      MR TRAVERS: Jeffrey Travers on behalf of the
15  plaintiffs
16      THE VIDEOGRAPHER: Sir?
17      MR COWLING: John Cowling on behalf of Osborn &
18  Barr defendants
19      MR KALAS: John Kalas on behalf of Monsanto
20  Company
21      THE VIDEOGRAPHER: Will our court reporter, Debbie
22  Bruns, please swear our witness
23      THE REPORTER: Would you please raise your right
24  hand to be sworn  Do you swear or affirm to testify to
25  the truth, the whole truth, and nothing but the truth?

## Page 7

1    THE WITNESS: Yes, I do
2  THEREUPON,
3      WILLIAM SAWYER, PH D ,
4      having been duly sworn, testified as follows:
5          EXAMINATION
6  BY MR COWLING:
7    Q  Good morning  Dr Sawyer, what would you like me
8  to call you?  Dr Sawyer, William, Bill, whatever --
9    A  That's fine
10    Q  -- whatever -- would you -- what would you prefer?
11    A  Dr Sawyer is fine
12    Q  Dr Sawyer
13    A  Yeah
14    Q  Hey, Dr Sawyer  My name is John Cowling  I'm an
15  attorney from Armstrong Teasdale, St  Louis, and I represent
16  two of the codefendants in this case, Osborn & Barr Holdings
17  Company, Inc , and Osborn & Barr Communications, Inc  Have
18  you ever heard of those companies other than seeing them on
19  the pleadings?
20    A  No, not until recently
21    Q  Okay  Do you know what they do?
22    A  Advertising
23    Q  Okay  Do you have any knowledge or opinions about
24  Osborn & Barr Communications' or Osborn & Barr Holdings'
25  liability in this case?

## Page 8

1    A  No, that's outside of the expertise of my training
2  and experience.
3    Q  Okay  Let me back up for the ground rules  This
4  is a continuation of your deposition in this Wade/Hall case,
5  correct?
6      MR TRAVERS: No, I think it's the first -- it's
7  the first deposition.
8      MR COWLING: Oh, first deposition in Wade, okay.
9  BY MR COWLING:
10    Q  You testified in respect to Mr. Hall --
11    A  That's correct.
12    Q  -- previously, but this is the --
13    A  Yeah.
14    Q  -- first deposition for Mr. Wade, okay.
15      So you understand you're under oath?
16    A  Yes, I do.
17    Q  And you've been deposed many times  You know the
18  ground rules?
19    A  Yes.
20    Q  Okay  So I don't have to go over them.
21      So you're a toxicologist?
22    A  Yes.
23    Q  And one of the things you did in this case is to
24  review at least some of the literature on glyphosate?
25    A  A considerable amount, yes.

## Page 9

1    Q  A considerable amount?
2      And when did you start doing your work?
3    A  What do you mean by --
4    Q  Just in general on glyphosate.
5    A  Late 1990s.
6    Q  Okay  This -- do you have an opinion as to when
7  it became generally known in -- that glyphosate is a
8  probable human carcinogen?
9    A  Well, based on the key studies, the evidence has
10  been gradually accumulating through the -- well, starting in
11  the late 1990s up to the most recent study published this
12  year  So, I mean, it's been a progression of increasing
13  human epidemiologic evidence, along with in vitro, human,
14  and animal evidence with respect to the underlying
15  mechanisms of genotoxicity, the underlying distribution of
16  the substance, the combined toxicity with POEA -- these are
17  all things that have been published and accumulating, and I
18  have been reviewing the studies for consistency and
19  coherence from animals and in vitro and humans  And even
20  with respect to genetic damage, it's very clear that there's
21  consistency and coherence throughout human studies, animal
22  studies, and in vitro human studies.
23    Q  Okay  And those are -- those are scientific
24  studies that are published in scientific journals for the
25  most part?

William Sawyer, Ph.D.

### Page 10

1    A.   Really everything I relied on is peer-reviewed,
2   published generally-accepted studies.
3    Q.   Correct.  So this IARC monograph was in 2015?
4        MR. TRAVERS:  I'm just going to object to the
5   extent you're asking about his general causation
6   opinions, which he's been deposed about before in the
7   Hall but -- but yeah.
8        MR. COWLING:  Okay, I don't -- I don't think I'm
9   going there.
10       MR. TRAVERS:  Oh, okay, yeah, I see where you're
11  going.
12       MR. COWLING:  You see where I'm going?
13       MR. TRAVERS:  Yeah.
14       MR. COWLING:  All right.
15  BY MR. COWLING:
16   Q.   And that was -- that was a -- a monograph that was
17  widely published to the public, correct?
18   A.   Yes.
19   Q.   And do you agree that that was one of the first
20  widely-publicized newsworthy study that concluded that
21  glyphosate is a probable human carcinogen?
22       MR. TRAVERS:  Objection to form.
23   A.   I'm not sure I -- I'm not clear on the question.
24  BY MR. COWLING:
25   Q.   Okay.  Do you agree that the IARC monograph and

### Page 11

1   its -- its conclusions were widely publicized in the news
2   media?
3    A.   Yes.
4    Q.   To your knowledge, is that the first time that
5   that conclusion of the IARC study that glyphosate is a
6   probable human carcinogen was subject to widespread news
7   reports?
8    A.   I can't answer that.  I don't really follow news
9   reports.  I rely on the generally-accepted peer-reviewed
10  studies and -- and of course governmental agencies and
11  international agency documents.  As far as what's trending
12  in the news media, I don't pay any attention to that.
13   Q.   Okay.  So you don't -- you don't know if that's
14  the first time it was widely publicized --
15   A.   I --
16   Q.   -- that an organization had reached this
17  conclusion --
18   A.   I would say it's probable, but I can't --
19   Q.   Okay.
20   A.   -- guarantee that.  It's not something I've
21  evaluated.
22   Q.   That's fair.  And the --
23       MR. COWLING:  I think that's it.
24       MR. KALAS:  Let's go off the record and switch
25  out.

### Page 12

1        THE VIDEOGRAPHER:  Did you want to go off the
2   record?
3        MR KALAS:  I'll sit there
4        THE VIDEOGRAPHER:  We're going off the record at
5   8:12
6        (Recess from 8:12 a.m to 8:13 a.m )
7        THE VIDEOGRAPHER:  We're back on the record  The
8   time is 8:13 a.m
9            EXAMINATION
10  BY MR KALAS:
11   Q   Good morning, Dr Sawyer
12   A   Good morning
13   Q   How are you?
14   A   Good
15   Q   Good  I'm going to ask you some questions today
16  about the five plaintiffs in the Wade case, okay?
17   A   Very good
18   Q   Okay  First off, let me mark your notice of
19  deposition in this case as Exhibit 1
20       (Exhibit 1 marked for identification )
21  BY MR KALAS:
22   Q   There, sir
23   A   Okay
24   Q   Have you seen this document before, sir?
25   A   Yes

### Page 13

1    Q.   Okay.  When did you first receive this document?
2    A.   I don't recall.
3    Q.   Okay.  And you saw that there were some document
4   requests --
5    A.   Yes.
6    Q.   -- on this document?
7    A.   I did.
8    Q.   Okay.  And in response to this document request,
9   am I correct that you provided -- I will mark as -- well,
10  strike that.
11       In response to the notice of deposition and
12  document requests, your attorneys provided what I'm marking
13  as Exhibit 2.
14       (Exhibit 2 marked for identification.)
15  BY MR. KALAS:
16   Q.   Have you seen this document before?
17   A.   I don't believe so.
18   Q.   Okay.  But in response to Exhibit 1, you did
19  provide a current CV, some invoices, and a retainer, and
20  then a materials considered list, correct?
21   A.   Yes --
22   Q.   Okay.
23   A.   -- I did.
24       MR. KALAS:  So I'll mark those documents as
25  Exhibits 3 through 6.

William Sawyer, Ph.D.

Page 14

1    (Exhibit 3 marked for identification.)
2  BY MR. KALAS:
3    Q.  Let's start with Exhibit 3.  Does Exhibit 3 appear
4  to be a true and correct copy of your CV, sir?
5    A.  Yes.
6    Q.  Okay.
7    MR. KALAS:  And then I'll mark Exhibit 4.
8    (Exhibit 4 marked for identification.)
9  BY MR. KALAS:
10   Q.  Does Exhibit 4 appear to be one of the invoices
11  you've submitted in the Wade matter?
12   A.  Yes.
13   Q.  Okay.  And that was for today's deposition, right?
14   A.  Yes.
15   (Exhibit 5 marked for identification.)
16  BY MR. KALAS:
17   Q.  Okay.  And then Exhibit 5, which was provided to
18  us, as well, and has some handwriting on it I want to ask
19  you about.  Is this another set of invoices you submitted in
20  the Wade matter?
21   A.  Yes.
22   Q.  Okay.  And I want to --
23   MR. KALAS:  John, I'll give you this copy.
24  BY MR. KALAS:
25   Q.  I want to ask you about the handwriting on this

Page 15

1  document.  So first of all on Exhibit 5, it looks like
2  there's invoices submitted for Plaintiffs Wade, Meeks,
3  Batiste and Ashelman, correct?
4    A.  Yes.
5    Q.  Okay.  And are those essentially retainers for
6  your work on those cases when you start to tackle a case?
7    A.  Yes.
8    Q.  Okay.  And has that become your practice in
9  Roundup® litigation, to call for a retainer of $6,500 at the
10  outset of a case?
11   A.  It varies slightly.
12   Q.  It varies slight -- how does it vary?
13   A.  In some cases if the file is more complex, it's --
14  the retainer can be higher --
15   Q.  Okay.
16   A.  -- in terms --
17   Q.  It could be --
18   A.  -- of hours.  This is 10 hours.
19   Q.  Okay.  So it could be $13,000 in a certain case
20  for 20 hours?
21   A.  No, I think the max was actually 12 hours.
22   Q.  Okay.  Okay.  Now, one invoice that isn't on here
23  is Stauffenberg, and I see these notes on the side that
24  Stauffenberg is represented by Wagstaff.  Do you see that?
25   A.  Yes.

Page 16

1    Q.  Okay.  So have you invoiced, as well, a $6,500
2  retainer to the Wagstaff firm?
3    A.  Yes.
4    Q.  Okay.  And then beyond the five invoices of
5  $6,500, four for Plaintiffs Wade, Meeks, Batiste, Ashelman,
6  and then one for today's deposition, and then adding in the
7  one for the Stauffenberg case, have you submitted any other
8  invoices in the Wade matter?
9    A.  No.
10   Q.  Okay.  So total invoices so far you've submitted
11  are about $39,000, correct?  That would be 6,500 --
12   A.  That's right --
13   Q.  -- times 6?
14   A.  -- yeah.
15   Q.  Okay.  And --
16   MR. TRAVERS:  John, just for the record, we sent
17  the Stauffenberg invoice yesterday --
18   MR. KALAS:  Okay.  I -- it may have got lost in
19  the wash.
20   MR. TRAVERS:  Yeah.
21   MR. KALAS:  Okay.
22  BY MR. KALAS:
23   Q.  Beyond those six invoices, I received last night
24  some toxicological notes which you put together in every
25  matter that had some discussions of interviews that took

Page 17

1  place yesterday and the day before yesterday with various
2  plaintiffs in this case, correct?
3    A.  I'm sorry, I didn't understand the question.
4    Q.  Did you conduct interviews yesterday and the day
5  before yesterday of various plaintiffs in this case?
6    A.  I did.
7    Q.  Okay.  And so we received notes of that last night
8  which are getting printed right now.
9    And so when you conducted those interviews, and
10  you worked on those toxicological notes, did you work
11  greater than ten hours on any of the plaintiffs that you had
12  a retainer for?  In other words, are you intending on
13  invoicing more money?
14   A.  I know I did on Stauffenberg for sure and probably
15  Wade, but I don't know the exact hours so I'd have to check,
16  you know, tally it up.  But Stauffenberg -- well, Wade was
17  the 355-page deposition, it was rather complex, as was the
18  records in Stauffenberg.  So it's certainly more than -- I
19  would say on those two were more than ten hours.
20   Q.  Okay.  All right.  So you intend to invoice
21  more -- more time at this point on the Wade matter.  You
22  just can't estimate how much.
23   A.  Right.  I'll get invoices out soon.  I've just
24  been working to the eleventh hour to make the deadlines --
25   Q.  I understand.

5  (Pages 14 to 17)

William Sawyer, Ph.D.

Page 18

```
 1      A.  -- on these reports yesterday.
 2      Q.  I understand.
 3      A.  And unfortunately the billing seems to go on hold
 4  until I get caught up to things.
 5      Q.  Okay.
 6          MR. TRAVERS:  Sorry, John, and if you want to ask
 7  questions about the reports, I don't need a copy, and I
 8  think Dr. Sawyer has --
 9          MR. KALAS:  Yeah, I need a copy.
10          MR. TRAVERS:  Okay.
11          MR. KALAS:  So when we have it, I can start
12  getting into those --
13          MR. TRAVERS:  Okay.
14          MR. KALAS:  -- but, you know, I got them at 8 p.m.
15          MR. TRAVERS:  Yeah --
16          MR. KALAS:  The printer doesn't open --
17          MR. TRAVERS:  -- I understand.
18          MR. KALAS:  So -- and I'm not criticizing getting
19  them at 8 p.m.  I understand he was working on them --
20          MR. TRAVERS:  Yeah.
21          MR. KALAS:  -- but -- okay.
22  BY MR. KALAS:
23      Q.  And then in addition to your reliance list that
24  you -- you have generally on your reports, you also
25  submitted a materials-specific reliance list for each of the
```

Page 19

```
 1  five plaintiffs in this case.  I'll mark that as Exhibit 6.
 2          (Exhibit 6 marked for identification.)
 3  BY MR. KALAS:
 4      Q.  Does that appear to be a true and correct reliance
 5  list for the exhibit -- or for the materials you considered
 6  in this particular case?  In other words, the case-specific
 7  materials?
 8      A.  Yes.
 9      Q.  Okay.  And then we also received an MCL, a
10  materials considered list of general documents with a
11  Caballero header on it, but I assume it's the materials
12  considered list you intend to rely on generally in this
13  case.  I'll mark that as Exhibit 7.
14          (Exhibit 7 marked for identification.)
15      A.  This is not up to date.
16  BY MR. KALAS:
17      Q.  Okay.
18      A.  What is up to date is the document reliance list
19  attached to each of the reports that I issued yesterday.
20      Q.  Okay.  And when we get those reports, I'll ask you
21  to tell me what's in those reports.
22          Let me ask you this while you have Exhibit 7 in
23  your hand.  Have you relied on all the documents in Exhibit
24  7 for your opinions in the Wade case?
25      A.  Excluding the documents that were specific to
```

Page 20

```
 1  Caballero, yes.
 2      Q.  Okay.
 3      A.  And when I say "documents," such things as
 4  deposition of Caballero and medical records specific to that
 5  case.
 6      Q.  Sure, understood.
 7          Okay.  I think we've gotten through all of that
 8  housekeeping.
 9          Let me just state at the outset so I don't forget,
10  we're going to designate this deposition as confidential
11  pursuant to the protective order given the discussion of EU
12  names, et cetera --
13          THE REPORTER:  The discussion of?
14          MR. KALAS:  EU names, et cetera, in the report.
15  BY MR. KALAS:
16      Q.  Okay.  Now, today you're here to be deposed
17  regarding Glen Ashelman, Christopher Wade, Chester Meeks,
18  Joshua Stauffenberg, and Bryce Batiste, correct?
19      A.  Yes.
20      Q.  Okay.  And you hold case-specific opinions
21  regarding each of those individuals, right?
22      A.  Yes.
23      Q.  Okay.  Are you going to tell the jury that you've
24  examined each individual's case, including their histories
25  of glyphosate use and potential co-exposures?
```

Page 21

```
 1      A.  Yes.
 2      Q.  Are you going to tell the jury you've come to the
 3  conclusion that glyphosate substantially contributed to
 4  their NHL?
 5      A.  Yes.
 6      Q.  Okay.  And each of these five gentlemen have
 7  separate medical histories, correct?
 8      A.  That's correct.
 9      Q.  Each of these gentlemen have separate potential
10  alternative risk factors, correct?
11      A.  Yes, I've assessed additional risk factors, and
12  especially toxicologically-related risk factors.
13      Q.  Sure.  But what I'm getting at is a little
14  different, which is each of these gentlemen have a different
15  set of potential alternative risk factors.  In other words,
16  all five of them don't have the same.
17      A.  Well, there -- there are some things in common.
18  ████████████████████████████████████
19      Q.  Right.  But, for instance, you examined Mr. Meeks'
20  work in the shipyards in Newport News, right?
21      A.  Yes.
22      Q.  Okay.
23      A.  Yes --
24      Q.  Okay.
25      A.  -- I'm well aware of his work.  I wish I could
```

## William Sawyer, Ph.D.

### Page 22

1  have spoke to him but -- a little too late for that, but
2  gathered what I could from his -- information from his wife,
3  as well as the records, and as well as the DOD study that I
4  looked at.
5      Q.  Okay.  But I'm getting at something a little
6  different, which is the other four plaintiffs, for instance,
7  didn't work in the shipyard, right?
8      A.  Correct --
9      Q.  Okay.
10     A.  -- yeah.  Well, of course everyone has different
11  occupational histories.
12     Q.  Okay, great.  So you'd agree that each of the five
13  plaintiffs held different jobs throughout their life?
14     A.  Yes, but they had in common factors, as well, such
15  as their exposure to Roundup®, glyphosate --
16     Q.  Okay.
17     A.  -- et cetera.
18     Q.  And each of these plaintiffs, maybe not all of
19  them, but there are different subtypes of NHL for each
20  plaintiff, correct?  Some have B-cell, some have -- I think
21  it's Waldenstrom's macro -- I can't pronounce it.  But they
22  have different subtypes of NHL, correct?
23     A.  Yeah, but what's -- you're correct.  But what is
24  in common and can't be overlooked is that four of them had
25  similar form of non-Hodgkin's lymphoma, and one of them had

### Page 23

1  a follicular non-Hodgkin's lymphoma.
2      Q.  Okay.
3      A.  And then of course there are subtypes beyond that
4  which you're referring to, and of course each subtype arises
5  from the same stem cell.  There's a -- from a mechanistic
6  standpoint, they have in common the same ancestry in terms
7  of cellular developmental process.
8      Q.  Yes, sir, and I appreciate all that.  But you, I
9  think, got to the same point I was getting to, which is, for
10  instance, some of the plaintiffs have follicular lymphoma,
11  and some have B-cell lymphoma, correct?
12     A.  Right.
13     Q.  Okay.  Now, I'm going to mark as Exhibit 8 an
14  email we received.  And given what you just said, I want to
15  see if you agree with the stipulations in this email.
16         MR. KALAS:  I'll mark this Exhibit 8.
17         (Exhibit 8 marked for identification.)
18  BY MR. KALAS:
19     Q.  If you look, this is an email -- do you see the
20  "From" line?  It's from DDickens@millerfirmllc.com.
21     A.  Yes.
22     Q.  Okay.  And you know David Dickens, right?
23     A.  Yes.
24     Q.  Okay.  You actually went to trial with
25  Mr. Dickens, right?

### Page 24

1      A.  I did.
2      Q.  He works with Mr. Travers?
3      A.  Yes, he did the -- my direct examination in the
4  Johnson case.
5      Q.  Okay.  And this is an email chain about expert
6  deposition dates which is a lot of very boring lawyer talk,
7  but Mr. Dickens made a representation here in paragraph 2 I
8  want to ask you about regarding the scope of your testimony.
9         In paragraph 2 it states, "You have requested two
10  days for the deposition of Dr. Sawyer as he will be offering
11  opinions regarding each of the five plaintiffs.  I have
12  reached out to Dr. Sawyer regarding his availability for a
13  second date, however, I anticipate that you will be able to
14  complete his deposition in a single day as (in the interest
15  of time and efficiency) his case-specific opinions in this
16  matter will not be as broad as they have been in other
17  cases, i.e., Johnson, Pilliod."
18         Did I read that correctly?
19     A.  Yes.
20     Q.  Moving on it states, "Regarding case-specific
21  opinions, Dr. Sawyer has not reviewed the entirety of
22  plaintiffs' medical records and did not perform a
23  differential diagnosis to form a specific causation opinion
24  that plaintiffs' exposure to Roundup® caused, or
25  substantially contributed to, their diagnosis of NHL."

### Page 25

1         Did I read that correctly?
2      A.  Yes.
3      Q.  Third paragraph (as read), "He will offer
4  testimony regarding plaintiffs' total exposure to Roundup®
5  prior to their diagnosis; a comparison of plaintiffs' total
6  exposure to the epidemiology and exposure studies; and
7  opinion that plaintiffs' total exposure was sufficient to
8  cause NHL."
9         Did I read that correctly?
10     A.  Yes.
11     Q.  Okay.  So -- now, starting with the second
12  paragraph, it states that you have not reviewed the entirety
13  of plaintiffs' medical records.  And I take it that's true,
14  right, you haven't reviewed every medical record?
15     A.  No, I haven't.  I've read a fair amount of every
16  plaintiff's medical records, but not all of the medical
17  records.  I know that Dr. Boyd, the oncologist, is -- has
18  really dove into that aspect of the -- the matter.
19     Q.  But you have reviewed some medical records for
20  each plaintiff, enough to make your toxicological
21  assessment, right?
22     A.  I have in terms of assessing the medical records
23  for any evidence that from a toxicologic standpoint could
24  explain, at least in part, the lymphoma, such as
25  immunosuppressant drugs like cyclosprine A, or other

William Sawyer, Ph.D.

Page 26

1 information within those medical records regarding
2 occupational exposure --
3     Q.  Okay.
4     A.  -- samples.
5        So I'm not here to duplicate -- duplicate the work
6 that Dr. Barry Boyd has performed; but of course as a
7 toxicologist, I look at the medical records from a different
8 view in terms of attempting to identify other potential risk
9 factors from a toxicological standpoint.  So my scope is
10 limited in that sense.
11     Q.  And that's the same scope that you've employed in
12 other cases, right?  You're not here to be the oncologist.
13 You're here to be the toxicologist.
14     A.  Right.
15     Q.  Okay.  And then moving on, it says that you
16 haven't done a differential diagnosis to rule out other
17 potential contributing factors to opine that glyphosate
18 caused or substantially contributed to plaintiffs' NHL.
19        Now, if you recall during the Jeff Hall case, we
20 had a long back and forth about differential diagnoses; and
21 as I understand it, when you reached your opinion that
22 glyphosate caused or substantially contributed to
23 plaintiffs' NHL, you were not conducting a differential
24 diagnosis to reach that opinion, right?
25        MR. TRAVERS:  Objection, compound.

Page 27

1     A.  Yeah, I think you really have to clarify the
2 question.
3 BY MR. KALAS:
4     Q.  Sure.  Mr. Dickens stipulates here that you will
5 not perform a differential diagnosis in this case.  Do you
6 see that?
7     A.  Correct.  Dr. Barry Boyd, from the medical
8 standpoint, is performing the differential diagnosis.  What
9 a toxicologist -- and what I am doing in this case is
10 assessing the records, the file that I have reviewed, and
11 also applying differential diagnosis in terms of
12 toxicological factors, I attempt to demonstrate other
13 underlying potential factors and determine whether those
14 potential underlying toxicological factors have any bearing.
15 For example, the use of a different herbicide by the
16 plaintiff or an occupational exposure, such as potential
17 radiation, these are things that I consider and look at.
18     Q.  And I understand that.  And I guess what I'm
19 getting at is that is the same practice you have carried out
20 in each and every Roundup® case, right?  To do this
21 toxicological evaluation of other potential confounding
22 factors, right?
23     A.  There may have been one case, Hardeman, which I
24 did not review specific causation factors in.
25     Q.  Okay.  But in this case you did, correct?

Page 28

1     A.  Yes.
2     Q.  And in the last case I deposed you in, the Russo
3 case, you did, correct?
4     A.  I think so.  I'm trying to -- sometimes I get
5 mixed up case to case, but I believe so.
6     Q.  And the last case before that I deposed you in,
7 Giglio, you did, right?  That was the methyl chloride case,
8 the dichloromethane case.
9     A.  Correct.
10     Q.  Okay.  So what you're doing in this case is
11 similar to most of the Roundup® cases you've testified in as
12 far as your methodology.
13     A.  I believe so.
14     Q.  Okay.
15        MR. TRAVERS:  And, John, I just want to state for
16 the record, we'll -- we're definitely going to abide by
17 Dave's stipulation at trial where we're going to --
18        MR. KALAS:  Let me -- let me tell you my concern
19 here, Jeff --
20        MR. TRAVERS:  Yeah.
21        MR. KALAS:  -- which is I think that there's a
22 trick being played here.  I think -- I think that
23 you're saying he's not going to conduct a differential
24 diagnosis in order to reach a specific causation
25 opinion, and then he's going to get on the stand and

Page 29

1 testify --
2        MR. TRAVERS:  Yeah.
3        MR. KALAS:  -- that he has decided that glyphosate
4 is a substantial contributing factor to plaintiffs' NHL
5 based on the fact that they fit into a box in the
6 epidemiology --
7        MR. TRAVERS:  Yeah.
8        MR. KALAS:  -- data and that he doesn't see any
9 other alternative causes of their NHL.  So that is what
10 I think is happening here, and I want to find out if
11 that's what's happening.  Because if that's what's
12 happening, then this stipulation doesn't mean a heck of
13 a lot to how we need to try our case.
14        MR. TRAVERS:  Yeah, we're not trying to trick you.
15 I guess -- yeah, we will -- no, we'll stand by that on
16 the --
17        MR. KALAS:  Okay.  So --
18        MR. TRAVERS:  -- on direct.
19        MR. KALAS:  -- so I understand the black and
20 white, and I'm trying to understand the contours of
21 this case's specific opinions.
22        MR. TRAVERS:  Yeah.  I mean, he's got -- I mean,
23 he's -- he's definitely reviewed stuff that -- from
24 what we're going to do at trial that's -- that third
25 paragraph is what we're going to do.  We're not going

William Sawyer, Ph.D.

### Page 30

1    to have him say --
2       MR. KALAS: Okay.
3       MR. TRAVERS: -- you know --
4       MR. KALAS: Let me ask him the questions, okay?
5       MR. TRAVERS: I just --
6       MR. KALAS: I understand.
7   BY MR. KALAS:
8      Q. Dr. Sawyer, if asked to come to trial by
9   Mr. Travers, are you going to stand up on the stand and say
10   that glyphosate substantially contributed to Mr. Wade's NHL?
11      A. Not exactly. My opinion is that the dose was
12   certainly sufficient to cause the NHL, and I will also
13   discuss ruling out other toxicological factors, or
14   identifying for the jury other toxicological factors that
15   were significant.
16      Q. Okay. So you will -- in the case of Mr. Wade,
17   we'll start with him. You will rule in glyphosate as a
18   potential cause of his NHL based upon the dose he was
19   exposed to, right?
20      A. Yes.
21      Q. And then you will tell the jury that based upon
22   the history you've reviewed, there are no other factors
23   apparent to you that could have substantially caused his
24   NHL, right?
25      A. Yeah, that's actually accurate.

### Page 31

1      Q. Okay. Likewise Mr. Stauffenberg, when you come to
2   trial, you'll say that you have ruled in glyphosate as a
3   potential cause of Mr. Stauffenberg's NHL, true?
4      A. Yes.
5      Q. Okay. And when you come to trial, you will say
6   that you have ruled out all other potential contributing
7   factors to Mr. Stauffenberg's NHL other than the areas in
8   which you defer to the oncologist or the epidemiologist,
9   true?
10      A. Yes.
11      Q. Okay. And the same would hold true for the other
12   three plaintiffs, correct?
13      A. That's correct.
14      Q. Okay. And so based upon -- and that will be based
15   upon your evaluation of the exposure days of these
16   individuals and how it relates to the epidemiology data as
17   far as the ruling in of glyphosate, right?
18      A. Yes, primarily, but I also have looked at the
19   degree of personal protective equipment, if any, unusual
20   exposures, spills, accidents, leakage, application
21   practices, body weight, dermal absorption factors, and other
22   toxicological factors.
23      Q. Okay.
24       MR. TRAVERS: And, John, again, just for the
25   record, we're stipulating that he's only going to

### Page 32

1   testify to the -- that the exposure is sufficient to
2   cause NHL, and -- and he's not going to testify about
3   ruling out other factors at trial. We're stipulating
4   to that.
5       MR. KALAS: So you will stipulate that he will not
6   discuss that he was able to rule out Mr. Meeks' work in
7   a shipyard as a potential cause of his NHL?
8       MR. TRAVERS: We will, unless you bring it up in
9   cross, cross-examination.
10       MR. KALAS: And you will --
11       MR. TRAVERS: If you ask in cross-examination
12   stuff about that, of course he'll --
13       MR. KALAS: Cross-examination --
14       MR. TRAVERS: Yeah.
15       MR. KALAS: -- at trial.
16       MR. TRAVERS: Yeah.
17       MR. KALAS: Okay. You understand I need to ask my
18   questions in deposition in case there is any allegation
19   of door opening.
20       MR. TRAVERS: Yeah -- no, I -- yeah, that's --
21   that's fine. We're -- we're stipulating in direct
22   we're not -- we're not going to ask him about ruling
23   out other factors, just that third paragraph about --
24       MR. KALAS: Okay.
25       MR. TRAVERS: -- being sufficient to cause NHL.

### Page 33

1       MR. KALAS: Okay.
2   BY MR. KALAS:
3      Q. Now, you served here a -- toxicological notes
4   which are being printed up, but one thing that I didn't see
5   in them are calculations of mgs per kg per day for each
6   plaintiff. Do you intend prior to trial to calculate a mg
7   per kg per day dose for any of the plaintiffs in this case?
8      A. I haven't been asked -- excuse me. I have not
9   been asked to perform that, no.
10      Q. Okay. And the question was about intent, not
11   about what you've been asked. So let me ask it again. Do
12   you intend right now, assuming you're not asked, to
13   calculate a mg per kg per day dose for any of the plaintiffs
14   in this case?
15      A. I would not because I believe that the deadline
16   for that is past now. I'd have to have them here at
17   deposition.
18      Q. Okay. I know you don't have the benefit of your
19   reports in front of you, except for the fact -- and we
20   probably should note this for the record now. You have
21   a lap -- sorry. You have a laptop in front of you, right?
22      A. Yes.
23      Q. Okay. And what's the laptop for?
24      A. I have the five PDF files open.
25      Q. Okay.

William Sawyer, Ph.D.

Page 34

1      A.  One PDF file for each of the five plaintiffs.
2      Q.  Okay.  And are you looking at any other documents
3  beyond your toxicological notes on those -- on that laptop
4  during the course of this deposition today?
5      A.  No, nothing else is open, and I'm not even online.
6      Q.  Okay.  And you're not communicating with
7  Mr. Travers or anybody else in any way, right?
8      A.  No.
9      Q.  Okay.  Going back to your toxicological notes, are
10  all of your opinions you intend to offer today regarding the
11  five plaintiffs in this case contained in your toxicological
12  notes?
13      A.  Yes.
14      Q.  Okay.  Do you have a second available day for
15  deposition if we don't finish up today?
16      MR. TRAVERS:  Objection.  We're going to object to
17  a second day.  So you can get the rest --
18      MR. KALAS:  I'm just asking if he has -- I'm just
19  asking if he has a day on his calendar between now
20  and --
21      MR. TRAVERS:  No, you get to go through us on
22  that.  You're not asking him --
23      MR. KALAS:  Are you instructing him not --
24      MR. TRAVERS:  Yes.
25      MR. KALAS:  -- to answer?

Page 35

1      MR. TRAVERS:  Yes.
2      MR. KALAS:  Okay.  I'm going to note for the
3  record that we asked for a second day, and you said
4  you're checking availability.  We haven't heard back on
5  that.  We're going to do our best to get through this
6  today.
7      MR. TRAVERS:  Yeah.
8      MR. KALAS:  We are going to do our absolute best,
9  but given the stipulations that were on the record and
10  Dr. Sawyer's somewhat contradictory testimony, along
11  with the specter of opening the door, quote, unquote --
12      MR. TRAVERS:  We're not going to -- we're not
13  going to open the door on direct --
14      MR. KALAS:  I under --
15      MR. TRAVERS:  -- per the stipulation.  If you want
16  to open the door on cross, that's up to you guys.
17      MR. KALAS:  All right.  We're going to do our best
18  to get through it.  I'm just noting for the record that
19  we asked for a second day given there's five plaintiffs
20  in this case, not one, and we'll do our best to get
21  through it.  In the MDL we have 3.5 hours per
22  plaintiff.
23      MR. TRAVERS:  You guys have got that limited now.
24      MR. KALAS:  We didn't get that limited on
25  Dr. Petty I don't think, and you guys made the

Page 36

1  agreement, but we're not going to do --
2      MR. TRAVERS:  All right.
3      MR. KALAS:  -- argue on the record.
4      MR. TRAVERS:  You guys --
5      MR. KALAS:  You guys backtracked --
6      MR. TRAVERS:  You --
7      MR. KALAS:  -- on your agreement -- you
8  backtracked on your agreement, but we'll talk about
9  that later.
10  BY MR. KALAS:
11      Q.  Now, in this case you're not starting from
12  scratch, correct?  You've reviewed data on Roundup® prior to
13  this case.
14      A.  Yes.
15      Q.  Okay.  You're relying on your previous testimony
16  in other cases in the Roundup® litigation, correct?
17      A.  I'm not sure what you mean by that.
18      Q.  You go to your materials considered list, I
19  believe you have an entry for prior testimony on it, sir, in
20  prior reports.
21      A.  Correct.
22      Q.  Okay.  So are you relying on your prior testimony?
23  In other words, do you stand by your prior testimony in the
24  Roundup® litigation?
25      A.  I do, yeah.

Page 37

1      Q.  Okay.
2      A.  Yeah.
3      Q.  Do you stand by your prior reports in the Roundup®
4  litigation?
5      A.  I -- so far I've never gone back and reviewed old
6  reports, but my current reports are up to date and contain
7  all of the scientific information from earlier reports.
8      Q.  Okay.  Nothing you want to withdraw from any of
9  these reports sitting here today?
10      A.  No.
11      Q.  Nothing you want to amend from any of those
12  reports sitting here today?
13      MR. TRAVERS:  Object, form.
14      A.  Not that I can think of at the moment.  I would
15  have to refresh my memory, go back and look at the old
16  reports to -- yeah.
17  BY MR. KALAS:
18      Q.  And like in previous cases, will you be deferring
19  on certain issues to other experts for the plaintiffs?
20      A.  Certainly.
21      Q.  Okay.  Which issues are you deferring on in this
22  case regarding the five plaintiffs?
23      A.  Well, certainly the differential diagnosis through
24  Dr. Barry Boyd, and the detailed analysis of the
25  epidemiological studies, including the six primary studies

10  (Pages 34 to 37)

William Sawyer, Ph.D.

Page 38

1 that I've listed in my report. I will certainly defer that
2 to the epidemiologist in terms of the detailed analysis of
3 the methodology employed.
4     Q.  The influence of genetics on plaintiffs' NHL, will
5 you be deferring that to Dr. Boyd?
6     A.  Yes.
7     Q.  Okay.  Now, you, in the Russo case the night
8 before the deposition, served an amended or a supplemental
9 report regarding the Prasad study and a few other studies.
10 Do you recall that?
11     A.  Yeah.
12     Q.  Okay.  And then you also served that same report
13 in the other multi-district litigation cases that you were
14 offered in, correct?
15     A.  Are you referring to the reference list?
16     Q.  The reference list, sir, and also I think you said
17 in the Russo deposition that the opinions you offered in
18 your supplemental report in Russo you intended to apply to
19 all of the MDL cases.  Do you remember that?
20     A.  Not really.
21     Q.  Okay.  Let me just ask this directly.  The
22 supplemental report in the Russo case that discussed Prasad
23 and the dosing in the Prasad study, do you intend to offer
24 those opinions regarding the five plaintiffs in the Wade
25 case, as well, if asked at trial?

Page 39

1     A.  Yes.
2     Q.  Okay.  And what will you say about the Prasad
3 study and the dosing in the Prasad study regarding Mr. Wade,
4 Mr. Stauffenberg, Mr. Ashelman, Mr. Batiste, and Mr. Meeks?
5 How will that relate to them?
6     And just to direct you, for instance in the Wade
7 study -- or in the Wade report you served yesterday, your
8 citation 304 in your materials considered list says summary
9 and written calculations regarding Prasad.  So that goes, I
10 think, to what your supplemental report was in Russo, and
11 what I'm trying to understand is how your supplemental
12 report in Russo, if that's what that means, relates to these
13 five plaintiffs.
14     A.  I don't recall.
15     Q.  You don't recall?
16     A.  No.  I really would need to look at the -- my
17 notes from that deposition that were submitted on the Prasad
18 study or the Prasad study itself.  I just --
19     Q.  Okay.
20     A.  -- don't -- don't recall.
21     Q.  I have the Prasad study so let's pull it out.
22     Let me -- let me ask you this before we pull it
23 out.  Does 304 refer to the submission you served on the
24 21st of October in the Russo case?
25     A.  Yes.

Page 40

1     Q.  Okay.
2     (Exhibit 9 marked for identification.)
3 BY MR. KALAS:
4     Q.  All right.  Is this the Prasad study you're
5 referring to, sir?
6     A.  Yes.
7     Q.  Okay.  And how is this study -- a study entitled,
8 "Clastogenic Effects of Glyphosate in Bone Marrow Cells of
9 Swiss Albino Mice," how does it relate to the five
10 plaintiffs in this case, and what will you tell the jury
11 about it if asked?
12     A.  Simply that the Prasad study is consistent with
13 other animal and in vitro human studies with respect to the
14 induction of chromosomal aberrations from glyphosate.
15     Q.  Okay.  Now, one thing that you did in citation 304
16 on your materials considered list in your Wade report, for
17 instance -- and I should call it your Wade notes -- was --
18 one thing you did in that document was you compared a -- the
19 dose in Prasad using the Nair, N-A-I-R, study to a dose you
20 had calculated for Mr. Russo.  Do you remember that?
21     A.  Without seeing the --
22     Q.  Okay.
23     A.  -- my notes on that, I can't get too specific,
24 but, yeah, I do recall performing that.
25     Q.  Okay.  Do you intend to compare the doses in the

Page 41

1 Prasad study to the five plaintiffs in this case in a mg per
2 kg manner?
3     A.  I think I might give a general index with --
4 stating that in this study the dose was not thousands and
5 thousands of times higher than received by the applicator,
6 but rather whatever my computation was, 10 times higher, 50
7 times higher, whatever.
8     Q.  Well, actually in the Russo case -- and I
9 understand you don't have the document in front of you, but
10 it's my recollection you stated that the doses in this study
11 were below the dose to Mr. Russo.
12     So let me ask you this.  From this general
13 overview of the Prasad study that you think you may give, do
14 you intend to compare -- let me back up.
15     You stated on the record already today that you're
16 not going to calculate a mg per kg dose -- or you don't
17 intend to calculate a mg per kg dose for any of the five
18 plaintiffs in this case, right?
19     MR. TRAVERS:  Objection to form.
20     A.  Correct.
21 BY MR. KALAS:
22     Q.  Okay.  Are you going to compare the Prasad study's
23 dosing to a mg per kg dose that has been generated in a
24 UK-POEM model, for instance, for a generic applicator in
25 this case?

11 (Pages 38 to 41)

William Sawyer, Ph.D.

Page 42

1     A.  Probably.
2     Q.  Okay.  So then let's go through this to see how
3  you're going to compare it in this case using the POEM
4  model.
5          MR. TRAVERS:  Okay.  I'm just going to object.
6  This is a general causation opinion.  He's already been
7  deposed twice since he put this in a supplemental
8  report.  So if you want to waste your time doing
9  general causation, that will go against your argument
10  for a second day.
11         MR. KALAS:  I'm not arguing for a second day.  I'm
12  hopeful to get through my whole line of questioning
13  today.
14         MR. TRAVERS:  Okay.
15         MR. KALAS:  I'm trying to find out what he's going
16  to say in this case.  As you are aware, in Missouri
17  expert reports are not required.  Correct, Jeff?
18         MR. TRAVERS:  Yes.
19         MR. KALAS:  Okay.  So we are going to want to find
20  out what he's going to say at trial and pursue it where
21  it goes, and I need to find out what he's going to say.
22  He's saying this relates to the five plaintiffs, and
23  he's going to testify about it on the five plaintiffs.
24  So this directly relates to your trial in this case.
25         MR. TRAVERS:  Okay.  You're mischaracterizing his

Page 43

1  testimony.
2  BY MR. KALAS:
3     Q.  Okay.  So let's look at this study, sir.  First of
4  all, this is an intraperitoneal study, correct?
5     A.  Yes, which indicates essentially 100 percent
6  absorption --
7     Q.  Okay.
8     A.  -- but we also know that glyphosate, through the
9  oral route, is at least highly absorbed, if not 90 percent.
10    Q.  Okay.
11    A.  So they're reasonably similar routes.
12    Q.  Hold on.  Let me back that up.
13        First of all, my question was just is this an
14  intraperitoneal study.
15    A.  Yes.
16    Q.  Okay.  Second of all, is it your opinion that
17  glyphosate is absorbed up to 90 percent via the oral route?
18    A.  It depends on the study, but fairly high
19  absorption.  Let's -- let me remove the 90 percent because I
20  don't have the citation memorized, but well absorbed,
21  reasonably high bioavailability.
22    Q.  Okay.  So you would disagree with the National
23  Toxicology Program when they state that glyphosate is
24  absorbed somewhere between 30 and 40 percent via the oral
25  route?

Page 44

1          MR. TRAVERS:  Objection, mischaracterizes what the
2  NTP statement --
3          MR. KALAS:  It doesn't but --
4     A.  It depends on how it's presented.  In this case it
5  was not presented as a mixture in -- in oats that had been
6  treated or in food that had been previously treated, but
7  rather the methodology in this study was IP so it's 100
8  percent absorbed.
9          Now, glyphosate, when given orally in -- let me --
10  let me explain this.  It's a lot simpler than what I'm
11  stating.
12         The -- let's go back to a POEM general dose,
13  because I am not calculating a specific milligram per
14  kilogram dose for each of the five plaintiffs.  But if I
15  made a general comparison and said that applicators
16  typically sustain exposures in -- within the 0.1
17  milligram per kilogram per day range, that 0.1 milligram per
18  kilogram per day is how much is systematically absorbed is
19  exactly equal to that of an IP dose.  They're completely
20  interchangeable because the POEM dose is how much has been
21  absorbed so the -- how much is absorbed orally doesn't
22  matter anymore.
23  BY MR. KALAS:
24    Q.  Okay.  So --
25    A.  We're not talking about that.  We're talking

Page 45

1  apples to apples.
2     Q.  Right.  So that's what confused me.  You mentioned
3  an oral dose was 90 percent absorbed.  In fact, what you --
4  if I understand you correctly, what you're saying is an
5  absorbed dose in an applicator model, in other words what
6  gets through the skin, is 100 percent bioavailable.  Is that
7  what you're saying?
8     A.  Exactly.
9     Q.  Okay.  And so what gets through the skin -- and
10  that's different than what's on the skin, right?
11    A.  Yes.
12    Q.  And an IP dose -- what is the intraperitoneal
13  area?  Where is that in the body?
14    A.  It's injected into the space in the abdomen, the
15  space which houses a number of organs, including the
16  stomach, liver, kidney, et cetera.
17    Q.  Okay.  And the -- are there humans who are exposed
18  to glyphosate via the intraperitoneal route that you're
19  aware of?
20    A.  No.
21    Q.  Okay.  And the dosing in this study went up to 15
22  milligrams per kilogram per day, right?
23    A.  Right.  There was a 25 and a 50 milligram per
24  kilogram dose.  Both were significant, as I recall.
25    Q.  Okay.  And what you're relying on, your notes in

12 (Pages 42 to 45)

William Sawyer, Ph.D.

## Page 46

1  the Russo case, you talked about the 25 milligram per
2  kilogram dose, right?
3      A.  That's right.
4      Q.  Okay.
5      A.  It was significant at the t.05 95 percent
6  confidence interval.
7      Q.  And that's what you'll tell the jury about the
8  five plaintiffs in this case, right?  When you're talking
9  about Prasad, you're talking about the 25 milligram per
10 kilogram dose, right?
11     A.  That's right.
12     Q.  Okay.  And so if we go back to what you're going
13 to tell the jury about the plaintiffs in this case, would
14 you make sure to tell them that there was a statistically
15 significant cytotoxic effect of the glyphosate in this
16 study?
17     A.  Certainly that's also important, yeah.
18     Q.  Okay.  And cytotoxicity, as we've discussed before
19 in the context of different studies, involves the cell dying
20 after exposure, right?
21     A.  Right, it's a decrease in what we call the mitotic
22 index.
23     Q.  Okay.  And when genetic damage is -- is observed
24 following cytotoxicity, it can be impossible to suss out
25 whether or not that genetic damage was due to a direct

## Page 47

1  genotoxic effect or the fact that the injection was toxic to
2  the cell, right?
3          MR. TRAVERS:  Object to the form.
4      A.  That's -- that's true to some extent, but more
5  importantly in this case the dosing was low enough that when
6  one applies the human equivalent dose factor equation, it
7  brings the dosing down considerably.
8  BY MR. KALAS:
9      Q.  Okay.  So my question was different.  We're going
10 to get to the human factor dosing, which I know you're going
11 to tell the jury about which you just testified; but it is
12 true that when there is a cytotoxic effect on cells, it can
13 be difficult to interpret whether the genetic damage
14 observed in a study is due to genotoxicity or the toxic
15 effect on the cells which then causes genotoxicity after the
16 cell dies, right?
17     A.  Right, and that's very important when studies of
18 this type are performed using dosing that is, as I said
19 earlier, 1,000 times or 10,000 times higher than what we see
20 in the real world.  In this study the dosing was not
21 extraordinarily high.  It was in a more reasonable range
22 with that which would be occurring in a -- in an actual
23 human exposure.
24     Q.  Okay.  And if I understand correctly, the authors
25 in this study were unable to determine whether or not the

## Page 48

1  effects that they observed were due to a cytotoxic --
2  cytotoxic or genotoxic effect of the administered compound,
3  correct?
4      A.  Yes, but it's still important, as the authors
5  state on page 4, at the very end of the last sentence into
6  page 5, that our results reveal that there was an elevation
7  in the number of micronuclei in the glyphosate exposed
8  animals.  Because MN could be the consequence of the mitotic
9  spindle malfunction, it is impossible -- no, it is possible
10 that the glyphosate could also express an aneugenic mode of
11 action as inhibiting cell division and mitotic spindle
12 apparatus.
13          So what I'm getting at is that even though we
14 can't conclude from this study alone that the chromosomal
15 aberrations were the direct action of glyphosate, it's clear
16 that the chromosomal aberrations are at least the secondary
17 effect because of possible mitotic spindle malfunction or
18 other factors which could be considered cytotoxic.
19     Q.  And just to unpack that for the jury because this
20 is some big words for the jury, when a -- when a cell --
21 when a compound is toxic, that is not the same thing as a
22 compound being carcinogenic, right?
23     A.  Right.
24     Q.  In order for carcinogenesis to occur, there needs
25 to be a mutation that is replicated, correct?

## Page 49

1      A.  Yes.
2      Q.  Okay.  And if a compound is toxic, in other words
3  it kills the cell, then replication cannot occur, true?
4      A.  Yes, but it's an oversimplification of what this
5  study is showing, is increased micronuclei, it's the MN that
6  I just talked about, and the possible mitotic spindle
7  malfunction.  These are different phenomena than simply
8  adaptive apoptosis, and that is a programmed or early cell
9  death.  This is a more specific cellular mechanism that is
10 not as simplistic as your question implies.
11     Q.  Dr. Sawyer, my question wasn't about this study.
12 My question was general.  If a cell cannot replicate, can --
13 if a cell cannot replicate, can carcinogenesis occur?
14          MR. TRAVERS:  Object to the form.
15 BY MR. KALAS:
16     Q.  In other words, if the cell is dead.
17     A.  Well, of course if the cell is -- is
18 nonfunctional, no longer an active cell but a dead cell,
19 that's true.
20     Q.  And when you've reviewed a lot of Monsanto emails,
21 and you've reviewed a lot of studies on Roundup®, and when
22 toxicologists like yourself use the word "toxic," do they
23 mean carcinogenic or do they mean toxic?
24     A.  Toxic, but unfortunately you're twisting the
25 study -- you're asking me --

William Sawyer, Ph.D.

Page 50

1    Q.  I'm not asking about the study.
2        MR. TRAVERS:  Objection, let him keep --
3        A.  It sure seems implied.  I mean, you're kind of
4    bordering the line here and mixing the study with your
5    questions.  And if you would like me to put the study away
6    and not address that -- I just want to be clear that you're
7    not implying that these --
8    BY MR. KALAS:
9        Q.  I'm just asking a question generally.
10       A.  Okay.
11       Q.  When a toxicologist like yourself uses the word
12   "toxic," do they -- does a toxicologist mean toxic or
13   carcinogenic?
14       A.  Toxic.
15       Q.  Okay.  And toxicity is different than
16   carcinogenicity under the rubric of toxicology in which
17   you've been trained, true?
18       A.  Well, "toxic" is a very general term, a term of
19   adverse effects.  Certainly toxic effects of the cell can be
20   noncarcinogenic or carcinogenic.  It depends on the agent
21   we're dealing with and the -- and the dose for that matter.
22       Q.  Right.  If somebody said, "Roundup® is more toxic
23   than glyphosate alone," they aren't saying in that
24   statement -- well, let me take that back and ask you.
25       A.  So you're --

Page 51

1        Q.  If you wrote --
2        A.  -- back to the study now.
3        Q.  If you wrote, "Roundup® is more toxic than
4    glyphosate alone," would you be talking about toxicity or
5    carcinogenicity?
6        A.  I would want to clarify that.
7        Q.  You'd be specific about carcinogenicity, true?
8        A.  I would.
9        Q.  Okay.  We may come back to Prasad, but I want to
10   make sure we keep moving here.
11       You're going to -- when you talk about the UK-POEM
12   model as a general applicator, are you going to tell the
13   jury that the applicators in the POEM model shared
14   similarities with any of the plaintiffs in this case?
15       A.  Yes.
16       Q.  Okay.  What are you going to tell the jury about
17   the similarities the applicators in the POEM model share
18   with the plaintiffs in this case?
19       A.  I would really have to answer that --
20       Q.  Plaintiff by plaintiff?
21       A.  Yes.
22       Q.  Sure.  Let's go plaintiff by plaintiff.  Let's
23   start with Mr. Wade.  What similarities are you going to
24   tell the jury -- let me back up and ask this question.
25       Do you intend in your direct to present a mg per

Page 52

1    kg value from the UK-POEM model to the jury?
2        A.  Yes.
3        Q.  Okay.  So since you intend to do that in this
4    case, let's get into that for a moment.
5        What number from the UK-POEM model are you going
6    to present to the jury in this case as far as a mg per kg
7    value?  And if it's different for each plaintiff, we can go
8    through each plaintiff one by one; but if you have one for
9    all five, that will make this go quicker.
10       A.  Well, I would have to go through and give you the
11   citations.  For example, the study of -- in Wade, footnote
12   48 --
13       Q.  What page, sir?
14       A.  It looks like page 20.
15       Q.  Okay.
16       A.  And I was referring to the Wumbei study,
17   W-U-M-B-E-I, where the glyphosate dose is 0.3 milligram per
18   kilogram body weight.
19       Q.  So I have Wumbei --
20       A.  Oh, I'm on Meeks.  I'm sorry.
21       Q.  Okay.  You're on Meeks.  Okay.  Let me -- let me
22   open Meeks.
23       A.  It's in -- it's in all of the reports.
24       Q.  All right.  So I'm looking at Wumbei, okay.  So
25   you're going to present a Wumbei -- a dose from the Wumbei

Page 53

1    study --
2        A.  With respect to farmer application.
3        Q.  Right, now that one, the Wumbei study, if I recall
4    correctly -- well, strike that.
5        Okay.  Does that study contain a mg per kg dose
6    you're going to present to the jury that you're going to
7    relate to the five plaintiffs in this case?
8        A.  Yes, with respect to 90 percent of the farmers in
9    that case --
10       Q.  Okay.
11       A.  -- never used masks, face shields, goggles, or
12   full respirators, and that less than 30 percent of the
13   farmers reported using impermeable clothing.
14       Q.  Okay.  So those are farmers, right?
15       A.  And also -- and that nine percent of the
16   farmers -- well, some other details, but that is just one
17   example of a milligram per kilogram per day dosage for
18   farmers --
19       Q.  Okay.  So is --
20       A.  -- and their conditions.
21       Q.  -- is Mr. Batiste a farmer?  Was he a farmer?
22       A.  I didn't say I was going to apply this to all --
23   all five plaintiffs.
24       Q.  Okay.  So that's what I'm trying to understand, is
25   for these five specific plaintiffs -- because Mr. Travers

William Sawyer, Ph.D.

## Page 54

1  has pointed out three or four times I need to ask questions
2  related to this case, and I'm trying to.  With these five
3  specific plaintiffs, which ones will Wumbei apply to?
4      A.  I would explain to the jury that Mr. Ashelman fits
5  the criteria in this case, and in Wumbei study where he sprayed once in the morning,
6  twice in the afternoon, and again in the evening.  However,
7  I would also point out to the jury that Mr. Ashelman wore
8  PPE, personal protective equipment, to a much greater degree
9  than in the examples in Wumbei study, and that I would not
10  expect Mr. Ashelman's cells to be as high as that recorded
11  in the Wumbei study.
12      Q.  Okay.  Are there any other applicators, the other
13  four plaintiffs in this case -- Mr. Wade, Mr. Batiste,
14  Mr. Meeks, and Mr. Stauffenberg -- who you will apply the
15  Wumbei mg per kg dose to?
16      A.  No.
17      Q.  Okay.  Any other studies in your report that you
18  intend to tell the jury about -- strike that.  Let me ask it
19  better.
20          Beyond the Wumbei mg per kg number which you'll
21  tell the jury is somewhat applicable to Mr. Ashelman, are
22  there any other mg per kg numbers in your report for
23  exposure and/or dose that you intend to tell the jury are
24  applicable to any of the five plaintiffs in this case?
25      A.  I will also explain that the acceptable operator

## Page 55

1  exposure level of 0.1 milligram per kilogram per day is
2  currently the reference dose used in multiple countries, and
3  it's -- there are studies that indicate that unprotected
4  home gardeners often exceed the dosage of that of actual
5  professional applicators.
6      Q.  Okay.  Let me unpack that for a minute.
7          So you intend to tell the jury that all -- for all
8  five plaintiffs that the -- about the acceptable operator
9  exposure level of .1 milligram per kilogram per day, right?
10      A.  Yes.  I'm going to explain it's not protective of
11  cancer.  It's designed as a non-cancer value based upon
12  reproductive toxicity in animals, and I'm not using it for
13  the purpose to determine whether it's a threshold for
14  cancer.  I'm explaining that it's simply an acceptable
15  operator exposure level throughout much of the world, and
16  it's not unusual for farmers to exceed that level.
17      Q.  Okay.  So appreciate that.  You're not going -- I
18  think you just said when I'm going to next, which is you're
19  going to tell the jury that it's not unusual for -- now, you
20  said earlier "home gardeners," and now you just said
21  "farmers" --
22      A.  Well --
23      Q.  -- so let me make sure I understand what you're
24  going to tell me.
25      A.  -- both.

## Page 56

1      Q.  Okay.  So you're going to tell the jury that it's
2  not unusual for individuals to exceed the  1 milligram per
3  kilogram per day AEOL, right?
4      A.  That's right.
5      Q.  Okay.
6      A.  I may even point to some Monsanto documents with
7  respect to the 0.1 being a level which is encountered, for
8  example, in the Spanish registration study.
9      Q.  Okay.  And you're going to tell the jury that
10  about all five plaintiffs, right?
11      A.  Tell what about --
12      Q.  That it's not unusual to exceed the .1 mg per kg
13  per day level in the way the five plaintiffs were applying
14  in this case, right?
15      A.  Yes.
16      Q.  Okay.  So I want to know what study at trial,
17  beyond Wumbei for Mr. Ashelman, you're going to point to to
18  tell the jury that's the dose that's like what Mr. Batiste
19  was exposed to, what Mr. Meeks was exposed to.  And if there's
20  not going to be a study, that's fine too, but I need to
21  understand that so I can ask you questions about those
22  specific plaintiffs, sir.
23          MR. TRAVERS:  Objection, compound, asked and
24  answered.
25          MR. KALAS:  Has not been answered.

## Page 57

1          MR. TRAVERS:  He just said the Spanish operators
2  study or the Spanish registration study.
3          MR. KALAS:  That's --
4  BY MR. KALAS:
5      Q.  Can you answer my question, sir?
6      A.  No, it was actually --
7      Q.  Too -- too complicated?
8      A.  -- way too complicated.
9      Q.  Okay.  So you mentioned that there are studies
10  that exceed, in your opinion, the AOEL of .1 mg per kg per
11  day in the data set you've reviewed, right?
12      A.  Yes.
13      Q.  Okay.  And you intend to tell the jury for all
14  five plaintiffs about these studies, right?  In other words,
15  you're going to say that these studies that show the
16  hypothetical exceedance apply to each plaintiff.
17      A.  Yes.
18      Q.  Okay.  So I want to know -- and you can look at
19  your materials considered list, or you can look at your
20  report, whatever you want to look at -- which studies you're
21  going to tell the jury about exceeding the .1 mg per kg per
22  day as it applies to the plaintiffs in this case.
23          MR. TRAVERS:  Objection, asked and answered.
24      A.  I may refer to the Operator Exposure Guidance for
25  Amateur (Home Garden) Pesticides.  I think that in Meeks'

William Sawyer, Ph.D.

Page 58

1  footnote 263. So that would be one document.
2      Another document that I have used which calculates
3  dose among various modes of application I believe is
4  Johnson, but let me just check.
5      And, again, I'm referring to studies that are in
6  my report. I'm not referring to anything new. And there
7  are multiple studies in my report I believe that address
8  this question. My report is documented with several hundred
9  references so it's difficult for me to memorize them all.
10 BY MR. KALAS:
11     Q. I'm certainly not asking you to do that. What I'm
12 asking you to do, because your -- and, again, I'll
13 characterize them as notes. Your notes don't set out which
14 of these generic dosing studies you are going to apply to
15 each plaintiff or to all the plaintiffs so I need to
16 understand that.
17     A. All right. I think --
18     MR. TRAVERS: Objection. Was that a question?
19     MR. KALAS: I need to clarify what I'm getting at
20 here so he can answer the question.
21     MR. TRAVERS: Okay.
22     MR. KALAS: -- better, Jeff.
23     MR. TRAVERS: Well, objection, asked and answered.
24     MR. KALAS: Okay.
25     A. Johnson, et al --

Page 59

1  BY MR. KALAS:
2      Q. Okay.
3      A. -- footnote 114 in Meeks, operator exposure when
4  applying amenity herbicides --
5      Q. Okay.
6      A. -- I believe that's the right study. Without
7  seeing it it's a little difficult.
8      Q. Are there any other studies on your -- now, you
9  said Meeks 263, right, footnote 263?
10     A. I'd have to go back and check that.
11     Q. Sorry. I just opened Meeks.
12     A. 263, yes.
13     Q. Okay. So that's Nielsen 2007 in my copy of Meeks.
14 Are you working off the same songbook?
15     A. I'm on the Meeks report.
16     Q. Yeah, that's what I'm on too.
17     A. Footnote 263.
18     Q. Nielsen 2007.
19     A. That's not good. That's not what I'm showing.
20     Q. Okay.
21     A. That's strange.
22     Q. Why don't you give me the citation, sir.
23     A. 263 -- footnote 263 on page 143.
24     Q. I'm on page 119 of Meeks.
25     A. Oh, you know what? I'm sorry. The -- I see what

Page 60

1  the problem is. I'm looking at the reference list, which is
2  simply numerical order --
3      Q. So not footnote 263, reference 263.
4      A. Right.
5      Q. Okay. Okay. Better.
6      Okay. You're talking about Operator Exposure
7  Guidance for Amateur (Home Garden) Pesticides, right?
8      A. Yeah.
9      Q. That's a -- that's a website, right?
10     A. Right.
11     Q. That website does not contain any dosing
12 information for glyphosate, true?
13     A. No, but it's -- out of memory, it seems to me it
14 may have addressed the similarities of home gardeners versus
15 applicators because of the increased lack of protection
16 among home gardeners.
17     Q. Okay. But my question is not about that, sir.
18 And I understand that you have some general points you want
19 to make. I -- what I'm trying to understand, and I think
20 I've got from you so far, the Spanish applicator study,
21 which is Bleeke 2007, correct?
22     MR. TRAVERS: Objection, form.
23     A. Yes.
24 BY MR. KALAS:
25     Q. Okay. The Johnson 2005 study and this UK website

Page 61

1  and Wumbei. Are there any other studies that have come up
2  with a mg per kg dose that you're going to show up at trial
3  and tell the jury are similar to the plaintiffs' exposure
4  profile so they can apply that mg per kg dose to the
5  plaintiffs?
6      MR. TRAVERS: Objection, asked and answered.
7  BY MR. KALAS:
8      Q. I want to make sure it's fully answered. If it's
9  fully answered, then we're good.
10     A. Well -- okay. The next one would be reference
11 number 132 in Meeks, which is Machado-Neto, and it's --
12     Q. Machado-Neto.
13     A. -- M-A-C-H-A-D-O, hyphen, N-E-T-O --
14     Q. Okay.
15     A. -- year 2000.
16     Q. Okay. Any others, sir?
17     A. I believe there are.
18     Q. Okay.
19     A. And I have several hundred references here, and as
20 I said, I don't have them all memorized.
21     Q. I just need to understand, sir, if there are any
22 other mg per kg doses you're going to apply to the
23 plaintiffs in this case. If you can't recall any others
24 sitting here today, then we can move on.
25     A. Well, the problem with that is it's -- it doesn't

16 (Pages 58 to 61)

William Sawyer, Ph.D.

1  mean there aren't more  It means you're --
2      Q  That's -- that's a problem  That is a problem  I
3  agree  So I need to understand your opinions, sir
4      A  On page 57 of Meeks --
5      Q  Okay
6      A  -- possibly -- again, I'd have to look to verify,
7  but possibly reference 146, which is the --
8      Q  Lesmes-Fabian study
9      A  Yes
10     Q  Okay
11     A  147, Curwin
12     Q  Okay
13     A  Possibly reference -- I'm sorry, footnote 151
14     Q  151 is about take-home pesticide exposure to
15  children living in agricultural areas?
16     A  Yes
17     Q  Okay  Any children plaintiffs in this case?
18     A  Yes, exposure to Mr Stauffenberg as a child
19     Q  Okay
20     A  Possibly the communication from James (sic) Costa
21  I don't know that I have the --
22     Q  What citation is that, sir, or what page?
23     A  It's on page 103 in Meeks, but I don't know that I
24  have an MON number  It could be MONGLY02155830, but I'm
25  not --

1      Q.  Okay.
2      A.  -- positive.
3      Q.  And that's an email you're going to rely on to
4  present that data to the jury?
5      A.  As I said, possibly.
6      Q.  Okay.
7      A.  Possibly.  There may be more in that email than
8  what's showing in my report.
9      Q.  Okay, sure.  But you're not sure sitting here
10  today without seeing the email?
11     A.  I think it's possible.
12     Q.  Again --
13     A.  Probable.
14     Q.  Probable, okay.  Now we're at probable.
15     A.  Yeah.
16     Q.  Okay.  So you're going to present a mg per kg
17  number, if it's in that email, to the jury; and though you
18  can't remember what that email says, you think it relates to
19  the plaintiffs right now?
20         MR. TRAVERS:  Objection, form, compound, misstates
21  his testimony.
22     A.  That's a pretty demanding question.  I literally
23  have 10,000 pages of studies and Monsanto documents in this
24  case, and I just can't remember specifically what's in that
25  document.  I think it's a reasonable position to be in.

1  BY MR. KALAS:
2      Q.  Okay.  So let me try to make the record clear
3  here.  Sitting here today, can you recall all of the studies
4  that assess a mg per kg dose generically that you will apply
5  to plaintiffs in this case?
6      A.  Yes.
7         MR. TRAVERS:  Objection, asked and answered.
8      A.  Yes, they're in my report.
9  BY MR. KALAS:
10     Q.  Okay.  So any generic study that has a mg per kg
11  dose is in your opinion, sitting here right now, fair game
12  for you to talk about as it applies to a particular
13  plaintiff in this case?
14        MR. TRAVERS:  Objection, form.
15     A.  That question I really don't understand.
16  BY MR. KALAS:
17     Q.  Okay.
18     A.  It sounds like a legal question.
19     Q.  We've been going around and around for 30 minutes
20  on this, and I really need to just understand what you're
21  going to tell the jury because I don't want to be surprised
22  at trial.  I know nobody else wants to be surprised at
23  trial.
24         Very simply, you have not calculated specifically
25  a mg per kg dose for any of the five plaintiffs in this

1  case, right?
2      A.  Correct.
3      Q.  And you don't intend to do so, right?
4      A.  Correct.
5      Q.  But you do intend to tell the jury that certain
6  studies apply to the plaintiffs in this case that were --
7  calculated a generic mg per kg dose, correct?
8      A.  Yes.  It's well-established that application
9  practices and durations under certain conditions of lack of
10  or with PPE result in a reasonable range of dose.
11     Q.  But there are certain studies like Wumbei which
12  would only apply to certain plaintiffs in this case, right?
13     A.  Yes.
14        MR. TRAVERS:  Objection to form, asked and
15  answered.
16  BY MR. KALAS:
17     Q.  There are other studies that maybe have an
18  applicator in a closed cab system using a closed mixing
19  system that would apply to none of the plaintiffs in this
20  case in your opinion, right?
21     A.  No, I disagree.  The Spanish study enclosed cab
22  tractor would offer more protection than an open cab, and
23  thus it would -- it still would be a reasonable comparison.
24     Q.  Okay.  So you think -- okay.  Okay.
25     A.  Because it would underestimate the dose.

17 (Pages 62 to 65)

William Sawyer, Ph.D.

## Page 66

1  Q   So it's your -- sitting here today, any study
2  discussed in your report that involves a mg per kg dose
3  you -- you may apply to a particular plaintiff in this case?
4      MR TRAVERS:  Objection, asked and answered
5  A   No, that doesn't quite make sense, that question
6      I think in terms of dosage to an applicator, one
7  has to consider in this case what each applicator was doing,
8  how that person was dressed, whether the equipment was
9  leaking -- there's so many factors  And all I can do is --
10  as a toxicologist is rely on the Monsanto internal documents
11  that have assessed exposure, the peer-reviewed studies that
12  have assessed exposure, and governmental agencies that have
13  assessed exposure, and provide a reasonable range
14  BY MR KALAS:
15  Q   Okay
16  A   I'm not going to try to assess each individual's
17  milligram per kilogram per day exposure dose because that's
18  not even possible without running the POEM model specific to
19  each person, but what I can do with these studies is at
20  least provide a reasonable range of what's been published in
21  the literature and in the various Monsanto studies
22  Q   Are you going to tell the jury about the operator
23  exposure assessment using the UK-POEM model and MON 2139
24  discussed on page 24 and 25 of your report?
25  A   Yeah  Although I do not have the milligram per

## Page 67

1  kilogram per day rate listed in my report, I'm familiar with
2  it
3  Q   Okay  And do you intend to tell the jury that the
4  milligram per kilogram per day rate in that document applies
5  to some or all of the plaintiffs in this case?
6  A   The only one it would really apply to specifically
7  would be Mr Ashelman because Mr  Ashelman was protected in
8  a similar manner  In this case -- well, actually, these are
9  even more protected  In the MON 2139 study, coveralls were
10  worn  Mr Ashelman wore blue jeans  He didn't have
11  coveralls  However, he did -- and he did not have a
12  waterproof jacket as in this study or waterproof trousers
13  So actually this study would underestimate all of the
14  plaintiffs' -- all five plaintiffs' dosage
15  Q   So if you got up on the stand and talked about
16  that study on pages 24 to 26 of your Meeks report, the MON
17  2139 study, you would tell the jury, if I understand what
18  you're saying correctly, that all five plaintiffs likely had
19  a dose higher than what was calculated in that study, right?
20  Is that what you're saying?
21  A   No
22  Q   Okay
23  A   No, I'm just stating that in this case, in 2139,
24  that the Monsanto sprayers who were in this study were far
25  more protected than that of even Mr  Ashelman, who was the

## Page 68

1  most protected plaintiff out of the five.  When I say,
2  "protected," based on personal protective equipment.
3      Q.  Let me see if I can short-circuit this then.
4  Given the dataset that's out there on exposure and
5  biomonitoring, passive dosimetry, taking this study for
6  example, this MON 2139 study, you would tell the jury what
7  the mg per kg number was in that study, right?
8      A.  If it's there.
9      Q.  Okay.
10      A.  I'm not -- I don't recall if it was reported or
11  not.
12      Q.  And then you would tell the jury that the
13  operators in the study had more personal protective
14  equipment than any of the five plaintiffs in this case,
15  correct?
16      A.  Yes.
17      Q.  But you would not tell the jury that therefore the
18  jury should assume the exposure and/or dose to plaintiffs
19  was higher than the study.  That's something you're not
20  going to say.
21      MR. TRAVERS:  Objection, compound, form.
22      A.  I'm not sure I understand that last part of the
23  question.
24  BY MR. KALAS:
25      Q.  Are you going to tell the jury that because the

## Page 69

1  operators -- Mr Batiste, Mr Ashelman, et cetera -- in this
2  case wore less personal protective equipment than the
3  operators in the MON2319 study, or any other study in the
4  dataset, that the dose to those operators -- Mr Batiste,
5  Mr Ashelman -- was likely higher than the dose to the
6  operators wearing the personal protective equipment?
7      A   If -- if the dose in 2139 was measured on patches
8  underneath the protective clothing, then yes
9      Q   Okay
10      MR KALAS:  All right  Let's go off the record
11      THE VIDEOGRAPHER:  We are going off the record
12  The time is 9:39
13      (Recess from 9:39 a m  to 9:51 a m )
14      THE VIDEOGRAPHER:  We're back on the record  The
15  time is 9:51 a m  This begins media unit number 2
16  BY MR KALAS:
17      Q   All right, Doctor, let's go to Mr Wade for a bit,
18  if you can open up that report  And, again, we have the
19  hard copies coming at some point, but I'm going --
20      A   So --
21      Q   -- to ask --
22      A   -- so you're done asking questions on the -- the
23  studies that I would be relying on, right?
24      Q   No, but I'm going to turn to Mr  Wade for a bit --
25      A   All right

18  (Pages 66 to 69)

William Sawyer, Ph.D.

|  | Page 70 |
|---|---|

1  Q. -- specifically.
2  A. Because I was --
3  Q. Do you have an answer you need to clarify?
4  A. Well, that there's more than one MONGLY document.
5  There are a number of them I could cite right now --
6  Q. Okay.
7  A. -- that are possible candidates. One in
8  particular is -- is --
9  Q. You can just give me the MONGLY number.
10  A. Yeah. And, again, I -- some of them are hits;
11  some are misses. MONGLY00154342 --
12  Q. Okay. And that is an assessment, I know even
13  without looking at the document, of 1,4-Dioxane in people,
14  not glyphosate in people, right?
15  A. It is, but there might -- might have been a
16  comparison. That's what I'm not sure about.
17  Q. And so when you say some are hits and some are
18  misses, what you mean is you're not really sure right now
19  which ones are the, quote, unquote, hits that you're going
20  to talk to the jury about?
21  A. Right. I know that I have some other MONGLY
22  documents that discuss dosage under certain conditions, but
23  I don't recall which number documents they are.
24  Q. Can I ask you a question? And I don't mean this
25  to cast aspersions in any way. How am I supposed to

|  | Page 72 |
|---|---|

1  A. Actually, the Acquavella, reference 7, leukocyte
2  biomonitoring --
3  Q. Right.
4  A. -- or -- and I think it's number 7, but there's a
5  figure that shows ranges of dosage, and I may also refer to
6  that. Although I'm not sure how accurate that study is
7  because it might be based on urinary secretion only under
8  the assumption of 100 percent urinary excretion.
9  Q. Okay. But just to be clear, you said something in
10  the last statement that I want to make sure is clear for the
11  record. And, again, not casting aspersions. Sitting here
12  today, you're not prepared to tell me which specific studies
13  you will compare to plaintiffs as far as mg per kg doses,
14  correct?
15  MR. TRAVERS: Objection, asked and answered. He
16  just told you which studies.
17  A. I'm not going to be providing the dose
18  calculations specific to each plaintiff. Rather, I am going
19  to provide the range of dosage in the studies that pertain
20  to specific application practices and personal protective
21  equipment, or lack of, such as the home gardeners in shorts
22  and short-sleeved shirts. So I am going to provide that
23  information of what's been generally accepted and published
24  in the literature, and by Monsanto in their own memos, and
25  provide a range of the dosage under certain conditions.

|  | Page 71 |
|---|---|

1  evaluate whether or not these studies relate to the
2  plaintiffs in this case if you can't identify, sitting here
3  today, which studies you're going to rely on to generalize a
4  dose for the plaintiffs in this case?
5  MR. TRAVERS: Objection, form, compound. You
6  can't speak to how you're going to analyze stuff.
7  A. Really the best approach is if I were to simply
8  say, look, there's -- if you go to the reference section of
9  my report, and look at the list of MONGLO (sic) documents,
10  and that's in the Meeks report on page 138 to 141, some of
11  those documents are responsive to the question.
12  BY MR. KALAS:
13  Q. Okay.
14  A. Now, I'm not prepared to tell you which one of
15  those documents are, but at least I am pointing to the
16  documents that I know in part contain answers to the
17  questions in terms of --
18  Q. Okay.
19  A. -- dosage under certain conditions.
20  The other document that is in the back of my mind,
21  it's possible that Andreotti provided a figure in the
22  study -- I can give you the full name of the Andreotti
23  study.
24  Q. It's the AHS epidemiology study, correct? Or are
25  you thinking of Acquavella?

|  | Page 73 |
|---|---|

1  BY MR. KALAS:
2  Q. And you'll tell -- you'll tell the jury that,
3  depending upon the type of application, the PPE worn, that
4  those studies are either comparable or underestimate the
5  exposure of a particular plaintiff in this case?
6  A. Right.
7  Q. Okay.
8  A. In this case we have at least one plaintiff who
9  was exposed in an extraordinary fashion.
10  Q. Okay. And that's who, sir?
11  A. Mr. Batisee.
12  Q. Batiste. Batiste/Batisee? Am I mispronouncing
13  that?
14  A. Batiste.
15  Q. Okay. And why do you describe Mr. Batiste -- I
16  know we said we're going to talk about Wade, and of course
17  we haven't yet. Why do you say Mr. Batiste's exposure was
18  extraordinary?
19  A. I made an error. Mr. Meeks rather.
20  Q. Mr. Meeks, okay.
21  A. Yes.
22  Q. Why do you say Mr. Meeks' exposure was
23  extraordinary?
24  A. Because he was frequently a wetback (sic). He had
25  so much leakage his shirt, due to leakage, would saturate

19 (Pages 70 to 73)

William Sawyer, Ph.D.

Page 74

1  his pants and arms and -- and his shirt, and he would
2  continue to work under those conditions without showering
3  immediately.
4      Q.  Okay.  So because he had a leaking backpack
5  sprayer that soaked his shirt, according to Ms. Meeks'
6  testimony, and he did not shower immediately, he had an
7  extraordinary exposure to Roundup®?  That's your opinion?
8      A.  Based on the description, yes.
9      Q.  Okay.  We'll get to Mr. Meeks later in the
10  deposition.  Let's turn to Mr. Wade, okay?
11      A.  Okay.
12      Q.  All right.  So did you have a conversation with
13  Mr. Wade about his use of Roundup®?
14      A.  Yes.
15      Q.  Okay.  And when was that?
16      A.  Yesterday.
17      Q.  Okay.  And was that telephonic or in person?
18      A.  Telephonic.
19      Q.  Okay.  And about what time yesterday did you talk
20  to him?
21      A.  After -- late afternoon.
22      Q.  Late afternoon, okay.
23          And who was on the phone call you had with
24  Mr. Wade?
25      A.  Chris Wade.

Page 75

1      Q.  Okay.  Nobody else?  Jim Clark wasn't on taking
2  notes?
3      A.  No.
4      Q.  Who took the notes on the call?
5      A.  I -- I just took the information directly.  I was
6  trying to finish my report, and I had some outstanding
7  questions.
8      Q.  Okay.  Prior to yesterday, had you spoken to
9  Mr. Wade at all?
10      A.  No.
11      Q.  Okay.  Was Mr. Travers on the call?
12      A.  No.
13      Q.  Okay.
14      A.  No one else was on the call.
15      Q.  Was Mr. Travers in the room while you were on the
16  call?
17      A.  No, only my --
18      Q.  Dog?
19      A.  -- my -- what should we call -- the office support
20  staff.
21      Q.  Dogs?
22      A.  Two.
23      Q.  Yeah.  They've been there for your experiments
24  too.
25      A.  I was going to bring the golden retriever here for

Page 76

1  the deposition.  She has a little jacket.  She's CG
2  certified, therapy training --
3      Q.  There you go.
4      A.  -- certified, yeah.
5      Q.  All right.  Now, prior to the call you had with
6  Mr. Wade, he was deposed under oath, right?
7      A.  He was.
8      Q.  Okay.  And you note in your notes here that that
9  was a lengthy deposition, right?
10      A.  Definitely.
11      Q.  364 pages?
12      A.  Well, I think it was 354 up to the point where
13  the --
14      Q.  Index?
15      A.  -- index and other junk starts.
16      Q.  You note that it covered considerable detail,
17  right?
18      A.  "Other junk."  She's laughing.
19          I'm sorry.
20      Q.  No worries.
21      A.  I don't mean to insult the court reporter.  It's
22  of course not junk but --
23      Q.  You know that it covered considerable detail,
24  right?
25      A.  Yes.

Page 77

1      Q.  Okay.  And that deposition was last year, correct?
2      A.  Yes.
3      Q.  And his attorneys were present at the deposition,
4  right?  Mr. Wade's attorneys.
5      A.  Yes.
6      Q.  They had an opportunity to ask Mr. Wade questions
7  at the deposition, true?
8      A.  Yes.
9      Q.  And another thing Mr. Wade did is he served the
10  plaintiff a fact sheet, correct?
11      A.  Correct.
12      Q.  And he served that under penalty of perjury,
13  right?
14      A.  Yes.
15      Q.  And he took an oath prior to taking his -- being
16  deposed, right?
17      A.  Yes.
18      Q.  And he gave his deposition under the penalty of
19  perjury, right?
20      A.  Yes.
21      Q.  And when he spoke to you, did you have an officer
22  of the court there to come in to swear him in?
23      A.  Yes, Bella and Teddy.
24      Q.  I appreciate the humor but --
25      A.  They don't lie.

20  (Pages 74 to 77)

William Sawyer, Ph.D.

Page 78

1    Q.  Okay.  I appreciate the humor, but I'll ask the
2  question again because I think the answer was -- was meant
3  in jest.
4        When Mr. Wade spoke to you, did you have an
5  officer of the court there to come in to swear him in?
6    A.  No.
7    Q.  Okay.  And did you have a court reporter sitting
8  there like we have today to create an official transcript of
9  what was said?
10    A.  No.
11    Q.  And in the Roundup® litigation, it's been your
12  practice to conduct these interviews with plaintiffs if
13  they're still living, right?
14    A.  Yes.
15    Q.  Okay.  And it has also been your practice in the
16  Roundup® litigation not to record these conversations on
17  cassette tape or on videotape, right?
18    A.  That's correct.
19    Q.  Okay.  And so there's no official record, beyond
20  the notes you took down, of what was said on the -- on the
21  conversation you had with Mr. Wade, correct?
22    A.  That's correct.
23        MR. TRAVERS:  Object to the form.
24  BY MR. KALAS:
25    Q.  Okay.  All right.  So let's look at what

Page 79

1  Mr. Wade -- well, let me back this up.
2        How long was your conversation with Mr. Wade
3  yesterday?
4    A.  Oh, very, very brief.
5    Q.  How long?
6    A.  I -- I would be surprised if it were even ten
7  minutes.
8    Q.  Okay.
9    A.  I had found almost everything I needed in the
10  deposition and the plaintiff fact sheets and medical
11  records.  I only had basically one question.
12    Q.  Okay.  And what was that question, sir?
13    A.  I asked him to really think back hard and try to
14  remember what other chemical products or home-garden-type
15  products or any chemical products such as paints and so
16  forth he had used in the past and identify the product, and
17  then I went on and asked him about usage for such products.
18    Q.  Okay.  So the conversation was yesterday, right?
19    A.  Yes.
20    Q.  Still fresh in your mind?
21    A.  Yes.
22    Q.  Okay.  So can you walk me through the specific
23  questions you would have asked him?
24    A.  Yeah.  I started with his work, are there any
25  chemical products that you've used in your line of work,

Page 80

1  including sprays, liquids, powders, and any cleaning agents
2  that contain solvents and so on.  And his only response was
3  DW-40.
4    Q.  WD-40?
5    A.  Yeah, WD-40 rather.  And then I questioned him
6  regarding the frequency of use and how it was used, and he
7  explained that he used it at the most once a month, and just
8  a brief squirt on a part he was working on.
9    Q.  Did you ask him what he used -- he was a
10  maintenance man on apartment buildings, right?  And on
11  commercial properties --
12    A.  Yes.
13    Q.  -- correct?
14    A.  Yes.
15    Q.  Okay.  Did you ask him what he used to kill
16  crabgrass?
17    A.  I didn't ask him specifically crabgrass, but I did
18  ask specifically about home garden and lawn products.
19    Q.  Okay.  You can't use glyphosate to kill crabgrass,
20  right?  Because it will kill your other grass.
21    A.  It will kill it all, yeah.
22    Q.  Okay.  So you didn't ask him specifically if you
23  had crabgrass on the property, what did you use to kill it?
24    A.  I did not.
25    Q.  Okay.  Did you ask him specifically what he used

Page 81

1  to strip paint or wallpaper off the wall?
2    A.  I did ask him if he used paint stripper ever --
3    Q.  Okay.
4    A.  -- and he said no, he did not, but he did go on
5  and volunteer that he had used paints.  And I asked what
6  type of paints, and he explained latex paint.
7    Q.  Did you ask him if he ever painted the exterior of
8  the building?
9    A.  I asked him what -- what he painted and -- and it
10  was interior, but I didn't specifically ask about exterior.
11    Q.  Okay.  And you wouldn't use latex paint generally
12  on the exterior of a building, correct?
13    A.  I'm not sure.  I don't know what polymers are in
14  exterior paint.
15    Q.  Okay.  Did you ask him if he had ever been exposed
16  to -- or strike that.
17        Did you ask him if he ever used leaf blowers, lawn
18  mowers, that sort of thing?
19    A.  I did.
20    Q.  Okay.  What did he say?
21    A.  He described, in fact, using gasoline --
22    Q.  Okay.
23    A.  -- but nothing extraordinary or abnormal.
24    Q.  Were these two-stroke or four-stroke engines?  Did
25  you ask that?

21 (Pages 78 to 81)

William Sawyer, Ph.D.

Page 82

1    A.  No.
2    Q.  Okay.  Is there a difference between two-stroke
3    and four-stroke engines as to the amount of PAHs excreted
4    from them?
5    A.  Yeah, the two strokes are certainly more
6    significant pollutant emitters of PM 10 and PM 2.5.
7    Q.  Okay.  And PM 10 and PM 2.5 contain PAHs, correct?
8    A.  Yes.
9    Q.  Okay.  And PAHs, in your opinion, are associated
10   with NHL, correct?
11   A.  Yeah.
12   Q.  Certain ones.
13   A.  Certain ones, yeah.
14   Q.  Okay.  Did you ask him about his diet?
15   A.  No, I didn't.
16   Q.  Okay.  Did you ask him about -- strike that.
17       Did you ask him what he used to kill rodents in
18   the buildings?
19   A.  No.
20   Q.  Okay.  Did you ask him what he used to treat for
21   termites?
22   A.  Termites, no.  I asked him in general -- and this
23   does sort of cover it.  I asked what insecticides, if any,
24   he used.
25   Q.  Okay.  Did you have an understanding of whether or

Page 83

1    not he understood insecticides to include termite killers?
2    Did you make sure to specify that?
3    A.  No, but I did ask insecticides, and he stated
4    Raid, Ortho bug killer, and that's all he could remember.
5    Q.  Do you know if Mr. Wade ever treated a building he
6    worked at for termites?
7    A.  No, I don't know.
8    Q.  Do you know if Mr. Wade ever treated a building he
9    worked at for rodent infestation?
10   A.  No, but I'm not sure what the relevance is with
11   respect to rodent infestation and contracting NHL.  I don't
12   believe there's any connection.
13   Q.  Well, you don't know then if he used any
14   rodenticides.
15   A.  Well, he's not going to use methylene chloride
16   to -- as a rodenticide.  I mean, rodenticides contain an
17   anticoagulant, which is a noncarcinogenic chemical that
18   causes massive hemorrhaging and intraperitoneal bleed to the
19   animal, and that is irrelevant to NHL.
20   Q.  Do you know if he used rodenticides, sir?
21   A.  No, but I'm being rather helpful for you to
22   understand that what you're asking is irrelevant and just
23   plain silly.
24   Q.  Okay.  Do you know if he used MCPA to fertilize
25   and/or treat grass?

Page 84

1    A.  I did not ask him specifically.  I asked him what
2    he used --
3    Q.  Okay.
4    A.  -- in treating grass, and he didn't have any
5    recollection of treating grass with any chemical products.
6    Q.  Okay.  When you asked him about solvents, did you
7    specify what solvents were when you asked him that question?
8    A.  Yes.
9    Q.  Okay.  How did you specify what solvents were?
10   A.  Cleaning solvents and degreasers.
11   Q.  So when you say "cleaning solvents and
12   degreasers," did you give some examples of particular
13   products?
14   A.  I don't think I did.
15   Q.  Okay.  Do you know if Mr. Wade understood what a
16   degreaser is?
17   A.  I'm not sure.
18   Q.  Okay.  Do you know if Mr. Wade understood what a
19   cleaning solvent is as opposed to a cleaning product?
20   A.  No, no, I can't answer that.  You'd have to ask
21   him.
22   Q.  Okay.  You didn't follow up to make sure in your
23   conversation yesterday he understood what you meant by
24   those?
25       MR. TRAVERS:  Objection, form.

Page 85

1    A.  No.
2    BY MR. KALAS:
3    Q.  Okay.  All right.  ████████████████████
     ████████████
5    A.  Today?
6    Q.  Yes, sir.
7    A.  Yes.
8    Q.  Okay.  And he was diagnosed with follicular
9    lymphoma in 2010, right?
10   A.  Yes.
11   Q.  ████████████████████████?
12   A.  Yeah.
13   Q.  Okay.  And do you know anything, sitting here
14   today, about his current prognosis?  And by "current
15   prognosis" I mean his lymphoma prognosis.
16   A.  No, I know it was a B-cell lymphoma.  You know,
17   he's had hypogammaglobulinemia posttreatment with the
18   chemotherapy, which from a toxicological standpoint is not
19   surprising because the chemotherapy can be associated with
20   immunologic toxicity later on if it's persistent.  He also
21   has recurrent sinus infections --
22   Q.  Okay.
23   A.  -- enlarged left carotid, and so I'm not going to
24   opine on his prognosis.
25   Q.  Okay.  So do you have any knowledge right now

22 (Pages 82 to 85)

William Sawyer, Ph.D.

| | |
|---|---|
| **Page 86** | **Page 88** |

**Page 86**

1  whether his lymphoma is active or indolent?
2      A.  No, I defer that to the oncologist.
3      Q.  Are you offering any opinions about his treatment?
4      A.  No.
5      Q.  Okay.  Are you offering any opinions about his
6  pain and suffering?
7      A.  No.
8      Q.  Okay.  And I think you already said you're not
9  offering any opinions about his prognosis going forward.
10     A.  That's correct.
11     Q.  Okay.  Now, it's true, isn't it, that there are
12  ████████ in this country who are diagnosed with
13  follicular lymphoma who have never used Roundup® a day in
14  their life?
15     A.  Correct.
16     Q.  Okay.  And just because Mr. Wade used Roundup®
17  does not mean, in and of itself, that his NHL was caused by
18  his Roundup® use, correct?
19     A.  Could you repeat that?
20     Q.  Sure.  Just because Mr. Wade used Roundup® does
21  not mean, in and of itself, that his NHL was caused by his
22  Roundup® use.
23         MR. TRAVERS:  Objection to form.
24     A.  No.  I would have to calculate his exposure,
25  compare that to the human study data thresholds, to render

**Page 87**

1  such an opinion.  Your question is too general to answer.
2  BY MR. KALAS:
3      Q.  Okay.  Well, you said "no," and then you said the
4  question is too general.  So --
5      A.  Well --
6      Q.  -- I want to make sure -- I want to make sure that
7  you're representing your opinion on the record here.
8         The question is just because somebody is exposed
9  to Roundup®, and in this case Mr. Wade is exposed to
10  Roundup®, and afterwards gets NHL, does not mean, in and of
11  itself, that the exposure caused the NHL, correct?
12         MR. TRAVERS:  Objection, asked and answered.
13         MR. KALAS:  There's two answers so I'm
14  trying to --
15         MR. TRAVERS:  His answer is on the record.
16     A.  Correct.  However, I need to clarify that that is
17  analogous to me using paint stripper in 1974, and that
18  one-time use would be insufficient, even if I had been
19  exposed to methylene chloride, to associate with NHL.
20  However, if I used paint stripper with methylene chloride to
21  a frequency consistent with human studies that show, you
22  know, a double -- doubling of the risk, then that could
23  result in a different opinion.  So the dose is very
24  important, and your question is not considering that.  So
25  it's difficult to comprehend what you're asking me.

**Page 88**

1  BY MR. KALAS:
2      Q.  That's a really important point.  Just because a
3  plaintiff like Mr. Wade is exposed to something that is
4  considered to be a carcinogenic hazard, it does not mean
5  that their cancer is caused by that carcinogenic hazard.
6  You need to take into account dose.  Right?
7         MR. TRAVERS:  Objection, form, compound.
8      A.  Yeah, there's several questions there.  Yes.
9  BY MR. KALAS:
10     Q.  All right.  Now, Mr. Wade worked in and around the
11  St. Louis area, correct?
12     A.  Yes.
13     Q.  Okay.  And you haven't visited any of the sites
14  where Mr. Wade applied herbicides, right?
15     A.  No.
16     Q.  You're not going to tell the jury that there was
17  bounce-back from buildings he was applying near without
18  looking at those buildings and examining wind patterns,
19  correct?
20         MR. TRAVERS:  Objection, form.
21     A.  If I were given a hypothetical, I could answer
22  that, but I'm not going to just make any assumptions, no.
23  BY MR. KALAS:
24     Q.  Okay.  So -- not sure if I understand that so let
25  me make sure I understand.

**Page 89**

1         When you're testifying about Mr. Wade, are you
2  going to say there was bounce-back from buildings he was
3  applying near of Roundup®?
4         MR. TRAVERS:  Objection, asked and answered.
5         MR. KALAS:  It wasn't.
6      A.  No.  However, I may respond to certain
7  hypotheticals.
8  BY MR. KALAS:
9      Q.  Okay.  So tell me a hypothetical you'd respond to
10  on that.  What do you have in mind?
11     A.  It's so vague I can't really identify -- you're
12  asking me to kind of create direct examination questions.
13  I'd have to leave that for the lawyers.
14     Q.  Okay.  So let me ask you specifically.  Are you
15  going to tell the jury you know that there was bounce-back
16  from buildings that Mr. Wade applied near?
17     A.  Am I going to testify to that?
18     Q.  Yes, sir.
19     A.  No, no, I don't have any direct knowledge of that.
20     Q.  Okay.  And you're not -- so -- okay.
21         Now, I'm going to mark as Exhibit 10 an amended
22  PFS of Mr. Wade.
23         (Exhibit 10 marked for identification.)
24  BY MR. KALAS:
25     Q.  Have you seen this document before?

23 (Pages 86 to 89)

William Sawyer, Ph.D.

Page 90

```
 1    A.  I'm not finding the date.
 2    Q.  It's near the back where he signed.
 3    A.  Well, let's see --
 4    Q.  Page 12.
 5    A.  -- is there a signature?
 6    Q.  Page 12.
 7    A.  Oh, I see, it's not the last page.
 8    Q.  Yeah.
 9    A.  August 13th, 2019.  I think so.
10    Q.  Okay.  And according to the amended PFS -- go to
11  page 8.  He stated that he applied Roundup® Pro.  Do you see
12  that?
13    A.  Yes.
14    Q.  Okay.  And in his deposition I think it was
15  unclear specifically -- well, strike that.
16        In his deposition he also stated that at times he
17  applied a premixed product, correct?
18    A.  Yeah, I believe page 103 and 104 of his
19  deposition.
20    Q.  And the premixed product, if I understand
21  correctly, was applied on the non-Wolff -- that's
22  W-O-L-F-F -- properties, and then the concentrate product
23  was applied at the Wolff properties, correct?
24    A.  I believe so.
25    Q.  Okay.  And if we go to his plaintiff fact sheet,
```

Page 91

```
 1  and we can go to his deposition as well if you'd like,
 2  the --
 3        MR. TRAVERS:  Do you have a copy of the
 4  deposition?
 5        MR. KALAS:  If we need to I'll go to it.  If
 6  not --
 7        MR. TRAVERS:  Well, if you're asking him -- if
 8  you've got a copy -- you just said you can go to the
 9  deposition.
10        MR. KALAS:  Yeah, if --
11        MR. TRAVERS:  Just give him a copy of the
12  deposition if you're going to ask --
13        MR. KALAS:  Jeff, let me ask --
14        MR. TRAVERS:  -- him questions about --
15        MR. KALAS:  -- questions and see if he can answer
16  it, okay?
17        MR. TRAVERS:  Okay.  Well -- all right.
18        MR. KALAS:  I'm not playing -- I'm not playing
19  tricks.
20        MR. TRAVERS:  Well, you do play tricks.  So if
21  you're going to misstate something in the testimony --
22  if you're going to summarize deposition testimony,
23  you're going to give him a copy of the deposition.
24        MR. KALAS:  Thanks for the speech, Jeff.
25
```

Page 92

```
 1  BY MR. KALAS:
 2    Q.  Let's go to the plaintiff fact sheet, the
 3  addendum, personal information.  And it's my understanding,
 4  and tell me if I'm wrong, that the places where he applied
 5  premix are the Eichelberger Apartments, the Wedgefield
 6  Apartments, and the Ray Kruse Construction.  And then the
 7  places where he applied the concentrate would have been the
 8  Daniele Hotel and then the, I believe, seven properties he
 9  maintained that were commercial on behalf of the Wolff
10  Construction firm.  Is that your understanding, as well?
11    A.  Well, that's a bit more detailed than what I have
12  in table 2.
13    Q.  Okay.  So let's go to your table 2.  What page,
14  sir?
15    A.  8.
16    Q.  Okay.
17    A.  And you'll see that the Eichelberger Apartments
18  was listed as handheld sprayer.
19    Q.  Okay.  And do you know that that was a premix or a
20  concentrate, sir?
21    A.  Premix.
22    Q.  Okay.  So I'm just trying to get -- not the -- not
23  the equipment used, just whether it's premix or concentrate
24  here.
25    A.  Okay.
```

Page 93

```
 1    Q.  Okay.  Ray Kruse, premix?
 2    A.  Premix, RU spray bottle.
 3    Q.  Okay.  And then the Wolff Construction sites
 4  are concentrate, correct?
 5    A.  Well, concentrate Pro is what I understand.
 6    Q.  Right, but it's a concentrated product that he
 7  mixed into a dilution, correct?
 8    A.  That's correct.
 9    Q.  Okay.  And the Daniele Hotel is also a
10  concentrate, correct?
11    A.  I don't recall.  That's why I have not stated.
12    Q.  Okay.
13    A.  I don't recall --
14    Q.  Okay.
15    A.  -- that in the deposition.
16    Q.  Okay.  So we'll leave that as unknown for now.
17  But we can state, based on his testimony in deposition, that
18  we know he used premix at the non-Wolff Construction sites,
19  and he used concentrate at the Wolff Construction sites,
20  except for the Daniele Hotel where we're unsure, correct?
21    A.  Yes.
22    Q.  Okay.  And as far as the type of premix Mr. Wade
23  used, he was unsure about that other than it came in a white
24  bottle, correct?
25    A.  Yes.
```

24 (Pages 90 to 93)

William Sawyer, Ph.D.

| Page 94 |
| --- |

1    Q.  Okay.  And when Mr. Wade was using the premix --
2         (Mr. Murner entered room.)
3    BY MR. KALAS:
4    Q.  -- formulations, he testified to using a
5    one-gallon knapsack sprayer, correct?  And let me strike
6    that.
7         He testified to using a one-gallon knapsack
8    sprayer and a handheld spray gun, correct?
9         MR. TRAVERS:  Objection, form.
10   A.  I don't remember.
11   BY MR. KALAS:
12   Q.  Okay.  So let's mark as Exhibit 11 his depo.
13        (Exhibit 11 marked for identification.)
14   A.  To answer your earlier question, on page 104 --
15   BY MR. KALAS:
16   Q.  Okay.
17   A.  -- he stated that -- the question was, "But you
18   were also working at the Daniele Hotel at times?"
19   "Yes."
20        He states above (sic) that, "Did you use a Pro
21   product at the Daniele Hotel?"  Line 16.
22   "No.  We used -- I used more of the pump spray at
23   Daniele."
24        "Did you use ready-to-use products at the Daniele
25   Hotel?"

| Page 95 |
| --- |

1    "Yes."
2         So to clarify, it was the ready-to-use product at
3    Daniele Hotel.
4    Q.  Okay.  So let's make the record clear.  So other
5    than the Wolff Construction properties, it was Mr. Wade's
6    testimony he used premix at the other properties he worked
7    at, right?
8    A.  Yes.
9    Q.  Okay.  And in the Wolff Construction properties he
10   used Roundup® Pro Concentrate, correct?
11   A.  Yes.
12   Q.  Okay.  Now, if you go to the bottom of 105, lines
13   22 to 25, he describes at the Eichelberger property using a
14   handheld spray gun and a one-gallon jug spray.  Do you see
15   that?
16   A.  Yes.
17   Q.  Okay.  And is that your understanding of the two
18   types of equipment he used to apply Roundup® at the Ray
19   Kruse property?
20   A.  Yes.
21   Q.  Okay.  And then likewise if you go to page --
22   sorry, did I say Ray Kruse?  I'm sorry.  Let me restate
23   that.
24        Is that your understanding of the types of
25   equipment he used to apply at the Eichelberger property?

| Page 96 |
| --- |

1    A.  Right.  That's what we were talking about, yeah.
2    Q.  All right.  Now let's go to Ray Kruse.
3    A.  Okay.
4    Q.  If you go to pages 113 to 114.
5    A.  113, okay.  All right.
6    Q.  And do you see where he talks about, on 113 to
7    114, that he used a hand spray bottle, hand -- handheld
8    sprayer at the Ray Kruse property?
9    A.  Yes.  I referred to that as the RU spray bottle --
10   Q.  Okay.
11   A.  -- and premix -- premix.
12   Q.  And so that would be something similar to a
13   knapsack sprayer or a handheld sprayer in the biomonitoring
14   or passive dosimetry studies, right?
15   A.  Well, let me explain.  He stated that he poured
16   into a pump sprayer.  My understanding, from what I recall
17   reading, he actually took premix and poured it into the pump
18   sprayer.
19   Q.  Right.  He's taking his premix from a jug, and
20   he's pouring it into the pump sprayer, and that premix is
21   already diluted.
22   A.  Right.
23   Q.  Okay.  But the type of sprayer he used at Ray
24   Kruse was a handheld knapsack-type sprayer, not a backpack
25   sprayer or tank sprayer, correct?

| Page 97 |
| --- |

1    A.  Let me check my reference at page --
2    Q.  I'm looking at 114, sir --
3    A.  Yeah.
4    Q.  -- of his depo.
5    A.  No, I understand that, but page 133 of the depo I
6    think may provide some additional information on that.
7    Q.  Okay.  133 you said?
8    A.  Yeah.
9    Q.  Please direct me on 133 what you're referring to.
10   A.  Footnote 16 for the Wolff Construction --
11   Q.  Okay.  So we're not on Wolff yet.  We're still at
12   Ray Kruse.
13   A.  Oh, yeah, I jumped ahead.
14   Q.  Okay.
15   A.  Okay.
16   Q.  So let's clean it up.
17   A.  Yeah, so --
18   Q.  Am I correct at the Ray Kruse property he used
19   either a handheld sprayer or a spray bottle, as well?
20   A.  Well, in my report for that property, I'm showing
21   a footnote to page 132 for the Ray Kruse construction.
22   Q.  Okay.  Okay.  And that has to do with the time he
23   worked there, right?
24   A.  Yeah, yeah.
25   Q.  Okay.  So I'm talking about the equipment.

25 (Pages 94 to 97)

William Sawyer, Ph.D.

Page 98

1    A.  Okay.
2    Q.  Okay.  So let's go back.
3         On page 114 he testified as to using a handheld
4    sprayer at the Ray Kruse property; is that correct?
5    A.  Yeah, we -- we are in complete agreement on that
6    in my report.
7    Q.  Okay.  Okay.  And he didn't tell you on the phone
8    call you had that he used any other type of sprayer at Ray
9    Kruse?
10   A.  No.  I didn't ask.  That was already established.
11   Q.  Okay.  Now, going to the Daniele Hotel -- and then
12   we'll turn to Wolff Construction after.  Going to the
13   Daniele Hotel, he used a handheld sprayer, as well, correct?
14   A one-gallon handheld sprayer.  That's page 116.
15   A.  Yes.
16   Q.  Okay.  Now, sticking with the handheld sprayers
17   here before we get to Wolff Construction, we've discussed
18   earlier today and at other times that they've done patch
19   studies on applicators using handheld sprayers, right?
20   A.  Okay.
21   Q.  Some of those would be studies like Machado-Neto,
22   Lavy -- those two come to mind now.  Are you familiar with
23   those studies?
24   A.  Yes.
25   Q.  Okay.  And what those studies indicate is that the

Page 99

1    majority of exposure, upwards of 80 to 85 percent, is to the
2    legs and ankles of applicators, correct?
3    A.  Yes.
4    Q.  Okay.  And you'd expect the same to be true for
5    Mr. Wade when he was using a knapsack sprayer in -- at the
6    Daniele Hotel, Ray Kruse hotel (sic), and Eichelberger
7    Apartments, true?
8    A.  Depends on the condition of the backpack sprayer.
9    Q.  But we're not talking about a backpack sprayer.  I
10   don't mean to cut you off, but we're not.
11   A.  Okay.
12   Q.  We're talking about knapsack sprayers, a handheld
13   sprayer.
14   A.  Yeah, yeah, okay.
15   Q.  So let me ask the question again.  Again, sorry to
16   cut you off, but I want to make sure we're talking about the
17   same thing.
18        At the Daniele Hotel, the Eichelberger Apartments,
19   the Ray Kruse property, Mr. Wade used a knapsack sprayer,
20   correct?
21   A.  Yes.  But when I reviewed the Machado study
22   recently, I noticed the word was "knapsack."  And I forget
23   what country that study was published in --
24   Q.  Brazil, I believe.
25   A.  South America somewhere, yeah.  I actually did a

Page 100

1    search for definition under different dictionaries what a
2    knapsack is, and I understood it to be on the back.
3    Q.  Okay.  So then let's exclude that.  You've
4    reviewed the Lavy study, and that has handheld sprayers,
5    correct?
6    A.  Yes.
7    Q.  Okay.  And in the Lavy study over 90 percent of
8    the exposure using a handheld sprayer were to the ankles or
9    legs, correct?
10   A.  I think that's -- I really have to check the
11   study.
12   Q.  Okay.
13   A.  I don't recall --
14   Q.  Let's -- let's do it.
15   A.  And also I don't recall what the differences were
16   in dress compared to Mr. Wade.
17   Q.  Well, patches on the outside, it shouldn't matter
18   what the difference in dress is, correct, because --
19   A.  True.
20   Q.  Okay.
21   A.  True, yeah.
22   Q.  Okay.
23   A.  But -- yeah.
24        (Exhibit 12 marked for identification.)
25

Page 101

1    BY MR. KALAS:
2    Q.  Okay.  So let's look at 12.  This is Lavy, okay?
3    Do you see Lavy has applicators and weeders?
4    A.  Yes.
5    Q.  Okay.  And do you see that the weeders are
6    described as manually applying a glyphosate solution 7 to
7    8.5 days during the season?  That's table 1?
8    A.  Yes.
9    Q.  Okay.  And this is a patch study, right?
10   A.  Yes.
11   Q.  Okay.  And if we go to table 2, individual patch
12   analysis --
13   A.  Okay.
14   Q.  -- do you see that in the applicators and weeders,
15   upwards of 97 percent of the exposure is to the ankles and
16   thighs?
17   A.  Yes, but that doesn't apply because in this study
18   it was accomplished by placing a two-and-a-half by
19   three-and-a-half centimeter cylindrical shield which served
20   as the spray chamber over the small weeds to be sprayed.  So
21   this is a completely different application, and it's
22   inappropriate to make any comparisons to.
23   Q.  Okay.  My question --
24   A.  So it's not an open aerosol spray, but rather a
25   specially-designed device to prevent any drift from damaging

26 (Pages 98 to 101)

William Sawyer, Ph.D.

## Page 102

1  the little conifer seedling plants in close proximity to the
2  weed.
3      Q.  Okay.
4      A.  So I'm actually surprised you would attempt to use
5  such a study for that purpose.
6      Q.  All right, sir.  Let me ask you this question
7  again.  Does this study say that 97 percent of the exposure
8  is to the ankles and thighs in applicators and weeders?  Is
9  that what the study says?
10         MR. TRAVERS:  Objection, form, misrepresents the
11  table.
12      A.  That is true when a cylindrical cone is put over
13  the little weed with the aerosol going directly on the plant
14  without any drift.  That's true.
15  BY MR. KALAS:
16      Q.  Okay.  And, again, you're not going to
17  specifically say there was drift in this case, correct?  You
18  already said that.
19      A.  Well, this is a special cylindrical device for
20  conifer seedling application.  This is not what Mr. Wade
21  used at all.  This is a whole different device.
22      Q.  If we go back to Machado-Neto, which I'll mark as
23  Exhibit 13 --
24         (Exhibit 13 marked for identification.)
25

## Page 103

1  BY MR. KALAS:
2      Q.  Well, let me back up actually.  You didn't answer
3  my last question.
4         Are you going to say there was specifically drift
5  in this case, in the Wade case, specific to this plaintiff?
6      A.  Certainly.  Based on the equipment he was using,
7  there would be drift.
8      Q.  Okay.  What was the spray droplet size set at?
9      A.  It was not a CDA device so there is no setting.
10      Q.  Okay.  Was it set at a -- a fan spray?  Was it set
11  at a direct stream?  I'm talking about the knapsack sprayers
12  at the three non-Wolff properties.
13      A.  It could have been set at either.
14      Q.  You didn't ask him?  You didn't think that was
15  important if you're going to talk about drift?
16      A.  Over all the years of spraying there, from 2004 to
17  2014, ten years of spraying --
18      Q.  I'm not talking about Wolff.
19      A.  -- I -- I --
20         MR. TRAVERS:  Well, let him --
21         MR. KALAS:  He's not talking about --
22         MR. TRAVERS:  Don't interrupt him, John.
23      A.  Okay.  But let's -- let's talk about any of the
24  sites.  With years of spraying, it would not be a logical
25  question to ask, you know, on -- on September 5th, 1995,

## Page 104

1  were you using a specific setting, either aerosol or -- it's
2  just an impossible question  No one can remember that over
3  all these years of spraying  The sprayers constantly adjust
4  their spray for different applications
5         MR KALAS: Okay  Motion to strike as
6  nonresponsive
7      A  Well, but that's the truth
8         MR  KALAS: Motion to strike as nonresponsive
9  BY MR  KALAS:
10      Q  Did you -- did you ask him what his spray setting
11  was when he applied at the non-Wolff properties?
12         MR TRAVERS: Objection, asked and answered
13      A  No  That would be a poor question because over
14  the years sprayers are constantly adjusting their tip
15  aerosol fan or aerosol more direct, and it's just not a
16  logical question
17  BY MR  KALAS:
18      Q  Okay  Did you do any evaluation of wind
19  characteristics, as far as the direction of the wind, et
20  cetera, to determine whether or not there was appreciable
21  drift while he was applying?
22      A  Well, no, because he doesn't remember what hour of
23  the day and location he was at that many years ago so I
24  could go back to the weather history charts and examine the
25  wind and then somehow magically understand which way he was

## Page 105

1  facing historically.  I mean, that again --
2      Q.  There's a lot of --
3      A.  -- that's -- that's -- let me finish.  That's an
4  impossible question, and for me to ask that question would
5  be utter nonsense.
6      Q.  Okay.  I didn't ask you if you asked a question.
7  I asked what you did to evaluate the wind characteristics.
8  Did you do anything to evaluate the wind characteristics
9  where he was spraying?
10      A.  No, I don't have the exact dates and time at each
11  location to reference.  That's impossible.
12      Q.  Okay.
13      A.  These questions are ridiculous.
14      Q.  Did you --
15      A.  You are just wasting the time.
16      Q.  Did you examine the spray droplet size from
17  the applicate -- applicators that he used at the non-Wolff
18  properties?
19      A.  Through studies, yes.  It has been published the
20  difference in droplet sizes from an aerosol wand versus a CD
21  applicator, and that information is published in one of the
22  studies in my report.  That actually might be the Johnson
23  study.  And the range of aerosol droplets from an aerosol
24  applicator such as that used by Mr. Wade is a very wide
25  range that results in much higher drift than that of a

William Sawyer, Ph.D.

**Page 106**

1  controlled droplet applicator, a CDA device.
2      Q.  Okay.  Have you tested the -- well, let me ask
3  this.  Are the specific applicators he used at the non-Wolff
4  properties available to you?
5      A.  No.
6      Q.  Okay.  So you cannot tell the jury, when you come
7  to testify in the Wade case, that you know the specific
8  droplet size generated by the specific applicators Mr. Wade
9  used, correct?
10         MR. TRAVERS:  Objection, form.
11     A.  Again, yes, I can.  I will refer to the literature
12  values for aerosol sprayers.
13  BY MR. KALAS:
14     Q.  Okay.  So the HDX applicator he used, what's
15  the -- show me the study that has HDX applicator spray
16  droplet sizes.  Which study is that?
17     A.  I refer to the aerosol studies in general.
18     Q.  All due respect, sir, you're not answering the
19  question.  He used a specific type of applicator.  Which
20  study refers to the specific type of applicator that he
21  used?
22         MR. TRAVERS:  Objection, asked and answered.
23  BY MR. KALAS:
24     Q.  A specific brand.
25     A.  That information is not in the generally-accepted

**Page 107**

1  peer-reviewed scientific literature.
2      Q.  Okay.  So you don't have that information?
3      A.  It's not that I don't have it.  It doesn't exist.
4      Q.  Okay.  And you don't have the information, sitting
5  here today, about wind patterns where he applied, correct?
6      A.  Oh, I could, but it would be ridiculous.  I don't
7  know where he was standing at a given time point, and what
8  compass direction he was facing in 1995 at the Daniele
9  Hotel.
10     Q.  So let me -- let me make sure I understand what
11  you're going to tell the jury.  You are going to tell the
12  jury, if I understand correctly, that of course there was
13  drift, though you can't name a specific instance of a day
14  when there was drift because you don't have the information
15  available to make that evaluation; is that true?
16         MR. TRAVERS:  Objection, form, compound.
17     A.  I will explain to the jury, based upon the
18  peer-reviewed studies, that aerosol applicators always
19  encounter drift, and that is measured and reported based
20  upon even the in-house Monsanto study that had patches -- I
21  think it was MONGLY -- I think it might have been 2139.
22  Drift is a phenomena that occurs when using an aerosol
23  applicator wand and has been very well-documented
24  quantitatively in studies, including the in-house study
25  performed by Monsanto which I have referenced in my report.

**Page 108**

1  BY MR. KALAS:
2      Q.  Do you remember a demonstrative you put together
3  for the Pilliod trial of drift all around a -- the
4  plaintiffs?  It was a computer demonstrative.  Do you
5  remember that?
6      A.  Yes.
7      Q.  Okay.  Do you intend to show the jury something
8  similar in this case?
9      A.  Based on the scientific study literature, yes.
10     Q.  Okay.  Which study shows that the way Mr. Wade was
11  applying Roundup® at the non-Wolff properties causes a cloud
12  of spray all around the person?  Which study shows that?
13         MR. TRAVERS:  Objection, form.
14     A.  Well, MON 2139.
15  BY MR. KALAS:
16     Q.  MON 2139.  MON 2139 you keep referring to.  Let's
17  go there.
18     A.  It shows the quantitative number in microgram per
19  centimeter of glyphosate found on the forehead --
20     Q.  Okay.
21     A.  -- and that in itself is demonstrative of drift at
22  the level of the forehead, and as well the shoulder.
23     Q.  Okay.  Well, I'm going to get to -- let's do
24  Machado-Neto first, then we'll talk about MON 2139 and how
25  that's going to relate to Mr. Wade.  But you mentioned

**Page 109**

1  Machado-Neto, as well, in context to Wade so let's look at
2  Machado-Neto marked as Exhibit 13
3         Machado-Neto is a study on applicators applying in
4  eucalyptus forests, correct?
5      A  Yes
6      Q  Did Mr Wade apply in a eucalyptus forest?
7      A  No
8      Q  Did he apply in an environment with the same
9  humidity characteristics as the Amazon forest in Brazil?
10     A  Being in St  Louis, there were probably days that
11  were identical, yes  There were humid days in St  Louis
12     Q  Okay  As humid as the Amazon you would say?
13     A  Yeah, there are days in -- I could -- I could get
14  on the weather and show you days where the humidity was 100
15  percent in -- in St  Louis
16     Q  Now --
17     A  And I'm sure the city of St  Louis jurors would
18  not -- not dispute that  It can be humid with the Gulf of
19  Mexico stream of air coming up in the summer months,
20  humidity in the -- especially in the early morning hours is
21  very often 100 percent
22     Q  How does the spray technique applying to
23  eucalyptus forest differ from how Mr Wade applied Roundup®
24  in the wilds of St  Louis?
25     A  Well, it depends on the working condition in table

28 (Pages 106 to 109)

William Sawyer, Ph.D.

Page 110

1  I  There's a wide range of conditions as far as
2  lever-operated knapsack versus a tractor driver or just a
3  mixer only  There's different scenarios given
4      Q   Okay  So my question is a little different, which
5  is how does the way you apply a pesticide in a eucalyptus
6  forest differ from applying to common weeds around an
7  apartment building?  In other words, do you spray in the
8  same direction, are the weeds higher in a eucalyptus forest,
9  that sort of question
10     A   Well, weeds can be any height  That's --
11  that's -- again, that's a question that's -- it's an unfair
12  question
13     Q   Well, the reason I ask it is, for instance, you
14  cited a new document on your MCL called Franke, F-R-A-N-K-E
15  Do you recall adding that to your MCL recently?
16     A   Yes
17     Q   Okay  And that has to do with applications in
18  China where they're applying around mulberry trees, and
19  they're holding the wand essentially out straight from them
20  On the other hand, from what I understand from Mr  Wade's
21  deposition, he generally applied holding the wand in a
22  downwards direction  Is that your understanding?
23     A   Yes --
24     Q   Okay
25     A   -- in general

Page 111

1      Q   Okay.
2      A   Not -- not all the time.  It depends on the height
3  of a weed of course.
4      Q   Did Mr. Wade testify as spraying waist-high weeds?
5      A   No, I think -- I don't think he discussed weeds
6  growing up a fence.  Let me just check.  I know that one of
7  our -- one of the plaintiffs did.
8          Well, he did spray at Ray Kruse Construction
9  around fences.
10     Q   Around fences.  And --
11     A   Yes.
12     Q   -- did you ask him when you talked to him, or did
13  they discuss in the deposition, whether around fences meant
14  around the bottom of the fences or up fences?
15     A   No.  He also sprayed at Wolff Construction fence
16  line.
17     Q   And a fence line would connotate around the bottom
18  of a fence, correct?
19     A   No, that's not correct.
20     Q   That's not correct?
21     A   No, no.  A fence -- spraying around a fence is a
22  matter of whether there are weeds intertwined and growing up
23  on the fence.
24     Q   Okay.
25     A   So we're talking about spraying weeds, and weeds

Page 112

1  can be ground level, they can be interweaved up a fence.
2  There are multiple combinations.  It's sort of like asking
3  me do I use my boat in the water or on the water.  Are the
4  fences -- are the weeds growing only at the base of the
5  fence, or are they growing up the fence.  These are
6  questions that are unfair, and I can't reasonably answer.  I
7  can't go back to 1995 and -- and look at the weeds.
8      Q   Well, wasn't it important to you, when you were
9  evaluating Mr. Wade's exposure, to clarify that?  I mean,
10  you had a -- you got an opportunity, correct, if I'm --
11  correct me if I'm wrong -- to talk to Mr. Wade after his
12  deposition to clear up any areas that were unclear, right?
13  You got that opportunity.
14     MR. TRAVERS:  Objection, compound question.
15     A   Right.  But I'm intelligent enough to realize that
16  it's ridiculous to ask a person about a fence, you know,
17  some 20 or 25 years ago.  It's just not a reasonable
18  question.
19  BY MR. KALAS:
20     Q   Let me ask you if you asked these questions, and
21  you can answer yes, no, or I don't remember.
22         Did you ask Mr. Wade what he meant by the term
23  "fence line"?
24     A   No, and I didn't need to because he's used two
25  different descriptions.

Page 113

1      Q   Okay.
2      A   He used a description also of -- of a fence, not
3  just fence line.
4      Q   Did you ask Mr. Wade whether he sprayed weeds that
5  had grown up the fence?
6      A   No, I think -- I did not ask him because I think
7  it would -- based on the timing of this, being as early as
8  1995, asking that type of specific information becomes
9  unreliable.
10     Q   It's your understanding that people who testify
11  about the way they used Roundup® 25 years ago, 30 years ago,
12  may give you unreliable answers?
13     A   No, I didn't say that.  Asking specifically how
14  tall a weed was on a given fence is not a reasonable
15  question --
16     Q   Did you ask him generally?
17     A   -- at that -- at that -- you didn't let me finish.
18  I'm sorry.
19     A   At that time duration.
20     Q   Did you ask him generally whether or not he
21  sprayed weeds that had grown up fences?
22     A   No, I did not, because my experience has been with
23  the interview of -- of applicators, whether professionals or
24  home and garden, that the Roundup® is used on fences where
25  weeds are growing up.  I mean, this is what I've learned

29 (Pages 110 to 113)

William Sawyer, Ph.D.

Page 114

1　from multiple, multiple cases, that landscapers don't ignore
2　the weeds growing up the fence. Part of their job is to
3　spray those weeds.
4　　　Q. Okay.
5　　　A. I mean, it's that simple.
6　　　Q. If you go to page 225 of Mr. Wade's deposition,
7　line 7 through 11, Mr. Wade states, question -- or excuse
8　me. The attorney states:
9　　　　Question, "In terms of -- with the backpack
10　sprayer, were you spraying it downward?"
11　　　Answer, "Yes."
12　　　Question, "Okay."
13　　　Answer, "Yeah, I never remember spraying it
14　upward."
15　　　Did I read that correctly?
16　　　A. Correct. Spraying upward means above a 180-degree
17　plane. Spraying -- it doesn't mean he didn't spray fences.
18　　　MR. KALAS: I'm going to move to strike everything
19　after "correct."
20　BY MR. KALAS:
21　　　Q. I asked you if I read it correctly, sir. Did I
22　read it correctly?
23　　　A. Yes. However, that does not negate spraying weeds
24　that are knee high on a fence.
25　　　Q. Where does he say -- okay. Now you're saying

Page 115

1　"knee high." Would spraying weeds knee high be a downward
2　application technique?
3　　　A. Yes, but it's still spraying weeds on a fence. My
4　whole point is that the applicators do not exclude spraying
5　of weeds simply because they're on a fence, and it's very
6　common for weeds to grow up a fence.
7　　　Q. Where --
8　　　A. It's uncommon for weeds not to grow up a fence.
9　　　Q. Where does he say -- Mr. Wade -- how often did
10　Mr. Wade apply, two to three times a month?
11　　　MR. TRAVERS: Objection --
12　BY MR. KALAS:
13　　　Q. At the Wolff --
14　　　MR. TRAVERS: -- vague.
15　BY MR. KALAS:
16　　　Q. At the Wolff properties.
17　　　A. Yes.
18　　　Q. Okay. At the Wolff properties he applied two to
19　three times a month. Do you expect that weeds would have
20　time to grow up a fence if he was applying biweekly?
21　　　MR. TRAVERS: Objection, form.
22　　　A. Certainly during the years when he was doing the
23　strip mall, he only sprayed once per year. I would expect
24　it to be a jungle growing up the fence.
25

Page 116

1　BY MR. KALAS:
2　　　Q. Yeah. Too bad he didn't apply to a fence there,
3　right?
4　　　A. I'm sorry?
5　　　Q. He didn't apply to a fence at the strip mall, did
6　he?
7　　　A. He didn't specifically say that.
8　　　Q. You didn't specifically ask him if he applied to a
9　fence at the strip mall, did you?
10　　　A. No. You know, I'm not really understanding this
11　fixation on a fence. I mean, he --
12　　　Q. Well, this all goes back to --
13　　　MR. TRAVERS: He's still talking.
14　　　MR. KALAS: He's --
15　　　MR. TRAVERS: You've got to stop interrupting.
16　　　MR. KALAS: -- he's wasting -- he's wasting time
17　is what --
18　　　A. It is --
19　　　MR. KALAS: He's doing.
20　　　A. -- an applicator, and I'm relying on the
21　generally-accepted exposures for applicators using an
22　aerosol wand. I mean, that's what's published and generally
23　accepted. Now, getting into all these details about whether
24　there were weeds on the fence is nothing more than a
25　distraction. It's not scientific.

Page 117

1　BY MR. KALAS:
2　　　Q. You're going to tell the jury that Mr. Wade
3　applied in a manner similar to applicators in the
4　Machado-Neto study, true?
5　　　A. Yes.
6　　　Q. Okay. Applicators in the Machado-Neto study,
7　using a knapsack sprayer like Mr. Wade, had 85 percent of
8　their exposure to the front of their legs and thighs and
9　their feet, correct?
10　　　A. Yes.
11　　　Q. Okay. And if you include the back of their legs
12　and thigh (sic), it was over 90 percent, correct?
13　　　A. Yes.
14　　　Q. It is true applicators using a knapsack sprayer,
15　like Mr. Wade did at the non-Wolff Construction properties,
16　have over 90 percent of their exposure to their legs and
17　ankles based on the generally-accepted literature, true?
18　　　MR. TRAVERS: Objection, misstates the study.
19　　　A. No, because you said "literature," not that
20　specific study only, and there are studies that show higher
21　exposure than that percentile.
22　BY MR. KALAS:
23　　　Q. Which study using a knapsack sprayer shows less
24　than 85 percent exposure to the legs and ankles? Not
25　backpack, not tractor, using a handheld sprayer, sir.

30　(Pages 114 to 117)

William Sawyer, Ph.D.

Page 118

1      A.  All right.  Could you repeat that, please?
2      Q.  Which study that you're thinking of shows exposure
3  to less than 85 percent of -- strike that.
4          Which study that you're thinking of shows less
5  than 85 percent exposure to the legs and ankles using a
6  handheld sprayer the way Mr. Wade used at the non-Wolff
7  properties?
8      A.  I don't recall.
9      Q.  Okay.  Now, are you going to compare the potential
10  dermal exposure in the Machado-Neto study to Mr. Wade's
11  potential dermal exposure while using Roundup®?
12      A.  Did you say specific to the Machado study?
13      Q.  Yes, sir.  Are you going to say that Mr. Wade --
14  let me be very specific about what I'm asking.  Are you
15  going to say that Mr. Wade likely had a potential dermal
16  exposure similar to the Machado study and present the
17  1945.83 number to the jury?
18      A.  As one of the study references, yes.
19      Q.  Okay.  And beyond Mr. Wade, are you going to say
20  that any other plaintiff in this case who used a handheld
21  sprayer had a potential dermal exposure similar to
22  applicator 1 in the Machado-Neto study?
23          MR. TRAVERS:  Objection, form.
24      A.  Let's be clear on who -- did you say --
25

Page 119

1  BY MR. KALAS:
2      Q.  Any plaintiff who used a handheld sprayer in this
3  case.
4      A.  I see, yes.
5      Q.  Okay.  So let's unpack then what you're going to
6  compare to the specific plaintiffs in this case.
7          First of all, potential dermal exposure is not the
8  dose that somebody receives, correct?
9      A.  Correct.  It depends on how much gets through the
10  fabric, if any fabric, and then also the dermal absorption
11  rate of 3 -- 3 percent.
12      Q.  Okay.  And let's take the fabric out of this for a
13  minute.  Let's assume these applicators are naked, okay?
14      A.  Okay.
15      Q.  Okay.  So if you go to page 311 of this study, it
16  says that evaluations -- top -- top of the page, first full
17  paragraph (as read), "Evaluations of potential dermal
18  exposure on tractor drivers and applicators were performed
19  in time periods less than 70 minutes and extrapolated to a
20  whole 7-hour working day of effective exposure."
21          Did I read that correctly?
22      A.  Yes.
23      Q.  Okay.  And so if we go back to Mr. Wade, for
24  instance, he generally applied, depending on the property,
25  somewhere between -- well, it varies, but there's a range

Page 120

1  between 10 minutes and, I think, 4 hours maximum, correct?
2      A.  Yes.
3      Q.  Okay.  And for the places he applied more than
4  once per year, the range is 10 minutes to 3 hours, correct?
5      A.  Could you repeat that?
6      Q.  For the places he applied more than once a year,
7  the range of time spent spraying is 10 minutes to 3 hours,
8  correct?
9      A.  Yes.
10      Q.  Okay.  Let me ask you this before we keep going.
11  You have testified many times you've applied Roundup® at
12  your home, right?
13      A.  I have.
14      Q.  Okay.  And you found it effective, right?
15      A.  Yes.
16      Q.  Have you ever had to apply Roundup® two to three
17  times per month at any of your homes to control weeds?
18      A.  Before I had significant mulch at my first home
19  at -- on Sanibel Captiva Road, yes.
20      Q.  Okay.
21      A.  Yes, during -- during the summer tropical months
22  absolutely.
23      Q.  Okay.  All right.  So if we go to table 3, the
24  potential dermal exposure number here, 1945.83, is
25  extrapolated from essentially what was a 1-hour application

Page 121

1  day to a 7-hour application day, correct?
2      A.  Yeah, a 70-minute day to 7-hour day --
3      Q.  Right.
4      A.  -- to be specific.
5      Q.  Well, they say it's less than 70 minutes, don't
6  they?  In the last paragraph we looked at, they don't say 70
7  minutes.
8      A.  Okay.  You're right.  It's less than 70.
9      Q.  Okay.  So if we took the potential dermal exposure
10  here, and we multiplied it by 3 percent, which is your
11  dermal absorption figure, that would end up at a dose of 57
12  mgs per day, right?
13      A.  Yes, but that -- that's not correct because we
14  have to factor in the penetration through clothing --
15      Q.  Okay.
16      A.  -- and shoes and so forth.
17      Q.  Okay.  So it would be less than 57 if somebody was
18  actually wearing clothes.
19      A.  Well, far less.
20      Q.  Okay.  It might be -- what's the clothing figure
21  you use?  I think it's 77 or 78 percent?
22      A.  No, no, it depends on the -- the pants, for
23  example --
24      Q.  Okay.
25      A.  -- if they're jeans, it's 80 percent penetration.

31 (Pages 118 to 121)

William Sawyer, Ph.D.

1    Q.  Okay.
2    A.  There are different areas of the body which -- the
3  shoes, for example, is a much lower penetration.
4    Q.  Okay.  So I wanted to assume this person was
5  naked, and we can say that with the caveat that if they had
6  clothes on, the potential dermal exposure would actually be
7  less than the 57 mgs, okay?
8    A.  Again, far less.
9    Q.  Okay.  So 57 mgs in our naked applicator after a 3
10  percent dermal absorption.  Then if we take it down to an
11  applicator who's only applying 1 hour as opposed to 7 hours,
12  which they extrapolated to here, our naked applicator would
13  be exposed to 8 milligrams a day, right?
14    A.  Yes.
15    Q.  Okay.  And then if our naked applicator weighs 80
16  kilograms, that would be a dose of .1 mgs per kg per day,
17  correct?
18    A.  Approximately, yeah.
19    Q.  Okay.  And then if we put in our PPE, right,
20  our -- and -- and -- strike that.
21       If we put in our clothing, and we reduce it by 80
22  percent, so we put clothes on our applicator, we're now down
23  to .02 mgs per kg per day, correct?
24    A.  Yes.
25    Q.  Okay.  And that would be a dose below the AOEL,

1  true?
2    A.  No.  The problem is we do have days of 3 hours,
3  for example so -- or even up to 4.  So I'd want to give a
4  range of what it would be for the different application --
5    Q.  Four hours --
6    A.  -- scenarios.
7    Q.  Four hours would be .08 mgs per kg per day,
8  correct?
9    A.  Yeah, and that's --
10    Q.  And that would be below the AOEL, true?
11    A.  Slightly.  And -- and I, as you know, have made
12  POEM calculations in the past, and that's a typical result
13  for somebody who sprays for 3 or 4 hours.  This -- this
14  study is highly consistent with what the POEM model reveals
15  for a 3-hour application or a 4-hour application.
16    Q.  Well, let's look at the POEM model that you said
17  you're going to tell the jury about, but let's -- one thing
18  I want to make clear is it would be irresponsible for
19  somebody to suggest to the jury that Mr. Wade's absorbed
20  dose of glyphosate was 1945.83 milligrams a day, right?
21    A.  Correct.
22       MR. TRAVERS:  Objection, form.
23  BY MR. KALAS:
24    Q.  That would be false.
25    A.  That would be incorrect.

1    Q.  Okay.  You wouldn't -- you wouldn't want anybody
2  you worked with to present that sort of information to the
3  jury that way, right?
4       MR. TRAVERS:  Objection, form.
5    A.  Well, I think if it was explained that that is the
6  potential dermal loading, and one has to consider body
7  weight and the type of clothing, or PPE, and the 3 percent
8  dermal absorption, then that would be an accurate approach.
9  But to just use the number raw like that would not be
10  correct.
11       (Exhibit 14 marked for identification.)
12  BY MR. KALAS:
13    Q.  Okay.  You mentioned the POEM model, and this is
14  one of the POEM documents that I think we discussed.  This
15  is the MON 2139 document?
16    A.  Yes.
17    Q.  Okay.
18       MR. TRAVERS:  I'm just going to object.  I mean,
19  we've definitely been over this one before in
20  depositions.
21  BY MR. KALAS:
22    Q.  Are you going to argue that the mg per kg number
23  estimated in this document can be applied to Mr. Wade or any
24  other of the plaintiffs in this case?
25    A.  With adjustment, yes.

1    Q.  Okay.  So I just want to make sure it's clear.
2  The mg per kg number you're going to present to the jury --
3  because there's a couple of different mg per kg numbers in
4  this study.  You're going to present to the jury the UK-POEM
5  tier 2 number that was calculated for an applicator,
6  correct?
7    A.  Well, depends on whether we're doing gloves, no
8  gloves, or all gloves, yeah.
9    Q.  Okay.  But you're going to use the POEM model
10  figures in this document and not the tier 3 numbers of
11  applicators in the field, right?
12    A.  Well, tier 2 is appropriate for the
13  tractor-mounted sprayer with hydraulic nozzle.
14    Q.  Okay.  So you're not going to present any -- if
15  you go to page 579 through 583, you're not going to present
16  these mgs per kg numbers to the jury using handheld sprayers
17  as generalizable to Mr. Wade or any of the other plaintiffs
18  in this case?
19       MR. TRAVERS:  Objection, form.
20    A.  Well, that -- that would be reasonable.  Then the
21  tractor --
22  BY MR. KALAS:
23    Q.  Okay.
24    A.  -- mounted sprayer in tier 2 would only apply to
25  Mr. Ashelman.

William Sawyer, Ph.D.

Page 126

1    Q.  Okay.  So the tractor data would only apply to
2    Mr. Ashelman.  The other data would apply to all five
3    plaintiffs.
4        A.  Well, with some explanation in terms of dress, in
5    terms of wearing shorts, no gloves, T shirt, other factors
6    that differ from the tier 2 results.
7        Q.  Okay.  But -- but just to be clear, just so the
8    record is clear, with adjustments you'll present these tier
9    2 numbers derived from the UK-POEM model to the jury and
10   argue that they are generalizable to the five plaintiffs in
11   this case, true?
12       A.  Well, refer to page 572 --
13       Q.  Okay.
14       A.  -- through 573.  The document states (as read),
15   "The product is measured in a bucket or measuring jar and
16   poured in the sprayer.  The use of the 1-litre container
17   does not illustrate a realistic situation at the farm when
18   applying through tractor-mounted sprayers.  Indeed, the
19   treatment of 50 hectare per day at a rate of 10 litre
20   hectare of MON 2139 will require the opening of 500 cans of
21   1 litre and would be time-consuming (500 minutes when
22   considering that one minute is necessary for opening and
23   pouring).  For that reason, the 1-litre container is rarely
24   used by the farmer and will not be considered in this risk
25   assessment."

Page 127

1        Q.  Well, I think my question is a little simpler,
2    although maybe I'm being unclear.  And if you're not going
3    to use this data, then we can move on.
4            Are you going to use the data in the -- derived
5    from the UK-POEM model to argue to the jury that plaintiffs'
6    exposures and doses in mgs per kg were similar to the data
7    points derived using the POEM model in this study?
8            MR. TRAVERS:  Objection to form.
9    BY MR. KALAS:
10       Q.  And if you're not going to, we can move on.
11       A.  Using the 10-liter container size on page 573,
12   that might be reasonable, or a 1-liter can without
13   refilling, but this principle of refilling 500 cans I would
14   avoid.
15       Q.  Okay.  So which pages -- maybe this is easier.  Go
16   to page 606, please.  Are you going to present this data in
17   606 to the jury -- handheld equipment, no gloves -- and say
18   that the exposure and/or dose to the plaintiff is similar to
19   the figures derived in this study?
20       A.  I would have to reduce the value down
21   proportionately to the time sprayed.  This was a duration of
22   spraying of 6 hours, and it had a number of operations at 7.
23   So this hour and number of operations, that means number of
24   mixes, would have to be reduced --
25       Q.  Okay.  So --

Page 128

1        A.  -- proportionately to the plaintiff, for
2    example -- any of these plaintiffs have specific durations
3    of exposure, and in some cases number of mixes, as in my
4    report currently.
5        Q.  Okay.  So Mr. Wade, for instance, I think
6    testified that sometimes he'd have two operations in a day,
7    correct?
8        A.  Yes.
9        Q.  Okay.
10       A.  And -- and we also know his range of hours.
11       Q.  Right.
12       A.  So I could take one of the examples from my table
13   2 in the report and adjust this accordingly so it would be
14   reasonably accurate.
15       Q.  So --
16       A.  I would not use the current value of 1.6 milligram
17   per kilogram per day as -- as it reads currently.  That
18   would have to be adjusted.
19       Q.  Okay.  So I'm not asking what you could do.  I'm
20   asking what you will do.  Do you intend to present this data
21   to the jury, adjusted for the characteristics of the
22   plaintiff, and argue that this is somewhere close to what
23   their absorb dose was?
24       A.  Yeah, that is a reasonable approximation.
25       Q.  Okay.  So then we need to take a look at the study

Page 129

1    if that's what you intend to do.
2            If you go to the first page -- or, excuse me, the
3    second page.  The UK-POEM is a model, right?  It is not
4    biomonitoring or passive dosimetry, right?
5        A.  Correct, but in my report I provided at least six
6    different references that validate the model.
7        Q.  Okay.  It's not a measurement in the field,
8    correct?
9        A.  No.
10       Q.  Okay.  And what it says here, top of 659, is it
11   states (as read), "In addition, results obtained from the
12   glyphosate monitoring studies showed that passive dosimetry
13   estimates are one order of magnitude greater than those
14   estimated biologically.  Therefore, estimates calculated
15   based on the UK-POEM model should be considered as high
16   conservative for glyphosate (at least 10 times too high)."
17           Did I read that correctly?
18       A.  Yes.
19       Q.  Okay.
20       A.  However, that's inconsistent with some of the
21   validation studies that I've provided.  And I'd also point
22   out that's based on urinary levels under the false
23   assumption that 100 percent of glyphosate passes out through
24   the urine.
25       Q.  Okay.  Did I read it correctly, sir?

33 (Pages 126 to 129)

William Sawyer, Ph.D.

Page 130

1　A. Yes --
2　　　MR. TRAVERS: Objection, asked and answered.
3　A. -- you did. I said "yes." However, that -- that
4　data is faulty since it was based on the assumption of 100
5　percent urine, and is inconsistent with several studies in
6　my report that have validated the UK-POEM as being accurate.
7　BY MR. KALAS:
8　　Q. All right. When you're being up front with the
9　jury and being honest with the jury comparing this to
10　Mister -- to Mr. Wade's dose, are you going to tell them
11　that Monsanto derived the figures that were on page 606?
12　　　MR. TRAVERS: Objection, form.
13　A. I'm not sure what you mean.
14　BY MR. KALAS:
15　　Q. When you present the data on page 606 to the jury,
16　are you going to say that this is, quote, unquote,
17　Monsanto's own data?
18　　　MR. TRAVERS: Objection, form.
19　A. On page 606?
20　BY MR. KALAS:
21　　Q. Yes.
22　A. No. I -- I would have to qualify that as POEM
23　calculations made by Monsanto; but these are calculated
24　operator exposure levels using the POEM model, which is a
25　generally-accepted model originating out of the UK which is

Page 131

1　designed for the use of various pesticides --
2　　Q. Okay.
3　A. -- and herbicides.
4　　Q. Will you tell the jury that it was Monsanto's
5　opinion that the POEM model overestimated exposure at least
6　10 times?
7　A. Yeah, that's true.
8　　Q. Okay. If we go to page 584, do you see that they
9　have a discussion of tier 3 field exposure studies? Do you
10　see that?
11　A. Yes.
12　　Q. Okay. And tier 3 studies are the passive
13　dosimetry studies. That's the patch studies, right?
14　A. Right, yeah.
15　　Q. Okay. And do you see that the first study, Cowell
16　1990a, is a weeder using a handheld applicator?
17　　　MR. TRAVERS: I'm just going to object. This is
18　all general causation testimony.
19　　　MR. KALAS: It has nothing to do with general
20　causation --
21　　　MR. TRAVERS: Yes, it does --
22　　　MR. KALAS: -- if he's going to apply it to the
23　plaintiff.
24　　　MR. TRAVERS: All right.
25　A. Yes.

Page 132

1　BY MR. KALAS:
2　　Q. Okay. Would you agree that the weeders exposed
3　during application with a handheld applicator is somebody
4　who is also analogous to Mr. Wade?
5　A. No, that would be false.
6　　Q. Why?
7　A. Well, these weeders used handheld sprayers with
8　shielded nozzles. Mr. Wade was not afforded a shielded
9　nozzle.
10　　Q. Are you going to tell the jury -- going back to
11　606 -- that Mr. Wade was exposed to 50 milliliters per hour
12　of surface contamination using the POEM model?
13　A. Yes, and that's actually a low figure compared to
14　the Machado study. That is a dermal -- potential dermal
15　exposure value without consideration of clothing or the
16　dermal absorption factor of 3 percent.
17　　Q. Go back to 13, please. Exhibit 13, please,
18　Machado-Neto. It's underneath what you're looking at.
19　Where is there a milliliter per hour figure in this study?
20　A. Well, that would have to be derived by the squared
21　centimeter -- converting the squared centimeter of coverage.
22　　Q. You haven't done that.
23　A. Have I done it?
24　　Q. I said, "You haven't done that," correct?
25　A. I don't know about that. I think I may have.

Page 133

1　　Q. Oh, you have? Where?
2　A. On my calculator and in my bill scribbles.
3　　Q. Okay, in your calculator and bill scribbles. Have
4　you disclosed that opinion anywhere in the glyphosate
5　litigation?
6　A. The conversion of the milligrams to --
7　　Q. Yes, sir.
8　A. -- centimeters squared per day?
9　　Q. Milliliters per hour, actually, sir, but --
10　A. Yeah, let me think. I don't think so.
11　　Q. Okay. Do you have a milliliter per hour figure
12　based on the Machado-Neto study you're prepared to offer
13　today?
14　A. No, I think actually maybe I have, because what
15　this is, is milligrams; and if we look at the type of
16　Monsanto product used, we would find the milligram per
17　gallon AS value.
18　　Q. Okay.
19　A. For example, for the concentrate it's 360
20　milligram per mill, I believe. And I think what I have done
21　in the past, if you take the table 3, and that's milligram
22　per day, it's a simple conversion at 360 -- I think 360
23　milligrams per mill. So it's -- yeah, it is -- it is a
24　simple conversion, and I think I have done that before, but
25　I don't think I've included that conversion in my reports.

34 (Pages 130 to 133)

William Sawyer, Ph.D.

Page 134

1    Q.  Okay.  Have you done any conversion in the case of
2  Mr. Wade to determine how many milliliters per hour of spray
3  he was exposed to?  Have you done a calculation for Mr. Wade
4  specifically?
5    A.  No, I just have documented that -- his
6  application frequency, time, and his dress and level of
7  PPE --
8    Q.  Do you have any data --
9    A.  -- and and --
10    Q.  Sorry.
11    A.  -- I have compared those characteristics to that
12  of the literature and the POEM models, the results of the
13  POEM models in the various documents that I've referenced,
14  including MON 2139 --
15    Q.  Do you have any --
16    A.  -- and -- and have --
17    Q.  Go ahead.
18    A.  -- included the fact that his dress, his PPE, was
19  far less protective than that in the POEM models for
20  applicators.
21    Q.  Do you have any empirically-derived figure that
22  records an applicator reported in literature, not dependent
23  on a calculation, yourself, do, that shows an applicator
24  applying like Mr. Wade has an exposure to spray of 50
25  milliliters per hour?

Page 135

1    MR. TRAVERS:  Objection to form.
2    A.  Not for exposure because that 50 mill per hour is
3  not -- is not exposure.  That's the surface contamination,
4  what we call the PDE in the Machado study in table 3.
5  That -- that would be the PDE -- or the -- not the PDE, the
6  dermal exposure, the D -- the DE rate.  The potential dermal
7  exposure of 1945.83 for a knapsack sprayer, that is the --
8  what's used in the POEM model as a volume of surface
9  contamination.  It's just that the POEM is reporting it in
10  mills per hour versus milligram per day.
11    BY MR. KALAS:
12    Q.  Sir, I'm doing my very best not to cut you off,
13  but please focus on the question I asked.  I'm going to ask
14  it again.  I'm asking a very specific question.
15    Can you show me any figure in the literature that
16  is not dependent on a calculation by you, Dr. Sawyer, that
17  reports a potential volume -- excuse me, let me make sure
18  it's -- I say it correctly -- a volume of surface
19  contamination using glyphosate the way Mr. Wade used
20  glyphosate of 50 milliliters per hour?
21    MR. TRAVERS:  Objection, asked and answered.
22    A.  Yes, I can.  The -- in my report I have listed, I
23  think, five or six footnotes validating the POEM model, and
24  those studies are what I'm referencing for the 50 mill per
25  hour --

Page 136

1    BY MR. KALAS:
2    Q.  Dr. Sawyer, Dr. Sawyer --
3    MR. TRAVERS:  Hey, let's lower your --
4    BY MR. KALAS:
5    Q.  -- please --
6    MR. TRAVERS:  -- voice here.
7    BY MR. KALAS:
8    Q.  -- focus on my question.
9    MR. TRAVERS:  John, let's lower the voice.
10    BY MR. KALAS:
11    Q.  Please focus on my question.  I'm asking about
12  glyphosate specifically.  Do you understand that part of my
13  question?
14    A.  I do.
15    Q.  Okay.  I'm asking about the way Mr. Wade applied
16  glyphosate.  Do you understand that part of my question?
17    A.  Yes.  I've already discussed that, yes.
18    Q.  Okay.  And I'm asking about the figure 50
19  milliliters per hour as to glyphosate specifically in the
20  biomonitoring and passive dosimetry literature.  Do you
21  understand that part of my question?
22    A.  Yes.
23    Q.  Okay.  Is there a reported figure of 50
24  milliliters per hour anywhere in the literature as to
25  glyphosate specifically that is not dependent on a

Page 137

1  calculation by Dr. William Sawyer?
2    MR. TRAVERS:  Objection, asked and answered.
3    BY MR. KALAS:
4    Q.  Applied the way Mr. Wade applied.
5    A.  In my reference list of studies, there are about
6  five studies that validate the POEM value of volume of
7  surface contamination.  Those are generally --
8  generally-accepted peer-reviewed studies I am relying on
9  which validate that specific value of 50 mills per hour.
10  That's not a -- that's not a Bill Sawyer number.  That's a
11  peer-reviewed published study number that validates that --
12  that value.
13    Q.  Dr. Sawyer -- I'm going to withhold my commentary
14  on that response.
15    Are any of those studies validating the POEM
16  model -- validating the POEM model using glyphosate as the
17  chemical being examined?
18    A.  No, they use a surrogate chemical in performing
19  the validation studies that behaves as an aerosol similar to
20  that of glyphosate.
21    Q.  What chemical is it?
22    A.  I forgot.
23    Q.  Oh --
24    A.  I have researched that in the past way back.
25    Q.  No, no --

35 (Pages 134 to 137)

William Sawyer, Ph.D.

### Page 138

1    A.  In fact, you've asked me about that in the past,
2  and I've told you --
3    Q.  Yeah.
4    A.  -- what chemical --
5    Q.  Okay.
6    A.  -- it is.
7    Q.  How does that chemical apply to Mr. Wade's
8  application?  Tell me how it's similar in the validation
9  models to the spray droplet application that he was using.
10    A.  High water solubility, as is glyphosate, a very
11  high water solubility.
12    Q.  Well, what's the solubility, sir?  What's the
13  figure of solubility?  Is it the same solubility as the
14  glyphosate acid or the glyphosate salt?
15    MR. TRAVERS:  Objection.  Now you're going into
16  stuff you've already done in past depositions.
17    MR. KALAS:  I haven't done it as to Mr. Wade.  I'm
18  asking about Mr. Wade.
19    MR. TRAVERS:  It applies to everything.  It's just
20  a waste of time.
21    MR. KALAS:  It's not a waste of time --
22    MR. TRAVERS:  It is.
23    MR. KALAS:  -- because he can't give a straight
24  answer.
25    MR. TRAVERS:  You've deposed him 11 times.

### Page 139

1    MR. KALAS:  Okay.
2    A.  All right.  Please repeat your question.
3  BY MR. KALAS:
4    Q.  The solubility characteristics of the surrogate
5  chemical that you forget the name of is the solubility
6  characteristics similar to the type of -- similar to the
7  salt used in the active ingredient of the product Mr. Wade
8  used?
9    A.  Yes.  It was --
10    Q.  Okay.
11    A.  -- highly water soluble, as is glyphosate salts in
12  the product are highly water soluble.
13    Q.  So what's the number?  Tell me how close they are
14  so I can understand how it applies to Mr. Wade.
15    A.  I don't remember the solubility number.
16    Q.  Okay.  And on the surrogate chemical, how does the
17  solubility characteristics of the surrogate chemical compare
18  to the solubility characteristics of the salt used in the
19  glyphosate product by Mr. Batiste?
20    MR. TRAVERS:  Objection.  This has been gone over
21  in previous depositions.
22    MR. KALAS:  Have I asked about Mr. Batiste in a
23  previous deposition?
24    MR. TRAVERS:  No, but you just threw in Batiste's
25  name at the end to make it look like it's specific to

### Page 140

1  him.
2    MR. KALAS:  Okay.
3    THE WITNESS:  Tricky.
4    A.  Similar.  The peer-reviewed studies show -- that
5  validate the POEM model show that the surrogate used is
6  accurate and valid.
7  BY MR. KALAS:
8    Q.  Show me the peer-reviewed study that indicates
9  that glyphosate has similar characteristics to the surrogate
10  chemical used in the POEM model for volume of surface
11  contamination that you are now analogizing to the plaintiffs
12  in this case.
13    MR. TRAVERS:  John, this is just rehashing old --
14  old deposition testimony, and I object to it.  It's a
15  waste of time, and it's beyond the scope of this
16  deposition.
17    MR. KALAS:  If he wants to talk about -- let me --
18  let me make a statement on the record and see if you --
19    MR. TRAVERS:  Okay.
20    MR. KALAS:  -- stipulate to it.
21    If he is just going to say these are general
22  figures that do not apply to the plaintiffs in this
23  case, then we will move on.  If he is applying it to
24  the plaintiffs in this case, then I am entitled to
25  understand the differences and the similarities between

### Page 141

1  the plaintiffs in this case and the figures he's using.
2  That's our position.
3    MR. TRAVERS:  Well, he's testified what he's going
4  to do, but you're -- you're asking about the comparison
5  between the surrogate chemical and glyphosate, and then
6  you keep asking him about validation models, and you've
7  gone over this ad nauseam in previous depositions --
8    MR. KALAS:  I'm asking about --
9    MR. TRAVERS:  -- and it doesn't make a difference
10  to this case right now.  It's already been -- his
11  previous testimony would still apply to these -- these
12  specific cases.
13  BY MR. KALAS:
14    Q.  Dr. Sawyer, is it your understanding the
15  solubility characteristics of the salt in the glyphosate
16  used by the plaintiffs do not matter to the volume of
17  surface area contamination?
18    A.  No, that's not my opinion.  There is -- it is
19  important --
20    MR. TRAVERS:  John, it's just -- you're just going
21  over --
22    MR. KALAS:  Now you're cutting --
23    MR. TRAVERS:  -- general --
24    MR. KALAS:  -- your witness off.  Now you're
25  cutting your witness off.

36 (Pages 138 to 141)

William Sawyer, Ph.D.

Page 142

```
1        MR. TRAVERS:  No.  You're just going over
2    general -- general exposure --
3        MR. KALAS:  You're wasting time.
4        MR. TRAVERS:  -- and you're trying to sneak it in
5    as --
6        MR. KALAS:  You're wasting time.
7        MR. TRAVERS:  -- as this opinion.  So that's -- I
8    object to this waste -- your waste of time and going --
9    rehashing previous general causation opinions.
10   BY MR. KALAS:
11       Q.  Dr. Sawyer, one last question on this study that
12   you're planning on applying to the plaintiffs.  If you go to
13   618, do you see the bottom 618, calculation of specific
14   exposure in mills per hour?  Do you see that, sir?  It's the
15   last table.
16       A.  Oh, yes, okay.
17       Q.  Okay.  And do you see that they're assuming an
18   8-hour day here?
19       A.  Yes.
20       Q.  That's longer than Mr. Wade or any of the other
21   plaintiffs testified to applying, correct?
22       A.  Yes.
23       Q.  Okay.  And do you see the mill per hour specific
24   exposure for trunk clothing area?
25       A.  Yes.
```

Page 143

```
1        Q.  Does that read .0159?
2        A.  Yes.
3        Q.  Do you see the specific exposure in mills per hour
4    for trunk unprotected skin?
5        A.  Yes.
6        Q.  Does that read .0102?
7        A.  Yes.
8        Q.  Do you see the specific exposure in mills per hour
9    for legs?
10       A.  Yes.
11       Q.  Does that read 3 3715?
12       A.  Yes.
13       Q.  Okay.  Now, Mr. Wade stated under oath that he
14   used a product that came in a purple or black jug, right?
15       A.  No, I believe he stated he used Roundup® Pro
16   Concentrate, and that he used a Home Depot product called
17   HDX --
18       Q.  Okay.
19       A.  -- approximately 5 percent of the time, and he
20   used a premixed product, and I don't have the information
21   regarding the color.
22       Q.  So let's look at the label for Roundup® Pro
23   Concentrate that would have been on the bottle that Mr. Wade
24   bought.  There you go.
25       Just so we orient ourselves, if you go to page --
```

Page 144

```
1        MR. COWLING:  Are you going to mark this?
2        MR. KALAS:  Yeah, it's 12 -- no, I've moved on,
3    15.
4        THE VIDEOGRAPHER:  16.
5        MR. KALAS:  16?  No, 15.  15.
6        THE VIDEOGRAPHER:  Okay.
7        (Exhibit 15 marked for identification.)
8    BY MR. KALAS:
9        Q.  Orient ourselves, go to page 11.  This is from
10   2010, right?
11       A.  Page 11, because page 15 is in Spanish.
12       Q.  Right.
13       A.  Well, so is page 11 I think.  No, it's not.  Okay.
14       Q.  Okay.  Do you see that from 2010?
15       A.  A limit of liability?
16       Q.  No, sir, near the bottom -- yeah, below that right
17   here (indicating).
18       A.  Okay.
19       Q.  Do you see it's from 2010?
20       A.  Yes.
21       Q.  Okay.  And 2010 was during the time Mr. Wade was
22   spraying, right?
23       A.  Yes.
24       Q.  Okay.  And Mr. Wade stated that he mixed Roundup®
25   Pro Concentrate according to the labeling instructions,
```

Page 145

```
1    right?
2        A.  Yes.
3        Q.  Okay.  And he stated that he read the label,
4    right?
5        A.  Yes.
6        Q.  Okay.  So let's look at the label.  If we go to
7    the first page --
8        A.  Okay.
9        Q.  -- it states, "Read the entire label before using
10   this product."  Do you see that?  Right underneath the EPA
11   reg number.
12       A.  I don't even see the EPA reg number.  On the front
13   page?
14       Q.  Right there, yeah.  "Read the entire label before
15   using this product."  Do you see that?
16       A.  Yes.
17       Q.  Okay.  It states, "Use only according to label
18   instructions," right?
19       A.  Yes.
20       Q.  Okay.  Do you have any indication that Mr. Wade
21   did not read the entire label before using the product?
22       A.  No.
23       Q.  Okay.  And then if you keep going down to 3.1, it
24   says "CAUTION!" In big letters with an exclamation point,
25   right?
```

37 (Pages 142 to 145)

William Sawyer, Ph.D.

Page 146

1    A.  Yes.
2    Q.  Okay.  And then if you go to the next column, it
3  says, "Avoid contact with eyes or clothing."  Do you see
4  that?
5    A.  I'm looking.  Which column?
6    Q.  Top, second column.  Right underneath "CAUSES
7  MODERATE EYE IRRITATION" it states --
8    A.  Oh, yeah.
9    Q.  -- "Avoid contact with eyes or clothing."  Do you
10  see that?
11    A.  Yes.
12    Q.  Okay.  Now, Mr. Wade talked about having a leaking
13  backpack sprayer, right?
14    A.  Yes.
15    Q.  But he couldn't remember how many times it leaked,
16  right?
17    A.  Correct.
18    Q.  And it's true that he stated he took off the
19  sprayer as soon as he realized there was potential leakage,
20  right?
21    A.  Yes.  However, he explained that his clothing was
22  wet --
23    Q.  Okay.
24    A.  -- generally on his back and -- without washing
25  until a later time.

Page 147

1    Q.  Okay.  So he testified that he did not change his
2  clothes after the backpack sprayer leaked on him, correct?
3    A.  Yes.
4    Q.  So Mister -- and moving on to how he used
5  the product -- let me back up before we keep going with this
6  label.
7        Mr. Wade testified that he'd wear shorts and a
8  T shirt in the summer, and a long-sleeved shirt and jeans in
9  the winter, correct?
10    A.  Yes.
11    Q.  Okay.  And he said he'd wear -- did not wear
12  gloves when mixing or spraying, right?
13    A.  Right.
14    Q.  Okay.  And he testified that he wore work boots
15  and sometimes tennis shoes, right?
16    A.  Yes.
17    Q.  Okay.  And he wore a mask and goggles at times,
18  correct?
19    A.  Hang on a second.  I'm trying to fix the
20  microphone.
21        I have recorded that he wore no personal
22  protective equipment such as the impermeable pants, boots,
23  masks, chemically-resistant gloves.  Yeah, I would -- unless
24  I missed something, I'm not aware of a mask.
25    Q.  All right.  We need to change the tape.  We'll

Page 148

1  come back to that in one second
2        MR KALAS:  Let's go off the record
3        THE VIDEOGRAPHER:  We're going off the record
4  The time is -- the time is 11:49 a m
5        (Recess from 11:49 a m  to 11:54 a m )
6        (Exhibits 16 through 20 marked for
7  identification )
8        THE VIDEOGRAPHER:  We're back on the record  The
9  time is 11:54 a m  This begins media unit number 3
10        MR  KALAS:  I've marked for the record the five
11  reports served last night
12  BY MR KALAS:
13    Q  So we'll just put those here so we have a record
14  of them  And if you need them, you can look at them, though
15  I know you have them on your computer
16        We were looking at Mr  Wade's use of personal
17  protective equipment  We were talking about masks and
18  goggles
19        If you turn to 215 and 216, do you see where he
20  talks about wearing a mask while using the tank sprayer?
21    A  After 2007 he says yes
22    Q  Okay  So he wore a mask sometimes, correct?
23    A  For the last few years it looks like he -- he wore
24  it sometimes  So thank you for pointing that out  It's
25  actually of no relevance since, as you know, the inhalation

Page 149

1  route for glyphosate is very minimal and not -- not even
2  significant.  It's primarily dermally absorbed.
3    Q.  Okay.  And likewise on the goggles point, just so
4  the record's clear, if we go to 219, he used eye protection
5  with both the backpack sprayer and the tank sprayer.  Do you
6  see that?  Lines 4 to 7.
7    A.  Lines what?
8    Q.  4 to 7 on 219.
9    A.  Oh.  Page 417 --
10    Q.  No, page 219, sir, lines 4 to 7.
11    A.  Okay, back to 219.  Yes.
12    Q.  Okay.  And then so it would be true to say that
13  sometimes when he applied glyphosate, prior to his diagnosis
14  with follicular lymphoma, he wore a mask and/or eye
15  protection, true?
16    A.  Based on page 219, yes.
17    Q.  Okay.  It's true that Mr. Wade did not have a
18  memory of a specific incident where he spilled on himself
19  while mixing Roundup® Concentrate, true?
20    A.  Yes.
21    Q.  Okay.  It's true Mr. Wade testified he tried to
22  avoid applying on windy days, right?
23    A.  I would have to check the deposition because I'm
24  confused.  I know there was one entry that stated that the
25  clients expected it to be used, and thus I did apply it

38  (Pages 146 to 149)

William Sawyer, Ph.D.

## Page 150

1    sometimes on windy days, but that may have been for
2    Mr. Batisee.  I don't remember.
3        Q.  Batiste?
4        A.  Batiste, yeah, but it could have been --
5        Q.  We'll get it right before we're done.
6        A.  So, I mean, without -- without further reviewing,
7    I don't remember.
8        Q.  Let's go to page 208, line 6 through 9.
9            Question, "Generally would you have tried to avoid
10   windy days when you were spraying so that the product only
11   killed the unwanted weeds?"
12           Answer, "Yes."
13           Moving down to 13 to 15.
14           "Were you careful to do everything you could to
15   avoid any drifting of the product?"
16           Answer, "Yes."
17           Did I read those two passages correctly?
18       A.  Yes.
19       Q.  Okay.  Am I correct in saying Mr. Wade testified
20   that he tried to avoid applying on windy days?
21       A.  Yes.
22       Q.  Okay.  And avoiding applying on windy days would
23   reduce drift, correct?
24       A.  Yes.
25       Q.  Avoiding applying on windy days would reduce

## Page 151

1    blowback, correct?
2        A.  Yes.
3        Q.  Do you know if the surrogate data that you would
4    generalize to Mr. Wade was derived on a windy or still day
5    in the POEM model?
6        A.  As per label to avoid -- avoid contact.  So
7    that's -- that's all I know.
8        Q.  No, no, my question was about -- going back to the
9    POEM model.  Do you know if the surrogate data you referred
10   to in the five studies or so about the volume of spray
11   deposition was derived on a windy or still day?
12       A.  No.
13       Q.  No, you don't know?
14       A.  No.
15       Q.  Okay.  It's true, if you go to 209 to 210, that
16   Mr. Wade testified that he read the label every time because
17   he could never remember the mixing instructions, right?
18       A.  Yeah, line 13.
19       Q.  Okay.  And if you go to 210, line 7 to -- or,
20   excuse me, line 19 to 22.
21       A.  Okay.
22       Q.  Did he say -- he --
23           Question, "Okay.  So as I understand it, did you
24   read it cover to cover, or you looked for what sections?"
25           Answer, "No, I looked at -- I would go through the

## Page 152

1    whole thing.  I do that with anything."
2        Q.  Did I read that correctly?
3        A.  Yes.
4        Q.  Mr. Wade, you'd agree, testified that he'd read
5    the whole label each time he used the product, right?
6        A.  Yes.
7        Q.  Okay.  It's true that Mr. Wade testified that he'd
8    wash his hands the first chance he got after applying,
9    right?  It's page 220 to 221.
10       A.  Yes, first available chance.
11       Q.  Okay.  All right.  Now, if we go back to the
12   Roundup® Pro label, based on that base, if we go to the
13   section on personal protective equipment on the first page,
14   right-hand column -- that's the document right there, sir.
15       A.  Yeah, I just have to make a note.
16       Q.  Okay.  I'll just note that that is a marked copy
17   so --
18       A.  Yeah, I'm not -- I'm writing on my tab.
19       Q.  All right.
20       A.  Okay.
21       Q.  All right.  If we go back to the label, it
22   states -- the label, sir.
23       A.  Okay.
24       Q.  Under "Personal Protective Equipment," it states,
25   "Applicators and other handlers must have long-sleeved shirt

## Page 153

1    and long pants, shoes plus socks."
2        Did I read that correctly?
3        A.  Yes.
4        Q.  Did Mr. Wade always wear a long-sleeved shirt?
5        A.  No.
6        Q.  Did Mr. Wade always wear long pants?
7        A.  No.
8        Q.  Did Mr. Wade follow this section of the label at
9    all times?
10       A.  No.
11       Q.  Okay.  Going to the second paragraph, it states,
12   "Discard clothing and other absorbent materials that have
13   been drenched or heavily contaminated with this product's
14   concentrate.  Do not reuse them."
15           Did I read that correctly?
16       A.  Yes.
17       Q.  Okay.  Do you know if Mr. Wade followed those
18   instructions when his backpack sprayer leaked on him?
19       A.  Instructions with respect to not reusing the
20   clothing?
21       Q.  Yes, sir.
22       A.  I do not.
23       Q.  Okay.  If we go down to the user safety
24   recommendations there in the black box, it states, "Users
25   should:  Wash hands before eating, drinking, chewing gum,

39 (Pages 150 to 153)

William Sawyer, Ph.D.

---

### Page 154

1  using tobacco or using the toilet."
2      Did I read that correctly?
3      A.  Yes.
4      Q.  And the second bullet point states, "Remove
5  clothing immediately if pesticide gets inside.  Then wash
6  thoroughly and put on clean clothing."
7      Did I read that correctly?
8      A.  Yes.
9      Q.  Okay.  Did Mr. Wade remove his clothing
10  immediately when the backpack sprayer leaked on him?
11      A.  No.
12      Q.  Okay.  Was that in accordance with the label?
13      A.  No.
14      Q.  Is it a violation of federal law to not follow a
15  pesticide label?
16      MR. TRAVERS:  Objection, form.
17      A.  I --
18      MR. TRAVERS:  He's not a lawyer.
19      A.  I'd have to --
20      MR. TRAVERS:  Don't answer it.
21      A.  I'd have to defer that to a -- to a lawyer or a
22  label registration expert.
23  BY MR. KALAS:
24      Q.  Okay.
25      A.  It's a good question.  I just don't know.

---

### Page 155

1      Q.  Let's go down to the directions for use.  Do you
2  see the section that says, "DIRECTIONS FOR USE"?
3      A.  Yes.
4      Q.  Okay.  Can you read the first sentence into the
5  record, please.
6      A.  "It is a violation of Federal law to use this
7  product in any manner inconsistent with its labeling."
8      Q.  Thank you, sir.  Let's go down to the second
9  paragraph there.  Do you see the second paragraph states,
10  "Do not apply this product in a way that will contact
11  workers or other persons, either directly or through drift"?
12      A.  Yes.
13      Q.  Did Mr. Wade testify that he applied this product
14  in such a way that contacted him through drift?
15      A.  I have to check the deposition.
16      Q.  Okay.  Let's go back to the deposition.
17      A.  I need the index.
18      Q.  If you don't know right now, we'll move on,
19  because I want to keep --
20      A.  Yeah, I mean --
21      Q.  -- efficient.
22      A.  -- I just don't remember.  I think --
23      Q.  Okay.
24      A.  -- it's possible, but I don't remember.
25      Q.  Okay.  Do you intend to tell the jury about a

---

### Page 156

1  specific spill incident Mr. Wade had when mixing or loading
2  Roundup®?
3      A.  On page 221, I'm going to reference that.
4      Q.  Okay.
5      A.  Starting on line 14, I think it is, yeah.  He
6  states that "I can remember pouring it on me when I was
7  mixing it."
8      Q.  Okay.
9      A.  Which is contrary to the -- you pointed out
10  earlier, about 15 minutes ago you pointed out that he -- in
11  the deposition he did not spill it on his skin.  Well, this
12  states he does -- he did.
13      Q.  So let's go to page 186, line 15 to 19.
14      Question (as read), "Okay.  So you have no memory
15  of spilling it on you when you were mixing the product?"
16      Answer, "Not -- not in -- not in the big tank, no.
17  In the backpack sprayer, yeah, probably, it got on my hands
18  and everything, but I don't remember specifically, no."
19      Did I read that correctly?
20      A.  Yes.
21      Q.  Okay.  So my question was --
22      A.  But a little later in the deposition he
23  remembered, on page 221.
24      Q.  Okay.  My question was do you intend to tell the
25  jury about a specific spray -- spill incident he had as

---

### Page 157

1  opposed to a general recollection that he knows he did
2  spill?
3      A.  Neither.  I would leave that up to the lawyers to
4  ask questions directly of Mr. Wade at trial.  I don't intend
5  to conduct a direct examination of Christopher Wade.
6      Q.  Okay.  So I want to be clear here.  When you get
7  up on the stand and testify before Mr. Wade likely, you're
8  not going to say that Mr. Wade had a specific incident he
9  could remember where he spilled on himself?
10      A.  No.  I suspect I'll be asked hypothetical
11  questions --
12      Q.  Okay.
13      A.  -- such as if Mr. Wade were to state this example.
14  I'm not going to attempt to conduct some kind of direct
15  examination of Mr. Wade.
16      Q.  Okay.  Do you intend to tell the jury about a
17  specific incident of skin contact Mr. Wade had with
18  glyphosate beyond the incident where the backpack sprayer
19  leaked?
20      MR. TRAVERS:  Objection to form.
21      A.  No.  Again, I would be responding to hypotheticals
22  or testimony that's already in the record regarding that.
23  BY MR. KALAS:
24      Q.  Okay.  And as far as Mr. Wade's dose goes, how
25  many days are you going to say Mr. Wade was exposed to

---

40 (Pages 154 to 157)

William Sawyer, Ph.D.



**Page 158**

1  glyphosate?  Strike that.  Let me ask it a more direct way.
2      Are you going to tell the jury that Mr. Wade had
3  107 exposure days to glyphosate?
4      A.  No.  I'm going to explain that he had 107 8-hour
5  time weighted exposure days, that he was exposed far more
6  than 107 different days, but as 8-hour time weighted
7  exposure days, it was 107.
8      Q.  Okay.  And using your 8-hour time weighted
9  exposure days of 107 --
10      MR. KALAS:  I'm going to mark this 21, Andreotti.
11      (Exhibit 21 marked for identification.)
12  BY MR. KALAS:
13      Q.  Mr. Wade -- if we go to supplementary table 1,
14  which are exposure days which fit into quartile 3 for
15  non-Hodgkin's lymphoma, correct, at 107 days?
16      A.  Correct.
17      Q.  Okay.  And that would be a relative risk of .85,
18  correct?
19      A.  Right.
20      Q.  With a confidence interval of .64 to 1.13,
21  correct?
22      A.  Yes.
23      Q.  And that a null value showing no association
24  between individuals exposed to 107 days and non-Hodgkin's
25  lymphoma, right?

**Page 159**

1      A.  Yes.
2      Q.  For follicular lymphoma, which was his subtype, he
3  would be in tertile 3, correct?
4      A.  Yes.
5      Q.  For tertile 3 the relative risk was .73, right?
6      A.  Yes.
7      Q.  A confidence interval of .33 to 1.62, right?
8      A.  Correct.
9      Q.  And that would be a null value showing no
10  association between greater than 62 days of exposure and
11  follicular lymphoma, right?
12      A.  Yes.
13      Q.  Okay.  You'll also compare Mr. Wade to the
14  Ericksson study, correct?
15      A.  Yes.
16      Q.  Okay.
17      MR. KALAS:  I'll mark that as Exhibit 22.  Oop,
18  sorry.
19      (Exhibit 22 marked for identification.)
20  BY MR. KALAS:
21      Q.  The Ericksson study has a subtype analysis in it,
22  right?
23      A.  Yes.
24      Q.  And that's in table 3 on page 1659.
25      And for follicular lymphoma, the odds ratio is

**Page 160**

1  1.89, correct.
2      A.  Yes, it is.
3      Q.  Okay.  With a confidence interval of .62 to 5.79,
4  right?
5      A.  Yes.
6      Q.  And that's elevated above 1, correct?
7      A.  Yes.
8      Q.  But it is still null, correct?
9      MR. TRAVERS:  Objection to form.
10      A.  It did not reach statistical significance,
11  correct.
12  BY MR. KALAS:
13
14
15
16
17
18
19      Q.  It's almost as if you anticipate where I'm going,
20  Dr. Sawyer.
21      A.  I know you well.
22      A.  Let me just make sure --
23      A.  You've deposed me probably 10 times.
24      Q.  Let me make sure we're -- the record's clear here.
25

**Page 161**

4      MR. TRAVERS:  Yeah.
5      BY MR. KALAS:

24      Q.  Okay.  So let me ask that question so it's clear.
25

41 (Pages 158 to 161)

William Sawyer, Ph.D.

Page 162

1
2
3     Q.  And -- okay.
4         Now, if we go to the mixing instructions on the
5     label -- and this is at page -- I think it's 5 carrying over
6     to 6 for the application he was using at 4.  It says to mix
7     .8 to 1.6 quarts of Roundup® Pro Concentrate per acre,
8     right?
9     A.  I haven't found that yet.
10    Q.  Okay.  So I'm starting at 8.3, "Non-Crop Areas and
11    Industrial Sites," and it carries through general weed
12    control, and it talks about control of perennial weeds.
13        So let me know when you're caught up, and I'll ask
14    a question again.
15    A.  Okay.  I should stay on 5?
16    Q.  Well, it starts on 5 and carries over to 6.
17    A.  I see at the bottom, "Tank mixtures with
18    products."
19    Q.  Right.  So if you keep going, it says (as read),
20    "For control of or partial control of the following
21    perennial weeds, apply .8 to 1.6 quarts of this product."
22    Do you see that?
23    A.  Yes.
24    Q.  And then it talks about putting a compound called
25    Ourst XP in, as well, right?

Page 163

1     A.  Yes.
2     Q.  And Mr. Wade, as far as we all know, did not use
3     Ourst XP, correct?
4     A.  Right.
5     Q.  Okay.  So is it your understanding that when
6     Mr. Wade mixed Roundup® Concentrate, he used .8 to 1.6
7     quarts for every acre he applied?
8     A.  I don't recall.
9     Q.  Okay.  He did say that he -- or he did testify
10    that he mixed according to labeling instructions, right?
11    A.  That he did.
12    Q.  Okay.  Now, Mr. Wade said in his deposition that
13    he went through 3 to 6 2-gallon containers of Roundup®
14    Concentrate every year, right?
15    A.  Yes.
16    Q.  Okay.  And there are 4 quarts in a gallon, right?
17    A.  Right.
18    Q.  Okay.  So given the fact that there's
19    approximately 1 quart -- 1.2 quarts per acre, is it your
20    understanding that Mr. Wade applied Roundup® in a coverage
21    manner to 48 acres a year?
22    A.  I would have to make that calculation.
23    Q.  Okay.
24    A.  I can't answer without making the calculation.
25    Q.  Have you visited the sites where he sprayed to

Page 164

1     measure the area?
2     A.  No.
3     Q.  Have you done any calculation using Google Earth
4     on the -- on the areas where he applied to see if it added
5     up to 48 acres a year?
6     A.  No.
7     Q.  Okay.  Have you inspected any of the sprayers
8     Mr. Wade used?
9     A.  No.
10    Q.  Okay.  Do you know if any of those sprayers still
11    exist?
12    A.  No.
13    Q.  Have you reached out to the Wolff Construction
14    company or anybody else to see if they still have any
15    sprayers?
16    A.  No, I don't have authorization for that.
17    Q.  Who do you need authorization from to track that
18    down?
19    A.  I -- that's -- I leave that to the attorneys.
20    Q.  Okay.  So you haven't asked them?
21    A.  No.
22    Q.  Okay.  Do you agree, based off what we've seen in
23    the label, that Mr. Wade did not apply Roundup® in
24    accordance with the label at all times?
25        MR. TRAVERS:  Objection, form.

Page 165

1     BY MR. KALAS:
2     Q.  As far as the PPE he wore, and as far as removing
3     contaminated clothing?
4         MR. TRAVERS:  Objection, form, asked and answered,
5     and beyond the scope of his expert testimony.
6     A.  So you asked me do I agree --
7         MR. KALAS:  You know what?  Strike that.  I'll --
8     I'll withdraw the question.
9     BY MR. KALAS:
10    Q.  Let's go to section 10 of warranty and liability.
11    A.  Okay.
12    Q.  Okay.  If you go to the third paragraph that
13    starts, "To the fullest extent"?
14    A.  Okay.
15    Q.  Okay.  It states (as read), "To the fullest extent
16    permitted by lawyer, buyer and all users are responsible for
17    all loss or damage from use or handling which results from
18    conditions beyond the control of this Company, including,
19    but not limited to, incompatibility with products other than
20    those set forth in the Direction (sic), applications to or
21    contact with desirable vegetation, unusual weather, weather
22    conditions which are outside the range normal -- considered
23    normal at the application site and for the time period when
24    the product is applied, as well as weather conditions which
25    are outside the application ranges set forth in the

42 (Pages 162 to 165)

William Sawyer, Ph.D.

## Page 166

1  Directions, application in any manner not explicitly set
2  forth in the Directions, moisture conditions outside the
3  moisture range specified in the Directions, or the presence
4  of products other than those set forth in the Directions in
5  or on the soil, crop or treated vegetation "
6      Did I read that correctly?
7      A  Yes
8      Q  Okay  And all of the statements we just read were
9  on a label contemporaneous with when Mr Wade was using this
10  product, correct?
11      A  Not exactly, and I wondered about that earlier
12  This -- this was a 2010 label
13      Q  Yeah
14      A  So this is a label in its very later years of
15  spraying as opposed to 1995 --
16      Q  Okay
17      A  -- 15 years earlier
18      Q  Let me ask you this  Was he using this label
19  during the time period in which -- or excuse me  Was he
20  using Roundup® during which the time period this label
21  appeared?
22      A  Yes, he did  However, again, this represents the
23  later few years of his Roundup® use
24      Q  Okay  And was he using a backpack sprayer during
25  the time in which this label appeared?

## Page 167

1      A  Yes.
2      Q  Okay.
3      MR. KALAS:  Let's take that lunch break.
4      THE VIDEOGRAPHER:  We are going off the record at
5  12:23 p.m.
6      (Recess from 12:23 p.m. to 1:24 p.m.)
7      THE VIDEOGRAPHER:  We're back on the record.  The
8  time is 1:24 p.m.
9  BY MR. KALAS:
10      Q.  Doctor, thanks for being back with us.
11      Let me ask you this.  Across your interviews of
12  plaintiffs in the five cases, did you ask any of the
13  plaintiffs -- and feel free to refer to Exhibit 16 through
14  20 for this.  Did you ask any of the plaintiffs about
15  whether or not they had seen or heard advertisements for
16  Roundup® products?
17      A  No --
18      Q.  Okay.
19      A  -- no, not -- it's not really part of my
20  assessment as a toxicologist.
21      Q.  Okay.  And you're not going to be opining at all
22  that any of the plaintiffs you spoke to, or read their
23  depositions, saw advertisements for Roundup® products,
24  right?
25      A.  Correct.

## Page 168

1      Q.  Okay.  While we're on the topic, let's go through
2  each of the interviews you had with plaintiffs so I can make
3  sure we have a complete record of those.
4      Let's turn next to your interviews in the Batiste
5  case.  And I'm going to be asking some questions about
6  Batiste after we get through these interviews so keep that
7  one handy, but let's start with Batiste.
8      If we go to your report, page 7, for Mr.
9  Batiste --
10      A.  Okay.
11      Q.  -- you had a phone call with Mr. Batiste on
12  Friday -- or, excuse me, not Friday, Sunday, the 3rd,
13  correct?
14      A.  Yes.
15      Q.  Okay.  And how long was your call with
16  Mr. Batiste?
17      A.  Brief, brief, not -- probably about ten minutes.
18      Q.  Ten minutes?
19      Who was on the call with Mr. Batiste?
20      A.  No one else.
21      Q.  Okay.  So no Jane Clark?
22      A.  No.
23      Q.  Okay.
24      A.  No, I only had a few questions.  It was --
25      Q.  Okay.

## Page 169

1      A.  -- not a -- I extracted everything I needed except
2  for a few things out of the deposition and plaintiff fact
3  sheets and medical records.
4      Q.  Okay.  So let's -- since it was recent, hopefully
5  fresh in your mind, but I don't want you to get cases
6  confused so let's make sure you remember.  And if you can't
7  recall, that's okay.
8      What specifically did you ask Mr. Batiste on your
9  call?
10      A.  I initially asked about the ███████ home
11  because I could not find a frequency for that.  I did find
12  in the records how long it took but not the frequency, which
13  he stated that it was on a weekly basis from March through
14  October at the ███████ home.
15      Q.  And the ███████ home, I believe, the one in
16  San Antonio?
17      A.  Yes.
18      Q.  Okay.  And beyond the frequency of application at
19  the ███████ home, what else did you ask Mr. Batiste?
20      A.  I asked questions regarding home use of -- or
21  occupational use of any solvents, solvent-based cleaners,
22  chemical products, sprays.  And I only did a few questions
23  at a time, and then I went and talked -- asked about home
24  garden, lawn, pesticide, herbicides, paints, paint stripper,
25  and things of that sort, gasoline.

43 (Pages 166 to 169)

William Sawyer, Ph.D.

## Page 170

1    Q.  Okay.  And why did you find it necessary, given
2  the deposition transcript, to ask him about those particular
3  products?
4    A.  I just wanted to be thorough in terms of any
5  significant products that were missed.
6    Q.  Okay.  And when you asked him about exposures to
7  solvents, did you specify what you meant by "solvents"?
8    A.  I think I said, you know, industrial cleaners with
9  solvents to help under -- the understanding of the question,
10  but I think that's all.
11    Q.  Okay, industrial cleaners.  Did you give him any
12  examples of products that are industrial cleaners in your
13  opinion when you asked him about that?
14    A.  I didn't.
15    Q.  Okay.  And when you asked him about -- I think you
16  asked about weed -- or herbicidal or insecticidal
17  products --
18    A.  Yeah.
19    Q.  -- correct?
20        Did you specify any particular herbicidal or
21  insecticidal products?
22    A.  No, I did not give any names, but I did state home
23  garden or lawn use, household use, and I believe that's --
24  that's the extent of it.  I didn't give any examples.
25    Q.  Did you ask him if he used fertilizers?

## Page 171

1    A.  I know I asked that of Mister -- or Mrs. Meeks
2  rather, I know that, because I remember her explaining that
3  her husband and her -- her garden was only organic, but her
4  husband did use fertilizer on the lawn, but she explained
5  that was a -- she called it a nonchemical fertilizer.
6    Q.  Okay.  So we'll get to Mrs. Meeks in a moment.
7        As to Mr. Batiste, do you recall if you asked
8  about fertilizers or dry products applied to the lawn?
9    A.  I probably did, but I just don't remember.
10    Q.  Okay.  You didn't write it down in the notes here?
11    A.  I know the answer was negative because I would
12  have recorded it if it was significant for a herbicide on
13  the lawn, but I -- I don't recall any affirmative response,
14  but I think I did ask the question.
15    Q.  Okay.  So it's your recollection right now that
16  you think you asked that question?
17    A.  I think so.
18    Q.  And like all other interviews that you've
19  conducted of plaintiffs in litigation, we don't have a
20  recording of your interview, a transcript of an audio
21  recording to make sure you asked that question?
22    A.  That's right.
23    Q.  Okay.  Now, Mr. Batiste was deposed under oath
24  prior to your conversation with him, right?
25    A.  Yes.

## Page 172

1    Q.  Okay.  And that was last year, right?
2    A.  Yes.
3    Q.  And Mr. Travers or one of his colleagues had an
4  opportunity to ask questions there, right?
5    A.  Yes.
6    Q.  Okay.  And Mr. Batiste also served, I think, a few
7  plaintiff fact sheets in this litigation under the penalty
8  of perjury, right?
9    A.  Yes.
10    Q.  Okay.  And like with Mr. Wade, when Mr. Batiste
11  spoke to you, you didn't have an officer of the court come
12  in to swear him in, right?
13    A.  Correct.
14    Q.  Okay.  And you didn't have a court reporter
15  sitting there to create an official transcript of what was
16  said, right?
17    A.  Right.
18    Q.  And in the Roundup® litigation at least -- well,
19  strike that.
20        Okay.  Let's move on to Mister -- is there
21  anything else Mr. Batiste told you in your discussion that
22  you did not put into your notes here on page 7?
23    A.  No.
24    Q.  Okay.  So you did not discuss any specific spill
25  incidences with Mr. Batiste in your discussion?

## Page 173

1    A.  No.
2    Q.  Okay.  And you --
3    A.  No, I limited my questions to only --
4  intentionally limited my questions in an attempt to rely as
5  heavily as possible on the deposition, and secondarily the
6  plaintiff fact sheet and medical records, to avoid this type
7  of questioning in terms of not under oath and that type of
8  thing.  So I kept my questions very minimal, only what I
9  absolutely needed to ask.
10    Q.  Okay.  And do you know if anybody was in the room
11  with Mr. Batiste when he had those discussions with you?
12    A.  I don't know either way.
13    Q.  Okay.  Let's move on to your phone call with
14  Mrs. Meeks.  Now -- though I think it will be clear by the
15  time you testify, Mr. Meeks is deceased, correct?
16    A.  Yes.
17    Q.  Okay.  And so he's not available to talk with you
18  about his -- his exposure, right?
19    A.  Unless the court reporter is -- has a crystal ball
20  instead of the stenography, correct.
21    Q.  Okay.  And we've reviewed epidemiological studies
22  before that discuss the fact that proxy respondents are less
23  reliable historians than the person who actually used the
24  product, right?
25    A.  That's --

William Sawyer, Ph.D.

## Page 174

1    MR. TRAVERS: Objection.
2    A. We've -- you've asked me that before.
3    BY MR. KALAS:
4    Q. Okay.
5    A. I'm in not saying that that's necessarily true or
6    not, but you -- yeah, you've asked me that.
7    Q. Okay. You've seen data that indicates that in the
8    glyphosate epidemiological data that proxy respondents have
9    less reliable recollection of glyphosate use than the person
10   who actually used the product, right?
11   MR. TRAVERS: Objection, mischaracterizes the
12   literature.
13   A. I would defer that to the epidemiologist.
14   BY MR. KALAS:
15   Q. Okay. You have no opinion one way or another
16   whether or not a proxy respondent is as reliable as the
17   person who used the product?
18   A. To within an attestable 95 percent degree of
19   confidence as used in the studies, the studies do
20   comparative analyses, I'm not prepared to discuss those
21   points. If you want my personal opinion based on
22   experience, I can give you an answer, but I don't -- I think
23   that's rather worthless. I think your best -- I'm best to
24   defer you to the epidemiologist who has a handle on the
25   actual statistical analyses regarding the reliability of a

## Page 175

1    proxy.
2    Q. Well, that's where I'm going next actually. You
3    were, to use a turn of phrase, under the gun in trying to
4    put these notes together, right? You've worked pretty hard
5    on them in the past few days.
6    A. Yes.
7    Q. Okay. If you had the option to speak to
8    Mr. Batiste or his wife about Mr. Batiste's use of Roundup®,
9    who would you have spoken to if you only had time to speak
10   to one?
11   A. You said Batiste. Are you referring to Batiste or
12   Meeks?
13   Q. For Batiste, sir, because both are still living.
14   If you had the opportunity to only speak to Mr. Batiste or
15   his wife about Mr. Batiste's use of Roundup®, who would you
16   speak to?
17   A. The person I called. I could have asked for her,
18   but I didn't.
19   Q. Okay. But who would you rather speak to?
20   A. Well, of course the user.
21   Q. Okay. Why?
22   A. Well, the applicator obviously would have more
23   detail in terms of answering the questions than an observer.
24   Q. Okay. But as we stated before, Mrs. Meeks was the
25   person you were able to talk to at this point in time. And

## Page 176

1    if we go to your report for Mrs. Meeks, and we go to page 9,
2    I believe, carrying through to page 10, you had a
3    conversation with Mrs. Meeks on Sunday, correct?
4    A. Yes.
5    Q. Okay. November 3rd?
6    A. Yes.
7    Q. And about what time of day was that conversation?
8    A. Midday.
9    Q. Okay.
10   A. Early afternoon.
11   Q. And how long did the conversation take?
12   A. I think probably 15 minutes. She -- I don't want
13   to say she was long-winded, but she took her time in
14   answering the questions and talking about her late husband
15   and different things.
16   Q. She had trouble giving a yes or no answer? That's
17   a joke. You don't have to answer that.
18   A. Now, are you making an implication?
19   Q. No, sir. Let's keep going.
20   A. I usually say yes or no, but then I explain why.
21   Q. Who was on the call with Mrs. Meeks?
22   A. Just me.
23   Q. And who took notes of the contents of that call?
24   A. I just did everything directly myself.
25   Q. Okay. And what questions did you ask Mrs. Meeks?

## Page 177

1    A. Primarily the duration of time her husband was
2    mixing or spraying on days in which he applied the Roundup®.
3    Since the deposition was not clear and was confusing, I
4    asked her specifically on the days that her husband sprayed
5    in the greenhouse and/or outside, what was the usual
6    duration. Not the highest, not the lowest, what was
7    typical, and she said 2 hours or more. And she did confirm
8    that -- because I saw this in the deposition. I asked her
9    if Mr. Meeks took breaks or came into the house or anything
10   of that sort, and she said that he would come in about every
11   hour for a drink and a short break and then resume spraying.
12   Q. Okay.
13   A. She also stated that during January and February
14   there was spraying, but it was very minimal, only as needed.
15   Q. Okay. Anything else you asked Mrs. Meeks about
16   beyond his work in the greenhouse?
17   A. Yes. I asked about personal protective equipment,
18   and she stated that he wore a mask sometimes outside, but
19   she explained to me -- volunteered -- voluntarily stated to
20   me not to be confused with it being for Roundup®, that he
21   used it when he cut grass and had other duties outside that
22   caused him to reactivate his allergies.
23   And then I went on and talked to her about the
24   possibility of other products in the nursery, were there
25   other chemicals, other fertilizers, pesticides, herbicides.

45 (Pages 174 to 177)

William Sawyer, Ph.D.

## Page 178

1    I specifically asked how did your husband control insects in
2    the nursery, and she stated that -- and she was very
3    detailed about this -- that her plants go largely to
4    commercial indoor suppliers, and that they could not have
5    bugs on them, that that would be horrible for their
6    business, and yet because they're going to an indoor
7    environment, her husband never used any type of chemical
8    sprays on them.  And she said that he used this Safer soap,
9    and she in detail explained how the Safer soap is sprayed on
10   the plants, and I don't know what duration; but then the
11   plants are rinsed with water, and then this other material
12   was added called plant shine.  And this process is how the
13   insects were controlled in the greenhouse and yet were
14   shipped out free of insects.
15       Q.  Okay.  Anything else you discussed with
16   Mrs. Meeks?
17       A.  Yes.  I asked if her husband had any occupational
18   chemical exposures that she was aware of, and she stated no.
19           I asked her about her husband's work in the yard
20   and garden, if there was one; and she affirmed there was a
21   garden and that it was an organic garden, and I already
22   explained about the fertilizer.
23           I asked if there were any other products used that
24   contained any solvents or industrial cleaners, furniture
25   stripper and paints, and she was not aware of any -- any at

## Page 179

1    all actually.
2        Q.  Okay.  Anything else you discussed with
3    Mrs. Meeks?
4        A.  Yes.
5        Q.  Okay.
6        A.  And I thought her answer was funny.  I asked her
7    about her husband's alcohol consumption.
8        Q.  Okay.
9        A.  And she started laughing and said, oh, no, he
10   doesn't -- he didn't drink alcohol.  And she said, "We're
11   both Christians, and we don't drink alcohol," and she was
12   very emphatic and explained that he's just not an alcohol
13   drinker.
14       Q.  Okay.  Anything else you discussed with
15   Mrs. Meeks?
16       A.  No, no, I think that was it.
17       Q.  And if there's anything you've forgotten, you
18   would have written it down in your notes, right?
19       A.  If there was any -- any responses that were in any
20   way related, yes.
21       Q.  Okay.  And so you didn't discuss any specific
22   spill incidences that Mr. Meeks had with Mrs. Meeks, right?
23       A.  I don't think I asked her because it doesn't seem
24   like she would have reasonable knowledge to know if he had
25   spills out there.

## Page 180

1        Q.  Okay.  And you didn't -- you didn't discuss any
2    specific incidents where Roundup® blew back on Mr. Meeks
3    when he was spraying it or anything like that?
4        A.  No, I didn't ask her because I just felt that
5    would be a -- a question that would be unreasonable for her
6    to answer.  She did not take part in it.  He went out and
7    did the spraying, and she observed him come in for his drink
8    or snack and then go back out again; but other than that,
9    she really didn't have much firsthand knowledge in terms of
10   the details during spraying.
11       Q.  Okay.  Let me follow up on a couple questions
12   here.
13           When Mr. Meeks was in the greenhouse, did you ask
14   Mrs. Meeks -- or do you have any testimony from Mrs. Meeks
15   that you can point me to where she talked about directly
16   observing him applying in the greenhouse?
17       A.  No.
18       Q.  Okay.  And when he applied out in the yard, in the
19   organic garden or around the organic garden, I guess, since
20   it was an organic garden, did she talk to you at all about
21   observations of how he was applying in the yard as opposed
22   to where he pointed the wand or anything like that?
23       A.  No, I didn't ask any -- any related questions with
24   respect to how he applied it.
25       Q.  Okay.  And likewise for Mr. Meeks, when he -- you

## Page 181

1    talked about the Safer soap.  Was it your understanding that
2    he use Safer soap for the entire period in which they had a
3    greenhouse?
4        A.  That's my understanding.
5        Q.  Okay.  Did you do any investigation to determine
6    whether or not Safer soap has been on the market since
7    they've had a greenhouse or when they had a greenhouse?
8        A.  No.
9        Q.  Okay.  Did you inquire as to whether or not
10   Mr. Meeks wore any personal protective equipment when using
11   the Safer soap in the greenhouse?
12       A.  No, I did not.
13       Q.  Okay.  Did you inquire as to whether or not he
14   would have changed his personal protective equipment from
15   when he was using the Safer soap to when he was using the
16   Roundup®?
17       A.  I didn't ask any related question to that.
18       Q.  Did you ask how often he used the Safer soap?
19       A.  No.
20       Q.  Okay.  Did you ask whether or not -- I want to
21   understand a little more how the Safer soap worked; and if
22   you don't know because you didn't ask, that's fine.
23           Did he apply the Safer soap directly onto the
24   plants for insecticidal benefits?  Did he apply it
25   underneath the plants?  Where did he apply it in the

William Sawyer, Ph.D.

| Page 182 |
| --- |

1  greenhouse?
2      A.  On the plant.
3      Q.  On the plant?
4      A.  Yeah.
5      Q.  Okay.  Did you ask Mrs. Meeks anything about
6  Mr. Meeks' exposures at the shipyards?
7      A.  I don't think so.  I think she -- when I asked her
8  about occupational exposure, she volunteered and said that
9  he did work in the shipyard, which I was very aware of from
10  the documents, the filed documents; but I don't think she
11  provided any additional information on the shipyards.
12      Q.  Okay.  Did you ask her if she ever visited him at
13  the shipyards?
14      A.  No.
15      Q.  Did you ask about his habits -- well, let me back
16  up here.
17          You asked about Mr. Meeks' clothing when he
18  applied Roundup®, right?
19      A.  Yes.
20      Q.  Did you ask about his clothing when he applied
21  Safer soap?
22      A.  No.
23      Q.  Did you ask about his clothing when he worked at
24  the shipyards?
25      A.  No.

| Page 183 |
| --- |

1      Q.  Did you ask about his habits regarding laundering
2  his clothes when he returned home from the shipyards?
3      A.  No.
4      Q.  Okay.  Is there anything else you asked
5  Mrs. Meeks, that you can think of right now, in your
6  interview with her that we haven't talked about already?
7      A.  The only thing I didn't mention is how often he
8  sprayed in the nursery, and that was every 2 weeks.
9      Q.  Every 2 weeks.  And that's year round, less often
10  in January and February?
11      A.  Yes.
12      Q.  Okay.
13      A.  Only -- she said only as -- as needed, and she
14  used the word "very minimal spraying" in January and
15  February.
16      Q.  Did you ask anything about the ventilation of the
17  nursery?
18      A.  No.
19      Q.  Let me ask you this.  They didn't want the plants
20  to die in the nursery, right?
21      A.  Correct.
22      Q.  Okay.  And Roundup®, if it got on any of the
23  plants in the nursery, it would kill them, right?
24      A.  Yes.
25      Q.  Did you ask if there was a plastic sheet or

| Page 184 |
| --- |

1  anything like that over the plants when he applied Roundup®
2  in the nursery?
3      A.  No.  The only thing -- it all related.  She did
4  state that when he sprayed around the nursery, there was a
5  gap between where the lawn mower could go, and she said that
6  the plastic -- if the lawn mower got close to the plastic,
7  it would tear or break the plastic.
8      Q.  That's on the outside.
9      A.  Yeah, yeah, and that he sprayed all around that
10  perimeter because he didn't want to get the lawn mower close
11  to it.
12      Q.  But then he sprayed inside, as well.
13      A.  Yes, but she didn't give any further details
14  about -- well, she did state that some of the plants were
15  potted and into a -- she called it like a hole that the pot
16  would sit down in, and weeds would grow up from that hole.
17      Q.  Understood.
18      A.  And she would spray around the base of that pot,
19  that I do remember.
20      Q.  He would.
21      A.  Or he would, yeah, yeah.
22      Q.  Okay.  So some of the plants were at ground level
23  then.
24      A.  Yes, some were in recessed, into-the-ground pots.
25      Q.  Okay.  And some of the other plants were -- well,

| Page 185 |
| --- |

1  let me ask you.  Did you ask if some of the other plants
2  were on tables or anything like that?
3      A.  I did.  She said they were in rows, is her word.
4      Q.  Rows in the ground?
5      A.  Rows, R-O-W-S.
6      Q.  In the ground?
7      A.  I don't remember --
8      Q.  Okay.
9      A.  -- if I asked her if it was elevated or in the
10  ground.  I'm not sure.
11      Q.  Let me ask you this.  If Mr. Meeks were spraying
12  around the spot in the ground where the weeds were, around
13  the potted plant, and there was significant drift from his
14  spray application, would you have expected to see some of
15  those plants die?
16      A.  Probably.
17      Q.  Okay.
18      A.  Although when you say "significant," significant
19  to a plant, yes.  The amount to the human obviously wouldn't
20  cause death.
21      Q.  Right.  Did you -- did Mrs. Meeks --
22      A.  I hope not.
23      Q.  -- report to you or Mister -- or did you review
24  anything in the Meeks case that suggested that plants died
25  in the greenhouse after he applied Roundup®?

47 (Pages 182 to 185)

William Sawyer, Ph.D.

## Page 186

1    A. No.
2    Q. Okay. Let's move on to Mr. Stauffenberg. We'll
3  do -- well, actually, let's do Mr. Ashelman.
4        MR. KALAS: We'll save Amy's case for last.
5        MR. TRAVERS: Okay.
6        THE WITNESS: Poor Amy.
7  BY MR. KALAS:
8    Q. All right, Mister -- Mr. Ashelman. Mr. Ashelman
9  is our farmer, right?
10   A. Yes.
11   Q. Okay. And you had a call with Mr. Ashelman
12 yesterday, correct?
13   A. I did.
14   Q. Okay. What time of day did you have that call?
15   A. Afternoon.
16   Q. Okay. And how long was the call?
17   A. Oh, probably about 15 minutes.
18   Q. Okay. And who was on the call?
19   A. Just me.
20   Q. Okay. And who took notes on the contents of the
21 call?
22   A. I did directly.
23   Q. Okay. Now, actually there are a few questions I
24 didn't ask you about Mrs. Meeks. Let's table Mr. Ashelman
25 for a second.

## Page 187

1        Prior to your call with Mrs. Meeks, she had been
2  deposed under oath, right?
3    A. Yes.
4    Q. Okay. And that was last year?
5    A. Yes.
6    Q. And her attorneys had an opportunity to ask her
7  questions at that deposition, right?
8    A. Yes.
9    Q. And she also served at least one plaintiff fact
10 sheet under the penalty of perjury, right?
11   A. Yes.
12   Q. Okay. And in the case of Mrs. Meeks, like in
13 other cases you've done interviews of, you didn't have a
14 court -- an officer of the court come in to swear her in,
15 right?
16   A. Correct.
17   Q. And you didn't have a court reporter sitting there
18 to create an official transcript of what was said, right?
19   A. Right.
20   Q. Okay. And like other interviews in the Roundup®
21 litigation, you did not create an audio recording of your
22 conversation with Mrs. Meeks, right?
23   A. Correct.
24   Q. All right. Now let's get back to Mr. Ashelman.
25   A. All right.

## Page 188

1    Q. So remind me again how long your conversation with
2  Mr. Ashelman was?
3    A. Approximately 15 minutes.
4    Q. Okay. And what did you ask Mr. Ashelman about?
5    A. I started off asking him about his equipment, that
6  is the design of the sprayer, the number of spray heads on
7  the sprayer, the reliability of the sprayer. I asked
8  whether he ever rebuilt the pump. I asked if he had -- the
9  spray had clogs or failures. I asked if he had any material
10 or branches snagging hoses and tearing hoses off during
11 application. Just a lot of details in terms of the
12 equipment, and he gave me responses to those questions.
13   Q. Anything else you asked him about?
14   A. Oh, yeah, lots of them.
15   Q. Okay. So tell me.
16   A. I asked him one important question that wasn't
17 clear in the deposition, was -- I asked from the time you
18 had the Roundup® in your hand until the time you mixed it
19 with the 200 gallons of water and added the surfactant
20 powder, and other preparations involved with the sprayer
21 with respect to the Roundup®, and spraying, what was the
22 time interval, and he said about 2 hours. And he said it
23 took him about a half hour to do the preparation, and he
24 said from -- his own words were from the time the tractor
25 left the barn area and sprayed and came back was about an

## Page 189

1  hour and a half, but the full interval was about 2 hours.
2    Q. Okay.
3    A. And with respect to the equipment, he said it was
4  quite reliable. He said he did have clogging occur with the
5  spray heads when using some other material, non-Roundup
6  material, because it was in a -- initially in a powder form,
7  and it would not completely dissolve and then he had
8  problems; but he said with respect to the Roundup®, he
9  really didn't have much trouble with clogged spray heads.
10       He did say that he had to replace spray heads,
11 primarily the outer spray heads of the two booms, because on
12 occasion he would hit something with that spray head. I
13 think he said a branch or a trunk would hit it and then
14 damage it, and he had to repair it. And he stated during
15 the repair he -- he wore his gloves, his elbow-length
16 gloves, and he didn't handle it with his bare hands.
17       Let me think what else. I asked him about this --
18 he called it a pelletized surfactant, but he didn't know
19 what it was exactly. It's something that he was told to use
20 that would increase the effectiveness of the Roundup®.
21   Q. Okay.
22   A. And he stated that the spraying was generally -- I
23 asked him what time of day he sprayed, and he said that
24 typically he would get one tank in in the morning, two in
25 the afternoon, and on some days he was able to get a fourth

48 (Pages 186 to 189)

William Sawyer, Ph.D.

## Page 190

1  tank in in the evening.
2       And I asked him specifically do you recall what
3  time of day or night, or the next day for that matter, did
4  you bathe with soap or shower with soap, and he said
5  generally at 8:00.
6       Q.  P.m.?
7       A.  8 p.m.  He said that was his -- his general time
8  he would bathe.
9       He then stated that he wore a -- I think he called
10  it a -- a respirator.  I'm looking at my notes.  I don't see
11  it, but I believe he did say he wore a mask or respirator
12  when spraying.
13       Q.  I believe it's on page 6?
14       A.  I'm on page 5.
15       Q.  Yeah, so page 6 -- oh, that's not from your
16  interview.  Never mind.  Okay.
17       A.  Yeah, and he -- I asked him about his personal
18  protective gear, what he wore.  He wore a -- he called them
19  heavy leather boots, jeans, a shirt I believe he said with
20  sleeves.  I don't remember any -- any hat, but I do recall
21  the -- he said he wore a -- I think he referred to it as a
22  respirator.
23       Q.  Okay.  Anything else you talked about with
24  Mr. Ashelman?
25       A.  No, I think that -- I think that covers it.

## Page 191

1       Q.  Okay.  A few follow-ups on what you brought up.
2  So you'll tell the jury that it's your understanding that
3  when Mr. Ashelman's equipment clogged, it was not with
4  Roundup®, correct?
5       A.  That's right.
6       Q.  Okay.  And so as far as cleaning clogged
7  equipment, you're not going to tell the jury he had any
8  significant exposures to Roundup® when cleaning clogged
9  equipment, right?
10       A.  That's correct.
11       Q.  Okay.  You'll -- when you say that Mr. Ashelman
12  told you that the equipment he had was reliable, did you
13  follow up about what he meant by the word "reliable"?
14       A.  He was using that word in -- in response to my
15  question that was detailed.
16       Q.  Okay.
17       A.  My question was did the equipment -- the spray
18  booms or the pump -- fail, leak, or require you to work on
19  it and repair it.  And he said that it was actually quite
20  reliable other than the mishaps of breaking the spray heads
21  off.
22       Q.  Okay.  And so just so I understand, you're not
23  going to tell the jury about any leaking equipment or failed
24  equipment, say, for broken spray heads that Mr. Ashelman had
25  to deal with that would have caused exposures to Roundup®,

## Page 192

1  right?
2       A.  Correct.
3       Q.  Okay.  Now, when you say that Mr. Ashelman spent 2
4  hours spraying, half hour of prep, one and a half hour of
5  spraying, so -- so one and a half hour out the barn door to
6  back, would that be for a single tank?
7       A.  Yes.
8       Q.  Okay.  So when you say that he did four tanks max,
9  it's your understanding that that could be up to 6 hours
10  spraying in a day?
11       A.  No, it would be 8 hours if he did -- oh, if he did
12  1 in the morning, 2 in the afternoon, and one in the
13  evening, it would be 8 hours.
14       Q.  Okay.  So you would count into that the half hour
15  of prep?
16       A.  Oh, yeah, the prep is the mixing time in prep,
17  yeah.
18       Q.  Okay.
19       A.  Yeah.
20       Q.  Did he detail to you in your conversation any
21  incidences during mixing where Roundup® splashed on him?
22       A.  No, and I'm glad you brought that up.  I asked him
23  if when he was pouring the pelletized material into the tank
24  did it splash, and he said no, it remained a fairly fine
25  material that he was able to add to the tank with no

## Page 193

1  problem.
2       Q.  Okay.  So unlike the Cazier case, you won't be
3  talking about any incidences where adding material into the
4  tank caused splashing of Roundup® on Mr. Ashelman?
5       A.  Exactly, there was no report of any splashing with
6  caked sodium sulfite, and large chunks dropping into the
7  tank and causing a splash as in Cazier versus Monsanto.
8       Q.  Is it Cazier?
9       A.  Yes.
10       Q.  Okay.  So I've been just butchering it this entire
11  time?
12       A.  Yes.
13       Q.  Okay.
14       A.  Well, you only did it once.
15       Q.  I -- that's how I've pronounced it now for six
16  months.  Okay, in the Cazier case.
17       Going back to Mr. Ashelman, did he report to you
18  any incidents where he put his face directly over the tank
19  as he mixed?
20       A.  No.
21       Q.  Okay.  Did any of the plaintiffs you interviewed,
22  going back to the ones we've already talked about, report
23  any incidents where they put their face directly over the
24  tank while they mixed if they were a mixer?
25       A.  Out of these five, I don't believe so.

William Sawyer, Ph.D.

## Page 194

1    Q.  Okay.  Now, you talked about his glove use.  Did
2  you ask Mr. Ashelman about his doffing procedures with
3  gloves.
4    A.  Did you say golfing?
5    Q.  Doffing.  It's for how he took the gloves --
6    A.  Oh --
7    Q.  -- on and off, sir.
8    A.  -- I did not.
9    Q.  Okay.
10   A.  No.
11   Q.  So you won't be telling the jury --
12   A.  Golfing.
13   Q.  Sorry.
14      MR. TRAVERS:  I was afraid to say I had no idea
15   what that meant.
16      THE WITNESS:  No, I mean, I really thought he
17   meant he was golfing on a golf course and --
18   BY MR. KALAS:
19   Q.  You won't tell the jury that Mr. Ashelman had any
20   increased exposure from improper doffing procedures with the
21   gloves, correct?
22   A.  No, I have no knowledge of his procedure --
23   Q.  Okay.
24   A.  -- with the gloves.
25   Q.  Okay.  And --

## Page 195

1    A.  Although I do say -- I believe he said -- I
2  believe I did ask him how often he changed the gloves --
3    Q.  Okay.
4    A.  -- and I believe it was a year or two --
5    Q.  Okay.
6    A.  -- that he wore them a long time.
7    Q.  Okay.  And how many times in a year would
8  Mr. Ashelman handle Roundup®?  Well, let me back up.
9      Did you ask him in your interview how many times a
10   year he handled Roundup®?
11   A.  No, I relied on the -- the deposition testimony.
12   Q.  Okay.  So we'll get to your exposure assessment in
13   a bit on him.
14      Pelletized surfactant, you said somebody told him
15   to use that in Roundup®.  Do you know who told him to use
16   that?
17   A.  No, it -- I did not get into that at all.
18   Q.  Okay.
19   A.  It was recommended to him to use this surfactant
20   to enhance the effectiveness of the Roundup®.
21   Q.  Okay.  And you won't be testifying then that
22   Monsanto told him to use that surfactant?
23   A.  No.
24   Q.  You won't be testifying that the surfactant that
25   he used was indicated on the Roundup® label as being proper

## Page 196

1  to be used with Roundup®?
2    A.  Correct.
3    Q.  Okay.  Anything else you asked Mr. Ashelman that
4  you've remembered as we've been discussing him?
5    A.  No.
6    Q.  Okay.  Moving on to Mr. Stauffenberg and your
7  discussion with Mr. Stauffenberg.  Did you have a call with
8  Mr. Stauffenberg on Sunday?
9    A.  I did.
10   Q.  Okay.  And who was on the call with
11   Mr. Stauffenberg?
12   A.  Chris Stauffenberg only.
13   Q.  Okay.  And --
14   A.  I'm sorry --
15   Q.  Do you mean Josh?
16   A.  Joshua, I'm sorry.
17   Q.  Chris Wade.
18   A.  Yeah.
19   Q.  That's all right.
20   A.  They begin to intermix after a while, so yeah.
21   Q.  How long was the call?
22   A.  A little longer.  I'm thinking probably about 20
23   minutes.
24   Q.  Okay.  And again I forgot to ask these questions
25   about Mr. Ashelman so let's go back real quick.

## Page 197

1    A.  They're all "yes."
2    Q.  I still have to ask them.
3      MR. TRAVERS:  He's going to slip a new one in
4    there.
5      THE WITNESS:  Oh, yeah?  He wouldn't do that.
6    BY MR. KALAS:
7    Q.  Mister -- Mr. Ashelman was deposed under oath in
8  2018, right?
9    A.  Yes.
10   Q.  His attorneys had an opportunity to ask him
11   questions there, right?
12   A.  Correct.
13   Q.  And he also served a plaintiff fact sheet under
14   penalty of perjury in this case, right?
15   A.  Yes.
16   Q.  Okay.  And when he spoke to you, Mr. Ashelman was
17   not sworn in by an officer of the court, right?
18   A.  Correct.
19   Q.  And he -- you didn't have a court reporter sitting
20   there to create an official transcript of what was said,
21   right?
22   A.  That's right.
23   Q.  And you didn't create an audio recording or a
24   transcript in some other way of your notes of what was said
25   on that call or what was asked of Mr. Ashelman?

50 (Pages 194 to 197)

William Sawyer, Ph.D.

## Page 198

1    A  Correct
2    Q  Okay  Back to Mr Stauffenberg
3       You said this call took 20 minutes  And, again,
4  it was just you and Mr Stauffenberg on the call?
5    A  Yes
6    Q  Okay  And what did you talk about with
7  Mr Stauffenberg?
8    A  The history, the best he could recall, in terms of
9  when he first remembers Roundup® and the use of Roundup® on
10  the farm, and how he was exposed to it as a child
11    Q  Okay  What else did you ask Mr Stauffenberg on
12  the call?
13    A  Well, he gave me a pretty long and detailed
14  summary of what he could recall  That triggered the
15  question -- I asked him specifically, "Did you ever spray
16  Roundup® from the ATV that you were driving?"  And his
17  answer was, I believe, no, but he said that he used to ride
18  on the ATV while his dad sprayed  And I asked him when, and
19  he said -- and this is where his memory -- he said his
20  memory was not very clear, but he thinks around five years
21  of age
22    Q  Okay
23    A  And that's why I did not include this in my -- in
24  my day's calculation  I flagged it as approximate because
25  he was very unsure of exactly whether it was five years old,

## Page 199

1  four years old, six years old, but he believes it was around
2  five years of age that he would ride on the ATV while his
3  dad -- and his dad had a trailing sprayer, and there was a
4  fairly frequent use of the sprayer because of the large
5  areas that they had to spray.
6       And I believe he said he rode on the ATV a total
7  number of times -- he thinks approximately, a rough
8  approximation, between 30 and 40 times.  I asked him if he
9  recalls how long it took, and he seemed very clear on that.
10  He said about an hour.  And he did not do the spraying, and
11  he did not mix it on the -- for the ATV, but he rode on it
12  while it was spraying.
13    Q.  Okay.  Anything else you asked Mr. Stauffenberg
14  about?
15    A.  I asked him about his own use of the Roundup®, and
16  that was consistent with the deposition testimony.  I also
17  asked him specifically about the use of other products, and
18  I started out with farm products in terms of handling any
19  other herbicides, pesticides, fertilizers, or other
20  chemicals on the farm, and he stated he did not.
21       I asked him regarding the handling of chemicals at
22  the farm or the home used to kill insects or pests of any
23  kind, and I believe he said that he used -- I don't see it
24  in my notes, but I think he said he used some type of bug
25  spray -- well, maybe it's here.  Yeah, yeah, he used --

## Page 200

1  well, let's see.  Other than, yeah, he said he did use bug
2  spray, and that was his own terms in quote, and he said for
3  example Raid.
4       And I asked him if there were any other chemical
5  exposures to paints or solvents, and he stated that he did
6  paint a fence with an enamel paint.  I asked him if he had
7  any unusual exposures or frequent exposures to gasoline, and
8  he responded to that that -- I believe he said once or
9  twice.  Let me check the notes here.  I don't see it, but I
10  believe he said that he washed some paint off his hand with
11  gasoline on a rag once or twice.  That was his only exposure
12  to gasoline beyond just normal filling of the automobile,
13  that kind of thing.
14    Q.  Any -- sorry, did I cut you off?
15    A.  No, go ahead.
16    Q.  Any other things you asked him about?
17    A.  Yes.
18    Q.  Okay.
19    A.  I asked him about the handling of paint stripper,
20  if he ever paint -- stripped furniture or other items with
21  paint stripper, and he said that he has in the past, and it
22  was primarily post cancer diagnosis.  And he may have told
23  me what it was he stripped, but I forget.
24       He also gave me a long, detailed summary of his
25  exposures to crops that had been treated with Roundup®, and

## Page 201

1  that he was playing through, as his dad was out there
2  spraying, corn crops as I recall.  Yeah.  And he said he
3  played hide-and-seek in the cornfields that had recently
4  been sprayed with Roundup®, that the fields were sprayed
5  once or twice a year.
6       And there was also -- I don't know if I have it in
7  here.  He spoke of -- I believe it was riding his bicycle in
8  a ditch that was adjacent to the cornfield, and that this
9  ditch, when flooded, it had killed all of the grass in the
10  yard.  He said because of the Roundup® in the -- in the
11  water.  But he used to ride his bike through that ditch, and
12  he said one time he actually went in the ditch with his head
13  under water was his --
14    Q.  Okay.
15    A.  -- description.
16    Q.  So we're getting, I think, a little conflated
17  here.  I want to make sure this record is clear.
18    A.  Okay.
19    Q.  It appears that you started talking a little bit
20  about statements made in deposition by Mr. Stauffenberg or
21  by a relative of Mr. Stauffenberg, and I'm trying to focus
22  on your interview with Mr. Stauffenberg of which I don't
23  have a transcript.
24    A.  Well, some of this he -- what I'm telling you he
25  said in response to my questions.

William Sawyer, Ph.D.

Page 202

1    Q.   Okay.  So he brought up the -- the bicycle
2    incident and the bug spray in response to your questions, as
3    well, even though in your report it appears as deposition
4    cites as opposed to in your interview section.
5    A.   Yes.
6    Q.   Okay.  Okay.  I just want to make sure that's
7    clear.
8         What else did you talk about with him on this
9    call?
10   A.   Okay.  Talked about the -- the bicycle, the ditch.
11   He said he actually put his head under the water once.  I
12   think that's about all.
13   Q.   Okay.  Let me follow up on a couple of those
14   questions.
15        Did you ask him about entering, as a child, areas
16   that had been treated with pesticides?
17   A.   Yes.
18   Q.   Okay.
19   A.   He said he played in the cornfield --
20   Q.   Okay.
21   A.   -- and that was not -- you know, it was -- I think
22   he said twice a year that his dad would spray.  It wasn't an
23   everyday exposure.  It was, you know, infrequent.
24   Q.   And how -- how long after dad sprayed the
25   cornfield did Mr. Stauffenberg tell you, on your call on

Page 203

1    November 3rd, would he -- how long after the spraying
2    occurred would he go in?
3    A.   I believe he made a reference to while his dad was
4    out there with the tractor spraying.
5    Q.   He told you that on the call?
6    A.   I believe so.
7    Q.   Okay.
8    A.   Yeah, soon after.
9    Q.   Okay.  Now, would he run in front of where dad was
10   spraying?  Behind where dad was spraying?  In other words,
11   did he go through treated areas, or did he not, or was it a
12   mix, or did you not ask?
13   A.   I didn't ask.
14   Q.   Okay.  Do you know the -- do you understand the
15   concept of adsorption?
16   A.   Yes, to the surface.
17   Q.   Okay.  Do you know how long it takes for
18   glyphosate to adsorb to soil?
19   A.   I've read that the soil adsorption value is fairly
20   high.  It likes to adsorb the soil.  That's really about it.
21   I can't cite the strength of that association.
22   Q.   Did you make any determination or ask
23   Mr. Stauffenberg any questions about the type of soil on
24   their property --
25   A.   No.

Page 204

1    Q.   -- as far as clay content, anything like that?
2    A.   No.
3    Q.   Did you do any independent analysis during your
4    conversation with Mr. Stauffenberg about the capability of
5    glyphosate to run off the soil and therefore kill the
6    vegetation in the ditch that he referred to?
7    A.   No.
8    Q.   Okay.  Or have you heard that glyphosate is
9    environmentally beneficial in part because runoff is very
10   low from glyphosate?
11   A.   No.  I'd have to defer that to an agricultural
12   expert that's -- as far as the soil adsorption and the
13   permeability constants and that type of thing, I really
14   can't -- I really don't plan on addressing that.
15   Q.   Okay.  So based on your conversation with
16   Mr. Stauffenberg, you're not going to tell the jury that the
17   vegetation in the ditch in which he submerged his head under
18   the water actually had Roundup® in it because you haven't
19   analyzed the ability of Roundup® to run off of the type of
20   soil that was on their property.
21        MR. TRAVERS:  Objection to form.
22   A.   I will not be making that assumption.  My -- what
23   I learned from Mr. Stauffenberg was that he was exposed to
24   the water in the ditch, whole body, and it was more than one
25   time.  He used to ride his -- for whatever reason ride his

Page 205

1    bicycle in that ditch.  And he stated that this ditch water,
2    upon a heavy rain, did kill their grass, and it's just more
3    of a facts-in-the-case thing.  I'm not opining whether he's
4    right or wrong.  I'm not opining how accurate he is.  That's
5    not my job.  I'm a toxicologist.  So I did not include any
6    quantitative exposure assessment with respect to those
7    exposures.  My exposure days assessment is not based on
8    that.
9    BY MR. KALAS:
10   Q.   Okay.  My question is a little bit different, or
11   maybe I wasn't clear enough in my question.
12        You're not going to tell the jury that the grass
13   in that ditch was dead because there was Roundup® in the
14   water, right?
15   A.   No, I can't draw a conclusion on that.  I would
16   have to defer that to the -- the witnesses.
17   Q.   Okay.  And as far as the corn in the field when
18   Mr. Stauffenberg told you he went into the field, did you
19   ask him how long it took for the Roundup® to dry on corn, if
20   he touched it?
21   A.   No.
22   Q.   Okay.  Are you going to tell the jury that
23   Mr. Stauffenberg had corn-to-skin transfer from running
24   through the field based off your interview with him?
25   A.   If it is established or hypothetically stated that

52 (Pages 202 to 205)

William Sawyer, Ph.D.

## Page 206

1   the corn had been sprayed within -- certainly within 24
2   hours, then the answer would be yes, and I would certainly
3   point to the EPA document on reentry --
4       Q.  Okay.
5       A.  -- and as well as the EPA 2008 document on the
6   transfer rate of glyphosate to skin in children.
7       Q.  Are you -- have you done the analysis, following
8   your discussion with Mr. Stauffenberg, about how long
9   glyphosate takes to dry on the type of corn they were
10  growing, and using the formulation of Roundup® they were
11  using?
12      A.  Can you repeat that?
13      Q.  Have you done any analysis, following your
14  conversation with Mr. Stauffenberg about entering the
15  cornfields, about how long glyphosate takes to dry and thus
16  be unavailable for hand-to-skin or corn-to-skin transfer on
17  the type of corn they were using, using the glyphosate
18  formulation they were using?
19      A.  No, because that's an incorrect statement.  It
20  doesn't have to be wet to transfer.  The EPA document I
21  referenced in my report has a transfer coefficient rate for
22  after it dries.
23      Q.  So we'll get to your opinions in your report about
24  Mr. Stauffenberg's exposure, but I'm asking about your
25  conversation with him.  And so I think you've answered that

## Page 207

1   question so we'll move on.
2          Going back to your Mr. Stauffenberg -- your
3   conversation with Mr. Stauffenberg, did you ask him about
4   any other pesticides they used on the farm?
5       A.  Did I ask him about pesticide use on the farm?
6   Yes.
7       Q.  Other pesticides beyond glyphosate.
8       A.  I did, and I said that he -- he said he did not
9   use any other products on the farm, but maybe his dad had.
10      Q.  Okay.  And did he ride on the ATV when dad applied
11  other pesticides?  Did you ask him that question?
12      A.  I did not.
13      Q.  Did you ask him how he was sure that it was
14  Roundup® that dad was applying when he was on the ATV?
15      A.  Yes.  He said it was for killing the weeds, and he
16  identified -- and I don't remember where -- where it was he
17  was riding, but he identified the purpose of it.
18      Q.  All right.
19      A.  From what he -- from what he identified, it was
20  clearly Roundup®, and I just don't remember if it was fence
21  line or ditches or both.
22      Q.  Is Roundup® the only herbicide used on farms to
23  kill weeds?
24      A.  No.
25      Q.  Okay.  So beyond the fact that they were using the

## Page 208

1   herbicide on the ATV to kill weeds, did you ask him any
2   other questions during your interview about how he was sure
3   it was Roundup®?
4       A.  No.
5       Q.  Okay.  And then did you ask -- and this actually
6   goes to Mr. Ashelman, too, so I'll ask it about Mr. Ashelman
7   next.  Did you ask about the type of fuel used on the farm
8   equipment on the Stauffenberg farm?  Were these diesel
9   tractors, gasoline, what have you?
10      A.  No, I didn't ask.
11      Q.  Okay.  So you didn't ask diesel exposures on the
12  farm?
13      A.  No.
14      Q.  Okay.  How about on the Ashelman farm?  Did you
15  ask about diesel exposures on the Ashelman farm?
16      A.  No.
17      Q.  Okay.  Did you ask about the surrounding farms
18  near the Stauffenberg farm that Mr. Stauffenberg grew up on?
19      A.  No.
20      Q.  Did you ask him about whether he knew what his
21  neighbors applied on surrounding farms?
22      A.  No, but I am aware that they had 6,000 acres so I
23  think the nearest neighbor is a long ways off.
24      Q.  Is the house right in the middle of the farm, or
25  is on the edge of the farm?

## Page 209

1       A.  Well, at least on three sides it would probably
2   be a --
3       Q.  Okay.
4       A.  -- pretty distance.
5       Q.  So how about the property across the street?  Did
6   you ask what's applied there?
7       A.  No.
8       Q.  Okay.  Did you ask if there was aerial
9   applications on the Stauffenberg farm of any other
10  pesticides or herbicides that Mr. Stauffenberg could recall?
11      A.  No.
12      Q.  Okay.  Now, prior to your call with Mister -- or
13  strike that.
14          Anything else you talked about with
15  Mr. Stauffenberg that you can recall before we move on?
16      A.  No.
17      Q.  Okay.  Prior to that call with Mr. Stauffenberg,
18  he was deposed under oath, right?
19      A.  Yes.
20      Q.  His family members were also deposed under oath,
21  right?
22      A.  Yes.
23      Q.  And that was last year?
24      A.  Correct.
25      Q.  And his attorneys had an opportunity to ask

53 (Pages 206 to 209)

William Sawyer, Ph.D.

## Page 210

1  Mr. Stauffenberg questions at that deposition, right?
2  A. Yes.
3  Q. His attorneys had opportunity to ask the
4  Stauffenberg relatives questions at their depositions,
5  right?
6  A. Yes.
7  Q. And Mr. Stauffenberg also served the plaintiff
8  fact sheet under the penalty of perjury, right?
9  A. Yes.
10  Q. Okay. And when he spoke to you, you didn't have
11  an officer of the court come in to swear in
12  Mr. Stauffenberg, right?
13  A. No, I did not.
14  Q. And when you spoke to Mr. Stauffenberg, you didn't
15  have a court reporter sitting there to create an official
16  transcript of what was said, right?
17  A. Correct.
18  Q. Okay. And it was your practice in the case of
19  Mr. Stauffenberg, as in the case of other plaintiffs in the
20  Roundup® litigation, not to create an audio recording or
21  other transcript of the discussion, right?
22  A. That's correct.
23  Q. Okay. Anything else you can recall of your five
24  conversations you had over the last few days with the
25  plaintiffs in this case that we haven't discussed?

## Page 211

1  A. No.
2  Q. Okay.
3  MR. KALAS: Let's go off the record for a minute.
4  THE VIDEOGRAPHER: We are going off the record at
5  2:29 p.m.
6  (Recess from 2:29 p.m. to 2:42 p.m.)
7  THE VIDEOGRAPHER: We're back on the record. The
8  time is 2:42 p.m. This begins media unit number 4.
9  BY MR. KALAS:
10  Q. All right. Let's go to your report in the Batiste
11  case, sir, if you can open that up.
12  A. All right.
13  Q. Now, you stated earlier that in the case of
14  Mr. Batiste and the other applicators, you might compare
15  them to the AOEL of .1 mgs per kg per day as a hypothetical
16  applicator, right?
17  A. Yes.
18  Q. Okay. And if you go to page 38, you discuss,
19  regarding this hypothetical applicator you might compare
20  plaintiffs to, a study called Nair, N-A-I-R, right?
21  A. I'm on Batiste page --
22  Q. 38?
23  A. -- 38. Yeah, yeah, there's Nair, right.
24  Q. Okay. And I'm confused by one thing here on your
25  hypothetical applicator, and I think you're -- you're

## Page 212

1  talking here in the context of the George study, and I
2  believe in your previous report the Prasad study. And you
3  state in your Batiste report underneath table 13 (as read),
4  "Applying the human equivalent dose and 3 percent dermal
5  absorption results in a reasonably similar dose to that
6  sustained by a hypothetical applicator at the AOEL level of
7  .1 mgs per kg per day."
8  Did I read that correctly?
9  A. Yes.
10  Q. Okay. So let's mark the Nair study so we're all
11  singing off the same songbook here as Exhibit 23.
12  (Exhibit 23 marked for identification.)
13  BY MR. KALAS:
14  Q. And I want to make sure we're comparing apples to
15  apples here.
16  So you would talk about, if I understand
17  correctly, the Nair study in the context of the Prasad study
18  when comparing the AOEL hypothetical dose in Mr. Batiste's
19  case or others to the Prasad dose, right?
20  A. Yes.
21  Q. Okay.
22  A. The Nair study is simply an allometric scaling
23  study that's generally accepted and been used for years.
24  Q. Okay. So you say the Nair study is generally
25  accepted, and, in fact, the Nair study discusses the fact

## Page 213

1  that many regulatory agencies use a straight mgs per kg
2  comparison as opposed to the allometric scaling that they
3  suggest here, right?
4  A. Well, they state, "It should be emphasized that
5  the common perception of scaling of dose based on the body
6  weight (mg/kg) alone is not the right approach."
7  Q. Right. So what they're saying is that the common
8  approach is not the right approach. Here is our approach
9  which we think is better. Right?
10  A. Yes.
11  Q. Okay. So when you say it's generally accepted,
12  the Nair application, there are actually many agencies that
13  don't use this, right?
14  MR. TRAVERS: I'm going to object to this line of
15  questioning as general causation --
16  MR. KALAS: Okay, thank you.
17  MR. TRAVERS: -- testimony --
18  MR. KALAS: Thanks, Jeff.
19  MR. TRAVERS: -- and just wasting more time.
20  MR. KALAS: Okay.
21  A. Yes.
22  BY MR. KALAS:
23  Q. Okay. And what the Nair study says to do to
24  compare to a human equivalent dose, which you are going to
25  talk about in Mr. Batiste's case and in other cases, that as

William Sawyer, Ph.D.

Page 214

1    in the case of a mouse, for instance, multiply the animal
2    dose by .081, correct?
3        MR. TRAVERS: Objection, form. This testimony
4    applies to every Roundup® case, and it's general
5    causation testimony, and he's been deposed on this
6    issue before.
7        MR. KALAS: Okay. Find me the transcript where
8    he's been deposed --
9        MR. TRAVERS: All right. He could have been
10   deposed if he hasn't been.
11       MR. KALAS: He could have been except you'd
12   require --
13       MR. TRAVERS: There could have been a
14   deposition -- this isn't -- the purpose of this
15   deposition isn't to take another shot at -- at opinions
16   you could have asked about earlier in any one of his
17   eleven depositions.
18       MR. KALAS: Okay.
19       MR. TRAVERS: So I think that --
20       MR. KALAS: Are you done making your speech?
21       MR. TRAVERS: No, it's about the --
22       MR. KALAS: Okay.
23       MR. TRAVERS: -- it's about the case-specific
24   facts of Wade, Ashelman, Stauffenberg, Batiste, and
25   Meeks.

Page 215

1        MR. KALAS: Okay. Are you done with your speech
2    now?
3        MR. TRAVERS: Yes.
4        MR. KALAS: Okay.
5    BY MR. KALAS:
6        Q.  Doctor, in the case of a mouse, it says to
7    multiply the animal dose by .081 to get a human equivalent
8    dose, correct?
9        A.  Yes. As I discussed in my prior deposition, I was
10   asked about the George study and the allometric scaling.
11       Q.  Okay. I'm asking you about the Nair study here.
12   Okay.
13       A.  Yeah. Well, the Nair study is what I had
14   previously cited in my report with a footnote exactly as
15   you're seeing right now. Nothing has changed. I've already
16   been asked about this.
17       Q.  Okay. I asked a simple question, which is all the
18   Nair study says to do is to multiply an animal dose by .081
19   to get a human equivalent dose, correct? In the case of a
20   mouse.
21       A.  Yes.
22       Q.  Okay. So --
23       MR. TRAVERS: Objection to revisiting his
24   deposition testimony.
25

Page 216

1    BY MR. KALAS:
2        Q.  So taking it to the Prasad study where you served
3    a supplemental report less than two weeks ago --
4        MR. TRAVERS: And he's been deposed -- he's had
5    the opportunity to be deposed on in two other
6    depositions.
7        MR. KALAS: Jeff, Jeff, please stop making
8    speaking objections. You've made your position clear.
9        MR. TRAVERS: Listen, you're going beyond the
10   scope of this deposition, and I am going to make the
11   record clear about how far off you're going, especially
12   if you're going to be asking for a second day.
13       A.  I was deposed all day on October 30th. That's
14   just what, eight days? Nine days ago?
15   BY MR. KALAS:
16       Q.  Dr. Sawyer, let me ask my questions. Jeff and I
17   can hash out whatever we're going to hash out after this
18   with the Court.
19       The Nair study says to multiply the animal dose by
20   .081 to get a human equivalent dose, correct?
21       A.  Yes.
22       Q.  Okay. And if I multiplied the dose in Prasad that
23   you talk about in your supplemental report --
24       MR. TRAVERS: That he had the opportunity to be
25   deposed --

Page 217

1        MR. KALAS: Stop cutting me off, Jeff
2        MR. TRAVERS: Hey, lower your voice
3        MR. KALAS: Stop cutting me off
4        MR. TRAVERS: John, lower your voice  I'm make --
5    you're going way outside --
6        MR. KALAS: You're not letting me finish my
7    question  Stop cutting me off
8        MR. TRAVERS: Okay
9        MR. KALAS: Let me finish my question --
10       MR. TRAVERS: Okay  And --
11       MR. KALAS: -- and make your objection
12       MR. TRAVERS: All right
13       A.  Okay  Go ahead
14   BY MR. KALAS:
15       Q.  Using the Prasad dose of 25 mgs per kg in the
16   Swiss albino mouse that you talked about in your
17   supplemental report from October 21st of this year, and
18   multiplying it by the human equivalent dose here of .081,
19   you would get a human equivalent dose of approximately 2 mgs
20   per kg, correct?
21       MR. TRAVERS: Objection  This questioning is
22   beyond the scope of this deposition  He's already been
23   deposed on this issue  He's going to be -- he's been
24   deposed twice since he issued that supplemental report
25       THE WITNESS: That's correct

William Sawyer, Ph.D.

Page 218

```
 1              MR. KALAS: Okay.
 2     BY MR. KALAS:
 3          Q.  And as we've discussed earlier today in the
 4     context of Mr. Wade and Mr. Batiste, exposure and dose are
 5     two separate things, correct?
 6          A.  Yes.
 7          Q.  Okay.  And so when you state here in your Batiste
 8     report that you apply a 3 percent dermal absorption to
 9     result in a reasonably similar dose to that sustained by a
10     hypothetical applicator at the AOEL level of .1 mg per kg
11     per day, you would actually apply a 3 percent dermal
12     absorption to a 2 mg per kg exposure to get a similar dose,
13     correct?
14          A.  That's what I did, yes.
15          Q.  Okay.  So when you say "dose," what you mean here
16     is exposure, right?
17          A.  No.  If you read one, two, three -- five lines
18     from the bottom of page 38, five lines up from the bottom,
19     it states, "Applying the HED and 3% dermal absorption
20     results in a reasonably similar dose."
21          Q.  Okay, sir.  But my question is, is that the
22     dose -- the human equivalent dose in the Prasad study, as we
23     just established, was 2 mg per kg per day, and the AOEL is
24     .1 mg per kg per day, right?
25              MR. TRAVERS:  Objection, asked and answered.
```

Page 219

```
 1          A.  No, you're -- you're comparing misinformation.
 2     BY MR. KALAS:
 3          Q.  Okay.
 4          A.  The --
 5          Q.  Tell me where I'm wrong.
 6          A.  Well, the 2 milligram per kilogram per day has to
 7     be multiplied times the percent absorption to achieve the
 8     dose.
 9          Q.  Okay.  So the two milligram per kilogram per day
10     dose in Prasad which is systematically available in the
11     mouse, a hundred percent --
12          A.  Okay.  I'm sorry.  I -- I was referring to page 38
13     of my report.
14          Q.  Yes, sir, I'm looking at it.
15          A.  Yes.  And you will see that the 3 percent is
16     applied to the exposure to achieve the actual systemic dose.
17          Q.  I understand.
18          A.  Okay, good.
19          Q.  So the 2 mg per kg equivalent dose is actually an
20     equivalent exposure.  In other words, the 2 mg per kg
21     exposure, if you apply a 3 percent dermal absorption factor,
22     will result in a .1 mg per kg dose, correct?
23              MR. TRAVERS:  Objection, form.
24          A.  Based on table 13 the result would be .081
25     milligram per kilogram per day, approximately 0.1.
```

Page 220

```
 1     BY MR. KALAS:
 2          Q.  0.8 -- or .081 is the multiplier applied here,
 3     sir.
 4          A.  Oh, I'm sorry.  Yeah, I was looking at the wrong
 5     column.
 6          Q.  Okay.
 7          A.  The result of table 13 is approximately -- let me
 8     get my calculator.
 9              MR. TRAVERS:  I also note for the record table 13
10     is in the general portion of his report.  It's not --
11     he's already served in the MDL, and it's been deposed
12     on twice.
13          A.  Yeah.  So 2.025 milligram per kilogram per day
14     times 3 percent equals .06 milligram per kilogram per day,
15     which is the actual systemic dose.
16     BY MR. KALAS:
17          Q.  I understand.  So you'd have to take an exposure
18     of 2 milligrams per kilogram per day, multiply it by 3
19     percent to get the dose.  That's what you're saying?
20          A.  Yes.
21          Q.  Okay.  And the dose in the Prasad study was 2
22     milligrams per kilogram per day at a human equivalent level,
23     correct?
24          A.  I don't recall.
25          Q.  Do you recall -- go back to 9, Exhibit 9.
```

Page 221

```
 1          A.  Okay.
 2          Q.  Do you see the dose that is discussed in that
 3     study are 25 milligrams per kilogram and 50, right?
 4          A.  Well, let's see.  25 and 50 milligram per kilogram
 5     per day body weight.
 6          Q.  Okay.
 7          A.  And this is for mice, I believe.
 8          Q.  Right.  So if I multiply 25 milligrams per
 9     kilogram by .081, I would get 2 milligrams per kilogram,
10     correct?
11              MR. TRAVERS:  Objection, form.
12          A.  2.025 milligram per kilogram, that's correct.
13     BY MR. KALAS:
14          Q.  And your calculations regarding the Prasad study
15     is citation 304 in your report that we discussed about
16     earlier, right?  Your written calculations regarding Prasad.
17          A.  Written calculations?  Where?
18          Q.  Yes, sir.
19          A.  Where are they?
20          Q.  Go back to the Batiste report.  We'll just use the
21     citation here.  304 on page 147.  That's the written
22     calculations normalizing the Prasad dose to a human
23     equivalent dose, right?
24          A.  Which -- which reference?
25          Q.  Batiste -- Batiste report reference 304 on page
```

56 (Pages 218 to 221)

William Sawyer, Ph.D.

Page 222

```
1    147.
2         A.  Right.  Yeah, I need to see that summary.  I don't
3    have it with me.
4         MR. KALAS:  Do you have -- mark as Exhibit 24 -- I
5    only have two copies, Jeff, but you were cc'd on this
6    so I assume you got it.
7         (Exhibit 24 marked for identification.)
8         MR. TRAVERS:  I'm just saying that we're not going
9    to consent to a second day of deposition without court
10   order so --
11        MR. KALAS:  Okay.
12        MR. TRAVERS:  -- take your risk if you're not
13   going to ask about case specific stuff.  You may lose
14   your opportunity.
15   BY MR. KALAS:
16        Q.  This is what you're referring to as citation 304,
17   correct?
18        A.  Yes.
19        Q.  Okay, thank you.  That was my only question about
20   it.
21        Let's -- let me ask you this before we turn back
22   to asking you about your interview with Mr. Batiste.
23        Exhibit 13, the Machado-Neto study, did you come
24   up with any further opinions about the Machado-Neto study
25   over lunch?
```

Page 223

```
1         A.  On a preliminary basis, yes.
2         Q.  Okay.  What are your new opinions about the
3    Machado-Neto study you came up with over lunch?
4         A.  Well --
5         Q.  These are new opinions obviously.
6         MR. TRAVERS:  Yeah, and --
7         MR. KALAS:  Go ahead.
8         MR. TRAVERS:  -- and we're not going to offer them
9    at trial, but if you want to ask him --
10        MR. KALAS:  You're not going to offer them at
11   trial?
12        MR. TRAVERS:  No.
13        MR. KALAS:  Okay.
14   BY MR. KALAS:
15        Q.  Then I'll ask you at the next depositions when I
16   can ask you these questions about your new opinions on
17   Machado-Neto.
18        As it stands now, are all the opinions you intend
19   to offer about Machado-Neto contained in your notes?
20        A.  I think so.
21        Q.  ███████████████████████████
     ███████████████████████████████████
22   ███████████████████████████████████
24   ███████ MR. TRAVERS:  Objection, form.
   ███
```

Page 224

```
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
6    BY MR. KALAS:
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
10        Q.  Okay.  And --
11        MR. KALAS:  I'll mark as exhibit -- I need some
12   more stickers.  Thank you.
13        (Exhibit 25 marked for identification.)
14   BY MR. KALAS:
15        Q.  This is Exhibit 25, sir.  This is his plaintiff
16   fact sheet.
17        MR. KALAS:  And then I'll mark as Exhibit 26 his
18   deposition.
19        (Exhibit 26 marked for identification.)
20   BY MR. KALAS:
21        Q.  All right.  Now, today Mr. Batiste is 39 years
22   old, right?
23        A.  Right, birthday is not till February.
24        Q.  Okay.  And when he was diagnosed with NHL, he was
25   32, just about to turn 33, right?
```

Page 225

```
1         A.  Yes.
2         Q.  It's a young age to be diagnosed with NHL, right?
3         A.  Yes.
4         Q.  But it does happen to people who have never
5    touched Roundup® a day in their life, right?  There are
6    people who are 32 who are diagnosed with NHL?
7         A.  Correct.
8         Q.  Like Mr. Wade, just because Mr. Batiste used
9    Roundup® and has NHL does not, in and of itself, mean his
10   use of Roundup® caused his NHL, true?
11        A.  Correct.  One has to calculate the dose and
12   compare it to that of the human epidemiologic studies to
13   determine whether it meets the threshold.
14        Q.  Okay.  And, in fact, let me ask this about all
15   five plaintiffs at once.  Just because all five plaintiffs
16   used Roundup® and have NHL does not mean, in and of itself,
17   that Roundup® caused NHL in any one of those plaintiffs,
18   correct?
19        MR. TRAVERS:  Object, asked and answered at the
20   beginning of this deposition.
21        A.  The question is actually confusing.  I didn't
22   understand.
23   BY MR. KALAS:
24        Q.  Okay.  All five plaintiffs -- we talked about some
25   things that plaintiffs had in common and plaintiffs had
```

57 (Pages 222 to 225)

William Sawyer, Ph.D.

## Page 226

1    different at the beginning of this deposition. Do you
2    remember that?
3        A. Yes.
4        Q. Okay. One thing all the plaintiffs have in common
5    is that they're all men, right?
6        A. Yes, yes, they're all men at low risk, nonsmokers,
7    no excessive alcohol among any of them, no drugs of abuse,
8    no pre-underlying conditions or other alternative chemical
9    exposures causing their NHL that I was able to identify.
10       MR. KALAS: Move to strike as nonresponsive.
11   BY MR. KALAS:
12       Q. Are all the plaintiffs men in this case?
13       A. Yes.
14       Q. Okay. That's one thing they have in common,
15   right?
16       A. One of many things, yes.
17       Q. Okay. And all the plaintiffs -- strike that.
18          Men, on the whole, are at a higher risk of NHL
19   over the course of their life than women, true?
20       A. I'll defer that to the various oncologists in
21   these cases.
22       Q. Okay. Let me ask you a hypothetical then.
23       A. I did not review the SEER registry specifically
24   for this case.
25       Q. Okay. Let me ask you a hypothetical then.

## Page 227

1        THE WITNESS: SEER is S-E-E-R, caps.
2    BY MR. KALAS:
3        Q. Assuming men are at a higher risk than women for
4    NHL generally, the fact that all of the plaintiffs in this
5    case are men does not mean, in and of itself, being a man
6    caused their NHL, right?
7        MR. TRAVERS: Objection, form.
8        A. Correct.
9    BY MR. KALAS:
10       Q. Okay. Likewise, just because each and every one
11   of these plaintiffs use Roundup® does not mean, in and of
12   itself, Roundup® caused their NHL, true?
13       MR. TRAVERS: Objection, asked and answered.
14       A. Correct, by itself. One has to look at the
15   various factors I identified, such as other chemical
16   exposures, radiological exposures, dose and duration of the
17   chemical, the frequency and the latency of the chemical
18   exposure. These are all factors that a toxicologist
19   considers. And just because they all shared an exposure in
20   itself is not what a toxicologist reviews, but rather all
21   these other aspects that are informative.
22   BY MR. KALAS:
23       Q. Correct. It would be incorrect for someone to
24   argue that the only thing the five plaintiffs in this case
25   have in common, the only common thread they have is that

## Page 228

1    they used Roundup®. There are other things they share in
2    common, true?
3        MR. TRAVERS: Objection, form, compound.
4        A. Can you separate the questions?
5    BY MR. KALAS:
6        Q. Sure. There are other things these men shared in
7    common besides using Roundup®, true?
8        A. Yes.
9        Q. Okay. It would be incorrect for somebody to argue
10   the only common thread that each of these plaintiffs have in
11   common was that they used Roundup®, true?
12       A. Correct. They had other commonalities which I
13   already identified, such as nonsmokers, non-heavy alcohol, a
14   nondrug user, no other significant risk factors from a
15   chemical and toxicological standpoint.
16       Q. Okay. But they also had things in common outside
17   of NHL causation in your opinion, right? Strike that. Let
18   me ask it a different way.
19          Each of these men at some level were exposed to
20   benzyne in their life, right?
21       MR. TRAVERS: Objection, form.
22       A. Yes. There's benzyne in this room air right now.
23   We know from the EPA background studies of rural air and
24   indoor air that all indoor environments have measurable
25   benzyne. Usually it's the low number of microgram per cubic

## Page 229

1    meter of air. But we're all exposed to benzyne whenever we
2    put gasoline in our car, so yes.
3    BY MR. KALAS:
4        Q. And all of these men at some level were exposed to
5    formaldehyde outside of their Roundup® use in their life,
6    correct?
7        A. Yes. It's a matter of dose, yeah. There's
8    formaldehyde in our circulating blood as a metabolite.
9        Q. Our -- our body creates formaldehyde.
10       A. Yeah, it creates levels, extremely low levels.
11       Q. Yeah, sure.
12       A. Hundreds and hundreds of times below that of what
13   was in the Roundup®, but yes.
14       Q. All these men consumed formaldehyde in their food.
15       A. In general the term "food."
16       Q. Okay. Namely fruits and vegetables usually,
17   correct?
18       A. Yes.
19       Q. Okay. All these men would have consumed nitrates
20   in some level, correct?
21       A. Yes.
22       Q. Okay. All of these men would have been exposed to
23   ethylene oxide at some dose in ambient air, correct?
24       A. Possibly.
25       Q. Okay. And so when I get at the question there are

58 (Pages 226 to 229)

William Sawyer, Ph.D.

| Page 230 | Page 232 |
|---|---|
| 1 other things each and every one of these men were exposed to | 1 experts. |
| 2 besides Roundup®, I'm not just getting at, you know, | 2 BY MR. KALAS: |
| 3 lifestyle factors. There are other chemicals each and every | 3 Q. Okay. You haven't looked at the data to see |
| 4 one of these men were exposed to beyond Roundup®, true? | 4 that -- see whether or not people use more Roundup® in |
| 5 A. Yeah, so were the controls in the human studies. | 5 Louisiana than in other states, right? |
| 6 Q. Sure. And most of those studies were not | 6 A. No. |
| 7 statistically significant when controlling for other | 7 Q. They don't farm soybeans in Louisiana, right? |
| 8 variables, right? | 8 A. Probably not to the extent that it is farmed in |
| 9 MR. TRAVERS: Objection, form. | 9 the Midwest or Northeast simply because the crops are more |
| 10 A. I will defer that to the epidemiologist. | 10 suitable to sugarcane and rice. |
| 11 BY MR. KALAS: | 11 Q. And there's no GMO rice that are Roundup® Ready, |
| 12 Q. I had a feeling you would. Let's keep going. | 12 right? |
| 13 Are you offering any opinions regarding the course | 13 A. You guys are working on it I understand. |
| 14 of Mr. Batiste's NHL? | 14 Q. Are there any GMO products on the market right now |
| 15 A. No. | 15 of Roundup® Ready rice? |
| 16 Q. Are you offering any opinions regarding | 16 A. I know it's being worked on. That I do know. |
| 17 Mr. Batiste's prognosis? | 17 I've read about it. But I don't know that it's on the |
| 18 A. No. | 18 market yet. |
| 19 Q. Okay. Now, Mr. Batiste lives in Lafayette, right? | 19 Q. All right. How about Roundup® Ready sugarcane? |
| 20 In the Lafayette area. | 20 Is that on the market? |
| 21 A. Oh, yes, I've been there. | 21 A. That I don't know. |
| 22 Q. Okay. And you've testified actually in many cases | 22 Q. Okay. You aren't going to say that Roundup® is |
| 23 in Louisiana, haven't you? | 23 used agriculturally in the Lafayette area to any large |
| 24 A. Yes. | 24 degree, are you? |
| 25 Q. Louisiana has one of the highest cancer rates in | 25 A. No, that's not -- not my -- |

| Page 231 | Page 233 |
|---|---|
| 1 the country, doesn't it? | 1 Q. Okay. |
| 2 A. It does, but I don't -- I don't think it's due to | 2 A. -- duty in this case, to opine on that. I'm a |
| 3 that delicious Cajun food that I like. Let's hope not. | 3 toxicologist, not an epidemiologist. |
| 4 Q. Okay. So I'll ask it again, and I appreciate the | 4 Q. How about obesity rates? Louisiana has one of the |
| 5 humor. | 5 highest obesity rates in the country, right? |
| 6 Louisiana has one of the highest cancer rates in | 6 A. I think so. I think Mississippi wins the prize |
| 7 the country, right? | 7 actually. |
| 8 A. You know, I have not actually looked at the SEER | 8 Q. I don't know if that's a prize you want to win |
| 9 registry or other registries to document that either way so | 9 but -- and as we talked before about -- and we may look at a |
| 10 I really can't opine on that. | 10 study, but if you'll just -- well, strike that. |
| 11 Q. Okay. So you won't -- you won't say to the jury | 11 So we talked before about there are studies out |
| 12 that it was more or less unusual for a man who's 32 to get | 12 there in the literature associating obesity with NHL, right? |
| 13 NHL in Louisiana as opposed to Nebraska or to Maine? | 13 A. I -- I believe there are studies that show an |
| 14 A. No. | 14 association. I don't know how strong it is and what other |
| 15 Q. Okay. | 15 factors are involved. But I would defer that to the |
| 16 A. No, that's not -- not my duty as a toxicologist. | 16 oncologists and medical epidemiologists who are better |
| 17 I would defer that to the medical epidemiologists and | 17 suited and prepared to answer that question. |
| 18 oncologists. | 18 Q. You're not going to tell the jury that |
| 19 Q. Okay. Is Mr. Batiste African American or | 19 Mr. Batiste's obesity didn't put him at a higher risk of NHL |
| 20 causation -- Caucasian? | 20 in and of itself, right? |
| 21 A. I think he's African American. | 21 MR. TRAVERS: Objection, asked and answered. |
| 22 Q. Okay. Are you aware the rate of NHL in African | 22 MR. KALAS: No, I didn't ask about Batiste. |
| 23 Americans in Louisiana exceeds the U.S. average? | 23 MR. TRAVERS: Okay. |
| 24 MR. TRAVERS: Objection, form. | 24 A. I'm going to defer that to the appropriate experts |
| 25 A. Again, I will defer that to the appropriate | 25 that I just mentioned. |

William Sawyer, Ph.D.

Page 234

BY MR. KALAS:
1
2     Q.  Okay.  And you're not going to be able to tell the
3  jury that Mr. Batiste would not have gotten NHL even if he
4  never used Roundup® a day in his life, right?
5     A.  Correct.  I mean, there's no way to -- to reach
6  that conclusion with any cancer in any situation because it
7  can occur as a background event so we can't, you know, draw
8  any conclusion on that.
9     Q.  And you're not going to tell the jury that
10  Mr. Batiste would not have gotten NHL at age 32 without
11  touching Roundup® a day in his life.
12     A.  No.  However, the risk that he has sustained based
13  on his substantial exposure, which is at the extreme high
14  end of the studies, including the ADH study --
15     Q.  AHS?
16     A.  Yeah, thank you.  Certainly the likelihood of
17  developing NHL has been more than doubled.  And so if there
18  is risk due to obesity, certainly this has substantially
19  added to that underlying risk, if it is there, based on the
20  studies that I've deferred to the medical epidemiologist and
21  oncologist.
22     Q.  When you say it's substantially added to the risk,
23  how much has it added to the risk?  10 percent?  20 percent?
24     A.  Well, the actual risk from the exposure has more
25  than doubled.  So if -- if the medical epidemiologists were

Page 235

1  to answer that based on a risk ratio or odds ratio at a
2  statistically significant level, then one could make such a
3  mathematical comparison.  I'm not prepared to do that, but I
4  am prepared to state that the Roundup® risk is certainly
5  additive to underlying risks from such hypothetical risk
6  factors such as obesity.
7     Q.  Okay.  Let me ask you this.  Have you ever heard
8  in your field of a concept called attributable risk?
9     A.  Yes.
10     Q.  Okay.  What is attributable risk?
11     A.  Risk that is specific to a chemical or other
12  inducing agent.
13     Q.  And how does one deduct an attributable risk?
14     A.  By comparison.
15     Q.  Okay.  So walk me through the process that a
16  toxicologist goes through to determine an attributable risk
17  to an individual.
18     MR. TRAVERS:  Objection.  This is clearly general
19  causation testimony.  I think you --
20     MR. KALAS:  Laying a foundation actually applying
21  it to Batiste.
22     MR. TRAVERS:  I think you even asked this in the
23  first deposition.
24     MR. KALAS:  I think these were cancer slope
25  factors, which are a different concept so --

Page 236

1     MR. TRAVERS:  No, I think it was attributable
2  risk.
3     MR. KALAS:  Okay.
4  BY MR. KALAS:
5     Q.  How does a toxicologist calculate an attributable
6  risk to an individual?
7     A.  In an additive fashion.
8     Q.  Okay.  But how do you calculate it, sir?  How do
9  you calculate the attributable risk?  So I want to know --
10  let me back up and ask a foundational question.
11     Would it be possible in your field to calculate an
12  attributable risk to Mr. Batiste?
13     A.  If I had something to compare it to.
14     Q.  Okay.  When you say, "If I had something to
15  compare it to," in the case of Mr. Batiste, what would you
16  want to compare it to?
17     A.  If I had a study that showed he experienced -- not
18  a study.  I already know the study -- if I -- if I had data
19  for Mr. Batiste showing that hypothetically he worked at
20  Chevron in Louisiana in their petroleum facility, in their
21  refinery, and for 20 years he had a 1 part per million
22  8-hour benzyne exposure, I would be able to say that he had
23  20 PPM-benzyne year exposure, which would place him at at
24  least a doubling, if not more, risk of hematopoietic
25  malignancy.  And that would be attributed to the 20 part per

Page 237

1  million year benzyne exposure, which is what the literature
2  shows is associated with roughly a doubling of the risk, I
3  believe.  And then I would compare to that his doubling or
4  more of risk from the Roundup® exposures.
5     Q.  And then what would happen?
6     A.  Well, I would conclude that both were reasonably
7  similar risk factors --
8     Q.  Okay.
9     A.  -- and that they were both additive.
10     Q.  Are you able to calculate an attributable risk for
11  Mr. Batiste?
12     A.  I haven't found anything to attribute -- else to
13  attribute it to --
14     Q.  I know.
15     A.  -- and so it's --
16     Q.  I cut you off, go ahead.  I'm sorry, were you
17  done?
18     A.  Yes.
19     Q.  Okay.  Are you able to calculate an attributable
20  risk using a percentage of risk compared to background NHL
21  risk of Roundup® use to Mr. Batiste?
22     A.  No, that would be erroneous because that's already
23  covered in the human epidemiologic studies.  They're already
24  measuring attributable risk background so we don't do it
25  twice.

60  (Pages 234 to 237)

William Sawyer, Ph.D.

Page 238

1    Q.  So when you talk about the dose data in the
2    studies that you're going to fit Mr. Batiste in, and you say
3    a doubling of the risk, the studies you are referring to are
4    Ericksson and McDuffie, correct?
5    A.  Yes.
6    Q.  And there are other studies that show a reduction
7    of the risk, correct?
8    A.  Not sure what you mean by "a reduction of the
9    risk."  You're talking about studies that show a risk ratio
10   less than 1?
11   Q.  A relative risk of less than 1, yes, sir.
12   A.  No, I haven't seen a single study that showed a
13   statistically significant reduction in risk.
14   Q.  Okay.
15   A.  Those -- those confidence intervals, for example
16   for the follicular malignancy we talked about earlier, range
17   all the way to 5.72 at the upper end.  It means it could be
18   that high.  It means it could be as low as -- I think it was
19   .3.  It was a very wide range, and we don't know what the
20   true answer is within that range.  So I think you're
21   misusing the statistics in a -- in a rather --
22   Q.  You can say it.  It won't hurt my feelings.
23   A.  -- erroneous, misleading fashion.
24   Q.  Okay.  If I understand correctly, when you're
25   trying to attribute risk to Mr. Batiste, you will tell the

Page 239

1    jury that Mr. Batiste -- you should look at the data for
2    Mr. Batiste on exposure days in the McDuffie and Ericksson
3    studies, correct?
4    A.  Well, that -- those are the two primary studies
5    with -- that show dose response --
6    Q.  Okay.
7    A.  -- and give different cutoff values such as
8    ever/never or greater than 2 days or 10 days or more --
9    Q.  Okay.
10   A.  -- or greater than 10 days actually.
11   Q.  And you will tell the jury that they should draw
12   no conclusions regarding Mr. Batiste from the Agricultural
13   Health Study because that is a null figure, not
14   statistically significant, right?
15   A.  No, I've included it in my report.
16   Q.  Okay.  So what will you tell the jury to take into
17   account on the Agricultural Health Study regarding
18   Mr. Batiste's exposure?
19   A.  As per the footnote in table --
20   Q.  I believe you're on page 16, sir.  I think it's in
21   the text.
22   A.  Yes, that -- I would state that the Agricultural
23   Health Study did not find a statistically elevated risk of
24   NHL; however, the study is useful with respect to comparison
25   of other epidemiological studies.  So I -- so I can't do a

Page 240

1    dose threshold analysis from that study, but I still
2    included it.  It's still an important study.
3    Q.  And I want to understand why you can't do a dose
4    threshold analysis for Mr. Batiste from that study.  Is the
5    reason you can't do a dose threshold analysis for
6    Mr. Batiste from that study because it doesn't show a
7    statistically significant decrease or increase of NHL?
8    A.  That's correct.
9    Q.  Okay.  And so when a study like the Agricultural
10   Health Study is applied to somebody like Mr. Batiste, and
11   there is no relationship, in other words the compound is not
12   protective or causative of NHL, you would expect to see a
13   null value, correct?
14   A.  Yes.
15   Q.  Okay.  And so it may -- it would also be correct
16   to say about Mr. Batiste, and indeed all of the applicators
17   in this case who fall within any of the quartiles in the
18   Agricultural Health Study, that the Agricultural Health
19   Study did not find any relationship between glyphosate and
20   NHL.  That would be correct, as well, right?
21   MR. TRAVERS:  Objection, form.
22   A.  Could you repeat that?  It was confusing.
23   BY MR. KALAS:
24   Q.  Sure.  You wrote here that you intend to tell the
25   jury the Agricultural Health Study did not find a

Page 241

1    statistically elevated risk of NHL, right?
2    A.  Yes.
3    Q.  Okay.  It would also be correct to say that for
4    applicators applying up to and greater than 108.5 days a
5    year, the Agricultural Health Study did not find any risk of
6    NHL.
7    MR. TRAVERS:  Objection, mischaracterizes the
8    study.
9    A.  Correct that I would not state anything different
10   than what I wrote here, that it did not find a statistically
11   elevated risk level.  However, I am going to explain to the
12   jury that the numbers that I have in table 4 are for any day
13   of exposure, even if the exposure was for 20 minutes.  These
14   are not time weighted 8-hour exposure days.
15   So it's not -- actually it's incorrect to take the
16   83.3 exposure days and compare them directly to these
17   numbers.  The numbers in table 4 actually need to be -- it
18   would have to take the 83.3 and multiply it times 8, and
19   then compare that number to table 4.  Because my
20   calculations being consistent with Ericksson are for 8-hour
21   time weighted exposures, but the Agricultural Health Study
22   didn't do it that way.  When they -- when this study shows
23   lifetime days, that could be any day of use for any period
24   of time.
25   MR. KALAS:  Motion to strike as nonresponsive.

61 (Pages 238 to 241)

William Sawyer, Ph.D.

Page 242

BY MR. KALAS:

Q. Doctor, my question was different. You stated what you would say, and I'm asking if it -- if -- if something would be correct to say about Mr. Batiste.

Would it be correct to say about Mr. Batiste that the applicators who were exposed to the same number of days as Mr. Batiste in the Agricultural Health Study for those applicators no association was observed between NHL and glyphosate use?

MR. TRAVERS: Objection, mischaracterizes the study.

A. It would -- no, it would show that there was no statistically increase or decrease in the risk of NHL, that the study was inconclusive, and that comparatively to table 4, Mr. Batiste would have over 640 exposure days compared to the days listed in table 4, thus his exposure is far beyond the ranges of the tertiles and quartiles in the Agricultural Health Study.

BY MR. KALAS:

Q. Okay. So you just said that it would be correct to say that there was no statistically significant increase or decrease, and that the study was inconclusive.

Is it your testimony that when there is no relationship between a compound and a disease, that a null study cannot show that there is no relationship between the

Page 243

compound and the disease?

MR. TRAVERS: Objection, form.

A. Correct, with one study. It's not generally-accepted methodology to take a single study which is null and purport from that in a conclusory fashion that there is no risk. Rather, that study would simply be inconclusive on a stand-alone basis. If that were the only study, then one could -- could not draw any conclusion.

BY MR. KALAS:

Q. Okay. Is there -- is not being able to draw any conclusion regarding causation and a study being inconclusive the same thing in your mind?

A. I don't understand.

Q. Okay. I'm having trouble understanding how you're going to use the word "inconclusive" in the context of Mr. Batiste.

As I understand the word "inconclusive" when you use it, what I understand it to mean is everything is still an open question. Is that how you're using the word "inconclusive"?

A. Yes, with respect to the Agricultural Health Study.

Q. Okay.

A. There are only six studies that provide dose metrics with respect to the NHL and the dose of glyphosate.

Page 244

This is one of six studies that shows no conclusive evidence either way. It doesn't show protective effect. It doesn't show a carcinogenic effect. It simply is -- is rather wide ranges of variability and is inconclusive.

Q. All right. Let me ask this one different way and then we'll keep moving.

I want you to hypothetically assume that -- for the purposes of this question -- and I know your opinions, but hypothetically assume glyphosate does not cause NHL. Can you assume that for the purpose of this question?

A. Sure.

Q. Okay. If glyphosate does not cause NHL, and glyphosate is not protective of NHL, would you expect in a cohort epidemiological study to see data for exposure days like Mr. Batiste has that are null?

A. No, and this study does not reflect Mr. Batiste's exposure days. He's 8 to 10 times beyond the maximum values in this -- this study.

Q. So if, following my hypothetical, I had an epidemiology study that looked at dose, and it showed what was true, glyphosate did not cause NHL, would that data be statistically significant either way, or would it hover around 1 with an odds ratio on either side?

MR. TRAVERS: Objection, form, compound.

A. I don't understand the first part of the question.

Page 245

BY MR. KALAS:

Q. Okay. Do you -- let me ask it this way. Do you think playing baseball causes NHL?

A. No.

Q. Okay. If playing baseball does not cause NHL, and I did a cohort study of people who played baseball for lifetime days, and my data didn't have false positives in it, would you expect that the odds ratio for playing baseball and NHL to be around 1, with a competence interval on either side of 1, with variation depending on the power of my study?

MR. TRAVERS: Objection, compound question. This is going beyond the scope of this deposition. It's clearly just general causation questioning.

A. I still don't understand the first part because you said assume that -- hypothetically that baseball players have an increased rate of NHL?

BY MR. KALAS:

Q. No, that's the hypothesis going in --

A. Oh, okay.

Q. -- and I want to study it.

A. Okay.

Q. So the null hypothesis is baseball doesn't cause NHL --

A. Okay.

William Sawyer, Ph.D.

Page 246

1    Q. -- and I'm studying whether or not it does. And
2  if baseball truly does not cause NHL, would I expect the
3  odds ratio to be around 1, with a confidence interval on
4  either side of 1?
5    A. Yes.
6    Q. Okay. Mr. Batiste's PFS discusses repairing oil
7  equipment. Do you recall that?
8    A. Yes.
9    Q. Okay.
10   A. Valves specifically.
11   Q. And, in fact, there was a resumé marked at his
12 deposition where Mr. Batiste discussed his work as a painter
13 and oilfield worker, right?
14   A. Yes.
15   Q. Okay. But you read Mr. Batiste's deposition,
16 right?
17   A. Yes, and there's no -- absolutely no evidence of
18 him achieving 20 part per million exposure years to benzyne.
19 It's not there.
20   Q. Well, I'm actually going to a different point,
21 sir.
22     Let's go to pages 159 to 160 of Mr. Batiste's
23 deposition. And do you see there on 159, line 5, they're
24 asking about that resumé? Do you see that?
25   A. Yes.

Page 247

1    Q. Okay. And starting, I guess, at 158, 13, it
2  states, "It indicates that you worked at Weatherford in
3  2000, Oilfield Valve in 2000, Landry Sheriff, is that
4  correct?"
5      Answer, "This is a -- they got this off -- it's
6  like a generic resumé, so that's where they -- Lofton was a
7  staffing company. Basically, this is not correct. Just
8  when I was younger, I fabricated a lot of stuff to get a
9  job."
10     Question, "So this information is false?"
11     (As read) "Yeah. The dates are wrong on
12 Weatherford, Oil Valve is -- Oilfield Valve is not correct,
13 Wood Group is not correct. Everything is saying I worked
14 six or seven jobs in 2000, so that's not correct. If you
15 look at the dates, I couldn't work all those places in the
16 same --"
17     Question, "So why did they have this information?"
18     Answer, "Because whenever you apply for a job, you
19 got to put in your work history like a resumé. I mean, in
20 order to get -- some people, in order to get a position,
21 they fabricate or just, you know, make up stuff to go to
22 work."
23     Question, "So you fabricated this information when
24 you applied for a job?"
25     Answer, "Oh, yeah."

Page 248

1      Question, "Did you ever tell them that you
2  fabricated this information?"
3      Answer, "Oh, no, I ain't going to tell them that.
4  I'm trying to get a job."
5      Did I read that correctly?
6    A. Yes.
7    Q. Okay. So Mr. Batiste, when he was under oath,
8  testified that he lied on a resumé in order to get a job,
9  true?
10   A. Yes.
11   Q. Okay. Now, going back to your interview with
12 Mr. Batiste, what makes you sure, as somebody who's
13 conducted lots of interviews over the years, that
14 Mr. Batiste did not fabricate something in his interview
15 with you in order to win a lawsuit?
16     MR. TRAVERS: Objection, form.
17   A. I can't control that. It is what it is.
18 BY MR. KALAS:
19   Q. Okay. So I just want to make sure I understand
20 though what your testimony is going to be.
21     You have no assurety beyond Mr. Batiste's word
22 that he told you the truth on your call, right?
23   A. That's right. It's for the -- judge --
24   Q. Okay.
25   A. -- and the jury. I have no business opining on

Page 249

1  someone's merits. That's not my role. That's totally up to
2  the judge.
3    Q. And given Mr. Batiste's admitted history of
4  fabrications, what did you use -- do to confirm the usage he
5  told you about on the call in the independent record?
6    A. Well, the good thing is I only needed to ask him
7  about the T-3 Services. I scoured the deposition, and I
8  could not find where anywhere he was asked how long he
9  sprayed time wise, you know, 10 minutes, 1 hour, 5 hours.
10 So I had to ask him at T-3 how long did he spray on the
11 average, and he said 30 minutes, up to 45 minutes per any
12 given day. So fortunately there really was not much
13 information that I needed to ascertain beyond the deposition
14 that was under oath.
15   Q. Okay. But you read this section of his deposition
16 under oath, right?
17   A. Yeah, but, I mean, I'm not to judge the person.
18 That's -- again, you're misplacing --
19   Q. No, I'm not --
20   A. -- misplacing me terribly. I mean, that's for the
21 judge and the jury.
22   Q. I'm not asking you to.
23     Did you do -- so I understand what you did in your
24 interview with Mr. Batiste, did you do any other outside
25 research, as far as interviewing people who he worked with

63 (Pages 246 to 249)

William Sawyer, Ph.D.

Page 250

1  or that sort of thing at T-3 or elsewhere, to find out if
2  Mr. Batiste was telling the truth about how he used Roundup®
3  in his deposition?
4      A.  Again, I think if -- if we were to contact the
5  judge in this case, I think the judge would tell you that
6  it's not my duty as a toxicologist to do detective work and
7  determine if somebody is telling the truth.  It's just not
8  what a toxicologist does.  I mean, that's for the judge and
9  jury to determine.
10     Q.  Well, I think -- I think -- I don't want to argue
11 with you, but I think in other cases, maybe not in this
12 litigation but in other litigations, you have actually
13 interviewed coworkers of plaintiffs in the cases, correct?
14     A.  Yes.
15     Q.  Okay.  And in this case -- well, let me strike
16 that and ask a more foundational question.
17         You do that in order to, in part at least, confirm
18 the exposure histories that plaintiffs give you in those
19 cases, right?
20     A.  Yes.  Certainly if we have other witnesses, and
21 the testimony is consistent, that does help confirm the
22 credibility of the testimony.  But what I'm stating is it's
23 not my job to render an opinion as to the degree of
24 reliability off a -- of a witness.
25     Q.  I don't want you to render an opinion.  I want to

Page 251

1  just understand your process.
2      A.  I don't understand what you're doing then.  It's
3  not -- it's not my opinion to render.
4      Q.  I just want to understand your process, sir, so
5  let me get back to the process.
6          In this case did you attempt to interview any
7  coworkers of Mr. Batiste?
8      A.  I don't know of any coworkers to interview.  I --
9  I can't issue a subpoena for a deposition or whatever.
10 That's -- that's ridiculous.
11     Q.  I'm asking about the attempt, not whether or not
12 you'd be able to -- be able to do it.
13     A.  Well, the attempt is the point.  How would I do
14 it?
15     Q.  Okay.  So how could you do it, okay.
16         Did you attempt to interview Mr. Batiste's father
17 to understand if Mr. Batiste was telling the truth?
18     A.  No.  I didn't even know he had a -- a father
19 that -- who would know much about his Roundup® exposure.
20     Q.  Okay.  Did you talk to anybody else who observed
21 Mr. Batiste applying Roundup® at any of the three properties
22 where he applied?
23     A.  No.
24     Q.  Did you call his mother, Delores, and ask her if
25 he applied the way he said?

Page 252

1      A.  No.
2      Q.  Did you call his brother, Kendrick, and ask him if
3  he applied the way he said?
4      A.  No.
5      Q.  And I assume you did not talk to Josetta Batiste
6  and ask if he applied the way he said?
7      A.  No.  And remember, all of that you would have been
8  complaining and whining that I did it not under oath, that
9  they were not under oath and my interview is worthless
10 and -- of course not.  I've tried to minimize my questions
11 in this case with Mr. Batiste to only about two primary
12 questions.
13     Q.  Okay.
14     A.  I'm relying on the -- the deposition testimony
15 primary to avoid such criticism.
16     Q.  You state that I would -- I think you used the
17 word "whine" about you not doing it under oath.
18     A.  How would I do it under an oath?  I'm a
19 toxicologist, not a lawyer.
20     Q.  Let me finish my question.
21         Do you have the capability to tape record a
22 conversation you have with a plaintiff?
23     A.  Sure, but it's worthless.  It's not under oath.
24     Q.  Okay.  But you would have a transcript of that
25 conversation, and then I wouldn't ask you the questions I've

Page 253

1  asked you today, true?
2          MR. TRAVERS:  Objection.
3      A.  You would still go through the list we went
4  through five times now about it was not under oath, et
5  cetera, et cetera.
6  BY MR. KALAS:
7      Q.  Okay.  There would be a transcript for the jury to
8  see if you recorded it.
9          MR. TRAVERS:  Objection to form.  That's a --
10 that's not even true.
11     A.  I -- I don't know.
12 BY MR. KALAS:
13     Q.  Okay.
14     A.  I don't know there would be a transcript.  I'm not
15 sure it would be admissible.
16     Q.  Okay.  Do you think that -- well, I'm not going to
17 ask you for a legal conclusion.
18         You intend to tell the jury in this case
19 information you learned in these off-the-record
20 conversations, right?
21     A.  Yes.
22     Q.  Okay.  Now, Mr. Batiste said in deposition that he
23 used Roundup® from 1998 to 2012, right?
24     A.  Yes.
25     Q.  Okay.

64 (Pages 250 to 253)

William Sawyer, Ph.D.

Page 254

1    A.  Well, 19 -- yeah, March through October 2012.  So
2  the latest date would be October.
3    Q.  Okay.  I was just asking about years, and I
4  understand your answer was more exact, but I want to make
5  sure this is clear.
6        Mr. Batiste testified in deposition that he used
7  Roundup® from 1998 to 2012, true?
8    A.  Yes.
9    Q.  Okay.  He used it both occupationally and
10  residentially, right?
11    A.  Yes.
12    Q.  He testified using Roundup® at his father's
13  property from '98 to 2012, right?
14    A.  Yes.
15    Q.  Okay.  And that's why I asked you if you had
16  spoken to the father.  Does that make sense now?
17    A.  Well, it was the father's property.  I don't know
18  if the father is even alive.  I mean --
19    Q.  You didn't ask Mr. Batiste if his dad was alive to
20  talk to him?
21    A.  No, I avoided asking any unnecessary questions.
22    Q.  Okay.
23    A.  I needed to know specifically the frequency at T-3
24  because it wasn't asked in deposition, and I inquired about
25  other potential co-exposures to chemicals.  Those were my

Page 255

1  only two primary questions.
2    Q.  Okay.  Do you see your report at pages 12 to 13?
3    A.  Okay.
4    Q.  You're discussing the -- discussing the deposition
5  of Josetta Batiste, and you state, starting in the last full
6  paragraph on 12, "She testified that her husband helped his
7  father maintain their land on a weekly basis," right?
8    A.  Yes.
9    Q.  Okay.  And then on the bottom of 12, going to 13,
10  you state, "It was usually Bryce and his father, but his
11  brothers occasionally participated."
12        Did I read that correctly?
13    A.  Yes.
14    Q.  Okay.  And so you were aware that there was a
15  witness who observed and participated with Mr. Batiste
16  spraying Roundup®, right?
17    A.  Yeah, it looks like it was the brother and -- and
18  possibly the father.
19    Q.  Okay.  And again -- well, I believe I already
20  asked that.  We'll keep moving.
21        He also sprayed at his place of employment called
22  T-3 from 2009 to '11, right?
23    A.  Yes.
24    Q.  Okay.  And he used concentrated Roundup®, right?
25    A.  Yes.

Page 256

1    Q.  Okay.  And he said in deposition -- and I think I
2  asked this about Wade, and I was the one who got mixed up
3  there -- that he used a little bottle of Roundup®, right?
4        MR. TRAVERS:  Objection, form.
5  BY MR. KALAS:
6    Q.  Concentrated Roundup®.
7    A.  Who used the little bottle?
8    Q.  The concentrated bottle that he used when he was
9  spraying.  He testified that he mixed and loaded from a
10  little bottle, correct?
11    A.  I -- I don't know.  Let me check.
12    Q.  All right.  Well, let's go to your report, and
13  I'll find it.
14    A.  Little gully --
15    Q.  Well, I'll find it.  Excuse me, small, not little.
16  And this -- the type of Roundup® you used you discuss on
17  page 7.  And if we go back to his deposition at page 101, he
18  describes it as a "light gray, small bottle," right?
19    A.  I see that.
20    Q.  Okay.  Now, you -- you stated in your report,
21  based on that description, that you believed it was Roundup®
22  Max Control 365, right?
23    A.  That's certainly possible.  Can't be conclusive --
24    Q.  Okay.
25    A.  -- but it does fit.

Page 257

1    Q.  Okay.  Have you looked in the documents produced
2  in this litigation to see whether Roundup® Max Control 365
3  was available during the times when he was spraying?
4    A.  What do you mean by "available"?  Do you mean was
5  it manufactured at that time?
6    Q.  Yes, sir.
7    A.  From what I have in my report in the table, it was
8  produced for part of that era.  I don't know that it was
9  produced in the earlier years.
10    Q.  Okay.
11    A.  And he is not clear as to what year he recalls the
12  light gray bottle being --
13    Q.  Did you follow up on that in your conversation
14  with him?
15    A.  No.
16    Q.  Okay.
17    A.  I did not, and I did not do it simply because the
18  exposure metrics in the studies are based on Roundup® use,
19  and it doesn't matter what color bottle it is.
20    Q.  Okay.  So you just stated "Roundup® Concentrate,"
21  right, in your table 1?
22    A.  Well, I said -- yeah, yeah.
23    Q.  Okay.  And we know it's a concentrate he used that
24  he mixed and loaded, but what specific concentrate is
25  somewhat unclear.

65 (Pages 254 to 257)

William Sawyer, Ph.D.

**Page 258**

1    A.  Well, I was conservative in what concentrate.  The
2    exposure from handling the higher percentage Pro would be --
3    produce the higher systemic dose.  So I didn't assume that,
4    I just used the concentrate.
5        Q.  Okay.  I brought a package insert from 2009 that
6    appeared on our Roundup® Concentrate product that was sold
7    at that time in a small bottle.
8        (Exhibit 27 marked for identification.)
9        MR. KALAS:  And I'll represent on the record that
10   I was not able to locate a Max Control 365 from that
11   time period.  This is a package insert to Roundup®
12   Concentrate Plus, another concentrate product that was
13   sold at that time period in a small bottle.
14   BY MR. KALAS:
15       Q.  So I'm going to ask you some questions about that,
16   but you can put it aside for a minute.
17       A.  One thing I should say though, this is not the
18   small bottle.  This is the 64-ounce half gallon.  I believe
19   the small bottle is about 32- or 34-ounce.
20       Q.  Look at the bottom left corner of this, sir.
21       A.  Yes.
22       Q.  Do you see how many ounces there are listed on the
23   bottom left corner?
24       A.  64.
25       Q.  I don't know what you're looking at.  Look right

**Page 259**

1    here (indicating).
2        A.  Yeah.  You know, maybe you handed me the wrong --
3        MR. TRAVERS:  Yeah.
4    BY MR. KALAS:
5        Q.  Maybe I did.  Here, I'll give you my copy.  Sorry
6    about that.  So I hope you don't mind, I have highlighting
7    on my copy.
8        A.  That's okay.
9        Q.  All right.
10       A.  It will make it exciting.
11       Q.  There you go.
12           Let me mark out this copy just so I know what I'm
13   getting at.  Give me a second, sorry.
14       A.  Are you going to scribble out the highlights?
15       Q.  That's right.  No, you can look at the highlights.
16   It will make this move quicker.
17       A.  Okay.
18       Q.  All right.  Here you go, 27.
19       MR. KALAS:  Apologies for that.  Apologies, guys.
20   I'll represent that everything I'm going to ask about
21   is exactly the same between the two.  I just looked at
22   it.
23   BY MR. KALAS:
24       Q.  Okay.  You can put that aside for the moment, but
25   to make the record clear, 27 is a 32-ounce bottle, right?

**Page 260**

1        A.  Yeah, that's the right one.
2        Q.  Okay.  All right.  Now, Mr. Batiste testified at
3    deposition he'd spray with the backpack sprayer in the
4    afternoon, right?
5        A.  Yes.
6        Q.  Okay.  And he didn't tell you anything to
7    contradict that in your conversation, right?
8        A.  No, but I don't recall actually questioning him
9    regarding that.
10       Q.  Okay.  And he said that he mixed Roundup®
11   according to the label instructions, right?
12       A.  Yes.
13       Q.  Okay.  And he spray -- he said that he would spray
14   an hour or two on average, correct?
15       A.  On the 1998 to 2001, yes.
16       Q.  Okay.  Now, you said 1998 to 2001.  Let's go back
17   to your report.
18       A.  I'm sorry, 2011.
19       Q.  Okay.  ███████████████████
20   ████████  ███████████████████
21       Q.  Okay.  And meanwhile at the T-3 Energy employer,
22   he would apply for 30 to 45 minutes per application,
23   correct?
24       A.  Yes.
25       Q.  Okay.  And back at ██████████ it would be 15

**Page 261**

1    to 20 minutes, right?
2        A.  Yeah.
3        Q.  So the maximum amount of time Mr. Batiste ever
4    sprayed was 2 hours per application, right?
5        A.  At a given location.  Of course it's possible that
6    he could have sprayed residential, you know, in the evening
7    and T-3 during the afternoon all in the same day.  So I
8    can't rule that possibility out, but in general I think
9    that's correct.
10       Q.  Did you ask him if that ever happened?
11       A.  No, I wasn't concerned about that.  Again, I tried
12   to minimize my questions to only what I needed to complete
13   the assessment.
14       Q.  You won't testify that he applied residentially
15   and occupationally in the same day, right?
16   ████  A.  No, that would be a question to ask him, not me.
17   ████  ███████████████████████
18   ████  ██████████████████████████
19   ████  ███████████████████████
20   ████  ████████████████████████████
21       Q.  Okay.  Did you ask him -- well, let me ask another
22   foundational question.
23           You said you're familiar with Louisiana.  Does it
24   get hot in Lafayette, Louisiana, during the summer?

66 (Pages 258 to 261)

William Sawyer, Ph.D.

---

### Page 262

```
 1        A.  Oh, yes, it gets very hot and humid.
 2        Q.  Okay.  Did you ask Mr. Batiste how many breaks he
 3   took while he was spraying?
 4        A.  No.
 5        Q.  Did you ask him if he sprayed continuously for 2
 6   hours per application, or if he would spot spray, take a
 7   break, spot spray, take a break?
 8        A.  I did not.
13        MR. TRAVERS:  Objection, form.
18   BY MR. KALAS:
19        Q.  Okay.  It might be, but you haven't reviewed the
20   medical records one way or another to determine that.
21        A.  Well, I did review the medical records, but not
22   thoroughly enough to prepare a weight table.
23        Q.  Okay.  Now, Mrs. Batiste said that when he was
24   applying at _____ -- which was the majority of his
25   application, correct?
```

### Page 263

```
 1        A.  Yes, by far.
 2        Q.  Okay.  When he was spraying at _____ he
 3   said that he applied weekly for 1 to 2 hours on the property
 4   lines, around buildings, and a tall fence using a backpack
 5   sprayer, right?
 6        A.  Yes.
 7        Q.  Okay.  Do you know how large the property is at
 8   _____?
 9        A.  No.
10        Q.  Did you do any calculations to determine whether
11   or not it would take 2 hours to spray property lines around
12   buildings and along a tall fence a week?
13        A.  No.
14        Q.  Okay.  Again, sir -- and I -- and I don't mean to
15   cast aspersions on you.  I know you've been working really
16   hard on these cases.
17        Given Mr. Batiste's history of fabrication, I want
18   to understand what you did to verify what he told you and
19   what he told the court reporter under oath.  You did not
20   conduct any measurements to verify that it would take 2
21   hours to spray the _____ property; is that correct?
22        MR. TRAVERS:  Objection, form, compound question.
23   Object to the characterization of Mr. Batiste's
24   testimony.
25        A.  I did not.
```

### Page 264

```
 1   BY MR. KALAS:
 2        Q.  Okay.  Now, Mr. Batiste said in deposition that he
 3   wore a T shirt, shorts, and tennis shoes with socks, right?
 4        A   Yes
 5        Q   Okay   Except -- and that's all residentially
 6   And then at T-3, occupationally, he wore a long-sleeved
 7   shirt and jeans, right?
 8        A   Yes
 9        Q   Okay   And after spraying at his father's house,
10   which could take the rest of the afternoon, he'd shower in
11   the evening, right?
12        A   Yes
13        Q   Okay   Does Mr Batiste describe in deposition any
14   specific spill incidences?
15        A   Only the statement that there was overflow from
16   the backpack which spilled on his skin and clothes, and that
17   he came in contact with Roundup® on his hands probably every
18   time   Sometimes the hose leaked   That's really all
19   attributed to pages 130, 232, and 233 of the deposition
20        Q   Let's go to those pages so we're singing off the
21   same songbook
22        A   130
23        Q   Okay
24        A   Great, I'm telling you what page to go to for
25   once   Page 130, question, line 5
```

### Page 265

```
 1        Q.  Okay.  So my question was a little, I think, more
 2   specific, and maybe I didn't ask it more directly.
 3        Mr. Batiste doesn't describe any spill incidences
 4   of the concentrate in his deposition, correct?
 5        A.  No.
 6        Q.  Okay.  So he doesn't describe any spill incidences
 7   when he was mixing.  He describes potential spill incidence
 8   from the backpack sprayer after it was mixed.
 9        A.  It appears that way, yeah.
10        Q.  Okay.
11        A.  I mean, there is the statement he said he came in
12   contact with Roundup® on hands, quote, probably every time,
13   unquote, so that the hand contact he doesn't officially
14   state was from the concentrate.  It could have been either
15   or both.
16        Q.  Okay.  So let's go to the testimony where you're
17   talking about the hands here.
18        A.  I think that's on page 233.
19        Q.  Okay.  And he's asked, question, "When would you
20   get any Roundup® on your hands?"
21        Answer, "Probably every time."
22        Question, "How?"
23        Answer, "Just when I'm mixing it and then
24   overflowing out the bottle."
25        Question, "When the hose would overflow?"
```

67 (Pages 262 to 265)

William Sawyer, Ph.D.

## Page 266

1    Answer, "Or just spraying it, in general,
2 sometimes the hose could leak, the end of it, or the wind
3 blowing it back on me."
4    Did I read that correctly?
5    A.  Yes.  However, line 3 does say, "Just when I'm
6 mixing it and then overflowing out the bottle."  That would
7 indicate when he's mixing it, there would be concentrate
8 exposure.
9    Q.  Okay.  So --
10   A.  So it sounds like we had both things going on
11 here.
12   Q.  Okay.  So let's go back to page 130, sir, line 5.
13   A.  Okay.
14   Q.  And he states -- and this may clarify what he said
15 on 233.
16   "And when you said you got wet, how did you get
17 wet?"
18   "Overflow sometimes, you know, you put the hose
19 and it overflows and it gets on you or get on your clothes,
20 whatever."
21   "So the water and the concentrate?"
22   "Yeah."
23   A.  Correct, but that's page 130.  Later he did talk
24 about the, while mixing, getting on the hands.
25   Q.  Okay.  So he says that when I'm mixing it "and,"

## Page 267

1 not "or," correct?
2    A.  On page 233 he said, "Just when I'm mixing it and
3 then overflowing out the bottle."
4    Q.  Which suggests one incident, right?
5    A.  Yeah.
6    Q.  Okay.  And because of that lack of clarity in the
7 transcript, because there's not the "and," or the "or" is
8 unclear, did you ask him, when you spoke to him, whether
9 when he was mixing it, he got concentrate on his hands
10 before the glyphosate entered the bottle?
11   MR. TRAVERS:  Objection, misstates the deposition
12   testimony as far as the word "clarity."
13   A.  I did not.
14 BY MR. KALAS:
15   Q.  You're not going to tell the jury that Mr. Batiste
16 testified clearly he got concentrate on his hands?
17   MR. TRAVERS:  Objection, form.
18   A.  I would prefer that either the plaintiff answer
19 that himself, or in my direct examination or
20 cross-examination, the transcript is simply read to the
21 jury.  It's not for me to interpret.  It's for the judge and
22 jury to interpret.
23 BY MR. KALAS:
24   Q.  So you cannot interpret that transcript as it lies
25 right now as to whether the concentrate got on his hands

## Page 268

1 prior to it entering the bottle or after it was mixed in
2 water, true?
3    A.  I can -- I can only say it could -- it could be --
4 it could be both.  It's just not possible from the
5 transcript to be conclusive.
6    Q.  Okay.  Now, Mr. Batiste used the backpack sprayer,
7 right?
8    A.  He did.
9    Q.  Okay.  Are you going to compare his exposures
10 using the backpack sprayer to the backpack sprayers in the
11 passive dosimetry literature?
12   A.  Probably.
13   Q.  Probably?  Okay.
14   So let's look at some backpack sprayers real quick
15 in the passive dosimetry literature.  Well, let me back up.
16   Are you going to say that the leaking on
17 Mr. Batiste's back led to increased exposure as opposed to a
18 functioning backpack sprayer?
19   A.  Yes.
20   Q.  Okay.  And are you going to quantify for the jury
21 how much that leaking increased his exposure?
22   A.  Only in the sense that I'm going to show MON 2132
23 I think was the number, or 2139, the table that shows the
24 highest by far, by a factor of 5 almost, the highest point
25 of impact on the body is on the back --

## Page 269

1    Q.  Okay.
2    A.  -- of the backpack sprayer.
3    Q.  Okay.  But you're not -- my question was a little
4 different, which didn't go to what area you'll identify as
5 the highest exposure.  My question are you going to
6 quantify the exposure to the back.
7    A.  Only in a qualitative sense, that according to
8 that table, the backpack sprayer can have a severalfold
9 increase in dose based upon MON 20 -- well, let me get the
10 number right.  There it is.  It looks like it's MON 2139,
11 and it shows the back ranging from 3.99 to 5.96 to 6.38
12 microgram per centimeter squared, as opposed to other parts
13 of the body which are more than a magnitude of order lower.
14 So from a relative risk standpoint, the spillage on the back
15 can have a huge impact on the dosage.
16   Q.  Okay.  So you intend to tell the jury that
17 MON 2139 is a -- is a reliable surrogate for Mr. Batiste's
18 exposure, right?
19   A.  No.  I will explain that this simply exemplifies
20 that when that type of leakage occurs, it has more -- a
21 vastly higher impact because no longer is it just drift mist
22 on the shirt, rather, it's a wet shirt.  It's literally
23 soaked with it.  And these numbers in this table speak for
24 themselves.  It shows comparing -- let's say the back
25 compared to the next highest reading, which was the thigh,

68 (Pages 266 to 269)

William Sawyer, Ph.D.

## Page 270

1  here we have almost a fourfold increase.  In other areas
2  it's more than a tenfold increase.
3      Q.  Okay.  Let's go -- well, let me ask you this.  Are
4  you aware of any study -- the UK-POEM model you're -- data
5  you're referring to is model data, correct?  It's not
6  recorded data using passive dosimetry?
7      A.  I'm sorry, what?
8      Q.  The UK-POEM data you're looking at here, the
9  MON 2139 about back exposure, that's model data, correct?
10     A.  No, not this table.  This is actual patch test
11  data.
12     Q.  Okay.  So which table are you looking at?
13     A.  In my report --
14     Q.  Yeah.
15     A.  -- page 28.
16     Q.  28 of Batiste?
17     A.  Yeah.
18     Q.  Okay.
19     A.  This is pads that were on real people who were
20  wearing all kind of protective gear, impermeable jacket,
21  impermeable pants, a respirator, who had everything.
22  They --
23     Q.  And that's micrograms per centimeter squared --
24     A.  Monsanto dressed these people very thoroughly --
25     Q.  Okay.

## Page 271

1      A.  -- protected them.
2      Q.  That's micrograms per centimeter squared, true?
3      A.  Yes.
4      Q.  Okay.  How many centimeters squared are on the
5  back, sir?
6      A.  I'd have to look up the exact value.
7      Q.  Okay.
8      A.  I don't have that with me.
9      Q.  Okay.
10     A.  It's possible it might be in the Machado study.
11     Q.  No, I've got a study for you here.  Let's go to
12  28, Exhibit 28, the Johnson study.
13         (Exhibit 28 marked for identification.)
14  BY MR. KALAS:
15     Q.  Do you see table 4 in this study?
16     A.  Yeah, I'm looking at it.
17     Q.  Okay.  Do you see the back area?
18     A.  Yes, 4,620 centimeters squared, which is slightly
19  higher than in -- surface area than the lower legs.
20     Q.  Okay.  So if we go back to table 7 in your report
21  that you're going to compare to Mr. Batiste, I'm correct
22  that table 7 in your report reports that those figures in
23  micrograms per centimeter squared, right?
24     A.  Yes.
25     Q.  Okay.  So the highest number recorded there is

## Page 272

1  6.38, right?
2      A.  Yes.
3      Q.  Okay.  And 6 38 -- let me just get my handy-dandy
4  calculator here up.  6.38 multiplied --
5      A.  It's about 19,000.
6      Q.  -- by 4620 equals 29,475 micrograms per centimeter
7  squared, right?
8      A.  Yes, about 29 milligrams.
9      Q.  29 milligrams on the whole back, right?
10     A.  Yes.
11     Q.  Okay.  And Mr. Batiste reported that he weighed
12  over 200 pounds in high school even.  Do you remember that?
13     A.  No.
14     Q.  Okay.  So let's go back to his depo.
15     A.  I'm not disagreeing.  I just don't remember.
16     Q.  Okay.  Go to page 59.
17     A.  Okay.
18     Q.  Page -- or line 18 to 20.
19         Question, "Were you in excess of 200 pounds in
20  high school?"
21         Answer, "Yeah."
22         Do you see that?
23     A.  Yes.
24     Q.  Okay.  So a potential dermal exposure on the back,
25  not accounting for protection, if any, from a soaked shirt

## Page 273

1  with 29 milligrams, normalized to a weight of
2  100 kilograms, would be .29 milligrams per kilogram,
3  correct?
4      A.  Yes.
5      Q.  Okay.  And then if that was absorbed at 3 percent,
6  the .29 milligrams per kilogram times .03 will get us to
7  .0087 milligrams per kilogram; is that correct?
8      A.  I'd have to calculate it.  It sounds right.
9      Q.  Okay.
10     A.  But that would be just for the chest -- or the
11  back rather, and would ignore the feet, legs, thighs, hands,
12  et cetera.  So that would be an additive amount to the
13  overall exposure.
14     Q.  And you said earlier, I think, the vast majority
15  of exposure with a leaking backpack sprayer is going to come
16  on the back, right?
17     A.  Yes, and that's what table 7 of Monsanto 2139 in
18  my report reveals.  What's interesting in this table, this
19  table does not show the lower legs, so we really can't make
20  a true dose comparison for the entire procedure.
21     Q.  Let's go to -- real quick to the Johnson study.
22  Now, I know we've talked about this before, but this is
23  actually a study that has a leaking backpack sprayer in it.
24  Were you aware of that?
25     A.  I don't know.  I'd have to rereview it.  I forget.

69 (Pages 270 to 273)

William Sawyer, Ph.D.

Page 274

1    Q.  Okay.  So if we go to 31, and do you see it talks
2  about, in the first full paragraph, "There is only one major
3  difference"?  Do you see that paragraph?
4    A.  Yeah.
5    Q.  Okay.  Last sentence states, "The relatively high
6  values for operators 28 and 29 in the CDA data set are
7  almost certainly attributable to leaking applicators."  Do
8  you see that?
9    A.  No.
10    Q.  Okay.  Last sentence of that paragraph, sir.
11    A.  Yes, but I remind you that this data can't be used
12  in comparison to any of the plaintiffs in this case because
13  it was controlled droplet administration, CDA, and that's
14  not what we're dealing with in this case.  That's a
15  completely different machine that has a spinning apparatus
16  that provides a uniform droplet of larger diameter that
17  eliminates or greatly reduces the drift and the overall
18  exposure.  So it would be incorrect to use CDA spray
19  application for any type of comparison to Mr. Batiste or the
20  other four plaintiffs.
21    Q.  I had a feeling you'd say that.  Let's -- let me
22  ask you this.  Do the backpack connections and the type of
23  backpack used with a CDA sprayer differ in any way from the
24  type of backpack Mr. Batiste used?  I'm not asking about the
25  sprayer apparatus.  I'm asking about the backpack apparatus.

Page 275

1    A.  Yeah, and that's -- that's what that last sentence
2  says, that the relatively high values for operators 28 and
3  29 are almost certainly attributed to the leaking backpack.
4    Q.  Okay.
5    A.  Yeah, I agree with you.  I mean, that's what this
6  study says, and you're right.  But what I'm saying is the
7  overall exposure to these ATV sprayers can't be used in
8  comparison.
9    Q.  But -- but, again, my question is different, which
10  is -- and I think we were in agreement, but I want to make
11  sure we're in agreement.
12      The backpack portion of a CDA sprayer versus a
13  hand sprayer, are those identical to your understanding?
14  Not the spray apparatus but the backpack part.
15    A.  All right.  I -- I don't know what you're talking
16  about.  Please explain it.
17    Q.  Okay.  So I -- if I understand what your testimony
18  is, is that this study, Johnson, isn't applicable to
19  Mr. Batiste because he wasn't using a controlled droplet
20  applicator, right?
21    A.  Yes.
22    Q.  Okay.  And a controlled droplet applicator has to
23  do with the spout or the spray head on the end of the spray
24  apparatus, right?
25    A.  Yes.

Page 276

1    Q.  Okay.  It doesn't have to do with the backpack
2  portion of it, right?  The backpack would be the same if I
3  had a CDA or just a typical backpack sprayer.
4    A.  I think they're the same, but I -- I'm assuming
5  that they're running at the same pressure, but I'm not --
6  I'm not sure of that.
7    Q.  Okay.  Well, if you're not sure --
8    A.  No, no.
9    Q.  -- we'll move on.
10    A.  I'm not sure that they operate at the same
11  pressure level.  So that can make a difference on -- you
12  know, if you're running at a higher pressure, that could
13  increase the leakage, but I -- I -- I don't have any
14  information on what pressure the CDA operates at.
15    Q.  Okay.  And if you look at the patches in figure 1,
16  they had a patch on the back here, right?  It's on page 27.
17    A.  Yes.
18    Q.  Okay.  And if you look at the potential dermal
19  exposure throughout the entire study for the 2 applicators
20  with the leaking backpacks, applicators 28 and 29 on table
21  6, their potential dermal exposures were .826 mills per hour
22  and .678 mills per hour, right?
23    A.  Yes.
24    Q.  Okay.  And comparing apples to apples here, that
25  was only in the case of applicator 29 slightly higher than

Page 277

1  applicator 33 who was not reported having a leaking backpack
2  sprayer, correct?
3      MR TRAVERS: Objection, form
4    A  Correct
5  BY MR KALAS:
6    Q  Okay So back to --
7    A  But overall that 678 and the  826, which is
8  operator 29 and 28 respectively, are in most cases 10 times
9  or even higher than the other sprayers
10    Q  Okay
11    A  You compared those two to the next highest sprayer
12  when, in fact, there is one, two, three, four, five, six,
13  seven sprayers that were about ten times less
14    Q  Okay  None of those sprayers reached anywhere
15  near 50 mills per hour, true?
16    A  No, but that -- that would be an
17  inappropriate comparison because here we're dealing with CDA
18  application
19    Q  Did I compare it to anything?
20    A  Yeah, you compared to --
21    Q  I did?
22    A  -- a value that is known to be used in the POEM
23  model for non-CDA aerosol
24    Q  You examined Mr Batiste's backpack sprayer?
25    A  No

70 (Pages 274 to 277)

William Sawyer, Ph.D.

Page 278

1    Q. Okay. Now, let's go to the label I marked as
2    Exhibit 27. You agree this is a concentrate label that was
3    in use during the time he was using Roundup® Concentrate,
4    right? The date should be on the back.
5    A. 2009.
6    Q. Okay. That was during the time he was using
7    Roundup® Concentrate, right?
8    A. Right. So I see you selected again a label that
9    is near the very end of the plaintiff's exposure period.
10    MR. KALAS: Motion to strike as nonresponsive.
11    BY MR. KALAS:
12    Q. My question was, is 2009 during the period he was
13    using Roundup® Concentrate?
14    A. Yes.
15    Q. Okay. If we go to the first page of the label,
16    very front, it says "CAUTION" in big letters, right?
17    A. Yes.
18    Q. Okay. Then if we go to the page that has
19    directions for use on it -- let me know when you're there.
20    You're probably following my highlights.
21    A. Precautionary statements? No?
22    Q. Directions for use, that one.
23    A. How did I miss that?
24    Q. I think you're there. No, go back.
25    A. Oh, I see, yours is --

Page 279

1    Q. Yeah.
2    A. Two -- okay. I've got two on a page here, okay.
3    Q. All right. Do you see directions for use?
4    A. Yes.
5    Q. Do you see user safety recommendations?
6    A. Yes.
7    Q. Okay. It states above the user safety
8    recommendations, "It is a violation of Federal law to use
9    this product in a manner inconsistent with this labeling."
10    Did I read that correctly?
11    A. Yeah. I wonder what it said in 1998.
12    Q. Okay. I'll bet you a dollar it said that on -- in
13    the label --
14    A. It might have. It may have, but I'd like to see
15    what everything had to say.
16    Q. Okay. Let's go to the user safety
17    recommendations. The first bullet point states, "Clothing
18    and protective equipment exposed to this product should be
19    washed in detergent in hot water. Such items should be kept
20    and washed separate from other laundry."
21    Did I read that correctly?
22    A. Yeah, that's interesting. It's different from the
23    other label we went through earlier in terms of disposing of
24    them.
25    Q. Okay. Did I read it correctly was the question.

Page 280

1    A. Yes.
2    Q. Okay.
3    A. Yeah, you're a good reader.
4    Q. Thank you.
5    Moving on to the second bullet point, it states,
6    "Users should wash hands before eating, drinking, chewing
7    gum, using tobacco, or using the toilet."
8    Did I read that correctly?
9    A. Yes. That's similar to our prior label, yeah.
10    Q. Okay. Third question -- or third bullet. "Users
11    should remove clothing immediately if product gets inside
12    and wash thoroughly and put on clean clothing."
13    Did I read that correctly?
14    A. Yes.
15    Q. Are you going to tell the jury product got inside
16    Mr. Batiste's soaked back?
17    A. Inside his back?
18    Q. No, inside the clothing on his back. Did the
19    clothing stop all the Roundup® from getting through?
20    A. I don't understand.
21    Q. Okay. You're going to tell the jury Mr. Batiste
22    had a leaking backpack sprayer, true?
23    A. Yes.
24    Q. Are you going to tell the jury Roundup® got
25    inside his clothing? In other words, passed through his

Page 281

1    clothing to his skin.
2    A. Well, based on normal use there is a 20 percent
3    coefficient passing through the fabric of a shirt. However,
4    that goes up to 100 percent transmission through the fabric
5    if the fabric is saturated. So the question is whether the
6    fabric on his back was saturated or -- or -- or not.
7    Q. Okay. Do you have an answer to that question that
8    you're going to tell the jury about?
9    A. I think I want to take a look at page 130 again
10    where we talked about the spilling on his -- the backpack
11    spilled on his skin and his clothes.
12    Q. Okay.
13    A. That is page 130 and 232.
14    Q. Okay. So I know it's late in the day. I imagine
15    you're getting a little tired.
16    A. I'm burned out.
17    Q. Let me just make sure the record is clear here.
18    When you come to trial to testify about Mr. Batiste, are you
19    going to tell the jury that it's your understanding, based
20    on his testimony, that some of the Roundup® would have
21    gotten inside his clothing from the leaking backpack
22    sprayer?
23    A. I think it's inconclusive. I would have to defer
24    that to the actual claimant.
25    Q. Okay. So, hypothetically, if Mr. Batiste

71 (Pages 278 to 281)

William Sawyer, Ph.D.

### Page 282

```
 1   testified that he felt glyphosate inside his clothing when
 2   his backpack sprayer was leaking, did Mr. Batiste indicate
 3   at any point in his deposition or his -- or his conversation
 4   with you that he washed thoroughly and put on clean clothing
 5   after that?
 6       A.  No.
 7       Q.  Moving on to the next page, when to apply, it
 8   states in the second bullet point (as read), "Always apply
 9   when wind is -- when the air is calm to prevent drift to
10   desirable plants," right?
11       A.  Yes.
12       Q.  And is it your understanding that Mr. Batiste
13   tried to apply when the wind was calm?
14       A.  No.
15       Q.  Okay.  So he did not use the label in accordance
16   with the instructions in that respect, correct?
17       A.  Well, he did state that he received -- I think he
18   called it blowback.  Let me see.  He stated that sometimes
19   it was windy when he sprayed.  Again, I can't -- I can't
20   conclude that he violated the label because when gusts come
21   up, even on -- when starting out with the spray, it's
22   possible that he experienced some sudden gusts that he
23   couldn't control.  So I -- I don't want to opine that he
24   violated the label unless I understood more about the
25   circumstances.
```

### Page 283

```
 1       Q.  And you didn't ask him, when you spoke to him,
 2   whether or not the wind that appeared when he was spraying
 3   were sudden, infrequent gusts, or wind that consistently was
 4   blowing, correct?
 5       A.  Correct, or -- or if there were wind tunnels in
 6   between buildings or sheds.  I mean, there's a lot of
 7   possibilities.  I didn't get into that with him.
 8       Q.  Okay.  And that would affect your opinions
 9   regarding drift, right?
10       A.  Yeah.  In terms of the degree of it, sure.
11       Q.  Okay.  Moving on to the application restrictions,
12   it says, "Do not apply this product in a way that will
13   contact any person or pet either directly or through drift."
14           Did I read that correctly?
15       A.  Yes.
16       Q.  Okay.  Is Mister -- this is a silly question, but
17   I'm going to ask it.  Is Mr. Batiste a person?
18       A.  I don't think he's an alien.  I think so.
19       Q.  Okay.  Did he testify that he applied Roundup® in
20   a way that contacted him?
21       A.  Could you repeat that?
22       Q.  Did he testify that he applied Roundup® in a way
23   that contacted him?
24       A.  Yes.
25       Q.  Okay.  Moving on --
```

### Page 284

```
 1       A.  I mean, the contact, however, is unavoidable.
 2   There's always exposure when applying Roundup®.  It's a
 3   matter to what degree.
 4       Q.  Does the label say do not apply this product in
 5   any way that will contact any person or pet either directly
 6   or through drift unless such contact is unavoidable?  Does
 7   it say that?
 8       A.  Yes, but that would mean not to use the product
 9   then.  There's always exposure when using it as per the
10   various studies and POEM, et cetera.  Even Monsanto's own
11   study of the patches that it's unavoidable.  You can't spray
12   Roundup® without some level of exposure.  It's impossible.
13   I mean, you can reduce it to a minimal amount that is
14   irrelevant.  It is possible to reduce the exposure, but
15   using a regular sprayer, there's going to be aerosol drift
16   no matter what you do.
17           MR. KALAS:  Okay.  Motion to strike as
18   nonresponsive.
19   BY MR. KALAS:
20       Q.  Let's move on, hazards to Humans and domestic
21   animals.  "Caution" -- this is the precautionary statement
22   section, sir.  It states, "Caution:  Causes moderate eye
23   irritation.  Avoid contact with eyes or clothing.  Wash
24   thoroughly with soap and water after handling."
25           Did I read that correctly?
```

### Page 285

```
 1       A.  Yes.
 2       Q.  Did Mr. Batiste avoid contact with his clothing
 3   when he applied Roundup®?
 4       A.  Well, no, it was unavoidable.
 5       Q.  Okay.  Did he attempt to buy a new replacement
 6   backpack sprayer after his backpack sprayer leaked the first
 7   time?
 8       A.  I don't know.
 9       Q.  Okay.  He said it leaked every time in his
10   deposition, right?
11       A.  I think so.
12       Q.  Okay.  So did you ask him if he tried to replace
13   the leaking backpack sprayer?
14       A.  No.
15       Q.  Okay.  Let's go to your days per year for
16   Mr. Batiste.
17           MR. TRAVERS:  Do you need a break?
18           THE WITNESS:  I think what we should do is just
19   try to push on until maybe -- maybe another 15
20   minutes maybe.
21           MR. TRAVERS:  Okay.
22           THE VIDEOGRAPHER:  I've got ten minutes left.
23           THE WITNESS:  That sounds good.
24   BY MR. KALAS:
25       Q.  Let's go to days per year calculation.  Okay.  And
```

72 (Pages 282 to 285)

William Sawyer, Ph.D.

## Page 286

1    for Mr. Batiste you calculated 83.3 minimum exposure days,
2    and that's using your 8-hour-a-day metric, right?
3        A.   Right.
4        Q.   So let's just take it to just days he used.  You
5    have events per year as 47 for residential use between 1998
6    and 2011, 47 for occupational use between 2009 and 2011, and
7    35 for residential use in 2012, right?
8        A.   Yes.
9        Q.   Okay.  And so, again, doing my math, which you've
10   accused me of not being very good at from time to time, 47
11   days times 14 years equals 658 days of use residentially
12   between 1998 and 2011, just based on days, right?
13       A.   Yes.
14       Q.   Plus 2012 would be 35, so that would total 693
15   residential days of use, right?
16       A.   Yes.
17       Q.   Okay.  And then in addition -- let me -- let me
18   back up a second.
19            I'm just asking about your personal recollection
20   here, your personal knowledge.  Have you ever met anybody in
21   your life who's applied Roundup® 693 days residentially in
22   the course of 14 years?
23            MR. TRAVERS:  Objection, outside the scope of his
24   opinion.
25       A.   I've never asked.  Probably.

## Page 287

1    BY MR. KALAS:
2        Q.   Okay.
3        A.   But I've never asked anyone personally to
4    calculate the exposure days.
5        Q.   Have you ever used Roundup® 47 days in a year?
6            MR. TRAVERS:  Objection, asked and answered.
7    We've thoroughly been over Dr. Sawyer's Roundup® use in
8    previous depositions.
9        A.   No.
10   BY MR. KALAS:
11       Q.   Okay.  And then his occupational use for 3 years
12   was 47 days times 3.  So that's going to be somewhere around
13   140.  So give or take, he had about 830 total days of use,
14   correct?  And that's not 8-hour days, that's just days.
15       A.   Correct.
16       Q.   Okay.
17       A.   But that's over a period of -- what was that,
18   12 --
19       Q.   About 15 years.
20       A.   15 -- well, really 14, I think, '98 to 2012.
21       Q.   Okay.
22       A.   That's over 14 years.
23       Q.   Okay.  So 830 divided by 14, it's your
24   understanding that Mr. Batiste, testifying under oath,
25   claims he used Roundup® more than once a week, 59.3 days a

## Page 288

1    year.
2        A.   Yes.  And I should point out that's because he
3    used it occupationally, as well.
4        Q.   Okay.  And that was only for 3 years, right?
5        A.   Yeah.
6        Q.   Okay.  So going back to the 830 figure, applying
7    that to the Andreotti study, he would fall into the fourth
8    quartile for NHL, correct, greater than 108 days?
9        A.   Yes.
10       Q.   Okay.  And for NHL, which Mr. Batiste has, the
11   odds ratio for greater than 108 days, the quartile he fits
12   in is a null value, shows no relationship between glyphosate
13   use and NHL, right?
14       A.   Correct.
15       Q.   And for B-cell lymphoma, the subtype that he has,
16   the fourth quartile shows a nonsignificant, null
17   relationship between glyphosate use and NHL, meaning that no
18   relationship, either protective or causative, was
19   demonstrated in that group, correct?
20       A.   Yes, but the other five studies, which even
21   includes a meta analysis of the null study, shows
22   statistically significant increased rates, and in two of the
23   studies risk ratios greater than 2.
24       Q.   Which of those meta analyses that you're referring
25   to, to refer Mr. Batiste's data to, uses all of the data of

## Page 289

1    the Agricultural Health Study?  Which one?
2        A.   I don't remember.
3        Q.   Okay.  Could be none of them, right?
4        A.   I don't recall.
5        Q.   Okay.
6        A.   I'd defer that to the medical epidemiologist.
7        Q.   Okay.  Now, anything -- is there anything that
8    Mr. Batiste you're going to tell the jury that is not
9    included in your toxicological notes that we haven't talked
10   about today?
11       A.   I don't think so.
12       Q.   Okay.  And did you look into the environment
13   around ▮▮▮▮▮▮▮ as far as what agricultural operations
14   or industrial operations were around that address?
15       A.   I did not.
16       Q.   Okay.  Did you look into at ▮▮▮▮▮ what
17   agriculture operations or industrial operations were around
18   that address?
19       A.   No.
20       Q.   Did you look at the ambient air exposure at
21   ▮▮▮▮ or ▮▮▮▮ to determine the level of
22   potential carcinogens in the ambient air?
23       A.   No.
24       Q.   Did you look at the groundwater at ▮▮▮ or
25   ▮▮▮▮▮▮ to determine the level of potential

73 (Pages 286 to 289)

William Sawyer, Ph.D.

Page 290

1  carcinogens in the groundwater?
2      A.  No.
3      Q.  Okay.  Did you -- same question for all the
4  plaintiffs here.  Did you look at the ambient air for any of
5  the plaintiffs in the Wade case?
6      A.  No.
7      Q.  Did you look at the groundwater contaminant levels
8  for any of the plaintiffs in the Wade case?
9      A.  No.
10      Q.  Did you do any examination of the proximity of
11  their home to agricultural or industrial operations in the
12  Wade case?
13      A.  No.  And I should point out the human
14  epidemiologic studies include background comparison groups
15  that sustain similar background exposures.
16      Q.  Okay.  And for similar individuals to the
17  plaintiffs in the Wade case, since Roundup® came on the
18  market and became widely used start -- starting in the mid
19  1990s, has the rate of NHL in this country increased,
20  decreased, or remained the same?
21      MR. TRAVERS:  Objection, form, and, again, general
22  causation opinion testimony.
23      A.  In the years -- not in those years, but from 1950
24  through approximately 1980s, there was an almost -- I think
25  it was like a 25 percent increased rate in NHL.

Page 291

1  BY MR. KALAS:
2      Q.  Were any of our plaintiffs using Roundup® in 1950?
3      A.  No, but they were after 1975.
4      Q.  1975?
5      A.  Not these plaintiffs, but in general in the U.S.,
6  yes.
7      Q.  Okay.  These plaintiffs weren't using Roundup® in
8  1975, right?
9      A.  No.
10      Q.  Okay.  In the 1950s when that rate of NHL started
11  increasing in this country, was Roundup® even on the market?
12      A.  No.
13      Q.  Okay.
14      MR. KALAS:  Let's stop to change the tape.
15      THE VIDEOGRAPHER:  We are going off the record.
16  The time is 4:40 p.m.
17      (Recess from 4:40 p.m. to 4:46 p.m.)
18      THE VIDEOGRAPHER:  We're back on the record.  The
19  time is 4:46 p.m.  This begins media unit number 5.
20      MR. KALAS:  We've been on the record now for, I
21  believe, seven hours and five minutes or so.
22  Mr. Travers has informed me that he is not going to
23  allow the witness to answer additional questions
24  regarding the three other plaintiffs:  Mr. Weeks -- or
25  excuse me, Meeks, Mr. Stauffenberg, and Mr. Ashelman.

Page 292

1  I've only gotten through my case-specific questions
2  regarding two of them.
3      As I stated at the beginning of this deposition,
4  we were going to make every effort to finish today.  We
5  have not.  We've requested a second day.  We -- given
6  the fact there are five plaintiffs in this case as
7  opposed to a single plaintiff or two plaintiffs, a
8  second day is warranted, and we reserve all available
9  relief going forward.
10      The fact that we are turning over the witness to
11  Mr. Travers does not in any way concede that we are
12  concluded with our questioning; however, it is a
13  courtesy given the fact that it is an open question
14  whether or not this deposition will continue.  And we
15  reserve the right to ask follow-up questions to any
16  areas Mr. Travers goes into that are new or broach new
17  areas.
18      So with that, I'll turn over the witness to
19  Mr. Travers.
20      MR. TRAVERS:  Okay.  And I'll just make a
21  statement for the record.  We did offer counsel for
22  Monsanto 30 to 45 minutes to ask additional questions
23  if the doctor could finish up today.  Counsel advised
24  us he could not finish up in 30 to 45 minutes.
25      MR. KALAS:  That's true.

Page 293

1      MR. TRAVERS:  Counsel -- all right.  And counsel
2  for Monsanto, the record will reflect, asked questions
3  repeatedly about Meeks, Stauffenberg, and Ashelman.
4  Counsel for Monsanto did not in good faith try to
5  complete this deposition in one day.  Counsel for
6  Monsanto repeatedly asked questions about general
7  causation, even though pursuant to the scheduling order
8  in this case, expert witnesses are not to be redeposed
9  on general causation opinions that they've already
10  disclosed and been deposed on.
11      Again, after being informed and -- and having the
12  plaintiffs stipulate that Dr. Sawyer will not be
13  testifying about ruling out other risk factors, counsel
14  for Monsanto still repeatedly asked about other risk
15  factors for the -- or for the plaintiffs.  So for that
16  reason we are objecting to a second day of deposition.
17      MR. KALAS:  Nothing further to add.
18  John, do you have anything?
19      MR. COWLING:  Well, I just want to -- I do have
20  additional questions based on the testimony today after
21  I asked questions this morning and would prefer to wait
22  until all of the -- until the deposition is completed
23  to ask those.  For example, I have only seen these
24  lengthy reports on all the plaintiffs today, but I can
25  ask some questions today if -- if need be.

74 (Pages 290 to 293)

William Sawyer, Ph.D.

Page 294

1    MR. TRAVERS: And do -- or do you want to go
2  before me or --
3    MR. COWLING: No, go ahead.
4    MR. TRAVERS: Okay.
5        EXAMINATION
6  BY MR. TRAVERS:
7    Q.  Just to -- I'd like to go back to the Meeks
8  report, and do you have it in front of you?  I've got --
9    A.  Okay.
10    Q.  If you could go to page 10 of that report.
11    A.  All right.
12    Q.  All right.  And can you read the first paragraph
13  under "Personal Protective Equipment" -- actually, you don't
14  have to read it, but under the -- for the first paragraph
15  under "Personal Protective Equipment," does that refresh
16  your recollection that there was testimony that Mr. Meeks
17  did get spills of Roundup® on his clothing?
18    MR. KALAS: Objection to leading and refreshing
19  recollection about questions that weren't asked.
20      You can answer.
21    A.  Yeah, it's in my report, and I was asked if the
22  opinions in my report are complete.  And, yeah, that's in my
23  report that his clothing was saturated on page 10, paragraph
24  1, under "Personal Protective Equipment."
25

Page 295

1  BY MR. TRAVERS:
2    Q.  And in that third paragraph under "Personal
3  Protective Equipment" -- or I'd like to direct you to that
4  third paragraph.  Did Mrs. Meeks do the laundry in the Meeks
5  household?
6    A.  Yes, she did.
7    MR. KALAS: Objection to form.
8  BY MR. TRAVERS:
9    Q.  So would that provide her a basis for testifying
10  as to whether Mr. Meeks' clothing got saturated with
11  Roundup®?
12    MR. KALAS: Objection to form.
13    A.  Yes, she generally washed the Roundup-soaked
14  clothing separately from the regular household laundry.
15  BY MR. TRAVERS:
16    Q.  I'd like to go to the Stauffenberg report, page 8.
17    A.  Okay.
18    Q.  I'd like you to go to the -- I direct you to the
19  last paragraph on that page.
20    A.  Yes.
21    Q.  And I'd like to ask you, was Josh Stauffenberg the
22  only person who testified that he was exposed to Roundup®
23  while riding an ATV?
24    A.  No.
25    Q.  And who else testified as to that?

Page 296

1    A.  Joshua's father.
2    Q.  And would you expect him to have firsthand
3  knowledge as to what herbicide he used?
4    A.  Yes.
5    MR. KALAS: Objection to form.
6  BY MR. TRAVERS:
7    Q.  And for Mister -- for Mr. Batiste, do you know if
8  he was under oath when he padded his resumé and submitted it
9  to an employer in order to get a job to help support his
10  family?
11    MR. KALAS: Objection to form, mischaracterizes
12  the record, and attorney is testifying.
13    A.  No, no, I don't know.
14  BY MR. TRAVERS:
15    Q.  And would you expect that his resumé was submitted
16  under oath to -- to his employer?
17    MR. KALAS: Objection to form.
18    A.  It would be very unusual.
19  BY MR. TRAVERS:
20    Q.  And at his deposition when he was under oath, he
21  truthfully testified that his resumé was not accurate,
22  correct?
23    MR. KALAS: Objection, calls for speculation about
24  whether or not he truthfully testified at deposition.
25    A.  Yeah, I can't answer whether he was truthful.  All

Page 297

1  I can say is that it appears to be a confession.
2  BY MR. TRAVERS:
3    Q.  Go to the Johnson study, the --
4    A.  All right.
5    Q.  I forget what exhibit -- I didn't write down the
6  exhibit number.
7    MR. KALAS: I thought it was like 26 or 27.
8    A.  I think it's on the top here.  Yeah, here it is.
9    MR. KALAS: That's not it.
10    THE WITNESS: No, that's Lavy.
11    MR. TRAVERS: He can have -- he can have my copy.
12    MR. KALAS: Is there any writing on it, Jeff?
13    MR. TRAVERS: No.
14    MR. KALAS: Okay.  That's fine.  I don't care.
15    MR. TRAVERS: Yeah.
16  BY MR. TRAVERS:
17    Q.  Just go to table 4.
18    A.  Okay.
19    Q.  Does that -- that table state how big the people
20  were in that study?
21    A.  No.

75  (Pages 294 to 297)

William Sawyer, Ph.D.

Page 298

```
 3        MR. KALAS:  Objection to form.
 4        A.  So simply dividing his dose by 100 kilograms is a
 5   false methodology.  One would have to also recalculate his
 6   body surface area and then divide by 100 kilograms or --
 7
 8        MR. KALAS:  Objection to form.
 9   BY MR. TRAVERS:
10        Q.  And I'd like you to go to this label, the
11   Roundup® --
12        A.  Yeah, I think that's near the top of the stack.
13        MR. KALAS:  Which label are you going to?
14        MR. TRAVERS:  The Weed & Grass Killer Concentrate
15   Plus.
16        THE WITNESS:  Not this one?
17        MR. TRAVERS:  No, no, the --
18        MR. KALAS:  The red label.
19        THE WITNESS:  Yeah, I don't have it.  I don't
20   think we marked that one.
21        MR. KALAS:  Yeah, we marked it.
22        THE WITNESS:  Oh, did we mark yours?  Okay.
23        MR. KALAS:  There it is.
24   BY MR. TRAVERS:
25        Q.  I'd like to go to the -- down to the user safety
```

Page 299

```
 1   recommendations
 2        A  Directions for use?
 3        Q  Yeah, directions for use
 4        A  Okay
 5        Q  Is there is -- is there any recommendation to wear
 6   long-sleeved shirts in this label?
 7        A  No
 8        Q  So if a -- so if a person used both -- so if a
 9   person used both Roundup® Pro herbicides and Roundup® that's
10   sold in -- for home use, they would have got two conflicting
11   messages about the type of safety gear to wear?
12        MR KALAS:  Objection, calls for speculation about
13        the messages a hypothetical person would receive, and
14        mischaracterizes the use patterns of the product
15        You can answer
16        A  Yes
17   BY MR TRAVERS:
18        Q  -- and Mr Wade used both professional and
19   home use Roundup®?
20        A  Yes
21        Q  And I want -- let's see
22        And you said before it would be impossible to
23   avoid contact with skin when using Roundup®, correct?
24        MR. KALAS:  Objection, form
25        A  Yes
```

Page 300

```
 1   BY MR. TRAVERS:
 2        Q.  So it would be misleading for Monsanto to tell its
 3   consumers in a label to avoid contact with skin --
 4        MR. KALAS:  Object --
 5   BY MR. TRAVERS:
 6        Q.  -- correct?
 7        MR. KALAS:  Sorry, were you done?
 8        MR. TRAVERS:  Yeah.
 9        MR. KALAS:  Objection, calls for speculation,
10   outside the scope, and --
11        MR. TRAVERS:  You asked about the label.
12        MR. KALAS:  I wasn't done with my objection.
13        MR. TRAVERS:  Okay.  Sorry, go ahead.
14        MR. KALAS:  Objection, calls for speculation,
15   outside the scope, and calls for an opinion on what a
16   hypothetical person would do, which is a, quote
17   unquote, general causation opinion.
18        You can answer.
19        A.  Can you repeat it?
20   BY MR. TRAVERS:
21        Q.  Yeah.  Well, let me say this.  Would it be
22   misleading for Monsanto to tell consumers in its label to
23   avoid skin exposure when they know it's impossible to avoid
24   skin exposure to Roundup®?
25        MR. KALAS:  Objection, calls for speculation,
```

Page 301

```
 1   outside the scope, calls for an opinion on corporate
 2   intent.
 3        A.  From a toxicological standpoint, and relying upon
 4   the peer-reviewed studies, many of which we've discussed
 5   today, even when using appropriate dress and PPE and
 6   following the label, there still is exposure.  That's not
 7   even up for debate.  It's in all of the studies and in
 8   Monsanto's own document, there still is exposures.  So it's
 9   not possible to completely avoid exposure.  It's possible to
10   reduce exposures but not to completely avoid.  And I'm not
11   speaking on this from a label expert.  I'm not a label
12   expert.  I'm simply providing a toxicological opinion based
13   on the studies.
14        MR. TRAVERS:  Those are all the questions I have.
15        MR. COWLING:  I just have a few questions.
16             FURTHER EXAMINATION
17   BY MR. COWLING:
18        Q.  So is it fair to say a significant portion of your
19   causation opinions are based on the six epidemiological
20   studies that you cite in your report?
21        A.  No.
22        Q.  No?
23        A.  No.
24        Q.  Is that a -- a factor?
25        A.  No.  My opinion on causation is based upon the
```

76 (Pages 298 to 301)

William Sawyer, Ph.D.

## Page 302

1  Bradfill -- Bradford Hill criteria in terms of those six
2  studies as one of the seven prongs  Also, the latency,
3  which is a temporality, the mechanism, and that is the
4  mutagenic effects of Roundup® and -- combined with PEOA, and
5  the consistency and coherence of those studies among in
6  vitro human, animal, and human studies with respect to
7  mutagenesis; and also the dosage using the dose metrics from
8  those six human studies, and the consistency of those six
9  studies along with the consistency of the studies on
10  mutagenic effects, which has also been confirmed by ATSDR
11      Q  Well, let me ask it this way  Without these
12  studies would you be able to render your opinions on
13  causation in this case?  If they didn't exist?
14      A  I would not  I would have a different opinion
15      Q  Okay  So they are -- they are a factor in your
16  opinion?
17      A  They're one of the --
18      Q  One of the --
19      A  -- prongs of the Bradford Hill criteria --
20      Q  Right
21      A  -- which toxicologists rely on in causation
22      Q  Right  And so these studies, the first one was in
23  2001 --
24      A  Yes
25      Q  -- correct?

## Page 303

1          And that was published in Cancer Epidemiology
2  Biomarkers & Prevention, right?  I think --
3      A  Let's see.  Yes, it was.
4      Q  Okay.  That's -- that's not a publication that's
5  in general circulation.  You would agree with me there,
6  wouldn't you?
7          MR. TRAVERS:  Objection to form.
8      A  I disagree.  It's a peer-reviewed study.
9  BY MR. COWLING:
10      Q  Right.  It's -- you have to subscribe in order to
11  get this journal, correct?  Or you have to access it behind
12  a pay wall, correct?
13      A  Well, that's true with almost all of the studies.
14  I -- I have been receiving the Journal of Forensic Sciences
15  since when I published in it in 1998, and I pay quite a bit
16  of money each year for that journal, and I have a whole set
17  of bookshelves of it --
18      Q  Right, but the general public can't access it
19  without paying for it.
20      A  Well, I think Monsanto can afford it.  I afford
21  it.
22      Q  Well, what about a St. Louis advertising agency?
23  Would you expect them to subscribe to these kind of journals
24  in their work as creating advertisements for customers?
25      A  I -- I -- I can't opine on that.  I don't know

## Page 304

1  what the -- much about the company, but I'm sure their
2  client could.
3      Q  Okay.  Now, in epidemiology generally one study is
4  not enough to draw any conclusions, is it?
5      A  That's what I explained earlier --
6      Q  Right?
7      A  -- regarding Agricultural Health Study, and I gave
8  a hypothetical example if that were the only study.
9      Q  Right.  So if McDuffie were the only study, you
10  couldn't draw any conclusions either, correct?
11      A  With respect to determining whether, in fact,
12  glyphosate was a carcinogen?  I'm not sure of your question.
13      Q  Well, whether there's a statistically significant
14  correlation between glyphosate use and -- and cancer,
15  typically you would need to have more than one study in
16  order to start drawing causal conclusions based on that kind
17  of data, correct?
18      A  Yes.
19      Q  Okay.  So the next study you rely on is from 2008,
20  the Ericksson study, correct?  The next one in time --
21      A  Um --
22      Q  -- of -- of these six studies.
23      A  Yeah, yes, that's correct.
24      Q  And Ericksson is published in the International
25  Journal of Cancer, and your testimony would be the same

## Page 305

1  about whether this would be accessible to the general public
2  without paying for it.  That's true for all these journals,
3  correct?
4      A  Well, maybe.  What I need to qualify is that the
5  abstracts are free, and the abstract is free to anyone.  And
6  these were available back in 2008 at no charge as abstracts
7  which has the conclusions of the studies.
8      Q  But no details, correct?
9      A  No, but for 25 bucks your company could have
10  purchased one once they read the abstract.  I mean, I can't
11  imagine your company not being able to afford at least $25.
12      Q  Well, you've relied on 10,000 pages of studies in
13  your -- to form your conclusions, correct?  Didn't you
14  testify to that this morning?
15      A  Yeah, but my conclusions extend beyond whether --
16  whether an article was published or not.
17      Q  Well, you relied on hundreds of studies in forming
18  your opinions in this case, correct?
19      A  I have probably referenced a couple hundred.
20      Q  Okay.  Now, you said one study wasn't enough.  Are
21  two studies enough from an epidemiological standpoint?  Are
22  you going to opine about that, or are you going to defer to
23  the epidemiologist?
24          MR. TRAVERS:  Objection, form.
25      A  Generally not.

William Sawyer, Ph.D.

Page 306

BY MR. COWLING:

Q. Okay, generally not.

The next study going forward in time of the six is 2018, correct?

A. Yes.

Q. Okay. In that study, the Andreotti study was published in the Journal of National Cancer Institute, correct?

A. Yes.

Q. And that study concluded that there was no -- no statistically significant relationship between glyphosate and -- and cancer, correct?

A. Yes, it was null.

Q. Okay.

A. It didn't show either way.

Q. So if you have two studies that are positive and one that's null, is that enough?

A. It can be. It depends on the degree of other factors in the Bradford Hill criteria in terms of coherence, consistency, dose response, et cetera.

Q. So it is an issue if you have two studies that show a positive correlation, and the next one doesn't, correct?

MR. TRAVERS: Objection, form.

A. No.

Page 307

BY MR. COWLING:

Q. That's not a problem?

A. No, no.

Q. So -- so two studies is not enough, but three studies, two of which are positive and one which is negative, is enough?

A. I didn't say two studies was enough. I said generally. But look at it this way. If an x-ray showed a fracture, and a second x-ray showed the same fracture, and the third x-ray missed that fracture, it doesn't mean there's no fracture. These studies have limitations, which is called Type II error, and that is dependent upon the size of the study, the number of subjects, and other design factors.

Q. And you need to be an epidemiologist or a toxicology (sic) to understand that, correct?

A. Well, I would defer to the epidemiologist in this matter. Although I have taught a section of an epidemiology course, I've studied epidemiology as part of my training, I am not an epidemiologist.

Q. Correct.

A. And that's why I prefer to defer the details of the design of the studies and the meta analysis to the epidemiologist rather than trying to answer those questions myself.

Page 308

Q. Okay, thank you. So the -- other three studies of the six that you rely on were all published in 2019 in scientific journals, correct?

A. Yes.

MR. COWLING: That's all I have, thanks.

MR. KALAS: A couple follow-ups on Mr. Travers' questions.

FURTHER EXAMINATION

BY MR. KALAS:

Q. Would you lie on a resumé?

A. No.

Q. Why not?

A. Unethical.

Q. When you are applying two pesticides with different personal protective equipment requirements, is it appropriate to violate one label and --

MR. TRAVERS: Objection, form.

MR. KALAS: Can I finish the question?

MR. TRAVERS: I thought you were done, sorry.

MR. KALAS: Let me ask it again.

MR. TRAVERS: Okay.

BY MR. KALAS:

Q. When applying two pesticides with different personal protective equipment called for on the label, is it appropriate to violate the personal protective equipment

Page 309

requirements on one label in order to follow the personal protective equipment requirements on the second label, or should one change their personal protective equipment based upon the pesticide they're applying using best hygiene practices?

MR. TRAVERS: Objection, form, compound.

A. No, I would follow the label.

BY MR. KALAS:

Q. Okay. No --

MR. KALAS: Well, let me put it this way, I've stated my position on the record about whether I have further questions. I do have further questions.

MR. TRAVERS: Right.

MR. KALAS: I have -- given the statement from Mr. Travers that we are going to stop today, I have no further questions today.

MR. TRAVERS: Yeah.

MR. KALAS: But I'm going to leave the deposition open, and, again, we'll reserve all available relief. Okay.

MR. TRAVERS: Fair.

MR. KALAS: Okay.

THE VIDEOGRAPHER: Okay. We are going off the record at 5:11 p.m.

(Deposition adjourned at 5:11 p.m.)

78 (Pages 306 to 309)

William Sawyer, Ph.D.

Page 310

1            ERRATA SHEET
2   DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE
    IN RE: Wade, et al, versus Monsanto Company, et al
3   DATE: November 5, 2019
    _____
4   PAGE LINE      CORRECTION & REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21   Under penalties of perjury, I have read my deposition in
    this matter and it is true and correct, subject to any
22   changes in form or substance as reflected above
23
24   _____      _____
    DATE               WILLIAM SAWYER, PH D
25

Page 311

1         CERTIFICATE OF OATH
2
3   STATE OF FLORIDA)
4   COUNTY OF LEE)
5
6      I, Deborah M. Bruns, Florida Professional
7   Reporter, Notary Public, State of Florida,
8   certify that William Sawyer, Ph.D., personally
9   appeared before me on November 5, 2019, and
10   that he was duly sworn.
11
12      Signed this 8th day of November, 2019.
13
14
15     _____
    Deborah M. Bruns, FPR
16   Notary Public, State of Florida
    My Commission No.: 1519360
17   Expires: 10/31/21
18
19      Personally known_____X_____
    OR Produced Identification_____
20   Type of Identification Produced_____
21
22
23
24
25

Page 312

1        REPORTER'S CERTIFICATE
2   STATE OF FLORIDA)
3   COUNTY OF LEE)
4      I, Deborah M. Bruns, Florida Professional
5   Reporter and Notary Public in and for the State
6   of Florida at Large, do hereby certify that I
7   was authorized to and did stenographically
8   report the deposition of WILLIAM SAWYER, PH.D;
9   that a review of the transcript was requested;
10   and that the transcript, consisting of pages 1
11   through 309 inclusive, is a true record of the
12   testimony given by the witness.
13      I further certify that I am not a
14   relative, employee, attorney or counsel of any
15   of the parties; nor am I a relative or employee
16   of any of the parties' attorney or counsel
17   connected with the action; nor am I financially
18   interested in the action.
19     DATED this 8th day of November, 2019.
20
21
22     _____
    Deborah M. Bruns, FPR
23   (This transcript has been digitally signed.)
24
25

79 (Pages 310 to 312)

William Sawyer, Ph.D.

Page 313

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

--------------------------------§
CHRISTOPHER WADE, et al.,        §
                                 §
     Plaintiffs,                 §
                                 § Case No. 1722-CC00370
vs.                              §
                                 §
                                 §
MONSANTO COMPANY, et al.,        §
                                 §
     Defendants.                 §
------------------------------- §

- - -

NOVEMBER 12, 2019

- - -

CONFIDENTIAL - WILLIAM SAWYER, PH.D.

- - -

VOLUME 2

     Videotaped deposition of WILLIAM SAWYER,
PH.D., held at South Seas Island Resort, 5400
Plantation Road, Captiva, Florida, 33924,
commencing at 8:09 a.m., on the above date,
before Trina B. Wellslager, Registered
Professional Reporter, Certified Realtime
Reporter, and Notary Public

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

## William Sawyer, Ph.D.

### Page 314

```
 1   APPEARANCES:
 2      THE MILLER FIRM, LLC
        BY: JEFFREY A. TRAVERS, ESQUIRE
 3      108 Railroad Avenue
        Orange, Virginia  22960
 4      (540) 672-4224
        jtravers@millerfirmllc.com
 5      Representing Plaintiffs
 6
 7   HOLLINGSWORTH, LLP
        BY: JOHN M. KALAS, ESQUIRE
 8      DANIEL MURER, ESQUIRE
        1350 I Street, Northwest
 9      Washington, DC  20005
        (202) 898-5800
10      jkalas@hollingsworthllp.com
        Representing Defendant Monsanto Company
11
12   APPEARANCES VIA TELEPHONE:
13      ARMSTRONG TEASDALE, LLP
        BY: JOHN F. COWLING, ESQUIRE
14      7700 Forsyth Boulevard
        St. Louis, Missouri  63105
15      (314) 621-5070
        jcowling@atllp.com
16      Representing Defendants Osborn & Barr
        Communications and Osborn & Barr Holdings
17
18   ALSO PRESENT:
19      LaJuana Pruitt, Videographer
20
21
22
23
24
25
```

### Page 315

```
 1            - - -
 2          I N D E X
 3            - - -
         VOLUME II
 4                           Page
 5   Testimony of:  WILLIAM SAWYER, PH.D
        DIRECT EXAMINATION BY MR. KALAS      317
 6      CROSS-EXAMINATION BY MR. TRAVERS     440
        REDIRECT-EXAMINATION BY MR. KALAS    442
 7      RECROSS-EXAMINATION BY MR. TRAVERS   444
 8
 9          SAWYER EXHIBITS
10   No. 29  10-21-19 Letter to Jerry Kristal
             from William Sawyer, Ph.D        318
11   No. 30  List of Trial and Depositions from
             Past Four Years, William Sawyer,
             Ph.D                             333
12   No. 31  Naval Nuclear Propulsion Program
             Report, May 2018                 333
13   No. 32  Monsanto Company's Objections and
             Responses to Plaintiff's First
14           Request for Admissions to Defendant
             Monsanto Company                 332
15   No. 33  Risk Assessment, Final Report,
             Prepared for USDA, Forest Service  346
16   No. 34  Videotaped Deposition Transcript of
             Joshua Taylor Stauffenberg       361
17   No. 35  Roundup Original Complete
             Directions for Use               369
18   No. 36  Deposition Transcript of Floye Ann
             Meeks                            384
19   No. 37  Study Title, MON 78294:  An
             Applicator Exposure Study Conducted
20           in Spain (Autumn 2005) Using
             Biomonitoring, MONGLY00668430-
21           MONGLY00668967                   388
     No. 38  Roundup Complete Directions for Use  416
22   No. 39  Deposition Transcript of Glen
             Ashelman                         428
23   No. 40  Roundup WeatherMAX Directions for
             Use                              433
24
25
```

### Page 316

```
 1            - - -
 2         THE VIDEOGRAPHER:  We are now on the record.
 3   Today's date is November the 12th, the year 2019.
 4   The time is 8:09 a.m.
 5         This is the continued deposition of
 6   Dr. William Sawyer taken in the matter of
 7   Christopher Wade versus Monsanto Company.
 8         My name is LaJuana Pruitt.  I'm your
 9   videographer.  Our court reporter is Trina
10   Wellslager.
11         Will counsel please introduce themselves,
12   beginning with plaintiffs' counsel.
13         MR. TRAVERS:  This is Jeff Travers on behalf
14   of the plaintiffs and the Miller Firm.
15         MR. KALAS:  John Kalas on behalf of Monsanto
16   Company, and Daniel Murner on behalf of Monsanto
17   Company.
18         MR. COWLING:  John Cowling on behalf of
19   Osborn & Barr Communications and Osborn & Barr
20   Holdings.
21         THE COURT REPORTER:  Do you solemnly swear
22   or affirm that the testimony you are about to
23   give will be the truth, the whole truth, and
24   nothing but the truth so help you God?
25         THE WITNESS:  Yes.
```

### Page 317

```
 1         WILLIAM SAWYER, PH.D.
 2   having been duly sworn, testified as follows:
 3         DIRECT EXAMINATION
 4   BY MR. KALAS:
 5     Q.  Dr. Sawyer, good morning.
 6     A.  Good morning.
 7     Q.  How are you?
 8     A.  Good.
 9     Q.  Good.  Thanks for joining us again.
10     A.  Certainly.
11     Q.  If you need to take a break for any reason,
12   let us know.  We're going to be on the record today
13   for three hours, and we'll take as many breaks as
14   you need, but we'll try to be as efficient as
15   possible.
16         Now, we got together this past Tuesday, on
17   the 5th, right?
18     A.  Yes.
19     Q.  Okay.  And in the interim time between when
20   we got together and today, have you reached any new
21   opinions, in other words, opinions you didn't hold
22   last week but now hold regarding the Wade matter?
23   And by "the Wade matter" I mean all five plaintiffs.
24     A.  No.
25     Q.  Okay.  Do you stand by your testimony from
```

William Sawyer, Ph.D.

## Page 318

1  last week on the 5th?
2    A.  With the exception of one error.
3    Q.  Okay.  What was the one error, sir?
4    A.  Regarding the Prasad study and questions you
5  asked me regarding dose.
6    Q.  Okay.
7    A.  So I made a couple of revisions as I
8  erroneously applied the human dermal absorption
9  factor to the equation.
10    Q.  Okay.  So do you have some written revisions
11  there that you've made or are they just revisions
12  that you've made mentally but have not put to paper
13  yet?
14    A.  No, they're on paper in the form of Bill's
15  scribbles.
16    Q.  Okay.  Do you mind if I see the document
17  you're holding there?
18    A.  Certainly.
19    Q.  Okay.  I understand these are your personal
20  notes.  May I mark this as Exhibit 29 for part of
21  the record?
22    A.  Yes.
23    Q.  Okay.
24      (Sawyer Exhibit 29 was marked for
25  identification.)

## Page 319

1    Q.  Okay.  There you go.
2      Okay.  And is that the only change to your
3  opinions or notes between last week and today?
4    A.  Yes.  I've added a couple of more studies.
5    Q.  Right.
6    A.  But that's in response to the -- providing
7  any and all materials reviewed, et cetera.
8    Q.  Sure.  And let's -- let's talk about those
9  right now.
10      Mr. Travers last night sent us two new
11  studies or two new reliance materials, maybe I
12  shouldn't call them studies, that you're now relying
13  on.
14      The first is called The Report of the
15  Advisory Group to Recommend Priorities for the IARC
16  Monographs during 2020 to 2024.
17      Is that one of the new materials you're
18  relying on?
19    A.  Yes.
20    Q.  Okay.  And how are you relying on those
21  materials or that report?
22    A.  Just as a confirmation by IARC that the
23  findings have not changed and there is no intention
24  of even reassessing for the next five years unless
25  relevant evidence indicating a change becomes

## Page 320

1  available.
2    Q.  Okay.  So you said there's no intention of
3  even reassessing, and you didn't say reassessing
4  what.  I assume you're talking about glyphosate
5  there?
6    A.  Yes.
7    Q.  Okay.  And then you also put forward a study
8  by Benitez, et al., called DNA Damage Induced By
9  Exposure to Pesticides in Children of Rural Areas of
10  Paraguay.
11      Is that the other new article that you're
12  relying on?
13    A.  Yes.
14    Q.  Okay.  And how are you relying on that
15  article?
16    A.  Simply that the control group was
17  pesticide-free and controlled by biological means,
18  whereas the soybeans, which 95 percent in Paraguay
19  are genetically modified, and Roundup ready, were
20  compared.  So there was an exposed group which could
21  have included other pesticides beyond just
22  glyphosate, but it was compared to a pesticide-free
23  control group.
24      And the results showed at P values less than
25  0.001 some significant markers of DNA damage,

## Page 321

1  including micronucleus measurement changes,
2  binucleated cells, broken eggs, karyorrhexis,
3  karyolysis, pyknosis of the nuclei, and some other
4  measurement changes that were statistically
5  significant.
6      And the study concluded that children
7  exposed to pesticides were observed to have a
8  greater genotoxic and cytotoxic effect from the
9  exposures.
10      The weakness of the study, it's not specific
11  to glyphosate.  However, the study was specifically
12  designed with respect to exposures of communities
13  who are surrounded by transgenic soybean crops.
14    Q.  Okay.  Let me just unpack that a little bit.
15      You mentioned that the study is not specific
16  to glyphosate.  Do you know, from the study, whether
17  or not the farmers were using Roundup as opposed to
18  a different manufacturer's glyphosate formulation,
19  say a generic Chinese manufacturer?
20    A.  No.
21    Q.  Okay.  And do you know the impurity levels
22  in pesticides in Paraguay, if they're regulated in
23  any way?
24      MR. TRAVERS:  Object to the form.
25    A.  No.

3 (Pages 318 to 321)

William Sawyer, Ph.D.

Page 322

1    Q.  Okay.  So you -- you can't tell from the --
2    the four corners of that study whether or not there
3    were some sort of contaminants in the glyphosate
4    sprayed in Paraguay that wouldn't be present here in
5    America, right?
6    A.  Yes.  However, the discussion study doesn't
7    hypothesize that as a possible explanation.
8    Q.  I'm just asking what you know.  From
9    reading that study were you able to tell that one
10   way or another?
11   A.  No.  But the discussion section doesn't even
12   suggest that's the case.
13   Q.  Okay.  And you quite candidly noted that
14   these people may have had other exposures to other
15   pesticides, right?
16   A.  Yes.
17   Q.  Okay.
18   A.  For example, pyrethrins from an attempt to
19   kill some type of bugs, for example.
20   Q.  And like the glyphosate, you don't know if
21   those pyrethrins were name brand or generically
22   manufactured from China or somewhere else, right?
23   A.  Correct.
24   Q.  Okay.  And you don't know the impurity
25   levels in those pyrethrins either, right?

Page 323

1    A.  If they were even used, that's true.
2    Q.  Okay.  And did the authors look at other
3    differences in the exposure profiles between the
4    control group and the exposed group in that study?
5    A.  Yes.
6    Q.  Okay.  What -- what other differences in the
7    exposure profiles did the authors look at?
8    A.  Age group, sex, nutritional status.
9    Q.  Did they consider the smoking status of the
10   home?
11   A.  I don't believe so, because the children in
12   the five to six year, seven to eight year, nine to
13   ten year, were considered nonsmokers, and any smoke
14   would have been passive.
15   Q.  Right.
16       And can secondhand smoke cause genetic
17   damage in children?
18   A.  Yes.  However, secondhand smoke would be
19   expected to be equally present in both -- both
20   groups.  There's no statement in the report
21   suggesting that smoking was the cause of the genetic
22   damage because children don't smoke.
23   Q.  Well, my question was different, but we'll
24   move on.
25       You said secondhand smoke would be expected

Page 324

1    to be equally present in both groups.  What are you
2    basing that on?
3    A.  That in countries who do not have designated
4    smoking rules, secondhand smoke is ubiquitous, as it
5    was here 30 years ago.
6    Q.  Okay.  So it's your opinion that -- well,
7    strike that.
8        The control group, those parents are farmers
9    as well, right?
10   A.  Yes.
11   Q.  Okay.  And the control group's parents are
12   farmers who don't use pesticides, right?
13   A.  Correct.
14   Q.  Okay.  Have you done -- have you found any
15   data out there on Paraguayan farmers who don't use
16   pesticides as to whether they smoke at the same rate
17   as Paraguayan farmers who do use pesticides?
18   A.  No.  That's certainly possible.  My point is
19   that it would have to be secondhand smoke exposure,
20   and secondhand smoke is rather ubiquitous in
21   countries that do not have strict smoking rules.
22   Q.  One thing we talked about last week was
23   runoff from glyphosate and -- and its relevance to
24   the Stauffenberg case.
25       Did you look into any data about these

Page 325

1    Paraguayan farmers, about whether the runoff of
2    pesticides into drinking water sources would be the
3    same in the control group versus the exposed group?
4    A.  No.
5    Q.  Okay.  In the time since we met last week
6    have you found a study that shows, with glyphosate
7    in particular, a 50 milliliter per hour volume of
8    surface contamination using a Roundup formulation in
9    the real world?
10   A.  I've looked at a textbook chapter, which
11   I've been unable to fully go through, which
12   indicates that the POEM model, and specifically the
13   volume of 50 mls per hour, is based upon different
14   activities, including 750 different data points.
15   And there are roughly eight or 10 different
16   scenarios in which that volume of 50 mls varies,
17   depending on the application process and so on.
18       And I do not have it printed, I have it on
19   an electronic version right now, as it is a
20   newly-received document.
21   Q.  Okay.  Move to strike as non-responsive.
22       What's the name of the textbook, sir?
23   A.  Occupational and Residential Exposure
24   Assessment for Pesticides, editors Franklin and
25   Worgan.  It's from Wiley Series in Agricultural and

4 (Pages 322 to 325)

William Sawyer, Ph.D.

Page 326

1  Plant Protection, and the chapter is on UK POEM, UK
2  Predictive Operator Exposure Model, under
3  Formulations and Scenarios.
4      Q.  Okay.  And going back to my question from
5  two questions ago, because I'm not sure if you
6  answered it, in the time since we met last week have
7  you found a study with glyphosate specifically that
8  shows a 50 milliliter per hour volume of surface
9  contamination in the real world, not in a model?
10     A.  The Machado study, under Backpack Sprayer,
11 well, specifically in a study called Knapsack
12 Sprayer, is using approximately, based on the
13 concentration cited in the study of 480 milligram
14 per liter undiluted product, and the dilution
15 product as listed in Table 3 from that study,
16 reveals approximately a 25 ml per hour exposure rate
17 to equal that amount of roughly 1,900 milligrams in
18 Table 3.
19     Q.  Okay.  So you answered my question with a 25
20 ml per hour exposure rate.  So --
21     A.  And...
22     Q.  -- am I correct then -- go ahead.  Were you
23 finished?  I'm sorry.
24     A.  Yeah.  Let me add to that.
25     Q.  Okay.

Page 327

1      A.  If you look at Table 3, under Backpack
2  Sprayer Lever versus Backpack Sprayer Hydraulic
3  Pressure, there is a 100-fold difference on the
4  dermal exposure to the back.  It's 100 times higher
5  in the pressurized spray unit, strongly suggesting
6  that that particular sprayer was leaking onto the
7  back.
8          And I point that out as one of the variables
9  that can change that 25 mls per hour to a different
10 value.  And the textbook that I just cited also
11 provides different variable scenarios.  So the 50 ml
12 is a reasonable value, but it varies depending on
13 the application.
14     Q.  All right.  So I'm looking at Table 3 of
15 Machado-Neto.  If you can pull that out from your
16 stack, or if you have it in your files there, that's
17 fine too.  And I want to understand exactly what
18 you're talking about.
19         THE VIDEOGRAPHER:  Sir, can you put your
20 microphone on?  Sir?
21     Q.  So you talked about the fact that the
22 pressurized backpack sprayer is a hundred times
23 higher than the non-pressurized backpack sprayer.
24 So point to me which two data points I should be
25 looking at here.

Page 328

1      A.  Well, in Table 2.
2      Q.  Okay.  Oh, table 2, okay.
3      A.  Yeah.
4      Q.  Let's go back to Table 2 then, okay.
5      A.  Column E.
6      Q.  Column E.
7      A.  Yeah.
8      Q.  And that's one and two?  Applicator one and
9  applicator two?
10     A.  Right.  There's approximately a hundred-fold
11 difference in the amount of material that is
12 impacting the back of the applicator.
13     Q.  Okay.  And, with all due respect, Table 2 is
14 not actually a quantified amount of material, it is
15 a percentage of proportion of distribution of the
16 material, right?
17     A.  Correct.
18     Q.  Okay.
19     A.  But what I stated was this shows a
20 tremendous differential between two backpack
21 sprayers.
22     Q.  Sure.
23     A.  And it has to do with the equipment, whether
24 it's leaking or not.
25     Q.  All right.  So I want to make sure I

Page 329

1  understand then your opinions on Machado-Neto.  Is
2  it your opinion that Machado-Neto then does not have
3  a handheld sprayer in it?  All of the sprayers are
4  either backpack or tractor-type sprayers?
5      A.  That's right.
6      Q.  Okay.  Now, going back to my question
7  initially, when I asked you if you had found a 50
8  milliliter per hour volume of surface contamination
9  you pointed me to a 25 milliliter per hour volume of
10 surface contamination.
11         Is that -- is it fair to say then that you
12 have not found in the literature a 50 milliliter per
13 hour volume of surface contamination for glyphosate
14 or a glyphosate-based herbicide in the real world?
15         MR. TRAVERS:  Objection.  Asked and
16 answered.
17     A.  No, it's not accurate.  The 25 ml per hour
18 in Table 3 of Machado --
19     Q.  Yep.
20     A.  -- Neto is reasonably similar to the 50 ml
21 in the POEM model due to the tremendous variability
22 in application.  And one cannot just take a single
23 snapshot of a study and use that as a fixed value.
24         The POEM model has studied that value under
25 different application scenarios of numerous data

5 (Pages 326 to 329)

William Sawyer, Ph.D.

Page 330

1  points and has applied, in the generally-accepted
2  model, 50 mls.
3      Q.  Okay.  So I think I understand your answer,
4  and if I do understand it -- I just want to make
5  sure I understand.  If I do understand it, we'll
6  move on.
7          It's your testimony that 25 ml per hour is
8  reasonably similar to 50 ml per hour, correct?
9      A.  I do, because of the variability between
10 spray conditions and the condition of the equipment,
11 and the fact that the POEM model has been validated
12 by the multiple studies as referenced in prior
13 depositions and is peer-reviewed and is generally
14 accepted and used throughout the world.
15     Q.  Okay.  And, just so I understand, 25 ml per
16 hour is as similar to 50 mls per hour as it is
17 similar to zero mls per hour.  True?
18     A.  No.
19     Q.  That's not true?
20     A.  No, the model does not use zero mls per
21 hour.
22     Q.  Okay.
23     A.  The 50 ml value is variable depending on the
24 application scenario and condition of equipment.
25         THE COURT REPORTER:  Condition?

Page 331

1          THE WITNESS:  Of equipment.
2      Q.  Okay.  So now I don't understand again.
3          So is it your testimony you've identified a
4  measured value using the glyphose-based herbicide
5  that has measured a 50 ml per hour?
6          MR. TRAVERS:  Objection.  Asked and
7  answered.
8      Q.  Because if you've identified it I'd like to
9  see it.  Can you just reflect for the record what
10 you're looking at, sir?
11     A.  Looking at Table 5.7 of the textbook that I
12 referenced.
13     Q.  Okay, okay.  And that wasn't on the
14 materials disclosed by Mr. Travers last night,
15 right?
16     A.  No.
17     Q.  And that wasn't on the materials considered
18 list you've had so far in this litigation, right?
19     A.  Correct.  I just found this this morning,
20 so...
21     Q.  Okay.  And does that textbook discuss
22 figures on glyphosate?  Is the word "glyphosate" in
23 the textbook?
24     A.  Probably not.  It's designed for --
25     Q.  Okay.

Page 332

1      A.  -- a water-soluble pesticide such as
2  glyphosate.
3      Q.  All right.  So my question's about
4  glyphosate.  So if it's not in the textbook we can
5  move on.  But I don't know if I understand you.
6          Is it your testimony, the question I asked,
7  is it your testimony you've identified a measured
8  value, using a glyphosate-based herbicide, that has
9  measured 50 ml per hour?  Because, if so, I'd like
10 to look at that article with you.
11         MR. TRAVERS:  Objection.  Asked and
12 answered.
13     A.  It has been in the development of the UK
14 POEM model.
15     Q.  Okay.  We've talked about that plenty of
16 times, so that's fine.
17         Let's go to Josh Stauffenberg.  Josh was
18 diagnosed with NHL in -- when he was 23, right?  And
19 your report's somewhere in there if you want to get
20 it, but if you have it in your Redweld, that's fine
21 too.
22     A.  Just make note that I did bring with me the
23 U.S. Naval Nuclear Plant Summary from Portsmouth, as
24 well as the Monsanto Company's Objections dated
25 November 11th, 2019.

Page 333

1      Q.  Okay.  I'll mark that at a break.
2          (Sawyer Exhibit 32 was marked for
3  identification.)
4      A.  I also brought an updated, per the
5  deposition, whatever it's called, notice, I brought
6  an updated case --
7      Q.  Testimony list?
8      A.  Four-year list, yeah.
9      Q.  Okay.  Can you hand me those?  And I'll just
10 mark them now.
11     A.  Yeah.  Here's the four-year list.
12     Q.  Okay.  Mark that as 30.
13     A.  And here are the two other documents.
14         (Sawyer Exhibit 30 was marked for
15 identification.)
16         (Sawyer Exhibit 31 was marked for
17 identification.)
18     Q.  Thank you.
19         Let me ask you real quick a question about
20 Portsmouth naval yards, even though that's related
21 to Mr. Meeks and not Mr. Stauffenberg.  Are you
22 aware there's a Portsmouth naval yard in Maine?
23     A.  I know there's a shipyard in Portsmouth,
24 Maine.  I don't know -- I guess I would have to
25 assume it's naval.

6 (Pages 330 to 333)

William Sawyer, Ph.D.



**Page 334**

1    Q.   Okay.  Do you know if what I've marked as
2    Document 31 is talking about the Portsmouth shipyard
3    in Maine or the Portsmouth, Virginia, naval
4    shipyard?
5    A.   I'm not sure.
6    Q.   Okay.  That's fine.
7    All right.  Let's go back to Stauffenberg,
8    and we'll get to Chester Meeks in a bit.
9    Now, I think I asked, Josh Stauffenberg was
10   diagnosed with NHL at 23, right?
11   A.   Looks like he was diagnosed in May of 2012.
12   Q.   Okay.  And he was born in 1989, right?
13   A.   Right.
14   Q.   So he was 23?
15   A.   December to May.  So he would have been 13,
16   or I mean 23.  I'm sorry.
17   Q.   And that's a very young age to be diagnosed
18   with NHL, right?
19   A.   Yes.
20   Q.   But, unfortunately, there are people
21   diagnosed with lymphoma at the age of 23 in the
22   United States who've never touched Roundup a day in
23   their life, right?
24   A.   Yes.
25   Q.   In fact, are you aware lymphoma is the most

**Page 335**

1    common type of cancer diagnosed in teenagers and
2    young adults?
3    A.   Yes.
4    Q.   Did you review any pathology for Josh
5    Stauffenberg?
6    A.   Only the pathology report.
7    Q.   Okay.  Anything noteworthy in the pathology
8    report to you?
9    A.   Only that it confirms his diagnosis.  And
10   with respect to the Lambda-restricted genetics, I
11   would defer that to the medical oncologist.
12   Q.
[REDACTED]
25   Q.   Okay.  And you used a word that started with

**Page 336**

1    [REDACTED]
14   Q.   Okay.
15   A.   Yeah.
16   MR. TRAVERS:  And, just for the record,
17   we're sticking by the stipulation that we're not
18   offering him -- on direct he's not going to be
19   talking about other risk factors, but you're
20   welcome to spend your time at this deposition
21   asking about them.
22   MR. KALAS:  Okay.
23   MR. TRAVERS:  But that's not going to be the
24   testimony he's offering in direct at trial.
25   MR. KALAS:  Okay.

**Page 337**

1    BY MR. KALAS:
2    Q.   Now, I want to focus on Josh's exposure to
3    Roundup as a bystander to start, okay?  So this is
4    prior to his application.
5    A.   All right.
6    Q.   All right.  Now, I think you told me last
7    depo that there were three scenarios where Josh may
8    have had exposure as a bystander, and I want to make
9    sure I got them down right.
10   One of those was riding on the back of an
11   ATV with his father 30 to 40 times as a child,
12   right?
13   A.   Yes.
14   Q.   A second was running through corn post
15   application, right?
16   A.   Yes.
17   Q.   Okay.  And a third was I think what I'll
18   call the bike incident, but going into the ditch
19   that did not have foliage growing in it and was
20   filled with water where he immersed in that water,
21   correct?
22   A.   Yes.
23   Q.   Okay.  Any other bystander exposures that
24   you were able to uncover in Josh's history?
25   A.   The example from the grandfather's testimony

7 (Pages 334 to 337)

William Sawyer, Ph.D.

Page 338

1 on Pages 78 through 80 in which Joshua had fallen
2 asleep on the floor in the back of the tractor while
3 Roundup was being sprayed, the back window was open
4 and the wind was blowing Roundup spray into the
5 tractor cab and Joshua was also covered with dirt
6 and dust. His grandfather noticed spray because I
7 had to wipe it off because I could no longer see
8 back behind me, so I had to get out and wipe it off.
9 It was gummy like it was wet, wet dust. The draft
10 was bringing it back up on the back window.
11     That was from Mr. Stauffenberg's deposition.
12     Q. Okay. Any other bystander incidences beyond
13 those four now?
14     A. Yes.
15     Q. Okay.
16     A. On Page 43 of the deposition of Joshua
17 Stauffenberg he further stated that he actually
18 sprayed the Roundup himself.
19     Q. Right. So that's not a bystander exposure.
20     A. Oh, yeah.
21     Q. So I'm focused on bystander. We'll get to
22 his spraying in a bit. So...
23     A. Well, he stated it in the same reference
24 that he had been around his father while he was
25 spraying Roundup.

Page 339

1     Q. Okay. And was that when he was riding on
2 the ATV or is this a different set of times?
3     A. A later time, when he was 14 to 15 years
4 old.
5     Q. Okay. And how was he next to his father?
6 Was he -- was he walking next to his father, a foot
7 away from his father, was he 10 feet away, 40 feet
8 away? What was he doing? Did you find out any of
9 that?
10     A. That wasn't asked in deposition.
11     Q. Did you ask Mr. Stauffenberg that when you
12 spoke to him on the phone?
13     A. No.
14     Q. Okay. And so you don't know if Josh was
15 close enough to his father when he was spraying for
16 drift to reach him, based on the record we have.
17 And by "spraying" I'm not talking about the ATV, I'm
18 talking about the 14 to 15-year-old period.
19     A. I'm not sure I understand the question.
20     Q. Okay. So I could say that I'm next to -- I
21 am by you when you're spraying Roundup and I could
22 be sitting as close as Mr. Travers is sitting next
23 to you or we could be on opposite sides of this
24 room. And if we were on opposite sides of this room
25 it would be less likely drift could hit me than if I

Page 340

1 was as close as Mr. Travers. So what I'm trying to
2 find out is whether you have any understanding of
3 how close he was to his dad during that.
4     A. Well, yes. On Page 99, 102 and 103, there's
5 some entries. Mr. Stauffenberg recalled a
6 particular event in which he opened up a pressurized
7 sprayer and was hit in the hands and legs with a
8 Roundup mixture.
9     Q. And that's his use, correct? That's his
10 spraying.
11     MR. TRAVERS: Objection to form.
12     A. Yeah, it would appear that way.
13     Q. Okay. So I'm asking about bystander, sir.
14 And if you don't know, that's fine. But do you know
15 how close Josh was to his dad at the ages of 14 to
16 15 when dad was spraying?
17     A. No.
18     Q. Do you know if he was close enough then for
19 drift from that spray, should it occur, to reach
20 him?
21     A. No. And I, as you noticed, I didn't include
22 that in my quantitative assessment.
23     Q. Okay. Let's go to the grandfather incident
24 you talked about. Do you know -- it said Josh was
25 covered with dirt and dust, right?

Page 341

1     A. Yes.
2     Q. What does glyphosate do when it interacts
3 with dirt and dust?
4     A. It will adsorb to -- it will adsorb to the
5 dust particle.
6     Q. Okay. Do you know if the presence of a
7 caking of dust on Josh would have prevented any
8 meaningful absorption of the glyphosate in that
9 incident?
10     MR. TRAVERS: Objection to form.
11     A. Could you repeat that?
12     Q. Do you know, one way or another, if the
13 presence of a caking of dust and dirt on Josh would
14 have prevented any meaningful absorption by Josh of
15 the Roundup had it got on him in that tractor
16 incident?
17     MR. TRAVERS: Objection to form.
18     A. No; but that's not what happened. He was
19 not first coated in dust and then glyphosate. He
20 was coated in glyphosate containing dust.
21     Q. Okay. So he was coated in glyphosate
22 containing dust, okay.
23     So that still I don't think answers my
24 question because I don't know if the -- I don't know
25 if the timing of the event matters to my question.

8 (Pages 338 to 341)

William Sawyer, Ph.D.

---

Page 342

1    My question is about if you have glyphosate
2  that is adsorbed to dust, and then the dust gets on
3  your skin, does the fact that the glyphosate is
4  adsorbed to the dust affect the absorption of the
5  glyphosate through your skin?
6    A.  It could decrease it.
7    Q.  Okay.  And you don't know how much, if it
8  did.
9    A.  I have not seen any dermal absorption
10  studies that address that phenomena.
11    Q.  Okay.  Now, in all of your review of
12  Mr. Stauffenberg's file, did you see any allegations
13  of any PIKA incidences when he was a child?
14    A.  No.
15    Q.  Okay.  Did you see any allegations
16  beyond running through corn post application that
17  Mr. Stauffenberg, from a bystander point of view,
18  may have had plant-to-skin transfer of glyphosate?
19    A.  No.
20    Q.  Okay.  Now, I take from your notes and your
21  MCL that you haven't reviewed epidemiology regarding
22  bystander exposure to Roundup and whether or not
23  bystander exposures are sufficient to cause NHL in a
24  pediatric population.
25    MR. TRAVERS:  Objection to form.

---

Page 343

1    Q.  That's something you're going to defer?
2    A.  Could you repeat that?  I just want to be
3  clear on this question.
4    Q.  Yeah, yeah.  I looked at your notes, I
5  looked at your MCL.  I didn't see a discussion of
6  epidemiology on bystander exposures in pediatric
7  populations and in incidents of NHL.
8    Are you -- so that's my preface to that
9  question.  Are you going to defer whether -- are you
10  going to defer on any epidemiological opinion
11  regarding bystander exposures to glyphosate in
12  children and incidences of NHL?
13    MR. TRAVERS:  Objection to form.
14    A.  I still don't understand the question.  I
15  don't know what an MCL is.
16    Q.  Materials Considered List.
17    A.  Oh.
18    I'm a toxicologist and I will be addressing
19  the enhanced carcinogenic risk to children versus
20  adults that is summarized in the EPA document called
21  Early Childhood Exposure to Carcinogens.
22    With respect to the human epidemiologic
23  evidence, I defer that to the epidemiologist in this
24  matter.
25    Q.  Okay.  So just so I understand, you may be

---

Page 344

1  talking about a potential enhanced carcinogenic risk
2  to children from a toxicology point of view,
3  correct?
4    A.  Yes.
5    Q.  Okay.  But you will defer on the human
6  epidemiology studies in pediatric populations to the
7  epidemiologist in this case, correct?
8    A.  Yes.
9    Q.  Okay.  Now, is bystander exposure to
10  glyphosate the same thing as applicator exposure to
11  glyphosate?
12    A.  No.
13    Q.  In the recorded literature are bystander
14  doses of glyphosate as high, on average, as
15  applicator doses to glyphosate?
16    A.  No.  But the scenario of the riding on the
17  back of the ATV during spraying places Joshua
18  Stauffenberg's exposure equal to that or higher than
19  that of his dad, who was on the front of the ATV.
20    Q.  Okay.  We'll get to the ATV in a minute.
21    But my question isn't about Joshua, my
22  question's about the recorded literature, okay?
23    A.  Yes.  But one must not corrupt the
24  literature by implying that riding on the back of an
25  ATV during spraying is classified as a bystander

---

Page 345

1  exposure.
2    Q.  Okay.  So let me go back.  You can classify
3  the ATV spraying incident how you want when we get
4  to it.
5    But you have -- what is your understanding
6  of what bystander means in the biomonitoring or
7  passive dosimetry literature?
8    A.  A person who's in the general area of the
9  applicator.
10    Q.  But who is not applying themselves?
11    A.  Correct.
12    Q.  Okay.  In the recorded literature are
13  bystander doses of glyphosate as high, on average,
14  as applicator doses of glyphosate?
15    A.  No.
16    Q.  Okay.  So I want to start with the walking
17  through the corn potential route of exposure.
18    And can you remind me about how often
19  Mr. Stauffenberg would walk through the corn after
20  spraying, how many times a year?
21    A.  Once per year.
22    Q.  Once per year.  And over the course of how
23  many years, sir?
24    A.  Uncertain.  And I did not quantitatively add
25  that exposure to my assessment.

9 (Pages 342 to 345)

William Sawyer, Ph.D.

Page 346

1    Q.  Okay.  How long would it take him to walk
2  through the corn?
3    A.  I didn't make such a quantitative
4  assessment, so I don't have that information.
5    Q.  Okay.  I'm going to mark as Exhibit 33 --
6  well, let me hold off for a second.
7       Have you looked at any data on dislodgeable
8  residues from corn or any vegetation and -- have you
9  looked at any data on that, specifically as to
10  glyphosate?
11    A.  Well, I'm familiar with the transferable
12  turf values used in EPA dose assessments.
13    Q.  Okay.  And what pesticide are those EPA
14  values derived from?
15    A.  I don't recall.
16    Q.  Okay.  Any other sources you've looked at
17  for dislodgeable residues?
18    A.  I've looked at a Swedish Health Department
19  study, but it basically uses the EPA transfer
20  values.
21    Q.  Any other sources?
22    A.  No.
23    Q.  Okay.  So I'm going to mark as Exhibit 33 a
24  document prepared for the United States Forest
25  Service.

Page 347

1       (Sawyer Exhibit 33 was marked for
2  identification.)
3    Q.  If you could go to Page 3-26 please.  Well,
4  actually, let me read the title into the record.  The
5  title of this document on the first page is Selected
6  Commercial Formulations of Glyphosate, Accord,
7  Rodeo, Roundup and Roundup Pro, Risk Assessment,
8  Final Report.  Did I read that correctly?
9    A.  Yes.
10    Q.  Okay.  Let's go to Page 3-26, okay.  And do
11  you see that 3-26 discusses a scenario where there
12  is dermal exposure from contaminated vegetation?
13    A.  Yes.
14    Q.  Okay.  And that is what you're alleging Josh
15  had, right, dermal exposure from contaminated corn,
16  right?
17    A.  Yeah, recently-sprayed corn.
18    Q.  Okay.  And if we look at this document they
19  model the potential dermal exposure from
20  contaminated vegetation in 3.2.3.3, right?
21    A.  Yes.
22    Q.  Okay.  And if you go down to the third
23  paragraph, it says, "As discussed above, the typical
24  application rate for glyphosate is one pound active
25  ingredient per acre, or approximately .0112

Page 348

1  milligrams active ingredient per centimeter
2  squared."
3       Did I read that correctly?
4    A.  Yes.
5    Q.  Do you have any reason to believe that the
6  Stauffenbergs were applying at a different rate than
7  one pound of a.i. per acre?
8    A.  No.
9    Q.  Okay.  And then going down to the next -- to
10  the last two sentences, it says, "If the
11  dislodgeable residue for glyphosate follows a
12  pattern similar to that of 2,4-D, the dislodgeable
13  residue immediately after the liquid carrier dries
14  will be approximately .00084 mgs per centimeter
15  squared, or approximately one microgram per
16  centimeter squared.  Following the methods provided
17  by Durkin, et al., the transfer rate would be about
18  1.1 micrograms per centimeter squared times hour."
19       Did I read that correctly?
20    A.  Yes.
21    Q.  Okay.  Do you have any reason to believe the
22  dislodgeable residue for glyphosate does not follow
23  a similar pattern to that of 2,4-D?
24    A.  No.
25    Q.  Okay.  And then going down, it says, "The

Page 349

1  exposed dose for an individual wearing shorts and a
2  short-sleeved shirt in contact with the contaminated
3  vegetation for one hour would be 5,830 micrograms,
4  or approximately 5.8 milligrams."
5       Did I read that correctly?
6    A.  Yes.
7    Q.  Okay.  And how they got there was they
8  multiplied the transfer rate times the exposed area
9  of the skin times the time, right?
10    A.  Yes.
11    Q.  Okay.  And Josh, of course, is a child at
12  this point, right?
13    A.  Yes.
14    Q.  And if he's wearing shorts and a
15  short-sleeved shirt his exposed area of the skin
16  will be significantly less than 5,300 centimeters
17  squared, right?
18    A.  Yes.  But one has to then calculate the
19  transferable rate through fabric of 20 percent for
20  cotton and so on.
21    Q.  Okay.  And the U.S. Forest Service, in their
22  analysis, did not do that here, right?
23    A.  Correct.
24    Q.  Okay.  Now, then it says, "Taking the dermal
25  absorption rates of .0002 to .0004h to the negative

10 (Pages 346 to 349)

William Sawyer, Ph.D.

Page 350

1    one, which are equivalent to .005 to .01 day to the
2    negative one, and assuming a 64 kilogram body weight
3    for a young woman, the absorbed dose would be .0005
4    to .0009 mg per kg."
5        Did I read that correctly?
6        A.  Yeah.  But this is erroneous.  He had
7    calculated the surface area of exposure for a child,
8    and now all of a sudden at dose the child was being
9    applied to somebody who weighs 64 kilograms.
10       Q.  Well, sir, with all due respect, they don't
11   discuss a child anywhere here.  I had asked the
12   question about a child.
13       A.  Oh.  Well, the 5,830, or I'm sorry, the
14   5,300 centimeters squared value is -- represents
15   nothing more than the lower legs.  That's not full
16   body at all.  The full body value is enormously
17   larger, depending on the age and stature of the
18   adult.  That 5,300 centimeters squared is not full
19   body by any means.
20       Q.  Okay.  So the U.S. Forest Service decided,
21   in their analysis, that the exposed area of skin in
22   somebody wearing shorts and a short-sleeved shirt
23   would be 5,300 centimeters squared; is that correct?
24   And that's in an adult.  Is that correct?
25       MR. TRAVERS:  Objection.  Asked and

Page 351

1    answered.
2        A.  Perhaps for just the lower legs and
3    forearms, yes.
4        Q.  Okay.  And that is what the -- and using
5    that area of exposed lower legs and lower forearms,
6    they determined in somebody who weighed 64 kilograms
7    the absorbed dose would be somewhere between five
8    times 10 to the negative four and nine times 10 to
9    the negative four mgs per kg, right?
10       A.  Right.  But that is another error here.  And
11   I think I pointed out the document stated that using
12   the flux and limiting it to one hour is wrong.  The
13   flux should not be used, the dermal absorption
14   factor should be used.  And one hour is
15   inappropriate because that would assume that washing
16   with soap occurred at one hour.  So there's some
17   assumptions here that just aren't right.
18       Q.  Well, Dr. Sawyer, I appreciate you may not
19   agree with this document, but I'm asking you what
20   the authors of this document concluded, not your
21   reaction to it.
22       So am I correct that the authors of this
23   document concluded that following one hour of
24   contact with contaminated vegetation in a young
25   adult woman, the dose would be five times 10 to the

Page 352

1    negative four to nine times 10 to the negative four
2    mgs per kg.
3        MR. TRAVERS:  Objection to form.  Misstates
4    the conclusions of the author.
5        A.  I disagree.
6        Q.  Well, I understand you disagree, but is that
7    what they stated?
8        MR. TRAVERS:  Objection.  Form.
9        A.  Yes, if you assume that it was only one hour
10   of dermal exposure and the only parts of the body
11   exposed was that of 5,300 centimeters squared, and
12   one were to assume that using flux was an
13   appropriate methodology.  Under those three factors,
14   yes.
15       Q.  Okay.  Was this document written by
16   Monsanto?  If you go to the first page.
17       A.  No, no.
18       Q.  Okay.  Let's move on.
19       Now, we talked about the ditch last time,
20   right, where the runoff water was and there was no
21   vegetation?  Do you remember that?
22       A.  Yeah.
23       Q.  Okay.  And I think you told me last time,
24   and correct me if I'm wrong, that you weren't sure
25   whether or not it was Roundup that had killed the

Page 353

1    vegetation in that ditch.  Is that still your
2    understanding?
3        A.  I can't make that determination.
4        Q.  Okay.
5        A.  I stated that is what the family members
6    have stated in their testimony.
7        Q.  Okay.  Is there any reason in the
8    intervening week, since we talked about it last,
9    have you come to -- have you -- have you reviewed
10   anything else that lets you come to the conclusion
11   that you are positive it was Roundup in the runoff
12   water in that ditch that killed the vegetation?
13       A.  I never opined and concluded that it was
14   Roundup runoff water.  I stated that's what the
15   facts in the case state.
16       Q.  Okay.  And by facts in the case, the
17   testimony of the plaintiffs, right?
18       A.  Yes.  I'm not here to judge their accuracy.
19       Q.  Okay.
20       A.  I'm a toxicologist.  It's simply a fact in
21   the case.
22       Q.  Well, you've -- you've worked on other cases
23   in the past where you've done, for instance, soil
24   sampling, right?
25       A.  Yes.

11 (Pages 350 to 353)

William Sawyer, Ph.D.

Page 354

1    Q.  Okay.  And one thing soil sampling would
2  enable you to do here is to determine the type of
3  soil on the Stauffenberg property, right?
4    A.  Yes.
5    Q.  Okay.  And if you knew the type of soil on
6  the Stauffenberg property you could better determine
7  the runoff characteristics from glyphosate that
8  hasn't adsorbed to that soil, right?
9    A.  I think a soil scientist could.  I wouldn't
10  be able to do that.
11    Q.  Okay.  You could send it to a lab and then
12  compare it to figures in the literature, right?
13  You're qualified to do that.
14    A.  I could certainly collect a sample and send
15  it out.
16    Q.  Okay.
17    A.  But I -- in terms of interpreting soil
18  adsorption, that's not my area of expertise.
19    Q.  Right.  And I want to make sure we're clear.
20  Not absorption, adsorption, right?
21    A.  Yeah, adsorption.
22    Q.  Okay.
23    A.  I would have to defer that to another
24  expert.
25    Q.  Okay.  So you're not -- so you're not

Page 355

1  qualified then, in your opinion, to determine how
2  much, if any, glyphosate would run off from the type
3  of soil on the Stauffenberg property; is that
4  correct?
5    A.  Yes.  That's beyond my abilities.
6    Q.  Okay.  Now, let's turn to the ATV exposure.
7  And he said he was exposed while riding behind his
8  father while his father sprayed, right?
9    A.  Yes.
10    Q.  Okay.
11    A.  And that the --
12    Q.  Go ahead.
13    A.  -- sprayer was located on a boom attached
14  behind the vehicle.
15    Q.  Behind the vehicle, okay.  Now...
16    A.  He was closer to it than his dad was.
17    Q.  Right.
18    And the large majority of exposures to
19  somebody riding an ATV in proximity to a boom will
20  be to the legs, correct?
21    A.  Yes.  However, a young child has a higher
22  percentage of their body being in the leg zone, as
23  opposed to an adult, who is much taller.
24    Q.  Got it.
25    What did Josh wear when he was on the ATV?

Page 356

1    A.  He doesn't recall.
2    Q.  Did his father recall?
3    A.  No.
4    Q.  Okay.  What did Josh wear when he ran
5  through the corn?
6    A.  I didn't ask him.
7    Q.  What did Josh wear when he was in the back
8  of the tractor and the dust blew in?
9    A.  I didn't ask.  I think it would be an
10  unreasonable question to ask the grandfather 10
11  years later, or 20 years later, or whatever it may
12  be, what -- what clothes were worn on that given
13  day.  It's just not a reasonable question.
14    Q.  And the type of clothes --
15    A.  If I asked you 20 years ago on Christmas
16  what were you wearing, would you remember?
17    Q.  A sweater my mom bought me.
18    A.  Good guess.  It's just not a reasonable
19  question, that's why I didn't ask him.
20    Q.  What Josh was wearing in those incidences
21  could have affected his dermal absorption, right?
22    A.  Yes.
23    Q.  Okay.  Now, since you're deferring on the
24  epi my guess is you don't have an opinion on this,
25  but I need to ask it.

Page 357

1    Do you have an opinion about the number of
2  child bystander exposure days that would lead to an
3  increased risk of NHL?
4    A.  No, I didn't approach it that way.  I
5  calculated actual exposure days.
6    Q.  Okay.  And by actual exposure days you mean
7  applicator exposure days, not bystander days.
8    A.  Correct.
9    Q.  Okay.  So you aren't going to offer an
10  opinion to a reasonable degree of toxicologic or
11  scientific certainty that Josh's bystander exposure
12  days led to an increased risk of NHL, you're going
13  to base your opinion on his applicator days, right?
14    MR. TRAVERS: Objection. Form.
15    A.  Yes.  I will qualify that there is
16  additional exposures through the bystander forms of
17  exposure, but I did not include any of that in my
18  quantitative dose assessment.
19    Q.  All right.  Now, Josh -- Josh's farm that
20  his family ran grew corn and soybeans, right?
21    A.  Yes.
22    Q.  All right.  And starting with corn, what
23  pesticides are typically applied to corn in
24  Illinois?
25    MR. TRAVERS: Objection. Form.

12 (Pages 354 to 357)

William Sawyer, Ph.D.

Page 358

1    A.  It depends on the year.
2    Q.  Okay.  What pesticides were typically
3  applied to corn in Illinois during the years Josh
4  lived or worked around the family farm?
5        MR. TRAVERS:  Objection.  Form.
6    A.  Glyphosate products; atrazine; various forms
7  of fertilizer prior to planting.  Primarily those
8  are the three.
9    Q.  What source are you basing that off of?
10    A.  Just general experience with
11  pesticide-herbicide usage in studies that I've
12  reviewed that rank order what's used with different
13  applications.
14    Q.  Okay.  Is there a specific study sitting
15  here today you can recall that discuss what
16  pesticide formulations to use when growing corn in
17  Illinois during the time period Josh was exposed?
18        MR. TRAVERS:  Objection.  Form.
19    A.  No, not specific to Illinois, simply in the
20  U.S.
21    Q.  Okay.
22    A.  The most common is glyphosate.  Second most
23  I think historically was atrazine, but I don't know
24  if that's the case anymore.
25    Q.  Okay.  How about soybeans.  What pesticides

Page 359

1  are typically applied to soybeans in Illinois during
2  the period Josh was around the farm?
3    A.  Overwhelmingly, different forms of Roundup.
4    Q.  What else?  Anything else?
5    A.  I'm not sure.
6    Q.  Okay.  Did the Stauffenbergs have a barn?
7    A.  Yes.
8    Q.  Okay.  What rodenticides or insecticides did
9  they use around the barn?
10    A.  Well, I asked Joshua Stauffenberg
11  specifically what he -- he has used on the farm, and
12  he stated bug spray, i.e., Raid.
13    Q.  Okay.  My question was different.  What
14  rodenticides or insecticides did the Stauffenberg
15  family use around their barn?
16    A.  I'm not certain.
17    Q.  Okay.  Did Josh spend time around the barn?
18    A.  Yes.
19    Q.  How much time did he spend around the barn?
20    A.  Uncertain.
21    Q.  Now, it's your belief, based on the data --
22  well, strike that.
23        Mr. Stauffenberg did not mix or load
24  Roundup, correct?
25    A.  Correct.

Page 360

1    Q.  Okay.  His father mixed the concentrate for
2  him when he used concentrated product?
3    A.  Yes.
4    Q.  Okay.  And his father does not have NHL,
5  right?
6    A.  Correct.
7    Q.  His grandfather does not have NHL, right?
8    A.  Correct.
9    Q.  Both of them were exposed to more Roundup
10  over the course of their life than Josh has been,
11  correct?
12        MR. TRAVERS:  Objection.  Form.
13    A.  I haven't made any -- any assessment as to
14  that question, so it would be speculative.
15    Q.  Okay.  Well, you -- you calculate exposure
16  in one way in lifetime days.  Is it your testimony
17  that you can't tell me today whether Josh's dad or
18  Josh's granddad, who were both farmers, had more
19  days of exposure to Roundup than Josh?  And if you
20  can't, we'll move on.
21    A.  Not in a quantitative fashion.  It would be
22  speculative.
23    Q.  Okay.  Now, starting with the West Street
24  address, he applied using a handheld sprayer, right?
25  And if you don't have it in your notes we can go to

Page 361

1  the depo.  Just let me know if we need to do that.
2    A.  That's not clear.  What address?
3    Q.  The West Street address.  He lived two
4  places on West Street, 239 and 293.
5        Why don't we go to the depo, just to keep
6  this moving along.
7        We'll mark the depo as 34.
8        (Sawyer Exhibit 34 was marked for
9  identification.)
10    Q.  All right.  If we go to Pages 189 to 191,
11  okay, and do you see on 187 they're talking about
12  West Street?
13    A.  Yes.
14    Q.  Okay.  And if you go to 189 through 191 he
15  talks about using a two-gallon sprayer with a cord
16  on it.  Do you see that?
17    A.  Yeah.
18    Q.  Okay.  And he talks about being a pump
19  sprayer?
20    A.  Yes.
21    Q.  Okay.  And so you agree with me that the
22  West Street address he used a hand pump sprayer,
23  correct?
24    A.  Yes.
25    Q.  Okay.  Now, if you look at Page 190 you see

13 (Pages 358 to 361)

William Sawyer, Ph.D.

Page 362

1   there that he says that generally for a season at
2   West Street he'd go through one two-gallon jug of
3   Roundup. Do you see that?
4        A. Yes.
5        Q. Okay. And he talks about the fact that the
6   sprayer did not have a wand but instead had a
7   trigger. Do you see that?
8        A. I don't see the word "trigger," but it's
9   probably here somewhere.
10       Q. Yeah. Let me make sure we're clear so we
11  can get some agreement here. I didn't give you one
12  with an index, unfortunately, so it will take me a
13  second.
14       All right. If you go to 201, do you see
15  where they ask at the bottom of 200 and top of 201:
16       "And how long was the wand that you would
17  use?
18       ANSWER: It wasn't a wand, it was -- so
19  going back to your kitchen, your kitchen bottle
20  description, it would be one of those attached to
21  the hose?
22       QUESTION: Let me see if I can find a
23  picture.
24       ANSWER: That. So it's not the wand but
25  it's -- this is -- this one is just a -- it's got

Page 363

1   a little trigger on it."
2        Do you see that?
3        A. Yes.
4        Q. Okay. So Mr. Stauffenberg, when he used it
5   at the West Street address, it had a bottle with a
6   trigger on it, like a bottle of Windex, as opposed
7   to a wand, right?
8        A. Yes.
9        MR. TRAVERS: Objection. Form.
10       Q. Okay. And then a trigger would require a
11  user to hold the spout for the Roundup closer to the
12  weed than the wand would, right?
13       MR. TRAVERS: Objection. Form.
14       A. No, that's not true. It means that it would
15  be sprayed in much closer proximity to the weed with
16  the wand because if one were to drop their hand it
17  would be just below the waist. The wand would allow
18  the sprayer outlet to come in very close contact
19  with the weed. So this represents a more -- a
20  scenario that is more amenable to drift.
21       Q. Did you ask Josh how far from the weed he
22  held the trigger when he sprayed?
23       THE VIDEOGRAPHER: Excuse me, sir. Your
24  microphone fell off again.
25       Q. I'll ask it again when you get it on.

Page 364

1        Did you ask Josh how far from the weed he
2   held the trigger when he sprayed?
3        A. No.
4        Q. Okay. Have you ever used a trigger Roundup
5   sprayer as opposed to a wand Roundup sprayer?
6        A. I have.
7        Q. Okay. And when you have sprayed with a
8   trigger Roundup sprayer, have you leaned over to
9   closer proximity to the weed with the trigger than
10  you would with the wand?
11       A. Only once I -- I used it at my mom's house
12  on her patio between the blocks, and recommended
13  that she never buy that particular unit again
14  because it was not possible to bring it in close
15  contact with the weeds.
16       Q. Okay.
17       A. Without walking around bent over.
18       Q. Well, that's my question. Did you bend over
19  to apply it when coming into close contact with the
20  weeds when you used it at your mom's house?
21       A. I don't specifically remember, I just know
22  that it was problematic because it -- to be able to
23  get in close contact with the weed it was necessary
24  to bend over.
25       Q. Hypothetically, if Josh did bend over to

Page 365

1   come into close contact with the weed with the
2   trigger sprayer, would that reduce drift as opposed
3   to using a wand where he'd be standing upright?
4        A. Please repeat that. I just didn't hear it
5   all.
6        Q. Hypothetically, if Josh did lean over to
7   come into close contact with the weed with the
8   trigger sprayer, would that reduce drift, as opposed
9   to a wand sprayer, where he would stand upright and
10  spray?
11       A. Yes. But that would require the individual,
12  as in my case, to know that it was hazardous and it
13  would not be wise to spray it from the hip level
14  downward because of drift onto the legs.
15       Q. Okay. And you don't know if Josh sprayed
16  leaning over closer to the weed or from the hip
17  level. You just don't know.
18       A. No. But I do know that it was his
19  understanding that was product was not hazardous.
20       Q. Okay. But there are other reasons you may
21  want to spray leaning over closer to the weed, for
22  instance, not having the formulation drift on to
23  non-target plants, right?
24       A. That's possible.
25       Q. Okay. So now at his home growing up, going

14 (Pages 362 to 365)

William Sawyer, Ph.D.

Page 366

1    back to the home in Manteno, he'd spray four to
2    eight times a year for his dad, right?
3         MR. TRAVERS: Objection. Form.
4         A.   On Page 10 of my report, second paragraph, I
5    reported that for a period of time following his NHL
6    diagnosis Mr. Stauffenberg continued to use Roundup
7    at his own residence. This application frequency
8    was approximately once every one to two weeks, and
9    the application duration was 10 to 15 minutes per
10   event. And then I reference Pages 187 to 188 in the
11   deposition.
12        Q.   Okay. So let's go to Page 143 to 144 of the
13   depo.
14             Do you see there where Josh talks about at
15   his home growing up using Roundup four to eight
16   times? Do you see it on Page 143? And you also
17   have that in your report on Page 11 underneath the
18   box.
19        A.   Yes.
20        Q.   Okay. And he'd use a three to five-gallon
21   tank with a wand when applying at his parents' home,
22   right? That's on Page 157 to 58, or 156 to 57.
23   Excuse me.
24        A.   Yes.
25        Q.   Okay. And he recalled some skin contact,

Page 367

1    right, when he was applying Roundup? Page 162 to
2    63, if you need a prompt.
3         A.   Oh, yeah, the splash off the rocks and so
4    on, yes.
5         Q.   Okay. But he also said that he couldn't say
6    it happened every time he applied Roundup, right?
7         A.   Correct.
8         Q.   Okay. And it was in his feet area, right?
9         A.   Yes.
10        Q.   Okay. And when he applied Roundup he'd wear
11   shorts, a cut-off T-shirt and sandals, right?
12        A.   Yes.
13        Q.   Okay. And if you go to Page 195, the only
14   parts of his skin he remembers Roundup getting on
15   when he sprayed, and this is starting at 19, 195,
16   19, was hands, fingertips, palms and toes, right?
17        MR. TRAVERS: Objection. Form.
18        A.   Yes, but that is what he could see. The
19   atomized mist contacts numerous areas of the body
20   without the operator being aware of it.
21        Q.   Sure. And we've talked about that many
22   times in different depositions. But specifically as
23   to Mr. Stauffenberg, he didn't tell you on a phone
24   call or anything that he recalled Roundup getting on
25   other parts of his body personally, beyond his

Page 368

1    hands, fingertips, palms and toes, right?
2         A.   Yes.
3         Q.   Okay. And he'd wear the same thing
4    applying, shorts, sandals, cut-off shirt, when he
5    was applying at his own home as he wore when he
6    applied at his dad's house, right?
7         A.   Yes.
8         Q.   Okay. Now, Mr. Stauffenberg testified he'd
9    wash his hands more often than not after using
10   Roundup, right? Page 196.
11        A.   Probably; but not every time he stated.
12        Q.   Okay. And I said more often than not, so
13   let me ask the question again.
14             He testified he'd wash his hands more often
15   than not after using Roundup, right?
16        A.   Yes.
17        Q.   Okay. And that would have reduced his
18   exposure, right?
19        A.   Yes.
20        Q.   He testified to taking a shower at least
21   once a day, right?
22        A.   Yes.
23        Q.   That depending on the time of the day that
24   would have reduced his exposure a lot or a little,
25   right?

Page 369

1         MR. TRAVERS: Objection. Form.
2         A.   It depends on the number of hours that have
3    passed.
4         Q.   Right. But even if it was eight hours after
5    it still would have reduced his exposure a little
6    bit in your opinion, right?
7         A.   Minor, but yes.
8         Q.   Okay. Let's go to Exhibit 35.
9             (Sawyer Exhibit 35 was marked for
10   identification.)
11        Q.   This is a label for Roundup Original. Do
12   you know what type of Roundup his parents used on
13   their soybeans and corn when Josh was a child?
14        A.   No.
15        Q.   Okay. So I didn't think the record talked
16   about that so -- at least your notes didn't. So we
17   went with Original here. Do you see the time period
18   from this label on the first page?
19        A.   1998.
20        Q.   Okay. And that would have been when Josh
21   was a child, right? He would have been nine?
22        A.   Yeah.
23        Q.   Okay. And if we go to Page 5 of this label,
24   it says, under Precautionary Statements, "Keep out
25   of reach of children." Did I read that right?

15 (Pages 366 to 369)

William Sawyer, Ph.D.

<table>
<tr><td>

Page 370

1 Near the top, right underneath hazards to human
2 health, to humans and domestic animals.
3    A.  I think I'm on the wrong page.
4    Q.  Yeah, I think you are -- yeah, that's it.
5 Right underneath at the top highlighted.
6    A.  "Keep out of reach of children."
7    Q.  Right.  The label says that, right?
8    A.  Yes, it does.
9    Q.  Okay.  Did Josh's parents keep Roundup out
10 of reach of Josh?
11       MR. TRAVERS:  Objection.  Form.
12    A.  I'm not sure I understand.  At what age?
13    Q.  When he was a child, sir.
14    A.  Are you -- give me a number.
15    Q.  Okay.
16    A.  Under 18 or...
17    Q.  When Josh was applying at 14 and 15, was he
18 considered a child under labeling requirements?
19    A.  I think so.
20    Q.  Okay.  Did Josh apply personally at 14 to
21 15?
22    A.  Yes.
23    Q.  Okay.  Was Roundup kept out of Josh's reach
24 when he was a child?
25       MR. TRAVERS:  Objection.  Form.

</td><td>

Page 372

1 product at 14 to 15?
2    A.  I believe he stated that his father mixed
3 it, which would imply it would be at least a
4 concentrate, or potentially a super concentrate.
5    Q.  Okay.  Go down to Page 7.  Do you see the
6 Agricultural Use Requirements?
7    A.  Yes.
8    Q.  Okay.  And when Josh was riding on the ATV
9 it was an agricultural use, right?
10    A.  Yes.
11    Q.  Okay.  And it says, in the second paragraph,
12 "Do not apply this product in a way that will
13 contact workers or other persons, either directly or
14 through drift.  Only protected handlers may be in
15 the area during application."
16       Did I read that correctly?
17    A.  Yes.
18    Q.  Okay.  Was Josh a protected handler when he
19 was in the area during application by his father?
20       MR. TRAVERS:  Objection.  Form.
21    A.  No.
22    Q.  Okay.  And then we talked about the corn,
23 running through the corn while the boom was
24 spraying.
25       The paragraph after this says, "Do not allow

</td></tr>
<tr><td>

Page 371

1    A.  No, he was permitted to use it.
2    Q.  Okay.  If you go to Personal Protective
3 Equipment, it says, "Applicators and other handlers
4 must wear long-sleeved shirt and long pants, shoes
5 plus socks, and protective eyewear.  Discard
6 clothing and other absorbent materials that have
7 been drenched or heavily contaminated with this
8 product's concentrate.  Do not reuse them.  Follow
9 manufacturer's instructions for cleaning/
10 maintaining PPE."
11       Did I read that correctly?
12    A.  Yes.  And as last week, you're a very good
13 reader.
14    Q.  Thank you.
15       Did Josh wear a long-sleeved shirt, long
16 pants, shoes, socks and protective eyewear when
17 applying Roundup?
18    A.  No.
19    Q.  Okay.  Would Josh have been considered an
20 applicator at the ages 14 to 15?
21    A.  Yes.
22    Q.  Okay.
23    A.  Home applicator, yes.
24    Q.  Okay.  Do you know if he was using a
25 concentrate mixed by his father or a ready-to-use

</td><td>

Page 373

1 or do not enter or allow worker entry into treated
2 areas during the restricted entry interval, REI, of
3 12 hours."
4       Did I read that correctly?
5    A.  Yes.
6    Q.  Okay.  What is a restricted entry interval?
7    A.  The time from application before other
8 agricultural workers can go in and pick and harvest
9 or carry out other activities.
10    Q.  Do you know if Josh waited 12 hours before
11 running through the corn?
12    A.  He did not.
13    Q.  Okay.  Are you going to compare
14 Mr. Stauffenberg's dose when applying to a generic
15 applicator in the UK POEM model?
16    A.  No.
17    Q.  Okay.  Are you modeling or comparing Josh's
18 -- well, let me break it up.
19       Are you modeling a milligram per kilogram
20 dose for Mr. Stauffenberg when he was a bystander?
21    A.  No.
22    Q.  Are you comparing Josh's milligram per
23 kilogram dose to a generic bystander model?
24    A.  No.
25    Q.  Okay.  All right.  Let's go back to your

</td></tr>
</table>

16 (Pages 370 to 373)

William Sawyer, Ph.D.

## Page 374

1   report. Go to Page 19. Using your exposure day
2   metric Josh would have been in the lowest tier of
3   applicators in the Andreotti study, right?
4       A.  Yes.
5       Q.  Okay. And for quartile one in the Andreotti
6   study that was a null finding. No statistically-
7   significant risk for NHL in those applicators,
8   right?
9       A.  I was wrong. The answer is yes, or no
10  rather. He would have been -- he would have
11  actually fallen into the second quartile. And, if
12  interested, I'll explain why.
13      Q.  Okay. I think I know why. Is it because
14  Andreotti is not using an eight-hour day?
15      A.  That's correct.
16      Q.  Okay. So Josh would have fallen in the
17  Andreotti study in the -- see, I know -- I know what
18  the answer would be. Let me start the question
19  over.
20          Josh would have fallen in the second
21  quartile in the Andreotti study, right?
22      A.  Yes.
23      Q.  Okay. And the second quartile in the
24  Andreotti study did not show a statistically-
25  significant increased risk for NHL, right?

## Page 375

1       A.  Correct.
2       Q.  It was a null finding, right?
3       A.  Yes.
4       Q.  Okay. So applicators with characteristics
5   similar to Josh in the Andreotti study did not get
6   NHL at any higher rate than applicators who had
7   never applied glyphosate in that study, right?
8       A.  Yes.
9           MR. TRAVERS: Objection. Form.
10      Q.  Okay. And in the Eriksson study, which did
11  use an eight-hour day, Josh was exposed for less
12  than 10 lifetime days; is that correct?
13          MR. TRAVERS: Objection. Form.
14      Q.  As an applicator.
15      A.  Could you repeat? I'm not sure what you
16  said exactly as far as day number.
17      Q.  Sure.
18          You've pointed out in many depositions
19  before that the Eriksson study used a Swedish
20  eight-hour working day, right?
21      A.  Yes.
22      Q.  Okay. Josh, over the course of his life,
23  was exposed, as an applicator, to less than 10 days
24  in the way the Eriksson study described exposure
25  days, right?

## Page 376

1       A.  That's right. He would have fallen into the
2   interval of less than 10 days.
3       Q.  Okay. And in the less than 10 day group in
4   the Eriksson study, that showed a value that, though
5   elevated, did not show a statistically-significant
6   increased risk of NHL in applicators with
7   characteristics similar to Josh, right?
8       A.  Yes.
9       Q.  Finally, in the McDuffie study, the McDuffie
10  study looked at applicators who were unexposed, zero
11  to two or less days per year, and greater than two
12  days per year, right?
13      A.  Yes.
14      Q.  Okay. And Josh, in the McDuffie study,
15  would have fallen into the zero to or -- zero to two
16  days per year group, right?
17          MR. TRAVERS: Objection to form.
18      A.  On the average. However, his maximum would
19  have placed him above the two day.
20      Q.  Okay.
21      A.  His exposure year.
22      Q.  Okay. So let me break that up then.
23          If we took the average exposure days you
24  calculated for Josh, he would have fallen into the
25  zero to two day group in the McDuffie study, right?

## Page 377

1       A.  Yes.
2       Q.  And that group had a risk ratio or I think
3   it's an odds ratio of 1.0, right?
4       A.  Yes.
5       Q.  Okay. And that's a null value, not
6   statistically significant, to show no relationship
7   between glyphosate exposure and NHL, right?
8       A.  Yes.
9       Q.  Okay. And if we took the maximum value of
10  three exposure days that you have on Page 11 of your
11  report, he would then have a statistically-
12  significant elevated risk in the greater than two
13  day group, right?
14      A.  Correct.
15      Q.  Okay. And is the McDuffie study the only
16  study you can point me to that is a primary study of
17  NHL applicators that would show a statistically-
18  significant increased risk of NHL in somebody with
19  similar characteristics as Josh?
20          MR. TRAVERS: Objection. Form.
21      A.  Yes. He would also fall into the Leon,
22  Zhang and Pahwa studies.
23      Q.  Are those primary studies, sir, or are those
24  pooled analyses or metaanalyses?
25      A.  They're pooled analyses, but they're very

17 (Pages 374 to 377)

William Sawyer, Ph.D.



**Page 378**

1  important.
2  Q. Okay. So I asked about primary studies, so
3  let me ask the question again.
4  Is the McDuffie study the only primary study
5  you can point me to where somebody with similar
6  characteristics to Josh had a statistically-
7  significant elevated risk of NHL?
8  A. Yes.
9  Q. Okay.
10  MR. KALAS: Let's go off the record.
11  THE VIDEOGRAPHER: We are going off the
12  record. The time is 9:43 a.m.
13  (Recess from 9:43 a.m. until 9:53 a.m.)
14  THE VIDEOGRAPHER: We're back on the record.
15  The time is 9:53 a.m.
16  BY MR. KALAS:
17  Q. Let's turn to Mr. Meeks. He was diagnosed
18  with NHL in 2012?
19  A. Yes.
20  Q. Okay. And he passed in 2017?
21  A. He did, at age -- at age 70.
22  Q. Okay. Now, he was diagnosed with NHL when
23  he was 64, right?
24  A. Yes.
25  Q. Okay. And there are 64-year-olds diagnosed

**Page 379**

1  with NHL every day in this country who've never used
2  Roundup, right?
3  A. Yes.
4  Q. Okay. Now, as we covered last time we got
5  together, Mr. Meeks was not deposed before he
6  passed, right?
7  A. Correct.
8  Q. So what we know about him, as far as his use
9  of Roundup, we've learned from his wife's
10  deposition, records produced by his wife, and to a
11  limited degree his medical records, right?
12  A. Yes.
13  Q.

**Page 380**

1  Q. Okay. And so he personally had a personal
2  -- strike that.
3
11  MR. TRAVERS: Object to the form.
12  Q.

**Page 381**

5  Q. Okay. Now, Mr. Meeks first started using
6  Roundup in the mid 1970s when he bought the Ortega
7  greenhouse, right?
8  A. Yes.
9  Q. Okay. And he'd spray both outside and
10  inside the greenhouse, right?
11  A. He did.
12  Q. And I think you told me the only other
13  product that he would generally use in the
14  greenhouse is Safer Soap on the plants to prevent
15  insects and that sort of thing.
16  A. Yes.
17  Q. Okay. Are there any other products that
18  you've been able to discern that he used in the
19  greenhouse or around the greenhouse?
20  A. Only fertilizers with no pesticide
21  additives.
22  Q. Okay. And you don't know what the actual
23  brand of the fertilizer was, right?
24  A. No.
25  Q. Okay. So that's based off Mrs. Meeks'

18 (Pages 378 to 381)

William Sawyer, Ph.D.

Page 382

1    recollection, right?
2    A.  Yes.
3    Q.  Okay.  Now, at the greenhouse he'd spray
4    every two weeks from March to December, correct?
5    A.  Yes.
6    Q.  Okay.  And when spraying and when mixing
7    Mr. Meeks would wear rubber gloves, right?
8    A.  Yes.
9    Q.  Okay.  And wearing rubber gloves would have
10   reduced his exposure to Roundup.  True?
11   A.  Yes.
12   Q.  Rubber gloves are an effective barrier to
13   glyphosate coming into contact with the skin, right?
14       MR. TRAVERS:  Objection.  Form.
15   A.  If they're not internally contaminated, yes.
16   Q.  Okay, when, when applying Roundup,
17   but not mixing, he'd wear a respirator, right?
18   A.  Depending on the weather conditions, whether
19   his allergies were bothering him or not, yes, he
20   wore it.
21   Q.  Okay.
22   A.  Due to seasonal allergies.
23   Q.  Okay.  And I think we've talked about it
24   before, but inhalation exposure is expected to be
25   minimal, right?

Page 383

1    A.  Yes.
2    Q.  Okay.  But the respirator, if he did wear
3    it, would still reduce his exposure in some small
4    amount to Roundup, right?
5    A.  It would.  But the fraction of his exposure
6    through inhalation was already less than five
7    percent of total.
8    Q.  Right.
9    A.  So it would reduce that five percent
10   somewhat.
11   Q.  Okay.  And when applying he'd wear long
12   pants, a short-sleeved shirt, socks and either
13   tennis shoes or boots, right?
14   A.  That's correct.
15   Q.  Okay.  And, in fact, Mrs. Meeks testified
16   that when Mr. Meeks would spray he would only have
17   exposed skin just above and below the elbow, right?
18   A.  Yes.
19   Q.  Okay.  All of this clothing Mr. Meeks wore
20   reduced his exposure to Roundup, right?
21       MR. TRAVERS:  Objection.  Form.
22   A.  Yes.
23   Q.  Okay.  Now, after applying Roundup Mr. Meeks
24   would shower, right?
25   A.  Yes; but not necessarily immediately.

Page 384

1    Q.  Okay.  And when you say "immediately," you
2    mean right after applying, right?
3    A.  Yes, he -- based on Page 228 of 379 of the
4    deposition, it was not an immediate process.
5    Q.  Okay, okay.  Do you recall -- actually,
6    let's mark it, so you're not having to recall.
7        I'll mark as Exhibit 36 the transcript of
8    the deposition of Mrs. Meeks.
9        (Sawyer Exhibit 36 was marked for
10   identification.)
11   Q.  Okay.  Sorry, this isn't minuscript, so it's
12   quite a lot of paper.  But if we go to 227.
13   A.  Whoops.  Popped that one.
14       Okay.  Ready.
15   Q.  Do you see at Line 6, it states:
16       "QUESTION:  Okay.  After he would spray
17   Roundup did he generally come in and wash his
18   hands or take a shower?
19       ANSWER:  He had to because it usually got
20   his pants all wet and his shirt got wet, you
21   know, and I always washed his clothes separately,
22   especially when he did the spraying, you know,
23   Roundup.
24       QUESTION:  Okay.  So the clothes that he
25   wore when he used Roundup was laundered

Page 385

1    separately; is that correct?
2        ANSWER:  Yes.
3        QUESTION:  Or would he wash up somewhere at
4    the greenhouse or outside?
5        ANSWER:  He would come in the house and get
6    a shower.
7        QUESTION:  Okay.  And that was always his --
8    was that always his practice?
9        ANSWER:  Yes.  Pretty much, yeah."
10       Okay.  So do you see there where Mrs. Meeks
11   testifies that because Mr. Meeks' clothing would get
12   wet he'd come inside after spraying Roundup to get
13   his clothes off?
14   A.  Yes.
15   Q.  Okay.  And do you see that she talks about
16   that he'd come in the house and get a shower?  Do
17   you see that?
18   A.  Yes.
19   Q.  Okay.  So my question is, did you ask
20   Mrs. Meeks, or is there any other place in the
21   record where she talks about whether, when he
22   changed his clothes, he would also take a shower or
23   whether he would change his clothes, go back out and
24   work and then take a shower at the end of the day?
25   A.  No.  I footnoted Page 228.

19  (Pages 382 to 385)

William Sawyer, Ph.D.

Page 386

1    Q.  Okay.
2    A.  But I don't see it there.
3    Q.  Right.  I didn't either.  I think you might
4  have meant 227.
5        So if -- if, sir, he showered when he took
6  off his clothes that were contaminated with Roundup,
7  after spraying Roundup, that would be a shower event
8  relatively soon after the spraying occurred, right?
9        MR. TRAVERS:  Objection.  Form.
10   A.  Yes.
11   Q.  Okay.  And that would have reduced his
12  exposure in some amount, right?
13   A.  Yes; but the starting point would be
14  exceedingly high.  Because she stated that -- that
15  usually his pants were all wet and his shirt was
16  wet, which would imply an unusually high exposure
17  beyond that of just invisible drift.
18   Q.  Okay.  And we're going to -- we're going to
19  get to that.  But, again, my question was different,
20  which is showering right after applying Roundup
21  would have reduced Mr. Meeks' exposure in some
22  amount, right?
23   A.  Yes.
24   Q.  Okay.  And it would have been more than a
25  diminimous amount given the time when he showered,

Page 387

1  right?
2    A.  Well, it would only be partially effective
3  because his spray time was generally several hours.
4    Q.  Right.  And as we've seen in the Wester '91
5  study, for instance, washing even four hours after
6  can remove 60 to 70 percent of Roundup on the skin,
7  right?
8        MR. TRAVERS:  Objection.  Form.
9    A.  Yes.  However, there are other studies that
10  give various time points that are slightly
11  different.
12   Q.  Okay.
13   A.  I'm not relying only on that study.
14   Q.  Understood.
15       Now, Mr. Meeks used a backpack sprayer and a
16  tank sprayer, right?  And I guess a handheld sprayer
17  as well.  I'm looking at Pages 8 to 9 of your notes.
18   A.  Yes.
19   Q.  Okay.  And are you going to compare
20  Mr. Meeks to a generic applicator in the UK POEM
21  model?
22   A.  No.
23   Q.  Okay.  And I think one of the studies you
24  said you might compare him to is the Bleeke study,
25  right?

Page 388

1    A.  Possibly.
2    Q.  Okay.  How is Mr. Meeks like the applicators
3  in Bleeke?
4    A.  I don't recall.
5    Q.  Okay.
6    A.  I know that he shared similarities with the
7  Machado study.
8    Q.  Okay.  The Bleeke study is a study of
9  conventional backpack sprayers like Mr. Meeks,
10  right?
11       MR. TRAVERS:  Objection.  Form.
12   A.  I don't recall.
13   Q.  Okay.  Let's look at it real quick.
14       We'll mark Bleeke as 37.
15       (Sawyer Exhibit 37 was marked for
16  identification.)
17   Q.  All right.  This is the Bleeke study that
18  you reviewed, right?
19   A.  Yes.
20   Q.  Okay.  And this has also been referred to in
21  different depositions as a Spanish backpack
22  applicator study, right?
23   A.  Yes.
24   Q.  Okay.  And if you go to Page 440, I'm using
25  the Bates numbers here, in study overview do you see

Page 389

1  that -- let me know when you're there.
2    A.  Page 440?
3    Q.  Yeah.  I'm using the Bates numbers.
4    A.  Is that the bottom right-hand corner?
5    Q.  Yeah.
6    A.  Page 440 of something?
7    Q.  No, no, no.  MONGLY000668440.
8        MR. TRAVERS:  It would be Page 11.
9    Q.  Yeah, it would be Page 11.  I can work off
10  those too.  Whatever's easier for you.
11   A.  Okay.
12   Q.  Okay.  Do you see study overview?
13   A.  Yeah.
14   Q.  Okay.  And do you see about midway through
15  that paragraph it talks about the fact that they
16  have applicators using conventional backpack
17  sprayers?
18   A.  Yes.  It looks like some were unshielded but
19  CDA sprayers.
20   Q.  Okay.  Keep going.  Do you see, "In
21  addition"?
22   A.  Yes.
23   Q.  Okay.  It says, "In addition, the test item
24  was mixed and loaded by 12 other volunteers and
25  subsequently applied in citrus fruit orchards with

20  (Pages 386 to 389)

William Sawyer, Ph.D.

Page 390

1  conventional backpack sprayers by the remaining 12
2  volunteers."
3      Do you see that?
4      A.  Yes.
5      Q.  Okay.  And Mr. Meeks used a conventional
6  backpack sprayer, right?
7      A.  Yes.
8      Q.  Okay.  Let's go to the results.  Let's go to
9  page Bates No. 528, which is Page 99 of 538.
10     All right.  Are you there?
11     A.  Yes.
12     Q.  Okay.  And one good thing about a study like
13 this is that they had monitors of the applicators,
14 right?
15         MR. TRAVERS:  Objection.  Form.
16     A.  It appears that way.
17     Q.  Okay.  And if you look at operator one here,
18 this is a backpack mixer loader.  Do you see that
19 the duration time is four hours for operator one?
20     A.  Three hours, 56 minutes.
21     Q.  Right.
22     A.  Yes.
23     Q.  And they have exposure-related observations
24 here.  So one thing that they noticed at 8:55 --
25 well, strike that.  Let me back up.

Page 391

1         This person's wearing protective gloves like
2  Mr. Meeks, right?
3      A.  Yes.
4      Q.  Okay.  And he's wearing a Coverall, which
5  would cover all of his skin, right?
6      A.  Yes.
7      Q.  Okay.  And if you look at the exposure-
8  related observations, at 8:55 they have the operator
9  touch the mixed foam with a gloved hand, but he
10 rinsed his gloves afterward, right?
11     A.  Yes.
12     Q.  That's a potential exposure event, right?
13     A.  Well, from touching other objects, yeah.
14     Q.  Okay.  At 9:26 there's slight leakage from
15 the tank upon agitation due to the lid not being
16 correctly fixed.  That's a potential exposure event,
17 right?
18     A.  Yes.
19     Q.  Okay.  Let's go to operator two, next page.
20     All right.  And if you go to the general
21 operation description, in the last paragraph, they
22 talk about minor contamination might have occurred
23 during slight leakages from the tank while agitating
24 and touching foam of product at top of tank.  Do you
25 see that?

Page 392

1      A.  I'm on Page 100.
2      Q.  Right.  Right here, sir.
3      A.  Okay.
4      Q.  Yeah?
5      A.  Yeah.
6      Q.  Do you see what I'm talking about there,
7  "Minor contamination may have occurred during slight
8  leakages from tank"?
9      A.  Yes.
10     Q.  And that's a potential exposure event,
11 right?
12     A.  Yes.
13     Q.  Okay.  And the operator smoked between
14 mixing events, right?  Same paragraph, last
15 sentence.
16     A.  Yes.
17     Q.  And that's a potential exposure event,
18 right?
19     A.  Yes.
20     Q.  Okay.  They talk about at 12:40 slight
21 dripping onto knees while agitating tank.
22         That's a potential exposure event, right?
23     A.  Yes.
24     Q.  Okay.  And if you go to applicator three,
25 also a backpack tank sprayer like Mr. Meeks, we have

Page 393

1  an operator in the general operation description
2  wearing normal clothes, jeans and T-shirt, or jeans
3  and shirt.  Do you see that?
4      A.  Yeah, new -- new gloves I see.
5      Q.  Right.  But he's wearing jeans and a shirt,
6  right?
7      A.  Yes.
8      Q.  And then when he returns from breakfast he's
9  using a short-sleeved shirt for mixes three through
10 six, right?
11     A.  Yes.
12     Q.  Okay.  And that is actually less clothing
13 than what Mr. Meeks' wife testified that he wore,
14 right?
15     A.  Yes.
16     Q.  Okay.  And if you go down to the last
17 paragraph here it says that the operator was
18 generally not very careful during mixing.
19 Contamination on gloves was likely to be transferred
20 onto face and hands.  See observations below.
21         Now, that's a potential exposure event,
22 right?
23     A.  Yes.  Touching other parts of the body and
24 objects, yes.
25     Q.  Okay.  And also when it became warm during

21 (Pages 390 to 393)

William Sawyer, Ph.D.

Page 394

1  the morning he rolled up the sleeves of his shirt,
2  exposing his arms. That allowed bare skin to be
3  exposed to Roundup he's spraying, right?
4      A. Yes.
5      Q. Okay. And they talk about a photo of this
6  operator. And that is on Page 227 of 538 at Bates
7  No. 656, correct? That's the photo they're
8  referring to?
9      A. Operator three, yes.
10     Q. Okay.
11     A. Also it appears there is, yeah, there's a
12 couple of inches of bare skin between the glove and
13 the elbow.
14     Q. Like Mr. Meeks, right?
15     A. Yes.
16     Q. Okay. And they talk about exposure-related
17 observations, and we kind of covered this. But one
18 of the exposure-related observations for operator
19 three was touching the face with the gloved hand,
20 right?
21     A. Yes.
22     Q. Okay. Another one was after mixing and
23 cleaning one of the nozzles, right? That's at
24 12:35?
25     A. Yes.

Page 395

1      Q. Okay. And then if we go to operator five --
2  and we're almost done here.
3      A. Okay. I see operator five.
4      Q. Do you see in the exposure-related
5  observations at 4:06 p.m., pump is leaking?
6      A. Yeah.
7      Q. Okay. That's a potential exposure event,
8  right?
9      A. Yes.
10     Q. Okay. If you go to 537, which is operator
11 10, last paragraph, and this is Page 108 of 538,
12 last paragraph, "Minor contamination may have
13 occurred when the operator removed his gloves
14 carelessly and touched the sprayer without gloves."
15 Do you see that?
16     A. Yeah.
17     Q. That's an exposure event or a potential
18 exposure event, right?
19     A. Yes.
20     Q. Okay. Going to Page 543. Do you see at
21 12:40 the operator -- let me know when you're there.
22     Do you see at 12:40 the operator repairs a
23 blocked nozzle?
24     A. At what time?
25     Q. 12:40 p.m., Page 543.

Page 396

1      A. Repaired blocked nozzle, yes.
2      Q. Okay. That's a potential exposure event,
3  right?
4      A. Yes.
5      Q. Okay. Page 545.
6      A. Although somehow he accomplished it with his
7  gloves on.
8      Q. Let me know when you're at 545, which is
9  Page 116 of 538.
10     A. Okay.
11     Q. Okay. Do you see that this applicator had a
12 leaking backpack sprayer in the last paragraph?
13     A. Yes.
14     Q. Okay. And they actually discuss a wet patch
15 on its back, right?
16     A. Yes.
17     Q. And that is what Mrs. Meeks talked about, a
18 wet patch or wet patches on Mr. Meeks' clothes,
19 right?
20     A. Yes.
21     Q. Okay. If we go to Photo 60, which is on
22 Page 257 of 538, that's the operator with the wet
23 patch on his back following application, right?
24     A. It's operator five, wet patch on back, yeah.
25     Q. Okay. And, just to be clear, that's not a

Page 397

1  Tyvek suit he's wearing there, right?
2      A. No.
3      Q. Okay. That fabric of that suit is -- well,
4  can you tell the fabric of the suit from the
5  picture?
6      A. No.
7      Q. Okay. Does it appear to be a suit that is
8  impenetrable to pesticides?
9         MR. TRAVERS: Objection. Form.
10     A. Probably not. It appears wet.
11     Q. Okay. So let's go back then to Page 439 of
12 the Bleeke study, which is near the beginning. And
13 actually let's go to 430 real quick, which is the
14 front page of the entire study. This study was done
15 in accordance with OECD guidance document 148,
16 right?
17        MR. TRAVERS: Objection. Form.
18     A. It states -- that's what it states, yes.
19     Q. Okay. So let's go to 13 -- let's go to 439
20 and these backpack applicators. Do you see the
21 summary of systemic doses?
22     A. Yes.
23     Q. Okay. And the highest dose in any of the
24 applicators, be IT backpack or Puro, is 2.07 times
25 10 to the negative three mgs per kg, right?

22 (Pages 394 to 397)

William Sawyer, Ph.D.

Page 398

1    A.  Yes.  But this is via biomonitoring under
2    false assumptions, and I also see in the summary,
3    CDA system.
4    Q.  Okay.
5    A.  Of 12 volunteers.
6    Q.  Right.  That's the Puro system, right?  And
7    we talked about that.  And that's not the folks we
8    were looking at just now, right?
9        MR. TRAVERS:  Objection.  Form.
10   A.  I'm not sure.
11   Q.  Okay.  Well, do you see in the table here
12   the Puro -- well, let's go to the top paragraph.  Do
13   you see the Puro is a CDA system in the top
14   paragraph?
15   A.  Yes.
16   Q.  Okay.  Is the backpack operator system
17   described as a CDA system?
18   A.  I think I earlier saw the word
19   "conventional."
20   Q.  Okay.  And you saw pictures of it, right?
21   We just looked at some pictures.
22   A.  Yes.
23   Q.  Were there any CDA-type nozzles on the end
24   of those wands?
25   A.  I don't think so.

Page 399

1    Q.  Okay.  So let's go back down to the table.
2    I understand that you have been critical of using
3    urine as a -- as a -- as a marker of glyphosate dose
4    and have suggested that the majority, up to 80
5    percent of glyphosate, may be excreted via the
6    feces; is that correct?
7    A.  Yes.
8    Q.  Okay.  So let's take the highest dose here,
9    which is .00207, do you see that, mgs per kg?
10   A.  Yes.
11   Q.  Okay.  Let's multiply that by five.  If we
12   multiply that by five it would be .01 mgs per kg,
13   right?
14   A.  Okay.  Which value are you looking at?
15   Q.  The highest number in the range for backpack
16   mixer loader, do you see that, 2.07 times 10 to the
17   negative three?
18   A.  Right.
19   Q.  Okay.  So if I multiply that by five it's
20   essentially .01 mgs per kg, right?
21   A.  I'm sorry.  Why are you multiplying by five?
22   Q.  Because it's your contention, sir, that only
23   20 percent of glyphosate that is systemically
24   absorbed is excreted via the urine, right?
25       MR. TRAVERS:  Objection.  Form.

Page 400

1    A.  I understand, yes.
2    Q.  Okay.  So if 80 percent were in the feces
3    that the authors of this study missed, I'm
4    multiplying by five to capture that.  Do you
5    understand?
6    A.  Yes.
7    Q.  Okay.  So if I multiply 2.07 times 10 to the
8    negative three times five, I get .01 mgs per kg,
9    right?
10   A.  Did you say .01?
11   Q.  Yes, sir.
12   A.  Yes.
13   Q.  Okay.  And if an operator is 80 kilograms
14   that would result in a dose of .8 mgs per kg, right?
15   Or, excuse me, .8 mgs.
16   A.  Yes.
17   Q.  Okay.  Is .8 mgs below -- or excuse me.  Is
18   .01 mgs per kg below the AOEL?
19   A.  Yes.
20   Q.  Okay.  And is .8 -- or, excuse me -- .01 mgs
21   per kg multiplied by 12.3, .123 mgs per kg?
22   A.  Say again, please.
23   Q.  Is .01 mgs per kg, multiplied by 12.3, .123
24   mgs per kg?
25   A.  Yes.

Page 401

1    Q.  Okay.  And is that .123 mgs per kg over a
2    thousand times lower than the highest doses in the
3    rodent carcinogenicity studies?
4        MR. TRAVERS:  Objection.  Form.
5    A.  Yes.
6    Q.  Okay.  And these doses were measured in
7    people who had observed leaking backpack sprayers,
8    right?
9    A.  Yes.
10   Q.  Okay.  Now, beyond his work at the Ortega
11   greenhouse Mr. Meeks also applied at five or six
12   other properties after 1995, right?
13   A.  Yes, but I -- I haven't assessed the
14   biomonitoring collection duration.
15   Q.  Okay.
16   A.  To the degree to be certain that that
17   actually even captured all of the urine.
18   Q.  Captured all of the what?  I'm sorry.
19   A.  Glyphosate-containing urine.
20   Q.  Okay.  Well, we can come back to this if I
21   have time at the end and go over that, but I need to
22   move on.  So I'll make a note of that.
23       Beyond his work at the Ortega greenhouse
24   Mr. Meeks also applied at five or six other
25   properties after 1995, right?

23 (Pages 398 to 401)

William Sawyer, Ph.D.

Page 402

1    A.  After 1995?
2    Q.  Yes.  So after he left the Ortega
3  greenhouse.
4    A.  He did, yes.
5    Q.  Okay, okay.  And other than the farm at
6  Olive Branch, which I'll come to separately, those
7  properties generally involved spraying every four to
8  six weeks, except in January or February, for an
9  hour or less, right?
10    A.  Could you repeat that, please?
11    Q.  Yeah.
12       Other than the farm at Olive Branch,
13  excluding the farm at Olive Branch, those other
14  properties generally involve spraying every four to
15  six weeks, except in January and February, for an
16  hour or less, correct?
17    A.  Yes.
18    Q.  Okay.  And then at Olive Branch it would
19  require two days or so of spraying every month,
20  right?
21    A.  Approximately.
22    Q.  Okay.  And he wore the same PPE at these
23  other properties that he wore at the Ortega
24  greenhouse, right?
25    A.  Possibly.  I don't recall.

Page 403

1    Q.  Okay.  You're not going to tell the jury,
2  based on your recollection right now, if he wore
3  different PPE, right?
4    A.  No.  But I did not quantitatively include
5  those properties in my assessment.
6    Q.  Okay.  And Mrs. Meeks, if we go to 325
7  actually of her depo -- actually, let's start at 324
8  to 325.  It's near the end.  She talks about the
9  fact that Mr. Meeks would come in from spraying
10  sweaty during the hotter part of the year, right?
11    A.  During the hotter part of the year she
12  stated, yes.
13    Q.  So sweaty, in fact, that he'd change his
14  shirts mid spraying, right?
15       MR. TRAVERS:  Objection.  Form.
16    A.  Not exactly.
17    Q.  Okay.  Page 324 to 325:
18       "QUESTION:  So during the summer would you
19  estimate that he would change shirts mid spray
20  like 50 percent of the time or 25 percent of the
21  time?  Can you estimate?
22       ANSWER:  I'm just going to say 25 percent
23  because I don't -- I don't know specific, you
24  know.  But he did it often enough that I noticed,
25  because he'd have a lot more laundry some times

Page 404

1  than others."
2       Did I read that correctly?
3    A.  Yes.
4    Q.  Okay.  So sometimes, about 25 percent by her
5  estimate, he'd change shirts mid spray, right?
6    A.  Yes.
7    Q.  And that's because he was just so sweaty,
8  right?
9    A.  I believe so, from what she said, yes.
10    Q.  Okay.  Did you follow up with Mrs. Meeks
11  when you had your interview with her or did you see
12  any other information in the record that would allow
13  you to discern whether, when Mr. Meeks came in with
14  soaked clothing, he was soaked by sweat, Roundup or
15  some combination of the two?
16    A.  Yeah, I refer -- well, let's see.  Yeah, I'd
17  refer to Page 324 of the deposition.
18    Q.  Okay.
19    A.  Middle paragraph, where she stated that,
20  well, sometimes they weren't just sweaty, they were
21  just wet from the spray, on his pants especially.
22  But I remember him taking his shirts and taking them
23  off and putting another shirt on until he would --
24  until he'd come in.
25    Q.  Okay.

Page 405

1    A.  So she did -- she did state that there were
2  times where it was not sweat but rather the spray.
3    Q.  Okay.  And did you -- were you able to
4  quantitatively determine how often it was just spray
5  versus how often it was just sweat versus how often
6  it was a mixture?
7    A.  No, that was not necessary.  I calculated
8  the time-weighted exposure days for comparison to
9  the dosimetric studies.
10    Q.  Okay.  So you're not going to show up at
11  trial and -- and testify to some quantitative
12  amount, based on the record in front of you today,
13  as to how often his clothes would be soaked by
14  Roundup versus sweat.
15    A.  Correct.  We don't have sufficient
16  information to make that determination.
17    Q.  Now, you determined Mr. Meeks had 164 days
18  of exposure, right?
19    A.  Yes.
20    Q.  Okay.  That would place him in the highest
21  quartile dose group in Andreotti?
22    A.  Yes.  And even more so if I multiplied that
23  number by eight hours.
24    Q.  Okay.  And in the highest quartile of the
25  dose group for NHL in Andreotti there was no

24  (Pages 402 to 405)

William Sawyer, Ph.D.

Page 406

1    statistically-significant relationship between
2    glyphosate exposure and NHL, right?
3        A.  Yes.
4        Q.  It was a null finding, correct?
5        A.  Yes.
6        Q.  Okay.  Now, Mr. Meeks worked in a sawmill
7    for many years, right?
8        A.  Yes.
9        Q.  Do you know what wood -- what the wood in
10   the sawmill he worked in was pretreated with?
11       A.  No.
12       Q.  Do you know if it was pretreated with any
13   phenols?
14       A.  Do not know.
15       Q.  Are phenols associated with NHL, or phenol
16   exposure?
17       A.  No; with respect to significant human
18   epidemiologic evidence.
19       Q.  Okay.  So you qualified your "no" answer
20   there.  Why did you not just say no?  Why did you
21   say with respect to significant human epidemiologic
22   evidence?  Do you think there was some evidence
23   or --
24       A.  Well, no.  For phenol, no.
25       Q.  Okay.

Page 407

1        A.  And I'm talking about specifically phenol.
2        Q.  Okay.
3        A.  Not -- not other chemicals.
4        Q.  How about chlorophenol wood preservatives.
5    Do you know if the wood was treated with that?
6        A.  Chlorophenoxy?
7        Q.  Yes, sir.
8        A.  I do not.
9        Q.  Okay.  Is that associated with NHL in
10   epidemiology studies?
11       A.  Yes.
12       Q.  Okay.  What did Mr. Meeks wear when he
13   worked in the sawmill?
14       A.  I do not have that information.  It's not
15   available.
16       Q.  Okay.  What dose of chlorophenoxy chemicals
17   was he exposed to in the sawmill?  If any.
18       A.  No information either way.
19       Q.  Okay.  He worked in a shipyard, right?
20       A.  Yes.
21       Q.  First he worked on ship shafts?
22       A.  As a mechanic, yes.
23       Q.  Okay.  And then he worked on ship
24   components, right?  And that was in the nuclear
25   field, right?

Page 408

1        A.  I asked Mrs. Meeks there and she did not
2    believe he worked specifically in nuclear -- with
3    nuclear components, but rather he was a mechanic,
4    and did general mechanical work.
5        Q.  Right.  So when I said "ship components," I
6    was taking that from Table 1 of your notes.  You
7    said that he repaired non-radioactive ship
8    components, right?
9        A.  Correct.
10       Q.  Okay.  So starting with the ship shafts,
11   what did he do day-to-day repairing ship shafts?
12       A.  Uncertain.
13       Q.  Okay.  And what did he wear when he worked
14   on the ship shafts?
15       A.  Uncertain.
16       Q.  Okay.  What did he do day-to-day when he
17   repaired non-radioactive ship components?
18       A.  According to her, general mechanical work.
19       Q.  Okay.  But on what components in the ship?
20   I mean, did you find that out?
21       A.  No.
22       Q.  Okay.  What did he wear when he repaired
23   non-radioactive ship components?
24       A.  She didn't know.
25       Q.  Okay.  Are you aware that the Newport News

Page 409

1    shipbuilding site is a Superfund site?
2           MR. TRAVERS:  Objection.  Form.
3        A.  No, I'm not aware of that.
4        Q.  Okay.  Do you know what exposures he would
5    have had, assuming that it is a Superfund site where
6    they built ships in the Norfolk area, do you know
7    what exposures to chemicals he would have had there?
8        A.  To chemicals or radiological agents?
9        Q.  Well, let's start first with chemicals like
10   volatile organics, that sort of thing.  Do you know
11   what exposures he would have had there?
12       A.  No.
13       Q.  Okay.  Do you agree that workers at
14   shipbuilding sites who work in shipyards may be
15   exposed to asbestos?
16       A.  Yes.
17       Q.  Is asbestos carcinogenic?
18       A.  Not with respect to NHL, no.
19       Q.  Okay.  Is asbestos carcinogenic?
20       A.  Yes; but not with respect to NHL.
21       Q.  Okay.  Do you agree that workers in
22   shipyards may be exposed to benzene?
23       A.  Possibly.
24       Q.  Okay.  Do you agree workers -- well, let me
25   back up.

25  (Pages 406 to 409)

William Sawyer, Ph.D.

| Page 410 | Page 412 |
|---|---|

**Page 410**

1    Is benzene carcinogenic?
2    A.  Yes.
3    Q.  Do you believe it's associated with NHL?
4    A.  It's associated by human epidemiological
5    evidence, yes.
6    Q.  Okay.  Well, would workers in shipyards be
7    exposed to cadmium?
8    A.  It's possible.  I mean, it's very
9    speculative, but it's certainly possible.
10   Q.  Okay.  Is cadmium carcinogenic?
11   A.  Not with respect to NHL, no.
12   Q.  Okay.  Is cadmium carcinogen?
13       MR. TRAVERS:  Object to the form.
14   A.  No, absolutely not, with respect to NHL or
15   hematopoietic malignances.
16   Q.  Okay.  So, again, previously when I asked
17   you about asbestos you answered my question and
18   clarified.  I'd appreciate it if you'd answer the
19   question, then clarify.
20       Is cadmium carcinogenic, sir?
21   A.  No; absolutely no relationship to NHL.
22   Q.  Okay.  Is cadmium related to any cancer?
23   A.  Yes.
24   Q.  Okay.
25   A.  But not NHL.

**Page 411**

1    Q.  Would a worker in a shipyard be exposed
2    potentially to coal tar pitch?
3    A.  Yes; if performing roofing work possibly.
4    Q.  How about if they're painting or repairing
5    ships?  Perhaps the deck of a ship, for instance.
6    A.  I don't believe so.
7    Q.  Okay.
8    A.  Coal tar pitch volatiles requires very high
9    temperatures, and we see that with some of the older
10   roofing practices.  And -- but I'm not aware of that
11   process being used in a shipbuilding yard.  It's
12   possible.
13   Q.  Okay.  Was it used as a pigment in black
14   paints even into the 1990s?
15   A.  Yes.  But coal tar pitch volatile by
16   definition is a heated stream of volatiles.
17   Q.  Okay.
18   A.  And no longer -- it loses its ability to
19   become airborne at normal room temperatures.
20   Q.  Are workers exposed to cadmium -- excuse me
21   -- chromium-6 in shipyards?
22   A.  Yes, that's certainly possible.
23   Q.  Is chromium-6 carcinogenic?
24   A.  Yes; but absolutely not with respect to NHL.
25   Q.  Are workers exposed to lead in shipyards?

**Page 412**

1    A.  Yes.
2    Q.  Is lead carcinogenic?
3    A.  It's a possible carcinogen, but not related
4    to hematopoietic malignancies.  There's no evidence
5    of NHL associated with lead.
6    Q.  Are workers exposed to nickel in shipyards?
7    A.  I'm sorry?
8    Q.  Are workers exposed to nickel in shipyards?
9    A.  It's possible.
10   Q.  Is nickel carcinogenic?
11   A.  Yes; but absolutely no evidence with respect
12   to human NHL and nickel.
13   Q.  Okay.  Are workers exposed to metalworking
14   fluids in shipyards?
15   A.  You'd have to be a bit more descriptive.
16   That's a multiple -- multitude of different
17   potential products.
18   Q.  All right.  Well, let me try to be more
19   specific.  Are workers exposed to solvents,
20   including chlorinated hydrocarbons, in shipyards?
21   A.  That is possible.
22   Q.  Okay.  Are solvents, including chlorinated
23   hydrocarbons, associated with cancer, or are they
24   carcinogenic is the better question?
25   A.  Certain solvents, such as TCE is, yes.

**Page 413**

1    Q.  Okay.
2    A.  Or I should say, yes, certain solvents are.
3    Q.  Are some of those solvents associated with
4    NHL?
5    A.  Yes, such as -- oh, I forget.
6    Q.  That's okay.
7    A.  Yes, it is possible.
8    Q.  Okay.  Are workers exposed to welding fumes
9    in shipyards?
10   A.  Yes.
11   Q.  Okay.  Are welding fumes carcinogenic?
12   A.  Yes; but no evidence with respect to NHL.
13   Q.  Are workers exposed to wood dust in
14   shipyards?
15   A.  Yes, it's possible.
16   Q.  Is wood dust carcinogenic?
17   A.  Yes, certain types of wood.  And I forget if
18   it were cedar or others.  There are two species of
19   wood that are associated with I think it's a nasal
20   pharyngeal carcinoma or a laryngeal cancer.
21   Q.  Okay.  Are workers exposed to
22   electromagnetic radiation in shipyards?
23   A.  I don't know.
24   Q.  Okay.  Are workers exposed to ultraviolet
25   radiation in shipyards?

26 (Pages 410 to 413)

William Sawyer, Ph.D.

Page 414

1    A.  If the sun is out, sure.
2    Q.  Okay.  How about from welding?
3    A.  Possibly.
4    Q.  Okay.  Is ultraviolet radiation
5  carcinogenic?
6    A.  Yes.
7    Q.  Is it associated with NHL?
8    A.  No.
9    Q.  Okay.  How about ionizing radiation.  Are
10  workers in shipyards exposed to ionizing radiation?
11    A.  Less than .2 percent are exposed.
12    Q.  Okay.
13    A.  At least at Portsmouth.
14    Q.  And you don't know Portsmouth, Maine, or
15  Portsmouth, Virginia, sitting here today.
16    A.  No.
17    Q.  Okay.  Is ionizing radiation carcinogenic?
18    A.  Yes.
19    Q.  Okay.  Is it associated with NHL?
20    A.  Yes.
21    Q.  Okay.  So of the three that you stated that
22  may be associated with NHL, there were benzene
23  solvents, including chlorinated hydrocarbons and
24  ionizing radiation.  As to benzene, have you
25  quantified the amount of benzene Mr. Meeks may have

Page 415

1  been exposed to while working in the shipyard?
2    A.  No.
3    Q.  As to solvents, including chlorinated
4  hydrocarbons, have you quantified the amount of
5  chlorinated hydrocarbons in solvents Mr. Meeks may
6  have been exposed to in the shipyard?
7    A.  No.
8    Q.  Okay.  As to ionizing radiation, have you
9  quantified the amount that Mr. Meeks specifically
10  may have been exposed to while working in the
11  shipyard?
12    A.  I reviewed the Occupational Radiation
13  Exposure from U.S. Naval Nuclear Plants and their
14  support facilities, including the Portsmouth
15  shipyard, with respect to ionizing radiation.
16    Q.  Okay.  And I appreciate that.  And that's
17  Exhibit 31, for the record.  My question was a
18  little more specific.
19       As to Mr. Meeks specifically, have you
20  quantified the amount of ionizing radiation he may
21  have been exposed to?
22    A.  Only secondary to the approximately 20,000
23  individuals who were studied for radiological
24  exposure.
25    Q.  Okay.  Mr. Meeks at his deposition produced

Page 416

1  a document that I'll mark as exhibit -- well, excuse
2  me.  I should say Mrs. Meeks.
3    A.  I was going to ask you about that.
4    Q.  Yeah.  Mrs. Meeks at deposition produced a
5  document I'll mark as Exhibit 38.
6       (Sawyer Exhibit 38 was marked for
7  identification.)
8    A.  Yeah, because if you're going to hand me
9  something Mr. Meeks testified to in deposition, I'm
10  out of here.
11    Q.  All right.  This is a label to Roundup
12  Herbicide by Monsanto, right?
13    A.  Yes.
14    Q.  It's from 1991, right?
15    A.  Yes.
16    Q.  Okay.  Let's go to --
17       MR. TRAVERS:  I'm just going to object.  We
18  don't know if Mr. Meeks used this -- used this
19  brand of Roundup.
20       MR. KALAS:  Okay.
21  BY MR. KALAS:
22    Q.  Let's go to the third page of the document,
23  the precautionary statements page.  Do you see that?
24    A.  Yes.
25    Q.  It says, "Warning," right?

Page 417

1    A.  Yes.
2    Q.  Okay.  It says, "May cause skin irritation,"
3  right?
4    A.  Yes.
5    Q.  Okay.  And it says, "Do not get in eyes, on
6  skin, or on clothing."
7       Did I read that correctly?
8    A.  Yes.
9    Q.  Okay.  And whether or not it's actually
10  achievable, if somebody attempted to avoid getting
11  Roundup on their skin, would that reduce their
12  exposure to Roundup when they apply?
13    A.  Yes.
14    Q.  Okay.  It says, moving on, "Avoid breathing
15  vapor or spray mist," correct?
16    A.  Yes.
17    Q.  Okay.  And then it says, "Wash thoroughly
18  with soap and water after handling."
19       Did I read that correctly?
20    A.  Yes.
21    Q.  Okay.  And would washing thoroughly with
22  soap and water after handling reduce exposure to
23  Roundup?
24    A.  Yes.
25    Q.  Okay.  Moving down to the first aid section,

William Sawyer, Ph.D.

| Page 418 |
|---|

1  it states, "If on skin, immediately flush with
2  plenty of water, remove contaminated clothing, wash
3  clothing before reuse."
4       Did I read that correctly?
5  A.  Yes.
6  Q.  And would following that direction reduce
7  exposure to Roundup?
8  A.  It would.
9  Q.  Okay.  Let me move on to Mr. Ashelman now.
10      Now, Mr. Ashelman is a farmer, right?
11  A.  Yes.
12  Q.  Okay.  Lives in Pennsylvania, correct?
13  A.  Yes.
14  Q.  Okay.  Was diagnosed with NHL in July of
15  2013, right?
16  A.  Yeah, in July of '13, yes.
17  Q.  Okay.  He was 63 years old, right?
18  A.  He was 62 at the time of the diagnosis.
19  Q.  Okay, 62.
20      And I think we've discussed this before
21  about every plaintiff, but there are 62-year-olds
22  diagnosed with NHL every day in this country, with
23  the same subtype as Mr. Ashelman, who've never used
24  Roundup in their life, right?
25  A.  Yes.

| Page 420 |
|---|

1  Q.  Okay.  And up until 2011, Mr. Ashelman, in
2  addition to raising crops, was a dairy farmer,
3  right?
4  A.  Yes.
5  Q.  Okay.  What exposures did he have as a dairy
6  farmer?
7  A.  I'm not sure.
8  Q.  Okay.  How did he control pests, like ticks,
9  that might plant themselves on cows?
10  A.  It would only be speculation.  He -- he may
11  have had a rope that the animals walked under which
12  wiped a pesticide onto the tissue.  It would be
13  speculation.  I just don't have the information on
14  that.
15  Q.  Okay.  And if he did have such a rope, you
16  don't know how he handled that rope.
17  A.  Correct.
18  Q.  Okay.  And you, in fact, when you
19  interviewed Mr. Ashelman didn't ask him about what
20  chemicals he used in the course of his dairy
21  farming, right?
22  A.  No.  I think I already had that information,
23  so I did not.
24  Q.  Okay.  Now, beginning in 2003 through 2012
25  he used Roundup, right?

| Page 419 |
|---|

1  [REDACTED]
9       MR. TRAVERS:  Objection.  Form.  Misstates
10  the McDuffie study.
11  Q.  We can look at if you want.
12  A.  Could you read back or restate that?
13  Q.  Sure.
14  [REDACTED]
18      MR. TRAVERS:  Same objection.
19  A.  [REDACTED]
20  Q.  Okay.  Now, Mr. Ashelman did not start using
21  Roundup until 2003, right?
22  A.  Yes; in May, June and/or July, 2003.
23  Q.  Okay.  Prior to that he used a different
24  herbicide that did not contain glyphosate.  True?
25  A.  Yes.

| Page 421 |
|---|

1  A.  Yes.
2  Q.  Okay.  And then he switched to a generic
3  glyphosate for the last few years he used
4  glyphosate, right?
5  A.  Yes.
6  Q.  Okay.  And he applied Roundup for 20 hours a
7  year for nine years, right?  I guess that would be
8  10 years, '03 to '12.
9  A.  Yes.
10  Q.  Okay.  And he used a product called
11  WeatherMAX, right?
12  A.  Yes.
13  Q.  Okay.  And he applied that WeatherMAX in an
14  open tractor trailing a boom, right?
15  A.  Yes.
16  Q.  Okay.  And when he applied he'd use long
17  rubber gloves, right?
18  A.  Yes.
19  Q.  Okay.  And when he mixed he'd wear long
20  rubber gloves, right?
21  A.  Yes.
22  Q.  Okay.  And wearing those long rubber gloves
23  would have reduced exposure, right?
24  A.  Yes.
25  Q.  Okay.  And he also wore boots when he

28 (Pages 418 to 421)

William Sawyer, Ph.D.

Page 422

1    applied and mixed, right?
2        A.  Yes.
3        Q.  We can look at the -- okay.  Let me know if
4    you need to look at the depo for any of this.
5        A.  No, I have it on Page 6.
6        Q.  Okay.  And wearing those boots would have
7    reduced his exposure to glyphosate, right?
8        A.  Yes.
9        Q.  Okay.  He wore a mouth and nose respirator
10   when applying, right?
11       A.  Yes.
12       Q.  Okay.  That would have reduced his
13   inhalation exposure, though it was minimal to start,
14   that would have reduced his inhalation exposure,
15   right?
16       A.  I would disagree with the minimal to start.
17   He was exposed as a typical applicator using a
18   15-nozzle dual boom.  I wouldn't call that a minimal
19   exposure.
20       Q.  Okay.  So let me take that out.  Wearing the
21   mouth and nose respirator would have reduced his
22   exposure via the inhalation route, right?
23       A.  Yes.
24       Q.  Okay.  And did you quantify in any way what
25   his exposure via the inhalation route would have

Page 423

1    been?
2        A.  No.
3        Q.  Do you know what droplet sizes were used on
4    his boom?
5        A.  A wide range, because they were non-CDA
6    spray heads.
7        Q.  Okay.  Do you know -- have you done any
8    calculations to determine what the micron sizes
9    would have been for glyphosate sprayed out of those
10   booms?
11       A.  I would not run personal experiments.  I've
12   relied on the published literature with respect to
13   aerosol droplet size from conventional aerosol spray
14   heads.
15       Q.  Okay.  And do you know if the spray heads
16   Mr. Ashelman used are the same that's in those
17   literature citations you're discussing?
18       A.  Yes, they're called aerosol.  There's two
19   types, aerosol and CDA.  He used aerosol.
20       Q.  Okay.  But do you know if they're the exact
21   same type, as in the same brand, same openings, that
22   sort of thing?
23       A.  The studies provide the information based on
24   aerosol spray heads, and there is no specific
25   differentiation that's really significant.  Aerosol

Page 424

1    spray heads have been shown to produce a wide range
2    of aerosol droplet size, not a fixed range of
3    droplet size, as with CDA.
4        Q.  Okay.  When you say there is no specific
5    differentiation that's really significant, are you
6    referring that there's no specific differentiation
7    between brands that's significant?
8        A.  That's correct.
9        Q.  Okay.
10       A.  All brands produce a wide range of droplet
11   size when using an aerosol spray head, irregardless
12   of the brand.
13       Q.  How high was his boom when he sprayed, off
14   the ground?
15       A.  I don't recall.
16       Q.  Okay.
17       A.  I didn't ask him the actual number of
18   inches.
19       Q.  Was he, when he rode on the tractor, above
20   or below the boom spray heads?
21       A.  Above.
22       Q.  Above the boom spray heads.
23       A.  Yes.
24       Q.  And how far above the boom spray heads would
25   he have ridden?  How many feet off the ground was

Page 425

1    Mr. Ashelman is what I'm getting at.
2        A.  I don't have that measurement.
3        Q.  Okay.  Do you have any measurements or cites
4    in the literature that show that the volatilization
5    or the aerosolization from the boom spray heads
6    would be taken up by wind or whatever and reach
7    somebody riding as high as Mr. Ashelman?
8        A.  Based upon studies and reports, a good
9    example would be the Spanish exposure assessment of
10   tractor boom sprayer, which produced doses near the
11   AOEL.
12       Q.  Okay.  But do you know if those operators
13   in the study you're referring to rode as high as
14   Mr. Ashelman?
15       A.  No, I don't.  But the fact is, any tractor's
16   elevated.  There aren't, to my knowledge, any
17   ground-level tractor seats.  They're all elevated.
18       Q.  Well, I understand that, sir.
19       A.  A tractor's a tractor.
20       Q.  I understand that, sir, but that's not -- I
21   mean, I don't want to argue with you.  That's not
22   exactly true.  I could go to a farm and see a
23   tractor where somebody has to climb a ladder up into
24   the cab, and I can see a John Deere-type tractor,
25   where somebody just gets on from the ground, right?

29 (Pages 422 to 425)

William Sawyer, Ph.D.

Page 426

1    I mean, there are differences.
2        A.  Well, I mean, if he was on a Farmall H from
3    1950 it -- it would be lower.
4        Q.  Okay.  And you don't know, when he was
5    applying Roundup from 2003 to 2012, how high he was,
6    right?
7        A.  No.
8        Q.  Okay.  Now, did he wear a long-sleeved shirt
9    when he applied Roundup?
10       A.  Yes.
11       Q.  Did he wear long pants when he applied
12   Roundup?
13       A.  Yes.
14       Q.  Okay.  And wearing a long-sleeved shirt and
15   long pants also would have reduced exposure to
16   Roundup.  True?
17          MR. TRAVERS:  Objection.  Form.
18       A.  Reduced it to that of the typical operator
19   of a tractor with dual booms and 30 spray heads.  It
20   would have been a typical dosage for a -- a farmer
21   under conditions such as those in the Spanish study
22   that I'm referring to that was prepared by Monsanto.
23       Q.  Okay.  So I'm not asking what level it would
24   have reduced it to, I'm just asking whether it would
25   have reduced it.  So let me ask the question again.

Page 427

1          Would wearing long-sleeved shirts and long
2    pants reduced Mr. Ashelman's exposure?
3        A.  Well, certainly, compared to somebody not
4    wearing any pants and in their undies.
5        Q.  Well, or in shorts, right?
6        A.  Yes; but the --
7        Q.  Okay.
8        A.  -- dose calculations that have already been
9    established in the literature include long pants
10   already.  So I'm not sure what you're getting at.
11       Q.  Did Mr. Ashelman tell you at all about any
12   spill incidences with Roundup?
13       A.  No, he -- he didn't have any significant
14   spills.
15       Q.  Okay.  Did he discuss any significant
16   splashing while mixing?
17       A.  No.
18       Q.  Okay.  Now, what pesticides, herbicides,
19   rodenticides and insecticides were used on
20   Mr. Ashelman's farm before 1999?
21       A.  I have those listed in Table 1, Page 7 of
22   the report.
23       Q.  Well, you know, the reason I ask is, I
24   didn't think you did.  If you start on -- if you go
25   to Table 1 and you carry that through it looks like

Page 428

1    everything starts in 1999.  Now you have a -- a
2    second table that starts in 1991 about herbicide
3    application history, so I can reask the question
4    tied to 1991.  So let me strike the previous
5    question and ask the question again.
6          Prior to 1991, what pesticides, herbicides,
7    rodenticides and insecticides were used on
8    Mr. Ashelman's farm?
9        A.  I don't have any -- any information on
10   products predating 1991.
11       Q.  He's been farming since 1969, right?
12          MR. TRAVERS:  Objection.  Form.
13       A.  I'm not certain.
14       Q.  Okay.  Let's go to his depo.  Wait one sec.
15          All right.  So we'll mark his depo as
16   Exhibit 39.
17          (Sawyer Exhibit 39 was marked for
18   identification.)
19       Q.  All right.  Go to Page 102, please.  And do
20   you see Line 11, it states:
21          "All right.  And on Page 3 of your fact
22          sheet you mention that you've been doing this
23          work since 1969, since you graduated high school.
24          I assume, but please correct me if I'm wrong,
25          you've been doing bits and pieces your whole life

Page 429

1    and just a full-time job when you graduated.
2          ANSWER:  That's why I put that there.  When
3    I was out of school my occupation was more or
4    less as a farmer then, yes."
5          Did I read that correctly?
6        A.  Yes.
7        Q.  Okay.  So Mr. Ashelman's been farming since
8    1969, right?
9        A.  More or less, as he said.
10       Q.  Right, right.  You don't know of any other
11   jobs he held from 1969 until he went to work for
12   PennDOT, right?
13       A.  No.
14       Q.  Okay.  Farming since 1969.  Roundup wasn't
15   introduced to the market until 1974, right?
16       A.  Correct.
17       Q.  Okay.  There was an increased risk of NHL in
18   farmers, like Mr. Ashelman, that preceded the
19   introduction of Roundup to the market, right?
20          MR. TRAVERS:  Objection.  Asked and
21   answered.
22       A.  Yes.
23       Q.  Okay.
24       A.  Prior answer.
25       Q.  Are you going to compare Mr. Ashelman to any

30 (Pages 426 to 429)

William Sawyer, Ph.D.

Page 430

1    operators in the UK POEM model as far as a generic
2    applicator in the UK POEM model and say Mr. Ashelman
3    is like them?
4        A.   I'm not going to prepare the calculation, if
5    that's what you're asking.
6        Q.   No, I'm asking the same question I asked
7    about the other two plaintiffs today.  Are you going
8    to compare them -- are you going to compare
9    Mr. Ashelman to a generic applicator and say he is
10   like this applicator at trial?
11       A.   Possibly to the Spanish model.
12       Q.   Okay, the Spanish model.  You've referred to
13   the Spanish model a few times.  So I think I need to
14   ask you, what study specifically are you referring
15   to when you talk about the Spanish model for tractor
16   applicators?
17       A.   It's in my report, about three-quarters of
18   the way through.
19       Q.   Okay.  Can you find it for me, please?
20       A.   I didn't print the entire report.
21       Q.   It's previously marked, sir.  I think it's
22   in that stack there.
23            MR. TRAVERS:  How much time do we have on
24       the record?
25            MR. KALAS:  I've got a count, but...

Page 431

1            THE VIDEOGRAPHER:  Let's see.  I've got two
2    hours and 44 minutes.
3        A.   It's in a box.
4        Q.   Okay.
5        A.   And I have a quote from the document
6    referring to the dermal absorption I think blowing
7    the risk assessment.
8        Q.   Okay.  So that is about the TNO study, if I
9    recall correctly, sir, which is a -- are you
10   referring to Page 104 where they discuss the Spanish
11   authorities in your Ashelman report?  It could also
12   be Page 107.
13       A.   I think it's Item C.
14       Q.   Which page, sir?
15       A.   Referring to the document, Christopher
16   Gustin.
17       Q.   Okay.  So this is about the Wester study,
18   right?
19       A.   Yes; but the assessment that Spain used
20   includes a tractor boom enclosed cab example.
21       Q.   Okay.
22       A.   Which was actually hovering around the AOEL
23   level.
24       Q.   So it's your testimony that if I look at
25   this E-mail chain I will see the Spanish

Page 432

1    calculations, right?
2        A.   Well, better yet, I think I've referenced it
3    in the -- in the list of documents.
4        Q.   Right.  And it would be very helpful if you
5    could show me what document that is.
6        A.   I think it's a MON document.
7        Q.   Okay.  So I need to go through the list of
8    MONGLY documents, which aren't called out in any way
9    beyond MONGLY, and I'll find it in there, right?
10       A.   Yes.
11       Q.   Okay.  Let's move on then.
12       A.   It could be -- it could be number -- it
13   could be the document No. 231.
14       Q.   231, okay.
15       A.   Monsanto document operator exposure
16   assessment for MON 2 on 3-9 UK case.  That's
17   possible.
18       Q.   Okay.  So that wouldn't be Spanish, that
19   would be UK.
20       A.   Possible, yeah.
21       Q.   Okay.
22       A.   Yeah.
23       Q.   Okay.  Now, glyphosate labels, including the
24   labels -- I'll show you.  Let's look at the label
25   Mr. Ashelman used.  Mr. Ashelman talked about using

Page 433

1    WeatherMAX, right?
2        A.   Yes.
3        Q.   Okay.  And he also -- so I'm going to mark
4    as Exhibit 40 the label to WeatherMAX.
5            (Sawyer Exhibit 40 was marked for
6    identification.)
7        Q.   And you see this label at the top is from
8    2002?
9        A.   Yes.
10       Q.   Okay.  And I know you criticized me last
11   time that I was using labels from the back end.
12   This would have been from the front end of his use,
13   right?
14       A.   Yes.
15       Q.   Okay.  And you see in the left-hand column
16   for Roundup WeatherMAX, it says near -- a little bit
17   above 1.0, "Read the entire label before using this
18   product," right?
19       A.   "Read the limited warranty."
20       Q.   Okay.  Above that.
21       A.   "Read the entire label," yes.
22       Q.   Okay.  And then if you go to 3.1, it says,
23   "Avoid contact with eyes, skin or clothing.  Avoid
24   breathing vapor or spray mist," right?
25       A.   Yes.

31 (Pages 430 to 433)

William Sawyer, Ph.D.

Page 434

1    Q.   Okay.  And if an applicator followed those
2  instructions they would reduce their exposure,
3  right?
4    A.   Yes.
5    Q.   Okay.  Going to Personal Protective
6  Equipment, it says, "Applicators and other handlers
7  must wear a long-sleeved shirt, long pants, shoes,
8  socks, chemical resistant gloves, EPA chemical
9  resistance Category A, 8 mls in thickness or
10  greater, composed of material such as butyl rubber,
11  natural rubber, neoprene rubber or nitrile rubber."
12    Did I read that correctly?
13    A.   Yes.
14    Q.   And if an applicator followed that
15  instruction they would reduce their exposure, right?
16    A.   Yes.
17    Q.   Moving on, it says, "Follow manufacturer's
18  instructions for cleaning/maintaining PPE.  If no
19  such instructions for washables, use detergent and
20  hot water, keep and wash PPE separately from other
21  laundry."
22    Did I read that correctly?
23    A.   Yes.
24    Q.   If an applicator followed that instruction
25  that would reduce their exposure, right?

Page 435

1    MR. TRAVERS:  Objection.  Form.
2    A.   Yes.
3    Q.   Okay.  Moving to user safety
4  recommendations, in that box there, it says, "User
5  should wash hands before eating, drinking, chewing
6  gum, using tobacco or using the toilet."
7    Did I read that correctly?
8    A.   Yes.
9    Q.   Okay.  You agree that somebody following
10  that instruction would reduce their exposure, right?
11    A.   Yes.
12    Q.   Okay.  And it says, in the next bullet,
13  "Remove clothing immediately if pesticide gets
14  inside, then wash thoroughly and put on clean
15  clothing."
16    Did I read that instruction correctly?
17    A.   Yes.
18    Q.   And would you agree a user following that
19  instruction would reduce their exposure?
20    A.   Yes; except the warning is, from a
21  toxicological standpoint, incorrect in that it
22  implies that if the clothes -- if the -- it implies
23  that the liquid would have to get inside the
24  clothing.
25    Q.   Okay.

Page 436

1    A.   When, in fact, during normal application
2  processes, 20 percent of the liquid penetrates the
3  fabric without the operator knowing it.
4    Q.   Okay.  But if pesticides got inside the
5  clothing, washing thoroughly and putting on clean
6  clothing would reduce exposure.  True?
7    A.   Yes.  But the problem is it always gets into
8  the clothing.
9    Q.   Okay.
10    A.   Twenty percent always makes it through the
11  cotton jeans.
12    Q.   Let me rephrase the question then.  If the
13  pesticide got through the clothing and the user felt
14  it, okay, in that situation, washing thoroughly and
15  putting on clean clothing would reduce their
16  exposure, right?
17    MR. TRAVERS:  Objection.
18    A.   Right.  And, on the inverse, if the operator
19  wasn't aware of the penetration, that operator could
20  go on wearing those pants day after day.
21    Q.   Well, that wouldn't be correct because they
22  are supposed to clean and maintain their PPE, and if
23  no instructions are present for PPE, they're
24  supposed to wash it separately from other laundry,
25  right, using detergent and hot water.

Page 437

1    A.   Yes; but there's no instruction to take your
2  pants off after you're done and wash them.
3    Q.   Okay.
4    A.   Only if they are visibly wet with pesticide
5  inside.
6    Q.   Okay.  Well, we'll let the label speak for
7  itself.
8    Let me ask you this:  I'm going to -- I have
9  a few more minutes here.  I want to ask you a
10  chemistry question.  Can you put on your chemistry
11  hat for me?
12    A.   Okay.
13    Q.   Have you ever heard of an organophosphonate?
14    A.   Yes.
15    Q.   Okay.  And an organophosphonate is different
16  than an organophosphate, correct?
17    A.   That's correct.
18    Q.   Okay.  An organophosphate -- in an
19  organophosphate, the phosphorus atom is only
20  attached to oxygen atoms.  True?
21    A.   Yes.
22    Q.   Okay.  Hence the term organophosphate,
23  right?
24    A.   Right.
25    Q.   Okay.  Meanwhile, an organophosphonate

32 (Pages 434 to 437)

William Sawyer, Ph.D.

Page 438

1   attaches the phosphorus atom to a carbon atom,
2   right?
3       A.  Yes.
4       Q.  Okay.  And which of those two things,
5   organophosphate or organophosphonate is glyphosate?
6       A.  Well, glyphosate's an organophosphonate.
7       Q.  Phosphonate, okay.
8       A.  Yeah.
9       Q.  And it's true that the carbon-phosphorus
10  bond in an organophosphonate is not as easily broken
11  as the oxygen-phosphorus bond in an organophosphate,
12  right?
13          MR. TRAVERS:  Objection to form.
14      A.  That's true.
15      Q.  Okay.  And because that bond is not as
16  easily broken, it makes interference with
17  cholinesterase tougher to achieve, right?
18      A.  Yes.  However, I presented at one of the
19  depositions some new studies that do demonstrate
20  inhibition of cholinesterase by the phosphonate
21  glyphosate.
22      Q.  Organophosphonate.
23      A.  Yeah.
24      Q.  Yeah.
25          But -- but just so the record's clear, I

Page 439

1   understand that you have some studies that suggest
2   cholinesterase inhibition or interference, but it is
3   true, I am correct, that because the carbon is
4   attached to the phosphorus, as opposed to an oxygen
5   being attached to the phosphorus, interference with
6   cholinesterase is harder to achieve, right?
7       A.  Yes.
8       Q.  Okay.  And it's true that there are
9   guideline studies carried out by Monsanto in rats
10  and dogs for the EPA that set forth that glyphosate
11  does not interfere with cholinesterase in those
12  models.
13          MR. TRAVERS:  Objection.  Form.
14      A.  I'd have to review the protocol because
15  there are clear studies that do show, in animal
16  studies, interference and inhibition of
17  cholinesterase by glyphosate.
18      Q.  Do you know if you've reviewed the EPA OECD
19  guideline studies on cholinesterase interference
20  with glyphosate?
21      A.  I have not, and I just stated, I would need
22  to review the protocols to --
23      Q.  Okay.
24      A.  -- answer your question more thoroughly.
25      Q.  Is glyphosate listed as an organophosphate

Page 440

1   by the USA EPA in the Federal Register?
2       A.  No, it's not an organophosphate.
3           MR. KALAS:  Okay.  I'm going to reserve my
4       time for any followup, and I'll try to get the
5       answer also to your question about duration in
6       the Bleeke study while Jeff's asking questions.
7           MR. TRAVERS:  Okay.  I'll be quick here.
8                  CROSS-EXAMINATION
9   BY MR. TRAVERS:
10      Q.  Let's go to the U.S. Forest Service
11  document.
12      A.  Do you remember what number it was?  What's
13  it look like?  Oh, yeah, yeah.  Okay.  I think I can
14  find that.  Okay.
15      Q.  And I'd like to go back to Page 3-26, the
16  last paragraph.
17      A.  Yeah.
18      Q.  And the first sentence states that these
19  estimated doses should be regarded as crude
20  approximations at best.
21          Did I read that correctly?
22      A.  Yes.
23      Q.  And do you agree with that?
24          MR. KALAS:  Objection.  Calls for
25      speculation.

Page 441

1       A.  I agree they are very crude and incorrect
2   with respect to the use of flux, and an
3   inappropriately low surface area of 5,300
4   centimeters squared is inconsistent with the general
5   literature of glyphosate exposure.
6       Q.  And that conclusion by the forest service is
7   in relation to the numbers that were read earlier in
8   this deposition by counsel for Monsanto, correct?
9           MR. KALAS:  Objection to form.
10      A.  Correct.
11      Q.  All right.  Then let's see.  I've just got
12  one more.
13          For the McDuffie study, which looked at the
14  use of glyphosate for greater than two days per
15  year, they did not -- they did not -- in the
16  McDuffie study the authors did not use the eight
17  hours -- an eight-hour exposure day in their
18  definition of days, did they?
19          MR. KALAS:  Objection to form.
20      A.  It is correct that they did not define an
21  exposure day as an eight-hour workday, as did
22  Eriksson.  Thus, to be conservative, I've treated it
23  that way.  However, if we used the study as written
24  and did not require the conversion to an eight-hour
25  day, then Mr. Stauffenberg would have exceeded the

33 (Pages 438 to 441)

William Sawyer, Ph.D.

Page 442

1    10-day measurement criteria in the McDuffie study.
2        Q.   And it would have exceeded the greater than
3    two days per year criteria --
4            MR. KALAS:  Objection.
5        Q.   -- in McDuffie as well?
6            MR. KALAS:  Objection.
7        A.   As well, yes.
8            MR. KALAS:  Objection to form.
9            MR. TRAVERS:  Those are all the questions
10   I've got.
11           REDIRECT-EXAMINATION
12   BY MR. KALAS:
13       Q.   Okay.  Two questions I forgot to ask, and
14   one followup here on -- on the Spanish applicator
15   study.  Let's start with the Spanish applicator
16   study, if you can go back to the Bleeke study, sir.
17   It's one of the many thick documents in front of
18   you.
19       A.   Yeah.
20       Q.   I think it's that one.
21       A.   Yeah, this is it.
22       Q.   Okay.
23           MR. TRAVERS:  I'm going to object.  Outside
24   the scope of --
25       Q.   He asked for a clarification.  I'm just

Page 443

1    trying to clean it up.  That's fine.  You can
2    object.
3            Go to Page 14 of 538.  443 is the Bates.
4        A.   Okay.
5        Q.   Okay.  Do you see that in the urine sample
6    collection section, 3.4.6.1.
7        A.   Yes.
8        Q.   It states, in the fourth line, middle of
9    that line, "Urine collection started CA 24 hours,
10   day negative one before handling of the test item,
11   continued on the day of application, and for three
12   days following application.
13           Did I read that correctly?
14       A.   Yes.
15       Q.   Okay.  And there are studies that show that
16   the half-life in the human body of glyphosate is
17   between five to 10 hours after dermal absorption,
18   right?
19           MR. TRAVERS:  Objection to form.
20       A.   There are.  But there are studies that do
21   show elimination still occurring up to two or three
22   days.
23       Q.   Right.  And this followed them up to three
24   days after, right?
25       A.   It did.

Page 444

1        Q.   Okay.  Two more questions.
2            You have not conducted any site inspections
3    of the five plaintiffs in this case.  Do you intend
4    to do any site inspections?
5        A.   No.
6            MR. TRAVERS:  Objection.  Outside the scope
7    of cross, or redirect.
8        Q.   And then finally -- well, strike that.
9            MR. KALAS:  I don't have any more questions,
10   unless you do, Jeff.
11           MR. TRAVERS:  I've just got a quick
12   question.
13           RECROSS-EXAMINATION
14   BY MR. TRAVERS:
15       Q.   And the Bleeke study, that's a study
16   referenced in your report; is that correct?
17       A.   It is.
18       Q.   And your opinion's based on the totality of
19   the evidence, correct?
20           MR. KALAS:  Objection to form.
21       Q.   Not just one study?
22       A.   That's correct.
23           MR. KALAS:  Same objection.
24       Q.   And -- one more.
25           Anything you've heard over the last two days

Page 445

1    of deposition changed your opinion that the exposure
2    to glyphosate for all five plaintiffs was sufficient
3    to cause their Non-Hodgkin's Lymphoma?
4            MR. KALAS:  Objection to form.
5        A.   No, no changes in opinion.
6        Q.   Okay.
7            MR. TRAVERS:  That's all.
8            MR. KALAS:  Again, I noted this on the first
9    part of the depo, but we're just going to mark
10   this as confidential.
11           MR. TRAVERS:  Very good.
12           MR. KALAS:  Yeah.
13           THE VIDEOGRAPHER:  Okay.  This concludes the
14   deposition.  The time is 11:20 a.m.
15           MR. KALAS:  Oh, wait.  Before we go off,
16   John, did you have any questions?
17           MR. COWLING:  No, I don't.
18           MR. KALAS:  Okay.  Sorry.
19           THE VIDEOGRAPHER:  Okay.  All right.  We're
20   off the record at 11:21.
21           MR. COWLING:  I'll take an Etran and the
22   exhibits.
23           (Whereupon, the deposition concluded at
24   11:21 a.m.)
25

34 (Pages 442 to 445)

William Sawyer, Ph.D.

## Page 446

```
 1          C E R T I F I C A T E
 2       I, TRINA B  WELLSLAGER, Registered
 3    Professional Reporter, Certified Realtime Reporter,
 4    and Notary Public, do hereby certify that, pursuant
 5    to notice, the deposition of WILLIAM SAWYER, PH D ,
 6    was duly taken on 11/12/19 at 8 09 a m  before me
 7       The said WILLIAM SAWYER, PH D , was duly
 8    sworn by me according to law to tell the truth, the
 9    whole truth and nothing but the truth and thereupon
10    did testify as set forth in the above transcript of
11    testimony  The testimony was taken down
12    stenographically by me   I do further certify that
13    the above deposition is full, complete, and a true
14    record of all the testimony given by the said
15    witness, and that a review of the transcript was
16    requested
17
18    _____
19    Trina B  Wellslager, RPR, CRR
20    (The foregoing certification of this transcript does
21    not apply to any reproduction of the same by any
22    means, unless under the direct control and/or
23    supervision of the certifying reporter )
24
25
```

## Page 448

```
 1          ------
 2          E R R A T A
 3          ------
 4    PAGE  LINE  CHANGE
 5    ____  ____  _____
 6    REASON: _____
 7    ____  ____  _____
 8    REASON: _____
 9    ____  ____  _____
10    REASON: _____
11    ____  ____  _____
12    REASON: _____
13    ____  ____  _____
14    REASON: _____
15    ____  ____  _____
16    REASON: _____
17    ____  ____  _____
18    REASON: _____
19    ____  ____  _____
20    REASON: _____
21    ____  ____  _____
22    REASON: _____
23    ____  ____  _____
24    REASON: _____
25
```

## Page 447

```
 1       INSTRUCTIONS TO WITNESS
 2
 3
 4       Please read your deposition over carefully
 5    and make any necessary corrections.  You should
 6    state the reason in the appropriate space on the
 7    errata sheet for any corrections that are made.
 8
 9       After doing so, please sign the errata sheet
10    and date it.  It will be attached to your
11    deposition.
12
13       It is imperative that you return the
14    original errata sheet to the deposing attorney
15    within thirty (30) days of receipt of the deposition
16    transcript by you.  If you fail to do so, the
17    deposition transcript may be deemed to be accurate
18    and may be used in court.
19
20
21
22
23
24
25
```

## Page 449

```
 1       ACKNOWLEDGMENT OF DEPONENT
 2
 3       I, WILLIAM SAWYER, PH D , do hereby
 4    acknowledge that I have read the foregoing pages,
 5    313 through 449, and that the same is a correct
 6    transcription of the answers given by me to the
 7    questions therein propounded, except for the
 8    corrections or changes in form or substance, if any,
 9    noted in the attached Errata Sheet
10
11
12    _____  _____
13    WILLIAM SAWYER, PH D              DATE
14
15
16
17
18    Subscribed and sworn to before me this
19    _____ day of _____, 20___
20    My Commission expires: _____
21
22    _____
23    Notary Public
24
25
```

35 (Pages 446 to 449)

William Sawyer, Ph.D.

Page 450

```
 1
 2                LAWYER'S NOTES
 3    PAGE  LINE
 4    ____ ____ _____
 5    ____ ____ _____
 6    ____ ____ _____
 7    ____ ____ _____
 8    ____ ____ _____
 9    ____ ____ _____
10    ____ ____ _____
11    ____ ____ _____
12    ____ ____ _____
13    ____ ____ _____
14    ____ ____ _____
15    ____ ____ _____
16    ____ ____ _____
17    ____ ____ _____
18    ____ ____ _____
19    ____ ____ _____
20    ____ ____ _____
21    ____ ____ _____
22    ____ ____ _____
23    ____ ____ _____
24    ____ ____ _____
25
```

36 (Page 450)