# EXHIBIT 23

Confidential - William Sawyer, Ph.D.

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE:  ROUNDUP PRODUCTS          MDL No. 2741
LIABILITY LITIGATION             CASE NO. 3:16-md-02741-VC
_____

This document relates to:

Russo v. Monsanto Co., et al.
Case No. 3:16-cv-06024

Perkins v. Monsanto Co., et al.
Case No. 3:16-cv-06025


_____




CONFIDENTIAL

VIDEOTAPED DEPOSITION OF WILLIAM SAWYER, PH.D.


DATE TAKEN:        Tuesday, October 22, 2019

TIME TAKEN:        8:08 a.m. to 12:12 p.m.

PLACE TAKEN:       South Seas Island Resort
                   5400 Plantation Road

                   Captiva Island, Florida



ON BEHALF OF:      The Defendant



REPORTER:          Theresa Schiff, RPR/CRR/FPR

                   Court Reporter and Notary Public

                   State of Florida

_____

Confidential - William Sawyer, Ph.D.

## Page 2

1  APPEARANCES:
2
   For the Plaintiff(s):
3
   ANDRUS WAGSTAFF, PC
4  7171 West Alaska Drive
   Lakewood, CO  80226
5
   By:  David J. Wool, Esquire
6  davidj.wool@gmail.com
7
8  For the Defendant(s):
9  HOLLINGSWORTH LLP
   1350 I Street
10 Washington, DC  20005
11 By:  John M. Kalas, Esquire
   jkalas@hollingsworthllp.com
12
13 ALSO PRESENT:  Matthew Allison, videographer
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1         I N D E X
2  ATTORNEY    DIRECT   CROSS   REDIRECT  RECROSS
3  MR KALAS          4         157
   MR WOOL                  150
4
5
       E X H I B I T S
6
7  NUMBER         DESCRIPTION    PAGE IDENTIFIED
8  Exhibit 1  Dr Sawyer's report          5
   Exhibit 2  Additional materials considered    9
9  Exhibit 3  10/21/19 letter to Andrus Wagstaff   10
   Exhibit 4  Franke study             13
10 Exhibit 5  World Health Organization document   20
   Exhibit 6  Expert disclosure         21
11 Exhibit 7  Notice of deposition       25
   Exhibit 8  Responses to notice of deposition  25
12 Exhibit 9  List of trial testimony    26
   Exhibit 10 National Cancer Institute chart   35
13 Exhibit 11 Copy of Russo deposition    98
   Exhibit 12 Photograph             110
14 Exhibit 13 Roundup label          114
   Exhibit 14 Andreotti Agricultural Health study  136
15 Exhibit 15 Johnson study           142
16
17
18
19
20
21
22
23
24
25

## Page 4

1      VIDEOGRAPHER:  Good morning.  We are now on the
2  record.  My name is Matthew Allison.  I am a
3  videographer for Golkow Litigation Services.
4  Today's date is October 22nd and the time is
5  8:08 a.m.
6      The video deposition -- this video deposition
7  is being held in Captiva, Florida, in the matter of
8  Matteo Anthony Russo v. Monsanto Company.  Taken for
9  the United States District Court, Northern District
10 of California.  Will all counsel please identify
11 themselves for the record?
12     MR. WOOL:  David Wool for the plaintiff, Mr.
13 Russo.
14     MR. KALAS:  John Kalas for the defendant,
15 Monsanto.
16     VIDEOGRAPHER:  And will the court reporter
17 please swear in the witness?
18 Thereupon,
19     WILLIAM SAWYER, PH.D ,
20 a witness herein, called by Counsel for Defendant,
21 having been duly sworn by the court reporter, testified
22 as follows:
23     THE WITNESS:  Yes, I do.
24           DIRECT EXAMINATION
25 BY MR. KALAS:

## Page 5

1  Q.  Good morning, Dr. Sawyer.
2  A.  Morning.
3  Q.  You have an iPad in front of you today, right?
4  A.  Yes.
5  Q.  Okay.  And you're going to be using that iPad
6  to refer to your expert report, correct?
7  A.  Correct.
8  Q.  Okay.  I'm going to mark as Exhibit 1 your
9  report just so we have a hard copy of it for the record.
10 A.  Certainly.
11     MR. WOOL:  And I have a copy.
12 BY MR. KALAS:
13 Q.  Dr. Sawyer, does this appear to be a true and
14 correct copy of your report that was served on
15 October 4th, 2019, in the Russo and Perkins cases?
16 A.  Yes.
17 Q.  Okay.  Thank you, sir.  And you can place that
18 aside since you're working off the iPad.  Just so the
19 record's clear, the only document you'll be referring to
20 on that iPad is your report, correct?
21 A.  Yes, that's the only thing that's on there.
22 Q.  Okay.  Now, the heading of this report says
23 Matteo Anthony Russo v. Monsanto Company and Goldie
24 Perkins v. Monsanto Company; do you see that?
25 A.  I do.

Confidential - William Sawyer, Ph.D.

Page 6

1    Q. Okay. Do you understand what a case specific
2    opinion is, sir?
3    A. Yes.
4    Q. Okay. Are you offering a case specific opinion
5    regarding Ms. Perkins in the Perkins v. Monsanto case?
6    A. No. However, if I was asked hypotheticals, for
7    example, if you ask me a female of a certain age, a
8    certain body weight, certain work characteristics that
9    were described in great detail and so on, I could answer
10   questions of that sort, but I'm not offering specific
11   opinions regarding Goldie Perkins.
12   Q. Okay. So let me make sure this is clear for
13   the record. Do you know anything about Ms. Perkins
14   other than the fact that she's a plaintiff in these
15   suits?
16   A. I have -- I have not assessed her file, no.
17   Q. Okay. Do you know how she applied Roundup?
18   A. Vaguely, but not to the degree I would speak
19   on.
20   Q. Okay. So not to the degree to offer an expert
21   opinion?
22   A. That's correct.
23   Q. Okay. Do you know what Goldie Perkins'
24   co-exposures were as far as other chemicals she was
25   exposed to?

Page 7

1    A. No, I did not make that assessment.
2    Q. Do you know where Goldie Perkins lived?
3    A. Not exactly.
4    Q. Okay. Do you know where she applied Roundup?
5    A. Vaguely.
6    Q. Do you know what she wore when she applied
7    Roundup?
8    A. No. I'm not going to attempt to answer those
9    types of questions regarding Goldie Perkins.
10   Q. Okay.
11       MR. WOOL: And we can stip -- I mean, he's not
12   offering a case specific opinion on Ms. Perkins.
13   BY MR. KALAS:
14   Q. Okay. And so you will not offer an opinion
15   regarding the dose that Ms. Perkins received of Roundup
16   either in days per year or milligrams per kilogram,
17   correct?
18   A. That's correct.
19   Q. Okay. Why didn't you submit a case specific
20   report for Ms. Perkins, if you can answer without
21   disclosing communications with counsel?
22       MR. WOOL: I'm just going to object insofar as
23   this sort of gets into the legal strategy and -- but
24   if you can answer without talking about anything
25   that we discussed.

Page 8

1        THE WITNESS: I simply wasn't asked to.
2    BY MR. KALAS:
3    Q. Okay. Thank you. Now, as to Mr. Russo, are
4    all the opinions you intend to offer regarding Mr. Russo
5    contained in the report I'm looking at here that's
6    Exhibit 1?
7    A. Yes, and additionally, I think I sent about
8    nine additional studies yesterday.
9    Q. Okay. So last night -- what you're referring
10   to is a -- two documents counsel served that contained
11   an updated addendum to your report and additional
12   materials for your report; is that what you're referring
13   to?
14   A. Yes. I hope it wasn't last night because I
15   submitted that yesterday, early afternoon.
16   Q. Okay. I guess 5:00 p.m. So that's sort of
17   a -- you know, right? It could be night, could be
18   afternoon, depends how you cut it; but whatever the case
19   may be, that's what you're referring to, correct?
20   A. Yes.
21   Q. Okay. I'm going to mark those documents as
22   Exhibit 2 and 3.
23       MR. KALAS: David, I only have two copies.
24       MR. WOOL: That's fine.
25   BY MR. KALAS:

Page 9

1    Q. Okay. So let's start with Exhibit 2 first,
2    which is the revised or the additional materials
3    considered, okay?
4    A. Yes.
5    Q. Okay. I want to walk through each of these and
6    ask you a few questions about them. Starting with
7    number one, Bonassi, when did you first review the
8    Bonassi study?
9    A. Within the last two days.
10   Q. Within the last two days?
11   A. Yeah.
12   Q. Did you find the Bonassi study yourself or was
13   the Bonassi study sent to you?
14   A. No, I actually found that as a footnote
15   reference in the study by Prasad, et al.
16   Q. Prasad, et al. Okay. And that's number seven
17   on this list, right?
18   A. Yes.
19   Q. Okay. So we'll get to that. Is the Bonassi
20   study dated after October 4th, 2019; in other words, was
21   it published after October 4, 2019?
22   A. No.
23   Q. Okay. And how are you using the Bonassi study
24   to support your opinions in this case?
25       MR. WOOL: Objection to form. Vague.

3 (Pages 6 to 9)

Confidential - William Sawyer, Ph.D.

Page 10

1  BY MR. KALAS:
2      Q.  Okay.  Well, let me rephrase it then.  What are
3  you relying on the Bonassi study for?
4          MR. WOOL:  The same objection.
5          THE WITNESS:  Simply as stated in Exhibit 2.
6  BY MR. KALAS:
7      Q.  You mean Exhibit 3?
8      A.  Yes, Exhibit 3.  Footnote two in the text which
9  is in the one, two, three, four, fifth paragraph.
10     Q.  Okay.  So you are including the Bonassi as a
11 citation to the quote you have here because the Prasad
12 authors cited it, correct?
13     A.  Well, it's generally accepted in the field of
14 toxicology and I've referenced two studies, Bonassi as
15 well as the Hagmar study with respect to chromosomal
16 aberrations.  These aberrations and lymphocytes do
17 statistically significantly correlate with increased
18 risk of human malignancies that's consistent with other
19 studies.  It's coherent based upon studies of different
20 designs and animals and is statistically significant.
21     Q.  Okay.  And that was an opinion that -- well,
22 strike that.
23         Second article on No. 2, Franke, okay, when did
24 you first review the Franke paper, not even sure if it's
25 a study from the citation, but...

Page 11

1      A.  Reference number what?
2      Q.  Two, sir.  Franke.
3      A.  It's detailed on page 83 of my report.
4      Q.  Okay.  Let's go to page 83 of your report.  And
5  you're referring to Exhibit 1 here, sir?
6      A.  Yes.
7      Q.  Okay.  So I'm looking at Exhibit 1, and I do
8  not see the Franke study discussed on page 83 of the
9  report, sir.
10     A.  Maybe we're speaking of two different things.
11 I was looking at the wrong list.  I'm sorry.
12     Q.  Can you work off Exhibit 2, please?
13     A.  Yeah, yeah.  I was looking at something else.
14     Q.  Okay.
15     A.  Okay.  Here we go.  Okay.  That's the knapsack
16 sprayer.
17     Q.  Okay.  So let me ask the question now that
18 we're singing from the same songbook.
19         When did you first review the Franke study or
20 paper?
21     A.  This past Saturday.
22     Q.  This past Saturday.  Okay.  And did you find
23 the Franke study or was it sent to you?
24     A.  I found it as a search looking at -- what I was
25 actually looking for was standard generally accepted

Page 12

1  methodology for assessment of dermal exposure when
2  backpack spraying.  And that is what dress is
3  generally -- and recommended as the standard for
4  pesticide application as well as what the -- what we
5  call the PDE, potential dermal exposure, values are on
6  various parts of the body.
7      Q.  And was the Franke study or paper dated after
8  October 4th, 2019?
9      A.  No.
10     Q.  Okay.  Like the Bonassi study, the Franke study
11 is a study that you found during your research --
12 well, strike that.
13         Let me ask you this.  The Franke study does not
14 appear to have been published in a journal.  Where did
15 you find it?  Is there a website?  Where can we find it,
16 or do you have a copy with you that we could mark today?
17     A.  Oh, we can mark a copy.
18     Q.  Okay.  Is that part of your file you brought
19 today?
20     A.  This is my entire file.
21     Q.  Okay.  Are you comfortable with us marking that
22 today as Exhibit 4 and making copy and bringing it back
23 Friday before your depo?
24         MR. WOOL:  Let me just make an objection.  I
25 mean, I don't know whether it's a journal or not,

Page 13

1  but it seems like Plant Research International could
2  very well be a journal.
3          MR. KALAS:  I looked for it, so that's why I
4  want a copy.
5  BY MR. KALAS:
6      Q.  Are you comfortable with us marking your file
7  today?
8      A.  Yes.
9      Q.  Okay.  So we'll mark your file as Exhibit 4, if
10 you can keep it altogether and then --
11     A.  Well, yeah, I thought you meant this document.
12     Q.  Okay.
13     A.  The file itself?
14     Q.  Yes, sir.
15     A.  I'd rather hang on to it because I have another
16 deposition Friday.
17     Q.  Okay.  So we'll look through the file at a
18 break and see if there's anything in particular I need
19 to mark out of it.
20     A.  That would be better, yeah.
21     Q.  Okay.  I'm going to mark Franke as Exhibit 4
22 for now though, if that's okay?
23     A.  Certainly.
24     Q.  Okay.  Go to -- I think you explained how
25 Franke was affecting your opinion, right, had to do with

4 (Pages 10 to 13)

Confidential - William Sawyer, Ph.D.

Page 14

1 deposition patterns of knapsack sprayers when spraying?
2 A. Yes, as well as the generally accepted PPE,
3 personal protective equipment, that is worn during the
4 application of pesticides.
5 Q. Okay. Let's go to number five -- or excuse me,
6 number three, Hagmar. When did you first review the
7 Hagmar study?
8 A. In the last couple of days.
9 Q. Okay. And did you find the Hagmar study or did
10 somebody send it to you?
11 A. No, I found that as a footnote reference within
12 the --
13 Q. Prasad?
14 A. Prasad study, yes.
15 Q. Okay. And was the Hagmar study dated after
16 October 4th, 2019?
17 A. No.
18 Q. Okay. And are you using the Hagmar study in
19 the same way you're using the Bonassi study?
20 A. Yes.
21 Q. Number four, Holmgaard. When did you first
22 review the Holmgaard paper?
23 A. I think late last week.
24 Q. Late last week. Now, you realize the Holmgaard
25 paper, sir, has been on the materials considered list of

Page 15

1 experts for Monsanto in glyphosate litigation for over a
2 year. Were you aware of that?
3 A. No, I wasn't. This was sent to me by one of
4 the attorneys involved in the litigation.
5 Q. Okay. So the attorney sent it to you after
6 October 4th, 2019?
7 A. That's right.
8 Q. Okay. And the study was published before
9 October 4th, 2019, right?
10 A. Yes.
11 Q. Okay. And how are you using the Holmgaard
12 study?
13 MR. WOOL: I'm just going to object to the
14 form.
15 THE WITNESS: With respect to primary
16 characteristics that damaged skin increases the
17 penetration rate of glyphosate through the dermal
18 skin barrier by a factor of 25 fold increase, and as
19 well as the fact that SLS, that's sodium lauryl
20 sulfate, which is in almost every soap and shampoo
21 produced, enhances the dermal absorption of
22 glyphosate.
23 BY MR. KALAS:
24 Q. Okay. Let's go to number five, Kladt, which is
25 a -- number five, are you there, sir?

Page 16

1 A. Yes.
2 Q. Okay. When did you first review number five?
3 A. I would have to estimate within a week after --
4 well, not even a week. Shortly after I received the
5 deposition of Dr. LeBeau, that's L-E-B-E-A-U, I believe.
6 Q. Yep.
7 A. Which would have been --
8 Q. Do you mean the report of Dr. LeBeau?
9 A. Yeah, the report.
10 Q. Okay.
11 A. I'm sorry. Yeah. And I reviewed that report
12 around the time of my last deposition. I know I had not
13 thoroughly reviewed it at the time of my deposition but
14 I had at least looked at it, so somewhere in plus or
15 minus the time of my last deposition, which I can tell
16 you what date that was.
17 Q. September 15th.
18 A. September 15th is correct.
19 Q. Did you find number five or was it sent to you?
20 A. No, that's a study that I found in my
21 assessment of the permeability coefficient known as
22 flux.
23 Q. And is number five, Kladt, dated after
24 October 4th, 2019?
25 A. No.

Page 17

1 Q. Okay. And how are you using it in supporting
2 your opinion?
3 MR. WOOL: Object to form.
4 THE WITNESS: In rebuttal of serious errors
5 made by Monsanto's dermal absorption experts.
6 BY MR. KALAS:
7 Q. So this is a rebuttal document to
8 Dr. LeBeau's opinion in Giglio, but it is not -- well,
9 strike that.
10 Okay. Number six, when did you first review
11 number six, Mesnage?
12 A. It's referenced in my report throughout the
13 last several depositions predating the October date.
14 Q. Okay. And this is Mesnage 2012, sir?
15 A. Yes; however, I should explain. It was
16 initially released as accepted in 2012 but the
17 publication date, if you actually look it up it will
18 show 2013, so it's a little confusing. It's the same
19 study but...
20 Q. I understand. So okay. So that was just
21 something cleaning up your materials considered list for
22 your report so that you had the correct citation from
23 2012?
24 A. Yes. But it's -- yes, I mean, I really didn't
25 even need to add it to the list.

Confidential - William Sawyer, Ph.D.

## Page 18

1    Q.  Okay.  All right.  Let's move to number seven
2  Prasad.  Now, we've talked about Prasad a couple times
3  already in the context of Bonassi and Hagmar.  When did
4  you first review Prasad?
5    A.  I would have to estimate about a week ago
6  approximately.
7    Q.  And did you find Prasad yourself or was it sent
8  to you?
9    A.  It was sent to me.
10    Q.  Okay.  By an attorney?
11    A.  Yes.
12    Q.  Okay.  And is Prasad dated after October 4th,
13  2019?
14    A.  No.
15    Q.  Okay.  And how are you using the Prasad paper
16  in support of your opinion?
17      MR. WOOL:  Object to form.
18      THE WITNESS:  As explained in Exhibit 3.
19  BY MR. KALAS:
20    Q.  Okay.  So Exhibit 3 explains how you're using
21  Prasad?
22    A.  It does.
23    Q.  Okay.  And then number eight, if I understand
24  correctly, is essentially a citation to Exhibit 3,
25  right?

## Page 19

1    A.  Yes.
2    Q.  Okay.  And then number nine is a citation to a
3  WHO document, field exposures to pesticides from 1975,
4  correct?
5    A.  Yes.
6    Q.  Okay.  And when did you first review that
7  document?
8    A.  I think approximately Saturday, this past
9  Saturday.
10    Q.  And did you find it yourself or was it sent to
11  you?
12    A.  No, I researched this myself.
13    Q.  Okay.  Is that document dated after
14  October 4th, 2019?
15    A.  No.
16    Q.  Okay.  And how are you using this document in
17  support of your opinions?
18      MR. WOOL:  Object to form.
19      THE WITNESS:  In two ways.  One is in terms of
20  the standard recommendations of personal protective
21  gear for pesticide application.  And, secondly, on
22  page eight, the assessment of measurements in
23  centimeters squared of areas potentially impacted by
24  pesticide drift.
25  BY MR. KALAS:

## Page 20

1    Q.  Okay.  And this is a document from 1975,
2  correct?
3    A.  It is.
4    Q.  And when was glyphosate released to the market?
5    A.  About that same time.
6    Q.  Okay.  I'm going to mark that one as Exhibit 5,
7  if you don't mind, sir?
8    A.  Sure.
9    Q.  Okay.
10      MR. WOOL:  John, if you're moving on to another
11  exhibit, can we actually just take a really quick
12  bathroom break?
13      MR. KALAS:  Can I just state one thing for the
14  record and then we'll move on?
15      MR. WOOL:  Of course.
16      MR. KALAS:  I'm just going to state for the
17  record that these materials were served 15 hours
18  ago, about 17 days after the disclosure deadline.
19  They are all materials that were available before
20  October 4th, 2019, and, therefore, we're going to
21  reserve all potential remedies given this late
22  disclosed and untimely opinion, and with that, I'll
23  go off the record.
24      MR. WOOL:  Okay.
25      VIDEOGRAPHER:  Going off the record at 8:33.

## Page 21

1      (A short break was taken.)
2      VIDEOGRAPHER:  We're back on the record.  The
3  time is 8:38.
4  BY MR. KALAS:
5    Q.  Doctor, I'm going to mark as Exhibit 6 the
6  expert disclosure in this case.  A couple questions
7  about that.  If you go to -- I guess the sixth page of
8  this -- they're not numbered but they're double sided,
9  it's the sixth page.
10    A.  So --
11    Q.  After your name, which is at the bottom of page
12  five, and then the body goes to page six.
13      MR. WOOL:  Do you have another copy by chance?
14      MR. KALAS:  I don't.  Sorry.
15      THE WITNESS:  I have my copy here.  No, I guess
16  I don't actually.
17      MR. KALAS:  Break?
18      MR. WOOL:  Okay.
19  BY MR. KALAS:
20    Q.  Okay.  If you go to line 16 of that, it says
21  your hourly rate is $580; do you see that?
22    A.  Yes.
23    Q.  Is that correct?
24    A.  No.
25    Q.  Okay.  What's your hourly rate?

Confidential - William Sawyer, Ph.D.

Page 22

1    A. 650.
2    Q. Okay. Likewise, if you look from 12 to 14, it
3  states, "In addition, Dr. Sawyer will also testify
4  regarding plaintiff's total exposure to Roundup,
5  including comparability of plaintiff's exposure with the
6  exposure data from applicators in studies on
7  glyphosate-based formulations, and an exposure analysis
8  that Dr. Sawyer performed." Did I read that correctly?
9    A. Yes.
10    Q. And is that what you intend to do as regards to
11  Mr. Russo, perform an exposure analysis?
12    A. Yes.
13    Q. Okay. Thank you.
14        MR. WOOL: If you're done with that, I don't
15  need to see it.
16 BY MR. KALAS:
17    Q. All right. Okay. One other thing, just
18  housekeeping. If you go back to Exhibit 3, I think,
19  that letter is directed in addition to attorneys from
20  the Andrus Wagstaff firm to attorneys from the Miller
21  firm; do you see that?
22    A. Yes.
23    Q. Do you intend to amend or revise all of your
24  reports that you served in the Roundup litigation and
25  the MDL to include this opinion? Well, let me back up.

Page 23

1  Let me strike that question.
2        This opinion that you put into Exhibit 3 is
3  specific to Matteo Russo, right, Matteo Anthony Russo?
4    A. And others.
5    Q. Okay. But you did a calculation in here
6  specific to Mr. Russo, right?
7    A. I did.
8    Q. Okay. So I guess the question is, is
9  Mr. Travers attorney of record in the Russo case to your
10  knowledge?
11    A. I thought so. I could be wrong.
12    Q. Okay.
13    A. I thought he was involved in this.
14    Q. Okay. Putting aside the opinions regarding Mr.
15  Russo, do you intend to serve this supplemental or
16  additional disclosure in all of the cases you've
17  submitted reports in in the MDL?
18    A. Yes.
19    Q. Okay.
20    A. Well, wait a minute. Let me clarify that. Do
21  you mean future cases, reports I'm working on currently
22  or previous reports?
23    Q. So you understand some reports were served on
24  October 4th, right?
25    A. Yes.

Page 24

1    Q. And you understand some reports were served on
2  October 9th, right?
3    A. Well, I'm trying to recall what was MDL and
4  which was non-MDL.
5    Q. Okay. So there are about, I think, five
6  reports you served -- I don't have the list of all of
7  them, but in the Nebraska cases, so that would be
8  Janzen, Domina, Dickey, Pollard, and then I believe you
9  served a report in the Mendoza cases. Those are the
10  five Weitz & Luxenberg cases. Is this intended to be a
11  supplement to those as well?
12    A. Yes.
13    Q. Okay. And then you served a report in the
14  Russo case and this is a supplement to that, right?
15    A. Yes.
16    Q. Okay. And you were served some reports, I
17  believe, in the Hernandez and -- I'm going to forget the
18  other one, Inez Hernandez?
19    A. Harris.
20    Q. Harris cases. And is this report intended to
21  supplement that as well?
22    A. Yes.
23    Q. Okay. Are there any other reports intended to
24  supplement that you're aware of right now that you
25  already served?

Page 25

1    A. Yes.
2    Q. Okay. Which ones?
3    A. Not that have been served yet.
4    Q. Okay.
5        MR. WOOL: And let me just object insofar as he
6  can't be expected to remember every case.
7        MR. KALAS: I understand he's in a lot of
8  cases.
9 BY MR. KALAS:
10    Q. All right. We'll move on now.
11        I'm going to mark as Exhibit 7 your notice of
12  deposition. I only have one copy of this, so I don't
13  even have a copy to work off of. Have you seen this
14  document before?
15    A. I have.
16    Q. Okay. And did you review this document in
17  preparation for your deposition?
18    A. Yes.
19    Q. Okay. I'm going to mark as Exhibit 8 your
20  responses to the notice of deposition. Have you seen
21  this document before?
22    A. I have.
23    Q. Okay. And you included in your responses to
24  the notice of deposition, I believe, some invoices?
25    A. Yes.

7 (Pages 22 to 25)

Confidential - William Sawyer, Ph.D.

## Page 26

1    Q.  Okay.  All right.  The copy I gave you actually
2  may not have those attached.
3        MR. WOOL:  Yeah, my copy does not.
4        THE WITNESS:  This does.
5  BY MR. KALAS:
6    Q.  Okay.  Your copy does.  Okay.  So -- and are
7  those all the invoices you've submitted in this case,
8  the Russo case thus far?
9    A.  Yes.
10    Q.  Did you include any invoices you've submitted
11  in the Perkins case or have you not submitted any in the
12  Perkins case?  That's compound.  Let me break it up.
13    A.  I have not yet.
14    Q.  Okay.  Let me ask it just so the record's
15  clean.  You haven't submitted any invoices in the
16  Perkins case, correct?
17    A.  Correct.
18    Q.  Okay.  Can we go back to your report which is
19  Exhibit 1, and is also on the iPad -- or actually, hold
20  on.  You also provided beyond the invoices Exhibit 9
21  which is a list of trial testimony, correct?
22        MR. WOOL:  I'm just going to object because I
23  think that's deposition and trial testimony.
24  BY MR. KALAS:
25    Q.  Okay.  Let me make it clean then.  You

## Page 27

1  submitted Exhibit 9 which is a list of deposition and
2  trial testimony, your past four years, correct?
3    A.  I did.
4    Q.  Okay.  And is that a full and complete list as
5  far as you're aware?
6    A.  Yes, it's up to date.
7    Q.  Okay.  All right.  So if we go to your report,
8  let's go to pages six to seven, please.  All right.  And
9  at the bottom of page six, top of page seven you state:
10  "Hence, this toxicological assessment has three
11  fundamental objectives.  One, to arrive at a
12  scientifically-reliable exposure dose estimation for
13  Mr. Russo, exposure days and mgs per kg per day, based
14  upon the available objective evidence.  Two, to assess
15  the potential of compounding risk factors contributing
16  to his NHL onset.  And three, to render a scientifically
17  accurate and reliable opinion as to whether his Roundup
18  exposures were sufficiently in range to substantially
19  contribute to his NHL induction and promotion."  Did I
20  read that correctly?
21    A.  Yes.
22    Q.  Is that a fair description of what you set out
23  to do in this case?
24    A.  Yes.
25    Q.  But you weren't starting from scratch, right?

## Page 28

1    A.  No.
2    Q.  Okay.  You're relying here on your previous
3  testimony and opinions in the Roundup litigation, true?
4    A.  Yes.
5    Q.  And you stand by all that testimony under oath,
6  right?
7    A.  Yes.
8    Q.  There's nothing you want to withdraw at this
9  point?
10    A.  No.
11    Q.  There's nothing you want to amend at this
12  point?
13    A.  No.
14    Q.  Okay.  And you stand by your previous reports
15  as well, right?
16    A.  Yes.
17    Q.  Okay.  And like in previous cases, do you
18  intend to defer on certain scientific issues to other
19  experts for the plaintiff?
20    A.  Yes, as per page seven, first full paragraph.
21    Q.  Okay.  You anticipate where I'm going to next.
22  For instance, you'll defer to Dr. Weisenburger and
23  Dr. Nabhan as to whether Mr. Russo's NHL could have been
24  caused either in whole or in part by some genetic issue,
25  true?

## Page 29

1    A.  Yes, and I will state that I have reviewed the
2  records and am not aware of any such factor, but I would
3  prefer to defer to the appropriate oncologist or
4  pathologist who will perform a deeper, more thorough,
5  more aggressive examination than I with respect to those
6  fundamental issues of potential genetic inheritance.
7    Q.  Right.  And to be fair, you are not a medical
8  doctor, right?
9    A.  No.  I'm a toxicologist.  I had training
10  through medical pathology in medical school.
11  Toxicologists have a great deal of knowledge in terms of
12  genetics.  I have a master's degree in molecular
13  biology, so I mean I'm qualified to understand and
14  discuss such matters, but I find that an expert who
15  specializes in medical oncology or pathology would be
16  better equipped than I to make such final
17  determinations.
18    Q.  Better equipped both by the type of work
19  they do every day and by their education and training,
20  true?
21        MR. WOOL:  Objection to form.  Compound.
22        THE WITNESS:  Yes, but as part of performing a
23  thorough and careful analysis, I did look at the
24  medical records, and I didn't see any such
25  information and I didn't see any, but I would

Confidential - William Sawyer, Ph.D.

## Page 30

1   further defer that opinion to the appropriate
2   experts.
3   BY MR. KALAS:
4       Q.  If I asked you at trial, Dr. Sawyer, will you
5   defer the opinion as to the influence of genetics on Mr.
6   Russo's cancer, would you say yes?
7       A.  Yes.
8       Q.  Okay.
9       A.  I just want to qualify that.
10      Q.  Of course.
11      A.  It's important for me to be thorough, otherwise
12  you could turn around and probably would say in front of
13  a jury, so Dr. Sawyer, you didn't bother to look at the
14  medical record, and isn't it true that there is a
15  genetic factor there that could account for this?  And
16  you didn't bother to look at that or tell anyone, so
17  that is why I am being thorough.
18      Q.  Okay.
19      A.  It's not that I'm trying to replace someone
20  else's role in this case, but I try to be careful and
21  thorough, and I just want you to understand that.
22      Q.  Understood.  Okay.  And so what you're going to
23  do in this case, if I understand correctly, is you're
24  going to tell the jury, like you have done in previous
25  cases, both at deposition and at trial, that Mr. Russo's

## Page 31

1   exposure profile matched those individuals in the
2   epidemiology study who -- epidemiology studies who were
3   at a purported higher risk for NHL, correct?
4       A.  Yes, that's accurate.
5       Q.  Okay.  But what you won't tell the jury, if I
6   understand correctly, correct me if I'm wrong, is that
7   you can say Mr. Russo would not have gotten NHL if he
8   had not been exposed to Roundup because you're going to
9   defer the elimination of genetics, at least, as an
10  independent cause of his NHL?
11          MR. WOOL:  Objection to form.
12          THE WITNESS:  That question really needs
13      clarification.
14  BY MR. KALAS:
15      Q.  All right.  Let me break it up.  I'll clarify.
16      A.  Thank you.
17      Q.  What you won't tell the jury, if I understand
18  you correctly, is that you can say to a reasonable
19  degree of scientific certainty that Mr. Russo would not
20  have gotten NHL if he had not been exposed to Roundup.
21  Am I correct that statement won't come out of your
22  mouth?
23      A.  That's correct.

## Page 32

9       Q.  Okay.  And you state that you'll defer on the
10  effect of the smoking to Dr. Ritz, correct?
11      A.  Yes, and the reason for that is, as a
12  toxicologist, obviously I'm capable of discussing the
13  risk of smoking and various malignancies.  And as I
14  stated way back in -- I think it may have been the Hall
15  or Johnson deposition, I am familiar with the study that
16  shows some association with smoking with 40-plus pack
17  years.  I believe that Dr. Ritz, being a medical
18  epidemiologist, would be in a better position to
19  thoroughly examine all of the human epidemiological
20  studies on smoking and arrive at a more accurate opinion
21  than I.
22      Q.  Okay.
23      A.  And if that were my only duty in this case, I
24  could perform that, but it -- you know, there are many
25  aspects to this case that require a toxicology's

## Page 33

1   assessment, and I would prefer to defer to Dr. Ritz who
2   would be able to assess the human epidemiologic
3   literature in greater detail than I at this point.
4       Q.  Okay.  Have you ever spoken to Dr. Ritz?
5       A.  I don't think so.
6       Q.  Okay.  Do you know if she's ever heard of Mr.
7   Russo?
8       A.  I don't know.
9       Q.  Okay.  Do you know if she knows what type of
10  cancer Mr. Russo has?
11      A.  I wouldn't be able to answer that.  I have not
12  reviewed her report in this case, so I can't answer
13  that.
14      Q.  And -- well, strike that.
15      You've actually in previous depositions, the
16  Hall case for instance, been quite candid about the
17  dangers of smoking, haven't you?
18      A.  Certainly.
19      Q.  Okay.  Cigarettes contain dozens of
20  carcinogens, right?
21      A.  Yes.
22      Q.

Confidential - William Sawyer, Ph.D.



**Page 34**

14  Q. Okay. Were there warnings on cigarettes that
15  cigarette smoking could cause cancer in the 1990s?
16  A. Yes.
17  Q. And despite the fact that Mr. Russo testified
18  that he read the label on everything that he used -- do
19  you recall that testimony?
20  A. Yes.
21  Q. Okay.

25  A. Yes.

**Page 35**

1  Q. Okay.

8  Q. Now, there are multiple chemicals that have
9  been associated with NHL in cigarette smoke, correct?
10  A. Yes.
11  Q. Mark as Exhibit 10 a chart from the National
12  Cancer Institute, and this is just to assist our
13  discussion. So if there's any carcinogens present in
14  cigarette smoke according to NCI that you disagree with,
15  please let me know.
16      The title of this table is Carcinogens in
17  Cigarette Smoke. Why don't you take a minute to look
18  over this table and tell me if there's any carcinogens
19  listed here that you disagree are present in cigarette
20  smoke.
21  A. Potentially all of these are.
22  Q. Okay. And I think you've testified before that
23  benzo[a]pyrene is associated with NHL, right?
24  A. Yes.
25

**Page 36**

4  Q. Why do you say "more significantly," sir?
5  A. Well, we know from the George study that
6  there's an interaction between dibenz[a,h]anthracene and
7  glyphosate increasing the number statistically, and
8  significantly increasing the number of tumors in animal
9  studies.
10  Q. Are there any other promoters listed in -- let
11  me back up and ask a foundational question.
12      Do you understand what a tumor promotor is,
13  sir?
14  A. Yes.
15  Q. Okay. Are there any tumor promoters listed in
16  this list of carcinogens as opposed to tumor initiators?
17  Don't forget the back of that page there too.
18  A. Well, I'm not seeing phorbol esters listed
19  which are promoters. I don't know that any of these are
20  strictly promoters.
21  Q. Okay. Some may be initiator promoters
22  combined?
23  A. Yes.
24  Q. So let's go back to the benzo[a]pyrene point.
25  Let me ask a question about that chemical and we can get

**Page 37**

1  to some of the others in a minute.

14  Q. And he had zero exposure days to benzo[a]pyrene
15  from his Roundup use, true?
16  A. Yes.
17  Q. You believe if we go to the second page, back
18  of the first page, that 1,3-Butadiene is associated with
19  NHL, right?
20  A. Yes.
21  Q. You've actually testified under oath in
22  litigation before that 1,3-Butadiene exposure causes
23  NHL, right?
24  A. Yes. It's actually pronounced.
25  Q. Butadiene?

Confidential - William Sawyer, Ph.D.



**Page 38**

1    A.  Diene.
2    Q.  Okay.  I always mess that one up.  Diene.
3

11    Q.  Understand that.  And how are the dosages
12   listed here?  Are they listed as fractions of grams or
13   are they listed as exposure days?
14       MR. WOOL:  Objection.  Form.
15       THE WITNESS:  Listed as the amount in
16   mainstream cigarette smoke in units of nanogram.
17   BY MR. KALAS:
18    Q.  Okay.  So they're listed in units of mass or
19   volume, not listed in days, correct?
20    A.  Correct.
21    Q.  But you're using days in your assessment of
22   Mr. Russo's dose, right?
23    A.  Yes, that's how the generally accepted human
24   epidemiologic datas have assessed the dose response
25   relationship of glyphosate in humans.

**Page 39**

1

20    Q.  You could not stand up to a jury with a
21   straight face and say there's no risk of cancer from
22   cigarette smoking?
23    A.  Of course not.
24    Q.  Okay.  That would be a lie?
25    A.  It would be incorrect, and it would not be

**Page 40**

1   consistent with the scientific literature.
2

**Page 41**

1

19    Q.  Okay.  Benzyne's in cigarette smoke, that's
20   listed on page two, right?
21    A.  Yes.
22    Q.  You believe benzyne is associated with NHL?
23    A.  I do.  The -- in federal cases only AML is
24   associated from a legal standpoint, but yeah, the
25   studies do point to NHL as well.

11 (Pages 38 to 41)

Confidential - William Sawyer, Ph.D.



Page 42

1
2
3
4
5
6
7
8
9
10    Q.  Okay.  And he would have had zero exposure days
11  to benzene via his Roundup use, true?
12    A.  Yes.
13    Q.  And ethylene oxide is in cigarette smoke,
14  right?
15    A.  It is.
16    Q.  And you actually talk about that later on in
17  your report that you believe the presence of ethylene
18  oxide was additive to the purported carcinogenicity of
19  glyphosate, right?
20    A.  Yes.
21    Q.  Okay.  And we'll get to that, but it's your
22  opinion that ethylene oxide is associated with NHL,
23  true?
24    A.  Yes.
25

Page 43

1
3    Q.  And in order to directly inhale ethylene oxide
4  from his Roundup use, the ethylene oxide would have had
5  to disassociate from the liquid mix under Henry's law and
6  he would have had to inhale it from a release above the
7  top of the container, true?
8        MR. WOOL:  Objection.  Form.  Compound.
9        THE WITNESS:  If you could break that up, it
10  would be more accurate.
11  BY MR. KALAS:
12    Q.  Sure.  Tell me where I'm not accurate because
13  I'm trying to be.  If Mr. -- that helicopter is loud.
14    A.  Cubans coming.  Don't laugh.  It happens all
15  the time.
16    Q.  Okay.  All right.  If Mr. Russo did inhale
17  ethylene oxide via his Roundup use, what would have to
18  happen is that the ethylene oxide would have had to
19  disassociate the liquid and be present in the head
20  space of the container, right?
21    A.  Yes.
22    Q.  Okay.  And then he would have had to open up
23  that container to release the ethylene oxide, right?
24    A.  Yes.
25    Q.  And he would have had to have placed himself in

Page 44

1  the breathing zone of the release pattern of the
2  ethylene oxide, right?
3    A.  That's right.
4    Q.  Okay.  And that would have only happened when
5  he mixed or loaded because that would have been when he
6  would have had to open the container, right?
7        MR. WOOL:  Objection to form.  You can answer.
8        THE WITNESS:  Yes, that's true.
9  BY MR. KALAS:
10
11
12
13
14
15
16
17    Q.  Okay.  Finally, there's formaldehyde in
18  cigarette smoke, correct?
19    A.  That's correct.
20    Q.  And you note in your report that formaldehyde
21  is associated with lymphatic cancer, true?
22    A.  Yes.
23
24
25

Page 45

1
2
3
4
5
6
7
8
9
10
11    Q.  Okay.  Cigarettes are carcinogenic, no
12  question, right?
13    A.  Correct.
14    Q.  Cigarettes are genotoxic, no question, right?
15    A.  Correct.
16    Q.  Cigarettes are mutagenic, no question, right?
17    A.  Correct.
18    Q.  Okay.  And you're deferring the opinion on the
19  contribution of the genotoxic mutagenic carcinogenic
20  cigarettes to Dr. Ritz, true?
21    A.  On a quantitive basis, yes.  As I stated, he
22  would be in a better position to assess the full body of
23  human epidemiologic studies of smoking and provide an
24  opinion in terms of weighing the risk.
25    Q.  She.

12 (Pages 42 to 45)

Confidential - William Sawyer, Ph.D.

Page 46

1    A.  Or she.  I'm sorry, yeah, Be -- I can't
2  pronounce her name.  Beate.
3    Q.  Beate.  It's like 1,3-Butadiene.
4    MR. WOOL:  I'll tell her you said that.
5    MR. KALAS:  Yeah.
6  BY MR. KALAS:
7    Q.  It's your opinion --
8    A.  Is the place haunted or what?
9    Q.  I don't know.  It's Halloween.
10   It's your understanding that even if Dr. Ritz,
11  Dr. Weisenburger and/or Dr. Nabhan opined that an
12  underlying risk factor contributed to Mr. Russo's
13  ▓▓▓▓▓ you'd still argue that the Roundup exposure was
14  additive to the cause of their NHL, right?
15   A.  Absolutely, and also based on George study, the
16  enhancement of carcinogenesis from smoking that is from
17  the dibenz[a,h]anthracene would have been enhanced by
18  the glyphosate exposures.
19   Q.  Is DMBA a chemical that's been associated with
20  NHL in the epidemiologic literature?
21   A.  Yes.
22   Q.  It is?
23   A.  It is a -- known as the most potent of the
24  carcinogenic polynuclear aromatic hydrocarbons.  DMBA is
25  found in cigarette smoke.

Page 47

1    Q.  Can you cite for me a human epidemiology study
2  that isolates DMBA as opposed to another PAH like
3  benzo[a]pyrene as a cause of human lymphoma?
4    MR. WOOL:  Object to form.
5    THE WITNESS:  Just to lay this out so it's
6    fully understood by the court, PAHs in human studies
7    have been studied together.  Only the animal studies
8    have segregated them as in Exhibit 10 which you've
9    been using.
10  BY MR. KALAS:
11   Q.  Okay.
12   A.  And animal studies --
13   Q.  Go ahead.
14   A.  -- have evaluated the potency of each of these
15  individual PAHs, and DMBA ranks right up there with
16  dibenz[a,h]anthracene in terms of being highly potent.
17   Q.  Okay.
18   A.  So to be clear, these polynuclear aromatic
19  hydrocarbons that you've listed in cigarette smoke, they
20  have not been studied individually in human
21  epidemiologic studies, and they can't be because humans
22  are exposed to all of these as a set.  And depending on
23  the source of the PAH, for example, coke oven fumes,
24  what we call coke oven emissions, have a higher
25  prevalence of certain PAHs, that's polynuclear aromatic

Page 48

1  hydrocarbons, than does diesel exhaust.  Diesel exhaust
2  has a high portion of noncarcinogenic PAHs compared to
3  coke oven emissions.
4    So the human studies are unable to segregate
5  these independently but treat them as a whole, and
6  generally by the type of source, whether it be a coke
7  oven emission or the heating and putting tar on a roof
8  or diesel smoke, all of these different sources have
9  different combinations of these PAHs.
10   Q.  Are you -- let me ask a couple follow-up
11  questions on that.
12   First of all, do you have an opinion as to
13  whether DMBA or glyphosate is a more potent carcinogen
14  in your opinion?
15   A.  The human studies are based on exposure days
16  and not on nanogram per kilogram body weight dose.  So
17  it's not possible to ascertain that.  What can be
18  ascertained from the literature is the risk ratio or PMR
19  or other epidemiological measurements of risk among
20  cigarette smokers five-pack year, and the same holds
21  true with glyphosate applicators based on exposure days.
22   Q.  Are you aware of an epidemiology study on
23  glyphosate that controlled for PAH exposure as opposed
24  to cigarette exposure?  I'm asking specifically PAH.
25   A.  No.

Page 49

1    Q.  In any individual case where you believe that
2  Roundup exposure was additive to plaintiff's cancer --
3  well, let me back up and ask another question.
4    You cited the George study a couple times
5  so strike the first question.  You cited the George
6  study a couple times, right?
7    A.  Yes.
8    Q.  George study, as I understand it, is only being
9  used by you and other experts for plaintiffs in -- let
10  me strike that.
11   It's only being used by you as support for the
12  idea that glyphosate may be a tumor promotor, correct?
13   A.  Yes, the study was not designed to determine
14  whether glyphosate was carcinogenic or not, and that's
15  the primary reason why IARP didn't use it.  It's not
16  designed for that purpose.  It's simply a very old,
17  generally accepted standard design for determining
18  whether a chemical is a promotor using DMBA.  It's a
19  standard protocol.
20   Q.  They also had an arm in that study to look at
21  initiation, right, where they provided glyphosate and
22  TPA on the animal?
23   A.  Yes.
24   Q.  Okay.  And was glyphosate a cancer initiator
25  there in that study design?

13 (Pages 46 to 49)

Confidential - William Sawyer, Ph.D.

Page 50

1    A.  Not according to the study.
2    Q.  Okay.  So are you able to disentangle, in your
3  opinion, whether glyphosate is an initiator, promotor or
4  both?
5        MR. WOOL:  Objection.  Form.
6        THE WITNESS:  To some extent.  That's why I've
7    cited extensive literature with respect to
8    chromosomal aberrations, that is genetic damage,
9    mutagenic damage induced by glyphosate.  Even the
10    ATSDR now has recently ruled that glyphosate is
11    genotoxic.
12  BY MR. KALAS:
13    Q.  ATSDR ruled it's genotoxic.  Okay.  What's your
14  citation for that, sir?
15    A.  ATSDR.
16    Q.  The one that was released in March?
17    A.  Yes.
18    Q.  Okay.  Let's go back to George.  Does the
19  George study support your theory that glyphosate is a
20  cancer initiator?
21    A.  No.  That's not my theory, it's a generally
22  accepted fact.
23    Q.  Is that opinion generally accepted by Health
24  Canada?
25    A.  No.

Page 51

1    Q.  Is that opinion generally accepted by the
2  United States Environmental Protection Agency?
3    A.  No.
4    Q.  Is that opinion generally accepted by the
5  Minnesota Department of Health?
6    A.  I haven't checked that source.  I can't answer
7  that.
8    Q.  Is that opinion generally accepted by the
9  European Food Safety Agency?
10    A.  No.
11    Q.  Is that opinion generally accepted by the
12  European Chemicals Agency?
13    A.  No.
14    Q.  Is that opinion generally accepted by the Food
15  Safety Commission of Japan?
16    A.  No, but it is by CDC in multiple studies.
17    Q.  Is that opinion generally accepted by the
18  Australian Pesticide and Veterinary Medicines Agency
19  [sic]?
20    A.  No.
21    Q.  Is that opinion generally accepted by the New
22  Zealand EPA?
23    A.  That I'm not sure.
24    Q.  Is that opinion generally accepted by the
25  Government of Jamaica?

Page 52

1    A.  I haven't checked that document.
2    Q.  Okay.  In any individual case where you believe
3  there are multiple contributing factors to a plaintiff's
4  NHL, including Roundup, are you able to disentangle how
5  much the Roundup exposure as a percentage would have
6  contributed to a plaintiff's cancer?
7    A.  You need to clarify that or give me a
8  hypothetical.  It's so general I'm not sure I
9  understand.
10    Q.  Okay.  Let's say that you have a plaintiff with
11  HIV, okay?
12    A.  Yes.
13    Q.  And that plaintiff -- you agree HIV is a risk
14  factor for non-Hodgkin's lymphoma?
15    A.  Yes.
16    Q.  It's a pretty significant risk factor for
17  non-Hodgkin's lymphoma, right?
18    A.  Yes.
19    Q.  If that plaintiff used Roundup, would you be
20  willing to opine that their Roundup exposure contributed
21  to their NHL?
22    A.  I would defer that to the medical oncologist.
23    Q.  So in that sort of case you would not say that
24  the Roundup exposure was additive to the NHL?
25    A.  I really would have to defer that.

Page 53

1    Q.  Okay.
2    A.  Because that really is a question of
3  immunologic function.
4    Q.  And glyphosate has not been shown to be a
5  immunotoxic in guideline studies, true?
6    A.  Correct.
7    Q.  Okay.
8    A.  But that doesn't rule out additivity.  But
9  because HIV induced -- the association between HIV and
10  NHL is very strong, and I think it would require the
11  medical oncologist to determine whether the additivity
12  was significant or not.
13    Q.  Okay.  So you would defer to the medical
14  oncologist, if I understand what you're saying
15  correctly, as to the degree of additivity of other risk
16  factors?
17    A.  Well, right now we're talking about AIDS and
18  AIDS --
19    Q.  HIV, sir.
20    A.  Yeah, HIV.  But HIV has enormous risk factor
21  for NHL.  It's very high, very strong.
22    Q.  So let's back it up a little bit.
23    A.  And --
24    Q.  Okay.  Go ahead.
25    A.  And for that reason we're comparing a

14 (Pages 50 to 53)

Confidential - William Sawyer, Ph.D.

## Page 54

1  motorcycle to a tractor trailer truck.  If we're dealing
2  with smoking, we're in the same ballpark, even with a
3  heavy smoker.  But with AIDS or HIV, it's such a strong
4  association that I would have to defer that.  I -- and I
5  actually haven't made that assessment because I haven't
6  run across any situations where any plaintiffs were HIV
7  positive.
8      Q.  Okay.  Let's pick a situation that you referred
9  to a few minutes ago and see if we can use that as our
10  hypothetical.  You talked about PAHs in coke ovens,
11  right?
12      A.  Yes.
13      Q.  Okay.  They're the nasty PAHs in the coke oven
14  facilities, right?
15      A.  Yeah, they tend to be more enriched with
16  benzo[a]pyrene, dibenz[a,h]anthracene, and to a heavier
17  degree than, as I said, diesel smoke which has
18  naphthylamine and some other noncarcinogenic PAHs,
19  that's the most characteristic.
20      Q.  Diesel smoke's a group one IARC carcinogen,
21  right?
22      A.  It is, but I'm saying proportionately there's a
23  lot of noncarcinogenic PAHs in diesel smoke with lesser
24  concentrations of the BAP and dibenz[a,h]anthracene
25  compared to a coke oven emission.

## Page 55

1      Q.  Okay.  Let's assume that you had Mr. Russo and
2  he had a 30-year history of working in a coke oven
3  plant.  Can you make that assumption for the purposes of
4  this hypothetical?
5      A.  Yes.
6      Q.  How would you disentangle the contribution of
7  the PAH exposure in the coke oven plant or the
8  apportionment of that from the apportionment of the
9  contribution of his Roundup use?
10      A.  Well, I would simply look at the PMR, SMR, RR,
11  other odds ratio, other comparisons in the coke oven
12  studies, some of which I'm familiar with, actually.  And
13  then compare those risk levels to that of the applicator
14  studies.  And when I say "applicator studies," the six
15  that I've referenced in my report that have an exposure
16  value, that is a metric of measurement of exposure with
17  an associated risk ratio or of PMR or other measure and
18  then compare a coke oven worker who is, like you said
19  40 years involved with coke oven work and compare those
20  risk ratios.
21      Q.  Okay.  So let me make sure I understand the
22  methodology here.  So if you were attempting to
23  apportion -- well, let me back up and ask a foundational
24  question.
25      It's your testimony that you've given in your

## Page 56

1  report and that I assume you'll give today, you didn't
2  identify any other risk factors for NHL in Mr. Russo
3  beyond his Roundup use, right?
4      A.  Correct.
5      Q.  Okay.  So if we had Mr. Russo and he worked in
6  a coke oven plant and he applied Roundup for more than
7  two days a year, right, that is the facts of this case?
8      A.  No, in this case and in all the cases I've
9  worked on and produced reports on over the past year or
10  so, I've used the highest level of threshold which is
11  ten days or greater.
12      Q.  Okay.  But he applied Roundup for greater than
13  two days a year, right?
14      A.  Right, but he greatly exceeded even the highest
15  threshold of --
16      Q.  I understand.
17      A.  -- two days or greater.
18      Q.  I'm just trying to get an odds ratio that we
19  can agree on.  The greater than two days a year figure
20  for McDuffie is 2.12, right?
21      A.  Yes.
22      Q.  Okay.  And then the greater -- let's assume
23  that the coke oven for somebody with the characteristics
24  of Mr. Russo showed an odds ratio of 3.24, okay?
25      A.  Yes.

## Page 57

1      Q.  So would you say in that case that two-thirds
2  of his cancer was due to his coke oven work and
3  one-third was due to Roundup, or would you follow some
4  different methodology?
5      A.  Well --
6          MR. WOOL:  Object to the form, improper
7  hypothetical.  Compound.
8          THE WITNESS:  I think I would point out that,
9  first of all -- well, I think what I would do is I
10  would establish the exposure days for Mr. Russo and
11  compare that to the human epidemiological studies
12  which places him far beyond the ten-day threshold.
13  Then I would do the same with the coke oven worker
14  studies.  Say, okay, what was the average number of
15  exposure years in the coke oven studies that
16  resulted in -- I think you set a risk level of --
17  BY MR. KALAS:
18      Q.  3.24 is double what the 2.12 is.
19      A.  Yeah, and I would have to look at it from that
20  perspective; in other words, in this case we have Mr.
21  Russo who is far beyond the threshold of the risk level
22  published by McDuffie, and yet we have a 40-year
23  exposure at a double the risk.  So the bottom line is
24  that would have to be assessed, but assuming that the
25  numbers you pointed out were the final numbers, the

Confidential - William Sawyer, Ph.D.

Page 58

1  answer would be that there would still be substantial
2  contribution; that is, contribution from the Roundup to
3  the occupational exposure.
4      Q.  And if I understand the word "substantial"
5  correctly, and we've talked about this in previous
6  depositions, what you mean by substantial is that there
7  is a statistically significant odds or risk ratio
8  associated with that exposure scenario?
9      A.  Yeah.
10     Q.  Okay.  So the word "substantial" does not
11  signify a quantity, it signifies statistical
12  significance in that scenario?
13     A.  That's correct.  In the example you've
14  presented, certainly the Roundup exposure would be
15  additive to the risk of the coke oven work.
16     Q.  But an example I presented you couldn't state
17  to a reasonable degree of scientific certainty, that
18  Mr. Russo would not have gotten NHL on the exact same
19  day he did had he not used Roundup, right?
20     A.  No, and we can't say that about anyone on
21  earth.  I mean, it's not possible to say that if a
22  person had not smoked a cigarette or not -- had it --
23  socially, certainly would not have developed.  We can't
24  say that about anyone.
25         MR. KALAS:  Okay.  Can we take a quick break?

Page 59

1         VIDEOGRAPHER:  Going off the record at 9:31.
2         (A short break was taken.)
3         VIDEOGRAPHER:  We're back on the record.  The
4  time is 9:38.
5  BY MR. KALAS:
6      Q.  All right.  Let's go back to page five of your
7  report real quick.  And you talk about in the objective
8  section, the first paragraph, you state in the last
9  sentence, "My toxicological assessment is also designed
10  to evaluate and weigh all other potential contributing
11  toxicological factors and assess the latency period from
12  initial exposures to the time of Mr. Russo's diagnosis."
13  Did I read that correctly?
14     A.  Yes.
15     Q.  Why was it important to you to evaluate other
16  things Mr. Russo might have been exposed to?
17     A.  Because I'm a toxicologist, that's what I'm
18  trained to do.  If there were confounding factors,
19  especially from a toxicological standpoint, then I must
20  assess that.  It's my duty.
21     Q.  It's important for a toxicologist to have
22  access to all the toxicological information that's
23  available regarding a plaintiff's exposures, right?
24     A.  That's right.
25     Q.  And when you questioned -- you questioned Mr.

Page 60

1  Russo about his other co-exposures, right?
2      A.  Yes.
3      Q.  When you questioned Mr. Russo, did you ask
4  about products he kept inside his house?
5      A.  Yes.
6      Q.  Okay.  And why did you find it important to ask
7  about products Mr. Russo kept inside his house?
8      A.  Well, I asked him more than -- I asked him what
9  his hobbies were, what type of products, chemicals he's
10  used.  I asked if he had used diisocyanate paints in
11  automotive painting, for example, as I've done in the
12  past with a full-face respirator.  You know, I asked
13  questions regarding -- to try to trigger his memory to
14  any possible exposures.  And the only thing that came up
15  that was of concern in the records or from my interview
16  was that of paint remover.  And that is because paint
17  remover historically has contained what's called
18  methylene chloride, that's dichloromethane.  And if my
19  memory serves me right, I think dichloromethane is a --
20  classified as a 2B possible human carcinogen.
21     Q.  Your memory does not serve you right.  If you
22  recall the Giglio case, we talked about this, it's 2A.
23     A.  2A.  Okay.
24     Q.  Yep.  It's associated with NHL, right?
25     A.  It is, yes.  And so I was concerned about that

Page 61

1  and questioned him, and I actually called him and asked
2  what the -- I'm talking about Giglio.
3      Q.  Are you talking about Giglio or Russo now?
4      A.  Giglio.
5      Q.  Okay.  You're getting the two Italian guys
6  mixed up.  So let's go back to Mr. Russo for a second.
7  Let me take that from the top.
8         You asked about hobbies, products and
9  chemicals, including certain types of paint.  When you
10  ask about products and chemicals, do you identify those
11  products and chemicals by the ingredient you're
12  interested in or do you identify them by brand name or
13  some combination or do you just ask for an inventory of
14  all of it and sort it out after?
15         MR. WOOL:  Objection to form.  Compound.
16         THE WITNESS:  Brand name and uses.  And that --
17  then I'm able to zero in.  For example, if I asked
18  about automobile painting, repair work to your car,
19  and the answer is no, I've never done any of that,
20  then I move on.  If the answer is yes, then I ask --
21  for example, I asked a question yesterday to a
22  plaintiff in Monsanto cases, I asked, have you ever
23  washed parts in gasoline?  That was my direct
24  question.  Have you actually ever put gasoline into
25  a tub or container and dropped parts into it and

Confidential - William Sawyer, Ph.D.

Page 62

1     washed them?
2     BY MR. KALAS:
3        Q.   To clean them essentially?
4        A.   Yeah, to degrease them.  Yeah.  In other words,
5     if there's any evidence at all pointing towards the use
6     of paint, I ask, what kind of paint?  Was it indoor
7     paint, wall paint, outdoor paint, you know, what type of
8     painting did you do?  And then I can ask more
9     specifically about the products.  But that's the way I
10    address the questions is to try to generally open the
11    door and then get more specific once I know if a person
12    conducts or has previously conducted work with certain
13    chemicals.
14       Q.   And in the case of somebody who has painted,
15    for instance, you're interested in whatever chemicals
16    may be in that paint, right?
17       A.   Right.
18       Q.   That's relevant to your evaluation, right?
19       A.   Yes.
20       Q.   That's information you need to reach your
21    expert opinion, right?
22       A.   Yes.
23       Q.   Okay.  And likewise, for other household
24    chemicals, for solvents or motor oils, you need to know
25    what chemicals are in those solvents or motor oils that

Page 63

1     plaintiff may have used, right?
2        A.   Yeah.  I already know that.  I mean, motor oil
3     does not contain any volatiles of any significance.
4        Q.   Let me make it about solvents then.  Solvents,
5     it's important for you to know what chemicals are in
6     those solvents, right?
7        A.   Yes.
8        Q.   Okay.  And that's because to reach your expert
9     opinion in the careful way that you do, you need to
10    eliminate other co-exposures as a potential cause of his
11    NHL or additive cause?
12       A.   Well, I need to assess such exposures.  For
13    example, if a person was using a benzyne-containing
14    product, I need to assess what the percentage is.  For
15    example, if it's in WD-40 and less than .01 percent, and
16    the spray was used on an occasional basis, or in the
17    case of Mrs. Pilliod, she only walked past the can, she
18    never even used it.  I mean that makes a big difference.
19    So I have to assess the use of the product as well.
20       Q.   And other herbicides, pesticides, rodenticides,
21    you want to assess that, right?
22       A.   Yes.
23       Q.   Okay.  And why is that important to you?
24       A.   To determine if there was exposure to a
25    carcinogen associated with NHL; and if so, assess the

Page 64

1     degree of exposure dose and duration.
2        Q.   You would not be able to do your -- or conduct
3     your expert evaluation in a careful way without finding
4     out that information, right?
5        A.   Well, I'm able to in general determine based on
6     what type of occupational work was conducted, what type
7     of hobbies and so on.  I mean, in many cases the hobbies
8     are fishing and the occupational work is delivering
9     mail, and no hobbies involving chemicals.  Painting was
10    never done; it was done by contractors.  You know, so in
11    many cases everything just checks out negative but in
12    other situations, as you recall in the Lamb case, we had
13    a person who was an applicator who used different
14    products and I had to carefully go through and assess
15    each product.
16       Q.   You would disagree it's a fishing expedition to
17    evaluate each product somebody used?
18          MR. WOOL:  Can you say that again?
19    BY MR. KALAS:
20       Q.   You would disagree it's a fishing expedition
21    for you to evaluate what products somebody used?
22       A.   Well, in the case where Monsanto experts have
23    evaluated things such as motor oil, I mean, yeah, that's
24    ridiculous.  I mean, a toxicologist should have general
25    enough knowledge to know what type of products to zero

Page 65

1     in on and not just go in and collect every product from
2     the household and put it on a list as a chemical of
3     concern.  I mean the Windex has butoxyethanol.  Why was
4     that on the list?  Doesn't make any sense.
5        Q.   And you compiled these lists based off your
6     personal interviews with plaintiffs, right?
7        A.   And by the list of products generated during
8     Monsanto's inspections, for example.
9        Q.   If Monsanto has the opportunity to take an
10    inspection?
11       A.   Yes.
12       Q.   Okay.  But you generate these lists that you
13    include -- you generate the list for Mr. Russo, for
14    instance, based off a conversation with Mr. Russo,
15    right?
16       A.   Yes, as well as his deposition.
17       Q.   Okay.
18       A.   And he was asked questions regarding product
19    used in the deposition.  I don't think I had any
20    inventory from either Monsanto or from plaintiff's
21    attorneys of what was in his home.
22       Q.   Would you agree that Monsanto's experts do not
23    have an opportunity to conduct the same type of
24    interview with Mr. Russo that you have; the attorneys
25    may, but the experts don't?

17 (Pages 62 to 65)

Confidential - William Sawyer, Ph.D.

Page 66

1     A.  Well, I don't know -- it's almost a legal-type
2  thing.  I can't really answer that because I don't know.
3  I know that in cases where I've worked in similar
4  situations with defendants, I was always able to provide
5  questions to the attorneys to ask at deposition.  But I
6  don't know for sure.
7     Q.  But you didn't get an -- when you worked on the
8  defendant side in litigation, you haven't had the
9  opportunity personally to interview plaintiff, right?
10    A.  Oh, I have.  I flew up to Missoula to the
11 military base -- well, actually the National Guard base
12 in Helena, and I spent a whole day questioning people
13 independently, even kept them in separate rooms so they
14 couldn't speak to one another.
15    Q.  Okay.
16    A.  And I was working for the state attorney
17 general for Montana on a defense case.  I was able to
18 question people directly.
19    Q.  Okay.  So you think one alternative for site
20 visits that might be useful is allowing expert witnesses
21 to directly interview plaintiffs in these cases because
22 that's what you've done?  You haven't done site visits?
23        MR. WOOL:  Objection to form.
24        THE WITNESS:  I have done that in the past.
25 BY MR. KALAS:

Page 67

1     Q.  Okay.  Now, if you go to page eight, you state
2  at the top of page eight, right above absorbed
3  dose-definition, "In fact, all of the regulatory studies
4  are based solely on animal models and not intended for
5  use in causation assessments."  Do you see that?
6     A.  No, which paragraph on page eight?
7     Q.  Top of the page, right above absorbed
8  dose-definition.
9     A.  Yes.
10    Q.  Okay.  First of all, you've reviewed some of
11 the regulatory evaluations of glyphosate, right?
12    A.  Yes.
13    Q.  Okay.  It's true that many of the regulatory
14 evaluations you've looked at had a section where they
15 reviewed the epidemiology on glyphosate, right?
16    A.  Generally, yes.
17    Q.  Okay.  And epidemiology, I know it's a basic
18 question, it's foundational, but that's looking at
19 people, right?
20    A.  Yes.
21    Q.  Okay.  EPA evaluated the epidemiology, right,
22 the U.S. EPA?
23    A.  Yes.
24    Q.  The Health Canada evaluated the human
25 epidemiology, right?

Page 68

1     A.  Yes.
2     Q.  European Food Safety Agency evaluated the
3  epidemiology, right?
4     A.  Yes.
5     Q.  The European Chemicals Agency evaluated the
6  epidemiology, right?
7     A.  Yes.
8     Q.  The Australian Pesticide Veterinary Medicines
9  Authority evaluated the epidemiology, right?
10    A.  Yes.
11    Q.  And after reviewing the epidemiology all of
12 those agencies concluded there was no risk of cancer to
13 people, right?
14    A.  That's correct.
15    Q.  And if you aren't at risk from an exposure,
16 then an exposure cannot cause your disease, true?
17    A.  Could you repeat that?
18    Q.  Sure.  If you're not at risk from an exposure
19 to a chemical, then that exposure cannot be the cause of
20 your disease, true?
21    A.  If that assessment is correct, yes.
22    Q.  Okay.  And so even though regulators looked at
23 human, animal mechanistic data and saw no risk of
24 cancer, those same regulators did see a potential risk
25 for other disease outcomes, right?

Page 69

1     A.  Yes.  There were what we call end points or
2  target points, such as reproductive hazards that were
3  considered end points and the regulatory dose was based
4  upon.
5     Q.  So the regulatory dose is based off noncancer
6  end points.  You've testified to that many times, right?
7     A.  That's correct.
8     Q.  Okay.  And the reason there is no cancer end
9  point, according to the regulators, is because they
10 believe there is no risk of cancer at human doses,
11 correct?
12    A.  Correct.
13    Q.  Okay.  Now, Mr. Russo had his own business,
14 right?
15    A.  Yes.
16    Q.  Okay.  And they were a food packaging company?
17    A.  Yes.
18    Q.  What do you know about Mr. Russo's work in the
19 manufacturing of the food packaging, as far as what his
20 responsibilities were?
21    A.  I don't recall, but he did explain to me that
22 he did not recall any exposure to chemicals in his
23 workplace.
24    Q.  Okay.  But you don't know if he went to a
25 factory every day or went to an office every day, you

18 (Pages 66 to 69)

Confidential - William Sawyer, Ph.D.

Page 70

1    didn't find out that information?
2        A.   My recall was that there was no industrial
3    toxic exposures involved in his role.
4        Q.   Where did he work?  What was the address?
5        A.   I don't recall.
6        Q.   Okay.  You don't recall what it was near?
7        A.   No.
8        Q.   Okay.  You don't know if it was near -- he
9    lived in San Pedro for a time, right?
10       A.   Yes.
11       Q.   Okay.  You don't recall if it was near the
12   shipyards?
13       A.   I don't recall.
14       Q.   Okay.  Would that be relevant to a
15   toxicological assessment, exposures from a shipyard?
16       A.   No.
17       Q.   No?  Not at all?  There's no exposure to
18   shipyards that are relevant to your toxicological
19   assessment?
20       A.   Well, living in a shipyard, yes, but not living
21   in distal proximity.
22       Q.   How about spending eight hours a day near a
23   shipyard, would that be relevant?
24       A.   Not in a residential area, no.
25       Q.   Okay.  But I'm not asking where he lived, I'm

Page 71

1    asking where he works, sir.
2        A.   Oh, okay.
3        Q.   So would working near a shipyard be relevant to
4    your toxicological evaluation?
5        A.   Not with NHL, no.
6        Q.   Okay.  There's no chemicals that are released
7    at shipyards associated with NHL that you're aware of?
8        A.   No, not that epidemiologic studies have
9    demonstrated a bystander in a shipyard would be at
10   elevated risk given NHL, no.
11       Q.   My question was a little bit different which
12   is, are there any chemicals released in shipyards that
13   are associated with NHL that you're aware of, not about
14   the epidemiology study, just about the presence of it?
15       A.   From a scientific standpoint, no.
16       Q.   Okay.  And so even though you didn't know where
17   Mr. Russo worked, you were able to eliminate potential
18   co-exposures at his workplace that could have
19   contributed and/or caused his NHL, true?
20       A.   I specifically asked him if there were any
21   chemical exposures involved in his work or in his
22   general work area.
23       Q.   How do you think he understood the term
24   chemical exposures?
25       MR. WOOL:  Objection.  Calls for speculation.

Page 72

1        THE WITNESS:  Well, I think I explained in my
2    question products, working with any products or in
3    the vicinity of where chemicals were being used, and
4    he said that was not his role, that he was not
5    involved in production.
6    BY MR. KALAS:
7        Q.   Did you evaluate the air quality of where Mr.
8    Russo lived?
9        A.   No.
10       Q.   Did you evaluate the presence of chemicals
11   associated with NHL in the air in San Pedro or Rancho
12   Palos Verdes?
13       MR. WOOL:  Objection to form.  Compound.
14       THE WITNESS:  Are you asking me if they had bad
15   air or something?  I don't understand.
16   BY MR. KALAS:
17       Q.   I'm asking you did you look at the benzyne
18   levels in the air?
19       A.   No.  We already know that benzyne levels are
20   ubiquitous in all urban environments.
21       Q.   Did you look at the benzyne levels in the air
22   was my question, not that we know that they're present
23   in all urban environments.  So please focus on the
24   question.  Did you look at data on the benzyne levels in
25   the areas where he lived?

Page 73

1        MR. WOOL:  In the air?
2        MR. KALAS:  Yeah, in the air.
3        THE WITNESS:  No, I didn't need to.  I'm very
4    familiar with the studies in urban areas published
5    in ATSDR, in the ATSDR toxicological profile on
6    benzyne that shows the range in microgram per liter
7    of benzyne in Los Angeles air, New York City,
8    Chicago, urban areas versus rural areas, and I'm
9    very familiar with those values, and certainly the
10   numbers are somewhat higher in urban areas than
11   rural areas.  But I did not perform any testing or
12   air monitoring at his home if that's what you're
13   asking me.
14   BY MR. KALAS:
15       Q.   That is what my question is.  You do not know
16   what the levels of benzyne were in the air where he
17   lived, correct?
18       A.   I do know in general in units, so microgram per
19   cubic meter.
20       Q.   Where did you write that down in your report?
21       A.   I didn't write it in my report.  I've had 30
22   years' of experience of assessing benzyne air, starting
23   with the health department in New York State, and the
24   Superfund sites I talked about in previous depositions
25   that released benzyne which ultimately were remediated

19 (Pages 70 to 73)

Confidential - William Sawyer, Ph.D.

Page 74

1   based on our studies.
2      Q.   Did you look at levels of dichloromethane in
3   the ambient air where he lived?
4      A.   No.  Dichloromethane is not a significant
5   contaminant in urban air.
6      Q.   How do you know?  Did you look at the data?
7   I'm just asking if you looked.  If you didn't, that's
8   fine, we move on.
9      A.   In the past I have.
10     Q.   Did you look for Mr. Russo in the years he
11  lived in Rancho Palos Verdes and San Pedro?
12          MR. WOOL:  Objection to form.  Compound.
13          THE WITNESS:  Can you clarify it, please?
14  BY MR. KALAS:
15     Q.   Did you look at levels of dichloromethane,
16  benzene or any other chemical in the ambient air where
17  Mr. Russo lived in San Pedro and Rancho Palos Verdes?
18          MR. WOOL:  Same objection.
19          THE WITNESS:  Only based upon my knowledge and
20      I've given you the source, the ATSDR toxicological
21      assessment of benzene published by CDC which
22      provides a very good table and other sources within
23      the manuscript of benzene concentrations in the air
24      of different cities, including in the areas where
25      Mr. Russo resided.

Page 75

1   BY MR. KALAS:
2      Q.   Let me ask you this, and try to tie this up
3   with a bow.
4          Did you go to any air quality data for the
5   years Mr. Russo lived in San Pedro, did you go to any
6   air quality data for the years he lived in Rancho Palos
7   Verdes and attempt to make an assessment of the
8   chemicals he was exposed to via ambient air in those
9   areas for Mr. Russo specifically?
10         MR. WOOL:  Objection.  Form.  Compound.
11         THE WITNESS:  Only based upon my considerable
12      use over the years of benzene monitoring data in
13      different U.S. cities, including the Los Angeles
14      area.
15  BY MR. KALAS:
16     Q.   Tell me when you went in writing this report to
17  the air quality data for the San Pedro area in 2004.
18  Tell me when you did that.
19     A.   I don't recall.  I've reviewed the regional
20  urban air benzene analyses published over the years for
21  the past 30 years as part of my work.
22     Q.   Is there any plaintiff that you've gone to the
23  air quality data for beyond the Pilliods to determine
24  what contaminants are in the air in the Roundup
25  litigation?

Page 76

1      A.   No, just my general use of the tables published
2   in the ATSDR toxicological profile on benzene which
3   provides the urban air levels for these various cities
4   and as well as rural benzene air levels in units of
5   microgram per cubic meter.
6      Q.   Beyond benzene, sir, did you go look up the
7   ambient air quality levels for dichloromethane for the
8   time Mr. Russo lived there?
9      A.   No.  Dichloromethane is not generally
10  measurable in significant quantities.
11     Q.   Okay.  So it's your testimony no
12  dichloromethane is present in the ambient air where
13  Mr. --
14     A.   No, I didn't say no.  In significant
15  quantities.
16     Q.   Okay.  But you don't know that quantity because
17  you didn't look?
18     A.   I'm familiar with the literature.  I didn't
19  look specifically for anything at his address.
20     Q.   Okay.
21     A.   I don't think I would find anything exactly for
22  his address.
23     Q.   And same deal for any other ambient air
24  exposures, other chemicals in the ambient air, you
25  didn't look specifically at Mr. Russo's address for air

Page 77

1   quality levels, correct?
2      A.   No.
3      Q.   Okay.
4      A.   But I relied upon my familiarity with the
5   regional levels from the various cities, the closest
6   being Los Angeles.
7      Q.   So you're not going to come to trial and give
8   any testimony about what the levels in the air were of
9   various potential carcinogens, specifically as to Mr.
10  Russo's address, right?
11     A.   I'm not sure I follow the question.
12     Q.   You're not going to come to trial and say the
13  benzene level at Mr. Russo's address in 2005 was "X",
14  right, because you haven't looked at that data?
15     A.   There is no such data specific to his address.
16     Q.   Okay.
17     A.   There's regional data that I'm familiar with.
18     Q.   Are you going to come to trial and talk about
19  that?
20     A.   I wasn't planning on it.
21     Q.   You're not offering any opinions on Mr.
22  Russo's -- well, strike that.
23          Mr. Russo was diagnosed with NHL in
24  January 2014, right?
25     A.   I just didn't hear all of that.

20  (Pages 74 to 77)

Confidential - William Sawyer, Ph.D.



Page 78

1      Q.  Mr. Russo was diagnosed with NHL in
2   January 2014, true?
3      A.  Yes.
4      Q.  Okay.  And to be clear, you're not offering any
5   opinions on Mr. Russo's prognosis, right?
6      A.  No.
7      Q.  You're not offering any opinions on his course
8   of treatment, right?
9      A.  Correct.
10
11
12
13
14
15
16
17      Q.  And in the epidemiology literature I'm correct
18   that the McDuffie study detected a statistically
19   significant increased risk for cancer or NHL with a
20   first degree relative with cancer, right?
21      A.  Yes.
22      Q.  And they detected that even after controlling
23   for other pesticides, right?
24      A.  I believe so.
25

Page 79

1
2
3                           And this is, again, if you
4   look at my report, from the genetic standpoint, I have
5   deferred that to the medical oncologist for a more
6   appropriate and in-depth assessment.
7      Q.  Okay.  If we go to page 21 of your report, page
8   21 of your report through about page 27, you discuss Mr.
9   Russo's use of Roundup based on his deposition
10   testimony, right?
11      A.  Yes, and then the interview is on page 27.
12      Q.  Right.  And the interview carries through --
13   the interview section carries through page 29, right?
14      A.  Yeah.
15      Q.  Okay.  So let's start with the deposition
16   testimony, 21 to 27, that's the only statements made by
17   Mr. Russo regarding his use that were made under oath,
18   right?
19      A.  I'm not sure because the amended plaintiff fact
20   sheet and so forth, I don't know if that's considered
21   under oath or not.
22      Q.  Okay.  The phone call with you is not under
23   oath, the two phone calls?
24      A.  Correct.
25      Q.  Okay.  What's it mean to you as an expert

Page 80

1   witness when you go under oath in a deposition?  What do
2   you intend to do when you're under oath?
3      A.  Tell the truth as always.
4      Q.  And you take that very seriously, right, when
5   you're under oath?
6      A.  Whether I'm under oath or not makes really no
7   difference to me.  I tell the truth.
8      Q.  Okay.  So taking the oath when you start a
9   deposition holds no significance to you?
10      MR. WOOL:  Objection to form.
11   Mischaracterizes.
12      THE WITNESS:  It doesn't change my behavior.
13   BY MR. KALAS:
14      Q.  Okay.  It doesn't change your behavior?
15      A.  No.
16      Q.  But what it does mean is that you're giving
17   statements under the penalty of perjury, correct?
18      A.  That's true, and I never even think about that.
19   I -- you know, I know you guys have looked at -- you
20   told me this in the first deposition -- virtually every
21   deposition I've given in 30 years, you have yet to
22   impeach me because I tell the truth.
23      Q.  I might disagree with that, but we'll move on.
24   Not about the telling the truth part but the impeachment
25   part but we'll move on.

Page 81

1      It's your understanding that Mr. Russo applied
2   Roundup at five properties, right?
3      A.  Well, I've documented four properties in table
4   three.
5      Q.  Let's go to table three, because I want to make
6   sure the record's clear here.  If you go to table three,
7   which starts on page 31 and carries to page 32, do you
8   see the first entry is for two residences?
9      A.  Oh, yeah, that's right.  Thank you.
10      Q.  So there are five properties, right?
11      A.  Yeah.
12      Q.  Okay.  But at three of these properties he
13   conducted what's typically known as spot spraying,
14   right?
15      A.  Yes.
16      Q.  And spot spraying essentially means in layman's
17   terms, see a weed, spray a weed, right?
18      A.  Yes.
19      Q.  Yes, sir?
20      A.  Correct.
21      Q.  Okay.  At the other two properties Mr. Russo
22   testified to periodically clearing land, right?
23      A.  Yes.
24      Q.  And those properties were the ████████
25   property in San Pedro and the ████████ property

21 (Pages 78 to 81)

Confidential - William Sawyer, Ph.D.

Page 82

1  in Rancho Palos Verdes, correct?
2  A.  That's right.
3  Q.  Okay.  Do you consider his exposures at the
4  three properties where he did spot spraying significant
5  in your overall evaluation?
6  A.  Well, I focused on the broadcast spraying.
7  Q.  Okay.  And those are the two properties we just
8  talked about, ███ and ████████?
9  A.  Correct.
10  Q.  Okay.
11  A.  I mean, it's important for the jurors to
12  understand that he did conduct applications at these
13  other properties but I assigned them zero exposure days.
14  Q.  Right.  And it's your opinion that the vast
15  majority of his exposure would have taken place at the
16  two broadcast spraying properties, right?
17  A.  Correct, but my point is I'm underestimating
18  his exposure days because I assign zero to those
19  properties.
20  Q.  And let's be clear about the way exposure days
21  work.  If we go to chart -- table three, excuse me, page
22  31.  One of the things you could not do on the spot
23  spraying properties is include them in your exposure day
24  metric because he did not have any understanding of --
25  or any recollection is probably the better term, of how

Page 83

1  long he sprayed at those places, right?
2  A.  Yes, the information was vague.
3  Q.  Okay.
4  A.  And the photographs or descriptions were not
5  helpful in understanding the quantity and duration of
6  spraying.
7  Q.  So if he only sprayed 15 minutes twice a year
8  at each of those properties, it might not have affected
9  your exposure day calculation much at all since those
10  are eight-hour days, right?
11  MR. WOOL: Objection.  Form.
12  THE WITNESS:  Under that hypothetical, that's
13  correct.
14  BY MR. KALAS:
15  Q.  Okay.  All right.  So if we start with the El
16  Rey property and you discuss this on page 22, it's my
17  understanding that Mr. Russo was spraying behind his
18  home in the easement due to a local ordinance to keep
19  the floodplain behind his home clear; is that right?
20  A.  That's correct.
21  Q.  And were you aware that flooding had
22  been a historical problem for the San Pedro area, given
23  the topography?
24  A.  I'm aware of that.
25  Q.  Okay.  You agree the ability of glyphosate to

Page 84

1  clear vegetation from floodplains is a beneficial use of
2  the product?
3  A.  Yes.
4  Q.  Floods can be damaging to property?
5  A.  Yes.
6  Q.  Floods can cause ecological damage?
7  A.  Yes.
8  Q.  Floods can cause runoff?
9  A.  Yes.
10  Q.  Floods can cause mudslides that cause homes to
11  fall down hills?
12  A.  Yes.
13  Q.  Floods can cause loss of life?
14  A.  Yes.
15  Q.  Okay.  The use of glyphosate to clear
16  vegetation -- well, strike that.
17  And if we go to page 23, you talk about what
18  Mr. Russo wore when he applied glyphosate at the San
19  Pedro property, right?
20  A.  Yes.
21  Q.  Okay.  And he talked about at his deposition
22  wearing jeans, right?
23  A.  Well, depending on whether this is an initial
24  clearing and/or the temperature.  He wore -- also wore a
25  short-sleeve shirt and shorts when it was hot and after

Page 85

1  the initial clearing was performed, and as he explained
2  to me, the risk of scratching from the dead vegetation
3  was gone.
4  Q.  Let me narrow my question then.  When he was
5  under oath at deposition, Mr. Russo testified that he
6  typically wore jeans when spraying at that property,
7  right?
8  A.  Yes, and I referenced that on page 23, second
9  paragraph of my report.
10  Q.  And when he was under oath at -- well, strike
11  that.
12  Is it your understanding that jeans are denim
13  and perhaps with a cotton blend in them?
14  A.  Yes, but I should also point out in my report I
15  reference per deposition that he wore short-sleeve
16  shirts because it was hot.  He also stated that in
17  deposition.
18  Q.  Okay.  I'm asking about jeans right now and
19  jeans are typically worn on the legs not the arms,
20  right?
21  A.  Correct.
22  Q.  Okay.  So let's stick with the jeans.
23  A.  Okay.
24  Q.  Do jeans provide a barrier to the legs from
25  glyphosate reaching the skin?

Confidential - William Sawyer, Ph.D.

Page 86

1    A.  Depending on the amount of sweating the number
2    varies, but in general penetration through the jeans is
3    20 percent.
4        Q.  20 percent.  Okay.  Now, you brought up
5    sweating.  I want to ask you a little bit about that
6    because we've talked about it before and I'm not sure if
7    we talked about this issue.  Glyphoste's hydrophilic,
8    right?
9        A.  Yes.
10       Q.  Hydrophilic means glyphosate is attracted to
11   water, true?
12       A.  Yes.  The definition is water loving.
13       Q.  Okay.  I took one year of Latin so I know that
14   much.
15           Our sweat, how much -- what percentage of our
16   sweat is water?
17       A.  Nearly all of it.
18       Q.  Nearly all of it.  Would glyphosate, given its
19   hydrophilic nature, be attracted to sweat beads?
20       A.  Yes.
21       Q.  Okay.  And what happens to sweat after we
22   exfoliate it, where does it go?
23       A.  Well, sometimes it dampens the jeans and allows
24   an increased route of travel from the outer part of the
25   jean to the inner part of the jean.

Page 87

1        Q.  Okay.  And where does sweat go on unexposed
2    skin?
3        A.  Unexposed skin?
4        Q.  Yes, sir -- or excuse me, exposed skin.  So if
5    I'm sweating in shorts.
6        A.  In Nevada during a one-half Ironman Triathlon,
7    I sweated so intensely that I could take a credit card
8    to scrape the wet off my arms afterwards but I never
9    dripped a drop.  However, here in Florida I can leave a
10   puddle on the floor after I come in from running or
11   working outside.
12       Q.  The purpose of our body sweating is to release
13   water and toxins and let it run off our body, right?
14       A.  But it can evaporate off for cooling or if the
15   humidity is high, as in south Florida, it can actually
16   drip off a person.
17       Q.  Drip off a person?
18       A.  Yes.
19       Q.  And then be unavailable for absorption?
20       A.  Yeah, but not so in --
21       Q.  In a canyon in Rancho Palos Verdes not so?
22       A.  Not likely.  It's very low humidity.
23       Q.  Low humidity?
24       A.  Yeah.
25       Q.  Okay.  So what assessment did you do?  What

Page 88

1    model did you create to assess the -- what happens to
2    human sweat when it gets off the body in Rancho Palos
3    Verdes or San Pedro?
4        MR. WOOL:  Objection.  Form.
5        THE WITNESS:  Simply studies referenced in my
6        report that indicate that sweating can increase
7        transfer through the jeans; however, in my
8        quantitative analysis, using the POEM method, I use
9        the 20 percent transfer rate which is the general
10       default value used in the literature.
11   BY MR. KALAS:
12       Q.  And sweating can enhance penetration through
13   the jeans.  Were those studies that were done on
14   glyphosate in particular?
15       A.  Well, I think in the Machado study provided
16   some information on sweating and fabric transfer, but I
17   can't point to that right now.
18       Q.  Okay.  You mentioned sweat evaporating.  If
19   glyphosate bound to the sweat and then it evaporated
20   riding along with the water, that's your theory, right,
21   that the glyphosate would evaporate with the water
22   molecule?
23       MR. WOOL:  Objection.  Form.
24       THE WITNESS:  No, that's not my theory.  It's
25       simply studies have pointed out that if the fabric

Page 89

1    becomes moist with sweat, the degree of transfer can
2    increase --
3    BY MR. KALAS:
4        Q.  Okay.
5        A.  -- to the fabric.
6        Q.  So you're talking about transfer through
7    fabric, my question is about evaporation which is
8    something you mentioned with the sweat.
9        A.  In a dry environment sweat evaporates to cool
10   the body and effectively -- works very effectively in a
11   dry, nonhumid environment.
12       Q.  Okay.  And is it your opinion that glyphosate
13   is bound to the water molecule from time to time that
14   evaporates?
15       A.  I'm not sure I understand that question.
16       Q.  So if I understand correctly, you agree with me
17   that glyphosate, being hydrophilic by nature, would bind
18   to sweat, which is mostly made up of water, correct?
19       A.  No, it wouldn't bind, it would be soluble in
20   the water.
21       Q.  Okay.  Soluble in the water.
22       A.  And the molecular weight and the vapor pressure
23   of glyphosate is very different than that of water.  It
24   has a much higher molecular weight and a vapor pressure
25   such that the water would evaporate at a higher rate

23 (Pages 86 to 89)

Confidential - William Sawyer, Ph.D.

Page 90

1 than the glyphosate, leaving the glyphosate behind.
2 Q. Okay. I understand completely. So if the
3 glyphosate solubilizes in the water in the sweat bead, a
4 few things could happen. One thing that could happen is
5 the sweat bead could run off the body and fall on the
6 ground, right?
7 A. In a human environment that's very likely.
8 Q. Okay. And the glyphosate would remain
9 solubilized in that sweat bead, right?
10 A. Yes.
11 Q. Okay. Another thing that could happen is the
12 water could evaporate because the water evaporates at a
13 lower temperature than glyphosate, right?
14 A. Yes.
15 Q. What's the temperature that water evaporates?
16 A. It will evaporate at any temperature, even from
17 ice it will sublimate it from ice.
18 Q. What is the temperature at which water
19 evaporates at a higher degree?
20 A. Well, boiling point is 212 degrees Fahrenheit.
21 Q. 212 degrees Fahrenheit. And glyphosate
22 evaporates at an even higher temperature than water,
23 true?
24 A. Yes.
25 Q. Okay. And so one of the reasons inhalation

Page 91

1 exposure is widely considered to be very low with
2 glyphosate is because it evaporates at such a high
3 temperature, true?
4 A. No.
5 Q. No, that's not why. Okay. Which part of
6 that's wrong?
7 A. The -- it would be the -- repeat what you said
8 again, please.
9 Q. One of the reasons inhalation exposure with
10 glyphosate is considered to be low is that it does not
11 evaporate at temperatures we experience here on earth,
12 except in an artificial setting, so not natural
13 temperatures?
14 A. Yes, it remains with the aerosol droplet.
15 Q. And the aerosol droplet for glyphosate to be
16 inhaled and bioavailable needs to be at a level below a
17 hundred mikrons, right?
18 A. Well, for actual inhalation, yes; however,
19 droplets larger than a hundred mikrons are still
20 captured in the mucosal surfaces of the mouth and nose
21 and nasal ciliary and upper respiratory tract and do not
22 make it to the deep lung, but nonetheless, are captured
23 by the mucosal surfaces and with some extent of
24 absorption.
25 Q. And what happens with those ones that are

Page 92

1 larger than a hundred mikrons is that they essentially
2 become orally ingested, right, they pass through a GI
3 tract?
4 A. That's right.
5 Q. Okay. And the majority of glyphosate that
6 passes through our GI tract is not absorbed, right, it
7 passes through unchanged?
8 MR. WOOL: Objection. Form. Compound.
9 THE WITNESS: I would agree that a portion of
10 it passes through the GI tract. I'm not prepared to
11 provide a quantitative percent of bioavailability at
12 this time.
13 BY MR. KALAS:
14 Q. Okay. And you didn't do any experiments or
15 anything like that to determine the exact mikron size in
16 the aerosol that Mr. Russo was exposed to, right?
17 A. No, I did assess it.
18 Q. Oh, you did assess it. Okay. How did you
19 experimentally assess the mikron size that Mr. Russo was
20 exposed to?
21 A. Very simple. I followed the general
22 methodology that's published in the peer review
23 literature and that is to determine whether the
24 application is aerosol or CDA. CDA provides a very,
25 much more uniform droplet size with less drift and lower

Page 93

1 exposure. And what I discovered was that he did not use
2 a CDA application method but aerosol.
3 Q. Okay. And so it's your opinion that when Mr.
4 Russo sprayed Roundup it was an aerosol that went
5 everywhere, that's your opinion? You're going to show
6 that video with the purple spray everywhere at trial?
7 That's what you're going to do?
8 MR. WOOL: Objection. Form. Misstates the
9 testimony. Compound.
10 THE WITNESS: No, I'm going to explain that
11 when an aerosol wand is pointed to the ground there
12 is less drift. When weeds are knee high or chest
13 high then the drift is much more serious due to the
14 level of application.
15 BY MR. KALAS:
16 Q. Are you going to tell the jury inhalation was a
17 significant route of exposure for Mr. Russo?
18 A. It is my opinion based upon the peer review and
19 published studies that inhalation is a very minor route
20 of exposure. It's not zero but it's very minor. Far
21 less than 10 percent of his total exposure was
22 inhalation.
23 Q. Okay. So you're not going to tell the jury
24 that inhalation was a significant route of exposure for
25 Mr. Russo? I'm asking specifically to Mr. Russo not the

24 (Pages 90 to 93)

Confidential - William Sawyer, Ph.D.

Page 94

1    general literature.
2        A.  Well, but you're asking the word "significant."
3        Q.  Okay.  So let me put a quantity on it.  Are you
4    going to tell the jury that more than 90 percent of Mr.
5    Russo's exposure was due to dermal exposure?
6        A.  Yes.
7        Q.  Okay.  Let's go back to testimony.  Now, Mr.
8    Russo at deposition said that he wore hiking or work
9    boots, right?
10       A.  He did, but I believe he later explained that
11   in more detail.
12       Q.  Okay.  My question is about what he said at
13   deposition, okay?  At deposition under oath did Mr.
14   Russo state that he wore hiking or work boots?
15       A.  Yes.
16       Q.  Okay.  And at deposition under oath did Mr.
17   Russo elaborate as to whether he said work boots he
18   meant sneakers?
19       A.  No.
20       Q.  Did his attorneys have an opportunity to ask
21   questions of him at deposition under oath?
22       A.  Yes.
23       Q.  Did Mr. Russo elaborate at deposition that when
24   he said work boots, he meant flip-flops?
25       A.  No.

Page 95

1        Q.  Did Mr. Russo's attorneys have an opportunity
2    to ask him to elaborate on whether when he said work
3    boots he meant flip-flops?
4        A.  Yes.
5        Q.  Okay.  When the weeds were tall, because of
6    scratching Mr. Russo testified he wore a long-sleeve
7    T-shirt, right?
8        A.  Yes.
9        Q.  Okay.  And so one thing that you've talked
10   about in previous cases is walking through weeds where
11   glyphosate has been applied and getting incidental
12   contact on the skin, right?
13       A.  Yes.
14       Q.  Okay.  And wearing the long-sleeve shirt here
15   and the long pants with the taller weeds meant that his
16   arms and legs would have been clothed and thus would
17   have had reduced exposure to that incidental contact,
18   right?
19       A.  As opposed to the -- a short-sleeve individual
20   using the home garden methodology, that's correct.  And
21   in this case I calculated it both ways.
22       Q.  Okay.  Now, when Mr. Russo was under oath at
23   deposition, he testified that he couldn't remember if he
24   wore gloves, right?
25       A.  He did.  He did testify to that, yes.

Page 96

1        Q.  And have you uncovered any photos or other
2    documentary evidence showing Mr. Russo wearing or not
3    wearing gloves when applying Roundup?
4        A.  I have not.
5        Q.  Okay.  Sticking with the ██████ property for a
6    minute.  This is the 2000 to 2006 period, did Mr. Russo
7    describe any incidents where he fell into the weeds
8    there after spraying?
9        A.  In the deposition?
10       Q.  Yes, sir, in the deposition.
11       A.  No.
12       Q.  At ██████  So ██████ is the canyon slope, sir,
13   and not the hillside.
14       A.  Deposition page 156, Mr. Russo has a
15   recollection of, quote, falling down the hillside a few
16   times and liquid and everything going on me.
17       Q.  Okay.  So, again, that was about the second
18   property, sir.
19       A.  ██████
20       Q.  No.  ██████████ was the second property.
21       A.  Oh, ██████  Okay.  I misunderstood the
22   terminology.  I'm sorry.
23       Q.  Okay.  So let me create a clean record here.
24       A.  Okay.
25       Q.  Did Mr. Russo at deposition under oath describe

Page 97

1    any incidents where he fell into the weeds at the ██████
2    property after spraying?
3        A.  No.
4        Q.  Okay.  Did Mr. Russo when he was under oath at
5    deposition describe a specific spill incident he
6    recalled at the ██████ property?
7        A.  At deposition, no.
8        Q.  Okay.  Let's move on to ██████████  Mr.
9    Russo sprayed there from 2006 to 2018, right?
10       A.  I quantitated 2006 through 2013.
11       Q.  Oh, that's because he hired it out after that.
12   Okay.  You're correct.  So let me fix that.  Mr. Russo
13   sprayed at ████████████ from 2006 to 2013, right?
14       A.  Yes.
15       Q.  Okay.  And he wore the same type of clothing
16   there that he wore at ██████ right?
17       A.  Yes.
18       Q.  Okay.  Now, you talked about in your report
19   that Mr. Russo -- and this is on page 25.  You state,
20   "Mr. Russo has a recollection of falling down the
21   hillside a few times and liquid and everything going on
22   me."  Do you see that?
23       A.  Yes.
24       Q.  Okay.  So if you would go to page 156 and 157
25   of his deposition, please.  I guess you don't have that.

Confidential - William Sawyer, Ph.D.

Page 98

1    We need to mark that. Give me a sec.
2         MR. KALAS: Did you have the depo on there?
3         MR. WOOL: I do have the depo on there. He
4    doesn't have access. It was just a calendar pop-up.
5    If you want, I can actually just bring up the depo.
6         MR. KALAS: That's all right. I already marked
7    it. Marking it as Exhibit 11, the depo.
8    BY MR. KALAS:
9         Q. All right. And it's true when he was under
10   oath at deposition, starting at page 156, line 6, Mr.
11   Russo stated the following upon questioning. "Question:
12   What's your recollection? Answer: Falling down the
13   hillside a few times and liquid and everything going on
14   me."
15        And that is the portion of his testimony you're
16   citing in your report, correct, sir?
17        A. Yes.
18        Q. Okay. If we continue to go down the deposition
19   transcript it reads, "Question: How many times would
20   that have happened at this property? Answer: No idea.
21   Question: Was it just a couple? Answer: Again, no
22   idea. Question: Was it less than? Answer: I would
23   only be able to speculate. Question: Was it single
24   digits? Answer: Yes. Question: This wasn't a regular
25   occurrence of you just falling down, correct? Answer:

Page 99

1    Correct. Question: When you would fall down, how would
2    it get on you, the Roundup? Answer: I can only assume
3    it spilled on me for when I was spraying, you know, I
4    fell down and the sprayer was going. I -- it's only an
5    assumption. Question: You don't have a specific
6    recollection of that? Answer: Nonverbal response.
7    Question: That's a no? Answer: No." Did I read that
8    correctly?
9         A. Yes.
10        Q. You agree that Mr. Russo did not have a
11   specific recollection at deposition under oath of the
12   sprayer spilling on him falling down the hill, correct?
13        A. Could you repeat that?
14        Q. You agree that at deposition under oath Mr.
15   Russo did not have a specific recollection of the
16   sprayer spilling on him when falling down a hill?
17        A. I can't answer that because he wasn't asked
18   about the sprayer falling on him.
19        Q. I said sprayer spilling on him. The Roundup --
20   let me rephrase.
21        A. I don't see where he ever was asked about the
22   sprayer spilling on him.
23        Q. Okay. If you go to page 156, line 21, and he
24   says: "When you would fall down, how would it get on
25   you, the Roundup?" You agree the attorney's asking how

Page 100

1    the Roundup would get on him, right?
2         A. Right.
3         Q. Okay. And afterwards he's asked, he says
4    "Answer: I could only assume it spilled on me when I
5    was spraying, you know, I fell down and the sprayer was
6    going. It's only an assumption. Question: You don't
7    have a specific recollection of that? Answer:
8    Nonverbal response. Question: That's a no? Answer:
9    No."
10        So it's true that Mr. Russo under oath at
11   deposition had no specific recollection of the Roundup
12   spilling on him when he fell down the hill?
13        A. No.
14        Q. You disagree with that?
15        A. I disagree because he said the sprayer was
16   going.
17        Q. Okay.
18        A. He was at ground level with the sprayer going,
19   so he was in the spray.
20        Q. How do you interpret the statement, "you don't
21   have a specific recollection of that? Answer:
22   Nonverbal response. Question: That's a no? Answer:
23   No." How do you interpret that?
24        A. Well, the attorney who -- Attorney Martinez
25   asked, how would it get on you, and he did say that

Page 101

1    prior to that -- somewhere he said that the sprayer was
2    going.
3         Q. Okay. But how do you interpret the
4    statement -- from a forensic toxicology point of view,
5    how do you interpret the statement you don't have a
6    specific recollection of that?
7         A. That we cannot conclude that liquid from the
8    sprayer got on him and I never assumed it did. What I'm
9    going is, is the fact in the case that according to his
10   deposition testimony, he was down at ground level with a
11   sprayer going, so he's now in the cloud of drift. I'm
12   not assuming that the sprayer actually opened up and
13   dripped on him, that's not my opinion.
14        Q. Okay. So you're not going to tell the jury
15   that when Mr. Russo fell down the hill, he had liquid
16   from the sprayer come out and get all over him?
17        A. No.
18        Q. Okay.
19        A. My understanding is the sprayer was going and
20   he was at ground level.
21        Q. Okay. I'm happy that the record's clear then.
22   Okay.
23        Now, another thing that Mr. Russo reported in
24   deposition, and you talk about this in your report, on
25   page 26, he stated in the third paragraph here, he

26 (Pages 98 to 101)

Confidential - William Sawyer, Ph.D.

Page 102

1  recalls that the Roundup pump sprayers would
2  occasionally fail and leak all over the place after
3  which he would have to stop and go in and wash.  Did I
4  read that correctly?
5      A.  Yes.
6      Q.  And you further state, he recalls getting the
7  concentrate on his skin and washing it off with soap and
8  water.  Did I read that correctly?
9      A.  Yes.
10     Q.  Okay.  And so it's your understanding that when
11 Mr. Russo noticed a leakage on his body that he
12 testified under oath at deposition he would stop and
13 wash it off, right?
14     A.  Yes.
15     Q.  Okay.  And washing is an effective method
16 especially in the near time after the exposure of
17 removing glyphosate from the skin, correct?
18     A.  If washed with sufficient water.  If wiped
19 or -- and not totally rinsed and the soap film, as I
20 talked about in Exhibit 2, the SLS, sodium lauryl
21 sulfate, remains on the skin with the glyphosate that
22 actually substantially enhances dermal absorption.  So
23 it's important that when a person washes with soap, they
24 do a thorough job of washing and rinse it all off.
25     Q.  Did you ask Mr. Russo if the soap he used

Page 103

1  contained sodium lauryl sulfate in your exposure
2  evaluation?
3      A.  No.
4      Q.  Okay.  And in the case of Mr. Russo, do you
5  have any reason to believe he did not wash thoroughly
6  after he was exposed to spills?
7      A.  No.  There have been situations where I have
8  discovered farmers in locations with nothing more than a
9  wet rag or wet towel or a bottle of water, and with very
10 limited ability to fully rinse.  But in this case I
11 believe he did have sufficient water available.
12     Q.  Okay.  And given the immediate washing after
13 spill incidents, you did not include spill incidents in
14 your dose evaluation, correct?
15     MR. WOOL:  I'm just going to object to the
16 mischaracterization of "immediately washing off
17 after spills," that is not reflected in the
18 testimony.
19 BY MR. KALAS:
20     Q.  Okay.  Did you include spills in your dose
21 estimate?
22     A.  I did not add anything in for spills, just
23 normal mixing and application.
24     Q.  You're not going to tell the jury spills during
25 either application or during mixing, loading were a

Page 104

1  significant route of exposure for Mr. Russo given his
2  washing history, correct?
3      A.  I would have to have more information in the
4  question.  For example, if I were given a hypothetical
5  in trial and stating that the washing occurred four
6  hours later or six hours later or some metric of time
7  that I could answer the question.
8      Q.  Did you ask Mr. Russo in your interview how
9  long after he spilled he washed his skin?
10     A.  With respect to spills, no.
11     Q.  Okay.  And so at this point, based on this
12 record, under oath when Mr. Russo stated he would stop
13 and go in and wash, you have no reason to believe spills
14 were a significant contributor to his exposure, right?
15     A.  I have no specific incidents of spills which I
16 have accounted for quantitatively.
17     Q.  Okay.
18     A.  I have treated him as not having significant
19 spills.  Now, if he explains significant spills to a
20 jury and I'm asked questions in a hypothetical regarding
21 time durations prior to washing, I could answer those
22 questions from based on the amount of time required for
23 dermal absorption.  But I am not at this time and in my
24 report I do not have any specific spill examples with a
25 metric of time prior to washing.

Page 105

1      MR. WOOL:  Let me just make an objection for
2  the record that I believe the stopping and going in
3  to wash the Roundup off of his skin was in the
4  context of the sprayer failing and not being usable.
5      MR. KALAS:  The record is going to speak for
6  itself but I appreciate the testimony.  Let's go off
7  the record.
8      VIDEOGRAPHER:  Going off the record at 10:43.
9  (A short break was taken.)
10     VIDEOGRAPHER:  We're back on the record.  The
11 time is 10:53.
12 BY MR. KALAS:
13     Q.  Okay.  Couple follow-up questions on Mr.
14 Russo's exposure.
15     Did you ask any questions or did you review any
16 evidence -- let me break it up.
17     Did you ask any questions about Mr. Russo about
18 the steepness or grade of the hillsides and/or canyons
19 he was applying on?
20     MR. WOOL:  Objection.  Form and compound.
21     THE WITNESS:  Perhaps simplify.
22 BY MR. KALAS:
23     Q.  Sure.  You understand the concept of steepness
24 or grade?
25     A.  Yes.

Confidential - William Sawyer, Ph.D.

Page 106

1    Q.  Okay.  And did you review any evidence
2  regarding the ███ property, either via deposition or
3  photographic or what have you that provided you any
4  information on the steepness or grade of the canyon
5  going down?
6    A.  Yes.
7    Q.  Okay.  What was the steepness or grade as a
8  degree?
9    A.  I have with me a Google Earth image.
10   Q.  Okay.
11   A.  And what I did to assess that, on the phone
12 with Mr. Russo during this interview, I asked him if he
13 could open Google Earth, which he did.  I asked him to
14 go to a certain address, which he did, and I asked him
15 to adjust his page, so he could see the swimming pool
16 back behind his property.
17   Q.  Okay.  So can you hold it up for the camera,
18 please?  So his property is with the red dot on it,
19 correct?
20   A.  Yes.
21   Q.  Okay.  Now, you're looking at a different
22 property than what I'm asking about.
23   A.  Correct, but I asked him to do this with both
24 of the properties.
25   Q.  Okay.

Page 107

1    A.  And so I could discuss with him and ask
2  questions where he sprayed and the topography.  And what
3  he explained was -- in response to your question, was
4  that there was a -- I think he called it a culvert or
5  a -- I think what he used was a culvert, but -- not
6  a pipe, but a very -- a sharp point where the water
7  normally flows.
8    Q.  Okay.  Which property are we talking about?
9    A.  On both properties.
10   Q.  Okay.
11   A.  And there is a portion of the property that is
12 very steep due to the cut of that culvert or ditch or
13 whatever you call it.
14   Q.  Okay.  I want to break up the properties, if
15 you don't mind, so I just understand exactly what you
16 discussed with him.
17      First of all, there's no discussion in the
18 deposition transcript under oath of the steepness or
19 grade of the properties, correct?
20   A.  Yes, that's right.
21   Q.  Okay.  And there's no photographic evidence
22 that in and of itself reveals the steepness or grade of
23 the properties, right?
24   A.  Right.  You can't tell from Google Earth
25 imagery.

Page 108

1    Q.  So you relied on your interview with Mr. Russo
2  to discern that, correct?
3    A.  Yes.
4    Q.  Okay.  So let's start with the ███ property,
5  okay?
6    A.  Yes.
7    Q.  The ███ property, as I understand it, had a
8  canyon behind it that had a floodplain in it, correct?
9    A.  Yes.
10   Q.  Okay.  And when Mr. Russo would apply, would he
11 apply at the bottom of the canyon and
12 going upwards or would he apply starting at the top of
13 the canyon and going downwards?
14   A.  I don't recall.
15   Q.  Okay.  And he didn't tell you anything about
16 that on your interview with him, right?
17   A.  He may have but I didn't find it relevant, so I
18 didn't take it down.
19   Q.  Okay.  And as far as the ███ property goes,
20 can you give me a rough number as far as the degree of
21 grade on the canyon going downwards?
22   A.  No.
23   Q.  Okay.  And then if we take the ███████
24 property, did Mr. Russo -- that's the one with the
25 hillside behind it, right?

Page 109

1    A.  Right.
2    Q.  Okay.  And did Mr. Russo explain to you whether
3  or not he applied starting at the top of the hill going
4  downwards or starting at the bottom of the hill going
5  upwards?
6    A.  No, I never asked him that.
7    Q.  Okay.  And did Mr. Russo indicate to you as far
8  as a degree what the grade was on that property going
9  upwards as far as a rough estimate of that?
10   A.  No.
11   Q.  Do you have any evidence that you could point
12 to right now to indicate the degree of that grade?
13   A.  No.
14   Q.  Okay.  And when you talk about this culvert, I
15 understand how that would work in a floodplain, it's
16 going down from both ends and you'd have a pipe in the
17 middle, right, to kind of get the water through; is that
18 how you understood it?
19   A.  I didn't understand it with a pipe, it was a
20 cut.
21   Q.  Just a cut?
22   A.  A sharp cut.
23   Q.  Okay.  But it would essentially -- the two
24 sides of the canyon would act as a funnel for the flood
25 water?

28  (Pages 106 to 109)

Confidential - William Sawyer, Ph.D.

Page 110

1    A.  That's correct.
2    Q.  Okay.  What I don't understand is on the
3  hillside how that would work.  So the hillside would be
4  going upwards; why would there be a culvert there?
5    A.  The way he described it, there was a -- at the
6  ▮▮▮▮▮▮▮▮▮ property he described a wall, and I can
7  see it in the photo, that was walled off on one side.
8    Q.  Okay.
9    A.  If you look at the --
10   Q.  Yeah, I'm looking at the property.
11   A.  I can show you on this Google image.
12   Q.  Okay.  So it appears that there are two walls?
13   A.  Yeah, there's two walls.  I think it's the
14  lower wall that -- right here.
15   Q.  Yeah.  Okay.
16   A.  Involved in the floodplain.
17   Q.  Okay.  So ▮▮▮▮▮▮▮ wasn't a floodplain,
18  that was just spraying the hills, right?  But it's your
19  understanding that -- let's -- do you mind if I approach
20  and just take a look at it with you real quick?
21     MR. WOOL:  Do you want to just mark it?
22     MR. KALAS:  Yeah, I just don't want to ruin it,
23  but let me mark this as Exhibit 12.
24  BY MR. KALAS:
25   Q.  Do you mind if I mark it as Exhibit 12?

Page 111

1    A.  Yeah, I suggest perhaps marking it maybe on
2  that corner where the road is.
3    Q.  Where the road is.  Yep.  That's a good idea.
4  Okay.  So I'm going to mark first in green the wall at
5  the back of the hillside where he sprayed.  Is that the
6  wall at the back of the hillside where he sprayed as you
7  understand it?
8    A.  Yes.
9    Q.  Okay.  And then I'm going to mark -- get
10  another color here.  I'm going to mark in pink the wall
11  at the back of the property behind him.  Is that pink
12  mark your understanding of where the wall was on the
13  property -- or the wall was on the property behind him?
14   A.  Yes.
15   Q.  Okay.  And then in between those two areas,
16  which I'll shade in in pink, is where your understanding
17  there was a culvert, correct?
18   A.  Some type of cut.
19   Q.  Okay.  I understand now.  So is it your
20  understanding, then, that the area that I shaded in in
21  green right here is the hillside on which Mr. Russo
22  sprayed?
23   A.  Yeah, and beyond.
24   Q.  Okay.  And beyond, okay.  So --
25   A.  Up to the wall.

Page 112

1    Q.  Up to the wall.  Right.  So up to the green
2  line.  So let me carry it through.  It's kind of faint,
3  but can you see where I carried through the green line
4  there?
5    A.  It seems to me that he actually sprayed beyond
6  that green line.
7    Q.  Okay.  So it's your understanding he sprayed
8  into the culvert area?
9    A.  Yes.
10   Q.  Okay.  Where did he testify about that?
11   A.  Well, he told me that it was a legal thing, he
12  had to, that there was a requirement by the code to keep
13  that free of congestion.
14   Q.  And I think there may be some confusion about
15  properties here.  That was the code at the ▮▮▮▮▮▮
16  property, right, where he had to keep the floodplain
17  clear?
18   A.  Yes.
19   Q.  And we talked about the beneficial uses of
20  glyphosate in keeping floodplains clear earlier?
21   A.  Right.
22   Q.  Okay.  There was no code at RPV for that,
23  right?
24   A.  That's true, yes.  Thanks.
25   Q.  So is it your understanding, then, that where I

Page 113

1  extended the green line through is the extent of the
2  hillside?
3    A.  I'm not certain.
4    Q.  Fair enough.  Okay.  So let's continue
5  on.  On page 25 you talk about the fact that Mr. Russo
6  testified under oath that he remembered reading labels
7  on both ready to use and concentrated Roundup products
8  at the ▮▮▮▮ address, right -- or excuse me, at the Rue
9  Le Charlene address, correct?
10   A.  Yes.
11   Q.  Okay.  And it's true that he testified
12  elsewhere in his deposition that he always read the
13  label on anything he used, right?
14   A.  I seem to recall that, but I'm wondering if I
15  should take the time to find it to be certain.
16   Q.  Okay.  So if you go to page, sir, 103 of
17  Exhibit 11.  Are you there?
18   A.  Yeah.
19   Q.  Okay.  Line 20 it states, "Question:  Do you
20  have a specific recollection of reading a Roundup label
21  though?  Answer:  I read all labels typically, and if
22  it's something that is of a chemical nature, I typically
23  read it closely."  Did I read that correctly?
24   A.  Yes.
25   Q.  Do you agree that Mr. Russo testified that he

29  (Pages 110 to 113)

Confidential - William Sawyer, Ph.D.

Page 114

1 reads all labels typically?
2    A. Is it my --
3    Q. Understanding that he testified to that?
4    A. Yes.
5    Q. Okay. Is it your understanding that Mr. Russo
6 testified that when something is of a chemical nature,
7 he would read that label closely?
8    A. Yes.
9    Q. Okay. And is Roundup, in your opinion, of a
10 chemical nature?
11    A. Yes.
12    Q. Okay. I'm going to mark as Exhibit 13 a label
13 for Roundup Weed and Grass Killer Concentrate Plus.
14    MR. KALAS: No, I couldn't remember what I
15 marked as 12.
16    MR. WOOL: And do you have a copy?
17    MR. KALAS: Yeah. And, counsel, just so you
18 know, this was produced in a smaller format, so what
19 I've done is you'll note that the Bates number for
20 like pages two and three are the same.
21    MR. WOOL: Okay.
22    MR. KALAS: That's just blown up.
23    MR. WOOL: Right.
24    MR. KALAS: So we can assess it more easily
25 here.

Page 115

1 BY MR. KALAS:
2    Q. Okay. So does this appear to be a label that
3 would have appeared on a bottle of a product that Mr.
4 Russo testified to using?
5    A. It is consistent with it based upon the
6 percentage of glyphosate, the diquat percentage and the
7 six ounces per gallon mixture; however, I don't know
8 what date this label is.
9    Q. Can you look at the last page? I'll help you
10 with that. Do you see the date in the bottom left of
11 that label?
12    A. Yes, 2009.
13    Q. Okay. And is that contemporaneous from when
14 Mr. Russo was using Roundup Concentrate Plus?
15    A. Yes.
16    Q. Okay. If you go to Bates number 154, the first
17 one of it, the one that says product facts at the top on
18 that exhibit, sir.
19    A. Oh. Okay. All right.
20    Q. All right. Do you see the section that says
21 "directions for use"?
22    A. Yes.
23    Q. Okay. And it says, "It is a violation of
24 federal law to use this product in a manner inconsistent
25 with its labeling." Did I read that correctly?

Page 116

1    A. Yes.
2    Q. Do you agree it's a violation of federal law to
3 use a pesticide in a manner inconsistent with its
4 labeling?
5    MR. WOOL: Objection. Calls for a legal
6 conclusion.
7    THE WITNESS: I think for an applicator that's
8 true. In other words, a commercial applicator. For
9 home user, I can't answer that. I'd have to ask a
10 lawyer.
11 BY MR. KALAS:
12    Q. Okay. You got a couple here. Let's go on to
13 the next portion. User safety recommendations. Do you
14 see the first bullet point?
15    A. I do.
16    Q. Okay. It says, "Clothing and protective
17 equipment exposed to this product should be washed in
18 detergent and hot water. Such items should be kept and
19 washed separate from other laundry." Did I read that
20 correctly?
21    A. Yes.
22    Q. Did Mr. Russo do that?
23    A. I don't know.
24    Q. You didn't ask him?
25    A. No.

Page 117

1    Q. Did he testify to washing his clothes separate
2 from other laundry?
3    A. I don't recall seeing such, no.
4    Q. Okay. So you don't know if he followed that
5 portion?
6    A. I don't know if the question was asked,
7 actually.
8    Q. But you don't know if he followed that portion
9 of the label?
10    A. I do not.
11    Q. Okay. Let's move to the next one. "User
12 should wash hands before eating, drinking" -- actually,
13 let me back up.
14    Do you agree bullet point one about clothing
15 and protective equipment would reduce potential exposure
16 to glyphosate?
17    A. Yes.
18    Q. Okay. Let's go to bullet point two. "User
19 should wash hands before eating, drinking, chewing gum,
20 using tobacco or using the toilet." Did I read that
21 correctly?
22    A. Yes.
23    Q. Okay. Do you know if Mr. Russo washed his
24 hands before eating, drinking, chewing gum, using
25 tobacco or using the toilet?

30 (Pages 114 to 117)

A. No.
Q. Okay. So you don't know if he followed the label on that bullet point, right?
A. I don't.
Q. Okay. Do you agree that had he followed the label on that bullet point it would have reduced his exposure?
A. Yes.
Q. Let's go to number three. "User should remove clothing immediately if product gets inside; then wash thoroughly and put on clean clothing." Did I read that correctly?
A. Yes.
Q. Do you recall any time Mr. Russo ever testified that he felt Roundup inside his clothes?
A. No.
Q. You're not going to tell the jury Roundup got inside his clothes based on testimony he gave at least, right?
A. Well, I think you're getting at -- referring to like a direct spill. For example, when he fell down the hillside, it's not my testimony that he had direct liquid from the tank go into his clothing. I never opined to that.
Q. Did Mr. Russo ever testify that he felt

product, glyphosate product -- or did he ever tell you off the record that he felt glyphosate product inside his clothing?
MR. WOOL: Objection. Form. Compound.
THE WITNESS: No.
BY MR. KALAS:
Q. Okay. And so do you know if he followed this bullet point on the label?
A. That question, I don't want to guess at it. You know, I can't --
Q. Okay.
A. -- to make that determination based on the information we have, there's no testimony that the product went inside his clothing. He didn't tell me that that occurred, so, and I have no reason to believe that he had soaked clothing.
Q. Okay.
A. It's possible, but I just don't have that information to --
Q. Sorry.
A. -- to answer that question about user should remove clothing immediately. You asked me if he followed that recommendation. I -- without more information I can't be certain.
Q. It's your understanding Mr. Russo tried to

follow labeling recommendations based on his testimony, right?
A. Yes.
Q. Okay. And did -- he never testified about removing his clothing mid application, right?
A. That's right.
Q. Okay. So if Mr. Russo tried to follow the label and he never testified about removing clothing mid application, that would suggest he never felt Roundup inside his clothing, right?
A. It would suggest that. I think the question should be directed to him.
Q. And you didn't direct that question to him when you had your interview with him, right?
A. I asked him about spills and he did have contact with his hands, but he didn't -- he didn't state that he had spills soaking his clothing.
Q. Okay. We'll talk about that in a minute. If we go to the next page here, sir, do you see the application restrictions section?
A. Yes.
Q. Okay. And it states, "Do not apply this product in a way that will contact any person or pet, either directly or through drift. Only the person applying this product may be in the area during

application." Did I read that correctly?
A. Yes. One point, however, about what you just read was, you know, I have reviewed various Monsanto concentrate plus labels, and I realize this is in the time era of his application; however, I don't believe this label dates back to the year 2000 when he first started broadcast spraying.
Q. Okay. Let's focus on this label because it's the one we have.
A. Right, I understand that. But what I'm trying to say is, I don't know that this label applies to his entire duration from 2000 to 2013.
Q. Okay. Marker laid down, totally got it. Record's going to speak for itself on what the labels say. On this particular label he was applying when he used this label, right?
A. Yes.
Q. Okay. Or when this label was effective, and --
MR. WOOL: This label was effective when he was applying.
MR. KALAS: Yes. That's what I meant. Word vomit.
BY MR. KALAS:
Q. And he testified to reading the label every time he used the product, right, it wasn't just one

Confidential - William Sawyer, Ph.D.

Page 122

1  time?
2      MR. WOOL: Objection to form. Compound.
3      THE WITNESS: My understanding from what his
4    testimony, he generally read labels of chemical
5    products. Now, as far as every time he used the
6    product, I don't think he specified that because if
7    he's using the same product over and over, it's a
8    little bit ambiguous in the testimony whether he
9    read the same label over and over.
10 BY MR. KALAS:
11     Q. Okay. This label says, "Do not apply this
12 product in a way that will contact any person or pet,
13 either directly or through drift," right?
14     A. Yes.
15     Q. Is Mr. Russo any person?
16     A. Yes.
17     Q. Did he apply at a time when there was drift
18 according to his testimony?
19     A. Yes, drift is unavoidable.
20     Q. Does this product say if drift is unavoidable,
21 it's okay to apply it?
22     A. No, but it's a ruling that can't be followed.
23 There's always drift.
24     Q. Okay.
25     A. And wind is highly variable, as he stated in

Page 123

1    his testimony to me, that the wind was variable and he
2    could not always stay behind the drift.
3      Q. Are there certain pesticides that are only
4    available for use in certain parts of the country
5    because of topografral [sic] or environmental issues like
6    you just discussed, unavoidable drift?
7      A. I'm not familiar with any but it's possible.
8      Q. Okay. Let me back up and ask a question I'm
9    not sure if I got an answer to, which is, does this
10   label say it's okay to apply if drift that results in
11   contact with a person is unavoidable?
12     A. No, but due to variable winds, there's always
13   some contact with drift. It's impossible to completely
14   avoid drift. That's been well documented in the studies
15   of glyphosate and the measurements through patches on
16   the body of applicators. There's always contact with
17   drift. It's unavoidable. So this is an impossible
18   restriction.
19     MR. KALAS: Move to strike as nonresponsive,
20     everything after "no."
21 BY MR. KALAS:
22     Q. Does the label say, do not apply this product
23 in a way that will contact any person or pet, either
24 directly or through drift unless you live near the
25 ocean. Does the label say that?

Page 124

1      A. No.
2      Q. Okay. Do you agree -- it's a question I forgot
3    to ask you. Going back to the previous page, bullet
4    point three, do you agree that bullet point three, that
5    user should remove clothing immediately if product gets
6    inside, do you agree that that recommendation would
7    reduce someone's exposure to glyphosate?
8      A. Bullet three?
9      Q. Under user safety recommendations.
10     A. Okay. What?
11     MR. WOOL: You're on the first one that ends --
12     THE WITNESS: Okay. So bullet three.
13 BY MR. KALAS:
14     Q. Yeah. Do you agree that that would -- if a
15   user followed that recommendation that they should
16   remove clothing immediately if the product gets inside,
17   wash thoroughly and put on clean clothing, do you agree
18   that would reduce exposure if somebody followed that
19   recommendation?
20     A. Yes.
21     Q. Okay. Going back to what we were just looking
22   at, which are the application restrictions. Do you
23   agree if somebody applied in such a way to avoid contact
24   with any person directly or through drift that would
25   reduce exposure to glyphosate?

Page 125

1      A. Yes.
2      Q. Go to the next page, precautionary statements.
3    It says, "Precautionary statements, hazards to humans
4    and domestic animals. Caution: Causes moderate eye
5    irritation. Avoid contact with eyes or clothing. Wash
6    thoroughly with soap and water after handling." Did I
7    read that correctly?
8      A. Yes.
9      Q. Did he wash after handling Concentrate Plus?
10     A. Eventually, not right away.
11     Q. Not right away. Okay.
12     A. It varied. In many -- in many cases there were
13   many hours after the initial exposure.
14     Q. You will at least agree with me that Mr. Russo
15   did not apply Roundup in a way that will avoid contact
16   with any person through drift? You're going to tell the
17   jury that he applied Roundup in a way that would result
18   in contact with a person through drift, right?
19     A. Yeah, through contact by touching potentially
20   treated areas and also through unavoidable drift.
21     Q. Okay. Go to page 155, please, the second one.
22   So it's the page after the one we were on.
23     A. Okay.
24     Q. Half of it's in Spanish. There you go. Do you
25   see the section that says "notice" above the Spanish

32 (Pages 122 to 125)

Confidential - William Sawyer, Ph.D.

Page 126

1    section?
2        A.  Yes.
3        Q.  Can you read that into the record?
4        A.  Environmental hazards --
5        Q.  No.  Notice.
6        A.  Oh, notice.  "Buyer assumes all responsibility
7    for safety and use not in accordance with directions."
8        Q.  Any reason to believe that wasn't on a label
9    that Mr. Russo read?
10       A.  Not -- no.  There's no reason to believe that
11   for the year 2009.
12       Q.  Okay.  Go to page 27.  You have Roundup
13   containers from Mr. Russo's garage.
14       A.  Yes.
15       Q.  Have you looked at those Roundup containers,
16   like have you examined them?
17       A.  No, I only have photos.
18       Q.  Is it your understanding Mr. Russo still
19   possesses those Roundup containers?
20       A.  I'm not sure.
21       Q.  Would it be incorrect -- well, you don't know
22   if he still possesses them.  Okay.  How did you get
23   those pictures?
24       A.  They were sent to me.
25       Q.  They were sent to you.  Okay.  By an attorney?

Page 127

1        A.  I don't know.
2        Q.  Okay.
3        A.  I don't remember if Mr. Russo sent them or an
4    attorney.
5            MR. WOOL:  Just for the record, he brought them
6    with him to his deposition.  I think these are
7    Anthony Martinez's photos.
8            MR. KALAS:  Okay.  And does Mr. Russo -- let me
9    just ask you on the record.  Does he still possess
10   these?
11           MR. WOOL:  I believe so.
12           MR. KALAS:  I'd ask that he preserve those.
13           MR. WOOL:  Yes, he was asked to preserve those.
14   BY MR. KALAS:
15       Q.  Have you tested these sprayers?
16       A.  No.
17       Q.  Do you intend to test these sprayers?
18       A.  No.
19       Q.  When you looked at these photographs did you
20   see any visible residue on the sprayers?
21       A.  No.
22       Q.  Okay.  You interviewed Mr. Russo in addition to
23   reviewing his depo testimony and plaintiff fact sheets,
24   right?
25       A.  Yes.

Page 128

1        Q.  Okay.  And Mr. Russo has a disease called CNS
2    lymphoma, right?
3        A.  Yes.
4        Q.  Do you have a concern about Mr. Russo's
5    cognitive ability at this point?
6        A.  I do.
7        Q.  Okay.
8        A.  I reviewed in the -- I believe it was in the
9    deposition transcript that he had to leave his
10   employment because he was not mentally functioning to
11   his normal degree, and he also told me on the phone that
12   he was experiencing -- he called it brain fog, secondary
13   to his chemotherapy.  And I sensed that in speaking with
14   him as well.  He certainly could have a cognitive
15   problem relating to his brain tumor and/or chemotherapy.
16       Q.  Okay.  And I understand you're going to defer
17   any medical opinions on that to another expert, right?
18       A.  Yes, and I've looked at medical records as well
19   and I would defer that, but it's my understanding, as a
20   toxicologist, that there is some evidence of his
21   so-called brain fog.
22       Q.  Okay.  How did you -- did he at his deposition
23   discuss that he was feeling foggy that day?
24       A.  No.  Actually, he came across quite well in my
25   interview.

Page 129

1        Q.  No, no.  Different question.  I asked about his
2    deposition.
3        A.  Oh.
4        Q.  Did he discuss feeling foggy at his deposition?
5        A.  I didn't -- I didn't ask him that so I'm not
6    sure.
7        Q.  Let's pause.  I want to make sure we're focused
8    on when you reviewed his deposition transcript --
9        A.  Oh, okay.
10       Q.  -- did you see him discuss at all feeling a
11   brain fog that day?
12       A.  I don't recall, but I can state after reading
13   the deposition that he -- I want to say contradicted
14   himself in a couple of places which makes me wonder if
15   he was experiencing some type of cognitive difficulty.
16       Q.  Okay.  But in your interview he did mention
17   feeling a brain fog that day, correct?
18       A.  No, he said not -- no.  He said that he has had
19   a problem with brain fog.
20       Q.  Understood.  Okay.  How did you -- what steps
21   did you undertake, either via corroboration with another
22   expert for the plaintiffs or on your own to ensure that
23   Mr. Russo was feeling healthy enough to undertake the
24   interview with you on the 23rd and 24th of September?
25       A.  Well, I asked him how he was feeling, how he

33 (Pages 126 to 129)

Confidential - William Sawyer, Ph.D.

Page 130

1  was doing.  And more importantly, I asked him questions
2  that required him to recall facts that I knew I already
3  had reviewed in the deposition and he recited back
4  answers that were consistent with his prior testimony.
5  I found him to be quite capable on the day I interviewed
6  him.
7      Q.  Okay.  So as far as you know, Mr. Russo was
8  quite capable to answer detailed questions about his use
9  of Roundup, both in your interview with him and at his
10  deposition, right?
11     A.  On the day I interviewed him, that's true.
12  During the deposition I can't say that because I wasn't
13  there.  But in reviewing the deposition there were some
14  inconsistencies in his testimony that didn't make any
15  sense.
16     Q.  So there were inconsistencies in his testimony
17  that didn't make any sense?
18     A.  A couple.
19     Q.  Okay.
20     A.  And that was -- and that is certainly possible
21  to be related to his cognitive difficulties.
22     Q.  Are you a neuropsychologist?
23     A.  No, and I'm not offering an opinion to the jury
24  about this.
25     Q.  Well, I -- that's what I'm getting at.  Are you

Page 131

1  a neurologist?
2      A.  No, and I am not -- stipulating, guaranteeing
3  that I'm not going to tell the jury that I felt he had a
4  brain fog.  I'm just telling you what I've read, and
5  that on the day that I interviewed him he seemed sharp
6  and consistent, and I tested him by asking him questions
7  I already knew the answer to, and he was consistent;
8  however, the records do indicate that he has had some --
9  experiencing cognitive problems related to the brain
10  tumor and potentially his treatment.
11     Q.  All right.  But I want to make sure -- I want
12  to make sure I understand what you're going to tell the
13  jury.  You're not going to tell the jury in response to
14  questions about your interview of Mr. Russo as opposed
15  to his deposition testimony that Mr. Russo was somehow
16  having brain fog on the day of his deposition testimony
17  and was much better on the day he talked to you?  That's
18  not something you're going to tell the jury?
19     A.  No, that would be beyond my role as a
20  toxicologist.  It is important that I assess the
21  validity of the telephone interview, and I did do that,
22  and I found that he was consistent and his testimony to
23  me was consistent with what he had previously testified
24  to and he clarified some things for me that I needed
25  more information for with respect to his use of the

Page 132

1  product.
2      MR. KALAS:  Okay.  Can we go off the record for
3  a minute, please?
4      VIDEOGRAPHER:  Going off the record at 2:55 --
5  I'm sorry, 11:29.
6      (A short break was taken.)
7      VIDEOGRAPHER:  We're back on the record.  The
8  time is 11:31.
9  BY MR. KALAS:
10     Q.  All right.  Doctor, if we go to table three in
11  your report which is on page 31 to 32.  You have some
12  assumptions regarding how Mr. Russo used the product and
13  the personal protective equipment he wore when he used
14  the product, right?
15     A.  Assumptions?  No.
16     Q.  Well, okay, let me -- inputs.  Is "inputs" a
17  more fair word?
18     A.  Yes.
19     Q.  Okay.  I want to ask you about a couple of
20  them.  Is it true that the statement never wore gloves
21  was not uttered by Mr. Russo under oath at deposition?
22     MR. WOOL:  Objection to the form of the
23  question.
24     THE WITNESS:  That's not what he stated under
25  oath.  He stated that he wasn't sure.

Page 133

1  BY MR. KALAS:
2      Q.  Right.  And you used "never wore gloves" as an
3  input in your Roundup application history based off your
4  off-the-record interview with Mr. Russo, right?
5      A.  Yes.
6      Q.  Okay.  And is it true that the statement that
7  he typically wore flip-flops or tennis shoes for spot
8  spraying was not testified to under oath at deposition
9  by Mr. Russo?
10     A.  I'd have to check the deposition because I
11  don't know that that question was ever asked related to
12  spot spraying as opposed to broadcast.
13     Q.  Okay.  Well, let's go back to the broadcast
14  spraying.  Is it true that at deposition, if you go to
15  page 131, lines 6 through 12, Mr. Russo stated under
16  oath that he would typically wear work boots or hiking
17  boots, correct?
18     A.  Page 131, line 6?
19     Q.  Well, it's the answer to that question, but
20  it's lines 11 and 12.
21     A.  Yes.
22     Q.  Okay.  And you wrote that he typically wore
23  tennis shoes, correct, in your inputs?
24     A.  With the broadcast spraying, that's correct.
25     Q.  Okay.  And that was not based off testimony

Confidential - William Sawyer, Ph.D.

Page 134

1   under oath at deposition but was based off your
2   off-the-record interview with Mr. Russo, correct?
3       A.   That's right.
4       Q.   And you didn't record that interview on tape
5   for the jury to hear, right?
6       A.   Correct.
7       Q.   And you didn't have a court reporter, like
8   Ms. Theresa in the room, to take down your interview,
9   right?
10      A.   No.
11      Q.   Okay.  And you used the tennis shoes as an
12  input in your dose model in this case, right?
13      A.   No, I did not.
14      Q.   Okay.
15      A.   I used the two models.  One used full gear.
16      Q.   Did you use never wore gloves as an input in
17  your model in this case?
18      A.   That I did.
19      Q.   Okay.
20      A.   And I used gloves in one model, no gloves in
21  the other.  So I covered both possibilities because I am
22  aware of the discrepancy in the deposition testimony
23  versus what he explained to me.
24      Q.   Well, of course, one model you calculated -- I
25  don't know if that's true.  Let's go to pages 43 and 45.

Page 135

1   If you start on model or page 43 using the home garden
2   sprayer; do you see that?
3       A.   Yeah.
4       Q.   Do you see the hands for dermal exposure during
5   spray application?
6       A.   Yeah, it's no gloves.
7       Q.   Okay.  If you go to page 45, which is the
8   hand-held sprayer, do you see the hands for hand-held
9   sprayer application?
10      A.   Yes.
11      Q.   What is it on gloves?
12      A.   No gloves.
13      Q.   Okay.  So both your models you did here assume
14  no gloves, and that's not based on his testimony under
15  oath, that's based off what he told you?
16      A.   That is true, but I do want to explain he gave
17  me a valid answer when I questioned him.  He said that
18  the only time he wore gloves was when he was first
19  clearing and handling brush, not when he was spraying.
20  Never wore gloves when he sprayed.
21      Q.   So I understand what your testimony is, sir,
22  and I understand you're giving that under oath, but,
23  again, there's no record beyond your recollection and
24  what you wrote down in your report about what he told
25  you, right?

Page 136

1       A.   No, there's no other external information.
2       Q.   Okay.  So in this case you -- rather than
3   leaving that as an unknown variable in your model, you
4   assume or you -- well, strike that.  Okay.  Let's keep
5   moving.
6            Do you expect the jury to -- well, strike that.
7            Let's go to exposure days on page 40.  Am I
8   correct that the mean exposure days you calculated for
9   Mr. Russo's application periods at ███████ and ███████
10  ███████  ███████ is 182 days?
11      A.   Eight-hour per day at 182, yes.
12      Q.   So I'm going to mark as Exhibit 14 something
13  we've probably done in every one of these.  You've seen
14  this study many times, right?
15      A.   Yes.
16      Q.   This is the Andreotti 2018 Agricultural Health
17  study?
18      A.   Yes.
19      Q.   And if we go to supplemental table one to start
20  with.
21      A.   Okay.
22      Q.   Mr. Russo would have fallen into quartile four
23  of supplemental table one, right?
24      A.   I need to find supplemental table one.
25      Q.   Sure.  It's in the back.

Page 137

1       A.   Okay.  I'm on supplemental table one.
2       Q.   If you go to the second page of supplemental
3   table one.  This is lifetime days, correct, this table?
4       A.   Yes.
5       Q.   Okay.  And you're going to tell the jury about
6   greater than ten days lifetime in the Eriksson study,
7   right?
8       A.   Yes, but keep in mind very -- this is very
9   careful, very important note that Eriksson defined it is
10  a Swedish working day when I contacted the governmental
11  health department documents in Sweden which defines as
12  an eight-hour workday.  It's not certain that in the
13  agricultural health study whether the lifetime days are
14  eight-hour days.  I'm not certain of that.
15      Q.   Did you review the AHS questionnaires to become
16  more certain of that?
17      A.   I did way back but I don't remember.
18      Q.   Okay.  So if you don't remember right now,
19  we'll move on.  If you go to NHL, quartile four.
20      A.   Okay.
21      Q.   It's -- if you look down at the bottom in the
22  key, it says, quartile four is greater than 108.5 days,
23  right?
24      A.   In the key?
25      Q.   At the bottom, sir, where it says quartiles,

Confidential - William Sawyer, Ph.D.

Page 138

1  Q1:1-13.74.
2       A.  Yeah, 108.
3       Q.  Okay.  And so Mr. Russo would have fallen into
4  that group, greater than 108, right?
5       A.  Correct.
6       Q.  Okay.  And for quartile four, the odds -- or
7  the relative risk is point eight, correct?
8       A.  Yes.
9       Q.  And the confidence interval was point six to
10  1.06, right?
11      A.  Yes.
12      Q.  And that is a null value, does not show a
13  relationship in this population between greater than
14  108.5 days of use of glyphosate and non-Hodgkin's
15  lymphoma, true?
16      A.  Yeah, and I state that in my report that there
17  was no significant finding in this study for that.
18      Q.  And you agree that in this cohorts study
19  conducted by the National Cancer Institute and other
20  agencies that's where he falls into, right?
21      A.  Yes.
22      Q.  And Monsanto had nothing to do with this study,
23  to your knowledge, right?
24      A.  I don't know about that.  I have a document
25  here called the -- peer review document, Critical

Page 139

1  Reviews Toxicology Expression of Concern regarding the
2  agricultural health study.
3       Q.  I don't think that's regarding the agricultural
4  health study, sir.  I think that's regarding the summary
5  papers and critical reviews of toxicology written by
6  Roberts, et al, Williams, et al, et cetera, correct?
7       A.  Yeah.  Yeah, you're right.
8       Q.  So Monsanto had nothing to do with the
9  agricultural health study, true, as far as you know
10  sitting here right now?
11      A.  I'd have to defer that to the epidemiologist.
12      Q.  Okay.  Are there any authors affiliated with
13  Monsanto on that study?
14      A.  Not that I know.  I don't recognize any of them
15  as affiliated, no.
16      Q.  All right.  None of them are listed as working
17  at Monsanto?
18      A.  No.
19      Q.  Okay.  All right.  Let's go to page 43 of your
20  report, says your absorbed dose calculation results.
21  The volume of surface contamination variable in this
22  study -- or in this model, and this is in both the home
23  garden sprayer and the hand-held sprayer, is 50 mills
24  per hour, right?
25      A.  Yes.

Page 140

1       Q.  Where is that derived from, that input?
2       A.  That's derived from the inputs above of
3  duration of spraying four hours, work rate .073 hectare,
4  with an AS.  That's the actual concentration of the
5  material at 143.8 milligram per mill.  At a dose of six
6  liter per hectare, and I reference where -- where those
7  input values came from on the previous two pages.
8       Q.  Well, but, sir, I've looked at lots of your
9  reports and they all have a volume of surface
10  contamination of 50 mills per hour.  Is that an
11  assumption built into the UK POEM model?
12      A.  Yeah, that's not a variable.
13      Q.  Okay.  That's not a variable.
14      A.  No.
15      Q.  It assumes 50 mills per hour.
16      A.  Right.
17      Q.  And then the mill per day is derived from
18  taking that mill per hour figure and inputting the
19  variables at the top?
20      A.  That's right.
21      Q.  Okay.  So 50 mills per hour, is there any
22  glyphosate study that is shown a volume of surface
23  contamination of 50 mills per hour?
24      A.  The Machado study might.
25      Q.  Might?

Page 141

1       A.  Yeah, I don't recall the exact numbers, that's
2  the problem.
3       Q.  Is there any study sitting here right now that
4  you cited in your expert report specifically that states
5  that there's a 50 mill per hour surface contamination
6  from glyphosate use?
7       A.  Machado study in my report.
8       Q.  It states 50 mills per hour, you'll testify
9  that under oath?
10      A.  No, no.  It provides the reference to the
11  measurements which are called PDE, potential dermal
12  exposure, that is how much lands on the surface of the
13  body on the pads.  In these studies pads were placed in
14  various areas of the body with measurements taken, using
15  ionized copper mixed into the solution of glyphosate,
16  and the ionized copper is then used as a surrogate
17  measure of the contact rate in mills per hour.
18      Q.  Let me ask you this.  The UK POEM model when it
19  was first developed was not developed using glyphosate
20  as the model pesticide, right, it was using other
21  pesticides?
22          MR. WOOL:  Objection.  Form.
23          THE WITNESS:  It was designed as a model for
24  multiple pesticides.
25  BY MR. KALAS:

Confidential - William Sawyer, Ph.D.

Page 142

1    Q.  Sir, I didn't ask how it was designed, I asked
2  how the data was derived.  So focus on the question,
3  please.
4        Was the data derived using glyphosate as the
5  model pesticide?
6    A.  No, it was designed for multiple pesticides.
7    Q.  I didn't ask about the design.  Move to strike
8  everything after "no."
9        I want to ask again about where the data inputs
10  for generic inputs that are carried across from each
11  model where they were derived from.  So the 50 mills per
12  hour is standard no matter what in the UK POEM model,
13  right?
14    MR. WOOL:  Objection.  Asked and answered.
15    THE WITNESS:  Yes.
16  BY MR. KALAS:
17    Q.  Okay.  Was that 50 mill per hour deposition
18  volume of surface contamination derived from data on
19  glyphosate or some other pesticide or do you not know?
20    MR. WOOL:  Objection.  Form.
21    THE WITNESS:  As I recall, it was derived from
22    a surrogate material that was sprayed and measured
23    upon patches.
24  BY MR. KALAS:
25    Q.  Okay.  So I'm going to mark as Exhibit 15 a

Page 143

1  study.  I only have two copies of this.  I'm sorry.
2    MR. WOOL:  Which one?
3    MR. KALAS:  Johnson.
4  BY MR. KALAS:
5    Q.  Take a look at Exhibit 15 with me, sir.  And
6  there were knapsack sprayers in the Johnson study,
7  correct?
8    A.  Yes.
9    Q.  Okay.  And if you look at the -- oh, and if you
10  look at the pictogram on page 27, do you see that?
11    A.  Yes.
12    Q.  They have patches on the study that were on the
13  outside of these applicator suits, right?
14    A.  That's right.
15    Q.  Okay.  And that's the methodology you're
16  describing in the Machado-Neto study, right?
17    A.  Yeah.
18    Q.  It's an appropriate methodology for a passive
19  dosimetry study, right?
20    A.  Yes.
21    Q.  Okay.  And if you go to table six and you look
22  at the PDE figure in mills per hour --
23    A.  Well, that's for CDA, you can't use that.  Are
24  you crazy?  That's an entirely different application
25  method.

Page 144

1    Q.  Can I finish my question?
2    A.  Okay.
3    Q.  If you go to table six, mills per hour, am I
4  correct that the highest mills per hour for PDE was .826
5  in this study?
6    A.  It is, but whoever led you to this document
7  didn't know what they were doing.  That's a CDA
8  application.  It's a controlled droplet atomizer.  It's
9  a completely different process which I explained earlier
10  in this deposition.
11    Q.  Sir, did I read it correctly?  Did I read the
12  data incorrectly?
13    A.  Yes, but it's being misused.
14    Q.  Is there any study you can point me to right
15  now where I can look in black and white and see 50 mills
16  per hour for glyphosate, because I'm going to go to
17  Machado-Neto and we're going to talk again.
18    A.  If we look at table seven, I don't know if this
19  was aerosol or CDA, but table seven shows a PDE of 21
20  for non-zero.
21    Q.  That means that there were 21 people who were
22  non-zero, right?  Look at the range.
23    A.  Okay.  So that's the number.  I got ya.  So
24  95th percentile 6, but I believe that's CDA, so it's
25  nonapplicable.

Page 145

1    Q.  I believe that's ATV actually, but that's okay.
2  My question was different, which is, is there any study,
3  sitting here today, that I'm going to look at in black
4  and white that you're going to say 50 mills per hour that
5  you're going to testify under oath trying to be truthful
6  today?
7    A.  As I said earlier, possibly Machado, but I'm
8  not -- I don't recall the values.
9    Q.  Okay.  Go to page 49, please.
10    A.  Forty-nine of what?
11    Q.  Your report, sir.
12    A.  Oh.
13    Q.  Mr. Russo applied sometimes with a backpack
14  sprayer, right?
15    A.  Yes.
16    Q.  Okay.  If you go to page 49, you discuss a
17  study by Bleeke, right?
18    A.  I'm sorry, I didn't hear the last word.
19    Q.  Page 49 you discuss a study by Bleeke, correct?
20    A.  Yes.
21    Q.  Okay.  Do you see where they discuss backpack
22  sprayers there?
23    A.  Yeah, backpack sprayer and controlled droplet
24  application.
25    Q.  So you wrote in the second to last sentence,

37 (Pages 142 to 145)

Confidential - William Sawyer, Ph.D.

Page 146

1  backpack sprayers -- well, let me back up and ask a
2  question about study design.
3        Was Bleeke a study that was conducted under
4  OECD guidelines?
5     A. Yes.
6     Q. Did Bleeke have field observers in it?
7     A. Yes.
8     Q. What is a field observer?
9     A. Just a person monitoring the protocol.
10    Q. And are field observers generally considered --
11  or studies with field observers observing application
12  generally considered more reliable than studies without
13  field observers?
14    A. Probably.
15    Q. So if you go to the second to last page --
16  sentence here, it says, "Backpack sprayers spent 132 to
17  202 minutes, 2.2 to 3.4 hours spray treating between
18  point 44 and 1.55 hectares." Did I read that correctly?
19    A. Yes.
20    Q. And it's your testimony that Mr. Russo spent
21  approximately 3.4 hours applying point -- applying to
22  .073 hectares, correct?
23    A. That's right.
24    Q. Okay. So it's your testimony that the
25  applicators in Bleeke were able to cover 20 times as

Page 147

1  much ground in the same period of time as Mr. Russo?
2     A. Yes, and that's due to the height of the
3  growth. The -- if the ground -- if the weeds are only
4  an inch high, it goes rapidly. If there's weeds that
5  are a foot high, it takes much longer to cover the same
6  amount of ground. So there's variability depending on
7  what's being sprayed.
8     Q. How tall were the weeds in Bleeke?
9     A. We don't know, but I'm stating that there is
10  variability depending on the height that has to be
11  sprayed.
12    Q. Am I correct that you don't know? "We don't
13  know" would suggest everybody doesn't know. You don't
14  know how tall the weeds were in Bleeke?
15    A. It's not stated in Bleeke.
16    Q. You're positive of that right now?
17    A. The weed height?
18    Q. The type of weeds they were spraying, you're
19  positive?
20    A. Well, type of weeds might be but not the weed
21  height.
22        MR. WOOL: I just want to object because we're
23     talking about the weed height and the question
24     involved the type of weed. Two different questions.
25        THE WITNESS: Exactly.

Page 148

1  BY MR. KALAS:
2     Q. You're positive that the typical type of weed
3  they sprayed, including characteristics of the weed are
4  not discussed in Bleeke?
5     A. I didn't say that. I said the weed height.
6     Q. Okay. We'll keep going. You have a table in
7  here from Machado-Neto on page 60, right?
8     A. Yes.
9     Q. And am I correct that the data in Machado-Neto
10  suggests that a knapsack sprayer spraying downward will
11  have upwards of 90 percent of their exposure to their
12  legs and feet?
13    A. No.
14    Q. Does not state that. Okay.
15    A. Well, wait a minute. Let me check that.
16    Q. I'm considering thigh part of legs, just to be
17  clear.
18    A. Are you using F or F and G?
19    Q. I'm using F, G and H.
20    A. Oh, and H.
21    Q. Legs, front thigh, legs, back thigh, feet. You
22  see those?
23    A. Yes.
24    Q. Okay. Am I correct that in Machado-Neto
25  sprayers with a hand wand pointing downward over

Page 149

1  90 percent of their exposure was to the areas of their
2  body from the thighs down to the feet?
3     A. Yes.
4     Q. Okay. And that's the application technique
5  that Mr. Russo sprayed, right, downwards with the wand?
6     A. Yes, however, there is also other information
7  that in another study I referenced performed by Monsanto
8  revealed the highest percentage was actually on the
9  back.
10    Q. Which study was that, sir?
11    A. I think it's MON 2139, page 65 of my report for
12  backpack sprayers. Shows the back receiving the -- by
13  far the highest exposure.
14    Q. Did you examine Mr. Russo's backpack sprayer?
15    A. No.
16    Q. Do you have any evidence in the record to
17  suggest that his backpack sprayer, as opposed to his
18  hand-held sprayer, was leaking?
19    A. No.
20        MR. KALAS: Can we go off the record for a
21     second?
22        VIDEOGRAPHER: Going off the record at 11:59.
23     (A short break was taken.)
24        VIDEOGRAPHER: We're back on the record. The
25     time is 11:59.

38 (Pages 146 to 149)

Confidential - William Sawyer, Ph.D.

Page 150

1    BY MR. KALAS:
2        Q.  Can you turn to page 73 real quick, sir?
3        A.  Okay.
4        Q.  You see the text box you have from the EPA
5    guidelines for carcinogen risk assessments, the first
6    box you have?
7        A.  Yes.
8        Q.  Okay.  Can you read that first sentence into
9    the record?
10       A.  "Epidemiologic studies, by their nature, are
11   limited to the extent which they can control for effects
12   due to exposure from other agents."
13       Q.  Thank you.  Do you agree with that statement?
14       A.  Yes.
15       Q.  Okay.  Turn over the witness.
16              CROSS-EXAMINATION
17   BY MR. WOOL:
18       Q.  All right.  Dr. Sawyer, I got just a couple
19   questions for you and I then -- well, I guess John will
20   actually have some more questions --
21          MR. KALAS:  Why do you think that?
22          MR. WOOL:  Well, he might be.  I don't know.
23   BY MR. WOOL:
24       Q.  So you were asked some questions at the
25   beginning of this deposition about disentangling

Page 151

1    multiple risk factors.  Do you remember generally that
2    line of questioning?
3        A.  Yes.
4        Q.  Okay.  And I just want to make sure that the
5    record is clear, multiple risk factors can combine to
6    cause a disease?
7          MR. KALAS:  Objection.  Form.
8          THE WITNESS:  That is correct.
9    BY MR. WOOL:
10       Q.  And is it your testimony that multiple risk
11   factors can combine to cause non-Hodgkin's lymphoma?
12       A.  Yes.
13          MR. KALAS:  Objection.  Form.
14   BY MR. WOOL:
15       Q.  In the case of Roundup exposure?
16       A.  Yes.  Certainly any -- there's a number of
17   different risk factors that are additive under the
18   generally accepted methodology of end target points,
19   carcinogens which have similar end target points are
20   considered additive.
21       Q.  And so a risk factor that is additive to, let's
22   say, an underlying risk factor can substantially
23   contribute to a person's development of non-Hodgkin's
24   lymphoma?
25          MR. KALAS:  Objection.  Form.

Page 152

1          THE WITNESS:  Yes.
2    BY MR. WOOL:
3        Q.  And additive risk factors can substantially
4    contribute -- or strike that.
5              And is that an opinion that you hold to a
6    reasonable degree of scientific certainty?
7        A.  Yes, to a reasonable toxicological certainty,
8    yes, that is generally accepted.
9        Q.  Okay.  And I think you were asked a question
10   about whether or not you could say that the combination
11   of multiple risk factors caused in individual's
12   development of a disease on a precise day; do you
13   remember that general line of questioning?
14       A.  Yes, whether I could state that the cancer
15   would not have happened.
16       Q.  Right.  And you can't say to an absolute
17   certainty that somebody would have gotten cancer or not
18   when there are multiple risk factors -- well, sorry.
19   Strike that.  That's a poorly phrased question.
20          Let's see.  You were asked some questions about
21   household chemicals.  Do you remember that line of
22   questioning?
23       A.  Yes.
24       Q.  And you actually had a chance to interview Mr.
25   Russo, right?

Page 153

1        A.  Yes.
2        Q.  And when you interviewed Mr. Russo, did you ask
3    him about all potential chemical exposures that you
4    believe might be pertinent to your assessment?
5        A.  Relevant to -- relevant to NHL, yes, and I did
6    so by initially asking the questions regarding
7    occupation, prior employment, potential contaminants in
8    the home based upon hobbies, auto repair, and nothing
9    significant came up except some use of household paints,
10   gasoline in the lawn mower, and that's about it.
11       Q.  And when you were asking Mr. Russo these
12   questions, did you refer to the household products by
13   the name that a consumer would recognize them?
14       A.  Yes, for example, furniture stripper.
15       Q.  Right.  And what I mean by that is, you didn't
16   say -- and this is just the chemical that's in my head,
17   but you didn't say, do you have any benzo[a]pyrene in
18   your home?
19       A.  No.  Most people wouldn't know what that --
20   what that that even is.
21       Q.  Right.  I barely know.  And so when you were
22   asking him these questions, you asked about -- I just
23   want to make sure the record is clear.  When you were
24   asking Mr. Russo these questions, you asked him using
25   the common name of the household products about every

39 (Pages 150 to 153)

Confidential - William Sawyer, Ph.D.

Page 154

1    product that would be relevant to forming your expert
2    opinions?
3        A.   Yes, only those --
4            MR. KALAS:  Can I object to form?
5            MR. WOOL:  Yeah.
6            THE WITNESS:  Only those that are relevant to
7        induction of cancer or NHL.  I certainly didn't
8        waste time asking about janitorial products and
9        household products that have no ability to induce
10       any type of malignancy.  That would be a waste of --
11       waste of time.
12   BY MR. WOOL:
13       Q.   And, Doctor, you would agree that non-Hodgkin's
14   lymphoma has a latency period, right?
15           MR. KALAS:  Objection, form.
16           THE WITNESS:  That's correct.  It's in my
17       report.
18   BY MR. WOOL:
19       Q.   Okay.  And whether or not a co-exposure from
20   another chemical contributed to somebody's non-Hodgkin's
21   lymphoma, determining whether or not that other
22   co-exposure had any bearing on Mr. Russo's non-Hodgkin's
23   lymphoma would necessarily involve a question of when
24   the co-exposure might have occurred, correct?
25           MR. KALAS:  Objection.  Form.

Page 155

1            THE WITNESS:  Well, in terms of weighing the
2        risk level, that's true.
3    BY MR. WOOL:
4        Q.   Right, and what I mean by that is, if I have a
5    carcinogenic substance in my house that I bought
6    yesterday, if I already had non-Hodgkin's lymphoma, that
7    substance couldn't have played any role in the
8    development of my disease, right?
9        A.   Correct.
10           MR. KALAS:  Objection.  Form.
11   BY MR. WOOL:
12       Q.   And let's see, you have actually offered
13   opinions on a number of cases wherein plaintiffs allege
14   they developed non-Hodgkin's lymphoma, right?
15       A.   Yes.
16       Q.   Okay.  And in some of those cases Monsanto had
17   an opportunity to inspect that person's residence -- or
18   strike that.
19           In some of those cases Monsanto had an
20   opportunity to inspect that person's property to some
21   degree, correct?
22       A.   Yes.
23       Q.   Okay.  And in reading any of the expert reports
24   generated by Monsanto's experts, did you see in any of
25   those reports any product that -- aside from Roundup --

Page 156

1    that was identified by the experts from inside the
2    plaintiff's household that you believe is relevant to
3    assessing the risk of non-Hodgkin's lymphoma?
4        A.   Out of the dozens and dozens and dozens of
5    products that were identified, all were irrelevant,
6    except in the case of a pesticide applicator who
7    commercially had some of his leftover reagents in the
8    garage.
9        Q.   Okay.  And just so I'm clear, the only products
10   that were directly relevant to your expert opinions were
11   other pesticides?
12           MR. KALAS:  Objection.  Form.  Mischaracterizes
13       his testimony.  Mischaracterizes his prior expert
14       reports.  You can answer -- well, actually, I don't
15       instruct you, but go ahead.
16           THE WITNESS:  Yes.
17   BY MR. WOOL:
18       Q.   Okay.  Now, you were asked some questions about
19   the origin of the 50 milliliter per hour figure that I
20   believe is reflected on page 43 of your expert report --
21   pages 43 and 45?
22       A.   Yes.
23       Q.   And you were asked specifically for a reference
24   for that figure.  Do you recall that question?
25       A.   Yes.

Page 157

1        Q.   And if you turn to the end of your report, the
2    very last pages with the references, you cite to upwards
3    of 330 studies and documents, correct?
4        A.   That's right.
5        Q.   Fair to say you haven't memorized every single
6    one of those?
7        A.   No.
8            MR. WOOL:  Okay.  That's it for me.
9            REDIRECT EXAMINATION
10   BY MR. KALAS:
11       Q.   All right.  Couple follow-ups.
12           Starting with the site inspection, the very
13   last case you and I had a talk in was the Giglio case,
14   right?
15       A.   Yes.
16       Q.   And there's a site inspection in that case by
17   Dr. LeBeau, right?
18       A.   Yes.
19       Q.   And he identified on that site inspection a
20   co-exposure, methyl chloride, a/k/a dichloromethane,
21   that has been associated with non-Hodgkin's lymphoma by
22   the IARC, NTP and other agencies, right?
23       A.   Yes.  I reported that in my report that
24   furniture stripper contained dichloromethane, yes.
25       Q.   Okay.  And so --

40 (Pages 154 to 157)

Confidential - William Sawyer, Ph.D.

Page 158

1    A.   And I assessed whether there was any exposure
2  to it.
3    Q.   Right.  After Dr. LeBeau saw that on the site
4  inspection, you performed an assessment, from a
5  toxicological point of view, to see whether or not that
6  dichloromethane contributed to plaintiff's cancer,
7  right?
8    A.   Yes.
9    Q.   That was a co-exposure you needed to take into
10  account to reach your opinion fairly, correct?
11    A.   Yes.
12    Q.   Okay.  And Mr. Giglio was not a pesticide
13  applicator, right, he was a turf installer?
14    A.   Well, he was an applicator in the commercial
15  sense that he used Roundup on all of his jobs.
16    Q.   But he was an applicator in the sense that
17  every plaintiff in the litigation is an applicator, not
18  in the sense like Mr. Cohen where he applied multiple
19  pesticides as part of his work?
20    A.   Well, no.  He was -- he was a commercial
21  applicator in the sense that he was using it officially
22  and commercially, not as a resident but rather as a turf
23  installer.
24    Q.   So when you spoke to Mr. Wool just now about
25  the pesticide, rodenticide, insecticide co-exposures,

Page 159

1  was Mr. Cohen the plaintiff you were thinking of?
2    A.   Yes, not Mr. Lamb, Mr. Cohen.
3    Q.   Okay.  And Mr. Cohen applied multiple different
4  pesticides, right?
5    A.   He did.
6    Q.   Mr. Giglio just applied Roundup as far as you
7  understand, right?
8    A.   Yes.
9    Q.   And yet there were co-exposures from the site
10  inspection you had to take into account, right?
11    A.   Yes.
12    Q.   Okay.  Back to identifying by brand name for
13  the plaintiff.  Did you -- are you positive that you
14  identified by brand name for the plaintiff in your
15  interview every product that has ever been sold in the
16  United States of America in the past 40 years that
17  contains ingredients associated with non-Hodgkin's
18  lymphoma?
19    MR. WOOL:  I just want to make an objection
20  that I don't think my question involved brand names
21  specifically, but you can answer.
22    THE WITNESS:  No, but I also need to make it
23  clear that there are no janitorial products,
24  household cleaners that cause meth -- that contain
25  methylene chloride or any carcinogen that could

Page 160

1  produce NHL.
2    MR. KALAS:  Thank you.  No further questions
3  unless Mr. Wool has some.
4    MR. WOOL:  Nothing from me.
5    MR. KALAS:  Hold on one second before we go off
6  the record.  I just want to see -- I guess because
7  there's EE names in it, I have to do this.  We're
8  going to designate as confidential.  Sorry.  Thanks.
9    VIDEOGRAPHER:  This concludes the deposition.
10  The time is 12:12.
11    (Deposition concluded at 12:12 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 161

1            CERTIFICATE OF OATH
2    I, Theresa Schiff, RPR/CRR/FPR, Notary Public,
3  State of Florida at Large, certify that the witness,
4  WILLIAM SAWYER, Ph D , personally appeared before me on
5  October 22, 2019 and was duly sworn
6  (This certificate has been digitally signed )
7
8
9
10
11
12
13
14        _____
        Theresa Schiff, RPR/CRR/FPR
15        Notary Public, State of Florida
        Commission GG155455
16        Commission Expires 12/16/2021
17
18
19
20
21
22
23
24
25

41 (Pages 158 to 161)

Confidential - William Sawyer, Ph.D.

Page 162

```
 1              CERTIFICATE OF REPORTER
 2    STATE OF FLORIDA )
 3    COUNTY OF LEE    )
 4        I, Theresa Schiff, RPR/CRR/FPR, do hereby certify
 5    that I was authorized to and did stenographically report
 6    the videotaped deposition of WILLIAM SAWYER, Ph.D.; that
 7    a review of the transcript was not requested; and that
 8    the transcript is a true and complete record of my
 9    stenographic notes.
10        I FURTHER CERTIFY that I am not a relative,
11    employee, or attorney, or counsel of any of the parties,
12    nor am I a relative or employee of any of the parties'
13    attorney or counsel connected with the action, nor am I
14    financially interested in the action.
15        DATED this 26th day of October, 2019.
16    (This certificate has been digitally signed.)
17
18
19        _____
            Theresa Schiff, RPR/CRR/FPR
20
21
22
23
24
25
```