# EXHIBIT 15

William Sawyer, Ph.D.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


IN RE:  ROUNDUP PRODUCTS          )MDL NO. 2741
LIABILITY LITIGATION              )Case No. 3:16-md-02741-VC
_____ )
This document relates to:         )
                                  )
Ines Hernandez                    )
                                  )
vs.                               )
                                  )
Monsanto Company                  )
                                  )
Case No. 3:16-cv-05750-VC         )
_____ )

VIDEOTAPED DEPOSITION OF:  WILLIAM SAWYER, Ph.D.,
                           D-ABFM

DATE:                      Friday, October 25, 2019

TIME:                      7:34 a.m. to 11:28 a.m.

LOCATION:                  5400 Plantation Road
                           Captiva, FL   33924

TAKEN BY:                  Counsel for the Defendant

REPORTER:                  Christi K. Cole, FPR
                           Florida Professional
                           Reporter

William Sawyer, Ph.D.

## Page 2

1 APPEARANCES:
2 For the Plaintiff(s):  BRIAN BRAKE, ESQUIRE
           The Miller Firm LLC
3          The Sherman Building
           108 Railroad Avenue
4          Orange, VA  22960
5
   For the Defendant(s):  CALI COPE-KASTEN, ESQUIRE
6          MATTHEW SKANCHY, ESQUIRE
           Wilkinson Walsh & Eskovitz LLP
7          2001 M Street, NW, Suite 1000
           Washington, D.C.  20036
8
9 Also Present:       MATTHEW ALLISON (Videographer)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1          I N D E X
2 WITNESS:                    PAGE:
3 WILLIAM SAWYER, Ph.D.
4 EXAMINATION                     5
   BY MS. COPE-KASTEN
5
6
   EXHIBIT        DESCRIPTION        PAGE:
7 Exhibit No. 1   Report            5
   Exhibit No. 2   Notice of Deposition   21
8 Exhibit No. 3   Additional Studies    23
   Exhibit No. 4   Curriculum Vitae     24
9 Exhibit No. 5   List of Cases      25
   Exhibit No. 6   Plaintiff Fact Sheet   38
10 Exhibit No. 7   File             52
   Exhibit No. 8   2019 North American Pooled
11               Project Publication   76
   Exhibit No. 9   Deposition Transcript   96
12
   CERTIFICATE OF OATH              105
13 CERTIFICATE OF REPORTER          106
   ERRATA SHEET                    107
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1          THE VIDEOGRAPHER:  Good morning.  We are now
2 on the record.  My name is Matthew Allison.  I am
3 the videographer for Golkow Litigation Services.
4 Today's date is October 25th, 2019, and the time
5 is 7:34 a.m.
6          This video deposition is being held in
7 Captiva, Florida, in the matter of Mr. And Mrs.
8 Hernandez vs. Monsanto Company, taken for the
9 United States District Court, Northern District of
10 California.
11          Will all counsel please identify themselves
12 for the record.
13          MR. BRAKE:  My name is Brian Brake.  I'm an
14 attorney with the Miller firm, and I represent the
15 Plaintiffs, Mr. And Mrs. Hernandez.
16          MS. COPE-KASTEN:  Cali Cope-Kasten from
17 Wilkinson Walsh & Eskovitz on behalf of Monsanto.
18          MR. SKANCHY:  Matthew Skanchy from Wilkinson
19 Walsh & Eskovitz on behalf of Monsanto as well.
20          THE VIDEOGRAPHER:  The court reporter is
21 Christi Cole and will now swear in the witness.
22          THE COURT REPORTER:  Could I get you to raise
23 your right hand, please.
24          THE WITNESS:  (Raises right hand.)
25          THE COURT REPORTER:  Do you solemnly swear or

## Page 5

1 affirm the testimony you're about to give will be
2 the truth, the whole truth, and nothing but the
3 truth?
4 THEREUPON,
5          WILLIAM SAWYER, Ph.D.,
6 a witness, having been first duly sworn, upon his
7 oath, testified as follows:
8          THE WITNESS:  Yes, I do.
9          EXAMINATION
10 BY MS. COPE-KASTEN:
11     Q.  Good morning, Doctor.
12     A.  Good morning.
13     Q.  Could you please state your full name for the
14 record.
15     A.  William Robert Sawyer.
16          (Exhibit No. 1 was marked for
17 identification.)
18 BY MS. COPE-KASTEN:
19     Q.  I'm going to start off by handing you Exhibit
20 1, which is your report for Mr. Hernandez.  And I
21 understand that you also have brought copies of this
22 with you today, correct?
23     A.  Yes.
24          MS. COPE-KASTEN:  Brian, do you want a copy?
25          MR. BRAKE:  Well, if you have one, sure.

William Sawyer, Ph.D.

**Page 6**

1    Thanks.
2    BY MS. COPE-KASTEN:
3    Q.   This is the report that you produced for Mr.
4    Hernandez, right?
5    A.   It is.
6    Q.   It's dated October 4th, 2019?
7    A.   Yes.
8    Q.   Did you prepare this report yourself?
9    A.   Yes.
10   Q.   Does this report contain all of the opinions
11   that you intend to give in Mr. Hernandez's case?
12   A.   Yes.
13   Q.   Why did you remove the reference to N-nitroso
14   compounds from this report?
15   A.   Uncertainty as to whether the N-nitroso
16   compounds result in the same toxicological endpoint of
17   interest in this case, which is NHL.
18   Q.   Tell me more about that uncertainty.  What do
19   you mean by that?
20   A.   In terms of the adequacy of human evidence --
21   that is peer-reviewed human studies -- of the known
22   level of confidence at the 95 percent level of
23   confidence, consistency with other studies, coherency
24   with other studies, and other factors that
25   toxicologists use, and general causation factors, do

**Page 7**

1    not fully establish that N-nitroso compounds cause NHL
2    in humans.
3    Q.   How did it come to your attention that there
4    was this inadequacy with respect to human information
5    for N-nitroso compounds and non-Hodgkin's lymphoma?
6    A.   Simply my further review on the subject.
7    Q.   Did you review any particular articles that
8    drew your attention to that?
9    A.   No.  Rather, lack of, in terms of the human
10   study evidence, is prima-- primarily geared towards
11   gastric malignancies and GI malignancies.
12   Q.   What type of evidence was your opinion
13   previously based on when you believed that it may have
14   a connection to non-Hodgkin's lymphoma?
15   A.   Well, certainly, it is a human carcinogen, a
16   well-known human carcinogen.  And it's also what we
17   call a multiple carcinogen.  That is, it is known to
18   cause cancer in multiple sites.
19         So it, certainly, has the propensity to
20   potentially cause non-Hodgkin's lymphoma.  I don't
21   think there's any question about that.  It's the
22   matter of, as a stand-alone compound by itself, is
23   there sufficient human evidence to establish causation
24   by that compound in it -- by itself?  And that -- and
25   that's the part that's uncertain.

**Page 8**

1    Q.   And it is your opinion, at least at this
2    point in time, that there is insufficient evidence
3    that as a stand-alone compound by itself
4    N-nitrosoglyphosate is capable of producing
5    non-Hodgkin's lymphoma?
6    A.   Yes.  However, I should add that it is
7    additive in the sense that it is a confirmed mutagenic
8    agent and can cause chromosomal aberrations.  So,
9    certainly, it has the potential of being additive;
10   but, as I say, the weakness in that -- with that
11   compound is that it is not for certain to cause NHL in
12   humans.
13   Q.   I want to go back to the additive nature in
14   just a second.  But for right now, I want to stick
15   with it as a stand-alone compound by itself.
16         Do you intend to offer any opinions at this
17   trial about the capability of N-nitrosoglyphosate on
18   its own to cause non-Hodgkin's lymphoma?
19   A.   No.
20   Q.   Now moving to the additive question, do you
21   intend to offer any opinions at Mr. Hernandez's trial
22   about the capability of N-nitrosoglyphosate to add to
23   the carcinogenicity of Roundup?
24   A.   No.
25   Q.   If you take a look at your report, page 33 in

**Page 9**

1    the middle of the page talks about trace chemicals.
2    Q.   On page 33?
3    Q.   Correct.
4    A.   Paragraph what?
5    Q.   It is the first full paragraph underneath
6    ethylene oxide.  It says, "The trace chemicals present
7    in Roundup."
8         Do you see that?
9    A.   I know why; I'm looking at Harris.  Okay.
10   Q.   You're with me?
11   A.   Yeah.
12   Q.   In the first sentence here where you talk
13   about trace chemicals, you specifically reference
14   formaldehyde and ethylene oxide as trace chemicals in
15   Roundup that are recognized to be human carcinogens.
16         Do you see that?
17   A.   Yes.
18   Q.   Are formaldehyde and ethylene oxide the only
19   trace chemicals you intend to offer an opinion about
20   in Roundup at trial?
21   A.   Yes, in terms of additional carcinogenic
22   potential.  Obviously, there are other chemicals of
23   interest.  Actually, it's the various POEAs and other
24   additives.  But not with respect to cancer, but with
25   respect to dermal absorption and enhanced genotoxicity

3 (Pages 6 to 9)

William Sawyer, Ph.D.

## Page 10

1   as shown in the various studies I've cited.
2     Q.  When you say "not with respect to cancer," it
3   is your opinion that POEA does not increase or add to
4   the cancer risk in Roundup?
5     A.  No, that's not my opinion.
6     Q.  What is your opinion with respect to whether
7   POEA is additive to the cancer risk in Roundup?
8     A.  That's not actually my opinion either.  My
9   opinion is that POEA has been shown to intensify the
10  absorption and overall toxicity of the glyphosate in
11  Roundup and, thus, that enhances the dosage.  And
12  through that pathway of enhanced overall dosage
13  increases the carcinogenic potential of the product as
14  a whole.
15     And there have been several studies that have
16  clearly demonstrated the product is of greater
17  toxicity and of greater carcinogenic potential than
18  glyphosate alone.  And I have referenced those studies
19  in my report and have discussed them in previous
20  depositions.
21    Q.  I don't want to get deep into the weeds right
22  now on POEA.  But as a high-level matter, do you
23  believe that POEA is a carcinogen --
24    A.  There is in--
25    Q.  -- human carcinogen?

## Page 11

1    A.  There is insufficient evidence with respect
2   to the carcinogenic activity of POEA.  To answer the
3   second part of your question regarding a human
4   carcinogen, no, it has not been identified as a human
5   carcinogen.
6    Q.  Do you consider POEA to be a trace chemical
7   present in Roundup?
8    A.  No, no.  The family of POEA, such as tallo--
9   tallowamine, is a significant proportional additive in
10  the product, as is other types of POEAs that are used
11  in various Roundup products.  So it's not a trace
12  chemical or a -- but, rather, a planned ingredient,
13  such as the tallowamine and other derivatives of
14  POEAs.
15    Q.  Setting aside the active ingredient
16  glyphosate and the surfactants like POEAs, are the
17  only additional chemicals, trace or otherwise, present
18  in Roundup that you intend to offer an opinion about
19  at trial formaldehyde and ethylene oxide?
20    A.  No.
21    Q.  What other chemicals do you intend to offer
22  opinions about?
23    A.  Propylene glycol; Polyoxyethylene Amine,
24  which is POEA.
25    Q.  Is propylene glycol a trace chemical in

## Page 12

1   Roundup?
2    A.  No, it's in some of the formulations as an
3  intent-- intentional additive, and other chemicals,
4  such as ammonium sulfate, antifoam additives,
5  dipropylene glycol, pelargonic acid.  And I think
6  that's all, unless there's something in my report I
7  missed.
8    Q.  All right.  I want to go through each of the
9  chemicals that you just listed, starting with
10  propylene glycol.  Do you believe that propylene
11  glycol is additive to the risk for non-Hodgkin's
12  lymphoma in Roundup?
13    A.  You have to clarify your question.  I'm not
14  sure what type of toxicity you're referring to.
15    Q.  Carcinogenicity.
16    A.  No, no, not directly.  If it enhances
17  absorption, it is -- then it enhances dose, and, of
18  course, enhances the potency of the product as a
19  carcinogen.  But it is not in itself a carcinogen by
20  any means.
21    Q.  Is it your opinion that propylene glycol
22  enhances absorption of Roundup?
23    A.  Yes.
24    Q.  Is ammonium sulfate a human carcinogen?
25    A.  No.

## Page 13

1    Q.  Is ammonium sulfate additive to the
2   carcinogenicity of Roundup?
3    A.  No.
4    Q.  Are the antifoam additives that you
5   referenced human carcinogens?
6    A.  No.
7    Q.  Are they additive to the carcinogenicity of
8   Roundup?
9    A.  No.
10    Q.  Is dipropylene glycol a human car--
11  carcinogen?
12    A.  Definitely no.
13    Q.  Is dipropylene glycol additive to the
14  carcinogenicity of Roundup?
15    A.  No.
16    Q.  Is pelargonic acid a human carcinogen?
17    A.  No.
18    Q.  Is pelargonic acid additive to the
19  carcinogenicity of Roundup?
20    A.  No.
21    Q.  Is formaldehyde a human carcinogen?
22    A.  Yes, it is.  It's a class A confirmed human
23  carcinogen.
24    Q.  Is ethylene gly-- is ethylene oxide a human
25  carcinogen?

William Sawyer, Ph.D.

Page 14

1    A.  Yes, one of the worst.
2    Q.  I want to focus on those two for right now
3  then.  Aside from formaldehyde and ethylene oxide, are
4  there any other chemicals present in Roundup that you
5  believe are human carcinogens?
6    A.  Yes.  N-nitroso compounds -- N-nitroso
7  compounds are clearly human carcinogens; however, as I
8  stated, not clearly linked to specifically NHL.
9    Q.  And you don't intend to offer an opinion
10  about N-nitroso compounds at the trial?
11    A.  That's correct.  Even though they do add to
12  the human toxicity, I'm not intending to offer that
13  opinion.
14    Q.  Do you believe that there is sufficient
15  evidence linking formaldehyde specifically to the
16  development of non-Hodgkin's lymphoma in humans?
17    A.  Yes.  It's well known that formaldehyde
18  causes various hematopoietic malignancies in humans.
19  It's been well published among morticians,
20  pathologists, medical examiners, and other
21  occupational exposures.
22    Q.  Do you believe that there's sufficient
23  evidence that ethylene oxide causes non-Hodgkin's
24  lymphoma in humans?
25    A.  Yes.  Ethylene oxide has been caused -- shown

Page 15

1  to cause hematopoietic malignancies in humans and many
2  other sites.
3    Q.  Do you consider formaldehyde and ethylene
4  oxide to be additive to the carcinogenic risk of
5  Roundup?
6    A.  Yes.
7    Q.  Have you attempted to quantify the amount
8  that they add to the risk?
9    A.  Attempted, yes.  But there is insufficient
10  data or studies performed specifically on the Roundup
11  product to evaluate the headspace release of highly
12  volatile formaldehyde and ethylene oxide to the user
13  in the direct breathing zone.
14    Q.  Would it be an accurate statement to say that
15  you do not know how much formaldehyde adds to the risk
16  of developing non-Hodgkin's lymphoma in Roundup?
17    A.  No, I would say there's insufficient data to
18  make such a calculation.  However, it is generally
19  accepted in the field of toxicology that chemicals
20  that have the same end target point are considered
21  additive.  So whatever percentage of additivity,
22  whether it be 0.1 or 1 percent or 10 percent, those
23  two chemicals are still additive in nature to the
24  overall carcinogenicity of the product.
25    Q.  When you say "those two chemicals," are you

Page 16

1  referring to formaldehyde and ethylene oxide?
2    A.  Yes.
3    Q.  I take it from your answer, too, even though
4  I did not initially ask about it, that you also cannot
5  quantify the extent to which ethylene oxide adds to
6  the risk that you believe Roundup presents for
7  non-Hodgkin's lymphoma?
8    A.  Yes.  My prior answer was for both
9  formaldehyde and ethylene oxide.
10    Q.  Does the amount of exposure to additive
11  chemicals impact the magnitude of the risk they add
12  for developing non-Hodgkin's lymphoma?
13    A.  Can you repeat that, please?
14    Q.  Does the amount of exposure to additive
15  chemicals impact the magnitude of the risk they add
16  for developing non-Hodgkin's lymphoma?
17    A.  Yes.
18    Q.  Have you attempted to quantify the amount of
19  exposure Mr. Hernandez had to formaldehyde from
20  Roundup?
21    A.  No.  There is insufficient data from Monsanto
22  with respect to the headspace quantities and releases
23  into the breathing zone under various conditions and
24  formulations.
25    Q.  Have you attempted to quantify the amount of

Page 17

1  exposure Mr. Hernandez had to ethylene oxide from
2  Roundup?
3    A.  No.  Same response.
4    Q.  Are you aware that the human body naturally
5  produces formaldehyde?
6    A.  Of course.
7    Q.  Are you aware that formaldehyde is naturally
8  found in a variety of foods?
9    A.  Certainly.
10    Q.  Is spinach an example --
11    A.  But I'm also aware that it is a highly potent
12  carcinogen.  The NIOSH, the National Institute of
13  Occupational Safety and Health REL, recommended
14  exposure limit, for formaldehyde is only about
15  15 microgram per cubic meter, approximately.  But that
16  is 15 micrograms in a cubic meter of air.
17        It's -- it is a reasonably potent carcinogen;
18  and due to its additivity, that is, when a carcinogen
19  has the same end target point, it should be considered
20  additive even if the information with respect to the
21  dosage of that compound is uncertain or unknown.  So
22  from a qualitative standpoint, the toxicity with
23  respect to hematopoietic malignancies is -- in NHL is
24  additive.
25    Q.  Is spinach a food in which formaldehyde is

5 (Pages 14 to 17)

William Sawyer, Ph.D.

Page 18

1   naturally found?
2       A.  Yes.
3       Q.  Are grapes a food in which formaldehyde is
4   naturally found?
5       A.  Yes.
6       Q.  Are apples a food in which formaldehyde is
7   naturally found?
8       A.  Yes.
9       Q.  Are carrots a food in which formaldehyde is
10  naturally found?
11      A.  Yes.
12      Q.  Do you have any evidence that the amount of
13  formaldehyde in Roundup exceeds the regulatory limits
14  that you were talking about?
15      A.  No.  There is no available quantitative data
16  on this subject.  To the best of my knowledge, it has
17  not been studied and produced by -- the knowledge --
18  the information I need has not been either studied or
19  produced by Monsanto.
20      Q.  Do you know whether the EPA has considered
21  the amount of formaldehyde that is in Roundup?
22      A.  I'm not certain.
23      Q.  Did you do anything to attempt to determine
24  how much formaldehyde Mr. Hernandez was exposed to
25  from food as compared to Roundup?

Page 19

1       A.  No, because the exposure routes are
2   different.  With respect to formaldehyde and ethylene
3   oxide, the exposure routes from Roundup is direct
4   inhalation of the formaldehyde in the headspace of the
5   air of the container when opened, which is very
6   different from the ingestion of part-per-billion or
7   part-per-trillion levels of formaldehyde in food.
8       And the toxicologic-- toxicological endpoints
9   of formaldehyde have been shown to be only through
10  inhalation.  In fact, that's true for ethylene oxide
11  as well.  That inhalation of formaldehyde must occur
12  for human malignancies to develop in a predictable,
13  statistically-significant manner.
14      Q.  Do you know how much formaldehyde Mr.
15  Hernandez inhaled from Roundup?
16      A.  The same answer as before with respect to
17  insufficient information from Monsanto with respect to
18  the measurements in the headspace gas of the
19  containers at various temperatures.
20      Q.  As a result of this insufficient information,
21  to which you have access, you do not know how much
22  formaldehyde Mr. Hernandez may have inhaled from
23  Roundup?
24      A.  I don't understand the question.
25      Q.  Because you did not have sufficient

Page 20

1   information to make a determination about how much
2   formaldehyde is in the headspace of Roundup, you do
3   not know how much formaldehyde Mr. Hernandez may have
4   inhaled from Roundup?
5       A.  That's true.
6       Q.  Would you expect that a person would inhale
7   different amounts of formaldehyde if they opened a
8   Roundup container in an enclosed space as compared to
9   outside in the open air?
10      A.  That -- I would defer that to an industrial
11  hygienist.  That really depends upon whether the
12  container is directly in the breathing zone; that is,
13  if it's 12 inches versus 24 inches from the nose.
14      I mean, there's -- there's a lot of factors
15  involved in that.  That's not something I can just off
16  the cuff provide a quantitative answer to.
17      Q.  Do you know how far away from Mr. Hernandez's
18  nose the Roundup bottles that he used were at the time
19  that he opened them?
20      A.  No.  It depends if that was on a workbench,
21  on the ground, on a table.  There's variables.  For
22  example, if I were to use my teacup as a Roundup
23  container and open it on the table, you can see that
24  my nose is within about eight inches.  If I put it on
25  the floor, it could be two or three feet.  There's --

Page 21

1   there's variability.
2       And, obviously, I have no photographs or
3   videos of historic abilities to accurately depict Mr.
4   Hernandez opening a bottle of Roundup.  And then, of
5   course, that could vary under different conditions
6   each time he opened it.
7       Q.  I'm going to mark as Exhibit 2 to your
8   deposition the notice of deposition that you were sent
9   for Mr. Hernandez.
10      (Exhibit No. 2 was marked for
11  identification.)
12      MR. BRAKE:  I've got it.  Thanks.
13  BY MS. COPE-KASTEN:
14      Q.  Have you seen this document before?
15      A.  Yes.
16      Q.  Did you have sufficient time to put together
17  responses to the requests for production that are
18  listed on page 3 of this document?
19      A.  Yes.
20      Q.  Did you bring documents with you today that
21  are in response to these requests for production?
22      A.  Yes.
23      Q.  I'm going to walk through these one at a time
24  starting with number 1:  Documents to show the total
25  that you have billed in connection with your work on

6 (Pages 18 to 21)

William Sawyer, Ph.D.

## Page 22

1 Mr. Hernandez's case. Did you bring documents with
2 respect to that today?
3     A. No, I have not prepared an invoice yet. I
4 was only retained on this case a couple of weeks ago.
5 I received a retainer, but I have not prepared any
6 invoices at this point.
7     Q. What was the amount of the retainer you
8 received?
9     A. I believe it was $6,500 split between the two
10 cases.
11     Q. Is it fair to say you received $3,250 as a
12 retainer for Mr. Hernandez's case then?
13     A. Yes.
14     Q. On the request for production number 2, did
15 you bring invoices or bills in connection with all of
16 your work in the Roundup litigation?
17     A. No, I do not keep any type of tabulation for
18 that.
19     Q. Do you have a rough estimate of what that
20 total is at this point?
21     A. I have no idea. I think I've worked on
22 somewhere between 25 and 30 different individual
23 plaintiffs in these cases in the last few years. I
24 have no idea.
25     Q. Do you know if it is more or less than

## Page 23

1 $300,000?
2     A. I do not know.
3     Q. I'm not going to make you hand me copies of
4 all of the documents that you are relying on in
5 support of your opinions in this case, because that
6 would be quite an amount of material.
7         But I do want to mark, as Exhibit 3, to your
8 deposition, a document that Mr. Brake handed me right
9 before the deposition started.
10         (Exhibit No. 3 was marked for
11     identification.)
12 BY MS. COPE-KASTEN:
13     Q. What is this document?
14     A. These are additional studies that are not on
15 my reference list at the end of the reports. These
16 are documents that I provided to Monsanto in the Russo
17 deposition on Monday, October 21st. And they're also
18 part of my file in the current matter.
19     Q. Are these studies --
20     A. Let me finish, please.
21     Q. Go ahead.
22     A. I'm sorry. On this list of nine, item number
23 6 was previously listed in my report. And because I
24 was re-reviewing that study, somehow I left the PDF
25 group with these others. So it ended up on the list.

## Page 24

1 But actually number 6 has been in my report for a long
2 time.
3     Q. Aside from number 6, are any of the other
4 documents on that list referenced in the report for
5 Mr. Hernandez that is marked as Exhibit 1 to this
6 deposition?
7     A. No.
8     Q. Are these the same documents that you
9 discussed with Mr. Kalas earlier this week?
10     A. Yes.
11     Q. Do any of these studies postdate October 4th,
12 2019?
13     A. No.
14     Q. Did you bring with you today a copy of your
15 current curriculum vitae?
16     A. Yes.
17     Q. Let's mark that as Exhibit 4 to the
18 deposition, just so we have it.
19     A. I should point out, it's the same as used in
20 the Russo deposition on Monday.
21         (Exhibit No. 4 was marked for
22     identification.)
23 BY MS. COPE-KASTEN:
24     Q. Did you bring with you today a list of cases
25 in which you have provided deposition, trial, or other

## Page 25

1 testimony over the past four years?
2     A. Yes.
3     Q. I will mark that as Exhibit 5 to your
4 deposition.
5         (Exhibit No. 5 was marked for
6     identification.)
7         MR. BRAKE: Thank you.
8 BY MS. COPE-KASTEN:
9     Q. Because you were retained in Mr. Hernandez's
10 case just a couple of weeks ago, is it accurate to say
11 that you have not invoiced Mr. Hernandez's counsel for
12 any of your time working on Mr. Hernandez's case so
13 far?
14     A. That's accurate, yes.
15     Q. How much time have you spent working on Mr.
16 Hernandez's case?
17     A. I don't know exactly.
18     Q. What is your closest estimate for how long
19 you have spent working on Mr. Hernandez's case?
20     A. Between the two cases, somewhere between 25
21 and 35 hours.
22     Q. Would you say that that was an even 50/50
23 split in terms of your time between the two?
24     A. Well, there were two depositions in one of
25 the cases. So it would be close, but not exactly

7 (Pages 22 to 25)

William Sawyer, Ph.D.

Page 26

1    50/50.
2         Q.   Do you remember which case had two
3    depositions?
4         A.   I think Mr. And Mrs. Hernandez, but I would
5    have to check.
6         Q.   What has the time you have spent on Mr.
7    Hernandez's case entailed?
8         A.   Review of depositions, Plaintiff's fact
9    sheets; research/review of additional studies;
10   assembly of the report; also, discussions, meeting
11   time with Attorney Brian Brake; and other items which
12   I don't recall right now.
13        Q.   Were your discussions and meetings with Mr.
14   Brake in person or over the phone?
15        A.   Both.
16        Q.   How many hours would you estimate you spent
17   talking to Mr. Brake?
18        A.   Maybe, I don't know, three or four.
19        Q.   Have you discussed Mr. Hernandez's case with
20   any of Mr. Hernandez's other experts?
21        A.   No.  I've reviewed Dr. Schiff's reports on
22   the two cases, but I have not spoke with him.
23        Q.   Did you review his reports after they were
24   completed?
25        A.   Yes, yeah.  And I think they were dated back

Page 27

1    in September, as I recall.
2         Q.   Can you please summarize your case-specific
3    opinions with respect to Mr. Hernandez.
4         A.   I have assessed, through numerous studies, as
5    referenced in my report, how glyphosate and other
6    Roundup chemicals found their way into Mr. Hernandez's
7    body and ultimately blood, and the mechanisms, from a
8    cellular and molecular biology aspect, induced his
9    NHL.  And I have assessed his exposure factors, such
10   as his use of Roundup concentrate with or without
11   gloves, and mixing it and spraying it.  And based upon
12   his dress and his PPE, which sometimes included long
13   pants and work boots; other times T-shirt; sometimes
14   long-sleeve shirt; sometimes goggles, sometimes not;
15   the various modes of how the chemical made it --
16   chemicals made its way into his blood.
17        I have assessed how material, that is
18   Roundup, reached various areas of the body, known as
19   potential dermal exposure, including his back when
20   using the backpack sprayer, and how the Roundup
21   glyphosate and other additives impacted his skin and
22   was dermally absorbed through systemic circulation.
23        I have assessed the amount of time required
24   for absorption and the effect of other conditions on
25   dermal absorption, such as potentially aberrated skin,

Page 28

1    scratches; use of sodium lauryl sulfate, soap; and
2    other factors on dermal absorption.
3         I have not calculated exposure days in this
4    case, as I have not been asked to.  It was -- it's
5    already been assessed by Dr. Schiff who opined that
6    his occupational exposure was consistent with that of
7    the human epidemiological studies.  And I am prepared
8    to discuss the criteria of the six human epidemiologic
9    studies with respect to thresholds of exposure, days,
10   and the resulting risk levels.
11        I have not performed a specific analysis of
12   alternative risk factors, although my report does
13   summarize the most significant risk factors on page 4.
14   I have deferred that analysis to the oncologist who
15   has already, in his report, gone into greater detail.
16        I have assessed the type of protective gear,
17   that is PPE, that is recommended as standard dating
18   back as early as 1975 through the World Health
19   Organization.  I have assessed Monsanto's own in-house
20   studies with respect to total dermal exposure during
21   backpack spraying from Monsanto documents that I've
22   referenced, as well as the Machado-Neto study --
23   that's M-A-C-H-A-D-O-N-E-T-O study -- with respect to
24   distribution of glyphosate on various areas of the
25   body during spraying under different exposure

Page 29

1    scenarios.  And the -- I have assessed the recommended
2    and required levels of protection as well as the --
3    Monsanto's own recommendations in-house on personal
4    protective equipment versus the omission of such PPE
5    on the label.
6         I've also assessed the typical latency
7    estimates in my report, as well as the ranges of
8    dermal absorption of glyphosate through the skin
9    dating back to many, many studies, and the most DTL
10   studies using a different technique.  And I've also
11   spent quite a bit of time researching and providing
12   the cellular and molecular toxicological study
13   information with respect to DNA damage and promotion
14   of malignancies by Roundup: The studies demonstrating
15   low-dose induction of chromosomal aberrations by
16   Roundup; also studies showing an enhanced level of
17   genotoxicity from Roundup versus glyphosate alone; as
18   well as impairment of DNA repair mechanisms.
19        And there may be other opinions.  It's very
20   difficult to take a -- nearly 300-plus studies and a
21   141-page report and recite off the cuff all of my
22   opinions.  So there may be others that are in my
23   report.
24        Q.   In order to form the opinions that you had
25   about Mr. Hernandez specifically, did you ever meet

8 (Pages 26 to 29)

William Sawyer, Ph.D.

## Page 30

1 Mr. Hernandez?
2 A. No.
3 Q. Have you ever spoken with Mr. Hernandez over
4 the phone?
5 A. No. I only relied on Plaintiff's fact sheet
6 and the depositions. And I should point out -- well,
7 I don't need to do that now.
8 MS. COPE-KASTEN: Can we take a quick break?
9 MR. BRAKE: Of course.
10 THE VIDEOGRAPHER: Going off the record at
11 8:25.
12 (A break was held.)
13 THE VIDEOGRAPHER: We're back on the record.
14 The time is 8:33.
15 BY MS. COPE-KASTEN:
16 Q. Dr. Sawyer, you mentioned that you reviewed
17 some depositions for this case. Can you tell me which
18 depositions you reviewed?
19 A. Deposition of Maria Hernandez dated
20 July 12th; deposition of Mr. Hernandez dated
21 July 12th -- no, I think I said deposition of Ines --
22 it's I-N-E-S -- Hernandez. I think I said dated
23 July 12th. Yeah, they were both July 12th.
24 Q. Is it correct that you did not review the
25 depositions of any of Mr. Hernandez's treating

## Page 31

1 physicians?
2 A. That's correct.
3 Q. Did you review the entire depositions of
4 Maria and Ines Hernandez?
5 A. Well, the only way I could do that is to go
6 to my computer and open them. I would need to look
7 and see. I don't recall.
8 Q. Let me try asking this way --
9 A. I think so, but I'm not sure.
10 Q. -- you don't review -- you don't recall
11 having only looked at particular portions of the
12 depositions as opposed to sitting down and skimming or
13 reading through the entire thing?
14 A. Well, there -- there were areas that were
15 completely irrelevant to me in terms of income and
16 things of that sort.
17 Q. Did you take any notes when you were
18 reviewing either Mr. Hernandez's or Mr. Her-- Mrs.
19 Hernandez's reports -- depositions?
20 A. No.
21 Q. Did you review any of Mr. Hernandez's medical
22 records in this case?
23 A. Not directly, only that referenced in Dr.
24 Schiff's -- by Dr. Schiff. In other words, I reviewed
25 Dr. Schiff's report.

## Page 32

1 Q. But you didn't go back to look at any of the
2 underlying medical records that Dr. Schiff referenced?
3 A. No, and -- and because I am not offering an
4 opinion in this case in terms of ruling out other
5 potential exposures and underlying factors. Dr.
6 Schiff is handling that.
7 Q. You did not conduct a differential diagnosis
8 in this case?
9 A. No.
10 Q. You are aware that Mr. Hernandez had a lawn
11 care business?
12 A. Yes.
13 Q. And he claims to have sprayed Roundup as part
14 of that business?
15 A. That's correct.
16 Q. Have you visited any of the properties on
17 which Mr. Hernandez claims to have sprayed Roundup as
18 part of his lawn care business?
19 A. No.
20 Q. You are also aware that Mr. Hernandez
21 occasionally sprayed Roundup on his personal property?
22 A. Yes.
23 Q. On page 4 of your report for Mr. Hernandez,
24 footnote 2 at the bottom says, "Mr. Hernandez used
25 Roundup occupationally until 2009, and residentially

## Page 33

1 until 2016; however, his residential use was minimal."
2 Do you see that?
3 A. Yes.
4 Q. Tell me what you mean by "his residential use
5 was minimal."
6 A. Based on his testimony, at ██████████████
7 ██ ████████, he only sprayed, quote, as needed, only
8 when he saw weeds on the cement in the back of the
9 house and in an area on the front of the house around
10 the fence. And that was 1997 to 2016. And in 2013 to
11 '16, he sprayed the cement as needed.
12 It's my understanding he was only
13 spot-spraying, not doing any broadcast or arduous
14 spraying. But simply spot-spraying weeds, which under
15 the conditions of Roundup use, which range all the way
16 up to large scale -- and I'm familiar with some
17 examples of 500 -- 500-acre sprays via tractors with
18 32 spray-head booms, which would be a large-scale
19 spray, to large-scale sprays in occupational use,
20 which include spraying large square-footage areas of
21 weeds. Or even in the case of Mr. Russo last Monday,
22 large-scale spraying of entire areas to remove all
23 vegetation.
24 But in this case we're dealing with simply
25 spot-spraying of weeds growing in or around cement.

9 (Pages 30 to 33)

William Sawyer, Ph.D.

Page 34

1  So it's a -- a minimal application relative to the
2  realm of applications in the use of Roundup.
3      Q.  What role did Mr. Hernandez's residential use
4  of Roundup play in your conclusions as to whether
5  Roundup was a substantial contributing factor in Mr.
6  Hernandez's development of non-Hodgkin's lymphoma?
7      A.  Well, based upon my reliance of Dr. Schiff's
8  assessment of exposure -- I did not complete a
9  quantitative exposure assessment; it was already done.
10 I was not asked to perform such.
11     But based on Dr. Schiff's analysis, Mr.
12 Hernandez certainly fits into the human epidemiologic
13 studies that offer a dose metric.  And those I have
14 included in my report on page 12 through 15.
15     So -- and, again, I have not attempted any
16 differential diagnosis with respect to other
17 underlying disease conditions or other chemical
18 exposures.  It's my understanding there was no
19 smoking.  But even -- even that I have not fully
20 assessed because I have not been asked to make that
21 type of assessment.
22     All I can tell the jury is that the fact
23 that, based upon Dr. Schiff's analysis, that Mr.
24 Hernandez does meet the -- all of the threshold
25 requirements of the six studies I've referenced, and

Page 35

1  that, as such, he has a substantial increased risk of
2  NHL from his years of Roundup exposure.  And Dr.
3  Schiff will be offering the differential-diagnosis
4  opinion, not I.
5      Q.  I want to try to separate out Mr. Hernandez's
6  residential use of Roundup.  Is it your understanding
7  that Mr. Hernandez's residential use of Roundup was
8  considered by Dr. Schiff as part of Mr. Hernandez's
9  larger Roundup use that put him within this
10 epidemiological study range?
11     A.  Yes.
12     Q.  Do you know whether Dr. Schiff considers Mr.
13 Hernandez's residential use to be minimal?
14     A.  That I don't know.
15     Q.  Is it your opinion that Mr. Hernandez's
16 residential use of Roundup was a substantial
17 contributing factor in his development of
18 non-Hodgkin's lymphoma?
19     A.  Just to be clear, I would like you to repeat
20 that, please.
21     MS. COPE-KASTEN:  Can I have you read it
22 back, because I don't remember exactly what words
23 I used?
24     THE WITNESS:  Neither do I.  That's the
25 problem.

Page 36

1      THE COURT REPORTER:  "Is it your opinion that
2  Mr. Hernandez's residential use of Roundup was a
3  substantial contributing factor in his development
4  of non-Hodgkin's lymphoma?"
5      THE WITNESS:  It was clearly an additive
6  exposure.  But the very large, substantial, and
7  significant exposure, comparatively, was from his
8  occupational use.
9  BY MS. COPE-KASTEN:
10     Q.  Can you define "additive" for me as you were
11 using it here?
12     A.  That his residential use was minor compared
13 to his occupational use, which involved considerably
14 more exposure time.  Yet the residential use, although
15 much -- much smaller in scale, is still part of the
16 overall dosage.  It's certainly not zero.
17     Q.  You did not attempt to quantify how much
18 greater than zero the risk was to Mr. Hernandez from
19 his residential use?
20     A.  No.
21     Q.  On page 5 of your report, the second bullet
22 point under exposure factors says residential use.  Do
23 you see that?
24     A.  Yes.
25     Q.  You have listed that Mr. Hernandez sprayed

Page 37

1  one to two bottles of concentrate per year from 2009
2  to 2016.  Do you see that?
3      A.  That's correct.
4      Q.  How much Roundup is in a bottle?
5      A.  Either 20 ounces or 1 gallon.
6      Q.  Do you know what the size was of the bottle
7  that Mr. Hernandez used in this case?
8      A.  I do not.
9      Q.  Would that make a difference to you in terms
10 of assessing Mr. Hernandez's exposure to Roundup?
11     A.  If I were to quantitatively calculate
12 exposure days, yes.
13     Q.  Down at the bottom of page 5, table 1 lists
14 Mr. Hernandez's residential Roundup application
15 history.  Do you see that?
16     A.  Yes.
17     Q.  You've got dates listed here for 1997 to 2016
18 at the ▮▮▮▮▮▮▮▮ address, correct?
19     A.  Yes.
20     Q.  Can you help me understand how that date fits
21 with your bullet point higher on the page that says he
22 used residential Roundup from 2009 to 2016?
23     A.  I have a -- I thought I brought his Plaintiff
24 fact sheet.  That's what I'm looking for.
25     Q.  I have a copy of that.  Are you looking for

William Sawyer, Ph.D.

Page 38

1   his original or his first amended Plaintiff fact
2   sheet?
3       A.  I think the first amended.  That's strange.
4   I thought I printed it.
5       Q.  I'll mark as Exhibit 6 to your deposition the
6   first amended Plaintiff fact sheet for Ines Hernandez.
7       A.  Thank you.
8           (Exhibit No. 6 was marked for
9   identification.)
10          THE WITNESS:  Well, I really believe that I
11  made a typo.  I think that should read 2016 in
12  bullet 1.
13  BY MS. COPE-KASTEN:
14      Q.  Under occupational use?
15      A.  Yeah.  I have --
16      Q.  It should read 1997 to 2016?
17      A.  Yes.
18      Q.  Okay.  With respect to residential use, my
19  confusion is in the bullet point.  You start at 2009
20  for his residential use, and in table 1, you start at
21  1997.  And I'm trying to figure out which start date
22  you considered to be the first residential use for Mr.
23  Hernandez's Roundup exposure.
24      A.  Okay.  So the question is -- bullet 2, that
25  should read 1997 to 2016, consistent with table 1,

Page 39

1   which is also consistent with his deposition.
2       Q.  Do you know whether, from the period between
3   1997 and 2009, Mr. Hernandez sprayed one to two
4   bottles of concentrate Roundup per year?
5       A.  I don't recall.
6       Q.  Is it your understanding that Mr. Hernandez
7   was diagnosed with non-Hodgkin's lymphoma in November
8   of 2009?
9       A.  No, 2011.  Also, on page 8 with respect to
10  the prior question, I have footnote 15 for the
11  deposition of Mr. Hernandez indicating that he
12  approximates that he used one to two bottles of
13  Roundup per year for his personal use.  And I believe
14  that is covering the years 1997 to 2016.  And he -- he
15  continued to spray both properties.
16      Q.  Talk to me about where you're getting the
17  2011 date for his diagnosis for non-Hodgkin's
18  lymphoma.
19      A.  I --
20      Q.  This --
21      A.  I was referring to my report on page 10,
22  first full paragraph.
23      Q.  Okay.
24      A.  But the pathology date, I think, was 19 --
25  was -- the pathology, I think, was 2009.  So,

Page 40

1   actually, it would be 2009.
2       Q.  Okay.  And then --
3       A.  Because the 2011 was a PET scan follow-up.
4       Q.  That's when he started to get treatment for
5   non-Hodgkin's lymphoma; it was 2011?
6       A.  Right.
7       Q.  So we're in agreement, 2009 is when he had
8   non-Hodgkin's lymphoma based on the pathology?
9       A.  I believe that's when the pathology found the
10  follicular lymphoma.  It was a biopsy of the left
11  axillary node which confirmed the diagnosis of NHL,
12  follicular subtype.  And the patient declined the
13  conventional treatment at that time and instead opted
14  for an alternative -- alternative herbal treatment.
15          But then in 2011, the PET scan showed that he
16  was at a Stage III level of disease, and that changed
17  the course of treatment.
18      Q.  Would you agree with me that any Roundup
19  exposure after 2009 did not contribute to that
20  follicular lymphoma that had already shown up in the
21  pathology in 2009?
22      A.  Yes.  However, the continued exposure based
23  upon the study of George, et al., for example,
24  indicates that promotion was still a potential problem
25  with the ongoing Roundup exposure.  But, of course,

Page 41

1   the malignancy was already present and continued
2   exposure had no -- no impact on that initial
3   development of the malignancy in that it already
4   occurred.  But certainly there is the concern of
5   promotion with continued exposure.
6       Q.  So if the question that we're trying to
7   determine is what caused Mr. Hernandez to develop
8   follicular lymphoma, would you agree with me that
9   exposure after 2009 is not relevant to that question?
10      A.  Yes.  However, ongoing promotion was -- was
11  certainly a problem with respect to his continued
12  Roundup exposure.
13      Q.  Are you aware of any indication that after
14  2012 Mr. Hernandez had non-Hodgkin's lymphoma?
15      A.  No.
16      Q.  Would you agree with me that any residential
17  spraying Mr. Hernandez did at the Hardaway Drive
18  property between 2013 and 2016 did not contribute to
19  his development of non-Hodgkin's lymphoma?
20      A.  Yes.
21      Q.  Would you agree with me that any residential
22  spraying Mr. Hernandez did at the ███████████
23  property after his treatment for non-Hodgkin's
24  lymphoma did not contribute to his development of
25  non-Hodgkin's lymphoma?

William Sawyer, Ph.D.

Page 42

1    A.  Yes.
2    Q.  Is it also the case that any Roundup Mr.
3  Hernandez sprayed on any client properties after he
4  had already developed non-Hodgkin's lymphoma in
5  November of 2009 would not have contributed to him
6  developing non-Hodgkin's lymphoma?
7    A.  Correct.  It was already full-blown and
8  developed.  My point is that simply there is still a
9  promotion aspect with ongoing Roundup exposures.
10    Q.  Do you know what other chemicals Mr.
11  Hernandez had on his personal property in 2009?
12    A.  No.  As I stated, I have not made that
13  assessment.
14    Q.  Would you want to know what chemicals he had
15  on his property at that time?
16    A.  No.  I was not asked to perform a full
17  differential diagnosis.  It's my understanding that is
18  being handled by Dr. Schiff.
19    Q.  If you were performing an exposure assessment
20  for Mr. Hernandez, would it be relevant to your
21  opinions to know what other chemicals he was exposed
22  to prior to his development of follicular lymphoma?
23    A.  Yes.
24    Q.  Beyond what we have already discussed, did
25  you do anything else to inform yourself about Mr.

Page 43

1  Hernandez's exposure to Roundup?
2    A.  Well, simply the information I've summarized
3  in pages 5, 6, 7, 8, 9.
4    Q.  And the content that you have summarized or
5  included on those pages is based on, as we have
6  already discussed, your review of Mr. Hernandez's
7  deposition, Mrs. Hernandez's deposition, the Plaintiff
8  fact sheet, and Dr. Schiff's report?
9    A.  Yes.
10    Q.  I want to talk a little bit about personal
11  protective equipment.  On page 5 of your report, you
12  list the personal protective equipment that Mr.
13  Hernandez used, correct?
14    A.  Yes.
15    Q.  When you say that he sometimes wore goggles,
16  gloves, and mask, did you attempt to determine how
17  often "sometimes" referred to?
18    A.  No.
19    Q.  Do you know whether he always wore long pants
20  and work boots, or were those also just sometimes?
21    A.  My understanding was, that was -- that was on
22  page 8.  As a general rule, Mr. Hernandez wore no
23  specific personal protective equipment.
24       He generally wore long pants, work boots, and
25  a T-shirt or long sleeves, depending on the weather.

Page 44

1  He occasionally wore goggles and/or a dust mask for
2  intense jobs.  He estimates that he wore a dust mask
3  only once or twice per week.  So as a general rule,
4  yes, he wore long pants and work boots and a T-shirt,
5  but sometimes long sleeves depending on the weather.
6    Q.  How does wearing long pants impact Mr.
7  Hernandez's dermal exposure to Roundup?
8    A.  The PDE -- that's potential dermal
9  exposure -- level measured on the outside of the
10  fabric has an approximate 20 percent penetration value
11  based on studies that I have cited, as well as the
12  generally accepted POEM methodology.  So that is -- of
13  the material landing on that fabric, about 20 percent
14  of it would actually contact the skin.
15    Q.  Is it fair to say that wearing long pants
16  reduced Mr. Hernandez's dermal exposure of Roundup as
17  compared to wearing shorts?
18    A.  Definitely.
19    Q.  Does wearing work boots reduce Mr.
20  Hernandez's dermal exposure of Roundup as compared to
21  wearing open footwear or a type of shoe that might be
22  more porous?
23    A.  That's correct.
24    Q.  Did you attempt to quantify the protective
25  effect of Mr. Hernandez's use of goggles, gloves, or a

Page 45

1  dust mask?
2    A.  I did not because the inhalation route of
3  exposure from Roundup is generally less than
4  10 percent of the overall exposure and is not a
5  critical factor.
6    Q.  Dermal exposure is the primary route that
7  you're concerned with for Roundup?
8    A.  Yes.  Ninety percent plus of the exposure is
9  dermal as opposed to inhalation.
10    Q.  Did you attempt to quantify Mr. Hernandez's
11  dermal exposure to Roundup?
12    A.  No.  I did not perform a dose calculation.  I
13  deferred that to what was already produced in
14  September by Dr. Schiff.  I was not asked to perform
15  dose calculations, but, rather, be prepared to explain
16  to the jury how the material is absorbed into the body
17  and how it makes it to systemic circulation and how it
18  ultimately plays a significant role in the development
19  of an NHL.  My -- I was not asked to perform a dose
20  calculation in this case.
21    Q.  I want to come back to the dose calculation,
22  but let's stick with dermal exposure and protection
23  for just a moment.  You're aware that Mr. Hernandez
24  mixed Roundup from concentrate?
25    A.  That is correct.

12 (Pages 42 to 45)

William Sawyer, Ph.D.

Page 46

1    Q.  And he also sprayed Roundup?
2    A.  Yes.
3    Q.  Your report indicates that he washed his
4  hands after mixing Roundup, correct?
5    A.  At the end of the day, yes.
6    Q.  Do you know whether he rinsed his hands off
7  as the day went on if he was exposed to Roundup?
8    A.  If he experienced a wet hand, he stated that
9  he would, on page 8, on the second to the last
10  paragraph -- he would rinse the area off with a wet
11  hand and continue working.  After work, he would come
12  home and shower with soap and shampoo.
13    Q.  So he would wash off his hands as the day
14  went on if he had exposure to Roundup on his skin?
15    A.  Well, under -- no, under unusual
16  circumstances where he speaks of on, again, page 8,
17  second full paragraph from the bottom, Roundup
18  splashed on his face several times and he noted a
19  burning sensation situation each time this occurred.
20  Mr. Hernandez described sweating a lot while working
21  outside and would frequently get Roundup on his hands
22  when the pressure would come out.  He describes that
23  it would come out like rain and go on your hands.  He
24  also describes more than five instances where the
25  backpack sprayer had leaked and soaked his back and

Page 47

1  shirt.  He would rinse the area off with a wet hand
2  and continue working.  After, he would come home and
3  shower with soap and shampoo.
4      So it's -- it's not clear that he performed a
5  thorough cleaning of his hands or body when these
6  excursions occurred with respect to the pressure
7  coming out and -- coming out like rain onto the hands.
8  It's not -- it's not clear that he fully washed his
9  hands with soap at that point in time.  And what I'm
10  referring to is his deposition, specifically page 153.
11    Q.  And just to be specific, I'm looking at page
12  5 of your report.  The fifth bullet point down says,
13  "Washed hands with water after mixing."
14      Do you understand that to be correct?
15    A.  Yes, yes.  And I was referring to once the
16  mixing is completed and he was doing spray activities.
17    Q.  And that's when, at the end of the day, he
18  would shower with soap and shampoo?
19    A.  Yes, yes.  But -- but he does not indicate
20  that he thoroughly washed hands with soap or any of
21  his body parts until after work.
22    Q.  If I get Roundup on my hands and I rinse it
23  off with water, but not soap, do I reduce the amount
24  of Roundup that my body is going to dermally absorb?
25    A.  It depends when that occurs, whether it be

Page 48

1  within a few minutes versus two hours or eight hours.
2    Q.  Do you know how soon after getting Roundup on
3  his skin Mr. Hernandez washed with water?
4    A.  Yeah, my understanding is that with respect
5  to his hands, he washed his hands after mixing.  And
6  that would have reduced the hand exposure.  But with
7  respect to other parts of the body or hands during
8  spraying, this didn't occur until after work.
9    Q.  Is it fair to say that because you did not
10  conduct an exposure assessment in this case, you did
11  not to -- attempt to quantify the impact of any of
12  these actions on Mr. Hernandez's dermal absorption of
13  Roundup?
14    A.  Not exactly.  My report details and provides
15  numerous studies, tables, and examples of the exposure
16  levels to, for example, patches placed on various
17  aspects of the body, and what the dermal exposure
18  levels the clothing -- the exposure impact is the
19  clothing and has a impact -- ultimately what the dermal
20  impact is under different scenarios.
21      So what I'm prepared to do is state what the
22  impact would be for a person wearing long pants, a
23  person wearing a T-shirt, a person wearing boots, work
24  boots, and a person wearing gloves versus a person
25  wearing no gloves.

Page 49

1      So I have not specifically calculated
2  exposure for Mr. Hernandez.  However, I am well
3  prepared to explain what the exposure is for a person
4  like Mr. Hernandez wearing the specific levels of PPE
5  as per the various referenced studies.
6    Q.  I guess what I'm trying to get at here is,
7  you don't know the exact details of Mr. Hernandez's
8  use of PPE, or protective behaviors, such as how often
9  he washed his hands or how quickly he washed his
10  hands, correct?
11    A.  No, I don't think that's true.  I -- I have
12  reviewed his Plaintiff fact sheets and the depositions
13  and am prepared to speak on the facts in the case,
14  what he's testified to.  That I can speak about.  I'm
15  not going to guess in areas where I don't have
16  information.
17      But where I do have established facts in the
18  case, I can provide accurate information as to the
19  amount of material that would land on the center of
20  the back versus the hands versus the legs; and
21  depending on what clothing was used, what percent of
22  that would actually contact the skin and what percent
23  of it would be absorbed into circulation.
24      So I -- I'm relying on the facts in the case.
25  So I think it's -- it's incorrect to report that I am

13 (Pages 46 to 49)

William Sawyer, Ph.D.

Page 50

1  ill-prepared and unable to speak specifically about
2  his exposures. I -- I have carefully examined the
3  depositions in this case, both him and his wife, and
4  the Plaintiff fact sheets, and that's what I'm relying
5  on.
6       Now, if there's information that's missing at
7  some point, I will not guess at it. I will simply not
8  speculate at all if -- if there's a piece of
9  information missing. And I think that's what your
10  question presented to me.
11     Q. Does the surface area with which Roundup
12  makes contact on a person's skin impact how much
13  Roundup is ultimately absorbed into the person's body?
14     A. Yes.
15     Q. Do you know how tall Mr. Hernandez was -- is?
16     A. No.
17     Q. Do you know how much Mr. Hernandez weighs?
18     A. No. But the peer-reviewed studies, such as
19  the Machado study and other exposure dose studies,
20  including Monsanto's own internal documents, do not
21  specify on the individual's height, weight, but rather
22  use an average value for a worker.
23     Q. Do they specify the amount of Roundup that
24  came into contact with the individual's skin?
25     A. Yes, that is the -- what we call the PDE,

Page 51

1  potential dermal exposure, value. And in the case of
2  the Machado study, which I have previously referenced
3  in my report, as well as table 7 from Monsanto, MON
4  2139, and other studies, provide the measured exposure
5  on various parts of the body under various conditions.
6  And I'll point you to a table in the Machado study
7  that I have relied on.
8       MS. COPE-KASTEN: While he's looking for
9  that, let me ask you: Is it going to be confusing
10  for you if I mark the set of documents he brought
11  with him today as a single exhibit, and that's his
12  file, or is that fine?
13       THE COURT REPORTER: (Nodding head.)
14  BY MS. COPE-KASTEN:
15     Q. Dr. Sawyer, let's go ahead and mark the
16  documents that you're looking through right now as
17  Exhibit 7. And we'll call that your Hernandez file.
18  Is that fair? And then can point me to the
19  specific reference in one of those documents you're
20  talking about.
21     A. Well, you can. The only thing is, this --
22  this particular folder is marked CV, cases over four
23  years, and referenced studies, and it really applies
24  to both Hernandez and Harris.
25     Q. That's fine. Let's -- let's cross that

Page 52

1  bridge when we come to it.
2       MR. BRAKE: Let me see that first, please.
3       MS. COPE-KASTEN: Why don't we go off the
4  record for a minute.
5       MR. BRAKE: Sure.
6       THE VIDEOGRAPHER: Going off the record at
7  9:23.
8       (A break was held.)
9       (Exhibit No. 7 was marked for
10  identification.)
11       THE VIDEOGRAPHER: We're back on the record.
12  The time is 9:35.
13  BY MS. COPE-KASTEN:
14     Q. Dr. Sawyer, during the break we marked, as
15  Exhibit 7, to your deposition, a set of articles that
16  you brought with you today. You were looking for
17  something in one of those articles particularly, so I
18  will let you go ahead and find that. I just wanted to
19  note that for the record.
20     A. Yes, it was in response to your question in
21  the Machado-Neto, et al., study from 2000. Table 2
22  provides the distribution of PDE -- that's potential
23  dermal exposures -- in the various body regions on a
24  percentage basis. In other words, what -- when using
25  a backpack, what percent -- percentage of it falls on

Page 53

1  various areas of the body, including the feet, legs,
2  thorax, back, head, arms, et cetera. And all of these
3  values are of individuals wearing Drill overalls, a
4  heavy overall, long sleeves, hood, semi-facemask, and
5  leather shoes, which -- which actually are defined as
6  leather boots in the study.
7       But the -- so to answer your question, there
8  are other references I've used as well that provide
9  the dermal exposure levels of individuals, both
10  wearing complete protective equipment, and those as
11  home gardeners wearing shorts and T-shirts. So the
12  dress does make a difference on the exposure. And I
13  have studies that have assessed that, which I'll be
14  using.
15       It's not necessary that I have knowledge of
16  the Plaintiff's body weight and height to assess the
17  potential dermal exposure because the studies have not
18  based it on the person's height and weight, but,
19  rather, how much the material lands on various areas
20  of the body.
21     Q. In table 2 of the Machado-Neto study that you
22  were just referencing, are those percentages that are
23  in that table in terms of potential dermal exposure?
24     A. Yes.
25     Q. Percentages of what?

14 (Pages 50 to 53)

William Sawyer, Ph.D.

Page 54

1    A.  Actually, what it is is a study of glyphosate
2  applicators.  And the way the study was designed was
3  to use what we call a surrogate.  In this case it was
4  copper oxychloride, O-X-Y-C-H-L-O-R-I-D-E, at a
5  concentration of 252 grams per 100-liter water.
6       So that was added to the Roundup.  And the
7  copper cation -- that's C-A-T-I-O-N -- was used as a
8  tracer to measure how much glyphosate landed on
9  various parts of the body, which is an accurate
10  measure because the copper oxychloride is 100 percent
11  water soluble, just like glyphosate.  So it travels
12  exactly like glyphosate.
13       But the analytical test method was not for
14  the glyphosate, but, rather, for the tracer.  And the
15  study was performed on various types of applicators,
16  backpack versus lever-operated versus
17  pressure-operated versus a tractor with various types
18  of booms.
19       MR. BRAKE:  (Sneezes.)
20       MS. COPE-KASTEN:  Bless you.
21       MR. BRAKE:  Thank you.
22       THE WITNESS:  And exposure to the hands
23  were -- were measured by the workers wearing
24  cotton gloves, which were then tested.  So that
25  shows how much actually made it onto the glove,

Page 55

1  not the skin.  Not how much was dermally absorbed
2  to the skin, but how much made it to the glove.
3       And the bodies were covered in various areas
4  with -- I'm trying to think of the name of these
5  things that females use.  There is a device that
6  females use that has a sticky-tape surface on one
7  side and gauze on the other.
8  BY MS. COPE-KASTEN:
9    Q.  I think "maxi pad" is the term that you were
10  looking for.
11    A.  It's a pad.  Let's just call it that.  The
12  specific make of the pad is in the -- it's called a --
13  Carefree.  Yeah, Carefree sanitary pad, actually.
14       Okay.  So the workers wear the sanitary pads
15  on various areas of their body and then go out and
16  spray.  And the -- the tracer is measured from the
17  pads.  The pads are sent to the lab.
18       And in the MON study that I mentioned, there
19  was some similarities in terms of the methodology as
20  well and in other studies.  And it's -- it's a way of
21  measuring how much exposure occurs to a worker under
22  different application procedures.
23    Q.  In order to calculate a percentage that was
24  dermally absorbed by these individuals, did the study
25  authors know how much Roundup was sprayed by the

Page 56

1  participants initially?
2    A.  In the -- in each study, that is correct.
3  The time varied somewhat in the Monsanto study versus
4  the Machado study and -- and other studies.  But, yes,
5  the -- the duration of spraying is recorded in the
6  studies.
7    Q.  Did you attempt to calculate the duration
8  that Mr. Hernandez sprayed Roundup?
9    A.  No.  I -- as I said, I did not perform an
10  exposure-day analysis based on an eight-hour workday,
11  which is used in the McDuffie, et al., and other
12  studies referenced in my report: The six primary
13  studies that provide a dose metric with a measurement
14  of risk ratio or PMR or other measure -- actually, I
15  think all six studies are risk-ratio measurements.
16    Q.  Do you intend to offer any particular
17  potential dermal exposure values in Mr. Hernandez's
18  case?
19    A.  Can you repeat that, please?
20    Q.  Do you intend to offer any particular
21  potential dermal exposure values for Mr. Hernandez in
22  his case?
23    A.  I intend to explain to the jurors and
24  instruct the jurors in terms of what the scientific
25  studies have shown for backpack sprayers with respect

Page 57

1  to the areas of highest exposure on the body.  For
2  example, in the back area, when using a backpack
3  sprayer; as well as the hands with gloves versus
4  without gloves; and other parts of the body, including
5  the hands, face, neck, versus the forearms and arms
6  versus the hands versus the front thorax versus the
7  back versus the legs, front -- the thigh and legs
8  versus the back of the thigh and legs, and explain
9  that the exposure when using a backpack sprayer is not
10  confined to only the lower legs, but the entire body.
11  And basically what the percentages are during
12  different modes of spraying, especially backpack
13  spraying, as that was the most significant exposure
14  experienced by Mr. Hernandez.
15    Q.  When you say that you intend to explain to
16  the jury what the scientific studies show, and you
17  just referenced percentages now, do you intend to give
18  the jury specific numbers in terms of percentages that
19  Roundup is exposed in different areas of the body?
20    A.  Only the relative differences in the
21  different parts of the body.  I'm not making a
22  quantitative dose in units of milligram per kilogram
23  body weight, since there's nothing to compare that to
24  in the human epidemiologic studies as those are based
25  on exposure days.  That is, there are various

15 (Pages 54 to 57)

William Sawyer, Ph.D.

Page 58

1  threshold measurements in those six studies I cited
2  that correspond to statistically significant increased
3  rates of NHL.  For example, one day or two days or ten
4  days or greater, and so on, as contained in my report
5  on the pages I've previously identified, which I think
6  is pages 12 to 15, I believe.  Yes.
7      So my explanation of the studies is simply
8  under different spraying conditions and under
9  different personal protective equipment conditions,
10  what areas of the body are impacted and in what rank
11  order, and to what degree does the glyphosate
12  penetrate clothing in percentages.  And what
13  percentage of that material then is able to transfer
14  through the skin into systemic circulation.
15      And once in systemic circulation, the impact
16  of the Roundup mixture on lymphocytes, stem cells
17  within the body, and what has been documented in the
18  scientific literature and even accepted and now
19  generally recognized by ATSDR to be mutagenic, that
20  is, capable of inducing genotoxicity.  And how
21  chromosomal aberrations are statistically and
22  substantially documented to correlate with increased
23  rates of NHL.
24      So I want to show the mechanistic of exactly
25  how this material goes from this -- the bottle of

Page 59

1  Roundup into the body and what it does within the body
2  and how that occurs.  That's basically my focus.
3      Q.  I understand what you're saying in terms of a
4  general focus.  What I'm trying to figure out for Mr.
5  Hernandez is, are you going to tell the jury, Mr.
6  Hernandez's dermal absorb-- exposure to Roundup was X?
7  Are you going to give them a number or a calculation
8  with respect to what Mr. Hernandez specifically
9  experienced?
10      A.  No.  I've stated that repetitively.
11      Q.  You've talked a couple of times about
12  backpack sprayers, so I want to talk about Mr.
13  Hernandez's -- Mr. Hernandez's experience with a
14  backpack sprayer.  You stated that he experienced at
15  least five spills down his back while wearing a
16  backpack sprayer?
17      A.  Yes.
18      Q.  Do you know how much leaked out of the
19  sprayer on any of those occasions that it spilled?
20      A.  No, no.  However, I will reference study
21  information that does indicate that by at least one or
22  two orders of magnitude, the exposure to the central
23  back upon back spray -- backpack spraying is a major
24  exposure factor.  And I reference that right from
25  Monsanto's own MON 2139 study showing the differential

Page 60

1  quantities of glyphosate measured on various areas of
2  the body during spraying with a backpack and using the
3  pads, that we spoke of, on various parts of the body
4  to measure the exposures.
5      Q.  Do you know what Mr. Hernandez's exposure to
6  Roundup from a backpack sprayer was as compared
7  specifically to the participants in any of those
8  studies?
9      A.  Only in a relative sense.  And that is
10  backpack spraying -- when compared to the 11 different
11  working conditions published in the Machado study,
12  backpack spraying reveals the highest exposure level
13  to the legs and front -- front thigh out of all
14  11 different combinations.  And that includes tractor
15  drivers, applicator helpers, solution mixers, tractors
16  with trailing booms, tank loader, pressurized
17  knapsack -- pressurized knapsack and operated
18  knapsack.  And clearly the knapsack lever operator or
19  the pressurized knapsack applicator values are the
20  highest measurement.
21      So it's -- from a relative standpoint,
22  backpack spraying leads to relatively high exposures.
23  And when we look at the human epidemiologic studies of
24  applicators, certainly Mr. Hernandez's mode of
25  spraying is one that would afford him the highest

Page 61

1  level of exposure to the legs and to the central back
2  area of his chest.
3      Q.  Speaking not in terms of relative exposure,
4  but in terms of concrete exposure, you don't know
5  whether Mr. Hernandez was exposed to similar levels of
6  Roundup from a backpack sprayer as the participants
7  were in those studies, correct?
8      A.  No, I do know that in the -- out of all the
9  various modes of application, backpack sprayers rank
10  in the highest level for exposure to their legs, that
11  is, lower legs and front thigh, as well as the central
12  area of the back.  And then based on MON 2139 and the
13  Machado-Neto study, table 2.  And I believe I've
14  referenced in my report some other studies as well,
15  which I could discuss if needed.
16      Q.  Let me try this from a slightly different
17  angle.  Do you know how tightly Mr. Hernandez had the
18  backpack sprayer adhered to his back, in terms of how
19  tight the straps on the sprayer were?
20      A.  No.  But that's irrelevant.
21      Q.  Do you know whether Mr. Hernandez sprayed
22  from the backpack sprayer in a similar manner to the
23  participants who were in these studies?
24      A.  Yes.  He used a backpack, and backpacks are
25  also included in the studies.  I mean, it's just --

16 (Pages 58 to 61)

William Sawyer, Ph.D.

| Page 62 |
| --- |

1 the question is -- maybe I don't understand your
2 question. Please repeat it.
3     Q. Did you ever observe Mr. Hernandez spraying
4 with a backpack sprayer?
5     A. No. And neither do I have any historical
6 video footage.
7     Q. You're aware that he purchased three
8 different backpack sprayers for occupational use?
9     A. Yes.
10     Q. Have you ever inspected any of those three
11 backpack sprayers?
12     A. No.
13     Q. Do you know how often Mr. Hernandez's
14 backpack sprayer leaked, as compared to the
15 participants in the studies that you were referring
16 to?
17     A. No, only that studies have demonstrated that
18 back -- backpack sprayers, due to the vent hole on the
19 top of the cap, bending over and sloshing the liquid
20 can cause drippage onto the back. And that has been
21 shown quantitatively in the MON 2139 study, and also
22 appears in other literature as well.
23     Q. How much do you believe Mr. Hernandez's risk
24 of developing non-Hodgkin's lymphoma increased based
25 on the number of times his backpack sprayer spilled,

| Page 63 |
| --- |

1 which you have included in your report as at least
2 five?
3     A. I don't have any quantitative value for that.
4 However, his overall exposures over the years, based
5 upon the assessment by Dr. Schiff, places him in a
6 reasonable range of the human epidemiologic studies.
7 And the human epidemiologic studies do not break down
8 by backpack or hand-held sprayer or tractor-boom
9 sprayer; it's simply a combination of all modes.
10     And what I am stating, based on the study
11 data, is that backpack sprayers rank at the highest
12 degree of exposure to the legs and front thigh, which
13 is well known and even accepted by Monsanto's own
14 experts as the highest exposed area of the body
15 outside of the hands when gloves are not worn.
16     I don't think there's any dispute between
17 experts in this case on both sides that the lower legs
18 and front thighs are the highest impact region to the
19 Roundup during spraying. Based on my review of
20 Dr. Sullivan, Dr. LeBeau, Dr. Phalen, reports, I think
21 we're all in agreement that the lower legs are the
22 primary site of action.
23     And with backpack spraying, the Machado study
24 shows that to be the case. And the MON 2132 -- or
25 2139 document also reveals the central back area as a

| Page 64 |
| --- |

1 high-impact area with spraying.
2     Q. I want to turn you to page 11 of your report.
3 Do you see that the first paragraph --
4     MS. COPE-KASTEN: Let's go off the record for
5 one second.
6     THE VIDEOGRAPHER: Going off the record at
7 9:59.
8     (A break was held.)
9     THE VIDEOGRAPHER: We're back on the record.
10 The time is 10:05.
11 BY MS. COPE-KASTEN:
12     Q. Dr. Sawyer, on page 11 of your report, you
13 have a section called NHL latency interval. Do you
14 see that?
15     A. Yes.
16     Q. At the end of that paragraph, you state, "Mr.
17 Hernandez's latency interval to date of diagnosis is
18 12 years (1997 to 2009)," right?
19     A. Right.
20     Q. What do you mean by that?
21     A. Well, latency is defined as the time of
22 initial exposure to the time of actual diagnosis.
23 And, remember, I stated his residential exposures
24 occurred in 1997, for example. And, remember, I said
25 that those exposures were minimal in comparison to his

| Page 65 |
| --- |

1 occupational. They were still significant exposures,
2 but they could certainly qualify as his -- his initial
3 exposures.
4     And he was diagnosed in 2009. So that's a
5 12-year latency period by definition. And it's not a
6 definition I have made up; it's a generally-accepted
7 definition in toxicological studies of latency, that
8 is, from initial -- initial exposure to initial
9 diagnosis. And, actually, not -- it is not a
10 measurement to initial symptoms. It is -- when that
11 diagnosis is made, and in the case of NHL, it's made
12 based upon the pathology of the biopsy.
13     Q. Do you know what the latency period is for
14 the development of non-Hodgkin's lymphoma in a person
15 with no Roundup exposure?
16     A. There is no such definition. I mean, the
17 latency period is from time of exposure to the
18 substance. It could be ionizing radiation, for
19 example.
20     I have a buddy who -- that had exposure in
21 Japan to the triple reactors. Fortunately, he's
22 healthy. But if he developed a malignancy related to
23 that radiological exposure, it would be from that time
24 of exposure to the time of diagnosis; or if it were a
25 person working in the, let's say, asbestos industry,

William Sawyer, Ph.D.

Page 66

1 from the time of that initial asbestos occupational
2 exposure to the time of that diagnosis of mesothelioma
3 would be a latency period.
4         And every chemical has different latency
5 periods. For mesothelioma and asbestos, it's a very
6 long latency. It's very often very typically 35 years
7 with hematopoietic malignancies and ionizing
8 radiation. For example, the latencies are very short
9 for hematopoietic malignancies such as NHL. And I
10 reference that to the World Trade Center studies which
11 I've referenced in my report.
12         Later in the report -- I don't know what
13 page, 280 -- or let me look at it and I'll give you
14 that page number.
15         Yeah, on page 124 in my report, footnote 273,
16 I reference the, "Minimum Latency and Types or
17 Categories of Cancer, World Trade Center Health
18 Program, Revised: January 6, 2015." And that ranges
19 from 0.4 to 2 years minimum. So that really gives us
20 a measure of the absolute minimum latency from a
21 mutagenic substance, which is, in that case, ionizing
22 radiation.
23         And I've also referenced other studies,
24 including the US EPA Glyphosate Issue Paper, page
25 57 -- and I've got to wait for this page to -- I don't

Page 67

1 know what page it is, actually -- referencing De Roos
2 2005; Portier 2016; Fontana, F-O-N-T-N-A --
3 F-O-N-T-A-N-A, et al.; Kato, K-A-T-O, et al.; and
4 Weisenburger 1992, with a general range of 1 to 25
5 years.
6      Q.   Does the 1 to 25 years refer to latency from
7 any environmental or chemical exposure, or is it
8 specific only to glyphosate in your opinion?
9      A.   Most of those studies I just referenced are
10 specific to glyphosate.
11      Q.   Do you know what the latency interval is for
12 exposure to other substances that are associated with
13 the development of non-Hodgkin's lymphoma?
14      A.   Yes. For example, Cyclosporine A, which is
15 an immunosuppressant drug used in organ transplant,
16 has a typical latent period of only six months to a
17 year. Very rapid. And that's one of the, you know,
18 well-known hazards, the toxicological hazards, of
19 Cyclosporine A. You absolutely have to have it if
20 you're going to have a major transplant. But on the
21 other hand, it carries a very high risk of NHL.
22      Q.   Would you agree with me that prior to the
23 diagnosis for any person of non-Hodgkin's lymphoma,
24 they would have had to have DNA damage?
25      A.   That is what -- that is highly consistent

Page 68

1 with the studies. Now, with respect to identifying
2 that damage in the lymphocytes, I would defer you to
3 Dr. Schiff.
4      Q.   If we take a hypothetical individual who has
5 never been exposed to any chemical or environmental
6 substance that is believed to cause non-Hodgkin's
7 lymphoma, and yet they develop non-Hodgkin's lymphoma,
8 do you know how long the latency interval could be
9 between when they first experienced DNA damage and
10 when they're diagnosed with non-Hodgkin's lymphoma?
11      A.   Well, that's highly dependent upon the DNA
12 repair mechanisms, which is individually variable. It
13 depends on the age of the person. Children are highly
14 susceptible to low levels, as per the US EPA document
15 called "Early-Life Exposures to Chemica--
16 Carcinogens." So the age of a person is a variable.
17         The use of immunosuppressant drugs is another
18 variable. For example, if a person is suffering from
19 very significant arthritis, that is rheumatoid
20 arthritis, and was prescribed methotrexate or a
21 similar drug that causes substantial
22 immunosuppression, that could very much shorten the
23 latency.
24         So there's -- there's a lot of factors and
25 variables involved. So there's no one answer for that

Page 69

1 question.
2      Q.   Could that period of time be years?
3      A.   Yes.
4      Q.   Do you intend to offer an opinion in Mr.
5 Hernandez's trial about his non-Hodgkin's lymphoma
6 latency period?
7      A.   Simply that the 12-year latency is certainly
8 in keeping with what we know about glyphosate-induced
9 NHL and latency period. He falls right in the middle,
10 and there's nothing unusual about that.
11      Q.   Your report talks about Mr. Hernandez's
12 treatment for non-Hodgkin's lymphoma. Do you intend
13 to give opinions at trial with respect to Mr.
14 Hernandez's treatment for non-Hodgkin's lymphoma?
15      A.   No. The only -- the only related piece that
16 I will state is, based upon the studies that I have
17 included in my report, his already-existing lymphoma
18 was subject to promotion by ongoing occupational and
19 residential exposures to Roundup.
20      Q.   And I think the answer to this is no based on
21 what we've already talked about today. But you
22 haven't attempted to quantify how much the promotional
23 effect would be for Mr. Hernandez at any point in time
24 based on his Roundup exposure?
25      A.   On page 126 of my report, I presented a

18 (Pages 66 to 69)

William Sawyer, Ph.D.

Page 70

1  summary of the study by George, et al., 2010.  And I
2  conducted a HED conversion from the animal study.  HED
3  stands for human equivalent dose.  That's a standard
4  methodology.  And, no, I may be giving you the wrong
5  page.  But let me check.
6      Q.  I think it's right.
7      A.  Actually, page 35, I provide, in table 12,
8  the human equivalent dose calculation from mouse to
9  human.  And I've referenced the methodology.  It's
10  been used for decades and has been generally accepted.
11      And what it shows is a dose level consistent
12  with that experienced by glyphosate applicators.  That
13  is, this George study did not use some exceptionally
14  high dosage thousands of times above what humans are
15  exposed to, but, rather, it actually falls within
16  range of what applicators are exposed to through their
17  skin.
18      And in this study, it did show statistically
19  significant promotion, which is important with respect
20  to Mr. Hernandez, in that he was being treated for the
21  NHL malignancy and yet at the same time was undergoing
22  further exposures to Roundup.  Thus, there is
23  potential for promotion of the malignant process that
24  he was being treated for.
25      Q.  Is it your opinion that during Mr.

Page 71

1  Hernandez's treatment for non-Hodgkin's lymphoma, he
2  was continuing to spray Roundup?
3      A.  For a short time, yes.
4      Q.  What does "a short time" mean?
5      A.  Well, he was diagnosed in 2009, and he was
6  treated in 2011.  And that -- I need to refer to page
7  11 -- wait a minute.  Page 10, I think.
8      Yeah, on page 10, based on the March 14th,
9  2011, PET scan, he was in a Stage III disease state.
10  And he underwent chemotherapy later in May of 2011.
11  And during that time, 2011, he continued to spray
12  residentially.
13      Q.  Do you know how frequently he was spraying
14  residentially during that time?
15      A.  I do not.  As I said, it was spot-spraying.
16  It was not -- it was relatively minimal compared to
17  the magnitude of his occupational spraying.
18      Q.  The question that I posed to you initially,
19  when you began talking about the George study, was
20  whether you attempted to quantify the amount of the
21  promotion that Mr. Hernandez, in particular, would
22  have had as a result of using Roundup.  Did you do any
23  particular calculation with respect to Mr. Hernandez
24  with respect to promotion?
25      A.  Only that the dose very close to that of

Page 72

1  the AOEL of 0.1 milligram per kilogram per day.  But I
2  did not calculate Mr. Hernandez's dose.  However, he
3  was an applicator, and applicators often encounter
4  dosages near the AOEL.  So my conclusion is that the
5  HED dose is in a reasonable range of an applicator.
6      Q.  But that requires you to make an assumption
7  that, as an applicator, Mr. Hernandez's dose was
8  similar, during the period of his NHL treatment, to
9  applicators that you were aware of from studies,
10  correct?
11      A.  Yes.  He -- his protective gear and his
12  backpack spraying certainly places him into a category
13  of a typical applicator, if anything, on the high end
14  because of his backpack spraying and short sleeves at
15  times.
16      And I think that the question that you're
17  raising, though, is -- is a little different.  I think
18  you're asking me if he was exposed as an applicator in
19  the year 2011.
20      Q.  Correct.  Or exposed in the year 2011 at
21  levels similar to those that you understand
22  applicators in the studies to have been exposed to.
23      A.  Well, during that day -- during that day --
24  during that year -- during that period, he was still
25  spraying as an applicator and, thus, would have

Page 73

1  received exposures similar to that of a typical
2  applicator.
3      Q.  I'm going to direct you to page 9 of your
4  report, the second complete paragraph.  Are you there?
5      A.  Yeah.
6      Q.  Do you see the third sentence states that
7  Mrs. Hernandez reports that her husband returned to
8  his lawn maintenance business after time off from his
9  illness from 2009 to 2014?  What do you mean by that?
10      A.  Well, based upon the Plaintiff fact sheet and
11  the deposition of Mr. Hernandez, he continued to
12  spray.
13      Q.  Occupationally?
14      A.  Yes.  And that went on up 'til 2016, at which
15  time in -- for example, in the year 2014, '15, and
16  '16, he would have been exposed to Roundup as an
17  applicator --
18      Q.  Is it your under--
19      A.  -- on --
20      Q.  I'm sorry about that.
21      A.  -- on a daily basis.
22      Q.  Is it your understanding, based on the
23  Plaintiff fact sheet, and Mr. Hernandez's deposition,
24  or any other source, that Mr. Hernandez continued to
25  spray Roundup at the same rate during his illness that

William Sawyer, Ph.D.

Page 74

1    he had sprayed prior to 2009, occupationally?
2        A.   The only exception to that is what the --
3    Mrs. Herandez (sic) -- or Mrs. Hernandez states that
4    he returned in 2014, where he worked six or seven
5    hours or less.  And that's per page 18 and 19 of her
6    deposition.  So that would indicate that his
7    application exposures were less than they had been
8    previously.
9        Q.   On page --
10       A.   But he was still receiving daily exposures,
11   which certainly is significant in comparison with the
12   human epidemiologic studies that only require one or
13   two days per year of spraying to result in a
14   significant increased rate of NHL.  Because it's still
15   a significant frequency, even if he had only dropped
16   his hours to six or seven hours a day or less.
17       Q.   I'd like you to turn to page 10 of your
18   report, please.  The second full paragraph that starts
19   "Roger Hernandez."
20            Do you see that?
21       A.   Yes.
22       Q.   It says, "Roger Hernandez, Mr. Hernandez's
23   son, reported that his father was very healthy prior
24   to his cancer diagnosis.  Now he is doing 'okay, but
25   more vulnerable to sickness.'"

Page 75

1            Where does that come from?
2        A.   I think it came from Mrs. Hernandez's
3    deposition.  But I'd have to check that.
4        Q.   You didn't ever interview Roger Hernandez,
5    did you?
6        A.   No.
7        Q.   You're not aware of Roger Hernandez giving a
8    deposition in this case?
9        A.   No.  It may have came out of a medical
10   record.  I can't remember.  No, it couldn't have been
11   a medical record; it had to have been her deposition,
12   I think.
13       Q.   If it did not come out of her deposition, do
14   you have any guess as to where it might have come
15   from?
16       A.   I just don't recall.
17       Q.   Do you intend to offer any opinions at Mr.
18   Hernandez's trial about him being more vulnerable to
19   sickness in the wake of his cancer diagnosis?
20       A.   No, I don't.  I would defer that to the
21   medical oncologist, Dr. Schiff.
22       Q.   Do you intend to offer any opinions at all
23   about Mr. Hernandez's mental or physical condition in
24   connection with his non-Hodgkin's lymphoma?
25       A.   No.

Page 76

1        Q.   You have added some citations to your report
2    to the 2019 North American Pooled Project publication,
3    right?
4        A.   Yes.
5            (Exhibit No. 8 was marked for
6        identification.)
7    BY MS. COPE-KASTEN:
8        Q.   I have marked that publication as Exhibit 8
9    to your deposition.  Exhibit 8 is a publication
10   entitled, "Glyphosate use and associations with
11   non-Hodgkin lymphoma major histological sub-types:
12   Findings from the North American Pooled Project,"
13   correct?
14       A.   That's right.  And I've outlined in my report
15   on page 14 the 468 follicular lymphomas that were
16   examined.
17       Q.   We'll get there.  The lead author on this
18   publication is Pahwa, P-A-H-W-A, correct?
19       A.   Yes.
20       Q.   Several of the other authors on this
21   publication were also authors on earlier glyphosate
22   epidemiology publications, right?
23       A.   Yes.
24       Q.   Do you recognize that Dr. Weisenburger is an
25   author on this paper?

Page 77

1        A.   Yes.
2        Q.   Are you aware that Dr. Weisenburger was a
3    co-author on the De Roos 2003 publication?
4        A.   Yes.
5        Q.   Are you aware that Dr. Weisenburger is also
6    an expert for the Plaintiff in this case?
7        A.   Yes.
8        Q.   This article was published in 2019, right?
9        A.   Yes.
10       Q.   Are you aware that the North American Pooled
11   Project investigators prepared PowerPoints with
12   glyphosate analyses several years ago?
13       A.   No.
14       Q.   Have you ever reviewed any prior versions of
15   this publication?
16       A.   It's possible that I received the version
17   that was marked accepted, with some type of acceptance
18   date on it, earlier this year.
19       Q.   The North American Pooled Project pooled
20   together a number of prior epidemiology studies,
21   correct?
22       A.   Yes.
23       Q.   Including studies that the authors on this
24   paper were also authors on?
25       A.   Yes.

William Sawyer, Ph.D.

Page 78

1    Q. I want to direct you to page 2, the second
2  column on the right, the first sentence. The authors
3  state, "The information available on the glyphosate
4  and NHL association is somewhat limited."
5    Do you agree with that?
6    A. I would need -- need further clarification.
7  That statement is somewhat broad. I would have to
8  read the preceding and the full paragraph to put it
9  into context.
10   Q. Take your time.
11   A. Okay. So the authors in the preceding
12 paragraph, and in the paragraph starting with, "The
13 information available" -- both of these paragraphs
14 point to weaknesses and limitations.
15   And with respect to the statement, "The
16 information available on the glyphosate and NHL
17 association is somewhat limited," yeah, it is somewhat
18 limited, somewhat. It's still sufficient, but it's
19 not as -- nearly as broad as the toxicological and
20 human epidemiological data we have on cigarette
21 smoking or benzene exposures in the occupational
22 setting. There were many other examples in terms of
23 the number of studies.
24   Q. The investigator's goal was to have a larger
25 number of non-Hodgkin's lymphoma cases and controls to

Page 79

1  allow for more detailed analyses of the relationship
2  between glyphosate and NHL, correct?
3    A. Yes.
4    Q. In your report you cite the never-ever use
5  odds ratio for glyphosate and non-Hodgkin's lymphoma
6  overall from this study?
7    A. Yes.
8    Q. I want to direct you to table 2, which is on
9  page 5 of this publication. This is where those
10 numbers were coming from, correct, those never-ever
11 numbers?
12   A. Yes.
13   Q. If we look at non-Hodgkin's lymphoma overall,
14 when the authors controlled for the use of 2, 4-D,
15 dicamba, and malathion, there was no significantly
16 increased risk of developing non-Hodgkin's lymphoma
17 based on glyphosate use, correct?
18   A. That is correct.
19   Q. In your report you also cite the odds ratio
20 for glyphosate and diffuse large B-cell lymphoma with
21 greater than two days per year of use?
22   A. Yes.
23   Q. You're aware that Mr. Hernandez had
24 follicular lymphoma?
25   A. I'm aware of that, certainly.

Page 80

1    Q. Follicular lymphoma and diffuse large B-cell
2  lymphoma are different subtypes of non-Hodgkin's
3  lymphoma, correct?
4    A. That's right.
5    Q. If we look in table 2 at follicular lymphoma,
6  the odds ratio with ever use of glyphosate is the same
7  for follicular lymphoma as it is for the control
8  group, correct?
9    A. It is.
10   Q. When the authors controlled for the use of 2,
11 4-D, dicamba, and malathion, that odds ratio went down
12 to 0.69, correct?
13   A. Yes.
14   Q. The North American Pooled Project figures for
15 follicular lymphoma with ever use of glyphosate do not
16 indicate that there is any increased risk of
17 developing follicular lymphoma with ever use of
18 glyphosate, correct?
19   A. Correct. But keep in mind the number of
20 cases for ever-used glyphosate with follicular
21 lymphoma dropped to only 28. So the type II error --
22 that's called the error of having a change present,
23 but not being able to see it -- goes way up with a
24 small number of subjects.
25   So the type II error in the epidemiological

Page 81

1  analysis is increased due to the low number of
2  subjects. And for further discussions on that, I
3  would defer that to the epidemiologist involved in
4  this case.
5    Q. What's type I error?
6    A. Type I error is when chance alone is the
7  reason of the observed change. So these studies are
8  run at a 95 percent confidence interval. You will see
9  that in the top right corner of the table. And that
10 means that if something is statistically significant
11 in this table, there's only a 5 percent chance -- 5
12 percent level of chance that it could have occurred by
13 chance, 95 percent certain that it was not by chance
14 alone. And that's type I error. So one has to be
15 appreciative of and understand, in epidemiology, both
16 type I and type II error.
17   Q. Does type I error also increase as the number
18 of subjects goes down?
19   A. No. If -- if a finding is statistically
20 significant, that is at the 95 percent confidence
21 interval with a lower number of subjects, that does
22 not -- does not mean that the chances of it occurring
23 by chance are greater. It's still at 5 percent.
24   Q. Do confidence intervals -- are confidence
25 intervals impacted by the number of subjects in a

21 (Pages 78 to 81)

William Sawyer, Ph.D.

Page 82

1  particular analysis?
2      A.  Yes, very much.
3      Q.  How so?
4      A.  Well, the lower number of subjects, the wider
5  the confidence interval.
6      Q.  Since you included --
7      A.  Let me give you an example.
8      Q.  Sure.
9      A.  If we knew -- if -- if we knew -- if we had
10  the data for every person who was ever exposed to
11  glyphosate for more than two days, if we had exact
12  data on every single person in the universe, we would
13  have such a narrow confidence interval it would be
14  zero.  We would have the exact answer.  Where if we
15  only had 28 people, that confidence interval could be
16  very variable and wide and result in type II error.
17      Q.  As a general matter, are larger studies, or
18  studies with more participants, preferable to smaller
19  studies?
20      A.  Yes.
21      Q.  Since you included the odds ratio for diffuse
22  large B-cell lymphoma with greater than two days per
23  year of exposure, I want to look at table 4, which is
24  the number-of-days-per-year analysis.  And I want to
25  look at follicular lymphoma, the type of cancer that

Page 83

1  Mr. Hernandez had.
2      When you look at greater than zero but less
3  than or equal to two days per year of glyphosate use,
4  the odds ratio of developing follicular lymphoma is
5  0.81, correct?
6      A.  Yes.
7      Q.  When the --
8      A.  Go ahead.
9      Q.  When the authors controlled for the use of 2,
10  4-D, dicamba, and malathion, that dropped to 0.47?
11      A.  Correct.  And with follicular lymphoma,
12  though, if we look at exposures greater than two days,
13  the odds ratio jumps to 2.21.  The confidence interval
14  is 0.99-4.93.  So it is deemed statistically not
15  significant; however, by an extremely low traction,
16  it's very, very borderline significant.
17      And one has to appreciate that there are only
18  eight cases.  And it becomes very difficult -- the
19  type II error with only eight cases is very high.
20  It's very difficult to achieve a 95 percent level of
21  confidence with only eight subjects.  And yet it
22  almost did.  There appears to be some potential of --
23  of that finding.  At least I can say, it's very close
24  to being significant.
25      Q.  When the authors controlled for the use of 2,

Page 84

1  4-D, dicamba, and malathion, the risk of developing
2  follicular lymphoma with greater than two days per
3  year of glyphosate use?
4      A.  It remained elevated, but not statistically
5  significant.  The variability was too high.  It was a
6  1.33 odds ratio, which is greater than 1.  But you can
7  see the tremendous variability to 0.5-3.23.  So --
8      Q.  And you would agree with me that that is not
9  borderline or marginally -- marginally statistically
10  significant?
11      A.  It's not.  However, a good epidemiologist
12  who's doing their -- their work correctly will look at
13  all of these values and not -- and, you know, if we
14  look at the Bradford Hill criteria, we don't only look
15  at data that's 95 percent certain, we look at all the
16  data, including case studies, case histories, and --
17  and increased or decreased odd ratios that are not
18  significant.
19      One has to look at the entire body of
20  evidence.  And that's what a good epidemiologist will
21  do.  And I'd defer that to our epidemiologist for
22  further detail.
23      Q.  Do you defer it to any epidemiologist, or
24  only the epidemiologist serving as the Plaintiffs'
25  expert?

Page 85

1      A.  I would defer it to qualified impartial
2  epidemiologists.
3      Q.  Is it your view that the Plaintiffs' experts,
4  who have been retained in the area of epidemiology,
5  are impartial?
6      A.  To the best of my knowledge, yes.
7      Q.  I want to turn to table 3.  And I know that
8  you didn't calculate a particular number of days per
9  year of glyphosate exposure, so I want to look at this
10  number-of-years-of-glyphosate-use table.
11      If we look at follicular lymphoma, regardless
12  of the number of years that glyphosate is used, you
13  don't see any increase in the risk of follicular
14  lymphoma with glyphosate use in this study, correct?
15      A.  That's correct.  But I -- I do want to point
16  out, based on my extensive review of the six studies
17  that do include dose metrics in exposure days or
18  years -- is that the exposure years' metric is
19  inaccurate in the fact that one can have used Roundup
20  since 1975 and only used it once or twice a year,
21  whereas opposed to a worker, an applicator who's
22  worked five years and using it every day, would have a
23  tremendously different exposure.  So, I mean, the
24  number of years of use is not a -- is not a very
25  precise metric with respect to exposure, where

William Sawyer, Ph.D.

Page 86

1    exposure days per year is a more accurate metric.
2        Q.  Do you believe that number of exposure days
3    per year is a more accurate metric than lifetime days
4    of use?
5        A.  Well, total exposure days is what I've been
6    using in my other assessment reports where I've done
7    specific dose calculations.  That is the most
8    accurate, is to calculate the total exposure days and
9    then compare that to the six studies.  And -- and
10   those six studies go all the way up to exposure
11   metrics of ten days or more.  And those are eight-hour
12   days.  So that's 80 hours.
13       Q.  You would agree with me that a number of
14   these underlying epidemiology studies did calculate
15   numbers of use -- numbers of years of use of
16   glyphosate, right?
17       A.  Well, number of years, again, is -- is not
18   the best metric because it does not necessarily
19   indicate how frequently during that year it was used.
20       Q.  I understand.  But setting aside whether it's
21   the best metric, you understand that these studies
22   reported that metric?
23       A.  Yes.
24       Q.  Did you look at non-Hodgkin's lymphoma
25   overall in this study?

Page 87

1        A.  In which study?
2        Q.  Oh, I'm sorry.  In this table, table 3.  Did
3    you look at non-Hodgkin's lymphoma overall?
4        A.  Yes.
5        Q.  Would you agree with me that the risk of
6    developing non-Hodgkin's lymphoma does not appear to
7    increase as the number of years of use of glyphosate
8    increase?
9        A.  Yes.  And I'm not surprised, because the
10   number of years that a person has used the product is
11   not an accurate metric of exposure as is the
12   cumulative exposure days, which is the actual
13   eight-hour day equivalence of use.
14       Q.  Is the same true for follicular lymphoma in
15   table 3, the risk of developing follicular lymphoma
16   does not appear to increase as the number of years of
17   glyphosate use increase?
18       A.  That's correct.  And for the same reasons:
19   That the number of years that somebody who has used
20   the product is not a metric of their exposure with
21   respect to eight-hour time-weighted periods, McDuffie
22   1988 -- not McDuffie.
23           The Swedish study -- maybe it was McDuffie --
24   defined the exposure day as a full working day, which
25   in Sweden is eight hours.  So we actually have a

Page 88

1    measurement, when using exposure days, that gives us a
2    real accurate duration of exposure.  Whereas,
3    this exposure years, that it could be the person used
4    it 15 minutes each year.  We have no idea of what the
5    actual duration of exposure was.  So it's not a -- as
6    accurate and meaningful as exposure days with respect
7    to the number of hours of frequency of glyphosate
8    handling and spraying.
9        Q.  I want to take you to table 5, because I
10   think that table 5 accounts for this concern that you
11   have by looking at number of years used by number of
12   days per year handled.  That's what you think is the
13   most accurate metric, correct?
14       A.  In theory.  But I recall this in the methods
15   on page 2.  And the right-hand column, last paragraph,
16   halfway down reads, "Some participants had missing
17   data for duration and frequency of glyphosate use
18   despite reporting that they had ever used glyphosate.
19   In duration and frequency analyses, values for missing
20   data were assigned to case -- cases and controls based
21   on the median duration or frequency of reported use
22   among controls by state/province in 10-year age group
23   and were used for the many analyses."
24           So basically what they're saying is that in
25   terms of this lifetime day usage, it's not necessarily

Page 89

1    lifetime days of eight hours of handling and spraying,
2    because there is missing data.  And they tried to fill
3    the gaps using some median values.  So it -- table 5
4    has a weakness in that respect.
5        Q.  Is that a weakness only for table 5, or would
6    it be a weakness for any of the tables that look at
7    duration or frequency of glyphosate use?
8        A.  That I'm not sure.  I'd have to re-review the
9    design.
10       Q.  Well, if it -- if it says some participants
11   had missing data for duration and frequency of
12   glyphosate use, and that those values were then
13   assigned based on median duration or frequency, would
14   you expect that tables 3 and 4, which are also based
15   on frequency, would be flawed in the same way?
16       A.  Well, first of all, I didn't say "flawed."  I
17   said weakened.
18       Q.  Can you explain to me the distinction you are
19   drawing between flawed and weakened?
20       A.  Well, flawed would -- has implications of
21   being wrong, incorrect.  Weakness means less ability
22   to provide a definitive result.  So table 3 is -- I
23   think you asked about number 3 and 4?
24       Q.  Correct.
25       A.  Well, 3 is the number of years of glyphosate

23 (Pages 86 to 89)

William Sawyer, Ph.D.

Page 90

1  use, which we already talked about, is -- is
2  problematic in the sense that it does not necessitate
3  a measure of use per year, but just, rather, the
4  number of years over a lifetime that a person used it;
5  where table 4 is the frequency, which is a more
6  accurate measure. I think that answers your question.
7      Q. It answers my question. But then my
8  follow-up question is: The portion of the method
9  section on page 2 that you read said that some
10 participants had missing data for duration and
11 frequency. If table 4 is a measure of frequency, is
12 it your understanding that table 4 is weakened by the
13 missing data in the author's use of median data for
14 those cases where glyphosate information was missing?
15     A. I think that's true. I think that there
16 would be less accuracy due to that -- that fact, yeah.
17     Q. Is it your opinion that table 4 provides
18 reliable information despite that reduced accuracy?
19     A. I'm not sure. I'd really have to further
20 review the paper again, which I can do right now if
21 you wish.
22     Q. Does your plan at this point include
23 re-reading the entire paper in order to do that?
24     A. Well, focusing primarily on the methodology.
25 See, because I -- it states, "Self-reported glyphosate

Page 91

1  use was examined using several exposure metrics:
2  Ever/never, duration (years used)" -- which I've
3  talked about -- "frequency (days/year handled), and
4  lifetime-days."
5      And then with respect to the missing data:
6  In duration and frequency, missing data for duration
7  and frequency. So in that table, we're looking at
8  frequency, and our frequency values range from zero,
9  greater than zero, and less than 2, or greater than 2.
10     So what I'm trying to determine is whether
11 some missing frequency data would have the same
12 impact. And we're only dealing with a zero, or zero
13 to 2, or greater than 2, whether that impact would be
14 relatively significant. I -- I don't know. I really
15 can't answer that for sure. I would have to defer
16 that to our epidemiology experts.
17     Q. Your report relies on table 4 in terms of the
18 diffuse large B-cell calculation?
19     A. It does. And when we look at the study
20 overall and we look at the conclusion, (as read:) "In
21 conclusion, this analysis of pooled data from NAPP
22 provides some limited evidence of an association
23 between glyphosate and NHL. The association between
24 glyphosate and NHL overall appears to be confounded by
25 exposures to other pesticides. However, increased

Page 92

1  odds ratio for NCH overall with greater days per year
2  and lifetime days of glyphosate use were not entirely
3  eliminated by adjustment for other pesticides. In
4  subtype analyses, although based on a relatively small
5  number of cases, SLL showed the most consistent
6  association and exposure-response pattern with the
7  different glyphosate use metrics and with control for
8  other pesticides. There were some elevated OR for
9  DLBCL and other subtypes, but these were not
10 consistent across the different glyphosate use
11 metrics. Larger numbers of NHL cases who used
12 glyphosate would be required to further identify
13 potential risks by NHL subtype."
14     So the authors are not throwing out the baby
15 with the bathwater. There is worthwhile evidence from
16 the study. I think the primary point in the
17 conclusion is that the subtypes really need larger
18 groups to be certain of, for example, the follicular.
19     So, yeah, I'm relying on the study as one of
20 the six for dose metrics. It's -- it's not a perfect
21 study. No epidemiologic -- no epidemiological study
22 is perfect. But we have to look at all six and look
23 at the metrics in those studies and -- for
24 consistency, coherence in different areas of the
25 world, statistical significance, which I've outlined

Page 93

1  on page 12 through 15 in my report. And if we look at
2  the different thresholds of exposure in these studies
3  and within these studies, there certainly appears to
4  be a dose-response relationship.
5      And from a mechanistic standpoint of
6  experimental evidence, we have the chromosomal
7  aberration studies, genotoxicity studies that I've
8  documented. You know, looking at this from a
9  standpoint of reliability and applying the Bradhill
10 (sic) -- Bradford Hill criteria, certainly all those
11 criterions have been met.
12     And in criticism, is any one of these studies
13 perfect? No. And, as read, is the study limited --
14 somewhat limited? The answer is yes. It's -- it's
15 not a huge abundant amount of data, but certainly
16 enough to draw conclusions.
17     Q. When you say that this study is one of the
18 six that you rely on in your report, you're aware that
19 one of the other six, McDuffie, is actually part of
20 this North American Pooled Project publication, right?
21     A. Yes, I'm well aware of that.
22     Q. I want to clarify. On page 15 of your report
23 in the top paragraph, you're talking about the North
24 American Pooled Project, right?
25     A. Yes.

24 (Pages 90 to 93)

William Sawyer, Ph.D.

Page 94

1    Q.  In the next paragraph, you say, (as read:)
2  "These findings are summarized."  You talk about, "The
3  authors caution," "the authors conclude."  That
4  paragraph is not about the North American Pooled
5  Project, though, right?
6    A.  That's right, yeah.  I probably should have
7  put a subtitle in there.
8    Q.  That is about the Zhang paper?
9    A.  It's -- it's regarding all six.
10    Q.  The last sentence in that paragraph states,
11  "The authors conclude, 'The overall'" -- "'the overall
12  evidence from human, animal and mechanistic studies
13  presented here supports a compelling link between
14  exposures to GBHs and increased risk for NHL.'"
15      That is a quote from Zhang and not the North
16  American Pooled Project, correct?
17    A.  It is.  That's from the meta-analysis
18  published in 2019, yes.  Yeah, I probably should put a
19  footnote on there for that.  That's a good point.
20    Q.  You read part of the conclusions from the
21  North American Pooled Project.  I want to direct you
22  to just a couple more statements on page 7 of that
23  publication.
24    A.  Page 7.
25    Q.  Under the discussion section.

Page 95

1    A.  Okay.
2    Q.  If you look at the second and third
3  sentences, those read, "Results from this analysis
4  provide some limited, but inconsistent, evidence for
5  an association between NHL overall and ever reported
6  use of glyphosate.  Although there was a statistically
7  significant association between ever glyphosate use
8  and NHL overall, this association was attenuated and
9  became no longer statistically significant when
10  adjusted for reported use of 2, 4-D, dicamba, and
11  malathion."
12      Do you agree with those statements?
13    A.  In combination with the next sentence, I do.
14  The next sentence reads, "However, the significant
15  excess risk among those who reported use of glyphosate
16  for greater or equal to 2 days per year was not
17  eliminated by adjustment for other pesticides."
18      So I think you conveniently forgot to read
19  that, too, maybe.
20    Q.  Let me read the sentence after that --
21    A.  Okay.
22    Q.  -- which states, "There was no pattern of
23  increasing risk of NHL overall with increasing years
24  of use of glyphosate."
25      Do you agree with that?

Page 96

1    A.  Yes, for the reasons I stated, that the
2  number of years of use does not tell us anything about
3  the duration of use, the dose.
4    Q.  I'm going to mark, as Exhibit 9 to your
5  deposition, Ines Hernandez's deposition.
6    A.  Okay.
7      (Exhibit No. 9 was marked for
8  identification.)
9  BY MS. COPE-KASTEN:
10    Q.  Do you recall, I don't know, half an hour ago
11  we were talking about Mr. Hernandez's use of
12  glyphosate or Roundup occupationally during his
13  illness?
14    A.  Yes, I do.
15    Q.  I want to turn you to page -- oh, you've
16  reviewed this deposition transcript, or at least the
17  relevant portions to you?
18    A.  Correct.
19    Q.  I want to turn you --
20    A.  But I've -- and I've cited it in my report --
21    Q.  I want to turn you to page --
22    A.  -- by -- by page numbers.
23    Q.  -- 48.
24    A.  Yes, I'm there.
25    Q.  If you look at lines 7 through 13, Mr.

Page 97

1  Hernandez is asked:
2      "So if you could not work between 2009 and
3  2014, does that mean you also were not spraying
4  Roundup between 2009 and 2014?
5      "Answer:  No, I wouldn't use it anymore.
6      "Question:  So during that period of time,
7  you did not use it, correct?
8      "Answer:  No, no."
9      Does that change your opinion with respect to
10  whether Mr. Hernandez was using glyphosate
11  occupationally between 2009 and 2014?
12    A.  Yes.  However, if you look back at the
13  transcript, I did say that his wife indicated that he
14  resumed his work in 2014 on to 2016; and during that
15  period is when the potential promotion of the
16  malignant process may have been present since that was
17  the time that he was, again, spraying the Roundup on a
18  daily basis.
19    Q.  Is it your understanding that Mr. Hernandez
20  had follicular lymphoma between 2014 and 2016?
21    A.  Yes.
22    Q.  For that entire period?
23    A.  Yeah.  He was -- he was in remission, but
24  yes.
25    Q.  You're aware that as part of his lawn care

William Sawyer, Ph.D.

Page 98

1 business, Mr. Hernandez used gas-powered equipment?
2    A.  Yes.  So does people in the control group in
3 the six human dose studies that I relied upon.  Yes.
4    Q.  And that included equipment like a
5 Weed-whacker and a blower?
6    A.  Yes.
7    Q.  Mr. Hernandez carried gasoline for the
8 machines in a five-gallon can during his jobs --
9    A.  Yeah.
10    Q.  -- do you recall reading that?
11    A.  Yes.
12    Q.  And he mixed that gasoline with oil in
13 another five-gallon can; do you remember that?
14    A.  Yes.  That's common for any worker in that
15 line of work, yes.
16    Q.  Do you know what kind of oil he used?
17    A.  It doesn't matter.  They're -- the only
18 mineral oils -- the only oils that have ever been
19 known to cause cancer are, of course, the mineral oils
20 that were used on sewing machines in the early 20th
21 century.  Two-stroke motor oil is not carcinogenic.
22    Q.  Do you know whether there are chemicals
23 present in gasoline that can be carcinogenic?
24    A.  Yes.
25    Q.  Did you do anything to determine whether Mr.

Page 99

1 Hernandez ever breathed in gasoline fumes while
2 working?
3    A.  No.  I don't need to.  I'm sure he did.  We
4 all do when we pour gasoline into small engines and
5 lawn mowers.  It's commonplace.  And there have been
6 studies on gasoline fill-ups by self-service
7 individuals, and that's all been documented in the
8 literature.  It's part of our everyday background
9 exposure.
10    Q.  Is it your opinion that that played no
11 possible role in Mr. Hernandez's development of
12 non-Hodgkin's lymphoma?
13    A.  That's correct.  Because in the studies there
14 would have been equal odds of that occurring in the
15 control group as well.
16    Q.  Do you consider it to be additive to his risk
17 or no increased risk?
18    A.  Null.  It makes no difference.  It's part of
19 the background exposure.  It's considered in the
20 studies.
21    MS. COPE-KASTEN:  Let's go off the record for
22 a minute.
23    THE VIDEOGRAPHER:  Going off the record at
24 11:17.
25    (A break was held.)

Page 100

1    THE VIDEOGRAPHER:  We're back on the record.
2 The time is 11:20.
3 BY MS. COPE-KASTEN:
4    Q.  Dr. Sawyer, before the break we were talking
5 about days per year of exposure to glyphosate.  Do you
6 remember that conversation?
7    A.  Which one?
8    Q.  Not most -- not most immediately before.
9 When we were talking about the North American Pooled
10 Project, we were talking about what it means to be a
11 day per year of exposure.
12    A.  For a day of year of exposure?
13    A.  (Nodding head.)
14    A.  For a day of a year?
15    Q.  Per year.
16    A.  Oh, per year.
17    Q.  Of exposure.
18    A.  Okay.  Okay.
19    Q.  Do you recall that?
20    A.  Yes.
21    Q.  You said that your understanding is that a
22 day is an eight-hour workday?
23    A.  Based on Eriksson, Eriksson defined that in
24 his 2008 study with respect to a full workday in
25 Sweden, which is eight hours.  I checked with the

Page 101

1 occupational standards and literature for Sweden.  At
2 one point in time they actually experimented with a
3 six-hour workday, but then they went back to eight
4 hours.  Too bad for those workers.  But, yeah, it's --
5 it's an eight-hour workday.
6    Q.  Do you know, for any of the other
7 epidemiology studies that reported number of days per
8 year of glyphosate use, whether they were using eight
9 hours or some other metric for one day of exposure?
10    A.  I looked at it very carefully.  In McDuffie,
11 it was not clear.  In the Agricultural Health Study,
12 it was not clear.  Thus, if Andreotti,
13 A-N-D-R-E-O-T-T-I, in the Agricultural Health Study,
14 or McDuffie, used something less than eight hours --
15 and in my assessments in Monsanto, I've used
16 eight-hour requirements -- then I am being
17 overdemanding, and my approach is very conservative.
18 So I'm not too concerned about that, if that were the
19 case, because I've always made my calculations based
20 on eight hours.
21    Q.  Is that a choice that you've made based on
22 the Eriksson study?
23    A.  Yeah, based on the definition in Eriksson.
24    Q.  You're aware that Mr. Hernandez grew up in
25 Mexico?

William Sawyer, Ph.D.

Page 102

1    A. Yes.
2    Q. When he was growing up, he worked on a farm
3 for a period of years; do you recall that?
4    A. Yes.
5    Q. Do you agree or disagree with the following
6 statement, "The farming occupation has been associated
7 with an increased risk of non-Hodgkin's lymphoma in
8 the United States and other countries."
9    A. I would need to see the citation and review
10 the study before blindly agreeing to something like
11 that. I would want to see the study, the science, the
12 statistics, and whether it's one study or six studies.
13    Q. Based on your overall review of the
14 epidemiology literature surrounding agricultural
15 workers, do you believe that farming as an occupation
16 increases the risk of developing non-Hodgkin's
17 lymphoma?
18    A. Well, if I hypothetically answered your last
19 question as yes, even though I haven't -- I don't have
20 the studies here in front of me -- if I were to say
21 yes -- and that's, again, hypothetical -- that would
22 make sense. Because studies have clearly shown -- and
23 a good example would be -- I'm trying to think of the
24 name of the study.
25       Well, there -- I can't name the study. But

Page 103

1 there are studies that have shown that glyphosate is,
2 by far, the most common exposure to farmers. More
3 glyphosate is used than any other chemical in farming
4 by far. And I -- I wish I could give you -- well, you
5 know, I could refer you to Chuck's study. He's an
6 expert in this case. I can't spell his last name.
7 Benbrook -- Benber -- Benbrier.
8    Q. Benbrook?
9    A. Benbrook. Benbrook, yeah. Chuck Benbrook,
10 yeah. You know, he had some values that I remember in
11 one of his studies.
12       But I've read many studies that demonstrate
13 that farming -- farmers use more glyphosate than any
14 other product. And so hypothetically if I said yes to
15 your question on -- on the NHL, that would make sense.
16 But I really would need to research those studies and
17 come to a conclusion based on the merits of the
18 multiple studies, whatever they are.
19    Q. Did you do anything, in the process of coming
20 to your opinions in Mr. Hernandez's case, to try to
21 determine whether any absence of glyphosate or Roundup
22 use in farming is an occupation that increases the
23 risk of non-Hodgkin's lymphoma?
24    A. No. And the reason why is that I wasn't
25 asked, and I did not perform a differential assessment

Page 104

1 in terms of exposures to other products and chemicals
2 in this case. So I -- this is not -- not something I
3 am addressing in my assessment in this matter.
4    Q. If I ask you, then, about Mr. Hernandez's
5 work in a factory that made cribs prior to his lawn
6 care business, is it also true that you did not do
7 anything to assess any possible exposures to any
8 carcinogens that he would have had at that occupation?
9    A. No. I would have to defer that to -- to Dr.
10 Schiff.
11       MS. COPE-KASTEN: I don't think I have any
12 more questions on Mr. Hernandez.
13       MR. BRAKE: All right. We're done.
14       THE VIDEOGRAPHER: This concludes the
15 deposition. The time is 11:28.
16       (Deposition concluded at 11:28 a m.)
17
18
19
20
21
22
23
24
25

Page 105

1       CERTIFICATE OF OATH
2
3 STATE OF FLORIDA)
4 COUNTY OF LEE)
5
6    I, the undersigned authority, certify that
7 WILLIAM SAWYER, Ph.D., D-ABFM, personally appeared
8 before me and was duly sworn.
9    WITNESS my hand and official seal this 28th day
10 of October, 2019.
11
12       _____
13       Christi K. Cole
        Notary Public - State of Florida
        My Commission No: GG 052969
14      Expires: February 15, 2021
15
16 Personally Known:          Yes
17 OR Produced Identification:
18 Type of Identification Produced:
19
20
21
22
23
24
25

27 (Pages 102 to 105)

William Sawyer, Ph.D.

### Page 106

1      REPORTER'S DEPOSITION CERTIFICATE

2

3 STATE OF FLORIDA)

4 COUNTY OF LEE)

5

6     I, Christi K. Cole, Certified Professional Court

7 Reporter and Notary Public in and for the State of

8 Florida at Large, certify that I was authorized to and

9 did stenographically report the deposition of WILLIAM

10 SAWYER, Ph.D., D-ABFM; that a review of the transcript

11 was requested; and that the transcript is a true and

12 complete record of my stenographic notes.

13     I further certify that I am not a relative,

14 employee, attorney, or counsel of any of the parties;

15 nor am I a relative or employee of any of the parties'

16 attorneys or counsel connected with the action; nor am

17 I financially interested in the action.

18

19     DATED this 28th day of October, 2019.

20

21

22         _____

23      Christi K. Cole, Court Reporter

24

25

### Page 108

1     ACKNOWLEDGMENT OF DEPONENT

2

    I,_____, do

3 hereby certify that I have read the
foregoing pages, and that the same

4 is a correct transcription of the answers
given by me to the questions therein

5 propounded, except for the corrections or
changes in form or substance, if any,

6 noted in the attached Errata Sheet.

7

8    _____

         DATE

9

10

11

12

13

14

   Subscribed and sworn

15 to before me this
   _____ day of _____, 20____.

16

   My commission expires:_____

17

18    _____

   Notary Public

19

20

21

22

23

24

25

### Page 107

1       - - - - - -
       E R R A T A

2       - - - - - -

3 PAGE LINE CHANGE

4 ____ ____ _____

5    REASON: _____

6 ____ ____ _____

7    REASON: _____

8 ____ ____ _____

9    REASON: _____

10 ____ ____ _____

11    REASON: _____

12 ____ ____ _____

13    REASON: _____

14 ____ ____ _____

15    REASON: _____

16 ____ ____ _____

17    REASON: _____

18 ____ ____ _____

19    REASON: _____

20 ____ ____ _____

21    REASON: _____

22 ____ ____ _____

23    REASON: _____

24 ____ ____ _____

25    REASON: _____

Golkow Litigation Services - 1.877.370.DEPS