# EXHIBIT 26

Dennis Weisenburger, M.D.

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4  IN RE: ROUNDUP PRODUCTS          ) MDL NO. 2741

   LIABILITY LITIGATION             )

5  _____ )

                                    ) Case No. 16-md-02741-VC

6  This document relates to:        )

                                    )

7  Stevick v Monsanto Co., et al. ) Volume I

   Case No. 3:16-cv-2341-VC         ) Pages 1 to 154

8                                   )

   _____ )

9

10

11

12

13        Videotaped Deposition of Dennis

14     Weisenburger, M.D., Volume I, taken on behalf of

15     the Defendant Monsanto Co., at 700 West

16     Huntington Drive, Monrovia, California 91016,

17     commencing at 8:35 a.m., Tuesday, December 18,

18     2018, before Elizabeth Borrelli, a Certified

19     Shorthand Reporter in the State of California,

20     License No. 7844.

21

22

23

24

25

Page 2

A P P E A R A N C E S

For the Plaintiff:
     ANDRUS WAGSTAFF
     BY:  KATHRYN M. FORGIE
     Attorney at Law
     1901 Harrison Street
     Suite 1100
     Oakland, California 94612
     (310) 339-8214
     kathryn.forgie@andruswagstaff.com

Page 3

APPEARANCES (Continued)

For the Defendants:

     ARNOLD & PORTER KAYE SCHOLER LLP
     BY: JULIE du PONT
     BY:  AARON H. LEVINE
     Attorneys at Law
     250 West 55th Street
     New York, New York 10019-9710
     (212) 836-8572 (direct)
     (212) 836-7586 (direct)
     julie.dupont@arnoldporter.com
     aaron.levine@arnoldporter.com
          -AND-
     ARNOLD & PORTER KAYE SCHOLER
     BY:  KATHRYN M. PODSIADLO
     Attorney at Law
     777 South Figueroa Street
     44th Floor
     Los Angeles, California 90017-5844
     (213) 243-4273 (direct)
     kathryn.podsiadlo@apks.com

          -AND-

     BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
     BY:  MARK S. OUWELEEN
     Attorney at Law
     54 West Hubbard Street
     Chicago, Illinois 60654
     (312) 494-4435
     mark.ouweleen@bartlit-beck.com

Also Present:
     RICHARD SMITH, videographer
     BRIAN BRAKE, telephonically

Page 4

I N D E X

WITNESS                           EXAMINATION
DENNIS WEISENBURGER, M.D.
By MS. du PONT                      8, 146
By MS. FORGIE                       140


EXHIBITS

WEISENBURGER                          PAGE
Exhibit 1      Monsanto Company's Notice to      9
               Take Oral and Videotaped
               Deposition of Dr. Dennis
               Weisenburger, 8 pages

Exhibit 2      Curriculum Vitae for Dr. Dennis   10
               Weisenburger, 118 pages
Exhibit 3      Document titled "Dr.              11
               Weisenburger Materials List -
               November 13, 2018," 27 pages
Exhibit 4      Document titled "Bill for Work    13
               on Case of Elaine Stevick," 2
               pages
Exhibit 5      Collection of photographs, 4      18
               pages

Exhibit 6      Expert Report of Dr. Dennis D.    19
               Weisenburger, 5 pages
Exhibit 7      Document titled "WHO              37
               Classification of Tumours of
               Haematopoietic and Lymphoid
               Tissues," 6 pages

Page 5

Exhibit 8      Article titled "Cancer           47
               Epidemiology Biomarkers &
               Prevention," 10 pages
Exhibit 9      Paper titled "Pesticide          53
               exposure as risk for
               Non-Hodgkin lymphoma including
               histopathological subgroup
               analysis," 14 pages
Exhibit 10     Article titled "Glyphosate Use   63
               and Cancer Incidence in the
               Agricultural Health Study," 14
               pages

Exhibit 11     Article titled "Roundup Weed     70
               Killer Has Probable Carcinogen,
               U.N. Says," 6 pages

Exhibit 12     Document titled "Addendum to     116
               Dr. Weisenburger's Reference
               List," 7 pages

Exhibit 13     Printout from Mayo Clinic        122
               titled "Non-Hodgkin's
               lymphoma," 6 pages

Exhibit 14     Printout from City of Hope       130
               website titled "Lympoma," 18
               pages

Exhibit 15     Memo with the subject "Detailed  137
               account of Roundup usage," 6
               pages

Exhibit 16     Article titled "An Detailed      146
               Evaluation of Glyphosate Use
               and the Risk of Non-Hodgkin
               Lymphoma in the North American
               Pooled Project (NAPP)," 22
               pages

Page 6

INFORMATION REQUESTED
(None)
UNANSWERED QUESTIONS
Page  Line
71   21

1
2
3
4
5
6
7
8  ///
9  ///
10 ///
11 ///
12 ///
13 ///
14 ///
15 ///
16 ///
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///

Page 7

1    MONROVIA, CALIFORNIA; TUESDAY, DECEMBER 18, 2018
2         8:35 A.M.
3
4         THE VIDEOGRAPHER:  We're on record.  My
5   name is Ryan Schaefer.  I'm a videographer for
6   Golkow Litigation Services.  Today's date is
7   December 18, 2018, and the time is 8:35 a.m.
8         This video deposition is being held in 700
9   West Huntington Drive, Monrovia, California for the
10  U.S. District Court, Northern District of
11  California.  The deponent is Dr. Dennis
12  Weisenburger.
13        Counsel will be noted on the stenographic
14  record.  Will counsel -- and will now counsel please
15  identify themselves.
16        MS. FORGIE:  Kathryn Forgie of Andrus
17  Wagstaff for the Plaintiff Stevick.
18        MS. du PONT:  Julie du Pont on behalf
19  of --
20        MR. BRAKE:  This is Brian -- oh, I'm so
21  sorry.  Go ahead.
22        MS. du PONT:  Go ahead, Brian.
23        MR. BRAKE:  This is Brian Brake of the
24  Miller firm for the plaintiff.
25        MS. du PONT:  Julie du Pont on behalf of

Page 8

1   Monsanto.
2         MS. PODSIADLO:  Kathryn Podsiadlo on
3   behalf of Monsanto.
4         MR. LEVINE:  Aaron Levine on behalf of
5   Monsanto.
6         MR. OUWELEEN:  Mark Ouweleen on behalf of
7   Monsanto.
8         THE VIDEOGRAPHER:  Will the -- will the
9   court -- the court reporter is Liz Borrelli and will
10  now swear in the witness.
11        DENNIS WEISENBURGER, M.D.,
12        having been duly administered
13        an oath in accordance with CCP 2094,
14        was examined and testified as follows:
15        MS. FORGIE:  So, just for the record,
16  Dr. Weisenburger is being offered today only for
17  case-specific testimony in the Stevick case, not
18  general causation.
19             EXAMINATION
20  BY MS. du PONT:
21     Q.  Okay.  Doctor, can you please just introduce
22  yourself on the record and give us your business
23  address?
24     A.  My name is Dennis Weisenburger.  My
25  business address is 1500 East Duarte Road, Duarte,

Page 9

1   California.
2      Q.  And you are at City of Hope Hospital?
3      A.  Yes.
4      Q.  And you've previously given sworn testimony on
5   behalf of plaintiffs in the Roundup litigation against
6   Monsanto, correct?
7      A.  Yes.
8      Q.  And do you believe your prior testimony was
9   the truthful and accurate?
10     A.  Yes.
11     Q.  And do you stand by that testimony today?
12     A.  Yes.
13        (Whereupon Exhibit 1 was marked for
14        identification.)
15  BY MS. du PONT:
16     Q.  I'm -- I've marked as Exhibit 1 the notice of
17  your deposition that's taking place today, which asks
18  you to bring with you to the deposition various
19  materials.  And I will represent to you that your
20  counsel has provided us with various materials for the
21  deposition today, and I'm going to go ahead and just
22  mark those and walk through those with you, okay?
23     A.  Okay.
24     Q.  First --
25        MS. FORGIE:  And, for the record, we've

Page 10

1 also filed objections -- served objections, I mean
2 --
3        MS. du PONT: Understood.
4        MS. FORGIE: -- not filed.
5        (Whereupon Exhibit 2 was marked for
6        identification.)
7 BY MS. du PONT:
8    Q. I -- marked as Exhibit 2 is an August 1, 2018
9 copy of your CV.
10        MS. FORGIE: Thank you for bringing it,
11 but I'm going to pass.
12 BY MS. du PONT:
13    Q. And is -- is this your most current CV?
14    A. Yes.
15    Q. And is there anything on the CV that you
16 haven't had a chance to put on here that you think is
17 relevant and important?
18    A. There are things, but nothing important
19 and relevant to this case.
20    Q. Okay. So as of today, this is your most
21 current CV for your professional experience?
22    A. Yes.
23    Q. Okay. You can set that aside.
24        We were also provided with an updated
25 exhibit list, which I will mark as -- updated

Page 11

1 materials considered list, I should say.
2        (Whereupon Exhibit 3 was marked for
3        identification.)
4        MS. du PONT: We'll mark this as
5 Exhibit 3.
6        MS. FORGIE: I will take an extra one of
7 those, please, if you have one. Thank you. And
8 this is Exhibit 3?
9        MS. du PONT: Yes.
10 BY MS. du PONT:
11    Q. And this materials considered list was served
12 with your report in this matter and was, again, provided
13 in response to the deposition notice by your counsel --
14 by Counsel.
15        Do you have any additional materials your
16 -- you want to add to this list at this time?
17        THE WITNESS: Does this include all of the
18 references that I gave you?
19        MS. FORGIE: No, there's an addendum,
20 which was served on you also.
21        MS. du PONT: This is the addendum.
22        MS. FORGIE: Oh.
23        MS. PODSIADLO: Are you talking about with
24 the additional depositions --
25        MS. FORGIE: Yes.

Page 12

1        MS. PODSIADLO: -- and -- yeah, that's --
2        MS. FORGIE: Oh.
3        MS. PODSIADLO: -- all here.
4        MS. du PONT: That's all here.
5        THE WITNESS: That's all here?
6        MS. du PONT: Yes.
7        MS. FORGIE: Sorry.
8 BY MS. du PONT:
9    Q. This also concludes a list of case-specific
10 materials, the last page, and then the supplemental
11 reliance list that includes the reports of Dr. Arber,
12 Bello and Villablanca.
13    A. Well, as long as it --
14        MS. FORGIE: I don't --
15        THE WITNESS: -- includes --
16        MS. FORGIE: -- I don't think --
17        THE WITNESS: -- everything that --
18        MS. FORGIE: -- it does include addendum.
19        THE WITNESS: I -- there wasn't an -- an
20 addendum list that --
21        MS. FORGIE: No.
22        THE WITNESS: -- I gave to Kathryn last
23 week that --
24        MS. FORGIE: It was served on you with the
25 objections.

Page 13

1        MS. du PONT: This is the list that was
2 served on us with the objection, so whatever was
3 served with the objections and responses, this is
4 it.
5        THE WITNESS: Updated through last Friday.
6        MS. FORGIE: Because this looks like the
7 original list to me, which had 297, and the addendum
8 has 123.
9        MS. du PONT: Well, why don't we deal with
10 this on a break?
11        MS. FORGIE: Okay. Yeah, let's do that.
12        MS. du PONT: Let's set it aside for now.
13        MS. FORGIE: That's a good idea.
14 Because -- but, yeah, that's a good idea.
15 BY MS. du PONT:
16    Q. In addition to the materials considered list
17 that we will come back to, you also provided an invoice
18 for your time on the Stevick matter, which I'll mark as
19 Exhibit 4.
20        (Whereupon Exhibit 4 was marked for
21        identification.)
22        MS. FORGIE: No, thank you.
23        [Reporter requests clarification.]
24        MS. FORGIE: I said no, thank you. Sorry.
25 My --

Page 14

1      THE REPORTER:  That won't help anyway.
2  Can you keep your voice up?  I'm not hooked up to
3  the mics.
4      MS. FORGIE:  Oh.
5  BY MS. du PONT:
6  Q.  So --
7      MS. FORGIE:  Sorry.
8  BY MS. du PONT:
9  Q.  So this is an invoice that says "Bill for work
10 on case of Elaine Stevick"; is that right,
11 Dr. Weisenburger?
12 A.  Correct.
13 Q.  And it looks like you've billed for time
14 starting on September 21st through November 19th, and
15 the total amount of time you've billed for is 20 hours?
16 A.  That's correct.
17 Q.  And your rate per hour is $500 per hour,
18 correct?
19 A.  Yes.
20 Q.  So as of November 19th -- I assume this is
21 2018 -- you've worked 10 -- you've billed $10,000 for
22 your work on the Stevick matter?
23 A.  That's correct.
24 Q.  And you had already received a retainer for
25 $5,000 for the Stevick matter?

Page 15

1  A.  Yes.
2  Q.  So you had a balance due of $5,000; is that
3  correct?
4  A.  Yes.
5  Q.  And have you been paid that $5,000?
6  A.  Yes.
7  Q.  When were you paid that?
8  A.  A couple weeks ago.
9  Q.  Were you paid after your deposition that you
10 gave on November 26, 2018?
11 A.  I haven't given a deposition in this case.
12 This is the deposition.
13 Q.  You gave a deposition --
14 A.  Previous deposition?
15 Q.  Right.  You gave a deposition in the Adams
16 matter --
17 A.  Gordon matter.
18 Q.  -- on November --
19     MS. FORGIE:  Gordon.
20     MS. du PONT:  -- 26th --
21     THE WITNESS:  The Gordon matter.
22     MS. du PONT:  Gordon, sorry.
23     [Reporter requests attorney and witness
24     speak one at a time.]
25     THE WITNESS:  The Gordon matter, yeah.  So

Page 16

1  I billed after that, I think, because I did them all
2  at the same time.
3  BY MS. du PONT:
4  Q.  Okay.  Since November 19th, have you done any
5  additional work on Ms. Stevick's case?
6  A.  Yes.
7  Q.  What additional work have you done?
8  A.  An additional 13 hours.
9  Q.  And that's also at $500 per hour?
10 A.  Yes.
11 Q.  So you've made an additional $2,500?  Am I
12 doing my math right?
13     MS. FORGIE:  Don't look at me.
14     THE WITNESS:  No, wait.  It's over --
15     MR. LEVINE:  6500.
16     THE WITNESS:  -- 5,000.  6500.
17     MR. LEVINE:  6500.
18     MS. du PONT:  6500.
19 BY MS. du PONT:
20 Q.  So you've earned an additional $6500 on the
21 Stevick matter since November 19th?
22 A.  Yes.
23 Q.  And have you billed for that time yet?
24 A.  No.
25 Q.  Do you intend to bill for that time?

Page 17

1  A.  Yes.
2  Q.  And you will also bill for $5,000 for this
3  half-day deposition?
4  A.  Yes.
5  Q.  So, in total, you will bill $21,500 for the
6  Stevick case as of today?
7  A.  I believe that's correct.
8  Q.  And on November 26th in the Gordon case, you
9  testified that you had made over $300,000 working on the
10 Roundup litigation so far.
11     Am I to assume that now you've made at
12 least -- well, let me just ask this:  How much have
13 you earned as of today on the Roundup litigation as
14 a whole?
15     MS. FORGIE:  Objection.
16     THE WITNESS:  Paid and billed?
17     MS. du PONT:  Yes.
18     THE WITNESS:  I've been billed -- I billed
19 but not paid.  So it's probably -- probably $380 or
20 90,000.
21 BY MS. du PONT:
22 Q.  Okay.  Now, you also -- your counsel also
23 provided some photos of the sprayer that Ms. Stevick
24 used to spray Roundup.  I'll mark that as Exhibit 5.
25 ///

Page 18

1      (Whereupon Exhibit 5 was marked for
2      identification.)
3 BY MS. du PONT:
4      Q.   And explain to me --
5      MS. FORGIE:  I will take one of those, if
6 you have an extra, please.  Thank you.
7 BY MS. du PONT:
8      Q.   This -- this Exhibit 5 was just provided you
9 by counsel --
10     A.   Yes.
11     Q.   -- for plaintiff?
12     And what is the relevance of this -- these
13 pictures for your opinion?
14     MS. FORGIE:  Objection.
15     THE WITNESS:  Well, it shows the container
16 that she used to apply the Roundup that was mixed by
17 her husband.
18 BY MS. du PONT:
19     Q.   Any other relevance to you other than that?
20     A.   No.
21     Q.   Okay.  You can set that aside.
22     Now, you prepared a report for
23 Ms. Stevick's case; is that correct?
24     A.   Yep.
25     Q.   Okay.

Page 19

1      A.   Yes.
2      MS. du PONT:  We are going to mark that as
3 Exhibit 6.
4      (Whereupon Exhibit 6 was marked for
5      identification.)
6      MS. du PONT:  Ms. Forgie, would you like a
7 copy?
8      MS. FORGIE:  No, thank you.  But thank you
9 for offering.
10 BY MS. du PONT:
11     Q.   Can I actually see that one for a second just
12 to make sure...
13     Thanks.
14     Does this appear to be the report that you
15 prepared in Ms. Stevick's case that we've marked as
16 Exhibit 6?
17     A.   Yes.
18     Q.   And you prepared this report yourself?
19     A.   I did.
20     Q.   No one else prepared it for you?
21     A.   No.
22     Q.   You didn't copy this -- any part of your
23 report from anyone else's report, correct?
24     A.   No.
25     Q.   That wouldn't be appropriate, would it?

Page 20

1      A.   No.
2      MS. FORGIE:  Objection.
3 BY MS. du PONT:
4      Q.   And does this report disclose all of the
5 opinions you intend to offer at trial for Ms. Stevick's
6 case?
7      A.   Yes.
8      Q.   And it also discloses all the basis for your
9 opinions that you intend to offer at trial in
10 Ms. Stevick's case?
11     MS. FORGIE:  Objection.
12     THE WITNESS:  Yes.
13 BY MS. du PONT:
14     Q.   And does the report disclose all the documents
15 and materials you relied on in forming your opinions in
16 Ms. Stevick's case?
17     A.   I would say no, because I reviewed a lot
18 of documents for this case and other cases that I
19 didn't reference.
20     Q.   Okay.
21     A.   But they are on the reference list that
22 you received.
23     Q.   So all of the materials that you are -- have
24 reviewed and are relying on are -- if they're not
25 referenced specifically in this report are on the

Page 21

1 materials considered list that your counsel has provided
2 in response to the notice for this deposition; is that
3 correct?
4      A.   Yes.
5      MS. FORGIE:  Yeah, I think the other point
6 I kept objecting about is that there's also a
7 general causation component to it, which we're not
8 here for today, but when you say Stevick's case, in
9 the trial, he probably will give that also, so that
10 will -- as part of discussing --
11     MS. du PONT:  And you can object, but you
12 don't need to answer the question for him, okay,
13 Ms. Forgie?
14     MS. FORGIE:  Well, I'm just trying to help
15 you clarify.
16     MS. du PONT:  Okay.
17     MS. FORGIE:  Because I think it's
18 confusing.
19 BY MS. du PONT:
20     Q.   Did you read the reports of Ms. Stevick's
21 other experts in this case?
22     A.   I did.
23     Q.   That's not on any of the -- the lists, though,
24 that we got.
25     THE WITNESS:  Would it be on the most

Page 22

1 recent list?
2      MS. FORGIE:  I'm not allowed to answer.
3      MS. du PONT:  Well --
4      THE WITNESS:  I don't know.  I sent the
5 list -- I obtained all of the reports on the -- from
6 the experts on the three cases that we're doing.
7      MS. du PONT:  Right.
8      THE WITNESS:  And I read them.  They were
9 provided to me by Ms. Forgie, and I'm assuming that
10 she added them to my list.  I don't know --
11      MS. du PONT:  Okay.
12      THE WITNESS:  -- whether she did.
13 BY MS. du PONT:
14   Q.  So you did consider the reports of Dr. Nabhan
15 and Shustov?
16      MS. FORGIE:  Objection.
17      THE WITNESS:  I saw the Nabhan one, not
18 the Shustov one.
19 BY MS. du PONT:
20   Q.  Okay.  And are you taking -- are you relying
21 on any of his opinions to form your own opinions in this
22 case?
23   A.  No.
24   Q.  Did you review any transcripts of the
25 depositions for Dr. Nabhan or Dr. Shustov?

Page 23

1   A.  Yes.  I also reviewed the depositions of
2 Nabhan but not Shustov.
3   Q.  What depositions of Dr. Nabhan did you review?
4 His deposition in this case?
5   A.  In this case and the other two cases we're
6 dealing with this week.
7   Q.  So his depositions in --
8   A.  Gebeyehou.
9   Q.  -- Gebeyehou, as well as Hardeman?
10   A.  Hardeman, yes.
11   Q.  And did you review rough transcripts?
12   A.  Yes.
13   Q.  Did you review any drafts of Dr. Nabhan's
14 expert reports before filing -- or before serving your
15 report in this case?
16   A.  No.
17   Q.  Did you review any depositions of fact
18 witnesses in Ms. Stevick's case?  Let me -- let me
19 help --
20   A.  For --
21   Q.  -- a little.
22   A.  For example...
23   Q.  For example, did you review the deposition of
24 Mr. and Mrs. Stevick?
25   A.  Yes.

Page 24

1   Q.  Did you review the deposition of Dr. Kim
2 (phonetic), her treating oncologist?
3   A.  No.
4   Q.  Was that not important for you to review?
5      MS. FORGIE:  Objection.
6      THE WITNESS:  It wasn't provided for my
7 review.  I did review the medical records.
8 BY MS. du PONT:
9   Q.  Did you ask your -- ask Counsel if you could
10 review the depositions of her treating doctors?
11   A.  No.
12   Q.  Was it not important for you to review the
13 depositions of the treating doctors?
14      MS. FORGIE:  Objection.
15      THE WITNESS:  I don't know whether it was
16 important or not.  I didn't ask for it.  Sometimes
17 the lawyers will send me the documents and I will
18 review them.  In this case, I didn't review them.
19 BY MS. du PONT:
20   Q.  Okay.  So I take it you did not review the
21 deposition transcript for Dr. Gonzalez (phonetic)?
22   A.  I did not.
23   Q.  And you did not review the deposition
24 transcript for Dr. Sedreck (phonetic)?
25   A.  I did not.

Page 25



Page 26

1    In reviewing the original slides from her
2

Page 27

1    Q.

Page 28

1    report?
2    A.  Well, because it was brought up in one of
3    the defense expert's report, so I thought well, I
4    should read about this and refresh my memory.
5    Q.  Okay.  Any other additional literature
6    searches that you did with respect to Ms. Stevick's
7    case?
8    A.  I don't believe so.
9    Q.  Did the lawyers provide you with any specific
10   literature with respect to Ms. Stevick's case?
11   A.  No.
12

Page 29

1
3    A.  October 26th.
4    MS. FORGIE:  Objection.
5    THE WITNESS:  Four, six -- nine hours, I
6    think.
7    BY MS. du PONT:
8    Q.  Including --
9    A.  Four, six, eight -- nine hours.
10   Q.  Four?  Very challenged today with my math.
11   How are you getting nine hours?
12   A.  Well, 3.5 plus .5 is 4, and 2 is 6, and 1
13   is 5, and 5 is 7 -- let's see.  Four, six, seven --
14   you're right, it's eight.
15   Q.  Okay.
16   A.  Maybe I'm challenged.
17   MS. FORGIE:  I did -- I did the same thing
18   you did.
19   BY MS. du PONT:
20
25





Page 34

Page 36

Page 35

Page 37

20    THE WITNESS:  You did --

21    MS. du PONT:  -- correct me.

22    THE WITNESS:  You did well.

23    (Whereupon Exhibit 7 was marked for

24    identification.)

25    MS. FORGIE:  Thank you.  What -- what

Page 38

1  number is this?

2       MS. du PONT:  This is Exhibit 7.

3       MS. FORGIE:  Thank you.

4  BY MS. du PONT:

5       Q.  If you can just turn to the second page.  This

6  is page 300 of the WHO classifications of tumors of the

7  hematopoietic and lymphoid tissues, and you see that

8  there's a -- a definition for primary diffuse large

9  B-cell lymphoma of the CNS.

10      Do you see that?

11      A.  Yes.

12      Q.  And can you just read for me what that

13  definition is?

14      A.  "Primary diffuse large B-cell lymphoma of

15  the CNS is defined as diffuse large B-cell lymphoma

16  arising within the brain, spinal cord, leptomeninges

17  or eye.  Excluded are lymphomas of the dura,

18  intravascular large B-cell lymphomas, lymphomas with

19  evidence of systemic disease or secondary lymphomas

20  and all immunodeficiency-associated lymphomas."

21  ███████████████████████████████████████████

    ████████████████████████████

    ██  ████████

24      Q.  And do you see under "Etiology" the WHO

25  classification states, "In immunocompetent individuals,

Page 39

1  the etiological factors are unknown."

2       Do you see that?

3       A.  That's what they say.

4       Q.  Do you agree with that?

5       A.  No.

6       Q.  And they go on to say that various viruses "do

7  not play a role" in this type of lymphoma, correct?

8       A.  Correct.

9       Q.  Okay.  And under the epidemiology, do you see

10  that it says that "CNS diffuse large B-cell lymphoma

11  accounts for less than 1 percent of all non-Hodgkin

12  lymphomas and 2.4 to 3 percent of all brain tumors."

13      Do you see that?

14      A.  Yes.

15      Q.  And do you agree with that?

16      A.  Yes.

17      Q.  Are you aware of any published literature that

18  shows that the genetic mutation patterns in primary CNS

19  lymphomas differ from diffuse large B-cell lymphomas not

20  otherwise specified?

21      MS. FORGIE:  Objection.

22      THE WITNESS:  There is literature on that,

23  yes.  The primary CNS lymphomas tend to have what's

24  called an activated B-cell phenotype.  And those

25  lymphomas occur throughout the body, but also are

Page 40

1  the predominant type of primary CNS lymphomas and

2  they have a certain pattern of mutations.

3  BY MS. du PONT:

4       Q.  So --

5       A.  But it's similar to the other activated

6  B-cell types.

7       Q.  But there -- there is literature showing that

8  there are distinct differences between primary diffuse

9  large B-cell lymphoma and diffuse large B-cell lymphoma

10  not otherwise specified?

11      A.  Well --

12      MS. FORGIE:  Objection.

13      THE WITNESS:  Well, not really, no.  I

14  mean, as I said, diffuse large B-cell lymphoma not

15  otherwise specified --

16      [Reporters asks counsel to slow down

17          when talking.]

18      THE WITNESS:  Diffuse large B-cell

19  lymphoma not otherwise specified has different

20  subtypes.  One of them is called the activated

21  B-cell type, okay?  And it just so happens that the

22  primary CNS lymphomas are mainly of the activated

23  B-cell type.  So they have the same mutation

24  patterns --

25      MS. du PONT:  Okay.

Page 41

1  ███████████████████████████████

    ████████████████████████

    █  ██████████████████████

    █  █████████████████████████████████

    █  ███████████████████████████████

    █  ██████████████████████████████████

    █  ████████████████████████

10  █  ████████████████████████████████

    █  █████████████████████

12  █  ████████████

13  █  ██████████████████████████████████

14  █  ████████████████████████████████

15  █  ███████████████████████████████████████

16  █  ██████████████████████████████████

    █  ████████████████████████

    █  ████████████████████████████████

20  █  ████████████████████████

21  BY MS. du PONT:

22      Q.  So you're not aware of any literature that --

23  that is contrary to what you've already answered?

24      MS. FORGIE:  Objection.

25      THE WITNESS:  The -- the patterns of the



Page 42

1  mutations are the same whether it occurs in the
2  brain, this activated B-cell type, or whether it
3  occurs primarily outside of the brain.  It's the
4  same pattern.  Some mutations may be a little more
5  frequent in the brain than outside the brain, but
6  it's the same mutations.  It's the same pattern of
7  mutations.
8      MS. du PONT:  Okay.  So I was asking a
9  slightly different question.
10  BY MS. du PONT:
11      Q.

Page 44

1      You can answer.
2      THE WITNESS:  Well, there is -- there --
3  there is a little bit of literature on subtypes.
4  There's the Eriksson paper, which listed the various
5  subtypes and showed increased odds ratios for most
6  or all of the subtypes.  They weren't statistically
7  significant because of the small numbers, but they
8  were increased.  And then there's at the NAPP study,
9  which looked at the major subtypes, flicker
10
get

Page 43

1
4

Page 45

1
6      MS. FORGIE:  Objection.
7      [Reporter requests clarification.]
8      MS. du PONT:  Glyphosate.
9      THE WITNESS:  No, because there's no
10  literature on that specific question.
11  BY MS. du PONT:
12      Q.  So you didn't review or rely on any
13  epidemiological studies that found an association
14  between the type of non-Hodgkin lymphoma that
15  Ms. Stevick had, primary CNS lymphoma, and Roundup or
16  glyphosate exposure; is that correct?
17      MS. FORGIE:  Objection.
18      THE WITNESS:  Yes, because there is no
19  literature.  There's nothing to review.
20  BY MS. du PONT:
21
25      MS. FORGIE:  Objection.

Page 46

1    THE WITNESS:  I -- I did not.  I -- I
2  don't believe there are any such reports.
3  BY MS. du PONT:
4    Q.



11  BY MS. du PONT:
12    Q.  Now, Ms. Stevick was not using Roundup in the
13  agricultural sense, right?  She wasn't a farmer?
14    A.  Correct.
15    Q.  She was using Roundup at her home, home use,
16  right?
17    A.  Yes.
18    Q.

23    A.  Yes.
24    Q.  And the two articles are McDuffie and
25  Eriksson, right?

Page 47

1    A.  Yes.
2    MS. FORGIE:  Objection.
3    MS. du PONT:  I'm going to mark as Exhibit
4  8 the McDuffie article.
5    (Whereupon Exhibit 8 was marked for
6    identification.)
7    MS. du PONT:  Would you like a copy,
8  Kathryn?
9    MS. FORGIE:  Sure, if we're going to
10  discuss it.
11    Thank you.  This is Exhibit 8?
12    THE WITNESS:  8.
13    MS. FORGIE:  Thank you.
14  BY MS. du PONT:
15    Q.  So we've marked as Exhibit 8 an article by
16  McDuffie, et al entitled "Non-Hodgkin's lymphoma and
17  specific pesticide exposures in men cross Canada study
18  of pesticides and health."
19    Do you see that Dr. Weisenburger?
20    A.  Yes.
21    Q.  And so this, as the title states, is a study
22  of pesticide use in Canada, right?
23    A.  Yes.
24    Q.  And this is a case control study?
25    A.  Yes.

Page 48

1    Q.  And it wasn't only looking at glyphosate
2  exposure; it was looking at a bunch of different
3  exposures to various pesticides, fungicides, herbicides,
4  correct?
5    A.  Yes.
6    Q.  And the total population involved in the study
7  looks like was 2,023; is that right?  If you take a look
8  at the abstract, that might help.
9    A.  517 cases and 1506 controls.
10    Q.  So the total study population was 2,023, if
11  you add those together?
12    A.  Correct.
13    Q.  And of -- we've looked at page 1158.  There's
14  a Table 2, "Herbicides:  Frequency of Exposure to
15  Herbicides Classified Into Major Chemical Classes and as
16  Individual Compounds."
17    Do you see that table?
18    A.  Yes.
19    Q.  And one of the major chemical classes includes
20  individual phosphonic herbicides, and glyphosate is
21  listed there, correct?
22    A.  Yes.
23    Q.  And it appears that there were a total of 51
24  cases of NHL in glyphosate users, right?
25    A.  Yes.

Page 49

1    Q.  And there were 133 controls --
2    A.  Yes.
3    Q.  -- is that correct?
4    A.  Right.
5    Q.  So in this study, there were a total of 184
6  cases and controls exposed to Roundup, correct?
7    A.  Yes.
8    Q.  And if we turn to page 1155 -- actually, just
9  stay on the table for a second.
10    With respect to glyphosate, they report
11  two separate odds ratios in this table, correct?
12    A.  Yes, uh-huh.
13    Q.  And the first odds ratio was adjusted for age
14  and province of residence, correct?
15    A.  Correct.
16    Q.  And that showed -- that did not show a
17  statistically significant increased risk of NHL with
18  exposure to glyphosate, correct?
19    A.  It showed a small risk but was not
20  statistically significant.
21    Q.  So the answer to my question is there was not
22  a statistically significant increased risk of
23  non-Hodgkin's lymphoma with glyphosate use in this
24  table, correct?
25    MS. FORGIE:  Objection.

Page 50

1    THE WITNESS:  Correct.
2    MS. FORGIE:  Asked and answered.
3    THE WITNESS:  Correct.
4  BY MS. du PONT:
5    Q.   And they also did a separate odds ratio
6  calculation where they controlled for some additional
7  medical variables.
8    Do you see that?
9    A.   Yes.
10   Q.   And that, likewise, did not show a
11 statistically significant increased risk of
12 non-Hodgkin's lymphoma with exposure to glyphosate, did
13 it?
14   A.   That's correct.
15   Q.   Now, you are relying on a specific table for
16 your opinion in this case.  It's Table 8, which is on
17 page 1161.
18   And that table shows an odds ratio of 2.12
19 for greater than two days of exposure to glyphosate,
20 correct?
21   A.   Yes.
22   Q.   But this figure here in Table 8 is not
23 controlled or adjusted for other pesticide use, correct?
24   MS. FORGIE:  Objection.
25   THE WITNESS:  It's not adjusted for other

Page 51

1  pesticide use, no.
2  BY MS. du PONT:
3    Q.   And you didn't mention that in your report,
4  did you?
5    A.   I did not.  It is mentioned in my general
6  causation report.
7    Q.   ████████████████████████████████
8  █          ████████████████████████
9    MS. FORGIE:  Object --
10 BY MS. du PONT:
11   Q.   -- correct?
12   MS. FORGIE:  Objection.  Asked and
13 answered.
14   THE WITNESS:  That's correct.
15   MS. FORGIE:  You can answer it again.
16   THE WITNESS:  That's correct.
17 BY MS. du PONT:
18   Q.   And if you turn to the conclusion in this
19 article, the last paragraph of the article, it states,
20 "Our results support previous findings of an association
21 between NHL and specific pesticide exposures."  And if
22 you go to the last two sentences of the -- that last
23 paragraph, it states, "In our final models,
24 non-Hodgkin's lymphoma was associated with a personal
25 history of cancer, a history of cancer in first-degree

Page 52

1  relatives and exposure to dicamba-containing herbicides,
2  to mecoprop and to Aldrin."
3    Do you see that?
4    A.   Yes.
5    Q.   It doesn't conclude that non-Hodgkin's
6  lymphoma was associated with Roundup or glyphosate,
7  correct?
8    MS. FORGIE:  Objection.
9    THE WITNESS:  It does not.
10 BY MS. du PONT:
11   Q.   ████████████████████████████████████████
12 █████████████████████████████
13 █    ██████████████
14 █    ███████████████████████████████████████
15 █    ██████████████████████████████
16 █    ███████████
17   MS. FORGIE:  Objection.
18   THE WITNESS:  Well, it just -- it shows
19 the odds ratio with greater than two days.  It
20 doesn't come to that conclusion, no.
21 BY MS. du PONT:
22   Q.   And it doesn't conclude that greater than two
23 days' exposure of -- of glyphosate is sufficient to
24 determine cause in an -- in an individual patient,
25 correct?

Page 53

1    MS. FORGIE:  Objection.
2    THE WITNESS:  Correct.
3  BY MS. du PONT:
4    Q.   And you didn't mention that in your report
5  either, did you?
6    A.   I did not.
7    Q.   Now, the McDuffie paper, it does not look
8  specifically at the risk of non-Hodgkin's lymphoma for
9  any of the non-Hodgkin's lymphoma subtypes, does it?
10   A.   It did not.
11   Q.   Okay.  You can set that aside.
12   Are you doing okay?  Do you want to take a
13 break?  We have been going for about --
14   A.   I'm fine.
15   Q.   -- 55 minutes.
16   Okay.
17   MS. FORGIE:  And I'm okay.
18   MS. du PONT:  Good.
19   Okay.  So I'm going to mark as Exhibit 9
20 the Eriksson paper.
21   (Whereupon Exhibit 9 was marked for
22 identification.)
23 BY MS. du PONT:
24   Q.   And you cited the Eriksson paper in page 3 of
25 your report for your opinion that greater than 10 days

Page 54

1 of total lifetime exposure to Roundup places someone at
2 high risk for NHL, correct?
3    A.  Correct.
4    Q.  And the -- now, this Eriksson paper, which we
5 have marked as Exhibit 9, it's entitled "Pesticide
6 Exposure as Risk Factor for Non-Hodgkin's Lymphoma
7 Including Histopathological Subgroup Analysis, Eriksson,
8 et al."  It's published in the -- I'm missing it.
9    A.  International Journal of Cancer.
10    Q.  International Journal of Cancer.  Thank you.
11       Okay.  And this was a study done in
12 Sweden, right?
13    A.  Yes.
14    Q.  And in this study, there were a total of 910
15 cases and 1,016 controls; is that right, if you look at
16 the abstract?
17    A.  Yes.
18    Q.  And that's a total study population of 1,926;
19 is that right?
20    A.  Yes.
21    Q.  And of those cases and controls, if we go to
22 Table 2, it shows the numbers that were exposed to
23 glyphosate in the cases and controls.
24       And do you see that there were 29 cases
25 exposed to glyphosate and 18 controls exposed to

Page 55

1 glyphosate?
2    A.  Yes.
3    Q.  So that's a total of 47 cases and controls
4 that were exposed to Roundup, correct?
5    A.  Correct.
6    Q.  ████████████████████████████████
████ ████████████████████████████████
████ ████████████████████████████████
██████
10    A.  Yes.
11    Q.  But, again, this number presented in Table 2
12 for glyphosate for greater than 10 days' exposure was
13 not controlled for other pesticides, correct?
14    A.  That's correct.
15       MS. FORGIE:  Objection.
16 BY MS. du PONT:
17 ████████████████████████████████
████ ████████████████████████████████
████ ████████████
20    A.  That's correct.
21    Q.  So let's take a look at Table 3 of the
22 Eriksson paper.
23       And that does break it down by the various
24 different lymphoma entities or subtypes, correct?
25    A.  Yes.

Page 56

1    Q.  And this table looks specifically at diffuse
2 large B-cell lymphomas, correct?
3    A.  Correct.
4    Q.  And if we look at diffuse large B-cell
5 lymphomas and glyphosate, there is not a statistically
6 significant increased risk of diffuse large B-cell
7 lymphoma reported with glyphosate, correct?
8    A.  That's correct.
9    Q.  Now, the -- the authors in Eriksson conducted
10 what's referred to as a multivariate analysis; is that
11 right?
12    A.  Yes.
13    Q.  And that is discussed -- unfortunately, there
14 are not page numbers on this, but the last --
15       MS. FORGIE:  You can use the Bates number.
16 BY MS. du PONT:
17    Q.  -- number of the Bates number is 2796.  And at
18 the bottom of the page, they talk about the multivariate
19 analysis.
20       Do you see that?
21    A.  Yes.
22    Q.  And they say, "Since mixed exposure to several
23 pesticides was more a rule than an exception and all
24 single agents were analyzed without adjusting for other
25 exposure, a multivariate analysis was made to elucidate

Page 57

1 the relative importance of different pesticides."
2       Do you see that?
3    A.  Yes.
4    Q.  So the authors here saw that pesticides could
5 be a potential confounder, so they adjusted the results
6 with respect to Roundup to control for that confounder,
7 correct?
8       MS. FORGIE:  Objection.
9       THE WITNESS:  Correct.
10 BY MS. du PONT:
11    Q.  And if we look at Table 7 with respect to
12 glyphosate, when they did the multivariate analysis for
13 glyphosate, they -- and they controlled for other
14 pesticides, glyphosate showed no statistically
15 significant increased risk for non-Hodgkin's lymphoma,
16 correct?
17    A.  The risk is increased, but it's not
18 statistically significant, that's correct.
19    Q.  So Table 7 states that there was not a
20 statistically significant increased risk for
21 non-Hodgkin's lymphoma with glyphosate, correct?
22       MS. FORGIE:  Objection.
23       THE WITNESS:  Correct.
24 BY MS. du PONT:
25 ██████████████████████████████



Page 58

5    MS. FORGIE:  Objection.
6    THE WITNESS:  Correct.
7 BY MS. du PONT:
8    Q.  But none of the odds ratios you rely on in
9 those two articles controlled for other pesticide use,
10 correct?
11    MS. FORGIE:  Objection.
12    THE WITNESS:  That's correct.
13 BY MS. du PONT:
14

20    MS. FORGIE:  Objection.
21    THE WITNESS:  It's true.  Although the
22 NAPP study, which hopefully will soon be published,
23 will -- will show a statistically significant
24 increased risk.
25 BY MS. du PONT:

Page 59

1    Q.  But the NAPP study hasn't been published yet,
2 correct?
3    A.  That's correct.
4    Q.  So let me ask my question.
5

12        can answer again.
13    THE WITNESS:  There's nothing published
14
15 today.
16 BY MS. du PONT:
17    Q.  D

22        I believe this
23 goes into general causation.
24    THE WITNESS:  Well, I looked at all the --
25 all the epidemiological literature on the subject of

Page 60

1 glyphosate and non-Hodgkin's lymphoma.
2 BY MS. du PONT:
3    Q.

8    A.  Well, the agricultural health study is a
9 negative study, so that would contradict --
10    Q.  Okay.
11    A.  -- the conclusion.
12    MS. du PONT:  Why don't we just take a
13 brief break --
14    MS. FORGIE:  Okay.
15    MS. du PONT:  -- okay?  This is a good
16 stopping point.
17    MS. FORGIE:  Can we take enough of a break
18 to get coffee?
19    MS. du PONT:  Yes.
20    MR. LEVINE:  Very good idea.
21    MS. FORGIE:  I will get coffee --
22    THE REPORTER:  Can you wait until he's off
23 the record?
24    MS. FORGIE:  The time is now 9:35 a.m. and
25 we're off the record.

Page 61

1    (Recess.)
2    THE VIDEOGRAPHER:  The time is now
3 9:57 a.m. and we're back on the record.
4 BY MS. du PONT:
5    Q.  Okay.  Now, before the break, Doctor, we were
6 talking about the agricultural health study.
7        Do you recall that?
8    A.  Yes.
9    Q.  And the most recent publication from the
10 agricultural health study was published in 2018 by the
11 lead author Andreotti; is that right?
12    A.  Yes.
13    Q.  And Andreotti and the agricultural health
14 study did look at cumulative days' exposure to Roundup,
15 didn't it?
16    A.  Yes.
17    Q.  And in that analysis, they did, in fact,
18 control for other pesticides, didn't they?
19    MS. FORGIE:  Okay.  I'm going to object to
20 all of this as going to general causation.
21        But you can answer.
22        If you want me to -- can I just have a
23 standing objection to any time --
24    MS. du PONT:  You can have a standing
25 objection.  And I just want to reply that he has

Page 62

1 ███████████████████████████████

2 ███████████████████████████████

3 ███████████████████████████████

4      MS. FORGIE:  I still object.

5      MS. du PONT:  Okay.  So let me go back and

6 ask my question before --

7      MS. FORGIE:  Also, I wanted to state for

8 the record that we -- we did serve the addendum on

9 Friday.

10      [Reporter requests clarification.]

11      MS. FORGIE:  Serve the addendum reference

12 list on Friday and we confirmed that.

13      MS. du PONT:  And we will mark a copy of

14 that as soon as we can get a copy of it.

15      MS. FORGIE:  Thanks.

16 BY MS. du PONT:

17    Q.  Okay.  So with respect to the agricultural

18 health study, it's your understanding that the -- that

19 the agricultural health study did look at cumulative

20 days' exposure for glyphosate, correct?

21    A.  Yes.

22    Q.  And the agricultural health study did control

23 for other pesticide use in that analysis, correct?

24    A.  I don't --

25      MS. FORGIE:  Objection.

Page 63

1      THE WITNESS:  I don't remember that.

2      MS. du PONT:  Okay.  Well, we'll -- we'll

3 look at it.

4      So I will mark as Exhibit 10 to the

5 Weisenburger deposition an article by Andreotti

6 entitled "Glyphosate Use in Cancer Institute" --

7 "Incidence in the Agricultural Health Study

8 published in the journal of national cancer

9 institute in 2018."

10      (Whereupon Exhibit 10 was marked for

11      identification.)

12      MS. du PONT:  Oops.  Give me that back.

13 Hold on.  Wrong one.

14      There you go.

15      MS. FORGIE:  You gave him the marked-up

16 copy.

17 BY MS. du PONT:

18    Q.  Now, the agricultural health study was a study

19 in the United States, correct?

20    A.  Yes.

21    Q.  And it looked at 5 -- or, sorry, 54,251 public

22 applicators; 44,932 used glyphosate, correct?

23    A.  Yes.

24    Q.  And if we turn to page 513 and we look at

25 Table 2, with respect to non-Hodgkin's lymphoma, do you

Page 64

1 see that there were a total of 440 -- 440 cases of

2 non-Hodgkin's lymphoma reported in those people that

3 were exposed to glyphosate?  And, Doctor, I'm adding up

4 the numbers from Q1, Q2, Q3 and Q4 to get 440.

5    A.  Okay.

6      MS. FORGIE:  Objection.  This clearly goes

7 to general causation.

8      MS. du PONT:  You have a standing

9 objection.

10      MS. FORGIE:  And I don't like it.

11      MS. du PONT:  And I have a standing

12 response.

13      MS. FORGIE:  I'm going to keep objecting.

14      [Reporter requests clarification.]

15      MS. FORGIE:  I said I decided I don't like

16 the standing.  I'm going to keep objecting.

17 BY MS. du PONT:

18    Q.  So do you agree, Doctor, that there were 440

19 cases of non-Hodgkin's lymphoma reported in those people

20 that were exposed to glyphosate?

21      MS. FORGIE:  Objection.

22      THE WITNESS:  Just your math?

23      MS. du PONT:  Yes.

24      THE WITNESS:  Yes.

25 BY MS. du PONT:

Page 65

1    Q.  Okay.  So that means if there were 440 cases

2 of non-Hodgkin's lymphoma reported out of 44,932 exposed

3 to glyphosate, that means that 99 percent of people

4 exposed to Roundup did not develop non-Hodgkin's

5 lymphoma, correct?

6      MS. FORGIE:  Objection.

7      THE WITNESS:  Approximately, yes, that's

8 correct.

9 BY MS. du PONT:

10    Q.  And if you refer back to the abstract at the

11 beginning of the study, you would -- would agree with me

12 that the agricultural health study found no association

13 between glyphosate and non-Hodgkin's lymphoma?

14      MS. FORGIE:  Objection.

15      THE WITNESS:  That's correct.

16 BY MS. du PONT:

17    Q.  And if we look at the abstract, it also states

18 that in this large -- the conclusion in the abstract is

19 "In this large, prospective cohort study, no association

20 was apparent between glyphosate and any solid tumors or

21 lymphoid malignancies overall, including non-Hodgkin's

22 lymphoma and its subtypes."

23      Do you see that?

24    A.  Yes, that's what they say.

25    Q.  So there was also no association found between

Page 66

1  diffuse ████████████ and Roundup, correct?
2       MS. FORGIE:  Objection.
3       THE WITNESS:  Correct.
4  BY MS. du PONT:
5       Q.  ████████████████████████
█ ███████████████████?
7       A.  No, but I discussed it at some length in
8  my general causation report.
9       Q.  Okay.  And if you refer to page 510, under
10 "Statistical Analysis," and it's about halfway down the
11 column under "Statistical Analysis."  The authors state,
12 "Based on the distribution among all cancer cases, we
13 categorized cumulative lifetime days and
14 intensity-weighted lifetime days of glyphosate exposure
15 into quartiles, textiles or the median, such that there
16 were at least five exposed cases in each category.  The
17 categories for lifetime days of glyphosate use are as
18 follows."  Quartile 1, is 1 to 13.74; quartile 2 is
19 13.75 to 38.74; quartile 3 is 38.75 to 108.4, and
20 quartile 4 is 108.5.
21      Do you see that?
22      A.  Yes.
23      MS. FORGIE:  Objection.
24 BY MS. du PONT:
25      Q.  And if we take a look at the analysis where

Page 67

1  they look at cumulative exposure, and that's back to
2  Table 2, do you see under the note under Table 2, it
3  says, "All models adjusted for age, state of
4  recruitment, education, cigarette smoking status,
5  alcohol per month, family history of cancer, atrazine,
6  alachlor, metolachlor, trifluralin, and 2.4-D."
7       Do you see that?
8       A.  Yes.
9       Q.  So the cumulative date exposure analysis in
10 the agricultural health study did, in fact, control for
11 other pesticide use, correct?
12      MS. FORGIE:  Objection.
13      THE WITNESS:  I'm just trying to see where
14 the --
15      MS. du PONT:  The note is right above the
16 discussion on page 513.
17      THE WITNESS:  Yeah, but I'm -- but
18 that's --
19      MS. FORGIE:  But read as much as you want.
20      THE WITNESS:  It has a -- it has a -- I
21 don't know, a symbol.  I'm trying to find the symbol
22 in the table.
23      Yeah, you're right.  That's correct.
24 BY MS. du PONT:
25      Q.  And so controlling for other pesticide use

Page 68

1  when the agricultural health study looked at
2  non-Hodgkin's lymphoma generally, they did not show any
3  dose-response relationship with respect to glyphosate
4  use and non-Hodgkin's lymphoma, correct?
5       MS. FORGIE:  Objection.
6       THE WITNESS:  In this table, that's
7  correct.
8  ████████████████
█ ███████████████████████████████
██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████
█ █████████████████████████████
16      THE WITNESS:  In this table, that's true,
17 but if you look at Table 3, you -- you find a
18 different result.  If you look at the 20-year lag
19 time, the highest dose had an increased odds ratio
20 of 1.35 --
21      [Reporter requests clarification.]
22      THE WITNESS:  Increased odds ratio of
23 1.35.
24 BY MS. du PONT:
25      Q.  And --

Page 69

1       A.  Although it wasn't statistically
2  significant.
3  ██████████████████████████████████
█ ████████████████████████████████████
█ █████████████████████ t increased risk in Q4, correct?
7       A.  On Table --
8       MS. FORGIE:  Objection.
9       THE WITNESS:  -- Table 3?
10      MS. du PONT:  Table 3.
11      THE WITNESS:  Yes.
12 BY MS. du PONT:
13      Q.  And the risk is numerically lower for the
14 third quartile versus the second quartile, correct?
15      MS. FORGIE:  Objection.
16      THE WITNESS:  Yes.  That often happens
17 with small numbers.
18 BY MS. du PONT:
19      Q.  But Table 3 does not show a statistically
20 significant increased risk for any of the four quartiles
21 for diffuse large B-cell lymphoma, correct?
22      MS. FORGIE:  Objection.
23      THE WITNESS:  That's correct.
24      MS. du PONT:  Okay.  You can put that
25 aside.

Page 70

1    I'm going to mark as Exhibit 11 a U.S.
2  News report regarding "Roundup Weed Killer Has
3  Probable Carcinogen, U.N. says."  And this is dated
4  March 20, 2015.
5    (Whereupon Exhibit 11 was marked for
6    identification.)
7  BY MS. du PONT:
8    Q.  And have you seen this article -- this U.S.
9  News article prior to today, Doctor?
10   A.  No.
11   Q.  And if you turn to page 3 of 6, do you see how
12 the article reports that "The French agency's experts
13 said the cancer risks of the weedkiller were mostly from
14 occupational exposure."
15    Do you see that?
16    MS. FORGIE:  Objection.  This goes to
17 general causation on an article he's never seen.
18    THE WITNESS:  Well, that's be --
19    MS. FORGIE:  Completely inappropriate.
20    THE WITNESS:  That's because the -- it's
21 true.  That's because the -- the studies were done
22 in farmers.
23 BY MS. du PONT:
24    Q.  So do you know who Kate Guyton is?
25    A.  No.

Page 71

1    Q.  I believe there's an article on your reference
2  list where she is one of the authors.  I'll represent to
3  you that she is someone associated with Iarc.
4    MS. FORGIE:  There's no question.
5  BY MS. du PONT:
6    Q.  Do you -- does that --
7    A.  Well, it says --
8    MS. FORGIE:  Wait for a question.
9  BY MS. du PONT:
10   Q.  Does that refresh your recollection of who she
11 is?
12   A.  No, but it says here "Kate Guyton of
13 Iarc."
14   Q.  Okay.  And she -- she stated here, "I don't
15 think home use is the issue.  It's agricultural use that
16 will have the biggest impact.  For the moment, it's just
17 something for people to be conscious of."
18    Do you see that?
19   A.  Yes.
20    MS. FORGIE:  Objection.
21 BY MS. du PONT:
22   Q.  So Iarc is saying it's not home use, right?
23    MS. FORGIE:  Objection.  Don't answer
24 that.  This goes into general causation.
25    MS. du PONT:  You can answer.

Page 72

1    MS. FORGIE:  It's far afield -- no.
2    MS. du PONT:  You can state --
3    MS. FORGIE:  I'm instructing him not to
4  answer.
5    MS. du PONT:  There's no privilege issue
6  here.  There's no --
7    MS. FORGIE:  I'm instructing him not to --
8    MS. du PONT:  -- confidential issue here.
9  He can answer.
10    MS. FORGIE:  I'm instructing him not to
11 answer.  This is way far afield.  It's not
12 appropriate, and you're using this to get at the
13 general causation.
14    MS. du PONT:  You can object and instruct
15 someone not to answer if it's a confidential trade
16 secret matter or if there's a confidentiality issue.
17 That -- that is -- that is not your objection.
18    He can answer --
19    MS. FORGIE:  I don't --
20    MS. du PONT:  -- the question.
21    MS. FORGIE:  -- need instructions from you
22 on how to practice law.  I'm well familiar with the
23 rules in this case.  At Monsanto's request,
24 everything was bifurcated as to general causation
25 and specific causation, so there's an exception to

Page 73



9    MS. FORGIE:  I understand.
10    MS. du PONT:  Are you still instructing
11 him not answer?
12    MS. FORGIE:  I am.
13    MS. du PONT:  So we reserve the right to
14 reopen this deposition at a later date because you
15 have instructed him not to answer that question.
16    MS. FORGIE:  You can take it up with the
17 Court.
18    MS. du PONT:  Okay.  You can put that
19 aside.
20    MS. FORGIE:  At some point, the rules have
21 to be followed.
22    MS. du PONT:  I believe I'm following the
23 rules.
24    MR. LEVINE:  Yeah, the rules say you
25 should let him answer.



Page 74

1      MS. du PONT:  Yes.  Under the rules, you
2  should definitely let him answer.  Last I checked,
3  the only way you can instruct a witness not to
4  answer is if there's a trade secret or a
5  confidentiality issue, and neither are present here.
6  BY MS. du PONT:
7      Q.

12

15      [Reporter requests clarification.]
16      MS. du PONT:  Levels.
17      THE WITNESS:  No.
18  BY MS. du PONT:
19      Q.  So you don't know what her glyphosate level
20  was before she used Roundup, right?
21      MS. FORGIE:  Objection.
22      THE WITNESS:  I don't think she ever had
23  it measured, at least to my knowledge.
24  BY MS. du PONT:
25      Q.  So there was no measurement of her -- while

Page 75

1  she was using Roundup of her glyphosate level, correct?
2      A.  Correct.
3      Q.

5

Page 76

1

Page 77

1

2



Page 78

Page 80

Page 79

Page 81

1    A.  Or more.

2        MS. FORGIE:  Objection.

3        THE WITNESS:  Or more.  I don't -- I don't

4    have a specific number.

5    BY MS. du PONT:

6    Q.  And does it matter to your methodology whether

7    when it comes into contact with the skin, it's washed

8    off immediately?

9    A.  Yes.

10   Q.  How does it matter?

11



**Page 82**

16 shirt.
17 BY MS. du PONT:
18    Q.  So can there be just -- is one day of exposure
19 to Roundup enough?
20    A.  Enough for what?
21    Q.  Enough for there to be sufficient exposure
22 under your methodology.
23     MS. FORGIE:  Objection.
24     THE WITNESS:  That's an incomplete
25 question.  Sufficient exposure for what purpose?

**Page 83**

1 BY MS. du PONT:
2    Q.  So they're exposed to Roundup.  They're
3 spraying their yard for one day for a couple hours.
7    A.  No.
    Objection.  Asked and
13 answered.
14     THE WITNESS:  Five days during their
15 lifetime?
16     MS. du PONT:  Yes.
17     THE WITNESS:  Probably not.
18 BY MS. du PONT:
22     MS. FORGIE:  Objection.
23     THE WITNESS:  I would --
24     MS. FORGIE:  Asked and answered.
25     You can answer.

**Page 84**

1     THE WITNESS:  I would have to look at
2 every case individually to see what was the level of
3 exposure.  Just the number of times may not be
4 sufficient.  So, for example, if the patient was
5 wearing, you know, all kinds of protective
6 equipment, it would make a difference.  So -- so one
7 has to look at all the factors, which is what I
8 tried to do in my interview of the patient and in my
9 report.
10 BY MS. du PONT:
11    Q.
14    A.  No.  The latency is measured from the time
15 they first used Roundup until they were diagnosed.
16 That's -- that's the latency.
17    Q.  So I guess what I'm asking is if they stopped
18 using
22     THE WITNESS:  I would certainly consider
23 that, yes, but, you know, if there was significant
24 exposure prior to that time, it probably wouldn't
25 change my opinion, everything else being equal.

**Page 85**

1 BY MS. du PONT:
2    Q.  So is there a certain cutoff in time where,
3 for example, if they
8     THE WITNESS:  Again, I'd have to look at
9 every case specifically and really try to determine
10 what was the level of exposure prior to them
11 stopping.  I don't have a specific cutoff time.
12 BY MS. du PONT:
13    Q.  Does it matter to your methodology how many
14 gallons of Roundup exposure there was per year?
15    A.  Well, I think it's another index of level
16 of exposure.  The more gallons, the more exposure.
17    Q.
20     MS. FORGIE:  Objection.
21     THE WITNESS:  I don't know.  I'd have to
22 look at all the other variables.
23 BY MS. du PONT:
24    Q.  Does it matter to your methodology what
25 surfactants were in the Roundup that was sprayed?



Page 86

1    A.  All the -- you know, Roundup has -- all of
2  Roundup has surfactants, so, you know, I -- and I
3  think in different formulations of Roundup, there
4  are -- I think there are different surfactants, so
5  it -- it doesn't really matter to my decision, no.
6    Q.

23    MS. FORGIE:  Objection.  General causation
24  again.
25    THE WITNESS:  Yes.

Page 87

1  BY MS. du PONT:
2    Q.  And by "it," I mean Roundup.
3    A.  Yes.
4    Q.  So I want to talk to you a little bit about
5  your statements in the Stevick report about Roundup use.
6    Do you have the report in front of you
7  still?
8    A.  Yes.
9    Q.  Okay.  Now, you write on the bottom of page 1
10  of your -- the body of your report that "She sprayed
11  half of the property, about 2,650 square feet, once per
12  month for 10 months of the year."
13    Do you see that?
14    A.  Yes.
15    Q.  And you agree that she didn't spray the entire
16  2,650 square feet, right?
17    A.  Correct.
18    Q.  She sprayed smaller parts within that 2,650
19  foot -- square foot area, right?
20    A.  Correct.
21    Q.  So you state, "She sprayed along the driveway,
22  sidewalks and patio, as well as around her vegetable
23  garden and rose beds. "
24    Do you see that?
25    A.  Yes.

Page 88

1  sprayed from your interview with her?
2    A.  Yes, and from other -- from the deposition
3  and other documents that I was sent.
4    Q.  Okay.  What were the other documents you were
5  sent?
6    A.  There was a memo from the Miller firm that
7  sort of summarized what's in the deposition.
8    Q.  Okay.
9    A.  But I interviewed her and confirmed
10  everything.  I -- you know, I -- I went over
11  everything to make sure it was correct.
12    Q.  And did you rely on that memo from the Miller
13  firm in preparing your report in this case?
14    A.  No.
15    MS. FORGIE:  Objection.
16    THE WITNESS:  I mostly relied on the
17  deposition and on my interview.
18  BY MS. du PONT:
19    Q.  Okay.  But you did consider the memo from the
20  Miller firm in preparing your report in the case?
21    A.  Yes.
22    MS. FORGIE:  Objection.  Mischaracterizes
23  his testimony.
24    THE WITNESS:  Yes.
25

Page 89

1    MS. du PONT:  And I would just request, as
2  I requested the notes that he took during the
3  interview, that the memo from the Miller firm be
4  produced following the deposition.
5    MS. FORGIE:  I have noted your request.
6  BY MS. du PONT:
7    Q.  Now, do you agree with me, because you've read
8  her deposition testimony, that she didn't spray nonstop
9  for that whole hour she was spraying Roundup each month?
10    MS. FORGIE:  Objection.
11    THE WITNESS:  That's correct.
12  BY MS. du PONT:
13    Q.  And you're aware that she didn't -- or you
14  write in your report that Ms. Stevick "used a hand-pump
15  sprayer with either a one- or three-gallon container."
16    Do you see that?
17    A.  Yes.
18    Q.  But you're aware she didn't even spray
19  three gallons at a time, right?  She never sprayed
20  three gallons at a time?
21    A.  Well, I never asked her what was the
22  maximum she ever sprayed.  She said on -- on
23  average, she sprayed one to one-and-a-half gallons
24  each time.
25    Q.  That's what she said during your interview?

Page 90

1    A.   Yes.

2    Q.   Are you aware that she testified that she

3  would only fill the three-gallon container with one

4  gallon of Roundup each time?

5    A.   I wasn't aware of that.

6    Q.   Do you have any reason to disagree that at her

7  deposition when she was asked, "And do you remember how

8  many gallons the sprayer was?"  She testified, "I think

9  we always bought, like, about a three-gallon total size,

10  but we'd only mix to the level, you know, of the

11  concentrate.  Like, it would be, like, an equivalent of

12  a gallon."

13       Do you have any reason to disagree that

14  that was her testimony at her deposition?

15       MS. FORGIE:  Objection.

16       THE WITNESS:  No, but I think there are

17  other areas in her deposition and also in my

18  interview with me that said she sprayed one to

19  one-and-a-half gallons each time.  So some of the

20  time, she must have sprayed more.

21  BY MS. du PONT:

22    Q.   So took a look at her deposition, and are you

23  aware that at her deposition when she was asked, "You

24  would empty an entire gallon each time you sprayed, is

25  that your testimony?"

Page 91

1       She answered, "I would say -- I would say

2  -- yeah, I would say a gallon.  I would use a gallon

3  as I would go in a course -- course of a month.

4       "Would you use a gallon for two months or

5  a gallon for one month?

6       "I was using about a gallon a month when I

7  was spraying, is what I remember."

8       Do you have any reason to disagree that

9  that was the testimony that she gave at her

10  deposition?

11    A.   No, but I --

12       MS. FORGIE:  Objection.  Asked and

13  answered.

14       THE WITNESS:  I think there are --

15       MS. FORGIE:  You can answer again.

16       THE WITNESS:  -- other areas of the

17  deposition where she says one-and-a-half gallons,

18  and that's what -- that's what she told me when I

19  interviewed her, so it -- I think it just depended

20  on how many weeds there were that day.  Some days

21  she sprayed one gallon.  Sometimes days she sprayed

22  a gallon and a half.

23  BY MS. du PONT:

24    Q.   So I looked through her deposition, and I

25  didn't see any testimony from her at her deposition

Page 92

1  under oath that she had sprayed one-and-a-half gallons.

2       MS. FORGIE:  Wait.  There's no question.

3  BY MS. du PONT:

4    Q.   Did you -- can you refer --

5    A.   Well --

6    Q.   Can you take a look at the deposition and find

7  for me where she testified to that?

8       MS. FORGIE:  Objection.  Asked and

9  answered.

10       You can answer it again.

11       THE WITNESS:  I -- I -- I would have to go

12  through the deposition page by page and find it.

13  And I don't remember whether it's actually there or

14  not.  I think it is, but I know that's what she told

15  me in the interview.

16  BY MS. du PONT:

17    Q.   So she told you in the interview that she

18  would spray between one and one-half gallons, but you

19  can't tell me right now that at her deposition, when she

20  was testifying under oath, whether she testified that

21  she sprayed 1.5 gallons, correct?

22       MS. FORGIE:  Objection.  Asked and

23  answered.

24       You can answer it again.

25       THE WITNESS:  I would have to go back and

Page 93

1  look at the deposition.  I -- I don't remember -- I

2  don't remember that, but I -- I -- I thought that

3  she said that in the deposition as well, since she

4  contradicts herself in the deposition in -- in a

5  number of places, so...

6       MS. FORGIE:  Would you like him to read

7  the deposition?

8       MS. du PONT:  No.  We're not going to --

9  we only have three-and-a-half hours today.  It would

10  take him a while to read it on the record.

11  BY MS. du PONT:

12    Q.   But you --

13       MS. FORGIE:  Is the tape on?

14       MS. du PONT:  Can you stop doing that?

15  I'm sorry.

16       THE VIDEOGRAPHER:  Sorry.

17       MS. du PONT:  It's causing me...

18       MS. FORGIE:  And -- and me too.  I'm,

19  sorry, but I'm, like, what's going on over there?

20  BY MS. du PONT:

21    Q.   So you would have -- your testimony today is

22  you would have to go back and look at the deposition,

23  but you can't remember, to the best of your recollection

24  sitting here today, that she testified at her deposition

25  that she used more than one gallon at any time she

Page 94

1  sprayed, correct?
2      MS. FORGIE:  Objection.  Asked and
3  answered three times.
4      THE WITNESS:  I --
5      MS. FORGIE:  You can answer again.
6      THE WITNESS:  I can't specifically
7  remember that, but I'd like to go back and look.
8  BY MS. du PONT:
9      ███  ██████████████████████
10  █ ████████████
11  █ ███████          on page 2 of your report?
12  █
13  A.  Yes.
14  Q.  ██████████████████████
15  █ ████████████████████████████████████
16  █ ████████████████████████████████
17  █ ██████████████████████?
18  A.  Yes, I remember that.
19  Q.  So your report is inconsistent with the
20  testimony that she gave at her deposition, correct?
21      MS. FORGIE:  Objection.
22      THE WITNESS:  This is what she told me in
23  my interview.  So I would say that she is somewhat
24  inconsistent in the history that she's giving.  One
25  to two, two to three, I mean, who remembers that

Page 95

1  over 30 -- 25 or 30 years, right?
2  BY MS. du PONT:
3  Q.  But --
4  A.  These are estimates.  These are
5  guesstimates.
6  Q.  But --
7  A.  These are not precise numbers, okay?
8  Q.  I understand.
9      But you chose to write in your report just
10  the two to three spills, and not that she had given
11  inconsistent testimony at her deposition about only
12  spilling one to two times, correct?
13      MS. FORGIE:  Objection.
14      THE WITNESS:  I wrote in my report what
15  she told me during my interview.
16  BY MS. du PONT:
17  Q.  Okay.  But not what she testified to at her
18  deposition, right?
19  A.  Correct.
20  Q.  And then you write that Ms. Stevick "is
21  estimated to have used approximately 350 gallons of
22  mixed Roundup during this time period."
23      Do you see that on page 2?
24  A.  Yes.
25  Q.  And how did you arrive at that number?

Page 96

1  A.  Well, again, it's just an estimate.  So I
2  took the number of days per month, number of months
3  per year, number of gallons per day and the number
4  of years and multiplied it.  So if you take 1.5, it
5  comes to 380.  If you take 1.1 -- it actually comes
6  to 280.  I don't know where I got the 330.  It's
7  probably 280.  So it's between 280 and 380 gallons.
8  And if you sort -- and so what she told me was that
9  when her husband was mixing it, she used more
10  because that was early on in the timeframe when she
11  was using it.  So the 150 comes from sort of --
12  well, it's sort of an in-between number, but it
13  comes from actually using the 1.5 gallons for the
14  first period of time when her husband was mixing for
15  her and the 1.1 gallons when she was actually buying
16  it off the shelf.  So, you know, I -- I would say
17  between 280 and 380 gallons.  That's probably a more
18  accurate estimate.  She also said she sometimes used
19  it more than once a month, so I didn't factor that
20  in either.
21  Q.  So -- but if we -- if we looked at the
22  testimony that I quoted to you earlier where she said
23  she sprayed one gallon every time, every month, that
24  would come out to more like 250 gallons, correct?
25  A.  280 gallons.  I think it was 1.1 gallons.

Page 97

1  Q.  If she testified that she would use a gallon,
2  not 1.1-gallon, a gallon every month for 10 months --
3  A.  Then it would be two --
4  Q.  -- for 25 years --
5  A.  It would be 250, right.
6  Q.  Okay.
7  A.  I was --
8      MS. FORGIE:  Having math issues today.
9      THE WITNESS:  I mean, I was told that the
10  -- the container she bought had 1.1-gallons, so --
11  which doesn't make a lot of sense, but that's what I
12  was told.
13  BY MS. du PONT:
14  Q.  And does the fact that she sprayed 250 gallons
15  or 350 gallons, does that change your opinion at all?
16  A.  No.
17  Q.  Now, besides her exposure to Roundup, you
18  state, "Ms. Stevick had no significant exposure to other
19  pesticides or chemicals."
20      Do you recall that --
21  A.  Yes.
22  Q.  -- stating that in your report?
23  A.  Yes.
24  Q.  What other pesticides and chemicals did you
25  ask her about during your interview?

Page 98

1    A.   Well, I asked her about other herbicides
2    or insecticides, fungicides, et cetera.  The only
3    use she had was once a year she used a - a product
4    on her roses, which was mainly a fungicide, and that
5    was the only other exposure that she really had to
6    any other types of pesticides.  And -- and I asked
7    her about solvents.  And I asked her about paints
8    and paint thinners and other known chemical causes
9    of non-Hodgkin lymphoma.
10    Q.   And what did she tell you about the solvents
11   and paint thinners?
12    A.   She said that she didn't -- she didn't use
13   them.  She wasn't exposed to them.  Her husband used
14   them in his business but that she wasn't really
15   involved in the day-to-day operations of his
16   business.
17    Q.   But his business was in their home, correct?
18    A.   Well, his business was in their yard and
19   in their shed so it wasn't in their home.
20    Q.   Isn't -- I believe it was in the garage.
21         Is that --
22    A.   Yeah, they --
23    Q.   -- what you remember?
24    A.   They stored things in the garage, but he
25   actually -- his actual work area was in the -- in

Page 99

1    the yard.
2    Q.   And you're aware that he, in his -- his work,
3    was using various chemicals, including solvents, paint,
4    paint thinners in his work?
5    A.   Yes.
6    Q.   And he was doing that work over the course of
7    30 years --
8    A.   Yes.
9    Q.   -- correct?
10    A.   Yes.
11    Q.   And did she ever observe him using these
12   materials in their home?
13    A.   She probably did.  I don't -- I don't
14   know.  She probably did.  Not -- not often.
15    Q.   That's what she told you, not often?
16    A.   I think he said it in his deposition that
17   he -- when he was working in their house to
18   refurbish it, she was usually not there.
19    Q.   Did she explain that she had had any exposure
20   whatsoever, though, to the paints and paint thinners and
21   solvents he had been using, considering that they were
22   in the home?
23         MS. FORGIE:  Objection.
24         THE WITNESS:  She said she didn't have any
25   exposure, and he said the same.

Page 100



1  BY MS. du PONT:

Page 101



Dennis Weisenburger, M.D.





Page 110

Page 111

Page 112

Page 113

1  to take a brief break because we need to change the
2  DVD.
3       THE WITNESS:  Okay.
4       THE VIDEOGRAPHER:  The time is now
5  10:57 a.m. and we are off the record.
6       (Recess.)
7       THE VIDEOGRAPHER:  The time is now
8  11:20 a.m. and we are back on the record.
9  BY MS. du PONT:
10

Page 114



6      (Whereupon Exhibit 12 was marked for

7      identification.)

8  BY MS. du PONT:

9      Q.  At the break, we did get your addendum to your

10 reference list that was provided to us on Friday by

11 counsel for the plaintiff.  And I've marked that as

12 Exhibit 12.

13      Can you just verify for me that's the

14 addendum to your references that we were talking

15 about earlier in the deposition?

16      A.  Yes, I think this is it, yes.

17      Q.  And you prepared that addendum after you

18 served your report in this matter in November --

19      A.  Yes.

20      Q.  -- correct?

21      A.  I prepared it last week.

22      Q.  Okay.  And what -- what specifically have you

23 added to the addendum list and why?

24      A.  Well, on this list are a bunch of articles

25 on hepatitis B and C that I had collected --

Page 117

1      Q.  Okay.

2      A.  -- in preparation of writing my report.

3  Some of the articles I referenced in the report, a

4  bunch of articles I didn't really feel were

5  relevant, so I didn't reference them, and then after

6  I read the expert reports for the three cases, there

7  were additional references that I -- that I -- that

8  I went to obtain, including the ones on radiation,

9  additional ones on hepatitis and some other issues

10 and topics that were raised by the -- the other

11 experts.  So this is sort of a summation of all

12 those articles.

13      Q.  Okay.

14      A.  Some of them I had from when I wrote my

15 report and others I collected within the last week

16 or so.

17      Q.  So some of them you had at the time you wrote

18 your report, but you didn't feel like you needed to put

19 them on the original reference list, but now you feel

20 like it's important to include them?

21      MS. FORGIE:  Objection.

22



Page 118

1
2      [Reporter requests clarification.]
3      THE WITNESS:  No.
4      And then so, you know, the reference list
5 could have been updated sooner, but it was a work in
6 progress.
7 BY MS. du PONT:
8      Q.   Okay.  And you're not -- you -- you did not
9 serve any sort of rebuttal report along with this
10 addendum, correct?
11     A.   No.
12     Q.   Okay.  You can put that aside.
13

Page 122

1 website from the Mayo Clinic.
2        Do you recall that, relying on a website
3 from the Mayo Clinic?
4    A.  I've never relied on a website from the
5 Mayo Clinic.
6    Q.  Let me see if I can look back at this, then.
7        If you can take a look at Exhibit 3.  We
8 marked it as Exhibit 3, which is what is listed as
9 Dr. Weisenburger materials list, November 13, 2018.
10        MR. LEVINE:  You have it there.
11        MS. du PONT:  Yeah, that's it.
12        THE WITNESS:  Where is it?
13        MS. du PONT:  If you look at reference 204
14 in that list.
15        THE WITNESS:  Oh, well.  That's something
16 that Kathryn added to the list.
17 BY MS. du PONT:
18    Q.  So --
19        MS. FORGIE:  Objection.  Don't answer
20 that.
21        (Whereupon Exhibit 13 was marked for
22        identification.)
23 BY MS. du PONT:
24    Q.  So we're -- what we've marked as Exhibit 13
25 is -- is -- a -- something from the Mayo Clinic on their

Page 123

1 website discussing non-Hodgkin's lymphoma.
2        Doctor, it's your testimony today that
3 this reference was provided to you by your counsel
4 and added to your list by your -- by Counsel?
5    A.  She may have --
6        MS. FORGIE:  Objection.
7        THE WITNESS:  She may have given it to me.
8 I don't remember.
9        MS. FORGIE:  Wait.  Objection.
10        Don't answer that.
11        THE WITNESS:  Okay.
12        MS. FORGIE:  Communications between us are
13 privileged.
14 BY MS. du PONT:
15    Q.  Do you --
16        MS. FORGIE:  Pretrial order No. 7.
17 BY MS. du PONT:
18    Q.  Do you remember --
19        [Reporter requests clarification.]
20        MS. FORGIE:  Pretrial order No. 7 from
21 Judge Chhabria.
22        MS. du PONT:  So pretrial order No. 7
23 applies to this case?
24        MS. FORGIE:  Absolutely.
25        THE REPORTER:  And I didn't get the judge.

Page 124

1        MS. FORGIE:  Judge Chhabria.
2        Why -- why wouldn't it?
3        MS. du PONT:  I'm just asking a question.
4 I just wanted to confirm that.
5        MS. FORGIE:  Yeah, this is an MDL case.
6        MS. du PONT:  Okay.
7        MS. FORGIE:  And it clearly states that
8 communications between counsel and experts are not
9 discoverable.
10 BY MS. du PONT:
11    Q.  Do you know how this reference got on your --
12 your reference list without revealing any communications
13 between --
14    A.  I -- I don't.
15    Q.  -- you and your counsel?
16    A.  I don't.
17    Q.  Okay.  Have you seen this before?
18    A.  I don't remember it.  I may have.
19    Q.  And if you take a look -- well, let me just
20 ask this:  The Mayo Clinic is a leading medical
21 institution in the United States, correct?
22    A.  Yes.
23    Q.  And if you look under "Causes," which is on
24 the second page of this document --
25    A.  Okay.

Page 125

1    Q.  -- do you see how the Mayo Clinic states, "In
2 most cases, doctors don't know what causes non-Hodgkin's
3 lymphoma"?
4        MS. FORGIE:  Do you have an extra copy --
5        MS. du PONT:  Oh, I apologize.
6        MS. FORGIE:  -- copy, please?
7        MS. du PONT:  I did not mean to not give
8 you.
9        There you go.
10        MS. FORGIE:  And what page are you on,
11 please?
12        MS. du PONT:  2.
13        MS. FORGIE:  Thank you.
14 BY MS. du PONT:
15    Q.  Sorry.  Do you see that it states here that in
16 most cases people diagnosed with non-Hodgkin's lymphoma
17 don't -- hold on.  I just lost my place.
18        That in most cases, doctors don't know
19 what causes non-Hodgkin's lymphoma, do you see where
20 it states that?
21    A.  Yes.
22    Q.  And it also goes on to say that "In some
23 cases, it's due to a weakened immune system, but it
24 begins when your body produces too many abnormal
25 lymphocytes, a type of white blood cell."

Page 126

1    Do you see that.
2    A.  Yes.
3    Q.  And do you agree with those statements?
4    A.  Yes.
5    Q.  Now let's look at the section under "Risk
6  Factors."
7    A.  Okay.
8    Q.  And do you see how it states that "In most
9  cases, people diagnosed with non-Hodgkin's lymphoma
10  don't have any obvious risk factors and many people who
11  have risk factors for the disease never develop it."
12    Do you see that?
13    A.  Yes.
14    Q.  And do you agree with that?
15    A.  Yes.
16    Q.  And then it lists a number of factors that may
17  increase the risk of non-Hodgkin's lymphoma.
18    Do you see that?
19    A.  Yes.
20    Q.  And would you agree that not all risk
21  factories for cancer are causes?
22    A.  Yes.
23    [Reporter requests clarification.]
24    MS. du PONT:  Yes.
25    THE WITNESS:  Are not causes, yeah.

Page 127

1  BY MS. du PONT:
2    Q.  And then it lists a number of factors here,
3  medications that suppress your immune system.
4    Do you see that?
5    A.  Yes.
6    Q.  So if you've had an organ transplant, you're
7  more susceptible to developing non-Hodgkin's lymphoma
8  because immunosuppressive therapy has reduced your
9  body's ability to fight new illnesses; is that right?
10    A.  Yeah.  It's a simplified explanation, yes.
11    Q.  Do you agree with that simplified explanation?
12    A.  More or less, yeah.
13    Q.  And then it states, "Infection with certain
14  viruses and bacteria."  It states, "Certain viral and
15  bacterial infections appear to increase the risk of
16  non-Hodgkin's lymphoma.  Viruses linked to increased
17  non-Hodgkin's lymphoma risk include HIV and Epstein-Barr
18  infection.  Bacteria linked to an increased risk of
19  non-Hodgkin's lymphoma include the ulcer-causing
20  Helicobacter pylori."
21    Do you see that?
22    Q.  Do you see that?
23    And do you agree with that?
24    A.  Yes.
25    Q.  And then it states, under "Chemicals,"

Page 128

1  "Certain chemicals such as those used to kill insects
2  and weeds may increase your risk of developing
3  non-Hodgkin's lymphoma."
4    Do you see that?
5    A.  Yes.
6    Q.  And this website does not specifically refer
7  to glyphosate or Roundup, correct?
8    MS. FORGIE:  Objection.
9    THE WITNESS:  Correct.
10  BY MS. du PONT:
11    Q.  And --
12    A.  It just uses very general terms, like
13  applying insecticides or herbicides.
14    Q.  But it does not specifically refer to Roundup
15  or glyphosate, correct?
16    A.  It does not.
17    Q.  And, in fact, it notes "More research is
18  needed to understand the possible link between
19  pesticides and the development of non-Hodgkin's
20  lymphoma.
21    Do you see that?
22    A.  Yes.
23    Q.  And then it also notes that "Older age.
24  Non-Hodgkin's lymphoma can occur at any age, but the
25  risk increases with age.  It's most common in people 60

Page 129

1  or over."
2    Do you see that?
3    A.  Yes.
4    Q.  And you agree with that?
5    A.  Yeah.  As I said, I don't think it's a
6  cause; it's a risk factor.
7    Q.  And that's what's stated here in the --
8    A.  Well --
9    Q.  Mayo --
10    A.  -- it's actually listed under "Causes,"
11  so...
12    Q.  I thought it was listed --
13    A.  No, it's listed --
14    Q.  -- under "Risk Factors."
15    A.  -- under "Risk Factors," you're right.
16  You're right.
17    Q.  All right.  We can set this aside for a
18  second.
19    Now --
20    MS. FORGIE:  I'm sorry, what number
21  exhibit was that, please?
22    THE WITNESS:  204.
23    MS. du PONT:  No.
24    MS. FORGIE:  204?
25    MS. du PONT:  It's 13.

Dennis Weisenburger, M.D.

Page 130

1    Just for the record, the Mayo Clinic
2  website non-Hodgkin's lymphoma excerpt is
3  Exhibit 13.
4      MS. FORGIE:  Thank you.
5  BY MS. du PONT:
6    Q.  Now, Doctor, you work at City of Hope?
7    A.  Yes.
8    Q.  And have you taken a look at what is on the
9  website for City of Hope about lymphoma?
10   A.  I haven't.
11   Q.  Okay.  Let's take a look.
12   A.  I guess I'm going to get to see it.
13   Q.  You are.
14      (Whereupon Exhibit 14 was marked for
15      identification.)
16      THE WITNESS:  Is this on my reference list
17  too?
18      MS. du PONT:  It is -- I don't think it's
19  on your reference list.  Not yet.  So let's take a
20  look at what is on the City of Hope website.
21  BY MS. du PONT:
22   Q.  You'll see it states that "Lymphoma is an
23  umbrella term describing dozens of cancers that begin in
24  the immune system."
25      Do you see that?

Page 131

1    A.  Yes.
2    Q.  And you agree that?
3    A.  Yes.
4    Q.  "Lymphomas are the most common type of blood
5  cancer and are broadly characterized as either Hodgkin
6  or non-Hodgkin disease."
7      Do you see that?
8    A.  Yes.
9    Q.  And you agree with that?
10   A.  Yes.
11   Q.  And it notes "All lymphoma subtypes combined
12  are the seventh most common cancer in the United
13  States."
14      Do you agree with that?
15   A.  Yes.
16   Q.  Okay.  And if you turn to the third page under
17  "Facts," it asks "What is lymphoma?"
18      Do you see that?
19   A.  Yep.  Yes, I do.
20   Q.  And, again, it's similar to what is stated in
21  the introduction.  It says, "Lymphoma is an umbrella
22  term describing dozens of cancer that begin in the
23  immune system."
24      And you agree with that?
25   A.  Yes.

Page 132

1    Q.  And, again, it notes that it's seventh most
2  common cancer in the United States, and you agree with
3  that?
4    A.  Yes.
5    Q.  And it states, "This year, approximately
6  74,690 adults and children in the United States will be
7  diagnosed with non-Hodgkin's lymphoma."
8      Do you agree with that statistic?
9    A.  Yes.
10   Q.  And then if we turn to the next page, it looks
11  at what are the types of lymphoma.
12      Do you see that?
13   A.  Yes.
14   Q.  And do you see that it lists diffuse large
15  B-cell lymphoma as the most common type of non-Hodgkin's
16  lymphoma?
17   A.  Yes.
18   Q.  But if you turn to the next page, it lists
19  central nervous system lymphoma, which develops in lymph
20  tissues located in the brain and spinal cord, as a
21  separate type of non-Hodgkin's lymphoma, correct?
22   A.  Here, they're being very general --
23  general -- they're generalizing to any lymphoma
24  that's occurring in the CNS.  So it's not just
25  diffuse large B-cell lymphoma.  There are other

Page 133

1  lymphomas that occur primary in the CNS as well.
2    Q.  But that's listed -- the primary CNS lymphomas
3  are listed separately from diffuse large B-cell
4  lymphomas, correct?
5    A.  Yes.
6    Q.  And then it asks, "What increases your risk of
7  lymphoma?"  And it states there, "Doctors do not know
8  what causes most lymphomas, and there is very little
9  that can be done to avoid being diagnosed.  For most
10  patients, it is not one but a combination of factors
11  that likely contributes to developing lymphoma."
12      Do you see that?
13   A.  It's a very general statement, yes.
14   Q.  Do you agree with it?
15      MS. FORGIE:  Objection.
16      THE WITNESS:  I don't -- I -- I don't
17  disagree -- agree or disagree.  I -- I don't know
18  what basis they make that -- they make that
19  statement.  It's a very general statement.  I don't
20  know what they mean by "factors."
21  BY MS. du PONT:
22   Q.  So you can't say one way or the other whether
23  you agree or disagree with that statement?
24   A.  Yes.
25   Q.  But it does list here several risk factors for

Page 134

1 lymphoma.
2      Do you see that?
3   A.  Yes.
4   Q.  And age is listed, correct?
5   A.  Yes.
6   Q.  And you agree age is a risk factor?
7   A.  Yes.
8   Q.  It lists family history --
9   A.  Yes.
10  Q.  -- do you see that?
11  A.  Uh-huh.
12  Q.  And you agree that family history is a risk
13 factor?
14  A.  Yes.
15  Q.  And it lists chemicals, and under that it
16 says, "pesticides and an exposure to other toxins like
17 Agent Orange and benzene may be linked to developing
18 lymphoma," correct?
19  A.  Yes.
20  Q.  And there, it notes that it may be linked to
21 developing lymphoma, right?
22  A.  That's what it says.
23  Q.  And this does not specifically refer to
24 Roundup, correct?
25  A.  No.

Page 135

1      MS. FORGIE:  Objection.
2      THE WITNESS:  It's a -- it's a very
3 general statement.
4 BY MS. du PONT:
5   Q.  And so it -- it does refer, however, to
6 benzene exposure, right?
7   A.  Yes.
8   Q.  Are you -- is it your opinion in this case
9 that the -- the ex -- the exposure to benzene in causing
10 non-Hodgkin's lymphoma -- let me withdraw that.
11      Is it your opinion in this case that the
12 time period for exposure for benzene for
13 non-Hodgkin's lymphoma is similar to the time period
14 for the exposure for Roundup and non-Hodgkin's
15 lymphoma?
16     MS. FORGIE:  Objection.
17     THE WITNESS:  You mean the latency?
18     MS. du PONT:  Yes.
19     MS. FORGIE:  Objection.
20     THE WITNESS:  I would say in general, yes,
21 because for most chemicals, there's environmental
22 chemicals, there are exposures that occur over a
23 significant period of time before people get cancer.
24 So for -- for -- for chemicals like benzene that --
25 mixed solvent exposures, then the median latency is

Page 136

1 about 20 to 25 years.
2 BY MS. du PONT:
3   Q.  And you would say they're -- the same median
4 length latency would apply to Roundup use?
5   A.  Well, it's hypothetical, but I would say
6 yes.  It may take a long time to develop lymphoma
7 from glyphosate exposure.  We -- we don't --
8      [Reporter requests clarification.]
9      THE WITNESS:  Glyphosate, Roundup.
10     MS. FORGIE:  Were you going to finish?
11 You started to say something else before the court
12 reporter --
13     THE WITNESS:  Yeah, so we don't really
14 know for -- for Roundup what the latency is, but,
15 you know, if I was to hypothesize, I would say it's
16 probably long, like -- like benzene-like solvents.
17     MS. du PONT:  Okay.  I'm just going to
18 take a little bit of a break.  I may not have any
19 further questions, but I just want to go through my
20 notes.
21     MS. FORGIE:  Okay.  How about 10, 15
22 minutes?
23     MS. du PONT:  10 minutes is great.
24     MS. FORGIE:  Okay.  So I'll start getting
25 ready for mine, then.

Page 137

1      MS. du PONT:  Okay.
2      MS. FORGIE:  Just to make it go faster.
3      THE VIDEOGRAPHER:  The time is now
4 11:46 a.m. and we are off the record.
5      (Recess.)
6      THE VIDEOGRAPHER:  The time is now
7 12:07 p.m. and we are back on the record.
8 BY MS. du PONT:
9   Q.  Okay.  Doctor, I just have a few more
10 questions.
11     Earlier in the deposition you had referred
12 to a memo that was provided to you by the Miller
13 firm regarding Ms. Stevick's Roundup usage.
14     Do you recall that discussion?
15  A.  Yes.
16     (Whereupon Exhibit 15 was marked for
17      identification.)
18 BY MS. du PONT:
19  Q.  And so on a break, we were able to get a copy
20 of that memo.  It was sent to us.  We were able to
21 forward it to someone here at the Marriott to print, and
22 they have since deleted it.  So we now have that marked
23 as Exhibit 15.  And I just want to show that to you.
24     MS. FORGIE:  Can I -- did anyone check
25 is -- Brian, are you back on the phone?

Dennis Weisenburger, M.D.

Page 138

1  MR. BRAKE: I'm here.
2  MS. FORGIE: Okay. Just checking since we
3  disconnected.
4  MR. BRAKE: Thank you for checking on me,
5  I appreciate it.
6  BY MS. du PONT:
7  Q. And --
8  MS. FORGIE: Someone has to.
9  BY MS. du PONT:
10  Q. And is the -- the memo that you were referring
11  to earlier that you had been provided --
12  A. Yes.
13  Q. -- by the Miller firm?
14  A. Yes.
15  Q. And this is a memo regarding a telephone call
16  to he Elaine and Christopher Stevick on November 11,
17  2018 from 5:00 to 6:30 p.m.
18  Do you see that?
19  A. Yes.
20  Q. And this was a telephone call that you did not
21  participate in, correct?
22  A. I did not.
23  Q. So it was a conference call with Elaine and
24  Christopher Stevick and Brian Brake, I'm guessing.
25  Is that what you can determine from this

Page 139

1  memo?
2  MS. FORGIE: Objection.
3  THE WITNESS: I don't know who was on the
4  call.
5  BY MS. du PONT:
6  Q. But you were not on the call?
7  A. I was not on the call, no.
8  Q. And it goes through a number of issues in
9  relation to her Roundup usage, including mixing,
10  frequency, amount of usage, talks about the area she was
11  spraying.
12  Is -- I think you stated earlier that you
13  did not rely on this memo as much as you relied on
14  the testimony from her deposition and your own
15  interview; is that --
16  A. That's --
17  Q. -- accurate?
18  A. That's correct.
19  Q. Did you rely on this memo for any of the facts
20  that are put forth in your report?
21  A. I don't believe so.
22  MS. du PONT: Okay. I have no further
23  questions at this time.
24  MS. FORGIE: Okay. I just have a few.
25  ///

Page 140

1  EXAMINATION
2  BY MS. FORGIE:
3  Q. Doctor, you earlier mentioned something about
4  the NAPP study.
5  Do you recall that?
6  A. Yes.
7  Q. What is the NAPP study?
8  A. So the NAPP study is a pooled study of
9  Canadian and U.S. case control studies that is
10  looking at a whole bunch of different things, but
11  one of the things that it's looking at is the use of
12  glyphosate and risk for non-Hodgkin's lymphoma and
13  its subtypes.
14  Q. And you -- you reference the NAPP study in
15  your expert report, correct?
16  A. Yes.
17  Q. And you stated that the risk estimate for
18  diffuse large B-cell NHL was 2.45 -- 2.49, 95 percent
19  confidence interval 1.2 --
20  [Reporter requests clarification.]
21  MS. FORGIE: 95 percent confidence
22  interval 1.23 to 5.04 for use greater than two days
23  per year.
24  MS. du PONT: Objection. Leading.
25  BY MS. FORGIE:

Page 141

1  Q. And you reference that in your expert
2  report --
3  A. Yes.
4  Q. -- correct?
5  A. Yes.
6  MS. du PONT: Objection. Form.
7  BY MS. FORGIE:
8  Q. And with regard to that confidence interval,
9  is that a statistic -- does that indicate that the odds
10  ratio of 2.49 is statistically significant?
11  A. Yes.
12  Q. Okay. And has the --
13  MS. du PONT: Objection. Form. Sorry.
14  [Reporter requests clarification.]
15  MS. du PONT: I just had an objection to
16  form.
17  BY MS. FORGIE:
18  Q. Has the NAPP study been presented at various
19  conferences?
20  A. Yes. It has been presented at least three
21  times.
22  Q. Okay. And are you aware that the abstract
23  itself has been peer reviewed?
24  A. It usually -- for these kind of
25  conferences, the abstracts usually are peer

Page 142

1  reviewed, yes.
2      Q.  Okay.  And what is the significance of the
3  NAPP study to you vis-a-vis the NAPP study alone and
4  also with regard to the McDuffie and Eriksson studies
5  that were also referenced --
6      A.  Well --
7      Q.  -- in your report?
8      A.  -- the NAPP study is important because it
9  has a large num- -- larger number of cases and
10  controls being exposed to glyphosate and it allows
11  for adjustment for the use of other pesticides, as
12  well as it has enough cases to actually look at the
13  major subtypes of non-Hodgkin lymphoma.
14      Q.  Okay.  And you were asked a series of
15  questions about subtypes and NHL overall.
16          Do you recall those questions?
17      A.  Yes.
18      Q.  And with regard to subtypes, how is it that
19  you're not always able to determine odds ratios for
20  particular subtypes in some of the epidemiological
21  studies?
22      A.  Well, often, there aren't enough cases
23  of specific subtypes to really -- to really do
24  meaningful analyses.  So they did it in the Eriksson
25  study, but they -- they didn't have a lot of cases

Page 143

1  of the various different subtypes then.  So,
2  although you see elevated odds ratios, they -- they
3  generally aren't statistically significant.  So I
4  think the NAPP study is nice because it -- it pools
5  together studies that are very similar in their
6  design and it is able to actually report -- it's
7  actually able to -- to adjust for the use of other
8  pesticides as well as look at some of the major
9  histologic subtypes.



Page 144

21  BY MS. FORGIE:
22      Q.  Okay.  And then you were asked several
23  questions about the AHS study.
24          Do you recall those questions?
25      A.  Yes.

Page 145

1      Q.  And do you have criticisms of the AHS study
2  that were included in your general causation report?
3          MS. du PONT:  Object to form.
4          THE WITNESS:  Yes.  I mean, one reason I
5  didn't use the AHS study in this report, it was
6  because I discussed it at length in my general
7  causation report and -- and explained why I didn't
8  place a lot of weight on that study as compared to
9  other studies.  So that's all explained in my
10  general causation report.
11  BY MS. FORGIE:
12      Q.  And that's why you didn't include it in your
13  report for Mrs. Stevick; is that correct?
14      A.  That's correct.
15          MS. du PONT:  Object to form.
16          MS. FORGIE:  I don't have anything
17  further.
18          MS. du PONT:  Just give me five minutes.
19          MS. FORGIE:  Sure.  Do you want to go off
20  the record?
21          MS. du PONT:  Yes, please.
22          MS. FORGIE:  Sure.
23          THE VIDEOGRAPHER:  The time now is
24  12:15 p.m. and we are off the record.
25          (Recess.)

Dennis Weisenburger, M.D.

Page 146

1    THE VIDEOGRAPHER: The time is now 12:22
2 p.m. and we are back on the record.
3    FURTHER EXAMINATION
4 BY MS. du PONT:
5    Q. Okay. Doctor, before the break, you were --
6 you responded to a number of questions by Ms. Forgie
7 regarding the NAPP study.
8    Do you recall that?
9    A. Yes.
10    Q. And I'm going to mark as Exhibit 16 a
11 presentation about the NAPP study that was given at the
12 CSEB conference in Mississauga, Ontario on June 3, 2015
13 entitled "A Detailed Evaluation of Glyphosate Use and
14 the Risk of Non-Hodgkin lymphoma in the North American
15 Pooled Project."
16    [Reporter requests clarification.]
17    MS. du PONT: Pooled project.
18    MS. FORGIE: Do you have a copy for me?
19    MS. du PONT: Yes.
20    THE WITNESS: NAPP.
21    (Whereupon Exhibit 16 was marked for
22    identification.)
23    MS. du PONT: Oh, can I -- that's fine.
24 Thanks.
25 BY MS. du PONT:

Page 147

1    Q. And we've marked this as Exhibit 16.
2    Is -- is this familiar to you, Doctor?
3    A. Yes.
4    Q. And, in fact, this is the reference on your
5 Stevick reliance list. I think it's reference three.
6    A. Yes.
7    Q. And Ms. Forgie had asked you about a -- an
8 abstract that had been peer reviewed, right?
9    A. Right.
10    MS. FORGIE: Objection.
11 BY MS. du PONT:
12    Q. And -- and this is not an abstract, right?
13    A. No. This is the present -- there's an
14 abstract that's submitted, and then, if it's
15 accepted, usually you can either have a platform
16 presentation where you prepare a slide deck like
17 this or a poster presentation where you prepare a
18 poster, so there's a -- the abstract is the summary
19 of this data.
20    Q. But that abstract did not refer to this odds
21 ratio of 2.49, did it?
22    A. I don't --
23    MS. FORGIE: Objection.
24    THE WITNESS: I don't remember whether it
25 did or not.

Page 148

1    MS. du PONT: Okay.
2    THE WITNESS: I don't remember.
3 BY MS. du PONT:
4    Q. But this -- this presentation that was given,
5 this actual document was not peer reviewed, correct?
6    MS. FORGIE: Objection.
7    THE WITNESS: Correct.
8 BY MS. du PONT:
9    Q. And I just want to refer you -- actually,
10 there's not any pages on this PowerPoint presentation,
11 but let me just count them.
12    So on the 13th page of the PowerPoint
13 there is a table that looks at duration, number of
14 years, of glyphosate use and NHL risks.
15    Do you see what page I'm referring to?
16    A. Yes.
17    Q. And this is a breakdown that looked at the
18 number of -- it broke it down by number of years, so it
19 looked at 0 years' exposure -- 0 years of glyphosate
20 use, 0 to 3.5 years of glyphosate, and then a greater
21 than 3.5 year use of glyphosate; is that correct?
22    A. Yes.
23    Q. And this actually showed a statistically
24 significant increased risk for diffuse large B-cell
25 lymphoma for use between 0 to 3.5 years, but it did not

Page 149

1 show an increased risk for greater than 3.5 years; is
2 that correct?
3    A. That's correct.
4    Q. So this does not establish a dose-response
5 relationship -- at least this -- this table that's
6 looking at glyphosate use by years does not establish a
7 dose-response relationship for glyphosate use and NHL,
8 correct?
9    MS. FORGIE: Objection.
10    THE WITNESS: That's correct.
11 BY MS. du PONT:
12    Q. And did this analysis did control for other
13 pesticide use, correct?
14    A. Yes.
15    Q. And then if you refer to the 15th page where
16 it looks at lifetime days of glyphosate use and NHL
17 risks, do you see that table?
18    A. Yes.
19    Q. And here, again, it breaks it down between
20 zero, zero to seven, and then greater than seven days of
21 lifetime use.
22    Do you see that?
23    A. Yes.
24    Q. And for diffuse large B-cell lymphoma in this
25 table, there was no statistically significant trend for

Dennis Weisenburger, M.D.

Page 150

1  increasing days of use, correct?
2      A.  That's correct.
3          MS. FORGIE:  Objection.
4          THE WITNESS:  That's correct.
5  BY MS. du PONT:
6      Q.  And there -- this, again, was controlled for
7  other pesticide use, correct?
8      A.  Yes.
9          MS. du PONT:  I don't have any further
10 questions at this time.
11         MS. FORGIE:  Nothing.
12         MS. du PONT:  Okay.  We're all set.
13         THE WITNESS:  Okay.  Thank you.
14         MS. du PONT:  Thank you.
15         THE VIDEOGRAPHER:  The time is now
16 12:27 p.m. and we are off the record.
17         (Whereupon we went off the video record
18         but stayed on the official record.)
19         THE REPORTER:  I assume, Counsel, you
20 would like a copy?
21         MS. FORGIE:  Yes.  And he would like to
22 read and sign.
23         MS. du PONT:  We have a standing order.
24         THE WITNESS:  I want one to proof and
25 correct, yeah.

Page 151

1          THE REPORTER:  And, Mark, do you need a
2  copy of the transcript?
3          MR. OUWELEEN:  No.
4  (Whereupon, the deposition adjourned at 12:28 p.m.)
5                  -oOo-
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 152

1
2
3
4
5
6
7
8      I, DENNIS WEISENBURGER, M.D., do hereby
9  declare under penalty of perjury that I have read
10 the foregoing transcript; that I have made any
11 corrections as appear noted, in ink, initialed by
12 me, or attached hereto; that my testimony as
13 contained herein, as corrected, is true and
14 correct.
15     Executed this _____ day of
16 _____, 20_____, at
17 _____, _____.
18     (City)          (State)
19
20
21
22
23     _____
      DENNIS WEISENBURGER, M.D.
24    Volume I
25

Page 153

1  STATE OF CALIFORNIA      )
                           )  ss.
2  COUNTY OF LOS ANGELES    )
3
4      I, Elizabeth Borrelli, Certified Shorthand
5  Reporter, Certificate No. 7844, for the State of
6  California, hereby certify:
7      I am the deposition officer that
8  stenographically recorded the testimony in the
9  foregoing deposition;
10     Prior to being examined the deponent was
11 first duly sworn by me;
12     The foregoing transcript is a true record
13 of the testimony given;
14     Before completion of the deposition,
15 review of the transcript [X] was [ ] was not
16 requested.  If requested, any changes made by the
17 deponent (and provided to the reporter) during the
18 period allowed are appended hereto.
19
20 Dated_____.
21
22
23     _____
      ELIZABETH BORRELLI, CSR 7844
24
25

Page 154

1   NAME OF CASE:  Roundup litigation: Stevick v. Monsanto

2   DATE OF DEPOSITION:  Tuesday, December 18, 2018

3   NAME OF WITNESS:  Dennis Weisenburger, M.D.

4   Reason Codes:

5       1.  To clarify the record.

6       2.  To conform to the facts.

7       3.  To correct transcription errors.

8   Page _____ Line _____ Reason _____

9   From _____ to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22

23

24          _____
            Signature of Deponent

25