**WILKINSON WALSH + ESKOVITZ LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonwalsh.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonwalsh.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:    202-847-4005

**WILKINSON WALSH + ESKOVITZ LLP**
Sean Eskovitz (CA Bar No. 241877)
(seskovitz@wilkinsonwalsh.com)
11601 Wilshire Boulevard
Suite 600
Los Angeles, CA 90025
Tel:    424-291-9655
Fax:    202-847-4005

**ARNOLD & PORTER KAYE SCHOLER LLP**
William Hoffman (*pro hac vice*)
(William.Hoffman@arnoldporter.com)
601 Massachusetts Avenue, N.W.
Washington, DC 20001
Tel: 202-942-6915
Fax: 202-942-5999

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

*Attorneys for Defendant*
*MONSANTO COMPANY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) |
| | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| *Stevick v. Monsanto Co., et al.*, 3:16-cv-2341-VC | **MONSANTO COMPANY'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM R. SAWYER ON *DAUBERT* GROUNDS** |

- 1 -

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on January 29, 2020, in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its *Daubert* Motion to Exclude the Testimony of Dr. William R. Sawyer.  Monsanto seeks an order excluding Sawyer under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).


DATED:  December 27, 2019

Respectfully submitted,

/s/ *Brian L. Stekloff*_____

Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonwalsh.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonwalsh.com)
WILKINSON WALSH + ESKOVITZ LLP
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:     202-847-4030
Fax:     202-847-4005

Sean Eskovitz (CA Bar No. 241877)
(seskovitz@wilkinsonwalsh.com)
WILKINSON WALSH + ESKOVITZ LLP
11601 Wilshire Boulevard
Suite 600
Los Angeles, CA 90025
Tel:     424-291-9655
Fax:     202-847-4005

William Hoffman (*pro hac vice*)
(William.Hoffman@arnoldporter.com)
ARNOLD & PORTER KAYE SCHOLER
601 Massachusetts Avenue, N.W.
Washington, DC 20001
Tel: 202-942-6915
Fax: 202-942-5999

Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
HOLLINGSWORTH LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

*Attorneys for Defendant*
*MONSANTO COMPANY*

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF WILLIAM SAWYER
3:16-md-02741-VC & 3:16-cv-2341-VC

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................1

BACKGROUND .........................................................................................................2

LEGAL STANDARD..................................................................................................4

    I.      The Court Should Exclude Dr. Sawyer's General Causation Opinions. .....6

          A.      Dr. Sawyer Is Not Qualified To Opine On Epidemiology..............6

          B.      Dr. Sawyer's Remaining General-Causation Opinions Are Scientifically And Methodologically Unsound. .............................7

    II.      The Court Should Exclude Dr. Sawyer's Analysis of Specific Causation As To Mrs. Stevick. ...................................................................................9

          A.      Dr. Sawyer "Rules In" Roundup Based On His Say-So About Studies He Is Not Qualified To Assess..........................................10

          B.      Dr. Sawyer's Exposure Calculation Is Based On A Flawed Methodology. ..................................................................................11

          C.      Dr. Sawyer Provides No Valid Basis For "Ruling Out" Other Potential Causes Of Mrs. Stevick's NHL. ....................................13

    III.     The Court Should Exclude Dr. Sawyer's Remaining Opinions. ...............15

CONCLUSION..........................................................................................................16

1

## <u>TABLE OF AUTHORITIES</u>

Page(s)

2

**Cases**

3

4

*Brown v. Burlington N. Santa Fe Ry. Co.*,
  765 F.3d 765 (7th Cir. 1996) .................................................................5

5

*Chapman v. Proctor & Gamble Distrib., LLC*,
  766 F.3d 1296 (11th Cir. 2014) .............................................................5

6

7

*Chesebrough-Pond's, Inc. v. Faberge, Inc.*,
  666 F.2d 393 (9th Cir. 1982) ...............................................................13

8

*Claar v. Burlington N. R. Co.*,
  29 F.3d 499 (9th Cir. 1994) ............................................................13, 14

9

10

*Clausen v. M/V NEW CARISSA*,
  339 F.3d 1049 (9th Cir. 2003) ........................................................13, 14

11

*Cooper v. Smith & Nephew*,
  259 F.3d 194 (4th Cir. 2001) .................................................................5

12

13

*Daubert v. Merrell Dow Pharm., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) .................................................................5

14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ...........................................................................3, 4

15

16

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) ...............................................................11

17

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ...........................................................................9, 11

18

19

*Guinn v. AstraZeneca Pharms. LP*,
  602 F.3d 1245 (11th Cir. 2010) .............................................................5

20

*Hall v. Conoco Inc.*,
  886 F.3d 1308 (10th Cir. 2018) ...........................................................15

21

22

*In re Aredia & Zometa Prod. Liab. Litig.*,
  483 F. App'x 182 (6th Cir. 2012) ..........................................................5

23

*In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Prod. Liab. Litig.*,
  892 F.3d 624 (4th Cir. 2018) .................................................................5

24

25

*In re: Roundup Prods. Liab. Litig.*,
  390 F. Supp. 3d 1102 (N.D. Cal. 2018) ........................................6, 11, 12

26

*Kilpatrick v. Breg, Inc.*,
  613 F.3d 1329 (11th Cir. 2010) .............................................................5

27

28

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ..............................................................................5

- ii -

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) .................................................................................5

*O'Conner v. Commonwealth Edison Co.*,
  807 F. Supp. 1376 (C.D. Ill. 1992) ..........................................................................12

*Poust v. Huntleigh Healthcare*,
  998 F. Supp. 478 (D.N.J. 1998) ..................................................................................5

*Sims v. Kia Motors of Am., Inc.*,
  839 F.3d 393 (5th Cir. 2016) .......................................................................................5

*Soldo v. Sandoz Pharm. Corp.*,
  244 F. Supp. 2d 434 (W.D. Pa. 2003)..........................................................................5

*Tamraz v. Lincoln Elec. Co.*,
  620 F.3d 665 (6th Cir. 2010) ...................................................................................2, 4

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000)......................................................................................................4

**Rules**

Federal Rule of Evidence 702 ............................................................................................4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Dr. William R. Sawyer fails to offer any admissible opinions in support of Plaintiff Elaine Stevick's claim that exposure to Roundup caused her to develop non-Hodgkin's Lymphoma ("NHL").

The vast majority of Dr. Sawyer's report addresses issues of *general* causation, such as the epidemiological, animal, and genotoxicity studies regarding Roundup, and what those studies say about the chemical's *possible* effects on human beings.  Dr. Sawyer was not disclosed as part of the general causation *Daubert* proceedings, and so his methodology is untested and unvalidated by this Court.  To the extent the Court allows new general causation experts—as Monsanto believes it should—their opinions are admissible only if supported by specialized knowledge or training and an accepted methodology.[1]  Dr. Sawyer has neither.  His testimony on general causation is an even less rigorous version of the opinions already proffered by Drs. Portier, Ritz, and Weisenburger, re-treading the same topics but with fewer qualifications and less consistency.  Rather than even attempting to apply a Bradford Hill analysis, Dr. Sawyer utilizes his own ad hoc methodology, offering conclusory pronouncements about epidemiology while admitting he has zero expertise in that area, and otherwise citing studies that have been universally discredited or that relate to irrelevant chemicals.  The Court should preclude him from offering these flawed observations at trial.

Dr. Sawyer's specific causation opinion should likewise be excluded.  At his deposition, Dr. Sawyer claimed to have conducted a differential diagnosis of Mrs. Stevick's NHL.  But Dr. Sawyer does not treat patients or apply that methodology anywhere outside the courtroom—and it shows.  Dr. Sawyer purported to "rule in" Roundup as a cause based purely on a comparison of Mrs. Stevick's alleged Roundup "dose" to metrics from cherry-picked, unadjusted epidemiological studies that he admits he lacks training to interpret.  He then "ruled out" other known and acknowledged risk factors for NHL for the first time at his deposition, offering cursory (at best) justifications.  "Simply claiming that an expert used the 'differential diagnosis'

---

[1] Should the Court rule that new expert designations are not permitted at this point, of course, Dr. Sawyer's general causation opinions would be untimely and should be precluded in their entirety.

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF WILLIAM SAWYER
3:16-md-02741-VC & 3:16-cv-2341-VC

method is not some incantation that opens the *Daubert* gate." *See, e.g.*, *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010) (quotation and alteration omitted).  Dr. Sawyer's methodology comes nowhere close to a valid differential diagnosis and therefore should be excluded as well.

Dr. Sawyer has now testified in two Roundup trials and has sat for deposition in dozens more cases.  The common thread in his testimony is willingness to say whatever will advance a particular Plaintiff's case.  His methods change from case to case (a classic ground for *Daubert* exclusion).  He has spent the vast majority of his time on the witness stand testifying about menacing-sounding chemicals other than glyphosate, despite the absence of any scientific evidence showing that those chemicals are dangerous or any claim by Plaintiffs that those chemicals caused their cancer.  And in the most recent Roundup trial, Dr. Sawyer was willing to attempt to convince jurors to be afraid of a spray bottle of Roundup, even though he knew it was a prop for his direct examination that contained only water.  Junk science and manipulative antics have no place in federal court.  The Court should exclude Dr. Sawyer's testimony.

## BACKGROUND

Plaintiff has offered Dr. Sawyer, a toxicologist by training, as an expert on two topics.  First, she has offered him as an expert "relating to his general absorption opinions."  Stekloff Decl., Ex. 1, 11/20/18 Ltr. from Pls.' Counsel at 4.  Second, she has proffered him to testify "on issues of specific causation, including the comparability of [Plaintiff's] exposure with the exposure data from epidemiological studies."  *Id.*

The vast majority of Dr. Sawyer's November 20, 2018 Report ("Sawyer Rpt.") relates to his so-called "general absorption opinions," which is simply a different label for general causation opinions.  Part B of the report (comprising roughly 84 pages, or two-thirds of the report) discusses glyphosate's history; the ingredients in various Roundup formulations; the routes of potential exposure to glyphosate; a summary of various methods, models, and studies for measuring exposure, including a review of the epidemiological literature; and a discussion of factors affecting dermal absorption.  *See* Stekloff Decl., Ex. 2, 11/20/18 Sawyer Rpt. at 32-

114.  This section has nothing to do with any particular plaintiff; indeed, Dr. Sawyer agreed at his deposition that the section "was intended to address . . . general points that [he is] making regarding glyphosate, dermal exposure, glyphosate exposure, things like that that would apply to anybody."  Stekloff Decl., Ex. 3, 12/20/18 Sawyer Dep. 18:16-24.  In fact, Dr. Sawyer copied nearly half of Part B from his report in the *Johnson* case, where he also offered general causation opinions.  The same text appears, nearly verbatim, in Dr. Sawyer's report for the *Pilliod* case and in each of his eleven Wave 1 reports.

Although the bulk of Dr. Sawyer's report is consistent across the *Johnson*, *Pilliod*, and *Stevick* cases, Dr. Sawyer's ultimate opinions on general causation have never had that characteristic.  He has applied different methodologies at different times, constantly changing course in the face of deposition questioning that proved the absence of any reliable scientific foundation for his conclusions.  At trial in both *Johnson* and *Pilliod*, he testified about whether Roundup can generally cause cancer, despite admitting earlier in both cases that he has no training in epidemiology, the most important evidence of causation.  He also focused his testimony on anecdotal observations about chemicals in some Roundup formulations besides glyphosate, despite the absence of any scientific evidence supporting the carcinogenicity of those chemicals or any claim by Plaintiffs that those chemicals caused their cancer.

Part A of Dr. Sawyer's report in this case (roughly 31 pages, or a quarter of the report) is the portion that discusses Mrs. Stevick with specificity.  Focusing exclusively on Mrs. Stevick's exposure, Part A details her medical history; describes her use and application of Roundup products; summarizes her deposition in this case and Dr. Sawyer's telephone interview of her; and lastly provides Dr. Sawyer's exposure and dose calculation.  *See* Stekloff Decl., Ex. 2, 11/20/18 Sawyer Rpt. at 1-31.

At his deposition, however, Dr. Sawyer went further, explaining that he plans to offer a differential diagnosis that considers and rules out all causes of Mrs. Stevick's NHL but for glyphosate—all without any medical degree or expertise.  Stekloff Decl., Ex. 3, 12/20/18 Sawyer Dep. 192:13-192:23.  Dr. Sawyer then described a two-step "methodology" that he

claims yielded that conclusion.  First, Dr. Sawyer estimated Mrs. Stevick's lifetime exposure days to glyphosate, as well as her average glyphosate dose in milligrams per kilogram per day using the Predictive Operator Exposure Model ("POEM").  *See id.* 194:8-195:19.  He then compared these figures to thresholds from six epidemiological studies to "rule in" glyphosate as a cause.  *See id.*  Second, Dr. Sawyer said he "ruled out" a substantial listing of other potential causes of Mrs. Stevick's NHL, such as her "health factors, family history, drug use, smoking[,] any type of pharmaceuticals such as long-term cortisone or implanted tissues which require an immunosuppressant drug, family history, genetic disorders, . . . [and] occupational exposures." *Id.* 194:12-196:5.  But Dr. Sawyer's report did not address these factors at all, and he provided nothing besides *ipse dixit* at his deposition to support his conclusion "that Mrs. Stevick's exposure to Roundup was a substantial factor that contributed to her development of NHL." Stekloff Decl., Ex. 2, 11/20/18 Sawyer Rpt. at 121; *see* Stekloff Decl., Ex. 3, 12/20/18 Sawyer Dep. 192:18-193:5 (age), 119:25-120:23 (radiation), 92:20-93:13 (other chemicals).

Neither Dr. Sawyer's general-causation opinions nor his specific-causation opinions as to Mrs. Stevick have been previously vetted.  His general-causation opinions were not before this Court at the general-causation *Daubert* stage.  And no court has sanctioned his novel attempt at a differential diagnosis, because he has not purported to apply that methodology outside this case.  Notably, all of these opinions require expertise that he does not possess, be it training in epidemiology or relevant clinical experience.  Stekloff Decl., Ex. 3, 12/20/18 Sawyer Dep. 242:16-19 ("Q:  You are going to defer to others all opinions and testimony about the results of the human epidemiological studies; correct?  A:  Yes.").

## LEGAL STANDARD

Under *Daubert* and Federal Rule of Evidence 702, an expert must be qualified and must offer testimony that is both relevant and reliable.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  *Daubert* created "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), which require "more than subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 590.  *Daubert*'s objective

- 4 -

1    "is to make certain that an expert . . . employs in the courtroom the same level of intellectual

2    rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v.*

3    *Carmichael*, 526 U.S. 137, 152 (1999).   Thus, "in determining whether proposed expert

4    testimony amounts to good science, [the court] may not ignore the fact that a scientist's normal

5    workplace is the lab or the field, not the courtroom or the lawyer's office." *Daubert v. Merrell*

6    *Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

7          In the specific causation context, *Daubert* requires experts purporting to use a differential

8    diagnosis to validly execute both aspects of that methodology—"ruling in" all possible causes

9    and then "ruling out" causes besides exposure.   *In re Aredia & Zometa Prod. Liab. Litig.*, 483

10   F. App'x 182, 188 (6th Cir. 2012) (expert offering a differential diagnosis must "accurately

11   diagnose the nature of the disease, reliably rule in the possible causes of it, and reliably rule out

12   the rejected causes"); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005)

13   ("[A]n expert does not establish the reliability of his techniques or the validity of his conclusions

14   simply by claiming that he performed a differential diagnosis on a patient."); *Soldo v. Sandoz*

15   *Pharm. Corp.*, 244 F. Supp. 2d 434, 551 (W.D. Pa. 2003) ("[T]he mere statement by an expert

16   that he or she applied differential diagnosis in determining causation does not *ipso facto* make

17   that application scientifically reliable or admissible.").   The district court must "delve into the

18   particular witness's method of performing a differential diagnosis to determine if his or her

19   ultimate conclusions are reliable." *Poust v. Huntleigh Healthcare*, 998 F. Supp. 478, 496 (D.N.J.

20   1998).   Expert opinions that pay lip service to this methodology but do not reliably apply it

21   should be excluded.   *See, e.g.*, *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices*

22   *and Prod. Liab. Litig.*, 892 F.3d 624, 642–45 (4th Cir. 2018).[2]   For the reasons explained below,

23   this Court should do the same.

24

25

26   [2] *See also, e.g.*, *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 401-04 (5th Cir. 2016) (affirming exclusion of differential diagnosis); *Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1308-11 (11th Cir. 2014)

27   (same); *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1252-55 (11th Cir. 2010) (same); *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1342-43 (11th Cir. 2010) (same); *Cooper v. Smith & Nephew*, 259 F.3d 194, 200 (4th Cir.

28   2001) (same); *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773-76 (7th Cir. 1996) (same).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ARGUMENT

**I.    The Court Should Exclude Dr. Sawyer's General Causation Opinions.**

The vast majority of Dr. Sawyer's report consists of general-causation opinions that he is neither permitted nor qualified to offer.  Plaintiff did not proffer Dr. Sawyer as a general-causation expert and has argued against the designation of additional general-causation experts at this stage.  If the Court elects to preclude new general-causation witnesses from testifying, it should apply that rule to Plaintiff as well.  To the extent new experts can testify, they would have to satisfy *Daubert*, and Dr. Sawyer cannot do so.  He lacks necessary qualifications, and his methodology is even less rigorous and scientifically grounded than the opinions of Drs. Portier, Ritz, and Weisenburger, which the Court found barely sufficient to clear *Daubert*.[3]

**A.  Dr. Sawyer Is Not Qualified To Opine On Epidemiology.**

The specific methodology the Court approved at the general causation *Daubert* stage was a Bradford Hill methodology, which requires training in epidemiology.  Indeed, the Bradford Hill criteria can be applied only *after* epidemiology data demonstrates an association between a substance and a condition.  *See* Stekloff Decl., Ex. 4, Reference Manual on Scientific Evidence at 598–99 ("We emphasize that these guidelines are employed only *after* a study finds an association to determine whether that association reflects a true causal relationship.") (emphasis in original).  Epidemiology, as this Court has observed, is "central to the general causation inquiry, and where such evidence exists, it must be addressed by the experts."  *See In re: Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1116 (N.D. Cal. 2018).

Dr. Sawyer has admitted that he has not evaluated the epidemiological studies for purposes of determining causation.  *See, e.g.*, Stekloff Decl., Ex. 6, 9/15/19 Sawyer *Giglio* Dep. 58:11-16 (admitting that he has only looked at "the dose aspects of the epidemiology and whether or not the plaintiff fits into the dose brackets within the epidemiology").  Rather, he defers that analysis and evaluation to other experts in these cases. Stekloff Decl., Ex. 3, 12/20/18 Sawyer Dep. 240:16-23 (deferring "the general causation of NHL supported by the

---

[3] Monsanto preserves its objections to the Court's rulings on general causation and maintains that Plaintiff's general causation experts should be excluded under *Daubert*.

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF WILLIAM SAWYER
3:16-md-02741-VC & 3:16-cv-2341-VC

epidemiologic literature"); Stekloff Decl., Ex. 6, 9/15/19 Sawyer *Giglio* Dep. 58:8-10 ("I'm not going to handle the epidemiological aspects.  I defer that to the medical epidemiologists in this matter."); 64:2-11 (agreeing that he is "not here to talk about general epidemiology opinions" and that he defers on the "significance" of certain epidemiology studies to epidemiologists). Further, Dr. Sawyer has admitted time and again that he lacks the expertise to testify about those studies.  *E.g.*, Stekloff Decl., Ex. 3, 12/20/18 Sawyer Dep. 240:16-241:1; Stekloff Decl., Ex. 6, 9/15/19 Sawyer *Giglio* Dep. 58:8-16, 64:2-11.

These failures should preclude him from testifying to general causation at all, because an expert who lacks training or expertise in epidemiology cannot meaningfully address that topic. But at minimum, Dr. Sawyer should be precluded from addressing the epidemiological studies at all.  Dr. Sawyer purports to draw conclusions about dosing and causation from the epidemiology, but the law does not permit experts to cherry-pick findings from studies they admit to being unqualified to address.

### B.  Dr. Sawyer's Remaining General-Causation Opinions Are Scientifically And Methodologically Unsound.

Dr. Sawyer's efforts to address animal and toxicological studies fare no better, because he merely recites the findings of a cherry-picked subset of those studies—and picks poorly.

One particularly salient example is Dr. Sawyer's opinions on tumor promotion, which are entirely absent from Dr. Sawyer's *Stevick* report and deposition, but which have been a focus of his testimony in other Roundup cases.  Dr. Sawyer purports to suggest that glyphosate can promote the carcinogenic effects of other chemicals, relying on the George study, which concluded that glyphosate "*failed* to provoke neoplastic development when tested as tumor initiator or complete carcinogen," but did show potential as a tumor promotor.  *See* Stekloff Decl., Ex. 8, George, J., et al., *Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach*, 73 Journal of Proteomics 951 (2010) at 954 (emphasis added).  The Court already considered and rejected this argument during the *Hardeman* trial when Plaintiffs

- 7 -

attempted to use it as a justification for their design defect theory.   Stekloff Decl., Ex. 9, *Hardeman* Trial Tr. 1810:1-1817:21, 1846:18-1851:2.

And for good reason.  The George study was evaluated by several major national and international agencies—including the EPA and IARC—and was uniformly found by them to be an inadequate study for scientific purposes:

- EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017) at 70 ("A number of studies were judged to be inadequate in protocol, conduct or reporting and were not considered in the analysis of glyphosate . . . An initiation-promotion study (George et al., 2010) in male Swiss mice that tested a commercial formulation of glyphosate (41%) on the skin.  Study deficiencies included small number (20) of animals, tested only males, and lack of histopathological examination.").

- IARC, *Some Organophosphate Insecticides and Herbicides, Monograph Vol. 112* (2015) at 352 ("Short duration of treatment, no solvent controls, and lack of any histopathological evaluation.  Age at start, NR (mice weighed 12–15 g bw) [The Working Group concluded **this was an inadequate study for the evaluation of glyphosate**]" (emphasis added)).

- BAuA, Proposal for Harmonised Classification and Labelling: N (phosphonomethyl)glycine; Glyphosate (ISO), CLH Report for Glyphosate (2016) at 66 ("[George] cannot contribute to a decision on the classification of glyphosate.").[4]

Even Plaintiff's expert, Dr. Portier, agrees that the George study is inadequate to form the types of conclusions Dr. Sawyer attempts to draw from it.  In his testimony for the *Hardeman* trial, Dr. Portier explained that the study is "addressing the question of promotion, which means that you already have these initiated cells.  Living can cause mutations to occur.  And so it's conceivable that glyphosate, all of these tumor findings we are seeing here, are glyphosate promoting out already [initiated] effects.  *I don't think it's likely*, but it's conceivable that's the case."  Stekloff Decl., Ex. 13, *Hardeman* Trial Ex. 1690 156:18-157:6 (emphasis added).

Despite this consensus view rejecting the George study, Dr. Sawyer strays far into the realm of speculation by opining, based solely on that unreliable study, that exposure to Roundup is a substantial contributing factor to the promotion of non-Hodgkin's lymphoma.  *E.g.*, Sawyer *Giglio* Rpt., at 160.  Moreover, Dr. Sawyer makes an unsupported speculative leap by inferring

---

[4] The BAuA is Germany's Federal Institute for Occupational Safety and Health.

from a study of chemicals painted on mouse skin that Roundup can promote *NHL* in *humans.* *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144-45 (1997) (excluding animal data where expert failed to adequately extrapolate to humans).  Dr. Sawyer's intense reliance on this study, in the face of overwhelming criticism, proves he is not applying well-established and science-based methods.

Another example is Dr. Sawyer's testimony about the trace chemicals present in Roundup.  Dr. Sawyer has spent much of his time on the stand testifying that some of these chemicals are carcinogens that caused or contributed to Plaintiffs' NHL.  But Dr. Sawyer cites no science linking any of the trace chemicals to NHL at any dose remotely approximating the minuscule amounts to which Plaintiffs could have been exposed, let alone in Roundup in particular.  Nor does Plaintiff offer any scientific evidence that any of these trace chemicals are the cause of her NHL.[5]  Dr. Sawyer's focus on these unsupported issues is yet another basis for excluding him from testifying at trial, but he at minimum should be precluded from attempting to frighten and confuse the jury by reference to chemicals that play no meaningful role in Plaintiff's claims or the case more generally.

These two areas are not outliers or fragments of Dr. Sawyer's testimony—they have been a feature of his analysis in virtually every case to date.  His methodology boils down to highlighting dangerous-sounding findings from particular studies, not conducting a rigorous and methodologically sound analysis of glyphosate.  The Court should preclude him from offering such junk science to the jury.

**II.    The Court Should Exclude Dr. Sawyer's Analysis of Specific Causation As To Mrs. Stevick.**

At his deposition, Dr. Sawyer claimed—for the very first time—that he conducted a "differential diagnosis" in concluding that Roundup was a substantial factor in causing Mrs.

---

[5] Not only does Dr. Sawyer lack scientific support for his trace chemical opinions generally, but in the Wave 1 cases, Dr. Sawyer has explicitly withdrawn his opinion as to one of the three trace chemicals in Roundup—N-Nitroso-glyphosate—described in his report for Mrs. Stevick.  Stekloff Decl., Ex. 15, 10/25/2019 Sawyer *I. Hernandez* Dep. Tr. 14:9-13.  His shifting positions on these chemicals underscores how unreliable his opinions are.

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF WILLIAM SAWYER
3:16-md-02741-VC & 3:16-cv-2341-VC

Stevick's NHL.  His analysis does not resemble any valid application of that methodology.  He claims that Roundup should be "ruled in" as a cause for Mrs. Stevick based on a comparison of her alleged "dose" of Roundup to certain epidemiological studies.  But Dr. Sawyer's dose calculation is unreliable—as he has all but admitted by abandoning his method in more recent cases—and he acknowledges that he lacks training or expertise in epidemiology and the treatment of patients.  Nor is there anything "specific" about his causation analysis—it would find Roundup to be a substantial factor for *any* individual exposed to a threshold amount of glyphosate.  As if to confirm the point, Dr. Sawyer did not analyze *any* of Mrs. Stevick's other risk factors in his report and has offered no valid scientific basis for ruling them out.  Dr. Sawyer's results-driven analysis is not a valid differential diagnosis, and it should therefore be excluded under *Daubert*.

### A.  Dr. Sawyer "Rules In" Roundup Based On His Say-So About Studies He Is Not Qualified To Assess.

Dr. Sawyer's sole basis for ruling in Roundup as a possible cause is his analysis of epidemiology studies, which, according to him, demonstrate that a person with Mrs. Stevick's exposure metrics, calculated by Dr. Sawyer as 255 days over 25 years, is at increased risk of developing NHL.  *See* Stekloff Decl., Ex. 3, 12/20/18 197:7-13; Sawyer Rpt. at 121.  This analysis has several flaws that, taken alone or together, require excluding Dr. Sawyer's specific causation opinions.

*First*, as explained above, Dr. Sawyer lacks the requisite expertise to opine on specific causation because he does not have the medical expertise necessary to perform a differential diagnosis.  On the issue of medical expertise, Dr. Sawyer is plainly underqualified to perform a differential diagnosis.  He is not a medical doctor.  He does not perform differential diagnoses— or, for that matter, diagnoses of any sort—outside the courtroom.  He has deferred repeatedly to oncologists on the question of what should be "ruled in" and "ruled out" as a possible cause of non-Hodgkin's lymphoma in other Roundup cases, *e.g.*, Stekloff Decl., Ex. 16, *Pilliod* Trial Tr. 3287:15-20; Stekloff Decl., Ex. 17, 11/14/19 Sawyer *Dickey* Dep. Tr. 69:24-70:25; Stekloff

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF WILLIAM SAWYER
3:16-md-02741-VC & 3:16-cv-2341-VC

Decl., Ex. 15, 10/25/19 Sawyer *I. Hernandez* Dep. Tr. 28:11-15, and he should not be permitted to suddenly reclaim that role here.

As to epidemiology, Dr. Sawyer based his exposure threshold on his analysis of a subset of the available studies, but Dr. Sawyer is not an epidemiologist, nor does he consider himself an epidemiology expert. Stekloff Decl., Ex. 3, 12/20/18 Sawyer Dep. Tr. 240:24-242:19. He further acknowledged that he would defer to epidemiologists on virtually every aspect of his analysis. *Id.* The Court should bar Dr. Sawyer from extracting alleged thresholds from studies he is not qualified to evaluate or otherwise opining on topics that exceed his expertise. *See, e.g.*, *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science.")

*Second*, Dr. Sawyer "rules in" Roundup based on an inappropriate subset of the epidemiological evidence. Dr. Sawyer cherry-picks six epidemiology studies—omitting, for instance, an assessment of De Roos (2005), which even Plaintiff's general-causation experts factor into their opinions—and plucks from those studies only the *unadjusted* figures that this Court has suggested provide an inadequate basis for a methodologically sound calculation. Indeed, Dr. Sawyer places particular emphasis on Eriksson and McDuffie, Stekloff Decl., Ex. 2, 11/20/18 Sawyer Rpt. at 26-27, which did not adjust for exposure to other pesticides. *See In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1119–20 (N.D. Cal. 2018). As this Court has already determined, "[f]ailing to take account of likely confounders by presenting and relying upon only unadjusted (or minimally adjusted) estimates is a serious methodological concern." *Id.* at 1140. That is exactly what Dr. Sawyer has done.

**B. Dr. Sawyer's Exposure Calculation Is Based On A Flawed Methodology.**

The next step in Dr. Sawyer's analysis—calculating a "dose" of Roundup for comparison to the epidemiology—is likewise flawed. To determine Mrs. Stevick's Roundup dose, Dr. Sawyer used the POEM model, a European regulatory formula used to estimate pesticide exposure. But as Dr. Sawyer admitted, POEM is designed to estimate pesticide exposure in

1    pesticide spray operators in the United Kingdom, and because it is a regulatory formula, it

2    systematically *overestimates* exposure.  Stekloff Decl., Ex. 3, 12/20/18 Sawyer Dep. Tr. 207:2-

3    7.  Dr. Sawyer further conceded that the model is not calibrated for glyphosate, *see* Stekloff

4    Decl., Ex. 18, 8/23/19 Sawyer *Hall* Dep. Tr. 437:7-11 (agreeing that POEM was not based on

5    glyphosate exposure), and was instead created using a "surrogate chemical," *id.*, which is more

6    easily absorbed and less readily excreted than glyphosate, *cf.* 2015 IARC Monograph on

7    glyphosate at 41-45.[6]  Nor is the model designed with the human epidemiology studies on

8    glyphosate in mind.  As Dr. Sawyer has conceded, the output of the POEM model is simply a

9    "quantitative dose in units of milligram per kilogram body weight," and "there's nothing to

10   compare that to in the human epidemiologic studies as those are based on exposure days."

11   Stekloff Decl., Ex. 15, 10/25/19 Sawyer *I. Hernandez* Dep. Tr. 57:20-25.  Perhaps for these

12   reasons, Dr. Sawyer has almost entirely abandoned the POEM model in recent cases, not even

13   attempting to calculate an alleged glyphosate dose for nine of the eleven Wave 1 plaintiffs.[7]  Yet

14   Dr. Sawyer offered no explanation for why it was appropriate to use POEM in this case, with

15   this Plaintiff, and with glyphosate.  *See, e.g.*, *O'Conner v. Commonwealth Edison Co.*, 807 F.

16   Supp. 1376, 1390 (C.D. Ill. 1992) ("Rules of both science and evidence require a scientist or an

17   expert to have a verifiable scientific basis for his opinion.")

18        Even were Dr. Sawyer to entirely change the basis of his primary specific causation

19   opinion now and abandon any assessment of exposure aside from a comparison of Mrs.

20   Stevick's days of Roundup use to the epidemiologic studies—as he has done in the majority of

21   the Wave 1 cases—his testimony should still be excluded.  To start, Dr. Sawyer by his own

22   admission would still lack qualification to testify to the underlying epidemiology.  Moreover,

23   because his testimony at that point would merely compare the magnitude of one number (Mrs.

24   Stevick's days of Roundup use) to a second number (the number of days of use in various

25   epidemiology publications)—a calculation the individual members of any jury could accomplish

26

27   [6] IARC, *Some Organophosphate Insecticides and Herbicides, Monograph Vol. 112* at 398 (2015),

28   [7] Dr. Sawyer has not purported to calculate an alleged dose for plaintiffs Dickey, Domina, Janzen, Mendoza, Pollard, Tanner, Sanders, Harris, and I. Hernandez.

- 12 -

1    with relative ease—his opinions on dose would not be the proper subject of expert testimony

2    and would be entirely unhelpful to the jury. *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666

3    F.2d 393, 398 (9th Cir. 1982) (noting that it would be "well within the discretion of the trial

4    judge to exclude" expert opinions that would not be "of any real assistance to the trier of fact.").

5    As such, regardless of the form his dose opinions take, they should be precluded.

6          **C.  Dr. Sawyer Provides No Valid Basis For "Ruling Out" Other Potential
             Causes Of Mrs. Stevick's NHL.**

7

8          Dr. Sawyer's analysis of other risk factors confirms that his specific causation opinion

9    should be excluded.  Part of conducting a differential diagnosis is "ruling out" other possible

10   causes. *See Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1061 (9th Cir. 2003) (quoting *Claar*

11   *v. Burlington N. R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)).  Here, it is undisputed that NHL has

12   several well-established risk factors, including age, autoimmune disease, certain infections,

13   immunosuppressant drugs, obesity, exposure to radiation, and exposure to certain chemicals.

14   *See* Stekloff Decl., Ex. 19, 11/20/18 Shustov Rpt. at 5-6; Stekloff Decl., Ex. 20, 11/20/18

15   Nabhan *Hardeman* Rpt. at 3-4; Stekloff Decl., Ex. 21, 12/14/18 Nabhan *Gebeyehou* Dep. at

16   19:25-20:17; Stekloff Decl., Ex. 22, 12/20/18 Weisenburger *Hardeman* Dep. at 90:7-12.  It is

17   also undisputed that several of these risk factors are present in Mrs. Stevick's case, such as age

18   and chemical and radiation exposure.  But Dr. Sawyer offers little to no analysis of any of these

19   factors—indeed, he did not analyze them *at all* in his report.

20         What's more, Dr. Sawyer did not offer any convincing explanation for ruling out these

21   factors at his deposition.  For example, Dr. Sawyer acknowledged for the first time at his

22   deposition that Mrs. Stevick's age is a possible alternative cause of her NHL.  *See* Stekloff Decl.,

23   Ex. 3, 12/20/18 Sawyer Dep. Tr. 192:24-193:3, 194:8-11.  But while acknowledging this risk,

24   Dr. Sawyer simply said it could not overcome her exposure to Roundup, without providing any

25   further explanation for that determination.  This failure to explain *why* he can attribute Mrs.

26   Stevick's NHL to Roundup use and not age-related factors renders his methodology unreliable.

27   It may be understandable that Dr. Sawyer lacks any clinical experience, but the law does not

28

- 13 -

1    permit him to perform what he calls a "differential diagnosis" by either ignoring recognized risk

2    factors or ruling them out based on say-so, especially without such clinical experience or

3    training.  Because Dr. Sawyer's elimination of other risk factors is not "founded on more than

4    subjective beliefs or unsupported speculation," his specific causation opinion should be

5    excluded.  *See Clausen*, 339 F.3d at 1058 (quoting *Claar*, 29 F.3d at 502).

6         Dr. Sawyer's analysis of the other possible risk factors fares no better.  He acknowledges

7    in his report that Mrs. Stevick was exposed to radiation as part of her work as a speech therapist,

8    Sawyer Rpt. at 14, and that radiation is a known risk factor for DLBCL, Stekloff Decl., Ex. 3,

9    12/20/18 Sawyer Dep. Tr. 84:21-85:7.  But he eliminated it as a cause at his deposition based

10   only on unidentified and as-yet unproduced nurse and dental practitioner studies.  *Id*. 119:25-

11   121:6.  It is also undisputed that Mrs. Stevick was exposed to various chemicals including

12   benzene and mecoprop, which Dr. Sawyer admits are known risk factors for DLBCL.  *Id.* at

13   85:11-22; 87:14-17.  But Dr. Sawyer ruled out these potential causes at his deposition without

14   calculating or quantifying Mrs. Stevick's cumulative exposure to such chemicals, as he

15   purported to do for Roundup.  *Id.* at 113:18-114:1.  Under a proper application of *Daubert*, such

16   inconsistent and results-driven methodology cannot be relayed to a jury.

17        Finally, Dr. Sawyer fails to account for the fact that in the majority of NHL and DLBCL

18   cases, the cause is unknown.   *See* Stekloff Decl., Ex. 23, 11/15/18 Nabhan *Adams* Dep. Tr.

19   68:22-69:2; Stekloff Decl., Ex. 24, 12/15/18 Shustov *Hardeman* Dep. Tr. 58:10-11; Stekloff

20   Decl., Ex. 25, 11/26/18 Weisenburger *Adams* Dep. Tr. 56:18-24.  Like Plaintiff's other experts,

21   Dr. Sawyer admits that NHL and DLBCL happens in people who were never exposed to

22   Roundup.  Stekloff Decl., Ex. 3, 12/20/18 Sawyer Dep. Tr. 196:6-16; *accord* Stekloff Decl., Ex.

23   23, 11/15/18 Nabhan Adams Dep. at 191:7-10; Stekloff Decl., Ex. 26, 12/18/18 Weisenburger

24   *Stevick* Dep. Tr. 75:16-20.  Dr. Sawyer also acknowledged that he cannot completely rule out

25   idiopathic causes for Mrs. Stevick's NHL and would ultimately defer to epidemiologists for that

26   determination.  Stekloff Decl., Ex. 3, 12/20/18 Sawyer Dep. Tr. 196:17-22; 197:4-18.  But he

27   nevertheless disregarded those possible causes in his own analysis based on the odds ratios in

28

- 14 -

1   the epidemiological studies, which, again, he is admittedly unqualified to assess.  That is not

2   reliable science.[8]

3        Because Dr. Sawyer's analysis is a differential diagnosis in name only, and is not a valid

4   or accepted scientific method, it should be excluded.

5   **III.     The Court Should Exclude Dr. Sawyer's Remaining Opinions.**

6        The Court should also preclude the remaining portions of Dr. Sawyer's analysis.  There

7   is no basis for allowing Dr. Sawyer to offer any opinion regarding Monsanto's documents,

8   conduct, or intent.  Dr. Sawyer agreed at his deposition that he was not qualified to offer an

9   expert opinion on such topics.  *See* Stekloff Decl., Ex. 3, 12/20/18 Sawyer Dep. Tr. 265:266:7.

10  Indeed, he went so far as to physically cross out all portions of his expert report related to

11  corporate intent, and testified that he would not offer those opinions at trial in this litigation.  *Id.*

12  at 270:10-19.  To the extent that any opinions regarding Monsanto's corporate intent have not

13  been excised from Dr. Sawyer's report, or to the extent Dr. Sawyer might be inclined to testify

14  about such topics at trial, those opinions should be struck.

15       Moreover, Dr. Sawyer should be precluded from offering opinions regarding what might

16  constitute "reasonable conclusion[s]" that the "jury could come to after reviewing the e-mails"

17  that Dr. Sawyer cited in his report, or from attempting to relay to the jury his "expertise on just

18  some of the technical terms of those e-mails."  *Id.* at 297:13-24.  Inferences are for the jury to

19  make.  Dr. Sawyer's interpretations of those emails in the first instance are, if anything, even

20  *less* admissible than his speculation about what the authors of those emails intended.

21       Relatedly, Dr. Sawyer is not qualified to opine on the ultimate issue of the adequacy of

22  Roundup's EPA-regulated labeling.  He has never drafted the labeling for an herbicide.  *See*

23

24  [8] Dr. Sawyer's methodology should be excluded for one further reason.  Where, as here, the causes of a disease
    are largely unknown, a differential diagnosis is "of little benefit."  Federal Judicial Center's Reference Manual on

25  Scientific Evidence, p. 618.  *See also* Restatement (Third) of Torts § 28 cmt 4 (2010) ("When the causes of
    disease are largely unknown . . . differential etiology is of little assistance.").  In such cases, an expert cannot

26  reliably employ a differential diagnosis to determine that the plaintiff's exposure to a substance caused her
    illness.  *See, e.g., Hall v. Conoco Inc.*, 886 F.3d 1308, 1314 (10th Cir. 2018) (concluding that "because the

27  evidence had pointed to idiopathic causes in most cases of acute myeloid leukemia," "the district court could
    reasonably view the failure to rule out idiopathic causes as a fatal error tainting the differential diagnosis").

28                                                                                        *(Footnote continued)*

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF WILLIAM SAWYER
3:16-md-02741-VC & 3:16-cv-2341-VC

Stekloff Decl., Ex. 27, 2/6/19 Sawyer *Pilliod* Dep. Tr. 337:7-11.  He has never been asked by EPA or any other regulator to opine on the contents of a label for an herbicide.  *Id.* at 337:22-338:6.  And he has never been invited by EPA to advise on labeling.  *Id.* at 338:3-6.  He is unqualified to offer any opinions about Monsanto's compliance with EPA regulatory requirements, and accordingly, any such opinions should be excluded. [9]

### **CONCLUSION**

For the reasons set forth above, the Court should grant Monsanto's Motion to Exclude Dr. William R. Sawyer's opinions.

---

[9] In other cases, Dr. Sawyer has deferred opinions on these topics to other experts, admitting that they are outside his area of expertise.  *See* Stekloff Decl., Ex. 18, 8/23/19 Sawyer *Hall* Dep. Tr. 76:25-77:4, 82:20-82:25.

1   DATED: December 27, 2019                    Respectfully submitted,

2                                               /s/ Brian L. Stekloff

3                                               Brian L. Stekloff (*pro hac vice*)
                                                (bstekloff@wilkinsonwalsh.com)
4                                               Rakesh Kilaru (*pro hac vice*)
                                                (rkilaru@wilkinsonwalsh.com)
5                                               WILKINSON WALSH + ESKOVITZ LLP
                                                2001 M St. NW, 10th Floor
6                                               Washington, DC 20036
                                                Tel: 202-847-4030
7                                               Fax: 202-847-4005

8                                               Sean Eskovitz (CA Bar No. 241877)
                                                (seskovitz@wilkinsonwalsh.com)
9                                               WILKINSON WALSH + ESKOVITZ LLP
10                                              11601 Wilshire Boulevard
                                                Suite 600
11                                              Los Angeles, CA 90025
                                                Tel:    424-291-9655
12                                              Fax:    202-847-4005

13                                              William Hoffman (*pro hac vice*)
14                                              (William.Hoffman@arnoldporter.com)
                                                ARNOLD & PORTER KAYE SCHOLER
15                                              601 Massachusetts Avenue, N.W.
                                                Washington, DC 20001
16                                              Tel: 202-942-6915
                                                Fax: 202-942-5999
17

18                                              Eric G. Lasker (*pro hac vice*)
                                                (elasker@hollingsworthllp.com)
19                                              HOLLINGSWORTH LLP
                                                1350 I St. NW
20                                              Washington, DC 20005
21                                              Tel: 202-898-5843
                                                Fax: 202-682-1639
22

23                                              Michael X. Imbroscio (*pro hac vice*)
                                                (mimbroscio@cov.com)
24                                              COVINGTON & BURLING LLP
                                                One City Center
25                                              850 10th St. NW
                                                Washington, DC 20001
26                                              Tel: 202-662-6000

27                                              Attorneys for Defendant
28                                              MONSANTO COMPANY

- 17 -

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF WILLIAM SAWYER
3:16-md-02741-VC & 3:16-cv-2341-VC