# EXHIBIT 18



**CONFIDENTIAL**

# Transcript of William Sawyer, Ph.D.

**Date:** August 23, 2018
**Case:** Peterson & Hall -v- Monsanto Company, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 3 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.                    1 (1 to 4)
Conducted on August 23, 2018

**Page 1**

```
           IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS

                    STATE OF MISSOURI

                         x

  RONALD PETERSON and   :

  JEFF HALL,            :

           Plaintiffs,  :

      v.                : Civil Action No.

  MONSANTO COMPANY, et  : 1622 CC01071

  al.,                  :

           Defendants.  :

                         x


          * * * CONFIDENTIAL * * *


       Deposition of WILLIAM SAWYER, Ph.D.

               Fort Myers, Florida

            Thursday, August 23, 2018

                  9:16 a.m.


  Job No.: 203750

  Pages: 1   269

  Reported By: RHONDA HALL BREUWET, RDR, CRR, LCR, CCR,

  FPR, CLR, NCRA Realtime Systems Administrator
```

**Page 2**

```
              Deposition of WILLIAM SAWYER, Ph.D.,

  held at the offices of:



      Sanibel Harbour Marriott Resort & Spa

          17260 Harbour Pointe Drive

          Fort Myers, Florida 33908










                 Pursuant to notice, before RHONDA

  HALL BREUWET, RDR, CRR, LCR, CCR, FPR, CLR, NCRA

  Realtime Systems Administrator, Notary Public in and for

  the State of Florida.
```

**Page 3**

```
                    A P P E A R A N C E S

  ON BEHALF OF PLAINTIFFS:

      JEFF T. SELDOMRIDGE, ESQUIRE

      The Miller Firm LLC

      The Sherman Building

      108 Railroad Avenue

      Orange, Virginia 22960

       540  672 4224



  ON BEHALF OF DEFENDANT MONSANTO:

      JOHN M. KALAS, ESQUIRE

      JOSEPH F. ALTIERI, ESQUIRE

      Hollingsworth LLP

      1350 I Street, N.W.

      Washington, DC 20005

       202  898 5800
```

**Page 4**

```
          A P P E A R A N C E S   C O N T I N U E D


  ON BEHALF OF DEFENDANT OSBORN & BARR:

      JENNIFER E. HOEKEL, ESQUIRE

      Armstrong Teasdale, LLP

      7700 Forsyth Boulevard

      Suite 1800

      St. Louis, Missouri 63105

       314  621 5070




  VIDEOGRAPHER:

      DONALD J. BREUWET
```

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.                    2 (5 to 8)
Conducted on August 23, 2018

---

**Page 5**

C O N T E N T S

EXAMINATION OF WILLIAM SAWYER, Ph.D.         PAGE

Direct Examination                           11

By Mr. Kalas

Cross Examination                            264

By Ms. Hoekel

---

**Page 6**

E X H I B I T S

Attached to transcript.

SAWYER DEPOSITION EXHIBITS                    PAGE

Ex. 1    Defendant Monsanto Company's        11
         Second Amended Notice of
         Videotaped Deposition of
         William Sawyer, Ph.D.

Ex. 2    Box of Records                       22

Ex. 3    CD ROMs                              25

Ex. 4    Various Documents                    26

Ex. 5    Document Titled Jeff Scott           29
         Hall:  Toxicological Notes,
         dated 5/31/18

Ex. 6    Document Titled Jeff Scott           29
         Hall:  Toxicological Notes,
         dated 8/22/18

Ex. 7    Email Chain Between Jeffrey          31
         Travers and Gregory Chernack,
         dated 8/15/18

Ex. 8    Supplemental Reliance List of        116
         Dr. Sawyer 5/25/18

Ex. 9    Plaintiff's Fact Sheet               118

Ex. 10   Email Chain Between Jeffrey          118
         Travers and Gregory Chernack

---

**Page 7**

E X H I B I T S

PAGE

Ex. 11   Document Titled "Glyphosate         176
         Use and Cancer Incidence in
         the Agricultural Health
         Study," By Andreotti, et al.

Ex. 12   Printout from SEER Web Site         188
         Titled "All Lymphoid
         Neoplasms With Detailed
         Non-Hodgkin Lymphoma
         Subtypes"

Ex. 13   Document Titled "Alkyl Amine        204
         Polyalkoxylates (JITF CST 4
         Inert Ingredients).  Human
         Health Risk Assessment to
         Support Proposed Exemption
         from the Requirement of a
         Tolerance When Used as Inert
         Ingredients in Pesticide
         Formulations"

Ex. 14   Document Titled "Studies on         241
         glysophate-induced
         carcinogenicity in mouse
         skin:  A proteomic approach"

Ex. 15   IARC Monograph on Glyphosate        249

---

**Page 8**

E X H I B I T S

PAGE

Ex. 16   Document Titled "Glyphosate         253
         Skin Binding, Absorption,
         Residual Tissue Distribution,
         and Skin Decontamination"

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC    Document 8572-19    Filed 12/27/19    Page 5 of 125
CONFIDENTIAL

Transcript of William Sawyer, Ph.D.                    3 (9 to 12)
Conducted on August 23, 2018

### 9

1  P R O C E E D I N G S
2      THE VIDEOGRAPHER:  Here begins
3  Media Number 1 in the video-recorded
4  deposition of William Sawyer, Ph.D., in
5  the matter of Peterson and Hall versus
6  Monsanto Company, et al., in the
7  Circuit Court of the City of St. Louis,
8  the State of Missouri, Case
9  Number 1622-CC01071.
10     Today's date is August 23rd of
11 2018.  The time on the video monitor is
12 9:16.  The videographer today is Don
13 Breuwet, representing Planet Depos.
14 This video deposition is taking place
15 at 17260 Harbour Pointe Drive, Fort
16 Myers, Florida.
17     Will counsel please identify
18 yourselves and state whom you
19 represent.
20     MR. KALAS:  John Kalas on behalf
21 of Monsanto Company.
22     MR. ALTIERI:  Joe Altieri on
23 behalf of Monsanto Company.
24     MS. HOEKEL:  Jennifer Hoekel on
25 behalf of the Osborn & Barr defendants.

### 0

1      MR. SELDOMRIDGE:  Jeff
2  Seldomridge on behalf of Plaintiff Jeff
3  Hall.
4      THE VIDEOGRAPHER:  The court
5  reporter today is Rhonda Breuwet,
6  representing Planet Depos.  Would the
7  court reporter please swear in the
8  witness.
9      THE REPORTER:  Raise your right
10 hand, please.
11     Do you solemnly swear the
12 testimony you are about to give will be
13 the truth, the whole truth, and nothing
14 but the truth?
15     THE WITNESS:  I do.
16     MR. KALAS:  Good morning,
17 Dr. Sawyer.
18     THE WITNESS:  Good morning.
19     MR. KALAS:  I just have a few
20 statements I want to put on the record
21 before we get going.  First of all, I'd
22 like to designate this deposition as
23 confidential pursuant to the applicable
24 pretrial orders in both -- in the
25 Missouri and city cases, St. Louis city

### (page 11)

1  cases.
2      I'd also like to note that we
3  requested two days of deposition time
4  with Dr. Sawyer.  We were told he would
5  be made available for one day of
6  deposition.  As everybody knows,
7  depositions in Missouri are untimed,
8  and we will do our best to ask the
9  questions we need to ask within this
10 one day, but we reserve our right to
11 seek all appropriate relief on that
12 issue.
13     (Exhibit Number 1, Defendant Monsanto
14     Company's Second Amended Notice of
15     Videotaped Deposition of William Sawyer,
16     Ph.D., was marked for identification.)
17     WILLIAM SAWYER, Ph.D.
18     acknowledged having been duly sworn to
19 tell the truth and testified upon his oath as follows:
20     DIRECT EXAMINATION
21 BY MR. KALAS:
22     Q.   Okay.  Now, I marked as Exhibit 1 your
23 amended -- or second amended notice of deposition
24 today, Dr. Sawyer.  Have you seen this document
25 before?

### 2

1      A.   Yes.
2      Q.   Okay.  And did you review the document
3  requests in this document prior to today?
4      A.   I did, all I think 26 items.
5      Q.   Okay.  I believe there's 23, but --
6      A.   Okay.  Thank you.
7      Q.   Yep.  And did you conduct a search for the
8  documents that we requested in this?
9      A.   Some, yes.  Some, no.
10     Q.   Okay.  Can you tell me -- if we can go to
11 pages 4 through 6, can you tell me which document
12 requests you did not conduct searches for.
13     A.   (Reviewing document.)
14     Items 8, 9, 13, 14, and 17.
15     Q.   Okay.  And start with Item 8.
16     Item 8 requested "All transcripts of any
17 depositions or trial testimony by Dr. Sawyer as an
18 expert witness within the last five years that
19 Dr. Sawyer has in his possession."
20     Did I read that correctly?
21     A.   Yes.
22     Q.   And why did you not conduct a search for
23 Request Number 8?
24     A.   Jen in my office has a shredding disposal
25 service which we use for cases that have been

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

4 (13 to 16)

---

**3**

1 adjudicated by settlement, mediation, arbitration, or
2 trial, and the documents I have on current cases would
3 rediscose confidential medical records, psychiatric
4 records, etc., and also breach the confidentiality
5 agreements I've gone into and signed on such cases,
6 and I think it would be unethical for me to just hand
7 those out.
8     Q.   Can you give me a sense of how many
9 deposition transcripts you currently have in your
10 possession that you believe are confidential?
11     A.   Not really.  It would be a wild guess.
12     Q.   Well, how many cases are currently open
13 that you're working on right now?
14     A.   I don't know.  I mean, I have cases that
15 just started in the past six months or year.  I have
16 some other cases I consider antique, they're so --
17 they've just been idle for so many years.  I don't
18 know.
19     Q.   Well, you just expressed that for the idle
20 cases or the closed cases --
21     A.   No.
22     Q.   -- if I understand correctly, you shred
23 those files.  So --
24     A.   No, I didn't say idle cases.
25     Q.   Okay.  So idle cases that are still open,

**4**

1 you still have those files?
2     A.   Certainly.
3     Q.   Okay.  And you can't estimate -- would you
4 say it's more than ten cases?
5     A.   Yes.
6     Q.   Would you say it's more than 20?
7     A.   Possibly.  I just don't know.
8     Q.   Okay.  What I would request while we --
9 well, let me ask you this:  Would you be willing to
10 produce those transcripts redacted, with confidential
11 information removed?
12     A.   No.  That could take numerous hours,
13 numerous hours, and I would still need to get
14 authority to do such.  I can't rediscose those
15 documents.
16     Q.   Were all those deposition you gave
17 designated as confidential by a court?
18     A.   No, but certainly by the client.
19     Q.   Okay.
20     A.   And certainly by HIPAA.
21     Q.   All right.  You are aware, of course, that
22 the deposition you gave in this case, for instance,
23 has been posted to the Internet?
24     A.   I'm not aware of that.
25     Q.   Okay.  I would ask that you hold on to

**5**

1 those transcripts and do not shred any more while we
2 work this out.
3         If you can go to -- well, let me ask, will
4 you agree not to do that?
5     A.   No.
6     Q.   Okay.  If we can go to Number 9, "Any
7 signed reports, declarations, or affidavits by
8 Dr. Sawyer as an expert witness within the last five
9 years that Dr. Sawyer has in his possession."
10         Why did you not look for those?
11         MR. SELDOMRIDGE:  Objection to
12 the extent of privilege.  We also have
13 a privilege agreement with Monsanto.
14     A.   Same answer, actually, as for Number 8,
15 with respect to not hanging on to completed cases, and
16 the current cases would rediscose medical records,
17 psychiatric records, laboratory test records,
18 confidentiality with my client, and, in many cases,
19 court-ordered confidentiality.
20 BY MR. KALAS:
21     Q.   Okay.  And would you agree not to shred
22 any reports, declarations, or affidavits responsive to
23 Number 9?
24     A.   No.  If I find or Jen Clark finds the
25 file's closed, it's gone.

**6**

1     Q.   How about electronic copies?  Do you get
2 electronic copies of deposition transcripts?
3     A.   I do, but I don't keep them once the
4 file's over.
5     Q.   What do you do with them?
6     A.   I erase them.
7     Q.   Do you personally erase them or does Jen
8 Clark?
9     A.   I do and Jen does.
10     Q.   Would you agree not to delete electronic
11 copies of any documents responsive to Number 8 or
12 Number 9 while we work this out?
13     A.   No.
14     Q.   If we go to Number 13, why did you choose
15 not to look for documents responsive to that request?
16         MR. SELDOMRIDGE:  Same objection.
17     A.   Same answer except it also becomes next to
18 impossible.  I don't have any good way to do that,
19 actually.
20 BY MR. KALAS:
21     Q.   Do you have records where you invoice to
22 the various law firms or other groups that you've
23 worked with as a consultant?
24     A.   I don't know.  I'd have to check with the
25 CPA.

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

5 (17 to 20)

Conducted on August 23, 2018

**7**

1    Q.   And the CPA might as well -- might also
2    have a -- an open account spreadsheet or something
3    like that of Miller Firm here and XYZ firm here of all
4    the groups you're working with?
5    **A.   Probably not because the way our CPA, over**
6    **the last 20 -- 28 years, handles things is we provide**
7    **a list of cases that are by state for tax purposes.**
8    **For example, if it's a New York state case, we pay**
9    **7 percent tax on it, income tax.**
10   **So I don't know that she would really have**
11   **much other than some financial records back to a**
12   **certain point in time, which whatever CPAs keep their**
13   **records for, I don't know if it's five years or seven**
14   **years or whatever.**
15   Q.   But you didn't ask her about that?
16   **A.   No.**
17   Q.   Will you ask her about that following this
18   deposition?
19   **A.   No.  That would be an expensive**
20   **undertaking.  I'm not willing to do it.**
21   Q.   Number 14, why did you choose not to look
22   for any documents responsive to Request 14?
23   MR. SELDOMRIDGE:  Same objection.
24   Argumentative.
25   **A.   I simply don't have any such equipment.**

**8**

1    BY MR. KALAS:
2    Q.   Okay.  So in the case of Number 14, you
3    actually did, in your mind, look for it.  You just
4    know that you don't have anything responsive to Number
5    14?
6    **A.   That's correct.**
7    Q.   Okay.
8    **A.   And the Hall case, I've made no such**
9    **studies whatsoever or even thought about it.**
10   Q.   Okay.  That's fine.  So 14, in fact, I
11   think we could mark as something you did look for.
12   How about 17?  Did you conduct -- you said
13   you didn't conduct a search for Request 17.  Why did
14   you not?
15   **A.   Because in my draft notes and in my entire**
16   **file, in my entire thought process, I have no**
17   **intention of offering any direct testimony regarding**
18   **to the development of any such equipment.**
19   Q.   Okay.  It is true, sir, that you, in your
20   possession, have a device that you have modified for
21   applying Roundup, right?
22   **A.   Yes, for my own home use, that's correct.**
23   Q.   And that device would be responsive to
24   Number 17, correct?
25   **A.   No, because it's irrelevant to this case.**

**9**

1    **I'm not bringing that thing into this case in direct**
2    **testimony.**
3    Q.   Do you recall testifying at the Johnson
4    trial that you applied Roundup personally, with zero
5    exposure?
6    MR. SELDOMRIDGE:  Objection.
7    Beyond the scope of this deposition.
8    We're not here to talk about the
9    Johnson trial.
10   **A.   Yeah, I've been advised not to speak about**
11   **the Johnson trial.**
12   BY MR. KALAS:
13   Q.   Okay, sir.  It is prior testimony, and I
14   am completely within my rights to ask about it.  So
15   I'll ask the question again.
16   Do you recall testifying at the Johnson
17   trial that you applied Roundup personally, with zero
18   exposure?  Do you recall that testimony?
19   MR. SELDOMRIDGE:  Same objection.
20   You can answer.
21   **A.   Yes.**
22   BY MR. KALAS:
23   Q.   Okay.  And you believe that you had zero
24   exposure because of a device that you -- that you
25   modified that -- well, you put it in your own words.

**20**

1    Why do you believe you have zero exposure
2    when you apply Roundup?
3    MR. SELDOMRIDGE:  Objection.
4    Calls for a narrative.
5    **A.   First of all, I have the right to patent**
6    **that device, and I find this way beyond the scope of**
7    **the deposition.  I developed that, as you know from my**
8    **testimony at Johnson, because my first experience with**
9    **the tank sprayer many, many years ago created drift.**
10   **So I modified the spray nozzle, the orifice, to squirt**
11   **more like a squirt gun and direct itself to wheeze**
12   **instead of producing a drifting aerosol.**
13   BY MR. KALAS:
14   Q.   Okay.  So this modified device that you
15   believe creates zero exposure, you still have it in
16   your possession, correct?
17   **A.   Yes.**
18   Q.   I would ask that you not destroy that
19   device.  I would ask that you keep it in the same
20   condition you have it while we work this out.  Are you
21   willing to do that?
22   **A.   I would have to discuss this with counsel.**
23   Q.   Okay.  So sitting here right now, you
24   can't say that you're willing to not modify a device
25   that you have used in an unchanged manner, if I

CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

6 (21 to 24)

---

**Page 2**

1  understand correctly, for 20 years?
2  **A. I'm not -- well, first of all, your**
3  **question -- your question is twofold. You're asking**
4  **me -- you're implying in your question that I have not**
5  **made any further modifications in 20 years.**
6  Q. Well, have you?
7  **A. Yes.**
8  Q. Tell me about the modifications you've
9  made in those 20 years.
10  **A. I think I've gone through probably at**
11  **least two wands.**
12  Q. When's the last time you made
13  modifications to a wand?
14  **A. That's a good question. I know I did when**
15  **we still had our home in New York state, which we sold**
16  **in 2012, I believe. And here in Florida, I think I**
17  **also replaced the wand, I'm pretty sure, because I**
18  **bought a new tank sprayer several years ago. But I --**
19  **I can't put an exact date on it.**
20  Q. Have you modified the wand since you've
21  been working on Roundup cases with the Miller Firm?
22  **A. No.**
23  Q. Okay. So since you haven't modified it in
24  the time since you started working on these cases, I'd
25  ask you to keep it in the same condition while we work

---

**Page 22**

1  out whether or not you will voluntarily produce it to
2  us for inspection.
3      Will you please do that?
4  **A. Again, I can't answer that until I speak**
5  **with counsel about that, in terms of giving you a yes**
6  **or no.**
7  Q. Okay. Okay. Now, beyond those requests,
8  you also have brought some documents that are
9  responsive to the rest of these requests, right?
10  **A. Yes.**
11  Q. Okay. And where are those documents, sir?
12  **A. Well, some are in the folder in front of**
13  **me, and some are within my box of studies and so**
14  **forth.**
15  Q. Okay. And the box of studies, I note, has
16  an exhibit sticker on it still. Is that the same box
17  that you brought to the Johnson case?
18  **A. It is. However, specific medical records**
19  **and items referring to Mr. Johnson have been removed.**
20  Q. Okay. And have medical records and items
21  referring to Mr. Hall been inserted?
22  **A. Yes.**
23      MR. KALAS: Okay. I'd like to
24  mark that box as Exhibit 2.
25      (Exhibit Number 2, Box of Records, was

---

**Page 23**

1      marked for identification.)
2  BY MR. KALAS:
3      Q. Now, since the box has been modified,
4  we're going to need to make a copy of that again, sir.
5  Were you comfortable with how we handled it last time
6  where we shipped it out and shipped it back?
7  **A. Yes. I was actually quite impressed.**
8      Q. So we're going to do that again, if that's
9  okay with you.
10  **A. Yes.**
11      Q. Okay. And then in addition to what's in
12  the box, you said you brought some additional records
13  here in the folder in front of you?
14  **A. Yes.**
15      Q. Okay. What's -- what's in there?
16  **A. Well, there's the Jeff Hall Supplemental**
17  **Response to Defendant Monsanto's PFS Question 7.**
18      Q. Okay.
19  **A. There's a draft -- well, I don't know if**
20  **it's a draft. It had simply communications from the**
21  **Miller Firm, including my draft expert disclosure.**
22      Q. Okay.
23      MR. KALAS: I don't know if you
24  guys consider that privileged, but --
25      MR. SELDOMRIDGE: Actually, I

---

**Page 24**

1      would like to have a look at that.
2      MR. KALAS: Yeah.
3      MR. SELDOMRIDGE: Thank you.
4  BY MR. KALAS:
5      Q. What else is in there?
6  **A. Jeff Hall's Response to Defendant Monsanto**
7  **Company's First Set of Interrogatories.**
8      Q. Okay.
9  **A. And then a Monsanto document,**
10  **MONGLY00288103.**
11      Q. Okay.
12  **A. And document with a title "Addendum to PFS**
13  **Prior Addresses for the Past 25 Years of Mr. Hall."**
14      Q. Okay.
15      MR. KALAS: Jeff, are you
16  withholding that correspondence?
17      MR. SELDOMRIDGE: Yes. I do
18  consider this to be privileged.
19      MR. KALAS:
20  **A. And then a photograph from my review of**
21  **two CDs, and it's just a single photograph. It's not**
22  **intended to be representative of the bulk of the**
23  **photographs, but it is simply one that I thought was**
24  **interesting and decided to print.**
25  ///

---

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

7 (25 to 28)

Conducted on August 23, 2018

---

**Page 25**

BY MR. KALAS:

Q.   Okay.

A.   And these CDs I'm holding are two CDs from Jeff Hall which depict properties that he worked on during his tenure of service as a landscaper.

MR. KALAS:   Jeff, have those been produced before?

MR. SELDOMRIDGE:   And I will relate to counsel that we received these yesterday, and I brought them with me down to Florida.

MR. KALAS:   I think -- can we mark those CDs as Exhibit 3, please, separately.

(Exhibit Number 3, CD-ROMs, was marked for identification.)

BY MR. KALAS:

Q.   Just to move this along, it may be quicker, Dr. Sawyer, if I ask you just a few specific questions about what's in there, and then I'll look at it on a break. And I'll mark that folder that you brought as Exhibit 4, please, if you don't mind.

Q.   Did you bring billing records, sir?

A.   Yes.

Q.   Okay.

---

**Page 26**

A.   Where would you like the sticker?

Q.   Outside's fine.

A.   Top?

Q.   Yeah. That's fine.

(Exhibit Number 4, Various Documents, was marked for identification.)

BY MR. KALAS:

Q.   How much have you invoiced on this case since you started working on it? And by "this case," I mean the Peterson-Hall case.

A.   10,685.66.

Q.   Okay. And when was the last invoice sent?

A.   August 14th, 2018.

Q.   Okay. So you haven't really billed much more beyond the 11,000 or so dollars, correct?

A.   Additional preparation time for today's deposition.

Q.   And how many hours would you estimate you spent preparing for today's deposition?

A.   I'm sorry. It's not going to be a real dead accurate number, but approximately 20 hours.

Q.   Okay. So 20 hours in addition to what you've invoiced thus far?

A.   Yes.

Q.   Okay. And in addition to this case, when

---

**Page 27**

I deposed -- or when I was at your deposition last in February, you had billed approximately $143,000 on glyphosate litigation as a whole.

Q.   Do you remember that?

A.   Yes.

Q.   Okay. How much would you say you billed subsequent to that on the Johnson trial, in preparation for it?

A.   Well, the trial fee was $4,600. And with respect to preparation time, I have no idea. I just don't remember.

Q.   Would you say you spent more than ten hours preparing for that trial?

Q.   Would you say you spent more than 20 hours preparing for that trial?

A.   Just don't recall.

Q.   Did you bill for your travel time to California?

A.   At a reduced rate.

Q.   What rate was that, sir?

A.   I think it was either 50 or 75 percent.

Q.   Okay. And did you invoice for your plane ticket to California?

A.   Yes.

---

**Page 28**

Q.   And what class of fare did you fly to California?

A.   I charged the firm for economy class.

Q.   Okay.

A.   Although I was upgraded because I fly so much.

Q.   I think everybody in this room probably has that.

Q.   And did you invoice for your hotel stay in California?

A.   No.

Q.   Okay.

A.   I did not. That was paid for by the firm.

Q.   Okay. So you don't know how much that hotel cost?

A.   Expensive.

Q.   Okay. San Francisco?

A.   Yeah.

Q.   What was the name of the hotel? Do you remember?

A.   Well, the first night was a hotel about 10 miles out of San Francisco that was built in the 1950s and still had the original neon sign on it with outdoor corridors.

Q.   Okay. So a motel more?

Transcript of William Sawyer, Ph.D.

8 (29 to 32)

Conducted on August 23, 2018

---

**29**

1    A.   Yeah.  Yeah.  And even that was expensive.
2    Q.   All right.  And then after the first
3    night, you moved?
4    A.   Yes.  There had been a convention at that
5    time and everything downtown had been filled, so they
6    moved it downtown for the -- the second night.  But
7    very expensive.  I don't know the figures, but --
8    Q.   Okay.
9    A.   -- high.
10        MR. KALAS:  I'm going to mark as
11   Exhibit 5 a document called "Jeff Scott
12   Hall:  Toxicological Notes," and it's
13   dated May 31, 2018.
14        (Exhibit Number 5, Document Titled "Jeff
15        Scott Hall:  Toxicological Notes," dated
16        5/31/18, was marked for identification.)
17        MR. SELDOMRIDGE:  Is it -- sorry.
18        MR. KALAS:  Yep.  And then I'm
19   going to mark as Exhibit 6 a document
20   that was provided to us this morning
21   called "Jeff Scott Hall:  Toxicological
22   Notes," and that's dated August 22,
23   2018.
24        (Exhibit Number 6, Document Titled "Jeff
25        Scott Hall:  Toxicological Notes," dated

---

**30**

1        8/22/18, was marked for identification.)
2    BY MR. KALAS:
3    Q.   And if I understand correctly, you have
4    your own copy with you right now of Exhibit 6?
5    A.   I do.
6    Q.   Okay.  So since this is the only other
7    paper copy, I'm going to hold on to the exhibit copy
8    since you have one.
9    A.   That's fine.
10   Q.   And I'll try to ask you questions off it.
11   My notes have page numbers from Exhibit 5, so we may
12   need to search around a little bit.
13   A.   All right.  Just for your benefit --
14   Q.   Yeah.
15   A.   -- in keeping you from being confused, I
16   know that you marked Exhibit 4, but there were more
17   documents in that folder you have not got to yet.
18   Q.   Right.  And I'm going to look at them on a
19   break so we don't spend all our time walking through.
20   A.   Okay.  I just didn't want you to think
21   that there was something more there that I was --
22   Q.   Nope.  Appreciate that.
23   A.   -- not letting you know about.
24   Q.   Nope.  I'll take a look at it on a break.
25        Now, Exhibits 5 and 6 are documents that

---

**3**

1    you prepared in reviewing Mr. Hall's case, correct?
2    A.   Yes.
3    Q.   Okay.  And you understand that this case
4    is in St. Louis, right?
5    A.   That's my understanding, yes.
6    Q.   And you intend to testify live at that
7    trial in St. Louis regarding Mr. Hall, if you're
8    allowed to, right?
9    A.   If asked.
10   Q.   Okay.  And you understand -- or do you
11   have any understanding of whether or not Missouri
12   rules require an expert report?
13   A.   My understanding is no.
14        MR. KALAS:  Okay.  So I'm going
15   to mark as Exhibit 7 an email that we
16   received from Mr. Travers that
17   Mr. Seldomridge was cc'd on.
18        (Exhibit Number 7, Email Chain Between
19        Jeffrey Travers and Gregory Chernack,
20        dated 8/15/18, was marked for
21        identification.)
22        MR. SELDOMRIDGE:  Thank you,
23   Counsel.
24        MR. KALAS:  Yep.
25   ///

---

**32**

1    BY MR. KALAS:
2    Q.   And what Mr. Travers states in this email
3    is that you won't be offering any substantive new
4    opinions that aren't expressed in your reports or
5    previously at trial or deposition.
6        Is that a correct statement?  Do you agree
7    with that?
8        MR. SELDOMRIDGE:  Objection.
9    Mischaracterizes the statement.
10   A.   Could you repeat the question, please?
11   BY MR. KALAS:
12   Q.   Sure.
13        What Mr. Travers states in this email, at
14   least on my reading, is -- and I'll read it into the
15   record.  He says, "I think there are only a few minor
16   additions to his reliance list, which I will get to
17   you tomorrow, and he won't be offering any substantive
18   new opinions that aren't expressed in his reports or
19   previously at trial or deposition."
20        Did I read that correctly?
21   A.   Yes.
22   Q.   And do you agree with that statement by
23   Mr. Travers, that you don't intend to offer any
24   substantive new opinions that haven't been expressed
25   in your reports or previously at trial or deposition?

Transcript of William Sawyer, Ph.D.

9 (33 to 36)

Conducted on August 23, 2018

---

**33**

1      A.   I would have to ask you just so I'm clear,
2  and it's to define more clearly what you are asking in
3  the question by the term "substantive new opinions."
4      Q.   Well, it was Mr. Travers' words, so let me
5  just ask you directly.  You've produced two reports in
6  this litigation, right?  One regarding Dewayne
7  Johnson, one regarding Jeff Scott Hall, right?
8      A.   Well, no.  Due to the slop house
9  compilation of those documents, I don't refer to them
10  as reports, but my notes.
11      Q.   Okay.  So Mr. Travers referred to them as
12  reports, and that's where the confusion is here.  So
13  do you have any substantive opinions -- and by
14  "substantive," I mean opinions regarding the science
15  in this litigation or the science regarding plaintiffs
16  in this litigation that are not contained in your
17  notes in the D. Johnson case for -- regarding Jeff
18  Scott Hall or that you haven't expressed at trial or
19  deposition.
20      MR. SELDOMRIDGE:  Objection.
21  Compound question.
22      MR. KALAS:  I can break it up if
23  you'd like me to.
24      A.   Well, the only thing -- I have to ask
25  about your question to be clear, how you're referring

---

**34**

1  to Exhibits 5 only or also Exhibit Number 6.
2  BY MR. KALAS:
3      Q.   Yeah, I have 6.  Sorry.
4      I'm referring to Exhibits 5 and 6 --
5      A.   Okay.
6      Q.   -- in addition to your report in the
7  Dewayne Johnson case and your testimony in the Dewayne
8  Johnson case.  So that collectively, do you have any
9  opinions that you're holding right now that you
10  haven't expressed in one of those places?
11      A.   I don't believe so.  I think the answer is
12  no.  But, however, I have not reviewed defendants'
13  reports, and it's possible that that could trigger
14  some additional research that could develop some type
15  of substantive -- substantial opinion that I'm not
16  aware of right now.
17      And the other thing that comes to mind is
18  I have some certain studies which are not contained
19  within Exhibit 5 or 6.  For example, some studies on
20  dermal absorption that are not referenced in these
21  reports but, based on those studies, actually result
22  in me having a substantial additional opinion.
23      Q.   Okay.
24      A.   So I can't -- I can't say that everything
25  in the universe is in Exhibit 5 and 6.

---

**35**

1      Q.   Okay.
2      A.   Because when we go through some of these
3  studies, you will learn of some additional opinions.
4      Q.   Okay.  I understand completely.
5      So I'll just note again for the record
6  that one of the reasons plaintiffs' counsel has put
7  forward for us having one day to depose you was that
8  all your opinions are in the report.
9      MR. KALAS:  That's our
10  understanding, at least, and Dr. Sawyer
11  has now noted that he has additional
12  opinions beyond the toxicological notes
13  which we are entitled to inquire about.
14      MR. SELDOMRIDGE:  Objection.
15  Mischaracterizes the email.
16  BY MR. KALAS:
17      Q.   So we'll look at that later.  Thank you,
18  Dr. Sawyer.
19      What prompted you to put together your
20  toxicological notes on Mr. Hall?
21      A.   Simply that it would be unreasonable and
22  nearly impossible to remember everything I have
23  included in this 156-page document.  And I think it
24  also facilitates and helps the process proceed in a
25  more orderly, efficient manner.

---

**36**

1      Q.   Okay.  And if you could, because there's
2  kind of different things in different places -- and I
3  don't mean that as a criticism, but could you
4  succinctly, or if not succinctly, at least give me the
5  overview of your opinions regarding surfactants that
6  you intend to offer in the Hall case?
7      MR. SELDOMRIDGE:  Objection.
8  Mischaracterizes the notes.
9      A.   (Reviewing document.)
10      Primarily that the surfactant POEA, which
11  is polyoxyethylene alkyl amine -- that's I think
12  P-O-L-Y-O-X-Y-E-T-H-Y-L-E-N-E, alkyl, A-L-K-Y-L
13  A-M-I-N-E -- is a chemical used in Monsanto's super
14  concentrate Roundup to which plaintiff used in his
15  work, and that the surfactant is used to facilitate
16  the penetration of the active ingredient of Roundup,
17  glyphosate, into the plant tissue.
18      However, this particular chemical is also
19  contaminated at trace levels with certain additional
20  carcinogens which individually at the levels present
21  are insufficient to likely produce a significant
22  cancer risk.  However, in total, they are additive to
23  the carcinogenicity of the primary product glyphosate.
24      THE REPORTER:  I'm sorry.  The
25  primary --

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

10 (37 to 40)

---

37

1    A.   Primary product, which is glyphosate.
2         And I will probably need to discuss with
3  the jury some of the basic toxicological principles of
4  percutaneous absorption and how this chemical
5  increases and enhances it in animals and humans, as
6  well as the fact that this chemical has been -- on a
7  worldwide basis been recognized as very dangerous and
8  has actually been banned in various countries, the
9  European Union, etc.
10 BY MR. KALAS:
11    Q.   By "this chemical," you mean POEA?
12    A.   Yeah, the various POEAs.  There's tallow
13 amine and other different forms of the POEA that are
14 used in Roundup and as well as additional co-form --
15 co-formulants such as cocoamine and other supplements
16 to the product.
17    Q.   I don't want to cut you off.  Are you done
18 or --
19    A.   Well, I would probably need to explain to
20 the jury some of the studies in Monsanto studies in
21 which glyphosate itself was used in dermal absorption
22 studies versus glyphosate along with the surfactants
23 which showed increased absorption.
24    Q.   Okay.  So if I understand you correctly,
25 if we were kind of putting these opinions regarding

---

38

1  surfactants into buckets, there's two main buckets,
2  one of which is you believe that surfactants have
3  carcinogenic impurities and that when combined with
4  glyphosate increase the carcinogenic effect of
5  glyphosate?
6         MR. SELDOMRIDGE:  Objection.
7  Mischaracterizes.
8    A.   Yes.  Under the US EPA methodology for
9  assessment of carcinogens, those carcinogens are
10 additive, and -- but I'm being very cautious to note
11 that -- and I will certainly directly tell the jury
12 that these co-contaminants such as ethylene oxide and
13 others are in trace level and -- but the sum of the
14 various carcinogens plus glyphosate have to be treated
15 in an additive manner as per generally accepted
16 methodology.
17 BY MR. KALAS:
18    Q.   I understand.
19         And then the second bucket, if I
20 understand correctly, is that the presence of
21 surfactants in Roundup formulations enhance the
22 percutaneous absorption of glyphosate?
23         MR. SELDOMRIDGE:  Same objection.
24    A.   Yes.  And I probably will also need to
25 check the formulation sheet on the super concentrate,

---

39

1  but I -- as I recall, I think there might be a
2  humectant in there as well, which according to
3  Monsanto, MONGLY06653096, quote, certain co-formulants
4  like humectants, it is highly likely we will get large
5  amounts of penetration of the skin.
6    Q.   Okay.
7    A.   And the basis of Monsanto's own admission
8  with respect to the nature of humectants and how they
9  work.
10    Q.   What page are you looking at there, sir?
11    A.   I'm looking at page 65 of Exhibit 6.
12    Q.   Okay.  Okay.  Now, I just want to kind of
13 cover some housekeeping here before we take our first
14 break.
15         Have you undergone any formal continuing
16 education relevant to this case since your deposition
17 in February?
18    A.   No.
19    Q.   So there aren't any areas where you felt
20 that you didn't have expertise in February that you've
21 now gained expertise in relevant to this case?
22    A.   No.
23    Q.   Okay.  Am I correct you've never been
24 asked to be part of a US EPA advisory board?
25    A.   Correct.

---

40

1    Q.   Am I correct that you never served on a
2  US EPA advisory board?
3    A.   Correct.
4    Q.   Outside of litigation, can you tell me
5  about any times you've opined on violations of EPA
6  regulations?
7         MR. SELDOMRIDGE:  Objection.
8  Vague.
9    A.   Well, when I worked for the government as
10 a toxicologist from 1988 to 1993, I testified at a
11 hearing on the spraying of the Cicero Swamp with an
12 organophosphate due to the threat of EEE virus, equine
13 encephalitis, and there was some controversy in that
14 hearing in which I testified regarding EPA's licensing
15 of certain products for aerial spraying versus what
16 chemical our health department proposed.  But that was
17 a good 20 -- I don't know, 25 or 28 years ago.  I
18 don't remember the details.
19 BY MR. KALAS:
20    Q.   Okay.
21    A.   But other than that, probably not.
22    Q.   Okay.  And just so I understand -- and I
23 understand it was a long time ago -- did you testify
24 or did you opine when working for I believe the
25 New York State government, correct?

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 13 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.                    11 (41 to 44)
Conducted on August 23, 2018

4

1    A.   Onandaga County Health Department, which
2  is a division of the New York State Health Department.
3    Q.   Did you opine or testify to anyone, when
4  you were looking at this spraying of an
5  organophosphate, the EPA had violated their own
6  regulations in approving that product?
7        MR. SELDOMRIDGE:  Objection.
8        Vague.
9    A.   It's possible.  I just don't recall the
10 specifics.  The concern were -- at that point was
11 impact -- direct impact with population.
12 BY MR. KALAS:
13   Q.   Okay.  Have you ever been asked by the EPA
14 to interpret their regulations for them?
15   A.   No.
16   Q.   Okay.  Have you ever been asked by EPA to
17 enforce their regulations for them?
18   A.   Well, in the health department, I
19 certainly did use EPA regulations and prepared reports
20 and recommendations for enforcement, one which
21 resulted in one of the most expensive cleanups in US
22 history, which was that of AlliedSignal's, which was
23 purchased by --
24   Q.   Honeywell?
25   A.   -- Honeywell, yes, and the massive cleanup

42

1  of Onandaga Lake and the waste beds -- the entire beds
2  created by, initially, AlliedSignal.
3    Q.   Well, my question was a little different,
4  which is not whether you used EPA regulations when
5  working at the health department but whether anyone at
6  EPA ever asked you to enforce their regulations for
7  them.
8    A.   Well, no.  That would require an officer,
9  you know, an enforcement division department work.
10 That's -- that was not -- I was -- I served as a
11 toxicologist, not an enforcement personnel.
12   Q.   Okay.  Have you ever been asked by EPA to
13 advise on modifying their regulations?
14   A.   No.
15   Q.   Okay.  Have you ever been asked by EPA to
16 advise on drafting their regulations?
17   A.   No.
18   Q.   Are you an ethicist?
19   A.   No.
20   Q.   Have you ever published a paper on
21 business ethics?
22   A.   No.
23   Q.   Have you ever worked as a professor
24 instructing students on regulatory compliance?
25   A.   Well, I've taught as an adjunct professor

43

1  two classes to medical students.  I don't think I
2  specifically -- I mean, you know, I did teach to some
3  extent on regulatory aspects of certain chemicals.
4        Could you repeat the question so I could
5  ask --
6    Q.   Sure, and I'll ask it a little more
7  narrow, now that you gave that answer.
8        When you were working as an adjunct
9  professor, did you ever instruct students on complying
10 with EPA regulations?
11   A.   Only in -- only in the aspect of
12 protective gear, PPE.
13   Q.   Okay.  And that's more OSHA or is that
14 more EPA?
15   A.   I would say more OSHA.
16   Q.   Okay.  Have you ever published a
17 peer-reviewed article on the alleged toxic effects of
18 inert ingredients in herbicides?
19   A.   No.
20   Q.   Have you ever studied the alleged toxic
21 effects of inert ingredients in herbicides prior to
22 working on the Roundup lawsuits?
23   A.   Yes.  Heavily, and I had to make decisions
24 for the health department with respect to the
25 truck-mounted sprayers for mosquitos.  Again,

44

1  primarily in the Cicero Swamp area with respect to
2  solvents, because at that time in the late 1980s,
3  early 1990s, some of the synthetic pyrethroid
4  insecticides that were being used were actually -- the
5  solvent was actually more dangerous than the
6  pesticide, and that was because of the use at that
7  time of hydrocarbon mixtures, including hexane and
8  toluene and other potentially neurotoxic agents.
9        And there's been other instances.  When I
10 was in the health department, I had to evaluate
11 carriers -- solvent carriers for use indoors, as well
12 as outdoors, including an incident which impacted the
13 Syracuse Symphony Orchestra in the civic center, in my
14 first year on the job, which sent people to the ER,
15 and determining what happened because the blood
16 cholinesterase levels were checking out normal, and
17 yet these -- which is a sign of organophosphate
18 poisoning, and yet these people are -- were
19 symptomatic, and it turned out to be potentially
20 caused by the carrier rather than the actual
21 organophosphate pesticide.  There's been other
22 examples as well.  It's not -- it's not a uncommon
23 problem.
24   Q.   Have you ever published a peer-reviewed
25 article on the dermal absorption of an herbicide?

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

12 (45 to 48)

Conducted on August 23, 2018

---

**45**

1    A.  No.

2    Q.  Have you ever published a peer-reviewed
3 article on the absorbed dose of an herbicide in an
4 occupational setting?

5    **A.  Published a paper on that?**

6    Q.  Peer-reviewed.

7    A.  No.

8    Q.  Have you ever published a peer-reviewed
9 article on the metabolism of an absorbed pesticide?

10    A.  No.

11    Q.  Have you ever published a peer-reviewed
12 article on the distribution in the human body of an
13 absorbed pesticide?

14    **A.  No.  But I've published original work on**
15 **the absorption/distribution of drugs, pharmaceuticals,**
16 **and drugs of abuse on a human body but not -- animal**
17 **model and human body but not pesticides, per se.**

18    MR. KALAS:  Move to strike
19    everything after "no" as nonresponsive.

20 BY MR. KALAS:

21    Q.  Have you ever published a peer-reviewed
22 article on the excretion of an absorbed pesticide?

23    **A.  No.  I certainly have for various**
24 **pharmaceuticals.**

25    Q.  Have you ever designed an in vitro dermal

**46**

1 absorption study?

2    **A.  No.**

3    Q.  Have you ever conducted an in vitro dermal
4 absorption study?

5    **A.  No.**

6    Q.  Have you ever designed an in vivo dermal
7 absorption study?

8    **A.  No.**

9    Q.  Have you ever conducted an in vivo dermal
10 absorption study?

11    **A.  No.**

12    Q.  Have you ever designed a human
13 biomonitoring study of pesticide exposure?

14    **A.  No, but I have for PCBs when I was with**
15 **the health department, and actually conducted studies**
16 **on nearly 100 volunteer and professional firefighters**
17 **with respect to a known dermal absorption exposure to**
18 **PCBs in their practice fire tower, which a friendly**
19 **corporation had donated PCB oil for them to burn and**
20 **practice with.**

21    MR. KALAS:  Okay.  Move to strike
22    everything after "no."

23 BY MR. KALAS:

24    Q.  I'm just going to note for the record that
25 normally in an untimed deposition I would move to

**47**

1 strike and move on, but if plaintiffs' counsel are
2 refusing to put you up for a second day, I'd ask you
3 to answer the question I asked and not talk about PCBs
4 when that's not at any issue in this case.

5    MR. SELDOMRIDGE:  Objection.  The
6    witness can answer as he will.

7 BY MR. KALAS:

8    Q.  Have you ever conducted a human
9 biomonitoring study of pesticides?

10    **A.  No, but I have for PCBs involving over 100**
11 **firefighters in the mechanism, whether it be PCB,**
12 **polychlorobiphenyl, which is a pesticide, by the way.**
13 **It's under -- falls under the category of pesticide.**
14 **Doesn't really matter whether it's a drug or a**
15 **pesticide.  The toxicological studies and the**
16 **mechanism and so forth of in vivo dermal absorption**
17 **and biomonitoring is similar.**

18    Q.  Have you ever published a peer-reviewed
19 paper on GMOs?

20    **A.  No.**

21    Q.  Have you ever published a peer-reviewed
22 paper -- strike that.

23    Are you an expert on the gut microbiome?

24    **A.  No.**

25    Q.  Okay.  A few questions, and then we can

**48**

1 take a break.

2    One of the things we talked about, about
3 15 minutes ago, is that you haven't undergone any
4 continuing education to I guess give you any new areas
5 of expertise.  So I just want to make sure, because
6 expert reports aren't required in Missouri, that we're
7 on the same page regarding the sort of scope of your
8 opinion.

9    In your toxicological notes, you state
10 that you will be deferring on detailed epidemiological
11 opinions in this matter, right?

12    **A.  Yes.**

13    Q.  Okay.  Is the scope of your testimony
14 regarding the epidemiology on glyphosate-based
15 herbicides going to be the same as what you offered in
16 the D. Johnson case?

17    **A.  Yes, except there is one particular study.**
18 **If it is peer-reviewed, then I may use that study in**
19 **addition to what I have in calculating lifetime days**
20 **of exposure amongst glyphosate applicators for**
21 **comparison to that of Mr. Hall's 218 lifetime days of**
22 **glyphosate application.**

23    Q.  What study are you referring to, sir?

24    **A.  Andreotti 2018.**

25    Q.  That's the updated Agricultural Health

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

---

49

1  Study?
2  **A.  Yes.**
3  Q.  Okay.  I'm familiar with it.
4  **A.  No.  I'm sorry.  I gave the wrong study.**
5  Q.  Okay.
6  **A.  That one's already peer-reviewed.**
7  Q.  Uh-huh.  Yes.  So which study are you
8  referring to, sir?
9  **A.  I am referring to that study, by the way,**
10 **but that's not the one that is currently an abstract**
11 **only, and I need to pull it out of the file here, give**
12 **you the correct information.**
13 Q.  Sure.  Is it the North American Pooled
14 Project?
15 **A.  Yeah, the NAPP.**
16 Q.  Okay.  I know which study you're talking
17 about.
18 **A.  Okay.**
19 Q.  You don't need to find it.
20 Once again, you'd be using that study,
21 though, to calculate lifetime days and not to offer an
22 independent epidemiological opinion, correct?
23 **A.  I would only point out if asked, for**
24 **example, by defendants' counsel whether or not that**
25 **study shows any statistically significant increase in**

---

50

1  **NHL.  I would answer the question and point to the**
2  **statistics and say yes; it nearly triples the rate of**
3  **NHL at a statistically significant competence interval**
4  **at 95 percent.**
5  THE REPORTER:  I'm sorry.  At a
6  statistically --
7  THE WITNESS:  -- significant
8  competence interval of 95 percent.
9  BY MR. KALAS:
10 Q.  Okay.  So I remember we went around and
11 around about this last time, so I want to try to keep
12 this so we're on the same page.
13 You said if asked by defendants' counsel.
14 So my question is, do you intend to testify on direct
15 at trial regarding the epidemiological findings in the
16 NAPP or Andreotti or anything else other than the
17 lifetime-days point which you intend to make?
18 **A.  I don't know.  I actually haven't thought**
19 **that far ahead.  It seems to me it would be reasonable**
20 **for the jurors to know that the study that shows that**
21 **statistically significant rate with only an average of**
22 **two exposure days per year would be important.  I**
23 **guess I would have to talk with plaintiffs' counsel to**
24 **determine what the plan for direct examination is.  I**
25 **mean, I can't really -- I can't really decide that.**

---

5

1  **It's not my -- I don't think it's my duty.  I'm not an**
2  **attorney.**
3  Q.  Okay.  So --
4  **A.  There may be legal issues on that in terms**
5  **of the fact that I'm deferring to the epidemiologist**
6  **for the general causation aspects.  Whether my**
7  **bringing up that study would be a general causation**
8  **area that others are handling, I don't know.**
9  Q.  Okay.  So I'll note for the record that,
10 for what I consider the first time, Dr. Sawyer is
11 testifying that he may offer epidemiological opinions
12 and not defer to Dr. Portier, Neugut, and Ritz.  Let
13 me ask that question directly.
14 As to the interpretation of
15 epidemiological studies, do you intend to defer still
16 to Drs. Portier, Ritz, and Neugut regarding the
17 interpretation of those studies?
18 MR. SELDOMRIDGE:  Objection.
19 Misstates and mischaracterizes.
20 **A.  Not exactly, because I don't even know who**
21 **the epidemiological experts will be in this case.  I**
22 **don't know that Dr. Portier is -- I can't answer the**
23 **question.  I don't have the information at this time.**
24 BY MR. KALAS:
25 Q.  Okay.  So it's my -- so sitting here

---

52

1  today, you leave open the possibility that you may
2  testify regarding the findings of the epidemiological
3  studies on your direct examination, correct?
4  **A.  No.  No.  I only pointed out that one**
5  **study if it were peer-reviewed, which I don't think it**
6  **is at this point.  Only the abstract has been actually**
7  **published, and that is part of a symposia.**
8  Q.  So now I don't understand again.
9  So do you foreclose, sitting here today, the
10 possibility that you may testify regarding the
11 findings of epidemiological studies on your direct
12 examination?
13 **A.  I will not accept the possibility of that**
14 **single study.  If I rely on it, if it is**
15 **peer-reviewed, because it does address dose, which is**
16 **critical to my assessment in this case --**
17 Q.  As does the Andreotti study, correct?
18 **A.  Yes.  Yes.  Absolutely.**
19 Q.  So do you intend to testify about the
20 Andreotti study at trial on direct?
21 **A.  I would point out in that study that there**
22 **was a finding of the statistically significant rate**
23 **for T-cell lymphoma, but the authors did not include**
24 **that in their assessment because it included 18 cases,**
25 **and in their methodology they're required 20 cases to**

---

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

14 (53 to 56)

Conducted on August 23, 2018

53

1 trigger use of the data in their conclusions.
2     Q.   Okay.  Did Mr. Hall have T-cell lymphoma?
3     A.   No.
4     Q.   He has B-cell lymphoma, right?
5     A.   Yes.
6     Q.   Did the authors find an increased rate of
7 B-cell lymphoma in that study?
8     A.   No.
9     Q.   Another thing I think we understood was
10 that -- or we talked about last time was about cancer
11 slope factors.  Do you remember cancer -- talking
12 about cancer slope factors?
13     A.   Yes.
14     Q.   And I believe you stated that a cancer
15 slope factor cannot apply to a single individual for
16 causation.  Do you recall that testimony?
17         MR. SELDOMRIDGE:  Objection.
18 Misstates.  Mischaracterization.
19     A.   I don't recall that question.  Can you
20 read it back or --
21 BY MR. KALAS:
22     Q.   Well, I'm just asking if you recall.  If
23 you don't recall it, that's fine.
24     A.   Well, I recall discussing it, but I don't
25 remember the question in that particular arrangement.

54

1     Q.   Okay.  You state in your toxicological
2 notes, "Cancer slope factors apply to a community or
3 population, not to a single individual."
4         Correct?
5     A.   That's correct.
6     Q.   And you stand by that statement?
7     A.   Absolutely.
8     Q.   And you would not tell a jury that a
9 cancer slope factor applies to Mr. Hall?
10     A.   As an individual, no.
11     Q.   Okay.
12     A.   As to a group of applicators, yes.
13     Q.   Okay.  And so if I understand correctly,
14 you can't calculate a dose for a single individual and
15 then apply it to a slope factor for a group of
16 individuals to determine that single individual's
17 cancer risk?
18     A.   That's a very confusing question.
19     Q.   All right.  Let me break it down.
20         You won't be presenting data at trial to
21 the jury that opines that Mr. Hall individually was at
22 an increased risk of cancer of some amount from his
23 use of Roundup?
24     A.   No.  I will be providing an assessment of
25 his dose level.  The epidemiological experts are

55

1 handling the general causation with respect to the
2 human epidemiologic data.  Now, I could apply the dose
3 level that I've determined and compare that to the
4 human epidemiologic data which shows an increased rate
5 of malignancy, but I have no intention of using the
6 animal slope factor to specifically measure Mr. Hall's
7 lifetime cancer risk.
8     Q.   Okay.  That was my question.  So thank
9 you.
10         Do you intend to tell the jury about a
11 safer alternative design of Roundup or
12 glyphosate-based herbicides?
13         MR. SELDOMRIDGE:  Objection.
14 Compound question.
15     A.   I can answer that with respect to
16 surfactants, adjuvants, and humectants, yes, that
17 there certainly is potentiation of the penetration of
18 the carcinogen into the body through the use of these
19 other materials in the product.
20         Does that answer your question?
21 BY MR. KALAS:
22     Q.   No, because I'm asking about something
23 different, and I'm sorry if I wasn't clear.
24         Are you intending to come to trial and
25 tell the jury that there is another formulation of

56

1 glyphosate-based herbicides that is safer than the
2 formulation Monsanto sells?
3     A.   Well, I may point to some other Monsanto
4 formulations sold in Europe, for example, that are
5 safer.
6     Q.   Okay.  And have you done any -- can you
7 tell me -- let me back up a second.  Which
8 formulations would those be?
9     A.   Primarily the formulations that no longer
10 contain the polyoxylated ethyl alkyl amines.
11     Q.   And have you done any testing to determine
12 that the European formulations of glyphosate-based
13 herbicides sold by Monsanto are safer than the
14 US-based formulations?
15     A.   The blower came on and I didn't quite hear
16 everything.  I don't hear that well.
17     Q.   And I know I said we'd take a break.  Just
18 a few more minutes.  I'm almost through this.
19         Have you done any testing to determine
20 that the European formulations of glyphosate-based
21 herbicides sold by Monsanto are safer than the
22 US-based formulations?
23     A.   No.  It's simply my assessment of the fact
24 that POEA has been removed and Monsanto's own
25 admissions in the documents that this particular

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

15 (57 to 60)

57

1  formulation enhances dermal absorption.
2      Q.  Have you done any testing to determine
3  that the European formulations that you were referring
4  to are as effective as the US formulations in killing
5  the weeds that Jeff Hall was trying to kill?
6          MR. SELDOMRIDGE:  Objection.
7      Vague.
8      A.  No, I have not.
9  BY MR. KALAS:
10     Q.  Okay.  And what acute toxicity test are
11 you relying on -- well, strike that.  Let me back up.
12         What specific tests are you relying upon
13 conducted on the Monsanto Europe products to opine
14 that they are safer than the Monsanto US products
15 containing POEA?
16     A.  Simply the Monsanto documents that
17 indicate the POEA enhances dermal absorption thus
18 enhances dose.
19     Q.  Well, I guess my question's a little
20 different, which is you're opining, if I understand
21 correctly, that the European formulations without POEA
22 are somehow safer.  And my question is, where is
23 the -- which documents lay out that the European
24 formulations are safer, in your opinion, than the US
25 formulations?  You're telling me, if I understand

58

1  correctly, the US formulations enhance absorption, but
2  I'm asking you, what are you comparing that to?
3          MR. SELDOMRIDGE:  Objection.
4      Mischaracterizes.  Vague.
5      A.  Only the toxicological study data within
6  Monsanto documents performed by Monsanto or the
7  subcontractors with respect to POEA enhancing
8  absorption.  That's all.  There is no other test data
9  available evaluating the differential toxicity.
10 BY MR. KALAS:
11     Q.  Okay.  So if I understand, if we're
12 talking about the buckets we talked about earlier,
13 your opinion is solely based on absorption data and
14 not based on carcinogenicity data or genotoxicity
15 data, correct?
16     A.  Yes, and that's simply because Monsanto
17 has failed to perform analyses with the disclosure of
18 quantitative values of products containing different
19 POEAs versus products containing pure glyphosate only.
20 The carcinogenicity bioassays have not included
21 assessment of that differential.  That is products
22 with POEA versus the various animal studies that have
23 been conducted on the pure glyphosate only, that is
24 the glysophate [sic] isopropylamine primarily.
25     Q.  So you haven't reviewed, then, dermal

59

1  absorption studies conducted by Monsanto looking at
2  both Roundup containing POEA and other formulations
3  containing other surfactants?  You haven't seen any
4  data like that?
5      A.  I have.  There is one study Monsanto
6  published, it's in my file, it's in my report, that
7  Monsanto performed that showed that the additive
8  enhanced absorption.  In fact, I think I have
9  something in my report that specifically discusses the
10 concern that Monsanto had that it could potentially
11 interfere with their registration of the product.
12     Q.  Okay.  My question was slightly different,
13 and I think I didn't ask it well.
14         Have you seen studies and compared the
15 studies between percutaneous absorption of
16 formulations containing POEA versus percutaneous
17 absorption formulations containing another surfactant?
18     A.  When you say another, you mean an
19 alternative, a non-POEA?
20     Q.  Yes, sir.
21     A.  I don't believe so.
22     Q.  Okay.  And did you ask for that sort of
23 data from the Miller Firm, if it existed?
24     A.  I asked for all of the dermal absorption
25 data available, everything.

60

1      Q.  Okay.  And you haven't reviewed all 10
2  million pages produced in this litigation, obviously,
3  correct?
4      A.  Is there really ten --
5          MR. SELDOMRIDGE:  Objection.
6      Argumentative.
7      A.  Is there really 10 million?
8  BY MR. KALAS:
9      Q.  I think it's about that, yeah.
10     A.  No.  I -- I have not reviewed 10 million.
11 And if I had, I think my number of hours would be a
12 bit higher.
13     Q.  Probably true.
14         MR. SELDOMRIDGE:  Counsel, I hate
15 to interrupt you, but can we take that
16 break?  I think we've been going for
17 about an hour.
18         MR. KALAS:  Yeah.  One last
19 question, and we'll take a break.
20 BY MR. KALAS:
21     Q.  So you don't -- you concede that there is
22 a possibility that you have not seen every dermal
23 absorption study in the Monsanto database because
24 you're relying on somebody else to provide those?
25     A.  Yes, however, I've done my best.  You

Transcript of William Sawyer, Ph.D.

16 (61 to 64)

Conducted on August 23, 2018

---

6

1  know, and I will probably leave this deposition and
2  keep digging because I don't want to miss anything.
3      Q.   Fair enough.
4          MR. KALAS:  All right.  Let's
5      take a break.
6          THE VIDEOGRAPHER:  All right.
7      The time is 10:30.  We are off the
8      record.
9          (Break taken from 10:30 a.m. to
10         10:42 a.m.)
11         THE VIDEOGRAPHER:  The time is
12     10:42.  We are on the record.
13 BY MR. KALAS:
14     Q.   Doctor, a few more housekeeping matters.
15 Am I correct that at trial you only intend to offer
16 opinions regarding Mr. Hall's occupational exposure to
17 glyphosate-based herbicides?
18     A.   On direct testimony?
19     Q.   Yes, sir.
20     A.   Yes.
21     Q.   Am I correct that your opinion -- or let
22 me ask you this:  Do you have a specific causation
23 opinion in this case?
24     A.   Yes.
25     Q.   And what is that opinion, sir?

---

63

1      A.   I don't understand that question,
2  actually.
3      Q.   Okay.  Your opinion on specific causation
4  that Mr. Hall has non-Hodgkin's lymphoma, am I correct
5  that it is based on -- well, strike that.  Let me ask
6  it again.  I skipped a step.
7          Your opinion on specific causation that it
8  is more likely than not that glyphosate caused the
9  onset of Mr. Hall's B-cell non-Hodgkin's lymphoma, I'm
10 correct that that is based on Mr. Hall's occupational
11 exposure to glyphosate alone, correct?
12     **A.   Yes, as opposed to other potential**
13 **contributors,** ████████████████████████
14 ██████████████████████ **but are you**
15 **asking me -- I think you already asked me this, but**
16 **are you asking me whether I'm concluding additional**
17 **exposure from GMO dietary glyphosate?**
18     Q.   Specifically as to Mr. Hall.  I know you
19 said generally you weren't going to talk about it.
20 Specifically as to Mr. Hall, do you intend to talk
21 about dietary exposure to glyphosate on direct?
22     **A.   No.**
23     Q.   Okay.  Now, I know you provided a updated
24 set of toxicological notes this morning, and we'll go
25 through those at some point, but am I correct that you

---

62

1      **A.   That based upon my review**
2  ████████████████████████████████████████
3  ████████████████████████████████████
4  ████████████████████████████████
5  ████████████████████ **that it**
6  **is more likely than not that the glyphosate caused the**
7  **onset of his B-cell non-Hodgkin's lymphoma.**
8      Q.   Okay.  And that opinion was not in the
9  toxicological notes, right?
10     **A.   I don't think I included any summary**
11 **conclusion of opinions to that effect.**
12     Q.   Okay.
13         MR. KALAS:  I note again for the
14     record that this is another opinion
15     that Dr. Sawyer is expressing for the
16     first time outside of his toxicological
17     notes or report as it was characterized
18     by Mr. Travers.
19         MR. SELDOMRIDGE:  Objection to
20     the mischaracterization.
21 BY MR. KALAS:
22     Q.   Am I correct that that opinion that you
23 just expressed regarding specific causation is based
24 solely on Mr. Hall's occupational exposure to
25 glyphosate-based herbicides?

---

64

1  haven't calculated a retrospective quantitative dose
2  estimate for Mr. Hall?
3      **A.   I have.  It's in the -- approximately**
4  **page 120 to 128 range of the Exhibit 6.**
5      Q.   Okay.  And that's based on the UK POEM
6  model data, correct?
7      **A.   It is.**
8      Q.   So I'm asking about something a little
9  different, and I probably am too vague in that
10 question.
11         Have you used EPA's dermal absorption
12 guidelines to calculate a retrospective quantitative
13 dose estimate for Mr. Hall?
14     **A.   No.  I relied on the more accurate**
15 **analysis performed by Monsanto and Monsanto's**
16 **contractors in which laboratory -- basically, gauze**
17 **patches were placed on different areas of the body,**
18 **and the subjects were then sent out in the field with**
19 **backpack sprayers -- that is, hydraulic aerosol**
20 **sprayers -- and then these materials were removed from**
21 **the body and sent to the laboratory for glyphosate**
22 **quantitative analyses, which provides a much more**
23 **accurate measurement than the general EPA methodology**
24 **which uses simply default best-guess parameters.**
25     Q.   We'll talk a little bit about that later,

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

---

**65**

1 but let's -- I had some other questions. At trial you
2 said you couldn't go back in time and measure
3 glyphosate levels of Mr. Johnson, right? And the same
4 is true of Mr. Hall, correct?
5      MR. SELDOMRIDGE: Objection.
6 Misstates.
7     **A. I would need to see the transcript to see**
8 **if that's what I said exactly, but I'm not sure I**
9 **understand what you're getting at.**
10 BY MR. KALAS:
11     Q. Well, it's not important. What is
12 important is, did you -- can -- can you measure
13 glyphosate levels in Mr. Hall currently from his
14 application from 2008 to 2012?
15     **A. Of course not. It's rapidly metabolized**
16 **and removed.**
17     Q. So you can't do a blood test of Mr. Hall
18 today to see how much glyphosate was present in
19 Mr. Hall from 2008 to 2012?
20     **A. No.**
21     Q. And that's because glyphosate does not
22 bioaccumulate, correct?
23     **A. That's correct.**
24     Q. And you couldn't do a urine test of
25 Mr. Hall today to see how much glyphosate was present

**66**

1 in Mr. Hall from 2008 to 2012, right?
2     **A. Correct.**
3     Q. And that's for the same reason.
4 Glyphosate does not bioaccumulate?
5     **A. It's not persistent. Correct.**
6     Q. And you couldn't do a fecal test of
7 Mr. Hall today to see how much glyphosate was present
8 in Mr. Hall from 2008 to 2012, correct?
9     **A. Correct.**
10     Q. You couldn't do a skin test of Mr. Hall to
11 see how much glyphosate was present in his skin from
12 2008 to 2012, right?
13     **A. That's correct.**
14     Q. And then once again, that's because
15 glyphosate does not bioaccumulate?
16     **A. Correct. Well, it does -- it does form**
17 **temporary tissue depos within the epidermis, but**
18 **certainly they would not persist for that many years**
19 **due to the fact that the epidermis is continually**
20 **turning over and replacing itself.**
21     Q. And how long does that turnover take for a
22 typical dead cell on the epidermis?
23     **A. Well, I can't speak on the dead cell, but**
24 **for the epidermis itself to recycle and renew,**
25 **approximately 30 days.**

**67**

1     Q. And is it your opinion that glyphosate
2 stays in the skin for 30 days?
3     **A. Monsanto's own data shows it certainly**
4 **forms a deposit in the skin, but the duration of time**
5 **it takes that to mobilize into the bloodstream is**
6 **uncertain.**
7     Q. So you don't know if that would recycle in
8 a day, the depo?
9     **A. In one day?**
10     Q. Yes, sir.
11     **A. No. It remains in the epidermis for one**
12 **day.**
13     Q. Okay.
14     **A. At least a percent -- a large percent of**
15 **it.**
16     Q. A large percent. What percentage is that,
17 sir?
18     **A. According to the studies, typically**
19 **20 percent remains in the epidermis from a dose.**
20     Q. 20 percent. Okay. Which study -- I'm
21 sorry.
22     **A. And that's based on various studies I**
23 **referenced from Monsanto or one of their**
24 **subcontractors.**
25     Q. Which study are you referring to where

**68**

1 20 percent of glyphosate stays in the epidermis?
2     **A. (Reviewing document.)**
3     **Well, the TNO study shows the mass balance**
4 **was found to range from 73 percent to 132 percent,**
5 **that 18 percent of the applied dose -- let's see. On**
6 **page 62 of my Exhibit 6, this is just one example.**
7 **Mean penetration of the higher dose of MON 35012 was**
8 **646, or about 18 percent of the applied dose.**
9     Q. Well, that, in fact, is not what this
10 says, right? It says that the mean -- the mean
11 penetration was 646, but one membrane absorbed 1,100,
12 or 18 percent. So the mean was more like 10 percent,
13 according to your notes, correct?
14     **A. 10.3 percent, yeah.**
15     Q. So what study are you relying on to argue
16 that 20 percent of glyphosate stays in the epidermis?
17 Can you point me to that data?
18     **A. Well, the TNO study at the lower dose,**
19 **using the worst-case scenario, there was 27 percent**
20 **missing.**
21     Q. Missing, sir?
22     **A. Yeah. Missing.**
23     Q. My --
24     **A. Which is bound into the epidermis.**
25     Q. How do you know that? Where is the data

Transcript of William Sawyer, Ph.D.

18 (69 to 72)

Conducted on August 23, 2018

---

**69**

1  point that says 27 percent is in the epidermis, sir?
2  **A.  Well, because under the EOCD [sic]**
3  **guidelines, what is not accounted for, because it's**
4  **not measured on either side of the membrane, is**
5  **trapped within the membrane.**
6  Q.  Sir, is there something in black and white
7  type that says epidermis 20 percent or greater that
8  you can point me to regarding skin bioaccumulation of
9  glyphosate?
10  **A.  (Reviewing document.)**
11  **Yeah, the Maibach -- wait a minute.  I**
12  **think that's Maibach -- Maibach study on page 39 of**
13  Exhibit 6, "The total percent recovery (percent label
14  removed by washing plus total percent label contained
15  in urine) was low, i.e. 16%.  A definitive explanation
16  for the low recovery is not provided in the report,
17  but the author does state that previous experience
18  would suggest that much of the test material may in
19  some way bind to or in the skin and cannot be removed
20  by washing.  In support of this . . . (Vickers
21  1963)" -- and that's a public peer-reviewed
22  publication -- stated "that a 'chemical reservoir' is
23  formed in the skin after drug application which is
24  eventually shed without penetration.  Thus, it is
25  concluded that the bound material is not apparently

**70**

1  available for systemic absorption."
2  And then I pointed out that that is in
3  violation of the OECD protocol in which the
4  unrecovered material that is bound in the skin should
5  be considered as absorbed because there is -- it could
6  be a slower absorption.  And, of course, as that
7  amount accumulates in the dermal tissue, Fick's law
8  would increase the likelihood of it migrating due to
9  the increasing higher concentration in the tissue, and
10  that is the principle behind the EOCD regulation that
11  that unabsorbed material be counted as absorbed.
12  So in this case, it would be 16 percent.
13  I know you asked about 20, but I provided a value here
14  of 16 percent and earlier a value in excess of
15  20 percent.
16  Q.  Okay.
17  MR. KALAS:  I'm going to note for
18  the record that eight minutes passed
19  from when I asked the question to when
20  Dr. Sawyer responded.  This
21  deposition -- this is exactly why this
22  deposition cannot be limited to one
23  day.  We intend to move for additional
24  time if it's going to take eight
25  minutes to answer a question.  I'll

**71**

1  talk to Mr. Seldomridge about this at
2  lunch.
3  MR. SELDOMRIDGE:  I would just
4  like to note for the record that the
5  parties already agreed on a one-day
6  deposition for Dr. Sawyer.
7  MR. KALAS:  We did not agree.  We
8  did not agree.  We have never agreed.
9  The deposition was always noticed day
10  to day, and we asked for two days for
11  plenty of time.
12  MR. SELDOMRIDGE:  My statement
13  still stands.
14  **A.  Thank you for being patient, and I will do**
15  **my very best to answer your questions as rapidly as I**
16  **can.  It's just that particular question required me**
17  **to look through my notes and provide an accurate**
18  **referenced answer.**
19  BY MR. KALAS:
20  Q.  Well, Dr. Sawyer, I would also ask you,
21  once again -- you referred to 16 percent here for the
22  low recovery, but I asked you a different question,
23  which is:  Can you point me to a data point in black
24  and white print that says 20 percent or 16 percent of
25  glyphosate is contained in the epidermis at the end of

**72**

1  one of these dermal absorption studies?  Do you have
2  that at your fingertips?
3  MR. SELDOMRIDGE:  Objection.
4  Redundant.
5  **A.  Yes.  This study did just that.**
6  BY MR. KALAS:
7  Q.  Where does it say in the Maibach '83
8  study, epidermis 16 percent?
9  **A.  Well, the term was "skin" in what I just**
10  **read to the court reporter, that lengthy paragraph**
11  **that appears at the top of page 39 in Exhibit 6, which**
12  **references MONGLY01330783.  It's a quote right out of**
13  **the Monsanto document.**
14  Q.  And the quote, if I understand correctly,
15  is that the total recovery was 16 percent, correct?
16  **A.  Yes.  So that would actually suggest**
17  **84 percent in the tissue.**
18  Q.  Okay.  So you believe there is 84 percent
19  of glyphosate in the tissue and you're going to cite
20  to this data point for that?
21  **A.  No.  However, the EO -- the OECD**
22  **guidelines state that the amount of substance not**
23  **found in the donor chamber should be considered**
24  **absorbed.  That is an official rule.  I reference that**
25  **to OECD guidance documents for the conduct of skin**

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 21 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

19 (73 to 76)

**73**

1 absorption studies 2004a, part 28, page 131, and thus
2 this is a deviation of protocol.
3     Q.  Dr. Sawyer, my question is very simple,
4 and I don't think you've answered it, which is:  Is
5 there a Monsanto document that says 20 percent of
6 glyphosate is in the epidermis, or is there any
7 document you're aware of that says 20 percent of
8 glyphosate is in the epidermis in a dermal absorption
9 study?  Not that it's not recovered, but there's
10 20 percent in the epidermis.
11     MR. SELDOMRIDGE:  Objection.
12 Compound.  Argumentative.
13     A.  (Reviewing document.)
14         Well, in the rhesus monkey dermal dosing
15 studies -- I'm referencing page 42, Item Number 5,
16 "Only 81.8% of applied 'Dose D' was recovered. The
17 authors claimed that the remaining 18.2% was 'lost'
18 since it was not detected.  If any of the missing
19 18.2% remained in the monkey in tissue or fluid that
20 was not tested, the amount of absorbed would have been
21 underestimated.  The lost material is beyond the
22 acceptable limit according to OECD guidelines of mass
23 balance.  If all of the missing 18.2% is assumed to
24 have remained in the monkey and is included in the
25 amount absorbed," the total would be 22.6 percent.

**74**

1         So, again, if the methodology had been
2 followed and not deviated from by Monsanto, they would
3 have concluded 22.6 dermal absorption.
4 BY MR. KALAS:
5     Q.  Do you have a data point in the Wester
6 study that says 22.6 percent of the glyphosate studied
7 in that study is in the epidermis or any dermis -- or
8 the dermis?  Excuse me.  Can you point me to that data
9 point in that study?
10     MR. SELDOMRIDGE:  Same objection.
11 Compound question.
12     A.  I'm not sure what you mean by point you to
13 a data point.
14 BY MR. KALAS:
15     Q.  Sir, I've been asking now for 15 minutes
16 for to you point to a data point that says 20 percent
17 or thereabouts of glyphosate is in the dermis, and you
18 continue to point to data points regarding lack of
19 recovery.  I am asking a very specific question, and
20 you are not giving me an answer to it.
21         My question is, is there a point in any of
22 these studies you've reviewed that says 20 percent is
23 in the skin?  Not that it's not recovered, that it's
24 in the skin.  It's a very clear question.
25     MR. SELDOMRIDGE:  Objection.

**75**

1     Argumentative.
2     A.  (Reviewing document.)
3         Yes.  On page 50, paragraph C, Monsanto
4 stated -- their scientist stated, "Even though we can
5 absorb additional 'uncertainty factors' in our risk
6 assessment based on our biomonitoring results, I feel
7 uncomfortable with this discussion.  This approach by
8 Spain sets a precedent and contradicts the fact that
9 we always claimed to fully understand the glyphosate
10 pharmacokinetics.  The Wester IV experiment suggests
11 that almost the entire 'systemically' available dose
12 was excreted in urine.  The low dose topical in vivo
13 experiment suggests that almost the entire dose (82%)
14 that was absorbed through the skin was excreted in the
15 feces.  We should have a robust and well-documented
16 explanation for this."
17         Basically, Monsanto doesn't fully
18 understand why they're not getting the recovery, and
19 that's why under the rules and regulations methodology
20 it has to be accounted for as absorbed.
21 BY MR. KALAS:
22     Q.  Is the word epidermis in that passage you
23 just read?
24     A.  No.
25     Q.  Is the word 20 percent -- or the value

**76**

1 20 percent in that passage you just read?
2     A.  No.
3     Q.  You are evading my question, and the
4 record will reflect that.  Once again, I just -- we'll
5 talk about it at lunch.
6     MR. SELDOMRIDGE:  Objection.
7     Harassing the witness.  Argumentative.
8 BY MR. KALAS:
9     Q.  Are you offering regulatory opinions in
10 this case, sir?
11     A.  No.  I'm only -- my only opinions are as
12 to the appropriateness of the work done by the
13 toxicologists.  I'm a toxicologist, and I can evaluate
14 their work at Monsanto in terms of the interpretation
15 of such work.  But I'm not a regulatory expert.  I
16 think that would be -- defer that to someone like
17 Dr. Benbrook.
18     Q.  Okay.  Now, you just -- so you're not --
19 strike that.
20         So you're not going to come to trial and
21 tell the jury that Monsanto violated EPA regulations,
22 right?
23     A.  Methodology, for example, the OECD
24 methodology's been violated.
25     Q.  My question was different.  Are you coming

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

---

77

1  to trial and telling the jury Monsanto violated EPA
2  regulations?
3      **A.   I don't believe so.  That's something I**
4  **would defer to Dr. Benbrook.**
5      Q.   Okay.  Now, you just read to me an email
6  from Monsanto.  Explain to me how -- well, strike
7  that.
8          You actually discuss in your toxicological
9  notes what you describe as a failure of Monsanto
10 toxicologists to meet ethical standards required in
11 the profession, right?
12         MR. SELDOMRIDGE:  Objection.
13 Mischaracterizes.
14         MR. KALAS:  It's a quote taken
15 right out of it.
16         MR. SELDOMRIDGE:  You can show
17 him the quote if you'd like to.
18     **A.   Can you repeat the question?**
19 **BY MR. KALAS:**
20     Q.   In your toxicological notes, you describe
21 what you call a failure of Monsanto toxicologists to
22 meet ethical standards required in their profession.
23         MR. SELDOMRIDGE:  Same objection.
24 BY MR. KALAS:
25     Q.   Do you recall putting that in your

---

78

1  toxicological notes?
2      **A.   Yes.**
3          MR. SELDOMRIDGE:  Same objection.
4  BY MR. KALAS:
5      Q.   Okay.  And one of the sources you used to
6  reach that conclusion was emails that you saw in the
7  course of reviewing documents in this litigation,
8  right?
9      **A.   Emails combined with the actual reports of**
10 **the test methodology results and discussion of those**
11 **results.**
12     Q.   Now, you're not planning on telling the
13 jury what somebody means in an email, right?
14     **A.   I wouldn't attempt to interpret an email.**
15 **I would simply rely on the facts stated.  For example,**
16 **in that last example, Monsanto does not really**
17 **understand the pharmacokinetics of glyphosate to the**
18 **degree they claim, and that's evidenced by the**
19 **unaccounted-for -- unaccounted-for, unrecovered**
20 **glyphosate in the various studies by, for example, the**
21 **TNO study, Wester study, the monkey study, etc.**
22     Q.   So you're going to tell the jury that a
23 statement in an email by a single Monsanto employee
24 represents the corporate state of mind of the entire
25 company?

---

79

1      **A.   No.  No.  Again, I'm only speaking about**
2  **scientists, toxicologists, who fail to perform.  For**
3  **example, the toxicologists who decided it would be too**
4  **risky to repeat a study because it resulted in very**
5  **high dermal absorption, and that could upset the**
6  **regulatory process.**
7          **Well, another example was the toxicologist**
8  **who decided not to repeat a monkey study because it**
9  **might, quote, find a new metabolite, quote.**
10     **Well, that's our job.  We're**
11 **toxicologists.  We're like detectives.  We want to**
12 **find the new metabolite and understand what's causing**
13 **the cancer, not fraudulently hide behind it.  That's**
14 **unethical for a toxicologist to behave that way.**
15     Q.   So you intend to tell the jury, based on
16 emails, that Monsanto toxicologists acted
17 fraudulently; is that correct?
18     **A.   Well, certainly by deciding not to run the**
19 **study because it could be too, quote, risky, unquote,**
20 **and might find a new metabolite.  That is a -- purely**
21 **a toxicological violation and should be reported.  I**
22 **mean, that's our -- that's our job.  That's our duty.**
23 **That's, for example, a police officer who should make**
24 **an arrest closing his eyes and looking the other way**
25 **because it's a buddy.**

---

80

1      Q.   Have you undergone any special training to
2  be able to explain to juries what toxicologists mean
3  in emails?  Did you take a class on that?
4          MR. SELDOMRIDGE:  Argumentative.
5      **A.   No.**
6  **BY MR. KALAS:**
7      Q.   Did you undergo any special training to
8  understand how toxicology -- toxicologists at Monsanto
9  use emails to guide company policy regarding
10 toxicology studies?
11     **A.   No.  I'm not addressing such issues as**
12 **that.**
13     Q.   Are you an expert in morality?
14     **A.   No.**
15     Q.   Are you an expert in honesty?
16     **A.   I'm not sure I understand the question.**
17     Q.   Just asking.
18         Are you an expert in when people are being
19 honest or being fraudulent?
20     **A.   You mean being able to detect such?**
21     Q.   To be able to tell a jury about it, sir.
22     **A.   I don't think that's my role.  My role is**
23 **a toxicology role.  I'm a toxicologist, and if a**
24 **toxicologist breaches his duties, then that I should**
25 **make evident.**

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 23 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018                 21 (81 to 84)

---

**81**

1    Q.   Do you have a special talent in reading an
2  email and telling people what somebody who wrote that
3  email was thinking?
4           MR. SELDOMRIDGE:  Argumentative.
5      A.   Strange question, but I think I understand
6  what you're asking.  Are you asking me if I'm a
7  mind-reader?
8  BY MR. KALAS:
9      Q.   I asked if you had a special talent in
10 reading an email and telling anyone what the person
11 who wrote that email was thinking.
12          MR. SELDOMRIDGE:  Redundant.
13 Argumentative.
14     A.   I can't -- I'm not a -- what do you call
15 those people who use the crystal ball?
16 BY MR. KALAS:
17     Q.   Psychic?
18     A.   A what?
19     Q.   A psychic.
20     A.   Psychic.
21          MR. SELDOMRIDGE:  Object to form.
22     A.   No, I'm not a psychic.  I simply use
23 what's in black and white and read what it states
24 clearly, what it states.  I'm not inferring anything
25 and have no desire to infer anything into someone's

---

**82**

1  message.
2      Q.   Okay.  So if you have no desire to infer
3  anything as to someone's message, then inferring that
4  they acted with a fraudulent intent is not something
5  you're going to tell a jury about?
6      A.   I would tell the jury that it was simply a
7  breach of duty to not pursue in chasing down and
8  finding that metabolite but rather deciding not to
9  repeat the study because it is too risky.
10     Q.   Have you undergone any special training
11 about opining as to the state of mind of a toxicology
12 department at a corporation?
13          MR. SELDOMRIDGE:  Objection.
14 Unintelligible.
15     A.   It's a little difficult for me to answer
16 that question because I don't totally understand it.
17 BY MR. KALAS:
18     Q.   Well, if you don't understand it --
19     A.   It's a long question.
20     Q.   My question is about your training, sir.
21 And do you have any special training about inferring
22 states of mind of a toxicology department at Monsanto?
23          MR. SELDOMRIDGE:  Same objection.
24     A.   No.  That's beyond my scope.  I don't
25 intend to do exactly what you just said.

---

**83**

1           MR. KALAS:  All right.  We're out
2  of tape.  So let's take a break.
3           THE VIDEOGRAPHER:  This marks the
4  end of Media Number 1 in the deposition
5  of William Sawyer.  The time is 11:25.
6  We are off the record.
7           (Break taken from 11:25 a.m. to
8            11:35 a.m.).
9           THE VIDEOGRAPHER:  This marks the
10 beginning of Media Number 2 in the
11 deposition of William Sawyer.  The time
12 is 11:35.  We are on the record.
13 BY MR. KALAS:
14     Q.   Dr. Sawyer, we were talking about emails
15 that you took a look at.  Did you interview any of the
16 authors of the emails that you relied upon in reaching
17 your expert opinions?
18     A.   No.
19     Q.   Did you speak at any time to any of the
20 authors of the emails you relied upon in reaching your
21 expert opinions?
22     A.   No.  I mean, I think it's a ridiculous
23 question.  If I were to call Monsanto and ask to speak
24 with their toxicologists, they'd probably hang up on
25 me.

---

**84**

1      Q.   Do you know -- do you know any of the
2  authors of the emails you relied upon in reaching your
3  expert opinion?
4      A.   No.
5      Q.   Did you ever interview any of the authors
6  of the articles you evaluated in reaching your expert
7  opinion?
8      A.   Did I review their articles?
9      Q.   Did you interview the authors of the
10 articles?
11     A.   Not in this case.
12     Q.   Okay.
13     A.   In other cases, yes.  Not in the Johnson
14 case either.
15     Q.   Okay.  You agree that it's possible to
16 take an email out of context, right?
17     A.   Yes.
18     Q.   And you agree that it would be appropriate
19 for someone trying to understand a company's conduct
20 based on emails to consider the context around the
21 emails or memos, right?
22     A.   Yes.
23     Q.   And you agree that it would be appropriate
24 for evaluating -- for someone evaluating the corporate
25 conduct of a company to consider the actual actions

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Transcript of William Sawyer, Ph.D.

22 (85 to 88)

Conducted on August 23, 2018

---

85

1 the company took rather than what is just written in
2 an email, correct?
3     A.   Yes.
4     Q.   Now, science can be an iterative process
5 with a lot of back and forth, right?
6     A.   In forensic toxicology, that is true.
7     Q.   And in toxicology in general, that's true
8 as well, right?
9     A.   Yeah, especially in forensic matters that
10 are open to debate.
11     Q.   And you could read a document that was
12 written at the midpoint in a scientific process and
13 take the ultimate outcome of that process out of
14 context, right?
15     A.   I don't understand.
16     Q.   Well, my point is, is that you could read
17 a document -- let's say that we're deciding whether or
18 not to build an airplane, and halfway through,
19 somebody writes an email that says, "It's too hard to
20 build the airplane. Let's not do it." At the end of
21 the day, we built the airplane because somebody else
22 disagreed.
23          If you just read the email that said "It's
24 too hard to build the airplane. Let's not do it," you
25 could have a misconception of where that process ended

---

86

1 up, right?
2     A.   In that example, yes.
3     Q.   And, generally, if you read an email at
4 the midpoint of a scientific process, you could have a
5 misconception of where that process ended up,
6 correctly -- or correct?
7     A.   Yes. However, in the cases in my report,
8 the airplane was never built.
9     Q.   When you claim Monsanto toxicologists have
10 violated standards laid out by the Society of
11 Toxicology, what standards are you referring to from
12 the Society of Toxicology?
13     A.   As per the Web site, ethics.
14     Q.   Okay. And do you have that Web site cited
15 in your notes or on your Materials Considered list?
16     A.   I don't know. I'd have to check my
17 footnotes.
18     Q.   The section where you discuss this, I
19 believe, was in I believe -- at least Exhibit 5, 123
20 to 124. You may have moved it, I think, to 129 in
21 Exhibit 6.
22     A.   I didn't -- I did not reference the
23 Web site.
24     Q.   Okay. And I'm correct you've never sat on
25 the Society of Toxicology's legal council, right?

---

87

1     A.   No.
2     Q.   And you've never been invited to that
3 council, right?
4     A.   No.
5     Q.   And have you ever offered an expert
6 opinion to that council?
7     A.   No.
8     Q.   Have you ever reported a toxicologist for
9 violating the Society of Toxicology's ethical
10 standards?
11     A.   No. I've never run across such an example
12 until recently.
13     Q.   Have you reported the Monsanto
14 toxicologists for violating the Society of
15 Toxicology's ethical standards?
16     A.   No.
17     Q.   Do you plan to?
18     A.   Possibly.
19     Q.   When do you plan to do that, sir?
20     A.   I didn't say I planned to do it.
21     Q.   When do you possibly plan to do that, sir?
22     A.   I don't know.
23     Q.   Why have you not done it already, if this
24 is your belief?
25     A.   I would prefer to wait until any

---

88

1 litigation -- pending litigation is over because I'm
2 afraid it could somehow be used by defense counsel to
3 somehow point the finger at me and use it and state
4 I'm biased.
5     Q.   You're worried about the perceived
6 conflict of interest, right?
7     A.   Yes.
8     Q.   You have an interest, at least a perceived
9 interest, in arguing that Monsanto's toxicologists
10 acted in an unethical manner?
11     A.   I have an interest of remaining impartial
12 and unbiased, and I would not want to get into some
13 type of legal argument with a toxicologist at Monsanto
14 that could interfere with the fair and un -- impartial
15 and unbiased opinion in this case. So my opinion is,
16 at this point, to leave the sleepy dog rest.
17     Q.   You agree that the fact that you have
18 received hundreds of thousands of dollars in
19 compensation for your time spent on this case could be
20 perceived as a conflict of interest by the Society of
21 Toxicology?
22          MR. SELDOMRIDGE:  Objection.
23 Misstates.
24     A.   It's an untruth question, and I can't
25 answer questions that are not of truth.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8572-19 Filed 12/27/19 Page 25 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

23 (89 to 92)

---

**89**

1 **BY MR. KALAS:**
2    Q.  Why is that question not of truth, sir?
3    **A.  Well, I have not received hundreds of**
4 **thousands of dollars.**
5    Q.  When I say "this case," I mean the
6 glyphosate litigation. So let me --
7    **A.  No. I've not received hundreds of**
8 **thousands of dollars.**
9    Q.  Sir, in your last deposition, you
10 testified you had invoiced over $143,000. You adopted
11 that figure again today. Are you now changing your
12 testimony about that?
13    **A.  That's not hundreds of thousands of**
14 **dollars, sir.**
15    Q.  Okay. I'm sorry. Let me -- let me change
16 the question, then, to be more exact. You agree it's
17 an awful lot of money, $143,000, right?
18    **A.  No, I do not. I've put in a huge amount**
19 **of hours and work into this matter.**
20    Q.  Okay.
21    **A.  And at my hourly rate, that's what it is.**
22 **That's what it comes to. And from that hourly rate, I**
23 **also pay my staff, and I pay a lot of other overhead**
24 **as well.**
25    Q.  You agree that it might be a perceived

---

**90**

1 conflict of interest to the Society of Toxicology that
2 you've received over $143,000 in the glyphosate
3 litigation if you reported Monsanto toxicologists as
4 having acted fraudulently?
5    **A.  Okay. The question was too long. I did**
6 **not follow all of it.**
7    Q.  Do you understand what a perceived
8 conflict of interest is?
9    **A.  Not exactly.**
10    Q.  Okay. Then let me go to that.
11       Do you understand that when you consult
12 and receive monies that there is a perceived conflict
13 of interest that you would, for instance, want to
14 disclose if you were publishing an article on a
15 subject that you had received money for consulting on?
16    **A.  Yes.**
17    Q.  Okay. And here, you've received money on
18 consulting regarding forensic toxicology matters about
19 Roundup, right?
20    **A.  Yes. However, I earned it with a number**
21 **of hours, unlike other experts who are paid huge**
22 **amounts of money and don't even bother to read the**
23 **current medical records of the plaintiff.**
24    Q.  I'm not saying you haven't earned every
25 penny of your $143,000, sir. My question is

---

**9**

1 different. My question is, would it be a perceived
2 conflict of interest to the Society of Toxicology that
3 you've received compensation upwards of $143,000 for
4 your work on this litigation?
5       MR. SELDOMRIDGE: Objection.
6    Argumentative.
7    **A.  Not -- I don't understand the question.**
8 **BY MR. KALAS:**
9    Q.  Okay. Has the Society of Toxicology, to
10 your knowledge, ever found that Monsanto toxicologists
11 violated their standards?
12    **A.  I haven't researched that.**
13    Q.  So when you were opining that the Monsanto
14 toxicologists violated the standards of the Society of
15 Toxicology, you didn't think to go look at what the
16 Society of Toxicology said about that, right?
17    **A.  There is -- let me explain it this way:**
18 **There are no buttons on their Web site that even**
19 **permit one to make such an inquiry.**
20    Q.  So you didn't do it?
21    **A.  No, I did. I looked at the Web site.**
22 **There is no possible means of even asking that**
23 **question.**
24    Q.  So when you looked at the Web site at the
25 ethics link that you failed to provide in your

---

**92**

1 toxicological notes or on your Materials Considered
2 list, when you looked at that Web site, you didn't see
3 any way to find out what toxicologists had been
4 brought up for ethical violations?
5    **A.  There is no way to do that.**
6    Q.  Okay. And, to your knowledge, have any
7 Monsanto toxicologists been brought up for ethical
8 violations by the Society of Toxicology?
9    **A.  I have no way to know that.**
10    Q.  So the answer is, to your knowledge, you
11 don't know of any ethical violations the Society of
12 Toxicology has found against Monsanto toxicologists?
13    **A.  I don't have information on that either**
14 **way.**
15    Q.  Okay. Now, you agree with me there's a
16 difference between toxicity and carcinogenicity,
17 right?
18    **A.  Yes.**
19    Q.  And just because something's toxic doesn't
20 mean it's carcinogenic, right?
21    **A.  Correct. That's correct.**
22    Q.  And just because something is cytotoxic
23 doesn't mean it's carcinogenic, right?
24    **A.  Correct.**
25    Q.  What is toxicity, sir?

Transcript of William Sawyer, Ph.D.

24 (93 to 96)

Conducted on August 23, 2018

---

**93**

1    A.   Toxicity is simply a concentration or dose
2  of a substance which results in a measurable adverse
3  effect to the organism.
4    Q.   What is cytotoxicity, sir?
5    A.   Cytotoxicity is specific to cellular
6  damage at a particular given level of substance.
7    Q.   What's the difference between toxicity and
8  cytotoxicity?
9    A.   Toxicity is general.  That could involve a
10  transient neurological response that is reversible
11  such as -- I notice you just drank water.  If that
12  amount of water was 150-proof moonshine, you would
13  undergo transient neurological impairment, which is
14  reversible, as opposed to a cytotoxic effect which
15  would actually damage and most likely destroy a cell.
16    Q.   And when you have cells that have
17  cytotoxic damage done to them, are there physical
18  manifestations of that damage if it is -- if it's
19  large enough, I guess?
20    A.   Well, for example, if it's hepatotoxic and
21  the substance is destroying sufficient hepatocytes,
22  yes, we would see markers of increased liver enzymes
23  such as ALT.  Doesn't mean that the insult is
24  permanent.  It could be reversible.  But given enough
25  cytotoxic agents, certainly adverse effects could be

**94**

1  either measured by laboratory analysis or by
2  histopathology methodology or by direct observation.
3    Q.   And what about on the skin?  If you have
4  cytotoxicity on the skin, what sort of effects would
5  you see, if you had enough?
6    A.   Generally, the skin under the OECD
7  guidelines, we look for erythema initially, which is
8  redness of the skin.  And in a more serious degree,
9  we'd look for the first-, second-, or third-degree
10  burn and necrosis, which is an obvious area, a patch
11  of cellular death.
12    Q.   Okay.  And then carcinogenicity, what is
13  carcinogenicity?
14    A.   Carcinogenicity is the formation of a --
15  what we consider a cell that has become immortal that
16  continues to, in an uncontrolled, unregulated manner,
17  reproduce generally immature, nonfunctional cells
18  forming what we call "tumors."
19    Q.   Now, there's such a thing as acute
20  toxicity, right?
21    A.   Certainly.
22    Q.   And what's acute toxicity?
23    A.   Well, a good example would be you drinking
24  that clear glass of 150-proof moonshine.  You would
25  acutely absorb all of that within about 30 seconds --

**95**

1  30 minutes into your blood vascular system, and you
2  would undergo acute neurological effects.
3    Q.   And many of the effects of glyphosate that
4  you look at in your toxicological notes here, they are
5  acutely toxic or cytotoxic effects, right?
6    A.   Yes.
7    Q.   And explain to me, in your opinion, how
8  these acutely toxic or cytotoxic effects are
9  indicative of a carcinogenetic process, just
10  generally.
11    A.   That's actually a rather uncommon
12  relationship to carcinogenicity.  It can -- that is,
13  continued cytotoxicity to a particular organ, for
14  example, will increase the likelihood of a
15  carcinogenic process occurring.
16        For example, if a cytotoxic agent
17  chronically causes a serious chronic cytotoxic damage
18  increasing cellular turnover, that can lead to a
19  increased rate for a insufficient level of DNA repair
20  from typical mutagenic processes that occur to result
21  in a malignant cell.
22    Q.   Do you believe glyphosate is acting
23  through the mechanism -- glyphosate-based herbicides
24  are acting through the mechanism you just described?
25    A.   No.  Based on, for example, the Wood 2009b

**96**

1  study, the extremely high-quality dose-response
2  relationship throughout the dose levels is suggestive
3  of a linear approach as opposed to a single high-dose
4  threshold due to cytotoxicity.
5    Q.   And so when you cite to studies on acute
6  toxicity or cytotoxicity in your toxicological notes,
7  you'd agree that a jury shouldn't use that as direct
8  evidence of a carcinogenic process from that acute
9  toxicity?
10    A.   Again, I think it's due to my just being
11  kind of tired and hungry, but I didn't really follow
12  your question accurately enough to answer it.
13    Q.   Sure.
14        If I understand you correctly, you believe
15  that glyphosate is acting through a linear genotoxic
16  approach as opposed to a cytotoxic approach, correct?
17    A.   Yes, and I base that on the fact that
18  there are genotoxic studies that demonstrate that the
19  compound can act through that pathway and that the
20  dose-response relationships in the animal studies are
21  consistent with the linear approach.  And I also will
22  defer to the epidemiologists dose-response evidence
23  within the human studies.
24    Q.   Okay.  So if I understand that's the
25  mechanism you're positing, then I'm correct that a

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

25 (97 to 100)

---

**97**

1 jury shouldn't take evidence of an acutely toxic or
2 cytotoxic effect from glyphosate as evidence of a
3 carcinogenic process or glyphosate-based herbicides?
4    **A.  I would need a more specific example of**
5 **that to be able to answer that question.**
6    Q.  All right.  Let's -- if glyphosate -- if
7 I, in a in vitro study, put glyphosate on a cell and
8 it kills it immediately, it's cytotoxic -- or
9 glyphosate-based herbicide, a cytotoxic effect, it's
10 your opinion that glyphosate is not acting through
11 that mechanism, a cytotoxic mechanism, to cause
12 cancer, right?
13    **A.  That wouldn't prove it, no.**
14    Q.  I'm not asking what proves anything.  I'm
15 asking if that piece of evidence, a cytotoxic effect
16 from glyphosate or glyphosate-based herbicides, is
17 being used by you to support your opinions regarding a
18 genotoxic mechanism.
19    **A.  I just don't follow the question.**
20    Q.  Okay.  Well, let me ask a couple
21 foundational questions, then.
22       The fact that glyphosate or
23 glyphosate-based herbicides cause an acutely toxic
24 effect in any given study should not be taken as
25 direct evidence of carcinogenicity, correct?

---

**98**

1    **A.  By itself in a vacuum, that's correct.**
2    Q.  Okay.
3    **A.  But that doesn't mean that that particular**
4 **study evidence in conjunction with other evidence**
5 **couldn't be considered.**
6    Q.  Okay.  So explain to me, under your theory
7 of the mechanism of glyphosate-based herbicides
8 causing cancer, how an acutely toxic effect of
9 glyphosate-based herbicides supports that theory.
10    **A.  Well, as I said, in a vacuum, it doesn't.**
11    Q.  Okay.  Now, likewise, the fact that
12 glyphosate or glyphosate-based herbicides caused a
13 cytotoxic effect in any given study should not be
14 taken as direct evidence of the carcinogenicity of
15 those compounds, correct?
16    **A.  By itself, that's accurate.**
17    Q.  Okay.  Now, moving on to Mr. Hall, you
18 spoke to Mr. Hall via the phone, right?
19    **A.  Twice.**
20    Q.  Twice.  Okay.
21       Now, according to your toxicological
22 notes, you had a conversation with him on
23 February 13th, 2018, right?
24    **A.  Yes.**
25    Q.  When was the other conversation?

---

**99**

1    **A.  Yesterday at approximately 3:30 or**
2 **4:00 p.m. Eastern Daylight Savings Time.**
3    Q.  Okay.  And I want to ask you some
4 questions about the February conversation, which is
5 the only one we were aware of prior to today; but I
6 guess first let me ask you about yesterday's
7 conversation.
8       Number one, are the contents of
9 yesterday's conversation included in your
10 toxicological notes of August 22nd, 2018?
11    **A.  Yes.**
12    Q.  They are?
13    **A.  Yes.**
14    Q.  Okay.  So what pages in Exhibit 6 do you
15 discuss yesterday's conversation?
16    **A.  Within pages 124 to 129.**
17    Q.  Okay.
18    **A.  And if we were to discuss those pages,**
19 **then I would be able to certify that everything is in**
20 **there or state that there may be places -- other**
21 **places in the report, but I -- because I think I kept**
22 **everything within those pages, but without reviewing**
23 **it, I can't recall.**
24    Q.  So what prompted the conversation with
25 Mr. Hall yesterday?

---

**00**

1    **A.  Well, I tried my very best to ascertain**
2 **his body weight during the years which he was working**
3 **occupationally with glyphosate prior to his 2012**
4 **cancer diagnosis.**
5 
6 
7       **, and**
8 **what concerned me was that I know that he worked**
9 **outdoors burning a large amount of calories doing his**
10 **work.**
11       **And then he became a volunteer with the**
12 **police department and then became an officer, and I**
13 **believe even upgraded to a lieutenant.  As we all**
14 **know, police officers like doughnuts.**
15 
16 
17       **So I decided the**
18 **only way to find out, because I could not find**
19 **anything in the medical records to cover that, I**
20 **thought I better call him.**
21       **And I also -- as I spoke to him, I had in**
22 **the back of my mind some other questions that I had**
23 **been pondering, which I asked him as well.**
24    Q.  What were those questions?
25    **A.  Well --**

---

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

26 (101 to 104)

Conducted on August 23, 2018



**01**

1    Q.   Actually, can I withdraw that question and
2  ask a follow-up on the first thing you said?
3
4
5    A.
6
7
8
9
10
11
12
13
14    Q.   Okay.
15    A.
16
17
18
19    Q.   Yep.  Okay.  Now, you said you asked some
20  other questions.  What other questions did you ask
21  him?
22    A.   Well, in reviewing and preparing for this
23  deposition, I noticed that in my interview he referred
24  to his use of jersey gloves, and I had made an
25  assumption that that were similar to the gloves I use

**02**

1  when I'm doing pruning and handling sharp branches and
2  so forth, which have leather palms.
3         And then I did a little research and
4  determined that the gloves that I have that I assumed,
5  I assumed wrong.  They're not jersey gloves.
6         So I asked him again to clarify what type
7  of gloves, what they looked like, what color, what
8  were they made of, did they have leather on the palms,
9  etc.  And he stated that they were jersey gloves and
10  described exactly what I have with me right here, that
11  these are jersey gloves.  This is what he used.
12         And so I -- after speaking to him, I
13  obtained some jersey gloves so I could have a better
14  idea of the makeup of this material in terms of
15  protection from liquids.
16    Q.   Is the material cotton or is it a
17  different material?
18    A.   100 percent cotton.
19    Q.   Okay.  So they're cotton gloves?
20    A.   Yes, they are.
21    Q.   Okay.  Now, what other questions did you
22  ask, if anything?
23    A.   Might help if I review --
24    Q.   Sure.
25    A.   -- my section here.

**03**

1    Q.   Sure.
2    A.   All right.  I asked him again -- and I
3  asked this during my initial interview, but I asked
4  him again, I said, "Why is it that your legs, your
5  lower legs, and then some days even your upper legs
6  and part of your trunk, became soaked?"
7         And he stated that he had to, on some
8  jobs, walk through deep weeds that brushed against him
9  with dew on them.
10         And I said, "Well, then, how is it that
11  this resulted in you contaminating your fabric
12  sneakers and your legs with Roundup?"
13         And he stated that because he would spray
14  these areas and everything was wet and he couldn't
15  tell where he had sprayed and hadn't sprayed and would
16  have to backtrack and walk through the Roundup on a
17  regular basis when spraying.  And I think I included
18  something on that in my section page 124 through 128.
19         Oh, and I also asked him about the gloves,
20  that how did they get wet, because he told me his
21  gloves would start out reasonably dry and very rapidly
22  become very wet and that he would leave them in the
23  truck overnight, and they would then be somewhat
24  drier.
25         But he said that his gloves were primarily

**04**

1  wet from contact with wet and treated vegetation as
2  well as leakage.  He had many episodes -- regular
3  episodes of his -- he called it the "stem," where it
4  interfaces near the trigger handle, would leak back on
5  his hand, and also explained that there were times
6  when he overpressurized.  And I have his wording in
7  here.  Let me find it.
8         Okay.  On page 125 at the very top,
9  "Permeable 'Jersey Gloves,'" that is information
10  largely from my second interview with him.  And he
11  also explained on the second-to-last bullet the
12  unavoidable walk and backtracking through treated
13  areas.
14         There's also an entry here where he spoke
15  about overpumping his handheld tank, and he also said
16  he had a strap that he would put on his shoulder to
17  carry that tank.  But he said that on times -- it's in
18  my write-up here somewhere that he at times
19  overpressurized the tank and that the O-ring would
20  dislodge and get on his body.  I don't know for sure
21  if he meant his hands on his legs, but he said it
22  was -- I used his exact word in a quote here, if I can
23  find it.
24    Q.   On 128, last bullet point.
25    A.   Yeah.  There.  "Mr. Hall also reports

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

27 (105 to 108)

Conducted on August 23, 2018

---

**05**

1  soaked hands from occasional leakage of the wand at
2  its interface near the flow control lever. Also, on
3  occasion, Mr. Hall overpumped the container and the
4  O-ring would 'let go' with subsequent 'drenching' with
5  Roundup." Yes.
6      Q. Anything else that you talked about with
7  Mr. Hall on your second call?
8      A. Yes. I asked him again to give me a
9  little more understanding of this touching the orifice
10  piece with his mouth, and he said about two or three
11  times a week, the wand would plug and he'd have to
12  unscrew the wand from the base to unclog it. He did
13  this with his bare hands by banging the wand and then
14  blowing through it. And he said that he would notice
15  a residue -- the taste of the film on his lips and
16  mouth. So he was mouthing the device, basically.
17      Q. And that was in your first set of
18  toxicological notes, right?
19      A. It was, but I wanted to really understand
20  it better, and so I asked him again. And he basically
21  he gave me the same answer --
22      Q. Okay.
23      A. -- but in a bit more detail in terms of
24  how he unscrewed it, that kind of thing.
25      Q. Anything else that you discussed with

**06**

1  Mr. Hall on the most recent discussion?
2      A. That he replaced the gloves once per week.
3  But he may have said that earlier, but I asked him
4  again just to verify.
5      Q. Okay.
6      A. And it's an important issue because, you
7  see, when you take a glove that is wet with glyphosate
8  intermixed in that liquid and you let it dry
9  overnight, the -- as you know, I had already testified
10  to this -- the volatility of glyphosate's very low.
11  It's not highly volatile. The water is going to
12  evaporate, leaving behind the glyphosate. And then he
13  wore these several days in a row, accumulating
14  glyphosate within the glove, making the glove actually
15  a greater hazard than if one were not to wear the
16  glove at all.
17      Q. And any other things you talked about with
18  Mr. Hall on the most recent conversation?
19      A. Yes. I asked him about his prior use of
20  Roundup before his commercial use of Roundup, and he
21  did state and confirm that from two thousand- -- you
22  know, up to the 2008 and beyond actually, he said, you
23  know, even while he was working agriculturally -- or
24  professionally, he used Roundup at his Gerber Court
25  home property. And I asked him to describe his use of

**07**

1  that and -- because, simply, that's additive dosewise
2  to the glyphosate that he was exposed to commercially.
3      But his use of the Roundup on his home
4  property, which is a fairly large yard, was restricted
5  to areas along the sidewalk, roadside, up near homes
6  and shrubs and specific locations. It's not like he
7  sprayed his whole yard with it.
8      Q. Now, originally, Mr. Hall had told you --
9  and it's actually still in Exhibit 6 -- that Mr. Hall
10  never used any Roundup or fertilizers on his own
11  property, right? That's what he told you originally?
12      A. I believe so.
13      Q. Okay. And, in fact, you still have that
14  in Exhibit 6 on page 12, correct?
15      A. Yes. Yes.
16      Q. Okay. Now, obviously there's a
17  contradiction there, correct?
18      A. Maybe. I asked him -- you know, he said
19  that he did not use -- I think his words were
20  "anything else."
21      Q. So as a forensic toxicologist, when you
22  have somebody who has contradicted themselves in
23  interviews, how do you decide which time they were
24  telling -- I don't want to say "the truth" because
25  people misremember, but which recollection is more

**08**

1  correct?
2      A. Well, I have to consider, was the question
3  clear to him. And what's confusing to me in the first
4  event, it seems that he's referring to not using
5  anything else. For example, 2,4-D or 2,4,5-T, that
6  kind of thing.
7      Q. Well, you wrote in Exhibit 5 and
8  Exhibit 6, "Mr. Hall never used any Roundup or
9  fertilizers on his own property," right? You wrote
10  that?
11      A. Right. But what I'm saying is, I'm not --
12  I'm not dead certain that question was clear to
13  him because I can't recall if I said to him, "Have you
14  ever used any herbicides or pesticides on your
15  property?"
16      So I don't know that I ever asked him
17  Roundup. So --
18      Q. And you don't -- sorry. Were you done?
19      A. Yeah.
20      Q. You don't keep notes of these discussions
21  other than what's in your toxicological notes, right?
22      A. I did not prepare a questionnaire. So I
23  did it -- you know, I talked to him and kind of went
24  through his history on my initial call and performed
25  the interview without notes, and I had Jen Clark on

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

28 (109 to 112)

Conducted on August 23, 2018

09

1 the line typing everything into my draft set of notes,
2 which I have here.
3    Q.  So how --
4    A.  So there was nothing put on paper, per se.
5    Q.  So, hypothetically, let's assume that
6 Mr. Hall completely understood you in the first
7 instance and understood your question to involve
8 Roundup. If you have a witness you're interviewing,
9 as a forensic toxicologist, who gives contradictory
10 statements regarding their usage history, how do you
11 decide which statement to use?
12        MR. SELDOMRIDGE:  Objection.
13 Confusing.
14    A.  That's a good question, and I just ran
15 across this yesterday. I'm not going to name the
16 case, but I have a case where the driver who severely
17 injured a motorcyclist -- actually severed the leg
18 completely off -- stated to the police at that time
19 that he had left work at 5:30. Two years later, he
20 was deposed and he swore under oath that he left work
21 between 6:00 and 6:30. That's a discrepancy. The
22 answer to that was he was extremely intoxicated when
23 he gave that answer to the police.
24 BY MR. KALAS:
25    Q.  Which one?  The 5:30 one, I assume?

1    A.  No.
2    Q.  And so when you're trying to weigh, as a
3 forensic toxicologist, two contradictory statements
4 like that, you know, do you just say, I'm going to go
5 with the more conservative thing? What do you do?
6    A.  Well, a case like this, I have to think
7 about the question that was asked. Was the question
8 clear?  If I asked the question as pesticides or
9 herbicides, he may have been thinking in terms of
10 alternate chemicals rather than Roundup.
11    Q.  But you can't recall exactly what question
12 you asked, right?
13    A.  No, not exactly.
14    Q.  And so this --
15    A.  This time, I actually said Roundup.
16    Q.  Right. And you may have said Roundup the
17 first time; you just can't recall?
18    A.  I don't think so. I think it was
19 pesticide/herbicides.
20    Q.  Okay. So when you were interviewing
21 Mr. Hall the first time, you didn't exactly ask the
22 questions you wanted to ask. Is that what you're
23 saying?
24    A.  Well, I was more interested in everything.
25 In other words, let's say he was chronically using

0

1    A.  Yeah. So I would weigh that less. In
2 fact, he gave other information at that time in his
3 interview that was -- he didn't even know the time of
4 day. He was so intoxicated that that information is
5 less credible.
6        So that's an example of how a forensic
7 toxicologists views it. Is that person under the
8 influence of a drug or alcohol? Was there a large gap
9 of time? I've been in depositions where questions
10 were asked six years later that are different than
11 that and the police statement from a sober individual.
12 So there's a lot of different variables to look at.
13    Q.  And here, the gaps in time are relatively
14 equivalent, right, February 2018 versus August 2018,
15 right?
16    A.  Yes.
17    Q.  And here, I presume, to your knowledge,
18 Mr. Hall was not intoxicated when talking to you?
19    A.  No.
20    Q.  Okay. As far as you know. You weren't
21 there. He was over the phone?
22    A.  There was no slurred speech or any -- any
23 indicators of such.
24    Q.  You haven't met him in person, right?
25 That's kind of what I'm getting at.

2

1 2,4-D. I'd want to know that as a toxicologist for --
2 you know, for possible concern of 2,4-D, especially if
3 he used it back in the early days when it contained
4 dioxins. I'd want to know that.
5    Q.  So, you know, that raises a good point.
6 You asked -- you asked Mr. Hall, if I understand
7 correctly, about other chemicals or other exposures he
8 might have been exposed to, right?
9    A.  Yes.
10    Q.  Okay. Why do you ask those questions?
11    A.  Well, I want to determine if I can find an
12 alternative cause of his NHL.
13    Q.  So what else is -- what other exposures
14 are there in the exposome, so to speak, that can help
15 contribute to NHL?
16    A.  Well, as I just said, dioxins, of course.
17    Q.  Okay. What else?
18    A.  Chemicalwise, the older formulation of
19 2,4-D, 2,4,5-T that contained dioxins as an impurity.
20 Although I think that would predate his -- based on
21 his age, would predate his possibility of use.
22        Radiological exposures to either whole
23 body electromagnetic, you know, radiation, but also
24 internal radiation from consumption of thorium-232 or
25 uranium-238, for example. Although that generally --

Transcript of William Sawyer, Ph.D.

29 (113 to 116)

Conducted on August 23, 2018



**3**

1  but -- and other carcinogens that have been shown to
2  induce non-Hodgkin's lymphoma. Also -- I'm trying to
3  think what other carcinogens now.
4        Benzene, of course, is ruled out as -- you
5  know, I'm sure all the experts would agree it only
6  causes AML, even though there are studies that
7  demonstrate NHL with benzene exposures, exposure to
8  wood preservatives from industrial sources or
9  superfund sites or other known areas of contamination.
10  Other genotoxic agents that become systemic that
11  potentially impact bone marrow stem cells, such as
12  cyclophosphamide chemotherapeutic agents, are
13  well-known to induce NHL; cyclosporine-A,
14  immunosuppressant therapy. And I think there's a
15  couple other chemicals that are not coming to mind
16  right now, but --
17     Q. So you don't have, if I understand, a
18  written list of other chemicals that can cause NHL, in
19  your opinion, or significantly contribute to NHL that
20  you ask plaintiffs about when you're doing an
21  interview in this litigation?
22        MR. SELDOMRIDGE: Objection.
23     Compound.
24     A. No. However, in this case, I did review
25  my printout of IARC carcinogens just to keep my memory

**4**

1  refreshed, but I don't have that with me today. If I
2  did, I could readily point out the couple of things
3  that I've missed.
4  BY MR. KALAS:
5     Q. And that's not on your Materials
6  Considered list either, is it, that printout?
7     A. No. I didn't even think of that.
8     Q. It should be, though, right?
9     A. The IARC printout? Yeah, I think that
10  could be, yeah. Yeah.
11     Q. ████████████████████████████
12  ████████████████████████████████████
13  ████████████████████████████████
14  ████████████████████████████████████████
15  ████████████████████████████████████████
16  ████████████████████████████
17  ████████████████████████████████
18  ████████████████████████████████████
19  ████████████████████
20  ████████████████████████████████████
21  ████████████████████
22  ████████████████████████████
23  ████████████████████████████████████████
24
25     Q. And did you look into the epidemiology on

**5**

1  being a former smoker and whether that's associated
2  with NHL?
3     A. Yes, and, again, that's based upon
4  pack-year history.
5     Q. And how about BMI and obesity? Did you
6  take that into consideration?
7     A. No. I'm not aware of any studies for a
8  person of his age to show a statistically significant
9  rate of NHL based on a ████████████████
10  ████████
11     Q. And how about night shift work? Did you
12  look into that issue, IARC has considered that a 2A
13  carcinogen.
14     A. I did not.
15     Q. You didn't ask Mr. Hall how long he worked
16  on the night shift?
17     A. No.
18        MR. KALAS: It is 12:30, so I
19     think it's time to recharge. Let's go
20     off the record.
21        THE VIDEOGRAPHER: The time is
22     12:28. We are off the record.
23        (Luncheon recess from 12:28 p.m. to
24         1:36 p.m.)
25        THE VIDEOGRAPHER: The time is

**6**

1  1:36. We are on the record.
2  BY MR. KALAS:
3     Q. Hello, Dr. Sawyer. Did you have a good
4  lunch?
5     A. Yes.
6     Q. Good.
7        MR. KALAS: I'm going to mark
8     just for housekeeping Exhibit 8.
9        (Exhibit Number 8, Supplemental Reliance
10        List of Dr. Sawyer 5/25/18, was marked
11        for identification.)
12  BY MR. KALAS:
13     Q. This is a supplemental reliance list that
14  was served in this case. Have you seen this before?
15     A. No.
16     Q. Okay. And are these -- is this a list of
17  documents that you reviewed in preparing for this
18  case?
19     A. (Reviewing document.)
20        I don't see anything here that's
21  unfamiliar, but there are, of course, duplicates and
22  triplicates of some of the same records, which, you
23  know, are different dates, which I can't really at
24  this point in time check on. It would take the rest
25  of the day.

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

30 (117 to 120)

---

7

1    Q.   You didn't prepare this list?
2    A.   No.
3    Q.   Okay.  And this list was provided to us by
4  attorneys from the Miller Firm.  Would you disagree
5  that you've received the records listed on this and
6  considered them in reaching your opinion?
7    A.   No.  As I said, I recognize all these
8  clinics and names and --
9    Q.   Okay.
10   A.   I just can't be certain.  For example,
11 OSF, there's five different batches there with Bates
12 stamp numbers.  I'd have to get on my electronic file
13 and open each one and see if I have all the numbers.
14 I mean, it would be pretty tedious, but I don't see
15 anything here that appears new.
16   Q.   Okay.  And then in addition to this list,
17 we received an email list from Mr. Travers that listed
18 the plaintiff fact sheet for Mr. Hall, Mr. Hall's
19 interrogatory answers, Dr. Nabhan's deposition in this
20 case, along with two documents -- MONGLY00952591 is
21 the beginning Bates number and MONGLY00288103 -- and
22 those are listed in Exhibit 7, about halfway through
23 that.
24        Did you review those materials as well?
25   A.   Could I see that?

---

8

1    Q.   It's in Exhibit 7, sir.
2    A.   7?
3    Q.   Yes, sir.
4    A.   Okay.
5    Q.   It's an email from Mr. Travers dated
6  August 16th, 2018, at 5:11 p.m., about halfway through
7  that.
8    A.   Right.  But I don't see the list that you
9  just --
10   Q.   You're right.  It's not on that.  It's
11 just on my personal copy.
12        MR. KALAS:  Here, I'll mark that
13 as exhibit -- I already marked
14 Exhibit 9.  So mark as Exhibit 9 the
15 PFS, and I'll come back to that.
16        (Exhibit Number 9, Plaintiff's Fact Sheet,
17         was marked for identification.)
18        MR. KALAS:  I'll mark as
19 Exhibit 10 the list that we got from
20 Mr. Travers.
21        (Exhibit Number 10, Email Chain Between
22         Jeffrey Travers and Gregory Chernack, was
23         marked for identification.)
24 BY MR. KALAS:
25   Q.   And I'll come back to Exhibit 9, sir.  I'm

---

9

1  asking about Exhibit 10 right now.
2    A.   Oh, okay.  I'm sorry.
3    Q.   That's the list that was sent to us by
4  Mr. Travers.  Did those all look like documents you've
5  reviewed in preparing your opinion?
6    A.   I know I received and I reviewed the
7  interrogatory answers.  Dr. Nabhan's deposition, I may
8  have been sent that but haven't got to it yet.  I
9  don't think I reviewed Dr. Nabhan's deposition.  As
10 far as the PFS, I'm not sure what that stands for.
11   Q.   Plaintiff fact sheet, sir.
12   A.   Oh, I'm sorry.  Yeah.  Yeah.  So the only
13 thing I can say is I don't know -- I don't recognize
14 these Bates stamp numbers.  I don't know what they
15 are.
16   Q.   I believe one is an MSDS from an AkzoNobel
17 product, and the other one is a change in formulation
18 letter.
19   A.   Yep, I reviewed those.  Yep.
20   Q.   Okay.  And you said you didn't know if you
21 had gotten to Dr. Nabhan's --
22   A.   I don't think I reviewed that deposition
23 yet.
24   Q.   Okay.  So you don't intend to offer any
25 opinions on direct right now deriving out of

---

20

1  information elicited in Dr. Nabhan's deposition?
2    A.   No.
3    Q.   Okay.  If we can go back to Exhibit 9 now,
4  which was the plaintiff fact sheet.  I think you
5  stated that you weren't sure in February of 2018 if
6  you had asked Mr. Hall if he had used Roundup or just
7  a herbicide generally, right?
8    A.   Right.
9    Q.   Okay.  If you go to page 7 of this, sir,
10 Section VII, do you see the section that says --
11 states "Roundup and Other Glyphosate-Based
12 Herbicides"?
13   A.   I'm looking.  Oh, yeah, there we go.
14   Q.   A.1. states, "Identify which of the
15 following products you have used," and then it says
16 "Roundup (any type)," and "Yes" is checked, right?
17   A.   Yes.
18   Q.   And that's consistent with your
19 understanding that Mr. Hall has used Roundup-branded
20 products, right?
21   A.   Yes.
22   Q.   Okay.  Then if you go to Number 3, it
23 says, "If you responded 'yes' to either question
24 above, complete the following information for each
25 product."

---

Transcript of William Sawyer, Ph.D.

31 (121 to 124)

Conducted on August 23, 2018

**2**

1    And then 3.a. says "Name of Product,"
2  right?
3    A.  Yes.
4    Q.  He wrote in there "Roundup," right?
5    A.  Yes.
6    Q.  Then on part b., it said, "Dates of Use
7  (range)."
8      You see that?
9    A.  Yes.
10   Q.  And it says "2008-2012," right?
11   A.  Correct.
12   Q.  And you agree with me that this plaintiff
13 fact sheet left no ambiguity as to whether or not it
14 was asking about Roundup or herbicides.  It mentions
15 Roundup specifically, right?
16   A.  Yeah.  That's correct, but my interest,
17 when I interviewed him, was try to ascertain other
18 possible causes, and I know I did ask him about using
19 2,4-D, 2,4,5-T.  I don't think I directed my question
20 to Roundup.  So I think that's why there's a
21 discrepancy.
22   Q.  Yes, sir.  And I completely understand
23 that, but you agree with me that the plaintiff fact
24 sheet here did direct the question as to Roundup,
25 right?

**22**

1    A.  It did, yeah.
2    Q.  And Mr. Hall answered "2008-2012," right?
3    A.  Yes.  Yes.
4    Q.  So as a forensic toxicologist with this
5  plaintiff fact sheet that Mr. Hall filled out that
6  states that he used Roundup from 2008 to 2012, how do
7  you square that with the discussed home use you put
8  into your August 22, 2018, toxicological notes from
9  2000 to 2008?  How do you explain that discrepancy?
10   A.  Well, it does say "work-related," c.
11   Q.  He wrote that, right?
12   A.  Yeah.  Yeah.  Again, you're asking me to
13 be a crystal ball reader, but he may have been
14 thinking in terms of his work because it does say
15 "work-related."  I -- you know, I don't know what to
16 make of it.
17   Q.  Okay.  Thank you.
18     Now, a couple other things I looked at
19 over lunch, if you can go back to Exhibit 4, please.
20 That's the manila folder.  And in the manila folder,
21 you had those billing records we talked about, right?
22   A.  Yes.
23   Q.  And if we could just look at those again
24 real quick, I have just a few questions I hope you can
25 make clear.

**23**

1    A.  Okay.
2    Q.  If you go to the bottom-line entry of the
3  invoice, which is at the end where you tabulated all
4  the hours --
5    A.  Okay.
6    Q.  -- it says that there was a previous
7  standing balance of about $7,000 there, right?
8    A.  Right.
9    Q.  Okay.  What case was that from?  Was that
10 from the Hall case or from a different case?
11   A.  Hall.
12   Q.  Hall.  Okay.
13     And so you should add the 7,000 into the
14 approximately 11,000, for $18,000, right?
15   A.  That's true.  Yes.
16   Q.  Okay.  And as to the previous $7,000
17 invoice, do you have line-entry invoice records of the
18 time you spent billing on that?
19   A.  Yeah.  I should still have that, although
20 I didn't submit it and dig for it because I thought I
21 already turned that over on our -- because I know I
22 was -- I was -- well, received a notice for deposition
23 I think in May.  I think that that initial deposition
24 was to be scheduled for early June.  And so you might
25 already have it.

**24**

1    Q.  I can represent that I don't believe we
2  have it.
3    A.  I think I still have it.
4    Q.  So if you could provide that to Jeff.
5      MR. KALAS:  Or you may already
6  have it, and you guys could send that
7  to us, I'd appreciate it.
8      MR. SELDOMRIDGE:  Yeah, we'll
9  make that available.
10     MR. KALAS:  Okay.
11 BY MR. KALAS:
12   Q.  And then in the text of the invoice there,
13 there's an entry I believe on May 31st, 2018, if you
14 could turn to that entry.
15   A.  Okay.
16   Q.  One of the things you wrote in there is,
17 extract text from Sargon motion.
18     Do you see that?
19   A.  "Extract relevant text."  Is that what
20 you're referring to?
21   Q.  Yes.  And you're discussing the Sargon
22 motion, right?
23   A.  Yes.  Yes.
24   Q.  Tell me what you were doing there with the
25 Sargon motion as far as extracting text and putting it

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

32 (125 to 128)

Conducted on August 23, 2018

---

**25**

1  into your notes.
2      A.  Well, I can't tell you absolutely
3  specifically without having the Sargon motion reply in
4  front of me, but as you know, I submitted a -- I
5  believe it was an affidavit, and there was information
6  with respect to the toxicological issues, you know,
7  Mr. Hayes's history and that kind of thing, and so I
8  copied/pasted what I could into my summary note set,
9  which was Exhibit 5.
10     Q.  Okay.  Who's Mr. Hayes?
11     A.  Mr. Hayes, I don't know.
12     Q.  You just said Mr. Hayes.  That's why I'm
13 asking.
14     A.  Mr. Hall.  I'm sorry.
15     Q.  Okay.
16     A.  You have to understand, I -- you know,
17 sometimes I call people the wrong name.  In fact,
18 there's this Jessica who used to be on my master swim
19 team, and I used to call her Lisa, and pretty soon
20 everybody was calling her Lisa.
21     Q.  So if I understand correctly, you weren't
22 taking text out of the actual motion the attorneys
23 write.  You were taking it out of your affidavit and
24 inserting it into your notes?
25     A.  Exactly.  Yeah.

---

**26**

1      Q.  Okay.  Thank you for clearing that up.
2          The last thing that was on your
3  supplemental MCL is you discussed the California
4  NSRL -- or excuse me.  You don't discuss it.  You have
5  the California NSRL on your supplemental MCL, which is
6  Exhibit 8?
7      A.  That's correct.
8      Q.  Okay.  And in your toxicological notes, I
9  don't see any discussion of the California NSRL.  Do
10 you intend to discuss the California NSRL at trial?
11     A.  Probably.
12     Q.  Okay.  What are you going to say about the
13 California NSRL at trial?
14     A.  Well, in two seconds I can say that I
15 agree with their assessment in terms of its
16 classification as a carcinogen.  However, I think in
17 terms of their cancer slope calculation, they should
18 have used Wood 2000b, as the methodology under US EPA
19 requires the most sensitive model and the
20 highest-quality model, which would be Wood 2000b.
21     Q.  You mean 2009b?
22     A.  I'm sorry?
23     Q.  You mean 2009b?
24     A.  Yes.  Yes.  Thank you.
25         MR. KALAS: Okay.  And I'll just

---

**27**

1      note again for the record that, again,
2  this is not in the notes, and that's
3  another reason why we require
4  additional time with Dr. Sawyer.
5  BY MR. KALAS:
6      Q.  Okay.  Thank you for clearing up that.
7          Turning back to Mr. Hall, and if we go to
8  Exhibit 6 that you have, starting on page 11, what I
9  would call I guess the summary of your discussion with
10 Mr. Hall in February 2018, right?
11     A.  Yes.
12     Q.  Okay.  Just generally, in these
13 questionnaires of witnesses or plaintiffs in the cases
14 that you work on, did we cover, when we discussed the
15 August conversation, all of the general subjects that
16 you ask about as far as alternative exposures and PPE
17 and that sort of thing, or are there other general
18 subjects you inquire about in these conversations?
19     A.  I'm not clear.  Are you asking me is there
20 information I ascertain that I didn't include?
21     Q.  No, no, no.  I'm not asking that at all.
22 What I'm asking is, just from a 30,000-foot level,
23 when we discussed your August 2018 conversation with
24 Mr. Hall, did we cover all of the broad subjects that
25 you would have asked about at the February

---

**28**

1  conversation as well, as far as alternative exposures,
2  personal protective equipment, etc.?
3          MR. SELDOMRIDGE:  Objection.
4  BY MR. KALAS:
5      Q.  And if you don't remember, I can just ask
6  it a different way.  Let me ask it a different way.
7          What would you be looking to find out from
8  Mr. Hall in one of these interviews?
9      A.  What document would I look at?
10     Q.  No.  What would you be trying to find out
11 from him?
12     A.  Oh, I was trying to ascertain, like I say,
13 his age and be certain -- and his age, his weight to
14 make sure I had that correct.  I was confused about
15 the gloves because I made an assumption that jersey
16 gloves were the padded type, and they're not.
17     Q.  Don't mean to cut you off.  I'm not asking
18 about August.  I'm asking about February.
19         When you talked to him in February, what
20 would you have been trying to find out?
21     A.  Oh, well, I was -- I started off trying to
22 determine just some general information about his use
23 of Roundup and his type of personal protective
24 equipment and also whether there are other chemicals
25 involved with exposures from other occupations and

---

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

33 (129 to 132)

Conducted on August 23, 2018

---

29

1 what his occupational history was. Talked about his
2 condition currently in terms of, you know, how he was
3 doing, and gave me the synopsis of his treatment.
4 Also asked about smoking in terms of what he could
5 recall because I found kind of a dichotomy of two
6 different scenarios of the smoking in the medical
7 records.
8      Q.   Okay. Now, I want to ask about all this,
9 but this may help curtail some questions.
10      When you conducted your exposure
11 assessment in Exhibit 6, are you including Mr. Hall's
12 personal use that he discussed from 2000 to 2008 with
13 you of Roundup?
14      A.   Back in -- back in February?
15      Q.   No. I'm just asking generally in the
16 entirety of your opinions. When you come to tell the
17 jury about Mr. Hall's exposure to Roundup, in your
18 exposure assessment you derived from the UK POEM
19 model, are you including his personal use that he
20 claims to have used from 2000 to 2008?
21      A.   No, I'm not including it in the dose
22 estimate because it's minuscule compared to his work
23 exposure. It's additive. You know, certainly there
24 was some additional exposure there from the home use,
25 but it was very minimal.

---

30

1      Q.   Okay. And one more question before we get
2 deep into this. When we were discussing sort of other
3 exposures besides Roundup or glyphosate-based
4 herbicides that, in your opinion, can cause
5 non-Hodgkin's lymphoma, do you have a collection of
6 articles you rely upon to reach those conclusions?
7      A.   Not by malignancy. By chemical, yeah.
8 But in other words, I don't have a file drawer that
9 says non-Hodgkin's lymphoma. I have a file drawer for
10 dioxins and etc., etc., different chemicals.
11      Q.   So as to the chemicals we just discussed
12 before lunch, I think you mentioned dioxins. We
13 talked about cigarettes. We talked about wood
14 preservatives, bunch of other stuff. Do you have a
15 separate file for each of those exposures?
16      A.   I used to. I used to file everything by
17 paper, and I tend to -- for the past, I would say, ten
18 years now, I keep everything electronically. And I
19 try to use keywords in my electronic files that I can
20 search. So I really don't have an up-to-date paper
21 collection of the substudies.
22      Q.   So if I understand correctly, when you
23 reached your specific causation opinion in this case,
24 did you conduct something called a "differential
25 diagnosis" or "differential etiology"?

---

3

1      A.   I did. That's --
2      Q.   Okay.
3      A.   In terms of my review of the medical
4 records and questions in terms of his exposures, his
5 occupational history, family history █████████████████
6 ████████████████████████████████████████████████████
7 ████████████████████████████████████████████████████
8 ████████████████████████████████████████████████████
9 ████████████████████████████████████████
10 ████████████████████████████████████████████████████
11 ████████████████████████████████████████████████████
12 ████████████████████████████████████████████████████
13 ████████████████████████████████████████████████████
14 ████████████████████████████████████████████████████
15 ████████████████████████████████████████████████████
16 ████████████████████████████████████████████████████
17 ████████████████████████████████████████████████
18      Q.   So what I'm trying to understand is, you
19 know, you have this list of potential causes you've
20 ruled in, and I'm trying to get an understanding of
21 the galaxy of literature you're relying on to rule
22 those in.
23      A.   Oh, I'm primarily relying on experience,
24 training and experience, and reviewing thousands or
25 ten thousands of studies over time and having specific

---

32

1 training in a medical school and in a toxicology
2 program and in knowing what causes NHL and what
3 doesn't. That's primarily what I rely on.
4      I do on occasion look at the IARC -- the
5 updated IARC list just to jog my memory when I'm
6 evaluating a case like this. But I don't have any
7 magic drawer I go to.
8      Q.   Okay. So you don't have on your Materials
9 Considered in this case the body of epidemiology
10 literature on the association of smoking and
11 non-Hodgkin's lymphoma?
12      A.   No. I reviewed online peer-reviewed
13 studies. In fact, I think I've printed the most
14 current and substantial one, which is in my file box
15 here.
16      Q.   And that wasn't on your Materials
17 Considered produced prior to this deposition. It's in
18 your box. It's not on any of the Materials Considered
19 we've looked at today?
20      A.   What do you mean by "Materials
21 Considered"? What does that mean?
22      Q.   Well, Exhibit 8, the documents cited in
23 Exhibits 5 and 6 and the Exhibit 10 and the documents
24 cited in your Dewayne Johnson Materials Considered
25 list.

---


Transcript of William Sawyer, Ph.D.

34 (133 to 136)

Conducted on August 23, 2018

**33**

1    A.   Oh, well, I didn't make those lists.
2  Those are documents provided to me by the law firm.
3    Q.   Okay. So --
4    A.   I haven't been asked to produce a full
5  list of documents I reviewed. I was requested to
6  bring them here today.
7    Q.   There's an agreement, and I believe it's
8  part of the pretrial order that Materials Considered
9  lists will be provided ten days ahead of depositions.
10 So is it my -- are you telling me right now that you
11 have reviewed more materials than what has been set
12 forth in Exhibits 5, 6, 8, 10, and your Dewayne
13 Johnson report?
14   A.   Yeah. I reviewed more studies, but --
15 there's a document here that is called the notice of
16 deposition, and that's what I used. It didn't say
17 anything about providing a list ten days ahead of
18 time.
19   Q.   I'm not casting any aspersions on you,
20 sir. It's about the attorneys. So I appreciate that.
21       Do you have a full list anywhere in your
22 possession of everything you've reviewed in preparing
23 your opinion?
24   A.   I have a list that includes the vast
25 majority of the studies, and I have it here in my box.

**34**

1    Q.   Okay. And that's up to date? Because I
2  saw a list from December 2017 in there.
3    A.   Yeah. It's from December. Now, I have --
4  the newer studies are not in these folders that are
5  marked A through C and D through G, EPA, J to R and S
6  to W. The new stuff's not in those. The new
7  stuff's -- new things I have are in these small
8  folders, and there's not much. There's probably, as
9  far as studies, maybe -- maybe a dozen studies.
10       MR. KALAS:  Okay. So I'll note
11 for the record that we have not had a
12 fulsome opportunity to prepare for this
13 deposition, given the fact that
14 Dr. Sawyer is now disclosing additional
15 studies that he's relying upon to reach
16 his opinion.
17       MR. SELDOMRIDGE:  And I want to
18 note for the record that it appears to
19 me that Dr. Sawyer is speaking about
20 his collective knowledge of -- you
21 know, through schooling and throughout
22 his entire career. There's no way we
23 can produce those documents.
24       MR. KALAS:  I think Dr. Sawyer's
25 testimony speaks for itself.

**35**

1        MR. SELDOMRIDGE:  Agreed.
2  BY MR. KALAS:
3    Q.   Dr. Sawyer, you agree with me there's a
4  body of epidemiological literature out there that
5  looks at the association between cigarette smoking and
6  non-Hodgkin's lymphoma, right?
7    A.   Yes.
8    Q.   And you've reviewed, if I understand
9  correctly, many of those studies over the years,
10 right?
11   A.   Yes.
12   Q.



**36**

9    Q.   Well, let me ask about your criteria. If
10 something is statistically significant in an
11 epidemiological study, do you consider that a risk
12 factor for non-Hodgkin's lymphoma?
13   A.   Again, it's too general to say yes or no
14 without reviewing the study. It's like that example I
15 gave earlier of the Agricultural Health Study that did
16 show a statistically significant finding for T-cell
17 lymphoma. However, there were only 18 subjects that
18 were positive, and the protocol that the study set
19 forth required 20.
20       So, I mean, there's -- one has to address
21 and assess each study independently before applying
22 the weight of evidence. I mean, that is the standard
23 methodology that toxicologists use, you know, Bradford
24 Hill and weight of evidence. So just to make a
25 general statement on the study is difficult without

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 37 of 125
CONFIDENTIAL

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

35 (137 to 140)

---

**Page 37**

1  reviewing it.
2      Q.  Well, it's difficult for me to ask you
3  about the study if I don't have a list of what you've
4  reviewed.  So what I'm trying to understand is what
5  exactly you have reviewed in reaching your opinion.
6  So if I can go topic by topic.
7      A.  But I answered it.
8      Q.  Well, I don't know if we have topic by
9  topic.
10     A.  I said that with respect to the smokeless
11 tobacco concern, I have not come across studies that
12 actually demonstrate NHL.
13     Q.  And did you do a search on PubMed or
14 Google Scholar or anything like that for NHL and
15 smokeless tobacco in reaching your opinion?
16         MR. SELDOMRIDGE:  Object to form.
17 Compound.
18     A.  I don't think I did a specific search for
19 the search term "smokeless tobacco and NHL," but I did
20 review and have reviewed over the years the body of
21 NH -- yeah, NHL studies as well as smokeless tobacco
22 studies, and I've never come across a significant
23 causal association.
24 BY MR. KALAS:
25     Q.  Okay.  When's the last time you reviewed

**Page 38**

1  that body of literature?
2      A.  Within -- within the time that I have been
3  working on these Monsanto cases.
4      Q.  And you used that review of that body of
5  literature to inform your opinions here regarding
6  Mr. Hall, right?
7      A.  Just to confirm my opinion that I don't --
8  I'm not aware of any relationship.
9          MR. KALAS:  All right.  So, once
10 again, there is a list of -- a body of
11 literature Dr. Sawyer has reviewed that
12 has not been disclosed.  We would ask
13 that that body of literature be
14 disclosed via in a supplemental
15 Materials Considered list forthwith,
16 and we also ask for additional
17 deposition time based on that.
18 BY MR. KALAS:
19     Q.  Since I can't ask you about that body of
20 literature today, Dr. Sawyer, let me continue on.
21 Back to Exhibit 6.
22         When you spoke to Mr. Hall, he told you
23 that he worked as a self-employed landscaper from 2007
24 to 2013, right?
25     A.  He did.

**Page 39**

1      Q.  Okay.  And did he tell you how many
2  clients he had when you spoke to him?
3      A.  No.
4      Q.  Did he tell you how many days he worked as
5  a landscaper when you spoke to him?
6      A.  Yes.
7      Q.  Four to five?
8      A.  Yes.
9      Q.  Okay.  And then what Mr. Hall told you in
10 February 2018 was that he used Roundup from 2008 to
11 2012, right?
12     A.  Yes.
13     Q.  And he told you that he used 12 to
14 13 gallons a summer, right?
15     A.  Yes.
16     Q.  And when he said "a summer," did he mean
17 his entire spring season or did he mean the
18 meteorological summer?
19     A.  I understood it as from when he started
20 his work in early April until the end of October.
21     Q.  And so that's approximately half a gallon
22 a week of super concentrate, right?
23     A.  Yes.
24     Q.  Okay.  And then I understand that Jeff has
25 a picture of the hand-pump sprayer, so did you -- did

**Page 40**

1  you get -- I guess I won't ask any questions because
2  there's an actual visual representation.
3          But you mention here that the hand pump
4  was set to a mist setting, right?  That's what he told
5  you, the hand-pump sprayer he used?
6      A.  I don't remember.
7      Q.  Okay.  So if you look at 11, "Roundup
8  Application Notes," you see that where it says on the
9  third line, the wand was set at a mist setting?
10     A.  Yes.
11     Q.  Okay.  So what's that mean as far as
12 droplet size?
13     A.  I believe, from what I have reviewed in
14 the Monsanto documents, that would be, I believe, in
15 the 100-micron range.
16     Q.  Okay.  And you don't know if the Monsanto
17 documents you reviewed are referring to the exact type
18 of hand-pump sprayer that Mr. Hall used?
19     A.  That's correct.
20     Q.  And so does the fact that the hand-pump
21 sprayer was set to a mist setting affect your opinions
22 in this case in any way?
23     A.  Well, if -- I think it confirms the next
24 sentence, that he noted that he could smell the
25 Roundup.  Certainly the mist setting, there's greater

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

36 (141 to 144)

**4**

1  degree of drift.
2      Q.  Now, you agree that every rate or every
3  body whose opinions on glyphosate -- and by "body," I
4  include IARC, so IARC, EPA, other regulatory bodies,
5  every body you've reviewed on glyphosate has found
6  that the inhalation exposure to Roundup is relatively
7  small proportion of the total exposure in an
8  occupational setting, right?
9      A.  Yes, I agree.
10     Q.  And do you agree with that opinion of
11 those bodies?
12     A.  Yes, I agree.
13     Q.  Okay.  Now, Mr. Hall told you, according
14 to these notes, that there was blowback of the mist on
15 windy days, right?
16     A.  Yes.
17     Q.  Did he tell you what proportion of the
18 days he sprayed it was windy?
19     A.  No, but he didn't live too far away from
20 the "Windy City," Central Illinois.  I'm sure there
21 are windy days.
22     Q.  But you don't know if it was once a week,
23 two times a week, twice a month?  You don't know what
24 proportion of the days were windy?
25     A.  No.

**42**

1      Q.  And then -- and this is also discussed at
2  sort of the back of Exhibit 6.  You talked about the
3  fact that Mr. Hall told you two to three times a week
4  he had to unclog the wand, right?
5      A.  Yes.
6      Q.  Now, the Roundup mixture he was using
7  contained Roundup concentrate, right?
8      A.  Super concentrate.
9      Q.  Okay.  Super concentrate?
10     A.  I think 52 percent.
11     Q.  And the constituents of Roundup super
12 concentrate -- it's probably an obvious question --
13 they're all liquid, right?
14     A.  Yes.
15     Q.  Okay.  And then there was some added water
16 to the mix that he made, right, Mr. Hall?
17     A.  Yes.
18     Q.  Okay.  So what would get in the wand to
19 clog up the wand?
20     A.  That particular chemical mix, if it sits
21 too long, it forms a -- almost a nasal mucus, slimy
22 precipitate, which can clog up the machine.
23     Q.  Okay.  And is it just in a sprayer that it
24 would happen like that, or if I put it, you know, on
25 the ground, would it eventually become a mucus -- 

**43**

1      A.  That, I can't answer.
2      Q.  Okay.  How about on my skin?
3      A.  On the ground, it -- no, it couldn't on
4  the ground because it's not going to persist long
5  enough.  On the skin, it's not going to persist long
6  enough.  It has to sit stationary, still for a while.
7      Q.  Okay.  And then you noted in this
8  interview -- and tell me if the August interview
9  changed this at all, but in this interview in
10 February, you noted that to unclog the wand, he would
11 bang the wand or blow on it with his mouth, right?
12     A.  Yes, which led me to ask more questions
13 yesterday.
14     Q.  Okay.  Did he tell you which of those two
15 things he did more often?  The way it's represented
16 here in the February interview is it's an either/or
17 proposition.
18         Which did he do more often, banging or
19 blowing on it?
20     A.  I -- I didn't ask that question.  What I
21 did find out is that he said that the clogs in the
22 removal with his bare hands of the instrument occurred
23 two to three times a week.
24     Q.  Okay.  And this might seem like an obvious
25 question as well, but when he put his mouth on the

**44**

1  wand, there wasn't a flow of herbicide coming out of
2  the wand, right?  It was clogged?
3      A.  It wouldn't be under pressure.  I know
4  that.
5      Q.  So it's not like it's a spray coming into
6  his mouth?
7      A.  You have to hold the trigger to have
8  pressure there.
9      Q.  Right.
10     A.  Right.  There's -- he didn't indicate in
11 any way that he drank it.
12     Q.  Okay.
13     A.  But certainly he had it on his lips, and
14 he could detect that.
15     Q.  So, still, it's a dermal exposure on the
16 lips or inside the mouth, correct?
17     A.  No.  What am I doing right now?  Licking
18 my lips.
19     Q.  Okay.
20     A.  Now, lips -- when it's on the lips, that
21 is considered oral.
22     Q.  Okay.
23     A.  Because it -- because of the licking.
24     Q.  So did you quantify the oral exposure at
25 all?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

37 (145 to 148)

Conducted on August 23, 2018

---

**45**

1    A.   No.  I treated it as zero.

2    Q.   Okay.

3    A.   And you'll see in my notes that I listed a

4  number of things that I've treated as zero that -- to

5  show that my dose value is greatly underestimated.

6    Q.   Now, another thing Mr. Hall discussed with

7  you in February was his dilution practices of Roundup,

8  right?

9    A.   Yes.

10    Q.   And he told you he diluted Roundup super

11  concentrate according to the label instructions,

12  right?

13    A.   Yes.

14    Q.   Did you ask Mr. Hall if he wore the PPE

15  called for by the Roundup super concentrate label

16  while diluting the Roundup super concentrate?

17    A.   Yes.  I asked him -- I didn't ask him -- I

18  didn't use the word "PPE required."  I asked him what

19  he wore, to get an objective honest answer.  You know,

20  "What did you wear?  How did you do it?"

21    Q.   Did you look at the Roundup super

22  concentrate label?

23    A.   I was already familiar with it.  Looked at

24  it many, many times.

25    Q.   Okay.  And does the -- did Mr. Hall's

---

**46**

1  personal protective equipment that he wore match what

2  was required on the label for mixing?

3    A.   In his mind, it did.  He was wearing

4  gloves, but they certainly weren't the right kind.

5    Q.   Well, the label calls for chemically

6  resistant gloves, right?

7    A.   Yeah.

8    Q.   So my question is, you said in his mind he

9  did.  Did he comply with the label in mixing/loading

10  Roundup super concentrate?

11    A.   With respect to the gloves, no.  He wore

12  a -- the nonchemically protective glove.

13    Q.   Now, cotton gloves do provide some

14  protection, though they aren't fully chemically

15  resistant, right?

16    A.   For perhaps under the conditions, early

17  morning dew and rubbing the gloves against the

18  vegetation coated with Roundup, the protection would

19  be a very brief duration because the cotton gloves

20  would wet and wick the material to direct contact with

21  the skin in a matter of minutes or hours.

22    Q.   Have you read any literature either put

23  out by regulatory agencies or in peer-reviewed

24  literature regarding the protective factor that cotton

25  gloves offer when they interact with glyphosate and

---

**47**

1  water?

2    A.   I did reference an OSHA study or -- I

3  think it was an OSHA study on gloves that I brought

4  with me and I previously referenced in Exhibit 5, I

5  believe.

6    Q.   The question was slightly different, which

7  is, did you review anything regarding the protective

8  factor that cotton gloves offer when they interact

9  with glyphosate, specifically glyphosate, and water?

10    A.   Yeah, the document I show is that a cotton

11  glove would offer no protection for that.

12    Q.   That's a glyphosate-specific study, sir.

13    A.   For a water-soluble chemical.

14    Q.   So you haven't reviewed any of the studies

15  in the published literature put out by various

16  regulatory agencies that actually specifically look at

17  glyphosate and cotton?

18    A.   That's a -- not a reasonable question.

19  When a scientist studies PPE -- that is, personal

20  protective equipment -- it's by chemical category; for

21  example, a solvent or a water-soluble compound and

22  other categories.  We don't category -- we don't form

23  a study just for glyphosate and water.  There is no

24  such thing.  It's not how it's studied.  It's studied

25  by the chemical characteristics of each agent.

---

**48**

1    Q.   So you haven't reviewed a study by Ronald

2  Wester, published in 1996, on glyphosate and cotton?

3    A.   I do have a Wester study, but I don't

4  think I have that one.

5    Q.   Since you haven't reviewed it, you won't

6  be telling the jury any opinions about that study,

7  right?

8    A.   I don't know.  I can't predict that.

9    Q.   The attorneys from the Miller Firm haven't

10  sent you that study, to your knowledge?

11    A.   I don't believe I've -- I have that study.

12    Q.   And you didn't find that in your

13  independent literature search, right?  You didn't look

14  for that?

15    A.   Oh, I did look for glove studies, yes.

16    Q.   But you didn't find that particular one?

17    A.   Did not.

18    Q.   Okay.  Now, you note here that Mr. Hall's

19  hands would get wet when diluting Roundup, right?

20    A.   That's what he stated, yes.

21    Q.   And did he tell you how often they would

22  get wet?  In other words, was it every time?  Only

23  sometimes?

24    A.   I didn't specifically ask him that.  I

25  can't answer that.

---

Transcript of William Sawyer, Ph.D.

38 (149 to 152)

Conducted on August 23, 2018

---

**49**

1    Q.   And did he tell you how much of his hand
2 would get wet? Was it the whole hand? A portion of
3 the hand?
4    A.   **When filling the container, I didn't ask**
5 **that. What I did ask yesterday was, during use, how**
6 **wet would his hand get specifically from glyphosate,**
7 **and he stated that the stem where it connects to the**
8 **area where the trigger is located would often become**
9 **leaky and that his hand would get soaked from the**
10 **material basically backflowing onto his hand and**
11 **dripping onto his fingers.**
12    Q.   So if I -- just so I understand correctly,
13 that's during use of Roundup, not during
14 mixing/loadings?
15    A.   **Right.**
16    Q.   So during mixing/loading, if I understand
17 correctly, you didn't specifically ask him what
18 portion of his hand would get wet?
19    A.   **Yeah, that's true.**
20    Q.   Okay. And do you know when in the
21 diluting process the portion or the whole hand or
22 whatever portion of his hand would get wet?
23    A.   **I didn't detail that. I don't know.**
24    Q.   So you didn't ask if it was before the
25 concentrate was mixed with water, during, or after?

**50**

1    A.   **All I recall was that the Roundup was put**
2 **in first and then the water.**
3    Q.   Okay. But it would matter when they would
4 get wet because if he got wet when the water was in
5 there, it would be a much more dilute concentration,
6 right?
7    A.   **Yes.**
8    Q.   Okay. And how did he mix the dilution?
9 In other words, did he use an instrument? I'm
10 imagining a guy -- I went to school in the South.
11 People made Brunswick stew with these like 8-foot
12 spoons. I mean, was it like a witch's vat? I mean,
13 how did he -- how did he mix it together?
14    A.   **In speaking with him, the only thing I**
15 **recall was he carried some type of water jug on the**
16 **truck, as I recall. I don't know if he had a hose off**
17 **that. I just -- he said something about it, but I**
18 **don't remember.**
19    Q.   So he had a water jug. So would he put in
20 the Roundup, put in the water, and then shake it?
21    A.   **He didn't say anything about shaking it.**
22    Q.   Okay.
23    A.   **I think -- my understanding is he's**
24 **putting the water in last, and that's providing the**
25 **dilution movement.**

**5**

1    Q.   So he's not inserting his hand into this
2 jug --
3    A.   **Oh, no.**
4    Q.   -- and mixing it around?
5    A.   **No.**
6    Q.   Okay. Now, I want to --
7    A.   **That's crazy.**
8    Q.   I have to ask, you know. I want to
9 come -- I want to go to I guess page 14, but before I
10 ask you about the PPE, I want to ask you about the
11 Application Frequency section real quick, and then
12 we'll come back to the PPE.
13         So what Mr. Hall told you is he used
14 Roundup about seven months a year, right?
15    A.   **Yes.**
16    Q.   And he told you he used it for a five-year
17 period, right?
18    A.   **Yes.**
19    Q.   And he told you he landscaped about 40
20 hours a week during those months, right?
21    A.   **Yes.**
22    Q.   And about five to ten hours a week would
23 be spent using Roundup, right?
24    A.   **Yes.**
25    Q.   Now, did you ask Mr. Hall what time of day

**52**

1 he typically applied Roundup?
2    A.   **Yes.**
3    Q.   What time of day did he typically apply
4 it?
5    A.   **Generally the morning.**
6    Q.   The morning. Okay. And would it be the
7 first thing he'd do when he'd get to a site?
8    A.   **I don't know. He might survey a site**
9 **first. I don't know.**
10    Q.   You didn't ask that?
11    A.   **I didn't ask.**
12    Q.   Okay. Now in -- you said "in the
13 morning." Do you know what time he'd get to a site?
14 Did he start his day at 7:00? 8:00?
15    A.   **I didn't ask. I can infer that it would**
16 **have been early because he said it was generally dew**
17 **when he started.**
18    Q.   And in the summertime, the sun comes up
19 pretty early, right?
20    A.   **Central Illinois, Central Time Zone.**
21    Q.   6:00 a.m., something like that?
22    A.   **Probably, yeah.**
23    Q.   And so it would be fair to assume he got
24 to a site somewhere between 7:30 and 8:30, you would
25 say, with the dew?

CONFIDENTIAL

## Transcript of William Sawyer, Ph.D.

39 (153 to 156)

## Conducted on August 23, 2018

---

53

1    A.   I can't make that assumption.

2    Q.   And you didn't ask, right?

3    A.   I didn't ask.

4    Q.   So I guess one thing that's a little

5  confusing to me here is that you said Mr. Hall told

6  you he worked on 10 to 12 houses per week, right?

7    A.   Yes.

8    Q.   Okay.  And if he worked 40 hours a week,

9  does that mean each house took about 40 -- four hours

10 to do?

11   A.   Yes.

12   Q.   Okay.  How big were the lots on these

13 houses?  That seems like an awful lot of time to me.

14   A.   Well, I did review, gosh, probably 50

15 photos last night from the CDs that I brought.  What I

16 did was I started at the beginning of the CD, and then

17 I jumped ahead about 10 or 15 and then another 10.  So

18 I just kind of took an equal distribution view of

19 about 50 photos, and what I saw in general were a lot

20 of large grass yards, a lot of large yachts -- not

21 yachts -- lots.

22   Q.   We won't talk about yachts today.

23   A.   No.  No.  But, yeah, many -- many of the

24 properties were a good size.  Now, there were also

25 some tiny ones, but yeah.  I mean, I know that he --

---

54

1  based on those photos, he did certainly work on some

2  fairly large yards.

3    Q.   Now, when you say "good size" and "large,"

4  I hope you don't mind me asking you to be more

5  specific.  Are we talking an acre?  Are we talking

6  half an acre?

7    A.   Oh, half-acre lot to --

8    Q.   Half acre?

9    A.   Yeah.  Even acre lot, I saw some of those.

10 But certainly I saw a lot of half-acre lots.

11 Half-acre lot would be roughly -- about

12 200-by-100-foot lot --

13   Q.   Okay.

14   A.   -- would roughly be a half acre.

15   Q.   And it's your understanding from what

16 Mr. Hall told you that it would take him four hours to

17 work on a half-acre lot on average?

18   A.   Well, I mean, that is something we can

19 extrapolate from what he said.  He didn't -- I didn't

20 ask him exactly how long per lot.

21   Q.   Okay.

22   A.   So, I mean, if we extrapolate the number

23 of lots, that's probably about right.

24   Q.   Now, going back to the clothing, it says

25 that you -- you said that he started the day in jeans,

---

55

1  right?

2    A.   Yes.

3    Q.   Okay.  And he also started his day in a

4  T-shirt and flannel shirt, right?

5    A.   Yes.

6    Q.   Now, you don't know -- I think we've

7  established this.  You didn't ask what time of day

8  he'd start his landscaping work, right?

9    A.   Morning with dew.  That's all I know.

10   Q.   Okay.  So you noted that he took his

11 flannel shirt off, on an average day, by 10:00, right,

12 because of the heat?

13   A.   Yes.

14   Q.   But if he started his day at 7:00 in the

15 morning, that would mean half the day, thereabouts, he

16 was wearing the flannel shirt.  While if he started at

17 9:00, it would only mean an hour of the day he was

18 wearing the flannel shirt, right?

19   A.   Right.

20   Q.   That could be a significant difference in

21 the personal protective equipment he was wearing while

22 applying Roundup?

23   A.   Yes.

24   Q.   And you didn't ask about that?

25   A.   No.

---

56

1    Q.   Okay.  And then he told you he'd do this

2  because the day would get hot, right?

3    A.   Yes.

4    Q.   And did he only take his flannel shirt off

5  on hot days, or did he take it off every day?

6    A.   Only when he was warm, too warm.

7    Q.   So like in April if he was applying

8  Roundup, early April in Central Illinois, he might

9  keep his flannel shirt on all day?

10   A.   It's possible.

11   Q.   And you didn't ask about what type of year

12 it got too hot to wear the flannel shirt after 10:00?

13   A.   No.

14   Q.   Okay.  Did he tell you what temperature it

15 would take for him to feel like he needed to take off

16 his flannel shirt?

17   A.   No.

18   Q.   Okay.  Now, Mr. Hall did tell you that

19 he'd wash his clothes each day, right?

20   A.   Not exactly in those words.  I think he

21 said he changed.  He put new clothes on each day.  I

22 don't know that he batch washed every day.  He may

23 have batched them --

24   Q.   Fair.

25   A.   But yes, he changed his -- he wore fresh

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8572-19 Filed 12/27/19 Page 42 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

40 (157 to 160)

**57**

1 clothes.

2     Q. Okay. And so leaving the gloves aside,

3 you aren't going to be telling the jury that

4 Mr. Hall's flannel shirt or jeans or socks had any

5 glyphosate that had built up and then been reactivated

6 the next day?

7     A. No.

8         MR. SELDOMRIDGE: Objection.

9 Compound.

10 BY MR. KALAS:

11     Q. Now, he told you that he wore a vapor mask

12 5 to 10 percent of the time, right?

13     A. Yes.

14     Q. How would he decide which 5 to 10 percent

15 of the time to wear it?

16     A. I didn't ask. It's not that relevant

17 because I'm not considering substantial inhalation

18 dosage anyway.

19     Q. Well, the vapor mask as well would provide

20 some protection of dermal absorption to the face,

21 right?

22     A. It should, yeah.

23     Q. Okay. And that would be relevant, right?

24     A. Based on the exposure dose data I relied

25 on from the UK model, a dust mask over the mouth area

**58**

1 would be -- have, from a mathematical standpoint, very

2 little impact. It would certainly offer -- afford

3 some protection, but very minimal compared to where

4 the primary dose is entering the body.

5     Q. Where does the primary dose enter the body

6 in an applicator?

7     A. In a handheld situation as opposed to a

8 backpack, feet, legs, hands. And he didn't wear a

9 backpack because in a backpack situation the exposure

10 for the backpack is typically six times higher than

11 any other part of the body. But he -- that's

12 irrelevant in this case.

13     Q. And as far as Mr. Hall's feet, legs, and

14 hands, he had clothing on those areas at all times

15 when he was applying Roundup, correct?

16     A. Right.

17         MR. SELDOMRIDGE: Objection.

18 Compound.

19     A. It was not nonpermeable clothing. It was

20 completely permeable.

21 BY MR. KALAS:

22     Q. It was cotton?

23     A. Yes. And he had -- did not wear rubber

24 boots, either. His feet were completely open, and he

25 states his feet were always soaked from the combined

**59**

1 dew and glyphosate.

2     Q. Yeah. Did you do any calculation of what

3 amount of the liquid combination of the dew and

4 Roundup mixture was the Roundup mixture versus the

5 dew?

6     A. No. That's impossible. And he also

7 indicated that it wasn't just dew that -- that was

8 contacting him. There were -- there wasn't always

9 dew, but he would spray, and he -- and I checked with

10 him again yesterday. He said he could never really

11 determine where to walk that would be, you know, free

12 of the spray because he would end up backtracking,

13 walking through areas that he already sprayed.

14     Not all his spraying, as we know, occurred

15 in the dew of the morning. Some of that spraying

16 occurred on days when there was no dew or post dew.

17     Q. Did Mr. Hall ever report to you that he

18 had soaking legs when -- or soaking feet when there

19 was no dew present?

20         MR. SELDOMRIDGE: Object to the

21 form. Compound.

22     A. He certainly did, with respect to his

23 hands, from the leakage. And he also indicated that

24 his feet would get wet and that the type of cheap

25 sneaker he had, the spray would go through it.

**60**

1 BY MR. KALAS:

2     Q. Okay. The question was a little

3 different. I don't think you addressed legs there,

4 and I'm not sure what you meant on feet. So let me

5 ask it again and try to break it down.

6     When Mr. Hall talked about the fact that

7 his feet would get wet and that the spray would go

8 through the cheap sneaker, did he indicate to you this

9 would happen in the absence of applying -- or in the

10 absence of dew?

11     A. Yes.

12     Q. Okay. When?

13     A. His words were "all the time."

14     Q. Okay. So it's your testimony that

15 Mr. Hall told you he applied enough Roundup to the

16 vegetation he was spraying to soak his feet through by

17 itself?

18     A. That is -- he said that his feet would

19 become very wet.

20     Q. His feet?

21     A. Yeah. Yeah. It went right -- when I

22 talked to him again yesterday, he said it went right

23 through his sneakers.

24     Q. And if somebody's using a hand-pump

25 sprayer, if I understand it correctly, you're -- and

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

41 (161 to 164)



**6**

1 tell me if you have a different understanding from
2 Mr. Hall, but they're holding the pump in one hand and
3 they have the wand out with the other and they're
4 pointing downwards and forwards, correct?
5     A.  Yes.
6     Q.  And they're applying it to a specific
7 piece of vegetation, correct, or range?
8     **A.  Not exactly. He -- for the most part, he**
9 **was spraying -- I'm trying to think of the word -- an**
10 **entire area. He wasn't selectively shooting just a**
11 **weed but --**
12     Q.  He was clearing land?
13     **A.  Yeah.**
14     Q.  And it's your testimony that he used
15 Roundup -- he told you he used Roundup in such copious
16 amounts that it would soak through his feet?
17     **A.  I think his words were that his feet would**
18 **become wet.**
19     Q.  Have you quantified how much Roundup it
20 would take for somebody to spray on an area of
21 vegetation for it to get off the vegetation onto the
22 shoes and soak through them?
23     **A.  No, but there's also the direct spray from**
24 **the wand as well that hit the feet.**
25     Q.  Okay. So if I understand you correctly,

**62**

1 it's your testimony that you understand Mr. Hall told
2 you that when he was spraying with this wand, somehow
3 he would spray his feet by mistake?
4     **A.  Yeah. When I first talked to him, he**
5 **explained there was overspray as well as drift, as**
6 **well as contact with material that he already sprayed.**
7 **There were several, several reps that caused that. He**
8 **was very clear on the feet being wet. He explains it**
9 **in very compelling detail.**
10     Q.  Did you ask Mr. Hall whether or not he
11 covered his head when he used Roundup?
12     **A.  I asked him what he wore, and it should be**
13 **in here. I just don't remember if he was wearing a**
14 **hat or not. I know he didn't wear any kind of face**
15 **shield or protection of that sort, but he might have**
16 **had a hat. I just don't remember.**
17     Q.  You didn't note that here in your notes,
18 right?
19     **A.  No, I didn't. I don't see it.**
20     Q.  Did Mr. Hall tell you or did you ask him
21 about eye protection?
22     **A.  Yeah, he didn't wear any eye protection.**
23     Q.

**63**

1     A.
2
3     Q.
4
5
6     **A.  Right.**
7     Q.  Okay.
8
9
10
11     Q.  Okay.
12
13     **A.  Well, again, I refer -- refer you to two**
14 **different medical record entries. One medical**
15 **entry --**
16
17
18
19
20
21
22
23
24     Q.  Okay.
25

**64**

1 Are you relying on both of those?
2     A.
3
4
5
6
7
8
9
10
11
12
13
14     Q.  And you think the contemporaneous medical
15 records might be a better source on that than his
16 memory?
17     **A.  His memory is not providing sufficient**
18 **information.**
19     Q.  Okay.
20     **A.  So this is the information I have to work**
21 **with.**
22     MR. KALAS:  Let's take a break
23 because we're out of tape. Thanks.
24     THE VIDEOGRAPHER:  This marks the
25 end of Media Number 2 in the deposition

Transcript of William Sawyer, Ph.D.

42 (165 to 168)

Conducted on August 23, 2018

65

1    of William Sawyer.  The time is 2:20
2    [sic].  We are off the record.
3        (Break taken from 2:40 p.m. to 2:55 p.m.).
4        THE VIDEOGRAPHER:  This marks the
5    beginning of Media Number 3 in the
6    deposition of William Sawyer.  The time
7    is 2:55.  We are on the record.
8    BY MR. KALAS:
9        Q.   Dr. Sawyer, going back to your dose
10   calculation for Mr. Hall, if you could turn to
11   page 127 of Exhibit 6, please.
12       A.   Okay.
13       Q.   Now, this was an exposure day calculation
14   you calculated here on page 127, right?
15       A.   It was a what?
16       Q.   Exposure day calculation.
17       A.   Yes.
18       Q.   And in this calculation, the first
19   assumption you made in the top line of the green box
20   is that Mr. Hall applied five days a week for the
21   months of April, May, June, July, August, September,
22   and October, right?
23       A.   Yes.
24       Q.   And what he told you is that he worked
25   four to five days a week, right?

66

1        A.   Yes, but he said that -- as I recall, that
2    whether it was four or five, it was still 40 hours.
3        Q.   What Mr. Hall told you was four to five,
4    not five days, right?
5        A.   Four to five, but 40 hours.  In other
6    words, he worked -- he didn't necessarily work eight
7    hours a day, and some days he worked well beyond eight
8    hours.
9        Q.   But if we're counting the number of days,
10   not the number of hours per day, he told you he worked
11   four to five days, not five days, right?
12       A.   Yes.
13       Q.   Okay.  And then you went down and you
14   calculated the number of hours of exposure he had per
15   year, right?  And that's in the second line.
16       A.   Yes.
17       Q.   Okay.  And you based that on multiplying
18   the number of days he was exposed, which was what you
19   calculated as 152.5 based on five days, and you
20   multiplied that by two hours a day, right?
21       A.   Right.
22       Q.   And what Mr. Hall told you was that he
23   applied Roundup one to two hours a day, right?
24       A.   Yes.
25       Q.   Okay.  And so, again, the two hours is the

67

1    highest end of what he told you rather than the
2    median, correct?
3        A.   Correct.
4        Q.   And that could be an overestimate of the
5    hours per day he applied Roundup, right?
6        A.   Yes.
7        Q.   And then you divided those hours of
8    exposure by seven to get how many exposure days under
9    the UK POEM model he had per year, right?
10       A.   Yes.
11       Q.   And the number you came up with was 43.6
12   exposure days per year, right?
13       A.   Yes.
14       Q.   And we talked about earlier that Mr. Hall
15   told you he worked on 10 to 12 houses per week, right?
16       A.   Yes.
17       Q.   And did those 10 to 12 houses represent
18   the entirety of his client base --
19       A.   I don't know.
20       Q.   -- in a given year?
21       A.   I can't answer that.  I don't know.
22       Q.   So they could have.  You just don't know?
23       A.   Well, probably not, because my
24   understanding, he worked for houses that largely had
25   been abandoned or foreclosed and uncared for.  And I

68

1    seem to think he -- and I can't remember for sure, but
2    he may have said it was working through subcontracts
3    through banks and entities of that sort.
4        Q.   Assuming that Mr. Hall only worked on 10
5    to 12 houses a week, would that mean that he -- strike
6    that.
7        Now, y'all present this in pages 124 to
8    128, but if we go back to page 15 of Exhibit 6, you
9    compare Mr. Hall to the characteristics of the other
10   pesticide applicators in the Agricultural Health
11   Study, right?
12       A.   The 1996 study, yeah.
13       Q.   And in Mr. Johnson's case, and I believe
14   in this case as well, you pulled this from one of the
15   initial studies of the AHS, right, 1996?
16       A.   Yes.
17       Q.   And the population studied in the AHS were
18   either farmers or professional pesticide applicators,
19   right?
20       A.   Yes.
21       Q.   And a large majority -- I think 90 percent
22   or so -- were actually farmers, right, rather than
23   commercial applicators?
24       A.   Correct.
25       Q.   Now, farmers usually apply Roundup to a

CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

43 (169 to 172)

---

**69**

1  larger swath of land than half an acre, right?
2      A.  Yes, but very often, they're either on a
3  tractor or in a closed tractor cab.
4      Q.  My question was just about the size of the
5  land, sir.  Farmers usually apply --
6          MR. SELDOMRIDGE:  Objection.
7      Argumentative.
8          MR. KALAS:  Can I finish my
9      question, Jeff?
10         MR. SELDOMRIDGE:  Go for it.
11  BY MR. KALAS:
12     Q.  Farmers usually apply Roundup to a larger
13  swath of land than a half an acre, right?
14     A.  Yes.
15     Q.  Okay.  And a farmer application day might
16  be considerably longer than one to two hours, right?
17     A.  Yes, but I took that into account by using
18  two hours per day, which on is on page 127, as
19  discussed.
20     Q.  Well, you used two hours a day for
21  Mr. Hall, right?
22     A.  I did.
23     Q.  So I'm asking about the farmer, sir.
24     A.  Right.  But I factored that divided by
25  seven-hour exposure.

**70**

1      Q.  I'm just asking about the farmers.  We'll
2  get to Mr. Hall in a second.
3      A.  We're comparing apples to apples here
4  because of my factoring.
5      Q.  Okay.  I will ask the questions, and you
6  can answer them however you see fit.
7      A.  I did answer.
8      Q.  Okay.  Farmers usually apply Roundup, when
9  they apply Roundup, for longer than a two-hour
10  application day, correct?
11     A.  Yes.
12     Q.  And, in fact, if farmers had an
13  application day like that in the UK POEM model, which
14  is one hour mixing, six hours applying, Mr. Hall would
15  fit in the 40 to 59 category in the demographic
16  characteristics of Table 5, correct?
17     A.  Yes.
18     Q.  And, additionally, a farmer could be
19  applying Roundup to GMO crops, right?
20     A.  Yes.
21     Q.  Mr. Hall wasn't doing that, right?
22     A.  No.
23     Q.  Okay.  And the amount of active ingredient
24  in the Roundup formulation a farmer applies to crops
25  is usually higher than 1 percent, right?

**7**

1      A.  I am going to make a calculation.
2      Q.  Can you explain on the record what you're
3  doing as you do it, please?
4      A.  Yes.  I'm waiting for the device to turn
5  on.
6      Q.  Okay.
7      A.  Well, in the interim, I'll explain what
8  I'm doing.  I'd like to divide 2.5 ounces by 128
9  ounces times 100 percent to reveal the percentage that
10  was applied to the weeds by Mr. Hall.
11     Q.  Well, you said 2.5 ounces divided by 128
12  ounces.  Of that 2.5 ounces, what percentage is
13  actually glyphosate?
14     A.  We'll get to that.  52 percent.
15     Q.  Okay.
16     A.  2.5 times .52 equals -- divided by 128
17  times 100.  So he was using -- whoops.  That just
18  didn't -- try it again.
19         (Calculating figures.)
20         So he was using 1.02 percent solution.
21     Q.  Right.
22     A.  And you asked me if the farmers were using
23  greater than 1 percent.
24     Q.  Right, which is where I was deriving that
25  number from, from what Mr. Hall was using.

**72**

1      A.  Very good.  The answer is yes.
2      Q.  Okay.  And they -- farmers use up to
3  41 percent glyphosate sometimes, right?
4      A.  Never.
5      Q.  Never?
6      A.  Not un -- and not undiluted.
7      Q.  Okay.
8      A.  Concentration, no.
9      Q.  Not -- original Roundup was 41 percent
10  glyphosate?
11     A.  Right, but then it gets diluted.
12     Q.  Okay.  But you don't know how much it gets
13  diluted?
14     A.  Slightly above 1 percent.
15     Q.  You believe all farmers use a 1 percent
16  formulation?
17     A.  No, no.  Some are slightly above that.
18     Q.  Well, did you -- have you looked into how
19  much above 1 percent farmers use?
20     A.  Yes, based on the label.
21     Q.  Okay.  So -- so you've looked for
22  application to Roundup ready crops, the percentage of
23  glyphosate used in the Roundup products for that?
24     A.  Yes, based on the label.
25     Q.  Okay.

---

Transcript of William Sawyer, Ph.D.

44 (173 to 176)

Conducted on August 23, 2018

73

1    A.   Yeah.
2    Q.   So which Roundup products' labels did you
3 review in reviewing the dilution instructions?
4    A.   I don't have it with me, but I had
5 reviewed the commercial version used in other cases.
6    Q.   Okay.  And that's not on your Materials
7 Considered list, right, for this case?  In other
8 words, you didn't set forth those labels in your
9 report or in -- in your supplemental MCL or anywhere
10 else we've looked at?  I'm not asking about your box
11 right now, sir.
12    A.   Well, I think you are.
13    Q.   No.  I'm asking about what you set forward
14 to us prior to today.
15    A.   I think I may have brought it, the Ranger
16 Pro.  Let's see.  I don't know.  I didn't bring the
17 Ranger Pro instructions.
18    Q.   Well, the Ranger Pro instructions were
19 for -- I believe from the Dewayne Johnson case,
20 correct?
21    A.   Yes.
22    Q.   And those weren't used on GMO crops,
23 right?  Dewayne Johnson wasn't a farmer applying to
24 GMO crops, correct?
25    A.   No, but I think that I did have some

74

1 information on dilution for GMO crops.
2    Q.   But you don't have that readily available
3 to you right now, as far as you know?
4    A.   I don't, no.
5    Q.   And you couldn't tell me what percentage
6 of active ingredient, off the top of your head,
7 farmers actually use on GMO crops?
8    A.   I recall slightly greater than 1 percent.
9    Q.   But you don't know.  For instance, Dewayne
10 Johnson used 3 percent, right?  And he wasn't using it
11 on GMO crops.
12    A.   Correct.
13    Q.   Okay.  So you did not conduct a comparison
14 between the amount of Roundup -- or strike that -- the
15 amount of glyphosate used by the farmers in the
16 Agricultural Health Study as far as the dilution, the
17 percentage of glyphosate in that dilution, you didn't
18 compare that in the percentage of glyphosate in the
19 dilution used by Mr. Hall?
20    A.   Well, I don't think that's really possible
21 because the Agricultural Health Studies, even the new
22 one, does indicate what percent were farmers, what
23 percent were applicators similar to Mr. Hall, and it
24 would be an error to assume that in the Agricultural
25 Health Studies that all of the applicators were using

75

1 a much higher quantity than Mr. Hall, when, in fact 20
2 or even 30 percent, based on the newer study, were
3 using the same mixtures as Mr. Hall.
4    Q.   Now, on page 127, you claim that
5 Mr. Hall's 218 exposure days are far beyond the fourth
6 exposure quartile in the Agricultural Health Study,
7 right?
8    A.   Yeah, in the 2018 study.
9    Q.   And, in fact, they're not far beyond;
10 they're encapsulated within the fourth quartile, which
11 is greater than 108.5 days, correct?
12    A.   Well, it's beyond the initial point of the
13 fourth quartile by a long -- almost double that.
14    Q.   But you don't know the distribution of use
15 days within that fourth quartile, right?
16    A.   No.  They didn't give enough specifics to
17 calculate whether it was the 95th percentile or just
18 where.
19    Q.   Okay.  So he could be the 80th percentile
20 because it's --
21    A.   It's possible, depending on distribution,
22 but the fact that he's double the 75th percentile is,
23 you know, very strongly suggestive that he was at the
24 extreme end.  And even if I were to go back, which I
25 probably will, and change the hours to 1.5 hours per

76

1 day, he's still in that fourth quartile.
2    Q.   So you're going to change these dosage
3 calculations, potentially, after this deposition?
4    A.   I'll probably just change the 2 to 1.5.
5 It'll changed number by a factor of 25 percent, I
6 believe.
7    Q.   Understand that I'm somewhat unclear
8 whether or not there's going to be epidemiology
9 opinions here, but if we look at follicular
10 lymphoma --
11        MR. KALAS:  I'm going to mark
12 this as Exhibit 11.
13        (Exhibit Number 11, Document Titled
14        "Glyphosate Use and Cancer Incidence in
15        the Agricultural Health Study," By
16        Andreotti, et al., was marked for
17        identification.)
18 BY MR. KALAS:
19    Q.   I've turned to the page I'd like to look
20 at real quick.  If we look at Table 2, "Cancer
21 incidence in relation to intensity-weighted lifetime
22 days of glyphosate use in the Agricultural Health
23 Study," and we look at follicular lymphoma, which is
24 the type of non-Hodgkin's lymphoma that Mr. Hall has,
25 correct, follicular lymphoma?

Transcript of William Sawyer, Ph.D.

45 (177 to 180)

Conducted on August 23, 2018

---

**77**

1    A.   Yes.

2         MR. SELDOMRIDGE:  Object to form.

3    Argumentative.

4    BY MR. KALAS:

5    Q.   The data in the Agricultural Health Study

6    suggests that no exposure, the reference dose had 16

7    cases of non-Hodgkin's lymphoma, right -- or excuse

8    me -- follicular lymphoma, right?  Right here, sir.

9    **A.   Okay.  Reference cases, 16, correct.**

10   Q.   Okay.  And then all the risk ratios for

11   exposure to glyphosate are below one, right?

12   **A.   Yes.**

13   Q.   And as somebody who has instructed

14   students on epidemiological studies in the past, what

15   does that mean to you?

16   **A.   Well, there's no significant finding**

17   **there, clearly.**

18   Q.   And so when you say that Mr. Hall fits

19   within the fourth quartile group in the Agricultural

20   Health Study, I'm correct that the highest exposure

21   group for follicular lymphoma had no significant

22   finding in that study, right?

23   **A.   Correct.**

24   Q.   And what "no significant finding" means is

25   that the authors of the study cannot establish a

**78**

1    relationship between the exposure to Roundup and

2    follicular lymphoma, right?

3    **A.   Yes.**

4    Q.   Now --

5    **A.   But as I said before, the T-cell**

6    **non-Hodgkin's lymphoma did show a statistically**

7    **significant finding, but it was based on 18 subjects,**

8    **while -- rather than 20.**

9    Q.   Is T-cell lymphoma a different disease

10   than follicular lymphoma?

11   **A.   Yes, but both starts out at the stem cell,**

12   **same stem cell.  It's the same area.**

13   Q.   Let's talk about non-Hodgkin's lymphoma

14   generally in this study.  Non-Hodgkin's lymphoma

15   generally in this study, is there any significant

16   finding for non-Hodgkin's lymphoma and exposure to

17   Roundup?

18   **A.   No.**

19   Q.   Okay.  And that's for every exposure

20   group, right?

21   **A.   Yeah.**

22   Q.   And that -- that is in -- including in the

23   individuals exposed for greater than 108.5 days,

24   right?

25   **A.   Yes.**

**79**

1    Q.   Okay.  Now, there's actually about 60

2    separate diseases that make up NHL, right?

3    **A.   Yes.**

4    Q.   Each of those diseases have separate

5    genetic translocations associated with the diseases,

6    right?

7    **A.   That's true.**

8    Q.   And each of those diseases have basically

9    their own pathological fingerprint, right?

10   **A.   Yes.**

11   Q.   And each of those diseases have their own

12   etiology, right?

13   **A.   Well, they share one similar etiology in**

14   **terms of mutation in the stem cell.**

15   Q.   Okay.  But, for instance, HIV is

16   associated with certain types of non-Hodgkin's

17   lymphoma, right?

18   **A.   That's true.**

19   Q.   But not others, right?

20   **A.   I'd have to defer that.  I have not**

21   **followed the subtypes with -- with AIDS.  So I'd have**

22   **to defer that.**

23   Q.   Have you followed the subtypes with

24   glyphosate?

25   **A.   To some extent.  Over the years I have,**

**80**

1    **but in this case I've deferred that to the**

2    **epidemiologists.  It was obviously -- you see the size**

3    **of my file box now, and to take on every aspect of**

4    **this case would have been overwhelming.**

5    Q.   Are you going to tell the jury that

6    glyphosate causes all types of non-Hodgkin's lymphoma?

7    **A.   No.  I'm going to leave that for the**

8    **epidemiologists and medical experts.**

9    Q.   Do you believe it's possible -- strike

10   that.  Let me back up.

11        It is your opinion that glyphosate and

12   glyphosate-based herbicides cause non-Hodgkin's

13   lymphoma, right?

14   **A.   Yes.**

15   Q.   Is that opinion -- do you have any opinion

16   about whether or not it only causes some subtypes of

17   non-Hodgkin's lymphoma and not others?

18        MR. SELDOMRIDGE:  Objection.

19   Redundant.

20   **A.   From a toxicological mechanistic**

21   **standpoint, it could cause any NHL.  One has to**

22   **remember that certain subtypes are extremely rare.**

23   **And in human epidemiologic studies, it's difficult to**

24   **get a sufficient number of cases to make a**

25   **determination.  I think what you're asking me now, I**

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

46 (181 to 184)

---

**Page 8**

1 really should defer to the epidemiologists.
2 BY MR. KALAS:
3    Q.   So you're not going to tell the jury about
4 any study that associates Roundup to follicular
5 lymphoma in particular?
6    A.   No.
7    Q.   And are you aware of any study that
8 associates Roundup to follicular lymphoma in
9 particular?
10    A.   No, but you're bringing a -- raising an
11 issue that I know the epidemiologist will handle, and
12 that is when a scientist or a defense lawyer tries to
13 cut down a category such as lymphoma into many, many
14 little subcategories, then the studies become
15 incapable of determining whether or not there is a
16 finding because the number of subjects becomes too
17 small to provide enough statistical power, and we call
18 that Type 2 error, as opposed to Type 1 error when
19 something appears positive by chance alone.
20         And so I think that I'm going to defer
21 that, although I know the answer to it. It's simply
22 that a follicular lymphoma is not a real common
23 variant compared to, you know, a B-cell non-Hodgkin's
24 lymphoma. So when one looks at lymphoma NHL in total,
25 one has a stronger statistical ability to determine if

---

**Page 82**

1 there was a change.
2    Q.   You stated in your toxicological notes on
3 page 116 of Exhibit 6 that follicular lymphoma is the
4 second most common form of NHL, right?
5    A.   It is, but if you look at the actual
6 numbers, it's not nearly as common as most of the
7 B cells or if you group non -- all the non-Hodgkin's
8 lymphoma together, then the statistical power becomes
9 much stronger.
10    Q.   Now, speaking of page 116, you talk about
11 the incidence of follicular lymphoma increasing in the
12 SEER registry from 1992 to 2001 among the elderly,
13 right?
14    A.   What page?
15    Q.   Page 116, sir.
16    A.   Yeah. Incidence rates for follicular
17 lymphoma according to SEER registry statistics for
18 white males compiled by subtype, age, and sex 3.18 --
19         THE REPORTER: I'm sorry.
20    A.   -- per 100,000 -- compiled by subtype,
21 age, and sex is 3.18 per 100,000 person years.
22 BY MR. KALAS:
23    Q.   I'm asking about the last line here, sir.
24 You said, "Incidence of follicular lymphoma in the
25 SEER registry from 1992-2001 increased 1.8% a year

---

**Page 83**

1 among the elderly (e.g., age 65 years or greater),"
2 right?
3    A.   Yes.
4    Q.   Are you going to tell the jury that the
5 rate of follicular lymphoma is going up in America?
6    A.   You know, I -- I think I'd have to talk to
7 plaintiffs' counsel. I would probably prefer to defer
8 that to the epidemiologists, but then again, I'd have
9 to defer that to counsel and see if -- what aspects of
10 this case they want me to discuss on direct
11 examination.
12    Q.   Well, you understand this is my
13 opportunity to find out what you plan to say. So do
14 you plan to tell the jury that the incidence of
15 follicular lymphoma from 1992 to 2001 increased
16 1.8 percent a year among the elderly?
17    A.   I could. I don't --
18    Q.   Okay.
19    A.   I feel like that's getting into the
20 epidemiological section, which I've deferred in my
21 report. I wish I could give you a better answer.
22    Q.   I wish you could too, Dr. Sawyer. I
23 really do, because I can't figure out if you defer or
24 where you have the opinions.
25    A.   Let's ask counsel right here.

---

**Page 84**

1    Q.   Uh-huh. I have. So --
2    A.   You have? Well, then good. Then you tell
3 me, and I'll know what to prepare for.
4    Q.   Well, we'll deal with that later.
5         Now, Mr. Hall wasn't elderly when he was
6 diagnosed with follicular lymphoma, right?
7    A.   No.
8    Q.   And did you look at the SEER data for
9 individuals between 20 and 64 at diagnosis?
10    A.   Yes.
11    Q.   Okay. You did?
12    A.   Yes.
13    Q.   You didn't report that here?
14    A.   No.
15    Q.   Okay. And did you look at the more
16 updated data from 2002 to 2011?
17    A.   I don't think so because I would have
18 referenced that as 2011.
19    Q.   So do you recall for 1992 to 2001 whether
20 the rate of follicular lymphoma increased for
21 individuals 20 to 64?
22    A.   I don't recall.
23    Q.   And that would be more relevant to
24 Mr. Hall than elderly individuals, right?
25    A.   Not necessarily. The problem is the

---

Transcript of William Sawyer, Ph.D.

47 (185 to 188)

Conducted on August 23, 2018

85

1 number of cases, as I said, for his group is only 3.18
2 per 100,000, where if you look at the age group up to
3 65, it skyrockets. There's a lot more cases per
4 100,000, which gives much more statistical reliability
5 and power to see if there's a trend. And because
6 there's so few cases at his age, the statistical power
7 to see such a trend is weakened.
8     Q.  Cancer's a disease of the aging is
9 basically what you're saying?
10    A.  Right, but you're going to see a lot more
11 cases in the older age group, which gives you more
12 detectable power because what we're saying here is
13 that among these aged people, the number of aged
14 people with NHL follicular lymphoma has been on the up
15 and up. It's been getting worse instead of better.
16    Q.  So --
17    A.  Or it's holding the same.
18    Q.  So were you aware that the rate of
19 follicular lymphoma in individuals aged 20 to 64 has
20 gone down by 2 percent from 2002 to 2011?
21    A.  I don't know that that's a statistically
22 significant finding because of the lower number of
23 cases and variability.
24    Q.  Just asking if you are aware of it, sir.
25    A.  It appears that way, but I'm not sure that

86

1 it's real. I didn't see any statistics in what I
2 looked at that showed that, but I think I only saw the
3 2001. I don't think I had access to the 2011.
4     Q.  Okay.
5         MR. KALAS:  I dropped my
6     microphone.  Sorry.
7 BY MR. KALAS:
8     Q.  So you don't believe you've seen those
9 figures, right?
10    A.  I don't recall seeing the -- up through
11 2011.
12    Q.  And I'm correct that the use of Roundup
13 has gone up a lot in this country from 2002 to 2011,
14 right?
15    A.  Yes. I mean, it's been on the uprise
16 since its introduction in, what, 1974.
17    Q.  Okay. So as the rate of -- if that number
18 was correct that the rate of follicular lymphoma has
19 gone down by 2 percent in Mr. Hall's age group -- and
20 I'd like you to assume it is correct -- if that is
21 correct, what that would mean is that, as the use of
22 Roundup has gone up, the rate of follicular lymphoma
23 in Mr. Hall's age group has gone down in our most
24 recent data, correct?
25    A.  Hypothetically, but there is -- I would

87

1 have to see the data. Is that incident data or
2 mortality? Because mortality goes down due to better
3 treatment.
4     Q.  So that's --
5     A.  And earlier identification where incidence
6 is something that would be more appropriate for
7 such an analysis that we're making.
8     Q.  So that figure I reported to you was
9 incidence data, sir.
10    A.  Okay.
11    Q.  So now let's talk about survival data.
12 You talk about the fact here on page 116 that the
13 median survival is 14 years, but the disease has been
14 documented to progress rapidly and aggressively in
15 less than one year, right?
16    A.  Yes.
17    Q.  Okay. Are you going to tell the jury that
18 the disease is progressing rapidly and aggressively in
19 Mr. Hall?
20    A.  No.
21    Q.  Okay. And, in fact, you're aware that the
22 five-year survival of follicular lymphoma in 20- to
23 64-year-olds is 90.6 percent?
24    A.  I'm not familiar with that percentage, but
25 I know it's -- there is a -- a five-year survival rate

88

1 with current therapy has improved drastically over the
2 past couple decades.
3         MR. KALAS:  All right. So I'm
4     going to mark as Exhibit 12 some data
5     from the SEER Web site.
6         MR. SELDOMRIDGE:  Thank you,
7     Counsel.
8         (Exhibit Number 12, Printout from SEER Web
9         Site Titled "All Lymphoid Neoplasms With
10        Detailed Non-Hodgkin Lymphoma Subtypes,"
11        was marked for identification.)
12 BY MR. KALAS:
13    Q.  And this report is called Table 19.27,
14 "All Lymphoid Neoplasms With Detailed Non-Hodgkin
15 Lymphoma Subtypes," correct?
16    A.  Yes.
17    Q.  Okay. And if you go to "Follicular
18 lymphoma," which is entry 2(a) 2.6 -- let me know when
19 you're there.
20    A.  Yes.
21    Q.  Okay. And do you see the third column,
22 which is the 20 to 64 ages range?
23    A.  I do.
24    Q.  And for follicular lymphoma, am I correct
25 that the APC, the annual percent change by age at

CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

48 (189 to 192)

89

1  diagnosis, has gone down in males by 2 percent from
2  2002 to 2011?
3       MR. SELDOMRIDGE:  Objection.
4  Mischaracterizes.
5       A.  (Reviewing document.)
6       Yes.
7  BY MR. KALAS:
8       Q.  And do you see the asterisk next to that
9  2 percent?
10      A.  Yes.
11      Q.  And if you go to the last page, am I
12 correct that that means that the APC, the annual
13 percent change, is statistically significant from
14 zero?
15      MR. SELDOMRIDGE:  Objection.
16 Mischaracterization.
17      A.  Repeat that question.
18 BY MR. KALAS:
19      Q.  Am I correct that the asterisk next to
20 2 percent -- negative 2 percent there, if you look at
21 the index on the last page, states that that means
22 that the annual percent change is significantly
23 different from zero at the .05 level?
24      A.  Yes.
25      MR. SELDOMRIDGE:  Same objection.

90

1  BY MR. KALAS:
2       Q.  Okay.  And now that I've shown you this
3  data, you'd agree that the rate of follicular lymphoma
4  has gone down in a statistically significant manner in
5  the age group Mr. Hall is part of while the use of
6  Roundup has gone up, correct?
7       A.  Yes.
8       Q.  Now, have you looked at any data on the
9  number of new cases of non-Hodgkin's lymphoma age
10 adjusted from SEER in the past 20 years?
11      A.  I looked at the -- an American Chemical
12 Society publication which -- well, it wasn't American
13 Chemical Society.  It was of members of the American
14 Chemical Society that showed a substantial increase in
15 lymphoma, all types of lymphoma, from 1950 on until
16 the date of publication.  Beyond that what I've
17 referenced in my report, I don't think I've looked at
18 anything else.
19      Q.  So you didn't look at the SEER data for
20 the number of new cases per hundred thousand people
21 age adjusted for non-Hodgkin's lymphoma?
22      A.  For non -- NHL or follicular?
23      Q.  NHL, I'm asking about now.
24      A.  In general?
25      Q.  Yes, sir.

9

1       A.  I probably looked at it the same time I
2  prepared page 118 and reported -- page 117 and
3  reported on this SEER registry values.  In fact, at
4  the top of my page, I talk about NHL prevalence
5  increases.  So, yeah, I looked at -- what did I
6  reference here?
7       Q.  You looked at Wheeler.
8       A.  Wheeler.  Right.  That's it.
9       Q.  So you haven't looked at the current SEER
10 data on the SEER Web site from the National Cancer
11 Institute on this?
12      A.  Well, I know I looked on the SEER
13 Web site, but I don't recall seeing data -- this
14 particular set of data.  Let me just look at what this
15 is.
16      Q.  Well, I'm asking about a different set of
17 data now, sir, not Exhibit 12.  I'm asking about NHL
18 over a 20-year period.
19      Do you recall looking at any data like
20 that?
21      A.  No, not that -- not that provides the APC
22 for that period, no.
23      Q.  Okay.  And you're not aware, then, if I
24 understand correctly, that the number of new cases of
25 non-Hodgkin's lymphoma in 1995 per 100,000 people was

92

1  19.98 in the SEER data?
2       A.  No, but it's consistent with page 118 in
3  my report where I stated the incidence rate for NHL
4  leveled recently to 19.6 per 100,000 years from 2003
5  to 2007, but incidence increases have also occurred in
6  other developing countries.
7       Part of what you have to remember -- this
8  has been very well published in peer-reviewed
9  literature -- is that a primary cause of non-Hodgkin's
10 lymphoma in our diet is dioxins, which have been
11 drastically reduced over the past 20 years.
12      Dioxin levels in the 1970s and even the
13 1980s in human blood serum, lipid, and in food has
14 substantially come down due to the regulations set
15 forth worldwide, and that accounts, in part, for the
16 SEER registry data you're pointing out.
17      MR. KALAS:  Move to strike
18 everything after "countries."
19 BY MR. KALAS:
20      Q.  Were you aware, then, sir -- had you seen
21 that the incidence of new cases and deaths -- strike
22 that -- the incidence of new cases per 100,000 people
23 for 2015 was 19.91 in the SEER data?
24      MR. SELDOMRIDGE:  Objection.
25 Confusing.

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

49 (193 to 196)

93

1    A.   No, but that's exactly consistent with my
2  report where I state the NHL incidence rate has
3  leveled recently to 19.6 per hundred thousand person
4  years.
5  BY MR. KALAS:
6    Q.   Okay. So if I understand correctly, it's
7  your opinion that the incidence of non-Hodgkin's
8  lymphoma in this country has not increased in the past
9  20 years and it's instead remained steady?
10    MR. SELDOMRIDGE: Objection.
11  Misstates.
12    A.   It had ballooned from 1950 up until about
13  1980. It exploded. And it's very well documented.
14  Now, in more recent years, it has leveled off.
15  BY MR. KALAS:
16    Q.   So that's my question.
17    A.   And that's primarily attributed to the
18  regulations that have very much reduced the dioxins in
19  the average human diet.
20    Q.   My question is, for the time period 1995
21  to 2015, do you agree the rate of non-Hodgkin's
22  lymphoma in this country has stayed level?
23    A.   For the years what?
24    Q.   1995 to 2015.
25    A.   Yes.

94

1    Q.   And in that same time period, the use of
2  Roundup has increased fifteenfold in this country,
3  right?
4    A.   Yeah, and the concentration of dioxin in
5  human serum lipid has decreased substantially during
6  that same time period and accounts -- also accounts
7  for what we're seeing.
8    Q.   All right.
9    A.   Also, during that time period, benzene
10  laws went into effect in the 1980s removing benzene
11  exposures from humans.
12    Q.   Are you stating now that benzene is an
13  alternative cause of non-Hodgkin's lymphoma, sir?
14    A.   The peer-reviewed literature indicates it
15  is. That certainly has been shown, but most -- let's
16  put it this way: There's a difference with
17  benzene with respect to what courts have determined
18  versus what the literature shows.
19    Q.   I'm asking what you think.
20    A.   Well, clearly there's a number of -- a
21  good number of human epidemiologic studies that
22  indicate non-Hodgkin's lymphoma can be induced by
23  benzene exposure.
24    Q.   And so benzene would be an exposure you'd
25  be concerned about when conducting differential

95

1  diagnosis on somebody whose been exposed to Roundup
2  and had non-Hodgkin's lymphoma diagnosed?
3    A.   Yes. And in this case, there was no
4  evidence of any significant benzene exposures.
5    Q.   All right. Now, in your toxicological
6  notes, you talk a little bit about surfactants. And
7  am I correct the term "surfactant" is shorthand for
8  surface active agent?
9    A.   Yes.
10    Q.   Okay. And surfactants are used for a
11  variety of applications in chemical mixtures, right?
12    A.   Yes.
13    Q.   And the reason a surfactant -- one of the
14  reasons a surfactant is -- well, strike that.
15    Why someone would add a surfactant to a
16  chemical mixture is dependent on the application the
17  mixture is being used for, right?
18    A.   Yes.
19    Q.   And, for instance, you could put a
20  surfactant in the mixer to reduce surface tension,
21  right?
22    A.   Yes.
23    Q.   You could put a surfactant in the mixer as
24  an emulsifier, right?
25    A.   Yes.

96

1    Q.   And an emulsifier is a compound that is
2  there to disperse another compound, right?
3    A.   Right. For example, helping an aqueous
4  solution penetrate a tissue or plant that has a higher
5  lipid content which is hydrophobic.
6    Q.   A surfactant could be a wetting agent?
7    A.   That's true.
8    Q.   And a wetting agent's basically a compound
9  that's there to ensure another compound stays where
10  you put it longer?
11    A.   Yes, and of course the wetting agent would
12  best have a lower volatility such as some of the
13  glycols.
14    Q.   Surfactants can be present in order to
15  enhance foaming, right?
16    A.   Nonionic surfactants can. Some of the
17  detergents actually can enhance foaming.
18    Q.   And the reason you'd want foaming is to
19  reduce drainage of a substance, right?
20    A.   I couldn't hear the last two words.
21    Q.   The reason you'd want foaming is to reduce
22  drainage of a substance, right?
23    A.   The reason you would want foaming?
24    Q.   Yeah. Why you'd put a surfactant into a
25  mixture in order to increase foaming, you're trying to

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

50 (197 to 200)

97

1    avoid drainage?
2        A.    I'd have to refer that to a agricultural
3    chemist. I'm really not familiar with -- it makes
4    sense to me, yes, but it's not something I've studied
5    in terms of the mechanics of trying to keep the liquid
6    from running off the leaf by some -- apparently, some
7    very microscopic small quantity of foam. It's a good
8    idea, but I'm not familiar with it.
9        Q.    Surfactants can be used to suspend or
10   stabilize a mixture, right?
11       A.    Absolutely. We see this even in foods.
12       Q.    And, in other words, there are a lot of
13   uses of surfactants that are beneficial to society?
14       A.    I use a nonion surfactant for my swim
15   goggles. It's called contact solution.
16       Q.    Yeah, and that raises a good point. There
17   are surfactants present all around us, right?
18       A.    Yes. There's good ones and dangerous
19   ones.
20       Q.    They have lots of everyday applications,
21   right?
22       A.    Yes.
23       Q.    It would be impossible to avoid
24   surfactants in our everyday lives?
25       A.    Yes, but it would be great to avoid the

98

1    dangerous ones.
2        Q.    Now, it's true I can find surfactants in
3    my laundry detergent at home, right?
4        A.    For sure.
5        Q.    I can find surfactants in the Ivory soap I
6    use to clean my dishes, right?
7        A.    Yes.
8        Q.    I can find surfactants in the Windex I use
9    on my windows at home?
10       A.    Yes, butoxyethanol.
11       Q.    I can find surfactants in the Murphy's Oil
12   I use to clean my wood floors?
13       A.    Yes.
14       Q.    I can find surfactants in the Resolve
15   carpet cleaner I use when my pup, Chloe, has an
16   accident?
17       A.    Yes, but let's hope that doesn't happen.
18       Q.    It does.
19           I can find surfactants in the Glade
20   Plug-In I have in my office to make it smell nice?
21       A.    I've never researched that one. I'm not
22   sure what's in Glade.
23       Q.    My toothpaste has surfactants in it,
24   right?
25       A.    I'm not sure.

99

1        Q.    My shampoo has surfactants in it, right?
2        A.    Absolutely.
3        Q.    The Coppertone sunscreen I put on my kids
4    to protect them from the sun, that has surfactants in
5    it, right?
6        A.    Yes.
7        Q.    The shaving cream I put on my face in the
8    morning, I put surfactants right on my face, don't I?
9        A.    Yes; the good ones.
10       Q.    When I put my Old Spice deodorant on after
11   that, there's also surfactants in it, right?
12       A.    I'm not familiar with the chemistry of
13   that particular product.
14       Q.    How about Cetaphil lotion for my dry skin?
15   Does that have surfactants in it?
16       A.    Yes.
17       Q.    And surfactants have lots of medical uses,
18   right?
19       A.    Yes. As I said, even contact lens
20   solution.
21       Q.    They're in caplets and tablets that I
22   swallow to make sure the medicines get distributed
23   evenly in my digestive tract, right?
24           MR. SELDOMRIDGE:  Objection.
25   Compound question.

200

1        A.    Yes.
2    BY MR. KALAS:
3        Q.    And surfactants are in the Children's
4    Tylenol I give my kids when they're sick, right?
5        A.    Depends on the -- whether it's the fast
6    release. If it's the tablet, I'm not sure it's in the
7    tablet. But in general, yes.
8        Q.    Surfactants are in my Listerine I use to
9    clean my mouth?
10       A.    Yeah, we could consider the ethanol a
11   surfactant, yeah.
12       Q.    And, of course, there's surfactants in
13   herbicides and pesticides, right?
14           MR. SELDOMRIDGE:  Objection.
15   Compound question.
16       A.    Too broad to answer that.
17   BY MR. KALAS:
18       Q.    Okay. There's surfactants in Roundup,
19   right?
20       A.    Yes.
21       Q.    And surfactants in all formulations of
22   glyphosate-based herbicides you've reviewed, right?
23       A.    Yes.
24       Q.    And the reasons surfactants are in
25   glyphosate-based herbicides is to enhance the wetting

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8572-19 Filed 12/27/19 Page 53 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

51 (201 to 204)

20

1  of those herbicides, right?
2      A.  More than that.  There's several reasons
3  for using it.
4      Q.  Why do you need to put surfactants in a
5  glyphosate-based herbicide, to your understanding?
6      A.  Well, for dispersion on the plant so the
7  water doesn't just sit there as a bead making very
8  minimal surface area contact.  Also, to slow the
9  evaporative loss, keep it in contact longer for longer
10  absorption.  Also, it can actually -- depending on the
11  surfactant can help maintain -- increase -- that is
12  actually increase penetration into the leaf of the
13  plant by forming a bridge, you might say, across
14  hydrophobic components of the tissue and allowing
15  greater, more rapid penetration into the plant.
16      Q.  Would Roundup work very well without
17  surfactants?
18          MR. SELDOMRIDGE:  Objection.
19  Vague.
20      A.  It seems to work in Europe very well
21  without any POEA.
22  BY MR. KALAS:
23      Q.  Different question.  Would Roundup work
24  very well without the presence of surfactants as a
25  class?

202

1          MR. SELDOMRIDGE:  Same objection.
2      A.  That's a pretty general question.  It's
3  too general to answer.
4  BY MR. KALAS:
5      Q.  Do you believe surfactants are unnecessary
6  to the Roundup formulation?
7      A.  No.
8      Q.  Now, EPA refers to surfactants as inert
9  ingredients, right?
10      A.  Yes.
11      Q.  And EPA regulates surfactants, right?
12      A.  Yes.
13      Q.  They require data on the toxicity of
14  inerts to be submitted, right?
15      A.  Not exactly.  They require -- did you use
16  the word "data"?
17      Q.  Data on toxicity.
18      A.  Data, yes, but not actually real studies
19  but computerized models as data.
20      Q.  Okay.  So it's your opinion that EPA only
21  looks at computerized models of surfactants?
22      A.  No.  No.  The surfactants are tested under
23  the usual EOCD guidelines.  But with respect to more
24  in-depth studies of animal carcinogenicity studies,
25  they're not required.  There's no data required on

203

1      that other than structural activity relationship
2  models.
3      Q.  EPA requires genotoxicity data on
4  surfactants, correct?
5      A.  I believe so, yes.
6      Q.  EPA requires mutagenicity data on
7  surfactants, correct?
8      A.  Yes.
9      Q.  What is mutagenicity?
10      A.  Whether the substance in question -- how
11  it performs on sister chromatid analysis and other
12  in vitro tests which determine whether the substance
13  has mutagenic potential.
14      Q.  And mutagenicity data is relevant to
15  whether or not a substance could be carcinogenic,
16  right?
17      A.  Yes.
18      Q.  EPA does not ignore the fact that inert
19  ingredients are in pesticide products, right?
20      A.  Correct.
21          MR. KALAS:  Go off the record for
22  a minute, please.
23          THE VIDEOGRAPHER:  Going off the
24  record.  The time is 3:49.
25          (Break taken from 3:49 p.m. to 4:01 p.m.)

204

1          THE VIDEOGRAPHER:  The time is
2  4:01.  We are on the record.
3          (Exhibit Number 13, Document Titled "Alkyl
4          Amine Polyalkoxylates (JITF CST 4 Inert
5          Ingredients).  Human Health Risk
6          Assessment to Support Proposed Exemption
7          from the Requirement of a Tolerance When
8          Used as Inert Ingredients in Pesticide
9          Formulations," was marked for
10          identification.)
11  BY MR. KALAS:
12      Q.  Dr. Sawyer, I've marked as Exhibit 13 a
13  document entitled "Alkyl Amine Polyalkoxylates (JITF
14  CST 4 Inert Ingredients).  Human Health Risk
15  Assessment to Support Proposed Exemption from the
16  Requirement of a Tolerance When Used as Inert
17  Ingredients in Pesticide Formulations."
18          Did I read that correctly, if I didn't
19  pronounce it correctly?
20      A.  Very good.
21      Q.  It's dated April 3rd, 2009, right?
22      A.  Yes.
23      Q.  It's from the US EPA, right?
24      A.  Yes.
25      Q.  And you've looked at this document before,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 54 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
52 (205 to 208)
Conducted on August 23, 2018

205

1 right?
2    A.   Yes.
3    Q.   And this is a document that contains the
4 EPA's human health risk assessment on inert
5 ingredients in certain pesticides, right?
6    A.   Yes.
7    Q.   And one of the inert ingredients contained
8 in this cluster is POEA, which we've talked about some
9 today, right?
10    A.   That's right.
11    Q.   Okay.  And if we can just go down to
12 page 10.
13    A.   Okay.
14    Q.   Section 4.1.1.
15    A.   Okay.
16    Q.   They discuss a compound called MON 0818,
17 right?
18    A.   Yes.
19    Q.   And that's POEA, right?
20    A.   Yeah, looks like -- tallow amine,
21 probably.
22    Q.   Okay.  And it says that -- in this
23 database, EPA has something called an "Ames test,"
24 right?
25    A.   Yes.

206

1    Q.   And that's A-M-E-S, right?
2    A.   Yes.
3    Q.   And an Ames test is a test on
4 mutagenicity, right?
5    A.   Yes.
6    Q.   And the Ames test is considered a reliable
7 marker of mutagenicity, right?
8    A.   Yes.
9    Q.   It's an OECD guideline test, right?
10    A.   Yes.
11    Q.   It's an EPA guideline test, right?
12    A.   Yes.
13    Q.   It's evidence you would consider, correct?
14    A.   Yes.
15    Q.   And EPA has some other data on there as
16 well regarding MON 8108, right?
17    A.   Yes.
18    Q.   So EPA has in its possession an acute oral
19 study on MON 0818, right?
20    A.   Yes.
21    Q.   And EPA has in its possession acute dermal
22 study on POEA MON 0818, right?
23    A.   Yeah.  And these are studies, when I
24 testified 20 minutes ago, I said that they did follow
25 OECD guidelines for testing, but they're very limited.

207

1    They don't include long-term carcinogenicity assays
2    or, as you'll see on page 51, any human data.
3    Q.   Well, okay.  And I'm just trying to
4 establish a database the EPA does have.
5    A.   Yeah, yeah.  We've kind of talked about
6 that earlier.
7    Q.   Okay.  So EPA has eye and skin irritation
8 studies on POEA, right?
9    A.   Certainly.
10    Q.   EPA has a dermal sensitization study on
11 POEA, right?
12    A.   Yes.
13    Q.   What's a dermal sensitization study
14 measure?
15    A.   It's really an important study in terms of
16 determining whether a chemical is a sensitizer, such
17 as toluene diisocyanate or formaldehyde --
18        THE REPORTER:  I'm sorry.  Tallow
19 amine di --
20        THE WITNESS:  No, no.  Toluene,
21 T-O-L-U-E-N-E D-I-I-S-O-C-Y-A-N-T-E
22 [sic], diisocyanate.
23 BY MR. KALAS:
24    Q.   And what is a sensitizer?
25    A.   That it systemically or dermally induces a

208

1 sensitization reaction which is measured either by
2 patch test or RAST testing and various immunological
3 markers.
4    Q.   What is a sensitization reaction?
5    A.   Typically a delayed hypersensitivity
6 reaction.
7    Q.   Okay.  How does that manifest?  What does
8 it look like if somebody's having a sensitization
9 reaction?
10    A.   Well, in human or in animal?
11    Q.   Anyone.
12    A.   Severe bronchoconstriction; decrease in
13 blood pressure; dizziness; usually the person
14 collapses; hypoxia due to the bronchoconstriction,
15 inability to get enough air; swelling of the lips and
16 other upper airway tissues; severe rash, full body
17 rash.  There's a whole number of features.
18    Q.   POEA's not a sensitizer, right?
19    A.   No.
20    Q.   And EPA has in its position an in vivo
21 mouse micronucleus assay on POEA, right?
22    A.   I don't know if I saw that.  Let me look.
23    Q.   It's right after Ames.
24    A.   Okay.
25    Q.   It does, correct?  Sorry.  I don't know if

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL

## Transcript of William Sawyer, Ph.D.
### Conducted on August 23, 2018

53 (209 to 212)

---

**209**

1 that was clear on the record. I'll ask it again.
2      Does EPA have in their possession an in
3 vivo mouse micronucleus assay on POEA?
4     **A. I don't see it, actually.**
5     Q. If you look at MON 0818, second line
6 under -- next to Ames.
7     **A. Oh, yeah, they do. An in vivo mouse**
8 **micronucleus assay, four-week rat diet, three-month**
9 **rat diet. Okay. Very good.**
10     Q. Okay. And the in vivo mouse micronucleus
11 assay is another type of genotoxicity study, right?
12     **A. Yes.**
13     Q. And that's a design that's also covered in
14 the EPA guidelines, right?
15     **A. Yes.**
16     Q. And it's in the OECD guidelines, right?
17     **A. Yes.**
18     Q. It's the type of study that you would
19 consider reliable, right?
20     **A. Yeah. These are all basic required**
21 **studies for numerous chemicals.**
22     Q. EPA actually has a three-month dietary
23 study on MON 0818, right?
24     **A. Yes.**
25     Q. Now, going down to page 11, middle

---

**2**

1     **A. Yes.**
2     Q. Okay. Now, if we go ahead -- or go down
3 here to the bottom of the page 11 in Section 4.1.2, it
4 states, "There is no evidence that the AAPs" -- and
5 that's the cluster of surfactants we're looking at,
6 alkyl amine polyalkoxylates -- "are mutagenic, or
7 clastogenic," right?
8     **A. Based on the testing that's performed,**
9 **that's correct. There was no requirement, of course,**
10 **for any human in vivo testing observed through**
11 **postmarketing studies.**
12     Q. What's it mean to be clastogenic?
13     **A. Actually, to damage the chromatids**
14 **themselves, break them.**
15     Q. And EPA didn't observe that in these
16 studies?
17     **A. No. No.**
18     Q. And damaging chromatids, what's that a
19 sign of?
20     **A. Well, chromatid -- well, chrome --**
21 **breakage, cleavage, or rearrangement of chromatids**
22 **results in very serious reproductive developmental**
23 **effects generally.**
24     Q. And if we go to page 57 -- let me know
25 when you're there.

---

**2 0**

1 paragraph that starts, "The available mammalian
2 toxicity database."
3     Let me know when you're there.
4     **A. Yes.**
5     Q. And what EPA states is, "The committee
6 concluded" -- this is near the bottom. "The committee
7 concluded the typical 100-fold uncertainty factor (10X
8 interspecies and 10X intraspecies) would be adequately
9 protective," right?
10     **A. Right. For noncarcinogenic effects, I**
11 **think that's appropriate.**
12     Q. And so what EPA decided with the cluster
13 four inerts is that the top-level people could be
14 exposed to would be 100 times below where they
15 observed a noncarcinogenic effect, right?
16     **A. Yes.**
17     Q. And that is a public protective policy,
18 right, to have the hundredfold uncertainty factor?
19     **A. Yeah, the uncertainty factor can vary from**
20 **100 to 1,000, depending on the severity of the effect**
21 **primarily.**
22     Q. But what it means in lay terms is that it
23 took a hundred times more than the dose we're letting
24 people be exposed to, to cause an effect that we
25 observed in the data we have?

---

**2 2**

1     **A. Yeah.**
2     Q. At the bottom, they discuss that they did
3 a bacterial reverse mutation test on a compound called
4 MON 59112.
5     You see that?
6     **A. Yes.**
7     Q. And what they found was that this
8 surfactant did not induce evidence of mutant colonies
9 over background, right?
10     **A. Yes.**
11     Q. And so what they're saying is that in
12 MON 59112, the tests that they ran, which is an Ames
13 test, showed that that compound was not mutagenic,
14 right?
15     **A. Right. Based again -- keep in mind that**
16 **these are in vitro assays. It's not in a human. We**
17 **don't know that -- and this is one of the pitfalls --**
18 **you know, the advantage of these types of tests are**
19 **they're relatively inexpensive, quick turnaround. On**
20 **the other hand, it's testing just for MON 59112,**
21 **whatever that is. When the human actually takes it**
22 **in, it can be metabolized to form other metabolites**
23 **which could potentially have metabolic activity. So**
24 **the -- the reverse mutation test, although a good and**
25 **very important test, it doesn't rule out the**

---

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

54 (213 to 216)

2 3

1 possibility of mutagenic effects in the actual test,
2 animal or human.
3     Q.  Is there a test on MON 59112 that you've
4 reviewed that shows that it's mutagenic in humans?
5     A.  I don't know what 59112 is.
6     Q.  You didn't review the internal Monsanto
7 study this was derived from, the Lawlor study?
8     A.  Lawlor?
9     Q.  Lawlor, L-A-W-L-O-R.
10     A.  Actually, I think that name is familiar.
11 I probably did.
12     Q.  So you did review that Monsanto found that
13 this surfactant was not mutagenic, right?
14     A.  I don't -- I have to review. I don't know
15 what -- I don't recall what model was used.
16     Q.  Okay. That document's not on any of the
17 Materials Considered lists that you've presented to
18 us, right?
19     A.  Let me check my footnotes. As far as the
20 lists that you received, those were from the
21 attorneys, not from my report necessarily. My -- my
22 notes contain, I don't know, over 200 footnotes.
23     Q.  Well, sir, I searched for the word
24 "Lawlor" and also the study number in your notes, and
25 I didn't find it. Would you have referred to it as

2 4

1 anything else?
2     A.  I would have referred to it as either a
3 MON number --
4     Q.  Okay.
5     A.  -- or the name of that study, Lawlor.
6     Q.  Okay.
7     A.  So --
8     Q.  We don't need search for it if your notes
9 will speak for themselves.
10         Let me ask you this: Do you agree a jury
11 should consider the fact that this surfactant was
12 negative in a mutagenicity study?
13     A.  Yes. Absolutely, and all of the data in
14 terms of human data, in vivo animal data, and even
15 newer studies on mutagenicity of POEAs.
16     Q.  And you're not going to tell the jury that
17 Monsanto wasn't conducting genotoxicity or
18 mutagenicity tests on its surfactants, right?
19     A.  I'm sorry. I didn't catch that.
20     Q.  Sorry.
21         You're not going to tell the jury that
22 Monsanto wasn't conducting genotoxicity or
23 mutagenicity tests on its surfactants, right?
24         MR. SELDOMRIDGE: Objection.
25 Compound.

2 5

1     A.  No.
2 BY MR. KALAS:
3     Q.  Okay. Monsanto was looking into this
4 issue?
5     A.  Yes. They followed OECD test guidelines.
6     Q.  Okay. And if you turn to page 58, they
7 also did a reverse mutation test on MON 0818, right?
8     A.  Turn to 58?
9     Q.  58 of -- yep, the inert cluster of proof.
10     A.  0818. Okay.
11     Q.  Okay. And they tested up to a cytotoxic
12 concentration of MON 0818, right, so it says in the
13 right-hand column?
14     A.  "Cytotoxicity not observed; second
15 cytotoxicity assay." Yes.
16     Q.  And what they found is even when they
17 killed the cell, they could not induce a mutagenic
18 response in this test system, right?
19     A.  Yes.
20     Q.  And this was an OECD guideline test
21 system, right?
22     A.  It doesn't say so, but I believe that the
23 bacterial reduced mutation test is.
24     Q.  It's the Ames test, A-M-E-S, right?
25     A.  Yes.

2 6

1     Q.  And, once again, this -- do you agree that
2 this data supports Monsanto's position that POEA does
3 not induce mutagenic changes, correct?
4     A.  Well, this is consistent with that
5 opinion, yes.
6     Q.  Okay. And continuing to the mammalian
7 erythrocyte micronucleus test, do you see those at the
8 bottom two rows here on 58?
9     A.  Yes.
10     Q.  And those are the in vivo mass micronuclei
11 tests we were talking about earlier, right?
12     A.  I think this is still in vitro, but it is
13 mammalian erythrocyte tests, but, as I recall, this is
14 a laboratory bench test.
15     Q.  You didn't look at the underlying Monsanto
16 studies that carried these out, the Myhr, M-Y-H-R,
17 study or the Stegeman and Kier study? You didn't look
18 at those?
19     A.  No, I am not familiar with those.
20     Q.  And so you would defer to what those
21 studies say as to exactly what they carried out,
22 right?
23     A.  I would certainly review those studies and
24 consider those results, yes.
25     Q.  But you agree, though, that this study,

Transcript of William Sawyer, Ph.D.

55 (217 to 220)

Conducted on August 23, 2018

27

1 which the bottom row says was carried out in male and
2 female mice, found no increase in the frequency of
3 micronuclei in these study -- in these rodents, right?
4     A.   I don't have enough information here to --
5 well, no.  Maybe I do.  On the last one they used 375,
6 750, and 1,500 milligram per kilogram, the male mice
7 up to 200 milligram, female no significant increased
8 frequency of MPCEs.  You know, from what the document
9 shows is that it was a negative study.
10     Q.   And this sort of data that we just looked
11 at is relevant to the inquiry of whether or not POEA
12 is carcinogenic, right?
13     A.   Yes, but it doesn't serve as a animal
14 bioassay for carcinogenicity.  These are all
15 OECD-approved tests that are commonly used, and they
16 certainly are helpful, but they're not the final
17 answer.
18     Q.   And you agree it would be incorrect to
19 argue that Monsanto has done no testing relevant to
20 the carcinogenicity of surfactants?
21     A.   Well, it's true that Monsanto has not
22 performed any carcinogenicity animal bioassays.
23     Q.   Right.  But that wasn't my question.  My
24 question was whether or not it would be correct to
25 argue that Monsanto has done no testing relevant to

28

1 the carcinogenicity of surfactants.
2          Would that be a correct statement?
3          MR. SELDOMRIDGE:  Objection.
4 Vague.
5     A.   Would you read the question again?
6 BY MR. KALAS:
7     Q.   My question is whether or not it would be
8 correct to argue that Monsanto has done no testing
9 relevant to the carcinogenicity of surfactants.
10          MR. SELDOMRIDGE:  Same objection.
11     A.   They haven't.  No, they haven't done it.
12 They've looked at genotoxicity, mutagenicity
13 sensitization, developmental reproduction toxicity,
14 but they have not carried out a single study to
15 actually assess animal bioassay carcinogenicity.
16 BY MR. KALAS:
17     Q.   Okay.  So it's your opinion that
18 genotoxicity studies are not relevant to the
19 carcinogenicity of compounds?
20     A.   They're relevant, but it's not the same
21 thing.
22     Q.   Okay.  So my question was, would it be
23 correct to say that Monsanto has done no testing
24 relevant to the carcinogenicity of surfactants?
25          MR. SELDOMRIDGE:  Objection.

29

1          Redundant.
2     A.   I wouldn't even say relevant.  I would say
3 related to but not -- relevant would almost imply that
4 it's a substitute or, you know, very important piece.
5 But it's -- no.  I disagree.
6 BY MR. KALAS:
7     Q.   So your opinion is that genotoxicity data
8 is not a very important piece of evaluating whether or
9 not a substance is carcinogenic?
10          MR. SELDOMRIDGE:  Objection.
11 Misstates.
12     A.   It's an important piece, but it's only a
13 piece.
14 BY MR. KALAS:
15     Q.   Okay.
16     A.   It's a sample of a -- it's one slice of
17 pie.  There's more to it than that.  There's human
18 epidemiologic data.  There's human genotoxicity data,
19 which has been done.  And there's animal bioassays
20 that need to be run to determine -- make that
21 determination.  You can't -- you can't just base it on
22 the Ames test and sister chromatid exchange bioassays.
23     Q.   So two questions ago you said it's not an
24 important piece to carcinogenicity.  In the last
25 question you said that genotoxicity data is an

220

1 important piece.  So do you believe -- I just want to
2 make it clear for the record because I'm confused.
3          Do you believe genotoxicity and
4 mutagenicity data is an important piece to evaluating
5 whether or not a compound is carcinogenic?
6     A.   It's an important --
7          MR. SELDOMRIDGE:  Objection.
8 Misstates.
9          THE REPORTER:  I'm sorry.
10          THE WITNESS:  I'm sorry too.  I'm
11 interrupting.
12          MR. SELDOMRIDGE:  Objection.
13 Misstates.
14          Go ahead.
15     A.   Repeat it, please.
16 BY MR. KALAS:
17     Q.   Do you believe genotoxicity and
18 mutagenicity data are important pieces to evaluating
19 whether or not a substance could be carcinogenic?
20     A.   I agree they're important pieces, but it's
21 not adequate to make the determination.
22     Q.   Okay.  So it would be incorrect that
23 Monsanto has done no studies relevant to whether or
24 not surfactants are carcinogenic?
25          MR. SELDOMRIDGE:  Objection.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 58 of 125

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

56 (221 to 224)

Conducted on August 23, 2018

---

**22**

1 Redundant.
2     A.   They haven't.   Monsanto has not.   They
3 should -- you know, to answer that question, you know,
4 run the animal bioassay and find out.
5 BY MR. KALAS:
6     Q.   How about formulated products?   Have you
7 looked at formulated products and seen if Monsanto has
8 done genotoxicity testing on those?
9     A.   I think so, but I -- I'm too tired now to
10 even think.   I'm going to have to look at my studies.
11     Q.   Well, I'm just -- I'm just asking if
12 you've looked at them, not to cite any for me, but go
13 ahead.
14     A.   Did your question specifically restrict
15 this to Monsanto or articles in the peer-reviewed
16 literature?
17     Q.   I asked about Monsanto, sir.
18     A.   Okay.
19     Q.   Because -- and just so you know why I'm
20 asking, the allegation has been posited that Monsanto
21 has not studied these compounds, and I'm asking if
22 you've seen any studies by Monsanto on the
23 genotoxicity or mutagenicity of formulated products.
24     A.   This Monsanto document might help answer
25 that question, but I don't know for sure what

---

**222**

1 MON 35050 is.
2     Q.   You're looking at a slide deck, correct?
3     A.   Yeah, but it does state that the
4 surfactant -- oh, alkyl sulfate is the cause of the
5 oxidative damage of DNA in liver and kidneys and not
6 glyphosate and that there's some indication DNA damage
7 have been observed rather due to cytotoxic properties
8 in formulation.   So, I mean, this suggests that
9 Monsanto has looked at it and they found a problem.
10     Q.   Did you look -- did you ask Jeff here or
11 any other attorneys from the Miller Firm to send you
12 the actual study instead of a slide deck?
13         MR. SELDOMRIDGE:   Objection.
14 Argumentative.
15     A.   I don't know that they have that.   I mean,
16 that's —
17 BY MR. KALAS:
18     Q.   Did you ask?
19     A.   No.   There was no indication that —
20 there's nothing here to reference.   You know, there's
21 no name of a study or MON number or anything like that
22 to —
23     Q.   Let me ask you this:   Did you call or ever
24 ask anyone on earth to send you all of the formulated
25 product genotoxicity and mutagenicity studies that

---

**223**

1 Monsanto's carried out on glyphosate-based herbicides?
2     A.   Well, early on in this case -- well, in --
3 early on, I guess I should phrase it, in the Monsanto
4 cases, I did ask for any available Monsanto studies on
5 carcinogenicity, mutagenicity, dermal absorption, and
6 so on, and I was provided a very large file.
7     Q.   Where is that file?
8     A.   Electronic.
9     Q.   Have you listed the contents of that file
10 anyplace in this litigation, every single document in
11 it?
12     A.   No.   I don't think I have ever been asked
13 to do that.
14         MR. KALAS:   I'm just going to
15     note for the record that there is a
16     body of literature that Dr. Sawyer has
17     in his possession and reviewed that has
18     been held back from us, according to
19     his testimony, by Dr. -- by plaintiffs'
20     counsel.   We are entitled to know what
21     he's reviewed.   We still have not
22     received a list of everything he's
23     reviewed, and we demand it immediately,
24     and we demand additional deposition
25     time based on that.

---

**224**

1         MR. SELDOMRIDGE:   And I'm just
2     going to note for the record that
3     counsel is being extremely
4     argumentative, that counsel and I have
5     had an agreement from -- and I have the
6     email here in front of me from April --
7     from August 6, 2018.   This is an email
8     exchange between Jeffrey Travers and
9     Gregory Chernack, and Jeffrey Travers
10     states, "You have already deposed and
11     cross-examined him for 16 hours.   There
12     is no need to depose him for more than
13     a day in the Jeff Hall case.   His
14     report for Jeff Hall is nearly
15     identical to the report for Dewayne
16     Johnson.   Only 18 pages of the report
17     are different, and most of it is a
18     recitation of Mr. Hall's medical
19     history.   It is also too late to be
20     raising this issue for the first time
21     due to the difficulty in scheduling."
22         And there's a reply by
23     Mr. Chernack, and this is the bottom
24     paragraph.   It says, "Your email
25     response may provide a solution here.

---

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

57 (225 to 228)

Conducted on August 23, 2018

225

1 The toxicological notes served in this
2 case contained the disclaimer that they
3 were not a formal report. However, you
4 describe the" -- "the notes as a
5 report. Will you stipulate that
6 Dr. Sawyer's toxicological notes
7 contain all of his opinions he intends
8 to offer and will he offer no
9 additional opinions at trial other than
10 those explicitly contained in his
11 toxicology notes? If so, we will agree
12 to limit the deposition to a single
13 day."
14        And Jeff Travers writes back and
15 he states, in essence, that Dr. Sawyer
16 will stay within the bounds of his
17 report. And based on that information,
18 we had an agreement. We provided
19 numerous dates for Dr. Sawyer's
20 deposition that have not been accepted
21 in the past. Dr. Sawyer is a very busy
22 man, and he does not have the time to
23 continue this deposition to another
24 day. And with our belief of this
25 agreement, we would oppose any such

226

1 continuation and the thinly veiled
2 attacks upon the witness here today.
3        MR. KALAS: Are you done? I have
4 a response to that.
5        MR. SELDOMRIDGE: Let me check.
6 Let me check. Yes.
7        MR. KALAS: Okay. First of all,
8 you paraphrased Mr. Travers' statement,
9 and that's been marked as Exhibit 7, so
10 that email will speak for itself.
11        Second of all, plaintiffs -- it's
12 our position that plaintiffs have
13 completely backtracked on whatever
14 agreement was reached between the
15 parties. Dr. Sawyer has expressed on
16 multiple occasions today that he
17 intends to opine beyond his
18 toxicological notes in this case and
19 his reports in the other case.
20        Moreover, we have just become
21 aware today that there is a body of
22 documents reviewed by Dr. Sawyer that
23 we have never received a listing of,
24 and we are entitled to know that. It
25 is inappropriate and is completely in

227

1 violation of the parties' agreements
2 and, frankly, the Rules of Procedure.
3 So we are going to take all applicable
4 and, you know, required steps to fully
5 elucidate what Dr. Sawyer's opinions
6 are.
7        MR. SELDOMRIDGE: There's no
8 reason for --
9        THE WITNESS: They're all MON
10 documents that I have. Every one of
11 them has the MON Bates stamp on them.
12        MR. KALAS: How am I supposed to
13 know what he sent you, Doctor?
14        MR. SELDOMRIDGE: That's correct.
15 They're your documents. There's no
16 reason to put on a show here. There's
17 -- we have turned over all the
18 documents that we have given to
19 Dr. Sawyer.
20        MR. KALAS: You have?
21        MR. SELDOMRIDGE: There is no
22 issue there.
23        Yes, of course. We have nothing
24 to hide here.
25        MR. KALAS: Okay. So --

228

1        MR. SELDOMRIDGE: We're not
2 hiding documents in some corner. That
3 is not what's happening here. You
4 know, we do not -- I do not believe
5 that we've moved substantially at all
6 from your notes, from Dr. Sawyer's
7 notes. And, you know, if you feel as
8 if we have here today, then take it up
9 with the judge.
10        MR. KALAS: We are.
11        MR. SELDOMRIDGE: This is not the
12 time or the place.
13        MR. KALAS: And we -- Dr. Sawyer
14 just testified --
15        MR. SELDOMRIDGE: Can we move on?
16 Can you ask questions?
17        MR. KALAS: I'm going to get
18 there.
19        MR. SELDOMRIDGE: Thank you, sir.
20        MR. KALAS: Dr. Sawyer just
21 testified that he reviewed genotoxicity
22 studies on formulated products. We
23 have never received any documentation.
24        MR. SELDOMRIDGE: Are we going to
25 continue with this, or are we going

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

229

1    to --
2        MR. KALAS:  Well, I know you want
3    to --
4        MR. SELDOMRIDGE:  -- actually try
5    to get to the root of this and talk
6    about the real issues?
7    BY MR. KALAS:
8        Q.   Dr. Sawyer, are you going to tell the jury
9    Monsanto's never tested the genotoxicity of formulated
10   products?
11       A.   No.
12       Q.   Have you reviewed the genotoxicity data
13   that Monsanto has created on formulated products?
14       A.   I believe so.  In the MON documents --
15   when I say MON documents that have a MON Bates stamp
16   number, that is what I refer to.  As far as anything
17   new, I only have about maybe 12 new documents in this
18   box.
19       Q.   I'm going back to the beginning of the
20   litigation, sir.  Where is the listing of the
21   formulation genotox studies you reviewed in forming
22   your opinion in this case?
23       A.   I reviewed things electronically.  I
24   didn't print thousands and thousands of pages.  I have
25   electronic documents received from Monsanto.  They

230

1    have your Bates stamp and name and number right on
2    them, so that's what I reviewed.
3        Q.   Have you reviewed all -- you testified
4    earlier, you have not reviewed all 8 million or 10
5    million or so pages produced in this litigation,
6    right?
7        A.   No, but I would click on a document to see
8    initially is it even relevant to my assessment.  If it
9    is, I would scan it and read it.  When I say "scan
10   it," I mean briefly read it.  And sometimes I found
11   some documents that were highly relevant.  I've even
12   included them in my report.
13           Other times I found studies that were less
14   relevant, and with respect to those genotoxicity
15   studies, they're less relevant.  The real issue here
16   is that I could not find any evidence whatsoever that
17   Monsanto ever made any effort to run a carcinogenic
18   assay on the POEA-type surfactants.
19       Q.   How about the mutagenicity studies on
20   formulated products?  Did you review those that
21   Monsanto carried out?
22       A.   I believe I did.
23       Q.   Okay.
24       A.   But it still doesn't answer the question.
25       Q.   All right.  You talked about ethylene

23

1    oxide a little bit earlier.
2        Do you remember that?
3        A.   Yes.
4        Q.   Okay.  And the amount of ethylene oxide in
5    the document that you provided as a supplemental
6    disclosure, which is from the AkzoNobel MSDS, the
7    amount of ethylene oxide in that POEA formulation is
8    less than .001 percent of the surfactant, right?
9        A.   That's what I said earlier today, correct.
10       Q.   And Roundup original surfactants make up
11   about 15 percent of the mixture, right?
12       A.   Yes.
13       Q.   Okay.  So ethylene oxide is less than
14   .0002 percent of that mixture, right?
15       A.   That's correct.
16       Q.   And in the case of a gallon of Roundup,
17   that would be less than -- or around .00025 ounces,
18   right?
19       A.   Yes, and -- but I'm holding a glass of
20   water.  Now I'm holding this cup with a lid on it,
21   sealed lid.  And if I only had that amount of ethylene
22   oxide in this glass, the rest of it was water, and I
23   let that sit on the shelf overnight or even for a week
24   or a month and I open that cap, the highly volatile
25   ethylene oxide, which builds up in what we call in

232

1    chemistry the headspace, escapes.  That's where the
2    exposure comes from.  It's not coming from continued
3    dermal contact.  It's a matter of ethylene oxide
4    headspace, and that's where the exposure can be
5    significant, because ethylene oxide, not only being a
6    confirmed human carcinogen, it's a very powerful
7    mutagenic agent.
8        Q.   Ethylene oxide in an amount of .002
9    --.00025 ounces is less than a hundredth of a
10   milliliter, right?
11       A.   That's right, but that in the gaseous
12   phase in the headspace, that's where the health
13   concern is, nowhere else.
14       Q.   Let's talk about the health concern.
15   Ethylene oxide is one of the most commonly used
16   sterilizers in hospital settings, isn't it?
17       A.   And the most dangerous.  Extremely
18   dangerous.
19       Q.   Not my question.
20       A.   Very carefully controlled.
21       Q.   Is it used in hospitals?  Is ethylene
22   oxide used in hospitals --
23       A.   It has --
24       Q.   -- to sterilize?
25       A.   It has been, yes.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 61 of 125

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

59 (233 to 236)

233

1    Q.   Okay.  And, in fact, it is one of the
2 sterilizers of choice when a hospital tool is heat or
3 moisture sensitive, right?
4    A.   Yes.
5    Q.   Okay.  And you wouldn't tell a jury that
6 there aren't safe applications of ethylene oxide,
7 right?
8    A.   Correct.
9    Q.   Okay.  Now, one thing you noted regarding
10 the Kumar study in mice was that the viral infection
11 in those mice had not been verified, right?
12    A.   That's right.
13    Q.   Did you review the report of Klaus Weber?
14    A.   Is it a peer-reviewed study or Monsanto
15 document?
16    Q.   It's not a Monsanto document, but it was
17 in the Monsanto production set.
18         Did you review it?
19    A.   So you finally admit there was a Monsanto
20 production set that you know about.
21    Q.   That's not the point, sir.  The point is,
22 I can't tell what you reviewed.
23         So did you review it?
24    A.   I don't know.
25    Q.   Okay.  You don't know because you don't

234

1 have a list of what you've reviewed, right?
2    A.   I never made a list.  It was a massive
3 amount of electronic damage -- data.
4    Q.   Let me ask how you got it.  How did you
5 get this massive amount of electronic data?  How was
6 it transported to you?
7    A.   I believe a service.  I don't want to say
8 Dropbox because I don't know if the Miller Firm uses
9 Dropbox, but some type of service that transmits large
10 quantities of electronic data.
11    Q.   And in that large quantity of electronic
12 data that you reviewed, there is a greater amount of
13 studies in that than what is listed in your
14 toxicological notes, right?
15    A.   Yes.
16    Q.   And you did not print all those studies
17 for your box that's been marked as Exhibit 2, right?
18    A.   No.  Again, I worked largely on electronic
19 files on my large big screen and reviewed the
20 electronic data in that fashion.  I didn't print
21 everything I looked at.
22    Q.   Is that electronic data still alive?
23    A.   Yes.  Absolutely.
24         MR. KALAS:  Well, we would ask
25 and request for plaintiffs' counsel

235

1 that now at this date they provide a
2 list of all the electronic data
3 provided to Dr. Sawyer and any other
4 experts in this litigation if it hasn't
5 been on an MCL.
6         MR. SELDOMRIDGE:  Again, I would
7 state for the record that the thinly
8 veiled attacks and attempts to try to
9 continue this deposition and most
10 likely try to postpone trial date are
11 unacceptable.
12         MR. KALAS:  Let me be clear.  I'm
13 not thinly veiling anything.  I think
14 it's inappropriate.
15         MR. SELDOMRIDGE:  There's no
16 reason to put on a show here.
17         MR. KALAS:  I'm not putting on a
18 show.
19         MR. SELDOMRIDGE:  If you want to
20 go ahead and depose Dr. Sawyer, he's
21 here in front of you right now.  Please
22 continue.
23    A.   I'm here.  I'm here, and I'll do my best
24 to answer your questions as quickly as I can.
25 ///

236

1 BY MR. KALAS:
2    Q.   And you don't know from my questions
3 whether or not you reviewed a report by Klaus Weber,
4 correct?
5    A.   I just don't recall.
6    Q.   And are you aware he's another independent
7 scientist who noted infection in the animals in the
8 Kumar study?
9         MR. SELDOMRIDGE:  Objection.
10 Misstates.
11    A.   I haven't reviewed it, I think, because I
12 don't recall ever -- any evidence that the animals
13 were actually determined to be infected by a virus.
14 It was a postulated assumption, a mere speculation
15 based on everything I read.
16 BY MR. KALAS:
17    Q.   But that's data you'd be interested in if
18 it's out there, right?
19    A.   Certainly.
20    Q.   Okay.  Now, it's your opinion glyphosate's
21 genotoxic, right?
22    A.   Yes.
23    Q.   And as the dose of a genotoxic agent one
24 is exposed to increases, the amount of cancer should
25 correspondingly increase, right?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 62 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018                    60 (237 to 240)

237

1    A.   Now, that question doesn't work.
2    Q.   Well, that's the whole theory behind the
3 linear cancer slope factors that you calculated,
4 right?
5    A.   No.
6    Q.   Explain to me where I'm wrong.
7    A.   I don't think I want to try rewording your
8 question.  If you could just be so kind to repeat your
9 question, maybe I'll understand it better.
10   Q.   Do genotoxic carcinogens act in a
11 dose-dependent manner?  In other words, the more
12 you're exposed to, the higher the rate of cancer in a
13 population?
14   A.   In general, yes, but one has to consider
15 the particular chemical in terms of its action also as
16 a promoter as a full carcinogen.  But in general, yes.
17   Q.   Do you believe the more glyphosate someone
18 is exposed to, the higher their risk of cancer?
19   A.   Yes.
20   Q.   Do you believe in the rodent studies, the
21 more glyphosate a rodent is exposed to, the higher
22 their risk of cancer?
23   A.   Absolutely.  Very clear-cut on the Wood
24 2009b study, for example.
25   Q.   And you're going exactly where I was

238

1 going.  You discuss some of the data on mouse lymphoma
2 in your toxicological notes, right?
3    A.   Yes.
4    Q.   And the mouse study with the highest dose
5 was, in fact, the Knezevich study, right?
6    A.   With the highest dose?
7    Q.   Yes.
8    A.   Yes.
9    Q.   And that's the 1983 mouse study, correct?
10   A.   Yes.
11   Q.   Okay.  And did you look at the lymphoma
12 data in the Knezevich study?
13   A.   I think I'm looking at page 88.  I have
14 Table 19 with the renal cell tumor incidence from that
15 study, and also on Table 18, I show the male CD mice
16 lesions.
17   Q.   And neither of those are lymphoma data,
18 right?
19   A.   Correct.
20   Q.   Did you look at the lymphoma data in the
21 Knezevich study?
22   A.   Yes.  I think -- I don't think there was
23 any significant finding.
24   Q.   You recall, in fact, that there were two
25 lymphomas in the control group and two in the

239

1 high-dose group, right?
2        THE REPORTER:  I'm sorry.  Two in
3 the high --
4        MR. KALAS:  High-dose group.
5    A.   Yes.
6 BY MR. KALAS:
7    Q.   How do you explain -- and strike that.
8 Let me ask a foundational question.
9        The high-dose group in the Knezevich study
10 got about five times as much glyphosate as the
11 high-dose group in the Wood 2009b study, right?  About
12 5,000 mgs per kg verses a thousand --
13   A.   About 5,000 milligram in the Knezevich and
14 Hogan study.  In Wood, I need to go back and look
15 because I forget what the high-dose group was.
16   Q.   Sure.
17   A.   Yeah, it looks like the Wood study
18 high-dose group was 810, so about five, yeah.
19   Q.   Five times or so?
20   A.   Yes.
21   Q.   How do you explain that in the Knezevich
22 study, when the mice got five times as much glyphosate
23 in the high-dose group as the Wood study, we did not
24 see any increase in lymphoma?
25   A.   Probably through genetic drift.  The

240

1 Knezevich and Hogan study, although it was CD-1 mice,
2 it was run about 26 years prior to the Wood, et al.,
3 2009b study.
4        So over that period of 26 years, these
5 mice are continually inbred, and that genetic strain
6 is attempted to be maintained.  But through that many
7 different birth cycles, you know, the mice only live a
8 short period of time and reproduce very frequently.
9 It's just -- it's not completely reasonable to say
10 that the mice that were used in the '83 study had the
11 same degree of sensitivity to that in the 2009 study.
12   Q.   And which set of mice has a genetic
13 fingerprint that is closer to a human's fingerprint?
14 Is it the '83 study or the 2009?
15   A.   We don't know.  Again, you may recall from
16 my prior deposition that there is no perfect animal
17 model.  It doesn't exist.  This is a model.  It's not
18 perfect.  So we can't say that the '83 study was
19 closer to a human or the 2009, but what the rules
20 read -- and when I say "the rules," the EPA
21 methodology, is who used the most sensitive study, and
22 that's what I did.  I used the most sensitive study.
23   Q.   And you'd agree, sir, that when mice were
24 dosed at the highest amount in glyphosate bioassays,
25 glyphosate was not induced in those mice?

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

61 (241 to 244)

---

241

1    A.   In the 1983 study, you are correct.
2         MR. KALAS:  I'm going to mark a
3    study called George as Exhibit 14.
4         (Exhibit Number 14, Document Titled
5         "Studies on glysophate-induced
6         carcinogenicity in mouse skin: A
7         proteomic approach," was marked for
8         identification.)
9         MR. SELDOMRIDGE:  Thank you,
10   Counsel.
11   BY MR. KALAS:
12   Q.   And you've seen this study before,
13   correct, sir?  This is the study you testified about
14   at the D. Johnson trial, right?
15   A.   I believe I have that study with me.  I
16   was looking for it last night.  And it really
17   should -- maybe it's in -- under G, over here.  GI --
18   I think it's in my box, but I have -- I've been having
19   trouble locating this.  Yes.
20   Q.   Okay.  And you argue -- you used this
21   study to argue that glyphosate was a tumor promoter,
22   right?
23   A.   Yes.
24   Q.   Okay.  And one thing that's necessary in a
25   study like this is you need to have a vehicle to

---

242

1    administer the test compound, right?
2    A.   Correct.
3    Q.   And in this case, the vehicle was ethanol
4    and acetone, right, 50 percent each?  It's on
5    page 952, right below the group listing.
6    A.   Let's see.
7         (Reviewing document.)
8         Okay.  So the control material was
9    administered in that fashion but not the glyphosate.
10   Q.   Okay.  Do you see the line below the
11   groups that says, "Vehicle for glyphosate DMBA and TPA
12   were 50% ethanol and acetone respectively"?
13   A.   DMBA, TPA.  Okay.  Okay.  Yeah, it was,
14   then.  It was also used for the glyphosate.  Yes.
15   Q.   And in this study, there's no positive
16   vehicle control, right?  There's an untreated control
17   but not a positive vehicle control?
18   A.   That's true.
19   Q.   And without a positive vehicle control,
20   one thing that we're left to wonder about is whether
21   you're seeing an effect from the vehicle or the
22   glyphosate, right?
23   A.   In theory, but we do know a little about
24   ethanol and acetone.  They're not -- they're not --
25   they're certainly compounds that we know a lot about

---

243

1    from toxicological standpoint.
2    Q.   Do you know where they source the ethanol
3    and acetone from in this study?
4    A.   Hopefully not from West Virginia in the
5    still country.  But no, I don't.
6    Q.   And so you don't know the purity of the
7    ethanol or the acetone, right?
8    A.   As I recall, this was done in India.  They
9    really don't give review of the purchase source.  I
10   would -- I would have to believe they didn't use, you
11   know, vodka off the shelf but rather laboratory-grade
12   ethanol.
13   Q.   But you can't tell this based off what
14   they said, right?
15   A.   No, but I think it's a bit of a leap to
16   assume that they used impure ethanol.  I mean, it's --
17   laboratory ethanol is -- as being a prior laboratory
18   director, we had gallons of 200-proof pure laboratory
19   ethanol and used to even come with a seal on it from
20   the fire, tobacco, whatever the thing is.
21   Q.   Why is purity important to you as a
22   laboratory director, of test contents?
23   A.   Well, simply to eliminate possible bias
24   and interference from contaminants.
25   Q.   Contaminants could throw off your results,

---

244

1    right?
2    A.   That's right.
3    Q.   And when you're testing a compound, be it
4    ethanol, acetone, anything else, where do professional
5    laboratories usually source that compound from?
6    A.   Well, I used to order a lot of these
7    high-purity chemicals from Sigma Chemical, Fisher
8    Scientific even.  I mean, there's a number of
9    different suppliers that provide these laboratory
10   chemicals, and they're usually graded with a percent
11   purity.
12   Q.   Why do you want to order it from a group
13   like Sigma or Fisher instead of buying it at CVS?
14   A.   Or from a moonshiner in West Virginia.
15        MR. SELDOMRIDGE:  Hey, I'm from
16        West Virginia.
17        THE WITNESS:  I know.  That's
18        what I'm saying.
19   BY MR. KALAS:
20   Q.   Why do you want to get it from a place
21   like Sigma or Fisher instead of a moonshiner in West
22   Virginia or CVS?
23   A.   Well, generally, any of the
24   laboratory-grade materials used in studies, in my
25   experience, especially as a laboratory director, we

---

Transcript of William Sawyer, Ph.D.

62 (245 to 248)

Conducted on August 23, 2018

---

245

1  look to see what the part-per-million, or in cases of
2  heavy metals, part-per-billion, impurity levels are.
3      Q.   And that's an important -- when you're
4  publishing a peer-reviewed study, it's important to be
5  working with pure materials as much as possible,
6  right?
7      A.   Yeah.  But, you know, we're dealing --
8  we're dealing with, like, the most two common
9  laboratory chemicals on earth.  I mean, it's -- if you
10  said that -- if they were using chenodeoxycholic acid,
11  for example, that is an obscure -- pretty obscure
12  chemical.  They are going to get it wherever they
13  could find it because it's so hard to get.  But, I
14  mean, the laboratory reagent grade ethanol and acetone
15  is virtually on the shelf of any laboratory you go to.
16  It's common.
17      Q.   If you're going to conduct a test of
18  Roundup, where would you source the Roundup from?
19      A.   I would probably source it from Monsanto
20  directly, if possible.
21      Q.   And if you were to source radiolabeled
22  glyphosate, where would you source it from?
23      A.   That would -- that's a little different.
24  There, I would want to initially source it from
25  Monsanto and then whatever radiological corporation or

---

246

1  laboratory who was going to label it.  I mean, there's
2  two different vendors involved in something like that.
3      Q.   Where did they source the Roundup from in
4  this study?
5      A.   Well, it appears to be Roundup original
6  with a trademark, Monsanto Company, St. Louis.
7      Q.   Where did they procure it from, sir?
8      A.   I see that some materials were purchased
9  from BioRad Laboratories.
10      Q.   Do you see that they procured the Roundup
11  they used in this study from a local market?
12      A.   No, I didn't see that.  Maybe I have to
13  read down further.
14      Q.   Top line.
15      A.   Top line?
16      Q.   It goes from the bottom of the left-hand
17  column to the top of the right-hand column.
18      A.   "As the isopropylamine salt was
19  procured" -- I see what they did.  Okay.  So they
20  bought -- they bought the Roundup original trademark
21  in a container that says Roundup on the front of it
22  like anyone else would buy.  That's fine.
23      Q.   That's fine?
24      A.   That has -- as one of your associates
25  would say, that's real world, because that's what

---

247

1  we're testing.
2      Q.   So this local market was in Lucknow,
3  India, correct?
4      A.   Yeah.
5      Q.   That's where the study took place.  And
6  are you aware that there's been issues with the
7  counterfeit pesticides in India?
8      A.   No, but if it's in a -- an original
9  trademarked Roundup container which has the cardboard
10  aluminum glued seal, and if that seal is intact, I
11  think they would -- they would be fine with this.
12      Q.   Is there a picture of the container they
13  used here?
14      A.   No, but it does say trademark after
15  Roundup original.
16      Q.   Did they discuss the seal on the container
17  in this study?
18      A.   No.
19      Q.   Okay.  And did they discuss the purity?
20  Did they do any testing of the purity of the Roundup
21  they used?
22      A.   No.
23      Q.   Okay.  And in a study that you would do in
24  a lab, you would normally have some assurance of the
25  purity provided to you by Sigma-Aldrich or whoever

---

248

1  else you purchased it from, right?
2      A.   For the solvents, absolutely.
3      Q.   And there's --
4      A.   But not necessarily.  If I were doing a
5  so-called real-world test, I would buy it off the
6  market shelf because what Monsanto provided me might
7  possibly be a higher purity or something different.
8  I'd want to actually buy it off the shelf and see what
9  people are really being exposed to.
10      Q.   And you don't know because you don't have
11  a picture of the container or any purity data or any
12  sourcing data for procurement whether or not this was,
13  in fact, a Roundup original package that was
14  manufactured by Monsanto?  You just don't know that?
15          MR. SELDOMRIDGE:  Objection.
16  Compound.
17      A.   No, but I think that's a stretch, based on
18  what they said in terms of it being Roundup original
19  trademark.
20  BY MR. KALAS:
21      Q.   And there's no pathological examination of
22  the skin lesions in this study, right?  Same column,
23  right side, right below the discussion of the ethanol
24  and acetone.  The animals were examined for gross
25  morphological changes, right?

---

Transcript of William Sawyer, Ph.D.
63 (249 to 252)
Conducted on August 23, 2018

249

1    A.   Right.
2    Q.   So there wasn't a pathological or
3 histopathological examination of those lesions, right?
4    A.   Doesn't appear to be.
5    Q.   And noncarcinogenic skin lesions can mimic
6 carcinogenic skin lesions, right?
7    A.   Can.  This is referred to as a squamous
8 cell papilloma.  The study was from a proteomics
9 laboratory.
10    Q.   You agree, pathological examination would
11 make this a stronger study, correct?
12    A.   Yes.
13    MR. KALAS:  I'm going to mark as
14 Exhibit 15 the IARC monograph on
15 glyphosate.
16    (Exhibit Number 15, IARC Monograph on
17    Glyphosate, was marked for
18    identification.)
19    THE VIDEOGRAPHER:  Did you want
20 to go ahead and change?
21    MR. KALAS:  Sure.  Let's change.
22 That's fine.  Let's go off the record.
23    THE VIDEOGRAPHER:  This marks the
24 end of Media Number 3 in the deposition
25 of William Sawyer.  The time is 5:05.

250

1    We are off the record.
2    (Break taken from 5:05 p.m. to 5:15 p.m.)
3    THE VIDEOGRAPHER:  This marks the
4 beginning of Media Number 4 in the
5 deposition of William Sawyer.  The time
6 is 5:15.  We are on the record.
7 BY MR. KALAS:
8    Q.   Okay, Doctor.  If we could turn in the
9 IARC monograph to page 34, please.  This is a
10 discussion of the George study by the IARC working
11 group on glyphosate, right?  Left-hand column.
12    A.   Yeah, I see it.
13    Q.   Okay.  And have you reviewed their
14 discussion of the George study before?
15    A.   No, I don't think so.
16    Q.   Okay.  You have reviewed this document
17 before?
18    A.   Oh, yeah.
19    Q.   Okay.  So if we can go to the right-hand
20 column in the part in the brackets.  Let me know when
21 you're there.
22    A.   Yeah, DMBA only.
23    Q.   No.  The brackets at the bottom of the
24 paragraph, sir.
25    A.   Oh, the glyphosate --

25

1    Q.   Yeah.
2    A.   -- the glyphosate formulation.
3    Q.   Yep.  Are you there?
4    A.   Yes.
5    Q.   Okay.  And you're -- do you have some
6 understanding that the brackets are meant to contain
7 the commentary of the IARC working group on the
8 studies they reviewed?
9    A.   Yes.
10    Q.   Okay.  And what the IARC working group
11 said about the George study is, "The glyphosate
12 formulation tested appeared to be a tumour promoter in
13 this study.  The design of the study was poor, with
14 short duration of treatment, no solvent controls,
15 small number of animals, and lack of histopathological
16 examination.  The Working Group concluded that this
17 was an inadequate study for the evaluation of
18 glyphosate."
19    Did I read that correctly?
20    A.   Yes.
21    Q.   Do you disagree with the conclusions of
22 the working group?
23    A.   The only point I'd disagree with is
24 stating that it was inadequate for the evaluation.
25 It's still a piece.  Using weight of evidence, I would

252

1 give it less weight because of these deficiencies, but
2 the last sentence implies that it was inadequate for
3 evaluation.
4    Q.   Okay.  So you disagree with the
5 bottom-line conclusion, but you agree with the
6 criticisms they had of the study?
7    A.   Yeah.  It detracts from the weight of the
8 study.
9    Q.   So why do you agree with the fact that the
10 design of the George study is poor?  What's poor about
11 it to you?
12    A.   I think the biggest problem is lack of
13 histopathological examination, and it would have been
14 helpful to have a larger number of animals.
15    Q.   Why is a lack of histopathological
16 examination one of the biggest problems to you?
17    A.   Well, to be certain that the papilloma was
18 actually a malignant process.
19    Q.   So there's some question based on the
20 design of the George study whether or not they're
21 actually observing cancer?
22    A.   Yes.  Yeah.  I mean, I wouldn't base an
23 opinion only on this study.  I think it has to be used
24 with other studies as well.
25    Q.   Do you believe the George study is

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

64 (253 to 256)

Conducted on August 23, 2018

253

1  sufficient in and of itself to argue that glyphosate
2  or glyphosate-based herbicides promote cancer?
3      A.  By itself?  No.  It has to be viewed with
4  the totality of the evidence.
5      Q.  Okay.
6          MR. KALAS:  I'm going to mark as
7  Exhibit 16 a study by Wester.
8          (Exhibit Number 16, Document Titled
9          "Glyphosate Skin Binding, Absorption,
10         Residual Tissue Distribution, and Skin
11         Decontamination," was marked for
12         identification.)
13         MR. SELDOMRIDGE:  Thank you,
14  Counsel.
15  BY MR. KALAS:
16     Q.  And this is the Wester 1991 study, right?
17     A.  Yes.
18     Q.  The rhesus monkey study, correct?
19     A.  Yes.
20     Q.  This is a study you've reviewed, right?
21     A.  Yes.
22     Q.  It's a study you've talked about at trial,
23  right?
24     A.  Yes.
25     Q.  And you talk about in your toxicological

254

1  notes as well, right?
2      A.  Yes.
3      Q.  And, in fact, this study conducts a few
4  different type of tests on a glyphosate-based
5  herbicide, right?
6      A.  It does.
7      Q.  So I want to walk through this with you.
8  If we can start at the Materials and Methods section
9  on page 726 of the study, please.  726.
10         MR. SELDOMRIDGE:  Thank you,
11  Counsel.
12  BY MR. KALAS:
13     Q.  Are you there?
14     A.  Yes.
15     Q.  I think you're on 727, actually.
16     A.  Yeah, you said 727.
17     Q.  No.  726, sir.  I'm sorry.
18         Okay.  Now, one of the tests that they
19  did -- it's right below "Materials and Methods" -- is
20  an in vitro percutaneous absorption study, right?
21     A.  Yes.
22     Q.  And what is the purpose of an in vitro
23  percutaneous absorption study?
24     A.  To measure the transport of a chemical
25  through the epidermis of the skin, which is placed

255

1  over the well with a differential fluid concentration
2  of glyphosate on one side of the membrane and a
3  circulating bath of nonglyphosate fluid on the other
4  side of the membrane, and then a known concentration
5  is placed on the high concentration side, and the
6  diffusion through that membrane is measured over a
7  period of time.
8      Q.  And the goal of that sort of study is to,
9  at least in an in vitro manner, try to figure out how
10  much is absorbed through the skin, right, of the
11  compound?
12     A.  Yes.
13     Q.  Okay.  And they did this study in the
14  Wester '91 study using Roundup, right, not glyphosate?
15     A.  Let me check.
16     A.  It's right here in the Materials and
17  Methods beginning on I think the sixth line, starting
18  "Undiluted."
19     A.  It's pretty vague.  It says "formulation,"
20  but it doesn't say what.
21     Q.  It says "Roundup" right after "in a
22  formulation," right?
23     A.  Right, but we don't know what -- if any
24  POEAs were in it or other adjuvants.
25     Q.  Roundup, sir, is 41 percent glyphosate,

256

1  15 percent POEA, right?
2      A.  Well, there's different Roundup
3  formulations.
4      Q.  Roundup original is 41 percent glyphosate?
5      A.  It doesn't say "original," though.
6      Q.  Well, at this point in time in 1991, there
7  weren't as many formulations as there are today,
8  correct?
9      A.  True.
10     Q.  And so if we take these authors at their
11  word, Roundup is 41 percent glyphosate and 15 percent
12  POEA, right?
13     A.  I think for that time era, I think that's
14  true.
15     Q.  And you haven't seen any Monsanto
16  documents or anything else to suggest that they
17  weren't using Roundup original in this study?
18     A.  True.
19     Q.  Now, the authors also did an evaluation of
20  partition into powdered stratum corneum in this study,
21  right, or binding to powdered --
22     A.  Binding, yeah.
23     Q.  -- human stratum corneum, right?
24         Now, what's an author looking for when
25  they conduct a binding study on powdered human stratum

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

65 (257 to 260)

257

1  corneum?
2      A.  Well, that's really a matter of what we
3  talked about earlier in terms of the explanation of
4  where the unaccounted glyphosate ended up.
5      Q.  So, in other words, what they're trying to
6  determine when they look at the binding to the human
7  stratum corneum is whether or not the Roundup or
8  glyphosate stays in these wells that we talked about
9  earlier, right?
10     A.  Well, not in the wells.  In the tissue
11  itself.
12     Q.  Okay.  In the tissue itself.  But this is
13  that skin accumulation theory that we were discussing
14  earlier, correct?
15     A.  It is.
16     Q.  Okay.  And then, again, that was done
17  using glyphosate in a formulation, right?
18     A.  It appears that way, yes.
19     Q.  And then the authors looked at IV
20  administration of glyphosate and the elimination of
21  the test compound, right?  And that is basically when
22  they use the bolus injection, right?
23     A.  Okay.  So we're talking about the next
24  stage of the study?
25     Q.  Yes, sir.  They did that as well.

258

1      A.  Yeah, there was a second stage which
2  involved intravenous injection of the test material.
3      Q.  Now, why would you do an intravenous
4  injection of the test material?  What would you be
5  looking for?
6      A.  Well, the outstanding feature is that it
7  does provide 100 percent systemic circulation of the
8  material, 100 percent bioavailability as opposed to
9  using an anal or an oral or any other type of
10  parenteral dosage, including dermal.
11     Q.  And so an advantage of an IV
12  administration is that you know all of the dose you
13  administered is available for systemic circulation,
14  right?
15     A.  Yes.
16     Q.  And an advantage of an IV administration
17  is that you generally will have almost complete
18  recovery of that administered dose, correct?
19     A.  If you test feces, urine.  In this case,
20  breath is not really important.  We don't have the
21  volatility to blow it off as we do with ethanol or
22  vinyl chloride.  So, yeah, if one were to test urine
23  and feces, that should cover it.
24     Q.  And they did test that in this study,
25  right?  They did test urine and feces, right?

259

1      A.  They did, and --
2      Q.  We're getting there.
3      A.  Yeah.
4      Q.  Okay.  So the next thing they tested -- I
5  know where you're going.  The next thing they tested
6  was dermal absorption of -- or actually, let me be
7  clear.  The next thing they did was a dermal systemic
8  exposure test in these rhesus monkeys, right?
9      A.  Dermal systemic.
10     Q.  Basically, a dermal administration to the
11  monkeys to see what happens with the glyphosate or the
12  Roundup.
13     A.  Yes.
14     Q.  Okay.
15     A.  But I want to say that I don't think I'm
16  going to keep going much longer.  I'm really having a
17  hard time focusing.
18     Q.  Okay.  What's the purpose of a dermal
19  administration?
20     A.  So you may want to do the -- you asked
21  me --
22     Q.  She's out of the room, so -- I appreciate
23  that.
24     A.  Oh, you mean she's not here any longer?
25     Q.  She's coming back.  She's got --

260

1      A.  Okay.
2      Q.  What's the purpose of a dermal
3  administration?
4      A.  Well, obviously, the direct in vivo dermal
5  test is used, and with a primate, of course, it's a
6  good choice, very close to human, and it provides a
7  good model for measuring dermal absorption of the
8  agent.
9      Q.  And they also did that with Roundup, like
10  all these other studies in this paper, right?
11     A.  They did what?
12     Q.  They did the study with Roundup, not
13  glyphosate alone, like all the other studies in this
14  paper, right?
15     A.  It appears that way.
16     Q.  Okay.
17     A.  I mean, we --
18     Q.  Well, for instance, in the IV percutaneous
19  absorption paragraph there on the right column of 726,
20  the bottom sentence says, "Topical glyphosate was
21  Roundup formulation."
22         You see that?
23     A.  Yeah.  In Roundup formulation, yeah.
24     Q.  Okay.
25     A.  It's a little confusing, though, because

CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

66 (261 to 264)

261

1  it's carbon-14-labeled glyphosate in Roundup
2  formulation.  So I think what they're -- I think I did
3  read before how they -- from a stoichiometric
4  measurement decided how much labeled glyphosate to
5  add.  I think that's how it worked.  They took actual
6  Roundup, and they added C-14-labeled glyphosate to
7  that at a specific ratio.
8      Q.  Jennifer has walked back in.  Doctor, I
9  intend, if it is all right with you, to finish my
10 questions about this study, then turn it over to
11 Ms. Hoekel for her questions for today.  Can you
12 handle going through that?
13     A.  We'll see.  I'm just, again, having a
14 little trouble focusing on some of the harder stuff
15 right now.
16     Q.  Okay.  The authors also looked at blood
17 concentrations of Roundup in this study, right?
18     A.  Yeah, via C-14 measurements, I believe.
19     Q.  Okay.  Okay.  And, finally, they also
20 looked at skin decontamination in this study, correct?
21     A.  They --
22     Q.  That's on the next page.
23     A.  They measured how much came off the skin,
24 what they could remove from the skin, if that's what
25 you're referring to.

262

1      Q.  Well, if you turn to page 727, first full
2  paragraph, they conducted an in vivo skin
3  decontamination study, right?
4      A.  Yeah.  That's basically the wash sample
5  analysis.
6      Q.  And what's the purpose of an in vivo skin
7  contamination study?
8      A.  It's critical to be able to calculate your
9  percent recovery.  When you run such a study, you have
10 to calculate what the dose that was applied to the
11 skin, how much was removed from the skin that is not
12 bound, how much is bound in the skin and how much
13 diffuses through systemic circulation under a given
14 interval of time.
15     Q.  Aren't you also interested in the
16 effectiveness of washing with water versus soap and
17 water?
18     A.  I think that's an interesting point, yeah.
19 And I also -- in my answer, I should also say, as well
20 as measurement of urine and feces.
21     Q.  Okay.  But from a -- if you're just
22 studying skin decontamination, that's not -- the
23 endpoint on that is not the ADME data.  That endpoint
24 is in the dermal absorption and IV systemic
25 distribution studies, right?

263

1      A.  I really don't think I can keep going on
2  right now.  The amount of concentration this is
3  requiring, I'm getting a little --
4      MR. KALAS:  How long have we been
5  on the record?
6      A.  -- a little tired.
7      THE VIDEOGRAPHER:  Six hours and
8  18 minutes.
9      MR. KALAS:  Okay.  So I'm going
10 to turn it over to Ms. Hoekel right
11 now.  I'm going to note that, in
12 addition to all the other things that
13 we've discussed today on the record,
14 that a full seven-hour deposition day,
15 the doctor wasn't able to continue on
16 it.  I'm not criticizing him for that,
17 but that's just a fact.  I'll let
18 Jennifer ask her questions.
19     THE WITNESS:  I've been at the
20 table over eight hours.
21     MR. KALAS:  Sir --
22     THE WITNESS:  I was here at the
23 table at 9:07.
24     MR. KALAS:  I understand your
25 statement, sir.  The record speaks for

264

1  itself.
2      Jennifer, please.
3      MR. SELDOMRIDGE:  And I will also
4  note that the deposition has not
5  concluded yet.
6      MR. KALAS:  I'll agree with that.
7      CROSS-EXAMINATION
8  BY MS. HOEKEL:
9      Q.  Dr. Sawyer, my name is Jennifer Hoekel,
10 and I represent the Osborn & Barr defendants in this
11 case.  And I will have a very brief couple of
12 questions for you, and they should mostly be yes or
13 no.
14     Do you know who Osborn & Barr is?  Do you
15 know who Osborn & Barr is?
16     A.  I really don't.
17     Q.  Okay.
18     A.  I've not a clue.
19     Q.  They're the -- they are an ad agency who
20 advertised certain of the Roundup products between
21 1990 and 2012.
22     A.  Okay.
23     Q.  And they've been named in a number of
24 these Monsanto cases.  Are you prepared to offer
25 any -- have you been asked to offer any opinions at

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 69 of 125

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

67 (265 to 268)

265

1 trial with respect to Osborn & Barr's liability in
2 these cases?
3     A.   Not specifically for Osborn. It's
4 possible I've been asked by plaintiffs' counsel for
5 opinions that may in some way relate to that, but not
6 specifically, no.
7     Q.   Let me ask a different question.
8        Have you been asked to provide any
9 opinions with respect to liability by an ad agency
10 with respect to Roundup?
11    A.   No.
12    Q.   Have you been asked to render any opinions
13 with respect to an advertising agency's responsibility
14 for label requirements?
15    A.   No.
16    Q.   And have you been asked to render any
17 opinions about an ad agency liability for other
18 marketing requirements?
19    A.   What do you mean by "other marketing
20 requirements"?
21    Q.   Any kind of other advertisement.
22    A.   No.
23        MS. HOEKEL:  I have nothing
24 further.  Jeff.
25        MR. SELDOMRIDGE:  I don't have

266

1 any questions at this time.
2        MS. HOEKEL:  I'm going to hand it
3 back to Mr. Kalas.
4        MR. KALAS:  It's the opinion of
5 Monsanto that this deposition remains
6 open, and we have additional questions
7 to ask Dr. Sawyer regarding Mr. Hall
8 based on some of the disclosures made
9 today, in addition to the -- all the
10 other issues we've outlined regarding
11 the expansion of his opinions, and I
12 think I've said all I need to say.
13        MR. SELDOMRIDGE:  Thank you,
14 Doctor.
15        THE VIDEOGRAPHER:  This marks the
16 end of Media Number 4 in the deposition
17 of William Sawyer.  This also concludes
18 today's deposition.  The time is 5:37.
19 We are off the record.
20    (Off the video record at 5:37 p.m.)
21        THE REPORTER:  Mr. Seldomridge,
22 do you need a copy of the transcript?
23        MR. SELDOMRIDGE:  E-tran, please.
24        THE REPORTER:  Do you need a
25 copy?

267

1     MS. HOEKEL:  Just E-tran.
2 (Recessed at 5:38 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

268

1           CERTIFICATE OF OATH
2
3
4    STATE OF FLORIDA
5    COUNTY OF LEE
6
7        I, the undersigned authority, certify
8 that WILLIAM SAWYER, Ph.D., personally appeared before
9 me and was duly sworn.
10
11        WITNESS my hand and official seal this
12 27th day of August, 2018.
13
14
15    Rhonda Hall-Breuwet, RDR, CRR, LCR, CCR, FPR, CLR
16    Rhonda Hall-Breuwet, RDR, CRR, LCR, CCR, FPR, CLR
17    NCRA Realtime Systems Administrator
18    Notary Public - State of Florida
19    My Commission Expires:  9/28/19
20    Commission No. FF 915315
21
22
23
24
25

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

269

1               C E R T I F I C A T E
2
3     STATE OF FLORIDA:
4
5              I, RHONDA HALL BREUWET, RDR, CRR, LCR,
6     CCR, FPR, CLR, NCRA Realtime Systems Administrator,
7     shorthand reporter, do hereby certify:
8              That the witness whose deposition is
9     hereinbefore set forth was duly sworn, and that such
10    deposition is a true record of the testimony given by
11    such witness.
12             I further certify that I am not
13    related to any of the parties to this action by blood or
14    marriage, and that I am in no way interested in the
15    outcome of this matter.
16             IN WITNESS WHEREOF, I have hereunto
17    set my hand this 27th day of August, 2018.
18
19
20
21    RHONDA HALL BREUWET, RDR, CRR, LCR, CCR, FPR, CLR,
22    NCRA Realtime Systems Administrator
23
24
25



## Planet Depos®
We Make It *Happen*™

**CONFIDENTIAL**

# Transcript of William Sawyer, Ph.D., Volume 2

**Date:** October 16, 2018
**Case:** Peterson & Hall -v- Monsanto Company, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 72 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
Conducted on October 16, 2018
1 (270 to 273)

270

1   IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2              STATE OF MISSOURI
3                    x
4   RONALD PETERSON and    :
5   JEFF HALL,             :
6         Plaintiffs,      :
7      v.                  : Civil Action No.
8   MONSANTO COMPANY, et   :  1622 CC01071
9   al.,                   :
10        Defendants.      :
11                   x
12
13       * * * CONFIDENTIAL * * *
14
15    Deposition of WILLIAM SAWYER, Ph.D.
16            Volume II
17         Fort Myers, Florida
18       Tuesday, October 16, 2018
19            9:05 a.m.
20
21  Job No.: 212745
22  Pages: 270   485
23  Reported By: RHONDA HALL BREUWET, RDR, CRR,
24  LCR, CCR, FPR, CLR, NCRA Realtime Systems
25  Administrator

271

1        Deposition of WILLIAM SAWYER,
2   Ph.D., held at the offices of:
3
4
5        Sanibel Harbour Marriott Resort & Spa
6           17260 Harbour Pointe Drive
7           Fort Myers, Florida 33908
8
9
10
11
12
13           Pursuant to notice, before RHONDA
14  HALL BREUWET, RDR, CRR, LCR, CCR, FPR, CLR, NCRA
15  Realtime Systems Administrator, Notary Public in
16  and for the State of Florida.
17
18
19
20
21
22
23
24
25

272

1          A P P E A R A N C E S
2   ON BEHALF OF PLAINTIFFS:
3    JEFF T. SELDOMRIDGE, ESQUIRE
4    The Miller Firm LLC
5    The Sherman Building
6    108 Railroad Avenue
7    Orange, Virginia 22960
8     540  672 4224
9
10
11   ON BEHALF OF DEFENDANT MONSANTO:
12    JOHN M. KALAS, ESQUIRE
13    GREGORY S. CHERNACK, ESQUIRE
14    Hollingsworth LLP
15    1350 I Street, N.W.
16    Washington, DC 20005
17     202  898 5800
18
19      and
20
21    BERT L. SLONIM, ESQUIRE
22    Arnold & Porter Kaye Scholer LLP
23    250 West 55th Street
24    New York, New York 10019
25     212  836 8000

273

1     A P P E A R A N C E S   C O N T I N U E D
2
3    ON BEHALF OF DEFENDANT OSBORN & BARR:
4     JENNIFER E. HOEKEL, ESQUIRE  Via Telephone
5     SCOTT T. JANSEN, ESQUIRE  Via Telephone
6     Armstrong Teasdale, LLP
7     7700 Forsyth Boulevard
8     Suite 1800
9     St. Louis, Missouri 63105
10     314  621 5070
11
12
13    VIDEOGRAPHER:
14     DONALD J. BREUWET
15
16
17
18
19
20
21
22
23
24
25

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC  Document 8572-19  Filed 12/27/19  Page 73 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
2 (274 to 277)
Conducted on October 16, 2018

274

```
        C O N T E N T S
EXAMINATION OF WILLIAM SAWYER, Ph.D.    PAGE
Direct Examination                      281
By Mr. Kalas
Cross Examination                       477
By Mr. Seldomridge
Redirect Examination                    480
By Mr. Kalas
```

276

```
            E X H I B I T S
                                        PAGE
Ex. 21   Deposition Transcript of       324
         William Sawyer, PhD.,
         dated 8/23/18
Ex. 22   Article Titled                 326
         Pesticide exposure as
         risk factor for
         non Hodgkin lymphoma
         including
         histopathological
         subgroup
         analysis"Article Titled
          Glyphosate Use and
         Cancer Incidence in the
         Agricultural Health
         Study
Ex. 23   History & Physical for         344
         Jeff S. Hall, dated
         3/23/12
```

275

```
            E X H I B I T S
         Attached to transcript.

SAWYER DEPOSITION EXHIBITS              PAGE
Ex. 17   Defendant Monsanto             281
         Company's Second Amended
         Notice of Continued
         Videotaped Deposition of
         William Sawyer, Ph.D.
Ex. 18   Plaintiffs' Objections         282
         to Defendants' Document
         Requests and Response to
         the Amended Notice of
         Videotaped Deposition of
         William Sawyer, Ph.D.
Ex. 19   Dr. William Sawyer             286
         Materials Considered
         List Peterson/Hall v.
         Monsanto Co.
Ex. 20   Article Titled                 321
          Glyphosate Use and
         Cancer Incidence in the
         Agricultural Health
         Study
```

277

```
            E X H I B I T S
                          PAGE
Ex. 24   Article Titled       349












Ex. 25   Article Titled       356




Ex. 26   National Cancer      363
         Institute Article Re
         Ethylene Oxide
```

Transcript of William Sawyer, Ph.D., Volume 2         3 (278 to 281)
Conducted on October 16, 2018



278

```
1           E X H I B I T S
2                           PAGE
3  Ex. 27  ████████████    ███
4  ███████████████████
5  ████████████████████
6  ███████████████████
7
8
9
10 Ex. 28  ████████████    ██
11
12 Ex. 29     Revised Glyphosate issue    413
13 Paper, Evaluation of
14 Carcinogenic Potential,
15 EPA's Office of
16 Pesticide Programs,
17 December 12, 2017, DP
18 Barcode D444689
19 Ex. 30     TNO Report: "In vitro    439
20 percutaneous absorption
21 study with 14C
22 glyphosate using viable
23 rat skin membranes"
24
25
```

279

```
1           E X H I B I T S
2                           PAGE
3  Ex. 31  Final Report:    449
4  Evaluation of the
5  Percutaneous Absorption
6  of Roundup Formulations
7  in Man Using an In-Vitro
8  Technique, Bates-stamped
9  MONGLY00135633 - 646
10 Ex. 32     Article Titled    463
11 "Glyphosate
12 Biomonitoring for
13 Farmers and Their
14 Families: Results from
15 the Farm Family Exposure
16 Study"
17
18
19
20
21
22
23
24
25
```

280

```
1           P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Here begins Media
3  Number 1 in the videotaped deposition of William
4  Sawyer, Ph.D., in the matter of Peterson and Hall
5  versus Monsanto Company, et al., in the Circuit
6  Court of the City of St. Louis, State of Missouri,
7  Case Number 1622-CC01071.
8          Today's date is October the 16th, 2018.
9  The time on the video monitor is 9:05.  The
10 videographer today is Don Breuwet representing
11 Planet Depos.  The video -- this video deposition
12 is taking place at 17260 Harbour Pointe Drive,
13 Fort Myers, Florida.
14         Will counsel please introduce
15 yourselves and state whom you represent.
16         MR. SELDOMRIDGE:  Jeff Seldomridge for
17 the plaintiffs.
18         MR. KALAS:  John Kalas and Greg
19 Chernack and Bert Slonim for Monsanto.
20         THE VIDEOGRAPHER:  On the phone?
21         MS. HOEKEL:  Jennifer Hoekel, Scott
22 Jansen, Osborne & Barr, on the phone.
23         THE VIDEOGRAPHER:  The court reporter
24 today is Rhonda Breuwet, representing Planet
25 Depos.  Will the court reporter please swear in
```

28

```
1  the witness.
2          THE REPORTER:  Raise your right hand.
3          Do you solemnly swear the testimony you
4  are about to give will be the truth, the whole
5  truth, and nothing but the truth?
6          THE WITNESS:  I do.
7              WILLIAM SAWYER, Ph.D.
8          acknowledged having been duly sworn to
9  tell the truth and testified upon his oath as
10 follows:
11         DIRECT EXAMINATION
12         BY MR. KALAS:
13  Q.  Good morning, Dr. Sawyer.
14  A.  Good morning.
15         MR. KALAS:  I just want to note for the
16 record this is a continuation of your deposition
17 that started on August 23rd, 2018.  And by
18 agreement of the parties we'll go five hours on
19 the record today.  So I'm going to mark as
20 Exhibit 17 our Second Amended Notice of Continued
21 Videotaped Deposition of William Sawyer.
22         (Exhibit Number 17, Defendant Monsanto
23 Company's Second Amended Notice of Continued
24 Videotaped Deposition of William Sawyer, Ph.D.,
25 was marked for identification.)
```

CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2          4 (282 to 285)
Conducted on October 16, 2018

---

282

1      BY MR. KALAS:
2      Q.   And have you seen that document before,
3  sir?
4      **A.   I have.**
5      Q.   Okay.  And you see that this document
6  had some document requests on it?
7      **A.   Yes.**
8          MR. KALAS:  Okay.  And then I'm going
9  to mark as Exhibit 18 Plaintiffs' Objections to
10 Defendants' Document Requests and Response to the
11 Amended Notice of Videotaped Deposition of William
12 Sawyer, Ph.D.
13         (Exhibit Number 18, Plaintiffs'
14 Objections to Defendants' Document Requests and
15 Response to the Amended Notice of Videotaped
16 Deposition of William Sawyer, Ph.D., was marked
17 for identification.)
18     BY MR. KALAS:
19     Q.   Mark right there.
20         Have you seen this document before,
21 sir?
22     **A.   No.**
23     Q.   Okay.  We received this document from
24 plaintiffs yesterday, and it was responsive to our
25 document requests in Exhibit 17, and there were

---

283

1  two document requests that they stated that they
2  had responsive documents to.  And if I could
3  direct your attention to the fourth page of this,
4  paragraph 5.  Paragraph 5 asks for billing
5  records, engagements letters, and invoices
6  prepared or submitted by Dr. Sawyer in connection
7  with this case to the extent those documents were
8  not previously produced on August 23rd, 2018.
9          Do you see that, sir?
10     **A.   I do.**
11     Q.   And then if you go down to the bottom,
12 it states that you will produce responsive
13 documents relating to Request Number 5 to the
14 extent they are properly discoverable,
15 nonprivileged, and are not publicly available
16 and/or otherwise produced to defendants in this
17 litigation.
18         Do you see that?
19     **A.   Yes.**
20     Q.   Do you have any billing records or
21 invoices that you produced today?
22     **A.   No.  I think I provided them at the
23 August 23rd deposition.**
24     Q.   Okay.  So since August 23rd, 2018, you
25 have not submitted any invoices to the Miller

---

284

1  Firm?
2      **A.   I'd have to double-check the dates.  I
3  don't think so.  I know I had previously submitted
4  the -- I don't even remember the date, but the
5  prior invoices.**
6      Q.   Okay.  Let me ask you this.
7      **A.   I can check that possibly during break.**
8      Q.   Okay.  That'd be great.
9          Let me ask you this.  In case you have
10 not submitted any invoices, since August 23rd,
11 2018, have you spent time working on this case?
12     **A.   I have.**
13     Q.   Okay.  About how much time would you
14 say you've spent working on this case?
15     **A.   I know in the past ten days, about ten
16 hours.**
17     Q.   Okay.
18     **A.   I'm not clear beyond that.  I don't
19 think -- I know I put in quite a bit of time prior
20 to August 23rd, but from August 23rd until about
21 ten days ago, I just don't recall.  I don't think
22 many hours.**
23     Q.   And in the past ten days you've worked
24 about ten hours.  And can you remind me of your
25 rate, please?

---

285

1      **A.   490 per hour.**
2      Q.   Okay.  So you've worked on about
3  $5,000 -- $4,900 worth of work on this case in the
4  past ten days?
5      **A.   That's correct.  That's pretty
6  accurate.**
7      Q.   Okay.  What have you been doing in the
8  past ten days?
9      **A.   Primarily reviewing studies and
10 miscellaneous documents throughout my file.  My
11 file's over 5,000 pages, and it's just very
12 difficult to get through it all, basically, which
13 I haven't.**
14     Q.   What -- what areas do you think you
15 haven't gotten through yet as far as subject
16 matter on this case?
17     **A.   Refreshing myself on studies that I
18 reviewed and incorporated into my work in this
19 case dating back to, well, as early
20 as approximately March of 2017.**
21     Q.   Okay.  So you haven't -- there's not
22 new material that you haven't been able to get
23 through in the past ten days?
24     **A.   No, but I have gone through the newer
25 materials; however, not to the degree that I would**

---

Transcript of William Sawyer, Ph.D., Volume 2

Conducted on October 16, 2018

286

1 like. I certainly will be performing further
2 review of materials that are already turned over
3 and already in my file. I will be continuing to
4 review documents up to the point of trial.
5     Q.   And let me mark as Exhibit 19 a
6 document that was produced to us by plaintiffs,
7 and this is -- it was a supplemental materials
8 considered list.
9         (Exhibit Number 19, Dr. William Sawyer
10 Materials Considered List (Peterson/Hall v.
11 Monsanto Co.), was marked for identification.)
12     BY MR. KALAS:
13     Q.   And is this list the newer materials
14 that you are referring to?
15     A.   It is, but I need to point out that I
16 was cautious in the sense of not missing anything.
17 So in some cases, there are documents that I am
18 quite certain were probably -- well, I'm certain,
19 actually, not probably. I'm certain, for example,
20 Number 4, Helmut Greim, I know that was in my file
21 box that was marked Exhibit Number 1 at the last
22 deposition, or 2. I'm sorry.
23     But -- so there may be things -- I know
24 there are things on this list that are probably
25 redundant, but I just wanted to be very careful in

287

1 not missing anything.
2     Q.   Okay. And I actually had a couple
3 questions about this list because there are a
4 couple descriptions that I couldn't make out.
5     If you go to Entry 11.
6     A.   Okay.
7     Q.   The first MONGLY entry, 0234, what is
8 that? Because that is -- that is -- the MONGLY
9 numbers are usually eight digits, and that has
10 four digits.
11     A.   Yeah, unfortunately, when I use these
12 documents, I tend to use and in some cases
13 memorize those last three digits and ignore the
14 rest, and so I should not have done that on the
15 list prep.
16     Q.   If you could check.
17     A.   I think I can find it for you.
18     Q.   Well, if you could check on that at
19 break like you check for your invoices and see if
20 you actually have that.
21     A.   Yeah, because I have a folder marked
22 miscellaneous --
23     Q.   Sure.
24     A.   -- documents, and I think that's what
25 it is.

288

1     Q.   Okay. We'll clean that up. And then
2 on 14, Number 14, you looked at a document called
3 "Surfactant Toxicology, Mark A. Martens Toxicology
4 Europe/Africa." What is that document, sir?
5     A.   I'll hand it to you to review.
6     Q.   Okay. Let me ask you this:  Am I
7 correct that all of the documents that are
8 Monsanto documents are in your box that is marked
9 as Exhibit 2 that are on this list?
10     A.   What do you mean by Monsanto documents?
11     Q.   Sure. So the MONGLY documents, I guess
12 Mark A. Martens, that may be it as far as
13 documents that --
14     A.   The answer is yes --
15     Q.   Yeah?
16     A.   -- I have everything with me.
17     Q.   Okay. All right. Okay. Thank you.
18     Now, I noted on here as well that there
19 is one epidemiology study on cigarette smoking and
20 the risk of non-Hodgkin's lymphoma subtypes,
21 correct? That's Number 21?
22     A.   Correct.
23     Q.   That is a study that was in -- looked
24 at non-Hodgkin's lymphoma subtypes among women,
25 right?

289

1     A.   Yes.
2     Q.   Okay. Is that the only epidemiology
3 study on cigarette smoking and non-Hodgkin's
4 lymphoma you've reviewed in preparing your
5 opinions in this case?
6     A.   I believe so.
7     Q.   Okay. And Jeff Hall's not a woman,
8 right?
9     A.   I'm not sure how the law reads on that,
10 I guess. Depends on how he feels that day.
11     Q.   Is Jeff Hall listed as a man in his
12 medical records, sir?
13     A.   No, not -- not that I'm aware of, no.
14     Q.   You don't believe Jeff Hall is listed
15 as a man in his medical records?
16     A.   Oh, no, no, no. I'm sorry. I
17 misunderstood your question. I believe he is
18 male.
19     Q.   Okay.
20     A.   Yes. For certain. And my comment
21 regarding how you feel that day is kind of, you
22 know, a nonserious response.
23     Q.   Understood.
24     If you look at entry -- back on
25 Exhibit 18, if you look at entry 17, you produced

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2

6 (290 to 293)

Conducted on October 16, 2018

---

290

1 three photographs responsive to entry 17, correct?
2 Back on Exhibit 18, sir, not 19.
3     A.   Oh, oh.
4     Q.   The one to your left.
5     A.   Okay.  Okay.  I'm on the wrong page
6 here.
7     Q.   Yeah.
8     A.   Yeah, that's correct.  Yes.
9     Q.   Okay.  And I'm holding them up to you,
10 but these are the -- these are the three
11 photographs on the back of this exhibit?
12     A.   Yes.  I prepared these photos myself.
13 I was very careful to try to obtain the highest
14 resolution image I could.
15     Q.   Okay.  And can you hold those three
16 photographs up, one by one, for the video, please,
17 sir.
18     A.   Certainly.  Be happy to.
19     Q.   Okay.  Good.  And you can just flip
20 through them.
21     A.   (Witness complies.)
22     Q.   Thank you.  So this is the backpack
23 sprayer that you use at home to apply Roundup,
24 right?
25     A.   That's correct.

---

292

1     were to go online and look up this particular
2     sprayer, it would be obvious whether it has the
3     angle tip that looks like this.  I didn't research
4     that.
5        Q.   Okay.  And when you apply Roundup using
6     this backpack sprayer, in which direction do you
7     hold the wand?
8        A.   I hold it so it's pointing in front of
9     me but down.
10       Q.   Okay.
11       A.   And it shoots a thick, heavy stream,
12     not an aerosol, not a mist.  It just shoots large
13     liquid drops in a stream onto the object.  And
14     that works perfect in my environment because I
15     have mulch and I occasionally have a weed about
16     the size of that telephone popping up, and I give
17     it a quick blast and with no drip, no overspray,
18     no exposure.
19       Q.   Okay.  And is it your experience that
20     when people are using a back -- or excuse me.
21     Strike that.
22          Is it your experience when you've
23     observed people using a wand sprayer they
24     generally point out and down?
25       A.   I can't answer that.  I'm not sure.

---

29

1     Q.   Okay.  And this is a wand sprayer,
2 correct?
3     A.   Yes.
4     Q.   Okay.  And you have manipulated the tip
5 of the sprayer, correct?
6     A.   Yes.
7     Q.   Okay.  And you've put what looks like
8 sort of a pressurized hose nozzle on the end of
9 that, right?
10     A.   No.  No.  This is a nozzle that came
11 with either this particular unit, which I bought
12 at northern tools on Route 41, Fort Myers,
13 Florida, which I think is also available on
14 Amazon.  But the tip -- and I'm having trouble
15 recalling.  I think this is a tip that was off my
16 original or second sprayer.
17     Q.   Okay.
18     A.   Because I think I've had, like, three
19 of them.  They don't last that long and they start
20 to leak, and I don't screw around with them when
21 they start to leak.  But this tip may not have
22 come with this particular sprayer.  It may have,
23 but I'm not sure.  I just don't remember.  And the
24 angle attachment there came with this tip, but
25 I -- I'm just not sure.  You know, I think if you

---

293

1        Q.   That's the way you use it, though,
2     right?
3        A.   Yes.  And I usually walk backwards.  If
4     there's more than just an occasional weed I'll
5     walk backwards just to avoid stepping on areas
6     that have been sprayed.
7        Q.   Just got to watch out for stumps and
8     roots?
9        A.   Yeah.  My yard's pretty flat.
10       Q.   Okay.
11       A.   As is most of the island.  Our highest
12     elevation is about 3 feet.
13       Q.   Now, I'm correct that you didn't review
14     the pathology of Mr. Hall's lymphoma, right?
15       A.   I'm sorry?
16       Q.   You did not review the actual
17     pathological slides for Mr. Hall's lymphoma,
18     right?
19       A.   No, but I did carefully review the
20     written pathology reports of those slides.  In
21     fact, I reviewed them again over the past ten
22     days.
23       Q.   All right.  And did you see anything
24     when you were reviewing those reports over the
25     last ten days that stood out to you?

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 78 of 125
CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2          7 (294 to 297)
Conducted on October 16, 2018

294

1      A.   Well, I note there was an error in
2  either my report or the actual transcription from
3  the physician that stated that the newer
4  malignancy had developed in the iliac artery
5  rather than adjacent to or surrounding the iliac
6  artery.  That's one thing I noticed when I did my
7  review over the past ten days, but -- and many
8  other things, but . . .
9      Q.   Did that carry any significance to you
10  other than being a sort of scrivener's error in
11  your report or the pathology report?
12      A.   Well, just based on my training and
13  background in medical pathology, which I -- as I
14  probably said in one of the depositions, really
15  enjoyed and had I think the third highest grade in
16  the course out of 150 students, I really enjoyed
17  pathology.  It really interests me.  And I know
18  that that particular malignancy does not grow
19  inside of the iliac artery.  And so I pointed that
20  out.
21          And unfortunately the mono --
22  monoclonal antibody regimen that Mr. Hall has been
23  on for maintenance is not a hundred percent
24  successful, and certainly helped, but,
25  unfortunately, based on the review of the

295

1  pathology results, the -- he's still in trouble.
2      Q.   Okay.  So when you reviewed the
3  pathology results, what did you see in it that,
4  you know, sort of gave you a concern that
5  Mr. Hall's still in trouble?
6      A.   Well, basically the shrinkage but not
7  complete remission, and then expansion of some of
8  the tumors.
9      Q.   And you're not a pathologist, right?
10      A.   No, but I'm trained in toxicology.
11  Toxicologists must have a strong educational and
12  training experience with pathology to be able to
13  understand how chemicals either -- chemotherapy,
14  for example, how it works, how it treats, how it
15  impacts the tissue as well as the adverse effects
16  from the chemotherapy to various tissues.
17      Q.   But in, like, a hospital setting, a
18  human pathologist would review the slide to talk
19  about whether or not there's shrinkage or
20  expansion of the tumors, right?
21      A.   Correct.  Correct.  And, again, I've
22  had histopathology through the medical school.
23      Q.   Sure.
24      A.   I've looked at, you know, thousands of
25  slides as part of my training.  But I'm not a

296

1  histopathologist.  I published a study on the
2  gastric mucosal in humans, the impact of a new
3  drug under investigation called chenodeoxycholic
4  acid.  I published my own slides that I prepared
5  from the block.  And so certainly I'm capable of
6  using histopathology in review as part of my work,
7  but I'm not a histopathologist, and I don't hold
8  myself out to be one.
9      Q.   Are you going to tell the jury that,
10  based on your review of pathology reports, that
11  Mr. Hall's still in trouble?
12      A.   Not on direct exam.  That's not my
13  intent.  No.  If it somehow came up in a
14  cross-examination question, sure, I'd be willing
15  to talk about that, but I think that in this case,
16  you know, there will be other oncologists and
17  pathologists who would probably be better suited
18  speaking about that.
19      Q.   Okay.  Now, do you -- based on your
20  review of follicular lymphoma, I'm looking at your
21  toxicological notes at 116 and 117.  That's
22  Exhibit 6, if you want to look at them.  You had,
23  I guess, a Figure 2 with some pictures of
24  follicular lymphoma in here.
25      A.   Do you remember which page?

297

1      Q.   116 and 117, sir.
2      A.   Oh, thank you.
3      Q.   You have it.  Yep.  You're on it, I
4  think.
5      A.   Page 116?
6      Q.   Yeah.  Are you looking at the May one
7  or the --
8      A.   August.
9          MR. SELDOMRIDGE:  You might want to use
10  the exhibit.
11      A.   That's August as well.
12          BY MR. KALAS:
13      Q.   Yeah.  So I'm using August.
14      A.   Yeah, that's what I have, is August.
15      Q.   Got it.
16      A.   So page 1- --
17      Q.   -- -16.  It's a page with this picture.
18  I see you on it.
19      A.   Oh, that's page 117.  Okay.
20      Q.   Yeah, 116 to 117.  I'm sorry.
21      A.   Yeah.  Yeah.
22      Q.   And on 117 you have an image there, and
23  you start the discussion about it on 116.  You go
24  to 118.  What were you trying to represent with
25  this picture in your notes?

CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2

Conducted on October 16, 2018

8 (298 to 301)

298

1      A.   Most importantly that Grade I or II,
2   the nodal architecture is placed by neoplastic
3   with follicular proliferation. That's what's
4   causing Mr. Hall's tumors to expand. He's a
5   Grade II. And it basically is just showing the
6   expansion. I know this is not a CD20 -- no, it
7   is. We also have a CD -- it is CD20, ECL2, and
8   CD10. So I think it's a reasonable
9   representation. It's obviously not his tissue,
10  but just in general representation.
11     Q.   Okay. And when you were representing
12  the -- sort of the progression here of follicular
13  lymphoma, you'd agree with me that you don't think
14  there's a pathological signature based on these
15  slides of a glyphosate-induced follicular
16  lymphoma. You haven't seen any literature on
17  that?
18     A.   Well, yeah, I can't answer that either
19  way. It's just unknown.
20     Q.   Okay.
21     A.   I mean, there -- glyphosate does not --
22  well, with most carcinogens, there generally is
23  not a specific signature for that carcinogen for
24  benzene-induced AML versus idiopathic AML. I
25  mean, they both look the same.

299

1      Q.   And there's idiopathic NHL as well,
2   right?
3      A.   Yes.
4      Q.   In fact, 90 percent of NHL cases are
5   considered to be idiopathic, right?
6      A.   I would have to check the statistics.
7   I may have that in my notes. The incident rate
8   for follicular lymphoma is 3.18 per 100,000 years.
9   With respect to the question of what percent of
10  those are idiopathic, I don't think I'm prepared
11  to answer that question right at the moment. It's
12  such a low incident that it's unlikely that a
13  reliable statistic with a known rate of error
14  which has been tested and generally accepted is
15  available.
16     Q.   Well, you've testified, I think, in
17  August that we're supposed to be looking at NHL
18  generally and not follicular lymphoma because you
19  believe glyphosate can cause all types of
20  lymphoma, right?
21     A.   Yes. That's a good point.
22     Q.   Okay. And so I'm correct that
23  90 percent of the cases of NHL are considered
24  idiopathic, right?
25     A.   That may be. But I -- I can't speak

300

1   specifically on follicular. The evidence to a
2   known rate of error is simply not there.
3      Q.   Let me ask you this: When you're
4   carrying out a differential diagnosis, how do you
5   account for idiopathic cause you of NHL in that?
6      A.   Primarily in the same manner that I
7   reported in my rebuttal report on the prior
8   Johnson case, and that is, first of all, assessing
9   the incident rate, which in the Johnson case and
10  in the Hall case is, for that particular age, is
11  extremely low. And I just pointed out 3.14 --
12  3.18 per 100,000 person years. That's an
13  exceedingly low rate.
14         And when -- what I did in the Johnson
15  case and in this case is look at the incidence in
16  other years, for example, childhood. Is this a
17  high rate in childhood or as a young adult or does
18  it simply increase into the seventh and eighth
19  generation of life, and the answer is it becomes
20  highly prevalent -- much more prevalent in the
21  seventh and eighth generation of life.
22     Q.   Do you mean decade or generation?
23     A.   I'm sorry. Decade.
24     Q.   Okay.
25     A.   Thank you.

30

1      Q.   Yeah. Okay. Now, you said you look at
2   the instant rate for follicular lymphoma so I'm
3   confused again. Should we be looking at
4   epidemiology and incidence rates for follicular
5   lymphoma or NHL under your methodology, because
6   follicular lymphoma is a subtype of NHL and it has
7   been your testimony previously that we should be
8   looking at NHL. Now, if -- are you changing that
9   or --
10     A.   No, no. No.
11     Q.   Okay.
12     A.   The -- what I did review is the NHANES
13  database, which is a cross-sectional analysis
14  of -- with respect to follicular lymphoma and NHL
15  in general, several thousand individuals in the
16  US --
17     Q.   Okay.
18     A.   -- which provide statistical analyses
19  in terms of the incident rate or the standard
20  mortality rate at various age groups.
21     Q.   So you look at the incident rate which
22  gives you some sense of the background incident,
23  but how do you rule out in a particular
24  plaintiff's case that -- an idiopathic etiology of
25  their lymphoma? What do you do to rule that out?

Transcript of William Sawyer, Ph.D., Volume 2
Conducted on October 16, 2018

9 (302 to 305)

---

**302**

1  A.  Well, again, primarily based on the
2  NHANES data because that is a reliable
3  statistically tested measurement with a known rate
4  of error, and that is the primary basis.  It is to
5  see if that person falls into an age group in
6  which the disease is highly prevalent or is that
7  person in an age group where it's very rare.
8  That's number one.
9      Number two, as a toxicologist, I review
10 and determine other exposures.  And in this case,
11 for example, ionizing radiation is certainly an
12 important factor to consider.  And I found no
13 evidence in the medical records, deposition
14 testimony, or other documentation that I've
15 referenced of any prior significant ionizing
16 radiation events.
17 Q.  So --
18 A.  Also.
19 Q.  Go ahead.
20 A.  I considered ████████████ And
21 as you know I've covered that in my notes on
22 page 12 and in a couple of other locations.  And
23 also the occupational history, which I've also
24 covered in my notes in tabular form that
25 demonstrates that there is no likelihood of any

---

**303**

1  chemical exposures other than glyphosate that
2  would have potentially induced or exacerbated his
3  follicular lymphoma.
4  Q.  Okay.  So I understand that you will
5  look at co-exposures, but let me ask you a
6  hypothetical.  If Mr. Hall had not been exposed to
7  glyphosate and he got follicular lymphoma, what
8  would you opine caused it?
9  A.  That -- I would not have been able to
10 identify any probable cause.
11 Q.  And there are people who are Mr. Hall's
12 age who are exposed -- who are not exposed to
13 glyphosate who do get follicular lymphoma,
14 correct?
15 A.  That's true, and there are
16 great-grandfathers who smoked cigarettes until
17 they're 90 years old and die of a heart attack and
18 don't develop lung cancer.  That doesn't mean that
19 there's not an association.
20 Q.  Yes, sir.  I understand what you're
21 arguing, but what I'm trying to understand is if
22 it is possible for Mr. Hall to get follicular
23 lymphoma at the age he is at without exposure to
24 glyphosate based on spontaneous mutations or other
25 idiopathic causes, how do you rule that out in

---

**304**

1  your differential diagnosis as a potential cause
2  of his follicular lymphoma?
3      MR. SELDOMRIDGE:  Asked and answered.
4  A.  Simply that the incident rate is 3.18
5  per 100,000 person years, which is a very, very
6  low risk value, and it's highly unlikely that his
7  disease was idiopathic, knowing that the risk of
8  NHL is greatly enhanced by his very heavy exposure
9  to glyphosate.
10     BY MR. KALAS:
11 Q.  Okay.  And how did you quantify that
12 enhanced -- well, strike that.
13     Did you look at his -- when you were
14 reading his pathology reports, did you look to see
15 if there was anything unusual about the shape of
16 the cells that pointed to glyphosate-based
17 herbicides as a cause of his lymphoma?
18 A.  No.  And in fact, that would be a
19 unsupportable exercise which would probably be
20 excluded under Daubert.  There's no information
21 that indicates to a known rate of error that the
22 cellular morphology would be any different from
23 idiopathic.
24 Q.  How about --
25 A.  -- lymphoma.

---

**305**

1  Q.  Sorry.  I'm sorry.  Were you done?
2  A.  Lymphoma.
3  Q.  Okay.  How about when you looked at the
4  immunological data for Mr. Hall?  Was there any
5  characteristics that were unique to that that
6  would associate the immunological data to
7  glyphosate-based herbicides as a cause?
8  A.  Again, that would be a unsupportable
9  exercise.  There's no documentation anywhere that
10 a specific immunological pattern of lymphoma would
11 be noted, specifically glyphosate versus
12 idiopathic. I don't believe there is any testable
13 data to support that notion.
14 Q.  How about when Mr. Hall's follicular
15 lymphoma was examined genetically?  Were there any
16 translocations of genetic abnormalities that
17 indicate glyphosate-based herbicides caused or
18 contributed to his cancer?
19     MR. SELDOMRIDGE: Objection. Compound.
20 A.  No.  Typical follicular lymphoma with
21 infiltrate consisting of the centrocytes, which I
22 spoke of earlier, and scattered centroblasts,
23 intrafollicular involvement of neoplastic
24 infiltrate is present.  Neoplastic infiltrate is
25 positive for CD20, CD10, BCL-6 and BCL-2.

CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2

Conducted on October 16, 2018

10 (306 to 309)

---

**306**

1           BY MR. KALAS:
2      Q.   And since there's no pathological test
3   or biomarker to determine that Mr. Hall's
4   follicular lymphoma is caused by glyphosate-based
5   herbicides as opposed to idiopathic causes, am I
6   correct that the lynchpin of your differential
7   diagnosis is the fact that this is a rare disease
8   for his age group?
9      **A.   Yes, and I ruled out other potential**
10  **causes.**
11     Q.   And --
12     **A.   Except for the elephant in the living**
13  **room, which is Roundup.**
14     Q.   Okay.  Now, am I correct that people
15  can get follicular lymphoma in Mr. Hall's age
16  group from idiopathic causes?
17           MR. SELDOMRIDGE:  Objection.  Asked and
18  answered.
19           BY MR. KALAS:
20     Q.   In his age group specifically.
21     **A.   Again --**
22           MR. SELDOMRIDGE:  Same objection.
23     **A.   -- I lead you back to the 3.18 per**
24  **100,000 person years statistic, which is**
25  **statistically tested and valid and found in**

---

**307**

1   **NHANES, which is a division of CDC.**
2           MR. KALAS:  So I'm going to move to
3   strike that answer because it wasn't responsive.
4           BY MR. KALAS:
5      Q.   My question was, can someone in
6   Mr. Hall's age group in that population of 3.18
7   per 100,000 person years get follicular lymphoma
8   from idiopathic causes as opposed to Roundup?
9           MR. SELDOMRIDGE:  Objection.  Asked and
10  answered.  Harassing the witness.
11     **A.   Same answer.**
12           BY MR. KALAS:
13     Q.   Okay.  So that answer is again not
14  responsive.  I'm going to mark this, and we'll
15  call the judge at a break and get you to answer
16  that question.  I'm going to ask it one more time
17  and give you an opportunity to ask -- answer it.
18           Can someone in Mr. Hall's age group in
19  the population of 3.18 per 100,000 person years
20  get follicular lymphoma from idiopathic causes as
21  opposed to Roundup?
22           MR. SELDOMRIDGE:  Objection.  Asked and
23  answered.  Harassing the witness.
24           Counsel, please don't threaten the
25  witness.

---

**308**

1      **A.   I've done my very best to answer it.**
2   **That is the accurate answer.**
3           BY MR. KALAS:
4      Q.   Okay.
5           MR. KALAS:  Mark that down, please.
6           BY MR. KALAS:
7      Q.   It's true, isn't it, that none of
8   Mr. Hall's treating physicians identified his
9   exposure to glyphosate-based herbicides as a cause
10  of his follicular lymphoma, right?
11     **A.   I'm sorry?**
12     Q.   It's true that none of Mr. Hall's
13  treating physicians identified his exposure to
14  glyphosate-based herbicides as a cause of his
15  follicular lymphoma, right?
16     **A.   I don't know for sure because I only**
17  **have records up through 9/18/17.**
18     Q.   So let me rephrase the question.  Up
19  until September 18th, 2017, which is as far as the
20  records you've reviewed go, it's true that none of
21  Mr. Hall's treating physicians identified his
22  exposure to glyphosate-based herbicides as a cause
23  of his follicular lymphoma?
24     **A.   Correct.**
25     Q.   Okay.  And that includes the time

---

**309**

1   period -- well, strike that.
2           Up until September 18th, 2017, which is
3   as far as the records you've reviewed go, it's
4   true that none of his treating physicians in any
5   medical record that you reviewed advised that he
6   discontinue his use of glyphosate-based
7   herbicides, right?
8      **A.   Correct.**
9      Q.   Okay.  Assuming Mr. Hall had not been
10  exposed to glyphosate-based herbicides, what would
11  you have said is the biggest contributor to his
12  follicular lymphoma?
13     **A.   I have found nothing that, within a**
14  **statistically significant increased risk, could**
15  **explain it.  For example,** ███████ **was**
16  **insufficient to induce the risk based upon human**
17  **study evidence.**
18  ████████████████████████████████████████
19  ██████████████████**, I have not**
20  **found that to be supportable with any**
21  **statistically significant human epidemiologic**
22  **studies with respect to lymphoma.**
23     Q.   So if somebody who looked like
24  Mr. Hall, had the exact same medical history as
25  Mr. Hall, everything else the same except for the

Transcript of William Sawyer, Ph.D., Volume 2
Conducted on October 16, 2018

11 (310 to 313)

3 0

1 Roundup exposure, walked in and asked you to do a
2 forensic toxicology analysis on the cause of their
3 follicular lymphoma, would you tell them that it
4 would be an idiopathic or unknown etiology?
5 **A.   I might.  For example, I did with**
6 **Mr. Peterson.  My opinion was that his dose was**
7 **insufficient to support his lymphoma as being**
8 **caused by Roundup, that it was potentially --**
9 **actually, could have been induced from his**
10 **exposure to 2,4,5-T and 2,4-D with dioxin**
11 **contaminations in it.  It could have been**
12 **idiopathic.**
13    Q.   And how much Roundup was Mr. Peterson
14 exposed to, if you recall?
15    **A.   Vastly less than Mr. Hall.**
16    Q.   Okay.  All right.  Now, last time we
17 got together -- well, actually, let me ask a
18 follow-up.
19        Where is the threshold from where it
20 goes from an insignificant risk, as in the case of
21 Mr. Peterson, to a significant risk, as in the
22 case of Mr. Hall?  Where do you draw that line?
23    **A.   Exposure -- exposure dose must be**
24 **consistent with the human epidemiology data that**
25 **demonstrates a statistically significant increased**

3

1 **risk rate.**
2    Q.   And based on that -- strike that.  Let
3 me ask another question.
4        You stated that in Mr. Peterson's case,
5 it could have been -- his NHL could have been
6 induced by his exposure to 2,4-D and 2,4,5-T with
7 dioxin contamination in it, right?
8    **A.   Yes.**
9    Q.   Okay.  And that would be a confounding
10 factor in a differential -- or in an epidemiology
11 study, right?
12    **A.   Could be.  Depending on the years of**
13 **exposure to such and the other -- other factors.**
14    Q.   And if you were instructing your
15 epidemiology students the way you used to when you
16 were teaching, you would tell them that if they
17 were doing an epidemiology study where somebody
18 had a co-exposure to 2,4-D or 2,4,5-T with dioxin
19 contamination and glyphosate they should control
20 for the 2,4,5-T or 2,4-D in that study to see if
21 glyphosate's causing the NHL, right?
22    **A.   It should be considered.  You know, in**
23 **the case with Mr. Hall, he used 2,4-D, 2,4,5-D --**
24 **2,4,5-T for many years at an enormously higher**
25 **level than that of 2,4,5 -- or than glyphosate.**

3 2

1    Q.   Okay.  And so you'd want to look at
2 both the -- if you were running an epidemiology
3 study looking at those co-exposures, you'd want to
4 look at both the number that was uncontrolled and
5 then the controlled number to see if controlling
6 for the dioxins contamination caused that number
7 to go down, right, that caused the glyphosate
8 number to go down?
9    **A.   To some extent.  That can be done via**
10 **years of exposure.  The 2,4-T -- 2,4-D was**
11 **primarily reformulated to remove dioxins after the**
12 **1960s and early '70s.  And so it's a little more**
13 **complex than just a yes or no, present or not**
14 **present.**
15    Q.   Let me ask you this:  Do you think
16 other pesticide exposures are a potential risk
17 factor for non-Hodgkin's lymphoma depending on the
18 pesticide?
19    **A.   Depending on usage, yes, quantity and**
20 **duration.**
21    Q.   Okay.  Now, in your transcript in
22 February and in your toxicological notes around
23 pages 116 to 118, you stated that you're relying
24 on Drs. Portier, Neugut, and Ritz for their
25 epidemiology opinions, right?

3 3

1    **A.   I'm sorry.  What document are you**
2 **referring to?**
3    Q.   So I'm referring to your toxicological
4 notes at the pages we're already at, 116 to 118.
5    **A.   But you said February.**
6    Q.   Right.  And then you also stated that
7 in your deposition.  So that was compound.  So let
8 me break it up.
9        In your toxicological notes at
10 pages 116 -- you state that you're deferring any
11 detailed epidemiology opinions in this matter to
12 Dr. Portier, Ritz, and Neugut, right?
13    **A.   And/or other epidemiologists that are**
14 **currently retained by the plaintiffs' firm in this**
15 **matter.**
16    Q.   Okay.  And if I understand correctly,
17 you're only using epidemiology to evaluate latency
18 in dose response, right?
19    **A.   Yes.**
20    Q.   And if we go to Andreotti 2018 which
21 was previously marked and is in your stack here --
22 I think it's maybe Exhibit 12?
23        MR. KALAS:  You just passed it,
24 actually.
25        ///

CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2

Conducted on October 16, 2018

12 (314 to 317)

---

3 4

1        BY MR. KALAS:
2        Q.   All right.  I just want to ask you
3   about the dose response and latency data in this.
4   And just by way of foundation, this is what's
5   known as a cohort study, right?
6        A.   Yes.
7        Q.   And a cohort study is generally more
8   expensive to conduct than a case-control study,
9   right?
10       A.   Yes.
11       Q.   But it has some advantages as compared
12  to a case-control study, correct?
13       A.   Yes.
14       Q.   For instance, recall bias is not a big
15  a concern in a cohort study, right?
16       A.   Correct.
17       Q.   And selection bias is not as big a
18  concern in a cohort study, right?
19       A.   Correct.
20       Q.   And proxy bias in the design of this
21  study is not as big a concern as a case-control
22  study, right?
23       A.   That, I would defer to the
24  epidemiologists --
25       Q.   Okay.

3 5

1        A.   -- who have analyzed the study in
2   greater detail than I.
3        Q.   Okay.  And cohort studies can be very
4   powerful, correct?
5        A.   Yes.
6        Q.   In the case of this study they follow
7   57,000 applicators of glyphosate, right?
8        A.   Yes.
9        Q.   And that is far more -- is a far larger
10  population that is being followed than any of the
11  case-control studies on glyphosate, right?
12       A.   I have to defer that.
13       Q.   Okay.  So if we go to Table 2 on this
14  study, which is on page 4 and then 5, the authors
15  looked at an intensity weighted dose response.  Do
16  you see that at the top of Table 2?
17       A.   Yes.
18       Q.   Okay.  And intensity weighting would be
19  a way to look at how much glyphosate is used,
20  right?
21       A.   Yes.  It was basically the days of
22  glyphosate use.
23       Q.   Well, it's not the days because that's
24  in supplemental Table 1 which is just lifetime
25  days.  What they looked at here was they weighted

3 6

1   the amount used, and then they put that in a
2   formula with the days, right?
3        A.   Yeah.  It's weighted, right.
4        Q.   And that's an accepted design to review
5   dose response in an epidemiology study, right?
6        A.   Yes.
7        Q.   Okay.  And what the authors found here,
8   if you go to page 5, and you look at the
9   follicular lymphoma numbers, which are third from
10  the bottom on the left-hand column of page 5,
11  is when they measured the individuals who were
12  exposed to glyphosate, the amount of follicular
13  lymphoma actually went down than in the
14  individuals who were not exposed to glyphosate,
15  right?
16       A.   No.  No.  Numbers are not statistically
17  significant.  There's no change.
18       Q.   Okay.  So let me rephrase the question.
19  Well, let me ask you this:  When you have a
20  decreased or elevated odds ratio that is not
21  statistically significant do you consider that a
22  null finding?
23       A.   No.
24       Q.   Okay.  So if it's a not a null finding,
25  sir, then the numbers went down -- in other words,

3 7

1   when somebody was exposed to glyphosate, they got
2   less follicular lymphoma than what they were not
3   exposed to glyphosate, right?
4        A.   No.  We can't say that they actually --
5   in group T1, T2, or 3 actually experienced a lower
6   rate because of the variability.  Group 1 it could
7   have been as high as twice as high, 2.15.  We
8   don't know because of the variability in that
9   analysis.  You know, I really am getting
10  uncomfortable with this because I have deferred
11  the analysis on the enormous amount of
12  epidemiological literature to the epidemiologists,
13  as I said earlier, and --
14       Q.   Okay.  So let --
15       A.   -- I think you're trying to take me
16  into that venue unfairly.
17       Q.   Well, sir, you've relied on
18  epidemiology.  You relied on the Eriksson study
19  for your dose response opinions, right?
20       A.   I relied on the studies that show that
21  the dosage received by Mr. Hall was clearly within
22  range of the human epidemiologic studies of
23  applicators.
24       Q.   So if we go to your toxicological
25  notes, page 118, sir, middle of the page, you

Transcript of William Sawyer, Ph.D., Volume 2

13 (318 to 321)

Conducted on October 16, 2018

3 8

1  stated in that second paragraph, last two
2  sentences, "When exposure for more than ten days
3  per year were considered the odds ratio was 2.36,
4  95 percent confidence interval 1.045 to 5.37.
5  With latency period of greater than ten years the
6  odds ratio was 2.26, 95 percent confidence
7  interval, 1.16" --
8      THE REPORTER: I'm sorry. "Greater
9  than ten years, the odds ratio . . ."
10     BY MR. KALAS:
11     Q.  -- "was 2.26, 95 percent confidence
12  interval, 1.16 to 4.40.  As error rates are
13  properly accounted for, these are statistically
14  significant findings."
15     Did I read that correctly?
16     **A.  You did.**
17     Q.  Okay.  Are you going to be tell the
18  jury that the dose response data in Eriksson
19  supports your opinion that glyphosate caused
20  Mr. Hall's non-Hodgkin's lymphoma?
21     **A.  No.  And I made that real clear that I**
22  **defer that to the epidemiologists.  What I'm**
23  **telling the jury is that the exposure Mr. Hall**
24  **sustained is consistent with that of the human**
25  **epidemiologic studies which have assessed the**

3 9

1  **incident rate or standard mortality ratios of NHL.**
2      Q.  Okay.  Now, are you going to tell the
3  jury that the latency data in the Eriksson study
4  supports your opinion that Mr. Hall's
5  non-Hodgkin's lymphoma was caused by glyphosate?
6      **A.  I would have to look at my latency**
7  **notes.**
8      Q.  It's right below it, sir.
9      **A.  One thing I should point out on your**
10  **prior question, was that -- well, never mind.**
11     Q.  So you discussed latency and you put
12  the Eriksson study in Table 31 on page 19 --
13  119 -- excuse me.
14     **A.  Okay.**
15     Q.  So my question is, if you don't intend
16  to tell the jury about the latency data in
17  Eriksson supporting your opinion that Mr. Hall's
18  non-Hodgkin's lymphoma was caused by
19  glyphosate-based herbicides, that's fine.  I just
20  need to know it right now.  But if you do intend
21  to tell them, then I need to know that too.  So do
22  you intend to tell them that?
23     **A.  Could you simplify your question?  I'm**
24  **not clear.**
25     Q.  Okay.  So I'm going to break down -- I

320

1  have two questions.  And the first -- I think
2  you've answered the first one.  You do not intend
3  to use the Eriksson study or any other
4  epidemiology study's dose response metrics to
5  support your opinion that Mr. Hall's NHL was
6  caused by glyphosate exposure, correct?
7      **A.  Not on direct exam unless --**
8      Q.  Okay.
9      **A.  -- on cross-exam somehow it comes up.**
10     Q.  My second question is, do you intend to
11  use the Eriksson study or any other epidemiology
12  study's latency evaluation to support your opinion
13  Mr. Hall's NHL was caused by glyphosate exposure?
14     **A.  Yes.**
15     Q.  Okay.  So then we'll talk about
16  latency.
17     Okay.  So if we go to supplementary
18  Table 3, please, which is in the very back of the
19  Andreotti study.  Very back.
20     **A.  Table 3 continued.**
21     MR. SELDOMRIDGE: Counsel, do you have
22  a page number?
23     MR. KALAS: He may not have the
24  supplementary tables on that.  So let me mark as
25  Exhibit 20 the Andreotti study with the

32

1  supplementary tables on it.
2      (Exhibit Number 20, Article Titled
3  "Glyphosate Use and Cancer Incidence in the
4  Agricultural Health Study," was marked for
5  identification.)
6      BY MR. KALAS:
7      Q.  And we're on the second page of
8  supplementary Table 3 which is lagged lifetime
9  days of glyphosate use in the AHS.
10     And if you look at the lagged lifetime
11  days -- and we'll go back to the intensity
12  weighted, but if you go back to the lag lifetime
13  days, for follicular lymphoma in the 20-year lag,
14  which is the right-hand column, am I correct that
15  as use of glyphosate went up after 20 years, the
16  incidence of NHL -- or excuse me -- follicular
17  lymphoma actually was below one?  So it starts at
18  1.52, nonstatistically significant, then goes to
19  .92 and .96.  And all those are null findings,
20  right?
21     **A.  None of them are statistically**
22  **significant.**
23     Q.  Okay.  And this dose response data
24  based on a 20-year lag does not support your
25  opinion that glyphosate causes NHL or follicular

CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2

Conducted on October 16, 2018

14 (322 to 325)

---

**322**

1  lymphoma in the case of Mr. Hall, correct?
2      **A.   Could you repeat that?**
3      Q.   Sure.  This data on follicular lymphoma
4  in the Andreotti study does not support your
5  opinion that glyphosate caused follicular lymphoma
6  in Mr. Hall, correct?
7      **A.   Correct.  This is just one study.**
8      Q.   Okay.  And if you go back to Table 3,
9  which is page 6 of 8 in Exhibit 20.
10     **A.   I thought we were on Table 3.**
11     Q.   You're on supplementary Table 3, sir.
12     **A.   Oh.**
13     Q.   So go to Table 3, page 6 of 8.  When
14  they did an intensity-weighted lifetime days of
15  glyphosate use in the agricultural health study,
16  looking at the 20-year lag for follicular
17  lymphoma, I'm correct that that data, 1.1, 1.35,
18  .9, all not statistically significant, I'm correct
19  that that data as well does not support your
20  opinion that glyphosate caused follicular lymphoma
21  in Mr. Hall, correct?
22     **A.   No.  In a vacuum, just this study**
23  **alone, it doesn't, although I can point out when**
24  **you asked me earlier about the relative risk**
25  **ratios being less than one, in this example two of**

**323**

1  **the three risk ratios are greater than one.  But**
2  **no conclusion can be made just upon this one study**
3  **as the risk ratios in some cases are less than one**
4  **and in other cases greater than one.  It's too**
5  **much variability.**
6      Q.   Right.  And one thing that you've
7  looked for in previous cases are statistically
8  significant results in epidemiology studies,
9  right?
10     **A.   Of course.**
11     Q.   And statistical significance is
12  important to you because in your opinion it rules
13  out chance, right?
14     **A.   Of course.**
15     Q.   Okay.  Now, at the deposition in
16  August, you stated that all lymphoma, whether it
17  has a T or B-cell origin -- strike that.
18         At the deposition in August, you stated
19  that all lymphoma, whether it's T or B-cell,
20  shares a stem cell origin, right?
21         MR. SELDOMRIDGE:  Objection.
22  Mischaracterization.
23     **A.   I would need to see that specifically**
24  **so I could --**
25         ///

**324**

1         BY MR. KALAS:
2      Q.   Yeah.
3      **A.   -- accurately answer the question.**
4      Q.   I only have one copy of the August
5  transcript, so you can have it.
6         (Exhibit Number 21, Deposition
7  Transcript of William Sawyer, PhD., dated 8/23/18,
8  was marked for identification.)
9         BY MR. KALAS:
10     Q.   Well, I'm going to read it, and then
11  you can look at it.  I asked you at page 178, line
12  9, "Is T-cell lymphoma a different disease than
13  follicular lymphoma?"  And you stated, "Yes, but
14  both starts out at the stem cell, same stem cell.
15  It's the same area."
16         It's right there marked as Exhibit 21,
17  page 178, sir.
18     **A.   (Reviewing document.)**
19     Q.   Do you recall testifying to that?
20     **A.   Which line number are you asking me?**
21     Q.   178, 9 to 12, sir.
22     **A.   Correct, but I went on on the next page**
23  **and further explained the answer to that in terms**
24  **of whether immunosuppression, for example having**
25  **AIDS versus a direct mutation, there are different**

**325**

1  **causes.**
2      Q.   Sure.  And I'm not asking about the
3  causes.  So that's not why I'm actually asking
4  about that.  What I didn't understand is sort of
5  what you meant by the mechanism there.  What do
6  you mean by all lymphomas, whether T or B-cell,
7  have a stem cell origin?
8      **A.   That's true.  All T and B-cells are**
9  **differentiated from the stem cell.**
10     Q.   Right.  Can you elaborate a little more
11  how that works where you have this -- are you
12  saying there's a mutation in the stem cell, sir?
13     **A.   Not necessarily, but certainly the**
14  **commonality is that both are derived -- the B and**
15  **T-cell lymphomas are derived from stem cells.**
16     Q.   When you stated that all lymphomas
17  share that similarity, you're just talking about
18  where they came from and not whether or not
19  they're the same disease?
20     **A.   Right.  Different things can happen to**
21  **that differentiating cell along its pathway to**
22  **become a mature lymphocyte.  These cells can --**
23  **for example, I gave the example of cyclosporine A**
24  **immunosuppression or AIDS or ionizing radiation or**
25  **chemical induction.  There's different causes, but**

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2
Conducted on October 16, 2018

15 (326 to 329)

---

326

1  these cells all come from -- the cells that end up
2  in trouble all are sourced from stem cells
3  originally.
4      Q.  Okay.
5          MR. KALAS:  All right.  Let's take a
6  break.  We've been going an hour.
7          THE VIDEOGRAPHER:  The time is 10:07.
8  We are off the record.
9          (Break taken from 10:08 a.m. to
10 10:17 a.m.)
11         THE VIDEOGRAPHER:  The time is 10:17.
12 We are on the record.
13         (Exhibit Number 22, Article Titled
14 "Pesticide exposure as risk factor for non-Hodgkin
15 lymphoma including histopathological subgroup
16 analysis"Article Titled "Glyphosate Use and Cancer
17 Incidence in the Agricultural Health Study," was
18 marked for identification.)
19         BY MR. KALAS:
20     Q.  Doctor, I'm marking as Exhibit 22 the
21 Eriksson study.  And this is the study discussed
22 in your toxicological notes, correct?
23     A.  With respect to latency, I believe.
24     Q.  Right.  And that's what you're going to
25 rely upon this study for when you come talk to the

---

327

1  jury in St. Louis, right?
2      A.  Yes.
3      Q.  Okay.  So let's -- I want to talk about
4  latency real quick.  First of all, are there any
5  other studies beyond the Agricultural Health Study
6  and the Eriksson study that you're aware of that
7  looks at the latency issue in the epidemiology
8  literature?
9      A.  Only with respect to those I referenced
10 on page 119.
11     Q.  Right.  And I should have been more
12 specific in that question.  Are there any studies
13 beyond the Agricultural Health Study and the Eric
14 study on glyphosate that you're aware of that look
15 at the latency issue in the epidemiology
16 literature?
17     A.  Not beyond what's on page 119.
18     Q.  Okay.  And so when you looked at the
19 study for the latency issue, you looked at the
20 materials and methods, right?
21     A.  Yes.
22     Q.  Okay.  And you also looked at the
23 introduction of the study, right?
24     A.  I did.
25     Q.  And when you looked at the materials

---

328

1  and methods and the introduction and the text of
2  the study, did you note that the only odds ratios
3  in the study adjusted for confounding by other
4  pesticides are found in Table 7?
5      A.  I reviewed this some time ago.  What is
6  your specific question?
7      Q.  Right.  Did you -- did you see any
8  other odds ratios in this study adjusted for other
9  pesticides when looking at your latency analysis
10 other than those in Table 7?
11     A.  I don't recall.
12     Q.  Okay.  And we've talked about this many
13 times.  You believe there are other environmental
14 exposures associated with NHL, right?
15     A.  Yes.
16     Q.  Okay.  And those are the types of
17 exposures you asked a client -- or asked about in
18 an interview of a client of Mr. Miller's firm,
19 right?
20     A.  Yes.
21     Q.  Okay.  And some of those exposures that
22 you might ask them about would include other
23 pesticides, right?
24     A.  Yes.
25     Q.  Dioxin, correct?

---

329

1      A.  Or compounds with dioxin would be
2  likely contained within.
3      Q.  Sure.  Benzene, right?
4      A.  Yes.
5      Q.  ▯▯▯▯▯
6      A.  Yes.
7      Q.  Okay.  And in an epidemiology study, if
8  it measured people with exposures to those other
9  things you believe might be associated with NHL in
10 addition to exposure to glyphosate, the findings
11 on glyphosate might be confounded by those other
12 exposures unless you control for them, right?
13     A.  I'm going to defer that to the
14 epidemiologists in this case.
15     Q.  Well, sir, with all due respect, if
16 you're going to offer latency opinion about this
17 study, do you have an understanding of whether or
18 not there were confounders in this study that were
19 controlled for?
20     A.  I don't recall.  I'd have to review it
21 again.  It's been over a year.
22     Q.  Okay.  So you'd agree that if you
23 wanted to evaluate latency to determine whether or
24 not glyphosate induces non-Hodgkin's lymphoma in a
25 statistically significant manner with greater than

---

Transcript of William Sawyer, Ph.D., Volume 2

16 (330 to 333)

Conducted on October 16, 2018

---

330

1 ten years since first exposure, you would want to
2 control for other exposures associated with
3 non-Hodgkin's lymphoma, right?
4       Let me break it up. That was a -- that
5 was a long question.
6       Some of the -- if you look at page --
7 the first page of this study, it states on page --
8 on the top paragraph, the third line --
9       MR. SELDOMRIDGE: Which one?
10       MR. KALAS: Top right, third line.
11       BY MR. KALAS:
12   Q.   "Some of these chemicals were
13 contaminated by dioxins, of which
14 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD) has
15 been recognized as a complete carcinogen by IARC."
16       Do you see that?
17   A.   Yes.
18   Q.   Okay. And the dioxin -- that's the
19 dioxin contamination you were talking about
20 earlier in 2,4,5-T and 2,4-D, right?
21   **A.   Yes, and you're obviously familiar with**
22 **that from my work in the nitro case.**
23   Q.   Right. And so if you go down to the
24 second full paragraph, in the second line, it
25 states, "During the 1970s certain chemicals, e.g.

---

332

1 typo.
2       "For the latency period 1-10 years, no
3 exposed cases were found for MCPA and 2,4,5-T
4 and/or 2,4-D. Regarding glyphosate, odds ratio
5 1.11, (95% confidence interval .24 to 5.08) was
6 obtained." Let me stop there.
7       Am I correct that for less than ten
8 years of latency that is not a positive finding,
9 1.11 with a confidence interval of .24 to 5.08?
10   **A.   Not necessarily.**
11   Q.   Okay.
12   **A.   One has to, in a latency analysis,**
13 **determine if there is a trend. In other words,**
14 **for example, was the odds ratio perhaps greater**
15 **than one, which it was, but nonsignificant. And**
16 **when looking at the various latency intervals, is**
17 **there a positive trend, or when you combine all**
18 **the latency intervals is there a statistically**
19 **significant increased rate. In this case there**
20 **was.**
21   Q.   Okay.
22   **A.   But I want to answer your question as**
23 **best I can, but you're sometimes getting into the**
24 **epidemiologic aspects of this which I have**
25 **deferred to the epidemiologists.**

---

33

1 the phenoxy herbicide 2,4,5-T, chlorophenols, and
2 the insecticide DDT, were prohibited due to health
3 concerns."
4       Do you see that?
5   **A.   Yes.**
6   Q.   And then it's -- the next sentence
7 states, "Later the phenoxy herbicide 2,4-D was
8 banned in Sweden."
9       Do you see that?
10   **A.   Yes.**
11   Q.   And one of the reasons that those
12 herbicides were banned were because they contained
13 dioxins, right?
14   **A.   Of course.**
15   Q.   Okay. And so if we go to the latency
16 analysis that you conducted in this study or that
17 you looked at in this study, that is found at the
18 top of 1659, top left-hand -- right here, and it
19 actually starts -- the first line starts on 1658.
20 So I'm going to read it into the record, and then
21 I'm going to ask you a few questions.
22       So it states, beginning on the bottom
23 of 1658, "Regarding phenoxy herbicides and
24 glyphosate, an analysis was made taken the latency
25 period for exposure into account." And that's a

---

333

1   Q.   Let me ask you this. When you're
2 talking about latency to the jury, do you feel
3 qualified as an expert to discuss the strengths
4 and weaknesses of the studies upon which you are
5 opining upon on latency?
6   **A.   Yes, if we stick just to latency.**
7   Q.   Okay. So I'm continuing off latency.
8 For the less than ten years that is a null
9 finding, correct?
10   **A.   It's not a null finding, it's a**
11 **nonsignificant finding. And I can understand how**
12 **you're using the word "null" versus**
13 **"nonsignificant." But that doesn't mean that the**
14 **data is not considered in conjunction with the**
15 **rest of the data.**
16   Q.   Sure. Okay. And then if we go to
17 latency period greater than ten years it states
18 that for MCPA there was an odds ratio of 2.81 with
19 a 95 percent confidence interval of 1.27 to 6.22.
20 For 2,4,5-T or 2,4-D there was an odds ratio of
21 1.72 with a 95 percent confidence interval of .98
22 to 3.19, and for glyphosate there's an odds ratio
23 of 2.26 with a 95 percent confidence interval of
24 1.16 to 4.4, correct?
25   **A.   Correct. And on page 119 in my report,**

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2

Conducted on October 16, 2018

17 (334 to 337)

---

334

1  I said specifically subjects with more than ten
2  years with respect to this particular study.  So I
3  have accurately assessed that data in my notes on
4  page 119.
5      Q.  Okay.
6      A.  So I'm not sure what the problem is.
7      Q.  Okay.  So if you -- here's my question.
8  For the less than ten years were there any exposed
9  cases for MCPA for 2,4,5-T and 2,4-D reported in
10 this study?  Top line, sir.
11     A.  Yes.  There was an elevated OR for
12 glyphosate of 1.11 which is not significant.
13     Q.  Not my question, sir.  I'm asking you
14 about the other exposures.  For the periods one to
15 ten years were there any exposed cases found for
16 MCPA or 2,4,5-T/2,4-D?
17     A.  No.
18     Q.  Okay.  So we know that that data point
19 for glyphosate would not be confounded by MCPA or
20 2,4,5-T and 2,4-D, right?  Because there were no
21 co-exposures during that one to ten-year period?
22     A.  It's probably a good question but I
23 didn't quite understand it.
24     Q.  Sure.  For the less than ten-year
25 period we know that the data point for glyphosate

335

1  would not be confounded by exposure to MCPA,
2  2,4,5-T or 2,4-D, correct?
3      A.  Yes, I think that's true.
4      Q.  Okay.  But we do know there's -- there
5  could be co-exposures for the period greater than
6  ten years, right?
7      A.  No, I would say greater than 40 years.
8      Q.  Well, right.  But they're only
9  measuring it ten years, greater than ten years.
10 So for the period greater than ten years we know
11 glyphosate -- somebody who used glyphosate could
12 be also exposed to MCPA or 2,4,5-T or 2,4-D or
13 some combination, correct?
14     A.  Yes, but remember, this was a 2008
15 study, and to go back to the 1960s or '70s,
16 we've -- we're putting a lot of heavy weight on
17 older workers as opposed to the mean age of the
18 workers.  So in -- yes, greater than ten years
19 could include co-exposure.  However, not many
20 co-exposures because simply that was so many years
21 ago.
22     Q.  Now, if you go to page 1661, it states,
23 that -- and I'm looking in the left-hand side,
24 last full paragraph that starts, "thus."
25         It states, regarding MCPA, halfway

336

1  through that paragraph --
2      A.  Hang on.
3      Q.  Sure.
4      A.  Down at the bottom of the page?
5      Q.  Yes.  Last full paragraph, left-hand
6  side.
7      A.  Okay.  I think I have it.
8      Q.  Okay.  It states, "MCPA, even if still
9  used, has been largely substituted by other
10 agents, among which glyphosate has been clearly
11 dominating."
12         Did I read that correctly?
13     A.  Yes.
14     Q.  And then if you look up again at the
15 sentence before that, "2,4,5-T, which was
16 contaminated by TCDD, was prohibited in Sweden in
17 1977."
18         See that?
19     A.  Yes.
20     Q.  Okay.  And dioxin is a potential cause
21 of non-Hodgkin's lymphoma, right?
22     A.  Of course.
23     Q.  The 2,4,5-T in Sweden was contaminated
24 with dioxin, correct?
25     A.  Up until '77, yes.

337

1      Q.  Okay.  And the MCPA was replaced by
2  glyphosate, correct?  That's what the authors say
3  here?
4      A.  Yes.
5      Q.  Okay.  And if you go back to the odds
6  ratios on 1659, the odds ratio for MCPA is
7  actually slightly higher than glyphosate for
8  greater than ten years, correct?
9      A.  Okay.  We're going back to table two.
10     Q.  To the statistics, right here, sir.
11     A.  Okay.  Hang on.  Let me --
12     Q.  Yeah.
13     A.  Now, you're asking if the statistic is
14 different?
15     Q.  No.  I'm asking is the odds ratio for
16 MCPA for greater than ten years latency higher for
17 MCPA than for glyphosate?
18     A.  Slightly.  The confidence interval is
19 1.27 to 6.22 versus 1.16 to 4.4.  So slightly,
20 yeah.
21     Q.  And if glyphosate replaced MCPA in
22 Sweden and the authors of this study did not
23 control for co-exposures when calculating their
24 odds ratios, it's possible that the entire
25 elevated risk for glyphosate could be measuring

Transcript of William Sawyer, Ph.D., Volume 2

18 (338 to 341)

Conducted on October 16, 2018

---

338

1  the elevated risk for MCPA, right?
2      A.  No.  The difference in the confidence
3  interval, both of these have very significant
4  confidence intervals.  The differential at the low
5  end of 1.27 versus the 1.16 is so close that it
6  wouldn't -- it wouldn't change the result.
7      Q.  Well, let me ask you this:  If the
8  greater than ten years group is measuring people
9  who've been farming at least for ten years, since
10 it's measuring exposures greater than ten years,
11 some group of those farmers will have replaced
12 their MCPA use with glyphosate, right?
13     A.  The farmers who have been farming at
14 least 31 years would have.
15     Q.  It doesn't state when MCPA was phased
16 out in this, does it?
17     A.  No.
18     Q.  Okay.  So why do you say 31 years, sir?
19     A.  I was thinking in terms of 1977 date --
20     Q.  Okay.
21     A.  -- for the 2,4,5-T or 2,4-D.
22     Q.  Okay.  So you don't know when MCPA was
23 replaced by glyphosate in Sweden?
24     A.  Not in Sweden.
25     Q.  Okay.

---

339

1      A.  In the same era.
2      Q.  Okay.
3      A.  But I can't -- can't give you the exact
4  year.
5      Q.  And in those farmers that were exposed
6  to MCPA and glyphosate, if you don't control for
7  MCPA in measuring the glyphosate odds ratio you
8  may be measuring an increased risk from MCPA
9  rather than glyphosate, right?
10     A.  No.  As I said, they did provide the
11 confidence intervals, and at the low end they're
12 nearly identical.  So I don't believe that
13 statistically one would be able to justify that --
14     Q.  Well, doesn't that --
15     A.  -- area.
16     Q.  Sorry.  Were you done?
17     A.  Yeah.
18     Q.  Doesn't that beg the point, sir, if
19 there's -- nearly identical, then the glyphosate
20 odds ratio and confidence interval might be
21 measuring the MCPA-induced NHL in that population
22 of farmers even though they happen to use
23 glyphosate, right?
24     A.  No, because glyphosate was used
25 throughout that entire interval of time where the

---

340

1      MCPA was not.  That was only used for the -- a few
2  of the earlier years.
3      Q.  When was glyphosate used in this
4  population -- when did glyphosate come on the
5  market in Sweden, sir?
6      A.  I believe in '74.
7      Q.  Okay.
8      A.  1974.
9      Q.  And this measures farmers who used
10 2,4,5-T and 2,4-D with dioxin contamination,
11 right?
12     A.  Right, prior to 1977.
13     Q.  So this population likely goes back far
14 earlier than 1974, correct?
15     A.  Yes.  I agree, but the majority of the
16 time interval is post-dioxin and post-MCPA.
17     Q.  You'd agree with me that the failure to
18 adjust for confounding by MCPA and 2,4,5-T and
19 2,4-D is a weakness in this latency evaluation,
20 correct?
21     A.  Yes, to some extent, but I think you're
22 overemphasizing that.  No human epidemiologic
23 study is perfect and cover every -- you know,
24 every aspect.  I think we have enough data here to
25 see that the majority of the exposure would have

---

34

1      been free of MCPA and dioxins based upon the
2  dates.
3      Q.  So this is a study with a weakness that
4  we can give varying weights to in this latency
5  evaluation.  What weakness did you see in the AHS
6  study in its latency evaluation?
7      A.  I agree that, you know, we can weight
8  the study with weaknesses.  I think you're right
9  that there are certainly weaknesses in any study,
10 but one has to weight them and look at the
11 objective -- objective evidence and weight it
12 accordingly.
13     Q.  Yes, sir.  So that's what I'm asking
14 about.  You have two studies with the latency
15 analysis, the AHS study and this study.  What
16 weakness in the AHS's latency analysis did you
17 see?
18     A.  I'm trying to remember where I put the
19 study.  There it is.
20         Well, with respect to latency, the
21 study did not -- could not provide any information
22 on latency simply because the findings were not
23 statistically significant.
24     Q.  Well, are you testifying now, sir, that
25 nonstatistically significant findings provide no

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 90 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
19 (342 to 345)
Conducted on October 16, 2018

342
1  information on whether or not a compound causes
2  lymphoma?
3      A.  No.  I already pointed out that there
4  was an apparent increase rate of follicular
5  lymphoma.  However, it was not statistically
6  significant and I referred to Table 3, I think.
7      Q.  Well, let's -- let's be clear.  If we
8  look at the follicular lymphoma number here on
9  supplementary Table 3, the highest dose group,
10 Tertile 3, had a odds ratio of .96 with a
11 confidence interval of .42 to 2.21, correct?
12     A.  Yes.
13     Q.  And that's the highest dosed group,
14 right?
15     A.  Correct.
16     Q.  Okay.  And that is an
17 intensity-weighted, 20-year-lagged metric,
18 correct?
19     A.  Yes.
20     Q.  Okay.  So what weaknesses in this
21 analysis causes you to weight the Eriksson study
22 above it for your latency opinion?
23     A.  Something that does not provide any
24 latency information because the results were too
25 variable.  As I said, the risk ratios in the

343
1  earlier latency up to ten years appeared to be
2  elevated at 1.5, but it was not statistically
3  significant with the range of .73 up to 3.2 times
4  that of background.  And as the dose increased, we
5  did not see any apparent increase in incidence.
6  So there just isn't sufficient information here to
7  draw any judgment upon latency.
8      Q.  So if I understand you correctly, this
9  isn't sufficient information to draw judgment on
10 latency because it is a null finding, correct?
11     A.  Yes.
12
13
14
15
16
17
18
19
20
21
22
23
24
25



REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 91 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
Conducted on October 16, 2018
20 (346 to 349)



**346**

13    BY MR. KALAS:
14    Q.   So if I understand correctly, one of
15 the things that is an important factor to you is
16 whether the answer was given in an earlier date
17 closer in time to the event, right?
18    A.   Yes.

**348**

**349**

16    BY MR. KALAS:
17    Q.   This is an epidemiology study that
18 appears in a journal called Cancer Epidemiology
19 Biomarkers and Prevention.  Have you heard of that
20 journal?
21    A.   Yes.
22    Q.   Is it a reputable journal, sir?
23    A.   Peer-reviewed.
24    Q.   And if you go to Table 2, which is on
25 the third page of this, do you see

**347**

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 92 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
21 (350 to 353)
Conducted on October 16, 2018



**Page 350**

1   A.   Yes.
2   Q.   Okay.  And if you look down at
3 follicular lymphoma, it states that the odds ratio
4 for follicular lymphoma for ▮
5 is 1.9.
6       Do you see that?
7   A.   Yes.
8   Q.   And the confidence interval is 1.2 to
9 2.9.
10      Do you see that?
11  A.   Yes.
12  Q.   And that is a statistically significant
13 relationship, right?
14  A.   Yes.
15
16
17
18
19
20
21                                                So
22 that is something that needs to be looked for
23 within this study, which I have not done,
24 obviously, since I haven't read it.
25  Q.   This isn't a study you found in your

**Page 35**

1 literature review?
2   A.   No.  I did not come across this.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 352**

1 ▮
2   A.   Correct.  It's not statistically
3 significant, but borderline.
4   Q.   It is a confidence interval of 1 to
5 3.8, right?
6   A.   Right.
7   Q.   And that is a borderline statistically
8 significant finding for ▮
9
10  A.   If we use the upper range of 7.5, it
11 is.
12  Q.   Okay.  And the odds ratio there
13 actually matches the overall odds ratio for ▮
14
15  A.   Right.  But the confidence interval
16 drops to a 1.0.
17
18
19
20
21
22
23
24
25

**Page 353**

1
2
3
4 He tends to be at the lower end of the statistic;
5 that is, borderline not significant.
6       So if this is the only study out there
7 that makes such a claim, it's not generally
8 acceptable to draw causation on just one study.
9   Q.   You would --
10  A.   So there are some factors in terms of
11 weighting this.  I think it's a good observation
12 that you've presented, but it in itself is very
13 weak.
14  Q.   You wouldn't draw a causation
15 conclusion based on one single statistically
16 significant study?
17  A.   No.  However, I would if there were
18 other studies that corroborated that single
19 statistic study.
20  Q.   Now --
21  A.   For example, if you had three more
22 studies that showed borderline statistics -- we
23 don't even have one study here that shows the
24 statistically significant rate.  That's the
25 problem.  But if we did have one that was

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 93 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
Conducted on October 16, 2018
22 (354 to 357)



**354**

1 statistically significant and then we had a study
2 like this that's borderline and another study like
3 this that's borderline, I think we could draw some
4 conclusions. But based on weight of the evidence
5 methodology -- but here you only have a study
6 that's borderline statistic and no others.
7     Q.   Now, you mentioned on your dose
8 calculation that he was on the lower end. But you
9 aren't including his ▮▮▮▮▮▮▮▮▮▮▮▮▮▮,
10 right?
11     A.   That question is also answered in the
12 toxicological and epidemiological literature.
13 When we go back less than -- or greater than 20
14 years, it was extremely common for ▮▮▮▮
15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮▮
24     A.   Yes.
25     Q.   And when you state that Mr. Hall is on

**355**

1 the lower end of this dose metric, he also had
2 some exposure ▮▮▮▮▮▮▮▮▮▮▮▮▮
3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4 ▮▮▮▮▮▮▮▮
5     A.   Correct. But that -- you're making
6 some kind of speculation that is not the case in
7 this study.
8     Q.   All right.
9     A.   So I mean we really can't do anything
10 with that statistically because the information is
11 not ascertained within the text of the study.
12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13 ▮▮▮▮▮▮
14 ▮▮▮
15     Q.   And you testified in August that
16 benzene is a risk factor for NHL, right?
17     A.   It is.
18     Q.   And you agree that Mr. Hall was exposed
19 to benzene at some level higher than the
20 background level of exposure to benzene that you
21 or I have, right?
22     A.   Yes.
23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 ▮▮▮▮▮▮
25 ▮▮▮

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 94 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
23 (358 to 361)
Conducted on October 16, 2018



**358**

**359**

**360**

15  A.  I did.
16  Q.  Okay.  You did?
17  A.  Yeah.
18  Q.  So -- but you weren't aware of this
19 data?
20  A.  That's right.
21  Q.  Okay.  And now that you've seen this
22 data, you would agree with me that you may
23 reassess that differential, correct?
24  A.  Yes.
25  Q.  Based on this data, how could you rule

**36**

1 out ▮▮▮▮▮▮▮ as a potential causative factor
2 in Mr. Hall's follicular lymphoma?
3  A.  I haven't reviewed either of these
4 studies in full.
5  Q.  Okay.  So there's a potential that
6 sitting here today you cannot rule out ▮▮▮
7 ▮▮▮▮ as a cause of his follicular lymphoma,
8 based on the numbers you just looked at?
9  A.  Correct.

14      MR. KALAS:  I'm going to mark as
15 Exhibit 26 --
16      BY MR. KALAS:

24  Q.  And you've stated that you believe that
25 ethylene oxide is associated with non-Hodgkin's

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8572-19 Filed 12/27/19 Page 95 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
24 (362 to 365)
Conducted on October 16, 2018



362

1   lymphoma, right?
2       A.  Yes.
3   ███████████████████████
4       A.  Yes.
5   ██████████████████████████
6   ████████████████████████████████
7   ████
8       A.  Yes.
9       Q.  Do we know for sure Mr. Hall inhaled
10  ethylene oxide from his exposure to glyphosate?
11      A.  Opening up the one gallon containers
12  would have induced inhalation in the breathing
13  zone of ethylene oxide, yes.
14      Q.  Did you ask Mr. Hall how he stood over
15  the containers when he opened them?
16      A.  No, but to open a container, based on
17  the length of a human arm, it is in the breathing
18  zone.
19      Q.  It's --
20      A.  Unless he opened them with his feet.  I
21  don't think that would work too well.
22      Q.  ████████████████████████████
23  ██████████████████████████████████
24  ███████████████████████████████████████
25  ████████████████████

363

1       A.  No.
2   ████████████████████████████████
3   ████
4           MR. KALAS:  I'll mark as Exhibit 26 a
5   printout from the National Cancer Institute.
6           (Exhibit Number 26, National Cancer
7   Institute Article Re Ethylene Oxide, was marked
8   for identification.)
9           BY MR. KALAS:
10      Q.  Have you seen this before, sir?
11      A.  No.
12      Q.  Okay.  It states -- this is called
13  "Ethylene Oxide, National Cancer Institute."  And
14  what is the National Cancer Institute, sir?
15      A.  Division of CDC, US governmental agency
16  which performs research on cancer primarily,
17  cancer treatment, as well as cancer cause.
18      Q.  Okay.  And if you go to the section
19  that says, "How are people exposed to ethylene
20  oxide?"  It states in the second paragraph,
21  "Despite these precautions" -- it states, "Despite
22  these precautions workers and people who live near
23  industrial facilities that produce or use ethylene
24  oxide may be exposed to ethylene oxide through
25  uncontrolled emissions."

364

1           Do you agree with that?
2       A.  Yes.
3       Q.  It states as well, "The general
4   population may also be exposed through tobacco
5   smoke."
6           Do you see that?
7       A.  Yes.
8       Q.  Do you agree with that?
9       A.  Yes.
10      Q.  "And the use of products that have been
11  sterilized with ethylene oxide, such as medical
12  products, cosmetics, and beekeeping equipment."
13          Do you agree with that?
14      A.  Yes.
15      Q.  Okay.  Do you see pesticides mentioned
16  as a potential route of exposure for ethylene
17  oxide here?
18      A.  No.
19      Q.  Okay.  Have you been able to quantify
20  whether Mr. Hall would have had anything beyond a
21  de minimis background exposure to ethylene oxide
22  from his use of glyphosate-based herbicides?
23      A.  I'm not sure I understand your question
24  with the word "de minimis."
25      Q.  Well, okay, have you been able to

365

1   quantify how much ethylene oxide exposure Mr. Hall
2   has had from glyphosate-based herbicides?
3       A.  No.
4   ████████████████████████████████████
5   ████████████████████████████████████
6   ████████████████████████████████
7   █████████████████████████
8       A.  Yes.
9           MR. KALAS:  Okay.  Finally, I'm going
10  to mark a study as Exhibit 27.
11          (Exhibit Number 27, Article Titled
12  ██████████████████████████████████████
13  ██████████████████████████████████████
14  ████████████████████████
15  ████████████████████████
16          BY MR. KALAS:
17  ████████████████████████████████████████
18  ██████████████████████████████████████████
19  ██████████████████████████████████████████
20  ██████████████████████████████████████████
21  ████████████████████████████████████
22          Did I read that correctly?
23      A.  Yes.
24      Q.  Okay.  And this is in Cancer Causes and
25  Control, right?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8572-19 Filed 12/27/19 Page 96 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
25 (366 to 369)
Conducted on October 16, 2018



**366**

1  A.  Yes.
2  Q.  And that's a peer-reviewed journal,
3  right?
4  A.  Yes.
5  Q.  And is this a study you reviewed when
6  you were looking to see what risk factors Mr. Hall
7  might have for non-Hodgkin's lymphoma or
8  follicular lymphoma?
9  A.  No.
10  Q.  Okay. So if we go to Table 2, which is
11  on page 337 -- actually, since we're running short
12  on tape, let's go to table three on page 340.
13
14
15
16
17
18
19
20
21
22
23
24
25

**367**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23  Misstates.
24  A.  I don't know if that was the third or
25  second, but one of the two.

**368**

1  BY MR. KALAS:
2  Q.  Okay. And ████████████ is not
3  something that you considered on your
4  differential, right?
5  A.  No. I did consider.
6  Q.  Okay. But you didn't have access to
7  this data when you considered it?
8  A.  That's correct.
9  MR. KALAS: Okay. Let's take a break.
10  THE VIDEOGRAPHER: This marks the ends
11  of Media Number 1 in the deposition of William
12  Sawyer. The time is 11:12. We are off the
13  record.
14  (Break taken from 11:12 a.m. to
15  11:26 a.m.)
16  THE VIDEOGRAPHER: This marks the
17  beginning of Media Number 2 in the deposition of
18  William Sawyer. The time is 11:26. We are on the
19  record.
20  (Exhibit Number 28, Table 1.14
21  ████████████ was marked for
22  identification.)
23  BY MR. KALAS:
24  Q.  Dr. Sawyer, I'm marking as Exhibit 28
25

**369**

1
2
3  MR. KALAS: Here you go.
4  MR. SELDOMRIDGE: Thank you, Counsel.
5  BY MR. KALAS:
6
7
8
9  A.  Yes.
10  Q.  Okay. Do you agree that some of these
11  carcinogens listed in Table 1.14 are associated
12  with non-Hodgkin's lymphoma?
13  A.  Yes.
14  Q.  All right. I'm going to mark as
15  exhibit -- actually, we already marked it.
16  Can you find the Wester study, please.
17  I think it's Exhibit 16. Let me know when you
18  have found it. Should have been at the stack here
19  at the bottom potentially. Would have been the
20  last -- there we go.
21  All right. So we started looking at
22  this study in your last -- or in the previous
23  volume of this deposition, but I just want to pick
24  up where we left off. Just to lay some
25  foundation, this article actually had multiple

Transcript of William Sawyer, Ph.D., Volume 2    26 (370 to 373)
Conducted on October 16, 2018

370

1  experiments that were reported on in it, right?
2      A.  Yes.
3      Q.  And the first experiment they report on
4  is something called an in vitro percutaneous
5  absorption of glyphosate model, right?
6      A.  Yes.
7      Q.  Okay.  And what the authors did here
8  was they used a Petri dish model of human skin to
9  see how much glyphosate was absorbed by that skin
10 for various time periods, correct?  And I'm
11 looking at page 728, sir, Table 1.
12     A.  Well, I -- I'm not sure that's right.
13 I understood that the screening method used a
14 flow-through diffusion cell.
15     Q.  Okay.  So what's the distinction of
16 that?  I might be wrong about that.  Explain to me
17 what a flow-through diffusion cell means.
18     A.  Well, a Petri plate kind of alarms me.
19 That's sort of like if I took this lid off my cup
20 and put fluid in it.
21     Q.  Okay.
22     A.  It doesn't make any sense.  This study
23 used the Franz flow-through diffusion cell with
24 the skin stretched across the opening of that
25 cell.

37

1      Q.  Okay.  I was just trying to put it in
2  layperson's terms.  It was an in vitro
3  methodology?
4      A.  Okay.
5      Q.  But that's fine.  I appreciate you
6  being specific.  So this was an in vitro
7  methodology using human skin, right?
8      A.  Yes.
9      Q.  And there was the Franz methodology,
10 right, F-R-A-N-Z?
11     A.  That's right.
12     Q.  Okay.  And that's an accepted
13 methodology for in vitro dermal absorption, right?
14     A.  Yes and I should point out it is
15 considered a screening study.
16     Q.  Right.  And they did this study with
17 Roundup, right, not glyphosate?
18     A.  I think it was the isoprophylamine
19 salt, but I'm just checking.
20     Q.  So if you go to page 726 on the
21 materials and methods, sir, it states in the
22 in vitro percutaneous absorption that they used
23 undiluted and two dilutions of glyphosate and
24 formulation Roundup.
25         Do you see that?

372

1      A.  Right, right.
2      Q.  And so Roundup would contain POEA,
3  right?
4      A.  Yes.
5      Q.  Okay.  And they did this in human skin
6  as opposed to an animal model, right?
7      A.  Correct.
8      Q.  Okay.  And we like to see in vitro
9  tests in human skin more than an animal model
10 because it's closer to human in vivo exposures,
11 right?
12     A.  Correct.
13     Q.  And as you noted in your toxicological
14 notes, there can be important physiological
15 differences between human skin and the skin of
16 other animals, right?
17     A.  Yes.
18     Q.  And those physiological differences
19 could affect absorption either positively or
20 negatively, right?
21     A.  Yes.
22     Q.  And so when they -- if you go back to
23 the materials and methods, the original Roundup
24 that they used would have had a concentration of
25 about 41 percent glyphosate, right?

373

1      A.  Yes.
2      Q.  Okay.  And then they diluted it by 1/20
3  and that would be a 2 percent solution or
4  thereabouts, right?
5      A.  Yes.
6      Q.  And then they diluted it by 1/32 and
7  that gets you to approximately, by my math, a
8  1.4 percent dilution.  Does that make sense to
9  you?
10     A.  Roughly.
11     Q.  And the 1.4 percent dilution would be
12 similar to what Mr. Hall was using, a 1 percent
13 solution, right?
14     A.  Yes.
15     Q.  And they put different amounts of the
16 solution on the skin in the study, right?
17     A.  Yes.
18     Q.  Okay.  And if you look at -- back to
19 Table 1, for the undiluted mixture they put
20 volumes of .014, .07, and .14 milliliters per
21 centimeter squared of their solution on the skin,
22 right?  I'm looking in the volume column,
23 undiluted.
24     A.  That's right.
25     Q.  And those corresponded to

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 98 of 125

CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2

27 (374 to 377)

Conducted on October 16, 2018

374

1  concentrations of 15.4 micrograms per centimeter
2  squared, 77 micrograms per centimeter squared, and
3  154 micrograms per centimeter squared, right?
4      A.  Yes.
5      Q.  And then for the diluted mixtures they
6  put on volumes of either .07 or .14, right?
7      A.  Yes.
8      Q.  Okay.  And for the 2 percent solution
9  that would correspond to the concentration of 4.1
10 micrograms per centimeter squared or 8.3
11 micrograms per centimeter squared, right?
12     A.  Yes.
13     Q.  For the 1.4 percent solution that would
14 correspond to 2.6 micrograms per centimeter
15 squared or 5.2 micrograms per centimeter squared,
16 right?
17     A.  Yes.
18     Q.  Okay.  And the highest data point for
19 percentage dose absorbed that they found in this
20 human skin study was an absorption rate of about
21 2.2 percent, right?
22     A.  Yes, with eight hours, right.
23     Q.  Okay.  And that 2.2 percent was a
24 higher absorption rate than the undiluted
25 absorption rate at eight hours of .4 percent,

375

1  right?
2      A.  Yes.
3      Q.  But the absolute amount absorbed in
4  this model, in this human skin model, would have
5  been far lower in the diluted concentration than
6  in the undiluted concentration, right?
7      A.  Correct.  But, again, that's only a --
8  less than a square centimeter area.  In the real
9  world the body is vastly -- is vastly larger
10 surface area than a centimeter square.  So in the
11 real world, the diluted formula over large area of
12 skin is what is of interest.
13     Q.  Sure.  But what this suggests, this
14 human skin model suggests, is that as glyphosate
15 is diluted, the percent absorption may go up,
16 though the absolute amount absorbed on a given
17 area of skin may go down?
18     A.  Yes.
19     Q.  And what this also suggests is that
20 because all three of these formulations contain
21 POEA that the increase in percent absorption is
22 due to the dilution here and not the presence of
23 POEA, right?
24     A.  Yes.  The methodology has limits on the
25 concentration that should be used because as the

376

1      concentration goes up, and there is a limiting
2      amount which can get through the keratin layer
3      using a very high concentration can mathematically
4      result in a low percentage.  And that's why 0.54
5      microgram per centimeter squared is recommended by
6      EPA and other agencies.
7          Q.  Well, let me ask you this:  If the
8      undiluted figure here was pure glyphosate as
9      opposed to Roundup containing POEA, but the
10     diluted figures both contained -- both still
11     contained POEA, would you use this data to argue
12     that the presence of POEA enhanced absorption?
13         A.  Can't tell from that.
14         Q.  Right.  And so when you dilute
15     glyphosate, when you add water to a glyphosate
16     formulation, the percent absorbed may be enhanced
17     due to the dilution as opposed to the presence of
18     POEA, correct?
19         A.  Can't determine that.  The fact is that
20     when the maximum, which is again, I think, .54
21     microgram per centimeter squared, when that -- let
22     me just check that number.
23         Well, when a higher dose is used per
24     square centimeter, the remainder of it that never
25     gets absorbed mathematically reduces the percent

377

1      absorbed.
2          So that's primarily what we're seeing
3      here.  At 154 microgram per centimeter, the --
4      there's going to be a lot of leftover material on
5      the outside well that never made it into the
6      keratin layer or epidermis.
7          Q.  Sure.  I guess what I'm getting at is a
8      slightly different point.  I probably asked the
9      question unartfully.
10         I've heard people argue -- and I'm not
11     saying you have -- that POEA -- that Roundup was
12     absorbed at a greater rate than pure glyphosate.
13     And Roundup, of course, as you know, contains, I
14     think, about 46 percent water, right?
15         A.  Yes.
16         Q.  And it may be that the enhanced
17     absorption is not due to the presence of POEA, the
18     enhanced absorption as a percentage is not due to
19     the presence of POEA, but is instead due to a
20     dilution of the mixture, correct?
21         A.  For sure or hypothetically?
22         Q.  Potentially, sir.
23         A.  Potentially, yes.
24         Q.  Okay.  And so you can't -- you're not
25     going to tell the jury, if I understand correctly,

Transcript of William Sawyer, Ph.D., Volume 2

28 (378 to 381)

Conducted on October 16, 2018

378

1 that it's been conclusively proven that POEA
2 enhances absorption because it could potentially
3 be caused by the dilution as well, right?
4    **A. Well, I would probably reference --**
5 **yeah, I think I would explain the POE -- POEA**
6 **does, as a surfactant, increase absorption based**
7 **on studies that I have referenced on page 56 in my**
8 **report.**
9    Q. Okay. You referenced a study that
10 talked about penetration of glyphosate through
11 animal cell membranes in placental cells, right?
12    **A. Yes.**
13    Q. Do placental cells have an epidermis,
14 sir?
15    **A. No.**
16    Q. Do they have a lipophilic fatty layer
17 protecting their outside?
18    **A. No.**
19    Q. Our skin does, right?
20    **A. Yes.**
21    Q. Okay. And so I think you stated
22 before, and I think it's commendable, that when
23 you're going to talk to the jury you're going to
24 give them all the evidence, right?
25    **A. Correct.**

379

1    Q. Okay. And when you talk to the jury
2 and tell them that there's -- that -- well, strike
3 that.
4       When you talk to the jury about POEA
5 and its effect on absorption, are you going to
6 tell them that it's conclusively proven that POEA
7 enhances absorption, or are you going to tell them
8 it could be due to the POEA or it could be due to
9 the dilution?
10    **A. Well, it also referenced footnote 161**
11 **on page 59. It discussed that study.**
12    Q. Okay. And your sentence for footnote
13 161 states that, "Other formulations may contain
14 higher levels, even as high as 60 to 80 percent as
15 in the formulation Genamin," right?
16    **A. Oh, I'm sorry. Reference 162. No,**
17 **that is 161. Yeah, okay.**
18    Q. Okay. And once again that's cell
19 membranes that you're discussing, right? Cell
20 membranes in -- in I believe placental cell lines
21 again, correct?
22       MR. KALAS: Let the record reflect
23 Dr. Sawyer's looking at the Mesnage study cited at
24 161.
25       BY MR. KALAS:

380

1    Q. Now that you've reviewed the Mesnage
2 study, sir, what type of cells is the Mesnage
3 study looking at?
4    **A. Kidney derived.**
5    Q. Kidney-derived cells. Those would be
6 cells inside our body, right?
7    **A. Yes.**
8    Q. Okay. And so once again those are not
9 cells that have lipophilic layers, right?
10    **A. Correct.**
11    Q. Those are not cells that have
12 epidermis, correct?
13    **A. Yes.**
14    Q. Those are not cells that have stratum
15 corneum, correct?
16    **A. Correct.**
17    Q. Okay. And our skin has all that,
18 right?
19    **A. Yes.**
20    Q. Okay. So when you're giving the jury
21 all of the data, are you going to tell them that
22 it is conclusively proven that POEA enhances
23 dermal absorption, or are you going to say that it
24 could be due to the dilution as well?
25    **A. I'm going to state from a mechanistic**

38

1 standpoint, that it's proven.
2    Q. Okay. What data are you going to cite
3 for that?
4    **A. (Reviewing document.)**
5       **The Richards study, footnote 150 on**
6 **page 56.**
7    Q. So we just discussed that study, sir,
8 about ten minutes ago. That's the study in
9 placental cells inside the body that don't have an
10 epidermis.
11       Let me ask you this: Sitting here
12 right now, can you think of a study that supports
13 your opinion that surfactants, specifically POEA,
14 enhance absorption rates as opposed to dilutions?
15 We've spent ten minutes reviewing it, so --
16 reviewing your notes, so if you haven't found it
17 yet, you can caveat that you haven't found
18 anything in your notes thus far.
19       But I -- we have other things to get
20 to, and we have a limited amount of time. So I'll
21 phrase my question with that caveat.
22       Based -- after reviewing your notes for
23 a few minutes, have you found any study that you
24 believe conclusively proves that POEA enhances
25 dermal absorption rates as opposed to dilutions

Transcript of William Sawyer, Ph.D., Volume 2          29 (382 to 385)
Conducted on October 16, 2018

382

1    enhancing dermal absorption rates?
2        A.   No, only the mechanistic information
3    that POEA surfactants are nonionic detergents and
4    enhance the ability of a hydrophilic substance to
5    make it through the channels between the
6    brick-and-mortar structure of the keratin layer of
7    the epidermis.
8        Q.   Okay.  So mechanistically, sir, is it
9    your testimony that nonionic surfactants disrupt
10   the epidermal layer?  Is that your testimony?
11       A.   Nonionic surfactants certainly enhance
12   hydrophilic component permeability.
13       Q.   Okay.  And you don't have a study using
14   Roundup that suggests that it's definitely the
15   nonionic surfactants as opposed to the dilution
16   enhancing the permeability rate, correct?
17       A.   Yes.
18       Q.   Now, another thing you've talked about
19   in the past is that there is bioaccumulation in
20   the skin which allows for absorption over a number
21   of days of glyphosate, right?  You talked about
22   that --
23       A.   Yes.
24       Q.   -- at the Johnson trial?  Okay.
25            And in Table 2 here, what they looked

383

1    at was actually partitioned from Roundup into the
2    human stratum corneum, right?  Back on Wester.
3            Table 2 right there.  You've got your
4    pen on it.  You see that table, sir?
5        A.   Yes.
6        Q.   Okay.  And what they found was that
7    something on the order of .05 percent of the
8    percentage dose accumulated in the stratum
9    corneum, right?
10       A.   Yes.
11       Q.   Okay.  And basically pretty much all
12   the Roundup that they applied to the skin model
13   here sat on top of the model, right?  It didn't
14   penetrate the skin, right?
15       A.   Correct.
16       Q.   Okay.  And this data doesn't suggest
17   that any significant amount of Roundup is
18   accumulating in the epidermal layer, right?
19       A.   That is correct.
20       Q.   And do you have another study you can
21   point me to that suggests that a significant
22   amount of glyphosate is accumulating in the
23   epidermal layer?
24       A.   Yes.
25       Q.   Which study, sir?

384

1        A.   Maibach.
2        Q.   Maibach 1983, sir, correct?  That's
3    correct, sir, Maibach 1983?
4        A.   (Reviewing document.)
5            Yes.
6        Q.   Okay.  And Maibach 1983 stated that
7    bound material, i.e. the glyphosate, is not
8    available for systemic absorption.
9            Do you recall that?
10       A.   Yes, but that's an assumption.
11       Q.   Okay.  Do you recall that the authors
12   of Nielsen 2007, a peer-reviewed study, said the
13   same thing about glyphosate?
14       A.   No.
15       Q.   Do you recall that the authors of the
16   Ward studies, those are the tape stripping studies
17   that you discussed in your toxicological notes,
18   said the same thing about glyphosate, that it --
19   the amount that stayed in the epidermal layer was
20   not available for systemic absorption?
21       A.   Yes.  However, that -- neither of those
22   statements are in compliance with OECD who states
23   that the amount of substance not found in the
24   donor chamber should be considered absorbed and
25   therefore potentially available in the systemic

385

1    circulation and that may take more time, it may
2    take alterations in conditions.  For example, wet
3    skin, skin that has been wet in a glove all day
4    long, the characteristics of that skin changes.
5        Q.   Okay.
6        A.   There's a number of properties of skin
7    that I've included in my report that show how skin
8    can change and become more permeable under
9    different conditions.
10       Q.   Well, that's a -- that's -- you're
11   referring to basically hydration of the skin,
12   correct, sir?
13       A.   And other factors.
14       Q.   And what data can you point me
15   to that shows that hydrated -- that the skin with
16   water and Roundup has an increased absorption rate
17   as opposed to dry skin?
18       A.   That hasn't been studied.
19       Q.   Okay.  So that's a theory on your part,
20   correct?
21       A.   No.  I'm stating peer-reviewed studies
22   that talk about how glyphosate itself can change
23   the cytokine structure in the skin with chronic
24   exposure and other conditions of the skin can also
25   change dermal absorption to various chemicals --

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 101 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
Conducted on October 16, 2018
30 (386 to 389)

386

1  Q.  What --
2  A.  -- in general.
3  Q.  Sorry.  What peer-reviewed study, sir,
4  shows that glyphosate changes the cytokine
5  structure of skin?
6  A.  (Reviewing document.)
7  Q.  Have you been able to find a study in
8  the six minutes that supports that?
9  A.  It's in my report.  I'm just forgetting
10  where.  I did come across my Table 11 which shows
11  enhanced absorption of glyphosate with surfactant.
12  Q.  Right.  And that's -- Table 11 is a TNO
13  study, correct?
14  A.  Right.
15  Q.  And that study was done using a
16  surfactant that Mr. Hall was not exposed to,
17  right?
18  A.  Right.  Cocoamine.
19  Q.  Okay.
20  A.  But nonetheless a surfactant.
21  Q.  Right.  And we'll look at that study a
22  little bit later, I think.  But am I correct that
23  after eight hours of that study, the
24  maximum amount absorbed was 2.6 percent?  You
25  don't -- you don't present that data in your

387

1  toxicological notes.  I'm just asking if you
2  recall that, sir.
3  A.  Well, it is in my table, yeah.
4  Q.  Okay.  And the TNO study that you
5  present here has 48-hour penetration, right?
6  A.  Yes.
7  Q.  48 hours of direct dosing in the -- in
8  the diffusion model that they used, right?
9  A.  Right.  2.6 percent low dose and
10  10.3 percent at high dose.
11  Q.  Okay.  So my question, sir, is, do
12  you -- are you going to tell the jury, when you're
13  presenting all the evidence, that Mr. Hall ever
14  had 48 hours direct exposure to glyphosate without
15  washing or anything else?
16  A.  No, but that -- that's -- that's
17  irrelevant.  The fact is that once it is in the --
18  as per -- I think it was Dr. Maibach said, as that
19  chemical reservoir develops over time in the skin
20  with repeated dose, as Mr. Hall experienced, day
21  after day, five days in a row repeated dose he's
22  developing a chemical reservoir within that skin
23  which will continue to absorb, as shown here in
24  Table 11 over a period of 48 hours.
25  Q.  Okay.  So where does Dr. Maibach say

388

1  that that's -- glyphosate in the skin is available
2  for dermal absorption?  He doesn't say that,
3  right?
4  A.  No.  He states that there's a chemical
5  reservoir that forms within the epidermis.
6  Q.  Who is Howard Maibach?
7  A.  I'm sorry?
8  Q.  Who is Howard Maibach?
9  A.  A toxicologist.
10  Q.  He's done a lot of skin absorption
11  studies over the years, right?
12  A.  Yeah.  He's an excerpt in percutaneous
13  absorption.
14  Q.  He's written hundreds of articles in
15  the peer-reviewed literature on percutaneous
16  absorption, right?
17  A.  Correct.  And I'm just stating what he
18  said.
19  Q.  And what he said in the Maibach study
20  you referred me to as well was that the bound
21  glyphosate is not available for absorption, right?
22  A.  Right, but I'm showing in Table 11 that
23  that's not true, that Monsanto's own data shows
24  that at 48 hours with a surfactant, we have
25  2.6 percent to 10.3 percent dermal absorption.

389

1  Q.  Howard Maibach has done hundreds more
2  dermal absorption studies than you have done,
3  right?
4  A.  Right, and I'm not relying on any study
5  I've performed.  I'm just stating what the facts
6  are in this case.
7  Q.  So you disagree with Howard Maibach's
8  conclusion about glyphosate as far as the
9  availability for dermal absorption in skin?
10  A.  Yeah.  That's proven correct based on
11  Table 11 in Monsanto's own data.
12  Q.  So the data in the Wester study in the
13  peer-reviewed literature does not suggest that
14  there's a significant reservoir of glyphosate in
15  the epidermis, right?
16  A.  Can you repeat that?
17  Q.  The data here does not suggest that
18  there's a significant reservoir of glyphosate in
19  the epidermis?
20  A.  In the Wester study?
21  Q.  Yes, sir.
22  A.  Correct.
23  Q.  Okay.  Now, if we go to Table 3, the IV
24  dose, what happens there is that the monkeys will
25  get a direct injection of glyphosate into their

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC    Document 8572-19    Filed 12/27/19    Page 102 of 125

CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2

31 (390 to 393)

Conducted on October 16, 2018

390

1  bloodstream -- bloodstream, right?
2      A.  Yes.
3      Q.  Okay.  And that's to -- is at least
4  designed to mimic a systemic dose, right?
5      A.  Yes.
6      Q.  Okay.  And glyphosate that is dermally
7  absorbed is also a systemic dose, right?  Goes to
8  all areas of the body?
9      A.  Yes.
10     Q.  Okay.  And one of the advantages of an
11 IV administration as opposed to a dermal
12 administration in a test design such as this
13 is that you have almost perfect recovery of the test
14 compound, right?
15     A.  Yes.
16     Q.  And what happened here when they
17 administered the IV dose is that nearly all of the
18 glyphosate was excreted in the urine, right?
19     A.  Right, with an IV dose, correct.
20     About 90 times as much glyphosate was
21 excreted in the urine as the feces, right?
22     A.  Yes.
23     Q.  Okay.  And they were able in the IV
24 dose to recover nearly all the administered
25 glyphosate, right?

392

1      A.  Variability between test animals.
2      Q.  And what's the ideal standard deviation
3  you'd be looking for in the IV study?
4      A.  10 percent.
5      Q.  Okay.  And that's what they had here,
6  right?
7      A.  Yes.
8      Q.  Okay.  And if you have a standard
9  deviation wider than 10 percent, that would raise
10 some concern about the reliability of the results,
11 right?
12     A.  Yes.
13     Q.  Okay.  And so the relatively tight
14 standard deviations here is another reason to
15 believe the design of the IV dosing study was
16 good, right?
17     A.  Yes.
18     Q.  Okay.  Now, if we go to the dermal
19 doses in Table 4 there are two arms here, right?
20     A.  Yes.
21     Q.  And the high-dose arm and the low-dose
22 arm, correct?
23     A.  Yeah.
24     Q.  Okay.  And what the study authors
25 stated in their conclusions about dermal

39

1      A.  Yes.
2      Q.  You don't have any problem with the
3  methodology that they used to design the tests
4  that they did in Table 3, right?
5      A.  I do.  The methodology is flawed in
6  that it assumes that dermal dosing would behave in
7  the same way.
8      Q.  Well, that's -- you have a problem with
9  the conclusion.  I'm asking about the methodology,
10 sir.  So do you have any problem with how they
11 designed the IV dosing study?
12     A.  No.
13     Q.  Okay.  And if we just had the IV dosing
14 study it would suggest that glyphosate is mainly
15 excreted via the urine, right?
16     A.  Yes.
17     Q.  Okay.  Now, one of the things that they
18 use here in the IV dosing is they have standard
19 deviations.
20     Do you see that?
21     A.  Yes.
22     Q.  And what is a standard deviation?
23     A.  The rate of error.
24     Q.  Okay.  And what is the cause of a
25 standard deviation in a study like this?

393

1  absorption based on their -- well, strike that.
2      You just disagree with the conclusion
3  the study authors drew about dermal absorption
4  based upon their reading of Table 4, right?
5      A.  Right.  The high dose shows minimal
6  feces accumulation versus urine, and the higher
7  dose, D, the lower dose is showing a greater
8  collection in the feces than the urine.
9      Q.  Okay.  And the standard deviations here
10 for the urine and the feces counts were about, in
11 some cases, nearly 80 percent, right?
12     A.  No.
13     Q.  Okay.  Do you see the feces count on
14 dose C?
15     A.  Yes.
16     Q.  Okay.  And the standard deviation there
17 is -- or the count there was .7 percent and the
18 standard deviation was .5 percent.
19     Do you see that?
20     A.  Yes.
21     Q.  Okay.  And that is approximately, I
22 guess, a 72 percent -- 71 percent standard
23 deviation, right?
24     A.  It's not how it's calculated.
25     Q.  Okay.  Are those larger standard

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 103 of 125
CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2     32 (394 to 397)
Conducted on October 16, 2018

394

1 deviations than the IV administration as a
2 percent?
3     A.   No.  Look at feces under the IV
4 administration, in Table 3 it's 1.3 plus or minus
5 .5.
6     Q.   Okay.  And so you have no concern about
7 the standard deviations here being .6, for
8 instance, for the urine in dose D with a .8 as the
9 average?
10     A.   That's giving a range in dose D in
11 urine of .2 to 1.4.
12     Q.   Okay.  And you don't have a concern
13 about that wide of a standard deviation there?
14     A.   Well, it has to be compared to the
15 feces, which is 3.6.  So that's a range of two to
16 5.2.  And so the -- when comparing the urine to
17 the feces, there's clearly a wide differential.
18 The difference between them is very -- very wide.
19     Q.   Okay.  Now, another thing that they did
20 was they measured the disposition in excretion of
21 glyphosate over a course of seven days, right?
22     A.   Yes.
23     Q.   Okay.  And if we go back to page 726 --
24 or excuse me.  Let's start at 727.
25         There's a diagram of how the monkeys

395

1 were positioned in the chairs when they applied
2 the dermal dose, right?
3     A.   Yes.
4     Q.   Okay.  And what they did is they put
5 the glyphosate formulation on a grid pattern on
6 their bellies, right?
7     A.   Yes.
8     Q.   And then they had a plate underneath
9 it, right?
10     A.   Yes.
11     Q.   Okay.  And then they left them in
12 chairs for 12 hours, right?
13     A.   Right.
14     Q.   And then after those 12 hours, they
15 washed them, correct?
16     A.   Yes.
17     Q.   And then after they washed them they
18 put them in what are known as metabolic cages,
19 right?
20     A.   Yes.
21     Q.   And they left them in there for the
22 remainder of the six and a half days, right?
23     A.   Yes.
24     Q.   Okay.  And first of all, is there --
25 when they wash the monkeys, they wash the grids,

396

1 correct?
2     A.   Yes.
3     Q.   Okay.  And there's such a thing in
4 toxicokinetics known as lateral diffusion, right?
5     A.   Yes.
6     Q.   And what happens in lateral diffusion
7 is that the compound on the grid, some portion of
8 it might run off the grid to other parts of the
9 belly, right?
10     A.   Not if the proper amount of material is
11 used.  In this case, I think it was 7 microliter
12 per centimeter squared.  It's not enough to run
13 off.  7 microliter is -- I've used in trace radio
14 labeling 1 microliter up to 10 microliter syringes
15 and that's a very tiny amount of material.  When
16 put on a pad, it's not going to run anywhere.
17     Q.   Okay.  So they didn't use 7 microliter.
18 You're thinking of the in vitro study.  They used
19 500 micrograms per 20 centimeters squared.  Do you
20 recall that?
21     A.   500 microgram.  That's a quantity.
22 It's not a volume of liquid.
23     Q.   So for the volume of liquid for this
24 study they used the 1/29 dilution.  That's here on
25 page 726.  And that's 40 microliters per

397

1 20 centimeters square.
2     A.   Right.  And that's a large area.  40
3 micro liters is basically two drops.  It's not
4 enough material that it's going to spread all over
5 the chest at the end of it.
6     Q.   So you've -- so you've been able to
7 exclude the possibility there was lateral
8 diffusion from the grids in the study?
9     A.   It would be reported if that happened.
10     Q.   Well --
11     A.   It would be reported as a deviation.
12     Q.   How would they have collected that if
13 they only did washing of the grids?
14     A.   They would have observed it when
15 they -- when they set up the experiment.
16     Q.   How could they observe it?  It's a
17 clear liquid, sir.  How could you observe that?
18     A.   Visible liquid rather than the material
19 being underneath the patch, the material would
20 have spread and diffused downward or whichever way
21 gravity is pointing, which it should be downward
22 in this case.  It would have been observed and
23 reported.
24     Q.   I guess I'm confused by the patch.  I
25 don't see any discussion that they used a patch

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 104 of 125
CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2          33 (398 to 401)
Conducted on October 16, 2018

398

1  here that they applied glyphosate to a patch and
2  then put it on the body?
3      **A.  No.  It's put on the body and then**
4  **covered.**
5      Q.  Where does it say it's occluded, sir?
6      **A.  These tests are always occluded.**
7  **They're not open for the animal to touch or --**
8      Q.  Where does it say in the design -- they
9  were in chairs where they were strapped down,
10 correct?
11     **A.  Right.**
12     Q.  So you wouldn't have a concern that the
13 animal would touch it.  So where does it say -- at
14 least in those 12 hours.  So where does it say
15 that they occluded it?
16     **A.  It may not have been occluded with the**
17 **strapping.  That's true.  But nonetheless, in**
18 **these types of studies the materials put on in a**
19 **small enough quantity per area that it just**
20 **doesn't run down onto the floor.**
21     Q.  Okay.  Now, are you going to testify to
22 the jury that washing glyphosate with water or
23 soap and water is a hundred percent effective?
24     **A.  Well, they used Ivory soap, which is**
25 **general.  It doesn't damage the skin.**

399

1      Q.  Different question, sir.  Are you going
2  to tell the jury that washing with Ivory soap and
3  water or water alone is a hundred percent
4  effective in getting glyphosate off the skin?
5      **A.  That is the standard methodology for**
6  **determining how much is unabsorbed versus how much**
7  **is bound in the skin versus how much measures**
8  **as absorbed in the animal.**
9      Q.  All right.  So let's turn to Table 6 on
10 page 730, and they have a discussion of skin
11 decontamination of glyphosate single site versus
12 skin grid application.
13         Do you see that?
14     **A.  Yes.**
15     Q.  Okay.  And what they did is they did
16 three washes of the glyphosate with soap and water
17 versus water alone, right?
18     **A.  Right.**
19     Q.  And did they recover a hundred percent
20 of the glyphosate doing that?
21     **A.  Well, no, because some of it is**
22 **absorbed.**
23     Q.  So you -- you believe that in the 12
24 hours the monkeys sat there, 30 -- or 28.3 percent
25 of glyphosate was absorbed in the grid animals?

400

1  That's your testimony?
2      **A.  Not systemically.**
3      Q.  Okay.
4      **A.  Some of it was bound in the reservoir**
5  **as a reservoir within the skin --**
6      Q.  Okay.
7      **A.  -- and unavailable during that short**
8  **period of time to be absorbed, but was absorbed as**
9  **time went on.**
10     Q.  Okay.  So if it's bound in the
11 reservoir in the skin, that means that if I wash
12 that reservoir at some point I might be able to
13 get some more out, right?
14     **A.  No.  This already shows that it washed,**
15 **for example, the soap and water in the first**
16 **column, 85 -- 85.1 percent of the applied dose**
17 **then 3.9 by third wash only .5 percent of the**
18 **wash, it's essentially gone.  You're not going to**
19 **wash any more off.**
20     Q.  Okay.  If there's glyphosate in the
21 reservoir in the monkeys' skin and then they're
22 put in metabolic cages for six and a half days, is
23 it potentially possible that the monkeys could
24 touch their skin where the glyphosate is in the
25 reservoir and put it in their mouth, the

40

1  glyphosate?
2      **A.  No, because 90 -- let's see.  85 to 3.9**
3  **to .5, it's essentially gone.  It's already been**
4  **washed off.**
5      Q.  Okay.  So you believe that there was no
6  glyphosate left on the monkeys' skin after the
7  washing?
8      **A.  Mathematically not enough to account**
9  **for what was found in the feces, of course not.**
10     Q.  Okay.
11     **A.  If you look at what was found in the**
12 **feces that's greater than .5 percent or --**
13     Q.  It's actually not, sir.  The feces is
14 actually, I believe, 3.6 percent?
15     **A.  Right.**
16     Q.  Which they were able to wash off about
17 80 percent here.  So my question is, how were you
18 able to rule out that the monkeys touched their
19 belly in the metabolic cages and put their hands
20 in their mouth?
21     **A.  Because the triple washing.  It was**
22 **down to .5 percent .6 percent .8 percent and**
23 **.5 percent.**
24     Q.  So you read that to state that there
25 was only .5 percent glyphosate left in the skin in

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 105 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
Conducted on October 16, 2018

34 (402 to 405)

402

1 the single site after three -- three washes?
2 That's how you read that rather than --
3    A.   Available to be washed off with soap.
4 And monkeys aren't scrubbing with soap.  If they
5 touch it, it's incidental touching.  It's not
6 scrubbing with soap.
7    Q.   Right.  That's my point, sir.  How can
8 you be sure that when the monkeys got out of the
9 chairs and into the metabolic cage they did not
10 touch their belly and transfer the glyphosate to
11 their mouth?
12    A.   They most likely did touch their
13 bellies but there's not enough left there to be of
14 any significance because it's already been washed
15 off with soap, with Ivory soap.
16    Q.   According to the grid --
17    A.   Three different washings.
18    Q.   According to the grid the total amount
19 washed off after three washes was 71.7 percent,
20 right?
21    A.   Yeah.  The rest is either combined,
22 absorbed systemically, or bound as a reservoir in
23 the skin.
24    Q.   Okay.  So the amount excreted after
25 seven days in dose D was 4.4 percent, right?

403

1 Strike that.
2    A.   Yes.  4.4, plus or minus 2.2.
3    Q.   Okay.
4    A.   No, wait a minute.  That may not be
5 right.  That's urine and feces.
6    Q.   Right.  That's what I was saying,
7 combined.
8    A.   Okay.
9    Q.   Okay.  And so 71.7 plus 4.4 only gets
10 us to about 75 percent, right?  76?
11    A.   Well, 77 plus .1 -- 77.1 and 4.4 --
12    Q.   Okay.
13    A.   -- is 81.5.
14    Q.   Okay.  And so there was enough
15 glyphosate left in the skin for the monkeys to
16 touch their bellies and put it in their mouth to
17 come up with the figures we've seen?
18    A.   Well, no.  They're not going to --
19 they're not eating their epidermis off their body.
20 It's bound in the epidermis, as per Dr. Maibach's
21 own words.  It's a reservoir within.  It's bound
22 within -- and Monsanto's argument is it's not
23 available for availability.
24    Q.   That's Dr. Maibach's argument, not
25 Monsanto.

404

1    A.   No, no, that's Monsanto's too.  I have
2 documented that, not available for
3 bioavailability, but yet out of the same mouth
4 comes, oh, it is available for the monkey to touch
5 and -- I mean, can't have it both ways.  If it's
6 bound in the reservoir and washed three times with
7 Ivory soap, there's nothing left for the monkey to
8 touch and put in the mouth.
9    Q.   Okay.  I understand, sir.  So let's
10 look at Table 5, and then we'll take a break.
11 Table 5, after 24 hours, sir, how much glyphosate
12 was in the blood in dose D after 24 hours?
13    A.   (Reviewing document.)
14       For dose D?
15    Q.   Yes, sir.
16    A.   .0006 --
17    Q.   Okay.
18    A.   -- microgram equivalents per milliliter
19 of carbon 14 glyphosate.
20    Q.   Okay.  And so after 24 hours of
21 exposure, approximately .0001 percent of the
22 glyphosate absorbed -- or the glyphosate applied
23 to the monkeys' bellies was detected in the blood,
24 correct?
25    A.   No.  That's not a percentage.  That's a

405

1 measurement in microgram equivalents per
2 milliliter.
3    Q.   Right.  But if I'm correct, sir, there
4 was 500 micrograms applied to the monkeys'
5 bellies, right?  Table 4.
6    A.   Well, dose D was 500 microgram per
7 20 centimeters squared.
8    Q.   Right.  So 500 micrograms total, right?
9    A.   Well, I don't know if that unit is in
10 microgram equivalents per mL of C14.
11    Q.   That's what it says -- that's what it
12 says at the top of Table 5, right?
13    A.   Yeah, but that's not what it says in
14 method.  Looks like there were two doses of C14
15 glyphosate with a tenfold difference in amount.
16 Dose C at 5,400 microgram and 200 centimeter
17 per -- 200 centimeter square and dose D at 500
18 microgram -- see those are units of glyphosate,
19 not necessarily the glyphosate C14 microgram
20 equivalent per mL.
21    Q.   That's a good -- that's a good point.
22 This was a 1/29 solution, right?
23    A.   Yes.
24    Q.   So in this 1/29 solution there would be
25 approximately 20 micrograms of glyphosate, right?

Transcript of William Sawyer, Ph.D., Volume 2

35 (406 to 409)

Conducted on October 16, 2018

406

1    A.   Let's see.  500 divided by -- I'd have
2  to calculate that to be exact.
3    Q.   Okay.  Well, 1/10 would be 50?
4    A.   Right.
5    Q.   1/20 would be 25 so 1/30 would be
6  approximately 17, and this is a little more than
7  that.  So how about 18 micrograms?  Can you agree
8  with that?
9    A.   I think that's approximate, yeah.
10   Q.   Okay.  So in this 1/29 solution there's
11 18 micrograms of glyphosate.  And after 24 hours
12 they detected approximately a little bit less than
13 .001 percent of that glyphosate in the blood,
14 right?
15   A.   I don't see how that's derived because
16 Table 5 is giving per mL.  We don't know how many
17 mL of blood are in the animal.
18   Q.   Let me ask you this:  Is the
19 .0006 micrograms per mL near background levels?
20 Because that's what the authors report, that the
21 amount in the blood after topical administration
22 was near background level.
23       Do you agree with that?
24   A.   I'm not finding that.
25   Q.   Go to page 729.  It states, "Table 5

407

1  gives the glyphosate C14 equivalence blood
2  concentrations following the two IV and two
3  topically administered doses.  C14 blood levels
4  were detectable after IV administration but were
5  near or at background level following topical
6  administration."
7       Do you see that, sir?
8    A.   Okay.
9    Q.   Do you agree with that statement?
10   A.   Yeah, I see no reason to disagree,
11 although it doesn't change my opinion because
12 that's systemic blood circulation and what we have
13 is during that first 12 hours is fecal elimination
14 through the liver.  So the blood has essentially
15 been cleared.  And then there is a steady state of
16 a small amount of absorption from the materials
17 deposited in the skin over longer period of time.
18   Q.   How have you been able to rule out --
19 well, strike that.
20       It's your opinion that the
21 biomonitoring studies on glyphosate should be
22 accounting for fecal exposure, right?
23   A.   Absolutely.
24   Q.   Okay.  And the fecal exposure listed in
25 this article indicate a -- four times as much in

408

1  dose D excreted via the feces as the urine, right?
2    A.   Yeah, and I can prove that very simply.
3  This whole idea of hand to abdomen to mouth and
4  then assuming that would be a fecal elimination
5  makes no sense.  Whether it is taken in orally or
6  through the skin, it's still going to pass through
7  the liver and be metabolized.
8    Q.   Well, we know from the NTP studies and
9  some other studies that orally absorbed glyphosate
10 is excreted mainly via the feces with some urinal
11 excretion as well, right?
12   A.   Right.  And that's -- that's very
13 important, and that's proof of what I'm trying to
14 explain, that when one injects an IV bolus and
15 gives a full day's worth of absorption in a few
16 seconds in an IV bolus, the liver cannot process
17 it at that rate.  The liver enzyme becomes
18 saturated, and we see spillover into the urine.
19   Q.   What study shows that the liver enzyme
20 becomes saturated from glyphosate exposure?
21   A.   The Maibach study.
22   Q.   The Maibach study.  Where does the
23 Maibach study measure enzymes, sir?
24   A.   They didn't measure enzymes.
25   Q.   Okay.

409

1    A.   But it shows that the fecal route is
2  predominant in -- in dose D, two animals in dose
3  D.
4    Q.   So that's the Wester study you're
5  talking about, not the Maibach study.
6    A.   Well, I think the Maibach study
7  actually did too.
8    Q.   The Maibach study didn't measure feces,
9  correct?
10   A.   Let me see.  Okay.  No.  I'm speaking
11 of the Wester study.
12   Q.   Okay.
13   A.   That the urine becomes a more
14 significant route -- or I mean feces becomes
15 more significant route when dermally applied
16 versus IV bolus.
17   Q.   Okay.  So my question is, where did
18 they measure the saturation of the liver enzymes
19 in the Wester study, sir?
20   A.   The liver enzymes weren't measured.
21   Q.   Okay.  And so where have you seen any
22 study in the peer-reviewed literature or elsewhere
23 that shows that liver enzymes become saturated
24 from glyphosate exposure, specifically the
25 mechanism and not the results of this Wester

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 107 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
Conducted on October 16, 2018
36 (410 to 413)

**40**

1 study?

2     **A. General dermal absorption studies**

3 **published in the literature where IV boluses have**

4 **been used versus dermal, slow, steady-state dermal**

5 **absorption that at the higher level drug level as**

6 **in dose D, the -- you know, the likelihood of --**

7 **when intravenous solution of a high dose of drug**

8 **is used, the likelihood of liver enzyme saturation**

9 **increases, and that's been shown in many studies**

10 **for different drugs.**

11     Q. Which study on glyphosate, sir?

12     **A. Liver enzyme studies were not conducted**

13 **by Monsanto on glyphosate.**

14     Q. Has it been conducted in the

15 peer-reviewed literature by anybody?

16     **A. No.**

17     Q. Okay. And my other question is,

18 glyphosate is hydrophilic, right?

19     **A. Yes.**

20     Q. And hydrophilic compounds are expected

21 not to be readily absorbed by the skin, right?

22     **A. Yes. I've already explained that.**

23     Q. Okay. And hydrophilic compounds are

24 expected to be excreted via the kidney, right, and

25 the urine?

**41**

1     **A. Not necessarily. Alcohol is extremely**

2 **hydrophilic, more so than glyphosate, and alcohol**

3 **is metabolized in the liver, as we all know by**

4 **alcohol dehydrogenase.**

5     Q. The glyphosate's not metabolized,

6 right? Or is very little metabolism to AMPA?

7     **A. Glyphosate is metabolized on a dermally**

8 **applied dose.**

9     Q. What is it metabolized to, sir?

10     **A. I believe a hydroxyamino**

11 **organophosphate. I think I have the -- that in my**

12 **report, the metabolic study.**

13     Q. Studies by -- studies by NTP and others

14 have found that glyphosate is metabolized

15 approximately 1 percent to a compound called AMPA,

16 correct?

17     **A. Yeah the AMPA. But the thing is that**

18 **that is, as I recall, based upon intravenously**

19 **administered glyphosate.**

20     Q. Okay. What study is out there that

21 shows that glyphosate is metabolized in a greater

22 amount to AMPA via dermal absorption?

23     MR. SELDOMRIDGE: Counsel, after this

24 question, do you want to break for lunch?

25     MR. KALAS: I don't want to commit

**42**

1 until I hear the answer. I might have one

2 follow-up.

3     MR. SELDOMRIDGE: I understand.

4     MR. KALAS: But yeah.

5     **A. (Reviewing document.)**

6     **At a higher fecal recovery in the**

7 **Wester study.**

8     BY MR. KALAS:

9     Q. And IARC has said glyphosate is not

10 readily metabolized, correct?

11     **A. Upon IV push, that's correct.**

12     Q. That -- do you recall that they did not

13 limit their opinion to IV push? They just said

14 generally glyphosate is not readily metabolized?

15     **A. That's how the studies have been run,**

16 **yeah.**

17     Q. Okay. And the EPA said glyphosate is

18 not readily metabolized, right? Strike that.

19     Can you point me to a metabolite of

20 dermal absorption of glyphosate that has been

21 recorded at a level of higher than 1 percent

22 anywhere?

23     **A. No, but based on the Wester study and**

24 **even Monsanto's own internal document from**

25 **Christophe Gustin who stated, "This approach by**

**43**

1 **Spain sets a precedent and contradicts the fact we**

2 **always claimed to fully understand the glyphosate**

3 **pharmacokinetics. This is dealing with Monsanto's**

4 **discovering that in fact at one point it was**

5 **discovered as a possible new metabolite.**

6     Q. Last question, sir. Did the statement

7 that you read from Christophe Gustin just there

8 discuss the metabolite about the pharmacokinetics?

9 Was there any discussion of metabolite in that

10 statement?

11     **A. No.**

12     MR. KALAS: Okay. Let's break for

13 lunch.

14     THE VIDEOGRAPHER: The time is 12:43.

15 We are off the record.

16     (Luncheon recess from 12:43 p.m. to

17 1:47 p.m.)

18     THE VIDEOGRAPHER: The time is 1:47.

19 We are on the record.

20     (Exhibit Number 29, Revised Glyphosate

21 issue Paper, Evaluation of Carcinogenic Potential,

22 EPA's Office of Pesticide Programs, December 12,

23 2017, DP Barcode D444689, was marked for

24 identification.)

25     ///

Transcript of William Sawyer, Ph.D., Volume 2          37 (414 to 417)
Conducted on October 16, 2018

4 4

1          BY MR. KALAS:
2     Q.   Dr. Sawyer, I marked as Exhibit 29 a
3  document called revised glyphosate issue paper
4  evaluation of carcinogenic potential. You've seen
5  this before, right?
6     A.   Yes.
7     Q.   Okay. Now, last time we got together
8  in August, I asked you if you had gone and made
9  sure you had all the studies that Monsanto
10 submitted to EPA in support of its registration of
11 glyphosate.
12         Do you remember me asking you about
13 that?
14    A.   Vaguely.
15    Q.   Okay. Since we got together in August,
16 have you gone back to make sure you have all of
17 the studies Monsanto submitted to EPA for its
18 registration of glyphosate?
19    A.   No.
20    Q.   Okay. So, for instance, when we talked
21 about the Myhr study on surfactants, you haven't
22 gone back to see if you actually had the Myhr
23 study on surfactants, right? M-Y-H-R.
24    A.   No, I do not.
25    Q.   Okay. And how about the Mecchi study,

4 6

1     Q.   And these are all AMES tests that were
2  submitted on glyphosate, right?
3     A.   Yes.
4     Q.   Okay. And this carries through to 105.
5  And did you go through this to make sure you had
6  all of the AMES tests submitted on glyphosate?
7     A.   No. I don't feel I need to review all
8  of the AMES studies. That's a basic bio screen
9  technique and they're already summarized by EPA.
10 I didn't have any special interest to obtain all
11 the original studies on those.
12    Q.   Okay. So you agree with EPA's
13 conclusion that glyphosate was negative in the
14 presence and absence of metabolic activation in
15 the AMES test?
16    A.   Yes.
17    Q.   Okay. If we go, then, to page 107, did
18 you look to see if you had all of the studies
19 cited here in Table 5.2 for in vitro mammalian
20 gene mutation assays for glyphosate?
21    A.   No. I'm already familiar with the
22 study evidence on this in terms of the in vitro
23 analyses.
24    Q.   So you didn't need to look at the
25 Jensen study to reach your conclusion about

4 5

1  M-E-C-C-H-I? Did you go back and see if you have
2  that study?
3     A.   I do not.
4     Q.   How about the Lawlor study,
5  L-A-W-L-O-R? Did you check to see if you have
6  that study?
7     A.   I do not have it.
8     Q.   Okay. When you reviewed this document,
9  Exhibit 29, did you look at it to see if EPA had
10 some studies that you had not been sent by the
11 Miller Firm?
12    A.   Yes, as majority of the studies I have,
13 I've researched myself. I didn't rely on the
14 Miller Firm to provide me the scientific studies.
15    Q.   Well, how about the studies that were
16 submitted by Monsanto to EPA on glyphosate? A lot
17 of those are not in the peer-reviewed literature.
18 Did you look at this document to see what the
19 Miller Firm might have as far as those go?
20    A.   No. I'm not sure how I'd even be able
21 to determine that.
22    Q.   If you could turn to page 101, sir.
23 And this is Table 5.1.
24         Do you see that?
25    A.   Yes.

4 7

1  in vitro mammalian gene mutation assays?
2     A.   No.
3     Q.   You didn't need to look at the Li study
4  to reach your conclusion? L-I.
5     A.   I don't see that on here.
6     Q.   It's the third row, sir.
7     A.   Oh, yeah. There it is. No. My
8  understanding is that the gene mutation studies
9  in vitro are largely negative.
10    Q.   Okay. So you agree with EPA that the
11 gene mutation studies for glyphosate are negative?
12    A.   On a screening basis using this
13 technique, yes.
14    Q.   Okay. How about Table 5.3 on page 111
15 through -- it's just 111 is 5.3. Did you go and
16 look to see if you had all the in vitro tests for
17 chromosome aberrations in mammalian cells?
18    A.   No. I reviewed this document
19 previously and relied on the summation of these
20 results that the results are largely negative.
21    Q.   Okay. So you agree with EPA that
22 glyphosate is negative in the in vitro chromosomal
23 aberration test for mammalian cells?
24    A.   Can you repeat that?
25    Q.   You agree with EPA that glyphosate is

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 109 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
Conducted on October 16, 2018

38 (418 to 421)

4 8

1 negative in the in vitro chromosomal aberration
2 test for mammalian cells?
3    A.  I would say largely, yes.
4    Q.  Turn to page 112 and carrying through
5 113, did you go to Table 5.4 to see if you had all
6 of the in vitro tests for micronuclei induction in
7 mammalian cells?
8    A.  No.  Again, I just relied on the EPA
9 summation of these studies.
10    Q.  Let me ask you this:  As far as
11 genotoxicity tests go as a whole, did you rely on
12 EPA's evaluation of those tests rather than
13 looking at the individual tests yourself?
14    A.  With respect to the in vitro tests,
15 yes.
16    Q.  So --
17    A.  Not with respect to the in vivo or
18 human evidence.
19    Q.  Okay.  So let's go to Table 5.5, then,
20 which is 117.  This is in vivo tests -- vivo --
21 for chromosomal aberrations in mammals with
22 glyphosate.  Did you look at this table to see if
23 you had all of these tests?
24    A.  No, but I understand that really the
25 vast majority of the in vivo animal tests, rodent

4 9

1 tests, are negative.
2    Q.  Okay.  So you agree with EPA that
3 glyphosate is negative in an in vivo chromosomal
4 aberration design for -- for genotoxicity?
5    A.  Largely.  Not -- not across the board.
6 There are some marginal and positive tests.
7    Q.  Using your weight of the evidence
8 evaluation are you going to tell the jury that
9 glyphosate causes chromosomal aberrations in an in
10 vivo model in mammals?
11    A.  No.  In humans, yes.  In animals, it's
12 equivocal.
13    Q.  So EPA in Table 5.5, if you look at
14 that, and the results of the in vivo chromosomal
15 aberration test report negative, negative,
16 negative, negative, negative for those tests,
17 correct?
18    A.  Yes, but I have a newer study I think
19 that's positive.
20    Q.  Which study is that?  Wozniak, sir?
21    A.  I'm sorry?
22    Q.  Is that study Wozniak?
23    A.  I think so.  I have to look.
24    Q.  Okay.  So let's assume it is Wozniak.
25    A.  Okay.

420

1    Q.  You have one positive study and five
2 negative studies, right?
3    A.  Right, and as you know, four negative
4 x-rays of a fracture and one positive x-ray that
5 caught the fracture means there's a fracture.
6    Q.  Okay.  Motion --
7    A.  Just because four out of five are
8 negative doesn't absolutely confirm negative.
9        MR. KALAS:  All right.  Motion to
10 strike everything after "right."
11        BY MR. KALAS:
12    Q.  My question was just simple arithmetic.
13 You have five negative studies and one you recall
14 that is positive for in vivo chromosomal
15 aberrations, correct?
16    A.  I didn't understand the question.
17    Q.  Just a matter of simple arithmetic.
18 You have five negative studies for chromosomal
19 aberrations in an in vivo model, and one that you
20 recall as positive in mammals, right?
21    A.  Yes.
22        MR. SELDOMRIDGE:  Objection.  That's
23 not arithmetic.
24        BY MR. KALAS:
25    Q.  You're not going to tell the jury that

42

1 you disagree with EPA's conclusion that the in
2 vivo mammalian bone marrow chromosomal assays
3 conducted with glyphosate technical for regulatory
4 purposes were all negative, right?
5    A.  Correct.
6    Q.  Okay.  Turning to page 118 through 121,
7 did you look at the in vivo tests for micronuclei
8 induction listed here in Table 5.6 to see if you
9 had all of these tests when reaching your
10 opinions?
11    A.  No.  I used the summary from EPA at
12 face value.
13    Q.  Okay.  So you agree with EPA that
14 glyphosate technical administered via the oral
15 route in nine micronuclei assays, that eight of
16 those nine were negative for micronuclei
17 induction, right?
18    A.  Yes.
19    Q.  And you don't disagree with EPA's
20 conclusion, based on their weight of evidence
21 evaluation, that the genotoxicity tests for
22 glyphosate were negative, correct?
23    A.  The majority of the assays were
24 negative, is what I would conclude.
25    Q.  Okay.  So then if we go to pages 203

Transcript of William Sawyer, Ph.D., Volume 2

39 (422 to 425)

Conducted on October 16, 2018

422

1 through 215, EPA also reported on genotoxicity
2 assays on formulated products.
3      Do you recall reviewing that?
4      A. I do.
5      Q. Okay. And have you reviewed all of the
6 AMES tests discussed by EPA from pages 203 to 208?
7      A. No.
8      Q. Okay. And you're going to defer to
9 EPA, then, on their description of the results in
10 those tests as negative, right?
11     A. Yeah. I think that's true for these
12 in vitro AMES tests.
13     Q. Okay. And then for the rest of these
14 tests, F.2, F.3, F.4, F.5, carrying through to
15 215, did you review all of the tests submitted to
16 EPA by Monsanto for genotoxic damage using
17 formulated products that are discussed here?
18     A. I've reviewed the summary. That's all.
19     Q. Okay.
20     A. And, again, my opinion is that the
21 studies were largely negative but not completely.
22     Q. Okay. So you agree, then, with EPA and
23 with the EPA SAP on glyphosate that both
24 glyphosate and formulated glyphosate-based
25 herbicides are negative for genotoxicity based on

423

1 the studies they've reviewed?
2      A. Largely negative.
3      Q. Okay. Now, if we can go back to your
4 toxicological notes, sir, you used something
5 called the POEM model to calculate a dose for
6 Mr. Hall, right?
7      A. Yes.
8      Q. Okay. And the dose you calculated is
9 described, I believe, on page 17 of your
10 toxicological notes, right?
11     A. Starting on page 16.
12     Q. Okay. And you state, "Mr. Hall" -- on
13 page 16, "Mr. Hall reasonably qualifies as an
14 exposed glyphosate spray operator using a
15 hydraulic nozzle (Table 7 below) with additional
16 acute soaking exposures. His dosage can be" --
17 "also be approximated from Tables 6 and 7;
18 however, Mr. Hall's high level acute exposures are
19 not accounted for in these tables," right?
20     A. Yes.
21     Q. Okay. And so when you go to 6 and 7,
22 and specifically 7, you've highlighted Table 7, no
23 gloves, handheld outdoor hydraulic nozzles, right?
24     A. Yes.
25     Q. And that -- that is what you are going

424

1 to tell the jury is Mr. Hall's occupational dose
2 to glyphosate, right?
3      A. I may break it down further by going
4 to -- start with MONGLY06403311 as Annex 2 of the
5 2A exposure results for handheld equipment
6 hydraulic nozzle, as prepared in the operator
7 exposure risk assessment for MON 78273 under UK
8 use conditions.
9      Q. Well, let me make sure I understand
10 what you're going to -- well, let me ask this.
11 Let me ask a foundational question. Are you going
12 to present to the jury a presumed occupational
13 dose for Mr. Hall?
14     A. Yes.
15     Q. Okay. And are you going to present the
16 4.689 number discussed here on page 17, 4.689 mg
17 per kg per day, or are you going to present the
18 1.445 mg per kg per day number that's on
19 MONGLY06403311 and is also repeated in Table 7 in
20 the top right-hand column?
21     A. Well, I'm going to factor the 1.445 and
22 the 4.689 milligram per kilogram per day values
23 based upon his body weight, which was obviously
24 higher than 60 kilograms. And I'm going to
25 explain that his dose was certainly at least 1.445

425

1 based on 3 percent dermal absorption, but more
2 likely higher, possibly as high as 4.689 to
3 10 percent dermal absorption and also going to
4 provide the actual raw data where this comes from
5 in Annex 2 from the document I just referenced at
6 64 -- 06403311 document for the legs, trunk,
7 hands, hundred percent penetration of glove value,
8 etc.
9      Q. Okay. So let's break that down. So if
10 I understand you correctly, you're going to
11 present both values to the jury, the 1.445 and the
12 4.689, right?
13     A. Yes. If I may explain it, at least the
14 1.455 no less, but possibly as high as 10 percent
15 based upon the studies I've referenced in my notes
16 demonstrating increased dermal absorption through
17 dermal uptake versus IV bolus analyses in
18 primates.
19     Q. Okay. And the dermal uptake analysis,
20 that actually does not measure 10 percent
21 glyphosate recovered in any of those studies,
22 right? The highest it goes is 4.4 percent?
23     A. Up to 22 percent if you follow the
24 rules.
25     Q. Okay.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC  Document 8572-19  Filed 12/27/19  Page 111 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
40 (426 to 429)
Conducted on October 16, 2018

426

1    A.   Apparently Monsanto can't follow rules,
2  even though they are designated by international
3  cooperative agency that the unaccounted-for
4  portion remaining in the tissue has to be
5  considered part of the absorption.
6    Q.   You admit that there are scientists not
7  affiliated with Monsanto in the Nielsen 2007
8  study, in the Maibach study, in the Wester study,
9  who have all opined that the amount not absorbed
10 that remains in the epidermis is not available for
11 absorption?
12   A.   I guess they would be struck under
13 Daubert for not following methodology.
14   Q.   Those --
15   A.   The methodology is clear and
16 unequivocal.
17   Q.   Those are peer-reviewed studies that
18 they stated that in, correct?
19   A.   Yes, but the methodology for
20 calculating dermal absorption is clear.
21   Q.   Okay.  And you have never done a
22 percutaneous dermal absorption study yourself,
23 right?
24   A.   No.  I have been trained in it, but I
25 have not conducted it myself.

427

1    Q.   And Dr. Maibach has done hundreds,
2  right?
3    A.   That's right.
4    Q.   Dr. Nielsen has done dozens, right?
5    A.   I can't speak on that, but probably.
6    Q.   Dr. Wester has done dozens, right?
7    A.   Yes.
8    Q.   Now, you believe that the 3 percent
9  number represented here in Table 7 is what you
10 would describe as the dose that Mr. Hall -- at
11 least it was your floor for his dose, right?
12   A.   That's correct, yeah.
13   Q.   Okay.
14   A.   As I stated on page 16, there was mouth
15 exposure.  He had numerous O-ring blowouts of his
16 sill cylindrical pump, which he was sprayed with.
17 The conditions of his exposures were certainly
18 more severe than that held in the spray operator
19 exposure studies.
20   Q.   Okay.  Now, you haven't quantified any
21 of those other exposures, right?
22   A.   No, no.
23   Q.   Okay.
24   A.   That's true.  And that's why I'm
25 stating just that the 3 percent value dermal

428

1  absorption is a floor number.
2    Q.   Okay.  And so -- then you stated, I
3  believe, that you wouldn't use the 60-kilogram
4  weight.  You would use Mr. Hall's weight which is
5  ████████████     right?
6    A.   Yes.
7    Q.   And that would take this down to
8  approximately .75 mg per kg per day, right?
9    A.   Yes.
10   Q.   Now, you've argued that gloves provide
11 no protection for glyphosate absorption, right?
12        MR. SELDOMRIDGE:  Objection.
13 Misstates.
14   A.   No, I didn't argue anything.  I have
15 here with me a pair of jersey gloves.  When these
16 become wet, they offer zero protection.  In fact
17 they make matters worse because it keeps the hand
18 in contact with wet glyphosate throughout the
19 entire workday.
20        BY MR. KALAS:
21   Q.   Have you gone back and looked at the
22 Wester '96 study since we discussed it in August?
23   A.   We -- yeah, today.  I looked at it
24 today and I looked at it yesterday as well and
25 about ten days prior to that.  Yes.

429

1    Q.   Okay.  So you have looked at that study
2  now?
3    A.   Yes.
4    Q.   Okay.  And what the authors in Wester
5  '96 found was that when they put cotton between
6  their -- their receptor fluid and the glyphosate
7  that was administered, only about half of the
8  glyphosate that was administered to the cotton
9  actually got through, right?
10   A.   Yes.
11   Q.   Okay.  And so the gloves or -- those
12 are cotton gloves, those jersey gloves, right?
13   A.   Yes.
14   Q.   And so the cotton in the Wester '96
15 study provided about 50 percent protection from
16 glyphosate absorption, right?
17   A.   In that experimental design.  However,
18 that's not real world wearing a wet glove.  The
19 hand is wet with glyphosate.
20   Q.   Okay.  Now, sir, another thing they
21 looked at in the Wester '96 study and in the
22 Nielsen 2009 study is something called flux,
23 right?
24   A.   Yes.
25   Q.   What is flux?

Transcript of William Sawyer, Ph.D., Volume 2

41 (430 to 433)

Conducted on October 16, 2018

---

430

1    A.   Flux is the rate at which it's
2 absorbed, not the percent of absorption, but
3 microgram per kilogram per hour.
4    Q.   And is flux a standard way to look at
5 dermal absorption in dermal absorption studies?
6    A.   Only for the rate, not for the actual
7 percent.
8    Q.   Right. But the percent represents
9 snapshot at the end of the study, right?
10    A.   Yes. And that's significant for
11 calculating dose.
12    Q.   Right. And so if somebody -- if we
13 have a study that looks at 48 hours of absorption
14 of a substance but we know somebody was only
15 exposed to that substance for eight hours, we
16 might want to look at the flux to calculate a
17 dose, right?
18    A.   No, not in a case where a person is
19 exposed five days in a row.
20    Q.   Well, sir, you agree that you can't
21 cite to me another author or another scientist
22 that you're aware of that claims that the
23 glyphosate that is retained in the epidermis is
24 available for absorption, right?
25    A.   Nor can I show you a study that shows

---

43

1 it isn't. But the methodology requires that to be
2 counted as absorbed.
3    Q.   I didn't ask about a study. I asked
4 about another scientist that agreed with you. Can
5 you name another scientist that agrees with you
6 that the glyphosate retained in the epidermis is
7 available for absorption?
8    A.   I have not investigated that. I rely
9 upon generally accepted peer-reviewed studies and,
10 more importantly, methodology that is -- that
11 dictates how such calculations are made, not
12 rather sitting in a bar somewhere talking to
13 another toxicologist.
14    Q.   Are you stating here that Dr. Maibach
15 does not follow OECD guidelines in evaluating
16 dermal absorption studies? Strike that.
17       Question's withdrawn.
18       Did you also look at the data put out
19 by the German regulators that suggested cotton is
20 85 percent protective of pesticide absorption?
21 That's the BAUA.
22    A.   No. There have been no studies of a
23 human wearing a wet glove. These are experimental
24 in vitro analyses performed in the laboratory that
25 are not realistic of a person wearing a wet,

---

432

1 soaked cotton glove.
2    Q.   I'm not sure if you answered the
3 question. Maybe you did. Have you reviewed that
4 BAUA document, to your knowledge?
5    A.   I'm not sure I have the German document
6 filed. I'm not sure.
7    Q.   Okay. And you don't -- and you can't
8 recall, sitting here today, whether they actually
9 did look at humans in either passive dosimetry or
10 biomonitoring for absorption through cotton
11 gloves?
12    A.   Not wet cotton gloves, no. That has
13 not been done.
14    Q.   How do you know, if you can't recall if
15 you've seen it?
16    A.   Because I reviewed the literature and
17 I've not come across any study ever performed with
18 a human wearing a wet glyphosate-soaked glove.
19    Q.   Well, sir, we've -- you testified
20 earlier that you reviewed the literature on
21 cigarette smoking too, right?
22    A.   Yes, I have, and I've kept up on it for
23 many years as well.
24    Q.   And we saw three studies today that you
25 hadn't found, right?

---

433

1    A.   That's correct.
2    Q.   Okay. So it's possible you may have
3 missed something as well in the literature on the
4 protective factors of gloves, right?
5    A.   As you know, I've referenced the
6 Drexler study on skin protection as well as the
7 Oregon OSHA and the Drexler abstract. Well, it's
8 the same study, actually.
9    Q.   Okay. My --
10    A.   With respect to gloves and even skin
11 creams and other agents used to protect the skin,
12 and cotton gloves and even OSHA does not recognize
13 a jersey glove to be protective whatsoever against
14 liquids.
15    Q.   Sir --
16    A.   It's a completely permeable glove. The
17 skin is still as wet as it would be with or
18 without the glove. It makes no difference. So
19 this is all nonsense.
20       MR. KALAS: Motion to strike as
21 nonresponsive.
22       BY MR. KALAS:
23    Q.   Sir, my question is whether or not it's
24 possible you might have missed something in the
25 literature on the protective factors of gloves.

---

Transcript of William Sawyer, Ph.D., Volume 2          42 (434 to 437)
Conducted on October 16, 2018

434

1    A.   Anything's possible.
2    Q.   Okay.  Now, did you review the Lavy
3 study, L-A-V-Y?
4    A.   What is the title?
5    Q.   "Conifer Seedling Nursery Worker
6 Exposure to Glyphosate."
7    A.   No.
8    Q.   And did you -- so you didn't see in
9 that study where in passive dosimetry they found
10 that cotton clothing provided a 23 percent
11 protective factor?
12       MR. SELDOMRIDGE:  Objections.  Asked
13 and answered.
14       MR. KALAS:  I didn't ask about Lavy.
15       MR. SELDOMRIDGE:  He just stated he
16 didn't review it.
17    A.   I relied, in my assessment 25 percent
18 exposure factor -- no.  That was distribution.
19 I'm sorry.  Let's see.
20       Well, the Annex 2 of the study I relied
21 upon uses 25 percent for the clothing and
22 50 percent for -- that's for the trunk and
23 50 percent for legs.
24       BY MR. KALAS:
25    Q.   That's the distribution, sir, correct?

435

1 The penetration is 100 percent for hands in your
2 model, correct?
3    A.   For hands, yes.
4    Q.   Okay.
5    A.   And --
6    Q.   So my question -- my question was about
7 Lavy and whether or not you were aware that they
8 found a 23 percent protective factor for clothing.
9    A.   For clothing?
10    Q.   Yes, sir, for cotton clothing.
11       MR. SELDOMRIDGE:  Same objection.
12    A.   That could be, but I -- I relied on the
13 Monsanto Annex 2 data.
14       BY MR. KALAS:
15    Q.   Well, let me ask you this:  Do you
16 believe passive dosimetry studies offer
17 information about real world exposure to
18 pesticides?
19    A.   Yeah.  That's why I used the Annex 2
20 study.  This was done using patches on the body
21 under realistic test conditions, and it tells us
22 exactly what the values are.
23    Q.   That's not true, is it, sir?  The model
24 actually is based on passive dosimetry, but the
25 authors of the POEM study did not actually use

436

1 passive dosimetry to monitor their workers, right?
2 They modeled it using this.
3    A.   No, they actually used patches on
4 the -- absorbent patches on the body and tested
5 them.
6    Q.   Where is that in this, sir?  Where is
7 that in this document where they say they were
8 using a patch?  Because if you look at 6403286,
9 they say, "The calculation of the absorbed dose is
10 performed in three steps.  First, the total amount
11 of active ingredient deposited onto clothes and
12 uncovered skin is determined using surrogate
13 exposure levels, potential exposure."
14       Do you see that?
15       MR. SELDOMRIDGE:  What page are you on,
16 Counsel?
17       MR. KALAS:  286, sir.
18    A.   Well, surrogate exposure level is
19 referring to the analyte that they tested, not on
20 the patch.  In other words, instead of using
21 glyphosate they could have used a harmless
22 chemical that was then tested at the laboratory
23 but of the same viscosity that would have the same
24 spray characteristics.
25       ///

437

1       BY MR. KALAS:
2    Q.   But then if you go to Tier 3, sir,
3 which is on page 3293, that is when they actually
4 report incorporating data from passive dosimetry
5 on glyphosate users, right?
6    A.   I don't understand the question.
7    Q.   Tier 1 and Tier 2 does not use data --
8 Tier 1 and Tier 2 of the POEM model that's used in
9 this document does not use data on actual
10 glyphosate exposures, right?
11    A.   No.  It uses a surrogate chemical.
12    Q.   Right.  Tier 3 actually uses data from
13 glyphosate exposures, right?
14    A.   Three -- 360 gram glyphosate acid per
15 liter.  Yes.
16    Q.   Okay.  And if you go to page 3315 to
17 3316 -- well, strike -- strike that.
18       They don't present tier three data in
19 this -- in this study for -- in the tables that
20 you pointed me to in the back, right?
21    A.   No.
22    Q.   Okay.  And, in fact, the only data they
23 present on Tier 3 has to do with data on
24 applicators who were using gloves, right?
25    A.   Yes, but I don't understand the point

Transcript of William Sawyer, Ph.D., Volume 2

43 (438 to 441)

Conducted on October 16, 2018

438

1  of this. The data I relied upon is using actual
2  spray and measurements of that spray on the body.
3  Now, whether it's glyphosate or a similar chemical
4  of molecular weight and velocity doesn't matter.
5      Q.  Well, how you apply might be different
6  depending on the chemical, right?  If you have a
7  different application goal, you might apply it
8  differently, correct?
9      A.  Yeah.  That's why I used the handheld
10  hydraulic nozzle sprayer.
11     Q.  You --
12     A.  That is what is used in the Hall
13  matter.  It wasn't a tractor or sprayer -- it
14  wasn't aerial spray.  It was a handheld hydraulic
15  nozzle and these are real values that were
16  measured using a surrogate patch analyzed by a
17  laboratory so they're -- these are accurate
18  results.  Now, maybe they're not the most
19  favorable for your client, but that's not my
20  concern.  I'm looking for the most accurate data.
21     MR. KALAS:  All right.  We're almost
22  out of tape.  So we're going to take a break real
23  quick, but it should be a short one.
24     THE VIDEOGRAPHER:  This marks the end
25  of Media Number 2 in the deposition of William

439

1  Sawyer.  The time is 2:26.  We are off the record.
2      (Break taken from 2:26 p.m. to
3  2:34 p.m.)
4      THE VIDEOGRAPHER:  This marks the
5  beginning of Media Number 3 in the deposition of
6  William Sawyer.  The time is 2:34.  We are on the
7  record.
8      BY MR. KALAS:
9      Q.  Now, you're using a 10 percent dermal
10  absorption figure based on lost mass balance,
11  right?
12     A.  Based on what?
13     Q.  Lost recovery, failed recovery of
14  glyphosate?
15     A.  In part.
16     Q.  Okay.  And what -- and the other part
17  is based on the TNO study, right?
18     A.  Yes.
19     Q.  Okay.  So let's look at the TNO study
20  marked as Exhibit 30.
21      (Exhibit Number 30, TNO Report: "In
22  vitro percutaneous absorption study with 14C
23  glyphosate using viable rat skin membranes," was
24  marked for identification.)
25      ///

440

1      BY MR. KALAS:
2      Q.  Okay.  And the version I've marked,
3  sir, is listed as TNO report dated July 29th,
4  twenty -- 2003.  And I know you have an earlier
5  version in your -- in your Exhibit 2, but I'm
6  going to be asking you some questions about the
7  one I marked.  So you might want to look at that.
8      First of all, this was an in vitro
9  dermal absorption study carried out by a lab
10  called TNO, correct?
11     A.  Yes.
12     Q.  Okay.  And you talked about this study
13  at the Johnson case, right?
14     A.  I think so.
15     Q.  Okay.  And this study is the only
16  direct measurement that you can point me to that
17  supports your 10 percent dermal absorption figure,
18  right?
19     A.  Well, it does state for a different
20  compounds, like MON 35012, field dilution that was
21  at 23.1 percent remaining in the skin and 2.3 --
22  okay.  2.4 percent for MON 0139.  70 percent
23  concentrate in 2.3 percent MON 0139, 70 percent
24  field dilution.
25     Q.  I understand you're orienting yourself

44

1  to the study again because we just marked it, but
2  my question was, is this the only study you're
3  going to rely upon for a direct measurement of
4  10 percent absorption?
5      A.  Under that term, "direct," yes.  And
6  I'm referring to page 16 to 35 on the older
7  version.
8      Q.  Right.  So if you can look at
9  Exhibit 30 they discuss something in here called
10  an autoradiography -- autoradiography,
11  A-U-T-O-R-A-D-I-O-G-R-A-P-H-Y.  What's an
12  autoradiography?
13     A.  That's a technique very useful for
14  measuring -- for example, I relied on it recently
15  for measuring thin sections of tissue from the
16  brain and needing to know how much thorium 230 and
17  thorium 232 was in that brain.  And so that thin
18  section can be read using a type of scanning
19  electron microscopy or other radiological
20  detection techniques to determine how much of a
21  specific radioisotope is in that slice of tissue.
22     Q.  And the authors of this study were
23  trying to measure how much remained in the skin,
24  right?
25     A.  Yes.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 115 of 125
CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2        44 (442 to 445)
Conducted on October 16, 2018

442

1    Q.  Okay.  And what they stated in
2  paragraph 4 of Exhibit 30 is that the results of
3  the autoradiography show too much variation to
4  draw any conclusions, right?
5    A.  Yeah.  That's matching up some stuff.
6  You're looking at paragraph 4 of page 2?
7    Q.  Yep.
8    A.  I see.  So they changed the report.
9    Q.  Well, sir, this is a final report that
10 I have marked from you -- for you from July 29th,
11 2003, and what the authors stated in the final
12 report was the results of the autoradiography draw
13 showed too much variation to draw any conclusions.
14       Did I read that correctly?
15   A.  Yeah, but I think my report was an
16 official signed report as well.  Let me check.  I
17 thought it had been signed off.  Certificate of
18 analysis.  Yeah, here we go.  Endorsement of
19 compliance.  Yeah, this is sort of like -- I had a
20 friend once who had two resumes.  They were both
21 different.
22   Q.  Okay.  So --
23   A.  This report is strange in that there's
24 two different summaries.
25   Q.  And I understand you want to talk about

443

1  the document that was in Exhibit 2, but I'm asking
2  if I read something correctly in Exhibit 30.  So
3  if you can look at that.  Paragraph 4 it states,
4  "The results of the autoradiography show too much
5  variation to draw any conclusions."
6       Did I read that correctly?
7    A.  You did.  Your version is certainly
8  more favorable for your client, so I guess that's
9  what we're going to use, then, and not this
10 version?
11   Q.  Well, sir, I'm just reading the final
12 report on --
13   A.  Well, I think this is a final report
14 too.  I see where it's been certified.
15   Q.  Well, I'm going to ask you questions
16 about Exhibit 30.
17   A.  Okay.
18   Q.  So you can look at that.
19       What does it mean to have too much
20 variation to draw any conclusions in a dermal
21 absorption study?
22   A.  Generally if the recovery is greater or
23 lesser than 10 percent.
24   Q.  And they had recovery of 132.4 percent
25 in one of their test arms, right?

444

1    A.  Yes.  However, the recovery for MON
2  35012 field dilution, I believe, was 117 percent.
3    Q.  It's actually reported as 73.4 percent
4  in paragraph 3 of Exhibit 30, sir.
5    A.  Really?  35012.
6    Q.  You're looking at the eight-hour
7  exposure period, sir.  Do you think that's what we
8  should be looking at?
9    A.  No.
10   Q.  Okay.  So if we look at the end of the
11 48 hours for 35012 it was 73.4 percent at the
12 field dilution but 132.4 percent in the
13 concentrate, right?
14   A.  Okay.
15   Q.  Do you see that?
16   A.  Yeah.
17   Q.  Okay.  You don't disagree with the
18 authors that the results of the autoradiography
19 show variation there?
20   A.  No.
21   Q.  Okay.  If you go on Exhibit 30 to
22 paragraph 6, which is on the next page, read this
23 and I want to know if I read it correctly.
24       "In conclusion, an 8-hour exposure
25 resulted in a penetration of 10% (MON 35012

445

1  concentration), 2.6% (MON 35012 field dilution),
2  .5% (MON 0139 70% concentrate), and 1.4 percent
3  (MON 0139 70% field dilution) over a period of 48
4  hours in viable rat skin membranes.  Due to the
5  high variation in dermal penetration within the
6  test groups and the poor recoveries, the data
7  presented in this report are not acceptable for
8  regulatory use and risk assessment.  This study
9  should be regarded as a sighting study rather than
10 a definitive study."
11       Did I read that correctly?
12   A.  Yes.
13   Q.  Okay.  And do you agree that there was
14 a high variation in dermal penetration within the
15 test groups in this study?
16   A.  Yes.
17   Q.  Do you agree that certain test groups
18 had poor recoveries?
19   A.  Yes.  I'm showing some very low
20 recoveries.  For example, the -- yeah.
21   Q.  Okay.  And do you agree that when you
22 have low recoveries and high variation that --
23 well, strike that.
24       What does it mean to be a citing study?
25   A.  Perhaps that is a term used in the

Transcript of William Sawyer, Ph.D., Volume 2

45 (446 to 449)

Conducted on October 16, 2018

446

1    Netherlands, as I'm not familiar with it.
2        Q.    Okay.  And I'm correct that Mr. Hall
3    used a field dilution of glyphosate, right?
4        A.    Correct.
5        Q.    And for the 48 hours in the rat skin
6    brain -- skin membranes with an eight-hour
7    exposure in paragraph 6 of Exhibit 30, the authors
8    reported a 2.6 percent absorption, right?
9        A.    Yes.
10       Q.    And that 2.6 percent absorption rate
11   comes from a formulation that most closely
12   approximates Mr. Hall's absorption -- Mr. Hall's
13   exposure, right?
14       A.    Yes.
15       Q.    And the main difference is this is with
16   a cocoamine surfactant as opposed to a
17   polyoxyethylated tallow amine surfactant, correct?
18       A.    Yes.
19       Q.    Now, if we go -- now, this was a
20   48-hour study, right?
21       A.    Yes.
22       Q.    And it was in rat skin, not human skin,
23   right?
24       A.    Correct.
25       Q.    And we discussed earlier that there can

447

1    be differences between animal skin and human skin,
2    right?
3        A.    Yes.
4        Q.    And generally, animal skin, especially
5    rodent skin, is more permeable than human skin,
6    right?
7        A.    Well, if you look at my report, the
8    majority of the time it is, yes, but there are a
9    good number of exceptions to that where the
10   reverse is true.
11       Q.    But those exceptions have not been
12   recorded in the published literature to include
13   glyphosate, right?
14       A.    Well, I haven't actually come across a
15   study that actually made that comparison.  We do
16   have human cadaver skin screening studies as well
17   as rat screening studies and there has been quite
18   a bit of variability.
19       Q.    Did you -- did you review a study by
20   Thomas Franz in 1983 comparing the absorption of
21   glyphosate, Roundup, and diluted Roundup?
22       A.    I believe so.  Or I may have read the
23   summary of it, the EPA -- the EPA document.
24       Q.    Thomas Franz is the gentleman who
25   invented the Franz diffusion method, right?

448

1        A.    Yes, the cell.
2        Q.    Franz diffusion cell method.  And he
3    found when he looked at glyphosate, Roundup, and
4    diluted Roundup, over an eight-hour period in an
5    in vitro human skin model that the absorption at
6    its highest amount was a .15 percent, right?
7        A.    I believe so.
8        Q.    Okay.  And he found that though the
9    diluted had the highest rate of absorption, the
10   micrograms per centimeter cubed -- squared
11   absorbed was actually the lowest in that method.
12   Do you remember that?
13       A.    No.
14       Q.    Okay.
15       A.    I don't disagree, but I don't remember
16   that, no.
17       Q.    That would make sense to you, though,
18   right?
19       A.    The lower amount would produce a higher
20   percentage.
21       Q.    But a lower absolute amount absorbed
22   depending on the ratios?
23       A.    Correct, but that becomes irrelevant
24   because of the massive surface area in a human
25   compared to a square centimeter -- you know, a .1

449

1    or a square centimeter cell.
2        Q.    Okay.  And do you recall that Dr. Franz
3    found that at topical doses of greater than
4    3,500 micrograms per centimeter squared, systemic
5    absorption will be in the range of 1.6 to
6    2.3 micrograms per centimeter squared?
7        A.    No.  Again, I don't disagree.  I just
8    don't remember reading that.
9             (Exhibit Number 31, Final Report:
10   Evaluation of the Percutaneous Absorption of
11   Roundup Formulations in Man Using an In-Vitro
12   Technique, Bates-stamped MONGLY00135633 - 646, was
13   marked for identification.)
14             BY MR. KALAS:
15       Q.    Okay.  Let me -- I just want to mark as
16   Exhibit 31 and just ask you if you recognize the
17   document I've marked as Exhibit 31 as something
18   you've reviewed?
19       A.    I don't think I have this document.
20       Q.    The -- Dr. Franz is regarded as an
21   authority on percutaneous absorption, right?
22       A.    I'm not going to use the term
23   "authority."  Certainly recognized in the
24   peer-reviewed literature.  He's published numerous
25   studies.  In terms of his personal reputation and

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 117 of 125
CONFIDENTIAL

Transcript of William Sawyer, Ph.D., Volume 2          46 (450 to 453)
Conducted on October 16, 2018

### 450

1  impartiality, I can't comment on that.
2     Q.   And Dr. Franz found that glyphosate in
3  an eight-hour human skin absorption model was
4  absorbed at less than 1 percent, right, no matter
5  how it was diluted?
6     A.   **With this particular screening method,**
7  **yes.**
8     Q.   Okay.  And he's not the only one who's
9  found that, correct?  Dr. Nielsen's found it in
10 the peer-reviewed literature that glyphosate in an
11 eight-hour in vitro human skin absorption
12 methodology is absorbed at a rate of less than
13 1 percent, correct?
14    A.   **That has been published, yes.**
15    Q.   And Dr. Wester, in the 1996 Wester
16 article, found after eight hours, less than
17 1 percent of glyphosate is absorbed in an in vitro
18 human skin model without cotton, correct?
19    A.   **Yes, but keep in mind that's a**
20 **screening method using cadaver skin.  It's not**
21 **metabolically activated.  It's dead skin.  And it**
22 **is not to be intended as anything more than a**
23 **screening model.**
24    Q.   And you'd want to look at dermatome
25 models, right, because that's metabolically

### 45

1  activated, correct?
2     A.   **No, it's not.  The dermatome model's**
3  **simply using a microtome method removing the**
4  **thicker mass of the epidermis making a thinner,**
5  **more workable tissue piece to place on the Franz**
6  **cell.  Metabolically activated can be performed on**
7  **a non dermatome tissue by adding certain active**
8  **enzymes and other nutrients to a live tissue.**
9     Q.   You're referring to S9?
10    A.   **I'm sorry?**
11    Q.   You're referring to S9?
12    A.   **S9?**
13    Q.   To metabolically activate it.  Is that
14 one of the compounds you're talking about?
15    A.   **Yes.**
16    Q.   Let me ask you this:  Are you aware of
17 any human skin absorption study that has found an
18 absorption of glyphosate over 1 percent over an
19 eight-hour period, other than the TNO study we're
20 looking at right now?
21    A.   **Not beyond the TNO study, but I point**
22 **out those studies that are less than 1 percent are**
23 **on cadaver skin, and they're not true in vivo**
24 **measurements.**
25    Q.   Well, you're -- have you reviewed every

### 452

1  single study on in vitro skin -- human skin models
2  to make sure they didn't come from a live person's
3  skin?
4     A.   **No.  I said in vivo.**
5     Q.   Okay.  So they're not all cadaver skin,
6  correct?  Some came from breast reconstructions,
7  for instance?
8     A.   **DTL I believe did use liposuction skin.**
9     Q.   Okay.  So some are from live people as
10 opposed to dead people?
11    A.   **Yes.  That's true based on the DTL**
12 **study.**
13    Q.   Okay.  So there's actually many DTL
14 studies, right?
15    A.   **I'm sorry?**
16    Q.   There's actually many DTL studies,
17 right?
18    A.   **Oh, yes.**
19    Q.   And when you mention DTL that's a
20 laboratory that has done some dermal absorption
21 studies, correct?
22    A.   **Yeah.  That's a UK laboratory.  I**
23 **believe that -- yeah, they've run several studies**
24 **I've looked at.**
25    Q.   You reviewed three studies by Dr. Ward,

### 453

1  right?  And those are the tape stripping studies
2  you discussed in your toxicological notes, right?
3     A.   **Yes.**
4     Q.   In addition to Dr. Ward, there's also
5  four studies by Dr. Davies on formulation
6  absorption.  Have you reviewed those studies?
7     A.   **Dave Fox?**
8     Q.   Davies, sir, D-A-V --
9     A.   **I was looking at Dave Fox.**
10    Q.   D-A-V-I-E-S.  Have you reviewed any of
11 those studies done by Dr. Davies at DTL?
12    A.   **Dr. Ward?**
13    Q.   No, sir.  We already talked about the
14 three Ward studies.
15    A.   **Yeah, okay.**
16    Q.   And you reviewed those.  Have you
17 reviewed any DTL studies conducted by Dr. Davies?
18 There are four in the production set on dermal
19 absorption of formulated products.  Have you seen
20 those?
21    A.   **I think so.  I'm just trying to figure**
22 **out where I put them.  I think I recently received**
23 **those.**
24    Q.   Okay.  And are you going to be offering
25 criticisms of those studies at trial?

Transcript of William Sawyer, Ph.D., Volume 2

47 (454 to 457)

Conducted on October 16, 2018

---

**454**

1    MR. SELDOMRIDGE: Counsel, do you have
2  a copy of those studies to show the doctor?
3    MR. KALAS: I do, but he usually brings
4  everything he's looked at. So . . .
5    If he's got it, he's got it. If not,
6  I'll show them to him.
7    **A.   You know, I think what happened was**
8  **that they're on my list. Remember a couple weeks**
9  **ago we --**
10   BY MR. KALAS:
11   Q.   Right.
12   **A.   -- provided a list.**
13   Q.   We marked that.
14   **A.   And if they're on that list, I did**
15 **review them, but I think I failed to print them.**
16   Q.   Now, if they're not on that list does
17 that mean you didn't review them?
18   **A.   That's correct.**
19   Q.   Okay. So I'll represent they're not on
20 the list. So the four studies by Dr. Davies -- we
21 can look at the list, actually. I marked it so
22 you don't have to take my word for it.
23   MR. SELDOMRIDGE: And I will also note
24 that we've supplied additional information just
25 via email.

---

**455**

1    MR. KALAS: You marked --
2    MR. SELDOMRIDGE: That was not included
3  on the list.
4    MR. KALAS: Right. Those were
5  Dr. Hansen's photographs.
6    MR. SELDOMRIDGE: That's correct.
7    MR. KALAS: Okay. But that did not
8  include the Davies studies, correct, Counsel?
9    MR. SELDOMRIDGE: Not that I'm aware
10 of.
11   BY MR. KALAS:
12   Q.   Okay. And so today, sitting here
13 today, you don't have any criticisms to offer the
14 Davies studies if you haven't seen them, right?
15   **A.   Correct.**
16   Q.   Likewise, the three studies done at DTL
17 by Dr. Smith, do you have any criticisms to offer
18 of those studies if they aren't on your
19 supplemental list?
20   **A.   The DTL studies?**
21   Q.   Three studies at DTL by a Dr. Smith.
22 Not Ward. Smith.
23   **A.   I'm not familiar with Dr. Smith's**
24 **studies.**
25   Q.   Okay. So sitting here today you have

---

**456**

1  no criticisms to offer of those studies either,
2  right?
3    **A.   Correct.**
4    Q.   Okay. Now, as far as Dr. Ward goes,
5  one of the things you criticized those studies for
6  were for their tape stripping, right?
7    **A.   Yes.**
8    Q.   But those studies did not -- those
9  studies reported two values for dermal absorption
10 of glyphosate, the values for the actual amount
11 they measured absorbed in the receptor fluid in
12 addition to an amount that was bioavailable based
13 on the tape stripping.
14   Do you recall that?
15   **A.   Yes.**
16   Q.   Okay. And the amount that was
17 bioavailable included the tape stripped value
18 still were under 1 percent in those studies,
19 right?
20   **A.   Yes.**
21   Q.   Okay. And going back to your POEM
22 model, if we used a 1 percent figure rather than a
23 3 percent figure at the weight Mr. Hall was at, we
24 would be down to approximately .25 milligrams per
25 kilogram per day, right? Because we went to the

---

**457**

1  1.445, and then we reduced that to .75 based on
2  the fact he was ▓▓▓▓▓▓▓▓. And then if we
3  used a 1 percent dermal absorption figure based on
4  the human skin data, we'd be at .25 milligrams per
5  kilogram per day, correct?
6    **A.   Yeah, that's right.**
7    Q.   Okay. And the POEM model is based on a
8  seven-hour workday, right? One hour
9  mixing/loading, six hours applying, right?
10   **A.   Yeah, it is.**
11   Q.   And Mr. Hall testified that he spent
12 about 20 minutes applying Roundup on four yards a
13 day, right? So 20 minutes per yard, four yards?
14   **A.   I have one hour, I believe. Let me**
15 **see.**
16   Q.   You don't recall that Mr. Hall
17 testified that he'd do 15 minutes per property
18 spraying at his deposition?
19   **A.   I have April 1st to October 31st each**
20 **year, 2008 to 2012, five years, for four to five**
21 **days per week during which he applied Roundup a**
22 **minimum of one to two hours per day. And I have**
23 **mathematical calculations in my report as well.**
24 **If we look at page 124.**
25   Q.   Okay. You said an hour to two hours

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC  Document 8572-19  Filed 12/27/19  Page 119 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
48 (458 to 461)
Conducted on October 16, 2018

458

1 per day, right?
2   A.   Yeah.
3   Q.   Okay.  So if you applied an hour and a
4 half per day, he would apply for about a quarter
5 amount of the time as the applicators in the POEM
6 model, right?
7   A.   Correct.
8   Q.   Okay.  And so if we reduce the .25
9 figure by four we would now be at approximately
10 .07 milligrams per kilogram per day, right?
11   A.   Approximately.
12   Q.   Okay.  And .07 milligrams per kilograms
13 per day would be about 20 times lower than what
14 you have noted in Table 7 as his floor, right,
15 1.445?
16   A.   Roughly, yeah.
17   Q.   Okay.  And so you'd agree with me that
18 the data you put as inputs in your POEM model
19 matter as to what your outcome is in that model,
20 right?
21   A.   Correct.  And the correct values, as I
22 stated, for dermal absorption between three and
23 10 percent and there's no dispute over body
24 weight.  There's -- I don't believe there's any
25 dispute over the number of hours per day or the

459

1 time duration.  And that does -- what I disagree
2 with is this 1 percent dermal absorption.
3   Q.   Now, incorrect inputs in a POEM
4 model -- in the POEM model could overestimate or
5 underestimate exposure, right?
6   A.   It could, but of course all of this is
7 somewhat irrelevant in that my primary comparison
8 is his hours and days worked over that five-year
9 period compared to that of the hours exposure and
10 work days in the human epidemiological data which
11 shows a significantly increased risk of
12 non-Hodgkin's lymphoma.
13   Q.   Okay.
14   A.   And I made my comparison, as you know,
15 to the agricultural worker study, and that clearly
16 shows that Mr. Hall's cumulative exposures of 152
17 days of exposure per year for five years is
18 certainly within the median exposure range of that
19 published in the Agricultural Health Study.
20   Q.   Okay.  And so when you come and talk to
21 the jury, you're going to tell them that the best
22 measure of his dose are the exposure days, right?
23   A.   Yes.
24   Q.   And not the POEM model?
25   A.   Correct, because we're comparing apples

460

1 to apples.  And if I take the dose calculation, we
2 can't compare that to the human epidemiologic
3 literature.
4   Q.   Okay.
5   A.   It is similar to -- a great example
6 would be inhalation of carbon monoxide.  Okay.  We
7 could -- we could -- we know it's regulated by
8 part per million levels in air, but we could draw
9 a blood sample for carboxyhemoglobin and get a
10 dose and -- well, actually that could work in that
11 case.
12        But there are instances in toxicology
13 where exposure days or exposure years -- for
14 example, benzene.  Benzene is based on benzene
15 exposure years.  It takes a minimal amount of
16 benzene exposure years to be compatible with that
17 in the studies that produce AML.  So we could take
18 a blood level of benzene and it would be useless.
19 There's nothing to compare it to.
20   Q.   Okay.  I understand.  So in order to
21 compare apples to apples for Mr. Hall what we
22 really should be looking at are exposure days,
23 right?
24   A.   Exposure days per year and duration of
25 exposure.

46

1   Q.   And as we saw earlier in the
2 Agricultural Health Study for the highest tertile
3 of both intensity weighted exposure and exposure
4 days, there was no statistically significant
5 relationship between glyphosate exposure and
6 follicular lymphoma, right?
7   A.   That is correct for that one study.
8   Q.   And --
9   A.   That's not the only human epidemiologic
10 study out there.
11   Q.   And as we saw in the Eriksson study
12 the -- you stated you weren't going to offer any
13 dose response opinions about that study, right?
14 That was your testimony earlier.  Are you changing
15 it?
16   A.   I can't -- no.  I just don't understand
17 your question.  There was no dose response days of
18 exposure per year table in that study, that I
19 recall.
20   Q.   Okay.  And so you're not offering any
21 opinions on any dose response data in that study,
22 right?
23   A.   I don't think that data is available in
24 that study.
25   Q.   Okay.  And as we saw, the only -- there

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8572-19 Filed 12/27/19 Page 120 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
49 (462 to 465)
Conducted on October 16, 2018

462

1  was no controlling for other pesticide exposures
2  in latency analysis in that study, right?
3     **A.  No, other than the fact of years in**
4  **which those chemicals went out of use.**
5     Q.  Now, you're aware that European
6  regulators no longer use the UK POEM model, right?
7     **A.  No, I would have to defer that to our**
8  **regulation expert.**
9     Q.  Okay.  So you haven't seen the
10 health -- the HSE department of the United Kingdom
11 stating that the POEM model no longer reflects
12 current application techniques?
13    **A.  No.**
14    Q.  Have you seen that the UN World Health
15 Organization international program on chemical
16 safety has criticized the POEM model as not being
17 validated?
18    **A.  That was kind of lengthy.  Say it**
19 **again, please.**
20    Q.  Have you seen that the UN World Health
21 Organization international program on chemical
22 safety has stated that the POEM model has not been
23 validated?
24    **A.  No.**
25    Q.  What does it mean for a model to be

463

1  validated?
2     **A.  Usually that would mean tested and**
3  **compared with some type of certification.**
4     Q.  Is there any biomonitoring data you've
5  reviewed that supports your POEM dose that you
6  presented in Table 7 for applicators?
7     **A.  No, and that's because the studies that**
8  **have been performed are defective as they relied**
9  **upon 100 percent urine excretion and ignored**
10 **hepatic fecal excretion.**
11    Q.  So let's look at one of them, in the
12 time we have left.  I'm marking as Exhibit 32 an
13 article titled "Glyphosate Biomonitoring For
14 Farmers and Their Families:  Results From the Farm
15 Family Exposure Study."
16       (Exhibit Number 32, Article Titled
17 "Glyphosate Biomonitoring for Farmers and Their
18 Families: Results from the Farm Family Exposure
19 Study," was marked for identification.)
20       MR. SELDOMRIDGE:  Thank you.
21       BY MR. KALAS:
22    Q.  You've seen this before, right?
23    **A.  Oh, yes.**
24    Q.  Okay.  And this was a biomonitoring
25 study in urine for applicators in South Carolina

464

1  and Minnesota, right?
2     **A.  Correct.**
3     Q.  Okay.  And if you go to page 325 --
4  strike that.  Let me ask you, this appeared in
5  Environmental Health Perspectives, right?
6     **A.  Yes.**
7     Q.  That's a peer-reviewed journal?
8     **A.  Yes.**
9     Q.  So if you go to page 325, they
10 calculated in Figure 1 a systemic dose based on
11 milligrams per kilogram body weight, right?  It's
12 in the Figure 1 in the bottom left.
13    **A.  Figure 1?**
14    Q.  Page 325, sir.  I think you're on 324.
15    **A.  Oh, I -- yes.**
16    Q.  Okay.  And for the 90th percentile
17 there they calculated a systemic dose of
18 approximately .001 milligrams per kilogram per --
19 strike that.
20       They calculated a systemic dose in the
21 90th percentile of .001 milligrams per kilogram,
22 right?
23    **A.  Yes.**
24    Q.  And they were calculating that based on
25 a urinary analysis, right?

465

1     **A.  Yes.**
2     Q.  And based on the Wester data, we should
3  be looking at urine and feces, right?
4     **A.  Right.**
5     Q.  That's your opinion?
6     **A.  Right.**
7     Q.  And the Wester data suggests that
8  four-fifths of the dermally absorbed glyphosate
9  would be excreted via the feces in your opinion,
10 right?
11    **A.  Depending on the dose.**
12    Q.  Okay.  The dose D, which you're relying
13 upon to state that glyphosate is excreted mainly
14 via the feces suggests four-fifths would be
15 excreted in the feces, right?
16    **A.  Yes.**
17    Q.  Okay.  And so if we multiplied the
18 systemic dose here by five to account for that,
19 the 90th percentile would be .005 milligrams per
20 kilogram per day, right?
21    **A.  Yes.**
22    Q.  Okay.  And you are familiar with the
23 Cal EPA NSRL for glyphosate, right?
24    **A.  Yes.**
25    Q.  And the Cal EPA NSRL for glyphosate

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8572-19 Filed 12/27/19 Page 121 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
50 (466 to 469)
Conducted on October 16, 2018

466

1 suggests a no significant risk level of
2 1.1 milligrams a day, right?
3    A.  (Reviewing document.)
4    Q.  I think they list it as
5 1100 micrograms, but . . .
6    A.  (Reviewing document.)
7       That's the responses.  Yeah, NSRL 1100
8 microgram per day, that's not per kilogram body
9 weight so that's 1.1 milligram per day divided by
10 119.
11    Q.  Yes, sir.  So what the Cal NSRL means
12 is that there's -- by their calculations a one in
13 100,000 risk of -- one in 100,000 years' risk of
14 cancer at that dose, right?
15    A.  Well, that's based on a hemangioma --
16 hemangioma study which I don't believe is the
17 correct study to calculate the slope on.  As you
18 know, I used the Wood study in mice to calculate
19 the cancer slope and came up with a more
20 protective number than that.  But in theory, what
21 you're saying is correct.
22    Q.  Okay.  And there's no regulatory agency
23 you're aware of that has used the lymphoma data in
24 male mice in the Wood study to calculate a no
25 significant risk level, right?

467

1    A.  That's correct.
2    Q.  Okay.  And so use Cal EPA's
3 1.1 milligram if we multiplied the 90th percentile
4 systemic dose here of .005 milligrams per kilogram
5 times Mr. Hall's weight which is 117, it would be
6 approximately .6 milligrams, right?
7    A.  Yes.
8    Q.  Okay.  .6 milligrams would be below the
9 Cal NSRL level for human cancer, right?
10    A.  Yes.  And, you know, that's consistent
11 with the -- the study -- the Agricultural Health
12 Study that did not find a statistically
13 significant rate of follicular cell malignancy,
14 which I should point out that there were some
15 terrible criticisms as to the quality of this
16 study by Acquavella, et al.
17       THE REPORTER:  I'm sorry.  By?
18       THE WITNESS:  Acquavella, et al., with
19 respect to its reliability.
20       BY MR. KALAS:
21    Q.  Have you reviewed any other
22 biomonitoring study that supports a
23 1.445 milligrams per kilogram per day dose for
24 glyphosate in applicators?
25    A.  I'm sorry.  Can you repeat that?

468

1    Q.  Have you reviewed any other
2 biomonitoring study other than Acquavella that you
3 would argue supports a 1.445 milligram per
4 kilogram per day dose for glyphosate?
5    A.  No.  And I said the glyphosate
6 biomonitoring study was assessed, and a lot of
7 deviations and defects were found.  So I don't
8 know that that number is of any value.
9    Q.  Well, okay.  You stated earlier you
10 didn't review the Lavy study, right?
11    A.  Correct.
12    Q.  Did you review the Curwin study,
13 C-U-R-W-I-N?
14    A.  I don't remember.  What is the title?
15    Q.  "Urinary Pesticide Concentrations
16 Amongst Children, Mothers, and Fathers Living in
17 Farm and Nonfarm Households in Iowa."  Did you
18 review that study?
19    A.  Yes, I believe I have that study.
20    Q.  And that study found parts per billion
21 for glyphosate exposure that was actually lower
22 than in the Acquavella study, right?
23    A.  That's right.
24    Q.  Okay.  And so that again is another
25 study that does not support your -- that does not

469

1 support the POEM dose of 1.445 milligrams per
2 kilogram per day, right?
3    A.  That's correct.
4    Q.  Did you review the Johnson 2005
5 study on passive dosimetry with glyphosate
6 exposure in backpack applicators?
7    A.  I believe within one of the documents I
8 have it was discussed.
9    Q.  Okay.  And that study found exposures
10 that were in the range of .0012 milligrams per
11 kilogram per day, right?
12    A.  I don't recall.
13    Q.  Okay.  Do you think that study supports
14 a dose of 1.445 milligrams per kilogram per day?
15    A.  I would have to review the study to
16 answer that.
17    Q.  Okay.  You don't -- sitting here right
18 now, you wouldn't argue that that study supports
19 your position, right?
20    A.  I can't say either way.
21    Q.  Okay.  How about the Connolly 2017
22 study?  Did you review that study on passive
23 dosimetry?
24    A.  I don't know.  I have to see it.
25    Q.  The title of it was "Exposure

CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
Conducted on October 16, 2018

51 (470 to 473)

470

1 Assessment Using Human Biomonitoring For
2 Glyphosate and Fluroxypyr" --
3 F-L-U-R-O-X-Y-P-Y-R -- "Users in Amenity
4 Horticulture"?
5    A.   I think it was reviewed in the EPA
6 document and I'm familiar with it from the EPA
7 summary.
8    Q.   And that study in passive dosimetry did
9 not find a dose approaching 1.445 milligrams per
10 kilogram per day, right?
11    A.   No.
12    Q.   Did you review the internal Cowell and
13 Steinman study conducted by Monsanto on Georgia
14 applicators, C-O-W-E-L-L?
15    A.   No.
16    Q.   Okay. And that's -- okay. So you
17 didn't review it. So you won't be arguing that
18 that study supports a dose of 1.445 milligram per
19 kilogram per day?
20    A.   I don't have any information on that
21 study.
22    Q.   Did you review the Spanish applicator
23 study on backpack applicators in Spain?
24    A.   As -- in summary, yes, through EPA
25 document and there was also a blurb -- something

47

1 about it in one of the Monsanto documents I have
2 as well.
3    Q.   Did the passive dosimetry in urinalysis
4 in that study approach 1.445 milligrams per
5 kilogram per day?
6    A.   No.
7    Q.   Is there any passive dosimetry or
8 biomonitoring study you can point me to to support
9 that dose figure?
10    A.   No. And in part because they rely upon
11 urinary excretion and assumed 100 percent through
12 urinary excretion. And also in the studies, at
13 least the studies that I reviewed, these were not
14 people who were generally working five days a week
15 year-round or even seasonally but were generally
16 farmers who occasionally use the material.
17    Q.   Okay. So passive dosimetry studies
18 share the same urinary excretion issue that the
19 biomonitoring studies do?
20    A.   No.
21    Q.   Okay. So the passive dosimetry studies
22 also don't support the 1.445 milligram per
23 kilogram figure per day that you report in the
24 POEM model, right?
25    A.   I would have to review the studies in

472

1 detail to answer that.
2    Q.   Okay. You aren't prepared to argue
3 that they do right now, right?
4    A.   No.
5    Q.   Okay. Now, you've stated before in a
6 case called Garza that in order to find something
7 to be a substantial contributing factor to
8 someone's cancers you need to determine whether
9 the increased risk is greater than background
10 risk. Do you remember testifying to that?
11    A.   No. What is the name of the case?
12    Q.   Garza, sir.
13    A.   More information. That doesn't ring a
14 bell.
15    Q.   One sec. Garza v. Allied Chem. It was
16 in Texas.
17    A.   Garza versus Allied Chem?
18    Q.   Yes, sir.
19    A.   I still don't -- what year?
20    Q.   2009, sir. Well, let me ask you if you
21 agree with this statement.
22    A.   Well, why don't you refresh my memory.
23 That'll help.
24    Q.   Okay.
25    A.   Can I see the cover page? That'll

473

1 really help.
2    Q.   Sure. I have some writing on it, but
3 that's okay. Do you remember testifying in that
4 case?
5    A.   Oh, I think I know what this was.
6 Yeah. Yeah.
7    Q.   So do you remember testifying that in
8 order for something to be a substantial
9 contributing factor to someone's cancer, you need
10 to determine whether the increased risk from that
11 substance is greater than the background?
12    A.   Correct.
13    Q.   Okay. And you still agree with that,
14 right?
15    A.   Of course.
16    Q.   Okay. And the background for NHL is
17 about 20 in 100,000, right?
18    A.   No, that's not correct for follicular.
19    Q.   Okay. So once again you stated
20 earlier -- which --
21    A.   Mr. Hall doesn't have all 113 varieties
22 of cancer. He has one. It's called follicular.
23    Q.   Okay. What epidemiology study in the
24 peer-reviewed literature supports glyphosate as a
25 risk factor for follicular lymphoma?

Transcript of William Sawyer, Ph.D., Volume 2

52 (474 to 477)

Conducted on October 16, 2018



474

1    A.  I'd have to defer that to the
2 epidemiologists.
3    Q.  But you agree they should be looking at
4 the follicular lymphoma data and not NHL
5 generally, right?
6    A.  No.  They should be looking at both.
7    Q.  Okay.  So --
8    A.  Because the reason is when a malignancy
9 is rare, especially in that age group, it's not
10 always possible to have a large enough population
11 to overcome Type 2 error.  Statistically Type 2
12 error is when there certainly is not enough power
13 to determine whether change is there or not.
14         And that is always a problem with rare
15 diseases.  And, therefore, sometimes they have to
16 be bunched together under a general category such
17 as lymphoma.
18    Q.  Is it your testimony that glyphosate
19 exposure causes all types of non-Hodgkin's
20 lymphoma or only some types?
21    A.  I'd have to defer that to the
22 epidemiologist.
23    Q.  Okay.  You're not offering an opinion
24 on that one way or another?
25    A.  No.

475

1    Q.  Okay.  So where did you calculate that
2 the dose Mr. Hall was exposed to increased his
3 risk for follicular lymphoma in particular greater
4 than the background rate?
5    A.  Based upon his occupational exposure
6 levels being in the medium range -- median range
7 of the human epidemiologic literature which shows
8 a statistically significant increased risk of
9 non-Hodgkin's lymphoma.
10    Q.  Which epidemiological literature did
11 you rely upon -- strike that.
12         You relied on the AHS study to set that
13 dose level, right?
14    A.  In terms of days per year worked, yes.
15    Q.  And the AHS study is negative or null
16 for finding relationship between glyphosate and
17 any type of lymphoma, right?
18    A.  That's correct.
19
20
21
22
23
24
25    A.  No.  I was not finding any studies that

476

1
2
3    Q.  Okay.  Now you've seen that, right?
4 Now we've seen some of those studies, right?
5    A.  Maybe.  I need to review them
6 carefully.
7    Q.  Okay.  And in order to reach a
8 conclusion in this case -- strike that.
9         MR. KALAS:  All right.  I'm going to
10 reserve the rest of my time.  I think I have 11
11 minutes by my count.
12         MR. SELDOMRIDGE:  I think that sounds
13 right.  The court reporter would know better than
14 I do.
15         MR. KALAS:  Want to switch or you just
16 want to ask?
17         MR. SELDOMRIDGE:  I think I'm okay
18 here.
19         MR. KALAS:  Do you guys need a break?
20         MR. SELDOMRIDGE:  Is that okay with you
21 as well?
22         THE WITNESS:  No.
23         THE VIDEOGRAPHER:  Off the record?
24         MR. KALAS:  Yeah, let's go off the
25 record.

477

1         THE VIDEOGRAPHER:  The time is 3:30.
2 We are off the record.
3         (Break taken from 3:30 p.m. to
4 3:37 p.m.)
5         THE VIDEOGRAPHER:  The time is 3:37.
6 We are on the record.
7         CROSS-EXAMINATION
8 BY MR. SELDOMRIDGE:
9    Q.  Doctor, do you know if any dermal
10 absorption studies have been conducted in live
11 humans?
12    A.  Of course.
13    Q.  Have there been quite a few of these
14 studies conducted?
15    A.  Yeah.  Dermal absorption studies are
16 performed on humans all the time.  I mean,
17 every -- for relatively safe chemicals -- probably
18 one of the more dangerous chemicals actually is
19 nicotine which has been thoroughly worked up in
20 early registry studies for the development of
21 Nicoderm, or the patch, the nicotine patch.  But
22 there's a number of pharmaceuticals and chemicals
23 that have been evaluated by in vivo human patch.
24    Q.  And do you know if these studies have
25 been conducted by tobacco companies?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8572-19 Filed 12/27/19 Page 124 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
Conducted on October 16, 2018
53 (478 to 481)

478

1    MR. KALAS: Objection. Relevance.
2    **A.  I'm not sure by tobacco companies.**
3    **Primarily pharmaceutical companies.**
4    BY MR. SELDOMRIDGE:
5    Q.   Do you know if any dermal absorption
6    studies have been conducted on live humans for
7    glyphosate?
8    **A.   None that I'm aware of, which is**
9    **surprising since Monsanto claims that it is**
10   **relatively harmless, and it is confusing. I don't**
11   **know why Monsanto has not performed dermal**
12   **absorption studies on live humans.**
13   Q.   Doctor, what about dermal absorption
14   studies on live humans for glyphosate-based
15   formulated products?
16   MR. KALAS: Objection. Form.
17   **A.   Well, certainly I would be opposed to**
18   **that because I am intimately familiar with the**
19   **toxicity of the formulation that is the glyphosate**
20   **and the co-contaminants, but based upon the**
21   **position Monsanto has taken regarding the product,**
22   **I find it unusual or uncertain as to why they have**
23   **not conducted dermal absorption studies on their**
24   **own people.**
25   ///

479

1    BY MR. SELDOMRIDGE:
2    Q.   And, Doctor, are you an oncologist?
3    **A.   No.**
4    Q.   Doctor, are you an epidemiologist?
5    **A.   No. I have -- I have been trained and**
6    **I have taught a section of epidemiology to the**
7    **medical students, but I'm not an epidemiologist.**
8    **It's just as a toxicologist, we are trained to use**
9    **epidemiologic studies as part of our work.**
10   Q.   And it's important to you to know how
11   to interpret those studies?
12   **A.   Absolutely.**
13   Q.   Doctor, at trial are you going to offer
14   a differential diagnosis of Mr. Hall?
15   **A.   No. I have no plan to offer a specific**
16   **causation opinion for Mr. Hall with respect to the**
17   **cause of his cancer but, rather, my role and my**
18   **duties in this case as a toxicologist is to**
19   **determine whether or not glyphosate and the**
20   **mixture Roundup super concentrate as used by**
21   **Mr. Hall is carcinogenic and comparatively, as to**
22   **its potency to any other carcinogen he may have**
23   **been exposed to during his life.**
24   Q.   Doctor, that's all the questions I have
25   for you at this time, depending on defense

480

1    counsel's questions to you.
2    **A.   Very good.**
3    MR. KALAS: Just a couple follow-ups
4    there.
5    REDIRECT EXAMINATION
6    BY MR. KALAS:
7    Q.   When you state you have no plan to
8    offer specific causation for Mr. Hall with regards
9    to the cause of his cancer, I want to make sure I
10   understand that.
11   Are you going to tell the jury that
12   Mr. Hall's cancer was caused by his exposure to
13   glyphosate-based herbicides?
14   **A.   No. I'm going to explain the**
15   **properties, the absorption, distribution,**
16   **metabolism, and the carcinogenicity aspects of**
17   **glyphosate and Roundup super concentrate.**
18   Q.   Okay. And so you only plan to offer a
19   general causation opinion that it's your opinion
20   glyphosate-based herbicides can cause cancer,
21   correct?
22   **A.   Yes, but as I said a moment ago,**
23   **relative to other potential carcinogens.**
24   Q.   Okay. And so you're not going to tell
25   the jury that you have conducted some evaluation

48

1    to rule out an idiopathic cause of Mr. Hall's
2    non-Hodgkin's lymphoma?
3    **A.   That's correct. I'm not the person to**
4    **provide the idiopathic assessment. That would be**
5    **the oncologist.**
6    Q.   Okay. And you're not going to tell the
7    jury that you've provided some assessment to rule
8    out
9
10
11   **A.   Correct. However, I am charged as a**
12   **toxicologist with the duties of determining and**
13   **looking to see if other carcinogens were involved**
14   **and evaluating them on a comparative basis.**
15   Q.   And you mentioned -- you talked about
16   dermal in vivo human studies with Mr. Seldomridge.
17   Do you recall that?
18   **A.   Yes.**
19   Q.   Okay. And you mentioned the Nicoderm
20   patch as an example of a dermal in vivo human
21   study, right?
22   **A.   Yes.**
23   Q.   Okay. Now, the Nicoderm patch, there
24   was a belief that there was some pharmacological
25   benefit to the user of that patch, right?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8572-19   Filed 12/27/19   Page 125 of 125
CONFIDENTIAL
Transcript of William Sawyer, Ph.D., Volume 2
Conducted on October 16, 2018
54 (482 to 485)

482

1    A.    Yes.
2    Q.    Okay.  And you don't believe there's
3 any pharmacological benefit from dermal absorption
4 to glyphosate, right?
5    A.    Correct.
6    Q.    Are you prepared to testify that a in
7 vivo human study for dermal absorption of
8 glyphosate would pass muster at an institutional
9 review board at a university in this country?
10    A.    It could if that board had the same
11 beliefs that Monsanto has, that it's a harmless
12 chemical and you literally have to drink it to
13 cause any toxicity.
14    Q.    Well, sir, isn't it true that in order
15 to do in vivo human studies of compounds in this
16 country we need to believe that there is some
17 pharmacological benefit to it?
18    A.    Not if the chemical's harmless, no.
19    Q.    Okay.  So it's your testimony that a
20 university would approve an in vivo dermal human
21 absorption study of glyphosate?
22    A.    If the chemical were harmless, yes.
23        MR. KALAS:  Okay.  I have no further
24 questions.
25        MR. SELDOMRIDGE:  That's all I have as

483

1 well, Doctor.
2        MR. KALAS:  Cool.  One thing.  I
3 mentioned this on the August deposition.  This is
4 a continuation, so I don't know if I need to
5 mention it again, but designate it as
6 confidential.  So, all right.  Thanks.
7        THE VIDEOGRAPHER:  This marks the end
8 of Media Number 3 in the deposition of William
9 Sawyer.  This also concludes today's deposition.
10 The time is 3:45.  We are off the record.
11        THE REPORTER:  Do you need the same as
12 last time?
13        MR. SELDOMRIDGE:  The same as last
14 time, E-tran.
15        (Concluded at 3:46 p.m.)
16
17
18
19
20
21
22
23
24
25

484

1                CERTIFICATE OF OATH
2
3
4 STATE OF FLORIDA
5 COUNTY OF LEE
6
7        I, the undersigned authority, certify that
8 WILLIAM SAWYER, Ph.D., personally appeared before me
9 and was duly sworn.
10
11        WITNESS my hand and official seal this 17th day
12 of October, 2018.
13
14
15 Rhonda Hall-Breuwet, RDR, CRR, LCR, CCR, FPR, CLR
16 Rhonda Hall-Breuwet, RDR, CRR, LCR, CCR, FPR, CLR
17 NCRA Realtime Systems Administrator
18 Notary Public - State of Florida
19 My Commission Expires:  9/28/19
20 Commission No. FF 915315
21
22
23
24
25

485

1                C E R T I F I C A T E
2
3 STATE OF FLORIDA:
4
5        I, RHONDA HALL BREUWET, RDR, CRR, LCR, CCR, FPR,
6 CLR, NCRA Realtime Systems Administrator, shorthand
7 reporter, do hereby certify:
8        That the witness whose deposition is hereinbefore
9 set forth was duly sworn, and that such deposition is
10 a true record of the testimony given by such witness.
11        I further certify that I am not related to any of
12 the parties to this action by blood or marriage, and
13 that I am in no way interested in the outcome of this
14 matter.
15        IN WITNESS WHEREOF, I have hereunto set my hand
16 this 17th day of October, 2018.
17
18
19 Rhonda Hall Breuwet
20
21 RHONDA HALL BREUWET, RDR, CRR, LCR, CCR, FPR, CLR,
22 NCRA Realtime Systems Administrator
23
24
25