# EXHIBIT 24

01

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

_____

IN RE:  ROUNDUP PRODUCTS            )

LIABILITY LITIGATION                )

_____ )  MDL No. 2741

                                    )

This document relates to:           )  Case No. 16-md-02741-VC

                                    )

Hardeman v. Monsanto Co., et al.    )

Case No. 3:16-cv-00525-VC           )

                                    )

                                    )

                                    )

_____

VIDEOTAPED DEPOSITION OF ANDREI SHUSTOV, M.D.

December 15, 2018

Seattle, Washington

## Page 2

APPEARANCES

For the Plaintiff:

R. BRENT WISNER, ESQ.
Baum, Hedlund, Aristei & Goldman, P.C.
10940 Wilshire Boulevard
17th Floor
Los Angeles, California 90024
310.207.3233
rbwisner@baumhedlundlaw.com

AIMEE H. WAGSTAFF, ESQ. (Via teleconference)
Andrus Wagstaff, PC
7171 West Alaska Drive
Lakewood, Colorado 80226
303.376.6360
aimee.wagstaff@andruswagstaff.com
JENNIFER A. MOORE, ESQ. (Via teleconference)
Grossman & Moore, PLLC
One Riverfront Plaza
401 West Main Street, Suite 1810
Louisville, Kentucky 40202
502.657.7100
jmoore@gminjurylaw.com

For Defendant Monsanto Co.:

AARON H. LEVINE, ESQ.
DAVID KERSCHNER, ESQ.
Arnold & Porter Kaye Scholer, LLP
250 West 55th Street
New York, New York 10019
212.836.8000
aaron.levine@arnoldporter.com
david.kerschner@arnoldporter.com

## Page 3

APPEARANCES (Continuing)

For Defendant Bayer:

LINDLEY JAMES BRENZA, ESQ.
Bartlit Beck, LLP
1801 Wewatta Street
Suite 1200
Denver, Colorado 80202
303.592.3100
lindley.brenza@bartlitbeck.com

Also present: Steven Crandall, videographer

## Page 4

EXAMINATION INDEX

| EXAMINATION BY: | PAGE NO. |
| --- | --- |
| Mr. Levine | 10 |
| Mr. Wisner | 276 |
| Mr. Levine | 313 |
| Mr. Wisner | 320 |
| Mr. Levine | 321 |

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
| --- | --- | --- |
| Exhibit No. 1 | Monsanto Company's Notice to Take Oral and Videotaped Deposition of Dr. Andrei Shustov. | 11 |
| Exhibit No. 2 | Curriculum vitae of Andrei R. Shustov, M.D. | 22 |
| Exhibit No. 3 | Expert Report of Dr. Andrei R. Shustov. | 26 |
| Exhibit No. 4 | Dr. Shustov Reliance List as of November 19, 2018. | 26 |
| Exhibit No. 5 | IARC monograph regarding glyphosate. | 92 |
| Exhibit No. 6 | IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble. | 94 |
| Exhibit No. 7 | IARC monograph regarding hepatitis c virus. | 95 |
| Exhibit No. 8 | IARC monograph regarding hepatitis B virus. | 100 |

## Page 5

EXHIBIT INDEX (Continuing)

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
| --- | --- | --- |
| Exhibit No. 9 | U.S. News & World Report article: "Roundup Weed Killer Has Probable Carcinogen, U.N. Says." | 103 |
| Exhibit No. 10 | Expert Report of Dr. Chadi Nabhan. | 107 |
| Exhibit No. 11 | International Journal of Environmental Research and Public Health: "Non-Hodgkin Lymphoma and Occupational Exposure to Agricultural Pesticide Chemical Groups and Active Ingredients: A Systematic Review and Meta-Analysis." | 126 |
| Exhibit No. 12 | Expert Report of Dr. Andrei R. Shustov. | 142 |
| Exhibit No. 13 | Expert Report of Dr. Chadi Nabhan. | 147 |
| Exhibit No. 14 | Fred Hutchinson Cancer Research Center Research Integrity Policy. | 153 |
| Exhibit No. 15 | Fred Hutchinson Cancer Research Center Research Misconduct Policy. | 155 |
| Exhibit No. 16 | Hepatitis B Foundation "Hepatitis B Blood Tests" website printout. | 193 |
| Exhibit No. 17 | Cancer Epidemiology, Biomarkers & Prevention. "Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health." | 226 |

Page 6

1    EXHIBIT INDEX (Continuing)
2    EXHIBIT NO.    DESCRIPTION    PAGE NO.
3    Exhibit No. 18   "Pesticide Exposure As Risk    241
4                     Factor for non-Hodgkin
                      Lymphoma Including
5                     Histopathological Subgroup
                      Analysis."
6    Exhibit No. 19   "Glyphosate Use and Cancer    250
                      Incidence in the Agricultural
7                     Health Study."
8    Exhibit No. 20   "Integrative Assessment of    258
                      Multiple Pesticides As Risk
9                     Factors for non-Hodgkin's
                      Lymphoma Among Men."
10
     Exhibit No. 21   "Cancer Incidence Among    262
11                    Glyphosate-Exposed Pesticide
                      Applicators in the
12                    Agricultural Health Study."
13   Exhibit No. 22   American Cancer Society    264
14                    website printout: "Key
                      Statistics for Non-Hodgkin
                      Lymphoma."
15
     Exhibit No. 23   American Cancer Society    266
16                    website printout: "Can
                      Non-Hodgkin Lymphoma Be
17                    Prevented?"
18   Exhibit No. 24   American Cancer Society    267
                      website printout: "What
19                    Causes Non-Hodgkin Lymphoma?"
20   Exhibit No. 25   Occupational Cancer Research    303
21                    Center: "An Detailed
                      Evaluation of Glyphosate Use
22                    and the Risk of Non-Hodgkin
                      Lymphoma in the North
23                    American Pooled Project
24                    (NAPP)."
25

Page 7

1    PORTIONS OF TRANSCRIPT REQUESTED TO BE MARKED
2    REQUESTED BY         PAGE NO.   LINE NO.
3    Mr. Levine          164        14
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1         BE IT REMEMBERED that on Saturday,
2    December 15, 2018, at 1900 Fifth Avenue, Seattle,
3    Washington, at 8:59 a.m., before JOHN M.S. BOTELHO,
4    Certified Court Reporter, appeared ANDREI SHUSTOV,
5    M.D., the witness herein;
6         WHEREUPON, the following
7    proceedings were had, to wit:
8
9         <<<<<< >>>>>>
10
11         THE VIDEOGRAPHER:  We are now on
12    the record.  My name is Steve Crandall, CLVS.  I am a
13    videographer for Golkow Litigation Services.  Today's
14    date is December 15th, 2018, and the time is 8:59
15    a.m.  This deposition is being held in Seattle,
16    Washington, in the matter of Hardeman vs. Monsanto
17    Company, et al., for the United States District
18    Court, Northern District of California.  The deponent
19    is Dr. Andrei Shustov.
20         Will counsel please identify themselves for the
21    record.
22         MR. WISNER:  Brent Wisner on behalf
23    of the deponent.
24         MR. LEVINE:  Aaron Levine for
25    Monsanto.

Page 9

1         MR. KERSCHNER:  David Kerschner for
2    Monsanto.
3         MR. BRENZA:  Lin Brenza with
4    Bartlit Beck for Bayer.
5         MR. WISNER:  And appearing by phone
6    is Aimee Wagstaff as well as Jennifer Moore also on
7    behalf of the deponent.
8         THE VIDEOGRAPHER:  The court
9    reporter is John Botelho, who will now swear in the
10    witness.
11
12    ANDREI SHUSTOV, M.D.,    having been first duly sworn
13                     by the Certified Court
14                     Reporter, deposed and
15                     testified as follows:
16
17         MR. WISNER:  Before we get started --
18    sorry to jump in -- I just want to make the record
19    clear that this witness is being put forward on
20    behalf of the specific cause opinions, and he's not
21    offering any general cause opinions beyond what is
22    contained in his report.  We will object to any
23    question that goes beyond the scope of that purpose.
24         We also understand that today's deposition
25    specifically relates to Mr. Hardeman and that

Andrei Shustov, M.D.

Page 10

1 tomorrow the remaining two plaintiffs will be -- be
2 questioned about. So to the extent you ask questions
3 today about the other two plaintiffs, we will object
4 to beyond the scope.
5     With that said, please get started. Sorry to
6 interrupt.
7        MR. LEVINE: I'll just add that all
8 objections should be to form to the deposition. Any
9 other objections can be reserved for later. But do
10 as you wish.
11
12        EXAMINATION
13 BY MR. LEVINE:
14 Q  Good morning, Dr. Shustov.
15 A  Good morning.
16 Q  My name is Aaron Levine. We met just a couple
17 minutes ago before we went on the record, correct?
18 A  Yes.
19 Q  And you understand that I represent Monsanto in this
20 case?
21 A  Yes.
22 Q  Can you state your full name and business address for
23 the record, please?
24 A  Sure. First name Andrei, A-n-d-r-e-i. Last name
25 Shustov, S-h-u-s-t-o-v.

Page 11

1     And business address, you said?
2 Q  Yeah.
3 A  Yes, it's Seattle Cancer Care Alliance, 825 Eastlake
4 Avenue East, Seattle, 98109.
5        (Exhibit No. 1 marked for
6        identification.)
7
8 Q  (By Mr. Levine) Dr. Shustov, I'm handing you what's
9 been marked as Exhibit 1. This is a notice of your
10 deposition.
11     Have you seen this notice before?
12 A  Yes.
13 Q  And you'll see with that notice, starting on, I
14 think, the third page, there is a Schedule A.
15 A  Okay.
16 Q  And within that part of the notice, it requests
17 production of various documents.
18     Have you reviewed this?
19 A  Yes, I did.
20 Q  And did you bring any materials responsive to the
21 requests in this notice?
22 A  I did not bring them to the deposition, no.
23 Q  Have you gone through the requests and provided
24 counsel with any materials responsive to the notice?
25 A  Whatever I have available on the list, yes.

Page 12

1 Q  Okay.
2        MR. LEVINE: Do you have any --
3 Counsel, do you have anything to produce in response
4 to --
5        MR. WISNER: I believe you received
6 our objections yesterday.
7        MR. LEVINE: Right.
8        MR. WISNER: I think we -- we
9 listed our objections to the various document
10 requests. The only one that I thought had any
11 documents that could be relevant would be invoices.
12        MR. LEVINE: Right.
13        MR. WISNER: However, my
14 understanding, he hasn't submitted any invoices. So
15 I was just mistaken that they even existed, so -- I
16 mean, but you could ask him about that, if you like.
17        MR. LEVINE: Sure. I understood
18 from your objections that invoices would be produced
19 --
20        MR. WISNER: Yeah.
21        MR. LEVINE: -- today, and --
22        MR. WISNER: And I was -- I was --
23 I thought they had been submitted, and they just --
24 there just haven't been any.
25        MR. LEVINE: Okay.

Page 13

1        MR. WISNER: Sorry.
2 Q  (By Mr. Levine) So, Dr. Shustov, I'd like you to
3 turn to Request No. 4 on the fifth page of the
4 document. Do you see that?
5 A  Page 4.
6 Q  No. Request No. 4.
7 A  Oh, I -- I apologize. It was Schedule --
8 Q  It's about the --
9 A  Request No. 4.
10 Q  -- fifth page, although --
11 A  It starts with "Words"?
12        THE REPORTER: It's -- sorry.
13 You're talking over each other.
14        THE WITNESS: Starts with, "Words"?
15 Q  (By Mr. Levine) No. So there's a request that
16 starts with "All billing records." Do you --
17 A  Oh, yes.
18 Q  -- see that?
19 A  Yes.
20 Q  And, by the way, the court reporter just reminded me
21 that I will certainly do my best not to talk over you
22 during the deposition, so that we can make it easier
23 for him to transcribe. Likewise, you should just
24 wait until I finish something. We'll probably both
25 mess up at some point. He'll let us know. But let's

Andrei Shustov, M.D.

Page 14

1   do our best --
2   A   I agree.
3   Q   Just like that.  Let's -- let's do our best to wait
4       until the other one finishes before we respond.
5   A   Understood.
6   Q   Thanks.
7              THE REPORTER:  And what was that
8       you interjected earlier?
9              MR. LEVINE:  He said, "I agree."
10             THE REPORTER:  "I agree."  Thank
11      you.
12  Q   (By Mr. Levine)  So, Dr. Shustov, Request No. 4 is
13      for all billing records, invoices, or other documents
14      reflecting time spent and/or fees charged by you,
15      either directly or through your employer or other
16      entity, in connection with the Roundup/glyphosate
17      litigation and/or consulting work regarding
18      glyphosate, the International Agency for Research on
19      Cancer, Roundup, or Monsanto.
20             Do you see that?
21  A   I do.
22  Q   Have you kept records of your time spent on this
23      litigation?
24  A   I did not submit any invoices.
25  Q   So, all due respect, that was not my question.

Page 15

1              My question is:  Have you kept any records of the
2       time that you've spent working on this litigation?
3   A   I do.
4   Q   And did you provide those to counsel when you
5       reviewed this notice and the request for that
6       information?
7              MR. WISNER:  So to the extent you
8       don't disclose any privileged communication, you can
9       answer the question factually if you gave me anything
10      reflecting that.
11             I just want to make sure he didn't disclose any
12      privileged communication.
13             THE WITNESS:  I'm sorry.  I don't
14      understand --
15  Q   (By Mr. Levine)  So --
16  A   -- what that means.
17  Q   -- let me -- let me explain it.  I'm not entitled to
18      ask you what you've spoken about with your counsel.
19  A   Okay.
20  Q   The substance of any communications.  So I will not,
21      or I will try not to -- and I'm sure there will be an
22      objection if I do -- ask you what you told Mr. Wisner
23      or anyone else about something in particular.  But I
24      can ask you about process, whether you've met with
25      Mr. Wisner, what you gave Mr. Wisner, et cetera.

Page 16

1   A   Sure.
2   Q   Have you provided counsel with the records that you
3       just told me about that you keep of the time spent in
4       this litigation?
5   A   Which is different from invoices?
6   Q   I'm asking about any records of the time that you've
7       spent.
8   A   I believe I did.
9              MR. LEVINE:  I'm going to request
10      production of records of Dr. Shustov's time spent.
11             MR. WISNER:  Sure.  And I represent
12      to you that his notes and partic -- and stuff that
13      he's prepared as note-wise related to his testimony
14      is protected from disclosure under Pretrial Order No.
15      7.  So we do not have to produce that.  And, in fact,
16      discovery related to that is actually specifically
17      prohibited by the court's order.  So I'm going to say
18      "no."
19             That said, if you want to ask him about the time
20      he spent, by all means --
21             MR. LEVINE:  I --
22             MR. WISNER:  -- do.
23             MR. LEVINE:  I know what I can ask
24      him.
25             Are you telling me that notes of time spent are

Page 17

1   protected?
2              MR. WISNER:  I believe --
3              MR. LEVINE:  Is that what you're
4       representing?
5              MR. WISNER:  I believe it says all
6       notes by the expert.  That's what the -- that's what
7       the order says.  So I'm just applying the order as
8       it's written.
9              MR. LEVINE:  So those -- my
10      understanding of that is they are notes as to the
11      substance of his opinions.  We are entitled to
12      information regarding billing.  And I'm going to note
13      that on the record and request that for production.
14      We'll follow up, but --
15             MR. WISNER:  I think we're --
16             MR. LEVINE:  I would --
17             MR. WISNER:  Sorry.
18             MR. LEVINE:  But I would ask that
19      you produce those at a break during this deposition.
20             MR. WISNER:  Okay.  Our position is
21      that it applies to notes.  And the information of his
22      billing, by all means, ask away.  But any of his
23      notes related to his preparation of his testimony is
24      specifically prohibited under PTO 7.  So I -- I
25      respectfully disagree.  But we can talk about this

Page 18

1    off the record, if you like.
2              MR. LEVINE:  And it's your opinion
3    that PTO 7 applies to these depositions?
4              MR. WISNER:  It says unequivocally
5    that it applies to all expert discovery --
6              MR. LEVINE:  Sure.
7              MR. WISNER:  -- in this MDL.
8              MR. LEVINE:  Okay.  Just making
9    sure --
10             MR. WISNER:  Sure.
11             MR. LEVINE:  -- I understood that.
12             MR. WISNER:  I can show it to you
13   at the break, if you like.
14             MR. LEVINE:  No.  I -- I -- I read
15   it.
16             MR. WISNER:  Okay.
17             MR. LEVINE:  I was just asking.  I
18   agree with you, by the way.
19             MR. WISNER:  Okay.
20   Q  (By Mr. Levine)  Dr. Shustov, how much time have you
21   spent working on the Roundup litigation?
22   A  Specifically on Mr. Hardeman case, somewhere between
23   30 and 40 hours.
24   Q  How about on the entire litigation?
25   A  Could you please define what is entire litigation as

Page 19

1    opposed to Mr. Hardeman?
2    Q  So you've been retained by counsel in -- counsel for
3       various plaintiffs in litigation involving Roundup,
4       correct?
5    A  That's correct.
6    Q  And you've done various work for counsel related to
7       those matters, correct?
8    A  Correct.
9    Q  And in total, how much time have you spent on all of
10      the matters you've worked on?
11   A  Without looking at the sort of track of -- of -- of
12      my time, I'd say roughly 50, 60 hours.
13   Q  And that includes the 30 to 40 hours you've spent on
14      Mr. Hardeman's case?
15   A  That's correct.
16   Q  When were you first contacted by plaintiff's counsel
17      to serve as an expert in this litigation?
18             MR. WISNER:  Again, Doctor, don't
19   reveal any substance of any communication, but the
20   date of contact is appropriate.
21             THE WITNESS:  I honestly don't
22   remember the exact date when I was contacted.
23   Q  (By Mr. Levin)  What do you --
24   A  My recollection is beginning of summer.
25   Q  And to be clear, you're talking about the beginning

Page 20

1    of the summer of 2018?
2    A  That's correct.  '18.
3    Q  '18?
4    A  Yeah.
5    Q  Yeah.
6       Do you recall whether that was -- can you be more
7    specific?  Do you recall whether that was April/May
8    or June/July?
9    A  I honestly don't remember.
10   Q  Do you remember who contacted you?
11   A  Yes.  It was Ms. Kathryn For -- Forgie -- Forge
12   (phonetic).
13             MR. WISNER:  Forgie.
14             THE WITNESS:  Forgie.  Go by
15   "Kathryn."
16             MR. WISNER:  And that's F-o-r-i-g-e
17   [sic].
18             MR. LEVINE:  We can get spelling on
19   a break.  Thank you.
20             MR. WISNER:  I actually spelled it
21   wrong.  F-o-r --
22             MR. LEVINE:  Rough is going to --
23             MR. WISNER:  -- g-i --
24             MR. LEVINE:  -- have a lot of --
25             MR. WISNER:  -- e.

Page 21

1              MR. LEVINE:  -- spelling errors.
2    We can --
3              MR. WISNER:  Sorry.  Just...
4    Q  (By Mr. Levine)  Dr. Shustov, did you know Ms. Forgie
5    before she contacted you?
6    A  No.
7    Q  Did you -- when Ms. Forgie contacted you -- well,
8    strike that.
9       Did you meet with any other attorneys before
10   agreeing to offer opinions in this litigation?
11   A  No.
12   [redacted]
13   [redacted]
14   [redacted]
15   [redacted]
16   [redacted]
17   [redacted]
18   Q  Have you met with any other attorneys besides
19      Mr. Wisner and Ms. Forgie in this litigation?
20   A  No.
21   Q  How much time have you spent meeting with attorneys
22      in this litigation?
23   A  The total time between three visits, roughly 15
24   hours.
25   Q  And do you recall when those visits were?

Andrei Shustov, M.D.

Page 22

1  A  I don't recall specific dates.  The very last one, as
2     was mentioned, was this week.
3  Q  And that was with Mr. Wisner?
4  A  That's correct.
5  Q  Anyone else?
6  A  No.
7  Q  Was anyone else attending by phone?
8  A  No.
9  Q  Okay.  And that was on Wednesday of this week?
10 A  I believe it was Thursday.
11 Q  Thursday.
12           MR. WISNER:  Sorry.
13 Q  (By Mr. Levine)  And how long -- I'm sorry if -- I
14    don't think I asked this.  But for how long did you
15    meet with Mr. Wisner on Thursday?
16 A  About four hours.
17           (Exhibit No. 2 marked for
18             identification.)
19
20 Q  (By Mr. Levine)  Handing you what's been marked as
21    Exhibit 2, which is your CV that was provided to us
22    with your expert report.
23       That is your current CV?
24 A  That's correct.
25 Q  And does it accurately summarize your education and

Page 23

1     professional -- professional experience?  Excuse me.
2  A  It does.
3  Q  Have you ever published -- you've published -- strike
4     that.
5        You've published regarding non-Hodgkin's
6     lymphoma, correct?
7  A  That's correct.
8  Q  Have you given presentations regarding non-Hodgkin's
9     lymphoma?
10 A  Yes, I did.
11 Q  Do you lecture regarding cancer risk?
12 A  In a very minimal capacity.
13 Q  Do you lecture regarding cancer prevention?  That
14    might be the same thing, but...
15 A  No.
16 Q  Have you conducted any scientific research regarding
17    Roundup?
18 A  No.
19 Q  Have you conducted any scientific research regarding
20    glyphosate?
21 A  No.
22 Q  Have you conducted any scientific research involving
23    pesticides?
24 A  No.
25 Q  Have you conducted any scientific research involving

Page 24

1     any herbicides?
2  A  No.
3  Q  Have you authored any articles regarding Roundup?
4  A  No.
5  Q  Have you authored any articles concerning glyphosate?
6  A  No.
7  Q  Have you authored any articles concerning pesticides?
8  A  No.
9  Q  Have you authored any articles concerning herbicides?
10 A  No.
11 Q  Apart from your work in this case, have you ever
12    written or presented information or opinions about
13    non-Hodgkin's lymphoma and Roundup or glyphosate?
14 A  No.
15 Q  Apart from your work in this case, have you had any
16    professional scientific involvement regarding
17    non-Hodgkin's lymphoma and Roundup or glyphosate?
18 A  Could you please repeat that?  As part of this
19    litigation?
20 Q  I'll ask it again.
21 A  Yeah.
22 Q  Apart from your work in this litigation --
23 A  Okay.
24 Q   -- have you had any professional scientific
25    involvement regarding non-Hodgkin's lymphoma and

Page 25

1     Roundup or glyphosate?
2  A  No.
3  Q  You've never given a talk to a profession --
4     professional medical or scientific group about
5     Roundup or glyphosate, correct?
6  A  No.
7  Q  You've never given a talk to a professional medical
8     or scientific group regarding pesticides or
9     herbicides, correct?
10 A  Correct.
11 Q  It's fair to say you've not been involved with the
12    manufacturing, testing, or marketing of chemical
13    products?
14 A  That's correct.
15 Q  You've never worked for the EPA, correct?
16 A  Correct.
17 Q  You've never worked for any foreign regulatory
18    authority, correct?
19 A  Correct.
20 Q  Have you testified as an expert before in litigation?
21 A  I did.
22 Q  How many times?
23 A  Once.
24 Q  And what was that litigation?
25 A  This was Wendell case of hepatosplenic T-cell

Andrei Shustov, M.D.

Page 26

1    lymphoma.
2    Q  Is that the only time you've testified as an expert
3       before?
4    A  Yes.
5                  (Exhibit Nos. 3 and 4 marked
6                   for identification.)
7
8    Q  (By Mr. Levine)  Handing you what's been marked as
9       Exhibit 3, which is your expert report in this case.
10      And I'm handing you Exhibit 4, which is your reliance
11      list in this case as of, I believe, November 19,
12      2018.
13         And I will represent, although I don't have it
14      with me, that we received a supplemental reliance
15      list which lists a few expert reports from
16      defendants' experts.
17         You understand that?
18   A  Yes.
19   Q  Okay.  And those were expert reports of Dr. Levine,
20      Dr. Grossbard, Dr. Steidl, and Dr. Arbor, correct?
21   A  Correct.
22   Q  And so Exhibit 3 I've handed you is your report,
23      correct?
24   A  That's correct.
25   Q  And does that report disclose all of the opinions you

Page 27

1       -- you intend to offer at trial?
2    A  At the time of this report, yes.
3    Q  And today?
4    A  If I'm asked something outside the report, I might
5       offer my opinion on the questions or answers.
6    Q  Understood.
7          But as of today, going into this deposition, that
8       report contains all of the opinions --
9    A  That's correct.
10   Q  -- you -- you intend to offer at trial?
11   A  That's correct.
12   Q  Again, just give me a second to finish the question.
13   A  Sorry.
14   Q  I'd love to speak casually with you.  Now's not the
15      time.
16         And the report, along with the Exhibit 4 reliance
17      list as well as the defendants' expert depositions
18      that you've reviewed, discloses all of the materials
19      you've relied on related to Mr. Hardeman in forming
20      your opinions in that case, correct?
21   A  That's correct.
22   Q  Okay.  Did you review any of the expert reports of
23      Mr. Hardeman's experts?
24   A  Can I ask you what -- what does that mean?
25   Q  Yes.

Page 28

1    A  Mr. Hardeman?
2    Q  So you're one of Mr. Hardeman's experts.
3    A  Okay.
4    Q  So Mr. Hardeman's the plaintiff in this case.  In
5       addition to your report, Mr. Hardeman has put forth
6       various other experts discussing the cause of his
7       cancer.
8          There -- I understand that on your reliance list,
9       there are reports of experts who have submitted
10      general causation opinions.  So I'm not asking about
11      those.
12         Besides those reports, have you reviewed any
13      reports of Mr. Hardeman's case-specific experts in
14      this case?
15   A  There are a lot of reports.  So I reviewed
16      Dr. Weisenburger's report.  I don't know if it counts
17      as his expert.  Then I reviewed Dr. Nabhan's report.
18      I reviewed Drs. Portier and Ritz.  I don't know if
19      they're list -- is it -- I just don't know which
20      qualifies to answer your question, so those.
21   Q  So you reviewed Dr. Nabhan's report, correct?
22   A  Yeah.
23   Q  And you reviewed Dr. Weisenburger's report?
24   A  That's correct.
25   Q  When --

Page 29

1              MR. WISNER:  Just to be clear, I
2       think there might be some confusion here.  When you
3       say "report" --
4              MR. LEVINE:  Oh.  So --
5              MR. WISNER:  -- are you talking
6       about --
7              MR. LEVINE:  I should --
8              MR. WISNER:  -- Hardeman's
9       report --
10             MR. LEVINE:  Yes.
11             MR. WISNER:  -- or are you talking
12      about reports generally?
13             MR. LEVINE:  Understood.
14             MR. WISNER:  Because they did give
15      general causation reports.
16   Q  (By Mr. Levine)  So I'm aware that you've reviewed
17      general opinions by Drs. Nabhan and Weisenburger that
18      are listed on your reliance list.
19   A  Mm-hmm.
20   Q  Have you reviewed any reports by Drs. Nabhan or
21      Weisenburger specifically related to Mr. Hardeman?
22   A  No.  I apologize.  It's very confusing, the language,
23      to me.  No.
24   Q  Okay.
25   A  Thanks for clarifying.

Andrei Shustov, M.D.



**Page 30**

**Page 31**

9    Q   (By Mr. Levine) How many depositions did you review
10       besides Mr. and Mrs. Hardeman that are specific to
11       Mr. Hardeman's case?
12    A   Well, I remember, as I mentioned, I reviewed
13       Dr. Weisenburger's -- specific to the case again.
14       Not general causation.
15    Q   Correct.
16    A   I have to -- I would have to look at actual
17       materials.  I apologize.  I -- there are many things
18       I reviewed.  So I reviewed Hardemans' both
19       depositions and -- and the depositions that I
20       mentioned and are listed.  Off the top of my head, I
21       don't remember.
22    Q   Okay.  There are no depositions specific to
23       Mr. Hardeman's case listed in your -- in any reliance
24       list we've received or in your report.  So I'm just
25       trying to find out whether there's anything you

**Page 32**

1        reviewed that's not included in those materials.
2    A   Okay.  That's -- maybe that's why I don't remember.
3    Q   Maybe because you didn't read any other --
4    A   Correct.
5    Q   -- depositions, correct?
6    A   Correct.
7    Q   Okay.  So it's fair to say whatever you've read has
8        been listed in the materials you've reviewed?
9    A   That's correct.
10   Q   Okay.  On your report, which I think is Exhibit 3, on
11       Page 1 it says you've reviewed extensive medical
12       records?
13   A   Yes.
14   Q   Which records did you review?
15               MR. WISNER:  I don't mean to --
16       sorry.  I don't mean to be nitpicky.  Where on
17       Exhibit 3 does it say that?  I just -- so it's clear.
18               MR. LEVINE:  It's on Page 1.  It's
19       in the --
20               MR. WISNER:  Third line?
21               MR. LEVINE:  Yeah.
22               MR. WISNER:  Okay.  Got it.
23       Thanks.
24               MR. LEVINE:  So many copies.  I
25       didn't highlight it in this one.

**Page 33**

1    Q   (By Mr. Levine)  So on Page 1, in the top paragraph,
2        it says you reviewed extensive medical records.
3
19   Q   Okay.  Let's talk a little bit about how you prepared
20       your opinions in this case.
21           You prepared your report in this case?
22   A   That's correct.
23   Q   Tell me about the method you used to prepare your
24       report in this case.
25               MR. WISNER:  Objection; vague.

Page 34

1    THE WITNESS:  So I'm a clinician.
2    And the method that we use in assessing patient,
3    clinical practice, are history taken, physical exam,
4    review of medical records, creating -- creating
5    differential diagnosis, and stating the opinion.
6    Q   (By Mr. Levine)  I'm sorry.  I forgot to ask you when
7    I was looking at your CV.  You mentioned you're a
8    clinician.  Do you teach medical students?
9    A   I do.
10   Q   Do you teach medical students about Roundup?
11   A   No.
12   Q   In preparing your report in this case, did you use
13   the same scientific methods and standards as you
14   would in your academic and clinical practice in
15   reviewing and reporting research results?
16   A   I did.
17   Q   Did you -- did you conduct any literature searches?
18   A   I did.
19   ████████████████████████
20   █ ████████████████████████████████
21   ████████████████████████████████
22   ██████████████████████████████
23   ██████████████████████████████
24   ██████████████████████████████████
25   ███████████████████████████████

Page 35

1    ████████████████████
2         █████████████████████████
3    █ ██████    █████████████████████
5    Q   (By Mr. Levine)  Okay.  So, first, you said you had
6    to read on general causation regarding Roundup,
7    correct?
8    A   Mm-hmm.
9    Q   What type of searches did you perform on general
10   causation regarding Roundup?  And I can be more
11   specific if you don't understand that.
12   A   Yeah, please specify.  What do you mean what type
13   of --
14   Q   What -- what search engines did you use?  What search
15   terms did you use?
16   A   We typically in medicine use something called PubMed.
17   Q   Mm-hmm.
18   A   And I put keywords, and then I select papers that I
19   believe are pertinent based on paper title or brief
20   review of the abstract.
21   Q   Did you conduct any Google searches?
22   A   No.
23   Q   Did the lawyers give you any literature?
24   A   No.
25   Q   Why did you need to do searches regarding general

Page 36

1    causation?
2    A   Because I'm not general causation expert.  I'm not
3    epidemiologist.  And I have only basic A-B-C-type
4    knowledge on epidemiology, so I had to rely on
5    published literature and opinions of authors and
6    experts in the field.  So that would help me, my
7    opinion on the questions that I was addressing.
8    Q   So your general causation searches were necessary for
9    your opinions in this case?
10   A   Correct.
11   Q   Were you -- prior to conducting the general causation
12   searches you did for your opinions in this case, did
13   you have any opinion about whether Roundup or
14   glyphosate causes non-Hodgkin's lymphoma?
15   A   A general opinion.
16   Q   And what was your general opinion prior to
17   conducting --
18   A   The --
19   Q   -- these searches?
20   A   -- general opinion --
21   Q   Again, please just let me finish the question.  For
22   the courtesy of the court reporter.  So I'll -- I'll
23   ask again.
24       What was your general opinion prior to conducting
25   the searches for this litigation?

Page 37

1    A   The general opinion in field of oncology that the
2    pesticides are a risk factor for developing, in my
3    field, lymphomas.  This is something I ask patients,
4    when I see on a daily basis new consults, whether
5    they were exposed to multitude of compounds in their
6    household life, in their military service, in their
7    professional work or growing up, and this is one of
8    the questions I always ask patients, whether they're
9    exposed to agricultural products, whether they grew
10   up on a farm or worked on warehouses that store those
11   type of compounds.
12   Q   So you said you always ask patients whether they were
13   exposed to agricultural products --
14   A   Correct.
15   Q   -- when you see new patients or consults, correct?
16   A   Correct.
17   Q   For how long have you been doing that?
18   A   Since I was trained in oncology, since I became an
19   oncologist.  This is something that is -- I can say
20   is a general knowledge in oncology.
21   ██████████████████████████████████
22   ███████████████████████
23   ████████████
24   ██████████████████████████████████
25   ██████████████████████████████████

Andrei Shustov, M.D.



Page 38

Page 40

1   A  I'd say six, seven hours.

2   Q  Did you review any other documents besides medical

3      records or medical literature in relation to

4      Mr. Hardeman's case, such as any legal documents?

5   A  No.

6   Q  Did you review a plaintiff fact sheet?

7   A  I did.

8         Can I ask a question?  The plaintiff fact sheet,

9      that's what the patients fill out, the questionnaire

10     that -- yes, I did.

11  Q  As -- I believe that is a pretty close description as

12     to --

13  A  Yeah.

14  Q  -- what it is.  And I will assume that you didn't

15     review any other questionnaire that he filled out

16     other than that.

17  A  I apologize.  The legal lingo is just not familiar to

18     me.

19         MR. LEVINE:  I think Mr. Wisner

20     would correct me if my assumption is --

21         MR. WISNER:  That's correct.

22         MR. LEVINE:  -- wrong.

23         MR. WISNER:  I don't believe he's

24     seen anything beyond the plaintiff fact sheet.  I

25     believe his understanding of the fact sheet is the

Page 41

17  Q  So the meeting was -- the physical exam was not

18     conducted in a medical facility or examination room.

19  A  No.

20  Q  Correct?

21         MR. WISNER:  Counsel, I'm sorry.

22     Can we go off the record really quickly?

23         MR. LEVINE:  Sure.

24         THE VIDEOGRAPHER:  Please stand by.

25     We're going off the record.  The time is 9:36 a.m.



Page 42

1        (Pause in proceedings.)

2

3        THE VIDEOGRAPHER:  We are back on

4    the record.  The time is 9:44 a.m.

Page 44

1    you understand you've examined Mr. Hardeman, correct?

2    A    That's correct.

9        MR. WISNER:  Objection.

16        MR. WISNER:  Objection; improper

17    hypothetical, speculation.

Page 43

6    Q

12    Q

Page 45

6    Q

10        MR. WISNER:  Objection; overbroad,

11    speculation, improper hypothetical.

15        MR. LEVINE:  I can re-ask, if you

16    like.

22    A

23    Q    Again, just try and wait one second before I'm

24    finished.

Andrei Shustov, M.D.



**Page 46**

12        MR. WISNER:  Objection; misstates
13   his testimony.

18   Q   (By Mr. Levine)  Have you ever been asked to review
19       the records of a patient and offer an opinion to
20       another doctor?
21   A   Yes, I did.
22   Q   I mean, have you done so without examining the
23       patient --
24   A   That --
25   Q   -- in your career?

**Page 47**

1    A   That would not be for straightforward stating my
2        medical opinion.  That's something that's in medicine
3        called curbsiding for specific questions that would
4        not bear any decision on that physician's actual
5        actions or -- or treatments.

13        MR. WISNER:  Objection; misstates
14   his testimony.

23   Q   (By Mr. Levine)  You mentioned you testified
24       previously in another litigation, correct?
25   A   That's correct.

**Page 48**

1    Q   Did you examine the patient in that litigation?
2    A   Patient was dead in that case.
3    Q   Okay.  That's unfortunate.  But you were able to
4        offer an opinion in that litigation without examining
5        a patient, correct?
6    A   That's correct.

22        MR. WISNER:  Objection; misstates
23   his testimony.
24        THE WITNESS:  Not from physical
25   examination, no.

**Page 49**



Page 50

Page 51

Page 52

14    MR. WISNER:  Objection; misstates
15  his testimony, compound.

Page 53

3  Q   Okay.  How much time did you spend preparing your
4    report in this case?
5         MR. WISNER:  Objection; vague as to
6    "prepare."  Do you mean writing?
7  Q   (By Mr. Levine)  Well, how much time did you spend
8    writing your report?
9  A   Approximately eight hours.
10  Q   Describe the process of writing a report.

17  A   You mean my report?
18  Q   Yeah.
19  A   It does not describe the process.  It describes my
20    conclusion.
21  Q   Strike that.

25  A   I don't understand what you're asking.

Andrei Shustov, M.D.

Page 54

7   Q   And then what about the section on the description of
8       DLBCL that's on Pages 4 to 5 of your report?
9       Describe that process.  It wasn't -- you -- you give
10      information on DLBCL in your report, correct?
11  A   That's correct.
12  Q   Describe the process of how you prepared that.
13  A   I typed it.
14  Q   Did you have literature in front of you?
15  A   I have practiced lymphoma therapy for 11 years.  I
16      wrote chapters on lymphomas, and I published over 60
17      papers.  I can write opinion on lymphomas off top of
18      my head.
19  Q   Okay.  So you wrote the opinions of lymphomas off the
20      top of your head in Pages 4 to 5 of your report?
21              MR. WISNER:  Objection; misstates
22      his testimony.
23              THE WITNESS:  I verified the
24      contemporary numbers for incidence during writing and
25      the rest of it, yes.

Page 55

1   Q   (By Mr. Levine)  Okay.  And that section, it's
2       entitled "General Characterization of Diffuse Large
3       B-Cell Lymphoma (DLBCL)," correct?
4   A   That's correct.
5   Q   The section's about DLBCL specifically, correct?
6   A   Correct.
7   Q   It's not about non-Hodgkin's lymphoma generally,
8       correct?
9   A   Both.
10  Q   This section contains general information on
11      non-Hodgkin's lymphoma?  Is that what you're telling
12      me?
13  A   Which section you're talking about?
14  Q   Like I just said, the section called "General
15      Characterization of Diffuse Large B-Cell Lymphoma."
16  A   Okay.  Yes.  That what I just said pertains to that
17      section.
18  Q   That -- this is a discussion of generally
19      non-Hodgkin's lymphoma is what you're saying?
20  A   This is discussion of diffuse large B-cell lymphoma.
21  Q   Okay.  Where's the discussion of non-Hodgkin's
22      lymphoma in general?
23  A   I did not write discussion of non-Hodgkin lymphoma
24      generally.
25  Q   Okay.  So this section, as I just asked you, is about

Page 56

1       DLBCL specifically and is not about non-Hodgkin's
2       lymphoma generally, correct?
3   A   That's correct.
4   Q   Non-Hodgkin's lymphoma is a heterogeneous disease,
5       correct?
6   A   It is heterogeneous disease.
7   Q   Okay.  Different subtypes have different clinical and
8       prognostic characteristics, correct?
9   A   That's correct.
10  Q   Different subtypes can have different risk factors,
11      correct?
12  A   They can.
13  Q   Okay.  And they can have different causes, correct?
14  A   Hypothetically, they can.
15  Q   They often do, correct?
16  A   Or the same cause can cause any lymphoma.
17  Q   Either way, I mean, the same -- either one could be
18      true, correct?
19  A   Either one can be true.
20  Q   And that would have to be researched in order to know
21      that, correct?
22  A   If possible.
23  Q   Okay.  Do you agree that, for the vast majority of
24      DLBCL, the cause is unknown?
25              MR. WISNER:  Objection; misstates

Page 57

1       his testimony.
2               THE WITNESS:  For vast majority of
3       DLBCLs, we never asked.
4   Q   (By Mr. Levine)  So --
5               THE REPORTER:  Of what?
6               THE WITNESS:  We never asked.
7   Q   (By Mr. Levine)  You disagree with that statement?
8   A   I disagree with that statement.
9   Q   Okay.  Turn to Page 4 of your report, Paragraph 2.
10      Do you see the first sentence in Paragraph 2 on
11      Page 4 of your report?
12  A   I'm sorry.  Where is it at?
13  Q   It says, "The causes of DLBCL are unknown in most
14      patients."
15  A   Sorry.  What page?
16  Q   On Page 4 of --
17  A   Yeah.
18  Q   -- your report, Paragraph No. 2, you state, "The
19      causes of DLBCL are unknown in most patients."
20      Is that true or not?
21  A   It is true.
22  Q   Okay.  So you agree with me, that for the vast
23      majority of DLBCL, the cause is unknown, correct?
24              MR. WISNER:  Objection; misstates
25      what's written right there.

## Page 58

1  Q  (By Mr. Levine) I'm asking you: Do you agree with

2     that or not?

3  A  The cause is unknown for most patients, but it

4     doesn't mean that for most DLBCL there is no cause.

5  Q  I never said there is no cause. Let me ask you

6     again.

7  A  Okay.

8  Q  Do you agree that for the vast majority of DLBCL, the

9     cause is unknown?

10 A  For vast majority of DLBCL patients, the cause is

11    unknown. To me, it makes a difference.

12 Q  Okay. And the same would be true for non-Hodgkin's

13    lymphoma. For the vast majority of non-Hodgkin's

14    lymphoma patients, the cause is unknown?

15       MR. WISNER: Objection; vague as to

16    "vast majority."

17       THE WITNESS: The cause for

18    non-Hodgkin lymphoma in majority of patients is

19    unknown because nobody looked.

20       MR. LEVINE: Okay. Brent, by the

21    way, you can object to the form. But if you start

22    throwing in the words in my question to coach the

23    witness, like --

24       MR. WISNER: I actually was

25    coaching --

## Page 59

1        MR. LEVINE: -- "vast majority" or

2     whatever, I'm going to mark the transcript. We'll

3     mark that part of the transcript, and we'll send that

4     to the judge. Speaking objections are not allowed.

5     I have no problem with you objecting to form.

6        MR. WISNER: Sure. And, Counselor,

7     to be frank, I was coaching you. You were --

8        MR. LEVINE: I don't need to be

9     coached. I can --

10       MR. WISNER: Hold on.

11       MR. LEVINE: -- tell you that --

12       MR. WISNER: Let me --

13       MR. LEVINE: -- right now.

14       MR. WISNER: Let me finish what

15    I'm --

16       MR. LEVINE: Don't coach me the

17    rest of the deposition.

18       MR. WISNER: Please let me finish

19    what I'm saying before you interject. I was simply

20    saying that I was trying to coach you, because I

21    think you kept jumping from a sentence that says

22    something to a sentence that said something else.

23    Hold on. Let me finish what I'm saying before you

24    interrupt.

25       MR. LEVINE: I -- I --

## Page 60

1        MR. WISNER: Please let me finish

2     what I'm saying before you interrupt. And before --

3     I didn't want to have to keep objecting to that, and

4     so I wanted you to know what I was objecting to. So

5     that was really a signal to you, not to the witness

6     whatsoever.

7        MR. LEVINE: I don't need to be

8     signaled. You can object to my questions on form.

9     This is my deposition. I can ask whatever I want,

10    and --

11       MR. WISNER: That's -- that's not

12    true, but okay. If you think so.

13       MR. LEVINE: I can explore the

14    doctor's opinions in whatever way I want.

15       MR. WISNER: That's also just

16    factually and legally incorrect, but we can fight

17    that as we get there. And I don't want to fight with

18    you. I was really just trying to tell you what my

19    objection was. So please continue with your

20    deposition.

21 Q  (By Mr. Levine) Do you agree that DLBCL is most

22    common in patients over the age of 60?

23 A  It is more common over the age of 60 than patients

24    younger than 60.

25 Q  Okay. And agree the same would be true for

## Page 61

1     non-Hodgkin's lymphoma? It's more common in patients

2     over 60?

3  A  That's not true as a general statement.

4  Q  Okay. You think it's equally as common in patients

5     under 60, or -- explain to me what's not true about

6     that statement.

7  A  It's a dramatic simplification of 60-plus type of

8     non-Hodgkin lymphomas. 'Cause some of them are most

9     common in children. Some of them are more common in

10    second decade of life. Some of them are common in

11    older patients. And you have to have a look at

12    particular type of lymphoma. You're talking about 60

13    different types.

14 Q  So when you're considering -- when you're -- again,

15    when you're looking at lymphoma, you really got to

16    look at it by the type in order to state an opinion?

17 A  That's correct.

18 Q  You agree that cancer generally is a function of age,

19    correct?

20 A  It's overly simplification.

21 Q  Do you agree that as people age, the risk of cancer

22    increases?

23 A  General risk of cancer if you take all the cancers

24    together. But there is such a thing as pediatric

25    oncology, and there are cancers that happen 90

Page 62

1    percent of the time in infants, 90 percent of the
2    time in young adults or adolescents, and there are
3    cancers that happen in older people.  If you talk
4    about all the cancers with hundreds of different
5    types, nobody can make a statement that cancers are
6    disease of elderly.  What do you say then --
7              THE REPORTER:  Are what?
8              MR. LEVINE:  Diseases of --
9              THE WITNESS:  Cancer is disease --
10             MR. LEVINE:  -- the elderly.
11             THE WITNESS:  -- of el -- what do
12   you say, then, to mothers of children who have cancer
13   the age of two or five or -- it's -- you're looking
14   at the very broad variety of diseases, and you're
15   lumping in one thing and say, Well, gee, that's
16   common in elderly.  Answer is, as a general
17   statement, it's incorrect.
18   Q  (By Mr. Levine) Okay.  Do you agree that, as people
19   age, the risk of DLBCL increases?
20   A  The incidence of DLBCL increases.
21   Q  Do you agree that a person's risk of developing DLBCL
22   increases with age?
23   A  Yes, I do.
24   Q  Do you agree that a person's risk of non-Hodgkin's
25   lymphoma increases with age?

Page 63

1    A  I disagree with that statement.  You have to tell me
2    what type of lymphoma it is.
3



Page 64

1    Q  How long did it take you to prepare that section of
2    your report?
3    A  I can't say that.  Like I said, the report, four or
4    five hours.  And I don't know what part of it was
5    typing this part and looking at his history.  It was
6    a part of the overall report preparation.
7    Q  Sorry.  I thought you said you spent eight hours
8    preparing your report.  Was it four to five or was it
9    eight?
10   A  Well, probably more like eight.
11   Q  Okay.  Pages 7 to 9 of your report discuss -- it's a
12   discussion of Mr. Hardeman's lymphoma causation,
13   correct?
14   A  Yeah.
15   Q  How long did you spend preparing that part of your
16   report?
17             MR. WISNER:  Objection; vague.
18             THE WITNESS:  So when you say
19   preparing the report, typing this part or preparing
20   to -- for this?
21   Q  (By Mr. Levine) Good question.  How long did you
22   spend typing it?
23   A  Typing this?  Like I said, I was typing report at the
24   same time.  I can't -- I can't really measure what
25   part went into typing this section versus the other

Page 65

1    section.  I -- I just -- it's sort of --
2    Q  How long --
3    A  -- I don't know how --
4              THE REPORTER:  "Sort of," what?
5              THE WITNESS:  I don't know how much
6    exactly I spent on this section versus that section.
7    Q  (By Mr. Levine) More than ten minutes?
8    A  Of course it's more than ten minutes.
9    Q  Okay.  More than an hour?
10   A  Yes, more than an hour.
11   Q  More than two hours?
12   A  That I can't say.
13   Q  Okay.
14   A  In order to type this, I had to again review their
15   records and look at the references that I -- I
16   mentioned before.  So part of preparation for this
17   report we just discussed.  Doing the search and --
18   and reading the papers that I thought were worthy.
19   But the typing actual report, it was part of a time I
20   spent typing.
21   Q  Turn to Page 9.  That's the conclusions you're
22   offering?
23   A  Sure.
24   Q  These are your opinions in this case?
25   A  That's correct.

**Page 66**

1  Q  It's your opinion that Mr. Hardeman has been exposed
2     to glyphosate in a -- in a manner and with magnitude
3     that fits within the published epidemiological
4     literature and studies where causation and an
5     association have been demonstrated, correct?
6  A  That's correct.
7  Q  And then it's your opinion that, in performing the
8     differential diagnosis into what caused Mr.
9     Hardeman's DLBCL, "I conclude," meaning you conclude,
10    "to a reasonable degree of medical certainty that his
11    exposure to Roundup/glyphosate is a substantial
12    factor contributing to the development of his NHL,"
13    correct?
14 A  That's correct.
15 Q  So I want to focus on your opinion that Mr.
16    Hardeman's exposure to Roundup and glyphosate is a
17    substantial factor contributing to the development of
18    his non-Hodgkin's lymphoma.  Okay?
19 A  Sure.
20 Q  Walk me through your methodology in forming that
21    opinion.
22 A  I reviewed the literature that was the basis of the
23    general causation opinion that I extracted from IARC
24    report and from general knowledge of causation.  And
25    I looked at specific exposures described in those

**Page 67**

1     papers, and I compared those to the duration and
2     amount of exposure that Mr. Hardeman had based on
3     taking his history.
4        And in my opinion, from what I learned from Mr.
5     Hardeman and what's described in literature on
6     general causation, it was consistent with the fact
7     that he had substantially higher levels of exposure
8     than the exposure described for causing risk of
9     lymphoma.
10 Q  Okay.  So your opinion is you reviewed the literature
11    and studies, determined that Mr. Hardeman's exposure
12    was within those studies, and that it was consistent
13    with the fact that he had substantially higher levels
14    of exposure than described in the literature for
15    causing lymphoma.
16       Did I summarize that correctly?
17 A  That's correct.
18 Q  Did you do anything else as part of your methodology?
19 A  Yes.  I performed what, again, I call the
20    differential diagnosis into other possible causes to
21    exclude other possibilities from his medical history
22    and from -- from his report to see if there are other
23    competing causes for his lymphoma.
24 Q  Did you identify other -- any other competing causes
25    for his lymphoma?

**Page 68**

1  A  Not to any significant medical degree of certainty.
2  Q  And you said that was a differential diagnosis?
3  A  I called it "differential diagnosis," but you can
4     also -- if you really want to dive into it, it's a
5     hypothetical deductive method.  That's what
6     differential diagnosis is.  So we identify the list
7     of possibilities, and you eliminate them based on
8     probability.
9  Q  So I've -- I don't profess to be an expert on every
10    medical textbook, but when I've looked in medical
11    textbooks, differential diagnosis is described as
12    diagnosing someone's disease that is responsible for
13    the symptoms they have.  Am I correct about that?
14            MR. WISNER:  Objection.  Move to
15    strike counsel's testimony.
16            THE WITNESS:  That's how we use it
17    in medicine, but it does not mean that you cannot use
18    it for anything else.  If you're asking nomenclature,
19    as far as nomenclature goes, I decided -- I chose to
20    use this nomenclature because it would give that
21    understanding how I did the -- how I did my analysis.
22       But your statement is correct.  The most common
23    use of differential diagnosis is to come up with
24    diagnosis of the disease.  I use this terminology
25    as -- as a method looking at causes of lymphoma.

**Page 69**

1  Q  (By Mr. Levine)  Can you cite me any medical textbook
2     or peer-reviewed publication that describes
3     differential diagnosis in the way that you've used it
4     to determine the cause of a disease?
5  A  No, I can't cite any literature.
6  Q  Okay.  Is differential diagnosis to determine the
7     cause of a patient's disease a method that has been
8     validated in the medical literature?
9            MR. WISNER:  Objection; vague.
10           THE WITNESS:  I cannot answer that.
11    I'm trying to -- to understand this.  But...
12 Q  (By Mr. Levine)  Would you like me to re-ask it?
13 A  No.  I understand what you're asking.
14 Q  Okay.
15 A  Differential diagnosis is a established method of,
16    like I said, selecting the most likely probability
17    out of possibilities most commonly used in medicine
18    to describe how we derive a diagnosis.  Like I said,
19    I liberally used it in my report for -- to give the
20    idea how we derive to the conclusion.  It's a matter
21    -- it's a matter of nomenclature or how I use the
22    term.  It's not -- it's not the -- and, again, it's
23    just -- it's just a weird question to me as being in
24    medicine.
25       Answer is "no."  It's not a method specifically

Andrei Shustov, M.D.

Page 70

1 described to derive etiology of -- of causes. But I
2 believe it's a valid way of looking at potential
3 causes of somebody [sic] disease or somebody's
4 cancer. Not commonly used, but I think it's a valid
5 methodology.
6 Q So does -- does differential diagnosis, as a
7 methodology for determining cause, a cause of a
8 patient's non-Hodgkin's lymphoma, have an error rate?
9 A Anything has an error rate.
10 Q Does it have a known error rate?
11 A I don't know what a known error -- an error rate is
12 for hypothetical deductive method.
13 Q Okay. You've explained to me your methodology and
14 with respect to differential diagnosis. Is there a
15 way that I can tell if you're wrong?
16 MR. WISNER: Objection;
17 speculation.
18 THE WITNESS: I don't know how to
19 answer that.
20 Q (By Mr. Levine) When you use differential diagnosis
21 to diagnose someone's disease, you can perform a test
22 to rule something in or rule something out, correct?
23 MR. WISNER: Objection; improper
24 hypothetical.
25 THE WITNESS: So let me just say

Page 71

1 this. Medicine is not a science. When you diagnose
2 something, obviously we can make a wrong diagnosis.
3 How do we measure that? So when you examine the
4 patient, who's not a science, and we base our opinion
5 on medical clinical judgment. How do you measure
6 that? So you -- you're entering sort of domain where
7 you make the best clinical judgment based on
8 information that you have and -- and go with your
9 decision.
10 I -- I don't know how you measure the mistakes or
11 errors in -- in clinical judgment. And any --
12 nothing in medicine is certain. And for most things,
13 you cannot -- you cannot measure the -- the amount of
14 error. How -- how do you measure if somebody's
15 misdiagnosed? What's the error? What's the
16 measurement for that error?
17 So I don't think there is the answer to the
18 question you're asking, in my opinion. It's -- it's
19 a matter of clinical -- clinical judgment and making
20 the best -- the best decision using this method of --
21 of deriving your conclusion.
22 Q (By Mr. Levine) Do you remember my question?
23 A I remember your question. What is the -- how you
24 define "error."
25 Q That's not my question. It was, like, six questions

Page 72

1 ago. All due respect.
2 A Would you --
3 Q I'd rather you --
4 MR. WISNER: Objection.
5 Argumentative. Ask your question. Don't tell him
6 what happened.
7 MR. LEVINE: I'm going to -- move
8 to strike his answer as nonresponsive. I will read
9 back --
10 MR. WISNER: Oppose.
11 MR. LEVINE: -- my question, which
12 he thinks had the word "error rate" in it.
13 MR. WISNER: Objection; misstates
14 his testimony.
15 Q (By Mr. Levine) Dr. Shustov, when you use
16 differential diagnosis to diagnose someone's disease,
17 you can perform a test to rule something in or rule
18 something out, correct?
19 MR. WISNER: Renew my objection.
20 THE WITNESS: That's not correct.
21 You have to use the test, but it's not the only way
22 how you make a diagnosis. You have to have
23 comprehensive collection of tests and examines and --
24 and -- and clinical history. You do not make disease
25 diagnosis based on just the test.

Page 73

1 Q (By Mr. Levine) But you can make a cancer diagnosis
2 after an examination based on the test, correct?
3 A On multiple tests.
4 Q Okay. With respect to differential diagnosis in
5 determining the cause of someone's non-Hodgkin's
6 lymphoma, do you perform any test?
7 A I do not perform any physical tests or laboratory
8 tests. For clinician, what I did is a test.
9 Q If you were -- is it fair to say that if you were to
10 opine that Roundup caused ten different patients'
11 non-Hodgkin's -- strike that.
12 If you were to opine that Roundup caused ten
13 different patients' non-Hodgkin's lymphoma, do you
14 have any way of knowing how many you would get right
15 and how many you would get wrong?
16 MR. WISNER: Objection; improper
17 hypothetical, speculation.
18 THE WITNESS: I can't answer this
19 question.
20 Q ██████████████████████████████████
   ██████████████████████████████████
   ██████████████████████████████████
   ███████████████████████████████
   ██████████████████████████████████



**Page 74**

**Page 76**

1 showered after using Roundup?

2 A  In my determination, no.

3 Q  Does it matter to your methodology how large or how

4 small the area was that a patient sprayed during

5 their use of Roundup?

6 A  It would matter in a sense of me trying to determine

7 what was the extent of exposure so I can compare to

8 the published literature.

9 Q  What -- so explain to me what matters in terms of the

10 area sprayed that you compare to the published

11 literature.

12 MR. WISNER:  Misstates his

13 testimony.

14 Q  (By Mr. Levine)  Explain your testimony to me.

15 A  So when I listen to Mr. Hardeman's history of

16 exposure, I ask him for how long and how much and

17 over what extensive areas did he use Roundup.  That

18 allowed me to determine the number of days, number of

19 month, duration of the exposure, and the manner of

20 exposure.  That is a -- numerically the duration of

21 days and number of days per year, number of years,

22 allowed me to compare it to published literature.

23 And the amount of area and hours per day allowed me

24 to make a clinical judgment to the fact that there

25 was significant exposure every time he used it.

**Page 75**

**Page 77**

1 Q  All right.  So my -- my question was:  Does it matter

2 how large or how small the area was sprayed?  The

3 size of the area that Mr. Hardeman sprayed.

4 A  So the size of the area did not contribute to

5 determination whether or not it was sufficient

6 exposure.

7 Q  Okay.  So the -- the size of the area is not part of

8 your methodology in determining whether Roundup

9 causes --

10 A  No, not my methodology, no.

11 Q  Sorry.  I was in the middle of a question.  So just

12 so we have a clean record.

13 The size of the area is not part of your

14 methodology in determining whether Roundup causes

15 someone's cancer, correct?

16 A  Correct.

17 Q  But now let's go back to something you said.

18 A  Sure.

19 Q  I think it does matter to you for how long a patient

20 used Roundup, correct?

21 A  It matters in a sense of being able to compare it to

22 published literature.

23 Q  Okay.  What is your criteria for the duration of

24 exposure necessary in order to determine that Roundup

25 caused an individual's cancer?

13 Q  (By Mr. Levine)  Okay.  Does it matter to your

14 methodology whether Roundup made contact with a

15 patient's skin?

16 A  I'm not determining how Roundup gets into people's

17 skin.  I'm determining whether people are exposed to

18 it.

19 Q  Right.

20 And in your determination of exposure, does it

21 matter whether a patient had Roundup come in contact

22 with their skin or not?

23 A  In my determination, no.

24 Q  Does it matter, in your determination of whether

25 someone had sufficient Roundup exposure, whether they

Andrei Shustov, M.D.

Page 78

1    A   I do not have any threshold to determine whether or
2        not the exposure caused -- there was sufficient
3        exposure in the individual patient.  It allows me to
4        make determination whether the amount of exposure
5        that the person had exceed the threshold that was
6        published in the literature as posing the risk of
7        lymphoma.
8    Q   Can you explain that to me a little more?
9    A   I don't know what the minimum exposure is.  I don't
10       know whether they need to do five minutes or 20
11       minute.  Nobody does studies like this.  But the
12       epidemiologic studies suggest that certain number of
13       days per year or the duration of exposure of -- of
14       that magnitude increases someone's risk of
15       non-Hodgkin lymphoma.
16   Q   Do those studies establish that the duration of
17       exposure that's stated in them specifically cause an
18       individual's non-Hodgkin's lymphoma?
19   A   So the studies that I've read establish that exposure
20       certain number of days per year, if you use that --
21       that cutoff at that exposure, increases someone's
22       risk of lymphoma.
23   Q   Okay.
24   A   Whether -- whether it's two days or ten days, it's a
25       cutoff that the studies used.

Page 79

1    Q   So what are the cutoffs?  Explain them to me.  What's
2        the two-day cutoff?
3    A   That's what this -- what I saw in -- what I -- I read
4        in the literature on general causation.
5    Q   So explain two days.  Ever?  Explain what the
6        literature says and that goes into your methodology
7        with respect to two days.
8    A   You have to look at the -- at the papers, what they
9        specifically define.
10   Q   I'm just asking you.  You've studied this.  You're
11       offering opinions on this.  What's -- what's the two
12       days mean?  Can you tell me?
13                MR. WISNER:  Objection.  The
14       witness has asked for the paper.  If you're going to
15       ask him questions about it, give him the paper.
16   Q   (By Mr. Levine) Can you tell me what the two days
17       means?
18   A   Two days means that people use it at least two days a
19       year.
20   Q   Okay.  And then you said ten days?
21   A   In another study that I recall, if I recall
22       correctly, was ten days.
23   Q   Per year?
24   A   That's correct.
25   Q   Does it matter to your methodology what the subtype

Page 80

1        was of non-Hodgkin's lymphoma that a patient was
2        diagnosed with in being able to determine whether
3        Roundup caused their cancer?
4                MR. WISNER:  Objection; improper
5        hypothetical, speculation.
6                THE WITNESS:  No, it doesn't.
7    Q   (By Mr. Levine) Can you identify any particular
8        subtype of non-Hodgkin's lymphoma where there is a
9        cluster of cases in patients exposed to Roundup?
10               MR. WISNER:  Objection; vague,
11       incomplete hypothetical, lacks foundation.
12               THE WITNESS:  It's -- it's -- no, I
13       can't.  It's hypothetical question and relying on,
14       again, statements of authorities and published
15       literature.  There is no specification of subtypes of
16       lymphoma --
17               MR. LEVINE:  Okay.
18               THE WITNESS:  -- related to
19       glyphosate.
20   Q   (By Mr. Levine) There's no evidence that there's a
21       cluster of cases of DLBCL in patients exposed to
22       Roundup, correct?
23               MR. WISNER:  Objection; vague,
24       incomplete hypothetical.
25               THE WITNESS:  I haven't seen any.

Page 81

1    Q   (By Mr. Levine) Okay.  Does it matter to your
2        opinion what the -- if somebody -- strike that.
3                MR. WISNER:  Counselor, I don't
4        want to stop you if you're in the middle of a
5        section.  But when you do reach the end of a section,
6        I'd like to take a break first.
7                MR. LEVINE:  Okay.  We can take a
8        break in just a --
9                MR. WISNER:  Yeah.
10               MR. LEVINE:  -- few more minutes.
11               MR. WISNER:  Whenever you're ready.
12               MR. LEVINE:  I'm close.
13   Q   (By Mr. Levine) Does it matter how many bottles or
14       containers of Roundup per year somebody purchased and
15       used, to your methodology?
16   A   To my methodology, no.
17   Q   Does it matter what percentage of glyphosate was in
18       the Roundup that was sprayed?
19   A   My methodology, no.
20   Q   Does it matter if the Roundup was a concentrate or
21       ready-to-use Roundup?
22   A   For my methodology, no.
23   Q   Does it matter what surfactants were included in the
24       Roundup?
25   A   To my methodology, no.

Andrei Shustov, M.D.

## Page 82

1  Q  Does it matter that there were surfactants at all?

2  A  If you ask me to speculate based on my medical

3     biology and my knowledge, I can speculate. But not

4     for methodology that I stated. If you ask me as a

5     biologist, I can offer my opinion on all of those

6     opinions.

7  Q  Do you have an opinion as to whether it matters

8     whether there are surfactants in the Roundup?

9  A  I do have an opinion. It doesn't matter, in my

10    opinion.

11  Q  Okay. Does it matter if a patient inhaled the

12    Roundup, to your methodology?

13  A  Not to my methodology.

14        MR. LEVINE: Okay. We can take a

15  break.

16        MR. WISNER: Sure.

17        THE VIDEOGRAPHER: Please stand by.

18  This concludes Media Unit No. 1. We're going off the

19  record. The time is 10:38 a.m.

20        (Pause in proceedings.)

21

22        THE VIDEOGRAPHER: This begins

23  Media Unit No. 2 in the deposition of Dr. Andrei

24  Shustov. We are back on the record. The time is

25  10:45 a.m.

## Page 83

1  Q  (By Mr. Levine) Dr. Shustov, as an oncologist, you

2     diagnose and treat non-Hodgkin's lymphoma, correct?

3  A  That's correct.

4  Q  And forgive me if I asked this before. I'm not sure

5     if I did. But you consult on second opinions

6     regarding diagnosis and treatment?

7  A  That's correct.

8  Q  Do you treat all types of non-Hodgkin's lymphoma or

9     just certain subtypes?

10  A  All of them.

11  Q  And you told me that -- I think you told me --

12    correct me if I'm wrong -- that when treating or

13    consulting with a patient, you attempt to determine

14    the cause of their non-Hodgkin's lymphoma when you

15    can, correct?

16  A  I don't try to determine the cause. I take medical

17    history to document patients' prior exposures or

18    possible risk factors, but that's not what I do

19    medicine determining the cause. I treat patients.

20  Q  When treating a patient --

21  A  Yeah.

22  Q  -- do you attempt to determine the cause of their

23    non-Hodgkin's lymphoma?

24  A  No.

25  Q  You don't do that in your practice?

## Page 84

1  A  It is part of the initial encounter and history

2     taking to document possible exposures, but it's not

3     part of the patient treatment or does not in most

4     cases drive treatment decisions.

5  Q  Okay. So you document possible causes in their

6     medical history, but you don't determine the cause;

7     am I correct?

8  A  I document exposures. But my job is not to determine

9     the cause of lymphomas in my everyday practice.

10  Q  Okay. So you would, in a patient's chart, document

11    whether they were exposed to Roundup, for example?

12  A  Correct.

13  Q  But you wouldn't necessarily opine in your chart as

14    to whether Roundup caused that patient's cancer?

15  A  That's correct. But that's the reason why we

16    document facts and medical records to state possible

17    risk factors.

18  Q  And I think you said you always ask about pesticides

19    and herbicides like Roundup, correct?

20  A  That's correct.

21  Q  You -- and when you're documenting information in a

22    patient's chart, you document their prior medical

23    history, correct, like you did here?

24  A  That's correct.

25  Q  And you document -- when treating or consulting with

## Page 85

1     a patient, you document their social history like you

2     did here, correct?

3  A  That's correct.

4  Q  When treating or consulting with a patient -- sorry.

5     I'll -- I was about to ask something I've asked

6     already, so I'll skip that.

7        Have you ever told a patient that Roundup caused

8     his or her non-Hodgkin's lymphoma?

9  A  No.

10  Q  So let's -- if you were treating a patient like Mr.

11    Hardeman, you would ask him as part of your treatment

12    and document in the medical records whether he was

13    exposed to Roundup, correct?

14        MR. WISNER: Objection; improper

15  hypothetical.

16        THE WITNESS: I would not ask him

17  when I was treating him. I would ask him on our

18  first encounter.

19  Q  (By Mr. Levine) Okay. Your first encounter with any

20    patient, you would ask them?

21  A  I would not ask specifically every patient were

22    exposed to Roundup. I would expose them -- I would

23    ask them in general were they exposed to agricultural

24    chemicals or radiation or military carcinogens, et

25    cetera, et cetera.

Page 86

1  Q  And you would ask that for a patient that was
2     diagnosed with a form of B-cell lymphoma or T-cell
3     lymphoma, correct?
4  A  Any cancer.
5  Q  Okay.
6                  (Exhibit No. 5 marked for
7                   identification.)
8
9  Q  (By Mr. Levine)  Handing you what's been marked as
10    Exhibit 5.  Noting that there are certain redactions
11    of personal identifying information here.
12       This is a medical record of yours, correct?  If
13    you look at the last page, it's electronically signed
14    by you.
15 A  Looks weird, but yes.
16 Q  And in this record, you reviewed past medical history
17    like you did here, correct?
18               MR. WISNER:  I have a clarify:  Is
19    this a medical record that's been produced in this
20    litigation?
21               MR. LEVINE:  Yes, it is.
22               MR. WISNER:  Does it relate to a
23    client?  That Mr. Hardeman?
24               MR. LEVINE:  It's not Mr. Hardeman's
25    record.  This goes to his methodology and

Page 87

1     credibility.
2                  MR. WISNER:  So this is another
3     person's medical record?
4                  MR. LEVINE:  Yep.
5                  THE WITNESS:  It is.
6                  MR. WISNER:  Don't answer any
7     questions related to this.  That is privileged
8     medical information.  Do not answer any questions --
9                  MR. LEVINE:  It's -- any --
10                 MR. WISNER:  -- about this
11    document.
12                 MR. LEVINE:  Any privileged
13    information is redacted.  This does not identify
14    whose it is.
15                 MR. WISNER:  It doesn't matter.
16    You're asking about a medical record he created in a
17    treatment of another patient.
18                 MR. LEVINE:  Yes.
19                 MR. WISNER:  That is privileged.
20    Do not answer any questions --
21                 MR. LEVINE:  It's not privileged.
22                 MR. WISNER:  -- about this
23    document.
24                 MR. LEVINE:  It's been turned over.
25                 THE REPORTER:  Sorry.

Page 88

1                  MR. LEVINE:  It's not privileged.
2                  THE REPORTER:  Slow down.
3                  MR. WISNER:  You have my objection.
4     Do not answer any questions about the treatment of
5     this patient.
6                  THE WITNESS:  This is very, very
7     bizarre.  And like I said, in my world, it -- it
8     would be kind of illegal even to obtain this.  And I
9     feel very, very uncomfortable doing this.  This is --
10 Q  (By Mr. Levine)  Dr. Shustov, I will represent to you
11    that this is a medical record for a plaintiff in the
12    Roundup litigation who alleges in a complaint that
13    she was exposed to Roundup.
14 A  Okay.
15 Q  This patient, therefore, according to her complaint,
16    indicates that she had chemical exposure to
17    pesticides or herbicides.
18 A  Okay.
19 Q  This is a medical record of yours, correct?
20 A  That's correct.
21 Q  You reviewed past medical history in this medical
22    record, correct?
23                 MR. WISNER:  Objection.  Do not
24    answer that question.  Calls for privileged medical
25    information.  I will object to any substantive

Page 89

1     question about this document.  It is highly improper
2     and borderline a violation of HIPAA and other federal
3     privacy laws.
4                  MR. LEVINE:  Bring it.
5                  MR. WISNER:  If you want to go down
6     this road, sir, you're welcome to.
7                  MR. LEVINE:  Bring it.
8                  MR. WISNER:  But I'd be welcome to
9     call the judge immediate -- immediately, if you like.
10                 MR. LEVINE:  Go for it.
11                 MR. WISNER:  All right.  Let's go
12    off the record.  Let's call the judge.
13                 THE VIDEOGRAPHER:  Please stand by.
14    Going off the record.  The time is 10:52 a.m.
15                 (Pause in proceedings.)
16
17                 THE VIDEOGRAPHER:  We are back on
18    the record.  The time is 11:02 a.m.
19                 MR. LEVINE:  So I will agree to
20    withdraw Exhibit 5.  I don't agree with counsel's
21    objections.  But in the interest of efficiency here,
22    we will withdraw Exhibit 5 from the record.
23                 (Exhibit No. 5 withdrawn.)
24
25                 MR. WISNER:  I understand that

Andrei Shustov, M.D.

Page 90

1  Ms. Wagstaff would like to put on the record a
2  conversation -- her interpretation of the
3  conversation that happened off the record.  Aimee.
4          MS. WAGSTAFF:  Yeah.  So Monsanto
5  had displayed to Dr. Shustov a medical record that
6  pertains to one of his other patients not involved in
7  the Hardeman case.  While some information was
8  redacted, it's my understanding from talking to
9  Dr. Shustov off the record that this patient of his
10  has a very rare subtype, and so it's easily
11  identifiable who the possible patient may be.  That
12  information is not redacted, and that Monsanto's
13  counsel told me that they have not contacted this
14  plaintiff to ask for a HIPAA waiver.  They have not
15  contacted the plaintiff's attorney.  And as we sit
16  here right now, the plaintiff has no idea, as near as
17  I can tell, that Monsanto is injecting its medical --
18  his or her medical history into this litigation which
19  is covered by media, which we feel is a very big
20  violation of the -- the HIPAA laws and other laws,
21  and we object wholeheartedly.  So we appreciate
22  Monsanto withdrawing that -- that exhibit.
23          MR. LEVINE:  Okay.  I don't
24  entirely agree with the complete characterization of
25  what you said, but we are withdrawing the exhibit.

Page 91

1  Q  (By Mr. Levine)  Dr. Shustov, is it fair to say that
2     you do not ask about pesticide exposure in every
3     patient that you treat for non-Hodgkin's lymphoma?
4  A  I'm not going to answer this question.  I'm going to
5     say I'm appalled by exposure of my patient to these
6     proceedings.  And I feel you're using my patient
7     against my credibility.  And I'm -- I feel my sort of
8     patient privacy and my integrity's violated.
9       In the medical world, it's a -- it's a absolutely
10     unethical move.  I just want to express that as a
11     physician.  You asked me to help you with litigation,
12     and you're using my patient to create an argument
13     against my statements.  I -- I resent that, I want to
14     put on the record.  And it's despicable for a medical
15     profession.  It's despicable to my patient who's
16     suffering from cancer.  And I can't explain how
17     appalling it is what was just done.  Maybe okay in
18     legal world, but that's despicable and appalling.
19     I'm not going to answer this question.
20  Q  Dr. Shustov, you told me earlier that you ask every
21     patient about pesticide exposure, correct?
22  A  I ask every patient about exposure to carcinogens,
23     including agricultural, military, household, and
24     occupational.
25  Q  And you told me you document that information in

Page 92

1     their medical records, correct?
2  A  If patients confirm the exposure, I document in
3     medical records.
4  Q  Thank you.
5       Okay.  We're going to make this Exhibit 5 since
6     we withdrew the previous Exhibit 5.
7          MR. WISNER:  I think that's
8  appropriate.
9          MR. LEVINE:  Okay.
10          (Exhibit No. 5 marked for
11           identification.)
12
13  Q  (By Mr. Levine)  Dr. Shustov, I'm handing you what's
14     been marked as Exhibit 5, which is the IARC monograph
15     No. 112 regarding glyphosate.
16       Dr. Shustov, you're familiar with IARC, correct?
17  A  That's correct.
18  Q  You cite IARC in your report to support your
19     conclusion that glyphosate caused Mr. Hardeman's
20     non-Hodgkin's lymphoma, correct?
21  A  My conclusion that glyphosate most likely has been
22     contributing factor and might have caused his
23     lymphoma.
24  Q  Okay.  So you cite IARC in your report to support
25     your conclusion that glyphosate most likely has been

Page 93

1     a contributing factor and might have caused his
2     lymphoma?
3  A  That's correct.
4  Q  So I'm clear, you just made a distinction that I want
5     to ask about.
6       Is it your opinion that glyphosate caused Mr.
7     Hardeman's non-Hodgkin's lymphoma?
8  A  In any particular patient, nobody can determine what
9     exactly caused the lymphoma, but my statement is that
10     it is likely that glyphosyte -- glyphosate
11     substantially contributed or might have caused the
12     lymphoma.
13  Q  Okay.  In your report, on Page 7, you describe IARC's
14     analysis as thorough and rigorous investigation by
15     independent researchers and investigators in the
16     field, correct?
17  A  I have no reason to question it.
18  Q  Okay.  Do you agree that according to IARC, there is
19     limited evidence in humans for the carcinogenicity of
20     glyphosate?
21  A  I agree there is evidence, whether it's limited or
22     not limited.  The reason it's listed there, there is
23     evidence to support it, and it is up to IARC to
24     decide whether it's limited or definitive.
25  Q  You have no reason to disagree that it's limited,

Page 94

1    correct?
2              MR. WISNER:  Objection; ambiguous.
3              THE WITNESS:  I have no reason to
4    -- to question IARC listing this as limited.
5              MR. LEVINE:  Okay.
6              MR. WISNER:  Nice.  I was just
7    thinking, I don't have to print out the preamble.
8              (Exhibit No. 6 marked for
9              identification.)
10
11   Q  (By Mr. Levine)  I am handing you what's been marked
12      as Exhibit 6, which is the IARC preamble.  Have you
13      -- are you familiar with this?
14   A  I've come across it.
15   Q  I'll ask you to turn to Page 19.
16   A  I'm here.
17   Q  Do you see the sub-letter "Carcinogenicity in
18      Humans," Sub-letter A, under 6?
19   A  I see.
20   Q  Okay.  And if you look at -- at the very bottom, it
21      refers to "limited evidence of carcinogenicity,"
22      correct?
23   A  I see it.
24   Q  And according to IARC, "limited evidence of
25      carcinogenicity" means a positive association has

Page 95

1    been observed between exposure to the agent and
2    cancer for which a causal interpretation is
3    considered by the working group to be credible, but
4    chance, bias, or confounding could not be ruled out
5    with reasonable confidence.
6    A  I see that.
7    Q  Do you see that?
8       I'm sorry.  We were speaking over each other.
9       Do you see that?
10   A  I see that.
11   Q  Do you have any reason to disagree with IARC's
12      definition of "limited evidence of carcinogenicity"?
13   A  I don't have any reason to disagree with limited
14      evidence.
15   Q  Okay.
16              (Exhibit No. 7 marked for
17              identification.)
18
19







**Page 102**

(redacted)

**Page 103**

14    (Exhibit No. 9 marked for
15         identification.)
16
17  Q  (By Mr. Levine)  Handing you what's been marked as
18     Exhibit 9.  This is an article regarding IARC's
19     findings on Roundup from -- from U.S. News & World
20     Report, correct?
21  A  That's correct.
22  Q  And if you can turn to Page 3 in this article.  Do
23     you see below the -- the part that says "Also"?
24     So --
25  A  I do see.

**Page 104**

1  Q  Where it starts, "The French agency's experts."  Do
2     you see that?
3  A  I do see it.
4  Q  Are you aware that the French agency's experts,
5     meaning IARC's experts, said that the cancer risks of
6     the weed killer were mostly from occupational
7     exposure?
8  A  I am reading it.  But I'm not aware of it.
9  Q  You were not aware of that in forming your opinions
10    in this case?
11  A  No.
12  Q  Do you know who Kate Guyton is?
13  A  No, I don't.
14  Q  Okay.  Do you agree that Kate Guyton -- do you agree
15    with Kate Guyton's comment that, "I don't think home
16    use is the issue.  It's agricultural use that will
17    have the biggest impact.  For the moment, it's just
18    something for people to be conscious of"?
19        MR. WISNER:  Objection.
20    Impeachment through extrinsic hearsay.
21        THE WITNESS:  I don't have opinion
22    on that, no.
23  Q  (By Mr. Levine)  You don't agree or disagree with
24    that?
25  A  I don't have opinion on it.

**Page 105**

1  Q  Okay.  Is it your opinion that home use is a cause of
2     non-Hodgkin's lymphoma?  Strike -- strike that.  Let
3     me be clear.
4        Is your opinion that home use of Roundup causes
5     non-Hodgkin's lymphoma?
6        MR. LEVINE:  Objection; incomplete
7     hypothetical.
8        THE WITNESS:  I don't have an
9     opinion on how people use Roundup, and I don't have
10    an opinion whether it matters they use it at home or
11    in a setting of agricultural profession.
12  Q  (By Mr. Levine)  We discussed --
13        MR. LEVINE:  I'll be just a minute
14    to get back to Dr. Shustov's report.
15  Q  (By Mr. Levine)  We're going to go to your report,
16    which was Exhibit 3.  So you can get that in front of
17    you again.
18        MR. WISNER:  Can I organize these?
19        MR. LEVINE:  Sure.
20        MR. WISNER:  I'm assuming you're
21    not going to go back to them.
22        MR. LEVINE:  No.  Can we take a
23    quick break?
24        MR. WISNER:  Yeah.  Sure.
25        THE VIDEOGRAPHER:  Please stand by.

Andrei Shustov, M.D.

Page 106

1    We're going off the record.  The time is 11:25 a.m.
2              (Pause in proceedings.)
3              (Mr. Brenza not present.)
4
5         THE VIDEOGRAPHER:  We are back on
6    the record.  The time is 11:33 a.m.
7    Q  (By Mr. Levine)  Dr. Shustov, the last thing we were
8    talking about was the quote from Kate Guyton at IARC,
9    correct?
10   A  Correct.
11   Q  Can you turn to Page 8 of your report?
12   A  I'm here.
13   Q  Do you see the third-from-last -- or second-from-the-
14   last bullet point on that page?
15   A  I do.
16   Q  It says, and I quote, "The results of the IARC
17   investigation were published in the Lancet Oncology
18   in May 2015 by Guyton, et al."
19      See that?
20   A  Yeah.
21   Q  You said you didn't know who she was, right?
22   A  I don't know who he is.  I didn't remember his name
23   until looking at my report.  I --
24   Q  Okay.
25   A  -- don't memorize the names, no.

Page 107

1    Q  I think it's a she, just for clarification.
2    A  Okay.
3    Q  But you cite her in your report, correct?
4    A  Okay.  I did.
5    Q  Did you review her paper?
6    A  I looked through her paper.
7    Q  And did you write this section of your report?
8    A  Of course I did.
9    Q  You didn't copy it?
10   A  I typed the section of my report.
11   Q  Okay.  I'm going to hand you, put a sticker on this,
12   what I was reading from, which is Exhibit 10.
13              (Exhibit No. 10 marked for
14               identification.)
15
16   Q  (By Mr. Levine)  I was reading from Page 8 on
17   Exhibit 10.
18   A  Okay.
19   Q  This is Dr. Nabhan's report in this case.
20   A  Okay.
21         MR. WISNER:  I'm sorry.  I'm sorry.
22   Did you just testify that you were questioning about
23   an Exhibit 10?
24         MR. LEVINE:  I was reading from
25   Exhibit 10, which was the exact -- but I'll clarify

Page 108

1    what that meant.  I was reading from Exhibit 10.
2         MR. WISNER:  Okay.
3         MR. LEVINE:  Which was the exact
4    same language that was in his report that Dr. Shustov
5    was looking at the same time, for the record.
6         MR. WISNER:  Okay.  Well --
7         MR. LEVINE:  Okay?
8         MR. WISNER:  -- from my
9    understanding, he was looking at Exhibit 3 when you
10   were questioning him.
11        MR. LEVINE:  Correct.
12        MR. WISNER:  Okay.  So if you want
13   to establish they're the same --
14        MR. LEVINE:  Well --
15        MR. WISNER:  -- go ahead.
16        MR. LEVINE:  -- we clearly agree
17   with that on the record.
18        MR. WISNER:  Okay.  Okay.
19        MR. LEVINE:  Okay?  Thank you for
20   pointing that out.
21   Q  (By Mr. Levine)  What I read you was from
22   Dr. Nabhan's report.  You said --
23   A  Sure.
24   Q  -- you wrote every word of your report.
25   A  I did.

Page 109

1    Q  Do you understand that he said he authored his
2    report?
3    A  Yes.
4    Q  Okay.  How did that paragraph get into your report?
5    A  This para -- my report?  I was -- I type it -- I used
6    the same language as Dr. Nabhan used.
7    Q  Okay.  Did you copy him or did he copy you?
8    A  I used the same language.  I had this report before I
9    typed mine.  And I thought that statement that he had
10   is definitive.  And I did not feel like coming up
11   with any -- any other language.
12   Q  You said you used the language from Dr. Nabhan's
13   report?
14        MR. WISNER:  Objection; misstates
15   his testimony.
16   Q  (By Mr. Levine)  Clarify that for me.
17   A  I used the statement, and --- is there a difference?
18   Q  Just clarify for me.  I didn't quite understand what
19   you were saying.
20   A  I used the same language that he used to make a
21   statement in my report because I felt that it was
22   relevant and there was nothing else for me to add.
23   Q  So I understand from your reliance materials that you
24   had reviewed Dr. Nabhan's general causation report,
25   correct?

Page 110

1  A  Can you repeat this?
2  Q  From your reliance list that we --
3  A  Yeah.
4  Q  -- discussed earlier in this deposition.
5  A  Okay.
6  Q  You had reviewed Dr. Nabhan's general causation
7     report in the MDL, correct?
8  A  Okay.
9  Q  You said you had not reviewed his specific causation
10    report for Mr. Hardeman, correct?
11 A  I don't recall what I said.  If it's in transcripts,
12    then yes.
13 Q  Okay.
14 A  Whatever I --
15 Q  Had you reviewed that report, that Exhibit 10, prior
16    to preparing your opinions?  And for the record, I'll
17    note that that report is dated the same day as your
18    report.
19 A  I do not recall the date specifically when I reviewed
20    the reports.
21 Q  Did you review that report, Dr. Nabhan's report for
22    Mr. Hardeman specifically?  Not his general causation
23    report.  Let me strike what I said just to be clear.
24    Did you review Dr. Nabhan's case-specific report
25    in Mr. Hardeman's case prior to writing your report?

Page 111

1  A  I don't -- I don't remember that.  I reviewed a lot
2     of reports.  I -- I honestly don't remember.
3  Q  So Dr. Nabhan's report -- Dr. Nabhan's report on
4     Page 1 is dated November 20th, 2018.  Can you see
5     that?
6  A  Okay.  I do see that.
7              (Mr. Brenza enters.)
8
9  Q  (By Mr. Levine)  Your report was provided to
10    defendants on November 20th, 2018.  Do you understand
11    that?
12 A  Okay.
13 Q  Did you review Dr. Nabhan's report dated November
14    20th, 2018, prior to writing your report in this
15    case?
16 A  I don't remember.
17 Q  Is that a "yes," "no," or "maybe"?
18 A  I don't remember, honestly.
19 Q  So to be clear, are you saying you may have reviewed
20    his report?
21          MR. WISNER:  Objection; misstates
22    his testimony.
23          MR. LEVINE:  I'm asking.  I'm
24    trying to understand.
25 Q  (By Mr. Levine)  Is it possible that you reviewed his

Page 112

1     report?
2  A  I honestly don't remember.  Is that an acceptable
3     answer, or...?
4          MR. WISNER:  You're assuming a lot
5     of facts here.
6  Q  (By Mr. Levine)  Do -- you don't -- to be clear, do
7     you not remember reading his report, or do you not
8     remember if you read it or not?
9          MR. WISNER:  I don't want to
10    interrupt the question that's pending.
11          MR. LEVINE:  So then don't.
12          MR. WISNER:  However, if you're
13    willing to go off the record, I can explain to you
14    what your confusion is, but --
15          MR. LEVINE:  No.
16          MR. WISNER:  -- it'd be outside the
17    presence of the witness.
18          MR. LEVINE:  No.
19          MR. WISNER:  Okay.  Then you
20    clearly don't want the truth.
21          MR. LEVINE:  I'll get it later on
22    my own.
23          THE WITNESS:  Could you please
24    repeat this again?  I...
25 Q  (By Mr. Levine)  Do you not remember actually reading

Page 113

1     his report, or do you not remember if you read it or
2     not?
3  A  I don't remember either.
4  Q  Do you know whether you got this language from
5     Dr. Nabhan or from the lawyers or from somewhere
6     else?
7          MR. WISNER:  Objection.  Calls --
8     calls for privileged communications so far as it asks
9     for language from lawyers.  To the extent you can
10    answer the question with regards to Dr. Nabhan, which
11    I believe you've answered now twice, please answer.
12          THE WITNESS:  I did not receive any
13    language from the lawyers.  I don't rely on either
14    your guys' or your guys' recommendation how to write
15    it.  As pertaining to Dr. Nabhan, I don't remember.
16    Out of all the reports that I read.
17 Q  (By Mr. Levine)  Just to be clear, who wrote this
18    section of your report?
19 A  I'm sorry?
20 Q  Just to be clear, who wrote this section of your
21    report?
22 A  I did.
23 Q  And is this section complete?
24          MR. WISNER:  Objection; vague.
25          THE WITNESS:  I'm sorry.  What do

Andrei Shustov, M.D.

Page 114

1    you mean it's complete?
2  Q  (By Mr. Levine)  Is this thorough and complete with
3    respect to your opinions about Roundup and
4    non-Hodgkin's lymphoma?
5          MR. WISNER:  Objection; vague.  I
6    don't have to answer this.  This is kind of
7    nonsensical question.  That's what I wrote, and
8    that's what I put in my report and that I felt
9    sufficient.
10  Q  (By Mr. Levine)  Okay.  And this section accurately
11    describes the evidence?
12  A  It describes my opinion.
13  Q  Is it accurate?  Any mistakes?
14          MR. WISNER:  Objection;
15    speculation.
16          THE WITNESS:  I don't understand
17    the question.  What do you mean "mistakes"?
18  Q  (By Mr. Levine)  So if there are sections that are
19    identical to Dr. Nabhan's report in there --
20  A  Okay.
21  Q  -- did you review them to see where they're --
22    they're correct, incorrect, accurate, whether there
23    were mistakes or not?
24  A  I wrote --
25          MR. WISNER:  Objection; misstates

Page 115

1    his testimony.
2          THE WITNESS:  I wrote my report
3    based on my review.
4  Q  (By Mr. Levine)  Okay.  And so as far as you're aware
5    right now, you don't know of any mistakes in that
6    section, correct?
7  A  Could I have made a mistake making my statements?  I
8    don't understand.  But a question --
9  Q  How about --
10  A  -- if I trust my -- my -- my report and my opinion,
11    or I -- I don't understand what it means.
12  Q  Did you review your report for accuracy?
13  A  I wrote it.  I reread it.  I did a spell check.  Can
14    I have some typos here?  I can have some typos.
15  Q  Okay.  How about substantively, though?  Did you
16    review it for accuracy?
17  A  I hope I did.
18  Q  Okay.  Did you review it for omissions, whether you
19    may have left anything out that should have been
20    included?
21  A  That would be part of writing a report.
22  Q  Okay.  Go to the first sub-bullet on Page 7 of
23    Exhibit 3.
24  A  Okay.  I'm here.
25  Q  The sub-bullet.  Not the main bullet, but the sub.

Page 116

1    "In March 2015."
2          Do you see that?
3  A  I see that.
4  Q  Okay.  Now go to Page 6 of Dr. Nabhan's report.  I
5    believe that's Exhibit 10.
6          MR. WISNER:  Page 6?
7  Q  (By Mr. Levine)  Page 6.  Paragraph that starts, "In
8    March 2015."
9  A  Okay.
10  Q  Do you agree these paragraphs are nearly identical?
11  A  They have similar language.  I can't tell they're
12    identical.
13  Q  These sections both say that IARC classified
14    glyphosate as a possible carcinogen, correct?
15  A  I can see that.
16  Q  And they explain that that's Class -- that's Class
17    2A, correct?
18  A  That's correct.
19  Q  It says Class 2A, but really with IARC it was
20    Category 2A, but...
21  A  Okay.
22  Q  And as we've discussed, IARC found that glyphosate
23    has limited evidence in humans, correct?
24  A  What IARC stated was positive association with
25    possible biases, if I remember correctly.

Page 117

1  Q  What IARC stated, as we've discussed before, was that
2    the evidence in -- the evidence in humans was
3    limited, meaning that chance, bias, or confounding
4    cannot be ruled out, correct?
5  A  That's correct.
6  Q  Okay.  You didn't include that in your report,
7    correct?
8  A  Not in this particular language.
9  Q  Okay.  This section, this sub-bullet or your entire
10    report omits the fact that IARC said the evidence was
11    limited, correct?
12  A  Not that language in my report, no.
13  Q  Okay.  And it omits the fact that IARC described
14    limited evidence as meaning can't rule out chance,
15    bias, or confounding, correct?
16  A  It's not included there.
17  Q  Okay.
18          THE REPORTER:  What was the answer?
19          THE WITNESS:  It's not included
20    there, no.
21  Q  ███████████████████████████████████████
22  ██ █████████████████████████████████████
23  ██ ████████████████████████████
24  ██ █████████████████████████████████
25  ██ ██████████████████████████████████████

Andrei Shustov, M.D.



**Page 118**

22    MR. WISNER: Objection; asked and
23    answered.
24  Q  (By Mr. Levine) I'm sorry?
25  A  I wrote it.

**Page 119**

1   Q  Okay. Do you think it's possible that you and
2      Dr. Nabhan both independently wrote the same sections
3      of your reports?
4         MR. WISNER: Objection;
5      argumentative, speculation, lacks foundation.
6            THE WITNESS: I can't answer that.
7   Q  (By Mr. Levine) If you turn to Page 8 of your
8      report, the bullet point that starts with "Group 2A."
9         Do you see that?
10  A  Yep. I'm here.
11  Q  Okay. And that's substantially similar to this --
12     the top bullet point on Page 8 of Dr. Nabhan's
13     report, correct?
14  A  I can see that.
15  Q  Okay. These sections -- we'll go by the section in
16     your report -- says that, Category 2A is the highest
17     level short of a "definitive association," which is
18     best established by randomized controlled study,
19     correct?
20  A  That's correct.
21  Q  What's the basis for your opinion that Category 1 in
22     IARC is established by a randomized controlled study?
23         MR. WISNER: Objection. Misstates
24     what's written.
25         MR. LEVINE: Fair enough.

**Page 120**

1   Q  (By Mr. Levine) Dr. Shustov, are you -- are you
2      saying that a definitive association by IARC requires
3      randomized controlled evidence?
4   A  What I'm saying is that definitive association in
5      these kind of cases cannot be established in a manner
6      that we consider highest level of evidence in -- in
7      medicine due to inability to perform randomized
8      studies.
9   Q  So I think this report is talking about IARC, not
10     when you say "we."
11         Are you a member of IARC?
12  A  I'm not.
13  Q  You're describing what IARC does, right? In the
14     third-from-last bullet point on Page 8?
15  A  Okay.
16  Q  And are you saying that Group 2A in IARC is the
17     highest level of evidence that they would give short
18     of -- short of having randomized controlled trial
19     evidence?
20  A  That's what -- what -- yes, that's what they will do,
21     short of --
22  Q  So --
23  A  -- randomized studies.
24  Q  -- in order to -- in order to determine that
25     something would be a definite carcinogen, a Group 1

**Page 121**

1   carcinogen, IARC would need randomized controlled
2   trial evidence?
3         MR. WISNER: Objection; misstates
4   the document --
5         MR. LEVINE: I'm asking.
6         MR. WISNER: -- and testimony.
7         THE WITNESS: The definitive
8   association of high level require unethical clinical
9   trials in humans.
10         MR. LEVINE: That's not my
11  question. My question is:
12  Q  (By Mr. Levine) With respect to IARC's
13  classifications, can IARC determine that something is
14  a definite carcinogen absent randomized controlled
15  trial evidence?
16         MR. WISNER: Objection; beyond the
17  scope of this witness's opinion.
18         MR. LEVINE: It directly relates to
19  his opinion as stated in this bullet point on his
20  report. He is -- he is making a statement.
21         MR. WISNER: It's fine. You're
22  asking him to --
23         MR. LEVINE: I'm asking about the
24  statement.
25         MR. WISNER: -- talk about the

Andrei Shustov, M.D.

Page 122

1  practices of IARC and their standards in a vacuum.
2  So --
3              MR. LEVINE: I'm asking.
4              MR. WISNER: -- if you know the
5  answer, answer it. If you don't, don't.
6              THE WITNESS: I think IARC would
7  not be able to determine definitive association to
8  the level that we would generally consider in medical
9  practice for -- for other -- other discoveries or
10 other studies where randomized studies are possible.
11 This is the highest that IARC can do.
12 Q  (By Mr. Levine)  What is the basis for your opinion
13    that Group 2A is the highest IARC can do absent
14    randomized controlled evidence?
15             MR. WISNER: Objection. That's not
16 what he said.
17 Q  (By Mr. Levine)  Is that --- did I mischaracterize
18    your opinion there?
19 A  So the basis for that is --
20 Q  Just to be clear --
21             MR. WISNER: Yeah.
22 Q  (Continuing by Mr. Levine)  -- so that we don't miss
23    it. Did I mischaracterize your opinion in my
24    question?
25 A  That reflects my opinion.

Page 123

1  Q  Okay.
2  A  Now can I answer the question?
3  Q  What is the basis for that opinion?
4  A  The basis for that opinion, once again, is that in
5     order to reach any high level of evidence, that
6     require unethical studies in humans.
7  Q  Do you know whether IARC has categorized any
8     carcinogens as Group 1 absent randomized controlled
9     trial evidence?
10 A  I can't answer that question without looking.
11 Q  I'll represent to you -- and you're welcome to look
12    at it, at the hepatitis C monograph.
13 A  Mm-hmm.
14 Q  Where they've identified a Group 1 carcinogen for
15    chronic hepatitis C. We -- we discussed that one,
16    right?
17 A  Okay.
18 Q  Do you know whether they've -- whether there's any
19    randomized controlled trial evidence in that
20    monograph?
21 A  I don't know without looking.
22 Q  Do you have any basis to disagree with the fact that
23    IARC can categorize a substance as a definitive
24    carcinogen without the need for randomized controlled
25    trial evidence?

Page 124

1  A  I don't have any reason to disagree. But I -- I have
2     a reason to state that this is the best they can do
3     talking about toxic chemicals.
4  Q  By the way, so let's discuss your opinion that it
5     would be impossible and unethical to perform such a
6     study, just real briefly.
7        Is it unethical to herbicides and pesticides?
8  A  That's not what I said.
9  Q  Okay. You could conceivably design a study
10    determining the effectiveness of two different
11    herbicides that -- as you acknowledged, these
12    chemicals may cause cancer. You could design a study
13    where people are randomized to two different
14    herbicides in their use for agricultural reasons,
15    correct?
16 A  You cannot normally expose people to even possible
17    carcinogens and try to figure out whether they
18    develop cancer. That's the --
19 Q  Sorry. I didn't mean to cut you off.
20 A  No, that's what I meant in my statement. So in order
21    to definitively prove that something is a carcinogen
22    outside level of evidence that it provide, you would
23    have to expose people if you -- if you pose a
24    question, "Is this a carcinogen?" and you decide to
25    do a study, you will have to approach a person, say,

Page 125

1     Well, I'm going give you a chemical that's possibly a
2     carcinogen, and I'm going the see if you develop
3     cancer. And but half of the people, we're just going
4     to let them drink water.
5        So that's why I say it would be unethical to do a
6     randomized study in a controlled environment where
7     you expose people to something that you believe might
8     be causing cancer.
9  Q  You could never do a study for any substance, a
10    randomized study where the primary question is, is
11    this going to cause someone's cancer, correct?
12 A  That's correct.
13 Q  But you could do a study of two chemicals to
14    determine the benefits of those chemicals where a
15    secondary outcome looks to see whether there's an
16    increased risk of cancer in those chemicals, correct?
17 A  That is correct, but they have to power the study to
18    determine that from -- prospectively power it to
19    determine the secondary outcome.
20 Q  Sure. But it wouldn't be impossible or unethical to
21    do that, correct?
22             MR. WISNER: Objection; incomplete
23 hypothetical.
24             THE WITNESS: You can design a
25 study like that if you -- you can design a study like

Page 126

1    that if you inform the -- the subjects that the
2    secondary goal of the study is see if you develop
3    cancer.
4    Q  (By Mr. Levine)  Okay.  To be clear, you said you can
5       design a study like that, right?
6    A  You can design the study.
7    Q  Can.  Not can't.  Can?
8    A  You can design it.  I'm not so sure that the study
9       could be conducted.  I can't see...
10   Q  So, now, to be clear, you understand that -- well,
11      I'll move on.
12        In your report, if you go to Page -- on Page 7,
13      in the top bullet point under "Discussion of
14      Mr. Hardeman's Lymphoma Causation."
15        Do you see that?
16   A  Okay.
17   Q  You discuss the Schinasi and Leon meta-analysis,
18      correct?
19   A  Mm-hmm.
20   Q  Handing you what's --
21   A  Yes.
22   Q  -- been marked as Exhibit 11.
23                (Exhibit No. 11 marked for
24                    identification.)
25   ////

Page 127

1               MR. LEVINE:  Here you go.
2               MR. WISNER:  I'm sorry.  Top of
3    Page 7?
4               MR. LEVINE:  Top of Page 7.
5               MR. WISNER:  Where is that?
6               MR. LEVINE:  It says, "The link
7    between exposure to pesticides and lymphoma
8    development has been reported by numerous
9    investigators."
10              THE REPORTER:  Slow down.
11              MR. LEVINE:  Oh, am I -- yeah.  You
12   almost -- you almost made me think I was looking at
13   Dr. Nabhan's report.  No.  Top of Page 7 of
14   Dr. Shustov's report.
15              MR. WISNER:  My bad.  Okay.  I'm
16   on -- I'm with you.
17              MR. LEVINE:  Oh.  You were on
18   Nabhan's.
19              MR. WISNER:  I was on Nabhan's.  I
20   was, like, What are you talking about?
21              MR. LEVINE:  Got it.
22              MR. WISNER:  It's not there.  Okay.
23   Q  (By Mr. Levine)  So I've just handed you --
24   A  Okay.
25   Q  -- Exhibit 11, which is the Schinasi and Leon --

Page 128

1    A  Okay.
2    Q  -- meta-analysis.
3               THE REPORTER:  "Which is," what?
4               MR. LEVINE:  Schinasi and Leon.
5    S-c-h-i-n-a-s-i, and Leon, L-e-o-n.
6    Q  (By Mr. Levine)  Now, in your report, you said this
7       meta-analysis found an association between develop --
8       between glyphosate and development of B-cell lymphoma
9       with an odds ratio of 2.0, 95 percent confidence
10      interval, 1.1 to 3.6, and there was the same odds
11      ratio for DLBCL subtype.
12        Do you see that?
13   A  I do.
14   Q  Now, first of all, turn to Page 4513.
15   A  Okay.
16   Q  Okay.  That contains -- few exposures down, you can
17      see glyphosate there, right?  Top third of the page.
18      Right there.
19   A  Okay.
20   Q  Okay.  And that contains an odds ratio for glyphosate
21      overall and an odds ratio for glyphosate association
22      with B-cell lymphoma, correct?
23   A  Okay.
24   Q  No odds ratio for DLBCL, correct?
25   A  That's correct.

Page 129

1    Q  If you go to the previous page, see under 3.4,
2       "Meta-Analyses"?  See that section?
3    A  Yep.
4    Q  You go to the last paragraph, it says, "The strongest
5       meta relative risk" --
6    A  Yeah, I see that.
7    Q  -- "estimates were associated with subtypes of NHL.
8       There was a positive association between exposure to
9       organophosphorous herbicides glyphosate and B-cell
10      lymphoma."
11        You see that?
12   A  I do.
13   Q  And then it gives the odds ratio that you cite in
14      your report.  You see that?
15   A  I see that.
16   Q  Then it says, "Phenoxy herbicide exposures were
17      associated with B-cell lymphoma, lymphocytic
18      lymphoma, and diffuse large B-cell lymphoma."
19        You see that?
20   A  I see it.
21   Q  That does not include glyphosate, correct?
22   A  Not in this paragraph.
23   Q  Okay.  There's nowhere in this meta-analysis where
24      glyphosate has the same odds ratio for DLBCL as it
25      does for B-cell lymphoma?

Andrei Shustov, M.D.

Page 130

1  A  I would have to look again through the whole thing.
2     This paragraph does not say that.
3  Q  Can you -- I'll represent to you that there is
4     nowhere in this meta-analysis that contains an odds
5     ratio for DLBCL.
6          MR. WISNER: Objection.
7  Q  (By Mr. Levine) If you want to look at -- if you
8     want to take a break and look at it --
9  A  Sure.
10  Q  -- and tell me where -- where you found it, by all
11     means, let's go.
12          MR. WISNER: All right.
13          MR. LEVINE: Off the record.
14          MR. WISNER: Want to take a lunch?
15          MR. LEVINE: Nope. Not quite yet.
16     But --
17          MR. WISNER: Okay.
18          THE VIDEOGRAPHER: Please stand by.
19     We're going off the record. The time is 12:05 p.m.
20          (Pause in proceedings.)
21
22          THE VIDEOGRAPHER: We are back on
23     the record. The time is 12:07 p.m.
24  Q  (By Mr. Levine) Dr. Shustov, would you be surprised
25     to learn that the Schinasi and Leon meta-analysis

Page 131

1     does not contain an odds ratio for glyphosate and
2     DLBCL?
3  A  I would be surprised to learn and frustrated then
4     that I made a mistake in my report if, in fact, it
5     does not have that.
6  Q  Okay.
7  A  Specifically for DLBCL.
8  Q  Now, Dr. Shustov, can you turn to Page 5 of
9     Dr. Nabhan's report?
10  A  I'm here.
11  Q  Okay. If you look at the bottom paragraph, it
12     contains the same language about four lines up from
13     the very bottom. It says, "This meta-analysis found
14     an association between glyphosate and B-cell lymphoma
15     with an odds ratio 2.0, 95 percent confidence
16     interval, 1.1 to 3.6, and this was the same odds
17     ratio for DLBCL.
18     Do you see that?
19  A  I see that.
20  Q  That would be the same mistake that's in your report,
21     correct?
22          MR. WISNER: Objection; assumes
23     facts not in evidence.
24          THE WITNESS: It would be if, in
25     fact, this -- this is true.

Page 132

1  Q  (By Mr. Levine) Okay. And whose mistake is that?
2     Yours or Dr. Nabhan's?
3  A  It is my mistake in my report.
4  Q  And his --
5  A  It would be if that's, in fact, true, yeah.
6  Q  Did you copy his mistake, or did you make the mistake
7     independently of Dr. Nabhan?
8  A  I would make mistake in my own report.
9  Q  So since you equivocated there and said it would be
10     if that was, in fact, the case in that meta-analysis,
11     I think we do need to break for lunch so you can
12     review it to let me --
13  A  Sure.
14  Q  -- know if you find something that I was --
15  A  Okay.
16  Q  -- not aware of.
17  A  Sure.
18          THE VIDEOGRAPHER: Please stand by.
19     We're going off the record. The time is 12:10 p.m.
20          (Pause in proceedings.)
21
22          THE VIDEOGRAPHER: We are back on
23     the record. The time is 1:07 p.m.
24  Q  (By Mr. Levine) Good afternoon, Dr. Shustov.
25  A  Good afternoon.

Page 133

1  Q  When we took a break, you were going to look through
2     the Schinasi and Leon meta-analysis to see if there
3     was a finding regarding DLBCL and glyphosate,
4     correct?
5  A  That's correct.
6  Q  Did you have sufficient amount of time to look
7     through the --
8  A  I did.
9  Q  -- meta-analysis?
10  A  I did.
11  Q  Is there any odds ratio consistent with what you
12     state in your report regarding glyphosate and DLBCL?
13  A  I have not found any other place where it's
14     mentioned. So I was looking at the same page that
15     you pointed out, and I realize now it's an honest
16     mistake for that particular number.
17  Q  Okay. So no odds ratio for DLBCL in that
18     meta-analysis, correct?
19          MR. WISNER: Objection; misstates
20     his testimony.
21          MR. LEVINE: Fair -- fair enough.
22     Short question, poorly worded. I will withdraw and
23     ask again.
24  Q  (By Mr. Levine) No odds ratio for DLBCL with respect
25     to glyphosate in that meta-analysis, correct?

Andrei Shustov, M.D.

Page 134

1  A  That's correct.

2  Q  And so that was a mistake, correct?

3  A  That's correct.

4  Q  And was that your mistake or Dr. Nabhan's mistake?

5  A  It was, of course, my mistake.

6  Q  Also his mistake, correct?

7  A  Based on this report. That's correct.

8  Q  Do you know whether he copied your mistake or whether

9     he'd made the mistake independently --

10         MR. WISNER: Objection.

11         THE WITNESS: I --

12  Q  (Continuing by Mr. Levine)  -- and used the same

13     words?

14         MR. WISNER: Objection;

15     speculation.

16         THE WITNESS: I can't even answer

17     that. But obviously, I mean, I can see it's easy to

18     make mistake because it's right next to each other.

19  Q  (By Mr. Levine)  Can you look at Page 8 of Exhibit 3,

20     which is your report? The bottom, very last bullet

21     or sub-bullet point.

22  A  I'm here.

23  Q  And turn to Page 8 of, I believe it's Exhibit 10,

24     which is Dr. Nabhan's report.

25         The last sub-bullet point on the top of the page

Page 135

1     would be the third sub-bullet. Do you see that?

2  A  Yep.

3  Q  Do you agree that your report and Dr. Nabhan's report

4     contain nearly identical paragraphs there -- sorry.

5     Strike that.

6         Do you agree that the sub-bullet I just asked you

7     to look at in your report as well as the bullet I

8     asked you to look at in Dr. Nabhan's report contain

9     nearly identical language?

10  A  They're very similar.

11  Q  Now, it says, "Epidemiologic studies were unable to

12     look at subtypes of NHL when assessing epidemiologic

13     causation."

14         Do you see that?

15  A  Yep.

16  Q  But you're aware there are epidemiologic studies

17     regarding glyphosate that do look at sub -- subtypes

18     of NHL, correct?

19  A  Some of them.

20  Q  Okay. So they weren't unable to?

21  A  Some studies looked at that.

22  Q  Okay. Is that your mistake or Dr. Nabhan's mistake?

23         MR. WISNER: Objection. Objection;

24     misstates what it says, and his testimony.

25         THE WITNESS: I don't consider what

Page 136

1     I said there is a mistake. They looked at it. When

2     I say unable to look, they weren't able to determine.

3     I -- that's what I meant by that.

4  Q  (By Mr. Levine)  Okay. Is it fair to say that a more

5     accurate description for that paragraph would be that

6     some epidemiologic studies were unable to look at

7     subtypes of NHL when assessing epidemiologic

8     causation, but others were able to?

9         MR. WISNER: Objection; misstates

10     his testimony.

11         THE WITNESS: That's another way of

12     wording it.

13  Q  (By Mr. Levine)  Would that be more accurate?

14  A  It will be more specifying.

15  Q  Okay. In the latter part of that paragraph, which is

16     on Page 9 of your report, you use an analogy that

17     said, "This is analogous to studying epidemiology of

18     breast and prostate cancer, where we now recognize

19     different subtypes, but yet study of epidemiology of

20     these" -- but yet study the epidemiology of these

21     cancers in the totality."

22         You see that?

23  A  I do.

24  Q  Who came up with that analogy?

25  A  It's in my report. I typed it.

Page 137

1  Q  I understand that. I just read you -- read it from

2     your report. I understand you typed it.

3         Who came up with that analogy?

4         MR. WISNER: Objection. Answer

5     this question to the extent it doesn't call for

6     privileged information.

7         THE WITNESS: I don't remember my

8     train of thought when I was typing it. I can't

9     answer that.

10  Q  (By Mr. Levine)  Did you come up with that analogy?

11  A  Well, at the time I typed the report, that's why I

12     came up with it. I don't remember my train of

13     thought at the time. I can't answer this. I -- I

14     was typing report, and that's in front of you.

15  Q  Is it fair to say that the paragraph we discuss in

16     Dr. Nabhan's report contains the same analogy at the

17     very end of that paragraph on the third bullet point

18     on Page 8 of Exhibit 10?

19  A  It's fair to say that.

20  Q  Can you cite me any publication that you considered

21     in forming your opinions which contains this analogy?

22  A  That's a conclusion. It's not citing any

23     publication. It's a general knowledge of oncology --

24  Q  Can you --

25  A  -- in the last ten years.



Page 138

1  Q  Can you cite me any publication that uses this

2     analogy?

3              MR. WISNER:  Objection.  This isn't

4  a memory test.

5              THE WITNESS:  Not on the spot, no.

6              MR. LEVINE:  I don't believe that

7  was a form objection.  Again, I'm going to note your

8  speaking objection for the record.

9              MR. WISNER:  Okay.  And I will

10 object that you're asking him to pull a study out of

11 thin air on the spot.  That's the definition of a

12 memory test and is improper.  So your objection's

13 noted.  Mine is as well.

14 Q  (By Mr. Levine)  Dr. Shustov, you don't cite any

15    reference for this analogy in your report, correct?

16 A  That's correct.

17 Q  And you don't reference Dr. Nabhan's report for this

18    analogy in your report, correct?

19 A  That's correct.

20 Q  And you wrote that in your report?

21 A  Wrote...

22 Q  You wrote that analogy into your report?

23 A  That's correct.

24 Q  And just to be clear, you did not copy that analogy

25    from Dr. Nabhan when putting it into your report,

Page 139

1     correct?

2              MR. WISNER:  Objection; vague.

3              THE WITNESS:  I don't recall it.

4  Q  (By Mr. Levine)  So you don't recall whether you did

5     or did not copy that from Dr. Nabhan when putting it

6     in your report?

7  A  I don't recall it.  I had multiple sources in front

8     of me, and I used my typing.  And now that with all

9     this, I don't know where specifically -- why the

10    language is similar.  But I potentially borrowed the

11    language from what's in front of me to make it proper

12    sounding.  And that's the only reasonable

13    explanation.

14 Q  So, so that I'm clear, you had multiple sources in

15    front of you that you considered in forming your

16    opinions for this report, correct?

17 A  That's not what I said.  Multiple sources to type my

18    report, not to form my opinion, but to put my

19    thoughts -- thoughts on the paper.  What I mean by

20    that, and there -- there is language that I might

21    have used where I did not -- I didn't know how to

22    speak in the proper legal terms, and I used --

23    potentially I borrowed the -- the -- the verbiage to

24    express my conclusions.

25 Q  Where did you borrow the verbiage from?

Page 140

1  A  I don't recall that.  And...

2  Q  List for me all of the sources that you can recall

3     from which you may have borrowed the verbiage.

4  A  I cannot list everything in front of me in middle of

5     typing the report.

6  Q  Can you list anything?

7  A  I think we already discussed this.  I had the patient

8     chart open.  I had printed papers in front of me.

9     And I had some of the sources on the -- on the

10    different page on the website.  I had samples of

11    legal terms provided to me by Kathryn, how to

12    verbalize things in the proper terms.  Not medical

13    terms, but legal terms.  And that's out of -- out of

14    my memory.

15 Q  So the sections that we've discussed that are similar

16    to Dr. Nabhan's report don't involve any legal terms,

17    correct?  At least thus far.

18 A  It's the form of -- form of verbalizing things and --

19    or the -- the conclusions.

20

Page 141

13             THE WITNESS:  That is correct.  But
   the basis

22

Golkow Litigation Services

Andrei Shustov, M.D.



Page 142

16    THE WITNESS:  Could we pause for a
17  second?  Can I ask a question, my counsel?  It just
18  came up to me.  Can we go off record?  Can I ask him
19  something, or it's...?
20    MR. LEVINE:  Sure.
21    MR. WISNER:  Sure.
22    THE VIDEOGRAPHER:  Please stand by.
23  We're going off the record.  The time is 1:22 p.m.
24    (Pause in proceedings.)
25  ////

Page 143

1    THE VIDEOGRAPHER:  We are back on
2  the record.  The time is 1:23 p.m.
3  Q  (By Mr. Levine) Dr. Shustov, I understand from off
4    the record that you want to clarify something?
5  A  Yes.  So it just occurred to me that when I was
6    trying to remember the records that I was using, the
7    sources and the records to help me type the report,
8    that Ms. Kathryn Forgie provided me with Dr. Nabhan's
9    report from another case.  And it just -- because I
10    couldn't explain all of this until you showed me
11    this.  And potentially if he copied it from one
12    report to another, so that's why you now show me this
13    similarities.
14  Q  So it wasn't Dr. Nabhan's report in Mr. Hardeman's
15    case that was submitted the same day as your -- your
16    report?
17  A  That's correct.
18  Q  Okay.
19  A  So, yes, I think Kathryn, I -- if I remember
20    correctly -- and I can verify with her at some point
21    if -- if you need to -- that she sent me as -- as a
22    template or the verbiage how the legal report's
23    supposed to sound, look, the Dr. Nabhan's expert
24    report on specific causation in another case.
25  Q  Okay.  As far as I'm aware -- and I will even allow

Page 144

1  Mr. Wisner to correct me if I'm wrong -- the only
2  other reports besides Dr. Nabhan's reports and
3  Hardeman, Gebeyehou, and Stevick that are case-
4  specific that Dr. Nabhan submitted was in the Johnson
5  case; am I correct?
6    MR. WISNER:  I don't think that's
7  correct.  I think Dr. Nabhan's prepared quite a few
8  more reports in litigation proceeding --
9    MS. WAGSTAFF:  That's actually --
10    MR. WISNER:  -- in St. Louis.
11    MS. WAGSTAFF:  -- not correct.  I
12  believe he submitted some in St. Louis.
13    MR. WISNER:  That's what I was
14  saying.  Yeah.  So I got it, Aimee.
15    MR. LEVINE:  Okay.  I'm not aware
16  that there were expert reports submitted in St. Louis.
17    MR. WISNER:  I believe in the
18  County there was.  I know for -- I actually defended
19  a deposition for Dr. Weisenberger on a case-specific
20  thing just three weeks ago with Mr. Stetkoff --
21  Steckloff.  I always get his name wrong.
22  Q  (By Mr. Levine) Can we -- so, Dr. Shustov --
23    MR. LEVINE:  Since that's who we
24  should be asking the question --
25    MR. WISNER:  Yeah.

Page 145

1    MR. LEVINE:  -- to.
2    MR. WISNER:  I was just trying to
3  answer your question.
4    MR. LEVINE:  Yes, you did.  I
5  appreciate that.
6    MR. WISNER:  Sure.
7  Q  (By Mr. Levine) Dr. Shustov, do you know what case
8    it was that you copied Dr. Nabhan's opinions from?
9  A  I --
10    MR. WISNER:  Objection.
11    THE WITNESS:  -- apologize.  I
12  don't.
13    MR. WISNER:  Misstates his
14  testimony.
15    THE WITNESS:  I -- I don't.  I
16  don't remember.  And the -- again, the -- the reason
17  for supplementing this was to familiarize myself with
18  the structure of legal reports, as I don't do this on
19  a daily basis.  I remember that.  She mention you can
20  use this as a template if you don't know how to
21  write.  This is not something I do.  It doesn't look
22  like medical records.  And I believe that's what
23  happened, because that kind of struck me discussing
24  all this.
25  Q  (By Mr. Levine) Dr. Shustov, is that your report on

Andrei Shustov, M.D.

Page 146

1    your reliance list in this case?
2    A  I don't believe so.
3              MR. LEVINE:  Can we go off the
4    record so you can identify what report it was of
5    Dr. Shustov?
6              MR. WISNER:  Sure.
7              THE VIDEOGRAPHER:  Please stand by.
8    We are going off the record.  The time is 1:25 p.m.
9              (Pause in proceedings.)
10
11             THE VIDEOGRAPHER:  We're back on
12   the record.  The time is 1:33 p.m.
13             MR. LEVINE:  So for the record --
14   and, Brent, you can correct me if I state anything
15   incorrectly -- Mr. Wisner has agreed to provide the
16   report of Dr. Nabhan that was provided to Dr. Shustov,
17   but we've agreed that to the extent that report was a
18   draft report that has not been submitted in any prior
19   case, that Mr. Wisner can redact any personal
20   identif -- identifying information or any
21   case-specific information with respect to the
22   plaintiff for whom that report was written.  Correct?
23             MR. WISNER:  That is correct.  And
24   we will also provide you the date in which it was
25   provided to the witness.

Page 147

1              MR. LEVINE:  Thank you.  That was
2    going to be the very next point I made.
3    Q  (By Mr. Levine)  Dr. Shustov, I'm handing you
4    Exhibits 12 and 13, which are yours and Dr. Nabhan's
5    reports in the Hardeman case with highlighting.
6                   (Exhibit No. 13 marked for
7                   identification.)
8
9    Q  (By Mr. Levine)  Those are highlighted copies of your
10   reports.
11             MR. WISNER:  Which one's 12?  Which
12   one's --
13             MR. LEVINE:  Top is 12, so...
14             MR. KERSCHNER:  Shustov is 12.
15   Q  (By Mr. Levine)  And, Dr. Shustov, I will represent
16   to you that all the yellow highlighting are the
17   identical words that were used in the two reports.
18   A  Okay.
19   Q  And if you want to take a look and confirm that
20   that's the case, you're more than welcome to.
21   A  One in the greens?
22   Q  The green highlighting is language that is
23   substantially similar in the two reports.
24             MR. WISNER:  Based on who?
25   Q  (By Mr. Levine)  You can tell me if you disagree with

Page 148

1    that assessment.  Take a look at the green language,
2    and tell me if you disagree that it is substantially
3    similar.  First let's start with the yellow.
4              MR. WISNER:  I know.  I guess I
5    just want to make sure we understand what we're doing
6    here.  So you want him to go through and compare the
7    green to the green and the yellow to the yellow to
8    see if they're both substantially similar or
9    identical?
10             MR. LEVINE:  Why don't we just
11   start.
12   Q  (By Mr. Levine)  Do you agree that the yellow
13   highlighting is identical language in the two
14   reports?  Whether it be in different orders of
15   paragraphs, the paragraphs are identical with respect
16   to any yellow highlighted language?
17             MR. WISNER:  All of it?
18             MR. LEVINE:  Let the witness look
19   at it and --
20             MR. WISNER:  Okay.  It's just,
21   like...
22             MR. LEVINE:  You're saying it's a
23   lot?
24             MR. WISNER:  You've highlighted a
25   lot.

Page 149

1              THE WITNESS:  Okay.  I agree.
2    Q  (By Mr. Levine)  Okay.  The green highlighting is
3    just for your reference.  I won't ask any questions
4    about it.  Don't need -
5              MR. WISNER:  I'm just going to
6    object that it's actually not accurate.
7              MR. LEVINE:  I'm not making any --
8    I'm stating on the record I am only asking about the
9    yellow highlighting.
10             MR. WISNER:  I know the yellow's
11   inaccurate.  I have examples of it right now.
12             MR. LEVINE:  Oh.
13             MR. WISNER:  I've found some.  So,
14   I mean, I just -- this is a tough, tough thing --
15             MR. LEVINE:  Sure.  My apologies.
16   Why don't you tell me --
17             MR. WISNER:  I mean, it's --
18   it's ---
19             MR. LEVINE:  -- what's inaccurate.
20             MR. WISNER:  --- it's -- it's
21   ticky-tack, but I'm just walking you through it.  So,
22   like, on Page 6 of Dr. Shustov's -- sorry --
23   Dr. Nabhan's report --
24             MR. LEVINE:  Mm-hmm.
25             MR. WISNER:  -- you have

Andrei Shustov, M.D.

Page 150

1   highlighted, "IARC is a division of the World Health
2   Organization (WHO)." Do you see that? And then the
3   actual language in Page 7 is, "IARC represents a
4   division of the World Health Organization." So
5   that's actually not identical.
6           MR. LEVINE: Okay. We'll
7   acknowledge that one. And if there are any other
8   mistakes, I apologize.
9           MR. WISNER: And I guess my other
10  objection --
11          MR. LEVINE: It'll speak for --
12          MR. WISNER: It's fine. It'll
13  speak for itself. But my -- my other objection I
14  just want to be clear is, you know, the word "IARC,"
15  for example, is used in both reports. And suggesting
16  that that somehow means it's copied or pasted, I
17  think, is an incorrect assertion. So we'll make our
18  arguments when we make them, but I just --
19          MR. LEVINE: Sure. And --
20          MR. WISNER: -- I object to that
21  kind of stuff.
22          MR. LEVINE: And I'll just let you
23  know, it's the combination of words that are put
24  together that suggest that, but that's for another
25  time.

Page 151

1   Q  (By Mr. Levine) Just to be clear, by the way,
2      there's no highlighting at the beginning of your
3      report in that document, correct?
4   A  That's correct.
5   Q  And through the -- up until -- up until Page 7 of
6      your report, you use a format of numbered paragraphs,
7      correct? I should say, on Pages 4 to 6 of your
8      report, you use a numbering format for the
9      paragraphs?
10  A  Okay.
11  Q  Okay. And you wrote those pages, correct?
12  A  That's correct.
13  Q  And then when you do begin to use the same language
14     as Dr. Nabhan's report, you switch to bullet points,
15     correct?
16  A  That's correct.
17  Q  Dr. Nabhan uses bullet points in his report, correct?
18  A  That's correct.
19  Q  So the language you copied is just in the bullet
20     point section, correct?
21  A  That's correct. It appears this way.
22  Q  Okay. And that includes, if you go to Page 9 of your
23     report, the "Conclusions" section, correct?
24          MR. WISNER: Objection.
25          THE WITNESS: They're also on the

Page 152

1   bullets, yes.
2   Q  (By Mr. Levine) Okay. And by the way, that section
3      specifically references Mr. Hardeman, correct? The
4      language that is in your report here that is
5      identical to Dr. Nabhan's report includes language
6      that includes Mr. Hardeman's name, correct?
7   A  That's correct.
8   Q  Whose conclusions are these?
9   A  These are my conclusions.
10  Q  As a -- you're employed at the Fred Hutchinson Cancer
11     Center; am I correct?
12  A  University of Washington.
13  Q  The Fred Hutchinson Cancer Center is part of the
14     University of Washington?
15  A  They're an alliance. They're a part of the alliance.
16     That's correct.
17  Q  Do you practice there?
18  A  Well, they are basically the same institution. I
19     practice at SCCA, but SCCA is a practice used by both
20     institutions.
21  Q  Are you subject to policies of integrity under the
22     Fred Hutchinson Cancer Center?
23          MR. WISNER: Objection; vague.
24          THE WITNESS: I have to see which
25  policy you -- you're referring to.

Page 153

1   Q  (By Mr. Levine) Are you aware of whether the Fred
2      Hutchinson Cancer Center has an academic integri --
3      has academic integrity rules prohibiting plagiarism?
4   A  They might.
5           (Exhibit No. 14 marked for
6            identification.)
7
8   Q  (By Mr. Levine) Handing you what's been marked as
9      Exhibit 14, which is the Fred Hutchinson Research
10     Integrity Policy. Do you see that?
11  A  Yep.
12  Q  Would you be subject to this policy in your
13     professional endeavors?
14  A  I am not sure I can answer this question. I would
15     have to double-check. I am employed by University of
16     Washington and have secondary appointment at Fred
17     Hutchinson Center.
18  Q  Can you please read the policy statement on the first
19     page of the Fred Hutchinson Research Integrity
20     Policy?
21  A  I just make a statement I don't represent Fred
22     Hutchinson in this case. I represent myself as
23     independently practicing physician. And I refuse to
24     implicate Fred Hutchinson name in this because I
25     don't act on behalf of Fred Hutchinson.

Andrei Shustov, M.D.

Page 154

1  Q  I assure you I am not implicating Fred Hutchinson.
2  A  I understand.  But you're asking me about Fred
3     Hutchinson policies and rules, and I act here on
4     behalf of myself.
5  Q  Okay.  And you know what?  Let me ask you:  Do you
6     agree that in all of its activities, Fred Hutchinson
7     Cancer Research Center expects the highest standards
8     of professional conduct from each employee?  Do you
9     understand that?
10 A  Fred Hutchinson has nothing to do with this case.
11 Q  Are you an employee of Fred Hutchinson?
12 A  No.
13 Q  Okay.  So you do not think that Fred Hutchinson would
14    consider you to be one of its employees?
15 A  I am not employed by Fred Hutchinson.  I have
16    secondary appointment at Fred Hutchinson, but I don't
17    represent Fred Hutchinson in this case.
18 Q  I understand that you don't in this case.
19    Do you understand that the center, meaning the
20    Fred Hutchinson Cancer Research Center, shall process
21    situations that may constitute research misconduct
22    under the center's Research Misconduct Policy and
23    Procedures?
24 A  I refuse to answer that.
25 Q  Do you understand that the Research Misconduct Policy

Page 155

1     and Procedures of Fred Hutchinson include intentional
2     or reckless fabrication, falsification, or
3     plagiarism?
4  A  It has nothing to do with this case.  I refuse to
5     answer that.
6                    (Exhibit No. 15 marked for
7                     identification.)
8
9  Q  (By Mr. Levine)  Handing you what's been marked as
10    Exhibit 15, which is the Fred Hutchinson Cancer
11    Center Research Misconduct Policy.
12 A  Okay.
13              MR. WISNER:  Is this document
14    available publicly?
15              MR. LEVINE:  Yes.
16              MR. WISNER:  Okay.
17              MR. LEVINE:  In fact, the URL is on
18    the bottom of the page.
19              MR. WISNER:  It just said
20    "extranet," so I didn't know if that was an internal
21    Internet or public one.
22              MR. LEVINE:  It came from a Google
23    search, I will represent.
24              MR. WISNER:  Okay.
25 Q  (By Mr. Levine)  You understand -- I'm reading from

Page 156

1     the section which states "Prevention."  You
2     understand that the Fred Hutchinson Cancer Center
3     expects intellectual honesty in all of its endeavors,
4     correct?
5              MR. WISNER:  Objection;
6     speculation.  This witness can cannot testify about
7     an institution's expectations.
8              THE WITNESS:  I do not consider
9     this under Fred Hutchinson policy.
10 Q  (By Mr. Levine)  Do you consider this to be
11    intellectually honest?
12              MR. WISNER:  What does "this" refer
13    to, Counsel?
14              MR. LEVINE:  This work.  Whatever
15    "this" is that he just referred to in his response.
16              THE WITNESS:  It's absolutely
17    intellectually honest, and I did not conduct research
18    here under Fred Hutchinson policies.
19 Q  (By Mr. Levine)  All due respect.  I asked you at the
20    beginning of this deposition whether you engaged in
21    the -- whether you applied the same intellectual
22    principles in your work here as you do in your
23    professional career for academic research.  And you
24    said "yes."
25 A  But it's different from policies.

Page 157

1  Q  Understood.  But you had told me you were conducting
2     yourself under the same standards as you do in your
3     research.  Is that correct or is it not correct?  Do
4     you -- are you conducting yourself in this case and
5     your research in this case according to the same
6     standards that you use in your practice and research?
7              MR. WISNER:  Okay.  I'm going to
8     object to the compound nature of the question.
9              MR. LEVINE:  Okay.  Then I'll --
10             MR. WISNER:  Answer to the extent
11    you can.
12             MR. LEVINE:  -- just re-ask the --
13    the very last part.
14 Q  (By Mr. Levine)  Are you conducting yourself in this
15    case according to the same standards that you use in
16    your practice and research outside of your testimony
17    here?
18 A  What standards you're referring to?  Standards of
19    what?
20 Q  Standards of academic integrity.
21 A  This is not academic activity.
22 Q  I'm simply asking you a question of whether you're
23    conducting yourself according to the same standards
24    that you hold yourself outside of your expert work.
25    You can answer "yes," you can answer "no," or you can

Andrei Shustov, M.D.

Page 158

1    give me --
2  A  I'm doing this to the best of my abilities and to the
3    best effort I can put forward to help in this case.
4  Q  You're telling me this is the best effort you could
5    have put forward in this case was to copy, I counted
6    about 13 paragraphs from Dr. Nabhan's report?
7          MR. WISNER: Objection;
8    argumentative, harassment.
9        Do not answer that question.  That has no valid
10    basis to be asked.
11  Q  (By Mr. Levine) Dr. Shustov, are you -- is it --
12    strike that.
13        Dr. Shustov, is it your testimony that what
14    you've put forth here is the best effort you could
15    have in copying what I count as approximately 13
16    paragraphs from Dr. Nabhan's report?
17          MR. WISNER: Same objection.
18          THE WITNESS: This is the best
19    effort I could put -- put out to form my opinions in
20    Mr. Hardeman's case.
21  Q  (By Mr. Levine) Dr. Shustov, you told me that you
22    teach medical students, correct?
23  A  That's correct.
24  Q  Medical student submitted a research paper to you
25    with 13 paragraphs copied from another student.  Is

Page 159

1    it fair to say you'd flunk the student?
2          MR. WISNER: Objection; improper
3    hypothetical, speculation.
4          THE WITNESS: If the student
5    referenced other papers and given examples of certain
6    facts or statements from other researchers or
7    students to help support the conclusion in -- in the
8    student's paper, it would require consideration.  I
9    can't say in a blank statement.  I would have to see
10    exactly what the paper of the student would have and
11    how it's used.
12  Q  (By Mr. Levine) If the paper was a research paper on
13    the cause of Mr. Hardeman's non-Hodgkin's lymphoma
14    and it contained 13 paragraphs with the yellow
15    highlighting that is identical to another student's
16    paper in that class with the exact same language,
17    would you pass that student?
18          MR. WISNER: Objection; improper
19    hypothetical, incomplete hypothetical, speculation,
20    and vague.
21          THE WITNESS: I would have to sit
22    down with the students and discuss what is the
23    specific -- what specific paper is and why he or she
24    quoted work with statements of other researchers,
25    physicians, or colleagues, or if you wish.

Page 160

1  Q  (By Mr. Levine) You would also, under the University
2    of Washington's academic integrity policies, be
3    required to report that plagiarism, correct?
4          MR. WISNER: Objection; incomplete
5    hypothetical.
6          MR. LEVINE: Just asking.
7          THE WITNESS: I don't know that. I
8    never had the situation.
9  Q  (By Mr. Levine) Would you report it?
10          MR. WISNER: Objection; incomplete
11    hypothetical, speculation.
12          THE WITNESS: Again, it depends on
13    what I find talking to the student, and I have to
14    have example of specific paper and why the statements
15    were used to support --
16  Q  (By Mr. Levine) This --
17  A  -- conclusions.
18  Q  So this is the paper.  You're -- you're the student
19    I'm referring to.  Dr. Nabhan is the student that I'm
20    referring to that was copied.  Would you report this?
21          MR. WISNER: Objection. Incomplete
22    hypothetical.  Misstates the testimony and exactly
23    what we're doing here.
24          THE WITNESS: I don't know what I
25    would do in this situation.

Page 161

1  Q  (By Mr. Levine) Is it fair to say you would consider
2    reporting this?
3          MR. WISNER: Objection; incomplete
4    hypothetical, speculation.
5          THE WITNESS: It would not be my
6    first thought, no.
7  Q  (By Mr. Levine) Would you question the reliability
8    of this -- this student's work?
9          MR. WISNER: Objection; incomplete
10    hypothetical, speculation.
11          THE WITNESS: I would raise
12    questions.
13  Q  (By Mr. Levine) As to the reliability of the work?
14  A  And not reliability.  I would ask the student what
15    was the reason for using the language, if I truly
16    suspected this was copied from another source.
17  Q  Would you have to assess the reliability of the other
18    student's report that it was copied from in order to
19    be able to determine whether this student's work was
20    reliable?
21          MR. WISNER: Objection; incomplete
22    hypothetical, misstates what happened here.
23          MR. LEVINE: Enough with the
24    speaking objection.  Just object to form.
25          MR. WISNER: Okay.  To be clear, we

Andrei Shustov, M.D.

Page 162

1  objected to a seven-hour deposition because you would
2  waste our time.  You are asking a hypothetical
3  question about whether or not if his expert report
4  was a paper that he was grading against another
5  student's paper and what he would do with regard to
6  reporting it under an undisclosed and yet
7  unidentified academic policy.  The absurdity to which
8  this question has reached is really beyond the pale.
9              MR. LEVINE:  The absurdity --
10             MR. WISNER:  Now --
11             MR. LEVINE:  -- to which --
12             MR. WISNER:  Let me finish my --
13             MR. LEVINE:  No.
14             MR. WISNER:  -- objection.
15             MR. LEVINE:  The absurdity --
16             MR. WISNER:  Let me finish.
17             MR. LEVINE:  No.  No.
18             MR. WISNER:  Let -- you cannot --
19             MR. LEVINE:  No.
20             MR. WISNER:  -- interrupt me.
21             MR. LEVINE:  No.
22             MR. WISNER:  I've not interrupted
23  you.  Share the same respect to me.
24             MR. LEVINE:  No.
25             MR. WISNER:  Okay?

Page 163

1              MR. LEVINE:  You're not -- this is
2  not --
3              MR. WISNER:  You are interrupting
4  me.
5              MR. LEVINE:  -- your deposition.
6              MR. WISNER:  You are interrupting
7  me.
8              MR. LEVINE:  You're --
9              MR. WISNER:  You are interrupting
10  me.
11             THE REPORTER:  I can't get this.
12             MR. WISNER:  Cut it out.
13             MR. LEVINE:  We --
14             MR. WISNER:  I let you do your
15  thing.  You let me do mine.  That's how it works.
16             MR. LEVINE:  No, it's not.
17             MR. WISNER:  You asked for it.
18             MR. LEVINE:  Not during my
19  questioning.
20             MR. WISNER:  Okay.
21             MR. LEVINE:  We'll go off the
22  record.
23             MR. WISNER:  No.  We are staying on
24  the record.  Because you asked me the question, and
25  I'm answering it straight-up.  You've asked for this,

Page 164

1  sir.
2              MR. LEVINE:  Go for it.
3              MR. WISNER:  Okay?  So let me
4  finish what I'm saying.
5              MR. LEVINE:  I'm going to --
6              MR. WISNER:  The absurdity to which
7  this question has reached is beyond the pale.  And if
8  you want to ask him, "Sir, is your paper honest?  Is
9  your paper correct?" go ahead.  But the absurdity of
10  the -- the speculative questions that you're asking
11  are ridiculous.  So, yes, I'm objecting because
12  you're wasting our time.  Please respond or ask your
13  next question.
14             MR. LEVINE:  I will ask the court
15  reporter to mark this part of the transcript and
16  Mr. Wisner's speaking objection, and we will note it
17  for the court.
18             MR. WISNER:  Please.  And may the
19  record reflect --
20             MR. LEVINE:  And --
21             MR. WISNER:  -- that I was
22  responding to a question asked directly by you to me
23  on the record.
24             MS. WAGSTAFF:  I would also -- this
25  is Aimee Wagstaff.  I would like to put on the

Page 165

1  record, I know you're new to the case, but early in
2  the MDL, we being the plaintiffs actually made a
3  motion to limit objections to object to form.  We
4  actually attached a proposed order to our CMC
5  statement requesting that.  Monsanto adamantly
6  opposed that, saying that speaking objections were
7  proper.  This went to the court, and the court sided
8  with Monsanto, saying that objections were not
9  limited to form.
10     So I will cut you some slack because you are --
11  you were not here at the beginning of the case, but
12  that is absolutely the law of the case.
13             MR. LEVINE:  Thank you, Aimee.  I
14  appreciate that.  And we can certainly bring that to
15  the court's attention if the situations are
16  analogous.  I appreciate your advice.
17     Continue?
18             MR. WISNER:  Absolutely.
19  Q  (By Mr. Levine)  Dr. Shustov, are you a member of the
20  American Medical Association?
21  A  No, I'm not.
22  Q  So do you think it would be appropriate to follow
23  their code of conduct as it relates to medical expert
24  testimony?
25             MR. WISNER:  Objection;

Andrei Shustov, M.D.



**Page 166**

1   speculation, lacks foundation.
2          THE WITNESS:  I have not reviewed
3   the American Medical Association code of conduct as
4   relates to testimonies.
5   Q  (By Mr. Levine)  Dr. Shustov, were you under the
6   impression that the legal rules applicable to this
7   case permitted you to copy someone else's opinions
8   and submit them as your own?
9          MR. WISNER:  Objection; misstates
10  the record.  Speculation.  Calls for a legal
11  conclusion.
12     Answer if you can, sir.
13         THE WITNESS:  I did not copy
14  anybody's opinion in my report.
15  Q  (By Mr. Levine)  Okay.  Let's turn to Page 3 of your
16  report.
17         MR. LEVINE:  Actually, you know
18  what?  Since I'm switching topics and I just got a
19  timing signal on the tape, now is a good time for a
20  quick break.
21         MR. WISNER:  Sure.
22         THE VIDEOGRAPHER:  Please stand by.
23  This concludes Media Unit No. 2 in the deposition of
24  Andrei Shustov.  We're going off the record.  The
25  time is 1:58 p.m.

**Page 167**

1          (Pause in proceedings.)
2
3          THE VIDEOGRAPHER:  This begins
4   Media Unit No. 3 in the deposition of Dr. Andrei
5   Shustov.  We are back on the record.  The time is
6   2:04 p.m.
7   Q  (By Mr. Levine)  Dr. Shustov, can you turn to Page 3
8   of your report?  I'm not sure I asked -- if I asked
9   you to do that.
10  A  I'm here.
11  Q  You have a section that -- on Page 3 that refers to
12  special exposure history.  You see that?
13  A  I do.
14  Q

**Page 169**

25  Q  Okay.  And what's your basis for that opinion?



REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Andrei Shustov, M.D.





Andrei Shustov, M.D.

Page 182

Page 184

1     understand that I'm referring to splenic marginal

2     zone lymphoma, correct?

3    A   You got it.

4    Q   SMZL is a nonaggressive form of lymphoma, correct?

5    A   That's correct.

22

oma.

Page 185





Page 186

1 [REDACTED]

Page 188

1    possibilities.
2 [REDACTED]

Page 187

1 [REDACTED]
23           MR. WISNER:  Objection; beyond the
24    scope.
25           THE WITNESS:  It is one of the

Page 189

1 [REDACTED]
2           MR. LEVINE:  I appreciate the
3    clarification.
4           MR. WISNER:  Hence my objection.  I
5    wasn't just being weird.
6           MR. LEVINE:  I appreciate that
7    clarification.
8           MR. WISNER:  You're welcome.  You
9    see, I'm not always mean with my coaching to the
10   opposing counsel.
11 Q [REDACTED]
18 [REDACTED]







Page 198

Page 200

Page 199

Page 201

1    obesity to be inclusive.
2    Q   Okay.  So maybe you can help me understand this.
3         What's your criteria for ruling something in, in
4    a differential diagnosis when determining causation?
5    A   Including factors that, to the best of my knowledge,
6    were either described, whether they're proven or not
7    proven in medical literature to be a risk factor for
8    lymphoma.
9    Q   And then what's your criteria for ruling something
10   out in a differential diagnosis when determining
11   causation?
12   A   Something I don't know is a risk of lymphoma.  I
13   don't rule things out.  I -- whatever factors and
14   causative factors that I'm aware of as a lymphoma
15   physician, I consider creating exclusive list and
16   then ruling them out based on either findings in a
17   particular patient or my conclusion reviewing
18   literature on that particular factor.
19   Q   So you would rule something in if there's -- if
20   there's -- strike that.
21        You would rule something in if it's described in
22   the literature as being a risk factor, whether it's
23   proven or not proven.  Did I state that correctly?
24   A   The factor that I'm aware of, yes.
25   Q   So if it's a risk factor, you rule it in?

Andrei Shustov, M.D.

Page 202

1  A  If this is the risk factor that I'm aware of was
2    interrogated for being risk factor for lymphoma, for
3    the purpose specifically of generating this report,
4    yes.
5  Q  But in order for you to rule something in, it doesn't
6    have to be proven as a cause, correct?
7  A  To generate the list of possibilities.
8  Q  Right.
9      So your ruling in does not require you to have
10    established that something is generally a cause --
11  A  That's correct.
12  Q  -- of non-Hodgkin's lymphoma, correct?
13  A  That's correct.  For the purpose of this report.
14  Q  That's how you rule things out, correct?
15        MR. WISNER:  Wait.
16  Q  (By Mr. Levine)  Am I -- sorry.  I'll strike that.  I
17    think -- I think temperatures are starting to go up
18    when I say that.
19        MR. WISNER:  No, no.
20        MR. LEVINE:  Let me -- let me --
21        MR. WISNER:  I think --
22        MR. LEVINE:  -- see if I --
23        MR. WISNER:  -- you jumped --
24        MR. LEVINE:  -- understand.
25        MR. WISNER:  -- from in to out.

Page 203

1        THE REPORTER:  What was that?
2        MR. WISNER:  You jumped from in to
3    out.  That's why.
4        MR. LEVINE:  Right.
5        MR. WISNER:  I just wanted to
6    object.  Okay.
7  Q  (By Mr. Levine)  So let me -- let me -- let me
8    clarify.
9      We were just discussing how you rule things in.
10    You rule in risk factors, but something doesn't have
11    to be established as a cause to rule it in; am I
12    correct?
13  A  To generate a list of possibilities for -- for my
14    elimination method to come up with the best plausible
15    scenario.
16  Q  And then part of your method for ruling out, do a
17    couple things, from what I understand you said.  One
18    is you can rule it out if somebody didn't have it,
19    right?
20  A  Correct.
21  Q  So risk factor might be smoking, let's say.  Not
22    proven as a cause.  But if someone didn't smoke, you
23    could easily rule that out, right?
24  A  Correct.
25  Q  But the other part of ruling it out under your

Page 204

1    methodology is to determine whether or not it's a
2    cause, right?  It's an established cause?
3        MR. WISNER:  Objection; vague.
4        MR. LEVINE:  Sorry.  I'm going to
5    re-ask that because it may look vague in the
6    transcript as well.
7  Q  (By Mr. Levine)  So the other part of ruling
8    something out under your methodology, if you can't
9    exclude its presence in that patient -- like, for
10    instance, a patient didn't smoke.  You with me so
11    far?
12  A  Yes.
13  Q  Okay.  So the other part of ruling it out under your
14    methodology if it is present in the patient is -- is
15    to determine whether or not that exposure or risk
16    factor can be a cause, correct?
17  A  In this particular patient.  Correct.
18  Q  In a particular patient that you're evaluating?
19  A  That's correct.
20  Q  So your general causation analysis comes in the
21    ruling-out part, correct?
22        MR. WISNER:  Objection; vague.
23    Calls for a legal conclusion.
24        THE WITNESS:  That's correct.  I'm
25    trying to process what you're asking.  Yes.

Page 205

17  We're going off the record.  The time is 3:01 p.m.
18        (Pause in proceedings.)
19
20        THE VIDEOGRAPHER:  We're back on
21  the record.  The time is 3:09 p.m.
22        MR. WISNER:  If someone comes in,
23  just if you're -- try to avoid questions about
24  Mr. Hardeman's medical treatment.
25        MR. LEVINE:  If someone comes in,

Andrei Shustov, M.D.



Page 206

1    you can let me know --
2                    MR. WISNER:  I'll let you know.
3                    MR. LEVINE:  -- immediately.
4                    MR. WISNER:  Yeah.
5                    MR. LEVINE:  Because I have never
6    noticed somebody come in.
7                    MR. WISNER:  Okay.
8                    MR. LEVINE:  So I won't notice it.
9                    MR. WISNER:  Okay.
10                   MR. LEVINE:  It would be
11   unintentional, but I agree --
12                   MR. WISNER:  Sure.
13                   MR. LEVINE:  -- that we should keep
14   that within the confines of those that are in this
15   room.
16

Page 207

Page 208

Page 209

Andrei Shustov, M.D.



Page 210

Page 212

Page 211

Page 213

19  Q  Do you agree that the vast majority of cases of
20     non-Hodgkin's lymphoma occur in patients who are
21     never exposed to Roundup?
22             MR. WISNER:  Objection;
23     speculation.
24             THE WITNESS:  I don't know the
25     answer to that.  I don't know how many people are

Andrei Shustov, M.D.

Page 214

1    exposed to Roundup and how many patients diagnosed
2    with lymphoma exposed to Roundup.
3    Q   (By Mr. Levine)  Do you have any basis one way or the
4    other to agree or disagree that the vast majority of
5    cases of lymphoma occur in patients who were never
6    exposed to Roundup?
7    A   I have no information to answer this, because you
8    have to surveil or survey every lymphoma patient who
9    is diagnosed and ask 60,000 new diagnosis per year
10   whether or not they use Roundup.  That would be the
11   basis for my answer.
12   Q   Do you have any basis to disagree that the vast
13   majority of cases of DLBCL occur in patients who were
14   never exposed to Roundup?
15           MR. WISNER:  Same objection; asked
16   and answered as well.
17           THE WITNESS:  I think nobody can
18   say that.  I'm not saying it yes or no.  But nobody
19   can answer this question if you want objective answer
20   without surveying every patient who was diagnosed
21   with DLBCL and asking them whether they were exposed
22   to Roundup.  That would be the proper answer.
23   Q   (By Mr. Levine)  Would you disagree with any expert
24   who testified that the vast majority of cases of
25   DLBCL occur in patients who were never exposed to

Page 215

1    Roundup?
2            MR. WISNER:  Objection; incomplete
3    hypothetical.
4            THE WITNESS:  I would ask for --
5            MR. WISNER:  Speculation.
6            THE WITNESS:  I would ask for basis
7    of that opinion, because I don't have any information
8    how can somebody reliably say that.  Once again,
9    every year, surveying every diagnosis of DLBCL,
10   whether or not they were exposed to Roundup.
11   Q   (By Mr. Levine)  Is it your opinion that if a patient
12   was exposed to Roundup for more than two days or ten
13   days according to the studies that you recite, that
14   Roundup was a cause of their non-Hodgkin's lymphoma?
15           MR. WISNER:  Objection; incomplete
16   hypothetical, speculation.
17           THE WITNESS:  It is my opinion that
18   exposure to Roundup increased this person's risk of
19   lymphoma.  And whether or not it directly caused the
20   lymphoma, contributed to his lymphoma, it's very
21   hard -- it's -- it's impossible to determine in
22   any -- every particular patient.  But increased risk
23   of lymphoma suggests that it is a possible,
24   substantial factor in this patient's diagnosis.
25   Q   (By Mr. Levine)  And when you say "this patient," are

Page 216

1    you referring to Mr. Hardeman or just in general to
2    any patient?
3    A   I thought you asked me general question.
4    Q   I was.
5    A   Yeah.
6    Q   That's why I was just trying to --
7    A   Yeah.
8

Page 217



REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Andrei Shustov, M.D.





Page 222

1

Page 224

1

4    Q  Are you aware of any epidemiological studies that
5       have found an association between Roundup and DLBCL?
6    A  Yes.  So the studies that I reviewed -- let me just
7       try and make sure I remember the -- the -- I believe
8       it was De Roos paper.  So the studies I reviewed, De
9       Roos, Eriksson.  And they're listed in my report
10      where I looked to confirm the conclusions stated in
11      IARC or in -- in epidemiology expert reports.
12   Q  So it's your testimony that in the studies that are
13      discussed in your report, there are statistically
14      significant findings that associate Roundup or
15      glyphosate with DLBCL?
16   A  I didn't have a reason to question epidemiologist
17      reports that I read and question the studies on
18      general causation by De Roos and Eriksson and
19      McDuffie.
20   Q  So I may not be understanding with you, but are
21      you -- understanding you.  But are you telling me
22      that the studies that you're mentioning -- De Roos,
23      Eriksson, McDuffie -- contain findings on DLBCL?
24   A  I have to go back and look.
25   Q  We'll look at --

Page 223

Page 225

1    A  Okay.
2    Q  We'll look at them.
3    A  Okay.
4    Q  But I'm just...
5    A  When I look at the studies by those authors and
6       groups, for me as a clinician, it didn't really
7       matter whether it was DLBCL or other lymphoma because
8       I believe that exposure to chemical carcinogens do
9       not discriminate the type of lymphoid cells that they
10      affect and can give rise to any type of lymphoma.
11   Q  Do you have any authority -- peer-reviewed
12      publication, medical textbook -- that says chemical
13      carcinogens do not discriminate to the subtype of
14      non-Hodgkin's lymphoma and that they can give rise to
15      any type of non-Hodgkin's lymphoma?
16   A  If we're -- if I were to look, again review the
17      papers, some of them did look at the subtypes of
18      lymphomas.  But the statement that I'm making is
19      based on my knowledge of general carcinogenesis of
20      chemical agents on producing mutations, and I do not
21      see any reason in this mechanistic pathway --
22              THE REPORTER:  "In this"...?
23              THE WITNESS:  -- why --
24              THE REPORTER:  "In this," what?
25              THE WITNESS:  And I do not see any

Page 226

1  reason why considering the mechanism of simple
2  chemicals to again discriminate between the type of
3  cells that transform to cancer.
4  Q  (By Mr. Levine)  Do you have any textbooks, peer-
5  reviewed publications, or medical authorities that
6  you can cite to that support the point you're making
7  that chemical carcinogens don't discriminate between
8  the subtypes of non-Hodgkin's lymphoma?
9  A  I cannot cite off top of my head any specific papers.
10  Again, this is basic scientific knowledge that I
11  would employ as a -- somebody who has expertise in
12  oncology.  If I were to do a search and I would be
13  able to answer the question whether there is specific
14  studies indicating that.
15  Q  So, Dr. Shustov, just so you know, I'm going to
16  actually suggest to Mr. Brenza that he ask you the
17  same question tomorrow, and we'll see whether you can
18  find any support --
19  A  Sure.
20  Q  -- for that statement.
21            (Exhibit No. 17 marked for
22             identification.)
23
24  Q  (By Mr. Levine)  Handing you what's been marked as
25  Exhibit 17, which is the McDuffie study.  This is, I

Page 227

1  think, one of the ones you just mentioned, correct?
2  A  Okay.
3  Q  You cite -- you're familiar with this study, right?
4  A  I'm familiar with this publication, yes.
5  Q  You cite it on the top of Page 8 of your report?
6  A  Yeah.
7  Q  This is one of the paragraphs that was copied from
8  the version of Dr. Nabhan's report that you have.
9            MR. WISNER:  Objection.
10  Q  (Continuing by Mr. Levine)  Correct?
11            MR. WISNER:  Misstates the record.
12            (Interruption by reporter.)
13
14            MR. WISNER:  I think he's expecting
15  you to answer the question.
16            THE WITNESS:  Oh, I'm sorry.  I
17  was -- I was going to say --
18            MR. LEVINE:  There was a little
19  talking over each other.  I'll forgive Mr. Wisner,
20  but he came in with the objection right in the middle
21  of the end of my question.  So let's start this over.
22  Q  (By Mr. Levine)  You're familiar with this study,
23  correct?
24  A  I believe I looked at the study.
25  Q  Yes.

Page 228

1  A  I'm not familiar with details of this study.  I refer
2  to it as a general causation.  I did not study this
3  paper in detail, but just to confirm the statements
4  and expert reports --
5  Q  Yeah.
6  A  -- on general causation.
7  Q  You cite this study on the top of Page 8 in your
8  report, correct?
9  A  That's correct.
10  Q  And this is one of the paragraphs that -- in your
11  report that you copied from the version of
12  Dr. Nabhan's report that you were given, correct?
13            MR. WISNER:  Objection; misstates
14  the record.
15            THE WITNESS:  That's one of the
16  paragraphs I included in my report.
17  Q  (By Mr. Levine)  Can -- can you clarify that report?
18  A  Yeah.  This is the paragraph I included in my report.
19  Q  From Dr. Nabhan's report, correct?
20            MR. WISNER:  Objection; misstates
21  the record.
22            THE WITNESS:  This is my report.
23  Q  (By Mr. Levine)  Okay.  How did this paragraph get
24  into your report?
25  A  I obviously placed it in my report.

Page 229

1  Q  From somewhere else, correct?
2  A  I used the language of Dr. Nabhan to state that,
3  but --
4  Q  Okay.
5  A  -- I put it in there.
6  Q  This study -- the McDuffie study looked at pesticide
7  use in Canada, right?
8  A  That's correct.
9  Q  On Page 1155, which is the first page of this study,
10  if you look at the end of the abstract, it says, "We
11  concluded that NHL was associated with specific
12  pesticides after adjustment for other independent
13  predictors."
14     You see that?
15            MR. WISNER:  First page?
16            MR. LEVINE:  Yep.  End of the
17  abstract.
18            MR. WISNER:  Yeah.
19            MR. LEVINE:  Right column, last
20  bolded sentence.
21            THE WITNESS:  Yeah, I see it.
22  Q  (By Mr. Levine)  Okay.  So they're saying
23  non-Hodgkin's lymphoma was associated with some
24  specific pesticides, right?  Not all of them?
25  A  Let me see where it says that.

Andrei Shustov, M.D.

## Page 230

1    Yes, I see it.
2    Q   Okay.  So you understand they're saying non-Hodgkin's
3        lymphoma was associated with some specific
4        pesticides, right?
5    A   Correct.
6    Q   Not all of them.
7        Now, Page 1158, Table 2, looked at herbicides,
8        right?
9    A   Okay.
10   Q   And there's a finding for glyphosate there, correct?
11   A   Yeah, I can see that.
12   Q   And so this -- this table presented adjusted odds
13       ratios, correct?  Two adjusted odds ratios, correct?
14   A   Yes, I believe so.
15   Q   Odds Ratio A was calculated with strata for variables
16       of age and province of residence, correct?
17   A   That's correct.
18   Q   Odds Ratio B controlled for additional confounders as
19       it was adjusted for statistically significant medical
20       variables, such as history of measles, mumps, cancer,
21       allergy desensitization shots, and a positive family
22       history of cancer in a first-degree relative, and
23       with strata for the variables of age and province of
24       residence, correct?
25   A   That's correct.

## Page 231

1    Q   Do you agree with this method in the McDuffie study?
2    A   I don't have any reason to disagree with it, but this
3        is paper on general causation and that I am not an
4        expert in.
5    Q   Okay.  Glyphosate, in the adjusted odds ratios in
6        Table 2, showed no significantly increased risk of
7        non-Hodgkin's lymphoma, correct?
8    A   So in this table, the odds ratio of 1.26.
9    Q   Not significantly increased, correct?
10   A   Yes, I can see this in this table.
11   Q   Okay.  And that was Odds Ratio A you were referring
12       to, which had strata for variables of age and
13       province of residence, correct?
14   A   I have to -- I have to look.  Sorry.
15   Q   When you said 1.26, you were citing from Odds Ratio A?
16   A   That's correct.
17   Q   And then there's Odds Ratio B, which controlled for
18       more factors, and that's 1.20, correct?
19   A   Yeah, I can see that.
20   Q   Just clarifying, when you said 1.26, which one you
21       were referring to.
22   A   Yeah.
23   Q   Okay.  Now, what you cite in your report is from
24       Table 8 on Page 1161, correct?
25           (Discussion off the record.)

## Page 232

1            THE WITNESS:  That's correct.
2    Q   (By Mr. Levine)  I'm sorry.  Just to clarify, 'cause
3        I kind of started speaking on my own while you were
4        looking at that.
5        What you cite in your report is from Page 8 on
6        1161, correct?
7    A   That's correct.
8    Q   Oh.  Table 8 on -- excuse me.  What you -- try this
9        again and again.
10       What you cite in your report is from Table 8?
11   A   That's correct.
12   Q   The finding you cite here from Table 8 for greater
13       than two days' exposure did not control for
14       statistically significant medical variables such as
15       history of measles, mumps, cancer, allergy
16       desensitization shots, and a positive family history
17       of cancer in a first-degree relative, correct?
18   A   In this table, yes.
19   Q   This was Odds Ratio A, not Odds Ratio B, correct?
20   A   In Table 8, yes.
21   Q   And you don't note that in your report, right?
22   A   Correct.
23   Q   That this is the less-adjusted finding?
24   A   Correct.
25   Q   Okay.  Now, if you turn to the conclusion on Page

## Page 233

1    1162, if you turn to the very last paragraph of
2    substantive text in this paper where that starts
3    with, "Our results."
4        Do you see that?
5    A   Very last paragraph?
6    Q   Yes.  See that?  See --
7    A   "In our final results."  I see that.
8    Q   Mm-hmm.  "In our final results"?
9            MR. WISNER:  Nope, you're not on
10       the right page.
11           THE WITNESS:  "In our final
12       results" here?
13   Q   (By Mr. Levine)  No.  Very -- so Page 1162.
14   A   Yes.
15           MR. WISNER:  He's starting in the
16       middle of the paragraph.
17           MR. LEVINE:  Oh.  Okay.
18   Q   (By Mr. Levine)  I was just pointing out the
19       paragraph.  The paragraph, itself, starts with, "Our
20       results."
21   A   Okay.  Got it.
22   Q   Do you see that?
23   A   Yep.
24   Q   And it says, "Our" -- so it says, "Our results
25       support previous findings of an association between

Page 234

1  NHL and specific pesticide exposures."
2      You see that?
3  A  Yep.
4  Q  And then we're going to go to where you were a second
5      ago.  Says, "In our final models, NHL was associated
6      with a personal history of cancer, a history of
7      cancer in first-degree relatives, and exposure to
8      dicamba-containing herbicides, to mecoprop, and to
9      aldrin.  Personal history of measles and of allergy
10     desensitization treatments lowered risk."
11         Do you see that?
12  A  Yeah.
13  Q  This study does not conclude that Roundup or
14     glyphosate was associated with non-Hodgkin's
15     lymphoma, correct?
16  A  I have to go back and basically reread this because I
17     don't want to jump to the conclusion.  This is
18     general causation paper, and this is -- this
19     methodology is not my expertise.  I don't want to
20     make a wrong statement.
21  Q  So that I understand.
22  A  Yeah.
23  Q  You're using this paper for your specific causation
24     method --
25  A  Right.

Page 235

1  Q  -- ology.
2  A  Yeah.
3  Q  Correct?
4  A  Yeah.
5  Q  And you're using the finding for greater than two
6      days that's reported in Table 8, correct?
7  A  That's correct.
8  Q  And you're using a finding that is not fully
9      adjusted, correct?
10         MR. WISNER:  Objection; vague.
11         THE WITNESS:  I'm using the
12     findings from -- from -- yes, from Table 8.
13  Q  (By Mr. Levine)  And that doesn't -- Table 8 doesn't
14     include the full adjustment Odds Ratio B that's
15     contained in the earlier table, correct?
16  A  That's correct.
17  Q  Can you cite anywhere in this study where the authors
18     conclude that more than two days' exposure of Roundup
19     or glyphosate is sufficient to determine that that
20     exposure can cause an individual patient's
21     non-Hodgkin's lymphoma?
22         MR. WISNER:  So I'm going to object
23     to overbreadth.  Do you want him to go through the
24     whole study and look through it?  Because we can do
25     that, or we can take a break and have him do it

Page 236

1  during the break.
2         MR. LEVINE:  Get your objection.
3         THE WITNESS:  So my statement in my
4     report is taken from Table 8.  And that's what I use
5     to make my conclusion and to support general
6     causation statements from statisticians.  So I looked
7     at the -- I looked at the paper, and it -- to me, it
8     looked like it's an appropriate piece of information.
9     Whether or not statisticians want to argue that
10    whether it's adjusted or not adjusted is not area of
11    my expertise.
12        And my -- my -- the primary purpose of my report
13    is the specific causation in Mr. Hardeman's case, not
14    to argue general causation.  And I used the
15    information that I saw in the table to support the
16    statement that I relied on from IARC and statistical
17    experts.  And I started my report from assumption and
18    knowledge that glyphosate is a risk factor for
19    non-Hodgkin's lymphoma for a specific purpose to make
20    conclusions about Mr. Hardeman, not for general
21    causation arguments for which I would have to spend
22    more time and probably would be an inappropriate
23    expert to argue points in this paper.
24        You -- you guys have epidemiologic experts to
25    debate these points because I'm not an expert in

Page 237

1  herbicide epidemiology.  I use the general causation
2  conclusion that glyphosate is a risk factor for
3  lymphoma.  And I'm -- I can't make statements or
4  testify towards general causation, so I pulled the
5  paper that was referenced in -- I believe in IARC,
6  and I looked at specific exposure for two days.  And
7  I used it as a basis of my report.
8      So what we started doing here is to figure out
9  the general causation, whether it's a true -- a true
10  number or not which require review, detailed review
11  of this by a person with higher expertise.  This is
12  not my expertise to debate this question, the
13  validity of this, of this table.
14         MR. LEVINE:  Okay.  I'm not sure
15     that that -- I'm certain that didn't answer my
16     question.  I move to strike as nonresponsive, but...
17         MR. WISNER:  I oppose.
18  Q  (By Mr. Levine)  Dr. Shustov, is this paper relevant
19     to your specific causation methodology?
20         MR. WISNER:  Objection; calls for a
21     legal conclusion.
22         THE WITNESS:  I believe this paper
23     is relevant to general causation.  But to do due
24     diligence, to fact-check the conclusion of IARC, I
25     looked at my references and several reports,



**Page 238**

1   including this, to identify specific -- specific
2   facts pertaining to glyphosate.
3   Q  (By Mr. Levine)  Dr. Shustov, to be clear, you
4   believe this paper is relevant to general causation.
5   Do you believe this paper is relevant to your
6   methodology for determining specific causation?
7           MR. WISNER:  Objection.  Move to
8   strike your testimony about what he thinks.  And I
9   also object that this calls for a legal conclusion.
10          MR. LEVINE:  First of all, you
11  can't move to strike the question, but you can
12  object --
13          MR. WISNER:  You testified.
14          MR. LEVINE:  -- to the question.
15          MR. WISNER:  So I -- I move to
16  strike your testimony about --
17          MR. LEVINE:  You can object to the
18  question, but --
19          MR. WISNER:  -- what he thought.
20          MR. LEVINE:  I'm not going to teach
21  you the law.
22          THE REPORTER:  Repeat what you
23  said.
24          MR. LEVINE:  I'll re-ask my
25  question.

**Page 239**

(redacted)

**Page 240**

(redacted)

**Page 241**

1           MR. WISNER:  If this is a good
2   moment, I'd like to take a break because --
3           MR. LEVINE:  Sure.
4           MR. WISNER:  -- we've been going
5   for an hour.
6           MR. LEVINE:  Sounds good.
7           THE VIDEOGRAPHER:  Please stand by.
8   This concludes the Media Unit No. 3 in the deposition
9   of Dr. Andrei Shustov.  We're going off the record.
10  The time is 4:01 p.m.
11              (Pause in proceedings.)
12
13          THE VIDEOGRAPHER:  This begins
14  Media Unit No. 4 in the deposition of Dr. Andrei
15  Shustov.  We are back on the record.  The time is
16  4:17 p.m.
17              (Exhibit No. 18 marked for
18              identification.)
19
20  Q  (By Mr. Levine)  Dr. Shustov, I'm handing you
21  Exhibit 18, which is the Eriksson paper.  Are you
22  familiar with this study?
23  A  I -- I looked at that study.
24  Q  It's cited in the third bullet point paragraph on
25  Page 8 of your report.

Page 242

1  A  Mm-hmm.
2  Q  Correct?
3  A  That's correct.
4  Q  You rely on this study for your opinions?
5  A  I reviewed this study again for purpose of supporting
6     or confirming statement on general causation, yes.
7  Q  Okay.  So this is -- this paper's for general
8     causation?
9  A  Well, it's listed in my report in the statements
10    where I discuss general causation.
11 Q  Do you use this paper for specific causation?
12 A  In one of these papers, one of the papers, two
13    papers --
14         THE REPORTER:  "One of the," what?
15         THE WITNESS:  In -- in one of the
16    two papers, I also remember using information about
17    duration of exposure.  I have to look at the paper,
18    see if it was Eriksson or De Roos.
19 Q  (By Mr. Levine)  No, it's -- so I think what you're
20    referring to is in the third bullet point of your
21    report, you say, "In a population-based case
22    controlled study, Eriksson, et al., and give the
23    citation, reported 910 cases and --
24 A  Yeah, there we go.
25 Q  -- 1,016 controls showed an odds ratio of 2.36 for

Page 243

1     developing non-Hodgkin's lymphoma in individuals
2     exposed to glyphosate more than ten days in their
3     lifetime.
4         Is that what you were just trying to find?
5  A  That's correct.
6  Q  Okay.  So let me ask again.
7         This paper you said you cited for general
8     causation, correct?
9  A  That's correct.
10 Q  Do you use this paper for your methodology -- for
11    your specific causation methodology in this case?
12 A  I use specific fact referred in this paper as a
13    ten-day exposure when I compared Mr. Hardeman's
14    exposure to a published data on the amount associated
15    with increased risk of lymphoma.
16 Q  You cite, I believe it's Table 2 on Page 1659, for
17    your opinion that glyphosate increases the risk in
18    patients who are exposed for greater than ten days
19    lifetime, correct?
20 A  That's correct.
21         MR. WISNER:  Objection; misstates
22    his testimony.
23 Q  (By Mr. Levine)  This table with respect to
24    glyphosate doesn't look at anything other than either
25    less than or equal to ten days or greater than ten

Page 244

1     days, correct?
2  A  That's correct.
3  Q  And this finding doesn't say anything about subtype,
4     correct?
5         THE REPORTER:  "This," what,
6     "doesn't"?
7         MR. LEVINE:  Doesn't say
8     anything --
9         THE REPORTER:  "This"...?
10        MR. LEVINE:  -- about -- with
11    respect to subtype.
12        THE REPORTER:  "This" -- "this,"
13    something, "doesn't" --
14        MR. LEVINE:  Table.
15        THE WITNESS:  This particular --
16        MR. LEVINE:  Or sorry.  This
17    finding.
18        THE WITNESS:  This particular table
19    and this particular finding does not cite the
20    sub-cites.
21        MR. LEVINE:  Okay.
22        THE WITNESS:  Subtypes.
23 Q  (By Mr. Levine)  And if you look at Table 3, the
24    table below, that table includes information with
25    respect to glyphosate and various subtypes, correct?

Page 245

1  A  That's correct.
2  Q  And Table 3 shows no significantly increased risk for
3     glyphosate and DLBCL, correct?
4  A  In Table 3.  Correct.
5  Q  And you don't cite that in your report for your
6     specific causation analysis, correct?
7  A  I did not cite it in the report.
8  Q  Now, if you look at Page 1660, the authors conducted
9     what's referred to as a multivariate analysis.  And
10    I'm referring to the top right -- top right column on
11    Page 1660, correct?
12 A  Okay.
13 Q  And they explain that they did this because mixed
14    exposure to several pesticides was more of a rule
15    than an exception in the study, and all single agents
16    were analyzed without adjusting for other exposure,
17    correct?
18 A  That's correct.
19 Q  Other pesticides is a potential confounder that can
20    affect the results irrespective of Roundup use,
21    correct?
22 A  I cannot answer this question.  That's a very general
23    term, "pesticides."  And, again, I would have to look
24    in the literature of different pesticides and their
25    risk of NHL and that that really goes to the realm of

Andrei Shustov, M.D.

Page 246

1　general causation. I -- I can't really answer the
2　question.
3　Q   When you treat patients, you ask about exposure to
4　pesticides, correct?
5　A   That's correct.
6　Q   And you do that because you're asking about
7　substances that can increase the risk of
8　non-Hodgkin's lymphoma, correct?
9　　　　　　MR. WISNER: Objection; misstates
10　his testimony.
11　　　　　　THE WITNESS: That's correct.
12　　　　　　MR. WISNER: Guess not.
13　　　　　　MR. LEVINE: I was just asking a
14　question. I wasn't trying to state his testimony,
15　but...
16　Q   (By Mr. Levine) And so it's fair to say that
17　exposure to other pesticides is a potential
18　confounder that can affect the results irrespective
19　of Roundup use, correct?
20　　　　　　MR. WISNER: Objection. Outside
21　the scope of this witness's testimony. He's here to
22　offer specific cause testimony. This is clearly in
23　the realm of general cause epidemiology.
24　　　Answer if you can, sir.
25　　　　　　THE WITNESS: I was going to say

Page 247

1　the same thing. I'm not an expert in herbicide
2　epidemiology, and this requires really an expert who
3　can adjust for all the variables amongst all the
4　pesticides.
5　　　　　　MR. LEVINE: It would definitely be
6　less of a coincidence if you said the same thing
7　before Mr. Wisner did, but fair enough.
8　Q   (By Mr. Levine) The authors state that a
9　multivariate analysis was made to elucidate the
10　relative importance of different pesticides, correct?
11　A   I see that.
12　Q   Now, if you look at Table 7. You with me?
13　A   Yep.
14　Q   After adjusting for the use of other pesticides,
15　glyphosate showed no significantly increased risk,
16　correct?
17　A   In this particular table, yes, multivariate.
18　Q   Okay. And the finding you cite from Table 2 is not
19　the multivariate analysis, correct?
20　A   That's correct.
21　Q   Okay. So to be clear, you cite the finding that does
22　not adjust for other pesticides in your specific
23　causation analysis, right?
24　A   That's correct.
25　Q   But in your specific causation analysis, you don't

Page 248

1　cite the finding that does adjust for other
2　pesticides, correct?
3　A   That's correct.
4　Q   This -- Eriksson, the study we're looking at, does
5　not conclude in their paper that greater than ten
6　lifetime days is sufficient to determine that Roundup
7　causes an individual's non-Hodgkin's lymphoma, do
8　they?
9　　　　　　MR. WISNER: Objection; overbroad.
10　　　　　　THE WITNESS: I have to really find
11　where it says that. And, again, this is starting to
12　get in the realm of general causation. I have to
13　read this entire paper. And I would not be an expert
14　to really answer this question intelligently without
15　analyzing all the analysis in the paper for which I
16　don't have specific expertise. I use the information
17　specifically about the amount of exposure to -- for
18　my specific causation.
19　Q   (By Mr. Levine) So let me clarify that question.
20　　　To be clear, Eriksson doesn't conclude that you
21　can use their finding of greater than ten lifetime
22　days to determine specific causation in an individual
23　patient, correct?
24　　　　　　MR. WISNER: Same objection.
25　　　　　　THE WITNESS: I have to read this

Page 249

1　paper, then, and -- and really -- I cannot just out
2　of my memory refer to all the conclusions that they
3　have and whether or not there is validity behind it
4　and analyze it. I can't really say that.
5　Q   (By Mr. Levine) If they made that conclusion, would
6　you have cited in it in your report?
7　　　　　　MR. WISNER: Objection;
8　speculation.
9　　　　　　THE WITNESS: From this particular
10　paper, I would rely on opinion of epidemiologists to
11　really state the oral analysis of general causation,
12　whether or not this paper in conjunction with other
13　papers indicate increased risk of lymphoma.
14　Q   (By Mr. Levine) So we've gone through, I think, the
15　only two studies that you cite in the report -- in
16　your report that relate to a specific duration of
17　exposure that would be sufficient for you to
18　determine cause, right?
19　A   Correct.
20　Q   That's McDuffie, and that's Eriksson, correct?
21　A   Correct. That's correct.
22　Q   Did you consider whether there's any data that's
23　inconsistent with the findings in McDuffie or
24　Eriksson?
25　　　　　　MR. WISNER: Objection; calls for

Andrei Shustov, M.D.

Page 250

1    general cause opinion.
2              MR. LEVINE: And sorry. Let me be
3    specific.
4    Q  (By Mr. Levine) Did you consider whether there's any
5       data that's inconsistent with the two-day-a-year
6       finding for McDuffie and ten-day-a-year finding from
7       Eriksson that you apply to your specific causation
8       opinion?
9              MR. WISNER: Same objection.
10             THE WITNESS: I do not recall
11   finding any inconsistent data that I would not be
12   able to use for that specific question of duration of
13   exposure in Mr. Hardeman's case. I, again, extracted
14   analysis specifically about the duration. That's the
15   only way it was pertaining to specific causation.
16             MR. LEVINE: Okay.
17             (Exhibit No. 19 marked for
18                identification.)
19
20   Q  (By Mr. Levine) Handing you what's been marked as
21      Exhibit 19.
22             MR. WISNER: The one and the only.
23   Q  (By Mr. Levine) Study by Andreotti. Are you
24      familiar with this study?
25   A  I have looked at that study.

Page 251

1    Q  You cite this study on Page 8 of your report after
2       you discuss the Eriksson study, correct?
3    A  That's correct.
4    Q  You rely on this for your -- you cite this -- strike
5       that.
6       Do you cite this for your general causation
7       opinions or specific causation opinions?
8    A  General causation.
9    Q  You agree that this study found no association
10      between glyphosate and non-Hodgkin's lymphoma,
11      correct?
12   A  That's correct.
13             MR. WISNER: Is this Exhibit 20?
14   I'm sorry. I missed it.
15             MR. KERSCHNER: 19.
16             MR. WISNER: 19. Sorry. Thank
17   you.
18   Q  (By Mr. Levine) And this study also found no
19      association with DLBCL specifically, correct? And
20      you can turn to Table 3 on Page 514 if you -- you
21      want to look at that finding.
22   A  That's correct.
23   Q  Now, can you turn to supplementary Table 1? It's
24      just after Page 516.
25   A  Okay.

Page 252

1    Q  So this table looks at cancer incidence in relation
2       to lifetime days of glyphosate use, correct?
3    A  That's correct.
4    Q  So they're doing in this table what you were using
5       from McDuffie and Eriksson, correct?
6    A  That's correct.
7    Q  And if you turn to the second page of that
8       supplementary table, it contains findings for
9       glyphosate and non-Hodgkin's lymphoma, correct?
10   A  I can see that.
11   Q  And it contains findings for glyphosate and diffuse
12      large B-cell lymphoma, correct?
13   A  That's correct.
14   Q  And those findings for each of those outcomes are
15      broken down into four quartiles, correct?
16   A  That's correct.
17   Q  The first is 0 to 13.74 days, correct?
18   A  That's correct.
19   Q  The second quartile is 13.75 to 38.74 days, correct?
20   A  That's correct.
21   Q  The third quartile is 38.75 to 108.4 lifetime days,
22      correct?
23   A  That's correct.
24   Q  And the fourth quartile is greater than 108.5
25      lifetime days of exposure, correct?

Page 253

1    A  That's correct.
2    Q  So the fourth quartile is almost 11 times greater
3       than the amount of exposure of the ten-day period you
4       cite from Eriksson with respect to lifetime days,
5       correct?
6              MR. WISNER: Objection; misstates
7    the document.
8              THE WITNESS: Sorry.
9              MR. WISNER: Answer the question.
10             THE WITNESS: That's correct.
11   Q  (By Mr. Levine) And with respect to the findings of
12      the four quartiles as they relate to non-Hodgkin's
13      lymphoma, this study found no significantly increased
14      risk for any of those quartiles in terms of lifetime
15      days of exposure, correct?
16   A  That's correct.
17   Q  And with respect to the four quartiles for diffuse
18      large B-cell lymphoma, the study found no increased
19      risk with respect to the each of the four quartiles
20      studied, correct?
21   A  That's correct.
22   Q  And you don't cite this in your -- these findings in
23      your report when you're discussing the lifetime
24      exposure days or exposure days per year, correct?
25   A  That's correct.

Andrei Shustov, M.D.

Page 254

1  Q  Now, let's go back to your report in terms of what
2     you say about this study.  I think one of your
3     criticisms of this study -- you say this study
4     suffered several critical flaws, right?
5  A  That's correct.
6  Q  Dr. Nabhan actually said the same thing, right?
7            MR. WISNER:  Show him the document.
8            MR. LEVINE:  Feel free to go look
9     at Dr. Nabhan's report.  Feel free to use your
10    highlighted copy.
11           MR. WISNER:  So we're on Exhibit 10?
12 Q  (By Mr. Levine)  Take a look at Exhibit 10, and you
13    can tell me whether this section was taken from
14    Dr. Nabhan's report.
15           MR. WISNER:  Okay.  Do you
16    understand what you're doing, sir?
17           THE WITNESS:  Yeah.
18           MR. WISNER:  Okay.  Got Exhibit 10
19    in there?  That's Exhibit 10.
20           THE WITNESS:  There we go.  That's
21    12.
22           MR. WISNER:  12.  Okay.  All right.
23    So you have 10.
24           THE WITNESS:  That's 10.  Yeah.
25           MR. WISNER:  Okay.  Great.  And you

Page 255

1     have your report?
2            THE WITNESS:  I do.
3            MR. WISNER:  Okay.  Do your thing.
4  Q  (By Mr. Levine)  10 is yours or Dr. Nabhan's?
5  A  10 --
6            MR. WISNER:  Is Nabhan's.
7            THE WITNESS:  10 is Nabhan's.
8            MR. WISNER:  And 3 is his.
9            THE WITNESS:  3's mine.  Okay.
10 Q  (By Mr. Levine)  All right.  So in Dr. Nabhan's
11    report, we're talking about Page 7, last bullet
12    point.
13 A  Okay.
14 Q  And in your report, we're talking about Page 8.
15 A  Okay.
16 Q  And you both say this study -- this study suffered
17    several critical flaws, correct?
18 A  That's correct.
19 Q  One of the flaws you cite is that this study included
20    farmers in the control group, right?
21 A  Correct.
22 Q  And you say that's a flaw because farmers have an
23    increased risk for non-Hodgkin's lymphoma, correct?
24 A  That's correct.
25 Q  Do you have an understanding as to why farmers have

Page 256

1     an increased risk of non-Hodgkin's lymphoma?
2            MR. WISNER:  Objection as
3     definitely is outside the scope.
4            THE WITNESS:  The hypothesis
5     speculation is because of the exposure to various
6     agricultural compounds.
7  Q  (By Mr. Levine)  Like pesticides?
8  A  Including pesticides.
9  Q  Okay.  And but you're not saying that this study
10    didn't control for pesticides, right?
11 A  I have to look at the study again.
12 Q  Okay.  Look at the study and tell me whether this
13    study controlled for the use of pesticides.
14           MR. WISNER:  We're on Exhibit 19?
15           MR. LEVINE:  Yes.
16           MR. WISNER:  Do you want to direct
17    him to a page, or do you just want him to flounder?
18           MR. LEVINE:  I'm pretty sure he
19    should be able to find it quickly.
20 Q  (By Mr. Levine)  Sorry.  Maybe it is taking you a
21    little too long.  It's in the abstract, Dr. Shustov,
22    under "Methods."  Thought if you started at the
23    beginning, you'd find it pretty quickly.
24 A  Yes, it controlled for other pesticides.
25           THE REPORTER:  "It," what?

Page 257

1            THE WITNESS:  It did control for
2     other pesticides.
3            THE REPORTER:  "Did control"...?
4     I'm sorry.
5            THE WITNESS:  For other pesticides.
6            THE REPORTER:  Oh.  "For other."
7     Thank you.
8  Q  (By Mr. Levine)  So in Eriksson and McDuffie, you
9     rely on two findings we discussed that you admitted
10    did not control for other pesticides, right?
11 A  Correct.
12 Q  And you didn't state that as a criticism of those
13    studies in your report, correct?
14 A  Not for general causation.  I extracted, again,
15    specific information from Eriksson and McDuffie
16    for -- for the case-specific causation.
17 Q  But here this study addresses your criticism of
18    including farmers by controlling for other
19    pesticides, correct?
20 A  I don't think -- and, again, I cannot say with
21    certainty that pesticides are the only confounding
22    factors in farmers' environment.  That's a well --
23    that's the generally accepted factor.  But I don't
24    know -- and, again, one has to be expert in
25    epidemiology of agriculture -- whether besides

Andrei Shustov, M.D.

Page 258

1  pesticides there are other confounding factors.
2  Q  You're enough of an expert to have included this
3  criticism in your report, right?
4         MR. WISNER:  Objection;
5  argumentative, speculation.
6         THE WITNESS:  That's -- but
7  that's --
8         MR. WISNER:  Calls for a legal
9  conclusion.
10     Answer.
11        THE WITNESS:  But that's exactly
12 what I stated, that I don't know whether they
13 controlled for other factors in agricultural
14 profession.
15 Q  (By Mr. Levine)  Do you know whether Eriksson or
16 McDuffie controlled for other factors in -- with
17 respect to the agricultural profession?
18 A  I don't.
19 Q  All right.
20        (Exhibit No. 20 marked for
21         identification.)
22
23        MR. WISNER:  20?
24        MR. LEVINE:  Yep.
25 Q  (By Mr. Levine)  I'm handing you what's been marked

Page 259

1  as Exhibit 20.  This is De Roos 2003, which I believe
2  you answered De Roos earlier, and this may have been
3  one of the De Roos papers you mentioned.
4  A  Yep.
5  Q  Right?
6  A  Yep.
7  Q  Do you know De Roos?
8  A  Do I know De Roos person?
9  Q  Yes.
10 A  No.
11 Q  Do you know that she was at the Fred Hutchinson
12 Cancer Center?
13 A  I had no idea.
14        MR. WISNER:  Is she really?
15        MR. LEVINE:  She was.
16        MR. WISNER:  Oh.
17        MR. LEVINE:  They've overlapped.
18        MR. WISNER:  I didn't know that.
19        MR. LEVINE:  Yeah.
20 Q  (By Mr. Levine)  You're familiar with this study,
21 right?
22 A  I looked at it.
23 Q  You cite this, I believe, on Page 8 of your report?
24 Yes.  Second bullet point.
25 A  That's correct.

Page 260

1  Q  Paragraph in the second bullet point is identical to
2  the one in Dr. Nabhan's report, correct?
3  A  The paragraph is not identical.  Has half a page
4  paragraph, and I have three lines of that.
5  Q  Your -- what's written in your report is identical to
6  what's written in Dr. Nabhan's report?
7  A  In the first -- first part of his paragraph, yes.
8  Q  Right.  He writes more, but you left out part of what
9  he writes?
10 A  It matches, yeah, first four full lines, yes.
11 Q  To be clear, everything in your report is copied from
12 his report?
13        MR. WISNER:  That's objection;
14 overbroad.  Everything in his report?
15        MR. LEVINE:  Every -- to be clear:
16 Q  (By Mr. Levine)  Everything in the bullet point with
17 respect to De Roos 2003 in your report is copied from
18 Dr. Nabhan's report, correct?
19        MR. WISNER:  Objection.
20        THE WITNESS:  I used, again, some
21 of the Dr. Nabhan's language to state my opinions in
22 general causation, which I confirmed -- to -- again,
23 to -- to use appropriate language to write legal
24 report, number one; and number two, to save time
25 writing report of Mr. Hardeman.

Page 261

1  Q  (By Mr. Levine)  You rely on this paper, De Roos
2  2003, for your general causation opinions or specific
3  causation opinions or both?
4  A  All of these papers listed here are mentioned to
5  support statements in general causation except
6  extraction on the timing of exposure for specific
7  causation.
8  Q  So you do -- you do not rely on De Roos 2003 for your
9  specific causation opinion, correct?
10 A  Give me a minute to look at if I extracted any
11 pertinent information.
12     On my quick review, I don't see any specific
13 information I use for specific causation for
14 Mr. Hardeman's case and used this for -- to support
15 general causation.
16 Q  Okay.  And I think all you're citing -- the only odds
17 ratio you're citing from this paper, De Roos 2003, is
18 an odds ratio for glyphosate increasing the risk of
19 developing NHL of 2.1 that was statistically
20 significant, correct?
21 A  That's correct.
22 Q  That odds ratio comes from Table 3 in De Roos,
23 correct?  That's on Page 5 of 9.
24 A  That's correct.
25 Q  And that odds ratio comes from the column that states

Andrei Shustov, M.D.

Page 262

1    "Logistic Regression," correct?
2  A  That's correct.
3  Q  And there's another column that refers to a
4    hierarchical regression, correct?
5  A  That's correct.
6  Q  And that shows -- that finding under the
7    "Hierarchical Regression" does not show any
8    statistically significant association for glyphosate
9    and non-Hodgkin's lymphoma, correct?
10 A  That's correct.
11 Q  But you don't cite that finding in your report,
12   correct?
13 A  I didn't.
14 Q  I'm...?
15 A  I did not.
16 Q  Okay. Why not?
17 A  I cannot answer that question. I make comments
18   towards general causation to support statements and
19   Dr. Ritz/Portier conclusions and make sure that
20   there's basis for those conclusions, but I did not
21   specifically study this analysis. So this is, again,
22   a question to general causation experts.
23            (Exhibit No. 21 marked for
24             identification.)
25 ////

Page 263

1  Q  (By Mr. Levine) Handing you what's been marked as
2    Exhibit 21. This is De Roos 2005, which you cite in
3    the fourth bullet point on Page 8 of your report in
4    the paragraph that we were discussing where you also
5    discuss Andreotti, correct?
6  A  That's correct.
7  Q  And just for everybody's fun fact information here,
8    this is the paper that says De Roos was from Fred
9    Hutchinson Can --
10 A  I can see that.
11 Q  -- Cancer Center.
12           MR. WISNER: Is it?
13           MR. LEVINE: It is.
14 Q  (By Mr. Levine) And --
15           MR. WISNER: Should go track her
16   down.
17 Q  (By Mr. Levine) Do you rely on this for your general
18   causation opinions or specific causation opinions or
19   both?
20 A  This is the fact check again for general causation
21   that is not purpose of my report, but take a look at
22   paper cited in IARC and do the general analysis of --
23   or extract information to correlate with -- with
24   conclusions of general causation experts in IARC.
25 Q  And you agree that De Roos 2005 found no association

Page 264

1    between glyphosate and non-Hodgkin's lymphoma,
2    correct?
3  A  That's correct.
4            MR. LEVINE: Let's take a short
5    break. We actually are getting substantially close
6    to being done.
7            THE VIDEOGRAPHER: Please stand by.
8    We're going off the record. The time is 4:55 p.m.
9            (Pause in proceedings.)
10
11           THE VIDEOGRAPHER: We are back on
12   record. The time is 5:08 p.m.
13 Q  (By Mr. Levine) Hello, Dr. Shustov.
14 A  Hello.
15           (Exhibit No. 22 marked for
16             identification.)
17
18           MR. WISNER: 22.
19           MR. LEVINE: Yeah.
20 Q  (By Mr. Levine) I'm handing you what's been marked
21   as Exhibit 22. You are familiar with the American
22   Cancer Society, correct?
23 A  Yes, I am.
24 Q  You cite -- you reference them in your reliance list
25   in this case, correct?

Page 265

1            THE REPORTER: What was the answer?
2            THE WITNESS: Yes.
3  Q  (By Mr. Levine) I'm just going to ask you if you
4    agree with a few things.
5      Do you agree that non-Hodgkin's lymphoma is one
6    of the most common cancers in the United States,
7    accounting for about 4 percent of all cancers?
8  A  Yes.
9  Q  Do you agree that the average American's risk of
10   developing non-Hodgkin's lymphoma during his or her
11   lifetime is about 1 in 47?
12 A  That's what they found, yes.
13 Q  And I think you've said this before, but you agree
14   that non-Hodgkin's lymphoma can occur at any age,
15   right?
16 A  Correct.
17 Q  Do you agree that the risk of developing
18   non-Hodgkin's lymphoma increases throughout life and
19   more than half of patients are 65 or older at the
20   time of diagnosis?
21 A  That's correct.
22 Q  Do you agree that the aging of the American
23   population is likely to lead to an increase in
24   non-Hodgkin's lymphoma cases during the coming years?
25 A  It's a reasonable prediction.

Andrei Shustov, M.D.

Page 266

1    (Exhibit No. 23 marked for
2    identification.)
3
4    Q   (By Mr. Levine)  Handing you Exhibit 23.  It's also
5        from the American Cancer Society regarding what
6        causes non-Hodgkin's lymphoma.  Do you see that?
7    A   Yeah.
8    Q   Do you agree --
9                MR. WISNER:  I'm sorry.  I think
10       you might have given me something else.  Oh.  You
11       said, "What causes non-Hodgkin's lymphoma?"
12               MR. LEVINE:  That's what it says on
13       top.
14               MR. WISNER:  I have "Can
15       Non-Hodgkin's Lymphoma Be Prevented?"  Is this what
16       you have?
17               MR. LEVINE:  That's not what I'm
18       looking at.
19               MR. WISNER:  Okay.  That's not what
20       he's looking at either.
21               MR. LEVINE:  Hold onto that.  We'll
22       use -- we'll go there next.
23               MR. WISNER:  That's 23, so...
24               MR. LEVINE:  Hold onto that.  We'll
25       go there too.  But thank you for clarifying.

Page 267

1                MR. WISNER:  No, I was just -- I
2        was lost, 'cause...
3                MR. LEVINE:  Yep.
4        (Exhibit No. 24 marked for
5        identification.)
6
7                MR. WISNER:  This is 24.
8        (Discussion off the record.)
9
10   Q   (By Mr. Levine)  So now we're looking at the American
11       Cancer Society "What Causes Non-Hodgkin's Lymphoma?"
12       correct?
13   A   Correct.
14   Q   Do you agree that researchers have found that
15       non-Hodgkin's lymphoma is linked with a number of
16       risk factors, but the cause of most lymphomas is not
17       known?
18   A   Is unidentified, yes.
19   Q   Do you agree that this is complicated by the fact
20       that lymphomas are actually a diverse group of
21       cancers?
22   A   Correct.
23   Q   Now let's turn to the previous exhibit, 23, which is
24       also from the American Cancer Society.  And this is,
25       as Brent mentioned, "Can Non-Hodgkin's Lymphoma Be

Page 268

1        Prevented?"
2            Got that?
3    A   Yep.
4    Q   Do you agree that there is no sure way to prevent
5        non-Hodgkin lymphoma?
6    A   As a general statement, yes.  I'm trying to think of
7        particular examples can be excluded, but as a general
8        statement, yes.
9    Q   Do you agree that most people with NHL have no risk
10       factors that can be changed, so there is no way to
11       protect against these lymphomas?
12   A   I think it's a very broad statement.  It's -- it's
13       really -- can't be said this way because we never
14       looked in most of the people's exposures in their
15       lives.
16   Q   So just to be clear, you're saying the American
17       Cancer Society statement is wrong?
18   A   I'm not saying wrong.  I think it is too broad to
19       apply to -- to general to apply to this topic.  The
20       statement is too general.
21   Q   So let me see if I can articulate that the way that I
22       understand it.  And maybe you'll agree to it.  Maybe
23       you won't.
24   A   Okay.
25   Q   But do you agree that most people with non-Hodgkin's

Page 269

1        lymphoma have no risk factors that can be changed?
2        Start with that part.
3                MR. WISNER:  Objection;
4        speculation.
5                THE WITNESS:  I only partially
6        agree with that statement.
7    Q   (By Mr. Levine)  What do you disagree with?
8    A   I disagree with the fact that you cannot make
9        statements for most people because most people were
10       not questioned whether they're exposed to known risk
11       factors, and it's just a general statement from the
12       fact that when people diagnosed with non-Hodgkin
13       lymphoma come to their doctors and those who end up
14       in SEER registry or all these registries, the
15       information about their specific exposure is not
16       collected.
17           So if somebody did the study and ask every
18       lymphoma patient carefully what they expose, actually
19       did research into that specific topic, I am not so
20       sure that in most people we would not have suspected
21       risk factors.
22   Q   In your clinical practice, with respect to the
23       patients that you treat for non-Hodgkin's lymphoma,
24       are you able to identify risk factors in most
25       patients?

Andrei Shustov, M.D.

| Page 270 |
|---|

1    A  I do not -- it's not the purpose of my clinical
2       practice to identify the risk factors.  The purpose
3       of me taking care of patients is treat and cure their
4       lymphoma.  I do not do comprehensive questioning and
5       research into what patients were expose to through
6       lifetime, the details of their households, besides
7       the general questions, as I stated, to document
8       whether they think or they know they were exposed to.
9            The -- the purpose of general practice is not to
10      identify what cause patient's lymphoma, but help them
11      or try to save their life.
12   Q  You can put that away.  But you're welcome to go to
13      the exhibit, or just you can agree with what I'm
14      asking.  But --
15            MR. LEVINE:  I don't think you're
16      going to object to this.
17            MR. WISNER:  Okay.  Okay.
18   Q  (By Mr. Levine)  Your CV lists professional societies
19      of which you're a member, right?
20   A  Okay.
21   Q  Am I correct that you're -- you're a member of the
22      American Association of Hematology?
23   A  Correct.
24   Q  And you're a member of the American Association of
25      Clinical Oncology?

| Page 271 |
|---|

1    A  That's correct.
2    Q  And you're a member of the Lymphoma Steering
3       Committee Southwest Oncology Group?
4    A  Correct.
5    Q  And you're a member of the U.S. Cutaneous Lymphoma
6       Society?
7    A  Correct.
8    Q  Just to be clear, is that U.S. -- that's what it says
9       in your CV.  Do you mean, by any chance, the U.S.
10      Cutaneous Lymphoma Consortium?  I ask because I
11      Googled...
12   A  I think that's the proper name.  You're correct.
13      Yeah.
14   Q  Okay.  Just minor typo in your report.
15   A  Sure.
16   Q  But --
17   A  Thank you.
18   Q  -- just trying -- was trying to figure it out.
19          And you're a member of the T-cell Lymphoma
20      Leukemia Foundation, correct?
21   A  Correct.
22   Q  Are there any other cancer organizations which you're
23      a member?
24   A  I don't think so.
25   Q  Okay.  Are you aware of any statements from any of

| Page 272 |
|---|

1       the cancer professional societies of which you're a
2       member that states glyphosate is an established cause
3       of cancer?
4    A  I would have to go to their websites and see exactly
5       how they address this issue.
6    Q  Okay.  As a member, have you been involved in
7       anything where you've seen a -- either presentation
8       or materials provided to you or anything else within
9       your scope of the membership of these organizations
10      that has stated that glyphosate or Roundup is a cause
11      of cancer?
12            MR. WISNER:  Objection; outside the
13      scope.
14            THE WITNESS:  As part of activities
15      in those societies, no.
16            MR. LEVINE:  Okay.
17            THE WITNESS:  It was not topic of
18      my involvement in society's function and activities.
19   Q  (By Mr. Levine)  Have you ever told a medical society
20      of which you're a member that Roundup causes
21      non-Hodgkin's lymphoma?
22   A  Have I told any member of the society that glyphosate
23      causes lymphoma?
24   Q  Have you -- have you told any medical society of
25      which you are a member that Roundup causes

| Page 273 |
|---|

1       non-Hodgkin's lymphoma?
2    A  That's a very odd question.  There's -- that's kind
3       of very nonsensical, how that --
4    Q  Let me be more specific, then.
5    A  Okay.
6    Q  I don't want you to --
7    A  Okay.
8    Q  -- answer a question that doesn't make sense.
9    A  Okay.
10   Q  In your involvement with these medical societies,
11      have you publicly stated in any way at any of
12      these -- at any meetings or in any statements to the
13      medical society that Roundup is a cause of
14      non-Hodgkin's lymphoma?
15   A  No, I haven't.
16   Q  Have you ever gone to an oncologist or pathologist at
17      your hospital and told them to assess his or her
18      patients for Roundup or glyphosate exposure in
19      treating a patient's non-Hodgkin's lymphoma?
20   A  No.  That would be also nonsensical.
21   Q  Have you ever gone to an oncologist or pathologist at
22      your hospital and told him to tell a patient to stop
23      using Roundup or glyphosate if that patient is
24      diagnosed with non-Hodgkin's lymphoma?
25   A  That's also absolutely implausible scenario that I

Andrei Shustov, M.D.

Page 274

1    find out somehow that some of these patients using
2    glyphosate outside HIPAA law and say, Hey, your
3    patient is using glyphosate.  This is just -- I can't
4    just imagine plausible scenario how that would
5    happen.
6    Q  Tumor boards?  I think you told me you participate
7       in --
8    A  Correct.
9    Q  -- tumor boards, right?
10   A  Correct.
11   Q  Do you discuss the facts of patients' cases in tumor
12      boards?
13   A  Correct.
14   Q  Have you ever stated in a tumor board, to other
15      members when discussing a patient's non-Hodgkin's
16      lymphoma, that they should tell their patient to stop
17      using Roundup or glyphosate?
18   A  No, that's not a function of tumor boards.
19   Q  Okay.  Have you in any tumor board stated to your
20      colleagues that they should assess their patients for
21      Roundup or glyphosate use?
22   A  No.
23   Q  You've never published that Roundup causes
24      non-Hodgkin's lymphoma, correct?
25   A  Correct.

Page 275

1    Q  You've never presented at a medical society that
2       Roundup causes non-Hodgkin's lymphoma, correct?
3    A  Correct.
4    Q  You've never informed any regulatory organization
5       that concluded glyphosate is not carcinogenic that
6       they're wrong, correct?
7    A  Correct.
8    Q  Do you agree that Mr. Hardeman responded well to
9       chemotherapy?
10   A  I agree.
11   Q  He was in complete remission by July 2015, correct?
12   A  Correct.
13   Q  Subsequent examinations have found no evidence of
14      cancer recurrence, correct?
15   A  Up to date, yes.
16   Q  You're not a pathologist, right?
17   A  That's correct.
18   Q  You're not an epidemiologist?
19   A  That's correct.
20   Q  You're not a toxicologist?
21   A  That's correct.
22   Q  You're not a radiation oncologist?
23   A  That's correct.
24   Q  You're not a hepatologist?
25   A  That's correct.

Page 276

1    Q  You're not an infectious disease doctor?
2    A  That's correct.
3    Q  You're not an immune -- immunologist, correct?
4    A  I did extensive research in immunology and publish in
5       immunology, but my current specialty is not
6       immunology, per se.  But I am very familiar with
7       field of immunology and doing research in immunology.
8            MR. LEVINE:  Okay.  Right now, I
9       have nothing further.
10           MR. WISNER:  Are you passing the
11      witness, sir?  Great.  Let's get started.
12
13
14           EXAMINATION
15   BY MR. WISNER:
16   Q  Dr. Shustov, before we begin, how are you doing
17      physically right now?
18   A  Tired.
19   Q  Okay.
20   A  Exhausted.
21   Q  It's been a long day.
22      I apologize for this bizarre procedure, but we
23      have to get through it.  I'm going to ask you a few
24      questions to follow up specifically on questions that
25      Mr. --

Page 277

1            MR. WISNER:  Is it "Levine" or
2       "Levine"?
3            MR. LEVINE:  "Levine."
4    Q  (Continuing by Mr. Wisner) -- Levine asked during
5       your deposition today.
6       I'm going to jump around on a lot of different
7       topics, because that's kind of how the deposition
8       unfolded today.  Let's start off with the issue of
9       general causation.
10      Now, should you testify in Mr. Hardeman's trial
11      next -- in February or March of next year, are you
12      going to offer to that jury any opinions about
13      general causation?
14           MR. LEVINE:  Objection.
15           THE WITNESS:  No.
16   Q  (By Mr. Wisner)  Okay.  Why?
17   A  Because I'm not expert in epidemiology or general
18      causation, and my expertise is in clinical practice
19      and clinical research in lymphomas.  And --
20           THE REPORTER:  "Research," what?
21           MR. LEVINE:  Clinical research and
22      lymphomas.
23           THE REPORTER:  Oh.  Thank you.
24           THE WITNESS:  And the questions of
25      general causations, with all fairness, should be



## Page 278

1    addressed to epidemiologists who have expertise to

2    analyze the complexity of epidemiologic studies.

3    I...

4    Q   (By Mr. Wisner)  So it would be fair to say, then,

5    that if or when you do testify, you plan to tell the

6    jury that you're assuming that general causation has

7    been established by other experts?

8            MR. LEVINE:  Objection.

9            THE WITNESS:  That's correct.

10   Q   (By Mr. Wisner)  And then having made that

11   assumption, you then engage in a specific cause

12   analysis; is that right?

13           MR. LEVINE:  Objection.

14           THE WITNESS:  That's correct.

15   Q   (By Mr. Wisner)  And the methodology of that analysis

16   is how you characterize as a differential diagnosis;

17   is that right?

18           MR. LEVINE:  Objection.

19           THE WITNESS:  That's correct.

20   Q   (By Mr. Wisner)  Now, a differential diagnosis, there

21   was some questions about whether or not it's used to

22   treat -- used to diagnose patients.  Is it also a

23   system of deductive reasoning?

24   A   It is.

25   Q   Please explain what you mean by that.

## Page 279

1    A   So differential diagnosis outside particular use in

2    clinical practice and every day in my opinion is a

3    general method of hypothetical deductive way of

4    establishing priority of certain factors you're

5    looking at by eliminating the alternatives.

6    Q   And to know if Roundup for Mr. Hardeman is a proper

7    risk factor to consider, is that where you then

8    consult epidemiology?

9            MR. LEVINE:  Objection.

10           THE WITNESS:  Correct.

11   Q   (By Mr. Wisner)  And in consulting epidemiology,

12   having already assumed that, in fact, it can cause

13   cancer, having consulted epidemiology, what are you

14   looking for to inform your specific cause analysis?

15   A   I'm looking for answer whether Roundup is a risk

16   factor for causing non-Hodgkin's lymphoma.

17   Q   And are you looking specifically for whether or not

18   Mr. Hardeman had exposure sufficient to fit within

19   the epidemiological literature?

20           MR. LEVINE:  Objection.

21           THE WITNESS:  That's true.

22   Q   (By Mr. Wisner)  Now, if there's an epidemiological

23   study that doesn't show any association at all -- for

24   example, the agricultural health study -- does that

25   aid you in that analysis in any way?

## Page 280

1            MR. LEVINE:  Objection.

2            THE WITNESS:  No, it doesn't.

3    Q   (By Mr. Wisner)  Why not?

4    A   Because Mr. Hardeman was exposed to glyphosate, and I

5    already assumed from epidemiologic studies that it is

6    a causative factor in non-Hodgkin lymphoma.  So the

7    study shows that it's not a factor.  It -- it doesn't

8    help me.

9    Q   There was a question, a couple questions earlier in

10   the deposition specifically about why you asked

11   Mr. Hardeman about his use of Roundup.  Do you

12   recall?

13   A   Yes, I do.

14

## Page 281

17

on.







Andrei Shustov, M.D.



Page 294

6   Q   And when you say "more likely" and "less likely," are
7       we talking about probability?
8   A   That's correct.  Nothing in medicine can prove with
9       certainty, but we can certainly determine the
10      likelihood.
11  Q   And when we say something's likely, that means more
12      likely than not?
13  A   That's correct.
14  Q   And when we say something is unlikely, we're saying
15      it's less likely than not?
16  A   That's correct.
17  A

Page 295

1   A
15  Q   Now, I understand that there are -- that genotoxicity
16      is one of the mechanisms through which Roundup can --
17      can cause cancer, right?
18          MR. LEVINE:  Objection.
19          THE WITNESS:  That's what I learned
20      from conclusions from genotoxic studies.
21  Q   (By Mr. Levine)  Okay.  And when you look at genotox
22      studies that -- strike that.
23          All right.  I'm going to do it quickly.  All
24      right.  Turn to Exhibit 17.
25          MR. LEVINE:  Which -- what exhibit

Page 296

1   are you on?
2           MR. WISNER:  McDuffie.
3   Q   (By Mr. Wisner)  Are you there, sir?
4   A   Yes.
5   Q   Okay.  I'd like you to turn to Page 1160.
6   A   Okay.
7   Q   You there?
8           You see the paragraph in the left-hand column
9       that reads Table 8?
10  A   Yes.
11  Q   All right.  Look at the last sentence there.  It
12      reads, "The exceptions were 2,4-D, for which there
13      was no dose-response relationship, and glyphosate,
14      which was not significant for exposure, but for which
15      we demonstrated a dose-response relationship."
16          Do you see that?
17  A   I do.
18  Q   Opposing counsel was asking for you for some
19      statement in this study that -- that validated this
20      greater-than-two-days number from the authors.
21          What is a dose-response relationship?
22          MR. LEVINE:  Objection.
23          THE WITNESS:  It means that the
24      higher the dose of exposure, the higher the risk of
25      consequence; in this case, developing lymphoma.

Page 297

1   Q   (By Mr. Wisner)  Is that something you're
2       specifically looking for in the context of -- of
3       whether or not Mr. Hardeman was sufficiently exposed?
4   A   For case-specific causation, yes.
5   Q   All right.  Now, turn to the next page.  It's 1161,
6       Table 8.
7   A   Okay.
8   Q   All right.  This was a table where that greater-than-
9       two-days number was reflected, right?
10  A   Correct.
11  Q   And Mr. Levine, he kind of accused you that this
12      wasn't a fully adjusted number.  Do you recall that?
13  A   Vaguely.
14  Q   Okay.  And one of the things that was raised was
15      whether or not it was adjusted for exposure to other
16      pesticides, right?
17  A   That's correct.
18  Q   Okay.  Well, let's look at Table 8.  And there's
19      actually a sentence right under Table 8.  Do you see
20      that?
21  A   I do.
22  Q   It reads, "Models that included the time variable,
23      days per year, and stratification for age and
24      province of residence" -- I'll stop right there.
25          Days per year, that's -- that's -- that's the

Page 298

1    number we're talking about with glyphosate, right?
2  A  Correct.
3  Q  Okay.  Says, "Were also assessed for individual
4    herbicide compounds."  It lists a bunch of them.  Do
5    you see that?
6  A  That's correct.
7  Q  "No significant associations were found."
8    Do you see that?
9  A  I do.
10 Q  Okay.  So it looks like the authors actually did look
11   for other associations but just didn't see any?
12 A  That's correct.
13 Q  Okay.  And if you actually turn to the previous page,
14   1160, if you look at Table 7.  Do you see that?
15 A  I do.
16 Q  And if you read the sentence underneath it, it goes,
17   "Among individual pesticides," and it lists a bunch.
18   Do you see that?
19 A  I do.
20 Q  "User," slash, "nonuser were included in the initial
21   multivariate model and found not to contribute
22   significantly to the risk of NHL."
23    Do you see that?
24 A  I do.
25 Q  So these authors actually looked to see if there was

Page 300

1              MR. LEVINE:  Just -- do you mind
2    showing me where you are?  I just -- moving a little
3    fast.
4              MR. WISNER:  Sure.  I actually
5    don't have it in front of me.  I just have it by
6    memory.  If you actually look at Table 3, in the --
7    in the footnote to it.
8              MR. LEVINE:  Maybe Dr. -- since
9    Dr. Shustov agreed with you, maybe he can show me,
10   where --
11             MR. WISNER:  Sure.
12             MR. LEVINE:  -- it is.  The 47
13   pesticides column.
14             MR. WISNER:  That's the number of
15   pesticides there.  Let me find this document.
16             THE WITNESS:  In the bottom.
17             MR. WISNER:  What's your confusion,
18   Counselor?  I don't want to --
19             MR. LEVINE:  Sorry.  I was looking
20   for the number 47.  I didn't realize you were the one
21   that counted it.
22             MR. WISNER:  Oh.
23             THE WITNESS:  It's also here in the
24   body.
25             MR. LEVINE:  Got it.

Page 299

1    any substantial confounders and determined that there
2    wasn't?
3              MR. LEVINE:  Objection.
4              THE WITNESS:  I can see that.
5  Q  (By Mr. Wisner)  Now, there was a discussion also
6    about De Roos 2003.  And I actually want to show you
7    that study very quickly.  That's No. 20.
8  A  Yeah.
9  Q  You got it?  I don't.  Do you have it?  Yes, that's
10   right.
11    Okay.  And in De Roos 2000 and -- the 2003 study,
12   there's Table 3.  Do you see that?
13 A  Yes, I do.
14 Q  And as you see, that has a listing for logistical
15   regression as well as hierarchical regression.  Do
16   you see that?
17 A  Yes, I do.
18 Q  And if you look in the footnote of that table, it
19   actually specifies that all of the risk ratios raised
20   in this table were, in fact, adjusted for exposure to
21   47 different pesticides?
22 A  I can see that.
23 Q  Now, that shows you, despite the fact that it was
24   adjusted for 47 other pesticides, there's still a
25   doubling the risk using logistical regression?

Page 301

1  Q  (By Mr. Wisner)  All right.  What, if anything, does
2    this De Roos 2003 paper tell you about potential
3    confounders for glyphosate?
4  A  That -- that they did adjustment for confounding
5    factors.
6  Q  Great.
7    And if you actually turn to the last page --
8    sorry.  Page 7 of -- 7 of 9 -- and you look at the
9    column to the left, third paragraph from the top
10   starts with, "Adjustment."
11    Do you see that?
12 A  Yes.
13 Q  It says, "Adjustment for multiple pesticides
14   suggested that there were few instances of
15   substantial confounding of pesticide effects by other
16   pesticides."
17    Do you see that?
18 A  I do.
19 Q  Okay.  Now, just to clear something up.  One of the
20   things that Mr. Levine kind of raised was that you
21   cited that the logistical regression in your paper,
22   not the hierarchical regression.  Do you recall that?
23 A  I do.
24 Q  Now, the De Roos 2003 article, that was published in
25   2003?

Andrei Shustov, M.D.

Page 302

1    A   Correct.
2    Q   So let's look at De Roos's 2005 article. It's
3        Exhibit 21. It might be folded up. There it is.
4        It's right there.
5            You there? You got it, sir?
6    A   Yeah.
7    Q   All right. Turn to Page 53.
8        All right. Now, this is kind of hard to find,
9        but on the third column on the left, so the first
10       column. You see that?
11   A   Okay.
12   Q   All right. Go all the way down through that first
13       paragraph, and there is a sentence that says, "A more
14       extensive study conducted."
15           Do you see that?
16   A   Yes.
17   Q   All right. Now, the next sentence starts,
18       "Similarly."
19           Do you see that?
20   A   Yeah.
21   Q   All right. Goes, "Similarly, increased NHL risk in
22       men was associated with having ever used glyphosate,
23       (odds ratio 2.1, confidence interval 1.1 to 4) after
24       adjustment for other commonly used pesticides in a
25       pooled analysis of National Cancer Institute-

Page 303

1        sponsored case-control studies conducted in Nebraska,
2        Kansas, Iowa, and Minnesota (De Roos 2003)."
3            You see that?
4    A   I do.
5    Q   So even Dr. De Roos, when she reports the -- the
6        results of her own study, she reported the logistical
7        regression?
8    A   That's correct.
9    Q   Okay. All right. I want to mark as an exhibit --
10           MR. WISNER: What's our next
11       exhibit number?
12           (Discussion off the record.)
13           (Exhibit No. 25 marked for
14           identification.)
15
16   Q   (By Mr. Wisner) All right. Handing you Exhibit 24
17       [sic]. I will just --
18           MR. LEVINE: We have a stapler, if
19       you want.
20           (Discussion off the record.)
21
22   Q   (By Mr. Wisner) All right. Doctor, I'm handing you
23       Exhibit 24 [sic].
24   A   Thank you.
25   Q   Now, I understand -- on your reliance list, I

Page 304

1        understand you cite Dr. Ritz's expert report, right?
2    A   Yes.
3    Q   And Dr. Ritz, she looked at something called a North
4        American Pooled Project, right?
5    A   Yeah.
6    Q   And that was discussed at length actually in her
7        expert report, right?
8    A   That's correct.
9    Q   And this is one of the citations in her report.
10       It's -- it's -- it's a document that's titled "A
11       Detailed Evaluation of Glyphosate Use and the Risk of
12       Non-Hodgkin Lymphoma in the North American Pooled
13       Project," dated June 3rd, 2015.
14           Do you see that?
15   A   Yeah.
16   Q   All right. Now, if you turn -- I put four onto a
17       page just so I could save some paper. But if you
18       turn specifically to the page that has, the top left,
19       "duration (number of years)."
20           Do you see that? Keep going.
21   A   4. Yeah.
22   Q   All right. And this study, by the way, the pooled
23       study is actually pooling data from De Roos 2003 and
24       McDuffie, correct?
25   A   Correct.

Page 305

1    Q   All right. So if you look at the "frequency (number
2        of days per year)" on the right, top right. Right
3        here. You see that?
4    A   Yeah.
5    Q   Okay. So we look at this slide here. It reflects
6        the overall as well as various subgroups of
7        non-Hodgkin's lymphoma. Do you see that?
8    A   Yeah.
9    Q   And we have the overall. It's a 1.98 statistically
10       significant for greater than two days' use. Do you
11       see that?
12   A   Yeah.
13   Q   Now --
14           MR. LEVINE: Sorry. I lost you.
15       Which? Oh. Okay.
16   Q   (By Mr. Wisner) Now, opposing counsel asked you to
17       point off the top of your head to an epidemiological
18       result specifically related to DLBCL. Do you recall
19       that?
20   A   I do.
21   Q   All right. Well, let's look at what it says about
22       DLBCL. It says 2.49 statistically significant
23       result. Do you see that?
24   A   I do.
25   Q   And it also has a P trend of 0.02?

Andrei Shustov, M.D.

| Page 306 |
|---|

1  A  Yeah.
2  Q  And that's reflecting the increase from 0 to 2 to
3    greater than 2, right?
4  A  That's correct.
5  Q  All right.  It also says what is adjusted for at the
6    bottom.  Do you see that?
7  A  I do.
8  Q  Adjusted for age; sex; state, slash, province;
9    emphatic or hematopoietic cancer in a -- in a first-
10    degree relative; use of a proxy respondent; use of
11    any personal protective equipment; use of 2,4-D; use
12    of dicamba; and use of malathion.
13    Do you see that?
14  A  I do.
15  Q  So this is a fully adjusted number that even
16    considered exposure to other pesticides; is that
17    right?
18  A  That's correct.
19  Q  And it relates specifically to DLBCL?
20  A  That's correct.
21  Q  And it shows a more than doubling of the risk that is
22    statistically significant?
23  A  Yeah.
24  Q  Okay.  All right.  I want to touch on one last one.
25    And there was a study that Mr. -- Mr. Levine showed

| Page 307 |
|---|

1    you, the Eriksson study.  I believe it is Exhibit 18.
2    Got it?
3  A  Yeah.
4  Q  Okay.  And he asked you to point to somewhere in this
5    study where the authors indicate you can use this
6    study to establish specific causation for a patient.
7    Do you recall that question?
8         MR. LEVINE:  Objection;
9    mischaracterizes the prior testimony.
10         THE WITNESS:  I think I do.
11  Q  (By Mr. Wisner)  I mean, it was generally.  Do you
12    recall that general --
13  A  Yeah.
14  Q  -- questioning?
15  A  Yeah.
16  Q  Okay.  Is that the purpose of a epidemiological study
17    published in a peer-reviewed literature?
18  A  No.
19  Q  Okay.  But let's see what the authors did say about
20    glyphosate.  Because they actually wrote about it.
21    Let's turn to the last page of the written text.
22    It's 1662.
23    We're almost done, Doctor.  I know you look --
24    you look exhausted.
25  A  I'm there.

| Page 308 |
|---|

1  Q  Okay.  All right.  The top of the paragraph, it
2    reads, "Glyphosate was associated with a
3    statistically significant increased odds ratio for
4    lymphoma in our study, and the result was
5    strengthened by a tendency to dose-response effect as
6    shown in Table 2."
7    Do you see that?
8  A  I do.
9  Q  So what does that sentence mean to you?
10  A  That the -- the high exposure produces the higher
11    risk of developing non-Hodgkin lymphoma.
12  Q  And that was the results reflecting greater-than-ten-
13    days-per-year use?
14  A  That's correct.
15  Q  Okay.  Now, there was a question about whether or not
16    these authors sufficiently adjusted for other
17    confounders.  Do you recall that?
18  A  I think I do.
19  Q  Okay.  Well, let's see what the authors had to say
20    about potential confounding for glyphosate.  It's the
21    next paragraph.  It says, "Glyphosate has succeeded
22    MCPA as one of the most used herbicides in
23    agriculture, and many individuals that used MCPA
24    earlier are now also exposed to glyphosate.  This
25    probably explains why the multivariate analysis does

| Page 309 |
|---|

1    not show any significant odds ratios for these
2    compounds."
3    Do you see that?
4  A  I do.
5  Q  So the authors actually openly considered potential
6    risk for confounding.  Do you see that?
7  A  I do.
8         MR. LEVINE:  Objection.
9  Q  (By Mr. Wisner)  And they dis -- they -- they
10    discredit it?
11         MR. LEVINE:  Objection.
12         THE WITNESS:  I see that.
13  Q  (By Mr. Wisner)  In fact, their conclusions as stated
14    in the previous paragraph is that there is, in fact,
15    a statistically significant increased odds ratio for
16    lymphoma which was strengthened by a tendency to
17    dose-response?
18         MR. LEVINE:  Objection.
19         THE WITNESS:  I can see that.
20  Q  (By Mr. Wisner)  Okay.  There was a question about
21    whether or not you go to these medical societies to
22    tell them that Roundup can cause cancer.  Do you
23    recall that?
24  A  I do.
25  Q  Would you -- I mean, is that something that you would

Andrei Shustov, M.D.

Page 310

1   do?
2   A   That -- just nonsensical in the medical world to --
3       it's not a function of society.  It's -- it just, I
4       can't even sort of -- it just -- it's just an odd
5       question to go to 35,000-person society and jump on
6       the podium and announce something.  It just kind
7       of -- it's an odd -- to envision the scenario.
8       That's not the function of the society.  So you don't
9       go to the society to make announcements.
10  Q   Well, Doctor, do you stand out on the sidewalk and
11      shout at people walking by you that glyphosate causes
12      cancer?
13  A   No.
14  Q   Why not?
15  A   That's kind of odd thing to do.
16          MR. WISNER:  Okay.  One second,
17      Counselor.  I'm almost done.
18  Q   (By Mr. Wisner)  Okay.  Some other quick questions
19      that came up.
20          There was a question asked to you about whether
21      or not the surfactants in Roundup contribute to its
22      carcinogenicity.  Do you recall that?
23  A   I think I do.
24  Q   Did you ever study this issue?
25  A   No.

Page 311

1   Q   So any opinion you have on this is not based on any
2       sort of study of the surfactants?
3          MR. LEVINE:  Objection.
4          THE WITNESS:  No.
5   Q   (By Mr. Wisner)  Okay.  There was a question about
6       the ethical implications of doing a randomized
7       control trial on glyphosate.  Do you recall that?
8   A   I do.
9          THE REPORTER:  You do or you don't?
10         THE WITNESS:  I do.
11  Q   (By Mr. Wisner)  And I just want to be clear.  Would
12      it ever be appropriate to intentionally expose a
13      human being to glyphosate when there's no known
14      benefit to that human being?
15         MR. LEVINE:  Objection.
16         THE WITNESS:  Can you re -- if
17      there's no known benefit or there is a potential
18      harm?
19  Q   (By Mr. Wisner)  Well, if there's no known benefit
20      and a potential harm, would it be ethical to
21      deliberately expose a human being to glyphosate?
22         MR. LEVINE:  Objection.
23         THE WITNESS:  No.
24  Q   (By Mr. Wisner)  Would that sort of randomized
25      controlled trial protocol be approved by an IRB?

Page 312

1   A   Never.
2   Q   Why not?
3   A   Because you're deliberately putting a patient to
4       possible risk of developing cancer.
5   Q   In fact, that's a -- that's a violation of the Geneva
6       Convention, isn't it?
7          MR. LEVINE:  Objection.
8          THE WITNESS:  Just general medical
9       ethics and Geneva Convention and just general
10      humanity rules.
11  Q   (By Mr. Wisner)  Now, there was some confusion about
12      IARC and whether or not IARC can issue a -- or
13      classify a compound in a Group 1 carcinogen.  Do you
14      recall that?
15  A   I do.
16  Q   And I think it got a little confusing with the
17      questions.  And to be clear, you understand that IARC
18      can classify something as a Group 1 carcinogen even
19      without a randomized control trial?
20  A   That's true.
21  Q   Okay.  However, the best evidence, in your opinion,
22      would be a randomized control trial?
23         MR. LEVINE:  Objection.
24         THE WITNESS:  For any impact on
25      human, yes.

Page 313

1          MR. WISNER:  Okay.  No further
2       questions.  Pass the witness.
3
4
5          FURTHER EXAMINATION
6   BY MR. LEVINE:
7   Q   Just a few questions, Dr. Shustov.
8          I believe you were asked a question about whether
9       you looked at Mr. Hardeman to see whether he was
10      obese, correct?
11  A   Well, I had encounter with him and examined him, yes.
12  Q   How many years after his diagnosis of non-Hodgkin's
13      lymphoma did you look at Mr. Hardeman?
14  A   It would make it three years.  Is that right?  I
15      think about three.
16  Q   Okay.  I mean, he was -- he was diagnosed in February
17      2015, right?
18  A   That's correct.
19  Q   Started experiencing symptoms --
20  A   Correct.
21  Q   -- around December of 2014, correct?
22  A   That's correct.
23  Q   So three to four years, correct?
24  A   That's right.
25  Q   Okay.  You did not look at Mr. Hardeman at the time

Andrei Shustov, M.D.

Page 314

1    that he was diagnosed with non-Hodgkin's lymphoma to
2    determine whether he was obese, correct?
3    A  I did not.
4    Q  Okay.  And you didn't look at him any time prior to
5       his diagnosis of non-Hodgkin's lymphoma, correct?
6    A  That's correct.  It could be deducted, though.  I did
7       not look at it specific issue.  But if I were asked
8       to really try to estimate, you can go back in medical
9       records and look at his BSA.
10   Q  At his -- I'm sorry?
11   A  Body -- his -- his height and weight at the time of
12      diagnosis.  That should be part of medical records.
13   Q  Have you done that?
14   A  No.
15   Q  Okay.  Does inflammation -- can inflammation cause
16      cancer?
17   A  It's a very broad statement.
18   Q  Just curious.
19   A  As a -- as a hypothetical possibility, yes.
20   Q  You said -- does obesity cause inflammation?  Let me
21      ask you that.
22   A  That's, again, generally broad statement.  And to --
23      in a judgment of a clinician/physician, it is
24      unlikely to be sufficient to reflect a knowledge that
25      inflammation causes cancer.

Page 315

1    Q  I'm sorry.  My question was:  Does obesity cause
2       inflammation?  Yes or no?
3    A  Not in a clinical sense, no.
4    Q  Dr. Shustov, I think you told me earlier that you
5       reviewed extensive medical records.  Do you remember
6       I was asking you about that?
7    A  I do.
8    Q  Extensive records, or...?
9    A  That's correct.
10   Q  And I think you told me that they started around
11      2005, correct?
12   A  That's correct.
13   Q  You don't have any military records of Mr. Hardeman,
14      correct?
15   A  No.
16   Q  So when you were asked by Mr. Wisner whether you saw
17      any military records that indicated he was diagnosed
18      with hepatitis C or hepatitis B when serving in the
19      military, you hadn't seen any military records,
20      period, correct?
21   A  No.
22   Q  You were asked about probabilities.  Do you remember
23      that?
24   A  I do.
25   Q  By Mr. Wisner.

Page 316

1       Did you do any probability calculations in
2    Mr. Hardeman to determine what percentage risk he had
3    for developing non-Hodgkin's lymphoma based on his
4    Roundup use?
5    A  I did not do mathematical calculations, no.
6    Q  And you were shown Exhibit 25, I believe, by
7       Mr. Wisner, correct?  Looks like a PowerPoint
8       presentation?
9    A  Yeah.
10   Q  Correct?
11   A  That's correct.
12   Q  Is this -- do you know if this was peer reviewed?
13   A  I don't.
14   Q  Does this publication look like it's from a peer-
15      reviewed journal?
16   A  It looks as a PowerPoint presentation.
17   Q  Okay.  And let's go to the page that you were
18      discussing.
19   A  Okay.
20   Q  It's the one at the top left box, started with
21      "duration," and we were looking at the box that said
22      "frequency."
23         You see that?
24   A  Yes.
25   Q  Now, before I ask you questions about this, you

Page 317

1    were -- you recall Mr. Wisner was asking you some
2    questions before about a dose-response relationship,
3    correct?
4    A  Correct.
5    Q  And that was with respect to, I believe, the McDuffie
6       study, correct?
7    A  I think so.
8    Q  He pulled out a quote from the McDuffie study and
9       read it to you about how it said they didn't find a
10      significantly increased risk for exposure, but they
11      found dose-response, correct?
12   A  That's correct.
13   Q  Okay.  Now, you -- he showed you this slide on the
14      top right-hand corner regarding frequency and
15      discussed evidence of a dose-response relationship,
16      correct?
17   A  Correct.
18   Q  Now, if you look at the slide on the left side
19      regarding duration, number of years of glyphosate use
20      and NHL risks.  Do you see that?
21   A  I do.
22   Q  And you see the column for DLBCL?
23   A  Yeah.
24   Q  And for greater than 0 and less than 3.5 years of
25      glyphosate use, there's a statistically significant

Page 318

1 increased risk there, right?
2 A For -- say it again.
3 Q Under DLBCL. In this PowerPoint.
4 A Yeah.
5 Q That is not peer reviewed or published. But there is
6 a odds ratio of 1.77 --
7 A Yeah.
8 Q -- for greater than 0 and less than 3.5 --
9 A Yeah.
10 Q -- years' use, correct?
11 A That's correct.
12 Q And then for greater than 3.5 years' use, there is an
13 odds ratio of 1.03 that's not statistically
14 significant, correct?
15 A I can see that.
16 Q And that would be evidence against the dose-response
17 relationship, correct?
18 A It would, again, depend on detail of this analysis,
19 that just looking at numbers, I might not be able to
20 answer very intelligently. Looking just to the
21 number, there is -- it's a not significant number for
22 more than three and a half years.
23 Q Now, Mr. Wisner said something a minute ago about
24 benefits. Do you recall that? Doing a study and
25 whether Roundup doesn't have any benefits?

Page 319

1 A Yes.
2 Q Okay. Are you saying -- you're not testifying in
3 this litigation that Roundup has no benefits,
4 correct?
5 A I just don't -- I honestly -- I need to -- more
6 definition what benefits are. That's why I asked the
7 question and he added the risks, so --
8 Q You're not offering any testimony with respect to the
9 benefits of Roundup use, correct?
10 A Can you define bene -- benefits to participant
11 health, or benefits to what?
12 Q Just asking you if it's within the scope of your
13 opinions in this litigation that you intend to
14 discuss as to whether Roundup has benefits.
15 MR. WISNER: Objection.
16 THE WITNESS: No.
17 MR. WISNER: Vague.
18 THE WITNESS: No.
19 MR. LEVINE: Okay. Nothing
20 further.
21 MR. WISNER: Just very short thing
22 just on what he just talked about;
23 ////
24 ////
25 ////

Page 320

1 FURTHER EXAMINATION
2 BY MR. WISNER:
3 Q On Exhibit 25, in that -- that greater than three and
4 a half years that you looked at.
5 A Okay.
6 Q Now, you understand that if it's -- if someone had
7 used Roundup three times over the course of four
8 years, that would put them in the greater than three
9 and a half years. You understand that?
10 MR. LEVINE: Objection.
11 THE WITNESS: That's correct.
12 Q (By Mr. Wisner) So you can actually have people with
13 relatively low exposure in that high group?
14 A Potentially.
15 Q Whereas if you're doing frequency, number of days per
16 year, that's guaranteeing that you're going to find
17 people who are at least using it more than two days,
18 cumulative days per year?
19 MR. LEVINE: Objection.
20 THE WITNESS: That's correct.
21 Q (By Mr. Wisner) And, you know, that's what we talk
22 about when we talk about -- when we talk about dose,
23 we talk about the volume of exposure?
24 A That's correct.
25 Q Okay. And then on that -- that question about

Page 321

1 benefits that he just asked, I just want to be clear,
2 Doctor. Is it your opinion that exposing a human
3 being to glyphosate has a health benefit?
4 A No.
5 MR. WISNER: Okay. No further
6 questions.
7
8
9 FURTHER EXAMINATION
10 BY MR. LEVINE:
11 Q Doctor, let's go back to Exhibit 25 for a second, in
12 that "frequency (number of days per year)" table.
13 A Okay.
14 Q That "frequency (number of days per year)" table
15 doesn't tell you anything about whether somebody used
16 gallons of Roundup per day or whether they used one
17 squirt of Roundup per day, correct?
18 A Not in this table.
19 MR. LEVINE: Nothing further.
20 MR. WISNER: Thank you, Dr. Shustov.
21 THE VIDEOGRAPHER: Please stand by.
22 This concludes the videotaped deposition of
23 Dr. Andrei Shustov. There were four media units used
24 today. We are going off the record. The time is
25 6:17 p.m.

Page 322

(Signature reserved.)
(Deposition concluded at
6:17 p.m.)

Page 324

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____

Andrei Shustov, M.D.

Page 323

STATE OF WASHINGTON )     I, John M.S. Botelho, CCR, RPR,
                    ) ss a certified court reporter
County of Pierce    )   in the State of Washington,
                        do hereby certify:

That the foregoing deposition of ANDREI SHUSTOV, M.D., was taken before me and completed on December 15, 2018, and thereafter was transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved the right of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of December, 2018.

_____
John M.S. Botelho, CCR, RPR
Certified Court Reporter No. 2976
(Certification expires 5/26/19.)

Page 325

WITNESS:  Andrei Shustov, M.D.

DATE:  December 15, 2018

CASE:  Hardeman v. Monsanto Co.

Please note any errors and the corrections thereof on this errata sheet.  The rules require a reason for any change or correction.  It may be general, such as "To correct stenographic error," or "To clarify the record," or "To conform with the facts."

PAGE  LINE  CORRECTION              REASON FOR CHANGE

____  ____  _____   _____
____  ____  _____   _____
____  ____  _____   _____
____  ____  _____   _____
____  ____  _____   _____
____  ____  _____   _____
____  ____  _____   _____
____  ____  _____   _____
____  ____  _____   _____
____  ____  _____   _____
____  ____  _____   _____
____  ____  _____   _____
____  ____  _____   _____
____  ____  _____   _____
____  ____  _____   _____