**WILKINSON WALSH + ESKOVITZ LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonwalsh.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonwalsh.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:    202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**ARNOLD & PORTER KAYE SCHOLER**
William Hoffman (*pro hac vice*)
(William.Hoffman@arnoldporter.com)
601 Massachusetts Avenue, N.W.
Washington, DC 20001
Tel: 202-942-6915
Fax: 202-942-5999

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

*Attorneys for Defendant*
*MONSANTO COMPANY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | ) MDL No. 2741 ) ) Case No. 3:16-md-02741-VC |
| *Alvarez Calderon v. Monsanto Co.*, 3:19-cv-01630-VC | ) ) **MONSANTO COMPANY'S NOTICE OF** ) **MOTION AND MOTION TO EXCLUDE** ) **TESTIMONY OF DR. WILLIAM R.** ) **SAWYER ON** ***DAUBERT*** **GROUNDS** ) ) Hearing date: Jan. 29, 2020 ) Time: ) |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on January 29, 2020, in Courtroom 4 of the United

States District Court, Northern District of California, located at 450 Golden Gate Avenue, San

Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its *Daubert* Motion to Exclude the Testimony of Dr. William R. Sawyer.  Monsanto seeks an order excluding opinion of this witness under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

DATED:  December 27, 2019

Respectfully submitted,

/s/ *Brian L. Stekloff*

Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonwalsh.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonwalsh.com)
WILKINSON WALSH + ESKOVITZ LLP
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:    202-847-4005

Pamela Yates (CA Bar No. 137440)
(Pamela.Yates@arnoldporter.com)
ARNOLD & PORTER KAYE SCHOLER
777 South Figueroa St., 44th Floor
Los Angeles, CA 90017
Tel: 213-243-4178
Fax: 213-243-4199

Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
HOLLINGSWORTH LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
COVINGTON & BURLING LLP
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

*Attorneys for Defendant*
*MONSANTO COMPANY*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **INTRODUCTION**

Several Wave 1 Plaintiffs, including Plaintiff Alvarez Calderon ("Plaintiff"), have designated Dr. William Sawyer as an exposure expert to provide testimony regarding their alleged levels of exposure to various Roundup-branded herbicides ("Roundup"). Dr. Sawyer *also* seeks to offer opinions regarding general causation and specific causation. For the reasons below, Dr. Sawyer's opinions do not meet the *Daubert* admissibility standards and should be excluded.[1]

*First*, Dr. Sawyer's general causation opinion should be excluded because it does not follow any valid or recognizable methodology. Although his reports (both in this and prior cases) reference the three types of evidence used to evaluate causation—epidemiological, animal, and mechanistic—Dr. Sawyer did not fully evaluate these types of evidence in forming his general causation opinion. Instead, Dr. Sawyer has conceded that he looked only at the "dose aspects of the epidemiology and whether or not the plaintiff fits in the dose brackets within the epidemiology" and that he did not consider other aspects of the epidemiology or animal or cell studies for purposes of determining general causation. *See* Stekloff Decl., Ex. 1, Sawyer Deposition in *Giglio* ("Sawyer *Giglio* Dep.") (9/15/2019) at 58:5-16; 169:12-15; Ex. 2, Sawyer Deposition in *Alvarez Calderon* ("Sawyer *Alvarez Calderon* Dep.") (12/21/19) at 21:13-22:8. In fact, in their opposition to Monsanto's motion to exclude Dr. Sawyer in the twelve other Wave 1 cases in which he is disclosed, the Wave 1 plaintiffs conceded that Dr. Sawyer is not being offered "as a general causation expert on epidemiology" and that Dr. Sawyer will not provide an opinion on the animal carcinogenicity data. ECF 8342, *In re: Roundup Products Liab. Lit.*, Case No. 16-md-02741-VC, at 4-5.

---

[1] Dr. Sawyer was previously disclosed as an expert in this MDL in the *Hardeman, Stevick,* and *Gebeyehou* cases. Monsanto moved to exclude his testimony in those cases. *See* Monsanto Company's Notice of Motion and Motion to Exclude Testimony of Dr. William R. Sawyer on *Daubert* Grounds, ECF No. 2418 ("*Hardeman* Motion to Exclude"). Monsanto is mindful of the Court's directive to not re-litigate issues that have previously been decided. However, because the Court did not rule on Monsanto's previous motion to exclude Dr. Sawyer, it files the instant motion. Monsanto incorporates by reference all arguments made in its prior briefing regarding Dr. Sawyer to the extent applicable.

***Second***, Dr. Sawyer likewise did not follow a valid methodology in reaching his specific causation opinions.  Rather, he concludes that Roundup was a potential cause of Plaintiff's NHL based purely on extrapolations from cherry-picked epidemiology studies, notwithstanding his lack of training in epidemiology and his admission that he did not actually analyze the epidemiological details of any of the studies from which he plucks individual, exposure-related data points.  In fact, he *defers* to others on the detailed analysis, interpretation, and meaning of the epidemiology studies on which he purports to rely.  *See* Stekloff Decl., Ex. 1, Sawyer *Giglio* Dep. at 58:8-10 ("I'm not going to handle the epidemiological aspects.  I defer that to the medical epidemiologists in this matter."); 64:2-11 (agreeing that he is "not here to talk about general epidemiology opinions" and that he defers the "significance" of certain epidemiology studies to the epidemiologists); Ex. 3, Expert Report of Dr. William R. Sawyer in *Alvarez Calderon* (December 12, 2019) ("Sawyer Alvarez Calderon Rpt.") at 14-15.  And he did not even attempt to consider—much less reliably analyze and rule out—many other possible causes of Plaintiff's NHL.  Stekloff Decl., Ex. 1, Sawyer *Giglio* Dep., at 55:18-56:10; 56:17-57:15; 127:25-128:4; Ex. 2, Sawyer *Alvarez Calderon* Dep., at 21:5-8 (admitting that his "specific causation opinions do not cover all aspects that the oncologist will be covering").  Dr. Sawyer's conclusion that Roundup was a "substantial contributing factor to" Plaintiff's development of NHL is therefore based on nothing more than impermissible *ipse dixit* and is not helpful to the jury.

***Third***, Dr. Sawyer's opinions are based on data that is universally considered to be unreliable.  Specifically, Dr. Sawyer's conclusion that the George study demonstrates Roundup is a cancer "promoter" is inconsistent with the conclusions of all scientific panels and regulators that have reviewed it, including both the EPA and IARC.  Indeed, IARC concluded that the George study is "inadequate" for the evaluation of glyphosate.

***Fourth***, Dr. Sawyer's opinion that trace chemicals in Roundup caused or contributed to Plaintiff's cancer is based merely on assertions that those chemicals (at much higher doses) have been associated with cancer.  But there is no scientific evidence of causation linking them to NHL at doses remotely comparable to those at issue here, and Dr. Sawyer does not even calculate the

doses of these chemicals to which Plaintiff was allegedly exposed. Nor is there any scientific evidence suggesting that exposure to Roundup is a cancer risk because of these trace chemicals.

**Fifth**, Dr. Sawyer seeks to offer opinions regarding Monsanto company documents and regulatory duties, which are clearly beyond his area of expertise and beyond the realm of proper expert testimony.

## BACKGROUND

On November 26, 2019, Monsanto moved to exclude testimony of Dr. William Sawyer on *Daubert* grounds in all twelve of the Wave 1 cases in which Dr. Sawyer had been disclosed and had submitted a report. *See* ECF 8010, *In re: Roundup Products Liab. Lit.*, Case No. 3:16-md-02741-VC. At that time, Dr. Sawyer had not submitted a report in this case.[2] Dr. Sawyer has since submitted his report in this case, which is attached hereto as Exhibit 3.

Plaintiff has not served a formal designation identifying the specific topics on which Dr. Sawyer is expected to offer his opinions in this case. In other Wave 1 cases, plaintiffs have offered Dr. Sawyer, a toxicologist by training, as an expert witness on, among other topics, "the mechanism of absorption of glyphosate-based formulations through the skin and other exposure pathways," "toxicology and animal studies on dermal absorption," "human exposure studies and data relating to glyphosate-based formulations," and "Plaintiff's total exposure to Roundup, including the comparability of Plaintiff's exposure with the exposure data from applicators in studies on glyphosate-based formulations." *See, e.g.,* Stekloff Decl. Ex. 4, Plaintiff's R. 26 Expert Disclosures in *Giglio*, at 7. In his report in this case, Dr. Sawyer purports to offer opinions on both general and specific causation. Dr. Sawyer also purports to offer an unsupported opinion that Roundup is a cancer promoter based on the George study, and that various trace chemicals in Roundup

---

[2] October 4, 2019 was the deadline for Wave 1 plaintiffs to disclose their experts. Plaintiff's counsel in *Alvarez Calderon* did not disclose Dr. Sawyer as an expert in Plaintiff's case until over a month after that deadline had passed, and even then sought permission to file only a "rebuttal" report by Dr. Sawyer. The Court granted Plaintiff's motion to file Dr. Sawyer's rebuttal report. *See* ECF 7811, *In re: Roundup Products Liab. Lit.* Case No. 3:16-md-02741-VC (Nov. 15, 2019).

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

1  contributed to Plaintiff's development of NHL.  Finally, Dr. Sawyer purports to offer opinions

2  regarding various EPA regulations and Monsanto's corporate state of mind.

3  <u>General Causation</u>

4  There are three types of evidence that are used to evaluate whether an agent is capable of

5  causing a particular outcome at human-relevant exposure levels: epidemiological, animal, and

6  mechanistic evidence.  *See In re: Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1115-1130

7  (N.D. Cal. 2018).  Epidemiology, which studies the incidence and etiology of disease in human

8  populations, is "central to the general causation inquiry, and where such evidence exists, it must be

9  addressed."  *Id.* at 7.  Dr. Sawyer, however, has conceded repeatedly that he has not evaluated the

10  merits or "epidemiological aspects" of any of the epidemiology studies, and instead is "deferring" to

11  other experts on that subject.  Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep. at 58:8-16; 64:2-11; Ex. 3,

12  Sawyer *Alvarez Calderon* Rpt. at 14-15.[3]  The general causation portions of Dr. Sawyer's reports

13  instead discuss glyphosate's history; the ingredients in various Roundup formulations; the routes of

14  potential exposure to glyphosate; and various factors purportedly affecting dermal absorption.  *See*

15  Stekloff Decl. Ex. 3, Sawyer *Alvarez Calderon* Rpt. at 29-129.   In other words, Dr. Sawyer's

16  "general causation" opinion is just a discussion of the properties of Roundup, not an analysis of

17  whether Roundup generally can cause NHL in humans.

18  <u>Specific Causation</u>

19  Dr. Sawyer also purports to address specific causation—whether Roundup caused Plaintiff's

20  cancer specifically—but does so only by purporting to "assess the [Plaintiff's] exposure dose based

21

22  _____

22  [3] This admission of deference is typical of Dr. Sawyer whenever he has been offered as an expert witness in

23  the Roundup litigation.  *See, e.g.*, Stekloff Decl. Ex. 5, Expert Report of Dr. William R. Sawyer in *Pilliod v.

23  Monsanto Co.*, No. RG-17-862702 (Cal. Sup. Ct. Alameda Cnty.) (Jan. 14, 2019) at 117 ("Sawyer *Pilliod*

24  Rpt.") ("I have deferred epidemiological causation opinions to other experts retained in the current matter.");

24  Ex. 6, Tr. of the Dep. of Dr. William R. Sawyer in *Pilliod* ("Sawyer *Pilliod* Dep.") (Feb. 6, 2019) at 40:5-8;

25  40:18-22; 42:5-12; 77:15-18; 80:3-4; 163:1-2; 176:7-9; 194:21; 203:1-5; 207:2-6; 212:10-12; 213:18-20;

25  230:3-5; 232:2-8; 233:23-25; 234:24-25; 236:10-21; 252:16-253:10; 260:4-18; Ex. 7, Tr. of the Dep. of Dr.

26  William R. Sawyer in *Stevick v. Monsanto Co.,* No. 3:16-cv-02341 (N.D. Cal. Dec. 20, 2018) ("Sawyer

26  *Stevick* Dep.") at 240:18-23; 241:24-242:15; Ex. 8, Tr. of the Dep. of Dr. William R. Sawyer in *Winston, et

27  al. v. Monsanto Co.*, No. 1822-CC00515 (Mo. Cir. Ct. City of St. Louis) ("Sawyer *Winston* Dep.") at 179:17-

27  22; 190:10-191:15; 197:13-202:20; 218:6-15; 234:11-239:24; 252:4-20.

28

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

on the human epidemiologic evidence and determine whether or not [Plaintiff's] exposures were within the range of that and the generally accepted peer-reviewed epidemiology studies."  Stekloff Decl. Ex. 2, Sawyer *Alvarez Calderon* Dep. at 21:13-22:8 ("[W]hen I say specific causation, that is whether or not the dose in these studies are consistent with that received by Mr. Alvarez.").  Importantly, Dr. Sawyer's "specific causation" opinion does not attempt to account for (much less rule out) many other possible causes or confounding factors of Plaintiff's NHL.  In other words, unlike other specific causation experts in the litigation and as the Wave 1 plaintiffs have already conceded, Dr. Sawyer did not conduct a full differential etiology in this case.  *See* ECF 8342, *In re: Roundup Products Liab. Lit.*, Case No. 3:16-md-02741-VC, at 13 (admitting that Dr. Sawyer "is not conducting a full differential etiology in the Wave 1 cases.").

Promotion

The George study is a small mouse study in which various combinations of (1) a known carcinogen, (2) a known tumor promotor, (3) Roundup, (4) 2- dimethylbenz[a]anthracene ("DMBA"), and (5) 7, 12-O-tetradecanoyl-phorbol-13-acetate ("TPA") were painted on the skins of the subject animals.  Stekloff Decl. Ex. 9, George, J., et al., *Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach*, 73 Journal of Proteomics 951 (2010) ("George 2010") at 953.  While it purports to find that Roundup facilitated the growth of cancer, *id.*, due to multiple flaws in the study design—including that it omitted histopathology (the standard scientific confirmation of cancer)—the George study has been uniformly rejected as evidence of promotion (or carcinogenicity).  *See*, *e.g.*, Stekloff Decl. Ex. 10, EPA Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017) at 70; Ex. 11, IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans* (2015) at 32 ("The Working Group concluded this was an inadequate study for the evaluation of glyphosate.").  Monsanto knows of no publication relying on the George study which states Roundup may promote tumors or cancer.

Notwithstanding this uniform disapproval of the George study, Dr. Sawyer relies on the

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

study to support his conclusion that Roundup can cause or even promote cancer in Plaintiff. Stekloff Decl. Ex. 3, Sawyer *Alvarez Calderon* Rpt., at 38-42.  He states that in the George study, "glyphosate was demonstrated to have strong tumor-promoting activity." *Id.* at 39. He further states that the results of the study "suggested that glyphosate has tumor-promoting potential in skin carcinogenesis." *Id.*  Critically, however, he does all of this without mentioning that the George study has been rejected by every scientific agency to review it.

Trace Chemicals

Roundup, like all herbicides, contains certain trace chemicals as byproducts of the manufacturing process.  Dr. Sawyer seeks to testify that various trace chemicals in Roundup are carcinogens, and thus caused or contributed to Plaintiff's NHL.  Dr. Sawyer provides no science linking any of the trace chemicals to NHL at any dose remotely approximating the minuscule amounts to which Plaintiff could have been exposed, and none attributing NHL in people exposed to Roundup to the presence of those trace chemicals.  Dr. Sawyer never even calculates a dose of these trace chemicals to which Plaintiff allegedly was exposed.

EPA Regulations and Corporate State of Mind

Finally, Dr. Sawyer seeks to offer improper opinion testimony regarding the relevant EPA regulations and Monsanto's corporate state of mind.  Dr. Sawyer is unqualified to discuss these topics, which are plainly outside the scope of his expertise.

## LEGAL STANDARD

Under *Daubert* and Federal Rule of Evidence 702, an expert must be qualified in the specific subject area in which he seeks to offer opinions, and his proffered testimony must be both relevant and reliable.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  *Daubert* created "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), which require far "more than subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 590.  *Daubert's* objective "is to make certain that an expert . . . employs in the court room the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).   Thus, "in

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

determining whether proposed expert testimony amounts to good science, [the court] may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*).

An expert's purported expertise, of course, also must match the subject matter about which he is being proffered to testify. The fact that Dr. Sawyer may be qualified to give an opinion about a person's level of exposure does not render him qualified to opine about general or specific causation, whether Roundup is a cancer promotor, whether trace chemicals in Roundup can cause NHL, or the relevant EPA regulations and Monsanto's regulatory duties. *See, e.g., White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002) ("A layman, which is what an expert witness is when testifying outside his area of expertise, ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion."); *Jenkins v. Arkansas Power & Light Co.*, 140 F.3d 1161, 1165 (8th Cir. 1998) (affirming district court's exclusion of testimony where expert lacked specialized knowledge about specific area in which he offered opinions). When an expert's field of expertise is not related to the subject at issue, such testimony will not aid the jury and is inadmissible. *See, e.g., Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 828 (5th Cir. 1993) (affirming exclusion of experts who "stepped outside of their areas of expertise" into an area in which they had no training); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty."). And an opinion like Dr. Sawyer's on the George study— which flies in the face of all scientific analysis of that study—must be rejected as not scientifically reliable. *See, e.g., Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 862 (9th Cir. 2014) (affirming district court's exclusion of expert after finding expert's testimony to be "inherently unreliable and unsupported by the facts."); *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) ("Under *Daubert*, any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.") (internal quotations omitted).

## ARGUMENT

1

## I.      The Court Should Exclude Dr. Sawyer's General Causation Opinions.

2

3            Dr. Sawyer's general causation opinions are inadmissible because he did not follow any

4    valid methodology to reach them.  As an initial matter, courts have repeatedly held that an expert

5    may not testify on matters outside his specific subject matter of expertise, *Apple, Inc. v. Samsung*

6    *Electronics Co., Ltd.*, 2013 WL 5955666, at *2 (N.D. Cal. Nov. 6, 2013) ("Under Federal Rule of

7    Evidence 702, experts may not make expert conclusions about areas outside their expertise.").[4]  In

8    the context of toxicologists specifically, courts have noted that although "a toxicologist may testify

9    that exposure to a chemical caused a person's symptoms and injuries," there is no "blanket rule that

10   toxicologists are qualified to render an opinion on causation."  *Marmo v. Tyson Fresh Meats, Inc.*,

11   457 F.3d 748, 758 (8th Cir. 2006).  Dr. Sawyer's report does not specify an acceptable methodology

12   for reaching a general causation opinion.  Moreover, to the extent Dr. Sawyer attempts to apply the

13   Bradford Hill criteria (a method for assessing causation)—which he has purported to apply in other

14   Roundup cases[5]—he has not reliably applied that methodology.

15           The Bradford Hill criteria can be applied only *after* epidemiology data demonstrates an

16   association.  *See* Stekloff Decl. Ex. 12, Reference Manual on Scientific Evidence at 598–99 ("We

17   emphasize that these guidelines are employed only *after* a study finds an association to determine

18   whether that association reflects a true causal relationship."); *see also* Stekloff Decl. Ex. 13*, A.*

19   Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. R. Soc. Med.

20   295, 295 (1965).  Critically, Dr. Sawyer has admitted that he has not evaluated the epidemiological

21   studies for purposes of determining causation.  *See, e.g.,* Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep. at

22   58:11-16 (admitting that he has only looked at "the dose aspects of the epidemiology and whether

23   or not the plaintiff fits into the dose brackets within the epidemiology"); *see also* Stekloff Decl. Ex.

24

25   _____

[4] *See also White v. Ford Motor Co.*, 312 F. 3d 998, 1008-09 (9th Cir. 2002) ("A layman, which is what an
expert witness is when testifying outside his area of expertise, ought not to be anointed with ersatz authority
as a court-approved expert witness for what is essentially a lay opinion.").

26

27   [5] *See, e.g.*, Stekloff Decl. Ex. 14, Tr. of the Dep. of Dr. William R. Sawyer in *Johnson v. Monsanto Co.,* No.
CGC-16-550128 (Cal. Sup. Ct. S.F. Cnty. Feb. 26, 2018) ("Sawyer *Johnson* Dep.") at 139:2-6, 145:12-15
(testifying that he uses the Bradford Hill criteria in forming causation opinions).

28

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

8, Sawyer *Winston* Dep. at 252:9-20 (admitting that he is "not the one who is evaluating the body of [epidemiology] literature and weighing each study for its merits and determining whether or not glyphosate is a carcinogen."). Rather, he defers that analysis and evaluation to other experts in these cases. Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep. at 58:8-10 ("I'm not going to handle the epidemiological aspects. I defer that to the medical epidemiologists in this matter."); 64:2-11 (agreeing that he is "not here to talk about general epidemiology opinions" and that he defers the "significance" of certain epidemiology studies to the epidemiologists). Plaintiffs in the other Wave 1 cases candidly admitted that Dr. Sawyer will not be offered "as a general causation expert on epidemiology." ECF 8342, *In re: Roundup Products Liab. Lit.*, Case No. 16-md-02741-VC, at 4-5. Because Dr. Sawyer has not analyzed the epidemiology evidence for purposes of determining causation, he also should not be permitted to offer a general causation opinion here.

Nor should Dr. Sawyer be permitted to offer general causation opinions based on the animal or mechanism studies he cites in his report. In their prior briefing, the Wave 1 plaintiffs conceded that Dr. Sawyer will not offer any assessment of the animal carcinogenicity data for purposes of general causation in any of the Wave 1 cases. *Id.* at 5. Moreover, although Dr. Sawyer describes certain genotoxicity studies in his reports, he offers no explanation for how the results of those studies can be extrapolated to reach a conclusion that Roundup can cause NHL in humans. *See, e.g.*, *O'Hanlon v. Matrixx Initiatives*, No. CV 04-10391 AHM (JTLX), 2007 WL 2446496, at *2 (C.D. Cal. Jan. 3, 2007) ("[W]hen extrapolating from studies concerning one substance, one species, one dose level or one manner of exposure, it is incumbent upon the expert to explain and demonstrate why the extrapolation is scientifically proper. . ."). Accordingly, any general causation opinion that Dr. Sawyer may attempt to offer would be based entirely on his say-so or on information about which the Wave 1 plaintiffs have expressly stated Dr. Sawyer will not testify. Dr. Sawyer's general causation opinions should therefore be excluded in their entirety.[6]

---

[6] Dr. Sawyer also claims that his general causation opinion includes an opinion on the "latency" of NHL. Stekloff Decl. Ex. 3, Sawyer *Alvarez Calderon* Rpt. at 128-29. His "latency" opinion consists of nothing more than presenting a chart that merely lists latency periods from certain epidemiology studies (which, as noted above, he concedes he has not fully analyzed). *See id.* Dr. Sawyer's extraction of these latency
*(Footnote continued)*

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

1

## II.   The Court Should Exclude Dr. Sawyer's Specific Causation Opinions.

2          Dr. Sawyer likewise did not use any reliable methodology to reach his specific causation

3   opinions.  As the Wave 1 plaintiffs have conceded, Dr. Sawyer did not perform a full differential

4   etiology in any of the Wave 1 cases.  *See* ECF 8342, *In re: Roundup Products Liab. Lit.*, Case No.

5   3:16-md-02741-VC, at 13.   Nevertheless, he seeks to opine that Roundup was "a substantial

6   contributing factor to" Plaintiff's development of NHL.  *See* Stekloff Decl. Ex. 2, Sawyer *Alvarez*

7   *Calderon* Dep. at 23:4-24:13; Ex. 3, Sawyer *Alvarez Calderon* Rpt. at 133.  That opinion should be

8   excluded because Dr. Sawyer has not followed any valid methodology.  *See*, *e.g.*, *Marmo*, 457 F.3d

9   at 758 (affirming district court's exclusion of toxicologist where toxicologist "interviewed

10  [plaintiff] but did not examine her and did not inquire about other toxic exposures . . . [and] did not

11  exclude confounding factors, which leaves open the possibility of competing causes of the disease

12  and raises questions about the competency of expert testimony.") (internal quotation omitted).

13         Dr. Sawyer apparently concludes that Roundup can be considered a potential cause for

14  Plaintiff's NHL based solely on exposure-related data extracted from epidemiology studies which,

15  as explained above, he has not evaluated for purposes of determining causation.  And there is

16  nothing "specific" about such a causation analysis—it would deem Roundup to be a "substantial

17  contributing factor" for *any individual anywhere in the world* who has been exposed to his

18  hypothetical threshold amount of glyphosate.  As if to confirm the point, Dr. Sawyer has not

19  attempted to analyze many other potential confounding factors for NHL in this or in the other Wave

20  1 cases, claiming instead that he "deferred" such analysis to other experts.  Stekloff Decl. Ex. 2,

21  Sawyer *Alvarez Calderon* Dep., at 21:5-8 (admitting that his "specific causation opinions do not

22  cover all aspects that the oncologist will be covering"); Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep., at

23  55:18-58:10; Stekloff Decl. Ex. 15, Sawyer Deposition in *I. Hernandez* ("Sawyer *I. Hernandez*

24  Dep.") at 28:11-15.  Dr. Sawyer's results-driven process does not resemble any sort of valid specific

25  causation analysis, and should be excluded under *Daubert* and its progeny.

26

27  estimates without further analysis is not a proper expert opinion, would not be helpful to the jury, and should
    be excluded.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**A.      Dr. Sawyer's Opinion that Roundup Is a "Substantial Contributing Factor" to Plaintiff's NHL Is Not the Proper Subject of Toxicology Expert Testimony.**

The purported foundation for Dr. Sawyer's "specific causation" opinion is his comparison of the number of days Plaintiff used Roundup to various exposure-related thresholds included in six epidemiology studies on Roundup.  According to Dr. Sawyer, when a person's exposure, calculated by Dr. Sawyer in eight-hour "exposure days," exceeds the thresholds in these six studies, that person is at increased risk of developing NHL.  Dr. Sawyer should be prohibited from offering his "specific causation" opinions for multiple reasons.

*First*, Dr. Sawyer is not qualified to draw conclusions on specific causation from the epidemiology studies.   Dr. Sawyer is not an epidemiologist, does not consider himself an epidemiology expert, and disclaimed any attempt to evaluate or interpret the relevant epidemiology studies for purposes of determining causation, instead relying on or deferring to others' opinions. *See, e.g.*, Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep., at 58:8-10; 64:2-11.

Indeed, he consistently testifies that he defers to epidemiologists on virtually every aspect of the epidemiology studies, from big-picture questions about the sufficiency of human data to show a connection between Roundup and NHL, to other matters such as epidemiological study design, statistical analysis of data, and the validity of epidemiological studies.  *See, e.g.*, *id.*; Stekloff Decl. Ex. 3, Sawyer *Alvarez Calderon* Rpt. at 14-15; Ex. 8, Sawyer *Winston* Dep. at 179:17-22; 190:10-191:15; 197:13-202:20; 218:6-15; 234:11-239:24; 252:4-20; Ex. 6, Sawyer *Pilliod* Dep. at 40:5-8; 40:18-22; 42:5-12; 77:15-18; 80:3-4; 163:1-2; 176:7-9; 194:21; 203:1-5; 207:2-6; 212:10-12; 213:18-20; 230:3-5; 232:2-8; 233:23-25; 234:24-25; 236:10-21; 252:16-253:10; 260:4-18.   The Court should not allow Dr. Sawyer to opine on topics that exceed his expertise, which includes extracting alleged thresholds from studies he is not qualified to evaluate.  *See, e.g.*, *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d at 614 ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.  That would not be responsible science.").

*Second*, even if Dr. Sawyer were qualified to analyze the epidemiology data on which he based his opinions, that analysis cannot justify his conclusion that Roundup caused *a particular*

- 11 -

*plaintiff's* cancer.  Dr. Sawyer repeatedly confirmed that under his counting-of-days "analysis," the actual amount of Roundup that was allegedly absorbed in Plaintiff's body, the number of exposure events Plaintiff allegedly experienced, Plaintiff's use of any personal protective equipment, and Plaintiff's efforts to clean Roundup off of his skin after alleged exposure events are all irrelevant. *See, e.g.,* Ex. 2, Sawyer *Alvarez Calderon* Dep. 80:3-82:3; 94:12-95:22; 99:22-100:11; *see also* Stekloff Decl. Ex. 18, Sawyer *Sanders* Dep. 26:24-27:19; Ex. 19, Sawyer *Pollard* Dep. 24:11-16; 50:2-25; Ex. 20, Sawyer *Mendoza* Dep. 27:23-29:1.  The only thing that matters for Dr. Sawyer's analysis is the number of "exposure days" Plaintiff allegedly experienced and whether Plaintiff met certain exposure-day thresholds in Dr. Sawyer's handpicked epidemiology studies.  However, even *general* causation cannot be established with epidemiology alone, as Plaintiff's experts concede and as this Court has found in this MDL.  *See* Stekloff Decl. Ex. 24, Tr. of Proceedings, Testimony of Dr. Christopher J. Portier, *Pilliod v. Monsanto Co.,* No. RG-170862702 (Cal. Sup. Ct. Alameda Cnty. Apr. 3, 2019) at 1893:3-8 ("Q: And so in terms of the human data we have in this case, you agree that you cannot make a firm statement that Roundup causes NHL from the epidemiology data alone, true? A: Correct.  I can't do it from the epidemiology data alone."); *In re: Roundup*, 390 F. Supp. 3d at 1116; *see also* Stekloff Decl. Ex. 12, Reference Manual on Scientific Evidence at 598. Without question, epidemiology alone cannot establish specific causation.  But that is what Dr. Sawyer has done:  he has concluded that Roundup caused Plaintiff's NHL merely because Plaintiff was exposed to Roundup for a number of days that exceeds the minimum "number-of-days" threshold presented by certain epidemiological data points from studies Dr. Sawyer has not fully analyzed.  Moving from general causation to specific causation requires more than just say so—but that is all Dr. Sawyer has provided.[7]

**Third,** most of the epidemiology data on which Dr. Sawyer relies in reaching his conclusions on specific causation is unreliable because it was not adjusted for the use of other

---

[7] While Dr. Sawyer noted that certain studies allegedly show that Roundup can have a genotoxic effect on human cells, he provides no justification for concluding that Roundup had this kind of effect on Plaintiff, and no explanation for how any alleged genotoxic effect led to their development of NHL.

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

1    pesticides.  Although his report mentions several epidemiology studies, Dr. Sawyer admits that the

2    "three primary studies" on which he relies for his specific causation opinions are McDuffie,

3    Eriksson, and Andreotti.  Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep. at 66:5-10.  Dr. Sawyer further

4    admits that Andreotti "did not find a statistically elevated risk of NHL," (Stekloff Decl. Ex. 3,

5    Sawyer *Alvarez Calderon* Rpt. at 16), so that study does not support his conclusions on specific

6    causation.  Dr. Sawyer also relies on Eriksson and McDuffie, which he states reported odds ratios of

7    2.36 and 2.12, respectively, for those with greater than ten days of exposure (in Eriksson) and

8    greater than two days of exposure (in McDuffie).  Stekloff Decl. Ex. 3, Sawyer *Alvarez Calderon*

9    Rpt. at 15.  However, those studies did not adjust for exposure to other pesticides.  *See* Ex. 1,

10   Sawyer *Giglio* Dep., at 78:13-80:18; *see also In re Roundup Prods., Liab., Lit.*, 390 F. Supp. 3d at

11   1119–20.  As this Court has already determined, "[f]ailing to take account of likely confounders by

12   presenting and relying upon only unadjusted (or minimally adjusted) estimates is a serious

13   methodological concern."  *Id.* at 1140.  Dr. Sawyer's reliance on unreliable data from studies that

14   did not adjust for other pesticide use provides another basis for exclusion of his specific causation

15   opinions.

16        **B.    Dr. Sawyer Did Not Consider Other Potential Causes of Plaintiff's NHL.**

17            Dr. Sawyer's failure to consider other possible causes of Plaintiff's NHL confirms that his

18   "specific causation" opinion is not, in fact, a reliable specific causation opinion.  During his

19   depositions in this and other Wave 1 cases, Dr. Sawyer specifically admitted that his assessment

20   defers the analysis of other potential risk factors for NHL to other experts in the case, including the

21   oncologists, pathologists, and medical epidemiologists.  Stekloff Decl. Ex. 2, Sawyer *Alvarez*

22   *Calderon* Dep. at 21:1-8; 106:23-108:9; Ex. 23, Sawyer *Russo* Dep. at 28:17-29:7; 32:9-33:3.[8]

23

24   ───────────────

25   [8] When asked whether he considered potential genetic causes of other Wave 1 plaintiffs' NHL, Dr. Sawyer
     admitted that he deferred that analysis to other experts.  Stekloff Decl. Ex. 1, Sawyer *Giglio* Dep., at 56:17-

26   57:1; Ex. 23, Sawyer *Russo* Dep. at 28:17-29:7; Ex. 16, Sawyer *Dickey* Dep. at 15:20-23.  When asked
     whether he had "gone through the process of ruling out random chance as the cause of [Plaintiff]'s NHL,"

27   Dr. Sawyer again responded that he "would defer that to our medical epidemiologist." Stekloff Decl. Ex. 1,
     Sawyer *Giglio* Dep. at 57:2-10.  Dr. Sawyer also admitted that he did not consider certain environmental

28   exposures in assessing the cause of plaintiffs' NHL. *Id.* at 127:25-128:4.

─────────────────────────────────────
MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

1  Furthermore, in this case, Dr. Sawyer specifically admitted that he had no information about any

2  chemical or environmental exposures Plaintiff may have experienced for the first twenty-five years

3  of his life.  Stekloff Decl. Ex. 2, Sawyer *Alvarez Calderon* Dep. at 34:1-35:17.  These represent just

4  some of the many examples in these cases (and in other Roundup cases) of Dr. Sawyer's

5  unwillingness or inability to testify about other potential causes and confounding factors of a

6  plaintiff's NHL.   Dr. Sawyer cannot properly reach an opinion on specific cause without

7  considering all of Plaintiff's individual circumstances, such as whether his NHL might be

8  attributable to some factor other than Roundup.  *See, e.g., Marmo*, 457 F.3d at 758 (affirming

9  district court's exclusion of toxicologist where toxicologist "did not exclude confounding factors,

10 which 'leaves open the possibility of competing causes of the disease' and raises questions about

11 the competency of expert testimony.")

12      In sum, there is nothing "specific" about Dr. Sawyer's specific causation opinion.  His

13 methodology consists of simply counting days of exposure and comparing them to data plucked

14 from epidemiology studies he is not qualified to analyze.  Thus, any specific causation opinion he

15 attempted to offer would be based on nothing more than his say-so, and should be excluded.

16 **III.    The Court Should Exclude Dr. Sawyer's Opinions Regarding the George Study.**

17      The George study was a small mouse study that, in relevant part, was designed to determine

18 if glyphosate *initiated* tumors or if it *promoted* tumors generated by a known tumor initiator.   It

19 concluded that glyphosate "*failed* to provoke neoplastic development when tested as tumor initiator

20 or complete carcinogen," but did show "carcinogenic potential" as a tumor promotor.   Stekloff

21 Decl. Ex. 9, George 2010 at 954 (emphasis added).

22      The George study was evaluated by several major national and international agencies—

23 including the EPA and IARC—and was uniformly found by them to be an inadequate study for

24 scientific purposes:

25      &bull;  Stekloff Decl. Ex. 10, EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper:*

26         *Evaluation of Carcinogenic Potential* (Dec. 12, 2017) at 70 ("A number of studies were
           judged to be inadequate in protocol, conduct or reporting and were not considered in the

27         analysis of glyphosate . . . An initiation-promotion study (George et al., 2010) in male Swiss
           mice that tested a commercial formulation of glyphosate (41%) on the skin.   Study

28

- 14 -

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

1
2
deficiencies included small number (20) of animals, tested only males, and lack of histopathological examination.").

3
4
5
6
- Stekloff Decl. Ex. 11, IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans* (2015) at 32 ("Short duration of treatment, no solvent controls, and lack of any histopathological evaluation, Age at start, NR (mice weighed 12–15 g bw) The Working Group concluded **this was an inadequate study for the evaluation of glyphosate**." (emphasis added)).

7
8
- Stekloff Decl. Ex. 25, BAuA, Proposal for Harmonized Classification and Labeling: N (phosphonomethyl)glycine; Glyphosate (ISO), CLH Report for Glyphosate (2016) at 66 ("[George] cannot contribute to a decision on the classification of glyphosate.").[9]

9
10
11
12
13
14
15
Despite this consensus view rejecting the George study, Dr. Sawyer strays far into the realm of speculation by opining, based solely on that unreliable study, that Roundup promoted cancer in Plaintiff.  Stekloff Decl. Ex. 3, Sawyer *Alvarez Calderon* Rpt., at 38-42.  Moreover, Dr. Sawyer makes an unsupported speculative leap by inferring from a study of chemicals painted on mouse skin that Roundup can promote *NHL* in *humans.   See, e.g., Joiner*, 522 U.S. at 145 (excluding animal data where expert failed to adequately extrapolate to humans).

16
**IV.    The Court Should Exclude Dr. Sawyer's Opinions Regarding Trace Chemicals.**

17
18
19
20
21
Roundup contains trace amounts of certain chemicals.  EPA considers these chemical "impurities" to be safe because they are present at extremely low (i.e. "trace") levels.  *See, e.g.*, Stekloff Decl. Ex. 26, EPA, Proposed Interim Registration Review Decision Case No. 0178 (April 2019), at 10 (finding that glyphosate is not likely to be carcinogenic to humans despite noting that "[m]ost pesticide products contain substances in addition to the active ingredient . . . .").[10]  There is

22
23
---
[9] The BAuA is Germany's Federal Institute for Occupational Safety and Health.

24
25
26
27
28
[10] *See also* Ex. 28, Tr. of the Dep. of Charles Benbrook, *Hall, et al. v. Monsanto Co.,* No. 1622-CC01071 (Mo. Cir. Ct. St. Louis Cty. May 23, 2018) at 277:20-278:4 ("Q: Whether it's formaldehyde, NNG, dioxane or any other glyphosate-based herbicides, EPA has always determined that those impurities are below specified limits as far as you know, correct?  A: As far as I know, correct.  Q:  Is it your opinion that impurities found in glyphosate-based herbicides at levels below EPA certified limits can cause non-Hodgkin's lymphoma? A: I -- I have no -- no reason to believe that, and I would -- would find that unlikely . . ."); Ex. 29, Tr. of the Dep. of  Charles Benbrook, *Johnson v. Monsanto Co.,* No. CGC-16-550128 (Cal. Sup. Ct. S.F. Cnty. Feb. 9, 2018) at 560:22-561:7 ("Q: EPA has not determined that the level of impurities in
*(Footnote continued)*

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

1    no scientific evidence of causation linking these trace chemicals to NHL at doses remotely

2    comparable to those at issue here; indeed, Dr. Sawyer does not even calculate the dose of these

3    chemicals to which Plaintiff was allegedly exposed.  And Dr. Sawyer has pointed to absolutely no

4    scientific evidence suggesting that exposure to Roundup is a cancer risk *because of these trace*

5    *chemicals.*

6         Dr. Sawyer nevertheless intends to offer unsupported testimony that such trace levels of

7    these chemicals (assuming they were even present in the particular bottles of Roundup allegedly

8    used by Plaintiff) are carcinogenic *and* that these trace chemicals caused or contributed to Plaintiff's

9    cancer.  This testimony is designed solely as a sideshow to distract, confuse, and provoke fear in the

10   jury.  At the most recent trial, Dr. Sawyer implied, without any scientific evidence, that trace

11   ingredients in Roundup could kill a person upon opening the Roundup bottle.  Stekloff Decl. Ex. 27,

12   Tr. of Proceedings, Testimony of Dr. William R. Sawyer, *Pilliod v. Monsanto Co.,* No. RG-

13   170862702 (Cal. Sup. Ct. Alameda Cnty. Apr. 11, 2019) at 3131:6-3132:16 ("A: [Ethylene oxide] is

14   a sterilization gas.  It kills every type of biological life on earth . . . if I had a little air in the bottle,

15   as one of our jurors has sitting there, that over time that air in the bottle, the ethylene oxide would

16   accumulate in that air space.  Q: . . .  So this actually has Roundup that's been sitting in here for a

17   while.  If I were to open up this cap, what would happen?  A:  There would be ethylene oxide

18   escaping from that head space.").  Dr. Sawyer's unsupported comments on these trace chemicals are

19   entirely speculative, inappropriate, and inadmissible.  *See Guidroz-Brault v. Missouri Pacific R.*

20   *Co.*, 254 F.3d 825, 829 (9th Cir. 2001) ("Rule 702 requires that expert testimony relate to scientific,

21   technical, or other specialized knowledge, which does not include unsupported speculation and

22   subjective beliefs.").[11]

23

24   _____

     glyphosate formulations is an issue of toxicological concern, right? . . . THE WITNESS: I agree with that.
25   Yes. The answer is yes.").

26   [11] Furthermore, Dr. Sawyer's opinions regarding trace chemicals will not assist the trier of fact and require
     exclusion for that reason.  *See Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 398 (9th Cir. 1982)
27   (noting that it would be "well within the discretion of the trial judge to exclude" expert opinions that would
     not be "of any real assistance to the trier of fact.").  The jury will not be aided by Dr. Sawyer's comments
28   regarding trace chemicals alleged to be found in Roundup at unspecified quantities because—absent any

                                                                                          *(Footnote continued)*
     _____
                                              - 16 -
     MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

1  **V.     The Court Should Exclude Dr. Sawyer's Opinions on Monsanto Company Documents**
2          **and Regulatory Duties.**

3          Dr. Sawyer also intends to offer inadmissible expert testimony on Monsanto company

4  documents and Monsanto's regulatory duties.  This proffered testimony is beyond Dr. Sawyer's

5  area of expertise and beyond the realm of proper expert testimony.  *See* Sawyer Deposition in

6  *Harris* at 11:1-9 (admitting that he is not a regulatory expert).

7          Having an expert narrate company documents, under the guise of explaining terminology, is

8  improper expert testimony because it invades the province of the jury.  *See Sanchez v. Boston Sci.*

9  *Corp.*, No. 2:12-CV-05762, 2014 WL 4851989, at *32 (S.D. W. Va. Sept. 29, 2014) ("The majority

10 of this section of Dr. Slack's report is simply a narrative review of corporate documents, which is

11 not helpful to the jury."); *City of New York v. FedEx Ground Package Sys., Inc.*, No. 13 Civ. 9173

12 (ER), 2018 WL 2941455, at *4 (S.D.N.Y. Oct. 10, 2018) (excluding expert opinion where expert

13 "relied on the same types of evidence that a jury traditionally relies upon to answer the sort of

14 questions that a jury traditionally answers.").  Moreover, even a properly qualified expert may not

15 opine as to the intent, motive, or state of mind of a corporation or its officers, because that would

16 substitute the expert's judgment for the jury's.  *See, e.g.,* ., *Oracle America Inc., et al. v. Hewlett*

17 *Packard Enterprise Co.*, No. 16-cv-01393-JST, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11, 2018)

18 ("Courts routinely exclude as impermissible expert testimony as to intent motive, or state of mind"

19 because such testimony "would be merely substituting the expert's judgment for the jury's . . ."

20 (quotations and citations omitted)).  Accordingly, Dr. Sawyer should be precluded from offering

21 any opinions related to Monsanto company documents or Monsanto's supposed state of mind.

22         Relatedly, Dr. Sawyer is not qualified to opine on the ultimate issue of the adequacy of

23 Roundup's EPA-regulated labeling.  He has never drafted the labeling for an herbicide.  *See*

24 Stekloff Decl. Ex. 6, 2/6/19 Sawyer *Pilliod* Dep. at 337:7-11.  He has never been asked by EPA or

25 any other regulator to opine on the contents of a label for an herbicide.  *Id.* at 337:22-338.  And he

26

27 evidence regarding whether those chemicals are capable of causing NHL (and at what dose)—there is a great
28 danger of the jury being misled at trial by irrelevant testimony and Dr. Sawyer's histrionics.

- 17 -
MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

has never been invited by EPA to advise on labeling.  *Id.* at 338:3-6.  He is unqualified to offer any opinions about Monsanto's compliance with EPA regulatory requirements, and accordingly, any such opinions should be excluded. [12]

## **CONCLUSION**

For the reasons set forth above, the Court should grant Monsanto's Motion to Exclude Testimony of Dr. William Sawyer.

---

[12] In other cases, Dr. Sawyer has deferred opinions on these topics to other experts, admitting that they are outside his area of expertise.  *See* Stekloff Decl. Ex. 30, Deposition of Dr. Sawyer in *Hall* (8/23/2018) at 76:25-77:4; 82:20-82:25.

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

1    DATED: December 27, 2019                    Respectfully submitted,

2                                                */s/ Brian L. Stekloff*

3                                                Brian L. Stekloff (*pro hac vice*)
                                                 (bstekloff@wilkinsonwalsh.com)
4                                                Rakesh Kilaru (*pro hac vice*)
                                                 (rkilaru@wilkinsonwalsh.com)
5                                                WILKINSON WALSH + ESKOVITZ LLP
                                                 2001 M St. NW, 10th Floor
6                                                Washington, DC 20036
                                                 Tel: 202-847-4030
7                                                Fax: 202-847-4005

8                                                Pamela Yates (CA Bar No. 137440)
                                                 (Pamela.Yates@arnoldporter.com)
9                                                ARNOLD & PORTER KAYE SCHOLER
10                                               777 South Figueroa St., 44th Floor
                                                 Los Angeles, CA 90017
11                                               Tel: 213-243-4178
                                                 Fax: 213-243-4199
12

13                                               Eric G. Lasker (*pro hac vice*)
                                                 (elasker@hollingsworthllp.com)
14                                               HOLLINGSWORTH LLP
                                                 1350 I St. NW
15                                               Washington, DC 20005
                                                 Tel: 202-898-5843
16                                               Fax: 202-682-1639

17                                               Michael X. Imbroscio (*pro hac vice*)
18                                               (mimbroscio@cov.com)
                                                 COVINGTON & BURLING LLP
19                                               One City Center
                                                 850 10th St. NW
20                                               Washington, DC 20001
                                                 Tel: 202-662-6000
21

22                                               Attorneys for Defendant
                                                 MONSANTO COMPANY
23

24

25

26

27

28

---

- 19 -

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

1

**CERTIFICATE OF SERVICE**

2        I HEREBY CERTIFY that on this 27th day of December, 2019, a copy of the foregoing was

3   filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all

4   appearing parties of record.

5                              */s/ Michael X. Imbroscio*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS