# EXHIBIT 2

1              UNITED STATES DISTRICT COURT

               NORTHERN DISTRICT OF CALIFORNIA

2

     IN RE: ROUNDUP PRODUCTS      § MDL No. 2741

3    LIABILITY LITIGATION         § Case No. 3:16-md-02741-VC

     _____ §

4                                 §

                                  §

5    This document relates to:    §

                                  §

6    Alvarez Calderon v. Monsanto §

     Company                      §

7    Case No. 3:19-cv-01630       §

     _____ §

8

9                    - - -

10           Saturday, December 21, 2019

11                   - - -

12

13       Videotaped deposition of WILLIAM R. SAWYER,

14   Ph.D., held at South Seas Resort, 5400 Plantation

15   Road, Captiva, Florida 33924, commencing at

16   8:40 a.m., on the above date, before Susan D.

17   Wasilewski, Registered Professional Reporter,

18   Certified Realtime Reporter, Certified Realtime

19   Captioner, Florida Professional Reporter

20                   - - -

21           GOLKOW LITIGATION SERVICES

22       877.370.3377 ph | 917.591.5672 fax

23               deps@golkow.com

24

25

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1    APPEARANCES:

 2       GOLDBERG & OSBORNE

         BY:  DAVID J. DIAMOND, ESQUIRE

 3            ddiamond@goldbergandosborne.com

         698 East Wetmore Road, Suite 200

 4       Tucson, Arizona 85705

         Phone:  (520) 620-3975

 5       Representing Plaintiff

 6

 7

 8       WILKINSON WALSH & ESKOVITZ

         BY:  MAX J. WARREN, ESQUIRE

 9            mwarren@wilkinsonwalsh.com

              HAYTER L. WHITMAN, ESQUIRE

10            hwhitman@wilkinsonwalsh.com

         2001 M Street, NW, 10th Floor

11       Washington, D.C. 20036

         Phone: (202) 847-4000

12       Representing Defendant Monsanto Company

13

14

15    ALSO PRESENT:

16       MATTHEW ALLISON, Videographer

17

18

19

20

21

22

23

24

25
```

William R. Sawyer, Ph.D.

```
 1                        - - -

 2                      I N D E X

 3                        - - -

 4   Testimony of:  WILLIAM R. SAWYER, Ph.D.          Page
```

```
 5        DIRECT EXAMINATION BY MR. WARREN............  6

 6        CROSS-EXAMINATION BY MR. DIAMOND............ 144

 7        REDIRECT EXAMINATION BY MR. WARREN......... 152
```

```
 8

 9

10                  E X H I B I T S

11             (Attached to transcript)

12    WILLIAM R. SAWYER, Ph.D., DEPOSITION EXHIBITS   PAGE
```

```
13   Exhibit 1    Monsanto Company's Amended Notice to    7

                  Take Oral and Videotaped Deposition

14                of Dr. William Sawyer

15   Exhibit 2    December 12, 2019 Report                18

                  Toxicology Consultants & Assessments

16                Specialists, LLC

17   Exhibit 3    Second Amended Plaintiff Fact Sheet     55

18   Exhibit 4    Non-Exempt Performance Evaluation       55

                  Trinchero Family Estates

19                Confidential-Calderon-JCalderon-SHFV

                  -HR-000042 and 43

20

     Exhibit 5    Transcript of the Videotaped            60

21                Deposition of Jaime Alvarez

                  Calderon, Thursday, July 18, 2019

22

     Exhibit 6    October 25, 2019 Report                 64

23                The Cohen Group
```

```
24

25
```

1                        E X H I B I T S

2                    (Attached to transcript)

3     WILLIAM H. SAWYER, Ph.D., DEPOSITION EXHIBITS     PAGE

4     Exhibit 7     Article:  The dose-response              117

                    relationship between tobacco smoking

5                   and the risk of lymphomas: A

                    case-control study

6                   Martina Taborelli, et al.

7     Exhibit 8     Expert Report of Clayton Smith, M.D.   112

                    Cover page:  "Exhibit 6"

8

      Exhibit 9     Household Products Database             138

9                   US Department of Health & Human

                    Services

10                  Chemical Name:  Formaldehyde

11    Exhibit 10    Household Products Database             141

                    US Department of Health & Human

12                  Services

                    Chemical Name:  Ethylene oxide

13

14

15

16

17

18

19

20

21

22

23

24

25

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

1                    - - -

2              THE VIDEOGRAPHER:  Good morning.  We are now

3         on the record.  My name is Matthew Allison.  I am

4         a videographer for Golkow Litigation Services.

5         Today's date is December 21st, 2019, and the time

6         is 8:40 a.m.

7              This video deposition is being held in

8         Captiva, Florida, in the matter of

9         Alvarez Calderon vs. Monsanto Company, taken in

10        the United States District Court, Northern

11        District of California.  The deponent is

12        Dr. William Sawyer.

13             Will all counsel please identify themselves

14        for the record.

15             MR. DIAMOND:  David Diamond for the

16        Plaintiff.

17             MR. WARREN:  Max Warren from Wilkinson Walsh

18        & Eskovitz on behalf of Monsanto.

19             MR. WHITMAN:  Hayder Whitman also from

20        Wilkinson Walsh, also on behalf of Monsanto.

21             THE VIDEOGRAPHER:  The court reporter is

22        Susan Wasilewski and will now swear in the

23        witness.

24             THE COURT REPORTER:  Do you solemnly swear

25        or affirm the testimony you're about to give will

William R. Sawyer, Ph.D.

1       be the truth, the whole truth, and nothing but

2       the truth?

3            THE WITNESS:  Yes.

4            THE COURT REPORTER:  Thank you.

5            WILLIAM SAWYER, Ph.D., called as a witness

6    by the Defendant, having been duly sworn, testified

7    as follows:

8                      DIRECT EXAMINATION

9    BY MR. WARREN:

10       Q.   Good morning, Dr. Sawyer.

11       A.   Good morning.

12       Q.   Would you please introduce yourself for the

13   record?

14       A.   William Robert Sawyer.

15       Q.   And I know you've been deposed numerous

16   times in related cases, so I don't think we need to

17   go through all the initial formalities.  Would you

18   agree with me?

19       A.   Yes.

20       Q.   Is there anything preventing you today from

21   providing accurate and honest testimony?

22       A.   No.

23       Q.   And last point on the matter:  You

24   understand when I refer to "this case," I'm

25   referring to the case of Mr. Jaime Alvarez Calderon?

William R. Sawyer, Ph.D.

```
 1       A.   Yes.

 2       (Sawyer Exhibit 1 was marked for identification.)

 3     BY MR. WARREN:

 4       Q.   I'm handing you what's been marked as

 5     Exhibit 1 to your deposition, which is the notice in

 6     Mr. Alvarez's case.  Have you seen this document

 7     before?

 8       A.   Yes.

 9       Q.   Did you bring any documents with you today

10     in connection with this request?

11       A.   Yes.

12       Q.   What did you bring?

13       A.   CV; trials and depositions the past four

14     years; an e-mail from Kathy Hampton of the Goldberg

15     & Osborne law firm; Sawyer Report, December 12,

16     2019; Roundup label for Roundup Pro Concentrate

17     dated 2006, along with an image of the jug;

18     deposition notice for today; the Second Amended

19     Plaintiff Fact Sheet for Mr. Alvarez; expert report

20     of Dr. Andreadis, MD, clinical epidemiology

21     certified; this is a copy of a study that's been

22     used in other depositions by George, et al.; and

23     also the October 25th, 2019, report from Mr. Cohen.

24       Q.   Okay.  And is that all you brought today?

25       A.   Yes.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

```
 1        Q.   You referenced your CV.  Has that CV been

 2   updated since you completed your report in this

 3   case?

 4        A.   No.

 5        Q.   How much time have you spent working on

 6   Mr. Alvarez' case?

 7        A.   I don't know.  I haven't tallied up the

 8   slips and prepared an invoice yet.

 9        Q.   So I take it you haven't billed all of your

10   time in Mr. Alvarez's case thus far?

11        A.   No, no, I have not.

12        Q.   All the hours that you've worked, are they

13   at your standard billing rate?

14        A.   Yes.

15        Q.   And you did not bring any invoices with you

16   today, right?

17        A.   No.  I have not produced one yet.  I will so

18   -- will do so in the near future.

19        Q.   And we just request that when you do produce

20   those invoices, that they are produced to us as

21   well.

22             When did you first begin working on

23   Mr. Alvarez's case?

24        A.   Early November of 2019.

25        Q.   Do you have any more clarity other than
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1    early November?

 2        A.   Could be as late as mid November.

 3        Q.   Do you have any sense of whether it was

 4    before or after November 8th?

 5        A.   I have a -- let's see.  I have an e-mail

 6    from Kathy Hampton dated November 21st, and I can

 7    state with this document that at that time documents

 8    were being provided to me.

 9        Q.   And is that the first time you were

10    contacted about Mr. Alvarez's case?

11        A.   It could have been a few days earlier.

12        Q.   Was --

13        A.   It could have been mid November.

14        Q.   Was Ms. Hampton the first person to contact

15    you about Mr. Alvarez's case?

16        A.   No.

17        Q.   Who was?

18        A.   Attorney David Diamond.

19        Q.   And when you were first contacted by

20    Mr. Diamond, what were you asked to do in this case?

21        A.   To assess the matter and determine whether

22    or not Mr. Alvarez received a significant and

23    substantial dosage of Roundup, and whether there

24    were confounding factors that caused his disease,

25    that is his NHL.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

1    Q.   Anything else?

2    A.   That's about all I recall from our call.

3    Q.   So the two points I got here, to kind of sum

4  it up, is first whether there was significant

5  substantial dosage to cause Mr. Alvarez's -- or

6  significant substantial dosage of Roundup, correct?

7    A.   Yes, that would be in the range --

8    Q.   And the second thing -- sorry.

9    A.   -- in the range with causation.

10    Q.   And the second thing was whether there were

11  confounding factors?

12    A.   Yes.

13    Q.   Are those the same two issues that you have

14  looked into for other reports in this Monsanto

15  litigation that you've worked on?

16    A.   Yes.

17    Q.   So your primary task in this case was no

18  different than the other reports you've done in this

19  Monsanto litigation?

20        MR. DIAMOND:  Form.

21    A.   Correct.  I have assessed ADME mechanisms,

22  genotoxicity promotion, exposure quantities on

23  various parts of the body, personal protective

24  equipment effectiveness, et cetera.

25    Q.   And did you meet with Mr. Alvarez's counsel

William R. Sawyer, Ph.D.

```
 1    in preparing for today?

 2         A.   I met with Attorney David Diamond this

 3    morning for maybe 35 minutes or so.

 4         Q.   Is that the first time you've met with him?

 5         A.   Yes.

 6         Q.   Have you spoken with him over the phone in

 7    the past?

 8         A.   Yes, maybe -- maybe twice total.

 9         Q.   Can you roughly recall when those times

10    were?

11         A.   Yeah.  One was the initial call that I just

12    explained.

13         Q.   Uh-huh.
```



William R. Sawyer, Ph.D.



REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.





William R. Sawyer, Ph.D.



REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.



William R. Sawyer, Ph.D.

```
 1      Q.   Did you speak with anyone else in

 2   preparation for today's deposition?

 3      A.   No.

 4      Q.   Did you speak with any of the other experts

 5   in this case?

 6      A.   No, not in conjunction with this specific

 7   case, no.

 8    (Sawyer Exhibit 2 was marked for identification.)

 9   BY MR. WARREN:

10      Q.   I have what is marked as Exhibit 2 to your

11   deposition, which is your report in Mr. Alvarez's

12   case.  I understand you have it on your computer.

13   Would you like a hard copy as well?

14      A.   I have a annotated version of it here, so

15   that's fine.

16        MR. DIAMOND:  I'll be leaving more paper

17     behind again.

18      A.   It's generally faster for me to respond to

19   questions using the computer.

20      Q.   And that's fair.  I understand that.  It is

21   a long report.  This is your report in Mr. Alvarez's

22   case, though?

23      A.   Yes.

24      Q.   Did you prepare the report yourself?

25      A.   Yes.
```

William R. Sawyer, Ph.D.

```
 1        Q.   Does it contain all of the opinions that you

 2    intend to offer in Mr. Alvarez's case?

 3        A.   Looking at the notice on --

 4        Q.   And I may be able to help.  What are you

 5    looking for here?

 6        A.   Page 134, item Number 1, in this case and in

 7    previous cases I've reviewed the report of

 8    Mr. Cohen, and I do have concerns regarding breach

 9    of generally accepted methodology and erroneous

10    understandings of facts in the case, such as the

11    amount of glyphosate pro that is mixed with three

12    gallons of water.

13        Q.   When did you review the report of Mr. Cohen?

14        A.   The report in this case -- and again, I've

15    reviewed several of his reports in the Monsanto

16    cases, but in this most recent case I would

17    approximate the third week of November.

18        Q.   So you reviewed Mr. Cohen's report prior to

19    completing your own report in this case?

20        A.   Prior to but during the -- during the time I

21    was writing this report, yeah.

22        Q.   And you chose not to include that in your

23    list of materials that you relied upon, correct?

24        A.   Well, I intended to cover it in Number 1 as

25    far as the --
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

```
 1        Q.   I understand.  And by Number 1, you're

 2   referring to what appears to be a list of deposition

 3   testimony in other cases that are not the Alvarez

 4   case, correct?

 5        A.   Right, where I've discussed Cohen's report.

 6   It's the same problem as in the past.  He uses a

 7   unrecognizable methodology and uses animal studies

 8   to compare human doses to, and a number of different

 9   things I've discussed in prior depositions which are

10   problematic in the current matter as well.

11        Q.   And you did not list on the final page of

12   your report, page 154, you did not list under New

13   Materials Relied on Specific to Alvarez, you did not

14   list any of Mr. Cohen's reports, right?

15        A.   No.

16        Q.   And the report itself, it doesn't mention

17   Mr. Cohen's work?

18        A.   Correct.

19        Q.   Your report?

20        A.   Right.  I brought his report and I've

21   highlighted areas of concern.

22        Q.   Are you intending to update your report

23   based on your areas of concern about Mr. Cohen's

24   work?

25        A.   No.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
1        Q.    You understand that you are providing

2    specific causation opinions in this case?

3        A.    Specific with respect to a toxicologist,

4    yes.

5        Q.    And I should say specific to Mr. Alvarez?

6        A.    Yes, but my specific causation opinions do

7    not cover all aspects that the oncologists will be

8    covering.

9        Q.    I understand.  I'm here trying to clarify

10   the difference between specific and general

11   causation.  Do you understand the difference between

12   the two?

13       A.    Yes.  My specific causation, one is to

14   assess the exposure dose based on the human

15   epidemiologic evidence and determine whether or not

16   Mr. Alvarez's exposures were within the range of

17   that in the generally accepted peer-reviewed

18   epidemiological studies, and his specific causation

19   assessment --

20       Q.    And what is your --

21       A.    Let me finish.

22       Q.    Okay.  Sorry.  I thought you were completed.

23       A.    My specific causation assessment also

24   assesses, as I said earlier, ADME (absorption,

25   distribution, metabolism and excretion), mechanistic
```

William R. Sawyer, Ph.D.

```
 1    studies, and assessing the studies based on dose

 2    response, consistency with other studies, coherence

 3    demonstrated by molecular based studies, such as in

 4    humans and animals.  Of course, that includes

 5    genotoxicity promotion, and when I say specific

 6    causation, that is whether or not the dose in these

 7    studies are consistent with that received by

 8    Mr. Alvarez.

 9        Q.   And, Dr. Sawyer, I don't mean to cut you

10    off.  This is helpful background.  My question more

11    specifically is you are aware of the difference

12    between general and specific causation, right?

13        A.   Right.  I mean, the specific causation

14    aspects I'm covering are specific to Mr. Alvarez,

15    his applications, that is how he was exposed,

16    whether or not it made it into his body

17    systemically.  That's based upon PPE, personal

18    protective equipment, numerous studies in terms of

19    the amount of dermal exposure on the clothing versus

20    how much is absorbed through the clothing, many

21    different factors that are really specific to

22    Mr. Alvarez based on his amount of spraying, how he

23    applied it, the use of a backpack, whether he

24    sprayed it on fences at elevated levels.  There is

25    numerous areas that are specific to Mr. Alvarez.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1       Q.   And thank you.  We will get to all the areas

 2    specific to Mr. Alvarez.  I just want to establish

 3    some background points here before we do that.

 4            Now, if you can turn to page 133 of your

 5    report, which I believe is your conclusion, and is

 6    it correct to say that you're concluding that

 7    Roundup was a substantial contributing factor to

 8    Mr. Alvarez's development and diagnosis of

 9    non-Hodgkin's lymphoma?

10       A.   Yes.  You didn't actually let me finish my

11    explanation on specific causation with respect to

12    Table 1 in my report.

13       Q.   And we will get to Table 1 in your report

14    and talk about it extensively.

15       A.   All right.  But the point is that I did

16    assess the carcinogenicity of other substances to

17    which he may have been exposed in a sense of ruling

18    out.  As a toxicologist, you either rule in or rule

19    out other sources, including radiological exposures

20    and chemical exposures to other products, to

21    alcohol, tobacco, et cetera.

22       Q.   Thank you.  But again, going back to my

23    question now, and let's just continue trying to

24    focus on the questions that I'm asking, is it your

25    conclusion in Mr. Alvarez's case that Roundup was a
```

William R. Sawyer, Ph.D.

1    substantial contributing factor to his development

2    and subsequent diagnosis of non-Hodgkin's lymphoma?

3        A.    Yes, it was.  His eight-hour exposure days

4    was in the extreme high end of study data, well

5    above the thresholds associated with NHL among human

6    applicators, and I also found no other historic

7    exposures of pharmaceuticals or other factors or

8    other chemicals that could explain his development

9    of NHL.

10       Q.    And you intend to tell the jury that Roundup

11   is a substantial contributing factor in

12   Mr. Alvarez's NHL?

13       A.    Yes.

14       Q.    Now, you mentioned Dr. Cohen's report.  I

15   just want to make sure it's clear.  Did you read

16   Dr. Cohen's report in the Alvarez case?

17       A.    Yes, and I have with me -- I made highlights

18   of areas of concern.

19       Q.    And Dr. Cohen's report is about dermal

20   absorption, right?

21             MR. DIAMOND:  Form.

22       A.    In part.

23             MR. DIAMOND:  It's Mr. Cohen, right?

24             MR. WARREN:  Sorry.

25       Q.    What is dermal absorption?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1        A.   That's defined as the quantity of topically

 2   applied substance that penetrates the outer keratin

 3   layer and epidermis and reaches the lymphatic and

 4   blood vasculature of the dermis resulting in

 5   systemic absorption and circulation of the drug or

 6   chemical substance.

 7        Q.   And in this question I'm not asking what

 8   your conclusions are.  I just want to know are there

 9   parts of your report in Mr. Alvarez's case that are

10   about dermal absorption?

11        A.   Yes.

12        Q.   And are there parts of your report that

13   cover other topics outside of how you define dermal

14   absorption?

15        A.   I don't understand that question.

16        Q.   Do you, in addition to dermal absorption, do

17   you also address other issues in your report?

18        A.   Certainly.  I'm a toxicologist.

19        Q.   I understand.  And I guess this is a good

20   time to ask that question.  What is toxicology?

21        A.   The science and study of the determination

22   of adverse effects of chemicals, pharmaceuticals and

23   other substances on the body.

24        Q.   Okay.  And in your report, everything you

25   provided is to a reasonable toxicological certainty?
```

William R. Sawyer, Ph.D.

```
 1      A.   Yes.

 2      Q.   What does that term, "reasonable

 3  toxicological certainty," mean to you?

 4      A.    More probable than not, and having assessed

 5  that determination based on generally accepted

 6  methodology, Bradford Hill criteria and weight of

 7  evidence, including such factors as dose response,

 8  statistical significance, coherence consistency,

 9  latent period, animal models, and other factors that

10  are generally recognized in toxicological causation.

11      Q.   And to be clear, it's still the case today

12  that everything in your report is to a reasonable

13  toxicological certainty?

14           MR. DIAMOND:  Form.

15      A.   Yes.

16      Q.   Are you board certified in toxicology?

17      A.   No.

18      Q.   Do you have any board certifications?

19      A.   No.

20      Q.   Did you perform a differential diagnosis in

21  this case?

22      A.   Yes.

23      Q.   What did your differential diagnosis entail?

24  And sorry, that was a vague question.  I can

25  rephrase.
```

William R. Sawyer, Ph.D.

```
1              We don't have to get into the results or

2     your findings, but process, in terms of the process,

3     what was your differential diagnosis in this case?

4         A.    Number one, as a toxicologist who has

5     completed pathology through medical school

6     curriculum, review the medical records and determine

7     the actual diagnosis and review the actual pathology

8     report, confirming that it was actually stage 4

9     DLBCL.

10             Secondly, review the family history, as well

11    as the occupational history, for potential

12    information on other chemical substances,

13    radiological exposures, chemical exposures.

14             Also review and assess the history of

15    tobacco, alcohol, and drug use, ███████████████

      ████████████████████████████████████████████

      ████████████████████████████████████████████

      ████████████████████████████████████████████

      ████████████████████████████████████████████

      █████████

21        Q.    Would it be Taborelli?

22        A.    Tab -- yeah, Taborelli -- with respect to

23    whether or not the ███████████████ was a potential

24    contributing factor, and certainly very carefully

25    assess the exposure factors of Mr. Alabama to the
```

William R. Sawyer, Ph.D.

1    actual Roundup, including the type of Roundup used.

2         And then also, chemical by chemical, assess

3    other historical products that he has used, such as

4    Miracle-Gro and two-cycle engine oil, et cetera, and

5    also then determine his exposure potential based

6    upon the peer-reviewed studies, that is based on the

7    personal protective equipment he used while

8    spraying, and also determine, based on the history,

9    the exposure history by season over the years and

10   the frequency and duration of Roundup use, and

11   calculate and convert his use into eight-hour

12   exposure days and compare that to the human

13   epidemiologic studies of Roundup applicators and

14   determine whether or not he was in the range

15   exceeding those thresholds in the studies that are

16   equated with statistically significant increased

17   rates of NHL.

18        I've also assessed the NHL latency period to

19   be certain that the latency period was sufficiently

20   long, and also in the differential diagnosis,

21   provide a final opinion as to whether or not his

22   exposure was a substantial contributing factor to

23   his NHL and do that in the mean -- in the --

24   following the methodology of differential diagnosis

25   of all those other parameters I just named.

William R. Sawyer, Ph.D.

1      Q.    Thank you.  Did you meet with Dr. Alvarez --

2      or sorry.

███  ████████████████████████████████████

███  ████████████████████████

███  ██  ██  ██████████████████████████

███  ████████████████████████████████████

███  ██████████████████████████████████

███  ████████████████████

███  ██  ██████████████████████████████

███  ████████████████████████████

███  ██  ██████████████████████████████

███  ██████████████████████████████████████

13      Q.    Did you speak to any of Mr. Alvarez's

14      doctors in forming your report in this case?

15      A.    No, but I did read the report issued by

16      Dr. Andreadis, A-n-d-r -- A-n-d-r-e-a-d-i-s.

17      Q.    You did not speak to any of the doctors

18      independently?

19      A.    No, no.  I reviewed his report.

20      Q.    Did you review any of Mr. Alvarez's

21      employment records?

22      A.    Only the information as found in his

23      deposition and Plaintiff Fact Sheets.

24      Q.    I understand.  My question is whether you

25      reviewed any of the records from his employer?

William R. Sawyer, Ph.D.

```
 1      A.   I didn't see any records from his employer
 2   to review.
 3      Q.   Does that mean they were not provided to
 4   you?
 5      A.   I believe that's the case.
 6      Q.   Where did Mr. Alvarez work?
 7      A.   Depending on -- well, what year?
 8      Q.   That's a fair question.  Did Mr. Alvarez
 9   work at Sutter Home Winery?
10      A.   He did.  He first started as a dishwasher at
11   the Silverado Country Club in Napa Valley and worked
12   his way up at Sutter Home as he worked there briefly
13   as a dishwasher.  Then -- I'm sorry, not dishwasher,
14   but bottle washer, and then moved up to landscaping
15   and ultimately became a supervisor.
16      Q.   Thank you.  That's helpful background.
17   Again, I think it will be helpful, especially given
18   the time limits in this deposition, if you really
19   focus on just answering the questions that I'm
20   asking.
21      A.   Okay.  I'll do that.  Thank you.
22      Q.   And so as an example, the question there was
23   did Mr. Alvarez work at Sutter Home Winery?
24      A.   Yes.
25      Q.   Thank you.  Have you ever visited Sutter
```

William R. Sawyer, Ph.D.

```
 1    Home Winery?

 2        A.   No, not Sutter Home.  I've been to some

 3    other nearby wineries but not that one.

 4        Q.   Have you seen any pictures of any of the

 5    various Sutter Home properties at which Mr. Alvarez

 6    worked?

 7        A.   I did see some overhead aerial photos, yes.

 8        Q.   And we already discussed Mr. Cohen's report

 9    in the Alvarez case as one document that you would

10    like to add to your reliance list.  Is there

11    anything else that you would like to add to your

12    reliance list?

13        A.   No.

14        Q.   Did you feel you had sufficient information

15    to form your opinion in this case?

16        A.   Yes.

17        Q.   Did you request any additional information

18    that you did not receive?

19        A.   No.

20        Q.   And much of this report is similar to other

21    reports you've filed in the Monsanto litigation,

22    right?

23        A.   Yes.

24        Q.   And this report doesn't even mention

25    Mr. Alvarez's name from page 20 until your final
```

William R. Sawyer, Ph.D.

```
 1    conclusion?

 2       A.   That's probably true.

 3       Q.   Much of it is just about Roundup and -- I

 4    should say Roundup generally?

 5       A.   General causation, yes.

 6       Q.   Much of your report, as you're saying, is

 7    general causation?

 8       A.   Yes.

 9       Q.   What is a -- and I may pronounce this

10    incorrectly.  I apologize.  What is a keratinocyte?

11       A.   Yeah.  A keratocyte is a very interesting

12    cell.  It begins -- excuse me -- in the epidermis

13    and as it ages, it moves outward to the skin surface

14    and it becomes compacted, it loses its original

15    configuration, and ultimately becomes what we call

16    keratin, which is a highly lipid-containing,

17    cholesterol-containing, dead cell which forms the

18    keratin of the skin, the most protective layer of

19    the skin, and eventually it's shed off from the

20    skin as --

21       Q.   Do you have any --

22       A.   -- as there is always new keratocytes

23    continually replacing the keratin layer.

24       Q.   Do you have any knowledge of Mr. Alvarez's

25    keratinocytes?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
1        A.   I'm not sure I understand the question.

2        Q.   Have you, to the extent it's possible, have

3    you seen Mr. Alvarez's keratinocytes?

4        A.   Are you asking if any pathology was

5    performed on his epidermis?  I'm not -- I don't

6    follow.

7        Q.   I guess my question is you reference

8    keratinocytes in your report, right?

9        A.   Yeah.

10       Q.   Do you have any knowledge as to how

11   Mr. Alvarez's keratinocytes may be different than

12   another person's?

13       A.   Well, no.  There is no reason to believe his

14   keratocytes would be any different than anyone

15   else's.  He had no malignancies of the skin that

16   were sufficient to change his dermal absorption.

17       Q.   Mr. Alvarez was born in Mexico, right?

18       A.   Yes.

19       Q.   Do you remember when he moved to the United

20   States?  Sorry.  It's not a memory test.  I can

21   speed things along.  Is it accurate to say that

22   Mr. Alvarez moved to the United States in 1979?  And

23   that's listed at page 4 of your report.

24       A.   Yes, he was -- he did, and he was in Mexico

25   from birth, 1954, to 1979.
```

William R. Sawyer, Ph.D.

1       Q.   So how old was he, roughly, when he moved to

2   the United States?

3       A.   Well, approximately 25, depending on the

4   month.

5       Q.   Do you have any information about

6   Mr. Alvarez's time in Mexico?

7       A.   No.

8       Q.   Do you know whether he worked while he was

9   there?

10       A.   No.

11       Q.   So, obviously, you wouldn't know where he

12   worked then?

13       A.   Correct.

14       Q.   Do you know whether he was exposed to any

15   chemicals?

16       A.   Unknown.

17       Q.   ███████████████████████████████████████

   ███   ██████████

   ███   ████   █████████████████████████████████████

   ███   █████████████████████████████████████████████

   ███   █████████.

22       Q.   So is it correct to say that you have no

23   opinion one way or the other about his time in

24   Mexico?

25       A.   What do you mean by time?  I know he was in

William R. Sawyer, Ph.D.

```
 1    Mexico over that period of time.
 2         Q.   I understand.  You have no opinions as it
 3    relates to Mr. Alvarez during that period of time
 4    for which he lived in Mexico?
 5         A.   Where he lived?
 6         Q.   Not where he lives.  Opinions about
 7    Mr. Alvarez during that period of time.
 8              MR. DIAMOND:  Form.
 9         A.   I can't -- it's such a general question, I
10    don't understand.
11         Q.   You provided a toxicological report, right?
12         A.   Yes.
13         Q.   Do you have any toxicological opinions about
14    Mr. Alvarez during the period of time from 1954 to
15    1979, when he lived in Mexico?
16         A.   No, I have no information on his residency
17    in Mexico.
18         Q.   If we could turn to page 13 of your report,
19    which is Table 2, this table is a summary of your
20    opinion of Mr. Alvarez's Roundup use?
21         A.   Yes.
22         Q.   Did you make this table?
23         A.   Yes.
24         Q.   What information did you use to create this
25    table?  And I don't want to cut you off but I may be
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1    able to speed things up here.  You already mentioned

 2    Mr. Alvarez's deposition as one thing you reviewed,

 3    right?

 4        A.   Yes.

 5        Q.   You also mentioned his Second Amended

 6    Plaintiff Fact Sheet, correct?

 7        A.   Yes.

 8        Q.   Other than those two things, is there any

 9    information that you used to create the information

10    that's in Table 2?

11        A.   Well, a third thing I did, I checked --

12    reviewed Mr. Cohen's report and discovered that I

13    was being even more conservative in my assessment

14    than Dr. Cohen in terms of underestimating the

15    exposure.

16        Q.   Now, you go through his frequency in the

17    third column, and that frequency is for different

18    periods of the year; is that right?

19        A.   Yes.  This table calculates the exposure in

20    eight-hour time-weighted exposure days.

21        Q.   Did you personally do anything to verify the

22    information that is in this table?

23        A.   Yes.  I attempted to set up an interview

24    with Mr. Alvarez.

25        Q.   You did not -- strike that.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

```
 1          And, unfortunately, through no fault of
 2   yours or Mr. Alvarez's, you were not able to have
 3   that interview, correct?
 4      A.   That's right.
 5      Q.   So all the information in Table 2 is based
 6   off of Mr. Alvarez's deposition, his Second Amended
 7   Plaintiff Fact Sheet, and, as you now say,
 8   Mr. Cohen's report?
 9          MR. DIAMOND:  Form.
10      A.   Not based on Mr. Cohen's report.  I stated
11   that I reviewed Mr. Cohen's report and discovered
12   that my exposure duration values were very
13   conservative and less than his.
14      Q.   Do you know whether Mr. Alvarez worked five
15   days a week, or is that an assumption that you made?
16      A.   I used two-and-a-half days per week in
17   Table 2 during the spring months, once per week
18   during the summer and fall, and zero during the
19   winter; a very conservative estimate.
20      Q.   I understand.  My question was how many days
21   per week he worked at Sutter Home.  So is it your
22   opinion today that Mr. Alvarez worked two-and-a-half
23   days at Sutter Home during the spring and once per
24   week in the summer and fall?
25      A.   With respect to spraying, yes.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

```
1        Q.   But his general employment at Sutter Home

2   was greater than that period of time?

3        A.   Yes.

4        Q.   And did you assume that he worked five days

5   per week?

6        A.   No.

7        Q.   How many days per week did he work?

8        A.   I didn't assess that.  I assessed his spray

9   frequency and duration.  I'm not about to guess at

10  how many days he worked per week.

11       Q.   And you say you assessed his spray frequency

12  and duration and you came up with, focusing on the

13  spraying, two-and-a-half days per week, right?

14       A.   Yes.  I used the midpoint range of three to

15  four hours per day as a conservative estimate, and

16  that's per his testimony, it was four hours, and --

17       Q.   And I'm asking you currently about the

18  column that's labeled "Frequency."  You say

19  two-and-a-half days per week, right?

20       A.   You interrupted my answer.

21       Q.   It appeared your answer was not related to

22  the question.

23            Now, how did you get to two-and-a-half days

24  per week?

25       A.   I used the midpoint range of three to four
```

William R. Sawyer, Ph.D.

```
 1    hours, which is explained earlier in the report, and

 2    used 3.5 hours, which is the midpoint between three

 3    to four hours, and two-and-a-half days per week was

 4    his testimony as a fact in the case of every other

 5    day, and every other day could be Monday, Wednesday,

 6    Friday, or it could be Tuesday, Thursday, so it

 7    averages out to 2.5 days a week.

 8       Q.   And that's based on an assumption that he

 9    worked five days per week?

10       A.   No, it's based on a fact in the case as he

11    said he sprayed every other day.  He didn't say how

12    many days he worked.

13       Q.   Dr. Sawyer, if he worked two days per week

14    and he sprayed every other day, how many days per

15    week did he spray?

16       A.   I don't know.  That's not what he said.  He

17    said he sprayed every other day.

18       Q.   I understand that and that wasn't my

19    question.  If he -- if he worked two days per week

20    and he sprayed every other day, how many days per

21    week did he spray?

22       A.   I don't know.  I didn't make that

23    calculation.  I stuck with the facts in the case.

24    I'm not about to make any guesswork during the

25    deposition today.
```

William R. Sawyer, Ph.D.

```
1       Q.   I understand.  You're saying that today you

2   cannot tell me what every other day of two days per

3   week is?

4       A.   No, that's very confusing.

5       Q.   You completed your report based on his --

6       A.   I notice Counsel is laughing.  No, it is.

7   What you're asking me doesn't make a lot of sense.

8   I used the facts in the case, that is his deposition

9   and Plaintiff Fact Sheet testimony, and I didn't try

10  to interpret that in any strange way.  He simply

11  said he sprayed every other day.

12      Q.   I understand.  In so doing, you made an

13  assumption as to how many days per week he worked,

14  didn't you?

15      A.   No, I did not.  He simply said he sprayed

16  every other day and that would be, as I say, a

17  Monday, Wednesday, Friday, or a Tuesday, Thursday.

18  I did not include weekends.

19      Q.   And when you did not include weekends, is

20  that based on information that he said in his

21  deposition or his Plaintiff Fact Sheet?

22      A.   As I recall, the Plaintiff's Fact Sheet did

23  indicate he worked full-time and he made X amount

24  per year and there was no information of him being a

25  part-time worker.
```

William R. Sawyer, Ph.D.

```
1         Q.   So you made the assumption that he worked

2    five days per week?

3         A.   Full-time, yes.

4         Q.   And full-time was an assumption on your part

5    of five days per week?

6         A.   Yes, but he sprayed every other day.

7         Q.   And how did you determine the frequency of

8    once per week in the summer and fall?

9         A.   He testified that he sprayed less during the

10   summer and fall.

11        Q.   Sorry.  Are you finished?

12        A.   Yes.

13        Q.   I don't want to cut you off.

14             So less in the summer and fall and you put

15   one day per week, right?

16        A.   Yes.

17        Q.   How did you get to one day per week?

18        A.   If he sprayed Tuesday, Thursday, that is

19   every other day, less than that would be one day per

20   week.  So I'm using a minimum --

21        Q.   So we are able to get to the bottom of every

22   other day of two days.  I understand you said if he

23   sprayed Tuesday and Thursday.  Where does that

24   information come from?

25        A.   That he said he sprayed every other day.  So
```

William R. Sawyer, Ph.D.

```
 1   on one week that would be a Monday, Wednesday,

 2   Friday.  The following week it would be a Tuesday,

 3   Thursday.

 4        Q.   Right.  And I'm focused now on the summer

 5   and fall intervals for which you say he sprayed once

 6   per week, right?

 7        A.   Yes.  That is less.  Less than would be --

 8   half of that would be one day a week as opposed to

 9   two days a week on a Tuesday, Thursday.

10        Q.   I understand that's less than.  Less than

11   two-and-a-half per week would also be once per

12   month, wouldn't it?

13        A.   Correct.

14        Q.   So you made the assumption that he sprayed

15   once per week during this interval?

16        A.   I did.

17        Q.   Thank you.  Now if we could turn to Table 3,

18   which is at page 13 of your report.  Do you have

19   that in front of you?

20        A.   Page 13?

21        Q.   Yeah.  Table █

22        A.   Yeah.

23        Q.   This is your calculation that Mr. Alvarez's

24   minimum exposure days, right?

25        A.   That's right.
```

William R. Sawyer, Ph.D.

1      Q.    You found that he was exposed for at least

2    546 days?

3      A.    At eight hours per day, yes.

4      Q.    This was your calculation of his minimum

5    exposure?

6      A.    Yes.

7      Q.    How did you get to this result?

8      A.    Two-and-a-half days per week is the

9    frequency, three-and-a-half hours duration.  Hours

10    per year would be 12-week intervals, that is there

11    is 12 weeks per month based on a 48-week calendar

12    year, which allows two weeks for holidays and

13    vacations.  So multiplying 2.5 times

14    three-and-a-half hours, times 12 weeks, equals 105

15    hours, over 31 years equals 3,255 hours, divided by

16    8 equals 406.9 exposure days.

17           So I should note even if I were to eliminate

18    the summer and fall, his exposure days would still

19    be 406.9.

20      Q.    And, I mean, as it says at the Footnote 31

21    as part of this table, you made assumptions about

22    the holidays and vacations for Mr. Alvarez?

23      A.    Yes, that it's unlikely he worked 52 weeks a

24    year.  I used a value of 48 weeks per year.

25      Q.    And as we just discussed, there were other

William R. Sawyer, Ph.D.

1    assumptions you made in forming this table as well,

2    such as part of the frequency?

3        A.   Yes.  In fact, I assumed that he sprayed

4    zero during the winter.

5        Q.   Is this table created to a reasonable

6    toxicological certainty?

7        A.   Yes, it is.  Based on the testimony, it

8    certainly is.  It's very conservative.

9        Q.   It's very conservative based on

10   Mr. Alvarez's Second Amended PFS and his deposition,

11   right?

12       A.   That's right.  I also note it's a smaller

13   value in terms of frequency and duration than

14   Mr. Cohen used.

15       Q.   When was Mr. Alvarez's Second Amended

16   Plaintiff Fact Sheet created?

17           MR. DIAMOND:  After his deposition, I think,

18       if you want to speed it up.

19       Q.   The Second Amended -- and as you're looking

20   for it, I can represent to everyone that it was

21   created on September 19th, 2019.

22           MR. DIAMOND:  I think his deposition was in

23       July.

24           MR. WARREN:  That's right.

25           MR. DIAMOND:  So it was --

William R. Sawyer, Ph.D.

```
 1      A.   9/19/2019 was his Plaintiff's Fact Sheet.

 2      Q.   Do you know who created that Plaintiff Fact

 3   Sheet?

 4           MR. DIAMOND:  I'm just going to object to

 5      form on that.

 6      A.   Jaime Alvarez Calderon.

 7      Q.   And just to make sure the record is clear,

 8   that's Jaime Alvarez Calderon?

 9      A.   I'm sorry?

10      Q.   Just to make sure the record is clear,

11   that's Jaime Alvarez Calderon, not Jamie.

12      A.   J-a-i-m-e.

13      Q.   Okay.  Do you know if anyone else created

14   that form with Mr. Alvarez?

15      A.   No, I wouldn't know.

16      Q.   You said you reviewed Mr. Alvarez's

17   deposition, right?

18      A.   Yes.

19      Q.   Based on that review of Mr. Alvarez's

20   deposition, do you think Mr. Alvarez was the only

21   person that created that Plaintiff Fact Sheet?

22      A.   I'm not sure.

23      Q.   Did you look at any of the other Plaintiff

24   Fact Sheets that Mr. Alvarez created in this case?

25   And I can just say this is the Second Amended
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

```
 1    Plaintiff Fact Sheet.  Did you look at any of the

 2    two prior ones?

 3        A.   It's possible.  Let me look at the document

 4    list.

 5        Q.   I can represent to you that at the end of

 6    your report you list Mr. Alvarez's Second Amended

 7    Plaintiff Fact Sheet and not any of the others.

 8        A.   I also looked at his PFS submitted and his

 9    first amended PFS submitted.

10        Q.   And what did you just read from in providing

11    that answer?

12        A.   My Monsanto Alvarez list of documents that I

13    have in this case.

14        Q.   And that's the list that's included with

15    your December 12th report?

16        A.   No.  No.  It's simply the actual files.  I

17    have two PDF files here.

18        Q.   So you have additional information in your

19    file of information that you considered in this case

20    that's not included in your reliance list in your

21    report?

22        A.   I'll read it to you.

23             MR. DIAMOND:  Form.

24        A.   I'll read you everything I have.

25        Q.   No, we don't need to do that.  I just -- the
```

William R. Sawyer, Ph.D.

```
1    question is a yes-or-no question.

2         Do you have additional information in your

3    file that you've considered in this case that's not

4    included in your reliance list?

5    A.   Well, I have the two Plaintiff Fact Sheets

6    that you're asking about.

7         MR. DIAMOND:  And my objection only is that

8         he disclosed what he's relying upon.  The fact

9         that he's looked at something but it isn't in his

10        list, he's telling you that he's looked at

11        something but it isn't necessarily something that

12        he relied upon.

13        MR. WARREN:  And generally, it's not just

14        what he relies on, but other information that he

15        considered as well in forming his report that

16        should be listed and disclosed.  It's not

17        significant as it relates to the various versions

18        of his -- of Mr. Alvarez's Plaintiff Fact Sheets.

19   BY MR. WARREN:

20   Q.   Do you know what changed between the various

21   Plaintiff Fact Sheets?

22   A.   I do not, but I can state that of all the

23   documents I've received and have, those are the only

24   two that are not specifically spelled out on my

25   materials considered list, and I relied on the
```

William R. Sawyer, Ph.D.

1    Second Amended Plaintiff Fact Sheet simply because

2    it had the details of interest, where the other fact

3    sheets didn't have that information.

4        Q.   And do you know how the Second Amended

5    Plaintiff Fact Sheet changed to have those details

6    of interest that you referenced?

7        A.   I don't recall any change.  It's simply the

8    information wasn't provided.

9        Q.   Dr. Sawyer, you said that one had the

10   information and one didn't, and now you're saying

11   there wasn't any change?

12       A.   Not that I recall.  I mean, as far as change

13   in testimony, there was more information provided on

14   the Second Amended Plaintiff Fact Sheet.

15       Q.   And personally, I'll refer to that as a

16   change.  Do you know how that additional information

17   got onto the Second Amended Plaintiff Fact Sheet?

18       A.   No.

19       Q.   And between the Plaintiff Fact Sheet and the

20   deposition, Mr. Alvarez is your only source of

21   information about Mr. Alvarez's use of Roundup,

22   right?

23       A.   Could you repeat that?  I missed a couple

24   words.

25       Q.   So you referred to the Plaintiff Fact Sheet

William R. Sawyer, Ph.D.

1    and the deposition.  That's Mr. Alvarez discussing

2    his use of Roundup?

3        A.   Correct.

4        Q.   Did anyone else -- strike that.

5             Do you have any other sources of information

6    that are not Mr. Alvarez as to Mr. Alvarez's use of

7    Roundup?

8        A.   No.

9        Q.   Did you talk to any of his friends about it?

10       A.   No.

11       Q.   Did you talk to any of his coworkers?

12       A.   No.

13       Q.   Did you talk to his ex-wife?

14       A.   No.

15       Q.   Did you read his ex-wife's deposition?  I

16   can represent to you it's not listed in your report

17   reliance list.

18       A.   No, I don't have it.

19       Q.   When you say you don't have it, does that

20   mean it was not provided to you?

21       A.   Correct.

22       Q.   And you said yourself that Mr. Alvarez did

23   not have a great command for this information,

24   right?

25       A.   That he what?

William R. Sawyer, Ph.D.

```
 1              MR. DIAMOND:  Form.

 2       Q.   You said that Mr. Alvarez does not have

 3   great command for this information?

 4              MR. DIAMOND:  Form.

 5       A.   I don't understand.

 6       Q.   Is it an opinion that Mr. Alvarez has a

 7   great command for recalling his use of Roundup?

 8              MR. DIAMOND:  Form.

 9       A.   Yes.  He worked with it for 31 years and

10   it -- he consistently provided detailed information.

11       Q.   Did he consistently provide consistent

12   information as to his use of Roundup?

13       A.   To the best of my knowledge, yes.

14       Q.   If we go to page 6 of your report, your

15   opinion is that Mr. Alvarez's command of the English

16   language is only moderate, right?

17       A.   Correct.

18       Q.   And, therefore, that is evident in his

19   deposition?

20       A.   Yes.

21       Q.   And when was Mr. Alvarez deposed?  Does

22   July 18th, 2019, sound accurate to you?

23       A.   July 18th?  Yes.

24       Q.   And that's of 2019?

25       A.   Yes.
```

William R. Sawyer, Ph.D.

```
 1       Q.   And his Second Amended Plaintiff Fact Sheet

 2   was completed September 19th, 2019?

 3       A.   That's right.

 4       Q.   So in both of those instances he was trying

 5   to recall his Roundup use that dated as far back as

 6   nearly 35 years ago?

 7       A.   Yes, and as recent as only a few years ago.

 8       Q.   But it included, even at 35 years ago, back

 9   to 1986; is that right?

10       A.   Correct.

11       Q.   And you have noted in your report some

12   instances where Mr. Alvarez had trouble remembering

13   details about his Roundup use, right?

14       A.   Yes.

15       Q.   For example, at page 7 you say that

16   regarding his use of Roundup Weed & Grass Killer 3,

17   Mr. Alvarez could not remember this with certainty?

18       A.   Correct.

19       Q.   So Mr. Alvarez was not sure about the

20   product he used?

21            MR. DIAMOND:   Form.

22       A.   No.  I would say he's not clear on all of

23   the products he used.

24       Q.   And, I mean, that's understandable because

25   he's recalling behavior that was 30 years ago.
```

William R. Sawyer, Ph.D.

```
 1      A.   And as recent as only a few years ago.

 2      Q.   In terms of being able to remember all the

 3   products he used, some of which was in the '80s and

 4   '90s, that's like trying to remember what brand of

 5   shampoo you used back in the '80s and '90s, right?

 6      A.   I used Ultra Swim.

 7      Q.   Ultra Swim?

 8      A.   Yeah.

 9      Q.   So you remember what brand of shampoo you

10   used 30 years ago?

11      A.   I sure do.  As a swimmer, I remember exactly

12   what I used.

13      Q.   I can represent to you that I do not

14   remember the brand of shampoo that I used when I was

15   -- or that I used 30 years ago.

16           MR. WHITMAN:  It was baby shampoo.

17           MR. DIAMOND:  I was going to say --

18           THE WITNESS:  That's pretty good.

19           MR. DIAMOND:  -- I was thinking the same

20      thing.

21           MR. WARREN:  We will work on making sure

22      that is not in the record.

23   BY MR. WARREN:

24      Q.   But -- and again, this is no offense to

25   Mr. Alvarez, but for some of his recall, you would
```

William R. Sawyer, Ph.D.

1    agree that he's not the most reliable source of

2    information here?

3         MR. DIAMOND:  Form.

4    A.   No, I didn't agree to that in my report.  I

5    stated that his command of the English language was

6    not very strong and one needs to be aware of that

7    when assessing the deposition.  I did not draw any

8    opinions or provide any opinions regarding the

9    abilities of his memory.  That's something for the

10   jury and a federal judge to assess.  I'm not going

11   to secondguess a plaintiff's state of mind.

12   Q.   And you don't believe it's up to you to

13   assess the accuracy of his memory in forming your

14   report about his use of Roundup?

15   A.   His memory appears to be intact, but I'm not

16   going to overstep my bounds and try to be a

17   neuropsychologist.

18   Q.   Is it your opinion that it's overstepping

19   your bounds to assess the accuracy of Mr. Alvarez's

20   memory?

21   A.   Only if I see glaring and unusual problems,

22   certainly, but his memory appeared to be intact.

23   Q.   So is it your testimony that only glaring

24   and unusual problems would cause you to assess

25   Mr. Alvarez's memory?

William R. Sawyer, Ph.D.

```
 1      A.   No, I don't think that's the only thing that

 2   would cause me to have concerns.  I found nothing in

 3   his deposition or Plaintiff Fact Sheets to -- any

 4   red flags to suggest that he had a memory problem,

 5   that he was suffering from Alzheimer's or some other

 6   problem.  There wasn't any evidence to flag such a

 7   theory.

 8      Q.   But below the level of Alzheimer's or some

 9   other problem along those lines, is there any other

10   reason to consider how accurate Mr. Alvarez is in

11   his memory of his use?

12      A.   His memory appeared fine, and as a

13   toxicologist, I'm relying on the deposition and

14   Plaintiff Fact Sheet as facts in the case.  I can't

15   secondguess it.  That's not my role.  That's what

16   jurors do, determine whether they believe him or

17   not.  That's not -- you're trying to place me in a

18   box I don't want to go to.  That's not where --

19   that's not my job.

20      Q.   I'm certainly not attempting to place you in

21   a box.  I'm just trying to get a --

22      A.   I'm not the jury.

23      Q.   I'm just trying to get a better sense of how

24   you formed your opinions in this case and what you

25   relied on.
```

William R. Sawyer, Ph.D.

```
 1      A.   No, you're trying to put me into the jury

 2   box.  That's not my job and I want to be very clear

 3   on that.

 4      Q.   I have no intention of putting you in the

 5   jury box.  It's fine with me if you stay out of

 6   there.  That would be difficult for us in this case.

 7      A.   Well, then stay away from such questions.

 8      Q.   The questions are simply to better

 9   understand your report and the basis of your

10   opinions in this case.

11           Now, we talked about it but I didn't mark

12   it.  I want to make sure the record is clear.

13   Exhibit 3 I'm showing again, is the Second Amended

14   Plaintiff Fact Sheet.

15      (Sawyer Exhibit 3 was marked for identification.)

16   BY MR. WARREN:

17      Q.   I'm not going to ask you any questions about

18   it but it will probably come up later.

19      (Sawyer Exhibit 4 was marked for identification.)

20   BY MR. WARREN:

21      Q.   Now I'm showing you what's been marked as

22   Exhibit 4 in this case.  This is an employment

23   record from Mr. Alvarez with a Bates stamp

24   Confidential Calderon-JCalderon-SHFV-HR-000042.

25           MR. DIAMOND:  Thanks.
```

William R. Sawyer, Ph.D.

1    Q.   Have you seen this document before?

2    A.   No.

3    Q.   Do you have any reason to believe that this

4    is not from Mr. Alvarez's employee file at Sutter

5    Home?

6    A.   No.

William R. Sawyer, Ph.D.

██   ██   ████████████████████████████████████

██   ███████████████████████████████████████

██   ███████████████████████████████████

██   ██████

██   ██   █████

6        Q.   It doesn't change your opinion one way or

7    the other?

8        A.   No.

9        Q.   It doesn't matter to you whether Mr. Alvarez

10   is very knowledgeable about assessing time or not?

11       A.   No.  I'm not going to try to read into that.

12   I don't understand what was meant by that.  I think

13   you would have to depose the supervisor and get that

14   information.  I'm not about to guess at what that

15   means.  It means -- it could mean that he's not

16   punching in on time, it could be a kind of a

17   sarcastic remark saying, look, don't keep checking

18   in 10 minutes late.  I have no idea and I'm not

19   going to read into it.  I'm going to pass on an

20   answer, but I just don't know what that means.

21       Q.   So even if you had received this, this would

22   not have impacted your opinion in any way?

23       A.   No.

24       Q.   You would not have included any of this

25   information in your report?

William R. Sawyer, Ph.D.

1      A.   No.  I can't discern from that statement

2   what -- you know, I -- you know, I know he's not a

3   pocket watch repairman, I think it's reasonable for

4   me to conclude that, but beyond that, I can't really

5   guess what was implied by that statement.

6      Q.   Going back to Table 3 of your report, you

7   list that Mr. Alvarez started using Roundup in 1986.

8      A.   Table 3 you said?

9      Q.   Yes, page 13.

10      A.   Yes.

11      Q.   And he used it for a full year in 1986?

12      A.   I made that assumption, yes.

13      Q.   So he used it for the same amount of time in

14   1986 as he did for every year from 1986 to 2017?

15      A.   Under my assumption, yes.

16      Q.   It did not change your opinion that

17   Mr. Alvarez's Plaintiff Fact Sheet stated he didn't

18   start using Roundup until June of 1986?

19      A.   That would change the exposure days ever so

20   slightly, and still, there's -- even -- even if that

21   assumption was made, it's still well over 50 times

22   the maximal exposure threshold in the studies that

23   I've referenced.

24      Q.   And I'm not asking you to make an assumption

25   here.  I'm asking you the information that's in

1    Mr. Alvarez's Plaintiff Fact Sheet states that he

2    didn't start using Roundup until June 1986, right?

3        A.   Yes, but if I made that change, it would

4    still have no significant outcome on the number of

5    exposure days.  They would still be in excess of 50

6    times the 10 eight-hour day threshold.

7        Q.   I understand.  And just to kind of make

8    things clear here, I'm going to be asking a few

9    questions about your assessments in Table 3.  I

10   think we can kind of, at the end of that, come back

11   and ask whether that changes your overall

12   assessment.  I think that if for each question, if

13   we go into whether that changes your overall

14   assessment as to whether or not he reached the

15   10 eight-hour day threshold, I think that may slow

16   things down unnecessarily.

17            So, similarly, does it change your opinion

18   that in Mr. Alvarez's deposition he stated he didn't

19   use Roundup in 1986?

20            MR. DIAMOND:  Form.

21       A.   Could you restate that?  I didn't understand

22   the entire question.

23       Q.   Mr. Alvarez stated in his deposition that he

24   didn't use Roundup in 1986, right?

25            MR. DIAMOND:  Form.

William R. Sawyer, Ph.D.

1      A.   I don't recall that.

2      Q.   If he had stated that he didn't use Roundup

3   in 1986, would that have impacted your writing in

4   Table 3?

5           MR. DIAMOND:  Take a look at page 11 of his

6       deposition.

7   BY MR. WARREN:

8      Q.   Sorry.  Could we just answer the question?

9   If he had stated that he didn't use Roundup in 1986

10  in his deposition, would that have impacted what's

11  in Table 3 of your report?

12     A.   It would decrease the value from 546 to

13  about 500 exposure days, about 10 percent.

14     (Sawyer Exhibit 5 was marked for identification.)

15  BY MR. WARREN:

16     Q.   Okay.  I am handing you what's been marked

17  Exhibit 5 of this deposition.  This is Mr. -- or

18  sorry.  That's correct.  This is Mr. Alvarez's

19  deposition.

20          MR. DIAMOND:  Is that the complete

21      deposition?

22          MR. WARREN:  This is the complete

23      deposition.  I have a copy for you as well.

24  BY MR. WARREN:

25     Q.   And you can look at the front if you want

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1    to.  I represent to you it's Mr. Alvarez's

 2    deposition, but if you go to page 17, which I've

 3    folded for you, do you see that on lines 5 through 8

 4    he is asked whether he used Roundup at those

 5    properties in 1986, and he states:  "No, not in that

 6    time, no."

 7        A.   Right, but that doesn't imply the entire

 8    year.  I think it's six weeks, six months.

 9            MR. DIAMOND:  My objection is it's not

10        correctly reading his testimony.

11            MR. WARREN:  Okay.  I feel I have the

12        ability to read his testimony.  This deposition

13        is about how Mr. -- or Dr. Sawyer read his

14        testimony.

15    BY MR. WARREN:

16        Q.   So did you read Mr. Alvarez's testimony to

17    say that he used Roundup for an entire year in 1986,

18    Dr. Alva -- Dr. Sawyer?  I'm sorry.

19        A.   I don't understand the question.

20        Q.   Is it your opinion, based on the information

21    in Mr. Alvarez's deposition, that he used Roundup in

22    1986?

23        A.   Did I see in his deposition -- no, no.

24    He -- from what I understand, it was I think about

25    six weeks he didn't use it, not a year.
```

William R. Sawyer, Ph.D.

```
 1         Q.   So your opinion is that -- I just want to

 2    make sure I understand.  Your opinion is that for a

 3    six-week period in 1986 he did not use Roundup?

 4         A.   Yeah.  I believe he -- I think he was

 5    washing bottles for about six weeks.  I don't think

 6    that he abstained from using Roundup for the entire

 7    year.

 8         Q.   Okay.  And is that information reflected in

 9    your report at Table 3?

10         A.   Regarding the six weeks?

11         Q.   Correct.

12         A.   No.  No.  It would be, on the overall

13    exposure days, it would be irrelevant.

14         Q.   Now, if Mr. Alvarez was not spraying Roundup

15    in 1993, when he was working at what's referred to

16    as The Inn property, would that impact your opinion

17    in any way?

18              MR. DIAMOND:  Form.

19         A.   Is that a hypothetical or what type of

20    question are you asking?

21         Q.   The question is the question.  We can -- it

22    can be a hypothetical for now.  If Mr. Alvarez

23    stated in his deposition that in 1993 he was not

24    using Roundup at The Inn property, would that change

25    your Table 3 of your report in any capacity?
```

William R. Sawyer, Ph.D.

```
 1      A.   It wouldn't change it significantly, no.

 2           MR. DIAMOND:  I know we've been going for

 3      about an hour and a half.  Well, maybe --

 4           MR. WARREN:  It's been less than that but

 5      we --

 6           MR. DIAMOND:  -- a little bit more than -- I

 7      guess maybe --

 8           MR. WARREN:  Now is a fine time to take a

 9      break.

10           MR. DIAMOND:  I was going to suggest.  If

11      you want to finish up a line of questions, that's

12      fine.

13           MR. WARREN:  I think it's a good time to do

14      it.

15           MR. DIAMOND:  Okay.  Great.

16           THE VIDEOGRAPHER:  We're going off the

17      record at 10:00 o'clock.

18        (Recess from 10:00 a.m. until 10:15 a.m.)

19           THE VIDEOGRAPHER:  We're back on the record.

20      The time is 10:15.

21           MR. WARREN:  Thank you.

22      BY MR. WARREN:

23      Q.   Now, Dr. Sawyer, I'm marking for the record

24      what is Exhibit 6, and this is the report of

25      Mr. Cohen with your highlighting and notes on it.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

1    I'm not going to ask you any questions about it at

2    this time.

3     (Sawyer Exhibit 6 was marked for identification.)

4    BY MR. WARREN:

5     Q.   The other request I'd like to make for the

6    record is you referenced an updated list of

7    materials you considered.  We just want to put on

8    the record that we are requesting that list as well.

9          Now, Dr. Sawyer, there were researchers that

10   were looking at glyphosate and other pesticides back

11   in the 1980s, right?

12    A.   Yes.

13    Q.   This includes a paper that you've read by

14   De Roos in 1983?

15    A.   Yes.  It's not 1980s, but yes.

16    Q.   Is it your opinion that the Roundup users

17   surveyed in De Roos 2003 did not contain people

18   using the product in 1980s?

19    A.   No.

20    Q.   That's not your opinion?

21    A.   That's my opinion.  You gave me a negative.

22   You said "do not."

23    Q.   You're right.  The question was confusing on

24   my part.  I agree with you.

25          MR. DIAMOND:  Did we mark Mr. Alvarez's

William R. Sawyer, Ph.D.

1     deposition, or did you want to?

2          MR. WHITMAN:  I think it's 5.

3          MR. DIAMOND:  It's 5?

4          MR. WARREN:  It is.  It is marked.

5          MR. DIAMOND:  All right.  I've got it.

6     Thank you.

7     BY MR. WARREN:

8     Q.   Going back to De Roos, in your opinion, when

9     were the Roundup users studied in De Roos, when were

10    they using the product?

11    A.   I would need to look at the method section.

12    I don't recall the exact dates.

13    Q.   So you don't recall whether De Roos surveyed

14    people during the 1980s?

15    A.   Yes, I do recall that.

16    Q.   Okay.  So it included Roundup users from the

17    1980s?

18    A.   Yes.

19    Q.   And back in the '80s and early '90s, Roundup

20    was not as popular as it is today, right?

21          MR. DIAMOND:  Form.

22    A.   I do know that statistically the production

23    and worldwide use has been increasing throughout

24    that period.  In terms of popular, I don't know what

25    that means in your questioning.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

```
 1      Q.   In the '80s and early '90s, were people

 2   frequently using multiple pesticides at the same

 3   time?

 4           MR. DIAMOND:  Form.

 5      A.   I'd refer that to Dr. Bretbar.  I can't

 6   answer that statistically.

 7      Q.   I'm sorry.  I may have misunderstood --

 8      A.   Charles -- Charles Benbrook.  I'm sorry.

 9      Q.   Oh, Benbrook.  Okay.  Thank you.

10           So you're not sure whether people in the

11   '80s and '90s were using other pesticides in

12   addition to Roundup?

13      A.   For what purpose are you asking?  For

14   killing --

15      Q.   I'm asking --

16      A.   -- killing weeds or for general insecticide

17   use?  I'm not sure what you're asking.

18      Q.   I'm asking general use of pesticides.  Were

19   people using other pesticides in addition to Roundup

20   in the 1980s and early '90s?

21      A.   Of course.

22      Q.   And is it important to consider the use of

23   multiple pesticides?

24           MR. DIAMOND:  Form.

25      A.   Yes.  I have done so in this assessment and
```

William R. Sawyer, Ph.D.

```
1    included products in Table 1, I believe it is, in my

2    report.

3        Q.   So did you consider the possibility that

4    Mr. Alvarez was using other pesticides in the '80s

5    and '90s other than Roundup?

6        A.   Yes.

7        Q.   Did the De Roos study also talk about an

8    issue called recall bias?

9        A.   Yes.

10       Q.   And that's where when people are asked what

11   pesticide they used, they may not remember?  I

12   should say recall bias specific to the De Roos study

13   has to do with when people were asked what

14   pesticides they used and they may not remember?

15       A.   That's not really the definition of recall

16   bias.  If you wish, I can explain it, but the answer

17   is no, that's not quite right.

18       Q.   And I don't think we need to explain it

19   further, but were the authors of the De Roos 2003

20   study concerned with people who may not be able to

21   recall the pesticides they used?

22       A.   Yes.

23       Q.   Did you consider that possibility, that

24   Mr. Alvarez may not have been able to recall what

25   pesticides he used in the -- 30 years ago?
```

William R. Sawyer, Ph.D.

```
1      A.    Yes.

2      Q.    How do you know he was using Roundup during

3   this time and not some other pesticide?

4      A.    Based on his consistent description in the

5   Plaintiff Fact Sheet and deposition.

6      Q.    Is it possible that Mr. Alvarez was using

7   another product other than Roundup during this time?

8      A.    Well, sure.  I could speculate that's the

9   case but that's not what the facts of the case

10  reveal, so I have no ability to make such a

11  speculation.

12     Q.    But it's a possibility?

13     A.    Anything is possible.

14     Q.    Did you include that possibility in your

15  opinion in this case?

16     A.    No.

17     Q.    How long --

18     A.    That's not consistent with the facts in the

19  case, so I did not.

20     Q.    How long had Roundup been sold commercially

21  in 1986?

22     A.    About 11 years.

23     Q.    When Mr. Alvarez worked at Sutter Home, he

24  worked at a few different properties, right?  And it

25  may be beneficial to refer to your report at page 6
```

William R. Sawyer, Ph.D.

```
 1    where -- because you list a few of the winery's

 2    properties.

 3         A.  Yes, he did, and I should point out that he

 4    was never caught up with his spraying.  He was going

 5    from one property to another continuously, and in

 6    response to that earlier question about him not

 7    spraying one particular property, that doesn't mean

 8    he wasn't spraying.  He was continually going from

 9    one property to the next, and just because he didn't

10    spray that one property you mentioned earlier,

11    doesn't mean that he was not spraying for a period

12    of time.

13         Q.  Was he -- you list a few properties in your

14    report, one of which is the Ranch House, right?

15         A.  I do, 1986, 2010.

16         Q.  One of which is called Main Street?

17         A.  Yes.

18         Q.  One of which is called Napa Cellars?

19         A.  Yes.

20         Q.  One of which is called Hoffman Lane/Joel

21    Gott?

22         A.  Yes.

23         Q.  The final one you list is Green Island Road

24    Warehouse?

25         A.  Yes.
```

William R. Sawyer, Ph.D.

```
 1        Q.   Also in his deposition but not listed in

 2    your report, he states that he worked at a property

 3    which was the house of the owners?

 4        A.   Yes.

 5        Q.   He also, not listed in your report but

 6    stated in his deposition, he worked at a property

 7    called The Inn?

 8        A.   Yes.

 9        Q.   So I just listed seven properties there.  Is

10    it your opinion that he worked at all seven

11    properties the entire time from 1986 to 2017 that

12    you say he was spraying Roundup?

13        A.   No.  No.  Again, he sprayed one property and

14    then moved onto the next, whatever property was

15    considered of significance.

16        Q.   At different points in his career he worked

17    at different properties, right?

18        A.   Yes, and during given time points he worked

19    at multiple properties, moving on from one to the

20    next as time permitted.

21        Q.   In the three properties in which you did not

22    list in your report but he did work, he did not

23    spray Roundup at those properties, right?

24             MR. DIAMOND:  Form.

25        A.   I don't recall.
```

William R. Sawyer, Ph.D.

```
 1        Q.   You don't know one way or the other whether

 2   he sprayed Roundup at the three properties you did

 3   not list in your report?

 4        A.   I don't recall.

 5        Q.   You don't recall whether you know or you

 6   don't recall whether he sprayed?

 7        A.   I simply don't recall.  If you want me to

 8   take a look at it, I will.

 9        Q.   So you don't know one way or the other, is

10   my question?

11        A.   It could be in my report.  I don't recall.

12        Q.   But he worked at seven properties overall at

13   Sutter Home, right?

14        A.   Yes.

15        Q.   Do you know how often he was at each

16   property?

17        A.   No, no, I don't.  He provided his frequency

18   of spraying and moving from one property to the next

19   as needed.

20        Q.   Were the properties all the same size?

21        A.   No.  They're all very different.  I have the

22   acreage listed on page 6.

23        Q.   Well, regardless of when he worked at the

24   properties, in your calculations in Table 3 you said

25   he sprayed Roundup for the same duration from 1986
```

William R. Sawyer, Ph.D.

1    to 2017, right?

2       A.   I didn't say that.  He did.  Okay?  He

3    stated that it was four hours per day.

4       Q.   I understand.  I'm asking you what's in your

5    -- what your opinion is in this case and what's in

6    your report.

7       A.   I used a midpoint between 3 and 4 hours,

8    three-and-a-half hours, to be specific.

9       Q.   So your opinion is that he sprayed

10   consistently from 1986 to 2017 the same number of

11   hours in different intervals as listed in Table 3?

12      A.   He stated, quote:  I sprayed every two days

13   for approximately four hours a day during the spring

14   months, less frequently in the summer and fall

15   months.

16           End quote.

17      Q.   And that quote is from his Plaintiff Fact

18   Sheet?

19      A.   Yes, and it's not something I created.  It's

20   a fact in the case.  That's what I have to rely on.

21   I can't invent information, so I don't understand

22   where you're going with this.

23      Q.   If there were to be a discrepancy between

24   Mr. Alvarez's deposition and the information listed

25   in his Plaintiff Fact Sheet, which would you go

William R. Sawyer, Ph.D.

```
 1   with?

 2      A.   I would have to have a more specific

 3   question because I have made that assessment, and in

 4   some cases in the deposition the questions were

 5   incomplete and I didn't find them to be

 6   contradictory.

 7      Q.   When you say I didn't find them to be

 8   contradictory, are you referring to the Plaintiff

 9   Fact Sheet and the deposition?

10      A.   That's correct.

11      Q.   So you did not find any contradictions

12   between the Plaintiff Fact Sheet and the deposition?

13           MR. DIAMOND:   Form.

14      A.   Not with respect to the spraying every two

15   days for approximately four hours a day, no.

16      Q.   If there were discrepancies between the two,

17   would you just rely on the Plaintiff Fact Sheet?

18           Dr. Sawyer, at this point this is a

19   hypothetical question.  Hypothetically at this

20   point, if there was a discrepancy between the

21   Plaintiff Fact Sheet and the deposition, would you

22   just rely on the Plaintiff Fact Sheet?

23      A.   I'm going to consult my file before I answer

24   your question.

25      Q.   Dr. Sawyer, if you're going to consult
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1    another file, I think it's proper to go off the

 2    record at this time so we're not continuing to use

 3    time.

 4        A.   Then I'm not going to do that.

 5        Q.   Okay.

 6        A.   I can't answer your question then.

 7        Q.   You cannot answer a hypothetical as to if

 8    there was a discrepancy between the Plaintiff Fact

 9    Sheet and the deposition, which you would rely on?

10        A.   I need to know if the Plaintiff Fact Sheet

11    was under the penalty of perjury, was it a sworn

12    testimony as was the deposition, and without looking

13    at it, I can't answer that question.

14        Q.   If --

15        A.   I'll give you a hypothetical.  If his

16    Plaintiff Fact Sheet was provided under the -- what

17    shall we say -- under the potential of perjury, I

18    would rely on either equally.

19        Q.   How is it possible to rely on either equally

20    if there is a discrepancy between the two?

21        A.   That would depend on the individual

22    discrepancy and determine if it was simply an

23    incomplete response or incomplete question in the

24    deposition, versus a more fuller detailed response

25    in the Plaintiff Fact Sheet.
```

William R. Sawyer, Ph.D.

1      Q.   So it's your -- sorry.

2      A.   In fact, the amended Plaintiff Fact Sheet

3   may have been in an attempt to provide information

4   that was misunderstood or not provided in the

5   deposition.

6      Q.   And you don't know how that amended

7   Plaintiff Fact Sheet was created, right?

8      A.   No.  I was going to take a look but you

9   wanted to go off the record, so I decided not to.

10      Q.   Well, that's not -- that's not a question as

11   to whether it was sworn testimony.  That's a

12   question as to the process by which that amended

13   fact sheet was amended?

14      A.   I don't understand the question.

15      Q.   You don't know if other people worked on

16   that Plaintiff Fact Sheet in addition to

17   Mr. Alvarez, do you?

18           MR. DIAMOND:  Form.

19      A.   I don't understand what you mean by worked

20   on it.  I understand that he could not write in

21   English to the degree required to fill out a

22   Plaintiff Fact Sheet.  That's my understanding,

23   someone would have to assist with the English

24   translation.

25      Q.   And you don't know who that would be to the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1    Plaintiff Fact Sheet?

 2       A.   Without looking at it, no.

 3       Q.   Now, one more question about those seven

 4    properties you were talking about.  Do you intend to

 5    tell the jury that Mr. Alvarez sprayed at all seven

 6    properties, sprayed Roundup?

 7       A.   No.  I intend to explain to the jury he

 8    sprayed every other day, as he stated.

 9       Q.   And you don't intend to tell the jury what

10    properties he sprayed at?

11       A.   No.

12       Q.   So your testimony for the jury will just be

13    that he sprayed every other day and you won't

14    reference what properties he sprayed at?

15            MR. DIAMOND:  Form.

16       A.   Yeah, and I will explain that I used a

17    frequency of two-and-a-half days per week based on

18    five-day workday weeks, two days one week, three the

19    other week.

20       Q.   And that five-day workweek was an

21    assumption?

22       A.   No.  He worked full-time.  That's just

23    nonsense.  He worked full-time and he testified that

24    he worked every other day spraying.

25       Q.   He testified that he worked every other day
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

```
 1    spraying?

 2        A.   Sprayed every other day, and --

 3        Q.   That's my mistake.  I misheard you.  I

 4    thought you said spraying --

 5        A.   So it would be three days on one week, two

 6    on the next, Tuesday/Thursday versus

 7    Monday/Wednesday/Friday.  That averages to 2.5 days

 8    per week as in Table 2.  It's not that difficult to

 9    understand.

10        Q.   It's not a question as to how easy or

11    difficult it is to understand.  It's a question as

12    to what your opinion is in this case and what you

13    will be telling the jury and what the basis is for

14    that opinion.

15        A.   I have explained it three times now.

16        Q.   Now, Table 3, you state that he sprayed

17    until 2017, right?

18        A.   Yes, and I think we've already answered this

19    too.

20        Q.   And that was the same duration in the

21    spring, summer and fall as he had sprayed in

22    previous years?

23        A.   That's what my table reveals, yes.  I don't

24    have exact -- excuse me -- months in that table.

25        Q.   I take it you still hold this opinion to a
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

1     reasonable toxicological certainty?

2        A.    Opinion of what?

3        Q.    Sorry.  That wasn't clear.  I take it you

4     still hold your opinion that he sprayed until 2017

5     to a reasonable toxicological certainty?

6        A.    Well, I do know he sprayed in 2016.  My

7     table goes up to -- to January -- you know, January

8     -- through the end of December of 2016.  I do know

9     that his hours in the year 2016 were cut back

10    somewhat due to his illness and his medical

11    appointments, which in fact could be the reason

12    there was a clock problem on that one document you

13    showed me because he did miss some work time due to

14    his medical illness.

15          So I -- it is my opinion to a reasonable

16    toxicological certainty that he sprayed from 1986 up

17    to 2017.

18       Q.    Two things based on that answer:  You say

19    that his hours in the year 2016 were cut back

20    somewhat due to his illness.  Is that reflected in

21    your table?

22       A.    No, no, it's not.  It's just not reflected

23    because I don't have the time sheets that show what

24    days he missed, and again, he's over 50 times the

25    highest exposure threshold.  If I'm off a few

William R. Sawyer, Ph.D.

1    percent, so what.

2        Q.   As long as he's more than 10 days, right?

3            MR. DIAMOND:   Form.

4        A.   He's 50 times above the 10-day threshold,

5    the 10-day eight-hour-day threshold.  So it is

6    possible I may -- I may have not included days of

7    missed work during the year 2016, but keep in mind

8    I've underestimated his spray hours at

9    three-and-a-half hours rather than four, I included

10   zero hours in the winter, I've been very

11   conservative, and such minor changes that you've

12   brought up will not significantly affect the

13   results.

14       Q.   So it's still your opinion to a reasonable

15   toxicological certainty that the minimum exposure

16   days for Mr. Alvarez was 546?

17       A.   Yes.  That's a very conservative

18   underestimate.  It includes zero hours in the

19   winter, only one day per week during the fall and

20   summer, and three-and-a-half rather than four hours

21   during the spring.  So I think it's a very

22   underestimated calculation, and the fact that I've

23   missed some days here where he was out sick with

24   medical exams, I don't think that has any

25   significant impact, and I don't have any records

William R. Sawyer, Ph.D.

1    providing what dates he missed, so, you know, I did

2    the best job I could.

3         Q.   Would it have helped you to have these

4    records for days that he missed?

5         A.   It would -- it would make the calculation

6    slightly more accurate, but not significantly.

7         Q.   What do you mean when you say not

8    significantly?  Significant as to what?

9         A.   Well, even if he missed the entire year of

10   2016, it would only change the number of exposure

11   days by 10 percent, so it's not going to have any

12   outcome change in terms of my opinion that he

13   exceeded the -- all of the thresholds of the human

14   epidemiologic studies.

15        Q.   And if he missed a significant period of

16   time in 2014 as he was undergoing chemotherapy, that

17   would not affect your opinion as to the thresh -- as

18   to whether he reached the thresholds of the human

19   epidemiological studies?

20             MR. DIAMOND:  Form.

21        A.   No.  Even if we removed the last 10 years of

22   his work, it wouldn't make any difference.  He would

23   still be far, far above the thresholds of the

24   studies.

25        Q.   And what if we removed the last 20 years of

William R. Sawyer, Ph.D.

1    his work, would it make any difference?

2         MR. DIAMOND:  Form.

3    A.   No, it would not.  That would only reduce

4    his exposure days to about 170 exposure days, which

5    is 17 times above the maximal threshold.

6    Q.   And in fact, his first year, in 1986, based

7    on your calculation, how many days did he work?

8    A.   48 weeks.

9    Q.   Sorry.  My question may not have been clear.

10   Based on your calculation, how many eight-hour days

11   of Roundup exposure did Mr. Alvarez have in 1986?

12   Does 17 days sound accurate to you?

13   A.   13.1.

14   Q.   13.1 days of Roundup exposure?

15   A.   Eight-hour exposure days of Roundup.

16   Q.   Following his work at Sutter Home in 1986,

17   in your opinion, right?

18        MR. DIAMOND:  Is that based upon a half year

19        or full year?  I'm just trying to -- because I

20        thought you made a good point before.

21   Q.   That's a fair clarification.  That's based

22   on the table at this point, which I believe you

23   calculated as a full year, right?

24   A.   Right.  And if I eliminated that year, I

25   would be eliminating 13.1 eight-hour exposure days.

William R. Sawyer, Ph.D.

```
 1    It has no significant impact on the exposure days

 2    compared to the human epidemiological study

 3    thresholds.

 4        Q.   And after that first year of Roundup use,

 5    where, in your opinion, he sprayed for 13.1 days,

 6    was he at an increased risk of getting non-Hodgkin's

 7    lymphoma?

 8        A.   Yes.

 9        Q.   And you also say that he sprayed in the

10    spring for two-and-a-half hours per week, right?

11    Sorry.  That -- I asked that question incorrectly.

12             You say that in the spring he sprayed

13    two-and-a-half times per week was the frequency,

14    right?

15        A.   On the average, yes.

16        Q.   So on the average, after his -- after one

17    week he had sprayed two-and-a-half times?

18        A.   No.  On the average, one week he would spray

19    a Monday, Wednesday, Friday, the following week

20    Tuesday, Thursday.  That averages to 2.5 days per

21    week.

22        Q.   And I'm asking unclear questions.  That's my

23    fault.

24             After two weeks you estimate that he sprayed

25    five times, right?
```

William R. Sawyer, Ph.D.

```
 1      A.   Yes.

 2      Q.   In just a two-week span?

 3      A.   Yes.

 4      Q.   Was he then at a significant increased risk

 5   of non-Hodgkin's lymphoma?  This is -- this is --

 6           MR. DIAMOND:  Form.

 7      Q.   This is five times in a two-week span.

 8      A.   Yes.  He would be at 2.18 eight-hour

 9   exposure days.  That does exceed the greater than

10   two days threshold in some of the studies.

11      Q.   And this occurred in the spring of 1986, in

12   your opinion?

13      A.   Yes.

14      Q.   Mr. Alvarez did not get non-Hodgkin's

15   lymphoma until 2014, right?

16      A.   That's correct.

17      Q.   Nearly 30 years later?

18      A.   Yes.

19      Q.   Was his risk of getting NHL greater in 2013

20   than it was in 1986?

21           MR. DIAMOND:  Form.

22      A.   Yes.

23      Q.   Why?

24      A.   Longer cumulative exposure, and accumulated

25   genetic damage.
```

William R. Sawyer, Ph.D.

```
 1      Q.   And that's what's referred to as a

 2   dose-response relationship for Roundup?

 3      A.   Yes.

 4      Q.   In your opinion there is a dose-response

 5   relationship, right?

 6      A.   Yes.

 7      Q.   So, for example, spraying for three times in

 8   a year is not the same thing as spraying -- sorry.

 9   Strike that.

10           For example, spraying for three days in a

11   year, eight-hour days, is not the same thing as

12   spraying for 300 eight-hour days in terms of your

13   NHL risk?

14      A.   Yes.

15      Q.   Now, even assuming that Mr. Alvarez stopped

16   spraying after 1986, would there be any change in

17   your opinion?

18           MR. DIAMOND:  Form.

19      Q.   I should rephrase that.  That question was

20   worded poorly.

21           Assuming hypothetically that Mr. Alvarez

22   stopped working at Sutter Home Winery and stopped

23   spraying Roundup after 1986, would you still find

24   that Roundup was a substantial contributing factor

25   in his NHL?
```

```
 1              MR. DIAMOND:  Form.

 2       A.   I would need to consult the studies further.

 3    I'm not prepared to answer that today in terms of

 4    cumulative genetic damage and DNA repair mechanisms

 5    over time.

 6       Q.   What studies are you referring to that you

 7    would need to consult?

 8       A.   I didn't come prepared to answer that

 9    question today.

10       Q.   You didn't come prepared to answer what

11    studies you would need to consult in determining

12    whether or not Roundup was a substantial

13    contributing factor in Mr. Alvarez's non-Hodgkin's

14    lymphoma?

15       A.   No.

16              MR. DIAMOND:  Form.

17       A.   That's not the question you asked.

18       Q.   We can start again.

19              If Mr. Alvarez had stopped spraying Roundup

20    after 1986, meaning, according to your chart --

21    sorry.  I'll start this over.

22              If Mr. Alvarez had stopped spraying Roundup

23    after 1986, according to your opinion, he would have

24    sprayed for how many exposure days?

25       A.   2.18.
```

William R. Sawyer, Ph.D.

```
 1      Q.   So I -- I think that's a different
 2   calculation than I asked you.  I'm saying if he
 3   sprayed for the entire year of 1986.  I believe you
 4   said 13.1.
 5      A.   13.1 eight-hour exposure days.
 6      Q.   If he had stopped spraying Roundup after
 7   1986 --
 8           MR. DIAMOND:  '86.  Is that what you said?
 9   Sorry.
10           MR. WARREN:  Not a problem.  I can start
11   over.  One of the few instances where I think the
12   record looks good for me here but --
13           MR. DIAMOND:  Yeah, I know.  I think it does
14   too.
15   BY MR. WARREN:
16      Q.   If Mr. Alvarez had stopped spraying Roundup
17   after 1986, would it be your opinion that -- and
18   everything else stayed the same for Mr. Alvarez,
19   would it be your opinion that Roundup was a
20   substantial contributing factor in his NHL?
21           MR. DIAMOND:  Form.
22      A.   I don't understand the question.
23      Q.   What don't you understand?
24      A.   The question.
25      Q.   What component of the question do you not
```

William R. Sawyer, Ph.D.

1    understand?

2        A.   I wasn't listening carefully.  I don't

3    understand.

4        Q.   Well, I can rephrase the question.  Please

5    do me a favor and try to listen carefully.

6            If Mr. Alvarez had stopped spraying Roundup

7    after 1986 and everything else in his life remained

8    the same, would it be your opinion that Roundup was

9    a substantial contributing factor to his NHL that he

10   got in 2014?

11           MR. DIAMOND:   Form.

12       A.   I'm not prepared to answer that today.  I

13   have never considered that question.

14       Q.   What would you need to answer that question?

15       A.   I'm not prepared to answer that question

16   today.

17       Q.   You're also not prepared to answer what you

18   would need to answer that question?

19       A.   No, I'm not prepared to answer the question.

20   I would research it and let you know.

21       Q.   So you will not answer the hypothetical of

22   if Mr. Alvarez had stopped spraying after 1986 and

23   everything else had remained the same in his life,

24   whether Roundup would be a substantial contributing

25   factor in his non-Hodgkin's lymphoma?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1              MR. DIAMOND:  Form; asked and answered.

 2              MR. WARREN:  Clearly, it was not answered.

 3              MR. DIAMOND:  Well, he already told you that

 4      he wasn't prepared to answer it.  You're just

 5      asking it again.

 6              MR. WARREN:  I'm asking for his -- whether

 7      he is able to answer this question, and if not,

 8      why he's not prepared today to answer the

 9      question.

10              MR. DIAMOND:  I didn't ask him to answer

11      that question.  I didn't ask him for a

12      hypothetical if Mr. Alvarez only had one year of

13      exposure to Roundup.  I asked him to take into

14      consideration the total amount of exposure that

15      Mr. Alvarez had, and I didn't ask him to parse it

16      out by month or year or anything like that.

17      That's my problem with it.

18              MR. WARREN:  It's clear he did not parse out

19      a lot of Mr. Alvarez's Roundup use.

20              MR. DIAMOND:  Mr. Cohen actually has greater

21      numbers --

22              MR. WARREN:  Mr. Cohen is not being deposed

23      today.

24              MR. DIAMOND:  I'm just telling you --

25              MR. WARREN:  I think it's good if we go off
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1      the record if we're going to have a continued

 2      discussion.  We can go off the record.

 3           MR. DIAMOND:  I don't need to.  You can go

 4      on.  When we take the next break, we can talk.

 5           MR. WARREN:  Sure.

 6  BY MR. WARREN:

 7      Q.   Okay.  So I agree with Mr. Diamond.  The

 8  hypothetical I asked, he has answered that he's not

 9  prepared to answer it today.

10           My question is that hypothetical, which is

11  if Mr. Alvarez had stopped spraying Roundup after

12  1986 and everything else in his life had remained

13  the same, what information would you need to review

14  in order to answer that question?

15      A.   I have not run across such a scenario yet.

16  I would take that under consideration and research

17  the studies and let you know.

18      Q.   You have not come across a scenario in which

19  an individual sprayed Roundup for one year?

20      A.   No, not with a 30-year gap.  That's the

21  question.  Now, if it were one year and the NHL

22  developed in a period of 10 years, certainly that

23  would be sufficient, but I have not researched a gap

24  in time of 30 years prior to diagnosis.  I would

25  research that and let you know.
```

William R. Sawyer, Ph.D.

1      Q.   And was it significant to your opinion the

2   number of days per year that Mr. Alvarez sprayed

3   Roundup, or the total number of days of exposure?

4           MR. DIAMOND:  Form.

5      A.   Consistent with the study evidence,

6   cumulative eight-hour exposure days.

7      Q.   So the number of days per year in which

8   Mr. Alvarez sprayed Roundup was not significant to

9   your opinion?

10          MR. DIAMOND:  Form.

11     A.   Of course it's significant in the

12  calculation.

13     Q.   You're saying of course it's significant.  I

14  asked you and you just stated that consistent with

15  the study evidence, cumulative eight-hour exposure

16  days is what you looked into.  My question is was it

17  both important his cumulative number of eight-hour

18  exposure days and the number of times per year in

19  which he sprayed Roundup?

20     A.   I've already considered that in Table 3.

21     Q.   And both of those components, the number of

22  days per year and the overall number of days, are

23  important in forming your opinion?

24     A.   Yes.  That's what Table 3 -- Table 2 and

25  Table 3 in my report considers, exactly.

William R. Sawyer, Ph.D.

```
 1              MR. WARREN:  Okay.  I think it may be

 2        beneficial to take a quick break.

 3              MR. DIAMOND:  Sure.

 4              MR. WARREN:  I also think that based on some

 5        of the answers, I can streamline some of the

 6        questions in my outline and kind of help

 7        everybody out, so if we take a break --

 8              MR. DIAMOND:  Okay.

 9              THE VIDEOGRAPHER:  We're going off the

10        record at 10:49.

11         (Recess from 10:49 a.m. until 10:58 a.m.)

12              THE VIDEOGRAPHER:  We're back on the record.

13        The time is 10:58.

14     BY MR. WARREN:

15        Q.   Dr. Sawyer, in an effort to streamline

16     things a little bit, I just want to ask a couple of

17     kind of summary questions.  If Mr. Alvarez's last

18     year of using Roundup was not 2017 but it was a year

19     or two before that, that would not change your

20     overall opinion, right?

21        A.   No.

22        Q.   If Mr. Alvarez did not use Roundup during

23     the time in which he was receiving chemotherapy,

24     that would not change your opinion, right?

25        A.   No.
```

William R. Sawyer, Ph.D.

 1     Q.   If Mr. Alvarez was demoted from his

 2   supervisory position at Sutter Home, that would not

 3   change your position, right?

 4     A.   Would not.

 5     Q.   If there were other individuals at Sutter

 6   Home who were also using Roundup, that would not

 7   change your opinion?

 8     A.   No, it would not.  I'm already aware of

 9   that, that's the case.

10     Q.   And you're aware of that because he said

11   that for the backpack sprayer, different people may

12   have improperly put the hose back on?

13     A.   That's correct.

14     Q.   And you don't know how much those other

15   individuals were using Roundup at Sutter Home?

16     A.   No.  That's irrelevant.

17     Q.   It doesn't matter for your opinion how much

18   or how many other individuals were using Roundup at

19   Sutter Home?

20     A.   No.  No.  I mean, hypothetically it could

21   increase his exposure if two or three sprayers were

22   spraying simultaneously in the same area, as per one

23   of the documents I provided in an earlier deposition

24   that was never returned to me, which I no longer

25   have.  Yeah.

William R. Sawyer, Ph.D.

```
 1      Q.   Do you have any indication that that was the

 2   case here, that there were two or three sprayers

 3   spraying simultaneously?

 4      A.   No.  I know that there were more than one

 5   sprayers, but I do not have any information

 6   indicating that they were spraying simultaneously in

 7   the same locations.

 8      Q.   And in addition to spraying Roundup,

 9   Mr. Alvarez had other job duties at Sutter Home,

10   right?

11      A.   Yes.

12      Q.   He would prune and trim trees and bushes?

13      A.   That's right.

14      Q.   He would plant trees and flowers?

15      A.   Yes.

16      Q.   He would mow the lawn?

17      A.   Yes.

18      Q.   He would fix sprinklers and water lawns and

19   plants?

20      A.   Yes.

21      Q.   And then he would spray Roundup, as you

22   listed?

23      A.   Yes.

24      Q.   He would also spray soap-based pesticide on

25   plants?
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1        A.   Yes.

 2        Q.   So those are -- and this is all from his

 3   PFS.  Those are six different job duties that I just

 4   listed?

 5        A.   Yes.

 6        Q.   Some of which had multiple parts, such as

 7   pruning and trimming?

 8        A.   Correct.

 9        Q.   On page 12 of your report you discuss

10   Mr. Alvarez's use of PPE, right?

11        A.   Yes.

12        Q.   What PPE did he wear?

13        A.   Generally, a short or a long-sleeved shirt

14   with jeans while spraying.

15        Q.   Did he wear any other PPE?

16        A.   He typically wore rubber boots and gloves.

17        Q.   And you say generally that's what he wore.

18   Why do you say generally?

19        A.   Well, because the documents indicate it was

20   short- or long-sleeve shirt.

21        Q.   Do you have any opinion as to how often he

22   was wearing short- versus long-sleeve shirts?

23        A.   No.

24        Q.   Does it make any difference to your final

25   conclusion what percentage of the time he wore
```

William R. Sawyer, Ph.D.

```
 1    short- versus long-sleeve shirts?

 2       A.   No.  His exposure dose measurement in

 3    eight-hour time-weighted days is so far in excess

 4    that it really is not going to make a difference

 5    either way.

 6       Q.   It is your opinion that how Roundup is

 7    actually handled or applied is, quote, a key

 8    determinant of a person's exposure?

 9       A.   Certainly.

10       Q.   But if he had worn less PPE, that would not

11    have impacted your opinion?

12            MR. DIAMOND:  Form.

13       A.   No.  I would still have the same opinion,

14    that his exposure was in the upper tertile and

15    quartile of the exposure studies and far exceeded

16    the thresholds of the human epidemiologic studies

17    showing statistically significant increased odds

18    ratios of developing NHL.

19       Q.   If he had worn more extensive PPE, would

20    that have impacted your opinion?

21            MR. DIAMOND:  Form.

22       A.   No.

23       Q.   Is there any amount of PPE that would change

24    your final conclusion in this case?

25       A.   Yes.
```

William R. Sawyer, Ph.D.

1      Q.    What would that be?

2      A.    Wearing a chemical-resistant Tyvek suit with

3    taped gloves, taped ankle joints, with a

4    self-contained respirator, SCBA, that would have

5    nullified the exposure.

6      Q.    Short of that, is there any amount of PPE

7    that would change your final conclusion in this

8    case?

9      A.    Not that would have reduced it below that of

10    the standard PPE recommended since 1971 by World

11    Health Organization, or that in the Machado study,

12    for example, in which the study --

13      Q.    I'm sorry, Doctor.  That doesn't seem to be

14    answering my question.

15      A.    It does.  The study occupants were wearing

16    full PPE and yet the exposure doses onto the body

17    were still of high significance, and including the

18    -- the Monsanto study I've included in my report

19    that showed the exposure levels of workers with full

20    PPE.  It doesn't nullify the exposure, it reduces

21    it.

22      Q.    And when you state full PPE, is that the

23    same clothing that you discussed a moment ago,

24    chemically resistant suit, taped gloves, taped

25    ankles, and the respirator?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

```
 1      A.   No.  No.  The standard documented protective
 2   gear for spraying pesticides and herbicides includes
 3   leather boots, drill overalls, long-sleeve shirt,
 4   face shield, hood, and gloves.  And I reference the
 5   World Health Organization PPE document in my report
 6   to that effect, and the same gear has been used in
 7   some of the exposure studies that have been
 8   performed.
 9      Q.   If Mr. Alvarez had been wearing that PPE
10   that you just listed, would you have still found
11   that Roundup was a significant contributing factor
12   to his NHL?
13      A.   Yes, as that protective gear, based on these
14   studies, does not reduce the exposure to null, and
15   more importantly, that is the standard where -- of
16   applicators, as per the World Health Organization
17   study I've referred to in my report, and the
18   epidemiological studies of applicators still reveals
19   significant rates of NHL, and those studies were
20   performed on applicators in some instances who wear
21   such protective gear.
22      Q.   And you state that that PPE does not reduce
23   the exposure to null, but it does reduce the
24   exposure, correct?
25      A.   Yes.
```

William R. Sawyer, Ph.D.

```
 1      Q.   Does it reduce it by a certain percentage?

 2      A.   Yeah.  Wearing the jeans or -- for example,

 3   reduces the penetration to the skin from 100 percent

 4   to 20 percent, as referenced in studies documented

 5   in my report.

 6      Q.   And is there a set percentage that comes out

 7   from wearing all the PPE that you listed that's

 8   considered the full PPE?

 9      A.   No.  The studies have not provided a full

10   percentage but, rather, a percentage for certain

11   factors, such as gloves reduces by a certain

12   percentage, cotton jeans reduces by a certain

13   percentage, the use of heavy leather boots reduces

14   by a certain percentage, and so on.

15      Q.   And all those percentages, even if you were

16   to apply them to the 546 exposure days for

17   Mr. Alvarez, it still would not amount to -- sorry.

18   You would still find that to be a substantial

19   contributing factor, right?

20      A.   Based on the human epidemiologic studies of

21   applicators who dressed that way in fact, there

22   would still be a odds ratio risk increase of NHL.

23      Q.   And that's including even if his year that

24   he stopped spraying Roundup was not exactly as it is

25   listed in this table, right?
```

William R. Sawyer, Ph.D.

```
 1      A.   I don't understand the question.

 2      Q.   So even if he didn't spray for 546 days, but

 3   sprayed for slightly less, reducing by the amount of

 4   PPE he used, you would still find it to be a

 5   substantial contributing factor for Mr. Alvarez,

 6   right?

 7      A.   Well, certainly.  It would still be greater

 8   than the 10-day time-weighted exposure threshold in

 9   which applicators were wearing the gear you're

10   talking about.

11      Q.   And that's the key factor there?

12      A.   I'm sorry?

13      Q.   That's the key amount that you look for, is

14   the 10-day threshold?

15           MR. DIAMOND:  Form.

16      A.   That's one of the thresholds of the studies

17   I've cited, yes.  That's the most demanding

18   threshold.

19      Q.   When you say most demanding, the other

20   thresholds are less days?

21      A.   Yes.

22      Q.   You mentioned that Mr. Alvarez had some

23   drenching episodes, right?

24      A.   Yes.

25      Q.   Do you know how many?
```

William R. Sawyer, Ph.D.

```
 1              I can actually rephrase that question.  Does

 2     it matter to your opinion how many drenching

 3     episodes he had?

 4        A.   Well, it's certainly important to know

 5     whether it was one or two or several hundred, but

 6     either way, the exposure is still vastly beyond the

 7     minimum thresholds with respect to causation.

 8        Q.   And even if there was zero drenching

 9     episodes, you would still find Roundup to be a

10     substantial contributing factor?

11        A.   Certainly.

12        Q.   Did you review other potential risk factors

13     for NHL as it relates to Mr. Alvarez?

14        A.   Yes.

15        Q.   Did you determine that those other potential

16     risk factors did not cause his NHL?

17        A.   Yes.

18        Q.   Is it your opinion that Mr. Alvarez would

19     not have gotten NHL if he had not used Roundup?

20              MR. DIAMOND:  Form.

21        A.   His risk would have been substantially less.

22        Q.   But do you intend to tell the jury that if

23     Mr. Alvarez had not used Roundup, he would never

24     have gotten NHL?

25              MR. DIAMOND:  Form.
```

William R. Sawyer, Ph.D.

```
 1      A.   No.

 2      Q.   That's not something you intend to tell the

 3   jury?

 4      A.   Correct.

 5      Q.   You went through other chemicals that

 6   Mr. Alvarez was exposed to and determined they were

 7   not potential causes of his NHL, right?

 8      A.   Yes.

 9      Q.   That information was listed in Table 1 of

10   your report?

11      A.   Yes, as well as questions I asked or

12   answered in the earlier portion of the report with

13   respect to ruling out certain conditions, such as

14   the use of carcinogenic pharmaceuticals, long-term

15   steroid use, organ transplant, and so on.

16      Q.   And you looked at that chart to determine

17   whether the specific items were known to cause NHL,

18   right, that's what the table says?

19      A.   Yes.

20      Q.   And also whether they were considered

21   probable human carcinogens?

22      A.   Yes.

23      Q.   Why did you use probable human carcinogen

24   instead of possible human carcinogen as the category

25   in that chart?
```

William R. Sawyer, Ph.D.

```
 1        A.   Because glyphosate as Roundup is a class 2A

 2   probable human carcinogen, as opposed to an animal

 3   carcinogen, which is -- holds far less weight.  In

 4   other words, toxicologists do not address and opine

 5   on causation based only on animal carcinogenic data.

 6        Q.   When you reference class 2A, that's in

 7   reference to IARC's classifications?

 8        A.   Yes.

 9        Q.   And in your opinion, if IARC has not found

10   something to be a probable human carcinogen, does

11   that mean it cannot be a carcinogen?

12        A.   No, but as a toxicologist I would not make a

13   causation determination on an animal carcinogen

14   without human data.  That would be improper and not

15   acceptable methodology.

16        Q.   Because the human data is the key data,

17   right?

18             MR. DIAMOND:  Form.

19        A.   The combination of human data, animal data,

20   experimental data, mechanistic data, dose-response,

21   consistency coherence, those are all primary factors

22   that toxicologists look at.

23        Q.   Between human data and animal data, what's

24   more significant for a toxicologist to look at?

25        A.   The combination of animal and human data.
```

William R. Sawyer, Ph.D.

1      Q.   That wasn't my question.  Between the two,

2   what is more significant in forming your opinions?

3      A.   My answer stands.

4      Q.   So there is no difference, in your opinion,

5   between human data and animal data?

6      A.   The combination of animal and human data is

7   what is generally required in the field of

8   toxicology to make a determination of

9   carcinogenesis --

10      Q.   And in that combination --

11      A.   -- in humans.

12      Q.   And in that combination, does animal or

13   human data have more weight?

14      A.   Yes.

15      Q.   Which one?

16      A.   Human.

17      Q.   And it would be improper to come to a

18   conclusion about the carcinogenic potential of

19   something solely based on animal data, right?

20           MR. DIAMOND:  Form.

21      A.   Yes.

22      Q.   In this chart you reference some things

23   that --

24      A.   Excuse me.  As per classifying as a human

25   carcinogen, yes.

William R. Sawyer, Ph.D.

1    Q.   In your chart you reference some things that

2  are listed as IARC Group 2B, right?

3    A.   Yes.

4    Q.   And IARC considers that to be a possible

5  human carcinogen?

6    A.   Yes.

7    Q.   But in your opinion, these things did not

8  possibly cause Mr. Alvarez's NHL?

9    A.   No, I didn't say that.  I said that I would

10  not draw a conclusion as to causation based on

11  animal data only, that it would have to have a

12  combination of animal and human data.

13    Q.   And maybe this is just my own confusion.

14  I'm certainly not a scientist or a doctor.  If IARC

15  is labeling something as a possible human carcinogen

16  and it's a product that Mr. Alvarez used, you are

17  now telling us that that did not cause Mr. Alvarez's

18  non-Hodgkin's lymphoma?

19         MR. DIAMOND:  Form.

20    A.   No, I'm not.  That's not what I'm saying.

21    Q.   When you came to your final conclusion in

22  this report, are you saying that it is only Roundup

23  that caused -- was a substantial contributing factor

24  in Mr. Alvarez's non-Hodgkin's lymphoma?

25         MR. DIAMOND:  Form.

William R. Sawyer, Ph.D.

1      A.   Absolutely.  The -- based on these

2   chemicals, for example, the page 10, Behr Premium

3   Plus Interior Eggshell Enamel, it's inhalation of

4   silica crystals, dust, that is rated as the Group B

5   possible human carcinogen.  As a toxicologist, that

6   silica has no possibility of reaching the areas in

7   the body systemically that cause lymphoma, only the

8   lung, and it's ruled out on that basis, not ruled

9   out simply because it's a group 2B possible human

10  carcinogen, but, rather, because it has no

11  propensity at all to impact and cause NHL.

12     Q.   I'm just asking.  IARC says it's possible

13  but you are saying it's not possible in this case?

14          MR. DIAMOND:  Form.

15     A.   Not possible for NHL.  Possible human

16  carcinogen with respect to silicosis and lung

17  cancer, certainly.

18     Q.   And I want to ask the question I asked last

19  time.  I want to make sure it's clear I'm asking it

20  more broadly than just the chemicals Mr. Alvarez

21  used.

22          It's your opinion that Roundup was a

23  substantial contributing factor in Mr. Alvarez's

24  NHL.  Is it your opinion that there was nothing else

25  that caused his NHL?

William R. Sawyer, Ph.D.

```
 1      A.   No.

 2           MR. DIAMOND:  Form.

 3      A.   No, that's not my opinion.  There are --

 4      Q.   So it's possible that something else causes

 5   NHL as well?

 6      A.   There are certainly other chemicals that can

 7   induce NHL, and it includes -- including

 8   radiological exposures.

 9      Q.   I'm saying specific to Mr. Alvarez.

10      A.   Nothing I could find.

11      Q.   So there is nothing else that could have

12   caused Mr. Alvarez's NHL?

13           MR. DIAMOND:  Form.

14      A.   Not that I have any information of.

15      Q.   And you don't intend to tell the jury that

16   there is anything else that could have caused

17   Mr. Alvarez's NHL?

18      A.   No, that's not exactly how I would phrase

19   it.  I would phrase it that based on my review of

20   the file, I was unable to identify any other

21   potential confounding factors with respect to the

22   cause of his NHL.

23      Q.   Is H. pylori a risk factor for NHL?

24      A.   It's possible, and I would defer that

25   because that's completely a -- really, it falls into
```

William R. Sawyer, Ph.D.

1     the arena of our oncologist, and I would defer that

2     to the oncologist.

3              It's my opinion as a toxicologist, and I've

4     studied ███████████, and I've actually taught a

5     section of medical epidemiology on ████████████

6     ██  ██████████████████████████████.  It is

7     possible that it could be a factor in NHL but I

8     think I would defer that to the oncologist.

9     Q.   And so you don't have an opinion one way or

10    the other whether ████████ caused or was a

11    substantial contributing factor to Mr. Alvarez's

12    NHL?

13             MR. DIAMOND:  I haven't asked him to opine

14        on that.  We have other doctors that have opined

15        on that, as well as Monsanto's doctor that's

16        already said it had no -- it was not causative in

17        any way, so I --

18             MR. WARREN:  Yeah, and I'm just asking

19        Dr. Alvarez's opinion --

20             MR. DIAMOND:  I haven't asked him -- I

21        haven't asked him to give an opinion on that.

22             MR. WHITMAN:  And we'll hear it in the

23        answer.

24             MR. WARREN:  Yeah, I know.  Let's just --

25        again, bad question.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1    BY MR. WARREN:

 2        Q.   So you don't have an opinion one way or the

 3    other whether ████████ was a cause or a substantial

 4    contributing factor to Mr. Alvarez's NHL?

 5        A.   It's certainly a consideration of being

 6    possible but I defer that to the oncologist.

 7        Q.   And you did not make that consideration one

 8    way or another in your report?
```

William R. Sawyer, Ph.D.





19    Q.   And it's significant that 50 percent of

20    humans living today will develop cancer regardless

21    of what they do in their life, right?

22    A.   That's right.

23         MR. WARREN:  I think now we can take that --

24    we can go off the record.

25         THE VIDEOGRAPHER:  Going off the record at

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1      11:33 [sic].

 2          (Recess from 11:23 a.m. until 11:27 a.m.)

 3          THE VIDEOGRAPHER:  We're back on the record.

 4      The time is 11:27.

 5   BY MR. WARREN:

 6      Q.   Dr. Sawyer, what documents did you review

 7   during the break?

 8      A.   A motion to strike one of the experts in

 9   this case.

10      Q.   Which expert?

11      A.   I don't remember his name.  It's a

12   physician.

13          MR. DIAMOND:  I can tell you:

14      Dr. Grossbard.

15      A.   He stated that it's his opinion as an expert

16   for Monsanto that there is insufficient ▮▮▮▮
```

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

```
20      Q.   Dr. Sawyer, ▮▮▮▮▮▮▮▮▮▮▮▮
```

▮ ▮▮▮▮▮▮▮

▮    ▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

William R. Sawyer, Ph.D.

1    ███████████████████████████████

2       Q.   Sorry for speaking too quickly.

3            You're aware that you reached a different

4    █████████████████   for Mr. Alvarez than Dr. Smith did,

5    right?

6       A.   No, I'm not aware of that.

7       Q.   I'll represent to you that Dr. Smith stated

8    Mr. Alvarez is a ███████████████████████████

██  ████████████████████████████████████████

██  ███████████████████████

11      A.   No, I'm not aware of that.

12      (Sawyer Exhibit 8 was marked for identification.)

13   BY MR. WARREN:

14      Q.   So I know we're stepping out of order right

15   now.  I'm showing you what has been marked as

16   Exhibit 8 of this deposition and this is the report

17   of Dr. Clayton Smith.

18           MR. DIAMOND:  What page are we looking at

19       now?

20           MR. WARREN:  This will be page 6 of the

21       report.

22           MR. DIAMOND:  And what number are we on?

23           MR. WARREN:  This is Number 8.  7 has been

24       marked but not used yet.

25   BY MR. WARREN:

William R. Sawyer, Ph.D.

1      Q.   So if you go to page 6 of Dr. Smith's

2    report, do you see a paragraph titled "Social

3    History"?

4      A.   Yes.

5      Q.   And you see what I just read, that Dr. Smith

6    states:  ████████████████████████████

███████████████████████████████████████████

███████████████████████.

9      A.   Yes, and I see he has a different ███████████

████    ██████, but I agree with Dr. Smith, that even if that

11   were the case, it would only be attributable to a

12   risk of follicular lymphoma and that's not what

13   we're dealing with in this case.

14           And I also refer to my study that I

15   referenced in the report by Taborelli.

16     Q.   And we'll get to that study in just a

17   moment.  Is Dr. Smith wrong in this opinion about

18   Mr. Alvarez's ████████████████████

19     A.   It's certainly different from what I've

20   obtained from the records, but I'm not going to

21   state it's wrong.  I don't see where he footnoted

22   his reference, so that's really hard for me to

23   evaluate without further information.

24     Q.   It's different than your assessment of his

25   history?

William R. Sawyer, Ph.D.

1       A.   That's what I said, yes, but even if it's

2   correct, it's still inconsequential and is not --

3   would not be a attributable cause.

4       Q.   Does it matter to you what type of

5   ████████████████████████████?

6       A.   No.

7       Q.   I take it you don't know what ███████

8  █ ███████████████████████████

9       A.   No.

10      Q.   Do you know when Mr. Alvarez ███████████

11 █ █████████?

12      A.   In approximately 1980 -- well, I'm not --

13  no, I don't know for sure when he ████████████

14 █ ████████████████████████████████

15 █ ██████████████████████████████████

16 █ ██████████████████████████████

17 █ ████████████████████████████████████

18 █ ████████████████████ The only thing it could

19  be related to would be follicular lymphoma.

20      Q.   And correct me if I'm wrong, but it seems

21  you have two opinions about Mr. Alvarez's ███████

22 █ ████████   First you say that a ████████████████

23 █ ███████████████████████████████████

24 █ ████████████████████

25      A.   ████████████████████████████████

William R. Sawyer, Ph.D.



1

7      Q.    And that's where I want to break it down

8    into two parts.  You say that a                    -- and,

9    Dr. Sawyer, just answer the question, then we can go

10   to Taborelli.

11

Dr. Sawyer, I'm asking for your

15   opinions here and not the --

16        A.    You know what, a good scientist consults the

17   literature.  Maybe lawyers don't but I do, and I'm

18   going to consult the literature that I brought with

19   me, like it or not.

20        Q.    You're going to consult the literature to

21   tell me whether one of your opinions in your report

22   dated in December is that Mr. Alvarez's

is insufficient to significantly

24   increase his NHL risk?

25        A.    You bet.  I'm going to check the odds ratio

William R. Sawyer, Ph.D.

1    in the 95 percent confidence interval and make sure

2    that I answer the question correctly.  I'm not going

3    to use my memory from what I read three months ago.

4    I'm --

5        Q.   And you don't want to refer to your cite in

6    your report either?

7        A.   I may.

8        Q.   If you're going to go through the entire

9    Taborelli study, you don't want to know what page

10   number you're looking for?

11       A.   I don't need to.  I already know it's --

12           MR. WARREN:  In that case, can we go off the

13       record?

14       A.   I already know Table 4.

15           MR. DIAMOND:  If you want, sure.

16           MR. WARREN:  I just don't want to use up

17       time while he rereads the study.

18           THE WITNESS:  And I want you to time this

19       and show how long we're off the record.  It

20       should be about 45 seconds.

21           MR. DIAMOND:  Okay.

22           MR. WARREN:  We're off the record.

23           MR. DIAMOND:  Since we're off the record --

24           THE VIDEOGRAPHER:  One second.  We're going

25       off the record at 11:34.

```
 1            (Recess from 11:34 a.m. until 11:35 a.m.)

 2            THE VIDEOGRAPHER:  We're back on the record.

 3       The time is 11:35.

 4            THE WITNESS:  And it took about 45 seconds

 5       off the record to answer the question and I think

 6       it was a waste of time to halt the deposition.

 7   BY MR. WARREN:

 8       Q.   I think we're all in agreement that that was

 9   a waste of time.

10            Now, is one of your opinions as to

11   Mr. Alvarez's ███████████████████████████

         ████████████████  is insufficient to increase the risk

13   of NHL?

14       A.   Yes.

15       Q.   Separately, are you of the opinion that

16   Mr. Alvarez's ███████████  has also nulled any

17   significantly increased odds ratio?

18       A.   That's correct.

19       Q.   And in coming to those opinions, you just

20   reviewed the Taborelli study, right?

21       A.   Yes.

22       (Sawyer Exhibit 7 was marked for identification.)

23   BY MR. WARREN:

24       Q.   And I'll state for the record that that's

25   been marked as Exhibit 7 of this deposition.
```

William R. Sawyer, Ph.D.

 1      A.   Yes.  I took 45 seconds and reviewed the

 2   odds ratio and confidence interval in Table 2, to

 3   refresh my memory.

 4      Q.   And in refreshing your memory, did you see

 5   what group of people were studied in the Taborelli

 6   study?  Does Italians in hospitals sounds accurate?

 7      A.   I'm sorry, I didn't hear that.

 8      Q.   Does Italians that are in hospitals sound

 9   accurate as the group --

10      A.   That's correct, yeah.

11      Q.   And were their smoking habits determined by

12   way of a questionnaire?

13      A.   Yes.

14      Q.   Do you know what the study authors did to

15   validate the results in this questionnaire?

16      A.   No.  There is no really good way to validate

17   smoking histories beyond questionnaires.  It's very

18   hard to go back in time and actually observe what a

19   person is smoking over the period of years.

20      Q.   I agree with that.  My question was slightly

21   different, which is do you know what the study

22   authors did to validate the results of the

23   particular questionnaire that they were using?

24      A.   I don't believe there was any historic

25   validation.  I mean, you can test for cotinine in

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

1    the laboratory and determine if the person is a

2    smoker, but it's really not possible to -- there's

3    no test that will show historically what year the

4    smoking started.

5        Q.   So in your opinion, it was correct for these

6    authors to rely on the results of this

7    questionnaire?

8        A.   Certainly.

9        Q.   And questionnaires are used all the time in

10   studies, right?

11       A.   Yes.

12       Q.   And it's reliable to use a questionnaire?

13       A.   Yes.

14       Q.   What was the overall conclusion of the

15   Taborelli study in the conclusions listed there in

16   the abstract on the first page?

17       A.   Direct association of risk with smoking

18   intensity, and that intensity is measured in

19   pack-years.

20       Q.   And did the authors also find that tobacco

21   smoking is a potential risk factor for NHL, if you

22   look at the first full paragraph that's in the right

23   column of page 1?

24       A.   I'm sorry.  Could you repeat that?  I didn't

25   hear it all.

William R. Sawyer, Ph.D.

 1      Q.   Sure.   The first full paragraph on the right

 2   column of page 1.

 3      A.   The first full paragraph, page 1.

 4      Q.   It states:   Tobacco smoking is a potential

 5   risk factor for NHL.

 6           Do you agree with that?

 7      A.   No.  It says:   Tobacco smoking is a

 8   potential risk factor for NHL and HL worth

 9   scrutinizing.

10           It means it has to be assessed, and that's

11   what they did in this study.   They assessed the

12   number of years of smoking intensity and

13   statistically evaluated that for non-Hodgkin's

14   lymphoma and Hodgkin's lymphoma.

15      Q.   And then they reached a conclusion on page

16   8, right, and they state:   In conclusion, our

17   results lent additional support to the possibility

18   that tobacco smoking may play a role in the etiology

19   of both NHL and HL.

20           Right?

21      A.   Yes.  It's certainly a possibility, yes.

22   It's dependent upon the dose.  It's a dose-response

23   relationship is what this study has shown.

24      Q.   So tobacco smoking is a possibility to be a

25   risk factor for NHL?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

```
 1            MR. DIAMOND:  Form.

 2      A.   Based upon dose intensity, one must consider

 3   that and evaluate it in that fashion, especially a

 4   toxicologist who is dose oriented.

 5      Q.   And that's based on the Taborelli study,

 6   right?

 7      A.   Yes.

 8      Q.   Did you base any of your findings -- any of

 9   your findings about cigarette smoking on anything

10   other than Taborelli's study, any other studies?

11      A.   Yeah.  There is a study that I have reviewed

12   and I have discussed in the Johnson -- I believe it

13   was the Johnson deposition, which --

14      Q.   I'm just referring to your opinion in this

15   case, Dr. Sawyer.

16      A.   Well, it's a Monsanto case and it's in my

17   deposition that I referenced I think a 40 pack-year

18   history showing a statistically insig --

19   statistically significant increased rate of NHL.

20      Q.   Did Taborelli reference a 40 pack-year

21   history?

22      A.   No.

23      Q.   Were they wrong in not referencing that

24   40 pack-year history?

25      A.   No.
```

William R. Sawyer, Ph.D.

```
1        Q.   If Mr. Alvarez had ███████████████ up

2   until his NHL diagnosis, would you have considered

3   ████████ to be a contributing factor to his NHL?

4        A.   For follicular lymphoma, yes.

5        Q.   What about for Mr. Alvarez's particular NHL?

6        A.   I'm not prepared to answer that because

7   that's not a fact in the case, that he ██████ up to

8   the time of his diagnosis, so I did not assess that.

9        Q.   And hypothetically, if Mr. Alvarez had done

10  so, would you have found ████████ to be a

11  contributing factor to his NHL?

12       A.   I just said I didn't prepare to answer that

13  question because it's not a fact in this case.

14       Q.   And what would you do to prepare to answer

15  that question other than looking at the Taborelli

16  study that you have in your hand right now?

17       A.   I would calculate his █████████ if he had

18  hypothetically ███████ up to the date of the

19  diagnosis.

20       Q.   If he had and those ██████████ were greater

21  than the ██████████ listed in the Taborelli study,

22  would you have found ████████ to be a contributing

23  factor to Mr. Alvarez's NHL?

24       A.   Well, it would have added another -- I think

25  another four years to his history -- or another
```

1    14 years, rather, to his history.

2        Q.   Do you know how the Taborelli authors

3    defined smokers in this study?  And I can actually

4    refer you to page 2, the right column at the bottom,

5    the authors state:  Smokers were defined as subjects

6    who had smoked at least one cigarette per day for at

7    least 12 months.

8            Is there any reference to pack-years in

9    assessing whether Roundup is a contributing factor

10   to NHL in the Taborelli study?

11       A.   Your question was incomprehendible because

12   you stated it too quickly.

13       Q.   The Taborelli study defines smokers as

14   people that have smoked at least one cigarette per

15   day for the last 12 months, right?

16       A.   Yes.

17       Q.   So did it matter to the authors of the

18   Taborelli study how many pack-years individuals had

19   been smoking cigarettes?

20       A.   No.

21       Q.   Did you consider Mr. Alvarez's use of

22   ████████████  in forming your opinion?

23           MR. DIAMOND:  Form.

24       A.   No.  It's not associated with NHL.

25       Q.   Are you aware that he used ███████

William R. Sawyer, Ph.D.

1        ████████████

2        A.   Yeah, I think I read that somewhere.

3        Q.   You chose not to include this in your

4   report?

5        A.   No, it's irrelevant.

6        Q.   ████████████████ is irrelevant in

7   non-Hodgkin's lymphoma?

8        A.   That's right.

9        Q.   Does it matter which form of ██████████

██   ████████ he used?

11       A.   I'm sorry.  I don't understand.

12       Q.   Does it matter what form of ████████

██   ████████ Mr. Alvarez used, whether he used ████████

██   ████████████████████████████?

15       A.   No.  It's associated with ████████████, not

16   NHL.

17       Q.   It's not associated with any other cancers

18   other than ████████████?

19       A.   Primarily ████████████ but not NHL.

20       Q.   Mr. Alvarez, as we discussed, worked at

21   Sutter Home Winery, right?

22       A.   He worked where?

23       Q.   At Sutter Home Winery.

24       A.   He did.

25       Q.   That's a large winery, right?

1      A.   Acreage-wise, yeah.

2      Q.   And I mean in terms of production of wine

3   too, right?

4      A.   Could be.  I haven't evaluated the

5   production rate.

6      Q.   Would it surprise you to hear it's the

7   fourth largest winery in the United States?

8      A.   Could be.

9      Q.   And that it produces 20 million cases a

10   year?

11      A.   Send me a case.

12      Q.   20 million and 1 cases a year.

13           MR. DIAMOND:  I think they have

14       other holdings besides Napa, so it's not -- the

15       wine doesn't all come from Napa, where

16       Mr. Alvarez worked.

17           MR. WARREN:  That's perfectly fine.

18      A.   I have a friend -- I test -- I was on Fox

19   News Morning in New York on that Dominican problem

20   with the alcohol, and I got an e-mail from my best

21   friend after the interview that said "send me some

22   of that DR -- DR booze."

23           So send me a case of that good wine.

24      Q.   I certainly didn't represent that it's good

25   wine.  I believe it's the number one producer of

William R. Sawyer, Ph.D.

```
 1    white zinfandel.

 2           MR. DIAMOND:  They have Napa Cellars, they

 3      have Joel Gott, they have many, many brands.

 4           MR. WARREN:  I understand.  I understand.

 5           THE WITNESS:  I'm going to need a glass of

 6      wine soon after this deposition.

 7           MR. DIAMOND:  I think this would be a good

 8      deposition where we actually have a bottle of

 9      wine.

10           MR. WARREN:  No comment.

11   BY MR. WARREN:

12      Q.   Did you look into whether any other Sutter

13   Home employees have gotten NHL?

14      A.   No, I don't have any information to evaluate

15   that.

16      Q.   Do you have any information as to whether

17   visitors to Sutter Home's properties have gotten

18   NHL?

19      A.   No, but I can't believe that the visitors

20   were out spraying and mixing.  That wouldn't make

21   any sense.

22      Q.   Do you have any information as to whether

23   Roundup sprayed at Sutter Home's properties would

24   get into the grapes that produce the wine?

25      A.   Hopefully not.  It was perimeter fencing.
```

William R. Sawyer, Ph.D.

```
 1    There was no information in the documents I reviewed

 2    that the -- that Mr. Alvarez actually went into the

 3    grape area but, rather, sprayed perimeter fencing.

 4        Q.   Do you intend to offer any opinions in this

 5    case about Mr. Alvarez's NHL diagnosis?

 6        A.   Any opinions on what?

 7        Q.   On his non-Hodgkin's lymphoma diagnosis.

 8        A.   No.  I'm aware of what it was.  I checked

 9    the pathology results, included a summary of it in

10    my report.  As a toxicologist, I've studied

11    pathology, I've been through medical school

12    pathology, but I'm not a pathologist.  I rely on the

13    diagnosis that was made.

14        Q.   You defer to others as to Mr. Alvarez's

15    non-Hodgkin's lymphoma diagnosis?

16        A.   Yes.

17        Q.   And that would also apply to his treatment,

18    right?

19        A.   Correct.

20        Q.   You don't intend to offer any opinions on

21    his treatment?

22        A.   No.

23        Q.   As you already stated, you don't intend to

24    offer any opinions to the jury about what caused

25    Mr. Alvarez's passing away?
```

William R. Sawyer, Ph.D.

```
 1      A.   No.

 2      Q.   Do you intend to offer any opinions about

 3   the Roundup label in this litigation?

 4      A.   That's such a general question.  I'm not

 5   sure how to accurately answer it.

 6      Q.   Mr. Alvarez didn't read the label, right?

 7      A.   That's right.

 8      Q.   So it did not impact Mr. Alvarez's Roundup

 9   purchasing decision what was in the label?

10      A.   I think that's correct, yes.

11      Q.   And you don't intend to provide an opinion

12   to the jury as to that fact?

13      A.   As to what?

14      Q.   I'm sorry.  That was an unclear question.

15           You do not intend to tell the jury that the

16   information in the label influenced Mr. Alvarez's

17   purchasing decisions?

18      A.   Not directly.  It could have impacted the

19   decision of the person who recommended he purchase

20   it, but --

21      Q.   Do you have any information as to whether or

22   not that was the case?

23      A.   I thought I remember reading something about

24   the purchasing, but I would defer that to -- that's

25   really beyond the scope of my testimony, to judge
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

1    whether the label impacted his superiors.  I can't

2    answer that.

3        Q.    And therefore, you don't intend to provide

4    any opinions about that to the jury?

5              MR. DIAMOND:   Form.

6        A.    It really -- if I'm asked a question about

7    the label, a specific question about the label, I'll

8    answer it, but I just don't have any information

9    with respect to the superiors who did read the label

10   and chose to buy the product.  I can't really speak

11   on that issue.  It's beyond my role.

12       Q.    And so it's your opinion -- do you intend to

13   tell the jury that some superiors at Sutter Home did

14   read the label and choose to buy the product that

15   Mr. Alvarez then used?

16       A.    No, I'm not even going to go that far.  I

17   defer that to other appropriate experts who are

18   witnesses.

19       Q.    You don't know one way or the other whether

20   or not that was the case?

21       A.    I don't think so, no.

22       Q.    I'm sorry.  That answer was unclear.  Is it

23   that you don't think so or is the answer no, that

24   you don't know one way or the other?

25       A.    From the file I thought I remember some

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

1    information on the purchasing, but it's -- I didn't

2    really intend on including that in my report or

3    discussing it.

4        Q.   Because that's outside the scope of your

5    report, right?

6        A.   Yes.

7        Q.   In your opinion, what is the latency period

8    for Roundup and non-Hodgkin's lymphoma?  It's page

9    14 of your report, I believe.

10       A.   .4 to 25-year minimum latency.

11       Q.   Do you intend to offer an opinion at trial

12   about the non-Hodgkin's lymphoma latency period with

13   Roundup?

14       A.   Simply that he clearly met the minimum

15   latency period.

16       Q.   Does latency act as a floor or is it also a

17   ceiling?

18       A.   Could you repeat that, please?

19       Q.   Sure.  Latency is a minimum amount of time

20   between use and an event, right?

21       A.   It's a minimal amount of time from the first

22   exposure to the diagnosis, and actually, not the

23   first symptom, but to the actual diagnosis.

24       Q.   Is there a maximum time period for the

25   latency of Roundup causing NHL, in your opinion?

William R. Sawyer, Ph.D.

```
 1      A.   No.

 2      Q.   So if somebody used Roundup for 10 days when

 3   they were 18 years old and they never used it again

 4   for the rest of their life and got non-Hodgkin's

 5   lymphoma when they were 90, would you find Roundup

 6   to be a substantial contributing factor?

 7           MR. DIAMOND:  Form.

 8      A.   I have not evaluated that in terms of a

 9   cessation period of that length and the potential of

10   genetic repair mechanisms over that length of time.

11   I have not made that evaluation as that was not a

12   question in this case, or any of the Monsanto cases

13   thus far.

14      Q.   It's your opinion that it was not a question

15   of impact of cessation of Roundup use in assessing

16   whether Roundup caused non-Hodgkin's lymphoma?

17           MR. DIAMOND:  Form.

18      A.   Of a cessation of 30 years or, as you just

19   said, 80 years.  There has been no such case where a

20   person used Monsanto 80 years ago and then developed

21   NHL.  In fact, it wasn't even available 80 years

22   ago.

23      Q.   But would there be, in your opinion, a

24   period of time of cessation of use in which you

25   would not find Roundup to be a substantial
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

1    contributing factor?

2       A.   Again, I have not made that evaluation.  It

3    has not been an issue in any of these cases and I'm

4    not about to give an off-the-cuff, irresponsible,

5    nonreferenced answer.  I will review the literature

6    if you would like and research that matter and then

7    provide the answer.

8       Q.   So, therefore, you're saying it's a

9    possibility that there is a maximum limit?

10          MR. DIAMOND:  Form.

11      A.   I have not made that evaluation.

12      Q.   But by saying you need to make an

13   evaluation, you are saying there is some

14   possibility, right?

15          MR. DIAMOND:  Form.

16      A.   I'm not offering any opinion without doing

17   the proper research and referencing the appropriate

18   generally accepted studies.

19      Q.   So sitting here today, it's your opinion

20   that there is a possibility?

21          MR. DIAMOND:  Form.

22      A.   We know that with asbestos and mesothelioma,

23   it's typical for a 35-year period to go by without a

24   single symptom or sign of malignancy.  We know with

25   mesothelioma, asbestos exposure can show up with

William R. Sawyer, Ph.D.

```
 1    mesothelioma 50 years later without any further

 2    exposures.

 3            Now you're asking me -- you're asking me a

 4    similar question with respect to Roundup and that

 5    evaluation I have not made and I'm not going to

 6    speculate.  I know you're trying to get me to

 7    speculate and put things on the record for you to

 8    file motions against me.  I'm not going there.

 9    That's just -- I am not that dumb to make such a

10    leap in speculation without appropriately

11    referencing the answer.

12       Q.   I'm certainly not asking you to speculate.

13    You have been through many depositions, you know

14    you're not supposed to speculate.  I'm also

15    certainly not attempting to be involved in the

16    filing of any motions.  I -- that's not my skill

17    set.

18       A.   Well, then why are you asking me such a

19    question?  I've explained to you that I've not made

20    the assessment.

21       Q.   I'm trying to find out what your opinions

22    are in this case and what the basis is for your

23    opinions.

24       A.   I don't provide opinions without consulting

25    the scientific literature.  Period.
```

William R. Sawyer, Ph.D.

```
 1              MR. DIAMOND:  And I think with respect to
 2        your question, you asked him if it was possible.
 3        I just don't think he's in a position today to
 4        say whether it's possible or not.  I think that's
 5        what he was saying.
 6              MR. WARREN:  And I'm asking for his opinion
 7        today.  By definition of not being able to say
 8        that one way or the other, that means that it is
 9        possible.
10              MR. DIAMOND:  No.
11              MR. WARREN:  If you're saying your opinion
12        today is that it's not possible, then by
13        definition you're saying -- okay.  Can -- let's
14        rephrase the question and make sure the record is
15        clear.
16              MR. DIAMOND:  I'm just going to make a form
17        objection ahead of time.
18              THE WITNESS:  I like that.
19   BY MR. WARREN:
20        Q.   Sitting here today, can you rule out the
21   possibility that there is a maximum period of time
22   for cessation of Roundup use where it would not be a
23   contributing factor to non-Hodgkin's lymphoma?
24        A.   I have not made the assessment.  I cannot
25   answer that without performing the appropriate
```

William R. Sawyer, Ph.D.

1    research and review.

2        Q.   So sitting here today, can you rule out that

3    possibility?

4        A.   I cannot provide any assessment without

5    looking at it further.

6        Q.   So the answer is no, you cannot rule out

7    that possibility?

8        A.   I'm not going to speculate.  I'm sorry.  Not

9    going to happen.

10       Q.   Therefore, the answer to that question is

11   no, you cannot rule out that possibility?

12       A.   That's not --

13            MR. DIAMOND:  Form.

14       A.   Not what I said.

15            MR. DIAMOND:  Come on.  We're wasting time

16       on this one.

17            MR. WARREN:  It's his decision to waste time

18       on this one.

19            MR. DIAMOND:  All right.

20   BY MR. WARREN:

21       Q.   Do you know whether there was any Roundup in

22   Mr. Alvarez's system at the time he developed his

23   first non-Hodgkin's lymphoma cancer cell?

24       A.   No.

25       Q.   In your report you state that POEA is banned

William R. Sawyer, Ph.D.

```
 1    in Europe, right?

 2        A.   I believe it's banned at this point just

 3    about everywhere in the world except the US.

 4            MR. WARREN:  Strike that because it's -- I'm

 5        not sure if it's accurate.  It's also not an

 6        answer to my question.

 7        Q.   You state that POEA is banned in Europe,

 8    right?

 9        A.   And many other countries:  Italy, France.

10        Q.   Did Mr. Alvarez use Roundup in Europe?

11        A.   No.

12        Q.   So why did you include this in your report?

13        A.   It's a generally recognized hazardous

14    chemical that potentiates the toxicity of glyphosate

15    as well as the genotoxicity of glyphosate.

16        Q.   And is it your opinion that POEA was banned

17    in Europe because it's carcinogenic?

18        A.   No.  I did not say it's carcinogenic.  I'm

19    not sure where you're finding that.

20        Q.   On page 42 of your report you state:  For

21    example, in a European Food Safety statement,

22    POE-tallow amine caused positive carcinogenic

23    findings in a number of test systems.  The consensus

24    was that the likely causative basis was

25    cytotoxicity.
```

William R. Sawyer, Ph.D.

1          Did I read that portion of your report

2    correctly?

3        A.   Yes, but I did not declare it to be a

4    carcinogen, did I?

5        Q.   You state that according to a European Food

6    Safety statement, it caused positive carcinogenic

7    findings, right?  It's page 42 of your report.

8        A.   I stated on page 42:  Additionally, some

9    substances only become carcinogenic when mixed with

10   or in the presence of other substances, which

11   include formulation impurities, and I talk about

12   interactions, and that's what the studies have

13   revealed with respect to POEA, that the interaction

14   of POEA increases genotoxicity and carcinogenesis.

15   I never stated and declared that POEA by itself is a

16   human carcinogen.

17       Q.   So it's your opinion that POEA by itself is

18   not carcinogenic, right?

19       A.   There is no evidence that POEA in humans is

20   a carcinogen; however, as I stated, when mixed with

21   other compounds, such as Roundup or glyphosate, it

22   increases carcinogenesis and genotoxicity

23   significantly, as shown in studies cited in my

24   report.

25       Q.   But again, just to answer my specific

William R. Sawyer, Ph.D.

```
 1   question, it's your opinion that POEA by itself is
 2   not carcinogenic, right?
 3       A.   In humans, that is correct.
 4       Q.   Your report references trace chemicals
 5   present in Roundup?
 6       A.   Yes.
 7       Q.   If Roundup did not have these trace
 8   chemicals that you reference in your report, would
 9   you have still found that it was a substantial
10   contributing factor in Mr. Alvarez's non-Hodgkin's
11   lymphoma?
12       A.   Yes.
13       Q.   One of those trace chemicals is
14   formaldehyde, right?
15       A.   Yes.
16       Q.   And there is a lot of products that have
17   formaldehyde?
18            MR. DIAMOND:  Form.
19       A.   Yes, but not at the level measured in the
20   formaldehyde cake on Monsanto's MSDS at 31,000 ppm.
21       Q.   I'm showing you what's been labeled as
22   Exhibit 9 to your deposition.
23       (Sawyer Exhibit 9 was marked for identification.)
24   BY MR. WARREN:
25       Q.   This is from the National Institute of
```

William R. Sawyer, Ph.D.

```
 1    Health Household Products Database.  Have you seen

 2    this before?

 3      A.   No.

 4      Q.   Do you have any reason to believe that the

 5    NIH's assessment of products that contain

 6    formaldehyde is incorrect?

 7      A.   No, but I should point out the quantity in

 8    the formaldehyde glyphosate cake is between --

 9      Q.   Dr. Sawyer, the question is just --

10      A.   -- three and 1,000 times above the

11    numbers -- the values -- percent values on this

12    document.

13      Q.   Dr. Sawyer, if you could please just answer

14    the questions that I asked.

15      A.   I did.

16      Q.   If you could please limit your responses to

17    the questions that I ask.

18           So you have no reason to believe that the

19    NIH's assessment of what products, regardless of

20    quantity, contain formaldehyde?

21      A.   I can't -- I can't answer that by ignoring

22    quantity.  I'm required as a toxicologist to

23    consider dose.

24      Q.   Dr. Sawyer, as you can see on this paper, it

25    just states "products that contain this ingredient,"
```

William R. Sawyer, Ph.D.

```
 1    and this ingredient is formaldehyde.  Do you see

 2    that.

 3        A.   That's incorrect.  It shows the percentage

 4    in each product.

 5        Q.   I'm not asking for everything that's on this

 6    piece of paper.

 7        A.   I know.

 8        Q.   If your lawyer wants to come back during his

 9    portion and ask you the percent that's on this

10    document, he's more than welcome to do so.  My

11    question --

12        A.   But then your questions are misleading.

13        Q.   There is nothing misleading about my

14    question.  My question --

15             MR. DIAMOND:  Form.

16        Q.   I'll strike that and start over.

17             I want to make it clear with my question

18    that I'm not asking you for every single piece of

19    information that's on this document.  I am simply

20    asking you some specific questions about the

21    document.

22        A.   Okay.  I'll give you a misleading sound bite

23    you can play in front of the jury.

24        Q.   Dr. Sawyer, do you have any reason to

25    believe that the NIH's list of products that contain
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

1    formaldehyde, regardless of quantity, is an accurate

2    list of products containing the ingredient?

3       A.   No, but the percent is also listed and

4    important in my consideration.

5       Q.   And similarly, you talk about ethylene

6    oxide?

7       A.   Yes.

8     (Sawyer Exhibit 10 was marked for identification.)

9    BY MR. WARREN:

10      Q.   I'm showing you what's been marked as

11   Exhibit 10 to this deposition, and I don't have many

12   questions about this.  I would just like to know is

13   this a list from the National Institute of Health as

14   well?

15      A.   Yes.

16      Q.   Have you seen this document before?

17      A.   No.

18      Q.   Ignoring the percent, do you have any reason

19   to believe that the NIH's list of products that

20   contain ethylene oxide is incorrect?

21      A.   Well, yes, and actually, on both documents

22   you gave me, they are incorrect because neither of

23   them include Roundup.

24      Q.   Is it your opinion that the NIH is

25   incorrect?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

```
 1              MR. DIAMOND:  Form.

 2        A.   Well, unfortunately, Roundup is not on these

 3   documents because the information in the

 4   confidential documents from Monsanto that I have

 5   were not provided to the US Department of Health and

 6   Human Services NIH.

 7        Q.   When did you receive those documents,

 8   roughly, the year?

 9        A.   2018.

10        Q.   It's now just about the end of 2019.  Have

11   you done anything to reach out to the National

12   Institute of Health as to the amount of ethylene

13   oxide that you believe is in Roundup?

14              MR. DIAMOND:  Form.

15        A.   You know, I will do that Monday morning if

16   you grant me permission to turn over the

17   confidential documents to the US government, I will

18   do it immediately.

19        Q.   Dr. Sawyer, do you have --

20        A.   Are you giving me permission?

21        Q.   I am not.

22        A.   Okay.

23        Q.   Dr. Sawyer, do you have any reason to

24   believe that the products that are listed on here --

25        A.   Your buddy is smiling.  I'm not sure why.
```

William R. Sawyer, Ph.D.

```
 1              MR. WHITMAN:  I'm just having a great time

 2     overall.

 3     BY MR. WARREN:

 4        Q.   Dr. Sawyer, do you have any reason to

 5     believe that the NIH's list of products that contain

 6     Roundup contains an accurate list of some of the

 7     products that contain Roundup?  I'm not asking

 8     whether it is a full and complete list of

 9     products -- sorry.  I misspoke in my question.  I'll

10     start over.

11              MR. DIAMOND:  Start again.

12        Q.   Dr. Sawyer, do you have any reason to

13     believe that the NIH's list of products that contain

14     ethylene oxide accurately lists some of the products

15     that contain that ingredient regardless of whether

16     or not it is a full and complete list of the

17     products that contain ethylene oxide?

18        A.   Yes.  The lists are not complete, but what I

19     see in here is correct.

20        Q.   Thank you.  So the items that are listed

21     here are correct in that they do contain ethylene

22     oxide?

23        A.   Yes.

24        Q.   Thank you.

25              MR. WARREN:  Can we go off the record for a
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
1      minute?

2           MR. DIAMOND:  Sure.  How much time have we

3      got?

4           MR. WARREN:  We're at 2:56.

5           THE VIDEOGRAPHER:  We're off the record at

6      11 -- I'm sorry.  12:06.

7        (Recess from 12:06 p.m. until 12:07 p.m.)

8           THE VIDEOGRAPHER:  We're back on the record.

9      The time is 12:07.

10          MR. WARREN:  Dr. Sawyer, thank you for your

11     time.  I have no further questions at this

12     moment.

13                    CROSS-EXAMINATION

14   BY MR. DIAMOND:

15     Q.  Dr. Sawyer, I'm going to want to ask you

16   about a few things, one of them being Dr. Cohen's

17   report, but before I get to that, I'm only

18   mentioning it now so that I don't forget.  Can I ask

19   you a couple questions about Dr. Grossbard?
```



William R. Sawyer, Ph.D.





16      Q.    Okay.

17      A.    However, he has made a number of serious

18   methodological errors.

19      Q.    What are those?

20           MR. WARREN:  Objection; vague.

21      A.    To start with, in the assessment of systemic

22   dose to glyphosate, the POEM methodology, that's a

23   UK methodology that's been used internationally, as

24   well as the Machado study, the Monsanto study as

25   referenced in my report, and many others, have

William R. Sawyer, Ph.D.

```
 1    evaluated the what we call PDE, potential dermal

 2    exposure, that is how much Roundup lands on the

 3    clothing or bare skin, depending what's worn, and

 4    this has been performed using female pads which have

 5    a double-stick tape on it, and these patches are

 6    placed on various parts of the body before a sprayer

 7    goes into the field and it measures how much spray

 8    drift lands on the lower legs, the thighs, the

 9    chest, the back, the hands, the face, and different

10    parts of the body, and that area constitutes a given

11    number of centimeters squared and for each area of

12    the body that amount of material that lands is

13    included in the dose calculation from the whole

14    body.

15         Mr. Cohen used his own self-proclaimed

16    methodology, which is not generally accepted or ever

17    published or reviewed or accepted in any of the

18    literature, and only measured the impact to the

19    front and back of the lower legs, ignored everything

20    else on the body.  So that's a fatal error in his

21    calculation that would need to be excluded.

22    Q.   And why is that a fatal error?

23    A.   Well, because he only focused on the lower

24    legs and the calf, when he -- the methodology

25    requires measurement of contact on the entire body
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
William R. Sawyer, Ph.D.

 1    surface.

 2          Number two, generally, peer-reviewed

 3    literature specifically refers to calculating human

 4    dosage by dermal absorption factor and specifically

 5    states that the use of the flux -- not like the flux

 6    capacitor in back to the future, but the use of

 7    what's called flux, in other words, penetration of

 8    material over a centimeter squared over a given

 9    amount of time, that methodology is inaccurate and

10    should be avoided in calculating dermal absorption

11    in humans, but rather than the dermal absorption

12    percent should be used, and he did not use the

13    percent, he used the flux rate.

14    Q.   Which is a lower rate?

15    A.   Well, it results in a much lower value, yes,

16    and because it assumes that the only absorption

17    occurs during the time from exposure to the time of

18    bathing and after that there is zero exposure, which

19    is not true.  The amount that is contained in the

20    epidermis continues to be absorbed over time.

21          Thirdly, and really most significantly,

22    Mr. Cohen applies his extremely low erroneous dose

23    to that of animal studies rather than human studies,

24    and the animal studies he uses, in fact, are based

25    on reproductive toxicological effects, not cancer,

William R. Sawyer, Ph.D.

1    and even if the animal studies he used were of

2    cancer in animals, it's still inappropriate as it's

3    not generally accepted to perform a causation

4    assessment solely on animal studies.

5           That's why I've used human exposure

6    time-weighted average studies, the same type of

7    scenario that's used with asbestos, which is a -- or

8    with benzene, which is benzene is measured in PPM

9    years.

10          So he's inappropriately taking his incorrect

11   calculation and then comparing it to an RFD or other

12   measure, such as the EU AOEL, for causation purposes

13   and that's incorrect.  You have to use human data

14   to -- he's just comparing to regulatory and animal

15   toxicological levels and that's just not reasonable

16   and correct methodology.

17      Q.   Anything else?

18      A.   (No response.)

19      Q.   I have a specific question.  Maybe I should

20   go to that first, or --

21      A.   Okay.

22      Q.   You're aware that Mr. Cohen makes an

23   assumption as to six ounces of Roundup concentrate

24   that was being mixed per one gallon of water by

25   Mr. Alvarez, and have you thought about that issue?

William R. Sawyer, Ph.D.

1      A.   Thank you.  That was one of the other errors

2    that I found and I forgot to mention that.  The

3    Roundup Pro uses 1.5 ounces per gallon.  Now, if you

4    multiply 1.5 times 3, that's 4.8 ounces per

5    three-gallon backpack.

6      Q.   1.6.

7      A.   I'm sorry?

8      Q.   1.6, not 1.5.

9      A.   Yeah.  I'm sorry.  I meant to say 1.6, which

10    is 4.8 for three gallons, and Mr. Alvarez stated he

11    used five ounces with three gallons of water, so he

12    used the correct mixture of Roundup Pro in his tank.

13          Mr. Cohen is incorrect in his claim.

14      Q.   And I think you copied the label and brought

15    it with you today?

16      A.   I did.

17          MR. DIAMOND:  And I don't know if you want

18      to mark that as an exhibit or not, or at least

19      just take a look at it.

20          MR. WHITMAN:  We might as well mark it.

21          MR. WARREN:  Yeah, we can mark it.  Is it

22      different than the label that's in his report?

23          THE WITNESS:  No.

24          MR. DIAMOND:  Then no, you're fine?

25          MR. WARREN:  Yeah.

1          MR. DIAMOND:  Okay.  It's just that --

2          MR. WARREN:  Unless you want to ask

3     additional questions about it.

4          MR. DIAMOND:  I don't want to ask additional

5     questions.  It was just something that came up.

6          MR. WARREN:  That's fine then.

7          MR. DIAMOND:  Okay.  I just have a couple of

8     things I want to take a look at to make sure that

9     I -- have been resolved.

10          That's all I have.

11                    REDIRECT EXAMINATION

12     BY MR. WARREN:

13     Q.   I just have, hopefully, a few quick

14     follow-up questions.

15          Dr. Sawyer, you were asked some questions

16     about Dr. Grossbard's deposition and his report.

17     Have you seen Dr. Grossbard's report prior to today?

18     A.   Prior to today, no.

19     Q.   Have you seen his deposition prior to today?

20     A.   No.

21     Q.   Did you consider either one of those things

22     as part of forming your report that's dated

23     December 12, 2019?

24          MR. DIAMOND:  Form.

25     A.   Prior to preparing my report?  No.

William R. Sawyer, Ph.D.

1      Q.   Did you consider any of them in forming your

2    report that's dated December 12, 2019?

3      A.   No.  I did with respect to my answers in

4    deposition today, but not prior to preparing the

5    report.

6      Q.   What is the name of the methodology that you

7    used in Mr. Alvarez's case?

8      A.   POEM, UK POEM is one of them.  The German

9    methodology also uses the calculation of

10   differential areas of the body.  The Machado study

11   also uses measurements from differential areas of

12   the body.  And also --

13     Q.   I'm sorry.  I think my question is slightly

14   different than what you're answering.

15     A.   -- also the Monsanto study included in my

16   report references different areas of the body in

17   centimeters squared, which were not followed by

18   Mr. Cohen.

19     Q.   And that's not my question.  My question is

20   what is the name of the methodology that you

21   performed in forming your report?

22     A.   Primarily POEM methodology.

23     Q.   Primarily POEM?

24     A.   Yeah.

25     Q.   So you followed the steps that are outlined

William R. Sawyer, Ph.D.

1    in the POEM methodology?

2         A.   With respect to body areas, yeah.

3         Q.   And I'm referring to your entire report,

4    your opinions in this case that you intend to

5    provide to the jury.  The methodology that you

6    followed is POEM?

7         A.   Oh, for my overall report?

8         Q.   Yes.

9         A.   Bradford Hill methodology using weight of

10   evidence methodology.

11        Q.   So not POEM.  The methodology you employed

12   in this report is Bradford Hill using weight of

13   evidence methodology?

14        A.   That's correct.

15        Q.   And you followed all the steps that are

16   outlined in the Bradford Hill methodology?

17        A.   I have.

18        Q.   You did not conduct a milligram per kilogram

19   per day exposure for Mr. Alvarez, right?

20        A.   No, no.  Unnecessary as the human studies

21   don't contain any data whatsoever with respect to

22   milligram per kilogram per day body weight, but,

23   rather, exposure days.

24        Q.   But you have conducted those assessments in

25   prior cases for this Monsanto litigation, right?

William R. Sawyer, Ph.D.

```
 1      A.   Yeah, just to compare to see how individuals
 2  compare to the AOEL since the AOEL is applicator
 3  exposure level to see if the individual's exposure
 4  was similar to or reasonably close to the AOEL, not
 5  as a measure of causation but a measure of whether
 6  or not the individual was similar to that of an AOEL
 7  applicator.
 8      Q.   And you just referred to what we mentioned a
 9  couple of times, which is ADME, which is absorption,
10  distribution, metabolism, and excretion, right?
11      A.   Yes.
12      Q.   And I think we talked about absorption a
13  good amount during this deposition today.  I want to
14  ask you just a couple of quick questions about
15  metabolism and excretion.  Your opinion is not that
16  glyphosate or Roundup has remained in Mr. Alvarez's
17  system the entire time he was using it, right?
18           MR. DIAMOND:  Form.
19      A.   Actually, it did.  He never really had --
20  was spraying every other day or even from a Thursday
21  to a Monday, insufficient time for total clearance,
22  as glyphosate has been shown to remain in bone
23  marrow for up to six days.
24      Q.   Right.  And we already discussed multiple
25  different periods of time in which he was not
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    spraying consistently during those periods, for

2    example, when he was going to chemotherapy, when he

3    may or may not have been spraying on certain

4    properties.

5       A.   Well, that's true, but overall, in general,

6    he sprayed frequently enough to not be able to clear

7    it all from his systemic circulation.

8       Q.   And I'm not asking whether he cleared it

9    all.  I'm asking whether at least some of the

10   Roundup that was in his system did clear his system?

11      A.   Well, sure.

12      Q.   Yeah.  And that's because glyphosate and

13   Roundup are rapidly metabolized and removed from the

14   body, right?

15           MR. DIAMOND:  Form.

16      A.   Well, that's actually uncertain in humans.

17   The study evidence that is in the literature

18   currently is based on IV bolus doses to rats, and I

19   don't know any human that IV abuses glyphosate.

20   When you absorb a chemical or a drug on a slow basis

21   over time, the pharmacokinetics and distribution can

22   be vastly different than that of a drug or chemical

23   given at IV bolus at an extraordinarily high dose.

24   It will tend to spill over into the urine at a high

25   dose by IV administration; where a dose continuously

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1    and slowly over time can be metabolized by the liver

 2    and distributed to the tissues in a differential

 3    pattern.

 4           And the human studies have not been run.

 5    I'm not sure why.  You know, Monsanto claims it's

 6    safe as water.  I don't know why they haven't run

 7    human studies.

 8    Q.    So is it now your opinion that glyphosate

 9    and Roundup are rapidly metabolized and removed from

10    the body?

11    A.    Are what?

12    Q.    Sorry.  I misspoke.  Are not rapidly

13    metabolized and removed from the body?

14    A.    That's not what I said.  I said that the

15    human study literature is insufficient to make that

16    determination.  We know what it does in IV dose in

17    animals but not on slow absorption in humans.

18    Q.    So at this point you don't know one way or

19    the other the speed at which it's metabolized and

20    removed from the body?

21    A.    There is evidence from some of the primate

22    studies anyway that perceived dermal dosing that a

23    percentage of it is excreted in the feces through

24    the liver, possibly, based on those studies, more

25    than even urine, but there have been no mass balance
```

William R. Sawyer, Ph.D.

```
 1    studies been performed on humans, which is normally

 2    done in phase 4 studies of new drugs under

 3    development, in which a tracer of that drug is given

 4    to a group of humans and the mass balance of where

 5    it distributes and finds its way out through either

 6    breath or sweat or urine or feces is examined, and

 7    that has not been done with glyphosate.  So we

 8    really don't know as toxicologists the true ADME of

 9    glyphosate in humans.

10        Q.   And if you really don't know the excretion

11    in humans, you can't testify to the jury about that,

12    right?

13             MR. DIAMOND:  Form.

14        A.   I will explain to the jury what I just

15    stated.

16        Q.   You -- strike that.

17             You intend to tell the jury about primate

18    studies and the lack of phase 4 studies in humans

19    relating to sweat or urine or feces and how that

20    relates to the excretion of Roundup?

21        A.   Or complete metabolism to carbon dioxide if

22    blown off on the breath.  Yeah, we really don't have

23    answers to that in humans.  Human studies have not

24    been conducted.  It's all animal-based studies with

25    IV -- primarily IV bolus doses, which do not
```

William R. Sawyer, Ph.D.

1    accurately reflect the pharmacokinetics of flow

2    absorption.

3        Q.   Sitting here today, is it your opinion that

4    glyphosate accumulate -- bioaccumulates in the body?

5        A.   No.

6        Q.   No, it is not your opinion?

7        A.   No, it doesn't bioaccumulate.  There are

8    certain tissues, such as skin, that can form a

9    reservoir and it can accumulate in the epidermis,

10   based on I think it was the Nabok study.  There is

11   also known distribution to different parts of the

12   body, such as the bone marrow, but I don't believe

13   there is any evidence of bioaccumulation.

14       Q.   And then, as you said, that after a period

15   of approximately six days of not using Roundup, that

16   whatever Roundup is in your system has then been

17   excreted?

18       A.   Well, based on animal studies.  We don't

19   know in humans.  It hasn't been evaluated in humans.

20       Q.   And your best opinion at this point, based

21   on the studies that are available to you, is that

22   after six days of nonuse of Roundup, Roundup has

23   been excreted from your system?

24       A.   In humans, the urine studies even show

25   excretion out to I think five days, so I think

William R. Sawyer, Ph.D.

1    approximately.

2        Q.   And just to be clear, and this is consistent

3    with the table in your report, Mr. Alvarez did not

4    use Roundup for the three-month period that you

5    define as the winter each year from 1986 to 2017,

6    correct?

7        A.   That's correct.

8            MR. WARREN:  I have no further questions.

9            MR. DIAMOND:  We're done.

10            THE WITNESS:  I don't know.

11            THE VIDEOGRAPHER:  This concludes the

12    deposition.  The time is 12:32.

13            (Whereupon, the deposition concluded at

14    12:32 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1            C E R T I F I C A T E

 2        I, SUSAN D. WASILEWSKI, Registered

 3   Professional Reporter, Certified Realtime Reporter

 4   and Certified Realtime Captioner, do hereby certify

 5   that, pursuant to notice, the deposition of WILLIAM

 6   R. SAWYER, Ph.D., was duly taken on Saturday,

 7   December 21, 2019, at 8:40 a.m. before me.

 8        The said WILLIAM R. SAWYER, Ph.D., was duly

 9   sworn by me according to law to tell the truth, the

10   whole truth and nothing but the truth and thereupon

11   did testify as set forth in the above transcript of

12   testimony.  The testimony was taken down

13   stenographically by me.  I do further certify that

14   the above deposition is full, complete, and a true

15   record of all the testimony given by the said

16   witness, and that a review of the transcript was

17   requested.

18

19   _____

20   Susan D. Wasilewski, RPR, CRR, CCP

21   (The foregoing certification of this transcript does

22   not apply to any reproduction of the same by any

23   means, unless under the direct control and/or

24   supervision of the certifying reporter.)

25
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should

 6     state the reason in the appropriate space on the

 7     errata sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your

11     deposition.

12

13          It is imperative that you return the

14     original errata sheet to the deposing attorney

15     within thirty (30) days of receipt of the deposition

16     transcript by you.  If you fail to do so, the

17     deposition transcript may be deemed to be accurate

18     and may be used in court.

19

20

21

22

23

24

25
```

William R. Sawyer, Ph.D.

```
 1                    - - - - - -

 2                  E  R  R  A  T  A

 3                    - - - - - -

 4     PAGE    LINE    CHANGE

 5     _____   _____    _____

 6        REASON: _____

 7     _____   _____    _____

 8        REASON: _____

 9     _____   _____    _____

10        REASON: _____

11     _____   _____    _____

12        REASON: _____

13     _____   _____    _____

14        REASON: _____

15     _____   _____    _____

16        REASON: _____

17     _____   _____    _____

18        REASON: _____

19     _____   _____    _____

20        REASON: _____

21     _____   _____    _____

22        REASON: _____

23     _____   _____    _____

24        REASON: _____

25
```

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4     acknowledge that I have read the foregoing pages, 1

 5     through 163, and that the same is a correct

 6     transcription of the answers given by me to the

 7     questions therein propounded, except for the

 8     corrections or changes in form or substance, if any,

 9     noted in the attached Errata Sheet.

10

11

12     _____      _____

13     WILLIAM R. SAWYER, Ph.D.                        DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     _____ day of _____, 20____.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24

25
```

William R. Sawyer, Ph.D.

1                          LAWYER'S NOTES

2      PAGE    LINE

3      _____   _____   _____

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25