# EXHIBIT 14

CONFIDENTIAL

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                  FOR THE COUNTY OF SAN FRANCISCO
 3                    CASE NO.:  CGC-16-550128
 4
        DEWAYNE JOHNSON,
 5
                         Plaintiff,
 6      vs.
 7      MONSANTO COMPANY,
 8                         Defendant.
        _____/
 9
10
11               * * * * CONFIDENTIAL * * * * *
12
            VIDEOTAPED DEPOSITION OF WILLIAM SAWYER, PH.D.
13
14
15                  Monday, February 26, 2018
16                    8:12 a.m. - 5:04 p.m.
17
18                      Sanibel, Florida
19
20
21                 Stenographically Reported By:
                   Tracie Thompson, RMR, CRR, CLR
22                   Registered Merit Reporter
                   Certified Realtime Reporter
23                  Certified LiveNote Reporter
24
25      Pages 1-264
```

Page 1

1 APPEARANCES:
2 On behalf of Plaintiff:
3    The Miller Firm, LLC
4    The Sherman Building
     108 Railroad Avenue
5    Orange, VA 22960
     540-672-4224
6    BY:  JEFFREY TRAVERS, ESQ.
     jtravers@millerfirmllc.com
7 and
8    Andrus Wagstaff
9    19 Belmont Street
     South Easton, MA 02375
10   310-339-8214
     BY:  KATHRYN M. FORGIE, ESQ.
11   kathryn.forgie@andruswagstaff.com
12
13 On behalf of Defendant:
14   Hollingsworth, LLP
15   1350 I Street N.W.
     Washington, DC  20005
16   202-898-5800
     BY:  RANJIT S. DHINDSA, ESQ.
17   rdhindsa@hollingsworth.com
     BY:  JOHN M. KALAS, ESQ.
18   jkalas@hollingsworth.com
19
20 and
     Winston & Strawn, LLP
21   35 W. Wacker Drive
     Chicago, IL  60601
22   312-558-6214
     BY:  JAMES HILMERT, ESQ.
23   JHilmert@winston.com
24
25 ALSO PRESENT:  Alan Pokotilow, Videographer

Page 2

            I-N-D-E-X
2 WITNESS                         PAGE
3 WILLIAM SAWYER
4 Direct Examination by Mr. Dhindsa ...............6
5            * * * * * * * *
6
7          E-X-H-I-B-I-T-S
8 DESCRIPTION                     PAGE
9 Exhibit 1  Curriculum Vitae ...................7
10 Exhibit 2  Report ...........................20
11 Exhibit 3  Article from Journal of the .......21
            American Bar Association in 2000
12
    Exhibit 4  Curriculum Vitae of William R. ....22
13            Sawyer
14 Exhibit 5  Listing from American College of ..22
            Forensic Examiners Institute
15
    Exhibit 6  Copy of the cover of The Journal ..27
16            of the Forensic Examiner
17 Exhibit 7  Wall Street Journal Article The ...31
            Making of an Expert Witness:
18            It's Definitely in the
            Credentials
19
    Exhibit 8  Article from the New York Times ...32
20            A Resume Distinguished by What
            it Didn't Mention
21
    Exhibit 9  Article entitled "The Emperor of ..34
22            Junk Science Forensics Has Died"
            from the Washington Post, dated
23            August 31, 2008
24 Exhibit 10  Memorandum dated 12-12-17 ........136
25

Page 3

          E-X-H-I-B-I-T-S
2 DESCRIPTION                     PAGE
3 Exhibit 11  Revised Glyphosate Issue Paper ...137
            dated 12-12-17
4
    Exhibit 12  Table 19.7 ......................146
5
    Exhibit 13  9.11 Report dated 10-17-12 ......151
6
7 Exhibit 14  Expert Report of Beate Ritz ......170
8 Exhibit 15  Article Spontaneous Neoplasm in ..176
            Aged Sprague-Dawley Rats
9 Exhibit 16  Article by Chirukandath .........180
            Gopinath, entitled "Spontaneous
10            Tumor Rates:  Their Use to
            Support Rodent Bioassays,"
11            published in the Journal of
            Toxicology and Pathology
12
    Exhibit 17  An article titled "B Lymphoid ....185
13            Neoplasms of Mice:
            Characteristics of Naturally
14            Occurring and Engineered
            Diseases and Relationships to
15            Human Disorders," published in
            Advances in Immunology.
16
    Exhibit 18  Article entitled "Evaluation of ..189
17            Carcinogenic Potential of the
            Herbicide Glyphosate, Drawing on
18            Tumor Incidence Data from 14
            Chronic/Carcinogenicity Rodent
19            Studies."
20 Exhibit 19  Expert Report of Christopher J. ..207
            Portier, PhD
21
    Exhibit 20  Billing records - Confidential ...260
22
    Exhibit 21  Box of files from Deponent .......263
23            (Retained by counsel)
24
25          * * * * * * *

Page 4

1 Thereupon,
2 the following proceedings began at 8:12 a.m.:
3     VIDEOGRAPHER:  We're on the record.  The
4 time is now 8:12 a.m.  Today is February 26 of
5 2018.  We're here today at
6 Sundial Beach Resort & Spa, located at 1451
7 Middle Gulf Drive, within Sanibel, Florida, for
8 the videotape deposition of
9 William Sawyer, Ph.D. in the matter of DeWayne
10 Johnson versus Monsanto company, Case Number
11 CGC-16-550128 to be heard before the Superior
12 Court of the State of California for the County
13 of San Francisco.
14     Your court reporter today is Tracie
15 Thompson here on behalf of Veritext Legal
16 Solutions.  I'm Alan Pokotilow, forensic
17 videographer, here on behalf of Veritext Legal
18 Solutions as well.
19     Will counsel please state your name and
20 affiliation for the record, after which our
21 court reporter will swear the witness and we can
22 proceed.
23     MR. DHINDSA:  Ron G. Dhindsa, along with
24 John Kalas and James Hilmert on behalf of the
25 defendant, Monsanto.

Page 5

2 (Pages 2 - 5)

CONFIDENTIAL

1      MR. TRAVERS:  Jeffrey Travers for the
2  Miller firm on behalf of plaintiff, DeWayne
3  Johnson.
4          WILLIAM SAWYER,
5  having been first duly sworn testified as follows:
6      MR. DHINDSA:  We're designating this
7  deposition confidential.
8          DIRECT EXAMINATION
9  BY MR. DHINDSA:
10     Q   Good morning, Dr. Sawyer.
11     A   Good morning.
12     Q   My name is Ron Dhindsa.  This is the first
13  time we've met, right?
14     A   Yes.
15     Q   But this is not the first time you've
16  testified under oath, correct?
17     A   Correct.
18     Q   In fact, you've testified in hundreds of
19  depositions before; is that right?
20     A   Yes.
21     Q   And in the past 15 years, is it fair to say
22  the majority of those depositions have been on behalf
23  of plaintiffs suing for injuries?
24     A   I can't speak on the past 15 years.  I can
25  speak on the past three years, which is roughly about
Page 6

1  55 or 60 percent plaintiff and 45 or 40 percent
2  defense.
3      Q   What type of cases have those been, if
4  there is a way you can generalize, categorize them?
5      A   Combination of criminal and civil cases,
6  probably about 15 percent criminal, the other 85
7  percent civil.  Cases involve -- civil cases involve
8  plaintiffs in class actions or MDLs, individual
9  plaintiffs, individual defendants, and governmental
10  entities, such as United States Attorney and various
11  State Attorney Generals and the US Navy.
12     Q   When did you first start testifying as an
13  expert witness?
14     A   1989.
15     Q   So since 1989, in the civil cases in which
16  you've served as an expert witness, have about 65
17  percent of those been for plaintiff?
18     A   Again, I really can't estimate over the
19  entire time era, but I certainly can over the past
20  three years.
21     MR. DHINDSA:  Please mark that.
22  (Thereupon, Exhibit 1 was marked for identification.)
23  BY MR. DHINDSA:
24     Q   Dr. Sawyer, the court reporter is handing
25  to you what's been marked as Exhibit Number 1.  Do
Page 7

1  you recognize this document?
2      A   Yes.
3      Q   What is this document?
4      A   This is a listing on JurisPro Expert
5  Witness Directory.
6      Q   All right.  If you'd turn to page 4 of 5,
7  do you see there the second question and answer?  The
8  question is, "In what percentage of your cases were
9  you retained by the plaintiff," and the answer is "65
10  percent."  Do you see that?
11     A   Yes, and I stated over the last three
12  years, approximately 55 or 60 percent.
13     Q   This document is accurate, as to the period
14  beyond the past three years, correct?
15     A   No.  This document was prepared several
16  years ago.  It reflects the prior three years.
17     Q   All right.  So this document reflects the
18  three years prior to the time it was produced.  You
19  were testifying 65 percent for the plaintiff,
20  correct?
21     A   That's correct.
22     Q   And you testified in hundreds of trials,
23  haven't you?
24     A   No.
25     Q   About how many trials have you testified
Page 8

1  in?
2      A   Approximately seven per year times 31
3  years, so -- actually, it would be more.
4  Approximately -- somewhere between 100 and 200.
5      Q   And in what percentage of the trials you've
6  been involved with have you testified on behalf of
7  plaintiffs?
8      A   I don't recall.
9      Q   More than 50 percent?
10     A   Approximately 50 percent.  Could be 60
11  percent.  I can't really give any more accurate
12  answer than that, since I have not tabulated that
13  information.
14     Q   Your primary source of income is offering
15  forensic toxicology opinions in litigation?
16     A   That's correct.  That's what I was trained
17  to do at Indiana University School of Medicine.  I'm
18  a forensic toxicologist, that is my livelihood.
19     Q   And you've actually had multiple websites
20  over the years advertising your services as a
21  forensic toxicologist, correct?
22     A   Two, that I recall.
23     Q   What are the two you recall?
24     A   Prior website, I think was -- I don't
25  remember the website acronym.  The current website is
Page 9

3 (Pages 6 - 9)

1 experttoxicologist.com.
2   Q   All right.  And was one of those websites
3 where you'd advertised www.experttox.com?
4   A   I think that was the prior website, yes.
5   Q   Was another one www.toxexpert.com?
6   A   Possibly, but I think that they may have
7 been the same.  I think that the e-mail was changed
8 because of too much spam.  I don't know that those
9 websites were actually significantly different.
10   Q   And another one was www.tcastox.com, right?
11   A   That was an e-mail only.  I don't believe
12 there was a website under that name.
13   Q   And you've advertised as well on various
14 websites that cater to attorneys, right?
15   A   Yes.
16   Q   Sites like www.almexperts.com?
17   A   Yes.
18   Q   And www.jurispro.com.
19   A   Yes, that would be Exhibit 1.
20   Q   And www.experts.com, correct?
21   A   Yes.  Historically, I'm not sure whether
22 Jen has that activated currently.  I'd have to follow
23 up on that.
24   Q   Did you say Jen?
25   A   Jen from my office, yes.

Page 10

1   Q   In fact, you had asked your brother to
2 develop sort of a search engine optimization
3 methodology so if someone put into Google "expert
4 toxicology," they would find you first, right?
5   A   Yes, but it's actually more involved than
6 that.  It's far more complex than just searching
7 for --
8       MR. DHINDSA:  Can we go off the record?
9       VIDEOGRAPHER:  The time is now 8:21.  We're
10 going off the record.
11 (A short break was taken at 8:22 a.m.)
12       VIDEOGRAPHER:  The time is now 8:22 a.m.
13 We're back on the record.
14 BY MR. DHINDSA:
15   Q   Dr. Sawyer, the search engine optimization
16 your brother developed, was that helpful in building
17 your practice?
18   A   Yes.
19   Q   What's your hourly consulting rate for
20 forensic toxicology?
21   A   460 per hour.
22   Q   How much money did you make last year doing
23 legal consulting or offering expert opinions in
24 litigation?
25       MR. TRAVERS:  We would object.  This is

Page 11

1 outside the scope of his expert testimony in
2 this case.
3 BY MR. DHINDSA:
4   Q   Go ahead, sir.
5   A   I could give you my reported income from
6 the line item on my tax return, which was
7 approximately 305,000.
8   Q   That was your adjusted gross income?
9   A   Yes.  For the tax year -- well, that would
10 be 2016 -- well, no, no, no.  Wait.  That could be --
11 it was 2016, I believe.  2017 hasn't been established
12 yet.
13   Q   How much money did you make the year before
14 that?
15       MR. TRAVERS:  Same objection.
16       THE WITNESS:  I don't recall.
17 BY MR. DHINDSA:
18   Q   What's the most you've ever been paid in a
19 year for doing legal consulting or offering expert
20 opinions in litigation?
21       MR. TRAVERS:  Same objection.
22       THE WITNESS:  I don't know.  I could try to
23 recall some of my gross income numbers on my tax
24 return, but beyond that, I don't know.
25 BY MR. DHINDSA:

Page 12

1   Q   Well, what are some of those numbers that
2 you can recall?
3       MR. TRAVERS:  Same objection.
4       THE WITNESS:  It goes up and down.  There
5 was a few years where it was much higher.
6 BY MR. DHINDSA:
7   Q   Is there a range you can recall?
8       MR. TRAVERS:  Same objection.
9       THE WITNESS:  Not with any accuracy.
10 BY MR. DHINDSA:
11   Q   Do you typically make more than $100,000 a
12 year doing legal consulting or offering expert
13 opinions in litigation?
14   A   Yes.
15       MR. TRAVERS:  Objection.  Compound.
16 BY MR. DHINDSA:
17   Q   Do you typically earn more than $200,000
18 doing legal consulting work per year?
19   A   Yes.
20   Q   Do you typically earn more than $300,000
21 per year doing legal consulting work?
22   A   That, I can't answer accurately.  I'd have
23 to research that.
24   Q   Has there ever been a year where you've
25 earned more than $500,000 doing legal consulting

Page 13

4 (Pages 10 - 13)

1 work?
2    A   Possibly.
3    Q   Has there ever been a year where you've
4 earned more than one million dollars doing legal
5 consulting work?
6    A   No.
7       MR. TRAVERS:  Object to the term "earn" as
8 vague.
9 BY MR. DHINDSA:
10    Q   And what is your daily rate for deposition
11 testimony?
12    A   $4,600 per day.
13    Q   And that is per day, not per deposition,
14 correct?
15    A   Correct, per day for a full day.  And for
16 local, I have a half day rate, which is $2,300.
17    Q   So since this is a two-day deposition, you
18 will be charging $9,200; is that correct?
19    A   Yes.
20    Q   What about your daily rate for trial
21 testimony?
22    A   That's what I just answered, I thought.
23    Q   It's the same for deposition and trial?
24    A   Yes.
25    Q   And do you typically fly first class when
Page 14

1 you travel somewhere for deposition or trial?
2    A   No.  I actually don't, but I very often get
3 upgrades because I fly so frequently.
4    Q   Now, you're not deposed in all of the cases
5 you work on, right?
6    A   No.  Much more prevalence of being deposed
7 on plaintiff cases versus defense cases.  That's why
8 there's sort of a false assumption of the 60 percent
9 that we talked about earlier, because that's based on
10 my three-year documentation of depositions and
11 trials.  Actually, I work on many more defense cases
12 that are not on that list because I'm simply not
13 deposed.
14    Q   And in a number of cases you are working on
15 you're not even disclosed, right, as an expert,
16 you're working confidentially?
17    A   No, disclosed, report submitted in state or
18 federal court, but simply the plaintiff does not
19 choose to take my deposition; wherein cases where I
20 am retained by plaintiff, it's almost 100 percent
21 guarantee I will be deposed.
22    Q   How many cases are you usually working on
23 at any one time, including those which don't go to
24 trial?
25    A   That's a good question.  At least 10, maybe
Page 15

1 15.
2    Q   How many cases are you working on right
3 now?
4    A   At least that.  Because cases don't --
5 cases have an average life of about, I'd say, two
6 years or more through the process before they're
7 adjudicated.
8    Q   So in a given year, you might be working on
9 a few dozen cases?
10    A   Possible, but it would be guesswork for me
11 to say yes to that.
12    Q   And in about what percentage of those cases
13 are you disclosed as an expert witness?
14    A   I've never really tracked that, but I know
15 the majority.
16    Q   You do do some confidential work where
17 you're not disclosed, correct?
18    A   Yeah.
19    Q   Some?
20    A   Some, but not that much.
21    Q   Your wife works with you at TCAS?
22    A   She's a bookkeeper.  Her work is strictly
23 related to accounting and that type of thing.
24    Q   So you're the primary breadwinner for the
25 family?
Page 16

1    A   Yes.
2    Q   The majority of your money comes from
3 litigation consulting, correct?
4    A   Yes.
5    Q   Do you live primarily in Florida?
6    A   Yes.
7    Q   Where we are right now in the Sanibel area,
8 correct?
9    A   Yes.
10    Q   In fact, you've been deposed at this very
11 location, this hotel before, haven't you?
12    A   Many times.
13    Q   And so the address 6450 Pine Avenue is
14 actually your home address, right, not just a
15 business address?
16    A   Home address that -- I purchased the house
17 with a very nice office, and I have an office in New
18 York state, which houses most of my files.
19    Q   You live on a canal, right?
20    A   Yes, it connects to Wulford Channel and the
21 bay and the ocean.
22    Q   About a block or so from the beach.
23       MR. TRAVERS:  Objection.  This has gone way
24 beyond the scope of an expert deposition.  You
25 guys asked for 14 hours, and you're going to
Page 17

CONFIDENTIAL

1    start spending time asking him about where he
2    lives?
3  BY MR. DHINDSA:
4      Q   Go ahead, sir.
5      A   What was the question?
6      Q   Do you live about a block from the beach?
7      A   There are no blocks on our little street.
8      Q   Do you own a boat?
9          MR. TRAVERS:  This is harassing the
10   witness.
11         THE WITNESS:  Do you want to go fishing
12   with me?  I can take you out catching some
13   Grouper today instead of doing this deposition.
14         MR. TRAVERS:  Really, you guys asked for 14
15   hours and you are going to ask him if he has a
16   boat?  If you want to waste your time, go ahead.
17  BY MR. DHINDSA:
18     Q   Go ahead, sir.  Do you own a boat?
19     A   I've always owned a boat since I was about
20   13 years old, yes.  I started off with a little wood
21   Lyman that was rotted out.
22     Q   Have you done any legal consulting pro
23   bono?
24     A   Every year I get at least one case that I
25   do at no charge.

Page 18

1      A   I'm sorry?
2      Q   Any others?
3      A   Other what?
4      Q   Any other properties that you own?
5      A   No.  I don't own the office property.  I
6  rent it.
7  (Thereupon, Exhibit 2 was marked for identification.)
8  BY MR. DHINDSA:
9      Q   Let me mark your resume which you've
10   provided to us, along with your expert report.
11         Doctor, I'm handing to you what's been
12   marked as Exhibit Number 2.  Do you recognize this
13   document?
14     A   Yes, it is my report and paraphernalia.
15     Q   On your CV contained in Exhibit 2 it notes
16   that you are board certified by the American Board of
17   Forensic Medicine and the American Board of Forensic
18   Examiners, right?
19     A   Yes.
20     Q   You had to sit for a test for each of
21   those, right?
22     A   For the American Board of Forensic
23   Examiners, the American Board -- no, for the American
24   Board of Forensic Medicine, yes.  The American Board
25   of Forensic Examiners, I did not have to formally sit

Page 20

1      Q   Why?
2      A   Out of sympathy, actually.  A person who's
3  having difficulty obtaining counsel.  For example,
4  I've worked on a case in the Tampa region, which the
5  woman contacted me that her dad had been poisoned by
6  her stepmother and there was insufficient evidence at
7  that time, in my opinion, for the D.A. to carry out
8  any type of action.  But I helped her in terms of
9  some additional analyses, hair and other samples, in
10  an attempt to determine whether there was sufficient
11  evidence for the D.A. to move forward.  I never did
12  charge her anything.  A lot of work, a lot of
13  expenses.  I do that every year, at least one.
14     Q   You mentioned you have a home in New York
15  state, correct?
16     A   Do I have a home in New York state, no.
17     Q   Do you have an office in New York state?
18     A   Yes.
19     Q   Is that on Singing Woods Drive?
20     A   No.  I sold that home.
21     Q   Any other residences or offices you have?
22     A   I have an office, as per my letterhead, 29
23  Fennel Street, Skaneateles, New York.
24  S-K-A-N-E-A-T-E-L-E-S.
25     Q   Any others?

Page 19

1  for a test.  Rather, it was a mail-out test and
2  return.
3      Q   Were those tests difficult?
4      A   No.
5  (Thereupon, Exhibit 3 was marked for identification.)
6  BY MR. DHINDSA:
7      Q   I'm going to mark an article as an exhibit.
8  This appeared in the Journal of the American Bar
9  Association in 2000, after you were certified.
10         The American Bar Association is a major
11  professional organization in the legal community,
12  right?
13         MR. TRAVERS:  Object to the foundation.
14         THE WITNESS:  I don't know much about the
15  bar.  I can't answer that.
16  BY MR. DHINDSA:
17     Q   You're not familiar with the American Bar
18  Association?
19         MR. TRAVERS:  Same objection.
20         THE WITNESS:  No more than a layperson
21  would be.  I don't know much about the bar
22  association.  I've never had any experience with
23  it or researched it.
24  BY MR. DHINDSA:
25     Q   In this article, sir, do you see that the

Page 21

6 (Pages 18 - 21)

1 American Board of Forensic Examiners changed its name
2 to the American College of Forensic Examiners?
3     MR. TRAVERS: Objection. Foundation.
4 BY MR. DHINDSA:
5   Q   I'm looking at page 3 of 6 at the top.
6     MR. TRAVERS: If you need time to review
7 this document, Dr. Sawyer, you can.
8     THE WITNESS: All right. I see that.
9 BY MR. DHINDSA:
10   Q   That happened after you were board
11 certified, right, in 1995?
12   A   Yes.
13   Q   So this article is talking about your
14 organization, right?
15   A   It is, but I don't find it important. If
16 you note in my report, I sign my name in the report
17 as the diplomatic American Board of Forensic
18 Medicine. I did not even include the title diplomat
19 American Board of Forensic Examiner on my report in
20 this case. The important credential is the ABFM.
21     MR. DHINDSA: Mark this as Exhibit 3.
22     THE COURT REPORTER: That will be 4.
23 (Thereupon, Exhibit 4 was marked for identification.)
24     MR. DHINDSA: Five.
25 (Thereupon, Exhibit 5 was marked for identification.)
Page 22

1     MR. TRAVERS: Objection. Asked and
2 answered. You're purposefully misrepresenting
3 these symbols.
4     THE WITNESS: You are. Admit it.
5 BY MR. DHINDSA:
6   Q   So you don't believe that the eagle perched
7 on the five star symbol is identical in Exhibits 4
8 and 5?
9     MR. TRAVERS: Objection. Asked and
10 answered.
11 BY MR. DHINDSA:
12   Q   You can answer, sir.
13   A   Sir, you are nitpicking the symbol. The
14 fact is the emblem is different.
15   Q   Now, turning back to Exhibit 3, this is the
16 article we were looking at previously. This is an
17 article discussing a gentleman named Robert O'Block,
18 right?
19     MR. TRAVERS: Objection. Foundation.
20 BY MR. DHINDSA:
21   Q   Just underneath where you were reading from
22 before on page 3.
23   A   Sir, I can't answer that. I don't know if
24 this is peer-reviewed or Internet trash. It's really
25 hard to determine what I'm looking at. It doesn't
Page 24

1 BY MR. DHINDSA:
2   Q   Dr. Sawyer, the court reporter has handed
3 you what's been marked as Exhibit 4 and Exhibit 5.
4 Do you see that?
5   A   Yes.
6   Q   Exhibit 4 is a TCAS -- your TCAS website
7 listing, correct?
8   A   Yes, it is.
9   Q   And Exhibit 5 is from the American College
10 of Forensic Examiners Institute, correct?
11   A   Yes.
12   Q   And the logos for -- that appear both on
13 Exhibits 4 and 5 are identical, correct, the logo
14 that says American Board of Forensic Medicine, ABFM,
15 Science, Integrity, Justice?
16     MR. TRAVERS: Objection. Mischaracterizes
17 the symbol.
18     THE WITNESS: No. The one on Exhibit 4, as
19 I received the emblem states American Board of
20 Forensic Medicine. In fact, it says right on
21 it, on the circle above the eagle's head,
22 forensic medicine. So no, you're incorrect.
23 BY MR. DHINDSA:
24   Q   The graphic on both of these is identical,
25 correct? The graphic on the --
Page 23

1 even give the author's name. I don't know.
2   Q   Well, it says on the second page, Mark
3 Hanson, legal affairs writer for the ABA journal, and
4 it lists the gentleman's address who authored this.
5     Now, regardless of the source, I'm asking
6 you to look at this article and take your time to
7 read it over. It notes that the organization we were
8 discussing earlier, the American College of Forensic
9 Examiners, was run by a gentleman named Robert
10 O'Block, correct?
11   A   Was run or is run?
12   Q   Well, at the time this was published was
13 run.
14   A   Was run, yeah. I believe he's deceased.
15   Q   And if you go down in this article, do you
16 see where they quote a law professor from the
17 University of Missouri?
18     MR. TRAVERS: Where is that?
19     MR. DHINDSA: Page 2 of 6, right at the
20 top.
21 BY MR. DHINDSA:
22   Q   Do you see that?
23   A   No. First paragraph, I see that, yeah.
24   Q   Right. And he says, "For the right amount
25 of money, he will certify just about anyone as an
Page 25

**Page 26**

1 expert in anything," right?
2    A   That's what it says, yes.
3    Q   Now, they go down and talk about the
4 testing for this board certification.  Do you see
5 that?
6    A   No.  What paragraph?
7    Q   Well, before that, right before -- right
8 below the quote I just read, it says -- this
9 professor from Nova Southeastern down in Florida, she
10 says that "Forensic scientists called board
11 certifications from this organization 'checkbook
12 credentials'," right?  Do you see that?
13    A   Yes.
14        MR. TRAVERS:  Objection.  Misstates the
15    paragraph.
16        THE WITNESS:  Again, if you notice --
17 BY MR. DHINDSA:
18    Q   If you turn to the page --
19        MR. TRAVERS:  The doctor was talking.
20        THE WITNESS:  Again, if you notice Exhibit
21    4 and Exhibit 1 and my report, I list DABFM.  I
22    don't even list the American Board of Forensic
23    Examiners as I am listing the reputable
24    organization that includes top forensic
25    pathologists around the country, and that is the

**Page 27**

1    American Board of Forensic Medicine.
2 BY MR. DHINDSA:
3    Q   So it's your testimony that you never list
4 this organization?
5    A   I have in the past, but not currently.
6        MR. DHINDSA:  Mark that, please.
7    (Thereupon, Exhibit 6 was marked for identification.)
8 BY MR. DHINDSA:
9    Q   The court reporter has handed to you what's
10 been marked as Exhibit Number 6.  Do you recognize
11 this document?
12    A   Yes.
13    Q   What is it?
14    A   That's the Journal of the Forensic
15 Examiner.
16    Q   And if you'd turn the page over, do you see
17 there on the right column where you're listed on the
18 2008 editorial advisory board of the forensic
19 examiner?
20    A   Yes, but if we ask the court reporter to
21 read back my response, I said that I listed.  I
22 didn't say that somebody else listed.
23    Q   Right.  So somebody else, namely the
24 forensic examiner on whose editorial advisory board
25 you served and was published by the same Robert

**Page 28**

1 O'Block we were speaking of earlier, has listed your
2 name and after your name Ph.D., FACFEI, DABFE, and
3 DABFM, correct?
4        MR. TRAVERS:  Objection.  Compound.
5 BY MR. DHINDSA:
6    Q   Did I read that correctly?
7    A   The journal listed that in that fashion,
8 yes, I didn't.
9    Q   Now, turning back to Exhibit No. 3, I'm on
10 page 4 of 6.  Now, about a third of the way down the
11 page, under the section entitled "Three Easy Steps,"
12 do you see where they're talking about board
13 certification?
14    A   No, I don't see the three easy steps.
15    Q   It's at the top of the page, the title of
16 the section, "Three Easy Steps."  I'm looking at
17 about four paragraphs down, five paragraphs down.
18    A   Page 4 of 6?
19    Q   Yes, sir.
20    A   "The ACFE maintained in promotional
21 materials that has scrutinized applications to make
22 sure candidates" -- no, I don't see it.
23    Q   Just below that, where you are reading
24 from, sir.
25    A   The ethics exam includes such questions as

**Page 29**

1 well as why it's okay to stretch the truth, et
2 cetera.  This is not --
3    Q   His --
4        MR. TRAVERS:  Dr. Sawyer was still
5    answering.
6        THE WITNESS:  I don't understand where
7    you're asking me to read.
8 BY MR. DHINDSA:
9    Q   If you will allow me to help you there.
10 This document says, Exhibit 3, to qualify as board
11 certified, you had to score 75 percent on a test that
12 asks questions like, "It is okay to stretch the
13 truth," correct?
14    A   For the forensic examiner exam, yes.  As I
15 explained, I don't hold that to be a significant
16 board certification.
17        MR. DHINDSA:  I object and move to strike
18    everything after the word "Yes."
19 BY MR. DHINDSA:
20    Q   Do you remember that question from the
21 test?
22    A   No.
23    Q   It says you can waive out of the test based
24 on the number of articles you've published or degrees
25 you hold, correct?

8 (Pages 26 - 29)

CONFIDENTIAL

1    A    Where do you see that?

2    Q    Two paragraphs down, "But any candidate for

3 board certification can qualify for a waiver of the

4 exam by accumulating a certain number of points on

5 his or her application."

6        Do you see that?

7        MR. TRAVERS:  Just for the record, that

8    doesn't accurately represent what he said in the

9    previous question.

10 BY MR. DHINDSA:

11    Q    Do you see that, sir?

12    A    Actually, I don't.

13    Q    The paragraph that starts, "But any

14 candidate for board certification."

15    A    Okay.  Now I see it.

16    Q    And you did not waive out of this test,

17 correct?

18    A    No, I simply completed the written test and

19 submitted it.

20    Q    Let me ask you to turn back to your CV

21 that's attached to your report, which is Exhibit 1, I

22 believe -- 2, I'm sorry.

23    A    Okay.

24    Q    If you'd turn to page B6.

25    A    Yes.

Page 30

---

1    Q    Do you see there where you list under board

2 certification Diplomat American Board of Forensic

3 Examiners, 1994 to present?

4    A    Yes, I listed it in my CV.  I had to.  I

5 have to list everything I've ever accomplished or

6 been involved in my past.

7    Q    You don't consider that significant?

8    A    I'm not sure what the question is.

9    Q    You testified earlier you didn't consider

10 that to be significant, correct?

11    A    I said a significant board certification.

12    Q    All right.  I'm going to mark another

13 article that appeared in the New York Times.

14        MR. DHINDSA:  What exhibit are we up to,

15    ma'am?

16        THE COURT REPORTER:  7.

17 (Thereupon, Exhibit 7 was marked for identification.)

18 BY MR. DHINDSA:

19    Q    Dr. Sawyer, the court reporter has handed

20 you what's been marked as Exhibit 7.  This is a New

21 York Times article entitled "The Making of an Expert

22 Witness."  It's definitely in the credentials.

23        Have you seen this article before?

24        MR. TRAVERS:  Objection.  Foundation.  I

25    think it's the Wall Street Journal.

Page 31

---

1        THE WITNESS:  No, I have not.

2 (Thereupon, Exhibit 8 was marked for identification.)

3 BY MR. DHINDSA:

4    Q    The court reporter has handed you what's

5    been marked as Exhibit Number 8.  I apologize for

6    that.  This is an article entitled "A Resume

7    Distinguished By What It Didn't Mention" from the New

8    York Times, dated September 6, 2001.

9        Are you familiar with this article?

10    A    No.

11    Q    Take a moment to review it.  This article

12 discusses a Dr. Schlager, who was also a board

13 certified person by the American Board of Forensic

14 Medicine.

15        Do you see that?

16    A    No, I'm reading it.

17    Q    Okay.  That appears on the final page.

18        MR. TRAVERS:  I'm going to object.  This is

19    way outside the scope of Dr. Sawyer's expert

20    testimony.  Again, you asked for 14 hours and

21    you still haven't asked him about his report.

22        I'm also going to make an objection that

23    this is highly prejudicial and way outweighs any

24    relevance it has to this case.

25        MR. DHINDSA:  That's not a basis for a

Page 32

---

1    valid objection.

2        THE WITNESS:  All right.  So what is the

3    question?

4 BY MR. DHINDSA:

5    Q    All right.  So I'm asking you about Exhibit

6 8.  Do you see there in this New York Times article

7 discussing a Dr. Schlager, who is also board

8 certified by the American Board of Forensic Medicine?

9    A    Yes.

10    Q    But the catch was he was in prison when he

11 was board certified, yet he told the ABFM that he was

12 on, quote/unquote, "sabbatical" and they certified

13 him, correct?

14    A    That's what the article states.

15    Q    Seems like lax certification procedures,

16 doesn't it?

17        MR. TRAVERS:  Objection.  Form.

18        THE WITNESS:  Not that I recall.  I had to

19    send official transcripts of all of my college

20    degrees, including my Ph.D. from IU School of

21    Medicine, and I had to have references from

22    board-certified physicians, including, I used

23    pathologists who I've worked with to provide a

24    reference.  There was quite a bit of preliminary

25    documentation required that I had to submit.

Page 33

9 (Pages 30 - 33)

CONFIDENTIAL

1    Now, this was in the year -- it's not clear
2  to me what year this person became board
3  certified, so I don't know if this predates the
4  procedures which I had underwent or not.
5  (Thereupon, Exhibit 9 was marked for identification.)
6  BY MR. DHINDSA:
7    Q    All right.  The court reporter is going to
8  mark as Exhibit 9 an article entitled "The Emperor of
9  Junk Science Forensics Has Died" from the Washington
10  Post, dated August 31, 2008.
11    Have you seen this article before?
12    MR. TRAVERS:  Objection as to the
13  representation it's an article or a news report.
14    THE WITNESS:  Did you say 2008?  I may be
15  looking at the wrong document then.
16  BY MR. DHINDSA:
17    Q    I'm sorry, it's dated August 31, 2017.
18    A    What was the question?
19    Q    Have you seen this article before?
20    MR. TRAVERS:  Objection to the
21  characterization of it as an article.
22  BY MR. DHINDSA:
23    Q    Have you seen this document before?
24    A    I think so.  I think I saw this on my
25  computer.  I don't recall what it was published in,

Page 34

1  Dr. O'Block's organization actually certified a cat.
2  Do you see that?
3    A    No, but I do recall that in reviewing this
4  in the past.
5    Q    Now, Dr. Sawyer, before today, were you
6  aware of these allegations against the American Board
7  of Forensic Medicine and the American Board of
8  Forensic Examiners?
9    MR. TRAVERS:  Objection.  Vague.
10    THE WITNESS:  Forensic Examiners, yes, not
11  Forensic Medicine.
12  BY MR. DHINDSA:
13    Q    And is that in part because you serve on
14  the editorial board of The Forensic Examiner, the
15  magazine whose publisher was Dr. O'Block?
16    A    Is what in part?
17    Q    The fact that you'd heard about these
18  allegations.
19    A    No.  The only thing I'm aware of is this
20  Washington Post news story, which I recall seeing
21  back last fall.
22    Q    So you have never heard that organizations
23  from which you have board certifications have been
24  described as certification mills?
25    MR. TRAVERS:  Objection.  Foundation.

Page 36

1  if at all.  It's The Watch, whatever that is.
2    Q    So Exhibit 9 is talking about Dr. O'Block,
3  correct?
4    A    Yes, that is correct.  That's how I knew he
5  was deceased.
6    Q    If you look at the top of Exhibit 9, it
7  shows this document was downloaded from
8  www.washingtonpost.com/news/the watch, correct?
9    A    Yes.
10    Q    The title of the article is "The Emperor of
11  Junk Science Forensics Has Died."
12    Did I read that correctly?
13    A    Yes.
14    Q    And it goes on to discuss a phone number,
15  if you look at the top of the second page, that
16  Dr. O'Block's organization had, 1-800-4AXPERT.
17    Do you see that?
18    A    Yes.
19    Q    In fact, that's still their phone number,
20  correct?
21    A    I don't know.
22    Q    Did you ever get any clients through that
23  phone number, to your knowledge?
24    A    Never.
25    Q    Moving down, the article discusses that

Page 35

1    THE WITNESS:  Not the American Board of
2  Forensic Medicine, no.  That is a board that is
3  run not by Dr. O'Block, but by a panel of board
4  members who are highly qualified forensic
5  experts, that Sherawat, I believe, is the
6  primary board member.
7  BY MR. DHINDSA:
8    Q    And what is the parent organization of the
9  American Board of forensic medicine?
10    A    The parent organization?
11    Q    Correct.
12    A    It is the American Board of Forensic
13  Examiners.  That is the parent organization.
14  However, as I said, Sherawat and other well-known
15  pathologists and forensic experts operate the Board
16  of Forensic Medicine.
17    Q    Now, you have a Ph.D. in toxicology from
18  Indiana University, right?
19    A    I do.
20    Q    But you aren't board certified by the
21  American Board of Toxicology, correct?
22    A    No.
23    Q    You took that test and failed the same
24  section twice, correct?
25    MR. TRAVERS:  Objection.  Foundation.

Page 37

10 (Pages 34 - 37)

1    THE WITNESS:  Yes, Section 2, I believe,
2  back in 1993 or '94, somewhere in that time.
3 BY MR. DHINDSA:
4    Q   And that was the section that focused on
5  animal studies, correct?
6    A   As I recall.
7    Q   And how to perform animal studies, right?
8    A   Primarily research studies.
9    Q   Likewise, that section was focused on
10  mutagenesis, correct?
11    A   I think it did contain in vitro mutagenesis
12  studies.
13    Q   That was also the section that discussed
14  mechanisms of cancer like genotoxicity, correct?
15    A   I believe there were questions of that sort
16  on there, yes.
17    Q   There were questions in that section
18  related to hematopoietic toxicity, correct?
19    A   Probably.
20    Q   And there were questions in that section
21  relating to non-Hodgkin's lymphoma, which is a
22  hematopoietic cancer, correct?
23    A   Yes.  However, I believe there were also
24  questions regarding that in the other sections which
25  I passed as well.
Page 38

1    Q   So just so I understand correctly, it's
2  true that you have twice failed the toxicology board
3  examination that looks at animal models of cancer,
4  correct?
5    MR. TRAVERS:  Objection.  Misrepresents his
6    prior testimony.
7    THE WITNESS:  Section 2 out of the three
8    sections, yes.
9 BY MR. DHINDSA:
10    Q   And it's also true that you've twice failed
11  the toxicology board examination that looks at
12  mutagenesis and genotoxicity, correct?
13    MR. TRAVERS:  Objection.  Misrepresents his
14    prior testimony.
15    THE WITNESS:  In Section 2 out of 3, yes.
16 BY MR. DHINDSA:
17    Q   It's true that you have twice failed the
18  toxicology board examination that looks at
19  hematopoietic toxicity, correct?
20    MR. TRAVERS:  Objection.  Misrepresents his
21    prior testimony.
22    THE WITNESS:  Same answer.
23    MR. DHINDSA:  I'm not asking about his
24    prior testimony.
25 BY MR. DHINDSA:
Page 39

1    Q   It's true that you've twice failed the
2  toxicology board examination that looks at
3  hematopoietic toxicity, correct?
4    MR. TRAVERS:  Objection.  Lacks foundation.
5    THE WITNESS:  Section 2 out of the three
6    sections, and there were numerous questions on
7    Sections 1 and 3 regarding that as well.
8 BY MR. DHINDSA:
9    Q   So to be clear, the section that you failed
10  twice had questions relating to hematopoietic
11  toxicity, correct?
12    MR. TRAVERS:  Objection.  Asked and
13    answered.
14    THE WITNESS:  It did, as did the other
15    sections.  It was not restricted only to Section
16    2.
17 BY MR. DHINDSA:
18    Q   Now, you've talked about the fact in the
19  past in prior testimony that you've taken many
20  classes with medical students, correct?
21    A   Yes, the first two years, primarily.
22    Q   But you're not a medical doctor, right?
23    A   No, but I've had the -- as required with my
24  degree, the medical school curriculum at IU School of
25  Medicine, as it was in 1983 through 1985.  I took
Page 40

1  courses actually into the third year as well as
2  pathology.
3    Q   You don't examine patients?
4    A   No, I'm not a medical doctor.  I don't
5  diagnose or treat patients.
6    Q   You're not an oncologist and hematologist,
7  right?
8    A   No.
9    Q   Oncologists and hematologists are the type
10  of doctors who treat cancer, right?
11    A   Treat it, yes.
12    Q   That's something you do not do, correct?
13    A   No.
14    Q   You don't diagnose non-Hodgkin's lymphoma,
15  right?
16    A   No.
17    Q   You don't diagnose mycosis fungoides,
18  right?
19    A   No, I rely on the diagnosis provided by the
20  oncologist and the pathologist.
21    Q   You don't treat non-Hodgkin's lymphoma,
22  right?
23    A   No.
24    Q   You don't treat mycosis fungoides?
25    A   No.
Page 41

CONFIDENTIAL

1    Q   You don't give prognoses to patients
2  regarding their non-Hodgkin's lymphoma, right?
3    A   Correct.
4    Q   You don't give prognoses to patients
5  regarding their mycosis fungoides?
6    A   No.
7    Q   You're not a veterinary pathologist?
8    A   No, but I have taken pathology.  And out of
9  the 152 students, as I recall, I had the number 3
10 grade at the end of the course.
11   Q   What course was that?
12   A   Pathology.
13   Q   Where did you take that course?
14   A   Indiana University School of Medicine.  And
15 just for the record, I have a 3.81 GPA, which was
16 primarily based on the medical school curriculum
17 courses.
18   Q   You're not board certified in veterinary
19 pathology, are you?
20   A   No.
21   Q   You've never served as a veterinary
22 pathologist in analyzing slides for any type of
23 scientific research, have you?
24   A   No, but I did have to blindly examine
25 numerous pathology slides for two different courses

Page 42

1  that were required as part of the medical school
2  curriculum.
3    Q   As a student?
4    A   Yes.
5    Q   You've not served as a peer-reviewer for a
6  veterinary pathology journal, correct?
7    A   Correct.
8    Q   You're not an animal toxicologist, correct?
9    A   Correct.
10   Q   You've never designed a rodent
11 carcinogenicity bioassay?
12   A   No.
13   Q   You've never conducted a rodent
14 carcinogenicity bioassay?
15   A   No.
16   Q   You've never been the study pathologist on
17 a rodent carcinogenicity bioassay?
18   A   No.
19   Q   You've never evaluated a rodent
20 carcinogenicity bioassay while acting as an employee
21 at EPA, correct?
22   A   Correct.
23   Q   And, similarly, you've never evaluated a
24 rodent carcinogenicity bioassay while acting as an
25 employee of the California EPA, right?

Page 43

1    A   Correct.
2    Q   You've never researched the similarity of
3  human tumors to rodent tumors, correct?
4    A   Can you repeat that?
5        (Phone rings.)
6        MR. DHINDSA:  Can we go off the record?
7        VIDEOGRAPHER:  The time is 9:05 a.m.  We're
8  going off the record.
9  (Thereupon, a short break was taken at 9:05 a.m.)
10       VIDEOGRAPHER:  The time is now 9:06 a.m.
11 We're back on the record.
12 BY MR. DHINDSA:
13   Q   Dr. Sawyer, you never have researched the
14 similarity of human tumors to rodent tumors, correct?
15   A   As part of my training, yes, but not as a
16 consultant, no.
17   Q   When you say as part of your training, do
18 you mean as part of your education?
19   A   Yes.
20   Q   So subsequent to graduating with your Ph.D.
21 you have not researched the similarity between human
22 tumors and rodent tumors, correct?
23   A   Well, I have as part of my work on various
24 cases, but not as a hands-on actually carrying out
25 the assay, no.

Page 44

1    Q   You've never designed any scientific
2  research to evaluate the similarity of human tumor to
3  rodent tumor, correct?
4    A   Correct.
5    Q   And you haven't done any research regarding
6  comparison of non-Hodgkin's lymphoma in rodents and
7  humans, correct?
8    A   Correct.
9    Q   You've never done any research comparing
10 mycosis fungoides in humans and rodents, correct?
11   A   Repeat that, please.
12   Q   You've never done any research comparing
13 mycosis fungoides in humans and rodents, correct?
14   A   I've reviewed some studies.
15   Q   The studies you've reviewed have been in
16 the context of being a consultant; is that correct?
17   A   Yes.
18   Q   You haven't conducted any scientific
19 research on comparison of mycosis fungoides in human
20 beings and rodents, correct?
21       MR. TRAVERS:  Objection.  Asked and
22 answered.
23       THE WITNESS:  I've reviewed studies but
24 have not carried out original research.
25 BY MR. DHINDSA:

Page 45

12 (Pages 42 - 45)

CONFIDENTIAL

1    Q    You've never peer-reviewed a rodent
2  carcinogenicity bio assay pre-publication, have you?
3    A    No, I don't believe so.
4    Q    What study compares mycosis fungoides in
5  humans and rodents?
6    A    I don't recall.
7    Q    You can't cite to any peer-reviewed
8  publication comparing mycosis fungoides in humans and
9  rodents?
10    A    No.
11    Q    You've never published on glyphosate,
12  correct?
13    A    Correct.
14    Q    You're not an ethicist, correct?
15    A    No.
16    Q    You don't hold yourself out as an expert on
17  corporate ethics?
18    A    No.
19    Q    You're not an expert on the state of mind
20  of a given corporation?
21    A    Only to the extent that as any toxicologist
22  has to evaluate literature and determine the
23  reliability and validity of the literature.  I
24  certainly take into account ethics in determining
25  whether a particular study or memo is reliable.

Page 46

1    Q    Well, as a scientist, if you're evaluating
2  the peer-reviewed literature, you wouldn't be looking
3  at any memos, correct?
4    A    I would.  There are memos quoted in the
5  scientific literature that have to do with ethics.
6    Q    Well, as a scientist or somebody who's
7  engaged in such an evaluation, how do you access such
8  memos?  Are they publicly available?
9    A    As I said, sometimes the portions of memos
10  are quoted within peer-reviewed studies.
11    Q    But sometimes they're provided by attorneys
12  for whom you're working?
13    A    That as well, yes.
14    Q    You've never worked for Monsanto, correct?
15    A    No.
16    Q    Have you ever had any communications with
17  anyone at Monsanto?
18    A    As you know, I've been deposed by Monsanto
19  for many days on other cases.
20    Q    Other than prior litigation involvement,
21  have you had any other communications with Monsanto,
22  to your knowledge?
23    A    No.
24    Q    You're not an expert on the use of
25  pesticide labeling by the public, are you?

Page 47

1    A    Only from the toxicologic standpoint as to
2  whether the label is accurate and provides a full
3  account of information regarding the substance in
4  question.
5    Q    Have you ever drafted a label for a
6  pesticide or other product approved by the United
7  States Environmental Protection Agency?
8    A    I have produced and prepared labels and
9  MSDSs back in 19- -- approximately 1994 through 1996,
10  but I no longer provide that service simply because
11  the insurance is just too expensive.  It's not
12  economically viable unless you do it on a large
13  scale.
14    Q    So you don't hold yourself out as an expert
15  on the use of pesticide labeling by the public,
16  correct?
17        MR. TRAVERS:  Objection.  Asked and
18  answered.
19        THE WITNESS:  No, not as an expert.
20  Certainly, I have relevant training and
21  experience in that area as to the validity of
22  the labeling and whether it provides a full
23  disclosure of the toxicological properties of
24  the material.
25  BY MR. DHINDSA:

Page 48

1    Q    You're not offering any such opinions in
2  this case, correct?
3    A    Only to the extent that the product in this
4  case was mislabeled in the sense that it did not warn
5  of cancer, it was a cancer hazard.
6    Q    Anything else?
7    A    No.
8    Q    You're not a human factors expert, correct?
9    A    No.
10    Q    You never mixed agricultural grade
11  pesticides?
12    A    Have I what?
13    Q    Mixed agricultural grade pesticides.
14    A    Well, I've mixed Monsanto Roundup on
15  occasions.  But when you say "commercial grade," no,
16  I've mixed hardware store grade, not commercial
17  grade.
18    Q    And that's for your home use?
19    A    Yes.
20    Q    You have Roundup at home?
21    A    I've had Roundup at home, yes.
22    Q    You're not an expert on the mechanics of
23  mixing agricultural grade pesticides, right, other
24  than for your home use?
25    A    Repeat that.

Page 49

13 (Pages 46 - 49)

CONFIDENTIAL

1   Q   You're not an expert on the mechanics of
2 mixing agricultural grade pesticides?
3   A   No.
4   Q   What do you use Roundup on at home?
5   A   In the past I've used Roundup for control
6 of weeds.  And in New York state I've used it to
7 control grass in certain areas on a limited basis.
8   Q   Are there any particular types of weeds you
9 use Roundup on?
10   A   No.
11   Q   When was the last time you used Roundup?
12   A   About two months ago.
13   Q   Was Roundup effective in your experience?
14   A   Yes.
15   Q   You've never worked as a pesticide
16 applicator, correct?
17   A   No.
18   Q   You have never worked as a pesticide
19 applicator?
20   A   I said no.
21   Q   You've never taught a course on the safe
22 application of pesticides, right?
23   A   Not a course.  I did, as part of the
24 fourth-year curriculum in Syracuse at Upstate Medical
25 Center, I included toxicity of various pesticides,

Page 50

1 especially the organic phosphates, to medical
2 students.
3       Other than that, I haven't taught any
4 specific courses on the handling of pesticides.
5   Q   You've never written or administered a
6 certification exam for pesticide application, have
7 you?
8   A   No.
9   Q   You're not an industrial hygienist?
10   A   No, however, I have directed laboratories
11 in laboratory testing protocols using industrial
12 hygiene standards for many years.  So I'm very
13 familiar with the field of industrial hygiene, but I
14 am not an industrial hygienist.
15   Q   Is there a board certification for
16 industrial hygienists, to your knowledge?
17   A   Yes, there is.
18   Q   Is that a board certification you hold?
19   A   No.
20   Q   You've never trained a class on the use of
21 Tyvek, have you?
22   A   Yes, I have.
23   Q   When was that?  Can you describe the
24 context?
25   A   Yes.  In the laboratory at Express Lab as

Page 51

1 part of the health and safety training manual, and as
2 well as my instruction to employees in the correct
3 use of Tyvek when entering hazardous zones.  For
4 example, the westside landfill in Pennsylvania in
5 1994 in which two of my staff members had to go onto
6 a property at OSHA level B or C, I can't remember
7 which.  So, yes, I've taught my employees in the past
8 as part of the health and safety training program.
9   Q   Have you ever tested Tyvek's permeability
10 under experimental conditions?
11   A   Yes.
12   Q   Please describe when that was.
13   A   Well, the most recent situation was I took
14 a pair of scissors and cut a square of fabric out of
15 the pant leg of this Tyvek 400 suit, and I took a
16 wine glass, taller wine glass, placed the fabric over
17 and into the wine glass, and I taped the rim to hold
18 the overlap of the fabric.  I took the scissors and
19 trimmed off the excess material.  And then in that
20 glass, I poured 98-degree Fahrenheit water into the
21 fabric and observed, in about two minutes, the
22 formation of water in the bottom of the glass.  I
23 have photographs of it, video as well.
24   Q   You would consider that to be under
25 experimental conditions?

Page 52

1   A   It does serve as a crude experiment, yes.
2   Q   And so you conducted that experiment when?
3   A   Yesterday at 8:30 p.m.
4   Q   Why did you conduct that experiment
5 yesterday?  Any particular reason?
6   A   Yes.  I had previously put my arm into the
7 Tyvek suit, and I did it just like this and I brought
8 it up to my elbow.  And I adjusted the water faucet
9 to measure about 98 degrees and I ran water up on the
10 fabric for one minute with Kleenex tissue underneath
11 the sleeve.  When I removed it, the Kleenex was dry.
12       I repeated the experiment again for five
13 minutes, removed it, and the Kleenex was damp.  So I
14 thought it might be worthwhile to go another step, as
15 I did research everything I could find published by
16 the corporation that makes the Tyvek 400, and they do
17 indicate the suit is impervious to dust.  They do not
18 state it's impervious to water or water vapor or
19 glyphosate vapor.
20       MR. DHINDSA:  I object and move to strike
21   all your testimony concerning an undisclosed
22   experiment that was apparently done well after
23   December 22, 2017, when your expert reports were
24   due in this case.
25       MR. TRAVERS:  I'll object that was a

Page 53

14 (Pages 50 - 53)

1    responsive answer, and he's disclosing the
2    experiment now.
3  BY MR. DHINDSA:
4    Q    Any other testing of Tyvek material you've
5  done, Dr. Sawyer?
6    A    No.
7    Q    You've never been involved in the design or
8  construction of Tyvek materials?
9    A    No.
10    Q    You're not an expert on EPA regulations?
11    A    I have considerable training and experience
12  with EPA regulations in review and use them as part
13  of my work as a toxicologist.
14    Q    Have you ever worked at the EPA?
15    A    No.
16    Q    Have you ever served on a scientific
17  advisory panel of the EPA or the California EPA?
18    A    No.  I worked for the health department and
19  served as an advisor to the legislative health
20  community, but I've never worked for EPA.
21    Q    And I understand you've testified that
22  you've used, referred to EPA regulations in the past,
23  but you're not an expert on compliance with the EPA
24  regulations, are you?
25    A    I have familiarity with the EPA regulations

Page 54

1  and the specifics in terms of whether or not a
2  procedure meets compliance.  I have training and
3  experience, but I'm not an expert on that, per se.
4    Q    And when you say specifics in whether
5  procedures meet compliance, what procedures are you
6  referring to?
7    A    For example, whether the human factors
8  handbook manual was followed correctly or whether the
9  methodology for a cancer bioassay was followed
10  correctly, all of the rules and regulations are
11  printed in numerous volumes of EPA documents which in
12  the past I have had to use as part of my work as a
13  toxicologist.
14    Q    You're not an expert on human factors,
15  right?
16    A    No.
17    Q    You're not an expert on human factors?
18    A    I am not.
19    Q    You're not an expert on California's
20  Proposition 65?
21    A    No.
22    Q    You're not testifying that anyone in this
23  case violated any EPA regulations, are you?
24    A    I don't believe so.
25    Q    You've never interpreted Proposition 65 on

Page 55

1  behalf of an agency?
2    A    I'm not sure I understand the question.
3    Q    You're familiar with California Proposition
4  65?
5    A    Yes.
6    Q    Have you ever interpreted Proposition 65 on
7  behalf of anyone, an agency or a party for whom
8  you've consulted?
9    A    Yes.
10    Q    Can you describe those circumstances?
11    A    I consulted on a case in San Diego in the
12  past three years in which a -- I believe it was a
13  battery factory of some sort had closed and the
14  building had been used for apartments.  And there was
15  a claim, or there still is a claim, of contamination
16  to the residents of that apartment to carcinogens
17  that were identified as carcinogens under the
18  proposition.  I did not find in that case that the
19  contaminates that were declared under the California
20  proposition were at a sufficient level to cause any
21  harm.
22    Q    Any other circumstances where you've
23  consulted on issues relating to Proposition 65 to
24  your knowledge?
25    A    I've worked on other California cases.  I'm

Page 56

1  not sure if they involved the proposition or not.  In
2  fact, the only thing that comes to mind is that one
3  did involve specific carcinogens that I evaluated
4  that were listed under the proposition.
5    Q    You're not testifying about Proposition 65
6  in this case?
7    A    Well, I reviewed the Proposition 65 finding
8  regarding glyphosate that was -- I think it was
9  prepared in 2017.
10    Q    Just for the record, Dr. Sawyer, you have
11  pulled a document out of a box of documents that you
12  have brought with you; is that correct?
13    A    I'm going to answer the prior question
14  first.
15    Q    Sure.
16    A    Well, I have in my hand the initial
17  statement on the proposed amendment to glyphosate
18  under Proposition 65.  I was looking for the date,
19  and I'm uncertain of the date, whether it was 2016 or
20  '17.  And -- but, yeah, I did review -- in fact, I
21  have some handwritten scribbles here.  I did review
22  the equations and the use of a hemangiosarcoma study
23  in the development of the cancer potency factor.
24    Q    May we mark that, sir, as an exhibit?
25    A    Yes, but the policy is anything that's

Page 57

15 (Pages 54 - 57)

1 marked goes back into my file in order so I know
2 where things are, and I can respond to the questions
3 sufficiently.
4     Q   Before we do that, let me just ask you
5 then:  The box that you've brought with you, does
6 that contain documents related specifically to
7 Mr. Johnson's case, this litigation?
8     A   Yes.
9     Q   And are those all publicly available
10 documents, to your knowledge?
11    A   Most of them.
12    Q   And you have some handwritten notes on some
13 of the documents in that box?
14    A   Probably.
15    Q   Would it be possible for us to allow the
16 court reporter overnight to make a copy of that box
17 and then mark the whole thing as an exhibit?  Would
18 that be okay with you?
19    A   Only if things are stapled together as they
20 are now.  No paper clips, no rubber bands, no
21 stapling in the middle of the page.
22    Q   Fair enough.
23    A   And the order must remain the same.
24    Q   And so I believe you testified that you've
25 reviewed Proposition 65 in relation to this case,

Page 58

1     A   I would have to estimate dating back to
2 about 1993.
3     Q   And I think you testified earlier you have
4 used Roundup as recently as a couple months ago; is
5 that right?
6     A   That's true.
7     Q   Have you or anyone you're aware of who's
8 used Roundup developed non-Hodgkin's lymphoma?
9     A   Not that I know of.
10    Q   You're not a genotoxicologist, are you?
11    A   No, but I've reviewed hundreds, if not
12 thousands, of human toxicity studies over the years
13 and I've had training and experience with
14 genotoxicity as part of my everyday work.
15    Q   Have you ever conducted any genotoxic
16 studies?
17    A   No.
18    Q   Have you ever designed any studies relating
19 to genotoxicity?
20    A   No.
21    Q   Have you ever served as a reviewer for any
22 studies relating to genotoxicity?
23    A   No.
24    Q   You're not a toxicologist who focuses his
25 studies on oxidative stress, right?

Page 60

1 right, and the determination about glyphosate?
2     A   Yes.
3     Q   Do you have any opinions about Proposition
4 65 that are not stated in your report?
5     A   Only that the more potent, more sensitive
6 animal studies from Wood 2009 B would have been a
7 more appropriate animal model to use in the cancer
8 potency calculation.
9     Q   Why do you say that?
10    A   Because the Wood 2009 B animal studies for
11 lymphoma provided a more sensitive analysis, the dose
12 response period was monotonic and highly significant,
13 as opposed to the hemangiosarcoma study used in the
14 proposed NSRL.
15    Q   Anything else?
16    A   No.
17    Q   You used the Wood 2009 B study on
18 lymphomas, right?
19    A   Yes.
20    Q   Do you have any opinions regarding the
21 hemangiosarcomas that are not in your expert report?
22    A   No.
23    Q   You testified earlier that you had used
24 Roundup.  Over what period of time have you used
25 Roundup?

Page 59

1     A   No.  Again, that's not my primary area of
2 expertise, but I certainly have a lot of experience
3 with the mechanisms of oxidative stress and the use
4 of studies with respect to oxidative stress as part
5 of my work as a toxicologist.
6     Q   Have you conducted any research on
7 oxidative stress?
8     A   Original research, no.
9     Q   Have you published any scientific articles
10 on oxidative stress?
11    A   No.
12    Q   Have you peer reviewed any scientific
13 articles relating to oxidative stress?
14    A   No.
15    Q   You're not a dermatologist, are you?
16    A   No.
17    Q   You're not a dermatotoxicologist, are you?
18    A   No.
19    Q   You're not a chemist?
20    A   No.  However, I have, I think, close to 35
21 to 40 credit hours in chemistry as part of my
22 master's and Ph.D. training, and I use chemistry
23 every day of my work as a toxicologist.
24    Q   Do you do any scientific research as a
25 chemist?

Page 61

16 (Pages 58 - 61)

**Page 62**

1    A    No.
2    Q    Do you serve as a peer-reviewer on any
3 chemistry journals?
4    A    No.
5    Q    You're not a biochemist, are you?
6    A    No.
7    Q    You've never designed a Rhesus monkey
8 study, have you?
9    A    No.
10    Q    You've never conducted a Rhesus monkey
11 study?
12    A    No, only rat studies.
13    Q    You've never peer-reviewed any Rhesus
14 monkey studies, have you?
15    A    No.
16    Q    You've never published any Rhesus monkey
17 studies, have you?
18    A    No.
19    Q    You've never done any research on the
20 dermal absorption of pesticides in humans, have you?
21    A    For many years I've calculated dermal
22 absorption based on published literature of various
23 pesticides and chlorinated hydrocarbons.
24    Q    You've never done any of your own research
25 on dermal absorption of pesticides in humans?

**Page 63**

1    A    No, not original research.  Again, I'm very
2 familiar with numerous studies of chlorinated
3 hydrocarbons and pesticides in animals and humans, as
4 I use dermal absorption factors as part of my work.
5    Q    I understand you're familiar with those
6 studies.  But you haven't done any research yourself
7 on dermal absorption of pesticides in humans, have
8 you?
9        MR. TRAVERS:  Objection.  Asked and
10 answered.
11        THE WITNESS:  Same answer.
12 BY MR. DHINDSA:
13    Q    You can't answer that question yes or no?
14        MR. TRAVERS:  Objection.  Asked and
15 answered.  He already answered it.
16        THE WITNESS:  I used the word yes or no in
17 my last response.
18 BY MR. DHINDSA:
19    Q    You're not a biostatistician, are you?
20    A    No, but I do use a lot of biostatistics in
21 my work every day for 30-some years.
22    Q    You're not board certified as a
23 biostatistician, are you?
24    A    No, but I use the work as part of my
25 training all the time.

**Page 64**

1    Q    You've never evaluated a study or series of
2 studies using formal multiple comparisons analysis,
3 have you?
4    A    Repeat the question, please.
5    Q    You've never evaluated a study or series of
6 studies using a formal multiple comparisons analysis,
7 have you?
8    A    I've reviewed studies using such analyses
9 numerous times.
10    Q    Have you ever designed or conducted any
11 such studies?
12    A    No, but I rely on and use them as part of
13 my training and experience as a toxicologist on a
14 daily basis.
15    Q    You've never published on mycosis
16 fungoides, have you?
17    A    No.
18    Q    You've never issued an expert opinion on
19 the cause of someone's mycosis fungoides, have you?
20    A    No, it's pretty rare.  It only occurs in
21 about five in one million Caucasians and 10 in one
22 million African Americans.  It's not something you
23 run into every day.
24    Q    You're not a cancer biologist, are you?
25    A    In a sense, yes, toxicologists are.

**Page 65**

1    Q    So it's your testimony to this jury that
2 you have specialty as a cancer biologist?
3    A    I have a specialty in understanding the
4 mechanisms, formation and malignancies from toxic
5 materials.  That is exactly what toxicologists do.
6    Q    You've never published on cancer latency,
7 have you?
8    A    No, but I'm very familiar with all of the
9 studies regarding latency of hematopoietic cancers,
10 which I've used for many years.  I'm not a latency
11 expert, per se, but I certainly have expertise in the
12 field.  That's part of my training and experience.
13    Q    Until you wrote this report, you've never
14 considered the carcinogenicity of glyphosate for an
15 expert opinion, have you?
16    A    I have.
17    Q    Can you describe that situation?
18    A    I was consulted on a glyphosate matter in
19 Houston, Texas, with the firm Dennis Reesh (phonetic)
20 -- I forget how you spell Dennis' last name -- back
21 in the early or mid 1990s, many years ago.  And I --
22 the case really comes to mind because it was a hairy
23 cell leukemia matter.  At that time, there was
24 actually at least one glyphosate study that I recall
25 that was statistically significant for hairy cell

17 (Pages 62 - 65)

1 leukemia, an epidemiologic study that was
2 significant. I remember I advised the firm not to
3 pursue the case as, at that time, I didn't feel there
4 was enough -- you know, beyond one study of hairy
5 cell leukemia at that time. I believe it was about
6 1993 or 1994.
7    Q   Can you identify that study?
8    A   No, it's been -- how many years was that?
9    Q   It's been a while.
10    A   I can't remember the author's name. The
11 case came to mind because, at that time, in reviewing
12 the epidemiological literature, it was clear that
13 glyphosate had carcinogenic potential, but I didn't
14 feel there was sufficient evidence under the Texas
15 law, which required at that time, I believe, a risk
16 ratio of two or greater and multiple epidemiologic
17 studies, to really move forward.
18    Q   So did you -- that occurred in the
19 mid 1990s, is that what you said, that consultation
20 in Texas?
21    A   About 1994, yeah.
22    Q   And did you ever express your view about
23 any potential carcinogenicity of glyphosate at the
24 time?
25    A   Yes.
Page 66

1    Q   To whom?
2    A   To my client.
3    Q   To anyone else?
4    A   I don't remember.
5    Q   You don't recall communicating your concern
6 to the Environmental Protection Agency?
7    A   No.
8    Q   You didn't communicate your concern to any
9 of the manufacturers of glyphosate, including
10 Monsanto, did you?
11    A   I believe that would be unethical. When
12 I'm consulting on a case like that, I can't contact
13 the defendant, I don't think. I'm not sure. That
14 calls for a legal answer, I guess.
15    Q   Did you communicate your concern for
16 glyphosate's carcinogenic potential to your golf
17 course club clients who were using Roundup?
18    A   Yes.
19    Q   What did you tell them?
20    A   There were a number of chemicals
21 on different golf course club clients for the
22 laboratory I directed back in the '90s that were
23 carcinogenic. Those being some of the dioxin
24 containing phenoxy herbicides, glyphosate, and some
25 of the chlorinated hydrocarbons that were still in
Page 67

1 use.
2    Q   Despite your concern about glyphosate's
3 potential carcinogenicity, which dates back to the
4 mid-1990s, you continued to use glyphosate yourself,
5 right?
6    A   With gloves, special protection on a very
7 limited basis, yes. And with the dogs kept inside.
8 Very, very carefully.
9    Q   You've never researched the translatability
10 of dermal findings in rodents to humans, have you?
11    A   I'm sorry, could you repeat that?
12    Q   Sure. You've never researched the
13 translatability of dermal findings in rodents to
14 humans, have you?
15    A   I don't understand if you're asking me if I
16 have used studies in my line of work or if I've
17 performed original studies. I don't understand the
18 question.
19    Q   Have you performed any original studies
20 regarding the translatability of dermal findings in
21 rodents to humans?
22    A   Not original studies. Certainly I've
23 reviewed the studies and recall some of my training
24 in toxicology from way back.
25    Q   But no original research yourself, right?
Page 68

1    A   I already answered that. I used the word
2 "no" in that answer.
3    Q   You're not an expert in weed science, are
4 you?
5    A   I'm sorry?
6    Q   You're not an expert in weed science, are
7 you?
8    A   It depends how you use the term. I
9 certainly am an expert in determining adverse health
10 effects of THC.
11    Q   Now, putting THC aside, other than THC,
12 non-desirable plants, let's say, define weeds that
13 way. You're not an expert in weed science, are you?
14    A   With respect to biochemistry of the plant
15 growth, is that what you're referring to, or just
16 what aspect?
17    Q   Any aspect. You don't hold a Ph.D. in
18 plant physiology or botany or anything like that, do
19 you?
20    A   No, but I do have considerable training and
21 experience with respect to what natural substances
22 are found in various plants that have various
23 pharmaceutical or toxicological properties.
24    Q   Can you describe your training in that
25 regard?
Page 69

18 (Pages 66 - 69)

CONFIDENTIAL

1    A    Yes, the origin of various cardiac
2  glycosides, a number of different chemicals that are
3  found indigenously in plants, in the seeds.  I mean,
4  that's really the extent of my training and expertise
5  with respect to weeds.
6    Q    You don't advise school districts or
7  farmers on what types of methods they should use to
8  manage weeds, do you?
9    A    No.
10   Q    You're not an expert in the shikimate
11 pathway, are you?
12   A    No, I'm familiar with the pathway, but I'm
13 not an expert with respect to original studies.
14   Q    You're not an expert in genetically
15 modified crops, are you?
16   A    No.
17   Q    And up until this expert report in this
18 matter, you've never opined on any alleged toxic
19 effect of surfactants, have you?
20   A    I believe I have testified with respect to
21 the increased dermal absorption by certain non-ionic
22 surfactants in other chemical matters, but I am
23 having difficulty remembering specifically what
24 non-ionic surfactants and when.
25   Q    Would that have been on more than one

Page 70

1    We're back on the record.  This is the beginning
2  of Media Unit Number 2.
3        Please continue.
4  BY MR. DHINDSA:
5    Q    Now, Dr. Sawyer, before we took a break, we
6  were talking about your epidemiology expertise.  Do
7  you recall that?
8    A    Yes.
9    Q    As I understand it, you are not offering
10 any epidemiologic opinions in this case, correct?
11   A    No.  I'm relying, as I stated in my report,
12 on the epidemiological experts retained in the matter
13 by plaintiffs.
14   Q    So you're not offering any of your
15 epidemiological opinions in this case?
16   A    Only limited to the reliance of the
17 epidemiologists already retained in this matter, as
18 well as the opinion that the recent IRAC
19 classification of glyphosate as a level 2A carcinogen
20 is appropriate.
21   Q    Which epidemiologists the plaintiff has
22 retained are you relying upon?
23   A    Page 7 of my report, first bullet.
24   Q    And that first bullet on page 7 of your
25 report identifies Dr. Christopher Portier, Dr. Beate

Page 72

1  occasion, do you think?
2    A    I don't know.  I just seem to recall that I
3  have run into non-ionic surfactants on another matter
4  in the past.
5    Q    You've never opined in any expert testimony
6  on any synergistic effects of glyphosate-based
7  herbicide mixtures on skin permeation, have you?
8    A    No, I don't think so.
9    Q    You're not an epidemiologist, right?
10   A    No.  However, I've taught a section of the
11 second year epidemiology course at Upstate Medical
12 Center in Syracuse, and I used epidemiological
13 studies routinely and heavily as part of my work as a
14 toxicologist.
15   Q    You have offered expert opinions on
16 epidemiology in the past, correct?
17   A    I have.
18       MR. TRAVERS:  We've been going over an hour
19 and a half.  I don't know if you need a break.
20       THE WITNESS:  No.  Does the court reporter
21 need a break, that's the question.
22       VIDEOGRAPHER:  The time is now 9:48 a.m.
23 We're going off the record.
24 (Thereupon, a short break was taken at 9:48 a.m.)
25       VIDEOGRAPHER:  The time is now 10:04 a.m.

Page 71

1  Ritz and Dr. Alfred Neugut as the experts upon whom
2  you're relying; is that right?
3    A    That's correct.
4    Q    Did you review any of the epidemiology
5  reports from the defense -- defendants' experts.
6    A    I did specific to the general causation
7  case that is pending.
8    Q    Did you ever review the report of
9  Dr. Mucci, M-U-C-C-I?
10   A    Neugut?
11   Q    Mucci, M-U-C-C-I.
12   A    Mucci, possible, but that is in my file of
13 experts that were involved in the general causation.
14   Q    Do you have that file with you today?
15   A    No.  No, the only thing in that file are
16 the expert reports, nothing else.
17   Q    When you say "the general causation
18 matter," are you referring to the litigation pending
19 in federal court?
20   A    Correct.
21   Q    Did you review the expert report of
22 Dr. Rider, R-I-D-E-R.?
23   A    Yes.  In fact, is Dr. Rider a veterinarian?
24   Q    Epidemiologist.
25   A    Epidemiologist.  I believe so, but I can't

Page 73

19 (Pages 70 - 73)

1 say for certain.
2   Q   Did you review the expert reports of
3 Dr. Weisenburger?
4   A   I don't recall.
5   Q   How about Dr. Jameson?
6   A   I read a portion of Jameson's report.  I
7 clearly remember his name associated with whiskey.
8   Q   Did you review the expert report of
9 Dr. Nabhan, N-A-B-H-A-N?
10   A   I believe so.
11   Q   And why are you not relying upon the
12 opinions of Drs. Weisenburger and Jameson and Nabhan
13 in your expert report?
14   A   Based upon the review of the plaintiff's
15 expert reports and defendant's expert reports, there
16 were several striking features that rendered the
17 defensive reports not credible.  For example, the use
18 of replacement values in the exposure categories when
19 certain exposure data was missing and resulting in
20 inaccuracies in the data and a lot of other problems
21 that were identified by the plaintiffs with respect
22 to some of the studies that the defendant's
23 epidemiologists were primarily relying on.
24   Q   You understand that Dr. Weisenburger is the
25 plaintiff's epidemiologic expert in the

Page 74

1 Shear, M.D., dermatologist, treating physician, and
2 Workers' Comp deposition of the plaintiff.
3   Q   Have you reviewed any of the depositions of
4 any of the treating physicians of Mr. Johnson, other
5 than Dr. Shear?
6   A   I don't believe so.
7   Q   Now, Dr. Sawyer, as an experienced expert
8 witness, you understand the difference between
9 general and specific causation?
10   A   Of course.
11   Q   General causation in a case like this one
12 is an inquiry into whether a compound is capable of
13 causing cancer at some human relevant dose, right?
14       MR. TRAVERS:  Objection.  Asks for a legal
15   opinion.
16 BY MR. DHINDSA:
17   Q   Go ahead.
18   A   Qualified, I'm not a legal expert.  As a
19 scientist and toxicologist, I understand general
20 causation would be whether a substance is capable of
21 causing a certain disease process or malignancy,
22 given sufficient dose and duration.
23   Q   Are you planning to testify in this case
24 about any epidemiological opinions regarding primary
25 science?  In other words, anything other than the

Page 76

1 multi-district federal litigation?
2       MR. TRAVERS:  Objection.  Lacks foundation.
3       THE WITNESS:  As I said, I don't recall.  I
4   think I reviewed the report, but I'm not
5   certain.
6 BY MR. DHINDSA:
7   Q   And you don't recall why you elected not to
8 rely upon the expert opinions of Dr. Weisenburger,
9 Nabhan or Jameson in this case?
10   A   As I said, there were problems pointed out
11 by plaintiff's experts that rendered the key studies
12 that defense experts were relying on as non-credible.
13   Q   Well, Drs. Weisenburger, Jameson and Nabhan
14 are all plaintiff's experts.  Are you aware of that?
15   A   Again, I don't remember what name is
16 attached to what report.
17   Q   Have you reviewed any deposition testimony
18 of any experts in this case?
19   A   Yes.
20   Q   Which ones, do you recall?
21   A   Yes.  They're listed in the index of my
22 report.
23   Q   The ones we discussed before?  Drs.
24 Portier, Neugut and Ritz?
25   A   Yes, as well as depositions of Stuart

Page 75

1 three plaintiff's experts you've mentioned, your
2 reliance upon them.
3   A   No.
4   Q   And specific causation in a case like this
5 one is an inquiry into whether the compound at the
6 dose the plaintiff was exposed to caused or
7 substantially contributed to the plaintiff's cancer,
8 right?
9       MR. TRAVERS:  Objection.  Asks for a legal
10   opinion.
11       THE WITNESS:  Not exactly.
12 BY MR. DHINDSA:
13   Q   How would you define the specific causation
14 inquiry in Mr. Johnson's case?
15       MR. TRAVERS:  Objection.  Asks for a legal
16   opinion.
17       THE WITNESS:  In this case or any case?
18 BY MR. DHINDSA:
19   Q   Well, in any case.
20   A   Well, specific causation, a toxicologist
21 has to look beyond just whether the dose is
22 sufficient, but also rule out or rule in other
23 potential compounding factors, as well as latency,
24 dose response and, as I said, other potential causes
25 or compounding factors.

Page 77

20 (Pages 74 - 77)

1    Q    Now, in your expert report, which we have
2  marked as Exhibit 2, are you offering a general
3  causation opinion in this case?
4    A    Yes.
5    Q    And are you offering a specific causation
6  opinion in this case?
7    A    Yes.
8    Q    What is your general causation opinion
9  based on?
10   A    Animal studies and human epidemiological
11 studies, as well as IARC's ruling as a 2A carcinogen,
12 that glyphosate is, in fact, a carcinogen.
13   Q    If I understand you correctly, with regard
14 to the human epidemiological studies, you're relying
15 upon the opinions of Dr. Portier, Neugut and Ritz,
16 right?
17   A    Yes.
18   Q    In your report, however, you yourself have
19 done an analysis of the animal studies upon which
20 you've relied for your general causation opinion,
21 correct?
22   A    As part of the general causation, correct.
23 I'm not relying solely on animal study for general
24 causation.
25   Q    Okay.  Anything else you're relying on for

Page 78

your general causation opinions?
2    A    As I said, IARC, California prop, and the
3  human epidemiologic evidence as compiled by
4  plaintiff's experts.
5    Q    Anything else?
6    A    No.
7    Q    Have you reviewed any of the primary
8  epidemiologic studies?
9    A    Yes.
10   Q    Which ones?
11   A    Page 161, Table 32.
12   Q    Okay.  Have you reviewed any primary
13 epidemiologic studies other than those identified on
14 page 161, Table 32 of your report?
15   A    Yes.
16   Q    Which are those?
17   A    Androtti, A-N-D-R-O-T-T-I, et al, 2018.
18   Q    Okay.
19   A    Agricultural health study from 1996, but
20 that is really more exposure, but is relevant to the
21 epi studies. Zhang, Z-H-A-N-G, 2017.
22   Q    What's the title of that Zhang article?
23   A    It's an abstract, "Study of the Effect of
24 Occupational Exposure to Glyphosate on Hepatorenal
25 Function."

Page 79

The glyphosate epidemiology expert panel
2  review from Acquavella.  That was dated 2016.
3        The consensus statement paper by Myers
4  M-Y-E-R-S, 2016.
5        The Greim, G-R-E-I-M, study from 2015.
6        Williams, et al., 2012, and the Williams et
7  al. study from 2000.
8    Q    Is that it?
9    A    Yeah.
10   Q    Turning back to Table 32 on page 161 of
11 your report.
12   A    Okay.
13   Q    The articles cited in that third block
14 McDiffie, Eriksson, et cetera, did you actually
15 review those articles as well?
16   A    Only within the US EPA issued paper.  I
17 didn't pull the original studies to review those.
18   Q    Are you going to be offering any opinions
19 in this case on the Androtti article?
20        Let me withdraw the question.
21        Dr. Sawyer, you're not planning to offer
22 any epidemiologic opinions on any particular study in
23 this case, right?
24        MR. TRAVERS:  Objection.  Asked and
25   answered.

Page 80

THE WITNESS:  Only to the extent -- yes,
2    only to the extent of the three primary areas
3    that I've referred to earlier in establishing
4    the carcinogenicity of glyphosate.
5  BY MR. DHINDSA:
6    Q    The three primary areas being animal
7  studies, human epidemiological studies as interpreted
8  by Drs. Portier, Neugut and Ritz, and IARC?
9    A    Correct.
10   Q    And you noted on page 7 of your report,
11 "Due to the volume of epidemiologic studies, as well
12 as the need for a fully qualified epidemiological
13 assessment, I will be deferring any detailed
14 epidemiological opinions in this matter to Drs. Chris
15 Portier, Beate Ritz, and Alfred Neugut," right?
16   A    Yes, that's accurate.
17   Q    That's still accurate?
18   A    Yeah.
19   Q    What do you mean by "detailed
20 epidemiological opinions"?  Does that mean you're
21 not going to offer an opinion as to the details of
22 any particular study yourself, but defer to these
23 other three plaintiff's experts?
24   A    Yes.  It means I am relying on the body of
25 human epidemiologic studies as detailed by the three

Page 81

21 (Pages 78 - 81)

CONFIDENTIAL

1 professors.
2    Q    Have you read all of the studies that have
3 been detailed by those three professors upon whom you
4 have relied?
5    A    Not all.  I have just explained what I have
6 reviewed.
7    Q    Now, am I correct that you've never met
8 Mr. Johnson?
9    A    That is correct.
10    Q    Have you ever spoken with Mr. Johnson?
11    A    I would need to look at my invoices.  I
12 think I may have questioned him via telephone
13 conference, but I really don't recall for sure.  To
14 be accurate, I'd need to see the invoices.
15    Q    Finally, am I correct this report, Exhibit
16 2 in front of you, contains your full and complete
17 opinions in this case?
18        MR. TRAVERS:  I'm going to object as asked
19    and answered as to what his opinions are in this
20    case.
21        THE WITNESS:  Yes.  In a note on page 155 I
22    used the term a "permeable Tyvek suit."
23 BY MR. DHINDSA:
24    Q    As of now, you do not have any intention of
25 supplementing your opinions in this case, do you?
                                                    Page 82

1    A    Well, you know, if there's new information
2 that I receive through whatever source or from
3 defendant's depositions and so on, it's possible.
4    Q    But as of now you don't have any intention
5 of supplementing your expert report, do you, sitting
6 here today?
7    A    No.
8    Q    If you do supplement your opinions in this
9 case, do you agree to make yourself available for a
10 supplemental deposition on those opinions?
11    A    I think that requires a legal answer.
12        MR. TRAVERS:  Yeah.  Objection.  Calls for
13    a legal conclusion.
14 BY MR. DHINDSA:
15    Q    Well, you wouldn't object to being deposed
16 again on new information?
17        MR. TRAVERS:  Objection.  That would be a
18    question for his lawyers.
19        THE WITNESS:  I can't answer that.  I don't
20    know what the rules are.  Of course I would
21    abide by any rules of the Court, but I don't
22    know what they are.
23 BY MR. DHINDSA:
24    Q    Did you ever tell any of your golf course
25 clients to stop using glyphosate or Roundup?
                                                    Page 83

1        MR. TRAVERS:  Objection.  Asked and
2    answered.
3        THE WITNESS:  I don't recall ever finding
4    positive results of it in the pond groundwater
5    samples collected, so probably not.  There were
6    some persistent pesticides and herbicides that
7    were coming up positive, as I recall, that
8    tended to be the drivers of risk.  I don't
9    recall any glyphosate detection, so probably
10    not.
11 BY MR. DHINDSA:
12    Q    And did you advise any of your golf course
13 clients that their greenskeepers should not use
14 Roundup or glyphosate?
15        MR. TRAVERS:  Objection.  Asked and
16    answered.
17        THE WITNESS:  Client, no.  Superintendent
18    of the Skaneateles golf club, yes.  Also serving
19    on the board of the Skaneateles Lake
20    Association, I also made recommendations which
21    were published for residents around the
22    protected watershed of Skaneateles Lake.
23        As far as laboratory clients, I don't
24    believe so, because I don't think we ever had
25    any positive detections of it.
                                                    Page 84

1 BY MR. DHINDSA:
2    Q    And what did you base your recommendation
3 to that Staneateles golf club on?
4    A    Well, the superintendent, Bob Marshall, we
5 had a meeting or two with respect to the watershed,
6 as I was a board member on the Skaneateles Lake
7 Association.  Skaneateles Lake is an unusual lake.
8 It is the primary water supply for Syracuse, New
9 York.  It's also a Class A water supply; that is,
10 there's no filtration plant needed because the water
11 is so pure.  It's a very sensitive watershed.  I met
12 with Bob Marshall a long time ago, probably 15 years
13 ago, as he was new to the area, came from California
14 with a special expertise in being able to maintain
15 high quality golf grounds using very little
16 chemicals.  I remember Bob explaining this is done by
17 spiking the ground and different other methods that
18 eliminated a lot of chemical use.  We did speak
19 with -- I did speak to him about the dangers of
20 lymphoma and leukemia from glyphosate, as well as
21 some other pesticides.
22    Q    When was that, approximately?
23    A    I would have to estimate 2008, 2010, 2012,
24 somewhere in that era.
25    Q    So --
                                                    Page 85

22 (Pages 82 - 85)

CONFIDENTIAL

1    A   No, it might have been earlier than that.
2  Hang on.  I think it may have -- actually could have
3  been as early as 2004.
4    Q   And did Mr. Marshall continue to use
5  glyphosate or stop using glyphosate after having that
6  conversation with you?
7    A   As I recall, it was not a chemical that he
8  had much use for.  I don't think it was something he
9  ever used.
10    Q   Did he stop using it after you spoke with
11  him about your concern?
12    A   I have no idea.
13    Q   Now, you testified earlier about your own
14  personal use of Roundup in your home.  Do you recall
15  that?
16    A   Yes.
17    Q   And I believe you mentioned that you wore
18  some personal protective equipment when using, when
19  mixing and applying Roundup; is that right?
20    A   Yes.
21    Q   What types of personal protective equipment
22  do you use when mixing and applying Roundup?
23    A   Long pants, gloves, and more importantly, I
24  learned the few times I've used it early on that it
25  is very sensitive to wind.  When I have used it over

Page 86

1  the past number of years, I made sure that I do it in
2  the evening and only on evenings when there's
3  absolutely no wind, because I had prior exposures
4  where it was flashing back on me from the wind.
5      I have a long extension nozzle that I'm
6  able to point directly at the target, the weed, and
7  zap that weed without any exposure whatsoever because
8  I do it when there's no wind and I have a long wand
9  that keeps it away from my body.  I'm very careful
10  never to get any on my gloves or hands when mixing.
11    Q   Do you wear a mask when using Roundup?
12    A   No.  In the past, yes.  Then I learned the
13  best avoidance is simply never use it when there's
14  any wind at all, only on completely calm conditions.
15    Q   So in using Roundup when there's no wind,
16  you don't think a mask is necessary?
17    A   Not with the device I have.  The device I
18  have puts out a fairly concentrated stream to the
19  target weed.  It doesn't produce a general aerosol.
20    Q   Do you wear goggles when using Roundup?
21    A   Not in the past few years.  Again, with the
22  little sprayer I have with the long nozzle and the
23  using it in the no wind conditions, there isn't any
24  generation of an aerosol flashing back.
25    Q   Previously have you used goggles when --

Page 87

1  worn goggles when using Roundup?
2    A   I may have used my face shield.  But then I
3  have a face shield that I've had for years that I use
4  when using my chain saw.  I think I've used that
5  early on.  Because, as I say, after one or two
6  experiences with the wind, I no longer use it when
7  there's any wind at all.
8    Q   How about boots?  Do you wear boots when
9  using Roundup?
10    A   I have steel-toed leather boots and they're
11  quite protective, actually, from many threats.  I
12  only wear them for that or chain sawing, no other
13  purpose.  When I have used it in the past, I
14  immediately wash my feet and hands with soap.
15    Q   Why is that?
16    A   Just in case there is any potential
17  contamination.
18    Q   And washing with soap and water is
19  effective in removing any potential contamination?
20    A   It is if you do it immediately, immediately
21  before the dermal absorption process has a chance to
22  peak.
23    Q   Do you wear coveralls when applying
24  glyphosate or Roundup?
25    A   No.  Again, I use a wand that I have set

Page 88

1  the nozzle so it's a fairly concentrated stream
2  without creating an aerosol, and I only use that
3  device when there is no wind at all.
4    Q   Where did you get this wand device from?
5    A   Actually, from my -- I believe from my
6  original sprayer that -- I then got another sprayer
7  years later, but it disbursed too much of an aerosol,
8  so I kept the original wand.  In fact, I think I
9  drilled it out actually years ago, drilled out the
10  brass end piece to give a slightly more heavier
11  concentrated stream.
12    Q   How long is that wand?
13    A   It's a good 30 inches.
14    Q   Do you use that wand sprayer for other
15  purposes, other than applying Roundup?
16    A   No, never.
17    Q   Did you say you also mix Roundup?
18    A   Yes.
19    Q   And do you wear the same personal
20  protective equipment that you've already described
21  for spraying when you mix Roundup?
22    A   Yes.
23    Q   Anything different?
24    A   The only difference is I do have a black
25  neoprene glove that goes up a little further on my

Page 89

23 (Pages 86 - 89)

CONFIDENTIAL

1 wrist, which is completely impermeable. Other than
2 that, nothing.
3    Q   Do you wear gloves when simply applying
4 Roundup?
5    A   Yes.
6    Q   Different gloves?
7    A   Yes.
8    Q   Are those gloves chemically resistant?
9    A   No.
10    Q   But the longer glove you wear when mixing
11 is chemically resistant?
12    A   Yes.
13    Q   Do you still have this nozzle wand assembly
14 in your garage?
15    A   Yes.
16    Q   Did you find that using the wand you've
17 described prevented glyphosate getting on to your
18 skin or clothing?
19    A   Yes. And I should point out that I don't
20 have any grass, and I suspect you guys already drove
21 past my home and you know I have a very large yard
22 that is completely mulch.
23    Q   How many times a year do you use Roundup?
24    A   Varies. Recently, not much. I think I've
25 used it once since the hurricane, which was September

Page 90

1 10th, I think. So I've used it once in the past
2 five months for about 10 minutes.
3    Q   A few times a year, maybe?
4    A   Yeah.
5    Q   You don't have non-Hodgkins lymphoma,
6 right?
7    A   No, but neither do I have any exposure to
8 glyphosate.
9    Q   You don't have mycosis fungoides, correct?
10    A   That I know of.
11    Q   What weeds do you spray with Roundup?
12    A   That's a good question. I haven't really
13 inventoried that. If it pops up in my mulch, I zap
14 it, it's that simple. I actually pull most of my
15 weeds, but sometimes there are these creepy weeds
16 that are difficult to pull and they're very small.
17 But I hand-pull most of my weeds.
18    Q   Dr. Sawyer, have you heard the term
19 "replication" in science?
20    A   Yes.
21    Q   Can we agree replication means if one
22 scientific investigator makes a set of observations,
23 another investigator can make a similar set of
24 observations when faced with similar conditions?
25    A   Yes, but that's where the scientific method

Page 91

1 is important, to standardize in the time what
2 those -- what methods were followed. And if the
3 correct methodology is followed, generally we get
4 coherence within the findings.
5    Q   Replication should be easy to demonstrate
6 in a simple experiment, right?
7    A   Yes.
8    Q   For instance, if I pour vinegar on pennies
9 which are copper, they'll pretty much always turn
10 green, right?
11    A   Yes.
12    Q   But then if you get more complex studies,
13 it can be a little harder to replicate findings,
14 right?
15    A   Yes. Again, that's why the methodology
16 must be standardized and well documented.
17    Q   That's one reason you try to control for
18 confounders in studies, right?
19    A   Yes.
20    Q   Good scientists control for the confounders
21 they know about when conducting an experiment, right?
22    A   As much as possible.
23    Q   But sometimes you can't control for
24 everything and there's latent confounding, right?
25    A   Yes.

Page 92

1    Q   In these more complex systems you can
2 usually see replicated findings if you have a true
3 effect, right?
4        MR. TRAVERS: Objection. Compound.
5        THE WITNESS: That is a very general
6    question. I need a more specific set of
7    parameters to be able to answer that.
8 BY MR. DHINDSA:
9    Q   You agree replication is important in
10 science?
11    A   Certainly. It's part of Bradford Hill
12 criteria for causation.
13    Q   That's because nominalist results can occur
14 in a single experiment, but if you see those results
15 happen again and again in multiple experiments, then
16 you're more confident you're seeing a real effect,
17 right?
18        MR. TRAVERS: Objection. Compound.
19        THE WITNESS: I don't understand the
20    question.
21 BY MR. DHINDSA:
22    Q   Well, you agree you can see anomalous
23 results in a single experiment, right?
24    A   I still didn't understand the question.
25    Q   You can have the results of an experiment

Page 93

24 (Pages 90 - 93)

CONFIDENTIAL

1 that don't reflect, for example, a true
2 cause-and-effect relationship, correct?
3    A    Type one error, correct.
4    Q    And so if you see similar results based on
5 similar experimental conditions in the multiple
6 experiments, then you're more confident you're seeing
7 a real effect, right?
8    A    Yes.
9    Q    And results that are not replicated in
10 multiple experiments need to be taken with a grain of
11 salt, don't they?
12        MR. TRAVERS:  Objection.  Vague.
13        THE WITNESS:  That's too general of a
14    question.
15 BY MR. DHINDSA:
16    Q    Now, I know you've talked about so-called
17 multi carcinogens in previous depositions.  And I'm
18 not going to debate with you on whether a compound
19 can cause cancers at more than one site.  That's not
20 where I am going with this question.
21        But you would agree with me that
22 carcinogens are usually site specific; that is, if I
23 give a compound that causes cancer of the liver and
24 pancreas at a given dose, and only causes those
25 cancers at that dose, it's not going to, then, cause

Page 94

1    THE WITNESS:  It can, because -- you use
2    the term "same species," but, unfortunately, in
3    the laboratory setting, the species that is
4    reproduced over generation and generation and
5    there can be some amplification of oncogenes and
6    other changes that can result in some
7    differences.
8 BY MR. DHINDSA:
9    Q    I'm sorry.  Let's take genetic drift out of
10 the equation.  If we're talking about the same
11 species and the same strain and the same generation,
12 you would not expect to see cancer at a different
13 site, correct?
14        MR. TRAVERS:  Objection.  Asked and
15    answered.
16        THE WITNESS:  It is certainly possible if
17    it's a multiple carcinogen.  If it's a
18    carcinogen that only has the -- let's say the
19    carcinogen that accumulates in a certain tissue,
20    a carcinogen that deposits only in one tissue
21    and really only has the ability to cause --
22    let's take asbestos and mesothelioma -- then we
23    would not expect another species to develop
24    brain cancer or a glioma from that asbestos.  We
25    would not anticipate that.  That would be

Page 96

1 cancer of the bone at the same dose in another study,
2 right?
3        MR. TRAVERS:  Objection.  Compound
4    question.
5        THE WITNESS:  It can, if it's a multiple
6    carcinogen, and there is genetic aspects of the
7    specie that are different, whether it be a human
8    or an animal.  We all have oncogenes and other
9    slight differences that can result and manifest
10    in malignancies from smoking a cigarette in the
11    bronchi of a lung in one individual, and yet it
12    can show up in the larynx or other area of the
13    throat in another individual.
14        So I think to answer your question, if --
15    there's more to it than what you're inferring in
16    the question.
17 BY MR. DHINDSA:
18    Q    If we're talking about the same species,
19 and you give a compound that causes cancer of the
20 liver and pancreas at a given dose, and only those
21 cancers at that dose, you would not expect that to
22 cause cancer of the bone at the same dose in the same
23 species in a different study, right?
24        MR. TRAVERS:  Objection.  Asked and
25    answered.

Page 95

1    completely unexpected and unrealistic because
2    that particular carcinogen doesn't have the
3    capacity to enter that other tissue.  So under
4    those circumstances, I would agree.
5 BY MR. DHINDSA:
6    Q    So it depends in part on the mechanism of
7 the carcinogen or carcinogenesis?
8    A    And its deposition in the tissue.  If we
9 take gamma radiation, whole body radiation, really
10 the cancer can appear anywhere.  So, you know, it
11 really depends on the deposition of the chemical as
12 well as genetic drift.
13    Q    Other than gamma radiation, are there any
14 other examples of which you are aware where that
15 cancer can manifest anywhere?
16    A    Well, let's take a multiple carcinogen,
17 such as dioxin.  Dioxin has been shown to produce
18 statistically significant reproducible cancer in
19 multiple sites.  Not just non-Hodgkin's lymphoma, but
20 a number of other sites.  There is not sufficient
21 evidence at this time to say that that dioxin
22 molecule can only cause five different types of
23 cancer.  If a larger population was studied over
24 time, we might find that it also causes an additional
25 cancer site.  So there are limitations to the

Page 97

25 (Pages 94 - 97)

CONFIDENTIAL

1 studies.
2     If we take 50 animals and dose them, and we
3 find cancer at three different sites from a given
4 chemical, such as glyphosate, we would get
5 a different answer if we dosed 50,000 animals and we
6 followed them for the same period of time.  We would
7 have a much more sensitive study and we might find
8 that there are even other cancer sites.  So there's
9 limitations to the animal model.  If we dosed only
10 five animals, we probably wouldn't find any cancer
11 because we wouldn't have any statistical basis to
12 measure it.
13    Q   Do you agree that most cancers are not site
14 specific and not multiple carcinogens?
15    A   If I looked at the list of IARC known
16 carcinogens, I could go through and make such an
17 evaluation.  I have never done that.  It could be
18 done.
19     So to answer your question, it could be
20 done, but I haven't done it.
21    Q   Would you defer to such an IARC list on
22 that question?
23    A   Well, it could be done from an IARC list,
24 yes.  One would have to go through the list, and then
25 arsenic, mark arsenic, skin cancer, liver cancer, et

1 cetera.  Then the next carcinogen, asbestos,
2 and tally it up.  I can't give you an accurate
3 opinion on that.  I have some thoughts on it, but I
4 can't say for certain that most chemicals are
5 multiple carcinogens or single site carcinogens
6 without performing such an analysis.
7    Q   Now, you've also talked a lot in the past
8 about statistical significance, right?
9    A   Yes.
10    Q   All else being equal, you would agree that
11 statistically significant results should get more
12 weight than non-statistically significant results?
13    A   Yes.
14    Q   It's generally accepted in the scientific
15 community that we use a 95 percent confidence value,
16 right?
17    A   Yes.
18    Q   And the reason scientists use that is
19 there's an element of chance and variation in any
20 scientific experiment, right?
21    MR. TRAVERS:  Objection.  Compound.
22    THE WITNESS:  Chance, yes.  The second part
23 of the question I forgot.
24 BY MR. DHINDSA:
25    Q   Variation.

1    A   Variability.  Yeah, variability can only be
2 overcome by increasing the power of the test,
3 increasing the number and removing confounders.
4    Q   So in epidemiology we use something called
5 the 95 percent confidence interval, right?
6    A   Yes.
7    Q   That's a term routinely used in
8 epidemiology?
9    A   Yes.
10    Q   What that measures is that you're 95
11 percent sure the true ratio falls within that range,
12 right?
13    A   Yes.
14    Q   Usually that range gets narrower as you get
15 more cases and controls, right?
16    A   Yes.
17    Q   But then in animal studies, we're often
18 calculating peer wise or trend tests, right?
19    A   Yes.
20    Q   In the case of a trend test, we're not
21 actually calculating a value, but rather the chance
22 in that single measurement that what you're seeing is
23 due to chance, right?
24    MR. TRAVERS:  Objection.  Compound.
25    THE WITNESS:  The question is a little

1 fuzzy.
2 BY MR. DHINDSA:
3    Q   What are you calculating in a trend test?
4    A   Whether the groups of animals at various
5 doses produce a statistically significant trend at
6 the 95 percent level of confidence.
7    Q   Even when we're discussing statistical
8 significance, we still have to worry about Type I and
9 Type II error, right?
10    A   Yes.  I should point out in your prior
11 question that the trend is of toxicological
12 significance because it is associated with a dose
13 response.
14    Q   What do you mean?
15    A   That as dosage increases, one would expect
16 to find an increased number of cases if the
17 relationship is real and not an artifact.
18    Q   But the 95 percent test there is not a
19 confidence interval in animals, right?
20    A   No.
21    Q   You've actually taught students about Type
22 I and Type II error?
23    A   I couldn't understand your question.  I
24 didn't hear it very well.
25    Q   You've taught students about Type I and

26 (Pages 98 - 101)

CONFIDENTIAL

1 Type II error, right?
2    A   Yes, yes.
3    Q   Type I error is a concern for false
4 positives, correct?
5    A   Yes.
6    Q   Type II error is a concern for false
7 negatives?
8    A   Exactly.  If one were to operate at the 99
9 percent confidence interval, we would decrease Type I
10 error, but greatly increase Type II error and impair
11 the ability to see the change if it is really there.
12 That's where the careful balance between Type I and
13 II error has to be considered, and the study must
14 contain sufficient numbers of animals for cases to be
15 able to overcome excessive Type II error.
16    Q   And you agree with me that, in an
17 epidemiology study, that concern for false negatives
18 goes down as study populations go up, right?
19       MR. TRAVERS:  Objection.  Compound.
20       THE WITNESS:  Are you asking me if Type II
21 error increases with increased animal numbers?
22 BY MR. DHINDSA:
23    Q   The concern for false negative will go down
24 as the numbers increase, right?
25    A   In theory, yes.
Page 102

1    Q   In other words, everything else being
2 equal, if the study has a greater number of cases and
3 controls, you're less concerned about seeing a false
4 negative than in a smaller study, right?
5       MR. TRAVERS:  Objection.  Compound
6    question.
7       THE WITNESS:  Yes.
8 BY MR. DHINDSA:
9    Q   Now, you also agree with me that when you
10 run enough experiments, you're going to get some
11 false positives, right?
12    A   Yes.
13    Q   In other words, if I run 20 trend tests in
14 animal studies, I'm going to see on average one
15 statistically significant result by chance alone,
16 right?
17    A   That's possible, yes.
18    Q   And that statistically significant result
19 may be entirely unrelated to the compound I'm
20 studying, right?
21    A   It really depends on the degree of power in
22 that analysis.
23    Q   Right.  So in a well-powered study, a
24 statistically significant result may be entirely
25 unrelated to the compound I'm studying, right?
Page 103

1    A   One has to look at the P value.  If the P
2 value is .048 versus .007, that does give some
3 insight as to the likelihood of that being a random
4 chance.
5    Q   But it can't be a random chance.  You can't
6 have a statistically significant result in a study
7 that's entirely unrelated to the compound being
8 studied, correct?
9    A   That is possible.  What one would do, a
10 good researcher would also look to see if there was,
11 in that group of 20 trends, another trend that was
12 positive.  And as I say, the P value for that trend
13 or the other trend.
14    Q   Have you ever come across statistically
15 significant results in studies you've reviewed where
16 the outcome is unrelated to the compound being
17 studied?
18    A   With respect to the malignancies?
19    Q   With respect to anything.
20    A   Nothing specific that I can recall.
21    Q   So it's your testimony to this jury that
22 you've never seen Type I error?
23    A   No, I didn't say that.  I said that I can't
24 cite a specific example.
25    Q   I mean, that's -- the entire purpose of
Page 104

1 establishing a P value is predicated on the reality
2 that there are going to be chance positive and
3 statistically significant findings that do not
4 represent a true cause-and-effect relationship,
5 correct?
6       MR. TRAVERS:  Objection.  Lacks foundation.
7       THE WITNESS:  I don't understand the
8    question.
9 BY MR. DHINDSA:
10    Q   You do understand that there can be Type I
11 error, correct?
12    A   Certainly.
13    Q   And that's something you teach?
14    A   Yes.
15    Q   And that is a fundamental premise of
16 epidemiology, designing studies to minimize Type I
17 error, right?
18    A   Yes.
19    Q   Scientists who design and implement these
20 studies have an understanding that Type I error can
21 exist, and they interpret their study results with
22 that in mind, correct?
23       MR. TRAVERS:  Objection.  Compound.
24       THE WITNESS:  I don't understand the last
25    part of the question.
Page 105

27 (Pages 102 - 105)

CONFIDENTIAL

1 BY MR. DHINDSA:
2     Q    As a scientist, you have a concern about
3 Type I error when reviewing the studies?
4     A    Yes.
5     Q    When you're offering expert testimony in a
6 case like this, it's best to look at scientifically
7 grounded epidemiological studies, correct?
8     A    Yes.
9     Q    Protecting public health is one of the
10 missions of the EPA, isn't it?
11         MR. TRAVERS:  Objection.  Lacks foundation.
12         THE WITNESS:  Yes.
13 BY MR. DHINDSA:
14     Q    You're familiar with the EPA?
15     A    Yes.
16     Q    You'd also agree if a substance -- withdraw
17 that question.
18         Describe your familiarity with the EPA.  I
19 know you said you never worked there before.  What's
20 your familiarity with the EPA?
21     A    Back in about 1992, I took my staff, when I
22 was with the health department, to a meeting in
23 Buffalo, New York, and it was on that very subject.
24 The presenter put a big slide up that said there is
25 no such thing as the EPA.  And what he implied by

Page 106

1     Q    There are physiological differences between
2 rodents and people?
3     A    Yes.
4     Q    As we know, there are substances that have
5 been deemed to be carcinogenic in people, like
6 arsenic, where carcinogenicity in rodents has not
7 been established, right?
8     A    That's correct.  That is a very good
9 example.
10     Q    And likewise there are substances that are
11 carcinogenic in rodents, but not people, right?
12     A    Or have not been studied thoroughly in
13 humans because of the ethics of intentionally dosing
14 a human, where you can intentionally dose a rat.
15     Q    Right.  So there are some substances that
16 are carcinogenic in rodents that have not been proven
17 to be carcinogenic in people, right?
18     A    That's true, yes.
19     Q    It's true that cancers can have the same
20 nomenclature between humans and rodents, but the
21 process that causes those cancers may be entirely
22 different between the two species, right?
23     A    Possible, yes.
24     Q    And so you agree that we have to be
25 cautious in extrapolating animal data to humans,

Page 108

1 that and taught, and it's true, is that you cannot
2 pick up the phone and call the EPA.  There are rather
3 hundreds of different offices and different divisions
4 and operations, and it's a very spread out, complex
5 operation.  I always remember the slide "There is no
6 EPA."
7     Q    That's a large agency with a lot of people.
8     A    Try it.  Try calling the EPA.  It is.  That
9 is my description of the EPA.  As you say, the duty,
10 the charge of the EPA is to protect the environment
11 and public health.
12     Q    And you agree that rodents are not people,
13 right?
14     A    There might be some.
15     Q    Scientifically?
16     A    Some of them are rats, yeah.
17     Q    There are differences in metabolism between
18 rodents and people, right?
19     A    There are, yeah.  It depends on the drug or
20 the substance, but there are very close similarities
21 and there are differences, depending on what pathway
22 we're looking at.
23     Q    There are differences in enzymatic
24 activities of rodents and people, right?
25     A    Yes.

Page 107

1 right?
2     A    Yes, definitely.
3     Q    You agree that without having at least
4 human epidemiological data suggesting causation, it
5 would be inappropriate to label a substance a human
6 carcinogen, right?
7     A    A confirmed human carcinogen, that would be
8 correct.  As a possible or probable, that could be
9 done and is done routinely by various agencies with
10 respect to classifications from animals in studies.
11     Q    So human epidemiologic data suggesting
12 causation would require to label a substance a proven
13 human carcinogen?
14     A    Yes, or a confirmed Class 1 human
15 carcinogen.
16     Q    Now, there's also called mechanistic data,
17 right?
18     A    Yes.
19     Q    That includes things like genotoxicity
20 studies and studies of oxidative stress?
21     A    Yes.
22     Q    Let's talk about genotoxicity first.
23 Genotoxicity is basically just referring to damage to
24 our DNA or cells, right?
25     A    Damage to the genetic material, actually,

Page 109

28 (Pages 106 - 109)

CONFIDENTIAL

1  not just cellular damage.
2      Q   And this happens all the time through
3  natural processes, right?
4      A   Yes.
5      Q   You agree that just because a chemical can
6  cause damage to DNA, that does not mean it will cause
7  mutations, right?
8      A   Depends on the frequency of damage.  There
9  are repair mechanisms which are operating in most of
10  us, but depending on the frequency of that damage, if
11  it is excessive, it can result in actual DNA damage.
12      Q   Right.  But frequently -- just because a
13  chemical causes damage to the DNA does not mean it's
14  going to cause mutations, right?
15          MR. TRAVERS:  Objection.  Asked and
16      answered.
17          THE WITNESS:  Same answer.
18  BY MR. DHINDSA:
19      Q   You agree that not all genotoxic chemicals
20  are mutagens?
21          MR. TRAVERS:  Objection.  Asked and
22      answered.
23          THE WITNESS:  Depends on the frequency of
24      the insult.
25  BY MR. DHINDSA:

Page 110

1      Q   What do you mean by "frequency of the
2  insult"?
3      A   Basically, whether the repair mechanisms
4  are able to cope with it.
5      Q   Is it your testimony that all genotoxic
6  chemicals are mutagens?
7      A   Depends on the dose.
8      Q   So some are and some aren't?
9      A   If the animal can tolerate a high enough
10  dose, yes.
11      Q   Are you saying that all genotoxic chemicals
12  are mutagens at some dose?
13      A   Well, there are cases where it's not
14  possible to achieve that high of a dose due to
15  general toxicity.
16      Q   If a genotoxic chemical does not also cause
17  mutations, then it cannot cause cancer through
18  genotoxicity, right?
19          MR. TRAVERS:  Objection.  Form.
20          THE WITNESS:  In theory.
21  BY MR. DHINDSA:
22      Q   Are you saying that genotoxicity will be
23  demonstrated in all chemicals hypothetically at a
24  high enough dose?
25      A   No, that's not what I'm saying.

Page 111

1      Q   You would agree that even if a chemical is
2  shown to cause damage to DNA, that does not mean this
3  can cause cancer, right?
4          MR. TRAVERS:  Objection.  Asked and
5      answered.
6          THE WITNESS:  I didn't understand the
7      tail end of that.
8  BY MR. DHINDSA:
9      Q   I'll repeat it.
10      So you would agree that even if a chemical
11  is shown to cause damage to DNA, that does not mean
12  it can cause cancer, right?
13          MR. TRAVERS:  Same objection.
14          THE WITNESS:  That individual chemical
15      would have to be studied to be certain of that
16      conclusion.
17  BY MR. DHINDSA:
18      Q   The individual chemical would need to be
19  studied further to determine whether it's, in fact,
20  carcinogenic?
21      A   Yes.
22      Q   All of us constantly have DNA damage in our
23  cells, right?
24      A   Yes.
25      Q   In fact, every human cell has oxidative DNA

Page 112

1  damage about 10,000 times per day in the normal
2  course, right?
3      A   During the normal course of the day, yes.
4  With respect to 10,000, I don't know if that number
5  is accurate.  I would have to research it.
6      Q   The human body has repair mechanisms that
7  respond to this DNA damage so that it does not cause
8  further damage, right?
9      A   Certainly.  That's what I explained.
10      Q   Okay.  Turning to non-Hodgkin's lymphoma,
11  it's true, isn't it, Dr. Sawyer, that everyone has a
12  background risk of non-Hodgkin's lymphoma?
13      A   Yes.
14      Q   In other words, someone could live in a
15  presumed vacuum their entire life and still get
16  non-Hodgkin's lymphoma, right?
17          MR. TRAVERS:  Objection to the form.
18          THE WITNESS:  Are you asking if a person
19      was not exposed to any environmental chemicals,
20      carcinogens, that they could still develop
21      non-Hodgkin's lymphoma?
22  BY MR. DHINDSA:
23      Q   Yes.
24      A   Yes.
25      Q   So you agree that -- it's your opinion that

Page 113

29 (Pages 110 - 113)

CONFIDENTIAL

1 not all of the causative factors for NHL are
2 environmental, right?
3    A   That's true.
4    Q   Some of the causative factors for NHL are
5 genetic?
6    A   Yes.  And even possibly viral.  Epstein
7 virus in Africa, for example.
8    Q   Some of the cause and effect for NHL are
9 due to genetic errors that occur naturally, right?
10    A   Yes.
11    Q   You'd also agree that many of the causative
12 factors for NHL are unknown, right?
13    A   Some.  It's interesting, NHL is one of the
14 better studied malignancies with respect to
15 causation.
16    Q   And you'd agree that if someone is exposed
17 to a compound that is a causative factor in NHL, they
18 might get NHL whether they were exposed to that
19 compound or not, right?
20    A   It depends on the dose and the duration and
21 that particular risk factor.  For example, if a
22 person received excessive full body radiation for --
23 since childhood -- for example, at Nagasaki -- there
24 would be a very substantial increased risk.
25    Q   Now, you've mentioned IARC, which is known

Page 114

1 as the International Agency for Research on Cancer,
2 right?
3    A   Yes.
4    Q   They're a group out of Lyon, France that
5 classifies carcinogenic hazards?
6    A   Yes.
7    Q   It seems like you consider IARC a reliable
8 source for classifying and listing carcinogenic
9 hazards?
10    A   Yes.  Over the years the World Health
11 Organization and IARC, which is a branch of the World
12 Health Organization, has provided excellent research
13 and written summaries of the findings of worldwide
14 studies with respect to cancer.
15    Q   Do you agree with IARC that exposure to
16 azathioprine is a potential causative agent for NHL?
17       MR. TRAVERS:  Objection.  Form.
18       THE WITNESS:  I would really need to review
19    the summary on that chemical.  I'm not certain
20    what classification it's rated at.  I don't
21    believe it was 2A.  It might have been.
22 BY MR. DHINDSA:
23    Q   Do you agree with IARC that exposure to
24 benzene is a causative agent for NHL?
25    A   Yes.

Page 115

1    Q   Do you agree with IARC that exposure to
2 busulfan is a causative agent for NHL?
3       MR. TRAVERS:  Objection.  Form.
4       THE WITNESS:  Referring to humans or
5    animals or both?
6 BY MR. DHINDSA:
7    Q   Either.
8    A   Yes.  However, I can't say that necessarily
9 for humans.  I would have to look at the evidence and
10 the classification.
11    Q   Do you agree with IARC that 1,3-Butadiene
12 is a causative agent for NHL?
13       MR. TRAVERS:  Objection.  Form.
14       THE WITNESS:  Yes.
15 BY MR. DHINDSA:
16    Q   Do you agree with IARC that exposure to
17 chlorambucil is a causative agent for NHL?
18       MR. TRAVERS:  Objection.  Form.
19       THE WITNESS:  I believe that has been
20    established in humans from chlorambucil
21    chemotherapy, so I think the answer is yes, but
22    I want to verify that by reviewing the document.
23    In fact, I think I need to see the document
24    before we go any further on this.  You're
25    putting me to a -- you're asking me to guess at

Page 116

1    things.  I don't think that's what we wanted to
2    do.
3 BY MR. DHINDSA:
4    Q   No, I don't want you to guess.
5    A   Let's see the document then.
6    Q   I'm not referring to any particular
7 document.
8    A   Yeah, you're referring to the IARC table,
9 the known carcinogen table.
10    Q   I'm asking you in your experience as a
11 professional toxicologist whether you have any views
12 about whether particular substances are carcinogenic.
13 So you can answer to the best of your ability.
14       MR. TRAVERS:  I'm going to object you're
15    asking about specific documents, the IARC
16    monographs.
17       THE WITNESS:  Let's get the IARC monograph
18    on the table and discuss it.
19 BY MR. DHINDSA:
20    Q   Do you have any knowledge about
21 cyclophosphamide?
22    A   Yeah, it's one of the original
23 chemotherapies developed by a German physician in the
24 1950s, was highly mutagenic, and it was once used for
25 systemic chemotherapy, but the only problem with

Page 117

30 (Pages 114 - 117)

CONFIDENTIAL

1 cyclophosphamide is it usually worked in eliminating
2 or reducing the malignancy, but then generally caused
3 one or two new malignances that were worse than the
4 original. And lymphoma is one of them.
5     Q    Do you believe cyclosporine is a causative
6 agent for NHL?
7     A    I would have to research that. I don't
8 recall.
9     Q    I think you testified earlier that
10 Epstein-Barr virus is a causative agent for NHL?
11    A    If you look at the studies, a lot of
12 people, physicians especially, just throw that on the
13 table. If you look at the actual studies, it is in
14 Africa, and I think it was in northern Africa, but
15 the studies in the US., I don't believe have shown
16 statistically significant findings with the 95
17 percent confidence level as was seen in Africa. So
18 there's still some confusion as to the Epstein-Barr
19 NHL relationship.
20    Q    Do you believe that melphalan is a
21 causative agent for NHL?
22    A    Can you spell that?
23    Q    M-E-L-P-H-A-L-A-N?
24    A    I'd have to research that.
25    Q    How about lindane, L-I-N-D-A-N-E?

Page 118

1     A    It is.
2     Q    How about HIV Type I, is that a causative
3 agent for NHL?
4     A    Absolutely.
5     Q    Hepatitis C?
6     A    I'm not sure.
7     Q    How about Kaposi sarcoma herpesvirus?
8     A    I'd have to look at the studies. The
9 problem with your line of questioning is that you are
10 not specifically asking about human confirmed status.
11 Some of those that you brought up I know are nothing
12 more than an animal model with no human evidence at
13 all. And I don't think that -- you know, I think
14 that could be -- it could confuse and misguide the
15 jury, actually. Because as a toxicologist, we don't
16 take the single animal study and use that in a
17 causation analysis, as in this case.
18        So I think that the questions -- I
19 appreciate your questions, but I think they could be
20 used in a misleading fashion.
21    Q    So in your view, for something to be a
22 proven carcinogen, or causative agent for NHL, there
23 would have to be human epidemiological data to
24 support that?
25        MR. TRAVERS: Objection. Form.

Page 119

1        THE WITNESS: In a forensic matter, yes.
2     In other words, I would not offer testimony in a
3     forensic matter if all I had was one animal
4     study.
5 BY MR. DHINDSA:
6     Q    Now, NHL is actually many different
7 diseases, right?
8     A    Yes.
9     Q    In fact, there's 60 or so different
10 diseases that have been ground together under the
11 classification NHL?
12        MR. TRAVERS: Object to the form.
13        THE WITNESS: I would need to, again,
14     review the SEER registry. I did review it in
15     December. In my report I may have even put a
16     number under different types of lymphoma of
17     varying varieties. I think it's around 50 or
18     60.
19        The important thing is -- in this matter is
20     the frequency, and in this case the specific T
21     cell variant of lymphoma is very uncommon. In
22     fact, it's rare.
23 BY MR. DHINDSA:
24     Q    Mycosis fungoides is one of those NHL
25 diseases?

Page 120

1     A    Yes.
2     Q    Is the SEER registry a reliable authority?
3        MR. TRAVERS: Objection. Vague.
4        THE WITNESS: I have found them to be
5     accurate. When you ask if they are a reliable
6     authority, it's so vague all I can tell you is
7     that I have relied on their statistics for many
8     years.
9 BY MR. DHINDSA:
10    Q    You agree the SEER is a pretty
11 comprehensive database on cancer studies in America,
12 right?
13    A    It is.
14    Q    It's true when we're dealing with something
15 that's proven to cause NHL, it causes a particular
16 type of NHL, right?
17        MR. TRAVERS: Objection. Compound.
18        THE WITNESS: No.
19 BY MR. DHINDSA:
20    Q    So you don't believe that the causative
21 agents for NHL are specific to certain sub types of
22 NHL?
23        MR. TRAVERS: Objection. Asked and
24     answered.
25        THE WITNESS: The literature is ongoing,

Page 121

31 (Pages 118 - 121)

1    there are numerous studies ongoing in an attempt
2    to further define and answer that question.  We
3    can't say, as of today, that the various
4    chemicals that can induce NHL are firmly
5    established to only cause certain types of NHL.
6    That is an area of ongoing research.
7  BY MR. DHINDSA:
8    Q    Right.  I understand it's an area of
9  ongoing research.  But is it your testimony that an
10 agent that causes one type of NHL will also cause the
11 other 50 or 60 types of NHL?
12     MR. TRAVERS:  Objection.  Asked and
13     answered.
14     THE WITNESS:  It's an area undergoing
15     current research.  We don't have an answer for
16     that at this time.
17 BY MR. DHINDSA:
18   Q    So you don't have any viewpoints about the
19 causal relationship between any agents, including
20 glyphosate and NHL generally as compared with
21 glyphosate and mycosis fungoides, right?
22   A    That may never be answered because the
23 incident rate of the fungoides is so low, you know,
24 five in a million or 10 in a million in the
25 African-American, that it becomes very difficult, if
Page 122

1  not impossible, to study that specific species of NHL
2  by itself.
3    Q    So we have to look at the epidemiology of
4  NHL generally when studying the potential chemical
5  causes?
6    A    Yes, simply because the number of cases
7  would diminished to such a low value that the Type II
8  error would go through the ceiling.  And one could
9  say, well, we -- this study showed a P value of .2;
10 therefore, we conclude it does not cause that
11 particular species of NHL.  But the Type II error
12 would be so large, if you only had one or two cases
13 of it, that it would be meaningless.  So what I'm
14 getting at is that to study each subspecies of NHL,
15 the frequency in which it occurs is very important in
16 determining whether there's sufficient Type II error
17 that has power to draw conclusions.
18   Q    And do you have any understanding about the
19 differences and the etiology of the various sub types
20 of NHL?
21   A    I don't understand your question clear
22 enough to answer.
23   Q    Do you understand that the various sub
24 types of NHL have different etiologies?
25   A    Well, there are sub types that are more
Page 123

1  common with immunosuppression from -- that occurred
2  during immunotherapy, for example.  There are
3  possibly some other sub types that occurred at a
4  higher frequency associated with certain exposures,
5  but off the top of my head, I can't name what they
6  are.
7    Q    You're not holding yourself out in this
8  case as an expert in the sub types of NHL, right?
9    A    No.
10   Q    Turning back to IARC.  Now, IARC classifies
11 things that it believes to be carcinogenic hazards,
12 right?
13     MR. TRAVERS:  Objection.  Lacks foundation.
14     THE WITNESS:  Are you asking me if IARC
15     classifies carcinogens by potency?  I'm not sure
16     what you're asking.
17 BY MR. DHINDSA:
18   Q    Let me rephrase the question.
19     I am asking you, is it your understanding
20 that IARC engages in what's called hazard assessment?
21   A    Yes.
22   Q    There's a difference between hazard
23 assessment and risk assessment, right?
24   A    Yes.
25   Q    Hazard looks at whether a substance might
Page 124

1  cause cancer at a hypothetical dose, whether or not
2  that dose is realistic, right?
3      MR. TRAVERS:  Objection.  Form.  Compound.
4      THE WITNESS:  I don't understand the
5      tail end of that again.
6  BY MR. DHINDSA:
7    Q    Are you familiar with hazard assessment?
8    A    Yes.
9    Q    And you understand that hazard assessment
10 looks at whether a substance might cause cancer at
11 some hypothetical dose, whether or not that dose is
12 actually used in the real world?
13     MR. TRAVERS:  Objection.  Compound.
14     THE WITNESS:  The first part of the
15     question, I can say yes.
16 BY MR. DHINDSA:
17   Q    And you disagree with the second part of
18 the question?
19   A    I don't understand the second part of the
20 question.
21   Q    The hazard assessment that IARC engages in
22 does not take into account the relevant human dosing,
23 does it?
24     MR. TRAVERS:  Objection.  Lacks foundation.
25     THE WITNESS:  It can, and then it would
Page 125

32 (Pages 122 - 125)

CONFIDENTIAL

1    move into the definition of risk assessment.
2 BY MR. DHINDSA:
3    Q   Did you review Monograph 112, IARC's
4 assessment of glyphosate?
5    A   Are you asking for the 1999 version or the
6 current version?
7    Q   I'm asking you for -- whether you've
8 reviewed the 2015 IARC Monograph 112 evaluating
9 glyphosate.
10    A   I have, yes.
11    Q   In your expert opinion, is that a hazard
12 assessment or a risk assessment?
13    A   The epidemiological studies that it uses
14 brings it in the realms of risk assessment.
15    Q   Why do you say that?
16    A   As the dose which they evaluate, which IARC
17 evaluated, was in terms of use frequency, exposure
18 frequency, which is a quantitative approach.
19    Q   So animal studies just look at hazard?
20    A   Are you referring to cancer?
21    Q   Yeah.  Rodent carcinogenicity bioassays.
22    A   Yes.  However, one can derive using the A
23 methodology and cancer slope measurement from those
24 animal studies which is used in regulatory risk
25 assessment, not in causation analysis.
                                            Page 126

1    Q   But the EPA didn't do that with regard to
2 glyphosate, did it?
3    A   No, they failed to identify the -- as you
4 know, the Wood 2009 B study as a viable model.
5    Q   And mechanistic studies, they just look at
6 hazard.
7    A   Yes.
8    Q   Meanwhile, causation analysis is concerned
9 with whether a substance caused or substantially
10 contributed to the development of a particular
11 person's cancer, right?
12        MR. TRAVERS:  Objection.  Form.
13        THE WITNESS:  Or a group of residences or
14    occupationally exposed classes of people.
15 BY MR. DHINDSA:
16    Q   You'd agree with me that you cannot have
17 risk without a hazard, right?
18        MR. TRAVERS:  Objection.  Vague.
19        THE WITNESS:  Are you asking if the hazard
20    must first be identified?
21 BY MR. DHINDSA:
22    Q   Right.
23    A   Yes.
24    Q   And the rigor of a risk assessment is less
25 than -- I'm sorry.
                                            Page 127

1        The rigor of a risk assessment is greater
2 than a hazard assessment, correct?
3        MR. TRAVERS:  Objection.  Lacks foundation.
4        THE WITNESS:  Yes, the risk assessment
5    requires a greater degree of workup.
6 BY MR. DHINDSA:
7    Q   Similarly, you can't have a causation
8 finding without a finding of risk first, right?
9        MR. TRAVERS:  Objection.  Lacks foundation.
10        THE WITNESS:  I'm not sure I understand the
11    question.
12 BY MR. DHINDSA:
13    Q   Something can't be determined in a risk
14 assessment to constitute a risk without ultimately
15 being proven to be causative, correct?
16        MR. TRAVERS:  Objection to the form.
17        THE WITNESS:  No, that's not true.  Under
18    the Federal Register, if we look at medical
19    monitoring, for example, sufficient risk would
20    be based upon animal studies without any human
21    studies.
22 BY MR. DHINDSA:
23    Q   Let me reask my question.  You can't
24 conclude that an agent causes cancer, being a proven
25 causal relationship, unless there's first some
                                            Page 128

1 determination that that agent is a risk for such a
2 cancer, right?
3        MR. TRAVERS:  Objection.  Asked and
4    answered.
5        THE WITNESS:  Yes, same answer.
6 BY MR. DHINDSA:
7    Q   Please repeat your answer.  I didn't hear
8 it.
9    A   I'd have to look at the record.
10    Q   It's a question that says something can't
11 be determined to be a risk -- to be determined in a
12 risk assessment to calculate a risk without
13 ultimately being proven to be causative, correct?
14        MR. DHINDSA:  Can you read that answer?
15        THE COURT REPORTER:  (Reading)
16        A.  No, that's not true.  Under the Federal
17    Register, if we look at medical monitoring, for
18    example, sufficient risk would be based upon
19    animal studies without any human studies.
20        MR. DHINDSA:  I object and move to strike
21    that answer as being nonresponsive.  Let me
22    repeat my question.
23        MR. TRAVERS:  That was responsive.
24 BY MR. DHINDSA:
25    Q   You can't conclude that an agent causes
                                            Page 129

33 (Pages 126 - 129)

CONFIDENTIAL

1  cancer, being a proven causal relationship, unless
2  there is first some determination that an agent is a
3  risk for that cancer, right?
4      MR. TRAVERS: Objection. Asked and
5  answered. He responded to it.
6      THE WITNESS: No. Same answer.
7  BY MR. DHINDSA:
8    Q   So is your proof -- is your testimony to
9  this jury that the same amount and rigor of evidence
10 that you would need to determine something is a risk
11 is the same amount and rigor of evidence you would
12 need to render a causal conclusion?
13     MR. TRAVERS: Objection. Misstates his
14 testimony.
15     THE WITNESS: No.
16 BY MR. DHINDSA:
17   Q   You understand the EPA does human health
18 risk assessments?
19   A   Of course.
20   Q   And do you believe that the conclusions of
21 regulatory agencies reach the same level of rigor as
22 the testimony you're giving here today on
23 scientifically established causation between an agent
24 and an outcome?
25     MR. TRAVERS: Objection. Vague. Compound.

Page 130

1      MR. DHINDSA: You're not entitled to
2  speaking objections, Mr. Travers.
3      MR. TRAVERS: Those aren't speaking
4  objections.
5      THE WITNESS: Your questions referred to
6  hazards. Are you referring to carcinogenic
7  hazards?
8      MR. DHINDSA: Carcinogenic hazards.
9      THE WITNESS: You didn't say that.
10 BY MR. DHINDSA:
11   Q   I'm saying that now. Can you answer the
12 question?
13   A   Ask the full question so that I am clear,
14 now that you've changed it.
15   Q   Now that I've clarified the question. It's
16 entirely possible that a compound can be deemed a
17 carcinogenic hazard, but ultimately be proven to be
18 non-carcinogenic, correct?
19   A   There may be an obscure sample of that,
20 that is possible. Off the top of my head, I can't
21 think of an example, but I'm not ruling it out.
22   Q   So in your professional expert opinion,
23 every chemical that you're aware of that's been
24 deemed to be a carcinogenic hazard has been also
25 proven to be carcinogenic?

Page 132

1      THE WITNESS: I don't understand the
2  question.
3      MR. DHINDSA: I'll withdraw the question.
4  BY MR. DHINDSA:
5    Q   It's entirely possible that a hazard
6  characterization could have no relevance in the real
7  world, right?
8      MR. TRAVERS: Objection. Lacks foundation.
9      THE WITNESS: Depending on the dose, that's
10 possible.
11 BY MR. DHINDSA:
12   Q   Not just depending upon the dose. There
13 are certainly compounds that have been deemed to be
14 hazardous, but, in fact, have been proven to be
15 non-carcinogenic at all, correct?
16     MR. TRAVERS: Objection. Lacks foundation.
17 Vague.
18     THE WITNESS: Did you say non-carcinogenic
19 or carcinogenic?
20 BY MR. DHINDSA:
21   Q   There have been compounds that have been
22 found to be hazards that have been proven to be
23 non-carcinogenic, correct?
24     MR. TRAVERS: Objection. Lacks foundation.
25 Vague. Form.

Page 131

1      MR. TRAVERS: Objection. Misstates his
2  testimony.
3      THE WITNESS: That's a total screw up.
4  What I said was that -- earlier -- a chemical
5  can be deemed as a carcinogenic hazard; however,
6  if the chemical cannot be administered to humans
7  in trial studies, and if the chemical doesn't
8  occur in occupational studies, then it would be
9  likely there would be no human evidence
10 available, and to then conclude that it is not a
11 hazard in humans would be inappropriate. It's
12 simply that studies are unavailable to determine
13 either way.
14 BY MR. DHINDSA:
15   Q   Now, on page 6 of your expert report, you
16 state the regulatory rulings are "No more or less
17 important in a toxicological assessment than any
18 other objective evidence."
19   A   Page what?
20   Q   Six.
21   A   Which paragraph?
22   Q   At the bottom, you have a bullet
23 "Regulatory Considerations."
24     Do you see it there --
25   A   I do.

Page 133

34 (Pages 130 - 133)

CONFIDENTIAL

1    Q   -- where it says "The regulatory rulings
2  are no more or less important in a toxicological
3  assessment than any other objective evidence"?
4    A   That's correct.  We do not -- toxicologists
5  do not base specific causation on regulatory
6  standards.
7    Q   And that's due in part to the fact that
8  you're doing something that requires a higher degree
9  of evidence than risk assessment in doing a causation
10  analysis, right?
11       MR. TRAVERS:  Objection to the form.
12       THE WITNESS:  Not exactly.  Probably more
13    importantly is that defendants, like you in
14    cases like this, normally point out that
15    regulatory standards have built-in safety
16    factors.  And the causation analysis based upon
17    occurrence of malignancy in an occupational
18    study or agricultural study, for example, would
19    give an accurate picture of the risk level;
20    whereas, a regulatory risk level uses the 95
21    percent upper confidence value of the arithmetic
22    mean, or, in some cases, the geometric mean
23    which could, if used in a causation analysis,
24    could potentially inflate the risk.  So that's
25    the problem with -- that's why regulatory

*Page 134*

1    rulings are not used directly in causation.
2  BY MR. DHINDSA:
3    Q   You look at the underlying data when it's
4  available?
5    A   Yes.  Yes, and provide the most accurate
6  picture.  And in causation analyses, such as this, I
7  tend to be rather conservative and try to draw a
8  causation with an under estimate, if anything, rather
9  than overestimating the risk.
10    Q   So the EPA inflates the risk?
11    A   I don't want to say that they intentionally
12  inflate it.  They use the upper 95 percent confidence
13  interval of the arithmetic mean.  The whole point is, if
14  you have 10,000 people and you have a range of
15  exposure, they don't use the mean, they use slightly
16  above that at the 95 percent confidence level of that
17  mean.
18    Q   So they are conservative in their risk
19  assessment?
20    A   The word "conservative," you have to be
21  careful how you use that.  I used the word a moment
22  ago meaning that I am careful not to inflate or
23  overestimate risk in these type of analyses.
24       EPA is cautious in that they used the upper
25  95 percent confidence interval to make sure that they

*Page 135*

1  do not underestimate the risk to be protective of
2  health.
3    Q   Right.
4    A   That's why the regulatory value itself is
5  not used directly as a threshold of causation.
6       MR. DHINDSA:  I'm going to mark this as the
7    next exhibit.
8       THE COURT REPORTER:  That will be 10.
9  (Thereupon, Exhibit 10 was marked for identification.)
10  BY MR. DHINDSA:
11    Q   Dr. Sawyer, the court reporter has handed
12  to you what's been marked as Exhibit 10, a document
13  that was released by EPA for public comments late
14  last year entitled "Draft Human Health Risk
15  Assessment in Support of Registration Review."
16       Have you seen this document before?
17    A   I have.  I have it right here.
18    Q   It appears to be a document released by the
19  EPA, right?
20    A   Correct.
21    Q   And EPA documents are one of the things
22  normally relied upon by toxicologists in your field?
23    A   Yes.
24    Q   Now, turn to page 3.  I'm going to read the
25  last paragraph out loud.

*Page 136*

1       "Additionally, the agency reevaluated the
2  human carcinogenic potential of glyphosate, which
3  included a weight of evidence, evaluation of data
4  from animal toxicity, genotoxicity, and
5  epidemiological studies.  This evaluation was
6  presented to the Federal Insecticide, Fungicide and
7  Rodenticide Scientific Advisory Panel, FIFRA SAP, and
8  was subsequently updated based on their review.  The
9  agency concluded that glyphosate should be classified
10  as 'not likely' to be carcinogenic to humans."
11       Now, that's a risk classification that you
12  disagree with, right?
13    A   Yes, and I can explain why it should not be
14  classified as an A.
15       MR. DHINDSA:  Now, I also want to mark as
16    an exhibit a document that was released at the
17    same time by EPA last year.  It's entitled
18    "Revised Glyphosate Issue Paper Evaluation of
19    Carcinogenic Potential."
20  (Thereupon, Exhibit 11 was marked for identification.)
21       THE WITNESS:  What was the date?  Same
22    date?
23  BY MR. DHINDSA:
24    Q   December 12, 2007, yes, sir.
25       Have you seen this document, Exhibit 11,

*Page 137*

35 (Pages 134 - 137)

CONFIDENTIAL

1 before, Dr. Sawyer?
2     A   Yes.
3     Q   I'm going to ask you to turn to page 144 of
4 Exhibit 11.
5     A   144?
6     Q   Yeah, 144.  I'm going to read the second to
7 the last paragraph out loud.
8         "For cancer descriptors, the available data
9 and weight of evidence clearly did not support the
10 descriptors 'carcinogenic to humans,' 'likely to be
11 carcinogenic to humans,' or 'inadequate information
12 to assess carcinogenic potential'.  For the
13 'suggested evidence of carcinogenic potential'
14 descriptor, considerations could be looked at in
15 isolation.
16        "However, following a thorough integrative
17 weight of evidence evaluation of the available data,
18 the database would not support this cancer
19 descriptor.  The strongest support is for 'not likely
20 to be carcinogenic to humans'."
21        Once again that is a risk classification
22 that you disagree with, right?
23     A   Yes.
24     Q   And EPA said that it was conducting a
25 weight of evidence analysis?

Page 138

1     A   That's correct.
2     Q   That's your methodology too, right?
3     A   Yes.
4     Q   To evaluate the weight of evidence used in
5 Bradford Hill?
6     A   Yes.
7     Q   One of the big differences between you and
8 EPA is that EPA reviewed more information than you,
9 right?
10        MR. TRAVERS:  Objection.  Lacks foundation.
11        THE WITNESS:  No, I reviewed all of their
12    data which they relied on in their document.
13 BY MR. DHINDSA:
14     Q   You stated in your expert report that "The
15 registrants of glyphosate have submitted proprietary
16 information and other data to regulatory agencies,
17 including the EPA."
18     A   Yes.
19     Q   You did not have access to certain data the
20 EPA had access to, right?
21        MR. TRAVERS:  Objection.  Lacks foundation.
22        THE WITNESS:  No, but I reviewed it in
23    their document.  Their document is -- what's the
24    word we used.  It's -- everything they relied on
25    in the weight of evidence decision was provided

Page 139

1     in the document.  There wasn't any secret
2     documents that they used that they did not
3     expose in their analysis.
4 BY MR. DHINDSA:
5     Q   Okay.  So EPA reviewed the primary data,
6 right?
7        MR. TRAVERS:  Objection.  Lacks foundation.
8        THE WITNESS:  Yes.
9 BY MR. DHINDSA:
10     Q   And you reviewed what EPA's analysis of
11 that data was, right?
12     A   In the raw data, which they presented.
13     Q   Well, the EPA did not present all of the
14 raw data for the underlying studies, did it?
15     A   They provided the raw data that was
16 necessary for them to make the decision, yes.
17     Q   Did the EPA provide copies of the pathology
18 reports from the underlying rodent carcinogenicity
19 bioassays?
20     A   No, that wasn't necessary because they
21 ruled the studies as non-significant.
22     Q   So you then decided you disagreed with what
23 EPA concluded about the underlying data, correct?
24     A   I have some very clear reasons why it was
25 wrong.

Page 140

1     Q   And EPA has been studying glyphosate for 40
2 or so years while you just started, right?
3        MR. TRAVERS:  Objection.  Lacks foundation:
4    Vague.
5        THE WITNESS:  I've been evaluating
6    glyphosate since I said earlier, since about
7    1994, '96, somewhere in that era.
8 BY MR. DHINDSA:
9     Q   And since 1994 or 1996 in that era, until
10 you were retained by the plaintiffs in this case,
11 what type of analysis have you done on glyphosate in
12 that time period?
13     A   Originally looked at the available
14 epidemiological studies back in the mid 1990s and I
15 got up to date with it.
16     Q   And you continue to use glyphosate since
17 that time, right?
18     A   In a controlled zero exposure manner, yes.
19     Q   This is your first expert engagement
20 relating to glyphosate; is that right, other than the
21 one you mentioned in Texas?
22     A   I use gasoline in my car too.  Gasoline has
23 benzene in it.  I continue to use it.  Do I wash
24 parts and stuff in gasoline with my bare hands?  No,
25 no.  It's the same principle.  There are carcinogenic

Page 141

36 (Pages 138 - 141)

CONFIDENTIAL

1 materials that are in use, but require special
2 provisions and warnings.  And, fortunately, I've been
3 careful and recognized it was a carcinogen way back
4 and have been very cautious with its use for decades.
5     Q   So you don't think people should stop using
6 Roundup, do you?
7     A   That's too vague to answer.  What people?
8 Who?
9     Q   Anyone.
10     A   Do I believe that we should be brined with
11 it, harvested with it and put on the dinner table
12 five days later?  Of course not.
13     Q   Do you think Roundup is effective in
14 killing weeds?
15     A   I answered that earlier.  Yes.
16     Q   You don't think there's a safer alternative
17 on the market to Roundup, do you, when used for its
18 intended purpose?
19     A   I haven't really evaluated that.  I can't
20 answer that.
21     Q   This is the first case in which you've
22 provided expert testimony relating to Roundup or
23 glyphosate, right?
24         MR. TRAVERS:  Objection.  Asked and
25     answered.

Page 142

1     answered.
2 BY MR. DHINDSA:
3     Q   Now, the EPA scientists are not
4 professional witnesses.  It's their full-time job to
5 evaluate compounds such as glyphosate, correct?
6         MR. TRAVERS:  Objection.  Lacks foundation.
7         THE WITNESS:  Yes, but it's their duty as
8     toxicologists to follow the methodology
9     correctly.
10 BY MR. DHINDSA:
11     Q   And just a few more methodological points.
12 You agree with me that toxicity does not equal
13 carcinogenicity, right?
14     A   Yes.
15     Q   You agree with me that for a substance to
16 significantly contribute to the development of the
17 disease, it must cause a notable increase in the
18 disease in an exposed population, all else being
19 equal?
20         MR. TRAVERS:  Objection.  Form.
21         THE WITNESS:  I didn't understand the
22     question.
23 BY MR. DHINDSA:
24     Q   For a substance to significantly contribute
25 to a disease, it must cause a notable increase in

Page 144

1         THE WITNESS:  Same answer.
2 BY MR. DHINDSA:
3     Q   I don't recall your answer.  Can you please
4 repeat it?
5         MR. TRAVERS:  It's on the record.
6         MR. DHINDSA:  Are you instructing him not
7     to answer?
8         MR. TRAVERS:  No.  I'm making an objection.
9     It's on the record.  I objected asked and
10     answered.  You're asking him to repeat the
11     answer.  It's on the record.  You've got your
12     real-time right there.
13 BY MR. DHINDSA:
14     Q   I'm politely asking you to remind me of
15 your answer.
16     A   What was your question again?
17     Q   Is this the first case in which you've
18 provided expert testimony relating to Roundup or
19 glyphosate?
20     A   I've consulted on a case in the 1990s,
21 which I explained.
22     Q   That did not involve expert testimony,
23 correct?
24     A   Correct.
25         MR. TRAVERS:  Objection.  Asked and

Page 143

1 that disease in a particular exposed population,
2 everything else being equal?
3         MR. TRAVERS:  Objection.  Form.
4         THE WITNESS:  To the -- yes, if I
5     understand your question correctly.  It's a
6     rather confusing compounding question.
7 BY MR. DHINDSA:
8     Q   Now, Dr. Sawyer, you've been testifying as
9 to causation in toxic tort and product liability
10 cases for roughly 25 years?
11     A   No, closer to 30.
12     Q   And during that time you've used a
13 methodology that's stayed pretty consistent, right?
14     A   Bradford Hill criteria and weight of
15 evidence throughout, yes.
16     Q   And the things you've relied upon have been
17 pretty consistent?
18     A   I'm not sure what you mean by "things."
19     Q   Well, for example, you mentioned you rely
20 on the SEER database as one source of information in
21 evaluating cancer risk?
22     A   Yes.
23     Q   And that's because I think you testified
24 earlier you find the SEER database to be accurate,
25 correct?

Page 145

37 (Pages 142 - 145)

CONFIDENTIAL

1   A   Yes.

2       MR. DHINDSA:  Mark that, please, as 12.

3 (Thereupon, Exhibit 12 was marked for identification.)

4 BY MR. DHINDSA:

5   Q   Now, Dr. Sawyer, the court reporter has

6 handed to you what's been marked as Exhibit Number

7 12.  You can see this is a table from the SEER

8 database from 1975 -- sorry, from 2010 to 2014

9 setting forth the age specific rates for

10 non-Hodgkin's lymphoma.

11      Do you see that?

12  A   Yes.

13  Q   And in looking at Exhibit 12, do you agree

14 that the rate of NHL for all ages, both sexes, from

15 2010 to 2014 was 19.5 per 100,000?

16  A   Yes, I have on page 159 of my report 19.6

17 per 100,000 from 2003 to 2007.  So I would have to

18 say that's in pretty close agreement.  Now, that's

19 for -- of course it's not specific to the malignancy

20 in this case.

21  Q   Right.  And 19.5 per 100,000, that's the

22 same as 1.95 times 10 to the minus 4?

23  A   Yes.

24  Q   You agree as well that the incidence for

25 all people between ages 40 to 44 is 9.7 per 100,000,

Page 146

1 studies, right?

2   A   I can't answer that.

3   Q   You never worked at the National Cancer

4 Institute?

5   A   No.

6   Q   Their work is financed by the United States

7 Government, right?

8   A   Well, that's true.  You asked if they

9 received any additional industrial funding.  I can't

10 answer that.  It's possible.  I don't know.

11  Q   Sometimes the scientists from the National

12 Cancer Institute, they publish their findings in

13 peer-reviewed scientific literature?

14  A   It's very common, yes.

15  Q   And the peer-reviewed literature is

16 something else you generally rely on, true?

17  A   Yes.

18  Q   So do other toxicologists in your field?

19  A   Yes.

20  Q   And you rely on peer-reviewed scientific

21 literature because it's a good way to heighten the

22 reliability of the study, right?

23  A   Certainly.

24      MR. DHINDSA:  Let's go off the record.

25      VIDEOGRAPHER:  The time is now 12:01 p.m.

Page 148

1 according to the SEER exhibit in front of you?

2   A   For all races?

3   Q   Right.

4   A   9.7 per 100,000.

5   Q   And 9.7 per 100,000 equals 9.7 times 10 to

6 the minus 5?

7   A   Yes.

8   Q   And do you agree that for African-American

9 males, between the ages 40 to 44, the rates reflected

10 in the SEER printout is 13 per 100,000?

11  A   Per males, yes.

12  Q   And that's the same as 1.3 times 10 to the

13 minus 4?

14  A   Yes.

15  Q   Now, SEER is put out by a group called the

16 National Cancer Institute, right?

17  A   Yes.

18  Q   That's the group at the National Institute

19 of Health that studies cancer?

20  A   Yes.

21  Q   In your experience, has the NCI and its

22 scientists generally put out reliable data?

23  A   Yes.

24  Q   The folks at the National Cancer Institute,

25 they don't receive any industry funding for their

Page 147

1       We're going off the record.

2 (A lunch break was taken at 12:01 p.m.)

3 Thereupon,

4 the following proceedings began at 1:03 p.m.:

5       VIDEOGRAPHER:  The time is now 1:03 p.m.

6 We're back on the record.  This is the beginning

7 of Media Unit 3.

8       Please continue.

9       DIRECT EXAMINATION

10 BY MR. DHINDSA:

11  Q   Dr. Sawyer, you reached some conclusions in

12 your expert report regarding NHL latency, correct?

13  A   Yes.

14  Q   Latency is the period between initial

15 exposure and initial clinical outcome, right?

16  A   Yes, that's what my report says.

17  Q   Now, you present some data regarding NHL

18 latency in your report also, correct?

19  A   Yes.

20  Q   And so you are intending to offer opinions

21 regarding the latency of NHL from exposure to

22 glyphosate?

23  A   Yes, that is necessary as a branch of

24 specific causation.

25  Q   Now, am I correct that you never published

Page 149

38 (Pages 146 - 149)

CONFIDENTIAL

1 in the peer-reviewed literature of a latency of NHL
2 chronic exposure to a chemical?
3    A    Yes.
4    Q    Am I right that you have never published on
5 the latency of glyphosate to cause any disease?
6    A    Correct.  I refer and relied on the
7 available peer-reviewed human epidemiological data.
8    Q    Prior to your involvement in this case, had
9 you looked at the potential latency between
10 glyphosate and NHL?
11    A    I think I did back in the mid 1990s.  I
12 know I did.  It was part of the analysis I did.
13    Q    Now, I understand you're deferring to other
14 scientists you've mentioned on epidemiology, but you
15 have said that latency is very important to the
16 question of temporality in the past, right?
17    A    Yes.
18    Q    Temporality is part of the Bradford Hill
19 criteria that you applied?
20    A    Yes.
21    Q    For instance, in the case of asbestos and
22 mesothelioma, you stated that if a person was first
23 exposed to asbestos a week before they got
24 mesothelioma, that would not fit what we know about
25 temporality, right?

Page 150

1    Q    And have you seen this document before?
2    A    Yes.  It's referenced in my report on page
3 161.
4    Q    Now, you based your latency opinion in part
5 on some of the findings of this 9.11 Commission
6 Report that is Exhibit 13, correct?
7    A    Yeah, in part.
8    Q    And you agree that the 0.4 year number is
9 not derived from biomonitoring but instead from
10 modeling, right?
11    A    Yeah, I stated that in the report, I
12 believe.
13    Q    And if the biomonitoring valuation suggests
14 that there is a two-year latency at a minimum for
15 exposure to compounds that cause lymphoma and the
16 manifestation of that lymphoma, right?
17       MR. TRAVERS:  Objection to the form.
18       THE WITNESS:  Latency is defined as from
19    first exposure to the time of diagnosis.
20 BY MR. DHINDSA:
21    Q    Right.  And the biomonitoring evaluation
22 suggests that there is a two-year latency at minimum
23 for exposure to compounds that cause lymphoma and the
24 manifestation of that lymphoma, right?
25    A    What biomonitoring are you referring to?

Page 152

1    A    That's correct.  The average latency for
2 mesothelioma is 35 years with a range -- the range
3 is, I believe, typically 20 to 40, or maybe even a
4 little shorter than that.  But it's a huge difference
5 between the latency of mesothelioma and a
6 hematopoietic malignancy such as lymphoma.
7    Q    Now it's your opinion that the latency for
8 glyphosate and NHL could be anywhere between four
9 months to 10 years, right?
10    A    Yes, that's a typical latency period.
11    Q    You base that period on what you term to be
12 peer-reviewed latency studies, right?
13    A    Yes.  Page 161.
14       MS. FORGIE:  Did you say 61?
15       THE WITNESS:  161.
16       MS. FORGIE:  161.
17       MR. DHINDSA:  I'm going to ask the court
18    reporter to mark this document as the next
19    exhibit.
20 (Thereupon, Exhibit 13 was marked for identification.)
21 BY MR. DHINDSA:
22    Q    Dr. Sawyer, the court reporter has handed
23 to you what's been marked as Exhibit Number 13.  Do
24 you see that?
25    A    Yes.

Page 151

1    Q    The biomonitoring studies on glyphosate and
2 non-Hodgkin's lymphoma.
3    A    Hand me the study and I'll answer the
4 question.
5    Q    Let's take a look at page 6 of Exhibit 13
6 that you have in front of you.
7    A    Page 6?
8    Q    Right, of the 9.11 report.
9       Do you see there, under paragraph C, about
10 halfway down that first paragraph, under lympho,
11 proliferative and hematopoietic cancers, it says,
12 "The reported minimum latency estimate using
13 statistical modeling and epidemiologic studies for
14 non-lymphocytic leukemia and benzene exposure is 1.5
15 years and for lymphoproliferative and hematopoietic
16 malignancies resulting from formaldehyde exposure is
17 two years."
18       Do you see that?
19    A    Yes.
20    Q    Below that, two sentences below, it says,
21 "A minimum latency period for two years has been
22 reported for non-Hodgkin's lymphoma, citing Bennett,
23 et al., 1991, following treatment of Hodgkins disease
24 with chemotherapy and radiotherapy which is similar
25 to the latency for secondary acute leukemia."

Page 153

39 (Pages 150 - 153)

CONFIDENTIAL

1        Do you see that?
2     A   Yeah, I see a note that I referenced the
3  document.  Minimum range, .4 to two years.  So I
4  included that two years as a minimal range value in
5  my report as well as the .4 in the very bottom of my
6  page 161.  Yeah, I referenced that.
7     Q   Right.  So my question is, the .4 number
8  from this 9.11 Commission Report, it's derived from
9  modeling, right?
10    A   No.  It's derived from radiation studies.
11    Q   It's derived from biomonitoring?
12    A   Radiation, radiological exposures.
13    Q   Where do you see that?
14    A   Go to page 1.
15    Q   Direct your attention to page 7.
16    A   Low level ionizing radiation studies.
17    Q   If you look at the top of page 7 of Exhibit
18 13.
19    A   Yes.
20    Q   At the very top, it says that the 0.4 years
21 is based on low estimates used for lifetime risk
22 modeling of low level ionizing radiation studies for
23 lymphomas and leukemias, right?
24    A   Yeah, that's what I'm trying to tell you.
25    Q   So you agree with that?

Page 154

1     A   Yeah.
2     Q   If there, indeed, is a two-year latency
3  period for the development of non-Hodgkin's lymphoma
4  and glyphosate exposure, you would agree that
5  exposures that occurred in the two years prior to
6  Mr. Johnson's manifestation of mycosis fungoides
7  would be immaterial to causation of his mycosis
8  fungoides, right?
9         MR. TRAVERS:  Objection.  Compound.
10        THE WITNESS:  I didn't understand all of
11    your question.
12 BY MR. DHINDSA:
13    Q   If you assume there is a two-year latency
14 period for the development of NHL and glyphosate
15 exposure, you would agree that the exposures that
16 occurred in the two years prior to Mr. Johnson's
17 manifestation of his mycosis fungoides would be
18 immaterial to the causation of his mycosis fungoides,
19 right?
20        MR. TRAVERS:  Objection.  Form.
21        THE WITNESS:  Not sure what you mean by
22    "immaterial."
23 BY MR. DHINDSA:
24    Q   They would not be relevant to a causation
25 analysis of his mycosis fungoides.

Page 155

1     A   I don't understand the question.  Are you
2  asking me if the two-year latency, assuming that that
3  is the minimal latency, rather than .4, that that
4  would be irrelevant to the current case?  I'm not
5  sure I understand the question.
6     Q   How do you define latency?
7     A   The time of initial exposure to diagnosis.
8  In this case he was exposed in June of 2012,
9  diagnosed in August of 2014, roughly 2.2 years.
10    Q   Right.  So if there is a two-year latency
11 period, then you would agree that the exposures that
12 Mr. Johnson had in the two years prior to his
13 manifestation of the mycosis fungoides would not be
14 relevant to determining the causation of that
15 disease?
16    A   No.  It certainly -- it would be relevant.
17 He had met the requirement of latency even in two
18 years, as his latency period was 2.2 years.  However,
19 I am not relying only on the two-year latency value,
20 but as the WTC document recommends, a range of --
21 starting with .4 years.
22        The reason I say that is apparently you are
23 favoring the two-year exposure, which was to -- at
24 page 7.  The two-year value, which was derived from I
25 believe ionizing radiation exposure -- I'm not sure

Page 156

1  where that --
2     Q   Let me restate the question, if I may.
3         So Mr. Johnson was diagnosed with mycosis
4  fungoides when?  August 12, 2014?
5     A   Yeah.
6     Q   So if there's a two-year latency period
7  associated with exposure to glyphosate and
8  non-Hodgkin's lymphoma, then any exposures he had in
9  the two years immediately prior to his diagnosis in
10 2014 would not be relevant in assessing the causation
11 of his mycosis fungoides, right?
12        MR. TRAVERS:  Objection.  Asked and
13    answered.
14        THE WITNESS:  No.  Certainly it would be
15    relevant.
16 BY MR. DHINDSA:
17    Q   How would it be relevant if there's a
18 two-year latency period?
19    A   Well, because the mechanism of induction of
20 cancer involves initial induction and promotion.  To
21 say that the continued exposure did not in any way
22 progress the malignancy is unfounded.
23    Q   Do you have any scientific proof that
24 glyphosate acts as a tumor promoter?
25    A   No, I do not.  But the standard is the

Page 157

40 (Pages 154 - 157)

CONFIDENTIAL

1  methodology for determining latency does not exclude
2  the potential additive effects of continued exposure.
3  In the specific case of glyphosate, the complete MOA
4  is not truly understood.
5         Even benzene, it's still uncertain, the MOA
6  in benzene.  How does benzene induce leukemia?  Is it
7  due to it forms an epoxide metabolite?  It's a
8  theory, but it's not even known.  We don't know
9  exactly how glyphosate produces cancer.
10        So to say the only thing that counted was
11  exposure prior to two years, first of all, it's a
12  breach in methodology.  There's no methodology that
13  says you cut off and discount exposures that continue
14  up to the time of diagnosis.  That's especially true
15  with chemicals that we know are known promoters.  And
16  we do not have evidence that glyphosate is a
17  promoter, but we don't understand the mechanism how
18  it produces cancer.
19    Q   Let me ask you --
20    A   We don't even know how arsenic produces
21  cancer.
22    Q   Let me ask it this way, then:  In terms of
23  evaluating what in your opinion caused Mr. Johnson's
24  mycosis fungoides, which first manifested in August
25  2014 -- I'm not talking about any potential ongoing

Page 158

1    Q   Mr. Johnson began using glyphosate or
2  Roundup in the summer of 2012, right?
3    A   June 2012.
4    Q   So his exposure for those -- his exposure
5  prior to August 12, 2012 would be for those months of
6  June, July, August, correct, of 2012?
7    A   Roughly 10 weeks until mid-August would be
8  two years prior.
9    Q   So about 20 to 30 days of use, correct?
10    A   Yes.  But, remember, in this case, I'm
11  comparing his use, his days of use, right up to the
12  time of diagnosis, and that is the correct
13  methodology.  I challenge you to show me anywhere in
14  the human epidemiologic or cultural studies where
15  only use up to the point of diagnosis was used.  I
16  mean, that's bastardizing the studies.  That's not
17  how it works.  We're looking at the exposure range of
18  the workers, not just up to the time they are -- two
19  years before they're diagnosed.  In other words, the
20  studies don't arbitrarily say we're only going to
21  count days of exposure up to two years before the day
22  of diagnosis.  The studies don't say that.  You're
23  like -- this is some kind of self-proclaimed
24  methodology you're introducing.
25    Q   I'm trying to understand your methodology.

Page 160

1  effect from subsequent glyphosate exposure in the two
2  years before then -- you would need to look at his
3  exposures to glyphosate that happened two years prior
4  to his diagnosis or further in the past, correct?
5         MR. TRAVERS:  Objection.  Asked and
6    answered.
7         THE WITNESS:  No.  I would look at
8    exposures throughout the entire period and
9    especially exposures that occurred .4 years
10    earlier.  That would be, what, three months
11    earlier and prior.
12  BY MR. DHINDSA:
13    Q   So if you assume a two-year latency for
14  Mr. Johnson, quantify the amount of his glyphosate
15  exposure before August 12, 2012, how much exposure
16  did he have?
17         MR. TRAVERS:  Object to compound question.
18         THE WITNESS:  Well, based on his testimony,
19    his peak use of glyphosate was during the months
20    of June, July and at least the first two weeks
21    of August, which would be within that window
22    you're referring to.  That's when he used it
23    heavily, as opposed to the off season, which he
24    didn't use it.
25  BY MR. DHINDSA:

Page 159

1  Sorry if I haven't been clear.  Are you saying
2  latency is immaterial, then?
3    A   Not at all.
4    Q   What have you done to study whether the
5  latency works the same way for ionized radiation or
6  glyphosate?
7    A   Or benzene or any chemical.
8    Q   What study have you done in that regard?
9    A   I relied on generally accepted latency
10  documents, such as this document published in the
11  Federal Register and the other studies in my table
12  that provide a reasonable range of latency.
13    Q   Is the 9/11 Commission document, Exhibit
14  13, a peer-reviewed publication?
15    A   It's a governmental publication.
16    Q   There's no evidence it's been peer-reviewed
17  or published in a scientific journal, correct?
18    A   The administrator has a group of scientists
19  that have put this together.  It's not just some
20  layperson or Internet trash.  It's an actual
21  governmental agency that has studied this and
22  produced this document.
23    Q   You agree that the 9/11 study you're
24  looking at, Exhibit 13, on latency does not look at
25  glyphosate specifically, correct?

Page 161

41 (Pages 158 - 161)

CONFIDENTIAL

1    A    That's correct.

2    Q    And you agree that if glyphosate does not

3  cause cancer, then latency is immaterial?

4    A    Correct.

5    Q    And you agree from your table in your

6  expert report, page 161, that glyphosate has only

7  been recorded for 10 years or more for latency in the

8  Erickson study, correct?

9    A    Yes, however, one to 25 years in the Deroos

10  study, D-E-R-O-O-S.

11    Q    Where is that noted in your report?

12    A    Top.

13    Q    You're referring to a study by Fontana, the

14  top of page 161 of your report?

15    A    Oh, yes.  I think it's a combination of the

16  Fontana, Kato and Weisenburger studies.

17    Q    The Fontana, Kato and Weisenburger studies

18  that you cite, they don't relate to glyphosate, do

19  they?

20    A    No.

21    Q    And so it's your opinion that a single

22  summer of 2012 using glyphosate-based herbicides

23  several times a week caused Mr. Johnson's mycosis

24  fungoides initially?

25    A    So you're asking me if I would consider

Page 162

1  only his exposure days from June 2012 until

2  mid-August 2012, would that number of exposure days

3  qualify him to have had a sufficient dose based on

4  comparison to the agricultural health study to

5  develop -- causally develop NHL?  Is that what you're

6  asking me?

7    Q    Well, not necessarily with respect to the

8  agricultural health study.  I'm asking you in

9  general, in your opinion, did that single summer's

10  use of glyphosate exposure -- strike that.

11        That the -- my question is:  Does

12  Mr. Johnson's use of glyphosate between June and

13  August of 2012, is that sufficient, in your mind, to

14  have caused his mycosis fungoides?

15    A    Well, it's not a matter of in my mind.

16  It's a matter of does his exposure days meet the

17  requirements to be an exposed applicator consistent

18  with those in the human epidemiological literature.

19  That's the question.

20    Q    What's the answer?

21    A    Well, I think he'd only had about 30

22  exposure days, which, if you look at Table 27 from

23  the agricultural health study, that would place him

24  in the mid range of days per year, however, it would

25  only be less than one year exposure.  So he would be

Page 163

1  somewhere between -- let's see -- five -- that would

2  put him in maybe the 12.8 to 14.9 percent category of

3  all 26,000 applicators that have been studied.  The

4  agricultural health study assessed the exposure

5  histories of about 26,000 licensed applicators.  He

6  would be at the lower end of the range and would

7  still qualify.

8        However, performing an analysis that way is

9  extremely misleading and incorrect because the human

10  epidemiologic studies did not only include the days

11  per year for those who developed lymphoma minus two

12  years from the date of diagnosis.  That's that

13  self-proclaimed thing that you're doing.  That's not

14  how the studies work.  What one has to do is consider

15  all of the days of exposure prior to the diagnosis

16  and then compare that to all of the days of exposure

17  in the epidemiologic studies and see if that person

18  fits.

19    Q    Is the agricultural health study something

20  you relied upon in your opinions?

21    A    2006, I believe it was, I relied on in

22  terms of the days of exposure of the licensed

23  applicators.  And I remember in this case Mr. Johnson

24  was not even a licensed applicator at first.

25  Licensed applicators have a higher exposure pattern

Page 164

1  than non-licensed applicators because they do it for

2  a living.  At any rate, I compared him to the

3  licensed applicator studies to determine whether his

4  exposure dose was similar to those in the

5  agricultural health study, the 26,000 people that

6  were followed.  And he fits that quite well.

7    Q    Do you consider the agricultural health

8  study a positive study?

9    A    No.

10    Q    So if you fall in the range of applicators,

11  do you think that that study shows a risk of NHL?

12    A    In most of the studies, yes.

13    Q    I'm talking about the agricultural health

14  study.

15    A    That's just one study.  We don't base an

16  opinion on cancer based on one study.  That's, again,

17  a breach of methodology and some kind of self-made

18  methodology that you're asking me about.

19    Q    I'm just asking you about one particular

20  study, Doctor.

21    A    No, that's not how it's done.  I'm sorry,

22  that's wrong.  You don't compare just to one study.

23    Q    Is the agricultural health study a reliable

24  study?

25    A    It has its flaws.  There was a follow-up by

Page 165

42 (Pages 162 - 165)

CONFIDENTIAL

1 Monsanto that -- I don't know if it applies to this
2 particular study, but I know that Monsanto in their
3 biomonitoring follow-up found problems with urine
4 being collected only for 12 hours or starting to
5 collect the urine prior to the application process
6 and so on. I mean, I can't say it's a perfect study,
7 but --
8    Q    Are you referring to the agricultural
9 health study with those issues or a study by
10 Acquavella?
11   A    Acquavella was the coordinator for the
12 Monsanto study.
13   Q    But not the agricultural health study?
14   A    Well, that's what I'm getting at. It's
15 unclear to me whether some of that data was also used
16 in the agricultural health study. It's not clear to
17 me.
18   Q    It's your opinion that you've ruled out all
19 of the possible causes of Mr. Johnson's mycosis
20 fungoides beyond his use of glyphosate-based
21 herbicides?
22   A    As documented in my report, I thoroughly
23 went through all of the medical records and I
24 considered the possibility of family history,
25 inheritance, prior work history, any prior

Page 166

1 occupational chemical exposures, lifestyle, risk
2 factors, the use of immunosuppressants, the
3 possibility of having acquired the AIDS virus. As I
4 said, the genetic predisposition, if there was one,
5 which I ruled out. I really have not been able to
6 find any other risk factor for Mr. Johnson.
7         I know that a physician had postulated it
8 was because he was African-American. That only
9 brings him from a five in one million to a 10 in one
10 million risk level. It's an extremely low risk level
11 for his age to develop that particular type of
12 lymphoma.
13        So yes, I have been unable to find any
14 significant risk factors.
15   Q    So in your opinion, being African-American
16 doubles the risk of NHL?
17   A    Yes, but from an extremely rare five in one
18 million to an extremely rare 10 in one million. So
19 if -- it's still not an expected consequence at that
20 age. If we look at SEER registry data in Exhibit 12,
21 the risk of non-Hodgkin's lymphoma skyrockets after
22 about age 60 on up to age 85 plus. At his young age,
23 I say young, his relatively young age, he's still in
24 a low risk category.
25   Q    Being African-American doubled

Page 167

1 Mr. Johnson's risk for mycosis fungoides, right?
2    A    Yes. As I said, from an extremely rare
3 five in a million to an extremely rare 10 in a
4 million.
5    Q    Now, even assuming your four-month to
6 10-year latency is correct, you'd still defer to
7 Drs. Portier, Ritz and Neugut regarding the
8 implications of that for the epidemiologic studies?
9    A    I totally don't understand your question.
10   Q    You testified earlier you're deferring to
11 Drs. Portier Ritz and Neugut, plaintiff's other
12 experts, regarding epidemiology opinions, correct?
13   A    Yes.
14   Q    And so assuming that your four-month to
15 ten-year assessment of latency is accurate, the
16 implications of that latency period, for that you
17 would defer to those three experts, Drs. Portier,
18 Ritz and Neugut?
19   A    I don't understand what you're referring to
20 by "implications."
21   Q    Well, the latency period has an implication
22 on the evaluation of the epidemiologic literature,
23 correct?
24   A    Implication, no. There's a method,
25 standard method which is followed in evaluating the

Page 168

1 epidemiologic literature. There's no implication.
2    Q    Well, that standard methodology includes an
3 assessment of the latency, correct?
4    A    Yes, which is the time from first exposure
5 to diagnosis, not from the first exposures two years
6 before diagnosis, as you've indicated.
7    Q    So do you agree with Dr. Neugut, for
8 example, that latency is not a major problem with
9 interpretation of the agricultural health study?
10       MR. TRAVERS: Objection. If you're going
11   to ask about Dr. Neugut's testimony, put it in
12   front of him.
13       THE WITNESS: I can't answer that. I have
14   no idea what you're talking about.
15 BY MR. DHINDSA:
16   Q    Do you know latency is a major problem with
17 the interpretation of the agricultural health study?
18   A    I deferred those opinions earlier to the
19 epidemiologists.
20   Q    And would you also agree with Dr. Ritz that
21 one would like to see immediate potential latency
22 period of at least 10 years for an epidemiology study
23 on glyphosate and NHL to be informative? Would you
24 agree with that?
25   A    No, absolutely not. We know that

Page 169

43 (Pages 166 - 169)

CONFIDENTIAL

1 hematopoietic malignancies from various environmental
2 contaminates such as benzene, ionizing radiation,
3 dioxins, and I think there was something else we
4 spoke of earlier, all of those show minimal latencies
5 less than 10 years.  So I think that would be
6 incorrect to have to require a minimum of 10 years in
7 performing the epi study because cases of lymphoma
8 would be lost and not counted.
9 (Thereupon, Exhibit 14 was marked for identification.)
10 BY MR. DHINDSA:
11    Q    The court reporter has marked as Exhibit 14
12 the actual report of Dr. Beate Ritz in support of
13 general causation on behalf of plaintiffs.  Do you
14 have that in front of you?
15    A    Yes.
16    Q    All right.  Dr. Sawyer, if you could turn
17 to page 19 at the top of the page.  Do you see there
18 where Dr. Ritz states, "One would want to see at
19 least the median latency period of 10 years"?
20    A    Yeah, he said at least.  He didn't say
21 starting at 10 years or more.  You implied the
22 question to me.
23    Q    And do you see where Dr. Ritz says, "Again,
24 for an individual, the latency period may vary one
25 year to many decades, but on average, for a study,

1    speaking objections.
2 BY MR. DHINDSA:
3    Q    Do you agree with that statement?
4    A    Only if the remainder of the sentence in
5 brackets is included.
6    Q    So in your opinion the case of Mr. Johnson
7 is a special case on the very low end of the
8 spectrum, correct?
9    A    No, I didn't say that.
10    Q    That's what your testimony implies, a very
11 short latency period for Mr. Johnson, correct, on the
12 short end of the range?
13    A    Well, yeah, let's use what my report says
14 and not make up new statements that I never said.
15    Q    You'd also agree with Dr. Portier that it
16 is likely that the latency period for the glyphosate
17 exposure for NHL is longer than five years, correct?
18       MR. TRAVERS:  Objection.  If you're going
19    to ask about Portier's opinion, put it out
20    there, put the document out there.
21 BY MR. DHINDSA:
22    Q    Do you recall what Dr. Portier said about
23 latency, Dr. Sawyer?
24    A    No, I'm not going to guess without seeing
25 the report.

1 one would prefer a minimum latency period of an
2 average of 10 years"?
3       Do you see that?
4    A    Yeah, that's an average, not a range.
5    Q    Do you agree with that statement?
6    A    I think 10 years could be an average
7 latency based on what I've cited on page 161 and the
8 study evidence.  I don't have a problem with the
9 average.  It's the range that is of concern.
10    Q    And if you'd turn to page 17 of Dr. Ritz's
11 report there, Exhibit 14, do you see there at the end
12 of the first -- sorry, at the second sentence of the
13 first paragraph, where Dr. Ritz says, "Although a
14 short latency period does not completely exclude the
15 possibility of exposure, disease relationships and
16 cancer, a longer latency period increases confidence
17 in results due to increased biological plausibility;
18 i.e., typically we would general expect a five- to
19 10-year minimum latency between exposure and disease
20 onset for blood system related cancers"?
21       Do you see that?
22       MR. TRAVERS:  Objection.  Are you going to
23    read the next parenthesis that gives context to
24    that sentence?
25       MR. DHINDSA:  I don't appreciate your

1    Q    And one of the reasons why we look at
2 latency is to assess whether or not the temporality
3 prong and Bradford Hill criteria is valid, right?
4    A    Yes, I answered that earlier.
5    Q    Now, you looked at a body of rodent data in
6 generating your opinions, right?
7    A    Yes.
8    Q    In any of the rodent studies you reviewed,
9 did you come across any rodents that developed
10 mycosis fungoides?
11    A    No.  And with a background rate in humans
12 of 10 in a million, it would be extremely unlikely to
13 see that in only 50 mice.  We would actually need --
14 we would actually need, statistically, about 5
15 million mice in a study to have enough statistical
16 power to pick up such a rare event.
17    Q    Is it your testimony that the mice or rats
18 actually developed mycosis fungoides?
19    A    I've never come across it.  It would be a
20 good veterinary question.  I'll defer to the
21 veterinarian.
22    Q    Do you have any opinions about whether
23 rodents are an appropriate model to study mycosis
24 fungoides?
25    A    I don't think they are, but, again, I'll

CONFIDENTIAL

Page 174

1 defer that to a veterinarian.
2    Q   Is it fair to say that the maximum
3 tolerated dose is the highest dose you can give and
4 still not alter the animal's normal longevity from
5 effects other than carcinogenicity?
6    A   Yes.
7    Q   Is it fair to say that the maximum
8 tolerated dose used in rodent bioassays is unusually
9 high for human exposure?
10    A   Under conditions of application, yes, but
11 certainly not in conditions of intentional poisoning.
12    Q   We're not talking about intentional
13 poisoning in this case, are we?
14    A   You didn't specify.  So I had to answer the
15 question thoroughly.
16    Q   I appreciate that.  It's fair to state that
17 the natural life span for rats and mice is
18 approximately two years?
19    A   It is.  Although, I could add my daughter
20 Jen with her cute little mouse passed on not too long
21 ago with two and a half years.  She must have had
22 a --
23    Q   Beat the average life span.
24    A   Yeah, it did.  She was so sad.  Not
25 kidding.

Page 175

1    Q   Sorry for your loss.
2    A   She actually held a memorial service at the
3 coast in Victoria, Canada, and she sent me a photo of
4 the flowers in the water.  I think she's lonely up
5 there.
6    Q   So given that the natural life span for
7 rodents is typically approximately two years, that's
8 why the rodent bioassay studies usually last about 24
9 months, right?
10    A   Yes.
11    Q   It's very common for about half of the
12 animals to die naturally for reasons unrelated to the
13 test, correct?
14    A   No.  You have to specify at what time
15 point.  At one week, half of the animals die, no.  At
16 two years, roughly.
17    Q   At two years, roughly half would be
18 expected to die for reasons unrelated to the test
19 compound?
20    A   No.  I'd have to check the specifics for
21 each strain.  That number seems a little high for
22 mice of this strain, but I'd have to check the
23 historical records for that strain to give an
24 accurate answer.
25    Q   Do you have any idea about rodents in

Page 176

1 general, how many would you expect to die of natural
2 causes during a two-year study?
3    A   Again, it depends on the strain, the
4 genetics of the species.
5    Q   Do you agree about one-third of the
6 animals, the rodents that die naturally, one-third of
7 those will do so as a result of cancer?
8    A   Again, one-third seems high, but it's going
9 to be somewhere between 25 percent, possibly a little
10 higher.
11 (Thereupon, Exhibit 15 was marked for identification.)
12 BY MR. DHINDSA:
13    Q   Dr. Sawyer, the court reporter has handed
14 to you what's been marked as Exhibit 15, an article
15 entitled "Spontaneous Neoplasms in Aged
16 Sprague-Dawley Rats" published in a scientific
17 journal, ARCH Toxicology.
18       Have you seen this article before?
19    A   No.
20    Q   Are you familiar with the Archives of
21 Toxicology?
22    A   Yes.
23    Q   That's a journal you've reviewed before?
24    A   Yes.
25    Q   And this is a reliable scientific journal?

Page 177

1    A   Yes.
2    Q   Now, if you'd turn, sir, to page -- the
3 second page.  Do you see there in Table 1 the overall
4 incidence of mortality and survival rates in a group
5 of Sprague-Dawley rats?
6    A   Yes.
7    Q   And you see 51 percent mortality amongst
8 male rats and 54 percent mortality amongst female
9 rats, correct?
10    A   Yes.
11    Q   Under "Result," the authors note that "At
12 the end of the two-year bioassay, mortality rates in
13 male and female rats in different studies ranged from
14 35 to 58 percent and 47 to 59 percent, respectively.
15 The overall mortality rates for male and female rats
16 were 51 percent and 54 percent respectively."
17       Do you see that?
18    A   Yeah, that's consistent with what I said,
19 in that range, yeah.
20    Q   And then if you'd turn to page 501, there
21 is at the penultimate page, under "Discussion," on
22 the bottom right, do you see there in that last
23 paragraph beginning with the word "Exception," the
24 second sentence reads, "The occurrence of all of the
25 tumors increased with age and the majority were

45 (Pages 174 - 177)

CONFIDENTIAL

1 observed in animals which were over 18 months of
2 age."
3       Do you see that?
4    A   Yes.
5    Q   And do you agree that animals tend to
6 develop tumors as they age, just like humans do?
7    A   Yes.
8    Q   So you would agree there is never a cancer
9 free rodent bioassay, right?
10   A   At a terminal age, of course not.
11   Q   And naturally occurring cancer is expected
12 to be seen in both the control and treatment groups
13 in these kinds of studies, these animal studies,
14 right?
15   A   Some sort of cancer, yes, some form,
16 some different sites, multiple sites.
17   Q   Is it fair to state that the tumor incident
18 rates can vary significantly by the strain of the
19 rodent used?
20   A   Yes.  There are actually genetic strains of
21 mice, for example, that develop sarcomas, a higher
22 incident rate.
23   Q   For example, the incidence of lymphomas in
24 mice varies by strain, stock, sex, age?
25   A   Yes, and genetic drift.

Page 178

1    Q   And so many laboratories that conduct these
2 rodent bioassays maintain historical control data on
3 untreated groups of rodents to determine the
4 background incidence per strain, right?
5    A   Yes.  However, if you look at the EPA
6 methodology, I may have even mentioned this in my
7 report, one has considered how recent that background
8 information is because of genetic drift.
9    Q   And you agree that historical control
10 incidence is information you should consider when
11 attempting to assess whether there is a
12 cause-and-effect relationship?
13   A   Yes.
14   Q   Is it fair to say that that's true even
15 with the same rodent strain, the incidence of certain
16 tumor types may be more common than others?
17   A   Yes.
18   Q   And the incidence of cancer in controls can
19 differ even within the same study using the same
20 rodent strain, right?
21   A   Can you repeat that?
22   Q   Sure.  The incidence of cancer in controls
23 can differ even within the same study using the same
24 rodent strain, right?
25   A   What do you mean "differ"?  Do you mean

Page 179

1 statistically and significantly different, or in one
2 group, one case in the control and another group
3 three cases in the control?  I'm not sure what you're
4 asking me.  When we deal with these studies, we deal
5 with significant differences.
6 (Thereupon, Exhibit 16 was marked for identification.)
7 BY MR. DHINDSA:
8    Q   Dr. Sawyer, the court reporter has handed
9 to you what's been marked as Exhibit Number 16.  This
10 is an article by Chirukandath Gopinath, entitled
11 "Spontaneous Tumor Rates:  Their Use to Support
12 Rodent Bioassays," published in the Journal of
13 Toxicology and Pathology.
14       Do you see that?
15   A   Yes.
16   Q   Have you reviewed this article before?
17   A   No.
18   Q   Are you familiar with the Journal of
19 Toxicology and Pathology?
20   A   It's Toxicologic Pathology.
21   Q   Is Toxicologic Pathology a scientifically
22 reliable journal?
23   A   Yes, it's peer-reviewed.
24   Q   Peer reviewed.
25       All right.  If you look there on the first

Page 180

1 page on the left column, about maybe 15, 16 lines
2 down, do you see there where the author states, "It
3 is well known that two control groups within the same
4 study can occasionally show statistically significant
5 differences stressing the importance of knowing the
6 range of incidence rather than just percentages."
7    A   Yes.  And I see they used the word that I
8 used a moment ago, statistically different,
9 statistically significant differences.
10   Q   Do you agree with that statement?
11   A   I can, yes.
12   Q   And, therefore, it's important to use
13 concurrent controls in addition to historical
14 controls when evaluating incidence, right?
15   A   Only if the historical controls are recent.
16   Q   And it's also important to use historical
17 controls as a way to evaluate the context of tumor
18 incidence in a particular study, right?
19   A   Again, if they're reasonably recent and
20 especially from the same laboratory without any other
21 interfering factors, such as hepatitis virus, et
22 cetera, yes.
23   Q   Those intervening factors, like a virus,
24 can alter substantially the result of any rodent
25 study, right?

Page 181

46 (Pages 178 - 181)

CONFIDENTIAL

1   A   Yes.
2   Q   And historical control data is typically
3   evaluated as an expected incidence range rather than
4   comparison to a single value, right?
5   A   Yes.
6   Q   Now, is it fair to state that cancer is a
7   continuum, it's not a threshold event, right?
8   A   I don't understand the question.
9   Q   Meaning cancer progresses, in other words?
10   A   Progresses until death, usually.
11   Q   I mean, it's well recognized that cancer,
12   that carcinogenesis is a multistage process.  Do you
13   agree with that?
14   A   Yes.
15   Q   Are you familiar with the term adenoma?
16   A   Yeah.
17   Q   Adenoma is a benign lesion, right?
18   A   Benign tumor.
19   Q   That means it's not cancerous, correct?
20   A   Correct.  Although, as the -- depending if
21   it's a hepatoma, for example, there's increased
22   incidence of transformation to a malignant tumor.
23   Q   A malignant tumor is called a carcinoma,
24   correct?
25   A   Correct.  In fact, in the liver, it's

Page 182

1   called an adenocarcinoma.  Very
2   often there's different types of carcinomas that can
3   occur, depending on the stem cell type.
4   Q   Are you familiar with the term "neoplasm"?
5   A   Of course.
6   Q   Neoplasm can either be a benign or
7   malignant mass of tissue?
8   A   Yes.
9   Q   Also know as a tumor, right?
10   A   Yes.
11   Q   It is fair to state that tumorigenesis is a
12   multistep process characterized by the progressive
13   development of preneoplastic, pre-malignant, benign
14   and malignant lesions?
15   MR. TRAVERS:  Objection.  Compound.
16   THE WITNESS:  I don't understand the
17   question.
18   BY MR. DHINDSA:
19   Q   Do you agree that tumorigenesis is a
20   multistep process?
21   Q   That process is characterized by the
22   development of preneoplastic lesions and ultimately
23   malignant lesions?
24   A   Yes.

Page 183

1   Q   And the development of tumors in rodents is
2   often preceded by the appearance of these
3   preneoplastic lesions, correct?
4   A   Yes.  That's what I said in the example of
5   the hepatomas in the liver.
6   Q   So pathologists who review the slides for
7   rodent bioassays look for the presence of
8   preneoplastic lesions such as focal hyperplasia as
9   part of their review, right?
10   A   Yes.
11   Q   So you'd agree, then, that the presence or
12   absence of preneoplastic lesions is an important
13   factor to consider when evaluating rodent bioassay
14   data?
15   A   Yes, it's part of the standard procedure,
16   the pathology, the necropsy will look for
17   preneoplastic lesions and hyperplasia and a number of
18   other indicators.
19   Q   Is it fair to state that tumor causation in
20   rodents does not directly equate to the same finding
21   in humans?
22   MR. TRAVERS:  Objection.  Vague.
23   THE WITNESS:  Sometimes it does.  Depends
24   on the species and the type of tumor.  In other
25   cases, it does not.

Page 184

1   BY MR. DHINDSA:
2   Q   You'd agree, generally, that there are
3   fundamental differences between rodents and men that
4   preclude exact modeling of any human disease, right?
5   A   I'm not sure what you mean by "exact
6   modeling."  Modeling is modeling.  It doesn't make
7   sense, exact modeling.
8   Q   Well, you'd agree generally that there are
9   fundamental differences between rodents and men that
10   preclude modeling of any human disease?
11   A   Well, modeling of animal mechanistic
12   induction of malignancy and its progression is done
13   all the time for the purpose of humans.  So it is
14   done.  So to say it's been precluded doesn't make any
15   sense.  Your question is a little messed up.  I think
16   I know what you're asking, but you're not asking it
17   in the correct fashion.
18   (Thereupon, Exhibit 17 was marked for identification.)
19   BY MR. DHINDSA:
20   Q   Dr. Sawyer, the court reporter has handed
21   to you what's been marked as Exhibit 17, an article
22   titled "B Lymphoid Neoplasms of Mice: Characteristics
23   of Naturally Occurring and Engineered Diseases and
24   Relationships to Human Disorders," published in
25   Advances in Immunology.

Page 185

47 (Pages 182 - 185)

CONFIDENTIAL

1        Do you see that?
2    A    Yes.
3    Q    Are you familiar with this article?
4    A    No.
5    Q    Are you familiar with this journal?
6    A    Not really.
7    Q    And if you'd turn to page 99, there's a
8 Section B "Of Mice and Men:  Mice Are Not Small
9 Humans."  Do you see that?
10    A    I do.
11    Q    And do you see there, at the beginning of
12 the second paragraph, it states, "It is essential,
13 however, to understand the fundamental differences
14 between mice and men may preclude the exact modeling
15 of any human disease"?
16    A    Yeah, here we go, the exact modeling.  That
17 was my issue with your question, where I said do you
18 mean modeling or exact modeling.  Because we're never
19 going to have exact modeling with an animal, but
20 certainly modeling is done all the time.
21    Q    So do you agree with this statement in the
22 Morris article that I've just read?
23    A    With respect to being exact, yes.
24    Q    And you would agree with Dr. Portier that
25 the strongest evidence for establishing a cause --
                                              Page 186

1 excuse me.  Strike that.
2        You'd agree with Dr. Portier that the
3 strongest evidence for establishing a relationship
4 between exposure to any given chemical and cancer in
5 humans comes from epidemiological studies, right?
6        MR. TRAVERS:  Object to the representation
7    of Dr. Portier's opinion.
8        THE WITNESS:  I can't answer that without
9    reviewing his full document.
10 BY MR. DHINDSA:
11    Q    Do you agree that many disease entities
12 recognized in humans do not have parallels in
13 rodents?
14    A    Yes, I already gratuitously mentioned some.
15    Q    For instance, you agree that there are
16 differences between lymphoid neoplasms in mice and
17 non-Hodgkin's lymphoma?
18    A    Yes, especially when we deal with
19 chemicals, such as inhaled chemicals that are
20 somewhat water soluble and never make it to the deep
21 lung in a rat due to the huge extensive snout.  Most
22 humans do not have large extensive snouts that I know
23 of where certain chemicals may pass down into the
24 deep lung without capturing them.  There's a lot of
25 differences between rodents and humans that
                                              Page 187

1 toxicologists are well aware of and take into
2 account.
3    Q    You agree that there are mouse lymphoma sub
4 types that do not have equivalent -- strike that.
5        Do you agree that there are mouse lymphoma
6 sub types that have no equivalent in human NHL and
7 human NHL sub types that have no equivalent in rats?
8    A    Correct.  And that's getting back to the
9 exact model issue again.  That's correct.
10    Q    You agree, for instance, that there are
11 significant differences between mouse and human
12 immune systems, right?
13    A    There are.
14        MR. DHINDSA:  Can we go off the record?
15        VIDEOGRAPHER:  The time is now 2:07 p.m.
16    We're going off the record.
17 (A short break was taken at 2:07 p.m.)
18        VIDEOGRAPHER:  The time is now 2:26 p.m.
19    We're back on the record.
20 BY MR. DHINDSA:
21    Q    Dr. Sawyer, is it fair to state that a
22 statistically significant P value alone is not enough
23 to determine whether or not a substance is
24 carcinogenic?
25    A    Correct.  There's other factors involved in
                                              Page 188

1 Bradford Hill and weight of evidence beyond just the
2 strength of the association.  That's one of the
3 progs, but there are more.
4    Q    Now, in your expert report you've
5 calculated the cancer slope factors based upon seven
6 separate tumor study findings across about a dozen or so
7 studies, right?
8    A    Yes.
9    Q    So I'd like to talk about those findings
10 first, and then we'll talk about how you calculated
11 your slope factor, okay?
12    A    Okay.
13        MR. DHINDSA:  To assist us, I'm going to
14    mark a paper called "Greim" from 2015 and its
15    appendices.
16 (Thereupon, Exhibit 18 was marked for identification.)
17 BY MR. DHINDSA:
18    Q    Dr. Sawyer, the court reporter has handed
19 to you what's been marked Exhibit Number 18, an
20 article by Dr. Greim, et al., entitled "Evaluation of
21 Carcinogenic Potential of the Herbicide Glyphosate,
22 Drawing on Tumor Incidence Data from 14
23 Chronic/Carcinogenicity Rodent Studies."
24        Do you see that?
25    A    Yes.
                                              Page 189

48 (Pages 186 - 189)

CONFIDENTIAL

1    Q    Are you familiar with this paper?
2    A    I referenced it 20 times in my report.
3    Q    This is a paper you obviously relied upon
4  in your report?
5    A    Yes.
6    Q    This is a scientifically reliable paper?
7    A    Yes.
8    Q    This paper is published in Critical Reviews
9  and Toxicology.  Are you familiar with that journal?
10   A    Yes.
11   Q    And that's generally a scientifically
12 reliable authority?
13   A    Yes.
14   Q    Now --
15   A    When you say "reliable study," it's
16 peer-reviewed -- it's a peer-reviewed journal.  It
17 doesn't mean that there aren't potential errors in
18 the study.
19   Q    There may be things you disagree with?
20   A    That's possible.
21   Q    All right.  Now, this Greim paper also
22 includes appendices, data tables from the proprietary
23 study, submitted by the Life Estate Registrants,
24 right?
25   A    Yes.
                                              Page 190

1    Q    Right.  IARC did not have all of the data
2  available on glyphosate review either, correct?
3    A    Correct.
4    Q    So your review did not include the
5  underlying study report and/or pathology report,
6  right?
7    A    Correct.
8    Q    Did your review include summary animal
9  data?
10   A    Yes.
11   Q    But no individual animal data, right?
12   A    Correct.
13   Q    You consider the incidence of malignant
14 lymphoma in this study to be due to treatment with
15 glyphosate; is that right?
16   A    Yes.
17   Q    Have you ever studied lymphomas in mice?
18   A    Hands-on, no.
19   Q    Have you ever published in the
20 peer-reviewed literature on lymphomas in mice?
21   A    I don't believe so, no.
22   Q    I'm sorry, were you finished?
23   A    No, I have not.
24   Q    The incidence in the high-dose group was
25 not statistically significant compared to controls,
                                              Page 192

1    Q    Let's start with the Wood study.
2    A    Now.
3    Q    Now, the Wood study was an 18-month study
4  of the CD-1 mice, correct?
5    A    Yes.
6    Q    And did you review this study in full?
7    A    Within Greim?
8    Q    Greim and the appendices, right?
9    A    I think it's -- what -- it's not page
10 numbered.
11   Q    Yeah, I'm looking actually at the text of
12 the Greim article, Study Number 14 --
13   A    Okay.
14   Q    -- which I believe is the Wood 2009 B mouse
15 study, page 201 to 202 of the Greim article.
16   A    Okay.  We're looking at Table 19?
17   Q    Right.
18   A    Okay.
19   Q    So you reviewed this study as presented in
20 the Greim papers?
21   A    Yes.
22   Q    But you didn't review the study in full,
23 did you, only what was available?
24   A    Yeah, it's not available still.  That's the
25 problem IARC had as well.
                                              Page 191

1  correct?
2    A    By whose analysis?
3    Q    As presented in Table 19.  I'm talking
4  about pair-wise analysis.
5    A    Using the Fisher's exact test, it was a
6  .028.
7    Q    If you'll look at Exhibit 11, which was the
8  EPA's Office of Pesticide Programs report, dated
9  December 12, 2017.  I think you have that somewhere
10 in front of you, a previous exhibit which we've
11 marked.
12   A    Yeah, I have a summary of it here.
13   Q    If you'll turn to page 89 of that exhibit,
14 Exhibit 11.
15   A    Right there it shows .059.
16   Q    Right.  And that is not statistically
17 significant, correct?
18   A    That's not the correct set of ends.
19 They've eliminated half of the lymphoma cases in that
20 analysis without justification.  Remember, HIRPA two
21 changes, possibility of using a different statistical
22 analysis for false positive assurance, which was
23 done.  However, this business of eliminating animals
24 that develop malignancy or died prior to FIFRA.
25 sacrifice date was never recommended by FIFRA.
                                              Page 193

49 (Pages 190 - 193)

1 That's something that was gratuitously added by EPA.
2 They effectively knocked out in that high-dose group
3 10 cancers -- lymphomas down to five.  In the next
4 group there were previously four lymphomas, now there
5 are two.  And in the lower group there was two and
6 now there's one.  So they effectively have eliminated
7 the total cases of lymphoma of 16 down to 8, and it
8 weakened the power; that is, they've increased the
9 type PT 2 Type II error to a very high level, which
10 has now diminished the significance of the test to a
11 .059.
12     Q    In your opinion, there were originally 16
13 cases?
14     A    Yeah, there were originally 16.
15     Q    How are you deriving that number?
16     A    I did this analysis the other day.  I have
17 to recall my steps.  I'm incorrect.  They didn't.  I
18 think I got confused with another one of my charts.
19 But, nonetheless, the statistic was previously .028
20 and the trend test was previously .007.  Using the
21 new statistical analysis, the trend is still highly
22 significant at .025 -- or at .006 rather, with a
23 false discovery rate of .025.  And the raw value for
24 the high-dose group, the raw P value, is still highly
25 significant at .029.  However, the false discovery

Page 194

1 rate is right at the cutoff of .059.
2     Q    What are you reading from, Dr. Sawyer?  Is
3 that your expert report or some notes or something
4 else?
5     A    Well, I just have some notes on the
6 December 12th, 2017 memorandum.
7     Q    Is there a correction you've discovered
8 that you need to make to your expert report?  Is that
9 what I heard you say?
10     A    No, no.  My notes that I had written on the
11 memoranda from EPA, it looks like I used the wrong
12 numbers there.
13     Q    And so what are the correct numbers again,
14 please?
15     A    As written on the memorandum.
16     Q    What's -- what is that EPA memorandum?
17     A    December 12, 2017, updated statistics
18 performed on animal carcinogenicity study data for
19 glyphosate.
20     Q    So in looking, again, at the EPA Office of
21 Pesticides Programs, Exhibit 11, do you then disagree
22 with the EPA's conclusion that the increased
23 incidence at the high dose was not statistically
24 significant to P equals 0.059?
25     A    It's 9/1,000ths higher than .05.  So what

Page 195

1 this is saying is that the false discovery rate is
2 not at 95 percent certainty or greater.  It's at
3 approximately 94 percent certainty or -- I'd have to
4 do my calculation exactly, between 94 and 95 percent
5 certainty.  So it just missed the .05 by 9,000ths
6 of a point.
7     Q    So by 9,000ths of a point it was not
8 statistically significant, right?
9     A    Right.
10     Q    Now, if you look back at the Greim article,
11 page 202, there was no repeated effect in the female
12 mice with regard to lymphomas, correct?
13     A    No, there was really a high control
14 background noted, and the trend is not any
15 statistical significance due to that high background
16 level in the controls.
17     Q    Yeah.  In fact, there were 11 cases of
18 lymphoma in the controls and 11 in the high-dose
19 group, right?
20     A    Right.
21     Q    Now, previously you mentioned that
22 historical control data is something we should look
23 at, right?
24     A    It is.  But one has to consider the dozens
25 or more breeding cycles that occurred over the time

Page 196

1 span of that historical control and as to where the
2 laboratory was that housed that historical control,
3 whether it was the same lab or a different lab.
4     Q    But you don't address the historical
5 control incidence for this lymphoma tumor incidence
6 in your expert report, do you?
7     A    With the females?
8     Q    For the males.
9     A    I thought I had.  Probably not on page 118,
10 but perhaps somewhere else in the report I had.  Let
11 me look.
12     Q    Sure.
13     A    It doesn't look like I did.
14     Q    So is it safe to assume that you were not
15 aware of the historical control incidence from the
16 laboratory and that historical control incidence at
17 the same time was 0 to 12 percent?
18     A    Yeah, I have noted here on page 2-20 of --
19 of the guidelines for carcinogen risk assessment,
20 which I referenced in my report.  I have a note here
21 that caution should be exercised in simply looking at
22 the ranges of historic responses because the range
23 ignores differences in survival of animals among
24 studies and is related to the number of studies in
25 the database and some other information in historical

Page 197

50 (Pages 194 - 197)

CONFIDENTIAL

1 controls in terms of how to interpret them. I
2 thought I put this information in my report, but it's
3 kind of my notes.
4   Q   You don't --
5   A   It may be in my report, yet I may have just
6 forgot where.
7   Q   Were you aware that the historical control
8 incidence from this laboratory that conducted study
9 14 in 2009, B study, that that historical control
10 incidence at that time was near 12 percent?
11   A   Yeah, it was very high. I was aware of
12 that. That's why I marked up -- did some research in
13 terms of the interpretation of that control data, in
14 terms of date. I know there's a warning in the
15 carcinogen risk assessment methodology -- I can't
16 seem to put my finger on that -- that specifically
17 considers the weight that one puts on to the control,
18 historic controls depending on how recent they are
19 and what laboratory the animals were in.
20   Q   So the 10 percent observed in the high-dose
21 males of lymphomas falls within the historical
22 control range for this study, correct?
23   A   It does. But as I recall, that was not a
24 recent statistical range. It was what had been.
25   Q   Those control animals were not exposed to

Page 198

1 glyphosate, right?
2   A   Correct. Keep in mind that the males
3 showed zero in the control group, where the females
4 showed 11 percent. So there appears to be a sex
5 difference with respect to the increased number of
6 malignant lymphomas found in the controls.
7   Q   Did you observe any such similar
8 differences in other studies with regard to lymphoma,
9 gender differences?
10   A   I think so.
11   Q   Let me direct your attention --
12       MR. TRAVERS: I think he's still answering.
13       THE WITNESS: You asked the question about
14 the evidence. I think so, but I need to check
15 my report to refresh my memory.
16       The study in Table 17, Sugimoto,
17 S-U-G-I-M-O-T-O, in 1997 used male CD-1 mice.
18 And in their control group, with respect to
19 malignant lymphoma, they found zero out of 26
20 male controls. That's consistent with the Wood
21 study conducted in approximately the same time
22 period using the CD-1 mice.
23 BY MR. DHINDSA:
24   Q   Turning back to --
25   A   Wait a minute.

Page 199

1   Q   All right. So the lymphomas --
2   A   All right.
3   Q   So the lymphomas you just described in the
4 Sugimoto study similarly were only in male mice and
5 not in female mice; is that right?
6   A   Yes. More importantly the control group
7 was zero.
8   Q   So there was not any replication across the
9 genders, right? In other words, you didn't have
10 lymphoma in both female and male mice that was
11 statistically significant?
12   A   Correct.
13   Q   Now, if you look back at the Greim study,
14 page 202, underneath Table 19 --
15   A   Okay.
16   Q   -- do you see there where the Greim authors
17 concluded that glyphosate was not considered
18 carcinogenic in the CD-1 mice they studied?
19   A   In the table or in the text?
20   Q   In the text.
21   A   Yes.
22   Q   And if you'd turn to the EPA OPP document,
23 which is Exhibit 11. Again, at page 88 -- are you
24 there, sir?
25   A   No.

Page 200

1   Q   It's this document.
2   A   This one? Yeah, that could be.
3   Q   Yeah, it's this document.
4   A   88?
5   Q   Yes, sir.
6   A   Okay.
7   Q   And do you see there at the bottom of the
8 page where the EPA found that the malignant lymphoma
9 in male mice in this Wood 2009 study not to be
10 treatment related?
11   A   I do.
12   Q   And they reached that conclusion in part
13 because the observed incidences, all of them, were
14 within the historical control range, correct?
15   A   Right. They failed to disclose the
16 historical control range was outdated and failed to
17 note that there was zero in the Wood study and the
18 CD-1 mice only. The same time period in the Sugimoto
19 study was zero in the mice.
20   Q   How do you know that that control data was
21 outdated?
22   A   I read it.
23   Q   Do you have a copy of that with you?
24   A   I do.
25   Q   Is that within the box of materials that

Page 201

51 (Pages 198 - 201)

CONFIDENTIAL

1 you brought with you?
2    A   Yeah.  I have to try to figure out where
3 that is.
4    Q   Well, maybe we can take a look at it at
5 the end of the day, if that's all right with you.
6    A   No, I'd rather do it now.  I think it's in
7 this document, the FIFRA document.
8    Q   You read it, but you can't recall right
9 now?
10    A   Yeah.  I think it's in the FIFRA, on page
11 18 of the FIFRA document.
12    Q   Which document is that, sir?
13    A   December 13 through 16, 2016.  That's the
14 FIFRA, F-I-F-R-A, Scientific Advisory Panel meeting.
15    Q   Okay.
16    A   On page 18 the panel made a note.
17 "Regarding historical controls, the panel noted that
18 the default position should be to not rely on
19 historical control data except when concurrent
20 controls, like Sugimoto, yield clearly unreliable
21 results.  Sugimoto showed reliable, exactly the same
22 results as zero in the control group.
23        So the position that your experts are
24 taking is not correct.  That -- we can't take
25 outdated controls when we have more recent controls

Page 202

1 from Sugimito and throw out the baby with the bath
2 water.
3    Q   Is that specific to Wood 2009?
4    A   Yes.  Page 18, the second paragraph from
5 the bottom.
6    Q   Well, if you look at the EPA OPP document
7 again at page 88, the EPA says that the historical
8 control data were generated within approximately five
9 years of the Wood study.  Do you disagree with that?
10    A   On page 88, which paragraph?
11    Q   The last paragraph.
12    A   Five years, okay.
13    Q   Right.  Any reason to disagree with that
14 fact?
15    A   Well, all I can say is that I -- out of
16 memory, I thought the time span that I read was
17 longer, but I don't -- I can't point to that date at
18 the moment.
19    Q   And the Sugimito study was not conducted at
20 the same lab as the Wood study, was it?
21    A   No.  I also read that this control data
22 that EPA is referring to on page 88, that was not the
23 same lab either.
24    Q   Now, your second and third cancer slope
25 factors are based on hemangioma and lymphoma findings

Page 203

1 in that Sugimoto study, right?
2    A   I gave you the wrong study name.  It's the
3 Atkinson study that used CD-1 mice with zeros.
4    Q   Do you want to correct the prior answer?
5    A   Yeah.  Yes, the Sugimoto study used --
6 well, no, no, that's true too.  The Sugimoto study
7 used CD-1 mice with a zero tumor incidence in the
8 control group, and the Atkinson study also used CD-1
9 mice with zero out of 47.  So now we have three
10 studies, over 150 mice, showing not a single
11 malignant lymphoma in the control group of CD-1 mice.
12 I think that's very compelling.
13    Q   What page are you on, sir?  Page 114 of
14 your report?
15    A   Yeah, Table 15.  So now we have three sets
16 of data on almost 150 mice without a single lymphoma
17 in the control group.
18    Q   Well, Table 15 --
19    A   How can you argue with that?
20    Q   Well, Table 15 on page 114 seems to reflect
21 data on incidences of hemangiosarcomas and not
22 lymphomas?
23    A   Oh, you're right.  My eyes are getting very
24 tired.  Sorry, you're correct on that.
25    Q   So turning back to your second and third

Page 204

1 cancer slope factors, they're based on
2 hemangiosarcoma -- hemangioma and lymphoma findings
3 of Sugimoto, right?
4    A   Yeah, Table 17.
5    Q   Even though your slope factor here at page
6 85 says two years, this is really an 18-month study,
7 right?
8    A   Yes.
9    Q   Did you review the study in full?
10    A   No.
11    Q   And --
12    A   I don't think I had that available.
13    Q   You didn't have the underlying individual
14 animal data and pathology reports?
15    A   No.
16    Q   All right.  So the incidents of malignant
17 lymphoma in the Sugimoto study was 2206, right?
18    A   Yes.  Before I forget, though, I should
19 point out, my eyes are correct this time.  On Table
20 18 we have another control group of -- these are
21 Swiss albino mice.  They're not CD-1, so forget it.
22    Q   Okay.  So looking at Table 17, which in
23 your report is titled "Incidences of Malignant
24 Lymphomas in Male CD-1 Mice," citing Sugimoto 1997,
25 when you used 0,0,1,5, that was a mistake, right?

Page 205

52 (Pages 202 - 205)

CONFIDENTIAL

1    A   I'm not sure where you are.
2    Q   I'm on Table 17, page 115 of your expert
3  report in this case.
4    A   Uh-huh, yes.
5    Q   You list there for the Sugimoto study in
6  terms of malignant lymphoma in mice, 0,0,1,5 as a
7  tumor incidence.  Do you see that?
8    A   I don't.
9    Q   I'm just reading down here on Table 17.
10    A   Yeah.
11    Q   You have zero out of 26 tumors in the
12  control group, right?
13    A   Yes.
14    Q   Then zero out of 34 in the low-dose group.
15  One out of 27 in the mid-dose group and 5 out of 29
16  in the high-dose group, right?
17    A   Right.  So what are you asking me?  I don't
18  follow.
19    Q   Well, if you look at the Greim paper, which
20  summarizes this study, page 200 --
21    A   Okay.
22    Q   -- if you look at Table 17, which
23  summarizes the Sugimoto study, do you see there at
24  the bottom where there is the data presented for male
25  mice with lymphoma?

Page 206

1    A   Yes, I do.
2    Q   And the numbers presented there are 2 out
3  of 50 in the control group, 2 out of 50 in the
4  low-dose group, 0 out of 50 in the mid-dose group and
5  6 out of 50 in the high-dose group, correct?
6    A   2, 2, 0, 6.  You said Table 17 on page 200?
7    Q   That's what I'm looking at, correct.
8    A   The two-year feeding study for Arysta,
9  A-R-Y-S-T-A, Life Sciences.
10    Q   Correct.
11    A   The numbers are completely different.
12    Q   Right.  So the 0,0,1,5 numbers in your
13  Table 17 are inaccurate, correct?
14    A   Well, I think we're looking at a different
15  study.  There's something wrong here.  Arysta Life
16  Sciences.
17        MR. DHINDSA:  I'll have the court reporter
18    mark the next exhibit while you're reviewing
19    that.
20    (Thereupon, Exhibit 19 was marked for identification.)
21  BY MR. DHINDSA:
22    Q   Dr. Sawyer, the court reporter has handed
23  you an exhibit that might help answer the question
24  here.
25    A   Okay.

Page 207

1    Q   Exhibit 19 is the expert report of
2  Dr. Christopher Portier.  If you'd turn to page 42,
3  his Table 12.  Do you see there where he's describing
4  the Sugimoto study and notes that with regard to
5  malignant lymphoma in male mice, the numbers are 2,
6  2, 0, 6?
7    A   Yes.
8    Q   Do you have any reason to disagree with
9  that?
10    A   No.
11    Q   And the incidence 6 in the high group was
12  not statistically significant when compared to
13  concurrent controls, correct?
14    A   Correct.
15    Q   And as we noted earlier, there was never a
16  repeated effect in female mice, correct?
17    A   For the malignant lymphoma?
18    Q   Right.
19    A   There is no evidence of it.
20    Q   With regard to the male mice, the dose
21  response is not linear, correct?
22    A   Correct.  No, it's not linear.
23    Q   Did you consider the historical control
24  incidence of lymphoma for this laboratory that
25  conducted the Sugimoto study?

Page 208

1    A   I did.  I had the value of zero in my
2  report.  In fact, according to this document, it
3  should have been 2.
4    Q   Are you referring to concurrent or
5  historical control when you say "zero"?
6    A   Table 17 in my report I'm referring to.  I
7  have the tumor instance as 0 out of 26 when the
8  numbers -- something -- you know, I'm not going to
9  say that my Table 17 is incorrect.  There's something
10  I'm missing here.  Because I have the correct doses
11  in Table 17.  The tumor instances only shows about
12  half of the animals.
13    Q   Well, you would agree, though, that if the
14  2, 2, 0, 6 number presented in Dr. Portier's report
15  and the Greim article for the Sugimoto study are
16  correct, that would alter your cancer slope factor
17  analysis?
18        MR. TRAVERS:  Objection.  Form.
19        THE WITNESS:  For that particular study, it
20    would.  It wouldn't affect the Wood study.
21  BY MR. DHINDSA:
22    Q   Right.  Are you aware that the historical
23  control rate for the performing laboratory of the
24  Sugimoto study was 4 to 19 percent?
25    A   For males or females or both?

Page 209

53 (Pages 206 - 209)

CONFIDENTIAL

1    Q    Males.  Were you aware of that?
2    A    No, not for males.
3    Q    So the 12 percent observed in the high-dose
4  group in the Sugimoto study would fall within the 4
5  to 19 percent control range for males, correct, for
6  lymphoma?
7    A    Yes.
8    Q    Now, let's turn to another study that you
9  cite.  Actually, it's the same study as the Sugimoto
10 study that we've been looking at.  You also found
11 that there was a statistically significant increase
12 in hemangiomas in this study, correct, on page 115 of
13 your report?
14   A    Yes.
15   Q    That increase was in female mice, not male
16 mice, correct?
17   A    Correct.
18   Q    All right.  Let's walk through the findings
19 for this tumor type in the four CD-1 mouse studies.
20 We can use Dr. Portier's report for this.  I'm
21 looking at, if you have his report in front of you,
22 page 38 of Exhibit 19.  Are you there?
23   A    Yes.
24   Q    All right.  So the Knezveich study found a
25 non-significant decreased trend in hemangiomas in

1  female CD-1 mice, right?
2    A    I'm sorry, I didn't understand your
3  question.
4    Q    Table 9 of Dr. Portier's reports reflects
5  that the Knezevich and Hogan study found a
6  non-significant decrease trend in hemangiomas in
7  female mice, right?
8    A    The females showed 0, 1, 1, 0.  That's
9  non-significant.
10   Q    Okay.  Then if you turn to the next page,
11 Table 10 of Dr. Portier's report reflects that the
12 Atkinson study found the numbers in hemangiomas in
13 female CD-1 mice to be 0, 0, 0, 0, or none, correct?
14   A    Correct.
15   Q    The Wood study was essentially none with
16 respect to hemangiomas in female CD-1 mice at 18
17 months with a P value of .438 as reflected in Table
18 11 of Dr. Portier's report, right?
19   A    Yes.
20   Q    So three of the four CD-1 mice studies do
21 not find evidence of an increase risk of hemangiomas
22 in CD-1 mice, right?
23   A    Yes.
24   Q    But you chose to calculate a cancer slope
25 factor based on a single positive study, right?

1        MR. TRAVERS:  Objection.  Form.
2        THE WITNESS:  That's true.
3  BY MR. DHINDSA:
4    Q    The study you selected to base your cancer
5  slope factor calculation on wasn't even the study
6  with the highest dose, correct?
7    A    Yes.
8    Q    And you would agree that that positive
9  finding upon which you based your cancer slope factor
10 is the outlier in the data study you reviewed,
11 correct?
12       MR. TRAVERS:  Objection to form.
13       THE WITNESS:  I'm not sure what you mean by
14 "outlier" in the question.
15 BY MR. DHINDSA:
16   Q    Well, three of the studies were negative in
17 CD-1 mice related to this tumor type --
18       MR. TRAVERS:  Objection.
19 BY MR. DHINDSA:
20   Q    -- hemangiomas, and you elected to rely
21 upon the one positive finding amongst the four CD-1
22 mice studies, right?
23       MR. TRAVERS:  Objection to form.
24       THE WITNESS:  Yes.
25 BY MR. DHINDSA:

1    Q    The US EPA looked at these studies as well,
2  right?
3    A    Yes.
4    Q    If you'd turn to page 90 of the EPA OPP
5  document marked Exhibit Number 11.  The EPA, which,
6  of course, had more information than was available to
7  you, found that there was no evidence of
8  corroborating preneoplastic or related non-neoplastic
9  lesions or evidence of tumor progression to support
10 biological significance of these tumor findings,
11 right?
12       MR. TRAVERS:  Objection to the form.
13 Objection.  Compound question.
14       THE WITNESS:  Well, it reads, "Hemangiomas
15 in female mice are found to occur at different
16 sites.  Tumor incidences are presented in Table
17 419.  A statistically significant trend was
18 observed.  Tumor incidence at the high dose,
19 which was approximately 4 times the recommended
20 high dose in test guidelines, was statistically
21 significant as compared to concurrent controls."
22 BY MR. DHINDSA:
23   Q    Where are you reading from?
24   A    The top, the second -- the first full
25 paragraph on page 90.

54 (Pages 210 - 213)

CONFIDENTIAL

1   Q   Oh, okay. I'm sorry, I want to direct your
2  attention to the bottom of the page where the US EPA
3  is providing a summary of the mouse data it reviewed
4  relating to these glyphosate rodent carcinogenic
5  studies. Do you see there the penultimate sentence
6  where the EPA states their conclusion that there was
7  no evidence of corroborating preneoplastic or related
8  non-neoplastic lesions or evidence of tumor
9  progression to support biological significance of
10 tumor findings?
11  A   I do.
12  Q   You agree with that, right?
13  A   I don't have that data to review. That's
14 data that I believe was submitted to EPA via the
15 manufacturer. It could have been Monsanto. I'm not
16 sure who the manufacturer was in that particular
17 instance. I don't have the pathology results to
18 review.
19      I do note in hemangiomas, the pre-malignant
20 evidence is not as easy to find as it would be for a
21 hepatoma, for example, as the blood vessel
22 malignancies can occur basically anywhere.
23  Q   You don't have any reason to disagree with
24 the EPA's statement that I just read, correct?
25      MR. TRAVERS: Objection. Asked and
Page 214

1  answered.
2      THE WITNESS: I don't have the data to say
3  one way or the other. It is what it is.
4  BY MR. DHINDSA:
5  Q   You mentioned there were multiple
6  manufacturers of glyphosate-related products, right?
7  A   Yes, I believe that's true.
8  Q   You agree that hemangiomas are benign
9  lesions?
10  A   Yes.
11      MR. DHINDSA: Let's go off the record for
12 the videographer.
13      VIDEOGRAPHER: The time is now 3:26 p.m.
14 We are going off the record.
15 (A short break was taken at 3:26 p.m.)
16      VIDEOGRAPHER: The time is now 3:39 p.m.
17 We're back on the record. This is the beginning
18 of Media Unit 4.
19 BY MR. DHINDSA:
20  Q   Dr. Sawyer, have you ever studied
21 hemangiomas?
22  A   It's part of my pathology training. I
23 haven't run any original hands-on studies on it, no.
24  Q   Have you ever published on hemangiomas?
25  A   No.
Page 215

1   Q   All right. Let me direct your attention to
2  page 115 of your expert report. Before we get there,
3  let me ask you, have you ever researched whether
4  hemangiomas in mice have any relationship to NHL in
5  humans?
6  A   No. By the way, I want to point out, since
7  you turned to Table 17, there's a footnote on Table
8  17 which directs to the glyphosate issue paper.
9  Q   Okay.
10  A   So it's possible that's where the 0,0,1,5
11 came from.
12  Q   You don't have any recollection sitting
13 here today?
14  A   No.
15  Q   Okay. So in Table 16 on page 115 of your
16 report, you're reporting data for the Sugimoto study,
17 do you see that?
18  A   Yes.
19  Q   And you note the tumor incidence is
20 0,0,2,5, correct?
21  A   Yes.
22  Q   Now, if you'd turn to page A-10 of your
23 expert report.
24  A   Okay.
25  Q   On page A-10, you were calculating a cancer
Page 216

1  slope factor based on the hemangiomas from the
2  Sugimoto study, right?
3  A   Yes.
4  Q   And in the column entitled "Observed," the
5  numbers you list are 0,0,4,1,0. Do you see that?
6  A   I do.
7  Q   And those numbers should actually be 0025,
8  correct?
9  A   It appears that way.
10  Q   So perhaps you just got confused there
11 between percentages and tumor numbers?
12  A   Typo, yeah.
13  Q   Okay. And you haven't conducted a study to
14 indicate how many mammary tumors in female rats are
15 related to NHL in humans, right?
16  A   No.
17  Q   In fact, you can't point to a study that
18 shows that inducing mammary tumors in female rats has
19 anything to do with NHL, right?
20  A   Remember the question you asked me about
21 the exact model. This is not intended as an exact
22 model, the determination of whether or not the
23 chemical glyphosate in rodent models induces
24 malignancies of any type. So you're over -- your
25 question really over scoped the intention of these
Page 217

55 (Pages 214 - 217)

CONFIDENTIAL

1 models and the intent of the model.
2      MR. DHINDSA: All right. I'll object and
3  move to strike everything after the word "No."
4 BY MR. DHINDSA:
5    Q   So you would never tell a jury that cancer
6 induction in rodents means NHL in people?
7    A   I would tell the jury that finding NHL in
8 animal models certainly is consistent with the human
9 epidemiological data. However, predicting one cancer
10 site in an animal model to a human is beyond the
11 capability of the assay. It's not designed to be an
12 exact prediction of the same site in humans.
13 Sometimes they do correlate, but the model is not
14 that exact because of the differences in a mouse
15 versus human and all of the factors that we spoke of
16 earlier.
17    Q   And there are also differences amongst the
18 various different cancer tumor types, right?
19    A   There are.
20    Q   So just because you have a finding in one
21 study of mammary gland tumors in a rodent strain,
22 that doesn't necessarily mean that has any bearing on
23 whether or not similarly exposed people will develop
24 non-Hodgkin's lymphoma, right?
25    A   It's suggested and it opens the door to
Page 218

1 looking closer at the human epidemiological data.
2    Q   Is it your expert opinion that developing a
3 tumor in any site, in any organ of a rodent means
4 that a person -- strike that question.
5      Is it your expert opinion that rodents
6 exposed to glyphosate who developed tumors in any
7 site, at any organ are at higher -- provide data that
8 is relevant to the question of whether or not humans
9 exposed to glyphosate can develop NHL?
10      MR. TRAVERS: Objection. Asked and
11 answered.
12      THE WITNESS: No, it simply serves as an
13 indicator that the chemical in question is a
14 probable or possible human carcinogen.
15 BY MR. DHINDSA:
16    Q   That certainly doesn't prove that any
17 chemical, including glyphosate, is a human carcinogen
18 by itself, right?
19      MR. TRAVERS: Objection. Argumentative.
20      THE WITNESS: Correct. It doesn't conclude
21 that. It doesn't confirm the human
22 carcinogenicity.
23      MR. DHINDSA: Can we go off the record?
24      VIDEOGRAPHER: The time is now 3:46 p.m.
25 We're going off the record.
Page 219

1 (A short break was taken at 3:46 p.m.)
2      VIDEOGRAPHER: The time is now 3:49 p.m.
3 We're back on the record.
4 BY MR. DHINDSA:
5    Q   Dr. Sawyer, you're aware that a typical
6 rodent bioassay examines about 20 sites in a rodent?
7    A   Twenty slices?
8    Q   Twenty sites.
9    A   Yes.
10      Just to be thorough with the question you
11 asked me, on page 94, last paragraph.
12    Q   What are you looking at, sir?
13    A   My report.
14    Q   Okay.
15    A   Page 94, last paragraph, and the top of
16 page 95 on down to the last paragraph is the answer
17 with respect to you asked how old were the controls
18 that were used in the Wood study. I did have them
19 dated, 59 studies from 1987 to 2000. So those are
20 the studies that I referred that are about 10 years
21 old. And then the Giknis and Clifford, et cetera.
22      And then on the next page, I underlined the
23 methodology per the guidelines. These are official
24 guidelines. The most relevant historic data comes
25 from the same laboratory, same supplier and is
Page 220

1 gathered within two to three years of the study under
2 review. Other data should be used only with extreme
3 caution. It doesn't say just to jump in and use it.
4 Use it in extreme caution. That's why I looked at
5 other studies to show -- for example, in the Sugimoto
6 study, that there were only two controls that
7 developed malignant lymphoma, not a vastly high
8 number. So this does answer the question you asked
9 me and I wanted to make you aware of it.
10    Q   The OPP document you're citing on page 94
11 of your report from which you've just read or
12 referenced, that's a 2016 OPP report, correct?
13 That's not the 2017 report we've been looking at?
14    A   Yes, '16.
15    Q   All right. In a typical rodent bioassay,
16 in addition to looking at 20 sites in each row, it
17 also looks at two sexes, right?
18    A   Yes.
19    Q   So there's usually about 40 trend tests
20 that could be run on a given rodent study, correct?
21    A   That's a good question. With respect to
22 methodology, no malignancies of that type are even
23 observed. Whether that would be a valid trend
24 test -- in other words, let's say you had 20
25 malignant sites to examine, but 10 of those sites
Page 221

56 (Pages 218 - 221)

1 never showed a single malignancy.  So I would have to
2 check the methodology to verify, but I don't know
3 that all 40 of those would constitute a trend that
4 could be used to statistically evaluate what the
5 expected occurrence of a positive trend would be by
6 chance.
7    Q   So there would be 40 potential trend tests
8 one could run?
9    A   I wouldn't say potential.  I'm not sure you
10 could count all those as trend tests in your
11 statistical analysis.
12    Q   Well, there certainly would be 40 sets of
13 data points to look at in a rodent study?
14    A   Right.  But if you take your calculator and
15 put zero minus zero, you're not going to get an
16 answer, okay?  In other words, if everything is
17 zero -- or let's say you're looking at a particular
18 site of cancer, pancreatic cancer, and you have four
19 zeroes across the board, I'm not sure that
20 constitutes a measurable trend.
21    Q   Right.  But there still would be 40 data
22 points to look at, whether the numbers were zero or
23 greater than zero, whether you could do a trend test
24 or not?
25    A   You would have -- in that example, you'd
Page 222

1 have 40 data points, but I'm not sure you could
2 include all 40 of those and say, hey, 5 percent of
3 those could be positive by chance.  I think you'd
4 have to use the trends that have an actual number of
5 some sort in it.
6    Q   And have you done that analysis with regard
7 to the rodent studies that are mentioned in your
8 report?
9    A   No, I believe Dr. Portier did.
10    Q   So you're relying on him for that --
11    A   Yes.
12    Q   -- that analysis?
13    A   Yeah, I didn't rerun it.
14    Q   Now, you're aware there are over
15 1,000 trend tests that could be run in the 12 rodent
16 studies that Dr. Portier found significant?
17    A   No, I'm not aware of that.
18    Q   And with over 1,000 tests, you'd expect
19 about 50 of those to be statistically significant,
20 right, by chance?
21    A   Without reviewing what he did, I'm not
22 certain I want to opine on that.  If you presented
23 the question in a hypothetical fashion, I might be
24 able to.
25    Q   So hypothetically, if you were looking at
Page 223

1 1,000 tests over a set of rodent data, you'd expect
2 about 50 of those tests to result in statistically
3 significant outcomes by chance, correct?
4    A   If those test were all paralyzed tests,
5 that would be true.
6    Q   And if 50 were statistically significant
7 without more, that would not be evidence of a
8 compound-related effect, right?
9    A   If they were equally disbursed among
10 the different bioassays, but if, for example, one
11 bioassay had all positive findings, well, that
12 wouldn't be true.  So it really depends on where the
13 positive analyses fall.
14    Q   So if the positive -- if I understand you
15 right, you're saying if the positive findings were
16 disbursed amongst the full set of studies, and you
17 had 50 statistically significant such results,
18 without more, that would not be evidence of a
19 compound-related effect unless you get 1,000 tests?
20       MR. TRAVERS:  Objection to the form.
21       THE WITNESS:  No.  This is why we have to
22    use the trend test, to see if those fall -- if
23    they were in the positive trend that was
24    statistically significant, that shows a dose
25    response effect.  Then that would confirm it as
Page 224

1    a real finding.
2 BY MR. DHINDSA:
3    Q   You can have a Type 1 error in that type of
4 test, right?
5    A   Certainly.
6    Q   In assessing whether or not statistically
7 significant findings in a rodent study represent
8 compound-related effects, one thing you're looking
9 for is replication or a pattern of those findings,
10 right?
11    A   Yes.
12    Q   Let's look at page 101 of your expert
13 report, Dr. Sawyer.
14    A   Okay.
15    Q   Do you have that in front of you, sir?
16    A   Yes, I do.
17    Q   All right.  So starting with the Lankas
18 study, which is reflected on page 101 of your expert
19 report, you claim that the statistical significance
20 in interstitial tumors is evidence of a
21 compound-related effect, right?
22    A   Yes.
23    Q   And you also state that this was the only
24 incidence of testicular interstitial cell tumor among
25 the rat studies, right?
Page 225

57 (Pages 222 - 225)

CONFIDENTIAL

1   A   Yes, but a very limited number of studies.
2   Q   Are you aware of any chemical registered in
3   the United States that has had a more substantial
4   number of rodent carcinogenicity bioassays done on
5   it?
6       MR. TRAVERS: Objection. Form.
7       THE WITNESS: I don't understand the
8   question.
9   BY MR. DHINDSA:
10  Q   Well, you said this is a limited number of
11  studies. Are you aware of any chemical registered in
12  the United States that's been more studied than
13  glyphosate?
14      MR. TRAVERS: Objection. Form.
15      THE WITNESS: When you say "studies," are
16  you referring to bioassays for malignancy or
17  dermal absorption studies or what?
18  BY MR. DHINDSA:
19  Q   Well, let's start with the rodent
20  bioassays. Do you know of any chemical registered in
21  the United States for which more rodent bioassay have
22  been done than glyphosate?
23  A   I'd have to assess vinyl chloride. I know
24  quite a few rodent studies have been run on it.
25  Certainly trichlorethylene. I would have to do an

Page 226

1   positive given the overwhelming weight of negative
2   studies, right?
3       MR. TRAVERS: Objection. Form.
4       THE WITNESS: I did. On Table 12 there are
5   four -- five Sprague-Dawley rat studies. And so
6   one out of five for that species, there could be
7   a genetic component that renders that species
8   more susceptible, but there's not enough
9   information to support that, yet it is possible.
10      The study that you're referring to in
11  Lankas was highly significant. The probability
12  of chance in that study we're looking at greater
13  than 99 percent chance on the -- well, about 99
14  percent chance of it being a false positive. We
15  have both a very significant Cochran-Armitage
16  trend test as well as a Fisher's exact test at
17  the high doses.
18      So from a statistical standpoint, you know,
19  it really doesn't appear to be a chance
20  incident. I mean, that's not just some
21  self-made opinion. That's what the numbers
22  show. The numbers speak for themselves, that
23  this is unlikely to be that chance. So I --
24  that's why in the Table 12, I think it was, I
25  show that there was only five studies that use

Page 228

1   inventory. It would be a rather exhaustive task. I
2   don't think it would be something I'm about to do,
3   but it's the only way to really find out.
4   Q   Do you believe that the rodent
5   carcinogenicity data on glyphosate is robust?
6       MR. TRAVERS: Object to the form.
7       THE WITNESS: No, I wouldn't say robust, I
8   would say about average.
9   BY MR. DHINDSA:
10  Q   If I can direct you to page 94 of the EPA
11  OPP report. This page is also discussing the Lankas
12  study we were discussing a few moments ago. Do you
13  see there under testicular tumors at the bottom of
14  that paragraph, four or five lines up, where the US
15  EPA says "Testicular tumors were not seen in the 7
16  other -- in the other 7 rat studies, many of which
17  tested up to or beyond the limit dose of 1,000
18  milligrams per kilogram per day"?
19  A   Yes.
20  Q   So there was one statistically significant
21  result for interstitial tumors in the rat studies
22  with 7 negative results in other males, right?
23  A   Yes.
24  Q   And you did nothing to rule out the
25  incidence of interstitial cell tumors as a false

Page 227

1   Sprague-Dawley. So the reason for this one
2   study being positive is unclear.
3   BY MR. DHINDSA:
4   Q   Right. And you agree that there was one
5   positive study and 7 negative studies with regard to
6   interstitial testicular tumors, right?
7   A   Yes.
8   Q   It's your opinion that the results of that
9   particular study, the Lankas study, should outweigh
10  the other studies, right?
11      MR. TRAVERS: Objection to the form.
12      THE WITNESS: No, I said that the
13  statistical analysis was not marginal, but
14  highly significant.
15  BY MR. DHINDSA:
16  Q   In the Lankas study.
17  A   Yeah, in the Lankas study. Highly
18  significant. I just gave you the numbers.
19  Q   On that basis, you believe the Lankas study
20  positive finding of interstitial testicular tumors
21  should outweigh the other seven studies which were
22  negative as to that tumor type, correct?
23      MR. TRAVERS: Objection. Asked and
24  answered.
25      THE WITNESS: Yes, and remember, there have

Page 229

58 (Pages 226 - 229)

CONFIDENTIAL

1    been some very famous epidemiologists who have
2    written papers on the fact that it is very
3    difficult to prove a negative with this type of
4    study.  When you have -- on one hand you have 99
5    plus percent probability.  On the other hand you
6    have five negative studies.  So it becomes very
7    hard to confirm that it's negative.  This is a
8    red flag that something is going on.
9        Now, do we understand exactly what's
10   happening, no.  We don't understand why only the
11   one study of male Sprague-Dawleys -- we could
12   say that, well, sure, the albino -- let's see.
13   The -- what was the other type of rat?  The
14   Wistars, yeah.  The albino, the Wistars,
15   had different genetics, different oncogene and
16   greater resistance than the Sprague-Dawley as a
17   hypothetical.  There's other hypotheticals as
18   well to explain this.  But when statistics are
19   this significant, it becomes difficult to just
20   throw it away.
21       MR. DHINDSA:  I object and move to strike
22   everything after the word "Yes."
23   BY MR. DHINDSA:
24       Q   You agree there's no replication of this
25   finding in the Lankas study with regard to

Page 230

1    Q   So it's your testimony that a testicular
2    tumor finding in a rat has some bearing on the
3    disease process of mycosis fungoides in humans?
4        MR. TRAVERS:  Objection.  Asked and
5    answered.
6        THE WITNESS:  Yes, that it is indicative of
7    the purpose that the bioassay was intended to do
8    and determined whether or not glyphosate has
9    carcinogenic potential.  That's what the purpose
10   of this assay was.  What you're asking me is
11   absolutely irrelevant.  That's not what these
12   tests are designed to do.
13   BY MR. DHINDSA:
14       Q   So what similarities does a test tumor in
15   rats have with mycosis fungoides in human?
16       MR. TRAVERS:  Objection.
17       THE WITNESS:  I don't understand the
18   question.
19   BY MR. DHINDSA:
20       Q   What similarities do testicular tumors in
21   rats have with mycosis fungoides in people?
22       A   Both are forms of a malignant process.
23       Q   All right.  And then in the Stout study --
24   well, let me follow-up before turning to that.
25       Now, if, in fact, the finding of

Page 232

1    interstitial testicular tumors, correct?
2        A   Yes, that one out of five Sprague-Dawley
3    studies were highly significant.  The other four were
4    not.
5        Q   You did not do a formal statistical
6    analysis to determine whether this Lankas finding on
7    interstitial testicular tumors was a false positive,
8    right?
9        MR. TRAVERS:  Objection.  Form.
10       THE WITNESS:  I did not rerun the
11   statistics that I footnoted at the .01 or less
12   than .01 value.
13   BY MR. DHINDSA:
14       Q   You're not a biostatistician, right?
15       A   No.
16       Q   Replication of findings is part of the
17   Bradford Hill analysis, right?
18       A   It is, but when we only have five studies
19   of one species, it really doesn't provide a lot of
20   power to determine whether or not the relationship is
21   there.
22       Q   What does a testicular tumor finding in
23   rodents say about mycosis fungoides cause in humans?
24       A   It is suggestive that glyphosate is
25   carcinogenic, that's all.  That one study.

Page 231

1    interstitial testicular tumors in Lankas were a false
2    positive, then your cancer slope factor calculation
3    based on that would be meaningless, right?
4        MR. TRAVERS:  Objection.  Form.
5        THE WITNESS:  Yes.  It would simply mean
6    that there would be no cancer slope to
7    calculate.
8    BY MR. DHINDSA:
9        Q   Now, turning to the Stout study, you claim
10   there that there was statistically significant
11   results for pancreatic ionic cell adenoma in males,
12   thyroid C-cell adenoma in females, and liver adenoma
13   in males?
14       A   Yes.
15       Q   Starting with the pancreatic tumors, you
16   claim that this is evidence of a compound-related
17   effect, right?
18       A   On page 103, what I wrote is "The trend
19   analysis for pancreatic tumors was not statistically
20   significant, as incidence of pancreatic tumors did
21   not follow a dose response pattern.  However, they
22   were statistically elevated and low in high-dose
23   groups as compared to the controls."
24       That's what I said.
25       Q   And do you believe those findings regarding

Page 233

59 (Pages 230 - 233)

CONFIDENTIAL

1 pancreatic tumors are evidence of a compound-related
2 effect in the Stout study?
3    A    By themselves, there's insufficient data,
4 but when one looks at all of the data for mice and
5 rats, it becomes relevant.
6    Q    How does it become relevant if it's not
7 statistically significant?
8    A    In determining whether there are
9 pairwise -- significant pairwise tests.  And what I
10 should do is go back in my report and review the EPA
11 methodology for evaluating carcinogenic potential.
12 When we have statistically significant pairwise
13 analysis, we don't just throw them out.  Rather, they
14 are evaluated along with the rest of the studies.
15    Q    So if I understand you correctly, then, in
16 part, your opinions rely not only on statistically
17 significant findings, but also those findings that
18 are not statistically significant; is that right?
19    A    No, that's not right.  I said and read to
20 you that there was statistically significant findings
21 on a pairwise basis.
22    Q    If you look at the EPA OPP document at page
23 95, it discusses pancreatic tumors.  Actually,
24 beginning on the bottom of page 94.
25    A    Yeah, it says "No significant trends."

Page 234

1 That's what I said.  However, there are pairwise
2 analogies that were statistically significant on the
3 top of page 95 at the low and high dose for pairwise
4 comparison.
5    Q    And further down in that paragraph, at the
6 top of page 95, do you see where the EPA says,
7 "Pancreatic tumors were not observed in the 7 other
8 rat studies"?
9    A    Yes.
10    Q    So you agree this was the only study, the
11 Stout study, to detect this potential effect of
12 pancreatic adeno cell tumors, correct?
13    A    Yes.
14    Q    And so there was one statistically
15 significant result of pancreatic tumors in male rats,
16 but 7 negative results in other male rats, correct?
17    A    Yes.
18    Q    And 15 total negative results across the
19 studies, correct, including females?
20    A    That's what it states, yes.
21    Q    And you did nothing to rule out that the
22 incidence of pancreatic tumors was a false positive
23 given the overwhelming weight of negative studies,
24 right?
25         MR. TRAVERS:  Objection.  Form.

Page 235

1         THE WITNESS:  I tabulated the findings in
2    Table 12 for observation.
3 BY MR. DHINDSA:
4    Q    Anything else?
5    A    Yeah, I followed the methodology and
6 tabulated the statistically significant results for
7 analysis.
8    Q    Anything else?
9    A    No.
10    Q    And if, in fact, the Stout finding on
11 pancreatic tumors were truly a false positive, then
12 your cancer slope factor calculated in reliance upon
13 that would be meaningless, right?
14         MR. TRAVERS:  Objection.  Form.
15         THE WITNESS:  I wouldn't be able to
16    calculate it.  There wouldn't be any
17    calculation.
18 BY MR. DHINDSA:
19    Q    Can you have a false positive result in a
20 rodent study and calculate a cancer slope factor from
21 it?
22    A    Not that would be relevant, no.
23    Q    So it would be irrelevant as a false
24 positive, right?
25    A    Yes.

Page 236

1    Q    Likewise, you claim the EPA found incidence
2 of liver adenomas to be statistically significant in
3 the Brammer study, right, as well as the Stout study?
4    A    In the Brammer study at the high dose.
5    Q    And how about in the Stout study?
6    A    With respect to a trend, yes.
7    Q    Now, if you look at the EPA OPP document,
8 at 95 -- this is Exhibit Number 11.  Are you there,
9 sir, page 95 of the EPA document?
10    A    Yes.
11    Q    Do you see there in the middle of the page,
12 under hepatocellular tumors, where the EPA states
13 that in Table 4.4, "The raw T value for trend was
14 statistically significantly for adenomas in male
15 Sprague-Dawley rats (Stout and Ruecker, 1990).
16 However, it was not statistically significant
17 following adjustment for multiple comparisons.  There
18 were no statistically significant pairwise
19 comparisons."
20         Do you see that?
21    A    Yes.
22    Q    Any reason to disagree with that?
23    A    No.
24    Q    And EPA also noted that six other rat
25 studies did not detect a relationship between

Page 237

60 (Pages 234 - 237)

1 glyphosate exposure and liver tumors, right?

2    A  I'd have to disagree with that. We have

3 the Brammer study with the significant finding at the

4 high-dose level.

5    Q  Well, if you look back at page 95, the EPA

6 there in the OPP document, Exhibit 11, is discussing

7 under, under hepatocellular tumors, both the Stout

8 and Ruecker and Brammer studies.

9     Do you see that?

10    A  Yeah.

11    Q  Then if you move down to -- towards the

12 bottom of that paragraph, four lines up, the EPA

13 states that "The hepatocellular tumors were not

14 observed in the other six rat studies, including four

15 other studies in Sprague-Dawley rats."

16     Do you see that?

17    A  But they were. Well, there was a trend in

18 one other study. That is the Stout study, I believe.

19    Q  Well, the EPA's accounting for the Stout

20 study there before making that statement about the

21 other studies.

22    A  Well, yeah, but they said in the other six

23 rat studies. It should be the other five -- five rat

24 studies. Two -- Stout and Brammer, which is two, and

25 then five negative studies.

Page 238

1    Q  Well, you see there on page 95 the EPA may

2 have reviewed more studies than you did. But they're

3 citing, as the other six studies, Atkinson, 1993,

4 Pavkov and Wyand, 1987, Enemoto, 1997, Lankas, 1981,

5 Suresh, 1996, and Wood 2009 A.

6     Do you see that?

7    A  Yeah, the Wyand -- I have Pavkov and Wyand.

8 I had that study. No, we have the same studies. It

9 appears that they should have used the number five

10 instead of six. Let me just count these. One, two,

11 three, four, five, six -- I have nine total.

12    Q  Okay. Well, in any event --

13     MR. TRAVERS: Were you done answering,

14 Doctor?

15 BY MR. DHINDSA:

16    Q  In any event, the EPA did not find any

17 other positive findings on liver tumors, other than

18 the Stout and Brammer studies, correct?

19    A  Yes, true.

20    Q  You did not do anything to rule out the

21 incidence of liver tumors -- strike that.

22     You did not do anything to rule out that

23 the incidence of liver tumors was a false positive,

24 given the overwhelming weight of negative studies,

25 correct?

Page 239

1     MR. TRAVERS: Objection to the form.

2     THE WITNESS: Correct. This whole line of

3 questioning is designed to be somewhat insulting

4 since -- to me, because I'm following the

5 guidelines on page 93 of my report. Number 1, a

6 significant positive trend of increased lymphoma

7 or any site malignancy incidence with increased

8 dose of glyphosate, and, Number 2, a significant

9 10 percent increase -- no, that's not the right

10 line.

11     What I'm getting at is the EPA methodology

12 requires the toxicologist to look at both trend

13 and pairwise differences and record those and

14 tabulate those. You keep using this term about

15 I didn't bother to do this or bother to do that.

16 I'm doing what the methodology requires. That's

17 why I tabulated this data in Table 12 for

18 examination.

19     MR. DHINDSA: I object and move to strike

20 everything after the word "Yes."

21 BY MR. DHINDSA:

22    Q  You would agree that regulatory guidelines

23 are not designed to determine causation, correct?

24    A  Yes. And I'm not determining causation

25 with this animal study. I am making a determination

Page 240

1 whether the animal studies indicate the glyphosate in

2 an animal model is carcinogenic. That's what the --

3 that's why these studies are run. I think we're

4 forgetting that. That's the purpose of this. It's

5 not an exact model. It's not a model of Mr. Johnson.

6 It's simply a model to determine whether or not this

7 chemical is carcinogenic in animals.

8    Q  All right. Let's turn to one last tumor

9 type. You also claimed that the EPA found incidence

10 of thyroid C-cell tumors to be statistically

11 significant, right?

12    A  I'm sorry, say it again.

13    Q  You also claim that the EPA found the

14 incidence of thyroid C-cell tumors to be significant,

15 right?

16    A  Yes. And I, again, tabulated that. Page

17 96 of my report is the statement that explains why I

18 have carried out these tasks. I wrote, "It's

19 troubling to all objective scientists, including the

20 FIFRA panel, that OPP deviated from long-standing US

21 EPA's evaluation of carcinogenic potential

22 methodology by implementing novel non-peer reviewed

23 extremely stringent 'requirements.' US EPA rules

24 normally apply as either, as opposed to and, with

25 respect to Number 1, including a significant dose

Page 241

61 (Pages 238 - 241)

CONFIDENTIAL

1 response if one of the pairwise tests comparisons was
2 significant or, 2, the Cochran-Armitage tests were
3 significant and the observed trend appeared amount of
4 time."
5    So the only way to derive that is to go
6 through the animal studies and tabulate the data, as
7 I did in Table 12, and as I did in the table for the
8 mouse, and see if it meets those requirements.  And
9 if it does, then one is required to run the cancer
10 slope analysis, which I did.  I didn't just run those
11 cancer slope analyses, as your expert toxicologist
12 suggested, I cherry picked them.  I did it based on
13 the fact that it meant that and/or requirement as per
14 to the rules and regulations.  And then I ran the
15 analysis.
16    Q   You're not an expert on EPA regulations,
17 are you?
18    MR. TRAVERS:  Objection.  Form.
19    THE WITNESS:  No, but they were written for
20    people like me.  They're written for
21    toxicologists to follow and obey.  I don't have
22    to be an expert on traffic safety to stop for a
23    red light.  The red light turns green, I go.  I
24    don't have to be a safety expert to do that.
25 BY MR. DHINDSA:

Page 242

1 for whatever reason, legal reasons or something, did
2 not provide that data.  So that's my understanding.
3    Q   Eleven other glyphosate manufacturers?
4    A   I think so.
5    Q   So how do you know that?  Did you talk to
6 Dr. Portier?
7    A   No, just previous conversations.
8    Q   Did the attorneys tell you that?
9    MR. TRAVERS:  Objection.  Communications
10    between attorneys and experts are off limits in
11    this litigation.
12 BY MR. DHINDSA:
13    Q   Previous conversations you had with who,
14 other than your attorneys?
15    A   No one.
16    Q   You don't know how Dr. Portier got access
17 to all that data?
18    A   I believe through discovery in this case.
19    Q   To your knowledge, did Dr. Portier rely on
20 that complete data for his report?
21    MR. TRAVERS:  Objection.  Dr. Portier's
22    report speaks for itself.
23    THE WITNESS:  I wouldn't know.  You would
24    have to ask Dr. Portier.
25 BY MR. DHINDSA:

Page 244

1    Q   Let me direct your attention back to page
2 95 of Exhibit 11, EPA's OPP document.  At the bottom
3 of page 95 the EPA is discussing thyroid tumors.  Do
4 you see that?
5    A   Yes.
6    Q   And under this, the EPA's current analysis,
7 there are 16 negative studies regarding thyroid
8 C-cell tumors, eight in males, eight in females,
9 right?
10    A   Yes.
11    Q   You did nothing to rule out that the
12 incidence of thyroid tumors was a false positive
13 given the overwhelming rate of negative studies with
14 regard to these tumor studies?
15    A   Here we go, I did nothing.
16    Q   And then you found the Atkinson Brat study
17 was negative?
18    A   Page 104 of my report.
19    Q   I'll withdraw the question.
20    Now, you state on page 110 of your report
21 that Dr. Portier was able to review the complete
22 animal data on the bioassays, right?
23    A   For I think all but 11.  I think he
24 eventually did get the Monsanto raw data, but I
25 believe there were about 11 other corporations who,

Page 243

1    Q   And you note that Dr. Portier collaborated
2 on the IARC monograph on glyphosate, right?
3    MR. TRAVERS:  Objection to the form.
4    THE WITNESS:  Yes.
5 BY MR. DHINDSA:
6    Q   He didn't tell you how he collaborated
7 because you haven't spoken with him, correct?
8    A   I don't think so.
9    Q   Now, moving on to mouse studies, you agree
10 that -- strike that.
11    All right.  Moving on to mouse studies.
12 You agree there were no significant results in the
13 Knezevich study, right?
14    A   On the report, page 111, I wrote "Incidents
15 of hepatocellular lesions were found to have
16 statistically significant trends for hypertrophy,
17 centrilobular hepatocyte necrosis and chronic
18 interstitial arthritis, males and females."
19    Q   So in the Knezveich study, there were no
20 statistically significant cancer results; is that
21 correct?
22    A   That's correct.
23    Q   Of all of the studies, the Knezveich study
24 was the one conducted in the highest milligrams per
25 kilogram per day dose, right?

Page 245

62 (Pages 242 - 245)

CONFIDENTIAL

1    A    Yes.

2    Q    And in the case of genotoxic carcinogens,

3 one would expect to see the most severe responses in

4 the ones with the highest doses, right?

5    A    What was the first part of the question?

6    Q    In the case of genotoxic carcinogens one

7 would expect to see the most severe responses in the

8 study with the highest doses, right?

9    A    Yes.

10    Q    But in this study with higher doses, no

11 trends were seen, right?

12    A    For hepatocellular centrilobular necrosis,

13 that was true, but that could be simply above the --

14 being above the maximum tolerated dose effect.

15    Q    Well, in the Knezveich study with high

16 doses, there were no trends seen with regard to

17 cancer outcomes, correct?

18    A    That's true.

19    Q    So do you have any concerns the maximum

20 tolerated dose was exceeded in the Knezveich studies?

21    A    I believe it was at 495 milligrams per

22 kilogram per day.  To answer it fully, I need to

23 check my report for the MTD value in mice, if you're

24 interested.

25        Well, I can't find the MTD.  I know I have

Page 246

1 that data in my report.  I know it's getting very

2 close to it, if it hasn't exceeded it.  The MTD was

3 5,000, but their high dose is 4945.  That just seems

4 to me that it was above the MTD.

5    Q    Are results from studies where the maximum

6 tolerated dose was exceeded less reliable.

7    A    Yes, because we're picking up secondary

8 processes from other types of injuries.  As here we

9 see, you know, simply higher cellular turnover due to

10 the damage to the hepatocytes.  And when everyone

11 adduces a higher turnover rate of any type of cell,

12 there's an increased risk of malignancy.

13    Q    Then you also cite a study by Kumar on page

14 116 of your report, right?

15    A    Oh, yeah, the Kumar study.

16    Q    You claim there is a statistically

17 significant relationship in that study as well.  Are

18 you aware that the EPA did not utilize that study in

19 its evaluation because of the potential issues with

20 the health of the animals in that study?

21        MR. TRAVERS:  Objection.  Compound

22    question.

23        THE WITNESS:  Yes, I researched that.  It

24    turned out that that was basically a rumor that

25    started.  There was no objective evidence of it.

Page 247

2    Q    What did you do to research that?

3    A    I think I read something in the glyphosate

4 issue paper, EPA 2016, but I don't recall.  One thing

5 I noted was that -- and I noted in the report was

6 that the claim that the possible viral infection was

7 not consistent with the male mice, only females,

8 revealed a high background rate of lymphoma.  I refer

9 to Table 18 of my report.

10    Q    Have you, like the EPA, reviewed the

11 underlying study documents related to that study?

12        MR. TRAVERS:  Objection.  Lacks foundation.

13        THE WITNESS:  Have I reviewed the original

14    Stout study?

15 BY MR. DHINDSA:

16    Q    We're talking about the Kumar study.

17    A    I thought you said Stout.  I guess I'm

18 hearing things.

19    Q    Let me repeat my question.  Have you, like

20 the EPA, reviewed the underlying study documents

21 relating to the Kumar study?

22    A    No, they're not published.  As per footnote

23 223 in my report, not published, but reported in the

24 US EPA 2016 and in Greim.

25    Q    So no one showed you the Klaus-Weber

Page 248

1 Analysis that found major health problems in these

2 mice in the Kumar study, correct?

3        MR. TRAVERS:  Objection.  Lacks foundation.

4        THE WITNESS:  I'm not familiar with any

5    such document.

6 BY MR. DHINDSA:

7    Q    Now, can you name another recognized

8 carcinogen that has been found to

9 cause hemangiosarcomas in a single study, but is

10 negative in five other studies where scientists have

11 recognized it as a carcinogen?

12        MR. TRAVERS:  Objection.  Compound

13    question.

14        THE WITNESS:  I don't recall.

15 BY MR. DHINDSA:

16    Q    Can you name another recognized carcinogen

17 that's been associated with hemangiomas in a single

18 study but is negative in five other studies where

19 scientists have recognized it as a carcinogen?

20        MR. TRAVERS:  Objection.  Compound

21    question.

22        THE WITNESS:  Same answer.  I don't recall.

23    You have to really go through all my files and

24    studies.

25 BY MR. DHINDSA:

Page 249

63 (Pages 246 - 249)

CONFIDENTIAL

1    Q   Can you name another recognized carcinogen
2  that has been found to be associated with lymphoma in
3  two studies, but is negative in four other studies
4  where scientists have recognized it as a carcinogen?
5      MR. TRAVERS:  Objection.  Compound
6  question.
7      THE WITNESS:  It's certainly reasonable if
8  the trend test is monotonic and the
9  Cochran-Armitage tests were significant, or if
10  one of the pairwise comparisons was significant
11  that meets the requirements, certainly.
12 BY MR. DHINDSA:
13    Q   Can you name another recognized carcinogen
14  where that's true?
15    A   Again, I'd have to go through my files and
16  hundreds of studies and look at that.  I don't
17  remember all these animal studies.
18    Q   You can't name one sitting here today,
19  correct?
20      MR. TRAVERS:  Objection.  Asked and
21  answered.
22      THE WITNESS:  Same answer.
23 BY MR. DHINDSA:
24    Q   You'd have to review your file to be able
25  to answer that question?

Page 250

1    Q   Okay.
2    A   Big difference.
3    Q   It's a bottom end, right?
4    A   Yes.  That's a misnomer.  That's not the
5  tail.  The tail would refer to the last five.
6    Q   Isn't that what you just described?
7    A   No, 95 percent lower confidence limit of
8  the dose.  In other words, the point of departure is
9  the 95 percent lower confidence limit of the dose.
10  So if you take the average on each side of that mean
11  on a Bell curve you have a confidence limit that
12  defines the average.  Now, at the end you have the
13  last five percent.  That's the 95th percentile.
14  There's a big difference in range.
15    Q   So basically the BMDL said that if what was
16  seen was a true incidence data, there's only a 5
17  percent chance or so that the true cancer slope
18  factor follows a slope that has a 10 percent rate of
19  cancer at that dose, right?
20      MR. TRAVERS:  Objection.  Compound
21  question.
22      THE WITNESS:  You must be a genius.  It's
23  over my head.  I don't understand what you
24  asked.
25 BY MR. DHINDSA:

Page 252

1    A   I would have to review literally a room
2  full of files.
3    Q   You haven't undertaken that analysis, have
4  you?
5    A   No, I haven't bothered to do that, as you
6  would say.
7    Q   You would agree with me that these rodent
8  studies with these statistically significant results
9  with pancreatic tumors is one study, hemangiomas in
10  another, liver tumors in a third, they're totally
11  consistent with statistical noise, right?
12      MR. TRAVERS:  Objection.  Compound
13  question.
14      THE WITNESS:  I have no idea what you just
15  asked me.
16 BY MR. DHINDSA:
17    Q   Now, your cancer slope factor is based on a
18  calculation of the BMDL, right?
19    A   It is.
20    Q   The BMDL, that's the lower end of the 95th
21  percentile of possible slopes based on that data,
22  right?
23    A   That would be accurate.  I believe you're
24  wrong.  I think it's the 95 percent confidence
25  factor, not the 95th percentile.

Page 251

1    Q   Well, explain to me what the BMDL is.
2    A   It's basically taking the dose and
3  calculating based on the statistical variability of
4  that dose the upper and lower 95 percent confidence
5  limit, which we've referred to as the benchmark dose.
6    Q   Right.
7    A   And then for the modeling, the BMD modeling
8  we use the BMDHE and the BMDLE values which use a
9  three quarter scaling by applying a mid point, and
10  this is done by the software program, the US EPA
11  software which is used to calculate the cancer slope.
12    Q   Okay.  Now, based on your BMDL found at
13  page 82, if you can take a look at that.
14    A   Okay.
15    Q   Are you there, sir?
16    A   Yes.
17    Q   All right.  Based on your BMDL found at
18  page A-2 of your report, you would agree, if you
19  completed the linear extrapolation cancer flow that
20  you calculate there through the high-dose group, you
21  would expect to see about 10 tumors in the high-dose
22  group?
23    A   Roughly.
24    Q   But instead there were only five, correct?
25    A   Yes.

Page 253

64 (Pages 250 - 253)

CONFIDENTIAL

1   Q   You used BMDL to calculate the cancer slope
2   factor, right?
3   A   Yeah.  That is the methodology and the
4   rule, not a personal decision.
5   Q   Then turning to page A-5, you would agree,
6   if you completed the linear calculation cancer slope
7   that you calculated there through the high-dose
8   group, you would expect to see about 15 tumors in the
9   high-dose group, right?
10   A   Approximately.
11   Q   But there were actually only six, correct?
12   A   Yes.
13   Q   Turning to page A-8 of your expert report.
14      MS. FORGIE:  Page?
15      MR. DHINDSA:  Page A-8.
16      MS. FORGIE:  Thank you.
17      MR. DHINDSA:  Sure.
18   BY MR. DHINDSA:
19   Q   On page A-8, you would agree if you
20   completed the linear calculation cancer slope that
21   you calculated there through the high-dose group, you
22   would expect to see about 20 tumors in the high-dose
23   group, right?
24   A   Yes, that's about right.
25   Q   But instead we actually saw only five,

Page 254

1   right?
2   A   Yes.
3   Q   Turning to page A-11 of your expert report.
4   You would agree if you completed the linear
5   extrapolation cancer slope that you calculated there
6   through the high-dose group, you would expect to see
7   about 13 tumors in the high-dose group, right?
8   A   Yes.
9   Q   But instead we actually saw only eight,
10   correct?
11   A   Yes.
12   Q   Turning to page A-14 of your expert report,
13   you would agree that if you completed the linear
14   extrapolation cancer slope that you calculated there
15   through the high-dose group, you would expect to see
16   about nine tumors in the high-dose group, right?
17   A   Approximately, yes.
18   Q   But instead we actually saw only five,
19   correct?
20   A   Yes.
21   Q   Turning to page A-17 of your expert report.
22   You would agree that if you completed the linear
23   extrapolation cancer slope that you calculated there
24   through the high-dose group, you would expect to see
25   about 13 tumors in the high-dose group; is that

Page 255

1   right?
2   A   Or more.
3   Q   Or more.  But instead we saw only seven,
4   correct?
5   A   Yes.
6   Q   Turning to page A-20 of your expert report.
7   You would agree that if you completed the linear
8   extrapolation cancer slope that you've calculated
9   there through the high-dose group, you would expect
10   to see about 11 tumors in the high-dose group, right?
11   A   Yes.
12   Q   But instead you actually saw only six,
13   correct?
14   A   Yes.
15   Q   You agree that, for all seven of your
16   linear extrapolation cancer slopes, the trend line
17   that you were using overestimates by a magnitude of
18   two or so your recorded data in the high-dose groups,
19   right?
20      MR. TRAVERS:  Objection.  Form.
21      THE WITNESS:  It does, but that's the
22   nature of the required mathematical calculation.
23   There's nothing erroneous about it.  It's simply
24   designed to be protective of human health.  It
25   has some protection mechanisms built into it by

Page 256

1   EPA.  So -- I talked about this this morning.
2   For regulatory risk assessment, we don't use
3   this particular slope to calculate a dose and
4   risk level for a single individual.  It is
5   designed for a population and it's generally
6   accepted and this is -- it is what it is, okay.
7   It's nothing I can modify or you can modify.  It
8   is the design of the risk assessment process.
9   BY MR. DHINDSA:
10   Q   And is it fair to say that overestimation
11   does not provide the best fit for the data whether or
12   not it conforms with the regulatory ideals?
13      MR. TRAVERS:  Objection to form.
14      THE WITNESS:  No.  It does provide an
15   overall best fit.
16   BY MR. DHINDSA:
17   Q   Do you agree that a basic principle of
18   toxicology is, sola dosis facit venenum?
19   A   Yeah, the dose makes a difference,
20   absolutely.
21   Q   The dose makes the poison, is that a fair
22   translation?
23   A   Yes, it is.
24   Q   And any substance, including such common
25   substances as table salt, can be potentially lethal

Page 257

65 (Pages 254 - 257)

1 when ingested in a high dose?
2    A   Yes.  When I was in my training at Indiana
3 University State Toxicology Department we actually
4 had a homicide.  A dad was punishing his child for
5 not finishing his dinner, poured salt from the shaker
6 and made him eat it.  He convulsed for about 45
7 minutes and then died.
8    Q   Even water will kill if enough is ingested
9 causing a condition called hyponatremia?
10    A   Hyponatremia.  It is possible.  It's very
11 rare, but it could happen.  I'm not aware of any
12 cases of it.
13    Q   And it's well understood in toxicology that
14 salt can be toxic at a high dose, right?
15    A   I just explained that with a homicide case,
16 yeah.
17    Q   You have not compared the LD50 for table
18 salt and glyphosate, correct?
19    A   No.  LD50 has nothing to do with
20 carcinogenic risk assessment, unless -- the LD50 is
21 useful if one were to drink the glyphosate
22 concentrate.  I think that would be a useful piece of
23 data.  But I think you told me this morning that
24 we're not here to assess drinking the material.
25    Q   So the LD50 for glyphosate is irrelevant to
Page 258

1 your opinions in this case, right?
2    A   Not totally irrelevant.  It does give us a
3 gross estimate of where one would want to start with
4 dosing.  In other words, if glyphosate was handed to
5 me in a coded vial and said this is a new product
6 that your guys, Monsanto, developed, and it was given
7 to me as a toxicologist and all I had was an LD50
8 value, then I could at least gauge where to set up my
9 animal study.  So I wouldn't want to kill 250 rats in
10 one shot.  I'd want to be able to gauge it so that my
11 high dose was still within a safe range and it would
12 be non-lethal.
13    Q   But it wasn't -- there was not any reason
14 for you to do any comparison of the LD50 for table
15 salt/glyphosate in this case, right?
16    A   No, it's already been established what the
17 MTD is.
18    Q   You agree that if the LD50 for glyphosate
19 was higher than that for table salt, it would not be
20 untruthful to say that glyphosate is less toxic that
21 table salt for that end point, right?
22    A   Well, I would warn anyone that that's an
23 extremely misleading statement because that's
24 regarding acute ingestion of the material, not
25 chronic low-level exposure.  Two different worlds
Page 259

1 here.
2    Q   Well, that would be relevant to acute
3 ingestion, which is part of the safety information
4 for glyphosate, right?
5    A   Correct.  But, again, I'm speaking in terms
6 of the current matter.
7    MR. DHINDSA:  Let me mark your billing
8 records that have been produced by Mr. Travers
9 as Exhibit 20.
10    MR. TRAVERS:  I'll designate this as
11 confidential until we can get the redactions
12 done on the banking information.
13    THE WITNESS:  Absolutely.
14 (Thereupon, Exhibit 20 was marked for identification.)
15 BY MR. DHINDSA:
16    Q   Dr. Sawyer, it appears from review of your
17 invoices you've produced today that comprise Exhibit
18 20 that you've invoiced $143,728.  Does that sound
19 about right?
20    A   No, that's incorrect, not on the Johnson
21 case.
22    Q   Do the invoices in front of you reflect
23 work done on cases other than the Johnson case?
24    A   Yes.
25    Q   All right.  Do the invoices in front of you
Page 260

1 there in Exhibit 20 reflect invoices you have been
2 paid for in relationship to your work on the
3 glyphosate litigation?
4    A   What glyphosate litigation specifically?
5    Q   Are you working on other glyphosate
6 litigation other than any litigation involving the
7 Roundup and alleged non-Hodgkin's lymphoma?
8    MR. TRAVERS:  I'm going to object to
9 anything other than this specific case.
10    THE WITNESS:  I served as a consulting
11 expert, which I don't know how that works
12 legally, but I don't believe that these first
13 three invoices are -- should even be here today.
14 That was work I did as a confidential private
15 consultant.
16 BY MR. DHINDSA:
17    Q   With regard to this litigation, with
18 glyphosate.
19    A   I'm not even going to say that.  That's up
20 to the lawyers.
21    Q   Looking beyond the first three pages, the
22 remaining invoices relate to work that you've done
23 with regard to plaintiffs in glyphosate litigation?
24    A   Yes.
25    Q   So in the work you've done on the
Page 261

66 (Pages 258 - 261)

CONFIDENTIAL

1 glyphosate litigation, is it fair to say you've
2 billed over $100,000?
3    A   No.  The only thing I'm permitted to talk
4 about right now are the invoices on this case.
5       MR. TRAVERS:  Actually, can I clarify this?
6 I think they're entitled to anything general,
7 for general causation as part of the report.  If
8 it's specific to another case, another
9 individual, I'd instruct you not to talk about
10 it.  But for general, just for general causation
11 and for general work, you can talk about it.
12       MR. DHINDSA:  In regards to Mr. Johnson's
13 case.
14       MR. TRAVERS:  Yeah.
15       THE WITNESS:  All right.  So my
16 understanding is then your question is are all
17 five invoices plus the deposition fee, did all
18 of that work add up to over $100,000; is that
19 the question?
20 BY MR. DHINDSA:
21    Q   Correct.
22    A   Yes.
23       MR. DHINDSA:  I want to mark this box of
24 documents that Dr. Sawyer has brought with him
25 today, including his Tyvek material, as Exhibit

Page 262

---

1    CERTIFICATE OF REPORTER
2 STATE OF FLORIDA
3 COUNTY OF LEE
4    I, TRACIE THOMPSON, Registered Merit Reporter,
5    do hereby certify that I was authorized to and
6    did stenographically report the foregoing
7    videotape deposition of WILLIAM SAWYER, PH.D.;
8    pages 1 through 265; that a review of the
9    transcript was requested; and that the
10    transcript is a true record of my stenographic
11    notes.
12    I FURTHER CERTIFY that I am not a relative,
13    employee, attorney, or counsel of any of the
14    parties, nor am I a relative or employee of any
15    of the parties' attorneys or counsel connected
16    with the action, nor am I financially
17    interested in the action.
18    Dated this 27th day of February, 2018.
19
20
21
   Tracie Thompson
22 Notary Public
   State of Florida
23 My Commission No. GG 175178
24 Expires:  March 1, 2022
25

Page 264

---

1    Number 21.
2 (Thereupon, Exhibit 21 was marked for identification.)
3       MR. DHINDSA:  And we have an agreement with
4    counsel and Mr. Sawyer as to how to handle
5    Exhibit 21.  We'll reserve the rest of our time.
6    No further questions for today.
7       VIDEOGRAPHER:  The time is now 5:04 p.m.
8    We are going off the record.
9 (Thereupon, the proceedings concluded for the day at 5:04
10 p.m., and will continue in Volume 2.)
11
12    I, WILLIAM SAWYER, PH.D., do hereby declare under
13 penalty of perjury under the laws that the forgoing
14 transcript is true and correct.
15    EXECUTED this ____ day of_____ 2017,
16 at_____,_____.
17    (City)          (State)
18
19    _____
20    WILLIAM SAWYER, PH.D.
21
22
23
24
25

Page 263

---

67 (Pages 262 - 264)

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.