# EXHIBIT 20

William R. Sawyer, Ph.D.

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS | § MDL No. 2741 |
| LIABILITY LITIGATION | § Case No. 3:16-md-02741-VC |
| _____ | § |
| | § |
| This document relates to: | § |
| | § |
| Mendoza v. Monsanto Company | § |
| Case No. 3:16-cv-06046-VC | § |
| _____ | § |

- - -

Friday, November 15, 2019

- - -

Videotaped deposition of WILLIAM R. SAWYER, Ph.D., held at South Seas Resort, 5400 Plantation Road, Captiva, Florida 33924, commencing at 1:39 p.m., on the above date, before Susan D. Wasilewski, Registered Professional Reporter, Certified Realtime Reporter, Certified Realtime Captioner, Florida Professional Reporter

- - -

GOLKOW LITIGATION SERVICES

877.370.3377 ph | 917.591.5672 fax

deps@golkow.com

William R. Sawyer, Ph.D.

### Page 2

```
 1    APPEARANCES:
 2    WEITZ & LUXENBERG
      BY: JERRY KRISTAL, ESQUIRE
 3        jkristal@weitzlux.com
      220 Lake Drive East, Suite 210
 4    Cherry Hill, New Jersey 08002
      Phone: (856) 755-1115
 5    Representing Plaintiffs
 6
 7
 8    WILKINSON WALSH & ESKOVITZ
      BY: CALI COPE-KASTEN, ESQUIRE
 9        ccope-kasten@wilkinsonwalsh.com
      2001 M Street, NW, 10th Floor
10    Washington, D.C. 20036
      Phone: (856) 755-1115
11    Representing Defendant Monsanto Company
12
13
14    ALSO PRESENT:
15    MATTHEW ALLISON, Videographer
16
17
18
19
20
21
22
23
24
25
```

### Page 3

```
 1              ---
 2             INDEX
 3              ---
 4  Testimony of: WILLIAM R. SAWYER, Ph.D.       Page
 5    DIRECT EXAMINATION BY MS. COPE-KASTEN......  5
 6    CROSS-EXAMINATION BY MR. KRISTAL............ 31
 7
 8
 9           EXHIBITS
10       (Attached to transcript)
11  WILLIAM R. SAWYER, Ph.D. DEPOSITION EXHIBITS   PAGE
12  Exhibit 1  Monsanto Company's Amended Notice to    5
             Take Oral and Videotaped Deposition of
13           Dr. William Sawyer
14  Exhibit 2  October 9, 2019 Report from Toxicology   8
             Consultants & Assessment Specialists,
15           LLC
16  Exhibit 3  Appendix F - Mrs. Yolanda Mendoza's     12
             Interview
17           Appendix G - Exposure Summary
             Information and Calculations based on
18           Information from Mrs. Yolanda
             Mendoza's Interview
19
20
21
22
23
24
25
```

### Page 4

```
 1              ---
 2       THE VIDEOGRAPHER: Good afternoon. We are
 3  now on the record. My name is Matthew Allison.
 4  I am a videographer for Golkow Litigation
 5  Services. Today's date is November 15th, 2019,
 6  and the time is 1:39 p.m.
 7       This video deposition is being held in
 8  Captiva, Florida, in the matter of Yolanda
 9  Mendoza vs. Monsanto Company, for the United
10  States District Court, Northern District of
11  California.
12       Will all counsel please state their
13  appearance for the record.
14       MR. KRISTAL: Jerry Kristal, Weitz &
15  Luxenberg, for Yolanda Mendoza.
16       MS. COPE-KASTEN: Cali Cope-Kasten from
17  Wilkinson Walsh & Eskovitz on behalf of Monsanto.
18       THE VIDEOGRAPHER: The court reporter is
19  Susan Wasilewski and will now swear in the
20  witness.
21       THE COURT REPORTER: Would you raise your
22  right hand?
23       Do you solemnly swear or affirm the
24  testimony you're about to give will be the truth,
25  the whole truth, and nothing but the truth?
```

### Page 5

```
 1       THE WITNESS: Yes, I do.
 2       THE COURT REPORTER: Thank you.
 3       MR. KRISTAL: I've got 1:40. Is that
 4  correct?
 5       THE VIDEOGRAPHER: (Nodding head.)
 6       MR. KRISTAL: Okay.
 7       WILLIAM R. SAWYER, Ph.D., called as a
 8  witness by Defendant Monsanto Company, having been
 9  duly sworn, testified as follows:
10          DIRECT EXAMINATION
11  BY MS. COPE-KASTEN:
12    Q.  Good afternoon, Dr. Sawyer. I am handing
13  you what has been marked as Exhibit 1 to your
14  deposition.
15    A.  Okay.
16   (Sawyer Exhibit 1 was marked for identification.)
17  BY MS. COPE-KASTEN:
18    Q.  This is the notice of deposition in
19  Ms. Mendoza's case. Are you familiar with this
20  document?
21    A.  I am.
22    Q.  Have you had a chance to review it?
23    A.  Yes.
24    Q.  Did you bring materials today in response to
25  this notice of deposition?
```

William R. Sawyer, Ph.D.

Page 6

1  A. I did.
2  Q. Are those materials the materials that we
3  reviewed earlier this morning?
4  A. Yes.
5  Q. Did you bring anything in addition to those
6  materials for Ms. Mendoza's case?
7  A. No.
8  Q. In preparing your report or in preparing for
9  today's testimony, did you have any conversations
10 with Ms. Mendoza's counsel about Ms. Mendoza's case?
11 A. No.
12 Q. Have you had any conversations with any of
13 Ms. Mendoza's other experts about her case?
14 A. No.
15 Q. Is there a reason that you were hesitating
16 before answering that question?
17 A. Yes. Because I interviewed Frank Tanner.
18 That's what I was looking at here, and I know Tanner
19 is the next case. I wanted to make sure that I was
20 correct with which individual I interviewed.
21     THE VIDEOGRAPHER: You don't have to -- it
22 was just too close to the --
23 Q. You did not interview Ms. Mendoza?
24 A. No.
25 Q. Have you ever met Ms. Mendoza?

Page 7

1  A. No.
2     MR. KRISTAL: Have you ever heard of the
3  Mendoza line? It's a baseball term. Sorry.
4  Q. Have you ever spoken to any of Ms. Mendoza's
5  treating physicians?
6  A. No.
7  Q. Have you read Ms. Mendoza's deposition?
8  A. I did.
9  Q. Did you read any other depositions in
10 connection with Ms. Mendoza's case?
11 A. Yes.
12 Q. Which depositions did you read?
13 A. Lloyd Damon's.
14 Q. Why did you read Mr. Damon's deposition in
15 this case?
16 A. Actually, I only skimmed it with respect to
17 the diagnosis and the Burkitt's lymphoma.
18 Q. Did you take any notes in connection with
19 either Ms. Mendoza's or Dr. Damon's depositions?
20 A. Did I take any what?
21 Q. Notes in connection with those depositions,
22 your review of them.
23 A. Yeah. I believe I have them referenced by
24 footnote in my report.
25 Q. Other than what is contained in your report,

Page 8

1  did you take any separate handwritten notes or typed
2  notes about those depositions?
3  A. No.
4  (Sawyer Exhibit 2 was marked for identification.)
5  BY MS. COPE-KASTEN:
6  Q. I'm going to hand you a copy of your report.
7  I've marked this as Exhibit 2 to your deposition in
8  Ms. Mendoza's case. This is the report that you
9  were just referring to?
10 A. Yes.
11 Q. You prepared this report for Ms. Mendoza's
12 case?
13 A. Yes.
14 Q. It's dated October 9th, 2019?
15 A. Yes.
16 Q. This report contains your general causation
17 opinions that you intend to offer at trial for
18 Ms. Mendoza?
19 A. Yes.
20 Q. It also contains all case-specific opinions
21 as to Ms. Mendoza's case?
22 A. Yes.
23 Q. Did you have all of the information that you
24 needed in order to come to your conclusions for
25 Ms. Mendoza's case?

Page 9

1  A. Yes.
2  Q. Aside from reviewing the deposition of one
3  of Ms. Mendoza's treating physicians, did you review
4  any medical records in connection with Ms. Mendoza's
5  case?
6  A. Yes.
7  Q. What records did you review?
8  A. Just various sets of records from UCSF
9  Medical Center that are specific to her diagnosis
10 and pathology report, as well as any information on
11 her -- any potential cigarette or tobacco use and
12 alcohol and drug use.
13 Q. When was Ms. Mendoza diagnosed with
14 non-Hodgkin's lymphoma?
15 A. October 30th, 2013, approximately,
16 November 1st. Let's see. The pathology was
17 actually reported on November 7th, was the final
18 cytology diagnosis of Burkitt's lymphoma.
19 Q. Is Burkitt's lymphoma a common type of
20 non-Hodgkin's lymphoma?
21 A. Not really.
22 Q. Are you aware of any studies that report
23 statistically significant associations between
24 Burkitt's lymphoma specifically and glyphosate or
25 Roundup?

3 (Pages 6 to 9)

William R. Sawyer, Ph.D.

Page 10

1  A. No. That would be buried into the general
2  lymphoma studies because it's not a -- it occurs in
3  such low frequency, there wouldn't be any power to
4  specifically test for it, that is type 2 error in
5  the epidemiologic studies would be very high due to
6  its low occurrence rate. So I don't -- I would have
7  to defer that line of questioning to the
8  epidemiologist in this matter, but, you know, in
9  answer to your question, no, I'm not aware of any --
10  any significant findings specific to it, but I
11  wouldn't expect that based on its low occurrence
12  rate.
13  Q. Do you have any familiarity with Burkitt's
14  lymphoma outside of Ms. Mendoza's case?
15  A. Yeah. Based on training and experience, I'm
16  aware of at least a study in Africa in which
17  Burkitt's lymphoma was related to a variant of
18  Epstein-Barr virus in Africa, but I don't believe
19  that relationship has been demonstrated in the US,
20  but then again, I'm not completely up-to-date on it
21  and I would defer that anyway to the medical
22  epidemiologist because it's purely a medical issue,
23  not a toxicological issue.
24  Q. Is that study from Africa something that is
25  listed in your materials considered list?

Page 11

1  A. No, no. It's something I haven't reviewed
2  in probably 20 years, but I did review a study on
3  that when I was assessing another NHL matter many
4  years ago, an NHL case out of Wisconsin, actually.
5  Q. It's a great state.
6  A. What's that?
7  Q. I said it's a great state.
8  A. It is. I love Wisconsin.
9  Q. It's where I'm from.
10  A. Oh.
11  Q. Aside --
12  MR. KRISTAL: Another Cheesehead.
13  MS. COPE-KASTEN: Yes.
14  Q. Aside from reviewing medical records,
15  Ms. Mendoza's deposition, and the deposition of her
16  treating physician, did you do any other
17  investigation or research into Burkitt's lymphoma in
18  connection with Ms. Mendoza's case?
19  A. No, I could not, and again, I wouldn't
20  really go in that direction in terms of ID,
21  infectious disease relationships, because it's
22  really a matter for the medical epidemiologist.
23  It's just something I'm aware of from research,
24  training and research in the past.
25  Q. You have reviewed Mr. Petty's report for

Page 12

1  Ms. Mendoza; is that right?
2  A. Yes, I have.
3  Q. And you're relying on Mr. Petty's report to
4  form your conclusions in this case?
5  A. With respect to the interview and the
6  calculation of exposure hours, which I converted to
7  exposure days, yes.
8  (Sawyer Exhibit 3 was marked for identification.)
9  BY MS. COPE-KASTEN:
10  Q. I'm marking as Exhibit 3 to your deposition
11  Appendicis F and G from Mr. Petty's report for
12  Ms. Mendoza.
13  You adopted the Roundup lifetime exposure
14  calculation that Mr. Petty performed in these
15  appendicis in order to reach your number of exposure
16  days, right?
17  A. Yes.
18  Q. Mr. Petty found a minimum of 57.1 exposure
19  days, a maximum of 59.8 exposure days, and a mean of
20  58.4 exposure days for Ms. Mendoza?
21  A. Yes.
22  Q. Do you believe that Ms. Mendoza had the same
23  risk of developing non-Hodgkin's lymphoma as an
24  agricultural worker with 800 exposure days to
25  Roundup?

Page 13

1  A. I don't understand the question.
2  Q. You concluded that Ms. Mendoza was at an
3  increased risk of developing non-Hodgkin's lymphoma
4  as a result of her exposure to Roundup?
5  A. Yes.
6  Q. Did the risk that she had for non-Hodgkin's
7  lymphoma from her Roundup use put her at a similar
8  level of risk of developing non-Hodgkin's lymphoma
9  to an agricultural worker who had sprayed 800 days
10  of Roundup?
11  MR. KRISTAL: Objection to form.
12  A. I still don't understand.
13  Q. You would agree with me that 58.4 is less
14  than 800, correct?
15  A. Yes.
16  Q. Is the risk of developing non-Hodgkin's
17  lymphoma similar at 58 days of exposure as it is at
18  800 days of exposure?
19  A. Well, based on the studies, the six that I
20  referenced, exceeding the exposure -- highest
21  exposure metric in any of the studies, which is
22  greater than a 10-day threshold, she exceeds that
23  threshold and, thus, she, according to that study,
24  for example, of McDuffie and Eriksson, she would be
25  at a risk -- her risk would be more than doubled.

William R. Sawyer, Ph.D.

Page 14

1   And that would also hold true for the -- I
2  think you said 800-hour sprayer.  That would -- they
3  would both have at least an odds ratio risk of I
4  think about 2.3 times that of background in the
5  control group.  I hope that answers your question.
6      Q.  Do you believe that Ms. Mendoza had the same
7  risk of developing non-Hodgkin's lymphoma from using
8  ready-to-use Roundup as she did from using
9  concentrated Roundup?
10     A.  I think you asked me specifically risk
11 level, risk?
12     Q.  Uh-huh.
13     A.  Well, she -- either way she would have an
14 elevated risk with -- based on her exposure days.
15 People in the studies, they use prepackaged, they
16 used the Plus, they used the concentrate.  It's a
17 cross-section of the entire universe of Roundup use
18 and glyphosate use.  It's not just restricted to one
19 product.
20     Q.  Would she have a different level of
21 potential absorbed dose with Roundup ready-to-use
22 versus concentrated product?
23         MR. KRISTAL:  Objection.
24     A.  That depends whether the concentrated
25 product was mixed with gloves on or off.  That makes

Page 15

1  all the difference in the world in terms of the
2  systemic dose between the two examples you've
3  provided.
4      Q.  Did Ms. Mendoza mix Roundup concentrated
5  product wearing gloves?
6      A.  She did not wear gloves when mixing or
7  spraying.
8      Q.  Understanding that she did not wear gloves
9  when mixing or spraying, did she face the same
10 absorbed dose potential from ready-to-use Roundup as
11 from her use of concentrated Roundup?
12         MR. KRISTAL:  Objection.
13     A.  No.  The concentrated Roundup during mixing
14 would have increased her dose above that of Roundup,
15 and I reference the POEM methodology with respect to
16 the differential between mixing and spraying when
17 gloves aren't worn.
18     Q.  You didn't run a POEM calculation for
19 Ms. Mendoza, did you?
20     A.  No.
21     Q.  Understanding that Ms. Mendoza had a
22 different potential absorbed dose level from
23 ready-to-use Roundup as from concentrated Roundup as
24 she used it with no gloves, did the risk of
25 developing non-Hodgkin's lymphoma increase when

Page 16

1  Ms. Mendoza used concentrated product as opposed to
2  just ready-to-use Roundup?
3          MR. KRISTAL:  Objection.
4      A.  I don't understand the question.
5      Q.  What about the question is confusing to you?
6      A.  The entire question.
7      Q.  We can agree that there is a difference
8  between ready-to-use Roundup and concentrated
9  Roundup use without gloves on in Mendoza --
10 Ms. Mendoza's case, correct?
11     A.  Yes.
12     Q.  You have told me that Ms. Mendoza's
13 potential dermal exposure and absorption of Roundup
14 was higher when she used concentrated Roundup as
15 opposed to ready-to-use Roundup, correct?
16     A.  Yes.
17     Q.  Was her risk of developing non-Hodgkin's
18 lymphoma higher as a result of that increased
19 potential dermal absorption when she used
20 concentrated product than when she used Roundup
21 ready-to-use?
22         MR. KRISTAL:  Objection.
23     A.  Well, I can't answer that.  The risk would
24 be based on her cumulative time-weighted exposure
25 days, and if she only used it once, for example,

Page 17

1  without gloves, that is the prepackaged spray, and
2  she used the concentrate and mixed it and sprayed it
3  once, neither would be sufficient to enhance her
4  risk.  So the studies don't evaluate it in the terms
5  that you're requesting.
6      Q.  You're aware that Ms. Mendoza did not spray
7  either ready-to-use Roundup or a concentrated
8  formulation only one time?
9      A.  Correct, but that's not what the question
10 was.
11     Q.  This is a new question.  You understand that
12 Ms. Mendoza sprayed ready-to-use Roundup for
13 approximately four months?
14     A.  Yes.
15     Q.  Is it your understandings that she sprayed
16 Roundup approximately once per week for
17 approximately one hour during that time?  I'm
18 looking at page 6 of your report, the bottom
19 paragraph.
20     A.  Yes.
21     Q.  Is it also your understanding that when
22 Ms. Mendoza switched to the concentrated product,
23 she continued to spray for approximately one hour
24 approximately once per week?
25     A.  Yes.

5 (Pages 14 to 17)

William R. Sawyer, Ph.D.

Page 18

1    Q. Based on your exposure for -- calculation
2  for Ms. Mendoza, what quartile of the Agricultural
3  Health Study would Ms. Mendoza be in?
4    A. Third quartile and the second tertile.
5    Q. Did the Agricultural Health Study find a
6  statistically significantly increased risk for
7  developing non-Hodgkin's lymphoma with Roundup or
8  glyphosate use for individuals in the third
9  quartile?
10   A. No.
11   Q. If you turn to page 7 of your report, the
12 bottom paragraph states that Ms. Mendoza has never
13 used a couple of different herbicides, that she may
14 have sprayed bug spray once or twice in her
15 lifetime, and that she has never applied
16 rodenticides or insecticides. Do you see that?
17   A. Yes.
18   Q. Did you attempt to determine whether
19 Ms. Mendoza had ever used any other herbicides other
20 than those that are listed here?
21   A. No. I just relied on her deposition
22 testimony.
23   Q. You would certainly agree with me that
24 herbicides, rodenticides, and insecticides are not
25 the only chemical products that can have a potential

Page 19

1  human cancer risk?
2    A. Yes.
3    Q. Did you attempt to conduct a chemical
4  inventory for any of the products or other chemicals
5  that Ms. Mendoza used or was exposed to during her
6  lifetime?
7    A. No. The questions were already asked in
8  deposition.
9    Q. Did you perform a site inspection of
10 Ms. Mendoza's home and property?
11   A. No.
12   Q. When you say that the questions were already
13 asked in deposition for Ms. Mendoza, what are you
14 referring to?
15   A. She stated on line 23 and 24, the only --
16 the only chemicals -- well, starting on 24: The
17 only chemicals I used are, like, Clorox to mop,
18 different chemicals that -- to keep the house clean,
19 like Magic Eraser. I use that on my bathtubs. I
20 don't maintain the pool, so I don't use any
21 chemicals for the pool.
22      She never changed her own oil or antifreeze
23 in the car. She painted.
24   Q. Do you know what kind of paint she used?
25   A. No, but it's irrelevant. There aren't any

Page 20

1  paints that cause NHL.
2    Q. Are there any paints that are possible or
3  probable human carcinogens?
4    A. Not -- not through volatile emissions.
5  There is some paints that have quarts silica that if
6  you were to sand the paint and inhale it, it could
7  cause silicosis or possibly lung cancer, but the
8  benzene containing paints have been gone for many
9  decades.
10   Q. Are there any chemicals for cleaning up
11 paint, like paint thinners, that are potential human
12 carcinogens or actual human carcinogens?
13   A. Not since the benzene reformulation acts
14 went in place, and the only thing you will find in
15 paint that comes close would be that of naphthalene
16 and Stoddard solvent or light naphtha, which
17 contains naphthaline, but naphthalene is not a human
18 carcinogen and it does not cause NHL and has never
19 been shown to cause NHL in any human studies.
20   Q. Are these the only questions that you are
21 referring to on pages 157 and 158 of Ms. Mendoza's
22 deposition transcript with respect to what has
23 already been asked of her regarding chemical use?
24   A. Yes.
25   Q. You would agree that if she simply forgot

Page 21

1  about a chemical that she used or a category of
2  chemicals that she used, that would not be reflected
3  in this deposition transcript here?
4      MR. KRISTAL: Objection.
5    A. Certainly that's possible. Are you asking
6  me if I am speculating that maybe she used something
7  and forgot? I don't understand the question
8  totally.
9    Q. I'm asking if this series of questions
10 provides you with a definite answer as to what
11 chemicals she used, or whether it's possible that
12 that list is incomplete?
13   A. Well, there is always possibilities, but I
14 think she reasonably answered the questions and
15 provided the information I needed.
16   Q. Are long sleeves and long pants considered
17 to be personal protective equipment when spraying
18 pesticides?
19   A. Under the World Health Organization 1982
20 standard PPE for spraying pesticides, yes, along
21 with neoprene gloves, head covering, face mask,
22 sealed boots. That would be the standard attire for
23 spraying pesticides since 1982, and that's not
24 what's on the label, is it?
25     MS. COPE-KASTEN: Move to strike the last

William R. Sawyer, Ph.D.

Page 22

1  portion of the doctor's answer.
2  Q. Long pants and long sleeves decrease the
3  amount of Roundup that a person would potentially
4  get on their skin, correct?
5     MR. KRISTAL: Objection; incomplete
6  hypothetical.
7  A. I don't follow.
8  Q. If I'm wearing long sleeves and long pants,
9  am I going to be less likely to get Roundup on my
10 skin than if I am wearing shorts and short sleeves?
11 A. Yes. The additional clothing on the portion
12 of the legs and arms will reduce the skin contact on
13 the average from 100 percent to 20 percent based
14 upon the clothing transfer studies I relied on,
15 which include studies I've recited in past
16 depositions that are on my reliance list. If you
17 wish, I could try to go through them with you.
18 There is several.
19 Q. At the top of page 7 of your report you talk
20 about the clothing that Ms. Mendoza wore when she
21 was spraying Roundup.
22 A. Yes.
23 Q. You note that her clothing depended on the
24 weather, sometimes she wore shorts but sometimes she
25 wore long pants, correct?

Page 23

1  A. Yes, and, of course, shorts are not
2  contraindicated anywhere on the label.
3     MS. COPE-KASTEN: Move to strike everything
4  after "yes" in the doctor's answer.
5  Q. On page 7 you also indicate that Ms. Mendoza
6  sometimes wore short sleeves and sometimes wore long
7  sleeves, depending on the weather?
8  A. Yes.
9  Q. Did you attempt to determine what percentage
10 of the time she wore long pants or long sleeves as
11 opposed to shorts or short sleeves when spraying
12 Roundup?
13 A. No. The dose metric epidemiologic studies
14 do not recognize or discern whether a person is
15 wearing long pants or long sleeves, but the studies
16 represent a cross-section of the population that is
17 using the product and some people wear shorts, some
18 don't.
19 Q. Are you able to determine how much Roundup
20 Ms. Mendoza would have dermally absorbed without
21 knowing what clothing she was wearing what
22 percentage of the time when spraying Roundup?
23     MR. KRISTAL: Objection.
24 A. No. That would make no difference on the
25 exposure day calculation in comparison to the

Page 24

1  exposure day thresholds in the studies.
2     Trying to do what you just asked would be
3  not in keeping with the methodology. It's something
4  that would probably be struck. In other words, the
5  methods that are in these studies are very specific
6  in terms of exposure day requirements, and
7  manipulating those exposure days based on clothing
8  is not in the methodology in those studies.
9  Q. When you say "it is probably something that
10 would be struck," what are you describing there?
11 A. Something that is a deviation from the
12 general methodology.
13 Q. What is "it" in that context?
14 A. I don't understand it. What it?
15 Q. You're using "it" and I'm trying to figure
16 out what the antecedent of it is. You are saying it
17 is a deviation, it would be struck. What is it?
18 A. Deviating from the methodology that appears
19 in the six studies. In Eriksson, et al., 2008;
20 McDuffie, et al., 2001; Andreotti 2018; Leon,
21 et al., 2019; Zhang, Z-h-a-n-g, et al., 2019; and
22 Pahwa, P-a-h-w-a, 2019, provide dose metrics and
23 exposure durations, and manipulating those exposure
24 durations based on the clothing worn would be a
25 deviation from the methodology and would not be

Page 25

1  appropriate and would be thrown out of the arena of
2  generally accepted science.
3     It's -- you know, I'm trying very hard to
4  follow the methodology and do the job correctly, and
5  you keep asking me why -- you know, questions about
6  how protective gear or dress clothing would affect
7  the comparison of exposure days to the studies, and
8  the simple answer is it doesn't, it doesn't affect
9  the comparison of exposure days in the studies.
10 Q. My question here has actually not been about
11 that. I think that maybe there is just a
12 miscommunication between the two of us with respect
13 to the question that's on the table, but the reason
14 that I'm asking about the personal protective
15 equipment is you're intending to offer opinions in
16 Ms. Mendoza's case beyond simply listing the number
17 of exposure days she has in comparison to these six
18 epidemiological studies, aren't you?
19 A. Correct.
20 Q. Is personal protective equipment relevant to
21 any of the opinions that you intend to offer in
22 Ms. Mendoza's case?
23 A. Absolutely.
24 Q. That's why I'm asking about personal
25 protective equipment, Doctor.

William R. Sawyer, Ph.D.

Page 26

1  MR. KRISTAL: No, I don't think Dr. Sawyer
2  is fussing over your asking about personal
3  protective equipment. I think he's fussing about
4  something else which he articulated.
5     A. Yeah, if you -- you know, ask me how the
6  clothing impacts systemic absorption. That would be
7  a great question, instead of keep working it into
8  exposure days. You keep bringing up the term
9  "exposure days" and I just don't understand that,
10 why you're doing that.
11    MS. COPE-KASTEN: Can we go back a ways in
12 this?
13    THE COURT REPORTER: Okay.
14    MS. COPE-KASTEN: Stop there for a second.
15    THE COURT REPORTER: Oops. Wait.
16 BY MS. COPE-KASTEN:
17    Q. The question that I asked when we started
18 this line, Doctor, was are you able to determine how
19 much Roundup Ms. Mendoza would have dermally
20 absorbed without knowing what clothing she was
21 wearing what percentage of the time when spraying
22 Roundup?
23    A. Yeah. You asked me two or three questions.
24 Please break it down a bit.
25    Q. Is it possible to calculate Ms. Mendoza's --

Page 27

1  I'm not asking whether you did. Is it possible to
2  calculate Ms. Mendoza's dermal exposure to Roundup?
3     MR. KRISTAL: Objection to form.
4     A. Yes. Using the POEM method, that is
5  possible.
6     Q. Is it possible to perform that calculation
7  without knowing what clothing Ms. Mendoza was
8  wearing at the times that she was spraying Roundup?
9     A. No.
10    Q. Is Ms. Mendoza's use of personal protective
11 equipment relevant to anything other than an
12 exposure dose calculation using the POEM method?
13    A. No.
14    Q. Is there anything unique about Ms. Mendoza's
15 case, or would that be true for any applicator of
16 Roundup, that their personal protective equipment
17 would not be relevant to an exposure calculation
18 other than a dose calculation using something like
19 the POEM method?
20    A. I think when you back up the question, I
21 said no to your last question. Maybe I
22 misunderstood your question.
23    Q. My question was is Ms. Mendoza's use of
24 personal protective equipment relevant to any
25 calculation other than an exposure dose calculation

Page 28

1  using the POEM method?
2     A. Yes. I thought you said the opposite
3  regarding the question. So yes.
4     Q. What is your understanding that it is also
5  relevant to?
6     A. Well, for example, I gave you the example
7  earlier today of the Machado-Neto study with
8  different penetrations and different potential
9  dermal absorption on different locations of the
10 body.
11    So, for example, if we know that the forearm
12 is receiving a certain dose per square centimeter of
13 tissue, and we know that the sleeve will block that
14 leaving only 20 percent coming through to the skin,
15 then knowing whether it's short sleeve or long
16 sleeve is important.
17    Q. That's important in terms of calculating the
18 absorbed dose for that person?
19    A. Certainly.
20    Q. Which you did not do for Ms. Mendoza?
21    A. No. There was no reason to calculate her
22 milligram per kilogram per day dosage because there
23 was nothing to compare it to except animal studies.
24 The only human studies use exposure days as a
25 metric, and one cannot determine causation based on

Page 29

1  comparison to animal studies.
2     MS. COPE-KASTEN: Let's go off the record
3  for a second.
4     THE VIDEOGRAPHER: We're going off the
5  record at 2:29.
6     (Recess from 2:29 p.m. until 2:31 p.m.)
7     THE VIDEOGRAPHER: We're back on the record.
8  The time is 2:31.
9  BY MS. COPE-KASTEN:
10    Q. Dr. Sawyer, you're aware that Ms. Mendoza
11 sprayed Roundup using both a hand sprayer and a
12 backpack sprayer, correct?
13    A. Yes.
14    Q. Did you attempt to determine what percentage
15 of the time she used one as opposed to the other?
16    A. No, because quantitatively it makes no
17 difference in the exposure days calculation;
18 however, it's important for me to know that she used
19 both and to assess how the use of such equipment
20 would or would not increase or decrease her exposure
21 systemically.
22    For example, if she were to tell me, which
23 she actually stated in her deposition that -- I
24 believe she stated that her back was wet, her
25 clothes were wet with a backpack sprayer, but she

8 (Pages 26 to 29)

William R. Sawyer, Ph.D.

Page 30

1    was not sure if it was from the backpack or if it
2    was from sweat.  You know, these are all details
3    that are important to understand in calculating the
4    degree of systemic exposure from different
5    operations.
6        Q.  Given that Ms. Mendoza could not recall a
7    particular instance on which her backpack sprayer
8    leaked and was not sure whether it was sweat or
9    leakage on her back, would the more conservative
10   route in assessing her dermal exposure to Roundup be
11   to assume that the sprayer did not leak and that it
12   was in fact sweat on her back?
13       A.  That would be my choice, yes.
14       Q.  Do you know at what point Ms. Mendoza
15   developed her first non-Hodgkin's lymphoma cancer
16   cell?
17       A.  You've asked me that question six times in
18   the last two days.  Same answer but I guess I need
19   to say it because it's a different deposition.
20       Q.  Yes.  You understand that Ms. Mendoza's
21   deposition that you're sitting in right now is
22   case-specific as to Ms. Mendoza, do you not?
23       A.  Yes, I do.  So --
24       Q.  I'm asking the question as to Ms. Mendoza.
25   Do you know when Ms. Mendoza's first non-Hodgkin's

Page 31

1    lymphoma cancer cell appeared?
2        A.  For the sixth time, no.  There is no
3    methodology to assess that question.  It doesn't
4    exist.
5        Q.  Are you aware of whether Ms. Mendoza had
6    Roundup in her system at the time that the first
7    cancer cell appeared in her body?
8        A.  Same answer.
9            MS. COPE-KASTEN:  I don't have any further
10   questions at this time.
11           MR. KRISTAL:  Okay.  What time is it?
12           THE VIDEOGRAPHER:  It's 2:35.
13              CROSS-EXAMINATION
14   BY MR. KRISTAL:
15       Q.  Does there need to be Roundup in the system
16   when Ms. Mendoza's first cell becomes cancerous in
17   order to render an opinion that her Roundup exposure
18   cumulatively was a substantial contributing factor
19   to the development of her non-Hodgkin's lymphoma?
20       A.  Absolutely not, and that is part of the
21   reason that chemically induced malignancies have
22   what's called a latent period, that is the genetic
23   damage can be present but not yet with any
24   malignancy.  Even at a single-cell level there can
25   be a latent period.

Page 32

1        Q.  Okay.  I just want to quickly follow up on
2    two answers where there was a motion to strike just
3    in case that's granted.
4            You mentioned the World Health Organization
5    1982 PPE -- the personal protection equipment
6    protocol in terms of what should be worn when
7    spraying pesticides.
8        A.  Yes.
9        Q.  Are those recommendations in that document
10   contained in any Roundup label?
11       A.  Only gloves and long sleeves for
12   applicators.  I don't believe any of the other
13   recommendations or requirements published in 1982
14   are on the label.
15       Q.  Okay.  And you also mentioned that wearing
16   shorts is not contraindicated on the label.  Is that
17   correct?
18       A.  It is.
19       Q.  It is correct or it is contraindicated?
20       A.  It is.  It is.
21       Q.  Are shorts contraindicated on any Roundup
22   label?
23       A.  No.
24           MR. KRISTAL:  That's all I have.
25           MS. COPE-KASTEN:  Nothing further.

Page 33

1            THE VIDEOGRAPHER:  This concludes the
2    deposition.  The time is 2:37.
3            (Whereupon, the deposition concluded at
4    2:37 p.m.)

William R. Sawyer, Ph.D.

Page 34

```
 1              CERTIFICATE
 2       I, SUSAN D. WASILEWSKI, Registered
 3   Professional Reporter, Certified Realtime Reporter,
 4   Certified Realtime Captioner, and Florida
 5   Professional Reporter, do hereby certify that,
 6   pursuant to notice, the deposition of WILLIAM R.
 7   SAWYER, Ph.D., was duly taken on Friday,
 8   November 15, 2019, at 1:39 p.m., before me.
 9       The said WILLIAM R. SAWYER, Ph.D., was duly
10   sworn by me according to law to tell the truth, the
11   whole truth and nothing but the truth and thereupon
12   did testify as set forth in the above transcript of
13   testimony.  The testimony was taken down
14   stenographically by me.  I do further certify that
15   the above deposition is full, complete, and a true
16   record of all the testimony given by the said
17   witness, and that a review of the transcript was
18   requested.
19
20   _____
21   Susan D. Wasilewski, RPR, CRR, CCP
22   (The foregoing certification of this transcript does
23   not apply to any reproduction of the same by any
24   means, unless under the direct control and/or
25   supervision of the certifying reporter.)
```

Page 35

```
 1           INSTRUCTIONS TO WITNESS
 2
 3
 4       Please read your deposition over carefully
 5   and make any necessary corrections.  You should
 6   state the reason in the appropriate space on the
 7   errata sheet for any corrections that are made.
 8
 9       After doing so, please sign the errata sheet
10   and date it.  It will be attached to your
11   deposition.
12
13       It is imperative that you return the
14   original errata sheet to the deposing attorney
15   within thirty (30) days of receipt of the deposition
16   transcript by you.  If you fail to do so, the
17   deposition transcript may be deemed to be accurate
18   and may be used in court.
19
20
21
22
23
24
25
```

Page 36

```
 1            ------
 2            E R R A T A
 3            ------
 4   PAGE  LINE  CHANGE
 5   ____  ____  _____
 6   REASON: _____
 7   ____  ____  _____
 8   REASON: _____
 9   ____  ____  _____
10   REASON: _____
11   ____  ____  _____
12   REASON: _____
13   ____  ____  _____
14   REASON: _____
15   ____  ____  _____
16   REASON: _____
17   ____  ____  _____
18   REASON: _____
19   ____  ____  _____
20   REASON: _____
21   ____  ____  _____
22   REASON: _____
23   ____  ____  _____
24   REASON: _____
25
```

Page 37

```
 1           ACKNOWLEDGMENT OF DEPONENT
 2
 3       I, _____, do hereby
 4   acknowledge that I have read the foregoing pages, 1
 5   through 36, and that the same is a correct
 6   transcription of the answers given by me to the
 7   questions therein propounded, except for the
 8   corrections or changes in form or substance, if any,
 9   noted in the attached Errata Sheet.
10
11
12   _____   _____
13   WILLIAM R. SAWYER, Ph.D.           DATE
14
15
16
17
18   Subscribed and sworn to before me this
19   ____ day of _____, 20___.
20   My Commission expires: _____
21
22   _____
     Notary Public
23
24
25
```

10 (Pages 34 to 37)

William R. Sawyer, Ph.D.

| Page 38 | |
|---|---|
| 1  LAWYER'S NOTES<br>2  PAGE  LINE<br>3  ____ ____ _____<br>4  ____ ____ _____<br>5  ____ ____ _____<br>6  ____ ____ _____<br>7  ____ ____ _____<br>8  ____ ____ _____<br>9  ____ ____ _____<br>10 ____ ____ _____<br>11 ____ ____ _____<br>12 ____ ____ _____<br>13 ____ ____ _____<br>14 ____ ____ _____<br>15 ____ ____ _____<br>16 ____ ____ _____<br>17 ____ ____ _____<br>18 ____ ____ _____<br>19 ____ ____ _____<br>20 ____ ____ _____<br>21 ____ ____ _____<br>22 ____ ____ _____<br>23 ____ ____ _____<br>24 ____ ____ _____<br>25 | |
| | |

11 (Page 38)