# EXHIBIT 21

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION § MDL No. 2741 § Case No. 3:16-md-02741-VC

This document relates to:

Tanner v. Monsanto Company
Case No. 3:19-cv-04099-VC

\- - -

Friday, November 15, 2019

\- - -

Videotaped deposition of WILLIAM R. SAWYER, Ph.D., held at South Seas Resort, 5400 Plantation Road, Captiva, Florida 33924, commencing at 2:51 p.m., on the above date, before Susan D. Wasilewski, Registered Professional Reporter, Certified Realtime Reporter, Certified Realtime Captioner, Florida Professional Reporter

\- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

APPEARANCES:
WEITZ & LUXENBERG
BY: JERRY KRISTAL, ESQUIRE
jkristal@weitzlux.com
220 Lake Drive East, Suite 210
Cherry Hill, New Jersey 08002
Phone: (856) 755-1115
Representing Plaintiffs

WILKINSON WALSH & ESKOVITZ
BY: CALI COPE-KASTEN, ESQUIRE
ccope-kasten@wilkinsonwalsh.com
2001 M Street, NW, 10th Floor
Washington, D.C. 20036
Phone: (856) 755-1115
Representing Defendant Monsanto Company

ALSO PRESENT:
MATTHEW ALLISON, Videographer

---
INDEX
---

Testimony of: WILLIAM R SAWYER, Ph D Page
DIRECT EXAMINATION BY MS COPE-KASTEN 5
CROSS-EXAMINATION BY MR KRISTAL 36

EXHIBITS
(Attached to transcript)

WILLIAM R SAWYER, Ph D DEPOSITION EXHIBITS PAGE
Exhibit 1 Monsanto Company's Amended Notice to Take Oral and Videotaped Deposition of Dr William Sawyer 5
Exhibit 2 October 9, 2019 Report from Toxicology Consultants & Assessment Specialists, LLC 7

---
THE VIDEOGRAPHER: Good afternoon. We are now on the record. My name is Matthew Allison. I am a videographer for Golkow Litigation Services. Today's date is November 15th, 2019, and the time is 2:51 p.m.
This video deposition is being held in Captiva, Florida, in the matter of Frank Tanner vs. Monsanto Company for the United States District Court, Northern District of California.
Will all counsel please state their appearance for the record.
MR. KRISTAL: Jerry Kristal, Weitz & Luxenberg, for Frank Tanner.
MS. COPE-KASTEN: Cali Cope-Kasten from Wilkinson Walsh & Eskovitz on behalf of Monsanto.
THE VIDEOGRAPHER: The court reporter is Susan Wasilewski and will now swear in the witness.
THE COURT REPORTER: Will you raise your right hand?
Do you solemnly swear or affirm the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?
THE WITNESS: I do.

THE COURT REPORTER: Thank you.
WILLIAM R. SAWYER, Ph.D., called as a witness by Defendant Monsanto Company, having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MS. COPE-KASTEN:
Q. Good afternoon, Dr. Sawyer.
(Sawyer Exhibit 1 was marked for identification.)
Q. I am handing you what has been marked as Exhibit 1 to your deposition in Mr. Tanner's case. This is your notice of deposition for Mr. Tanner's matter. Have you had a chance to review this document?
A. Yes.
Q. I understand that you brought some documents with you today in response to this notice of deposition.
A. Yes.
Q. Are those the materials that we have discussed earlier today?
A. Yes.
Q. Is there anything that you have brought for Mr. Tanner's case other than what we've already discussed today?
A. No.

Page 6

Q. In forming your opinions in Mr. Tanner's case, did you meet or speak with Mr. Tanner's counsel?
A. Yes.
Q. Who did you meet or speak with?
A. Jerry Kristal.
Q. Did you meet with him or speak on the phone?
A. Met with him.
Q. How many times?
A. Just once regarding this case.
Q. Was that the meeting earlier this week on Wednesday?
A. Yeah. That was Wednesday for about three hours, and it was regarding the seven plaintiffs in the matter at hand.
Q. Have you met Mr. Tanner?
A. No.
Q. Have you spoken with Mr. Tanner?
A. I have not. Yes, I have. I interviewed him.
Q. Tell me about that interview. When did it take place?
A. October 9th, 2019.
Q. I am handing you what has been marked as Exhibit 2 to your deposition. That's your report in

Page 7

this case.
(Sawyer Exhibit 2 was marked for identification.)
BY MS. COPE-KASTEN:
Q. Did you author this report?
A. Yes.
Q. Does it contain all of the general causation opinions you intend to offer at trial for Mr. Tanner?
A. Yes.
Q. Does it contain all of the case-specific opinions you intend to offer for Mr. Tanner?
A. Yes.
Q. Did you have sufficient information to reach all of the conclusions that you wanted to reach in this case?
A. Yes.
Q. This report is dated October 9th, 2019.
A. It is.
Q. Your interview with Mr. Tanner was on the same day that you submitted this report?
A. That's right.
Q. How long did you speak to Mr. Tanner on October 9th?
A. I don't recall.
Q. Do you have a ballpark? Was it a long time,

Page 8

short time?
A. I really don't remember. I was under -- under the gun time-wise on the deadline and it was a long day, so I really don't remember.
Q. Do you remember the substance of your conversation with him?
A. Well, I specifically do remember asking him questions regarding any prior history of HIV or AIDS, Crohn's disease, rheumatoid arthritis, hepatitis B or C, prior malignancies, chemotherapies, organ transplants, immunosuppressive pharmaceuticals, ulcerative colitis, or long-term prednisone use, which was negative.
I did ask him about smoking, if he had ever smoked cigarettes or tobacco, and if so, did he ever smoke more than 100 cigarettes in a lifetime, which is the CDC threshold for a smoker. I also asked him regarding his use of tobacco or drugs of abuse, and with respect to his exposure history, there may have been some questions to fill in the gaps, but I recall primarily working off of the deposition testimony and the plaintiff fact sheet. I don't know that I had to ask him many questions regarding his exposure history because it was reasonably well compiled in the deposition.

Page 9

Q. When you asked Mr. Tanner about his prior medical conditions, did you ask him about those because that information was not clear from his medical records, or that was just the route that you chose to get that information?
A. I generally ask those questions when I interview a person, whether or not the information is already in the record, just to be certain, and a lot of times it's very difficult to find answers to all of these questions in the medical records and it's more expedient to just ask.
[redacted]

Page 10

[redacted]

Page 11

[redacted] hat this line that's under History of Tobacco, Alcohol and Drug Use on page 5, we can just strike that, that doesn't apply to Mr. Tanner's case?
A. That's correct.
Q. You did not rely on an exposure calculation by Mr. Petty with respect to Mr. Tanner, did you?
A. No. He did not assess Mr. Tanner, to my knowledge.

Page 12

Q. As a result, you performed your own exposure days calculation for Mr. Tanner?
A. That's right.
Q. That exposure calculation appears in Table 2 on the bottom of page 7 of your report?
A. Yes, both Table 1 and 2, actually.
Q. Can you walk me through your exposure calculations in Tables 1 and 2 for Mr. Tanner?
A. Yes. It's simply that he initiated his exposures to Roundup in 1984, he used Roundup concentrate once per week for approximately 10 minutes, he typically sprayed with a 3.5 gallon backpack sprayer, and his exposure was residential and occupational.
He used to control weeds and maintain lawns on estates in the Pasadena and Los Angeles area. And then in 2001 to '06, sprayed every two weeks 30 minutes to three hours, used a two-and-a-half gallon container, about 25 to 70 gallons of Roundup over 7- to 10-acre parks.
He also used a three-and-a-half gallon backpack sprayer or a 35-gallon electric sprayer, and this was occupational use or industrial turf and ornamental. The purpose was to control weeds in Los Angeles County parks, and that information

Page 13

results in Table 2.
Once a week at 10 minutes, so per year that would be roughly 520 minutes, and over 16 years, that would be roughly 138 hours, which is 17.38 hour time-weighted days.
And then from 2001 to 2006, he used it once every two weeks for 30 minutes to three hours, had 105-minute average times 27 30-minute -- which equals 27 30-minutes per year, divided by 60 minutes equals 45.5 hours, over five years equals 227.5 hours, which is equivalent to 28.4 time-weighted eight-hour working days.
So the sum would be 45.6 average lifetime exposure days.
Q. Why did you choose to average the 30-minutes to three-hours window of spraying from 2001 to 2006?
A. Just to obtain a midpoint value.
Q. Do you know how often Mr. Tanner sprayed at 105 to 180 minutes during that period?
A. Yes.
Q. How often?
A. On the average, 105 minutes.
Q. My question might not have been clear. I understand that you averaged that time period to being a 105-minute average. Do you know how often

Page 14

in actuality he sprayed for 30 minutes versus 105 minutes versus three hours, or anywhere else along that spectrum?
A. No. I simply used a midpoint value.
Q. If Mr. Tanner regularly sprayed for only 30 minutes and occasionally sprayed at 105 to 180 minutes, you would agree with me that your exposure days estimate could potentially be lower?
A. So what? It would be 14 hours -- 14 exposure days lower, which would be 31 exposure days; still three times above the threshold, so it doesn't really matter.
Q. Just to clarify, the answer to that is yes, it could be lower but you don't believe that it would matter even if it were lower?
A. No. No, I didn't say that. It's not my belief. It's a mathematical truth that if we use 30 minutes rather than 30 minutes to three hours, if we took the worst case -- well, it would be the best case for him, actually, less exposure, but if we took the lowest value possible, the 30 minutes, that would roughly subtract off about 14 exposure days, thus, the grand total would be about 34 exposure days. So it's just not important. It's not a relevant issue here. He's already exceeding the

Page 15

greater than 10-day threshold of the studies.
I don't -- I don't disagree. It could be more towards the 30, it could toward -- more towards the three hours. Either way, it's still well above the greater than 10-day threshold.
Q. Do you recall Mr. Tanner testifying that he worked for a couple of years on his father's livestock farm?
A. I do recall farm work. I don't know if it was livestock, I'm not sure, but, yeah, I do recall the farm, farm work.
Q. Are you aware of studies comparing livestock farming and the risk of developing non-Hodgkin's lymphoma?
A. As I said in earlier depositions, I -- yesterday, I do recall the study and I think it was somewhere in the Southeast US, I'm not sure, and there -- I believe there was an association between livestock farming and NHL.
I don't know how significant it was or if it's been shown to be coherent through other types of studies. I really don't -- I haven't looked at the study in many years, but I believe there is one.
Q. Fair to say that you did not attempt to determine what impact livestock farming may have had

Page 16

on Mr. Tanner's risk for developing non-Hodgkin's lymphoma?
A. No, and I would certainly defer that to an infectious disease or medical ep -- medical oncologist to evaluate since it is not a toxicological matter but purely an infectious disease or microbiological assessment, but even if that were a reasonable risk factor, there still would be, in this case, added to that risk the Roundup exposures based on the studies that I'm relying on.
Q. Do you recall Mr. Tanner's testimony in his deposition that he at least occasionally sprayed other pesticides between 1961 and 1975, not including Roundup?
A. He was a licensed applicator, but -- he did use several but wasn't able to recall the details.
Q. Is it accurate to say that you do not know which other pesticides Mr. Tanner sprayed at that time?
A. Weed oil, he said very rarely.
Q. Any others in addition to weed oil?
A. No.
Q. To the extent that Mr. Tanner did spray other pesticides between 1961 and 1975, those are

Page 17

not reflected in your assessment of any risks Mr. Tanner may have had for non-Hodgkin's lymphoma from other chemical exposures?
MR. KRISTAL: Objection.
A. Did you start out your question with the word "if"?
Q. I started out with the word "to." To the extant that Mr. Tanner had exposure.
A. To the extent that he had -- see, that's the part I don't understand. Are you asking me to assume hypothetically that he had exposure to pesticides?
Q. Let me break it down into separate questions.
You just read in Mr. Tanner's deposition that he testified that he occasionally sprayed pesticides between 1961 and 1975, right?
A. Right.
Q. He said that he could not remember what the brands were of those, correct?
A. Correct.
Q. Weed oil was one thing that you were able to name that he used during that time period?
A. Yes.
Q. From his testimony that he used pesticides

plural and could not remember the brands plural, is it your understanding that Mr. Tanner was recalling spraying more than one type of pesticide at that time?
A. Yes, during that duration, yes.
Q. You did not take into account in assessing Mr. Tanner's risks from other chemical exposures what any of those pesticides might have been because you don't know what they were, correct?
MR. KRISTAL: Objection.
A. If I understand your question right, that's true. We don't have any further information and he was unable to provide me with any specific information during the interview.
Q. And -- but it's not your intention to tell the jury that he did not have exposure to other pesticides, you just don't know one way or the other, right?
A. Correct.
Q. You specifically mentioned his testimony that he used weed oil. What is weed oil?
MR. KRISTAL: Back in those days?
MS. COPE-KASTEN: (Nodding head.)
A. Donations from --
MR. KRISTAL: I'm making a bad legal

cannabis joke.
THE WITNESS: Oh, you're thinking of that weed oil.
A. Well, it's not CBD oil.
Q. What is it, your understanding, that weed oil is as a pesticide?
A. I believe what he's referring to, and it hasn't been used in years because of its toxicity, and that is light naphtha, which in fact does kill weeds and grass.
Q. Do you know with certainty that that's what he's referring to when he says weed oil?
A. Not with certainty because it's not normally -- normally they're a little more descriptive with it, but back in that era of time, that would make sense, but it's really a slang name that he's using.
Q. If the product that he was using was light naphtha, do I understand from prior testimony you have given that you do not believe that to be a probable or definite human carcinogen?
A. Correct. And it contains naphthalene, which is an animal carcinogen, possible human carcinogen, not associated with NHL.
Q. Mr. Tanner testified that the weed oil left

a tar on the soil. Do you know what that refers to?
A. That would be consistent with light naphtha simply because the volatility is not very high, it takes time to evaporate, and eventually can leave a -- enough of a residue that airborne particulate matter can stick to it and cause a visible dirty coating on plants and leaves and other objects sprayed, so that would be -- that would be an appropriate description.
Q. You understand that Mr. Tanner had a landscaping business?
A. Yes, and I referred to that as the occupational work he did with -- in 2000 -- well, really, before then, but increased it in 2001 to 2006.
Q. The reason that his business increased between 2001 and 2006 was because he received some contracts from the Los Angeles Sanitation Department?
A. Exactly.
Q. I want to break down Mr. Tanner's exposure periods as you have broken them down in your report, from 1984 to 2001, and then separately from 2001 to 2006.
Do you know what personal protective

equipment Mr. Tanner was wearing between 1984 and 2001 at the time that he sprayed Roundup?
A. Long sleeves and gloves.
Q. Are you aware that Mr. Tanner attended regular pesticide applicator training courses?
A. Yes.
Q. That's because he had a pesticide applicator license?
A. He did.
Q. As part of those applicator training courses, Mr. Tanner was advised to wear a Tyvek suit when spraying pesticides. Do you recall that?
A. I do.
Q. Are you aware that Mr. Tanner regularly did wear a Tyvek suit when spraying pesticides?
A. Eventually, that's true.
Q. When is it your understanding he began wearing a Tyvek suit to spray Roundup?
A. I'm not finding it but I believe it was when he accepted the contracts, and he spoke of at the County properties there was a place to discharge the Tyvek suits and wash up at the County facilities, and he stated -- actually, he said -- he stated that he used the Tyvek suits often from 1984 to 2000, and then he said, "I should have said I used them

Page 22

rarely, because I do recall that if there was a very short time of spring, I might not have suited up with a Tyvek suit."

And then that's on page 91 of the deposition. And then on line 23 he stated -- the question was: So what you're telling me is if a job wasn't a large job, you might not have suited up?

And he said yes, and then that would be true because he was only doing, from 1984 to 2001, 10-minute jobs once a week, so that is consistent with his exposure frequency in Table 1.

So I would -- my opinion, based on what I've read, is that he was fully suiting up between the years 2001 and 2006.

Q. I want to direct your attention to page 44, starting at line 19. Mr. Tanner was asked: And prior to getting the license in roughly 2001, did you take measures to protect yourself from pesticides such as those you mentioned, the Tyvek suit, the rubber boots, the face shield, is that something you did throughout your landscaping career, or later?

Mr. Tanner's answer was: It was completely done from when I got the license, the applicator license. Always wore the suit, every time, without

Page 23

exception. From 1961, when I started Flora Landscaping, until 19 -- approximately 1975, I would use it sparingly.

Did I read that correctly?

A. Yes. So we have three definitions: One is he used it all the time; the other one he used it sparingly; and then the later one that I pointed out is that he only used it on the longer jobs, didn't use it on the short jobs, which is -- correlates with 1984 to '01, where he only worked 10 minutes once per week, and he said he would not wear the suit unless it was a longer job.

So it is what it is. My opinion is, based on what he said, he didn't wear the suit frequently until he started doing the longer jobs, and his jobs were only once a week at 10 minutes until 2001.

I don't -- I'm not the judge or the jury, but it would appear to me that he did wear a Tyvek suit but not frequently until the later years.

Q. It is your opinion that between 2001 and 2006, he was consistently wearing the Tyvek suit for Roundup spraying jobs?

MR. KRISTAL: Objection.

A. Based upon his testimony, yes.

Q. In addition to the Tyvek suit during that

Page 24

time, he also wore rubber boots to spray Roundup?

A. Yes.

Q. In addition to a Tyvek suit and rubber boots, he also wore a face shield during that time?

A. He did, but I'm not sure of the frequency. Let me check. Well, he stated he wore it, so I'll assume it was all the time.

Q. What is the impact on dermal absorption of Roundup from wearing a Tyvek suit, rubber boots, and a face shield when spraying?

A. It depends on the type of Tyvek suit, whether it's a dust suit or an actual chemical-resistant suit. He doesn't explain what type of Tyvek suit he was wearing, so I really can't be very specific in answering that.

Q. Can you give me an answer for each of the two types of suits? If it was a dust suit, what would the impact be on dermal absorption of Roundup from wearing a Tyvek dust suit, a face shield, and rubber boots when spraying Roundup?

A. It can pass through the dust suit. The face shield is protective of the eyes especially. And the third thing I think you asked was rubber boots?

Q. Uh-huh. Yes.

A. Less than one percent penetration.

Page 25

Q. Do you know what the percentage of penetration is for a Tyvek dust suit?

A. No, but it is permeable. It's designed to allow vapor movement and air, but the pore size is small enough to block particulate.

Q. If what he was wearing was a Tyvek chemical-resistance suit in addition to a face shield and rubber boots, what would the impact be on his dermal absorption of Roundup when spraying?

MR. KRISTAL: Objection.

A. If the gloves were such that the sleeves of the Tyvek suit hindered the gloves, or if the gloves were taped, and the same with the boots, it would provide nearly 100 percent protection, except for the exposed upper neck and face and head and a slight amount from -- well, an inconsequential amount through inhalation with a face shield.

Q. You would agree with me that there is no difference in the number of exposure days Mr. Tanner had to Roundup regardless of the type of Tyvek suit he was wearing?

A. I'm sorry. I don't understand the question.

Q. If Mr. Tanner was wearing a Tyvek dust suit --

A. Yes.

Q. -- he would have 45.6 exposure days to Roundup, correct, that's what you calculated?
A. Yes.
Q. If Mr. Tanner were wearing a Tyvek chemical-resistance suit, he would still have 45.6 lifetime average exposure days to Roundup?
A. No. I think if throughout the history, from '84 to '06, he was wearing a chemically resistant suit with gloves on, taped and sealed, both his ankles and lower arms, with a face shield, his exposure would be negligible and outside of the range of the human studies. The human studies aren't designed for somebody who is protected to that degree, with the sleeves taped to the gloves and the ankles taped to the chemically resistant Tyvek suit.
I can say that's really an impossibility in southern California, to wear a chemically resistant Tyvek suit outdoors for three hours. He would end up in hyperthermia, possibly malignant hyperthermia. It would be -- it would be probably a hospitalization each time. I mean, that's just -- it's just not reasonable that a person can be in a chemically resistant suit because they are nonbreathable and the heat in southern California in

the summer, that just wouldn't work. It's not even -- it's just not possible to do that, unless he had -- if, you know, constantly replenishing with fresh ice and so forth under the suit.
Q. Based on that understanding, is it your belief that Mr. Tanner was likely wearing a Tyvek dust suit when he was spraying Roundup?
A. Well, they are designed for comfort and breathability, the Tyvek 400 suit, for example. That's possible.
Q. Are there more than two types of Tyvek suits?
A. Oh, yes. There's numerous, many different models.
Q. And you don't know which one Mr. Tanner was wearing?
A. No, but I can rule out chemically resistant sealed at the sleeves and ankles in the summer heat for three hours with a 40-pound backpack sprayer on his back walking around. It would be rather unlikely due to heat exhaustion.
Q. Would it be -- I'm not that familiar with the chemically resistant suits. Would it be possible for him to wear a Tyvek chemically resistant suit outdoors in California under the

conditions you just described if his gloves and boots were not taped to the suit?
A. No, because the sleeves are tight elastic and allow -- still allow very little air movement, but the rule is under OSHA B, and I think OSHA A certification under HSWA, which I've been certified for many times, to prevent chemical entry one must tape the end of the sleeve around the glove and seal it, and the same with the ankle and the rubber boot, and it's just to be certain there is no infiltration of chemicals, so a safety issue.
Q. Did you review any medical records in Mr. Tanner's case?
A. Just limited medical records on his diagnosis from City of Hope Medical Center with respect to his diagnosis and pathology as stated in my report on page 8.
Q. Do you know whether Mr. Tanner had follicular lymphoma or diffuse large B-cell lymphoma?
A. DLBCL as per the pathology assessment and the immunohistochemical analyses performed.
Q. Do you recall whether Mr. Tanner was initially diagnosed with DLBCL at the time of his non-Hodgkin's lymphoma diagnosis?

A. Well, immunohistochemical stains showed lymphoid aggregates composed of T cells and B cells.
And then the hematopathology assessment revealed DLBCL, but I, without looking deeper into the records, I don't know the dates or the time span in between initial assessments versus the final pathology assessment.
Q. Do you recall Mr. Tanner testifying that he used fertilizers as part of his landscaping business?
A. I did. It's in his deposition. He talks about a nitrogen fertilizer, as I recall.
Q. Did you take into account any potential genotoxic or carcinogenic effect from any of the fertilizers Mr. Tanner may have used when coming to your conclusions in this case?
MR. KRISTAL: Object to form.
A. I did. There are -- there is no genotoxic or carcinogenic potential from organic fertilizers, unless they are contaminated with plutonium or uranium, thorium, isotopes, nuclear fuel.
Q. Do you know whether his were?
A. Let's hope not.
MR. KRISTAL: Giving new meaning to mushroom cloud.

MS. COPE-KASTEN: Could we go off the record for just a moment?
THE VIDEOGRAPHER: We're going off the record at 3:47.
(Recess from 3:47 p.m. until 3:49 p.m.)
THE VIDEOGRAPHER: We're back on the record. The time is 3:49.
BY MS. COPE-KASTEN:
Q. On page 5 of your report you have a section entitled Family Medical History.
A. Okay.
[REDACTED]
A. Yes, I'm aware of that.
Q. Between 1961 and 1975, Mr. Tanner used personal protective equipment called a rain suit. Do you know what a rain suit is?
A. That's a vague description. It can be, among outdoor workers, a yellow -- typically yellow suit with a hood, long sleeves, long pants, that is designed to keep a person dry, basically.
Q. If he wore that rain suit when spraying pesticides, what type of protection would the rain suit offer?
A. I really can't say. I would have to have

more specifics on the suit, and it's a vague description. I'm not sure.
Q. Take a look around page 45 of his deposition and see if that provides you with enough information to answer it.
A. He states on page 45, line 17, question: What's a rain suit?
Answer: Well, to protect yourself from rain.
Okay is the question.
Answer: Basically, just plastic covers that would -- where any liquid would be shielded from.
Question: Essentially, they cover the body?
Answer: Yes.
Was there head covering also or a face covering?
Yes.
And would you use these rain suits when you applied pesticides then, right?
Answer: Yes.
Okay. And then you said from 1961 through '75 is when you used the rain suits, if I understand correctly. Did you use something else in 1975, or did something else change?
Answer: 19 --

Question: Or is that when you were in the office, from 1975 to 1984?
I was in the office.
Okay.
So I had no contact with any chemicals.
When you started working in the field again in 1984, did you go back to using the rain suits or did you use something else?
Answer: No.
The Witness: I used Tyvek.
Q. Does that give you any further information about what level of protection a rain suit would have provided Mr. Tanner from dermal absorption of any substances he was spraying?
A. It could be reasonably effective, it depends on the design and the ventilation aspects of the suit. It may have multiple cuts and flaps for ventilation. It may be two-piece. There is a lot of ifs, so a photo of it would be helpful.
Q. I want to direct you to page 75 of Mr. Tanner's deposition. Starting around line 13, he's talking about horticultural oils that he used to get rid of aphids and mites, m-i-t-e-s, around his home.
A. Yes, I see that.

Q. Is that also consistent with the light naphtha that you were talking about earlier?
A. No. Actually, that is an oil that is still used. It's used very commonly in California, for example. It's generally used on a seasonal basis to kill bugs and it's a very -- a completely harmless paraffin type oil, paraffin-based oil, that's sprayed onto the various fruit trees and it's harmless to the tree but suffocates the larvae and the various bugs. So that's not an oil that would be sprayed on grass or weeds. It's strictly a treatment that's commonly used even today for fruit trees.
Q. Would it be considered an insecticide?
A. I don't believe it is. It's not an insecticide. It's a harmless paraffinic type oil.
Q. I'm going to direct you to the page right above that, page 74 from Mr. Tanner's deposition.
A. One other point to answer your question. I did specifically evaluate that type of oil recently in one of the Monsanto cases. It was in my report, the name of the oil, the ingredients, the toxicity rating, and so on, and, unfortunately, I don't remember which plaintiff it was.
Q. Do you remember the name of the product

itself?
A. I don't.
Q. On page 74 of Mr. Tanner's deposition he talks about Ronstar, R-o-n-s-t-a-r, Pre-Emergent.
Are you familiar with Ronstar Pre-Emergent?
A. No. That's the first time I've seen that, actually.
Q. Do you know what the active ingredient is in Ronstar?
A. No.
Q. When Mr. Tanner began spraying for the Los Angeles County park system in 2001, he began using an adjuvant called Foam A. Are you familiar with Foam A?
A. No.
Q. You told me earlier that you have read Mr. Tanner's deposition. Have you read any other depositions in Mr. Tanner's case?
A. No, just Mr. Tanner's deposition.
Q. Have you performed a site inspection of any of the properties on which Mr. Tanner alleges that he sprayed Roundup?
A. No.
Q. Have you performed a chemical inventory of Mr. Tanner's home?

A. No.
Q. Aside from any chemicals that are identified in Mr. Tanner's deposition or plaintiff fact sheet, are you aware of what other chemicals Mr. Tanner was exposed to in the course of his landscaping business?
A. No.
Q. Are you aware of what chemicals Mr. Tanner was exposed to in and around his home and his own property, aside from those that are identified in his deposition or plaintiff fact sheet?
A. No, nothing more than what was in the deposition and fact sheet.
Q. Did you conduct a absorbed dose for Mr. Tanner?
A. No, I did not perform a POEM calculation with respect to milligram per kilogram per day dose, but, rather, calculate the dose assessment in the units of exposure days as per the US -- not the US -- the generally accepted peer-reviewed epidemiological studies that offered a dose metric.
MS. COPE-KASTEN: Can we go off the record?
THE VIDEOGRAPHER: Going off the record at 4:02.
(Recess from 4:02 p m. until 4:05 p m.)

THE VIDEOGRAPHER: We're back on the record. The time is 4:05.
MS. COPE-KASTEN: Dr. Sawyer, thank you for your time today. I don't have any further questions for you.

CROSS-EXAMINATION

BY MR. KRISTAL:
Q. Very briefly, if you could please turn to Mr. Tanner's report, page 7. It's Exhibit 2.
THE VIDEOGRAPHER: Mr. Kristal, could you put your mic on?
MR. KRISTAL: Thank you. I will put my mic on so I can be heard.
Q. If you would turn to Exhibit 2, page 7, please, and look at Table 2, the 2001 to 2006 row. Do you see that?
A. Yes.
Q. I'm not sure I heard you correctly or you may have misspoken, but if we used the 30-minute time frame instead of the 105-minute average to calculate exposure days, is that about 30 percent of the total number? In other words, instead of using 105, if we use 30, the ultimate number would be reduced by about 70 percent?
A. Let's see. I was using 105 minutes.

Q. Right.
A. So it would be roughly a differential of --
Q. Thirty minutes is about 30 percent of 105 minutes?
A. Yeah. I was going to say about 31 percent, yeah.
Q. Okay. So if you wanted to use the 30-minute low end, you would multiply 28.4 exposure days by 31 percent and get the number of exposure days using the 30-minute time frame?
A. Yes.
Q. Okay.
A. Which would be roughly nine exposure days.
Q. Okay. So if he had nine exposure days during the 2001 to 2006 period, and 17.3 during the 1984 to 2001, his lifetime exposure days would be 26.3?
A. Correct.
Q. And how does that compare to the highest exposure metric and exposure days from the epidemiological studies showing an increased risk?
A. A factor of approximately 2.6 above the upper threshold value of greater than 10 days. And I should also add even if I were to eliminate completely and assume zero exposure from 2001 to

Page 38

2006, we would still have 17.3 exposure days from 1984 to 2001, which is also in great excess of even the highest threshold value in the generally accepted peer-reviewed studies.

Q. And what would your opinion be to a reasonable degree of scientific certainty as to whether or not his cumulative Roundup exposure was a substantial contributing factor to the development of his non-Hodgkin lymphoma if the exposure days were 17.6?

A. It would not change the finding that to a reasonable toxicological certainty, his excess of 10 exposure days per year resulted in an increase of substantial contributory risk of contracting NHL.

Q. Whatever other chemicals Mr. Tanner may have been exposed to, does that affect the number of exposure days of Roundup that he had in his lifetime?

A. No. The contribution from the Roundup is a substantial factor in the development of his lymphoma. Even if there had been other contributors, they still add together and increase overall risk of developing the disease.

Q. And if Mr. Tanner had any exposure to livestock, does that in any way change his total

Page 39

lifetime exposure days to Roundup?

A. No.

MR. KRISTAL: I have no further questions.

THE VIDEOGRAPHER: This concludes the deposition. The time is 4:10.

(Whereupon, the deposition concluded at 4:10 p m.)

Page 40

C E R T I F I C A T E

I, SUSAN D WASILEWSKI, Registered Professional Reporter, Certified Realtime Reporter, Certified Realtime Captioner, and Florida Professional Reporter, do hereby certify that, pursuant to notice, the deposition of WILLIAM R SAWYER, Ph D , was duly taken on Friday, November 15, 2019, at 2:51 p m , before me

The said WILLIAM R SAWYER, Ph D , was duly sworn by me according to law to tell the truth, the whole truth and nothing but the truth and thereupon did testify as set forth in the above transcript of testimony The testimony was taken down stenographically by me I do further certify that the above deposition is full, complete, and a true record of all the testimony given by the said witness, and that a review of the transcript was requested

______________________________

Susan D Wasilewski, RPR, CRR, CCP

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter )

Page 41

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

------
ERRATA
------

PAGE LINE CHANGE

____ ____ ______________________________
REASON: ______________________________
____ ____ ______________________________
REASON: ______________________________
____ ____ ______________________________
REASON: ______________________________
____ ____ ______________________________
REASON: ______________________________
____ ____ ______________________________
REASON: ______________________________
____ ____ ______________________________
REASON: ______________________________
____ ____ ______________________________
REASON: ______________________________
____ ____ ______________________________
REASON: ______________________________
____ ____ ______________________________
REASON: ______________________________
____ ____ ______________________________
REASON: ______________________________

ACKNOWLEDGMENT OF DEPONENT

I, ___________________________, do hereby acknowledge that I have read the foregoing pages, 1 through 42, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet

_____________________________ _______________
WILLIAM R SAWYER, Ph D DATE

Subscribed and sworn to before me this
____ day of _____________, 20___
My Commission expires: _______________

____________________________________
Notary Public

LAWYER'S NOTES

PAGE LINE

____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________