# EXHIBIT 28



## ** CONFIDENTIAL **

## Deposition of
# Charles Benbrook, Ph.D.

**Date:** May 23, 2018

**Case:** Ronald Peterson and Jeff Hall v. Monsanto Company, et al.

**No.** 1622-CC01071

**Court Reporter:** Patsy D. Jacoy, CCR

Paszkiewicz Court Reporting
Phone: 618-307-9320
Toll-Free: 855-595-3577
Fax: 618-855-9513
Email: sarah@spreporting.com

Page 1

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS

STATE OF MISSOURI

———————————————————————————————————————————

RONALD PETERSON and JEFF HALL,      )
                                    )
            Plaintiff(s),           )
                                    )
      vs.                           )   1622-CC01071
                                    )
MONSANTO COMPANY; OSBORN &          )
BARR COMMUNICATIONS, INC.;          )
OSBORN & BARR HOLDINGS, INC.,       )
                                    )
            Defendant(s).           )

———————————————————————————————————————————

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

CHARLES BENBROOK, Ph.D.

**CONFIDENTIAL**

———————————————————————————————————————————

8:30 A.M.

MAY 23, 2018

QUALITY INN & SUITES CONFERENCE CENTER

700 PORT DRIVE

CLARKSTON, WASHINGTON

REPORTED BY:  PATSY D. JACOY, CCR 2348

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

## Page 2

APPEARANCES

FOR THE PLAINTIFFS:
TIMOTHY LITZENBURG
The Miller Firm LLC
The Sherman Building
108 Railroad Avenue
Orange, VA 22960
540 672 4224
tlitzenburg@millerfirmllc com

FOR THE DEFENDANT MONSANTO:

GRANT W HOLLINGSWORTH
Hollingsworth LLP
1350 I Street N W
Washington, DC 20005
202 898 5800
ghollingsworth@hollingsworthllp com
SARAH A KRAJEWSKI
Winston & Strawn
35 W Wacker Drive
Chicago, IL 60601
312 558 8132
skrajewski@winston com

FOR THE DEFENDANTS OSBORN & BARR:
JENNIFER E HOEKEL
Armstrong Teasdale LLP
7700 Forsyth Blvd , Suite 1800
St Louis, MO 63105
314 621 5070
jhoekel@armstrongteasdale com

ALSO PRESENT: STEPHAN ANDREYCHUK, Video Operator

## Page 3

INDEX

EXAMINATION BY:                   PAGE(S)
BY MR. HOLLINGSWORTH               11
BY MS. HOEKEL:                    325
BY MR. HOLLINGSWORTH:             338
BY MR. LITZENBURG                 417

EXHIBITS FOR IDENTIFICATION          PAGE
Exhibit 1    12/12/17 EPA Memorandum,          93
Exhibit 2    Code of Federal          95
             Regulations, Subpart F -
             Tocology
Exhibit 3    158.400 Product performance     112
             data requirements table
Exhibit 4    EFSA Statement regarding     141
             the EU assessment of
             glyphosate and the
             so-called "Monsanto papers"
Exhibit 5    EPA Risk Assessment     173
             Guidelines of 1986
Exhibit 6    April 1996 Proposed     174
             Guidelines For Carcinogen
             Risk Assessment

## Page 4

Exhibit 7    March 2005 Guidelines For     175
             Carcinogen Risk Assessment
Exhibit 8    1996 Food Quality Protection     188
             Act Implementation Plan
Exhibit 9    Pesticide residue tolerance     194
             decision with respect to
             alkyl amine polyalkoxylates
Exhibit 10   PRN 97-1: Agency Actions     198
             under the Requirements of
             the Food Quality Protection
             Act
Exhibit 11   EPA 40 CFR Part 180     201
Exhibit 12   Article entitled Is it time     217
             to reassess current safety
             standards for
             glyphosate-based herbicides?
Exhibit 13   July 22, 1996 EPA memo     233
             regarding good laboratory
             practice standards
             inspection on
             September 14 through 17,
             1993, MONGLY00158466-158508
Exhibit 14   Parry report from August 18,     237
             1999

## Page 5

Exhibit 15   Study titled, Genotoxic     243
             Potential of Glyphosate
             Formulations:
             Mode-of-Action
             Investigations,
             MONGLY02413658-2413664
Exhibit 16   Evaluation of the potential     249
             genotoxicity of Glyphosate,
             Glyphosate mixtures and
             component surfactants by
             James Parry,
             MONGLY01314233-1314267
Exhibit 17   A Study of the Short-Term     258
             Effects of MON 35050 in Male
             CD-1 Mice,
             MONGLY00204822-00204868
Exhibit 18   The Salmonella typhimurium     265
             reverse mutation by MON
             77280,
             MONGLY02638195-2638235
Exhibit 19   Revised Glyphosate Issue     268
             Paper: Evaluation of
             Carcinogenic Potential,
             EPA's Office of Pesticide
             Programs, December 12, 2017

2 (Pages 2 to 5)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 6

1    Exhibit 20   MON 77280 Bacterial Reverse    270
2               Mutation Test (Ames Test)
3               Final Report,
4               MONGLY00979251-979276
5    Exhibit 21   April 13, 2015 review by    283
6               Health Canada of glyphosate
7    Exhibit 22   April 28, 2017    287
8               re-evaluation decision on
9               glyphosate by Health Canada
10   Exhibit 23   Publication from BFR titled    289
11               Does glyphosate cause
12               cancer?
13   Exhibit 24   CLH report, Proposal for    291
14               Harmonised Classification
15               and Labeling
16   Exhibit 25   EFSA Conclusion on    296
17               Pesticide Peer Review
18   Exhibit 26   Committee for Risk    301
19               Assessment Opinion
20               proposing harmonised
21               classification and labeling
22               at EU level of glyphosate
23
24
25

Page 7

1    Exhibit 27   Australian Pesticides and    310
2               Veterinary Medicines
3               Authority Regulatory
4               position:  Consideration of
5               the evidence for a formal
6               reconsideration of
7               glyphosate
8    Exhibit 28   New Zealand Review of the    314
9               Evidence Relating to
10               Glyphosate and
11               Carcinogenicity
12   Exhibit 29   Inchem glyphosate    318
13               (pesticide residues in
14               food: 1986 evaluations Part
15               II Toxicology)
16   Exhibit 30   1994 review by the World    319
17               Health Organization JMPR of
18               glyphosate
19   Exhibit 31   A Review by the World    321
20               Health Organization of
21               Pesticide residues in food
22               - 2004
23   Exhibit 32   2/16/2001 email from a    342
24               Monsanto person to Donna
25               Farmer, MONGLY02626548

Page 8

1    Exhibit 33   Series of disclosure forms    361
2               for the article GMOs,
3               Herbicides and Public
4               Health
5    Exhibit 34   Glyphosate epidemiology    388
6               expert panel review:  a
7               weight of evidence
8               systematic review of the
9               relationship between
10               glyphosate exposure and
11               non-Hodgkin's lymphoma or
12               multiple myeloma
13   Exhibit 35   Critical Reviews in    409
14               Toxicology review article
15               entitled Evaluation of
16               carcinogenic potential of
17               the herbicide glyphosate,
18               drawing on tumor incidence
19               data from fourteen
20               chronic/carcinogenicity
21               rodent studies
22
23
24
25

Page 9

1    Exhibit 36   Critical Reviews in    416
2               Toxicology article entitled
3               A review of the
4               carcinogenic potential of
5               glyphosate by four
6               independent expert panels
7               and comparison to the IARC
8               assessment
9    Exhibit 37   Expert report of Charles    418
10               Benbrook
11   Exhibit 38   7/6/2016 email from John    427
12               Lynch to Jennifer Listello,
13               MONGLY03558820-3558823
14   Exhibit 39   Peer-reviewed paper    430
15               entitled Differences in the
16               carcinogenic evaluation of
17               glyphosate between the
18               International Agency for
19               Research on Cancer (IARC)
20               and the European Food
21               Safety Authority (EFSA)
22   Exhibit 40   Copies of receipts from    433
23               purchased of Roundup by
24               Jeff Hall
25

3 (Pages 6 to 9)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                 May 23, 2018                       CONFIDENTIAL

---

Page 10

1    CLARKSTON, WASHINGTON; MAY 23, 2018
2              8:30 A.M.
3              --oOo--
4
5
6         VIDEO OPERATOR:  This is the videotaped
7    deposition of Charles Benbrook, Ph.D.  Today's date is
8    May 23, 2018.  The time is 8:30 a.m.  This is the case
9    of Ronald -- Ronald Peterson and Jeff Hall versus
10   Monsanto Company.  The case number is 1622-CC01071.
11   This case is pending in the Circuit Court of the City
12   of St. Louis, State of Missouri.  My name is Stephan
13   Andreychuk, and I am representing Paszkiewicz Court
14   Reporting.  The court reporter is Patsy Jacoy.  This
15   deposition is taking place at Quality Inn, 700 Port
16   Drive, Clarkston, Washington 99403.
17        Counsels, will you -- Counsel, will you please
18   state your appearance.
19        MR. LITZENBURG:  Timothy Litzenburg for
20   the plaintiffs.
21        MR. HOLLINGSWORTH:  Grant Hollingsworth
22   of Hollingsworth LLP for Monsanto Company.
23        MS. KRAJEWSKI:  Sarah Krajewski of
24   Winston & Strawn for Monsanto Company.
25        MS. HOEKEL:  Jennifer Hoekel -- excuse

---

Page 11

1    me -- for the Osborn & Barr defendants.
2         VIDEO OPERATOR:  The court reporter will
3    now swear in the witness.
4
5         CHARLES BENBROOK, Ph.D.,
6    sworn as a witness by the Certified Court Reporter,
7    testified as follows:
8
9              EXAMINATION
10   BY MR. HOLLINGSWORTH:
11   Q.  Dr. Benbrook, thanks for coming in.  You've
12   been deposed several times before, correct?
13   A.  Yes.
14   Q.  You're aware of the ground rules, correct?
15   A.  Yes.
16   Q.  You know, we'll keep the pace at a reasonable
17   pace here and just wait until I'm done asking my
18   question before you answer, and I'll give you the same
19   courtesy, all right?
20   A.  Fine.
21   Q.  Sir, your last deposition in February about
22   three months ago you stated that you hope as this body
23   of litigation goes on you have an opportunity to go
24   deeper into the record.  Do you recall that?
25   A.  Yes.

---

Page 12

1    Q.  At the time of your last deposition you
2    testified that you spent 320 to 350 hours reviewing
3    materials in preparation for your role as an expert
4    witness.  Do you recall that?
5    A.  Yes, I do.
6    Q.  And that was between October and December 23rd
7    of 2017.  Do you recall that?
8    A.  Correct.
9    Q.  Now, since that time, how many hours -- and
10   that's since your deposition on February 9th of 2018 up
11   through today -- how many hours have you spent
12   reviewing materials and otherwise preparing for your
13   testimony today?
14   A.  I -- I didn't -- I didn't bring my in --
15   invoices.  I don't have the exact number, but it would
16   be, oh, I don't know, since -- since the last
17   deposition it probably would be 50 hours, something
18   like that.
19   Q.  Okay.  And are you aware that we asked for
20   your invoices prior to your deposition here today?
21   A.  I -- I'm -- I'm not sure if you did.  I --
22   Mr. Litzenburg said that he had worked out with you all
23   the documents that need to be brought and that he's
24   taken care of it.
25   Q.  Okay.  So you didn't review any notice of

---

Page 13

1    deposition to see whether you had materials responsive
2    to the request; is that correct?
3    A.  I -- I read -- I read it, and -- and as I
4    said, Mr. Litzenburg said that he's work -- worked that
5    all out with you, so...
6    Q.  Okay.  And so -- but you did have documents
7    responsive to the request, but you haven't provided
8    them today?
9         MR. LITZENBURG:  Asked and answered.
10   A.  Pardon me?
11   Q.  (BY MR. HOLLINGSWORTH)  You can answer.
12        MR. LITZENBURG:  It's asked and
13   answered.
14        You can -- you can tell him the same thing you
15   went over if you want.
16   A.  I think you -- you have -- I mean, perhaps you
17   don't have -- I mean, I have not submitted an -- an
18   invoice, of course, for May yet, the current month, so
19   that doesn't exist but, you know, we certainly can get
20   you those hours.
21   Q.  (BY MR. HOLLINGSWORTH)  Okay.  And it's not
22   just hours, but it's also communications with several
23   people listed on the notice of deposition and document
24   subpoena request.  Do you recall that?
25   A.  Yes.

---

4 (Pages 10 to 13)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL               May 23, 2018                 CONFIDENTIAL

Page 14

1    Q.  Okay.  And is it your testimony that you
2  didn't have any communications with those people?
3         MR. LITZENBURG:  No.  We've -- we've
4  provided a written response and objection which I have
5  just slid across the table prior to the start of this
6  deposition which is signed by me.
7    Q.  (BY MR. HOLLINGSWORTH)  You can answer.
8    A.  I -- I'm -- I believe that you have everything
9  that pertains to the case.  I don't have any written
10  communications or -- with any of the -- the people that
11  I saw in the request.  I haven't contacted anybody, so,
12  yeah, I think you have everything that's -- that --
13  the -- the further work that I've done in preparation
14  for the deposition, you -- you have a record of all of
15  it between my report and -- and the documents that --
16  that you've been -- that have been noted in this -- I
17  guess it's the supplemental information.
18    Q.  So it's your testimony that the people
19  discussed in the notice of deposition and document
20  subpoena, you haven't had any written communications
21  with those people?
22         MR. LITZENBURG:  Again, there's written
23  objections that I've provided and signed.
24         You can answer or not, but...
25    A.  It -- it -- why don't you give me a copy of

Page 15

1  the thing and I'll just make sure that I haven't
2  forgotten something.
3    Q.  (BY MR. HOLLINGSWORTH)  We'll go over that in
4  a little bit.  I want to get back to the hours spent
5  during the last -- since your last deposition.  Have
6  you had an opportunity to dive deeper into the record?
7    A.  I -- I think just to -- to go over the -- the
8  critical documents and -- and exchanges that I address
9  in my expert report.  I -- I'm not -- I wouldn't
10  characterize it as necessarily much deeper, but trying
11  to refresh my memory on all the -- the key documents
12  that -- that form my opinion.
13    Q.  And what are the critical documents that form
14  your opinion?
15    A.  They're cited in my expert report.
16    Q.  Well, there's lots of documents cited in your
17  expert report.
18    A.  Yeah.
19    Q.  Did you re-review all the documents in your
20  expert report?  Is that what you did?
21         MR. LITZENBURG:  Objection to form.
22    A.  Basically, yes.
23    Q.  (BY MR. HOLLINGSWORTH)  Okay.  So you didn't
24  review any additional documents?
25    A.  Well, to prepare for the deposition, no.

Page 16

1    Q.  Okay.  As of your last deposition on
2  February 9th, you stated that you had not reviewed in
3  any detail EPA's most recent issue paper on the
4  carcinogenic potential of glyphosate that came out in
5  December 2017.  Do you recall that?
6    A.  Yes, I do.
7    Q.  And since this -- since your deposition on
8  February 9th, you haven't taken any deeper dive into
9  that record from EPA; is that correct?
10    A.  No, I haven't.
11    Q.  Okay.  And why did you feel it wasn't
12  important to review in any detail EPA's most recent
13  issue paper on the carcinogenic potential of
14  glyphosate?
15    A.  Because in -- in my work on the case and in my
16  expert report I go into great detail on the evolution
17  of EPA's thinking on the oncogenicity of glyphosate.
18  It's -- it's a -- an issue that the agency has been
19  struggling with since the early 1980s.  I'm -- I
20  address that issue in great detail in my report and
21  I -- it was very clear to me that there was really
22  nothing -- nothing new in the EPA's late 2017 and 2018
23  reports in terms of a change in their position.  So
24  I'm -- I've been aware of their position throughout all
25  my work on this and there really wasn't much new to

Page 17

1  learn from that, so I didn't feel it was important
2  to -- to really pay much attention to.
3    Q.  Is it your testimony that EPA did not consider
4  any additional studies or list any additional studies
5  in the references or tables within the 2017 OPP report
6  that -- that does, in fact, show that they reviewed new
7  materials?
8    A.  I think there was -- there was a few new
9  studies that -- that came out since the -- the last
10  time they wrote and released a -- a formal document,
11  yes, yeah, there --- there's been a -- a few more.  But
12  I didn't -- I didn't pay much attention to it before
13  filing my expert report in the previous deposition
14  and -- and I haven't returned to it.
15    Q.  Okay.  And how about the EPA 2016 -- September
16  2016 issue paper on the carcinogenic potential of
17  glyphosate?  You testified at the last deposition that
18  you hadn't reviewed that in much detail.  Is that -- is
19  that still the case today?
20    A.  Yes, because it's consistent with what they
21  have been saying for a number of years.
22    Q.  When you say it's consistent with what they've
23  been saying for a number of years, do you mean that EPA
24  has determined that glyphosate is not likely to be
25  carcinogenic to humans?

5 (Pages 14 to 17)

Charles Benbrook, Ph.D.
May 23, 2018

Page 18

1 A. That's the classification that -- that EPA has
2 had in place, yeah, for a number of years.
3 Q. And that classification, that's what's
4 ultimately important to you, right?
5 A. Well, it's a -- it's one -- one entity around
6 the world that looked at -- that has looked at and made
7 a judgment based on the laws that -- that EPA is
8 obligated to administer, based on the standard in -- in
9 the federal Insecticide, Fungicide, Rodenticide Act
10 that governed their decision-making and, yeah, I'm
11 quite -- quite familiar with the statutory basis and
12 the -- the scientific arguments that the EPA has -- has
13 advanced in support of -- of its -- its decision, and
14 I'm also aware of the position and -- and arguments
15 that -- that other entities have -- have taken,
16 including those that -- that don't agree with the
17 position that the EPA has -- has taken. And, you know,
18 I would say that the debate hasn't progressed very far
19 since the last time we talked three months ago. It's
20 been pretty much where it was then.
21 Q. EPA's conclusion that glyphosate is not likely
22 to be carcinogenic to humans, that dates back to at
23 least 1991, correct?
24 A. That was the year that they overturned their
25 previous classification of glyphosate as a possible

Page 19

1 human carcinogen, a decision that was in place from, I
2 think, 1985 to 1991.
3 MR. LITZENBURG: Can -- can we go off
4 the record for one second. We don't need to stop the
5 video, just off that record.
6 (Discussion off the written record.)
7 Q. (BY MR. HOLLINGSWORTH) EPA's cancer
8 assessment peer review committee in 1991 determined
9 that glyphosate is not likely to be carcinogenic to
10 humans, a Group E classification that, as you state,
11 has remained the same all the way until today, correct?
12 A. Correct.
13 Q. And although EPA's classification of
14 glyphosate has not changed since 1991, their review of
15 the relevant studies and scientific publications is
16 certainly not static. The review is continuing to keep
17 up with the scientific developments and literature,
18 correct?
19 A. I don't -- I don't agree with that statement
20 fully, no, I don't think they have.
21 Q. So it's your opinion that EPA's review of the
22 scientific literature and publications has not changed
23 since its determination in 1991 that glyphosate is not
24 likely to be carcinogenic to humans?
25 A. As I -- as we -- we went into in great detail

Page 20

1 in the earlier deposition, as I go into great detail in
2 my expert report, the -- the factor that -- that I
3 think many scientists place the most weight on, those
4 who -- who disagree with EPA's judgment is the
5 significant evidence in the literature now that -- that
6 glyphosate and glyphosate-based herbicides trigger
7 genotoxic effects through at least two mechanisms, and
8 as -- in the very important reclassification of
9 glyphosate and glyphosate-based herbicides by the
10 International Agency For Research on Cancer in March of
11 2015, the principal reason that that IARC
12 classification was such a shock to Monsanto, such a
13 shock to me and -- and a -- a big surprise to people
14 around the world was what the IARC working group
15 characterized as the strength of the evidence on a
16 mechanism through which glyphosate and glyphosate-based
17 herbicides could plausibly trigger cancer, and it -- so
18 it -- it was, in fact, the -- the -- the clear view of
19 this very highly-respected and qualified working group
20 that there was strong evidence of genotoxic effects in
21 the literature following exposure to glyphosate and
22 glyphosate-based herbicides, and I -- I -- I place a
23 lot of weight in the independence of the IARC review.
24 I -- I thought that their -- the judgments they reached
25 on the question of genotoxicity were well supported and

Page 21

1 logical and, frankly, they agreed with Dr. Parry's
2 conclusions from, you know, a decade earlier when he
3 under contract to Monsanto looked at -- at the studies
4 that were available up into and -- and through the
5 early 2000s.
6 So, you know, I -- I think that EPA's
7 unwillingness to acknowledge that there was new and
8 persuasive data in the peer-reviewed literature showing
9 that glyphosate and glyphosate-based herbicides are
10 genotoxic, that that was -- I think that's the -- the
11 most important factor that explains the -- the
12 difference in -- in EPA's current classification
13 relative to the IARC classification.
14 Q. Are you finished?
15 A. Yeah.
16 Q. You state that you are familiar with the
17 glyphosate toxicology database and the scientific
18 literature on glyphosate. Is that fair?
19 A. Yes.
20 Q. You state also that IARC's finding was such a
21 shock, such a big surprise to you. Why is it such a
22 big surprise to you, given you are well versed in the
23 scientific literature, the weight of the evidence which
24 shows glyphosate is not likely to be carcinogenic to
25 humans?

6 (Pages 18 to 21)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 22

1      A. Well, you know, I was aware at least a year
2  before the IARC working group report and finding was --
3  was released that it was going on. The European
4  community was reviewing glyphosate and, you know, and
5  clearly the questions around glyphosate oncogenicity
6  was a -- a major issue in the regulation of glyphosate
7  in the US and worldwide, and I had been tracking that
8  issue since the '80s. I was -- I had most of the --
9  the key documents in the '80s and '90s that we've
10  talked about in -- in this case, I had received,
11  reviewed, talked to people about at the time they came
12  out.
13      So the -- the -- the concern and the
14  scientific debate and the uncertainty around the EPA
15  classification of glyphosate and how other regulators
16  around the world were treating it is -- you know,
17  it's -- it's been -- it's been something I've tracked
18  in -- in some detail for 30 years. And given the --
19  the remaining uncertainty around the registrant
20  conducted and submitted studies, the emerging evidence
21  on -- on genotoxicity, I -- I -- I was among those
22  that -- that expected actually that IARC would classify
23  glyphosate as a possible human carcinogen.
24      Knowing their criteria pretty well and knowing
25  the literature, I -- I thought that they would -- would

Page 23

1  quite likely classify glyphosate as a -- as a possibly
2  human carcinogen, you know, sort of one -- one layer
3  down from their ultimate decision. And when -- when I
4  read, you know, in the media the day or day after the
5  press release was issued by IARC and the -- the
6  short -- the short paper came out in the Lancet about
7  the -- the classification, I -- you know, it -- it
8  surprised me that it -- that IARC went all the way to a
9  probable human carcinogen because I -- I knew that
10  there was debate and -- and disagreement about the
11  animal evidence, that there -- there was certainly no
12  way they were going to characterize the animal data as
13  strong. They -- they ended up discussing it as
14  sufficient.
15      And epidemiological data also, while there was
16  a number of studies, I -- you know, at -- at the time I
17  didn't know for sure how persuasive they would consider
18  the epidemiological data to be, and -- and back in 2014
19  to 2015 when the IARC decision had come out, I had not
20  done as nearly a thorough a job in assessing all the --
21  the then existing epidemiological data as I've done now
22  in preparation for the case, and that was one aspect of
23  the record that I've learned a lot about since the IARC
24  decision came out.
25      I did expect IARC to put considerable weight

Page 24

1  on the positive genotoxicity data, especially the data
2  on the formulated products where not only were there a
3  number of positive genotox studies, but there were a --
4  a dozen or more studies in the peer-reviewed literature
5  showing that formulated glyphosate-based herbicides are
6  more toxic than the active ingredient, and I thought
7  IARC would put considerable weight on that, as they
8  did.
9      So, you know, as I said, I -- I kind of
10  expected a -- a possible rating, but I was -- I was
11  really surprised when it came out as probable.
12      Q. You agree the evidence of genotoxicity and
13  oncogenicity associated with exposure to glyphosate --
14  glyphosate-based herbicides is complicated, correct?
15      A. Yeah, yes.
16      Q. To be fair, you don't consider the evidence of
17  genotoxicity and oncogenicity to be a slam dunk under
18  any circumstances, correct?
19      MR. LITZENBURG: Object to form.
20      A. Well, no, I -- I think it is a -- you know, it
21  certainly was a slam dunk based on the detailed review
22  that the IARC working group did, and I have a great
23  deal of respect as do regulatory agencies and
24  international bodies around the world for the -- the
25  competence and the rigor and the care that an IARC

Page 25

1  working group puts into these assignments and, you
2  know, I -- I place -- I place a lot of weight on their
3  judgment and, you know, I'm certainly not -- I don't
4  feel that I know the literature well enough or -- or
5  know the science that is required to really at a very
6  deep level understand what all these studies mean, but
7  I -- I do believe that the IARC working group has a mix
8  of people that has those skills and I -- I think that
9  they felt that the data was -- was quite strong, and
10  that's why they elevated the ranking to probable.
11      In fact, there -- as I said in my expert
12  report, the most protracted debate in the working group
13  was whether to classify glyphosate as a proven human
14  carcinogen as opposed to a probable, and when I've --
15  when Aaron Blair told me that, I was doubly shocked
16  because I -- I just was really surprised that based on
17  the IARC criteria that they would go that -- that some
18  of the people in the working group felt that the data
19  was -- was that strong, but, you know, as I said in my
20  expert report, you know, it -- the release of the IARC
21  report has obviously changed the -- views of a lot
22  of people about this body of evidence and certainly
23  affected my thinking.
24      Q. (BY MR. HOLLINGSWORTH) You read the IARC
25  report before your last deposition, correct?

7 (Pages 22 to 25)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 26

1    A. I -- yes, yes, of course.
2    Q. And at your last deposition you stated the
3  evidence of genotoxicity and oncogenicity associated
4  with exposure to glyphosate-based herbicides is
5  complicated, it's not a slam dunk under any
6  circumstances. Are you taking back that testimony?
7        MR. LITZENBURG: Object to form.
8    A. Well, I'm -- I'm -- I don't know the context
9  in which I gave that -- that answer. You asked me
10  having -- based on all of my review of the data, yes,
11  it's complicated, but -- but ultimately the -- the
12  decision that was made by IARC and the -- and the
13  classification, by "slam dunk," I interpret you -- your
14  including that phrase today in this deposition as did
15  I -- did I regard -- do I regard today the evidence as
16  strong and in support of the -- the classification that
17  IARC did, and yes, I do feel that they had -- they
18  obviously had what they felt was substantial and
19  persuasive evidence to make that classification. And,
20  you know, that -- that to me makes the judgment that
21  they -- they reached a -- a clear and decisive one.
22  And if you want to use the word "slam dunk" around it,
23  fine.
24    Q. (BY MR. HOLLINGSWORTH) Sir, it's not my
25  interpretation of the word "slam dunk" it's your own

Page 27

1  word "slam dunk," and, you know, we're not deposing
2  IARC here today. We're deposing you.
3    A. Yeah.
4    Q. And you testified previously at your last
5  deposition that the evidence of genotoxicity and
6  oncogenicity associated with exposure to
7  glyphosate-based herbicides, it's complicated, it's
8  not a slam dunk under any circumstances. Is that not
9  your opinion today?
10        MR. LITZENBURG: Object to form, asked
11  and answered.
12    A. The -- the -- what I was trying to convey in
13  response to the question in my earlier deposition is,
14  A, that -- that reaching this kind of a scientific
15  judgment is complicated. Many factors have to be taken
16  into account within each of the categories of
17  information that EPA has to -- has to and has reviewed
18  and that IARC has to and did review. There -- there
19  are many factors that experts in the field have to take
20  into account in integrating into a single judgment that
21  data set.
22        At -- but at the -- at the end of the day, I
23  regarded and I regard today that the classification
24  reached by IARC represents a decisive, and if you want
25  to use the term "slam dunk" judgment, then yes. So in

Page 28

1  my -- in my earlier statement by -- by saying it wasn't
2  a slam dunk, I -- I was referring to the fact that
3  there -- there wasn't unequivocal animal data. For
4  example, Monsanto refused to redo the mouse study which
5  may have clarified that question. That would have made
6  it more of a slam dunk. There -- there was ongoing
7  questions about a number of epidemiological studies
8  and -- and differences of findings across the studies
9  that would not make the -- the database easy to reach a
10  decision or quote/unquote a slam dunk.
11        So that's what I was trying to explain when I
12  answered that question in the earlier deposition. But
13  if you're -- if you're asking me today, you know, why I
14  would say that the -- the classification of glyphosate
15  as a probable human carcinogen as reached by IARC in
16  2015 was a strong and decisive decision, whether you
17  want -- whether you feel the -- the term "slam dunk"
18  applies or not is -- is kind of irrelevant, but in my
19  judgment it reflected a -- that the IARC working group
20  regarded the evidence as strong and persuasive, and --
21  and because of that, they reached this unexpected
22  decision to classify glyphosate and glyphosate-based
23  herbicides as probable human carcinogens.
24    Q. (BY MR. HOLLINGSWORTH) You had reviewed the
25  Agricultural Health Study's most recent update to the

Page 29

1  cohort on glyphosate and farmers prior to your last
2  deposition, correct?
3    A. Yes, I had.
4    Q. Okay. And in terms of the evidence of
5  oncogenicity in glyphosate being a slam dunk, would it
6  be more of a slam dunk if the AHS cohort, as exhibited
7  in the 2018 journal from the National Cancer Institute,
8  found that there was actually an association between
9  glyphosate and non-Hodgkin's lymphoma rather than what
10  they found, which is no association?
11    A. Certainly that would have been another piece
12  of evidence that would -- would probably have led the
13  IARC working group to classify glyphosate and
14  glyphosate-based herbicides as a -- as a proven human
15  carcinogen, and this is -- you know, this is kind of
16  basically when I spoke with Aaron Blair, the chair of
17  the working group, a couple days after it came out, he
18  said that the key reason that they -- the working group
19  at the end of the -- at the end of the day decided not
20  to classify glyphosate as a proven human carcinogen was
21  he used the word "noise" in the -- in the epi data, and
22  by that he was, I think, quite clearly referring to the
23  fact that, you know, an earlier Agricultural Health
24  Study was positive for the connection between
25  glyphosate and non-Hodgkin's lymphoma, but the most

8 (Pages 26 to 29)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 30

1  recent one wasn't, so that's what he was referring to
2  as noise.
3      Q. The evidence between glyphosate and
4  non-Hodgkin's lymphoma is not a slam dunk because the
5  2018 update to the AHS cohort determined there's no
6  association between glyphosate and NHL or any of its
7  subtypes, correct?
8      A. No, I don't agree with that, as I've just
9  tried to explain in some length. Sorry you -- you
10 didn't understand it. Do you want me to restate it
11 again?
12     Q. The evidence between glyphosate and
13 non-Hodgkin's lymphoma is not a slam dunk because the
14 AHS cohort update found no association between
15 glyphosate and non-Hodgkin's lymphoma, correct?
16     A. I don't agree with that.
17     Q. Why not?
18     A. The most recent publication from the
19 Agricultural Health Study is one of multiple
20 epidemiological studies, as you know, some of which
21 report no association and several of which do report
22 association. The Agricultural Health Study cohort is
23 primarily made up of commercial applicators and -- and
24 farmers who have sprayed Roundup-based herbicides in
25 some cases over many years in an agronomic/agricultural

Page 31

1  setting where the people handling the herbicide and
2  making the applications are spraying from equipment
3  that has enclosed cabs and sophisticated air filtration
4  systems, and the evidence in the record from both
5  Monsanto-commissioned worker exposure studies and EPA
6  worker exposure risk assessments is quite clear that
7  those sorts of uses of glyphosate, particularly in the
8  last 15 or 20 years, typically don't result in -- in
9  high exposure episodes and certainly nowhere near as
10 high as people who are occasionally or -- or frequently
11 applying glyphosate with handheld or backpack sprayers
12 or some other method of application that entails much
13 higher levels of worker and applicator exposure.
14         And, in fact, the -- from my review of -- of
15 the epidemiological literature, a primary factor
16 distinguishing the Agricultural Health Study from the
17 positive -- the studies that have reported a positive
18 linkage between Roundup use and exposures and
19 non-Hodgkin's lymphoma is that the -- the study cohorts
20 include a significant number of people that -- that
21 used and applied Roundup herbicides in industrial turf,
22 ornamental or -- or sort of nonagricultural
23 circumstances.
24     Q. Sir, what are you basing your testimony that
25 the Agricultural Health Study includes farmers who

Page 32

1  aren't applying glyphosate via backpack sprayers or
2  some of the other types of exposure that you claim
3  result in higher exposure?
4      A. Reading the methodology and the various -- I
5  mean, there's been dozens of scientific papers based on
6  the Agricultural Health Study not just involving
7  Roundup and glyphosate but multiple other pesticides
8  that -- that I have been involved with over the years,
9  and in all of those papers there is a methodology
10 section that discusses in varying levels of detail the
11 cohort that -- of people that were enrolled in the
12 study and there's a -- you know, as you are no doubt
13 aware, there's also a couple of almost purely
14 methodological studies where the Agricultural Health
15 Study team has described the methods that -- through
16 which they have carried out the study, and in those
17 papers there's great detail on the -- the cohort and
18 the -- the types of scenarios and circumstances in
19 which they applied glyphosate and, you know, it's
20 certainly my judgment that the vast majority of the
21 total pounds of glyphosate and Roundup herbicides
22 sprayed by the people in the cohort or the vast number
23 of acres treated were treated in, you know, relatively
24 large-scale commercial equipment, ground-driven
25 equipment or airplanes and not backpack sprayers

Page 33

1  spraying around the, you know, buildings on a -- on a
2  farm.
3      Q. You're speculating when you say that the
4  farmers in the Agricultural Health Study did not apply
5  glyphosate via backpack sprayers or some other method
6  of what you claimed is increased exposure?
7      A. No, sir. I am testifying to the fact that the
8  vast majority of the glyphosate and Roundup herbicides
9  sprayed by the individuals in the Agricultural Health
10 Study cohort sprayed glyphosate in sort of typical
11 agricultural settings on crop fields that you, know,
12 would be five, ten, 15 acres to maybe 80 or 100 acres.
13 They did so as part of their -- their work. If it's a
14 farmer, they would be spraying their own land. If they
15 were a commercial applicator, they would be spraying
16 the farms and farmland of many clients, and the vast
17 majority of all of the pesticides that -- that these
18 applicators and farmers applied, including the Roundup
19 herbicides, would have been done in an agricultural
20 setting.
21         That's not to say that around their home,
22 around the buildings, you know, and their place of
23 business, in the case of a farmer around a barn, that
24 they didn't occasionally spray with a backpack sprayer
25 or a sprayer on the back of an ATV. It's probably

HIGHLY CONFIDENTIAL
Charles Benbrook, Ph.D.
May 23, 2018
HIGHLY CONFIDENTIAL

Page 34

1  fairly certain that a number of them did that at some
2  point along the way. But I am quite sure based on my
3  understanding of the cohort and the information that's
4  reported in the methodology sections of the multiple
5  papers on the Agricultural Health Study that the vast
6  majority of the Roundup sprayed by these people over
7  their lifetimes were -- were done in a -- with
8  equipment that included cabs and air filtration systems
9  and relatively low exposures compared to these other
10  use patterns and spray equipment.
11      Q  You're speculating when you say that farmers
12  did not use Roundup around their house to any great
13  extent; is that correct?
14      A  No, I'm not speculating. That is a relative
15  statement. They -- let me make it -- try to make it
16  even clearer. For the vast majority of the individuals
17  in the cohort of the Agricultural Health Study, if you
18  calculated their total use of Roundup over their life
19  by pounds, pounds of active ingredient applied, and
20  then apportioned that between the volume of Roundup
21  sprayed in the course of really them doing their jobs,
22  i.e., treating agricultural fields and -- and added up
23  the total pounds sprayed in that way and then asked
24  them, "What about Roundup use in and around your garden
25  or your house where you used an ATV or a handheld or a

Page 35

1  backpack sprayer, what would be the total pounds of
2  Roundup that you applied in that mechanism?" And even
3  if they said they sprayed -- they used Roundup in that
4  way most every year and sprayed three or four times
5  around their house, it would -- the amount of active
6  ingredient applied would still be a tiny fraction of
7  the amount sprayed on their farm fields and, you know,
8  through the larger-scale equipment. So that's a
9  relative statement and I stand by it.
10      Q  So the exposure analysis that you're talking
11  about from the glyphosate literature, that was
12  incorporated into the Agricultural Health Study's
13  intensity score, correct?
14      A  It's a factor, yes.
15      Q  And you testified previously that the
16  intensity score from the Agricultural Health Study is a
17  very sophisticated way of tracking exposure. Do you
18  recall that?
19      A  I -- I do, and it is a sophisticated way.
20  I -- I don't know of a -- really any epidemiology study
21  that went further or attempted to go further than the
22  Agricultural Health Study in that refined measure of
23  exposure, you know, based on the -- the recall of the
24  people enrolled in the study about, you know, when they
25  applied Roundup and under what circumstances, and I do

Page 36

1  think that that intensity score is an improvement over
2  some of the other indicators of exposure incorporated
3  in other epidemiological studies, but it certainly
4  leaves a lot to be desired as -- as the Agricultural
5  Health Study coauthors point out in the -- in most of
6  their papers, at the end there's a section on
7  limitations, and they acknowledge that, you know, while
8  they feel that their intensity score is better than
9  just asking people, "Well, how many days in a year did
10  you apply Roundup," for example, that -- that the score
11  is a -- is a step towards a more accurate exposure
12  metric, but it -- it certainly leaves a lot to be
13  desired.
14      Q  The intensity score from the Agricultural
15  Health Study is a more sophisticated and accurate way
16  of tracking exposure in epidemiology studies especially
17  compared to the single day of use method of tracking
18  exposure, correct?
19      A  I would agree with that, yep.
20      Q  I want to go back to your statements earlier
21  about what you reviewed in this case. Now, you
22  testified that you didn't review the 2017 OPP issue
23  paper on the carcinogenic potential of glyphosate in
24  any great detail, correct?
25      A  Correct.

Page 37

1      Q  And you testified previously that EPA's review
2  of the scientific literature on glyphosate hasn't
3  changed much between 1991 and 2017; is that correct?
4      A  Well, over that time frame, of course, there
5  were additional two-year chronic feeding studies
6  submitted to the agency, several of them, three dozen
7  genotoxicity studies at least, several different
8  epidemiological studies. So, yeah, the EPA has --
9  has -- in -- as it has continued to refine its risk
10  assessment of the oncogenic potential of -- of
11  glyphosate, it has incorporated its review of the
12  registrant commissioned and submitted studies as well
13  as studies that have appeared in the open peer-reviewed
14  journal. Yeah, I -- it -- it has taken those into
15  account, but it has basically not changed its -- its
16  underlying judgment.
17      Q  EPA hasn't changed its underlying judgment in
18  considering additional chronic feeding studies on
19  glyphosate, specifically EPA now has 14 chronic feeding
20  studies on glyphosate, correct?
21      A  From the registrants, yeah.
22      Q  And that is significantly more than what they
23  had in 1991 when they determined that glyphosate is not
24  likely to be carcinogenic to humans, correct?
25      A  I would agree with that, yep.

10 (Pages 34 to 37)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 38

1    Q. It includes four more mouse studies than what
2    EPA had in 1991 when they concluded that glyphosate is
3    not likely to be carcinogenic to humans, correct?
4    A. I believe that's the correct number.
5    Q. Okay. And is it your opinion that those
6    additional studies are not important to a regulator's
7    review of the weight of the evidence as to whether
8    glyphosate causes non-Hodgkin's lymphoma?
9    A. No, that's not my testimony and I've never
10   said that, so no.
11   Q. So you agree then that EPA's review of the
12   animal carcinogenicity database between 1991 and 2017
13   has evolved with increased scientific publications,
14   increased studies, advances in science that are
15   relevant and, in fact, important to their 2017
16   determination that glyphosate is not carcinogenic to
17   humans?
18   MR. LITZENBURG: Object to form.
19   A. I -- I do believe that EPA does as thorough a
20   job as it can in describing the review that it made of
21   these additional studies in explaining why it doesn't
22   place much weight on the multiple tumors reported in
23   those studies that other scientists believe were
24   associated with the treatment. They -- as a matter --
25   you know, just as a factual matter their -- their

Page 39

1    classification, it didn't change, and hence I would say
2    it didn't evolve. They have tried to defend their
3    classification in the light of the new -- new science,
4    and that's -- that has come out and that is, in fact,
5    the important and new content of the -- the 2017 and
6    I'm sure any future documents that come out from EPA on
7    the question of glyphosate oncogenicity.
8    However, other scientists looking at some of
9    the same studies, other studies, and in particular the
10   IARC, their position evolved in -- over this -- as a
11   result of this new information in a different way and
12   led them to change their classification and, as I said,
13   one of the -- the critical disagreements between EPA
14   and IARC is the question of how strong and significant
15   is the genotox database, and clearly IARC felt it was
16   significant and felt there was very strong evidence.
17   But, in addition, the IARC working group had
18   done a thorough review of many of the cancer studies,
19   those that were -- that were available to them, had
20   done meta analyses, had taken a -- a different view on
21   some of the tumors that were elevated where EPA
22   ultimately agreed with Monsanto and -- and reached a
23   judgment that they were not treatment-related, while
24   some of the -- several other scientists that looked at
25   the same studies have -- have reached a different

Page 40

1    agreement.
2    And so if you look at the -- the meta analysis
3    that was done and provided support for the IARC working
4    group's judgment on the animal data that's the part of
5    the -- the IARC criteria that we're talking about,
6    they -- their -- their position and view of the data
7    evolved, but reached a different point where they felt
8    that there was sufficient animal data to support the
9    classification in light of the other data of glyphosate
10   as a possible human carcinogen.
11   So -- you know, I -- I have a -- a deep
12   understanding of why EPA over the years has made the
13   decisions that they did, why they originally classified
14   glyphosate as a possible human carcinogen, why they
15   were ultimately driven to change their classification
16   culminating in the 1991 change in their -- in
17   classification and -- and why in the ensuing years they
18   just -- the EPA has not felt that there was strong
19   enough evidence based on their -- their regulations and
20   the way that they review data and the statute that they
21   work under to -- to change the classification, whereas
22   the IARC working group obviously did, and I -- I
23   believe that the IARC working group's assessment of the
24   literature and judgment was -- was sound and robust
25   and -- and less influenced by the -- some of the

Page 41

1    factors that discouraged EPA from continuing to fight
2    with Monsanto over the classification of -- of
3    glyphosate.
4    Q. (BY MR. HOLLINGSWORTH) Are you finished?
5    A. Yeah.
6    Q. To be clear, when EPA first approved Roundup
7    in 1974 it was not classified as a possible human
8    carcinogen, correct?
9    A. They didn't -- they -- I don't think they had
10   a two-year feeding study when the very first actions
11   were taken.
12   Q. It was not classified as a possible human
13   carcinogen when it was first approved in 1974, correct?
14   A. It wasn't classified at all.
15   Q. So when you say EPA originally classified
16   glyphosate as a possible human carcinogen, that's not
17   true with respect to its original approval, correct?
18   A. No, it is true. The -- I'm not aware of a
19   formal decision that EPA made on glyphosate
20   oncogenicity before the 1985 decision based on the
21   1990 -- 1983 biodynamic mouse study. The first study
22   that they -- that they received, the rat study from IBT
23   was, you know, classified as nonacceptable or
24   fraudulent. I don't remember the -- the details. So,
25   I mean, EPA really didn't have a valid two-year chronic

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL              May 23, 2018                CONFIDENTIAL

Page 42

1  feeding study database until the 1983 mouse study was
2  submitted to the agency, and the first time that in my
3  knowledge and my read of the record that EPA made a
4  decision relative to oncogenicity was following the
5  receipt of the 1983 biodynamic study, and based on the
6  statistically significant increase in a dose response
7  way to a rare tumor, renal tubular adenomas in the male
8  mice in that study, they classified glyphosate as a
9  possible human carcinogen. And I'm -- I'm not aware of
10  an earlier time when EPA made a decision one way or
11  another on the oncogenicity prior to that time.
12      Q. You're speculating when you say that EPA did
13  not make a prior decision as to glyphosate's
14  carcinogenicity that is prior to 1985 and the
15  toxicology branch memo that you're referring to,
16  correct?
17      A. I am not speculating, sir. I have read every
18  single tolerance petition and notice in the federal
19  register. I have spent many, many hours reviewing the
20  early history of glyphosate tolerances because it --
21  the tolerance setting process was where EPA made a
22  number of decisions, and in all of those tolerance
23  actions, the agency reports a review of the toxicology
24  database available to them at the time, and throughout
25  that period from the very first -- basically it was an

Page 43

1  experimental use permit in 1974 through the -- the
2  decision in 1985, EPA did not have a valid database
3  because the whole first round of studies, the majority
4  of the first set of chronic feeding studies done by
5  Monsanto had been commissioned at IBT which was a --
6  later found to be a fraudulent lab that did not conduct
7  the studies in a -- in a honest or acceptable way
8  relative to good laboratory practices.
9      So basically, Monsanto spent the second half
10  of the '70s and into the early 1980s redoing the entire
11  chronic database and that -- the 1983 biodynamic mouse
12  study was the first, you know, full two-year valid
13  chronic feeding study that the agency had, and I -- I
14  cannot remember a single tolerance petition or final
15  rule where -- where EPA stated that they had two valid
16  long-term feeding studies and made a judgment about
17  oncogenicity until 1985. So I'm not speculating about
18  it. That's -- that's what I am aware of based on a --
19  you know, a quite detailed review of the record.
20      Q. When the toxicology branch in 1985 recommended
21  that glyphosates be classified as a possible
22  carcinogen, they only had one valid long-term feeding
23  study on rodents, correct?
24      A. They had the 1983 biodynamic study, correct.
25      Q. EPA today has 14 chronic feeding studies on

Page 44

1  rodents, correct?
2      A. Yes.
3      Q. They have determined that each of those
4  studies provides evidence that glyphosate is
5  noncarcinogenic to humans, correct?
6      A. In their reviews of each of the studies, they
7  go through all of the tumors that were reported in the
8  histopathology, several of which were -- have been
9  considered by some scientists reviewing the studies as
10  treatment-related, but at the end of the day in -- in
11  essentially all of the cases the EPA has accepted
12  Monsanto's assertion that these -- the tumors observed
13  were -- were not treatment-related, either because of
14  maximum tolerated dose being exceeded or arguments on
15  historical controls or uncertainty about the diagnosis.
16      But they -- when they review one of these
17  studies, they -- they don't render a judgment that
18  because of their review of the study the agency has
19  concluded that glyphosate does -- is not -- is not a
20  human carcinogen. They -- they don't -- they don't go
21  to that question when they review each of the
22  individual studies. When they make their overall
23  judgment on oncogenicity at any point along the time
24  they refer to the studies that they have in hand and
25  have reviewed at that point in time.

Page 45

1      Q. Sir, glyphosate went off patent in 2000,
2  correct?
3      A. Glyphosate herbicides were protected by
4  several different patents, but 2000, 2001 was the time
5  when most of the patent protection prohibiting other
6  companies from bringing generic glyphosate-based
7  herbicides on the market had lapsed, that's -- yes,
8  that's correct.
9      Q. As a result of that, there are now roughly six
10  different companies who have long-term carcinogenicity
11  studies on rodents, correct?
12      A. There's certainly several. I'd -- I'd have to
13  look at the list to -- to know whether it's six or
14  four, but it's in that ballpark, yes.
15      Q. So when you say each time EPA considered these
16  long-term rodent studies they agreed with Monsanto's
17  assertion as to how to interpret the tumors in those
18  studies, EPA was actually reviewing studies from other
19  manufacturers, correct?
20      A. Correct. Cheminova study was one of the
21  important ones that -- that had a carcinoma in it that
22  was debated at great length within -- within EPA and
23  which certainly members of the IARC working group
24  disagreed with the judgment of OPP that the tumors were
25  not treatment-related.

12 (Pages 42 to 45)

HIGHLY CONFIDENTIAL                Charles Benbrook, Ph.D.                HIGHLY CONFIDENTIAL
                                       May 23, 2018

Page 46

1    Q. But certainly it's not just Monsanto whose
2  studies EPA is considering, correct?
3    A. Correct, correct.
4    Q. So EPA -- it wouldn't be just Monsanto that is
5  getting EPA's agreement as to the interpretation of the
6  studies, correct?
7    A. Yeah, yes, correct.
8    Q. EPA has conducted a weight of evidence review
9  of each one of the 14 long-term rodent carcinogenicity
10 studies and determined that the weight of the evidence
11 for each one of those studies shows that glyphosate is
12 not likely to be carcinogenic to humans based on the
13 rodent study, correct?
14         MR. LITZENBURG: Form, asked and
15 answered.
16   A. Typically EPA makes a weight of the evidence
17 judgment when it's trying to reach a decision like how
18 to classify an active ingredient like glyphosate where
19 there's multiple genotox studies, multiple animal
20 studies, many different areas of data, perhaps some --
21 some epidemiological studies that they're aware of. So
22 in -- in most cases the weight of evidence judgment
23 comes at -- at the time when EPA is asked to sort of
24 re-review an active ingredient that's been on the
25 market for several years which they -- they, of course,

Page 47

1  did in 1986 on the registration standard and again in
2  1993 when the re-registration eligibility document on
3  glyphosate came out, so that's when they articulate
4  their weight of the -- weight of the evidence judgment
5  vis-a-vis classification of does pesticide X pose a --
6  a risk of cancer.
7         Your use of the EPA made a weight of the
8  evidence judgment on each one of these studies, I
9  suppose you could say that that EPA took into account
10 multiple pieces of information in -- in review of their
11 studies, for example, historical control data from
12 other studies and made a weight of the evidence
13 judgment, but I think it is more common for a -- a
14 thorough weight of the evidence decision to come at
15 these other decision points.
16   Q. (BY MR. HOLLINGSWORTH) Sir, when the
17 toxicology review branch classified glyphosate as a
18 possible carcinogen in 1985, they reviewed one study
19 and came to a conclusion as to what that rodent study
20 said about the potential for glyphosate to be
21 carcinogenic, correct?
22   A. Yes, sir.
23   Q. Is it your testimony that EPA doesn't make
24 that same review and determination each time it has a
25 new rodent carcinogenicity study?

Page 48

1    A. EPA clearly does not convene the -- this
2  cancer review committee and -- and make such a -- what
3  you might call a global decision on the classification
4  of glyphosate or any other -- any other pesticide each
5  time a new study comes in. They -- they probably will
6  convene a committee if -- if a new study dramatically
7  changes the evidentiary database, but each time they
8  get a study and review it doesn't trigger that
9  committee coming back together and reaching a judgment
10 as they did and as was codified in the meetings in
11 1985.
12   Q. Sir, you've never been employed by EPA,
13 correct?
14   A. No, I haven't.
15   Q. You've never been part of an EPA review
16 committee of a rodent carcinogenicity study, correct?
17   A. No, I have not.
18   Q. You've never been part of an EPA review
19 process in any regard with respect to rodent
20 carcinogenicity studies, correct?
21   A. Correct.
22   Q. You're speculating when you say that EPA
23 doesn't review each study as it comes in and make a
24 determination as to whether or not that study provides
25 evidence of carcinogenicity, correct?

Page 49

1    A. Ab --
2         MR. LITZENBURG: Form.
3    A. Absolutely not correct, sir. I don't -- don't
4  know -- I'm -- I apologize if I'm not being clear with
5  you. Every time they get a new study in they do an
6  evaluation of the study. First there's a screening
7  evaluation to see if the records show that it was
8  conducted in accord with good laboratory practices and
9  all the -- all the supporting documentation in terms of
10 inspecting the animals and the number of animals that
11 died and the percentage of the chemical in the feed and
12 many technical details about the conduct of the study
13 were -- were done properly and are properly documented
14 in the study.
15        If it passes that initial screen, then the
16 study will be reviewed by one of the toxicologists in
17 the -- in the tox branch or the health effects
18 division -- the names change over the years -- and they
19 will review the study. They will assess whether they
20 agree with the interpretation of the results of the
21 study as reported in the report from the contract lab
22 or the laboratory of a particular company that
23 conducted the study and submits the results.
24        They will also look at whether they believe
25 the statistical analysis was appropriate, and sometimes

13 (Pages 46 to 49)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 50

1  they ask the -- the companies that conducted the study
2  for additional information to clarify some aspects of
3  the interpretation and statistical analysis of the
4  results.
5          And at the end of the day, they make a
6  judgment of whether the study is -- was conducted
7  appropriately and meets one of their data requirements,
8  and they also reach a judgment on whether the study was
9  positive or negative for an oncogenic response.
10  Sometimes the -- the agency will agree essentially 100
11  percent with the interpretation of the data and the
12  statistical analysis as reported by the -- the lab that
13  conducted the study on behalf of the registrant and
14  submitted it to the EPA, and in other cases they
15  disagree with either some aspect of the findings or the
16  statistical analysis, as they did in the case of the
17  1983 bio -- biodynamic study.
18          So in -- in every study that came in following
19  the 1983 study, the 13 others that are part of the
20  industry-commissioned and submitted record of long-term
21  feeding studies, they were -- they did this same
22  analysis and reached their -- reached their own
23  decisions, sometimes -- you know, which tracked
24  fairly -- fairly closely what the -- the registrant
25  concluded and other times it didn't, and that's the

Page 51

1  standard operating procedure.
2          But the review of the -- of the -- of each
3  study, it -- it wouldn't trigger a reassessment of the
4  classification of -- of any pesticide or in this case
5  of glyphosate unless the new study reported results
6  that were substantially different from what the EPA
7  felt the earlier studies had shown.
8      Q. EPA conducts an independent, thorough review
9  of each rodent carcinogenicity study as it comes into
10  the agency, correct?
11      A. They certainly conduct a review and, you know,
12  I think and certainly would hope to think that it's for
13  the most part independent of the registrant's review,
14  but, you know, clearly the -- the registrants do all
15  that they can to influence the way that the -- the EPA
16  scientists look at these studies, and as the -- the
17  extensive record of the back and forth between Monsanto
18  and the Office of Pesticide Programs in -- in terms of
19  the classification of the 1983 biodynamic study shows
20  in -- in great depth, I mean, it's -- there's an
21  ongoing exchange of information and discussions about
22  the proper interpretation of some of these studies.
23      Q. Each time a new rodent carcinogenicity study
24  comes in, EPA takes an independent review of that study
25  and reaches a judgment as to whether the study was

Page 52

1  positive or negative for oncogenic response, correct?
2      A. Right, correct.
3      Q. EPA has also considered what you said were
4  three dozen or so genotox studies in between 1991 and
5  2017 when they made their most recent determination
6  that glyphosate is not likely to be carcinogenic to
7  humans, correct?
8      A. Yeah, these would be peer -- studies that came
9  out in the peer-reviewed literature, not -- not studies
10  commissioned by the registrants and submitted to EPA
11  and not in the public record.
12      Q. You agree that EPA considers peer-reviewed
13  publications on the open literature when conducting its
14  risk assessments, correct?
15      A. They make note of them, but I -- I agree with
16  a -- a number of scientists that track the
17  decision-making in the Office of Pesticide Program that
18  they -- they place less weight on the open
19  peer-reviewed literature than -- than what -- what I
20  feel and many other people feel they should.  It's a --
21  it's a generic issue in EPA pesticide risk assessment
22  that's been, you know, under discussion, under debate
23  for -- for 20 years.
24          MR. LITZENBURG:  Good time for a quick
25  break?

Page 53

1          MR. HOLLINGSWORTH:  Sure.
2          VIDEO OPERATOR:  We're going off the
3  record.  The time is 9:36.
4          (Recess taken.)
5          VIDEO OPERATOR:  We are going on the
6  record.  The time is 9:46.
7      Q. (BY MR. HOLLINGSWORTH)  Dr. Benbrook, we left
8  off at the genotoxicity studies and publications that
9  EPA has reviewed in the interim time between 1991 and
10  2017, and you noted that EPA had reviewed roughly three
11  dozen studies in the open literature, genotox studies
12  in the open literature, correct?
13      A. Correct.
14      Q. Since that time between 1991 and 2017 there's
15  been additional registrants and additional GLP-required
16  genotoxicity studies conducted on glyphosate that EPA
17  has reviewed, correct?
18      A. I -- yes, I'm aware of some of those, yes.
19      Q. Okay.  So it would be not just the open
20  literature three dozen or so studies that EPA has
21  reviewed but also several additional GLP studies on
22  genotox, correct?
23      A. Correct.
24      Q. You noted that in the interim between 1991 and
25  EPA's most recent classification of glyphosate as

14 (Pages 50 to 53)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                     CONFIDENTIAL

Page 54

1   noncarcinogenic to humans in 2017 that there's been
2   several additional epidemiological studies, correct?
3       A. Correct.
4       Q. Do you know how many epidemiology studies have
5   been conducted between 1991 and 2017 on glyphosate and
6   non-Hodgkin's lymphoma?
7       A. They're -- they're conducted in probably all
8   continents on the planet and -- and several are not
9   published in English language journals so I wouldn't
10  say that I know all of them. I have -- in my expert
11  report I discuss several of the most prominent ones in
12  terms of the attention that both EPA gives to them
13  in -- in their evolving reports and as well as the
14  attention and focus that the IARC working group devoted
15  to them.
16      Q. Indeed. And let me know if you agree. Nearly
17  the entire if not the entire epidemiology database on
18  glyphosate has occurred between 1991 and 2017 in terms
19  of when the studies were published, correct?
20      A. Certainly the vast majority of it. I can't
21  think of a single one that came out before '91.
22      Q. And in terms of epidemiology, epidemiology is
23  the study of the formulated product used in real world
24  dosing situations by farmers and whoever else would
25  apply the formulated product, correct?

Page 55

1       A. Correct.
2       Q. The most recent epidemiology study published
3   on glyphosate, the Agricultural Health Study published
4   in 2018 has found that there's no association between
5   glyphosate and non-Hodgkin's lymphoma or any of its
6   subtypes, correct?
7           MR. LITZENBURG: Form.
8       A. Correct.
9       Q. (BY MR. HOLLINGSWORTH) Dr. Benbrook, I want
10  to go back to what you've reviewed in this case. I
11  recall at the last deposition you said that you had
12  reviewed a few depositions, and I'll let you name them
13  again today, but have you reviewed any additional
14  depositions since that time?
15      A. No.
16      Q. And do you recall what depositions you've
17  reviewed?
18      A. I'm sure it's in my testimony from -- from
19  before. I -- I didn't go back and look at any of that
20  part of the record in preparing for this deposition, so
21  I just would assume that my memory from back -- from
22  three months ago served to answer that question.
23      Q. You have not reviewed --
24      A. Yeah.
25      Q. You have not reviewed Dr. Heydens' deposition;

Page 56

1   is that correct?
2       A. Correct.
3       Q. You have not reviewed Dr. Acquavella's
4   deposition, correct?
5       A. Correct.
6       Q. Have you reviewed Dr. Farmer's deposition?
7       A. I think I read part of it.
8       Q. You have not reviewed Mr. Rowland from the
9   EPA, you have not reviewed his deposition, have you?
10      A. No, I haven't.
11      Q. You have not reviewed Dr. Saltmiras'
12  deposition, correct?
13      A. Correct.
14      Q. You have not reviewed Steve Adams' deposition,
15  correct?
16      A. Correct.
17      Q. You have not reviewed any of Dr. Goldstein's
18  depositions; is that correct?
19      A. Correct.
20      Q. Sir, you have a lot of opinions about those
21  folks in your report. Didn't you think it was
22  important to review their depositions and hear their
23  side of the story?
24      A. No, I didn't. My opinions are based on the
25  very large number of e-mail communications that each of

Page 57

1   these individuals had amongst themselves under
2   circumstances where I believe they were being
3   forthright and not -- not trying to shield the truth in
4   any way. The -- the -- the discovery record in terms
5   of these individuals' opinions, actions, knowledge of
6   the science is extremely extensive, tens of thousands
7   of documents. Obviously I only reviewed a small
8   fraction of them, but I -- I became quite confident
9   that the 15 or 20,000 pages of documents that I -- I
10  read and multiple exchanges among these individuals
11  that I had a -- a clear and reasonably accurate
12  understanding of what their -- their feelings were,
13  what their knowledge was, what their interpretation of
14  the different scientific issues were.
15          So I -- you know, there really -- it wasn't a
16  question of another side of the story. I just simply
17  read what they said amongst themselves. It was -- you
18  know, to me it was quite clear and I tried to include
19  in my expert report a number of direct quotes from, you
20  know, dozens of internal e-mails which I think speak
21  for themselves.
22      Q. Your opinions on Dr. Heydens, Dr. Farmer,
23  Dr. Saltmiras, Dr. Goldstein are based on company
24  e-mails and documents given to you by the Miller Firm,
25  correct?

15 (Pages 54 to 57)

HIGHLY                Charles Benbrook, Ph.D.              HIGHLY
CONFIDENTIAL               May 23, 2018              CONFIDENTIAL

Page 58

1     A. Yes, correct.
2     Q. Your opinions on Mr. Rowland are based on
3  company e-mails and documents as well as perhaps some
4  FOIA e-mails given to you by the Miller Firm or
5  otherwise available online, correct?
6     A. Well, let's be clear here. I mean, I don't --
7  I've never met Jeff Rowland [sic]. I've never talked to
8  him. I don't really have an opinion on him. I do have
9  an opinion about what his role was in the EPA review of
10  glyphosate oncogenicity, and I base that opinion on his
11  own statements to the -- for the most part, either
12  statements by him or statements by Monsanto scientists
13  and representatives about him. So it -- it's less of
14  an opinion and -- and more of just a factual accounting
15  of the exchanges that -- and communications that
16  occurred between them.
17     Q. You reviewed company documents and e-mails on
18  Drs. Farmer, Heydens, Saltmiras, Goldstein and
19  determined what their feelings were, what their
20  knowledge was and what their interpretations of the
21  scientific issues were, correct?
22     A. Correct.
23     Q. And that was based entirely on documents given
24  to you by the Miller Firm, correct?
25     A. I -- I may have had a few of these e-mails

Page 59

1  from other sources, but by far the majority of the
2  documents that I reviewed were Bates stamped and -- and
3  disclosed by Monsanto's part of the discovery process
4  and provided to me by the Miller Firm.
5     Q. Have you reviewed any of the legal briefing in
6  this case?
7     A. I think I read the -- the initial complaint
8  and perhaps the revised complaint, you know, a year ago
9  or so and very little of the other briefings. I know
10  there's a substantial number of motions and responses,
11  but I have not focused on them, no.
12     Q. When you say the "complaint," that's the
13  complaint in another case in California, not the
14  Peterson/Hall complaint; is that correct?
15     A. That's correct.
16     Q. So I'm correct in stating that you haven't
17  reviewed the Peterson/Hall complaint?
18     A. That -- that is correct.
19     Q. What sort of information does someone at EPA's
20  OPP rely upon in approving registration of a pesticide
21  and the continued registration of a pesticide?
22     A. That's an awfully open-ended question, sir.
23     Q. Do you think you can answer it?
24        MR. LITZENBURG: Object to form.
25     A. Well, I'm not sure it's worth the time.

Page 60

1     Q. (BY MR. HOLLINGSWORTH) Okay.
2     A. I mean, we have a lot to cover, right?
3     Q. Could you give me a brief summary?
4     A. Sure. All agricultural-use pesticides that
5  are being used on food crops first have to have a
6  tolerance established. In order to establish the
7  tolerance the -- a number of studies are required to
8  determine the chronic toxicity of the -- of the
9  pesticide following expected dietary and/or drinking
10  water exposure from labeled uses of the pesticide.
11        This entails basically the entire chronic
12  database that we've been talking about and the
13  establishment of a chronic reference dose and also the
14  determination of whether a pesticide is a -- possibly
15  an oncogen.
16        The other data required to establish a
17  tolerance is residue chemistry data that basically
18  involves the methods and techniques to measure the
19  amount of the pesticide that is present on or in the
20  food after harvest as the food leaves the farm gate.
21  This entails a -- a number of studies that relate to
22  the environmental fate and the breakdown of the
23  pesticide, and also the companies are required to
24  develop and submit to the agency an analytical method
25  that is sufficiently sensitive to detect the pesticide

Page 61

1  at a level or above the requested tolerance.
2        So that's the tolerance side of things.
3        In order to get a registration, which is also,
4  of course, required prior to the EPA issuing a label
5  that would allow the commercial sale of the product, in
6  order to get a registration there's a number of other
7  data requirements that are -- are necessary that EPA
8  uses and assesses to make judgments about what sort of
9  single word and cautions and use rates and restrictions
10  on application equipment and many other factors that
11  are included on any pesticide label.
12        So those -- the -- the -- most of the studies
13  and data that a company develops and submits to the
14  agency are done either in the course of supporting a
15  tolerance petition leading to the establishment of
16  tolerances or in support of the registration action
17  which would entail a certain number of crops, certain
18  types of application equipment, various restrictions,
19  etcetera.
20     Q. Thank you. How about you, when you're
21  reviewing the safety of a pesticide, do you review
22  those same things that EPA reviews?
23     A. It -- well, first of all, safety of a
24  pesticide is a very broad question. Sometimes I have
25  been asked to assess the safety of pesticides relative

16 (Pages 58 to 61)

HIGHLY                     Charles Benbrook, Ph.D.                   HIGHLY
CONFIDENTIAL                     May 23, 2018                  CONFIDENTIAL

Page 62

1   to birds, other times to fish, sometimes to people,
2   sometimes to other crops from drift and crop damage.
3   So there's a -- a very different set of data, a very
4   different set of EPA reviews and actions, a very
5   different set of scientific issues that arise in the --
6   in the course of assessing these different components
7   or aspects of safety.
8       Q. I appreciate that and thanks for clarifying.
9   I'll ask a better question. When conducting a review
10  of a pesticide's human health assessment --
11      A. Okay.
12      Q. -- what type of materials does Dr. Benbrook
13  typically rely upon?
14      A. The -- certainly the -- whatever subchronic
15  studies are -- are in the record, the chronic feeding
16  studies that have been done, some of which are designed
17  to also include oncogenicity and others don't include
18  oncogenicity, certainly the database that relates to
19  reproductive and -- and birth defects or whether the
20  pesticide has the potential through mutagenicity or
21  teratogenicity to influence the -- the development of a
22  fetus during a woman's pregnancy or in the first few
23  years of life, and then the battery of -- of acute
24  studies that are done that basically test, you know,
25  how much of the pesticide is required to actually kill

Page 63

1   a mouse or a rat or some other organism setting what's
2   called the lethal dose 50 or the dose at which 50
3   percent of the animals in a -- in a particular study
4   are killed.
5       So I would look at all those -- those aspects.
6   I would also try to get an initial feeling of exposure.
7   There's a number of pesticides where there's virtually
8   no exposure, so it kind of doesn't matter too much how
9   toxic they are if there's no exposure. You know, an
10  example would be, you know, a pheromone, you know,
11  where there's a tiny amount of it put out in a field
12  and there's really no circumstance leading to human
13  exposure to a pheromone, so there isn't -- there isn't
14  a -- much of a need to look too deeply at the -- at the
15  toxicological database. In fact, this is why the EPA
16  doesn't even require tox studies on certain of that
17  type of semiochemical.
18      Q. Now, those studies that you would review in
19  conducting a human health assessment of a pesticide,
20  you would review those alongside the label for the
21  pesticide; is that correct?
22      A. The label's certainly an important document
23  that gives critical information on who might be
24  exposed.
25      Q. Neither the EPA nor Dr. Benbrook outside of

Page 64

1   litigation reviews company e-mails in conducting a
2   human health assessment of a pesticide, correct?
3       A. No, I don't -- I don't know that as a general
4   rule. The general public wouldn't have access to the
5   e-mails, but if they did, they often would be quite
6   interested in them. Are you -- I don't quite
7   understand your question perhaps.
8       Q. EPA doesn't base its review and approval of a
9   registrant's pesticide based on a review of company
10  e-mails, correct?
11      A. Well, they get a lot of e-mails from the
12  company themselves so they would clearly take into
13  account whatever the company is communicating to them
14  or transmitting to them over e-mail. But no, the
15  EPA -- EPA toxicologists would not, for example, be
16  aware of the candid expressions of concerns and
17  opinions among Monsanto policy officials and scientists
18  that is -- that is contained in the discovery record of
19  this case, no, they would not -- they would not
20  routinely have access to that information.
21      Q. And outside your work in this litigation or
22  other litigation, you do not rely on company e-mails in
23  reviewing the human health assessment for a particular
24  pesticide, correct?
25      A. Not unless I had them.

Page 65

1       Q. You agree that the label review manual nor any
2   FIFRA regulations or EPA guidelines instruct EPA
3   personnel to review company e-mails when registering or
4   re-registering a pesticide, correct?
5       A. If I understand your question correctly,
6   someone in the registration division or the tox
7   division that has raised a question or requested a
8   document from a registrant and gets it from the
9   document via e-mail, yes, they would review those
10  e-mails.
11      Q. Beyond communications with EPA with respect to
12  fulfilling the registration requests and data
13  requirements, EPA would not rely on internal company
14  e-mails in conducting its human health risk assessment,
15  correct?
16      A. Well, they don't -- they don't typically ask
17  for them or have them, but I think if they did have
18  them they would probably often find them of
19  considerable interest.
20      Q. Do you know how many documents were produced
21  in this case?
22      A. I don't know the exact number, but it's a big
23  number.
24      Q. You didn't have access to the full range of
25  documents so you could conduct your own searches of the

17 (Pages 62 to 65)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 66

1  database, correct?
2      A.  No, I -- I did have access to it and I did
3  some of my own searches and, you know, it was a -- it
4  was a way that I found some of the documents that I
5  relied on, but for the most part, I would send an
6  e-mail to either Mr. Litzenburg or Mr. Travers that --
7  the two individuals with the Miller Firm that I've had
8  most of my communication, and I've said to them, "Well,
9  I've read this," one of the Bates stamps documents that
10  talks about an issue, and it might make reference to a
11  PowerPoint presentation that had been made at a meeting
12  or it might make reference to some other document or
13  some study that Monsanto had -- had done that I wanted
14  to learn more about to see if it shed further light on
15  the -- the communication that was happening in that
16  particular Bates-stamped document.
17      So I would send an e-mail to Mr. Litzenburg or
18  Mr. Travers and say, "See the date and the document,"
19  and I'd give them the Bates number and I say, "It
20  mentions a PowerPoint.  Is the PowerPoint in the
21  record?  If so, please send it to me."  I probably sent
22  over 50 e-mails like that over the six, seven months
23  that I was trying to -- trying to figure out a way how
24  to get through this record.
25      I mean, this is a massive record, and I -- I

Page 67

1  am well aware that I have not reviewed anywhere near
2  the totality of it, and so I felt it was my obligation
3  to try to, as effectively as I could with the time that
4  I had, track down the documents that seemed most
5  important.  So I did some of my own searches and got
6  some of them that way, and in other cases I sent
7  e-mails to -- to Mr. Litzenburg and Mr. Travers, and
8  in -- and generally they were able to find what I asked
9  for.  And then they would e-mail it to me and then I
10  would take it from there.
11      Q.  If you wanted documents on a particular issue,
12  you would often send an e-mail to the Miller Firm and
13  ask for more company documents on that subject, they
14  would conduct a search and then return you a search
15  that lined up with the documents you requested.  Is
16  that fair?
17      A.  They would -- they would e-mail the documents.
18      Q.  Sure.
19      A.  Yeah, correct.
20      Q.  But is that -- is that fair?  Is that how it
21  would go that you would request more company e-mails or
22  documents on a particular issue, you would ask the
23  Miller Firm for more documents on that issue, they
24  would conduct a search and then e-mail those documents
25  to you; is that correct?

Page 68

1      A.  Correct.
2      Q.  You mentioned that you conducted your own
3  search.  You had access to the full database of
4  documents produced in this case?
5      A.  Correct.  Well, let me just say I had access
6  to an internal document management system, and it was
7  my understanding that all the documents were in it,
8  but, you know, obviously I don't have detailed
9  knowledge of the people that were managing that
10  electronic database, but it was represented to me that
11  it -- it was fairly comprehensive.
12      Q.  Do you have your report with you,
13  Dr. Benbrook?
14      A.  No, I didn't bring anything.
15      Q.  I'm not going to mark this.
16      THE WITNESS:  I'm not breaking any rules
17  of civil procedure by having a cookie during the
18  deposition, am I?
19      Q.  (BY MR. HOLLINGSWORTH)  Just let you refer to
20  it --
21      A.  Okay.
22      Q.  -- as you want to.  I'll refer to my copy over
23  here.
24      MR. LITZENBURG:  That's just the Lee
25  Johnson report?

Page 69

1      MR. HOLLINGSWORTH:  Correct.
2      MR. LITZENBURG:  Okay.  Are you marking
3  it?
4      MR. HOLLINGSWORTH:  No, I'm not going to
5  mark it for confidentiality reasons.
6      Q.  (BY MR. HOLLINGSWORTH)  At page 189, you note
7  in your report:  In the records I have reviewed I have
8  not encountered a single example of a person working
9  for Monsanto who reacted to a new pesticide law or
10  regulatory requirement by assessing where and how
11  compliance might make the company's products inherently
12  safer or reduce the frequency of high-exposure
13  application scenarios.  Correct?
14      A.  Uh-huh.
15      Q.  You never conducted a search for records
16  showing Monsanto seeking to make its products
17  inherently safer, did you?
18      MR. LITZENBURG:  Object to form.
19      A.  Hundreds of the documents that I reviewed were
20  certainly relevant to that -- that topic.  It was
21  Monsanto's responses to requirements or requests from
22  regulatory agencies primarily in the US and in Europe
23  and their efforts to assure that the -- that the
24  scientific database, both company-generated and
25  submitted and external open scientific community

18 (Pages 66 to 69)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 70

1   database, supported their quote/unquote freedom to
2   operate, which is their code word inside the company
3   for protecting any registration that they have for any
4   of their products to assure that there's no change in
5   their regulatory status that might limit their market
6   share.
7        Q. (BY MR. HOLLINGSWORTH)  Product stewardship,
8   did you conduct a search for Monsanto's product
9   stewardship efforts in this case?
10       A. Yes.
11       Q. And what did that search return?
12       A. Well, there's multiple documents that address
13  to one degree or another the -- what the company felt
14  its stewardship obligations were, but the documents
15  that I felt were most important and germane to those
16  were Monsanto's own discussion and statements about
17  their -- their stewardship obligations, their
18  participation in various industry agreements that
19  provide kind of a code of ethics, code of practice
20  relative to their obligation to people that buy their
21  products and people that may be affected by them.
22       At -- at multiple times over the last 20 years
23  I've reviewed in detail documents on the Monsanto
24  website where there's always places where they talk
25  about their pledge to stewardship, their pledge to

Page 71

1   product safety, their pledge to use the best and most
2   recent science to ensure that the products that they're
3   selling to their customers work as best as -- as best
4   as possible and are as safe as possible and that
5   they -- they leave no stone unturned in the -- the
6   pledge that they make to their customers.
7        You know, Monsanto has throughout this time
8   period had a very substantial PR and outreach campaign
9   and presence, and I -- I feel that the -- you know, the
10  purest articulation of that are the -- these parts of
11  their website where they talk about it, spell it out in
12  writing, so I've reviewed multiple renditions of that
13  over the years.
14       Q. And not just on the company's website but
15  internal documents you reviewed, you agree that over
16  the last 20 years, Monsanto certainly makes efforts
17  with respect to product stewardship and ensuring that
18  their products are safe, correct?
19       A. They certainly were forced to make some
20  efforts in Europe because of the more aggressive
21  posture that European regulators took leading to the
22  company finally agreeing to phase out the use of the
23  known high-risk surfactant polyethoxylated amine or
24  POEA, POEA, which was a -- which was a very significant
25  regulatory concession on the part of the company, and I

Page 72

1   believe around 2010 as -- the details are in my -- in
2   my report, the company officials had agreed that they
3   -- they needed to phase out the use of that POEA
4   surfactant to reduce human health risk in Europe, and
5   they did so, and I believe by 2012 there were very few,
6   if any, Monsanto brand Roundup herbicides for sale in
7   any country in Europe that still had that widely
8   recognized high-risk surfactant, but to me the fact
9   that they did not make the corresponding change in any
10  Roundup product in the United States, in Canada, in
11  Brazil, in Argentina, or as far as I know anyplace else
12  in -- in the world really was a -- a serious violation
13  of this pledge that they had made to do whatever they
14  can to assure that their products are as safe as
15  possible.
16       Q. Sir, with respect to POEA and what went on in
17  Europe, you have nothing -- you have seen nothing that
18  indicates in either the company documents or what
19  you've found online that any concern about POEA was
20  related to the carcinogenicity of glyphosate, correct?
21       A. Specifically to carcinogenicity, no, but often
22  specifically to genotoxicity and because the
23  genotoxicity determination was so integral to the
24  weight of evidence judgment about oncogenicity given
25  the -- the range of data from the animal studies and

Page 73

1   the growing body of epi studies, Monsanto's concern
2   about the scientific communities' and regulators' view
3   of the genotoxicity of glyphosate was integral to and
4   very significant in the -- in the judgments about
5   oncogenicity.
6        Q. Sir, the issue with POEA in Europe, that
7   started with respect to some of the German regulators'
8   concerns about POEA, correct?
9        A. No, I don't believe the Germans were the first
10  ones.
11       Q. Who is --
12       A. I think the -- I think the French and the
13  Italians were quite aggressive and early in raising
14  these concerns, and because Germany was the rapporteur
15  country for the EU-wide reassessment and
16  re-registration of glyphosate-based herbicides, the
17  questions that the Italians and the French were raising
18  inevitably were communicated to the Germans, and
19  ▮▮▮▮▮▮ in one of his many e-mails to Heydens
20  and Farmer and -- and others in Monsanto headquarters
21  in -- in St. Louis would talk about how their -- they
22  were being challenged by the Italian and the French
23  regulators and that this was inevitably going to be
24  also taken up by the Germans and that they would
25  ultimately, in ▮▮▮▮▮ opinion, be forced to remove

19 (Pages 70 to 73)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                      CONFIDENTIAL

Page 74

1  POEA from their Roundup products across the continent.
2      And his position, which I think was concurred
3  with by several of the other participants in this
4  discussion that were Monsanto employees based in
5  Europe, they all took the position why don't we do this
6  worldwide?  You know, why should we go forward with a
7  difference in how we formulate and represent our
8  products in Europe compared to the US?  Doesn't that,
9  you know, invite questions?
10      And yes, I think it does invite questions, and
11  I -- I highlight what -- what I believe was a serious
12  breach of Monsanto's stewardship pledge to not provide
13  to farmers in Canada, the US and Mexico access to a
14  safer product that they already had agreed they would
15  do in Europe.
16      Q.  Sir, with respect to the French, Italian and
17  German concerns about POEA in Europe, that stemmed from
18  cases of intentional or accidental ingestion of
19  glyphosate producing various respiratory effects and
20  similar health effects, not cancer effects, correct?
21      A.  Part -- I would agree with part of your
22  question.  A concern directly over cancer is not
23  prominently featured in any of the e-mails that I
24  reviewed.  They -- all of the e-mails that I reviewed
25  on this topic reference their concern of a change in

Page 75

1  the position of the European regulators on the question
2  of genotoxicity.  The particular incident that you're
3  talking about that -- that is in the record is talked
4  about in ███ in several of his e-mails where there
5  was a -- I think there was -- one was accidental,
6  another somebody tried to commit suicide, and the
7  regulators had kind of case histories of that.
8      Yes, those -- those were part of what these
9  European regulators had questions about, but was
10  definitely not what was driving their concern.  What
11  was driving their concern was the growing body of
12  literature done predominantly by European scientists, I
13  think it's important to note, that reported that
14  formulated glyphosate-based herbicides were five times,
15  ten times, 100 times more toxic than the pure
16  glyphosate active ingredient in a variety of different
17  organisms and -- and testing systems and -- and that
18  any assessment of worker exposure, particularly workers
19  that used handheld or backpack sprayers or applications
20  where they weren't in an enclosed cab with an air
21  filtration system, where all of the regulators knew
22  that those were the high-exposure scenarios, they --
23  these regulators became very concerned because they
24  knew that applicators and handlers weren't spraying 100
25  percent glyphosate as their whole tox database was

Page 76

1  based on studies on pure glyphosate.  They knew that
2  they were applying formulated products.
3      So when they learned from credible
4  peer-reviewed published studies and especially dozens
5  of them, they got -- they were -- they became very
6  concerned, and that's what -- that's what was the big
7  concern inside Monsanto and it was the big concern
8  among the regulators and it's what, you know,
9  ultimately forced Monsanto to drop the POEA surfactant
10  and replace it with others that did not have the same
11  potentiation effect on the finished formulated
12  herbicide.
13      Q.  I understand that, but to be clear, European
14  regulators' initial concerns were not related to cancer
15  with respect to POEA?
16      A.  I -- I just don't agree with you that any
17  regulator that had been working on the glyphosate case,
18  whether in the course of re-registration in Europe or
19  in the US, would separate in their mind the
20  genotoxicity database from the oncogenicity database
21  because they're very related as obvious when IARC came
22  out with its classification in 2015, and really the big
23  change and the -- the primary reason that IARC
24  surprised so many people was the -- what they regarded
25  as the strength of the genotoxicity data, and I think,

Page 77

1  you know, beginning as -- even in the early 2000s,
2  these were the issues that regulators in the EU were
3  pressing Monsanto employees based in Europe on and what
4  led to these -- these discussions.
5      So I -- I simply don't agree that either the
6  European regulators or the concerns inside the company
7  were not related to oncogenicity.  I think -- I think
8  they were related to oncogenicity because they knew
9  that on a weight of evidence judgment the genotox
10  database would play a big role.  In fact, if you read
11  some of the e-mails and the statements that
12  particularly Heydens made in several of the e-mails,
13  it's pretty clear he says, "Well, we're fine on
14  glyphosate.  Even on the genotoxicity database, we'll
15  win that debate, but we're in big trouble on the
16  formulated product, we're vulnerable there."
17      That -- that statement is made half a dozen
18  times in the record, and for them internally, when they
19  don't -- when they don't suspect anybody is going to be
20  listening, for them to be so candid about their concern
21  about this new science, I think speaks volumes to, you
22  know, what they knew in their -- since this -- we're
23  talking about stewardship and their obligations, I
24  think it's highly relevant and it was an important part
25  in why I reached some very harsh opinions about

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 78

1    Monsanto's behavior in this particular case.
2        Q.  Sir, you mentioned at one point that the whole
3    tox database is based on the active ingredient, but EPA
4    and foreign regulators certainly consider with respect
5    to genotoxicity, for example, genotox tests on the
6    formulated product as well, correct?
7        A.  When I say the tox database, I'm primarily
8    referring to the core long-term -- most of them
9    long-term feeding studies that are used to establish
10   the chronic reference dose, make the decision whether
11   the chemical's an oncogen or not an oncogen and assess
12   reproductive and birth defects.  That's the chronic tox
13   database, not the acute or six-pack set of studies that
14   I talked with Mr. Cople about quite a bit in the
15   deposition three months ago that are done on the
16   formulated product and which EPA requires in order to
17   determine what specific single words and precautions
18   about eye exposure, skin irritation to put on the label
19   of each formulated product.
20       So there -- there is some data and some
21   assessment of formulated product-specific risks.  We
22   talked quite a bit about it in the last deposition, and
23   I acknowledge that that's useful science and it's good
24   that they did it, but those studies do not include
25   assessments of genotoxicity, of metabolic or

Page 79

1    reproductive effects or cancer because those all entail
2    long-term -- longer-term studies that would be done
3    with a formulated product as opposed to the active
4    ingredient.
5        And the -- again, one of my strong opinions
6    expressed in the report is that once Monsanto realized
7    and knew that its formulated product was more toxic
8    than its active ingredient, it had an obligation to its
9    users to redo at least some of its chronic studies with
10   formulated product to determine whether they really
11   were riskier or not.  They -- they certainly were
12   afraid.  It's clear from the record they were concerned
13   that if they did do those studies that they -- the
14   studies would show that, in fact, the formulated
15   glyphosate-containing herbicides were more toxic than
16   glyphosate alone, and that's why they moved heaven and
17   earth to never do those studies and discouraged any
18   regulator around the world from doing those studies.
19       And, in fact, I remember one of the -- one of
20   the e-mails from Donna Farmer where she said, "This is
21   the agenda of some of the European regulators and
22   activists, they want us to do chronic studies on our
23   formulated products and we have to resist that."  And,
24   you know, in my opinion, yes, it would have imposed
25   additional costs on the company.  To redo three or four

Page 80

1    of the chronic studies on formulated glyphosate
2    herbicides would have cost Monsanto probably ten
3    million bucks, but frankly, for the highest-selling
4    pesticide in history, a product they were making over a
5    billion dollars a year in sales, spending ten million
6    dollars to settle this growing concern about whether
7    the formulated products were more toxic and possibly
8    carcinogenic would have been a prudent investment, but
9    it's never been done.
10       Q.  Sir, I was just asking what the regulators
11   consider in conducting their risk assessment, and they
12   certainly consider genotoxicity studies on the
13   formulated product both by the registrants and by
14   independent scientists in the open literature, correct?
15       A.  I don't know --
16           MR. LITZENBURG:  Form, asked and
17   answered.
18       A.  I don't know of any genotoxicity studies
19   submitted by the registrants to EPA on formulated
20   product.  There may be some in the record that I
21   haven't seen.  I'd be very interested in seeing them,
22   but I don't think that any of the -- I don't believe
23   that EPA asked Monsanto to -- or any of the other
24   companies to do them.
25       Q.  (BY MR. HOLLINGSWORTH)  Worldwide regulators

Page 81

1    in conducting their risk assessment you'll at least
2    agree consider genotoxicity on the formulated product
3    conducted by independent scientists on the open
4    literature, correct?
5        A.  That is correct.  And it's exactly why some of
6    the European regulators became much more concerned than
7    they had been in the past and requested from Monsanto
8    steps to reduce the risk.  And that started, as I said,
9    around 2000.
10       Q.  With respect to whether Monsanto conducted any
11   genotoxicity tests on the formulated product, did you
12   conduct a search for those tests?  Did you ask the
13   Miller Firm to conduct a search for those tests?
14       A.  There was so much in the record around the
15   Dr. Parry consultancy and his work for Monsanto and
16   their internal deliberations about what to do with
17   Dr. Parry's report, which was obviously not welcomed --
18   the conclusions were not welcomed by Monsanto because
19   based on Dr. Parry's review of the peer-reviewed
20   studies available at the time, he concluded there was
21   evidence that -- that glyphosate and glyphosate-based
22   herbicides were genotoxic.  And -- and he did in his
23   report emphasize that the data was much stronger on
24   glyphosate-based herbicides, although, you know, when
25   Parry did his review, there were only two or three of

21  (Pages 78 to 81)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 82

1    these genotox studies in the literature on formulated
2    product.  Today there's probably over two dozen, so
3    the -- the database has rapidly evolved.
4        Q.  Right.  And you discussed Dr. Parry and
5    genotoxicity studies on the formulated product, those
6    type of issues, for at least a quarter of your 207-page
7    report.  Is that fair?
8        A.  It's -- yeah, it's an important topic,
9    correct.
10       Q.  So wasn't it important to you to track that
11   all the way through and determine whether Monsanto
12   conducted the studies that Parry recommended on the
13   formulated product?
14       A.  Oh, I did.  I absolutely did and it's in my
15   report.  They -- they did not do the studies that
16   Parry -- Dr. Parry recommended, and the -- Heydens
17   makes it pretty clear why in the penultimate e-mail
18   that -- that ended this -- what was -- six, six or
19   eight months after Parry submitted -- he submitted two
20   reports.  One was his assessment of the published
21   studies where he concluded that approximately half the
22   studies had valid indications of genotoxicity and the
23   other half did not, and he determined that I think
24   about six of them, he just couldn't tell because they
25   weren't -- they weren't well designed and conducted

Page 83

1    studies, but then he submitted a second report where he
2    laid out what he felt Monsanto should do to clarify, to
3    confirm, to dispel concern about genotoxicity.  And
4    it's a quite lengthy document.  It lays out, you know,
5    I think 15 or 20 different studies, and in most cases
6    he recommended it be done on glyphosate and formulated
7    glyphosate products, you know, with the -- the major
8    surfactants which, of course, would have included at
9    the time POEA.  And, indeed, I think Dr. Parry would
10   have been quite pleased if Monsanto had hired him and
11   his lab to do some of that work, but Monsanto decided
12   not to move forward with it.
13       Q.  Right.  Given your reliance on Dr. Parry and
14   genotox on the formulated products, wouldn't you want
15   to make absolutely certain via your own search or
16   searches conducted by the Miller Firm that Monsanto did
17   not, in fact, conduct genotoxicity studies on the
18   formulated product such as those that Dr. Parry
19   recommended?
20       A.  As I said, I reviewed hundreds of e-mails and
21   correspondence -- and communications inside Monsanto
22   about the genotox database, and I don't remember a
23   single reference to a study that Monsanto had done, a
24   genotox study on formulated product.  I know they had
25   thought about it, they had considered doing it, but

Page 84

1    they -- they -- they had never done it, and one of the
2    reasons they never did it is they knew that if they did
3    do it and the studies showed a positive response, they
4    would be obligated under 6(a)2(b) of FIFRA to submit it
5    to the -- to the EPA.
6        Their -- their policy clearly was don't look,
7    don't ask, don't do the studies and just hope that they
8    can discourage regulators around the world from
9    considering data on formulated product, which Monsanto
10   regarded as a grave threat to the current registration
11   status of glyphosate-based -- their Roundup brand
12   glyphosate herbicides around the world.  It was a huge
13   concern of theirs.
14       The record is -- I didn't need any more
15   documents to understand that the -- both the nature of
16   the concern and the depth of the concern, and the
17   reason I don't need any other documents is the
18   principal leaders responsible for the toxicology
19   database and its presentation to regulators, its
20   interactions with the scientific community debated all
21   of these issues and discussed them among themselves in
22   incredible depth over many, many years, and I reviewed
23   the record and it's -- it's just very clear to me
24   what -- where they were at, what they were concerned
25   about and what they did as a result.

Page 85

1        Q.  You reviewed hundreds of e-mails and company
2    documents discussing Parry or genotoxicity on the
3    formulated product, but you did not conduct a search
4    for any primary studies conducted by Monsanto on the
5    formulated product either in the US or abroad, did you?
6        A.  If you're asking did I query the database for
7    the results of, say, the Ames studies that Monsanto had
8    done in the '70s and '80s all -- the first round, no, I
9    didn't do that.  I have read summaries of what that --
10   that body of work showed and was quite convinced that
11   the summaries presented in multiple EPA documents of
12   that first generation of mutagenicity studies were
13   accurate and reflected what the studies actually
14   showed.  I didn't feel any need to query the database
15   to get the raw data and look at it.
16       Q.  Your opinions on Parry and whether or not
17   Monsanto conducted a genotoxicity study on the
18   formulated product are based entirely on e-mails and
19   perhaps other company documents rather than the primary
20   studies, correct?
21       MR. LITZENBURG:  Object to form.
22       A.  I -- I have to say these are not opinions.
23   These are things that I read in the words of Monsanto
24   scientists and simply are taking at face value.  It's
25   not my interpretation or a weight of the evidence

22  (Pages 82 to 85)

HIGHLY                  Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                   CONFIDENTIAL

Page 86

1   judgment about what these Monsanto scientists and
2   corporate officials were saying or thinking. I simply
3   read their own words, which are as clear as can be in
4   the record of this case, in -- certainly on these
5   questions about genotoxicity and their concern about
6   formulated products and their reaction to the Parry
7   report, it's -- they're not opinions. I'm simply --
8   and often quoting verbatim what the Monsanto people
9   said.
10      Q. You based your opinions on Parry and
11  genotoxicity studies on the formulated product without
12  reviewing the 2017 OPP issue paper on the carcinogenic
13  potential of glyphosate in any detail, correct?
14      A. Correct.
15      Q. And you did not review the 2017 OPP issue
16  paper on the carcinogenic potential of glyphosate to
17  determine whether there were any tests conducted by
18  Monsanto on the formulated product, correct?
19      A. I didn't need to review that document to find
20  that out because, as I said, I -- I had spent many,
21  many hours reviewing the record and there -- there is
22  no discussion among any of the Monsanto scientists
23  about the results of such a study or the fact that they
24  even did such a study, but there is multiple direct
25  statements to the effect that they will not do such

Page 87

1   studies, they will not support such studies and they --
2   they will actively engage with regulators to object to
3   and discourage them from requesting such studies. So
4   it's -- it's very clear in the record what Monsanto has
5   done relative to testing formulated product for
6   genotoxicity, and the answer is they -- they haven't
7   done the tests internally because they were clearly
8   concerned about the consequences of the results of such
9   studies.
10      Q. Yes or no?
11          MR. LITZENBURG: Object to form.
12      Q. (BY MR. HOLLINGSWORTH) Did you review the
13  2017 OPP issue paper on the carcinogenic potential of
14  glyphosate to determine whether any of the tests on the
15  formulated product -- genotoxicity tests recommended by
16  Dr. Parry were, in fact, done by Monsanto?
17          MR. LITZENBURG: Asked and answered,
18  object to form.
19      A. No, I did not, and I didn't need to, as I
20  said.
21      Q. (BY MR. HOLLINGSWORTH) Did you review any
22  regulatory submissions to worldwide regulators
23  regarding these genotoxicity tests on the formulated
24  product that you claim are so important?
25          MR. LITZENBURG: Object to form.

Page 88

1       A. Certainly not. You know, they're -- Monsanto
2   is sending such data to regulatory authorities around
3   the world. I don't know what the total number is, but
4   it's got to be over 100, and so no, I didn't -- didn't
5   try to track all that. It would have taken a team of
6   50 people several years to do that. No, I didn't do
7   that. It wasn't feasible. It wasn't needed either
8   because, again, as I said, the internal record is quite
9   clear what -- what Monsanto did and why they did it
10  relative to the testing of formulated product for
11  genotoxicity.
12          And, you know, what -- what EPA said in a 2017
13  report, you know, will -- would not affect and has not
14  affected, you know, certainly my opinion because
15  there's -- there isn't -- there is not a section in
16  that report discussing this substantial database of
17  Monsanto-commissioned studies on the genotoxicity of
18  formulated product because they didn't commission the
19  studies.
20      Q. (BY MR. HOLLINGSWORTH) The internal record
21  that you reviewed on the genotoxicity of formulated
22  products is based on company e-mails either given to
23  you by the Miller Firm or your own search, correct?
24          MR. LITZENBURG: Object to form.
25      A. Correct.

Page 89

1       Q. (BY MR. HOLLINGSWORTH) And you did not
2   specifically conduct a search for primary studies on
3   the formulated product either done by Monsanto in the
4   US for stewardship purposes or for purposes of
5   fulfilling regulatory requirements in other countries
6   throughout the world, correct?
7       A. I interpret your use of the term "primary" as
8   the raw data, and no, I didn't do a search for the raw
9   data.
10      Q. You didn't do a search for the raw data or the
11  study summaries on the formulated product --
12  genotoxicity studies on the formulated product either
13  done by Monsanto for stewardship purposes in the US or
14  to fulfill regulatory obligations abroad, correct?
15      A. Well, I had them. I mean, those documents are
16  all in the record that I reviewed. You know, drafts of
17  the -- the Monsanto summaries, the Monsanto
18  ghostwritten reviews on genotoxicity -- the record is
19  full of Monsanto's discussion of the genotoxicity
20  database of which, of course, they're referring
21  primarily when they're talking about their own studies
22  to genotox studies done on the parent active
23  ingredient.
24          So, you know, I -- I had the documents. I
25  didn't have to do a review -- a search for them. I --

23 (Pages 86 to 89)

HIGHLY          Charles Benbrook, Ph.D.          HIGHLY
CONFIDENTIAL            May 23, 2018          CONFIDENTIAL

Page 90

1  I'm sure, as I said before, there had to have been many
2  other documents that I didn't review that are pertinent
3  to genotoxicity, but because there was such a
4  consistent pattern in the communications and the issues
5  raised and the decisions that Monsanto made internally
6  about how to deal with genotoxicity, I didn't feel that
7  there was anything important and new for me to learn
8  from doing more aggressive and thorough searches, and
9  even if I had, I would have told the Miller Firm that
10  I'm sorry, I can't -- I can't do an expert report by
11  the third week in December and be prepared for the
12  deposition.
13       I had a given amount of time to answer the
14  questions presented to me by the -- by the Miller Firm
15  relative to this case. I -- I worked hard at it. I
16  did my best. I reviewed a lot of documents, and
17  there's some aspects of this record that I'm quite
18  confident that my opinions are well supported, and a
19  more thorough review of the record would simply provide
20  additional support for them. There are other aspects
21  of the record that, you know, I -- I actually would
22  like to have more time to study and in more depth and
23  perhaps I'll -- I'll have that occasion in the years
24  ahead.
25       Q. I asked you whether you conducted a search for

Page 91

1  formulated genotoxicity studies conducted by Monsanto
2  either for stewardship purposes or fulfilling
3  regulatory obligations abroad, and you said "I had
4  them." You were not referring to the primary studies,
5  the primary genotoxicity studies on the formulated
6  product, correct?
7       MR. LITZENBURG: Form.
8       A. I'm -- I'm -- that's a multi-part question. I
9  think I've been very clear and very -- very open in
10  discussing what I did. I don't understand your
11  question. If you want to break it up and have us spend
12  more time on this, let's do it.
13       Q. (BY MR. HOLLINGSWORTH) That's fair. The
14  documents you reviewed regarding genotoxicity studies
15  conducted on the formulated product were made up of
16  Monsanto Company e-mails rather than primary studies,
17  correct?
18       A. Monsanto didn't conduct any genotoxicity
19  studies on the formulated product, at least I've seen
20  no mention of it anywhere in the record, and I'm quite
21  certain in all of the discussions if they had done a
22  genotox study on a formulated product they would have
23  said something about it because they -- they were
24  discussing in great depth this issue over a 15-year
25  period. So I -- I felt that I -- I was already aware

Page 92

1  of the extent of the raw database of genotox studies on
2  formulated product and that based on the records that I
3  had and that I have requested and that I reviewed and
4  EPA documents, I was quite confident that there were no
5  such studies. So I -- I didn't -- I didn't conduct any
6  further searches or spend any additional time trying to
7  track down studies which I was quite confident didn't
8  exist.
9       Q. You were quite confident studies didn't exist
10  with respect to Monsanto's formulated product
11  genotoxicity studies based on your review of the
12  company e-mails given to you by the Miller Firm,
13  correct?
14       A. Correct.
15       Q. Sir, are you familiar with the EPA-required
16  guideline testing that every pesticide product is
17  required to go through before it's registered?
18       A. Yes.
19       Q. Agree that FIFRA places the burden to
20  demonstrate the pesticide is safe on the manufacturers
21  and registrants?
22       A. Yes.
23       Q. Sir, you recall reviewing the December 12,
24  2017 draft human health risk assessment in support of
25  registration review?

Page 93

1       A. Right, the one we discussed at length in the
2  previous deposition.
3       Q. You're familiar with that document, correct?
4       A. Yes.
5       Q. But you didn't think it was important to
6  review it in any detail prior to the last deposition,
7  correct?
8       A. No, I did not look at it in any great detail,
9  that's correct. I read the -- the summary and I looked
10  quickly through it. I had a pretty good idea of what
11  was new in it and that there were -- was also no
12  substantial change from multiple other EPA documents
13  addressing the same topic, so I -- I didn't see any
14  point in rereading stuff that I had read multiple times
15  in earlier EPA documents addressing the same topic.
16       Q. And you haven't found the time to review it in
17  any -- anytime since your last deposition, correct?
18       A. Correct.
19       MR. HOLLINGSWORTH: Can we mark this as
20  Exhibit 1.
21       (Deposition Exhibit 1 was
22       marked for identification.)
23       Q. (BY MR. HOLLINGSWORTH) The purpose and scope
24  of this document is stated in the first sentence. It
25  notes that EPA's health effects division assesses the

24 (Pages 90 to 93)

HIGHLY                   Charles Benbrook, Ph.D.                   HIGHLY
CONFIDENTIAL                   May 23, 2018                   CONFIDENTIAL

Page 94

1  risk posed to humans from exposure to pesticide
2  chemicals.  The pesticide registration division asks
3  the health effects division to evaluate hazard and
4  exposure data and conduct dietary, occupational,
5  residential and aggregate exposure assessments as
6  needed to estimate the risks to human health that will
7  result from all registered uses for glyphosate in
8  support of registration review.
9        Do you agree that's the evaluation EPA's
10  health effects division is undertaking with this human
11  health risk assessment for glyphosate?
12      **A. Yes, I do.**
13      Q. All registered uses is essentially referring
14  to the who, what, where, when and how that a pesticide,
15  here Roundup, can be sprayed as approved by EPA and
16  outlined in the product's label, correct?
17      **A. Correct.**
18      Q. Please turn to page 29.  This is toxicology
19  data requirements that I think we've referred to at
20  some point today, correct?
21      **A. Correct.  At some -- yeah, it's not perhaps**
22  **all of them, but it's the toxicology data requirements**
23  **for glyphosate and looks like it's the acute studies,**
24  **the subchronic, developmental toxicity chronic,**
25  **mutagenicity, delayed neurotox, the general metabolism,**

Page 95

1  **dermal penetration and immunotox study requirements,**
2  **correct.**
3      Q. I'm going to mark as Exhibit 2 something that
4  you've also reviewed previously, I think, Dr. Benbrook.
5        (Deposition Exhibit 2 was
6        marked for identification.)
7      Q. (BY MR. HOLLINGSWORTH)  And this is the Code
8  of Federal Regulations, specifically Subpart F,
9  Toxicology Section 158.500, toxicology data
10  requirements table, correct?
11      **A. Correct.**
12      Q. And this sort of goes hand in hand with the
13  toxicology data requirements on page 29 of the human
14  health risk assessment, correct?
15      **A. Yes.**
16      Q. Okay.  The oral -- the acute oral toxicity is
17  one of the required tests for any formulated product,
18  correct?
19      **A. Correct.**
20      Q. Monsanto conducted the acute oral toxicity for
21  its Roundup formulated product, correct?
22      **A. For some of them, yes, it's part of the**
23  **six-pack studies.**
24      Q. For -- you say "for some of them."  EPA is --
25  for some formulations -- strike that.

Page 96

1        There are hundreds of formulations of
2  glyphosate-based herbicides, correct?
3      **A. And even more labels covering products that**
4  **have almost the same formulation.**
5      Q. Right.  So in the case where products have
6  almost the -- glyphosate-based herbicides have almost
7  the exact same formulation, EPA has in some cases
8  waived the requirement for the six-pack studies,
9  correct?
10      **A. Correct.**
11      Q. But certainly there is a sufficient underlying
12  database for Monsanto's glyphosate-based herbicides
13  showing that it has satisfied the acute six-pack
14  requirements from EPA, correct?
15      **A. I would agree with that.**
16      Q. The acute dermal toxicity, that's another part
17  of the acute six-pack studies, correct?
18      **A. Correct.**
19      Q. It's required for all registered pesticides in
20  the US and Monsanto has conducted those studies with
21  respect to glyphosate-based herbicides, correct?
22      **A. Correct.**
23      Q. Acute inhalation toxicity, that is a required
24  test, but EPA has waived acute inhalation study with
25  respect to glyphosate-based herbicides, correct?

Page 97

1      **A. Certainly, yes, in most cases.  I wouldn't be**
2  **surprised if there might be one in the record**
3  **somewhere, but...**
4      Q. Sure.
5      **A. Yeah.**
6      Q. Primary -- primary eye irritation is a study
7  required for every formulated pesticide product, and
8  Monsanto has conducted that study with respect to
9  glyphosate-based herbicides, correct?
10      **A. Correct.**
11      Q. Primary dermal irritation, Monsanto has
12  conducted that study with respect to its
13  glyphosate-based herbicides, correct?
14      **A. Yes.**
15      Q. Dermal sensitization, Monsanto has conducted
16  that study with respect to glyphosate-based herbicides,
17  correct?
18      **A. Yes, in most cases.**
19      Q. So that's -- so that's the acute tox six-pack,
20  and Monsanto has conducted the studies as required in
21  the acute tox six-pack for all of its glyphosate-based
22  herbicides, correct?
23      **A. Subject to the caveat that we mentioned that**
24  **some of the labels are so similar to others that EPA**
25  **waives them, but yeah, I think we're on the same page**

HIGHLY                Charles Benbrook, Ph.D.              HIGHLY
CONFIDENTIAL                May 23, 2018              CONFIDENTIAL

Page 98

1    with this.
2        Q.  Sure.  Oral subchronic in the rodent, that's
3    required for every pesticide formulated product, and
4    Monsanto has satisfied that with respect to
5    glyphosate-based herbicides, correct?
6        A.  That's -- oral subchronic is done on the
7    active ingredient, not the formulated product.
8        Q.  Oh, thank you.  So if we go back to our data
9    table, 90-day oral rodent it says TGAI, which means
10   technical -- technical grade active ingredient,
11   correct?
12       A.  Which -- I'm looking at this table.  You're
13   looking at a different one?
14       Q.  Exhibit --
15       A.  Is it the next page?
16       Q.  Exhibit 2, it's just making the point --
17       A.  Oh, okay.
18       Q.  -- that you were making.
19       A.  All right.
20       Q.  It's just this -- these data tables,
21   Dr. Benbrook, that shows whether it's technical grade
22   active ingredient or the end use product.
23       A.  Oh, okay, okay, okay, I'm with you.
24       Q.  Okay.  Monsanto conducted the oral subchronic
25   tests required by EPA for all of its glyphosate-based

Page 99

1    herbicides, correct?
2        A.  Correct.
3        Q.  The oral subchronic nonrodent, that is another
4    required test for EPA, but EPA here said it's not a
5    data gap because there is a chronic dog study in the
6    database, correct?
7        A.  I'd have to look at the table to --
8        Q.  It's Footnote 2.
9        A.  Okay, I would agree with that.
10       Q.  Okay.  21-day dermal, that is a test required
11   by EPA that should be done both on the technical grade
12   active ingredient and the formulated product, correct?
13       A.  I -- I'd have to look at the -- the
14   requirements to make sure of that.  I'm -- I'm not sure
15   that's the case.
16       Q.  Sure.  It's on page 2 of Exhibit 2.
17       A.  So this is 21/28 day dermal --
18       Q.  Dermal --
19       A.  -- food, nonfood, so MP is manufacturing
20   product.  That would be the pure active ingredient and
21   EP is the -- what does EP stand --
22       Q.  End use product.
23       A.  End use product, okay.  So that's the --
24       Q.  Meaning the formulated product, correct?
25       A.  Okay.  So we're 21-day dermal, it's required

Page 100

1    for food, not required for nonfood, and it's on the TGA
2    and the end use product so it would be required for the
3    food uses.
4        Q.  Sure.  And there's certainly food uses for
5    glyphosate-based herbicides, correct?
6        A.  Well, there's food uses of those
7    glyphosate-based herbicide labels that include crop
8    uses and directions for use on crops, but none of the
9    products that are part of this case or the Lee Johnson
10   case were agricultural.  They were non-ag formulations
11   as part of the ITO portfolio of Roundup products.
12       Q.  Sir, I understand that there are plaintiffs in
13   this litigation that do use farm use or agricultural
14   use products, and you'll agree that Monsanto has
15   conducted the 21-day dermal study on both its active
16   ingredient and the formulated product for
17   glyphosate-based herbicides?
18       A.  Correct, yeah, I would agree that they would
19   have had to do that.
20       Q.  The 90-day inhalation study, that's required
21   for all formulated products, and Monsanto has
22   conducted that study for glyphosate-based herbicides,
23   correct?
24       A.  What does CR stand for?  Conditionally
25   required.  I -- I'd have to go into the database to

Page 101

1    look at what's -- what they did on that.
2        Q.  Sir, Exhibit 1 on page 29 has the requirements
3    and whether or not Monsanto satisfied those
4    requirements.
5        A.  Okay, let's look there.
6        Q.  And the 90-day inhalation that's required for
7    every formulated pesticide product in the US has been
8    conducted by Monsanto for glyphosate-based herbicides,
9    correct?
10       A.  Let me match it up with the -- is it -- are we
11   talking inhalation rat?
12       Q.  90-day inhalation.
13       A.  Correct.
14       Q.  So with respect to the toxicity, the acute
15   toxicity testing, you certainly can't say that
16   glyphosate-based herbicides haven't undergone toxicity
17   testing, correct?
18       A.  And I never did.
19       Q.  The subchronic testing that we just discussed,
20   oral subchronic for the rodent, nonrodent, 21-day
21   dermal, 90-day inhalation, those are all subchronic
22   studies, correct?
23       A.  Correct.
24       Q.  And what is a subchronic study?
25       A.  Typically a study of duration where the -- the

26 (Pages 98 to 101)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL               May 23, 2018               CONFIDENTIAL

Page 102

1    test organism is exposed to the test substance for
2    between 70 and 90 days typically is the -- considered
3    the subchronic range of study duration.
4         Q.  So you cannot say that Roundup formulations
5    did not undergo subchronic toxicity testing as
6    required, correct?
7         A.  No doubt some.  Let's look at the other -- at
8    the other list here.  Some of them are conditionally
9    required and others are certainly required, but again,
10   I'd have to do a more in-depth review to know exactly
11   which -- you know, which labels were supported by which
12   ones, but across the whole port -- the whole portfolio
13   of Roundup labels, it wouldn't -- wouldn't surprise me
14   a bit if they hadn't done each of these studies at
15   least once.
16        Q.  Sure.  And as indicated by EPA on page 29 of
17   Exhibit 1, toxicology data requirements, EPA has
18   assured that Monsanto has conducted the required
19   subchronic toxicity testing on glyphosate-based
20   herbicides, correct?
21        A.  On the technical, the technical material, yes.
22        Q.  Sir, some of these subchronic studies are both
23   on the technical grade active ingredient --
24        A.  Correct.
25        Q.  -- and the end use product, correct?

Page 103

1         A.  That's correct, some of them are.
2         Q.  So EPA has indicated on page 281, toxicology
3    data requirements, EPA has assured that Monsanto has
4    conducted the required subchronic toxicity testing on
5    glyphosate-based herbicides including in some cases on
6    the formulated product, correct?
7         A.  Correct.
8         Q.  Developmental toxicity in the rodent, that's
9    required for all pesticide products in the US, correct?
10        A.  Correct.
11        Q.  Monsanto has conducted those studies for
12   glyphosate-based herbicides, correct?
13        A.  On the -- certainly on the active ingredient,
14   yes.
15        Q.  Developmental toxicity nonrodent, that's
16   required for all pesticide products in the US and
17   Monsanto has conducted those for glyphosate-based
18   herbicides, correct?
19        A.  This is 8703700 B, correct?
20        Q.  Correct.
21        A.  Yeah, it -- definitely required on the
22   technical -- technical glyphosate, on the next page
23   they -- they're saying that 3700 B -- got the right
24   number -- yes, is prenatal developmental study in
25   rabbits, acceptable guidelines, blah, blah, blah,

Page 104

1    and -- and doesn't say anything there about whether
2    it's required in formulated products, and if we look
3    over here at this one -- actually don't -- oh, yeah,
4    here it is, they say technical grade active
5    ingredients, it's not -- it doesn't say that they're
6    required in formulated product, and my guess is they
7    probably haven't been done on very many of them.
8         Q.  Sure.  But I'm just asking whether Monsanto
9    met the EPA requirement for developmental toxicity
10   studies as indicated in the toxicology data
11   requirements on page 29 of the human health risk
12   assessment.
13        A.  Correct, on the -- on the pure active
14   ingredient they did, yes.
15        Q.  Okay.  And those studies conducted on rabbits,
16   once Monsanto has conducted that study for some
17   representative formulations, you agree there's no point
18   subjecting a bunch more rabbits and killing more
19   rabbits to conduct those studies for every single
20   glyphosate-based herbicide, correct?
21        A.  The --
22             MR. LITZENBURG:  Object to form.
23        Go ahead.
24        A.  The premise of your question is incorrect.
25   You asked if Monsanto had conducted this develop --

Page 105

1    subchronic developmental study on a formulated
2    glyphosate herbicide that it would be inappropriate or
3    less important to test others.  I don't believe that
4    they -- they did any such tests, and if they had -- and
5    certainly if they had done it on a couple of the
6    significantly different formulations and had the data
7    and no concerns were raised with the data, I would
8    totally agree with you that I would -- I would hope
9    that the agency would waive requiring that same study
10   on similar formulated product where there's really no
11   significant new scientific insights to be gained.  I
12   would totally agree with you.
13        Q.  (BY MR. HOLLINGSWORTH)  Right, sir, and I'm
14   not trying to hide the ball or anything, and I realize
15   that this is a study that has to be done on the
16   technical-grade active ingredient as indicated in the
17   data table on page 2.  I'm just asking since Monsanto
18   satisfied that with respect to glyphosate as the active
19   ingredient, it doesn't make sense to kill those bunnies
20   over and over again each time a new formulated product
21   is registered, correct?
22             MR. LITZENBURG:  Object to the form.
23        A.  I think that it was -- especially after the
24   early 2000s when there was multiple other studies in
25   the open literature showing that unfortunately,

27 (Pages 102 to 105)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL              May 23, 2018               CONFIDENTIAL

Page 106

1   formulated glyphosate herbicides are much more toxic in
2   a number of different ways and to a number of different
3   organisms than the parent compound that I -- I think
4   EPA and -- and Monsanto should have conducted some of
5   these subchronic studies on at least a few of the major
6   formulations to determine whether, in fact, in the case
7   of this particular subchronic rabbit study that the
8   results -- either they would be essentially the same,
9   in which case there would be no need to do further
10  ones, or perhaps the studies would show that the
11  formulated product was much more toxic, at which point
12  that would have triggered several other steps no doubt
13  to try to get a solid empirical understanding of how
14  much more toxic the formulated products were compared
15  to the parent active ingredient.
16          Once those additional studies were done and
17  EPA scientists were convinced that they've looked under
18  that rock and they've learned what there is to be
19  learned, then yes, I would hate to see a mouse, a rat,
20  a rabbit, a monkey subjected to -- to any additional
21  testing, but -- but I would not agree that -- that the
22  fact that Monsanto had tested parent -- or essentially
23  100 percent pure glyphosate in the subchronic study
24  absolved or eliminated any need to redo subchronic
25  studies of this sort and other subchronic studies on

Page 107

1   the formulated product.
2        Q. (BY MR. HOLLINGSWORTH)  Reproduction study is
3   a study that's required for all registered pesticides,
4   and EPA states in Exhibit 1 that Monsanto satisfied
5   that data requirement, correct?
6        A. Correct.
7        Q. So with respect to all of the reproduction
8   studies, the developmental, toxicity and reproduction
9   studies, Monsanto satisfied all those data
10  requirements, correct?
11          MR. LITZENBURG:  Object to form.
12       A. For the -- for the pure active ingredient,
13  yes.
14       Q. (BY MR. HOLLINGSWORTH)  And that's all that's
15  required from EPA, correct?
16       A. That is all that EPA required of them, yes.
17       Q. Chronic toxicity rodent, that is another test
18  that's required for all registered pesticides, correct?
19       A. Correct.
20       Q. Monsanto conducted those -- that chronic
21  toxicity rodent study for glyphosate-based herbicides,
22  correct?
23       A. Yes, conducted several of them.
24       Q. Chronic toxicity nonrodent, that's another
25  requirement for any registered pesticide, correct?

Page 108

1        A. Correct.
2        Q. Monsanto --
3        A. For food use pesticides.
4        Q. Monsanto satisfied that data requirement
5   according to EPA, correct?
6        A. Yes.
7        Q. Oncogenicity mouse, that's another requirement
8   for all registered pesticides, correct?
9        A. Correct.
10       Q. Monsanto satisfied that data requirement
11  according to EPA, correct?
12       A. Yes.
13       Q. Chronic/oncogenicity, that's a required test
14  for any pesticide product, correct?
15       A. Correct.
16       Q. And Monsanto satisfied it, correct?
17       A. For the active ingredient, yes.
18       Q. Mutagenicity, gene mutation, bacterial?
19       A. How about we do all four at once?
20       Q. Sure.  There's -- there's several different
21  types of --
22       A. Four.
23       Q. There's four different types of genotoxicity
24  essentially, or mutagenicity studies required for
25  registered pesticides, correct?

Page 109

1        A. Correct.
2        Q. And Monsanto has conducted all of those
3   genotoxicity studies as required by EPA, correct?
4        A. Correct.
5        Q. Acute delayed neurotoxicity, that's not a
6   required study, correct?
7        A. I'm sorry, could you --
8        Q. Sure.  I'm -- I'm on Exhibit 1 again.
9        A. So we're in this -- this table, right?
10       Q. Now we're going to neurotoxicity.
11       A. Okay.
12       Q. Acute delayed neurotoxicity, that's not a
13  required study, correct?
14       A. Correct.
15       Q. 90-day neurotoxicity, that's not a required
16  study, correct?
17       A. Correct.
18       Q. Acute neurotoxicity screening battery in the
19  rat, that is a required study for any registered
20  pesticide, correct?
21       A. Correct, yes.
22       Q. And Monsanto has fulfilled those data
23  requirements according to EPA, correct?
24       A. Yes.
25       Q. 90-day neurotoxicity screening battery in the

28 (Pages 106 to 109)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 110

1    rat, that is a required study for any registered
2    pesticide, correct?
3         A. Yes, on the active ingredient.
4         Q. And Monsanto has fulfilled that data
5    requirement according to EPA, correct?
6         A. Yes.
7         Q. General metabolism, that is a required study
8    for any registered pesticide, correct?
9         A. Yes, it is.
10        Q. And Monsanto has fulfilled that data
11   requirement for glyphosate-based herbicides, correct?
12        A. On the technical active ingredient, correct.
13        Q. Dermal penetration study, that is not a
14   required study for registering a pesticide, correct?
15        A. According to this table, yes.
16        Q. Immuno -- is not, correct?
17        A. Yes, correct.
18        Q. Immunotoxicity, that is a required test for
19   registered pesticides in the US, correct?
20        A. Yes, it is.
21        Q. And Monsanto has satisfied that data
22   requirement, correct?
23        A. For the technical ingredient, yes.
24        Q. Fair to say that Monsanto has satisfied all
25   toxicological data requirements for glyphosate

Page 111

1    according to EPA?
2         A. On the -- that they've imposed on either the
3    technical active ingredient or the formulated product,
4    yes, they've satisfied the data requirements. I've
5    never claimed otherwise.
6         Q. Now, those are the toxicology data
7    requirements, but there's numerous other studies
8    required for registering a pesticide, correct?
9         A. Yes.
10             MR. LITZENBURG: If you're moving off
11   the six-pack or whatever, good time to take a
12   five-minute break?
13             MR. HOLLINGSWORTH: Sure.
14             VIDEO OPERATOR: We're going off the
15   record. The time is 11:10.
16             (Recess taken.)
17             VIDEO OPERATOR: We are going back on
18   the record. The time is 11:21.
19        Q. (BY MR. HOLLINGSWORTH) EPA requires product
20   performance testing pursuant to 40 CFR Section 158.400,
21   correct?
22        A. Product performance testing?
23        Q. Yes.
24        A. What -- what -- what aspect of product
25   performance? Let me -- let me see what you're talking

Page 112

1    about. You've got an exhibit in your hand.
2         Q. I do. It's a different one.
3              MR. HOLLINGSWORTH: Can we go off the
4    record for a second.
5              VIDEO OPERATOR: We are going off the
6    record. The time is 11:21.
7              (Recess taken.)
8              VIDEO OPERATOR: We are going back on
9    the record. The time is 11:21.
10        Q. (BY MR. HOLLINGSWORTH) I'm going to mark an
11   exhibit.
12        A. 3.
13        Q. Number 3.
14             (Deposition Exhibit 3 was
15             marked for identification.)
16        Q. (BY MR. HOLLINGSWORTH) EPA requires product
17   performance testing on all pesticide products, correct?
18        A. Very, very limited. They no longer require
19   efficacy data. I -- I think that's what you mean by
20   "product performance," or is it some other aspect of
21   product performance that you're referring to?
22        Q. It's -- it's what's going on here in 40 CFR
23   Section 158.400, product performance data requirements
24   table.
25        A. Uh-huh. (Witness reading document.) Looks

Page 113

1    like with the exception of some indoor use patterns,
2    they're all not required.
3         Q. Do you agree that FIFRA allows risk to humans
4    and the environment to be balanced by the benefits of a
5    pesticide's use?
6         A. That's a -- a way to characterize the basic
7    standard in the -- FIFRA statute, correct,
8    balancing of risks and benefits.
9         Q. Is product performance testing, testing of how
10   well a product works, in this instance, how well it
11   kills weeds?
12        A. Well, it certainly would be important testing
13   from the perspective of the farmer who's buying
14   Roundup-based herbicides to kill weeds, sure, it would
15   be useful.
16        Q. And that's what product performance testing
17   looks at?
18        A. Typically, yes, does the -- does the product
19   work against the target pest listed on the label, is it
20   efficacious.
21        Q. And do you claim Monsanto did not conduct the
22   EPA-required product performance testing?
23        A. They -- product performance testing
24   requirements changed over the course of the history of
25   glyphosate-based herbicides. I believe it was around

29 (Pages 110 to 113)

HIGHLY                     Charles Benbrook, Ph.D.                     HIGHLY
CONFIDENTIAL                     May 23, 2018                     CONFIDENTIAL

Page 114

1   1978 that the basic -- there was amendments to the
2   FIFRA statute and Congress basically removed the
3   requirement that EPA request studies on new
4   registration applications relative to product efficacy.
5   So since approximately the early '80s, there's been
6   no -- there hasn't been a mandatory data requirement on
7   product efficacy.
8        That's not to mean that different registrants
9   haven't conducted a -- a huge number of field studies
10  on their formulated products which they have to do to
11  know what to put on the label. I mean, they don't want
12  to label a Roundup herbicide for -- for killing a roach
13  because it won't, so the -- the companies do the
14  studies, but they're not required to submit them to the
15  agency.
16       Q. Okay. And EPA -- and Monsanto's Roundup
17  products have been on the market since approximately
18  1974, correct?
19       A. Correct.
20       Q. Do you claim Monsanto did not conduct the
21  EPA-required product performance testing throughout the
22  years?
23       A. I've never made that claim.
24            MR. LITZENBURG: Form.
25       Q. (BY MR. HOLLINGSWORTH) Okay. So you have no

Page 115

1   reason to believe they didn't?
2        A. No, I have no reason to believe that, you
3   know.
4        Q. Sure. EPA requires testing on hazards to
5   non-target organisms pursuant to 40 CFR Section
6   158.600, correct?
7        A. Yes.
8        Q. Do you claim Monsanto did not conduct the
9   EPA-required testing on hazards to non-target
10  organisms?
11       A. I don't address that to -- at all in my expert
12  report. I make no -- no statement to that effect.
13       Q. And you have no reason to believe they didn't
14  conduct those tests, right?
15       A. EPA -- you know, EPA has stated, you know,
16  multiple times that all of their mandatory data
17  requirements have been satisfied, and I interpret that
18  to mean all the human toxicology, the product
19  formulation, the residue chemistry and the ecotox,
20  yeah, I -- I don't have -- I'm not aware of any
21  mandatory data requirements that have not been
22  satisfied in the case of glyphosate-based herbicides.
23       Q. EPA has determined on several occasions that
24  the glyphosate database is complete and that Monsanto
25  has satisfied all required toxicology and ecotoxicology

Page 116

1   data requirements, correct?
2        A. Correct.
3        Q. And that includes applicator and
4   post-application exposure studies?
5        A. To the extent that they're required, yes.
6        Q. That includes spray drift evaluation studies?
7        A. I'd have to -- I mean, that's an interesting
8   question with all the concern about herbicide drift
9   these days. You know, I didn't -- in preparing for
10  this case, which is about non-Hodgkin's lymphoma
11  experienced by people applying the pesticides, I didn't
12  look at the record on spray drift and off-target damage
13  to other plants.
14       Q. Okay. But you have no reason to believe that
15  Monsanto did not conduct an -- EPA-required spray drift
16  studies, correct?
17       A. I -- I would be surprised if they failed to
18  conduct mandatory studies.
19       Q. Data derived from spray drift testing assists
20  in determining the need and content of precautionary
21  language on pesticide labels to minimize the potential
22  for harm to non-target organisms, correct?
23       A. In general, yes.
24       Q. EPA also requires testing on environmental
25  fate, right?

Page 117

1        A. They require the companies to submit a suite
2   of en -- you know, environmental fate, physical and
3   chemical properties of all pesticides. That's an
4   essential part of the tolerance petition process
5   because they have to know the physical and chemical
6   properties to determine whether the residues are going
7   to stick around on a plant. So yeah, it's an essential
8   part of the process.
9        Q. Environmental fate studies are studies and
10  testing aimed at determining the persistence of a
11  pesticide product once it is placed in the environment,
12  correct?
13       A. Yeah, the persistence and the metabolism of
14  what it breaks down to and whether it's going to show
15  up in ground water, whether it might bind to soil
16  particles and move around in blowing dust and -- yeah,
17  to try to understand in what form does the chemical
18  persist in the environment and where might it go and as
19  a result what organisms might be exposed.
20       Q. Right. And you don't claim that Monsanto
21  didn't conduct those studies, correct?
22       A. I'm making no such claim.
23       Q. Okay. And with respect to the persistence of
24  glyphosate-based herbicides in the environment, you
25  agree they have a favorable toxicology profile in that

30 (Pages 114 to 117)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL                May 23, 2018                CONFIDENTIAL

Page 118

1   sense, correct?
2        A.  Well, you're -- you're mixing up environmental
3   fate and toxicology.  They're two different things.
4        Q.  Let me ask the question again.  With respect
5   to pesticides and here glyphosate-based herbicides'
6   persistence in the environment, you agree that
7   Monsanto's glyphosate-based herbicides have a favorable
8   profile in that respect?
9        A.  Certainly over the years, the general view in
10  the scientific and regulatory community was that the
11  physical and environmental -- physical and
12  environmental properties of glyphosate-based herbicides
13  were favorable.  However, that -- that view is changing
14  now that there have been many more studies.  The open
15  literature reports soil half lives for glyphosate and
16  its principal breakdown product AMPA ranging from 50 to
17  1,000 days, believe it or not, in certain soils.
18  There's a number of studies that have documented
19  incrementally rising levels of glyphosate and/or AMPA
20  in certain soils where glyphosate is applied --
21  glyphosate-based herbicides are applied each year and
22  sometimes multiple times a year, and there's some very
23  troubling new studies out of Argentina on bound
24  glyphosate residues in small particle dust which
25  scientists are concerned is leading to a new inhalation

Page 119

1   exposure pathway.
2        So in general, during most of the history of
3   glyphosate it's been regarded as having a favorable
4   environmental profile, but because it has become by far
5   the most heavily applied pesticide in history, the
6   sheer volume of it is changing the levels and
7   persistence in many environments and levels are -- are
8   building up to where, unfortunately, some ecological
9   and environmental impacts are being documented in the
10  literature.  And it's a very active area of science.
11       So it's not relevant to this case at all, but
12  that is -- it's sort of the current state of the
13  assessment of glyphosate's environmental presence and
14  risks associated thereto.
15       Q.  Putting aside your concerns about the volume
16  of glyphosate applied, you agree that glyphosate is
17  considered to have a favorable environmental profile,
18  correct?
19       A.  It -- certainly less favorable than 20 years
20  ago, but if you -- if you take the -- you know, the top
21  20 herbicides used, it would fall in -- somewhere
22  around the middle, somewhere -- certainly in the lower
23  ten of them just on the basis of their physical
24  environmental properties.  But, again, it -- physical
25  and environmental properties and their relationship to

Page 120

1        risk, it depends on whether we're talking about
2   inhalation risk through dust particles that have
3   glyphosate bound to it, whether we're talking about
4   surface water risk or ground water risks.  It's -- it's
5   very situation and environment specific and -- and it's
6   dangerous to make general statements across the board
7   given the fact that the literature is full of studies
8   that show strikingly different environmental
9   persistence and -- and levels in certain environments
10  compared to others.
11       Q.  EPA also requires testing on residue
12  chemistry, correct?
13       A.  Correct.
14       Q.  Do you claim that Monsanto did not conduct any
15  of that required testing?
16       A.  No, I've never made that claim.  Is there some
17  reason you're asking me about that?  I'm just curious.
18       Q.  I'm just asking what you know about the
19  Monsanto toxicology database and if you're making any
20  claims with respect to Monsanto not having completed
21  the --
22       A.  Okay.
23       Q.  -- EPA-required --
24       A.  Let's --
25       Q.  -- studies.

Page 121

1        A.  -- let's -- I'm sure you have more important
2   things to get to so let's move through this as fast as
3   we can.
4        Q.  Okay, sure.  You agree that Monsanto has
5   conducted every EPA-required study with respect to its
6   toxicology database, ecotoxicology database, exposure
7   database, anything the EPA might require in order to
8   register glyphosate-based herbicides and keep those
9   products --
10            COURT REPORTER:  Might require -- sorry,
11  anything the EPA might require...
12       Q.  (BY MR. HOLLINGSWORTH)  To register
13  glyphosate-based herbicides and keep those products on
14  the market?
15       A.  Correct.
16       Q.  Okay.  EPA approves pesticide labels for the
17  purpose of educating the public on the safe use of
18  pesticides, correct?
19       A.  No, no.  EPA approves labels to distinguish
20  those pesticide products that can be lawfully purchased
21  and applied in accordance with the label and -- versus
22  those that aren't.  I mean, it's -- the purpose of a
23  label is not just to educate the public.
24       Q.  Sure.  In your opinion, what is the purpose of
25  a pesticide label?

31 (Pages 118 to 121)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 122

1    A. To distinguish between pesticide products that
2  have been reviewed and lawfully labeled for specific
3  uses as articulated on the label from all other
4  pesticide products that should not be sold and cannot
5  be lawfully used.
6    Q. All words, statements, graphic
7  representations, designs or other information on a
8  pesticide label must be approved by EPA, correct?
9    A. Correct, yes.
10    Q. In other words, EPA has to approve all
11  pesticide labeling, right?
12    A. Each time a new label is drafted by a
13  manufacturer and submitted to the agency, the agency
14  has to approve it. Each time they request a label
15  amendment, the agency has to approve it, yes.
16    Q. As dictated by EPA's label review manual and
17  other FIFRA regulations and guidance documents, a
18  pesticide label is intended to translate EPA risk
19  assessments, correct?
20    A. No. I mean, there's not a summary of EPA risk
21  assessments on labels. There -- there are use patterns
22  and application rates and precautions and requirements
23  for personal protective equipment that are consistent
24  with and reflect the EPA's judgments after carrying out
25  risk assessments, and the -- certainly the hope of both

Page 123

1  the manufacturer and the EPA is that if somebody
2  applies a label -- applies a product consistent with
3  all of the label directions that there will be no
4  adverse impacts for either the person applying it or
5  anyone else or any part of the environment. That's
6  certainly the hope and the expectation.
7    Q. EPA's risk assessment judgments are consistent
8  with the personal protective equipment requirements,
9  precautions, application rates and use patterns found
10  on the pesticide label, correct?
11    A. The -- the registrants are responsible for
12  drafting the worker safety provisions, the PPE
13  requirements that it feels are necessary to mitigate
14  any significant risks from its products or avoid damage
15  to personal property, and for the most part, unless EPA
16  is aware of -- from its own risk assessments of the
17  active ingredients or a formulated end use product
18  that -- that the risks are greater or deserve attention
19  or inconsistent with the requirements that the agency
20  has had, unless that's the case, they approve what
21  the -- what the company has proposed on the label
22  because it -- after all, the label is drafted and
23  created and the contents of it are the responsibility
24  of the manufacturer.
25    Q. EPA's labeling with respect to PPE is

Page 124

1  consistent with the risk assessments that EPA has made
2  with respect to the toxicology studies that the PPE
3  requirements are derived from, correct?
4    A. Correct.
5    Q. EPA's worker safety provisions are consistent
6  with studies reviewed in EPA's risk assessment
7  documents, correct?
8    A. The PPE requirements on the pesticide labels
9  are -- are written by the manufacturers, are the
10  responsibility of the manufacturers, and EPA would only
11  require changes in them if they didn't comply with
12  detailed specifications in the label manual about where
13  certain information needed to appear, the signal words,
14  the cautions -- there's certain standard things on all
15  pesticide labels that -- that the manufacturers have to
16  comply with in -- in reporting information to users so
17  that, yes, the EPA requires the format and the content
18  of minimal information about signal words and hazards
19  and eye irritation, etcetera, but the section on either
20  required or suggested personal protective equipment to
21  mitigate worker exposure, that's drafted by the
22  companies, and the only time that the EPA would require
23  an addition or a change in that is if the EPA had had
24  occasion to do an assessment or was aware of -- of
25  unexpected worker risks as in the case of the early

Page 125

1  report from California, the Blondell report, which is
2  talked about in my expert report where in the early
3  years of glyphosate use in California there was an
4  unexpectedly high frequency of eye irritation and skin
5  irritation poisoning episodes involving Roundup
6  herbicides which the California Department of Pesticide
7  Regulation reported to the EPA, and so EPA started
8  looking into it and had called -- you know, called for
9  more information from Monsanto and then there was a --
10  a deeper assessment of that. But unless EPA is aware
11  of a problem, they don't proactively review, render
12  judgment on the adequacy of or call for changes in the
13  PPE on a label.
14    Q. While the registrant may be responsible for
15  the content of a pesticide label, agree that it is
16  EPA's goal for a label to translate its risk
17  assessments of that product?
18    A. No, I don't agree with that. I mean, EPA
19  doesn't try to summarize the -- the findings of its
20  risk assessments. It assures that the label
21  directions, the precautions and the required PPE are
22  consistent with EPA risk assessments that show that
23  if -- if these use conditions as proposed by the
24  registrant on the labels are followed, then exposures
25  would not exceed what EPA calls its level of concern,

32 (Pages 122 to 125)

HIGHLY                   Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                    CONFIDENTIAL

Page 126

1    sort of the general term of art dividing unacceptable
2    levels of exposure and risk where EPA generally will
3    ask the registrant to put some additional restrictions
4    on versus uses and -- for which they don't have a
5    concern.
6         Q.  Sure.  EPA assures that the label directions,
7    the precautions and the required PPE are consistent
8    with the EPA risk assessments, correct?
9         A.  I'm sorry.  I just -- I think I understand the
10   distinction you're -- you're trying to establish, and
11   I -- I really don't agree with it.  EPA looks at
12   everything on a pesticide label, and there are certain
13   things on the label that the registrant is responsible
14   for, solely responsible for, that the EPA doesn't make
15   a judgment of whether it's accurate, whether it's
16   necessary or will meet all the needs under all
17   circumstances.  They really feel that's the
18   manufacturer's responsibility because the manufacturer
19   knows way more about the products than the EPA.
20        If, however, as a part of EPA's review of data
21   and -- and risk assessments they have information or
22   they become aware of information that there are human
23   poisoning episodes, adverse effects on human beings
24   that were not anticipated and that didn't -- did not
25   come to the attention of EPA in whatever assessment of

Page 127

1    the available data that they have, unless that's the
2    situation, they -- they don't -- they don't render a
3    judgment one way or another on the adequacy of what's
4    on the label.
5         So I -- I don't agree that they try to use the
6    label to communicate -- that EPA doesn't use its
7    interjections in revising labels as a -- as a way to
8    try to communicate to the public about the results of
9    its risk assessments.  I just -- I don't agree with
10   that.
11        Q.  Sure, Dr. Benbrook, and I was just trying to
12   summarize what I thought you said and what you did say
13   in the previous answer, so what -- what you said was
14   EPA assures that the label directions, the precautions
15   and the required PPE are consistent with the EPA risk
16   assessments, correct?
17        A.  They would -- they would never approve a set
18   of label directions that -- for which EPA had a valid
19   risk assessment that showed exposures above their level
20   of concern.  They would not do that.  They would --
21   they would engage the registrant in a -- in a
22   discussion about that circumstance, and a number of
23   things would normally happen as a result which might
24   entail the registrant providing the EPA with more
25   detailed information based on studies that the

Page 128

1    registrants have that actually show that EPA's usually
2    Tier 1 estimates of exposure are higher than they
3    actually are in the real world, in which case EPA says,
4    "Well, we have a better risk assessment now and now
5    we're not concerned anymore," and they would -- they
6    would allow the labeling to go ahead as proposed by the
7    company.
8         On the other hand, after going back and forth
9    and getting more information, perhaps asking some of
10   the other science branches to look at the underlying
11   issues, if the EPA is still concerned, then they
12   would -- they would -- they would negotiate with the
13   company about some changes in the label instructions or
14   the PPE or something to lower the exposure estimate to
15   below the level of concern, and that -- that back and
16   forth is -- goes on, you know, all the time and fairly
17   regularly across all pesticides regulated by EPA.
18        Q.  So what I think you're saying is EPA will
19   sometimes approach a registrant about concerns it might
20   have with the toxicology database, ecotoxicology
21   database, perhaps request more information, more
22   studies, and the registrant in many cases will come
23   back to EPA with more studies and EPA will say based on
24   that enhanced risk assessment, the product can continue
25   being used accordingly?

Page 129

1         A.  Right.  And that -- those additional studies
2    may be more information on actual events in the fields
3    or poisoning episodes that have been evaluated by state
4    departments of agriculture or state departments of
5    health.  So, you know, there's a big world out there
6    and a lot of people using pesticides and things happen,
7    and that information about those things often is
8    provided to EPA and that triggers them to look back at
9    their assessment of that particular use pattern.
10   Sometimes they think it's -- well, if somebody
11   didn't -- didn't follow the label, it was a misuse and
12   there would be no reason to reopen assessment of it,
13   and in other cases they may determine that it seems
14   like people followed the label, but something happened
15   that the registrant had not addressed or mitigated on
16   the label and the agency wasn't aware of and didn't
17   assess, so that -- that's how that process unfolds.
18        Q.  EPA considers acute toxicity testing when
19   deciding what language is permissible on a pesticide
20   label, correct?
21        A.  Well, just the -- the part that is in that
22   signal word box and it addresses, you know, eye
23   irritation, skin irritation, it's a -- it's a box
24   usually on the -- close to the front of the -- or
25   the -- the main part of the label, it's on all

                                     33 (Pages 126 to 129)

HIGHLY           Charles Benbrook, Ph.D.          HIGHLY
CONFIDENTIAL           May 23, 2018          CONFIDENTIAL

---

Page 130

1    products.
2       Q. So EPA does consider acute toxicity testing in
3    deriving some of the label language?
4       A. Correct.
5       Q. EPA considers applicator exposure assessments
6    when deciding what language is permissible on pesticide
7    labels, correct?
8       A. Not -- not for -- you know, for new
9    registrations, they do very little in terms of an
10   assessment of applicator exposure because, for one
11   thing, there have been no applicators out there using
12   it because it hasn't been on the market. So the -- the
13   initial registration reviews and approvals focus
14   predominantly on the chronic -- the chronic database
15   and issues that have to be resolved to establish
16   tolerances. That's actually the most significant part
17   of the science review is related to establishing the
18   tolerances.
19      The label review, that's where the application
20   rates, the number of applications, the type of
21   equipment, and the long list of pests that are -- that
22   are controlled, any unique environmental circumstances
23   that have to be addressed get addressed. The company
24   has -- will propose the worker safety requirements, if
25   any, the PPA -- PPE requirements, if any, but the

---

Page 131

1    agency at that stage in the process doesn't do a full
2    risk assessment to try to determine if those worker
3    safety precautions or the PPE is adequate. They --
4    they view it as the company's responsibility to put
5    whatever worker safety precautions, requirements,
6    suggestions and PPE that are necessary to mitigate
7    risks as the company understands them, but the agency
8    does not aspire to do a thorough risk assessment of
9    what those exposure levels and risks might be before a
10   product is first put on the market because they just --
11   they wouldn't have the resources or the information to
12   do it.
13      Q. Sure. But there are required applicator
14   exposure studies, correct? We went over that just
15   recently?
16      A. They're part -- sure. They're part of the --
17   the required studies done on any new pesticide, yes.
18      Q. And EPA intends that both its label reviewers
19   and the registrants consider those pesticide applicator
20   exposure tests when determining what language is
21   permissible on pesticide labels, correct?
22      A. Sure, they take it into account, yes.
23      Q. Some of your work has focused on intensity of
24   pesticide use per acre, right?
25      A. Yes.

---

Page 132

1       Q. EPA can, of course, limit the amount that can
2    be applied per acre via the pesticide label, correct?
3       A. Yes.
4       Q. EPA can, of course, limit the number of
5    pesticide applications that are made in a given period
6    via the pesticide label, correct?
7       A. Correct.
8       Q. So a big part of pesticide product approval
9    and reapproval process is determining the best ways to
10   educate consumers about how to safely apply pesticides,
11   including reducing the potential for any harmful
12   exposure, correct?
13      A. No, I'm sorry, I don't agree with that. In
14   the initial -- initial approval of labels and in
15   re-registration, the EPA is -- it assesses whether
16   their review of the mandatory data, the vast majority
17   of which is on the -- the technical active ingredient,
18   supports the use patterns that are incorporated in a
19   label. And by "use pattern" I mean the crop or crops
20   to be treated, the timing of the treatments, the total
21   amount of active ingredient that can be applied in a
22   season, which is on essentially every label. There
23   will be a maximum amount of the technical active
24   ingredient that can be applied per acre, and sometimes
25   there will be a limit on how much of the active

---

Page 133

1    ingredient can be applied in a single application.
2      So if it's a label where EPA puts both a limit
3    on the total amount that can be applied as well as the
4    maximum amount that can be applied per application,
5    that puts a cap on the number of applications that can
6    be made. Certainly up to the maximum level.
7      So there's all sorts of different combinations
8    of -- of requirements and/or limits that both
9    registrants use and EPA uses, and the basic purpose of
10   these specific quantitative parameters of how a
11   pesticide can be used in a maximum way, what's the most
12   glyphosate that can be applied on a soybean field in a
13   year, the label needs to specify that because it's
14   under that -- that circumstance of use that the EPA
15   then conducts a dietary risk assessment, an ecotox risk
16   assessment, etcetera, and ultimately reaches its
17   judgment that the exposure levels do not -- do not --
18   are not likely to cause risk that exceeds their level
19   of concern.
20      So these use requirements are integral to the
21   risk assessment process because they define the maximum
22   amount of pesticide that can be used in an area in a
23   given period of time.
24      Q. EPA has the ultimate authority to enforce
25   label requirements, correct?

---

34 (Pages 130 to 133)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 134

1    A.  Yes.  And they delegate that authority to
2  states and Indian tribes in some cases, but yeah, under
3  federal law it's EPA's responsibility -- EPA or its
4  designee to enforce the labels.
5    Q.  EPA doesn't designate any sister agencies such
6  as ATSDR or any other government agency to enforce
7  label requirements, correct?
8    A.  Correct.
9    Q.  FIFRA provides the US EPA with the means to
10  restrict the use of pesticides, to update registered
11  pesticides with new safety information and to take
12  action when new evidence of adverse environmental or
13  human health effects are reported, correct?
14    A.  Correct.
15    Q.  You know that some glyphosate-based herbicides
16  are for consumer use, correct?
17    A.  Yes.
18    Q.  And consumer use pesticides, but here
19  glyphosate-based herbicides, are in lower
20  concentrations, of course, right?
21    A.  Correct.
22    Q.  And that's because they're expected to be used
23  less intensively than agricultural or IT&O products,
24  correct?
25    A.  Well, actually some of the consumer use

Page 135

1  products more -- more glyphosate gets sprayed on a
2  small area if you're just weighing -- weighing the
3  amount of the spray, but all of these -- the consumer
4  products in general have no more than 10 percent of
5  glyphosate technical active ingredient in the
6  formulation, so they're regarded as a dilute -- a
7  dilute formulation compared to the industrial products
8  that Mr. Peterson, Mr. Hall, Mr. Johnson bought and
9  applied in the course of the -- carrying out their
10  duties and responsibilities, of which the vast
11  majority -- well, all of the products that I'm aware
12  that they applied had between 45 and 50 percent
13  glyphosate in the end use product that they purchased,
14  and those -- those would clearly not be regarded as a
15  home use label.
16    Q.  So the less intensive use means consumers
17  would tend to use it less frequently, in lower
18  quantities for a shorter period of time at a lower
19  concentration than these commercial applicators or
20  farmers, correct?
21    A.  One of the things that is well known that --
22  with some of the consumer products people, some people
23  that buy them, they get pretty aggressive in treating
24  weeds and they'll -- they'll take their little pump
25  thing and their little magic wand and they'll spray

Page 136

1  quite a bit along a crack in their driveway or around a
2  fence line, and despite the fact that the dilution of
3  glyphosate in the liquid that they're spraying is quite
4  low, if they move the wand fairly slowly, they actually
5  put on a higher rate of the active ingredient per unit
6  area than a farmer would.
7    So it's -- it's well known that in many
8  home-based nonagricultural use settings, actually a
9  fair amount of glyphosate per unit area gets applied.
10  Because, for one thing, a lot of people doing that,
11  they really don't know how to calculate how much
12  they've sprayed.  There on the -- on the bottle there
13  will be, you know, spray, you know, one pint of this
14  per 1,000 square feet.  Well, you know, do you think
15  many people using it actually try to calibrate when
16  they've sprayed a pint?
17    So in -- in home uses there just isn't the
18  economic incentive or imperative to be careful about
19  how much you use that there is in agriculture.  If
20  somebody is spraying 400 acres on their farm, it's an
21  economically significant issue that they -- they only
22  want to spray as much as they need to control the
23  weeds.  So actually on larger-scale applications, I
24  think applicators have a much better idea how much
25  they're using per unit area and hence how intensive

Page 137

1  they are.
2    I mean, I totally agree with you that the
3  products that the homeowner is using are -- using and
4  applying, they're more dilute, but I also am very aware
5  that many casual users, periodic users of, you know,
6  consumer brands of Roundup don't have a -- a very good
7  idea of how much they've sprayed on a unit area.
8    Q.  You looked at IT&O and agricultural labels,
9  correct?
10    A.  Correct.
11    Q.  And like other labels, those include
12  instructions about personal protective equipment or
13  PPE, correct?
14    A.  Most of them do.
15    Q.  Agree that PPE isn't necessarily expected to
16  eliminate all exposure but to reduce it to acceptable
17  levels?
18    A.  Correct.
19    Q.  EPA standards aren't to eliminate all exposure
20  but to have exposure be at acceptable levels?
21    A.  That certainly -- that's the primary goal of
22  EPA, yes.
23    Q.  Personal protective equipment includes the
24  clothing that people wear when applying a herbicide
25  product, correct?

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                   CONFIDENTIAL

---

Page 138

1    A. Correct.
2    Q. Personal protective equipment used to reduce
3  exposure to herbicide products -- strike that.
4        For example, chemical-resistant rubber gloves
5  should reduce an applicator's exposure to a herbicide,
6  correct?
7    A. Monsanto's own studies show that very clearly,
8  yes.
9    Q. Eye protection should reduce an applicator's
10 exposure to a herbicide, correct?
11   A. Certainly in the eyes, yes.
12   Q. A face mask should reduce an applicator's
13 exposure to a herbicide, correct?
14   A. Correct.
15   Q. Chemical-resistant boots should reduce an
16 applicator's exposure to a herbicide, correct?
17   A. Yes.
18   Q. Long-sleeved shirt and pants should reduce an
19 applicator's exposure to a herbicide, correct?
20   A. Yes.
21   Q. Tyvek or other chemical-resistant suit should
22 reduce an applicator's exposure to a herbicide,
23 correct?
24   A. Correct.
25   Q. Sir, please turn to paragraph 461 of your

---

Page 139

1  report, if you would. I've got the last few pages
2  here, by the way. Sorry about that.
3    A. Okay. Paragraph 461?
4    Q. Uh-huh.
5    A. Technical question. Is it appropriate for me
6  to be talking about my report when it hasn't been
7  entered as an exhibit?
8    Q. Yes, it's fine. Your counsel can mark it as
9  an exhibit if they want to.
10   A. Okay.
11   Q. But it can be used for reference.
12   A. I bet he will. Okay. Shoot. I've got 461.
13   Q. Okay. You state at paragraph 461 of your
14 report: It is entirely appropriate and expected that
15 Monsanto would devote time and resources to the task of
16 persuading regulatory agencies, the scientific
17 community, political leaders, farmers and farm
18 organizations, competitors, the media and the general
19 public that the health and safety data developed by the
20 company is valid and supports the conclusion that all
21 Monsanto products are safe.
22       Did I read that correctly?
23   A. Yes.
24   Q. When you say "it is entirely appropriate and
25 expected," are you referring to an industry standard?

---

Page 140

1    A. Common practice in the industry, so if you
2  call that a standard, yes.
3    Q. I want to show you a clip from a recent movie
4  you're in.
5        MR. LITZENBURG: Is there some way that
6  this can appear on the video as well?
7        VIDEO OPERATOR: Just want to play it
8  back?
9        MS. KRAJEWSKI: Yeah.
10       MR. LITZENBURG: Okay. How long is it?
11       MR. HOLLINGSWORTH: Ten seconds.
12       MR. LITZENBURG: Okay.
13   A. Okay. Can you give me a little context
14 here --
15   Q. (BY MR. HOLLINGSWORTH) Sure.
16   A. -- before I look at it because then I might
17 not have to look at it twice.
18   Q. Are you familiar with the movie Food
19 Evolution?
20   A. Yeah, I know it exists.
21   Q. You were in that movie, correct?
22   A. I understand I am, yes.
23   Q. Okay. I want to show you a recent clip from
24 that movie.
25       (Video playing.)

---

Page 141

1    Q. (BY MR. HOLLINGSWORTH) Agree that it is
2  entirely reasonable and appropriate --
3        MR. LITZENBURG: Hold on.
4        VIDEO OPERATOR: Can we play it back
5  onto here? Put the screen down just a little bit.
6        (Video playing.)
7    Q. (BY MR. HOLLINGSWORTH) Do you agree it's
8  entirely reasonable and appropriate for a company,
9  whether it be a pesticide company or an organic foods
10 company, to use whatever science to convince the public
11 and the regulators that their company's product is
12 safe?
13   A. Sure.
14   Q. It is reasonable for a company to assure
15 regulators and the general public that the health and
16 safety data developed to register the product is valid
17 and based on sound science, correct?
18   A. They certainly strive to make that case, yes.
19       MR. HOLLINGSWORTH: Exhibit 4.
20       (Deposition Exhibit 4 was
21       marked for identification.)
22   Q. (BY MR. HOLLINGSWORTH) Dr. Benbrook, this is
23 a publication from EFSA, the European Food Safety
24 Authority. You're familiar with EFSA, correct?
25   A. Yes, I am.

---

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

HIGHLY                 Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL              May 23, 2018                   CONFIDENTIAL

Page 142

1    Q. Please turn to page 4 and the section entitled
2    Concluding Remarks on How EU Experts Ascertain the
3    Reliability of Studies During Peer-Review Process.
4    **A. Okay.**
5    Q. See the last paragraph?
6    **A. Yeah, I do, yeah.**
7    Q. The paragraph is talking about how a European
8    regulator checks on the quality and reliability of
9    every single original study.  Do you see that?
10   **A. Yes.**
11   Q. And includes -- that includes the primary
12   guideline studies by manufacturers that are required
13   for a product's approval, correct?
14   **A. Yes.**
15   Q. In fact, as noted here sometimes regulators
16   will even dismiss a pesticide company's guideline study
17   based on the regulator's independent review of the data
18   and the conclusions derived from that data, correct?
19   **A. What do you mean by "dismiss"?  Just waive the**
20   **requirement, or --**
21   Q. No.  Sometimes regulators will say that they
22   are not satisfied with a study --
23   **A. Oh, okay.**
24   Q. -- because of the --
25   **A. Yes, that happens sometimes.**

Page 143

1    Q. The second paragraph, the second sentence in
2    the paragraph notes:  It is also not unusual for member
3    state and EFSA experts to disagree with industry on how
4    the results of the studies that they submit and
5    their --
6    **A. What -- where are you?**
7    Q. Oh, sorry.  The second sentence in that
8    paragraph?
9    **A. Oh, the second sentence in that paragraph.**
10   **Okay, yes.  I see.  I'm with you.**
11   Q. It is also not unusual for member state and
12   EFSA experts to disagree with industry on how the
13   results of the studies that they submit in their
14   dossiers should be interpreted for risk assessment.
15   So the European regulators here explain that
16   they don't just agree with the -- what the company
17   tells them, right?  They may well take issue with how
18   the study results should be interpreted, correct?
19   **A. Sometimes they do.**
20   Q. And you mentioned that's -- that's a similar
21   situation that routinely or sometimes occurs with
22   respect to the EPA, correct?
23   **A. Correct.**
24   Q. And, of course, it's entirely appropriate for
25   Monsanto to attempt to persuade regulatory agencies

Page 144

1    that its view of the science is correct?
2    **A. As I said in my report, yeah.**
3    Q. It's entirely appropriate for Monsanto to
4    disagree with regulatory agencies and argue its point
5    of view to them, correct?
6    **A. Correct.**
7    Q. For example, it's entirely appropriate for
8    Monsanto to persuade a regulatory agency that the
9    underlying safety data is valid and supports the
10   conclusion its product is safe, correct?
11   **A. Assuming that they've provided all of the data**
12   **and accurately represented it, yes.**
13   Q. And you spoke a little bit about previously
14   with respect to EPA, but in regards to, you know,
15   worldwide regulators, you agree it's common and
16   reasonable for a dialogue to take place between the
17   regulator and the company making the products, correct?
18   **A. Correct, yes.**
19   Q. There may be times, for example, where the
20   regulator is uncertain or comes to a different
21   conclusion about the data from guideline studies
22   supporting the product's approval, and it would be
23   perfectly reasonable for the company to devote
24   resources to generate additional studies for that end
25   point or to conduct similar guideline studies to

Page 145

1    satisfy the regulator's concerns, correct?
2    **A. Correct.**
3    Q. You note a wide diversity of ways in which a
4    pesticide company might defend the safety of its
5    product.  What are some of the ways that a company
6    might do that?
7    **A. If there was an -- an issue with an individual**
8    **study they might replicate it to see if conducted in**
9    **a -- in a -- in a second lab or a different strain of**
10   **animal whether the results are the same.  If it's an**
11   **issue around exposure, uncertainty about exposure, they**
12   **may run additional tests in food or water or applicator**
13   **exposure studies as Monsanto did and -- when they**
14   **commissioned the very substantial and important set of**
15   **worker safety exposure studies that they did in the UK.**
16   **They might use some new scientific methods that have**
17   **become available since the original toxicology database**
18   **was done that provide deeper insight on potential**
19   **mechanisms.  And, of course, this is -- this is what**
20   **happened in the case of glyphosate-based herbicides in**
21   **the last 15 years there's been an explosion of new**
22   **scientific methods to assess genotoxity and basically**
23   **genetic impacts of toxic chemicals, and some of those**
24   **studies on glyphosate and glyphosate-based herbicides**
25   **has raised an issue.**

37 (Pages 142 to 145)

HIGHLY                Charles Benbrook, Ph.D.              HIGHLY
CONFIDENTIAL                  May 23, 2018               CONFIDENTIAL

Page 146

1    So there's -- there's a number of different
2  ways that a company can generate new information that
3  it hopes will mitigate or assuage the concerns that
4  regulators have in a given regulatory assessment.
5      Q.  So as scientific -- scientific methods expand,
6  EPA is going to consider new studies, new science
7  coming from the scientific methods and -- in taking
8  another look at the product as it goes forward,
9  correct?
10     A.  That is what responsible companies do.
11     Q.  There's also times where EPA may ask for a
12  study and then they'll have the communication that you
13  talked about with the registrant about their concerns
14  with the study, and EPA may not ultimately require that
15  the registrant repeat the study, correct?
16     A.  That has happened and certainly has happened
17  in the case of this record, yes.
18     Q.  And that's perfectly reasonable in some
19  circumstances, correct?
20     A.  Well, I mean, it -- it's legal.  But, you
21  know, I think that -- there are points in this record
22  where Monsanto's doggedness and determination just
23  simply wore EPA down.  They just didn't feel they could
24  devote the resources to fighting over things like the
25  interpretation of the 1983 biodynamic mouse study.  I

Page 147

1  mean, the EPA is -- is regulating at any one time
2  approximately 600 active ingredients, and the amount of
3  staff time and science resources that they invested
4  over the years in -- in glyphosate and glyphosate-based
5  herbicides was hugely disproportional to the majority
6  of other pesticides.
7      So, you know, EPA is like any other entity.
8  They've got to pick their fights and devote their
9  resources where they think they're going to generate
10  the -- the biggest benefit to public health and the
11  environment, and they just didn't feel they could
12  sustain the -- the debate that they had ongoing with
13  Monsanto any longer because it was clear that Monsanto
14  was going to keep coming at them one -- until they got
15  the answer they wanted.
16     Q.  Right.  But EPA has a final say and authority
17  over whether a pesticide is registered or whether a
18  pesticide should be -- a pesticide's use should be
19  decreased in some way, correct?
20     A.  Correct.
21     Q.  So EPA doesn't have to have the conversation
22  with registrants about a particular study or a group of
23  studies.  They can come to their own determination and
24  either cancel the study, say it's not -- it's not
25  sufficient, or, you know, limit the use of the product

Page 148

1  in some other way, correct?
2          MR LITZENBURG:  Form
3      A.  They have a lot of options, correct, including
4  all the ones you mentioned.
5      Q  (BY MR HOLLINGSWORTH)  And including that EPA
6  has the power and authority to force the company to
7  conduct the study, correct?
8      A.  Yes, they do.  And they can threaten to
9  initiate a cancellation process if they really feel
10  that it's important enough.
11     Q  EPA can refuse to extend the company's
12  registration if there's a perceived data gap, correct?
13     A.  Correct.
14     Q  EPA has never found that Monsanto
15  misrepresented anything to it regarding the safety of
16  its glyphosate-based herbicides, correct?
17     A.  Well, other than the IBT studies, that was
18  a -- you know, it can be argued that Monsanto didn't
19  know that the -- that the IBT lab was conducting
20  fraudulent studies despite the fact a former Monsanto
21  employee was working for them, but if you give them the
22  benefit of the doubt, they like the rest of the
23  industry were conned by this particular lab.
24     Q  IBT was a lab conducting studies not just for
25  pesticide companies, not just for Monsanto, but for

Page 149

1  government agencies and other companies outside of the
2  pesticide industry, correct?
3      A.  Correct.
4      Q.  IBT -- so the -- so the issues with IBT are
5  not specific to Monsanto, correct?
6      A.  Oh, definitely correct, yeah.
7      Q.  And you haven't seen anything that indicates
8  Monsanto was engaged or had knowledge of the particular
9  fraud that occurred at IBT, correct?
10     A.  There's no -- I'm not aware of any definitive
11  judgment that that was the case.  There were certainly
12  some people in EPA that thought that was the case,
13  including Adrian Gross who broke the -- really broke
14  the IBT thing wide open, and I know that because he
15  told me, so...
16     Q.  When did you have a conversation with Adrian
17  Gross and who is he exactly?
18     A.  Adrian Gross was a toxicologist that worked
19  for the Office of Pesticide Programs for most of the
20  '70s, into the '80s, and he was a -- a person that both
21  EPA and FDA sent to inspect GLP Laboratories conducting
22  animal studies.  He was a -- one of their sort of
23  well-known investigators, and he -- he was sent to --
24  when issues started to surface about IBT, he was sent
25  by both EPA and FDA to go do the inspection of IBT that

38  (Pages 146 to 149)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 150

1  blew the whole thing wide open.
2      Q. EPA has never determined that Monsanto was
3  actively involved in the fraud at IBT, correct?
4      A. Not that I'm aware of.
5      Q. EPA has never found that Monsanto
6  misrepresented anything to it regarding the safety of
7  its glyphosate-based herbicides, correct?
8      A. Relative to the IBT studies?
9      Q. No, in any respect at all.
10     A. Could you re-ask the question.
11     Q. Sure. EPA has never found that Monsanto
12  misrepresented anything to it regarding the safety of
13  its glyphosate-based herbicides, correct?
14     A. I'm not aware of any official findings to
15  that -- to that point.
16     Q. You believe that the labels for Roundup and
17  glyphosate-based herbicides should contain a warning
18  about cancer; is that correct?
19     A. Yes.
20     Q. Specifically what?
21     A. That there's a possible risk of non-Hodgkin's
22  lymphoma and care should be taken to minimize
23  exposures.
24     Q. "Possible risk," is that the -- is that the
25  language that you would use?

Page 151

1      A. It would -- a number of -- of words to that
2  effect. It's certainly not a -- you know, I don't
3  think it would be appropriate for -- for a definitive
4  statement to be said, but in -- in multiple areas of
5  pesticide risk assessment -- in fact, in no area is
6  there ever total certainty about anything. So there's
7  a certain degree of -- of hedging that is appropriate
8  in -- in the kinds of warning statements and -- and
9  guidance that's provided to users of pesticides via the
10  label.
11     Q. You don't think a definitive statement about
12  Roundup or glyphosate-based herbicides and NHL would be
13  appropriate because the science behind the association
14  between glyphosate and NHL is not a slam dunk, correct?
15     A. Correct. It would be inappropriate for the
16  label to say, "Be cautious using this product because
17  it's been proven to cause non-Hodgkin's lymphoma among
18  people spraying it." That would be going beyond the
19  data. However, it would be appropriate and I think it
20  would have been helpful to all of these -- to certainly
21  Lee Johnson who paid a lot of attention to have a
22  cautionary statement of the sort that appears now on
23  the -- on the MD -- on the material data sheet that
24  says that some studies show that -- a linkage between
25  use of and exposure of this pesticide and non-Hodgkin's

Page 152

1  lymphoma. That -- it's stating that there's a possible
2  association. It's not saying that you're definitely
3  going to get cancer if you apply it, but it's alerting
4  people to a potential risk for which there is some
5  evidence but not equivocal -- but not unequivocal
6  evidence, and it's -- it's a way to alert people to --
7  to really be careful and follow the label instructions
8  and recognize that there -- there may be some risk.
9      Q. You referenced the material safety data sheet.
10  That is a requirement of OSHA which is another
11  government agency, correct?
12     A. Correct.
13     Q. And your testimony is that the warning that's
14  provided on the OSHA labels for glyphosate-based
15  herbicides is sufficient in this case, correct?
16          MR. LITZENBURG: Object to form.
17     A. Well, I mean, given that it's -- given that
18  the language that appears on the -- on the material
19  safety data sheets now has presumably been approved by
20  OSHA as compliant with the requirements, of course they
21  require that -- that any chemical that has been
22  identified as a possible, probable or proven human
23  carcinogen by IARC has to state that fact on the
24  material safety data sheet. So I believe that
25  statement is now on them, and I -- I also believe

Page 153

1  that -- and I recall from the record that Monsanto has
2  agreed to put in various communications, although to my
3  knowledge not on any pesticide labels, a acknowledgment
4  that -- that some studies suggest a possible link
5  between use of Roundup-based herbicides and
6  non-Hodgkin's lymphoma. That's -- that's all that they
7  have agreed to state to my knowledge at this point.
8      Q. (BY MR. HOLLINGSWORTH) Right. So when
9  required or requested by a regulatory agency such as
10  OSHA to change a label such as the material safety data
11  sheet, Monsanto certainly will comply with that request
12  and comply in such a way that satisfies --
13     A. Right.
14     Q. -- your -- your preferred label, correct?
15     A. Correct. But let's be really clear here. A
16  pesticide manufacturer's responsibility is not just
17  negotiating with EPA what goes on the pesticide label.
18  It's not just what they're required to do with OSHA.
19  It encompasses all of the methods of communication that
20  they use in marketing, selling, supporting people in
21  the safe and efficacious use of their products.
22  There's much more detailed information on Monsanto's
23  website. There's educational brochures that you can
24  pick up at a dealer selling pesticides. There's
25  innumerable different ways that Monsanto and all

39 (Pages 150 to 153)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 154

1   pesticide registrants are obligated to truthfully
2   communicate what they understand about their products
3   to the user community and to the medical community who,
4   after all, has to try to understand if they have a
5   person that used a pesticide and gets harmed or has
6   some injury or feels that a disease might be associated
7   with the use, the medical community has to have the
8   best information that's available.
9           And so, you know, to me it's not just what is
10  on the label. It's not just what is on the material
11  data safety sheet, but the -- the totality of the
12  Monsanto controlled, Monsanto authored, Monsanto
13  paid-for information in the public arena about the
14  safety of its products, and it's -- in many cases it
15  would be -- it would be, for example, in the PowerPoint
16  that Monsanto provided to the school district where Lee
17  Johnson worked which the local seller of the products
18  showed to potential buyers. I mean, that's a --
19  technical information that the source of which is
20  ultimately Monsanto, but it's used in informing and
21  instructing people that are actually using the
22  pesticide about how concerned they should be.
23          And so, you know, it's -- my opinions about
24  Monsanto's adherence to its pledge to safety and really
25  going -- doing whatever it could to reduce and minimize

Page 155

1   human risks is based on the totality of its activities,
2   including some of the information that it had and was
3   aware of that it never did communicate to regulators
4   which I believe would have altered the views of
5   regulators had they been informed of the information as
6   I -- I feel that they should have been. So it's a --
7   I'm sorry about the longwinded answer, but your
8   question is an important one and I want to make sure
9   my -- my views are reflected accurately in the record.
10      Q. No problem. I understand that. So Monsanto
11  comported with industry standard with respect to the
12  language on the OSHA label, correct?
13      A. Correct.
14      Q. What else do you think -- do you claim is
15  wrong with the label specifics? Is there anything
16  wrong with the PPE, for example?
17          MR. LITZENBURG: Object to form.
18      A. Well, for example, the -- the product that
19  Jeff Hall applied, the -- he applied two, the Roundup
20  grass and weed Super Concentrate and another product
21  called Pro Max. I mean, just in the last couple days
22  I've looked at the labels on those, and for the life of
23  me I cannot explain why there are no PPE requirements
24  on the Roundup Super Concentrate label. I have no
25  logical explanation for that. But given that Monsanto

Page 156

1   felt that such required PPE was on all of the other
2   very similar IT&O products at the time, why they
3   weren't on that one is a total mystery to me.
4           And, you know, also I guess in the -- I think
5   it's the power max -- the Pro Max label, in the
6   original approved label there was a requirement for
7   chemical-resistant gloves to be used which EPA required
8   Monsanto to place on all of its labels in the 1986
9   registration standard, but Monsanto never did, but
10  apparently in the original label it was on it and then
11  it disappeared. Monsanto obviously requested and
12  proposed eliminating the requirement that gloves be
13  worn and EPA approved.
14          Now, why all that happened, I haven't had a
15  chance to delve more deeply into the record, but
16  clearly there's some inconsistencies in the PPE across
17  very similar products.
18      Q. (BY MR. HOLLINGSWORTH) Sir, you mentioned
19  previously that there's often these communications
20  between the regulator and the pesticide company with
21  respect to labels or studies. You haven't seen
22  anything indicating that these discussions didn't
23  happen with respect to the 1986 registration standard
24  then forward to the 1993 registration eligibility
25  decision with respect to PPE, correct?

Page 157

1       A. Sure. It was an ongoing -- ongoing discussion
2   and, you know, there's a -- a large number of very
3   similar Roundup products that had small changes in the
4   surfactants and adjuvants, for example, to make them
5   rain -- rain-fast. That was a significant feature of
6   the Pro Max and the Super Concentrate products that
7   Jeff Hall applied, and I'm sure that there was a change
8   in the surfactants that made the product more rain-fast
9   but, of course, no one knows what those were because
10  that's confidential business information. But why
11  the -- the PPE requirements are different on some of
12  those labels than on the majority of the other labels
13  for very similar uses I have no explanation.
14      Q. You can't say for certain that there wasn't a
15  conversation between Monsanto and EPA in between the
16  1986 registration standard and the 1993 registration
17  eligibility decision in which EPA determined that this
18  increased PPE was not necessary, correct?
19      A. Well, of course there was an ongoing debate,
20  and Monsanto refused to change the label and said,
21  "We'll submit additional data." And it was -- you know
22  it was a fairly protracted process, but ultimately,
23  again, EPA acquiesced to the position that Monsanto
24  took, and they -- they dropped even the requirement for
25  gloves. I mean, here you've got somebody applying

40 (Pages 154 to 157)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                     CONFIDENTIAL

Page 158

1   Roundup with a handheld sprayer with the mist all
2   around, and the label doesn't even require gloves to be
3   worn when Monsanto's own exposure studies show that
4   gloves reduce the exposure by tenfold.
5        You know, it just -- just befuddles me why
6   Monsanto, you know, has resisted at least requiring
7   that gloves be worn when you're applying a pesticide,
8   and as I stated in my expert report, I think that's a
9   perfect example of a very low cost, unobtrusive
10  requirement on a label which would have made their
11  product significantly safer, no doubt about it,
12  significantly safer, and yet they didn't do it.
13       Now, sure, Monsanto argued to EPA that, well,
14  even without gloves the exposure is likely not high
15  enough to exceed your level of concern.  Obviously EPA
16  ultimately agreed with them, but I think when a company
17  says to users and the public that, you know, we're
18  making the safest products that we can, when there's a
19  very simple change or requirement like just wearing
20  gloves, that it's a good thing to do given that there
21  might be a little bit of uncertainty about the risk
22  involved with exposures to your product.
23       What if they are -- what if Monsanto was wrong
24  about the hazard of glyphosate-based herbicide
25  exposures at the time?  And -- and obviously nobody

Page 159

1   knows for sure, you know, how hazardous any of these
2   products are.  The -- the risk assessment science isn't
3   at the point where it's definitive.  And so I just
4   think it was irresponsible not to put the requirement
5   to at least wear gloves on all of the products, but --
6   perhaps I wouldn't extend that to these home -- these
7   dilute -- very dilute home products, but Lee Johnson
8   and Jeff Hall and Mr. Peterson, they were buying
9   glyphosate products that were about 50 percent
10  concentrated, which is, you know, concentrated -- a
11  significant amount of glyphosate in the product.
12       Q. EPA ultimately agreed with Monsanto's view of
13  glyphosate-based herbicides' toxicology and exposure
14  profile and didn't require that gloves be used for
15  glyphosate-based herbicides, correct?
16       A. Correct.
17       Q. With respect to the home use label, you said
18  gloves shouldn't be required for that?
19       A. For the -- concentrations under -- under 10
20  percent -- and most of the home products are like 2
21  percent, so they're -- you know, they're very dilute.
22  I mean, you would have to -- you would have to get a
23  lot on your hands to get even a fraction of the levels
24  of exposure of Jeff Hall and Lee Johnson who were
25  spraying, you know, gallons of Roundup in a working day

Page 160

1   in the -- with the kind of equipment that they were
2   using, be quite different.
3        Q. So gloves shouldn't be required for the dilute
4   products?
5            MR. LITZENBURG:  Object to form, asked
6   and answered.
7        A. Isn't that what I just said?
8        Q. (BY MR. HOLLINGSWORTH) Okay.  Just making
9   sure.  And with respect to PPE, I think -- I believe
10  you testified previously the clothes that someone wears
11  is a form of personal protective equipment, correct?
12       A. Correct.
13       Q. Wearing a long-sleeved shirt and pants would
14  reduce an applicator's exposure to the pesticide
15  product, correct?
16       A. It -- it would, yes.
17       Q. So when you said that glyphosate-based
18  herbicides don't include any PPE at all, that's
19  actually not true because it requires at least
20  long-sleeved shirt and pants, shoes plus socks,
21  correct?
22           MR. LITZENBURG:  Form.
23       A. Well, that language appears on many of the
24  labels, although I have to say that there are also
25  advertisements out there on the television where the

Page 161

1   guy spraying Roundup products is in shorts and
2   short-sleeved shirt, so it's -- it's a part of the --
3   the PPE on Roundup product labels that, you know, has
4   been in play and it -- it certainly does have -- it's
5   better to have long-sleeved shirt and long pants than
6   shorts and a T-shirt, I would definitely agree with
7   that.
8        Q. (BY MR. HOLLINGSWORTH)  Long-sleeved shirt and
9   long pants, shoes plus socks, that's a common personal
10  protective equipment requirement for not just
11  glyphosate-based herbicides but other pesticides
12  registered?
13       A. Correct.
14       Q. What about with respect to application?  Is
15  there any further warnings you feel should be on
16  glyphosate-based herbicide labels with respect to how
17  people are applying the product?
18       A. Yes.  Yes, there again, Monsanto in response
19  to these growing questions from European regulators in
20  the decade of the 2000s commissioned a number of
21  studies to bolster Monsanto's estimates of worker
22  exposure and risk, and one of the significant sets of
23  studies that they did was a contract laboratory very
24  experienced in this that worked in the UK and analyzed,
25  oh, a number of -- of typical application scenarios for

41 (Pages 158 to 161)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                      CONFIDENTIAL

Page 162

1    IT&O products involving backpack sprayers, handheld
2    sprayers, sprayers on ATVs, sprayers in the back of
3    pickups, under a number of circumstances.
4         In most of the application scenarios they did
5    it with and without gloves, with and without a face
6    shield, with and without some sort of a Tyvek suit or
7    -- or additional clothing, and they also in several of
8    them calculated exposure when the applicator that's --
9    that's using a handheld or a backpack sprayer was --
10   was spraying on a windy day to assess the level of
11   exposure if the applicator walked in the same direction
12   back and forth, so in one direction the wind is blowing
13   at their back and the other direction the wind is
14   blowing in their face versus perpendicular to the wind,
15   and the result of those studies was that just a pattern
16   on windy days of applying perpendicular to the wind
17   reduced exposures at least fivefold consistently across
18   all of these, and some of the -- the Monsanto
19   scientists in Europe advocated adding that as a label
20   requirement that on windy days apply this product
21   perpendicular to the wind, which really, again, it's
22   just sort of a simple common sense thing when you think
23   about it, and in my opinion it should have been added
24   to labels 15 years ago and -- certainly would have
25   reduced the -- Lee Johnson's exposures because he -- he

Page 163

1    talked about how the product would blow back against
2    his neck.  That was because he was walking in the same
3    direction of the wind and the product that he sprayed
4    behind him was blowing onto him.  If he'd walked
5    perpendicular to the wind, it would have blown away
6    from him and he would have been exposed to about five
7    times less based on -- on this data.  And, you know,
8    given that, you know, Monsanto knew that and some of
9    their scientists even thought it should go on the
10   label, I just -- I have no explanation for why they
11   didn't add that to the label.
12        So that's an example of a simple additional
13   requirement that wouldn't have cost them anything,
14   wouldn't have hurt their market sales, but would have
15   given a concrete and practical instruction to the
16   applicators to reduce their exposures, and I think that
17   would have been a valuable thing.
18        Q.  You aren't testifying that Monsanto made any
19   label changes in Europe or somewhere else abroad that
20   it did not make in the United States, correct?
21             MR. LITZENBURG:  Object to form.
22        A.  Oh, yes, they did.
23        Q.  (BY MR. HOLLINGSWORTH)  And what would those
24   be?
25        A.  Well, for one thing, they -- they took the

Page 164

1    POEA surfactant out of the product so --
2        Q.  Is that a label change?
3        A.  The manufacturers are not required to list the
4    identity of the surfactants on the label, it's
5    confidential business information.  But certainly EPA
6    is aware of the changes in the confidential statement
7    of formula, as would the European regulators, so
8    that's -- that's clearly a -- a consequential change.
9        Q.  That's not a label change, correct?
10       A.  It's not a label change, no.
11       Q.  And do you know of any change -- label changes
12   in Europe or somewhere else abroad that Monsanto did
13   not make in the United States?
14       A.  Yeah -- yeah, there are -- I'm -- I remember
15   several of them.  There's sev -- several in the UK that
16   are talked about in the record.  I don't think I -- I
17   put anything about that in my expert report.  For
18   example, they put in the -- the labels in the UK
19   additional guidance and worker safety provisions for
20   uses in forestry applications where sometimes people
21   were spraying the pesticide in an upward direction, and
22   those provisions were put on the UK labels at the
23   insistence of the UK regulator, but I don't believe
24   they were put on in other European countries or in
25   the -- they haven't been put on in the US.

Page 165

1         And I think there were some special
2    requirements in Italy, as I -- as I think back on it,
3    and specifically on these IT&O products, not on the ag
4    products, which, of course, account for the majority of
5    the sales of Roundup, but -- but on these specific IT&O
6    products that involve handheld sprayers, ATV sprayers,
7    backpack sprayers.
8        Q.  Monsanto has never included any sort of cancer
9    warning either in the US or abroad on any of its
10   glyphosate-based herbicides, correct?
11       A.  I don't know of any.
12       Q.  Do you know of any other glyphosate
13   manufacturer that has included a cancer warning on its
14   glyphosate-based herbicides either in the US or abroad?
15       A.  No.
16       Q.  So Monsanto's certainly comporting with
17   industry standard in not providing a cancer warning on
18   its glyphosate-based herbicides, correct?
19             MR. LITZENBURG:  Object to form.
20       A.  Because Monsanto is the -- was the original
21   patent holder and manufacturer of glyphosate and
22   glyphosate-based herbicides and really responsible for
23   all of the Roundup labels, if Monsanto does not add
24   such a warning on its labels, there's absolutely no
25   reason to expect any other company to.  So it really

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                     CONFIDENTIAL

Page 166

1   was Monsanto's call, and they -- they've chosen not to.
2       Q. (BY MR. HOLLINGSWORTH)  Sir, there are now
3   approximately 20 glyphosate manufacturers just in the
4   United States alone, correct?
5       A. I don't think there's 20 manufacturers of the
6   technical material.  I mean, there's --
7       Q. There are 20 people who are licensed who
8   have -- 20 companies that have -- at least 20 companies
9   that have licensed the right to sell glyphosate-based
10  herbicides in the United States, correct?
11      A. That's -- but you originally asked me if there
12  were 20 companies that -- that manufacture or make the
13  glyphosate, and I don't believe there are 20 companies
14  that do that.
15      Q. And that's fair.  I'll restate my question.
16      A. Okay.
17      Q. There are 20 -- there are at least 20
18  companies, a sufficient number of companies in the
19  United States that are licensed to sell
20  glyphosate-based herbicides, correct?
21      A. Yes.
22      Q. And Monsanto does not control those companies,
23  correct?
24      A. Well, it depends on whether the company has
25  entered into a data compensation agreement with

Page 167

1   Monsanto when it -- when it first entered the market or
2   whether the company said "I don't" -- you know, "I
3   don't want to be dependent on Monsanto," and developed
4   a totally new data package, which I think a couple of
5   companies did, which is why there's 14 long-term
6   chronic studies.
7       So, yeah, I think I'm aware that a couple of
8   other companies did the full data package and are not
9   dependent in any way on Monsanto-generated studies, but
10  there certainly aren't 20 that developed a complete
11  stand-alone data set.
12      Q. Is it your testimony that Monsanto controls a
13  label language that each company who is licensed to
14  sell glyphosate-based herbicides in the US includes on
15  their label?
16      MR. LITZENBURG:  Object to form.
17      A. No, they don't -- they don't control it.  When
18  a -- when a company enters into -- a company that's
19  buying technical glyphosate from either Monsanto or
20  some other manufacturer around the world to formulate
21  their own glyphosate-based product, so this would be
22  Helena Chemical Company or Wilbur Ellis or any of the
23  many so-called me too formulators, they would license
24  from Monsanto the right to use the basic -- the basic
25  label -- the number of crops, the rates of application,

Page 168

1   the pests that are required.  But they can add
2   additional material onto the label if -- if EPA
3   approves it.  They're not bound contractually -- at
4   least I'm not aware that they're bound contractually to
5   Monsanto to not change anything on the label, but
6   certainly the core -- the core provisions of it
7   including the minimum PPE, which is, I think, relevant
8   to this case, you know, is controlled by what's on the
9   Monsanto label.
10      Q. (BY MR. HOLLINGSWORTH)  Glyphosate-based
11  herbicides and the companies who make them, they --
12  strike that.
13      Glyphosate-based herbicide companies may
14  include additional language on the label with respect
15  to the cancer warning, and no glyphosate-based
16  herbicide company that you know of has included that on
17  the label either in the US or abroad, correct?
18      A. Yes, sir.
19      MR. HOLLINGSWORTH:  Let's take a break.
20      VIDEO OPERATOR:  We're going off the
21  record.  The time is 12:44.
22      (Deposition recessed at 12:44 p.m.,
23      to be reconvened at 1:15 p.m.)
24
25

Page 169

1       AFTERNOON SESSION
2
3           1:42 P.M.
4           --oOo--
5
6       VIDEO OPERATOR:  We are going back on
7   the record.  The time is 1:42.
8       MR. LITZENBURG:  I am Timothy Litzenburg
9   of the Miller Firm for the plaintiffs.  I just want to
10  note for the record that we have been going since 8:00
11  a.m., and there -- despite Monsanto's motion, which was
12  contested, there have been no questions about anything
13  regarding Missouri law, no questions about Jeffrey
14  Hall, there have been no questions about Osborn & Barr
15  or any of the other bases for which the defendants
16  asked Judge Mullen to allow additional depositions in
17  this case.  Dr. Benbrook has been deposed two
18  separate -- or two full days in the past already this
19  year, and we would ask that this be sped up because at
20  this point we view this as duplicative and harassing
21  and we will invoke our Rule 57.03(b)(2) right to
22  suspend it if need be.
23      MR. HOLLINGSWORTH:  And I just want to
24  correct the record for a second.
25

43 (Pages 166 to 169)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 170

1            CONTINUING EXAMINATION
2   BY MR. HOLLINGSWORTH:
3       Q. I believe Peterson and Hall have been
4   discussed; isn't that correct, Dr. Benbrook?
5           MR. LITZENBURG:  By -- by my witness.
6       A. I brought them up a time or two.
7       Q. (BY MR. HOLLINGSWORTH)  Correct, and we've had
8   some lengthy discussion about what kind of products
9   they used, what kind of personal protective equipment
10  is on those labels, etcetera?
11          MR. LITZENBURG:  Well, we can get a
12  transcript typed up by the court reporter from St.
13  Louis that day, but I believe that you were there and
14  the argument was Osborn & Barr needed to ask questions
15  and -- and Monsanto needed to ask questions about
16  Missouri law.  So let's get around to it.
17          MS. HOEKEL:  And I also would like to
18  say we did not start at 8:00 a.m., despite --
19          THE WITNESS:  We were late.
20          MS. HOEKEL:  -- we started at 8:30 a.m.,
21  and Osborn & Barr counsel has not yet had an
22  opportunity to ask questions, and my understanding is
23  that this deposition was noticed up for two days and we
24  are three hours and 30 minutes into it, so I'm sure
25  we'll get to the topics that --

Page 171

1           MR. LITZENBURG:  Well, depending on how
2   things shake out.  I mean, I would be happy for you to
3   take -- to take over and ask questions out of turn,
4   however you guys want to do it, because we're not going
5   to let it go on forever with the same questions that
6   have been asked and answered.  But that said, let's
7   resume.
8       Q. (BY MR. HOLLINGSWORTH)  Welcome back,
9   Dr. Benbrook.
10      A. Thank you.
11      Q. Please turn to your report again.  I want to
12  go to the section on page 40 titled Three Major OPP/EPA
13  Actions and Decisions.
14      A. Okay.
15      Q. At paragraph 201 you note:  The data
16  requirements, risk assessment protocols, and decision
17  criteria supporting pesticide regulatory decisions made
18  by the OPP/EPA change incrementally over time.  The
19  changes have, to varying degrees, tracked scientific
20  advances in the underlying residue chemistry,
21  toxicology, and environmental sciences.
22          Did I read that correctly?
23      A. Yes.
24      Q. EPA updates its data requirements over the
25  years based on advances in science and technology,

Page 172

1   correct?
2       A. Correct.
3       Q. EPA updates its risk assessment protocols over
4   the years to track advancements in regulatory processes
5   and procedures with the aim of more accurately and
6   efficiently assessing pesticide risk, correct?
7       A. And in addition complying with any changes in
8   the statute, yeah.
9       Q. EPA also updates its testing guidelines based
10  on advances in science and technology, correct?
11      A. It has done that in the past, yeah.
12      Q. EPA has updated its decision criteria over the
13  years, correct?
14      A. Somewhat.
15      Q. One example of EPA updating its decision
16  criteria over the years is via the cancer guidelines,
17  correct?
18      A. Correct.
19      Q. In 1986 EPA promulgated its first cancer
20  guidelines which included a letter system A through E,
21  correct?
22      A. Correct.
23      Q. Prior to that time, however, they were
24  proposed guidelines and EPA, for example, in 1985 was
25  using those proposed guidelines, correct?

Page 173

1       A. Correct.
2           MR. HOLLINGSWORTH:  We'll mark Exhibit
3   5.
4           (Deposition Exhibit 5 was
5           marked for identification.)
6       Q. (BY MR. HOLLINGSWORTH)  Sir, is this the first
7   time in which EPA used guidelines with this A through E
8   classification system?
9       A. What was the first time, this document?
10      Q. Yes, so sorry.  This is the risk assessment
11  guidelines of 1986, correct?
12      A. Correct.
13      Q. Are you familiar with this document?
14      A. Yeah, I've seen it over the years.
15      Q. And is this the first time to your knowledge
16  that EPA used the A through E classification system
17  with respect to carcinogenicity?
18      A. I believe that's the case.
19      Q. Okay.  In 1996 EPA updated its guidelines
20  again.  Are you aware of that?
21      A. I don't recall the exact year, but yes, I know
22  they've been updated a time or two, and certainly with
23  the passage of the Food Quality Protection Act there
24  were a number of science policies and risk assessment
25  guidelines that had to be revisited.

44 (Pages 170 to 173)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                      CONFIDENTIAL

Page 174

1    Q. The Food Quality Protection Act was passed by
2  Bill Clinton in 1996, correct?
3    **A. It was passed by the Congress and signed by**
4  **Bill Clinton in 1996.**
5    Q. Correct. Thank you.
6         MR. HOLLINGSWORTH:  We'll mark Exhibit
7  6.
8         (Deposition Exhibit 6 was
9         marked for identification.)
10   Q. (BY MR. HOLLINGSWORTH)  Sir, these are the
11  April 1996 Proposed Guidelines For Carcinogen Risk
12  Assessment.  Are you familiar with this document?
13   **A. Yes.**
14   Q. If you turn to page 4, it discusses the major
15  changes from the 1986 guidelines.  Do you see that?
16   **A. Yes.**
17   Q. In the weighing evidence of hazard section it
18  notes:  A major change is the way hazard evidence is
19  weighed in reaching conclusions about the human
20  carcinogenic potential of agents.  In the 1986 cancer
21  guidelines, tumor findings in animals or humans were
22  the dominant components of decisions.  Do you agree
23  with that?
24   **A. That's what it says, yes.**
25   Q. Okay.  And you're familiar with that based on

Page 175

1  your review of the 1986 cancer guidelines, correct?
2    **A. Correct.**
3    Q. Other information -- it goes on and states:
4  Other information about an agent's properties and
5  structure activity relationships to other carcinogenic
6  agents and its activities and studies of carcinogenic
7  processes was often limited and played only a
8  modulating role as compared with tumor findings.
9  Correct?
10   **A. Correct.**
11   Q. Okay.  So it's fair to say that in 1986 the
12  proposed cancer guidelines were driven by tumor
13  findings from the relevant studies, correct?
14   **A. Correct.**
15   Q. Let's move on to 2005.
16        (Deposition Exhibit 7 was
17        marked for identification.)
18   Q. (BY MR. HOLLINGSWORTH)  Sir, this is a March
19  2005 Guidelines For Carcinogen Risk Assessment.  You
20  are generally aware of these guidelines, correct?
21   **A. Yes, sir.**
22   Q. Agree that the 2005 EPA guidelines for
23  carcinogen risk assessment utilize a consideration of
24  all relevant information to derive a weight of evidence
25  characterization of hazard, dose response assessment,

Page 176

1  exposure assessment and risk characterization?
2    **A. That's a fair characterization, yes.**
3    Q. What are the key things differentiating the
4  2005 EPA guidelines for carcinogen risk assessment from
5  the 18 -- 1986 guidelines?
6    **A. Well, for one thing, the Food Quality**
7  **Protection Act had passed which substantially changed**
8  **the -- a number of the exposure and risk assessment**
9  **statutory mandates that the EPA was operating under,**
10  **directed the agency to take into account cumulative**
11  **exposures across all routes of exposure for a given**
12  **active ingredient or any other similar active**
13  **ingredients that posed a risk to humans through a**
14  **comparable mode of action.  The understanding of**
15  **mechanism -- mechanistic factors in the genesis of**
16  **abnormal cell growths with the potential to progress to**
17  **cancer had evolved tremendously, and certainly there's**
18  **several aspects of the -- this most recent 2005 set of**
19  **guidelines that discussed the role of genotoxicity**
20  **data.**
21       **There's a number of changes in the -- in the**
22  **ways that the agency modeled oncogenic risk when they**
23  **had reached a judgment of -- of the fact that a**
24  **chemical had the potential to cause cancer.  A number**
25  **of changes in how they calculated exposures and some**

Page 177

1  **discussion, although not -- not as -- not as extensive**
2  **on an array of the statistical considerations that come**
3  **into play in analyzing the results from a particular**
4  **study.**
5    Q. If you turn to page 1-7, there's a section
6  titled Key Features of the Cancer Guidelines?
7    **A. Okay.**
8    Q. And critical analysis of available information
9  as a starting point for evaluation?
10   **A. Got it.**
11   Q. And it has a sentence underlined there it
12  says:  These cancer guidelines view a critical analysis
13  of all available information that is relevant to
14  assessing the carcinogenic risk as the starting point
15  from which a default option may be invoked if needed to
16  address uncertainty or the absence of critical
17  information.  Do you see that?
18   **A. Yes.**
19   Q. And what do you understand that to mean?
20   **A. Well, it -- it's stating that they are going**
21  **to use a weight of the evidence, a totality of the**
22  **evidence approach to initially make a judgment of**
23  **whether their exposure to a given pesticide poses a**
24  **carcinogenic risk, and sometimes the evidence is quite**
25  **clear in making that judgment, sometimes it's equivocal**

45 (Pages 174 to 177)

HIGHLY                  Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL                   May 23, 2018               CONFIDENTIAL

Page 178

1    and -- and what they're saying is that they first make
2    that evaluation, that's their starting point, and they
3    may make a default option that a pesticide does appear
4    to pose oncogenic risk or they'll explore that in more
5    detail and carry out a quantitative risk assessment to
6    see whether the level of concern for oncogenic risks is
7    exceeded, and in other cases they might judge that the
8    evidence isn't strong enough to support that and either
9    not conduct a quantitative risk assessment or wait for
10   further data or ways to, as they say, address
11   uncertainty or the absence of critical information.
12      Q.  So they're going to rely on a weight of the
13   evidence review in order to address uncertainty or some
14   missing critical information.  Is that fair?
15      A.  At -- yeah, at each point in time when they
16   have to make a decision, that's what the -- these
17   guidelines spell out, and I think it's an accurate
18   reflection of how the agency has conducted their
19   oncogenic risk assessments for several years, actually.
20      Q.  Please turn to page 1-11.  It's titled Weight
21   of Evidence Narrative.  Let me know when you're there.
22      A.  I'm there.
23      Q.  Therein notes:  The cancer guidelines
24   emphasis -- emphasized the importance of weighing all
25   of the evidence in reaching conclusions about the human

Page 179

1    carcinogenic potential of agents.  This is accomplished
2    in a single integrative step after assessing all of the
3    individual lines of evidence which is in contrast to
4    the stepwise approach in the 1986 cancer guidelines.
5        So how exactly is this weight of evidence
6    review in contrast to the stepwise approach of the 1986
7    cancer guidelines?
8        MR. LITZENBURG:  Object to form.
9        A.  Well, I think it's -- you know, it's fairly
10   clear if you read the whole document how they -- how
11   they take into account all the differing lines of
12   evidence, and one of the things that it -- had changed
13   substantially between 1986 and 2005 or the early 2000s
14   as they were finalizing this policy is that much more
15   was known about how to evaluate oncogenic risks.  There
16   were structure activity relationships.  There was the
17   beginning of understanding of endocrine disruption.
18   There was much more information on genotoxicity.  There
19   was much more information known on the etiology of
20   different tumors.  There was beginning to be some
21   significant epidemiological evidence about a number of
22   cancers including brain cancer in children caused by
23   pesticides.  And so EPA had to have a way at this time
24   to integrate and take into account all of that
25   information, and this is their attempt in their

Page 180

1    guidelines to explain both why they have moved to what
2    they would -- they characterize as a weight of evidence
3    approach and -- and how they do it.
4        Q.  (BY MR. HOLLINGSWORTH)  So EPA's
5    carcinogenicity review and classification 1986 versus a
6    carcinogenicity review and classification after 2005
7    would reflect the advances in science and technology
8    that occurred in that 20-year span, correct?
9        A.  Certainly reflects some of them, yes.
10       Q.  And I think paragraph 202 of your report sort
11   of speaks to that change over time.
12       A.  202?
13       Q.  Yes.
14       A.  Okay.  Yeah.
15       Q.  The impact of changes over time in data
16   requirements, study protocols, risk assessment methods,
17   decision criteria governing OPP/EPA regulatory
18   decisions and politics is a complex endeavor,
19   especially in the case of a pesticide like glyphosate
20   that has been registered by EPA since the mid 1970s and
21   gone through so many profound changes in use patterns,
22   test results and risk assessments.
23           So fair to state your're referring to these
24   advances in science, technology and regulatory risk
25   assessment that occurred between the 1970s and today in

Page 181

1    that paragraph?
2        A.  Well, and very much so the massive increase in
3    the amount used and the number of people exposed and
4    the distribution of levels of exposure across the
5    population.  So, I mean, there was big changes with how
6    carcinogenic risk was evaluated for all pesticides,
7    particularly challenging in the case of glyphosate
8    because of the equivocal nature of the underlying
9    chronic toxicity database, but at the same time you had
10   a pesticide that -- for which there was ten, 15 million
11   pounds applied a year when EPA made the critical
12   decisions that when I wrote my expert report there's
13   over 200 million pounds being used in a year.  So
14   obviously a very different set of issues and challenges
15   confronting the EPA in determining whether the current
16   uses and risks of glyphosate-based herbicides are --
17   meet the -- meet the agency's requirements.
18       Q.  So do you agree that the advancements in
19   science and technology as reflected in these 2005
20   cancer guidelines make the cancer determination after
21   2005 more accurate than the cancer determination based
22   on 1986 guidelines?
23       A.  Well, you know, it would depend.  If there's a
24   single clear animal study that was in the record back
25   in the '80s, maybe it didn't change it much, but in

46 (Pages 178 to 181)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 182

1   cases where there's a lot of different data,
2   particularly different studies that kind of point in
3   different directions, that's when the -- you know, the
4   more granular protocols in the 2005 guidelines explain
5   how the agency tries to deal with those -- those
6   situations.  So yeah, I think they're -- they
7   articulate in a -- in a fairly straightforward and
8   responsible way how EPA tried to deal with all the
9   information that they -- they have at the time in
10  making a judgment.
11       Q.  EPA's 2005 carcinogenicity guidelines take
12  into account weight of the evidence and advances in
13  science and technology to more accurately consider the
14  full range of toxicology and exposure studies on a
15  particular pesticide, correct?
16            MR. LITZENBURG:  Object to form.
17       A.  As I said, they -- they certainly have made a
18  effort to incorporate much of the scientific advance
19  that they were aware of.  Did they -- did they fully
20  incorporate all of the cutting edge science on all
21  different tumor types?  Probably not, but based on
22  the -- the scope of the challenges that they faced in
23  evaluating the oncogenicity of pesticides, they came up
24  with a process which was as comprehensive and rigorous
25  as they knew how to do.

Page 183

1       Q.  (BY MR. HOLLINGSWORTH)  And you'll agree that
2   the 2005 cancer guidelines are certainly an advancement
3   from where we were in 1986, correct?
4            MR. LITZENBURG:  Object to form.
5       A.  You know, I -- I kind of think given what they
6   came up with in 1986 it kind of reflected their best
7   judgment of where things were and science has advanced,
8   and I -- I think the 2005 is an equally timely
9   reflection of the -- the information that should be
10  taken into account when a regulatory agency makes this
11  kind of decision.  I -- you know, I -- I don't believe
12  that the 2005 guidelines are substantially more
13  thorough or careful or robust than the 1986.  They --
14  but I think that they kept up with the times and tried
15  to incorporate the -- the new information.
16       Q.  (BY MR. HOLLINGSWORTH)  Section III A of your
17  report is on the three major OPP/EPA actions and
18  decisions, correct?
19       A.  Yes.
20       Q.  The first major EPA regulatory action that you
21  list concerns pesticide residue tolerance approvals,
22  correct?
23       A.  Correct.
24       Q.  Why is the pesticide residue tolerance
25  approval one of the three major EPA regulatory actions

Page 184

1   for pesticides?
2       A.  Because a -- a labeled use of a pesticide that
3   leaves residues on a harvested agricultural crop would
4   lead to that crop being seized and deemed adulterated
5   and unmarketable by the FDA if there was not a
6   tolerance in place to cover the residues.
7       Q.  At page 44 of your report, paragraph 221, you
8   note:  To make judgments regarding risks versus
9   benefits, the OPP must carry out detailed assessments
10  of how a given pesticide is used on a given crop.
11            Is that sort of assessment part of the residue
12  tolerance approval process?
13       A.  No.
14       Q.  Okay.  What is that then?
15       A.  EPA and certainly, as I said, since the
16  passage of major amendments in -- to FIFRA in the late
17  '70s, EPA does not require efficacy data, does not do a
18  benefits assessment when it is evaluating a
19  registration application for a new pesticide or a new
20  use of an already registered pesticide.  They've stated
21  very clearly that they don't do that.  So that they're
22  not -- they're not making a risk/benefit judgment at
23  that point on either issuing a new label or a new use.
24            When it comes time to do a reassessment or
25  re-registration of a pesticide that has already been on

Page 185

1   the market, the statutory standard that EPA is mandated
2   to apply is assuring that there's no unreasonable
3   adverse effects on man and environment, taking into
4   account the -- the risks and the benefits associated
5   with each unique use of a pesticide.
6            In the course of making these re-registration
7   divisions, EPA does do a benefits assessment in cases
8   where the information and studies available to EPA
9   suggest that there -- there is some risk of either harm
10  to the environment, to fish or birds or earthworms or
11  some risk to humans to -- through the diet or
12  applicators through exposure.  If there's a risk
13  concern that conceivably approaches or exceeds the
14  agency's level of concern, then that triggers the need
15  for a benefits assessment so that at the end of the
16  process they -- they have the two pieces of the
17  equation to make a judgment of whether the -- the
18  projected benefits justify the risks that EPA has
19  determined is associated with the uses of the
20  pesticide.
21       Q.  So the initial review by EPA and FDA in this
22  1996 Food Quality Protection Act deals strictly with
23  risks and there's a standard of reasonable certainty of
24  no harm; is that correct?
25       A.  There's no role for FDA in that review.

47 (Pages 182 to 185)

HIGHLY                    Charles Benbrook, Ph.D.              HIGHLY
CONFIDENTIAL                  May 23, 2018                CONFIDENTIAL

Page 186

1     Q. Okay.
2     A. No role. It does -- the FQPA did revise the
3  Food, Drug and Cosmetic Act, but it revised Section 408
4  and 409 which are fully under the purview and
5  responsibility of EPA to --
6     Q. So the initial review by EPA pursuant to the
7  1996 Food Quality Protection Act deals strictly with
8  risks and there's a standard of reasonable certainty of
9  no harm, correct?
10    A. Correct.
11    Q. And then afterwards if there's determined to
12 be some sort of risk, EPA will consider the benefits of
13 the pesticide product in deciding how to regulate it,
14 correct?
15    A. Well, that -- again, that's not exactly right.
16 So when EPA did the tolerance review after the passage
17 of the FQPA or when they entertained an application
18 from Monsanto for a new tolerance for glyphosate, they
19 would -- they would look at the chronic database and
20 whether they had the data that they needed to establish
21 a chronic reference dose and determine whether the
22 pesticide was an oncogen or not and they would -- they
23 would have a calculation of the quote\unquote risk cup,
24 which was a term of art introduced into the lexicon of
25 pesticide regulation after the passage of the FQPA, and

Page 187

1  they would calculate the percent of the allowable risk
2  that would fit in this cup that has already been taken
3  up by all of the currently registered uses of the
4  pesticide or any related pesticides that work through
5  the same mode of action. And if there was a big chunk
6  of the risk cup still available for allocation to new
7  uses or if the newly proposed tolerance increased the
8  estimate of exposure, the Tier 1 exposure by only 1
9  percent, they would just say, "Fine." They would
10 approve the tolerance.
11    If, however, a -- a reassessment of existing
12 tolerances or a request to establish new tolerances
13 produced a Tier 1 estimate of dietary exposure which
14 exceeded the risk cup, then EPA would do a more
15 in-depth study. It would -- it could go many different
16 ways. It could require new studies to reassess the
17 chronic reference dose. It could work with the company
18 to determine whether they -- a lower tolerance might
19 cover some of the uses that the company was seeking
20 or -- they would do a lot of different things, and if
21 it came down to whether the agency was going to cancel
22 the registration of a given pesticide on a given food
23 because of one of these tolerance considerations, they
24 did at the end of the day -- they had to take into
25 account the -- risk/benefit standard and that --

Page 188

1  that, of course, was a big issue of controversy within
2  the industry. You have -- EPA was responsible for
3  applying two statutes which in some circumstances might
4  be in conflict.
5           MR. HOLLINGSWORTH: Let's mark an
6  exhibit, Exhibit 8.
7           (Deposition Exhibit 8 was
8           marked for identification.)
9     Q. (BY MR. HOLLINGSWORTH) Dr. Benbrook, this is
10 the 1996 Food Quality Protection Act Implementation
11 Plan. You're familiar with this document, correct?
12    A. Very much so.
13    Q. And I think you testified previously today
14 that you had reviewed all of the pesticide residue
15 tolerance approvals or determinations for glyphosate;
16 is that correct?
17    A. I think I've got them all. You know, some of
18 them get very complicated because EPA will submit a
19 petition for tolerances at certain levels in a set of
20 crops, and before final action has -- had been taken on
21 that petition, for example, the EPA may have changed
22 its crop groupings, which crops they put in certain
23 groupings for tolerance-setting purposes, and so EPA
24 would call up Monsanto and say, "Well, we've kind of
25 changed how we do business, so you might want to

Page 189

1  withdraw that petition and just redo it with our
2  current crop groupings, and then when we take action,
3  you won't have to redo it."
4     So despite the fact that I've spent an
5  enormous amount of time trying to comprehensively track
6  the history of residue tolerance setting involving
7  glyphosate, I'm not going to sit here and say that I've
8  got every federal register notice and understand every
9  nuance of sort of the evolution of some petitions,
10 which gets very complicated, but in general, I've
11 tracked it very carefully.
12    Q. Sure. And that's fair, and let me know if you
13 haven't seen one that I put in front of you today.
14 The -- the glyphosate residue tolerance are associated
15 with particular crops, I think you just mentioned that,
16 correct?
17    A. Well, any food use crop.
18    Q. Right. So --
19    A. And not -- completely not an issue in this
20 case. I mean, there was no -- the vast majority of
21 pesticides that Jeff Hall -- now, Peterson was a farmer
22 so he would have used agricultural -- agriculturally
23 labeled glyphosate, but Jeff Hall, there wouldn't --
24 tolerance issues wouldn't apply to those labels.
25    Q. Even though there might not be, you know, over

48 (Pages 186 to 189)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 190

1   150 specific pesticide residue approvals for
2   glyphosate, there are decisions for over 150 pest --
3   crops treated with glyphosate-based herbicides,
4   correct?
5       A. I would -- yeah, I'm sure that's correct.
6       Q. Since the Food Quality Protection Act was
7   passed in 1996, EPA has been required to conduct a
8   cumulative risk assessment involving all routes of
9   exposure with each residue tolerance approval, correct?
10      A. Yes.
11      Q. What is a margin of safety?
12      A. It's -- in the context of dietary exposure and
13  general population exposure, it's the amount of room in
14  the risk cup or it's actually -- it's a ratio of the
15  EPA's best estimate of exposure in the numerator of a
16  fraction and in the denominator, the total amount of
17  exposure that EPA is willing to accept without
18  triggering its level of concern. So that -- that ratio
19  is the -- the margin of concern or this basic risk
20  metric.
21      Q. All right. So there's certain margins of
22  safety built into the FQPA tolerance approval risk
23  assessment, correct?
24      A. Okay, we -- I'm not sure if we're -- if you're
25  asking me about something different. In the setting of

Page 191

1   a chronic reference dose, there are standard safety
2   factors. You're not asking about those, am I correct?
3       Q. No.
4       A. Because some people would refer to them as
5   margins of safety too. Okay, so we're fine.
6       Q. There are certain margins of safety built into
7   FQPA tolerance approval risk assessment, correct?
8       A. Well, yeah, and there's more than one type --
9       Q. Sure.
10      A. -- but I would agree with you.
11      Q. Please turn to page 6.
12      A. Of the FQPA document?
13      Q. Yes, sir.
14      A. Okay.
15      Q. The section titled Statutory Framework EPA's
16  Role in Food Safety?
17      A. Uh-huh.
18      Q. The third paragraph notes: EPA requires
19  extensive data as part of its pesticide review and
20  approval process requiring more than 120 studies before
21  granting a registration for most pesticides used in
22  food production. Do you agree with that statement?
23      A. Yes.
24      Q. It's certainly the case with glyphosate that
25  EPA has reviewed more than 120 studies for glyphosate,

Page 192

1   correct?
2       A. Yes.
3       Q. A few sentences down it notes: When new
4   evidence arises to challenge the safety of a registered
5   pesticide, the agency may take action to suspend or
6   cancel its registration and revoke the associated
7   tolerance. You agree with that statement, right?
8       A. Yes.
9       Q. So with respect to tolerances, EPA can revoke
10  a pesticide tolerance or not approve a pesticide
11  tolerance based on new evidence challenging the safety
12  of a pesticide such as glyphosate, correct?
13      A. Correct.
14      Q. The next sentence of the FQPA implementation
15  plan notes that: EPA may also undertake an extensive
16  special review of a pesticide's risks and benefits
17  before approving a pesticide residue tolerance. Do you
18  agree with that statement?
19      A. You didn't read it quite as it's written. EPA
20  may also undertake an extensive special review of a
21  pesticide's risks and benefits or work with
22  manufacturers and users to implement changes in a
23  pesticide's use. That was the sentence you were
24  reading, right?
25      Q. Sure.

Page 193

1       A. Okay.
2       Q. Do you agree with that statement?
3       A. As I read it, yes.
4       Q. Okay. Residue tolerance is also applied to
5   surfactants used in pesticide products, correct?
6       A. Well, no. The -- the tolerance for glyphosate
7   residues covered glyphosate and its primary metabolite
8   AMPA up through some point in the '90s, I don't
9   remember the exact date, when EPA made a decision to no
10  longer encompass or take into account AMPA residues in
11  the expression of glyphosate tolerances. There's
12  nothing in the tolerances for glyphosate and its
13  principal metabolite AMPA that has anything to do with
14  or speaks to the surfactants.
15      Now, some of the surfactants may themselves
16  have tolerances or exemptions from the requirement for
17  a tolerance, but they would be completely separate from
18  the glyphosate tolerance.
19      Q. Right. But surfactants such as POEA will be
20  considered via the FQPA and a tolerance determination
21  will be made with respect to those surfactants,
22  correct?
23      A. You know, I'm trying to think back how much --
24  I don't think EPA put a lot of effort into reviewing
25  surfactants as it implemented the FQPA. I mean, it had

49 (Pages 190 to 193)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 194

1  such an enormous job to do with just the active
2  ingredients. You know, I know that they've -- they've
3  done some work on surfactants and adjuvants and there's
4  been an attempt to come up with a -- you know, a
5  generally recognized is it safe or an improved set of
6  surfactants and adjuvants and -- but I -- I certainly
7  wouldn't agree that adjuvants and surfactants receive
8  the same level of scrutiny upon passage of the FQPA as
9  the active ingredients did.
10          MR. HOLLINGSWORTH: Let's mark this
11  exhibit.
12          (Deposition Exhibit 9 was
13          marked for identification.)
14      Q. (BY MR. HOLLINGSWORTH) Dr. Benbrook, have you
15  seen this pesticide residue tolerance decision with
16  respect to alkyl amine polyalkoxylates, otherwise known
17  as POEA?
18      A. Yes, I believe I have.
19      Q. Okay. So this shows EPA pursuant to FQPA
20  looking at surfactants, and here this is a surfactant
21  used in glyphosate-based herbicides, in making a
22  determination whether or not to regulate them pursuant
23  to FQPA, correct?
24      A. And as I said earlier, they provided an
25  exemption from the requirement for tolerance for

Page 195

1  multiple surfactants and adjuvants, and this is one of
2  them.
3      Q. Right. They certainly considered the safety
4  of the POEA surfactant, correct?
5      A. Well, they -- yes, they had to have done some
6  sort of toxicological assessment. I didn't look at the
7  database. I don't -- I don't know how extensive the
8  studies were. I can guarantee you they didn't do a
9  two-year cancer study. It's not -- POEA and this class
10  of surfactants has not been tested at anywhere near the
11  depth and rigor of glyphosate technical material.
12      Q. As the next -- if you go back to the FQPA
13  implementation plan, the next sentence indicates: New
14  evidence challenging the safety of a pesticide may also
15  lead EPA to require reduced application rates or
16  otherwise implement measures to decrease exposure. Did
17  I read that correctly?
18      A. Correct.
19      Q. So the 1996 FQPA provides another avenue for
20  EPA to reduce exposure to a pesticide by reducing
21  application rates, for example, when presented with new
22  evidence showing an increased risk associated with the
23  pesticide product, correct?
24      A. Dietary risk, yeah.
25      Q. The last paragraph notes that: The Food

Page 196

1  Quality Protection Act amends both FIFRA and FFDCA and
2  significantly strengthens the US pesticide regulatory
3  system. Do you agree with that?
4      A. Yes, I do.
5      Q. Please turn to section titled Guiding
6  Principles.
7      A. Is this in the FQPA document?
8      Q. Yes, sir.
9      A. What page?
10      Q. Seven.
11      A. Okay.
12      Q. Under the health-based approaches to food
13  safety it notes: EPA will take a health-based approach
14  to implementing the new law, especially with respect to
15  establishing safety factors for potentially sensitive
16  populations such as infants and children. Do you agree
17  with that statement?
18      A. Yes.
19      Q. And the safety factors are a key principle of
20  regulatory risk assessment, correct?
21      A. Correct.
22      Q. There's a safety factor applied to women and
23  children that's above the safety factor applied to the
24  general population, correct?
25      A. It's in addition to.

Page 197

1      Q. And it's -- sorry. It's children and infants,
2  correct?
3      A. Children and -- yeah, it's really -- the FQPA
4  directed the EPA to take into account the unique risks
5  faced by the developing fetus during pregnancy and
6  infants and children because of the 1993 National
7  Academy of Sciences report on pesticides in the diets
8  of infants and children which I started during my
9  tenure as the executive director of the board on
10  agriculture. So I assure you I know the history of the
11  FQPA as well as anybody in this room, and yes, the
12  critical difference in the FQPA relative to FIFRA was
13  that it removed the requirement that the EPA take into
14  account the benefits of a pesticide when setting,
15  adjusting or cancelling a tolerance. That was one of
16  the biggest changes in federal regulatory policy
17  embodied in the FQPA.
18      Q. FQPA mandates regular consideration of
19  aggregate exposures from food and nonoccupational
20  sources as part of EPA's evaluation of whether a
21  tolerance can be set that meets the standards of the
22  law. Do you agree with that?
23      A. Yeah, and they also take into account
24  occupational exposures. I mean, it's a -- cumulative
25  exposure really means -- it's just directing the EPA

50 (Pages 194 to 197)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 198

```
 1   what -- what they were sort of doing already, but it
 2   made it a statutory mandate to take into account all
 3   routes of exposure for a given population group to a
 4   pesticide.
 5        Q. Right. So the determination of a pesticide
 6   residue tolerance under the FQPA takes into account
 7   occupational exposure to a pesticide, correct?
 8        A. It would play a role into how much of that
 9   risk cup was taken up.
10        Q. And it also takes into account sources of
11   exposure such as drinking water, residential use and
12   lawn care use, correct?
13        A. Yes.
14            (Deposition Exhibit 10 was
15            marked for identification.)
16        Q. (BY MR. HOLLINGSWORTH) Sir, this is PRN 97-1:
17   Agency Actions under the Requirements of the Food
18   Quality Protection Act. You're familiar with this
19   pesticide registration notice, correct?
20        A. Yes, I've -- I've seen it. It's been a while
21   since I've read it.
22        Q. The pesticide registration notice is
23   essentially a regulatory guidance with respect to
24   FIFRA, correct?
25        A. Correct.
```

Page 199

```
 1        Q. Please turn to Section 5 of the document
 2   entitled Interim Approach to Risk Assessment.
 3        A. Yep.
 4        Q. Okay. And if you turn to the next page, it
 5   talks about how there's an interim decision logic that
 6   allows decisions to be made now which are more
 7   protective -- or sorry -- which are protective, more
 8   economic of resources and which can be revised as
 9   knowledge increases. EPA has designed an interim
10   strategy to meet new FQPA reasonable certainty of no
11   harm standard in the absence of full data and fully
12   developed exposure risk assessment methodologies.
13   You're familiar with that, right?
14        A. Yes.
15        Q. Okay. And then lower down it notes -- do you
16   see the risk cup section?
17        A. Yes.
18        Q. Okay. And that's what you were just talking
19   about, correct?
20        A. Correct.
21        Q. Okay. The full cup represents the total
22   reference dose and each use of a pesticide contributes
23   a specific amount of exposure that adds a finite amount
24   to the risk cup, correct?
25        A. Yep.
```

Page 200

```
 1        Q. Okay. So each use of a glyphosate-based
 2   herbicide on a crop EPA assumes 100 percent use on that
 3   crop and then they consider that use within the risk
 4   cup analysis; is that correct?
 5        A. That's their Tier 1 dietary risk assessment.
 6        Q. Okay.
 7        A. And they assume that the residues would be at
 8   the tolerance level. 100 percent crop acres treated
 9   plus 100 percent of the residue -- of the tolerance
10   level.
11        Q. Okay. And that's a fairly conservative
12   estimate. Do you agree?
13        A. It's very conservative.
14        Q. But then if EPA gets more information on
15   exposure over time, EPA may adjust that conservative
16   estimate in order to take into account those more
17   accurate understandings of exposure, correct?
18        A. Not asking the question exact right. EPA
19   would not get information on exposure. They would get
20   information on residue levels in food, for example.
21   Perhaps the FDA put baked beans in the total diet study
22   and there were -- was data showing that in 400 samples
23   of baked beans there were 4 percent of them that had
24   glyphosate at some level that was, say, 1/80th of the
25   tolerance. EPA would take that information and include
```

Page 201

```
 1   it in a more refined estimate of exposure to glyphosate
 2   through baked beans.
 3        So it's not that -- it's not that the agency
 4   gets better information on exposure, but it would get
 5   better information on percent of acres treated or the
 6   mean residue level, but both of those are just parts of
 7   the equation that calculates exposure.
 8        Q. Sure. EPA considers things like amount of
 9   acres treated or the residue level for a specific crop
10   in determining -- making a judgment about decreasing or
11   increasing the amount of risk attributed to that new
12   use. Is that fair?
13        A. Right. And if you want me to explain the
14   precise standard I'll be glad to. I'm not sure it's
15   important to you in this case, but it's actually quite
16   interesting.
17        Q. Let's take a look at the November 10, 2004
18   pesticide residue tolerance approval.
19            MR. LITZENBURG: Can we take a
20   five-minute break before we get to the next exhibit?
21            MR. HOLLINGSWORTH: Sure.
22            VIDEO OPERATOR: We're going off the
23   record. The time is 2 -- 2:27.
24            (Deposition Exhibit 11 was
25            marked for identification.)
```

51 (Pages 198 to 201)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL               May 23, 2018                CONFIDENTIAL

Page 202

1    (Recess taken.)
2    VIDEO OPERATOR:  We are going back on
3  the record.  The time is 2:42.
4    MR. LITZENBURG:  Off the record -- this
5  is Tim Litzenburg, plaintiffs' counsel -- I have just
6  informed counsel that I had a death in the immediate
7  family this week and we will have to suspend this
8  deposition for a 5:00 a.m. flight tomorrow.  Counsel
9  have agreed to finish today's portion of the deposition
10  at around 5:00 p.m. and then continue to meet and
11  confer on when we can complete Dr. Benbrook's
12  deposition in the Peterson/Hall matter, and you all may
13  say whatever you like.
14    MR. HOLLINGSWORTH:  Sure.  And, you
15  know, we agree to go to 5:00 today and then see where
16  we are at that moment.  We may request, and I think you
17  stated earlier, that you could go until as late as
18  10:00 tonight.  We may take you up on that, but we will
19  let you know at 5:00.
20    MR. LITZENBURG:  Okay, that's fair.
21    Q.  (BY MR. HOLLINGSWORTH)  Change up a little
22  bit.
23    **A.  As long as we can have dinner before 10:00.**
24    Q.  Hmm?
25    **A.  A dinner break before 10:00 because somebody**

Page 203

1  **using their brain as hard as I am needs calories.**
2  **Heaven forbid I wouldn't want to lose any weight at**
3  **this deposition.**
4    THE WITNESS:  You're not on the record,
5  are you?
6    MR. LITZENBURG:  I'm trying to slim
7  down.  I'm trying to get my summer bathing suit body.
8    THE WITNESS:  I believe we can strike
9  those comments.  Oh, boy, let's get focused.
10    Q.  (BY MR. HOLLINGSWORTH)  Okay.  Dr. Benbrook,
11  please take back out -- I believe this was Exhibit 2;
12  is that correct?  Yes, Exhibit 2.  And we have the
13  toxicology data requirements table, correct?
14    **A.  Yeah.**
15    Q.  And I'm pulling this out because it indicates
16  what EPA requires with respect to the different types
17  of required toxicology tests, correct?
18    **A.  Yes.**
19    Q.  And that is between the technical grade active
20  ingredient or the end use product, in other words, the
21  formulated product, correct?
22    **A.  Or both, correct.**
23    Q.  Or both?
24    **A.  Yeah.**
25    Q.  EPA requires two long-term rodent

Page 204

1  carcinogenicity studies in total in order to register a
2  pesticide for sale and use in this country, correct?
3    **A.  Certainly for any of the major food use**
4  **pesticides, yes.**
5    Q.  And for glyphosate that's the case as well?
6    **A.  That's certainly the case, yes.**
7    Q.  As the toxicology data requirements table
8  indicates, EPA requires the active ingredient to be
9  used as a test substance when conducting chronic
10  carcinogenicity testing, correct?
11    **A.  Correct.**
12    Q.  So EPA has made the decision that the active
13  ingredient is the appropriate test substance for a
14  chronic carcinogenicity testing, correct?
15    **A.  That's what they minimally require, yes.**
16    Q.  It wasn't Monsanto who decided that the
17  official carcinogenicity rodent testing would be of the
18  active ingredient rather than the formulated product,
19  it was EPA, correct?
20    **A.  It was -- yeah, it's what EPA requires of all**
21  **registrants.**
22    Q.  Now, for the other required tests and, for
23  example, acute toxicity testing, EPA has made a
24  decision there that the end use formulated product
25  should be tested, correct?

Page 205

1    **A.  Correct, in this six-pack set of tests that we**
2  **talked about and -- and a few others, yeah.**
3    Q.  All -- all formulated products must undergo
4  dermal testing, correct?
5    **A.  Yes.**
6    Q.  EPA does not require chronic animal
7  carcinogenicity testing on the formulated product,
8  correct?
9    **A.  That's correct.**
10    Q.  EPA does not require chronic animal
11  carcinogenicity testing on Roundup, correct?
12    **A.  Correct.**
13    Q.  EPA does not require chronic animal
14  carcinogenicity testing on Ranger Pro, correct?
15    **A.  Correct.**
16    Q.  EPA does not require chronic animal
17  carcinogenic testing on any end use formulated
18  pesticide product, correct?
19    **A.  Not -- certainly not as a routine approach,**
20  **no.**
21    Q.  Do you know why EPA doesn't require chronic
22  animal carcinogenicity testing on the formulated
23  product whether it be Roundup, Ranger Pro or some other
24  pesticide?
25    **A.  I think there's a -- a couple reasons.  I think**

52 (Pages 202 to 205)

HIGHLY                   Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL                    May 23, 2018               CONFIDENTIAL

Page 206

1  the workload of dealing with just the two chronic
2  studies on active ingredients is -- places considerable
3  strain on the agency, and if they were to, say, include
4  even one formulated product for each active ingredient,
5  that would double the workload to evaluate those
6  studies.  So I think there's workload considerations.
7  And then there's -- there's valid considerations that
8  the registrants, including Monsanto, have argued that
9  there's -- you know, there's 100-plus Roundup labels
10  which probably make a dozen different surfactants
11  and adjuvants in various different proportions, and it
12  would be -- it would be infeasible and inappropriate to
13  require, you know, $4 million worth of chronic testing
14  on every single one of them.
15     So part of the practical issues was, you know,
16  which formulated products to choose, if EPA were to
17  require such testing, so there -- there are valid
18  regulatory policy and efficiency of decision-making
19  reasons why EPA has not as a matter of course required
20  chronic testing on formulated products.
21     Q.  So there are valid regulatory policy and
22  efficiency decision-making reasons including the
23  workload that's put on EPA for potentially reviewing a
24  long-term cancer study of every formulated product, and
25  then also the expense and workload that would be put on

Page 207

1  companies in developing that those data -- those tests
2  and data packages, correct?
3     A.  That is why at this point EPA does not include
4  routinely chronic testing of, say, at least one of the
5  major formulations for all pesticides, that is correct.
6     Q.  Are there any other reasons?
7     A.  Well, I -- I think those are the two major
8  ones.
9     Q.  Do you know of any pesticide company that
10  conducts long-term rodent carcinogenicity studies on
11  its formulated pesticide products?
12     A.  Certainly not as a -- not as a routine
13  practice and certainly not that I'm aware of where
14  they've submitted them to -- to EPA, but I would
15  imagine -- I would imagine that even Monsanto maybe in
16  another country has done some further testing of
17  formulated product, whether it's Q testing or genotox
18  or cancer, but -- but where there would be no -- no
19  knowledge or record of that in the US.  It's a big
20  world.  There's a lot of different people doing a lot
21  of different testing and, you know, my review of the
22  record really was limited to toxicity testing done by
23  Monsanto to submit to the EPA, and so I -- you know,
24  it's just -- it's hard for me to know what might have
25  been done in China or Japan or Turkey.

Page 208

1     Q.  Sure.  But you don't know of one pesticide
2  company in the United States or abroad that has
3  conducted a long-term rodent carcinogenicity study on
4  one of its formulated pesticide products, correct?
5     A.  The -- the only example would be a pesticide
6  where there really isn't much added to it, you know,
7  other than the active ingredient where there's really
8  no biologically active adjuvants or surfactants and,
9  you know, I -- I would imagine across the 600 active
10  ingredients the EPA has agricultural-use pesticides,
11  there's probably a few that really don't have many
12  adjuvants.  So in that case it would be -- the chronic
13  test would really be on essentially the same chemical
14  that's in end use products.
15     Q.  Sir, you don't know one of those instances
16  either where EPA has reviewed a pesticide product that
17  is purely the active ingredient and, therefore, would
18  also qualify as the end use product, reviewed one of
19  those long-term rodent carcinogenicity --
20     A.  I didn't do a search for that.  Didn't seem
21  relevant to the -- to this case.
22     Q.  Okay.  So you do not know of one pesticide
23  company in the United States or abroad that has
24  conducted a long-term rodent carcinogenicity study on
25  one of its formulated pesticide products, correct?

Page 209

1     A.  I can't think of any examples off the top of
2  my head.
3     Q.  It is certainly not industry standard to
4  conduct a long-term rodent carcinogenicity study on a
5  formulated product, is it?
6        MR. LITZENMAN:  Objection to form.
7     A.  It certainly is not a standard operating
8  procedure, but when a chemical company becomes aware
9  that their formulated product is, in fact, much more
10  toxic than the active ingredient included in it, that
11  should trigger in that company a concern and an
12  interest in actually quantifying whether the formulated
13  product is posing risks that have not been picked up or
14  reflected in either the company's toxicological work on
15  the pure active ingredient or the data that the
16  regulatory agency has incorporated in its assessment of
17  risk.
18        And this, of course, is the -- the exact
19  situation that applies to the stewardship of glyphosate
20  and Roundup products by Monsanto and EPA's review of it
21  starting in the early 2000s when there was a number of
22  studies in the peer-reviewed literature, including
23  studies that Monsanto's own hired expert regarded as
24  scientifically valid and likely to demonstrate a
25  genotoxic effect bigger in the formulated product than

53 (Pages 206 to 209)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                 May 23, 2018                      CONFIDENTIAL

Page 210

1    in the pure glyphosate.
2         You know, there's -- there's no question but
3    that the record in this case shows that, you know, by
4    the early 2000s, Monsanto was -- knew that its
5    formulated product was more toxic to mammals than its
6    pure active ingredient, and I think as -- as the use of
7    glyphosate expanded, as the GE crops came on and, you
8    know, became so popular around the world, a responsible
9    company would have in that -- in that instance done a
10   battery of -- of chronic feeding studies on at least
11   one of its major formulated products, and I think had
12   they done that and had the study produced no
13   indications of toxicity beyond what was already aware
14   from the long-term studies on glyphosate alone, then we
15   wouldn't be here today, but I think it -- it -- in this
16   unusual and unique circumstance it was the company's
17   responsibility without being asked by EPA to do such
18   studies.  That is my opinion.
19        Q. Finished?
20        A. Yeah.
21        Q. Given there's not a single pesticide company
22   in the US or abroad that has conducted a long-term
23   rodent study on one of its formulated pesticide
24   products, it certainly isn't industry standard for a
25   company to do that, correct?

Page 211

1         A. Well, I'll agree with you, it's not a routine
2    industry standard, but I'm not prepared to say that no
3    company has ever done a chronic feeding study on a
4    formulated product.  I -- I don't -- I have not done
5    the research to agree or disagree with that statement
6    of yours.
7         Q. Given you're not aware of a single pesticide
8    company in the US or abroad that has conducted a
9    long-term rodent carcinogenicity study on one of its
10   formulated pesticide products, it certainly isn't
11   industry standard for a company to do that kind of
12   testing, correct?
13        MR. LITZENBURG:  Object to form.
14        A. Yes, sir, that's exactly what I just said.  I
15   agreed with you on that part of your statement.
16        Q. (BY MR. HOLLINGSWORTH)  You testified above --
17   earlier today that your definition of a reasonable
18   company is based, in part, on following the industry
19   standards, correct?
20        A. Certainly at a minimum, yes.
21        Q. So it's certainly not unreasonable that
22   Monsanto has not tested Roundup in a long-term rodent
23   carcinogenicity study, correct?
24        A. No, no, it is not.
25        MR. LITZENBURG:  Wait a second.

Page 212

1         A. With what -- with what they knew from their
2    own testing, much of which was not disclosed to the
3    EPA, they -- they -- they were deeply concerned about
4    the added risk in their formulated products.  They knew
5    that there was added risk in genotoxicity.  They knew
6    that there was added risk in terms of dermal absorption
7    from studies that they had commissioned and funded, yet
8    they did not ask the next and logical question of
9    whether in a -- in a chronic feeding study using the
10   formulated product would such a chronic -- would such a
11   feeding study demonstrate heightened risk as well.
12        And I -- I do not accept that that was in
13   accord with industry practice in the chemical industry,
14   the drug industry, the pesticide industry.  Any
15   industry that is exposing people or selling to people
16   something that they become exposed to, they have an
17   obligation to do what certainly is reasonable and
18   prudent to assure that it's -- that exposures are safe.
19   That's what everyone expects of these companies.
20        And in this case, Monsanto made a corporate
21   decision to not only not do the testing themselves, but
22   to vigorously oppose anyone else doing it and certainly
23   oppose any regulatory agency from requesting them, and
24   that is to me crystal clear in the record that I
25   reviewed.

Page 213

1         Q. (BY MR. HOLLINGSWORTH)  EPA without Monsanto
2    urging it to do anything has never required that any
3    company conduct long-term rodent carcinogenicity
4    studies on any pesticide products, correct?
5         MR. LITZENBURG:  Object to form.
6         A. Again, this is the third or fourth time you've
7    asked that and I'll answer it the same way.  I'm not
8    aware of any EPA data requirement for a chronic feeding
9    study on a formulated product.
10        Q. (BY MR. HOLLINGSWORTH)  Your reasonable
11   company standard is to say that Monsanto is
12   unreasonable for not conducting a test that no other
13   company in the country or the world that you're aware
14   of has ever conducted, correct?
15        MR. LITZENBURG:  Object to form.
16        A. I'm -- I -- I doubt that no company selling
17   pesticides around the world has never tested a
18   formulated product or essentially the same formula in a
19   long-term chronic feeding study.  It's a -- you know,
20   I'd be shocked if no company has done that, but I
21   haven't -- it hasn't been an issue that I've ever
22   carefully researched and it would be a very
23   time-consuming exercise given the diversity of
24   countries around the world.
25        MR. HOLLINGSWORTH:  Move to strike as

54 (Pages 210 to 213)

HIGHLY                  Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                    CONFIDENTIAL

Page 214

1  nonresponsive.
2      Q.  (BY MR. HOLLINGSWORTH)  Please listen to my
3  question, sir.  Your reasonable company standard is to
4  say that Monsanto is unreasonable for not conducting a
5  test that no other company in the country or the world
6  that you know of has ever conducted before, correct?
7      A.  I'm merely --
8          MR. LITZENBURG:  Objection, asked and
9  answered, form.
10     A.  -- speaking to what Monsanto knew about its
11  products and what Monsanto has pledged to people buying
12  its products and the general public about its
13  commitment to safety.  I am not basing this on some
14  relative standard of behavior relative to the
15  testing -- chronic testing of formulated products where
16  I agree with you there is not a routine requirement
17  from any regulatory agency around the world to test all
18  formulated end use products in chronic toxicity studies
19  for the reasons that we've just discussed, but I am
20  insisting that it is my opinion that the circumstances
21  arose in the case of Roundup-based herbicides, the most
22  widely used pesticide in the world ever, that Monsanto
23  should have carried out a battery of at least one or
24  two chronic feeding studies on their major formulated
25  products to either confirm that risks were

Page 215

1  substantially heightened as other studies suggested or
2  dispel that concern.
3      Q.  (BY MR. HOLLINGSWORTH)  Your standard for a
4  company's product stewardship with respect to pesticide
5  products is that the company conduct a study that no
6  other company that you know of in the world or the US
7  has ever conducted before.  Is that -- is that what you
8  say a steward -- a stewardship obligation is?
9          MR. LITZENBURG:  Objection to form,
10  asked and answered.
11         And, Dr. Benbrook, if you feel that you've
12  asked and answered this question enough times, you are
13  welcome to state that.
14     A.  I have -- I just answered the question.  If
15  you want me to do it one more time it will be the last
16  time I do it.
17     Q.  (BY MR. HOLLINGSWORTH)  I'm sure you're not
18  the only person in the world who has noticed the EPA or
19  any other worldwide regulators does not require testing
20  on the formulated pesticide product in long-term
21  carcinogenicity tests, correct?
22     A.  Correct.
23     Q.  Where is the outcry?
24     A.  Well, there's --
25         MR. LITZENBURG:  Object to the form.

Page 216

1      A.  The outcry is -- "outcry" is a pejorative word
2  and suggests a worked up perhaps bordering on out of
3  control reaction to something.  I would not
4  characterize the view of many scientists that have been
5  tracking glyphosate-based herbicide risk over many
6  years in calling for chronic feeding studies.  For
7  example, the peer-reviewed journal article that Pete
8  Myers was the lead author on and I was the senior
9  author because I wrote most of the manuscript, it was
10  not ghostwritten by Monsanto, believe it or not, in
11  that paper, a well-respected international group of
12  scientists expressed levels of concern about the risks
13  to -- of glyphosate and glyphosate-based herbicides and
14  in particular called upon Monsanto and regulators to
15  assure that studies -- more and better studies are done
16  on formulated product.
17         Now, my coauthors would not characterize their
18  carefully worded, well-referenced journal article as an
19  outcry, but they did characterize it as an expression
20  of concern.
21     Q.  (BY MR. HOLLINGSWORTH)  What have you done to
22  turn people around on this issue?
23         MR. LITZENBURG:  Object to form.
24     A.  Excuse me?
25     Q.  (BY MR. HOLLINGSWORTH)  What have you done to

Page 217

1  turn people around on this issue to make the rest of
2  the world see things as you see it that a company
3  should be required to do a long-term carcinogenicity
4  test on its formulated pesticide product when no other
5  company in the world that you know of has ever done
6  that?
7      A.  I -- I think really the only concrete action
8  that I took is I agreed to join an international team
9  of experts in pesticide toxicity regulation, use, risk,
10  who over an approximate two-year period authored an
11  original peer-reviewed journal article expressing
12  concern about several aspects of the current testing
13  and regulatory treatment of glyphosate, including all
14  of the important topics that we've discussed today.
15  That is the -- what I -- I guess the action that I've
16  taken to try to raise awareness of this among people
17  that don't spend a lot of time following the in's and
18  out's of the pesticide regulatory process.
19         MR. HOLLINGSWORTH:  Let's mark an
20  exhibit here.
21         (Deposition Exhibit 12 was
22         marked for identification.)
23     Q.  (BY MR. HOLLINGSWORTH)  Sir, this is the
24  original peer-reviewed journal article that you just
25  mentioned expressing concern about regulatory treatment

                                      55 (Pages 214 to 217)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL               May 23, 2018                CONFIDENTIAL

Page 218

1  of glyphosate-based herbicides; is that correct?
2      A. No.
3      Q. Oh, it's not?
4      A. No.
5      Q. What article is that?
6      A. It's the -- the article published in
7  Environmental Health where Pete Myers is the lead
8  author, I'm the senior author. It's a different -- it
9  covers a lot of the same ground, but it was -- it's a
10 different paper and it came out before this one.
11     Q. Sure. This paper is called Is It Time to
12 Reassess Current Safety Standards For Glyphosate-Based
13 Herbicides? Correct?
14     A. Yes.
15     Q. Okay. And it has several authors including
16 yourself, but also Vandenberg, Blumberg, Antoniou --
17     A. Antoniou.
18     Q. Antoniou, Carroll, Colburn, Everett, Hansen,
19 Landrigan, Lanphear, Mesnage, vom Saal, Welshons and
20 Myers, correct?
21     A. Correct.
22     Q. Okay. And in this article on -- would you
23 agree this article is on taking a look at regulatory
24 risk assessments' approach to glyphosate-based
25 herbicides?

Page 219

1      A. It's, yeah, certainly one of the topics
2  addressed.
3      Q. Okay. In this article, despite mentioning
4  numerous things that regulators might do to regulate
5  glyphosate-based herbicides, you do not mention
6  anywhere that they should -- that pesticide companies
7  should conduct long-term rodent carcinogenicity studies
8  on its formulated products, correct?
9      A. I'd have to -- I'd have to read it to see if
10 that specific sentence is in there. I'm sure there's
11 something about testing formulated products.
12     Q. This is your own paper, it was written March
13 2017, and as far as you recall and you, you know, if you
14 want to look at it now or later, you did not suggest
15 with all those coauthors in a peer-reviewed journal
16 that Monsanto should test its formulated product in a
17 long-term rodent carcinogenicity test, correct?
18     A. No, not correct. Let me read you the
19 paragraph starting on the pages of this -- page 3, top
20 paragraph. These results reveal that GBH -- that
21 stands for glyphosate-based herbicide -- safety
22 evaluations focused on glyphosate alone can
23 under-estimate toxicity and are insufficient to assess
24 relevance to human and environmental exposures.
25 Although the number of commercial formulations is

Page 220

1  extensive and will be difficult to study
2  comprehensively, we propose that the most widely
3  applied GBH formulations should be tested in parallel
4  with glyphosate alone; in other words, subjected to the
5  same long-term chronic feeding studies as glyphosate
6  alone.
7      Q. Where do you say that EPA or other worldwide
8  regulators should be -- should require that registrants
9  such as Monsanto conduct long-term rodent
10 carcinogenicity studies on its formulated products?
11          MR. LITZENBURG: Object to form.
12     A. In this passage we don't identify who should
13 do the testing, but any reasonable reading of this even
14 by people that don't know much about pesticide
15 regulation would understand that this testing would
16 either be done by the registrant under -- under a data
17 requirement from a regulator or the government would
18 have to fund the research, and by all means, I would
19 much rather see independent money from outside of EPA
20 support this type of long -- long-term testing of
21 glyphosate-based formulations, and most of my --
22 certainly most if not all of my coauthors would agree
23 with that, but we -- we were not delving into the
24 details of how this testing should -- should be done.
25 But you asked if this paper called for long-term

Page 221

1  testing of formulations, and I say it does and I just
2  read the passage where --
3      Q. (BY MR. HOLLINGSWORTH) Sure.
4      A. -- it's spelled out.
5      Q. And this paper certainly isn't a formal
6  request to EPA or another worldwide regulator to
7  consider long-term rodent carcinogenicity testing on
8  the formulated product, correct?
9      A. Correct.
10     Q. Are you aware of anyone who has formally
11 raised objections to it with EPA or another worldwide
12 regulator?
13     A. Well, I'm not, but there's no reason why it
14 would be if somebody hadn't. There's regulators all
15 over the world, I mean, all sorts of petitions and
16 requests from concerned citizens and scientific
17 organizations. So, I mean, I -- I'm sure that there
18 have been formal requests to regulators somewhere in
19 the world to call for, you know, more in-depth testing
20 of formulated product. It's a -- it's a common
21 concern.
22     Q. You're not required [verbatim] of any formal
23 response from EPA or another worldwide regulator with
24 respect to that request, are you?
25          MR. LITZENBURG: Object to form.

56 (Pages 218 to 221)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 222

1    A. Excuse me?
2    Q. (BY MR. HOLLINGSWORTH) You're not re --
3  you're not aware of any response from EPA or another
4  worldwide regulator with respect to that request,
5  correct?
6    A. No, I'm not.
7    Q. Sir, have you designed a long-term rodent
8  carcinogenicity study on a formulated pesticide before?
9    A. No.
10   Q. Has anyone designed a GLP or OECD-approved
11 study on the Roundup formulated product?
12   A. I'm -- I don't know the answer to that
13 question.
14   Q. As far as you know, has anyone designed a GLP
15 or OECD-approved study on the Roundup formulated
16 product?
17   A. Well, I don't know if Seralini's study would
18 qualify under OECD guidelines. It certainly qualified
19 as a chronic feeding study. It was not designed to be
20 a cancer study. So that would probably be the only one
21 that I'm aware of that certainly arguably was designed
22 in accord with OECD chronic feeding requirements, but
23 as I said, not oncogenicity requirements which would
24 have required many more animals per treatment group.
25   Q. Right. And you're aware that EFSA had a

Page 223

1  review of Seralini's 2012 publication, correct?
2    A. Yes.
3    Q. EFSA said, Seralini, et al , does not allow
4  giving weight to their results and conclusions as
5  published. Conclusions cannot be drawn on the
6  difference in tumor incidence between treatment groups
7  on the basis of the design, the analysis and the
8  results as reported. EFSA finds the study as reported
9  by Seralini, et al., as an insufficient scientific
10 quality for safety assessments. Were you aware of
11 that?
12   A. Yes.
13   Q. Okay. So EFSA, which is a worldwide regulator
14 that you've put some stock in that you're aware of, has
15 determined, in fact, that the Seralini study is not
16 appropriate for regulatory risk assessment, correct?
17       MR. LITZENBURG: Object to form.
18   A. That is -- that is their statement, yes.
19   Q. (BY MR. HOLLINGSWORTH) Have you investigated
20 the feasibility of conducting a long-term rodent
21 carcinogenicity study on a formulated pesticide
22 product?
23       MR. LITZENBURG: Object to form.
24   A. I don't know why there would be any difference
25 in doing a chronic feeding study on glyphosate-based

Page 224

1  formulation versus pure glyphosate. It's a simple
2  matter of calculating the dose of glyphosate the same
3  in the two studies. You're going to get a certain
4  amount of surfactant and adjuvant along with it. So I
5  don't think there's any substantial technical hurdle in
6  conducting such a study if that's what you're getting
7  at.
8    Q. (BY MR. HOLLINGSWORTH) What would the route
9  of administration be?
10   A. Same as in a -- in a standard chronic feeding
11 study.
12   Q. And what would that be?
13   A. Well, it would depend on the study design, but
14 typically through the diet, sometimes through the
15 water.
16   Q. You're not -- you're not an expert in rodent
17 carcinogenicity testing, correct?
18   A. I've never conducted a study, no.
19   Q. You have no expertise in rodent pathology or
20 any sort of pathology, correct?
21   A. Sir, you -- you and your partner asked me this
22 line of questioning for over two hours in the last
23 deposition, and I just simply want to say how annoying
24 it is to me to have to go over this again. I have no
25 advanced degree in any of the toxicological sciences.

Page 225

1  I have no certifications because none exist in carrying
2  out chronic feeding studies and evaluating them, and
3  all of the other questions that you're probably going
4  to ask me are, frankly, a waste of our time and -- and
5  annoying to me. So if you want to go through it, let's
6  do it, but I want to register on the record that you,
7  know, you had reasons to -- to call this deposition and
8  force it into two days, and you have hardly asked a
9  single question that wasn't asked multiple times in the
10 first deposition. So if you want to keep doing it,
11 let's do it, but I personally want to wage an objection
12 to it to say that I'm annoyed by it and, frankly,
13 I'm -- I'm a little bit offended that you would keep
14 asking me the same damn question over and over again.
15       MR. HOLLINGSWORTH: Move to strike as
16 nonresponsive.
17   Q. (BY MR. HOLLINGSWORTH) Sir, I'm asking you a
18 different variation of the question, and we can look at
19 the transcript sometime later if you want. I'm going
20 to continue with my questioning now. Surfactants are
21 basically soaps, right?
22   A. No.
23       MR. LITZENBURG: Object to form.
24   A. Several surfactants have soaplike
25 characteristics, but there are many other types of

57 (Pages 222 to 225)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                    CONFIDENTIAL

Page 226

1    surfactants that are used in the formulation of
2    different pesticides.
3        Q. (BY MR. HOLLINGSWORTH)  Ingesting soaps, of
4    course, can make anyone acutely ill, correct?
5        A. Yeah, if you ingest enough of it.
6        Q. Ingesting soaps can make people chronically
7    ill, correct?
8        A. At a proper dose, at a high enough dose, yes.
9        Q. Ingesting soaps can cause illness sufficient
10   to make it impossible to give a high dose to
11   test for carcinogenicity; isn't that true?
12       A. It might.
13       Q. But you don't know because you're not an
14   expert in rodent carcinogenicity testing, correct?
15       A. No, that's not the reason I don't know.  I've
16   never read a protocol where a team of scientists
17   explored the maximum tolerated dose in a chronic
18   feeding study with a formulated glyphosate product.  If
19   in the course of the preliminary range-finding study
20   that they would have to do to establish what the
21   maximum tolerated dose is, if it came to pass that they
22   couldn't -- they couldn't increase the dose to the same
23   level of glyphosate as in the chronic feeding studies
24   with -- with glyphosate alone, then they naturally
25   would say, "Well, we'll just have to include a lower

Page 227

1    glyphosate dose in conjunction with the surfactants."
2        In fact, Monsanto fully expected and any
3    expert in the field would -- would predict with a high
4    level of certainty that the maximum tolerated dose to a
5    formulated Roundup herbicide is much lower than the
6    maximum tolerated dose to glyphosate technical -- 100
7    percent glyphosate because the formulated product is
8    more toxic, and yes, it's more toxic because it has
9    other things in it.  That's the point.
10       So the dosing range in a formulated product
11   study would be set the same way the dosing range is set
12   in a study of 100 percent pure active ingredient.  They
13   would determine what the maximum tolerated dose is and
14   then test two or three levels below that and carry out
15   the test.
16       Q. You don't know if ingesting soaps can cause
17   illness sufficient to make it impossible to give a high
18   enough dose to cause a toxic effect because you've
19   never taken Chem 101, correct?
20       MR. LITZENBURG:  Object to the form.
21       A. That's a ridiculous question and it doesn't
22   deserve an answer, so if you want to break it up, we'll
23   go through it, but that's -- I'm sorry, I just --
24   that's --
25       Q. (BY MR. HOLLINGSWORTH)  Okay.  But to be

Page 228

1    clear, you don't know the correct way to develop the
2    protocol for a long-term carcinogenicity test on a
3    formulated product because you've never seen that
4    protocol before and you've never designed that kind of
5    test before, correct?
6        A. Incorrect.  I just described to you exactly
7    how it would be done.  It would be done in the same way
8    that Monsanto carried out the 1983 biodynamic study,
9    the same way that the rat study, the same way that all
10   14 studies were done.  The companies have to carry out
11   a range-finding study, a dose range-finding study to
12   determine what they believe is the maximum tolerated
13   dose as defined by EPA, and that's exactly what they
14   would do with a formulated product.  They would test
15   different concentrations of the formulated product in
16   the diet or in the drinking water of the animal until
17   the animals displayed acute toxic effects and they
18   would call that the maximum tolerated dose.
19       Q. You've never talked to an expert in rodent
20   carcinogenicity studies about your ideas that you just
21   mentioned for this long-term rodent carcinogenicity
22   study on a formulated pesticide product, correct?
23       MR. LITZENBURG:  Object to form.
24       A. I don't -- I can't remember ever discussing
25   setting the dosing range for a two-year cancer study on

Page 229

1    formulated glyphosate, no, I don't ever remember
2    talking to anybody about it.
3        Q. (BY MR. HOLLINGSWORTH)  So your opinions on
4    how to conduct a long-term carcinogenicity study on a
5    formulated product aren't based on any expertise that
6    you sought out, but instead are based on your own
7    self-taught ideas about it, correct?
8        A. No.  It's based on tracking or mimicking or
9    replicating the methodology that has -- that is used by
10   all pesticide manufacturers in conducting chronic
11   feeding studies, in compliance with EPA data
12   requirements, GLP requirements.
13       Q. GLP, good laboratory practices, were developed
14   in the late 1970s and '80s in large part due to the IBT
15   scandal that impacted multiple industries and the
16   federal government, correct?
17       A. Yeah.
18       Q. FDA was actually the first agency within the
19   federal government to discover issues with IBT,
20   correct?
21       A. Correct.
22       Q. And that FDA investigation had nothing to do
23   with the regulation of pesticide products, correct?
24       A. Not initially, but very quickly pesticides
25   were heavily involved.

HIGHLY                  Charles Benbrook, Ph.D.                  HIGHLY
CONFIDENTIAL                  May 23, 2018                  CONFIDENTIAL

---

Page 230

1    Q.  Agree that GLPs apply to all studies performed
2  to determine the toxicity, metabolism or other effects
3  of humans and domestic animals?
4    A.  Correct.
5    Q.  Agree that GLPs implement an extensive and
6  detailed process to ensure and maintain high quality --
7  high standards of quality over health effects testing?
8    A.  Correct.
9    Q.  Agree that GLPs institute a quality management
10  system of controls at each laboratory producing data to
11  ensure that data -- that safety studies are conducted
12  in a controlled, documented and traceable manner by
13  ensuring the uniformity, reliability, reproducibility,
14  quality and integrity of testing?
15    A.  Not -- you didn't say it quite right.  It
16  assures that the studies are conducted in a way that
17  there's no confounding factors affecting the health of
18  the animals and that the data is -- the data on the
19  results of the study and the conduct of the study is
20  collected in accord with protocols that are laid out.
21  So there's a distinction between GLPs referring to the
22  conduct of the study versus how the data is collected
23  and reported.  If you -- if you want to look back at
24  the transcript with how you asked the question, you
25  will see that I needed to make that distinction.

---

Page 231

1    Q.  That's fair.  Agree that GLP standards are the
2  product of 30 years of development and international
3  consensus?
4    A.  They certainly evolved over a long period of
5  time and there is certainly an attempt on a global
6  basis to harmonize them, yes.
7    Q.  And that's been -- that attempt has -- I'll
8  restate the question.
9    A.  Yeah, sorry.
10    Q.  That attempt is exhibited in the OECD
11  guidelines for toxicology testing, correct?
12    A.  Correct.
13    Q.  And you're aware that GLP investigators may at
14  any time visit the site or the lab that a study is
15  being conducted in and audit that lab and that lab's
16  data, correct?
17    A.  I'm not an expert in their enforcement and
18  inspection protocols, but I think in general,
19  regulatory agencies have access to those labs and
20  certainly carry out periodic inspections.
21    Q.  Agree that EPA has a wide range of enforcement
22  methods with respect to GLP violations including
23  criminal penalties?
24    A.  Yes.
25    Q.  And Monsanto has certainly had some of its

---

Page 232

1  toxicology studies audited pursuant to GLP before,
2  correct?
3    A.  Correct.
4    Q.  Has the Miller Firm given you the GLP audit of
5  the 1990 rat study?
6    A.  No.
7    Q.  Did you ask the Miller Firm if any of their --
8  if they had any documents showing that Monsanto's study
9  had been audited via the GLP procedures?
10    A.  Well, I knew far more about the IBT scandal
11  than anybody at the Miller Firm because we investigated
12  it when I was the staff director of the subcommittee on
13  the house ag committee that I worked for, including
14  extensive interviews with Adrian Gross and other people
15  that were involved in it.  So, I mean, I -- I have
16  known for over 30 years an awful lot about IBT and what
17  came about as a result of it, and I'm -- I'm not here
18  opining about whether -- what role Monsanto played in
19  the problems with IBT, simply like other people in the
20  pesticide industry they had commissioned studies there
21  with which EPA -- that EPA eventually regarded as
22  invalid or fraudulent, and just like the other
23  pesticide registrants they redid the studies in other
24  labs.  They also had some problems with some of the
25  replacement studies that they had done at Craven Labs,

---

Page 233

1  but they then redid those.  So Monsanto has had its
2  share of laboratory GLP bad experiences.
3    Q.  Monsanto has repeated any studies that EPA has
4  requested it repeat with respect to what you just
5  referred to, correct?
6    A.  Correct.
7        MR. LITZENBURG:  Object to form.
8        MR. HOLLINGSWORTH:  Let me go off the
9  record very quickly.
10        VIDEO OPERATOR:  We're going off the
11  record.  The time is 3:23.
12        (Discussion off the record.)
13        (Deposition Exhibit 13 was
14        marked for identification.)
15        VIDEO OPERATOR:  We're going back on the
16  record.  The time is 3:25.
17        MR. LITZENBURG:  I just want to make
18  sure I get these straight.  Last thing I had was 11 was
19  the Vandenberg publication.  This is now 13.  What was
20  12?
21        (Discussion off the written record.)
22        THE WITNESS:  There we go, yeah,
23  Vandenberg 12.
24        MR. LITZENBURG:  What was 11 then?
25        THE WITNESS:  11 is the -- and you

---

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL               May 23, 2018                CONFIDENTIAL

Page 234

1    actually never asked me about this.  This is one of the
2    final rules on tolerances.  You -- I think we took a
3    break and you forgot to come back to it.
4              MR. LITZENBURG:  Right.  Okay.  If
5    that's -- okay, I got it.  Good to go.
6         Q.  (BY MR. HOLLINGSWORTH)  Okay.  Dr. Benbrook,
7    this is a July 22, 1996 EPA memo regarding good
8    laboratory practice standards inspection on
9    September 14 through 17, 1993, correct?
10        A.  That's what it is in the re line, yes.
11        Q.  Okay.  And it states in the third paragraph
12   there:  Based solely on our review of the information
13   gathered during September 14 through 17, 1993
14   inspection of your facility, we have concluded that
15   enforcement action will not be issued.  Correct?
16        A.  Yes.
17        Q.  Okay.  And if you go to page MONGLY 00158485,
18   Appendix B, study audit report?
19        A.  I've never seen this document before, but just
20   let me get my bearings.
21        Q.  Sure, it's Appendix B.
22             MR. LITZENBURG:  And you're always --
23   feel free to read the document as you need to.
24        A.  Okay.  So it's -- it's a report of an
25   inspection of laboratory, and you want me to go to one

Page 235

1    of the appendices?
2         Q.  (BY MR. HOLLINGSWORTH)  Right, I want to see
3    what study it was.
4         A.  Which appendix?
5         Q.  Appendix B.
6         A.  Okay.
7         Q.  Okay.  And here it notes it is a study titled,
8    Chronic study of glyphosate administered in feed to
9    albino rats.  Do you see that?
10        A.  Uh-huh.
11        Q.  So it's one of these long-term rodent
12   carcinogenicity studies, correct?
13        A.  Correct.
14        Q.  And this one is by Stout and it's completed in
15   1990, correct?
16        A.  Right.  And I take it it's an internal
17   Monsanto study.
18        Q.  You're familiar with the style [sic] of the 1990
19   rat study, aren't you?
20        A.  Yes.
21        Q.  Okay.  If you turn over to the next page, it
22   says:  The study audit was accomplished with a review
23   of available raw data, records and reports, interviews
24   with the study personnel.  The study's audit was based
25   on completeness of raw data, conformance of the raw

Page 236

1    data to the study report findings and conclusions,
2    adherence to GLP standard requirements and to available
3    and appropriate standard operating procedures and
4    protocols and scientific soundness.  Do you see that?
5         A.  Yes.
6         Q.  Okay.  So via the GLP procedures, EPA can come
7    in and audit Monsanto's at any time and make sure
8    that the data from their studies match up with what
9    they reported in the study reports, correct?
10        A.  Well, not just that the data matches up but
11   that the conditions of the lab and the health of the
12   animals, etcetera, was all in compliance with
13   requirements.
14        Q.  Right.  GLP requirements make sure that the
15   final study report, recordkeeping, quality assurance,
16   the test substance, receipt and distribution,
17   application of the test system, equipment maintenance
18   and calibration records, everything associated with the
19   study and the lab is in compliance with GLP, correct?
20        A.  Correct.
21        Q.  And this is one of the important rodent
22   carcinogenicity studies on glyphosate, correct?
23        A.  Yes.
24        Q.  Okay.
25             MR. HOLLINGSWORTH:  Let's mark an

Page 237

1    exhibit.
2              (Deposition Exhibit 14 was
3              marked for identification.)
4         Q.  (BY MR. HOLLINGSWORTH)  Sir, you're familiar
5    with this, right?
6         A.  Yeah.
7         Q.  This is the second Parry report that is the
8    Parry report from August 18, 1999, correct?
9         A.  It's the report from him expressing his
10   opinions after his assessment of a set of genotoxicity
11   studies that Monsanto provided to him.
12        Q.  Monsanto provided Dr. Parry initially with
13   four studies that were in the open scientific
14   literature, correct?
15        A.  There were more than four in his review.
16        Q.  Sure.  Let me ask the question.
17        A.  The first package was four.  I --
18        Q.  The first package was four, and those were
19   open literature studies, correct?
20        A.  I'd have to go back to review the record to --
21   to confirm or -- or correct that statement.  I know he
22   reviewed many more than four.  I never paid much
23   attention to the order in which they sent them to him.
24        Q.  Monsanto also allowed Mr. -- Dr. Parry to
25   review Monsanto's genotoxicity database, correct?  That

HIGHLY                 Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL                   May 23, 2018              CONFIDENTIAL

Page 238

1    is, studies conducted by Monsanto for registration
2    purposes?
3        A. They allowed Dr. Parry to see some of those
4    studies.
5        Q. Sure. EPA already had all the studies
6    discussed in this report available for their review,
7    correct?
8        A. Probably.
9        Q. EPA had these studies to review and hasn't
10   required Monsanto to change its label because of a
11   concern for genotoxicity either at the time of the
12   Parry reports or any time since, correct?
13       A. Correct.
14       Q. You discussed Dr. Parry in detail in your
15   report, correct?
16       A. Yes.
17       Q. You also testified about him a little bit at
18   your last deposition, correct?
19       A. Was quite a bit I thought. Glad to do some
20   more.
21       Q. You note at paragraph 126 of your report that
22   Monsanto scientists agreed that improved, new and more
23   sophisticated genotoxicity studies should be carried
24   out to resolve lingering questions. So according to
25   you, Monsanto's toxicologists got Dr. Parry's

Page 239

1    recommendations and agreed that some additional studies
2    should be done based on Dr. Parry's recommendations; is
3    that correct?
4        A. You lost me there how you formulated the
5    question there. Dr. Parry recommended not in this memo
6    but in a second one that additional studies be done,
7    you know, to -- to the people that he was interacting
8    with at Monsanto. And those studies were not done.
9    That's -- that's -- I'm not sure exactly what -- what
10   context the paragraph from my expert report was, so if
11   you're asking something different, let's make sure I
12   understand the context so I don't --
13       Q. Sure. At paragraph 125 of your report you
14   note: Following his review Parry prepared and
15   submitted a detailed report to Monsanto acknowledging
16   some evidence of genotoxicity. Dr. Parry also
17   recommended that Monsanto undertake a set of more
18   sensitive genotoxicity studies --
19       A. Right.
20       Q. -- on glyphosate and formulated Roundup
21   herbicides to determine if the findings reported in
22   earlier studies were replicable and hence real.
23       A. Correct.
24       Q. What are the improved, new and more
25   sophisticated genotoxicity studies you're referring to?

Page 240

1        A. They're laid out in the second Parry memo to
2    Monsanto which -- actually, I think it's just as long
3    if not a little bit longer than -- than the first one
4    and it's also discussed in my expert report.
5        Q. Sir, are you certain this is not the second
6    Dr. Parry memo?
7        A. I'd -- again, I'd have to -- do you have the
8    first one?
9        Q. I have the second one.
10       A. Okay. So -- okay. So when you handed it to
11   me, I thought you said this is the Dr. Parry memo. And
12   the first Dr. Parry memo was his evaluation, so that's
13   why I assumed that this was the first Dr. Parry memo.
14   Let me just read -- read it a bit.
15           MR. LITZENBURG: Can we go off -- we
16   don't have to stop the video, but if we can go off that
17   record for a second.
18           (Discussion off the written record.)
19       A. Counselor, this -- this is not the -- the
20   longer version of a -- a subsequent report, memo that
21   Dr. Parry provided to Monsanto. This is -- and this
22   isn't even the long version -- I believe that -- I
23   believe that this is not -- this isn't even -- I'm not
24   even sure this is complete of this one. So, you know,
25   it's certainly possible that there were more than one

Page 241

1    version of this report from Dr. Parry to Monsanto, but
2    this is not the long version of Dr. Parry's
3    recommendations for further research, which is what --
4    what I think of as the second memo. So there may be
5    a -- sort of an ordering or numbering problem between
6    us, but I think we both agree there was an analysis of
7    a set of studies which this talks about and then a
8    second memo saying here's my recommendations for the
9    further research that you -- you could do or someone
10   could do to clarify some of the issues and concerns
11   raised from his review of the published literature.
12       Q. (BY MR. HOLLINGSWORTH) Sure. And
13   specifically you'll recall that Dr. Parry recommended
14   that they perform an in vivo bone marrow micro --
15   micronucleus assay with multiple dosing with adequate
16   numbers of animals to determine whether the work of
17   Bolognesi, et al., 1997 can be reproduced, correct?
18       A. That was one of, oh, I think there were 15
19   recommendations in that memo or something like that.
20       Q. Sure. But you'll recall that?
21       A. Yeah, yeah.
22       Q. And Bolognesi was one of these studies done in
23   Italy available on the open literature that Dr. Parry
24   reviewed initially, correct?
25       A. Correct.

61 (Pages 238 to 241)

HIGHLY                Charles Benbrook, Ph.D.               HIGHLY
CONFIDENTIAL                May 23, 2018               CONFIDENTIAL

---

Page 242

1    Q. Okay. Have you searched the scientific
2  literature to determine whether Monsanto performed the
3  studies Dr. Parry recommended?
4    A. I've certainly tracked and searched for
5  genotoxicity studies. I have a big folder of them.
6  These are published studied in the peer-reviewed
7  literature. I think there's at least 20 now, and I'm
8  not aware of one that followed the -- the protocol that
9  Dr. Parry recommended. Not to say that there isn't
10  some -- there might be one somewhere in some journal
11  that I missed, there's a lot of different scientific
12  journals, but I'm not aware of it.
13    Q. Aware that Monsanto has conducted over four
14  dozen mutagenicity and genotoxicity studies on
15  glyphosate-based formulations?
16    MR. LITZENBURG: Object to form.
17    A. I -- I would be surprised if that's a truthful
18  statement. I'm sure that they've conducted that many
19  on glyphosate technical material, and certainly
20  counting all the early Ames studies, I would agree with
21  that statement.
22    Q. (BY MR. HOLLINGSWORTH) But you don't know one
23  way or the other, do you?
24    A. I -- I don't know the number of studies that
25  Monsanto has carried out on formulated product because,

---

Page 243

1  for one thing, Monsanto has probably carried out
2  studies that they didn't tell anybody about, so how
3  would people know about them?
4    Q. Aware that Monsanto has conducted at least ten
5  mutagenicity and genotoxicity studies on the
6  surfactants used in glyphosate -- glyphosate-based
7  herbicides?
8    A. I know that they've done some genotox work on
9  their proprietary surfactants which are, you know,
10  other chemicals that Monsanto has discovered and done
11  work on. Yeah, I'm aware that they've done some
12  genotox work on them.
13    Q. Are you aware -- are you familiar with the
14  Journal of Agricultural and Food Chemistry?
15    A. Sure.
16    Q. Have you ever published articles in that?
17    A. I don't think so.
18    Q. Have any of your colleagues?
19    A. Oh, yeah.
20    Q. Is the Journal of Agricultural and Food
21  Chemistry a reputable scientific journal?
22    A. Yes.
23      (Deposition Exhibit 15 was
24      marked for identification.)
25    Q. (BY MR. HOLLINGSWORTH) Sir, this is a study

---

Page 244

1  titled, Genotoxic Potential of Glyphosate Formulations:
2  Mode-of-Action Investigations, published in the Journal
3  of Agricultural and Food Chemistry in 2008. Do you see
4  that?
5    A. Yes.
6    Q. Have you reviewed this publication before?
7    A. Yes.
8    Q. The authors of this publication are all
9  current or former Monsanto employees, correct?
10    A. Correct.
11    Q. Could you please read from the second column
12  on the first page of this article beginning with "in
13  contrast," through the end of the paragraph?
14    A. First page, right column?
15    Q. Yes.
16    A. And you want the sentence "in contrast"?
17    Q. Through the rest of the paragraph.
18    A. Oh, I see. In contrast, IP injection of CD-1
19  mice with analytical grade glyphosate or the same
20  Roundup formulation resulted in an increased incidence
21  of alkali-labile sites in DNA from liver and kidney.
22  The effects reported in the latter study were observed
23  at 300 milligrams per kilogram with glyphosate and at
24  900 milligrams per kilogram for GCHF -- which I'm
25  guessing is glyphosate something formulated product.

---

Page 245

1    Q. Keep reading, sir.
2    A. I want to -- glyphosate containing herbicide
3  formulations, it's in the abstract. So formulated
4  glyphosate, including a dramatic increase in the number
5  of 8-hydroxydeoxyguanine, and then paren, 8-0HdG, un
6  paren, residues in DNA from liver cells after treatment
7  with glyphosate but not the formulated glyphosate
8  product; opposite results were found in the kidney.
9  All of these changes were observed under unrealistic
10  exposure conditions, very high-dose -- very high-dose
11  levels administered by an irrelevant route of exposure
12  for an agricultural herbicide.
13    Q. That paragraph describes the prior genotox
14  studies on the formulated products, some of which were
15  reviewed by Dr. Parry, correct?
16    A. No.
17    Q. What does that describe?
18    A. They're talking about a study that they did.
19  At least that's how I read it. In contrast they're --
20    Q. Sure. And -- and that -- that's fair, but if
21  you see, the references, for example, 7 and 8, and if
22  you turn to the back, the references 7 and 8 are Peluso
23  and Bolognesi. Do you see that?
24    A. Yes.
25    Q. Okay. So that paragraph is referring to some

---

62 (Pages 242 to 245)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL                 May 23, 2018              CONFIDENTIAL

Page 246

1  of the genotoxicity studies on the glyphosate-based
2  herbicides formulated products, some of which were
3  reviewed by Dr. Parry, correct?
4      A. Correct.
5      Q. Okay. Bolognesi 1997 is a study that
6  Dr. Parry recommended Monsanto try to reproduce,
7  correct?
8      A. It was one of the ones that they addressed in
9  their -- and Dr. Parry addressed in his -- what I call
10  the second memo laying out recommendations for further
11  studies, correct.
12     Q. I'm going to continue reading where you left
13  off, and that's: To better understand the significance
14  of these results, four separate but interrelated assays
15  were undertaken to determine if high-dose IP
16  administration produces toxicity that may be
17  responsible for the observed changes via secondary
18  effects rather than direct genotoxicity and whether a
19  more relevant oral route of exposure produces the same
20  toxic responses as those seen with IP administration.
21  The first assay was performed to understand the
22  relevance of findings reported by Bolognesi, et al., by
23  investigating the degree of liver and kidney toxicity
24  that occurred under dosing conditions used by those
25  investigators. Did I read that correctly?

Page 247

1      A. Correct, you did.
2      Q. So is it fair to state that Monsanto did, in
3  fact, follow Dr. Parry's recommendation by conducting
4  testing to try to reproduce the effects seen in
5  Bolognesi 1997?
6      MR. LITZENBURG: Object to form.
7      A. I'd -- I'd have to refresh my memory
8  specifically what Dr. Parry recommended before agreeing
9  or disagreeing with your characterization of it. So if
10  you have the second Parry memo, I'll be glad to look at
11  it and --
12     Q. (BY MR. HOLLINGSWORTH) Sure. Are you aware
13  that Monsanto conducted this testing in the early 2000s
14  and sent their findings to EPA shortly thereafter?
15     A. Yes.
16     Q. How are you aware of that?
17     A. Well, for one thing, I read this -- this
18  article before and, you know, if they did the studies,
19  I -- I guess I would assume that they submitted the
20  results to EPA. I suppose they might not have, but,
21  you know, this is -- this is one of the --
22  follow-up studies that Monsanto carried out to try to
23  undermine the significance or relevance of these
24  published studies. I mean, they did a lot of -- a lot
25  of studies to try to raise questions about the

Page 248

1  relevance or validity of all of the genotoxicity
2  studies that other scientists had carried out that
3  reported a positive result, and they also authored many
4  review articles. So this is -- this is part of
5  Monsanto's effort to challenge the -- either the
6  findings or the relevance of the genotox literature
7  published in peer-reviewed journals.
8      MR. LITZENBURG: Let's just take a
9  five-minute break, if we can.
10     VIDEO OPERATOR: We are going off the
11  record. The time is 3:46.
12     (Recess taken.)
13     VIDEO OPERATOR: We are going back on
14  the record. The time is 4:07.
15     MR. HOLLINGSWORTH: Off the record we
16  decided to go until around 10:00 tonight and take a
17  dinner break at some point, so that's what we're going
18  to do and then we'll figure out what to do after that.
19     MR. LITZENBURG: I agree that we are
20  going to take a dinner break in about 45 minutes, and
21  defense counsel has agreed to hand me back the witness
22  at approximately 9:15 so we can wrap by 10:00. And I
23  just want to say Exhibit 14 does not have a -- a MONGLY
24  number. I understand you're working on it, but I can
25  identify the document at the time.

Page 249

1      MR. HOLLINGSWORTH: Sure. We'll get one
2  before the end of the night.
3      MR. LITZENBURG: Got it.
4      Q. (BY MR. HOLLINGSWORTH) Dr. Benbrook, there
5  were a couple of different Parry reports, correct?
6      A. Correct.
7      Q. Okay. And we're going to mark this other one
8  as an exhibit right now. It's Exhibit 16, I believe.
9      (Deposition Exhibit 16 was
10     marked for identification.)
11     Q. (BY MR. HOLLINGSWORTH) You're familiar with
12  this Parry report, correct?
13     A. This is -- the way that I reviewed the record,
14  this actually came in two chunks to Monsanto. The
15  first set of pages that go through MON 433 [verbatim]
16  through MON 4263 is the full report of Parry's
17  evaluation of a set of studies that Monsanto had sent
18  him to evaluate their robustness, whether he agreed
19  with their findings, etcetera. The -- what I believe
20  from my review of the record was a second and separate
21  report not submitted at the same time, but within -- I
22  believe it was a few weeks to six weeks is this key
23  issues report which is sort of Parry laying out his
24  recommendations.
25     I do note that the -- the Bates numbers are

63 (Pages 246 to 249)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL                 May 23, 2018                CONFIDENTIAL

Page 250

1  continuous as if they were submitted at the same time,
2  but I believe from my reading of the record that there
3  was a gap between them.
4      Q. Okay. But that is the full report as far as
5  you're concerned?
6      A. Yeah, this is the full report of his review,
7  and this is his set of recommendations as I have
8  reviewed them in the past.
9      Q. Okay. Is an in vivo bone marrow micronucleus
10 assay one of the sophisticated new genotox studies you
11 mention in your report?
12     A. Well, certainly at the time that it was
13 discovered it would be regarded as one of the, you
14 know, new studies, yes. I'm not sure it still is, but
15 it's 20 years later.
16     Q. Agree that in vivo testing should carry
17 greater weight than in vitro testing?
18     A. In general, yes.
19     Q. It takes a while to set up these in vivo
20 studies, correct?
21     A. Well, certainly some time, yes.
22     Q. How long does it take to set up an in vivo
23 study like the one we just mentioned?
24     A. It would depend on the study design.
25     Q. Please turn to the page Bates stamped MONGLY

Page 251

1  01314246.
2      A. Okay.
3      Q. There we have a section titled Key Issues
4  Concerning the Potential Genotoxicity of Glyphosate --
5      A. I have a different thing. I have reports
6  utilized in the assessment of genotoxicity activity of
7  glyphosate and glyphosate formulations. 4246, is that
8  the Bates number you gave me? I must have the wrong
9  number maybe or you do.
10         MR. LITZENBURG: Yeah, and I didn't get
11 a copy, which I'm not going to make a huge fuss about,
12 but we need to make extremely sure we're identifying
13 and talking about the same thing.
14     Q. (BY MR. HOLLINGSWORTH) 4246, do you have this
15 one?
16     A. Well, has it got the same damn number? Boy,
17 that's odd, isn't it? I think we've discovered the
18 same Bates number on two different pages.
19     Q. Why don't we mark this one as well?
20     A. Okay. Maybe if you told me what the --
21 because you probably --
22     Q. It says key -- it says --
23     A. This is page 14. What does your page 14 say?
24     Q. This doesn't have a page 14.
25     A. Oh.

Page 252

1          MR. LITZENBURG: Can -- can we go off
2  the record for a minute?
3          VIDEO OPERATOR: We're going off the
4  record. The time is 4:12.
5          (Discussion off the record.)
6          VIDEO OPERATOR: We're going back on the
7  record. The time is 4:12.
8      Q. (BY MR. HOLLINGSWORTH) Sorry about that,
9  Dr. Benbrook. Please turn to page Bates stamped 424 --
10 64.
11     A. Got it.
12     Q. Do you see there it says: Key issues
13 concerning the potential genotoxicity of glyphosate,
14 glyphosate formulations and surfactants;
15 recommendations for future work?
16     A. Yes, I do.
17     Q. This is a detailed list of recommended
18 research that you mention at paragraph 682 of your
19 report, correct?
20     A. I -- I haven't checked to see that paragraph,
21 but I'll take your word for it at this hour of the day.
22     Q. Okay. Within that section there's a
23 subsection titled Actions Recommended. Do you see it?
24     A. Yes, sir.
25     Q. Subsection B recommends Monsanto perform an in

Page 253

1  vivo bone marrow micronucleus assay with multiple
2  dosing with adequate numbers of animals to determine
3  whether the work of Bolognesi, et al., 1997 can be
4  reproduced. Do you see that?
5      A. Yes.
6      Q. And we reviewed Heydens 2008, correct?
7      A. We did.
8      Q. Okay. And Heydens 2008, as we discussed
9  earlier, was designed to check the results of the
10 Bolognesi and Peluso studies, those Italian studies out
11 of Italy, correct?
12     A. Well, it clearly -- you know, it focused on
13 the intraperitoneal injection route of exposure which
14 is different from the way other organisms or people
15 would be exposed, and also, you know, make reference to
16 the high-dose level and the fact that according to them
17 the administration of that dose level through that
18 mechanism caused overt toxicity to -- to the liver and
19 kidneys.
20         And, in fact, I -- I remember there's an
21 e-mail exchange among Heydens and Farmer and some of
22 the other Monsanto people where they're talking about
23 what studies they should agree to re -- to do on the
24 genotoxicity of the formulations, and they -- he
25 specifically recalled this overt toxicity issue and

64 (Pages 250 to 253)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                      CONFIDENTIAL

Page 254

1  said that they had to be very careful in designing the
2  study to avoid a false positive in a study that they
3  would conduct by virtue of triggering this overt
4  toxicity.
5      Q. Right. And avoiding a false positive is
6  something that's always a concern in toxicology
7  studies, correct?
8      A. Yes.
9      Q. And is it fair to say Monsanto did, in fact,
10  follow Dr. Parry's recommendation by conducting testing
11  to try to reproduce the effects seen in Bolognesi in
12  1997?
13     A. I -- I'm not prepared to agree or disagree
14  with that statement. These are very technical reports
15  by Dr. Parry. They use a lot of highly technical terms
16  that it would take me some time to fully refresh my
17  memory and understand both what Dr. Parry recommended
18  and -- and compare it to what Monsanto did as reported
19  in the Journal of Ag Chemistry because I -- I do
20  remember that part of what Dr. Parry recommended was
21  not to redo some of these types of studies that
22  resulted in such a high dose delivered directly to some
23  organ, that it would just not be relevant.
24        I mean, he -- he agreed with Monsanto that
25  there's certain ways to administer, formulate a

Page 255

1  glyphosate in a test system that just kind of
2  overwhelms the system, and he -- he didn't feel that
3  replicating them to show that that happens was useful.
4  But to do a -- you know, a thorough and proper job of
5  opining on whether Monsanto conducted the studies that
6  Monsanto recommended, I cannot -- I'm not in a position
7  to do that sitting here today.
8      Q. Were you in a position to do that when you
9  wrote your report?
10     A. Well, you know, I -- I -- I fully believed
11  from my understanding of the documents that what I
12  wrote in my report was supported by the record that I
13  reviewed.
14     Q. Okay.
15     A. So please read me a paragraph in my report
16  that you want to ask me about and I'll respond to it.
17     Q. Sure. Well, I was talking about the Parry
18  report, and we just read Section -- Subsection D that
19  recommends Monsanto perform an in vivo bone marrow
20  micronucleus assay with multiple dosing with adequate
21  numbers of animals to determine whether the work of
22  Bolognesi, et al., 1997 can be reproduced. And you see
23  that, correct?
24     A. That's what it says, yes.
25     Q. Okay. And Heydens 2008 specifically notes

Page 256

1  that the study conducted by Monsanto was performed in
2  order to test the results from Bolognesi to see if they
3  were, in fact, accurate, correct?
4      A. I think you -- they were conducting these
5  further studies to see if there was another plausible
6  mechanistic explanation for the positive genotoxicity
7  results reported in the original Bolognesi study, and
8  according to the work that they did, they felt that
9  they had a basis to write this peer-reviewed journal
10  article saying that the -- both the route of -- the
11  route of administration of the formulated glyphosate
12  herbicide and the dosing level created overt toxicity
13  that, according to them, was responsible for the
14  positive result. So it raises questions about whether
15  Bolognesi's original paper was a false positive.
16        It -- you know, based on my, you know, just
17  reading a few parts of this, that is my understanding
18  and interpretation of what Monsanto did in this work
19  reported in the Journal of Ag and Food Chemistry. I am
20  not prepared, as I sit here today, to say that this is
21  what Dr. Parry recommended and is responsive to what --
22  all of the recommendations that Dr. Parry made relative
23  to understanding the Bolognesi study, and I'm pretty
24  sure it's not, but I just -- it's -- it's complicated
25  stuff and I -- you know, I just -- I'm -- it's too late

Page 257

1  in the day. I'm not going to sit here and read it and
2  try to figure it out, and it is the kind of thing
3  sometimes I have to read other papers or consult with
4  other experts to understand because it's technical,
5  highly technical stuff that, you know, requires time to
6  understand if you're not a scientist working in the
7  field.
8      Q. You don't have the expertise to opine on what
9  kind of genotoxicity Monsanto conducted, but
10  nonetheless, you felt you had the expertise to say that
11  Monsanto didn't conduct the study that Dr. Parry
12  recommended; is that correct?
13     A. No. I said I'm not prepared sitting here
14  today to determine whether the follow-up genotoxicity
15  work that Dr. Parry recommended on formulated
16  glyphosate herbicides was done by Monsanto as reported
17  in this Journal of Food and Ag Chemistry paper. I
18  don't believe that -- I certainly don't believe that
19  what Monsanto did as reported in this paper was
20  responsive to all the things that Dr. Parry
21  recommended, and I think there are -- you know, the
22  issues that were raised -- that have been raised about
23  the Bolognesi work are very complicated and I'm -- I'm
24  not prepared to opine one way or another whether this
25  particular study satisfied them or not.

65 (Pages 254 to 257)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 258

1     Q. All right. You would have to reach out to a
2  genotoxicity expert in order to be prepared to opine
3  one way or the other whether Monsanto conducted that
4  study Parry recommended, correct?
5     A. It certainly might be one of the things that I
6  did to try to understand more deeply whether this 2008
7  work -- it is 2008, yes -- was fully responsive to the
8  Parry report.
9        MR. HOLLINGSWORTH: Let's mark Exhibit
10  17.
11        (Deposition Exhibit 17 was
12        marked for identification.)
13     Q. (BY MR. HOLLINGSWORTH) This is A Study of the
14  Short-Term Effects of MON 35050 in Male CD-1 Mice.
15  There's a cover page dated July 26, 2002. Do you see
16  that?
17     A. Mine is July 31, 2002.
18     Q. On the cover, the front cover?
19     A. Oh, July 26th, okay, yeah, got it.
20     Q. Have you seen -- have you reviewed this study
21  before?
22     A. No.
23     Q. This is a primary study, genotox study on a
24  Monsanto formulated product, correct?
25        MR. LITZENBURG: Object to testimony.

Page 259

1     A. I don't know what MON 35050 is.
2     Q. (BY MR. HOLLINGSWORTH) Sure, we'll take a
3  look. Please turn to Bates page ending in 4825.
4     A. 4825. Got it.
5     Q. Okay. The second -- this is a -- this is a
6  letter from Monsanto to EPA, correct?
7     A. Looks like the transmittal letter, yeah.
8     Q. Okay. It says -- the second paragraph notes:
9  In 1997 and 1998, two related Italian research groups
10  authored papers in the open literature reporting that
11  they had measured genotoxic effects of Italian Roundup.
12  Their work had been conducted via intraperitoneal IP
13  injection of large quantities of Roundup formulation
14  and olive oil/DMSO carrier, and had focused on
15  detection of clastogenicity and DNA adduct formation in
16  treated liver and kidney tissues. Did I read that
17  correctly?
18     A. Yes, you did.
19     Q. The 1997 paper is Bolognesi 1997, correct?
20     A. Yes.
21     Q. Turning the page, the letter continues:
22  Beginning in 1999, for stewardship purposes, Monsanto
23  undertook to repeat aspects of these studies and
24  investigate other explanations for the reported
25  outcomes. The enclosed two reports and the attached

Page 260

1  summary describe the results of those investigations.
2  The attached summary describes additional follow-up
3  experimental work that has not been described in a
4  final report format. Monsanto wishes to share this
5  information with the agency. Did I read that
6  correctly?
7     A. Yes.
8     Q. Okay. So Monsanto conducted this study and is
9  now reporting it and its findings to EPA, correct?
10     A. Yes.
11     Q. So this letter to EPA from Monsanto explains
12  that Monsanto undertook to repeat aspects of the
13  Bolognesi 1997 study beginning in 1999, right?
14     A. Yes.
15     Q. 1999 is the year that Dr. Parry provided his
16  evaluation of the genotoxicity data to Monsanto,
17  correct?
18     A. Correct.
19     Q. Could you please -- I'll review -- I'll read
20  it for you. The next paragraph notes: This evidence
21  together demonstrates that any genotoxic responses that
22  may have occurred in the literature studies were
23  secondary to widespread and marked cytotoxicity in the
24  animals and were not indicative of primary genotoxic
25  activity. Did I read that correctly?

Page 261

1     A. Yes.
2        MR. LITZENBURG: I'm sorry, what's the
3  page?
4        THE WITNESS: He's on page 2 of the --
5  this Tompkins letter July 25. 4826.
6     Q. (BY MR. HOLLINGSWORTH) It states: This
7  evidence together demonstrates that geno -- that any
8  genotoxic responses that may have occurred in the
9  literature studies were secondary to widespread and
10  marked cytotoxicity in the animals and were not
11  indicative of primary genotoxic activity. Do you have
12  any reason to disagree with that conclusion?
13     A. No.
14     Q. Are you aware that Monsanto conducted a
15  follow-up experiment in which they used IP dosing of
16  the formulations minus the glyphosate otherwise
17  referred to as a formulation blank?
18     A. No, I don't believe I've seen a report on that
19  study. I mean, unless it's one of the ones talked
20  about in this Journal of Ag and Food Chemistry paper.
21     Q. Are you familiar with what a formulation blank
22  is in the genotoxicity setting of formulated product?
23     A. In general I assume it's a study of the -- of
24  the coformulants of the surfactants alone and often
25  they'll do it all three, the formulation -- the

66 (Pages 258 to 261)

HIGHLY       Charles Benbrook, Ph.D.       HIGHLY
CONFIDENTIAL       May 23, 2018       CONFIDENTIAL

Page 262

1    formulated product, the pure active ingredient and the
2    surfactants.
3        Q.  Reading from the second-to-last sentence of
4    the same paragraph it notes:  The follow-up experiment
5    described in the attached summary established that the
6    organ toxicity effects were caused by MON 35050
7    formulation matrix alone without glyphosate supporting
8    a further conclusion that these effects are nonspecific
9    response attributable to the dosing method vehicle
10   perhaps in combination with the formulation surfactant
11   ingredient but are not in any way linked to glyphosate
12   itself.  Did I read that correctly?
13       A.  Yes.
14       Q.  Any reason to disagree with that conclusion?
15       A.  No.
16           MR. LITZENBURG:  Object to form.
17       Q.  (BY MR. HOLLINGSWORTH)  So is it fair to say
18   that Monsanto ran at least one of the studies
19   recommended by Dr. Parry?
20           MR. LITZENBURG:  Object.
21       A.  Again, I -- as I said before, I'd have to take
22   some time to think about the -- you know, what
23   Dr. Parry says in this second recommendation memo and
24   really carefully think through if what -- what Monsanto
25   is describing here was what he recommended.  I'm not

Page 263

1    sure that that's the case.  It may be.
2        Q.  (BY MR. HOLLINGSWORTH)  Okay.  And --
3        A.  But I take on its face what they did.
4        Q.  And in order to find out exactly whether
5    Monsanto's study lined up with Dr. Parry's
6    recommendation, you would have to consult the
7    genotoxicity expert, and I believe you stated earlier
8    you may have done that when you were writing your
9    report?
10           MR. LITZENBURG:  Object to form.
11   Mischaracterization.
12       A.  No, I don't -- no, I don't think I did.  I
13   think I read other -- other reviews, other discussions
14   of the glyphosate and glyphosate-based formulation
15   genotox studies.  We covered it in the journal articles
16   that we -- that I coauthored with these other
17   scientists.  It was a -- it was a body of literature
18   that I was generally pretty familiar with and, you
19   know, I think that -- I think that Monsanto raised some
20   legitimate concerns and questions about not just the
21   Bolognesi but some of the other studies, and in the
22   ensuing years there have been improvements in the
23   methodology and new assays, and some of them have
24   not -- not -- have reported genotoxic effects that
25   didn't involve intraperitoneal administration and were

Page 264

1    not such high doses.
2        So it's a -- it's an evolving area of science
3    and I -- I acknowledge that this work that Monsanto did
4    was an attempt to provide an alternative explanation to
5    regulators and the scientific community in general
6    about another explanation for the positive genotoxicity
7    results that were reported in this Bolognesi study and
8    they did similar things with others.  They tried to
9    conduct science that would raise questions or
10   invalidate the conclusions reached by other scientists,
11   and sometimes they did it with success and sometimes
12   they didn't.
13       Q.  (BY MR. HOLLINGSWORTH)  Sitting here today,
14   you cannot say because you don't have the expertise to
15   tie the recommendation made by Dr. Parry with the study
16   conducted by Monsanto, Hotz 2002, and the subsequent
17   published study, Heydens 2008, correct?
18       A.  Well, should we just take the time for me to
19   do that?  Do you want to take a break while I do that?
20       Q.  Can you do that?
21       A.  Yeah, I'll give it a try.  Why don't we break
22   now for dinner and I'll spend some time doing that and
23   we'll see you at -- what time are we coming back after
24   dinner?
25       Q.  It's a little early for dinner.

Page 265

1            MR. LITZENBURG:  Hang on.  Let's go off
2    the record.
3            VIDEO OPERATOR:  We're going off the
4    record.  The time is 4:30.
5            (Discussion off the record.)
6            VIDEO OPERATOR:  We are going back on
7    the record.  The time is 4:32.
8        Q.  (BY MR. HOLLINGSWORTH)  Dr. Benbrook, do you
9    recall that Monsanto conducted various genotoxicity
10   studies on the glyphosate formulated product that were
11   conducted for purposes of registration in Brazil?
12       A.  I vaguely remember some discussion of
13   different studies that they did in South America and
14   some different studies that they did in Asia and, you
15   know, I vaguely remember some discussion of a -- of
16   a -- some studies that the Brazilian regulators asked.
17   I didn't have access to them and didn't really take
18   them into account because I didn't have them.  Perhaps
19   they're in the record of this case somewhere and I
20   didn't -- it was among the documents I didn't get to.
21           MR. HOLLINGSWORTH:  Let's mark this now.
22   Exhibit 18.
23           (Deposition Exhibit 18 was
24               marked for identification.)
25       Q.  (BY MR. HOLLINGSWORTH)  Dr. Parry, this is

67 (Pages 262 to 265)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL              May 23, 2018                CONFIDENTIAL

Page 266

1     a --
2         A.  My name is Dr. Benbrook.
3         Q.  Sorry.  Dr. Benbrook, this is a genotoxicity
4     study on MON 77280, Salmonella typhimurium reverse
5     mutation.  Do you see that?
6         A.  Yes.
7         Q.  Okay.  And it's a -- data requirements for the
8     Instituto Brasileiro.  Do you see that?
9         A.  Yes.
10        Q.  The performing laboratory is BioAgri
11    Laboratorios Limited.  Do you see that?
12        A.  Yes.
13        Q.  The study sponsor is Monsanto do Brasil.  Do
14    you see that?
15        A.  Uh-huh.  I do.
16        Q.  It was completed in 1998.  Do you see that?
17        A.  Yes.
18        Q.  Okay.  If you turn the page, the study
19    director is last name Perina.  Do you see that?
20        A.  Yes.
21        Q.  Okay.  If you turn to the page 201, Bates page
22    201?
23        A.  Okay.
24        Q.  It notes that the commercial name for this
25    product is MON 77280.  Do you see that?

Page 267

1         A.  Yes.
2         Q.  Are you aware that this is a negative
3     genotoxicity study on glyphosate formulated product --
4         A.  Before we go on -- before we move on to the
5     findings it says:  Common name glyphosate.  Which
6     suggests to me that this is a study on the technical
7     glyphosate active ingredient.
8         Q.  Sure.  And that's fair, but you'll agree also
9     that sometimes people refer to glyphosate formulated
10    product as glyphosate, correct?
11        A.  Correct.
12        Q.  And that's the case in epidemiology studies,
13    correct?
14        A.  Sometimes, yeah.
15        Q.  Okay.  The study summary notes:  A microbial
16    assay was carried out with the product MON 77280 in
17    order to study the possible mutagenic effect of that
18    substance --
19        A.  Uh-huh.
20        Q.  -- on the following strains.
21           And it names several.  Do you see that?
22        A.  Yeah.
23        Q.  Okay.  The last sentence of that paragraph
24    notes:  These results indicate that under the test
25    conditions the product MON 77280 did not exhibit

Page 268

1     genetic activity on the strains of Salmonella
2     typhimurium use.  Do you see that?
3         A.  Yes.
4         Q.  Okay.  So this is a negative genotoxicity
5     study, correct?
6         A.  Correct.
7         Q.  Okay.  And you testified earlier that you
8     hadn't reviewed the glyphosate -- the OPP 2017 issue
9     paper on the carcinogenic potential of glyphosate,
10    correct?
11        A.  Yeah, as I said, not in any depth.  I read the
12    summary of it and understood, you know, that it had not
13    changed in any significant way the agency's
14    determination.
15           MR. HOLLINGSWORTH:  And we'll mark this
16    2017 OPP issue paper as an exhibit.
17           (Deposition Exhibit 19 was
18            marked for identification.)
19        Q.  (BY MR. HOLLINGSWORTH)  Dr. Benbrook, if you
20    turn to the tables at the back of this document.
21        A.  Which one?
22        Q.  The 2017 OPP issue paper.
23        A.  Yeah, yeah, but which page or which table?
24        Q.  Oh, hold on, give me a second.
25        A.  It's probably page 203 I'm guessing.

Page 269

1         Q.  Right.  If you look at Appendix F?
2         A.  F -- F.1.1, page 203.
3         Q.  Correct.  These are listing genotoxicity
4     studies on the formulated product -- glyphosate
5     formulated product that are in the possession of EPA,
6     correct?
7         A.  Yeah, looks like that's what it is.
8         Q.  And if you turn to page 206 of 216?
9         A.  Okay.
10        Q.  It notes Perina 1998.  Do you see that?
11        A.  Oh, I do, yeah.
12        Q.  And it notes that it was done on MON 77280.
13    Do you see that?
14        A.  Correct, okay.
15        Q.  That's the same study that we just reviewed in
16    the prior exhibit, correct?
17        A.  Seems to be, yeah.
18        Q.  Okay.  So this shows that Monsanto has
19    conducted genotoxicity studies on the glyphosate
20    formulated product and that the EPA is in possession
21    and has reviewed those studies, correct?
22           MR. LITZENBURG:  Object to form.
23        A.  Well, at least one.
24           MR. HOLLINGSWORTH:  We'll mark another
25    exhibit here.

68 (Pages 266 to 269)

HIGHLY                     Charles Benbrook, Ph.D.                     HIGHLY
CONFIDENTIAL                    May 23, 2018                     CONFIDENTIAL

Page 270

1          (Deposition Exhibit 20 was
2      marked for identification.)
3      Q.  (BY MR. HOLLINGSWORTH)  Sir, this is a
4  genotoxicity on MON -- genotoxicity study on MON 77280,
5  bacterial reverse mutation test, Ames test --
6      A.  Ames test, yeah.
7      Q.  Do you see that?
8      A.  Uh-huh.
9      Q.  It's a final report dated April 2010.  Do you
10  see that?
11      A.  Yes.
12      Q.  Again, the study sponsor is Monsanto do
13  Brasil.  Do you see that?
14      A.  Yes.
15      Q.  Okay.  And the -- study director, if you
16  turn the page, is Camolesi.  Do you see that?
17      A.  I do.
18      Q.  Okay.  And if you look at a study summary page
19  on Bates 259?
20      A.  259?
21      Q.  Uh-huh.
22      A.  Got it.
23      Q.  The study was performed to evaluate the test
24  substance MON 77280 supplied by Monsanto do Brasil for
25  its possible mutagenic activity, using the bacterial

Page 271

1  reverse mutation test with five histidine deficient
2  mutant tester strains of Salmonella typhimurium.  Do
3  you see that?
4      A.  Yep, standard Ames test.
5      Q.  And down at the bottom it says:  The
6  results -- the results revealed that the test substance
7  MON 77280 provided no positive mutagenic effect.  Do
8  you see that?
9      A.  I do.
10      Q.  So this is another negative mutagenicity or
11  genotoxicity test on the glyphosate formulated product,
12  correct?
13      A.  Right, right, in this Salmonella strain of
14  which there are many, many in the record.
15      Q.  Sure.  And if you turn again to EPA 2017 OPP
16  report, and the list of glyphosate formulations that
17  were studied for genotoxic effect.
18      A.  I'm guessing it shows up.
19      Q.  Do you see the Camolesi is one of those
20  studies?  It's on the first page, page 203?
21      A.  Yes, I do.
22      Q.  So Monsanto, for purposes of registration in
23  Brazil, conducted genotoxicity tests on the formulated
24  glyphosate product and the EPA is in possession and has
25  reviewed those studies, correct?

Page 272

1      A.  According to this table, yes.
2      Q.  So you certainly cannot say that Monsanto did
3  not conduct any cancer testing on the glyphosate
4  formulated product, correct?
5          MR. LITZENBURG:  Object to form.
6      A.  Any cancer testing?
7      Q.  (BY MR. HOLLINGSWORTH)  Yes.  Sir, you
8  testified previously that genotoxicity studying [sic]
9  is a form of cancer study, correct?
10      A.  No, I did not testify to that.
11      Q.  What did you mean when you said that?
12      A.  I testified that regulators and scientists
13  consider mechanistic data or genotoxicity studies as an
14  important part of their evaluation of whether a
15  pesticide poses a cancer risk.  It -- a genotoxicity
16  study is not the same thing as a cancer study, but it's
17  important evidence that the EPA under its new
18  guidelines takes into account in making a weight of
19  evidence determination, just as IARC took account of
20  the genotoxicity data in its weight of evidence
21  determination that glyphosate and glyphosate-based
22  herbicides are, in their judgment, probable human
23  carcinogens.
24          So a genotox study is not the same as a cancer
25  study, but it is drawn upon by scientists to gain

Page 273

1  insight on the -- the mechanism through which exposure
2  to glyphosate-based herbicides could trigger abnormal
3  cell growth that could progress to a -- a frank tumor.
4      Q.  Right.  And EPA was in possession of these
5  Monsanto studies on the glyphosate formulated product
6  that are used by scientists to gain insight on the
7  mechanism through which exposure to glyphosate-based
8  herbicides could trigger abnormal cell growth that
9  leads to a tumor, correct?
10          MR. LITZENBURG:  Object to the form.
11      A.  Yes, correct.  I don't know when, but...
12          MR. LITZENBURG:  Dr. Benbrook, would
13  you -- I think Number 15 is the thing we only have one
14  copy of.  Can I look at it while you all are looking at
15  other things?
16          THE WITNESS:  Sure.  17, 16, 14, 20, 18,
17  13.
18      Q.  (BY MR. HOLLINGSWORTH)  Are we good to
19  continue?
20      A.  Sorry.  There's just a lot of paper here.
21          MR. LITZENBURG:  You're doing better
22  than me.
23          THE WITNESS:  There's 15.
24          MR. LITZENBURG:  Thank you.
25      A.  Okay.

69 (Pages 270 to 273)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 274

1    Q. (BY MR. HOLLINGSWORTH) Sir, you mentioned
2    impurities in your report, the impurities that results
3    from the glyphosate manufacturing process. Do you
4    recall that?
5    A. Uh-huh.
6    Q. Okay.
7    A. A short, very short section.
8    Q. Sure. And you specifically mention NNG and
9    formaldehyde, correct?
10   A. Correct.
11   Q. Every aspect of the -- first of all,
12   impurities are monitored by EPA and for the -- for
13   formaldehyde and NNG they're modified -- they're
14   monitored to make sure that they are below specified
15   limits, correct?
16   A. Well, yeah, when the agency is aware of their
17   presence and especially if they have a toxicological
18   concern about them, impurities can get a lot of
19   attention in the regulatory process. For example,
20   dioxin in some of the phenoxy herbicides was the
21   primary basis of concern about the toxicity of those
22   products.
23   Q. EPA's position, the detection -- is -- let me
24   restate that.
25       To be clear, it is EPA's position that

Page 275

1    detections of impurities below regulatory limits are
2    not carcinogenic concerns, correct?
3    A. Well, yes, in general, they would -- they
4    would assess the levels and risk associated with the
5    impurities in essentially the same way they would the
6    active ingredient. They would apply kind of the same
7    standards, yeah.
8    Q. And when testing the active ingredient, they
9    can, in fact, test the impurities in the active
10   ingredient, correct?
11   A. Well, EPA doesn't -- doesn't do those tests
12   really. It's the -- they require the companies to do,
13   you know, environmental fate studies and residue
14   metabolism studies. That's where they would pick up
15   the impurities is in the residue database as part of
16   the tolerance-setting process.
17   Q. EPA monitors the company's data on
18   glyphosate-based herbicides and determines whether the
19   impurities are below specified limits, correct?
20   A. When -- yes, when they become aware that
21   there's a -- a potential for impurities in one of the
22   manufacturing processes, they'll take that into account
23   in making a decision on the tolerances.
24   Q. Do you claim that Monsanto's glyphosate-based
25   herbicides ever had impurities that existed in amounts

Page 276

1    above the EPA certified limits?
2        MR. LITZENBURG: Object to form.
3    A. You know, I -- EPA became aware of the -- the
4    NNG impurity and formaldehyde, and then there was an
5    impurity in one of the surfactants quite early in the
6    regulatory history, and they required Monsanto to
7    submit data to them that established the levels, and
8    they -- in fact, many batches of -- of -- of
9    manufactured and formulated product from different
10   plants I remember there was actually quite extensive
11   data collected by Monsanto and submitted to the agency,
12   and they did a toxicological evaluation and they did
13   reach a judgment that the levels of the impurities
14   were -- did not exceed their level of concern. And --
15   and they -- there really was -- has been relatively
16   little focus for the last 30 years of -- of regulation
17   of glyphosate-based herbicides on those impurities.
18   Q. (BY MR. HOLLINGSWORTH) Right. So it's
19   certainly not your opinion that Monsanto's
20   glyphosate-based herbicides ever had impurities that
21   existed in amounts above the EPA's certified limits,
22   correct?
23   A. Correct.
24   Q. Do you claim that Monsanto's glyphosate-based
25   herbicides ever specifically had formaldehyde at levels

Page 277

1    above EPA certified limits?
2    A. I -- I wouldn't be surprised if I went back
3    and carefully reviewed this part of the record, which
4    is -- again, it's very old. There probably wasn't an
5    EPA certified limit. I mean, for one thing, don't
6    forget, the EPA had only been in existence a couple of
7    years when these first actions were -- on glyphosate
8    were being done. They became aware of the NNG and the
9    formaldehyde and later on this dioxane contaminant and,
10   you know, they -- they asked questions about the levels
11   and I -- I think -- I vaguely remember that some other
12   part of EPA had a regulatory level, and they assessed
13   that, or maybe it was an international level, I don't
14   really recall the details, but there -- you know, I
15   think the -- the record shows that there was a -- a --
16   an assessment of these impurities and a judgment was
17   reached that they were -- they did not trigger EPA's
18   level of concern, so yeah, that's my understanding of
19   the record.
20   Q. Whether it's formaldehyde, NNG, dioxane or any
21   other glyphosate-based herbicides, EPA has always
22   determined that those impurities are below specified
23   limits as far as you know, correct?
24   A. As far as I know, correct.
25   Q. Is it your opinion that impurities found in

70 (Pages 274 to 277)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 278

1    glyphosate-based herbicides at levels below EPA
2    certified limits can cause non-Hodgkin's lymphoma?
3        **A.  I -- I have no -- no reason to believe that,**
4    **and I would -- would find that unlikely, but, you know,**
5    **it's -- it's possible I suppose.**
6        Q.  You don't have the expertise to determine
7    whether impurities found in glyphosate-based herbicides
8    at levels below EPA certified limits can cause NHL,
9    correct?
10       **A.  I'm -- I certainly don't have a crystal ball**
11   **that could make that determination, and I -- I doubt**
12   **that anybody has -- has done the kind of in-depth work**
13   **that would be required to definitively judge that, and**
14   **I know that Monsanto actually did commission a two-year**
15   **feeding study on NNG in the early days, but it -- the**
16   **study was terminated because of excessive mortality in**
17   **one of the treatment groups and it wasn't repeated**
18   **and -- but, you know, the levels are -- the levels that**
19   **have been consistently reported were very low and it**
20   **was a -- it has been the judgment of EPA all along that**
21   **they didn't -- they didn't feel that the level of risk**
22   **was high enough to warrant any further assessment.**
23       Q.  Right.  And you don't hold the opinion that
24   impurities in glyphosate-based herbicides at the level
25   in which they actually exist are causing NHL, correct?

Page 279

1        **A.  Correct.**
2        Q.  I want to move on to some other parts of the
3    globe, Dr. Benbrook.  Sir, you testified in April of
4    2015 right after the IARC classification of glyphosate
5    that the currently standing judgment of the EPA is that
6    glyphosate is not a carcinogen.  Do you recall that?
7        **A.  Yes.**
8        Q.  You testified that glyphosate-based herbicides
9    are under active review by the US -- in the US by EPA
10   and also in Europe by the European community, correct?
11       **A.  At that time, yes.**
12       Q.  You testified that with the IARC judgment
13   being published there's going to be intense scrutiny on
14   the oncogenicity of both glyphosate technical material
15   and formulated Roundup herbicides, correct?
16       **A.  Correct.**
17       Q.  That intense scrutiny of glyphosate-based
18   herbicides post IARC classification of glyphosate
19   referred, in part, to intense scrutiny by worldwide
20   regulators, correct?
21       **A.  Of course, that was part of it.**
22       Q.  Sir, IARC itself does not regulate the
23   substance it -- substances it classifies, correct?
24       **A.  Correct.**
25       Q.  IARC leaves the regulation of those substances

Page 280

1    to national governments, correct?
2        **A.  Yes.**
3        Q.  And when we say IARC leaves that to national
4    governments, what that means -- or one thing that means
5    is that the applicable -- it leaves it to the
6    applicable regulatory agencies, correct?
7        **A.  Yeah, operating under the statutes and laws of**
8    **the countries in which they operate.**
9        Q.  Such as --
10       **A.  Which differ.**
11       Q.  And such as EPA, Health Canada, EFSA, you're
12   familiar with all of those, correct?
13       **A.  Correct.**
14       Q.  And Australia, New Zealand, every country for
15   the most part has a regulatory agency that is
16   regulating the use of pesticides in that country,
17   correct?
18       **A.  Correct.**
19       Q.  In major countries the health regulators have
20   scientific staffs with expert toxicologists,
21   epidemiologists, pathologists and other specialists,
22   correct?
23       **A.  Yes.**
24       Q.  They're qualified to evaluate and spend a lot
25   of time evaluating the safety of various substances

Page 281

1    including herbicides, correct?
2        **A.  Well, it -- it varies, but certainly several**
3    **countries conduct the same -- same sort of evaluation**
4    **that the US EPA does, but certainly some other**
5    **countries sort of follow the lead of the US or EFSA or**
6    **other developed countries that have the scientific**
7    **expertise and the resources to do the detailed kind of**
8    **work that's required to render these kinds of**
9    **judgments.**
10       Q.  You've commented in your expert report and
11   deposition about the ongoing scientific discussion
12   about the standards that should be used in assessing
13   carcinogenicity including that of Roundup, correct?
14       **A.  Yes, I did testify to that.**
15       Q.  And, of course, the scientific evaluations
16   made by EPA and other worldwide regulators are part of
17   that ongoing discussion, correct?
18       **A.  Yes.**
19       Q.  There are articles and letters to the editor
20   and discussions at conferences and so on debating about
21   the decisions made by regulators, the standards they
22   employ and the evidence they consider, correct?
23       **A.  Yes.**
24       Q.  In reaching your opinions, you certainly
25   considered the evaluations of EPA, EFSA and other

71 (Pages 278 to 281)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 282

1  regulators who have evaluated Roundup, correct?
2      A.  Correct, as well as the open peer-reviewed
3  literature.
4      Q.  Aware that the European and US reviews that
5  you foretold in April of 2015 have since that time
6  repeatedly determined that Roundup is not carcinogenic?
7      A.  There's been, as far as I know, no major
8  change in the regulatory treatment of Roundup
9  herbicides with a possible exception of the Proposition
10 65 actions required in the state of California where
11 there has been a requirement that there be some
12 warning, and those requirements, as you know and as we
13 talked about in the last deposition, are in -- tied up
14 in litigation and administrative reviews, etcetera, and
15 are not -- not final at this time.
16     Q.  Aware that every single weight of the evidence
17 risk assessment by a worldwide regulator since the IARC
18 classification has found that glyphosate-based
19 herbicides are not carcinogenic?
20         MR. LITZENBURG:  Object to form.
21     A.  You know, I'm not -- you know, I can't sit
22 here today and say that I am aware of every action
23 taken by every regulator around the world in the last
24 short while.  You know, I -- I know that some countries
25 at certain points of time have stopped the use of

Page 283

1  glyphosate-based herbicides, I know Germany is phasing
2  out the use of glyphosate-based herbicides, but I can't
3  sit here and say that I am -- I'm confident that I'm
4  aware of the status of the review of oncogenicity of
5  Roundup-based herbicides in every country around the
6  world.
7      Q.  Okay.  Let's go through them.
8         MR. HOLLINGSWORTH:  Let's mark an
9  exhibit.
10        (Deposition Exhibit 21 was
11         marked for identification.)
12     Q.  (BY MR. HOLLINGSWORTH)  Sir, this is a
13 April 13, 2015 review by Health Canada of glyphosate.
14 Do you see that?
15     A.  Yes.
16        MR. LITZENBURG:  What's the number?
17        THE WITNESS:  21.
18     Q.  (BY MR. HOLLINGSWORTH)  Please turn to the
19 table of contents.
20     A.  Okay, got it.
21     Q.  Section 3 in the table contents is titled
22 Impact on Human and Animal Health.  Do you see that?
23     A.  Yes.
24     Q.  It notes that Canada conducts a dietary
25 exposure risk assessment, correct?

Page 284

1      A.  Yes.
2      Q.  The dietary risk assessment conducted by
3  Canada is both for acute and chronic exposure, correct?
4      A.  Yes.
5      Q.  The Canadian regulatory authority also
6  conducts a drinking water exposure assessment, correct?
7      A.  Yes.
8      Q.  The Canadian regulatory authority also
9  conducts an occupational exposure risk assessment,
10 correct?
11     A.  Yes.
12     Q.  The Canadian regulatory authority also
13 conducts a nonoccupational exposure risk assessment,
14 correct?
15     A.  Yes.
16     Q.  The Canadian regulatory authority also
17 conducts a residential exposure risk assessment,
18 correct?
19     A.  Yes.
20     Q.  Fair to say that the Canadian regulatory
21 authority conducts a risk assessment with respect to
22 all routes and types of exposure to pesticides at
23 issue?
24        MR. LITZENBURG:  Object to form.
25     A.  I would agree with that, yes.

Page 285

1      Q.  (BY MR. HOLLINGSWORTH)  Please turn to section
2  entitled Impact on Human Health on page 11.
3      A.  Okay.
4      Q.  The first sentence says:  The toxicology
5  database for glyphosate acid was extensive consisting
6  of all guideline toxicity studies required to
7  characterize toxicity of a pesticide.  Do you agree
8  with that statement?
9      A.  Yes, it's what it says.
10     Q.  A few sentences down it's:  Relevant
11 acceptable scientific studies published in the
12 peer-reviewed literature were also incorporated into
13 the hazard assessment including those studies that were
14 considered by World Health Organization's International
15 Agency For Research on Cancer, IARC, and their recent
16 hazard classification of glyphosate.
17        So this Canadian regulatory body considered
18 IARC classification in review of glyphosate, correct?
19     A.  Well, kind of -- since it came out in March of
20 2015 they certainly couldn't have given it a lot of
21 consideration, plus the -- the full monograph wasn't
22 out at this time.  But what they're saying is that they
23 looked at the same studies that the -- that the IARC
24 working group considered in their assessment, and I'm
25 sure that's right because IARC depended on open

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                     CONFIDENTIAL

Page 286

1   literature, public peer-reviewed studies. That's what
2   they do. That's how they do their reviews.
3       Q. Please turn to the cancer assessment section
4   at page 15.
5       A. Okay.
6       Q. There it notes: Overall weight of evidence
7   indicates that glyphosate is unlikely to pose a human
8   cancer risk.
9           So the Canadian regulatory body considered
10  IARC's classification of glyphosate and reviewed the
11  studies IARC reviewed and reaffirmed its position that
12  glyphosate does not pose a human cancer risk, correct?
13      A. Well --
14          MR. LITZENBURG: Object to form.
15      A. -- as I -- as I said, this document came out a
16  month after the release of the IARC working group
17  report and several months before the full monograph,
18  so, you know, I certainly -- they were aware of the --
19  they were clearly aware of the classification and they
20  felt that they had incorporated the studies that IARC
21  did and they reached a different judgment.
22      Q. (BY MR. HOLLINGSWORTH)  And some of those
23  studies that Canada reviewed and incorporated were, as
24  it notes above, epidemiology studies, correct?
25      A. Yes.

Page 287

1       Q. Are you aware that Canada since this time
2   conducted a more thorough review of the IARC
3   classification and studies and came to the same
4   conclusion?
5       A. I know that it's been -- it's been an ongoing
6   topic of review in several different countries and I --
7   you know, I -- I was aware that there was additional
8   assessments being done in Canada and I -- I don't know
9   if they put out a final report or not.
10          MR. HOLLINGSWORTH: Let's mark
11  Exhibit...
12          (Deposition Exhibit 22 was
13          marked for identification.)
14      Q. (BY MR. HOLLINGSWORTH)  Sir, this is an
15  April --
16      A. Just one second, please.
17      Q. Sure. I'm just going to introduce the
18  document. This is a April 28, 2017 re-evaluation
19  decision on glyphosate by Health Canada. Correct?
20      A. Okay.
21      Q. Correct, sir?
22      A. Yes.
23      Q. Go to page 1, the executive summary. It
24  notes: The overall finding from the reexamination of
25  glyphosate is highlighted as follows. Glyphosate is

Page 288

1   not genotoxic and is unlikely to pose a human cancer
2   risk. Do you see that?
3       A. Yes, I do.
4       Q. So two years after IARC and after Canada's
5   decision in April of 2015 they reaffirmed their
6   decision that glyphosate is not genotoxic and unlikely
7   to pose a human cancer risk, correct?
8       A. That's what they report here, yes.
9       Q. And they did so in considering the studies
10  that IARC considered in IARC's review, correct?
11      A. That's also what they -- they claim.
12      Q. Sir, you've familiar with the BFR, correct?
13      A. Yes.
14      Q. Sir, are you also aware that in 1991 and 1992
15  that Health Canada came to that same conclusion that
16  glyphosate is not carcinogenic?
17      A. I didn't do a detailed historical assessment
18  of the PMRA's treatment of glyphosate as part of this
19  case, no, I didn't.
20      Q. Okay. Do you agree that just like in the US,
21  Health Canada -- US's EPA reviewing glyphosate's
22  toxicology and carcinogenicity every 15 years or every
23  so often, other countries conduct similar reviews where
24  they're assessing the overall toxicology database of
25  that pesticide over a span of years?

Page 289

1       A. Correct.
2           (Deposition Exhibit 23 was
3           marked for identification.)
4       Q. (BY MR. HOLLINGSWORTH)  Sir, Exhibit 23 is a
5   publication from BFR, the German risk assessment group
6   that has a header titled, Does glyphosate cause cancer?
7   Do you see that?
8       A. Yes.
9       Q. And it notes:  In its recent evaluation from
10  March 2015 the International Agency For Research on
11  Cancer, IARC -- US's came to the conclusion that glyphosate
12  should now be classified at Carcinogenic Group 2A. Do
13  you see that?
14      A. Yes.
15      Q. Further down it notes: The Federal Institute
16  For Risk Assessment, BFR, was responsible for the human
17  health risk assessment and has assessed glyphosate as
18  noncarcinogenic. This was supported by competent
19  national European and other international institutions
20  for health assessment including the WHO/FAO joint
21  meeting on pesticide residues. Do you see that?
22      A. Yes.
23      Q. If you go down two paragraphs it notes:  In
24  the opinion of BFR, the classification of glyphosate as
25  carcinogenic in Group 2A, probably carcinogenic to

73 (Pages 286 to 289)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 290

1  humans, as published in the 20th of March 2015 issue of
2  the Lancet journal comes as a surprise, since other
3  evaluations performed by supranational bodies such as
4  the WHO-panel of the Joint Meeting of Pesticide
5  residues, JMPR, 2004) and also by national regulatory
6  agencies such as US EPA had concluded the contrary,
7  i.e., that glyphosate was not carcinogenic.  Do you see
8  that?
9      **A. Yes.**
10     Q. Agree that as of March 2015 IARC was the only
11  group that had classified glyphosate as a carcinogen?
12     **A. Well, EPA had from 1995 [verbatim] to 1991 as**
13  **a possible human carcinogen. I think some of the other**
14  **regulatory agencies around the world had done so too.**
15     Q. Sir, do you agree at the time of March 2015
16  IARC was the only group that classified glyphosate as a
17  probable carcinogen?
18     **A. Yes.**
19     Q. Please turn to the next page and the last
20  paragraph.  It notes:  It is not possible to fully
21  examine the indications for the genotoxic potential of
22  glyphosate based on the short report published by IARC
23  in particular due to the fact that the assessment
24  included studies using formulations that are not
25  specified in any detail.  Did I read that correctly?

Page 291

1      **A. Yes.**
2      Q. It goes on:  BFR will, therefore, perform a
3  thorough review of the classification --
4      **A. Well, wait a second.  Oh, you skipped to the**
5  **last sentence, right?**
6      Q. Yes.  It goes on, it states:  BFR will,
7  therefore, perform a thorough review of the
8  classification issued by IARC once the monograph
9  becomes available.  Do you see that?
10     **A. Yes.**
11     Q. Are you aware that BFR did perform a thorough
12  review once the monograph became available?
13     **A. I surely am.**
14        MR. HOLLINGSWORTH:  Mark an exhibit.
15        (Deposition Exhibit 24 was
16        marked for identification.)
17     Q. (BY MR. HOLLINGSWORTH)  Sir, this is the --
18  you're familiar with BFR, correct?
19     **A. Yes.**
20     Q. You're aware of this proposal for harmonized
21  classification and labeling, correct?
22     **A. This report, I don't think I've seen this.**
23     Q. Well, you're generally familiar with BFR's
24  review of glyphosate-based herbicides, correct?
25     **A. Yes.**

Page 292

1      Q. So this document is considering the potential
2  human and ecological health harm that may be associated
3  with the pesticide and then harmonizing the labeling to
4  mitigate the harm, correct?
5      **A. Within Europe?**
6      Q. Yes.
7      **A. Okay.**
8      Q. Is that correct?
9      **A. I don't know.  I've never seen the document**
10  **before.**
11     Q. Okay.  Well, the title of this document
12  indicates its purpose, right, to harmonize the
13  pesticide label of glyphosate --
14     **A. I would assume since it's part of the European**
15  **review it's harmonization within the European Union.**
16     Q. Okay.
17     **A. And if that's not correct, please tell me**
18  **otherwise.**
19     Q. Sure.  Please turn to page 8.
20     **A. Okay.**
21     Q. There in the third paragraph it notes:  The
22  International Agency For Research on Cancer, IARC --
23     **A. Right.**
24     Q. -- of the World Health Organization, WHO,
25  published in a monograph that glyphosate is probably

Page 293

1  carcinogenic to humans, Group 2A.  Do you see that?
2      **A. Yes.**
3      Q. It goes on:  During the European Food Safety
4  Authority, EFSA, peer-review process for the renewal or
5  approval of the pesticide active substance glyphosate,
6  the IARC evaluation regarding the potential
7  carcinogenicity and genotoxicity of glyphosate or
8  glyphosate-containing herbicides was
9  taken into consideration, but EFSA and EU experts came
10  to a different conclusion.  Do you see that?
11     **A. Yes.**
12     Q. So since IARC, the European Food Safety
13  Authority, EFSA, considered IARC's classification of
14  glyphosate-based herbicides and European experts came
15  to a different conclusion, that is, that
16  glyphosate-based herbicides are not carcinogenic,
17  correct?
18     **A. Correct.**
19     Q. Please turn to page 80 for human information.
20     **A. Okay.**
21     Q. The middle of the second paragraph notes:  An
22  essential consideration in both risk assessment and
23  interpreting the relevance of toxicology data is
24  exposure assessment.  So EFSA and German regulators are
25  considering human exposure in conducting their risk

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

HIGHLY               Charles Benbrook, Ph.D.               HIGHLY
CONFIDENTIAL              May 23, 2018                CONFIDENTIAL

Page 294

1    assessment. Correct?
2        A. Yes.
3            MR. LITZENBURG: Are we on 24 now?
4            THE WITNESS: Hold on a second.
5            MR. LITZENBURG: Was I given a copy?
6    Have I lost it?
7            MR. HOLLINGSWORTH: Here.
8            MR. LITZENBURG: You were on page 81?
9            MR. HOLLINGSWORTH: 80, I believe.
10           MR. LITZENBURG: 80.
11       Q. (BY MR. HOLLINGSWORTH) Please turn to page 98
12   and the section entitled Conclusions on Classification.
13       A. Okay.
14       Q. There BFR notes: Based on the epidemiological
15   data as well as data from long-term studies in rats and
16   mice, taking a weight of evidence approach, no hazard
17   classification for carcinogenicity is warranted for
18   glyphosate. Do you see that?
19       A. Yes.
20       Q. So the Germans agreed with the other European
21   nations that glyphosate is noncarcinogenic, correct?
22       A. Are they saying they -- they don't feel
23   there's enough data to reach a judgment or that
24   they're -- they're not saying that they're not ready to
25   classify it as oncogenic. I mean, I have to read this

Page 295

1    for context. No hazard classification for
2    carcinogenicity is warranted. Okay. Yeah, so
3    they're -- they're saying that -- that no
4    classification suggesting carcinogenicity is warranted.
5    All right. Got it.
6        Q. And the Germans in this 2016 review considered
7    both IARC as well as the epidemiological data and
8    long-term rodent studies in taking a weight of evidence
9    approach came to the opposite conclusion of IARC,
10   didn't they?
11       A. They did.
12       Q. Are you aware that that is consistent with the
13   European Commission's finding in 2002?
14       A. Talking about the JMPR or which -- which
15   commission? I'm sure you're going to introduce another
16   document so I'll know what you're talking about.
17       Q. Are you aware of the European Commission
18   Health and Consumer Protection Directorate General?
19       A. Yes.
20       Q. Okay. That is another -- a former version of
21   a European -- Europe-wide regulator, correct?
22       A. Correct.
23       Q. Okay. And are you aware that prior to this
24   2016 finding the European Commission in 2002 also found
25   that glyphosate is not carcinogenic?

Page 296

1        A. Correct.
2        Q. Are you familiar with EFSA?
3        A. Yes. We -- we've already talked about it.
4        Q. Are you aware that the Germans also in 2013
5    came to a similar conclusion that a hazard
6    classification for glyphosate is not warranted?
7        A. I don't know what document or review you're
8    speaking about in 2013, specific to Germany. I have no
9    reason to dispute your assertion, but I'm not aware of
10   it.
11       Q. You're generally familiar with the BFR and
12   that they make repeated determine --
13       A. It's the -- the German version of the EPA.
14       Q. And you're aware that Germ -- in 2016 BFR's
15   review of glyphosate wasn't the first time they
16   reviewed. They reviewed it previously, correct?
17       A. Correct. Essentially the same sequential
18   series of reviews of -- have been going on in multiple
19   countries around the world since the early 1980s.
20           MR. HOLLINGSWORTH: Okay. Let's mark
21   this exhibit.
22           (Deposition Exhibit 25 was
23           marked for identification.)
24       Q. (BY MR. HOLLINGSWORTH) Sir, you're generally
25   familiar with EFSA's pesticide review process, correct?

Page 297

1        A. Yes.
2        Q. This title -- this document is titled
3    Conclusion on the Peer Review of the Pesticide Risk
4    Assessment of the Active Substance Glyphosate. Do you
5    see that?
6        A. Correct.
7        Q. Okay. So by its very title, EFSA is stating
8    that it's conducting a risk assessment for glyphosate,
9    correct?
10       A. For glyphosate active ingredient, yes.
11       Q. The abstract notes: Following a second
12   mandate from the European Commission to consider
13   findings from the International Agency for Research on
14   IARC [verbatim] regarding the potential carcinogenicity
15   of glyphosate or glyphosate-containing plant protection
16   products in the ongoing peer review of the active
17   substance, EFSA concluded that glyphosate is unlikely
18   to pose a carcinogenic hazard to humans and the
19   evidence does not support classification with regard to
20   its carcinogenic potential. Did I read that correctly?
21       A. Yes.
22       Q. So the Europeans considered IARC, and like the
23   Germans, came to the opposite conclusion, correct?
24       A. Correct.
25       Q. EFSA considered IARC's classification of

75 (Pages 294 to 297)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 298

1  glyphosate, and after it did its own review determined
2  that glyphosate is not carcinogenic, correct?
3      **A. Under the conditions of use and exposures that**
4  **they took into account, yes.**
5      Q. And here at page 8, if you go to page 8?
6      **A. Of the same document?**
7      Q. Yes.
8      **A. Okay, I'm there.**
9      Q. It talks about the active substance and the
10  formulated product. Do you see that?
11      **A. Yes.**
12      Q. And the represented formulated -- the
13  representative formulated product for the evaluation
14  was MON 52276. Do you see that?
15      **A. Not yet.**
16      Q. It's in the second paragraph.
17      **A. Okay. It's the isopropanol ammonia salt with**
18  **surfactants?**
19      Q. Right.
20      **A. Not identified.**
21      Q. So EFSA considered glyphosate and this
22  glyphosate formulated product MON 52276 in coming to
23  their conclusion that it is -- glyphosate is unlikely
24  to pose a carcinogenic hazard to humans, correct?
25      **A. Correct.**

Page 299

1      Q. Please turn to page 10. The third paragraph
2  there, it states: The glyphosate dossier consists of
3  an exceptionally large database. Do you agree with
4  that?
5      **A. Yes.**
6      Q. And here, EFSA agreed during the peer review
7  to rely on the magnitude of valid studies rather than
8  on one key study for each end point due to that
9  exceptionally large database, correct?
10      **A. Correct.**
11      Q. If you go down to the bottom, there's some
12  bolding there. Do you see that?
13      **A. I see several terms that are bolded.**
14      Q. It notes: Glyphosate did not present
15  genotoxic potential and no evidence of carcinogenicity
16  was observed in rats or mice. Do you see that?
17      **A. That's what it says, yeah.**
18      Q. Please turn to the next page, page 11. Third
19  paragraph there says: From the wealth of
20  epidemiological studies the majority of experts
21  concluded that there is very limited evidence for an
22  association between glyphosate-based formulations and
23  non-Hodgkin's lymphoma. Did I read that correctly?
24      **A. Yes.**
25      Q. So EFSA in 2015 reviewed the wealth of

Page 300

1  epidemiological studies on glyphosate and determined
2  that glyphosate-based formulations -- there's limited
3  evidence for an association between glyphosate-based
4  formulations and non-Hodgkin's lymphoma, correct?
5      **A. That's how they characterize it, correct.**
6      Q. With respect to the statement by EFSA on the
7  prior page that the glyphosate dossier consists of an
8  exceptionally large database, are you aware of any
9  other herbicide in the history of man that has as many
10  studies on the active ingredient as glyphosate?
11      **A. Oh, Atrazine would probably be close and 2,4-D**
12  **might be also. Those would be the only two. 2,4-D has**
13  **been so extensively studied because of its role in**
14  **Agent Orange and heavy use around the world for even**
15  **longer than glyphosate, so certainly the three most**
16  **heavily tested herbicides in history would be Atrazine,**
17  **2,4-D and glyphosate.**
18      Q. And you can't say for certain as you're
19  sitting here today which would be the most heavily
20  tested herbicide in the history of man?
21          MR. LITZENBURG: Object to form. Asked
22  and answered.
23      **A. I would -- I think 2,4-D and glyphosate. It**
24  **would depend on how you weight different factors.**
25  **There have been -- there's been an enormous volume of**

Page 301

1  **studies and work on 2,4-D.**
2      Q You're familiar with the European Chemicals
3  Agency, correct?
4      **A. The what?**
5      Q European Chemicals Agency?
6      **A. Yes.**
7          **(Deposition Exhibit 26 was**
8          **marked for identification.)**
9      Q (BY MR HOLLINGSWORTH) The European Chemical
10  Agency is roughly equivalent to the US EPA in that they
11  have primary authority over the pesticide label for all
12  pesticide products in the EU, correct?
13      **A. Yes.**
14      Q Aware that they have a committee for risk
15  assessment also known as the RAC?
16      **A. I didn't know what it was called, but I**
17  assume -- I assume that they have names for a lot of
18  things.
19      Q So this document is entitled The Committee For
20  Risk Assessment Opinion Proposing Harmonized
21  Classification and Labeling at EU Level Glyphosate,
22  correct?
23      **A. Correct.**
24      Q So, again, by its very title, it is a group
25  from the EU that is dedicated to conducting risk

76 (Pages 298 to 301)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 302

1 assessments that is harmonizing that assessment with
2 pesticide labeling statements, correct?
3     A. Uh-huh, correct.
4     Q. The European Chemical Agency or ECHA then
5 issued its opinion regarding the safety of glyphosate
6 in March 2017, correct?
7     A. Yes.
8     Q. Can you turn to page 19? There's a section
9 called RAC Evaluation of Germ Cell Mutagenicity?
10    A. Okay.
11    Q. And from 19 to 28 -- from pages 19 to 28 of
12 this March 2017 assessment, ECHA discusses the
13 scientific data regarding glyphosate and genotoxicity
14 or mutagenicity, correct?
15    A. Looks to be that way, yes.
16    Q. If you turn to page 28, there is the RAC
17 evaluation of carcinogenicity. Do you see that?
18    A. Yes.
19    Q. And if you turn from pages 28 to 49, ECHA
20 discusses the glyphosate rodent cancer studies and the
21 glyphosate epidemiology studies, correct?
22    A. Correct.
23    Q. ECHA discusses findings of seven rat studies
24 and five mice studies, correct?
25    A. I guess they missed two.

Page 303

1     Q. Correct?
2     A. Yes.
3     Q. ECHA discusses each of the epidemiology
4 studies that were considered by IARC, correct?
5     A. I'd have to look at the full reference list,
6 but if you assert that you've done it and that's the
7 case, I am not going to argue with you.
8     Q. At the human data section on page 43, it
9 provides an overview table and notes that there's an
10 overview table, see Tables 43 to 45, of the
11 epidemiological studies assessed by IARC as available
12 in the CLH report and in the RAR. Do you see that?
13    A. Yes.
14    Q. So ECHA in 2017 considered the epidemiology
15 studies assessed by IARC, correct?
16    A. Correct.
17    Q. So ECHA looked at all the case control studies
18 addressed by IARC, right?
19    A. According to this, that's correct.
20    Q. ECHA looked at the 2005 AHS cohort study,
21 right?
22    A. I'm sure they did, yes.
23    Q. ECHA could not have looked at the 2018 JNCI
24 study because it had not come out yet, right?
25    A. That is correct.

Page 304

1     Q. ECHA also looked at the 2014 Schinasi meta
2 analysis, the IARC working group meta analysis, and the
3 Chang 2016 meta analysis, correct?
4     A. Yes.
5     Q. At page 52, at the bottom there in bold, ECHA
6 concludes that: Based on the epidemiological data as
7 well as the data from long-term studies in rats and
8 mice, taking a weight of evidence approach, no
9 classification for carcinogenicity is warranted.
10 Correct?
11    A. That's what it says, correct.
12    Q. In other words, ECHA did not find evidence
13 that glyphosate causes cancer, right?
14    A. That is their judgment based on their weight
15 of the evidence review.
16    Q. You disagree with the European Chemical
17 Agency's opinion regarding glyphosate and cancer; is
18 that right?
19        MR. LITZENBURG: Object to form.
20    A. I would only point out at this hour that it is
21 not in agreement with the IARC workings group
22 assessment of the same body of evidence, and I think
23 this last two hours has demonstrated that IARC is the
24 first recognized international body of experts
25 responsible for evaluating the oncogenicity of

Page 305

1 chemicals including pesticides that has reached a
2 different conclusion compared to other regulatory
3 bodies in specific countries and all of these related
4 European and European community entities. And I think
5 that the -- the reasons why IARC reached a different
6 judgment have been widely debated, they'll continue to
7 be debated, and almost certainly won't be resolved
8 until there's significantly richer and deeper both
9 epidemiological studies done and -- and the Ramazzini
10 study -- Institute study will clearly carry a lot of
11 weight in the European reviews. And it -- it will --
12 remains to be seen whether the level of concern
13 inherent in the IARC working group's classification of
14 glyphosate and glyphosate-based herbicides as probable
15 human carcinogens and possibly proven ones, you know,
16 whether that is a -- you know, was a -- an accurate and
17 appropriate assessment or over -- overcautious, over --
18 perhaps the -- you know, down the road science will
19 show that the weight that the IARC working group placed
20 on the genotoxicity studies which they regard as
21 providing strong evidence of a genotoxicity of
22 glyphosate-based herbicides and even glyphosate itself,
23 perhaps as more studies are done the judgment of the --
24 of the entire scientific community will change. But
25 it -- it really -- it -- there is this disagreement and

77 (Pages 302 to 305)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 306

1    it's not surprising to me that Monsanto would point to
2    all of these other determinations as suggesting that
3    IARC got it wrong, but it might be that these earlier
4    assessments misread and didn't take into account the
5    more modern studies on genotoxicity.
6           You know, I -- among many experts in
7    genotoxicity, they feel there's clear evidence that --
8    that glyphosate and glyphosate-based herbicides trigger
9    oxidative stress in a number of cell systems at
10   environmentally relevant doses.  There's suggestive
11   data that at very low doses from prenatal exposures
12   that they trigger changes in the liver and suggestive
13   of progression to nonfatty liver disease.
14          There's -- there's tons of new science coming
15   out certainly on a -- you know, on a weekly basis
16   around the world that is -- that ultimately and
17   eventually will be incorporated into the weight of
18   evidence evaluations.  It -- it's possible that IARC is
19   the first international agency to recognize and state
20   that by their reading of the totality of the data that
21   they feel that the classification has been
22   inappropriate and it's -- so they reached that
23   conclusion and they set out their reasons.
24          I agree with their judgment strongly on
25   genotoxicity and I do think that EPA and EFSA's and

Page 307

1    BFR's continued position that glyphosate-based
2    herbicides are not genotoxic will be proven to be
3    wrong.  For one thing, you know, you -- you never asked
4    me about other things in all of these studies.
5    Virtually all of the European assessments, the EFSA
6    assessment, the BFR assessment is based upon their
7    review of typical exposures mostly through the diet to
8    glyphosate and glyphosate-based herbicides.  They're --
9    they're judgments that are based on their dietary risk
10   assessment and their determination of whether the
11   average German or the average citizen in -- in a
12   European country faces a risk from glyphosate.
13          It's quite clear if you read the details of
14   them -- I was hoping you would give me the opportunity
15   to point out a few of those as we went through these
16   documents.  I think it's generally accepted that all of
17   these regulatory agencies are certainly more concerned
18   about the levels of exposure to people who are
19   occupationally using glyphosate or for one reason or
20   another exposed at a higher level of which there's
21   multiple studies going on around the world of clusters
22   of fatal chronic kidney disease that some scientists
23   believe that exposure to glyphosate may play a role.
24          So there's -- one of the big distinctions
25   between EPA's and other regulatory agencies'

Page 308

1    classification of glyphosate as not posing carcinogenic
2    risk is because the principal focus and science base
3    supporting that is in reference to typical exposures to
4    the average citizen living in the country, and if -- if
5    the regulators were asked if they were equally
6    confident that applicators and mixer/handlers and
7    people that use -- sprayed glyphosate for several hours
8    a day with handheld equipment also faced no oncogenic
9    risk, I'm reasonably certain that they would say they
10   are less confident in their judgment in that scenario
11   because they know the exposure levels are so much
12   higher.
13          So this is one of the -- the explanations
14   that's in the variety of peer-reviewed publications
15   that have -- have appeared where scientists are trying
16   in good faith to explain how the IARC working group
17   looking at this body of science could reach one
18   conclusion and other scientific bodies, regulatory
19   agencies looking at a similar set of data, not exactly
20   the same, reaches an alternative decision.  And I
21   understand those distinctions, and I -- I acknowledge
22   that they're subtle in some senses, but I -- I do
23   believe that it -- a deep understanding of the
24   differences in the IARC review compared to these
25   regulatory agency reviews is -- is -- sheds light on

Page 309

1    why they reached a -- different conclusions.
2       Q.  (BY MR. HOLLINGSWORTH) Sir, Health Canada,
3    the Canadian regulator, BFR, the German regulator,
4    EFSA, European regulator, European Chemical Agency,
5    another European regulator, they all reviewed
6    epidemiology on glyphosate-based herbicides, correct?
7       A.  Yes.
8       Q.  Including epidemiology on users, specifically
9    farmers, that includes the AHS cohort with multiple
10   levels including intense levels of use of glyphosate,
11   correct?
12      A.  They took into account I'm sure the published
13   studies from the Agricultural Health Study, correct.
14      Q.  Okay.  So IARC stands alone as compared to the
15   rest of the worldwide regulators who conducted a hazard
16   or risk assessment for glyphosate-based herbicides that
17   included a review of epidemiology, genotoxicity and
18   other relevant sciences, correct?
19          MR. LITZENBURG:  Object to form and
20   calling -- repeatedly calling IARC a regulator.
21      A.  Would you repeat the question, please.
22      Q.  (BY MR. HOLLINGSWORTH)  Sure.  IARC stands
23   alone as compared to worldwide regulators who conducted
24   a hazard -- a risk assessment for glyphosate-based
25   herbicides that included a review of epidemiology,

78 (Pages 306 to 309)

HIGHLY                  Charles Benbrook, Ph.D.                  HIGHLY
CONFIDENTIAL                 May 23, 2018                    CONFIDENTIAL

Page 310

1    genotoxicity, animal carcinogenicity, and other
2    scientific data in the glyphosate database, correct?
3        A. I would concur that the -- IARC and its
4    working group reached a different conclusion based on a
5    review of largely the same scientific data.
6        Q. You're familiar with the Australian Pesticides
7    and Veterinary Medicines Authority, correct?
8        A. Just a bit.
9        Q. Have you ever been to Australia?
10       A. Yes, once.
11           MR. HOLLINGSWORTH: Mark the exhibit.
12           (Deposition Exhibit 27 was
13           marked for identification.)
14       Q. (BY MR. HOLLINGSWORTH) Sir, have you reviewed
15   this 2016 glyphosate risk assessment document done by
16   the Australian regulators?
17       A. No.
18       Q. APVMA is responsible for regulating pesticides
19   and pesticide labels in Australia, correct?
20       A. Yes.
21       Q. Please turn to page 3. There in the table of
22   contents or the executive summary section there's a
23   subsection titled Assessment of IARC monograph --
24   glyphosate monograph, correct?
25       A. Correct, it's 4.2.

Page 311

1        Q. Please turn to page 10 in the introduction
2    section. The last paragraph notes: The APVMA chose to
3    consider glyphosate for reconsideration following the
4    publication of the IARC monograph 112 in July 2015.
5    Once the chemical has been nominated for
6    reconsideration, the APVMA examines a new
7    information -- examines the new information to
8    determine whether there's sufficient scientific grounds
9    to warrant placing the chemical under formal
10   reconsideration.
11           So this is another example of the close
12   scrutiny of glyphosate by the worldwide regulatory
13   communities that you referenced in your April 2015
14   testimony, correct?
15           MR. LITZENBURG: Object to form.
16       A. I would agree with that.
17       Q. (BY MR. HOLLINGSWORTH) If you go down to the
18   section entitled Evaluation Methodology Weight of
19   Evidence Approach it notes: The nomination assessment
20   process involved the scientific weight of evidence
21   evaluation of information in the IARC monograph.
22           So the Australian regulators conducted a
23   weight of evidence review of the information considered
24   by IARC, correct?
25       A. Yes.

Page 312

1        Q. Please turn to the section entitled Proposed
2    Regulatory Position on page 12.
3        A. Okay.
4        Q. There it notes that: Based on the nomination
5    assessment the APVMA concludes that the scientific
6    weight of the evidence indicates that exposure to
7    glyphosate does not pose a carcinogenic or genotoxic
8    risk to humans.
9            So like the German regulator, the European
10   Food Safety Authority, the European Chemical Agency,
11   the Australian regulatory body considered the science
12   reviewed by IARC and came to the conclusion that
13   glyphosate is not carcinogenic, correct?
14       A. Yes, that's what it says.
15       Q. Okay. And this review by Australia is on
16   glyphosate or products containing glyphosate, correct?
17       A. Yes.
18       Q. Okay. And if you go to page 17, it discusses
19   a July 2013 review by the Australian regulator. Do you
20   see that?
21       A. Page 17, I see June -- June 2011. Oh, down at
22   the bottom.
23       Q. Right. Do you see the July 2013 review?
24       A. Yes.
25       Q. Okay. So like the other worldwide regulators,

Page 313

1    Australia had reviewed glyphosate previously and come
2    to the conclusion that the weight and strength of
3    evidence demonstrate that glyphosate is not genotoxic,
4    carcinogenic or neurotoxic, correct?
5        A. That's what it says, yes.
6        Q. Okay. And are you aware -- if you look at
7    page 16?
8        A. Okay.
9        Q. Australia also reviewed glyphosate in 1996,
10   correct?
11       A. Yes.
12       Q. That was for ecotoxicology purposes, correct?
13       A. Just reading it now. In water -- okay, so
14   environmental aquatic effects, yes.
15       Q. Those were studies on the formulated product,
16   in part, correct?
17       A. Yes.
18       Q. Let's stay down under and go to New Zealand.
19       A. This gets out of control.
20           MR. LITZENBURG: Yeah, it would be nice
21   to keep them in order, but in the end she'll keep all
22   the stickered ones and scan them in and everything, so
23   as long as they are there.
24       A. Okay.
25           (Deposition Exhibit 28 was

79 (Pages 310 to 313)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 314

1    marked for identification.)
2    Q. (BY MR. HOLLINGSWORTH) You're aware of New
3    Zealand EPA, correct?
4    A. Yes.
5    Q. They have authority over pesticide regulation
6    and labeling in New Zealand, correct?
7    A. He gets the other one?
8        THE WITNESS: Tim, this is 28.
9    Q. (BY MR. HOLLINGSWORTH) Correct, sir?
10   A. I'm sorry. Can you ask the question --
11   Q. New Zealand EPA has authority over pesticide
12   regulation and labeling in New Zealand, correct?
13   A. Yes.
14   Q. Are you aware of this document from August
15   2016 titled Review of the Evidence Relating to
16   Glyphosate and Carcinogenicity prepared by the
17   Environmental Protection Authority of New Zealand?
18   A. No, I've never seen this.
19   Q. Okay. But you're generally aware that New
20   Zealand has this regulatory body that reviews
21   pesticides, correct?
22   A. Correct.
23   Q. Please turn to the introduction section.
24   A. Okay.
25   Q. The second paragraph notes: Glyphosate is

Page 315

1    widely considered by regulatory authorities and
2    scientific bodies to have no carcinogenic potential.
3    You agree with that, don't you?
4    A. Yes, at this time.
5    Q. The next paragraph notes: However, since that
6    time, results of further studies have come to light and
7    the International Agency For Research on Cancer, IARC,
8    Monograph 112 on glyphosate, came to a conclusion that
9    glyphosate should now be classified as carcinogenic and
10   so since Group 2A, probably carcinogenic to humans. Do
11   you see that?
12   A. Yes.
13   Q. So, again, the international regulatory
14   community is considering the IARC classification and
15   review of glyphosate, correct?
16   A. Correct.
17   Q. Further down in this paragraph they refer to
18   IARC as the IARC working group or IWG. Do you see
19   that?
20   A. Yes.
21   Q. At the bottom of this section it notes: This
22   report discusses the relevant data on glyphosate,
23   especially the more recent studies, and reviews the
24   basis on which the IARC working group classified it as
25   a probable human carcinogen. This involves review of

Page 316

1    the quality of evidence for carcinogenicity in humans
2    and experimental animals and the mechanistic arguments.
3    Did I read that correctly?
4    A. You did.
5    Q. So the New Zealand regulatory authority is
6    taking a look at the full toxicology data set and
7    epidemiology as well as the basis for the IARC
8    classification, correct?
9    A. Yeah, they certainly looked at part of it, but
10   I doubt that they did as thorough a review as either
11   BFR or IARC did, but they -- they looked at certainly
12   some of the studies.
13   Q. Please turn to page 16 in the conclusions
14   section. There it notes: The overall conclusion is
15   that based on a weight of evidence approach taking into
16   account the quality and reliability of the available
17   data glyphosate is unlikely to be genotoxic or
18   carcinogenic to humans and would not require
19   classifications under HSNO as a carcinogen or mutagen.
20   Did I read that correctly?
21   A. You did.
22   Q. So New Zealand, like Australia, Germany,
23   EFSA, the European Chemical Agency, they considered
24   IARC and considered the body of science on glyphosate
25   and glyphosate-based herbicides and concluded that

Page 317

1    glyphosate-based herbicides are not carcinogenic,
2    correct?
3    A. Correct.
4    Q. Sir, were you aware that even another branch
5    of the World Health Organization has since IARC's
6    classification of glyphosate also reviewed the
7    glyphosate database and found that glyphosate is not
8    carcinogenic?
9    A. Which one are you talking about? We've
10   already talked about four or five.
11   Q. Sure. I'm talking about the other branch of
12   the World Health Organization, that is, the joint FAO
13   WHO meeting on pesticide residues.
14   A. That's the last one that we haven't talked
15   about, correct.
16   Q. You're familiar with that body, correct?
17   A. Yes.
18   Q. The World Health Organization has been
19   reviewing glyphosate-based herbicides for a long time.
20   Are you aware of that?
21   A. Yes.
22   Q. Are you aware that the JMPR first reviewed
23   glyphosate in 1986?
24   A. I -- I don't recall the dates of all their
25   reviews, but I'm glad to talk about the reports that

80 (Pages 314 to 317)

HIGHLY            Charles Benbrook, Ph.D.            HIGHLY
CONFIDENTIAL            May 23, 2018            CONFIDENTIAL

Page 318

1    you're going to introduce into evidence.
2            (Deposition Exhibit 29 was
3            marked for identification.)
4    Q. (BY MR. HOLLINGSWORTH) Sir, if you look at
5    the top, this is glyphosate pesticide residues in food
6    1986 evaluations?
7    A. Correct.
8    Q. Do you see that?
9    A. Yes.
10   Q. And this is by the Joint Meeting of Pesticide
11   Residues, correct?
12   A. Yes.
13   Q. And that's part of the World Health
14   Organization, correct?
15   A. Correct.
16   Q. If you look at the page 8, there's a section
17   titled Comments?
18   A. Yes, I see it.
19   Q. And it notes: The chronic toxicity of
20   glyphosate is low. The only significant toxicity seen
21   in a number of animal bioassays was mild hepatotoxicity
22   at high doses in mice. There's no evidence of
23   carcinogenicity. Do you see that?
24   A. Yes, I do.
25   Q. So the WHO in 1986 first determined there is

Page 319

1    no evidence of carcinogenicity associated with
2    glyphosate, correct?
3    A. Correct.
4    Q. Are you aware that the WHO again reviewed
5    glyphosate in 1994?
6    A. I don't recall the specific year, but I know
7    that just like the EPA, every five or ten years they'll
8    revisit a chemical, particularly if it's one that the
9    use of which is expanding around the world as was the
10   case with glyphosate.
11           MR. HOLLINGSWORTH: We'll mark this as
12   an exhibit.
13           (Deposition Exhibit 30 was
14           marked for identification.)
15   Q. (BY MR. HOLLINGSWORTH) Sir, this is a 1994
16   review by the World Health Organization JMPR of
17   glyphosate. Do you see that?
18   A. Yes.
19   Q. Okay. And if you turn to -- there's a section
20   titled Mutagenicity and related end-points. Do you see
21   that?
22   A. What page?
23   Q. It's 7.6. There's no page numbers, but
24   Section 7.6.
25   A. 7.2, must be getting warmer, 7.3. 7.6, yes, I

Page 320

1    have it.
2    Q. All right. And there it notes: The
3    results of several studies are summarized in Table 15.
4    The results show that glyphosate is not mutagenic.
5    Correct?
6    A. Correct, that's what it says.
7    Q. Okay. So the WHO again reviewed glyphosate
8    genotoxicity and toxicity in 1994 and determined that
9    glyphosate is not carcinogenic, correct?
10           MR. LITZENBURG: Can I have a copy of
11   it?
12           MR. HOLLINGSWORTH: Sorry.
13           MR. LITZENBURG: That's 29?
14           THE WITNESS: 30.
15           MR. LITZENBURG: Last one I got was 28.
16   What was 29?
17           THE WITNESS: 29 was the 5/21 -- it's
18   got a date on the upper left corner, 5/21/2018, which
19   is the 1986 --
20           MR. LITZENBURG: I think I need a copy
21   of that as well.
22           THE WITNESS: -- JMPR review and this is
23   the -- the more recent one.
24           MR. LITZENBURG: Got it. Grant, can you
25   give me a copy of 29?

Page 321

1    A. Are we done with the section -- are we done
2    with this one?
3            MR. HOLLINGSWORTH: I think I did give
4    you a copy of it.
5            MR. LITZENBURG: Exhibit 28, 30.
6            MR. HOLLINGSWORTH: 1994. You can have
7    mine.
8            MR. LITZENBURG: Okay. Thanks.
9    Q. (BY MR. HOLLINGSWORTH) So the WHO, World
10   Health Organization, in 1994 reviewed glyphosate and
11   determined that it's nonmutagenic correct?
12   A. Correct.
13   Q. Mutagenic. Are you aware that the JMPR again
14   reviewed glyphosate in 2004?
15   A. No, I didn't remember that specific date. I
16   know it's -- it's -- it's a -- common for JMPR to
17   revisit the database on any major pesticide that --
18   that there's concerns about as there was in the case of
19   glyphosate, so I'm sure that they have returned to it
20   in addition more than -- more than once since 2004.
21           MR. HOLLINGSWORTH: Let's mark this
22   exhibit.
23           (Deposition Exhibit 31 was
24           marked for identification.)
25   Q. (BY MR. HOLLINGSWORTH) Sir, this is the 2004

81 (Pages 318 to 321)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                      CONFIDENTIAL

Page 322

1   review by the World Health Organization, specifically
2   the joint FOA WHO meeting on pesticide residues,
3   correct?
4       **A. Right, written by two individuals that work**
5   **with the German regulator, the BFR that we've talked**
6   **about before.**
7       Q. Okay. And if you turn to the page marked 95,
8   at the beginning right after the table -- it's the
9   table of contents?
10      **A. Oh, okay.**
11      Q. There it notes that they consider the
12  long-term carcinogenicity, genotoxicity and other
13  relevant toxicological properties of glyphosate,
14  correct?
15      **A. Certainly several of them, yes.**
16          MR. LITZENBURG: If you're about to go
17  on to --
18      Q. (BY MR. HOLLINGSWORTH) Can you turn to page
19  158.
20          MR. HOLLINGSWORTH: Just a little bit
21  longer here.
22      Q. (BY MR. HOLLINGSWORTH) Turn to page 158.
23      **A. Of this same document?**
24      Q. Yeah.
25      **A. 158. Okay. Got it.**

Page 323

1       Q. It notes in the second paragraph up from the
2   bottom --
3       **A. The short one, "in view of"?**
4       Q. The one above that.
5       **A. The genotox, okay.**
6       Q. It notes: The genotoxic potential of
7   glyphosate has been extensively tested. Do you see
8   that?
9       **A. Yes.**
10      Q. And then at the bottom of that paragraph it
11  notes: The meeting concluded that glyphosate is
12  unlikely to be genotoxic. Correct?
13      **A. That's what it says.**
14      Q. And then the next paragraph it notes: In view
15  of the absence of the carcinogenic potential in animals
16  and the lack of genotoxicity standard tests, the
17  meeting concluded that glyphosate is unlikely to pose a
18  carcinogenic risk to humans. Correct?
19      **A. That is the judgment that they reached at this**
20  **time, yes.**
21      Q. Okay. And that judgment by the JMPR stands
22  through today including any determination after IARC,
23  correct?
24      **A. Correct.**
25          MR. LITZENBURG: If we're done with that

Page 324

1   exhibit let's break. It's 5:57.
2           MR. HOLLINGSWORTH: Sure.
3           MR. LITZENBURG: Let's do our dinner.
4           VIDEO OPERATOR: We are going off the
5   record. The time is 5:57.
6           (Deposition recessed at 5:57 p.m.,
7            to be reconvened at 6:45 p m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 325

1               EVENING SESSION
2
3               7:26 P.M.
4               --oOo--
5
6
7           VIDEO OPERATOR: We are going on the
8   record. The time is 7:26.
9           MR. HOLLINGSWORTH: Jennifer, do you
10  want to just start and put it on the record?
11          (Discussion off the written record.)
12          MS. HOEKEL: So we're going to -- I'm
13  going to ask a few questions. That way we don't have
14  to worry about how much time I'm going to take. I'm
15  just going to take my time and then I'll hand you back
16  to Mr. Hollingsworth.
17          MR. LITZENBURG: All right.
18
19              EXAMINATION
20  BY MS. HOEKEL:
21      Q. So, Dr. Benbrook, my name is Jennifer Hoekel.
22  I represent the Osborn & Barr defendants. Are you
23  familiar with who Osborn & Barr are?
24      **A. Vaguely, yes.**
25      Q. What -- what is your understanding?

82 (Pages 322 to 325)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 326

1    A. You're a PR firm in the city of St. Louis.
2    Q. I had a couple of follow-up questions from
3    your -- the deposition you gave in the Johnson case.
4    You said that IARC reclass -- reclassified glyphosate
5    and glyphosate-based herbicides in March of 2011 at one
6    point in your deposition. Did you mean March 2015?
7    A. Yes, of course.
8    Q. And earlier today you said that EPA classified
9    glyphosate as a possible carcinogen from 1995 to 1991?
10   A. No, that --
11   Q. Did you mean 1985 to 1991?
12   A. What I said was that as of 1985 EPA considered
13   glyphosate a possible human carcinogen. That
14   classification remained in place until the CARC meeting
15   in 1991.
16   Q. And the record will reflect that what at least
17   was taken down was 1995, and that's why I wanted to
18   clarify that we meant 1985.
19   A. Yeah, well, you know, I'm quite sure if
20   someone listens to the recording that I said 1985 to
21   1991.
22        MR. LITZENBURG: Well, that's a good
23   opportunity. He'll read and sign this one.
24   Q. (BY MS. HOEKEL) And in the Roundup litigation
25   have you produced just one report?

Page 327

1    A. Yes.
2    Q. And that's in the Johnson case, correct?
3    A. Correct.
4    Q. And that report doesn't include any opinions
5    on any liability by Osborn & Barr, correct?
6    A. Correct.
7    Q. And you've been designated in the Hall and
8    Peterson cases as an expert, correct?
9    A. Yes.
10   Q. And that expert designation says, in part,
11   that you'll provide your expert opinion on the
12   regulatory and liability issues germane to the case,
13   including the history of EPA's regulation of glyphosate
14   and Roundup products, the interaction between EPA and
15   Monsanto, and Monsanto's knowledge of internal
16   discussions regarding and consultation with experts
17   regarding glyphosate and Roundup products.
18        Is that your understanding of your testimony
19   that will be offered in the Peterson and Hall cases?
20   A. Yes, that certainly describes the major areas
21   of focus.
22   Q. Okay. And nowhere in the expert disclosure
23   that's been filed in the Peterson/Hall cases does it
24   mention that you will be rendering any opinions with
25   respect to Osborn & Barr. Do you have any opinions

Page 328

1    with respect to Osborn & Barr?
2    A. I don't know anything about it so I have no
3    opinions.
4    Q. Thank you. So my guess is your answer is
5    going to be I don't know to a lot of these, but I'm
6    going to tick through them kind of quickly.
7    A. Okay.
8    Q. Do you know what glyphosate products Osborn &
9    Barr was involved in marketing or advertising?
10   A. No.
11   Q. Do you know what years Osborn & Barr was
12   involved in that marketing or advertising?
13   A. No.
14   Q. Do you know what products Mr. Hall -- what
15   glyphosate products Mr. Hall used?
16   A. Yes.
17   Q. Which products were those?
18   A. Pro Max and Roundup Super Concentrate.
19   Q. And are those professional products or
20   residential products?
21   A. They're in the IT&O portfolio and they would
22   be professional products not available to the typical
23   homeowner.
24   Q. Do you know when he used those products?
25   A. He -- there were two time periods during which

Page 329

1    the -- he identified predominant use being in the
2    residential setting and in another time period slightly
3    different, but it was, I think, from sometime in mid
4    2000s to well after 2010. It was quite a long period
5    of time.
6    Q. When you say used in a "residential setting,"
7    can you explain what you meant by that?
8    A. In and around a home.
9    Q. And were those -- was that in regard to the
10   rental homes Mr. Hall worked on?
11   A. I would imagine that he had clients that he
12   managed the grounds for or had properties that he had
13   to -- he -- I have seen several of his invoices. He
14   purchased a very substantial quantity of Roundup
15   products, so he obviously was -- had -- he had to cover
16   a lot of ground.
17   Q. Do you know how he applied the Roundup
18   products?
19   A. I haven't looked into it in any great detail.
20   Q. Do you know what personal protective equipment
21   he used when he was applying the products?
22   A. No.
23   Q. Do you know whether under -- so Mr. Hall is a
24   resident of the state of Illinois. I don't know if
25   you're aware of that or not. Do you know whether under

83 (Pages 326 to 329)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                    CONFIDENTIAL

Page 330

1    Illinois law Mr. Hall had to be qualified or certified
2    in any way to use these particular Roundup products?
3        A. I don't specifically know. I don't think he
4    had to be.
5        Q. Are you aware that in certain states there are
6    certification requirements for users of certain kinds
7    of Roundup products?
8        A. I certainly know that there's certification
9    requirements for different pesticide products. I'm not
10   aware that these were restricted-use pesticides.
11       Q. Okay. Do you just not know either way?
12       A. I've seen no discussion or evidence of it, so
13   I -- I'd be glad to be informed that they were if they
14   are, but I'm not aware of it and I would be surprised
15   if they were.
16       Q. Okay. Do you know what, if any, advertising
17   Mr. Hall saw for Roundup products?
18       A. No.
19       Q. Do you know what labels Mr. Hall saw for
20   Roundup products?
21       A. He saw the Pro Max label and the Roundup Super
22   Concentrate label at a minimum. He may have seen
23   others.
24       Q. And, again, the time frame for those
25   products -- the time frame that Mr. Hall was using

Page 331

1    those products, did you recall?
2        A. As I said, mid 2000s to 2010 or after. So
3    more than a ten-year period.
4        Q. Do you know whether Osborn & Barr was involved
5    in marketing any of those particular products that
6    Mr. Hall used?
7        A. As I said, I have no knowledge of what your
8    company is or what it has done, so of course not, I
9    don't have any knowledge of any advertisements.
10       Q. Do you know whether in Illinois that whether
11   or not state law certification requirements are only
12   used with respect to restricted-use pesticides?
13       A. I -- I would imagine that there's some other
14   criteria in circumstances when a restricted-use license
15   is required. For example, the new Dicamba labels that
16   have recently been approved, an added requirement is
17   that anybody applying them has to be trained and
18   certified as a restricted-use -- qualified to apply
19   restricted-use products. So there's a -- a variety of
20   different reasons over the years that EPA has required
21   or individual states have required that a person be
22   certified. Sometimes it's actually different at the
23   state level.
24       Q. Okay. So is it fair to say you're not sure
25   whether or not Mr. Hall should have been qualified or

Page 332

1    certified --
2        A. I --
3        Q. -- under Illinois law to use those products?
4        A. I'm -- I was not aware the state in which
5    Mr. Hall applied glyphosate products.
6        Q. Do you know what products Mr. Peterson used?
7        A. No.
8        Q. You don't -- you don't know what kind of
9    glyphosate --
10       A. No.
11       Q. -- Mr. Peterson used?
12       A. I didn't -- didn't get an opportunity to
13   request the labels and study them, but I certainly will
14   by the time this case goes to trial.
15       Q. Okay. Do you know whether he was using a
16   residential-type Roundup product or a commercial-type
17   Roundup product?
18       A. Mr. Peterson?
19       Q. Mr. Peterson, I'm sorry.
20       A. I'm sure he was using an agricultural product
21   for his farm. He had a large farm.
22           MR. LITZENBURG: Let me say I understood
23   this to be just about Jeff Hall. If -- well, we may
24   let you have another bite at the apple if Peterson
25   comes up for trial and he's going to testify about

Page 333

1    anything specific.
2            MS. HOEKEL: Okay. Well, I would
3    certainly say that if -- if he's not prepared to talk
4    about Peterson and as you noted earlier in your
5    objection that you thought this was about Peterson and
6    Hall, if he is going to have opinions about Peterson
7    then we would certainly --
8            MR. LITZENBURG: We will certainly let
9    you guys know and let you guys have an opportunity to
10   do discovery.
11       Q. (BY MS. HOEKEL) So at this point you don't
12   know when Mr. Peterson used or what he used?
13       A. Other than an agricultural label to spray his
14   large farm.
15       Q. Okay. And, again, do you know under Illinois
16   law whether or not Mr. Peterson would need to be
17   qualified or certified to use that product?
18       A. No -- no knowledge of the Peterson case.
19       Q. Okay. So I think you already told me this,
20   but let me ask it very clearly. Do you have any
21   opinions on whether or not Osborn & Barr is liable to
22   any of the plaintiffs in the Peterson/Hall case?
23       A. As I said, I don't know anything about what
24   Osborn & Barr has done, but if it becomes clear to me
25   and I'm instructed by plaintiffs' counsel that I need

84 (Pages 330 to 333)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL               May 23, 2018               CONFIDENTIAL

Page 334

1    to learn about that, then I will and I'll let you know
2    what I come up with.
3        Q.  Okay.  In your report that you did in the
4    Johnson case you indicate that companies selling
5    pesticide are responsible for testing to ensure that
6    the pesticides can be used safely.  Do you have any
7    opinions on what an advertising agency's responsibility
8    is with respect to the marketing of pesticides?
9        A.  That's an interesting question since they're
10   working for a client.  I would assume that -- I don't
11   know anything specifically about the code of ethics or
12   regulations governing advertising companies.
13       Q.  Okay.
14       A.  Not prepared to speak to it.
15       Q.  Okay.  And so you're not offering any
16   testimony today on, for example, the FTC standards for
17   advertising agency liability?
18       A.  No.
19       Q.  And I know that Mr. Hollingsworth asked you
20   some questions about government's regulation of
21   glyphosate, and I'm going to ask you a couple of just
22   very short questions that are limited to a certain time
23   frame.  Between 1990 and 2012, had any government
24   agency banned glyphosate to your knowledge?
25       A.  None that I'm aware of.

Page 335

1        Q.  And between 1990 and 2012, had any government
2    agency classified glyphosate as a possible carcinogen?
3        A.  Well, it was classified up through 1991.
4        Q.  And that's the EPA --
5        A.  Correct, that we've talked about.
6        Q.  -- policy?
7        A.  Yeah.
8        Q.  And EPA changed their position in 1991?
9        A.  Correct.
10       Q.  And they changed their position to not
11   classifying glyphosate as a possible carcinogen,
12   correct?
13       A.  Correct, yeah.
14       Q.  Do you -- do you believe that no-till farming
15   provides benefits over traditional farming methods
16   using till?
17       A.  Well, it would, of course, depend on how no
18   till as a practice is deployed.  Every farming system
19   has its appropriate applications and inappropriate
20   applications.  No till has obvious major benefits for
21   the reduction of soil erosion on highly erodible land,
22   but when no till is adopted on flat, nonerodible land,
23   those benefits are not meaningful.  So it depends on
24   the circumstance in which no till is used and the --
25   scope of the environmental and -- and other impacts

Page 336

1    that you consider important in making such an
2    evaluation.
3        Q.  So besides soil erosion, what other benefits
4    are there to no-till farming?
5        A.  Reduces the number of trips through the field.
6    It reduces the amount of fuel that's used.  It takes
7    less labor for the farmer.  Those are the well-known
8    and widely accepted benefits, and there are, of course,
9    downsides and costs involved.  So it -- for most --
10   most farmers weigh the pros and cons and some -- some
11   adopt and believe in no till and others haven't and
12   don't.
13       Q.  Is soil erosion a current problem in the
14   United States?
15       A.  In some -- some agricultural fields, yes, of
16   course.
17       Q.  Have you ever heard it said that the largest
18   export of the United States some years is its topsoil?
19       A.  Well, yes, I've heard that colloquialism, and
20   there's certainly a -- a grain of truth to it.  If you
21   take all the soil that floats down the Mississippi
22   River and all the other major rivers and weigh it and
23   then compare it to, say, the weight of grains that are
24   exported from the United States, the amount of soil
25   lost would certainly be of the same order of magnitude

Page 337

1    as the total grain shipments, and in really bad years,
2    probably more.
3        Q.  And would you agree that since the
4    introduction of Roundup, that no-till farming -- the
5    numbers of acreage in a year that are -- that are
6    farmed without till has increased substantially?
7        A.  It hasn't increased substantially in the
8    United States.  It certainly did in Argentina and
9    Brazil where essentially all of the expansion in
10   soybean production was using no till and Roundup-ready
11   soybeans, and so in South America, the connection
12   between genetically engineered soybeans, use of Roundup
13   and no till was -- it was a package that everyone
14   adopted, but the -- the evidence collected by the
15   USDA's National Resources Conservation Service and the
16   Conservation Tillage Information Service and all of the
17   both public and private surveys show pretty clearly
18   that -- that the availability of GMO soybeans and corn
19   and cotton, it's had an impact on the percent of
20   acreage managed in no till, but it certainly
21   wouldn't -- I don't think anybody would consider it
22   dramatic like the impact in South America.
23           MS. HOEKEL:  I don't have any further
24   questions at this time other than to reserve our rights
25   to ask for your deposition again if you are intending

85 (Pages 334 to 337)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY                 Charles Benbrook, Ph.D.                 HIGHLY
CONFIDENTIAL               May 23, 2018                 CONFIDENTIAL

---

Page 338

1    on offering any opinions with respect to Mr. Peterson.
2         THE WITNESS:  Well, I look forward to
3    learning more about your company.
4         MS. HOEKEL:  Back to you, Grant.
5         MR. HOLLINGSWORTH:  Sure.
6
7              EXAMINATION
8    BY MR. HOLLINGSWORTH:
9         Q.  Sir, you've never designed, conducted or
10   authored a genotoxicity study of any kind; is that
11   correct?
12        A.  Yes.
13        Q.  You have not undertaken any training in
14   genotoxicity, any formal training, correct?
15        A.  Correct.
16        Q.  You are not, therefore, qualified to track
17   whether or not Monsanto conducted the genotoxicity
18   studies on the formulated product that Dr. Parry
19   recommended, correct?
20        A.  No, I don't agree with that.
21        Q.  Why not?
22        A.  Because I can read the Parry report and
23   I've -- I've studied it.  I can see from the questions
24   that you've asked you would like an even more in-depth
25   analysis of it, which I'm, you know, willing to do.

---

Page 340

1    and the level of dosing.  That's what they say they did
2    and they -- on the basis of what they did they -- they
3    conclude and state that they believe that the reported
4    evidence of genotoxicity was caused by an unrealistic
5    method of administration of the test substance and an
6    unrealistically high dosage rate.  That's -- that's
7    what I take from my review of that study.
8         Q.  Both Bolognesi and Peluso claim to show DNA
9    damage in mice after IP injection with glyphosate and
10   Roundup, and the Hotz and Heydens studies seek to mimic
11   that route and dosing of exposure to test whether
12   the -- genotoxic effect is due to the surfactant
13   qualities or, in fact, due to toxic qualities
14   associated with -- genotoxic qualities associated with
15   Roundup or glyphosate, correct?
16        A.  They were also interested in exploring the
17   difference between the formulated product and the pure
18   active ingredient, correct.
19        Q.  Right.  And Dr. Parry recommended that
20   Monsanto conduct a study, a genotoxicity study to test
21   the findings of the Bolognesi study, correct?
22        A.  Some of Dr. Parry's recommendations clearly
23   were directed at further elucidating whether the
24   findings in these two published studies were valid or
25   perhaps caused by something else, as Monsanto felt and

---

Page 339

1    I -- there's a difference between being trained and
2    qualified in designing and conducting a study and being
3    able to read and understand the basic approach in the
4    study, the findings of the study and the explanation or
5    articulation by the study authors on what the -- the
6    study findings were and their significance and also to
7    understand what other people have said and written
8    about the studies.
9         It -- it's not necessary to -- to be a -- a
10   scientist conducting long-term chronic feeding studies
11   to understand the basic factors that are in debate
12   around the world about the oncogenicity of glyphosate.
13   There's many people that understand the basic issues
14   and -- and reasons for the differences of opinion who
15   have never conducted such a study.
16        Q.  Sir, as indicated in the Hotz 2002 study and
17   the Heydens 2008 publication of that study, those were
18   studies conducted by Monsanto in order to verify the
19   claims made in the Bolognesi and Peluso genotoxicity
20   studies, correct?
21        A.  Well, no.  I mean, I think the authors are
22   quite clear, they designed and carried out the studies
23   to explore whether there are alternative explanations
24   for the results that were reserved, and in particular,
25   impacts in that assay system of the method of dosing

---

Page 341

1    explored in the additional research that they carried
2    out.
3         Q.  He recommended that Monsanto conduct an in
4    vivo genotoxicity study in mice to counter what
5    genotoxic evidence Bolognesi, et al., 1997 claimed,
6    correct?
7         A.  Essentially, yes, that's one of his
8    recommendations.
9         Q.  And Hotz 2002 is exactly such a study, isn't
10   it?
11        A.  It -- it certainly sheds light on that, yes.
12        Q.  And Heydens 2008 is the study in the open
13   scientific literature that publishes the GLP study
14   submitted to EPA in 2002, correct?
15        A.  Correct.
16        Q.  So you certainly cannot say that Monsanto did
17   not follow through with some of the recommendations
18   made by Dr. Parry with respect to genotoxicity testing,
19   correct?
20        A.  I'll grant you -- I'll grant you that they did
21   follow up on some aspects of Parry's recommendations,
22   yes.
23        Q.  And, in fact, afterwards, after conducting the
24   initial phases of Hotz' 2002 study but before it was
25   published, Monsanto met with Dr. Parry and relayed the

---

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                     May 23, 2018                    CONFIDENTIAL

Page 342

1    initial results and Dr. Parry was satisfied with those
2    results, correct?
3         A.  I -- I don't recall reviewing the documents
4    that lay that out.
5              MR. HOLLINGSWORTH:  Let's mark an
6    exhibit.
7              (Deposition Exhibit 32 was
8              marked for identification.)
9         Q.  (BY MR. HOLLINGSWORTH)  Dr. Benbrook, there's
10   some redactions in this version of the e-mail for EU
11   privacy laws.  I believe you know many of the people
12   involved in these e-mails, but we would ask unless you
13   think it's absolutely necessary to refrain from stating
14   the names of the EU folks.  Is that okay?
15        A.  Well, who's it from?  That, I need to know.
16   Some Monsanto person wrote this.
17        Q.  Right, a Monsanto person by the name of
18   Richard wrote this.
19   ████  ██████████████████
20   ████
21        A.  Okay.  That's who I thought.
22        Q.  And you're familiar with him, correct?
23        A.  Yes.  An important person in this saga.
24        Q.  Right.  And "the saga" meaning communications
25   with Dr. Parry and testing associated with the

Page 343

1    recommendations he made, correct?
2         A.  And discussions with his colleagues in
3    St. Louis about what Monsanto should do to produce
4    safer Roundup formulations.
5         Q.  Have you reviewed this e-mail previously?
6         A.  Let me take a peek.  Certainly remember the --
7    Parry's complaints about the Williams, et al., Cantox
8    paper.  That could have shown up in other e-mails too.
9    (Witness reading document.)  I -- I don't think I've
10   seen this particular e-mail before, but I've seen other
11   e-mails that characterize the meeting that -- that
12   Monsanto scientists had with Dr. Parry, but I don't
13   believe I've seen this specific one.
14        Q.  You don't cite this e-mail in your expert
15   report, correct?
16        A.  I'd have to look.  I don't -- I
17   haven't memorized every Bates number that I cite.
18        Q.  As far as you know, the Miller Firm did not
19   provide you with this e-mail, correct?
20             MR. LITZENBURG:  Can I have a copy of
21   it?
22             MR. HOLLINGSWORTH:  Yeah.
23        A.  I -- I can't say that because, you know,
24   particularly this -- this first sentence, the overall
25   tone of the meeting was positive after a negative start

Page 344

1    because Parry was angry about the -- the criticisms in
2    the Williams, et al., paper which was, in effect, a
3    Monsanto paper about some of his colleagues that had
4    conducted genotoxicity studies.  That -- that sentence,
5    I have read at least one e-mail that makes that point,
6    but I don't believe it was this e-mail.  It may have
7    been a different one.
8         Q.  This is an e-mail about a meeting with
9    Professor Parry on February 15, 2001, correct?
10        A.  Right.
11        Q.  That's after his recommendations for Monsanto
12   with respect to further genotoxicity studies, correct?
13        A.  Correct.
14        Q.  The e-mail recounting the meeting notes that:
15   The presentation of the results of MON 35050 studies
16   changed the mood because it clarified certain effects
17   found in the Bolognesi and Peluso papers.  Do you see
18   that?
19        A.  Correct, I see that.
20        Q.  The MON 35050 study is the Hotz 2002 study,
21   correct?
22        A.  Which we talked about earlier, correct.
23        Q.  Okay.  So Dr. Parry at this time in February
24   of 2001 was aware of the -- what would be the Hotz 2002
25   study and -- and how it clarified some of the certain

Page 345

1    effects found in Bolognesi and Peluso papers, correct?
2         A.  This is obviously ████████████ read and
3    report on this meeting with Dr. Parry.  It's -- I don't
4    think anyone can tell from just this e-mail what
5    specifically is meant by "changed the mood" about some
6    of the aspects of the Bolognesi and Peluso studies that
7    Monsanto had disagreed with and criticized from the
8    beginning.  I think that -- that what he's reporting is
9    that they shared with Parry this -- the results of a
10   study that Parry was not aware of and that the study
11   lends some evidence to the view of Monsanto that the
12   route of administration and the dosage level was high,
13   so high that -- that there was no valid reason to
14   conclude that the Bolognesi and Peluso papers were
15   indicative of a genotoxic effect of glyphosate-based
16   herbicides.  You know, that's what I surmise from this,
17   but there's certainly not enough information in this
18   e-mail to draw any detailed conclusions on what
19   Dr. Parry's reaction was to that additional
20   information.
21        Q.  The second paragraph notes that they reviewed
22   the mutagenicity studies, Dr. Parry and these employees
23   from Monsanto, available for the surfactants used in
24   glyphosate formulations.  We demonstrated with work
25   undertaken since the previous discussion that

87 (Pages 342 to 345)

HIGHLY                Charles Benbrook, Ph.D.              HIGHLY
CONFIDENTIAL               May 23, 2018              CONFIDENTIAL

Page 346

1    structurally related surfactants, etheramines, do not
2    directly cause genotoxicity.  Do you see that?
3        A. Yeah.
4        Q. So Monsanto reviewed the -- both the
5    mutagenicity studies on surfactants and glyphosate
6    formulations and via Hotz 2002 showed him that the --
7    structurally related surfactants do not directly
8    cause genotoxicity, correct?
9        A. That's what it says, correct.
10       Q. Okay.  And as a result of this meeting, do you
11   see the section marked Results?
12       A. Yes.
13       Q. Okay.  And that's results of the meeting with
14   Dr. Parry, correct?
15       A. I -- I would assume so, yeah.
16       Q. Okay.  It says:  Results:  Acceptance that
17   glyphosate is not genotoxic.
18          So after the meeting on February 15, 2001,
19   after Dr. Parry reviewed the Hotz -- what would be the
20   Hotz 2002 study, he came to an acceptance that
21   glyphosate is not genotoxic; is that correct?
22       A. The -- the pure active ingredient glyphosate
23   is not genotoxic, and this was a distinction that Parry
24   stated very clearly in -- in his report.  He recognized
25   that the -- the data pointing to genotoxicity of the

Page 347

1    formulated product was considerably stronger than the
2    data on the parent active ingredient, an understanding
3    and recognition that was shared by all the Monsanto
4    people because they had been talking about it, how
5    they're okay on studies on glyphosate active
6    ingredient, but they're very worried or they're
7    vulnerable or they could be in trouble from
8    genotoxicity assessments of the formulated product.
9    Parry was aware that that was a major concern, and I --
10   by my read of the words here that they confirmed that
11   Parry was not concerned about the evidence on gly --
12   pure glyphosate tested alone.
13       Q. Dr. Parry, after the meeting on February 15,
14   2001, also came to a broad agreement with Monsanto that
15   genotoxic results in some studies with surfactants
16   arose due to oxidative damage rather than direct
17   genotoxicity, correct?
18       A. Yes, that's correct.
19       Q. So while it may have been -- in your report I
20   think you noted that Monsanto decided to break off
21   their relationship with Dr. Parry after his reports in
22   1999, but this e-mail indicates that they were still
23   talking to Dr. Parry in February 2001 and that new
24   studies conducted according to his recommendations
25   convinced Dr. Parry that glyphosate is not genotoxic

Page 348

1    and surfactants -- genotoxicity studies have to do with
2    oxidative damage rather than direct genotoxicity,
3    correct?
4        A. As I say in my expert report, the discussion
5    within Monsanto about how to react to Dr. Parry's
6    report and whether to initiate the additional studies
7    that he recommended was a topic of ongoing discussion
8    inside Monsanto for a couple of years, and I -- you
9    know, I don't think that the decision to really cut off
10   their communications and active work with Dr. Parry
11   didn't happen till later in -- in 2001 or it might have
12   even been not until 2002.  The -- the critical e-mails
13   confirming when those decisions were made are cited
14   fully in my expert report.
15          So, you know, I think that this was -- you
16   know, this was one of the meetings where Monsanto was
17   gauging Dr. Parry's views, how -- how far he would go
18   in being comfortable with or friendly towards the
19   genotoxicity database for glyphosate -- those are words
20   that Monsanto people used in their e-mails to each
21   other.  And this particular meeting did not sway
22   Monsanto one way or another in a definitive way whether
23   to continue to work with Dr. Parry or not.  It was a
24   step in a process, but within a few months, there was a
25   series of meetings where Donna Farmer, for one, stated

Page 349

1    unequivocally that she will not support any further
2    studies on formulated glyphosate products, genotoxicity
3    studies, she would not support it under any
4    circumstances.
5          And, you know, this is -- this was a clear
6    statement of certainly her position and it -- it, by my
7    read, was largely consistent with the -- the actions of
8    Monsanto both internally and -- and in relating to the
9    independent scientific community.  And clearly Monsanto
10   did not hire Dr. Parry to do any of the studies
11   because, as you know, Heydens in another e-mail says it
12   would take a lot of time and a lot of money to convince
13   Dr. Parry to accept our view of the overall database.
14          And he also expressed concern that if they
15   funded the studies and Parry took the time to do them
16   that the results might reinforce some of Parry's
17   observations from the already completed study that, in
18   fact, in -- in possibly two different mechanisms,
19   glyphosate and -- and even more convincingly
20   glyphosate-based herbicides cause genotoxic damage to
21   cells.
22          So that's the -- that's the history of
23   Monsanto's engagement of Dr. Parry.  They hoped that he
24   would help them convince regulators and the independent
25   scientific community that there was no reason for

88 (Pages 346 to 349)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                     May 23, 2018                     CONFIDENTIAL

Page 350

1    concern about glyphosate-based herbicides and
2    genotoxicity, and at the end of the day, Dr. Parry did
3    not give rise to confidence inside Monsanto that that
4    was his view or would be his message to other
5    scientists or to regulators, and so they cut off their
6    relationship with him.
7        Q.  Genotoxicity studies on the formulated
8    products are not required to register a pesticide,
9    correct?
10       A.  Are -- are not required?
11       Q.  Correct.
12       A.  Generally, yes.
13       Q.  Okay.  And that's the case with EPA, correct?
14       A.  Correct.
15       Q.  Monsanto conducted genotoxicity studies on the
16   formulated product as part of its product stewardship
17   and also in response to Dr. Parry's recommendations to
18   conduct those studies, correct?
19             MR. LITZENBURG:  Object to form.
20       A.  From my read of the record, it's very clear
21   that Monsanto conducted those studies because they felt
22   that the emerging scientific literature reporting clear
23   evidence of genotoxic effects from exposure of certain
24   cell systems, assay systems, organisms to
25   glyphosate-based herbicides posed a threat to their

Page 351

1    freedom to operate, to sell glyphosate.  They knew it
2    was a critical aspect of the ongoing assessment of
3    glyphosate oncogenicity.
4        They regarded these studies and this area of
5    work as a -- as a serious threat to their ability to
6    maintain the regulatory status quo for Roundup
7    herbicides around the world, and I agree with them and
8    feel that their concern was well placed, and this is
9    clearly why they stated in their own words as clear as
10   the -- the day is long that that's why they hired
11   Dr. Parry and that's what they hoped they would get
12   from him, and they didn't get that from him because he
13   still had questions.
14       Now, I -- you know, I think that Heydens and
15   the other people in -- in Monsanto, they -- they
16   realized there was a chance that if they funded
17   Dr. Parry's work and took the time to do all the things
18   that he recommended that he might come around and, in
19   fact, be the advocate and defender of Roundup
20   herbicides that they hoped, but I think there were more
21   people, or certainly enough people, Donna Farmer
22   clearly being among them, that had substantial concerns
23   that this added work on formulated products would, in
24   fact, continue to show genotoxic effects through
25   possibly several different mechanisms.

Page 352

1        And the farther we go into the decade of
2    2000s, the more independent studies appear in the
3    literature that support that and, you know, throughout
4    this period Monsanto remained, you know, committed to
5    trying to prevent other people from doing the work.
6    They did very little of it themselves.  They had to do
7    some apparently because the Brazilian regulators asked
8    for it.  But, you know, I think it's -- to me it's
9    quite clear how they felt internally about the jeopardy
10   that emerging genotoxicity data posed to their freedom
11   to operate, which means sell Roundup-based herbicides
12   in all the markets that they had current labels.
13       Q.  (BY MR. HOLLINGSWORTH)  Monsanto responded to
14   what you term "emerging genotoxicity data" in the
15   scientific literature by conducting a GLP study to test
16   whether those results were actually due to genotoxic
17   effects, correct?
18       A.  Are you referring to the studies covered in
19   the Journal of Agriculture Food Chemistry paper?
20       Q.  Correct, as well as Hotz 2002.
21       A.  I think they did those in a defensive posture
22   to try to develop data that could be presented to other
23   scientists and to regulators that raised questions
24   about the design and conduct of the Bolognesi and
25   Peluso papers.  It's exactly the reaction and strategy

Page 353

1    that they used when other positive genotoxicity studies
2    were published.  They always did their best to raise
3    questions about the design of the study or the
4    interpretation of the results or the relevance of the
5    dose level or of the route of administration, and
6    they -- they -- they continued to do that and -- until
7    it became -- you know, it just became harder and harder
8    for them to do it when, for example, the study came
9    through from the population of human beings in Ecuador
10   that were exposed to glyphosate that had been sprayed
11   aerially, and the scientists tested these people and
12   there was evidence of damage to their DNA, or that's --
13   that was, I think, you know, one of the very important
14   studies that the IARC working group put considerable
15   weight on.  It wasn't -- wasn't an unusual route of
16   exposure.  It wasn't a very high unrealistic dose.  It
17   was a dose that human beings in the real world were
18   exposed to, and the evidence of -- of genotoxic damage
19   in the -- those individuals was, certainly according to
20   the scientists that carried out -- carried the study
21   out and many others that have looked at it, was quite
22   clear.
23       Q.  Sir, you testified previously today that it's
24   perfectly reasonable for a company to use -- to conduct
25   studies and use favorable science resulting from those

89 (Pages 350 to 353)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                    CONFIDENTIAL

Page 354

1   studies to convince regulators and the general public
2   that their products are safe, correct?
3        A. Correct.
4        Q. And Monsanto here conducted a study,
5   specifically Hotz 2002, to respond to scientific claims
6   in the open literature and show that there were no
7   genotoxic effects associated with Roundup formulated
8   products and that study showed that there were negative
9   results, correct?
10       A. No. The -- study that they did
11   acknowledged that there was damage to liver and kidney
12   cells, but they -- they conclude that that damage was
13   from -- you know, direct cytotoxicity kind of like an
14   acute effect that didn't have anything to do with
15   damage to or disruption of DNA, and as I've said, you
16   know, three or four times now that they concluded in
17   their paper that that damage was brought about by the
18   combination of a direct administration to a target
19   tissue, which is different from how human beings are
20   exposed to glyphosate, and what they regarded and
21   characterized as an unrealistically high dose level.
22       Q. EPA has the Hotz 2002 study as well as the
23   Brazilian genotoxicity studies on the formulated
24   product and they have repeatedly since those studies
25   were completed determined that glyphosate-based

Page 355

1   herbicides are not genotoxic, correct?
2        A. That is -- has been and remains their
3   position, yes, sir.
4        Q. And to be clear, you did not consider the Hotz
5   2002 study in coming to your opinions in this case
6   prior to today, correct?
7            MR. LITZENBURG: Object to form.
8        A. I -- I -- as I said earlier, I was unaware of
9   a study that Monsanto did at the request of the
10   Brazilian regulatory authority and submitted to them,
11   and I wasn't aware and missed in the record that at
12   some time between when it was submitted to the
13   Brazilian regulatory authority they also submitted it
14   for information purposes to EPA, which was the right
15   and proper thing for them to do and something that they
16   should have done consistently whenever they had new
17   science but did not.
18       Q. (BY MR. HOLLINGSWORTH) And you didn't ask the
19   Miller Firm to provide you with the primary studies
20   showing that Monsanto responded to Dr. Parry's
21   recommendations and conducted some of those studies,
22   correct?
23       A. Did I ask them to do a search on that subject?
24   Probably not. Again, the -- the record -- the
25   documents that I reviewed had addressed in detail over

Page 356

1   about a two-year period the consultancy of Dr. Parry,
2   what he did, what Monsanto felt about it. Monsanto was
3   very critical of Dr. Parry's report. One of the -- one
4   of the people wrote in a similar e-mail to this that he
5   wondered if Dr. Parry had ever worked for industry
6   before because, you know, clearly Dr. Parry was not
7   careful in the choice of his words to only tell
8   Monsanto what they wanted to hear.
9           So, you know, I think Monsanto, if you look at
10   the record, that they are always eager and often speedy
11   in submitting to regulatory agencies information that
12   they feel supports their current view of glyphosate
13   toxicity or risk or glyphosate formulated product
14   toxicity and risk, but clearly when they have data that
15   is not supportive of that, they are -- typically do
16   everything they can to prevent ever having to disclose
17   it to regulators.
18       Q. Are you familiar with the New England Journal
19   of Medicine?
20       A. Yes.
21       Q. The New England Journal of Medicine is one of
22   the most, if not the most, reputable scientific journal
23   in the United States. Is that fair?
24       A. Well, certainly regarded as one of the top
25   medical journals. It's a specialized journal.

Page 357

1        Q. Have you ever published in the New England
2   Journal of Medicine?
3        A. Just a -- a short paper commentary with Phil
4   Landrigan.
5        Q. You published a scientific article in the New
6   England Journal of Medicine entitled GMOs, Herbicides
7   and Public Health, correct?
8        A. Yes.
9        Q. The New England Journal of Medicine has taken
10   issue in the past with your failure to disclose
11   financial conflicts of interest, haven't they?
12       A. Well, they -- they received a number of
13   complaints from Monsanto employees and other people
14   that certainly the journal suspected had associations
15   with Monsanto asking if the disclosures or -- and
16   statements that -- that Dr. Landrigan and I submitted
17   were in accord with their requirements, and both
18   Dr. Landrigan and I reviewed what we said and told them
19   that yes, we felt that it was in accord with their
20   requirements. And they said, "Okay, well, we'll think
21   about it some more." And they got some more complaints
22   and they -- they came back to us and said, "Well, what
23   about your" -- I don't remember the -- the specific
24   points, but I think there was a complaint that I hadn't
25   acknowledged that I had done expert witness work on

90 (Pages 354 to 357)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 358

1   pesticide cases in the past, and obviously this was
2   before being engaged in this litigation, so it
3   wasn't -- it wasn't a time when I could acknowledge
4   that, didn't know about it, but the -- I wasn't -- the
5   communications that Dr. Landrigan and I were having
6   wasn't with the editors, with the associate editor or
7   one of the people that deals with this sort of issue
8   for the journal. They asked if -- if I had any
9   objection to disclosing the fact -- you know, whatever
10  I added to the statement, I don't remember the
11  specifics -- things but, you know, I'm sure I -- I
12  added the statement that I had done expert witness work
13  in the past on pesticide litigation, which was truthful
14  but not relevant in any way to the content of the
15  commentary. I think I acknowledged that I served on a
16  USDA advisory committee, and I don't remember what
17  else, but it was -- it was information that the -- that
18  the journal felt, you know, went the extra mile to
19  disclose any potential sources of bias, and I
20  didn't object to them adding that because it's all
21  truthful information.
22      Q. The discussions you had with the people at the
23  New England Journal of Medicine with respect to the
24  failures to disclose, those occurred after the article
25  was published, correct?

Page 359

1      A. Yes.
2      Q. You testified that the statement that you had
3   done expert witness work in the past on pesticide
4   litigation was truthful, but not in any way relevant --
5   in any way relevant to the content of the commentary.
6   That's the commentary for your publication GMOs,
7   Herbicides and Public Health, correct?
8      A. Correct.
9      Q. Okay. So the fact that you testified against
10  pesticide companies in the past isn't relevant to a
11  publication on GMOs, Herbicides and Public Health; is
12  that correct?
13     A. That's not correct.
14     Q. Okay. Well, please explain.
15     A. I never testified against a pesticide company,
16  you know, claiming that the pesticide company is bad.
17  I was involved in litigation involving some aspect of
18  pesticide use or pesticide regulation or pesticide risk
19  that had specific circumstances that had plaintiffs and
20  that had defendants, and the cases involved the -- what
21  had actually happened and the steps and behaviors of
22  the pesticide registrants relative to their obligations
23  under the FIFRA statute and EPA regulations and -- and
24  what the companies knew about the products, and so
25  it -- I didn't testify against pesticide companies in

Page 360

1   general. I was asked as an expert because of my long
2   knowledge about the studies that pesticide companies
3   have to do and risk assessment methodologies and
4   acceptable levels of risk and standards of corporate
5   conduct and pesticide stewardship pledges, etcetera,
6   that I was asked to opine on specific actions and
7   inactions that different companies did, and that --
8   that is not the same thing as attacking or targeting
9   either an individual pesticide company just generically
10  because you don't like them or the industry as a whole.
11     Q. Sir, you testified for plaintiffs against a
12  defendant pesticide company, correct?
13     A. Several of the cases were plaintiffs that had
14  either used and applied pesticides or had been harmed
15  by a pesticide that somebody else applied, and one of
16  the cases involved a conflict between two pesticide
17  companies.
18     Q. Okay. So it is true that you testified for
19  plaintiffs against a defendant pesticide company,
20  correct?
21     A. In multiple cases, yes.
22     Q. And you did not disclose that in your New
23  England Journal of Medicine article titled GMOs,
24  Herbicides and Public Health because you thought it
25  wasn't relevant in any way to that topic, correct?

Page 361

1      A. It wasn't relevant. I had never done an
2   expert witness case on glyphosate, which is the focus
3   of the study. The other two pesticides or herbicides
4   that are talked about in that are Dicamba and 2,4-D. I
5   had never done an expert report or testified at trial
6   or been involved in a case with those. There was
7   nothing in my history and background involving
8   pesticide litigation that was relevant to the topic and
9   the content of that commentary.
10     Q. You testified as a plaintiff against a
11  defendant herbicide company with respect to a
12  herbicide, correct?
13     A. Yes.
14        MR. HOLLINGSWORTH: Let's mark an
15  exhibit here.
16        (Deposition Exhibit 33 was
17        marked for identification.)
18     Q. (BY MR. HOLLINGSWORTH) Sir, this is a series
19  of disclosure forms for the article GMOs, Herbicides
20  and Public Health that you authored in the New England
21  Journal of Medicine. Do you see that?
22     A. Right, this looks like screen shots off the
23  website.
24     Q. Correct. And it's three of them specifically,
25  three disclosure forms with the most recent one from

91 (Pages 358 to 361)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 362

1    March 30, 2016 coming first and the original one from
2    July 1, 2015 coming last.  Do you see that?
3        **A. Okay, one...**
4            MR. LITZENBURG:  Well, I have a question
5    you can answer or you can refuse, but this first page
6    has a two-line statement.  Did you all type that up or
7    did it come with this?
8            MR. HOLLINGSWORTH:  (Shaking head.)
9            MR. LITZENBURG:  He shook his head.  It
10   appears to have come with it.
11       **A. Okay.  So I assume we're going to talk about**
12   **these in order, so we'll start with the -- the July**
13   **one?  July 1, 2015?**
14   Q. (BY MR. HOLLINGSWORTH)  Yes, July 1, 2015.
15       **A. Okay.**
16   Q. And that one -- that one comes first, correct?
17       **A. Yeah.**
18   Q. Okay.  On the original conflict of interest
19   form you note that you have no relationships,
20   conditions, circumstances that present a potential
21   conflict of interest, correct?
22       **A. Correct.**
23   Q. The article went through peer review and was
24   published in August of 2015, correct?
25       **A. I don't remember the exact date, but I'll take**

Page 363

1    **your word for it.  It wasn't in peer review a terribly**
2    **long time.**
3    Q. Subsequent to the publication date, New
4    England Journal of Medicine took issue with your
5    conflicts of interest statement, correct?
6        **A. Not really.  People that contacted the journal**
7    **did, and the associate editor in e-mail said that she's**
8    **under a lot of pressure from people in the industry,**
9    **people in Monsanto that are complaining about**
10   **inadequate disclosure statements by Dr. Landrigan and**
11   **I, would we have any -- any problems with adding**
12   **additional statements that are truthful to the**
13   **disclosure statements, even though I told them at the**
14   **time I didn't think they were relevant, but I had no**
15   **objection to adding, you know, the further disclosures.**
16       **Being an independent scientist I didn't have**
17   **the legal department of Mount Sinai University to back**
18   **Dr. Landrigan when he said, "No, I'm not going to**
19   **change my statement."  So I was -- I saw no reason to**
20   **object to a request from the associate editor of the**
21   **New England Journal of Medicine to make an additional**
22   **truthful statement in my disclosure that I felt**
23   **initially and I still feel to this day wasn't relevant,**
24   **but I'm -- I have no objection to adding it if --**
25   **because the editor said it would -- it would satisfy**

Page 364

1    **any -- any legitimate concern that's been raised by any**
2    **of the people that had contacted her.**
3    Q. Is it your testimony that the New England
4    Journal of Medicine is not concerned with inadequate
5    conflicts of interest disclosures for their
6    publications?
7        **A. No, I didn't say that.**
8    Q. Okay.  But the New England Journal of Medicine
9    wasn't satisfied with your next conflict of interest
10   disclosure, correct?
11       **A. They were satisfied with it until some people**
12   **contacted them and started badgering them and raising**
13   **all kinds of concerns and Lord knows what other things**
14   **that were said, but I -- I have heard enough about some**
15   **of the things that editors are -- are told and, you**
16   **know, it's -- it's kind of an ugly dark side of science**
17   **the sorts of things that go on.**
18   Q. Your first conflict of interest statement --
19   well, there wasn't one, right?  You had no declared
20   conflicts of interest, correct?
21       **A. That met their criteria, yes.**
22   Q. The second conflict of interest statement that
23   came after the article was published noted:  Member of
24   the USDA advisory committee on biotechnology and 21st
25   century agriculture, principal of Benbrook Consulting

Page 365

1    Services which has worked on pesticide risk and soil
2    health for clients including Consumers Union, the Farm
3    Foundation, the Noble Foundation and the IPM Institute
4    of North America.  Expert witness in litigation
5    involving the labeling of genetically engineered foods.
6    Did I read that correctly?
7        **A. Correct.**
8    Q. Why did the New England Journal of Medicine
9    require you to include conflicts of interest statement
10   with respect to your employment and the interests that
11   sponsor your employment?
12       **A. Because they were receiving multiple**
13   **complaints from various people in Monsanto and**
14   **consulting firms that Monsanto worked for and trolls**
15   **that are encouraged or supported by Monsanto, and they**
16   **get tired of answering e-mails and say, well, what**
17   **else, you know, can -- you know, in a -- going**
18   **overboard to disclose anything, what -- what -- what**
19   **could you disclose?**
20       **And, for example, since GMOs were part of**
21   **the -- the focus of the -- the commentary, although not**
22   **on the labeling of GMOs, but I said, "Well, you know,**
23   **I've served as an expert witness in substantial**
24   **litigation, several cases, involving the labeling of**
25   **genetically engineered foods."  I'm glad to disclose**

92 (Pages 362 to 365)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL               May 23, 2018              CONFIDENTIAL

Page 366

1    that if that makes somebody happy. So I did.
2        Q. So in response to the New England Journal of
3    Medicine's request that you change your conflict of
4    interest statement, you then noted for the article on
5    GMOs, Herbicides and Public Health that you were, in
6    fact, sponsored by some groups that were associated
7    with the organic food industry as well as groups that
8    are anti GMO, correct?
9        A. Are you talking about the third one?
10       Q. I'm talking about the conflict of interest
11   statement.
12       A. So --
13       Q. The second one.
14       A. So I disclosed that I'm the principal of
15   Benbrook Consulting Services, which is true. I've
16   worked on pesticide risk and soil health for a number
17   of clients, and I listed a few of them. And I've acted
18   as an expert witness in litigation involving the
19   labeling of genetically engineered foods. These were
20   in my -- in my back and forth via e-mail. I'm not -- I
21   don't think I ever actually had a phone -- it was a
22   woman, I don't ever -- never had a phone conversation
23   with her. She asked me about what does Benbrook
24   Consulting Services do and what are some of the issues
25   that -- that I worked on, and I described them. She

Page 367

1    said, "Well, why don't you disclose that?" And I said,
2    "Fine." It's truthful statements, not relevant at all
3    to the content of the commentary, which just satisfies
4    her -- any concerns that she had, that the journal had,
5    I -- I -- I didn't feel there was any reason to object
6    to it, so I agreed to it.
7        Q. The New England Journal of Medicine thought it
8    was relevant that you include on your conflict of
9    interest statement that you had interest and sponsors
10   that relate to organic food groups as well as anti GMO
11   groups, correct?
12       A. On what basis are you making that statement?
13       Q. Are you claiming that the Consumers Union, the
14   Farm Foundation, the Noble Foundation and the IPM
15   Institute of North America as well as being an expert
16   witness in litigation involving the labeling of
17   genetically engineered foods, are you claiming that has
18   no relation to sponsors and activities for the organic
19   industry and anti GMO groups?
20       A. Essentially, yes. Farm Foundation is a
21   general farm organization that has a -- is -- would
22   clearly be regarded by anybody as industry friendly.
23       The Noble Foundation is run by the man that
24   used to be the North American director of Bayer
25   Agrosciences. They had an -- extensive programs on

Page 368

1    plant breeding and soil conservation, cropping systems,
2    and my involvement with the Noble Foundation was in
3    their big project that they did on soil health which
4    had not much to do with pesticides.
5        My work with the IPM Institute of North
6    America over several years was focused on developing a
7    more accurate data-driven method for characterizing the
8    relative risk of pesticides, very highly regarded work
9    in all communities. Even Monsanto supports this type
10   of more rigorous data-driven work.
11       And Consumers Union is the parent organization
12   that publishes Consumers Report. I've done consulting
13   work with Consumers Union for almost 30 years, multiple
14   different projects, many of them involving pesticides.
15   In a ten-year project with Consumers Union, I was the
16   lead author and analyst and there were three people
17   from Consumers Union that were involved and wrote a
18   book on pesticide -- pesticide use and risk and
19   regulation in the United States that came out in 1996
20   called Pest Management at the Crossroads.
21       But I -- you know, I simply do not agree that
22   these four major clients of mine represent the interest
23   of the organic industry. It's a -- that's a leap too
24   far for me.
25       Q. You failed to mention the fact that you were

Page 369

1    involved as an expert witness in litigation for
2    plaintiffs bringing anti GMO labeling claims against
3    various food companies that may use GMOs, correct?
4        A. In the -- in the initial disclosure I didn't
5    mention any of my expert witness work because none of
6    it was on glyphosate, Dicamba or 2,4-D or the increase
7    in herbicide use associated with herbicide-tolerant
8    crops, nor the fact that both Dr. Landrigan and I are
9    deeply concerned about the increased risk or
10   reproductive problems and birth defects from the huge
11   increase in herbicide use and exposures that we are
12   well aware are occurring. None of that had anything to
13   do with the work that I did for these organizations,
14   none of it had anything to do with the prior expert
15   witness work so I didn't disclose it because it wasn't
16   relevant.
17       Q. You stated in response to my question that you
18   simply do not agree "that these four major clients of
19   mine represent the interest of the organic industry,"
20   but you failed to mention that you testified for anti
21   GMO, specifically the Just Label It movement, in the
22   initial disclosure, correct?
23       A. I -- I've been involved with one or two Just
24   Label It activities. They paid my travel to a
25   Pennsylvania legislature committee hearing on GMOs,

93 (Pages 366 to 369)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 370

1    which was a -- kind of a educational
2    information-gathering hearing by the Committee on
3    Agriculture where I was invited, but I hadn't -- I
4    couldn't -- I wasn't able to go because I lived on the
5    West Coast unless I -- somebody paid my travel, and
6    Just Label It offered to pay my travel and so I
7    accepted that offer.
8        Q.  You didn't think it was relevant to disclose
9    that you were funded by an anti GMO group, specifically
10   Just Label It, in your article in the New England
11   Journal of Medicine titled GMOs, Herbicides and Public
12   Health, correct?
13       A.  I didn't then and I don't now and I also don't
14   even remember exactly the timing.  My trip to
15   Pennsylvania was right around this time.  It may not
16   have even happened when I did the original disclosure.
17   I can -- I can probably figure out from some -- my old
18   calendar when that committee hearing occurred.  If you
19   were going to pull out a document with the date, that
20   would be helpful.
21       Q.  Sir, you made claims about Monsanto's conflict
22   of interest and disclosure statements throughout your
23   report, correct?
24       A.  Yes, several.
25       Q.  At paragraph 136 you accuse Monsanto

Page 371

1    scientists of failing to disclose obvious serious
2    conflicts of interest in their interactions with
3    journal editors, correct?
4        A.  Yes.
5        Q.  In your initial interactions with the journal
6    editors at the New England Journal of Medicine before
7    publication, you did not mention the fact that you were
8    funded by anti GMO groups in an article that
9    specifically discussed GMOs, correct?
10       A.  I was not funded by anti GMO groups to write
11   the article in the New England Journal of Medicine.
12   That's not a correct statement.
13       Q.  I didn't say that you were funded by them --
14       A.  Yes, you did.
15       Q.  -- to write the article.  No, I did not.  I
16   said in your initial interactions with the journal
17   editors at New England Journal of Medicine, before it
18   was published you did not mention the fact that you
19   were funded for the Just Label It movement by anti GMO
20   groups in an article that specifically discussed GMOs,
21   correct?
22       A.  I heard you to ask whether I was funded by
23   anti GMO groups to write the New England Journal of
24   Medicine commentary with Dr. Landrigan, and the answer
25   to that question is no.  Now, if you're asking have I

Page 372

1    done work in -- over the years in Benbrook Consulting
2    Services for organizations that generally are skeptical
3    or even in direct opposition to GMOs?  Yes, I -- I
4    certainly have over the last 30 years, but that work
5    did not play any role in any way, shape or form in the
6    specific commentary and issues that Dr. Landrigan and I
7    addressed.
8        Q.  And while you may have not been funded
9    specifically to write the article, is it your testimony
10   that the GMO -- the anti GMO group, specifically Just
11   Label It, would not in some way benefit from your
12   article titled GMOs, Herbicides and Public Health that
13   made various attacks on herbicides and GMOs?
14       A.  Just Label It is a -- as you know, it's an
15   organization with a very narrow and specific focus on
16   the debate that had been going on for a number of years
17   and certainly was still very much in play in 2015 about
18   the need for mandatory federal labeling of food that's
19   been made from genetically engineered crops.  That's
20   what they talked about.  The commentary by
21   Dr. Landrigan and I doesn't say anything about
22   labeling.  It wasn't the focus of it in any way, shape
23   or form, and I -- you know, I just simply reject the
24   notion that because I did other work for other clients
25   that a Monsanto or a CropLife or a Syngenta would not

Page 373

1    feel supportive of their PR and political positions,
2    you know, has to -- that all of that has to be
3    disclosed.  I don't -- that is not how I read the
4    requirements and in my conversations with the associate
5    editor she said, "Well, I understand where you're
6    coming from.  I'm not -- I'm not saying that you
7    violated our disclosure requirements, but I have had
8    complaints and it would be helpful if you would agree
9    to make some further disclosures."  And I said, "All
10   right, I would be glad to do that as long as they are
11   truthful."
12       Q.  Is it also your testimony that your litigation
13   support here as an expert witness against Monsanto will
14   not in some way benefit the organic interests, anti GMO
15   interests that fund a great majority of your past and
16   perhaps present work?
17       A.  That remains to be seen.  This is a -- you
18   know, I don't know if it will, and certainly glyphosate
19   is not used by organic farmers.  It's not -- they're
20   not at risk of -- of any repercussions to their
21   operations, and so there's certainly no direct impact
22   on the organic farming industry if EPA were to change
23   its position.  So I -- I really think -- I don't feel
24   that there's any direct link or explanation for, you
25   know, why I am -- I agreed to take on this assignment

94 (Pages 370 to 373)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL               May 23, 2018                CONFIDENTIAL

Page 374

1  and try to answer the questions placed before me in
2  this litigation.
3      Q. Dr. Benbrook, can you point me to one study
4  you've authored where you determined GMO crops were as
5  safe as non-GMO crops?
6      A. I don't believe -- well, I mean, I'd have to
7  think a little bit about it. I don't believe I ever
8  wrote a comparative safety assessment of all GMO crops.
9  I've written several papers on the impact of GMO crops
10 on overall pesticide use measured by the pounds of
11 active ingredient applied, which is the standard way
12 the analysts in the industry and regulators -- it's one
13 of the standard ways that they keep track of whether
14 pesticide use is going up or down. They quantify the
15 total amount applied. I have published two
16 peer-reviewed papers on that topic and probably will
17 publish additional ones in the future, and so on that
18 particular issue, yes, I have conducted independent
19 research and published my findings in peer-reviewed
20 journals.
21     Q. Just like you haven't conducted any
22 comparative work showing that GMO crops were as safe as
23 non-GMO crops, you also haven't authored any studies
24 where you determined GMO crops were as nutritious as
25 non-GMO crops, correct?

Page 375

1      A. Specifically GMO crops, no, have not published
2  any papers comparing GMO crops to, say, organic crops,
3  I haven't done that.
4      Q. GMO crops can be engineered to improve human
5  nutrition. Golden rice is an example of that, right?
6      MR. LITZENBURG: Object to form.
7      A. Yes.
8      Q. (BY MR. HOLLINGSWORTH) Sir, you testified
9  previously that the National Academy of Sciences is a
10 prominent and prestigious organization. Do you recall
11 that?
12     A. Yes.
13     Q. You testified previously that when a report
14 from the National Academy of Sciences comes out it has
15 tremendous credibility and impact on the action -- on
16 congregational actions and deliberations, correct?
17     A. In some cases, yes, but in other cases, no.
18     Q. The National Academy of Sciences issued a
19 report on GMO crops, correct?
20     A. They've issued several.
21     Q. The National Academy of Sciences released a
22 public statement on their website about GMO crops, a
23 report stating: The study committee found no
24 substantiated evidence of a difference in risk to human
25 health between current commercially available

Page 376

1  genetically engineered crops and conventionally bred
2  crops, nor did it find conclusive cause and effect
3  evidence of environmental problems from GE crops. Do
4  you recall that?
5      A. Statements to that effect have appeared in at
6  least two or three of the NAS reports on the subject,
7  yes.
8      Q. Do you claim that your scientific publications
9  on genetically engineered crops have more credibility
10 than those from the National Academy of Sciences?
11     A. No. I haven't made that claim.
12     Q. Okay. Do you think they have less credibility
13 than publications from the National Academy of
14 Sciences?
15     A. That question makes no sense to me.
16     Q. Do you agree that genetically engineered crops
17 generally have had a favorable economic outcome for
18 farmers?
19     A. No, I don't agree with that. I think the
20 economic impact of GMO crops for farmers has really
21 dramatically changed over the -- the time periods from
22 1996 until today and the added costs associated with
23 genetically engineered seeds and the herbicides that go
24 along with it is a very serious concern and problem for
25 many crop farmers, particularly corn and soybean

Page 377

1  farmers, because the market prices for their
2  commodities have come down significantly.
3      So to the extent that in the first five years
4  or so of the planting of GE crops there was clearly
5  benefits to the technology, it was adopted very quickly
6  by farmers, but it never -- it never substantially
7  changed their profitability, and certainly for the last
8  ten years the share of the gross income from an acre of
9  soybeans or an acre of corn going for the purchase of
10 the GE seeds and herbicides has significantly gone up
11 and is a concern for farmers.
12     Q. Sir, let's pull out your report again. Please
13 turn to the table of contents section at 6D.
14     A. Which one? Which --
15     Q. Your report?
16     A. Oh, okay.
17     Q. Section 6D, table of contents?
18     A. Section 6D, table of contents, okay. 6D, all
19 right. Attacks on scientists or organizations
20 producing adverse data on glyphosate.
21     Q. That subsection is titled Monsanto Reliance on
22 Ghostwriting. Correct?
23     A. D. Oh, there's two Ds.
24     Q. Yes.
25     A. Huh, I made a mistake, what do you know? Yes,

95 (Pages 374 to 377)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL                May 23, 2018                CONFIDENTIAL

Page 378

1    there's a 6D, Monsanto Reliance on Ghostwriting, yes.
2        Q. Besides the two Ds in the table of contents,
3    do you have any other errors in your report that you
4    would like to point out right now?
5        A. At the end of the last deposition I noted that
6    there's a number of typos and small errors like this
7    that I would -- that I would like to correct, and that
8    remains the case.
9        Q. And the claim that Monsanto didn't conduct the
10   studies that Dr. Parry recommended, another error in
11   your report?
12           MR. LITZENBURG: Object to form.
13       A. No.
14       Q. (BY MR. HOLLINGSWORTH) No?
15       A. No.
16       Q. You claim to be an expert in ghostwriting,
17   correct?
18       A. Well, I guess I don't know exactly what the
19   qualifications would be for someone to characterize
20   themselves as an expert at ghostwriting, but as someone
21   who's published over 35 peer-reviewed papers in
22   journals in a dozen different fields, which is probably
23   as broad a record of scientific publishing as anyone,
24   and also as someone who has as part of my professional
25   responsibilities when I worked for the Congress, when I

Page 379

1    worked for the National Academy of Sciences, the
2    integrity of science and scientific ethics, the quality
3    of scientific communications has been a important and
4    recurrent theme throughout my career and, you know,
5    clearly ghostwriting and inaccurate attribution of
6    published papers is a -- is a matter taken very
7    seriously in the scientific community throughout my
8    career and will continue to be a very important thing.
9    So if that's what you or a reasonable person would
10   regard as the knowledge and experience of an expert in
11   ghostwriting, then yes, I would characterize myself as
12   such an expert.
13       Q. So you don't want to withdraw your testimony
14   from the last deposition that you're an expert in
15   ghostwriting, you stand by that?
16       A. I -- I stand by it.
17       Q. The first subsection, Subsection 6D.1, is
18   about Dr. John Acquavella, correct?
19       A. Correct.
20       Q. He's a former Monsanto employee and also
21   worked on the Intertek expert panel publications after
22   his employment with Monsanto, correct?
23       A. Yes.
24       Q. And you authored this report starting last
25   October, finished up sometime in December 2017,

Page 380

1    correct?
2        A. Yes.
3        Q. Okay. And during that time and since that
4    time, you know, roughly six months, you haven't
5    taken the time to review Dr. Acquavella's deposition
6    and see what he had to say about your claims with
7    respect to him and ghostwriting, correct?
8        A. I -- as I said, I -- I haven't reviewed
9    Dr. Acquavella's deposition.
10       Q. Do you wish you had reviewed Dr. Acquavella's
11   deposition to determine whether the claims you made
12   about Dr. Acquavella and ghostwriting were, in fact,
13   true?
14           MR. LITZENBURG: Object to form.
15       A. I -- I based my discussion of Acquavella's
16   complaints to his colleagues in Monsanto about
17   inaccurate attribution of the authorship of papers in
18   the volume that he was working on on his own words and
19   the e-mails that he exchanged and, you know, I -- I
20   probably would gain sort of -- you know, further
21   understanding of the context and -- but I -- I --
22   Acquavella is a pretty straight shooter kind of guy.
23   He sort of calls it like he sees it, and I have no
24   reason to believe that he was lying or misleading his
25   colleagues in all of the e-mails that I saw where he

Page 381

1    discussed either inappropriate authorship, incomplete
2    disclosure or -- or ghostwriting, all of which he found
3    ethically unacceptable.
4        Q. (BY MR. HOLLINGSWORTH) So you're not claiming
5    Dr. Acquavella himself is a ghostwriter, correct?
6        A. Well, I'm not going to express an opinion on
7    that. Dr. Acquavella was involved with a lot of these
8    Monsanto sponsored and certainly significantly Monsanto
9    ghostwritten papers and, you know, he certainly was not
10   as directly involved as some of the other people in
11   Monsanto, and he was one of the few that raised ethical
12   concerns about the behavior of the company in this
13   whole area of scientific publishing.
14       Q. The first sentence in that section on
15   Dr. Acquavella and ghostwriting notes that it is a
16   clear example of ghostwriting, but you're saying you
17   don't have an opinion here today as to whether
18   Dr. Acquavella is a ghostwriter; is that correct?
19           MR. LITZENBURG: Object to form.
20       A. What's the -- let's go to 135 and see what I
21   wrote. First I say in paragraph 707 that as I use the
22   term "ghostwriting" in this report, I refer to three
23   types of contributions to written documents by a person
24   not listed as the author or among the coauthors. One
25   is individuals that produce the first original draft of

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                      CONFIDENTIAL

Page 382

1    a document or sections of the document.
2         Individuals -- second, individuals that
3    contributed to revising a document or sections within
4    it in a way that -- that substantively adds or alters
5    to the -- to the content of the document. So I would
6    not include, for example, in this second example, an
7    editor that simply corrected grammar or spelling.
8         The third type of ghostwriting as I use the
9    term is providing information and text either in an
10   original or a revised or expanded document that is
11   listed as authored by other -- other individuals
12   without citing the contributions of the individual that
13   originally wrote or contributed to the comments.
14        So those are the three types of ghostwriting
15   that I addressed -- reviewed and addressed in this
16   section.
17        Q. So by your definition in your report, Dr. John
18   Acquavella cannot be a ghostwriter because he was an
19   author of the Acquavella 2016 epidemiology expert
20   review panel, correct?
21        MR. LITZENBURG: Object to form.
22        A. I talk about Acquavella's role and concerns
23   about the ethical behavior of Monsanto in publishing
24   papers starting in paragraph 717. A clear example
25   arose in the wake of the efforts of Monsanto to produce

Page 383

1    peer-reviewed papers and make presentations at
2    scientific meetings critical of the IARC working
3    group's classification. So this would be the Cantox
4    volume that Monsanto started to work on almost -- even
5    a few days before the IARC decision was reached. Bill
6    Heydens, of course, was heavily involved in organizing
7    the group of third party experts, and Dr. Heydens asked
8    Dr. Acquavella to lead one of the -- the study
9    committees, and in a November 3, 2015 e-mail, Heydens
10   circulated the Monsanto-designated panel makeup to
11   Acquavella and Larry Kier who was one of the other
12   Monsanto consultants at the time who was going to be
13   involved in that particular chapter in this special
14   issue of the Critical Reviews of Toxicology.
15        Acquavella replied, as I say in paragraph 720,
16   about an hour later that his name should be in the
17   author line, to which Heydens replies: I thought we
18   discussed previously that we would not be able to use
19   you or Larry as panelists/authors because of your prior
20   employment at Monsanto. And then, of course,
21   Acquavella responds to Heydens: I didn't realize that,
22   Bill. I don't think that's going to be okay with my
23   panelists. We call that ghostwriting and it is
24   unethical. And by the "we," he's referring to his
25   coauthors as I read that -- that statement.

Page 384

1         Q. (BY MR. HOLLINGSWORTH) So you're reading this
2    company e-mail by Dr. Acquavella and interpreting what
3    he means to say with certain text in this company
4    e-mail, correct?
5         A. Yeah, this and the other e-mails, it's laid
6    out here, you know, I -- I think pretty clearly and,
7    you know, if you want to pull out the original e-mails
8    we can talk some more about it.
9         Q. But you never reviewed Dr. Acquavella's
10   deposition when you made your claims about him and
11   Monsanto's ghostwriting, correct?
12        MR. LITZENBURG: Asked and answered as
13   with everything today.
14        A. Yep, yep, as I -- you know, I have no reason
15   to change my previous answer to that question.
16        Q. (BY MR. HOLLINGSWORTH) So your opinions on
17   ghostwriting with respect to Dr. Acquavella are based
18   entirely on company e-mails, correct?
19        A. And reviews of the -- the various drafts and
20   the papers and my reading of the actual final paper and
21   my understanding of where the parts of that paper came
22   from as well as the other chapters. For example, the
23   introductory chapter which Dr. Heydens wrote, drafted
24   the introductory chapter that appeared under the name
25   of other people and not his. So, yes, the -- the

Page 385

1    record in this case on the ghostwriting in the Critical
2    Issues of Toxicology special issue is voluminous and
3    very clear, and Dr. Acquavella was uncomfortable with
4    participating in it, and that's why in my report I
5    characterize it that he sort of calls them out on the
6    behavior and he says, "It's not acceptable to -- to my
7    coauthors to not have the accurate names of people that
8    wrote the material on it," including himself, since he
9    wrote -- he drafted the chapter, but Dr. Heydens said,
10   "Sorry, your name can't be on it because you are a
11   former employee of Monsanto." And he objected to that
12   because he didn't feel it was ethical.
13        Q. Are you aware that Dr. Acquavella denied that
14   there was any ghostwriting at his deposition with
15   respect to the expert panel papers you allege were
16   ghostwritten?
17        A. I -- as I said, I didn't read Dr. Acquavella's
18   deposition. I know from other parts of the record
19   which I reviewed, some of which I talk about in -- in
20   the expert report, that Acquavella maintained the
21   position that he -- the authorship of the chapter that
22   he was responsible for did not -- did not begin as a
23   draft paper in the computer of a -- of a employee of
24   Monsanto Company that was written by an employee of
25   Monsanto Company. He actually wrote it. So yes, he --

97 (Pages 382 to 385)

HIGHLY                    Charles Benbrook, Ph.D.              HIGHLY
CONFIDENTIAL                   May 23, 2018                CONFIDENTIAL

Page 386

1    I know that he continued to insist in the case of his
2    chapter, but he was -- you know, he I'm -- I'm quite
3    sure was fairly well aware that other chapters either
4    in whole or in part were, in fact, initially written by
5    a Monsanto employee whose name did not appear on the
6    papers as published, which is ghostwriting.
7        Q.  Do you withdraw, therefore, your allegation
8    that the epidemiology Intertek panel paper was
9    ghostwritten?
10       MR. LITZENBURG:  Object to form.
11       A.  At -- at this hour after a long day, if -- if
12   we're going to talk about -- in any further detail
13   about the extent and specific examples of ghostwriting
14   in any of the chapters, I've got to -- I need the time
15   to go back and, you know, refresh my memory about
16   the -- the documents.  But, you know, I -- I stand
17   behind everything that I wrote in my expert report,
18   documenting multiple examples of unambiguous
19   ghostwriting.  It's something that's pervasive in
20   Monsanto Company, has been going on for a long time and
21   which they -- they really don't -- they don't even put
22   any effort in -- in trying to hide.  I mean, they --
23   Heydens openly talks about it's cheaper for us to
24   ghostwrite this -- this thing than to pay outside
25   scientists to do.

Page 387

1        So, you know, the record is -- is very clear
2    and I'm -- I certainly don't feel that had I taken the
3    extra time to read Dr. Acquavella's deposition or the
4    other individuals that there's any way that anything
5    they could say would eliminate the importance or
6    veracity of what they said to each other in these
7    e-mails that I did review.
8        Q.  (BY MR. HOLLINGSWORTH)  Sir, you say the
9    record is clear with respect to ghostwriting, but
10   you'll admit the record with respect to your review is
11   incomplete because you didn't review Dr. Acquavella's
12   testimony denying the ghostwriting occurred?
13       MR. LITZENBURG:  Objection, asked and
14   answered.  I'll go ahead and instruct you not to answer
15   if you read Acquavella's report again.
16       A.  Yeah, I don't have anything more to say on --
17       Q.  (BY MR. HOLLINGSWORTH)  Well, that wasn't my
18   question, sir.  My question is you say the record is
19   clear with respect to ghostwriting, but you'll admit
20   with respect to your review, your review is incomplete
21   so it can't be clear, correct?
22       MR. LITZENBURG:  Object to form.
23       A.  In -- in the chapter of the -- in the paper in
24   the Critical Reviews of Toxicology special issue to
25   which Acquavella and Larry Kier were the -- the two

Page 388

1    primary authors of one of the chapters, there clearly
2    is material in those chapters that was derived from and
3    was influenced by, for example, Heydens' review of all
4    the papers, which he talks about in detail about how he
5    was -- he reserved the right to review the papers and,
6    you know, I'm -- I'm not -- I can't point line by line
7    to places in -- in Acquavella's chapter where Heydens
8    made substantive contributions, but, you know, clearly
9    Heydens was involved in all of the chapters and, you
10   know, the -- I do believe that there was a lesser
11   degree of ghostwriting in Acquavella's chapter than
12   some of the others.  I will agree with you on -- to
13   that extent.
14       Q.  (BY MR. HOLLINGSWORTH)  Well, let's look at
15   the article line by line.
16       MR. HOLLINGSWORTH:  Please mark an
17   exhibit.
18       (Deposition Exhibit 34 was
19       marked for identification.)
20       Q.  (BY MR. HOLLINGSWORTH)  So this is a paper by
21   Dr. Acquavella and the other epidemiology panelists
22   titled Glyphosate epidemiology expert panel review:  a
23   weight of evidence systematic review of the
24   relationship between glyphosate exposure and
25   non-Hodgkin's lymphoma or multiple myeloma.  Correct?

Page 389

1        A.  Correct.
2        Q.  What in this publication is false in any way?
3        A.  Well, the -- the paper was scoped out and the
4    initial draft was done by Acquavella and Dr. Kier
5    together as is clear from the -- the e-mail.  I don't
6    recall the -- the reasons why Kier's name doesn't
7    appear on this.  That would certainly be one thing that
8    I -- I would point to.  Kier was at this time no longer
9    a direct employee of Monsanto but was working as a-- as
10   a consultant.
11       I -- Kier had -- like Acquavella, he had
12   written on this topic in projects, internal Monsanto
13   projects and -- and scientific publications in the
14   past, and I don't remember the circumstances of why his
15   name was taken off, but that certainly -- one of the
16   things that likely would hit one of these areas that I
17   noted as falling under the -- the definition of -- that
18   I used in my expert report of ghostwriting, which is
19   not -- not thoroughly and accurately acknowledging the
20   people who contributed to the -- to the substance of
21   the paper as published.
22       Q.  Are you aware of Dr. Kier's expertise?
23       A.  Well, he did a lot of different things.  You
24   know, I -- I don't recall off the top of my head what
25   you would call his specialization or his focus.  I know

98 (Pages 386 to 389)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 390

1    he was on one or maybe two of the other papers.
2        Q. So your claim that the Acquavella 2016 review
3    article is ghostwritten is based on Dr. Kier's name not
4    being included as an author, correct?
5        A. Well, first of all, to go back to the -- the
6    reason that I included Acquavella calls Monsanto out
7    for unethical behavior, the -- the focus and the
8    substance of that episode was Heydens telling
9    Acquavella that his name could not appear on this
10   chapter that he had written. And Acquavella said back
11   to Heydens, "Well, I'm not okay with that, my panel is
12   not okay with that because that would be unethical."
13   And presumably because of Acquavella's objection,
14   Acquavella's name now appears on the paper as
15   published.
16       Q. Dr. Kier is a genotoxicity expert, and you're
17   claiming that he should be an author on the
18   epidemiology expert panel review?
19       A. I didn't make that claim. I didn't make that
20   statement. I said in the early discussion in e-mail
21   traffic Dr. Heydens asked Dr. Acquavella and Dr. Kier
22   to work on this chapter together. Dr. Kier also
23   drafted -- I think he was the -- probably the principal
24   author of the genotox chapter. I'm simply noting that
25   the written record shows that Dr. Kier was involved at

Page 391

1    the early stages of this in putting together this
2    chapter that ultimately came out with the one, two,
3    three, four -- five coauthors that appear in the paper
4    as published.
5        Q. The record will reflect that is your
6    understanding of the events. Which particular sections
7    or sentences of this publication do you allege are
8    ghostwritten?
9        A. I'm not -- I'm not prepared at -- to sit here
10   and go through that. I'd have to re-review not only
11   the documents that -- that I had access to, but
12   probably request even more of the documents of which
13   I'm sure there's many, many more in the record because
14   the -- there was substantial back and forth between
15   the -- Heydens and Cantox and Cantox and the authors,
16   and Acquavella was involved in multiple discussions
17   about the content of these papers, the response to the
18   reviewer comments, and I -- I am not -- I can't at this
19   time go through a line-by-line assessment of it and
20   say, well, a sentence that said essentially the same
21   thing appeared in some other Monsanto document, but I
22   can almost assure you that Acquavella has written
23   papers very much like this in the past and it's
24   entirely understandable that he would draw on his past
25   writing to -- to produce this.

Page 392

1    It's -- you know, there's no great surprise
2    and since his name does appear on it, as it was
3    published, then he -- this paper cannot be criticized
4    as an example of ghostwriting because Acquavella's
5    name -- it was excluded from the coauthor list, despite
6    the fact that that was what Heydens wanted to have
7    happen and had -- and initially planned to have happen.
8    But because Acquavella objected to it, I'm presuming
9    that that was the reason that his name does appear on
10   the paper now.
11       Q. If you were truly an expert in ghostwriting,
12   would you then be able to point me to sections in this
13   paper that you claim are ghostwritten that actually
14   exist?
15          MR. LITZENBURG: Objection, the expert
16   report speaks for itself, his prior testimony speaks
17   for itself. This entire 13-hour deposition has been
18   duplicative after being limited by the Johnson judge.
19   It's harassment at this point. Subject to that,
20   please.
21       Q. (BY MR. HOLLINGSWORTH) You can answer.
22       A. Let's talk about the introduction chapter,
23   introductory chapter.
24       Q. I'm going to --
25       A. The record is much clearer in that case.

Page 393

1        Q. So are you withdrawing your claim with respect
2    to the Acquavella 2016 paper then?
3        A. No, I'm not withdrawing it at this time.
4          MR. LITZENBURG: Let the record reflect
5    that a small portion of what Monsanto touts as the 2016
6    Intertek paper has been introduced as Exhibit 34.
7    There are at least five sections of this paper.
8    Presumably this is the most favorable to Monsanto's
9    claims.
10       Q. (BY MR. HOLLINGSWORTH) Dr. Benbrook, you
11   claim to be an expert in ghostwriting, but you cannot
12   point me to a single place in this article that you
13   allege is ghostwritten and you cannot point me to a
14   single place in this article where the underlying
15   science is fraudulently represented or misrepresented
16   in some way, correct?
17          MR. LITZENBURG: Objection, asked and
18   answered. You've presented him with an exhibit that is
19   about 20 percent of the ghostwritten article.
20       A. In the acknowledgement section that appears at
21   the end of the Acquavella chapter, it says: The
22   authors gratefully acknowledge the very useful comments
23   provided by seven reviewers who were selected by the
24   editor and anonymous to the authors. These comments
25   helped improve the manuscript. Okay. Declaration of

99 (Pages 390 to 393)

Page 394

1    interest --
2        Q. (BY MR. HOLLINGSWORTH) Is there nothing wrong
3    with the acknowledgment section?
4        A. No, I don't -- I'm not -- I don't believe that
5    there is. The -- in the declaration of interest,
6    the -- it truthfully states that the employment
7    affiliation -- current employment affiliation is shown
8    on the cover page, and I believe that that's accurate,
9    and they acknowledge: It should be recognized that
10   each of the individuals participated in the review
11   process and preparation of this paper as an independent
12   professional and not as a representative of their
13   employer.
14       It's noteworthy that it doesn't say
15   participated in the writing of this paper.
16       This expert panel evaluation was organized and
17   conducted by Intertek Scientific and Regulatory
18   Consultancy -- which is not in dispute. Monsanto hired
19   Intertek to manage the process of putting these papers
20   together, managing the review process. Funding for
21   this evaluation was provided by Monsanto Company --
22   which is a truthful statement -- which is a producer of
23   glyphosate and products containing this active
24   ingredient. The authors had sole responsibility for
25   the content of the paper, and the interpretations and

Page 395

1    opinions expressed in the paper are those of the
2    authors.
3        Q. Do you take issue with that sentence, Doctor?
4        A. Clearly Heydens' views and interpretation of
5    the data and Monsanto's interpretation of the data are
6    reflected in the paper and, you know, I think that
7    there's no -- I can't imagine there's any disagreement
8    about that. At issue is whether this -- this
9    declaration of interest is a -- is an accurate
10   reflection of the role and contribution that Monsanto
11   Company made in this.
12       So let me continue. JA, standing for
13   Acquavella, worked for the company, and it goes through
14   the individual authors and states who they worked for
15   and whether they had any employment affiliation at some
16   point with Monsanto.
17       Q. And that's something that you didn't think was
18   important in your own declaration of interest for the
19   New England Journal of Medicine, correct?
20       MR. LITZENBURG: Objection, harassment,
21   argumentative. I will object for the umpteenth time
22   that you've handed him a fifth of what is the Intertek
23   paper and he is reading from the declaration of
24   interest which is different from the one he is talking
25   about in his paper.

Page 396

1        And I will tell you, Dr. Benbrook, I will read
2    you the original declaration of interest in a moment
3    when the torch is passed if you would like to answer as
4    you like or refuse to answer repeated questions.
5        A. What was the question?
6        Q. (BY MR. HOLLINGSWORTH) The -- you're
7    certainly not saying that the paragraph from the
8    declaration of interest with respect to the authors'
9    employment past and present is in any way a sign of
10   ghostwriting, correct?
11       A. Correct.
12       Q. Okay. How about the last paragraph? This
13   article is part of a supplement sponsored and supported
14   by Intertek Scientific and Regulatory Consultancy.
15   Funding for the sponsor -- sponsorship of this
16   supplement was provided to Intertek by Monsanto Company
17   which is a primary producer of glyphosate products
18   containing this active ingredient.
19       That is entirely true and not ghostwritten,
20   correct?
21       A. Correct. And appropriate to disclose in the
22   context of this paper.
23       Q. So you have failed to present me with any
24   evidence that anything in this publication is
25   ghostwritten or that any of the science discussed in

Page 397

1    this publication is misrepresented in any way, correct?
2        MR. LITZENBURG: Object to form. Again,
3    the expert report addresses the paper in toto and
4    you've given him one section of the paper.
5        A. My assessment of ghostwriting by Monsanto
6    extends to dozens of instances. As I said, this one
7    chapter is likely to be the one among the five chapters
8    in the -- in the special issue of the Critical Reviews
9    of Toxicology that there's no overt discussion of the
10   ghostwriting parts of the chapter, and as -- and I know
11   that -- and agree with you that Acquavella insisted
12   that the -- the authorship of the paper reflected, in
13   his judgment, accurately upon the people that -- that
14   wrote it. And it -- I think it's only that because
15   Acquavella insisted on that that that's the case and
16   that's to his credit.
17       There are other chapters in this special issue
18   where the discussions of the parts and the ways in
19   which Monsanto contributed to and/or flat out
20   ghostwrote is -- is unambiguous in the record, and as I
21   said, the introductory chapter. I believe elsewhere in
22   my report I quote the specific e-mails where Heydens
23   talks about how -- you know, how he wrote the draft,
24   the first draft of the introductory chapter. No doubt
25   the chapter changed some as the scientists whose name

100 (Pages 394 to 397)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                    CONFIDENTIAL

Page 398

1    appears on it worked through the draft.
2         And the -- the other thing that -- the other
3    aspect of this whole special issue which is a violation
4    of scientific integrity and the publication process and
5    I -- I would suspect applies to some extent to
6    Acquavella's chapter as well as that Monsanto was
7    heavily involved in providing the panels, the coauthors
8    of the individual chapters, with the issues,
9    argumentation, points that needed to be made in
10   response to the peer reviewers that the journal sent
11   these different papers to.
12        There's multiple e-mails back and forth
13   between the Intertek staff that was working on this and
14   principally Heydens to get input from Monsanto on how
15   to respond to the reviewer comments back to the -- the
16   panels via Intertek. So there was very few instances
17   where coauthors of the chapters directly communicated
18   with Monsanto to get advice and assistance in
19   responding to reviewer comments. It was -- in the
20   majority of the instances that I saw in the record it
21   was done with Intertek as sort of the go-between, but
22   the fact that -- that Monsanto substantially
23   contributed to the response to reviewer comments in
24   most, if not all, of the chapters of this special issue
25   is very clear in the record.

Page 399

1         VIDEO OPERATOR: Five minutes on tape,
2    Counsel.
3         MR. LITZENBURG: Right. And eight
4    minutes left.
5         Q. (BY MR. HOLLINGSWORTH) Right, Dr. Benbrook,
6    I'm just trying to figure out how you can say that
7    Dr. Acquavella and the epidemiology panel paper is a
8    clear example, quote, of ghostwriting in your expert
9    report, but you can't tell me what part was
10   ghostwritten, you can't tell me what is inaccurate in
11   the sections you say are ghostwritten, correct?
12        A. Okay. Let's go back to paragraph 717 in my
13   expert report where I highlight how Acquavella called
14   out Monsanto for proposing that this chapter in the --
15   in the special issue of the Critical Reviews of
16   Toxicology be published without Acquavella's name on
17   it, which Acquavella objected to that, called Monsanto
18   out because that would be unethical and an example of
19   ghostwriting.
20        That is what I said would -- if that had been
21   the way the paper ultimately was published, it would
22   have been a clear example of ghostwriting, but as we
23   have said, as, you know, I -- I don't remember
24   exactly -- well, I go through the whole back and forth
25   between Acquavella and Heydens, and clearly

Page 400

1    Acquavella's unwillingness to accept that proposal or
2    that requirement by Heydens is what resulted in
3    Acquavella's name appearing on the paper which
4    eliminates one way in which -- one clear way in which
5    this chapter in this special issue would be
6    characterized by most reasonable people as -- as, you
7    know, certainly in part ghostwritten.
8         Q. Right. It wasn't the form in which the paper
9    was ultimately published, correct? Dr. Acquavella's
10   name appeared on the publication. Therefore, it cannot
11   be ghostwriting, correct?
12        MR. LITZENBURG: Object to form.
13        A. Dr. Acquavella's contribution to the paper is
14   acknowledged by virtue of his inclusion among the
15   coauthors. That doesn't mean that there aren't other
16   aspects of the paper that came from other scientists or
17   individuals in Monsanto that aren't attributed to them,
18   and certainly one of the areas, as I said, in several
19   of the chapters, and I don't remember the specifics of
20   all the back and forth on Acquavella's chapter in terms
21   of response to the review, but that -- that was an area
22   in several of these chapters where Monsanto clearly did
23   contribute to the final substantive content of the
24   papers without their role being acknowledged.
25        In addition, the editor of the journal

Page 401

1    includes a commentary as an introduction to the
2    chapter, and in that commentary he explains accurately
3    the process leading to a private, independent journal
4    publishing a special issue on this highly controversial
5    subject, a matter of, you know, about a year after the
6    IARC report came out, which clearly on its face is
7    Monsanto's rebuttal of the IARC working group, and that
8    was -- that's the point of this. There's -- nobody
9    is --
10        VIDEO OPERATOR: One minute on tape.
11        A. Nobody is -- there's no attempt to hide that,
12   but in the editor's discussion, he makes a -- clear and
13   specific representations about the lack of Monsanto's
14   role in picking the coauthors, which were not true,
15   Monsanto's role -- role in the -- in the substance of
16   the papers, which in several of the chapters was not
17   true, and no role of Monsanto in responding to any of
18   the reviews. There's at least those three direct
19   statements by the editor that are made that are not
20   factually true.
21        Q. (BY MR. HOLLINGSWORTH) Not made with respect
22   to this publication and you still haven't pointed out
23   anything ghostwritten, correct?
24        A. By "this publication" I'm talking about the
25   Critical Reviews of Toxicology special issue of which

101 (Pages 398 to 401)

Page 402

1    this was one of five chapters.
2    Q. You can't point out anything in this chapter,
3    correct?
4         MR. LITZENBURG: Objection, asked and
5    answered.
6         Don't answer it anymore. He's asked you 25,
7    30 times if you can point out --
8         VIDEO OPERATOR: Ten seconds.
9         MR. LITZENBURG: -- what of these five
10   chapters.
11   Q. (BY MR. HOLLINGSWORTH) Monsanto's name is all
12   over this declaration of interest, isn't it?
13   A. Yes.
14   Q. Okay. Just as with all the Intertek papers,
15   correct?
16        MR. LITZENBURG: Objection to form.
17   They're not in front of him. He's got our word on it
18   and the tape's up.
19   Q. (BY MR. HOLLINGSWORTH) Yes or no?
20   A. I think the tape's up.
21   Q. Yes or no?
22        MR. LITZENBURG: You can answer.
23   Q. (BY MR. HOLLINGSWORTH) Monsanto's name is all
24   over this declaration of interest, correct?
25        MR. LITZENBURG: The -- question

Page 403

1    was --
2    A. Correct.
3         MR. LITZENBURG: -- as with every paper,
4    right? Which -- which question are you asking him?
5    Q. (BY MR. HOLLINGSWORTH) Monsanto's name is all
6    over this declaration of interest and every declaration
7    of interest that you have a problem with, correct?
8         MR. LITZENBURG: No.
9    A. The declarations of interest are different
10   somewhat across the papers. The one I was just talking
11   about, it wasn't a Monsanto declaration of interest.
12   It was a statement by the editor of the journal.
13   Q. (BY MR. HOLLINGSWORTH) I'm talking about the
14   declarations of interest, sir. Monsanto's name is all
15   over these; isn't that true?
16   A. Correct. Yeah.
17   Q. Okay.
18        VIDEO OPERATOR: We're going off the
19   record. The time is 9:27.
20        (Discussion off the record.)
21   Q. (BY MR. HOLLINGSWORTH) Dr. Benbrook --
22   A. MR. LITZENBURG: Hang on a second. We
23   have previously had a --
24        VIDEO OPERATOR: We're not on the record
25   yet.

Page 404

1         MR. LITZENBURG: Let's go on.
2         VIDEO OPERATOR: We're going back on the
3    record. The time is 9:28.
4         MR. LITZENBURG: We had an agreement on
5    counsel for defendant to go until 9:30 at night tonight
6    and for me to have 45 minutes and the defendant to have
7    15 minutes of redirect. The defendant, as I understand
8    it, is now waiving his right to those 15 minutes of
9    redirect and is going to use them instead prior to my
10   questioning.
11        MR. HOLLINGSWORTH: We have an agreement
12   that we're going to continue this deposition. We are
13   reserving our right to do so anyway, so it's not that I
14   have, you know, no redirect. It's that I, you know, am
15   done for today and we will come back and redepose
16   Dr. Benbrook as necessary and as we have the right to.
17        MR. LITZENBURG: Well, my response is
18   that what has occurred on the record is we would have
19   quit at 5:00 if we thought we were going to come back
20   and continue this deposition.
21        MR. HOLLINGSWORTH: Agree to --
22        MR. LITZENBURG: But we'll fight about
23   it offline.
24        MR. HOLLINGSWORTH: We agree to
25   disagree. You can quit right now if you would like,

Page 405

1    but I'm going to continue.
2    Q. (BY MR. HOLLINGSWORTH) Dr. Benbrook, you are
3    aware that regulatory agencies, EPA, EFSA, they do not
4    consider review articles of -- of any importance when
5    they have the primary studies to review, correct?
6    A. I think that's generally a correct statement.
7    Q. Okay. The regulator is going to take an
8    independent review of those primary studies rather than
9    rely on a review paper, correct?
10   A. Well, it's funny that you would ask that
11   question because in the case of the BFR review of
12   glyphosate genotoxicity studies done and submitted to
13   the agency or published in the peer-reviewed literature
14   before 2000, the year 2000, it's been shown very
15   clearly that the BFRA review of that body of literature
16   was in effect ghostwritten by Dr. Kier who had written
17   a report for the glyphosate task force reviewing the
18   pre-2000 genotoxicity data, and a word-for-word
19   comparison of the glyphosate task force review of these
20   early genotoxicity studies written by Dr. Kier appears
21   verbatim in the BFRA review of that information.
22        In addition, it -- it is -- it's been shown
23   that the -- much of the text of Dr. Kier's task force
24   report is essentially verbatim -- repeats essentially
25   verbatim the conclusions in a Williams, et al., 2000

102 (Pages 402 to 405)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                    CONFIDENTIAL

Page 406

1  review article that was also predominantly written by
2  Monsanto or Monsanto consultants.  And so in the case
3  of the BFRA's review of so -- so-called independent
4  review of all of the genotoxicity studies done prior to
5  2000, the BRF [verbatim] report is ghostwritten by Kier
6  which was in his -- drew on Williams, and Williams drew
7  on Monsanto.  So, in effect, Monsanto wrote the
8  majority of that section of the BFR report and
9  obviously without any attribution.
10      Now, I am aware of this careful analysis of
11  plagiarism in the case of this section of the report.
12  I would imagine you probably are aware of the
13  documentation of it too.  I don't know the extent to
14  which similar cut and pasting or unattributed borrowing
15  of other review articles was done in other parts of the
16  BFRA report, but clearly in -- in that particular
17  example, it is not accurate to say that BFRA undertook
18  their own independent assessment of those studies and
19  wrote their findings.  They borrowed the analysis done
20  by other people.
21      Q.  Are you finished?
22      A.  Huh?
23      Q.  You finished?
24      A.  Yes, I am.
25      Q.  The genotoxicity studies that BFR is

Page 407

1  reviewing, those -- many of those studies are industry
2  studies, they are not publicly available studies,
3  correct?
4      A.  I would say a majority of them would be
5  industry studies that are not publicly available,
6  correct.
7      Q.  And some of them would have been industry
8  studies that are only available to the regulator to
9  whom they have been submitted, in this case lots of
10  them to the EPA, correct?
11      A.  Correct.
12      Q.  So any reliance by BFR on a review paper in
13  this instance would be in line with standard regulatory
14  protocol to rely on review papers when the primary
15  studies are not available and only when the primary
16  studies are not available, correct?
17      A.  Certainly if they gave attribution to where --
18  who did the review, and -- and wrote it, yeah, that
19  would not be inappropriate.
20      Q.  And the careful review for plagiarism that you
21  discuss, that is not a review that was done in any
22  peer-reviewed journal, correct?
23      A.  I don't know if it was published in a
24  peer-reviewed journal, I've just seen the report of it.
25      Q.  Right.  You've seen the report of a blogger

Page 408

1  who claims that he has expertise with respect to
2  plagiarism and he is the sole author of that report,
3  correct?
4      A.  Yes, I believe he's the sole author.  There's
5  one -- one individual listed.
6      Q.  Okay.  And you have -- you don't know that
7  person, correct?
8      A.  No.
9      Q.  You've never talked to that person, correct?
10      A.  No.
11      Q.  But you're ready to believe everything he
12  states and -- and all the plagiarism claims he makes
13  even though you're not aware of anybody else signing
14  onto that, nor have you discussed it with him or anyone
15  else?
16      A.  Well, I actually pulled -- pulled out the
17  Williams, et al, 2000 paper and found the passage that
18  essentially appears in the BFRA that appeared in the
19  Kier documents.  I -- it's pretty easy to find it.
20      Q.  You also claimed that the Greim publication
21  was ghostwritten, correct?
22      A.  Which chapter is it?
23      Q.  Greim is a review article on the 14 animal
24  carcinogenicity studies from glyphosate manufacturers,
25  correct?

Page 409

1      A.  Would you give me a copy of it if we're going
2  to talk about it?
3      Q.  Sure.
4      A.  Some of these individuals authored more than
5  one review article.
6          (Deposition Exhibit 35 was
7          marked for identification.)
8      Q.  (BY MR. HOLLINGSWORTH)  You're familiar with
9  this publication, correct?
10      A.  Right.  This is another -- I guess you could
11  call it paper in this special issue of the Critical
12  Reviews of -- in Toxicology.
13      Q.  You claim this paper was ghostwritten by
14  Dr. Saltmiras, correct?
15      A.  Well, I -- I don't know.  I'd have to look at
16  what I said in my expert report about it.  Do you have
17  the -- have you -- let's see.  Here's the Gary Williams
18  2000.  Okay.  My discussion of the Critical Reviews of
19  Toxicology special issue begins on page 147, paragraph
20  774, and I identify it as one of the most egregious
21  examples of ghostwriting in the record.  Special issue
22  was conceived and commissioned by Monsanto and -- after
23  the company learned of the IARC reclassification.  I
24  don't think any of that's in dispute.
25          There are -- as I said in paragraph 776, there

103 (Pages 406 to 409)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL               May 23, 2018                CONFIDENTIAL

Page 410

1    are dozens of e-mails and documents memorializing the
2    role Monsanto played in the conceptualization, writing,
3    publication of the papers and also the identification
4    of which authors would be selected for which panels.
5    The Canadian firm Intertek was sort of the intermediary
6    and played an -- an organizational role in carrying it
7    out.
8         Q.  Are you talking about the Greim publication?
9         A.  I'm -- I am refreshing my memory about what I
10   wrote seven, eight months ago about the special issue,
11   and I'm hoping that there's some specific paragraphs
12   about the Greim paper, although we'll just have to see.
13   Give me a minute to look at it.
14            MR. LITZENBURG:  What has Greim just
15   been marked?  35?
16            THE WITNESS:  It's the carcinogenicity
17   chapter.
18        Q.  (BY MR. HOLLINGSWORTH)  Sir, do you want to
19   withdraw your claims about Greim, considering you don't
20   recall them and you can't navigate through your own
21   report to find them?
22            MR. LITZENBURG:  Objection to form.
23   Depositions are not for requesting people to withdraw
24   things.
25        A.  I -- I have no reason to withdraw anything

Page 411

1    I've put in the expert report.
2         Q.  (BY MR. HOLLINGSWORTH)  Go -- go to paragraph
3    798, sir.  That's where you made the claim.
4         A.  798.  Okay.  As part of his 2015 performance
5    evaluation Saltmiras summarized his glyphosate-related
6    activities which included ghostwrote cancer chapter --
7    cancer review paper Greim, et al., 2015.  Coordinated
8    care 2015 --
9         Q.  We're talking about Greim, sir.
10        A.  Okay.
11        Q.  You claim that Dr. Saltmiras ghostwrote the
12   Greim publication, correct?
13        A.  That's what he says in -- that's what he says
14   in this e-mail.
15        Q.  But by your definition and the first thing an
16   expert in ghostwriting checks is who is an author on
17   the paper, correct?
18        A.  Correct.
19        Q.  And Dr. Saltmiras is an author on the paper,
20   correct?
21        A.  His name does appear as the paper was
22   published.
23        Q.  So Dr. Saltmiras can't by your own definition
24   have been a ghostwriter on the Greim publication,
25   correct?

Page 412

1         A.  Because his name was added, but he obviously
2    thought that he did.  I don't -- I don't -- I can't
3    explain why he made this claim in his performance
4    evaluation when, in fact, he appears on -- you know, on
5    the list of authors.  You know, it's a -- I don't -- I
6    don't know what he was referring to, but by his own
7    words, he said that he ghostwrote the cancer review
8    paper.
9         Q.  Right.  You based your opinion as to
10   ghostwriting on company e-mails and company documents?
11        A.  Right.
12        Q.  Rather than looking at the first place you
13   should have looked, which is the authorship --
14        A.  Right.
15        Q.  -- of the paper as published, correct?
16        A.  And --
17            MR. LITZENBURG:  Asked and answered,
18   argumentative.
19        A.  Now that I've thought for a minute about it,
20   what Saltmiras is complaining about is that he wrote
21   the -- the paper, he wrote the whole paper, and he --
22   he is, I think, saying, "I really deserve the credit
23   for this paper despite the fact that there were three
24   other coauthors."  Because he wrote the paper.  Now,
25   whether these other coauthors contributed substantially

Page 413

1    enough to legitimately be listed as coauthors, I -- I'm
2    not -- not prepared to address at this late hour
3    without going back and looking at what's in the record
4    about who did what, but I'm -- I'm -- I believe that
5    that's the explanation for why Saltmiras reported to
6    his supervisor that he -- he deserves credit for
7    ghostwriting this paper because he wrote it.  So
8    instead of it just being David Saltmiras, it's these
9    three other people added.  That -- that's the
10   explanation.
11        Q.  (BY MR. HOLLINGSWORTH)  You're speculating in
12   that explanation and Dr. Saltmiras is included as an
13   author in this publication and, therefore, could not
14   have ghostwritten it, correct?
15        A.  He --
16            MR. LITZENBURG:  Object, asked and
17   answered.
18        A.  I think the -- what Saltmiras was reporting to
19   his supervisor was that he deserves credit for being
20   the principal author, the major author, perhaps the
21   sole author, I don't really know, of this particular
22   paper, and he himself characterized his role as
23   ghostwriting it and I took him at his word.
24        Q.  (BY MR. HOLLINGSWORTH)  Dr. Benbrook, even in
25   the company e-mails and company documents on which you

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL               May 23, 2018               CONFIDENTIAL

Page 414

1  rely, it doesn't anywhere state that Dr. Saltmiras was
2  the sole author of the paper, correct?  You are
3  speculating?
4      **A.  Right, right, he never -- he never says that**
5  **and, you know, certainly Greim has, you know, been**
6  **involved with writing similar reviews in the past, but**
7  **what Saltmiras says is that he ghostwrote the cancer**
8  **review paper, and I interpreted that to mean that he**
9  **felt that he was the person that actually wrote the**
10 **paper despite the fact that other people's names appear**
11 **on it.  That -- that's what I take from his -- his**
12 **statement.**
13     Q.  And by relying on your interpretation of
14 company documents and company e-mails, you failed to
15 look at the final publication that included
16 Dr. Saltmiras as an author when making your claim that
17 he ghostwrote the publication, correct?
18         MR. LITZENBURG:  Objection, asked and
19 answered.
20         You don't have to keep answering the same
21 question.
22     **A.  No, I don't agree with that.**
23     Q.  (BY MR. HOLLINGSWORTH)  Why not?
24         MR. LITZENBURG:  Could you tell us what
25 time it is, like time-time?  Like what time it is right

Page 415

1  now?
2          VIDEO OPERATOR:  Yeah, it's 9:45.
3          MR. LITZENBURG:  Okay.  Defense
4  counsel's questioning is done.
5          MR. HOLLINGSWORTH:  Let me just have one
6  more question here, Dr. Benbrook.
7      Q.  (BY MR. HOLLINGSWORTH)  Monsanto's name, like
8  the other publications you allege are ghostwritten,
9  appears all over this declaration of interest and these
10 acknowledgements, correct?
11     **A.  I'm -- if I recall, it's -- it's similar to**
12 **the one that we reviewed in the case of Acquavella's**
13 **chapter, but there's some -- some differences.**
14 **Acknowledging this is somewhat different, acknowledging**
15 **the role of some Monsanto colleagues, employment**
16 **affiliation, blah, blah, blah, recognizing that**
17 **Saltmiras and Christian Strupp were employed by a**
18 **member of the glyphosate task force which is -- is**
19 **true.**
20     Q.  Like the prior publication, you can't point to
21 a single place in this publication, the Greim
22 publication, that is ghostwritten or in which the
23 underlying science is misrepresented, correct?
24         MR. LITZENBURG:  Either don't answer
25 that or answer it very succinctly.  He's gone past his

Page 416

1  time and it's my turn.
2      **A.  No, I -- I believe that a thorough review of**
3  **the record will show that there were several instances**
4  **in which contributions from Monsanto, work writing --**
5  **assistance in response to reviewer comments not**
6  **attributed to Monsanto were reflected in this, and**
7  **certainly Heydens' characterization in his opening**
8  **commentary, editorial comment about how all the papers**
9  **were put together was not an accurate reflection of the**
10 **record.**
11     Q.  Maybe you'll conduct that thorough examination
12 before trial?
13         MR. LITZENBURG:  Move to strike.  Give
14 us a two-minute break so that I can -- well, we have to
15 switch around.  Give me a two-minute break to go to the
16 bathroom, and I'm going to take 45 minutes of
17 questioning.
18         VIDEO OPERATOR:  We're going off the
19 record.  The time is 9:46.
20         (Recess taken.)
21         (Deposition Exhibit 36 was
22         marked for identification.)
23         VIDEO OPERATOR:  We're going back on the
24 record.  The time is 9:51.
25

Page 417

1          EXAMINATION
2  BY MR. LITZENBURG:
3      Q.  Good evening, Dr. Benbrook.  I'm going to ask
4  you some questions in reverse order, and I apologize if
5  it seems scattered, and if I speak too fast I'm sure
6  you or the reporter will ask me to slow down.  I, of
7  course, represent DeWayne Johnson and Jeff Hall and
8  Ronald Peterson and you're my expert in those cases,
9  correct?
10     **A.  Correct.**
11     Q.  Okay.  Mr. Hollingsworth stopped you a moment
12 ago from reading a sentence from your own report where
13 Saltmiras was discussing writing the Kier and Kirkland
14 paper as well; is that correct?
15         MR. HOLLINGSWORTH:  Object to the
16 characterization.
17     **A.  I was getting to that, yes.**
18     Q.  (BY MR. LITZENBURG)  Can we mark your -- we
19 have marked as Number 36 -- where did it just go?
20     **A.  The -- 36, the last one?**
21     Q.  Just a second ago.
22     **A.  35.  36.**
23     Q.  Yeah, okay.  So this is -- let's make 37 --
24 give it to her, 37, which is --
25     **A.  She needs the -- she needs the first page,**

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 418

1    right --
2        Q. Your report.
3        A. -- to put the sticker on?
4            MR. HOLLINGSWORTH: Let's work it out
5    afterward.
6        Q. (BY MR. LITZENBURG) Yeah, that's okay. Just
7    turn to the page that you need. Let her -- okay.
8    That's -- let's make that 37. That's your expert
9    report.
10           MR. HOLLINGSWORTH: We're going to
11   maintain there are portions of that expert report that
12   were previously marked as confidential and will remain
13   confidential going forward.
14           (Deposition Exhibit 37 was
15           marked for identification.)
16       Q. (BY MR. LITZENBURG) Okay. I've now marked as
17   Exhibit 37 your expert report. If you could quickly,
18   and if you can't quickly we'll ask other questions
19   while you do it, turn to the section that you were just
20   interrupted from reading about David Saltmiras and
21   ghostwriting.
22       A. Okay.
23       Q. Maybe it will help you along. Okay. If you
24   look at page -- well, how about look at paragraph 769,
25   if you would.

Page 419

1        A. Okay, 769. Okay, this is about the
2    Kier/Kirkland.
3        Q. And in this paragraph you are not opining but
4    rather quoting from Monsanto internal documents or
5    rather a Monsanto manuscript clearance form for what
6    was ultimately that paper; is that correct?
7        A. Yes, sir.
8        Q. And at that time, the -- the authors were
9    listed as David Saltmiras, Larry Kier; is that correct?
10       A. Yes.
11       Q. Okay. And when they were published did David
12   Saltmiras appear as an author?
13       A. Which -- what is the final paper?
14       Q. Let me -- this is Kier/Kirkland 2013. Let me
15   ask you this.
16       A. Oh, okay.
17       Q. If in Kier/Kirkland 2013, which this
18   manuscript ultimately became --
19           MR. HOLLINGSWORTH: Is that an exhibit
20   you marked, Kier and Kirkland 2013?
21           THE WITNESS: Yeah, I'm with him now.
22   It's the -- the --
23           MR. HOLLINGSWORTH: I got it. Sorry.
24       Q. (BY MR. LITZENBURG) If Dr. Saltmiras's name
25   did not appear on the ultimate paper as published, is

Page 420

1    that an example of ghostwriting?
2        A. Yes.
3        Q. Okay. And he I think stopped you from reading
4    a prior section where -- about Greim and then Kier and
5    Kirkland, David Saltmiras was essentially arguing for
6    his annual bonus, right?
7        A. Well --
8            MR. HOLLINGSWORTH: Object to the
9    characterization.
10       A. -- I think he was -- he was presenting
11   information to his management about the important
12   contributions he had made to the goals of the company.
13       Q. (BY MR. LITZENBURG) Okay. I'm going to hand
14   you Exhibit Number 36, which is entitled A Review of
15   the Carcinogenic Potential of Glyphosate By Four
16   Independent Expert Panels in Comparison to the IARC
17   Assessment, and I'm going to direct your attention to
18   as printed page 15 there.
19       A. Okay.
20       Q. And I have bracketed the section that I would
21   like to read aloud if you don't mind.
22       A. Okay. So this is the Williams, et al., the
23   2016 -- it's downloaded in 2016. There's -- there's
24   two Williams and they're different people, so got to
25   keep your Williams folks straight.

Page 421

1        Q. Sure. And just remember she'll scan all this
2    in so there will be no confusion about --
3        A. Okay.
4        Q. -- what paper or what --
5        A. Okay.
6        Q. -- page, but if you'll turn to the last page
7    and the bracketed section.
8        A. All right.
9        Q. Would you read that aloud, please.
10       A. The expert panel members' recruitment and
11   evaluation of the data was organized and conducted by
12   Intertek Scientific and Regulatory Consultancy. The
13   expert panelists were engaged by and acted as
14   consultants to Intertek and were not directly contacted
15   by the Monsanto Company. Funding for this evaluation
16   was provided by Intertek -- was provided to Intertek by
17   the Monsanto Company which is the primary producer of
18   glyphosate and products containing this active
19   ingredient. Neither Monsanto company employees nor any
20   attorneys reviewed any of the expert panel's
21   manuscripts prior to the submission to the journal.
22       Q. Dr. Benbrook, is that the declaration of
23   interest you were referring to in the Intertek papers
24   that is false?
25       A. That's -- this is one of the -- it's one of

106 (Pages 418 to 421)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                   CONFIDENTIAL

Page 422

1   the places in the declaration statements of the five
2   chapters in addition to the statement by the editor
3   which appears in the beginning of the journal where it
4   is stated that Monsanto had no role in reviewing the
5   papers, no role in responding to reviewer comments, no
6   role in picking the coauthors, all of which were not
7   true.
8        Q.  And without waiving our agreement otherwise to
9   not seek correspondence among attorneys and their
10  experts, I will represent that you actually sent that
11  paper to me and that's where I have printed it out
12  from.  Does that refresh your recollection that you
13  actually found that paper on your own?
14       A.  Yeah, I have this -- yeah, this was a paper
15  that was one of the ones that I had.
16       Q.  Okay.  And when David Saltmiras discusses
17  ghostwriting in -- in source documents, that is his
18  word, not your word or your opinion; is that correct?
19       A.  Correct.
20       Q.  Okay.  Let's see.  Same thing with Bill
21  Heydens, when you refer to Dr. Heydens talking about
22  ghostwriting, is that your characterization of what he
23  did or his wording within the company?
24       A.  His wording in multiple cases.
25       Q.  Okay.  And, again, the declaration of interest

Page 423

1   you've just read aloud is substantially different from
2   the one that was looked at over and over again in this
3   one of five papers, correct?
4        A.  The --
5            MR. HOLLINGSWORTH:  Object to the
6   characterization.
7            COURT REPORTER:  What was your answer?
8   I'm sorry.
9        A.  It's different from the one in the Acquavella
10  paper.
11       Q.  (BY MR. LITZENBURG)  Would you -- let's see.
12  We're going to go through some exhibits probably in
13  reverse order and hopefully it won't be too tricky, but
14  let's begin with 32 which has this odd blacked-out
15  appearance to it in e-mails.  Can you find that?
16       A.  Boy, you know, see, this is -- 30, 31.
17       Q.  I'll tell you what.  As you look for it, I'm
18  going to read you some sections.
19       A.  Oh, I've got it right here.
20       Q.  Okay.  Right before the section that says
21  results it says:  There was considerable discussion of
22  the capacity of surfactants to cause inflammatory
23  responses, and consequent oxidative stress.  Do you see
24  that?
25       A.  Yes.

Page 424

1        Q.  Okay.  And is that supportive of what you've
2   told us all along that the formulated product is more
3   carcinogenic than the active ingredient?
4        A.  Well --
5            MR. HOLLINGSWORTH:  Object to the
6   characterization.
7        A.  I've -- I've stated all along that there was a
8   substantially growing number of studies in the record
9   starting about 1999 showing that formulated glyphosate
10  products were more genotoxic than the pure active
11  ingredient and that the primary reason for this was
12  widely recognized in -- among the regulatory community
13  and inside Monsanto as from the surfactant in the --
14  the broad class of polyethoxylated amines or POEA.
15  These are -- as the counsel for the defendant stated,
16  they're, you know, basically soaplike products that
17  work by helping the glyphosate active ingredient
18  penetrate the surface of -- weed leaf surfaces to get
19  inside the weed because the glyphosate has to get
20  inside the weed to kill it because if it stays on the
21  surface, it will wash off in a rainfall and the product
22  won't be effective.
23       So this is the reason that essentially all
24  glyphosate-based herbicides and all Roundup Monsanto
25  brand herbicides have a surfactant that served this

Page 425

1   role, but it is also widely known that surfactants of
2   this type also facilitate the movement of glyphosate
3   through cell walls once inside the plant, and this
4   is a -- a important factor in altering the toxicity of
5   glyphosate in mammalian systems.
6       So when different scientists have conducted
7   research and reported results that formulated
8   glyphosate products are more toxic than glyphosate,
9   there's always at least two reasons cited.  One is that
10  the -- the surfactant itself ounce for ounce or gram
11  for gram is more toxic than glyphosate, but secondly,
12  the presence of the surfactant in conjunction with
13  glyphosate alters the degree to which the glyphosate
14  gets inside cells and that increases its toxicity.
15       So all of that was known, so this -- this
16  conclusion that Monsanto tested the surfactants by
17  themselves and they caused an inflammatory response and
18  oxidative stress is perfectly consistent with the
19  general concern about the formulated products.
20       Q.  (BY MR. LITZENBURG)  Thank you for that and I
21  appreciate the opportunity for you being able to fully
22  answer a question on that topic.  I was -- I think I
23  said something asinine like this last deposition as
24  well, but we have 27 minutes before the court reporter
25  walks out and I'm going to try to get through this

107 (Pages 422 to 425)

HIGHLY                 Charles Benbrook, Ph.D.              HIGHLY
CONFIDENTIAL                May 23, 2018                CONFIDENTIAL

---

Page 426

1  stack, so let's try --
2  **A. Let's do it.**
3  Q. We'll try to go quicker. The -- so when it
4  talks about genotoxic results in some studies with
5  surfactants even as ████████t has met with
6  Dr. Parry to try to -- well, let me withdraw that.
7  Does this e-mail to you suggest that ████
8  ████ met with Dr. Parry to try to convince him and
9  bring him around to Monsanto's position?
10  MR. HOLLINGSWORTH: Objection, form.
11  **A. Well, you know, I -- yes, I think Monsanto's**
12  **hope and expectation was that Dr. Parry would take a**
13  **glyphosate or Roundup-friendly view of the genotoxicity**
14  **database. That's the word that they use in describing**
15  **why they initiated the consultancy with Dr. Parry, and**
16  **I think it's fairly clear in the record that it's also**
17  **why they -- they ended the relationship, because they**
18  **weren't confident that Dr. Parry was going to be that**
19  **glyphosate or Roundup-friendly expert.**
20  Q. (BY MR. LITZENBURG) And when it says
21  genotoxic results with -- in studies with surfactants
22  arose due to oxidative damage, that's consistent with
23  the IARC conclusion and consistent with papers finding
24  associations between formulations and non-Hodgkin's
25  lymphoma; is that correct?

---

Page 427

1  **A. Correct.**
2  Q. Okay. And the very last sentence appears to
3  suggest that a future action might be to send some
4  money to Professor Parry to help sponsor some unrelated
5  things; is that correct? Or not unrelated -- let me
6  withdraw that question.
7  The final action item is: Consider supporting
8  studentship to help Professor Parry in research program
9  on the biological significance of oxidative damage.
10  Does that mean to send money to his institution?
11  MR. LITZENBURG: Object to form.
12  **A. Right, and they were -- as it says, via the UK**
13  **BBRSC, that's a -- some other research entity or**
14  **organization that Monsanto would first give the money**
15  **to them, and then this organization would contract with**
16  **Dr. Parry's lab, and Monsanto often routes money to**
17  **academics through third parties so that the academic**
18  **doesn't have to ever disclose that they -- their work**
19  **was supported by Monsanto.**
20  MR. LITZENBURG: Court reporter, mark
21  this as the next exhibit, please.
22  (Deposition Exhibit 38 was
23  marked for identification.)
24  MR. HOLLINGSWORTH: Do you have another
25  copy?

---

Page 428

1  MR. LITZENBURG: I don't. Do you want
2  to look at it? I'm only going to ask him about items
3  circled, if you want.
4  Q. (BY MR. LITZENBURG) While he looks at that,
5  do you remember a number of -- well, in your direct
6  examination of 13 hours and some today, you were given
7  a number of assessments from a number of foreign
8  countries on glyphosate, correct?
9  **A. Correct.**
10  MR. HOLLINGSWORTH: Object to the
11  representation as to the length of the examination.
12  Q. (BY MR. LITZENBURG) Multiple of those were
13  from Canada. Do you recall that?
14  **A. Yes.**
15  Q. Okay. I have bracketed an e-mail -- well,
16  first of all, this exhibit that's just been marked is
17  from one Monsanto employee to another; is that correct?
18  **A. Yes.**
19  Q. Would you please read to me only the bracketed
20  portion of that e-mail?
21  **A. Yes. To date I have eight industry**
22  **associations, plus CropLife Canada, who have expressed**
23  **interest in engaging in further discussions on how to**
24  **collaborate as a more substantial critical mass,**
25  **representing a signature chunk of Canada's GDP and**

---

Page 429

1  **innovative -- innovation investments, to capture the**
2  **attention of the federal government and encourage an**
3  **approach to motivate IARC to make adjustments in their**
4  **current inappropriate practices.**
5  Q. Dr. Benbrook, do you think the average person
6  on the street would understand the significance of that
7  language in that e-mail?
8  **A. Heavens, no.**
9  Q. And to you, what does that tell you as --
10  well, let me ask you this: Are you an expert in
11  communications within pesticide manufacturers?
12  **A. Yes.**
13  Q. And are you an expert in communications
14  between pesticide manufacturers and regulators?
15  **A. Yes.**
16  Q. And are there certain terms of art and certain
17  even code words that appear in those types of
18  communications?
19  **A. Yes.**
20  Q. The person that you just read to me, does that
21  suggest to you in any way -- or does that provide any
22  support perhaps for why Canada might have assessed
23  glyphosate as noncarcinogenic at times?
24  MR. HOLLINGSWORTH: Objection, calls for
25  speculation.

---

108 (Pages 426 to 429)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  May 23, 2018                    CONFIDENTIAL

Page 430

1    A.  This -- this e-mail is a -- a clear example of
2  plans that Monsanto made and efforts that Monsanto made
3  to engage various industry organizations to stimulate a
4  critical mass of opposition, criticism, of IARC.  They
5  did it in Canada.  They did it in the United States.
6  They've done it around the world.  And -- and obviously
7  they -- they were very effective in getting a number of
8  organizations, both governmental organizations and
9  private organizations, to issue reports that echoed
10  their Roundup-friendly view of the science and -- and
11  cast doubt upon the scientific relevance or validity of
12  the reclassification that IARC announced in March of
13  2015.
14    Q.  I'm going to keep -- actually while I look
15  through those, and I may halt you at some point --
16  well, let's try to keep your answers somewhat short.
17    MR. LITZENBURG:  This is going to be the
18  next exhibit, please.
19    (Discussion off the written record.)
20    (Deposition Exhibit 39 was
21    marked for identification.)
22    Q.  (BY MR. LITZENBURG)  Have you -- can you
23  identify what this is, Dr. Benbrook?
24    A.  Yes.  This is a peer-reviewed paper published
25  in the Journal of Epidemiology and Community Health in

Page 431

1  2016 by a group of I believe 94 scientists with
2  expertise in assessment of the toxicological properties
3  of pesticides entitled Differences in the Carcinogenic
4  Evaluation of Glyphosate Between the International
5  Agency For Research on Cancer, paren, IARC, unparen,
6  and the European Food Safety Authority, paren, EFSA,
7  unparen.
8    Q.  Have you reviewed that as part of your work in
9  this case?
10    A.  I did review this very soon after it came out
11  in 2016.
12    Q.  And could you explain very briefly --
13  you'll -- you'll get an opportunity to speak to jurors
14  in each of these trials about this.  Would you explain
15  very briefly the significance of that document and how
16  it may impact your opinion.
17    A.  This -- this is a very clear explanation of
18  the differences in the assessment of the oncogenicity
19  and genotoxicity data on glyphosate active ingredient
20  and formulated glyphosate-based herbicides by the IARC
21  working group relative to the review of the same
22  information by EFSA.  It very carefully and clearly
23  highlights the differences in the interpretation and
24  conclusions that IARC drew from the review of specific
25  studies on key aspects of the overall evaluation of

Page 432

1  oncogenicity of glyphosate-based herbicides and
2  explained why this group of 94 scientists believes that
3  the IARC working group's evaluation was, in fact, more
4  accurate and defensible based on a weight of the
5  evidence review of the data compared to the review of
6  EFSA.
7    Q.  Okay.  I'm having a little trouble locating it
8  and we are running short of time, but there were some
9  EFSA and other European authorities documents presented
10  to you, assessments and discussion of glyphosate today;
11  is that correct?
12    A.  Yes.
13    Q.  I'm going to represent to you that some of
14  them say that they dismiss the positive mice studies on
15  glyphosate or a single positive mouse study on
16  glyphosate and cancer because of a viral infection in
17  the colony.  If the person that injected that
18  suggestion into the discussion was Jess Rowland of the
19  EPA, how would that affect your analysis or that issue?
20    MR. HOLLINGSWORTH:  Object to the
21  representation, lacks foundation, calls for a
22  hypothetical.
23    A.  It would be a quite extraordinary thing for
24  Mr. Rowland to -- to pass that information on, and one
25  would presume that EPA had in its possession, you know,

Page 433

1  clear evidence of -- of that fact because clearly if
2  another -- if another regulator having heard that
3  statement made, whether it was made by Jeff Rowland or
4  anybody else, would -- would have doubts about the
5  results of the Wood study.
6    MR. LITZENBURG:  Okay.  And this is
7  another thing I only have one copy of.  Will you please
8  mark it?
9    And, Grant, you can look at it if you like.
10    MR. HOLLINGSWORTH:  What is it?
11    MR. LITZENBURG:  It's just receipts from
12  Jeff Hall.
13    (Deposition Exhibit 40 was
14    marked for identification.)
15    Q.  (BY MR. LITZENBURG)  I have marked as Exhibit
16  Number 30 -- what is it?
17    A.  These are three receipts --
18    Q.  I'm sorry, Exhibit 40.
19    A.  40.
20    Q.  Tell me what that is.
21    A.  They are three receipts from Jeff Hall
22  purchases of usually cases of Roundup Super
23  Concentrate.  This one is for $790, there's a $1,594
24  for 12 cases and a third receipt for $1,455.  One is in
25  May of 2008, another is in September of 2010 and

109 (Pages 430 to 433)

HIGHLY                  Charles Benbrook, Ph.D.                  HIGHLY
CONFIDENTIAL                  May 23, 2018                  CONFIDENTIAL

---

Page 434

1  another one is in August of 2009.  So over this period
2  of time it looks like approximately, you know, every
3  year or so at least these three invoices represent
4  substantial purchases of Roundup Super Concentrate.
5      Q.  Okay.  And you have reviewed this as part of
6  your work in the Jeff Hall case?
7      A.  This is a few -- a few of the records that I
8  had that I have seen in -- just in the last couple
9  days.
10      Q.  Okay.  And that's -- and you have reviewed --
11  is it true that part of your work on this case you have
12  reviewed the corresponding labels to those products?
13      A.  Yes, correct.
14      Q.  Okay.  You can set that aside.  Can you find
15  Exhibit 17.
16      A.  Got it.
17      Q.  Exhibit Number 17 is a study on the short-term
18  effects of MON 35050 in male CD-1 mice.  Do you see
19  that?
20      A.  Yes.
21      Q.  Okay.  Let's see if I find my notes on it.
22  And this was submitted it appears to the EPA in 2002;
23  is that correct?
24      A.  Yeah, this is what Mr. Hollingsworth referred
25  to as the Hotz study, correct?

---

Page 435

1      Q.  Yes.  And does it make any reference to James
2  Parry or his recommendation or his conclusions as far
3  as you've seen?
4      A.  No, it does not.
5      Q.  Okay.  And if -- let's see.  Well, I'm going
6  to -- let's see.
7      A.  On the -- in this -- the transmittal date, the
8  list of submitted data that identifies this as the
9  Kathy Hotz study, that has a date of 2001.  So the
10  original study was completed and submitted to Monsanto
11  by 2001, in turn transmitted by Monsanto in July of
12  2002 to the agency, so the work in conducting this
13  study certainly had started coincidental --
14  coincidentally with the primary time when Monsanto was
15  interacting with Dr. Parry on, you know, whether --
16  whether the commission of this study was done before or
17  after the report by Dr. Parry laying out his
18  recommendations.  I -- you know, I would have to look
19  more carefully at the timing, but it would be pretty
20  close.
21      Q.  Well, I'll -- I'll point you to the page
22  ending -- the MONGLY number ending in 4857, if you
23  would.
24      A.  4857, okay.
25      Q.  I am going to represent to you, because we

---

Page 436

1  have a very limited time, that the Parry report was in
2  September of 1999 and it appears the date that the
3  first animals were sacrificed -- or the date of the
4  first exposure of animals in this -- what's been called
5  the Hotz study was actually two months prior to his
6  recommendations; is that correct?
7          MR. HOLLINGSWORTH:  Object to the
8  characterization, lacks foundation.
9      A.  Well, on page 12 of this report, the data --
10  date protocol signed by the study director was
11  July 22nd, 1999, and that clearly was before Monsanto
12  had received the second report from Dr. Parry.
13      Q.  (BY MR. LITZENBURG)  Okay.  Set that aside.
14  Have you seen anything today to suggest that
15  Dr. Parry's report or recommendations were ever
16  disclosed to date to the EPA?
17      A.  No.
18      Q.  Were they legally required to do so?
19          MR. HOLLINGSWORTH:  Objection, calls for
20  a legal conclusion.
21      A.  Yes, based on my understanding of the
22  requirements of FIFRA, Section 6(a)(2)(b), it -- yes,
23  Dr. Parry's report seems to meet the -- criteria
24  for a -- a commissioned study that should have been
25  provided to the EPA because it reports a -- an adverse

---

Page 437

1  effect or a determination of possible risk to humans
2  that was inconsistent with the agency's current
3  evaluation of genotoxicity and also inconsistent with
4  all of the studies and positions expressed by Monsanto
5  to EPA.
6      Q.  (BY MR. LITZENBURG)  19 -- or Exhibit Number
7  18 is dated -- is for a study in Brazil completed on
8  March 8th of 1998.  That could not have been something
9  done in response to Dr. Parry's recommendations,
10  correct?
11      A.  Clearly not.
12          MR. HOLLINGSWORTH:  Objection, lacks
13  foundation, calls for speculation.
14      Q.  (BY MR. LITZENBURG)  A study in -- about
15  good -- well, let me see what I have about this.  Set
16  that aside.  Will you -- can you see if you can find
17  Exhibit Number 15?
18      A.  Yeah, they're in order now.
19      Q.  Great, great.
20      A.  Not -- not too hard.  Got it.
21      Q.  And I believe Mr. Hollingsworth described all
22  these authors as Monsanto employees, but they are not;
23  is that right?
24          MR. HOLLINGSWORTH:  Object to the
25  representation.

110 (Pages 434 to 437)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                    May 23, 2018                    CONFIDENTIAL

Page 438

1    A. One is an employee of Pfizer and one is an
2    employee of Lexicon Genetics.
3    Q. (BY MR. LITZENBURG) And this is --
4    A. And one is an employee of Tibotec. So there's
5    two or three employees of Monsanto and two or three
6    other people.
7    Q. This is a review paper of animal studies; is
8    that correct?
9    A. In effect, yes.
10   Q. Okay. And the first one that it refers to
11   is -- it says in the introduction: These assays are
12   described briefly in Williams, et al., 1, and if you
13   look at Reference Number 1, turning to the back, that
14   is Williams, et al., in the year 2000, Williams and
15   Munro?
16   A. Right.
17   Q. Are you familiar with that paper?
18   A. Oh, absolutely.
19   Q. Any significance to you in your analysis of
20   that paper?
21   A. Well, it's a -- it's a Monsanto-commissioned
22   and Monsanto-written review article on what Monsanto
23   Company believes their genotoxicity studies show and
24   published in the Journal of Regulatory Toxicology and
25   Pharmacology.

Page 439

1    Q. And Williams and Munro 2000 does not identify
2    any Monsanto employees as its authors here, correct?
3    A. I -- I'd have to look at it. Williams was not
4    an employee of Monsanto. Munro had had significant
5    work with Monsanto and continued to work with them in
6    various consulting capacities, and I don't remember who
7    Kroes is.
8    Q. Okay. Well, we got -- we got nine minutes.
9    When Dr. Heydens wrote an e-mail suggesting that in --
10   the Intertek 2016 paper be ghostwritten, in his own
11   words, he said just recall that we did this in Williams
12   2000. Was that this paper?
13   A. Yes.
14         MR. HOLLINGSWORTH: Objection, lacks
15   foundation.
16   A. And they -- recall that he says they did it
17   that way because it would lower the cost.
18   Q. (BY MR. LITZENBURG) Okay. In -- when we talk
19   about this industry standard of care, are you speaking
20   about the standard of care among producers of
21   glyphosate alone or are you talking about a chemical
22   industry or a pesticide industrywide standard of care?
23   A. Certainly chemical industry, pesticide
24   industrywide. I mean, even with the -- you know, you
25   could encompass the drug industry. I mean, anybody

Page 440

1    manufacturing and selling chemicals that might in some
2    circumstances pose risk to humans, they kind operate
3    under the -- the same set of scientific and ethical
4    expectations.
5    Q. Any indication that Jeff Hall or Lee Johnson
6    ever used generic glyphosate?
7    A. Not that I'm aware of.
8    Q. Okay. You know what the TNO report is?
9    A. Yes.
10   Q. Was that reported to the EPA to date as far as
11   you know?
12         MR. HOLLINGSWORTH: Objection, calls for
13   a legal conclusion, lacks foundation.
14   A. No. To my knowledge the TNO report
15   commissioned by Monsanto was never submitted to the
16   EPA.
17   Q. (BY MR. LITZENBURG) Okay. And that Number 17
18   that we looked at just a moment ago, would you turn
19   back to it. It's a paper that's very black on the
20   front.
21   A. Yes, okay.
22   Q. And what --
23   A. Put it back in my pile.
24   Q. -- it actually found was that this product,
25   it's MON something with a number, was causing cancer,

Page 441

1    but their conclusion was that it was the coformulants
2    or the surfactants that was doing it rather than the
3    active ingredient; is that correct?
4          MR. HOLLINGSWORTH: Object to the
5    representation.
6    A. I think it was a genotox study predominantly.
7    It wasn't a two-year cancer study, but you're correct
8    in that they conclude that the toxic effects observed
9    in the study were caused by the coformulant.
10   Q. (BY MR. LITZENBURG) Okay. And do you know
11   what the coformulant is? Does it say like what it is
12   in there other than by some proprietary name?
13   A. It -- I don't think it's -- it's identified --
14   I think they say it's a -- it's sold under the Roundup
15   brand in specific European companies, among them Italy,
16   but it also says curiously, I noticed this before,
17   it's -- a surfactant component was anionic in nature
18   and different from that used in other Monsanto
19   glyphosate products sold in most countries including
20   the US. So I'm not exactly sure what it -- what it
21   was.
22   Q. Do you have any idea if they repeated these
23   studies with other formulated products, that type of
24   study?
25   A. I'm not aware that they did.

111 (Pages 438 to 441)

HIGHLY                 Charles Benbrook, Ph.D.                 HIGHLY
CONFIDENTIAL                  May 23, 2018                  CONFIDENTIAL

Page 442

1    Q. And certainly Monsanto did not complete all of
2  the studies recommended by Dr. Parry to date. In fact,
3  they said they weren't going to do -- they simply
4  weren't going to do them, in one executive's word; is
5  that correct?
6    **A. That's --**
7      MR. HOLLINGSWORTH: Object to the
8  representation, lack of foundation.
9    **A. Yes, there's multiple statements in the**
10 **e-mails back and forth between Monsanto senior**
11 **scientists and Heydens that -- to the effect that**
12 **that -- at the -- after considering the pros and cons**
13 **of commissioning the additional studies that Parry**
14 **recommended that they weren't going to do it.**
15   Q. (BY MR. LITZENBURG) All right. Real close.
16 Well, let's see. There were some German documents that
17 we looked at today, correct?
18   A. Yes.
19   Q. Are you aware of whether Germany has taken any
20 action with respect to glyphosate-containing products
21 in recent months?
22   **A. Yes. The German government has announced that**
23 **they're going to phase out the use of glyphosate-based**
24 **herbicides fairly quickly, you know, within a year or**
25 **so.**

Page 443

1    Q. Okay. I'm going to the last exhibit, I think,
2  we'll look at, Exhibit Number 25 here.
3    A. Okay.
4    Q. And page 10. And if you're in trouble finding
5  it I've got an unmarked copy that I can enter, an
6  undrawn on --
7    **A. I'm getting really close. I'm getting really**
8  **close. 24. It's got to be the next one. This is the**
9  **EFSA report.**
10   Q. Turn to page 10, if you would.
11   A. Okay.
12   Q. And do you see the -- where carcinogenicity is
13 in bold about two-thirds down?
14   **A. Yes, I do.**
15   Q. Okay. That sentence ends, and then the
16 sentence begins: Out of five mice studies considered,
17 one study with Swiss albino mice showed a statistically
18 significant increased incidence of malignant lymphomas
19 at the top dose of 1,460 milligrams per kilograms BW
20 per day. This study was discussed at length during the
21 first Pesticides Peer Review Experts' Meeting. Do you
22 see that?
23   **A. Yes.**
24   Q. Okay. Although observed above the limited
25 historical control data of the study, the increased --

Page 444

1  well, let me stop reading that and withdraw that
2  portion of the question since your last answer.
3      The final sentence of that paragraph says:
4  The study was reconsidered during the second experts'
5  teleconference as not acceptable due to viral
6  infections --
7    **A. Yes.**
8    Q. -- that could influence survival as well as
9  tumor incidence, especially lymphomas.
10   **A. Yeah.**
11   Q. If in this EFSA conference call the person
12 that caused EFSA to reject the one positive
13 statistically significant mouse study was Jess Rowland,
14 and he was the sole person to suggest that there was a
15 virus in this mouse colony, how would that affect your
16 opinion?
17   **A. First of all --**
18     MR. HOLLINGSWORTH: Objection, lacks
19 foundation, calls for speculation.
20   **A. -- there -- there was several more than one**
21 **positive mouse study. To your question, anyone who**
22 **passed on an explanation for this particular Wood study**
23 **as representing that the tumors were associated with**
24 **some sort of a viral infection certainly would have had**
25 **to have had evidence to support that. If EPA had**

Page 445

1  **credible evidence that it believed was sound that, in**
2  **fact, a viral infection was the -- the cause, I**
3  **wouldn't have a problem with Rowland or anyone else**
4  **passing it on in a -- in a peer-reviewed call of this**
5  **nature, but clearly if somebody passed along spurious**
6  **information for which there was no solid justification,**
7  **that would be an extremely serious breach of -- of**
8  **conduct in any professional arena.**
9    Q. (BY MR. LITZENBURG) Dr. Benbrook, I have one
10 more minute and two more questions. After everything
11 we've discussed today and to date, has Monsanto made
12 any efforts that you're aware of to warn users and
13 potential users like Lee Johnson and other plaintiffs,
14 Jeff Hall in this lawsuit, of the potential
15 carcinogenicity of its products?
16   **A. Nothing that I am aware of over the last 20**
17 **years.**
18   Q. Has anyone or any agency prevented Monsanto or
19 rebuffed a request by Monsanto to -- to warn users or
20 potential users about that risk?
21   **A. No.**
22     MR. HOLLINGSWORTH: Objection, calls for
23 speculation.
24     MR. LITZENBURG: And that is it, we're
25 done.

112 (Pages 442 to 445)

HIGHLY                Charles Benbrook, Ph.D.              HIGHLY
CONFIDENTIAL              May 23, 2018                  CONFIDENTIAL

---

Page 446

1          MR. HOLLINGSWORTH: Thank you, sir.
2       THE WITNESS: Are we done?
3       VIDEO OPERATOR: This concludes the
4    video deposition of Charles Benbrook, Ph.D., Volume 1.
5    We're going off the record. The time is 10:29.
6          (Deposition concluded at 10:29 p.m.)
7          (Signature was reserved.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 447

1          CORRECTION & SIGNATURE PAGE
2    RE: RONALD PETERSON vs MONSANTO COMPANY
     CITY OF ST LOUIS, STATE OF MISSOURI;
3    1622-CC01071
     CHARLES BENBROOK, Ph D ; TAKEN MAY 23, 2018
4          REPORTED BY: PATSY D JACOY
5    I, CHARLES BENBROOK, Ph D , have read the within
     transcript taken May 23, 2018, and the same is true and
6    accurate except for any changes and/or corrections, if
     any, as follows:
7
8    PAGE/LINE      CORRECTION      REASON
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22     Signed at _____, Washington,
23   on this date: _____
24        _____
25        CHARLES BENBROOK, Ph D

---

Page 448

1          REPORTER'S CERTIFICATE
2
3       I, PATRICIA D JACOY, the undersigned Certified Court
4    Reporter, pursuant to RCW 5 28 010 authorized to administer
5    oaths and affirmations in and for the State of Washington, do
6    hereby certify that the sworn testimony and/or proceedings, a
7    transcript of which is attached, was given before me at the
8    time and place stated therein; that any and/or all witness(es)
9    were duly sworn to testify to the truth; that the sworn
10   testimony and/or proceedings were by me stenographically
11   recorded and transcribed under my supervision, to the best of
12   my ability; that the foregoing transcript contains a full,
13   true, and accurate record of all the sworn testimony and/or
14   proceedings given and occurring at the time and place stated
15   in the transcript; that a review of which was requested; that
16   I am in no way related to any party to the matter, nor to any
17   counsel, nor do I have any financial interest in the event of
18   the cause
19       WITNESS MY HAND AND DIGITAL SIGNATURE this 28th day of
20   May, 2018
21
     _____
22   PATRICIA D JACOY
     Washington State Certified Court Reporter, #2348
23
24
25