# EXHIBIT 30



## Planet Depos®
We Make It *Happen*™

**CONFIDENTIAL**

# Transcript of William Sawyer, Ph.D.

**Date:** August 23, 2018
**Case:** Peterson & Hall -v- Monsanto Company, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 3 of 70
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018
1 (1 to 4)

**Page 1**

```
   IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS

              STATE OF MISSOURI

                      x

RONALD PETERSON and    :

JEFF HALL,             :

        Plaintiffs,    :

    v.                 : Civil Action No.

MONSANTO COMPANY, et   : 1622 CC01071

al.,                   :

        Defendants.    :

                       x


         *  *  * CONFIDENTIAL *  *  *


        Deposition of WILLIAM SAWYER, Ph.D.

              Fort Myers, Florida

            Thursday, August 23, 2018

                  9:16 a.m.


Job No.: 203750

Pages: 1   269

Reported By: RHONDA HALL BREUWET, RDR, CRR, LCR, CCR,

FPR, CLR, NCRA Realtime Systems Administrator
```

**Page 2**

```
            Deposition of WILLIAM SAWYER, Ph.D.,

held at the offices of:



    Sanibel Harbour Marriott Resort & Spa

    17260 Harbour Pointe Drive

    Fort Myers, Florida 33908














              Pursuant to notice, before RHONDA

HALL BREUWET, RDR, CRR, LCR, CCR, FPR, CLR, NCRA

Realtime Systems Administrator, Notary Public in and for

the State of Florida.
```

**Page 3**

```
              A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS:

    JEFF T. SELDOMRIDGE, ESQUIRE

    The Miller Firm LLC

    The Sherman Building

    108 Railroad Avenue

    Orange, Virginia 22960

     540  672 4224



ON BEHALF OF DEFENDANT MONSANTO:

    JOHN M. KALAS, ESQUIRE

    JOSEPH F. ALTIERI, ESQUIRE

    Hollingsworth LLP

    1350 I Street, N.W.

    Washington, DC 20005

     202  898 5800
```

**Page 4**

```
      A P P E A R A N C E S   C O N T I N U E D


ON BEHALF OF DEFENDANT OSBORN & BARR:

    JENNIFER E. HOEKEL, ESQUIRE

    Armstrong Teasdale, LLP

    7700 Forsyth Boulevard

    Suite 1800

    St. Louis, Missouri 63105

     314  621 5070




VIDEOGRAPHER:

    DONALD J. BREUWET
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

---

**Page 5**

C O N T E N T S

EXAMINATION OF WILLIAM SAWYER, Ph.D.    PAGE

Direct Examination                              11

By Mr. Kalas

Cross Examination                              264

By Ms. Hoekel

---

**Page 7**

E X H I B I T S

PAGE

Ex. 11   Document Titled "Glyphosate     176
         Use and Cancer Incidence in
         the Agricultural Health
         Study," By Andreotti, et al.

Ex. 12   Printout from SEER Web Site    188
         Titled "All Lymphoid
         Neoplasms With Detailed
         Non-Hodgkin Lymphoma
         Subtypes"

Ex. 13   Document Titled "Alkyl Amine    204
         Polyalkoxylates (JITF CST 4
         Inert Ingredients).  Human
         Health Risk Assessment to
         Support Proposed Exemption
         from the Requirement of a
         Tolerance When Used as Inert
         Ingredients in Pesticide
         Formulations"

Ex. 14   Document Titled "Studies on     241
         glysophate-induced
         carcinogenicity in mouse
         skin:  A proteomic approach"

Ex. 15   IARC Monograph on Glyphosate   249

---

**Page 6**

E X H I B I T S

Attached to transcript.

SAWYER DEPOSITION EXHIBITS                   PAGE

Ex. 1    Defendant Monsanto Company's    11
         Second Amended Notice of
         Videotaped Deposition of
         William Sawyer, Ph.D.

Ex. 2    Box of Records                  22

Ex. 3    CD ROMs                         25

Ex. 4    Various Documents               26

Ex. 5    Document Titled  Jeff Scott     29
         Hall:  Toxicological Notes,
         dated 5/31/18

Ex. 6    Document Titled  Jeff Scott     29
         Hall:  Toxicological Notes,
         dated 8/22/18

Ex. 7    Email Chain Between Jeffrey     31
         Travers and Gregory Chernack,
         dated 8/15/18

Ex. 8    Supplemental Reliance List of  116
         Dr. Sawyer 5/25/18

Ex. 9    Plaintiff's Fact Sheet         118

Ex. 10   Email Chain Between Jeffrey     118
         Travers and Gregory Chernack

---

**Page 8**

E X H I B I T S

PAGE

Ex. 16   Document Titled "Glyphosate     253
         Skin Binding, Absorption,
         Residual Tissue Distribution,
         and Skin Decontamination"

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 5 of 70

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

3 (9 to 12)

Conducted on August 23, 2018

**9**

1    P R O C E E D I N G S
2        THE VIDEOGRAPHER:  Here begins
3    Media Number 1 in the video-recorded
4    deposition of William Sawyer, Ph.D., in
5    the matter of Peterson and Hall versus
6    Monsanto Company, et al., in the
7    Circuit Court of the City of St. Louis,
8    the State of Missouri, Case
9    Number 1622-CC01071.
10       Today's date is August 23rd of
11   2018.  The time on the video monitor is
12   9:16.  The videographer today is Don
13   Breuwet, representing Planet Depos.
14   This video deposition is taking place
15   at 17260 Harbour Pointe Drive, Fort
16   Myers, Florida.
17       Will counsel please identify
18   yourselves and state whom you
19   represent.
20       MR. KALAS:  John Kalas on behalf
21   of Monsanto Company.
22       MR. ALTIERI:  Joe Altieri on
23   behalf of Monsanto Company.
24       MS. HOEKEL:  Jennifer Hoekel on
25   behalf of the Osborn & Barr defendants.

**0**

1        MR. SELDOMRIDGE:  Jeff
2    Seldomridge on behalf of Plaintiff Jeff
3    Hall.
4        THE VIDEOGRAPHER:  The court
5    reporter today is Rhonda Breuwet,
6    representing Planet Depos.  Would the
7    court reporter please swear in the
8    witness.
9        THE REPORTER:  Raise your right
10   hand, please.
11       Do you solemnly swear the
12   testimony you are about to give will be
13   the truth, the whole truth, and nothing
14   but the truth?
15       THE WITNESS:  I do.
16       MR. KALAS:  Good morning,
17   Dr. Sawyer.
18       THE WITNESS:  Good morning.
19       MR. KALAS:  I just have a few
20   statements I want to put on the record
21   before we get going.  First of all, I'd
22   like to designate this deposition as
23   confidential pursuant to the applicable
24   pretrial orders in both -- in the
25   Missouri and city cases, St. Louis city

**9** (second column top, page 1)

1    cases.
2        I'd also like to note that we
3    requested two days of deposition time
4    with Dr. Sawyer.  We were told he would
5    be made available for one day of
6    deposition.  As everybody knows,
7    depositions in Missouri are untimed,
8    and we will do our best to ask the
9    questions we need to ask within this
10   one day, but we reserve our right to
11   seek all appropriate relief on that
12   issue.
13       (Exhibit Number 1, Defendant Monsanto
14       Company's Second Amended Notice of
15       Videotaped Deposition of William Sawyer,
16       Ph.D., was marked for identification.)
17       WILLIAM SAWYER, Ph.D.
18       acknowledged having been duly sworn to
19   tell the truth and testified upon his oath as follows:
20       DIRECT EXAMINATION
21   BY MR. KALAS:
22       Q.  Okay.  Now, I marked as Exhibit 1 your
23   amended -- or second amended notice of deposition
24   today, Dr. Sawyer.  Have you seen this document
25   before?

**2**

1    A.  Yes.
2        Q.  Okay.  And did you review the document
3    requests in this document prior to today?
4    A.  I did, all I think 26 items.
5        Q.  Okay.  I believe there's 23, but --
6    A.  Okay.  Thank you.
7        Q.  Yep.  And did you conduct a search for the
8    documents that we requested in this?
9    A.  Some, yes.  Some, no.
10       Q.  Okay.  Can you tell me -- if we can go to
11   pages 4 through 6, can you tell me which document
12   requests you did not conduct searches for.
13   A.  (Reviewing document.)
14       Items 8, 9, 13, 14, and 17.
15       Q.  Okay.  And start with Item 8.
16       Item 8 requested "All transcripts of any
17   depositions or trial testimony by Dr. Sawyer as an
18   expert witness within the last five years that
19   Dr. Sawyer has in his possession."
20       Did I read that correctly?
21   A.  Yes.
22       Q.  And why did you not conduct a search for
23   Request Number 8?
24   A.  Jen in my office has a shredding disposal
25   service which we use for cases that have been

Transcript of William Sawyer, Ph.D.

4 (13 to 16)

Conducted on August 23, 2018

---

3

1  adjudicated by settlement, mediation, arbitration, or
2  trial, and the documents I have on current cases would
3  redisclose confidential medical records, psychiatric
4  records, etc., and also breach the confidentiality
5  agreements I've gone into and signed on such cases,
6  and I think it would be unethical for me to just hand
7  those out.
8      Q.   Can you give me a sense of how many
9  deposition transcripts you currently have in your
10 possession that you believe are confidential?
11     A.   Not really.  It would be a wild guess.
12     Q.   Well, how many cases are currently open
13 that you're working on right now?
14     A.   I don't know.  I mean, I have cases that
15 just started in the past six months or year.  I have
16 some other cases I consider antique, they're so --
17 they've just been idle for so many years.  I don't
18 know.
19     Q.   Well, you just expressed that for the idle
20 cases or the closed cases --
21     A.   No.
22     Q.   -- if I understand correctly, you shred
23 those files.  So --
24     A.   No, I didn't say idle cases.
25     Q.   Okay.  So idle cases that are still open,

---

4

1  you still have those files?
2      A.   Certainly.
3      Q.   Okay.  And you can't estimate -- would you
4  say it's more than ten cases?
5      A.   Yes.
6      Q.   Would you say it's more than 20?
7      A.   Possibly.  I just don't know.
8      Q.   Okay.  What I would request while we --
9  well, let me ask you this:  Would you be willing to
10 produce those transcripts redacted, with confidential
11 information removed?
12     A.   No.  That could take numerous hours,
13 numerous hours, and I would still need to get
14 authority to do such.  I can't redisclose those
15 documents.
16     Q.   Were all those deposition you gave
17 designated as confidential by a court?
18     A.   No, but certainly by the client.
19     Q.   Okay.
20     A.   And certainly by HIPAA.
21     Q.   All right.  You are aware, of course, that
22 the deposition you gave in this case, for instance,
23 has been posted to the Internet?
24     A.   I'm not aware of that.
25     Q.   Okay.  I would ask that you hold on to

---

5

1  those transcripts and do not shred any more while we
2  work this out.
3      If you can go to -- well, let me ask, will
4  you agree not to do that?
5      A.   No.
6      Q.   Okay.  If we can go to Number 9, "Any
7  signed reports, declarations, or affidavits by
8  Dr. Sawyer as an expert witness within the last five
9  years that Dr. Sawyer has in his possession."
10     Why did you not look for those?
11     MR. SELDOMRIDGE:  Objection to
12 the extent of privilege.  We also have
13 a privilege agreement with Monsanto.
14     A.   Same answer, actually, as for Number 8,
15 with respect to not hanging on to completed cases, and
16 the current cases would redisclose medical records,
17 psychiatric records, laboratory test records,
18 confidentiality with my client, and, in many cases,
19 court-ordered confidentiality.
20 BY MR. KALAS:
21     Q.   Okay.  And would you agree not to shred
22 any reports, declarations, or affidavits responsive to
23 Number 9?
24     A.   No.  If I find or Jen Clark finds the
25 file's closed, it's gone.

---

6

1      Q.   How about electronic copies?  Do you get
2  electronic copies of deposition transcripts?
3      A.   I do, but I don't keep them once the
4  file's over.
5      Q.   What do you do with them?
6      A.   I erase them.
7      Q.   Do you personally erase them or does Jen
8  Clark?
9      A.   I do and Jen does.
10     Q.   Would you agree not to delete electronic
11 copies of any documents responsive to Number 8 or
12 Number 9 while we work this out?
13     A.   No.
14     Q.   If we go to Number 13, why did you choose
15 not to look for documents responsive to that request?
16     MR. SELDOMRIDGE:  Same objection.
17     A.   Same answer except it also becomes next to
18 impossible.  I don't have any good way to do that,
19 actually.
20 BY MR. KALAS:
21     Q.   Do you have records where you invoice to
22 the various law firms or other groups that you've
23 worked with as a consultant?
24     A.   I don't know.  I'd have to check with the
25 CPA.

---

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

---

**7**

1   Q.   And the CPA might as well -- might also
2   have a -- an open account spreadsheet or something
3   like that of Miller Firm here and XYZ firm here of all
4   the groups you're working with?
5   **A.   Probably not because the way our CPA, over**
6   **the last 20 -- 28 years, handles things is we provide**
7   **a list of cases that are by state for tax purposes.**
8   **For example, if it's a New York state case, we pay**
9   **7 percent tax on it, income tax.**
10   **So I don't know that she would really have**
11   **much other than some financial records back to a**
12   **certain point in time, which whatever CPAs keep their**
13   **records for, I don't know if it's five years or seven**
14   **years or whatever.**
15   Q.   But you didn't ask her about that?
16   **A.   No.**
17   Q.   Will you ask her about that following this
18   deposition?
19   **A.   No.  That would be an expensive**
20   **undertaking.  I'm not willing to do it.**
21   Q.   Number 14, why did you choose not to look
22   for any documents responsive to Request 14?
23   MR. SELDOMRIDGE:  Same objection.
24   Argumentative.
25   **A.   I simply don't have any such equipment.**

---

**8**

1   BY MR. KALAS:
2   Q.   Okay.  So in the case of Number 14, you
3   actually did, in your mind, look for it.  You just
4   know that you don't have anything responsive to Number
5   14?
6   **A.   That's correct.**
7   Q.   Okay.
8   **A.   And the Hall case, I've made no such**
9   **studies whatsoever or even thought about it.**
10   Q.   Okay.  That's fine.  So 14, in fact, I
11   think we could mark as something you did look for.
12   How about 17?  Did you conduct -- you said
13   you didn't conduct a search for Request 17.  Why did
14   you not?
15   **A.   Because in my draft notes and in my entire**
16   **file, in my entire thought process, I have no**
17   **intention of offering any direct testimony regarding**
18   **to the development of any such equipment.**
19   Q.   Okay.  It is true, sir, that you, in your
20   possession, have a device that you have modified for
21   applying Roundup, right?
22   **A.   Yes, for my own home use, that's correct.**
23   Q.   And that device would be responsive to
24   Number 17, correct?
25   **A.   No, because it's irrelevant to this case.**

---

**9**

1   **I'm not bringing that thing into this case in direct**
2   **testimony.**
3   Q.   Do you recall testifying at the Johnson
4   trial that you applied Roundup personally, with zero
5   exposure?
6   MR. SELDOMRIDGE:  Objection.
7   Beyond the scope of this deposition.
8   We're not here to talk about the
9   Johnson trial.
10   **A.   Yeah, I've been advised not to speak about**
11   **the Johnson trial.**
12   BY MR. KALAS:
13   Q.   Okay, sir.  It is prior testimony, and I
14   am completely within my rights to ask about it.  So
15   I'll ask the question again.
16   Do you recall testifying at the Johnson
17   trial that you applied Roundup personally, with zero
18   exposure?  Do you recall that testimony?
19   MR. SELDOMRIDGE:  Same objection.
20   You can answer.
21   **A.   Yes.**
22   BY MR. KALAS:
23   Q.   Okay.  And you believe that you had zero
24   exposure because of a device that you -- that you
25   modified that -- well, you put it in your own words.

---

**20**

1   Why do you believe you have zero exposure
2   when you apply Roundup?
3   MR. SELDOMRIDGE:  Objection.
4   Calls for a narrative.
5   **A.   First of all, I have the right to patent**
6   **that device, and I find this way beyond the scope of**
7   **the deposition.  I developed that, as you know from my**
8   **testimony at Johnson, because my first experience with**
9   **the tank sprayer many, many years ago created drift.**
10   **So I modified the spray nozzle, the orifice, to squirt**
11   **more like a squirt gun and direct itself to wheeze**
12   **instead of producing a drifting aerosol.**
13   BY MR. KALAS:
14   Q.   Okay.  So this modified device that you
15   believe creates zero exposure, you still have it in
16   your possession, correct?
17   **A.   Yes.**
18   Q.   I would ask that you not destroy that
19   device.  I would ask that you keep it in the same
20   condition you have it while we work this out.  Are you
21   willing to do that?
22   **A.   I would have to discuss this with counsel.**
23   Q.   Okay.  So sitting here right now, you
24   can't say that you're willing to not modify a device
25   you have used in an unchanged manner, if I

---

Transcript of William Sawyer, Ph.D.                    6 (21 to 24)
Conducted on August 23, 2018

2

1  understand correctly, for 20 years?
2      **A. I'm not -- well, first of all, your**
3  **question -- your question is twofold. You're asking**
4  **me -- you're implying in your question that I have not**
5  **made any further modifications in 20 years.**
6      Q. Well, have you?
7      **A. Yes.**
8      Q. Tell me about the modifications you've
9  made in those 20 years.
10     **A. I think I've gone through probably at**
11 **least two wands.**
12     Q. When's the last time you made
13 modifications to a wand?
14     **A. That's a good question. I know I did when**
15 **we still had our home in New York state, which we sold**
16 **in 2012, I believe. And here in Florida, I think I**
17 **also replaced the wand, I'm pretty sure, because I**
18 **bought a new tank sprayer several years ago. But I --**
19 **I can't put an exact date on it.**
20     Q. Have you modified the wand since you've
21 been working on Roundup cases with the Miller Firm?
22     **A. No.**
23     Q. Okay. So since you haven't modified it in
24 the time since you started working on these cases, I'd
25 ask you to keep it in the same condition while we work

22

1  out whether or not you will voluntarily produce it to
2  us for inspection.
3          Will you please do that?
4      **A. Again, I can't answer that until I speak**
5  **with counsel about that, in terms of giving you a yes**
6  **or no.**
7      Q. Okay. Okay. Now, beyond those requests,
8  you also have brought some documents that are
9  responsive to the rest of these requests, right?
10     **A. Yes.**
11     Q. Okay. And where are those documents, sir?
12     **A. Well, some are in the folder in front of**
13 **me, and some are within my box of studies and so**
14 **forth.**
15     Q. Okay. And the box of studies, I note, has
16 an exhibit sticker on it still. Is that the same box
17 that you brought to the Johnson case?
18     **A. It is. However, specific medical records**
19 **and items referring to Mr. Johnson have been removed.**
20     Q. Okay. And have medical records and items
21 referring to Mr. Hall been inserted?
22     **A. Yes.**
23         MR. KALAS: Okay. I'd like to
24 mark that box as Exhibit 2.
25         (Exhibit Number 2, Box of Records, was

23

1          marked for identification.)
2  BY MR. KALAS:
3      Q. Now, since the box has been modified,
4  we're going to need to make a copy of that again, sir.
5  Were you comfortable with how we handled it last time
6  where we shipped it out and shipped it back?
7      **A. Yes. I was actually quite impressed.**
8      Q. So we're going to do that again, if that's
9  okay with you.
10     **A. Yes.**
11     Q. Okay. And then in addition to what's in
12 the box, you said you brought some additional records
13 here in the folder in front of you?
14     **A. Yes.**
15     Q. Okay. What's -- what's in there?
16     **A. Well, there's the Jeff Hall Supplemental**
17 **Response to Defendant Monsanto's PFS Question 7.**
18     Q. Okay.
19     **A. There's a draft -- well, I don't know if**
20 **it's a draft. It had simply communications from the**
21 **Miller Firm, including my draft expert disclosure.**
22     Q. Okay.
23         MR. KALAS: I don't know if you
24 guys consider that privileged, but --
25         MR. SELDOMRIDGE: Actually, I

24

1  would like to have a look at that.
2          MR. KALAS: Yeah.
3          MR. SELDOMRIDGE: Thank you.
4  BY MR. KALAS:
5      Q. What else is in there?
6      **A. Jeff Hall's Response to Defendant Monsanto**
7  **Company's First Set of Interrogatories.**
8      Q. Okay.
9      **A. And then a Monsanto document,**
10 **MONGLY00288103.**
11     Q. Okay.
12     **A. And document with a title "Addendum to PFS**
13 **Prior Addresses for the Past 25 Years of Mr. Hall."**
14     Q. Okay.
15         MR. KALAS: Jeff, are you
16 withholding that correspondence?
17         MR. SELDOMRIDGE: Yes. I do
18 consider this to be privileged.
19         MR. KALAS: And then a photograph from my review of
20     **A. And then a photograph from my review of**
21 **two CDs, and it's just a single photograph. It's not**
22 **intended to be representative of the bulk of the**
23 **photographs, but it is simply one that I thought was**
24 **interesting and decided to print.**
25 ///

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

---

25

BY MR. KALAS:

Q.   Okay.

A.   **And these CDs I'm holding are two CDs from Jeff Hall which depict properties that he worked on during his tenure of service as a landscaper.**

MR. KALAS:  Jeff, have those been produced before?

MR. SELDOMRIDGE:  And I will relate to counsel that we received these yesterday, and I brought them with me down to Florida.

MR. KALAS:  I think -- can we mark those CDs as Exhibit 3, please, separately.

(Exhibit Number 3, CD-ROMs, was marked for identification.)

BY MR. KALAS:

Q.   Just to move this along, it may be quicker, Dr. Sawyer, if I ask you just a few specific questions about what's in there, and then I'll look at it on a break.  And I'll mark that folder that you brought as Exhibit 4, please, if you don't mind.

Q.   Did you bring billing records, sir?

A.   **Yes.**

Q.   Okay.

---

26

A.   **Where would you like the sticker?**

Q.   Outside's fine.

A.   **Top?**

Q.   Yeah.  That's fine.

(Exhibit Number 4, Various Documents, was marked for identification.)

BY MR. KALAS:

Q.   How much have you invoiced on this case since you started working on it?  And by "this case," I mean the Peterson-Hall case.

A.   **10,685.66.**

Q.   Okay.  And when was the last invoice sent?

A.   **August 14th, 2018.**

Q.   Okay.  So you haven't really billed much more beyond the 11,000 or so dollars, correct?

A.   **Additional preparation time for today's deposition.**

Q.   And how many hours would you estimate you spent preparing for today's deposition?

A.   **I'm sorry.  It's not going to be a real dead accurate number, but approximately 20 hours.**

Q.   Okay.  So 20 hours in addition to what you've invoiced thus far?

A.   **Yes.**

Q.   Okay.  And in addition to this case, when

---

27

I deposed -- or when I was at your deposition last in February, you had billed approximately $143,000 on glyphosate litigation as a whole.

Q.   Do you remember that?

A.   **Yes.**

Q.   Okay.  How much would you say you billed subsequent to that on the Johnson trial, in preparation for it?

A.   **Well, the trial fee was $4,600.  And with respect to preparation time, I have no idea.  I just don't remember.**

Q.   Would you say you spent more than ten hours preparing for that trial?

Q.   Would you say you spent more than 20 hours preparing for that trial?

A.   **Just don't recall.**

Q.   Did you bill for your travel time to California?

A.   **At a reduced rate.**

Q.   What rate was that, sir?

A.   **I think it was either 50 or 75 percent.**

Q.   Okay.  And did you invoice for your plane ticket to California?

A.   **Yes.**

---

28

Q.   And what class of fare did you fly to California?

A.   **I charged the firm for economy class.**

Q.   Okay.

A.   **Although I was upgraded because I fly so much.**

Q.   I think everybody in this room probably has that.

And did you invoice for your hotel stay in California?

A.   **No.**

Q.   Okay.

A.   **I did not.  That was paid for by the firm.**

Q.   Okay.  So you don't know how much that hotel cost?

A.   **Expensive.**

Q.   Okay.  San Francisco?

A.   **Yeah.**

Q.   What was the name of the hotel?  Do you remember?

A.   **Well, the first night was a hotel about 10 miles out of San Francisco that was built in the 1950s and still had the original neon sign on it with outdoor corridors.**

Q.   Okay.  So a motel more?

---

Transcript of William Sawyer, Ph.D.

8 (29 to 32)

Conducted on August 23, 2018

---

**29**

1    A.   Yeah.  Yeah.  And even that was expensive.
2    Q.   All right.  And then after the first
3    night, you moved?
4    A.   Yes.  There had been a convention at that
5    time and everything downtown had been filled, so they
6    moved it downtown for the -- the second night.  But
7    very expensive.  I don't know the figures, but --
8    Q.   Okay.
9    A.   -- high.
10        MR. KALAS:  I'm going to mark as
11   Exhibit 5 a document called "Jeff Scott
12   Hall:  Toxicological Notes," and it's
13   dated May 31, 2018.
14       (Exhibit Number 5, Document Titled "Jeff
15        Scott Hall:  Toxicological Notes," dated
16        5/31/18, was marked for identification.)
17       MR. SELDOMRIDGE:  Is it -- sorry.
18       MR. KALAS:  Yep.  And then I'm
19   going to mark as Exhibit 6 a document
20   that was provided to us this morning
21   called "Jeff Scott Hall:  Toxicological
22   Notes," and that's dated August 22,
23   2018.
24       (Exhibit Number 6, Document Titled "Jeff
25        Scott Hall:  Toxicological Notes," dated

---

**3**

1    you prepared in reviewing Mr. Hall's case, correct?
2    A.   Yes.
3    Q.   Okay.  And you understand that this case
4    is in St. Louis, right?
5    A.   That's my understanding, yes.
6    Q.   And you intend to testify live at that
7    trial in St. Louis regarding Mr. Hall, if you're
8    allowed to, right?
9    A.   If asked.
10   Q.   Okay.  And you understand -- or do you
11   have any understanding of whether or not Missouri
12   rules require an expert report?
13   A.   My understanding is no.
14       MR. KALAS:  Okay.  So I'm going
15   to mark as Exhibit 7 an email that we
16   received from Mr. Travers that
17   Mr. Seldomridge was cc'd on.
18       (Exhibit Number 7, Email Chain Between
19        Jeffrey Travers and Gregory Chernack,
20        dated 8/15/18, was marked for
21        identification.)
22       MR. SELDOMRIDGE:  Thank you,
23   Counsel.
24       MR. KALAS:  Yep.
25 ///

---

**30**

1        8/22/18, was marked for identification.)
2    BY MR. KALAS:
3    Q.   And if I understand correctly, you have
4    your own copy with you right now of Exhibit 6?
5    A.   I do.
6    Q.   Okay.  So since this is the only other
7    paper copy, I'm going to hold on to the exhibit copy
8    since you have one.
9    A.   That's fine.
10   Q.   And I'll try to ask you questions off it.
11   My notes have page numbers from Exhibit 5, so we may
12   need to search around a little bit.
13   A.   All right.  Just for your benefit --
14   Q.   Yeah.
15   A.   -- in keeping you from being confused, I
16   know that you marked Exhibit 4, but there were more
17   documents in that folder you have not got to yet.
18   Q.   Right.  And I'm going to look at them on a
19   break so we don't spend all our time walking through.
20   A.   Okay.  I just didn't want you to think
21   that there was something more there that I was --
22   Q.   Nope.  Appreciate that.
23   A.   -- not letting you know about.
24   Q.   Nope.  I'll take a look at it on a break.
25       Now, Exhibits 5 and 6 are documents that

---

**32**

1    BY MR. KALAS:
2    Q.   And what Mr. Travers states in this email
3    is that you won't be offering any substantive new
4    opinions that aren't expressed in your reports or
5    previously at trial or deposition.
6        Is that a correct statement?  Do you agree
7    with that?
8        MR. SELDOMRIDGE:  Objection.
9    Mischaracterizes the statement.
10   A.   Could you repeat the question, please?
11   BY MR. KALAS:
12   Q.   Sure.
13       What Mr. Travers states in this email, at
14   least on my reading, is -- and I'll read it into the
15   record.  He says, "I think there are only a few minor
16   additions to his reliance list, which I will get to
17   you tomorrow, and he won't be offering any substantive
18   new opinions that aren't expressed in his reports or
19   previously at trial or deposition."
20       Did I read that correctly?
21   A.   Yes.
22   Q.   And do you agree with that statement by
23   Mr. Travers, that you don't intend to offer any
24   substantive new opinions that haven't been expressed
25   in your reports or previously at trial or deposition?

---

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

---

**33**

1    A.   I would have to ask you just so I'm clear,
2  and it's to define more clearly what you are asking in
3  the question by the term "substantive new opinions."
4    Q.   Well, it was Mr. Travers' words, so let me
5  just ask you directly.  You've produced two reports in
6  this litigation, right?  One regarding Dewayne
7  Johnson, one regarding Jeff Scott Hall, right?
8    A.   Well, no.  Due to the slop house
9  compilation of those documents, I don't refer to them
10 as reports, but my notes.
11   Q.   Okay.  So Mr. Travers referred to them as
12 reports, and that's where the confusion is here.  So
13 do you have any substantive opinions -- and by
14 "substantive," I mean opinions regarding the science
15 in this litigation or the science regarding plaintiffs
16 in this litigation that are not contained in your
17 notes in the D. Johnson case for -- regarding Jeff
18 Scott Hall or that you haven't expressed at trial or
19 deposition.
20       MR. SELDOMRIDGE:  Objection.
21  Compound question.
22       MR. KALAS:  I can break it up if
23  you'd like me to.
24   A.   Well, the only thing -- I have to ask
25  about your question to be clear, how you're referring

---

**34**

1  to Exhibits 5 only or also Exhibit Number 6.
2  BY MR. KALAS:
3    Q.   Yeah, I have 6.  Sorry.
4        I'm referring to Exhibits 5 and 6 --
5    A.   Okay.
6    Q.   -- in addition to your report in the
7  Dewayne Johnson case and your testimony in the Dewayne
8  Johnson case.  So that collectively, do you have any
9  opinions that you're holding right now that you
10 haven't expressed in one of those places?
11   A.   I don't believe so.  I think the answer is
12 no.  But, however, I have not reviewed defendants'
13 reports, and it's possible that that could trigger
14 some additional research that could develop some type
15 of substantive -- substantial opinion that I'm not
16 aware of right now.
17       And the other thing that comes to mind is
18 I have some certain studies which are not contained
19 within Exhibit 5 or 6.  For example, some studies on
20 dermal absorption that are not referenced in these
21 reports but, based on those studies, actually result
22 in me having a substantial additional opinion.
23   Q.   Okay.
24   A.   So I can't -- I can't say that everything
25 in the universe is in Exhibit 5 and 6.

---

**35**

1    Q.   Okay.
2    A.   Because when we go through some of these
3  studies, you will learn of some additional opinions.
4    Q.   Okay.  I understand completely.
5        So I'll just note again for the record
6  that one of the reasons plaintiffs' counsel has put
7  forward for us having one day to depose you was that
8  all your opinions are in the report.
9        MR. KALAS:  That's our
10  understanding, at least, and Dr. Sawyer
11  has now noted that he has additional
12  opinions beyond the toxicological notes
13  which we are entitled to inquire about.
14       MR. SELDOMRIDGE:  Objection.
15  Mischaracterizes the email.
16 BY MR. KALAS:
17   Q.   So we'll look at that later.  Thank you,
18 Dr. Sawyer.
19       What prompted you to put together your
20 toxicological notes on Mr. Hall?
21   A.   Simply that it would be unreasonable and
22 nearly impossible to remember everything I have
23 included in this 156-page document.  And I think it
24 also facilitates and helps the process proceed in a
25 more orderly, efficient manner.

---

**36**

1    Q.   Okay.  And if you could, because there's
2  kind of different things in different places -- and I
3  don't mean that as a criticism, but could you
4  succinctly, or if not succinctly, at least give me the
5  overview of your opinions regarding surfactants that
6  you intend to offer in the Hall case?
7        MR. SELDOMRIDGE:  Objection.
8  Mischaracterizes the notes.
9    A.   (Reviewing document.)
10       Primarily that the surfactant POEA, which
11 is polyoxyethylene alkyl amine -- that's I think
12 P-O-L-Y-O-X-Y-E-T-H-Y-L-E-N-E, alkyl, A-L-K-Y-L
13 A-M-I-N-E -- is a chemical used in Monsanto's super
14 concentrate Roundup to which plaintiff used in his
15 work, and that the surfactant is used to facilitate
16 the penetration of the active ingredient of Roundup,
17 glyphosate, into the plant tissue.
18       However, this particular chemical is also
19 contaminated at trace levels with certain additional
20 carcinogens which individually at the levels present
21 are insufficient to likely produce a significant
22 cancer risk.  However, in total, they are additive to
23 the carcinogenicity of the primary product glyphosate.
24       THE REPORTER:  I'm sorry.  The
25  primary --

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 12 of 70
CONFIDENTIAL

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018                10 (37 to 40)

37

1    A.   Primary product, which is glyphosate.
2         And I will probably need to discuss with
3  the jury some of the basic toxicological principles of
4  percutaneous absorption and how this chemical
5  increases and enhances it in animals and humans, as
6  well as the fact that this chemical has been -- on a
7  worldwide basis been recognized as very dangerous and
8  has actually been banned in various countries, the
9  European Union, etc.
10 BY MR. KALAS:
11    Q.   By "this chemical," you mean POEA?
12    A.   Yeah, the various POEAs.  There's tallow
13 amine and other different forms of the POEA that are
14 used in Roundup and as well as additional co-form --
15 co-formulants such as cocoamine and other supplements
16 to the product.
17    Q.   I don't want to cut you off.  Are you done
18 or --
19    A.   Well, I would probably need to explain to
20 the jury some of the studies in Monsanto studies in
21 which glyphosate itself was used in dermal absorption
22 studies versus glyphosate along with the surfactants
23 which showed increased absorption.
24    Q.   Okay.  So if I understand you correctly,
25 if we were kind of putting these opinions regarding

38

1  surfactants into buckets, there's two main buckets,
2  one of which is you believe that surfactants have
3  carcinogenic impurities and that when combined with
4  glyphosate increase the carcinogenic effect of
5  glyphosate?
6         MR. SELDOMRIDGE:  Objection.
7  Mischaracterizes.
8    A.   Yes.  Under the US EPA methodology for
9  assessment of carcinogens, those carcinogens are
10 additive, and -- but I'm being very cautious to note
11 that -- and I will certainly directly tell the jury
12 that these co-contaminants such as ethylene oxide and
13 others are in trace level and -- but the sum of the
14 various carcinogens plus glyphosate have to be treated
15 in an additive manner as per generally accepted
16 methodology.
17 BY MR. KALAS:
18    Q.   I understand.
19         And then the second bucket, if I
20 understand correctly, is that the presence of
21 surfactants in Roundup formulations enhance the
22 percutaneous absorption of glyphosate?
23         MR. SELDOMRIDGE:  Same objection.
24    A.   Yes.  And I probably will also need to
25 check the formulation sheet on the super concentrate,

39

1  but I -- as I recall, I think there might be a
2  humectant in there as well, which according to
3  Monsanto, MONGLY06653096, quote, certain co-formulants
4  like humectants, it is highly likely we will get large
5  amounts of penetration of the skin.
6    Q.   Okay.
7    A.   And the basis of Monsanto's own admission
8  with respect to the nature of humectants and how they
9  work.
10    Q.   What page are you looking at there, sir?
11    A.   I'm looking at page 65 of Exhibit 6.
12    Q.   Okay.  Okay.  Now, I just want to kind of
13 cover some housekeeping here before we take our first
14 break.
15         Have you undergone any formal continuing
16 education relevant to this case since your deposition
17 in February?
18    A.   No.
19    Q.   So there aren't any areas where you felt
20 that you didn't have expertise in February that you've
21 now gained expertise in relevant to this case?
22    A.   No.
23    Q.   Okay.  Am I correct you've never been
24 asked to be part of a US EPA advisory board?
25    A.   Correct.

40

1    Q.   Am I correct that you never served on a
2  US EPA advisory board?
3    A.   Correct.
4    Q.   Outside of litigation, can you tell me
5  about any times you've opined on violations of EPA
6  regulations?
7         MR. SELDOMRIDGE:  Objection.
8  Vague.
9    A.   Well, when I worked for the government as
10 a toxicologist from 1988 to 1993, I testified at a
11 hearing on the spraying of the Cicero Swamp with an
12 organophosphate due to the threat of EEE virus, equine
13 encephalitis, and there was some controversy in that
14 hearing in which I testified regarding EPA's licensing
15 of certain products for aerial spraying versus what
16 chemical our health department proposed.  But that was
17 a good 20 -- I don't know, 25 or 28 years ago.  I
18 don't remember the details.
19 BY MR. KALAS:
20    Q.   Okay.
21    A.   But other than that, probably not.
22    Q.   Okay.  And just so I understand -- and I
23 understand it was a long time ago -- did you testify
24 or did you opine when working for I believe the
25 New York State government, correct?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 13 of 70
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
11 (41 to 44)
Conducted on August 23, 2018

4

1    A.   Onandaga County Health Department, which
2  is a division of the New York State Health Department.
3    Q.   Did you opine or testify to anyone, when
4  you were looking at this spraying of an
5  organophosphate, the EPA had violated their own
6  regulations in approving that product?
7          MR. SELDOMRIDGE:  Objection.
8  Vague.
9    A.   It's possible.  I just don't recall the
10 specifics.  The concern were -- at that point was
11 impact -- direct impact with population.
12 BY MR. KALAS:
13   Q.   Okay.  Have you ever been asked by the EPA
14 to interpret their regulations for them?
15   A.   No.
16   Q.   Okay.  Have you ever been asked by EPA to
17 enforce their regulations for them?
18   A.   Well, in the health department, I
19 certainly did use EPA regulations and prepared reports
20 and recommendations for enforcement, one which
21 resulted in one of the most expensive cleanups in US
22 history, which was that of AlliedSignal's, which was
23 purchased by --
24   Q.   Honeywell?
25   A.   -- Honeywell, yes, and the massive cleanup

42

1  of Onandaga Lake and the waste beds -- the entire beds
2  created by, initially, AlliedSignal.
3    Q.   Well, my question was a little different,
4  which is not whether you used EPA regulations when
5  working at the health department but whether anyone at
6  EPA ever asked you to enforce their regulations for
7  them.
8    A.   Well, no.  That would require an officer,
9  you know, an enforcement division department work.
10 That's -- that was not -- I was -- I served as a
11 toxicologist, not an enforcement personnel.
12   Q.   Okay.  Have you ever been asked by EPA to
13 advise on modifying their regulations?
14   A.   No.
15   Q.   Okay.  Have you ever been asked by EPA to
16 advise on drafting their regulations?
17   A.   No.
18   Q.   Are you an ethicist?
19   A.   No.
20   Q.   Have you ever published a paper on
21 business ethics?
22   A.   No.
23   Q.   Have you ever worked as a professor
24 instructing students on regulatory compliance?
25   A.   Well, I've taught as an adjunct professor

43

1  two classes to medical students.  I don't think I
2  specifically -- I mean, you know, I did teach to some
3  extent on regulatory aspects of certain chemicals.
4          Could you repeat the question so I could
5  ask --
6    Q.   Sure, and I'll ask it a little more
7  narrow, now that you gave that answer.
8          When you were working as an adjunct
9  professor, did you ever instruct students on complying
10 with EPA regulations?
11   A.   Only in -- only in the aspect of
12 protective gear, PPE.
13   Q.   Okay.  And that's more OSHA or is that
14 more EPA?
15   A.   I would say more OSHA.
16   Q.   Okay.  Have you ever published a
17 peer-reviewed article on the alleged toxic effects of
18 inert ingredients in herbicides?
19   A.   No.
20   Q.   Have you ever studied the alleged toxic
21 effects of inert ingredients in herbicides prior to
22 working on the Roundup lawsuits?
23   A.   Yes.  Heavily, and I had to make decisions
24 for the health department with respect to the
25 truck-mounted sprayers for mosquitos.  Again,

44

1  primarily in the Cicero Swamp area with respect to
2  solvents, because at that time in the late 1980s,
3  early 1990s, some of the synthetic pyrethroid
4  insecticides that were being used were actually -- the
5  solvent was actually more dangerous than the
6  pesticide, and that was because of the use at that
7  time of hydrocarbon mixtures, including hexane and
8  toluene and other potentially neurotoxic agents.
9          And there's been other instances.  When I
10 was in the health department, I had to evaluate
11 carriers -- solvent carriers for use indoors, as well
12 as outdoors, including an incident which impacted the
13 Syracuse Symphony Orchestra in the civic center, in my
14 first year on the job, which sent people to the ER,
15 and determining what happened because the blood
16 cholinesterase levels were checking out normal, and
17 yet these -- which is a sign of organophosphate
18 poisoning, and yet these people are -- were
19 symptomatic, and it turned out to be potentially
20 caused by the carrier rather than the actual
21 organophosphate pesticide.  There's been other
22 examples as well.  It's not -- it's not a uncommon
23 problem.
24   Q.   Have you ever published a peer-reviewed
25 article on the dermal absorption of an herbicide?

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

---

45

1    A.   No.
2    Q.   Have you ever published a peer-reviewed
3 article on the absorbed dose of an herbicide in an
4 occupational setting?
5    **A.   Published a paper on that?**
6    Q.   Peer-reviewed.
7    **A.   No.**
8    Q.   Have you ever published a peer-reviewed
9 article on the metabolism of an absorbed pesticide?
10   **A.   No.**
11   Q.   Have you ever published a peer-reviewed
12 article on the distribution in the human body of an
13 absorbed pesticide?
14   **A.   No.  But I've published original work on**
15 **the absorption/distribution of drugs, pharmaceuticals,**
16 **and drugs of abuse on a human body but not -- animal**
17 **model and human body but not pesticides, per se.**
18        MR. KALAS:  Move to strike
19    everything after "no" as nonresponsive.
20 BY MR. KALAS:
21   Q.   Have you ever published a peer-reviewed
22 article on the excretion of an absorbed pesticide?
23   **A.   No.  I certainly have for various**
24 **pharmaceuticals.**
25   Q.   Have you ever designed an in vitro dermal

---

46

1 absorption study?
2    **A.   No.**
3    Q.   Have you ever conducted an in vitro dermal
4 absorption study?
5    **A.   No.**
6    Q.   Have you ever designed an in vivo dermal
7 absorption study?
8    **A.   No.**
9    Q.   Have you ever conducted an in vivo dermal
10 absorption study?
11   **A.   No.**
12   Q.   Have you ever designed a human
13 biomonitoring study of pesticide exposure?
14   **A.   No, but I have for PCBs when I was with**
15 **the health department, and actually conducted studies**
16 **on nearly 100 volunteer and professional firefighters**
17 **with respect to a known dermal absorption exposure to**
18 **PCBs in their practice fire tower, which a friendly**
19 **corporation had donated PCB oil for them to burn and**
20 **practice with.**
21        MR. KALAS:  Okay.  Move to strike
22    everything after "no."
23 BY MR. KALAS:
24   Q.   I'm just going to note for the record that
25 normally in an untimed deposition I would move to

---

47

1 strike and move on, but if plaintiffs' counsel are
2 refusing to put you up for a second day, I'd ask you
3 to answer the question I asked and not talk about PCBs
4 when that's not at any issue in this case.
5        MR. SELDOMRIDGE:  Objection.  The
6    witness can answer as he will.
7 BY MR. KALAS:
8    Q.   Have you ever conducted a human
9 biomonitoring study of pesticides?
10   **A.   No, but I have for PCBs involving over 100**
11 **firefighters in the mechanism, whether it be PCB,**
12 **polychlorobiphenyl, which is a pesticide, by the way.**
13 **It's under -- falls under the category of pesticide.**
14 **Doesn't really matter whether it's a drug or a**
15 **pesticide.  The toxicological studies and the**
16 **mechanism and so forth of in vivo dermal absorption**
17 **and biomonitoring is similar.**
18   Q.   Have you ever published a peer-reviewed
19 paper on GMOs?
20   **A.   No.**
21   Q.   Have you ever published a peer-reviewed
22 paper -- strike that.
23        Are you an expert on the gut microbiome?
24   **A.   No.**
25   Q.   Okay.  A few questions, and then we can

---

48

1 take a break.
2        One of the things we talked about, about
3 15 minutes ago, is that you haven't undergone any
4 continuing education to I guess give you any new areas
5 of expertise.  So I just want to make sure, because
6 expert reports aren't required in Missouri, that we're
7 on the same page regarding the sort of scope of your
8 opinion.
9        In your toxicological notes, you state
10 that you will be deferring on detailed epidemiological
11 opinions in this matter, right?
12   **A.   Yes.**
13   Q.   Okay.  Is the scope of your testimony
14 regarding the epidemiology on glyphosate-based
15 herbicides going to be the same as what you offered in
16 the D. Johnson case?
17   **A.   Yes, except there is one particular study.**
18 **If it is peer-reviewed, then I may use that study in**
19 **addition to what I have in calculating lifetime days**
20 **of exposure amongst glyphosate applicators for**
21 **comparison to that of Mr. Hall's 218 lifetime days of**
22 **glyphosate application.**
23   Q.   What study are you referring to, sir?
24   **A.   Andreotti 2018.**
25   Q.   That's the updated Agricultural Health

**49**

1  Study?
2      A.   Yes.
3      Q.   Okay.  I'm familiar with it.
4      A.   No.  I'm sorry.  I gave the wrong study.
5      Q.   Okay.
6      A.   That one's already peer-reviewed.
7      Q.   Uh-huh.  Yes.  So which study are you
8  referring to, sir?
9      A.   I am referring to that study, by the way,
10 but that's not the one that is currently an abstract
11 only, and I need to pull it out of the file here, give
12 you the correct information.
13     Q.   Sure.  Is it the North American Pooled
14 Project?
15     A.   Yeah, the NAPP.
16     Q.   Okay.  I know which study you're talking
17 about.
18     A.   Okay.
19     Q.   You don't need to find it.
20          Once again, you'd be using that study,
21 though, to calculate lifetime days and not to offer an
22 independent epidemiological opinion, correct?
23     A.   I would only point out if asked, for
24 example, by defendants' counsel whether or not that
25 study shows any statistically significant increase in

**50**

1  NHL.  I would answer the question and point to the
2  statistics and say yes; it nearly triples the rate of
3  NHL at a statistically significant competence interval
4  at 95 percent.
5          THE REPORTER:  I'm sorry.  At a
6  statistically --
7          THE WITNESS:  -- significant
8  competence interval of 95 percent.
9  BY MR. KALAS:
10     Q.   Okay.  So I remember we went around and
11 around about this last time, so I want to try to keep
12 this so we're on the same page.
13          You said if asked by defendants' counsel.
14 So my question is, do you intend to testify on direct
15 at trial regarding the epidemiological findings in the
16 NAPP or Andreotti or anything else other than the
17 lifetime-days point which you intend to make?
18     A.   I don't know.  I actually haven't thought
19 that far ahead.  It seems to me it would be reasonable
20 for the jurors to know that the study that shows that
21 statistically significant rate with only an average of
22 two exposure days per year would be important.  I
23 guess I would have to talk with plaintiffs' counsel to
24 determine what the plan for direct examination is.  I
25 mean, I can't really -- I can't really decide that.

**5**

1  It's not my -- I don't think it's my duty.  I'm not an
2  attorney.
3      Q.   Okay.  So --
4      A.   There may be legal issues on that in terms
5  of the fact that I'm deferring to the epidemiologist
6  for the general causation aspects.  Whether my
7  bringing up that study would be a general causation
8  area that others are handling, I don't know.
9      Q.   Okay.  So I'll note for the record that,
10 for what I consider the first time, Dr. Sawyer is
11 testifying that he may offer epidemiological opinions
12 and not defer to Dr. Portier, Neugut, and Ritz.  Let
13 me ask that question directly.
14          As to the interpretation of
15 epidemiological studies, do you intend to defer still
16 to Drs. Portier, Ritz, and Neugut regarding the
17 interpretation of those studies?
18          MR. SELDOMRIDGE:  Objection.
19          Misstates and mischaracterizes.
20     A.   Not exactly, because I don't even know who
21 the epidemiological experts will be in this case.  I
22 don't know that Dr. Portier is -- I can't answer the
23 question.  I don't have the information at this time.
24 BY MR. KALAS:
25     Q.   Okay.  So it's my -- so sitting here

**52**

1  today, you leave open the possibility that you may
2  testify regarding the findings of the epidemiological
3  studies on your direct examination, correct?
4      A.   No.  No.  I only pointed out that one
5  study if it were peer-reviewed, which I don't think it
6  is at this point.  Only the abstract has been actually
7  published, and that is part of a symposia.
8      Q.   Okay.  So now I don't understand again.
9  So do you foreclose, sitting here today, the
10 possibility that you may testify regarding the
11 findings of epidemiological studies on your direct
12 examination?
13     A.   I will not accept the possibility of that
14 single study.  If I rely on it, if it is
15 peer-reviewed, because it does address dose, which is
16 critical to my assessment in this case --
17     Q.   As does the Andreotti study, correct?
18     A.   Yes.  Yes.  Absolutely.
19     Q.   So do you intend to testify about the
20 Andreotti study at trial on direct?
21     A.   I would point out in that study that there
22 was a finding of the statistically significant rate
23 for T-cell lymphoma, but the authors did not include
24 that in their assessment because it included 18 cases,
25 and in their methodology they're required 20 cases to

Transcript of William Sawyer, Ph.D.

14 (53 to 56)

Conducted on August 23, 2018

---

53

1  trigger use of the data in their conclusions.
2      Q.   Okay.  Did Mr. Hall have T-cell lymphoma?
3      A.   No.
4      Q.   He has B-cell lymphoma, right?
5      A.   Yes.
6      Q.   Did the authors find an increased rate of
7  B-cell lymphoma in that study?
8      A.   No.
9      Q.   Another thing I think we understood was
10  that -- or we talked about last time was about cancer
11  slope factors.  Do you remember cancer -- talking
12  about cancer slope factors?
13      A.   Yes.
14      Q.   And I believe you stated that a cancer
15  slope factor cannot apply to a single individual for
16  causation.  Do you recall that testimony?
17      MR. SELDOMRIDGE:  Objection.
18      Misstates.  Mischaracterization.
19      A.   I don't recall that question.  Can you
20  read it back or --
21  BY MR. KALAS:
22      Q.   Well, I'm just asking if you recall.  If
23  you don't recall it, that's fine.
24      A.   Well, I recall discussing it, but I don't
25  remember the question in that particular arrangement.

---

54

1      Q.   Okay.  You state in your toxicological
2  notes, "Cancer slope factors apply to a community or
3  population, not to a single individual."
4      Correct?
5      A.   That's correct.
6      Q.   And you stand by that statement?
7      A.   Absolutely.
8      Q.   And you would not tell a jury that a
9  cancer slope factor applies to Mr. Hall?
10      A.   As an individual, no.
11      Q.   Okay.
12      A.   As to a group of applicators, yes.
13      Q.   Okay.  And so if I understand correctly,
14  you can't calculate a dose for a single individual and
15  then apply it to a slope factor for a group of
16  individuals to determine that single individual's
17  cancer risk?
18      A.   That's a very confusing question.
19      Q.   All right.  Let me break it down.
20      You won't be presenting data at trial to
21  the jury that opines that Mr. Hall individually was at
22  an increased risk of cancer of some amount from his
23  use of Roundup?
24      A.   No.  I will be providing an assessment of
25  his dose level.  The epidemiological experts are

---

55

1  handling the general causation with respect to the
2  human epidemiologic data.  Now, I could apply the dose
3  level that I've determined and compare that to the
4  human epidemiologic data which shows an increased rate
5  of malignancy, but I have no intention of using the
6  animal slope factor to specifically measure Mr. Hall's
7  lifetime cancer risk.
8      Q.   Okay.  That was my question.  So thank
9  you.
10      Do you intend to tell the jury about a
11  safer alternative design of Roundup or
12  glyphosate-based herbicides?
13      MR. SELDOMRIDGE:  Objection.
14      Compound question.
15      A.   I can answer that with respect to
16  surfactants, adjuvants, and humectants, yes, that
17  there certainly is potentiation of the penetration of
18  the carcinogen into the body through the use of these
19  other materials in the product.
20      Does that answer your question?
21  BY MR. KALAS:
22      Q.   No, because I'm asking about something
23  different, and I'm sorry if I wasn't clear.
24      Are you intending to come to trial and
25  tell the jury that there is another formulation of

---

56

1  glyphosate-based herbicides that is safer than the
2  formulation Monsanto sells?
3      A.   Well, I may point to some other Monsanto
4  formulations sold in Europe, for example, that are
5  safer.
6      Q.   Okay.  And have you done any -- can you
7  tell me -- let me back up a second.  Which
8  formulations would those be?
9      A.   Primarily the formulations that no longer
10  contain the polyoxylated ethyl alkyl amines.
11      Q.   And have you done any testing to determine
12  that the European formulations of glyphosate-based
13  herbicides sold by Monsanto are safer than the
14  US-based formulations?
15      A.   The blower came on and I didn't quite hear
16  everything.  I don't hear that well.
17      Q.   And I know I said we'd take a break.  Just
18  a few more minutes.  I'm almost through this.
19      Have you done any testing to determine
20  that the European formulations of glyphosate-based
21  herbicides sold by Monsanto are safer than the
22  US-based formulations?
23      A.   No.  It's simply my assessment of the fact
24  that POEA has been removed and Monsanto's own
25  admissions in the documents that this particular

CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

15 (57 to 60)

57

1  formulation enhances dermal absorption.
2      Q.  Have you done any testing to determine
3  that the European formulations that you were referring
4  to are as effective as the US formulations in killing
5  the weeds that Jeff Hall was trying to kill?
6          MR. SELDOMRIDGE:  Objection.
7      Vague.
8      A.  No, I have not.
9  BY MR. KALAS:
10     Q.  Okay.  And what acute toxicity test are
11 you relying on -- well, strike that.  Let me back up.
12         What specific tests are you relying upon
13 conducted on the Monsanto Europe products to opine
14 that they are safer than the Monsanto US products
15 containing POEA?
16     A.  Simply the Monsanto documents that
17 indicate the POEA enhances dermal absorption thus
18 enhances dose.
19     Q.  Well, I guess my question's a little
20 different, which is you're opining, if I understand
21 correctly, that the European formulations without POEA
22 are somehow safer.  And my question is, where is
23 the -- which documents lay out that the European
24 formulations are safer, in your opinion, than the US
25 formulations?  You're telling me, if I understand

58

1  correctly, the US formulations enhance absorption, but
2  I'm asking you, what are you comparing that to?
3          MR. SELDOMRIDGE:  Objection.
4      Mischaracterizes.  Vague.
5      A.  Only the toxicological study data within
6  Monsanto documents performed by Monsanto or the
7  subcontractors with respect to POEA enhancing
8  absorption.  That's all.  There is no other test data
9  available evaluating the differential toxicity.
10 BY MR. KALAS:
11     Q.  Okay.  So if I understand, if we're
12 talking about the buckets we talked about earlier,
13 your opinion is solely based on absorption data and
14 not based on carcinogenicity data or genotoxicity
15 data, correct?
16     A.  Yes, and that's simply because Monsanto
17 has failed to perform analyses with the disclosure of
18 quantitative values of products containing different
19 POEAs versus products containing pure glyphosate only.
20 The carcinogenicity bioassays have not included
21 assessment of that differential.  That is products
22 with POEA versus the various animal studies that have
23 been conducted on the pure glyphosate only, that is
24 the glysophate [sic] isopropylamine primarily.
25     Q.  So you haven't reviewed, then, dermal

59

1  absorption studies conducted by Monsanto looking at
2  both Roundup containing POEA and other formulations
3  containing other surfactants?  You haven't seen any
4  data like that?
5      A.  I have.  There is one study Monsanto
6  published, it's in my file, it's in my report, that
7  Monsanto performed that showed that the additive
8  enhanced absorption.  In fact, I think I have
9  something in my report that specifically discusses the
10 concern that Monsanto had that it could potentially
11 interfere with their registration of the product.
12     Q.  Okay.  My question was slightly different,
13 and I think I didn't ask it well.
14         Have you seen studies and compared the
15 studies between percutaneous absorption of
16 formulations containing POEA versus percutaneous
17 absorption formulations containing another surfactant?
18     A.  When you say another, you mean an
19 alternative, a non-POEA?
20     Q.  Yes, sir.
21     A.  I don't believe so.
22     Q.  Okay.  And did you ask for that sort of
23 data from the Miller Firm, if it existed?
24     A.  I asked for all of the dermal absorption
25 data available, everything.

60

1      Q.  Okay.  And you haven't reviewed all 10
2  million pages produced in this litigation, obviously,
3  correct?
4      A.  Is there really ten --
5          MR. SELDOMRIDGE:  Objection.
6      Argumentative.
7      A.  Is there really 10 million?
8  BY MR. KALAS:
9      Q.  I think it's about that, yeah.
10     A.  No.  I -- I have not reviewed 10 million.
11 And if I had, I think my number of hours would be a
12 bit higher.
13     Q.  Probably true.
14         MR. SELDOMRIDGE:  Counsel, I hate
15     to interrupt you, but can we take that
16     break?  I think we've been going for
17     about an hour.
18         MR. KALAS:  Yeah.  One last
19     question, and we'll take a break.
20 BY MR. KALAS:
21     Q.  So you don't -- you concede that there is
22 a possibility that you have not seen every dermal
23 absorption study in the Monsanto database because
24 you're relying on somebody else to provide those?
25     A.  Yes, however, I've done my best.  You

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 18 of 70
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.                    16 (61 to 64)
Conducted on August 23, 2018

6

1  know, and I will probably leave this deposition and
2  keep digging because I don't want to miss anything.
3       Q.  Fair enough.
4            MR. KALAS:  All right.  Let's
5  take a break.
6            THE VIDEOGRAPHER:  All right.
7  The time is 10:30.  We are off the
8  record.
9            (Break taken from 10:30 a.m. to
10           10:42 a.m.)
11           THE VIDEOGRAPHER:  The time is
12  10:42.  We are on the record.
13 BY MR. KALAS:
14      Q.  Doctor, a few more housekeeping matters.
15 Am I correct that at trial you only intend to offer
16 opinions regarding Mr. Hall's occupational exposure to
17 glyphosate-based herbicides?
18      A.  On direct testimony?
19      Q.  Yes, sir.
20      A.  Yes.
21      Q.  Am I correct that your opinion -- or let
22 me ask you this:  Do you have a specific causation
23 opinion in this case?
24      A.  Yes.
25      Q.  And what is that opinion, sir?

62

1       A.  That based upon my review ███████
2  ███████████████████████████████████████
3  ███████████████████████████████
4  ██████████████████████████████████
5  ███████████████████ that it
6  is more likely than not that the glyphosate caused the
7  onset of his B-cell non-Hodgkin's lymphoma.
8       Q.  Okay.  And that opinion was not in the
9  toxicological notes, right?
10      A.  I don't think I included any summary
11 conclusion of opinions to that effect.
12      Q.  Okay.
13           MR. KALAS:  I note again for the
14  record that this is another opinion
15  that Dr. Sawyer is expressing for the
16  first time outside of his toxicological
17  notes or report as it was characterized
18  by Mr. Travers.
19           MR. SELDOMRIDGE:  Objection to
20  the mischaracterization.
21 BY MR. KALAS:
22      Q.  Am I correct that that opinion that you
23 just expressed regarding specific causation is based
24 solely on Mr. Hall's occupational exposure to
25 glyphosate-based herbicides?

63

1       A.  I don't understand that question,
2  actually.
3       Q.  Okay.  Your opinion on specific causation
4  that Mr. Hall has non-Hodgkin's lymphoma, am I correct
5  that it is based on -- well, strike that.  Let me ask
6  it again.  I skipped a step.
7            Your opinion on specific causation that it
8  is more likely than not that glyphosate caused the
9  onset of Mr. Hall's B-cell non-Hodgkin's lymphoma, I'm
10 correct that that is based on Mr. Hall's occupational
11 exposure to glyphosate alone, correct?
12      A.  Yes, as opposed to other potential
13 contributors, ████████████████████████████████████
14 ████████████████████████████████ but are you
15 asking me -- I think you already asked me this, but
16 are you asking me whether I'm concluding additional
17 exposure from GMO dietary glyphosate?
18      Q.  Specifically as to Mr. Hall.  I know you
19 said generally you weren't going to talk about it.
20 Specifically as to Mr. Hall, do you intend to talk
21 about dietary exposure to glyphosate on direct?
22      A.  No.
23      Q.  Okay.  Now, I know you provided a updated
24 set of toxicological notes this morning, and we'll go
25 through those at some point, but am I correct that you

64

1  haven't calculated a retrospective quantitative dose
2  estimate for Mr. Hall?
3       A.  I have.  It's in the -- approximately
4  page 120 to 128 range of the Exhibit 6.
5       Q.  Okay.  And that's based on the UK POEM
6  model data, correct?
7       A.  It is.
8       Q.  So I'm asking about something a little
9  different, and I probably am too vague in that
10 question.
11           Have you used EPA's dermal absorption
12 guidelines to calculate a retrospective quantitative
13 dose estimate for Mr. Hall?
14      A.  No.  I relied on the more accurate
15 analysis performed by Monsanto and Monsanto's
16 contractors in which laboratory -- basically, gauze
17 patches were placed on different areas of the body,
18 and the subjects were then sent out in the field with
19 backpack sprayers -- that is, hydraulic aerosol
20 sprayers -- and then these materials were removed from
21 the body and sent to the laboratory for glyphosate
22 quantitative analyses, which provides a much more
23 accurate measurement than the general EPA methodology
24 which uses simply default best-guess parameters.
25      Q.  We'll talk a little bit about that later,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 19 of 70
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

17 (65 to 68)

---

**65**

1  but let's -- I had some other questions.  At trial you
2  said you couldn't go back in time and measure
3  glyphosate levels of Mr. Johnson, right?  And the same
4  is true of Mr. Hall, correct?
5        MR. SELDOMRIDGE:  Objection.
6  Misstates.
7     **A.  I would need to see the transcript to see**
8  **if that's what I said exactly, but I'm not sure I**
9  **understand what you're getting at.**
10 **BY MR. KALAS:**
11    Q.  Well, it's not important.  What is
12 important is, did you -- can -- can you measure
13 glyphosate levels in Mr. Hall currently from his
14 application from 2008 to 2012?
15    **A.  Of course not.  It's rapidly metabolized**
16 **and removed.**
17    Q.  So you can't do a blood test of Mr. Hall
18 today to see how much glyphosate was present in
19 Mr. Hall from 2008 to 2012?
20    **A.  No.**
21    Q.  And that's because glyphosate does not
22 bioaccumulate, correct?
23    **A.  That's correct.**
24    Q.  And you couldn't do a urine test of
25 Mr. Hall today to see how much glyphosate was present

---

**66**

1  in Mr. Hall from 2008 to 2012, right?
2     **A.  Correct.**
3     Q.  And that's for the same reason.
4  Glyphosate does not bioaccumulate?
5     **A.  It's not persistent.  Correct.**
6     Q.  And you couldn't do a fecal test of
7  Mr. Hall today to see how much glyphosate was present
8  in Mr. Hall from 2008 to 2012, correct?
9     **A.  Correct.**
10    Q.  You couldn't do a skin test of Mr. Hall to
11 see how much glyphosate was present in his skin from
12 2008 to 2012, right?
13    **A.  That's correct.**
14    Q.  And then once again, that's because
15 glyphosate does not bioaccumulate?
16    **A.  Correct.  Well, it does -- it does form**
17 **temporary tissue depos within the epidermis, but**
18 **certainly they would not persist for that many years**
19 **due to the fact that the epidermis is continually**
20 **turning over and replacing itself.**
21    Q.  And how long does that turnover take for a
22 typical dead cell on the epidermis?
23    **A.  Well, I can't speak on the dead cell, but**
24 **for the epidermis itself to recycle and renew,**
25 **approximately 30 days.**

---

**67**

1     Q.  And is it your opinion that glyphosate
2  stays in the skin for 30 days?
3     **A.  Monsanto's own data shows it certainly**
4  **forms a deposit in the skin, but the duration of time**
5  **it takes that to mobilize into the bloodstream is**
6  **uncertain.**
7     Q.  So you don't know if that would recycle in
8  a day, the depo?
9     **A.  In one day?**
10    Q.  Yes, sir.
11    **A.  No.  It remains in the epidermis for one**
12 **day.**
13    Q.  Okay.
14    **A.  At least a percent -- a large percent of**
15 **it.**
16    Q.  A large percent.  What percentage is that,
17 sir?
18    **A.  According to the studies, typically**
19 **20 percent remains in the epidermis from a dose.**
20    Q.  20 percent.  Okay.  Which study -- I'm
21 sorry.
22    **A.  And that's based on various studies I**
23 **referenced from Monsanto or one of their**
24 **subcontractors.**
25    Q.  Which study are you referring to where

---

**68**

1  20 percent of glyphosate stays in the epidermis?
2     **A.  (Reviewing document.)**
3        **Well, the TNO study shows the mass balance**
4  **was found to range from 73 percent to 132 percent,**
5  **that 18 percent of the applied dose -- let's see.  On**
6  **page 62 of my Exhibit 6, this is just one example.**
7  **Mean penetration of the higher dose of MON 35012 was**
8  **646, or about 18 percent of the applied dose.**
9     Q.  Well, that, in fact, is not what this
10 says, right?  It says that the mean -- the mean
11 penetration was 646, but one membrane absorbed 1,100,
12 or 18 percent.  So the mean was more like 10 percent,
13 according to your notes, correct?
14    **A.  10.3 percent, yeah.**
15    Q.  So what study are you relying on to argue
16 that 20 percent of glyphosate stays in the epidermis?
17 Can you point me to that data?
18    **A.  Well, the TNO study at the lower dose,**
19 **using the worst-case scenario, there was 27 percent**
20 **missing.**
21    Q.  Missing, sir?
22    **A.  Yeah.  Missing.**
23    Q.  My --
24    **A.  Which is bound into the epidermis.**
25    Q.  How do you know that?  Where is the data

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

---

**69**

1 point that says 27 percent is in the epidermis, sir?

2 **A.   Well, because under the EOCD [sic]**

3 **guidelines, what is not accounted for, because it's**

4 **not measured on either side of the membrane, is**

5 **trapped within the membrane.**

6 Q.   Sir, is there something in black and white

7 type that says epidermis 20 percent or greater that

8 you can point me to regarding skin bioaccumulation of

9 glyphosate?

10 **A.   (Reviewing document.)**

11 **Yeah, the Maibach -- wait a minute.   I**

12 **think that's Maibach -- Maibach study on page 39 of**

13 Exhibit 6, "The total percent recovery (percent label

14 removed by washing plus total percent label contained

15 in urine) was low, i.e. 16%.  A definitive explanation

16 for the low recovery is not provided in the report,

17 but the author does state that previous experience

18 would suggest that much of the test material may in

19 some way bind to or in the skin and cannot be removed

20 by washing.  In support of this . . . (Vickers

21 1963)" -- and that's a public peer-reviewed

22 publication -- stated "that a 'chemical reservoir' is

23 formed in the skin after drug application which is

24 eventually shed without penetration.  Thus, it is

25 concluded that the bound material is not apparently

---

**70**

1 available for systemic absorption."

2 And then I pointed out that that is in

3 violation of the OECD protocol in which the

4 unrecovered material that is bound in the skin should

5 be considered as absorbed because there is -- it could

6 be a slower absorption.  And, of course, as that

7 amount accumulates in the dermal tissue, Fick's law

8 would increase the likelihood of it migrating due to

9 the increasing higher concentration in the tissue, and

10 that is the principle behind the EOCD regulation that

11 that unabsorbed material be counted as absorbed.

12 So in this case, it would be 16 percent.

13 I know you asked about 20, but I provided a value here

14 of 16 percent and earlier a value in excess of

15 20 percent.

16 Q.   Okay.

17 MR. KALAS:  I'm going to note for

18 the record that eight minutes passed

19 from when I asked the question to when

20 Dr. Sawyer responded.  This

21 deposition -- this is exactly why this

22 deposition cannot be limited to one

23 day.  We intend to move for additional

24 time if it's going to take eight

25 minutes to answer a question.  I'll

---

**7**

1 talk to Mr. Seldomridge about this at

2 lunch.

3 MR. SELDOMRIDGE:  I would just

4 like to note for the record that the

5 parties already agreed on a one-day

6 deposition for Dr. Sawyer.

7 MR. KALAS:  We did not agree.  We

8 did not agree.  We have never agreed.

9 The deposition was always noticed day

10 to day, and we asked for two days for

11 plenty of time.

12 MR. SELDOMRIDGE:  My statement

13 still stands.

14 **A.   Thank you for being patient, and I will do**

15 **my very best to answer your questions as rapidly as I**

16 **can.  It's just that particular question required me**

17 **to look through my notes and provide an accurate**

18 **referenced answer.**

19 BY MR. KALAS:

20 Q.   Well, Dr. Sawyer, I would also ask you,

21 once again -- you referred to 16 percent here for the

22 low recovery, but I asked you a different question,

23 which is:  Can you point me to a data point in black

24 and white print that says 20 percent or 16 percent of

25 glyphosate is contained in the epidermis at the end of

---

**72**

1 one of these dermal absorption studies?  Do you have

2 that at your fingertips?

3 MR. SELDOMRIDGE:  Objection.

4 Redundant.

5 **A.   Yes.  This study did just that.**

6 BY MR. KALAS:

7 Q.   Where does it say in the Maibach '83

8 study, epidermis 16 percent?

9 **A.   Well, the term was "skin" in what I just**

10 **read to the court reporter, that lengthy paragraph**

11 **that appears at the top of page 39 in Exhibit 6, which**

12 **references MONGLY01330783.  It's a quote right out of**

13 **the Monsanto document.**

14 Q.   And the quote, if I understand correctly,

15 is that the total recovery was 16 percent, correct?

16 **A.   Yes.  So that would actually suggest**

17 **84 percent in the tissue.**

18 Q.   Okay.  So you believe there is 84 percent

19 of glyphosate in the tissue and you're going to cite

20 to this data point for that?

21 **A.   No.  However, the EO -- the OECD**

22 **guidelines state that the amount of substance not**

23 **found in the donor chamber should be considered**

24 **absorbed.  That is an official rule.  I reference that**

25 **to OECD guidance documents for the conduct of skin**

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 21 of 70
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

19 (73 to 76)

73

1 absorption studies 2004a, part 28, page 131, and thus
2 this is a deviation of protocol.
3    Q.  Dr. Sawyer, my question is very simple,
4 and I don't think you've answered it, which is:  Is
5 there a Monsanto document that says 20 percent of
6 glyphosate is in the epidermis, or is there any
7 document you're aware of that says 20 percent of
8 glyphosate is in the epidermis in a dermal absorption
9 study?  Not that it's not recovered, but there's
10 20 percent in the epidermis.
11    MR. SELDOMRIDGE:  Objection.
12 Compound.  Argumentative.
13    A.  (Reviewing document.)
14    Well, in the rhesus monkey dermal dosing
15 studies -- I'm referencing page 42, Item Number 5,
16 "Only 81.8% of applied 'Dose D' was recovered.  The
17 authors claimed that the remaining 18.2% was 'lost'
18 since it was not detected.  If any of the missing
19 18.2% remained in the monkey in tissue or fluid that
20 was not tested, the amount of absorbed would have been
21 underestimated.  The lost material is beyond the
22 acceptable limit according to OECD guidelines of mass
23 balance.  If all of the missing 18.2% is assumed to
24 have remained in the monkey and is included in the
25 amount absorbed," the total would be 22.6 percent.

74

1    So, again, if the methodology had been
2 followed and not deviated from by Monsanto, they would
3 have concluded 22.6 dermal absorption.
4 BY MR. KALAS:
5    Q.  Do you have a data point in the Wester
6 study that says 22.6 percent of the glyphosate studied
7 in that study is in the epidermis or any dermis -- or
8 the dermis?  Excuse me.  Can you point me to that data
9 point in that study?
10    MR. SELDOMRIDGE:  Same objection.
11 Compound question.
12    A.  I'm not sure what you mean by point you to
13 a data point.
14 BY MR. KALAS:
15    Q.  Sir, I've been asking now for 15 minutes
16 for to you point to a data point that says 20 percent
17 or thereabouts of glyphosate is in the dermis, and you
18 continue to point to data points regarding lack of
19 recovery.  I am asking a very specific question, and
20 you are not giving me an answer to it.
21    My question is, is there a point in any of
22 these studies you've reviewed that says 20 percent is
23 in the skin?  Not that it's not recovered, that it's
24 in the skin.  It's a very clear question.
25    MR. SELDOMRIDGE:  Objection.

75

1    Argumentative.
2    A.  (Reviewing document.)
3    Yes.  On page 50, paragraph C, Monsanto
4 stated -- their scientist stated, "Even though we can
5 absorb additional 'uncertainty factors' in our risk
6 assessment based on our biomonitoring results, I feel
7 uncomfortable with this discussion.  This approach by
8 Spain sets a precedent and contradicts the fact that
9 we always claimed to fully understand the glyphosate
10 pharmacokinetics.  The Wester IV experiment suggests
11 that almost the entire 'systemically' available dose
12 was excreted in urine.  The low dose topical in vivo
13 experiment suggests that almost the entire dose (82%)
14 that was absorbed through the skin was excreted in the
15 feces.  We should have a robust and well-documented
16 explanation for this."
17    Basically, Monsanto doesn't fully
18 understand why they're not getting the recovery, and
19 that's why under the rules and regulations methodology
20 it has to be accounted for as absorbed.
21 BY MR. KALAS:
22    Q.  Is the word epidermis in that passage you
23 just read?
24    A.  No.
25    Q.  Is the word 20 percent -- or the value

76

1 20 percent in that passage you just read?
2    A.  No.
3    Q.  You are evading my question, and the
4 record will reflect that.  Once again, I just -- we'll
5 talk about it at lunch.
6    MR. SELDOMRIDGE:  Objection.
7    Harassing the witness.  Argumentative.
8 BY MR. KALAS:
9    Q.  Are you offering regulatory opinions in
10 this case, sir?
11    A.  No.  I'm only -- my only opinions are as
12 to the appropriateness of the work done by the
13 toxicologists.  I'm a toxicologist, and I can evaluate
14 their work at Monsanto in terms of the interpretation
15 of such work.  But I'm not a regulatory expert.  I
16 think that would be -- defer that to someone like
17 Dr. Benbrook.
18    Q.  Okay.  Now, you just -- so you're not --
19 strike that.
20    So you're not going to come to trial and
21 tell the jury that Monsanto violated EPA regulations,
22 right?
23    A.  Methodology, for example, the OECD
24 methodology's been violated.
25    Q.  My question was different.  Are you coming

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

---

**77**

1  to trial and telling the jury Monsanto violated EPA
2  regulations?
3       A.   I don't believe so.  That's something I
4  would defer to Dr. Benbrook.
5       Q.   Okay.  Now, you just read to me an email
6  from Monsanto.  Explain to me how -- well, strike
7  that.
8            You actually discuss in your toxicological
9  notes what you describe as a failure of Monsanto
10  toxicologists to meet ethical standards required in
11  the profession, right?
12           MR. SELDOMRIDGE:  Objection.
13  Mischaracterizes.
14           MR. KALAS:  It's a quote taken
15  right out of it.
16           MR. SELDOMRIDGE:  You can show
17  him the quote if you'd like to.
18       A.   Can you repeat the question?
19  BY MR. KALAS:
20       Q.   In your toxicological notes, you describe
21  what you call a failure of Monsanto toxicologists to
22  meet ethical standards required in their profession.
23           MR. SELDOMRIDGE:  Same objection.
24  BY MR. KALAS:
25       Q.   Do you recall putting that in your

---

**78**

1  toxicological notes?
2       A.   Yes.
3            MR. SELDOMRIDGE:  Same objection.
4  BY MR. KALAS:
5       Q.   Okay.  And one of the sources you used to
6  reach that conclusion was emails that you saw in the
7  course of reviewing documents in this litigation,
8  right?
9       A.   Emails combined with the actual reports of
10  the test methodology results and discussion of those
11  results.
12       Q.   Now, you're not planning on telling the
13  jury what somebody means in an email, right?
14       A.   I wouldn't attempt to interpret an email.
15  I would simply rely on the facts stated.  For example,
16  in that last example, Monsanto does not really
17  understand the pharmacokinetics of glyphosate to the
18  degree they claim, and that's evidenced by the
19  unaccounted-for -- unaccounted-for, unrecovered
20  glyphosate in the various studies by, for example, the
21  TNO study, Wester study, the monkey study, etc.
22       Q.   So you're going to tell the jury that a
23  statement in an email by a single Monsanto employee
24  represents the corporate state of mind of the entire
25  company?

---

**79**

1       A.   No.  No.  Again, I'm only speaking about
2  scientists, toxicologists, who fail to perform.  For
3  example, the toxicologists who decided it would be too
4  risky to repeat a study because it resulted in very
5  high dermal absorption, and that could upset the
6  regulatory process.
7            Well, another example was the toxicologist
8  who decided not to repeat a monkey study because it
9  might, quote, find a new metabolite, quote.
10           Well, that's our job.  We're
11  toxicologists.  We're like detectives.  We want to
12  find the new metabolite and understand what's causing
13  the cancer, not fraudulently hide behind it.  That's
14  unethical for a toxicologist to behave that way.
15       Q.   So you intend to tell the jury, based on
16  emails, that Monsanto toxicologists acted
17  fraudulently; is that correct?
18       A.   Well, certainly by deciding not to run the
19  study because it could be too, quote, risky, unquote,
20  and might find a new metabolite.  That is a -- purely
21  a toxicological violation and should be reported.  I
22  mean, that's our -- that's our job.  That's our duty.
23  That's, for example, a police officer who should make
24  an arrest closing his eyes and looking the other way
25  because it's a buddy.

---

**80**

1       Q.   Have you undergone any special training to
2  be able to explain to juries what toxicologists mean
3  in emails?  Did you take a class on that?
4            MR. SELDOMRIDGE:  Argumentative.
5       A.   No.
6  BY MR. KALAS:
7       Q.   Did you undergo any special training to
8  understand how toxicology -- toxicologists at Monsanto
9  use emails to guide company policy regarding
10  toxicology studies?
11       A.   No.  I'm not addressing such issues as
12  that.
13       Q.   Are you an expert in morality?
14       A.   No.
15       Q.   Are you an expert in honesty?
16       A.   I'm not sure I understand the question.
17       Q.   Just asking.
18            Are you an expert in when people are being
19  honest or being fraudulent?
20       A.   You mean being able to detect such?
21       Q.   To be able to tell a jury about it, sir.
22       A.   I don't think that's my role.  My role is
23  a toxicology role.  I'm a toxicologist, and if a
24  toxicologist breaches his duties, then that I should
25  make evident.

---

Transcript of William Sawyer, Ph.D.

21 (81 to 84)

Conducted on August 23, 2018

---

**81**

1    Q.   Do you have a special talent in reading an
2  email and telling people what somebody who wrote that
3  email was thinking?
4         MR. SELDOMRIDGE:  Argumentative.
5    **A.   Strange question, but I think I understand**
6  **what you're asking.  Are you asking me if I'm a**
7  **mind-reader?**
8  **BY MR. KALAS:**
9    Q.   I asked if you had a special talent in
10  reading an email and telling anyone what the person
11  who wrote that email was thinking.
12        MR. SELDOMRIDGE:  Redundant.
13  Argumentative.
14    **A.   I can't -- I'm not a -- what do you call**
15  **those people who use the crystal ball?**
16  **BY MR. KALAS:**
17    Q.   Psychic?
18    **A.   A what?**
19    Q.   A psychic.
20    **A.   Psychic.**
21        MR. SELDOMRIDGE:  Object to form.
22    **A.   No, I'm not a psychic.  I simply use**
23  **what's in black and white and read what it states**
24  **clearly, what it states.  I'm not inferring anything**
25  **and have no desire to infer anything into someone's**

---

**82**

1  message.
2    Q.   Okay.  So if you have no desire to infer
3  anything as to someone's message, then inferring that
4  they acted with a fraudulent intent is not something
5  you're going to tell a jury about?
6    **A.   I would tell the jury that it was simply a**
7  **breach of duty to not pursue in chasing down and**
8  **finding that metabolite but rather deciding not to**
9  **repeat the study because it is too risky.**
10    Q.   Have you undergone any special training
11  about opining as to the state of mind of a toxicology
12  department at a corporation?
13        MR. SELDOMRIDGE:  Objection.
14  Unintelligible.
15    **A.   It's a little difficult for me to answer**
16  **that question because I don't totally understand it.**
17  **BY MR. KALAS:**
18    Q.   Well, if you don't understand it --
19    **A.   It's a long question.**
20    Q.   My question is about your training, sir.
21  And do you have any special training about inferring
22  states of mind of a toxicology department at Monsanto?
23        MR. SELDOMRIDGE:  Same objection.
24    **A.   No.  That's beyond my scope.  I don't**
25  **intend to do exactly what you just said.**

---

**83**

1         MR. KALAS:  All right.  We're out
2  of tape.  So let's take a break.
3         THE VIDEOGRAPHER:  This marks the
4  end of Media Number 1 in the deposition
5  of William Sawyer.  The time is 11:25.
6  We are off the record.
7         (Break taken from 11:25 a.m. to
8          11:35 a.m.).
9         THE VIDEOGRAPHER:  This marks the
10  beginning of Media Number 2 in the
11  deposition of William Sawyer.  The time
12  is 11:35.  We are on the record.
13  BY MR. KALAS:
14    Q.   Dr. Sawyer, we were talking about emails
15  that you took a look at.  Did you interview any of the
16  authors of the emails that you relied upon in reaching
17  your expert opinions?
18    **A.   No.**
19    Q.   Did you speak at any time to any of the
20  authors of the emails you relied upon in reaching your
21  expert opinions?
22    **A.   No.  I mean, I think it's a ridiculous**
23  **question.  If I were to call Monsanto and ask to speak**
24  **with their toxicologists, they'd probably hang up on**
25  **me.**

---

**84**

1    Q.   Do you know -- do you know any of the
2  authors of the emails you relied upon in reaching your
3  expert opinion?
4    **A.   No.**
5    Q.   Did you ever interview any of the authors
6  of the articles you evaluated in reaching your expert
7  opinion?
8    **A.   Did I review their articles?**
9    Q.   Did you interview the authors of the
10  articles?
11    **A.   Not in this case.**
12    Q.   Okay.
13    **A.   In other cases, yes.  Not in the Johnson**
14  **case either.**
15    Q.   Okay.  You agree that it's possible to
16  take an email out of context, right?
17    **A.   Yes.**
18    Q.   And you agree that it would be appropriate
19  for someone trying to understand a company's conduct
20  based on emails to consider the context around the
21  emails or memos, right?
22    **A.   Yes.**
23    Q.   And you agree that it would be appropriate
24  for evaluating -- for someone evaluating the corporate
25  conduct of a company to consider the actual actions

---

**85**

1  the company took rather than what is just written in
2  an email, correct?
3      **A.   Yes.**
4      Q.   Now, science can be an iterative process
5  with a lot of back and forth, right?
6      **A.   In forensic toxicology, that is true.**
7      Q.   And in toxicology in general, that's true
8  as well, right?
9      **A.   Yeah, especially in forensic matters that**
10  **are open to debate.**
11      Q.   And you could read a document that was
12  written at the midpoint in a scientific process and
13  take the ultimate outcome of that process out of
14  context, right?
15      **A.   I don't understand.**
16      Q.   Well, my point is, is that you could read
17  a document -- let's say that we're deciding whether or
18  not to build an airplane, and halfway through,
19  somebody writes an email that says, "It's too hard to
20  build the airplane.  Let's not do it."  At the end of
21  the day, we built the airplane because somebody else
22  disagreed.
23          If you just read the email that said "It's
24  too hard to build the airplane.  Let's not do it," you
25  could have a misconception of where that process ended

**86**

1  up, right?
2      **A.   In that example, yes.**
3      Q.   And, generally, if you read an email at
4  the midpoint of a scientific process, you could have a
5  misconception of where that process ended up,
6  correctly -- or correct?
7      **A.   Yes.  However, in the cases in my report,**
8  **the airplane was never built.**
9      Q.   When you claim Monsanto toxicologists have
10  violated standards laid out by the Society of
11  Toxicology, what standards are you referring to from
12  the Society of Toxicology?
13      **A.   As per the Web site, ethics.**
14      Q.   Okay.  And do you have that Web site cited
15  in your notes or on your Materials Considered list?
16      **A.   I don't know.  I'd have to check my**
17  **footnotes.**
18      Q.   The section where you discuss this, I
19  believe, was in I believe -- at least Exhibit 5, 123
20  to 124.  You may have moved it, I think, to 129 in
21  Exhibit 6.
22      **A.   I didn't -- I did not reference the**
23  **Web site.**
24      Q.   Okay.  And I'm correct you've never sat on
25  the Society of Toxicology's legal council, right?

**87**

1      **A.   No.**
2      Q.   And you've never been invited to that
3  council, right?
4      **A.   No.**
5      Q.   And have you ever offered an expert
6  opinion to that council?
7      **A.   No.**
8      Q.   Have you ever reported a toxicologist for
9  violating the Society of Toxicology's ethical
10  standards?
11      **A.   No.  I've never run across such an example**
12  **until recently.**
13      Q.   Have you reported the Monsanto
14  toxicologists for violating the Society of
15  Toxicology's ethical standards?
16      **A.   No.**
17      Q.   Do you plan to?
18      **A.   Possibly.**
19      Q.   When do you plan to do that, sir?
20      **A.   I didn't say I planned to do it.**
21      Q.   When do you possibly plan to do that, sir?
22      **A.   I don't know.**
23      Q.   Why have you not done it already, if this
24  is your belief?
25      **A.   I would prefer to wait until any**

**88**

1  **litigation -- pending litigation is over because I'm**
2  **afraid it could somehow be used by defense counsel to**
3  **somehow point the finger at me and use it and state**
4  **I'm biased.**
5      Q.   You're worried about the perceived
6  conflict of interest, right?
7      **A.   Yes.**
8      Q.   You have an interest, at least a perceived
9  interest, in arguing that Monsanto's toxicologists
10  acted in an unethical manner?
11      **A.   I have an interest of remaining impartial**
12  **and unbiased, and I would not want to get into some**
13  **type of legal argument with a toxicologist at Monsanto**
14  **that could interfere with the fair and un -- impartial**
15  **and unbiased opinion in this case.  So my opinion is,**
16  **at this point, to leave the sleepy dog rest.**
17      Q.   You agree that the fact that you have
18  received hundreds of thousands of dollars in
19  compensation for your time spent on this case could be
20  perceived as a conflict of interest by the Society of
21  Toxicology?
22          MR. SELDOMRIDGE:  Objection.
23  Misstates.
24      **A.   It's an untruth question, and I can't**
25  **answer questions that are not of truth.**

Transcript of William Sawyer, Ph.D.                23 (89 to 92)
Conducted on August 23, 2018

---

**89**

1  BY MR. KALAS:
2      Q.   Why is that question not of truth, sir?
3      **A.   Well, I have not received hundreds of**
4  **thousands of dollars.**
5      Q.   When I say "this case," I mean the
6  glyphosate litigation. So let me --
7      **A.   No. I've not received hundreds of**
8  **thousands of dollars.**
9      Q.   Sir, in your last deposition, you
10 testified you had invoiced over $143,000. You adopted
11 that figure again today. Are you now changing your
12 testimony about that?
13     **A.   That's not hundreds of thousands of**
14 **dollars, sir.**
15     Q.   Okay. I'm sorry. Let me -- let me change
16 the question, then, to be more exact. You agree it's
17 an awful lot of money, $143,000, right?
18     **A.   No, I do not. I've put in a huge amount**
19 **of hours and work into this matter.**
20     Q.   Okay.
21     **A.   And at my hourly rate, that's what it is.**
22 **That's what it comes to. And from that hourly rate, I**
23 **also pay my staff, and I pay a lot of other overhead**
24 **as well.**
25     Q.   You agree that it might be a perceived

---

**90**

1  conflict of interest to the Society of Toxicology that
2  you've received over $143,000 in the glyphosate
3  litigation if you reported Monsanto toxicologists as
4  having acted fraudulently?
5      **A.   Okay. The question was too long. I did**
6  **not follow all of it.**
7      Q.   Do you understand what a perceived
8  conflict of interest is?
9      **A.   Not exactly.**
10     Q.   Okay. Then let me go to that.
11         Do you understand that when you consult
12 and receive monies that there is a perceived conflict
13 of interest that you would, for instance, want to
14 disclose if you were publishing an article on a
15 subject that you had received money for consulting on?
16     **A.   Yes.**
17     Q.   Okay. And here, you've received money on
18 consulting regarding forensic toxicology matters about
19 Roundup, right?
20     **A.   Yes. However, I earned it with a number**
21 **of hours, unlike other experts who are paid huge**
22 **amounts of money and don't even bother to read the**
23 **current medical records of the plaintiff.**
24     Q.   I'm not saying you haven't earned every
25 penny of your $143,000, sir. My question is

---

**9**

1  different. My question is, would it be a perceived
2  conflict of interest to the Society of Toxicology that
3  you've received compensation upwards of $143,000 for
4  your work on this litigation?
5          MR. SELDOMRIDGE: Objection.
6  Argumentative.
7      **A.   Not -- I don't understand the question.**
8  BY MR. KALAS:
9      Q.   Okay. Has the Society of Toxicology, to
10 your knowledge, ever found that Monsanto toxicologists
11 violated their standards?
12     **A.   I haven't researched that.**
13     Q.   So when you were opining that the Monsanto
14 toxicologists violated the standards of the Society of
15 Toxicology, you didn't think to go look at what the
16 Society of Toxicology said about that, right?
17     **A.   There is -- let me explain it this way:**
18 **There are no buttons on their Web site that even**
19 **permit one to make such an inquiry.**
20     Q.   So you didn't do it?
21     **A.   No, I did. I looked at the Web site.**
22 **There is no possible means of even asking that**
23 **question.**
24     Q.   So when you looked at the Web site at the
25 ethics link that you failed to provide in your

---

**92**

1  toxicological notes or on your Materials Considered
2  list, when you looked at that Web site, you didn't see
3  any way to find out what toxicologists had been
4  brought up for ethical violations?
5      **A.   There is no way to do that.**
6      Q.   Okay. And, to your knowledge, have any
7  Monsanto toxicologists been brought up for ethical
8  violations by the Society of Toxicology?
9      **A.   I have no way to know that.**
10     Q.   So the answer is, to your knowledge, you
11 don't know of any ethical violations the Society of
12 Toxicology has found against Monsanto toxicologists?
13     **A.   I don't have information on that either**
14 **way.**
15     Q.   Okay. Now, you agree with me there's a
16 difference between toxicity and carcinogenicity,
17 right?
18     **A.   Yes.**
19     Q.   And just because something's toxic doesn't
20 mean it's carcinogenic, right?
21     **A.   Correct. That's correct.**
22     Q.   And just because something is cytotoxic
23 doesn't mean it's carcinogenic, right?
24     **A.   Correct.**
25     Q.   What is toxicity, sir?

---

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

24 (93 to 96)

Conducted on August 23, 2018

93

1     A.   Toxicity is simply a concentration or dose
2 of a substance which results in a measurable adverse
3 effect to the organism.
4     Q.   What is cytotoxicity, sir?
5     A.   Cytotoxicity is specific to cellular
6 damage at a particular given level of substance.
7     Q.   What's the difference between toxicity and
8 cytotoxicity?
9     A.   Toxicity is general.  That could involve a
10 transient neurological response that is reversible
11 such as -- I notice you just drank water.  If that
12 amount of water was 150-proof moonshine, you would
13 undergo transient neurological impairment, which is
14 reversible, as opposed to a cytotoxic effect which
15 would actually damage and most likely destroy a cell.
16     Q.   And when you have cells that have
17 cytotoxic damage done to them, are there physical
18 manifestations of that damage if it is -- if it's
19 large enough, I guess?
20     A.   Well, for example, if it's hepatotoxic and
21 the substance is destroying sufficient hepatocytes,
22 yes, we would see markers of increased liver enzymes
23 such as ALT.  Doesn't mean that the insult is
24 permanent.  It could be reversible.  But given enough
25 cytotoxic agents, certainly adverse effects could be

94

1 either measured by laboratory analysis or by
2 histopathology methodology or by direct observation.
3     Q.   And what about on the skin?  If you have
4 cytotoxicity on the skin, what sort of effects would
5 you see, if you had enough?
6     A.   Generally, the skin under the OECD
7 guidelines, we look for erythema initially, which is
8 redness of the skin.  And in a more serious degree,
9 we'd look for the first-, second-, or third-degree
10 burn and necrosis, which is an obvious area, a patch
11 of cellular death.
12     Q.   Okay.  And then carcinogenicity, what is
13 carcinogenicity?
14     A.   Carcinogenicity is the formation of a --
15 what we consider a cell that has become immortal that
16 continues to, in an uncontrolled, unregulated manner,
17 reproduce generally immature, nonfunctional cells
18 forming what we call "tumors."
19     Q.   Now, there's such a thing as acute
20 toxicity, right?
21     A.   Certainly.
22     Q.   And what's acute toxicity?
23     A.   Well, a good example would be you drinking
24 that clear glass of 150-proof moonshine.  You would
25 acutely absorb all of that within about 30 seconds --

95

1 30 minutes into your blood vascular system, and you
2 would undergo acute neurological effects.
3     Q.   And many of the effects of glyphosate that
4 you look at in your toxicological notes here, they are
5 acutely toxic or cytotoxic effects, right?
6     A.   Yes.
7     Q.   And explain to me, in your opinion, how
8 these acutely toxic or cytotoxic effects are
9 indicative of a carcinogenetic process, just
10 generally.
11     A.   That's actually a rather uncommon
12 relationship to carcinogenicity.  It can -- that is,
13 continued cytotoxicity to a particular organ, for
14 example, will increase the likelihood of a
15 carcinogenic process occurring.
16         For example, if a cytotoxic agent
17 chronically causes a serious chronic cytotoxic damage
18 increasing cellular turnover, that can lead to a
19 increased rate for a insufficient level of DNA repair
20 from typical mutagenic processes that occur to result
21 in a malignant cell.
22     Q.   Do you believe glyphosate is acting
23 through the mechanism -- glyphosate-based herbicides
24 are acting through the mechanism you just described?
25     A.   No.  Based on, for example, the Wood 2009b

96

1 study, the extremely high-quality dose-response
2 relationship throughout the dose levels is suggestive
3 of a linear approach as opposed to a single high-dose
4 threshold due to cytotoxicity.
5     Q.   And so when you cite to studies on acute
6 toxicity or cytotoxicity in your toxicological notes,
7 you'd agree that a jury shouldn't use that as direct
8 evidence of a carcinogenic process from that acute
9 toxicity?
10     A.   Again, I think it's due to my just being
11 kind of tired and hungry, but I didn't really follow
12 your question accurately enough to answer it.
13     Q.   Sure.
14         If I understand you correctly, you believe
15 that glyphosate is acting through a linear genotoxic
16 approach as opposed to a cytotoxic approach, correct?
17     A.   Yes, and I base that on the fact that
18 there are genotoxic studies that demonstrate that the
19 compound can act through that pathway and that the
20 dose-response relationships in the animal studies are
21 consistent with the linear approach.  And I also will
22 defer to the epidemiologists dose-response evidence
23 within the human studies.
24     Q.   Okay.  So if I understand that's the
25 mechanism you're positing, then I'm correct that a

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 27 of 70

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

25 (97 to 100)

**97**

1 jury shouldn't take evidence of an acutely toxic or
2 cytotoxic effect from glyphosate as evidence of a
3 carcinogenic process or glyphosate-based herbicides?
4    **A.   I would need a more specific example of**
5 **that to be able to answer that question.**
6    Q.   All right.  Let's -- if glyphosate -- if
7 I, in a in vitro study, put glyphosate on a cell and
8 it kills it immediately, it's cytotoxic -- or
9 glyphosate-based herbicide, a cytotoxic effect, it's
10 your opinion that glyphosate is not acting through
11 that mechanism, a cytotoxic mechanism, to cause
12 cancer, right?
13    **A.   That wouldn't prove it, no.**
14    Q.   I'm not asking what proves anything.  I'm
15 asking if that piece of evidence, a cytotoxic effect
16 from glyphosate or glyphosate-based herbicides, is
17 being used by you to support your opinions regarding a
18 genotoxic mechanism.
19    **A.   I just don't follow the question.**
20    Q.   Okay.  Well, let me ask a couple
21 foundational questions, then.
22       The fact that glyphosate or
23 glyphosate-based herbicides cause an acutely toxic
24 effect in any given study should not be taken as
25 direct evidence of carcinogenicity, correct?

**98**

1    **A.   By itself in a vacuum, that's correct.**
2    Q.   Okay.
3    **A.   But that doesn't mean that that particular**
4 **study evidence in conjunction with other evidence**
5 **couldn't be considered.**
6    Q.   Okay.  So explain to me, under your theory
7 of the mechanism of glyphosate-based herbicides
8 causing cancer, how an acutely toxic effect of
9 glyphosate-based herbicides supports that theory.
10    **A.   Well, as I said, in a vacuum, it doesn't.**
11    Q.   Okay.  Now, likewise, the fact that
12 glyphosate or glyphosate-based herbicides caused a
13 cytotoxic effect in any given study should not be
14 taken as direct evidence of the carcinogenicity of
15 those compounds, correct?
16    **A.   By itself, that's accurate.**
17    Q.   Okay.  Now, moving on to Mr. Hall, you
18 spoke to Mr. Hall via the phone, right?
19    **A.   Twice.**
20    Q.   Twice.  Okay.
21       Now, according to your toxicological
22 notes, you had a conversation with him on
23 February 13th, 2018, right?
24    **A.   Yes.**
25    Q.   When was the other conversation?

**99**

1    **A.   Yesterday at approximately 3:30 or**
2 **4:00 p.m. Eastern Daylight Savings Time.**
3    Q.   Okay.  And I want to ask you some
4 questions about the February conversation, which was
5 the only one we were aware of prior to today; but I
6 guess first let me ask you about yesterday's
7 conversation.
8       Number one, are the contents of
9 yesterday's conversation included in your
10 toxicological notes of August 22nd, 2018?
11    **A.   Yes.**
12    Q.   They are?
13    **A.   Yes.**
14    Q.   Okay.  So what pages in Exhibit 6 do you
15 discuss yesterday's conversation?
16    **A.   Within pages 124 to 129.**
17    Q.   Okay.
18    **A.   And if we were to discuss those pages,**
19 **then I would be able to certify that everything is in**
20 **there or state that there may be places -- other**
21 **places in the report, but I -- because I think I kept**
22 **everything within those pages, but without reviewing**
23 **it, I can't recall.**
24    Q.   So what prompted the conversation with
25 Mr. Hall yesterday?

**00**

1    **A.   Well, I tried my very best to ascertain**
2 **his body weight during the years which he was working**
3 **occupationally with glyphosate prior to his 2012**
4 **cancer diagnosis.**
5 ████████████████████████████████
6 ████████████████████████████████
7 ███████████████████████████**t, and**
8 **what concerned me was that I know that he worked**
9 **outdoors burning a large amount of calories doing his**
10 **work.**
11       **And then he became a volunteer with the**
12 **police department and then became an officer, and I**
13 **believe even upgraded to a lieutenant.  As we all**
14 **know, police officers like doughnuts.** ██████████
15 ████████████████████████████████
16 ████████████████████████████████
17 ███████████████████████**So I decided the**
18 **only way to find out, because I could not find**
19 **anything in the medical records to cover that, I**
20 **thought I better call him.**
21       **And I also -- as I spoke to him, I had in**
22 **the back of my mind some other questions that I had**
23 **been pondering, which I asked him as well.**
24    Q.   What were those questions?
25    **A.   Well --**

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 28 of 70
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

26 (101 to 104)



01

1    Q.   Actually, can I withdraw that question and
2  ask a follow-up on the first thing you said?
3
4
5    A.
6
7
8
9
10
11
12
13
14   Q.   Okay.
15   A.
16
17
18
19   Q.   Yep.  Okay.  Now, you said you asked some
20 other questions.  What other questions did you ask
21 him?
22   A.   Well, in reviewing and preparing for this
23 deposition, I noticed that in my interview he referred
24 to his use of jersey gloves, and I had made an
25 assumption that that were similar to the gloves I use

02

1  when I'm doing pruning and handling sharp branches and
2  so forth, which have leather palms.
3        And then I did a little research and
4  determined that the gloves that I have that I assumed,
5  I assumed wrong.  They're not jersey gloves.
6        So I asked him again to clarify what type
7  of gloves, what they looked like, what color, what
8  were they made of, did they have leather on the palms,
9  etc.  And he stated that they were jersey gloves and
10 described exactly what I have with me right here, that
11 these are jersey gloves.  This is what he used.
12        And so I -- after speaking to him, I
13 obtained some jersey gloves so I could have a better
14 idea of the makeup of this material in terms of
15 protection from liquids.
16   Q.   Is the material cotton or is it a
17 different material?
18   A.   100 percent cotton.
19   Q.   Okay.  So they're cotton gloves?
20   A.   Yes, they are.
21   Q.   Okay.  Now, what other questions did you
22 ask, if anything?
23   A.   Might help if I review --
24   Q.   Sure.
25   A.   -- my section here.

03

1    Q.   Sure.
2    A.   All right.  I asked him again -- and I
3  asked this during my initial interview, but I asked
4  him again, I said, "Why is it that your legs, your
5  lower legs, and then some days even your upper legs
6  and part of your trunk, became soaked?"
7        And he stated that he had to, on some
8  jobs, walk through deep weeds that brushed against him
9  with dew on them.
10       And I said, "Well, then, how is it that
11 this resulted in you contaminating your fabric
12 sneakers and your legs with Roundup?"
13       And he stated that because he would spray
14 these areas and everything was wet and he couldn't
15 tell where he had sprayed and hadn't sprayed and would
16 have to backtrack and walk through the Roundup on a
17 regular basis when spraying.  And I think I included
18 something on that in my section page 124 through 128.
19       Oh, and I also asked him about the gloves,
20 that how did they get wet, because he told me his
21 gloves would start out reasonably dry and very rapidly
22 become very wet and that he would leave them in the
23 truck overnight, and they would then be somewhat
24 drier.
25       But he said that his gloves were primarily

04

1  wet from contact with wet and treated vegetation as
2  well as leakage.  He had many episodes -- regular
3  episodes of his -- he called it the "stem," where it
4  interfaces near the trigger handle, would leak back on
5  his hand, and also explained that there were times
6  when he overpressurized.  And I have his wording in
7  here.  Let me find it.
8        Okay.  On page 125 at the very top,
9  "Permeable 'Jersey Gloves,'" that is information
10 largely from my second interview with him.  And he
11 also explained on the second-to-last bullet the
12 unavoidable walk and backtracking through treated
13 areas.
14       There's also an entry here where he spoke
15 about overpumping his handheld tank, and he also said
16 he had a strap that he would put on his shoulder to
17 carry that tank.  But he said that on times -- it's in
18 my write-up here somewhere that he at times
19 overpressurized the tank and that the O-ring would
20 dislodge and get on his body.  I don't know for sure
21 if he meant his hands on his legs, but he said it
22 was -- I used his exact word in a quote here, if I can
23 find it.
24   Q.   On 128, last bullet point.
25   A.   Yeah.  There.  "Mr. Hall also reports

Transcript of William Sawyer, Ph.D.

27 (105 to 108)

Conducted on August 23, 2018

---

**05**

1  soaked hands from occasional leakage of the wand at
2  its interface near the flow control lever. Also, on
3  occasion, Mr. Hall overpumped the container and the
4  O-ring would 'let go' with subsequent 'drenching' with
5  Roundup." Yes.
6      Q.  Anything else that you talked about with
7  Mr. Hall on your second call?
8      A.  Yes. I asked him again to give me a
9  little more understanding of this touching the orifice
10 piece with his mouth, and he said about two or three
11 times a week, the wand would plug and he'd have to
12 unscrew the wand from the base to unclog it. He did
13 this with his bare hands by banging the wand and then
14 blowing through it. And he said that he would notice
15 a residue -- the taste of the film on his lips and
16 mouth. So he was mouthing the device, basically.
17     Q.  And that was in your first set of
18 toxicological notes, right?
19     A.  It was, but I wanted to really understand
20 it better, and so I asked him again. And he basically
21 he gave me the same answer --
22     Q.  Okay.
23     A.  -- but in a bit more detail in terms of
24 how he unscrewed it, that kind of thing.
25     Q.  Anything else that you discussed with

**06**

1  Mr. Hall on the most recent discussion?
2      A.  That he replaced the gloves once per week.
3  But he may have said that earlier, but I asked him
4  again just to verify.
5      Q.  Okay.
6      A.  And it's an important issue because, you
7  see, when you take a glove that is wet with glyphosate
8  intermixed in that liquid and you let it dry
9  overnight, the -- as you know, I had already testified
10 to this -- the volatility of glyphosate's very low.
11 It's not highly volatile. The water is going to
12 evaporate, leaving behind the glyphosate. And then he
13 wore these several days in a row, accumulating
14 glyphosate within the glove, making the glove actually
15 a greater hazard than if one were not to wear the
16 glove at all.
17     Q.  And any other things you talked about with
18 Mr. Hall on the most recent conversation?
19     A.  Yes. I asked him about his prior use of
20 Roundup before his commercial use of Roundup, and he
21 did state and confirm that from two thousand- -- you
22 know, up to the 2008 and beyond actually, he said, you
23 know, even while he was working agriculturally -- or
24 professionally, he used Roundup at his Gerber Court
25 home property. And I asked him to describe his use of

**07**

1  that and -- because, simply, that's additive dosewise
2  to the glyphosate that he was exposed to commercially.
3          But his use of the Roundup on his home
4  property, which is a fairly large yard, was restricted
5  to areas along the sidewalk, roadside, up near homes
6  and shrubs and specific locations. It's not like he
7  sprayed his whole yard with it.
8      Q.  Now, originally, Mr. Hall had told you --
9  and it's actually still in Exhibit 6 -- that Mr. Hall
10 never used any Roundup or fertilizers on his own
11 property, right? That's what he told you originally?
12     A.  I believe so.
13     Q.  Okay. And, in fact, you still have that
14 in Exhibit 6 on page 12, correct?
15     A.  Yes. Yes.
16     Q.  Okay. Now, obviously there's a
17 contradiction there, correct?
18     A.  Maybe. I asked him -- you know, he said
19 that he did not use -- I think his words were
20 "anything else."
21     Q.  So as a forensic toxicologist, when you
22 have somebody who has contradicted themselves in
23 interviews, how do you decide which time they were
24 telling -- I don't want to say "the truth" because
25 people misremember, but which recollection is more

**08**

1  correct?
2      A.  Well, I have to consider, was the question
3  clear to him. And what's confusing to me in the first
4  event, it seems that he's referring to not using
5  anything else. For example, 2,4-D or 2,4,5-T, that
6  kind of thing.
7      Q.  Well, you wrote in Exhibit 5 and
8  Exhibit 6, "Mr. Hall never used any Roundup or
9  fertilizers on his own property," right? You wrote
10 that?
11     A.  Right. But what I'm saying is, I'm not --
12 I'm not dead certain that that question was clear to
13 him because I can't recall if I said to him, "Have you
14 ever used any herbicides or pesticides on your
15 property?"
16         So I don't know that I ever asked him
17 Roundup. So --
18     Q.  And you don't -- sorry. Were you done?
19     A.  Yeah.
20     Q.  You don't keep notes of these discussions
21 other than what's in your toxicological notes, right?
22     A.  I did not prepare a questionnaire. So I
23 did it -- you know, I talked to him and kind of went
24 through his history on my initial call and performed
25 the interview without notes, and I had Jen Clark on

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8573-32 Filed 12/27/19 Page 30 of 70
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
28 (109 to 112)
Conducted on August 23, 2018

09

1 the line typing everything into my draft set of notes,
2 which I have here.
3     Q.  So how --
4     A.  So there was nothing put on paper, per se.
5     Q.  So, hypothetically, let's assume that
6 Mr. Hall completely understood you in the first
7 instance and understood your question to involve
8 Roundup.  If you have a witness you're interviewing,
9 as a forensic toxicologist, who gives contradictory
10 statements regarding their usage history, how do you
11 decide which statement to use?
12        MR. SELDOMRIDGE:  Objection.
13 Confusing.
14     A.  That's a good question, and I just ran
15 across this yesterday.  I'm not going to name the
16 case, but I have a case where the driver who severely
17 injured a motorcyclist -- actually severed the leg
18 completely off -- stated to the police at that time
19 that he had left work at 5:30.  Two years later, he
20 was deposed and he swore under oath that he left work
21 between 6:00 and 6:30.  That's a discrepancy.  The
22 answer to that was he was extremely intoxicated when
23 he gave that answer to the police.
24 BY MR. KALAS:
25     Q.  Which one?  The 5:30 one, I assume?

1     A.  No.
2     Q.  And so when you're trying to weigh, as a
3 forensic toxicologist, two contradictory statements
4 like that, you know, do you just say, I'm going to go
5 with the more conservative thing?  What do you do?
6     A.  Well, a case like this, I have to think
7 about the question that was asked.  Was the question
8 clear?  If I asked the question as pesticides or
9 herbicides, he may have been thinking in terms of
10 alternate chemicals rather than Roundup.
11     Q.  But you can't recall exactly what question
12 you asked, right?
13     A.  No, not exactly.
14     Q.  And so this --
15     A.  This time, I actually said Roundup.
16     Q.  Right.  And you may have said Roundup the
17 first time; you just can't recall?
18     A.  I don't think so.  I think it was
19 pesticide/herbicides.
20     Q.  Okay.  So when you were interviewing
21 Mr. Hall the first time, you didn't exactly ask the
22 questions you wanted to ask.  Is that what you're
23 saying?
24     A.  Well, I was more interested in everything.
25 In other words, let's say he was chronically using

0

1     A.  Yeah.  So I would weigh that less.  In
2 fact, he gave other information at that time in his
3 interview that was -- he didn't even know the time of
4 day.  He was so intoxicated that that information is
5 less credible.
6        So that's an example of how a forensic
7 toxicologists views it.  Is that person under the
8 influence of a drug or alcohol?  Was there a large gap
9 of time?  I've been in depositions where questions
10 were asked six years later that are different than
11 that and the police statement from a sober individual.
12 So there's a lot of different variables to look at.
13     Q.  And here, the gaps in time are relatively
14 equivalent, right, February 2018 versus August 2018,
15 right?
16     A.  Yes.
17     Q.  And here, I presume, to your knowledge,
18 Mr. Hall was not intoxicated when talking to you?
19     A.  No.
20     Q.  Okay.  As far as you know.  You weren't
21 there.  He was over the phone?
22     A.  There was no slurred speech or any -- any
23 indicators of such.
24     Q.  You haven't met him in person, right?
25 That's kind of what I'm getting at.

2

1 2,4-D.  I'd want to know that as a toxicologist for --
2 you know, for possible concern of 2,4-D, especially if
3 he used it back in the early days when it contained
4 dioxins.  I'd want to know that.
5     Q.  So, you know, that raises a good point.
6 You asked -- you asked Mr. Hall, if I understand
7 correctly, about other chemicals or other exposures he
8 might have been exposed to, right?
9     A.  Yes.
10     Q.  Okay.  Why do you ask those questions?
11     A.  Well, I want to determine if I can find an
12 alternative cause of his NHL.
13     Q.  So what else is -- what other exposures
14 are there in the exposome, so to speak, that can help
15 contribute to NHL?
16     A.  Well, as I just said, dioxins, of course.
17     Q.  Okay.  What else?
18     A.  Chemicalwise, the older formulation of
19 2,4-D, 2,4,5-T that contained dioxins as an impurity.
20 Although I think that would predate his -- based on
21 his age, would predate his possibility of use.
22        Radiological exposures to either whole
23 body electromagnetic, you know, radiation, but also
24 internal radiation from consumption of thorium-232 or
25 uranium-238, for example.  Although that generally --

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

29 (113 to 116)



**3**

1  but — and other carcinogens that have been shown to
2  induce non-Hodgkin's lymphoma.  Also — I'm trying to
3  think what other carcinogens now.
4        Benzene, of course, is ruled out as — you
5  know, I'm sure all the experts would agree it only
6  causes AML, even though there are studies that
7  demonstrate NHL with benzene exposures, exposure to
8  wood preservatives from industrial exposures or
9  superfund sites or other known areas of contamination.
10  Other genotoxic agents that become systemic that
11  potentially impact bone marrow stem cells, such as
12  cyclophosphamide chemotherapeutic agents, are
13  well-known to induce NHL; cyclosporine-A,
14  immunosuppressant therapy.  And I think there's a
15  couple other chemicals that are not coming to mind
16  right now, but —
17      Q.  So you don't have, if I understand, a
18  written list of other chemicals that can cause NHL, in
19  your opinion, or significantly contribute to NHL that
20  you ask plaintiffs about when you're doing an
21  interview in this litigation?
22        MR. SELDOMRIDGE:  Objection.
23  Compound.
24      A.  No.  However, in this case, I did review
25  my printout of IARC carcinogens just to keep my memory

**4**

1  refreshed, but I don't have that with me today.  If I
2  did, I could readily point out the couple of things
3  that I've missed.
4  BY MR. KALAS:
5      Q.  And that's not on your Materials
6  Considered list either, is it, that printout?
7      A.  No.  I didn't even think of that.
8      Q.  It should be, though, right?
9      A.  The IARC printout?  Yeah, I think that
10  could be, yeah.  Yeah.
11      Q.
12
13
14
15
16
17
18
19
20
21
22
23
24
25      Q.  And did you look into the epidemiology on

**5**

1  being a former smoker and whether that's associated
2  with NHL?
3      A.  Yes, and, again, that's based upon
4  pack-year history.
5      Q.  And how about BMI and obesity?  Did you
6  take that into consideration?
7      A.  No.  I'm not aware of any studies for a
8  person of his age to show a statistically significant
9  rate of NHL based on a
10
11      Q.  And how about night shift work?  Did you
12  look into that issue, IARC has considered that a 2A
13  carcinogen.
14      A.  I did not.
15      Q.  You didn't ask Mr. Hall how long he worked
16  on the night shift?
17      A.  No.
18        MR. KALAS:  It is 12:30, so I
19  think it's time to recharge.  Let's go
20  off the record.
21        THE VIDEOGRAPHER:  The time is
22  12:28.  We are off the record.
23        (Luncheon recess from 12:28 p.m. to
24          1:36 p.m.)
25        THE VIDEOGRAPHER:  The time is

**6**

1  1:36.  We are on the record.
2  BY MR. KALAS:
3      Q.  Hello, Dr. Sawyer.  Did you have a good
4  lunch?
5      A.  Yes.
6      Q.  Good.
7        MR. KALAS:  I'm going to mark
8  just for housekeeping Exhibit 8.
9        (Exhibit Number 8, Supplemental Reliance
10        List of Dr. Sawyer 5/25/18, was marked
11        for identification.)
12  BY MR. KALAS:
13      Q.  This is a supplemental reliance list that
14  was served in this case.  Have you seen this before?
15      A.  No.
16      Q.  Okay.  And are these -- is this a list of
17  documents that you reviewed in preparing for this
18  case?
19      A.  (Reviewing document.)
20        I don't see anything here that's
21  unfamiliar, but there are, of course, duplicates and
22  triplicates of some of the same records, which, you
23  know, are different dates, which I can't really at
24  this point in time check on.  It would take the rest
25  of the day.

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

30 (117 to 120)

---

**7**

1   Q.  You didn't prepare this list?
2   A.  No.
3   Q.  Okay.  And this list was provided to us by
4 attorneys from the Miller Firm.  Would you disagree
5 that you've received the records listed on this and
6 considered them in reaching your opinion?
7   A.  No.  As I said, I recognize all these
8 clinics and names and --
9   Q.  Okay.
10   A.  I just can't be certain.  For example,
11 OSF, there's five different batches there with Bates
12 stamp numbers.  I'd have to get on my electronic file
13 and open each one and see if I have all the numbers.
14 I mean, it would be pretty tedious, but I don't see
15 anything here that appears new.
16   Q.  Okay.  And then in addition to this list,
17 we received an email list from Mr. Travers that listed
18 the plaintiff fact sheet for Mr. Hall, Mr. Hall's
19 interrogatory answers, Dr. Nabhan's deposition in this
20 case, along with two documents -- MONGLY00952591 is
21 the beginning Bates number and MONGLY00288103 -- and
22 those are listed in Exhibit 7, about halfway through
23 that.
24       Did you review those materials as well?
25   A.  Could I see that?

**8**

1   Q.  It's in Exhibit 7, sir.
2   A.  7?
3   Q.  Yes, sir.
4   A.  Okay.
5   Q.  It's an email from Mr. Travers dated
6 August 16th, 2018, at 5:11 p.m., about halfway through
7 that.
8   A.  Right.  But I don't see the list that you
9 just --
10   Q.  You're right.  It's not on that.  It's
11 just on my personal copy.
12       MR. KALAS:  Here, I'll mark that
13 as exhibit -- I already marked
14 Exhibit 9.  So mark as Exhibit 9 the
15 PFS, and I'll come back to that.
16       (Exhibit Number 9, Plaintiff's Fact Sheet,
17       was marked for identification.)
18       MR. KALAS:  I'll mark as
19 Exhibit 10 the list that we got from
20 Mr. Travers.
21       (Exhibit Number 10, Email Chain Between
22       Jeffrey Travers and Gregory Chernack, was
23       marked for identification.)
24 BY MR. KALAS:
25   Q.  And I'll come back to Exhibit 9, sir.  I'm

**9**

1 asking about Exhibit 10 right now.
2   A.  Oh, okay.  I'm sorry.
3   Q.  That's the list that was sent to us by
4 Mr. Travers.  Did those all look like documents you've
5 reviewed in preparing your opinion?
6   A.  I know I received and I reviewed the
7 interrogatory answers.  Dr. Nabhan's deposition, I may
8 have been sent that but haven't got to it yet.  I
9 don't think I reviewed Dr. Nabhan's deposition.  As
10 far as the PFS, I'm not sure what that stands for.
11   Q.  Plaintiff fact sheet, sir.
12   A.  Oh, I'm sorry.  Yeah.  Yeah.  So the only
13 thing I can say is I don't know -- I don't recognize
14 these Bates stamp numbers.  I don't know what they
15 are.
16   Q.  I believe one is an MSDS from an AkzoNobel
17 product, and the other one is a change in formulation
18 letter.
19   A.  Yep, I reviewed those.  Yep.
20   Q.  Okay.  And you said you didn't know if you
21 had gotten to Dr. Nabhan's --
22   A.  I don't think I reviewed that deposition
23 yet.
24   Q.  Okay.  So you don't intend to offer any
25 opinions on direct right now deriving out of

**20**

1 information elicited in Dr. Nabhan's deposition?
2   A.  No.
3   Q.  Okay.  If we can go back to Exhibit 9 now,
4 which was the plaintiff fact sheet.  I think you
5 stated that you weren't sure in February of 2018 if
6 you had asked Mr. Hall if he had used Roundup or just
7 a herbicide generally, right?
8   A.  Right.
9   Q.  Okay.  If you go to page 7 of this, sir,
10 Section VII, do you see the section that says --
11 states "Roundup and Other Glyphosate-Based
12 Herbicides"?
13   A.  I'm looking.  Oh, yeah, there we go.
14   Q.  A.1. states, "Identify which of the
15 following products you have used," and then it says
16 "Roundup (any type)," and "Yes" is checked, right?
17   A.  Yes.
18   Q.  And that's consistent with your
19 understanding that Mr. Hall has used Roundup-branded
20 products, right?
21   A.  Yes.
22   Q.  Okay.  Then if you go to Number 3, it
23 says, "If you responded 'yes' to either question
24 above, complete the following information for each
25 product."

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

**2**

1      And then 3.a. says "Name of Product,"
2  right?
3      A.  Yes.
4      Q.  He wrote in there "Roundup," right?
5      A.  Yes.
6      Q.  Then on part b., it said, "Dates of Use
7  (range)."
8          You see that?
9      A.  Yes.
10     Q.  And it says "2008-2012," right?
11     A.  Correct.
12     Q.  And you agree with me that this plaintiff
13  fact sheet left no ambiguity as to whether or not it
14  was asking about Roundup or herbicides.  It mentions
15  Roundup specifically, right?
16     A.  Yeah.  That's correct, but my interest,
17  when I interviewed him, was try to ascertain other
18  possible causes, and I know I did ask him about using
19  2,4-D, 2,4,5-T.  I don't think I directed my question
20  to Roundup.  So I think that's why there's a
21  discrepancy.
22     Q.  Yes, sir.  And I completely understand
23  that, but you agree with me that the plaintiff fact
24  sheet here did direct the question as to Roundup,
25  right?

**22**

1      A.  It did, yeah.
2      Q.  And Mr. Hall answered "2008-2012," right?
3      A.  Yes.  Yes.
4      Q.  So as a forensic toxicologist with this
5  plaintiff fact sheet that Mr. Hall filled out that
6  states that he used Roundup from 2008 to 2012, how do
7  you square that with the discussed home use you put
8  into your August 22, 2018, toxicological notes from
9  2000 to 2008?  How do you explain that discrepancy?
10     A.  Well, it does say "work-related," c.
11     Q.  He wrote that, right?
12     A.  Yeah.  Yeah.  Again, you're asking me to
13  be a crystal ball reader, but he may have been
14  thinking in terms of his work because it does say
15  "work-related."  I -- you know, I don't know what to
16  make of it.
17     Q.  Okay.  Thank you.
18          Now, a couple other things I looked at
19  over lunch, if you can go back to Exhibit 4, please.
20  That's the manila folder.  And in the manila folder,
21  you had those billing records we talked about, right?
22     A.  Yes.
23     Q.  And if we could just look at those again
24  real quick, I have just a few questions I hope you can
25  make clear.

**23**

1      A.  Okay.
2      Q.  If you go to the bottom-line entry of the
3  invoice, which is at the end where you tabulated all
4  the hours --
5      A.  Okay.
6      Q.  -- it says that there was a previous
7  standing balance of about $7,000 there, right?
8      A.  Right.
9      Q.  Okay.  What case was that from?  Was that
10  from the Hall case or from a different case?
11     A.  Hall.
12     Q.  Hall.  Okay.
13          And so you should add the 7,000 into the
14  approximately 11,000, for $18,000, right?
15     A.  That's true.  Yes.
16     Q.  Okay.  And as to the previous $7,000
17  invoice, do you have line-entry invoice records of the
18  time you spent billing on that?
19     A.  Yeah.  I should still have that, although
20  I didn't submit it and dig for it because I thought I
21  already turned that over on our -- because I know I
22  was -- I was -- well, received a notice for deposition
23  I think in May.  I think that initial deposition
24  was to be scheduled for early June.  And so you might
25  already have it.

**24**

1      Q.  I can represent that I don't believe we
2  have it.
3      A.  I think I still have it.
4      Q.  So if you could provide that to Jeff.
5          MR. KALAS:  Or you may already
6      have it, and you guys could send that
7      to us, I'd appreciate it.
8          MR. SELDOMRIDGE:  Yeah, we'll
9      make that available.
10          MR. KALAS:  Okay.
11  BY MR. KALAS:
12     Q.  And then in the text of the invoice there,
13  there's an entry I believe on May 31st, 2018, if you
14  could turn to that entry.
15     A.  Okay.
16     Q.  One of the things you wrote in there is,
17  extract text from Sargon motion.
18          Do you see that?
19     A.  "Extract relevant text."  Is that what
20  you're referring to?
21     Q.  Yes.  And you're discussing the Sargon
22  motion, right?
23     A.  Yes.  Yes.
24     Q.  Tell me what you were doing there with the
25  Sargon motion as far as extracting text and putting it

Transcript of William Sawyer, Ph.D.

32 (125 to 128)

Conducted on August 23, 2018

25

1  into your notes.
2      A.  Well, I can't tell you absolutely
3  specifically without having the Sargon motion reply in
4  front of me, but as you know, I submitted a -- I
5  believe it was an affidavit, and there was information
6  with respect to the toxicological issues, you know,
7  Mr. Hayes's history and that kind of thing, and so I
8  copied/pasted what I could into my summary note set,
9  which was Exhibit 5.
10     Q.  Okay.  Who's Mr. Hayes?
11     A.  Mr. Hayes, I don't know.
12     Q.  You just said Mr. Hayes.  That's why I'm
13  asking.
14     A.  Mr. Hall.  I'm sorry.
15     Q.  Okay.
16     A.  You have to understand, I -- you know,
17  sometimes I call people the wrong name.  In fact,
18  there's this Jessica who used to be on my master swim
19  team, and I used to call her Lisa, and pretty soon
20  everybody was calling her Lisa.
21     Q.  So if I understand correctly, you weren't
22  taking text out of the actual motion the attorneys
23  write.  You were taking it out of your affidavit and
24  inserting it into your notes.
25     A.  Exactly.  Yeah.

26

1      Q.  Okay.  Thank you for clearing that up.
2          The last thing that was on your
3  supplemental MCL is you discussed the California
4  NSRL -- or excuse me.  You don't discuss it.  You have
5  the California NSRL on your supplemental MCL, which is
6  Exhibit 8?
7      A.  That's correct.
8      Q.  Okay.  And in your toxicological notes, I
9  don't see any discussion of the California NSRL.  Do
10  you intend to discuss the California NSRL at trial?
11     A.  Probably.
12     Q.  Okay.  What are you going to say about the
13  California NSRL at trial?
14     A.  Well, in two seconds I can say that I
15  agree with their assessment in terms of its
16  classification as a carcinogen.  However, I think in
17  terms of their cancer slope calculation, they should
18  have used Wood 2000b, as the methodology under US EPA
19  requires the most sensitive model and the
20  highest-quality model, which would be Wood 2000b.
21     Q.  You mean 2009b?
22     A.  I'm sorry?
23     Q.  You mean 2009b?
24     A.  Yes.  Yes.  Thank you.
25         MR. KALAS: Okay.  And I'll just

27

1      note again for the record that, again,
2  this is not in the notes, and that's
3  another reason why we require
4  additional time with Dr. Sawyer.
5  BY MR. KALAS:
6      Q.  Okay.  Thank you for clearing up that.
7          Turning back to Mr. Hall, and if we go to
8  Exhibit 6 that you have, starting on page 11, what I
9  would call I guess the summary of your discussion with
10  Mr. Hall in February 2018, right?
11     A.  Yes.
12     Q.  Okay.  Just generally, in these
13  questionnaires of witnesses or plaintiffs in the cases
14  that you work on, did we cover, when we discussed the
15  August conversation, all of the general subjects that
16  you ask about as far as alternative exposures and PPE
17  and that sort of thing, or are there other general
18  subjects you inquire about in these conversations?
19     A.  I'm not clear.  Are you asking me is there
20  information I ascertain that I didn't include?
21     Q.  No, no, no.  I'm not asking that at all.
22  What I'm asking is, just from a 30,000-foot level,
23  when we discussed your August 2018 conversation with
24  Mr. Hall, did we cover all of the broad subjects that
25  you would have asked about at the February

28

1  conversation as well, as far as alternative exposures,
2  personal protective equipment, etc.?
3          MR. SELDOMRIDGE:  Objection.
4  BY MR. KALAS:
5      Q.  And if you don't remember, I can just ask
6  it a different way.  Let me ask it a different way.
7          What would you be looking to find out from
8  Mr. Hall in one of these interviews?
9      A.  What document would I look at?
10     Q.  No.  What would you be trying to find out
11  from him?
12     A.  Oh, I was trying to ascertain, like I say,
13  his age and be certain -- and his age, his weight to
14  make sure I had that correct.  I was confused about
15  the gloves because I made an assumption that jersey
16  gloves were the padded type, and they're not.
17     Q.  Don't mean to cut you off.  I'm not asking
18  about August.  I'm asking about February.
19         When you talked to him in February, what
20  would you have been trying to find out?
21     A.  Oh, well, I was -- I started off trying to
22  determine just some general information about his use
23  of Roundup and his type of personal protective
24  equipment and also whether there are other chemicals
25  involved with exposures from other occupations and

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 35 of 70
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.                    33 (129 to 132)
Conducted on August 23, 2018

29

1  what his occupational history was.  Talked about his
2  condition currently in terms of, you know, how he was
3  doing, and gave me the synopsis of his treatment.
4  Also asked about smoking in terms of what he could
5  recall because I found kind of a dichotomy of two
6  different scenarios of the smoking in the medical
7  records.
8      Q.  Okay.  Now, I want to ask about all this,
9  but this may help curtail some questions.
10     When you conducted your exposure
11  assessment in Exhibit 6, are you including Mr. Hall's
12  personal use that he discussed from 2000 to 2008 with
13  you of Roundup?
14     A.  Back in -- back in February?
15     Q.  No.  I'm just asking generally in the
16  entirety of your opinions.  When you come to tell the
17  jury about Mr. Hall's exposure to Roundup, in your
18  exposure assessment you derived from the UK POEM
19  model, are you using his personal use that he
20  claims to have used from 2000 to 2008?
21     A.  No, I'm not including it in the dose
22  estimate because it's minuscule compared to his work
23  exposure.  It's additive.  You know, certainly there
24  was some additional exposure there from the home use,
25  but it was very minimal.

30

1      Q.  Okay.  And one more question before we get
2  deep into this.  When we were discussing sort of other
3  exposures besides Roundup or glyphosate-based
4  herbicides that, in your opinion, can cause
5  non-Hodgkin's lymphoma, do you have a collection of
6  articles you rely upon to reach those conclusions?
7      A.  Not by malignancy.  By chemical, yeah.
8  But in other words, I don't have a file drawer that
9  says non-Hodgkin's lymphoma.  I have a file drawer for
10  dioxins and etc., etc., different chemicals.
11     Q.  So as to the chemicals we just discussed
12  before lunch, I think you mentioned dioxins.  We
13  talked about cigarettes.  We talked about wood
14  preservatives, bunch of other stuff.  Do you have a
15  separate file for each of those exposures?
16     A.  I used to.  I used to file everything by
17  paper, and I tend to -- for the past, I would say, ten
18  years now, I keep everything electronically.  And I
19  try to use keywords in my electronic files that I can
20  search.  So I really don't have an up-to-date paper
21  collection of the subduties.
22     Q.  So if I understand correctly, when you
23  reached your specific causation opinion in this case,
24  did you conduct something called a "differential
25  diagnosis" or "differential etiology"?

31

1      A.  I did.  That's --
2      Q.  Okay.
3      A.  In terms of my review of the medical
4  records and questions in terms of his exposures, his
5  occupational history, family history
6
7
8
9
10
11
12
13
14
15
16
17
18     Q.  So what I'm trying to understand is, you
19  know, you have this list of potential causes you've
20  ruled in, and I'm trying to get an understanding of
21  the galaxy of literature you're relying on to rule
22  those in.
23     A.  Oh, I'm primarily relying on experience,
24  training and experience, and reviewing thousands or
25  ten thousands of studies over time and having specific

32

1  training in a medical school and in a toxicology
2  program and in knowing what causes NHL and what
3  doesn't.  That's primarily what I rely on.
4      I do on occasion look at the IARC -- the
5  updated IARC list just to jog my memory when I'm
6  evaluating a case like this.  But I don't have any
7  magic drawer I go to.
8      Q.  Okay.  So you don't have on your Materials
9  Considered in this case the body of epidemiology
10  literature on the association of smoking and
11  non-Hodgkin's lymphoma?
12     A.  No.  I reviewed online peer-reviewed
13  studies.  In fact, I think I've printed the most
14  current and substantial one, which is in my file box
15  here.
16     Q.  And that wasn't on your Materials
17  Considered produced prior to this deposition.  It's in
18  your box.  It's not on any of the Materials Considered
19  we've looked at today?
20     A.  What do you mean by "Materials
21  Considered"?  What does that mean?
22     Q.  Well, Exhibit 8, the documents cited in
23  Exhibits 5 and 6 and the Exhibit 10 and the documents
24  cited in your Dewayne Johnson Materials Considered
25  list.

Transcript of William Sawyer, Ph.D.

34 (133 to 136)

Conducted on August 23, 2018



**33**

1     A.   Oh, well, I didn't make those lists.
2     Those are documents provided to me by the law firm.
3     Q.   Okay.  So --
4     A.   I haven't been asked to produce a full
5     list of documents I reviewed.  I was requested to
6     bring them here today.
7     Q.   There's an agreement, and I believe it's
8     part of the pretrial order that Materials Considered
9     lists will be provided ten days ahead of depositions.
10    So is it my -- are you telling me right now that you
11    have reviewed more materials than what has been set
12    forth in Exhibits 5, 6, 8, 10, and your Dewayne
13    Johnson report?
14    A.   Yeah.  I reviewed more studies, but --
15    there's a document here that is called the notice of
16    deposition, and that's what I used.  It didn't say
17    anything about providing a list ten days ahead of
18    time.
19    Q.   I'm not casting any aspersions on you,
20    sir.  It's about the attorneys.  So I appreciate that.
21         Do you have a full list anywhere in your
22    possession of everything you've reviewed in preparing
23    your opinion?
24    A.   I have a list that includes the vast
25    majority of the studies, and I have it here in my box.

**34**

1     Q.   Okay.  And that's up to date?  Because I
2     saw a list from December 2017 in there.
3     A.   Yeah.  It's from December.  Now, I have --
4     the newer studies are not in these folders that are
5     marked A through C and D through G, EPA, J to R and S
6     to W.  The new stuff's not in those.  The new
7     stuff's -- new things I have are in these small
8     folders, and there's not much.  There's probably, as
9     far as studies, maybe -- maybe a dozen studies.
10    MR. KALAS:  Okay.  So I'll note
11    for the record that we have not had a
12    fulsome opportunity to prepare for this
13    deposition, given the fact that
14    Dr. Sawyer is now disclosing additional
15    studies that he's relying upon to reach
16    his opinion.
17    MR. SELDOMRIDGE:  And I want to
18    note for the record that it appears to
19    me that Dr. Sawyer is speaking about
20    his collective knowledge of -- you
21    know, through schooling and throughout
22    his entire career.  There's no way we
23    can produce those documents.
24    MR. KALAS:  I think Dr. Sawyer's
25    testimony speaks for itself.

**35**

1          MR. SELDOMRIDGE:  Agreed.
2     BY MR. KALAS:
3     Q.   Dr. Sawyer, you agree with me there's a
4     body of epidemiological literature out there that
5     looks at the association between cigarette smoking and
6     non-Hodgkin's lymphoma, right?
7     A.   Yes.
8     Q.   And you've reviewed, if I understand
9     correctly, many of those studies over the years,
10    right?
11    A.   Yes.
12    Q.

**36**

9          Q.   Well, let me ask about your criteria.  If
10    something is statistically significant in an
11    epidemiological study, do you consider that a risk
12    factor for non-Hodgkin's lymphoma?
13    A.   Again, it's too general to say yes or no
14    without reviewing the study.  It's like that example I
15    gave earlier of the Agricultural Health Study that did
16    show a statistically significant finding for T-cell
17    lymphoma.  However, there were only 18 subjects that
18    were positive, and the protocol that the study set
19    forth required 20.
20         So, I mean, there's -- one has to address
21    and assess each study independently before applying
22    the weight of evidence.  I mean, that is the standard
23    methodology that toxicologists use, you know, Bradford
24    Hill and weight of evidence.  So just to make a
25    general statement on the study is difficult without

Transcript of William Sawyer, Ph.D.

35 (137 to 140)

Conducted on August 23, 2018

---

**37**

1  reviewing it.
2      Q.  Well, it's difficult for me to ask you
3  about the study if I don't have a list of what you've
4  reviewed.  So what I'm trying to understand is what
5  exactly you have reviewed in reaching your opinion.
6  So if I can go topic by topic.
7      A.  But I answered it.
8      Q.  Well, I don't know if we have topic by
9  topic.
10     A.  I said that with respect to the smokeless
11 tobacco concern, I have not come across studies that
12 actually demonstrate NHL.
13     Q.  And did you do a search on PubMed or
14 Google Scholar or anything like that for NHL and
15 smokeless tobacco in reaching your opinion?
16         MR. SELDOMRIDGE:  Object to form.
17 Compound.
18     A.  I don't think I did a specific search for
19 the search term "smokeless tobacco and NHL," but I did
20 review and have reviewed over the years the body of
21 NH -- yeah, NHL studies as well as smokeless tobacco
22 studies, and I've never come across a significant
23 causal association.
24 BY MR. KALAS:
25     Q.  Okay.  When's the last time you reviewed

---

**38**

1  that body of literature?
2      A.  Within -- within the time that I have been
3  working on these Monsanto cases.
4      Q.  And you used that review of that body of
5  literature to inform your opinions here regarding
6  Mr. Hall, right?
7      A.  Just to confirm my opinion that I don't --
8  I'm not aware of any relationship.
9         MR. KALAS:  All right.  So, once
10 again, there is a list of -- a body of
11 literature Dr. Sawyer has reviewed that
12 has not been disclosed.  We would ask
13 that that body of literature be
14 disclosed via in a supplemental
15 Materials Considered list forthwith,
16 and we also ask for additional
17 deposition time based on that.
18 BY MR. KALAS:
19     Q.  Since I can't ask you about that body of
20 literature today, Dr. Sawyer, let me continue on.
21 Back to Exhibit 6.
22         When you spoke to Mr. Hall, he told you
23 that he worked as a self-employed landscaper from 2007
24 to 2013, right?
25     A.  He did.

---

**39**

1      Q.  Okay.  And did he tell you how many
2  clients he had when you spoke to him?
3      A.  No.
4      Q.  Did he tell you how many days he worked as
5  a landscaper when you spoke to him?
6      A.  Yes.
7      Q.  Four to five?
8      A.  Yes.
9      Q.  Okay.  And then what Mr. Hall told you in
10 February 2018 was that he used Roundup from 2008 to
11 2012, right?
12     A.  Yes.
13     Q.  And he told you that he used 12 to
14 13 gallons a summer, right?
15     A.  Yes.
16     Q.  And when he said "a summer," did he mean
17 his entire spring season or did he mean the
18 meteorological summer?
19     A.  I understood it as from when he started
20 his work in early April until the end of October.
21     Q.  And so that's approximately half a gallon
22 a week of super concentrate, right?
23     A.  Yes.
24     Q.  Okay.  And then I understand that Jeff has
25 a picture of the hand-pump sprayer, so did you -- did

---

**40**

1  you get -- I guess I won't ask any questions because
2  there's an actual visual representation.
3         But you mention here that the hand pump
4  was set to a mist setting, right?  That's what he told
5  you, the hand-pump sprayer he used?
6      A.  I don't remember.
7      Q.  Okay.  So if you look at 11, "Roundup
8  Application Notes," you see that where it says on the
9  third line, the wand was set at a mist setting?
10     A.  Yes.
11     Q.  Okay.  So what's that mean as far as
12 droplet size?
13     A.  I believe, from what I have reviewed in
14 the Monsanto documents, that would be, I believe, in
15 the 100-micron range.
16     Q.  Okay.  And you don't know if the Monsanto
17 documents you reviewed are referring to the exact type
18 of hand-pump sprayer that Mr. Hall used?
19     A.  That's correct.
20     Q.  And so does the fact that the hand-pump
21 sprayer was set to a mist setting affect your opinions
22 in this case in any way?
23     A.  Well, if -- I think it confirms the next
24 sentence, that he noted that he could smell the
25 Roundup.  Certainly the mist setting, there's greater

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8573-32 Filed 12/27/19 Page 38 of 70
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018
36 (141 to 144)

4

1  degree of drift.
2      Q.  Now, you agree that every rate or every
3  body whose opinions on glyphosate -- and by "body," I
4  include IARC, so IARC, EPA, other regulatory bodies,
5  every body you've reviewed on glyphosate has found
6  that the inhalation exposure to Roundup is relatively
7  small proportion of the total exposure in an
8  occupational setting, right?
9      A.  Yes, I agree.
10     Q.  And do you agree with that opinion of
11 those bodies?
12     A.  Yes, I agree.
13     Q.  Okay.  Now, Mr. Hall told you, according
14 to these notes, that there was blowback of the mist on
15 windy days, right?
16     A.  Yes.
17     Q.  Did he tell you what proportion of the
18 days he sprayed it was windy?
19     A.  No, but he didn't live too far away from
20 the "Windy City," Central Illinois.  I'm sure there
21 are windy days.
22     Q.  But you don't know if it was once a week,
23 two times a week, twice a month?  You don't know what
24 proportion of the days were windy?
25     A.  No.

42

1      Q.  And then -- and this is also discussed at
2  sort of the back of Exhibit 6.  You talked about the
3  fact that Mr. Hall told you two to three times a week
4  he had to unclog the wand, right?
5      A.  Yes.
6      Q.  Now, the Roundup mixture he was using
7  contained Roundup concentrate, right?
8      A.  Super concentrate.
9      Q.  Okay.  Super concentrate?
10     A.  I think 52 percent.
11     Q.  And the constituents of Roundup super
12 concentrate -- it's probably an obvious question --
13 they're all liquid, right?
14     A.  Yes.
15     Q.  Okay.  And then there was some added water
16 to the mix that he made, right, Mr. Hall?
17     A.  Yes.
18     Q.  Okay.  So what would get in the wand to
19 clog up the wand?
20     A.  That particular chemical mix, if it sits
21 too long, it forms a -- almost a nasal mucus, slimy
22 precipitate, which can clog up the machine.
23     Q.  Okay.  And is it just in a sprayer that it
24 would happen like that, or if I put it, you know, on
25 the ground, would it eventually become a mucus?

43

1      A.  That, I can't answer.
2      Q.  Okay.  How about on my skin?
3      A.  On the ground, it -- no, it couldn't on
4  the ground because it's not going to persist long
5  enough.  On the skin, it's not going to persist long
6  enough.  It has to sit stationary, still for a while.
7      Q.  Okay.  And then you noted in this
8  interview -- and tell me if the August interview
9  changed this at all, but in this interview in
10 February, you noted that to unclog the wand, he would
11 bang the wand or blow on it with his mouth, right?
12     A.  Yes, which led me to ask more questions
13 yesterday.
14     Q.  Okay.  Did he tell you which of those two
15 things he did more often?  The way it's represented
16 here in the February interview is it's an either/or
17 proposition.
18         Which did he do more often, banging or
19 blowing on it?
20     A.  I -- I didn't ask that question.  What I
21 did find out is that he said that the clogs in the
22 removal with his bare hands of the instrument occurred
23 two to three times a week.
24     Q.  Okay.  And this might seem like an obvious
25 question as well, but when he put his mouth on the

44

1  wand, there wasn't a flow of herbicide coming out of
2  the wand, right?  It was clogged?
3      A.  It wouldn't be under pressure.  I know
4  that.
5      Q.  So it's not like it's a spray coming into
6  his mouth?
7      A.  You have to hold the trigger to have
8  pressure there.
9      Q.  Right.
10     A.  Right.  There's -- he didn't indicate in
11 any way that he drank it.
12     Q.  Okay.
13     A.  But certainly he had it on his lips, and
14 he could detect that.
15     Q.  So, still, it's a dermal exposure on the
16 lips or inside the mouth, correct?
17     A.  No.  What am I doing right now?  Licking
18 my lips.
19     Q.  Okay.
20     A.  Now, lips -- when it's on the lips, that
21 is considered oral.
22     Q.  Okay.
23     A.  Because it -- because of the licking.
24     Q.  So did you quantify the oral exposure at
25 all?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8573-32 Filed 12/27/19 Page 39 of 70
CONFIDENTIAL

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

37 (145 to 148)

## 45

1  A. No. I treated it as zero.
2  Q. Okay.
3  A. And you'll see in my notes that I listed a
4  number of things that I've treated as zero that -- to
5  show that my dose value is greatly underestimated.
6  Q. Now, another thing Mr. Hall discussed with
7  you in February was his dilution practices of Roundup,
8  right?
9  A. Yes.
10  Q. And he told you he diluted Roundup super
11  concentrate according to the label instructions,
12  right?
13  A. Yes.
14  Q. Did you ask Mr. Hall if he wore the PPE
15  called for by the Roundup super concentrate label
16  while diluting the Roundup super concentrate?
17  A. Yes. I asked him -- I didn't ask him -- I
18  didn't use the word "PPE required." I asked him what
19  he wore, to get an objective honest answer. You know,
20  "What did you wear? How did you do it?"
21  Q. Did you look at the Roundup super
22  concentrate label?
23  A. I was already familiar with it. Looked at
24  it many, many times.
25  Q. Okay. And does the -- did Mr. Hall's

## 46

1  personal protective equipment that he wore match what
2  was required on the label for mixing?
3  A. In his mind, it did. He was wearing
4  gloves, but they certainly weren't the right kind.
5  Q. Well, the label calls for chemically
6  resistant gloves, right?
7  A. Yeah.
8  Q. So my question is, you said in his mind he
9  did. Did he comply with the label in mixing/loading
10  Roundup super concentrate?
11  A. With respect to the gloves, no. He wore
12  a -- the nonchemically protective glove.
13  Q. Now, cotton gloves do provide some
14  protection, though they aren't fully chemically
15  resistant, right?
16  A. For perhaps under the conditions, early
17  morning dew and rubbing the gloves against the
18  vegetation coated with Roundup, the protection would
19  be a very brief duration because the cotton gloves
20  would wet and wick the material to direct contact with
21  the skin in a matter of minutes or hours.
22  Q. Have you read any literature either put
23  out by regulatory agencies or in peer-reviewed
24  literature regarding the protective factor that cotton
25  gloves offer when they interact with glyphosate and

## 47

1  water?
2  A. I did reference an OSHA study or -- I
3  think it was an OSHA study on gloves that I brought
4  with me and I previously referenced in Exhibit 5, I
5  believe.
6  Q. The question was slightly different, which
7  is, did you review anything regarding the protective
8  factor that cotton gloves offer when they interact
9  with glyphosate, specifically glyphosate, and water?
10  A. Yeah, the document I show is that a cotton
11  glove would offer no protection for that.
12  Q. That's a glyphosate-specific study, sir.
13  A. For a water-soluble chemical.
14  Q. So you haven't reviewed any of the studies
15  in the published literature put out by various
16  regulatory agencies that actually specifically look at
17  glyphosate and cotton?
18  A. That's a -- not a reasonable question.
19  When a scientist studies PPE -- that is, personal
20  protective equipment -- it's by chemical category; for
21  example, a solvent or a water-soluble compound and
22  other categories. We don't category -- we don't form
23  a study just for glyphosate and water. There is no
24  such thing. It's not how it's studied. It's studied
25  by the chemical characteristics of each agent.

## 48

1  Q. So you haven't reviewed a study by Ronald
2  Wester, published in 1996, on glyphosate and cotton?
3  A. I do have a Wester study, but I don't
4  think I have that one.
5  Q. Since you haven't reviewed it, you won't
6  be telling the jury any opinions about that study,
7  right?
8  A. I don't know. I can't predict that.
9  Q. The attorneys from the Miller Firm haven't
10  sent you that study, to your knowledge?
11  A. I don't believe I've -- I have that study.
12  Q. And you didn't find that in your
13  independent literature search, right? You didn't look
14  for that?
15  A. Oh, I did look for glove studies, yes.
16  Q. But you didn't find that particular one?
17  A. Did not.
18  Q. Okay. Now, you note here that Mr. Hall's
19  hands would get wet when diluting Roundup, right?
20  A. That's what he stated, yes.
21  Q. And did he tell you how often they would
22  get wet? In other words, was it every time? Only
23  sometimes?
24  A. I didn't specifically ask him that. I
25  can't answer that.

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

**49**

1    Q.   And did he tell you how much of his hand
2  would get wet? Was it the whole hand? A portion of
3  the hand?
4    **A.   When filling the container, I didn't ask**
5  **that. What I did ask yesterday was, during use, how**
6  **wet would his hand get specifically from glyphosate,**
7  **and he stated that the stem where it connects to the**
8  **area where the trigger is located would often become**
9  **leaky and that his hand would get soaked from the**
10 **material basically backflowing onto his hand and**
11 **dripping onto his fingers.**
12   Q.   So if I -- just so I understand correctly,
13 that's during use of Roundup, not during
14 mixing/loadings?
15   **A.   Right.**
16   Q.   So during mixing/loading, if I understand
17 correctly, you didn't specifically ask him what
18 portion of his hand would get wet?
19   **A.   Yeah, that's true.**
20   Q.   Okay. And do you know when in the
21 diluting process the portion or the whole hand or
22 whatever portion of his hand would get wet?
23   **A.   I didn't detail that. I don't know.**
24   Q.   So you didn't ask if it was before the
25 concentrate was mixed with water, during, or after?

**50**

1    **A.   All I recall was that the Roundup was put**
2  **in first and then the water.**
3    Q.   Okay. But it would matter when they would
4  get wet because if he got wet when the water was in
5  there, it would be a much more dilute concentration,
6  right?
7    **A.   Yes.**
8    Q.   Okay. And how did he mix the dilution?
9  In other words, did he use an instrument? I'm
10 imagining a guy -- I went to school in the South.
11 People made Brunswick stew with these like 8-foot
12 spoons. I mean, was it like a witch's vat? I mean,
13 how did he -- how did he mix it together?
14   **A.   In speaking with him, the only thing I**
15 **recall was he carried some type of water jug on the**
16 **truck, as I recall. I don't know if he had a hose off**
17 **that. I just -- he said something about it, but I**
18 **don't remember.**
19   Q.   So he had a water jug. So would he put in
20 the Roundup, put in the water, and then shake it?
21   **A.   He didn't say anything about shaking it.**
22   Q.   Okay.
23   **A.   I think -- my understanding is he's**
24 **putting the water in last, and that's providing the**
25 **dilution movement.**

**51**

1    Q.   So he's not inserting his hand into this
2  jug --
3    **A.   Oh, no.**
4    Q.   -- and mixing it around?
5    **A.   No.**
6    Q.   Okay. Now, I want to --
7    **A.   That's crazy.**
8    Q.   I have to ask, you know. I want to
9  come -- I want to go to I guess page 14, but before I
10 ask you about the PPE, I want to ask you about the
11 Application Frequency section real quick, and then
12 we'll come back to the PPE.
13       So what Mr. Hall told you is he used
14 Roundup about seven months a year, right?
15   **A.   Yes.**
16   Q.   And he told you he used it for a five-year
17 period, right?
18   **A.   Yes.**
19   Q.   And he told you he landscaped about 40
20 hours a week during those months, right?
21   **A.   Yes.**
22   Q.   And about five to ten hours a week would
23 be spent using Roundup, right?
24   **A.   Yes.**
25   Q.   Now, did you ask Mr. Hall what time of day

**52**

1  he typically applied Roundup?
2    **A.   Yes.**
3    Q.   What time of day did he typically apply
4  it?
5    **A.   Generally the morning.**
6    Q.   The morning. Okay. And would it be the
7  first thing he'd do when he'd get to a site?
8    **A.   I don't know. He might survey a site**
9  **first. I don't know.**
10   Q.   You didn't ask that?
11   **A.   I didn't ask.**
12   Q.   Okay. Now in -- you said "in the
13 morning." Do you know what time he'd get to a site?
14 Did he start his day at 7:00? 8:00?
15   **A.   I didn't ask. I can infer that it would**
16 **have been early because he said it was generally dew**
17 **when he started.**
18   Q.   And in the summertime, the sun comes up
19 pretty early, right?
20   **A.   Central Illinois, Central Time Zone.**
21   Q.   6:00 a.m., something like that?
22   **A.   Probably, yeah.**
23   Q.   And so it would be fair to assume he got
24 to a site somewhere between 7:30 and 8:30, you would
25 say, with the dew?

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

39 (153 to 156)

---

**53**

1    A.   I can't make that assumption.

2    Q.   And you didn't ask, right?

3    A.   I didn't ask.

4    Q.   So I guess one thing that's a little

5  confusing to me here is that you said Mr. Hall told

6  you he worked on 10 to 12 houses per week, right?

7    A.   Yes.

8    Q.   Okay.  And if he worked 40 hours a week,

9  does that mean each house took about 40 -- four hours

10  to do?

11    A.   Yes.

12    Q.   Okay.  How big were the lots on these

13  houses?  That seems like an awful lot of time to me.

14    A.   Well, I did review, gosh, probably 50

15  photos last night from the CDs that I brought.  What I

16  did was I started at the beginning of the CD, and then

17  I jumped ahead about 10 or 15 and then another 10.  So

18  I just kind of took an equal distribution view of

19  about 50 photos, and what I saw in general were a lot

20  of large grass yards, a lot of large yachts -- not

21  yachts -- lots.

22    Q.   We won't talk about yachts today.

23    A.   No.  No.  But, yeah, many -- many of the

24  properties were a good size.  Now, there were also

25  some tiny ones, but yeah.  I mean, I know that he --

---

**54**

1  based on those photos, he did certainly work on some

2  fairly large yards.

3    Q.   Now, when you say "good size" and "large,"

4  I hope you don't mind me asking you to be more

5  specific.  Are we talking an acre?  Are we talking

6  half an acre?

7    A.   Oh, half-acre lot to --

8    Q.   Half acre?

9    A.   Yeah.  Even acre lot, I saw some of those.

10  But certainly I saw a lot of half-acre lots.

11  Half-acre lot would be roughly -- about

12  200-by-100-foot lot --

13    Q.   Okay.

14    A.   -- would roughly be a half acre.

15    Q.   And it's your understanding from what

16  Mr. Hall told you that it would take him four hours to

17  work on a half-acre lot on average?

18    A.   Well, I mean, that is something we can

19  extrapolate from what he said.  He didn't -- I didn't

20  ask him exactly how long per lot.

21    Q.   Okay.

22    A.   So, I mean, if we extrapolate the number

23  of lots, that's probably about right.

24    Q.   Now, going back to the clothing, it says

25  that you -- you said that he started the day in jeans,

---

**55**

1  right?

2    A.   Yes.

3    Q.   Okay.  And he also started his day in a

4  T-shirt and flannel shirt, right?

5    A.   Yes.

6    Q.   Now, you don't know -- I think we've

7  established this.  You didn't ask what time of day

8  he'd start his landscaping work, right?

9    A.   Morning with dew.  That's all I know.

10    Q.   Okay.  So you noted that he took his

11  flannel shirt off, on an average day, by 10:00, right,

12  because of the heat?

13    A.   Yes.

14    Q.   But if he started his day at 7:00 in the

15  morning, that would mean half the day, thereabouts, he

16  was wearing the flannel shirt.  While if he started at

17  9:00, it would only mean an hour of the day he was

18  wearing the flannel shirt, right?

19    A.   Right.

20    Q.   That could be a significant difference in

21  the personal protective equipment he was wearing while

22  applying Roundup?

23    A.   Yes.

24    Q.   And you didn't ask about that?

25    A.   No.

---

**56**

1    Q.   Okay.  And then he told you he'd do this

2  because the day would get hot, right?

3    A.   Yes.

4    Q.   And did he only take his flannel shirt off

5  on hot days, or did he take it off every day?

6    A.   Only when he was warm, too warm.

7    Q.   So like in April if he was applying

8  Roundup, early April in Central Illinois, he might

9  keep his flannel shirt on all day?

10    A.   It's possible.

11    Q.   And you didn't ask about what type of year

12  it got too hot to wear the flannel shirt after 10:00?

13    A.   No.

14    Q.   Okay.  Did he tell you what temperature it

15  would take for him to feel like he needed to take off

16  his flannel shirt?

17    A.   No.

18    Q.   Okay.  Now, Mr. Hall did tell you that

19  he'd wash his clothes each day, right?

20    A.   Not exactly in those words.  I think he

21  said he changed.  He put new clothes on each day.  I

22  don't know that he batch washed every day.  He may

23  have batched them --

24    Q.   Fair.

25    A.   But yes, he changed his -- he wore fresh

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8573-32 Filed 12/27/19 Page 42 of 70
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

40 (157 to 160)

---

**57**

1 clothes.
2  Q. Okay. And so leaving the gloves aside,
3 you aren't going to be telling the jury that
4 Mr. Hall's flannel shirt or jeans or socks had any
5 glyphosate that had built up and then been reactivated
6 the next day?
7  A. No.
8  MR. SELDOMRIDGE: Objection.
9 Compound.
10 BY MR. KALAS:
11  Q. Now, he told you that he wore a vapor mask
12 5 to 10 percent of the time, right?
13  A. Yes.
14  Q. How would he decide which 5 to 10 percent
15 of the time to wear it?
16  A. I didn't ask. It's not that relevant
17 because I'm not considering substantial inhalation
18 dosage anyway.
19  Q. Well, the vapor mask as well would provide
20 some protection of dermal absorption to the face,
21 right?
22  A. It should, yeah.
23  Q. Okay. And that would be relevant, right?
24  A. Based on the exposure dose data I relied
25 on from the UK model, a dust mask over the mouth area

---

**58**

1 would be -- have, from a mathematical standpoint, very
2 little impact. It would certainly offer -- afford
3 some protection, but very minimal compared to where
4 the primary dose is entering the body.
5  Q. Where does the primary dose enter the body
6 in an applicator?
7  A. In a handheld situation as opposed to a
8 backpack, feet, legs, hands. And he didn't wear a
9 backpack because in a backpack situation the exposure
10 for the backpack is typically six times higher than
11 any other part of the body. But he -- that's
12 irrelevant in this case.
13  Q. And as far as Mr. Hall's feet, legs, and
14 hands, he had clothing on those areas at all times
15 when he was applying Roundup, correct?
16  A. Right.
17  MR. SELDOMRIDGE: Objection.
18 Compound.
19  A. It was not nonpermeable clothing. It was
20 completely permeable.
21 BY MR. KALAS:
22  Q. It was cotton?
23  A. Yes. And he had -- did not wear rubber
24 boots, either. His feet were completely open, and he
25 states his feet were always soaked from the combined

---

**59**

1 dew and glyphosate.
2  Q. Yeah. Did you do any calculation of what
3 amount of the liquid combination of the dew and
4 Roundup mixture was the Roundup mixture versus the
5 dew?
6  A. No. That's impossible. And he also
7 indicated that it wasn't just dew that -- that was
8 contacting him. There were -- there wasn't always
9 dew, but he would spray, and he -- and I checked with
10 him again yesterday. He said he could never really
11 determine where to walk that would be, you know, free
12 of the spray because he would end up backtracking,
13 walking through areas that he already sprayed.
14  Not all his spraying, as we know, occurred
15 in the dew of the morning. Some of that spraying
16 occurred on days when there was no dew or post dew.
17  Q. Did Mr. Hall ever report to you that he
18 had soaking legs when -- or soaking feet when there
19 was no dew present?
20  MR. SELDOMRIDGE: Object to the
21 form. Compound.
22  A. He certainly did, with respect to his
23 hands, from the leakage. And he also indicated that
24 his feet would get wet and that the type of cheap
25 sneaker he had, the spray would go through it.

---

**60**

1 BY MR. KALAS:
2  Q. Okay. The question was a little
3 different. I don't think you addressed legs there,
4 and I'm not sure what you meant on feet. So let me
5 ask it again and try to break it down.
6  When Mr. Hall talked about the fact that
7 his feet would get wet and that the spray would go
8 through the cheap sneaker, did he indicate to you this
9 would happen in the absence of applying -- or in the
10 absence of dew?
11  A. Yes.
12  Q. Okay. When?
13  A. His words were "all the time."
14  Q. Okay. So it's your testimony that
15 Mr. Hall told you he applied enough Roundup to the
16 vegetation he was spraying to soak his feet through by
17 itself?
18  A. That is -- he said that his feet would
19 become very wet.
20  Q. His feet?
21  A. Yeah. Yeah. It went right -- when I
22 talked to him again yesterday, he said it went right
23 through his sneakers.
24  Q. And if somebody's using a hand-pump
25 sprayer, if I understand it correctly, you're -- and

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 43 of 70

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

41 (161 to 164)



**Page 60**

1  tell me if you have a different understanding from
2  Mr. Hall, but they're holding the pump in one hand and
3  they have the wand out with the other and they're
4  pointing downwards and forwards, correct?
5     **A.  Yes.**
6     Q.   And they're applying it to a specific
7  piece of vegetation, correct, or range?
8     **A.   Not exactly.  He -- for the most part, he**
9  **was spraying -- I'm trying to think of the word -- an**
10 **entire area.  He wasn't selectively shooting just a**
11 **weed but --**
12    Q.   He was clearing land?
13    **A.   Yeah.**
14    Q.   And it's your testimony that he used
15 Roundup -- he told you he used Roundup in such copious
16 amounts that it would soak through his feet?
17    **A.   I think his words were that his feet would**
18 **become wet.**
19    Q.   Have you quantified how much Roundup it
20 would take for somebody to spray on an area of
21 vegetation for it to get off the vegetation onto the
22 shoes and soak through them?
23    **A.   No, but there's also the direct spray from**
24 **the wand as well that hit the feet.**
25    Q.   Okay.  So if I understand you correctly,

**Page 62**

1  it's your testimony that you understand Mr. Hall told
2  you that when he was spraying with this wand, somehow
3  he would spray his feet by mistake?
4     **A.   Yeah.  When I first talked to him, he**
5  **explained there was overspray as well as drift, as**
6  **well as contact with material that he already sprayed.**
7  **There were several, several reps that caused that.  He**
8  **was very clear on the feet being wet.  He explains it**
9  **in very compelling detail.**
10    Q.   Did you ask Mr. Hall whether or not he
11 covered his head when he used Roundup?
12    **A.   I asked him what he wore, and it should be**
13 **in here.  I just don't remember if he was wearing a**
14 **hat or not.  I know he didn't wear any kind of face**
15 **shield or protection of that sort, but he might have**
16 **had a hat.  I just don't remember.**
17    Q.   You didn't note that here in your notes,
18 right?
19    **A.   No, I didn't.  I don't see it.**
20    Q.   Did Mr. Hall tell you or did you ask him
21 about eye protection?
22    **A.   Yeah, he didn't wear any eye protection.**
23    Q.
24
25

**Page 63**

1     **A.**
2
3     Q.
4
5
6     **A.   Right.**
7     Q.   Okay.
8
9
10
11    Q.   Okay.
12
13    **A.   Well, again, I refer -- refer you to two**
14 **different medical record entries.  One medical**
15 **entry --**
16
17
18
19
20
21
22
23
24    Q.   Okay.
25

**Page 64**

1  Are you relying on both of those?
2     **A.**
3
4
5
6
7
8
9
10
11
12
13
14    Q.   And you think the contemporaneous medical
15 records might be a better source on that than his
16 memory?
17    **A.   His memory is not providing sufficient**
18 **information.**
19    Q.   Okay.
20    **A.   So this is the information I have to work**
21 **with.**
22    MR. KALAS:  Let's take a break
23 because we're out of tape.  Thanks.
24    THE VIDEOGRAPHER:  This marks the
25 end of Media Number 2 in the deposition

Transcript of William Sawyer, Ph.D.

42 (165 to 168)

Conducted on August 23, 2018

---

**65**

1  of William Sawyer. The time is 2:20
2  [sic]. We are off the record.
3      (Break taken from 2:40 p.m. to 2:55 p.m.).
4      THE VIDEOGRAPHER: This marks the
5  beginning of Media Number 3 in the
6  deposition of William Sawyer. The time
7  is 2:55. We are on the record.
8  BY MR. KALAS:
9      Q.   Dr. Sawyer, going back to your dose
10 calculation for Mr. Hall, if you could turn to
11 page 127 of Exhibit 6, please.
12     A.   Okay.
13     Q.   Now, this was an exposure day calculation
14 you calculated here on page 127, right?
15     A.   It was a what?
16     Q.   Exposure day calculation.
17     A.   Yes.
18     Q.   And in this calculation, the first
19 assumption you made in the top line of the green box
20 is that Mr. Hall applied five days a week for the
21 months of April, May, June, July, August, September,
22 and October, right?
23     A.   Yes.
24     Q.   And what he told you is that he worked
25 four to five days a week, right?

**66**

1      A.   Yes, but he said that -- as I recall, that
2  whether it was four or five, it was still 40 hours.
3      Q.   What Mr. Hall told you was four to five,
4  not five days, right?
5      A.   Four to five, but 40 hours. In other
6  words, he worked -- he didn't necessarily work eight
7  hours a day, and some days he worked well beyond eight
8  hours.
9      Q.   But if we're counting the number of days,
10 not the number of hours per day, he told you he worked
11 four to five days, not five days, right?
12     A.   Yes.
13     Q.   Okay. And then you went down and you
14 calculated the number of hours of exposure he had per
15 year, right? And that's in the second line.
16     A.   Yes.
17     Q.   Okay. And you based that on multiplying
18 the number of days he was exposed, which was what you
19 calculated as 152.5 based on five days, and you
20 multiplied that by two hours a day, right?
21     A.   Right.
22     Q.   And what Mr. Hall told you was that he
23 applied Roundup one to two hours a day, right?
24     A.   Yes.
25     Q.   Okay. And so, again, the two hours is the

**67**

1  highest end of what he told you rather than the
2  median, correct?
3      A.   Correct.
4      Q.   And that could be an overestimate of the
5  hours per day he applied Roundup, right?
6      A.   Yes.
7      Q.   And then you divided those hours of
8  exposure by seven to get how many exposure days under
9  the UK POEM model he had per year, right?
10     A.   Yes.
11     Q.   And the number you came up with was 43.6
12 exposure days per year, right?
13     A.   Yes.
14     Q.   And we talked about earlier that Mr. Hall
15 told you he worked on 10 to 12 houses per week, right?
16     A.   Yes.
17     Q.   And did those 10 to 12 houses represent
18 the entirety of his client base --
19     A.   I don't know.
20     Q.   -- in a given year?
21     A.   I can't answer that. I don't know.
22     Q.   So they could have. You just don't know?
23     A.   Well, probably not, because my
24 understanding, he worked for houses that largely had
25 been abandoned or foreclosed and uncared for. And I

**68**

1  seem to think he -- and I can't remember for sure, but
2  he may have said it was working through subcontracts
3  through banks and entities of that sort.
4      Q.   Assuming that Mr. Hall only worked on 10
5  to 12 houses a week, would that mean that he -- strike
6  that.
7      Now, y'all present this in pages 124 to
8  128, but if we go back to page 15 of Exhibit 6, you
9  compare Mr. Hall to the characteristics of the other
10 pesticide applicators in the Agricultural Health
11 Study, right?
12     A.   The 1996 study, yeah.
13     Q.   And in Mr. Johnson's case, and I believe
14 in this case as well, you pulled this from one of the
15 initial studies of the AHS, right, 1996?
16     A.   Yes.
17     Q.   And the population studied in the AHS were
18 either farmers or professional pesticide applicators,
19 right?
20     A.   Yes.
21     Q.   And a large majority -- I think 90 percent
22 or so -- were actually farmers, right, rather than
23 commercial applicators?
24     A.   Correct.
25     Q.   Now, farmers usually apply Roundup to a

Transcript of William Sawyer, Ph.D.

43 (169 to 172)

Conducted on August 23, 2018

**69**

1  larger swath of land than half an acre, right?
2      A.  Yes, but very often, they're either on a
3  tractor or in a closed tractor cab.
4      Q.  My question was just about the size of the
5  land, sir.  Farmers usually apply --
6      MR. SELDOMRIDGE:  Objection.
7      Argumentative.
8      MR. KALAS:  Can I finish my
9      question, Jeff?
10      MR. SELDOMRIDGE:  Go for it.
11  BY MR. KALAS:
12      Q.  Farmers usually apply Roundup to a larger
13  swath of land than a half an acre, right?
14      A.  Yes.
15      Q.  Okay.  And a farmer application day might
16  be considerably longer than one to two hours, right?
17      A.  Yes, but I took that into account by using
18  two hours per day, which on is on page 127, as
19  discussed.
20      Q.  Well, you used two hours a day for
21  Mr. Hall, right?
22      A.  I did.
23      Q.  So I'm asking about the farmer, sir.
24      A.  Right.  But I factored that divided by
25  seven-hour exposure.

**7**

1      A.  I am going to make a calculation.
2      Q.  Can you explain on the record what you're
3  doing as you do it, please?
4      A.  Yes.  I'm waiting for the device to turn
5  on.
6      Q.  Okay.
7      A.  Well, in the interim, I'll explain what
8  I'm doing.  I'd like to divide 2.5 ounces by 128
9  ounces times 100 percent to reveal the percentage that
10  was applied to the weeds by Mr. Hall.
11      Q.  Well, you said 2.5 ounces divided by 128
12  ounces.  Of that 2.5 ounces, what percentage is
13  actually glyphosate?
14      A.  We'll get to that.  52 percent.
15      Q.  Okay.
16      A.  2.5 times .52 equals -- divided by 128
17  times 100.  So he was using -- whoops.  That just
18  didn't -- try it again.
19      (Calculating figures.)
20      So he was using 1.02 percent solution.
21      Q.  Right.
22      A.  And you asked me if the farmers were using
23  greater than 1 percent.
24      Q.  Right, which is where I was deriving that
25  number from, from what Mr. Hall was using.

**70**

1      Q.  I'm just asking about the farmers.  We'll
2  get to Mr. Hall in a second.
3      A.  We're comparing apples to apples here
4  because of my factoring.
5      Q.  Okay.  I will ask the questions, and you
6  can answer them however you see fit.
7      A.  I did answer.
8      Q.  Okay.  Farmers usually apply Roundup, when
9  they apply Roundup, for longer than a two-hour
10  application day, correct?
11      A.  Yes.
12      Q.  And, in fact, if farmers had an
13  application day like that in the UK POEM model, which
14  is one hour mixing, six hours applying, Mr. Hall would
15  fit in the 40 to 59 category in the demographic
16  characteristics of Table 5, correct?
17      A.  Yes.
18      Q.  And, additionally, a farmer could be
19  applying Roundup to GMO crops, right?
20      A.  Yes.
21      Q.  Mr. Hall wasn't doing that, right?
22      A.  No.
23      Q.  Okay.  And the amount of active ingredient
24  in the Roundup formulation a farmer applies to crops
25  is usually higher than 1 percent, right?

**72**

1      A.  Very good.  The answer is yes.
2      Q.  Okay.  And they -- farmers use up to
3  41 percent glyphosate sometimes, right?
4      A.  Never.
5      Q.  Never?
6      A.  Not un -- and not undiluted.
7      Q.  Okay.
8      A.  Concentration, no.
9      Q.  Not -- original Roundup was 41 percent
10  glyphosate?
11      A.  Right, but then it gets diluted.
12      Q.  Okay.  But you don't know how much it gets
13  diluted?
14      A.  Slightly above 1 percent.
15      Q.  You believe all farmers use a 1 percent
16  formulation?
17      A.  No, no.  Some are slightly above that.
18      Q.  Well, did you -- have you looked into how
19  much above 1 percent farmers use?
20      A.  Yes, based on the label.
21      Q.  Okay.  So -- so you've looked for
22  application to Roundup ready crops, the percentage of
23  glyphosate used in the Roundup products for that?
24      A.  Yes, based on the label.
25      Q.  Okay.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 46 of 70
CONFIDENTIAL

Transcript of William Sawyer, Ph.D.                    44 (173 to 176)
Conducted on August 23, 2018

**Page 73**

1    A.  Yeah.
2    Q.  So which Roundup products' labels did you
3  review in reviewing the dilution instructions?
4    A.  I don't have it with me, but I had
5  reviewed the commercial version used in other cases.
6    Q.  Okay.  And that's not on your Materials
7  Considered list, right, for this case?  In other
8  words, you didn't set forth those labels in your
9  report or in -- in your supplemental MCL or anywhere
10  else we've looked at?  I'm not asking about your box
11  right now, sir.
12    A.  Well, I think you are.
13    Q.  No.  I'm asking about what you set forward
14  to us prior to today.
15    A.  I think I may have brought it, the Ranger
16  Pro.  Let's see.  I don't know.  I didn't bring the
17  Ranger Pro instructions.
18    Q.  Well, the Ranger Pro instructions were
19  for -- I believe from the Dewayne Johnson case,
20  correct?
21    A.  Yes.
22    Q.  And those weren't used on GMO crops,
23  right?  Dewayne Johnson wasn't a farmer applying to
24  GMO crops, correct?
25    A.  No, but I think that I did have some

**Page 74**

1  information on dilution for GMO crops.
2    Q.  But you don't have that readily available
3  to you right now, as far as you know?
4    A.  I don't, no.
5    Q.  And you couldn't tell me what percentage
6  of active ingredient, off the top of your head,
7  farmers actually use on GMO crops?
8    A.  I recall slightly greater than 1 percent.
9    Q.  But you don't know.  For instance, Dewayne
10  Johnson used 3 percent, right?  And he wasn't using it
11  on GMO crops.
12    A.  Correct.
13    Q.  Okay.  So you did not conduct a comparison
14  between the amount of Roundup -- or strike that -- the
15  amount of glyphosate used by the farmers in the
16  Agricultural Health Study as far as the dilution, the
17  percentage of glyphosate in that dilution, you didn't
18  compare that in the percentage of glyphosate in the
19  dilution used by Mr. Hall?
20    A.  Well, I don't think that's really possible
21  because the Agricultural Health Studies, even the new
22  one, does indicate what percent were farmers, what
23  percent were applicators similar to Mr. Hall, and it
24  would be an error to assume that in the Agricultural
25  Health Studies that all of the applicators were using

**Page 75**

1  a much higher quantity than Mr. Hall, when, in fact 20
2  or even 30 percent, based on the newer study, were
3  using the same mixtures as Mr. Hall.
4    Q.  Now, on page 127, you claim that
5  Mr. Hall's 218 exposure days are far beyond the fourth
6  exposure quartile in the Agricultural Health Study,
7  right?
8    A.  Yeah, in the 2018 study.
9    Q.  And, in fact, they're not far beyond;
10  they're encapsulated within the fourth quartile, which
11  is greater than 108.5 days, correct?
12    A.  Well, it's beyond the initial point of the
13  fourth quartile by a long -- almost double that.
14    Q.  But you don't know the distribution of use
15  days within that fourth quartile, right?
16    A.  No.  They didn't give enough specifics to
17  calculate whether it was the 95th percentile or just
18  where.
19    Q.  Okay.  So he could be the 80th percentile
20  because it's --
21    A.  It's possible, depending on distribution,
22  but the fact that he's double the 75th percentile is,
23  you know, very strongly suggestive that he was at the
24  extreme end.  And even if I were to go back, which I
25  probably will, and change the hours to 1.5 hours per

**Page 76**

1  day, he's still in that fourth quartile.
2    Q.  So you're going to change these dosage
3  calculations, potentially, after this deposition?
4    A.  I'll probably just change the 2 to 1.5.
5  It'll changed number by a factor of 25 percent, I
6  believe.
7    Q.  Understand that I'm somewhat unclear
8  whether or not there's going to be epidemiology
9  opinions here, but if we look at follicular
10  lymphoma --
11        MR. KALAS:  I'm going to mark
12    this as Exhibit 11.
13        (Exhibit Number 11, Document Titled
14        "Glyphosate Use and Cancer Incidence in
15        the Agricultural Health Study," By
16        Andreotti, et al., was marked for
17        identification.)
18  BY MR. KALAS:
19    Q.  I've turned to the page I'd like to look
20  at real quick.  If we look at Table 2, "Cancer
21  incidence in relation to intensity-weighted lifetime
22  days of glyphosate use in the Agricultural Health
23  Study," and we look at follicular lymphoma, which is
24  the type of non-Hodgkin's lymphoma that Mr. Hall has,
25  correct, follicular lymphoma?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 47 of 70
CONFIDENTIAL

Transcript of William Sawyer, Ph.D.                    45 (177 to 180)
Conducted on August 23, 2018

---

**77**

1     A.   Yes.
2          MR. SELDOMRIDGE:  Object to form.
3     Argumentative.
4     BY MR. KALAS:
5     Q.   The data in the Agricultural Health Study
6     suggests that no exposure, the reference dose had 16
7     cases of non-Hodgkin's lymphoma, right -- or excuse
8     me -- follicular lymphoma, right?  Right here, sir.
9     **A.   Okay.  Reference cases, 16, correct.**
10    Q.   Okay.  And then all the risk ratios for
11    exposure to glyphosate are below one, right?
12    **A.   Yes.**
13    Q.   And as somebody who has instructed
14    students on epidemiological studies in the past, what
15    does that mean to you?
16    **A.   Well, there's no significant finding**
17    **there, clearly.**
18    Q.   And so when you say that Mr. Hall fits
19    within the fourth quartile group in the Agricultural
20    Health Study, I'm correct that the highest exposure
21    group for follicular lymphoma had no significant
22    finding in that study, right?
23    **A.   Correct.**
24    Q.   And what "no significant finding" means is
25    that the authors of the study cannot establish a

**78**

1     relationship between the exposure to Roundup and
2     follicular lymphoma, right?
3     **A.   Yes.**
4     Q.   Now --
5     **A.   But as I said before, the T-cell**
6     **non-Hodgkin's lymphoma did show a statistically**
7     **significant finding, but it was based on 18 subjects,**
8     **while -- rather than 20.**
9     Q.   Is T-cell lymphoma a different disease
10    than follicular lymphoma?
11    **A.   Yes, but both starts out at the stem cell,**
12    **same stem cell.  It's the same area.**
13    Q.   Let's talk about non-Hodgkin's lymphoma
14    generally in this study.  Non-Hodgkin's lymphoma
15    generally in this study, is there any significant
16    finding for non-Hodgkin's lymphoma and exposure to
17    Roundup?
18    **A.   No.**
19    Q.   Okay.  And that's for every exposure
20    group, right?
21    **A.   Yeah.**
22    Q.   And that -- that is in -- including in the
23    individuals exposed for greater than 108.5 days,
24    right?
25    **A.   Yes.**

**79**

1     Q.   Okay.  Now, there's actually about 60
2     separate diseases that make up NHL, right?
3     **A.   Yes.**
4     Q.   Each of those diseases have separate
5     genetic translocations associated with the diseases,
6     right?
7     **A.   That's true.**
8     Q.   And each of those diseases have basically
9     their own pathological fingerprint, right?
10    **A.   Yes.**
11    Q.   And each of those diseases have their own
12    etiology, right?
13    **A.   Well, they share one similar etiology in**
14    **terms of mutation in the stem cell.**
15    Q.   Okay.  But, for instance, HIV is
16    associated with certain types of non-Hodgkin's
17    lymphoma, right?
18    **A.   That's true.**
19    Q.   But not others, right?
20    **A.   I'd have to defer that.  I have not**
21    **followed the subtypes with -- with AIDS.  So I'd have**
22    **to defer that.**
23    Q.   Have you followed the subtypes with
24    glyphosate?
25    **A.   To some extent.  Over the years I have,**

**80**

1     **but in this case I've deferred that to the**
2     **epidemiologists.  It was obviously -- you see the size**
3     **of my file box now, and to take on every aspect of**
4     **this case would have been overwhelming.**
5     Q.   Are you going to tell the jury that
6     glyphosate causes all types of non-Hodgkin's lymphoma?
7     **A.   No.  I'm going to leave that for the**
8     **epidemiologists and medical experts.**
9     Q.   Do you believe it's possible -- strike
10    that.  Let me back up.
11    It is your opinion that glyphosate and
12    glyphosate-based herbicides cause non-Hodgkin's
13    lymphoma, right?
14    **A.   Yes.**
15    Q.   Is that opinion -- do you have any opinion
16    about whether or not it only causes some subtypes of
17    non-Hodgkin's lymphoma and not others?
18         MR. SELDOMRIDGE:  Objection.
19    Redundant.
20    **A.   From a toxicological mechanistic**
21    **standpoint, it could cause any NHL.  One has to**
22    **remember that certain subtypes are extremely rare.**
23    **And in human epidemiologic studies, it's difficult to**
24    **get a sufficient number of cases to make a**
25    **determination.  I think what you're asking me now, I**

Transcript of William Sawyer, Ph.D.

46 (181 to 184)

Conducted on August 23, 2018

---

**8**

1 really should defer to the epidemiologists.
2 BY MR. KALAS:
3     Q.   So you're not going to tell the jury about
4 any study that associates Roundup to follicular
5 lymphoma in particular?
6     A.   No.
7     Q.   And are you aware of any study that
8 associates Roundup to follicular lymphoma in
9 particular?
10     A.   No, but you're bringing a -- raising an
11 issue that I know the epidemiologist will handle, and
12 that is when a scientist or a defense lawyer tries to
13 cut down a category such as lymphoma into many, many
14 little subcategories, then the studies become
15 incapable of determining whether or not there is a
16 finding because the number of subjects becomes too
17 small to provide enough statistical power, and we call
18 that Type 2 error, as opposed to Type 1 error when
19 something appears positive by chance alone.
20         And so I think that I'm going to defer
21 that, although I know the answer to it. It's simply
22 that a follicular lymphoma is not a real common
23 variant compared to, you know, a B-cell non-Hodgkin's
24 lymphoma. So when one looks at lymphoma NHL in total,
25 one has a stronger statistical ability to determine if

**82**

1 there was a change.
2     Q.   You stated in your toxicological notes on
3 page 116 of Exhibit 6 that follicular lymphoma is the
4 second most common form of NHL, right?
5     A.   It is, but if you look at the actual
6 numbers, it's not nearly as common as most of the
7 B cells or if you group non -- all the non-Hodgkin's
8 lymphoma together, then the statistical power becomes
9 much stronger.
10     Q.   Now, speaking of page 116, you talk about
11 the incidence of follicular lymphoma increasing in the
12 SEER registry from 1992 to 2001 among the elderly,
13 right?
14     A.   What page?
15     Q.   Page 116, sir.
16     A.   Yeah. Incidence rates for follicular
17 lymphoma according to SEER registry statistics for
18 white males compiled by subtype, age, and sex 3.18 --
19         THE REPORTER: I'm sorry.
20     A.   -- per 100,000 -- compiled by subtype,
21 age, and sex is 3.18 per 100,000 person years.
22 BY MR. KALAS:
23     Q.   I'm asking about the last line here, sir.
24 You said, "Incidence of follicular lymphoma in the
25 SEER registry from 1992-2001 increased 1.8% a year

**83**

1 among the elderly (e.g., age 65 years or greater),"
2 right?
3     A.   Yes.
4     Q.   Are you going to tell the jury that the
5 rate of follicular lymphoma is going up in America?
6     A.   You know, I -- I think I'd have to talk to
7 plaintiffs' counsel. I would probably prefer to defer
8 that to the epidemiologists, but then again, I'd have
9 to defer that to counsel and see if -- what aspects of
10 this case they want me to discuss on direct
11 examination.
12     Q.   Well, you understand this is my
13 opportunity to find out what you plan to say. So do
14 you plan to tell the jury that the incidence of
15 follicular lymphoma from 1992 to 2001 increased
16 1.8 percent a year among the elderly?
17     A.   I could. I don't --
18     Q.   Okay.
19     A.   I feel like that's getting into the
20 epidemiological section, which I've deferred in my
21 report. I wish I could give you a better answer.
22     Q.   I wish you could too, Dr. Sawyer. I
23 really do, because I can't figure out if you defer or
24 where you have the opinions.
25     A.   Let's ask counsel right here.

**84**

1     Q.   Uh-huh. I have. So --
2     A.   You have? Well, then good. Then you tell
3 me, and I'll know what to prepare for.
4     Q.   Well, we'll deal with that later.
5         Now, Mr. Hall wasn't elderly when he was
6 diagnosed with follicular lymphoma, right?
7     A.   No.
8     Q.   And did you look at the SEER data for
9 individuals between 20 and 64 at diagnosis?
10     A.   Yes.
11     Q.   Okay. You did?
12     A.   Yes.
13     Q.   You didn't report that here?
14     A.   No.
15     Q.   Okay. And did you look at the more
16 updated data from 2002 to 2011?
17     A.   I don't think so because I would have
18 referenced that as 2011.
19     Q.   So do you recall for 1992 to 2001 whether
20 the rate of follicular lymphoma increased for
21 individuals 20 to 64?
22     A.   I don't recall.
23     Q.   And that would be more relevant to
24 Mr. Hall than elderly individuals, right?
25     A.   Not necessarily. The problem is the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC Document 8573-32 Filed 12/27/19 Page 49 of 70
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

47 (185 to 188)

---

85

1  number of cases, as I said, for his group is only 3.18
2  per 100,000, where if you look at the age group up to
3  65, it skyrockets. There's a lot more cases per
4  100,000, which gives much more statistical reliability
5  and power to see if there's a trend. And because
6  there's so few cases at his age, the statistical power
7  to see such a trend is weakened.
8        Q.  Cancer's a disease of the aging is
9  basically what you're saying?
10       A.  Right, but you're going to see a lot more
11 cases in the older age group, which gives you more
12 detectable power because what we're saying here is
13 that among these aged people, that number of aged
14 people with NHL follicular lymphoma has been on the up
15 and up. It's been getting worse instead of better.
16       Q.  So --
17       A.  Or it's holding the same.
18       Q.  So were you aware that the rate of
19 follicular lymphoma in individuals aged 20 to 64 has
20 gone down by 2 percent from 2002 to 2011?
21       A.  I don't know that that's a statistically
22 significant finding because of the lower number of
23 cases and variability.
24       Q.  Just asking if you are aware of it, sir.
25       A.  It appears that way, but I'm not sure that

86

1  it's real. I didn't see any statistics in what I
2  looked at that showed that, but I think I only saw the
3  2001. I don't think I had access to the 2011.
4        Q.  Okay.
5            MR. KALAS:  I dropped my
6        microphone. Sorry.
7  BY MR. KALAS:
8        Q.  So you don't believe you've seen those
9  figures, right?
10       A.  I don't recall seeing the -- up through
11 2011.
12       Q.  And I'm correct that the use of Roundup
13 has gone up a lot in this country from 2002 to 2011,
14 right?
15       A.  Yes. I mean, it's been on the uprise
16 since its introduction in, what, 1974.
17       Q.  Okay. So as the rate of -- if that number
18 was correct that the rate of follicular lymphoma has
19 gone down by 2 percent in Mr. Hall's age group -- and
20 I'd like you to assume it is correct -- if that is
21 correct, what that would mean is that, as the use of
22 Roundup has gone up, the rate of follicular lymphoma
23 in Mr. Hall's age group has gone down in our most
24 recent data, correct?
25       A.  Hypothetically, but there is -- I would

87

1  have to see the data. Is that incident data or
2  mortality? Because mortality goes down due to better
3  treatment.
4        Q.  So that's --
5        A.  And earlier identification where incidence
6  is something that that would be more appropriate for
7  such an analysis that we're making.
8        Q.  So that figure I reported to you was
9  incidence data, sir.
10       A.  Okay.
11       Q.  So now let's talk about survival data.
12 You talk about the fact here on page 116 that the
13 median survival is 14 years, but the disease has been
14 documented to progress rapidly and aggressively in
15 less than one year, right?
16       A.  Yes.
17       Q.  Okay. Are you going to tell the jury that
18 the disease is progressing rapidly and aggressively in
19 Mr. Hall?
20       A.  No.
21       Q.  Okay. And, in fact, you're aware that the
22 five-year survival of follicular lymphoma in 20- to
23 64-year-olds is 90.6 percent?
24       A.  I'm not familiar with that percentage, but
25 I know it's -- there is a -- a five-year survival rate

88

1  with current therapy has improved drastically over the
2  past couple decades.
3            MR. KALAS:  All right. So I'm
4        going to mark as Exhibit 12 some data
5        from the SEER Web site.
6            MR. SELDOMRIDGE:  Thank you,
7        Counsel.
8            (Exhibit Number 12, Printout from SEER Web
9            Site Titled "All Lymphoid Neoplasms With
10           Detailed Non-Hodgkin Lymphoma Subtypes,"
11           was marked for identification.)
12 BY MR. KALAS:
13       Q.  And this report is called Table 19.27,
14 "All Lymphoid Neoplasms With Detailed Non-Hodgkin
15 Lymphoma Subtypes," correct?
16       A.  Yes.
17       Q.  Okay. And if you go to "Follicular
18 lymphoma," which is entry 2(a) 2.6 -- let me know when
19 you're there.
20       A.  Yes.
21       Q.  Okay. And do you see the third column,
22 which is the 20 to 64 ages range?
23       A.  I do.
24       Q.  And for follicular lymphoma, am I correct
25 that the APC, the annual percent change by age at

Transcript of William Sawyer, Ph.D.

48 (189 to 192)

Conducted on August 23, 2018

---

89

1 diagnosis, has gone down in males by 2 percent from
2 2002 to 2011?
3          MR. SELDOMRIDGE: Objection.
4 Mischaracterizes.
5          A. (Reviewing document.)
6          Yes.
7 BY MR. KALAS:
8          Q. And do you see the asterisk next to that
9 2 percent?
10         A. Yes.
11         Q. And if you go to the last page, am I
12 correct that that means that the APC, the annual
13 percent change, is statistically significant from
14 zero?
15         MR. SELDOMRIDGE: Objection.
16 Mischaracterization.
17         A. Repeat that question.
18 BY MR. KALAS:
19         Q. Am I correct that the asterisk next to
20 2 percent -- negative 2 percent there, if you look at
21 the index on the last page, states that that means
22 that the annual percent change is significantly
23 different from zero at the .05 level?
24         A. Yes.
25         MR. SELDOMRIDGE: Same objection.

---

90

1 BY MR. KALAS:
2          Q. Okay. And now that I've shown you this
3 data, you'd agree that the rate of follicular lymphoma
4 has gone down in a statistically significant manner in
5 the age group Mr. Hall is part of while the use of
6 Roundup has gone up, correct?
7          A. Yes.
8          Q. Now, have you looked at any data on the
9 number of new cases of non-Hodgkin's lymphoma age
10 adjusted from SEER in the past 20 years?
11         A. I looked at the -- an American Chemical
12 Society publication which -- well, it wasn't American
13 Chemical Society. It was of members of the American
14 Chemical Society that showed a substantial increase in
15 lymphoma, all types of lymphoma, from 1950 on until
16 the date of publication. Beyond that what I've
17 referenced in my report, I don't think I've looked at
18 anything else.
19         Q. So you didn't look at the SEER data for
20 the number of new cases per hundred thousand people
21 age adjusted for non-Hodgkin's lymphoma?
22         A. For non -- NHL or follicular?
23         Q. NHL, I'm asking about now.
24         A. In general?
25         Q. Yes, sir.

---

9

1          A. I probably looked at it the same time I
2 prepared page 118 and reported -- page 117 and
3 reported on this SEER registry values. In fact, at
4 the top of my page, I talk about NHL prevalence
5 increases. So, yeah, I looked at -- what did I
6 reference here?
7          Q. You looked at Wheeler.
8          A. Wheeler. Right. That's it.
9          Q. So you haven't looked at the current SEER
10 data on the SEER Web site from the National Cancer
11 Institute on this?
12         A. Well, I know I looked on the SEER
13 Web site, but I don't recall seeing data -- this
14 particular set of data. Let me just look at what this
15 is.
16         Q. Well, I'm asking about a different set of
17 data now, sir, not Exhibit 12. I'm asking about NHL
18 over a 20-year period.
19         Do you recall looking at any data like
20 that?
21         A. No, not that -- not that provides the APC
22 for that period, no.
23         Q. Okay. And you're not aware, then, if I
24 understand correctly, that the number of new cases of
25 non-Hodgkin's lymphoma in 1995 per 100,000 people was

---

92

1 19.98 in the SEER data?
2          A. No, but it's consistent with page 118 in
3 my report where I stated the incidence rate for NHL
4 leveled recently to 19.6 per 100,000 years from 2003
5 to 2007, but incidence increases have also occurred in
6 other developing countries.
7          Part of what you have to remember -- this
8 has been very well published in peer-reviewed
9 literature -- is that a primary cause of non-Hodgkin's
10 lymphoma in our diet is dioxins, which have been
11 drastically reduced over the past 20 years.
12         Dioxin levels in the 1970s and even the
13 1980s in human blood serum, lipid, and in food has
14 substantially come down due to the regulations set
15 forth worldwide, and that accounts, in part, for the
16 SEER registry data you're pointing out.
17         MR. KALAS: Move to strike
18 everything after "countries."
19 BY MR. KALAS:
20         Q. Were you aware, then, sir -- had you seen
21 that the incidence of new cases and deaths -- strike
22 that -- the incidence of new cases per 100,000 people
23 for 2015 was 19.91 in the SEER data?
24         MR. SELDOMRIDGE: Objection.
25 Confusing.

---

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

49 (193 to 196)

---

93

1    A.   No, but that's exactly consistent with my
2 report where I state the NHL incidence rate has
3 leveled recently to 19.6 per hundred thousand person
4 years.
5 BY MR. KALAS:
6    Q.   Okay. So if I understand correctly, it's
7 your opinion that the incidence of non-Hodgkin's
8 lymphoma in this country has not increased in the past
9 20 years and it's instead remained steady?
10       MR. SELDOMRIDGE: Objection.
11   Misstates.
12   A.   It had ballooned from 1950 up until about
13 1980. It exploded. And it's very well documented.
14 Now, in more recent years, it has leveled off.
15 BY MR. KALAS:
16   Q.   So that's my question.
17   A.   And that's primarily attributed to the
18 regulations that have very much reduced the dioxins in
19 the average human diet.
20   Q.   My question is, for the time period 1995
21 to 2015, do you agree the rate of non-Hodgkin's
22 lymphoma in this country has stayed level?
23   A.   For the years what?
24   Q.   1995 to 2015.
25   A.   Yes.

---

94

1    Q.   And in that same time period, the use of
2 Roundup has increased fifteenfold in this country,
3 right?
4    A.   Yeah, and the concentration of dioxin in
5 human serum lipid has decreased substantially during
6 that same time period and accounts -- also accounts
7 for what we're seeing.
8    Q.   All right.
9    A.   Also, during that time period, benzene
10 laws went into effect in the 1980s removing benzene
11 exposures from humans.
12   Q.   Are you stating now that benzene is an
13 alternative cause of non-Hodgkin's lymphoma, sir?
14   A.   The peer-reviewed literature indicates it
15 is. That certainly has been shown, but most -- let's
16 put it this way: There's a difference with
17 benzene with respect to what courts have determined
18 versus what the literature shows.
19   Q.   I'm asking what you think.
20   A.   Well, clearly there's a number of -- a
21 good number of human epidemiologic studies that
22 indicate non-Hodgkin's lymphoma can be induced by
23 benzene exposure.
24   Q.   And so benzene would be an exposure you'd
25 be concerned about when conducting differential

---

95

1 diagnosis on somebody whose been exposed to Roundup
2 and had non-Hodgkin's lymphoma diagnosed?
3    A.   Yes. And in this case, there was no
4 evidence of any significant benzene exposures.
5    Q.   All right. Now, in your toxicological
6 notes, you talk a little bit about surfactants. And
7 am I correct the term "surfactant" is shorthand for
8 surface active agent?
9    A.   Yes.
10   Q.   Okay. And surfactants are used for a
11 variety of applications in chemical mixtures, right?
12   A.   Yes.
13   Q.   And the reason a surfactant -- one of the
14 reasons a surfactant is -- well, strike that.
15       Why someone would add a surfactant to a
16 chemical mixture is dependent on the application the
17 mixture is being used for, right?
18   A.   Yes.
19   Q.   And, for instance, you could put a
20 surfactant in the mixer to reduce surface tension,
21 right?
22   A.   Yes.
23   Q.   You could put a surfactant in the mixer as
24 an emulsifier, right?
25   A.   Yes.

---

96

1    Q.   And an emulsifier is a compound that is
2 there to disperse another compound, right?
3    A.   Right. For example, helping an aqueous
4 solution penetrate a tissue or plant that has a higher
5 lipid content which is hydrophobic.
6    Q.   A surfactant could be a wetting agent?
7    A.   That's true.
8    Q.   And a wetting agent's basically a compound
9 that's there to ensure another compound stays where
10 you put it longer?
11   A.   Yes, and of course the wetting agent would
12 best have a lower volatility such as some of the
13 glycols.
14   Q.   Surfactants can be present in order to
15 enhance foaming, right?
16   A.   Nonionic surfactants can. Some of the
17 detergents actually can enhance foaming.
18   Q.   And the reason you'd want foaming is to
19 reduce drainage of a substance, right?
20   A.   I couldn't hear the last two words.
21   Q.   The reason you'd want foaming is to reduce
22 drainage of a substance, right?
23   A.   The reason you would want foaming?
24   Q.   Yeah. Why you'd put a surfactant into a
25 mixture in order to increase foaming, you're trying to

---

Transcript of William Sawyer, Ph.D.

50 (197 to 200)

Conducted on August 23, 2018

---

97

1  avoid drainage?

2  **A.  I'd have to refer that to a agricultural**
3  **chemist.  I'm not familiar with -- it makes**
4  **sense to me, yes, but it's not something I've studied**
5  **in terms of the mechanics of trying to keep the liquid**
6  **from running off the leaf by some -- apparently, some**
7  **very microscopic small quantity of foam.  It's a good**
8  **idea, but I'm not familiar with it.**

9  Q.  Surfactants can be used to suspend or
10  stabilize a mixture, right?

11  **A.  Absolutely.  We see this even in foods.**

12  Q.  And, in other words, there are a lot of
13  uses of surfactants that are beneficial to society?

14  **A.  I use a nonion surfactant for my swim**
15  **goggles.  It's called contact solution.**

16  Q.  Yeah, and that raises a good point.  There
17  are surfactants present all around us, right?

18  **A.  Yes.  There's good ones and dangerous**
19  **ones.**

20  Q.  They have lots of everyday applications,
21  right?

22  **A.  Yes.**

23  Q.  It would be impossible to avoid
24  surfactants in our everyday lives?

25  **A.  Yes, but it would be great to avoid the**

---

98

1  **dangerous ones.**

2  Q.  Now, it's true I can find surfactants in
3  my laundry detergent at home, right?

4  **A.  For sure.**

5  Q.  I can find surfactants in the Ivory soap I
6  use to clean my dishes, right?

7  **A.  Yes.**

8  Q.  I can find surfactants in the Windex I use
9  on my windows at home?

10  **A.  Yes, butoxyethanol.**

11  Q.  I can find surfactants in the Murphy's Oil
12  I use to clean my wood floors?

13  **A.  Yes.**

14  Q.  I can find surfactants in the Resolve
15  carpet cleaner I use when my pup, Chloe, has an
16  accident?

17  **A.  Yes, but let's hope that doesn't happen.**

18  Q.  It does.

19  I can find surfactants in the Glade
20  Plug-In I have in my office to make it smell nice?

21  **A.  I've never researched that one.  I'm not**
22  **sure what's in Glade.**

23  Q.  My toothpaste has surfactants in it,
24  right?

25  **A.  I'm not sure.**

---

99

1  Q.  My shampoo has surfactants in it, right?

2  **A.  Absolutely.**

3  Q.  The Coppertone sunscreen I put on my kids
4  to protect them from the sun, that has surfactants in
5  it, right?

6  **A.  Yes.**

7  Q.  The shaving cream I put on my face in the
8  morning, I put surfactants right on my face, don't I?

9  **A.  Yes; the good ones.**

10  Q.  When I put my Old Spice deodorant on after
11  that, there's also surfactants in it, right?

12  **A.  I'm not familiar with the chemistry of**
13  **that particular product.**

14  Q.  How about Cetaphil lotion for my dry skin?
15  Does that have surfactants in it?

16  **A.  Yes.**

17  Q.  And surfactants have lots of medical uses,
18  right?

19  **A.  Yes.  As I said, even contact lens**
20  **solution.**

21  Q.  They're in caplets and tablets that I
22  swallow to make sure the medicines get distributed
23  evenly in my digestive tract, right?

24         MR. SELDOMRIDGE:  Objection.
25  Compound question.

---

200

1  **A.  Yes.**

2  **BY MR. KALAS:**

3  Q.  And surfactants are in the Children's
4  Tylenol I give my kids when they're sick, right?

5  **A.  Depends on the -- whether it's the fast**
6  **release.  If it's the tablet, I'm not sure it's in the**
7  **tablet.  But in general, yes.**

8  Q.  Surfactants are in my Listerine I use to
9  clean my mouth?

10  **A.  Yeah, we could consider the ethanol a**
11  **surfactant, yeah.**

12  Q.  And, of course, there's surfactants in
13  herbicides and pesticides, right?

14         MR. SELDOMRIDGE:  Objection.
15  Compound question.

16  **A.  Too broad to answer that.**

17  **BY MR. KALAS:**

18  Q.  Okay.  There's surfactants in Roundup,
19  right?

20  **A.  Yes.**

21  Q.  And surfactants in all formulations of
22  glyphosate-based herbicides you've reviewed, right?

23  **A.  Yes.**

24  Q.  And the reasons surfactants are in
25  glyphosate-based herbicides is to enhance the wetting

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC  Document 8573-32  Filed 12/27/19  Page 53 of 70
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

51 (201 to 204)

**20**

1 of those herbicides, right?
2   A.  More than that.  There's several reasons
3 for using it.
4   Q.  Why do you need to put surfactants in a
5 glyphosate-based herbicide, to your understanding?
6   A.  Well, for dispersion on the plant so the
7 water doesn't just sit there as a bead making very
8 minimal surface area contact.  Also, to slow the
9 evaporative loss, keep it in contact longer for longer
10 absorption.  Also, it can actually -- depending on the
11 surfactant can help maintain -- increase -- that is
12 actually increase penetration into the leaf of the
13 plant by forming a bridge, you might say, across
14 hydrophobic components of the tissue and allowing
15 greater, more rapid penetration into the plant.
16   Q.  Would Roundup work very well without
17 surfactants?
18       MR. SELDOMRIDGE:  Objection.
19   Vague.
20   A.  It seems to work in Europe very well
21 without any POEA.
22 BY MR. KALAS:
23   Q.  Different question.  Would Roundup work
24 very well without the presence of surfactants as a
25 class?

**202**

1       MR. SELDOMRIDGE:  Same objection.
2   A.  That's a pretty general question.  It's
3 too general to answer.
4 BY MR. KALAS:
5   Q.  Do you believe surfactants are unnecessary
6 to the Roundup formulation?
7   A.  No.
8   Q.  Now, EPA refers to surfactants as inert
9 ingredients, right?
10   A.  Yes.
11   Q.  And EPA regulates surfactants, right?
12   A.  Yes.
13   Q.  They require data on the toxicity of
14 inerts to be submitted, right?
15   A.  Not exactly.  They require -- did you use
16 the word "data"?
17   Q.  Data on toxicity.
18   A.  Data, yes, but not actually real studies
19 but computerized models as data.
20   Q.  Okay.  So it's your opinion that EPA only
21 looks at computerized models of surfactants?
22   A.  No.  No.  The surfactants are tested under
23 the usual EOCD guidelines.  But with respect to more
24 in-depth studies of animal carcinogenicity studies,
25 they're not required.  There's no data required on

**203**

1 that other than structural activity relationship
2 models.
3   Q.  EPA requires genotoxicity data on
4 surfactants, correct?
5   A.  I believe so, yes.
6   Q.  EPA requires mutagenicity data on
7 surfactants, correct?
8   A.  Yes.
9   Q.  What is mutagenicity?
10   A.  Whether the substance in question -- how
11 it performs on sister chromatid analysis and other
12 in vitro tests which determine whether the substance
13 has mutagenic potential.
14   Q.  And mutagenicity data is relevant to
15 whether or not a substance could be carcinogenic,
16 right?
17   A.  Yes.
18   Q.  EPA does not ignore the fact that inert
19 ingredients are in pesticide products, right?
20   A.  Correct.
21       MR. KALAS:  Go off the record for
22 a minute, please.
23       THE VIDEOGRAPHER:  Going off the
24 record.  The time is 3:49.
25       (Break taken from 3:49 p.m. to 4:01 p.m.)

**204**

1       THE VIDEOGRAPHER:  The time is
2 4:01.  We are on the record.
3       (Exhibit Number 13, Document Titled "Alkyl
4       Amine Polyalkoxylates (JITF CST 4 Inert
5       Ingredients).  Human Health Risk
6       Assessment to Support Proposed Exemption
7       from the Requirement of a Tolerance When
8       Used as Inert Ingredients in Pesticide
9       Formulations," was marked for
10       identification.)
11 BY MR. KALAS:
12   Q.  Dr. Sawyer, I've marked as Exhibit 13 a
13 document entitled "Alkyl Amine Polyalkoxylates (JITF
14 CST 4 Inert Ingredients).  Human Health Risk
15 Assessment to Support Proposed Exemption from the
16 Requirement of a Tolerance When Used as Inert
17 Ingredients in Pesticide Formulations."
18       Did I read that correctly, if I didn't
19 pronounce it correctly?
20   A.  Very good.
21   Q.  It's dated April 3rd, 2009, right?
22   A.  Yes.
23   Q.  It's from the US EPA, right?
24   A.  Yes.
25   Q.  And you've looked at this document before,

Transcript of William Sawyer, Ph.D.

52 (205 to 208)

Conducted on August 23, 2018

---

205

1  right?
2      A.  Yes.
3      Q.  And this is a document that contains the
4  EPA's human health risk assessment on inert
5  ingredients in certain pesticides, right?
6      A.  Yes.
7      Q.  And one of the inert ingredients contained
8  in this cluster is POEA, which we've talked about some
9  today, right?
10     A.  That's right.
11     Q.  Okay.  And if we can just go down to
12  page 10.
13     A.  Okay.
14     Q.  Section 4.1.1.
15     A.  Okay.
16     Q.  They discuss a compound called MON 0818,
17  right?
18     A.  Yes.
19     Q.  And that's POEA, right?
20     A.  Yeah, looks like -- tallow amine,
21  probably.
22     Q.  Okay.  And it says that -- in this
23  database, EPA has something called an "Ames test,"
24  right?
25     A.  Yes.

---

206

1      Q.  And that's A-M-E-S, right?
2      A.  Yes.
3      Q.  And an Ames test is a test on
4  mutagenicity, right?
5      A.  Yes.
6      Q.  And the Ames test is considered a reliable
7  marker of mutagenicity, right?
8      A.  Yes.
9      Q.  It's an OECD guideline test, right?
10     A.  Yes.
11     Q.  It's an EPA guideline test, right?
12     A.  Yes.
13     Q.  It's evidence you would consider, correct?
14     A.  Yes.
15     Q.  And EPA has some other data on there as
16  well regarding MON 8108, right?
17     A.  Yes.
18     Q.  So EPA has in its possession an acute oral
19  study on MON 0818, right?
20     A.  Yes.
21     Q.  And EPA has in its possession acute dermal
22  study on POEA MON 0818, right?
23     A.  Yeah.  And these are studies, when I
24  testified 20 minutes ago, I said that they did follow
25  OECD guidelines for testing, but they're very limited.

---

207

1      They don't include long-term carcinogenicity assays
2  or, as you'll see on page 51, any human data.
3      Q.  Well, okay.  And I'm just trying to
4  establish a database the EPA does have.
5      A.  Yeah, yeah.  We've kind of talked about
6  that earlier.
7      Q.  Okay.  So EPA has eye and skin irritation
8  studies on POEA, right?
9      A.  Certainly.
10     Q.  EPA has a dermal sensitization study on
11  POEA, right?
12     A.  Yes.
13     Q.  What's a dermal sensitization study
14  measure?
15     A.  It's really an important study in terms of
16  determining whether a chemical is a sensitizer, such
17  as toluene diisocyanate or formaldehyde --
18         THE REPORTER:  I'm sorry.  Tallow
19  amine di --
20         THE WITNESS:  No, no.  Toluene,
21  T-O-L-U-E-N-E D-I-I-S-O-C-Y-A-N-T-E
22  [sic], diisocyanate.
23  BY MR. KALAS:
24     Q.  And what is a sensitizer?
25     A.  That it systemically or dermally induces a

---

208

1  sensitization reaction which is measured either by
2  patch test or RAST testing and various immunological
3  markers.
4      Q.  What is a sensitization reaction?
5      A.  Typically a delayed hypersensitivity
6  reaction.
7      Q.  Okay.  How does that manifest?  What does
8  it look like if somebody's having a sensitization
9  reaction?
10     A.  Well, in human or in animal?
11     Q.  Anyone.
12     A.  Severe bronchoconstriction; decrease in
13  blood pressure; dizziness; usually the person
14  collapses; hypoxia due to the bronchoconstriction,
15  inability to get enough air; swelling of the lips and
16  other upper airway tissues; severe rash, full body
17  rash.  There's a whole number of features.
18     Q.  POEA's not a sensitizer, right?
19     A.  No.
20     Q.  And EPA has in its position an in vivo
21  mouse micronucleus assay on POEA, right?
22     A.  I don't know if I saw that.  Let me look.
23     Q.  It's right after Ames.
24     A.  Okay.
25     Q.  It does, correct?  Sorry.  I don't know if

---

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

---

**209**

1 that was clear on the record. I'll ask it again.
2          Does EPA have in their possession an in
3 vivo mouse micronucleus assay on POEA?
4     A.  I don't see it, actually.
5     Q.  If you look at MON 0818, second line
6 under -- next to Ames.
7     A.  Oh, yeah, they do.  An in vivo mouse
8 micronucleus assay, four-week rat diet, three-month
9 rat diet.  Okay.  Very good.
10    Q.  Okay.  And the in vivo mouse micronucleus
11 assay is another type of genotoxicity study, right?
12    A.  Yes.
13    Q.  And that's a design that's also covered in
14 the EPA guidelines, right?
15    A.  Yes.
16    Q.  And it's in the OECD guidelines, right?
17    A.  Yes.
18    Q.  It's the type of study that you would
19 consider reliable, right?
20    A.  Yeah.  These are all basic required
21 studies for numerous chemicals.
22    Q.  EPA actually has a three-month dietary
23 study on MON 0818, right?
24    A.  Yes.
25    Q.  Now, going down to page 11, middle

**210**

1 paragraph that starts, "The available mammalian
2 toxicity database."
3          Let me know when you're there.
4     A.  Yes.
5     Q.  And what EPA states is, "The committee
6 concluded" -- this is near the bottom.  "The committee
7 concluded the typical 100-fold uncertainty factor (10X
8 interspecies and 10X intraspecies) would be adequately
9 protective," right?
10    A.  Right.  For noncarcinogenic effects, I
11 think that's appropriate.
12    Q.  And so what EPA decided with the cluster
13 four inerts is that the top-level people could be
14 exposed to would be 100 times below where they
15 observed a noncarcinogenic effect, right?
16    A.  Yes.
17    Q.  And that is a public protective policy,
18 right, to have the hundredfold uncertainty factor?
19    A.  Yeah, the uncertainty factor can vary from
20 100 to 1,000, depending on the severity of the effect
21 primarily.
22    Q.  But what it means in lay terms is that it
23 took a hundred times more than the dose we're letting
24 people be exposed to, to cause an effect that we
25 observed in the data we have?

**211**

1     A.  Yes.
2     Q.  Okay.  Now, if we go ahead -- or go down
3 here to the bottom of the page 11 in Section 4.1.2, it
4 states, "There is no evidence that the AAPs" -- and
5 that's the cluster of surfactants we're looking at,
6 alkyl amine polyalkoxylates -- "are mutagenic, or
7 clastogenic," right?
8     A.  Based on the testing that's performed,
9 that's correct.  There was no requirement, of course,
10 for any human in vivo testing observed through
11 postmarketing studies.
12    Q.  What's it mean to be clastogenic?
13    A.  Actually, to damage the chromatids
14 themselves, break them.
15    Q.  And EPA didn't observe that in these
16 studies?
17    A.  No.  No.
18    Q.  And damaging chromatids, what's that a
19 sign of?
20    A.  Well, chromatid -- well, chrome --
21 breakage, cleavage, or rearrangement of chromatids
22 results in very serious reproductive developmental
23 effects generally.
24    Q.  And if we go to page 57 -- let me know
25 when you're there.

**212**

1     A.  Yeah.
2     Q.  At the bottom, they discuss that they did
3 a bacterial reverse mutation test on a compound called
4 MON 59112.
5          You see that?
6     A.  Yes.
7     Q.  And what they found was that this
8 surfactant did not induce evidence of mutant colonies
9 over background, right?
10    A.  Yes.
11    Q.  And so what they're saying is that in
12 MON 59112, the tests that they ran, which is an Ames
13 test, showed that that compound was not mutagenic,
14 right?
15    A.  Right.  Based again -- keep in mind that
16 these are in vitro assays.  It's not in a human.  We
17 don't know that -- and this is one of the pitfalls --
18 you know, the advantage of these types of tests are
19 they're relatively inexpensive, quick turnaround.  On
20 the other hand, it's testing just for MON 59112,
21 whatever that is.  When the human actually takes it
22 in, it can be metabolized to form other metabolites
23 which could potentially have metabolic activity.  So
24 the -- the reverse mutation test, although a good and
25 very important test, it doesn't rule out the

Transcript of William Sawyer, Ph.D.

54 (213 to 216)

Conducted on August 23, 2018

23

1  possibility of mutagenic effects in the actual test,
2  animal or human.
3      Q.  Is there a test on MON 59112 that you've
4  reviewed that shows that it's mutagenic in humans?
5      A.  I don't know what 59112 is.
6      Q.  You didn't review the internal Monsanto
7  study this was derived from, the Lawlor study?
8      A.  Lawlor?
9      Q.  Lawlor, L-A-W-L-O-R.
10      A.  Actually, I think that name is familiar.
11  I probably did.
12      Q.  So you did review that Monsanto found that
13  this surfactant was not mutagenic, right?
14      A.  I don't -- I have to review. I don't know
15  what -- I don't recall what model was used.
16      Q.  Okay. That document's not on any of the
17  Materials Considered lists that you've presented to
18  us, right?
19      A.  Let me check my footnotes. As far as the
20  lists that you received, those were from the
21  attorneys, not from my report necessarily. My -- my
22  notes contain, I don't know, over 200 footnotes.
23      Q.  Well, sir, I searched for the word
24  "Lawlor" and also the study number in your notes, and
25  I didn't find it. Would you have referred to it as

24

1  anything else?
2      A.  I would have referred to it as either a
3  MON number --
4      Q.  Okay.
5      A.  -- or the name of that study, Lawlor.
6      Q.  Okay.
7      A.  So --
8      Q.  We don't need search for it if your notes
9  will speak for themselves.
10          Let me ask you this: Do you agree a jury
11  should consider the fact that this surfactant was
12  negative in a mutagenicity study?
13      A.  Yes. Absolutely, and all of the data in
14  terms of human data, in vivo animal data, and even
15  newer studies on mutagenicity of POEAs.
16      Q.  And you're not going to tell the jury that
17  Monsanto wasn't conducting genotoxicity or
18  mutagenicity tests on its surfactants, right?
19      A.  I'm sorry. I didn't catch that.
20      Q.  Sorry.
21          You're not going to tell the jury that
22  Monsanto wasn't conducting genotoxicity or
23  mutagenicity tests on its surfactants, right?
24          MR. SELDOMRIDGE:  Objection.
25  Compound.

25

1      A.  No.
2  BY MR. KALAS:
3      Q.  Okay. Monsanto was looking into this
4  issue?
5      A.  Yes. They followed OECD test guidelines.
6      Q.  Okay. And if you turn to page 58, they
7  also did a reverse mutation test on MON 0818, right?
8      A.  Turn to 58?
9      Q.  58 of -- yep, the inert cluster of proof.
10      A.  0818. Okay.
11      Q.  Okay. And they tested up to a cytotoxic
12  concentration of MON 0818, right, so it says in the
13  right-hand column?
14      A.  "Cytotoxicity not observed; second
15  cytotoxicity assay." Yes.
16      Q.  And what they found is even when they
17  killed the cell, they could not induce a mutagenic
18  response in this test system, right?
19      A.  Yes.
20      Q.  And this was an OECD guideline test
21  system, right?
22      A.  It doesn't say so, but I believe that the
23  bacterial reduced mutation test is.
24      Q.  It's the Ames test, A-M-E-S, right?
25      A.  Yes.

26

1      Q.  And, once again, this -- do you agree that
2  this data supports Monsanto's position that POEA does
3  not induce mutagenic changes, correct?
4      A.  Well, this is consistent with that
5  opinion, yes.
6      Q.  Okay. And continuing to the mammalian
7  erythrocyte micronucleus test, do you see those at the
8  bottom two rows here on 58?
9      A.  Yes.
10      Q.  And those are the in vivo mass micronuclei
11  tests we were talking about earlier, right?
12      A.  I think this is still in vitro, but it is
13  mammalian erythrocyte tests, but, as I recall, this is
14  a laboratory bench test.
15      Q.  You didn't look at the underlying Monsanto
16  studies that carried these out, the Myhr, M-Y-H-R,
17  study or the Stegeman and Kier study? You didn't look
18  at those?
19      A.  No, I am not familiar with those.
20      Q.  And so you would defer to what those
21  studies say as to exactly what they carried out,
22  right?
23      A.  I would certainly review those studies and
24  consider those results, yes.
25      Q.  But you agree, though, that this study,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 57 of 70
CONFIDENTIAL

Transcript of William Sawyer, Ph.D.                    55 (217 to 220)
Conducted on August 23, 2018

**27**

1  which the bottom row says was carried out in male and
2  female mice, found no increase in the frequency of
3  micronuclei in these study -- in these rodents, right?
4      A.  I don't have enough information here to --
5  well, no.  Maybe I do.  On the last one they used 375,
6  750, and 1,500 milligram per kilogram, the male mice
7  up to 200 milligram, female no significant increased
8  frequency of MPCEs.  You know, from what the document
9  shows is that it was a negative study.
10     Q.  And this sort of data that we just looked
11  at is relevant to the inquiry of whether or not POEA
12  is carcinogenic, right?
13     A.  Yes, but it doesn't serve as a animal
14  bioassay for carcinogenicity.  These are all
15  OECD-approved tests that are commonly used, and they
16  certainly are helpful, but they're not the final
17  answer.
18     Q.  And you agree it would be incorrect to
19  argue that Monsanto has done no testing relevant to
20  the carcinogenicity of surfactants?
21     A.  Well, it's true that Monsanto has not
22  performed any carcinogenicity animal bioassays.
23     Q.  Right.  But that wasn't my question.  My
24  question was whether or not it would be correct to
25  argue that Monsanto has done no testing relevant to

**28**

1  the carcinogenicity of surfactants.
2          Would that be a correct statement?
3          MR. SELDOMRIDGE:  Objection.
4  Vague.
5      A.  Would you read the question again?
6  BY MR. KALAS:
7      Q.  My question is whether or not it would be
8  correct to argue that Monsanto has done no testing
9  relevant to the carcinogenicity of surfactants.
10         MR. SELDOMRIDGE:  Same objection.
11     A.  They haven't.  No, they haven't done it.
12  They've looked at genotoxicity, mutagenicity
13  sensitization, developmental reproduction toxicity,
14  but they have not carried out a single study to
15  actually assess animal bioassay carcinogenicity.
16  BY MR. KALAS:
17     Q.  Okay.  So it's your opinion that
18  genotoxicity studies are not relevant to the
19  carcinogenicity of compounds?
20     A.  They're relevant, but it's not the same
21  thing.
22     Q.  Okay.  So my question was, would it be
23  correct to say that Monsanto has done no testing
24  relevant to the carcinogenicity of surfactants?
25         MR. SELDOMRIDGE:  Objection.

**29**

1          Redundant.
2      A.  I wouldn't even say relevant.  I would say
3  related to but not -- relevant would almost imply that
4  it's a substitute or, you know, very important piece.
5  But it's -- no.  I disagree.
6  BY MR. KALAS:
7      Q.  So your opinion is that genotoxicity data
8  is not a very important piece of evaluating whether or
9  not a substance is carcinogenic?
10         MR. SELDOMRIDGE:  Objection.
11  Misstates.
12     A.  It's an important piece, but it's only a
13  piece.
14  BY MR. KALAS:
15     Q.  Okay.
16     A.  It's a sample of a -- it's one slice of
17  pie.  There's more to it than that.  There's human
18  epidemiologic data.  There's human genotoxicity data,
19  which has been done.  And there's animal bioassays
20  that need to be run to determine -- make that
21  determination.  You can't -- you can't just base it on
22  the Ames test and sister chromatid exchange bioassays.
23     Q.  So two questions ago you said it's not an
24  important piece to carcinogenicity.  In the last
25  question you said that genotoxicity data is an

**220**

1  important piece.  So do you believe -- I just want to
2  make it clear for the record because I'm confused.
3          Do you believe genotoxicity and
4  mutagenicity data is an important piece to evaluating
5  whether or not a compound is carcinogenic?
6      A.  It's an important --
7          MR. SELDOMRIDGE:  Objection.
8  Misstates.
9          THE REPORTER:  I'm sorry.
10         THE WITNESS:  I'm sorry too.  I'm
11  interrupting.
12         MR. SELDOMRIDGE:  Objection.
13  Misstates.
14         Go ahead.
15     A.  Repeat it, please.
16  BY MR. KALAS:
17     Q.  Do you believe genotoxicity and
18  mutagenicity data are important pieces to evaluating
19  whether or not a substance could be carcinogenic?
20     A.  I agree they're important pieces, but it's
21  not adequate to make the determination.
22     Q.  Okay.  So it would be incorrect that
23  Monsanto has done no studies relevant to whether or
24  not surfactants are carcinogenic?
25         MR. SELDOMRIDGE:  Objection.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 58 of 70

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

56 (221 to 224)

Conducted on August 23, 2018

---

**22**

1  Redundant.
2  A.  They haven't.  Monsanto has not.  They
3  should -- you know, to answer that question, you know,
4  run the animal bioassay and find out.
5  BY MR. KALAS:
6  Q.  How about formulated products?  Have you
7  looked at formulated products and seen if Monsanto has
8  done genotoxicity testing on those?
9  A.  I think so, but I -- I'm too tired now to
10 even think.  I'm going to have to look at my studies.
11 Q.  Well, I'm just -- I'm just asking if
12 you've looked at them, not to cite any for me, but go
13 ahead.
14 A.  Did your question specifically restrict
15 this to Monsanto or articles in the peer-reviewed
16 literature?
17 Q.  I asked about Monsanto, sir.
18 A.  Okay.
19 Q.  Because -- and just so you know why I'm
20 asking, the allegation has been posited that Monsanto
21 has not studied these compounds, and I'm asking if
22 you've seen any studies by Monsanto on the
23 genotoxicity or mutagenicity of formulated products.
24 A.  This Monsanto document might help answer
25 that question, but I don't know for sure what

**222**

1  MON 35050 is.
2  Q.  You're looking at a slide deck, correct?
3  A.  Yeah, but it does state that the
4  surfactant -- oh, alkyl sulfate is the cause of the
5  oxidative damage of DNA in liver and kidneys and not
6  glyphosate and that there's some indication DNA damage
7  have been observed rather due to cytotoxic properties
8  in formulation.  So, I mean, this suggests that
9  Monsanto has looked at it and they found a problem.
10 Q.  Did you look -- did you ask Jeff here or
11 any other attorneys from the Miller Firm to send you
12 the actual study instead of a slide deck?
13 MR. SELDOMRIDGE:  Objection.
14 Argumentative.
15 A.  I don't know that they have that.  I mean,
16 that's --
17 BY MR. KALAS:
18 Q.  Did you ask?
19 A.  No.  There was no indication that --
20 there's nothing here to reference.  You know, there's
21 no name of a study or MON number or anything like that
22 to --
23 Q.  Let me ask you this:  Did you call or ever
24 ask anyone on earth to send you all of the formulated
25 product genotoxicity and mutagenicity studies that

**223**

1  Monsanto's carried out on glyphosate-based herbicides?
2  A.  Well, early on in this case -- well, in --
3  early on, I guess I should phrase it, in the Monsanto
4  cases, I did ask for any available Monsanto studies on
5  carcinogenicity, mutagenicity, dermal absorption, and
6  so on, and I was provided a very large file.
7  Q.  Where is that file?
8  A.  Electronic.
9  Q.  Have you listed the contents of that file
10 anyplace in this litigation, every single document in
11 it?
12 A.  No.  I don't think I have ever been asked
13 to do that.
14 MR. KALAS:  I'm just going to
15 note for the record that there is a
16 body of literature that Dr. Sawyer has
17 in his possession and reviewed that has
18 been held back from us, according to
19 his testimony, by Dr. -- by plaintiffs'
20 counsel.  We are entitled to know what
21 he's reviewed.  We still have not
22 received a list of everything he's
23 reviewed, and we demand it immediately,
24 and we demand additional deposition
25 time based on that.

**224**

1  MR. SELDOMRIDGE:  And I'm just
2  going to note for the record that
3  counsel is being extremely
4  argumentative, that counsel and I have
5  had an agreement from -- and I have the
6  email here in front of me from April --
7  from August 6, 2018.  This is an email
8  exchange between Jeffrey Travers and
9  Gregory Chernack, and Jeffrey Travers
10 states, "You have already deposed and
11 cross-examined him for 16 hours.  There
12 is no need to depose him for more than
13 a day in the Jeff Hall case.  His
14 report for Jeff Hall is nearly
15 identical to the report for Dewayne
16 Johnson.  Only 18 pages of the report
17 are different, and most of it is a
18 recitation of Mr. Hall's medical
19 history.  It is also too late to be
20 raising this issue for the first time
21 due to the difficulty in scheduling."
22 And there's a reply by
23 Mr. Chernack, and this is the bottom
24 paragraph.  It says, "Your email
25 response may provide a solution here.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 59 of 70
CONFIDENTIAL

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018                     57 (225 to 228)

225

1  The toxicological notes served in this
2  case contained the disclaimer that they
3  were not a formal report.  However, you
4  describe the" -- "the notes as a
5  report.  Will you stipulate that
6  Dr. Sawyer's toxicological notes
7  contain all of his opinions he intends
8  to offer and will he offer no
9  additional opinions at trial other than
10 those explicitly contained in his
11 toxicology notes?  If so, we will agree
12 to limit the deposition to a single
13 day."
14      And Jeff Travers writes back and
15 he states, in essence, that Dr. Sawyer
16 will stay within the bounds of his
17 report.  And based on that information,
18 we had an agreement.  We provided
19 numerous dates for Dr. Sawyer's
20 deposition that have not been accepted
21 in the past.  Dr. Sawyer is a very busy
22 man, and he does not have the time to
23 continue this deposition to another
24 day.  And with our belief of this
25 agreement, we would oppose any such

226

1  continuation and the thinly veiled
2  attacks upon the witness here today.
3      MR. KALAS:  Are you done?  I have
4  a response to that.
5      MR. SELDOMRIDGE:  Let me check.
6  Let me check.  Yes.
7      MR. KALAS:  Okay.  First of all,
8  you paraphrased Mr. Travers' statement,
9  and that's been marked as Exhibit 7, so
10 that email will speak for itself.
11      Second of all, plaintiffs -- it's
12 our position that plaintiffs have
13 completely backtracked on whatever
14 agreement was reached between the
15 parties.  Dr. Sawyer has expressed on
16 multiple occasions today that he
17 intends to opine beyond his
18 toxicological notes in this case and
19 his reports in the other case.
20      Moreover, we have just become
21 aware today that there is a body of
22 documents reviewed by Dr. Sawyer that
23 we have never received a listing of,
24 and we are entitled to know that.  It
25 is inappropriate and is completely in

227

1  violation of the parties' agreements
2  and, frankly, the Rules of Procedure.
3  So we are going to take all applicable
4  and, you know, required steps to fully
5  elucidate what Dr. Sawyer's opinions
6  are.
7      MR. SELDOMRIDGE:  There's no
8  reason for --
9      THE WITNESS:  They're all MON
10 documents that I have.  Every one of
11 them has the MON Bates stamp on them.
12      MR. KALAS:  How am I supposed to
13 know what he sent you, Doctor?
14      MR. SELDOMRIDGE:  That's correct.
15 They're your documents.  There's no
16 reason to put on a show here.  There's
17 -- we have turned over all the
18 documents that we have given to
19 Dr. Sawyer.
20      MR. KALAS:  You have?
21      MR. SELDOMRIDGE:  There is no
22 issue there.
23      Yes, of course.  We have nothing
24 to hide here.
25      MR. KALAS:  Okay.  So --

228

1      MR. SELDOMRIDGE:  We're not
2  hiding documents in some corner.  That
3  is not what's happening here.  You
4  know, we do not -- I do not believe
5  that we've moved substantially at all
6  from your notes, from Dr. Sawyer's
7  notes.  And, you know, if you feel as
8  if we have here today, then take it up
9  with the judge.
10      MR. KALAS:  We are.
11      MR. SELDOMRIDGE:  This is not the
12 time or the place.
13      MR. KALAS:  And we -- Dr. Sawyer
14 just testified --
15      MR. SELDOMRIDGE:  Can we move on?
16 Can you ask questions?
17      MR. KALAS:  I'm going to get
18 there.
19      MR. SELDOMRIDGE:  Thank you, sir.
20      MR. KALAS:  Dr. Sawyer just
21 testified that he reviewed genotoxicity
22 studies on formulated products.  We
23 have never received any documentation.
24      MR. SELDOMRIDGE:  Are we going to
25 continue with this, or are we going

Transcript of William Sawyer, Ph.D.

58 (229 to 232)

Conducted on August 23, 2018

---

**229**

1    to --
2        MR. KALAS:  Well, I know you want
3    to --
4        MR. SELDOMRIDGE: -- actually try
5    to get to the root of this and talk
6    about the real issues?
7    BY MR. KALAS:
8        Q.   Dr. Sawyer, are you going to tell the jury
9    Monsanto's never tested the genotoxicity of formulated
10   products?
11       A.   No.
12       Q.   Have you reviewed the genotoxicity data
13   that Monsanto has created on formulated products?
14       A.   I believe so.  In the MON documents --
15   when I say MON documents that have a MON Bates stamp
16   number, that is what I refer to.  As far as anything
17   new, I only have about maybe 12 new documents in this
18   box.
19       Q.   I'm going back to the beginning of the
20   litigation, sir.  Where is the listing of the
21   formulation genotox studies you reviewed in forming
22   your opinion in this case?
23       A.   I reviewed things electronically.  I
24   didn't print thousands and thousands of pages.  I have
25   electronic documents received from Monsanto.  They

---

**230**

1    have your Bates stamp and name and number right on
2    them, so that's what I reviewed.
3        Q.   Have you reviewed all -- you testified
4    earlier, you have not reviewed all 8 million or 10
5    million or so pages produced in this litigation,
6    right?
7        A.   No, but I would click on a document to see
8    initially is it even relevant to my assessment.  If it
9    is, I would scan it and read it.  When I say "scan
10   it," I mean briefly read it.  And sometimes I found
11   some documents that were highly relevant.  I've even
12   included them in my report.
13           Other times I found studies that were less
14   relevant, and with respect to those genotoxicity
15   studies, they're less relevant.  The real issue here
16   is that I could not find any evidence whatsoever that
17   Monsanto ever made any effort to run a carcinogenic
18   assay on the POEA-type surfactants.
19       Q.   How about the mutagenicity studies on
20   formulated products?  Did you review those that
21   Monsanto carried out?
22       A.   I believe I did.
23       Q.   Okay.
24       A.   But it still doesn't answer the question.
25       Q.   All right.  You talked about ethylene

---

**231**

1    oxide a little bit earlier.
2        Do you remember that?
3        A.   Yes.
4        Q.   Okay.  And the amount of ethylene oxide in
5    the document that you provided as a supplemental
6    disclosure, which is from the AkzoNobel MSDS, the
7    amount of ethylene oxide in that POEA formulation is
8    less than .001 percent of the surfactant, right?
9        A.   That's what I said earlier today, correct.
10       Q.   And Roundup original surfactants make up
11   about 15 percent of the mixture, right?
12       A.   Yes.
13       Q.   Okay.  So ethylene oxide is less than
14   .0002 percent of that mixture, right?
15       A.   That's correct.
16       Q.   And in the case of a gallon of Roundup,
17   that would be less than -- or around .00025 ounces,
18   right?
19       A.   Yes, and -- but I'm holding a glass of
20   water.  Now I'm holding this cup with a lid on it,
21   sealed lid.  And if I only had that amount of ethylene
22   oxide in this glass, the rest of it was water, and I
23   let that sit on the shelf overnight or even for a week
24   or a month and I open that cap, the highly volatile
25   ethylene oxide, which builds up in what we call in

---

**232**

1    chemistry the headspace, escapes.  That's where the
2    exposure comes from.  It's not coming from continued
3    dermal contact.  It's a matter of ethylene oxide
4    headspace, and that's where the exposure can be
5    significant, because ethylene oxide, not only being a
6    confirmed human carcinogen, it's a very powerful
7    mutagenic agent.
8        Q.   Ethylene oxide in an amount of .002
9    --.00025 ounces is less than a hundredth of a
10   milliliter, right?
11       A.   That's right, but that in the gaseous
12   phase in the headspace, that's where the health
13   concern is, nowhere else.
14       Q.   Let's talk about the health concern.
15   Ethylene oxide is one of the most commonly used
16   sterilizers in hospital settings, isn't it?
17       A.   And the most dangerous.  Extremely
18   dangerous.
19       Q.   Not my question.
20       A.   Very carefully controlled.
21       Q.   Is it used in hospitals?  Is ethylene
22   oxide used in hospitals --
23       A.   It has --
24       Q.   -- to sterilize?
25       A.   It has been, yes.

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 61 of 70

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

59 (233 to 236)

---

233

1    Q.   Okay.  And, in fact, it is one of the
2  sterilizers of choice when a hospital tool is heat or
3  moisture sensitive, right?
4    A.   Yes.
5    Q.   Okay.  And you wouldn't tell a jury that
6  there aren't safe applications of ethylene oxide,
7  right?
8    A.   Correct.
9    Q.   Okay.  Now, one thing you noted regarding
10 the Kumar study in mice was that the viral infection
11 in those mice had not been verified, right?
12   A.   That's right.
13   Q.   Did you review the report of Klaus Weber?
14   A.   Is it a peer-reviewed study or Monsanto
15 document?
16   Q.   It's not a Monsanto document, but it was
17 in the Monsanto production set.
18        Did you review it?
19   A.   So you finally admit there was a Monsanto
20 production set that you know about.
21   Q.   That's not the point, sir.  The point is,
22 I can't tell what you reviewed.
23        So did you review it?
24   A.   I don't know.
25   Q.   Okay.  You don't know because you don't

---

234

1  have a list of what you've reviewed, right?
2    A.   I never made a list.  It was a massive
3  amount of electronic damage -- data.
4    Q.   Let me ask how you got it.  How did you
5  get this massive amount of electronic data?  How was
6  it transported to you?
7    A.   I believe a service.  I don't want to say
8  Dropbox because I don't know if the Miller Firm uses
9  Dropbox, but some type of service that transmits large
10 quantities of electronic data.
11   Q.   And in that large quantity of electronic
12 data that you reviewed, there is a greater amount of
13 studies in that than what is listed in your
14 toxicological notes, right?
15   A.   Yes.
16   Q.   And you did not print all those studies
17 for your box that's been marked as Exhibit 2, right?
18   A.   No.  Again, I worked largely on electronic
19 files on my large big screen and reviewed the
20 electronic data in that fashion.  I didn't print
21 everything I looked at.
22   Q.   Is that electronic data still alive?
23   A.   Yes.  Absolutely.
24        MR. KALAS:  Well, we would ask
25 and request for plaintiffs' counsel

---

235

1  that now at this date they provide a
2  list of all the electronic data
3  provided to Dr. Sawyer and any other
4  experts in this litigation if it hasn't
5  been on an MCL.
6        MR. SELDOMRIDGE:  Again, I would
7  state for the record that the thinly
8  veiled attacks and attempts to try to
9  continue this deposition and most
10 likely try to postpone trial date are
11 unacceptable.
12        MR. KALAS:  Let me be clear.  I'm
13 not thinly veiling anything.  I think
14 it's inappropriate.
15        MR. SELDOMRIDGE:  There's no
16 reason to put on a show here.
17        MR. KALAS:  I'm not putting on a
18 show.
19        MR. SELDOMRIDGE:  If you want to
20 go ahead and depose Dr. Sawyer, he's
21 here in front of you right now.  Please
22 continue.
23   A.   I'm here.  I'm here, and I'll do my best
24 to answer your questions as quickly as I can.
25 ///

---

236

1  BY MR. KALAS:
2    Q.   And you don't know from my questions
3  whether or not you reviewed a report by Klaus Weber,
4  correct?
5    A.   I just don't recall.
6    Q.   And are you aware he's another independent
7  scientist who noted infection in the animals in the
8  Kumar study?
9        MR. SELDOMRIDGE:  Objection.
10 Misstates.
11   A.   I haven't reviewed it, I think, because I
12 don't recall ever -- any evidence that the animals
13 were actually determined to be infected by a virus.
14 It was a postulated assumption, a mere speculation
15 based on everything I read.
16 BY MR. KALAS:
17   Q.   But that's data you'd be interested in if
18 it's out there, right?
19   A.   Certainly.
20   Q.   Okay.  Now, it's your opinion glyphosate's
21 genotoxic, right?
22   A.   Yes.
23   Q.   And as the dose of a genotoxic agent one
24 is exposed to increases, the amount of cancer should
25 correspondingly increase, right?

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

60 (237 to 240)

---

237

1      A.   Now, that question doesn't work.
2      Q.   Well, that's the whole theory behind the
3  linear cancer slope factors that you calculated,
4  right?
5      A.   No.
6      Q.   Explain to me where I'm wrong.
7      A.   I don't think I want to try rewording your
8  question.  If you could just be so kind to repeat your
9  question, maybe I'll understand it better.
10     Q.   Do genotoxic carcinogens act in a
11 dose-dependent manner?  In other words, the more
12 you're exposed to, the higher the rate of cancer in a
13 population?
14     A.   In general, yes, but one has to consider
15 the particular chemical in terms of its action also as
16 a promoter as a full carcinogen.  But in general, yes.
17     Q.   Do you believe the more glyphosate someone
18 is exposed to, the higher their risk of cancer?
19     A.   Yes.
20     Q.   Do you believe in the rodent studies, the
21 more glyphosate a rodent is exposed to, the higher
22 their risk of cancer?
23     A.   Absolutely.  Very clear-cut on the Wood
24 2009b study, for example.
25     Q.   And you're going exactly where I was

---

238

1  going.  You discuss some of the data on mouse lymphoma
2  in your toxicological notes, right?
3      A.   Yes.
4      Q.   And the mouse study with the highest dose
5  was, in fact, the Knezevich study, right?
6      A.   With the highest dose?
7      Q.   Yes.
8      A.   Yes.
9      Q.   And that's the 1983 mouse study, correct?
10     A.   Yes.
11     Q.   Okay.  And did you look at the lymphoma
12 data in the Knezevich study?
13     A.   I think I'm looking at page 88.  I have
14 Table 19 with the renal cell tumor incidence from that
15 study, and also on Table 18, I show the male CD mice
16 lesions.
17     Q.   And neither of those are lymphoma data,
18 right?
19     A.   Correct.
20     Q.   Did you look at the lymphoma data in the
21 Knezevich study?
22     A.   Yes.  I think -- I don't think there was
23 any significant finding.
24     Q.   You recall, in fact, that there were two
25 lymphomas in the control group and two in the

---

239

1  high-dose group, right?
2           THE REPORTER:  I'm sorry.  Two in
3      the high --
4           MR. KALAS:  High-dose group.
5      A.   Yes.
6  BY MR. KALAS:
7      Q.   How do you explain -- and strike that.
8  Let me ask a foundational question.
9           The high-dose group in the Knezevich study
10 got about five times as much glyphosate as the
11 high-dose group in the Wood 2009b study, right?  About
12 5,000 mgs per kg verses a thousand --
13     A.   About 5,000 milligram in the Knezevich and
14 Hogan study.  In Wood, I need to go back and look
15 because I forget what the high-dose group was.
16     Q.   Sure.
17     A.   Yeah, it looks like the Wood study
18 high-dose group was 810, so about five, yeah.
19     Q.   Five times or so?
20     A.   Yes.
21     Q.   How do you explain that in the Knezevich
22 study, when the mice got five times as much glyphosate
23 in the high-dose group as the Wood study, we did not
24 see any increase in lymphoma?
25     A.   Probably through genetic drift.  The

---

240

1  Knezevich and Hogan study, although it was CD-1 mice,
2  it was run about 26 years prior to the Wood, et al.,
3  2009b study.
4           So over that period of 26 years, these
5  mice are continually inbred, and that genetic strain
6  is attempted to be maintained.  But through that many
7  different birth cycles, you know, the mice only live a
8  short period of time and reproduce very frequently.
9  It's just -- it's not completely reasonable to say
10 that the mice that were used in the '83 study had the
11 same degree of sensitivity to that in the 2009 study.
12     Q.   And which set of mice has a genetic
13 fingerprint that is closer to a human's fingerprint?
14 Is it the '83 study or the 2009?
15     A.   We don't know.  Again, you may recall from
16 my prior deposition that there is no perfect animal
17 model.  It doesn't exist.  This is a model.  It's not
18 perfect.  So we can't say that the '83 study was
19 closer to a human or the 2009, but what the rules
20 read -- and when I say "the rules," the EPA
21 methodology, is who used the most sensitive study, and
22 that's what I did.  I used the most sensitive study.
23     Q.   And you'd agree, sir, that when mice were
24 dosed at the highest amount in glyphosate bioassays,
25 lymphoma was not induced in those mice?

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 63 of 70

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

61 (241 to 244)

---

**24**

1    A.  In the 1983 study, you are correct.
2         MR. KALAS:  I'm going to mark a
3    study called George as Exhibit 14.
4         (Exhibit Number 14, Document Titled
5         "Studies on glysophate-induced
6         carcinogenicity in mouse skin:  A
7         proteomic approach," was marked for
8         identification.)
9         MR. SELDOMRIDGE:  Thank you,
10   Counsel.
11 BY MR. KALAS:
12   Q.  And you've seen this study before,
13 correct, sir?  This is the study you testified about
14 at the D. Johnson trial, right?
15   A.  I believe I have that study with me.  I
16 was looking for it last night.  And it really
17 should -- maybe it's in -- under G, over here.  GI --
18 I think it's in my box, but I have -- I've been having
19 trouble locating this.  Yes.
20   Q.  Okay.  And you argue -- you used this
21 study to argue that glyphosate was a tumor promoter,
22 right?
23   A.  Yes.
24   Q.  Okay.  And one thing that's necessary in a
25 study like this is you need to have a vehicle to

---

**242**

1  administer the test compound, right?
2    A.  Correct.
3    Q.  And in this case, the vehicle was ethanol
4  and acetone, right, 50 percent each?  It's on
5  page 952, right below the group listing.
6    A.  Let's see.
7         (Reviewing document.)
8         Okay.  So the control material was
9  administered in that fashion but not the glyphosate.
10   Q.  Okay.  Do you see the line below the
11 groups that says, "Vehicle for glyphosate DMBA and TPA
12 were 50% ethanol and acetone respectively"?
13   A.  DMBA, TPA.  Okay.  Okay.  Yeah, it was,
14 then.  It was also used for the glyphosate.  Yes.
15   Q.  And in this study, there's no positive
16 vehicle control, right?  There's an untreated control
17 but not a positive vehicle control?
18   A.  That's true.
19   Q.  And without a positive vehicle control,
20 one thing that we're left to wonder about is whether
21 you're seeing an effect from the vehicle or the
22 glyphosate, right?
23   A.  In theory, but we do know a little about
24 ethanol and acetone.  They're not -- they're not --
25 they're certainly compounds that we know a lot about

---

**243**

1  from toxicological standpoint.
2    Q.  Do you know where they source the ethanol
3  and acetone from in this study?
4    A.  Hopefully not from West Virginia in the
5  still country.  But no, I don't.
6    Q.  And so you don't know the purity of the
7  ethanol or the acetone, right?
8    A.  As I recall, this was done in India.  They
9  really don't give review of the purchase source.  I
10 would -- I would have to believe they didn't use, you
11 know, vodka off the shelf but rather laboratory-grade
12 ethanol.
13   Q.  But you can't tell this based off what
14 they said, right?
15   A.  No, but I think it's a bit of a leap to
16 assume that they used impure ethanol.  I mean, it's --
17 laboratory ethanol is -- as being a prior laboratory
18 director, we had gallons of 200-proof pure laboratory
19 ethanol and used to even come with a seal on it from
20 the fire, tobacco, whatever the thing is.
21   Q.  Why is purity important to you as a
22 laboratory director, of test contents?
23   A.  Well, simply to eliminate possible bias
24 and interference from contaminants.
25   Q.  Contaminants could throw off your results,

---

**244**

1  right?
2    A.  That's right.
3    Q.  And when you're testing a compound, be it
4  ethanol, acetone, anything else, where do professional
5  laboratories usually source that compound from?
6    A.  Well, I used to order a lot of these
7  high-purity chemicals from Sigma Chemical, Fisher
8  Scientific even.  I mean, there's a number of
9  different suppliers that provide these laboratory
10 chemicals, and they're usually graded with a percent
11 purity.
12   Q.  Why do you want to order it from a group
13 like Sigma or Fisher instead of buying it at CVS?
14   A.  Or from a moonshiner in West Virginia.
15        MR. SELDOMRIDGE:  Hey, I'm from
16   West Virginia.
17        THE WITNESS:  I know.  That's
18   what I'm saying.
19 BY MR. KALAS:
20   Q.  Why do you want to get it from a place
21 like Sigma or Fisher instead of a moonshiner in West
22 Virginia or CVS?
23   A.  Well, generally, any of the
24 laboratory-grade materials used in studies, in my
25 experience, especially as a laboratory director, we

---

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

62 (245 to 248)

Conducted on August 23, 2018

---

**245**

1　look to see what the part-per-million, or in cases of
2　heavy metals, part-per-billion, impurity levels are.
3　　　Q.　And that's an important -- when you're
4　publishing a peer-reviewed study, it's important to be
5　working with pure materials as much as possible,
6　right?
7　　　A.　Yeah.　But, you know, we're dealing --
8　we're dealing with, like, the most two common
9　laboratory chemicals on earth.　I mean, it's -- if you
10　said that -- if they were using chenodeoxycholic acid,
11　for example, that is an obscure -- pretty obscure
12　chemical.　They are going to get it wherever they
13　could find it because it's so hard to get.　But, I
14　mean, the laboratory reagent grade ethanol and acetone
15　is virtually on the shelf of any laboratory you go to.
16　It's common.
17　　　Q.　If you're going to conduct a test of
18　Roundup, where would you source the Roundup from?
19　　　A.　I would probably source it from Monsanto
20　directly, if possible.
21　　　Q.　And if you were to source radiolabeled
22　glyphosate, where would you source it from?
23　　　A.　That would -- that's a little different.
24　There, I would want to initially source it from
25　Monsanto and then whatever radiological corporation or

**246**

1　laboratory who was going to label it.　I mean, there's
2　two different vendors involved in something like that.
3　　　Q.　Where did they source the Roundup from in
4　this study?
5　　　A.　Well, it appears to be Roundup original
6　with a trademark, Monsanto Company, St. Louis.
7　　　Q.　Where did they procure it from, sir?
8　　　A.　I see that some materials were purchased
9　from BioRad Laboratories.
10　　　Q.　Do you see that they procured the Roundup
11　they used in this study from a local market?
12　　　A.　No, I didn't see that.　Maybe I have to
13　read down further.
14　　　Q.　Top line.
15　　　A.　Top line?
16　　　Q.　It goes from the bottom of the left-hand
17　column to the top of the right-hand column.
18　　　A.　"As the isopropylamine salt was
19　procured" -- I see what they did.　Okay.　So they
20　bought -- they bought the Roundup original trademark
21　in a container that says Roundup on the front of it
22　like anyone else would buy.　That's fine.
23　　　Q.　That's fine?
24　　　A.　That has -- as one of your associates
25　would say, that's real world, because that's what

**247**

1　we're testing.
2　　　Q.　So this local market was in Lucknow,
3　India, correct?
4　　　A.　Yeah.
5　　　Q.　That's where the study took place.　And
6　are you aware that there's been issues with the
7　counterfeit pesticides in India?
8　　　A.　No, but if it's in a -- an original
9　trademarked Roundup container which has the cardboard
10　aluminum glued seal, and if that seal is intact, I
11　think they would -- they would be fine with this.
12　　　Q.　Is there a picture of the container they
13　used here?
14　　　A.　No, but it does say trademark after
15　Roundup original.
16　　　Q.　Did they discuss the seal on the container
17　in this study?
18　　　A.　No.
19　　　Q.　Okay.　And did they discuss the purity?
20　Did they do any testing of the purity of the Roundup
21　they used?
22　　　A.　No.
23　　　Q.　Okay.　And in a study that you would do in
24　a lab, you would normally have some assurance of the
25　purity provided to you by Sigma-Aldrich or whoever

**248**

1　else you purchased it from, right?
2　　　A.　For the solvents, absolutely.
3　　　Q.　And there's --
4　　　A.　But not necessarily.　If I were doing a
5　so-called real-world test, I would buy it off the
6　market shelf because what Monsanto provided me might
7　possibly be a higher purity or something different.
8　I'd want to actually buy it off the shelf and see what
9　people are really being exposed to.
10　　　Q.　And you don't know because you don't have
11　a picture of the container or any purity data or any
12　sourcing data for procurement whether or not this was,
13　in fact, a Roundup original package that was
14　manufactured by Monsanto?　You just don't know that?
15　　　　　MR. SELDOMRIDGE:　Objection.
16　Compound.
17　　　A.　No, but I think that's a stretch, based on
18　what they said in terms of it being Roundup original
19　trademark.
20　BY MR. KALAS:
21　　　Q.　And there's no pathological examination of
22　the skin lesions in this study, right?　Same column,
23　right side, right below the discussion of the ethanol
24　and acetone.　The animals were examined for gross
25　morphological changes, right?

249

1    A.   Right.
2    Q.   So there wasn't a pathological or
3  histopathological examination of those lesions, right?
4    A.   Doesn't appear to be.
5    Q.   And noncarcinogenic skin lesions can mimic
6  carcinogenic skin lesions, right?
7    A.   Can.  This is referred to as a squamous
8  cell papilloma.  The study was from a proteomics
9  laboratory.
10    Q.   You agree, pathological examination would
11  make this a stronger study, correct?
12    A.   Yes.
13    MR. KALAS:  I'm going to mark as
14  Exhibit 15 the IARC monograph on
15  glyphosate.
16    (Exhibit Number 15, IARC Monograph on
17    Glyphosate, was marked for
18    identification.)
19    THE VIDEOGRAPHER:  Did you want
20  to go ahead and change?
21    MR. KALAS:  Sure.  Let's change.
22  That's fine.  Let's go off the record.
23    THE VIDEOGRAPHER:  This marks the
24  end of Media Number 3 in the deposition
25  of William Sawyer.  The time is 5:05.

250

1    We are off the record.
2    (Break taken from 5:05 p.m. to 5:15 p.m.)
3    THE VIDEOGRAPHER:  This marks the
4  beginning of Media Number 4 in the
5  deposition of William Sawyer.  The time
6  is 5:15.  We are on the record.
7  BY MR. KALAS:
8    Q.   Okay, Doctor.  If we could turn in the
9  IARC monograph to page 34, please.  This is a
10  discussion of the George study by the IARC working
11  group on glyphosate, right?  Left-hand column.
12    A.   Yeah, I see it.
13    Q.   Okay.  And have you reviewed their
14  discussion of the George study before?
15    A.   No, I don't think so.
16    Q.   Okay.  You have reviewed this document
17  before?
18    A.   Oh, yeah.
19    Q.   Okay.  So if we can go to the right-hand
20  column in the part in the brackets.  Let me know when
21  you're there.
22    A.   Yeah, DMBA only.
23    Q.   No.  The brackets at the bottom of the
24  paragraph, sir.
25    A.   Oh, the glyphosate --

251

1    Q.   Yeah.
2    A.   -- the glyphosate formulation.
3    Q.   Yep.  Are you there?
4    A.   Yes.
5    Q.   Okay.  And you're -- do you have some
6  understanding that the brackets are meant to contain
7  the commentary of the IARC working group on the
8  studies they reviewed?
9    A.   Yes.
10    Q.   Okay.  And what the IARC working group
11  said about the George study is, "The glyphosate
12  formulation tested appeared to be a tumour promoter in
13  this study.  The design of the study was poor, with
14  short duration of treatment, no solvent controls,
15  small number of animals, and lack of histopathological
16  examination.  The Working Group concluded that this
17  was an inadequate study for the evaluation of
18  glyphosate."
19    Did I read that correctly?
20    A.   Yes.
21    Q.   Do you disagree with the conclusions of
22  the working group?
23    A.   The only point I'd disagree with is
24  stating that it was inadequate for the evaluation.
25  It's still a piece.  Using weight of evidence, I would

252

1  give it less weight because of these deficiencies, but
2  the last sentence implies that it was inadequate for
3  evaluation.
4    Q.   Okay.  So you disagree with the
5  bottom-line conclusion, but you agree with the
6  criticisms they had of the study?
7    A.   Yeah.  It detracts from the weight of the
8  study.
9    Q.   So why do you agree with the fact that the
10  design of the George study is poor?  What's poor about
11  it to you?
12    A.   I think the biggest problem is lack of
13  histopathological examination, and it would have been
14  helpful to have a larger number of animals.
15    Q.   Why is a lack of histopathological
16  examination one of the biggest problems to you?
17    A.   Well, to be certain that the papilloma was
18  actually a malignant process.
19    Q.   So there's some question based on the
20  design of the George study whether or not they're
21  actually observing cancer?
22    A.   Yes.  Yeah.  I mean, I wouldn't base an
23  opinion only on this study.  I think it has to be used
24  with other studies as well.
25    Q.   Do you believe the George study is

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

64 (253 to 256)

---

253

1 sufficient in and of itself to argue that glyphosate
2 or glyphosate-based herbicides promote cancer?
3    **A.   By itself?  No.  It has to be viewed with**
4 **the totality of the evidence.**
5    Q.   Okay.
6       MR. KALAS:  I'm going to mark as
7 Exhibit 16 a study by Wester.
8       (Exhibit Number 16, Document Titled
9       "Glyphosate Skin Binding, Absorption,
10       Residual Tissue Distribution, and Skin
11       Decontamination," was marked for
12       identification.)
13       MR. SELDOMRIDGE:  Thank you,
14 Counsel.
15 BY MR. KALAS:
16    Q.   And this is the Wester 1991 study, right?
17    **A.   Yes.**
18    Q.   The rhesus monkey study, correct?
19    **A.   Yes.**
20    Q.   This is a study you've reviewed, right?
21    **A.   Yes.**
22    Q.   It's a study you've talked about at trial,
23 right?
24    **A.   Yes.**
25    Q.   And you talk about in your toxicological

---

254

1 notes as well, right?
2    **A.   Yes.**
3    Q.   And, in fact, this study conducts a few
4 different type of tests on a glyphosate-based
5 herbicide, right?
6    **A.   It does.**
7    Q.   So I want to walk through this with you.
8 If we can start at the Materials and Methods section
9 on page 726 of the study, please.  726.
10       MR. SELDOMRIDGE:  Thank you,
11 Counsel.
12 BY MR. KALAS:
13    Q.   Are you there?
14    **A.   Yes.**
15    Q.   I think you're on 727, actually.
16    **A.   Yeah, you said 727.**
17    Q.   No.  726, sir.  I'm sorry.
18       Okay.  Now, one of the tests that they
19 did -- it's right below "Materials and Methods" -- is
20 an in vitro percutaneous absorption study, right?
21    **A.   Yes.**
22    Q.   And what is the purpose of an in vitro
23 percutaneous absorption study?
24    **A.   To measure the transport of a chemical**
25 **through the epidermis of the skin, which is placed**

---

255

1 over the well with a differential fluid concentration
2 of glyphosate on one side of the membrane and a
3 circulating bath of nonglyphosate fluid on the other
4 side of the membrane, and then a known concentration
5 is placed on the high concentration side, and the
6 diffusion through that membrane is measured over a
7 period of time.
8    Q.   And the goal of that sort of study is to,
9 at least in an in vitro manner, try to figure out how
10 much is absorbed through the skin, right, of the
11 compound?
12    **A.   Yes.**
13    Q.   Okay.  And they did this study in the
14 Wester '91 study using Roundup, right, not glyphosate?
15    **A.   Let me check.**
16    Q.   It's right here in the Materials and
17 Methods beginning on I think the sixth line, starting
18 "Undiluted."
19    **A.   It's pretty vague.  It says "formulation,"**
20 **but it doesn't say what.**
21    Q.   It says "Roundup" right after "in a
22 formulation," right?
23    **A.   Right, but we don't know what -- if any**
24 **POEAs were in it or other adjuvants.**
25    Q.   Roundup, sir, is 41 percent glyphosate,

---

256

1 15 percent POEA, right?
2    **A.   Well, there's different Roundup**
3 **formulations.**
4    Q.   Roundup original is 41 percent glyphosate?
5    **A.   It doesn't say "original," though.**
6    Q.   Well, at this point in time in 1991, there
7 weren't as many formulations as there are today,
8 correct?
9    **A.   True.**
10    Q.   And so if we take these authors at their
11 word, Roundup is 41 percent glyphosate and 15 percent
12 POEA, right?
13    **A.   I think for that time era, I think that's**
14 **true.**
15    Q.   And you haven't seen any Monsanto
16 documents or anything else to suggest that they
17 weren't using Roundup original in this study?
18    **A.   True.**
19    Q.   Now, the authors also did an evaluation of
20 partition into powdered stratum corneum in this study,
21 right, or binding to powdered --
22    **A.   Binding, yeah.**
23    Q.   -- human stratum corneum, right?
24       Now, what's an author looking for when
25 they conduct a binding study on powdered human stratum

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 67 of 70
CONFIDENTIAL
Transcript of William Sawyer, Ph.D.
65 (257 to 260)
Conducted on August 23, 2018

257

1  corneum?
2      A.  Well, that's really a matter of what we
3  talked about earlier in terms of the explanation of
4  where the unaccounted glyphosate ended up.
5      Q.  So, in other words, what they're trying to
6  determine when they look at the binding to the human
7  stratum corneum is whether or not the Roundup or
8  glyphosate stays in these wells that we talked about
9  earlier, right?
10      A.  Well, not in the wells.  In the tissue
11  itself.
12      Q.  Okay.  In the tissue itself.  But this is
13  that skin accumulation theory that we were discussing
14  earlier, correct?
15      A.  It is.
16      Q.  Okay.  And then, again, that was done
17  using glyphosate in a formulation, right?
18      A.  It appears that way, yes.
19      Q.  And then the authors looked at IV
20  administration of glyphosate and the elimination of
21  the test compound, right?  And that is basically when
22  they use the bolus injection, right?
23      A.  Okay.  So we're talking about the next
24  stage of the study?
25      Q.  Yes, sir.  They did that as well.

258

1      A.  Yeah, there was a second stage which
2  involved intravenous injection of the test material.
3      Q.  Now, why would you do an intravenous
4  injection of the test material?  What would you be
5  looking for?
6      A.  Well, the outstanding feature is that it
7  does provide 100 percent systemic circulation of the
8  material, 100 percent bioavailability as opposed to
9  using an anal or an oral or any other type of
10  parenteral dosage, including dermal.
11      Q.  And so an advantage of an IV
12  administration is that you know all of the dose you
13  administered is available for systemic circulation,
14  right?
15      A.  Yes.
16      Q.  And an advantage of an IV administration
17  is that you generally will have almost complete
18  recovery of that administered dose, correct?
19      A.  If you test feces, urine.  In this case,
20  breath is not really important.  We don't have the
21  volatility to blow it off as we do with ethanol or
22  vinyl chloride.  So, yeah, if one were to test urine
23  and feces, that should cover it.
24      Q.  And they did test that in this study,
25  right?  They did test urine and feces, right?

259

1      A.  They did, and --
2      Q.  We're getting there.
3      A.  Yeah.
4      Q.  Okay.  So the next thing they tested -- I
5  know where you're going.  The next thing they tested
6  was dermal absorption of -- or actually, let me be
7  clear.  The next thing they did was a dermal systemic
8  exposure test in these rhesus monkeys, right?
9      A.  Dermal systemic.
10      Q.  Basically, a dermal administration to the
11  monkeys to see what happens with the glyphosate or the
12  Roundup.
13      A.  Yes.
14      Q.  Okay.
15      A.  But I want to say that I don't think I'm
16  going to keep going much longer.  I'm really having a
17  hard time focusing.
18      Q.  Okay.  What's the purpose of a dermal
19  administration?
20      A.  So you may want to do the -- you asked
21  me --
22      Q.  She's out of the room, so -- I appreciate
23  that.
24      A.  Oh, you mean she's not here any longer?
25      Q.  She's coming back.  She's got --

260

1      A.  Okay.
2      Q.  What's the purpose of a dermal
3  administration?
4      A.  Well, obviously, the direct in vivo dermal
5  test is used, and with a primate, of course, it's a
6  good choice, very close to human, and it provides a
7  good model for measuring dermal absorption of the
8  agent.
9      Q.  And they also did that with Roundup, like
10  all these other studies in this paper, right?
11      A.  They did what?
12      Q.  They did the study with Roundup, not
13  glyphosate alone, like all the other studies in this
14  paper, right?
15      A.  It appears that way.
16      Q.  Okay.
17      A.  I mean, we --
18      Q.  Well, for instance, in the IV percutaneous
19  absorption paragraph there on the right column of 726,
20  the bottom sentence says, "Topical glyphosate was
21  Roundup formulation."
22          You see that?
23      A.  Yeah.  In Roundup formulation, yeah.
24      Q.  Okay.
25      A.  It's a little confusing, though, because

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED
Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 68 of 70
CONFIDENTIAL

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018
66 (261 to 264)

26

1 it's carbon-14-labeled glyphosate in Roundup
2 formulation. So I think what they're -- I think I did
3 read before how they -- from a stoichiometric
4 measurement decided how much labeled glyphosate to
5 add. I think that's how it worked. They took actual
6 Roundup, and they added C-14-labeled glyphosate to
7 that at a specific ratio.
8      Q.  Jennifer has walked back in. Doctor, I
9 intend, if it is all right with you, to finish my
10 questions about this study, then turn it over to
11 Ms. Hoekel for her questions for today. Can you
12 handle going through that?
13     A.  We'll see. I'm just, again, having a
14 little trouble focusing on some of the harder stuff
15 right now.
16     Q.  Okay. The authors also looked at blood
17 concentrations of Roundup in this study, right?
18     A.  Yeah, via C-14 measurements, I believe.
19     Q.  Okay. Okay. And, finally, they also
20 looked at skin decontamination in this study, correct?
21     A.  They --
22     Q.  That's on the next page.
23     A.  They measured how much came off the skin,
24 what they could remove from the skin, if that's what
25 you're referring to.

262

1      Q.  Well, if you turn to page 727, first full
2 paragraph, they conducted an in vivo skin
3 decontamination study, right?
4      A.  Yeah. That's basically the wash sample
5 analysis.
6      Q.  And what's the purpose of an in vivo skin
7 contamination study?
8      A.  It's critical to be able to calculate your
9 percent recovery. When you run such a study, you have
10 to calculate what the dose that was applied to the
11 skin, how much was removed from the skin that is not
12 bound, how much is bound in the skin and how much
13 diffuses through systemic circulation under a given
14 interval of time.
15     Q.  Aren't you also interested in the
16 effectiveness of washing with water versus soap and
17 water?
18     A.  I think that's an interesting point, yeah.
19 And I also -- in my answer, I should also say, as well
20 as measurement of urine and feces.
21     Q.  Okay. But from a -- if you're just
22 studying skin decontamination, that's not -- the
23 endpoint on that is not the ADME data. That endpoint
24 is in the dermal absorption and IV systemic
25 distribution studies, right?

263

1      A.  I really don't think I can keep going on
2 right now. The amount of concentration this is
3 requiring, I'm getting a little --
4           MR. KALAS:  How long have we been
5      on the record?
6      A.  -- a little tired.
7           THE VIDEOGRAPHER:  Six hours and
8      18 minutes.
9           MR. KALAS:  Okay. So I'm going
10     to turn it over to Ms. Hoekel right
11     now. I'm going to note that, in
12     addition to all the other things that
13     we've discussed today on the record,
14     that a full seven-hour deposition day,
15     the doctor wasn't able to continue on
16     it. I'm not criticizing him for that,
17     but that's just a fact. I'll let
18     Jennifer ask her questions.
19           THE WITNESS:  I've been at the
20     table over eight hours.
21           MR. KALAS:  Sir --
22           THE WITNESS:  I was here at the
23     table at 9:07.
24           MR. KALAS:  I understand your
25     statement, sir. The record speaks for

264

1 itself.
2      Jennifer, please.
3           MR. SELDOMRIDGE:  And I will also
4      note that the deposition has not
5      concluded yet.
6           MR. KALAS:  I'll agree with that.
7           CROSS-EXAMINATION
8 BY MS. HOEKEL:
9      Q.  Dr. Sawyer, my name is Jennifer Hoekel,
10 and I represent the Osborn & Barr defendants in this
11 case. And I will have a very brief couple of
12 questions for you, and they should mostly be yes or
13 no.
14     Do you know who Osborn & Barr is? Do you
15 know who Osborn & Barr is?
16     A.  I really don't.
17     Q.  Okay.
18     A.  I've not a clue.
19     Q.  They're the -- they are an ad agency who
20 advertised certain of the Roundup products between
21 1990 and 2012.
22     A.  Okay.
23     Q.  And they've been named in a number of
24 these Monsanto cases. Are you prepared to offer
25 any -- have you been asked to offer any opinions at

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.

Conducted on August 23, 2018

67 (265 to 268)

---

265

1 trial with respect to Osborn & Barr's liability in
2 these cases?
3     A.   Not specifically for Osborn. It's
4 possible I've been asked by plaintiffs' counsel for
5 opinions that may in some way relate to that, but not
6 specifically, no.
7     Q.   Let me ask a different question.
8        Have you been asked to provide any
9 opinions with respect to liability by an ad agency
10 with respect to Roundup?
11     A.   No.
12     Q.   Have you been asked to render any opinions
13 with respect to an advertising agency's responsibility
14 for label requirements?
15     A.   No.
16     Q.   And have you been asked to render any
17 opinions about an ad agency liability for other
18 marketing requirements?
19     A.   What do you mean by "other marketing
20 requirements"?
21     Q.   Any kind of other advertisement.
22     A.   No.
23        MS. HOEKEL:  I have nothing
24 further.  Jeff.
25        MR. SELDOMRIDGE:  I don't have

---

266

1 any questions at this time.
2        MS. HOEKEL:  I'm going to hand it
3 back to Mr. Kalas.
4        MR. KALAS:  It's the opinion of
5 Monsanto that this deposition remains
6 open, and we have additional questions
7 to ask Dr. Sawyer regarding Mr. Hall
8 based on some of the disclosures made
9 today, in addition to the -- all the
10 other issues we've outlined regarding
11 the expansion of his opinions, and I
12 think I've said all I need to say.
13        MR. SELDOMRIDGE:  Thank you,
14 Doctor.
15        THE VIDEOGRAPHER:  This marks the
16 end of Media Number 4 in the deposition
17 of William Sawyer.  This also concludes
18 today's deposition.  The time is 5:37.
19 We are off the record.
20        (Off the video record at 5:37 p.m.)
21        THE REPORTER:  Mr. Seldomridge,
22 do you need a copy of the transcript?
23        MR. SELDOMRIDGE:  E-tran, please.
24        THE REPORTER:  Do you need a
25 copy?

---

267

1     MS. HOEKEL:  Just E-tran.
2     (Recessed at 5:38 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

268

1        CERTIFICATE OF OATH
2
3
4     STATE OF FLORIDA
5     COUNTY OF LEE
6
7        I, the undersigned authority, certify
8 that WILLIAM SAWYER, Ph.D., personally appeared before
9 me and was duly sworn.
10
11        WITNESS my hand and official seal this
12 27th day of August, 2018.
13
14
15  Rhonda Hall-Breuwet, RDR, CRR, LCR, CCR, FPR, CLR
16  Rhonda Hall-Breuwet, RDR, CRR, LCR, CCR, FPR, CLR
17  NCRA Realtime Systems Administrator
18  Notary Public - State of Florida
19  My Commission Expires:  9/28/19
20  Commission No. FF 915315
21
22
23
24
25

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 3:16-md-02741-VC   Document 8573-32   Filed 12/27/19   Page 70 of 70

CONFIDENTIAL

Transcript of William Sawyer, Ph.D.
Conducted on August 23, 2018

68 (269 to 272)

269

```
1              C E R T I F I C A T E
2
3    STATE OF FLORIDA:
4
5           I, RHONDA HALL BREUWET, RDR, CRR, LCR,
6    CCR, FPR, CLR, NCRA Realtime Systems Administrator,
7    shorthand reporter, do hereby certify:
8           That the witness whose deposition is
9    hereinbefore set forth was duly sworn, and that such
10   deposition is a true record of the testimony given by
11   such witness.
12          I further certify that I am not
13   related to any of the parties to this action by blood or
14   marriage, and that I am in no way interested in the
15   outcome of this matter.
16          IN WITNESS WHEREOF, I have hereunto
17   set my hand this 27th day of August, 2018.
18
19
20
21   RHONDA HALL BREUWET, RDR, CRR, LCR, CCR, FPR, CLR,
22   NCRA Realtime Systems Administrator
23
24
25
```