Michael Miller (pro hac vice)
mmiller@millerfirmllc.com
Brian K. Brake (pro hac vice)
Bbrake@millerfirmllc.com
Tayjes Shah (pro hac vice)
Tshah@millerfirmllc.com
The Miller Firm LLC
108 Railroad Avenue
Orange, VA  22960
Telephone: (540) 672-4224
Facsimile:  (540) 672-3055

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to:<br>*Stevick v. Monsanto Co.,* 3:16-cv-02341-VC | Hearing Date:  January 29, 2020 |
| | **PLAINTIFFS' OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS** |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................ 4
II. LEGAL STANDARD ........................................................................................................ 6
III. ARGUMENT .................................................................................................................... 7
   A. Dr. Sawyer's Opinions Are Reliable and Relevant. ..................................................... 7
   B. Dr. Sawyer is not Offering Any General Causation Opinions .................................... 8
   C. Dr. Sawyer's Case-Specific Opinions on Stevick are Reliable and Admissible. .. 9
      i. Dr. Sawyer Used Proper Methodology in Assessing Specific Causation. ...... 9
      ii. Dr. Sawyer makes Proper use of Epidemiology Studies to Form his Opinions. . 11
      iii. Dr. Sawyer's Dose Calculation is Sufficiently Reliable . . . . . . . . . . . . . . . . . . . 11
   D. Dr. Sawyer May Rely on and Explain Technical Details Contained in Internal Monsanto Documents ........................................................................................................ 13
   E. Dr. Sawyer's Testimony Regarding Other Carcinogens in Roundup is Admissible ............ 14
IV. CONCLUSION ................................................................................................................ 14

# TABLE OF AUTHORITIES

Asad v. Cont'l Airlines, Inc., 314 F. Supp. 2d 726, 741 (N.D. Ohio 2004) ................................ 11

Beck v. Koppers, Inc., No. 3:03 CV 60 P D, 2006 WL 270260, at *10 (N.D. Miss. Feb. 2, 2006) ....... 7, 11

Clausen v. M/V NEW CARISSA, 339 F.3d 1049, 1057 (9th Cir. 2003) ....................................... 9

Fleming v. Nicholls-Wilcox, Inc., No. 02-1-7632-42, 2005 WL 5419258 (Ga. Super., May 10, 2005 ....... 4

Fleming v. Nicholls-Wilcox, Inc., No. 02-1-7632-42, 2005 WL 5419258 (Ga. Super., May 10, 2005) ...... 4

In re Roundup Prod. Liab. Litig., No. 16-MD-02741-VC, 2018 WL 3368534, at *5 (N.D. Cal. July 10, 2018) .................................................................................................................................. 8

In re Roundup Products Liability Litgation (N.D. Cal., July 12, 2019, No. 16-CV-0525-VC) 2019 WL 3219360, ............................................................................................................................... 5

In re Seroquel Prod. Liab. Litig., No. 6:06-MD-1769-ORL-22D, 2009 WL 3806436, at *4 (M.D. Fla. July 20, 2009) ............................................................................................................................ 13

In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig., 2011 WL 6302287, at *18 (S.D. Ill. Dec. 16, 2011 ..................................................................................................... 13

Johnson v Monsanto Co., 2018 WL 2324413 (Cal.Super. May 17, 2018) ................................... 4

Johnson v Monsanto Co., 2018 WL 5246323 (Cal.Super. Oct. 22, 2018) .................................... 4

Johnson v Monsanto Co., No. CGC-16-550128, 2018 WL 2324413, at *15 (Cal.Super. May 17, 2018) . 11

Johnson, 2018 WL 5246323 ................................................................................................. 6

Nw. Coal. for Alternatives to Pesticides (NCAP) v. U.S. E.P.A., 544 F.3d 1043, 1048–49 (9th Cir. 2008) .................................................................................................................. 11

Pepsi Americas, 527 Fed.Appx. 660, 661–662 (9th Cir. 2013) ................................................... 6

Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC, 858 F. Supp. 2d 505, 512 (D. Md. 2012) ................................................................................................................. 11, 13

## I. INTRODUCTION

William Sawyer, Ph.D. "is a highly qualified toxicologist - currently chief toxicologist of Toxicology Consultants and Assessment in New York. He is Board Certified in forensic medicine, toxicology and pharmacology and is well published." *Fleming v. Nicholls-Wilcox, Inc.*, No. 02-1-7632-42, 2005 WL 5419258 (Ga. Super., May 10, 2005). Dr. Sawyer has more than 28 years of experience in public health and forensic toxicology including five years of governmental service. *See* Dr. Sawyer Declaration and CV (Sawyer Decl.) (Brake Decl., **Ex. A**). He has a Ph.D. in toxicology and a Master's degree in cellular and molecular biology and has consulted for numerous governmental agencies including "the United States Attorney's Office, US Navy, various prosecutors, Attorney State General of Montana, New York, New Jersey and other states." *See Johnson v. Monsanto* Trial Transcript ("Johnson Tr.") at 3586-3588. (Brake Decl., **Ex. B**) In fact, Dr. Sawyer has previously served as an expert witness for law firms representing Monsanto. *Pilliod v. Monsanto* Trial Transcript ("Pilliod Tr.") at 3079:7-3080:19 (Brake Decl., **Ex. C**).

To date, Dr. Sawyer has given many dozens of hours of testimony in the Roundup® litigation through over 15 days of deposition and two days of testimony in the *Johnson* and *Pilliod* trials. He has spent hundreds of hours reviewing published studies, medical records and internal documents written by Monsanto scientists. Monsanto has repeatedly tried and failed to exclude or strike Dr. Sawyer's opinions. *See Pilliod v Monsanto Co.*, 2019 WL 2158266 (Cal.Super. Mar. 18, 2019); *Johnson v Monsanto Co.*, 2018 WL 2324413 (Cal.Super. May 17, 2018) (denying pre-trial preclusion); *Johnson v Monsanto Co.*, 2018 WL 5246323 (Cal.Super. Oct. 22, 2018) (denying Monsanto's post-trial motion to set aside the verdict).

Dr. Sawyer's core role at trial is to explain how Roundup® travels from the bottle to the bone. Pilliod Tr. at 3183:15-3184:3 (Brake Decl., **Ex. C**) ("The bone is a preferential point of distribution... That's where the [lymphoma] malignancy starts."). In toxicological terminology, this area of study is called Absorption, Distribution, Metabolism, Excretion ("ADME"). (Stevick Report at 30) (Attached to Monsanto's Motion to Exclude Sawyer, ECF 8572, as **Ex 2**).

Dr. Sawyer will offer testimony as to the effect of various types of clothing, protective gear and equipment on increasing or decreasing exposure to Roundup®; Stevick Rep. at 15, 112 (**Ex.**

4

**2)**. Dr. Sawyer will testify as to the mechanism of carcinogenicity including the relative genotoxicity and promotion activity of both glyphosate and the formulated product (including adjuvants and impurities). *Id.* at 39.

As noted in Plaintiffs' Expert Designations, Dr. Sawyer is being offered to:

> ...testify on issues concerning the mechanism of absorption of glyphosate-based formulations through the skin and other exposure pathways, and the effect of wearing personal protective equipment on the exposure levels. Dr. Sawyer will also testify on issues of specific causation, including the comparability of Plaintiff's exposure with the exposure data from epidemiological studies, for Plaintiff Elaine Stevick.

November 20, 2018 Designation (Attached to Monsanto's Motion to Exclude Dr. Sawyer, ECF 8572, as **Ex. 1**).

Dr. Sawyer is offering case specific opinions for Elaine Stevick. The calculations of Roundup® exposure he relies on allows Dr. Sawyer to compare the specific Plaintiff's days of Roundup® use to the epidemiological data showing an increased risk of Non-Hodgkin Lymphoma (NHL). *In re Roundup Products Liability Litgation* (N.D. Cal., July 12, 2019, No. 16-CV-0525-VC) 2019 WL 3219360, at *1 (Dr. Weisenburger's testimony admissible where he testified that Hardeman's "...exposure levels still far exceeded the threshold used in most of the epidemiological literature, and specifically the McDuffie and Eriksson studies."). Dr. Sawyer also explains how Elaine has been exposed to Roundup based on the manner in which she sprayed and the personal protective gear she wore. *See* Sawyer Rep. at 15-21 (**Ex. 2**).

Dr. Sawyer's same type of testimony was deemed admissible in *Johnson, Pilliod* and deemed admissible by the Ninth Circuit. In *Whitlock,* the Court held:

> The district court exceeded its gatekeeping function in excluding Dr. Sawyer's testimony that the alleged TCE and chromium exposure levels were "within [a] reasonable range of that known [from several studies] to induce" the alleged injuries. Plaintiffs' alleged exposures were not so low that the occupational studies were irrelevant. Dr. Sawyer's consideration of the heightened sensitivity of children and Plaintiffs' probable ingestion of TCE-contaminated groundwater does not render his opinion inadmissible. Furthermore, Appendix G to the 2004 Public Health Assessment states that "hexavalent chromium releases from 1975–1995[ ] were likely orders of magnitude higher than estimates produced by the air model." Finally, the district court rested its decision in part on an erroneous interpretation of Dr. Sawyer's deposition testimony: He identified 50 μg/m$^3$, not 300 μg/m$^3$, as

a threshold TCE exposure associated with the effects observed in the Byers study. Because Dr. Sawyer's opinion "rests on a reliable foundation and is relevant to the task at hand," *662 *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786, it is admissible. Whether it proves causation is not a question of admissibility. *See Primiano,* 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

Whitlock v. Pepsi Americas (9th Cir. 2013) 527 Fed.Appx. 660, 661–662

Likewise, here, Dr. Sawyer's opinion that Roundup® exposure was sufficient to cause Elaine Stevick's cancer may not satisfy Plaintiff's burden of proof (in the absence of a full differential etiology), but it is admissible and helpful testimony, particularly where there are other experts that have also reviewed Elaine Stevick's medical records.

Monsanto's motion should be denied in full, and the jury should be allowed to consider Dr. Sawyer's testimony before reaching its conclusions, as have juries in other Roundup® trials. *See, e.g., Johnson*, 2018 WL 5246323 at *1 (noting that "this case required the jury to resolve the complex scientific question of whether Plaintiff's exposure to GBHs caused his NHL," which it did with the help of "Dr. Sawyer, a toxicologist, [who] testif[ied] about various aspects of the science underlying GBHs.").

## II.    LEGAL STANDARD

Under Rule 702, reliable expert opinion testimony has to " 'assist the trier of fact' either 'to understand the evidence' or 'to determine a fact in issue'"; and "the witness has to be sufficiently qualified to render the opinion" *Primiano v. Cook,* 598 F.3d 558, 563, (9th Cir. 2010) *as amended (Apr. 27, 2010).* However, "Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." *Id.; Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.,* 752 F.3d 807, 816 (9th Cir. 2014); *Whitlock v. Pepsi Americas,* 527 Fed.Appx. 660, 661–662 (9th Cir. 2013) ("Because Dr. [William] Sawyer's opinion rests on a reliable foundation and is relevant to the task at hand it is admissible. Whether it proves causation is not a question of admissibility.").

"The relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *Messick v. Novartis Pharmaceuticals Corp.,* 747 F.3d 1193, 1196 (9th Cir. 2014); *In re Roundup Products Liability Litigation* 390 F.Supp.3d 1102, 1152

(N.D. Cal. 2018) ("...opinions may be bolstered by Dr. Jameson's narrower opinions regarding glyphosate's ability to cause cancer in animals.") Under California law, one expert is not required to "expressly link together the evidence of substantial factor causation." *Hernandez v. Amcord, Inc.,* 215 Cal.App.4th 659, 675 (2013).

It is entirely proper for an expert witness to rely on reports and opinions of other experts, particularly experts as qualified as Dr. Ritz, Dr. Weisenburger and Dr. Portier. *In re Roundup Products Liability Litigation* 358 F.Supp.3d 956, 959 (N.D. Cal. 2019) (...the important point is that these experts will not be repeating the analysis of the general causation experts, but rather relying on them to rule in glyphosate."); *Beck v. Koppers, Inc.,* (N.D. Miss. Feb. 2, 2006) No. 3:03 CV 60 P D, 2006 WL 270260, at *10 ("[Dr. William] Sawyer's dosage and risk assessment testimony (as long as the latter is based on Dahlgren's general causation testimony) meets the threshold requirements of Rule 702. It is undisputed that Sawyer is qualified by his knowledge and education to render his dosage and risk assessment testimony."

### III.  ARGUMENT

#### A.  Dr. Sawyer's Opinions Are Reliable and Relevant.

Monsanto does not contend that testimony about Roundup® exposure routes are irrelevant to this case. Indeed, Monsanto has designated its own expert (Dr. Sullivan) to talk exclusively about exposure routes, rates of exposure and the effects of equipment on exposure.

It is anticipated that Dr. Sawyer's opinion will generally follow the testimony elicited at both the Johnson and Pilliod trials. Pilliod Tr. at 3104-3252 (Brake Decl., **Ex. C**); Johnson Tr. *at* 3587-3679 (Brake Decl., **Ex. B**). Dr. Sawyer's testimony will bolster the testimony of the causation experts by explaining how Roundup® makes it from the bottle through the skin, into the body, and ultimately is distributed through the blood and into the bone where malignant lymphocytes form. *See e.g., In re Roundup Products Liability Litigation* (N.D. Cal. 2018) 390 F.Supp.3d 1102, 1152 (Drs. Ritz, Portier and Weisenburger's "opinions may be bolstered by Dr. Jameson's narrower opinions regarding glyphosate's ability to cause cancer in animals").

A jury's understanding of how certain factors increase or decrease exposure to Roundup is relevant to their consideration of whether or not Roundup caused a plaintiff's cancer and whether

Monsanto was responsible for that increased exposure. *See e.g In re Roundup Products Liability Litigation* (N.D. Cal., Nov. 19, 2019) 2019 WL 6133745, at *1 ("...a state court might find that 3M Cattle's provision of a defective sprayer foreseeably caused Trosclair's cancer by increasing the amount of Roundup he absorbed through his skin."). It will be helpful for jurors to understand how Roundup® is capable of penetrating the skin and circulating to lymphocyte cells in order for them to decide whether Roundup can cause NHL.

### B. Dr. Sawyer is not Offering Any General Causation Opinions.

During the general causation phase of this litigation the Court held that "plaintiffs need not establish any particular level of exposure." *In re Roundup Prod. Liab. Litig.*, No. 16-MD-02741-VC, 2018 WL 3368534, at *5 (N.D. Cal. July 10, 2018). Now that plaintiffs have gotten past the general causation phase, it will be helpful for the jury to understand how various factors such as lack of protective gear; the spraying equipment and the type of surfactant in the Plaintiff's specific formulation affect the exposure routes of glyphosate into the body.

Even without a general causation opinion, Dr. Sawyer's exposure testimony is proper. Rule 702 "provides that expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 836 (9th Cir. 2011).

The absorption of glyphosate is a fact in issue. Dr. Sawyer will assist the jury in understanding how GBFs are absorbed through the skin; how much glyphosate is absorbed through the skin; how protective clothing can help limit the exposure to GBFs; and how different equipment can affect exposure. *See* Sawyer Stevick Dep. at 151:8-17 (Attached to Monsanto's Motion to Exclude Dr. Sawyer, ECF 8572, as **Ex. 3)** ("...I found that it was not possible to spray it directly down on weeds without encountering overspray on the ankle/lower leg area because the wand is very short...So I would advise not wearing ankle socks or breathable sneakers in using such a device."); 161:21-162:3 (...she constantly had exposure to her hand from the leakage that was wetting her -- her fingers and hand. . . there was simply no label on the container to recommend the use of gloves and she didn't know any better."). Dr. Sawyer goes over these factors as they apply to all users in great detail in his report. See **Ex. 2** Sawyer MDL Rep. 44-114, 113 ("Farmers

who did not use rubber gloves had five times more glyphosate in their urine than those wearing protective gloves"). This all useful information for the jury to determine how GBFs actually get into the body and how exposure can increase or decrease based on various factors.

### C. Dr. Sawyer's Case-Specific Opinions on Stevick are Reliable and Admissible.

#### i. Dr. Sawyer Used Proper Methodology in Assessing Specific Causation.

The words "differential diagnosis" are not magic words. *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003), *as amended on denial of reh'g* (Sept. 25, 2003). What is important is the scientific technique used to form an opinion. *Id*. at 1058. While Dr. Sawyer did not use the words "differential diagnosis" in his report, he did confirm that he utilized this methodology reaching his specific opinion on Stevick. "Q. And did you, in fact, perform a differential diagnosis to come to your specific causation conclusion in Mrs. Stevick's case? A Yes. The only -- the only factor that contributes to her NHL is her age, nothing else." **Ex 3**. Sawyer Stevick Dep. at 192:23-193:3. Based on this differential diagnosis, Dr. Sawyer will opine that Elaine Stevick's exposure to Roundup was sufficient to cause NHL.

With respect to other carcinogens, Dr. Sawyer properly "ruled in" and "ruled out" these factors. Dr. Sawyer conducted a thorough review of Mrs. Stevick's family history, age; prior work history; operational hazards; home hazards; alcohol, tobacco, and drug history; and medical history as stated in his deposition. **Ex. 2** Report at 1-16; **Ex. 3** Sawyer *Stevick* Dep. at 89:8-90:8, 108:12-21. Furthermore, Dr. Sawyer reviewed all relevant medical records. **Ex. 2** Report at 1-10. Dr. Sawyer conducted a phone interview with Mrs. Stevick (disclosed in his report) to get details on her exposure to Roundup and other carcinogens. *Id.* at 9. Dr. Sawyer read Mrs. Stevick's deposition testimony that occurred on November 9, 2018. *Id*. at 10. Dr. Sawyer compared Mrs. Stevick's exposure to GBFs to the exposure of subjects in epidemiological studies of glyphosate and further explained how he will calculate Mrs. Stevick's dose at trial using the UK POEM methodology. **Ex. 3** Sawyer *Stevick* Dep. at 43:2-11. Dr. Sawyer also took into account idiopathic causes of Mrs. Stevick's cancer when preforming his differential diagnosis. **Ex. 3** Sawyer *Stevick* Dep. at 197:22-198:1.

After "ruling in" the totality of the evidence, Dr. Sawyer then "ruled out" on a differential

basis all other non-trivial possible causes of a Mrs. Stevick's NHL:

> The second thing was to determine on a differential basis if I could find any health factors, family history, drug use, smoking, any type of pharmaceuticals such as long-term cortisone or implanted tissues which require an immunosuppressant drug, family history, genetic disorders. You know, I looked at all those things and found nothing, including her occupational exposures, that were sufficient enough to be of merit.

**Ex. 3** Sawyer *Stevick* Dep. at 89:8-90:8, 195:10-18. Dr. Sawyer further opined that the dosage of GBF received by Mrs. Stevick was clearly within range of the human epidemiologic studies of applicators. **Ex. 3** Sawyer *Stevick* Dep. at 45:1-3, 198:19-199:10.

Dr. Sawyer did not rule out age as a contributing risk factor; but he was not required to. *Cooper,* 239 Cal. App. 4th at 578.  Dr. Sawyer did note that the epidemiology studies were age-stratified and there is still an increased risk in NHL, so that would put Stevick's risk above the background risk for her age-group.  *Id.* at 246:25-247:12; **Ex**. **2** Report at 27.

Dr. Sawyer did "rule out" Ms. Stevick's exposure to other non-GBF carcinogens such as, radiation, benzene and mecoprop. **Ex. 2** Report at 1-16; **Ex. 3** Sawyer *Stevick* Dep. at 89:8-90:8, 108:12-21.  As to exposure to radiation, Dr. Sawyer testified during deposition that the "13 times or 30 times" that Mrs. Stevick was exposure to radiation while wearing an "apron and a collar" was nowhere near enough "millirems to be of any risk." **Ex. 3** Sawyer *Stevick* Dep. 120:3-15. A topic that Dr. Sawyer is "intimately familiar with." *Id*. at 120:22. Likewise, Dr. Sawyer took into account a host of other possible carcinogen exposures: WD-40, GUNK, CRC Lectra cleaner, Armor All, Scotch Super Adhesive, Cleaning duster, and Liquid Wrench, etc. that Ms. Stevick walked by occasionally. **Ex. 3** Sawyer *Stevick* Dep. 108:12-111:3. After considering each, Dr. Sawyer testified that none of the chemicals would produce a concentration of benzene at even a measurable level in the air and ruled each out. **Ex. 3** Sawyer *Stevick* Dep. 108:12-15. It is very much disputed that Ms. Stevick was exposed to benzene and mecoprop.  Dr. Sawyer stated "it's just ridiculous to insinuate that any of these chemicals contained enough benzene to have any relevance." *Id.* at 108:12-21.  Ms. Stevick did not use mecoprop; her husband did. *Id.*  155:10-156:9

### ii. Dr. Sawyer makes Proper use of Epidemiology Studies to Form his Opinions.

Dr. Sawyer has been trained in epidemiology and he uses epidemiology in his every day practice. **Ex. A** Sawyer Decl. at 13-14, 16. In addition, Dr. Sawyer has been qualified to offer epidemiology opinions in the *Johnson* case and other cases. As noted by Judge Karnow in allowing Dr. Sawyer to testify, "Dr. Sawyer's conclusion was based on Johnson's exposure to glyphosate, the absence of other risk factors in his medical history, animal studies pertaining to glyphosate, and **human epidemiological studies pertaining to glyphosate**." **Ex. B** (*Johnson v Monsanto Co.*, No. CGC-16-550128, 2018 WL 2324413, at *15 (Cal.Super. May 17, 2018)) (emphasis added). However, here, Dr. Sawyer will only make use of the epidemiology studies as a means of comparing Stevick's dose to the dose in the epidemiology studies. **Ex. 3** Sawyer *Stevick* Dep. 241:13-17. He will be deferring detailed opinions on the epidemiology studies to epidemiologists. **Ex. 3** Sawyer *Stevick* Dep. at 241:11-19.

It is entirely proper for an expert witness to rely on reports and opinions of other experts, particularly experts as qualified as Dr. Riz and Dr. Portier. *Asad v. Cont'l Airlines, Inc.*, 314 F. Supp. 2d 726, 741 (N.D. Ohio 2004) ("an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts."). *Beck v. Koppers, Inc.,* No. 3:03 CV 60 P D, 2006 WL 270260, at *10 (N.D. Miss. Feb. 2, 2006) ("[Dr. William] Sawyer's dosage and risk assessment testimony (as long as the latter is based on Dahlgren's general causation testimony) meets the threshold requirements of Rule 702."); *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, 858 F. Supp. 2d 505, 512 (D. Md. 2012) ("Courts in this circuit and across the country have consistently held that an expert may rely on the work of others when preparing an expert report")

### iii. Dr. Sawyer's Dose Calculation is Sufficiently Reliable

Dr. Sawyer will base his dose calculation at trial on a generally accepted pesticide modeling technique, the UK Predictive Operator Exposure Model. (UK POEM). Defendant fails to present any evidence that this model does not yield reliable data. *See e.g.. Nw. Coal. for Alternatives to Pesticides (NCAP) v. U.S. E.P.A.*, 544 F.3d 1043, 1048–49 (9th Cir. 2008) (Rejecting argument

that pesticide exposure modeling [a different model than the UK POEM] is unreliable where "Petitioners have presented no evidence that modeling does not yield reliable data. There is nothing inherently unreliable about the use of models...").

As noted by Dr. Sawyer, Monsanto, itself, utilizes the UK POEM modeling on glyphosate when making regulatory submissions. **Ex. 2** Report at 18-21. In fact, in the latest evaluation of glyphosate by EFSA in 2015 (upon which Monsanto relies) the UK POEM is used to estimate operator exposure to glyphosate.[1] In the 2015 Greim article written by Monsanto employee David Saltmiras cites the UK POEM stating "Systemic exposure of operators, as assessed for the EU reapproval of glyphosate, is predicted to be between 0.0034 (German BBA model, tractor-mounted ground-boom sprayer) and **0.226 mg/kg bw/day (UK POEM, hand-held-spraying to low targets, data not shown).**"[2]

The UK POEM was developed by the United Kingdom regulatory body. **Ex. A** (Sawyer Decl. at ¶ 62-71). It is recognized by the European Food Safety Authority (EFSA) as an available and reliable exposure modeling technique. *Id*. at 64. The latest regulatory body to review the UK POEM model notes that it "is an internationally developed model based on a robust dataset." *Id.* at 67. Dr. Sawyer notes that the UK POEM has been peer-reviewed and relied upon in "numerous peer-reviewed studies" including "a 2017 risk assessment of small farmers exposed to plant protection products in the Niger River valley." *Id.* at 65.

In arriving at this absorption range, Dr. Sawyer correctly applies generally accepted guidelines from the OECD that "[t]he current default approach taken by nearly all regulatory agencies is to determine the dermal absorption value by adding the absorbed dose and the chemical remaining in the skin, following washing" **Ex. 2** Report at 93.

Finally, Dr. Sawyer uses the UK POEM, not to establish a threshold dose for cancer causation, but simply to compare whether Ms. Stevick's exposure to glyphosate is similar to that of professional users. Dr. Sawyer acknowledges that the "important way, the most accurate way,

---

[1] EFSA, "Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate", p. 41 (2015) available at: https://efsa.onlinelibrary.wiley.com/doi/epdf/10.2903/j.efsa.2015.4302
[2] Greim, et al., "Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies" Crit Rev Toxicol. 2015 Mar 16; 45(3): 185–208. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4819582/

to compare dose to human [epidemiological] study. Here this dose calculation, the only thing it can be compared to is that of other applicators to see is -- is this dose in the with applicators in the studies..." **Ex. 3** Sawyer Stevick Dep. at 231:16-21.  Under the UK POEM based on studies examining real professional and amateur applicator, the empirical evidence demonstrates that home users generally have a higher rate of exposure than professional users due to the equipment used and lack of protective gear. **Ex. 3** Sawyer Stevick Dep. at 132:13-17 (Stevick dose at 0.239 mg/kg/hr).

### D. Dr. Sawyer May Rely on and Explain Technical Details Contained in Internal Monsanto Documents

Plaintiff agrees that Dr. Sawyer will not testify about the intent or state of mind of Monsanto, but Dr. Sawyer will rely upon and discuss the scientific findings, opinions and data contained in internal Monsanto documents.  Experts may rely and discuss corporate documents if the documents are relevant to their opinions. *In re Seroquel Prod. Liab. Litig.*, No. 6:06-MD-1769-ORL-22D, 2009 WL 3806436, at *4 (M.D. Fla. July 20, 2009). Also, there is "nothing particularly unusual, or incorrect, in a procedure of letting a witness relate pertinent information in a narrative form as long as it stays within the bounds of pertinency and materiality." *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, 2011 WL 6302287, at *18 (S.D. Ill. Dec. 16, 2011); *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir.1998) ("He could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive.").

Unfortunately, Monsanto has a corporate policy not to publish or publicize unfavorable data or scientific opinions on glyphosate.  Therefore, much of the scientific data and opinions of Monsanto scientists and consultants are contained only in internal Monsanto documents and emails.  The emails cited by Dr. Sawyer are filled with technical knowledge and jargon that would not be easily comprehended by a lay juror.

**E.      Dr. Sawyer's Testimony Regarding Other Carcinogens in Roundup is Admissible.**

Monsanto asks the court to preclude Dr. Sawyer from testifying that Roundup® contained "trace" chemicals that may have contributed to Plaintiffs' NHL. Monsanto's request is unavailing. Dr. Sawyer's consideration of Roundup® and other GBHs' entire chemical makeup is not only appropriate, but necessary in evaluating whether Elaine Stevick was exposed to known or suspected carcinogens. Such an analysis may also explain the greater carcinogenicity shown in studies of the completed Roundup product than in studies of glyphosate alone. To that end, Dr. Sawyer lists and describes the chemicals known to be present in Roundup® in various years of use, **Ex. 2** at 35-39, including several known carcinogens: formaldehyde, ethylene oxide, and n-nitroso. *Id.* at 39. Dr. Sawyer will testify that while these carcinogens may not be sufficient alone to cause cancer, "the rule is in toxicology and even under EPA policy, that regardless of the concentration of the carcinogen, they are all additive in terms of their effect."  Pilliod Tr. at 3133:3-11, **Ex. C**.

For instance, ethylene oxide is a serious and dangerous impurity in the Roundup surfactants. IARC labels it a class 1 carcinogen[3] capable of causing NHL. As noted by Dr. Sawyer:

> **Ethylene Oxide** is a carcinogenic and mutagenic gas. It is classified by both U.S. EPA and by IARC as a human carcinogen by inhalation. Studies show that exposures to ethylene oxide are associated with an increased risk of cancers of white blood cells. Ethylene oxide was identified by Monsanto as being present in Roundup as long ago as 2000 (per Safety Data Sheet) noting that ethylene oxide accumulates in the top ("headspace") of product containers and can be inhaled when the lid is removed.

Stevick Rep. at 39, **Ex. 2**.

**IV. CONCLUSION**

The jury must decide in Phase I whether Elaine Stevick proved by a preponderances of evidence that her exposure to Roundup was a substantial factor in causing her NHL.  How Roundup permeated her body, blood, and ultimately her bone is the essential question that Dr. Sawyer answers as an expert toxicologist.  For all the foregoing reasons, Monsanto's Motion to Exclude Dr. Sawyer's Testimony should be denied, and the jury permitted to hear this important testimony as have other juries.

---

[3] https://monographs.iarc.fr/wp-content/uploads/2018/06/mono100F-28.pdf.

Dated: January 3, 2020                Respectfully submitted,

                                           By: /s/ Brian K. Brake, Esq.
                                                   Michael J. Miller, Esq. (pro hac vice)
                                                   Brian K. Brake, Esq. (pro hac vice)
                                                   The Miller Firm LLC
                                                   108 Railroad Avenue
                                                   Orange, VA 22960
                                                   Phone: 540-672-4224
                                                   Fax: 540-672-3055
                                                   mmiller@millerfirmllc.com
                                                   bbrake@millerfirmllc.com