# EXHIBIT A

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| Hardeman v. Monsanto Co., et al., | : | |
| 3:16-cv-0525-VC | : | |
| | | |
| Stevick v. Monsanto Co., et al., | : | MDL No. 2741 |
| 3:16-cv-2341-VC | : | Case No. 3:16-md-02741-VC |
| | | |
| Gebeyehou v. Monsanto Co., et al., | : | |
| 3:16-cv-5813-VC | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

## DECLARATION OF EXPERT TOXICOLOGIST DR. WILLIAM R. SAWYER

STATE OF FLORIDA         '

                                     '

COUNTY OF LEE          '

## A. Identification

**Name and Purpose**

1. My name is William R. Sawyer, Ph.D. I have been retained as an expert toxicologist by the plaintiff, Elaine Stevick, et al., to review and assess the various toxicological aspects of this case relevant to the plaintiff's use and exposure to glyphosate-based herbicide and subsequent lymphoma diagnosis.

## B. Qualifications and Training

2. I am a professional toxicologist with a doctorate in toxicology from the Indiana University School of Medicine. I earned an associate degree from the State University of New York Agricultural and Technical College at Morrisville in 1976. I earned a bachelor of science degree in biology from the State University of New

1

York at Geneseo in 1978. I earned a master's degree in cellular and molecular biology, also from the State University of New York at Geneseo, in 1982. I subsequently earned a doctorate in toxicology from the Indiana University School of Medicine in 1988. This required approximately three years of medical school curriculum with three years of course work in toxicology as well as training in the State Department of Toxicology and original, peer-reviewed and published toxicological research.

3.    During my training at the Indiana University School of Medicine's Department of Toxicology and Pharmacology, I studied under the late Robert B. Forney, Sr., Ph.D. Dr. Forney was the department chairman, the director of the State Department of Toxicology and one of the top researchers in his field with international recognition. I received considerable training with respect to toxic exposure evaluations of alcohol, numerous pharmaceuticals, natural products and toxic chemicals including formaldehyde. I also worked in the State Department of Toxicology facility at the medical center in Indianapolis, Indiana, performing forensic analyses for poisons (including heavy metals), pharmaceuticals, drugs of abuse and alcohol.

4.    I am a diplomate of the American Board of Forensic Medicine. I have been previously certified by the State of New York Department of Health as a clinical laboratory director in forensic toxicology (License No. SAWYW1) and as a licensed environmental laboratory director by the states of New York, New Jersey, California and South Carolina. I have previously been trained and certified under OSHA 29 CFR1910.120 for Hazardous Waste Operations and Emergency Response.

5.    I am an active member of various professional societies including, Sigma Xi, the Scientific Research Society, the American Academy of Forensic Sciences and the International Association of Forensic Toxicologists. I am presently chief toxicologist at Toxicology Consultants and Assessment Specialists, LLC, in Sanibel, Florida (also registered to operate the LLC in New York).  I have served as a peer-reviewer for the journal "The Forensic Examiner" and as a member of its editorial board. I was previously an adjunct assistant professor at the Upstate Medical Center in the Department of Medicine at S.U.N.Y. Health Science Center in Syracuse, New York, for approximately 22 years.

6.    I have studied the toxicological effects and conducted toxicological assessments of petroleum and petroleum products, pharmaceuticals, hazardous chemicals, herbal products, pesticides, herbicides and alcohol for more than 34 years as part of my training in toxicology and daily work experience as a toxicologist.

7.    With regard to qualifications specific to the current matter, I have studied the pharmacokinetics (drug absorption, distribution, metabolism and excretion) and toxicological effects of a wide range of manufactured substances as well as performed risk and causation assessments as part of my training and daily work experience. Specific to the current matter, I have also published original work using animal bioassays (rats) with respect to drug absorption, metabolism, excretion and postmortem redistribution. I have been recognized as an expert in the field of toxicology by courts in more than 30 states as well as internationally and have routinely consulted and testified in Federal and State courts on both civil and criminal matters.

8.    I have attached hereto as **Attachment A** my curriculum vitae which accurately reflects my professional standing and experience in the field of toxicology.

## C. Objective

9.    Defendant's motion to exclude my testimony presents a wide range of criticisms ranging from the methodology employed to conduct my toxicological assessment to my causal findings as well as criticisms of my qualifications and competency. The motion presents a criticism of my toxicological report on the cause of Ms. Stevick's non-Hodgkin's lymphoma (NHL) with regards to my use of epidemiological studies (used only for dose comparison and latency analyses). Additionally, Defendant has introduced an erroneous argument with regard to whether or not I provide a complete specific causation evaluation of Ms. Stevick in my report.

10.    The objective of this declaration is to respond to Defendant's motion by providing the court with a cogent explanation of the basis, methods and procedures followed to evaluate Ms. Stevick's exposure to Roundup (glyphosate) through application of generally-accepted methodologies and peer-reviewed studies as well as a finite comparison of Ms. Stevick's approximate dose to similarly-exposed applicators. Additionally, defendant objects to the use of my general toxicological assessment of Roundup™ with respect to Mr. Hardeman and Mr. Gebeyehou. I am endeavoring to respond to Defendant's motion with peer-reviewed study evidence in an effort to "untangle" the confusing narrative created by the Defendant's numerous misrepresentations. This includes response to Defendant's misinformed arguments concerning my specific use of the epidemiological studies and causation

methodology, particularly as applicable to the differential diagnosis presented in my report.

**D.  Case Summary**

11.   Ms. Stevick was diagnosed with non-Hodgkin's lymphoma on December 25, 2014, after she was admitted to the Kaiser Foundation Hospital for hydrocephalus and a posterior fossa mass. She had spent her career as a speech pathologist, beginning in 1981 through 2014, working in hospitals and clinics as well as with severely autistic children in schools.

12.   In my report, I reviewed Ms. Stevick's medical records and documented that her records indicated that she had no family history of lymphoma, rarely consumed alcohol, never smoked and did not use illegal drugs.

13.   Under California's Proposition 65 law, glyphosate was declared a chemical "known to cause cancer." Subsequent to California's own internal review, peer review and public comment period, the state listed glyphosate as a carcinogen on July 7, 2017. These rulings followed the classification of glyphosate as a "probable human carcinogen" by the World Health Organization's International Agency for Research on Cancer (IARC) in March 2015. It is my understanding that this court has already issued orders on the general causation opinions and, therefore, these opinions were not included within my report. I have deferred the epidemiological aspects of causation to Dr. Ritz, Dr. Portier and Dr. Weisenburger.

### E.  Review of Contents

15.   In reviewing this rebuttal, it is helpful to keep in mind that the discipline of toxicology is not limited to a single, narrow field of study. Toxicologists are trained and tasked with assessing every available piece of scientifically-credible information relevant to the toxicological assessment. In so doing, each piece of evidence is assessed solely on the basis of its merits and relevancy. Thus, an objective toxicological assessment is based on an impartial investigative methodology following the Bradford Hill criteria and weight of evidence (WOE) methodology.

16.   Defendant has produced a lengthy, confusing motion entangled with numerous misunderstandings. There are frequent repetitions of general issues expressed in different words in different sections making it difficult to respond without redundancy. In the interests of clarity and brevity, I have, therefore, chosen to organize this rebuttal on the basis of key toxicological issues raised in Defendant's motion as noted in the following sections herein:

- F.  Failure to Offer Admissible Opinions
- G.  Failure to Perform Differential Diagnosis
- H.  Specific Causation with Regards to Differential Diagnosis
- I.   Improper Epidemiological Evaluation of Ms. Stevick's Dose
- J.  Unable to Rule Out Idiopathic Causation
- K.  Unqualified to Assess Epidemiological Studies
- L.  Relied Only Upon Exposure
- M.  No Explanation of How Roundup Causes Cancer
- N.  Conclusions Based Solely Upon "Say-So"
- O.  Alleged Misuse of POEM Model and "Flawed" Calculations
- P.  Inappropriate Application of POEM Model
- Q.  Failure to Consider Alternative Causative Factors
- R.  Inappropriate Causal Inferences from Epidemiological Evidence
- S.  Unqualified Opinions Regarding Corporate Intent
- T.  Untimely Rebuttal Opinions
- U.  Miscellaneous

## F.  Failure to Offer Admissible Opinions

"Group 1 Plaintiffs' exposure expert Dr. William R. Sawyer fails to offer any admissible opinions in support of Plaintiffs' claim that exposure to Roundup, a glyphosate-based herbicide ("GBH") manufactured by Defendant Monsanto Company ("Monsanto"), caused them to develop non-Hodgkin's lymphoma ("NHL"). The vast majority of Dr. Sawyer's report simply re-ploughs ground from the general causation phase, such as the epidemiological, animal, and genotoxicity studies regarding Roundup, and what those studies say about glyphosate's possible effects on human beings. The Court should preclude Dr. Sawyer from offering those untimely opinions at trial."  [pg. 1, lines 1-9]

17.  In toxicology, examination of any potential causative factor is part of the investigative process, which applies the required generally-accepted, peer-reviewed steps to reach scientifically-credible conclusions. This impartial methodology is central to the organization and spirit of my report. Indeed, a review of underlying causative factors, both factual and potential, is always a primary goal in any toxicological assessment.

18.  The epidemiological, animal and genotoxicity studies cited in my toxicological assessment represent a significant part of the totality of objective evidence in this matter. An evidential review in the present is required due to the fact that Defendant has attempted to diminish the significance of specific health effects of glyphosate, particularly with regard to the manner in which glyphosate enters and affects the human body. Toxicological considerations include such factors as rates of absorption, frequency of exposure and duration of exposure. All of these factors are highly relevant with respect to dose.

### G.  Failure to Perform Differential Diagnosis

> At his deposition, Dr. Sawyer claimed to have conducted a differential diagnosis of Ms. Stevick's NHL - even though the term differential diagnosis, as well as the elements of such a diagnosis, appear nowhere in his report. But even taking Dr. Sawyer's claim at face value, he has not come close to making a valid application of that methodology. He "rules in" Roundup as a cause of Ms. Stevick's NHL based purely on extrapolations from epidemiological studies, notwithstanding his lack of training in epidemiology and this Court's observation that epidemiology alone cannot establish specific causation. And he fails to "rule out" other actually recognized risk factors for NHL - indeed, he did not address any of them in his written report, and discussed them only in vague, conclusory terms at his deposition. Because Dr. Sawyer has not performed a differential diagnosis in any recognizable sense, his conclusions must be excluded.

19.  Defendant has misconstrued my deposition testimony and ignored the fact that I applied the required investigative methodology to arrive at objective toxicological findings. Dose is of paramount importance in any such investigation, but elimination of confounding factors is a central part of the investigative process. Specifically, my deposition testimony in this regard stated:[1]

> **Q:** Do you plan to offer a differential diagnosis in this case with respect to the cause of Mrs. Stevick's cancer?
>
> **A:** As a toxicologist from a toxicological perspective, yes.
>
> **Q:** So you do plan to offer a differential diagnosis from a toxicologist with respect to the cause of Mrs. Stevick's cancer; is that right?
>
> **A:** Yes, with respect to the **dose being sufficient** and by considering, searching, and **ruling out other factors.**

20.  Differential diagnosis is a generally-accepted toxicological and medical assessment methodology. It is an *investigative* clinical methodology which *potentially* identifies the presence of a disease or entity when multiple alternatives are possible. In the current matter, *a clinical differential diagnosis has already been performed* as established by Ms. Stevick's treating physicians.

21.  Differential diagnosis can have toxicological bearing by providing a framework in which to review and consider the significance of potentially causative factors. For example, consideration of potential factors includes assessment of reported pathological diagnosis, age at diagnosis, latency interval, family cancer history, use of immunosuppressive pharmaceuticals, smoking, IV drug abuse, alcohol, radiological exposures or exposure to chemical carcinogens. This assessment

---

[1] Deposition of William R. Sawyer dated 12/20/2018, pg. 192, lines 13-23.

approach was applied in my written report and covered all of the above potential factors.

22. "Part A" of my toxicological assessment[2] of Ms. Stevick contains a review of her medical history, an assessment of her health factors, family history, alcohol, tobacco and employment history and other personal details. Ms. Stevick's clinical history and findings of her physicians were also reviewed[3] as well as a detailed chronology of her medical history[4] and a review of her clinical hematology analyses after diagnosis.

23. Additionally, I documented Ms. Stevick's Roundup application history and a summary of a telephone conversation with Ms. Stevick in which she answered specific questions with respect to past residency locations, occupational exposure history, use of chemicals and potential exposures and provided details concerning her use of Roundup and the manner in which it was applied. A concise summary of her deposition testimony as relevant to the current matter was also included.[5] I further reviewed her pathology, any abnormalities in DNA analyses, age at diagnosis, use of other pesticides, radiological exposures, occupational history and other considerations.

24. All of these potential causative factors were subsequently eliminated as potential factors upon review. Additionally, I reviewed the available toxicological and clinical literature to assess NHL latency[6] as potentially applicable to Ms. Stevick. *These factors constitute the bulk of available evidence* with respect to alternative causative considerations.

25. Forensic toxicology is by definition an investigative discipline. All of the steps previously noted are consistent with both the toxicological assessment methodology and with a differential diagnostic procedure. The findings of my investigation were individually reported in the appropriate sections of my assessment. Defendant is well aware of this fact.

---

[2]  William R. Sawyer, "Toxicological Assessment of Elaine Stevick: Part A: Medical History and Exposure Review," pgs. 1-2.

[3]  Id., pgs. 2-3.

[4]  Id., pgs. 4-8.

[5]  Id., pgs. 9-15.

[6]  Id., pg. 117.

26.  The only toxicological consideration I identified as a confirmed causative factor was Ms. Stevick's <u>age</u> which places her at a higher NHL risk level. It is noteworthy that I confirmed this fact in deposition and Defendant was so informed with respect to differential diagnosis yet stated that I did not consider it:[7]

---

**Q:** Okay. And did you, in fact, perform a differential diagnosis to come to your specific causation conclusion in Mrs. Stevick's case?

**A:** Yes. The only -- the only factor that contributes to her NHL is her age, nothing else.

**Q:** And --

**A:** Other than, you know, glyphosate.

---

27.  In pointing out that my report does not contain a formal, major sub-heading entitled *"Differential Diagnosis,"* Defendant is ignoring the report's content by contending that *"the elements of such a diagnosis appear nowhere in his report;"* therefore, assuming that I performed no such diagnosis. Defendant's contention is misleading and erroneous.

---

[7] Deposition of William R. Sawyer dated 12/20/2018, pg. 192, lines 24-25 and pg. 193, lines 1-5.

## H.  Specific Causation with Regards to Differential Diagnosis

28.  Defendant also states that "*At his deposition, however, Dr. Sawyer purported to expand the scope of his proposed testimony, explaining that he plans to offer a differential diagnosis that considers and rules out all causes of Ms. Stevick's NHL but for glyphosate.*"[8] Defendant further states that I used my exposure calculation comparisons to epidemiological studies to *"rule in"*[9] glyphosate as a cause.

29.  The term "*rule in*" has been used exclusively by Defendant. More accurately, in that deposition, I used the term *"rule out."*[10] Thus, my causation opinion was based on considering and ruling out other factors that could have caused Ms. Stevick's NHL (as documented in my report).

30.  Defendant further erroneously indicates that I failed to rule out other potential causes of Ms. Stevick's NHL as Defendant states "*Second, Dr. Sawyer asserted that he had 'ruled out' a substantial listing of other potential causes of Ms. Stevick's NHL such as her health factors, family history, drug use, smoking, any – any type of pharmaceuticals such as long-term cortisone or implanted tissues which require an immunosuppressant drug, family history, genetic disorders…[and] occupational exposures." (*Id. at 195:10 – 19.)[11]

31.  Defendant further argues in the motion stating "*Again, Dr. Sawyer's report did not address these factors at all, much less meaningfully assess them or offer any science-based justification for ruling them out.*"[12] The defendant further states "*As if to confirm the point, Dr. Sawyer did not analyze any of Ms. Stevick's other risk factors in his report and has offered no valid scientific basis for ruling them out. Dr. Sawyer's results-driven analysis is not a valid differential diagnosis. It, therefore, should be excluded under Daubert.*"[13]

---

[8]  Monsanto Company's Notice of Motion to Exclude Testimony of Dr. William R. Sawyer on Daubert Grounds, Dated 1/3/2019. Page 3: lines: 22 – 24.

[9]  Monsanto Company's Notice of Motion to Exclude Testimony of Dr. William R. Sawyer on Daubert Grounds, Dated 1/3/2019. Page 4: lines: 3.

[10]  Page 197, line 10 – 13.

[11]  Monsanto Company's Notice of Motion to Exclude Testimony of Dr. William R. Sawyer on Daubert Grounds, Dated 1/3/2019. Page 4: lines: 5 – 9.

[12]  Id. Page 4, lines 8 – 10.

[13]  Monsanto Company's Notice of Motion to Exclude Testimony of Dr. William R. Sawyer on Daubert Grounds, Dated 1/3/2019. Page 8: lines: 20 – 23.

32. To be clear, Defendant is stating that I did not rule out these factors in spite of the readily-observable fact that my report included an extensive review of Ms. Stevick's medical records (8 pages), documented history as a lifelong non-smoker, a lack of family history of NHL, her rare alcohol consumption, her lack of illicit drug use and her lack of occupational exposure (she was a speech pathologist for autistic children). I also noted her potential radiological and Mecoprop exposures (addressed separately below). These factors were all found to be negative and had no bearing on her NHL diagnosis (which I also stated in deposition).

33. There were no confounding factors except for her advanced age which I discussed in reference to the design of the epidemiological studies which account for age.[14] Her documented life history showed no chemical exposures to any probable or known carcinogens except those in Roundup. The purpose of documenting such information as her medical history and conducting a personal interview with her is to identify and/or rule out factors that would be consequential to her NHL diagnosis. I then explained that her "exposure dose" and comparison to human epidemiological studies of applicators placed her at a similar increased risk of NHL.

34. Defendant presumes to propose how I should structure my report whereas if my report contains the same relevant information and opinions, their grievances with the report's structure does not refute the validity and implications of its contents. The aforementioned review of all of these factors are in my report and are covered in more detail below.

35. Additionally, per Defendant, "*In the specific causation context, Daubert requires experts who purport to use a differential diagnosis to validly execute both aspects of that methodology – "ruling in" all possible causes and then "ruling out" causes besides exposure.*"[15] I applied extreme thoroughness in this regard. I specifically interviewed Ms. Stevick, physically obtained her sprayer for testing, questioned her regarding her residencies, occupations, chemical exposures and drug and alcohol use. I also questioned her with respect to immune-suppressive pharmaceuticals associated with NHL, tissue implants, family medical history and potential exposures to probable or known human carcinogens.

---

[14] Re: Elaine and Christopher Stevick v. Monsanto Co., November 20, 2018 report by Dr. William Sawyer. pg. 28.

[15] Monsanto Company's Notice of Motion to Exclude Testimony of Dr. William R. Sawyer on Daubert Grounds, Dated 1/3/2019. Page 4: lines: 26 – 27, page 5, line 1.

36.   Notably, all of the potentially-confounding factors were negative and I explained in deposition that I *"ruled out"* other causes in keeping with generally-accepted toxicological methodology.

37.   Defendant claims that during my deposition, I *"for the very first time"*[16] claimed that I conducted a *"differential diagnosis."* Defendant's interpretation is misleading. Whereas my report does not specifically contain the sub-heading "Differential Diagnosis," Section D of my report assesses how Ms. Stevick's chronic glyphosate exposure, dermal absorption, dose compared to six epidemiological studies, mechanism of carcinogenicity, latency of NHL and other considerations were all deemed to be contributing factors. Conversely, non-contributing factors were ruled out as is consistent with the differential methodology. My report concludes that "*it is my opinion, to reasonable toxicological certainty, that Mrs. Stevick's exposure to Roundup was a substantial factor that contributed to her development of NHL.*"[17]

---

[16] Id., pg. 8, line 13.

[17] Re: Elaine and Christopher Stevick v. Monsanto Co., November 20, 2018 report by Dr. William Sawyer. pg. 121.

## I.  Improper Epidemiological Evaluation of Ms. Stevick's Dose

> "He 'rules in' Roundup as a cause of Mrs. Stevick's NHL based purely on extrapolations from epidemiological studies, notwithstanding his lack of training in epidemiology and this Court's observation that epidemiology alone cannot establish specific causation." [pg. 7, lines 18-21] …
> "Notably, the foregoing sections rely on interpretations of epidemiological data that Dr. Sawyer agrees are beyond his expertise." [pg. 9, lines 4-5]

38.   Defendant's presumptions that I possess a *"lack of training in epidemiology,"* that my opinions are based *"purely on extrapolations from epidemiological studies"* and that I *"agree"* that such opinions are beyond my expertise are fundamental distortions.

39.   Firstly, Defendant's phrasing ("*based purely*") is false and misleading. In addition to the epidemiological evaluation, I reviewed the latency time from initial exposure to diagnosis, the specifics of her glyphosate exposure and dose, in-depth review of her medical history and life history. These are all essential steps in an impartial toxicological assessment and one of the eight prongs of Bradford Hill criteria ("temporality" - latency).

40.   Next, Defendant's statement that I lack "*training in epidemiology*" is also untrue as a significant aspect of toxicology training and course work includes epidemiology. Toxicologists review and rely on epidemiological studies on a nearly daily basis. Furthermore, I taught a portion of the epidemiology course to second year medical students at Upstate Medical University in Syracuse, New York, for over 20 years.

41.   With regards to my training, and experience, I did not perform a general causation evaluation based on epidemiological studies; instead, deferring those conclusions to the epidemiological experts. Rather, I compared Ms. Stevick's chronic Roundup exposure to that presented in epidemiological studies with respect to "*days of exposure.*" I also reviewed the epidemiological studies in order to establish whether Ms. Stevick's case conformed to the latency requirements for NHL. Such comparisons are well within the expertise of my training and experience as a toxicologist.

42.   Defendant's contention that my conclusions on the aforementioned categories (chronic glyphosate exposure and latency of NHL) as related to epidemiological studies are beyond my expertise is incorrect. Defendant has intermixed general causation (based on human/epidemiological studies) and epidemiological factors such as days of exposure, dose, and latency on which I am sufficiently trained and qualified to assess with respect to how they compare to the specifics of Ms.

Stevick's case. General causation of lymphoma based on epidemiological studies and comparison of specifics of Ms. Stevick's case to epidemiological studies are two different concepts which the defendant is conflating and confusing.

43.   Defendant has further stated that "*because this testimony covers ground that plaintiffs' general causation experts have extensively addressed, it should be exclude.*"[18] General causation of glyphosate was covered in the prior (July 2018) Daubert hearings. However, mechanisms of absorption and causation specific to certain formulations such as carcinogenesis, co-carcinogens in the product, surfactants and adjuvants added to the Roundup used by Plaintiffs with enhanced dermal absorption were <u>not</u> previously addressed by the epidemiological experts. These issues were reviewed in my report for this reason.

44.   It is critical to note that I have previously stated that I have deferred epidemiological opinions to epidemiological experts tasked specifically for this purpose. Those experts have addressed the issues already ruled on in the prior Daubert hearings, and I do not intend to duplicate their work. Defendant is aware of this, but has, nonetheless, presented a distorted interpretation of my methodology and findings on a presumed basis of having conducted an improper epidemiological evaluation *"beyond my expertise."*

---

[18]  Monsanto Company's Notice of Motion to Exclude Testimony of Dr. William R. Sawyer on Daubert Grounds, Dated 1/3/2019. Pg 6, lines: 19 – 21.

### J.  Unable to Rule Out Idiopathic Causation

"Dr. Sawyer admits that NHL and DLBCL happens in people who were never exposed to Roundup.… he cannot completely rule out idiopathic causes for Ms. Stevick's NHL, and would ultimately defer to epidemiologists for that determination." [pg. 13, lines 7-8]

45.  Defendant seems to not comprehend the requirements of an objective toxicological assessment and inaccurately represents my role as a toxicologist. Obviously, non-Hodgkin lymphoma and diffuse large B-cell lymphoma occurs in people not exposed to Roundup. I have never uttered any claim to the contrary.

46.  An objective and impartial toxicological assessment is based upon an investigative methodology. The expert toxicologist is tasked with assessing every available piece of scientifically-credible information relevant to the toxicological assessment. In so doing, each piece of evidence is assessed on its merits.

47.  I have scrutinized the relevant peer-reviewed studies, examined the available medical records and deposition testimony, compiled historical information and conducted telephone interviews with Ms. Stevick. I have taken numerous steps with respect to discovering any and all potential causes of her NHL. That is the role of the toxicologist which is intrinsically an investigative discipline.

48.  To be clear: It is a matter of record that I have explicitly deferred to the opinions of the epidemiologists (epidemiologists assess it on a statistical basis) as a basis for my opinions regarding potential idiopathic causes.

## K.  Unqualified to Assess Epidemiological Studies

"Here, he has blown through that previously self-imposed limitation based solely on the odds ratios present in the epidemiological studies (which, again, he has admitted to being unqualified to assess). That is not a reliable scientific method."  [pg. 13, lines 13-17]

49.  Defendant contends that since I am not an epidemiologist, I am "unqualified" to assess such studies or render any opinion. Again, Defendant seems not to comprehend the qualifications of a toxicologist – we are trained and expected to understand epidemiological studies and integrate the results of human epidemiological data in determining the carcinogenic potential of chemicals.

50.  I have in no way relied *"solely on the odds ratios"* as purported by Defendant. To be clear: I have fully assessed potential confounding factors in the present matter as documented within my report. Such factors include subject <u>age</u>, immunological suppression via pharmaceuticals, radiation and other potential causative elements. Of particular and immediate relevancy to the present matter, the dose studies upon which I relied were specifically performed on the basis of *age group stratification.* Subject groups were organized on the basis of (a) 19 year-olds to <30 yrs., (b) 30-39 yrs., (c) 40-49 yrs., (d) 50-59 yrs., and (e) greater than 60 yrs. Thus, I was able to objectively compare Ms. Stevick's glyphosate exposure to those of human applicators falling within the same age range. Toxicologists routinely rely on human epidemiological and occupational studies for exposure dose data whether it be a pharmaceutical or arsenic in public water.

## L.  Relied Only Upon Exposure

> "[Dr. Sawyer's] report does not analyze anything further about Mrs. Stevick besides her exposure…" [pg. 10, lines 1-2]

51. Defendant's characterization of relying solely upon exposure to assess causation is both incorrect and misleading. I provided within my report an extensive section which cited study findings concerning the mechanism(s) of carcinogenicity. Indeed, Part C of my report is conspicuously subtitled *"Mechanism of Ms. Stevick's NHL Induction"* which details studies pertinent to the question of carcinogenic induction.

52. For example, I cited (among others) a very recent study by Wozniak, et al.,[19] published in 2018, which incubated human peripheral blood mononuclear cells (PBMCs) for 24 hours in the formulation Roundup 360 PLUS, glyphosate, and its metabolite aminomethylphosphonic acid (AMPA). The study assessed the impact on DNA damage at concentrations ranging from 1 to 1,000 µM. The Roundup formulation *caused DNA damage* (single-strand breaks, double-strand breaks, ALS formation, DNA lesions) even at concentrations as low as 5 µM, and glyphosate and AMPA *caused DNA lesions* at concentrations of 250 µM and 500 µM, respectively.

53. Additionally, I reviewed the findings of an investigation undertaken by Suarez-Larios, et al.,[20] to determine whether exposure to pesticides induced double-strand breaks (DSB) in cells.  Of the eight pesticides tested, four showed significant effects on the number of cells with double-strand breaks. However, glyphosate and paraoxon (both organo-phosphates) *showed the greatest increase* in the number of cells with such cellular damage.

54. Other pertinent studies were cited as well throughout my report in a variety of contexts. These are not incidental findings and are directly relevant to the present matter. Defendant is well aware of this and seeks to confuse the court by "claiming" that my assessment relied solely on exposure.

---

[19] Wozniak, E., et al., "The mechanism of DNA damage induced by Roundup 360 PLUS, glyphosate and AMPA in human peripheral blood mononuclear cells – genotoxic risk assessment," 2018, Food and Chemical Toxicology, doi: 10.1016/j.fct.2018.07.035

[20] Suarez-Larios, K., et al., "Screening of pesticides with the potential of inducing DSB and successive recombinational repair," 2017, Journal of Toxicology, Volume 2017.

## M.  No Explanation of How Roundup Causes Cancer

> "…nor does [Dr. Sawyer's] report provide any explanation for how Roundup operated to cause her particular NHL" [pg. 10, lines 2-3]

55. Defendant's assertion is erroneous and unfounded. Part B of my report includes a review of significant flaws in Monsanto-sponsored studies upon which Defendant has elected to place sole reliance. For example, on page 90 I discussed the systemic circulation and disposition of glyphosate to bone (where stem cells are located). On page 40, I reviewed studies with respect to the Roundup additive "POEA" adversely impacting bone marrow.

56. I further noted in my report that Monsanto's evidence of "*well defined urinary elimination*" is compromised and erroneous.  I made this point specifically because such an assumption is misleading and potentially dangerous with respect to the dose assessment and comparisons to current ADI or the AOEL regulatory levels.  Studies cited by Niemann, et al., include non-dermal dose assessments such as male SD rats receiving oral dosing (Brewster, et al., 1991),[21] oral dosing in feed (Chan & Mahler, 1992)[22] and IV and oral doses in rats (Anadon, et al., 2009).[23]  None of the cited studies involved dermal dosing and **do not** establish "*well defined urinary elimination*" which is simply assumed based on IV injection studies.  Furthermore, the Brewster study found that urine and feces were equally important routes of elimination and after seven days, the total body burden (~1%) of the dose administered was <u>mostly in bone</u>.

57. Defendant has chosen to agree with its own Monsanto-sponsored studies and wholeheartedly refutes the findings of objective studies revealing flaws in both the methodologies and findings presented therein. In disavowing knowledge of an "explanation" to account for Ms. Stevick's NHL, Defendant has performed a gymnastic leap in logic as the findings of studies cited in my report clearly provide toxicological support for causative induction.

---

[21] Brewster, D.W., Warren, J., and Hopkins, W.E., "Metabolism of glyphosate in Sprague-Dawley rats: Tissue distribution, identification, and quantitation of glyphosate-derived materials following a single oral dose," July 1991, Fundamental and Applied Toxicology, Volume 17, Issue 1, pg. 43-51.

[22] Chan, P. and Mahler, J., "Glyphosate (CAS No. 1071-83-6) administered in dosed feed to F344/N rats and B6C3F1 mice," 1992, U.S. Department of Health and Human Services. NTP Technical Reports Series No. 16. NIH Publication 92-3135.

[23] Anadón, A. et al., "Toxicokinetics of glyphosate and its metabolite aminomethyl phosphonic acid in rats," 2009, Toxicol Lett 190(1), pg. 91-95.

### N. Conclusions Based Solely Upon "Say-So"

> "Moving from general causation (can an agent cause cancer?) to specific causation (did it cause the particular plaintiff's cancer?) requires more than just say-so – but that is all Dr. Sawyer has provided." [pg. 10, lines 3-5]

58. Defendant's assertion is highly misleading and seeks to discredit the information presented in my toxicological assessment through application of a dismissive label.

59. I have taken steps to review and examine causative factors on the basis of the objective evidence. For example, Part C of my report (page 115) discusses the mechanism of genotoxicity induced by glyphosate and its metabolite "AMPA." I further review in some detail the absorption, distribution, metabolism and excretion ("ADME") factors and assess them in the light of independent study findings. I reviewed some of the pertinent factors intensifying dermal absorption of glyphosate as well as performed an examination of some of the co-formulants and surfactants (based upon the best available data with respect to "proprietary" formulations).

60. Additionally, I reviewed indirect disclosures of surfactant and co-formulant toxicity and their potential impact(s) on carcinogenicity. For example, I clearly noted the Mesnage, et al., (2013) study of nine herbicides containing glyphosate including five different formulations of Roundup. By studying the chemical patterns using mass spectrometry, Mesnage and his colleagues determined the identity of co-formulants in Roundup® and performed toxicity analyses. They subsequently deduced the chemical structure of additives in six of the nine formulations and showed that *each of these supposedly inert ingredients was more toxic than glyphosate alone*.[24]

61. Throughout my toxicological assessment, I have applied the required methodology and explained the relevance of study findings to the best of my ability. I have cited findings based upon the generally-accepted, peer-reviewed toxicological literature. At no time have I presented findings or conclusions based solely upon my *"say-so."* Defendant's contention to the contrary is incorrect.

---

[24] Mesnage, R., Bernay, B., and Séralini, G.E., "Ethoxylated adjuvants of glyphosate-based herbicides are active principles of human cell toxicity," 2013, Toxicology 313(2-3), pg. 122-8.

### O.  Alleged Misuse of POEM Model and "Flawed" Calculations

> "…it is also important to note that his exposure calculations are flawed. Dr. Sawyer used the POEM model, a European regulatory formula used to estimate pesticide exposure." [pg. 10, lines 6-8]

62.  Defendant contends that my dose calculations are flawed and not supported by reliable methodology. Contrary to Defendant's' assertion, the generally-accepted Predictive Operator Exposure Model (POEM) methodology has been generally accepted for many years for calculation of dermal absorption. It is in no way novel, untested or unreliable. Ironically, Defendant has failed to reveal the documented fact that POEM was also used and relied upon by Defendant whose own documents, disclosures and expert reports make frequent and regular reference to it.[25]

63.  The POEM model was developed to measure potential dermal exposure on the body surface and systemic absorption under various conditions. It was designed to accommodate different pesticides and herbicides (such as Roundup™) and provides the ability to enter a wide range of parameters such as product, percent active ingredient, density, percent dermal absorption, etc.

64.  The European Food Safety Authority (EFSA), in their 2014 guidance[26] for exposure assessment of field operators, presented a table of available databases and exposure models for predicting operator exposure to herbicides and insecticides. The references clearly include the POEM model and the fact that there is availability of supporting data (as shown below). Note that references to the POEM model (as cited by EFSA) date as far back as 1986 and 1992.

---

[25] "Operator exposure assessment for MON 2139 UK – Case" MONGLY06509236

  "UK POEM calculations in preparation of meeting Spanish competent authorities." MONGLY01275627

[26] European Food Safety Authority, "Guidance on the assessment of exposure of operators, workers, residents and bystanders in risk assessment for plant protection products," EFSA Journal 2014;12(10):3874

**Table 1:** Overview of available database and models

| Exposed category | Database/model | Availability of supporting data | | Reference |
|---|---|---|---|---|
| | | Yes | No | |
| Operator (field) | German model | x | | Lundehn et al. (1992) |
| Operator (field) | UK POEM | x | | UK MAFF (1986) and the Predictive Operator Exposure Model (POEM—UK MAFF, 1992) |
| Operator (field) | Agricultural operator exposure model (AOEM) | x | | Großkopf C. (2013), A new model for the prediction of agricultural operator exposure during professional application of plant protection products in outdoor crops Available at http://www.bfr.bund.de/cm/350/joint-development-of-a-new-agricultural-operator-exposure-model.pdf |
| Operator (field) | EUROPOEM II | x | | EUROPOEM II (2002) |
| Operator (field) | PHED | x | | PHED (1992) |
| Operator (field) | TNsG Biocides | | x | TNsG (2008) TNsG (2002) Human exposure to Biocidal Products—Guidance on exposure estimation |

65. The UK Predictive Operator Exposure Model (UK POEM) is clearly cited in numerous administrative guidelines and regulatory documents including the U.K. "Operator Exposure Assessment Guidelines."[27]  Additionally, numerous peer-reviewed studies cite the POEM model. For example, a 2017 risk assessment of small farmers exposed to plant protection products in the Niger River valley clearly states that *"The UK Predictive Operator Exposure Model (UK-POEM) was used to estimate the potential dermal exposure <u>according to the previously observed local practices</u>."*[28]

---

[27] U.K. Health and Safety Executive, HSE, "Operator Exposure,"2016, Data requirements handbook, Retrieved from: http://www.hse.gov.uk/pesticides/topics/pesticide-approvals/pesticides-registration/data-requirements-handbook/operator-exposure.htm

[28] Illyassou et al., "Risk assessment for small farmers exposed to plant protection products in the Niger River valley," Comm. Appl. Biol. Sci, Ghent University, 81/n, 2017.

66. Similarly, the POEM model has been used in in published risk assessments. A 2017 assessment[29] of farmers' exposure to pesticides in the urban and peri-urban areas of Northern Benin stated:

> When measuring insecticide deposits on the body, it should be possible to estimate if the risk level could be considered as acceptable for the small producers according to their usual practices. The risk will be considered as acceptable if the potential exposure (measured on the patches **or obtained using an exposure model such as UK-POEM**) is lower than the AOEL value (Acceptable Operator Exposure Level, expressed in mg as/kg bw/day) (EFSA 2014).

67. The UK POEM model is also in use internationally. New Zealand[30] used the UK POEM to assess risk to outdoor home garden users.[31] When New Zealand's Environmental Protection Authority selected the UK POEM model (and <u>peer-reviewed</u> it) to use in evaluation of risk to users of pesticide concentrates in areas outside the home, they justified it by stating that the UK-POEM "*is considered a suitable model for home use pesticide applications because…*":

    a) it is an internationally-developed model based on a <u>robust dataset</u>,

    b) it allows for <u>small, handheld sprayers and smaller container sizes</u> for the mixing and loading making it more suitable for a home user, and

    c) it specifically includes user scenarios that <u>more accurately reflect home applications than the commercial models</u>."[32]

68. The POEM model is a long-standing, generally-accepted and peer-reviewed method of calculating dermal absorption for a variety of liquid agents, a method which Defendant has itself applied in prior studies and publications. Defendant has omitted critical information and produced misleading statements to the court.

---

[29] Lawson, et. al., "Three Methods to Assess Levels of Farmers' Exposure to Pesticides in the Urban and Peri-urban Areas of Northern Benin, 2017, Tunisian Journal of Plant Protection 91 Vol. 12, No. 1.

[30] EPA, "Risk Assessment Methodology for Hazardous Substances: How to assess the risk, cost and benefit of new hazardous substances for use in New Zealand," 2018, Environmental Protection Authority.

[31] Illyassou, K., et al., "Risk Assessment for Small Farmers Exposed to Plant Protection Products in the Niger River Valley," 2017, Comm. Appl. Biol. Sci.

[32] EPA, "Risk Assessment Methodology for Hazardous Substances: How to assess the risk, cost and benefit of new hazardous substances for use in New Zealand," 2018, Environmental Protection Authority.

## P.  Inappropriate Application of POEM Model

> "... Dr. Sawyer admitted, POEM is designed to estimate pesticide exposure in pesticide spray operators in the United Kingdom, and because it is a regulatory formula, it systematically overestimates exposure. Dr. Sawyer further conceded that the model is not calibrated for glyphosate and was instead created using a "surrogate chemical," [pg. 10, lines 9-14]

69.  Defendant contends that the POEM model *"...is not calibrated for glyphosate."* It is a matter of record (as described herein) that the POEM method has been widely used in peer-reviewed research studies and tested for reliability using glyphosate (Roundup).[33]  In fact, the POEM methodology is designed for use with many liquid agents. Defendant's reference to a "*surrogate chemical*" reflects the fact that the POEM model was designed to perform dermal absorption calculations for *any liquid agent* – not just glyphosate. Defendant's objections are predicated on the theory that the POEM is not designed specifically or only for glyphosate. The POEM model is designed to determine how much liquid makes contact with the skin. The model then incorporates the input of a dermal adsorption factor for the specific chemical (such as glyphosate) which the POEM is then calibrated to.

70.  I have referenced studies where actual glyphosate/Roundup was experimentally sprayed with various patches attached to the applicator's clothing. These patches were then tested for the quantity of glyphosate impacting the various body areas. The POEM model uses this data to calculate dermal exposure which is then multiplied by the percent (%) dermal absorption factor. One of the key studies was conducted by Monsanto using human applicators with patches affixed to their clothing.[34]

71.  A 2010 biomonitoring study conducted by Monsanto[35] using the UK POEM showed that home garden users, working in t-shirt, shorts and without gloves, experienced higher glyphosate exposures per hour than professional pesticide applicators. The hourly rate of exposure ranged from 0.066 to 0.67 mg/kg over 6 hours (0.011 - 0.11 mg/kg/hr) in professional applicators compared to a dose of 0.12 mg/kg for

---

[33] Lawson, A., et al., "Three Methods to Assess Levels of Farmers' Exposure to Pesticides in the Urban and Peri-urban Areas of Northern Benin," 2017, Tunisian Plant Protection Journal, Vol.12, pp. 91–108.

Illyassou, K., et al., "Risk Assessment for Small Farmers Exposed to Plant Protection Products in the Niger River Valley," 2017, Comm. Appl. Biol. Sci.

[34] "Operator exposure assessment for MON 2139, UK – Case", pgs. 13 of 23 and 22 of 23.

[35] Monsanto, "Glyphosate MON 76473 Document MIII – Tier II, Summary and hazard assessment, Section 3," 2010, Toxicological studies (annex III, Point 7), Monsanto Company.

residential users over 30 minutes; i.e., 0.24 mg/kg/hr. This study by Monsanto provides evidence that the POEM has been used by Monsanto as recent as 2010 for home and garden use.

### Q.  Failure to Consider Alternative Causative Factors

> "Dr. Sawyer's analysis of the other possible risk factors fares no better. He acknowledges in his report that Mrs. Stevick was exposed to radiation as part of her work as a speech therapist, and that radiation is a known risk factor for diffuse large B-cell lymphoma (DLBCL), the umbrella term for the subtype of NHL that Mrs. Stevick has. But he eliminated it as a cause at his deposition based only on unidentified and as-yet-unproduced "studies of nurses and dental assistants." It is also undisputed that Mrs. Stevick was exposed to various chemicals including benzene and mecoprop, which Dr. Sawyer admits are known risk factors for DLBCL. But Dr. Sawyer ruled out these potential causes at his deposition without doing any calculations to quantify Mrs. Stevick's cumulative exposure to such chemicals."  [Page 12, lines 13-23]

72.  Defendant's contention is both highly misleading and factually incorrect. With respect to diseases, on page 13 of my November 20, 2018, report, I stated:

> "She has never been diagnosed with any immune disorders, lupus, ulcerative colitis, ulcers, Crohn's disease, rheumatoid arthritis, diabetes, Epstein-Barr virus, Hepatitis C, obesity or celiac disease."

73.  I further questioned Ms. Stevick with respect to exposures and the various conditions cited above.   Also in my report, I assessed potential radiological exposures.  On page 14, I stated:

> "Ms. Stevick was never exposed to radiation as a child but as an adult, she would perform swallow studies in radiology as part of her work as a speech therapist.  'I would be present for the X-ray to analyze but we always wore huge protective gear – bib and a thyroid collar.'  (She did not wear anything to protect her head.)  Over the course of her career (30 years), she attended approximately 15 of these X-rays."

74.  Radiation was clearly identified as a risk factor on page 14 of my report.  I have had considerable training and experience with gamma emissions from naturally occurring radiation sources (NORM), specific radionuclides (Th, U, etc.) as well as gamma emissions from diagnostic instrumentation. Ms. Stevick wore heavy protective gear during approximately 15 video-fluoroscopic swallowing study exposure events.  Radiation dose exposures during video-fluoroscopic procedures

are much lower than that of a routine chest CT.  In fact, it would take *"more than 40 procedures per year to exceed the annual radiation exposure dose limit."*[36]

75.   Ms. Stevick was not the patient and thus received far less (if any) gamma radiation exposures compared to the above referenced assessment of patients being irradiated.  Defendant is citing radiation exposure as a dire risk factor which, in reality, is of no concern in this matter.

76.   Defendant further states *"But Dr. Sawyer ruled out these potential causes at his deposition without doing any calculations to quantify Ms. Stevick's cumulative exposure to such chemicals"* [referring to benzene and Mecoprop].  With respect to benzene, I assessed Ms. Stevick's exposures, and she has no history of any benzene exposures. (Ms. Stevick's occasional walk through a residential garage which contains a spray can of WD40 does not constitute an exposure and is simply a frivolous exposure claim by Defendant. Beyond the can of WD40 stored in Plaintiff's garage, it is unknown where "benzene" originated in Defendant's motion, or why it was included at all, as Ms. Stevick has had no such exposures.)

77.   With respect to Mecoprop (methylchlorophenoxypropionic acid, also known as MCPP), this is a common general-use herbicide found in many household weed killers and "weed-and-feed" type lawn fertilizers. A <u>powder</u> form of Mecoprop was used on Ms. Stevick's property by her husband

78.   Unlike glyphosate, *Mecoprop is not a probable or known human carcinogen.* Rather, Mecoprop is an IARC Group 2B carcinogen meaning that the agent is "possibly carcinogenic to humans." Thus, I did not carry out a quantitative assessment on Mecoprop as there is insufficient evidence of carcinogenicity in humans.

79.   I accounted for these factors in my report as required by the assessment methodology and reported these facts in deposition. Defendant's contention that I have failed to consider alternative causative factors is both erroneous and misleading.

---

[36] Kim, HM, et al., "Patients' radiation dose during video-fluoroscopic swallowing studies according to underlying characteristics," 2013, Dysphagia, Vol. 28(2), pp. 153-158.

### R.  Inappropriate Causal Inferences from Epidemiological Evidence

> Dr. Sawyer's sole basis for ruling in Roundup as a possible cause in his analysis of epidemiology studies which, according to him, demonstrate that a person with Mrs. Stevick's exposure metrics, calculated by Dr. Sawyer as 255 days over 25 years, is at increased risk of developing NHL."
> [Page 8, lines 25-28]

80.  I have explicitly stated that (a) Ms. Stevick was well within the range (dose) of the studies that documented a significantly increased risk level, and (b) there were no other evident or confounding factors that could reasonably account for her malignancy. Defendant's assertion is erroneous by omission of pertinent facts.

81.  Defendant also incorrectly frames the epidemiological studies upon which I relied. As previously noted herein, I specifically deferred general causation based on the epidemiological studies to other experts, as stated in my deposition:

> *"I'm deferring that to the epidemiologists.  I'm not going to rehash the general causation that was already decided.  That was not what I was asked to do.  My understanding is that's already been handled by a group of experts and the judge has already made decisions on the general causation aspects."*   Deposition of William R. Sawyer, December 20, 2018, pg. 199, lines 20-25.

82.  To be clear: I relied on epidemiological studies for <u>dose comparisons</u>. Defendant states "*this epidemiology-based analysis could not, in any event, justify a finding that Roundup caused a particular Plaintiff's cancer.  This Court held as much at the general causation stage observing that '{w}hether {an} agent causes the outcome, however, cannot be proven by epidemiological studies alone'*…"   Defendant is correct that causation cannot be established by epidemiologists alone, but rather by toxicologists <u>and</u> epidemiologists. For example, I was asked in the Johnson v. Monsanto trial (to which Defendant refers in their motion) if glyphosate causes NHL:

> *Q:  "So you do plan to offer a differential diagnosis from a toxicologist with respect to the cause of Mrs. Stevick's cancer; is that right?"*
>
> *A:  "Yes, with respect to the dose being sufficient and by considering, searching and ruling out other factors."*
>
> Deposition of William R. Sawyer, December 20, 2018, pg. 192, lines 18-23.

84.  In concert with this line of reasoning, I was further asked if glyphosate causes NHL as follows:

> *Q:  "And did you reach an opinion to a reasonable degree of scientific certainty that Roundup and Ranger Pro can cause non-Hodgkin's lymphoma?"*
>
> *A:  "Yes.  I have been following the peer-reviewed literature on glyphosate since mid-1990s."*
>
> *Q:  "And what is the opinion you've reached generally?"*
>
> *A:  "That, clearly, glyphosate and with its combination of adjuvants, is a known carcinogen."*

85.  Although I was asked this question, my report clearly shows in Part D ("Evidential Considerations") that my toxicological assessment was focused only on <u>dose</u> rather than upon an evaluation of the epidemiological literature with respect to determining whether or not glyphosate is a carcinogen.  Parts B and C of my report focus on general causation <u>outside</u> of the discipline of epidemiology.  This is consistent with both my prior deposition testimony and the contents of my assessment which covers these toxicological aspects in significant detail.

86.  Defendant further states that *"Dr. Sawyer based his exposure threshold on his analysis of those studies but Dr. Sawyer is not an epidemiologist nor does he consider himself an epidemiology expert."*  This statement is fundamentally incorrect as toxicologists are explicitly trained to understand and rely upon epidemiological studies.  I not only rely on them in my day-to-day practice, I also taught a portion of the medical epidemiology course at Upstate Medical University in Syracuse, New York, for nearly 22 years.

87.  It is critically important to recognize the role of epidemiology in assessing the Bradford Hill causation criteria.  Three of the evidential prongs (*Coherence of Association*, *Temporality* and *Relevant Experimental Data*) are associated with epidemiological data. A review of the Hill factors as applicable to toxicology is shown below:

a. **Strength of Association**: Between the exposure and a particular health effect (*deferred to the epidemiologists as per my notes and depositions*)

b. **Specificity of the Association** (*deferred to the epidemiologists as per my notes and depositions*)

c. **Consistency of the Association** (*deferred to the epidemiologists as per my notes and depositions*)

d. **Dose-responsiveness of the Chemical**:  *In my toxicological notes, I assessed Ms. Stevick's dose compared to glyphosate applicators within the Agricultural Health Study and consistent with Eriksson, M., et al., 2008, and McDuffie, H. et al., 2001.*

e. **Biological Plausibility of the Causal Connection**: *I assessed the plausibility of the causal connection of cancer and NHL based upon glyphosate's dermal absorption properties, systemic circulation with (~1%) of the dose administered circulating to the bone marrow and glyphosate's genotoxicity.*

f. **Coherence of the Association**: Coherence between <u>epidemiological</u> and laboratory findings increases the likelihood of an effect. *(deferred to the epidemiologists as per my notes and depositions).*

g. **Temporality (time relationships)**: *Latency – time from 1st exposure to the time of diagnosis was fully assessed via review of the medical records, employment history, phone interview and a thorough review of the various human <u>epidemiological</u> studies regarding NHL latency (time from 1st exposure to diagnosis).*

h. **Relevant Experimental Data**: *This was assessed using animal and human genotoxicity/mechanistic studies (animal bioassays were deferred to other experts who handled to the prior general causation aspects of this case using animal carcinogenicity studies which also included dose-response).*

88.   It is thus notable that the toxicological opinions I have provided are based upon a set of well-established scientific criteria and methodology. I strive to do my utmost to provide opinions on aspects of the criteria within my expertise, education, training

and experience. In the present matter, I have deferred my opinions concerning the general human epidemiology and relevant aspects of causation to Dr. Ritz, Dr. Portier and Dr. Weisenburger.

89.  I fully understand that epidemiologists have already covered general causation with respect to whether it is capable of causing NHL. My general causation assessment in the present matter addresses adjunct causal considerations. These include use of personal protective equipment, dermal absorption, co-carcinogens in the product, surfactants and effects on the skin, dermal absorption, modes of action, etc.  All of these considerations are compliant with the required investigative methodology and are relevant to the questions at issue in the present matter.

90.  To be clear: Although toxicologists commonly assess and opine on all eight prongs of the Bradford Hill methodology (including epidemiological data, as I have done in the past), expert epidemiologists are engaged in the current matter, and they are best suited to render opinions most firmly in their areas of expertise.

91.  Defendant's assertions that I produced inappropriate causal inferences solely from epidemiological evidence are false. Defendant's characterizations of deferring epidemiological opinions to other experts because I am untrained, incapable or incompetent are equally unfounded. Additionally, the statements in Defendant's motion to this effect wholly ignore the information presented in my toxicological assessment as well as prior relevant testimony in deposition.

## S.  Unqualified Opinions Regarding Corporate Intent

> "Dr. Sawyer agreed at his deposition that he was not qualified to offer an expert opinion on such topics.  Indeed, he went so far as to physically cross out portions of his expert report related to corporate intent, said that he would do the same for any other such portions of his report that were brought to his attention and testified that he would not be offering opinions of that kind at trial in this litigation." [Page 14, lines 1-6]

92.   I have consistently stated in documents, in deposition (and now further stipulate in this declaration) that I will not comment on the "*intent*" of Defendant's toxicologists in their communications. My role as an expert is to provide comprehensive explanations of toxicological concepts, terminology and case facts that will facilitate jury comprehension to the furthest possible degree.

93.   While I have reviewed communications between Defendant's toxicologists, it is within my expertise to understand and explain the toxicological terms used in these communications (such as the term "pharmacokinetics" or "ADME") as well as the toxicological finding of the results.

94.   Further, if a Defendant communication contains a seeming ethical violation, it is my belief that the court and jury will make up their own minds about such matters.

95.   To be absolutely clear, I stipulate to avoid any statements or opinions regarding the intent of Monsanto emails, correspondence, letters or other communications.

## T.  Untimely Rebuttal Opinions

> "Finally, the Court should also exclude Dr. Sawyer's untimely rebuttal opinions. Monsanto served its expert reports - including the report of its exposure expert, Dr. Michael J. Sullivan - on Plaintiffs on November 27, 2018. This Court's Pre-Trial Order No. 53 specified that rebuttal reports were due on or before December 4, 2018. To this day, Dr. Sawyer has not produced any rebuttal report."  [Page 14, lines 15-19]

96.  With regard to Dr. Michael J. Sullivan.  I was asked the following at deposition:

> Q:  "You do know that the purpose under the Federal Rules of an expert report is to disclose all the opinions that you intend to offer at trial? You're aware of that?"
>
> A:  "Understood. But the –"
>
> Q:  "Okay."
>
> A:  "-- report of Dr. Sullivan was not issued at that time."
>
> Q:  "I understand. So you have some opinions about Dr. Sullivan's report?"
>
> A:  "I do."
>
> Q:  "Okay. We'll get to those."
>
> Deposition of William R. Sawyer, December 20, 2018, pg. 16, lines 9-20

97.  Although I have read Dr. Sullivan's report and discussed it in deposition, I do hereby stipulate not to offer opinions or criticisms of Dr. Sullivan's report unless asked by Defendant as Plaintiff's attorneys will undoubtedly cross-examine Dr. Sullivan.

## U.  Miscellaneous

98.  Defendant incompletely states that I used a body weight of 50 kg rather than 55 kg. As stated in deposition, Ms. Stevick explained, via telephone interview, that in her later years, she gained weight.  She also stated that she gained additional weight from the pharmaceuticals used to treat her NHL. Thus, the 50 kg weight more accurately provides the mg/kg-day dosage in her earlier years of application.

99.  Finally, Defendant states that my change in body weight from 55 kg to 50 kg should be excluded.  The dose is 10% higher at a 50 kg body weight.  I will stipulate to a 10% lower dose to resolve the Defendant's concern with respect to this issue.

**Summary**

100. Defendant's motion is based on a set of underlying litigation objectives to discredit my testimony and toxicological assessment through distortions, omissions and repetition.   Conversely, my toxicological assessment and deposition testimony consistently reported findings on the basis of case facts. My written report frequently cited the prevailing peer-reviewed studies, laboratory measurement reports and regulatory guidance and applied conscientious adherence to the generally-accepted and scientifically-credible methodologies applicable to this matter. These demonstrable facts are at odds with Defendant's unfounded motion.

101. I stand by my assessment in every respect to reasonable toxicological certainty.

I declare, under penalty of perjury, that the foregoing is true and correct.


_____
William R. Sawyer, Ph.D., D-ABFM
Chief Toxicologist

32

## William R. Sawyer, Ph.D.
Forensic Toxicologist

Curriculum Vitae

## Introduction

Dr. William Sawyer is a professional toxicologist with a doctorate in toxicology from Indiana University School of Medicine. He is a diplomate of the American Board of Forensic Medicine with 31 years of experience in public health and forensic toxicology including five years of governmental service. His specialized areas of expertise include causation analyses (defendant, plaintiff or criminal), dioxins, solvents, heavy metals, petroleum, crude oil, radionuclides/NORM, alcohol toxicology, drugs-of-abuse, pharmaceuticals, herbal products and other substances.

## Contact Information

Toxicology Consultants & Assessment Specialists, LLC (*TCAS, LLC*)
6450 Pine Avenue
Sanibel, Florida 33957

Toxicology Consultants & Assessment Specialists, LLC (*TCAS, LLC*)
29 Fennell Street
Skaneateles, New York 13152

Telephone:  800-308-0080
                     239-472-2436 (FL)
                     315-685-2345 (NY)

E-mail:      toxdoc1@comcast.net

## Education

Indiana University School of Medicine                         1983 - 1988
Indianapolis, Indiana
Robert B. Forney, Ph.D., Committee Chairman
Ph.D., Toxicology, 1988

State University of New York at Geneseo                    1979 -1982
Edward Ritter, Ph.D., Committee Chairman
Master of Science degree, Cellular & Molecular Biology, 1982

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

State University of New York at Geneseo                    1976 -1978
Bachelor of Science degree, Biology, 1978

State University of New York Agricultural                   1974 -1976
and Technical College at Morrisville
Associate degree, 1976

## Experience

As a scientist and communicator in forensic toxicology, Dr. Sawyer provides services to governmental agencies, corporations, investigators and select defendants or plaintiffs. Dr. Sawyer currently serves as chief toxicologist for Toxicology Consulting and Assessment Specialists, LLC. He has served for 23 years as an assistant professor (adjunct) with the Department of Medicine, Upstate Medical University, Syracuse, New York. Dr. Sawyer also has approximately 14 years of experience as a licensed clinical and environmental laboratory director in several states.

Additionally, Dr. Sawyer has received extensive training in alcohol toxicology at Indiana University School of Medicine (IU) in the Department of Pharmacology and Toxicology. This department is known for its development of the "Drunkometer" which is now known as the breathalyzer.  This device was invented by Rolla N. Harger, MD, at IU. Later blood to breath ratios and other original alcohol work was published by the late Dr. Robert. B. Forney (an internationally-respected expert in alcohol toxicology) whom Dr. Sawyer trained under. As part of his training requirements, Dr. Sawyer assisted in training Indiana State Police members who elected to be certified in breathalyzer testing, alcohol toxicology and sobriety screening.

Dr. Sawyer routinely provides impartial toxicological evaluations involving chemical exposures, alcohol ingestion, intentional poisonings, carcinogens, pharmaceuticals, pyrolysis products, heavy metals, organic chemicals and drugs-of-abuse in civil and criminal litigation. Toxic exposure investigations include analytical protocol, referral of autopsy material for analyses, environmental and occupational health risk assessments, site assessment and causation determination. Final work products that include scientific methods and validation, forensic documentation and written reports used in both forensic and routine (non-judicial) assessments are provided to multiple, nationwide clients.

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

## Forensic Environmental and Laboratory Analyses

Through education, training and experience, Dr. Sawyer has gained extensive expertise in forensic petroleum analyses as well as environmental and clinical forensic analyses. With more than 23 years of laboratory experience, Dr. Sawyer has directed laboratory analyses, sampling protocol and chain-of-custody documentation in criminal and civil matters. He has also provided petroleum spill assessments to multiple clients including governmental environmental agencies (NYSDEC), various state attorney general offices (New York), defense and plaintiff law firms and industry. Petroleum spill and exposure assessment reports have provided objective evidence of characterization, age and source within reasonable scientific certainty.

## Professional Experience

**Toxicologist**                                                                1988-1993
Onondaga County Department of Health
Syracuse, New York

Responsible for municipal and civil risk assessment, evaluation of environmental exposures and design and execution of environmental monitoring studies.  Advise and communicate with the Office of the Environment/County Executive and legislative subcommittees with respect to public health and environmental health issues. Established a clinical and environmental toxicology laboratory licensed under the NYS DOH and NYS ELAP agencies (NYSDOH #SAWYW1 and NY ELAP license #10183)

**Assistant Professor** (adjunct)                                              1988-2012
SUNY Upstate Medical University
Department of Medicine
Syracuse, New York

**Chief Toxicologist**                                                         1990-Present
Toxicology Consultants & Assessment Specialists, LLC
Sanibel, Florida
Registered DBA, 1990
Incorporated, January, 1994 (New York)
Limited liability corporation, January 2009 (Florida)

**Peer Reviewer**                                                              1998-2017
Editorial Advisory Board for the "The Forensic Examiner"

3

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

**Laboratory Director**                                        1993-2002
EXPRESSLAB, Inc. (Lozier Laboratories)
Middlesex, New York

- NYSDOH Clinical License #SAWYW1 (1988-2000)
- NYS Environmental License (ELAP) #11369
- National Environmental Laboratory Accreditation Program (NELAP) #11369
- New Jersey DEPE License #73744
- South Carolina License #9101100
- California Environmental License

**Associate Editor**                                           1997-2000
Practical Reviews in Forensic Medicine & Sciences
Published by Oakstone Medical Publishing, Inc.
Jointly sponsored by Albert Einstein College of Medicine
and Montefiore Medical Center; CME
(continuing medical education) accredited

**Licensed Laboratory Director**                               1988-1993
Onondaga County Department of Health
Syracuse, New York
Licensed clinical laboratory, chlorinated hydrocarbons (NYS CLEU)
NYS License #SAWYW1 Drug Analysis /Qualitative & Forensic Toxicology
(License expired 9-26-2000),
NYS ELAP License #10183

**Analytical Toxicologist** (part-time)                        1983-1988
State Department of Toxicology
Indianapolis, Indiana

**Laboratory Technician** (part-time)                          1979-1983
Clinical Research Center
(National Institute of Health)
Strong Memorial Hospital
Rochester, New York

**Laboratory Technician** (part-time)                          1979-1983
Highland Hospital
Special Determinations Laboratory, Rochester, New York

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

## Certifications

| | |
|---|---|
| **OSHA 29 CFR1910.120** | Re-certified |
| Hazardous Waste Operations & Emergency Response | December 2004 |
| 40 hour certified | |

**Clinical Laboratory Director**                                    Inactive
New York State Department of Health
Certificate of Qualification
License Code #SAWYW1

**Environmental Laboratory Director**                          Inactive
New York State Department of Health
ELAP License #11369
ELAP License #10183

**South Carolina Department of Health**                      Inactive
Environmental Laboratory Director
ELAP License #9101100

**New Jersey DEPE Laboratory Director**                    Inactive
License #73744

**Asbestos Inspector**                                              Inactive
EPA Certificate #10-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

## Societies and Honors

American Academy of Forensic Sciences                  1985-Present
Member, promoted to member, 1990

Sigma Xi, The Scientific Research Society                  1986- Present
Associate Member

National Myositis Association                                     1995-1997
Medical Advisory Board Member

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

| | |
|---|---|
| Society of Automotive Engineering<br>Member | 1986-Present |
| International Association of Forensic Toxicologists<br>Member | 1985-Present |
| Sigma Xi Research Competition<br>Fifth place | 1987 |
| Sigma Pi Alpha Scholastic Honor Society<br>Academic Award | 1984 |

## Professional Presentations

Sawyer, W.R. and Rigle, D.A., Featured continuing medical education credit workshop (2.00 credit hours) entitled, "Fundamentals of Medical Toxicology," Annual Scientific Meeting of The American College of Forensic Examiners, American Board of Forensic Medicine, Las Vegas, Nevada, October 24 – October 27, 2000.

Sawyer, W.R. and Rigle, D.A., Featured continuing medical education credit workshop (3.75 credit hours) entitled, "Forensic Medicine Toxicology," and "Reactive Airways Dysfunction Syndrome (RADS)," Annual Scientific Meeting of The American College of Forensic Examiners for the American Board of Forensic Medicine, New York, New York, October 29 - November 1, 1999.

Sawyer, W.R. and Rigle, D.A., "The Medical Aspects of Toxic Exposure Assessments," Annual Scientific Meeting of The American Board of Forensic Medicine and The American College of Forensic Examiners, Naples, Florida, October 12-14, 1998.

Sawyer, W.R. and Rigle, D.A., "Evaluating Toxic Exposures after Daubert," Featured presentation at the 4th Annual National Expert Witness & Litigation Seminar, Hyannis, Massachusetts, June 23, 1995.

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

## Articles, Abstracts, Treatises and Editorial Publications

Sawyer, W.R. *"Alcohol Content of Beer and Malt Beverages: Forensic Considerations,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 6, February 2000, Oakstone Medical Publishing, Inc. from Logan, B.K., et al., Journal of Forensic Sciences, November 1999, Vol. 44, No. 6, pg. 1292-1295.

Sawyer, W.R. *"Fulminant Liver Failure in a Young Child Following Repeated Acetaminophen Overdosing,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 6, February 2000, Oakstone Medical Publishing, Inc. from Bauer, M, et al., Journal of Forensic Sciences, November 1999, Vol. 44, No. 6, pg. 1299-1303.

Sawyer, W.R. *"Exposure to Contaminated Milk Presents 'Difficult Case' for Application of Daubert Reliability Standard,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 4, December 1999, Oakstone Medical Publishing, Inc. published in Expert Testimony, Evidence, & Trial Consultants, October 1999, Vol. 7, Issue 10, pg. 3.

Sawyer, W.R. *"The Extent of Postmortem Drug Redistribution in a Rat Model,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 4, December 1999, Oakstone Medical Publishing, Inc. from Hilberg, M.D., et al., Journal of Forensic Sciences, September 1999, Vol. 44 No. 5, pg. 956-62.

Sawyer, W.R. *"Potassium Nitrite Reaction with 11-Nor-Delta9-Tetrahydrocannabinol-9-Carboxylic Acid in Urine in Relation to the Drug Screening Analysis,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 3, November 1999, Oakstone Medical Publishing, Inc. from Lewis, S.A., Journal of Forensic Sciences, September 1999, Vol. 44 No. 5, pg. 951-55.

Sawyer, W.R. *"GC/Mass Spectrometry Data from Fire Debris Samples: Interpretation and Application,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 3, November 1999, Oakstone Medical Publishing, Inc. from Wallace, J.R., Journal of Forensic Sciences, September 1999, Vol. 44, No. 5, pg. 996-1012.

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

Sawyer, W.R. *"Toluene Diisocyanate Colocalizes with Tubulin on Cilia of Differentiated Human Airway Epithelial Cells,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 12, August 1999, Oakstone Medical Publishing, Inc. from Lange, R.W., et al., Toxicological Sciences, July 1999, Vol. 50, No. 1, pg. 64-71.

Sawyer, W.R. *"Differential Diagnosis Methodology Accepted by U.S. Circuit Court of Appeals,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 12, August 1999, Oakstone Medical Publishing, Inc. Referenced Literature: The Testifying Expert, July 1999, Vol. 7, Issue 7, pg. 9 and Vol. 7, Issue 6, pg. 2.

Sawyer, W.R. *"The Enigma of Arsenic Carcinogenesis: Role of Metabolism,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 11, July 1999, Oakstone Medical Publishing, Inc. from Goering, P.L., et al., Toxicological Sciences, May 1999, Vol. 49, No. 1, pg. 5-14.

Sawyer, W.R. *"Blood Alcohol Content Testimony,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 11, July 1999, Oakstone Medical Publishing, Inc. Referenced Literature: The Testifying Expert, June 1999, Vol. 7, Issue 6, pg. 9 and Goldfrank's Toxicologic Emergencies.

Sawyer, W.R. *"Forensic Evaluation of Pulmonary Toxicity Attributed to Amiodarone,"* (Special Presentation), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 10, June 1999, Oakstone Medical Publishing, Inc. Literature Review Backer, et al., American Heart, Vol. 123 (6), June, 1992, PDR, 1999, et al.

Sawyer, W. R. *"Fatal Ingestion of Paroxetine (Deroxatt TM),"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 10, June 1999, Oakstone Medical Publishing, Inc. from Tracqui, P., et al., Bulletin of The International Association of Forensic Toxicologists, January 1999, Vol. 27, No. 1, pg. 9-10.

Sawyer, W.R. *"A New Drug-of-Abuse 4-Methylthioamphetamine (Flatliners) & Toxic Related Fatality,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 10, June 1999, Oakstone Medical Publishing, Inc. from Groombridge, C., et al., Bulletin of The International Association of Forensic Toxicologists, April 1999, Vol. 24, No. 2, pg. 5-9.

Sawyer, W.R. *"The Response of the Intoxilyzer 5000 to Five Potential Interfering Substances,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 9, May 1999, Oakstone Medical Publishing, Inc. from Caldwell, J.P. and Kim, N.D., Journal of Forensic Science, 1997, Vol. 42, No. 6, pg. 1080-87.

Sawyer, W.R. *"Nitrites Adulteration in Urine Drug Testing,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 8, April 1999, Oakstone Medical Publishing, Inc. from Spiehler, V., Bulletin of The International Association of Forensic Toxicologists, Spring 1999, Vol. 24, No. 1, pg. 17-18.

Sawyer, W.R. *"A Case of Ballistic Toxicology,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 8, April 1999, Oakstone Medical Publishing, Inc. from Kerkoff, W., Bulletin of The International Association of Forensic Toxicologists, Spring 1999, Vol. 24, No. 1, pg. 4-5.

Sawyer, W.R. *"Postmortem Drug Redistribution - Human Cases Related to Results in Experimental Animals,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 7, March 1999, Oakstone Medical Publishing, Inc. from Hilberg, T., et al., Journal of Forensic Sciences, January 1999, Vol. 44, No. 1, pg. 3-9.

Sawyer, W.R. *"Special Publication – Forensic Source Identification of Lead,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 6, February 1999, Oakstone Medical Publishing, Inc.

Sawyer, W.R. and Rigle D.A. Original Article/Special Presentation, *"Toxicology of Aromatic Hydrocarbons,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 5, January 1999, Oakstone Medical Publishing, Inc.

Sawyer, W.R. *"Controlled Ethyl tert-Butyl Ether (ETBE) Exposure of Male Volunteers,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 6, February 1999, Oakstone Medical Publishing, Inc. from Nihlen, A, et al,. Toxicological Sciences, Vol. 46, No. 1, pg. 143-150, November 1998.

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

Sawyer, W.R. *"Vitamin B2 Interference with TDx Drugs-of-Abuse Assays,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 5, January 1999, Oakstone Medical Publishing, Inc. from Kunsman, SW., et al., Journal of Forensic Sciences, November 1998, Vol. 43, No.6, pg. 1225-27.

Sawyer, W.R., *"A Fatal Case of Benzene Poisoning & Special Discussion by Drs. Sawyer & Rigle,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 5, January 1999, Oakstone Medical Publishing, Inc. from Barbera, N, Bulla, G. & Romano, G. Journal of Forensic Sciences, November 1998, Vol. 43, No. 6, pg. 1250-1.

Sawyer, W.R., *"Biological and Chemical Hazards of Forensic Skeletal Analyses,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences , Vol. 1., No. 4, December 1998, Educational Reviews, LLC from Galloway, A. and Snodgrass, BA., Journal of Forensic Sciences, September 1998, Vol. 43, No. 5 pg. 940-48.

Rigle, D.A., Sawyer, W.R., Original Article/Special Presentation: *"Carbon Monoxide Toxicity versus Carbon Dioxide Toxicity and their Relationship in Attempted Suicide,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 3, November 1998, Educational Reviews, LLC.

Sawyer, W.R., *"2,3,7,8-tetrachlorodibenzo-p-dioxin in Pregnant Long Evans Rats: Disposition to Maternal and Embryo/Fetal Tissues,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 4, December 1998, Educational Reviews, LLC from Hurst, CH, et al., Toxicological Sciences, October 1998, Vol. 45, No. 2, pg. 129-36.

Sawyer, W.R., *"Burns from undisclosed acids in a liquid used by temporary workers. A recent problem in occupational medicine caused by lack of information,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, September 1998, Educational Reviews, LLC. Vol. 1, No. 3, November 1998, from Fischer, M., Hellmann, A., et al., Deutche Medizinische Wochenschrift, February 6, 1998, Vol. 123, No. 6, pg. 151-54.

Sawyer, W.R., *"Automobile Exhaust as a means of Suicide: An Experimental Study with a Proposed Model,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 3,

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

November,1998, Educational Reviews, LLC from Morgen, C., Schramm, J., et al., Journal of Forensic Sciences, Vol. 43, No. 4, July 1998, pg. 827-36.

Sawyer, W.R. *"Beyond Rohypnol: Use of Gamma-Hydroxybutyrate and Burundanga in Rape,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 3, November 1998, Educational Reviews, LLC from Hollinger, MA, The Forensic Examiner, Vol. 7, Nos. 3 & 4, March/April,1998, pg. 5-27.

Sawyer, W. R., *"The Absorption, Blood Levels, and Excretion of Mercury after a Single Dose of Mercury Vapor in Humans,"* (Special Article Review Presentation, Critical Assessment and Original Abstract) Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 1, September 1998, Educational Reviews, LLC from Sandborgh, G, et al., Toxicology and Applied Pharmacology, May 1997, Vol. 150, pg. 146-153.

Sawyer, W.R., *"The Effect of Glutaraldehyde Adulteration of Urine Specimens on Behring Syva Emit II Drugs of Abuse Assays,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol.1, No. 2 October 1998, Educational Reviews, LLC. from George, Bulletin of The International Association of Forensic Toxicologists, Vol. 27, No. 2, January 1997, pg. 10-11.

Sawyer, W.R., *"Identification of Unique Cocaine Metabolites and Smoking By-Products in Postmortem Blood and Urine Specimens,"* (Special Article Review Presentation, Critical Assessment an Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol.1, No. 1, September 1998, Educational Reviews, LLC. from Jenkins, AJ and Goldberger, BA , Journal of Forensic Science, 1997, Vol. 42, No. 5, September, pg. 824-827.

Miller, F.W., Sawyer, W.R., *"What Causes Myositis,"* National Myositis Association Newsletter, No. 16, pg. 2, December, 1995.

Rigle, D.A., Sawyer, W.R., *"Evaluation of Toxic Exposures After Daubert,"* S.E.A.K. Expert Witness Handbook, S.E.A.K., 1995 edition.

Sawyer, W.R. and Rigle, D.A., *"Toxic Etiology of Multiple Chemical Sensitivities: Review of Case Histories with Documented Toxic Exposure,"* Published in the Society of Toxicology, The Toxicologist, Volume 15, No. 1, 1995, pg. 228 - 229.

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

Sawyer, W.R., *"Analysis of Volatile Organic Contaminants from Biological Matrices by Purge and Trap Gas Chromatography and Mass Spectrometry,"* Presented at the 44th Annual American Academy of Forensic Sciences Meeting, February 20, 1992, Abstract No. K45, pg. 197.

Sawyer, W.R., Doedens, D.J., Authors Response to Discussion of *"Heroin, Morphine and Hydromorphone Determination in Postmortem Material by High Performance Liquid Chromatography,"* Journal of Forensic Sciences, Vol. 35, No. 3, May, 1990, pg. 522-523.

Sawyer, W.R., Steup, D.R., Martin, B.S. and Forney, R.B., *"Cardiac Blood pH as a Possible Indicator of Postmortem Interval,"* Presented at the 40th Annual American Academy of Forensic Sciences Meeting, February 19, 1988, Abstract No. K65, pg. 141.

Carfagna, M.A., Sawyer, W.R. and Forney, R.B., *"Postmortem Distribution of Ethanol in Rats,"* The International Association of Forensic Toxicologists, Abstracts, 1987, pg. 13.

Sawyer, W.R., Forney, R.B., *"Postmortem Disposition of Morphine in the Rat,"* Presented at the 24th International Meeting, Banff, Canada, The International Association of Forensic Toxicologists, Abstracts, 1987, pg. 12.

Sawyer, W.R., Doedens, D.J. and Forney, R.B., *"Heroin, Morphine, and Hydromorphone Determination in Postmortem Material by High Performance Liquid Chromatography,"* American Academy of Forensic Sciences 38th annual meeting, Abstract K13, 1986, pg. 114.

Sawyer, W.R., Steup, D.R., Martin, B.S. and Forney, R.B., *"Cardiac Blood pH as a Possible Indicator of Postmortem Interval,"* Journal of Forensic Sciences, Vol. 33, No. 6, Nov. 1988, pg. 1439-1444.

Sawyer, W.R., Forney, R.B., *"Postmortem Disposition of Morphine in Rats,"* Forensic Science International, Vol. 38, Oct. 1988, pg. 259-273.
Sawyer, W.R., Waterhouse, G.A.W., Doedens, D.J. and Forney, R.B., *"Heroin, Morphine and Hydromorphone Determination in Postmortem Material by High Performance Liquid Chromatography,"* Journal of Forensic Sciences, Vol. 33, No. 5, Sept. 1988, pg. 1146-1155.

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

Carfagna, M.A., Sawyer, W.R. and Forney, R.B., *"Postmortem Distribution of Ethanol in Rats,"* The International Association of Forensic Toxicologists, Proceedings of the 24th International Meeting, July 28-31, 1987, pg. 87-93.

Sawyer, W.R., Ritter, E. and Faloon, W.W., *"The Morphological Effects of Chenodeoxycholic Acid on Human Gastric Mucosa,"* The American Journal of Gastroenterology, Vol. 79, No. 5, 1984, pg. 348-353.

## Personal Information

Dr. Sawyer is a member of the Gulf Coast Swim Team as a distance swimmer and completed several "*Swim Around Key West*" 12.5 mile ocean swim races in under six hours. He is also a triathlete with the distinction of being a four-time Ironman. He loves to fish and SCUBA dive in northern New York State and the Gulf of Mexico.

| | |
|---|---|
| **Place of Birth:** | Webster, New York |
| **Citizenship:** | United States |
| **Marital Status:** | Married, 1989 |

**Curriculum Vitae**
**William Robert Sawyer**
**August 2018**
**Page 1**

## Introduction

Dr. William Sawyer is a professional toxicologist with a doctorate in toxicology from Indiana University School of Medicine. He is a diplomate of the American Board of Forensic Medicine with more than 28 years of experience in public health and forensic toxicology including five years of governmental service.  His specialized areas of expertise include causation analyses (defendant, plaintiff or criminal), dioxins, solvents, heavy metals, petroleum, crude oil, radionuclides/NORM, alcohol toxicology, drugs-of-abuse, pharmaceuticals, herbal products and other substances.

## Contact Information

Toxicology Consultants & Assessment Specialists, LLC (*TCAS, LLC*)
6450 Pine Avenue
Sanibel, Florida 33957

Toxicology Consultants & Assessment Specialists, LLC (*TCAS, LLC*)
29 Fennell Street
Skaneateles, New York 13152

Telephone:  800-308-0080
                    239-472-2436 (FL)
                    315-685-2345 (NY)

E-mail:      toxdoc1@comcast.net

## Education

Indiana University School of Medicine                            1983 - 1988
Indianapolis, Indiana
Robert B. Forney, Ph.D., Committee Chairman
Ph.D., Toxicology, 1988

State University of New York at Geneseo                       1979 -1982
Edward Ritter, Ph.D., Committee Chairman
Master of Science degree, Cellular & Molecular Biology, 1982

**Curriculum Vitae**
**William Robert Sawyer**
**August 2018**
**Page 2**

| | |
|---|---|
| State University of New York at Geneseo | 1976 -1978 |
| Bachelor of Science degree, Biology, 1978 | |
| | |
| State University of New York Agricultural | 1974 -1976 |
| and Technical College at Morrisville | |
| Associate degree, 1976 | |

## Experience

As a scientist and communicator in forensic toxicology, Dr. Sawyer provides services to governmental agencies, corporations, investigators and select defendants or plaintiffs. For nearly 30 years, Dr. Sawyer has served as chief toxicologist for Toxicology Consulting and Assessment Specialists, LLC. He has served for 23 years as an assistant professor (adjunct) with the Department of Medicine, Upstate Medical University, Syracuse, New York. Dr. Sawyer also has approximately 14 years of experience as a licensed clinical and environmental laboratory director in several states.

Dr. Sawyer routinely provides impartial toxicological evaluations involving chemical exposures, alcohol ingestion, intentional poisonings, carcinogens, pharmaceuticals, pyrolysis products, heavy metals, organic chemicals and drugs-of-abuse in civil and criminal litigation. Toxic exposure investigations include analytical protocol, referral of autopsy material for analyses, environmental and occupational health risk assessments and site assessment and causation determination. Final work products that include scientific methods and validation, forensic documentation and written reports used on both forensic and routine (non-judicial) assessments are provided to multiple, nationwide clients.

## Forensic Environmental and Laboratory Analyses

Through education, training and experience, Dr. Sawyer has gained extensive expertise in forensic petroleum analyses as well as environmental and clinical forensic analyses. With more than 23 years of laboratory experience, Dr. Sawyer has directed laboratory analyses, sampling protocol and chain-of-custody documentation in criminal and civil matters. He has also provided petroleum spill assessments to multiple clients including governmental environmental agencies (NYSDEC), various state attorney general offices (New York), defense and plaintiff law firms and industry. Petroleum spill and exposure

**Curriculum Vitae**
**William Robert Sawyer**
**August 2018**
**Page 3**

assessment reports have provided objective evidence of characterization, age and source within reasonable scientific certainty.

## Professional Experience

**Chief Toxicologist**                                                    1990-Present
Toxicology Consultants & Assessment Specialists, LLC
Sanibel, Florida
Registered, DBA, 1990
Incorporated, January, 1994 (New York)
Limited liability corporation, January 2009 (Florida)

**Peer Reviewer**                                                         1998-Present
Editorial Advisory Board for the "The Forensic Examiner"

**Assistant Professor** (adjunct)                                         1988-2012
SUNY Upstate Medical University
Department of Medicine
Syracuse, New York

**Laboratory Director**                                                   1993-2002
EXPRESSLAB, Inc. (Lozier Laboratories)
Middlesex, New York

- NYSDOH Clinical License #SAWYW1 (1988-2000)
- NYS Environmental License (ELAP) #11369
- National Environmental Laboratory Accreditation Program (NELAP) #11369
- New Jersey DEPE License #73744
- South Carolina License #9101100
- California Environmental License

**Associate Editor**                                                      1997-2000
Practical Reviews in Forensic Medicine & Sciences
Published by Oakstone Medical Publishing, Inc.
Jointly sponsored by Albert Einstein College of Medicine
and Montefiore Medical Center; CME
(continuing medical education) accredited

**Curriculum Vitae**
**William Robert Sawyer**
**August 2018**
**Page 4**

**Toxicologist**                                                           1988-1993
Onondaga County Department of Health
Syracuse, New York

Responsible for municipal and civil risk assessment, evaluation of environmental exposures and design and execution of environmental monitoring studies.  Advise and communicate with the Office of the Environment/County Executive and legislative subcommittees with respect to public health and environmental health issues. Established a clinical and environmental toxicology laboratory licensed under the NYS DOH and NYS ELAP agencies (NYSDOH #SAWYW1 and NY ELAP license #10183)

**Licensed Laboratory Director**                                           1988-1993
Onondaga County Department of Health
Syracuse, New York
Licensed clinical laboratory, chlorinated hydrocarbons (NYS CLEU)
NYS License #SAWYW1
Assistant Director
NYS ELAP License #10183

**Analytical Toxicologist** (part-time)                                     1983-1988
State Department of Toxicology
Indianapolis, Indiana

**Laboratory Technician** (part-time)                                       1979-1983
Clinical Research Center
(National Institute of Health)
Strong Memorial Hospital
Rochester, New York

**Laboratory Technician** (part-time)                                       1979-1983
Highland Hospital
Special Determinations Laboratory
Rochester, New York

**Curriculum Vitae**
**William Robert Sawyer**
**August 2018**
**Page 5**

## Certifications

**Board Certification**
Diplomate, American Board of Forensic Medicine
(D-ABFM)

1996-Present

**OSHA 29 CFR1910.120**
Hazardous Waste Operations & Emergency Response
40 hour certified

Re-certified
December 2004

**Clinical Laboratory Director**
New York State Department of Health
Certificate of Qualification
License Code #SAWYW1

Inactive

**Environmental Laboratory Director**
New York State Department of Health
ELAP License #11369
ELAP License #10183

Inactive

**South Carolina Department of Health**
Environmental Laboratory Director
ELAP License #9101100

Inactive

**New Jersey DEPE Laboratory Director**
License #73744

Inactive

**Asbestos Inspector**
EPA Certificate #10-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

Inactive

## Societies and Honors

Sigma Xi, The Scientific Research Society
Associate Member

1986- Present

American College of Forensic Examiners
Member

1995-Present

**Curriculum Vitae**
**William Robert Sawyer**
**August 2018**
**Page 6**

| | |
|---|---|
| National Myositis Association<br>Medical Advisory Board Member | 1995-1997 |
| American Academy of Forensic Sciences<br>Member, promoted to Fellow, 1998 | 1985-Present |
| Society of Automotive Engineering<br>Member | 1986-Present |
| International Association of Forensic Toxicologists<br>Member | 1985-Present |
| Sigma Xi Research Competition<br>Fifth place | 1987 |
| Sigma Pi Alpha Scholastic Honor Society<br>Academic Award | 1984 |

## Professional Presentations

Sawyer, W.R. and Rigle, D.A., Featured continuing medical education credit workshop (2.00 credit hours) entitled, "Fundamentals of Medical Toxicology," Annual Scientific Meeting of The American College of Forensic Examiners, American Board of Forensic Medicine, Las Vegas, Nevada, October 24 – October 27, 2000.

Sawyer, W.R. and Rigle, D.A., Featured continuing medical education credit workshop (3.75 credit hours) entitled, "Forensic Medicine Toxicology," and "Reactive Airways Dysfunction Syndrome (RADS)," Annual Scientific Meeting of The American College of Forensic Examiners for the American Board of Forensic Medicine, New York, New York, October 29 - November 1, 1999.

Sawyer, W.R. and Rigle, D.A., "The Medical Aspects of Toxic Exposure Assessments," Annual Scientific Meeting of The American Board of Forensic Medicine and The American College of Forensic Examiners, Naples, Florida, October 12-14, 1998.

Sawyer, W.R. and Rigle, D.A., "Evaluating Toxic Exposures after Daubert," Featured presentation at the 4th Annual National Expert Witness & Litigation Seminar, Hyannis, Massachusetts, June 23, 1995.

Curriculum Vitae
**William Robert Sawyer**
**August 2018**
Page 7

## Articles, Abstracts, Treatises and Editorial Publications

Sawyer, W.R. *"Alcohol Content of Beer and Malt Beverages: Forensic Considerations,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 6, February 2000, Oakstone Medical Publishing, Inc. from Logan, B.K., et al., Journal of Forensic Sciences, November 1999, Vol. 44, No. 6, pg. 1292-1295.

Sawyer, W.R. *"Fulminant Liver Failure in a Young Child Following Repeated Acetaminophen Overdosing,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 6, February 2000, Oakstone Medical Publishing, Inc. from Bauer, M, et al., Journal of Forensic Sciences, November 1999, Vol. 44, No. 6, pg. 1299-1303.

Sawyer, W.R. *"Exposure to Contaminated Milk Presents 'Difficult Case' for Application of Daubert Reliability Standard,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 4, December 1999, Oakstone Medical Publishing, Inc. published in Expert Testimony, Evidence, & Trial Consultants, October 1999, Vol. 7, Issue 10, pg. 3.

Sawyer, W.R. *"The Extent of Postmortem Drug Redistribution in a Rat Model,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 4, December 1999, Oakstone Medical Publishing, Inc. from Hilberg, M.D., et al., Journal of Forensic Sciences, September 1999, Vol. 44 No. 5, pg. 956-62.

Sawyer, W.R. *"Potassium Nitrite Reaction with 11-Nor-Delta9-Tetrahydrocannabinol-9-Carboxylic Acid in Urine in Relation to the Drug Screening Analysis,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 3, November 1999, Oakstone Medical Publishing, Inc. from Lewis, S.A., Journal of Forensic Sciences, September 1999, Vol. 44 No. 5, pg. 951-55.

Sawyer, W.R. *"GC/Mass Spectrometry Data from Fire Debris Samples: Interpretation and Application,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 3,

**Curriculum Vitae**
**William Robert Sawyer**
**August 2018**
**Page 8**

November 1999, Oakstone Medical Publishing, Inc. from Wallace, J.R., Journal of Forensic Sciences, September 1999, Vol. 44, No. 5, pg. 996-1012.

Sawyer, W.R. *"Toluene Diisocyanate Colocalizes with Tubulin on Cilia of Differentiated Human Airway Epithelial Cells,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 12, August 1999, Oakstone Medical Publishing, Inc. from Lange, R.W., et al., Toxicological Sciences, July 1999, Vol. 50, No. 1, pg. 64-71.

Sawyer, W.R. *"Differential Diagnosis Methodology Accepted by U.S. Circuit Court of Appeals,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 12, August 1999, Oakstone Medical Publishing, Inc. Referenced Literature: The Testifying Expert, July 1999, Vol. 7, Issue 7, pg. 9 and Vol. 7, Issue 6, pg. 2.

Sawyer, W.R. *"The Enigma of Arsenic Carcinogenesis: Role of Metabolism,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 11, July 1999, Oakstone Medical Publishing, Inc. from Goering, P.L., et al., Toxicological Sciences, May 1999, Vol. 49, No. 1, pg. 5-14.

Sawyer, W.R. *"Blood Alcohol Content Testimony,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 11, July 1999, Oakstone Medical Publishing, Inc. Referenced Literature: The Testifying Expert, June 1999, Vol. 7, Issue 6, pg. 9 and Goldfrank's Toxicologic Emergencies.

Sawyer, W.R. *"Forensic Evaluation of Pulmonary Toxicity Attributed to Amiodarone,"* (Special Presentation), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 10, June 1999, Oakstone Medical Publishing, Inc. Literature Review Backer, et al., American Heart, Vol. 123 (6), June, 1992, PDR, 1999, et al.

Sawyer, W. R. *"Fatal Ingestion of Paroxetine (Deroxatt TM),"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 10, June 1999, Oakstone Medical Publishing, Inc. from Tracqui, P., et al., Bulletin of The International Association of Forensic Toxicologists, January 1999, Vol. 27, No. 1, pg. 9-10.

Sawyer, W.R. *"A New Drug-of-Abuse 4-Methylthioamphetamine (Flatliners) & Toxic Related Fatality,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 10, June

1999, Oakstone Medical Publishing, Inc. from Groombridge, C., et al., Bulletin of The International Association of Forensic Toxicologists, April 1999, Vol. 24, No. 2, pg. 5-9.

Sawyer, W.R. *"The Response of the Intoxilyzer 5000 to Five Potential Interfering Substances,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 9, May 1999, Oakstone Medical Publishing, Inc. from Caldwell, J.P. and Kim, N.D., Journal of Forensic Science, 1997, Vol. 42, No. 6, pg. 1080-87.

Sawyer, W.R. *"Nitrites Adulteration in Urine Drug Testing,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 8, April 1999, Oakstone Medical Publishing, Inc. from Spiehler, V., Bulletin of The International Association of Forensic Toxicologists, Spring 1999, Vol. 24, No. 1, pg. 17-18.

Sawyer, W.R. *"A Case of Ballistic Toxicology,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 8, April 1999, Oakstone Medical Publishing, Inc. from Kerkoff, W., Bulletin of The International Association of Forensic Toxicologists, Spring 1999, Vol. 24, No. 1, pg. 4-5.

Sawyer, W.R. *"Postmortem Drug Redistribution - Human Cases Related to Results in Experimental Animals,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 7, March 1999, Oakstone Medical Publishing, Inc. from Hilberg, T., et al., Journal of Forensic Sciences, January 1999, Vol. 44, No. 1, pg. 3-9.

Sawyer, W.R. *"Special Publication – Forensic Source Identification of Lead,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 6, February 1999, Oakstone Medical Publishing, Inc.

Sawyer, W.R. and Rigle D.A. Original Article/Special Presentation, *"Toxicology of Aromatic Hydrocarbons,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 5, January 1999, Oakstone Medical Publishing, Inc.

Sawyer, W.R. *"Controlled Ethyl tert-Butyl Ether (ETBE) Exposure of Male Volunteers,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 6, February 1999,

**Curriculum Vitae**
**William Robert Sawyer**
**August 2018**
**Page 10**


Oakstone Medical Publishing, Inc. from Nihlen, A, et al,. Toxicological Sciences, Vol. 46, No. 1, pg. 143-150, November 1998.

Sawyer, W.R. *"Vitamin B2 Interference with TDx Drugs-of-Abuse Assays,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 5, January 1999, Oakstone Medical Publishing, Inc. from Kunsman, SW., et al., Journal of Forensic Sciences, November 1998, Vol. 43, No.6, pg. 1225-27.

Sawyer, W.R., *"A Fatal Case of Benzene Poisoning & Special Discussion by Drs. Sawyer & Rigle,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 5, January 1999, Oakstone Medical Publishing, Inc. from Barbera, N, Bulla, G. & Romano, G. Journal of Forensic Sciences, November 1998, Vol. 43, No. 6, pg. 1250-1.

Sawyer, W.R., *"Biological and Chemical Hazards of Forensic Skeletal Analyses,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences , Vol. 1., No. 4, December 1998, Educational Reviews, LLC from Galloway, A. and Snodgrass, BA., Journal of Forensic Sciences, September 1998, Vol. 43, No. 5 pg. 940-48.

Rigle, D.A., Sawyer, W.R., Original Article/Special Presentation: *"Carbon Monoxide Toxicity versus Carbon Dioxide Toxicity and their Relationship in Attempted Suicide,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 3, November 1998, Educational Reviews, LLC.

Sawyer, W.R., *"2,3,7,8-tetrachlorodibenzo-p-dioxin in Pregnant Long Evans Rats: Disposition to Maternal and Embryo/Fetal Tissues,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 4, December 1998, Educational Reviews, LLC from Hurst, CH, et al., Toxicological Sciences, October 1998, Vol. 45, No. 2, pg. 129-36.

Sawyer, W.R., *"Burns from undisclosed acids in a liquid used by temporary workers. A recent problem in occupational medicine caused by lack of information,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, September 1998, Educational Reviews, LLC. Vol. 1, No. 3, November 1998, from Fischer, M., Hellmann, A., et al., Deutche Medizinische Wochenschrift, February 6, 1998, Vol. 123, No. 6, pg. 151-54.

Sawyer, W.R., *"Automobile Exhaust as a means of Suicide: An Experimental Study with a Proposed Model,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 3, November,1998, Educational Reviews, LLC from Morgen, C., Schramm, J., et al., Journal of Forensic Sciences, Vol. 43, No. 4, July 1998, pg. 827-36.

Sawyer, W.R. *"Beyond Rohypnol: Use of Gamma-Hydroxybutyrate and Burundanga in Rape,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 3, November 1998, Educational Reviews, LLC from Hollinger, MA, The Forensic Examiner, Vol. 7, Nos. 3 & 4, March/April,1998, pg. 5-27.

Sawyer, W. R., *"The Absorption, Blood Levels, and Excretion of Mercury after a Single Dose of Mercury Vapor in Humans,"* (Special Article Review Presentation, Critical Assessment and Original Abstract) Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 1, September 1998, Educational Reviews, LLC from Sandborgh, G, et al., Toxicology and Applied Pharmacology, May 1997, Vol. 150, pg. 146-153.

Sawyer, W.R., *"The Effect of Glutaraldehyde Adulteration of Urine Specimens on Behring Syva Emit II Drugs of Abuse Assays,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol.1, No. 2 October 1998, Educational Reviews, LLC. from George, Bulletin of The International Association of Forensic Toxicologists, Vol. 27, No. 2, January 1997, pg. 10-11.

Sawyer, W.R., *"Identification of Unique Cocaine Metabolites and Smoking By-Products in Postmortem Blood and Urine Specimens,"* (Special Article Review Presentation, Critical Assessment an Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol.1, No. 1, September 1998, Educational Reviews, LLC. from Jenkins, AJ and Goldberger, BA , Journal of Forensic Science, 1997, Vol. 42, No. 5, September, pg. 824-827.

Miller, F.W., Sawyer, W.R., *"What Causes Myositis,"* National Myositis Association Newsletter, No. 16, pg. 2, December, 1995.

Rigle, D.A., Sawyer, W.R., *"Evaluation of Toxic Exposures After Daubert,"* S.E.A.K. Expert Witness Handbook, S.E.A.K., 1995 edition.

**Curriculum Vitae**
**William Robert Sawyer**
**August 2018**
**Page 12**

Sawyer, W.R. and Rigle, D.A., *"Toxic Etiology of Multiple Chemical Sensitivities: Review of Case Histories with Documented Toxic Exposure,"* Published in the Society of Toxicology, The Toxicologist, Volume 15, No. 1, 1995, pg. 228 - 229.

Sawyer, W.R., *"Analysis of Volatile Organic Contaminants from Biological Matrices by Purge and Trap Gas Chromatography and Mass Spectrometry,"* Presented at the 44th Annual American Academy of Forensic Sciences Meeting, February 20, 1992, Abstract No. K45, pg. 197.

Sawyer, W.R., Doedens, D.J., Authors Response to Discussion of *"Heroin, Morphine and Hydromorphone Determination in Postmortem Material by High Performance Liquid Chromatography,"* Journal of Forensic Sciences, Vol. 35, No. 3, May, 1990, pg. 522-523.

Sawyer, W.R., Steup, D.R., Martin, B.S. and Forney, R.B., *"Cardiac Blood pH as a Possible Indicator of Postmortem Interval,"* Presented at the 40th Annual American Academy of Forensic Sciences Meeting, February 19, 1988, Abstract No. K65, pg. 141.

Carfagna, M.A., Sawyer, W.R. and Forney, R.B., *"Postmortem Distribution of Ethanol in Rats,"* The International Association of Forensic Toxicologists, Abstracts, 1987, pg. 13.

Sawyer, W.R., Forney, R.B., *"Postmortem Disposition of Morphine in the Rat,"* Presented at the 24th International Meeting, Banff, Canada, The International Association of Forensic Toxicologists, Abstracts, 1987, pg. 12.

Sawyer, W.R., Doedens, D.J. and Forney, R.B., *"Heroin, Morphine, and Hydromorphone Determination in Postmortem Material by High Performance Liquid Chromatography,"* American Academy of Forensic Sciences 38th annual meeting, Abstract K13, 1986, pg. 114.

Sawyer, W.R., Steup, D.R., Martin, B.S. and Forney, R.B., *"Cardiac Blood pH as a Possible Indicator of Postmortem Interval,"* Journal of Forensic Sciences, Vol. 33, No. 6, Nov. 1988, pg. 1439-1444.

Sawyer, W.R., Forney, R.B., *"Postmortem Disposition of Morphine in Rats,"* Forensic Science International, Vol. 38, Oct. 1988, pg. 259-273.
Sawyer, W.R., Waterhouse, G.A.W., Doedens, D.J. and Forney, R.B., *"Heroin, Morphine and Hydromorphone Determination in Postmortem Material by High*

**Curriculum Vitae**
**William Robert Sawyer**
**August 2018**
**Page 13**

*Performance Liquid Chromatography,"* Journal of Forensic Sciences, Vol. 33, No. 5, Sept. 1988, pg. 1146-1155.

Carfagna, M.A., Sawyer, W.R. and Forney, R.B., *"Postmortem Distribution of Ethanol in Rats,"* The International Association of Forensic Toxicologists, Proceedings of the 24th International Meeting, July 28-31, 1987, pg. 87-93.

Sawyer, W.R., Ritter, E. and Faloon, W.W., *"The Morphological Effects of Chenodeoxycholic Acid on Human Gastric Mucosa,"* The American Journal of Gastroenterology, Vol. 79, No. 5, 1984, pg. 348-353.

## Personal Information

Dr. Sawyer is a member of the Gulf Coast Swim Team as a distance swimmer and completed several "*Swim Around Key West"* 12.5 mile ocean swim races in under six hours. He is also a triathlete with the distinction of being a four-time Ironman. He loves to fish and SCUBA dive in northern New York State and the Gulf of Mexico.

| | |
|---|---|
| **Place of Birth:** | Webster, New York |
| **Citizenship:** | United States |
| **Marital Status:** | Married, 1989 |