# EXHIBIT B

1  in toxicology.  I've been practicing nearly 30 years.

2      Q.  And you mentioned medical school.  Where did you

3  go to medical school?

4      A.  Indiana University School of Medicine with a

09:52:46  5  Ph.D. in toxicology.  And I trained under the late

6  Dr. Forney.

7      Q.  When did you graduate from medical school?

8      A.  I graduated from IU in 1988.

9      Q.  And prior to graduating medical school, you

09:53:01  10  actually obtained a Master's; is that correct?

11      A.  Yes.  I have a Master's degree in cellular and

12  molecular biology from State University of New York,

13  Geneseo.

14      Q.  And after graduating medical school, you said

09:53:16  15  you got a Ph.D. in toxicology; is that right?

16      A.  That's what I -- I went through a Ph.D. program

17  through the medical school in -- specifically in

18  toxicology, which included the first three years of

19  medical school course curriculum, along with specific

09:53:31  20  training in toxicology.  It was also training in the

21  State Department of Toxicology, as we handled all the

22  autopsies and deaths for the State of Indiana.

23      Q.  We've talked a lot about this case and heard

24  from witnesses who are toxicologists.  Can you explain to

09:53:47  25  us what is toxicology?

A.  It's a very specific field.  We are the ones who determine causation, what chemicals, pharmaceuticals, environmental substances can do to the body.  And physiologically and mechanistically how they operate.

09:54:03

Q.  After graduating with your Ph.D. in toxicology, what did you do next in your career?

A.  I worked for five years as a governmental toxicologist in Syracuse, New York.  I was responsible for assessing the environmental exposures, forensic

09:54:21

matters, in general Public Health.  Everything from lead in water to hazardous chemicals from, I think, almost 18 different Superfund sites in the area.

Q.  You said that was through the Department of Health?

09:54:39

A.  Yes.

Q.  After -- how long were you with the Department of Health?

A.  Five years.  And during that time, I started consulting and developed my own consulting business in, I

09:54:48

think, 1990, which I am still with today.

Q.  Okay.  And what's the name of that consulting business?

A.  Toxicology Consultants and Assessment Specialists, LLC.  And I do work throughout the US and

09:55:02

also internationally.

3587

1      Q.  And from 1990 to the present, you've had that

2  sole business as a toxicology or consulting toxicologist;

3  is that right?

4      A.  Correct.

09:55:12    5      Q.  And you said "consulting."  Who do you consult

6  with in that role for your actual business?

7      A.  Civil matters, which about -- 60 percent are

8  plaintiff, about 40 percent defendant.  Also a number of

9  governmental agencies, the United States Attorney's

09:55:29   10  Office, US Navy, various prosecutors, Attorney State

11  General of Montana, New York, New Jersey and other

12  states.

13      Q.  So you said both plaintiffs' and defendants'

14  side.  Have you ever served as an expert for a

09:55:44   15  manufacturer?

16      A.  Many times.  And currently.

17      Q.  So it's not just on the plaintiff's side of

18  claiming a chemical caused an injury.  You've also served

19  as an expert for the defendant saying it didn't?

09:55:58   20      A.  Oh, yes.  I have some very good defense experts

21  who have true, good defense cases.  I'm very selective in

22  what cases I take.

23      Q.  Now, there's a term "forensic toxicologist."

24  Are you a forensic toxicologist?

09:56:11   25      A.  Yes, I am.

3588

1        Q.  Can you explain what a forensic toxicologist is?

2        A.  My training was in forensic toxicology.

3    Forensic toxicology is simply application of science to

4    the law.  The word "forensic," the Latin root stems from

09:56:25    5    debate, as we are debating today.  This is a forensic

6    matter.

7        Q.  And so, you know, based on that, you're involved

8    in a lot of cases, both civil and criminal; is that fair?

9        A.  That's correct.

09:56:37    10        Q.  And so you've probably done this a lot,

11   depositions and trial testimony.  Is that fair?

12        A.  Yes.  When I looked at my list of cases and

13   trials, I testify in court, in trials, about six times

14   per year on the average.

09:56:50    15        Q.  And, once again, that's both for plaintiff and

16   defense side?

17        A.  That's correct.

18        Q.  Other than your work for the Department of

19   Health that we talked about and your own company as a

09:57:00    20   forensic toxicologist, what else have you done in the

21   field of toxicology?

22        A.  I've served as a peer-reviewer for the Forensic

23   Examiner, which is a peer-reviewed journal.  In the past,

24   I've directed various laboratories as a licensed lab

09:57:20    25   director in multiple states, including clinical, forensic

3589

1  and environmental analyses.  And probably other things,

2  but I don't have my CV in front of me.

3      Q.  That fine.  You mentioned a laboratory director.

4  Who were you a laboratory director for?

09:57:33  5      A.  Oh, for Express Laboratories in Rochester,

6  New York, Public Health Laboratory in Syracuse, New York,

7  Lozier Laboratory in Rochester, New York.  Possibly

8  others.

9      Q.  Are you Board-certified in anything?

09:57:52  10      A.  Yes.  American Board of Forensic Medicine in

11  1996, I believe.

12      Q.  Do you also teach in the field of toxicology?

13      A.  Yes.  I've taught medical students at the State

14  University of New York, Upstate Medical Center in

09:58:09  15  Syracuse for, I think, 22 years, as an adjunct assistant

16  professor in the Department of Medicine.

17          I specifically taught a portion of the clerkship

18  toxicology course, as well as a portion of the

19  second-year students in Public Health.

09:58:31  20      Q.  With respect to -- you mentioned in your work,

21  you know, both in your actual business and otherwise,

22  you've worked for government agencies.  What have you

23  been doing for those government agencies?

24      A.  Oh, a wide variety of cases.  I've worked in

09:58:49  25  criminal cases, in terms of cause of death from

1  intentional poisoning with arsenic thallium.  In fact,

2  the movie was produced on my original work in 1993 called

3  "The Black Widow."

4          I've worked on prosecution cases involving drugs

09:59:13  5  and alcohol, which are quite common.  I've worked on

6  large chemical case matters, worked on the BP Oil

7  release.  There's just numerous cases.

8      Q.  Have you, in the cases you've worked on,

9  established causation analysis for chemicals or

09:59:28  10  pesticides?

11      A.  Yes.

12      Q.  How often have you done a chemical analysis with

13  respect to causation for chemicals?

14      A.  Really, continuously since the last -- about the

09:59:44  15  last 30 years.  That's how I started in the Health

16  Department.

17      Q.  Have you ever published in any peer-reviewed

18  journals?

19      A.  Yes.

09:59:53  20      Q.  How many?

21      A.  Not a lot.  Maybe -- probably about 8 or 10

22  original articles.  And then probably about 25 review

23  articles.

24      Q.  With respect to those articles, those are in the

10:00:11  25  field of toxicology?

3591

1        A.  Yes.

2        Q.  In some of the cases you've worked on, have you

3   ever done anything with respect to 911 and the World

4   Trade Center?

10:00:18   5        A.  Oh, yes.  I was called on that shortly after it

6   occurred and wrote a report, which was very extensive,

7   including all of the chemicals that were released,

8   including volatiles, such as benzene, even dioxin.  And

9   probably nuclear aromatic hydrocarbons and other

10:00:45  10   carcinogens, which led to a much broader investigation

11   ultimately.

12        Q.  In your work, have you ever been involved in

13   preparing product labeling or material safety data

14   sheets?

10:01:01  15        A.  I'm sorry, I didn't quite hear that.

16        Q.  Yeah, no.  I'm sorry.  I'll be louder for you.

17            Have you ever been involved in -- in product

18   labeling or material safety data sheets?

19        A.  Oh, yes.  I have prepared material safety data

10:01:11  20   sheets for corporations, yes.  And product labels as

21   well.

22        Q.  And can you tell us a little bit about that?

23   You know, what type of corporations were these?

24        A.  Well, one -- the first one I ever did was a --

10:01:25  25   actually, a corporation that made a bookbinding spray for

1  libraries.  And, unfortunately, their original spray had

2  carbon tetrachloride in it, which is a very dangerous

3  liver carcinogen.  And then they had switched to a

4  chemical, which was highly volatile.  And I actually

10:01:47  5  remember doing a flame test with it.  I could shoot a

6  flame about 10 feet with it.  And they reformulated.  And

7  then I wrote a material data safety sheet and label for

8  that product, which is still in use.

9        Q.  And --

10:02:01  10        A.  Using a non-flammable propellant.  Because it

11  was designed for use in close quarters, in offices and

12  closets.

13        Q.  And what was your particular role in that

14  process?

10:02:17  15        A.  Safety.  I had to be certain that a number of

16  characteristics were met, that the international

17  guidelines for safety were met in terms of warnings for

18  each of the chemicals in the product.

19            And, also, with respect to the label -- labels

10:02:37  20  are interesting.  You actually have to have labels in a

21  certain format of certain size, letters and displays that

22  are easily understood and read.  And there's actually

23  standards for this.  There's a big volume of documents

24  which we use to write labels and material safety data

10:02:55  25  sheets that follow strict guidelines.

1       Q.  And who ultimately is responsible for the
2  warnings in the product labeling?

3       A.  Well, the manufacturer.

4          MR. DICKENS:  At this time, your Honor, we'll
10:03:05  5  tender Dr. Sawyer as an expert in toxicology, forensic
6  toxicology and exposure assessments.

7          THE COURT:  Any *voir dire*?

8          MR. LOMBARDI:  No objection, your Honor.

9          THE COURT:  All right.  Very well.  Then I will
10:03:16  10  accept Dr. Sawyer as an expert in toxicology and forensic
11  toxicology and related assessments.

12          You may proceed.

13       Q.  BY MR. DICKENS:  Okay.  Doctor, you're here
14  today in your role as an expert; is that right?

10:03:27  15       A.  Yes.

16       Q.  And you've reached some opinions in this case?

17       A.  Yes, I have.

18       Q.  And the opinions that you're going to be
19  expressing here today, do you hold those to a reasonable
10:03:39  20  degree of scientific certainty?

21       A.  Yes.

22       Q.  And did you review your role in this case from
23  the experience of a toxicologist?

24       A.  Yes.

10:03:49  25       Q.  And did you reach an opinion to a reasonable

1  degree of scientific certainty that Roundup and Ranger

2  Pro can cause non-Hodgkin's lymphoma?

3      A.  Yes.  I have been following the peer-reviewed

4  literature on glyphosate since mid-1990s.

10:04:06  5      Q.  And what is the opinion you've reached,

6  generally?

7      A.  That, clearly, glyphosate and with its

8  combinations of adjuvants, is a known carcinogen.

9      Q.  You just used the word "adjuvants."  Can you

10:04:23  10  tell us what that word means?

11      A.  Well, glyphosate is the -- the primary -- the

12  principal ingredient in Roundup and Ranger Pro.  And

13  glyphosate is roughly 41 percent of the product in

14  Roundup and about 51 percent, I believe, in Ranger Pro.

10:04:46  15          However, there are additional chemicals and

16  chemical -- what we call reactants, by-products, within

17  the Roundup and Ranger Pro.  It's not just glyphosate and

18  water.

19      Q.  There is water in Roundup and Ranger Pro; right?

10:05:06  20      A.  Right.  But there's more than just water in

21  glyphosate.

22      Q.  And we'll get to some of those in just a little

23  bit.  But did you also reach an opinion, to a reasonable

24  degree of scientific certainty, that glyphosate

10:05:19  25  formulations have a greater potential to cause cancer

1  than glyphosate alone?

2        A.  Yes, I did.  Yes.

3        Q.  And what is that opinion?

4        A.  That glyphosate, based on animal test data, is

10:05:43  5  carcinogenic by itself.  However, there are additives to

6  the product which increase and enhance its

7  carcinogenicity by several mechanisms.

8        Q.  And one of those that we'll talk about is

9  surfactants; is that correct?

10:05:56  10       A.  That's correct.

11       Q.  Okay.  And those are your general opinions.  Did

12  you also look at Mr. Johnson's case specifically?

13       A.  Yes, I did.  In fact, I early on interviewed

14  Mr. Johnson by telephone.

10:06:08  15       Q.  And did you reach an opinion, after your review

16  of this case, as to whether or not Mr. Johnson's Roundup

17  and Ranger Pro exposures substantially contributed to his

18  diagnosis of non-Hodgkin's lymphoma?

19       A.  Yes.

10:06:22  20       Q.  And what is that opinion?

21       A.  That Mr. Johnson, and I'll explain in detail

22  when asked, was heavily exposed, far more than the

23  individuals in the Monsanto UK POEM studies, for example.

24  He was heavily exposed.  He had a wet face.  He had

10:06:48  25  exposures in which he was notably damp or wet with the

3596

1 material.  And his --

2      Q.  And based -- I'm sorry.

3      A.  -- and his use of the product was

4 extraordinarily heavy, approximately 50 gallons per hour.

10:07:04  5      Q.  And is that a lot?

6      A.  Yes.  Backpack sprayers put out between 4 and 24

7 gallons per hour, on the average about -- about

8 16 gallons per hour, and he was spraying at 50 gallons

9 per hour through a rigged system, which operated at an

10:07:23  10 uncontrolled pressure.  It was either on or off.

11      Q.  And you know, based on Mr. Johnson's testimony,

12 you understand, you know, he had roughly a 50-gallon tank

13 he'd been spraying out of, is that what you're basing

14 that 50-gallon number on?

10:07:43  15      A.  Right.  And that he -- he actually would go

16 through as much as 150 gallons of this stuff in one day.

17      Q.  Can you -- you mentioned Mr. Johnson and

18 speaking to him, can you tell us what types of materials

19 you reviewed before reaching your opinions in this case?

10:07:56  20      A.  Certainly.  I initially reviewed a very large

21 quantity of medical records on Mr. Johnson from -- some

22 records dating prior to his diagnosis and then up at his

23 diagnosis, including pathology results in August of 2014,

24 and then his treatment records.

10:08:27  25          I also reviewed several of his depositions.

1    When I say "several," there was a Worker Comp deposition,

2    and I believe there were two depositions following that.

3    I also reviewed -- I had a file box, a full file box, of

4    studies that I reviewed, which would be approximately

5    5,000 pages.  I brought with me today what I could handle

6    on the airplane, which is a good amount of material, but

7    just a variety of documents also from Monsanto, in fact,

8    memorandums, emails, official documents, including

9    reports that were issued by Monsanto.

10        Q.  You mentioned studies, were those both published

11   studies and internal Monsanto studies?

12        A.  Yes.  When I say "studies," my large file box is

13   primarily published studies from the generally accepted

14   period of the literature, but I also have a large volume

15   of inhouse studies from Monsanto, many of which were

16   never provided to the EPA or any regulatory agency.

17        Q.  Those studies, were those both epidemiological

18   studies and the animal studies that you reviewed?

19        A.  Primarily the animal studies or the -- what we

20   call the *in vitro* studies.

21        Q.  And -- did what did those studies entail?  Did

22   you review any studies with respect to exposure of

23   individuals or animals to Roundup and how that affects

24   carcinogenicity?

25        A.  I certainly did.  The key studies that I

10:08:48

10:09:15

10:09:31

10:09:51

10:10:07

3598

1 reviewed with respect to exposure were actually

2 Monsanto-published studies.

3     Q.  You mentioned some internal correspondence,

4 emails, other types of documents with Monsanto.  Are

10:10:27   5 those documents you reviewed and relied upon in reaching

6 your opinions?

7     A.  Yes.

8     Q.  And these documents that you reviewed, the

9 internal documents for Monsanto, are those types of

10:10:45  10 documents that are reasonably relied upon by experts in

11 your field as a toxicologist?

12     A.  Yes.  All the time, yeah.

13     Q.  And what do you mean all the time?  How do

14 toxicologists rely on that information?

10:10:56  15     A.  Well, a toxicologist is sort of like a

16 detective.  Okay.  We look hard and deep to try to find

17 all the evidence we can, whether it is helpful for the

18 client or adverse to the client.  It doesn't matter.  The

19 objective is to look at every possible piece of evidence

10:11:14  20 and then assemble it into a conclusion based on the merit

21 of that evidence.

22     Q.  And is that what you did in this case?

23     A.  Yes.

24     Q.  And what in particular were you investigating?

10:11:27  25     A.  A number of factors.  To start with, the

3599

1  exposure dose, which was very thoroughly calculated by

2  Monsanto in their operator exposure studies.

3        Q.  And can I just stop you right there.  Can you

4  define what "exposure dose" means?

10:11:50   5        A.  Yeah.  Okay.  Exposure is, in this case, how

6  much material gets on the body.  Okay.  The dose,

7  however, is how much gets into the body, in the systemic

8  circulation or into the tissue target, so there's a big

9  difference.  If, for example, the dermal absorption was

10:12:12  10  only 1 percent, only 1 percent of that material would

11  make its way to the target organ, whether it be the

12  dermis, the skin or the liver or internal organs, that's

13  what we call the internal dose.

14        Q.  Is that also referred to as systemic dose?

10:12:26  15        A.  Yes.

16        Q.  So systemic or internal, it means the same

17  thing?

18        A.  Yes, yeah.  It means -- the bottom line is the

19  target organ.

10:12:35  20        Q.  And so you were discussing what you were

21  investigating in this case, and so one of the first

22  things you did was investigate all of the materials to

23  try to figure out exposure and internal dose; is that

24  fair?

10:12:47  25        A.  Yes.  The first step was to determine whether

1  Mr. Johnson was significantly exposed, that is, did the

2  exposure at work actually make it into his systemic

3  circulation?  Did it make it into the blood and impact

4  any of the stem cells that ultimately developed into a

10:13:13  5  T-cell lymphoma?  So really the question for Mr. Johnson

6  was:  Was he significantly exposed, and if so, was that

7  exposure dose substantial and significant enough to cause

8  damage to his stem cells.

9      Q.  And based on your experience, education, review

10:13:36  10  of all of the materials, you reached an opinion that, in

11  fact, it was enough of an exposure dose to cause his

12  non-Hodgkin's lymphoma?

13      A.  Much so.

14      Q.  Now, to be clear, Doctor, you don't believe that

10:13:56  15  Roundup or Ranger Pro needs to be taken off the market

16  for all purposes; correct?

17      A.  No.  If there were proper warnings, if an

18  individual knew that they were dealing with a carcinogen

19  and it was used in a limited fashion without producing

10:14:11  20  what we call aerosol, that is aerosol that drifts and

21  gets all over the body, it could be used.

22      Q.  And, in fact, like many people here in this

23  room, you've used Roundup; correct?

24      A.  I believe it is fairly popular.

10:14:27  25      Q.  And what do you mean by that?

3601

1        A.  Well, I think it's used both over the shelf.

2  You can buy it at Walmart or Home Depot.  I buy it at the

3  Bailey's Hardware Store in Sanibel, Florida.

4        Q.  And so you believe that Roundup and Ranger Pro

10:14:44    5  could potentially be used properly; correct?

6        A.  Yeah.  There is a proper way of using it, yes.

7        Q.  Okay.  And so do you take any precautions in

8  your use of the Roundup?

9        A.  Yes.  I've used it several times per year.  The

10:14:56   10  first time I ever used it was about 20 years ago, and I

11  was absolutely disgusted, because I had bought a

12  backpack, and I used it on spot weeds, and the wind blew

13  it all over my legs.  I immediately washed with soap, and

14  I actually went into my swimming pool after that and --

10:15:16   15        Q.  And why did you do that?

16        A.  Well, because it produced an aerosol mist that

17  the wind would uncontrollably blow back on the body.

18        Q.  Did you try to prevent that drift?

19        A.  I sure did.

10:15:27   20        Q.  Okay.  But you weren't able to?

21        A.  No, I did.  I drilled with about a

22  30-thousandths drill into my orifice in my workshop and

23  turned it into, basically, a squirt gun, where I can

24  directly squirt weeds.  I have mulch.  I don't have

10:15:45   25  grass, and I have -- occasionally I have weeds shoot up

3602

1  in that mulch, and I can direct it right on those weeds

2  with no aerosol production, and I wear heavy rubber

3  gloves, and I have zero exposure.

4        Q.  Okay.

10:15:59   5        A.  So, I mean, the -- I think that -- I don't think

6  that the material necessarily needs to be completely

7  banned, but there are a lot of things we use that are

8  dangerous, but it's a matter of how you handle it and the

9  warnings.

10:16:09  10        Q.  Okay.  And so you -- you made that modification

11  to the actual hose.  Was that after your first time of

12  spraying?

13        A.  Yes.

14        Q.  And was that because of your first experience

10:16:18  15  with the drift?

16        A.  Yes.  And I knew at that time it had

17  carcinogenic potential.

18        Q.  So you had already known that?

19        A.  Yes.

10:16:27  20        Q.  And did you take that into consideration in your

21  choice to use it?

22        A.  I did.

23        Q.  So you actually made the choice, you had the

24  choice whether or not to use the product?

10:16:36  25        A.  Yes.

1      Q.  How much -- you mentioned your use.  How large

2  of an area are you actually spraying?

3      A.  Well, I have nearly an acre, but as I say, it's

4  almost 100 percent mulch.  I don't have grass, but I do

10:16:56    5  get occasional weeds.

6      Q.  How does your exposure, when you do that, how

7  does that compare to Mr. Johnson?

8      A.  Mr. Johnson was using a higher pressure system,

9  which was on or off.  He had no controls to reduce it,

10:17:16    10  and he was, based on his testimony, as I understand,

11  about 50 gallons in an hour, which is several times what

12  would normally come out of a --

13          MR. LOMBARDI:  Your Honor, may we approach?

14          THE COURT:  Yes.

10:17:37    15          (Sidebar.)

16          MR. LOMBARDI:  He had no nothing in his expert

17  report about Mr. Johnson's use of this -- I don't know

18  what the right term is -- the 50-gallon pump and the

19  details of how that worked or a comparison between that

10:17:57    20  and the way that he used the product, so this is beyond

21  the scope of his opinions.

22          MR. DICKENS:  Your Honor, they're the ones that

23  brought it up.  We weren't going to get into how he uses

24  it.

10:18:09    25          THE COURT:  I know.  Was there anything -- did

3604

1  he review any materials that indicated how Mr. Johnson

2  used it?

3          MR. DICKENS:  Absolutely.  He knew he used his

4  truck sprayer.

10:18:19  5          THE COURT:  He knew all of that and that was --

6  whatever reports he read about Mr. Johnson was all

7  disclosed?

8          MR. DICKENS:  Absolutely.  He went into detail

9  about how he used that, how he used the truck sprayer --

10:18:36  10  67-page report that goes -- that all the details -- all

11  of the evidence Mr. Johnson has given (inaudible).

12          THE COURT:  So what is it that's new?

13          MR. LOMBARDI:  What's new is that he -- I don't

14  dispute that he talked about he used a backpack sprayer

10:18:51  15  or that he used the pump in the back of the truck.  I

16  don't dispute that, but now we've had discussion about

17  it's an unregulated pump.  It was out of control, the way

18  it sprayed, you couldn't control the way it's spraying.

19  That stuff I don't believe was in his report.  And there

10:19:09  20  certainly wasn't any comparison between the way

21  Mr. Johnson did it and the way Mr. -- Dr. Sawyer did it.

22  And this did come up at his deposition.  Dr. Sawyer's use

23  of Ranger Pro did come up at his deposition.  There was

24  no comparison of that at all.  But no detail other than

10:19:26  25  he used the pump in the back of the truck, is my

3605

1 recollection.

2      MR. DICKENS:  We wouldn't -- he can include any

3 use by Dr. Sawyer.  We have to explain how his exposure

4 compares to Mr. Johnson.

10:19:44  5      THE COURT:  I'll allow it.

6      (End sidebar.)

7      THE COURT:  You may continue, Mr. Dickens.

8     Q.  BY MR. DICKENS:  Okay.  Dr. Sawyer, we were just

9 discussing how your exposure compared to the exposure of

10:20:04 10 Mr. Johnson.  Can you explain to us, again, how that --

11 your exposure in your one-acre yard compared to

12 Mr. Johnson?

13     A.  Well, what I explained was I experienced what we

14 call drift.  That's aerosol droplets that the wind blows

10:20:18 15 back onto the body.  Now, I never experienced any drift

16 above my knees, but Mr. Johnson experienced drift that --

17 in fact, to his entire body, including even face.  And he

18 was using an application rate about three times above

19 that which is that which was used in the Monsanto

10:20:43 20 operator exposure assessment study.  Thus, his exposure

21 from the standpoint of the dose I relied on from the

22 Monsanto study was severalfold higher than that.

23     Q.  And so, you know, based on that, once again, you

24 believe that there's appropriate uses for Roundup or

10:21:10 25 Ranger Pro, if used in small quantities?

1    A.  Yes, with appropriate warnings and the proper

2  equipment.

3    Q.  And because you were aware of the

4  carcinogenicity potential of Roundup and Ranger -- or

10:21:24    5  Roundup when you used it, you were able to take that into

6  consideration?

7    A.  Yes.  I'm an extreme outlier.  I mean, I've been

8  following -- I looked at the original hairy cell leukemia

9  studies back in the '90s.  I've been following it for

10:21:38   10  years.  I know what it does.  That's why I was rather

11  disgusted when I got it on my lower legs.

12    Q.  And that's why you immediately stopped, went,

13  washed it all off and got in the swimming pool?

14    A.  Yeah.

10:21:53   15    Q.  Now, what type of glyphosate products did

16  Mr. Johnson spray, based on your understanding?

17    A.  Primarily, he initially worked with what we call

18  Roundup, which is 41-percent glyphosate, with a number of

19  other chemicals in it, and then later, he worked more

10:22:15   20  often with Roundup, which is basically the same mixture,

21  but simply a higher concentration, 51 percent -- or

22  52 percent versus 41 percent in the Roundup.

23    Q.  Other than the concentration, is there any

24  difference between Roundup that you can buy in stores

10:22:35   25  that ordinary consumers like us and the Ranger Pro that

3607

1  Mr. Johnson used?

2      A.  No.  The concentration is the difference.  Now,

3  if you were to go to Home Depot or Lowe's, you would find

4  that there's Roundup and -- which they call Roundup

10:22:55  5  Concentrate, and there's also a Roundup Super

6  Concentrate, which is 51 percent, and the instructions

7  simply -- state simply dilute it more when you buy the

8  Super Concentrate, so it's basically the same material.

9      Q.  Does Monsanto sell glyphosate by itself?

10:23:20  10      A.  No.  However, they license it to other

11  corporations, such as Syngenta and a number of other

12  corporations, but they don't sell it to consumers as pure

13  glyphosate, no.

14      Q.  Monsanto -- is Monsanto the manufacturer of both

10:23:39  15  Roundup and Ranger Pro?

16      A.  Yes.

17      Q.  Did Mr. Johnson use any glyphosate formulations

18  by any other manufacturer?

19      A.  Not that I found in the records or his

10:23:50  20  deposition.

21      Q.  And was Mr. Johnson ever exposed to any other

22  chemicals, pesticides or herbicides that had been

23  associated with non-Hodgkin's lymphoma?

24      A.  Not to my knowledge, no.

10:24:02  25      Q.  And you reviewed that, his chemical exposure;

3608

1 correct?

2       A.   That's correct.

3       Q.   You mentioned, kind of, the makeup of Roundup

4 and Ranger Pro, and you said water and glyphosate and

10:24:14   5 some other stuff.  What are some of those other

6 chemicals?

7       A.   Well, propylene glycol.  Propylene glycol is

8 used to help emulsify the material.  Remember, the

9 product works by gaining entry into the plant leaf, and

10:24:36  10 the absorption of that chemical into the plant leaf is

11 very critical in terms of operating and knocking out the

12 ES -- or the EPSP enzyme, which permits plant growth in

13 light.

14            So some of these additives, propylene glycol,

10:25:01  15 dipropylene glycol, tallow amine, which is what we call a

16 POEA, a polyethoxylated ethyl amine, are all used to help

17 the penetration of the product either spread onto the

18 leaf or penetrate into the leaf and work more

19 efficiently.  It's a very clever design, really, in terms

10:25:30  20 of how this product works.

21            And so there are also what we call

22 co-contaminants that -- for example, when the POEA is

23 made, whether it's tallow amine or another POEA, there's

24 oxidation reactions in preparing that, which result in

10:25:50  25 ethylene oxide, 1, 4-Dioxane, and those two chemicals are

1  known confirmed Class A human carcinogens.  In fact,

2  ethylene oxide is one of the most potent carcinogens

3  known to man, and it's highly volatile, so when it is

4  used -- whenever ethylene oxide is present, it's volatile

10:26:12  5  as it's inhaled.

6           So there are co-contaminants.  There's even some

7  additional co-contaminants that form during the

8  production process, called N-nitroso compounds, which are

9  also known human carcinogens, which generally cause

10:26:30  10  cancer in humans, so --

11       Q.  And, Doctor -- I'm sorry.

12       A.  Yeah, I mean, it's a mixture of adjuvants,

13  surfactants, glyphosate, and then trace quantities of

14  these other carcinogens, which act in an additive and in

10:26:51  15  some cases synergistic effect to cause cancer, along with

16  glyphosate.

17       Q.  You just mentioned surfactant.  We've heard some

18  of that here in this case so far.  What is a surfactant?

19       A.  Well, a surfactant is -- think of -- think of

10:27:10  20  water on a freshly waxed car and the water droplets bead

21  up.  If you were to add surfactant to that rain water, it

22  would spread out over that waxed car, and a surfactant

23  is -- in a sense, it's a detergent.  It's a soap.  But in

24  this case, they generally use what we call non-ionic

10:27:35  25  surfactants, but the fact is the surfactant is simply

1 allowing a reduction of the hydrophobic to hydrophilic

2 repellant and allows the material to spread out evenly

3 over the leaf or the human tissue.

4      Q.  It's a fairly complicated explanation, but I

10:28:00  5 think you just said it there.  It helps, you know, spread

6 out those droplets; correct?

7      A.  Yes.

8      Q.  And so for Roundup or Ranger Pro, those

9 surfactants help it spread across the surface of the

10:28:15  10 leaf?

11      A.  It does.  And at the same time, it also enhances

12 permeability through the epidermis of the skin or the

13 leaf cuticle.

14      Q.  And so if you get it on your skin, how does --

10:28:25  15 what does the surfactant do?

16      A.  Well, a number of things.  There --

17      Q.  And I believe -- to help us out here, I believe

18 you have an -- or helped prepare a demonstrative with

19 respect to what a surfactant does in a herbicide such as

10:28:44  20 Roundup -- or in Ranger Pro.

21          MR. DICKENS:  Permission to publish Plaintiff's

22 Exhibit 36, your Honor?

23          THE COURT:  Any objection?

24          MR. DICKENS:  That's what I've given you.

10:28:56  25          MR. LOMBARDI:  Is it the board?

```
 1          MR. DICKENS:  It's --

 2          MR. LOMBARDI:  I'm sure I don't.  I trust

 3 Mr. Dickens.

 4          MR. DICKENS:  That's what I handed you earlier.

 5          THE COURT:  All right.  Thank you.  You may

 6 proceed.

 7     Q.  BY MR. DICKENS:  And so this demonstrative,

 8 Dr. Sawyer, says, "Surfactants are able to increase

 9 glyphosate absorption through the skin by," and number

10 one is:  "Removal of lipids from the epidermal surface

11 due to surfactant action."

12          What is that?

13     A.  That's a critical step.  This is a detergent

14 soap-type effect.  A lipid is a hydrophobic -- let's make

15 it simpler.  A greasy, oily material.  It doesn't mix

16 with water.  So if you have a greasy pot or pan, and you

17 add a little soap to it, you can -- and remove that

18 greasy, oily film.  That's what a surfactant does.

19          And on our skin, on our epidermal surface, we

20 have fatty acids, a number of them, and other what we

21 call hydrophobic lipid material, which is resistant to

22 letting aqueous material enter our epidermis.  So that

23 surfactant breaks that surface tension, emulsifies some

24 of that material, so there's a higher likelihood of the

25 water soluble drug, in this case glyphosate, to enter.
```

10:29:03
10:29:22
10:29:40
10:30:03
10:30:26

3612

1       Q.  You just mentioned soap, and some Monsanto

2  witnesses have essentially said surfactants are soaps or

3  liquid detergents or laundry detergents.  Is that your

4  understanding as well?

10:30:44  5       A.  That's -- that's true.  It's a little bit of a

6  crude definition, but yes.

7       Q.  Okay.  And so, you know, just like that soap,

8  you know, can help, kind of, with the actual epidermis,

9  can you explain how does the surfactant in Roundup

10:31:04  10  compare to what's in soap?  Is it the same thing?

11       A.  It's a non-ionic surfactant, largely.  There are

12  several surfactants used.

13       Q.  And that's in Roundup?

14       A.  Oh, yeah.  In Roundup primarily is tallow amine,

10:31:18  15  which is a POEA.  That is a very powerful surfactant, and

16  it also has some very serious toxicological consequences

17  associated with it.

18       Q.  Are POEAs used in soap or laundry detergent?

19       A.  Not to my knowledge.  Used for industrial

10:31:39  20  cleaning of tanks, I know.

21       Q.  Okay.  And so for the POEA, you said it has some

22  toxicological consequences.  What are some of those

23  toxicological consequences of POEA?

24       A.  Primarily, once it becomes systemic, it has been

10:31:57  25  shown to induce what we call DNA adducts, that is the

3613

1  DNA, the molecular code material in our body, in our

2  cells, which determine whether we produce normal skin or

3  carcinogenic skin.  That DNA can be damaged by what we

4  call these adducts, that is the binding of the POEA, the

10:32:22   5  tallow amine, to the DNA, and when the DNA is read, it is

6  misread and becomes corrupted.  There's also oxidative

7  damage done to the DNA from tallow amine and other POEAs.

8      Q.  Has Monsanto ever conducted any carcinogenicity

9  studies on the surfactant such as POEA?

10:32:43   10     A.  No, they have not.

11     Q.  Has the EPA ever reviewed the carcinogenicity of

12  surfactants?

13     A.  No.  No.  I've researched that.  The only thing

14  EPA has done is what's called an SAR, a structural

10:32:58   15  activity relationship by computer.

16     Q.  And what is that?  Can you explain it?  You say

17  by computer.  How do they test that?  How does that

18  related in any way to carcinogenicity?

19     A.  Well, there are certain classes of compounds

10:33:11   20  that are generally carcinogenic.  For example, let's take

21  chlorinated hydrocarbons, such as trichloroethylene, TCE,

22  or DDT or dioxins or PCBs.  They're all chlorinated

23  hydrocarbons, and they have certain chemical

24  configurations with chlorine that are very often

10:33:34   25  carcinogenic.

3614

1            So by performing an SAR analysis, one is simply

2   looking at the configuration of the chemical.  In this

3   case, it's an organic phosphate.  It's not a neurotoxic

4   organic phosphate, but it is an organic phosphate, and

10:33:55   5   the SAR did not find that chemical to be -- likely to be

6   carcinogenic.  That is the EPA position.

7            Q.  Okay.  And so that's based on a computer model,

8   but they haven't actually looked at any testing as to

9   carcinogenicity?

10:34:09   10            A.  No, it's never been tested.

11            Q.  And has Monsanto ever submitted any testing at

12   all with respect to the carcinogenicity of their

13   surfactants?

14            A.  No.  However, Monsanto has documented and

10:34:24   15   recommended that such evaluations be performed.  That's

16   very clear.

17            Q.  And did they ever perform them?

18            A.  No.  What has been performed are university

19   studies showing, you know, the DNA adduct formation and

10:34:43   20   DNA oxidative damage.  That's been published in the

21   peer-reviewed scientific literature.

22            Q.  Okay.  And so Monsanto themselves never

23   conducted any testing, but you mentioned universities.

24   So those are third parties?

10:34:54   25            A.  Correct.

3615

1    Q.  And those third parties have tested the

2  carcinogenicity of surfactants?

3    A.  Only the DNA aspects.

4    Q.  And going back to our demonstrative, increase

10:35:18   5  the hydration state of the skin under closed exposure

6  conditions, what do you mean there, Doctor?

7    A.  That is simply the effect, for example, that

8  skin cream would have by keeping the skin moist, less apt

9  to dry out and become less permeable.

10:35:36   10    Q.  Number three, I think we've already talked

11  about.  It increases the skin contact; correct?

12    A.  Correct.

13    Q.  And then number four, what do you mean by number

14  four?

10:35:43   15    A.  This -- this is very important to plants, not as

16  important to humans.

17    Q.  Okay.  And let's move on to number 5.  How does

18  number 5 apply to humans?

19    A.  Very critical.

10:36:02   20    Q.  And how?

21    A.  Well, glyphosate is generally accepted, widely

22  known, and even as per Material Safety Data Sheets

23  produced by Monsanto, is a skin irritant.  I don't think

24  there's any debate about that from Monsanto or anyone.

10:36:20   25  It does irritate the skin.  It can cause redness of skin,

3616

1  and that redness of skin, that's an irritant effect.

2  Whenever skin is irritated, inflammation occurs and

3  there's dilation of the dermal capillaries and blood

4  vasculature.  That's what causes red skin.  It's just a

10:36:35  5  simple fact.  It's a skin irritant.

6       Q.  And once the skin then becomes irritated in any

7  way, does that affect the amount of absorption into the

8  skin of the product?

9       A.  Heavily.  When vasodilation occurs in the dermal

10:36:53  10  layers, dermal absorption is increased.

11       Q.  So if you have any damaged skin at all, you said

12  dermal absorption of the actual Roundup or Ranger Pro

13  increases for a human?

14       A.  Yes.

10:37:06  15       Q.  And what role does that play in non-Hodgkin's

16  lymphoma?

17       A.  Well, it increases the dosage.  In other words,

18  if a person is chronologically being exposed and has skin

19  irritation developing from the use of it, certainly that

10:37:27  20  would increase dermal absorption in those specific areas

21  of irritation.

22       Q.  And is some of that what you're discussing in

23  number six here?

24       A.  That's simply an inflammation process.  That

10:37:45  25  does occur as well.  That is not necessarily significant

1  with respect to increased dermal absorption.

2      Q.  Based on your review of all the materials you

3  saw in this case, is it your understanding that Monsanto

4  agrees that the increase of -- or surfactants can

10:38:06   5  increase subepidermal blood flow due to irritant action

6  of the surfactant?

7      A.  Yes.

8      Q.  So do you also know whether or not Monsanto

9  agrees that Roundup and Ranger Pro can irritate the skin?

10:38:24  10      A.  Yes.

11      Q.  And that can increase the amount of dermal

12  absorption?

13      A.  Yes.

14      Q.  Doctor, if you can turn to Exhibit 209 in your

10:38:42  15  binder.

16      A.  Okay.

17      Q.  It's a document already in evidence.  It's

18  surfactant toxicology.  And if you can turn to that last

19  page of this particular document.  Let me know when you

10:39:02  20  get there.

21      A.  All right.

22      Q.  Can you please read the general conclusions

23  included here and let me know when you're ready.

24      A.  Yes.  Simply that surfactants are biologically

10:39:16  25  not inert.

3618

1      Q.  Okay.  And before you go on, after reading this,

2  do you agree with the statements made in this particular

3  exhibit?

4      A.  I do.

10:39:25   5      MR. DICKENS:  Permission to publish Plaintiff's

6  Exhibit 209, your Honor.

7      THE COURT:  Very well.

8      MR. LOMBARDI:  No objection.

9      Q.  BY MR. DICKENS:  And is it your understanding

10:39:39  10  that this is a document prepared by Monsanto?

11      A.  Yes, it is a Monsanto document that was prepared

12  as a slide presentation.

13      Q.  And that's based on your review of, you know,

14  the first document, I guess, or the first page?

10:39:55  15      A.  That is correct.  I reviewed that and even

16  researched who the ex-employee was.

17      Q.  And who was that employee?

18      A.  That was Mark Martens.

19      Q.  Thank you, Doctor.  I want to go through and

10:40:12  20  have you explain what some of these conclusions mean for

21  us.

22      It says, "Surfactants are biologically not

23  inert."  First of all, what is "inert"?

24      A.  Inert is what Monsanto publishes on their label

10:40:25  25  of the bottle.

3619

1    Q.  And what does it mean?

2    A.  They list the surfactants as an inert ingredient

3  meaning that that ingredient is not the primary

4  ingredient that kills the weed.  So they're calling it

10:40:43   5  inert.

6         However, by definition toxicologists consider

7  inert materials such as hydrogen, water.  Harmless things

8  are inert, okay?  Inert has, from a toxicological

9  standpoint, means harmless.  And what this slide states

10:41:06  10  that surfactants are biologically not inert.  I agree

11  with that.  That is true.  They can be toxic, and this

12  must be addressed.

13    Q.  And with respect to POEA, that's once again the

14  surfactant used in the Roundup and Ranger Pro used by

10:41:21  15  Mr. Johnson?

16    A.  Yes.

17    Q.  Is the POEA, is that not inert and toxic, in

18  your opinion?

19    A.  It's very toxic, yes.  And it's not inert.

10:41:34  20  That's why Monsanto's toxicologists put this together and

21  stated it must be addressed, and over the last 15 years

22  or so, it has not been addressed.

23    Q.  And that's based on your review, the toxicity of

24  the surfactants has not been addressed by Monsanto?

10:41:55  25    A.  That's correct.

1    Q.  The second bullet point I want you to explain to

2  us, it says, "Part of the toxicity of surfactants is

3  related to the surfactant action which destabilizes cell

4  membranes."

10:42:09    5         What is -- can you describe the process of

6  destabilizing cell membranes?  What does that mean?

7    A.  Yes, I have an epidermal layer of the human skin

8  demonstrative that might help.  But if you want to get to

9  that later, that's fine.

10:42:28   10    Q.  Yeah, that's fine.  We can get to that later.

11         We'll go to the third one.  "Part of the

12  toxicity of surfactants can be specific skin

13  sensitization oestrogenicity.  I probably pronounced that

14  incorrectly, but can you tell us what that means and

10:42:44   15  whether you agree with it?

16    A.  Yeah.  The -- some of the surfactants can

17  immunologically sensitize the skin.  Some of the

18  surfactants act in an estrogenetic capacity.  In other

19  words, as the tail of the molecule metabolizes, that

10:43:07   20  specific molecule is close enough to the structure of

21  estrogen that it has a certain level of estrogenicity.

22         This is spelled with an "O" because it's

23  British.  It's estrogenicity.

24         But the problem with estrogenetic chemicals is

10:43:23   25  they can cause a number of developmental abnormalities

1  and can even stimulate estrogen positive breast cancer.

2         So -- and I want to be careful about this

3  because the non-oil compounds are clearly estrogenetic,

4  and that's not what's in Roundup and Ranger Pro.  Tallow

10:43:49   5  amine is in Ranger Pro and Roundup, and I don't believe

6  that tallow amine is estrogenetic.  I'm pretty sure of

7  that.

8         So in this slide with respect to the toxicity

9  being estrogenetic, I don't think that applies in this

10:44:11   10  case.

11       Q.  Okay.

12       A.  But in terms of skin sensitization, yes.

13       Q.  And that's helpful.

14         Now the fourth bullet point, "Toxicity of

10:44:20   15  surfactants depends on their concentration in the

16  formulation."

17         Do you agree with that?

18       A.  Absolutely.  Dose makes a difference.

19       Q.  And the more concentration of surfactant in the

10:44:34   20  formula, the higher the toxicity?

21       A.  Yes.

22       Q.  And then the last bullet point, "The high added

23  value of herbicide formulations containing surfactants

24  resides in the optimal compromise between efficacy and

10:44:48   25  safety for man and the environment."

3622

1          Once again, do you agree with that statement?

2     A.   Absolutely, yeah.

3     Q.   We talked some about the POEA and the toxicity

4 of POEA.  Did Monsanto ever consider whether or not to

10:45:05   5 change the surfactant used in Roundup or Ranger Pro?

6          MR. LOMBARDI:  Objection, your Honor.  With this

7 witness relating facts not in evidence and facts that

8 this witness is not able to relay pursuant to our

9 discussions this morning.

10:45:16  10          THE COURT:  Can you approach, please, Counsel.

11          (Sidebar.)

12          THE COURT:  Are you asking did Monsanto ever

13 consider changing the formula, essentially?

14          MR. DICKENS:  Essentially, yes.

10:45:39  15          THE COURT:  And how would he know that?

16          MR. DICKENS:  Based on all of his review of the

17 materials, he's aware of the considerations as to the

18 toxicity of the POEA.  We're not going to get into bans

19 or anything along those lines, but there's plenty of

10:45:52  20 materials with respect to the toxicity.

21          MR. LOMBARDI:  That's not the objection.  The

22 ban is not the objection to this.  This is using this

23 witness to convey facts that are hearsay to the jury from

24 documents that are hearsay.  He can't do that.  That's

10:46:05  25 what we talked about this morning.

3623

1          THE COURT:  All right.  Let me sustain your

2    objection.

3          (End sidebar.)

4          THE COURT:  The objection is sustained.  You may

10:46:21   5    ask another question, Mr. Dickens.

6          MR. DICKENS:  Sure.

7       Q.  Doctor, can you tell us what are the routes of

8    exposure of Roundup and Ranger Pro to humans?

9       A.  Most significantly, dermal to a slight extent,

10:46:38   10   inhalation.  And really that's the only two significant

11   routes.

12      Q.  And when you say "dermal," that means through

13   the skin?

14      A.  Yes.  Yes.

10:46:52   15      Q.  And inhalation is essentially breathing in the

16   Roundup or the Ranger Pro?

17      A.  Yeah, depending on the aerosol droplet size.

18   And in this case, it's not very significant at all as

19   Mr. Johnson wore a dust mask which should have captured

10:47:12   20   much of the droplets.

21      Q.  You say that a dust mask.  It's your

22   understanding Mr. Johnson wore a mask over his nose and

23   mouth?

24      A.  Yes.

10:47:22   25      Q.  And when you say -- are you talking with respect

3624

1 to inhalation, and that should have provided protection

2 from inhaling the Ranger Pro or Roundup?

3     A.  That's correct.  The operator exposure studies

4 have demonstrated that even without a dust mask,

10:47:46    5 inhalation is a very minimal, very minimal portion of the

6 overall systemic dose.

7     Q.  And is there any other route of -- you mentioned

8 inhalation and dermal.  Those are the significant routes;

9 is that correct?

10:48:02    10     A.  Yeah, the hand-mouth activity has not been

11 officially evaluated.  It is possible among some

12 applicators who smoke cigarettes, for example, or have a

13 habit of touching their mouth, there could be some

14 hand-to-mouth exposure, but that has not really been

10:48:25    15 verified in the literature.

16     Q.  So the overwhelming concern for applicators of

17 Roundup and Ranger Pro is having Roundup get onto the

18 skin; is that right?

19     A.  Yes.

10:48:37    20     Q.  And that's true with respect to Mr. Johnson?

21     A.  Yes, it is.

22     Q.  Now there's a term.  Do you understand the term

23 "AD and E"?

24     A.  Yes.

10:48:51    25     Q.  What is that?

1    A.  Absorption of the drug.  That is, how much of it

2 makes its way into systemic circulation.  The

3 distribution of the drug, whether it goes to the liver or

4 kidney or bone or whether it accumulates in the fat, and

10:49:10   5 the excretion, "E" is for excretion, how it is removed

6 from the body, whether it goes through the urine or the

7 feces or out in the breath.  And then metabolism.  That

8 is, is the drug or the chemical altered in any way after

9 it gets into the body.  Does the liver change it into

10:49:32  10 metabolites or does it all just go out unchanged in the

11 urine.  That's the metabolism aspect of it.

12    Those are the four very important points that

13 toxicologists study to determine the mechanism of how a

14 drug causes potential adverse effects or injury.

10:49:49  15    Q.  Why don't I take a step back.

16    With respect to the POEAs or surfactants that we

17 discussed, generally are there safer, less toxic

18 alternatives than POEA for herbicides such as Roundup or

19 Ranger Pro?

10:50:03  20    A.  Yes.

21    Q.  And were those safer, less toxic surfactants

22 available to Monsanto?

23    A.  Sure.  I mean, there's -- I wear contacts.

24 Contact lens solution has non-ionic surfactants in it

10:50:25  25 that are harmless.  I mean, there's many non-ionic

1 surfactants that are harmless that are used in medicine,

2 in ophthalmology and so on.  So certainly there are

3 alternatives.

4         Now I can't speak on the cost on that.  There

10:50:47  5 may be cost factors.  There may be, you know, other

6 engineering reasons, but I can't speak on that aspect.

7     Q.  Those alternatives for the surfactant, were

8 those available in 2012, when Mr. Johnson began spraying

9 Roundup and Ranger Pro?

10:51:00  10     A.  Yes.

11     Q.  Did Monsanto have other glyphosate formulations

12 that used other types of surfactants other than POEA?

13     A.  I'm sorry, I didn't --

14     Q.  Did Monsanto have any other glyphosate

10:51:17  15 formulations that used surfactants other than POEA?

16     A.  Oh, absolutely, yeah.  In other parts of the

17 world, they had to.

18     Q.  I understand you have a demonstrative to help

19 explain how Roundup and Ranger Pro can get into the skin;

10:51:33  20 is that right?

21     A.  Yes.

22         MR. DICKENS:  Permission to publish Plaintiff's

23 Exhibit --

24         THE COURT:  Mr. Dickens, perhaps before we get

10:51:44  25 into this next demonstrative we can take the morning

```
 1  recess.

 2          MR. DICKENS:  That's perfect.

 3          THE COURT:  All right.  So we'll be in recess,

 4  Ladies and Gentlemen, for 15 minutes.  And we'll resume

 5  again at five after 11:00.

 6          Please remember do not discuss the case nor do

 7  any research.  Thank you.

 8          MR. LOMBARDI:  Your Honor, may we approach for

 9  just one second?

10          THE COURT:  Yes.

11          (Sidebar.)

12          MR. LOMBARDI:  Your Honor, the last question and

13  answer was a direct violation of what this witness was

14  not supposed to do.  He was asked are there -- does

15  Monsanto sell products without POEA, and he says, "Yes of

16  course, they do.  They're required to in other parts of

17  the world."  That's the bans.

18          And so he was told not to do it, we raised it

19  this morning not to do it, and now he puts it on the

20  record.  There's nothing for me to object to because I

21  couldn't have objected before he blurted it out.

22          And so it's improper, it shouldn't happen again,

23  and I want to confer about whether there's anything we

24  can do about it, but it shouldn't have happened.

25          THE COURT:  You can't mention the bans.
```

10:51:55 — line 5
10:52:04 — line 10
10:52:20 — line 15
10:52:35 — line 20
10:52:54 — line 25

1          MR. DICKENS:  The question didn't have to do

2 with bans (inaudible) -- instruction, that's fine.  But

3 the question itself and the first part of the answer was

4 completely fine.

10:53:19    5          MR. LOMBARDI:  She can't hear us.

6          I feel the question in the first part of the

7 answer isn't violative of any instruction by the Court.

8 You know, there was one sentence there.  It didn't

9 mention the ban in Europe.  Obviously, I didn't know what

10:53:37   10 he was going to say.  However, I don't think there's any

11 issue here, you know.  We moved on as quickly as

12 possible, AND I didn't follow it up with any additional

13 questions based on it.

14          THE COURT:  Remind him during the break that he

10:53:50   15 can't get into that.  I don't know if you want a motion

16 to strike that, but it brings more attention to it.

17          MR. LOMBARDI:  That's what I wanted to confer

18 about, your Honor.  Thank you.

19          (End sidebar.)

11:06:22   20          (Recess.)

21          THE COURT:  Welcome back, Ladies and Gentlemen.

22          Ladies and Gentlemen, Dr. Sawyer remains under

23 oath.  And Mr. Dickens, when you're ready, you may

24 proceed.

11:06:52   25          MR. DICKENS:  Thank you, your Honor.

3629

```
 1            I can actually have Dr. Sawyer step down.  And

 2   permission to publish Plaintiff's Exhibit 1042.

 3            THE COURT:  Any objection?

 4            MR. LOMBARDI:  No objection, your Honor.

 5            THE COURT:  Very well.  You may step into the

 6   well, Dr. Sawyer.

 7       Q.  BY MR. DICKENS:  Okay.  Dr. Sawyer, what are we

 8   looking at?

 9       A.  Is it possible, can I use the pointer?

10            I wanted to explain -- I was asked to explain

11   aspects of dermal absorption, that is, how does a drug or

12   chemical, specifically glyphosate, make its way through

13   the skin.

14            What this is, is the epidermal layers of the

15   skin.  We are constantly producing new skin.

16       Q.  And Doctor, can you step to the side to the rest

17   of the jurors can see.

18       A.  All right.

19            We're constantly renewing our skin.  It's not a

20   long-term tissue.  And what we have are what we call

21   keratocytes that -- this is the dermal layer, the dermis.

22   And these cells differentiate into what we call --

23       Q.  Just so I can just -- so this is human skin.  Is

24   this essentially like the top, like if this were an arm?

25       A.  This is the external layer, yeah.
```

Timestamps:
11:07:05 (line 5)
11:07:30 (line 10)
11:07:45 (line 15)
11:08:00 (line 20)
11:08:24 (line 25)

1          So we have these keratinocytes and they

2    differentiate into the -- as they basically move towards

3    the outside of the skin, into a differentiated brick and

4    mortar or layered pattern, a very tight pattern.

11:08:43    5          Q.  And what is the significance of that pattern?

6          A.  Well, as they -- as these cells develop and move

7    forward, they become filled with keratin, cholesterol,

8    ceramides, and other substances that are very lipo --

9    hydrophobic.  In other words, chemicals that do not

11:09:10    10   absorb water, and they're very resistant.  They're

11   basically designed to block substances from coming in.

12          And they can be modified.  For example, organic

13   solvents defat these cells.

14          Q.  What do you mean by that, Doctor?

11:09:27    15         A.  It empties them from the cholesterol, the fatty

16   acids, and the ceramides in these cells are depleted and

17   removed.  And then chemicals absorb very rapidly down

18   into the dermis where the blood and circulatory system

19   picks up the chemical.

11:09:47    20         Q.  I thought skin was supposed to protect us

21   from --

22          A.  It is, but it can be damaged in several ways.

23   Okay?  Surfactants, these -- this layer of keratin into

24   the stratum granulosum, this layer has protein in it as

11:10:04    25   well.  It also has hair follicles.

1              And the proteins especially that are involved in

2     this matrix have three-dimensional configurations.  Okay?

3     These configurations are designed to not allow substances

4     in and yet hold the integrity of the skin together.

11:10:27    5              Now, if that protein is denatured with heat, for

6     example, it can form a complete block, a complete cement

7     barrier.  If the outside of this tissue is hit with a

8     surfactant such as tallow amine, the tallow amine can

9     basically dampen or release the hydrophobic nature.

11:11:02    10             Remember I told you about putting a drop of

11     water on the waxed surface of a car and it beads up.  The

12     surfactant can allow water-soluble material to penetrate

13     through this hydrophobic barrier, and that's the

14     principle of using the surfactants, is to increase the

11:11:22    15     permeability into a vegetable leaf.

16             However, the same thing holds true with the

17     human skin, and it's well proven that the surfactants

18     increase dermal absorption of glyphosate.  Monsanto's own

19     documents admit that.

11:11:37    20     Q.  So the dermal absorption, does it ever -- does

21     it ever get blocked at any level as it moves down into

22     the skin?

23     A.  Depends on the chemical.  A chemical such as

24     trichloroethylene, which is an organic solvent, can pass

11:11:54    25     through this very readily and destroy the matrix, empty

1    out these keratinocytes.  And other chemicals such as

2    surfactants can simply increase the ability of a watery

3    substance, like glyphosate, which is water soluble, can

4    increase that permeability.

11:12:13    5        So there are several things to keep in mind.  If

6    this protein structure that holds this matrix together is

7    altered, that can either increase or decrease

8    permeability depending on what it does to the protein.

9    Surfactants can increase the permeability of a

11:12:31    10    hydrophilic substance such as glyphosate.

11        Q.  So the POEA, which is the tallow amine in this

12    case, actually helps glyphosate get into the skin and

13    down into -- as you were saying, down into the sensory

14    neuron and the Merkel cell; is that right?

11:12:53    15        A.  Yeah, mainly blood vasculature, which is within

16    this dermal area.

17        But the other thing that glyphosate does, which

18    has been well documented, it changes the cytokines, which

19    are structures that hold this together.  And glyphosate

11:13:11    20    changes the structure of the epidermis over time.

21        So a person who's chronologically using

22    glyphosate ends up with a more permeable skin.

23        Q.  And Mr. Johnson's exposure to the Roundup and

24    the Ranger Pro, would that have occurred with him?  Would

11:13:29    25    it have changed the permeability of his skin?

3633

```
          1      A.  Yes.  That's been well documented in the

          2 peer-reviewed literature, and it's in my report.

          3      Q.  And so it's actually the Roundup formulation

          4 with the surfactant which allows that to happen; correct?

11:13:41  5 It becomes more permeable.

          6      A.  Yes, but the glyphosate itself changes the

          7 cytokine structure that holds the integrity of the

          8 epidermis together.

          9      Q.  But without the surfactant, it wouldn't as

11:13:53 10 readily pass through the skin.

         11      A.  Well, there's two factors.  The surfactant and

         12 the glyphosate itself increases permeability over time.

         13      Q.  So the combination of the two.  The Roundup

         14 formulation actually would have more permeability than

11:14:08 15 glyphosate itself?

         16      A.  Correct.

         17      Q.  Thank you, Doctor.

         18          Doctor, before the break you had mentioned your

         19 role in the Material Safety Data Sheets.  Does IARC,

11:14:39 20 which we've heard about in this case, does IARC play any

         21 role in information that's included within a Material

         22 Safety Data Sheet?

         23          MR. LOMBARDI:  Your Honor, beyond the scope of

         24 the report.

11:14:55 25          THE COURT:  Can you approach, Counsel.
```

3634

```
1              (Sidebar.)

2              THE COURT:  Did he offer this opinion at his

3    deposition?

4              MR. DICKENS:  He did at his deposition.  He

11:15:21  5  specifically stated that IARC is used in Material Safety

6    Data Sheets with respect to carcinogenicity.  I'll accept

7    their representation.

8              THE COURT:  All right.  Thank you.

9              (End sidebar.)

11:15:44 10    THE COURT:  All right.  Very well.  You may

11   proceed, Mr. Dickens.

12             MR. DICKENS:  May I approach to hand the witness

13   some water, your Honor?

14             THE COURT:  Yes.

11:15:58 15    Q.  BY MR. DICKENS:  Okay, Doctor, I was asking you,

16   does IARC play any role in the information within the

17   Material Safety Data Sheets?

18        A.  Yes.

19        Q.  And how is that considered for a manufacturer in

11:16:13 20  the information included in the Material Safety Data

21   Sheets?

22        A.  Well, under US governmental guidelines, and even

23   international guidelines such as OECD, the IARC

24   classification is required to be stated with respect to

11:16:31 25  carcinogenicity -- carcinogenicity level in the MSDS.
```

```
 1              MR. LOMBARDI:  Your Honor, I'm going to have to
 2 renew my objection.  This is beyond the scope, I believe.
 3              MR. WISNER:  I believe he stated it in his
 4 deposition.  It's not beyond the scope.
11:16:49  5              THE COURT:  Counsel, can you approach, please.
 6              (Sidebar.)
 7              THE COURT:  Okay.  So was this in his deposition
 8 or --
 9              MR. LOMBARDI:  It was not in his report.
11:17:03 10              THE COURT:  Well, but did he offer it at
11 deposition?
12              MR. DICKENS:  So they're talking about the SD
13 isn't and they asked you don't have any firsthand
14 knowledge why they used -- they're referring to their
11:17:21 15 SDS.  This was used in the field for an evaluation of
16 chemicals and preparation of labels and Material Safety
17 Data Sheet.  IARC is very commonly used.  Sometimes we
18 see on OSHA or in the NIOSH as well.  Were you ever
19 involved in it?  Yes, I explained that in detail
11:17:40 20 yesterday.
21              (End sidebar.)
22              THE COURT:  All right.  Objection overruled.
23              You may proceed, Mr. Dickens.
24         Q.  BY MR. DICKENS:  Okay.  Doctor, can you explain
11:17:58 25 to us how IARC is used in the preparation of Material
```

1  Safety Data Sheets?

2       A.  Yes.  All MSDSes -- that stands for Material

3  Safety Data Sheet -- are required to provide the IARC

4  classification of carcinogenicity, as IARC has been for

11:18:17  5  many years the key agency internationally that determines

6  whether or not a chemical is carcinogenic, and they have

7  several classes of what we call a confirmed known human

8  carcinogen, a probable carcinogen, a possible carcinogen,

9  and even a class for those of questionable possibilities

11:18:40  10  of carcinogenicity, and then a lowest class, which is

11  non-carcinogenic.

12       Q.  I want to turn back to the skin and your

13  discussion there.  You used some terms, and I'm not sure

14  we defined those, really.  You were talking about

11:18:55  15  hydrophilic and lipophilic.

16           Can you explain what that means and how it

17  applies to Roundup and Ranger Pro.

18       A.  That is the -- really the key basis of dermal

19  absorption of glyphosate.  That is, if it is hydrophobic

11:19:15  20  tissue, that is a fatty acid cholesterol ceramide-based

21  keratin cell -- that's what on the very outer portion of

22  our skin -- that's what we call hydrophobic.  It repels

23  water.

24           And between those cells in the integrity of that

11:19:37  25  brick-and-mortar structure, which I showed you, are

3637

1  proteins and cytokines that hold the matrix together, and

2  water-soluble molecules can pass through that with

3  surfactant.  Even without it, small amounts can get

4  through.

11:19:59  5          But surfactant breaks the tension, allows the

6  chemicals that are water soluble to make its way through

7  the matrix.

8      Q.  And you mentioned hair follicles as well.  So

9  someone who has more hair on their arm, would that

11:20:17  10 actually prevent more glyphosate and surfactant to get

11 into the skin?

12     A.  No.  The greater the number of hair follicles

13 usually enhances dermal absorption.  It's an easy path

14 for a water-soluble molecule to take.

11:20:29  15     Q.  So somebody who may have more hair on the skin

16 or the chest or the back, that actually increases dermal

17 absorption?

18     A.  It does.

19     Q.  Would someone in a profession like Mr. Johnson,

11:20:46  20 an integrated pest manager, would they tend to have more

21 dermal absorption than someone like me who stands up here

22 and asks you questions?

23     A.  Yeah.  So I examined that in my report, as you

24 know, and cited numerous studies.  Farmers, for example,

11:21:03  25 have a higher propensity of what we call skin cracks and

1  fissures, and it's from working with dry soils,

2  materials, farm equipment, their hands tend to have a

3  higher of permeability from cracking of the skin.  That's

4  been very well documented.

11:21:21  5      Q.  How do you go about testing the actual dermal

6  absorption of a chemical like Roundup or Ranger Pro?

7      A.  There are several ways.  One is a simple patch

8  test on the skin of an animal in which a known quantity

9  of material over a square centimeter of tissue is placed

11:21:46  10 for a particular length of time, and then the amount of

11 material that is left on the patch or on the outside of

12 the skin is measured.  The amount that's absorbed in the

13 body is measured through the urine and feces.  And one

14 can then determine how much made it in.

11:22:09  15      Another method is an *in vitro* method.  That

16 means a laboratory bench method where a Franz diffusion

17 disk is used.  The Franz diffusion disk if I had a cup,

18 okay, and on this cup I took human cadaver skin, fresh

19 human cadaver skin that's been recently removed and

11:22:37  20 refrigerated under careful control, and that human

21 cadaver skin is then stretched over this round surface,

22 and then another cylinder placed on the other side of it,

23 and then the fluid in this cup I'm holding would contain

24 glyphosate and -- a known amount of it.

11:22:56  25      And then the other side of the cup would include

1  saline at physiological pH, with a stirring mechanism so

2  the fluid is moving, and then after a number of hours the

3  amount of glyphosate on this side of the cup is measured

4  versus on the other side of the cup.  And that tells us

11:23:19   5  how much went through the skin.

6         Another aspect to that, though, is the skin is

7  then removed and the skin itself is tested to see how

8  much remained in the skin.

9         And then under the official international rules,

11:23:38   10  the amount of glyphosate that passed through the membrane

11  into that other fluid and the amount that's still

12  retained in the skin is added together, and that gives

13  you the amount of dermal absorption that occurred.

14         So it's really critical to understanding -- this

11:23:55   15  is called a Frazier diffusion cell.  It's simply, like I

16  say, two cups with fluid, with a membrane, either rat or

17  human skin membrane, stretched across it.

18     Q.  And so if any of the thing on the skin, if any

19  of that was -- essentially you couldn't account for it,

11:24:14   20  does that happen sometimes where you just can't account

21  for what you put on the skin?

22     A.  Yes.  That's called the percent recovery.  So

23  when we take what's in the cup and what's in the skin and

24  what's on the other side of the cup, and let's say we

11:24:29   25  started with 100 micrograms, when we add those three

1   numbers up we should end up with 100 micrograms.

2       Q.  Does that always happen?

3       A.  No.

4       Q.  And so what do you do when you're trying to

11:24:43   5   figure out how much dermal absorption, what do you do

6   with that part you don't get back?

7       A.  Well, what happens on many of the studies,

8   what's measured in the cup where you put the glyphosate

9   in is measured on the other side but the tissue itself is

11:24:59   10   not tested.

11           So under the Federal -- well, really under EPA

12   and even under the OECD rules -- OECD rules are an

13   international agency that make the rules for this

14   particular test -- if it doesn't equal 100, then it's

11:25:16   15   assumed that the rest of it is stuck in the skin, and

16   that has to be considered as absorbed.

17       Q.  We've heard Monsanto witnesses state that the

18   total dermal absorption of glyphosate is less than

19   1 percent.  Do you agree with that?

11:25:35   20       A.  No.  I have carefully examined all of the

21   studies that Monsanto has used from, you know, the 1980s

22   on up to the current dates.

23       Q.  And you reviewed those and relied on those in

24   reaching your opinions in this case?

11:25:52   25       A.  Absolutely.

1    Q.  And you mentioned back from the 1980s.  Has

2  Monsanto been performing dermal absorption studies all

3  the way back into the 1980s?

4         MR. LOMBARDI:  Your Honor, this is hearsay for

11:26:05    5  this witness, and pursuant to the rulings this morning,

6  he's not able to talk about that.

7         MR. DICKENS:  Your Honor, I simply asked whether

8  or not they have performed these studies.

9         THE COURT:  All right.  He may answer that

11:26:15   10  question.

11         THE WITNESS:  Yes, yes.  Monsanto's performed

12  one, two -- at least eight studies.

13         MR. LOMBARDI:  Your Honor, this is going beyond

14  the answer to the question.

11:26:30   15         THE COURT:  So do you have another question for

16  the witness, Mr. Dickens?

17         MR. DICKENS:  Yes.

18    Q.  Did you rely on those studies back from the

19  1980s in reaching your opinion as to what the dermal

11:26:39   20  absorption of Roundup or Ranger Pro is?

21    A.  Yeah.  As my primary role as a toxicologist,

22  that's what I do, is I assess the study data and

23  determine what the dermal absorption is.  That's what

24  I -- that's what toxicologists do.

11:26:59   25    Q.  And would -- and based on your review of those

3642

1  studies, you did reach an opinion with respect to what

2  the dermal absorption for Roundup and Ranger Pro was;

3  correct?

4       A.  Yes.

11:27:09   5       Q.  And would reviewing those studies assist the

6  jury in explaining what your opinions are with respect to

7  your opinion on dermal absorption rates?

8       A.  I missed the last two words.

9       Q.  Yes.  Would reviewing those studies with the

11:27:23   10  jury -- or assist the jury in understanding what your

11  opinion is as to the dermal absorption rates for Roundup

12  and Ranger Pro?

13       A.  Absolutely.  It's a critical portion of this

14  assessment as to how much was systemically absorbed into

11:27:39   15  Mr. Johnson's body.

16       Q.  And are you aware of a study back in the 1980s

17  performed by Dr. Maibach?

18       A.  Certainly.

19       Q.  And you reviewed that in preparation for your

11:27:53   20  opinions in this case?

21       A.  Yes, I have reviewed it extensively over the

22  past year.

23       Q.  And you relied upon the Maibach study in forming

24  your opinions as to what the dermal absorption rate is;

11:28:09   25  correct?

3643

```
 1          A.  That's correct.

 2          Q.  And it's one of the key factors that you

 3 analyzed?

 4          A.  Yes.

 5          Q.  The Maibach study, was that a study conducted by

 6 Monsanto?

 7          A.  Yes.

 8          Q.  And what was it studying?

 9          A.  Well, there were two aspects of the study.

10          MR. LOMBARDI:  It's not otherwise in evidence,

11 your Honor.

12          THE COURT:  Objection sustained.

13          MR. WISNER:  Your Honor, could we have a

14 sidebar?

15          THE COURT:  Yes.

16          (Sidebar.)

17          THE COURT:  Is the Maibach study the TVO?

18          MR. WISNER:  No, that's different.  So he has to

19 explain to the jury the basis of his opinion; right?  The

20 scientific basis.  And he's not going into any hearsay or

21 out-of-court statements, and if they want a limiting

22 instruction to limit his discussion of these studies to

23 his understanding, that's fine.

24          But to give a divorced opinion without

25 explaining the basis of it, that accounts for exclusion
```

11:28:14 (line 5)
11:28:24 (line 10)
11:28:32 (line 15)
11:28:56 (line 20)
11:29:16 (line 25)

1  of his opinion in a post-trial motion, and he has to be

2  able to lay the foundation as to why he has the opinion

3  he has.  And he's testified that these are the studies he

4  looked at, and so we're not publishing anything, we're

11:29:33  5  not getting into courtroom misconduct or anything of that

6  stuff.  He's literally talking about the studies he

7  looked at to form his opinion, and that's fair game.

8          MR. LOMBARDI:  The Maibach study was performed

9  and submitted to the EPA, and the EPA reviewed it, and

11:29:50  10  he's going to be talking about it in that context.  If

11  you exclude the Maibach study, you have to exclude

12  everything he admitted to the -- (inaudible) -- the

13  Maibach has not been admitted at trial.

14          MR. WISNER:  That's not the standard.  You don't

11:30:06  15  have admitted evidence for him to perform a basis for

16  submitting it.

17          THE COURT:  So he can say he has, that he relied

18  on this study in reaching his opinion.  And what is the

19  question that you have for him?

11:30:19  20          MR. DICKENS:  He has to discuss the basis as to

21  what the findings were, what the findings on the actual

22  studies were in reaching his conclusion, as to whether or

23  not the 1 percent or 3 percent or 10 percent, but you

24  know, without that foundation as to exactly what he

11:30:34  25  reviewed to reach his opinion, it's completely divorced.

1 It's divorced from what he reviewed and irrelevant.

2          THE COURT:  The problem is it's not in evidence.

3 So if he's just repeating what the study says, then

4 that's hearsay.

11:30:49  5          MR. WISNER:  But your Honor, that's correct, but

6 experts are specifically allowed to rely on hearsay.

7          THE COURT:  Yes, they are.

8          MR. WISNER:  Let me finish my point.  And I

9 understand it can't be published for sure.  Got that

11:31:03 10 we're not publishing anything here.  But for him to give

11 his opinion without discussing the factual basis of it

12 and it's his beliefs of the facts, they can impeach him

13 and say you got it wrong.  That's fine.  That's what

14 cross-examination is for.

11:31:17 15          But for him to say my opinion is dermal

16 absorption is 10 percent, and for him not to say the

17 basis of that, which is these studies that he reviewed,

18 the question that was objected to is what did that study

19 look at.

11:31:30 20          I mean, I'm not entirely sure what the issue is.

21 The rule is not it has to be in evidence before you can

22 discuss it as an expert.  That's never been the rule.

23          MR. DICKENS:  Your Honor, I believe that the way

24 that -- with the study that's not in evidence, the way

11:31:45 25 this should go is he's asked for his opinion on dermal

3646

1 absorption.  He's asked what's his basis.  He can say I

2 looked at the Maibach study, looked at that study, my

3 conclusion IS, and then you say my conclusions.  But he's

4 got to have a study that's not in evidence.

11:32:02  5        This witness can't convey to the jury the

6 hearsay evidence of that study.  He can tell the jury I

7 relied on the Maibach study to come to my conclusion, but

8 he cannot disclose the hearsay statements.

9            THE COURT:  That's correct.  So.

11:32:17  10            MR. WISNER:  Well, your Honor, respectfully --

11            THE COURT:  They may open the door on cross, I

12 don't know, and they're permitted on cross to read from

13 the study and say, well, isn't it true that this study

14 said, you know, the dermal absorption is five and you

11:32:33  15 just said it was ten and whatever, and that may open the

16 door to your further probing about the study.  I don't

17 know, but for right now, he can't just repeat what was in

18 the study unless you have an agreement, on some witnesses

19 you have agreement to allow each other to do that.

11:32:49  20            MR. WISNER:  We didn't hear.

21            THE COURT:  If you don't have that agreement,

22 then you can't just repeat the contents of the study

23 because that's hearsay.

24            MR. LOMBARDI:  So I'm anticipating on cross they

11:33:02  25 may bring up different dermal absorption.  That goes for

3647

```
 1  them as well.  They can't bring up different dermal
 2  absorption.
 3          THE COURT:  It's different on cross, first of
 4  all -- I don't know.
 5          MR. WISNER:  Your Honor, one issue, though, and
 6  I think this is important, is you know they're admitting,
 7  for example, EPA document; right?  To the state of mind
 8  of Monsanto, and we'll talk about those issues later, but
 9  how this affects his understanding, is it admissible for
10  that purpose as well?  We'd be happy to have a curative
11  instruction, Ladies and Gentlemen, he's going to talk
12  about some stuff.  You aren't to assume any statements
13  made by him are factually true.  They just go to his
14  opinion.
15          THE COURT:  I think that's different because his
16  state of mind isn't at issue with regard to the issue of
17  the failure to warn.  I mean, it's different.
18          MR. WISNER:  Okay.
19          THE COURT:  All right.
20          (End sidebar.)
21          THE COURT:  All right.  Mr. Dickens, you may
22  proceed.
23          MR. DICKENS:  Thank you, your Honor.
24      Q.  Dr. Sawyer, we're not allowed to discuss each of
25  the studies you reviewed, but you have reviewed dermal
```

11:33:13
11:33:34
11:33:48
11:33:59
11:34:28

3648

1  absorption studies conducted by Monsanto and others in

2  reaching your opinion as to the dermal absorption rate;

3  correct?

4      A.  Yes.

11:34:38   5      Q.  And you reached an opinion as to what the dermal

6  absorption rate for Ranger Pro and Roundup is; correct?

7      A.  That's correct.

8      Q.  And what is your opinion with respect to the

9  percentage of dermal absorption of Roundup and Ranger Pro

11:34:50  10  in the human skin?

11      A.  Based upon the studies conducted by Monsanto or

12  their contractors, 10 percent.  10 percent of the dose is

13  absorbed systemically.

14      Q.  Okay.  And can you put that in context?  What

11:35:05  15  does that mean, 10 percent?

16      A.  Well, it mean that 90 percent of it can be

17  washed off after a sustained period of time.  It does

18  not -- or 90 percent of it does not penetrate through the

19  epidermis into the dermal area, but 10 percent does make

11:35:28  20  it into the skin, into the body.

21      Q.  And what is the significance of that?

22      A.  It's important in calculating the dose.  The

23  dose for a worker handling either a backpack sprayer or a

24  hose, hydraulic hose unit as Mr. Johnson did, has been

11:35:50  25  carefully assessed in the Monsanto operator exposure

1    studies, and this -- when I say "carefully assessed,"

2    this is where the operators actually wear patches on

3    their body, basically a gauze patch, different locations,

4    back, neck, legs, shins, chest, hands, and after they've

11:36:15    5    worked for six hours, these pads are removed.

6            MR. LOMBARDI:  Your Honor, this is what we just

7    spoke about.  It's an improper --

8            THE COURT:  Okay.  Counsel, can you move on to a

9    different question.

11:36:30   10            MR. DICKENS:  Absolutely.

11        Q.  So the 10 percent, without getting into

12    specifics of actual studies, can you -- can you explain

13    what -- if there's 10 percent left in the skin, does that

14    eventually get washed off at some point in time?  What

11:36:47   15    happens to that 10 percent?

16        A.  It is available for -- it's been assimilated by

17    the body, and it's available as a harmful material.

18        Q.  Once again, without getting into specific

19    studies, are there other studies that found a smaller

11:37:10   20    percentage of dermal absorption than 10 percent?

21        A.  Yes.

22        Q.  And you took those into consideration as well?

23        A.  I did.

24        Q.  And were you able to -- in consideration of all

11:37:21   25    those studies, you still were able to reach your opinion

1  that it was 10 percent of dermal absorption?

2      A.  Yes.  I relied primarily on primate studies,

3  which are most close to humans, and in primate studies

4  that were -- had actual dermal application to the body,

11:37:40  5  as opposed to the rat or human studies that were

6  performed using the Franz diffusion tube with cadaver

7  skin.

8      Q.  Why did you rely more on the monkey or primate

9  studies rather than the other one?

11:37:57  10      A.  More relevant to humans, and they were live

11  animals, and in the live organs, we have circulating

12  capillaries blood through the capillaries, we have a live

13  vascular system.  That's certainly more realistic than

14  using cadaver skin.

11:38:19  15      Q.  Without talking about specifics, were all the

16  studies on dermal absorption that you reviewed, were all

17  of those submitted to the EPA?

18      A.  No.  They were not.  Only select studies were

19  submitted to the EPA for consideration on licensing.

11:38:33  20      Q.  You said "only select studies."  Who made those

21  selections?

22      A.  Monsanto.

23      Q.  Are you aware of something known as the farm

24  family exposure study?

11:38:51  25      A.  Yes.

3651

1    Q.  And you reviewed that in reaching your opinions

2 in this case?

3    A.  Yes.

4         MR. DICKENS:  If I can publish, your Honor,

11:39:02   5 Plaintiff's Exhibit 977?

6         THE COURT:  Any objection?

7         MR. LOMBARDI:  No objection, your Honor.

8         THE COURT:  Very well.  You may proceed.

9    Q.  BY MR. DICKENS:  And, Doctor, this is the

11:39:16  10 glyphosate biomonitoring for farmers and their families.

11 Results from the farm family exposure study; is that

12 right?

13    A.  Yes.

14    Q.  And there's a John Acquavella.

11:39:27  15         Do you see that?

16    A.  Yes.

17    Q.  And where does he work?

18    A.  Monsanto Corporation.

19    Q.  And do you know what year this was published?

11:39:39  20    A.  I believe it was 2004.

21    Q.  And so this was approximately eight years prior

22 to Mr. Johnson using Roundup or Ranger Pro?

23    A.  Yes.

24    Q.  And if I can turn your attention to the first

11:39:59  25 page, Doctor.  It says, "The purpose of this," and I

3652

1 believe that's, "farm family exposure study."

2         Do you see that?

3     A.  Yes.

4     Q.  And it says, "Quantify real-world pesticide

11:40:13  5 exposures immediately before, during and after a

6 pesticide application and to identify significant

7 exposure determinants."  Did I read that --

8     A.  Yes.

9     Q.  And that is your understanding as to the purpose

11:40:25  10 that Monsanto conducted this study?

11     A.  That's correct.

12     Q.  I want to turn your attention.  As we heard

13 previously in Dr. Farmer's testimony, it states:  "None

14 of the systemic doses estimated in this study approached

11:40:43  15 the US Environmental Protection Agency reference dose for

16 glyphosate of 2 milligrams per kilogram per day."

17         MR. LOMBARDI:  Your Honor, we had a lengthy

18 discussion on this point yesterday.

19         THE COURT:  Counsel, can you approach?

11:41:09  20         (Sidebar.)

21         MR. LOMBARDI:  Your Honor, we've been through

22 the NSRL and all kinds of things.  We entered a

23 stipulation that we gave to the Court that specifically

24 said that nobody was going to get into any comparison

11:41:21  25 with any reference doses.  Counsel could have asked

3653

1  questions about this document that did not go to that.

2  Instead, the second thing he highlighted went directly to

3  the EPA reference dose, which is an absolute direct

4  violation of what this Court ordered, what we agreed to.

11:41:38   5       MR. DICKENS:  This stipulation specifically

6  allowed us to ask two or three limited questions on this.

7       MR. LOMBARDI:  If that's what it is, then it's

8  my --

9       MR. DICKENS:  I asked two questions.

11:41:49   10      MR. LOMBARDI:  Okay.  That's okay, then.  That's

11  fine.  Got it.

12       (End sidebar.)

13       THE COURT:  You may proceed, Mr. Dickens.

14       MR. DICKENS:  Thank you, your Honor.

11:42:09   15   Q.  Can I ask you, Doctor, what is the reference

16  dose that's being referenced in this particular sentence?

17   A.  This is a what we call RFD, risk reference dose,

18  established by EPA to be protective specifically and only

19  for non-carcinogenic effects, in this case birth defects.

11:42:34   20  It is not designed and can never be used as a safe level

21  for cancer.  That's not what that value is designed to be

22  protective against.

23   Q.  Okay.  So it has nothing to do with

24  carcinogenicity at all?

11:42:46   25   A.  That's correct.

3654

1      Q.  How did they measure real-world glyphosate or

2  glyphosate formulation exposure in this study?

3      A.  They had urine samples.

4      Q.  Was it, in your opinion, an appropriate way to

11:43:06  5  measure real-life exposure?

6      A.  No.  There's a horrible error, very serious

7  error, with respect to measuring urine for glyphosate,

8  that is, that when one is dermally absorbing glyphosate,

9  it largely comes out of the feces.  And by measuring

11:43:28  10  urine and assuming that it all comes out in the urine

11  gives a very erroneous result.

12      Q.  Was the glyphosate in the feces measured in this

13  study?

14      A.  No.

11:43:43  15      Q.  Why would more glyphosate be excreted in the

16  feces rather than the urine?

17      A.  Well, there are two types of studies.  One study

18  to determine the excretion route of urine is to inject an

19  animal, IV bolus injection of glyphosate, and when that

11:44:04  20  is done, about 89 percent of it comes out in urine.

21          However, one -- one takes a primate, such as a

22  monkey, and doses that monkey dermally with the same

23  amount of glyphosate, but rather than giving an IV push,

24  lets it absorb over a period of hours.  It comes out in

11:44:30  25  the feces, largely in the feces, and that is because the

1 liver -- when it is being slowly absorbed, the liver

2 continually metabolizes it and sends it out the bile

3 deduct into the feces, but when it's injected

4 intravenously, the liver is saturated.  It's overloaded,

11:44:49  5 and it spills out and comes out in the urine.

6        So there are two types of routes of exposure

7 that have been used to study how glyphosate is excreted,

8 and this study is assuming that it all comes out in

9 urine, and it's dead wrong.  It's an erroneous study.

11:45:08  10     Q.  BY MR. DICKENS:  Which of the two types of

11 exposure would be more relevant for Mr. Johnson, the IV

12 or the dermal exposure?

13     A.  Certainly the dermal.

14     Q.  Now --

11:45:17  15     A.  The dermal excretion through the feces.

16     Q.  And so, once again, if you're not measuring in

17 feces in a study, you're not getting an actual real-world

18 estimate as to exposure to applicator?

19     A.  Correct.  And in this study, assuming that

11:45:37  20 90 percent of it is coming out in the urine when, in

21 fact, only 10 or 20 percent goes out in the urine, the

22 numbers in this study are off by a factor of 5.

23     Q.  Grossly underestimated?

24     A.  Grossly underestimated.  Yes.  Much so.

11:45:52  25     Q.  I want to turn your attention to page 3.  And I

1  can highlight it for us.

2        In this study, it's -- it states:  "All the

3  farmers used tractors and boom sprayers."

4        First of all, what's a boom sprayer?

11:46:09  5    A.  That sits behind the tractor, and it has

6  multiple nozzles that sprays out in the direction from

7  the tractor.  So it's leaving a trail of aerosol behind

8  the tractor.

9    Q.  So I also want to turn your attention here:

11:46:27  10  "Most of the farmers reported having tractors with

11  enclosed cabins."

12        Do you see that as well, Doctor?

13    A.  Yes, I do.

14    Q.  So what is your understanding of how the

11:46:39  15  glyphosate was being sprayed by the farmers involved in

16  this study?

17    A.  Well, in a much safer manner for the applicator,

18  as opposed to Mr. Johnson who was continually -- not

19  continually, but very commonly impacted with heavy mist

11:46:58  20  exposure from the hose sprayer and the various wind

21  currents causing the drift material to directly impact

22  his entire body.

23    Q.  Would you expect farmers spraying from tractors

24  in enclosed cabins to have more or less exposure than

11:47:19  25  Mr. Johnson?

3657

1      A.  Far less.  And as proven in Monsanto's operator

2  exposure risk assessment study, which I relied on in my

3  dose calculations.

4      Q.  Are there other factors for an applicator that

11:47:54   5  would affect how much exposure they had to Roundup or

6  Ranger Pro, other than the method of spraying?

7      A.  Yes.

8      Q.  And what are some of those other factors?

9      A.  The amount of protective gear.  For example, in

11:48:16  10  the Monsanto operator exposure studies, where the

11  individuals wore patches for testing, in that study a

12  full faceplate was recommended.  A faceplate is a shield

13  that -- I actually have one I use with my chain saw.

14  It's a faceplate that goes way down even below the jaw, a

11:48:39  15  solid plastic faceplate.  They also use water

16  impermeable, waterproof jackets and waterproof coveralls.

17          So the protection that was used in that study

18  was beyond that of Mr. Johnson, who wore impermeable

19  clothing.

11:48:59  20      Q.  And --

21      A.  And no full faceplate.

22      Q.  You say "impermeable clothing."  But we've heard

23  testimony he wore a Tyvek suit.  Isn't that impermeable?

24      A.  He wore a Tyvek 400 dust suit.

25      Q.  Okay.

3658

1      A.  It's a dust suit.  It keeps out particulate

2  dust.  It has open sleeves, open legs.  It's not designed

3  for aerosol, organic solvents or any type of liquids.

4      Q.  And do you have any personal experience with the

11:49:32   5  Tyvek 400 suit worn by Mr. Johnson?

6      A.  Yes.  I've used an OSHA-certified, OSHA 40-hour

7  HAZMAT, several times for my own use, to be able to go on

8  to Superfund sites, extremely dangerous sites.  And I'm

9  very familiar with the various classes of suits made by

11:49:54  10  Tyvek.

11      I -- I've worn the dust suit in situations where

12  I was being protected from heavy metals, from dust.  But

13  I would never wear a suit like that in an instance where

14  organic chemicals were in the air.  It's not designed for

11:50:12  15  that.  It's a dust suit.

16      Q.  Did you specifically do anything to research the

17  Tyvek 400 in reaching your opinion that Roundup or Ranger

18  Pro could permeate that?

19      A.  I did.  I looked at the various Tyvek literature

11:50:26  20  and specifications specific to the 400.  It is a

21  breathable -- it's called a breathable suit.  It's

22  designed for comfort, but yet designed to keep dust out.

23      Q.  And where specifically did you go to find those

24  specifications?

11:50:39  25      A.  I looked at Tyvek's own literature.

3659

1        Q.  And you reviewed and relied on those in reaching

2    your opinions in this case?

3        A.  Yes.  And my experience 30 years using Tyvek

4    suits.

11:50:51    5        MR. DICKENS:  Your Honor, at this time I'll move

6    to publish Plaintiff's Exhibit 118.

7            THE COURT:  Any objection?

8            MR. LOMBARDI:  No objection, your Honor.

9            THE COURT:  Okay.  You may proceeded.

11:51:09    10       Q.  BY MR. DICKENS:  Now, Doctor, is this the

11   document that you reviewed with respect to the DuPont

12   safety specifications for the Tyvek 400?

13       A.  Yes.

14       Q.  And, once again, you pulled this directly from

11:51:21    15   DuPont themselves?

16       A.  Yes.

17       Q.  Is it your understanding that DuPont's the

18   manufacturer of this particular suit?

19       A.  That's correct.

11:51:30    20       Q.  Doctor, it says, "Tyvek 400 fabric offers

21   inherent barrier against particles down to 1.0 micron in

22   size."

23           Do you see that?

24       A.  Yeah, that's correct.  It's designed to keep out

11:51:47    25   dust particulate.  But yet designed for comfort.  As we

1    see here, "Comfort fit design based on the wearer input

2    to provide our most comfortable garment."

3            It allows moisture to go in and out.  So you --

4    so you don't basically turn into a horrible, overheated,

11:52:05    5    sweaty mess, which happens when one wears the more

6    sophisticated suits, which I've worn many times.

7        Q.  So there's different types of Tyvek?

8        A.  Yes.

9        Q.  And you wear them in different situations?

11:52:19    10        A.  Correct.

11        Q.  This one you referenced as a dust suit.  Are

12    there some that wouldn't be permeable to liquids?

13        A.  There are suits that are completely impermeable

14    to organic solvents, liquids, glyphosate, water, yes.

11:52:35    15        Q.  Well, which suit does the Roundup or Ranger Pro

16    product labeling instruct its -- its users to use?

17        A.  The actual label from Roundup and Ranger Pro

18    does not require any suit.  It's rather strange.  When

19    they ran their own operator exposure study, they

11:52:54    20    recommended waterproof jacket, pants, faceplate,

21    et cetera.  But none of that is on the warning of Roundup

22    that was used by Mr. Johnson.

23        Q.  Well, it protects against particles down to

24    1.0 micron in size.  With the Roundup and Ranger Pro

11:53:11    25    Mr. Johnson was spraying, was that -- would that have

3661

1 permeated?  Is it of the sufficient size?

2     A.  No.  It's not designed as a water or

3 solvent-proof suit.  It's the wrong suit for the -- it's

4 not the right suit for the job.  Let's put it that way.

11:53:31  5     This is the suit that's designed -- for example,

6 spreading the talc material on the baseball field.  This

7 would be a great suit for keeping the talc dust off

8 Mr. Johnson.  But it's not the right suit for spraying

9 Roundup.

11:53:47  10     Q.  Okay.  I'm going to turn your attention to

11 page 3 of this document.  And it actually has

12 "Herbicides."  And it says, "General."  Then it says,

13 "Solid form."

14     Do you see that?

11:54:00  15     A.  Certainly.  In a solid form, it would be

16 acceptable.  The solid form means particles.  And

17 particles of herbicide are generally greater than

18 1 micron in size, and they would not make it through the

19 pores.

11:54:13  20     Q.  Okay.  And there is solid herbicides sold out

21 there?

22     A.  Oh, absolutely.  Yeah.  You can put them in

23 these lawn spreaders, for example, that you push.

24     Q.  Now, some of these other examples actually say

11:54:28  25 it's, you know, suitable for use for liquid.

3662

1          Do you see that, Doctor?

2     A.  Yes, I see that.

3     Q.  But there's no mention of it being suitable for

4  herbicides that are liquid like Roundup or Ranger Pro; is

11:54:46   5  that right?

6     A.  Correct.

7     Q.  And, once again, Monsanto's labeling doesn't

8  warn you or tell you to wear any type of Tyvek or other

9  permeable suit, does it?

11:54:57   10     A.  That's correct.

11     Q.  And so Mr. Johnson, even though he was wearing,

12  you know, this Tyvek suit, that was above and beyond the

13  labeling requirements?

14     A.  That's correct.

11:55:08   15     Q.  But, you know, it wasn't keeping him completely

16  protected from the Roundup and Ranger Pro that he was

17  spraying?

18     A.  No.  It did very little.

19     Q.  With respect to Mr. Johnson's spraying, do you

11:55:34   20  have an understanding how he was spraying the Roundup and

21  Ranger Pro?

22     A.  Yes.

23     Q.  Okay.  And what is your understanding of the

24  different manners in which he would spray?

11:55:45   25     A.  Primarily he was using a large hydraulic nozzle

3663

1  hose, which was connected to a hose reel, which was

2  connected to a pressurized pump, and then a 50-gallon

3  reservoir tank on the truck.

4       And he was able to reel out the hose line and

11:56:04  5  walk around and spray with it.  It was an uncontrolled

6  pressure.  In other words, he couldn't turn the pressure

7  down or up.  It was either on or off.

8       Q.  And you mentioned aerosol earlier today.  Was

9  his type of spraying, would that create an aerosol?

11:56:20  10       A.  Yes.  He was using a -- interchangeable colored

11  spray heads consistent with that used in pressure

12  washers.

13       Q.  Have you ever used spray heads similar to that?

14       A.  Yes.  I have a pressure washer I use on my boat.

11:56:38  15       Q.  Okay.  So Mr. Johnson, unlike the way you did it

16  with a long hose that you modified, was actually using a

17  pressure hose gun, essentially?

18       A.  Yes.

19       Q.  Is that a type of spray that you would expect to

11:56:58  20  be smaller or greater than the way in which you do it?

21       A.  Well, a pressure washer nozzle produces a huge

22  aerosol.  If you've ever used one, just one trigger would

23  literally fill this courtroom with mist.  I mean, it's

24  not -- not the right nozzle for application by any means.

11:57:21  25       Q.  Based on your review of the materials, was

1    Monsanto aware that Roundup or Ranger Pro was being

2    sprayed in this manner?

3             MR. LOMBARDI:  Objection, your Honor.  Same

4    objection we've discussed before.

11:57:34   5             THE COURT:  Sustained.  Sustained.

6             Please ask a different question.

7        Q.  BY MR. DICKENS:  Was there anything in the

8    product labeling for Roundup or Ranger Pro that suggested

9    that you should not spray in the manner Mr. Johnson was

11:57:49  10    for his job at Benicia School District?

11       A.  No.

12       Q.  Are you aware of any warnings from Monsanto

13   whatsoever suggesting that this was an inappropriate way

14   to spray Roundup or Ranger Pro?

11:58:02  15       A.  No.

16             THE COURT:  Mr. Dickens, is this a good time to

17   break for the lunch recess?

18             MR. DICKENS:  It is, your Honor.

19             THE COURT:  Okay.  Ladies and Gentlemen, we're

11:58:23  20   going to break now for the lunch recess.  We'll be in

21   recess until 1:30.  Please remember:  Do not discuss the

22   case, do not do any research.  And we'll resume again at

23   1:30.

24             (Time Noted:  11:58 p.m.)

11:58:39  25

3665

```
1                    REPORTER'S CERTIFICATE

2

3          I certify that the proceedings in the

4   within-titled cause were taken at the time and place

5   herein named; that the proceedings were reported by

6   me, a duly Certified Shorthand Reporter of the State of

7   California authorized to administer oaths and

8   affirmations, and said proceedings were thereafter

9   transcribed into typewriting.

10         I further certify that I am not of counsel or

11  Attorney for either or any of the parties to said

12  Proceedings, not in any way interested in the outcome of

13  the cause named in said proceedings.

14         IN WITNESS WHEREOF, I have hereunto set my hand:

15  July 26th, 2018.

16

17

18

19                      <%signature%>
                        Leslie Rockwood Rosas
20                      Certified Shorthand Reporter
                        State of California
21                      Certificate No. 3462

22

23

24

25
```

3666

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   COUNTY OF SAN FRANCISCO

3

4   DEWAYNE JOHNSON,

5                Plaintiff,

6         vs.                    Case No. CGC-16-550128

7   MONSANTO COMPANY, et al.,

8                Defendants.
    _____/

9

10

11

12        Proceedings held on Thursday, July 26, 2018,

13        Volume 17, Afternoon Session, before the Honorable

14        Suzanne R. Bolanos, at 1:31 p.m.

15

16

17

18

19

20

21  REPORTED BY:

22  LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23  Job No. 2965331B

24

25  Pages 3667 - 3811

```
 1  APPEARANCES:

 2

 3  FOR THE PLAINTIFF:

 4       R. BRENT WISNER, ESQ.

 5       BAUM, HEDLUND, ARISTEI, GOLDMAN PC

 6       12100 Wilshire Boulevard, Suite 950

 7       Los Angeles, California 90025

 8       310-207-3233

 9

10       DAVID DICKENS, ESQ.

11       THE MILLER FIRM, LLC

12       108 Railroad Avenue

13       Orange, Virginia 22960

14       540-672-4224

15

16  FOR THE DEFENDANT:

17       SANDRA A. EDWARDS, ESQ.

18       FARELLA BRAUN + MARTEL LLP

19       235 Montgomery Street

20       San Francisco, California 94104

21       415-954-4400

22

23

24

25
```

```
 1  APPEARANCES (Continued):

 2

 3  FOR THE DEFENDANT:

 4       GEORGE C. LOMBARDI, ESQ.

 5       JAMES M. HILMERT, ESQ.

 6       WINSTON & STRAWN LLP

 7       35 West Wacker Drive

 8       Chicago, Illinois 60601

 9       312-558-5969

10

11       KIRBY T. GRIFFIS, ESQ.

12       HOLLINGSWORTH LLP

13       1350 I Street, N.W.

14       Washington, D.C. 20005

15       202-898-5800

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF PROCEEDINGS

 2

 3  WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

 4  WILLIAM ROBERT SAWYER    3671    3679      3777      3794

 5

 6

 7

 8                    EXHIBITS ADMITTED

 9                        (None.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    Thursday, July 26, 2018

2                         1:31 p.m.

3                         Volume 17

4                    Afternoon Session

5                  San Francisco, California

6                      Department 504

7                 Judge Suzanne Ramos Bolanos

8

9                       PROCEEDINGS

12:54:53   10

11            THE COURT:  Welcome back, Ladies and Gentlemen.

12    Good afternoon, Counsel.

13            MR. DICKENS:  Thank you.

14            THE COURT:  Do you wish to recall Dr. Sawyer?

13:31:15   15            MR. DICKENS:  I do, your Honor.  We will recall

16    Dr. William Sawyer.

17            THE COURT:  Good afternoon, Dr. Sawyer.

18            THE WITNESS:  Thank you.

19            THE COURT:  Ladies and gentlemen, Dr. Sawyer

13:32:42   20    remains under oath, and, Mr. Dickens, you may proceed.

21

22            DIRECT EXAMINATION (Continued)

23    BY MR. DICKENS:

24        Q.  Good afternoon, Doctor.

13:32:50   25        A.  Good afternoon.

3671

1    Q.  I want to go back to the Tyvek for a second.

2  Would the drift from Mr. Johnson's truck sprayer have

3  passed through his Tyvek suit?

4    A.  The size of the aerosol droplets would have been

13:33:03   5  greater than 1 micron, so no, not the droplets.  However,

6  the moisture film that accumulates on the fabric will go

7  through, because that's at the molecular level.  It's

8  simply the glyphosate liquid and the other liquids that

9  are in the chemical would definitely pass through the

13:33:23  10  pores.  However, the actual droplets would not fit

11  through the pore.  In other words, it has to become a

12  moist surface, a wet surface, to penetrate --

13    Q.  And would that moist surface -- based on his

14  description of the spray, would a moist surface have

13:33:40  15  developed on the Tyvek suit?

16    A.  Yes.

17    Q.  And --

18    A.  The same way it did on his face and other areas,

19  yes.

13:33:45  20    Q.  And based on kind of the description you gave us

21  with respect to the dermal absorption, that same

22  absorption would apply to the Tyvek suit?  Once that mist

23  is on there, it would start to seep through?

24    A.  Actually, it's worse.  Mr. Johnson testified --

13:34:03  25  and I can tell you from wearing the darn things -- that

3672

1  you sweat, sometimes sweat profusely.

2      Q.  How does sweat affect --

3      A.  It means that the undergarments, the shirt,

4  pants and so on, are moist.  So when that glyphosate and

13:34:19  5  surfactants, adjuvants, contact the moist clothing, it

6  has an immediate diffusion pathway to the skin.  Because

7  you have damp skin against damp clothes against a damp

8  Tyvek suit, so you have an immediate pathway.  So it

9  actually enhances the sweating, enhance -- plus it opens

13:34:38  10  the pores, plus there's vasodilation when a person is hot

11  and sweaty.

12      Q.  Do you have an understanding as to whether or

13  not Mr. Johnson was able to shower immediately after he

14  got it on himself?  "It," Ranger Pro?

13:34:54  15      A.  Based on my review of his depositions, in most

16  cases, he did not immediately shower.  Rather, he would

17  go back to work and finish his functions, and then shower

18  at home.

19      Q.  And do you have an understanding -- did he do

13:35:17  20  anything to try to wash it off after being exposed to the

21  Ranger Pro?

22      A.  Well, I know he talked about washing his hands

23  and arms and forearms, and I believe he even wiped

24  himself at times.

13:35:32  25      Q.  Would that have gotten all the Ranger Pro off of

3673

1  him so that there wouldn't be any more absorption?

2      A.  No.  And the other thing to remember is that the

3  studies have shown that the first hour of exposure shows

4  the greatest degree of absorption, and then it falls off

13:35:52  5  each hour -- less absorbed, less absorbed, and so on --

6  so that the first couple hours are critical.

7      Q.  What facts did you consider in determining the

8  total amount of Mr. Johnson's exposure?

9      A.  Well, as I said, I compared him to what's in the

13:36:08  10  literature, in terms of workers who were wearing patches

11  that were measured.  But I also compared him in terms of

12  his gallon per hour.  You know, he's testified that he's

13  used up to 150 gallons a day, and even 50 gallons in an

14  hour, which is 3 times above the rate.  Even if he used

13:36:30  15  the backpack sprayer and held it on non-stop, it would

16  only be about 16 or 15 gallons per hour, and he was

17  running 50 gallons per hour with a spray head that

18  produces a horrible aerosol.

19          So based on his testimony description in terms

13:36:47  20  of the drift, the fact that his face actually was wet,

21  based on the quantity used, he is an outlier.  He's --

22  beyond the worst case that I've found in the literature

23  which I used as my basis of calculations.  So my dose

24  calculation's actually another underestimate.

13:37:04  25      Q.  Based on his exposure and the 10-percent dermal

3674

1 absorption rate that you testified to, is that enough to

2 cause a carcinogenic response?

3      A.  Yes, absolutely.  He is -- I can say that

4 emphatically, and base it on the peer-reviewed

13:37:21  5 literature, in that his exposure -- his levels of

6 exposure were far higher than that in the literature, but

7 its duration of 2.25 years of exposure, or three seasons

8 of exposure, was less than the average in the

9 peer-reviewed epidemiologic studies who developed T-cell

13:37:43  10 lymphoma.  So it puts him approximately in the middle of

11 the human epidemiologic studies that show human cancer.

12 He falls in the middle of the exposure categories, not at

13 the extreme low end, not at the extreme high end.  And I

14 say it again, because his exposure days were far less

13:38:03  15 than that in the human literature.  However, his

16 intensity of exposure was actually higher.

17      Q.  So did you consider the total number of days

18 that he sprayed in consideration of your opinions in this

19 case?

13:38:16  20      A.  I did.  I calculated ninety, based on his

21 testimony.  Ninety days of spraying.

22      Q.  And that was based on 20 to 30 times of spraying

23 per each year?

24      A.  Twenty to thirty, although he did testify that

13:38:30  25 perhaps it was more.  It could have been as high as

3675

1    forty.

2         Q.  And you mentioned three spraying seasons.

3    That's from the date of his first use until the date of

4    when?  Was that date of diagnosis?

13:38:44    5         A.  August of 2014.  The date of diagnosis was when

6    the pathology was taken and he was diagnosed with

7    lymphoma.

8         Q.  Did you consider whether or not 2.25 years, as

9    you state, was long enough for non-Hodgkin's lymphoma to

13:39:02    10   form?

11        A.  Yeah.  I have -- for many years, have searched

12   the literature and have kept track of latencies for

13   different cancers.  Different cancers have different --

14   very different latencies.  You know, mesothelioma has the

13:39:18    15   longest latency of any.  Lymphoma has the shortest

16   latency period of any known human cancer, as short as

17   eight weeks.  When a drug called Cyclosporin A -- some of

18   you may have heard of it.  That's a drug used for tissue

19   transplant recipients.  For example, if I were to have a

13:39:43    20   kidney transplant, I would have to have Cyclosporin A to

21   suppress the immune system to not reject that organ.  In

22   that case, that particular drug has a side effect of

23   non-Hodgkin's lymphoma developing in as short as eight

24   weeks.

13:39:56    25         Now, that's not the case here.  We're not

3676

1  dealing with Cyclosporin A.  We're dealing with another

2  chemical, and, therefore, I've used other literature

3  studies to determine the shortest latency period.

4       Q.  In studies, how is latency looked at?  How is it

13:40:13   5  considered?

6       A.  Very specifically.  The rule is -- it's a

7  standard worldwide international rule:  It's from the

8  time of first exposure until the time of diagnosis.  When

9  that pathology sample is collected, that person is

13:40:28  10  diagnosed.  That is how all the studies in the

11  epidemiologic literature work.  It's from time of first

12  exposure to time of diagnosis.

13       Q.  So if Mr. Johnson was considered in that study,

14  his latency would have been that 2.25 years that you

13:40:44  15  mentioned previously?

16       A.  That's correct.

17       Q.  I want to turn your attention to one exhibit.

18       MR. DICKENS:  Permission to publish Plaintiff's

19  Exhibit 880?

13:40:52  20       THE COURT:  Any objection?

21       MR. LOMBARDI:  No objection, your Honor.

22       THE COURT:  Very well.  You may proceed.

23       Q.  BY MR. DICKENS:  Doctor, I'll point this out:

24  This is an article by Dennis Weisenburger, "Pathological

13:41:05  25  Classification of Non-Hodgkin's Lymphoma For

3677

1  Epidemiologic Studies."

2          Have you reviewed this previously, Dr. Sawyer?

3      A.  Yes.

4      Q.  And I want to turn your attention to a chart on

13:41:20  5  page 6 of this study.  Do you see that there?

6      A.  Yes.

7      Q.  And this has -- it says "latency curve."  Can

8  you explain what a latency curve is?

9      A.  Yes.  Latency is generally found to exhibit what

13:41:39  10  we call a bell-shaped curve.  We'll have some individuals

11  who develop it very early, and then a mean peak value,

12  which typically, for lymphomas, is about a ten-year mean,

13  and then some people that don't develop it for 20 or

14  25 years, and they're at the other end, at what we call

13:42:00  15  the tail.  So this diagram, Figure 4, shows two latency

16  curves for non-Hodgkin's lymphoma, based upon a high

17  acute exposure versus a steady, long-term, low exposure,

18  and it makes a difference on the latency curve.

19      Q.  And so the A, the first one we see there, that

13:42:21  20  is the short-term high dose; is that right?

21      A.  That's correct.

22      Q.  And what's your reading of this particular

23  latency curve with respect to short-term high dose versus

24  the long-term low dose?

13:42:35  25      A.  Well, this is typical for most chemicals with

1 respect to chemical carcinogenesis, that if the person is

2 receiving the sustained high dose, the latency is

3 generally much shorter.  And that's what we have in this

4 case.  We have a person who received very high dosage but

13:42:53   5 for a shorter period of time, only 2.25 years, prior to

6 the diagnosis.

7            MR. DICKENS:  Thank you, Doctor.  I have no

8 further questions.  If I may pass the witness.

9            THE COURT:  Thank you.

13:43:04   10            MR. DICKENS:  Can I approach?  Dr. Sawyer left

11 his binder behind.

12            THE COURT:  Yes, of course.

13            THE WITNESS:  Thank you very much.

14            THE COURT:  Counsel, Mr. Dickens, would you mind

13:43:31   15 getting some water for Dr. Sawyer?

16            MR. DICKENS:  Not a problem.

17            MR. LOMBARDI:  May I approach?

18            THE COURT:  Yes.

19

20                      CROSS-EXAMINATION

21 BY MR. LOMBARDI:

22     Q.  Good afternoon, Doctor.  I'm going to try to

23 moderate my voice to fit the room and move the podium

24 also.  If you have any trouble understanding me or

13:44:18   25 hearing me, you'll let me know; right?

3679