REDACTED VERSION OF EXHIBIT 2
TO MOTION TO EXCLUDE TESTIMONY OF
MONSANTO'S SPECIFIC CAUSATION EXPERT
MICHAEL GROSSBARD, M.D.

Michael L. Grossbard, M.D.

```
 1        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                  -  -  -
 3   IN RE:  ROUNDUP          :   MDL NO. 2741
       PRODUCTS LIABILITY       :
 4   LITIGATION               :   Case No.
                              :   16-md-02741-
 5                            :   VC
                              :
 6   _____ :   _____
                              :
       This Document Relates    :
 7   to:                      :
                              :   Case No.
 8   Sanders v Monsanto       :   3:19-cv-05752
       Co.,                     :
 9                            :
            - and -           :
10                            :
       Jaime Alvarez Calderon :   Case No.
11   V. Monsanto, Co.,        :   3:19-cv-01630
                              :
12
             C O N F I D E N T I A L
13
                    -  -  -
14
              November 26, 2019
15
                    -  -  -
16
             Videotaped deposition of
17   MICHAEL L. GROSSBARD, M.D., taken
       pursuant to notice, was held at the law
18   offices of Arnold & Porter Kaye Scholer,
       250 West 55th Street, New York, New York,
19   beginning at 12:03 p.m., on the above
       date, before Michelle L. Gray, a
20   Registered Professional Reporter,
       Certified Shorthand Reporter, Certified
21   Realtime Reporter, and Notary Public.
22                  -  -  -
             GOLKOW LITIGATION SERVICES
23        877.370.3377 ph| 917.591.5672
                deps@golkow.com
24
```

```
 1     APPEARANCES:
 2
 3        WEITZ & LUXENBERG
          BY:  JERRY KRISTAL, ESQ.
 4        BY:  JOSH KRISTAL, ESQ.
          220 Lake Drive East, Suite 210
 5        Cherry Hill, New Jersey 08002
          (856) 755-1115
 6        jkristal@weitzlux.com
          joshkristal@weitzlux.com
 7        Representing the Sanders Plaintiffs
 8
          GOLDBERG & OSBORNE
 9        By:  DAVID J. DIAMOND, ESQ.
          698 East Wetmore Road, Suite 200
10        Tucson, Arizona 85705
          (520) 879-7168
11        Ddiamond@goldbergosborne.com
          Representing the Alvarez Calderon
12        Plaintiffs
13
          ARNOLD & PORTER KAYE SCHOLER, LLP
14        BY:  BERT L. SLONIM, ESQ.
          BY:  AARON H. LEVINE, ESQ.
15        250 West 55th Street
          New York, New York 10019
16        (212) 836-8897
          bert.slonim@kayescholer.com
17        aaron.levine@arnoldporter.com
          Representing the Defendants
18
19        VIDEOTAPE TECHNICIAN:
             Ingrid Rodriguez
20
          ALSO PRESENT:
21           Matthew Hans - Paralegal
             (Weitz Lux)
22
                         -  -  -
23
24
```

Michael L. Grossbard, M.D.

```
1                      -   -   -
2                   I N D E X
3                    -   -   -
4

   Testimony of:
5

                  MICHAEL L. GROSSBARD, M.D.
6

          By Mr. Kristal            15, 342
7

          By Mr. Slonim                271
8

          By Mr. Diamond               367
9
10
11

                   -   -   -
12

               E X H I B I T S
13

                   -   -   -
14
```

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Grossbard-1 | Expert Report of Michael Grossbard, MD 10/25/19 | 29 |
| Grossbard-2 | Screenshots from Lymphoma Presentation NYU Langone | 73 |
| Grossbard-3 | Icahn School of Medicine Profile of Michael Grossbard, MD | 100 |

```
15
16
17
18
19
20
21
22
23
24
```

Michael L. Grossbard, M.D.

```
1                  -   -   -
2          E X H I B I T S  (Cont'd.)
3                  -   -   -
4
```

```
5   NO.            DESCRIPTION            PAGE
6   Grossbard-4    Determining if         107
                   Something is a
7                  Carcinogen
                   American Cancer Society
8                  Web Printout
9   Grossbard-5    Known and Probable     114
                   Human Carcinogens
10                 American Cancer
                   Society
11                 Web Printout
12  Grossbard-6    DeVita, Hellman &      120
                   Rosenberg's
13                 Cancer Principles
                   & Practice of Oncology
14                 11th Edition
15  Grossbard-7    Motion                 130
                   Pilliod v Monsanto
16
    Grossbard-8    Pretrial Order         147
17                 Hardeman v Monsanto
18  Grossbard-9    Spinning Science       155
                   & Silencing Scientists
19                 Minority Staff Report
                   MONGLY07894891-910
20                 & E-mail, 5/11/15
                   Subject, Post-IARC
21                 Activities to Support
                   Glyphosate
22                 MONGLY01228576
23
24
```

Michael L. Grossbard, M.D.

```
 1                   -   -   -
 2           E X H I B I T S  (Cont'd.)
 3                   -   -   -
 4
 5    NO.            DESCRIPTION              PAGE
 6    Grossbard-10 Proposal for              173
                   Post-IARC Meeting
 7                 Scientific Projects
                   Draft, 5/11/15
 8                 MONGLY01723742
 9    Grossbard-11 Systematic Review         182
                   And Meta-Analysis of
10                 Glyphosate Exposure and
                   Risk of Lymphohematopoietic
11                 Cancers
                   (Chang)
12
      Grossbard-12 Monsanto Manuscript       193
13                 Clearance Form
                   Global Regulatory
14                 MONGLY02117800-04
15    Grossbard-13 Review of                 199
                   Genotoxicity of
16                 Glyphosate and Glyphosate
                   Based Formulations
17                 MONGLY01691608-63
18    Grossbard-14 Review of                 200
                   Genotoxicity Studies
19                 Of Glyphosate and Glyphosate
                   Based Formulations
20                 (Kier & Kirkland)
21    Grossbard-15 Differences in the        205
                   Carcinogenic Evaluation
22                 Of Glyphosate Between
                   IARC & EFSA
23                 (Portier)
24
```

Michael L. Grossbard, M.D.

```
 1                       -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                       -   -   -
 4
 5     NO.              DESCRIPTION              PAGE
 6     Grossbard-16 How Did the US EPA     218
                     & IARC Reach Diametrically
 7                   Opposed Conclusions on the
                     Genotoxicity of
 8                   Glyphosate Based Herbicides?
                     (Benbrook)
 9
       Grossbard-17 IARC Monographs        226
10                   On the Identification of
                     Carcinogen Hazards to
11                   Humans
12     Grossbard-18 Exposure to           231
                     Glyphosate Based
13                   Herbicides & Risk
                     For Non-Hodgkin Lymphoma
14                   (Zhang)
15     Grossbard-19 Profile of            232
                     Emanuela Taioli
16                   Mount Sinai
17     Grossbard-20 Glyphosate is a       250
                     Weed Killer, or Herbicide
18                   Icahn School of
                     Medicine at Mount Sinai
19
       Grossbard-21 Notice to Take        259
20                   Deposition in
                     Sanders v Monsanto
21
       Grossbard-22 Monsanto's Responses  260
22                   And Objections to
                     Plaintiff's Requests
23
24
```

Michael L. Grossbard, M.D.

```
 1                      -   -   -
 2           E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Grossbard-23 Invoices of                 260
                    Dr. Grossbard
 7                  10/2/19
                    11/8/19
 8
      Grossbard-24 Trial Testimony             264
 9                  Of Dr. Grossbard
10    Grossbard-25 Curriculum Vitae            265
                    Michael L. Grossbard, MD
11
      Grossbard-26 Statement from              276
12                  Health Canada on
                    Glyphosate
13                  1/11/19
14    Grossbard-27 Evaluation of               286
                    Carcinogenic Potential
15                  Of the Herbicide
                    Glyphosate
16                  (Greim)
17    Grossbard-28 Glyphosate                  313
                    Reevaluation Decision
18                  4/28/17
                    Health Canada
19
      Grossbard-29 Document                    346
20                  8/4/15
                    Subject, Glyphosate
21                  Activities
                    MONGLY01723742
22
23
24
```

Michael L. Grossbard, M.D.

```
 1                    -   -   -
 2          E X H I B I T S  (Cont'd.)
 3                    -   -   -
 4
 5   NO.             DESCRIPTION              PAGE
 6   Grossbard-30 Glyphosate               350
                   Exposure Data
 7                 IARC Monograph
                   Pages 321-412
 8
     Grossbard-31 Expert Report of        360
 9                 Dr. Grossbard
                   RE: Hardeman
10                 11/26/18
11   Grossbard-32 Expert Report of        363
                   Dr. Grossbard
12                 RE:  Gebeyehou
                   11/26/18
13
14   Grossbard-33 Expert Report of        368
                   Dr. Grossbard
15                 RE:  Alvarez Calderon
                   10/25/19
16
                     -   -   -
17
18
19
20
21
22
23
24
```

Michael L. Grossbard, M.D.

```
 1                    –   –   –

 2            DEPOSITION SUPPORT INDEX

 3                    –   –   –

 4

 5   Direction to Witness Not to Answer

 6   PAGE    LINE   PAGE LINE      PAGE LINE
     None.

 7

 8   Request for Production of Documents

 9   PAGE    LINE   PAGE LINE      PAGE LINE
     None.

10

11   Stipulations

12   PAGE    LINE   PAGE LINE      PAGE LINE
     None.

13

14   Questions Marked

15   PAGE    LINE   PAGE LINE      PAGE LINE
     None.

16

17

18

19

20

21

22

23

24
```

Michael L. Grossbard, M.D.

1                    -  -  -

2              THE VIDEOGRAPHER:  We are

3       now on the record.  My name is

4       Ingrid Rodriguez.  I'm a

5       videographer for Golkow Litigation

6       Services.

7              Today's date is

8       November 26th, 2019, and the time

9       is 12:03 p.m.

10             This video deposition is

11      being held at Arnold Porter LLP,

12      New York, New York, in the matter

13      of John D. Sanders versus Monsanto

14      Company and Jaime Alvarez Calderon

15      versus Monsanto Company, for the

16      United States District Court

17      Northern District of California.

18             The deponent is Dr. Michael

19      Grossbard.

20             All counsel present will be

21      noted on the stenographic record.

22             The court reporter is

23      Michelle Gray and will now swear

24      in the witness.

Michael L. Grossbard, M.D.

```
1                 -  -  -
2          ... MICHAEL L. GROSSBARD, M.D.,
3    having been first duly sworn, was
4    examined and testified as follows:
5                 -  -  -
6               MR. KRISTAL:  Maybe we
7          should introduce ourselves on the
8          record and then you can hand me
9          whatever you intend to hand --
10              MR. SLONIM:  Sure.
11              MR. KRISTAL:  This is Jerry
12         Kristal.  I'm from Weitz &
13         Luxenberg, and I represent, along
14         with Josh Kristal and Matt Hans
15         who are also from Weitz &
16         Luxenberg, we represent John
17         Sanders.
18              Good morning, Doctor.
19              THE WITNESS:  Good morning.
20              MR. DIAMOND:  Dave Diamond.
21         I represent Jaime Alvarez
22         Calderon.
23              MR. SLONIM:  Bert Slonim.
24         I'm here with Aaron Levine, and we
```

Michael L. Grossbard, M.D.

1    represent the defendants.

2         And Jerry, thank you.  I

3    wanted to hand you some documents

4    before we begin.

5         So first we have an updated

6    curriculum vitae for

7    Dr. Grossbard.  I'll hand that to

8    you.

9         MR. KRISTAL:  Thank you.

10         MR. SLONIM:  We also have an

11    updated trial testimony list for

12    the matters in which Dr. Grossbard

13    has given testimony in the past

14    four years.  I'm going to hand

15    that to you.

16         MR. KRISTAL:  Thank you.

17         MR. SLONIM:  We also have

18    invoices from Dr. Grossbard

19    covering the two matters that are

20    the subject of today's

21    questioning, the Sanders matter

22    and the Alvarez matter.

23         I'll hand you those

24    invoices.

Michael L. Grossbard, M.D.

 1              MR. KRISTAL:  Thank you.

 2              MR. SLONIM:  And finally, we

 3      did notice that there is a bit of

 4      a typo in Dr. Grossbard's report

 5      for the -- for Mr. Alvarez.

 6              There are two paragraphs in

 7      the Sanders report on Page 5 at

 8      the bottom, the last the

 9      paragraphs on the bottom.  It's

10      basically regarding risk factors

11      for the development of

12      non-Hodgkin's lymphoma.

13              Those were also supposed to

14      have been included in the Alvarez

15      report, but they were

16      inadvertently omitted due to a

17      typographical error.

18              MR. KRISTAL:  Which section

19      of the Sanders report?

20              MR. SLONIM:  If you take a

21      look at the Sanders report.

22              MR. KRISTAL:  Bert, you're

23      not adding something to Sanders.

24      You're adding something to Alvarez

Michael L. Grossbard, M.D.

1    Calderon?

2         MR. SLONIM:  Correct.

3         MR. KRISTAL:  I'll let David

4    deal with that then.

5         MR. SLONIM:  There were two

6    paragraphs in the Sanders

7    report -- basically, one

8    paragraph, the last paragraph of

9    the Sanders report, concerning

10   risk factors for non-Hodgkin

11   lymphoma.  That should have been

12   also included in the Alvarez

13   report, but it was inadvertently

14   omitted.

15        MR. KRISTAL:  We'll deal

16   with that when we get there, I

17   guess.

18        MR. SLONIM:  Okay.  And just

19   one other thing before we start.

20   Of course, this depositions taken

21   pursuant to a notice.  I would

22   just note for the record that we

23   have submitted responses and

24   objections to the notice.

```
1              MR. KRISTAL:  Anything else?
2              MR. SLONIM:  I think that's
3         it.
4                   -  -  -
5              EXAMINATION
6                   -  -  -
7    BY MR. KRISTAL:
8         Q.    I know you've been deposed
9    before.  So for my purposes, the most
10   important ground rule, so to speak, is if
11   you don't understand any question that
12   I'm asking you, please don't answer it.
13   Just tell me that you don't understand
14   it, and then it's up to me to rework it,
15   rephrase it, or do something with it so
16   you do understand it.  Okay?
17        A.    Sounds good, yes.
18        Q.    With that understanding, is
19   it fair that if you answer a question, we
20   can be assured that you did understand
21   the question?
22        A.    Yes.
23        Q.    Can you tell me what Sevin
24   is, S-E-V-I-N?
```

Michael L. Grossbard, M.D.

1        A.    Sevin is an insecticide.

2        Q.    Okay.  And when was the

3   first time you heard of Sevin?

4        A.    Oh, gosh.  20 years ago or

5   more.

6        Q.    Okay.  In what context?

7        A.    Household use, I think.

8        Q.    You were using Sevin?

9        A.    I don't know if I ever used

10  it.  I can't say I did or didn't.  I just

11  knew the name.

12       Q.    Okay.  So what do you mean

13  by household use?

14       A.    As a -- as a spray you could

15  use for -- as an insecticide.

16       Q.    So your recollection is

17  about 20 years ago, you heard of the

18  insecticide Sevin that could be used to

19  spray around the house?

20       A.    That's my recollection.

21       Q.    Okay.  And in what context

22  would you have heard that?

23       A.    I don't remember.

24       Q.    Was it an ad, a commercial,

Michael L. Grossbard, M.D.

1    somebody mentioned it to you?

2          A.    I have no recollection.

3          Q.    You have no recollection.

4    Okay.

5                Did you ever do any research

6    into whether or not Sevin -- strike that.

7                What is Sevin comprised of?

8    Do you know?

9          A.    I can't remember that off

10   the top of my head.

11         Q.    Okay.  Did you ever know?

12         A.    I did at one point.

13         Q.    Okay.  When did you know

14   what the components of Sevin were?

15         A.    So I can't give you all the

16   components.  But at some point I knew the

17   active ingredient.  I don't remember when

18   that was.

19         Q.    Okay.  Well, was it pursuant

20   to your work in Roundup litigation?

21         A.    No.  It was prior to that.

22         Q.    And in what context would

23   you have had a reason to find out what

24   the active ingredient of Sevin was?

Michael L. Grossbard, M.D.

1          A.     I've previously read

2     literature on pesticides and cancer prior

3     to any work with Roundup.  I'm sure it

4     was in that context.  But I can't tell

5     you the time or date.

6          Q.     Is Sevin or any of its

7     active ingredients a carcinogen?

8          A.     The literature is not

9     conclusive in that regard.  There are

10    some data suggesting it is and some data

11    suggesting that it's not.

12         Q.     Okay.  In your opinion, to a

13    reasonable degree of certainty, is

14    exposure to Sevin associated with an

15    increased risk of non-Hodgkin lymphoma?

16         A.     I can't answer that with any

17    degree of certainty.  To my knowledge

18    it's not associated with any significant

19    increase in risk.

20         Q.     Is it associated with an

21    increase in risk of lymphoma?

22         A.     You've asked me

23    non-Hodgkin's lymphoma first?

24         Q.     I did.

Michael L. Grossbard, M.D.

1          A.     Yeah.  It's not associated

2    with other types of lymphoma, mainly

3    Hodgkin's disease to the best of my

4    knowledge.

5          Q.     And when you say there's

6    some evidence that it may be associated

7    and some evidence it may not, what do

8    you -- what does the evidence that it is

9    and what is the evidence that it isn't?

10         A.     I can't quote you specific

11   literature on that today.

12         Q.     How about generally?

13         A.     I can't quote you anything

14   that I would feel comfortable that I've

15   looked at recently.

16         Q.     How about anything that you

17   looked at at any point in time?

18         A.     I can't quote that to you.

19         Q.     Okay.  Do you know who makes

20   Sevin?

21         A.     I do not.

22         Q.     Have you ever seen a Sevin

23   label?

24         A.     I don't know the answer.

Michael L. Grossbard, M.D.

1   Maybe, maybe not.

2        Q.    So if I understand you, you

3   are not of the opinion, as you sit here

4   today, that exposure to Sevin is

5   associated with any cancer?

6        A.    Again, I know there's

7   literature on both sides of that, but I

8   can't name specifics today.

9        Q.    And that was not my

10  question.  I'm just asking you for your

11  opinion.  If you had an opinion one way

12  or the other, then we would backfill with

13  what's the basis of the opinion.

14            So my question is, as you

15  sit here today, do you have an opinion

16  whether or not exposure to Sevin is

17  associated with any kind of cancer?

18       A.    I'm not prepared to offer a

19  firm opinion on that today.

20       Q.    Okay.  How about a weak

21  opinion?

22       A.    I'm not even going to offer

23  a weak opinion.

24       Q.    I was just following up

Michael L. Grossbard, M.D.

1    because you qualified "opinion."  So you

2    have no opinion one way or the other?

3         A.    Not today, no.

4         Q.    Okay.  Today is the day.

5         A.    Understood.

6         Q.    Okay.  But I appreciate what

7    you're saying.

8               How about Lorsban?  What is

9    Lorsban?

10        A.    It's also a pesticide.

11        Q.    And what kind of pesticide?

12        A.    I can't give you the

13   classification on that.

14        Q.    Meaning you don't know if

15   it's an herbicide, fungicide,

16   insecticide?

17        A.    Meaning I don't recall.

18        Q.    Okay.  Did you ever know?

19        A.    I did.

20        Q.    And in what context would

21   you have determined what kind of

22   pesticide Lorsban was?

23        A.    For that agent, it would be

24   in the context of this litigation and the

Michael L. Grossbard, M.D.

1  reference I made to it in Mr. Sanders'

2  report.  Based on his prior use.

3          Q.    Do you know what the active

4  ingredients of -- or ingredient of

5  Lorsban is?

6          A.    I do not recall.

7          Q.    Did you do any research in

8  terms of whether or not Lorsban is

9  associated with any cancer?

10         A.    I did not do research as to

11 whether it was associated with any

12 cancer.  I did do research -- well, I did

13 do -- I did look up literature as to

14 whether it was associated with

15 non-Hodgkin lymphoma specifically, and

16 that is a cancer.

17         Q.    Right.  And what is --

18 strike that.

19              What research did you do

20 into whether or not Lorsban exposure is

21 associated with non-Hodgkin lymphoma?

22         A.    I reviewed a couple of

23 papers on -- off of PubMed.

24         Q.    What papers?

Michael L. Grossbard, M.D.

1          A.     I don't recall.

2          Q.     Okay.  And there's no paper

3    that relates to Lorsban in your materials

4    considered list for Mr. Sanders, is

5    there?

6          A.     That's true.

7          Q.     What kind of -- strike that.

8                 How many such papers did you

9    review from PubMed regarding Lorsban?

10         A.     Two or three.  I can't

11   remember specifically.

12         Q.     Okay.  That's fair enough.

13                And do you recall what kinds

14   of papers?  Meaning, whether were they

15   epidemiological studies, or were they

16   genotoxicity studies?

17         A.     They would have been

18   epidemiological.

19         Q.     Okay.  And do you consider

20   that a full review as to whether or not

21   Lorsban is or isn't associated with

22   non-Hodgkin lymphoma?

23         A.     I do not.

24         Q.     Okay.  Do you have an

Michael L. Grossbard, M.D.

1  opinion as you sit here today whether

2  Lorsban is or isn't associated with

3  non-Hodgkin lymphoma?

4       A.    I don't believe it is to any

5  significant degree.

6       Q.    And what do you mean by

7  "significant degree"?

8       A.    In other words, that there

9  was a statistically significant

10 association between Lorsban and lymphoma

11 in the papers that I looked at.

12      Q.    Okay.  And if there were

13 statistically significant findings in one

14 of those papers, would it be your opinion

15 that Lorsban was associated with

16 non-Hodgkin lymphoma?

17           MR. SLONIM:  Objection.

18           THE WITNESS:  Not from a

19      single paper.

20 BY MR. KRISTAL:

21      Q.    Okay.  What would be the

22 minimum evidence that you would need to

23 say that Lorsban was associated with

24 non-Hodgkin lymphoma?

Michael L. Grossbard, M.D.

1          A.     So I would need to do a much

2     more thorough review of the literature on

3     that.  I would need to assess a variety

4     of criteria regarding the methodology of

5     the publications, the statistical

6     significance of the findings, the aspects

7     of the specific studies themselves, were

8     they cohort studies, epidemiologic

9     studies, were they case-control studies.

10         Q.     May I just ask you -- it's

11    early, and I'm just asking him to slow

12    down for Michelle's sake so she can get

13    everything down.

14         A.     Sure.

15         Q.     That's all I'm --

16         A.     Sure.

17         Q.     That's all I'm trying to

18    say.

19              MR. SLONIM:  Doctor, did you

20         complete your answer?

21              MR. KRISTAL:  No, no, I

22         realize the answer wasn't

23         complete.

24              MR. SLONIM:  Maybe we can do

Michael L. Grossbard, M.D.

1       this.  Maybe we can have the

2       question read back, and the

3       doctor's --

4            MR. KRISTAL:  I can read the

5       doctor's answer if you like.

6            MR. SLONIM:  No, I prefer to

7       have the court reporter do that

8       please.

9            (Whereupon, the court

10      reporter read back the requested

11      portion of testimony.)

12           MR. SLONIM:  Doctor, if you

13      want to complete your answer --

14           THE WITNESS:  Sure.

15           MR. SLONIM:  -- if there was

16      more than what --

17           THE WITNESS:  Sure.  Just to

18      the extent possible, I'd want to

19      explore the strength of the

20      association that existed, whether

21      there was a temporal relationship

22      between exposure to the agent and

23      the development of lymphoma,

24      whether there was a mechanistic

Michael L. Grossbard, M.D.

1              way that this could happen, in

2              other words a biological mechanism

3              by which this could happen.  I

4              want would want to explore if

5              there was a dose-response effect

6              that was seen -- higher dose, more

7              likelihood of lymphoma.

8                   Those would be some of the

9              features.

10   BY MR. KRISTAL:

11        Q.    But you didn't do any of

12   that for Lorsban, correct?

13        A.    That's correct.

14        Q.    And you didn't do that for

15   Sevin either?

16        A.    That is correct.

17        Q.    What's Delnav?

18        A.    That's another pesticide.

19        Q.    Do you know what kind of

20   pesticide?

21        A.    Again, I don't recall.

22        Q.    Okay.  Did you do any

23   research on whether or not Delnav is

24   associated with any cancer?

Michael L. Grossbard, M.D.

1          A.     I did similar type research

2     that I did for the other compound that we

3     just discussed.

4          Q.     And do you have an opinion

5     as you sit here today whether exposure to

6     Delnav is associated with non-Hodgkin

7     lymphoma?

8          A.     From the limited literature

9     that I reviewed, it did not appear to be

10    that there was a firm association or a

11    statistically significant association.

12         Q.     Has it been associated at

13    all?

14         A.     I don't recall.

15         Q.     Did you at one point in time

16    know that, and you don't recall it?  I'm

17    not sure I understand when you say "I

18    don't recall."  Don't recall means you

19    knew and you're just not remembering --

20              MR. SLONIM:  Objection.

21    BY MR. KRISTAL:

22         Q.     -- as opposed to not

23    knowing.

24              MR. SLONIM:  Objection.

Michael L. Grossbard, M.D.

1              THE WITNESS:  Well, I
2         think -- I think I don't recall.
3         Again, I looked up two or three
4         papers.  I looked at them.  I did
5         not consider this to be a
6         substantial contributing factor to
7         Mr. Sanders' development of
8         lymphoma and didn't pursue it
9         further.
10  BY MR. KRISTAL:
11         Q.    Okay.  My question was
12  perhaps a little broader.  The question
13  is whether you associated Delnav exposure
14  with NHL?
15         A.    Again, I don't think there
16  was -- from my limited review, I did not
17  find a statistically significant
18  relationship to draw that conclusion.
19         Q.    I'm going to mark as
20  Exhibit 1, your report in Sanders.
21              (Document marked for
22         identification as Exhibit
23         Grossbard-1.)
24  BY MR. KRISTAL:

Michael L. Grossbard, M.D.

1    Q.    Take a look at it.  And if

2  you can just tell us if that is your

3  report in Sanders with your CV that's now

4  been updated, your materials considered

5  list, and the update to your testimony.

6    A.    It looks -- it looks

7  accurate, yes.

8    Q.    If you turn to Page 6.

9  Third paragraph down, just let me know

10  when you're there.

11    A.    I'm there.

12  ▮    ▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20            Did I read that correctly?

21    A.    You did.

22    Q.    Okay.  So in your report,

23  you're stating that Sevin is associated

24  with the development of NHL, are you not?

Michael L. Grossbard, M.D.

1          A.     I am.  Although I don't make

2     any conclusions about statistical

3     significance there.

4          Q.     Okay.  Why did you say today

5     that you don't have an opinion if when

6     you wrote the report you said Sevin has

7     been associated with the development of

8     NHL?  How are those two things possibly

9     consistent?

10          A.     Well, I think -- I think

11     they're consistent.  I believe that an

12     association doesn't draw a conclusion

13     that that's statistically significant and

14     a definite cause.

15          Q.     Nor did I ask you that.  I

16     asked earlier -- we can go back and look

17     at the question -- if Sevin was

18     associated with NHL.  And you said you

19     don't have an opinion.  You haven't done

20     enough research; is that right?

21               MR. SLONIM:  Objection.

22          Asked and answered.

23     BY MR. KRISTAL:

24          Q.     Did you say that?

Michael L. Grossbard, M.D.

1                    MR. SLONIM:  Speaks for

2          itself.  Argumentive.

3    BY MR. KRISTAL:

4          Q.    Okay.  You can answer.

5    Didn't you say that when I asked you?

6          A.    I did say that.

7          Q.    Okay.  In your report you

8    said, in essence -- I can read the whole

9    thing again, but Sevin has been

10   associated with the development of NHL.

11                    Do you see that?

12         A.    I do.

13         Q.    Okay.  And you're saying

14   those answers are the same?

15         A.    Well, I'm saying I qualified

16   my answer as I answered it to you.

17         Q.    What do you mean you

18   qualified it?

19         A.    Again, by stating

20   statistical significance, which I did not

21   state here.

22         Q.    Well, two things.  In your

23   report, there's no mention of statistical

24   significance, correct?

Michael L. Grossbard, M.D.

1          A.     That's correct.

2          Q.     So are you saying in your

3   opinion, Sevin has been associated with

4   the development of NHL, but you don't

5   believe it's a risk factor?

6                 MR. SLONIM:   Objection.

7                 THE WITNESS:   I would not

8          classify this as a risk factor for

9          Mr. Sanders' NHL, yes.

10  BY MR. KRISTAL:

11         Q.     Okay.  Yet that paragraph

12  says, Mr. Sanders -- "Mr. Sanders had

13  several risk factors for NHL."  And the

14  rest of that paragraph goes on to discuss

15  in part Sevin, right?

16         A.     That's correct.

17         Q.     So aren't you saying in that

18  paragraph that Sevin was a risk factor

19  for Mr. Sanders' NHL?

20         A.     I don't think so.

21         Q.     Okay.  Let's read it again.

22                "Mr. Sanders had several

23  risk factors for NHL."

24                That's the first sentence of

Michael L. Grossbard, M.D.

1    the paragraph, right?

2            A.    That is correct.

3            Q.    And then you continue with

4    the next sentence.  "Mr. Sanders

5    testified that he was exposed to several

6    chemicals when he was employed as a ranch

7    hand, beginning in the 1960s through his

8    retirement in 2014, that have been

9    associated with the development of NHL,

10   e.g., Sevin, Lorsban and Delnav."

11           Correct?

12           A.    That is correct.

13           Q.    And that's the entire

14   paragraph?

15           A.    That is correct.

16           Q.    So what did you mean when

17   you said Mr. Sanders had several risk

18   factors for NHL and then followed it up

19   with the next sentence, talking about

20   Sevin being associated with the

21   development of NHL?  You're saying those

22   things are not connected?

23           A.    I'm saying those things are

24   not connected as risk factors for him.

Michael L. Grossbard, M.D.

1    They are associations.

2          Q.    But why did you say

3    Mr. Sanders had several risk factors for

4    NHL?

5          A.    I go on through the rest of

6    the three paragraphs to describe risk

7    factors.

8          Q.    So you're saying --

9          A.    As well as -- as well as the

10   risk factors before.

11         Q.    Okay.  So you're telling us

12   that the sentence that follows right

13   after "Mr. Sanders had several risk

14   factors for NHL" has nothing to do with

15   the risk factors that Mr. Sanders had for

16   NHL?  Is that what you're telling us?

17         A.    I'm saying there is an

18   association between them.  But I can't

19   tell you that they are risk factors for

20   him, yes.

21         Q.    Despite the fact that the

22   sentence where you say they are

23   associated comes right after you say

24   Mr. Sanders had several risk factors?

Michael L. Grossbard, M.D.

1        A.    Exactly, despite the fact.

2        Q.    Same thing with Lorsban,

3  correct?  You testified earlier Lorsban

4  had not been associated in your mind with

5  the development of NHL.  And here you're

6  saying it has, correct?

7            MR. SLONIM:  Objection.

8            THE WITNESS:  I believe I

9        also said in terms of statistical

10       significance.

11  BY MR. KRISTAL:

12       Q.    I can't find it right now.

13  We will go back to it.

14            If a person -- strike that.

15            Is radiation exposure a risk

16  factor for lymphoma?

17       A.    I believe it's both a risk

18  factor and a cause.

19       Q.    Okay.  So there are certain

20  things that -- certain exposures that can

21  be both risk factors and causes of

22  non-Hodgkin lymphoma, correct?

23       A.    I believe that's true, yes.

24       Q.    And there are certain things

Michael L. Grossbard, M.D.

1    that can be a risk factor but not

2    necessarily a cause of NHL, correct?

3           A.    That's true.

4           Q.    Okay.  So how do you

5    determine which are the things that are

6    risk factors for non-Hodgkin lymphoma and

7    are causes of non-Hodgkin lymphoma?  What

8    criteria do you use?

9           A.    I think the easiest and

10   first thing is to look at is a mechanism

11   of how something could cause lymphoma.

12              So I think that's the

13   question that you asked, so it would be

14   that.

15          Q.    Is there anything else?  I'm

16   just trying to lay out --

17          A.    Yeah, I mean --

18          Q.    -- what are the criteria

19   that you have to determine if a risk

20   factor for NHL is also a cause, and you

21   mentioned mechanism of action.  And I'm

22   just asking if -- I want to get the full

23   list and then come back.

24          A.    So I think just in relating

Michael L. Grossbard, M.D.

1   risk factor to cause, it would actually

2   be mechanism of action, how it would

3   happen.

4           Q.    Okay.  Meaning does it cause

5   some genetic damage that could mutate

6   into a cancer cell?

7           A.    It -- either cause or

8   contribute to genetic damage.

9           Q.    Okay.  Is there any

10  particular -- strike that.

11              There are a number of

12  different ways that DNA can be damaged,

13  correct?

14          A.    Sure.

15          Q.    Is there a particular way

16  that a -- let's use a chemical -- causes

17  or contributes to genetic damage, other

18  than damage to DNA?

19              MR. SLONIM:  Objection.

20              THE WITNESS:  You're asking

21      a particular chemical

22      specifically?  I'm sorry.  As

23      opposed --

24  BY MR. KRISTAL:

Michael L. Grossbard, M.D.

1        Q.    Well, any -- any -- we can

2   stick with a general substance.  If

3   you're determining whether a substance

4   that is a risk factor is a cause, you

5   said you look at the mechanism of action

6   to see whether it causes or contributes

7   to genetic damage.

8              What type of genetic damage

9   are you talking about?

10       A.    So ultimately that --

11             MR. KRISTAL:  Thank you for

12        the objection.  It was a terrible

13        question.

14             THE WITNESS:  Ultimately

15        that genetic damage would have to

16        contribute to a mutation.

17   BY MR. KRISTAL:

18       Q.    Okay.  And what are the

19   types of genetic damage, in your opinion,

20   that can contribute to a mutation?

21       A.    So direct -- direct damage

22   to DNA, impairment of replication, cell

23   division, increased stimulation of cell

24   division, making it more likely that

Michael L. Grossbard, M.D.

1    there would be errors in DNA

2    transcription.  Those would be some of

3    the classes.

4           Q.    Okay.  Any others?

5           A.    Those are what I'm thinking

6    off the top of my head.

7           Q.    Okay.  What kind of direct

8    damage are you talking about?

9           A.    So direct damage would be

10   radiation, for example.  Direct damage to

11   the DNA strands.

12          Q.    No, and that's -- I'm sorry.

13   Were you done?

14          A.    Go ahead.  Yeah.

15          Q.    I was talking very generally

16   about direct damage.  Are you talking

17   about DNA strand breaks as one, as an

18   example?

19          A.    DNA strand breaks would be

20   one.

21          Q.    Sister chromatid exchange is

22   another?

23          A.    That would be.

24          Q.    Anything else in your

Michael L. Grossbard, M.D.

1    opinion?

2         A.    Not for these agents, no.

3         Q.    When you say for these

4    agents --

5         A.    Sorry, not --

6         Q.    -- I'm talking very broadly,

7    as broad as you can get.  I want to take

8    the 10,000-foot view.

9         A.    Understood.  So you can

10   have -- you can have areas of DNA that

11   are spliced out, for example, for some

12   reason or another.  But I can't think of

13   any of these risks or causes that we are

14   talking about here that do that.

15        Q.    I'm not limiting it --

16        A.    Yeah, and I understand that

17   you want the entire --

18        Q.    So you're talking about a

19   translocation?  Is that what --

20        A.    No, not a translocation, but

21   actually just splicing it, just losing

22   part of the DNA.

23        Q.    Okay.

24        A.    I guess chromosomal

Michael L. Grossbard, M.D.

1    translocations would be another result of

2    DNA damage.

3            Being very basic, point

4    mutations in the DNA.

5        Q.    When you're talking about

6    impairing replication, what are you

7    talking about there in terms of a

8    mechanism?

9        A.    Impairing cell division.

10   Essentially you can disrupt microtubular

11   formation, for example, or function.

12       Q.    Does damage to a tumor

13   suppressor gene fall in that category in

14   terms of --

15       A.    Go ahead.

16       Q.    -- then lacking control over

17   replication of cells?

18       A.    Yes.  Mutation of tumor

19   suppressor gene would fall into that

20   group.

21       Q.    Does oxidative stress lead

22   to DNA damage?  Can the -- strike that.

23            Can oxidative stress lead to

24   DNA damage?

Michael L. Grossbard, M.D.

1           A.      Yes, it can.

2           Q.      Does damage to a tumor

3    promoter gene also fall in the category

4    of a mechanism?

5           A.      It's not usually damage to

6    the gene, but alteration of expression of

7    the gene.

8           Q.      That's a much better term.

9    Thank you.

10          A.      Okay.  Yes, that --

11          Q.      So if you alter the

12   expression of a tumor promoter gene, you

13   can thereby trigger replication of cells

14   that could lead to a cancer possibly?

15          A.      Correct.

16          Q.      You give an example in your

17   report that if a person was exposed to

18   radiation through radiation therapy and

19   subsequently developed a lymphoma within

20   the field of radiation, in your opinion

21   the radiation therapy caused the

22   lymphoma?

23          A.      That would be true.

24          Q.      Okay.  Is there any

Michael L. Grossbard, M.D.

1  validated medical test that you would

2  follow to make that determination?

3          A.    There is no medical test

4  that I'm aware of.

5          Q.    Is there any validated

6  medical procedure that you would follow

7  to make that determination?

8          A.    No, there's no medical

9  procedure that would allow that

10  determination.

11          Q.    Is there a validated medical

12  protocol that you would follow to make

13  that determination?

14          A.    By protocol, you mean?

15          Q.    I don't know.  You used the

16  term in your report, "validated test,

17  procedure or protocol."  So what did you

18  mean?

19                You did use those terms,

20  right?

21          A.    I have to look back.  I may

22  have.

23          Q.    Okay.  Let's look.

24                On Page 5, are you with me?

Michael L. Grossbard, M.D.

1    The paragraph just above the discussion

2    of Mr. Sanders' case, the last sentence.

3                "Moreover, it is

4    scientifically impossible for anyone to

5    conclude that exposure to Roundup either

6    induced or contributed to a particular

7    person's lymphoma because there is no

8    validated medical test, procedure, or

9    protocol for making such a

10   determination."

11               Did I read that correctly?

12       A.    You did.

13       Q.    What did you mean by

14   validated medical protocol?

15       A.    Be a set of procedures by

16   which one analyzes something.

17       Q.    Okay.  There's no such

18   procedure for the radiation lymphoma

19   issue, correct?

20       A.    Other than medical judgment

21   that radiation is a DNA-damaging agent,

22   if you will, that if lymphoma developed

23   in the field of radiation, that it would

24   be highly likely that that happened.

Michael L. Grossbard, M.D.

1          Q.    Are you saying in your

2    report -- obviously you're not, given

3    your last answer -- that no -- no one can

4    ever scientifically say that exposure to

5    anything induces or contributes to a

6    cancer unless there's a validated medical

7    test, procedure, or protocol for making

8    such a determination?

9          A.    I'm obviously not saying

10   that for everything.

11         Q.    Okay.  Just Roundup?

12         A.    In that specific sentence,

13   Roundup.  There would be many other

14   things also.

15         Q.    Why is medical judgment --

16   strike that.

17              You seem to be throwing that

18   sentence in.  I don't mean that in a

19   derogatory way.  You have that sentence

20   in your report to in essence say, even if

21   Roundup was a potential cause for NHL in

22   an individual case, you couldn't say

23   whether it caused or contributed without

24   these validated medical tests, procedures

Michael L. Grossbard, M.D.

1    or protocols.  Am I reading that right?

2         A.    Yeah, that would be correct.

3         Q.    Okay.  So for some

4    substances that you believe cause cancer,

5    you're saying that you need a validated

6    test, procedure, or protocol to determine

7    whether that substance caused or

8    contributed to that person's cancer and

9    in other situations you don't?

10        A.    No, I don't believe that I'm

11   saying that, in terms of a validated

12   test, protocol, or procedure.  But those

13   all depend upon medical literature,

14   medical knowledge, logic.

15        Q.    Well, of course.  Nobody is

16   throwing darts, right?

17        A.    I think --

18        Q.    You're doing the best that

19   you can as a scientist to make an

20   assessment of everything you've read and

21   putting it all together and coming up

22   with your opinion, right?

23             MR. SLONIM:  Objection to

24        that question and also -- and it

Michael L. Grossbard, M.D.

1           may have been inadvertent counsel.

2           I'm sure it was.  But I don't

3           believe the doctor had finished

4           his prior answer.

5                MR. KRISTAL:  Oh.

6      BY MR. KRISTAL:

7           Q.    I thought you had.  Could

8      you -- if I do that, just put up your

9      hand and say -- I will stop talking.  I'm

10     not trying to interrupt you in any way.

11                MR. SLONIM:  I'd like to

12          have the court reporter read back

13          the pending question to which I

14          have an objection.

15                But can you read it back,

16          please.

17                MR. KRISTAL:  Sure.  I'm

18          going to blame it on the caffeine.

19          So I apologize.

20                (Whereupon, the court

21          reporter read back the requested

22          portion of testimony.)

23     BY MR. KRISTAL:

24          Q.    My question was, so for some

Michael L. Grossbard, M.D.

1    substances that you believe cause cancer,

2    you're saying that you need a validated

3    test, protocol or procedure to determine

4    whether that substance caused or

5    contributed to that person's cancer, and

6    in other situations you don't.

7                    And your answer was, "No, I

8    don't believe that I'm saying that, in

9    terms of a validated test, protocol or

10   procedure.  But those all depend upon

11   medical literature, medical knowledge,

12   logic."

13                   Were you done with that

14   question?  And if not, please finish it.

15   And I do apologize.

16        A.    At this point, I don't

17   remember.  So let's just leave it there.

18        Q.    Okay.  So now I'm confused.

19   So I'm going to try to ask you questions

20   so I'm not confused.

21                   In order for you to say that

22   radiation therapy caused someone's

23   lymphoma, you do not need any validated

24   medical test, procedure, or protocol.  Is

Michael L. Grossbard, M.D.

1   that fair to say?  In the circumstance

2   that we gave where somebody had radiation

3   therapy and the lymphoma was within the

4   field of the radiation.

5       A.    Look, it's not a protocol or

6   a procedure, but it's an understanding of

7   the biology of tumors.  It's an

8   understanding of what radiation therapy

9   does.  It's an understanding that if it

10  happened a week after or three days after

11  radiation, that that would be

12  biologically implausible that it did it.

13  So it would have to have a proper

14  temporal relationship in terms of

15  occurring some years after the radiation.

16          I don't know if that's a

17  protocol or not.  But it's a way of

18  thinking.

19      Q.    Well, what did you mean when

20  you used the term "validated medical

21  test" in your report?  What does that

22  phrase mean, as you used it?

23      A.    For a --

24      Q.    Validated medical test?

Michael L. Grossbard, M.D.

1          A.     For a test, a single test,
2    be it a blood test or a chromosome test
3    or some test that would give you an
4    answer.
5          Q.     What blood test would give
6    you an answer that an exposure to
7    something did or didn't cause cancer?
8    Does such a blood test exist?
9          A.     No.  And I'm saying there is
10   no such blood test.
11         Q.     What chromosome test exists
12   that would tell you whether or not
13   exposure to a substance did or didn't
14   cause a cancer?
15         A.     So it can give clues to it,
16   but can't be definitive.
17         Q.     Okay.  When you say it can
18   give clues to it, what do you mean?  When
19   you see chromosomal damage of some sort?
20         A.     Yes.
21         Q.     That doesn't tell you what
22   caused the chromosome damage, right?
23         A.     So for example -- and we're
24   out of the domain of lymphoma now, but

Michael L. Grossbard, M.D.

1    we're talking generally.  If you have

2    something called myelodysplastic syndrome

3    as your diagnosis, and you received

4    chemotherapy three to five years before,

5    and you have abnormalities of Chromosome

6    5 or 7, there is a very strong

7    association between that, enough that

8    most doctors will say that that

9    chemotherapy was the cause of that

10   mutation.

11        Q.    And without that chromosomal

12   test, most doctors would say that anyway,

13   right, based on logic and knowledge of

14   the medical literature and those things?

15        A.    Most likely, yes.

16        Q.    Okay.  So you don't need

17   that particular test; it's not a

18   requirement?

19        A.    No, it's not a requirement.

20        Q.    Okay.  What did you mean

21   about the validated medical procedure?

22        A.    Some type of biopsy or study

23   of a specimen under a microscope,

24   something that would tell you what the --

Michael L. Grossbard, M.D.

1   what the origin of that disease was.

2          Q.    Okay.  Anything else?

3          A.    No.  That's what I meant.

4          Q.    Okay.  What biopsy could you

5   look at under a microscope and say

6   "Substance X caused this or didn't cause

7   this"?  What are you talking about?

8          A.    I don't believe you can.

9          Q.    Right.  So there is no such

10  validated medical procedure?

11         A.    Right.

12         Q.    Okay.  Then why did you say

13  with respect to Roundup, unless there's a

14  validated medical test, procedure, or

15  protocol, you couldn't say whether

16  someone's exposure did or didn't cause

17  their NHL, if there is no such test to

18  begin with?

19         A.    Because there are other

20  agents for which I could.

21         Q.    Like what?

22         A.    Not for lymphoma, but

23  cigarette smoking and lung cancer.

24         Q.    Anything else?

Michael L. Grossbard, M.D.

1        A.    That's the one that I think

2   of off the top of my head.

3        Q.    Is there anything else that

4   you can think of, that there's some kind

5   of test?

6        A.    Not that I'm thinking off

7   the top of my head.

8        Q.    Okay.  What do you mean by

9   validated medical protocol --

10        A.    Protocol --

11        Q.    -- as you used it in your

12   report?

13        A.    Yeah, protocol would imply a

14   series of tests in some sort of sequence

15   that would allow you to elucidate the

16   mechanism.

17        Q.    There's no such protocol

18   that exists to determine whether a

19   substance caused or contributed to

20   someone's cancer, right?

21        A.    Again, that would be

22   correct.

23        Q.    Okay.  So are you saying no

24   one can apply their best scientific

Michael L. Grossbard, M.D.

1    judgment, having reviewed the literature,

2    having assessed the quality of the

3    literature, having looked at whether or

4    not there's an association, looking at

5    biological plausibility, looking at all

6    of those things, and no one can simply

7    disagree with you and say Roundup did

8    contribute to the development of this

9    particular person's NHL?

10        A.    I don't believe I'm saying

11   that.

12        Q.    Oh, okay.  So there are

13   reasonable doctors and scientists who

14   could make such a determination?

15             MR. SLONIM:  Objection.

16   BY MR. KRISTAL:

17        Q.    Right?

18        A.    Yeah.  I mean, I happen to

19   disagree with their opinions, but they

20   have their opinion, and I have mine.

21        Q.    I'm not -- I understand

22   that.

23        A.    Yeah.

24        Q.    And you're not saying there

Michael L. Grossbard, M.D.

1   is no evidence whatsoever that exposure

2   to glyphosate is capable of causing

3   cancer.  You just don't believe it's

4   tipped to the point where you would say

5   it does.  Is that fair to say?

6          A.    I think for almost any agent

7   I would have to say there's not no

8   evidence.  There are thousands of pieces

9   in the literature on one side or another

10  for almost every scientific issue, and

11  many of them are in conflict.

12          I think the preponderance --

13  vast preponderance of the evidence would

14  suggest that glyphosate does not cause

15  lymphoma.

16          Q.    Are chemicals that, in your

17  opinion, are capable of -- strike that.

18          Are chemicals that are risk

19  factors for cancer also causative,

20  meaning with respect to chemicals

21  themselves, if it's determined to be a

22  carcinogen, then it's a risk factor and a

23  carcinogen -- am I making any sense here?

24  If not, please stop me.

Michael L. Grossbard, M.D.

1          A.     Zero.

2                 MR. SLONIM:  Object.  I'll

3      object.

4   BY MR. KRISTAL:

5          Q.     No, no, and that's why I

6   don't want you to guess.

7                 Is there any chemical that

8   you believe is a risk factor for NHL that

9   is also not causative?

10                MR. SLONIM:  Objection.

11  BY MR. KRISTAL:

12         Q.     In other words, capable of

13  causing NHL?

14         A.     Sure.

15                Off the top of my head, I

16  can't think of an agent that I -- a

17  chemical that I would consider to be a

18  risk factor that wouldn't be a cause.

19         Q.     Okay.  Is Agent Orange a

20  risk factor for lymphoma?

21         A.     The literature, again, is

22  not very definitive in that regard.

23  There are some studies that suggest

24  there's a higher risk of lymphoma in

Michael L. Grossbard, M.D.

1    association with Agent Orange.  There are

2    other studies that don't.  The Veterans

3    Administration clearly considers that to

4    be a coverable or reimbursable diagnosis

5    associated with Agent Orange exposure.

6          Q.    Okay.  So your opinion is

7    that Agent Orange is or isn't a risk

8    factor for lymphoma?

9          A.    I believe it's not a

10   significant risk factor for lymphoma.

11   I --

12         Q.    Okay.  Okay.  Go ahead.

13   █          █████████████████████

█  ████████████████████████████████████

█  ███████████████████████████████████████

█  █████████████████████████████████████

17         Q.    Okay.  And you used the term

18   in your answer "significant risk factor."

19   Is there a difference between a risk

20   factor and a significant risk factor?

21         A.    Shows a statistically

22   significant increase in the disease in

23   question.

24         Q.    So in order to be considered

Michael L. Grossbard, M.D.

1    a risk factor in your opinion, there has

2    to be a statistically significant

3    association epidemiologically?

4         A.    For me, yes.

5         Q.    Okay.  Have you read the

6    literature regarding whether or not you

7    need to have statistically significant

8    results before you can render an opinion

9    that an exposure is associated with an

10   outcome?  Have you seen that body of

11   literature?

12        A.    No.

13        Q.    Is there anything magical

14   about statistical significance?

15        A.    What do you mean by magical?

16        Q.    Well, a P-value -- you know

17   what a P-value is?

18        A.    I do.

19        Q.    P-values can be selected

20   randomly, correct?

21             MR. SLONIM:  Objection.

22             THE WITNESS:  Well, they're

23        not usually selected randomly, but

24        they could be.

Michael L. Grossbard, M.D.

1    BY MR. KRISTAL:

2          Q.    In other words, you could

3    have a P-value of .05, right, or for a --

4    yes?

5          A.    That's correct.

6          Q.    Or you could have a P-value

7    of .10?

8          A.    You could.

9          Q.    And if you had a -- if you

10   picked going into a study, we're going to

11   analyze statistically this data using a

12   P-value of .10, there would be more

13   things that would be considered

14   statistically significant, right?

15         A.    If you defined it as such,

16   yes.

17         Q.    Okay.  Are you saying that

18   in order to be a risk factor, something

19   has to be statistically significant at a

20   P of .05?

21         A.    For me, the confidence

22   interval that you measure, and if that's

23   at a .05 level or .01 level, it has to be

24   outside of that domain of one.  So it --

Michael L. Grossbard, M.D.

1  there has to be either an increased risk

2  or decreased risk one way or the other,

3  but in this case, for a risk factor, an

4  increased risk.  And, yes, that has to

5  exceed one, being statistically

6  significant.

7          Q.    I understand that's a

8  definition of statistically significant.

9  It can't cross one, right, the confidence

10  interval?

11          A.    Sure.

12          Q.    Okay.  What I'm asking you

13  is a different question though.

14              Are you saying that in order

15  for you to say something is -- strike

16  that.

17              In order for you to say that

18  an exposure is associated with an

19  outcome, does it have to be statistically

20  significant at the P equals .05 level?

21          A.    So to say something is

22  associated, no.  To say it's

23  significantly associated, yes.

24          Q.    Okay.  So if something was

Michael L. Grossbard, M.D.

1    statistically significant in a study at a

2    P equals .10, you would say that's

3    significantly associated or not?

4         A.    To my interpretation, that

5    would be not statistically significantly

6    associated because I use a .05 cutoff by

7    a large --

8         Q.    Why do you -- why do you use

9    a .05 cutoff?

10        A.    It's really what I was

11   taught in statistic classes in the

12   epidemiology classes that I took.

13        Q.    Okay.  .04, .06 make a

14   difference?

15        A.    Sure.  Below .05 is fine.

16   So .04, yes; .06, no.

17        Q.    Do you give any weight to

18   associations that are not statistically

19   significant?

20        A.    Sure.  I think you have to

21   include all of that in thinking about a

22   particular agent or product.

23        Q.    Okay.  What pesticides do

24   you consider to be risk factors for

Michael L. Grossbard, M.D.

1    lymphoma, if any?

2         A.    Where I think the literature

3    is stronger than other places, DDT,

4    lindane.  Those would be a couple.

5    Malathion.

6         Q.    Have you done the level of

7    research on any one of those three

8    pesticides as you've done in this case

9    for glyphosate?

10        A.    I would have to say no.

11        Q.    What are you basing your

12   opinion on malathion, the IARC review?

13        A.    Not only IARC, although IARC

14   does classify it as a carcinogen.

15               Other papers I've come

16   across, I can't quote them to you.

17        Q.    Do you remember giving a

18   little presentation where you had a chart

19   where risk factors for lymphoma and you

20   listed pesticide exposure and you

21   mentioned Agent Orange?

22        A.    I don't.

23        Q.    Okay.  Let me take a minute

24   and see if we can boot that up.

Michael L. Grossbard, M.D.

1          MR. SLONIM:  While you're

2     doing that, maybe we should take a

3     break.

4          MR. KRISTAL:  I was going to

5     ask somebody else to do it.  Or

6     if you -- anytime you want to take

7     a break is fine with me.  If you

8     want to take a break now, that's

9     fine.

10          MR. SLONIM:  I thought you

11     were -- I thought you were booting

12     something up.

13          MR. KRISTAL:  I'm moving it

14     down to the booter-upper.

15          Offshoot of my wife being my

16     volume turner-downer.

17  BY MR. KRISTAL:

18          Q.    All right.  If someone had

19  exposure to malathion and developed

20  lymphoma, would it be your opinion that

21  malathion contributed to the development

22  of a lymphoma?

23          A.    Potentially.  It would again

24  depend upon the extent of exposure, the

Michael L. Grossbard, M.D.

1    temporal association, the same criteria

2    that we spoke about before.

3            Q.    Well, when you say extent of

4    exposure, what are you talking about?

5            A.    If they used malathion once,

6    one day, 27 years ago, I would not think

7    that it's a significant contributing

8    factor.

9            Q.    Okay.  Where is your cutoff

10   for that or any other pesticide exposure?

11   In other words, what do you use as a

12   guidepost or a metric?

13           A.    To some degree, that would

14   have to rely on published literature.

15           Q.    Fine.  Do you have cutoff?

16   Does it have to be -- where do you

17   derive --

18           A.    Yeah.

19           Q.    -- some cutoff?  If one day

20   27 years ago isn't sufficient -- and I'm

21   not saying it is or isn't -- what is the

22   cutoff?  Is it two days?  100 days?

23           A.    I can't give you an

24   arbitrary cutoff.  I'm not prepared based

Michael L. Grossbard, M.D.

1    on malathion literature to answer that

2    question today.

3         Q.    Okay.  And where would you

4    get an answer to that question for any

5    pesticide that you believe is capable of

6    causing lymphoma?

7         A.    I think it would be very

8    hard to get an answer to that question in

9    any degree.

10        Q.    So then, how do you answer

11   it?  If in your opinion you need a

12   sufficient exposure, what are you looking

13   to to determine whether a particular

14   exposure is or isn't sufficient?

15        A.    So first of all, there has

16   to be a consistent epidemiologic

17   association in the literature with an

18   agent as being a cause of lymphoma.

19             Second of all, the person

20   would need to be exposed to that agent in

21   a temporally associated fashion.

22             Beyond that, it would really

23   depend on how strong the literature was.

24        Q.    Well, temporal association,

Michael L. Grossbard, M.D.

1   is a gimme, right?  We don't live in a

2   bizarro world.  You have to have an

3   exposure prior to an outcome with a

4   sufficient latency, right?

5        A.    Well, I don't think that's a

6   gimme, unless you put in sufficient

7   latency.

8             In other words, if you were

9   exposed to malathion today --

10       Q.    Of course.

11       A.    -- and you get lymphoma

12  tomorrow -- so I don't think it's a

13  given.

14       Q.    What is your minimum latency

15  period with respect to non-Hodgkin

16  lymphoma and causation by a pesticide?

17       A.    It's hard to answer that

18  with any definitive sense.  In terms of

19  using other DNA-damaging agents, if I

20  argue that the mechanism for -- by which

21  this is happening is through some DNA

22  damage, typically between two and

23  six years.

24       Q.    Okay.  So --

Michael L. Grossbard, M.D.

1        A.    Although it doesn't -- let

2   me extend that.  It doesn't go to zero

3   after six years.

4        Q.    Right.

5        A.    In other words --

6        Q.    Yeah, at a minimum it would

7   have to be between two and six.  It could

8   be 10, 15, 20.

9        A.    Correct.  As it gets farther

10  away, that risk would again diminish.

11       Q.    Well, for some substances it

12  could actually increase, no?  Well, I'm

13  just asking.

14       A.    Maybe in theory, but I can't

15  name any.

16       Q.    Okay.  So far we haven't

17  gotten to the exposure level issue.  And

18  how do you determine if someone had a

19  sufficient exposure?  I know you talked

20  about consistency and temporal and

21  latency.  I'm talking now about

22  sufficiency of exposure.  How do you --

23  is that a medical judgment based on

24  reading of the literature?

Michael L. Grossbard, M.D.

1        A.     That's about the best you

2   can do, yes.

3        Q.     Okay.  And there's nothing

4   wrong with that.

5             MR. SLONIM:  Objection.

6             THE WITNESS:  I don't think

7   so.

8   BY MR. KRISTAL:

9        Q.     Let me ask another line of

10  questions, and maybe we'll take a

11  few-minute break and I can check out this

12  video, and then we'll come back.  Is that

13  all right?

14       A.     Sure.

15       Q.     Okay.  Is -- I think you

16  already answered this.  But I'll ask it.

17  Is smoking cigarettes a risk factor and a

18  cause of lung cancer?

19       A.     I believe it is, yes.

20       Q.     Okay.  And I know that you

21  have treated and cared for lots of lung

22  cancer patients.  Fair to say?

23       A.     I have.

24       Q.     And you have taken smoking

Michael L. Grossbard, M.D.

1    histories from them?

2         A.    I have.

3         Q.    If someone had a

4    200-pack-year history with a sufficient

5    latency and then got lung cancer, would

6    you say that their cigarette smoking

7    caused their lung cancer, or at least

8    contributed to their lung cancer?

9         A.    At least contributed and

10   most likely caused.

11        Q.    Okay.  And you could do that

12   without using any validated medical test,

13   procedure, or protocol, correct?

14        A.    We always did.  Now, there

15   is now developed genetic signatures of

16   smoking-induced lung cancer.  But I do

17   not use that as a routine to make that

18   determination.  Correct.

19        Q.    Does radon exposure, in your

20   opinion, also cause lung cancer?

21        A.    I believe it does.

22        Q.    If someone lived in a house

23   that had high radon levels and after an

24   appropriate latency period they developed

Michael L. Grossbard, M.D.

1    lung cancer, is it your opinion that the

2    radon exposure substantially contributed

3    to the development of their lung cancer?

4         A.    Assuming, again, on the

5    amount of their exposure and latency, and

6    I'm not prepared to give you amounts

7    today, but yes.

8         Q.    And I'm not going to ask

9    amounts.  I appreciate it.

10        A.    I thought you might.

11              Go ahead.

12              MR. SLONIM:  Why don't we

13        take a break.

14              MR. KRISTAL:  Well, let me

15        just finish this line of

16        questioning.

17   BY MR. KRISTAL:

18        Q.    And you can make that

19   determination about radon without any

20   validated medical test, procedure, or

21   protocol, correct?

22        A.    Yes.

23        Q.    Now, if someone had a

24   200-pack-year history of smoking and

Michael L. Grossbard, M.D.

1    lived in that same house that had the

2    high radon levels and then got lung

3    cancer after an appropriate latency

4    period, would it be your opinion that

5    both exposures to cigarette smoke and to

6    radon substantially contributed to the

7    development of their lung cancer?

8              MR. SLONIM:  Objection.

9              THE WITNESS:  With a caveat

10        that I have not reviewed any

11        literature related to that

12        particular type of question,

13        perhaps ever, and certainly

14        recently, yes, I think it would

15        have substantially contributed

16        both.

17              MR. KRISTAL:  Okay.  Why

18        don't we take a short break.

19              And just while we're on --

20        if you ever need a break for any

21        reason, if it's not in the middle

22        of a question or in the middle of

23        an answer, just say so, we'll take

24        a break.

Michael L. Grossbard, M.D.

1              THE WITNESS:  I'm aware.

2      Thank you.

3              THE VIDEOGRAPHER:  The time

4      now is 12:59 p.m., and we're off

5      the record.

6              (Short break.)

7              THE VIDEOGRAPHER:  This

8      marks the beginning of Tape Number

9      2.  The time now is 1:11 p.m.  We

10     are back on the record.

11 BY MR. KRISTAL:

12     Q.    We're marking as Exhibit 2.

13            (Document marked for

14     identification as Exhibit

15     Grossbard-2.)

16 BY MR. KRISTAL:

17     Q.    These are screen shots from

18 a video.  The first page says "NYU

19 Langone Medical Center, Lymphoma, Michael

20 Grossbard M.D.  Event, Blood disorders:

21 Types, symptoms and treatment.  Date

22 Wednesday, February 4th, 2014."

23            And I have captured on the

24 second page a slide that is entitled "Who

Michael L. Grossbard, M.D.

1    Gets Lymphoma?"

2              So my first question is,

3    this is something that you prepared to

4    give this lecture or somebody at your

5    request prepared?

6         A.    No, no, nobody prepares

7    stuff for me.  So it must have been me.

8         Q.    Right.  I'm the same way.

9              So what was the nature of

10   this presentation?

11        A.    I don't remember.  I think

12   it was part of a grand rounds

13   presentation at NYU.  But I don't

14   remember.

15        Q.    Okay.  Was the audience, to

16   the best of your recollection, mainly

17   physicians?

18        A.    If it was grand rounds, it

19   was mainly physicians.

20        Q.    Okay.  What other scenarios

21   would you give this type of lecture,

22   other than in a grand rounds situation?

23        A.    Could have been to a support

24   group type, or sessions where people come

Michael L. Grossbard, M.D.

1    to learn -- from the lay public, come to

2    learn generally about lymphoma.

3             Q.    Okay.

4             A.    I mean, I just don't

5    remember.  That's -- most likely it was

6    grand rounds.

7             Q.    Fair enough.  The second

8    page of Exhibit 2, there's a slide that

9    says "Who Gets Lymphoma?"

10            And the first bullet point

11   says, "Anyone!!"

12            Correct?

13            A.    Correct.

14            Q.    And then the second bullet

15   point you wrote, "There are risk

16   factors:"

17            Correct?

18            A.    Correct.

19            Q.    And you list a number of

20   risk factors underneath that heading

21   under that bullet point.

22            A.    Correct.

23            Q.    All right.  And one of those

24   risk factors listed is pesticide

Michael L. Grossbard, M.D.

1  exposure, correct?

2       A.    Correct.

3       Q.    And I want to play, so that

4  you can see it, and then we'll turn the

5  video -- we'll turn the laptop around so

6  it can be video'd -- what you said at

7  that time, and I'm particularly focusing

8  in and using this now, because of the

9  questioning about whether Agent Orange is

10  a risk factor.

11            Are you with me on the

12  context?

13       A.    I understand.

14       Q.    Okay.  So it's not

15  particularly loud, but you'll be able to

16  hear yourself, I believe.

17       A.    It's not playing.

18            (Video playback.)

19                 -  -  -

20            DR. GROSSBARD:  Who gets

21       lymphoma?  And I probably put my

22       question backwards, put my

23       question before the fact.  But

24       that's all right.

Michael L. Grossbard, M.D.

1            So anyone.  I mean, everyone
2       is in some way a candidate to get
3       lymphoma.  That's not to make
4       everybody here feel real badly.
5       It just strikes across a broad
6       patient population.
7            So there are some risk
8       factors.  People who are older are
9       more at risk of lymphoma.  Men are
10      at a little bit more at risk than
11      women.  Caucasians are at a bit
12      more at risk than African
13      Americans and Asians.
14           There are exposures, toxins,
15      pesticide exposure.  One example
16      is Agent Orange exposure to people
17      who are exposed during the Vietnam
18      War.  There was an excess of
19      lymphomas in those patients.
20      Radiation exposure.  There was a
21      higher incidence of lymphoma in
22      atomic bomb survivors.
23           And then you can see that
24      sometimes there's a secondary

Michael L. Grossbard, M.D.

1    cancer after you get radiation as

2    a therapy.

3         And then it's also seen in

4    patients who have immune system

5    deficiencies, for example,

6    patients with AIDS, acquired

7    immunodeficiency syndrome, and

8    transplant -- organ transplant,

9    like a transplant of a liver or a

10   kidney, when your immune system is

11   suppressed.

12        People who have autoimmune

13   disease, disease like lupus or

14   rheumatoid arthritis, are more

15   susceptible.

16        And then, unlike many

17   cancers, or perhaps unknown about

18   cancers, is there are infections

19   that can cause lymphoma because

20   they cause a stimulation in the

21   immune system chronically, and it

22   can lead to the development of

23   lymphoma.

24        There's a bacteria called

Michael L. Grossbard, M.D.

1      Helicobacter pylori that can cause

2      lymphomas in the stomach.

3      Hepatitis C and HIV can cause

4      lymphoma.

5           Borrelia burgdorferi, which

6      is the organism that causes Lyme

7      disease, which I'm sure everybody

8      is familiar with, where you get

9      joint pains when you get bit by a

10     tick, that can cause a lymphoma of

11     the skin.

12          And then there's another

13     kind of organism called Chlamydia

14     that can give you lymphomas

15     involving the eye, the orbit.

16          So some of these are truly

17     bacterial infections.  And in some

18     of these cases, you can treat the

19     bacterial infection, like in a

20     lymphoma of the stomach, never

21     have to give chemotherapy, never

22     have to give radiation therapy.

23          And by reversing that

24     chronic infectious immune

Michael L. Grossbard, M.D.

1          stimulation, you can actually have

2          the lymphoma regress completely.

3                (End video playback.)

4     BY MR. KRISTAL:

5          Q.    I'd like to ask you first.

6     Is that what you said at that time?

7          A.    Well, I'd think I would have

8     to say that, yes.  I also look much

9     younger then.  But that's a separate

10    problem.

11         Q.    We all did.

12         A.    Okay.

13         Q.    It's a temporal issue.

14                Do you stand by what you

15    said at that time?

16         A.    Yes.  And if I could also

17    use that, it reminds me of something

18    else.  If I could use that to amend one

19    of my earlier question -- answers to my

20    questions -- answers to your questions.

21    Is that possible?  Because it --

22         Q.    Right, there's always the

23    amendment to something right after a

24    break.  Go ahead.

Michael L. Grossbard, M.D.

1           MR. SLONIM:  Objection.

2           THE WITNESS:  No, really,

3     it's -- it's that you showed me a

4     slide there that reminded me of

5     something, the second slide, which

6     I'm not sure why you showed.  But

7     you'll ask me about it I'm sure.

8           You asked if there's any --

9     the slide that shows that

10    Helicobacter pylori causes gastric

11    MALT lymphoma.

12          And you asked me if there

13    was test, procedure, protocol that

14    could -- could -- could be used to

15    determine if something -- somebody

16    has a lymphoma, what the cause of

17    lymphoma is.

18 BY MR. KRISTAL:

19    Q.    Right.

20    A.    In a Helicobacter

21 pylori-induced lymphoma or the other

22 bacterially induced lymphomas, I do think

23 there is a procedure or protocol by which

24 you can tell the cause.  That is, you

Michael L. Grossbard, M.D.

1    identify the presence of the antibody to

2    that bacterial organism.  You then treat

3    with antibiotics, and the lymphoma goes

4    away.  That is a cause for the lymphoma.

5        Q.    Okay.  So let me just see if

6    I can follow up with what you're saying.

7             In that particular situation

8    where there is a lymphoma that is caused

9    by a bacteria, you could look to see if

10   the body has an antigen to that bacteria,

11   treat the bacteria, and if the treatment

12   to treat the bacteria is successful, and

13   the cancer goes away, you would say that

14   caused the lymphoma?

15       A.    I would.

16       Q.    Okay.  And you certainly --

17   well, maybe not certainly.  You certainly

18   have attributed H. pylori to the cause of

19   an individual's lymphoma without such a

20   test, correct?

21       A.    Yes, but -- but I don't

22   think that they are ever independent of

23   one another.  That is, you have the

24   lymphoma, your Helicobacter pylori

Michael L. Grossbard, M.D.

1    positive, and you treat it.

2              If it -- if it didn't go

3    away -- and in the vast majority of cases

4    they do go away.  If it didn't go away,

5    then I could not say that it was a

6    Helicobacter pylori-driven lymphoma.

7         Q.    So unless you treat the H.

8    pylori and it goes away, you would say

9    that the H. pylori in that particular

10   person didn't cause or contribute to the

11   development of lymphoma?

12        A.    I couldn't say definitively

13   in that setting.

14        Q.    Okay.  All of my questions

15   that I'm asking you about your opinions

16   are to a reasonable degree of

17   certainty -- certainty, whether something

18   is more likely than not.  Okay.  I'm not

19   asking you for certainty.  Are you with

20   me?

21              MR. SLONIM:  Objection.

22   BY MR. KRISTAL:

23        Q.    Maybe I should have said

24   that earlier.

Michael L. Grossbard, M.D.

1              Do you understand what more
2   likely than not means?
3         A.    I do.
4         Q.    Okay.  Meaning the nose of
5   the football crosses the 50-yard line,
6   it's more likely than not?
7              MR. SLONIM:  Objection.
8              THE WITNESS:  It's more
9         likely than not what?  That wasn't
10        a full -- that wasn't a full
11        sentence.  If the nose of the
12        football crosses the 50-yard line,
13        it's more likely than not what?
14  BY MR. KRISTAL:
15        Q.    My point is to be more
16  likely than not, something just has to be
17  more than 50 percent.
18        A.    Agreed.
19        Q.    Okay.  That was my point.
20             So I want to turn this
21  around so we can start so the jury, or
22  whoever may be looking at this or not,
23  can see the video.  It's going to play
24  the section.

Michael L. Grossbard, M.D.

1          MR. SLONIM:  You're going to

2     play the exact same clip?

3          MR. KRISTAL:  Exact same

4     clip.

5          (Video playback.)

6               -  -  -

7          DR. GROSSBARD:  Who gets

8     lymphoma?  And I probably put my

9     question backwards, put my

10    question before the fact.  But

11    that's all right.

12         So anyone.  I mean, everyone

13    is in some way a candidate to get

14    lymphoma.  That's not to make

15    everybody here feel real badly.

16    It just strikes across a broad

17    patient population.

18         So there are some risk

19    factors.  People who are older are

20    more at risk of lymphoma.  Men are

21    at a little bit more at risk than

22    women.  Caucasians are at a bit

23    more at risk than African

24    Americans and Asians.

Michael L. Grossbard, M.D.

1               There are exposures, toxins,

2       pesticide exposure.  One example

3       is Agent Orange exposure to people

4       who are exposed during the Vietnam

5       War.  There was an excess of

6       lymphomas in those patients.

7       Radiation exposure.  There was a

8       higher incidence of lymphoma in

9       atomic bomb survivors.

10              And then you can see that

11      sometimes there's a secondary

12      cancer after you get radiation as

13      a therapy.

14              And then it's also seen in

15      patients who have immune system

16      deficiencies, for example,

17      patients with AIDS, acquired

18      immunodeficiency syndrome, and

19      transplant -- organ transplant,

20      like a transplant of a liver or a

21      kidney, when your immune system is

22      suppressed.

23              People who have autoimmune

24      disease, disease like lupus or

Michael L. Grossbard, M.D.

1    rheumatoid arthritis, are more

2    susceptible.

3         And then, unlike many

4    cancers, or perhaps unknown about

5    cancers, is there are infections

6    that can cause lymphoma because

7    they cause a stimulation in the

8    immune system chronically, and it

9    can lead to the development of

10   lymphoma.

11        There's a bacteria called

12   Helicobacter pylori that can cause

13   lymphomas in the stomach.

14   Hepatitis C and HIV can cause

15   lymphoma.

16        Borrelia burgdorferi, which

17   is the organism that causes Lyme

18   disease, which I'm sure everybody

19   is familiar with, where you get

20   joint pains when you get bit by a

21   tick, that can cause a lymphoma of

22   the skin.

23        And then there's another

24   kind of organism called Chlamydia

Michael L. Grossbard, M.D.

1           that can give you lymphomas

2           involving the eye, the orbit.

3                So some of these are truly

4           bacterial infections.  And in some

5           of these cases, you can treat the

6           bacterial infection, like in a

7           lymphoma of the stomach, never

8           have to give chemotherapy, never

9           have to give radiation therapy.

10                And by reversing that

11           chronic infectious immune

12           stimulation, you can actually have

13           the lymphoma regress completely.

14                (End video playback.)

15   BY MR. KRISTAL:

16           Q.   The reason that we played

17   this video was because you had earlier

18   said that you did not consider Agent

19   Orange to be a risk factor for

20   non-Hodgkin lymphoma.

21                MR. SLONIM:  Objection.

22           Form.

23   BY MR. KRISTAL:

24           Q.   You did say that, correct?

Michael L. Grossbard, M.D.

1      A.     That's true.

2      Q.     Okay.  So which is it?  In

3   2014, to this audience, whether it was

4   grand rounds and physicians were in the

5   audience, or whether it was some other

6   event where there might have been more

7   general members of the public, you said

8   Agent Orange was a risk factor.  And here

9   you said it wasn't.

10      A.     Correct.

11      Q.     So which one is it?

12      A.     It's the one that I just

13   stated to you, 2014 is six years ago.  In

14   the context of this case and Mr. Sanders'

15   exposure to Agent Orange, I looked up the

16   literature on Agent Orange because it

17   would have been very easy for me if I

18   could find a direct cause for his

19   lymphoma, something that I could say

20   something that contributed substantially,

21   there's no way they had any other cause

22   of his lymphoma would have made it very

23   easy for me to have an answer to this

24   case, as to why he has lymphoma.

Michael L. Grossbard, M.D.

1          When I looked up the

2    literature I could come to no such

3    conclusion.  So opinions change based

4    upon literature that's available and

5    other information that's available.

6          Q.    Okay.  So let me see if I'm

7    understanding.  Are you saying that

8    sometime after you gave this talk in

9    2014, and up until the point that you

10   were doing research on Mr. Sanders' case,

11   which would have been a month or so ago,

12   there were some literature on Agent

13   Orange that made you change your opinion?

14   Is that what you're telling us?

15         A.    I don't think I'd given a

16   careful enough reasoning -- reading to

17   the literature in 2014.

18         Q.    So you're saying that it's

19   not something that occurred since 2014;

20   it's just a reevaluation of the evidence?

21         A.    That's correct.

22         Q.    So what you told this

23   audience of either doctors or the general

24   public at the time was not correct.  Is

Michael L. Grossbard, M.D.

1    that what you're saying?

2          A.    It would be incorrect.

3          ■          ████████████████████████

■  ████████████████████████████████████

■  ████████████████████████████

■  ██████████████████████████████████

■  ████████████████████████████

8          A.    I do not.

9          Q.    Are you familiar with the

10   term "modifiable risk factor"?

11         A.    I mean, I can -- I can

12   assume -- I'll tell you what I think it

13   means, and you can tell me if that's what

14   you mean.

15         Q.    Okay.

16         A.    That would be some risk

17   factor that you have that's associated

18   with a disease that you can change.  So

19   smoking would be a modifiable risk factor

20   for lung cancer.  You can stop smoking.

21         Q.    Exactly.  That's how I'm

22   using the term.

23               Something like your genetic

24   makeup unless we come to the point where

Michael L. Grossbard, M.D.

1   you can modify your genetic makeup, is

2   not a modifiable risk factor.  Is that

3   fair to say?

4         A.    Not in the United States

5   right now, but in other countries, I'm

6   afraid.  But correct.

7         Q.    Well, we've done it with

8   plants.  Maybe we're going to start doing

9   it with people.

10              MR. SLONIM:  Objection.

11   BY MR. KRISTAL:

12        Q.    But you're aware that

13   Monsanto has modified the genes of

14   certain crops to be resistant to Roundup,

15   right?  That's not a secret.

16              MR. SLONIM:  Objection.

17              THE WITNESS:  I am aware.

18   BY MR. KRISTAL:

19        Q.    Okay.  Do you agree that the

20   more risk factors a person has for

21   non-Hodgkin lymphoma, the greater the

22   risk of getting non-Hodgkin lymphoma?

23        A.    Not necessarily.  I'm not

24   sure that risk factors work in a

Michael L. Grossbard, M.D.

1    cumulative sense.

2         Q.    Well, so, if somebody had

3    radiation exposure, exposure to

4    malathion, Helicobacter pylori infection,

5    immunosuppressive, Hep C, HIV, you don't

6    think they're at a greater risk than if

7    someone only had one of those risk

8    factors?

9              MR. SLONIM:   Objection.

10        Form.

11             THE WITNESS:   That

12        particular aggregation of multiple

13        risk factors, I think, would place

14        someone at higher risk, yes.

15   BY MR. KRISTAL:

16        Q.    Well, that's what I'm

17   asking.  The more risk factors you have,

18   the greater the risk you have of getting

19   NHL?

20             MR. SLONIM:   Objection.

21   BY MR. KRISTAL:

22        Q.    Generally speaking.

23        A.    I'm sure I could think of

24   exceptions, but generally speaking that's

Michael L. Grossbard, M.D.

1   probably true.

2        Q.    Okay.  Can you think of a

3   situation where the more risk factors you

4   have, the lower the risk would be to NHL?

5        A.    Not off the top of my head,

6   no.

7        Q.    And I know you said this

8   earlier in stating your understanding of

9   a modifiable risk factor, is the reason

10  it's modifiable is you can change your

11  exposure to that risk factor, right?  You

12  can modify it?

13       A.    Correct.

14       Q.    Okay.  So for example, I

15  would imagine, if someone comes in to you

16  and gives you a large pack year history,

17  or any history of smoking, you would

18  advise them to modify that risk factor by

19  cutting back or stopping smoking

20  entirely?

21       A.    That is true.

22       Q.    Do you agree that in order

23  for someone to modify a risk factor for

24  NHL, they first have to know that it's a

Michael L. Grossbard, M.D.

1  risk factor?

2              MR. SLONIM:  Objection.

3              THE WITNESS:  If they are

4       going to intentionally set out to

5       do it, yes.

6  BY MR. KRISTAL:

7       Q.    And if a person has

8  knowledge that a certain exposure is a

9  risk factor, they can then make a

10 decision whether or not they want to

11 reduce that risk factor, correct?

12             MR. SLONIM:  Objection.

13             THE WITNESS:  I think that's

14      true.

15 BY MR. KRISTAL:

16      Q.    Or they can completely

17 eliminate the exposure, right?

18      A.    They can certainly try.

19      Q.    And thereby lower their

20      risk?

21      A.    Potentially, yes.

22      Q.    Have you ever done work for

23 the tobacco industry?

24      A.    I don't believe so, no.

Michael L. Grossbard, M.D.

1    Q.    Before the Roundup

2    litigation, have you ever done work for

3    Monsanto?

4    A.    I don't believe so, no.

5    Q.    Okay.  When were you first

6    asked to get involved?  I know that the

7    Sanders case that we're here on, and

8    later today, the Alvarez Calderon cases

9    are not your first cases.  The first two

10   cases were Hardeman, H-A-R-D-E-M-A-N, and

11   Gebeyehou, G-E-B-E-Y-E-H-O-U.

12   A.    That's correct.

13   Q.    All right.  When were you

14   first contacted about whether or not you

15   wished to get involved in Roundup

16   litigation, approximately?

17   A.    I would say spring or summer

18   of 2018.

19   Q.    And what were the

20   circumstances that you were approached?

21        MR. SLONIM:  So I'm going to

22        instruct the witness.  Insofar as

23        that might call for the substance

24        of communications with counsel,

Michael L. Grossbard, M.D.

1       that's privileged, and you

2       shouldn't -- you're instructed not

3       to answer.

4           Insofar as you can respond

5       to the question without disclosing

6       the substance of the

7       communications with counsel,

8       you're free to do so.

9           MR. KRISTAL:  Yeah, let me

10      make it easier.  I don't -- I

11      could fuss with you a little bit

12      over that, but it's no real

13      necessity to do that.

14  BY MR. KRISTAL:

15      Q.    Who was the first person

16  that contacted you?

17      A.    That, I believe, was

18  Mr. Slonim.

19      Q.    And had you met before?

20      A.    I did know him from before,

21  yes.

22      Q.    And how did you know him?

23      A.    We had worked previously, or

24  I had worked together with him and others

Michael L. Grossbard, M.D.

1    on some litigation related to hormone

2    replacement therapy.

3          Q.    Okay.  The HRT cases?

4          A.    Correct.

5          Q.    Okay.  And were you

6    designated -- who was the defendant in

7    that case?  That was -- I'm blanking on

8    it.  Do you remember who the company was?

9          A.    I don't now.  Sorry.

10         Q.    Okay.  That's fair enough.

11               Did you testify in the HRT

12   litigation, either by deposition or

13   trial?

14         A.    I testified at deposition.

15         Q.    Okay.  And was your role in

16   that litigation similar to your role

17   here, to evaluate a person's medical

18   history and their use of hormone

19   replacement and render an opinion on

20   causation?

21         A.    That would be true.

22         Q.    Okay.  And what years were

23   that?  That would have been, five, six,

24   eight years ago?

Michael L. Grossbard, M.D.

1          A.     Yeah, it was prior to 2014.

2    And I only remember that because I moved

3    to a new position at NYU in 2014.  I do

4    not remember doing any of that in --

5    after I moved to NYU.  2012, 2013, maybe.

6          Q.     Who or what is Perkins Coie,

7    C-O-I-E?

8          A.     I don't know.

9          Q.     You have no idea what that

10   law firm is?

11         A.     It's a law firm.  But I

12   don't -- I don't remember anything else,

13   no.

14         Q.     When you say you don't

15   remember anything else, did you have some

16   sort of relationship with them?

17         A.     Boy.  Not that I recall.

18         Q.     Let me show you a document.

19   You were at what became the Icahn,

20   I-C-A-H-N, School of Medicine at Mount

21   Sinai for a period of time after the

22   merger between Roosevelt and Beth Israel?

23         A.     That is true.

24         Q.     And at that facility, there

Michael L. Grossbard, M.D.

1    is a requirement that you disclose sort

2    of outside company involvement, so to

3    speak?

4         A.    Yes.

5         Q.    Let me mark this as

6    Exhibit 3.

7              (Document marked for

8              identification as Exhibit

9              Grossbard-3.)

10   BY MR. KRISTAL:

11        Q.    This is the document that

12   has the Icahn School of Medicine at Mount

13   Sinai logo.  It says, "Michael Grossbard,

14   M.D., professor of medicine, hematology

15   and medical oncology."

16             That would be you?

17        A.    It would be.

18        Q.    Okay.  And then it has,

19   "Industry relationships."  And under

20   consulting it says Perkins Coie, C-O-I-E,

21   LLP, right?

22        A.    Mm-hmm.

23        Q.    As --

24        A.    Yes, sorry.

Michael L. Grossbard, M.D.

1    Q.    -- somebody who you had

2    reported a relationship with during 2018

3    and/or 2019?

4    A.    Well, that would be

5    impossible though, because I haven't been

6    at Mount Sinai since 2014.  So I don't

7    know how I would have reported anything.

8    And I don't recall any relationship -- I

9    know the name.  I don't remember what I

10   did with them.  And I -- it certainly

11   wasn't in 2018 or 2019.

12   Q.    How were you contacted in

13   terms of getting involved?  Was it a

14   phone call, an e-mail to set up a

15   meeting?  How did that work?

16   A.    I think it was a phone call,

17   but I don't remember.

18   Q.    Okay.  I don't want to know

19   what was said or told to you.  But what

20   did you do or not do as a result of that

21   first phone call?

22   A.    I'm not sure how to answer

23   that question, not because I'm trying to

24   be difficult, but when you say --

Michael L. Grossbard, M.D.

1        Q.    You get a phone call --

2        A.    I don't want to -- I don't

3   want to --

4        Q.    No.  You get a phone call.

5   Somebody says something about Roundup.

6   Do you want to get involved.  What did

7   you do next?  Did you say, "No, thank

8   you"?  Did you say, "I want to check into

9   Monsanto"?  Did you say "I want to" -- I

10  don't know.  I'm just hypothesizing what

11  your reaction is.

12               MR. SLONIM:  So --

13  BY MR. KRISTAL:

14       Q.    Not in terms of what you

15  said to counsel, what you did after the

16  fact.

17               MR. SLONIM:  Insofar as you

18          can answer the question without

19          disclosing the substance of any

20          communications with counsel, you

21          can answer.  Just bear that in

22          mind.

23  BY MR. KRISTAL:

24       Q.    Yeah, it's a rule that

Michael L. Grossbard, M.D.

1  applies to experts and lawyers.  So I'm

2  not asking you what the --

3       A.    Yeah.

4       Q.    -- two of you actually said

5  to each other.  I just want to know,

6  after you hung up the phone, what was the

7  next step?

8       A.    I said we would meet and

9  discuss things.

10      Q.    Okay.  And did you meet and

11  discuss things?

12      A.    We did.

13      Q.    And who did you meet with,

14  and where did you meet?

15      A.    It was in my office.  It was

16  with Mr. Slonim and with Julie DuPont.  I

17  don't believe anybody else was there.

18      Q.    Okay.  And how long did you

19  meet with Mr. Slonim -- Slonim and

20  Ms. DuPont?

21      A.    Again, I don't remember.

22  Let's say between 30 minutes and an hour.

23      Q.    Okay.  Then what happened in

24  terms of what you did or didn't do

Michael L. Grossbard, M.D.

1   afterwards?

2        A.   At that point I provided --

3   well, I mean, I provided some general

4   information about lymphoma.

5             MR. SLONIM:  I'm --

6             THE WITNESS:  I'm not -- I

7        mean --

8             MR. KRISTAL:  I'm not asking

9        that.  And I don't want you

10        instructing.

11   BY MR. KRISTAL:

12        Q.   I don't want to know what

13   you said to the lawyers.  I don't want to

14   know what the lawyers said to you.  I'm

15   talking about after the meeting ended,

16   whatever you discussed, whatever you said

17   or didn't say.

18             MR. SLONIM:  Any

19        communications, the substance of

20        any communications, information,

21        anything like that, that either

22        originated from the lawyers and

23        went to you or originated from you

24        or went to the lawyers, the

Michael L. Grossbard, M.D.

1          substance of that, is off limits.

2          That's protected.

3              If he wants to know about

4          information about who, what, when,

5          where, that's fine.  The substance

6          is off limits.

7              THE WITNESS:  Next step, we

8          met again about a month, six weeks

9          later.

10  BY MR. KRISTAL:

11      Q.    Okay.  Between the time that

12  the first meeting ended in person and you

13  met again sometime later, did you

14  personally do anything involving Roundup

15  or glyphosate?

16      A.    Not to my recollection, no.

17      Q.    No, you didn't do any

18  research?  You didn't read anything,

19  study anything?

20      A.    Specifically on glyphosate,

21  I don't believe so, no.

22      Q.    How about pesticides in

23  general?

24      A.    No pesticides.

Michael L. Grossbard, M.D.

1          Q.     Roundup?

2          A.     No.

3          Q.     Were you aware of the

4    Roundup litigation at the time that you

5    got the first call?

6          A.     I believe I was.  But I

7    can't -- I can't recall dates like that.

8          Q.     Were you aware of the

9    International Agency for Research on

10   Cancer's evaluation of glyphosate in 2015

11   before you had the phone call with

12   Mr. Slonim?

13         A.     I can't remember.  I was not

14   aware in the year 2015.  That, I can tell

15   you for sure.

16                When I became aware, I don't

17   know if it was after or before my phone

18   call with him.

19         Q.     You certainly would agree

20   that the International Agency for

21   Research on Cancer is a well respected

22   authority in the field of what does and

23   doesn't cause cancer?  Not that you agree

24   with them all the time.

Michael L. Grossbard, M.D.

1              MR. SLONIM:  Objection.

2              THE WITNESS:  They are one

3        of many authorities that is

4        respected, yes.

5   BY MR. KRISTAL:

6        Q.    Okay.  And for example in

7   your report, you have a citation to the

8   American Cancer Society website, correct?

9        A.    I have to go back and look

10  at it.

11       Q.    On Page 5.  There's a blue

12  https link?

13       A.    Yes, correct.

14             (Document marked for

15        identification as Exhibit

16        Grossbard-4.)

17  BY MR. KRISTAL:

18       Q.    I'm going to mark as

19  Exhibit 4, some pages from the American

20  Cancer Society website.

21             If you look down at the

22  bottom, it's certainly the same website

23  link, except it's a different specific

24  link.

Michael L. Grossbard, M.D.

1                    Do you see that?

2          A.    Sure.  Yes.

3          Q.    Okay.  And the American

4   Cancer Society -- take your time if you

5   want to look at this for a second, a

6   minute, however long you need.

7          A.    Okay.  I didn't read

8   anything -- yeah, but --

9          Q.    No, and --

10         A.    -- if you have some -- if

11  you have some questions, sure.

12         Q.    That's great.  Okay.  And at

13  any time if I show you a document, you

14  can sort of look at it quickly and

15  familiarize yourself.  And if I ask a

16  question, you need to dive in deeply

17  before answering, then obviously that's

18  what you should do.

19         A.    Sure.

20         Q.    So the title of this has the

21  American Cancer Society logo.  And the

22  title is "Determining if something is a

23  carcinogen.  What is a carcinogen?"

24  That's how it starts?

Michael L. Grossbard, M.D.

1          A.     Yes.

2          Q.     And the definition here is,

3    "Substances and exposures that can lead

4    to cancer are called carcinogens."

5                 I assume you agree with

6    that?

7          A.     I do.

8          Q.     "In general, the American

9    Cancer Society does not determine if

10   something causes cancer, that is, if it

11   is a carcinogen, but we do look to other

12   respected organizations for help with

13   this."

14                Do you see that?

15         A.     I do see that.

16         Q.     And one of the -- if you

17   turn to Page 4 of 8.  There's a section

18   entitled -- called, "Who determines how

19   carcinogens are classified?  Several

20   national and international agencies

21   review the available evidence to try to

22   determine the cancer-causing potential of

23   different substances.

24                "International Agency for

Michael L. Grossbard, M.D.

1    Research on Cancer, IARC.  The

2    International Agency for Research on

3    Cancer is part of the World Health

4    Organization.  One of its major goals is

5    to identify causes of cancer.  The most

6    widely used system for classifying

7    carcinogens comes from the IARC."

8              Do you agree with that, that

9    the most widely used system for

10   classifying carcinogens comes from IARC?

11        A.    I have no reason to disagree

12   with it.

13        Q.    Okay.  And have you in the

14   past, when you are trying to evaluate

15   whether a substance is a carcinogen, gone

16   to see, as part of your review, what IARC

17   has said about that carcinogen, if they

18   have in fact evaluated it?

19        A.    That is one of the pieces of

20   evidence that I use, yes.

21        Q.    If you look at Page 2 of 8.

22   Just want to ask you this.

23        A.    It's on Page 2?

24        Q.    Okay.  Yes, sir.  In the

Michael L. Grossbard, M.D.

1    middle of the page.

2          A.    Yeah.

3          Q.    There's a paragraph that

4    starts, "Substances labeled as

5    carcinogens can have different levels of

6    cancer-causing potential."

7                Do you see that?

8          A.    I do.

9          Q.    All right.  Let me read

10   that, and then I'm going to ask you about

11   the last sentence.

12               "Some might increase cancer

13   risk after only a short exposure, but

14   others might only cause cancer after

15   prolonged high levels of exposure.  And

16   for any particular person, the risk of

17   developing cancer depends on many

18   factors, including how they are exposed

19   to a carcinogen, the length and intensity

20   of the exposure, and the person's genetic

21   makeup."

22               Do you see that?

23         A.    I do.

24         Q.    And do you agree with that

Michael L. Grossbard, M.D.

1  last sentence that I read?

2       A.    Sure.   Those aren't the only

3  factors, but I would agree those are

4  factors.

5       Q.    Okay.   And when it says that

6  one of the factors for any particular

7  person is that person's genetic makeup,

8  is that what is known as individual

9  susceptibility?

10       A.    Again, I don't know that a

11  specific -- I don't have a specific

12  definition of individual susceptibility

13  in mind.  But to me it would be how

14  susceptible a given -- I'm being be

15  redundant.

16           I understand -- how

17  susceptible an individual is, so yeah, I

18  think that would probably go into that.

19       Q.    So just following up on

20  that --

21       A.    So susceptibility --

22       Q.    Okay.

23       A.    -- would not only include

24  the genetic makeup.  It would include how

Michael L. Grossbard, M.D.

1    they process or absorb something, which I

2    guess is part of their genetic makeup

3    too, as far as their metabolism.  That's

4    true.  But yes, there are -- that's

5    part -- that's part of the factors that

6    go into it.

7              Q.    And as part of the factors

8    that go into whether or not someone

9    actually gets cancer from a particular

10   exposure, for example, some people may

11   get a cancer after a much shorter

12   exposure than someone else because of

13   their individual makeup.  Is that fair to

14   say?

15             A.    That's theoretically

16   possible, yes.

17             Q.    And we've also heard of, you

18   know, granny who smoked three packs of

19   cigarettes a day for 60 years and never

20   got hung cancer or any other sequelae of

21   cigarette smoking, right?

22             A.    That is true.

23             Q.    And that would be in essence

24   based on her particular genetic makeup,

Michael L. Grossbard, M.D.

1    in part?

2         A.    Potentially, yes.

3              (Document marked for

4         identification as Exhibit

5         Grossbard-5.)

6    BY MR. KRISTAL:

7         Q.    I'm going to mark as

8    Exhibit 5 -- this is another page from

9    the American -- set of pages from the

10   American Cancer Society.  If you look

11   down at the bottom, just confirm that

12   that's the same website that you cited in

13   your report, different particular link.

14   This one is called "Known and probable

15   human carcinogens."

16        A.    Yes, it's from the same

17   www.cancer.org website.

18        Q.    And in this -- without going

19   through the entire thing, this again is

20   stating that, in part, the American

21   Cancer Society relies on IARC's

22   evaluation to make a determine whether

23   something is or isn't a carcinogen.  I

24   can read more detail if you want.  But

Michael L. Grossbard, M.D.

1   I'm just asking if reading it, that's a

2   fair summary?

3        A.   I mean, this is -- this

4   document appears to have a list of agents

5   that are carcinogens, probably more as

6   you go further.  But that's one of the

7   things.  And they do say that they derive

8   that from IARC and NTP.

9        Q.   Right.  And it could be one

10  or the other, they say, right?

11       A.   That is correct.

12       Q.   It doesn't have to be on

13  both IARC or the National Toxicology

14  Program list?

15       A.   That looks to be correct,

16  yes.

17       Q.   But American Cancer Society

18  is telling the public, who may go to this

19  website, that IARC is one of the agencies

20  that they rely on to determine what does

21  or doesn't cause cancer?

22       A.   They are saying that, yes.

23       Q.   And here they list the

24  probable and known substances.  And if

Michael L. Grossbard, M.D.

1    you turn to Page 11 of 21, this lists

2    glyphosate as a probable human carcinogen

3    as determined by IARC, correct?

4           A.    Yes, that is on that page,

5    and that is IARC determination.

6           Q.    And you just have a

7    reasonable scientific disagreement with

8    IARC's determination.  Is that fair?

9                 MR. SLONIM:  Objection.

10                THE WITNESS:  Correct.

11                Although IARC uses specific

12                classifying criteria that they

13                use, and I may not use those same

14                criteria, nor may other people use

15                those same criteria to evaluate.

16    BY MR. KRISTAL:

17          Q.    Okay.  Do you agree that

18    IARC looks in part at the epidemiology,

19    the human studies?

20          A.    I do.

21          Q.    In part, IARC looks at

22    experimental studies using animals?

23          A.    I agree with that.

24          Q.    In part, IARC looks at the

Michael L. Grossbard, M.D.

1  mechanism of action, the genotoxicity, so

2  to speak.

3          A.    I agree.

4          Q.    And in part, IARC looks at

5  exposures to the substance?

6          A.    Correct.  I agree.

7          Q.    Do you do anything

8  differently in your evaluation in terms

9  of the type of evidence you're looking at

10  to arrive at your opinion?

11          A.    I would not say that I use

12  different types of evidence.

13          Q.    Okay.  You can evaluate it

14  differently perhaps.  But that's a fairly

15  general methodology for evaluating

16  whether something is or isn't a

17  carcinogen?

18          A.    Those would all be

19  important.  I think we then throw in --

20  maybe you did -- bacterial studies to

21  look at if something's a mutagen.  That's

22  also something that IARC looks at.

23          Q.    I put that under

24  genotoxicity --

Michael L. Grossbard, M.D.

1          A.      Okay.

2          Q.      -- meaning mechanism of

3    action.

4          A.      Sorry.  Yes.  Okay.  Sure.

5          Q.      You cite in your report to a

6    classic oncology text, DeVita?

7          A.      Yes.

8          Q.      Okay.  And is that a

9    textbook that you have referred to in

10   your career, outside of litigation?

11         A.      Have I used that text

12   before?

13         Q.      Yes.

14         A.      Yes.

15         Q.      Okay.  In your report, you

16   reference the 2015 volume.  You're aware

17   that 2019 volume is out, right?

18         A.      I'm probably not aware.

19         Q.      Okay.  Let me just show you

20   a chapter on chemical factors.

21                 Do you know Karen Jacobson,

22   by the way, while I'm -- Dr. Jacobson,

23   who wrote -- who was a co-author on the

24   non-Hodgkin lymphoma chapter in DeVita?

Michael L. Grossbard, M.D.

1      A.    I know who she is.  I don't
2  know her personally.
3      Q.    Certainly she has a good
4  professional reputation?
5      A.    I'm sure.  I honestly don't
6  know enough to comment on her reputation.
7      Q.    One way or the other?
8      A.    Yeah.
9      Q.    Do you know that she's also
10  a great person?
11          MR. SLONIM:  Objection,
12      Counsel.  Come on.
13          THE WITNESS:  She's also a
14      great person?  I don't know her.
15          MR. SLONIM:  That's an --
16      that's an improper question.
17  BY MR. KRISTAL:
18      Q.    I know she might read this
19  transcript, so I had to ask that.
20      A.    My answer is the same.  I
21  don't know her.
22          MR. SLONIM:  Okay.  Let's --
23      I don't think -- I don't think
24      it's necessary to comment on

1        somebody's personality.

2               MR. KRISTAL:  I was digging

3        in that in a serious manner, you'd

4        be absolutely right.  But I'm not.

5               (Document marked for

6        identification as Exhibit

7        Grossbard-6.)

8    BY MR. KRISTAL:

9        Q.    Looking at Exhibit 6, a

10   portion of DeVita, Hellman, and

11   Rosenberg's Cancer Principles & Practice

12   of Oncology, 11th Edition.  And this is

13   2019.

14              We can turn to the page

15   after the photos.  It's got the copyright

16   page.  Sixth page in.

17       A.    Yes.

18       Q.    Okay.  It is 2019, 11th

19   edition?

20       A.    That's what it says, yes.

21       Q.    And there is a chapter in

22   prior versions of DeVita's cancer text on

23   chemical factors, which in this edition

24   is Chapter 9.  Do you recall that?

Michael L. Grossbard, M.D.

1          A.     I don't.

2          Q.     Okay.  This chapter, Chapter

3     9, Chemical Factors, was written by

4     Amanda K. Ashley and Christopher J. Kemp.

5     Do you know either one of them?

6          A.     I do not.

7          Q.     Okay.  And the introduction

8     to this chapter reads, "It is convenient

9     to divide the causation of cancer into

10    two categories, genetic susceptibility

11    versus environmental exposure."

12               Is that a convenient

13    division in oncology, not necessarily the

14    only way?

15         A.     That is one way to divide

16    it, yes.

17         Q.     Okay.  And in this

18    particular sentence, the environmental

19    exposures would be what we had referred

20    to earlier as a modifiable exposure,

21    correct?

22         A.     I believe so.

23         Q.     All right.  "In this chapter

24    we focus on chemical factors in the

Michael L. Grossbard, M.D.

1    etiology of cancer with the understanding

2    that genetic predisposition and

3    environmental exposure interact to

4    ultimately dictate cancer risk."

5                 Do you agree with that, that

6    environmental exposure and genetic

7    predisposition interact to ultimately

8    dictate cancer risk?

9         A.    Sure.  Those aren't the only

10   two factors, but they certainly do

11   interact.

12        Q.    Okay.  And in that sentence,

13   the word "etiology," E-T-I-O-L-O-G-Y,

14   means cause, correct?

15        A.    That's true, yes.

16        Q.    All right.  And on the next

17   page, there's a heading, "Determining

18   Carcinogenicity."

19                 Do you see that?

20        A.    I do see that.

21        Q.    And what's listed there

22   first is the "International Agency for

23   Research on Cancer monographs on the

24   evaluation of carcinogenic risk to

Michael L. Grossbard, M.D.

1    humans," correct?

2         A.    Correct.

3         Q.    So is this text used to

4    teach medical students or is it used post

5    medical school by doctors?

6         A.    Ordinarily used post medical

7    school.

8         Q.    Okay.  So this is practicing

9    doctors who are in the field of cancer

10   medicine, would be the audience, so to

11   speak, for this book?

12        A.    It would be the primary

13   audience, yes.

14        Q.    And this primary audience is

15   being told in this chapter on determining

16   carcinogenicity, that one of the agencies

17   to look to is the International Agency

18   for Research on Cancer, correct?

19        A.    It appears that way.  Though

20   I'm not really reading any of this.  But

21   it appears that way.

22        Q.    Okay.  I don't want you to

23   answer a question -- take your time.

24   Read it.  It's -- you can read the first

Michael L. Grossbard, M.D.

1    couple of paragraphs.  It then segues on

2    the next page to the National Toxicology

3    Program.  It's only two or three

4    paragraphs.

5         A.    Okay.

6         Q.    So I just want to -- in the

7    middle of the first paragraph --

8              MR. SLONIM:  What page are

9         you on, please?

10             MR. KRISTAL:  It's the page

11        "Determining Carcinogenicity" that

12        Dr. Grossbard was reading.

13             MR. SLONIM:  So I guess

14        these pages are not numbered, at

15        least on my copy.

16             MR. KRISTAL:  I guess so.  I

17        don't know why they're not

18        numbered.  That doesn't make any

19        sense.

20             MR. SLONIM:  Okay.  But just

21        so we're clear on the record, so

22        you're on the -- it says

23        "Determining Carcinogenicity," in

24        red.

Michael L. Grossbard, M.D.

 1              MR. KRISTAL:  Right.

 2              MR. SLONIM:  And underneath

 3       that it says, "International

 4       Agency for Research on Cancer."

 5              And then where are you?

 6              MR. KRISTAL:  I'm in the

 7       middle of the first paragraph

 8       towards the right.  The sentence

 9       that begins, "Since 1971."

10              THE WITNESS:  Okay.  I have

11       that.

12  BY MR. KRISTAL:

13       Q.    It says here, since 1971 --

14  and I'm paraphrasing -- more than a

15  thousand agents have been evaluated by

16  IARC.  Is that generally your

17  understanding?

18       A.    That is my general

19  understanding.

20       Q.    Okay.  And then dropping

21  down to the -- you're familiar with the

22  IARC classification in terms of --

23       A.    I am.

24       Q.    -- whether it is a definite

Michael L. Grossbard, M.D.

1    carcinogen, probable carcinogen, possible

2    carcinogen, and then below that?

3          A.    Correct.

4          Q.    Okay.  And here in the last

5    paragraph, "According to" -- strike that.

6                You know that Group 1 is

7    agents that are carcinogenic to humans,

8    right, according to the IARC

9    classification?

10         A.    Correct.

11         Q.    And Group 2A, are agents

12   that are probably carcinogens, correct?

13         A.    Correct.

14         Q.    All right.  And it reads

15   here, "According to the IARC, 32 agents

16   used occupationally are classified as

17   Group 1, and 27 additional occupational

18   agents are classified as Group 2A."

19                Do you see that?

20         A.    I do see that.

21         Q.    So if we do simple math,

22   there are only 59 agents used

23   occupationally out of over a thousand

24   that IARC have determined to be either

Michael L. Grossbard, M.D.

1    Group 1 or Group 2A, right?

2         A.    As it's written in this,

3    yes.  I don't know those 32 agents off

4    the top of my head.  I don't --

5         Q.    No, no, I'm not asking that.

6         A.    I don't know the 47 -- more

7    importantly, I don't know the other 400,

8    as to whether they are occupationally or

9    otherwise.  So I can't give you the exact

10   classification.  This is -- this may be

11   their summary.  This may be IARC's

12   summary.  I don't know.

13        Q.    Okay.  The point is, you

14   don't consider IARC to be a rubber stamp

15   for every agent they evaluate to be

16   considered either a Group 1 carcinogen or

17   a Group 2A probable carcinogen, correct?

18        A.    I don't think the

19   organization is a rubber stamp.  I think

20   they do classify a lot of agents as

21   carcinogens that I may have some question

22   as to their carcinogenicity.

23        Q.    Okay.  And that's just a

24   reasonable scientific disagreement,

Michael L. Grossbard, M.D.

1    right?

2          A.    I think it's reasonable,

3    yes.

4          Q.    Okay.  I'm done with that,

5    unless you wanted to read other portions.

6    You're welcome to.

7          A.    Well, it's very exciting,

8    but we can move on.

9          Q.    Right.  We could be watching

10   paint dry, right?

11               What did you know about

12   Monsanto before you agreed to do work on

13   their behalf?

14               MR. SLONIM:  Objection.

15         Form.  It's a very broad question.

16               THE WITNESS:  I can answer?

17   BY MR. KRISTAL:

18         Q.    Yeah.

19         A.    Yeah.  Nothing really.

20         Q.    Had you ever heard of

21   Monsanto before you were asked to get

22   involved in this litigation?

23         A.    Yes.

24         Q.    And what was your

Michael L. Grossbard, M.D.

1  understanding of Monsanto?

2       A.    Now, I might be wrong.  But

3  somewhere in my imagination sits that

4  Monsanto supplied the first Astroturf in

5  Houston.  Do you know if that's true?  I

6  know I'm not supposed to ask you

7  questions.  Don't know if you --

8       Q.    I really don't know.

9       A.    So that -- that's my belief

10  of where I first heard of Monsanto.

11       Q.    Right.  Okay.

12       A.    But I -- maybe I'm making

13  that up.  Well, I'm not making that up.

14  That's where I first heard of them.  I'm

15  making --

16       Q.    Exactly.

17       A.    Yeah.

18       Q.    Well, it matters not whether

19  that is true or not.

20       A.    Yes.

21       Q.    I'm asking your general

22  understanding.

23       A.    That's was -- that's was my

24  belief.  I do also somewhere recall

Michael L. Grossbard, M.D.

1    coming upon data, and it may have been in

2    the late press, about genetically

3    modified crops.

4              I did not know -- I don't

5    believe I knew assistant point that

6    Monsanto made Roundup.

7         Q.    Did you know what Roundup

8    was?

9         A.    I had seen it in the --

10        Q.    Home Depot or Lowe's?

11        A.    -- in the hardware store and

12    whatnot.  But did I ever use it?  No.

13        Q.    You're aware that there have

14    been trials already in Roundup cases?

15        A.    Yes, I am.

16        Q.    I wanted to share with you

17    some comments that judges have written in

18    opinions after those trials and ask you

19    about that.

20              (Document marked for

21         identification as Exhibit

22         Grossbard-7.)

23    BY MR. KRISTAL:

24        Q.    So marking as Exhibit 7.

Michael L. Grossbard, M.D.

1    This is from July of 2019 in the Pilliod

2    case, P-I-L-L-I-O-D.  It's the amended

3    order denying motions of defendant for

4    JNOV and conditionally granting motions

5    of defendant for new trial.

6                    Do you see that?

7            A.    I do see that.

8            Q.    And if you turn to the

9    second page.  Do you have any

10   understanding of the three trials that

11   have gone to verdict in Roundup?

12           A.    My understanding -- I mean,

13   I read about them in the newspaper.

14   Other than -- other than that, no.  And

15   of course, the Hardeman case I did look

16   at records in that one, wrote a report.

17   But the actual trial itself, no.

18           Q.    Okay.  You were never called

19   to testify in Hardeman, correct?

20           A.    I was not.

21           Q.    Okay.  But you're aware of

22   the Hardeman verdict?

23           A.    Yes.

24           Q.    Okay.  And you're -- are you

Michael L. Grossbard, M.D.

1    aware in the three trials that, based on

2    the evidence that was presented by both

3    sides, the juries, all three of them,

4    determined that punitive damages were

5    warranted against Monsanto?

6              MR. SLONIM:  Objection.

7    BY MR. KRISTAL:

8         Q.    Were you aware of that?

9              MR. SLONIM:  Objection.

10             THE WITNESS:  I'm not aware

11        of those specifics.

12   BY MR. KRISTAL:

13        Q.    Okay.  Have you ever heard

14   of the term "punitive damages"?

15        A.    Yes.

16        Q.    What's your understanding of

17   punitive damages?

18             MR. SLONIM:  Objection.

19             THE WITNESS:  Again, it's

20        really a lay understanding --

21   BY MR. KRISTAL:

22        Q.    Yeah, that's what I'm

23   asking.

24        A.    -- in that -- that it's sort

Michael L. Grossbard, M.D.

1    of extra -- extra costs or extra damages

2    or extra payments that are made as

3    punishment, if you will.  I don't -- I

4    don't know beyond that.  That's really my

5    definition of punitive.

6          Q.    Pretty close.

7          A.    Pretty close.  It's what my

8    parents did to me when I didn't get an A,

9    punitive.

10         Q.    Exactly.  Exactly.  So you'd

11   work harder and do it better next time.

12         A.    Probably not.

13         Q.    On Page 3, there's a section

14   of this opinion, punitive damages.  And

15   I'm going to read it and ask you a

16   question about it.

17               "The claim for punitive

18   damages required plaintiffs to prove by

19   clear and convincing evidence that

20   Monsanto committed malice, oppression, or

21   fraud.  The Court finds the evidence can

22   support a finding by clear and convincing

23   evidence that Monsanto committed malice,

24   oppression, or fraud.  The Court

Michael L. Grossbard, M.D.

1    addresses punitive damages in the motion

2    for a new trial."

3              Do you see that?

4         A.    I do see that.

5         Q.    Okay.  So is this the first

6    time that you're hearing that the jury --

7              MR. SLONIM:  Counsel, I'm

8         going to object to any questions

9         dealing with judicial opinions.

10              The witness is here as an

11         expert witness to offer testimony

12         about the opinions that he intends

13         to offer and the bases for these

14         opinions.  He's not here to answer

15         questions of law or to respond to

16         judicial opinions.  It's

17         completely improper.

18              MR. KRISTAL:  Well, I think

19         if you give it some time, he's

20         relying on certain articles, for

21         example, that were ghostwritten by

22         Monsanto that were part of the

23         punitive damages.  And I'm going

24         to be asking about whether he

Michael L. Grossbard, M.D.

1          realizes that.

2                  MR. SLONIM:  So -- I'm

3          sorry.

4                  MR. KRISTAL:  If he doesn't

5          know that, it may affect his

6          evaluation of those studies.

7                  In any event --

8                  MR. SLONIM:  So I'm going

9          to -- I'm going to allow a little

10         latitude here.  I think it's

11         completely improper.  But if

12         there's a nexus -- I mean, if you

13         want to ask him questions about

14         articles he read, you can ask him

15         questions about that.

16                 To tie it to a judicial

17         opinion that he hasn't looked at,

18         hasn't relied on, he's not a

19         lawyer, it doesn't form a basis

20         for his opinion, the judicial

21         opinion doesn't.

22                 If you want to ask him about

23         the article, ask him about the

24         article.  But this is improper.

Michael L. Grossbard, M.D.

1          I'll allow -- if there's a

2     connection, I'll allow it.  But

3     otherwise, I'm going to stop --

4     I'm going to shut down this line.

5          MR. KRISTAL:  I don't think

6     you have the right to do that.

7     But you'll do what you do.  And

8     I'll do what I do.

9  BY MR. KRISTAL:

10      Q.    Does it matter to you if

11  some of the evidence that you're relying

12  on for your opinion was in fact not

13  written by the authors who are in the

14  article but written by Monsanto?  Does

15  that matter to you?

16      A.    That's a hard question to

17  answer, because it depends on the

18  science.  It depends on whether the

19  authors have taken the responsibility.

20  It depends on the specifics that you're

21  mentioning.

22      Q.    Does it matter to you if

23  Monsanto -- what I've called ghostwrote

24  article and had other authors' name on

Michael L. Grossbard, M.D.

1    them for the purpose of supporting

2    litigation defense?

3         A.    To answer the question you

4    want me to answer, I've never personally

5    ghostwritten an article.  I have had

6    colleagues that have had ghostwritten

7    articles.  Not necessarily by -- in the

8    kind of setting that you're describing.

9    But I -- whatever I put my name to, I

10   wrote.  So, again, it would depend on the

11   particular paper, the circumstances, et

12   cetera.

13        Q.    Well, you certainly rely on

14   the Greim, G-R-E-I-M, article?

15        A.    That is true.

16        Q.    And you rely on the Kier,

17   K-I-E-R, and Kirkland article?

18        A.    That is true.

19        Q.    Are you aware that those

20   were ghostwritten by Monsanto for

21   purposes of allowing an expert such as

22   yourself to be used in defense of

23   litigation?

24             MR. SLONIM:  Objection.

Michael L. Grossbard, M.D.

1            THE WITNESS:  I'm not aware

2        of that.

3  BY MR. KRISTAL:

4        Q.    Are you saying that that

5  doesn't matter to you?  I mean, you've

6  been doing cancer work for decades.

7        A.    Correct.

8        Q.    You don't have to work for

9  Monsanto.  You have every right to work

10  or not work.  But does it matter to you

11  what the conduct of the company is that

12  you're working on behalf of?

13            MR. SLONIM:  Objection.

14            THE WITNESS:  I consider

15        myself to be an ethical person.

16            I can't -- I mean, your

17        question is a hard one.  I

18        hadn't -- I hadn't heard that

19        until two seconds ago.  I'd have

20        to read the paper again in that

21        context.  So I don't -- I don't

22        know.

23            If you're asking me do I

24        think it's good if a company is

Michael L. Grossbard, M.D.

1          unethical in general?  I mean, I'm

2          not sure what -- ask a specific

3          question again.  I'll try to

4          answer it the best I can.

5     BY MR. KRISTAL:

6          Q.    No, I think you answered it

7     the best you can.  There's no trick or

8     something.

9          A.    No, I know there's no trick.

10    I'm just trying to answer your question.

11         Q.    And I think you answered the

12    question.

13         A.    Okay.

14         Q.    Reading from Page 16, second

15    paragraph.  "A defendant's efforts to

16    impede, discourage, or distort scientific

17    inquiry into facts could support an award

18    of punitive damages.  Such efforts would

19    show a conscious disregard for the health

20    of persons exposed to glyphosate by

21    interfering with the creation and

22    publication of scientific information

23    that is directly relevant to public

24    health."

Michael L. Grossbard, M.D.

1                    First of all, do you agree

2     with that?

3                    MR. SLONIM:  Objection.

4                    THE WITNESS:  Without --

5          without taking Mr. Slonim's words

6          from two minutes ago, I mean, this

7          is to my understanding, a legal

8          document.

9     BY MR. KRISTAL:

10         Q.    Yeah.

11         A.    I'm a little loathe to

12    disagree or agree to any judge's language

13    in any way, shape, or form.

14         Q.    Okay.  But if a company

15    impeded, discouraged, or distorted the

16    scientific inquiry, that would

17    demonstrate a conscious disregard for the

18    health of the persons exposed to that

19    substance, would it not?

20                    MR. SLONIM:  Objection.  The

21         expert has no expertise in such

22         determinations.  He's here as a

23         medical witness -- a medical

24         witness and scientist on cancer

Michael L. Grossbard, M.D.

1          and non-Hodgkin's lymphoma.

2                   MR. KRISTAL:  Who was a

3          human being before he became a

4          doctor.

5                   MR. SLONIM:  He's not

6          here -- he's not here to offer

7          opinions in regard to ethics,

8          corporate ethics, or any such

9          thing.  That's not his expertise.

10                  MR. KRISTAL:  Nor am I

11         asking questions about that.

12                  THE WITNESS:  Could you ask

13         your question -- or just repeat

14         it -- however.  Just one more

15         time.

16                  MR. KRISTAL:  Sure.

17                  (Whereupon, the court

18         reporter read back the requested

19         portion of testimony.)

20                  THE WITNESS:  I guess I

21         would have to agree with that

22         statement.

23     BY MR. KRISTAL:

24         Q.    Okay.  And on Page 17, Judge

Michael L. Grossbard, M.D.

1  Smith writes, second full paragraph, "In

2  this case, there was clear and convincing

3  evidence that Monsanto made efforts to

4  impede, discourage, or distort scientific

5  inquiry and the resulting science."

6              Is that the first time

7  you're hearing of that notion?

8              MR. SLONIM:  Objection.

9              THE WITNESS:  It is.

10  BY MR. KRISTAL:

11       Q.    Does it make a difference to

12  you?

13       A.    I don't think that's a

14  terrifically good thing.  But does it

15  make a difference in how I interpret the

16  literature?  That, I can't answer to you.

17       Q.    Well, if the company is

18  distorting the literature that you're

19  relying on, doesn't that make a

20  difference?

21       A.    Again, we'd have to go over

22  specific literature and what is

23  distorting and what I'm relying on before

24  I could really answer that question.

Michael L. Grossbard, M.D.

1          MR. SLONIM:  Okay.  We've

2     been going for about an hour.

3     When you find a convenient time to

4     take a break.

5          MR. KRISTAL:  Take a break

6     now.

7          THE VIDEOGRAPHER:  The time

8     now is 2:10 p.m., and we're off

9     the record.

10          (Short break.)

11          THE VIDEOGRAPHER:  This

12     marks the beginning of Tape Number

13     3.  The time now is 2:21 p.m., and

14     we're back on the record.

15 BY MR. KRISTAL:

16          Q.    In Exhibit 1, your report in

17 the Sanders case, under the materials

18 considered, you list as Entry 42, Greim,

19 G-R-E-I-M, H, the letter H for the first

20 initial, et al.

21          You list that article?

22          MR. SLONIM:  Which reference

23     number was that?

24          MR. KRISTAL:  42.

Michael L. Grossbard, M.D.

1    BY MR. KRISTAL:

2         Q.    Correct?

3         A.    Yes.

4         Q.    And you would consider --

5    the title is "Evaluation of Carcinogenic

6    Potential of the Herbicide Glyphosate

7    Drawing on Tumor Incidence Data From 14

8    Chronic Carcinogenicity Rodent Studies."

9              Do you see that?

10        A.    Yes.

11        Q.    And that is what is known as

12   a review article?

13        A.    Yes.  They review the 14

14   animal studies and mouse and rat studies

15   in some detail.

16        Q.    So it fair to say, because

17   they're not on your list, you did not

18   yourself read or evaluate the studies

19   that the Greim paper is reviewing?

20        A.    I don't believe that I read

21   the individual studies beyond the data

22   that are included in that article.

23        Q.    Okay.  And you specifically

24   cite to the Greim -- it's one of the few

Michael L. Grossbard, M.D.

1   articles that you specifically cite to,

2   correct?

3             MR. SLONIM:  Objection.

4             THE WITNESS:  I don't know

5        if I would call it one of the few

6        articles that I specifically cite

7        to.  I cite to a number of

8        articles.  But I do cite to that.

9   BY MR. KRISTAL:

10       Q.    Okay.  In the animal and

11  genotoxicity studies, you cite to the

12  Greim article, correct?

13       A.    That's true.

14       Q.    And then in the genotoxicity

15  of glyphosate section, you cite to an

16  article, Kier and Kirkland.

17             Do you see that?

18       A.    I do see that.

19       Q.    And Kier and Kirkland is

20  another review article, right?

21       A.    Yes, it is.

22       Q.    It's entitled "Review of

23  Genotoxicity Studies of Glyphosate and

24  Glyphosate-Based Formulations."

Michael L. Grossbard, M.D.

1           Do you see that?  It's 58 --

2      A.    58, I've got it.  Yes.

3      Q.    Entry 58 --

4      A.    Yes, I do see that.

5      Q.    -- on your materials

6  considered list.

7           I take it as well, because I

8  don't see them on your materials

9  considered list, that you did not review

10  the individual genotoxicity studies that

11  the Kier and Kirkland paper reviewed?

12      A.    I don't remember if they

13  included the Paz-y-Miño study in their --

14  in their report -- in the review or not.

15  Because I did review those, and I did

16  review the Bolognesi study.  And I don't

17  know if those are -- I can't remember

18  whether those were included in that

19  review article.

20      Q.    Okay.  And it's P-A-Z dash Y

21  dash M-I-N-O.  Paz-y-Miño.

22      A.    Oh, sorry.

23      Q.    No, that's not your fault.

24           Other than perhaps those

Michael L. Grossbard, M.D.

1    two, if they are cited in Kier and

2    Kirkland, you did not read the other

3    genotoxicity studies themselves that were

4    reviewed by Kier and Kirkland?

5         A.    By and large, I would say

6    no.  I would have to look.  But my guess

7    is no.

8              (Document marked for

9         identification as Exhibit

10         Grossbard-8.)

11   BY MR. KRISTAL:

12         Q.    Okay.  I'm going to mark as

13   Exhibit 8.  This is the opinion in the

14   Hardeman case in which you have been

15   designated as an expert but did not

16   testify.

17              Is that right?  You were

18   designated in the Hardeman case?

19         A.    I wrote a report.  I guess

20   that means that I was designated as an

21   expert.

22         Q.    Right.

23         A.    I don't know the legal

24   language there, but...

Michael L. Grossbard, M.D.

1           Q.    If you go to Page 4, I'm
2     going to read some stuff and ask you a
3     question.

4               "Monsanto raises two
5     challenges to the punitive damages award.
6     One, any award of punitive damages is
7     unsupported by the evidence; and, two,
8     even assuming some award of punitive
9     damages is appropriate, 75 million
10    exceeds the constitutional ceiling set by
11    the due process clause.

12              "Monsanto is wrong on the
13    first point.  Based on the evidence that
14    came in at trial, Monsanto deserves to be
15    punished.  As relevant here, California
16    law provides for an award of punitive
17    damages where the defendant acted with
18    malice, meaning either conduct which was
19    intended by the defendant to cause injury
20    to the plaintiff, or despicable conduct
21    which was carried on by the defendant
22    with a wilful and conscious disregard of
23    the rights of others.

24              "It was reasonable for the

Michael L. Grossbard, M.D.

1    jury to put Monsanto's behavior in the

2    latter category because the evidence

3    easily supported a conclusion that

4    Monsanto was more concerned with tamping

5    down safety inquiries and manipulating

6    public opinion than it was with ensuring

7    that its product was safe."

8              MR. SLONIM:  Objection.

9    BY MR. KRISTAL:

10        Q.    Okay.  Is that the first

11   time you're hearing this, that it's

12   reasonable for a jury to evaluate

13   Monsanto's behavior based on the evidence

14   as despicable conduct?

15             MR. SLONIM:  Objection.

16             THE WITNESS:  It is.

17   BY MR. KRISTAL:

18        Q.    Okay.  And how does that

19   make you feel?

20             MR. SLONIM:  Objection.

21        That's completely improper.  His

22        feelings -- the witness's feelings

23        are not at issue here.  The

24        witness is testifying as an

Michael L. Grossbard, M.D.

1          expert, offering scientific and

2          medical opinions and the bases for

3          those opinions.

4     BY MR. KRISTAL:

5          Q.    Okay.

6          A.    Look, I can't comment on

7     something that I don't know what the

8     despicable conduct is.  I didn't -- I

9     didn't see the trial.  I didn't read

10    transcripts from the trial.

11               I know I wrote a report in

12    this case, and I know that I felt very

13    strongly that hepatitis infection was the

14    cause of his lymphoma.  So I had a firm

15    opinion on this, but I -- beyond that I

16    can't make any comment.

17          Q.    Well, I guess my question

18    was more, how do you feel about working

19    on behalf of such a company, if that's

20    true?

21               MR. SLONIM:  Objection.

22               THE WITNESS:  I don't see

23          myself as working on behalf of a

24          company, if you will.

Michael L. Grossbard, M.D.

1            I see myself as addressing a

2      scientific question here.

3  BY MR. KRISTAL:

4            Q.   Do you disclose to your

5  patients who have had the misfortune of

6  having been diagnosed with NHL that

7  you're working on behalf of Monsanto in

8  litigation involving Roundup?

9            A.   If it has nothing to do with

10  Roundup, if their lymphoma has nothing to

11  do with Roundup, no.

12            Q.   Okay.  Well, in your

13  opinion, that would never happen?

14            A.   In my opinion that would

15  never happen.  Let me answer you

16  differently then.

17            Q.   Okay.

18            A.   I have in the last two

19  months, for the first time, had three --

20  three patients who came in and said that

21  they were joining in the Roundup suit.

22  That's the first time in my career that

23  anybody has ever said that to me.

24            I did disclose to those

Michael L. Grossbard, M.D.

1    people that I am working on behalf of --

2    I didn't say Monsanto, but that I am an

3    expert on the side of the case that does

4    not believe that Roundup causes lymphoma.

5          Q.    That's great, because that

6    certainly at least is an appearance of a

7    conflict.  And that's what you're

8    supposed to do is be honest with your

9    patient so they can make a decision,

10   right?

11              MR. SLONIM:  Objection.

12          That is a completely improper,

13          loaded question.

14              MR. KRISTAL:  Loaded

15          question, the answer to which is

16          very supportive of the doctor for

17          having done that.

18   BY MR. KRISTAL:

19          Q.    You can answer the question.

20              MR. SLONIM:  Can --

21   BY MR. KRISTAL:

22          Q.    That's appropriate thing to

23   do, right?

24              MR. SLONIM:  Let's have

Michael L. Grossbard, M.D.

1    the -- let's have the question

2    read back, please.  I want to -- I

3    want to think --

4         MR. KRISTAL:  I'm praising

5    the doctor in having him agree

6    with that.

7         MR. SLONIM:  I want --

8         MR. KRISTAL:  If you don't

9    want me to ask that, I won't.

10        MR. SLONIM:  Well, if you

11   withdraw it, then I don't need to

12   hear it.

13        MR. KRISTAL:  Okay.  I'll

14   withdraw it.

15 BY MR. KRISTAL:

16        Q.    I assume that you disclosed

17 that because you thought it was the

18 proper thing to do?

19        MR. SLONIM:  Objection.

20        THE WITNESS:  I did.

21 BY MR. KRISTAL:

22        Q.    Okay.  Does NYU Langone have

23 a disclosure of outside consultancy

24 policy?

Michael L. Grossbard, M.D.

1          A.     They do.

2          Q.     Have you disclosed in that

3    forum that you are an expert on behalf of

4    Monsanto in a Roundup litigation?

5          A.     I didn't say on behalf of

6    Monsanto, but I did -- I expressed that I

7    am involved in litigation.

8          Q.     Okay.

9          A.     So what I --

10         Q.     That's the extent of it?

11         A.     What I need to disclose

12   is --

13         Q.     Right.

14         A.     -- any outside work that I'm

15   doing.

16         Q.     Right.

17         A.     And so I exposed that --

18   exposed -- I --

19         Q.     Disclosed?

20         A.     Disclosed, sorry.

21                -- disclosed that I'm

22   working on this litigation.  I didn't --

23   I don't know that I said the name of the

24   company involved.  I can't -- I can't

Michael L. Grossbard, M.D.

1   recall.

2        Q.    Okay.

3        A.    Probably if I said anything,

4   I wouldn't have said Monsanto.  I

5   probably would have said Bayer to be

6   entirely honest.

7        Q.    Right.

8        A.    But I don't -- I don't

9   remember.

10        Q.    And that was appropriate to

11   disclose as well, right?

12        A.    Yes.

13        Q.    Because disclosures of

14   potential conflicts of interest is always

15   appropriate, right?

16             MR. SLONIM:  Objection.

17             THE WITNESS:  I believe so.

18   BY MR. KRISTAL:

19        Q.    Of course.

20             MR. KRISTAL:  I didn't think

21        that was controversial.

22             (Document marked for

23        identification as Exhibit

24        Grossbard-9.)

Michael L. Grossbard, M.D.

1    BY MR. KRISTAL:

2         Q.    Marked as Exhibit 9, this is

3    a document entitled "Spinning Science and

4    Silence Go Scientists:  A Case Study in

5    How the Chemical Industry Attempts to

6    Influence Science."  And it's prepared by

7    the Minority Staff Report for members of

8    the Committee on Science, Space and

9    Technology, U.S. House of

10   Representatives, February 2018.

11            Have you seen this before?

12        A.    I have not.

13        Q.    By the way, have you ever,

14   in your regular practice, gone to the

15   EPA's evaluation of a chemical as to

16   whether or not it's carcinogenic or not?

17        A.    I have not.

18        Q.    Have you ever gone to Health

19   Canada's evaluation of a chemical to make

20   a determination --

21        A.    No.

22        Q.    -- along the lines as to

23   whether a chemical is carcinogenic or

24   not?

Michael L. Grossbard, M.D.

1    A.    No, I have not.

2    Q.    Have you ever done to any

3  regulatory agency's evaluation of a

4  chemical's propensity or not to be a

5  carcinogen in the regular course of your

6  practice?

7    A.    I have not.

8    Q.    If you turn to the second

9  page, it's got the U.S. House of

10 Representatives logo on it, correct?

11    A.    It does.

12    Q.    And then I just want to read

13 a portion of the introduction so you can

14 get oriented.  And then if you need to,

15 or want to, you can skim it, read it, do

16 whatever you want --

17    A.    Okay.

18    Q.    -- or wait until I ask a

19 question.

20         On Page 1, "Introduction."

21 And by the way this one is -- has a

22 Monsanto Bates stamp number, MONGLY --

23 M-O-N-G-L-Y -- 07894891 is the first

24 page.  Under the paragraph, introduction.

Michael L. Grossbard, M.D.

1              "On February 6, 2018, the

2      Committee on Science, Space and

3      Technology is scheduled to hold a hearing

4      entitled 'In Defense of Scientific

5      Integrity:  Examining the IARC Monograph

6      Program and Glyphosate Review.'  The

7      chemical glyphosate is an herbicide most

8      commonly found in Monsanto's commercial

9      weedkiller Roundup.

10              "Committee chairman Lamar

11      Smith scheduled this hearing after months

12      of letter writing criticizing the IARC

13      review of glyphosate and examining the

14      EPA's action on glyphosate.

15              "Many of the criticisms

16      contained in the committee's letters

17      regarding IARC mimic criticisms that the

18      chemical industry has leveled on the IARC

19      process.

20              "Since these industry

21      talking points are apparently the basis

22      for both a congressional investigation as

23      well as a committee hearing, minority

24      committee staff have written this staff

Michael L. Grossbard, M.D.

1   report to better inform the committee

2   members about the chemical industry

3   tactics, which have ultimately produced

4   these industry talking points.

5              "The report necessarily

6   focuses on the Monsanto Company due to

7   their primary role in inventing, selling,

8   and marketing glyphosate and

9   glyphosate-resistant seeds.

10             "This report is based in no

11  small part on documents that had been

12  made publicly available due to ongoing

13  third-party litigation with Monsanto.

14             "These newly released public

15  documents have revealed in an

16  unprecedented manner the tactics of the

17  chemical industry in attacking public

18  health science related to their

19  products."

20             Did anybody show you this

21  document prior to today?

22             MR. SLONIM:  Objection.  And

23         I specifically instruct the

24         witness not to disclose anything

Michael L. Grossbard, M.D.

1    about communications with counsel.

2          If you can answer the

3    question --

4          MR. KRISTAL:  I'll ask it a

5    different way to respect that

6    objection.

7    BY MR. KRISTAL:

8    Q.   Have you ever seen this

9    document before?

10   A.   No, I have not.

11   Q.   Had anybody told you about

12   this document?

13         MR. SLONIM:  Objection.

14   Insofar as it calls for any

15   disclosure about communications

16   with counsel, the witness is

17   instructed not to answer.

18         THE WITNESS:  I've never

19   seen or heard of this document.

20   BY MR. KRISTAL:

21   Q.   Okay.  And under background,

22   they first mention the IARC

23   classification of glyphosate in March of

24   2015, correct?

Michael L. Grossbard, M.D.

1          A.     That is true.

2          Q.     And the first paragraph

3   ends, "As more scientific data is

4   gathered and analyzed to more fully

5   understand the impacts of glyphosate on

6   human health, it is important for the

7   science to lead the way and for industry

8   and politicians to remain on the

9   sidelines, but that has not happened."

10             Do you agree, in evaluating

11   the science on glyphosate, it's important

12   for the industry and politicians to

13   remain on the sidelines?

14          A.     For me personally, it is.   I

15   mean, I can't assess that in a global

16   sense, but...

17          Q.     And if that didn't happen?

18             MR. SLONIM:   Objection.

19             THE WITNESS:   For me?

20   BY MR. KRISTAL:

21          Q.     Yeah.

22          A.     Then I would be biased,

23   potentially.

24          Q.     I don't follow your answer.

Michael L. Grossbard, M.D.

1          A.     If I -- if I was influenced

2    by industry in my decisions, I think I

3    would be biased.  I don't know if there

4    are any politicians trying to influence

5    me right now.

6          Q.     Obviously you're interested

7    in public health, or you wouldn't be in

8    the field you're in, correct?

9          A.     That's true.

10         Q.     Okay.  And working on behalf

11   of a company, if you believed that they

12   did things related to Roundup that was

13   contrary to the public health, that

14   doesn't make a difference to you, in

15   terms of whether you even want to work on

16   their behalf?

17         A.     I am fundamentally answering

18   science questions in this case.  Does

19   glyphosate cause lymphoma?  I don't think

20   it does.

21              IARC says it probably does.

22   Health Canada doesn't.  The European

23   regulatory agencies say it don't.  The

24   Australian regulatory agencies say they

Michael L. Grossbard, M.D.

1   don't.

2              I'm not out on some fringe

3   somewhere.  I'm deciding something on the

4   basis of a scientific assessment.

5              So I don't -- I mean, I

6   don't know about the unethical conduct

7   that you're telling me about.  I'm not

8   aware of it, except what you've pointed

9   out today.  And I'm still not sure from

10  what you're showing me that there was

11  something unethical there.

12         Q.    Okay.

13         A.    So I don't -- I don't know.

14  I mean, if you ask me do I -- do I want

15  to work for evil people, it's not my

16  premise in life.

17         Q.    Next paragraph.  "There is

18  significant evidence that Monsanto

19  launched a disinformation campaign to

20  undermine IARC's classification of

21  glyphosate as a probable carcinogen."

22             Have you seen any of that

23  evidence?

24             MR. SLONIM:  Objection.

Michael L. Grossbard, M.D.

1    BY MR. KRISTAL:

2         Q.    Has anybody shown that to

3    you?

4         A.    I have not.

5         Q.    If you drop down -- well,

6    let me continue since it's a long

7    sentence.  "A multi-district litigation

8    court case against Monsanto regarding

9    potential adverse health consequences of

10   exposures to glyphosate has revealed

11   hundreds of pages of internal Monsanto

12   e-mails, memorandums and other records

13   that clearly show Monsanto engaged in a

14   decades long concerted effort to fend off

15   any evidence suggesting potential adverse

16   human health effects from glyphosate, and

17   more recently to undermine IARC's

18   findings.

19            "They ghostwrote scientific

20   articles on glyphosate, established front

21   groups to help amplify their anti-IARC

22   message and scientific evidence they did

23   not like, and they attempted to silence

24   scientists who reached conclusions

Michael L. Grossbard, M.D.

1   questioning glyphosate's safety."

2           Were you aware of any of

3   that?

4           MR. SLONIM:  Objection.

5           THE WITNESS:  I am not.

6   BY MR. KRISTAL:

7       Q.    And if we turn to the page

8   entitled "Ghostwriting."  Yeah,

9   ghostwriting.  Page 6.

10      A.    Okay.

11      Q.    "Internal Monsanto e-mails

12  show that Monsanto's scientists

13  ghostwrote scientific journal articles on

14  glyphosate.  It is clear from these

15  e-mails revealed in court documents that

16  ghostwriting articles on glyphosate was a

17  concerted effort by the company.

18           "Monsanto scientists wanted

19  to both steer the scientific studies away

20  from identifying potential adverse human

21  health effects from exposure to

22  glyphosate, and they wanted other

23  independent scientists listed on these

24  studies to provide the aura of

Michael L. Grossbard, M.D.

1    objectivity and independence."

2                 Is that the first time that

3    you're hearing this?

4                 MR. SLONIM:  Objection.

5                 THE WITNESS:  Since this

6         morning, yes.

7    BY MR. KRISTAL:

8         Q.    Is ghostwriting proper, in

9    your opinion?

10                MR. SLONIM:  Objection.

11                THE WITNESS:  Again, I

12        answered that earlier, that I

13        would never allow something that I

14        have to be ghostwritten.

15                Ghostwriting is in two

16        forms.  Ghostwriting is presenting

17        inaccurate or wrong data or

18        scientifically invalid data,

19        that's a scientific problem, as

20        well as a ghostwriting problem,

21        especially for those who put their

22        names on that particular document.

23                I don't even allow my good

24        work, or what I think is my good

Michael L. Grossbard, M.D.

1          work, to be ghostwritten.  I write

2          it, bad or good.  I don't know.

3          I'm not a -- I'm not a

4          ghostwriting fan.

5    BY MR. KRISTAL:

6          Q.    And you would agree that

7    it's not just the actual data itself, but

8    the way you present data, and the words

9    that you use, if they're ghostwritten,

10   can also slant the evidence one way or

11   the other, right?

12                 MR. SLONIM:  Objection.

13                 THE WITNESS:  I believe

14          every scientific paper in its

15          conclusions in one way or another

16          is slanting it toward a -- toward

17          a direction.

18                 Again, I think that's --

19          that's less on me.  And yes, I

20          would like to have any conflict of

21          interest declared, just like I

22          like to declare mine and feel a

23          need to declare mine.

24                 Once it's there with a

Michael L. Grossbard, M.D.

1          conflict of interest declared,

2          assuming that's done, then the

3          authors that put their name on

4          that paper, regardless of whoever

5          wrote it, have to stand by those

6          findings.

7     BY MR. KRISTAL:

8          Q.    Well, before it's even

9     declared, you agree that if an article is

10    ghostwritten, the publisher of the

11    journal to which it's submitted should

12    have that information before the article

13    is reviewed, right?

14              MR. SLONIM:  Objection.

15              THE WITNESS:  I don't know.

16         I mean, I -- again, I may be

17         talking from my own experience.

18         There are very well known

19         professors that I worked with at

20         Harvard who had their articles

21         ghostwritten.  They didn't write

22         them themselves.

23              I don't -- I don't agree

24         with that.  But they stand by

Michael L. Grossbard, M.D.

1          that.  I don't know if the journal
2          knew that they were written by
3          someone else.
4     BY MR. KRISTAL:
5          Q.    Well, I assume you've sat on
6     journal review boards that were looking
7     at articles submitted to the journal in
8     terms of whether they should be accepted
9     or not accepted or reviewing them
10    generally?
11         A.    That, I have.
12         Q.    Okay.  Wouldn't you want to
13    know if you're reviewing an article that
14    was ghostwritten by a chemical company
15    that is anticipating litigation?
16    Wouldn't you want to know that fact, one
17    way or the other, going in?
18         A.    So anticipating litigation
19    or not, I would want that somewhere put
20    in that article, whether it uses the word
21    "ghostwritten," whether it says "funded
22    by," whether it says "sponsored."  I
23    mean, I don't -- I don't know how -- I
24    don't know how I would know.  Most of the

Michael L. Grossbard, M.D.

1  things, I ready suspect some of them are

2  ghostwritten.  But I really have no idea.

3        Q.    Okay.  But there is a

4  difference between funding and sponsoring

5  an article, and ghostwriting an article,

6  right?

7        A.    There can be.

8        Q.    Okay.  Well, maybe we should

9  start -- what is your understanding of

10  what ghostwriting is?

11        A.    Someone -- my interpretation

12  of ghostwriting is someone else entirely

13  writes the article, that the actual

14  author whose name on there has not

15  written that article.  They, I hope, have

16  read that article before it's published.

17  But the writing is not their own.

18        Q.    If you drop down to the

19  second paragraph or third paragraph,

20  actually, on Page 6.  "Ghostwriting

21  Greim."

22              Do you see that?

23        A.    I do see that, yes.

24        Q.    The first sentence which

Michael L. Grossbard, M.D.

1   gives a little bit of background in terms

2   of what Monsanto anticipated from IARC.

3   Is that fair to say?

4           A.    It does say that.

5           Q.    And in the middle of the

6   paragraph, "In an e-mail between Monsanto

7   scientists, Bill Heydens and Donna

8   Farmer, they discuss what became known as

9   the Greim paper, a 2015 study published

10  in Critical Reviews in Toxicology whose

11  listed authors include Helmut Greim and

12  David Saltmiras.

13              "In the e-mails they

14  contemplate paying for a study to combat

15  problematic findings, but determine a

16  cheaper option would be to ghostwrite the

17  exposure tox and genetox sections and add

18  Greim and Kier or Kirkland to have their

19  names on the publication, but we would be

20  keeping the costs down by us doing the

21  writing and they would just edit and sign

22  their names, so to speak."

23              That's not kosher, right?

24              MR. SLONIM:  Objection to

Michael L. Grossbard, M.D.

1          form.

2              THE WITNESS:  I don't know

3          that's not kosher.  If you

4          actually edit the article and you

5          go through it -- if the authors

6          edit the article, if they verify

7          all the data that's in there, it's

8          not something that I would do, but

9          I don't know that that's

10         un-kosher, so to speak.

11    BY MR. KRISTAL:

12         Q.    Well, without disclosing the

13    fact that the paper was initially

14    written --

15             MR. SLONIM:  Objection.

16         Form.

17    BY MR. KRISTAL:

18         Q.    -- by the company?

19             MR. SLONIM:  Objection.

20         Form.

21             THE WITNESS:  I can't really

22         answer that question.  I mean,

23         what I -- what I would like is not

24         necessarily what the industry

Michael L. Grossbard, M.D.

1          standard is, if you will.

2    BY MR. KRISTAL:

3          Q.    Right.   Because something is

4    an industry standard doesn't make it

5    right?

6                MR. SLONIM:   Objection to

7          form.

8                THE WITNESS:   You know,

9          there are so many things that are

10         the standard that aren't the right

11         in this country, that that's just

12         kind of hard to address, at least

13         in the next seven hours.

14   BY MR. KRISTAL:

15         Q.    We're going to come back to

16   this.   I want to show you Exhibit 10, is

17   a copy of a PowerPoint.

18                (Document marked for

19         identification as Exhibit

20         Grossbard-10.)

21   BY MR. KRISTAL:

22         Q.    It's a draft, May 11th,

23   2015.   The title is "Proposal for

24   Post-IARC Meeting, Scientific Projects."

Michael L. Grossbard, M.D.

1              The internal Bates number

2    from Monsanto, I believe, is UPL

3    0000001777008.

4              But the last page of this

5    has the -- where this document came from.

6              This is a Monsanto

7    PowerPoint.  It says at the bottom of the

8    first page if you -- second page,

9    "Monsanto Company confidential

10   information."

11             Do you see that?

12        A.    Okay.  I see that.

13        Q.    Okay.  And the title is "Why

14   Do More?"

15             MR. SLONIM:  I'm sorry.

16        Where are you reading?

17             Okay, got it.

18   BY MR. KRISTAL:

19        Q.    Do you see that?

20        A.    I do see that, yes.

21        Q.    And the first bullet point

22   is, "Severe stigma attached to Group 2A

23   classification."

24             Do you agree that if IARC

Michael L. Grossbard, M.D.

1    determines a company's product to be a

2    probable carcinogen, that that can be a

3    severe stigma?

4              MR. SLONIM:  Objection to

5         form.

6              THE WITNESS:  I think that

7         stigma, I don't know, raises a --

8         raises a flag for caution for

9         users.  Is that fair?

10   BY MR. KRISTAL:

11        Q.    Yeah.

12        A.    Sure.

13        Q.    Well, there should be a

14   caution for users, if a product does in

15   fact probably cause cancer.

16        A.    Right.  No, so I agree with

17   that.  I just don't know -- I just don't

18   know if I accept the word "stigma."

19        Q.    Oh, I am -- oh, I see what

20   you're saying.

21        A.    Yeah.

22        Q.    Okay.  And the reason that

23   it's important for people to know,

24   because if it's a modifiable risk factor,

Michael L. Grossbard, M.D.

1    people can decide for their own whether

2    they want to reduce or eliminate that

3    risk factor?

4              MR. SLONIM:  Objection.

5              THE WITNESS:  It's one of

6         several reasons why it would be

7         important.

8    BY MR. KRISTAL:

9         Q.    Okay.  And under "Why Do

10   More?" the fifth bullet point.  "Provide

11   additional support, air cover, for future

12   regulatory reviews."

13             Do you see that?

14        A.    I do see that.

15        Q.    Is that an appropriate use

16   of an article being contemplated for

17   authorship by a company?

18             MR. SLONIM:  Objection.

19        This is a draft that the --

20        there's no -- there's no

21        foundation.  The witness has never

22        seen this before.

23             MR. KRISTAL:  There's plenty

24        of foundation.  It's just not with

Michael L. Grossbard, M.D.

1          this witness.  Not like you

2          haven't seen this before.

3                MR. SLONIM:  No, there's

4          no -- there's absolutely no

5          foundation.  The document on its

6          face says draft.  The witness has

7          no idea what the context is, who

8          authored the -- the authorship of

9          this document is not stated.  It's

10         not stated if it's a final

11         document, if it's a third draft,

12         first draft.  It's completely

13         improper.

14     BY MR. KRISTAL:

15         Q.    Go ahead.

16         A.    I'm sorry.  Could you repeat

17     the question?

18              (Whereupon, the court

19         reporter read back the requested

20         portion of testimony.)

21                MR. SLONIM:  Objection.

22         Form.  Foundation.

23     BY MR. KRISTAL:

24         Q.    To provide air cover for

Michael L. Grossbard, M.D.

1    future regulatory reviews?

2             MR. SLONIM:  Objection.

3         Form.  Foundation.

4             THE WITNESS:  Is that an

5         appropriate use of a scientific

6         article published in a

7         peer-reviewed journal?  Is that

8         what you're asking?  As opposed

9         to --

10   BY MR. KRISTAL:

11        Q.    That's --

12        A.    -- as opposed to is this a

13   marketing, company strategy, which it may

14   be appropriate for, even if I disagree

15   with it, versus --

16        Q.    Right.  Right.

17        A.    You're asking me the former?

18        Q.    You're contemplating

19   articles.  And I'm asking you the former.

20   That's right.

21             MR. SLONIM:  Objection.

22        Foundation.  Form.  Hypothetical.

23             THE WITNESS:  So is it

24        appropriate to contemplate such

Michael L. Grossbard, M.D.

1         articles?  Is that what you're

2         asking?

3    BY MR. KRISTAL:

4         Q.    For that purpose, to provide

5    air cover for regulatory reviews.

6         A.    It's not why I would choose

7    to write an article personally.

8         Q.    Okay.  And the last bullet

9    point here, "Why Do More?" says,

10   "Litigation support."

11             Do you see that?

12        A.    I do see that.

13             MR. SLONIM:  Objection.

14        Foundation.  Form.  Context.

15   BY MR. KRISTAL:

16        Q.    Do you believe it's proper

17   for Monsanto to be contemplating putting

18   articles out in the scientific literature

19   to provide litigation support?

20             MR. SLONIM:  Objection.

21        Form.  Foundation.  Context.

22             THE WITNESS:  This is

23        getting into corporate strategy

24        things that really aren't in my

Michael L. Grossbard, M.D.

1          area of expertise.

2     BY MR. KRISTAL:

3          Q.    Okay.  If you turn to Page

4     4, it's entitled "New Meta-Analysis."

5               Do you see that?

6          A.    I do see that.

7          Q.    And you're aware of what a

8     meta-analysis is obviously.

9          A.    I am.

10          Q.    Meta-analysis reviews

11     individual studies, kind of pools the

12     results, and runs various statistical

13     analyses.  Yes?

14          A.    In a broad manner, yes.

15          Q.    Okay.  And generally

16     speaking, a meta-analysis is done because

17     it provides what's known in epidemiology

18     as more power for the aggregate of the

19     studies to detect a risk if there is a

20     risk, one of the reasons?

21          A.    That's true.

22          Q.    And under project

23     description, it says, "Conduct proper

24     meta-analysis to support the position

Michael L. Grossbard, M.D.

1    that glyphosate is not associated with

2    NHL and multiple myeloma."

3              Do you see that?

4         A.    I do.

5         Q.    And under risk for doing a

6    new meta-analysis, Monsanto wrote, "None,

7    since we've already done the analysis."

8              Do you see that?

9              MR. SLONIM:  Objection.

10        Form.  Foundation.

11             THE WITNESS:  I do, yeah.

12   BY MR. KRISTAL:

13        Q.    Now --

14             THE COURT REPORTER:  I

15        didn't hear an answer, please.

16             THE WITNESS:  I do.

17   BY MR. KRISTAL:

18        Q.    Below that in parentheses,

19   it says, "Timing, Donna checking with

20   Exponent, but currently estimate three to

21   four months to write plus two-plus months

22   to get online publication."

23             Do you see that?

24        A.    I do see that.

Michael L. Grossbard, M.D.

1        Q.    Now, one of the

2   meta-analysis that you had read and

3   relied on is the Chang, C-H-A-N-G, and

4   Delzell meta-analysis?

5        A.    That's correct.

6        Q.    And you are aware that that

7   was sponsored by Monsanto, funded by

8   Monsanto?

9        A.    I can't remember right now.

10  In other words, if you show me the

11  manuscript, that it's cited in there,

12  then I'm sure I noticed it at one point.

13       Q.    Okay.  And you're also aware

14  that Chang -- it was under the auspices

15  of a consulting group called Exponent?

16       A.    I'm not aware that.

17            (Document marked for

18            identification as Exhibit

19            Grossbard-11.)

20  BY MR. KRISTAL:

21       Q.    I'm going to mark as

22  Exhibit 11, and tell me if this is an

23  article entitled "Systematic Review and

24  Meta-Analysis of Glyphosate Exposure and

Michael L. Grossbard, M.D.

1   Risk of Lymphohematopoietic Cancers,"

2   Chang and Delzell 2016.

3              Do you see that?

4        A.    Yes.

5        Q.    Okay.  And if you look down,

6   the contact, down at the bottom for Ellen

7   Chang is an Exponent e-mail address.

8              Do you see that at the very

9   bottom?

10       A.    I see that.

11       Q.    It's listed as Health

12  Science Practice, Exponent, Inc.?

13       A.    Okay.

14       Q.    Are you familiar with

15  Exponent?

16       A.    I'm not.

17       Q.    Have you ever read -- do you

18  know who David Michaels is, former head

19  of OSHA?

20       A.    I do not.

21       Q.    Have you ever seen his book,

22  Doubt is Their Product?

23       A.    I have not.

24       Q.    You should read it.

Michael L. Grossbard, M.D.

1          MR. SLONIM:  Objection.

2          MR. KRISTAL:  Dr. Grossbard

3     is going to do or not do whatever

4     he wants to do, regardless of my

5     suggestion that he read it.

6  BY MR. KRISTAL:

7     Q.    If you look -- I'm trying to

8  find the references, the acknowledgment.

9  Sorry, the funding.

10          "This work was supported by

11 Monsanto Company, the original producer

12 and marketer of glyphosate formulations."

13          Do you see that?

14     A.    I do see that.

15     Q.    Okay.  So Chang and Delzell

16 was an Exponent study, a meta-analysis,

17 right?

18     A.    Right.

19          MR. SLONIM:  Are you going

20     to ask him to read the disclosure

21     statement?

22          MR. KRISTAL:  We can read

23     the disclosure statement too.  I'm

24     not trying to hide anything.

Michael L. Grossbard, M.D.

1          Where are you?  What statement

2          would you like him to read?

3                MR. SLONIM:  Page 424,

4          bottom line.

5  BY MR. KRISTAL:

6          Q.    "The sponsors were provided

7  the opportunity to review the manuscript

8  prior to journal submission, but

9  inclusion of their suggestions was left

10  to the discretion of the authors, who

11  retained sole control of the manuscript

12  content and findings.  Statements in this

13  paper are those of the authors and not

14  those of the authors' employer or the

15  sponsors.  The authors are employed by

16  Exponent, a scientific research and

17  consulting firm that provides services

18  for private and governmental clients,

19  including on projects concerning

20  glyphosate and other pesticides.

21               "In the past five years,

22  Ellen Chang has provided consulting

23  services through Exponent on behalf of

24  Monsanto Company on other issues, and she

Michael L. Grossbard, M.D.

1    has also provided consulting services on

2    other pesticides and lymphohematopoietic

3    cancers for other clients."

4            Did I read that correctly?

5        A.    You did.

6        Q.    Okay.  Now, do you have an

7    issue with the meta-analysis that have

8    been done on glyphosate?

9        A.    I think all of them are

10   flawed to some degree just by the nature

11   of meta-analyses.

12       Q.    Okay.  So are they flawed by

13   the nature of meta-analyses to the extent

14   that every other meta-analysis is

15   similarly flawed?

16       A.    Yes.

17       Q.    Okay.  But you're not saying

18   that the meta-analyses should not have

19   been done in the first place for some

20   reason?

21       A.    No, I am not.

22       Q.    Okay.  Obviously, because

23   Monsanto themselves paid for and reviewed

24   and commented on one, correct?

Michael L. Grossbard, M.D.

1          MR. SLONIM:  Objection.

2          THE WITNESS:  My opinions --

3      my opinions are unrelated to

4      whether Monsanto paid for them or

5      not.

6  BY MR. KRISTAL:

7      Q.    But my point is, a

8  meta-analysis done in this case were

9  appropriate to do?

10      A.    Sure.  When you have a

11  number of small studies, and then one

12  significantly larger study, you would

13  like to try and pool data, as you said

14  to -- and as I would say, to increase the

15  power of the assessment.

16      Q.    The next page, "Publication

17  on animal carcinogenicity data."

18          MR. SLONIM:  I'm sorry.

19      You're back on --

20          MR. KRISTAL:  Page 5.

21          MR. SLONIM:  -- Exhibit 10.

22          MR. KRISTAL:  Yes, I'm

23      referring to Exhibit 10.  Thank

24      you.

Michael L. Grossbard, M.D.

1    BY MR. KRISTAL:

2         Q.    Do you see that?

3         A.    I do see that.

4         Q.    Okay.  And here, under

5    project description, they mention, "Greim

6    and one or two other external authors?"

7    Right?

8              MR. SLONIM:  Objection.

9         Objection to form.

10             THE WITNESS:  I do see that.

11   BY MR. KRISTAL:

12        Q.    And under cost, it says,

13   "Majority of writing can be done by

14   Monsanto keeping OS $ down."

15             Correct?

16        A.    What does OS mean?

17             MR. SLONIM:  Objection.

18        Form.

19   BY MR. KRISTAL:

20        Q.    I'm not really allowed to

21   tell you.  But --

22        A.    Oh.

23        Q.    -- the majority of the

24   writing here is being suggested to keep

Michael L. Grossbard, M.D.

1    the costs down, right?

2                    MR. SLONIM:  Objection.

3           Form.  Form.  Foundation.  Draft

4           document.  Unknown authorship.

5           Lacks context.

6                    MR. KRISTAL:  We can speak

7           outside if you want to throw that

8           in.

9                    THE WITNESS:  I don't

10          know -- I mean, look, I -- the

11          statement is there.  I don't know

12          what OS dollars means.  I just

13          don't.

14   BY MR. KRISTAL:

15          Q.    They're talking about

16   keeping whatever OS means dollars down,

17   right?

18                    MR. SLONIM:  Objection.

19          Form.  Foundation.

20                    THE WITNESS:  Yes, they are.

21   BY MR. KRISTAL:

22          Q.    Okay.  And how are they

23   going to do that?

24          A.    One of the ways, if I read

Michael L. Grossbard, M.D.

1    that sentence, is that the majority of

2    writing can be done by Monsanto.

3         Q.    Okay.  On Page 8, the

4    PowerPoint is entitled "Genetox/MOA."

5              Do you see that?

6         A.    I do.

7         Q.    And you're aware MOA is an

8    abbreviation for mechanism of action?

9              MR. SLONIM:  I'm sorry.

10        You're on Page 6?

11             MR. KRISTAL:  Eight.

12             THE WITNESS:  Yes, that's

13        widely accepted.

14   BY MR. KRISTAL:

15        Q.    Okay.  And the first bullet

16   point is, "Counter IARC's" -- bless

17   you -- "claim of strong evidence of DNA

18   damage/oxidative stress."

19             Correct?

20             MR. SLONIM:  Objection.

21        Form.  Foundation.

22             THE WITNESS:  Correct as to

23        whether it says that, yes.

24   BY MR. KRISTAL:

Michael L. Grossbard, M.D.

1      Q.    Right.   Now, it is true that

2   in the glyphosate monograph issued by

3   IARC, they did -- the working group

4   determined that there was strong evidence

5   of DNA damage and oxidative stress from

6   the glyphosate and Roundup studies,

7   correct?

8            MR. SLONIM:   Objection.

9            THE WITNESS:   There are

10       pieces of evidence related to DNA

11       damage and oxidative stress.   I

12       don't remember if they classified

13       it as strong.

14   BY MR. KRISTAL:

15      Q.    Okay.   We'll look at that in

16   a minute or two.

17            Have you ever been asked to

18   participate on an IARC working group

19   panel to evaluate any potential

20   carcinogen?

21      A.    No, I have not.

22      Q.    Do you have a general

23   understanding that the working group

24   chosen by IARC for any particular

Michael L. Grossbard, M.D.

1  evaluation are considered to be experts

2  in their field?

3          MR. SLONIM:  Objection.

4          THE WITNESS:  That's my

5      general understanding, yes.

6  BY MR. KRISTAL:

7      Q.   Okay.  You have no reason to

8  think that that didn't happen with

9  respect to the glyphosate evaluation,

10  correct?

11      A.   I have no judgment

12  whatsoever regarding the people that were

13  on that panel.

14      Q.   Okay.  And Monsanto writes

15  in this PowerPoint, the second bullet

16  point under genetox/mechanism of action,

17  "Could be important for future litigation

18  support."

19          Do you see that?

20          MR. SLONIM:  Objection.

21      Form.  Foundation.

22          THE WITNESS:  I do see that.

23  BY MR. KRISTAL:

24      Q.   So is it clear that Monsanto

Michael L. Grossbard, M.D.

1    was at least concerned about future

2    litigation from IARC's finding?

3                    MR. SLONIM:  Objection.

4         Form.  Foundation.  Calls for

5         speculation.

6                    THE WITNESS:  It appears

7         they were preparing for future

8         litigation.  Whether that's

9         related to IARC's finding or

10        otherwise, I can't say.

11   BY MR. KRISTAL:

12        Q.    Okay.  And indeed you are

13   using Greim in support of Monsanto's

14   litigation position in this case?

15        A.    As one of the pieces of

16   evidence, yes.

17        Q.    And you are using Kier and

18   Kirkland as one of the pieces of evidence

19   in this case?

20        A.    Yes, I am.

21             (Document marked for

22        identification as Exhibit

23        Grossbard-12.)

24   BY MR. KRISTAL:

Michael L. Grossbard, M.D.

1      Q.    I'm going mark as Exhibit 12

2  the document entitled "Monsanto

3  Manuscript Clearance Form, Global

4  Regulatory."  The date is February 29,

5  2012.

6             Do you have that in front of

7  you?

8      A.    I do.

9      Q.    The Monsanto Bates number is

10  MONGLY 02117800.

11             And this Monsanto manuscript

12  clearance form starts out, "Please

13  indicate type of publication."

14             And the box "manuscript" has

15  an X in it, correct?

16      A.    Yes.

17      Q.    The next question, "Has this

18  information been publicly disclosed

19  previously?"  The answer is yes; is it

20  not?

21      A.    Yes, though I'm not sure

22  what information they're --

23      Q.    Well --

24      A.    -- they're asking about.

Michael L. Grossbard, M.D.

1      Q.    Well, I'm going to get to

2  it.

3            And it says, "If yes, where

4  and when?"  And then on the document, it

5  says, "This manuscript reviews glyphosate

6  genotoxicity publications since the

7  Williams, et al., 2000 review."

8            Did I read that correctly?

9            MR. SLONIM:  Objection.

10  Form.  Foundation.

11            THE WITNESS:  You did.

12  BY MR. KRISTAL:

13      Q.    Are you relying on the

14  Williams, Munro, and Kroes article?

15      A.    I don't think I cite that,

16  no.

17      Q.    Okay.  Were you aware that

18  there had been a prior article reviewing

19  the genotoxicity in 2000?

20      A.    I'm not sure.

21      Q.    Okay.  If there was, you

22  haven't read it, the Williams, Munro, and

23  Kroes, K-R-O-E-S?

24      A.    I don't believe so.  I

Michael L. Grossbard, M.D.

1    certainly didn't cite it as something

2    that I relied on.

3          Q.    And you certainly would not

4    know one way or the other whether that

5    was also ghostwritten by Monsanto?

6                MR. SLONIM:  Objection.

7          Form.  Foundation.

8                THE WITNESS:  I would not

9          know.

10   BY MR. KRISTAL:

11         Q.    Okay.  The title of the

12   article, the manuscript that's being

13   referenced here is, "Review of

14   Genotoxicity of Glyphosate and

15   Glyphosate-Based Formulations."

16               Do you see that?

17         A.    I do see that.

18         Q.    And that is the title of the

19   Kier and Kirkland manuscript; is it not?

20   The Kier and Kirkland article.

21         A.    Let me just double-check the

22   exact title.  Give me a second.

23         Q.    Yeah.  I think it was --

24         A.    58.

Michael L. Grossbard, M.D.

1    Q.    -- 58.

2    A.    Okay.  More or less.  And

3  it's "Review of Genotoxicity Studies."

4  It's not the exact same title.  But --

5    Q.    Pretty close?

6    A.    -- it's more or less.

7    Q.    Okay.  And the authors are

8  listed as "David Saltmiras and Larry Kier

9  (consultant)."

10        Correct?

11   A.    That's correct.

12   Q.    And the author handling the

13 correspondence is David Saltmiras,

14 correct?

15   A.    That's correct.

16   Q.    Do you know that David

17 Saltmiras is a Monsanto -- was at the

18 time and still is at the time a Monsanto

19 employee?

20        MR. SLONIM:  Objection.

21  Form.  Foundation.

22        THE WITNESS:  I don't know

23  that.

24 BY MR. KRISTAL:

Michael L. Grossbard, M.D.

1          Q.    Okay.  Under lead author's

2    comments, "This manuscript provide" --

3    "This manuscript provide a comprehensive

4    quality check on the large number of

5    genotoxicity publications on glyphosate

6    since the Williams, et al., 2000

7    glyphosate toxicology review manuscript.

8    This work falls under the scope of the EU

9    glyphosate task force and will be a

10   valuable resource in future product

11   defense claims that Monsanto is mutagenic

12   or genotoxic."

13              Do you see that?

14              MR. SLONIM:  Objection.

15        Form.  Foundation.

16              THE WITNESS:  I do see that.

17   BY MR. KRISTAL:

18        Q.    Okay.  And are you aware

19   that this later became the Kier and

20   Kirkland publication that you're relying

21   on?

22        A.    I am now.  I am now because

23   you're telling me.  Otherwise there's

24   nothing else in this thing that would

Michael L. Grossbard, M.D.

1    tell me that.

2              (Document marked for

3         identification as Exhibit

4         Grossbard-13.)

5    BY MR. KRISTAL:

6         Q.    I'm going to mark -- I'm

7    going to mark as Exhibit 13 another

8    Monsanto document.  This is dated, let's

9    see -- I don't see a date on it.  Authors

10   Larry Kier, David Saltmiras.

11   Affiliations, Larry Kier is listed as a

12   private consultant.  David Saltmiras is

13   just listed as Monsanto Company.

14   Corresponding authors, David Saltmiras.

15              Do you see that?

16              And the title is "Review Of

17   Genotoxicity of Glyphosate and

18   Glyphosate-Based Formulations."

19              Correct?

20        A.    I do see that, yes.

21        Q.    And that's the same title

22   that we just looked at for Kier and

23   Kirkland?

24        A.    It's the same title that we

Michael L. Grossbard, M.D.

1    just looked at on the Monsanto manuscript

2    clearance form.  I think it's slightly

3    different from the -- from the Kier and

4    Kirkland title.

5                 (Document marked for

6          identification as Exhibit

7          Grossbard-14.)

8    BY MR. KRISTAL:

9          Q.    I'm going to mark as

10   Exhibit 14.  Is this the Kier and

11   Kirkland article that you're relying on?

12         A.    Yes, it is.

13         Q.    And if you look, certainly

14   the abstract starts out the same way --

15   not exactly certainly the same.  They

16   both start out, "An earlier review of the

17   toxicity of glyphosate in the original --

18   in the manuscript, it says, "original

19   Roundup formulation," and in the article

20   it says, "Roundup-branded formulation."

21               Right?

22         A.    Okay.

23         Q.    "Concluded that neither

24   glyphosate nor the formulation poses a

Michael L. Grossbard, M.D.

1   risk for the production of

2   hereditable/somatic mutations in humans."

3            Right?

4            MR. SLONIM:  Object to form.

5            THE WITNESS:  Yes, I see

6       that.

7   BY MR. KRISTAL:

8       Q.    So I don't want to go

9   through a line-by-line comparison.  And

10  I'm sure it's not word-by-word the same.

11  But it appears to be at least the -- a

12  draft of the original manuscript that

13  became Kier and Kirkland?

14      A.    I mean the abstract is -- is

15  different.  Some of them -- some of the

16  words are the same.  It's obviously been

17  edited and rewritten since the -- from

18  the one to the other.

19      Q.    And that's why I said it

20  doesn't -- it's not word for word, but it

21  appears to be the same -- at least the

22  beginning of the article that became Kier

23  and Kirkland, right?

24      A.    From the abstract.

Michael L. Grossbard, M.D.

1  Obviously without going through the text,

2  I can't say where the similarities are,

3  and where the similarities are -- or

4  where the differences are.

5       Q.   And if you look at the

6  acknowledgment on Kier and Kirkland.

7  They are acknowledging David Saltmiras

8  for providing regulatory studies and

9  thoughtful review of the manuscript --

10            MR. SLONIM:  Where are you

11       reading -- where are you reading,

12       please?

13            MR. KRISTAL:  310.

14            MR. SLONIM:  310 on the

15       bottom, continuing over to the

16       top?

17            MR. KRISTAL:  Yes, sir.

18            THE WITNESS:  Yes.

19  BY MR. KRISTAL:

20       Q.   Okay.  And did you know that

21  this article had been written for a

22  consortium of pesticide companies that

23  manufactured and used glyphosate-based

24  herbicides, glyphosate task force?

Michael L. Grossbard, M.D.

1    A.    I knew that several

2  companies are cited here as supporting

3  this.  I didn't know it was specifically

4  for them.

5    Q.    Again, you have not read the

6  underlying studies that Kier and Kirkland

7  are reviewing here, so you wouldn't know

8  one way or the other how accurate their

9  review of the findings are, correct?

10    A.    I have only read them in the

11  context -- I haven't read the actual

12  studies.  I've only read summaries in the

13  context of IARC, Health Canada, and other

14  documents, including this one.

15    Q.    Okay.  Did you read the

16  glyphosate IARC manuscript, the

17  monograph?

18    A.    I did.

19    Q.    Fair to say that you have

20  read a very small fraction of the

21  articles that are referenced by IARC in

22  their evaluation?

23            MR. SLONIM:  Objection.

24            THE WITNESS:  I think that's

Michael L. Grossbard, M.D.

1          fair to say.  I don't know very --
2          I've read a fraction.  Whether I
3          call it a very small fraction or
4          fraction is semantics.
5     BY MR. KRISTAL:
6          Q.    Well, you formed an opinion
7     in the Hardeman and Gebeyehou cases in 20
8     -- the fall of 2018, and if I'm recalling
9     correctly, there was about 12 or 15
10    articles that you were relying on in toto
11    for your opinions about glyphosate being
12    carcinogenic or not, right?
13         A.    I can't remember the exact
14    number of references, but you're probably
15    in the ballpark.
16         Q.    Okay.  And one of them had
17    35 references as materials considered.
18    The other had 38, and about half or more
19    related to other risk factors, such as
20    hepatitis C and those kinds of things?
21         A.    Probably.  You've looked at
22    it more recently than I have.
23         Q.    Okay.  Turning pages is a
24    good thing.

Michael L. Grossbard, M.D.

1          A.     Depends how many are left.

2          Q.     That's true.

3          A.     It still is a good thing, I

4     guess.

5                 MR. SLONIM:  At some

6          convenient time, why don't we take

7          a break.

8                 MR. KRISTAL:  Okay.  Yeah.

9                 MR. SLONIM:  Okay.

10                MR. KRISTAL:  Sure.

11                THE VIDEOGRAPHER:  The time

12         right now is 3:12 p.m., and we are

13         off the record.

14                (Short break.)

15                THE VIDEOGRAPHER:  The time

16         right now is 3:23 p.m., and we're

17         back on the record.

18                (Document marked for

19         identification as Exhibit

20         Grossbard-15.)

21    BY MR. KRISTAL:

22         Q.     Marking as Exhibit 15 an

23    article entitled "Differences in the

24    Carcinogenic Evaluation of Glyphosate

Michael L. Grossbard, M.D.

1    Between the International Agency For

2    Research on Cancer (IARC) and the

3    European Food Safety Authority (EFSA)."

4              Have you seen this article

5    before?

6         A.   I don't think so.

7         Q.   How did you go about

8    obtaining the articles that are on your

9    materials considered list?

10        A.   I did a PubMed search

11   looking at glyphosate and lymphoma.  I

12   read the IARC report.  I pulled

13   references.  I found a number of review

14   articles in the course of time or

15   meta-analysis and pulled those original

16   manuscripts.

17             Those would be some of the

18   ways.

19        Q.   This article didn't come up

20   in your search?

21        A.   It may or may not have come

22   up in my search.  I may have not looked

23   at it.

24        Q.   Okay.  And this is dated

Michael L. Grossbard, M.D.

1    August 2016, is it not, down at the

2    bottom?

3              A.    Yes, it is.

4              Q.    Published in the British

5    Medical Journal -- I'm sorry.  Journal of

6    Epidemiology and Community Health?

7              A.    Yes.

8              Q.    I guess that's owned by the

9    British Medical Journal.

10             And there are 94 authors,

11   are there not?

12             A.    You know, I'm going to take

13   your word on that one.

14             Q.    Well, you can see because of

15   the --

16             A.    Oh.

17             Q.    -- because of the footnotes.

18   They give all the affiliations, so the

19   last one is Number 94?

20             A.    Either you're smarter than I

21   am or I'm tired or one or the other.  But

22   yes, 94.

23             Q.    You have to understand

24   something.  I've been looking at these

Michael L. Grossbard, M.D.

1  documents longer than you.  It took me a

2  while to figure that out.  The first time

3  I saw this I was literally --

4        A.    Well, I've read plenty of

5  scientific papers over time, so I

6  wouldn't know the number of authors by

7  that special technique that you've

8  developed.

9        Q.    Could you take a look -- I

10 realize that you haven't read this.  Do

11 you know any of these authors?  And I

12 just want to point out, for example,

13 someone who is a professor at the Icahn

14 School of Medicine at Mount Sinai,

15 Phillip Landrigan, Number 46.

16       A.    I know the name.

17       Q.    Do you know Dr. Landrigan?

18       A.    I know the name.  I don't

19 know him personally.  I spent one

20 miserable year there.

21       Q.    Ah.

22       A.    I've met Dr. Weisenburger in

23 the past.

24       Q.    Okay.  He's a respected

1    cancer researcher, is he not?

2              MR. SLONIM:  Objection.

3              THE WITNESS:  I think so,

4        yes.

5    BY MR. KRISTAL:

6        Q.    And in the middle of the

7    page, Hardell, Lennart Hardell is listed.

8        A.    Well, I know --

9        Q.    You've got several of his

10   articles, epidemiological studies.

11       A.    Correct.  I know the name

12   from that.  I'm sure I've seen some of

13   these names as authors in publications

14   before, but I don't know any of them.

15       Q.    Okay.  And without reading

16   the entire article, if we turn to the

17   summary page.

18       A.    Okay.

19       Q.    Under the summary, WG stands

20   for working group?

21       A.    Yes.  That's what I was

22   flipping to look at.  But yes, I see

23   that.

24       Q.    So I just want to be able to

Michael L. Grossbard, M.D.

1    say it in language.  "The IARC working

2    group concluded that glyphosate is a

3    probable human carcinogen, putting it

4    into IARC Category 2A due to sufficient

5    evidence of carcinogenicity in animals,

6    limited evidence of carcinogenicity in

7    humans, and strong evidence for two

8    carcinogenic mechanisms."

9              Do you see that?

10        A.    I do see that.

11        Q.    So, and that is sort of

12   touching on the three areas that you say

13   are at least in large part what someone

14   evaluating the evidence for

15   carcinogenicity should be looking at,

16   right?  Epidemiology, animal studies, and

17   carcinogenic mechanistic studies?

18        A.    Correct.

19        Q.    Do you agree or disagree

20   that there's strong evidence for

21   carcinogenic mechanisms of glyphosate?

22        A.    I don't think the evidence

23   is strong, no.

24        Q.    Okay.  How would you

Michael L. Grossbard, M.D.

1  categorize that evidence on just the

2  genotoxicity mechanism?

3       A.   So genotoxicity basically

4  largely from animal studies and from

5  bacterial studies, mostly rodent studies,

6  I would consider it to be relatively weak

7  evidence, and weak evidence particularly

8  with respect to lymphoma.

9       Q.   So you obviously disagree

10 with IARC on that evaluation?

11      A.   I do.

12      Q.   And you agree that the

13 epidemiology under IARC's definition of

14 limited evidence is what you would

15 consider limited evidence?

16           MR. SLONIM:   Object.

17 BY MR. KRISTAL:

18      Q.   That there's an association

19 but they could not rule out bias or

20 confounding, chance?

21      A.   I'm not sure about the

22 strength of the association even.

23      Q.   Okay.  These authors

24 conclude, if you look at the right-hand

Michael L. Grossbard, M.D.

1  column under that little arrow bullet

2  point, "The most appropriate and

3  scientifically based evaluation of the

4  cancers reported in humans and laboratory

5  animals as well as supportive mechanistic

6  data is that glyphosate is a probable

7  human carcinogen."

8          Do you disagree with these

9  94 authors?

10      A.   I didn't read the manuscript

11  to know what their criteria are for

12  making that decision.  If their criteria

13  are the same as those of IARC, then I can

14  see why they came to that conclusion.

15      Q.   Okay.  But whatever criteria

16  they used, you disagree with it?

17      A.   I don't believe specifically

18  that glyphosate causes lymphoma -- is a

19  carcinogen-causing lymphoma.

20      Q.   Do you have a different

21  opinion -- strike that.

22          What's the difference

23  between glyphosate and Roundup?

24      A.   Glyphosate is the native --

Michael L. Grossbard, M.D.

1    as I understand it, glyphosate is the

2    native chemical.  Roundup is a

3    formulation of glyphosate that includes

4    surfactant.  And that's the major

5    difference.

6           Q.    What's a surfactant?

7           A.    Surfactant is an agent that

8    helps with absorption of something or

9    helps -- it helps break down barriers

10   that inhibit absorption.  So surfactant

11   is also used in the lung, where it's a

12   lining of the lung, that promotes the

13   most expansion of the lung in babies.

14          Q.    And you are -- are you aware

15   that Monsanto has never tested the

16   formulated product in any long-term

17   chronic carcinogenicity study?

18          A.    Outside of epidemiologic

19   studies where they haven't formally

20   tested but where Roundup has been a

21   product that's used.

22          Q.    Right.  I'm not talking

23   about the epidemiologic --

24          A.    So you mean -- you mean --

Michael L. Grossbard, M.D.

1  you're talking about Roundup itself as a

2  product in mice as opposed to glyphosate?

3  Is that --

4       Q.    Mice or any other rodent.

5       A.    Or any other species?

6       Q.    Exactly.

7       A.    I haven't seen any such

8  studies, correct.

9       Q.    Okay.  And you're aware that

10  Monsanto has never conducted any

11  epidemiological study on its workers that

12  were manufacturing glyphosate?

13       A.    I don't know the answer to

14  that question, but not to my knowledge is

15  there such a study.

16       Q.    Okay.  Certainly if there

17  was a study, you probably would have

18  stumbled about upon it in your search,

19  right?

20            MR. SLONIM:  Objection.

21            THE WITNESS:  I might have

22       stumbled.

23  BY MR. KRISTAL:

24       Q.    Okay.  Shouldn't a

Michael L. Grossbard, M.D.

1    manufacturer, certainly if there is a

2    question that a substance that they

3    manufacture is carcinogenic at least do a

4    study on their own workers who are

5    manufacturing the product?

6                    MR. SLONIM:  Objection.

7           Form.  Foundation.  Calls for

8           speculation.

9                    THE WITNESS:  I don't know

10          the answer to that question,

11          because I don't know what

12          companies do in that setting.  I

13          don't know if that's a standard of

14          management for a company or not.

15   BY MR. KRISTAL:

16          Q.    Okay.  Are you aware of the

17   pesticide industry voluntary code of

18   conduct?

19          A.    I am not.

20          Q.    Okay.  You have testified,

21   though, in the past in some of your other

22   litigations on whether or not certain

23   conduct met or didn't meet certain

24   standards of care in the context of

Michael L. Grossbard, M.D.

1   medical malpractice cases?

2                    MR. SLONIM:   Objection.

3          Form.   Foundation.

4                    THE WITNESS:   That would

5          be -- that would be true, yes.

6   BY MR. KRISTAL:

7          Q.    Yeah.   And that's a --

8   strike that.

9                    What method -- did you --

10  I'm trying to find out the methodology

11  that you use when you're looking at a

12  standard of care and you're looking at

13  conduct.   Is it really just comparing and

14  contrasting and using your expert opinion

15  and analysis as to whether that conduct

16  fell below or above the standard of care?

17                   MR. SLONIM:   Objection.

18         Form.   Foundation.   Malpractice

19         cases have nothing to do with

20         this.   This is a doctor who is

21         offering his scientific opinion

22         and medical opinion regarding

23         glyphosate and the particular

24         plaintiff.

Michael L. Grossbard, M.D.

1                He's not offering any

2        opinions about malpractice, not

3        offering any opinions about

4        company conduct.  Completely

5        beyond the scope of his expert

6        opinion.

7                THE WITNESS:  The vast

8        majority of the malpractice work

9        that I do does not really relate

10       to standard of care.  It relates

11       more to the causation issue.

12    BY MR. KRISTAL:

13       Q.    Okay.  But the ones that did

14    relate to standard of care, it's a

15    compare and contrast?

16       A.    I used --

17                MR. SLONIM:  Objection to

18        form.

19                THE WITNESS:  I --

20                MR. SLONIM:  Foundation.

21        Relevance.

22                THE WITNESS:  I use my many

23        years of experience in the field,

24        and my knowledge of what's --

Michael L. Grossbard, M.D.

1          standard of care really is defined

2          of what the majority of people in

3          a given community do in terms of

4          that particular problem.

5               So, yes, I use my experience

6          and knowledge of others in the

7          community to make that judgment.

8    BY MR. KRISTAL:

9          Q.    And that's certainly

10   reasonable?

11         A.    I think it is.

12              MR. SLONIM:  Objection.

13         Form.  Foundation.  Relevance.

14              (Document marked for

15         identification as Exhibit

16         Grossbard-16.)

17   BY MR. KRISTAL:

18         Q.    Let me mark as Exhibit 16.

19   Have you come across this article?  "How

20   did the U.S., EPA and IARC reach

21   diametrically opposed conclusions on the

22   genotoxicity on glyphosate-based

23   herbicides?"

24              Have you seen this one?  It

Michael L. Grossbard, M.D.

1    was published in the --

2         A.    Yeah.

3         Q.    -- Journal of Environmental

4    Sciences Europe in 2019, by Charles M.

5    Benbrook?

6         A.    It's not listed in my

7    materials considered.  My recollection is

8    I saw this online somewhere.

9              But I haven't looked at it

10   recently.

11        Q.    And that's -- did you ever

12   think to do that yourself?  In other

13   words, how could these two bodies reach

14   different conclusions?  Why did they

15   reach different conclusions?

16        A.    Sure, not just those two

17   bodies.

18        Q.    Right.

19        A.    But other bodies.

20        Q.    Right.

21        A.    Yes.

22        Q.    Did you go through that

23   exercise to analyze what they were relied

24   on and what they did rely on?

Michael L. Grossbard, M.D.

1          A.    So not in a formal way, but

2    yes, in a partial way.  That is, I looked

3    at the animal -- particularly with

4    respect to Health Canada, not so much

5    with respect to the EPA.  I looked on the

6    animal studies they relied on.  I looked

7    at the literature they relied on.  And

8    there were some differences.

9          Q.    Why Health Canada?  What

10   what's that got to do with -- why did you

11   choose Health Canada as the one which --

12         A.    No particular reason.

13         Q.    Eh?  I was doing a Canadian

14   accent?  So --

15         A.    Very poorly.

16         Q.    Admittedly so.

17               MR. DIAMOND:  I got it.

18               THE WITNESS:  Yeah, I

19   didn't.  And I'm not that slow.

20   BY MR. KRISTAL:

21         Q.    It's late.

22         A.    There was, again, in

23   searching sort of Google, PubMed, I came

24   up with that.

Michael L. Grossbard, M.D.

1        Q.    If you look here in the

2   abstract -- and obviously you can read

3   whatever portion of the article you want.

4   Under conclusions, the article says, "EPA

5   and IARC reached diametrically opposed

6   conclusions on glyphosate genotoxicity

7   for three primary reasons.

8                "One, in the core tables

9   compiled by EPA and IARC, the EPA relied

10  mostly on registrant-commissioned

11  unpublished regulatory studies, 99

12  percent of which were negative, while

13  IARC relied mostly on peer-reviewed

14  studies of which 70 percent were

15  positive."

16               Do you see that?

17       A.    I do see that.

18       Q.    Okay.  And have you done

19  that level of analysis?

20       A.    I have not gone through the

21  118 papers or whatever to see how they

22  differed, positive, negative.

23       Q.    But that's a significant

24  difference, correct?  You understand that

Michael L. Grossbard, M.D.

1    registrant-commissioned studies to be the

2    folks that are manufacturing and selling

3    glyphosate-based herbicides?

4         A.    I assumed that was the case,

5    so...

6         Q.    Okay.  Do you think that's

7    significant that 99 percent of their

8    studies were negative while the published

9    literature, 70 percent were positive?

10        A.    Again, I don't know what

11   their interpretation of positive is.  So

12   I don't know whether it's statistically

13   significantly positive, whether there's

14   just some association.  I can't interpret

15   that independently.

16        Q.    Okay.  The second reason

17   here in the abstract, "EPA's evaluation

18   was largely based on data from studies on

19   technical glyphosate, whereas IARC's

20   review placed heavy weight on the results

21   of formulated glyphosate-based herbicides

22   and AMPA assays."

23             Do you see that?

24        A.    Yes, although I'm not sure

Michael L. Grossbard, M.D.

1    that I know what AMPA assays is.

2          Q.    Okay.  Do you know what AMPA

3    is?

4          A.    No.

5          Q.    Aminomethylphosphonic acid.

6                MR. SLONIM:  Objection.

7    BY MR. KRISTAL:

8          Q.    Do you know what that is in

9    the context of this litigation?

10               MR. SLONIM:  Objection.

11               THE WITNESS:  I don't want

12         to --

13   BY MR. KRISTAL:

14         Q.    No, no that's okay.

15         A.    No.  I mean --

16         Q.    I'm not trying to embarrass

17   you.

18         A.    Oh, no, you're not going to

19   embarrass me with that.

20         Q.    It's a metabolite of

21   glyphosate.

22         A.    I -- I just -- yeah, I've

23   seen it.  I just can't quote you an

24   answer.

Michael L. Grossbard, M.D.

1        Q.    But in the realm of

2    determining carcinogenicity for humans,

3    one should look at whether or not a

4    metabolite of the parent compound can

5    also cause genetic damages, correct, as

6    part of the inquiry?

7        A.    That would usually be

8    incorporated into the study, because it's

9    hard to distinguish between the agent

10   itself and the metabolite as to what

11   causes it in most of your animal studies.

12       Q.    But if you can distinguish,

13   you can look at both, right, the parent

14   compound and the metabolite?

15       A.    If you could distinct them,

16   you could, yes.

17       Q.    And the third reason, in the

18   article here in the abstract, "EPA's

19   evaluation was focused on typical general

20   population dietary exposures, assuming

21   legal food crop uses, and did not take

22   into account nor address generally higher

23   occupational exposures and risks.  IARC's

24   assessment encompassed data from typical

Michael L. Grossbard, M.D.

1    dietary, occupational, and elevated

2    exposure scenarios."

3                    Do you agree with that?

4           A.    I can't say exactly what the

5    EPA looked at.  But IARC certainly looked

6    at occupational studies that were done.

7           Q.    And occupational studies of

8    individuals who were applying Roundup?

9           A.    Yes.  Sorry.  I could have

10   clarified that.

11          Q.    And EPA placed much less

12   weight on those studies?

13                  MR. SLONIM:  Objection.

14                  THE WITNESS:  That's what

15          these authors say.

16   BY MR. KRISTAL:

17          Q.    Is that your --

18          A.    I don't --

19          Q.    You don't know one way --

20          A.    I don't have an

21   understanding.

22          Q.    Okay.  How about Health

23   Canada?

24          A.    How about Health --

Michael L. Grossbard, M.D.

1          Q.    They placed -- they placed

2     less weight on those studies as well, the

3     studies of folks actually using Roundup?

4               MR. SLONIM:  Is that a

5          question?

6               MR. KRISTAL:  Yes.

7               THE WITNESS:  I don't know

8          that that's true, no.

9     BY MR. KRISTAL:

10         Q.    One way or the other?

11         A.    Correct.

12         Q.    Okay.  Have you seen the

13    IARC update, so to speak, on the

14    evaluation of glyphosate?

15              (Document marked for

16         identification as Exhibit

17         Grossbard-17.)

18    BY MR. KRISTAL:

19         Q.    This is a portion of a much

20    larger document that -- and the portion

21    that I've selected is the portion on

22    glyphosate.

23              This is marked as

24    Exhibit 17.  "The International Agency

Michael L. Grossbard, M.D.

1    for Research on Cancer report of the

2    advisory group to recommend priorities

3    for the IARC monographs during 2020 to

4    2024."

5         A.    I don't believe I've seen

6    this.

7         Q.    Okay.  And if you turn to --

8    not the 103rd page of this document, but

9    in the original document, 103 is the

10   glyphosate section.

11        A.    You know, I don't have 103.

12   I've got 102 and 104.

13        Q.    It's not on the back?

14        A.    Truly.

15        Q.    Maybe it's on the back.

16        A.    Oh, maybe it's on the back?

17        Q.    It's two-sided.

18        A.    No, there's nothing on this

19   one.

20        Q.    All right.  Well, we'll have

21   to -- that's weird.  We'll have to

22   substitute.  You can use mine.

23        A.    Okay, sorry.

24        Q.    And if you look at the table

Michael L. Grossbard, M.D.

1    of contents, Page 103, should be --

2            A.    Okay.  Got it.  Following

3    him.

4                  MR. DIAMOND:  Do you want to

5            mark that one if that's the one

6            you're going to use?

7                  MR. KRISTAL:  Yeah, that's a

8            good idea.

9    BY MR. KRISTAL:

10           Q.    Are you aware that

11   periodically IARC, in determining what

12   substances to evaluate in the future,

13   look at substances that they have already

14   evaluated to determine whether continued

15   evaluation is necessary or not?

16           A.    That, I am aware of, yes.

17           Q.    Okay.  And if you turn to

18   the glyphosate section.  It begins on

19   103, but I want to talk to you about the

20   summary paragraph on Page 104.

21           A.    Okay.

22           Q.    If you want to read the

23   whole thing, you can or skim it.

24           A.    Give me two minutes.

Michael L. Grossbard, M.D.

 1          Q.     Yeah.  Take your time.

 2          A.     Okay.

 3          Q.     It's only a page and a half

 4   of glyphosate, and then they go on to the

 5   next substance.  Yes?

 6          A.     Golden seal, yes.

 7          Q.     Right.  Okay.  And I'm not

 8   going to ask you about golden seal.

 9          A.     That would be really

10   wonderful for me.

11          Q.     In the summary paragraph,

12   IARC wrote, in Exhibit 17, "In summary,

13   the advisory group reviewed the evidence

14   published since IARC monographs Volume

15   112 and concluded that the evidence on

16   cancer in humans appears to remain

17   limited.  In addition, no changes

18   anticipated in the conclusions regarding

19   cancer in experiment on animals or

20   mechanistic evidence.  Therefore, a

21   reevaluation would not be warranted

22   within the next five years."

23                 Do you see that?

24          A.     I do see that.

Michael L. Grossbard, M.D.

1    Q.    Were you aware that IARC had

2 reviewed materials relevant to glyphosate

3 being carcinogenic or not, since its

4 evaluation in 2015 and made the

5 determination that I just read, that

6 they're not changing the evaluation or

7 seeking to reevaluate?

8    A.    I can't recall.

9    Q.    You don't recall if you saw

10 this or not?

11    A.    Yeah.

12    Q.    So you may have; you may not

13 have?

14    A.    Correct.

15    Q.    Okay.  It's not on your

16 materials considered list, correct?

17    A.    Yeah.

18    Q.    How did things get on the

19 materials considered list?

20    A.    They were a reference list

21 that I provided.

22    Q.    No, I understand that.

23    A.    Oh, sorry.

24    Q.    In other words, if you saw

Michael L. Grossbard, M.D.

1    this and looked at it, why is it not on

2    your materials considered list?

3           A.    It's a fair question, of

4    course.  And anything that I considered I

5    would have -- would have looked at.

6                 I mean, I don't remember

7    seeing this.  If it's not there and I

8    looked at it, it's because I left it out

9    inadvertently.

10                (Document marked for

11          identification as Exhibit

12          Grossbard-18.)

13   BY MR. KRISTAL:

14          Q.    Got it.  You're familiar

15   with the Zhang, Z-H-A-N-G, et al.,

16   meta-analysis that was published in 2019

17   entitled "Exposure to Glyphosate-Based

18   Herbicides and Risk For Non-Hodgkin

19   Lymphoma:  A Meta-Analysis and Supporting

20   Evidence"?

21          A.    Yes, I am.

22          Q.    And there are five women who

23   are listed as the authors here, five

24   scientists listed as the authors?

Michael L. Grossbard, M.D.

1          A.      Yeah.  I'll take it for your

2     word that the second person is a woman.

3          Q.      Okay.  You're familiar with

4     Emanuela Taioli, the fourth author who is

5     an epidemiologist at Icahn where you

6     worked, Icahn School of Medicine?

7          A.      I'm not -- I don't work

8     there.  I did briefly.

9          Q.      You did.  I know that.

10          A.      Yeah.  I'm very adamant

11     about that issue.

12          Q.      I take it not a good time.

13          A.      Not a good time.

14          Q.      Is that because of new

15     management?  We don't need to --

16               (Document marked for

17               identification as Exhibit

18               Grossbard-19.)

19     BY MR. KRISTAL:

20          Q.      Marking as Exhibit 19 from

21     the Mount Sinai Icahn School of Medicine

22     website, Emanuela Taioli, M.D., Ph.D.'s

23     profile.

24               Do you see that?

Michael L. Grossbard, M.D.

1          A.     Yeah, it looks like she

2     joined in 2015 after I left.

3          Q.     Oh, so it would have been

4     after you --

5          A.     Yeah.

6          Q.     Okay.  But she has a

7     master's of science and a Ph.D. in

8     epidemiology, according to her biography?

9          A.     Yes.

10          Q.     And she also is an M.D. from

11     the University of Milan?

12          A.     Yes.

13          Q.     Okay.  Do you have any

14     advanced degrees in epidemiology?

15          A.     I do not.

16          Q.     And she here, according to

17     this, was the associate director, at the

18     bottom, for population science and

19     co-leader of the cancer prevention and

20     control program.

21               Do you see that?

22          A.     Where is that?  I'm sorry.

23          Q.     Bottom of the first page on

24     to the top --

Michael L. Grossbard, M.D.

1      A.    Oh, associate director.

2 Yeah, okay.  Yes, I see that.

3      Q.    And in the second paragraph

4 on the second page, she was the chief of

5 epidemiology for the Northwell Health

6 System at the Hofstra School of Medicine?

7      A.    Yes.

8      Q.    You have no quarrels with

9 her qualifications as an epidemiologist,

10 I take it?

11      A.    No.

12      Q.    In this study, you're aware

13 that three of the five authors of this

14 document were on the EPA scientific

15 advisory panel for glyphosate?  Are you

16 aware of that?

17      A.    That's my -- that's my

18 recollection, yes.

19      Q.    Have you ever served on the

20 scientific advisory panel for EPA for

21 anything?

22      A.    I have not.

23      Q.    And fair to say that that

24 speaks to the qualifications of these

Michael L. Grossbard, M.D.

1    authors?

2              MR. SLONIM:  Objection.

3              THE WITNESS:  It speaks to

4         the qualifications of the authors,

5         but not necessarily the quality of

6         the publication.

7    BY MR. KRISTAL:

8         Q.    Okay.  If you look at -- I

9    just want to look at the summary table,

10   which is on Page 199 of the article --

11   it's table, oh, no -- yeah, it's Table 7.

12        A.    Okay.

13        Q.    You are aware that there

14   have been four meta-analyses conducted

15   over the last number of years with

16   respect to the epidemiology related to

17   exposure to Roundup, correct?

18        A.    Correct.

19        Q.    And Table 7 in this article

20   lays out the findings of the four

21   meta-analyses along with the findings of

22   the individual studies that were

23   considered, correct?

24        A.    Yes.

Michael L. Grossbard, M.D.

1       Q.    Okay.  And you're familiar

2   with the first meta-analysis was by

3   Schinasi and Leon, S-C-H-I-N-A-S-I, and

4   Leon?

5       A.    That's correct.

6       Q.    And when they did their

7   meta-analysis and they combined results

8   of the prior individual studies, their

9   meta-analysis relative risk was 1.45, and

10   that was statistically significant,

11   correct?

12       A.    Yes, although they were

13   including studies that did not control

14   for other pesticides, among other things

15   they didn't control for, but yes, that's

16   the result of the meta-analysis.

17       Q.    And there are

18   acknowledgments in each of the

19   meta-analysis of the strengths and

20   limitations of their study, right, that's

21   standard protocol?

22       A.    Yes.

23       Q.    And the fact that they

24   didn't control for that doesn't mean that

Michael L. Grossbard, M.D.

1    these results are meaningless, does it?

2         A.    Well, I think they need to

3    be interpreted very cautiously, to say

4    that they show that there is a

5    statistically significant increase in

6    lymphoma upon exposure to glyphosate --

7    or Roundup.

8         Q.    But the -- it was the

9    individual studies, whichever ones did or

10   didn't control for use of other

11   pesticides, that were used in the

12   meta-analysis, correct?

13        A.    Yes.  But combining several

14   bad or flawed studies in a meta-analysis

15   doesn't make your meta-analysis better.

16        Q.    Okay.  You understand the

17   third meta-analysis here, Chang and

18   Delzell, was paid for by Monsanto.  We

19   looked at that earlier, right?

20        A.    Yes.

21        Q.    And so are you saying that

22   going into a meta-analysis of the studies

23   that Monsanto paid for, they knew that

24   the underlying studies were flawed and,

Michael L. Grossbard, M.D.

1    therefore, shouldn't be in the

2    meta-analysis?

3         A.    I'm not saying that.

4         Q.    Okay.  So Monsanto at least

5    felt the underlying studies were

6    sufficient enough to pay somebody to do a

7    meta-analysis, correct?

8              MR. SLONIM:  Objection.

9              THE WITNESS:  Again, I don't

10        know what their rationale is for

11        sponsoring that.  And I would hope

12        that they didn't sponsor it

13        knowing what the outcome was going

14        to be.

15   BY MR. KRISTAL:

16        Q.    Well, they already said in

17   the --

18        A.    Well, that --

19        Q.    -- PowerPoint that the risk

20   was none because they already had done

21   the analysis.

22              MR. SLONIM:  Objection.

23        Objection.  Form.  Foundation.

24   BY MR. KRISTAL:

Michael L. Grossbard, M.D.

1    Q.    That's what it said.

2    A.    That's fine.  That may be --

3          MR. SLONIM:  Objection.

4    Form.  Foundation.  Let me -- let

5    me -- Doctor, you've just got to

6    give me a chance when he asks a

7    question --

8          THE WITNESS:  Sorry.  I

9    apologize.

10         MR. SLONIM:  -- to interpose

11   an objection.

12         Okay.

13         THE WITNESS:  Say the

14   question again, please.

15         (Whereupon, the court

16   reporter read back the requested

17   portion of testimony.)

18         THE WITNESS:  Okay.  Again,

19   I don't know that the risk was

20   none.  I don't know.  I know what

21   you gave me, which was an internal

22   document by I don't know who,

23   whether it was a scientist,

24   whether it was a marketing person,

Michael L. Grossbard, M.D.

1          whether -- I don't know who wrote

2          that honestly.  You may not even

3          know who wrote that.

4     BY MR. KRISTAL:

5          Q.    Well --

6          A.    But that said, I can only

7     take it for what it's worth.  I would

8     hope that the science was there.  The

9     authors, as we said, declared what their

10    conflict was, declared where the funding

11    was, and this was the result they had.

12         Q.    My point was, though, if

13    Monsanto thought that the underlying

14    studies was so significantly flawed that

15    you could not rely on the results of a

16    meta-analysis, they could have decided

17    not to do a meta-analysis, correct?

18              MR. SLONIM:  Objection.

19         Form.  Calls for speculation.

20         Lack of foundation.

21    BY MR. KRISTAL:

22         Q.    They didn't have to -- they

23    didn't have to fund the study, did they?

24              MR. SLONIM:  Objection.

Michael L. Grossbard, M.D.

1          Form.  Foundation.  Calls for

2          speculation.

3                THE WITNESS:  I can't answer

4          the rationale for that, one way or

5          the other.

6    BY MR. KRISTAL:

7          Q.    Right.  You would agree that

8    nobody forced Monsanto to pay somebody

9    money to do a meta-analysis on Roundup?

10          A.    I would think that would be

11   unlikely.

12          Q.    Okay.  If we look at the

13   Chang and Delzell, even the Monsanto

14   study shows a meta-relative risk of 1.27

15   that's statistically significant,

16   correct?

17          A.    Correct.

18          Q.    All right.  And you know

19   that IARC itself did its own

20   meta-analysis during its evaluation,

21   correct?

22          A.    Correct.

23          Q.    And when IARC did its

24   meta-analysis, it came up with a relative

Michael L. Grossbard, M.D.

1    risk of 1.30 that was also statistically

2    significant, correct?

3            A.    As is published here, yes.

4            Q.    Well, you're not arguing

5    that these numbers are not accurate, are

6    you?

7            A.    No.

8            Q.    Okay.  And under the current

9    meta-analysis in the Zhang study, they

10   did two analyses, one using the

11   Agricultural Health Study from 2005 and

12   the other meta-analysis using the

13   agricultural health study from 2018,

14   correct?

15           MR. SLONIM:  Objection.

16      Form.  Foundation.

17           THE WITNESS:  Yes.

18   BY MR. KRISTAL:

19           Q.    And in essence, the results

20   were not identical, but pretty darn

21   close, right?

22           MR. SLONIM:  Objection.

23   BY MR. KRISTAL:

24           Q.    Whichever -- whether you use

Michael L. Grossbard, M.D.

1    the earlier Agricultural Health Study or

2    the later Agricultural Health Study, in

3    the meta-analysis, the meta-relative risk

4    was pretty close?

5            MR. SLONIM:  Objection.

6        Misrepresents the data.

7            THE WITNESS:  Well, they

8        only used half of the data from

9        the AHS 2018 study.

10   BY MR. KRISTAL:

11       Q.   Well, because they

12   specifically, a priori, stated that they

13   were looking at the higher exposure

14   groups, correct?

15       A.   That's correct.

16       Q.   Okay.  And that is something

17   that is proper epidemiologically because

18   if there is a risk, you would expect to

19   find it in the higher exposed groups,

20   correct?

21           MR. SLONIM:  Objection.

22       Form.  Foundation.

23           THE WITNESS:  As well as the

24       lower exposed groups.

Michael L. Grossbard, M.D.

1  BY MR. KRISTAL:

2       Q.    Well, not necessarily, it

3  depends on the exposure, right?

4       A.    It depends on a lot of

5  factors for both groups.  But --

6       Q.    All right.  And in the --

7  I'm sorry.  Go ahead.

8       A.    But I can't intellectually

9  get my hand -- hand or something.  Head?

10 Some part of my body.  I can't

11 intellectually get some part of my body

12 around the fact that you take a much

13 larger study, a study that in terms of

14 number of entrants, participants, dwarfs

15 any of the other studies done by nearly

16 an order of magnitude, and yet you come

17 out with -- and a study that that in and

18 of itself was a negative study.  It did

19 not show -- the AHS 2018 report, it did

20 not show any statistically significantly

21 increased risk of lymphoma.

22          And yet you put that into

23 the mix, and you find even a higher

24 relative risk than you had before.  That

Michael L. Grossbard, M.D.

1    doesn't -- that doesn't make intellectual

2    sense.

3           Q.    Now, you would agree that

4    the folks that were enrolled in the

5    Agricultural Health Study were licensed

6    pesticide applicators, correct?

7           A.    I would agree with that.

8           Q.    And you agree with respect

9    to a modifiable risk factor involving a

10   pesticide, that one can reduce their risk

11   by wearing certain -- what's called PPE,

12   personal protective equipment, correct?

13          A.    Most likely that's correct,

14   yes.

15          Q.    And are you aware that

16   licensed applicators are trained on what

17   personal protective equipment to use,

18   correct?

19          A.    To variable degrees, yes.

20          Q.    So in a study looking at a

21   population that is trained on how to

22   reduce their exposures, you would expect

23   there to be lower relative risks?

24                MR. SLONIM:  Objection.

Michael L. Grossbard, M.D.

1              Form.  Foundation.

2              Mischaracterizes the study.

3                   THE WITNESS:  Potentially.

4              So I don't recall -- and I'm happy

5              to look at the study specifically.

6              I don't recall a reference to the

7              use of PPE within that group of

8              people and the percent that used

9              it.

10     BY MR. KRISTAL:

11          Q.    Okay.  The Zhang

12     meta-analysis found a relative risk of

13     1.45 statistically significant for the --

14     using the Agricultural Health Study from

15     2005, correct?

16          A.    That is correct.

17          Q.    And when they used the

18     Agricultural Health Study in 2008, the

19     relative risk was 1.41, also

20     statistically significant, correct?

21                   MR. SLONIM:  Objection.  The

22              question mischaracterizes what was

23              used.

24                   THE WITNESS:  That's true,

Michael L. Grossbard, M.D.

1          yes.  Again, with the caveat that

2          they used only about half of the

3          participants in that study.

4    BY MR. KRISTAL:

5          Q.    And the authors who were on

6    the scientific advisory panel with

7    respect to glyphosate for EPA then also

8    go into a consideration of the mechanism

9    as well as the animal study evidence,

10   correct?

11         A.    Some selected animal study

12   evidence, but yes.

13         Q.    Well, you had less than

14   selected animal studies, right, because

15   you didn't read any of the underlying

16   studies, right?  You read what somebody

17   else wrote about those studies?

18              MR. SLONIM:  Objection.

19              THE WITNESS:  I wouldn't say

20         that I had less than that, no.

21   BY MR. KRISTAL:

22         Q.    Well, you didn't read any of

23   the underlying animal studies, correct?

24         A.    No, but I looked at the

Michael L. Grossbard, M.D.

1   summary data from all of them, which is

2   more than what I can say they do in this

3   paper.

4          Q.     Right.   But my point is, you

5   were looking at what somebody wrote about

6   the animal studies, not what the authors

7   of the original animal studies wrote?

8          A.     As these people are.

9          Q.     Okay.   So again, just a

10  reasonable disagreement among scientists?

11                MR. SLONIM:   Objection.

12                THE WITNESS:   No.   No.   They

13         left out -- they left out any rat

14         data, if I remember correctly.

15         There's no -- they have animal

16         data, but leave out all the rat

17         studies.

18  BY MR. KRISTAL:

19         Q.     Was this peer reviewed?

20         A.     It probably was.   Everything

21  that's peer-reviewed isn't great.

22         Q.     And the final conclusion

23  was, if you turn to Page 204, "The

24  overall evidence from human, animal, and

Michael L. Grossbard, M.D.

1   mechanistic studies presented here

2   supports a compelling link between

3   exposures to glyphosate-based herbicides

4   and increased risk for NHL."

5            You disagree with that?

6       A.    I do.

7       Q.    Have you ever written a

8   letter to the editor or commentary

9   expressing your disagreement with an

10  article or disagreement with the

11  methodology of an article?

12      A.    Any article?

13      Q.    Yeah, any article.  I can

14  show you a couple if you don't remember.

15      A.    Okay.  Go ahead.  I mean, I

16  was going to say I have, and I don't know

17  if they were published.

18      Q.    Well, let me finish this,

19  and I'll come back to that.

20            I do -- well, it's probably

21  in my not likely to be used category, but

22  I'll get there.  Remind me.

23      A.    Why would I do that?

24      Q.    In any event, there is a

Michael L. Grossbard, M.D.

1    mechanism, whether you have personally

2    used it or not, to comment and criticize,

3    in the scientific debate, an article that

4    you viewed as flawed?

5         A.    Yes, there is.

6         Q.    Okay.  And you have not done

7    that with respect to this article?

8         A.    I have not.

9         Q.    Do you have any plans to do

10   that?

11        A.    I don't.

12              (Document marked for

13        identification as Exhibit

14        Grossbard-20.)

15   BY MR. KRISTAL:

16        Q.    I want to show you something

17   from the web from the Icahn School of

18   Medicine at Mount Sinai, entitled

19   "Glyphosate."

20              Have you seen this before?

21        A.    No, I have not.

22        Q.    Why don't you take a minute

23   to take a look at it.

24        A.    Okay.

Michael L. Grossbard, M.D.

1          Q.     And here, the Mount Sinai
2    School of Medicine states on this
3    glyphosate sheet, quote, "How are we
4    exposed to glyphosate?  Glyphosate is
5    often applied to lawns and gardens and
6    can contaminate plants, soil, air and
7    food.  Glyphosate can be inhaled or
8    ingested."
9               Do you agree with that?
10         A.     Sure, I do.
11         Q.     "Glyphosate used on lawns
12   and in parks can be tracked into homes on
13   shoes or strollers that have had contact
14   with glyphosate treated surfaces.
15   Residues of glyphosate are detected on
16   some produce as well as in processed
17   foods."
18              Do you agree with that?
19         A.     Second statement, I know is
20   true.  The first statement I have no
21   reason to argue with.
22         Q.     Okay.  "What are the health
23   effects of glyphosate?  Children and
24   fetuses are most vulnerable to pesticide

Michael L. Grossbard, M.D.

1    exposure due to their developing organ

2    systems and differences in the way they

3    metabolize toxins.  In addition,

4    developmentally normal hand-to-mouth

5    behavior, close proximity to the ground

6    where pesticides settle, and high

7    respiratory rates result in higher

8    exposures in children compared with

9    adults."

10            Do you agree with that?

11       A.    That may well be true.

12       Q.    "Cancer.  Glyphosate is

13   classified by the World Health

14   Organization's International Agency for

15   Research on Cancer as probably

16   carcinogenic to humans, based on strong

17   evidence that it causes cancer in

18   laboratory animals, and some evidence

19   that it increases cancer risk in humans."

20            And you agree that's whether

21   IARC says, but you disagree with that?

22       A.    I think that's a correct

23   statement.

24       Q.    Okay.  This also lists under

Michael L. Grossbard, M.D.

1   health effects of glyphosate, there's a

2   section on hormone disruption.

3                  Do you see that?

4        A.    I do.

5        Q.    Have you evaluated that

6   literature?

7        A.    Not really, no.

8        Q.    Birth defects is listed

9   here.  Have you evaluated that

10  literature?

11       A.    None of the primary

12  literature, no.

13       Q.    Nervous system toxicity,

14  have you evaluated that literature?

15       A.    I haven't evaluated the

16  primary literature, no.

17       Q.    Antibiotic resistance, have

18  you evaluated that literature?

19       A.    I have not.

20       Q.    If an individual is being

21  treated with antibiotics for Helicobacter

22  pylori, and glyphosate can lead to

23  antibiotic resistance, does that have an

24  effect on the risk of NHL for that

Michael L. Grossbard, M.D.

1    particular person?

2                MR. SLONIM:  Objection.

3          Foundation.  Calls for

4          speculation.

5                THE WITNESS:  No, it would

6          not.

7    BY MR. KRISTAL:

8          Q.    "How can I reduce my

9    exposure to" --

10         A.    Can I -- can I -- I'm sorry.

11   Can I just clarify that?  You said

12   whether there's risk of NHL -- developing

13   NHL as opposed to the -- as opposed to

14   the outcome of treatment?

15               In other words, if it's

16   causing antibiotic resistance, that's

17   talking about the treatment.

18               You were asking if it has --

19   so I should have clarified the question

20   before I answered.

21         Q.    So let me -- let me -- no,

22   no, that's a good point.  And based on my

23   question, I appreciate the answer.

24               Let me be more specific

Michael L. Grossbard, M.D.

1  because that's not quite what I was

2  asking you.

3              If it has antibiotic

4  resistance property, it would, you would

5  agree, affect the treatment for the H.

6  pylori, if it did?

7              MR. SLONIM:  Objection.

8         Lack of foundation.  Calls for

9         speculation.

10             THE WITNESS:  If it did and

11        if it was a specific antibiotics

12        that we use -- I mean, all

13        mechanisms of resistance --

14  BY MR. KRISTAL:

15        Q.    Right.

16        A.    -- aren't identical.  But it

17  potentially could affect the treatment,

18  yes.

19        Q.    And if it affected the

20  treatment, it could affect whether or not

21  the NHL in that person resolved?

22             MR. SLONIM:  Objection.

23        Lack of foundation.  Calls for

24        speculation.

Michael L. Grossbard, M.D.

1               THE WITNESS:  In theory, it

2          could affect whether it resolved

3          from the antibiotics.  There are

4          other --

5     BY MR. KRISTAL:

6          Q.    That's what I'm talking

7     about.

8          A.    There are other -- there are

9     other treatment methods.

10          Q.    No, no, I appreciate that.

11     I'm just following up on the discussion

12     where you said if H. pylori is

13     successfully treated, you can have an NHL

14     go into remission.

15          A.    Sure.  And I was just

16     clarifying that it's a treatment effect

17     as opposed to risk of developing effect.

18          Q.    No, and that's a good point.

19               "How can I reduce my

20     exposure to glyphosate?  Avoid using weed

21     killers in" -- "weed killers that list

22     glyphosate as the active ingredient."

23     That would be one way to reduce exposure

24     to glyphosate, correct?

Michael L. Grossbard, M.D.

1          A.     It would.

2          Q.     "Leave strollers" -- strike

3    that.

4                 "Leave shoes, strollers and

5    wheeled luggage by the front door" -- "by

6    the door in your home."

7                 That's another way to reduce

8    exposure, correct?

9          A.     In theory, yes.

10         Q.     "Wash your hands before

11   eating and after spending time outdoors."

12                That would be another way to

13   reduce your glyphosate exposure?

14         A.     There's probably many good

15   reasons for doing that, but yes.

16         Q.     "Choose GMO-free foods

17   labeled USDA organic or non-GMO project

18   verified."

19                That's another way to reduce

20   glyphosate exposure?

21         A.     I would assume so, yes.

22         Q.     "Advocate for glyphosate

23   bans in public spaces in your community."

24                That's another way to reduce

Michael L. Grossbard, M.D.

1    exposure to glyphosate?

2              MR. SLONIM:  Objection.

3         Form.  Foundation.

4              THE WITNESS:  Sure.

5    BY MR. KRISTAL:

6         Q.    And "Encourage neighbors to

7    avoid use of glyphosate-containing

8    products" is another way to reduce

9    exposure that the School of Medicine of

10   Mount Sinai has articulated.

11             MR. SLONIM:  Objection.

12   BY MR. KRISTAL:

13        Q.    You would agree with that?

14        A.    Yeah.  And I guess

15   specifically the Institute for Exposomic

16   Research --

17        Q.    Okay.

18        A.    -- which I have no idea what

19   that is.

20        Q.    Okay.  Again, these efforts

21   to reduce exposure to glyphosate go back

22   to the issue of modifiable risk factors

23   if someone is aware that something is a

24   risk factor?

Michael L. Grossbard, M.D.

1              MR. SLONIM:  Objection.

2        Form.

3   BY MR. KRISTAL:

4        Q.    Even though you don't

5   consider --

6        A.    That would be the obvious

7   rationale behind this, yes.

8        Q.    We're making good progress.

9              I'm going to mark as

10  Exhibit 21 today's notice of deposition,

11  which is the invite.

12             (Document marked for

13        identification as Exhibit

14        Grossbard-21.)

15             MR. KRISTAL:  I'm going to

16        mark the documents that counsel

17        had provided earlier.

18             MR. SLONIM:  Counsel?

19             MR. KRISTAL:  Yes.

20             MR. SLONIM:  If you would,

21        could I ask you to mark the

22        responses and objections that we

23        interposed?

24             MR. KRISTAL:  Sure.  I don't

Michael L. Grossbard, M.D.

1    have copies of those.  I have a

2    single set, and I'll be happy to

3    mark that if you want.

4         MR. SLONIM:  I appreciate

5    it.

6         MR. KRISTAL:  Actually I

7    highlighted mine.  Is yours

8    highlighted?

9         I would mark 22 as

10   Monsanto's responses and

11   objections to the documents

12   requested in the notice of

13   deposition.

14        (Document marked for

15   identification as Exhibit

16   Grossbard-22.)

17        MR. KRISTAL:  I'm going to

18   mark 23 collectively your two

19   invoices, one from October 2nd,

20   2019, and the other one from

21   November 8th, 2019.  I'll do that

22   collectively.

23        (Document marked for

24   identification as Exhibit

Michael L. Grossbard, M.D.

 1          Grossbard-23.)

 2   BY MR. KRISTAL:

 3          Q.    I'm not trying to embarrass

 4   you in any way.  But referenced in the

 5   August 2nd, 2019 invoice is both Saunders

 6   and Sanders.  I'm assuming Saunders is

 7   just a typo?

 8          A.    It's a typo.

 9          Q.    Okay.  There wasn't a third

10   case.

11          A.    No, no, no.

12          Q.    Got it.  Okay.

13          A.    No.

14                MR. SLONIM:  Just to make

15          sure that I gave you the right

16          document --

17                MR. KRISTAL:  I didn't even

18          look at it.  I just marked it.

19                THE WITNESS:  One is --

20          actually it looks like -- well, I

21          can't tell.  You tell me.

22                MR. KRISTAL:  Just take

23          off --

24                MR. SLONIM:  I handed you

Michael L. Grossbard, M.D.

1          the wrong document.

2              MR. KRISTAL:  Take the

3          sticker off 22 and put it on that

4          document, and we're good to go.

5              MR. DIAMOND:  Is 22 as it is

6          now my notice?

7              MR. SLONIM:  No.  22 was the

8          objections that we had interposed,

9          responses and objections in the

10          Sanders case.

11              Here you go.

12              What was 20, by the way?

13              THE WITNESS:  20 was this

14          glyphosate from Mount Sinai.

15              MR. SLONIM:  What was 19?

16              THE WITNESS:  19 was the

17          picture of Dr. Taioli with the

18          biography.

19              MR. SLONIM:  19, 20.  Okay.

20          Thank you.

21              THE WITNESS:  Sure.

22      BY MR. KRISTAL:

23          Q.    On November 8, 2019, there's

24      an entry for reviewing Scaggs report.

Michael L. Grossbard, M.D.

1    You have to be a Boz Scaggs fan?  It's

2    Staggs, right?  That's another typo?

3            A.    So two things.  Number one,

4    that's a typo.  Number two, I can't stand

5    Boz Scaggs.

6            Q.    I actually like him.

7            A.    You like him.  That does not

8    surprise me.

9            Q.    So for both cases between

10   September 7th and October 23rd --

11           A.    I'm sorry.  I want to

12   clarify one other thing.  Within my

13   report, I actually also have a little

14   typo.  Every time I mentioned Staggs it

15   says Scaggs.

16           Q.    Ah.

17           A.    So I apologize for that

18   globally.  So it wasn't really a typo.

19   It was a correct assessment based on a

20   typo.

21           Q.    All right.  From

22   September 7, '19 through October 23, '19

23   you spent a total of 34 cases on the two

24   cases?

Michael L. Grossbard, M.D.

1          A.    If that's what it totals to,

2    then yes, that's true.

3               (Document marked for

4          identification as Exhibit

5          Grossbard-24.)

6    BY MR. KRISTAL:

7          Q.    I'm going to mark as

8    Exhibit 24 both the updated testimony

9    list and the updated curriculum vitae.

10              Are there any articles --

11   strike that.

12              From looking at your older

13   curriculum vitae, most of the articles

14   that you've published related to

15   treatment therapies and efficacy around

16   that.  Is that fair to say?

17         A.    I think that's the majority

18   of papers that I published, yes.

19         Q.    Have you written any papers

20   that dealt with assessing the causation

21   of a potential carcinogen?

22         A.    I don't believe so.  I don't

23   think so.

24              THE WITNESS:  Is this

Michael L. Grossbard, M.D.

1    supposed to have the sticker too?

2         MR. KRISTAL:  I just put

3    that together page of one.

4         THE WITNESS:  No?  Okay.

5         MR. KRISTAL:  We can mark it

6    separately.

7         MR. SLONIM:  It might be

8    easier to mark it separately,

9    don't you think?  Just to make it

10   for a cleaner record.

11        MR. KRISTAL:  It's of no

12   moment one way or the other.  So I

13   have no problem marking it

14   separately.

15        (Document marked for

16   identification as Exhibit

17   Grossbard-25.

18        (Whereupon, a discussion was

19   held off the stenographic record.)

20        MR. KRISTAL:  Okay.  So for

21   housekeeping purposes, Exhibit 24

22   is the updated list of testimony

23   and Exhibit 25 is the updated

24   curriculum vitae.

Michael L. Grossbard, M.D.

1    BY MR. KRISTAL:

2          Q.    Correct?

3          A.    That's true.

4          Q.    All right.  Mr. Sanders'

5    report.  Exhibit 1, we're closing in on

6    the homestretch.  So we're approaching

7    third and the coach is signaling us home.

8          A.    Is this like the ball is a

9    little over the 50-yard line?

10         Q.    More like the 20 going --

11   we're in the red zone.

12               Okay.  If I am reading this

13   correctly --

14               MR. SLONIM:  What page are

15         you on?

16               MR. KRISTAL:  The page with

17         the conclusions, Page 10.

18   BY MR. KRISTAL:

19         ▮▮▮      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮

▮      ▮▮▮     ▮▮▮▮▮▮▮▮▮▮

▮      ▮▮▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Michael L. Grossbard, M.D.



Michael L. Grossbard, M.D.



Michael L. Grossbard, M.D.



Michael L. Grossbard, M.D.

1

2

3

4

5

6     Q.    Well, and in reality, right?

7     A.    Sure.

8           MR. KRISTAL:  Those are all

9     the questions I have now, subject

10    to some other questions.  But

11    thank you for your time.

12          THE WITNESS:  You're

13    welcome.

14          MR. SLONIM:  Why don't we

15    take a break and let me look at my

16    notes.

17          THE VIDEOGRAPHER:  The time

18    right now is 4:16 p.m., and we're

19    off the record.

20          (Short break.)

21          THE VIDEOGRAPHER:  This

22    marks the beginning of Tape Number

23    4.  The time now is 4:44 p.m., and

24    we're back on the record.

Michael L. Grossbard, M.D.

1                 -  -  -

2              EXAMINATION

3                 -  -  -

4    BY MR. SLONIM:

5         Q.    All right.  Dr. Grossbard,

6    you were asked some questions about

7    Deposition Exhibit Number 9.  Can I ask

8    you to pull that, please?

9         A.    Sure.  Got it.

10        Q.    This is a document that was

11   prepared by the minority staff report of

12   the -- it was prepared for the --

13   entitled the minority staff report.  It

14   was prepared for the members of the

15   Committee on Science, Space and

16   Technology from the House of

17   Representatives in February 2018; is that

18   correct?

19        A.    That is correct.

20        Q.    And you recall you were

21   asked some questions about that?

22        A.    Yes.

23        Q.    And by way of context, and

24   just to set the time frame, do you recall

Michael L. Grossbard, M.D.

1   that the IARC monograph that you were

2   discussing with Mr. Kristal, that was

3   prepared in 2015?

4               MR. KRISTAL:  Objection to

5        form.

6               THE WITNESS:  Correct.

7   BY MR. SLONIM:

8        Q.    So let me rephrase the

9   question.

10              Doctor, do you recall the

11   year that IARC monograph regarding

12   glyphosate was released?

13       A.    2015.

14       Q.    Okay.  And so it's your

15   understanding that this was about two and

16   a half or three years subsequent to the

17   monograph?

18       A.    Yes.

19       Q.    And is it your understanding

20   that after the IARC monograph regarding

21   glyphosate was prepared, that regulatory

22   agencies that had responsibility for the

23   safety of pesticides from around the

24   world re-reviewed the information

Michael L. Grossbard, M.D.

1   regarding possible carcinogenicity and

2   genotoxicity of glyphosate?

3              MR. KRISTAL:  Object to

4        form.

5              THE WITNESS:  Yes.  I

6        believe I said that earlier, but

7        yes.

8   BY MR. SLONIM:

9        Q.    And one of the agencies that

10  took a look at that was Health Canada; is

11  that correct?

12             A.    That is true.

13             MR. KRISTAL:  Objection.

14  BY MR. SLONIM:

15       Q.    In your expert report,

16  Doctor -- well, strike that.

17             In connection with your work

18  in this matter, did you have occasion to

19  review the materials that were prepared

20  by Health Canada regarding their review

21  of the carcinogenicity and genotoxicity

22  of glyphosate?

23       A.    I did and I included it in

24  my report.

Michael L. Grossbard, M.D.

1          Q.    Now, taking a look at

2   Exhibit 9.  And let me ask you to turn

3   please to the first page, the

4   introduction.

5          A.    Yes.

6          Q.    And do you recall that

7   Mr. Kristal actually took the time to

8   read the first full paragraph into the

9   record.  Do you recall that?

10         A.    I do recall that.

11         Q.    Do you see sort of on the

12  bottom of that first paragraph the

13  authors, the authors of this report,

14  state that their report is, "based in no

15  small part on documents that have been

16  made publicly available due to ongoing

17  third-party litigation with Monsanto."

18              Is that your understanding,

19  that this document, which you had not

20  seen before, is based in large measure on

21  documents that were produced in

22  connection with litigation?

23         A.    That's what they say here.

24         Q.    And do you see, they

Michael L. Grossbard, M.D.

1    reference Footnote 1, do they not?

2         A.    Yes, they do.

3         Q.    And Footnote 1 is a

4    reference to something that's called the

5    Monsanto papers; is that correct?

6         A.    It is.

7         Q.    Do you see it's also listed,

8    the name of the plaintiffs' law firm, the

9    Baum Hedlund firm?

10             MR. KRISTAL:  Objection to

11        form.

12             THE WITNESS:  I see that.

13   BY MR. SLONIM:

14        Q.    You understand that Baum

15   Hedlund is one of the plaintiffs' law

16   firms that is bringing actions against

17   Monsanto in regard to glyphosate?

18             MR. KRISTAL:  Objection.

19   BY MR. SLONIM:

20        Q.    Is that your understanding?

21             MR. KRISTAL:  Form.

22             THE WITNESS:  I didn't know

23        the name of that firm prior to

24        today, but that would be my

Michael L. Grossbard, M.D.

1          assumption based on reading this.

2               (Document marked for

3          identification as Exhibit

4          Grossbard-26.)

5     BY MR. SLONIM:

6          Q.    Now, let me mark as

7     Deposition Exhibit Number 26 a document

8     that was issued by Health Canada on

9     January 11th, 2019.

10         A.    Okay.

11         Q.    Now, doctor, you've seen

12    this before, haven't you?

13         A.    Yes, I have.

14         Q.    And the document was dated

15    or issued by Health Canada on January 11,

16    2019; is that correct?

17         A.    That's what it says, yes.

18         Q.    And turning to the first

19    full paragraph --

20              MR. KRISTAL:  Do you have a

21         copy for me?

22              MR. SLONIM:  I'm sorry.  I

23         do not.

24              MR. KRISTAL:  We're at your

Michael L. Grossbard, M.D.

1      firm.  You don't have copies.

2      Okay.  I'll take a look after the

3      doctor --

4              THE WITNESS:  Do you want --

5              MR. KRISTAL:  I'll do it

6      after you're done.  I find that

7      odd.

8  BY MR. SLONIM:

9      Q.    Doctor, they state that

10  Health Canada's primary objective in

11  regulating pesticides is to protect

12  Canadians' health and the environment.

13  Is that your understanding of Health

14  Canada's function?

15              MR. KRISTAL:  Objection to

16      form.

17              THE WITNESS:  That's what

18      they say.

19  BY MR. SLONIM:

20      Q.    In the second paragraph --

21  strike that.

22              What is your understanding

23  of what Health Canada did in 2017 in

24  regard to glyphosate?

Michael L. Grossbard, M.D.

1       A.    They re-reviewed data,
2   re-reviewed animal, genotoxicity data and
3   re-reviewed all of the -- took another
4   look at the data at that point to see
5   whether they were going to be -- to see
6   whether -- to assess the safety of
7   glyphosate.
8       Q.    And Health Canada -- did you
9   read the Health Canada 2017 review?
10      A.    I did.
11      Q.    We're going to mark that in
12  just a minute or two.
13            Now, after Health Canada
14  published its reevaluation decision in
15  2017, did they -- is it your
16  understanding that they received
17  objections that the scientists at Health
18  Canada then considered?
19            MR. KRISTAL:  Objection to
20        form.
21            THE WITNESS:  That is what
22        they said, yes.
23  BY MR. SLONIM:
24      Q.    Okay.  And would you take a

Michael L. Grossbard, M.D.

1    look, please, at the second paragraph and

2    the second sentence.  I'll read it.

3              It states, and I quote,

4    "There have also been concerns raised

5    publicly about the validity of some of

6    the science around glyphosate in what's

7    being referred to as the Monsanto

8    papers."

9              Did I read that correctly?

10   A.    You did.

11   Q.    Is it your understanding

12   that when Health Canada says that there

13   are questions that have been raised about

14   the validity of some of the science in

15   glyphosate, that they're talking about

16   the same concerns that are set forth in

17   Exhibit Number 9 which was the document

18   prepared by the minority staff?

19             MR. KRISTAL:  Objection.

20        Foundation.

21             THE WITNESS:  That would be

22        my belief, based on looking at

23        both documents.

24   BY MR. SLONIM:

Michael L. Grossbard, M.D.

1      Q.   Okay.  And in other words,

2  in the Health Canada document it says

3  that the concerns were raised by what's

4  referred to as the Monsanto papers; is

5  that right?

6           MR. KRISTAL:  Objection to

7      form.

8           THE WITNESS:  Correct.

9  BY MR. SLONIM:

10     Q.   And Exhibit 9, Footnote 1,

11 references the Monsanto papers.  And they

12 say that this report is based in no small

13 part on documents that have been made

14 publicly available through third-party

15 litigation; is that correct?

16     A.   That's correct.

17          MR. KRISTAL:  Objection to

18     form.

19 BY MR. SLONIM:

20     Q.   Okay.  Now, direct your

21 attention, please, to the bottom -- to

22 the first page, the bottom, the bottom

23 paragraph.  It begins, "Our scientists

24 left no stone unturned."

Michael L. Grossbard, M.D.

1          Do you see that?

2          A.    It's the second page of this

3    document, but that's okay.

4          Q.    I see.  When it copied, it

5    copied a little differently.

6          A.    I see it.

7          Q.    Would you -- would you read

8    that paragraph into the record, please,

9    beginning with, "Our scientists"?

10         A.    "Our scientists left no

11   stone unturned in conducting this review.

12   They had access to all relevant data and

13   information from federal and provincial

14   governments, international regulatory

15   agencies, published scientific reports,

16   and multiple pesticide manufacturers.

17   This includes the reviews referred to in

18   the Monsanto papers.  Health Canada also

19   had access to numerous individual studies

20   and raw scientific data during its

21   assessment of glyphosate, including

22   additional cancer and genotoxicity

23   studies.  To help ensure an unbiased

24   assessment of the information, Health

Michael L. Grossbard, M.D.

1    Canada selected a group of 20 of its own

2    scientists who are not involved in the

3    2017 reevaluation to evaluate the notices

4    of objection.

5         Q.   Okay.  So let's unpack this

6    a little bit.  Is it your understanding

7    that when Health Canada conducted their

8    re-review of the potential

9    carcinogenicity and genotoxicity of

10   glyphosate, that their scientists

11   expressly considered the Monsanto papers

12   that are referred to in Exhibit 9,

13   reference Footnote 1?

14             MR. KRISTAL:  Objection.

15        Foundation.  Form.

16             THE WITNESS:  That's my

17        understanding.

18   BY MR. SLONIM:

19        Q.   And is it also your

20   understanding that they had access to the

21   individual studies and more scientific

22   data regarding glyphosate?

23             MR. KRISTAL:  Objection.

24        Form.

Michael L. Grossbard, M.D.

1                    THE WITNESS:  Correct.

2         That's true.

3    BY MR. SLONIM:

4         Q.    You recall plaintiff's

5    counsel asked you whether or not you had

6    reviewed the individual scientific

7    studies regarding genotoxicity.  Do you

8    recall being asked those questions?

9         A.    I do.

10        Q.    And you indicated that you

11   had read reviews; is that correct?

12        A.    That's correct.

13        Q.    Okay.  And did the reviews

14   you read, it included Kier and Kirkland;

15   is that correct?

16        A.    That is true.

17        Q.    Did the review also include

18   Health Canada reviews?

19        A.    That is true.

20        Q.    And is it your understanding

21   Health Canada, that their scientists

22   actually had access to the underlying raw

23   scientific data?

24                    MR. KRISTAL:  Objection.

Michael L. Grossbard, M.D.

1      Form.

2              THE WITNESS:  That's what

3      they stated, yes.

4  BY MR. SLONIM:

5      Q.    And take a look, please, at

6  the fourth -- fourth paragraph.  It says,

7  "After a thorough scientific review."  On

8  the first page, fourth paragraph.

9      A.    Okay.  Got it.

10     Q.    What's your understanding of

11 Health Canada's assessment after they

12 re-reviewed all of the scientific

13 evidence including the Monsanto papers?

14     A.    They felt that glyphosate

15 was safe for use and that it did not pose

16 a cancer risk.

17     Q.    Okay.  Now, do you recall in

18 connection with this Exhibit Number 9,

19 Mr. Kristal, the plaintiff's counsel,

20 directed your attention to Page 6.

21     A.    Yes.

22     Q.    And asked you some questions

23 about ghostwriting and your feelings

24 about ghostwriting.  Do you recall that?

Michael L. Grossbard, M.D.

1          A.     Yes.

2          Q.     And do you recall he

3    specifically asked you some questions

4    about the Greim paper?

5          A.     Correct.

6          Q.     And do you see Greim is also

7    referred to on this Page 6?

8          A.     I do.

9          Q.     I don't believe Greim was

10   marked as a deposition exhibit.

11              MR. SLONIM:  Was it?

12              MR. KRISTAL:  You're asking

13        me?  I don't believe I marked it.

14              MR. SLONIM:  Well, let's do

15        this.  I have one copy.  I don't

16        believe Greim was marked.

17              THE WITNESS:  I'm not seeing

18        it in the documents.

19              MR. SLONIM:  I think you

20        marked Kier and Kirkland.

21              THE WITNESS:  That's true.

22        Well, that's true.  I have that

23        here.

24              MR. SLONIM:  Let's mark as

Michael L. Grossbard, M.D.

1              the next deposition exhibit the

2              Greim paper.

3                    (Document marked for

4              identification as Exhibit

5              Grossbard-27.)

6    BY MR. SLONIM:

7         Q.    Doctor, my computer is being

8    uncooperative.

9                    Can I ask you please to turn

10   to the last page of the article, 2006?

11                   MR. KRISTAL:  May I just

12             interrupt for a second.  Are you

13             done with the Health Canada

14             document?  If so, may I have it so

15             I can review it while you're --

16                   THE WITNESS:  Sure.  I think

17             that was it.

18                   MR. KRISTAL:  Yes.  Thank

19             you.

20   BY MR. SLONIM:

21        Q.    Can you take a look at

22   deposition exhibit -- Page 206 of the

23   Greim article.

24        A.    Yes.  Okay.  Yes.

Michael L. Grossbard, M.D.

1    Q.    And, Doctor, can you read
2    please into the record the
3    acknowledgment?
4         A.    The acknowledgment says,
5    "Special thanks go to Elizabeth Webb,
6    Monsanto toxicologist for her detailed
7    attention to document and data table
8    formatting and as the reference library
9    curator.  Quality control and review of
10   data transcription were valued services
11   provided by Carrie Leigh Logan and Aparna
12   Desai Nemali, Monsanto quality assurance
13   specialists."
14        Q.    Based -- based on that
15   acknowledgment, is it your understanding
16   that Monsanto contributed to the
17   preparation of this article?
18        A.    They state that here, yes.
19        Q.    And then would you go down
20   please to the -- to the last page.  I'm
21   sorry, to the -- yeah, my computer is
22   being a little fussy over here.
23             Take a look, please, at the
24   declaration of interest.

Michael L. Grossbard, M.D.

1          A.    Okay.

2          Q.    And directing your attention

3    to the second sentence.  Well, let's see.

4    Does it indicate that employee -- that

5    people that were involved in preparation

6    of this article were members of the

7    glyphosate task force?

8          A.    It does.

9          Q.    And does it indicate

10    further -- well, strike that.

11              Based on reading that

12    disclosure, who do you understand the

13    glyphosate task force to be?

14          A.    They say it's a consortium

15    of European glyphosate registrants.  So I

16    assume manufacturers.

17          Q.    Okay.  So it's your

18    understanding that the -- that the

19    manufacturers had input and were

20    disclosed as having input into the

21    preparation of this article?

22              MR. KRISTAL:  Objection.

23        Form.

24              THE WITNESS:  Yes.

Michael L. Grossbard, M.D.

1   BY MR. SLONIM:

2       Q.    And then please read the

3   sentence about Dr. Helmut Greim.

4       A.    "Helmut Greim was funded as

5   an independent consultant for his expert

6   contributions to this manuscript."

7       Q.    So is it your understanding

8   that in this disclosure, it indicates

9   that Helmut Greim was being paid by the

10  consortium of glyphosate manufacturers?

11          MR. KRISTAL:  Objection.

12      Form.

13          THE WITNESS:  Yes.

14  BY MR. SLONIM:

15      Q.    Do you recall that you were

16  asked some questions about -- and we'll

17  take a look at some of these documents.

18  But you were asked some questions about a

19  Monsanto employee, David Saltmiras, and

20  his participation in the preparation of

21  this article?

22      A.    I do recall that.

23      Q.    Would you read, please, the

24  next sentence that talks about

Michael L. Grossbard, M.D.

1    Mr. Saltmiras?

2              MR. KRISTAL:  It's doctor.

3              THE WITNESS:  "David

4         Saltmiras and Christian Strupp are

5         employed by member companies of

6         the GTF, Monsanto and ADAMA" --

7         A-D-A-M-A -- "Agricultural B.V."

8    BY MR. SLONIM:

9         Q.    Reading that disclosure,

10   does that tell you what Mr. Saltmiras was

11   employed by member companies of the

12   glyphosate task force, including

13   Monsanto?

14        A.    It does.

15        Q.    I'll direct your attention

16   to the next sentence, which also talks

17   about Mr. Saltmiras.  Would you please

18   read the disclosure there about

19   Mr. Saltmiras?

20        A.    David Saltmiras is also

21   chair of the toxicology technical working

22   group of the GTF.

23        Q.    Reading that statement, do

24   you understand what Mr. Saltmiras' role

Michael L. Grossbard, M.D.

1    is as part of the glyphosate task force?

2         A.    Yes.  It appears he's a

3    representative of Monsanto on that task

4    force.

5         Q.    Going down two sentences,

6    does it explain what Monsanto's role is

7    with respect to glyphosate?

8         A.    It states that Monsanto was

9    the original producer and marketer of

10   glyphosate formulations.

11        Q.    And reading this disclosure,

12   would you have any-- was there any

13   question in your mind that Monsanto was

14   the original producer and marketer of

15   glyphosate, that it was a member of the

16   glyphosate task force, and that it

17   employed Mr. Saltmiras who contributed to

18   this article?

19              MR. DIAMOND:  Form.

20              MR. KRISTAL:  Objection to

21        form.

22              THE WITNESS:  Yes, all of

23        those are true.

24   BY MR. SLONIM:

Michael L. Grossbard, M.D.

1    Q.    Would you please read the

2  next sentence of this disclosure?

3    A.    "The authors had sole

4  responsibility for the writing and

5  content of the paper, and the

6  interpretation and opinions expressed in

7  the paper are those of the authors and

8  may not necessarily be those of the

9  member companies of the glyphosate task

10  force."

11    Q.    You were asked some

12  questions about your opinion about the --

13  about ghostwriting and about the kinds of

14  disclosures.

15          Reading this disclosure, do

16  you have any reservations about the way

17  in which Monsanto's involvement in

18  preparation of this article and content

19  of this article is disclosed?

20          MR. KRISTAL:  Objection.

21      Foundation.

22          THE WITNESS:  I don't.  As I

23      said, I think you need to make

24      disclosures.

Michael L. Grossbard, M.D.

1    BY MR. SLONIM:

2          Q.    Okay.   Now, you -- the Greim

3    paper itself, we're talking about the

4    disclosures.   This paper talks about the

5    animal studies of carcinogenicity; is

6    that correct?

7          A.    It does.

8                MR. KRISTAL:   Objection.

9          Form.

10   BY MR. SLONIM:

11         Q.    And is this a paper that you

12   reviewed in connection with your --

13   forming your expert opinions in this

14   matter?

15         A.    It is.

16         Q.    And do you recall that you

17   were asked about whether or not you had

18   reviewed any of the underlying studies

19   themselves?

20         A.    That's correct.

21         Q.    If you take a look, please,

22   at the last page of the article.   It's

23   probably Page 208.

24         A.    Sorry.

Michael L. Grossbard, M.D.

1      Q.    Last page.

2      A.    Yes.

3      Q.    And the very -- very bottom

4   indicates, "Supplementary material

5   available online."

6            Do you see that?

7      A.    Correct.

8      Q.    And it indicates that

9   there's supplementary -- there's

10  supplementary data for Studies 1 through

11  14; is that correct?

12     A.    Yes.

13     Q.    And that's how many studies

14  were actually discussed in the paper; is

15  that right, 14 studies?

16     A.    That is true, yes.

17     Q.    Did you have an opportunity

18  to take some look at the supplementary

19  data that's available online?

20     A.    I glanced at it.  I did not

21  go over it in any detail.

22     Q.    Was that original source

23  data from each one of the 14 animal

24  studies that's discussed in the Greim

Michael L. Grossbard, M.D.

1    paper?

2          A.    That was my understanding.

3          Q.    Okay.  Now, another document

4    that you were shown was Deposition

5    Exhibit Number 10.  Can you pull that

6    out, please.

7          A.    Yes.

8          Q.    This document, on its face,

9    what is the word -- what is the word

10   above May 11, 2015?

11         A.    "Draft."

12         Q.    What's your understanding of

13   what a draft is?

14         A.    A draft is an incomplete

15   version, a sketch of some original ideas

16   that may or may not be the final product.

17         Q.    Have you ever seen this

18   document before?

19         A.    No.

20         Q.    Do you know who wrote it?

21         A.    I have no idea.

22         Q.    Do you know if it's a final

23   document?

24         A.    I do not.

Michael L. Grossbard, M.D.

1          Q.    Do you know if it was -- if

2     it was reviewed by anybody?

3          A.    In terms of anybody?  I

4     don't know who wrote it, who reviewed it,

5     who read it, who spoke it.

6          Q.    You don't know if there were

7     any comments back and forth on that?

8          A.    I don't know if there were

9     comments back and forth at all, no.

10          Q.    You were asked some

11     questions about different comments here

12     about different kinds of studies and

13     things that might be conducted,

14     meta-analysis and so on.

15               Do you recall that?

16          A.    I do.

17          Q.    And, Doctor, is there

18     anything wrong with a company whose

19     product is being criticized from wanting

20     to get into the public domain relevant

21     information so that there's more

22     scientific evidence available and so that

23     information can be put into context and

24     evaluated?

Michael L. Grossbard, M.D.

1          MR. DIAMOND:  Form.

2          MR. KRISTAL:  You're asking

3     hypothetically?  Is that a hypo?

4     I object to form.

5  BY MR. SLONIM:

6          Q.   You can answer the question,

7  Doctor.  Do you want to have it read

8  back?

9          A.   Please.

10          (Whereupon, the court

11     reporter read back the requested

12     portion of testimony.)

13          THE WITNESS:  No.

14  BY MR. SLONIM:

15          Q.   Doctor, if an assessment of

16  carcinogenicity is published, and if a

17  manufacturer believes that the assessment

18  is scientifically incorrect, do you have

19  any criticism of a company from

20  responding to that by putting into the

21  public domain additional information that

22  may be informative?

23          MR. KRISTAL:  Same

24     objection.

Michael L. Grossbard, M.D.

1          MR. DIAMOND:  Form.

2          THE WITNESS:  No, I don't.

3    BY MR. SLONIM:

4          Q.    Now, Doctor, one of the

5    exhibits that you were shown was

6    Deposition Exhibit Number 11, the Chang

7    and Delzell article.

8          Do you recall that?

9          A.    Yes.

10         Q.    Can you pull up Deposition

11   Exhibit Number 11.

12         A.    Okay.  I got it.

13         Q.    Can you turn, please, to

14   Page 424.

15         A.    Got it.

16         Q.    Do you -- on the right-hand

17   side, do you see the subheading

18   "Funding"?

19         A.    I do.

20         Q.    Would you read that once

21   into the record, please, and then I'm

22   going to ask a question.

23         A.    "This work was reported by

24   Monsanto Company, the original producer

Michael L. Grossbard, M.D.

1  and marketer of glyphosate formulations."

2      Q.    Reading that disclosure,

3  what does that communicate to you or what

4  is your understanding of who paid for the

5  meta-analysis that these authors

6  published?

7      A.    Monsanto paid and funded the

8  work in this report.

9      Q.    Can you read into the

10  record, please, the full disclosure

11  statement, it's about four or five

12  sentences, and then I'm going to ask you

13  some questions.

14      A.    "The sponsors were provided

15  the opportunity to review the manuscript

16  prior to journal submission, but

17  inclusion of their suggestion was left to

18  the discretion of the authors, who

19  retained sole control of the manuscript

20  content and the findings.  Statements in

21  this paper are those of the authors and

22  not those of the authors' employer or the

23  sponsors.  The authors are employed by

24  Exponent, a scientific research and

Michael L. Grossbard, M.D.

1    consulting firm that provides services

2    for private" -- "for private and

3    governmental clients, including on

4    projects concerning glyphosate and other

5    pesticides.

6              "In the past few years,

7    Ellen Chang has provided consulting

8    services through Exponent on behalf of

9    Monsanto Company on other issues, and she

10   has also provided consulting services on

11   other pesticides and lymphohematopoietic

12   cancers for other clients."

13        Q.    Reading that disclosure,

14   Doctor, do you have any concern that the

15   Chang and Delzell article is

16   ghostwritten?

17        A.    No, I don't.

18        Q.    Why not?

19        A.    She's clearly stated that --

20   what her -- what her conflicts are.  And

21   she's -- it's clearly funded by Monsanto.

22   And there's no indication here to suggest

23   that somebody else wrote this.

24              It specifically says the

Michael L. Grossbard, M.D.

1    authors retained sole control of the

2    manuscript content.

3           Q.    Okay.   Now, another document

4    that you were asked about was Deposition

5    Exhibit Number 12.

6           A.    Tell me what that is.

7           Q.    It's the Monsanto manuscript

8    clearance form.

9           A.    Got it.   Okay.

10          Q.    Do you recall being asked

11   some questions about this, in particular,

12   Mr. Saltmiras?

13          A.    Yes.

14          Q.    And this is in connection

15   with the Kier and Kirkland article; is

16   that correct?

17          A.    That's true, yes.

18          Q.    Okay.   Now, let's take a

19   look at Kier and Kirkland.   That was

20   marked I guess as Exhibit Number 14.

21          A.    Okay.   I've got that.

22          Q.    Yeah, let's take a look at

23   one other while we are talking about

24   this.   Let's take a look also at

Michael L. Grossbard, M.D.

1   Deposition Number 13.

2        A.    Okay.  I've got that.

3        Q.    Okay.  So do you recall in

4   Deposition Exhibit Number 12 you were

5   asked questions about whether

6   Mr. Saltmiras -- whether the role of

7   Monsanto was properly disclosed in the

8   Kier and Kirkland articles?

9        A.    I remember questions to that

10  effect.

11       Q.    And do you recall the same

12  thing in connection with being questioned

13  about Deposition Exhibit Number 13?

14       A.    Yes.

15       Q.    Now, let's take a look at

16  Deposition Exhibit Number 14.  Do you

17  have that?

18       A.    I do.

19       Q.    Could you turn, please, to

20  Page 310.  I direct your attention to the

21  lower right-hand side, acknowledgments?

22       A.    Okay.

23       Q.    Would you read please the

24  first sentence through David Saltmiras,

Michael L. Grossbard, M.D.

1  just read that into the record.

2       A.    "The authors would like to

3  thank the following individuals for their

4  contributions to this work by providing

5  regulatory studies and their thoughtful

6  review of the manuscript:  David

7  Saltmiras, Monsanto Company."

8       Q.    So what's your understanding

9  insofar as that first sentence of

10  Mr. Saltmiras and the role that he played

11  in -- in this manuscript and study?

12       A.    Provided data on regulatory

13  studies, and he reviewed the manuscript.

14       Q.    And please take a look under

15  the last sentence of that acknowledgment.

16  And read that into the record, please.

17       A.    We would also like to

18  acknowledge David Saltmiras for his

19  invaluable service in providing

20  coordination with individual companies

21  and the glyphosate task force.

22       Q.    Are you able to glean

23  anything from that sentence in regard to

24  what Mr. Saltmiras did further by way of

Michael L. Grossbard, M.D.

1    assistance to the authors in preparation

2    of this article?

3              MR. KRISTAL:  Objection.

4         Foundation.

5              THE WITNESS:  He helped to

6         coordinate their work with -- with

7         members and member companies from

8         the glyphosate task force.

9    BY MR. SLONIM:

10        Q.    Okay.  And looking down at

11   the declaration of interest.  Do you see

12   that?

13        A.    Yes.

14        Q.    The second sentence.  Please

15   read that about the -- that description

16   of the glyphosate task force.

17        A.    Oh, sorry.  "The glyphosate

18   task force is a consortium of 25 European

19   glyphosate registrants listed on" -- and

20   it gives a website.

21        Q.    Okay.  Now, based on reading

22   that disclosure, what is your

23   understanding of what the glyphosate task

24   force is?

Michael L. Grossbard, M.D.

1              MR. KRISTAL:  Objection.

2       Foundation.

3              THE WITNESS:  As I stated

4       earlier, it's a consortium of

5       companies that manufacture

6       glyphosate.

7  BY MR. SLONIM:

8       Q.    No confusion about that in

9  your mind, is there?

10             MR. KRISTAL:  Objection.

11      Foundation.

12             MR. DIAMOND:  Form.

13             MR. KRISTAL:  And form.

14             THE WITNESS:  No.

15  BY MR. SLONIM:

16      Q.    Read, please, the -- go up

17  to the first sentence under the

18  declaration of interest.  Would you read

19  that, please.

20      A.    "Larry Kier and David

21  Kirkland were paid consultants of the

22  glyphosate task force for the preparation

23  of this review."

24      Q.    Reading that sentence, what

Michael L. Grossbard, M.D.

1  does that -- what is your understanding

2  of the role of Larry Kier and David

3  Kirkland, the two named authors of this

4  article?

5       MR. KRISTAL:  Objection.

6  Foundation.

7       THE WITNESS:  They were paid

8  by manufacturers to prepare their

9  review.

10 BY MR. SLONIM:

11      Q.    And then the third sentence

12 talks about Larry Kier's past employment.

13 Can you please read that.

14      A.    "Larry Kier is also a past

15 employee of Monsanto Company."

16      Q.    And then finally, would you

17 read the last sentence about the authors'

18 responsibility?

19      A.    "The authors had sole

20 responsibility for the writing and

21 content of the paper, and the

22 interpretations and opinions expressed in

23 the papers are those of the authors and

24 may not necessarily be those of the

Michael L. Grossbard, M.D.

1   member companies of the glyphosate task

2   force."

3          Q.    Now, Doctor, having read the

4   acknowledgments and having read the

5   declaration of interest, is there any

6   concern in your mind that the Kier and

7   Kirkland paper was ghostwritten?

8                MR. KRISTAL:  Objection to

9          foundation and form.

10               MR. DIAMOND:  Form.

11               THE WITNESS:  No.

12  BY MR. SLONIM:

13         Q.    Why not?

14         A.    Because it basically says

15  they were responsible for the writing and

16  content of the paper.  I have to take

17  that for what it's worth.

18         Q.    And it discloses -- strike

19  that.

20               And does it also disclose

21  the role of the glyphosate task force and

22  Monsanto?

23               MR. KRISTAL:  Objection.

24               THE WITNESS:  It does.

Michael L. Grossbard, M.D.

1    BY MR. SLONIM:

2         Q.    Now, doctor, can I ask you

3    to take a look, please, at Deposition

4    Number 15.

5              MR. DIAMOND:  Exhibit 15.

6              MR. SLONIM:  Exhibit 15.

7              THE WITNESS:  What is it?

8    BY MR. SLONIM:

9         Q.    It's the Portier article.

10        A.    Not seeing it.

11             MR. KRISTAL:  It's the one

12        with all the authors.  94.

13             THE WITNESS:  I do remember

14        that.

15             MR. SLONIM:  Keep the

16        Benbrook article.  We may have

17        that next.  Okay.  Let's try to

18        find the Portier article.

19             There it is.

20             THE WITNESS:  There it is.

21        How can you miss that?

22    BY MR. SLONIM:

23        Q.    Okay.  So, Doctor, do you

24    recall being questioned about this

Michael L. Grossbard, M.D.

1    article?

2           A.    I do.

3           Q.    And this article purports to

4    explain differences in the evaluation

5    that was prepared by IARC versus the

6    evaluation that was prepared by the

7    European Food Safety Authority.  Do you

8    recall being asked questions about that?

9           A.    Correct, yes.

10          Q.    And do you recall that

11   plaintiff's counsel pointed out that

12   there were multiple authors on this -- on

13   this paper?

14          A.    Correct.

15          Q.    He did not -- plaintiff's

16   counsel did not ask you about the

17   conflict of interest disclosure, did he?

18          A.    He did not.

19          Q.    Would you please turn to

20   Page Number 744.

21          A.    Okay.

22          Q.    Direct your attention to the

23   right, to the right-hand side, the middle

24   of the page, where there's a disclosure

Michael L. Grossbard, M.D.

1    about competing interests.

2              Do you see that?

3         A.    Yes, I do.

4         Q.    Would you read please the

5    first full sentence under competing

6    interests?

7         A.    "CJP, MTS, and DDW are

8    providing advice to a U.S. law firm

9    involved in glyphosate litigation."

10        Q.    Is it your understanding

11   that the first named author, Dr. Portier,

12   and also Dr. Dennis Weisenburger, and a

13   third author on this paper were working

14   as paid experts for plaintiffs' attorneys

15   at the time they prepared this document?

16        A.    That would be my

17   understanding based on the competing

18   interest comment.

19        Q.    Okay.  Is it your

20   understanding -- strike that.

21              Do you recall that you were

22   also shown Deposition Exhibit Number 16,

23   an article by Dr. Benbrook?

24        A.    I do, yes.

Michael L. Grossbard, M.D.

1          Q.     And that article purports to
2    explain how the U.S. EPA and IARC reached
3    diametrically opposite conclusions.  Do
4    you recall being asked some questions
5    about that?
6          A.     I do.
7          Q.     And do you recall that the
8    plaintiff's counsel asked you about
9    the -- for instance, the number of
10   regulatory studies, the genotoxicity
11   studies that were prepared by the
12   registrants as opposed to the number that
13   was reviewed by -- by IARC?  Do you
14   recall that, those questions?
15         A.     I do recall that, yes.
16         Q.     Okay.  Did plaintiff's -- I
17   don't -- strike that.
18                Did plaintiff's counsel ask
19   you about the conflict of interest
20   disclosure on the Benbrook article?
21         A.     Not to my recollection.
22         Q.     Okay.  Let's take a look at
23   that.
24                Would you turn, please, to

Michael L. Grossbard, M.D.

1  Page 14 of 16.

2          A.    Yes.

3          Q.    And do you see in the

4  right-hand side, it talks about competing

5  interests?

6          A.    Yes.

7          Q.    Would you read the first

8  full sentence, please?

9          A.    "CB" -- or Charles

10 Benbrook -- "has served since

11 September 2016 as an expert witness for

12 plaintiffs in U.S. litigation involving

13 the impact of glyphosate-based herbicides

14 on non-Hodgkin's lymphoma."

15         Q.    So what's your understanding

16 of the author's -- the author of this

17 publications role in the litigation?

18         A.    He's serving as a

19 plaintiffs' expert.

20         Q.    A paid expert?

21         A.    Correct.

22              MR. KRISTAL:  Do you know

23        any others?

24 BY MR. SLONIM:

Michael L. Grossbard, M.D.

1           Q.    Now, Doctor, I'm going to

2    mark as the next Deposition Exhibit 28,

3    the Health Canada glyphosate reevaluation

4    decision dated April 28, 2017.

5                (Document marked for

6           identification as Exhibit

7           Grossbard-28.)

8    BY MR. SLONIM:

9           Q.    Take a look, please, also at

10   Deposition Exhibit Number 1.  That's your

11   report.

12          A.    Yeah, I know.  I just have

13   to find it.  I guarantee these are in no

14   particular order.

15                Oh, here it is.  Got it.

16   Got it.

17          Q.    And if you take a look at

18   Page 8 of your expert report.

19          A.    Okay.  Got it.

20          Q.    Sort of the underneath the

21   geno -- animal genotoxicity studies, you

22   actually reference this document, don't

23   you?

24          A.    I do, yes.

Michael L. Grossbard, M.D.

1      Q.    Okay.  So I want to ask you

2   some questions about this document.

3            When was this prepared

4   relative to the IARC monograph?

5      A.    About two years later.

6      Q.    Okay.  Turn, please, to Page

7   1.

8      A.    Okay.

9      Q.    Do you understand that this

10  document was prepared in response to

11  IARC?

12            MR. DIAMOND:  Form.

13            THE WITNESS:  I don't -- I

14       don't recall whether that was a

15       response to IARC or not.  I recall

16       they were doing an assessment of

17       regulated pesticides.

18  BY MR. SLONIM:

19      Q.    Okay.  Take a look, please,

20  at page -- bear with me.

21      A.    Sorry.  This is the

22  reevaluation?

23      Q.    Yes.

24      A.    Yeah, that was triggered in

Michael L. Grossbard, M.D.

1    response to IARC, yes.

2          Q.    Okay.  And we may -- as we

3    work our way through the document, I

4    think we'll have an opportunity to point

5    out some places where that's made

6    clearer.

7                Now, directing your

8    attention now, this is -- right on the

9    very first page is their executive

10   summary; is that correct?

11         A.    That's correct.

12         Q.    Do you see right in the

13   middle of the page, they report overall

14   findings?

15         A.    Correct.

16         Q.    And would you read the first

17   bullet?

18         A.    Glyphosate is not genotoxic

19   and is unlikely to pose a human cancer

20   risk.

21         Q.    What does it mean when it

22   says glyphosate is not genotoxic?  What

23   does that mean?

24         A.    As we defined earlier it

Michael L. Grossbard, M.D.

1   means that it's not causing DNA damage,

2   that it's not a mutagen, that it's not --

3   it's not a carcinogen through genotoxic

4   mechanisms.

5        Q.    What's it mean when it says

6   it's unlikely to pose a human cancer

7   risk?

8        A.    I don't know their

9   definition of unlikely.  But I mean, it

10  means not -- not likely, that there's

11  not -- in my mind, that there's not a

12  statistically significant association

13  between exposure to glyphosate and

14  developing cancer.

15       Q.    Do you recall that you were

16  asked some questions about whether Health

17  Canada and other regulatory agencies

18  adequately considered occupational

19  exposures as opposed to non-occupational

20  exposures?

21       A.    I do recall that.

22       Q.    Okay.  Directing your

23  attention, please, to Page 5.

24       A.    Okay.

Michael L. Grossbard, M.D.

1          Q.    Let's start with the

2    non-occupational exposures at the top.

3    Do you see that?

4          A.    Yes.

5          Q.    Reading the first paragraph,

6    can you tell us how -- what kind of

7    non-occupational exposures Health Canada

8    considered?

9          A.    They considered residential

10   exposure from applying the

11   glyphosate-containing products to lawns,

12   gardens.  They considered it not only

13   from application, but also from mixing,

14   loading, and preparing the product for

15   use.

16              They looked at exposure

17   post -- post-application, including

18   incidental oral exposure, which I think

19   is something that we discussed on that

20   Mount Sinai document.

21              They looked at dermal and

22   inhalation exposure.  And then they -- I

23   think those are the major areas.  Then

24   they looked at chronic dietary exposure

Michael L. Grossbard, M.D.

1   through food and drinking water.

2       Q.    Now, do you also -- so you

3   recall that in the Mount -- in the Mount

4   Sinai document that you looked at, there

5   were questions about children?

6       A.    Yes.

7       Q.    Did -- looking at the second

8   full paragraph under the non-occupational

9   exposures, did Health Canada consider

10  exposures that might occur with children?

11      A.    It looks like they did.

12      Q.    And they also considered --

13  did they also consider exposures that

14  could occur through inhalation or

15  ingestion from food that may have

16  glyphosate residue?

17      A.    Yes, they do.

18      Q.    Okay.  And directing your

19  attention, please, to the last full

20  paragraph of -- of that subsection.

21  Would you please read the two sentences

22  into the record.

23      A.    This is in paragraph

24  "Occupational Risk"?

Michael L. Grossbard, M.D.

1    Q.    No, non-occupational

2  scenarios.

3    A.    Sorry.  Non --

4  non-occupational scenarios.  Where do

5  you -- where are you directing my

6  attention to?  I'm sorry.

7    Q.    Yeah.  Yeah.  Right over

8  here.  Those two sentences.

9    A.    These two?

10    Q.    Yep.

11    A.    "Non-occupational scenarios

12  were aggregated with background

13  (chronic), dietary exposure (food and

14  drinking water).  The resulting aggregate

15  risk estimates reached the MOE for all

16  uses and are not of concern."

17    Q.    What's your understanding of

18  when they say the exposure were not of

19  concern?

20    MR. DIAMOND:  Form.

21    THE WITNESS:  That

22    they're -- that they're not

23    putting people at risk.

24  BY MR. SLONIM:

Michael L. Grossbard, M.D.

1    Q.    Now, directing your

2   attention, please, to the bottom of the

3   page, do you see that they talk about

4   occupational exposures?

5    A.    Yes.

6    Q.    And do you recall that

7   Mr. Kristal asked you some questions

8   about whether the EPA and Health Canada

9   and other regulatory agencies gave

10   adequate consideration to occupational

11   exposures?

12        MR. KRISTAL:  Object to

13      form.

14        THE WITNESS:  I do recall

15      some version of that, yes.

16  BY MR. SLONIM:

17    Q.    Do you remember he suggested

18   that perhaps IARC gave more deference to

19   occupational exposures and that the

20   regulatory agencies gave inadequate

21   consideration?

22    A.    That I do remember.

23        MR. KRISTAL:  Objection to

24      form.  Misstates the evidence.

Michael L. Grossbard, M.D.

1   BY MR. SLONIM:

2        Q.    Is that your understanding

3   of the thrust of Mr. Kristal's questions

4   to you?

5             MR. KRISTAL:   Objection.

6        Form.

7             THE WITNESS:   That was the

8        gist, yes.

9   BY MR. SLONIM:

10       Q.    Would you please read

11  that -- it's a short paragraph.   Please

12  read that short paragraph into the

13  record.

14       A.    "Risks to handlers are not

15  of concern for all scenarios.   Based on

16  the precautions and directions for use on

17  product labels reviewed for this

18  reevaluation, risk estimates associated

19  with mixing, loading, and applying

20  activities met the target dermal and

21  inhalation MOE" -- which is margins of

22  exposure -- "and are not of concern."

23       Q.    What's your understanding of

24  when they say that the exposure levels

Michael L. Grossbard, M.D.

1  were not of concern?

2           MR. KRISTAL:  Objection.

3           THE WITNESS:  That they did

4      not increase the risk of a bad

5      outcome, specifically lymphoma or

6      other cancers.

7  BY MR. SLONIM:

8      Q.    Okay.  Now, turn, please, to

9  Page 17.

10     A.    Okay.

11     Q.    At the top, do you see that

12 there were comments that related to IARC

13 and IARC's assessment?

14     A.    I do see that.

15     Q.    Is that consistent with your

16 understanding that this document was

17 generated in response to IARC?

18          MR. KRISTAL:  Objection.

19      Form.

20          THE WITNESS:  Yes.

21 BY MR. SLONIM:

22     Q.    Turn, please, to Page 18.

23     A.    Okay.

24     Q.    Do you see the discussion of

Michael L. Grossbard, M.D.

1    IARC?

2         A.    I do.

3         Q.    Okay.  And is it your

4    understanding that in this section of the

5    document, Health Canada scientists are

6    explaining some of the reasons why they

7    reached a different assessment than IARC

8    did?

9              MR. KRISTAL:  Objection to

10        form.

11   BY MR. SLONIM:

12        Q.    Well, let me rephrase it.

13             Doctor, take a minute,

14   please, and read Pages 18, and going over

15   to 19 on the IARC assessment.  Just read

16   that to yourself.

17        A.    Okay.

18        Q.    Is it your understanding

19   that in this document, that Health Canada

20   explains similarities and differences

21   between its assessment and IARC's

22   assessment?

23             MR. KRISTAL:  Objection.

24        Form.

Michael L. Grossbard, M.D.

1          THE WITNESS:  I believe

2      that's true.

3   BY MR. SLONIM:

4          Q.    Going to Page 19.

5          A.    Yes.

6          Q.    Would you -- under the

7   subheading "Genotoxicity," would you read

8   that first two sentences into the record?

9          A.    "PMRA did not identify any

10  genotoxic potential for the active

11  ingredient glyphosate acid.  Negative

12  results for in vitro and in vivo gene

13  mutation and chromosomal effect assays in

14  mammalian cells contributed to the

15  overall conclusion that the active

16  ingredient glyphosate was not genotoxic."

17         Q.    What does it mean when it

18  says "negative results for in vitro and

19  in vivo genome mutation and chromosomal

20  effect assays"?  What's that mean?

21         A.    So those include studies in

22  a test tube, for example, bacterial

23  mutagenic assays.  And they also include

24  in vivo, so in animal studies.

Michael L. Grossbard, M.D.

1      Q.    What's it mean when it says
2   they had negative results?
3      A.    It means that they didn't
4   find evidence of genotoxicity.
5      Q.    Directing your attention,
6   please, to the second paragraph.  It
7   starts with, "In a large battery."
8      A.    Okay.
9      Q.    Read the first two
10  sentences, please.
11     A.    "In large battery of
12  genotoxicity" -- "genotoxicity assays,
13  conducted according to the OECD, test
14  guidelines for glyphosate is available.
15  Many studies have been replicated several
16  times and all indicated negative results
17  for genotoxicity."
18     Q.    What significance if any is
19  it that there were replicated studies
20  from the international test guidelines
21  that showed negative results?
22             MR. KRISTAL:  Objection to
23        form.
24             THE WITNESS:  So when you're

Michael L. Grossbard, M.D.

1           doing any kind of study you want

2           to make sure that a study is

3           either a -- is a true positive or

4           a true negative as opposed to a

5           false positive or false negative,

6           by repeating studies.  And using a

7           multiplicity -- multiplicity of

8           studies to examine things, you can

9           carefully assess a question.

10    BY MR. SLONIM:

11          Q.    Read the next sentence,

12    please.

13          A.    "The IARC assessment did not

14    consider the majority of these studies."

15          Q.    What significance if any

16    does that have in your assessment of IARC

17    and IARC's review?

18                MR. KRISTAL:  Objection.

19          Foundation.

20                THE WITNESS:  If there

21          were -- if there were many

22          negative studies that weren't

23          included, that can bias the

24          interpretation by IARC.

Michael L. Grossbard, M.D.

1    BY MR. SLONIM:

2         Q.    Read the next sentence,

3    please.

4         A.    "Instead, the IARC monograph

5    reported mixed results for studies with

6    glyphosate-formulated products that

7    examined DNA damage, gene mutation, and

8    chromosomal aberrations and included

9    results from nonmammalian systems, for

10   example fish and plants, that are not

11   considered relevant for human health

12   hazard characterization."

13        Q.    Doctor, do you agree that

14   results from nonmammalian systems, for

15   instance fish and plants, are not

16   relevant for human health hazard

17   characterization?

18             MR. KRISTAL:  Objection to

19        form.

20             THE WITNESS:  Yes, and I

21        think you need to be very careful

22        in extrapolating from any animal

23        model to people, or from any in

24        vitro model to people.

Michael L. Grossbard, M.D.

1   BY MR. SLONIM:

2        Q.    And so insofar as IARC did

3   not consider a majority of studies that

4   were performed according to international

5   guidelines and insofar as IARC did

6   consider studies from nonmammalian

7   systems, how would you characterize

8   IARC's analysis of genotoxicity?

9              MR. KRISTAL:  Objection to

10             form.  Also assumes facts not in

11             evidence.

12             THE WITNESS:  I believe it

13             would have less relevance to the

14             true human situation.

15   BY MR. SLONIM:

16       Q.    Direct your attention,

17   please, to the next paragraph.  And would

18   you read that paragraph into the record.

19       A.    "The IARC monograph also

20   noted that in several cases positive

21   results occurred at very high or toxic

22   levels only.  It is important to

23   characterize the relationship of

24   genotoxic results in the context of

Michael L. Grossbard, M.D.

1  observed cytotoxicity.  Positive results

2  at very high or toxic dose levels

3  indicate that the genotoxic effects are

4  due to cytotoxicity, rather than direct

5  DNA acting properties of

6  glyphosate-formulated products."

7       Q.    Let me ask you to stop you

8  there and let's see if we can unpack

9  this.  Let's go to the first sentence.

10           What significance, if any,

11  is there of the fact that positive

12  results all occurred at very high or

13  toxic levels only?

14       A.    So first of all, if you're

15  not duplicating a situation which people

16  may be exposed in life, a concentration

17  or level to which patients can be

18  exposed, it doesn't have much relevance

19  to a human situation.

20           Number two, if you're

21  getting to toxic dose levels you may be

22  causing cell death.  And when you cause

23  cell death, the DNA damage can be a

24  result of that process of necrosis and

Michael L. Grossbard, M.D.

1    death, rather than primary DNA damage

2    causing the problem.

3            Q.    In that context, directing

4    your attention to the third sentence that

5    you read.  What does it mean when they

6    say, "Positive results at very high or

7    toxic dose levels indicate that the

8    genotoxic effects are due to cytotoxicity

9    rather than direct DNA acting properties

10   of glyphosate-formulated product"?

11           What -- in plain language,

12   can you tell us what that means?

13           A.    If you give -- if you

14   give --

15           MR. KRISTAL:  Object to

16        form.

17           THE WITNESS:  If you give a

18        poison or a toxin to a cell and it

19        dies, at the time of cell death,

20        or cytotoxicity, cell death, you

21        end up seeing changes in DNA,

22        fragments of DNA that may be the

23        result of the ongoing death

24        process rather than primary DNA

Michael L. Grossbard, M.D.

1        damage from the agent.

2   BY MR. SLONIM:

3        Q.    Doctor, do you recall that

4   when Mr. Kristal questioned you for the

5   plaintiff, that he asked you some

6   questions about endocrine disrupting

7   activity?

8        A.    Mm-hmm.

9        Q.    The answer is yes?

10       A.    Yes.  Yes.  Sorry, I was

11  swallowing water.

12       Q.    And do you recall that he

13  also asked you some questions about

14  oxidative stress?

15       A.    Yes.

16       Q.    Now, directing your

17  attention, please, to Page 20.  The full

18  paragraph above carcinogenicity.

19            Do you see that?

20       A.    I do.

21       Q.    Would you read that full

22  paragraph into the record, please?

23       A.    "The IARC suggested other

24  mechanisms of action that might

Michael L. Grossbard, M.D.

1    contribute to potential carcinogenicity,

2    such as inflammation, immunosuppression,

3    endocrine disrupting activity, and

4    oxidative stress which were based mainly

5    on in vitro studies.  However, no

6    evidence of glyphosate-induced

7    immunosuppression was observed in a

8    registrant-supplied guideline" -- in a

9    registrant-supplied guideline

10   immunotoxicity study reviewed by the

11   PMRA.

12              "In addition, no other

13   studies in the extensive toxicity

14   database suggest a concern for

15   immunotoxicity, inflammation, or

16   oxidative stress.  Glyphosate also showed

17   no evidence of interaction with estrogen,

18   androgen, or thyroid endocrine pathways

19   in studies conducted by the U.S. EPA

20   Endocrine Disrupter Screening Program."

21        Q.    So let's take them one at a

22   time.

23              In regard to the effect that

24   glyphosate could have on endocrine

Michael L. Grossbard, M.D.

1    pathways and endocrine disruption, is

2    that something that was reviewed by

3    Health Canada scientists?

4            A.    It was.

5            Q.    And what did they conclude?

6                  MR. KRISTAL:  Objection.

7                  THE WITNESS:  They conclude

8         that there was no evidence to

9         support that in people.

10   BY MR. SLONIM:

11           Q.    In regard to oxidative

12   stress, is it your understanding that

13   Health Canada scientists reviewed

14   evidence related to oxidative stress that

15   might have been brought about by

16   glyphosate?

17           A.    Yes, they did.

18           Q.    And what's your

19   understanding of Health Canada's

20   assessment of oxidative stress?

21                 MR. KRISTAL:  Objection.

22                 THE WITNESS:  That it was

23        seen -- that it was seen in vitro,

24        but that there was no evidence,

Michael L. Grossbard, M.D.

1          again, in the animal studies or

2          other toxicity, that this was of

3          concern, as a mechanism of

4          carcinogenicity.

5    BY MR. SLONIM:

6          Q.    Now, let's take a look,

7    please, at Page 23.

8          A.    Okay.

9          Q.    You see the subheading,

10   "Conclusion"?

11         A.    Yes.

12         Q.    Would you read the first

13   full paragraph into the record, please.

14         A.    "Overall, the IARC concluded

15   that the evidence of carcinogenicity was

16   limited in humans but sufficient in

17   animals.  This conclusion was based on

18   statistically increased incidence of

19   tumor findings in four chronic studies in

20   rodents, two in rats, and two in mice, as

21   well results from genotoxicity, mostly in

22   vitro, assays using formulated products.

23              "However, the IARC did not

24   reflect the lack of dose-response

Michael L. Grossbard, M.D.

1   relationships or other contextual

2   information, for example

3   background/historical control data,

4   cytotoxicity, in their decision."

5        Q.    In your own review of IARC,

6   and the other scientific evidence, did

7   you find that IARC did not consider the

8   lack of a dose-response relationship?

9             MR. KRISTAL:  Objection.

10            THE WITNESS:  Right.  I

11        don't believe they included that

12        as an assessment or important

13        criteria.

14   BY MR. SLONIM:

15        Q.    In your own -- in your own

16   review of IARC, were you concerned about

17   the absence of contextual information

18   such as historical control data and

19   cytotoxicity?

20            MR. KRISTAL:  Objection.

21        Foundation.

22            THE WITNESS:  Yes.  Many --

23        many murine systems, you see

24        spontaneous tumors, and so you'll

Michael L. Grossbard, M.D.

1          need a lot of background on the

2          prior data from those mouse

3          strains or rat strains.

4    BY MR. SLONIM:

5          Q.    I want to walk through some

6    of the bulleted points on the bottom of

7    this page and onto the top of the next

8    page.

9               Would you read the first

10   bullet, please?

11         A.    A clear dose-response was

12   not observed for any of the noted tumors.

13         Q.    What's -- what is the --

14   what is the context for this?  Is this

15   animal studies?

16              MR. DIAMOND:  Form.

17              THE WITNESS:  Sorry?

18              MR. DIAMOND:  I just made an

19         objection.

20              THE WITNESS:  That is animal

21         studies, yes.

22   BY MR. SLONIM:

23         Q.    Of what significance is it

24   that a dose-response relationship was not

Michael L. Grossbard, M.D.

1    observed?

2         A.    If you believe that an agent

3    is causing a particular tumor, be it

4    lymphoma, or be it sarcoma, then you'd

5    like to see the higher the dose that you

6    give, the more frequently those tumors

7    would occur in an animal.

8         Q.    Directing your attention to

9    the bottom bullet on that page where it

10   talks about slightly increased.

11            Do you see that?

12        A.    "Slightly increased tumor

13   incidences at dose levels at or above the

14   limit dose of testing, 1,000 milligrams

15   per kilogram of body weight per day, were

16   not considered relevant for human health

17   assessment."

18        Q.    Can you tell us what your

19   understanding of that is?

20        A.    So these are -- these are

21   quite large doses.  And you would not see

22   these doses in a real-world situation.

23        Q.    Is that an assessment --

24        A.    Doses is a bad word.

Michael L. Grossbard, M.D.

1    Exposures.

2           Q.    Is that an assessment is

3    that you observed in your own review?

4           A.    Yes.

5           Q.    Turn to the next page,

6    please.

7           A.    Okay.

8           Q.    Read the next bullet,

9    please.

10          A.    "Incidences fell within

11   valid historical control data from the

12   respective performing laboratories."

13          Q.    Can you tell us what that

14   means, and what significance if any it

15   has?

16              MR. KRISTAL:  Objection.

17          Foundation.

18              THE WITNESS:  You -- you

19          will see in all of these mouse or

20          rat strains, spontaneous tumors

21          that occur.

22              And so in any given small

23          study, you might not see that

24          reflected as you would in a larger

Michael L. Grossbard, M.D.

1          population of controls for many

2          studies.  You need to account for

3          the spontaneous tumor rate in

4          assessing any data.

5    BY MR. SLONIM:

6          Q.    Did IARC do that?

7               MR. KRISTAL:  Objection.

8               THE WITNESS:  Not carefully

9          enough, no.

10   BY MR. SLONIM:

11         Q.    Would you read the next

12   bullet, please.

13         A.    "There was a lack of

14   preneoplastic lesions, for example

15   fossae, hypertrophy, and hyperplasia

16   and/or other biologically plausible

17   evidence, for example, mode of action

18   data, to relate the noted tumors to

19   glyphosate treatments."

20         Q.    Can you explain what that

21   means and what, if any, significance it

22   has to you?

23         A.    Typically when you have

24   cancers, not necessary in lymphoma, but

Michael L. Grossbard, M.D.

1    in other types of cancers, solid tumors,

2    leukemia, you can see precancerous

3    pathologic or histologic changes in the

4    tissue.  That would be indicative of a --

5    of a causation.  And then the other --

6    the other half of that is you need to

7    have a true mechanism of action for

8    something to do something.

9          Q.    Can you read the next bullet

10   that talks about, the weight of the

11   evidence.

12         A.    "The weight of evidence from

13   a wide range of assays, both in vitro and

14   in vivo, that examine various endpoints

15   such as gene mutation, chromosomal

16   damage, DNA damage and repair, indicated

17   no genotoxic concern for glyphosate."

18         Q.    What significance if any

19   does that have?

20         A.    Again, it's important that

21   the weight of evidence or the majority of

22   studies or the majority of studies

23   combined with the importance of those

24   studies does not suggest any genotoxic

Michael L. Grossbard, M.D.

1    concern.

2           Q.    Now, so, Doctor, we've gone

3    through a bit of the genotoxicity and the

4    animal studies.

5               Are the data that Health

6    Canada sets forth in their assessment, is

7    that congruent with your own review?

8           A.    Yes, it is.

9               MR. KRISTAL:  Objection to

10          form.

11   BY MR. SLONIM:

12          Q.    Doctor, referring back to

13   the deposition exhibit that we marked at

14   the start, the Health Canada 2019.

15          A.    Okay.

16          Q.    Would you --

17          A.    Oh.

18          Q.    2019.

19          A.    I may not have that.  Now I

20   do.

21          Q.    Can I see that, please?

22          A.    Yeah.

23          Q.    Would you read the first

24   full sentence of the last paragraph?

Michael L. Grossbard, M.D.

1        A.      "No pesticide regulatory

2    authority in the world currently

3    considers glyphosate to be a cancer risk

4    to humans at the levels at which humans

5    are currently exposed."

6        Q.      Is it -- Doctor, is that

7    consistent with your understanding?

8              MR. KRISTAL:  Objection.

9              MR. DIAMOND:  Form.

10             THE WITNESS:  Yes, it is.

11             MR. SLONIM:  I have no

12        further questions.  Thank you.

13             MR. KRISTAL:  You okay,

14        Michelle?

15             THE COURT REPORTER:  I'm

16        fine.

17                   -  -  -

18                EXAMINATION

19                   -  -  -

20    BY MR. KRISTAL:

21        Q.      Okay.  Let's start with

22    Greim, Exhibit 27.  Do you have that

23    there?

24        A.      Yes, I do.

Michael L. Grossbard, M.D.

1    Q.    Okay.  Does it say anywhere

2    that the article was ghostwritten by

3    Monsanto?

4         A.    Does it say anywhere in the

5    article?

6         Q.    Yeah.

7         A.    Not that I'm aware of.  I

8    mean, I have to go through it, but I

9    don't recollect it from reading it.

10        Q.    Okay.  So when you read the

11   disclosures that are made, you're taking

12   that on face value, correct?

13             MR. SLONIM:  Objection.

14             THE WITNESS:  Why wouldn't

15        I?

16   BY MR. KRISTAL:

17        Q.    Well, have you looked -- why

18   wouldn't you?

19             In part because there is

20   evidence before you that shows that it's

21   not accurate.  Would you agree with that?

22             MR. SLONIM:  Objection.

23             THE WITNESS:  That what's

24        not accurate?  I'm sorry.

Michael L. Grossbard, M.D.

1    BY MR. KRISTAL:

2        Q.    The disclosures don't

3    disclose that it was ghostwritten when

4    there is evidence that it was

5    ghostwritten, correct?

6            MR. SLONIM:  Objection.

7            THE WITNESS:  Right the

8        disclosures do not say it's

9        ghostwritten.  But it says here

10       the authors had sole

11       responsibility for the writing and

12       content of the paper.

13   BY MR. KRISTAL:

14       Q.    That's right.

15       A.    So I would not have a reason

16   to believe otherwise is what I'm saying.

17       Q.    That's right.  Because you

18   haven't looked at the evidence that might

19   say otherwise, correct?

20       A.    The only evidence that I

21   have is from -- from their declaration of

22   interest here.

23       Q.    Right.  So you have not

24   looked at any other evidence as to

Michael L. Grossbard, M.D.

1    whether that statement is true or not

2    true?

3           A.    That is true.

4           Q.    And you have in front of you

5    the minority report, which indicates that

6    Greim was in fact ghostwritten, right?

7                 MR. SLONIM:  Objection.

8    BY MR. KRISTAL:

9           Q.    That's what it says?

10                MR. SLONIM:  Objection.

11                THE WITNESS:  Let me pull

12          out Page 6.  Give me a second.

13                MR. DIAMOND:  What exhibit

14          number is that one?

15                THE WITNESS:  That's Exhibit

16          Number 9.

17                MR. DIAMOND:  Thanks.

18                THE WITNESS:  What it says

19          here, to quote, "In the e-mails,

20          they contemplate paying for a

21          study to combat problematic

22          findings, but determine a cheaper

23          outcome" -- "cheaper option would

24          be to ghostwrite the exposure tox

Michael L. Grossbard, M.D.

1              and genetox sections and add Greim

2              and Kier or Kirkland to have their

3              names on a publication, but we

4              would be keeping the costs down by

5              us doing the writing and they

6              would just edit and sign their

7              names, so to speak."

8                   Is that what you're

9              referring to?

10   BY MR. KRISTAL:

11         Q.    Right.  And you have not

12   looked at any of that evidence, correct,

13   to make your own determination whether

14   Greim was or wasn't ghostwritten?

15                   MR. SLONIM:  Objection.

16                   THE WITNESS:  No, I can only

17              go by what's declared in the

18              manuscript because that's what I

19              have available to me.

20                   Even this doesn't give me

21              enough evidence to provide a

22              decision in either direction.

23                   (Document marked for

24              identification as Exhibit

Michael L. Grossbard, M.D.

1          Grossbard-29.)

2    BY MR. KRISTAL:

3          Q.    Okay.  Let me mark as

4    Exhibit 29.  This is a document dated

5    August 4th, 2015.  The subject is

6    "Glyphosate Activities."  The MONGLY

7    number is 01723742.  I will represent to

8    you that this is from Dr. Saltmiras.

9              Preliminary question, have

10   you asked Monsanto to send you any

11   depositions of Monsanto employees or show

12   you any Monsanto documents on these

13   subjects?

14         A.    I have not.

15         Q.    Do you plan on doing that?

16         A.    I do not.

17         Q.    Why not?

18         A.    I have made my assessment

19   based on the scientific data.  I don't

20   think -- I don't think who wrote it

21   actually matters as long as they're

22   standing -- the authors are standing by

23   the data that are in there.

24         Q.    Okay.  If you look at what

Michael L. Grossbard, M.D.

1    Saltmiras wrote, if you look down to the

2    next-to-last paragraph, you see IARC --

3    IARC prep?

4          A.    I see that.

5          Q.    He writes, "IARC prep, AHS

6    Sorahan reanalysis for multiple myeloma

7    presented at EUROTOX 2012, Kier and

8    Kirkland (2013), ghostwrote Cancer review

9    paper, Greim et al. (2015)."

10              Do you see that?

11         A.    I do see that.

12         Q.    Are you accepting Saltmiras

13   on his word that he wrote here that he

14   ghostwrote that article?

15              MR. SLONIM:   Objection.

16         Form.   Foundation.

17              THE WITNESS:   This document

18         is what?   Just if you can

19         elaborate on it a little bit more

20         so I can understand it better.

21   BY MR. KRISTAL:

22         Q.    That is a statement by

23   Saltmiras on his glyphosate activities

24   for his employer.

Michael L. Grossbard, M.D.

1            MR. SLONIM:  Objection.

2      Form.  Foundation.

3            THE WITNESS:  I mean,

4      look --

5  BY MR. KRISTAL:

6      Q.    It certainly says what it

7  says, right?

8      A.    Yeah.  I can't -- I can't

9  argue with this one way or the other.

10     Q.    Okay.  Now, you were asked

11 about, in the Greim paper, whether they

12 provided supplementary materials online,

13 right?

14     A.    Yes, I was.

15     Q.    And you had access to that,

16 but you said honestly you only glanced at

17 it, correct?

18     A.    That is true.

19     Q.    So you don't know whether or

20 not the Greim paper accurately did or

21 didn't summarize those studies that were

22 the supplemental materials, correct?

23     A.    I could not tell you that,

24 correct.

Michael L. Grossbard, M.D.

1        Q.    And you know that the IARC

2    group, the working group evaluating

3    glyphosate actually looked at that

4    supplementary material and determined

5    that it was insufficient and explained

6    why it was insufficient, right?

7        A.    That's correct.

8        Q.    Okay.  And they said it was

9    insufficient in part because information

10   was lacking on statistical methods,

11   correct?

12            MR. SLONIM:  Objection.

13            THE WITNESS:  Again, I'm not

14       remembering the specific details

15       but if you're reading --

16   BY MR. KRISTAL:

17       Q.    It's not a -- it's not a

18   memory test.

19       A.    If you're reading that, I

20   can look at it.  And I'm not going to

21   argue with it.

22            (Document marked for

23       identification as Exhibit

24       Grossbard-30.)

Michael L. Grossbard, M.D.

1   BY MR. KRISTAL:

2         Q.    Here's Exhibit 30.  It's the

3   glyphosate section of Monograph 112?

4         A.    Sure.  What page?

5         Q.    Page 112 -- I'm sorry.  Page

6   354, Section 3.1.3, "Review Articles"?

7         A.    Got it.

8         Q.    And they're discussing the

9   Greim paper that we've been discussing,

10  correct?

11        A.    Correct.

12        Q.    And three quarters of the

13  way down that paragraph, "The working

14  group was unable to evaluate these

15  studies which are not included in Table

16  3.1 and section 5.3 because the

17  information provided in the review

18  article and its supplement was

19  insufficient, e.g., information was

20  lacking on statistical methods, choice of

21  doses, body weight gain, survival data,

22  details of histopathological examination,

23  and/or stability of dosed feed mixture."

24              That's what the IARC folks

Michael L. Grossbard, M.D.

1    said about the Greim supplementary

2    materials, correct?

3           A.    That's correct.  That's what

4    it says here.

5           Q.    And, therefore, even though

6    Greim, et al., were providing this

7    material, do you have any reason to

8    disagree with the IARC working group's

9    analysis?

10          MR. SLONIM:  Objection.

11          THE WITNESS:  I have no

12      basis sitting here to make a

13      disagreement with that.

14   BY MR. KRISTAL:

15          Q.    Okay.  You were asked a

16   hypothetical about something along the

17   lines, anything wrong with a company

18   whose product is being criticized for

19   wanting to get into the public domain

20   relevant information.  Do you remember

21   that?

22          A.    I do recall that.

23          Q.    You don't know one way or

24   the other if that applies to Monsanto not

Michael L. Grossbard, M.D.

1  having looked at any Monsanto documents,

2  correct?

3           MR. SLONIM:  Objection.

4           THE WITNESS:  Right.  As a

5      concept and as a hypothetical, I

6      don't have any problem with it.

7  BY MR. KRISTAL:

8      Q.    Nor should anybody.  But you

9  don't know if that happened here?

10          MR. SLONIM:  Objection to

11     form.  Foundation.

12          THE WITNESS:  That Monsanto

13     tried to get information into the

14     public domain?  Or that --

15 BY MR. KRISTAL:

16     Q.    You don't know if Monsanto's

17 product that was being criticized, they

18 wanted to get into the public domain

19 relevant information or whether they were

20 spinning science or anything about it?

21          MR. SLONIM:  Objection.

22     Form.  Foundation.

23          THE WITNESS:  Well, I mean,

24     look, they wanted to get science

Michael L. Grossbard, M.D.

1          into the -- into the domain.

2    BY MR. KRISTAL:

3          Q.    How do you know that?

4          A.    I can't -- I can't tell --

5          Q.    How do you know that?

6          A.    If they're -- if they're

7    funding and sponsoring these particular

8    things, then the argument would be that

9    they want to get science into the domain.

10         Q.    Unless that they're

11   ghostwriting it, and they're doing it for

12   litigation support, such as you're

13   utilizing it here as we sit here?

14             MR. SLONIM:  Objection.

15   BY MR. KRISTAL:

16         Q.    Right?

17             MR. SLONIM:  Objection.

18             THE WITNESS:  So number one,

19        that I can't answer, obviously.

20   BY MR. KRISTAL:

21         Q.    Right.  That's what I'm

22   saying.  You don't know one way or the

23   other?  That's all I'm saying.

24         A.    Okay.  I have to agree with

Michael L. Grossbard, M.D.

1    you on that.

2         Q.    Okay.  Chang and Delzell,

3    you were asked whether there's any

4    indication from the disclosure whether

5    that was ghostwritten or not, correct?

6              MR. SLONIM:  Objection.

7              THE WITNESS:  Yes.

8    BY MR. KRISTAL:

9         Q.    Okay.  Now, the fact that an

10   author doesn't disclose whether or not

11   the article was ghostwritten or not,

12   doesn't mean it wasn't ghostwritten,

13   right?

14             MR. SLONIM:  Objection.

15             THE WITNESS:  As I said

16        earlier, there are lots of

17        ghostwritten publications in the

18        literature.  I happen to know that

19        good academic publications, not

20        related to glyphosate in any way,

21        that I know are written by

22        somebody else, and the authors

23        have their name on it.

24   BY MR. KRISTAL:

Michael L. Grossbard, M.D.

1          Q.    Okay.  And regardless of

2    whether Chang or Delzell was or wasn't

3    ghostwritten -- let's assume it wasn't.

4    It still came up with a meta-analysis

5    relative risk of 1.31 that was

6    statistically significant, right, for

7    NHL?

8          A.    Although --

9                MR. SLONIM:  Objection.

10               THE WITNESS:  Although the

11         conclusion of their study is that

12         there is no significant risk.

13   BY MR. KRISTAL:

14         Q.    Well --

15         A.    But the number that you

16   quoted that was published there, yes,

17   that is a one piece of evidence that's in

18   that paper.

19         Q.    All right.  The article that

20   had 94 authors, right?

21         A.    Yes.

22         Q.    Three of them disclosed that

23   they were working for plaintiffs as

24   experts in the Roundup litigation,

Michael L. Grossbard, M.D.

1    correct?

2            A.    That is true.

3            Q.    91 have no such disclosure

4    to make, right?

5            A.    Or did not make, yes.

6            Q.    That's right.  And you're

7    not saying that because three of the 94

8    authors disclosed that they were

9    plaintiffs' experts, that somehow the

10   content of the article is wrong, are you?

11   You are not making that assertion?

12           A.    So I can't make that

13   assertion.

14           Q.    Right.  One way or the

15   other?

16           A.    Correct.

17           Q.    Same thing with the Benbrook

18   article.  The fact that Dr. Benbrook

19   disclosed that he was a plaintiffs'

20   expert is a positive, is it not?

21                 MR. SLONIM:  Objection.

22   BY MR. KRISTAL:

23           Q.    That's what you are supposed

24   to do.

Michael L. Grossbard, M.D.

1          MR. SLONIM:  Objection.

2          THE WITNESS:  I think

3     anybody disclosing, as I said

4     before, is the right thing to

5     do.

6 BY MR. KRISTAL:

7          Q.    Okay.  And you don't know

8 whether Dr. Benbrook's analysis is

9 correct or not correct, not having read

10 the article, correct?

11         A.    Correct.  I'm not going to

12 comment on his assessment.

13         Q.    Okay.  Now, with respect to

14 Health Canada.  Earlier -- and I can pull

15 up the exact question and answer, but you

16 said, you acknowledge that you had never

17 relied on Health Canada's evaluation of

18 anything in your regular professional

19 life, correct?

20         A.    Oh, outside of this?

21         Q.    Yes.

22         A.    That's right.

23         Q.    You don't consider this part

24 of your regular professional life, do

Michael L. Grossbard, M.D.

1    you?

2            A.    It's regular.  It's part of

3    my professional life.  No, really.  It

4    is, but --

5            Q.    In your work as an

6    oncologist, outside of litigation --

7            A.    Have I relied --

8            Q.    -- have you ever relied on

9    Health Canada's evaluation of anything

10   for any reason?

11           A.    I have not.

12           Q.    Had you ever even heard of

13   Health Canada before this litigation?

14           A.    Yes.

15           Q.    Okay.  So despite the fact

16   that you heard of them, you never went to

17   them to review anything they said about

18   anything?

19           A.    It wouldn't be something

20   that would be relevant to my everyday

21   work, if you will.

22           Q.    Okay.  And in point of fact,

23   you formed the opinions that you have

24   here today not having reviewed Health

Michael L. Grossbard, M.D.

1    Canada at the time that you first formed

2    those opinions, correct?

3              Let me make it easier.  I'm

4    going to mark the Hardemann and Gebeyehou

5    reports.  And you tell me if Health

6    Canada, either the --

7         A.    Oh, I'm sorry.  I

8    understand.  I may have misunderstood

9    your question.

10        Q.    Let me ask a clear question.

11   I know it's getting late in the day and

12   we're all hungry and we're rushing.

13              (Document marked for

14              identification as Exhibit

15              Grossbard-31.)

16   BY MR. KRISTAL:

17        Q.    In the Hardemann report,

18   this is your Hardemann report

19   November 26, 2018, there's a grand

20   total --

21              MR. SLONIM:  What number?

22              MR. KRISTAL:  That's 31.

23   BY MR. KRISTAL:

24        Q.    Grand total of 38 articles

Michael L. Grossbard, M.D.

1    that you formed in considering your

2    Hardemann opinion, correct?

3          A.    Correct.

4          Q.    And for example, the first

5    one is about hepatitis B and C, right?

6          A.    Correct.

7          Q.    Third one is about chronic

8    hepatitis C, right?

9          A.    Correct.

10          Q.    The other is simply

11    statistics from the American Cancer

12    Society.  That has nothing to do with

13    glyphosate, correct?

14          A.    Yes and no.

15          Q.    Well, it doesn't speak to

16    glyphosate, right?

17          A.    No it speaks to the

18    incidence of the disease --

19          Q.    Yeah.

20          A.    -- and whether the disease

21    is rising.

22          Q.    Okay.  Number 6 is about

23    hepatitis virus?

24          A.    Yes.

Michael L. Grossbard, M.D.

1    Q.  Number 7 is about hepatitis

2 B?

3    A.  Correct.

4    Q.  Number 8 is about obesity,

5 right?

6    A.  Correct.

7    Q.  Number 10 is about long-term

8 outcomes, right?

9    A.  Yes.

10    Q.  Hepatitis C is Number 11?

11    A.  Yes.

12    Q.  HCV infection is Number 19?

13    A.  Yes.

14    Q.  Viral elimination is Number

15 20?

16    A.  Yes.

17    Q.  Obesity is 21?

18    A.  Correct.

19    Q.  Hepatitis C is 23?

20    A.  Correct.

21    Q.  Hepatitis B is 24 and 25?

22    A.  True.

23    Q.  Hepatitis C is 27 and 28?

24    A.  Okay.  Yes.

Michael L. Grossbard, M.D.

1    Q.    Hepatitis C is 30 and 33?

2    A.    Yes.

3    Q.    Hepatitis B is 35 and 36?

4    A.    Yes.

5    Q.    And hepatitis C is 38,

6  right?

7    A.    Yes.

8    Q.    So there was about 15, 16

9  articles that formed the basis of your

10  opinion in this litigation, not including

11  Health Canada, correct?

12    A.    Yes.  That would be true.

13  That would be true.

14    Q.    And the same thing is true

15  for the Gebeyehou report.

16        (Document marked for

17        identification as Exhibit

18        Grossbard-32.)

19  BY MR. KRISTAL:

20    Q.    We're going to mark that as

21  32.  This was prepared November 26, 2018.

22    A.    Yes.

23    Q.    And if you'll turn to the

24  back, this has less articles.  This has

Michael L. Grossbard, M.D.

1    35, right?

2           A.    Correct.

3           Q.    And without going into great

4    detail, if you scan it, about half of

5    those -- and we can do it if you want --

6    relate to hepatitis C or hepatitis B or

7    something unrelated to glyphosate; is

8    that correct?

9           A.    Yeah, I don't think we need

10   to go through them.

11          Q.    Okay.  And Health Canada is

12   not mentioned in any materials considered

13   or in either report?

14          A.    That would be true.

15          Q.    Because you hadn't read it

16   at that time, right?

17          A.    That would be true.

18          Q.    Okay.  And you understand

19   that the glyphosate monograph itself, the

20   actual monograph, came out in 2017, even

21   though the working group met in 2015?

22          A.    That's true.

23          Q.    Okay.  When you were talking

24   about Health Canada, and I can see if I

Michael L. Grossbard, M.D.

1  can pull up the exact quote, the question

2  was -- you were asked to read a

3  paragraph.  And you read, "Risks to

4  handlers are not of concern for all

5  scenarios.  Based on the precautions and

6  directions for use on product labels

7  reviewed for this reevaluation," and then

8  it goes on about risk assessment.

9       A.    Okay.

10       Q.    Do you have any idea what

11  the Canadian labels for glyphosate-based

12  herbicides say in terms of precautions

13  and directions?

14       A.    I do not.

15       Q.    That would affect whether or

16  not someone has exposure and, therefore,

17  whether they're at risk?

18       A.    Certainly the label on

19  handling would affect exposure.

20       Q.    And you don't know what it

21  said or didn't say, correct?

22       A.    That's correct.

23       Q.    All right.  And when you

24  were reading what Health Canada said, as

Michael L. Grossbard, M.D.

1    Mr. Slonim had you read, you didn't read

2    the underlying studies to come to your

3    own evaluation.  You're telling us what

4    Health Canada said about articles you

5    didn't read, correct?

6                  MR. SLONIM:  Objection.

7    BY MR. KRISTAL:

8          Q.    For the most part?

9          A.    In some cases, yes.  In some

10   cases not.

11         Q.    Would you agree for the most

12   part, you had not read the underlying

13   studies?

14         A.    Related to the genotoxicity?

15         Q.    Genotoxicity?

16         A.    As I said earlier, I

17   wouldn't change my answers.

18         Q.    And the animal studies for

19   the most part --

20         A.    As I said earlier, I relied

21   on review articles on those.

22                  MR. KRISTAL:  Thank you

23         again.  And this is like a tennis

24         match.

Michael L. Grossbard, M.D.

1           So if Mr. Slonim has no more

2      questions, I have no more

3      questions.  And if he has other

4      questions, I may have.

5           MR. DIAMOND:  I have a few.

6      But if you want to go first.

7           MR. SLONIM:  No.  I have no

8      further questions with regard to

9      the Sanders.

10          MR. KRISTAL:  I'm done.

11          And Mr. Diamond...

12              -  -  -

13  (Whereupon, a discussion was held off the

14  stenographic record.)

15              -  -  -

16          EXAMINATION

17              -  -  -

18  BY MR. DIAMOND:

19      Q.   Okay.  Hi, Doctor.  David

20  Diamond.  I represent Jaime Alvarez

21  Calderon.  I'll refer to him as

22  Mr. Alvarez.  I'll do that when we're

23  talking.

24          I want to mark as whatever

Michael L. Grossbard, M.D.

1   the next exhibit is -- 33.

2              (Document marked for

3          identification as Exhibit

4          Grossbard-33.)

5   BY MR. DIAMOND:

6          Q.    Your report in Mr. Alvarez's

7   case.

8              MR. DIAMOND:  Bert, do you

9          have a copy?

10             MR. SLONIM:  Yeah.  I'll dig

11         out my copy.

12  BY MR. DIAMOND:

13         Q.    And just briefly, I know

14  before we started, and I can't even

15  remember what we said at the beginning.

16  But just to make sure that I'm clear on

17  it, your answers to Mr. Kristal regarding

18  his questions, if asked regarding

19  Mr. Alvarez, would be the same, correct?

20         A.    98 percent of his questions

21  would be generic as opposed to

22  plaintiff-specific, so yes.

23         Q.    Right, because I don't want

24  to get back into some of those same

Michael L. Grossbard, M.D.

1    questions again.

2              MR. SLONIM:  And, Counsel,

3         just one thing.  We had indicated

4         earlier on that there was some --

5         a paragraph, basically, that was

6         omitted inadvertently from the

7         Mr. Alvarez report concerning risk

8         factors.

9              MR. DIAMOND:  You know, I

10        wasn't aware of that.  But that

11        was a question that I had.

12             MR. SLONIM:  It's already in

13        this record.  But let me -- just

14        so it's clear.

15             MR. KRISTAL:  Before you do

16        that -- it might be easier for

17        Mr. Diamond if I give him the

18        Sanders report so he can see what

19        you're talking about.

20             MR. DIAMOND:  Sure.  One of

21        my questions was that I didn't

22        have any risk factors in

23        Mr. Alvarez's report.  And I

24        wasn't aware of a supplemental

Michael L. Grossbard, M.D.

1        report.

2              THE WITNESS:  There is not.

3              MR. SLONIM:  There's not a

4        supplemental report.  Take a look

5        at Deposition Exhibit Number 1,

6        which is the Sanders report.

7              MR. DIAMOND:  I have it.

8              MR. SLONIM:  Turn to Page 5,

9        please.

10             MR. DIAMOND:  I'm there.

11             MR. SLONIM:  Okay.  If you

12       look at the last paragraph and if

13       you go up a couple of sentences.

14       It says, "At the outset."

15             MR. DIAMOND:  The last

16       paragraph at the bottom of Page 5.

17             MR. SLONIM:  And then go up

18       a couple of sentences.  It says,

19       "At the outset."

20             MR. DIAMOND:  I see it.

21             MR. SLONIM:  So beginning at

22       where it says, "At the outset,"

23       and down to the bottom of Page

24       5 --

Michael L. Grossbard, M.D.

1          MR. DIAMOND:  Okay.

2          MR. SLONIM:  -- that same

3      text should have been included in

4      the Alvarez report, and we

5      realized belatedly that it was

6      not.

7          MR. DIAMOND:  Okay.  So let

8      me just take a quick look at it.

9      And then I may have a question or

10     two about it.

11         MR. SLONIM:  Sure.

12  BY MR. DIAMOND:

13     Q.    I did look at the Sanders

14  report before, and I looked at the

15  Hardeman report.  And in those reports,

16  you discussed other specific risk factors

17  pertaining to those plaintiffs.

18     A.    Correct.

19     Q.    But I didn't see any

20  discussion of any specific risk factors

21  pertaining to Mr. Alvarez, which I'm

22  assuming is because he didn't have any

23  other risk factors?

24     A.    That list of risk factors

Michael L. Grossbard, M.D.

1    that I provided as potential risk

2    factors, infection, diabetes, obesity, I

3    could not identify any of those risk

4    factors for Mr. Alvarez.

5         Q.    Fair enough.  That will make

6    things a little quicker.

7              And when I was looking at

8    your report, and I'm looking at Page 3 at

9    the top, the last sentence before the

10   non-Hodgkin's lymphoma paragraphs begin?

11        A.    Okay.  Maybe.  Oh, okay.

12   Yes, I see it.  I see it.  Okay.

13        Q.    I'll read it to you.

14        A.    No, I got it.

15   "Scientifically impossible"?

16        Q.    Yes.

17        A.    Yes.

18        Q.    And so it's my understanding

19   that that's your opinion in this case, is

20   that you can't determine the cause of

21   Mr. Alvarez non-Hodgkin's lymphoma?

22        A.    That is true.

23        Q.    Okay.  And the basis for

24   that is because of your belief or opinion

Michael L. Grossbard, M.D.

1    that you can't make that determination

2    for anyone?

3                    MR. SLONIM:  Objection.

4    BY MR. DIAMOND:

5         Q.    That's -- well, go ahead.

6         A.    For anyone with lymphoma?  I

7    mean --

8         Q.    It was a bad question.  And

9    I didn't -- I'm misstating some things

10   that you said.  So let me see if I can

11   figure it out a little bit better and ask

12   a good question.

13                   Your opinion is just that

14   exposure to Roundup cannot be a cause of

15   non-Hodgkin's lymphoma?

16        A.    That would be true.

17        Q.    Okay.  And that's based upon

18   everything that you discussed earlier

19   today, correct?

20        A.    Yes.  There would be no -- I

21   mean, what's in the report and any

22   questions that I've been asked, yes.

23        Q.    Okay.  But it's not based

24   upon any type of differential etiology or

Michael L. Grossbard, M.D.

1  differential diagnosis depending on how

2  you say it.  I think the court discusses

3  using the terms interchangeably --

4  interchangeably for legal purposes.

5          MR. SLONIM:  Objection.

6      Form.

7  BY MR. DIAMOND:

8      Q.    Is that correct?

9      A.    So I -- I -- the question

10 being?  I mean, I'm sorry.  I can't

11 name -- I can't say it's -- I can't say

12 what causes it because --

13     Q.    Of doing any type of ruling

14 in, ruling out factors?

15     A.    So I can rule in or rule out

16 factors, again, if you have some of these

17 things that I believe are causes.  If he

18 had radiation in the field, if he had

19 Helicobacter pylori, if there's HIV

20 infection, if there's EBV virus.

21          There's a whole litany that

22 we don't need to go through.  But absent

23 that, and without those well defined

24 factors, for the majority of patients, I

Michael L. Grossbard, M.D.

1  can't -- or the majority of patients --

2  majority of individuals with lymphoma, I

3  can't say what caused their lymphoma.

4      Q.    And just turning to Page 6

5  of your report.

6      A.    Yes.

7      Q.    And we get down to where we

8  talk about clinical history.

9      A.    Yes.

10      Q.    I'm going to ask you about

11  some of the things that you put in these

12  few paragraphs.

13      A.    Sure.

14      Q.    Just to ask you what the

15  relevance to your opinions are of the

16  facts that you've sort of set forth,

17  okay?

18      A.    Absolutely.

19      Q.    So I'm going to try to break

20  it down, and then I'm going to ask you

21  for each one, what's the relevance to any

22  of your opinions.

23      A.    Okay.

24      Q.    The fact that he was born in

Michael L. Grossbard, M.D.

1  Mexico City has no relevance to your

2  opinions, does it?

3       A.    No.  It's all just part of

4  providing a medical history.

5       Q.    Okay.  The fact that he was

6  born in 1954, does that have any

7  relevance?

8       A.    Older individuals, the older

9  you are, the more likely you are to have

10  lymphoma.  But I can't say that age

11  caused his lymphoma.

12       Q.    It may make him more

13  susceptible?

14       A.    No more susceptible, but

15  more likely that he got lymphoma.

16  Whether you call the word "susceptible"

17  or not is hard to say.

18       Q.    But it's not a cause?

19       A.    No.

20       Q.    Okay.  And then you

21  mentioned that he has no family history

22  of non-Hodgkin's lymphoma.

23       A.    Yes.

24       Q.    Is that relevant to your

Michael L. Grossbard, M.D.

1    opinions?

2         A.    It is.  Family history is a

3    recognized risk factor, though not a

4    cause for lymphoma.

5         Q.    Okay.  And he doesn't have

6    that history?

7         A.    That is true.

8         Q.    You mentioned that he does

9    have a history of cancer in his son?

10        A.    That's true.

11        Q.    And that he was diagnosed

12   with an osteosarcoma -- osteosarcoma.

13   Does have that any relevance to your

14   opinions?

15        A.    To the best of my knowledge,

16   there's no literature linking lymphoma

17   and osteosarcoma in families.

18        Q.    Okay.  And the same, you go

19   on and say that his mother was diagnosed

20   with a brain tumor, but it's unknown

21   whether the lesion was benign or

22   malignant, correct?

23        A.    Yes.

24        Q.    Does that have any relevance

1 to your opinions regarding Mr. Alvarez?

2       A.    No.   There's not enough

3 family history of cancer here to provide

4 a genetic reason for this.

5       Q.    Okay.   I'm skipping down a

6 paragraph.   From March '86 to the present

7 time, he's been employed by Sutter Home

8 Vineyards as a landscaper.   His work

9 includes pruning trees, watering, and

10 mowing the lawns and that he reports he

11 sprayed Roundup over an approximately

12 20-acre property.

13            Does that have any relevance

14 to your opinions?

15       A.    Well, it has relevance to

16 the fact that my opinion is really

17 whether Roundup is the cause of his

18 lymphoma.   So, I think stating his use of

19 Roundup matters.   If he never used it,

20 then we would never even be sitting here.

21       Q.    Okay.   And would it make any

22 difference if he sprayed 80 acres?

23       A.    Oh, in terms of quantitation

24 of acres?   Not to my -- no.

Michael L. Grossbard, M.D.

1    Q.    Okay.  And you also

2  mentioned that he sprayed a soap-based

3  pesticide on plants.  Any relevance to

4  your opinions regarding Mr. Alvarez?

5    A.    I don't know what that

6  pesticide was and I don't know -- I can't

7  say that that caused lymphoma.

8         MR. KRISTAL:  It does kill

9         aphids, I can testify to that.

10        I'm sorry.

11        MR. DIAMOND:  And that's

12        correct.  That's what he said.  He

13        used it on his roses.

14        MR. KRISTAL:  I use it on

15        all my houseplants.

16  BY MR. DIAMOND:

17    Q.    Going down to the next

18  paragraph, you mentioned Mr. Alvarez

19  describes using both Roundup Ready-to-Use

20  Weed & Grass Killer III, as well as

21  Roundup Pro Concentrate between 1986 and

22  2017.

23        Any significance to your

24  opinions?

Michael L. Grossbard, M.D.

1          A.     Just trying to document when

2      he used and what he used as far as

3      Roundup.  But the difference between

4      those as far as my opinion, no.

5          Q.     All right.  And the fact

6      that he sprayed -- you go on to say, "He

7      sprayed about every two days during the

8      spring months and less frequently in the

9      summer and fall.  And at deposition

10     Mr. Alvarez testified only to the use of

11     the concentrate."

12             Any specific -- any special

13     significance to that?

14         A.     It's not going to alter my

15     opinion, no.

16         Q.     Okay.  You mentioned in the

17     next paragraph that his past medical

18     history was notable for H. pylori

19     antibody positive.  Any special

20     significance in Mr. Alvarez's case for

21     that?

22             A.     There could be.  But there

23     isn't in his case.  The reason to point

24     it out is that there are certain types of

Michael L. Grossbard, M.D.

1    lymphoma that are associated with

2    Helicobacter pylori.  That does not

3    appear to be his type.

4         Q.    And that, you talked about

5    earlier, the MALT?

6         A.    Correct.

7         Q.    Okay.  And he didn't have

8    that type of lymphoma?

9         A.    No, he did not.

10        Q.    You also mentioned that he

11   was -- his history was notable for

12   hyperlipidemia, hypertension, tinnitus,

13   depression and coronary artery disease?

14             MR. KRISTAL:  Join the club.

15   BY MR. DIAMOND:

16        Q.    Any significance to those

17   for your opinions?

18        A.    A little bit.  Not with

19   respect to causation of lymphoma.

20        Q.    Okay.

21        A.    But with respect to whether

22   chemotherapy caused his heart problem

23   some years later when he had -- when he

24   had to go for an emergent bypass surgery,

1  I don't believe that was related to his

2  chemotherapy personally.  I believe it's

3  related to underlying coronary artery

4  disease.

5      Q.    And so that's where you

6  disagree with his treating doctor,

7  Dr. Andreadis?

8      A.    That would be true.

9      Q.    Okay.  You mentioned, if you

10  go down a little bit further, that his

11  height was 61 inches, and his weight was

12  134 pounds with a BMI of 25.8.  Any

13  specific significance to that?

14      A.    Only to the relevance that

15  obesity, which he does not have, would be

16  associated with lymphomas.  So I'm

17  pointing out to myself, to you, to

18  anyone, that that's not a risk factor

19  that I would cite here.

20      Q.    Okay.  And you mentioned the

21  next couple of sentences, that the one --

22  one note, it says that he drank a six

23  pack of beer daily.  Another one he drank

24  one drink per day.  I think if you even

Michael L. Grossbard, M.D.

1    look at some of the other records it

2    talks about a couple of times -- a couple

3    of beers a day, excuse me.

4              Any significance to the

5    amount of alcohol that he was drinking

6    for your opinions?

7         A.    With respect to causation of

8    lymphoma, no.

9         Q.    Okay.  You mentioned in here

10   that he has a history of cigarette

11   smoking.  With respect to his cigarette

12   smoking, any specific relevance to your

13   opinions regarding causation?

14        A.    There's some very -- there

15   is some literature suggesting a

16   relationship between cigarette smoking

17   and specifically follicular lymphoma.  In

18   his case, I don't think that's a major

19   factor.

20        Q.    Okay.  So just to be clear,

21   you don't -- is it a factor or not a

22   factor?  More likely than not.

23        A.    Yeah, more likely than not

24   it is not a substantial contributing

Michael L. Grossbard, M.D.

1   factor.

2        Q.    Fair enough.  Mr. Kristal

3   did such a great job.  I hardly have any

4   questions.

5        A.    Thank you, Mr. Kristal.

6             MR. KRISTAL:  I'll take that

7        to mean I asked a lot of

8        questions?

9             MR. SLONIM:  Given the fact

10       that it's 6:20, if you wanted to

11       wrap it up soon, I don't think

12       anyone would be upset.

13            MR. DIAMOND:  I don't think

14       so either.  Let me just take a

15       quick look over my notes.

16            In terms just of

17       housekeeping, do you have a copy

18       of my notice of deposition?  It

19       hasn't been marked.

20            MR. KRISTAL:  Did you bring

21       one?

22            MR. DIAMOND:  No.  I was

23       going to mark my notice of

24       deposition and just say that your

Michael L. Grossbard, M.D.

1    objections would be the same.  Do

2    you want to stipulate to that?

3         MR. SLONIM:  I hesitate to

4    do that simply because I haven't

5    seen any.

6         MR. DIAMOND:  I gave it to

7    Aaron, and he looked it over.

8         So if I represent that the

9    documents that I asked to be

10   brought would be the same

11   documents that were requested in

12   Mr. Sanders' case, would it be

13   fair to say that the objections

14   would be the same?

15        MR. SLONIM:  Yes.  Agreed.

16        MR. DIAMOND:  Fair enough.

17   That's all I have.

18        Thank you.

19        MR. SLONIM:  I think we're

20   done.  Thank you very much.

21        THE VIDEOGRAPHER:  The time

22   now is 6:20 p.m., and we're off

23   the record.

24        (Excused.)

Michael L. Grossbard, M.D.

1            (Deposition concluded at

2        approximately 6:20 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Michael L. Grossbard, M.D.

1

2                        CERTIFICATE

3

4

5            I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.

7

             It was requested before
8   completion of the deposition that the
    witness, MICHAEL L. GROSSBARD, M.D., have
9   the opportunity to read and sign the
    deposition transcript.

10

11                    *Michelle L. Gray*

12
             _____
             MICHELLE L. GRAY,
13           A Registered Professional
             Reporter, Certified Shorthand
14           Reporter, Certified Realtime
             Reporter and Notary Public
15           Dated:  December 2, 2019

16

17

18           (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)

23

24

Michael L. Grossbard, M.D.

1                    INSTRUCTIONS TO WITNESS

2

3                    Please read your deposition

4      over carefully and make any necessary

5      corrections.  You should state the reason

6      in the appropriate space on the errata

7      sheet for any corrections that are made.

8                    After doing so, please sign

9      the errata sheet and date it.

10                    You are signing same subject

11     to the changes you have noted on the

12     errata sheet, which will be attached to

13     your deposition.

14                    It is imperative that you

15     return the original errata sheet to the

16     deposing attorney within thirty (30) days

17     of receipt of the deposition transcript

18     by you.  If you fail to do so, the

19     deposition transcript may be deemed to be

20     accurate and may be used in court.

21

22

23

24

Michael L. Grossbard, M.D.

1        _   _   _   _   _   _

                E R R A T A

2        _   _   _   _   _   _

3

4    PAGE   LINE   CHANGE

5    _____  _____   _____

6        REASON: _____

7    _____  _____   _____

8        REASON: _____

9    _____  _____   _____

10        REASON: _____

11    _____  _____   _____

12        REASON: _____

13    _____  _____   _____

14        REASON: _____

15    _____  _____   _____

16        REASON: _____

17    _____  _____   _____

18        REASON: _____

19    _____  _____   _____

20        REASON: _____

21    _____  _____   _____

22        REASON: _____

23    _____  _____   _____

24        REASON: _____

Michael L. Grossbard, M.D.

1

2          ACKNOWLEDGMENT OF DEPONENT

3

4          I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 391, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    MICHAEL L. GROSSBARD, M.D.        DATE

17

18

19   Subscribed and sworn

     to before me this

20   _____ day of _____, 20_____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Michael L. Grossbard, M.D.

```
1                        LAWYER'S NOTES

2        PAGE   LINE

3        _____  _____  _____

4        _____  _____  _____

5        _____  _____  _____

6        _____  _____  _____

7        _____  _____  _____

8        _____  _____  _____

9        _____  _____  _____

10       _____  _____  _____

11       _____  _____  _____

12       _____  _____  _____

13       _____  _____  _____

14       _____  _____  _____

15       _____  _____  _____

16       _____  _____  _____

17       _____  _____  _____

18       _____  _____  _____

19       _____  _____  _____

20       _____  _____  _____

21       _____  _____  _____

22       _____  _____  _____

23       _____  _____  _____

24       _____  _____  _____
```