**WILKINSON WALSH + ESKOVITZ LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonwalsh.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonwalsh.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:   202-847-4005

**WILKINSON WALSH + ESKOVITZ LLP**
Sean Eskovitz (CA Bar No. 241877)
(seskovitz@wilkinsonwalsh.com)
11601 Wilshire Boulevard
Suite 600
Los Angeles, CA 90025
Tel:    424-291-9655
Fax:   202-847-4005

**ARNOLD & PORTER KAYE SCHOLER LLP**
William Hoffman (*pro hac vice*)
(William.Hoffman@arnoldporter.com)
601 Massachusetts Avenue, N.W.
Washington, DC 20001
Tel: 202-942-6915
Fax: 202-942-5999

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

*Attorneys for Defendant*
*MONSANTO COMPANY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| *Stevick v. Monsanto Co., et al.*, 3:16-cv-2341-VC | **MONSANTO COMPANY'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM R. SAWYER ON *DAUBERT* GROUNDS** |

- 1 -

Perhaps the best evidence of the weakness of Dr. Sawyer's opinions is his 32-page declaration (really, supplemental expert report) in support of Plaintiff's opposition to Monsanto's motion to exclude his testimony. In that declaration, Dr. Sawyer attempts to walk back earlier concessions and defend his slipshod methods in an effort to preserve his ability to testify in support of virtually every aspect of Plaintiff's case.

The Court should disregard Dr. Sawyer's attempt to backfill the deficiencies in his prior report and testimony in Mrs. Stevick's case. But even if considered, the declaration—like Dr. Sawyer's prior reports and testimony—underscores that he is not a scientist who employs reliable, tested methods, but a mouthpiece for Plaintiff's allegations. Because Dr. Sawyer's testimony is neither scientifically sound nor helpful to the jury, the Court should exclude it in its entirety.

I.  **The Court Should Exclude Dr. Sawyer's Purported "Differential Diagnosis" Of Mrs. Stevick.**

The parties agree that "[t]he words 'differential diagnosis' are not magic words" and that "[w]hat is important is the scientific technique used to form an opinion." Opp. 9. The problem for Dr. Sawyer is that he has not applied anywhere close to the right techniques.

It is apparent that Dr. Sawyer lacks the qualifications to conduct a differential diagnosis. Plaintiff does not dispute that Dr. Sawyer is not a specialist in NHL, a physician with a clinical practice, or even a medical doctor. *See* Ex. 1, 2/26/18 Sawyer Dep. Tr. 41:3-5. ("Q. You don't examine patients? A. No, I'm not a medical doctor. I don't diagnose or treat patients."). Perhaps more importantly, despite asserting that "[d]ifferential diagnosis is a generally accepted toxicological and methodological assessment methodology," Opp. 7, neither Dr. Sawyer nor Plaintiff offers a single example of his performing the methodology elsewhere. For good reason: Dr. Sawyer has testified in two Roundup trials and submitted dozens of reports without ever conducting a differential diagnosis.

Nor do Dr. Sawyer's methods resemble a differential diagnosis. There is nothing "misleading and erroneous" about the observation that he first invoked the methodology at his

deposition. Decl. 9. It is not enough that Dr. Sawyer's report includes "a thorough review of Mrs. Stevick's family history, age; prior work history; operational hazards; home hazards; alcohol, tobacco, and drug history; and medical history." Opp. 9. Notwithstanding this background material, there is no effort in the report to actually analyze whether those factors played a role in her NHL, let alone rule them out.

And there is no valid differential diagnosis set forth in Dr. Sawyer's deposition or recent declaration. As Plaintiffs acknowledge, merely invoking the term "differential diagnosis" hardly satisfies the standard for admissibility. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005); *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 551 (W.D. Pa. 2003). Notably, Dr. Sawyer now appears to distance himself from the first step of the differential diagnosis methodology—ruling in. Decl. 10. This effort to elide the first step in the process makes sense, because his original approach in this litigation purported to rule in Roundup based solely on unadjusted epidemiological data. *See, e.g.*, Sawyer Rep. at 27-28 (ECF 8572-3); Sawyer MDL Dep. Tr. 42:2-43:11 (ECF 8572-4) (describing how exposure-day threshold was derived from two epidemiological studies); 231:7-233:7 (confirming that his specific-causation opinion is based primarily on Mrs. Stevick's exposure days). As Monsanto has explained, such an approach does not provide a reliable basis for ruling in Roundup as a cause for a particular plaintiff. *See Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) (noting that experts cannot pick and choose from the scientific landscape). Further, Dr. Sawyer's rigid reliance on these days-per-year statistics doubles down on Plaintiff's impermissible strategy of suggesting that Roundup was necessarily a substantial contributing factor for NHL in any person who sprayed Roundup more than the threshold number of days per year in the McDuffie and Eriksson studies. *See, e.g.*, PTO 45 at 24, 50 (explaining that "exclusive consideration of numbers unadjusted for other pesticides, when adjusted numbers are available, would be disqualifying"); PTO 85 at 8 (precluding Drs. Nabhan and Shustov from "testify[ing] that glyphosate is a substantial causative factor for anyone who exceeds two days per year or ten lifetime days of Roundup use, because that conclusion is again based on unadjusted data").

Nor does Dr. Sawyer validly rule out alternative causes of NHL. Take, for example, Dr. Sawyer's treatment of mecoprop. There is no dispute that he has never attempted to quantify Mrs. Stevick's exposure to mecoprop, despite admitting that it is an acknowledged NHL risk factor. *Compare* Sawyer MDL Dep. Tr. 87:14-17 (ECF 8572-4) (agreeing mecoprop is a risk factor), *with id.* 117:14-17 (explaining that he did not quantify her mecoprop exposure). At his deposition, he offered no explanation for ruling it out besides pure say-so. In his declaration, he purports to rule it out simply because it is "not a probable or known human carcinogen" as evidenced by the fact that it "is an IARC Group 2B carcinogen." Decl. 25. But blind deference to an IARC classification from the 1980s is not a substitute for sound scientific analysis, let alone a basis for ruling out a chemical he has twice previously testified was a risk factor for NHL. Sawyer MDL Dep. Tr. 87:14-17, 157:10-13 (ECF 8572-4).

Dr. Sawyer also failed to "t[ake] into account" idiopathic causes. Dr. Sawyer himself has acknowledged that 50 percent of the population will develop cancer at some point in their lifetime regardless of what they do during their life. *See* Ex. 2, Sawyer *Alvarez* Dep. Tr. 110:5-22. Previously, he has admitted that his "entire basis" for ruling out idiopathic or unknown causes was that Mrs. Stevick cleared his exposure-day threshold, which is based on the epidemiology studies that he is not qualified to assess. *See infra* at 6; Sawyer MDL Dep. Tr. 198:15-199:25 (ECF 8572-4). Such bootstrapping cannot possibly provide a reliable basis for a proper differential diagnosis. *See Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 838 (9th Cir. 2011) (finding an expert opinion inadmissible where the expert "simply assumed that causation existed without going through the steps in the differential diagnosis process that his report said he would"). In his declaration, Dr. Sawyer does even less, asserting that he has "explicitly deferred to the opinions of the epidemiologists . . . as a basis for my opinions regarding potential idiopathic causes." Opp. 15. An expert cannot simply outsource the rationale for his opinions when he is unqualified, unable, or unwilling to defend them on his own.

The bottom-line is simple: Dr. Sawyer lacks the experience and training to conduct a differential diagnosis, and his attempt to retrofit his methodology in response to obvious defects—

whether on the fly in his deposition or in his revisionist declaration—cannot satisfy any conception of *Daubert* reliability.

### II. The Court Should Exclude Dr. Sawyer's Untested And Unreliable General-Causation Opinions.

Under Plaintiff's own proposed rule, the vast majority of Dr. Sawyer's opinions must be excluded. Plaintiff has taken the position that the parties can address general causation only through the experts that were vetted at the general causation *Daubert* phase. *See* Ex. 3, 12/16/19 CMC Tr. 37:15-41:25. Plaintiff attempts to shoehorn Dr. Sawyer's testimony into that rule by explicitly pronouncing that "Dr. Sawyer is not offering any general causation opinions." *See* Opp. 8. That attempt fails. The vast majority of Dr. Sawyer's opinions must be excluded, because they relate not to Mrs. Stevick's "particular level of exposure," Opp. 8, but to general characteristics of Roundup.

Both Plaintiff and Dr. Sawyer have admitted as much. Plaintiff asserts that Dr. Sawyer's opinions will include "issues concerning the mechanism of absorption of glyphosate-based formulations through the skin and other exposure pathways and the effect of wearing personal protective equipment on the exposure levels." Opp. 5. Those "issues" relate to how Roundup generally operates to cause cancer, not on any specifics of Mrs. Stevick. Indeed, in their opposition, Plaintiff lists the issues above as separate from "***issues of specific causation***, including the comparability of Plaintiff's exposure with the exposure data from epidemiological studies, for Plaintiff Elaine Stevick." Opp. 5 (emphasis added).

For his part, Dr. Sawyer has explained that the vast majority of his report, which touches on Roundup ingredients, exposure models and dermal absorption, and a review of epidemiology literature, "was intended to address . . . general points that [he is] making regarding glyphosate, dermal exposure, glyphosate exposure, things like that that would apply to anybody." 12/20/18 Sawyer Dep. Tr. 18:16-24 (ECF 8572-4). Similarly, in another case involving Roundup, Dr. Sawyer expressly admitted that these are general causation opinions: "I'm going to explain the properties, the absorption, distribution, metabolism, and the carcinogenicity aspects of glyphosate and Roundup super concentrate. Q. Okay. And so you only plan to offer a *general causation opinion* that it's your opinion glyphosate-based herbicides can cause cancer, correct? A. *Yes*, but as I said a moment

ago, relative to other potential carcinogens." Sawyer *Hall* Dep. Tr. 480:14-23 (ECF 8572-19) (emphasis added).  His newly-minted declaration does nothing to negate these concessions, repeatedly invoking the Bradford Hill criteria (Decl. 5, 27-28) and the "epidemiological, animal and genotoxicity studies," Decl. 6, 17, which all relate to general causation.

To the extent the Court permits new general causation experts, as Monsanto submits it should, that does not provide a free pass for Dr. Sawyer.  Despite now purporting to have conducted some kind of Bradford Hill analysis, *see* Decl. 27-28, Dr. Sawyer has previously admitted that he is not qualified to utilize epidemiology.  *See, e.g.*, 9/15/19 Sawyer *Giglio* Dep. 58:8-16, 64:2-11 (ECF 8572-7); Sawyer MDL Dep. Tr. 199:11-20 (ECF 8572-4) ("Q Yeah, but when I asked you what you were relying on to conclude that more likely than not Mrs. Stevick's cancer was not the result of an idiopathic cause, you referenced -- or you testified that that's based on the epidemiologic studies I've referenced, which included McDuffie 2001 and Eriksson 2008.  What other epidemiologic studies are you relying on to conclude that more likely than not Mrs. Stevick's cancer was not the result of an idiopathic cause? A I'm deferring that to the epidemiologists.").  Dr. Sawyer's efforts to buttress his expertise by reference to his toxicology training more than three decades ago do nothing to walk back his earlier concessions, nor do they provide a sufficient basis for him to address and interpret those studies.[1]

Nor does it benefit Dr. Sawyer to assert that he is simply comparing Ms. Stevick's dose to the epidemiology studies.  *See* Decl. 13-14.  If Dr. Sawyer lacks expertise in epidemiology—as all the available evidence suggests—he should not be allowed to address or discuss it.  Further, to the extent he is simply comparing his exposure calculation to the studies, he is doing something the jury is capable of doing on its own.  *See, e.g.*, *City of New York v. FedEx Ground Package Sys., Inc.*, No. 13 Civ. 9173 (ER), 2018 WL 4961455, at *4 (S.D.N.Y. Oct. 10, 2018) (excluding expert opinion

---

[1] Plaintiff's opposition also misstates Dr. Sawyer's expertise.  Dr. Sawyer is a toxicologist by training, but contrary to Plaintiff's opening assertion that he "is a highly qualified toxicologist" by virtue of being "Board Certified in forensic medicine, toxicology and pharmacology," (Opp. 4 (citation omitted)), Dr. Sawyer is not board-certified in any discipline.  *See* Ex. 2, Sawyer *Alvarez* Dep. Tr. 26:16-19 ("Q. Are you board certified in toxicology?  A.  No. Q.  Do you have any board certifications?  A.  No.").  Quoting a decision from fifteen years ago that is no longer applicable—which Plaintiff surely knows because Dr. Sawyer is Plaintiff's own expert who has testified to his credentials and lack of board certification in this very litigation—strains the bounds of responsible advocacy.

*(Footnote continued)*

where expert "relied on the same types of evidence that a jury traditionally relies upon to answer the sort of question that a jury traditionally answers").

Dr. Sawyer's other "general" testimony about Roundup is similarly inadmissible.[2] Plaintiff maintains that it is "necessary" for Dr. Sawyer to testify about all ingredients in Roundup, including trace chemicals that Plaintiff alleges are "known carcinogens," such as formaldehyde, ethylene oxide, and n-nitroso. Opp. 14. As an initial matter, Dr. Sawyer has outright withdrawn his opinion as to n-nitroso in the Roundup litigation, making clear that it is not, in fact, "necessary" for Dr. Sawyer to opine on these chemicals to the jury. 10/25/2019 Sawyer *I. Hernandez* Dep. Tr. 14:9-13 (ECF 8572-16). More broadly, there is nothing scientific about simply listing other chemicals present in Roundup and attempting to make them sound menacing. Dr. Sawyer has conceded in another Roundup case that these trace chemicals are not "necessary" to his opinions about Roundup. *See* Ex. 2, Sawyer *Alvarez* Dep. Tr. 138:7-12 ("Q. If Roundup did not have these trace chemicals that you reference in your report, would you have still found that it was a substantial contributing factor in Mr. Alvarez's non-Hodgkin's lymphoma? A. Yes."). That is unsurprising: Neither Dr. Sawyer nor Plaintiff has presented any epidemiology, animal, or toxicological studies suggesting that these other chemicals are associated with NHL. (Indeed, the only support Plaintiff provides in the opposition brief is a nod to IARC's classification of ethylene oxide as a Group 1 carcinogen.) Nor have they attempted to present any science suggesting how these chemicals would operate to cause NHL, or articulate the levels at which these chemicals are allegedly carcinogenic or allegedly present in Roundup. Tellingly, despite attempting to rehabilitate virtually every other aspect of his methodology, Dr. Sawyer provides no defense in his new declaration of his efforts to introduce these other chemicals into the trial.

Likewise, Dr. Sawyer's opinions about impurities in Roundup are not scientifically supportable—as Plaintiff's own experts admit. Dr. Portier has explained that "[v]ery seldom can you build a commercial chemical product without impurities," and the presence of impurities is not

---

[2] Plaintiff's opposition brief does not even attempt to refute Monsanto's argument that Dr. Sawyer's reliance on the universally discredited George study should be excluded by the Court, just as the Court rejected George as a sound basis for a design defect theory in *Hardeman*.

something for which he faults Roundup.  *See* Ex. 4, 6/5/19 Portier Lamb Dep. Tr. 280:2-9.  Contrary to Dr. Sawyer's alarmist take on impurities in Roundup, Dr. Portier has explained that, in manufacturing a chemical product, the company has "no choice" but to permit some impurities in the final product, but he can "probably rule out the impurities from having a major impact" in the animal studies he reviewed.  *Id.* 280:13-282:11.  Dr. Portier is not alone:  in *Hardeman*, there was ***no*** expert testimony or scientific evidence admitted suggesting that impurities affect Roundup's safety profile.

Because Dr. Sawyer's general causation testimony is neither scientifically sound nor helpful to the jury, it should be excluded.

**III.   The Court Should Exclude Dr. Sawyer's Opinions Based on the POEM Model.**

Plaintiff argues what is not in dispute when it comes to Dr. Sawyer's use of the UK Predictive Operator Exposure Model (the "POEM"):  that it is a "generally accepted pesticide modeling technique" used internationally and by Monsanto.  Opp. 11-12.  The relevant point is whether it makes sense to apply this methodology to calculate Mrs. Stevick's exposure.  Neither Plaintiff nor Dr. Sawyer provide any justification for using the *regulatory* POEM, which Dr. Sawyer admits systematically overestimates exposure, Sawyer MDL Dep. Tr. 205:14-206:12 (ECF 8572-4), and is not calibrated for glyphosate, *see* Sawyer *Hall* Dep. Tr. 437:7-11 (ECF 8572-19), to estimate Mrs. Stevick's *residential* glyphosate exposure.  Likewise, Plaintiff does nothing to justify Dr. Sawyer's results-driven selection of POEM inputs that are inconsistent with the published literature. *See* Sawyer MDL Dep. Tr. 261:9-13 (ECF 8572-4) ("Are you able to name a dermal absorption study in human skin where the study authors themselves reported a dermal absorption value higher than 2 percent? A No."); *Lust*, 89 F.3d at 598.  Because Dr. Sawyer's analysis is the product of flawed scientific methods, it should be excluded.

**IV.   The Court Should Not Allow Dr. Sawyer to "Explain" "Technical Jargon" in Monsanto Documents.**

Plaintiff insists that Dr. Sawyer be permitted to "explain technical details contained in internal Monsanto documents," but cannot cite one document or email of Monsanto's that a lay juror could not comprehend.  In this litigation, Plaintiffs have had access to and taken the depositions of

- 8 -

dozens of Monsanto employees and in the process elicited testimony about countless internal documents. And in each of the three Roundup trials so far, including *Hardeman*, the parties have introduced voluminous videotaped testimony from Monsanto employees explaining the documentary evidence, without any evidence that jurors were confused by the technical terminology in them, or needed an expert witness to provide clarification. The Court has already suggested that expert testimony that amounts to a narration of Plaintiff's case theory should be excluded. *See Ex. 5*, 3/14/19 *Hardeman* Trial Tr. 2103:23-2104:11. There is no reason to depart from that approach for Dr. Sawyer.[3]

## CONCLUSION

For the reasons set forth above and in Monsanto's opening brief, the Court should grant Monsanto's Motion to Exclude Dr. William R. Sawyer's opinions.

---

[3] The Court should be all the more skeptical of Plaintiff's attempt to substitute Dr. Sawyer's interpretation of unidentified internal documents for the interpretation of the actual authors in light of the fact that in *Hardeman*, it was *Monsanto* that had to introduce testimony from company witnesses clarifying the context of internal documents plaintiffs sought to mischaracterize. *See* Ex. 6, 3/26/19 *Hardeman* Trial Tr. 2753-58, 2773-75, 2777-80. For example, plaintiffs declined to designate Dr. Donna Farmer's testimony explaining what she meant in her own emails and instead designated testimony only from other witnesses speculating on what Dr. Farmer meant.

DATED: January 10, 2020

Respectfully submitted,

/s/ Brian L. Stekloff

Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonwalsh.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonwalsh.com)
WILKINSON WALSH + ESKOVITZ LLP
2001 M St. NW, 10th Floor
Washington, DC 20036
Tel: 202-847-4030
Fax: 202-847-4005

Sean Eskovitz (CA Bar No. 241877)
(seskovitz@wilkinsonwalsh.com)
WILKINSON WALSH + ESKOVITZ LLP
11601 Wilshire Boulevard
Suite 600
Los Angeles, CA 90025
Tel:    424-291-9655
Fax:    202-847-4005

William Hoffman (*pro hac vice*)
(William.Hoffman@arnoldporter.com)
ARNOLD & PORTER KAYE SCHOLER
601 Massachusetts Avenue, N.W.
Washington, DC 20001
Tel: 202-942-6915
Fax: 202-942-5999

Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
HOLLINGSWORTH LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
COVINGTON & BURLING LLP
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

Attorneys for Defendant
MONSANTO COMPANY

MONSANTO'S REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF WILLIAM SAWYER
3:16-md-02741-VC & 3:16-cv-2341-VC

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of January, 2020, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ Brian L. Stekloff