# EXHIBIT 2

1                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

2

    IN RE: ROUNDUP PRODUCTS      § MDL No. 2741

3   LIABILITY LITIGATION         § Case No. 3:16-md-02741-VC

    _____ §

4                                § 

                                 §

5   This document relates to:    §

                                 §

6   Alvarez Calderon v. Monsanto §

    Company                      §

7   Case No. 3:19-cv-01630       §

    _____ §

8

9                         - - -

10               Saturday, December 21, 2019

11                        - - -

12

13       Videotaped deposition of WILLIAM R. SAWYER,

14   Ph.D., held at South Seas Resort, 5400 Plantation

15   Road, Captiva, Florida 33924, commencing at

16   8:40 a.m., on the above date, before Susan D.

17   Wasilewski, Registered Professional Reporter,

18   Certified Realtime Reporter, Certified Realtime

19   Captioner, Florida Professional Reporter

20                        - - -

21           GOLKOW LITIGATION SERVICES

22       877.370.3377 ph | 917.591.5672 fax

23               deps@golkow.com

24

25

## Page 2

```
1  APPEARANCES:
2    GOLDBERG & OSBORNE
     BY:  DAVID J. DIAMOND, ESQUIRE
3      ddiamond@goldbergandosborne.com
     698 East Wetmore Road, Suite 200
4    Tucson, Arizona 85705
     Phone:  (520) 620-3975
5    Representing Plaintiff
6
7
8    WILKINSON WALSH & ESKOVITZ
     BY:  MAX J. WARREN, ESQUIRE
9      mwarren@wilkinsonwalsh.com
       HAYTER L. WHITMAN, ESQUIRE
10     hwhitman@wilkinsonwalsh.com
     2001 M Street, NW, 10th Floor
11   Washington, D.C. 20036
     Phone: (202) 847-4000
12   Representing Defendant Monsanto Company
13
14
15   ALSO PRESENT:
16     MATTHEW ALLISON, Videographer
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1        E X H I B I T S
2      (Attached to transcript)
3  WILLIAM H. SAWYER, Ph.D., DEPOSITION EXHIBITS    PAGE
4  Exhibit 7                         117
5
6
7  Exhibit 8   Expert Report of Clayton Smith, M.D.  112
       Cover page:  "Exhibit 6"
8
   Exhibit 9   Household Products Database       138
9      US Department of Health & Human
       Services
10     Chemical Name:  Formaldehyde
11 Exhibit 10  Household Products Database       141
       US Department of Health & Human
12     Services
       Chemical Name:  Ethylene oxide
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1          - - -
2         I N D E X
3          - - -
4  Testimony of:  WILLIAM R. SAWYER, Ph.D.      Page
5    DIRECT EXAMINATION BY MR. WARREN............  6
6    CROSS-EXAMINATION BY MR. DIAMOND........... 144
7    REDIRECT EXAMINATION BY MR. WARREN.......... 152
8
9
10        E X H I B I T S
11     (Attached to transcript)
12 WILLIAM R. SAWYER, Ph.D., DEPOSITION EXHIBITS    PAGE
13 Exhibit 1   Monsanto Company's Amended Notice to   7
       Take Oral and Videotaped Deposition
14     of Dr. William Sawyer
15 Exhibit 2   December 12, 2019 Report         18
       Toxicology Consultants & Assessments
16     Specialists, LLC
17 Exhibit 3   Second Amended Plaintiff Fact Sheet   55
18 Exhibit 4   Non-Exempt Performance Evaluation    55
       Trinchero Family Estates
19     Confidential-Calderon-JCalderon-SHFV
       -HR-000042 and 43
20
   Exhibit 5   Transcript of the Videotaped       60
21     Deposition of Jaime Alvarez
       Calderon, Thursday, July 18, 2019
22
   Exhibit 6   October 25, 2019 Report          64
23     The Cohen Group
24
25
```

## Page 5

```
1          - - -
2      THE VIDEOGRAPHER:  Good morning.  We are now
3  on the record.  My name is Matthew Allison.  I am
4  a videographer for Golkow Litigation Services.
5  Today's date is December 21st, 2019, and the time
6  is 8:40 a.m.
7      This video deposition is being held in
8  Captiva, Florida, in the matter of
9  Alvarez Calderon vs. Monsanto Company, taken in
10 the United States District Court, Northern
11 District of California.  The deponent is
12 Dr. William Sawyer.
13     Will all counsel please identify themselves
14 for the record.
15     MR. DIAMOND:  David Diamond for the
16 Plaintiff.
17     MR. WARREN:  Max Warren from Wilkinson Walsh
18 & Eskovitz on behalf of Monsanto.
19     MR. WHITMAN:  Hayder Whitman also from
20 Wilkinson Walsh, also on behalf of Monsanto.
21     THE VIDEOGRAPHER:  The court reporter is
22 Susan Wasilewski and will now swear in the
23 witness.
24     THE COURT REPORTER:  Do you solemnly swear
25 or affirm the testimony you're about to give will
```

Page 6

1  be the truth, the whole truth, and nothing but
2  the truth?
3      THE WITNESS:  Yes.
4      THE COURT REPORTER:  Thank you.
5      WILLIAM SAWYER, Ph.D., called as a witness
6  by the Defendant, having been duly sworn, testified
7  as follows:
8          DIRECT EXAMINATION
9  BY MR. WARREN:
10  Q.  Good morning, Dr. Sawyer.
11  A.  Good morning.
12  Q.  Would you please introduce yourself for the
13  record?
14  A.  William Robert Sawyer.
15  Q.  And I know you've been deposed numerous
16  times in related cases, so I don't think we need to
17  go through all the initial formalities.  Would you
18  agree with me?
19  A.  Yes.
20  Q.  Is there anything preventing you today from
21  providing accurate and honest testimony?
22  A.  No.
23  Q.  And last point on the matter:  You
24  understand when I refer to "this case," I'm
25  referring to the case of Mr. Jaime Alvarez Calderon?

Page 7

1  A.  Yes.
2  (Sawyer Exhibit 1 was marked for identification.)
3  BY MR. WARREN:
4  Q.  I'm handing you what's been marked as
5  Exhibit 1 to your deposition, which is the notice in
6  Mr. Alvarez's case.  Have you seen this document
7  before?
8  A.  Yes.
9  Q.  Did you bring any documents with you today
10  in connection with this request?
11  A.  Yes.
12  Q.  What did you bring?
13  A.  CV; trials and depositions the past four
14  years; an e-mail from Kathy Hampton of the Goldberg
15  & Osborne law firm; Sawyer Report, December 12,
16  2019; Roundup label for Roundup Pro Concentrate
17  dated 2006, along with an image of the jug;
18  deposition notice for today; the Second Amended
19  Plaintiff Fact Sheet for Mr. Alvarez; expert report
20  of Dr. Andreadis, MD, clinical epidemiology
21  certified; this is a copy of a study that's been
22  used in other depositions by George, et al.; and
23  also the October 25th, 2019, report from Mr. Cohen.
24  Q.  Okay.  And is that all you brought today?
25  A.  Yes.

Page 8

1  Q.  You referenced your CV.  Has that CV been
2  updated since you completed your report in this
3  case?
4  A.  No.
5  Q.  How much time have you spent working on
6  Mr. Alvarez' case?
7  A.  I don't know.  I haven't tallied up the
8  slips and prepared an invoice yet.
9  Q.  So I take it you haven't billed all of your
10  time in Mr. Alvarez's case thus far?
11  A.  No, no, I have not.
12  Q.  All the hours that you've worked, are they
13  at your standard billing rate?
14  A.  Yes.
15  Q.  And you did not bring any invoices with you
16  today, right?
17  A.  No.  I have not produced one yet.  I will so
18  -- will do so in the near future.
19  Q.  And we just request that when you do produce
20  those invoices, that they are produced to us as
21  well.
22      When did you first begin working on
23  Mr. Alvarez's case?
24  A.  Early November of 2019.
25  Q.  Do you have any more clarity other than

Page 9

1  early November?
2  A.  Could be as late as mid November.
3  Q.  Do you have any sense of whether it was
4  before or after November 8th?
5  A.  I have a -- let's see.  I have an e-mail
6  from Kathy Hampton dated November 21st, and I can
7  state with this document that at that time documents
8  were being provided to me.
9  Q.  And is that the first time you were
10  contacted about Mr. Alvarez's case?
11  A.  It could have been a few days earlier.
12  Q.  Was --
13  A.  It could have been mid November.
14  Q.  Was Ms. Hampton the first person to contact
15  you about Mr. Alvarez's case?
16  A.  No.
17  Q.  Who was?
18  A.  Attorney David Diamond.
19  Q.  And when you were first contacted by
20  Mr. Diamond, what were you asked to do in this case?
21  A.  To assess the matter and determine whether
22  or not Mr. Alvarez received a significant and
23  substantial dosage of Roundup, and whether there
24  were confounding factors that caused his disease,
25  that is his NHL.

William R. Sawyer, Ph.D.

Page 10

1    Q.   Anything else?
2    A.   That's about all I recall from our call.
3    Q.   So the two points I got here, to kind of sum
4  it up, is first whether there was significant
5  substantial dosage to cause Mr. Alvarez's -- or
6  significant substantial dosage of Roundup, correct?
7    A.   Yes, that would be in the range --
8    Q.   And the second thing -- sorry.
9    A.   -- in the range with causation.
10    Q.   And the second thing was whether there were
11  confounding factors?
12    A.   Yes.
13    Q.   Are those the same two issues that you have
14  looked into for other reports in this Monsanto
15  litigation that you've worked on?
16    A.   Yes.
17    Q.   So your primary task in this case was no
18  different than the other reports you've done in this
19  Monsanto litigation?
20        MR. DIAMOND:  Form.
21    A.   Correct.  I have assessed ADME mechanisms,
22  genotoxicity promotion, exposure quantities on
23  various parts of the body, personal protective
24  equipment effectiveness, et cetera.
25    Q.   And did you meet with Mr. Alvarez's counsel

Page 11

1  in preparing for today?
2    A.   I met with Attorney David Diamond this
3  morning for maybe 35 minutes or so.
4    Q.   Is that the first time you've met with him?
5    A.   Yes.
6    Q.   Have you spoken with him over the phone in
7  the past?
8    A.   Yes, maybe -- maybe twice total.
9    Q.   Can you roughly recall when those times
10  were?
11    A.   Yeah.  One was the initial call that I just
12  explained.
13    Q.   Uh-huh.
14    A.   The second call was in response to my
15  request to be able to interview Mr. Alvarez, and,
16  unfortunately, I was -- it was explained to me that
17  he was not well enough in the hospital to
18  intelligently respond to questions.
19    Q.   Was it Mr. Diamond that explained that to
20  you?
21    A.   Yes.
22    Q.   What did he say when you said that
23  Mr. Alvarez was not well enough?
24    A.   Well, I asked if -- more specifics and he
25  explained that the ex-wife was there with him and

Page 12

1  she just didn't feel he was responsive enough to
2  handle questions.
3    Q.   And do you know why he was in the hospital
4  at that time?
5        MR. DIAMOND:  I should say he just passed
6  away.
7        MR. WARREN:  Okay.  I was not aware of that.
8    A.   Yes, he --
9        MR. WARREN:  I don't want to -- I don't want
10  to probe inappropriately down that path.  I think
11  it's good to --
12        MR. DIAMOND:  Yeah.
13        MR. WARREN:  -- to clarify that.
14    A.   I can answer your question.
15    Q.   Sure.
16    A.   He was placed into final supportive care,
17  and knowing that he was -- the family was told he
18  only had a short time to live.
19    Q.   Do you know when he passed away?
20    A.   Oh, I would have to approximate about two
21  weeks.
22        MR. DIAMOND:  Actually, I can tell you.  It
23  was just, like, this last week.
24        MR. WARREN:  Okay.
25        MR. DIAMOND:  His health was deteriorating

Page 13

1  but he didn't pass away until maybe a week or so.
2        MR. WARREN:  I understand.
3  BY MR. WARREN:
4    Q.   And do you know what the official cause of
5  death was?
6    A.   Secondary to NHL.
7    Q.   Was there a primary that you're aware of?
8    A.   Well, primary was NHL, but, I mean, the --
9  in terms of the actual leukocytosis and there are
10  other occurrences that may have precipitated the
11  death secondary to chemotherapy and so on, are -- is
12  what I -- I'm using the term as secondary and I have
13  not looked at the or been provided the death
14  certificate or any other documents, so I really
15  can't comment on that any further.
16    Q.   And the information that you just provided
17  in terms of the cause of death, was that related to
18  you during the phone call with Mr. Diamond?  I can
19  rephrase the question.
20    A.   Yes, yes.
21    Q.   Okay.
22    A.   That he -- that he -- the medical records as
23  well, that he was out of remission.
24        MR. DIAMOND:  And I don't think you want to
25  get into sort of what would be considered work

Page 14

1  product stuff here, the conversations between me
2  and my expert.  I don't want to -- I don't want
3  to object.  I mean, I -- if you want to ask me
4  questions later on about what I know, I will be
5  happy to provide that information, and I will be
6  filing something.
7      MR. WARREN:  And that's in relation, I
8  think, to what I was going to say.  Just because
9  we -- or at least I have not been provided any
10  updated medical records that have to do with
11  this, I need to get a sense of, one, what the
12  information is, and two, how Dr. Sawyer is aware
13  of that information.
14      MR. DIAMOND:  Again, I can't say for sure
15  because I haven't seen the most recent medical
16  records --
17      MR. WARREN:  And neither have I.
18      MR. DIAMOND:  -- and I can only base it upon
19  what the family has told me, which is that he
20  relapsed again, was placed in ICU, and I actually
21  did a -- I asked for a trial preference in the
22  case.
23      MR. WARREN:  Right.
24      MR. DIAMOND:  And I put in there that the --
25  when we deposed Dr. Andreadis in November, he was

Page 15

1  very guarded about how Mr. Alvarez was doing at
2  that time, and then I mentioned that he was
3  placed in ICU on a couple of occasions because he
4  had relapsed, and then it was just essentially
5  comfort.
6      MR. WARREN:  So -- and that's helpful
7  clarification for Mr. Alvarez.  It's important
8  for me to know -- Dr. Sawyer has now said that
9  the cause of death was NHL, and so I need to be
10  able to ask him the basis for his opinions
11  related to NHL.
12      MR. DIAMOND:  And I think it would be
13  probably something that would be considered to be
14  work product privilege.
15      MR. WARREN:  The basis of his opinions is
16  work product?
17      MR. DIAMOND:  I would assume, if it's -- if
18  you're asking him -- I don't think he would have
19  heard anything other than from talking to me.
20      MR. WARREN:  Okay.  Well, I need to
21  understand what he -- what -- how he -- again,
22  what the basis of his opinions are.  If the
23  entire basis of his opinion for this issue is
24  just a conversation that you've relayed to him,
25  then that's information that I need to know.  If

Page 16

1  he didn't look into any medical records or he
2  didn't have any additional information --
3      MR. DIAMOND:  Correct.  He did not.
4      MR. WARREN:  Okay.  So I guess we can kind
5  of continue the questions with Dr. Sawyer here.
6  BY MR. WARREN:
7  Q.  So what is the --
8      MR. DIAMOND:  And I --
9      MR. DIAMOND:  I'm just trying to help.
10      MR. WARREN:  No, and I was going to say I
11  thank you for the help.  It is helpful to kind of
12  speed things along.
13  BY MR. WARREN:
14  Q.  So to make sure we have the record clear
15  here, what is the basis for your opinion that
16  non-Hodgkin's lymphoma was the cause of
17  Mr. Alvarez's death?
18  A.  That he was out of remission, as I stated,
19  and deteriorating from his NHL, a naturally
20  progressive condition of NHL.
21  Q.  And that answer that you just provided,
22  that's based on conversations you had with Counsel?
23  A.  Right.  It's based on my review of the
24  medical records, but I don't have medical records
25  that are that recent, so the recent -- obviously,

Page 17

1  I'm well aware of the type of NHL he had and the
2  pathology involved and so on, and I was told by
3  Counsel that he was in ICU and then it was
4  determined it was terminal and he was put on
5  supportive care for the last -- the remainder of his
6  life, and I learned that from Counsel.
7  Q.  Okay.  And what is the latest medical
8  records that you did review prior to your report
9  that's dated on December 12th?
10  A.  The latest date, I don't recall.  I really
11  focused on medical records for the purpose of
12  identifying the pathology, the pathology
13  confirmation, drug/alcohol history, use of any
14  carcinogenic pharmaceuticals or immunosuppressive
15  pharmaceuticals, such as cyclophosphamide or
16  cyclosporin A, prednisone.  I didn't review his
17  medical records for the purpose of determining
18  whether or not he would survive.  That was not my
19  duty as a toxicologist.  Rather, I was looking for
20  any information that could impact and explain his
21  development of NHL.
22  Q.  Do you intend to tell the jury at trial that
23  non-Hodgkin's lymphoma was the cause of
24  Mr. Alvarez's death?
25  A.  No.

Page 18

1　Q.　Did you speak with anyone else in
2　preparation for today's deposition?
3　A.　No.
4　Q.　Did you speak with any of the other experts
5　in this case?
6　A.　No, not in conjunction with this specific
7　case, no.
8　(Sawyer Exhibit 2 was marked for identification.)
9　BY MR. WARREN:
10　Q.　I have what is marked as Exhibit 2 to your
11　deposition, which is your report in Mr. Alvarez's
12　case.　I understand you have it on your computer.
13　Would you like a hard copy as well?
14　A.　I have a annotated version of it here, so
15　that's fine.
16　　　MR. DIAMOND:　I'll be leaving more paper
17　behind again.
18　A.　It's generally faster for me to respond to
19　questions using the computer.
20　Q.　And that's fair.　I understand that.　It is
21　a long report.　This is your report in Mr. Alvarez's
22　case, though?
23　A.　Yes.
24　Q.　Did you prepare the report yourself?
25　A.　Yes.

Page 19

1　Q.　Does it contain all of the opinions that you
2　intend to offer in Mr. Alvarez's case?
3　A.　Looking at the notice on --
4　Q.　And I may be able to help.　What are you
5　looking for here?
6　A.　Page 134, item Number 1, in this case and in
7　previous cases I've reviewed the report of
8　Mr. Cohen, and I do have concerns regarding breach
9　of generally accepted methodology and erroneous
10　understandings of facts in the case, such as the
11　amount of glyphosate pro that is mixed with three
12　gallons of water.
13　Q.　When did you review the report of Mr. Cohen?
14　A.　The report in this case -- and again, I've
15　reviewed several of his reports in the Monsanto
16　cases, but in this most recent case I would
17　approximate the third week of November.
18　Q.　So you reviewed Mr. Cohen's report prior to
19　completing your own report in this case?
20　A.　Prior to but during the -- during the time I
21　was writing this report, yeah.
22　Q.　And you chose not to include that in your
23　list of materials that you relied upon, correct?
24　A.　Well, I intended to cover it in Number 1 as
25　far as the --

Page 20

1　Q.　I understand.　And by Number 1, you're
2　referring to what appears to be a list of deposition
3　testimony in other cases that are not the Alvarez
4　case, correct?
5　A.　Right, where I've discussed Cohen's report.
6　It's the same problem as in the past.　He uses a
7　unrecognizable methodology and uses animal studies
8　to compare human doses to, and a number of different
9　things I've discussed in prior depositions which are
10　problematic in the current matter as well.
11　Q.　And you did not list on the final page of
12　your report, page 154, you did not list under New
13　Materials Relied on Specific to Alvarez, you did not
14　list any of Mr. Cohen's reports, right?
15　A.　No.
16　Q.　And the report itself, it doesn't mention
17　Mr. Cohen's work?
18　A.　Correct.
19　Q.　Your report?
20　A.　Right.　I brought his report and I've
21　highlighted areas of concern.
22　Q.　Are you intending to update your report
23　based on your areas of concern about Mr. Cohen's
24　work?
25　A.　No.

Page 21

1　Q.　You understand that you are providing
2　specific causation opinions in this case?
3　A.　Specific with respect to a toxicologist,
4　yes.
5　Q.　And I should say specific to Mr. Alvarez?
6　A.　Yes, but my specific causation opinions do
7　not cover all aspects that the oncologists will be
8　covering.
9　Q.　I understand.　I'm here trying to clarify
10　the difference between specific and general
11　causation.　Do you understand the difference between
12　the two?
13　A.　Yes.　My specific causation, one is to
14　assess the exposure dose based on the human
15　epidemiologic evidence and determine whether or not
16　Mr. Alvarez's exposures were within the range of
17　that in the generally accepted peer-reviewed
18　epidemiological studies, and his specific causation
19　assessment --
20　Q.　And what is your --
21　A.　Let me finish.
22　Q.　Okay.　Sorry.　I thought you were completed.
23　A.　My specific causation assessment also
24　assesses, as I said earlier, ADME (absorption,
25　distribution, metabolism and excretion), mechanistic

Page 22

1  studies, and assessing the studies based on dose
2  response, consistency with other studies, coherence
3  demonstrated by molecular based studies, such as in
4  humans and animals.  Of course, that includes
5  genotoxicity promotion, and when I say specific
6  causation, that is whether or not the dose in these
7  studies are consistent with that received by
8  Mr. Alvarez.
9     Q.  And, Dr. Sawyer, I don't mean to cut you
10 off.  This is helpful background.  My question more
11 specifically is you are aware of the difference
12 between general and specific causation, right?
13    A.  Right.  I mean, the specific causation
14 aspects I'm covering are specific to Mr. Alvarez,
15 his applications, that is how he was exposed,
16 whether or not it made it into his body
17 systemically.  That's based upon PPE, personal
18 protective equipment, numerous studies in terms of
19 the amount of dermal exposure on the clothing versus
20 how much is absorbed through the clothing, many
21 different factors that are really specific to
22 Mr. Alvarez based on his amount of spraying, how he
23 applied it, the use of a backpack, whether he
24 sprayed it on fences at elevated levels.  There is
25 numerous areas that are specific to Mr. Alvarez.

Page 23

1     Q.  And thank you.  We will get to all the areas
2  specific to Mr. Alvarez.  I just want to establish
3  some background points here before we do that.
4        Now, if you can turn to page 133 of your
5  report, which I believe is your conclusion, and is
6  it correct to say that you're concluding that
7  Roundup was a substantial contributing factor to
8  Mr. Alvarez's development and diagnosis of
9  non-Hodgkin's lymphoma?
10    A.  Yes.  You didn't actually let me finish my
11 explanation on specific causation with respect to
12 Table 1 in my report.
13    Q.  And we will get to Table 1 in your report
14 and talk about it extensively.
15    A.  All right.  But the point is that I did
16 assess the carcinogenicity of other substances to
17 which he may have been exposed in a sense of ruling
18 out.  As a toxicologist, you either rule in or rule
19 out other sources, including radiological exposures
20 and chemical exposures to other products, to
21 alcohol, tobacco, et cetera.
22    Q.  Thank you.  But again, going back to my
23 question now, and let's just continue trying to
24 focus on the questions that I'm asking, is it your
25 conclusion in Mr. Alvarez's case that Roundup was a

Page 24

1  substantial contributing factor to his development
2  and subsequent diagnosis of non-Hodgkin's lymphoma?
3     A.  Yes, it was.  His eight-hour exposure days
4  was in the extreme high end of study data, well
5  above the thresholds associated with NHL among human
6  applicators, and I also found no other historic
7  exposures of pharmaceuticals or other factors or
8  other chemicals that could explain his development
9  of NHL.
10    Q.  And you intend to tell the jury that Roundup
11 is a substantial contributing factor in
12 Mr. Alvarez's NHL?
13    A.  Yes.
14    Q.  Now, you mentioned Dr. Cohen's report.  I
15 just want to make sure it's clear.  Did you read
16 Dr. Cohen's report in the Alvarez case?
17    A.  Yes, and I have with me -- I made highlights
18 of areas of concern.
19    Q.  And Dr. Cohen's report is about dermal
20 absorption, right?
21       MR. DIAMOND:  Form.
22    A.  In part.
23       MR. DIAMOND:  It's Mr. Cohen, right?
24       MR. WARREN:  Sorry.
25    Q.  What is dermal absorption?

Page 25

1     A.  That's defined as the quantity of topically
2  applied substance that penetrates the outer keratin
3  layer and epidermis and reaches the lymphatic and
4  blood vasculature of the dermis resulting in
5  systemic absorption and circulation of the drug or
6  chemical substance.
7     Q.  And in this question I'm not asking what
8  your conclusions are.  I just want to know are there
9  parts of your report in Mr. Alvarez's case that are
10 about dermal absorption?
11    A.  Yes.
12    Q.  And are there parts of your report that
13 cover other topics outside of how you define dermal
14 absorption?
15    A.  I don't understand that question.
16    Q.  Do you, in addition to dermal absorption, do
17 you also address other issues in your report?
18    A.  Certainly.  I'm a toxicologist.
19    Q.  I understand.  And I guess this is a good
20 time to ask that question.  What is toxicology?
21    A.  The science and study of the determination
22 of adverse effects of chemicals, pharmaceuticals and
23 other substances on the body.
24    Q.  Okay.  And in your report, everything you
25 provided is to a reasonable toxicological certainty?

Page 26

1    A.  Yes.
2    Q.  What does that term, "reasonable
3 toxicological certainty," mean to you?
4    A.  More probable than not, and having assessed
5 that determination based on generally accepted
6 methodology, Bradford Hill criteria and weight of
7 evidence, including such factors as dose response,
8 statistical significance, coherence consistency,
9 latent period, animal models, and other factors that
10 are generally recognized in toxicological causation.
11    Q.  And to be clear, it's still the case today
12 that everything in your report is to a reasonable
13 toxicological certainty?
14       MR. DIAMOND:  Form.
15    A.  Yes.
16    Q.  Are you board certified in toxicology?
17    A.  No.
18    Q.  Do you have any board certifications?
19    A.  No.
20    Q.  Did you perform a differential diagnosis in
21 this case?
22    A.  Yes.
23    Q.  What did your differential diagnosis entail?
24 And sorry, that was a vague question.  I can
25 rephrase.

Page 28

1 actual Roundup, including the type of Roundup used.
2       And then also, chemical by chemical, assess
3 other historical products that he has used, such as
4 Miracle-Gro and two-cycle engine oil, et cetera, and
5 also then determine his exposure potential based
6 upon the peer-reviewed studies, that is based on the
7 personal protective equipment he used while
8 spraying, and also determine, based on the history,
9 the exposure history by season over the years and
10 the frequency and duration of Roundup use, and
11 calculate and convert his use into eight-hour
12 exposure days and compare that to the human
13 epidemiologic studies of Roundup applicators and
14 determine whether or not he was in the range
15 exceeding those thresholds in the studies that are
16 equated with statistically significant increased
17 rates of NHL.
18       I've also assessed the NHL latency period to
19 be certain that the latency period was sufficiently
20 long, and also in the differential diagnosis,
21 provide a final opinion as to whether or not his
22 exposure was a substantial contributing factor to
23 his NHL and do that in the mean -- in the --
24 following the methodology of differential diagnosis
25 of all those other parameters I just named.

Page 27

1       We don't have to get into the results or
2 your findings, but process, in terms of the process,
3 what was your differential diagnosis in this case?
4    A.  Number one, as a toxicologist who has
5 completed pathology through medical school
6 curriculum, review the medical records and determine
7 the actual diagnosis and review the actual pathology
8 report, confirming that it was actually stage 4
9 DLBCL.
10       Secondly, review the family history, as well
11 as the occupational history, for potential
12 information on other chemical substances,
13 radiological exposures, chemical exposures.
14       Also review and assess the history of
15 tobacco, alcohol, and drug use, and consider the
16 ████ ██████████████████████████████████████
17 ████ ██████████████████████████████████████
18 ████ ██████████████████████████████████████
19 and specifically studies such as -- I forget the
20 name --
21    Q.  Would it be ████████?
22    A.  Tab -- yeah, ██████ -- with respect to
23 whether or not the ████████ was a potential
24 contributing factor, and certainly very carefully
25 assess the exposure factors of Mr. Alabama to the

Page 29

1    Q.  Thank you.  Did you meet with Dr. Alvarez --
2 or sorry.
3       Did you meet with Mr. Alvarez in forming
4 your report in this case?
5    A.  No.  As I stated, I requested to interview
6 him but he was not well enough to interview, so I
7 did not make any attempt to visit him at the
8 hospital knowing that.
9    Q.  And that would include a phone interview,
10 you did not conduct a phone interview?
11    A.  That's what I requested and he was in ICU
12 and just not well enough to intelligently respond.
13    Q.  Did you speak to any of Mr. Alvarez's
14 doctors in forming your report in this case?
15    A.  No, but I did read the report issued by
16 Dr. Andreadis, A-n-d-r -- A-n-d-r-e-a-d-i-s.
17    Q.  You did not speak to any of the doctors
18 independently?
19    A.  No, no.  I reviewed his report.
20    Q.  Did you review any of Mr. Alvarez's
21 employment records?
22    A.  Only the information as found in his
23 deposition and Plaintiff Fact Sheets.
24    Q.  I understand.  My question is whether you
25 reviewed any of the records from his employer?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

Page 30

1    A.  I didn't see any records from his employer
2  to review.
3    Q.  Does that mean they were not provided to
4  you?
5    A.  I believe that's the case.
6    Q.  Where did Mr. Alvarez work?
7    A.  Depending on -- well, what year?
8    Q.  That's a fair question.  Did Mr. Alvarez
9  work at Sutter Home Winery?
10    A.  He did.  He first started as a dishwasher at
11  the Silverado Country Club in Napa Valley and worked
12  his way up at Sutter Home as he worked there briefly
13  as a dishwasher.  Then -- I'm sorry, not dishwasher,
14  but bottle washer, and then moved up to landscaping
15  and ultimately became a supervisor.
16    Q.  Thank you.  That's helpful background.
17  Again, I think it will be helpful, especially given
18  the time limits in this deposition, if you really
19  focus on just answering the questions that I'm
20  asking.
21    A.  Okay.  I'll do that.  Thank you.
22    Q.  And so as an example, the question there was
23  did Mr. Alvarez work at Sutter Home Winery?
24    A.  Yes.
25    Q.  Thank you.  Have you ever visited Sutter

Page 31

1  Home Winery?
2    A.  No, not Sutter Home.  I've been to some
3  other nearby wineries but not that one.
4    Q.  Have you seen any pictures of any of the
5  various Sutter Home properties at which Mr. Alvarez
6  worked?
7    A.  I did see some overhead aerial photos, yes.
8    Q.  And we already discussed Mr. Cohen's report
9  in the Alvarez case as one document that you would
10  like to add to your reliance list.  Is there
11  anything else that you would like to add to your
12  reliance list?
13    A.  No.
14    Q.  Did you feel you had sufficient information
15  to form your opinion in this case?
16    A.  Yes.
17    Q.  Did you request any additional information
18  that you did not receive?
19    A.  No.
20    Q.  And much of this report is similar to other
21  reports you've filed in the Monsanto litigation,
22  right?
23    A.  Yes.
24    Q.  And this report doesn't even mention
25  Mr. Alvarez's name from page 20 until your final

Page 32

1  conclusion?
2    A.  That's probably true.
3    Q.  Much of it is just about Roundup and -- I
4  should say Roundup generally?
5    A.  General causation, yes.
6    Q.  Much of your report, as you're saying, is
7  general causation?
8    A.  Yes.
9    Q.  What is a -- and I may pronounce this
10  incorrectly.  I apologize.  What is a keratinocyte?
11    A.  Yeah.  A keratocyte is a very interesting
12  cell.  It begins -- excuse me -- in the epidermis
13  and as it ages, it moves outward to the skin surface
14  and it becomes compacted, it loses its original
15  configuration, and ultimately becomes what we call
16  keratin, which is a highly lipid-containing,
17  cholesterol-containing, dead cell which forms the
18  keratin of the skin, the most protective layer of
19  the skin, and eventually it's shed off from the
20  skin as --
21    Q.  Do you have any --
22    A.  -- as there is always new keratocytes
23  continually replacing the keratin layer.
24    Q.  Do you have any knowledge of Mr. Alvarez's
25  keratinocytes?

Page 33

1    A.  I'm not sure I understand the question.
2    Q.  Have you, to the extent it's possible, have
3  you seen Mr. Alvarez's keratinocytes?
4    A.  Are you asking if any pathology was
5  performed on his epidermis?  I'm not -- I don't
6  follow.
7    Q.  I guess my question is you reference
8  keratinocytes in your report, right?
9    A.  Yeah.
10    Q.  Do you have any knowledge as to how
11  Mr. Alvarez's keratinocytes may be different than
12  another person's?
13    A.  Well, no.  There is no reason to believe his
14  keratocytes would be any different than anyone
15  else's.  He had no malignancies of the skin that
16  were sufficient to change his dermal absorption.
17    Q.  Mr. Alvarez was born in Mexico, right?
18    A.  Yes.
19    Q.  Do you remember when he moved to the United
20  States?  Sorry.  It's not a memory test.  I can
21  speed things along.  Is it accurate to say that
22  Mr. Alvarez moved to the United States in 1979?  And
23  that's listed at page 4 of your report.
24    A.  Yes, he was -- he did, and he was in Mexico
25  from birth, ████ to 1979.

Page 34

1 Q. So how old was he, roughly, when he moved to
2 the United States?
3 A. Well, approximately ██, depending on the
4 month.
5 Q. Do you have any information about
6 Mr. Alvarez's time in Mexico?
7 A. No.
8 Q. Do you know whether he worked while he was
9 there?
10 A. No.
11 Q. So, obviously, you wouldn't know where he
12 worked then?
13 A. Correct.
14 Q. Do you know whether he was exposed to any
15 chemicals?
16 A. Unknown.
17 Q. Do you know whether he smoked cigarettes in
18 Mexico?
19 A. No. I just have his medical record history
20 of smoking, as well as his deposition record of
21 smoking.
22 Q. So is it correct to say that you have no
23 opinion one way or the other about his time in
24 Mexico?
25 A. What do you mean by time? I know he was in

Page 35

1 Mexico over that period of time.
2 Q. I understand. You have no opinions as it
3 relates to Mr. Alvarez during that period of time
4 for which he lived in Mexico?
5 A. Where he lived?
6 Q. Not where he lives. Opinions about
7 Mr. Alvarez during that period of time.
8 MR. DIAMOND: Form.
9 A. I can't -- it's such a general question, I
10 don't understand.
11 Q. You provided a toxicological report, right?
12 A. Yes.
13 Q. Do you have any toxicological opinions about
14 Mr. Alvarez during the period of time from ██ to
15 1979, when he lived in Mexico?
16 A. No, I have no information on his residency
17 in Mexico.
18 Q. If we could turn to page 13 of your report,
19 which is Table 2, this table is a summary of your
20 opinion of Mr. Alvarez's Roundup use?
21 A. Yes.
22 Q. Did you make this table?
23 A. Yes.
24 Q. What information did you use to create this
25 table? And I don't want to cut you off but I may be

Page 36

1 able to speed things up here. You already mentioned
2 Mr. Alvarez's deposition as one thing you reviewed,
3 right?
4 A. Yes.
5 Q. You also mentioned his Second Amended
6 Plaintiff Fact Sheet, correct?
7 A. Yes.
8 Q. Other than those two things, is there any
9 information that you used to create the information
10 that's in Table 2?
11 A. Well, a third thing I did, I checked --
12 reviewed Mr. Cohen's report and discovered that I
13 was being more conservative in my assessment
14 than Dr. Cohen in terms of underestimating the
15 exposure.
16 Q. Now, you go through his frequency in the
17 third column, and that frequency is for different
18 periods of the year; is that right?
19 A. Yes. This table calculates the exposure in
20 eight-hour time-weighted exposure days.
21 Q. Did you personally do anything to verify the
22 information that is in this table?
23 A. Yes. I attempted to set up an interview
24 with Mr. Alvarez.
25 Q. You did not -- strike that.

Page 37

1 And, unfortunately, through no fault of
2 yours or Mr. Alvarez's, you were not able to have
3 that interview, correct?
4 A. That's right.
5 Q. So all the information in Table 2 is based
6 off of Mr. Alvarez's deposition, his Second Amended
7 Plaintiff Fact Sheet, and, as you now say,
8 Mr. Cohen's report?
9 MR. DIAMOND: Form.
10 A. Not based on Mr. Cohen's report. I stated
11 that I reviewed Mr. Cohen's report and discovered
12 that my exposure duration values were very
13 conservative and less than his.
14 Q. Do you know whether Mr. Alvarez worked five
15 days a week, or is that an assumption that you made?
16 A. I used two-and-a-half days per week in
17 Table 2 during the spring months, once per week
18 during the summer and fall, and zero during the
19 winter; a very conservative estimate.
20 Q. I understand. My question was how many days
21 per week he worked at Sutter Home. So is it your
22 opinion today that Mr. Alvarez worked two-and-a-half
23 days at Sutter Home during the spring and once per
24 week in the summer and fall?
25 A. With respect to spraying, yes.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 38

1    Q.   But his general employment at Sutter Home
2  was greater than that period of time?
3    A.   Yes.
4    Q.   And did you assume that he worked five days
5  per week?
6    A.   No.
7    Q.   How many days per week did he work?
8    A.   I didn't assess that.  I assessed his spray
9  frequency and duration.  I'm not about to guess at
10  how many days he worked per week.
11    Q.   And you say you assessed his spray frequency
12  and duration and you came up with, focusing on the
13  spraying, two-and-a-half days per week, right?
14    A.   Yes.  I used the midpoint range of three to
15  four hours per day as a conservative estimate, and
16  that's per his testimony, it was four hours, and --
17    Q.   And I'm asking you currently about the
18  column that's labeled "Frequency."  You say
19  two-and-a-half days per week, right?
20    A.   You interrupted my answer.
21    Q.   It appeared your answer was not related to
22  the question.
23       Now, how did you get to two-and-a-half days
24  per week?
25    A.   I used the midpoint range of three to four

Page 39

1  hours, which is explained earlier in the report, and
2  used 3.5 hours, which is the midpoint between three
3  to four hours, and two-and-a-half days per week was
4  his testimony as a fact in the case of every other
5  day, and every other day could be Monday, Wednesday,
6  Friday, or it could be Tuesday, Thursday, so it
7  averages out to 2.5 days a week.
8    Q.   And that's based on an assumption that he
9  worked five days per week?
10    A.   No, it's based on a fact in the case as he
11  said he sprayed every other day.  He didn't say how
12  many days he worked.
13    Q.   Dr. Sawyer, if he worked two days per week
14  and he sprayed every other day, how many days per
15  week did he spray?
16    A.   I don't know.  That's not what he said.  He
17  said he sprayed every other day.
18    Q.   I understand that and that wasn't my
19  question.  If he -- if he worked two days per week
20  and he sprayed every other day, how many days per
21  week did he spray?
22    A.   I don't know.  I didn't make that
23  calculation.  I stuck with the facts in the case.
24  I'm not about to make any guesswork during the
25  deposition today.

Page 40

1    Q.   I understand.  You're saying that today you
2  cannot tell me what every other day of two days per
3  week is?
4    A.   No, that's very confusing.
5    Q.   You completed your report based on his --
6    A.   I notice Counsel is laughing.  No, it is.
7  What you're asking me doesn't make a lot of sense.
8  I used the facts in the case, that is his deposition
9  and Plaintiff Fact Sheet testimony, and I didn't try
10  to interpret that in any strange way.  He simply
11  said he sprayed every other day.
12    Q.   I understand.  In so doing, you made an
13  assumption as to how many days per week he worked,
14  didn't you?
15    A.   No, I did not.  He simply said he sprayed
16  every other day and that would be, as I say, a
17  Monday, Wednesday, Friday, or a Tuesday, Thursday.
18  I did not include weekends.
19    Q.   And when you did not include weekends, is
20  that based on information that he said in his
21  deposition or his Plaintiff Fact Sheet?
22    A.   As I recall, the Plaintiff's Fact Sheet did
23  indicate he worked full-time and he made X amount
24  per year and there was no information of him being a
25  part-time worker.

Page 41

1    Q.   So you made the assumption that he worked
2  five days per week?
3    A.   Full-time, yes.
4    Q.   And full-time was an assumption on your part
5  of five days per week?
6    A.   Yes, but he sprayed every other day.
7    Q.   And how did you determine the frequency of
8  once per week in the summer and fall?
9    A.   He testified that he sprayed less during the
10  summer and fall.
11    Q.   Sorry.  Are you finished?
12    A.   Yes.
13    Q.   I don't want to cut you off.
14       So less in the summer and fall and you put
15  one day per week, right?
16    A.   Yes.
17    Q.   How did you get to one day per week?
18    A.   If he sprayed Tuesday, Thursday, that is
19  every other day, less than that would be one day per
20  week.  So I'm using a minimum --
21    Q.   So we are able to get to the bottom of every
22  other day of two days.  I understand you said if he
23  sprayed Tuesday and Thursday.  Where does that
24  information come from?
25    A.   That he said he sprayed every other day.  So

Page 42

1  on one week that would be a Monday, Wednesday,
2  Friday. The following week it would be a Tuesday,
3  Thursday.
4  Q. Right. And I'm focused now on the summer
5  and fall intervals for which you say he sprayed once
6  per week, right?
7  A. Yes. That is less. Less than would be --
8  half of that would be one day a week as opposed to
9  two days a week on a Tuesday, Thursday.
10  Q. I understand that's less than. Less than
11  two-and-a-half per week would also be once per
12  month, wouldn't it?
13  A. Correct.
14  Q. So you made the assumption that he sprayed
15  once per week during this interval?
16  A. I did.
17  Q. Thank you. Now if we could turn to Table 3,
18  which is at page 13 of your report. Do you have
19  that in front of you?
20  A. Page 13?
21  Q. Yeah. Table 3.
22  A. Yeah.
23  Q. This is your calculation that Mr. Alvarez's
24  minimum exposure days, right?
25  A. That's right.

Page 43

1  Q. You found that he was exposed for at least
2  546 days?
3  A. At eight hours per day, yes.
4  Q. This was your calculation of his minimum
5  exposure?
6  A. Yes.
7  Q. How did you get to this result?
8  A. Two-and-a-half days per week is the
9  frequency, three-and-a-half hours duration. Hours
10  per year would be 12-week intervals, that is there
11  is 12 weeks per month based on a 48-week calendar
12  year, which allows two weeks for holidays and
13  vacations. So multiplying 2.5 times
14  three-and-a-half hours, times 12 weeks, equals 105
15  hours, over 31 years equals 3,255 hours, divided by
16  8 equals 406.9 exposure days.
17  So I should note even if I were to eliminate
18  the summer and fall, his exposure days would still
19  be 406.9.
20  Q. And, I mean, as it says at the Footnote 31
21  as part of this table, you made assumptions about
22  the holidays and vacations for Mr. Alvarez?
23  A. Yes, that it's unlikely he worked 52 weeks a
24  year. I used a value of 48 weeks per year.
25  Q. And as we just discussed, there were other

Page 44

1  assumptions you made in forming this table as well,
2  such as part of the frequency?
3  A. Yes. In fact, I assumed that he sprayed
4  zero during the winter.
5  Q. Is this table created to a reasonable
6  toxicological certainty?
7  A. Yes, it is. Based on the testimony, it
8  certainly is. It's very conservative.
9  Q. It's very conservative based on
10  Mr. Alvarez's Second Amended PFS and his deposition,
11  right?
12  A. That's right. I also note it's a smaller
13  value in terms of frequency and duration than
14  Mr. Cohen used.
15  Q. When was Mr. Alvarez's Second Amended
16  Plaintiff Fact Sheet created?
17  MR. DIAMOND: After his deposition, I think,
18  if you want to speed it up.
19  Q. The Second Amended -- and as you're looking
20  for it, I can represent to everyone that it was
21  created on September 19th, 2019.
22  MR. DIAMOND: I think his deposition was in
23  July.
24  MR. WARREN: That's right.
25  MR. DIAMOND: So it was --

Page 45

1  A. 9/19/2019 was his Plaintiff's Fact Sheet.
2  Q. Do you know who created that Plaintiff Fact
3  Sheet?
4  MR. DIAMOND: I'm just going to object to
5  form on that.
6  A. Jaime Alvarez Calderon.
7  Q. And just to make sure the record is clear,
8  that's Jaime Alvarez Calderon?
9  A. I'm sorry?
10  Q. Just to make sure the record is clear,
11  that's Jaime Alvarez Calderon, not Jamie.
12  A. J-a-i-m-e.
13  Q. Okay. Do you know if anyone else created
14  that form with Mr. Alvarez?
15  A. No, I wouldn't know.
16  Q. You said you reviewed Mr. Alvarez's
17  deposition, right?
18  A. Yes.
19  Q. Based on that review of Mr. Alvarez's
20  deposition, do you think Mr. Alvarez was the only
21  person that created that Plaintiff Fact Sheet?
22  A. I'm not sure.
23  Q. Did you look at any of the other Plaintiff
24  Fact Sheets that Mr. Alvarez created in this case?
25  And I can just say this is the Second Amended

Page 46

1 Plaintiff Fact Sheet. Did you look at any of the
2 two prior ones?
3     A. It's possible. Let me look at the document
4 list.
5     Q. I can represent to you that at the end of
6 your report you list Mr. Alvarez's Second Amended
7 Plaintiff Fact Sheet and not any of the others.
8     A. I also looked at his PFS submitted and his
9 first amended PFS submitted.
10     Q. And what did you just read from in providing
11 that answer?
12     A. My Monsanto Alvarez list of documents that I
13 have in this case.
14     Q. And that's the list that's included with
15 your December 12th report?
16     A. No. No. It's simply the actual files. I
17 have two PDF files here.
18     Q. So you have additional information in your
19 file of information that you considered in this case
20 that's not included in your reliance list in your
21 report?
22     A. I'll read it to you.
23         MR. DIAMOND: Form.
24     A. I'll read you everything I have.
25     Q. No, we don't need to do that. I just -- the

Page 47

1 question is a yes-or-no question.
2         Do you have additional information in your
3 file that you've considered in this case that's not
4 included in your reliance list?
5     A. Well, I have the two Plaintiff Fact Sheets
6 that you're asking about.
7         MR. DIAMOND: And my objection only is that
8 he disclosed what he's relying upon. The fact
9 that he's looked at something but it isn't in his
10 list, he's telling you that he's looked at
11 something but it isn't necessarily something that
12 he relied upon.
13         MR. WARREN: And generally, it's not just
14 what he relies on, but other information that he
15 considered as well in forming his report that
16 should be listed and disclosed. It's not
17 significant as it relates to the various versions
18 of his -- of Mr. Alvarez's Plaintiff Fact Sheets.
19 BY MR. WARREN:
20     Q. Do you know what changed between the various
21 Plaintiff Fact Sheets?
22     A. I do not, but I can state that of all the
23 documents I've received and have, those are the only
24 two that are not specifically spelled out on my
25 materials considered list, and I relied on the

Page 48

1 Second Amended Plaintiff Fact Sheet simply because
2 it had the details of interest, where the other fact
3 sheets didn't have that information.
4     Q. And do you know how the Second Amended
5 Plaintiff Fact Sheet changed to have those details
6 of interest that you referenced?
7     A. I don't recall any change. It's simply the
8 information wasn't provided.
9     Q. Dr. Sawyer, you said that one had the
10 information and one didn't, and now you're saying
11 there wasn't any change?
12     A. Not that I recall. I mean, as far as change
13 in testimony, there was more information provided on
14 the Second Amended Plaintiff Fact Sheet.
15     Q. And personally, I'll refer to that as a
16 change. Do you know how that additional information
17 got onto the Second Amended Plaintiff Fact Sheet?
18     A. No.
19     Q. And between the Plaintiff Fact Sheet and the
20 deposition, Mr. Alvarez is your only source of
21 information about Mr. Alvarez's use of Roundup,
22 right?
23     A. Could you repeat that? I missed a couple
24 words.
25     Q. So you referred to the Plaintiff Fact Sheet

Page 49

1 and the deposition. That's Mr. Alvarez discussing
2 his use of Roundup?
3     A. Correct.
4     Q. Did anyone else -- strike that.
5         Do you have any other sources of information
6 that are not Mr. Alvarez as to Mr. Alvarez's use of
7 Roundup?
8     A. No.
9     Q. Did you talk to any of his friends about it?
10     A. No.
11     Q. Did you talk to any of his coworkers?
12     A. No.
13     Q. Did you talk to his ex-wife?
14     A. No.
15     Q. Did you read his ex-wife's deposition? I
16 can represent to you it's not listed in your report
17 reliance list.
18     A. No, I don't have it.
19     Q. When you say you don't have it, does that
20 mean it was not provided to you?
21     A. Correct.
22     Q. And you said yourself that Mr. Alvarez did
23 not have a great command for this information,
24 right?
25     A. That he what?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

Page 50

1    MR. DIAMOND: Form.
2    Q. You said that Mr. Alvarez does not have
3 great command for this information?
4    MR. DIAMOND: Form.
5    A. I don't understand.
6    Q. Is it an opinion that Mr. Alvarez has a
7 great command for recalling his use of Roundup?
8    MR. DIAMOND: Form.
9    A. Yes. He worked with it for 31 years and
10 it -- he consistently provided detailed information.
11    Q. Did he consistently provide consistent
12 information as to his use of Roundup?
13    A. To the best of my knowledge, yes.
14    Q. If we go to page 6 of your report, your
15 opinion is that Mr. Alvarez's command of the English
16 language is only moderate, right?
17    A. Correct.
18    Q. And, therefore, that is evident in his
19 deposition?
20    A. Yes.
21    Q. And when was Mr. Alvarez deposed? Does
22 July 18th, 2019, sound accurate to you?
23    A. July 18th? Yes.
24    Q. And that's of 2019?
25    A. Yes.

Page 51

1    Q. And his Second Amended Plaintiff Fact Sheet
2 was completed September 19th, 2019?
3    A. That's right.
4    Q. So in both of those instances he was trying
5 to recall his Roundup use that dated as far back as
6 nearly 35 years ago?
7    A. Yes, and as recent as only a few years ago.
8    Q. But it included, even at 35 years ago, back
9 to 1986; is that right?
10    A. Correct.
11    Q. And you have noted in your report some
12 instances where Mr. Alvarez had trouble remembering
13 details about his Roundup use, right?
14    A. Yes.
15    Q. For example, at page 7 you say that
16 regarding his use of Roundup Weed & Grass Killer 3,
17 Mr. Alvarez could not remember this with certainty?
18    A. Correct.
19    Q. So Mr. Alvarez was not sure about the
20 product he used?
21    MR. DIAMOND: Form.
22    A. No. I would say he's not clear on all of
23 the products he used.
24    Q. And, I mean, that's understandable because
25 he's recalling behavior that was 30 years ago.

Page 52

1    A. And as recent as only a few years ago.
2    Q. In terms of being able to remember all the
3 products he used, some of which was in the '80s and
4 '90s, that's like trying to remember what brand of
5 shampoo you used back in the '80s and '90s, right?
6    A. I used Ultra Swim.
7    Q. Ultra Swim?
8    A. Yeah.
9    Q. So you remember what brand of shampoo you
10 used 30 years ago?
11    A. I sure do. As a swimmer, I remember exactly
12 what I used.
13    Q. I can represent to you that I do not
14 remember the brand of shampoo that I used when I was
15 -- or that I used 30 years ago.
16    MR. WHITMAN: It was baby shampoo.
17    MR. DIAMOND: I was going to say --
18    THE WITNESS: That's pretty good.
19    MR. DIAMOND: -- I was thinking the same
20 thing.
21    MR. WARREN: We will work on making sure
22 that is not in the record.
23 BY MR. WARREN:
24    Q. But -- and again, this is no offense to
25 Mr. Alvarez, but for some of his recall, you would

Page 53

1 agree that he's not the most reliable source of
2 information here?
3    MR. DIAMOND: Form.
4    A. No, I don't agree to that in my report. I
5 stated that his command of the English language was
6 not very strong and one needs to be aware of that
7 when assessing the deposition. I did not draw any
8 opinions or provide any opinions regarding the
9 abilities of his memory. That's something for the
10 jury and a federal judge to assess. I'm not going
11 to secondguess a plaintiff's state of mind.
12    Q. And you don't believe it's up to you to
13 assess the accuracy of his memory in forming your
14 report about his use of Roundup?
15    A. His memory appears to be intact, but I'm not
16 going to overstep my bounds and try to be a
17 neuropsychologist.
18    Q. Is it your opinion that it's overstepping
19 your bounds to assess the accuracy of Mr. Alvarez's
20 memory?
21    A. Only if I see glaring and unusual problems,
22 certainly, but his memory appeared to be intact.
23    Q. So is it your testimony that only glaring
24 and unusual problems would cause you to assess
25 Mr. Alvarez's memory?

Page 54

1   A. No, I don't think that's the only thing that
2 would cause me to have concerns. I found nothing in
3 his deposition or Plaintiff Fact Sheets to -- any
4 red flags to suggest that he had a memory problem,
5 that he was suffering from Alzheimer's or some other
6 problem. There wasn't any evidence to flag such a
7 theory.
8   Q. But below the level of Alzheimer's or some
9 other problem along those lines, is there any other
10 reason to consider how accurate Mr. Alvarez is in
11 his memory of his use?
12   A. His memory appeared fine, and as a
13 toxicologist, I'm relying on the deposition and
14 Plaintiff Fact Sheet as facts in the case. I can't
15 secondguess it. That's not my role. That's what
16 jurors do, determine whether they believe him or
17 not. That's not -- you're trying to place me in a
18 box I don't want to go to. That's not where --
19 that's not my job.
20   Q. I'm certainly not attempting to place you in
21 a box. I'm just trying to get a --
22   A. I'm not the jury.
23   Q. I'm just trying to get a better sense of how
24 you formed your opinions in this case and what you
25 relied on.

Page 55

1   A. No, you're trying to put me into the jury
2 box. That's not my job and I want to be very clear
3 on that.
4   Q. I have no intention of putting you in the
5 jury box. It's fine with me if you stay out of
6 there. That would be difficult for us in this case.
7   A. Well, then stay away from such questions.
8   Q. The questions are simply to better
9 understand your report and the basis of your
10 opinions in this case.
11   Now, we talked about it but I didn't mark
12 it. I want to make sure the record is clear.
13 Exhibit 3 I'm showing again, is the Second Amended
14 Plaintiff Fact Sheet.
15   (Sawyer Exhibit 3 was marked for identification.)
16 BY MR. WARREN:
17   Q. I'm not going to ask you any questions about
18 it but it will probably come up later.
19   (Sawyer Exhibit 4 was marked for identification.)
20 BY MR. WARREN:
21   Q. Now I'm showing you what's been marked as
22 Exhibit 4 in this case. This is an employment
23 record from Mr. Alvarez with a Bates stamp
24 Confidential Calderon-JCalderon-SHFV-HR-000042.
25   MR. DIAMOND: Thanks.

Page 56

1   Q. Have you seen this document before?
2   A. No.
3   Q. Do you have any reason to believe that this
4 is not from Mr. Alvarez's employee file at Sutter
5 Home?
6   A. No.
7   Q. Now, if you turn to the back of this page,
8 do you see a section labeled Individual Development
9 Objectives for Fiscal Year 2017?
10   A. Yes.
11   Q. And what's the discussion date listed there
12 just below that?
13   A. August 4, '16.
14   Q. Does it appear to have a supervisor's
15 signature on it?
16   A. Yes.
17   Q. Do you see where Mr. Alvarez's supervisor
18 said that Jaime Alvarez, quote, "could learn more
19 about how the clocks work"?
20   A. Yes.
21   Q. Does it impact your opinion to know that as
22 recently as 2016 Mr. Alvarez's supervisor said that
23 he needed to learn more about how the clocks work?
24   MR. DIAMOND: Form.
25   A. Could you repeat that?

Page 57

1   Q. Does it impact your opinion at all to know
2 that as recently as 2016, Mr. Alvarez's supervisor
3 said he "could learn more about how the clocks
4 work"?
5   A. No.
6   Q. It doesn't change your opinion one way or
7 the other?
8   A. No.
9   Q. It doesn't matter to you whether Mr. Alvarez
10 is very knowledgeable about assessing time or not?
11   A. No. I'm not going to try to read into that.
12 I don't understand what was meant by that. I think
13 you would have to depose the supervisor and get that
14 information. I'm not about to guess at what that
15 means. It means -- it could mean that he's not
16 punching in on time, it could be a kind of a
17 sarcastic remark saying, look, don't keep checking
18 in 10 minutes late. I have no idea and I'm not
19 going to read into it. I'm going to pass on an
20 answer, but I just don't know what that means.
21   Q. So even if you had received this, this would
22 not have impacted your opinion in any way?
23   A. No.
24   Q. You would not have included any of this
25 information in your report?

Page 58

1    A.  No.  I can't discern from that statement
2  what -- you know, I -- you know, I know he's not a
3  pocket watch repairman, I think it's reasonable for
4  me to conclude that, but beyond that, I can't really
5  guess what was implied by that statement.
6    Q.  Going back to Table 3 of your report, you
7  list that Mr. Alvarez started using Roundup in 1986.
8    A.  Table 3 you said?
9    Q.  Yes, page 13.
10    A.  Yes.
11    Q.  And he used it for a full year in 1986?
12    A.  I made that assumption, yes.
13    Q.  So he used it for the same amount of time in
14  1986 as he did for every year from 1986 to 2017?
15    A.  Under my assumption, yes.
16    Q.  It did not change your opinion that
17  Mr. Alvarez's Plaintiff Fact Sheet stated he didn't
18  start using Roundup until June of 1986?
19    A.  That would change the exposure days ever so
20  slightly, and still, there's -- even -- even if that
21  assumption was made, it's still well over 50 times
22  the maximal exposure threshold in the studies that
23  I've referenced.
24    Q.  And I'm not asking you to make an assumption
25  here.  I'm asking you the information that's in

Page 59

1  Mr. Alvarez's Plaintiff Fact Sheet states that he
2  didn't start using Roundup until June 1986, right?
3    A.  Yes, but if I made that change, it would
4  still have no significant outcome on the number of
5  exposure days.  They would still be in excess of 50
6  times the 10 eight-hour day threshold.
7    Q.  I understand.  And just to kind of make
8  things clear here, I'm going to be asking a few
9  questions about your assessments in Table 3.  I
10  think we can kind of, at the end of that, come back
11  and ask whether that changes your overall
12  assessment.  I think that if for each question, if
13  we go into whether that changes your overall
14  assessment as to whether or not he reached the
15  10 eight-hour day threshold, I think that may slow
16  things down unnecessarily.
17    So, similarly, does it change your opinion
18  that in Mr. Alvarez's deposition he stated he didn't
19  use Roundup in 1986?
20    MR. DIAMOND:  Form.
21    A.  Could you restate that?  I didn't understand
22  the entire question.
23    Q.  Mr. Alvarez stated in his deposition that he
24  didn't use Roundup in 1986, right?
25    MR. DIAMOND:  Form.

Page 60

1    A.  I don't recall that.
2    Q.  If he had stated that he didn't use Roundup
3  in 1986, would that have impacted your writing in
4  Table 3?
5    MR. DIAMOND:  Take a look at page 11 of his
6  deposition.
7  BY MR. WARREN:
8    Q.  Sorry.  Could we just answer the question?
9  If he had stated that he didn't use Roundup in 1986
10  in his deposition, would that have impacted what's
11  in Table 3 of your report?
12    A.  It would decrease the value from 546 to
13  about 500 exposure days, about 10 percent.
14  (Sawyer Exhibit 5 was marked for identification.)
15  BY MR. WARREN:
16    Q.  Okay.  I am handing you what's been marked
17  Exhibit 5 of this deposition.  This is Mr. -- or
18  sorry.  That's correct.  This is Mr. Alvarez's
19  deposition.
20    MR. DIAMOND:  Is that the complete
21  deposition?
22    MR. WARREN:  This is the complete
23  deposition.  I have a copy for you as well.
24  BY MR. WARREN:
25    Q.  And you can look at the front if you want

Page 61

1  to.  I represent to you it's Mr. Alvarez's
2  deposition, but if you go to page 17, which I've
3  folded for you, do you see that on lines 5 through 8
4  he is asked whether he used Roundup at those
5  properties in 1986, and he states:  "No, not in that
6  time, no."
7    A.  Right, but that doesn't imply the entire
8  year.  I think it's six weeks, six months.
9    MR. DIAMOND:  My objection is it's not
10  correctly reading his testimony.
11    MR. WARREN:  Okay.  I feel I have the
12  ability to read his testimony.  This deposition
13  is about how Mr. -- or Dr. Sawyer read his
14  testimony.
15  BY MR. WARREN:
16    Q.  So did you read Mr. Alvarez's testimony to
17  say that he used Roundup for an entire year in 1986,
18  Dr. Alva -- Dr. Sawyer?  I'm sorry.
19    A.  I don't understand the question.
20    Q.  Is it your opinion, based on the information
21  in Mr. Alvarez's deposition, that he used Roundup in
22  1986?
23    A.  Did I see in his deposition -- no, no.
24  He -- from what I understand, it was I think about
25  six weeks he didn't use it, not a year.

Page 62

1    Q.  So your opinion is that -- I just want to
2  make sure I understand.  Your opinion is that for a
3  six-week period in 1986 he did not use Roundup?
4    A.  Yeah.  I believe he -- I think he was
5  washing bottles for about six weeks.  I don't think
6  that he abstained from using Roundup for the entire
7  year.
8    Q.  Okay.  And is that information reflected in
9  your report at Table 3?
10   A.  Regarding the six weeks?
11   Q.  Correct.
12   A.  No.  No.  It would be, on the overall
13  exposure days, it would be irrelevant.
14   Q.  Now, if Mr. Alvarez was not spraying Roundup
15  in 1993, when he was working at what's referred to
16  as The Inn property, would that impact your opinion
17  in any way?
18       MR. DIAMOND:  Form.
19   A.  Is that a hypothetical or what type of
20  question are you asking?
21   Q.  The question is the question.  We can -- it
22  can be a hypothetical for now.  If Mr. Alvarez
23  stated in his deposition that in 1993 he was not
24  using Roundup at The Inn property, would that change
25  your Table 3 of your report in any capacity?

Page 63

1    A.  It wouldn't change it significantly, no.
2        MR. DIAMOND:  I know we've been going for
3  about an hour and a half.  Well, maybe --
4        MR. WARREN:  It's been less than that but
5  we --
6        MR. DIAMOND:  -- a little bit more than -- I
7  guess maybe --
8        MR. WARREN:  Now is a fine time to take a
9  break.
10       MR. DIAMOND:  I was going to suggest.  If
11  you want to finish up a line of questions, that's
12  fine.
13       MR. WARREN:  I think it's a good time to do
14  it.
15       MR. DIAMOND:  Okay.  Great.
16       THE VIDEOGRAPHER:  We're going off the
17  record at 10:00 o'clock.
18   (Recess from 10:00 a.m. until 10:15 a.m.)
19       THE VIDEOGRAPHER:  We're back on the record.
20  The time is 10:15.
21       MR. WARREN:  Thank you.
22  BY MR. WARREN:
23   Q.  Now, Dr. Sawyer, I'm marking for the record
24  what is Exhibit 6, and this is the report of
25  Mr. Cohen with your highlighting and notes on it.

Page 64

1  I'm not going to ask you any questions about it at
2  this time.
3   (Sawyer Exhibit 6 was marked for identification.)
4  BY MR. WARREN:
5    Q.  The other request I'd like to make for the
6  record is you referenced an updated list of
7  materials you considered.  We just want to put on
8  the record that we are requesting that list as well.
9        Now, Dr. Sawyer, there were researchers that
10  were looking at glyphosate and other pesticides back
11  in the 1980s, right?
12   A.  Yes.
13   Q.  This includes a paper that you've read by
14  De Roos in 1983?
15   A.  Yes.  It's not 1980s, but yes.
16   Q.  Is it your opinion that the Roundup users
17  surveyed in De Roos 2003 did not contain people
18  using the product in 1980s?
19   A.  No.
20   Q.  That's not your opinion?
21   A.  That's my opinion.  You gave me a negative.
22  You said "do not."
23   Q.  You're right.  The question was confusing on
24  my part.  I agree with you.
25       MR. DIAMOND:  Did we mark Mr. Alvarez's

Page 65

1  deposition, or did you want to?
2        MR. WHITMAN:  I think it's 5.
3        MR. DIAMOND:  It's 5?
4        MR. WARREN:  It is.  It is marked.
5        MR. DIAMOND:  All right.  I've got it.
6  Thank you.
7  BY MR. WARREN:
8    Q.  Going back to De Roos, in your opinion, when
9  were the Roundup users studied in De Roos, when were
10  they using the product?
11   A.  I would need to look at the method section.
12  I don't recall the exact dates.
13   Q.  So you don't recall whether De Roos surveyed
14  people during the 1980s?
15   A.  Yes, I do recall that.
16   Q.  Okay.  So it included Roundup users from the
17  1980s?
18   A.  Yes.
19   Q.  And back in the '80s and early '90s, Roundup
20  was not as popular as it is today, right?
21       MR. DIAMOND:  Form.
22   A.  I do know that statistically the production
23  and worldwide use has been increasing throughout
24  that period.  In terms of popular, I don't know what
25  that means in your questioning.

Page 66

1    Q.  In the '80s and early '90s, were people
2  frequently using multiple pesticides at the same
3  time?
4        MR. DIAMOND:  Form.
5    A.  I'd refer that to Dr. Bretbar.  I can't
6  answer that statistically.
7    Q.  I'm sorry.  I may have misunderstood --
8    A.  Charles -- Charles Benbrook.  I'm sorry.
9    Q.  Oh, Benbrook.  Okay.  Thank you.
10       So you're not sure whether people in the
11  '80s and '90s were using other pesticides in
12  addition to Roundup?
13   A.  For what purpose are you asking?  For
14  killing --
15   Q.  I'm asking --
16   A.  -- killing weeds or for general insecticide
17  use?  I'm not sure what you're asking.
18   Q.  I'm asking general use of pesticides.  Were
19  people using other pesticides in addition to Roundup
20  in the 1980s and early '90s?
21   A.  Of course.
22   Q.  And is it important to consider the use of
23  multiple pesticides?
24       MR. DIAMOND:  Form.
25   A.  Yes.  I have done so in this assessment and

Page 67

1  included products in Table 1, I believe it is, in my
2  report.
3    Q.  So did you consider the possibility that
4  Mr. Alvarez was using other pesticides in the '80s
5  and '90s other than Roundup?
6    A.  Yes.
7    Q.  Did the De Roos study also talk about an
8  issue called recall bias?
9    A.  Yes.
10   Q.  And that's where when people are asked what
11  pesticide they used, they may not remember?  I
12  should say recall bias specific to the De Roos study
13  has to do with when people were asked what
14  pesticides they used and they may not remember?
15   A.  That's not really the definition of recall
16  bias.  If you wish, I can explain it, but the answer
17  is no, that's not quite right.
18   Q.  And I don't think we need to explain it
19  further, but were the authors of the De Roos 2003
20  study concerned with people who may not be able to
21  recall the pesticides they used?
22   A.  Yes.
23   Q.  Did you consider that possibility, that
24  Mr. Alvarez may not have been able to recall what
25  pesticides he used in the -- 30 years ago?

Page 68

1    A.  Yes.
2    Q.  How do you know he was using Roundup during
3  this time and not some other pesticide?
4    A.  Based on his consistent description in the
5  Plaintiff Fact Sheet and deposition.
6    Q.  Is it possible that Mr. Alvarez was using
7  another product other than Roundup during this time?
8    A.  Well, sure.  I could speculate that's the
9  case but that's not what the facts of the case
10  reveal, so I have no ability to make such a
11  speculation.
12   Q.  But it's a possibility?
13   A.  Anything is possible.
14   Q.  Did you include that possibility in your
15  opinion in this case?
16   A.  No.
17   Q.  How long --
18   A.  That's not consistent with the facts in the
19  case, so I did not.
20   Q.  How long had Roundup been sold commercially
21  in 1986?
22   A.  About 11 years.
23   Q.  When Mr. Alvarez worked at Sutter Home, he
24  worked at a few different properties, right?  And it
25  may be beneficial to refer to your report at page 6

Page 69

1  where -- because you list a few of the winery's
2  properties.
3    A.  Yes, he did, and I should point out that he
4  was never caught up with his spraying.  He was going
5  from one property to another continuously, and in
6  response to that earlier question about him not
7  spraying one particular property, that doesn't mean
8  he wasn't spraying.  He was continually going from
9  one property to the next, and just because he didn't
10  spray that one property you mentioned earlier,
11  doesn't mean that he was not spraying for a period
12  of time.
13   Q.  Was he -- you list a few properties in your
14  report, one of which is the Ranch House, right?
15   A.  I do, 1986, 2010.
16   Q.  One of which is called Main Street?
17   A.  Yes.
18   Q.  One of which is called Napa Cellars?
19   A.  Yes.
20   Q.  One of which is called Hoffman Lane/Joel
21  Gott?
22   A.  Yes.
23   Q.  The final one you list is Green Island Road
24  Warehouse?
25   A.  Yes.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

Page 70

1    Q.  Also in his deposition but not listed in
2  your report, he states that he worked at a property
3  which was the house of the owners?
4    A.  Yes.
5    Q.  He also, not listed in your report but
6  stated in his deposition, he worked at a property
7  called The Inn?
8    A.  Yes.
9    Q.  So I just listed seven properties there.  Is
10  it your opinion that he worked at all seven
11  properties the entire time from 1986 to 2017 that
12  you say he was spraying Roundup?
13    A.  No.  No.  Again, he sprayed one property and
14  then moved onto the next, whatever property was
15  considered of significance.
16    Q.  At different points in his career he worked
17  at different properties, right?
18    A.  Yes, and during given time points he worked
19  at multiple properties, moving on from one to the
20  next as time permitted.
21    Q.  In the three properties in which you did not
22  list in your report but he did work, he did not
23  spray Roundup at those properties, right?
24      MR. DIAMOND:  Form.
25    A.  I don't recall.

Page 71

1    Q.  You don't know one way or the other whether
2  he sprayed Roundup at the three properties you did
3  not list in your report?
4    A.  I don't recall.
5    Q.  You don't recall whether you know or you
6  don't recall whether he sprayed?
7    A.  I simply don't recall.  If you want me to
8  take a look at it, I will.
9    Q.  So you don't know one way or the other, is
10  my question?
11    A.  It could be in my report.  I don't recall.
12    Q.  But he worked at seven properties overall at
13  Sutter Home, right?
14    A.  Yes.
15    Q.  Do you know how often he was at each
16  property?
17    A.  No, no, I don't.  He provided his frequency
18  of spraying and moving from one property to the next
19  as needed.
20    Q.  Were the properties all the same size?
21    A.  No.  They're all very different.  I have the
22  acreage listed on page 6.
23    Q.  Well, regardless of when he worked at the
24  properties, in your calculations in Table 3 you said
25  he sprayed Roundup for the same duration from 1986

Page 72

1  to 2017, right?
2    A.  I didn't say that.  He did.  Okay?  He
3  stated that it was four hours per day.
4    Q.  I understand.  I'm asking you what's in your
5  -- what your opinion is in this case and what's in
6  your report.
7    A.  I used a midpoint between 3 and 4 hours,
8  three-and-a-half hours, to be specific.
9    Q.  So your opinion is that he sprayed
10  consistently from 1986 to 2017 the same number of
11  hours in different intervals as listed in Table 3?
12    A.  He stated, quote:  I sprayed every two days
13  for approximately four hours a day during the spring
14  months, less frequently in the summer and fall
15  months.
16    End quote.
17    Q.  And that quote is from his Plaintiff Fact
18  Sheet?
19    A.  Yes, and it's not something I created.  It's
20  a fact in the case.  That's what I have to rely on.
21  I can't invent information, so I don't understand
22  where you're going with this.
23    Q.  If there were to be a discrepancy between
24  Mr. Alvarez's deposition and the information listed
25  in his Plaintiff Fact Sheet, which would you go

Page 73

1  with?
2    A.  I would have to have a more specific
3  question because I have made that assessment, and in
4  some cases in the deposition the questions were
5  incomplete and I didn't find them to be
6  contradictory.
7    Q.  When you say I didn't find them to be
8  contradictory, are you referring to the Plaintiff
9  Fact Sheet and the deposition?
10    A.  That's correct.
11    Q.  So you did not find any contradictions
12  between the Plaintiff Fact Sheet and the deposition?
13      MR. DIAMOND:  Form.
14    A.  Not with respect to the spraying every two
15  days for approximately four hours a day, no.
16    Q.  If there were discrepancies between the two,
17  would you just rely on the Plaintiff Fact Sheet?
18      Dr. Sawyer, at this point this is a
19  hypothetical question.  Hypothetically at this
20  point, if there was a discrepancy between the
21  Plaintiff Fact Sheet and the deposition, would you
22  just rely on the Plaintiff Fact Sheet?
23    A.  I'm going to consult my file before I answer
24  your question.
25    Q.  Dr. Sawyer, if you're going to consult

Page 74

1 another file, I think it's proper to go off the
2 record at this time so we're not continuing to use
3 time.
4    A.   Then I'm not going to do that.
5    Q.   Okay.
6    A.   I can't answer your question then.
7    Q.   You cannot answer a hypothetical as to if
8 there was a discrepancy between the Plaintiff Fact
9 Sheet and the deposition, which you would rely on?
10    A.   I need to know if the Plaintiff Fact Sheet
11 was under the penalty of perjury, was it a sworn
12 testimony as was the deposition, and without looking
13 at it, I can't answer that question.
14    Q.   If --
15    A.   I'll give you a hypothetical.  If his
16 Plaintiff Fact Sheet was provided under the -- what
17 shall we say -- under the potential of perjury, I
18 would rely on either equally.
19    Q.   How is it possible to rely on either equally
20 if there is a discrepancy between the two?
21    A.   That would depend on the individual
22 discrepancy and determine if it was simply an
23 incomplete response or incomplete question in the
24 deposition, versus a more fuller detailed response
25 in the Plaintiff Fact Sheet.

Page 75

1    Q.   So it's your -- sorry.
2    A.   In fact, the amended Plaintiff Fact Sheet
3 may have been in an attempt to provide information
4 that was misunderstood or not provided in the
5 deposition.
6    Q.   And you don't know how that amended
7 Plaintiff Fact Sheet was created, right?
8    A.   No.  I was going to take a look but you
9 wanted to go off the record, so I decided not to.
10    Q.   Well, that's not -- that's not a question as
11 to whether it was sworn testimony.  That's a
12 question as to the process by which that amended
13 fact sheet was amended?
14    A.   I don't understand the question.
15    Q.   You don't know if other people worked on
16 that Plaintiff Fact Sheet in addition to
17 Mr. Alvarez, do you?
18       MR. DIAMOND:  Form.
19    A.   I don't understand what you mean by worked
20 on it.  I understand that he could not write in
21 English to the degree required to fill out a
22 Plaintiff Fact Sheet.  That's my understanding,
23 someone would have to assist with the English
24 translation.
25    Q.   And you don't know who that would be to the

Page 76

1 Plaintiff Fact Sheet?
2    A.   Without looking at it, no.
3    Q.   Now, one more question about those seven
4 properties you were talking about.  Do you intend to
5 tell the jury that Mr. Alvarez sprayed at all seven
6 properties, sprayed Roundup?
7    A.   No.  I intend to explain to the jury he
8 sprayed every day, as he stated.
9    Q.   And you don't intend to tell the jury what
10 properties he sprayed at?
11    A.   No.
12    Q.   So your testimony for the jury will just be
13 that he sprayed every other day and you won't
14 reference what properties he sprayed at?
15       MR. DIAMOND:  Form.
16    A.   Yeah, and I will explain that I used a
17 frequency of two-and-a-half days per week based on
18 five-day workday weeks, two days one week, three the
19 other week.
20    Q.   And that five-day workweek was an
21 assumption?
22    A.   No.  He worked full-time.  That's just
23 nonsense.  He worked full-time and he testified that
24 he worked every other day spraying.
25    Q.   He testified that he worked every other day

Page 77

1 spraying?
2    A.   Sprayed every other day, and --
3    Q.   That's my mistake.  I misheard you.  I
4 thought you said spraying --
5    A.   So it worked three days on one week, two
6 on the next, Tuesday/Thursday versus
7 Monday/Wednesday/Friday.  That averages to 2.5 days
8 per week as in Table 2.  It's not that difficult to
9 understand.
10    Q.   It's not a question as to how easy or
11 difficult it is to understand.  It's a question as
12 to what your opinion is in this case and what you
13 will be telling the jury and what the basis is for
14 that opinion.
15    A.   I have explained it three times now.
16    Q.   Now, Table 3, you state that he sprayed
17 until 2017, right?
18    A.   Yes, and I think we've already answered this
19 too.
20    Q.   And that was the same duration in the
21 spring, summer and fall as he had sprayed in
22 previous years?
23    A.   That's what my table reveals, yes.  I don't
24 have exact -- excuse me -- months in that table.
25    Q.   I take it you still hold this opinion to a

Page 78

1  reasonable toxicological certainty?
2      A.  Opinion of what?
3      Q.  Sorry.  That wasn't clear.  I take it you
4  still hold your opinion that he sprayed until 2017
5  to a reasonable toxicological certainty?
6      A.  Well, I do know he sprayed in 2016.  My
7  table goes up to -- to January -- you know, January
8  -- through the end of December of 2016.  I do know
9  that his hours in the year 2016 were cut back
10 somewhat due to his illness and his medical
11 appointments, which in fact could be the reason
12 there was a clock problem on that one document you
13 showed me because he did miss some work time due to
14 his medical illness.
15     So I -- it is my opinion to a reasonable
16 toxicological certainty that he sprayed from 1986 up
17 to 2017.
18     Q.  Two things based on that answer:  You say
19 that his hours in the year 2016 were cut back
20 somewhat due to his illness.  Is that reflected in
21 your table?
22     A.  No, no, it's not.  It's just not reflected
23 because I don't have the time sheets that show what
24 days he missed, and again, he's over 50 times the
25 highest exposure threshold.  If I'm off a few

Page 79

1  percent, so what.
2      Q.  As long as he's more than 10 days, right?
3      MR. DIAMOND:  Form.
4      A.  He's 50 times above the 10-day threshold,
5  the 10-day eight-hour-day threshold.  So it is
6  possible I may -- I may have not included days of
7  missed work during the year 2016, but keep in mind
8  I've underestimated his spray hours at
9  three-and-a-half hours rather than four, I included
10 zero hours in the winter, I've been very
11 conservative, and such minor changes that you've
12 brought up will not significantly affect the
13 results.
14     Q.  So it's still your opinion to a reasonable
15 toxicological certainty that the minimum exposure
16 days for Mr. Alvarez was 546?
17     A.  Yes.  That's a very conservative
18 underestimate.  It includes zero hours in the
19 winter, only one day per week during the fall and
20 summer, and three-and-a-half rather than four hours
21 during the spring.  So I think it's a very
22 underestimated calculation, and the fact that I've
23 missed some days here where he was out sick with
24 medical exams, I don't think that has any
25 significant impact, and I don't have any records

Page 80

1  providing what dates he missed, so, you know, I did
2  the best job I could.
3      Q.  Would it have helped you to have these
4  records for days that he missed?
5      A.  It would -- it would make the calculation
6  slightly more accurate, but not significantly.
7      Q.  What do you mean when you say not
8  significantly?  Significant as to what?
9      A.  Well, even if he missed the entire year of
10 2016, it would only change the number of exposure
11 days by 10 percent, so it's not going to have any
12 outcome change in terms of my opinion that he
13 exceeded the -- all of the thresholds of the human
14 epidemiologic studies.
15     Q.  And if he missed a significant period of
16 time in 2014 as he was undergoing chemotherapy, that
17 would not affect your opinion as to the thresh -- as
18 to whether he reached the thresholds of the human
19 epidemiological studies?
20     MR. DIAMOND:  Form.
21     A.  No.  Even if we removed the last 10 years of
22 his work, it wouldn't make any difference.  He would
23 still be far, far above the thresholds of the
24 studies.
25     Q.  And what if we removed the last 20 years of

Page 81

1  his work, would it make any difference?
2      MR. DIAMOND:  Form.
3      A.  No, it would not.  That would only reduce
4  his exposure days to about 170 exposure days, which
5  is 17 times above the maximal threshold.
6      Q.  And in fact, his first year, in 1986, based
7  on your calculation, how many days did he work?
8      A.  48 weeks.
9      Q.  Sorry.  My question may not have been clear.
10 Based on your calculation, how many eight-hour days
11 of Roundup exposure did Mr. Alvarez have in 1986?
12 Does 17 days sound accurate to you?
13     A.  13.1.
14     Q.  13.1 days of Roundup exposure?
15     A.  Eight-hour exposure days of Roundup.
16     Q.  Following his work at Sutter Home in 1986,
17 in your opinion, right?
18     MR. DIAMOND:  Is that based upon a half year
19 or full year?  I'm just trying to -- because I
20 thought you made a good point before.
21     Q.  That's a fair clarification.  That's based
22 on the table at this point, which I believe you
23 calculated as a full year, right?
24     A.  Right.  And if I eliminated that year, I
25 would be eliminating 13.1 eight-hour exposure days.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 82

1 It has no significant impact on the exposure days
2 compared to the human epidemiological study
3 thresholds.
4    Q.  And after that first year of Roundup use,
5 where, in your opinion, he sprayed for 13.1 days,
6 was he at an increased risk of getting non-Hodgkin's
7 lymphoma?
8    A.  Yes.
9    Q.  And you also say that he sprayed in the
10 spring for two-and-a-half hours per week, right?
11 Sorry.  That -- I asked that question incorrectly.
12    You say that in the spring he sprayed
13 two-and-a-half times per week was the frequency,
14 right?
15    A.  On the average, yes.
16    Q.  So on the average, after his -- after one
17 week he had sprayed two-and-a-half times?
18    A.  No.  On the average, one week he would spray
19 a Monday, Wednesday, Friday, the following week
20 Tuesday, Thursday.  That averages to 2.5 days per
21 week.
22    Q.  And I'm asking unclear questions.  That's my
23 fault.
24    After two weeks you estimate that he sprayed
25 five times, right?

Page 83

1    A.  Yes.
2    Q.  In just a two-week span?
3    A.  Yes.
4    Q.  Was he then at a significant increased risk
5 of non-Hodgkin's lymphoma?  This is -- this is --
6    MR. DIAMOND:  Form.
7    Q.  This is five times in a two-week span.
8    A.  Yes.  He would be at 2.18 eight-hour
9 exposure days.  That does exceed the greater than
10 two days threshold in some of the studies.
11    Q.  And this occurred in the spring of 1986, in
12 your opinion?
13    A.  Yes.
14    Q.  Mr. Alvarez did not get non-Hodgkin's
15 lymphoma until 2014, right?
16    A.  That's correct.
17    Q.  Nearly 30 years later?
18    A.  Yes.
19    Q.  Was his risk of getting NHL greater in 2013
20 than it was in 1986?
21    MR. DIAMOND:  Form.
22    A.  Yes.
23    Q.  Why?
24    A.  Longer cumulative exposure, and accumulated
25 genetic damage.

Page 84

1    Q.  And that's what's referred to as a
2 dose-response relationship for Roundup?
3    A.  Yes.
4    Q.  In your opinion there is a dose-response
5 relationship, right?
6    A.  Yes.
7    Q.  So, for example, spraying for three times in
8 a year is not the same thing as spraying -- sorry.
9 Strike that.
10    For example, spraying for three days in a
11 year, eight-hour days, is not the same thing as
12 spraying for 300 eight-hour days in terms of your
13 NHL risk?
14    A.  Yes.
15    Q.  Now, even assuming that Mr. Alvarez stopped
16 spraying after 1986, would there be any change in
17 your opinion?
18    MR. DIAMOND:  Form.
19    Q.  I should rephrase that.  That question was
20 worded poorly.
21    Assuming hypothetically that Mr. Alvarez
22 stopped working at Sutter Home Winery and stopped
23 spraying Roundup after 1986, would you still find
24 that Roundup was a substantial contributing factor
25 in his NHL?

Page 85

1    MR. DIAMOND:  Form.
2    A.  I would need to consult the studies further.
3 I'm not prepared to answer that today in terms of
4 cumulative genetic damage and DNA repair mechanisms
5 over time.
6    Q.  What studies are you referring to that you
7 would need to consult?
8    A.  I didn't come prepared to answer that
9 question today.
10    Q.  You didn't come prepared to answer what
11 studies you would need to consult in determining
12 whether or not Roundup was a substantial
13 contributing factor in Mr. Alvarez's non-Hodgkin's
14 lymphoma?
15    A.  No.
16    MR. DIAMOND:  Form.
17    A.  That's not the question you asked.
18    Q.  We can start again.
19    If Mr. Alvarez had stopped spraying Roundup
20 after 1986, meaning, according to your chart --
21 sorry.  I'll start this over.
22    If Mr. Alvarez had stopped spraying Roundup
23 after 1986, according to your opinion, he would have
24 sprayed for how many exposure days?
25    A.  2.18.

Page 86

1    Q.   So I -- I think that's a different
2    calculation than I asked you.  I'm saying if he
3    sprayed for the entire year of 1986.  I believe you
4    said 13.1.
5    A.   13.1 eight-hour exposure days.
6    Q.   If he had stopped spraying Roundup after
7    1986 --
8        MR. DIAMOND:  '86.  Is that what you said?
9    Sorry.
10       MR. WARREN:  Not a problem.  I can start
11   over.  One of the few instances where I think the
12   record looks good for me here but --
13       MR. DIAMOND:  Yeah, I know.  I think it does
14   too.
15   BY MR. WARREN:
16   Q.   If Mr. Alvarez had stopped spraying Roundup
17   after 1986, would it be your opinion that -- and
18   everything else stayed the same for Mr. Alvarez,
19   would it be your opinion that Roundup was a
20   substantial contributing factor in his NHL?
21       MR. DIAMOND:  Form.
22   A.   I don't understand the question.
23   Q.   What don't you understand?
24   A.   The question.
25   Q.   What component of the question do you not

Page 87

1    understand?
2    A.   I wasn't listening carefully.  I don't
3    understand.
4    Q.   Well, I can rephrase the question.  Please
5    do me a favor and try to listen carefully.
6        If Mr. Alvarez had stopped spraying Roundup
7    after 1986 and everything else in his life remained
8    the same, would it be your opinion that Roundup was
9    a substantial contributing factor to his NHL that he
10   got in 2014?
11       MR. DIAMOND:  Form.
12   A.   I'm not prepared to answer that today.  I
13   have never considered that question.
14   Q.   What would you need to answer that question?
15   A.   I'm not prepared to answer that question
16   today.
17   Q.   You're also not prepared to answer what you
18   would need to answer that question?
19   A.   No, I'm not prepared to answer the question.
20   I would research it and let you know.
21   Q.   So you will not answer the hypothetical of
22   if Mr. Alvarez had stopped spraying after 1986 and
23   everything else had remained the same in his life,
24   whether Roundup would be a substantial contributing
25   factor in his non-Hodgkin's lymphoma?

Page 88

1        MR. DIAMOND:  Form; asked and answered.
2        MR. WARREN:  Clearly, it was not answered.
3        MR. DIAMOND:  Well, he already told you that
4    he wasn't prepared to answer it.  You're just
5    asking it again.
6        MR. WARREN:  I'm asking for his -- whether
7    he is able to answer this question, and if not,
8    why he's not prepared today to answer the
9    question.
10       MR. DIAMOND:  I didn't ask him to answer
11   that question.  I didn't ask him for a
12   hypothetical if Mr. Alvarez only had one year of
13   exposure to Roundup.  I asked him to take into
14   consideration the total amount of exposure that
15   Mr. Alvarez had, and I didn't ask him to parse it
16   out by month or year or anything like that.
17   That's my problem with it.
18       MR. WARREN:  It's clear he did not parse out
19   a lot of Mr. Alvarez's Roundup use.
20       MR. DIAMOND:  Mr. Cohen actually has greater
21   numbers --
22       MR. WARREN:  Mr. Cohen is not being deposed
23   today.
24       MR. DIAMOND:  I'm just telling you --
25       MR. WARREN:  I think it's good if we go off

Page 89

1    the record if we're going to have a continued
2    discussion.  We can go off the record.
3        MR. DIAMOND:  I don't need to.  You can go
4    on.  When we take the next break, we can talk.
5        MR. WARREN:  Sure.
6    BY MR. WARREN:
7    Q.   Okay.  So I agree with Mr. Diamond.  The
8    hypothetical I asked, he has answered that he's not
9    prepared to answer it today.
10       My question is that hypothetical, which is
11   if Mr. Alvarez had stopped spraying Roundup after
12   1986 and everything else in his life had remained
13   the same, what information would you need to review
14   in order to answer that question?
15   A.   I have not run across such a scenario yet.
16   I would take that under consideration and research
17   the studies and let you know.
18   Q.   You have not come across a scenario in which
19   an individual sprayed Roundup for one year?
20   A.   No, not with a 30-year gap.  That's the
21   question.  Now, if it were one year and the NHL
22   developed in a period of 10 years, certainly that
23   would be sufficient, but I have not researched a gap
24   in time of 30 years prior to diagnosis.  I would
25   research that and let you know.

Page 90

1    Q.   And was it significant to your opinion the
2  number of days per year that Mr. Alvarez sprayed
3  Roundup, or the total number of days of exposure?
4       MR. DIAMOND:  Form.
5    A.   Consistent with the study evidence,
6  cumulative eight-hour exposure days.
7    Q.   So the number of days per year in which
8  Mr. Alvarez sprayed Roundup was not significant to
9  your opinion?
10       MR. DIAMOND:  Form.
11    A.   Of course it's significant in the
12  calculation.
13    Q.   You're saying of course it's significant.  I
14  asked you and you just stated that consistent with
15  the study evidence, cumulative eight-hour exposure
16  days is what you looked into.  My question is was it
17  both important his cumulative number of eight-hour
18  exposure days and the number of times per year in
19  which he sprayed Roundup?
20    A.   I've already considered that in Table 3.
21    Q.   And both of those components, the number of
22  days per year and the overall number of days, are
23  important in forming your opinion?
24    A.   Yes.  That's what Table 3 -- Table 2 and
25  Table 3 in my report considers, exactly.

Page 91

1       MR. WARREN:  Okay.  I think it may be
2  beneficial to take a quick break.
3       MR. DIAMOND:  Sure.
4       MR. WARREN:  I also think that based on some
5  of the answers, I can streamline some of the
6  questions in my outline and kind of help
7  everybody out, so if we take a break --
8       MR. DIAMOND:  Okay.
9       THE VIDEOGRAPHER:  We're going off the
10  record at 10:49.
11       (Recess from 10:49 a.m. until 10:58 a.m.)
12       THE VIDEOGRAPHER:  We're back on the record.
13  The time is 10:58.
14  BY MR. WARREN:
15    Q.   Dr. Sawyer, in an effort to streamline
16  things a little bit, I just want to ask a couple of
17  kind of summary questions.  If Mr. Alvarez's last
18  year of using Roundup was not 2017 but it was a year
19  or two before that, that would not change your
20  overall opinion, right?
21    A.   No.
22    Q.   If Mr. Alvarez did not use Roundup during
23  the time in which he was receiving chemotherapy,
24  that would not change your opinion, right?
25    A.   No.

Page 92

1    Q.   If Mr. Alvarez was demoted from his
2  supervisory position at Sutter Home, that would not
3  change your position, right?
4    A.   Would not.
5    Q.   If there were other individuals at Sutter
6  Home who were also using Roundup, that would not
7  change your opinion?
8    A.   No, it would not.  I'm already aware of
9  that, that's the case.
10    Q.   And you're aware of that because he said
11  that for the backpack sprayer, different people may
12  have improperly put the hose back on?
13    A.   That's correct.
14    Q.   And you don't know how much those other
15  individuals were using Roundup at Sutter Home?
16    A.   No.  That's irrelevant.
17    Q.   It doesn't matter for your opinion how much
18  or how many other individuals were using Roundup at
19  Sutter Home?
20    A.   No.  No.  I mean, hypothetically it could
21  increase his exposure if two or three sprayers were
22  spraying simultaneously in the same area, as per one
23  of the documents I provided in an earlier deposition
24  that was never returned to me, which I no longer
25  have.  Yeah.

Page 93

1    Q.   Do you have any indication that that was the
2  case here, that there were two or three sprayers
3  spraying simultaneously?
4    A.   No.  I know that there were more than one
5  sprayers, but I do not have any information
6  indicating that they were spraying simultaneously in
7  the same locations.
8    Q.   And in addition to spraying Roundup,
9  Mr. Alvarez had other job duties at Sutter Home,
10  right?
11    A.   Yes.
12    Q.   He would prune and trim trees and bushes?
13    A.   That's right.
14    Q.   He would plant trees and flowers?
15    A.   Yes.
16    Q.   He would mow the lawn?
17    A.   Yes.
18    Q.   He would fix sprinklers and water lawns and
19  plants?
20    A.   Yes.
21    Q.   And then he would spray Roundup, as you
22  listed?
23    A.   Yes.
24    Q.   He would also spray soap-based pesticide on
25  plants?

Page 94

1    A.   Yes.
2    Q.   So those are -- and this is all from his
3  PFS.  Those are six different job duties that I just
4  listed?
5    A.   Yes.
6    Q.   Some of which had multiple parts, such as
7  pruning and trimming?
8    A.   Correct.
9    Q.   On page 12 of your report you discuss
10  Mr. Alvarez's use of PPE, right?
11    A.   Yes.
12    Q.   What PPE did he wear?
13    A.   Generally, a short or a long-sleeved shirt
14  with jeans while spraying.
15    Q.   Did he wear any other PPE?
16    A.   He typically wore rubber boots and gloves.
17    Q.   And you say generally that's what he wore.
18  Why do you say generally?
19    A.   Well, because the documents indicate it was
20  short- or long-sleeve shirt.
21    Q.   Do you have any opinion as to how often he
22  was wearing short- versus long-sleeve shirts?
23    A.   No.
24    Q.   Does it make any difference to your final
25  conclusion what percentage of the time he wore

Page 95

1  short- versus long-sleeve shirts?
2    A.   No.  His exposure dose measurement in
3  eight-hour time-weighted days is so far in excess
4  that it really is not going to make a difference
5  either way.
6    Q.   It is your opinion that how Roundup is
7  actually handled or applied is, quote, a key
8  determinant of a person's exposure?
9    A.   Certainly.
10    Q.   But if he had worn less PPE, that would not
11  have impacted your opinion?
12      MR. DIAMOND:  Form.
13    A.   No.  I would still have the same opinion,
14  that his exposure was in the upper tertile and
15  quartile of the exposure studies and far exceeded
16  the thresholds of the human epidemiologic studies
17  showing statistically significant increased odds
18  ratios of developing NHL.
19    Q.   If he had worn more extensive PPE, would
20  that have impacted your opinion?
21      MR. DIAMOND:  Form.
22    A.   No.
23    Q.   Is there any amount of PPE that would change
24  your final conclusion in this case?
25    A.   Yes.

Page 96

1    Q.   What would that be?
2    A.   Wearing a chemical-resistant Tyvek suit with
3  taped gloves, taped ankle joints, with a
4  self-contained respirator, SCBA, that would have
5  nullified the exposure.
6    Q.   Short of that, is there any amount of PPE
7  that would change your final conclusion in this
8  case?
9    A.   Not that would have reduced it below that of
10  the standard PPE recommended since 1971 by World
11  Health Organization, or that in the Machado study,
12  for example, in which the study --
13    Q.   I'm sorry, Doctor.  That doesn't seem to be
14  answering my question.
15    A.   It does.  The study occupants were wearing
16  full PPE and yet the exposure doses onto the body
17  were still of high significance, and including the
18  -- the Monsanto study I've included in my report
19  that showed the exposure levels of workers with full
20  PPE.  It doesn't nullify the exposure, it reduces
21  it.
22    Q.   And when you state full PPE, is that the
23  same clothing that you discussed a moment ago,
24  chemically resistant suit, taped gloves, taped
25  ankles, and the respirator?

Page 97

1    A.   No.  No.  The standard documented protective
2  gear for spraying pesticides and herbicides includes
3  leather boots, drill overalls, long-sleeve shirt,
4  face shield, hood, and gloves.  And I reference the
5  World Health Organization PPE document in my report
6  to that effect, and the same gear has been used in
7  some of the exposure studies that have been
8  performed.
9    Q.   If Mr. Alvarez had been wearing that PPE
10  that you just listed, would you have still found
11  that Roundup was a significant contributing factor
12  to his NHL?
13    A.   Yes, as that protective gear, based on these
14  studies, does not reduce the exposure to null, and
15  more importantly, that is the standard where -- of
16  applicators, as per the World Health Organization
17  study I've referred to in my report, and the
18  epidemiological studies of applicators still reveals
19  significant rates of NHL, and those studies were
20  performed on applicators in some instances who wear
21  such protective gear.
22    Q.   And you state that that PPE does not reduce
23  the exposure to null, but it does reduce the
24  exposure, correct?
25    A.   Yes.

Page 98

1    Q.   Does it reduce it by a certain percentage?
2    A.   Yeah.  Wearing the jeans or -- for example,
3  reduces the penetration to the skin from 100 percent
4  to 20 percent, as referenced in studies documented
5  in my report.
6    Q.   And is there a set percentage that comes out
7  from wearing all the PPE that you listed that's
8  considered the full PPE?
9    A.   No.  The studies have not provided a full
10  percentage but, rather, a percentage for certain
11  factors, such as gloves reduces by a certain
12  percentage, cotton jeans reduces by a certain
13  percentage, the use of heavy leather boots reduces
14  by a certain percentage, and so on.
15    Q.   And all those percentages, even if you were
16  to apply them to the 546 exposure days for
17  Mr. Alvarez, it still would not amount to -- sorry.
18  You would still find that to be a substantial
19  contributing factor, right?
20    A.   Based on the human epidemiologic studies of
21  applicators who dressed that way in fact, there
22  would still be a odds ratio risk increase of NHL.
23    Q.   And that's including even if his year that
24  he stopped spraying Roundup was not exactly as it is
25  listed in this table, right?

Page 99

1    A.   I don't understand the question.
2    Q.   So even if he didn't spray for 546 days, but
3  sprayed for slightly less, reducing by the amount of
4  PPE he used, you would still find it to be a
5  substantial contributing factor for Mr. Alvarez,
6  right?
7    A.   Well, certainly.  It would still be greater
8  than the 10-day time-weighted exposure threshold in
9  which applicators were wearing the gear you're
10  talking about.
11    Q.   And that's the key factor there?
12    A.   I'm sorry?
13    Q.   That's the key amount that you look for, is
14  the 10-day threshold?
15       MR. DIAMOND:  Form.
16    A.   That's one of the thresholds of the studies
17  I've cited, yes.  That's the most demanding
18  threshold.
19    Q.   When you say most demanding, the other
20  thresholds are less days?
21    A.   Yes.
22    Q.   You mentioned that Mr. Alvarez had some
23  drenching episodes, right?
24    A.   Yes.
25    Q.   Do you know how many?

Page 100

1    I can actually rephrase that question.  Does
2  it matter to your opinion how many drenching
3  episodes he had?
4    A.   Well, it's certainly important to know
5  whether it was one or two or several hundred, but
6  either way, the exposure is still vastly beyond the
7  minimum thresholds with respect to causation.
8    Q.   And even if there was zero drenching
9  episodes, you would still find Roundup to be a
10  substantial contributing factor?
11    A.   Certainly.
12    Q.   Did you review other potential risk factors
13  for NHL as it relates to Mr. Alvarez?
14    A.   Yes.
15    Q.   Did you determine that those other potential
16  risk factors did not cause his NHL?
17    A.   Yes.
18    Q.   Is it your opinion that Mr. Alvarez would
19  not have gotten NHL if he had not used Roundup?
20       MR. DIAMOND:  Form.
21    A.   His risk would have been substantially less.
22    Q.   But do you intend to tell the jury that if
23  Mr. Alvarez had not used Roundup, he would never
24  have gotten NHL?
25       MR. DIAMOND:  Form.

Page 101

1    A.   No.
2    Q.   That's not something you intend to tell the
3  jury?
4    A.   Correct.
5    Q.   You went through other chemicals that
6  Mr. Alvarez was exposed to and determined they were
7  not potential causes of his NHL, right?
8    A.   Yes.
9    Q.   That information was listed in Table 1 of
10  your report?
11    A.   Yes, as well as questions I asked or
12  answered in the earlier portion of the report with
13  respect to ruling out certain conditions, such as
14  the use of carcinogenic pharmaceuticals, long-term
15  steroid use, organ transplant, and so on.
16    Q.   And you looked at that chart to determine
17  whether the specific items were known to cause NHL,
18  right, that's what the table says?
19    A.   Yes.
20    Q.   And also whether they were considered
21  probable human carcinogens?
22    A.   Yes.
23    Q.   Why did you use probable human carcinogen
24  instead of possible human carcinogen as the category
25  in that chart?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

William R. Sawyer, Ph.D.

| Page 102 |
| --- |

1    A.  Because glyphosate as Roundup is a class 2A
2  probable human carcinogen, as opposed to an animal
3  carcinogen, which is -- holds far less weight.  In
4  other words, toxicologists do not address and opine
5  on causation based only on animal carcinogenic data.
6    Q.  When you reference class 2A, that's in
7  reference to IARC's classifications?
8    A.  Yes.
9    Q.  And in your opinion, if IARC has not found
10  something to be a probable human carcinogen, does
11  that mean it cannot be a carcinogen?
12    A.  No, but as a toxicologist I would not make a
13  causation determination on an animal carcinogen
14  without human data.  That would be improper and not
15  acceptable methodology.
16    Q.  Because the human data is the key data,
17  right?
18      MR. DIAMOND:  Form.
19    A.  The combination of human data, animal data,
20  experimental data, mechanistic data, dose-response,
21  consistency coherence, those are all primary factors
22  that toxicologists look at.
23    Q.  Between human data and animal data, what's
24  more significant for a toxicologist to look at?
25    A.  The combination of animal and human data.

| Page 103 |
| --- |

1    Q.  That wasn't my question.  Between the two,
2  what is more significant in forming your opinions?
3    A.  My answer stands.
4    Q.  So there is no difference, in your opinion,
5  between human data and animal data?
6    A.  The combination of animal and human data is
7  what is generally required in the field of
8  toxicology to make a determination of
9  carcinogenesis --
10    Q.  And in that combination --
11    A.  -- in humans.
12    Q.  And in that combination, does animal or
13  human data have more weight?
14    A.  Yes.
15    Q.  Which one?
16    A.  Human.
17    Q.  And it would be improper to come to a
18  conclusion about the carcinogenic potential of
19  something solely based on animal data, right?
20      MR. DIAMOND:  Form.
21    A.  Yes.
22    Q.  In this chart you reference some things
23  that --
24    A.  Excuse me.  As per classifying as a human
25  carcinogen, yes.

| Page 104 |
| --- |

1    Q.  In your chart you reference some things that
2  are listed as IARC Group 2B, right?
3    A.  Yes.
4    Q.  And IARC considers that to be a possible
5  human carcinogen?
6    A.  Yes.
7    Q.  But in your opinion, these things did not
8  possibly cause Mr. Alvarez's NHL?
9    A.  No, I didn't say that.  I said that I would
10  not draw a conclusion as to causation based on
11  animal data only, that it would have to have a
12  combination of animal and human data.
13    Q.  And maybe this is just my own confusion.
14  I'm certainly not a scientist or a doctor.  If IARC
15  is labeling something as a possible human carcinogen
16  and it's a product that Mr. Alvarez used, you are
17  now telling us that that did not cause Mr. Alvarez's
18  non-Hodgkin's lymphoma?
19      MR. DIAMOND:  Form.
20    A.  No, I'm not.  That's not what I'm saying.
21    Q.  When you came to your final conclusion in
22  this report, are you saying that it is only Roundup
23  that caused -- was a substantial contributing factor
24  in Mr. Alvarez's non-Hodgkin's lymphoma?
25      MR. DIAMOND:  Form.

| Page 105 |
| --- |

1    A.  Absolutely.  The -- based on these
2  chemicals, for example, the page 10, Behr Premium
3  Plus Interior Eggshell Enamel, it's inhalation of
4  silica crystals, dust, that is rated as the Group B
5  possible human carcinogen.  As a toxicologist, that
6  silica has no possibility of reaching the areas in
7  the body systemically that cause lymphoma, only the
8  lung, and it's ruled out on that basis, not ruled
9  out simply because it's a group 2B possible human
10  carcinogen, but, rather, because it has no
11  propensity at all to impact and cause NHL.
12    Q.  I'm just asking.  IARC says it's possible
13  but you are saying it's not possible in this case?
14      MR. DIAMOND:  Form.
15    A.  Not possible for NHL.  Possible human
16  carcinogen with respect to silicosis and lung
17  cancer, certainly.
18    Q.  And I want to ask the question I asked last
19  time.  I want to make sure it's clear I'm asking it
20  more broadly than just the chemicals Mr. Alvarez
21  used.
22      It's your opinion that Roundup was a
23  substantial contributing factor in Mr. Alvarez's
24  NHL.  Is it your opinion that there was nothing else
25  that caused his NHL?

Page 106

1   A. No.
2       MR. DIAMOND: Form.
3   A. No, that's not my opinion. There are --
4   Q. So it's possible that something else causes
5   NHL as well?
6   A. There are certainly other chemicals that can
7   induce NHL, and it includes -- including
8   radiological exposures.
9   Q. I'm saying specific to Mr. Alvarez.
10  A. Nothing I could find.
11  Q. So there is nothing else that could have
12  caused Mr. Alvarez's NHL?
13      MR. DIAMOND: Form.
14  A. Not that I have any information of.
15  Q. And you don't intend to tell the jury that
16  there is anything else that could have caused
17  Mr. Alvarez's NHL?
18  A. No, that's not exactly how I would phrase
19  it. I would phrase it that based on my review of
20  the file, I was unable to identify any other
21  potential confounding factors with respect to the
22  cause of his NHL.
23  Q. Is ▓▓▓▓▓ a risk factor for NHL?
24  A. It's possible, and I would defer that
25  because that's completely a -- really, it falls into

Page 107

1   the arena of our oncologist, and I would defer that
2   to the oncologist.
3       It's my opinion as a toxicologist, and I've
4   studied ▓▓▓▓▓ [sic], and I've actually taught a
5   section of medical epidemiology on ▓▓▓ but
6   normally that's equated with stomach cancer. It is
7   possible that it could be a factor in NHL but I
8   think I would defer that to the oncologist.
9   Q. And so you don't have an opinion one way or
10  the other whether ▓▓▓▓▓ caused or was a
11  substantial contributing factor to Mr. Alvarez's
12  NHL?
13      MR. DIAMOND: I haven't asked him to opine
14  on that. We have other doctors that have opined
15  on that, as well as Monsanto's doctor that's
16  already said it had no -- it was not causative in
17  any way, so I --
18      MR. WARREN: Yeah, and I'm just asking
19  Dr. Alvarez's opinion --
20      MR. DIAMOND: I haven't asked him -- I
21  haven't asked him to give an opinion on that.
22      MR. WHITMAN: And we'll hear it in the
23  answer.
24      MR. WARREN: Yeah, I know. Let's just --
25  again, bad question.

Page 108

1   BY MR. WARREN:
2   Q. So you don't have an opinion one way or the
3   other whether ▓▓▓▓▓ was a cause or a substantial
4   contributing factor to Mr. Alvarez's NHL?
5   A. It's certainly a consideration of being
6   possible but I defer that to the oncologist.
7   Q. And you did not make that consideration one
8   way or another in your report?
9   A. No. I defer that to the oncologist.
10  Q. Did you consider Mr. Alvarez's family
11  history in reaching your opinions?
12  A. Yes.
13  Q. Did his family history impact your opinion
14  one way or the other? I think it's on page 5 of
15  your report, if you're going to --
16  A. Yes.
17  Q. What was the impact?
18  A. That he does have a first-degree relative
19  with a malignancy.
20  Q. And you said you performed a differential
21  diagnosis in this case, right?
22  A. Yes.
23  Q. As part of that differential diagnosis, did
24  you rule in or rule out potential risk factors?
25  A. Yes.

Page 109

1   Q. Did you rule in or rule out family history
2   as a possible risk factor for Mr. Alvarez's
3   non-Hodgkin's lymphoma?
4   A. Yes. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7   ▓▓▓▓▓ neither of which are from the same stem cell
8   line as NHL and are not substantial contributing
9   factors.
10      MR. DIAMOND: How much time is left, just
11  out of curiosity?
12      MR. WARREN: 2:15.
13      MR. DIAMOND: 2:15? So an hour and 15. I
14  do want to take another break in about five, 10
15  minutes, just so I can run to the bathroom. Too
16  much coffee this morning.
17      MR. WARREN: How about, I think, maybe one
18  or two more questions and then we can take --
19      MR. DIAMOND: Yeah, whenever you're ready.
20  BY MR. WARREN:
21  Q. So what you just listed, that is the method
22  you used to rule out family history as a substantial
23  risk factor for Mr. Alvarez's non-Hodgkin's
24  lymphoma?
25  A. Well, there simply is no hematopoietic

Page 110

1  malignancies in the family history.
2      Q.   And hematopoietic malignancies, that would
3  be the basis to determine whether family history
4  plays a role in someone's non-Hodgkin's lymphoma?
5      A.   As you know -- yes.  You know as a lawyer
6  that -- and I'm sure you've used this in cases --
7  that it's true that if you include basal cell
8  carcinoma, 50 percent of humans alive today will
9  develop some type of cancer, and the fact that he
10  had a mother and a son who developed cancer is
11  irrelevant in the sense that that's expected.  It's
12  expected that 50 percent of humans living today will
13  develop cancer at some point in their life, if you
14  include basal cell carcinoma, and there was no
15  evidence of any hematopoietic malignancies in his
16  family history.  So I'm not finding anything
17  significant with respect to his family cancer
18  history.
19      Q.   And it's significant that 50 percent of
20  humans living today will develop cancer regardless
21  of what they do in their life, right?
22      A.   That's right.
23      MR. WARREN:  I think now we can take that --
24  we can go off the record.
25      THE VIDEOGRAPHER:  Going off the record at

Page 111

1  11:33 [sic].
2      (Recess from 11:23 a.m. until 11:27 a.m.)
3      THE VIDEOGRAPHER:  We're back on the record.
4  The time is 11:27.
5  BY MR. WARREN:
6      Q.   Dr. Sawyer, what documents did you review
7  during the break?
8      A.   A motion to strike one of the experts in
9  this case.
10      Q.   Which expert?
11      A.   I don't remember his name.  It's a
12  physician.
13      MR. DIAMOND:  I can tell you:
14  Dr. Grossbard.
15      A.   He stated that it's his opinion as an expert
16  for Monsanto that there is insufficient family
17  cancer history to suggest that the NHL was caused by
18  hereditary factors and that brain cancer and the
19  osteosarcoma do not increase the risk of lymphoma.
20      Q.   Dr. Sawyer, ▮▮▮▮▮▮▮▮▮▮▮
▮▮ ▮▮▮▮▮▮▮▮▮▮▮
▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for
24  approximately 17 years prior to his diagnosis, thus,
25  he has no significant risk of NHL at the point that

Page 112

1  this NHL developed from ▮▮▮▮
2      Q.   Sorry for speaking too quickly.
3      You're aware that you reached a different
4  ▮▮▮▮▮▮▮▮▮▮▮ for Mr. Alvarez than Dr. Smith did,
5  right?
6      A.   No, I'm not aware of that.
7      Q.   I'll represent to you that Dr. Smith stated
8  Mr. Alvarez is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in
10  January 2008.
11      A.   No, I'm not aware of that.
12      (Sawyer Exhibit 8 was marked for identification.)
13  BY MR. WARREN:
14      Q.   So I know we're stepping out of order right
15  now.  I'm showing you what has been marked as
16  Exhibit 8 of this deposition and this is the report
17  of Dr. Clayton Smith.
18      MR. DIAMOND:  What page are we looking at
19  now?
20      MR. WARREN:  This will be page 6 of the
21  report.
22      MR. DIAMOND:  And what number are we on?
23      MR. WARREN:  This is Number 8.  7 has been
24  marked but not used yet.
25  BY MR. WARREN:

Page 113

1      Q.   So if you go to page 6 of Dr. Smith's
2  report, do you see a paragraph titled "Social
3  History"?
4      A.   Yes.
5      Q.   And you see what I just read, that Dr. Smith
6  states: Mr. Alvarez is ▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9      A.   Yes, and I see he has a different ▮▮▮▮
10  dose, but I agree with Dr. Smith, that even if that
11  were the case, it would only be attributable to a
12  risk of follicular lymphoma and that's not what
13  we're dealing with in this case.
14      And I also refer to my study that I
15  referenced in the report by ▮▮▮▮.
16      Q.   And we'll get to that study in just a
17  moment.  Is Dr. Smith wrong in this opinion about
18  Mr. Alvarez's ▮▮▮▮▮
19      A.   It's certainly different from what I've
20  obtained from the records, but I'm not going to
21  state it's wrong.  I don't see where he footnoted
22  his reference, so that's really hard for me to
23  evaluate without further information.
24      Q.   It's different than your assessment of his
25  history?



**Page 114**

1    A.   That's what I said, yes, but even if it's
2   correct, it's still inconsequential and is not --
3   would not be a attributable cause.

**Page 115**

13   is insufficient to significantly increase his NHL
14   risk, right? Dr. Sawyer, I'm asking for your
15   opinions here and not the --
16    A.   You know what, a good scientist consults the
17   literature. Maybe lawyers don't but I do, and I'm
18   going to consult the literature that I brought with
19   me, like it or not.
20    Q.   You're going to consult the literature to
21   tell me whether one of your opinions in your report
22   dated in December is that Mr. Alvarez's
23   is insufficient to significantly
24   increase his NHL risk?
25    A.   You bet. I'm going to check the odds ratio

**Page 116**

1   in the 95 percent confidence interval and make sure
2   that I answer the question correctly. I'm not going
3   to use my memory from what I read three months ago.
4   I'm --
5    Q.   And you don't want to refer to your cite in
6   your report either?
7    A.   I may.
8    Q.   If you're going to go through the entire
9   study, you don't want to know what page
10   number you're looking for?
11    A.   I don't need to. I already know it's --
12     MR. WARREN: In that case, can we go off the
13   record?
14    A.   I already know Table 4.
15     MR. DIAMOND: If you want, sure.
16     MR. WARREN: I just don't want to use up
17   time while he rereads the study.
18     THE WITNESS: And I want you to time this
19   and show how long we're off the record. It
20   should be about 45 seconds.
21     MR. DIAMOND: Okay.
22     MR. WARREN: We're off the record.
23     MR. DIAMOND: Since we're off the record --
24     THE VIDEOGRAPHER: One second. We're going
25   off the record at 11:34.

**Page 117**

1    (Recess from 11:34 a.m. until 11:35 a.m.)
2     THE VIDEOGRAPHER: We're back on the record.
3   The time is 11:35.
4     THE WITNESS: And it took about 45 seconds
5   off the record to answer the question and I think
6   it was a waste of time to halt the deposition.
7   BY MR. WARREN:
8    Q.   I think we're all in agreement that that was
9   a waste of time.
10     Now, is one of your opinions as to
11   Mr. Alvarez's   is insufficient to increase the risk
13   of NHL?
14    A.   Yes.
15    Q.   Separately, are you of the opinion that
16   Mr. Alvarez's   has also nulled any
17   significantly increased odds ratio?
18    A.   That's correct.
19    Q.   And in coming to those opinions, you just
20   reviewed the   study, right?
21    A.   Yes.
22    (Sawyer Exhibit 7 was marked for identification.)
23   BY MR. WARREN:
24    Q.   And I'll state for the record that that's
25   been marked as Exhibit 7 of this deposition.



Page 118

1    A.  Yes.  I took 45 seconds and reviewed the
2  odds ratio and confidence interval in Table 2, to
3  refresh my memory.
4    Q.  And in refreshing your memory, did you see
5  what group of people were studied in the ████
6  study?  Does Italians in hospitals sounds accurate?
7    A.  I'm sorry, I didn't hear that.
8    Q.  Does Italians that are in hospitals sound
9  accurate as the group --
10    A.  That's correct, yeah.
11    Q.  And were their ████ habits determined by
12  way of a questionnaire?
13    A.  Yes.
14    Q.  Do you know what the study authors did to
15  validate the results in this questionnaire?
16    A.  No.  There is no really good way to validate
17  ████████████████████████████████████████
   ████
   ████████████████████████████████████
20    Q.  I agree with that.  My question was slightly
21  different, which is do you know what the study
22  authors did to validate the results of the
23  particular questionnaire that they were using?
24    A.  I don't believe there was any historic
25  validation.  I mean, you can test for cotinine in

Page 119

1  the laboratory and determine if the person is a
   ████
   ████████████████████████████████████
   ████
   ██████████████████████████████████████████
5    Q.  So in your opinion, it was correct for these
6  authors to rely on the results of this
7  questionnaire?
8    A.  Certainly.
9    Q.  And questionnaires are used all the time in
10  studies, right?
11    A.  Yes.
12    Q.  And it's reliable to use a questionnaire?
13    A.  Yes.
14    Q.  What was the overall conclusion of the
   ████
   ████████████████████████████████
   ████
   ████████████████████████████████████
   ████
   ██████████████████████████████
20    Q.  And did the authors also find that ████
   ████ is a potential risk factor for NHL, if you
21
22  look at the first full paragraph that's in the right
23  column of page 1?
24    A.  I'm sorry.  Could you repeat that?  I didn't
25  hear it all.

Page 120

1    Q.  Sure.  The first full paragraph on the right
2  column of page 1.
3    A.  The first full paragraph, page 1.
4    Q.  It states: ████████████████ is a potential
5  risk factor for NHL.
6       Do you agree with that?
7    A.  No.  It says: ████████████████ is a
8  potential risk factor for NHL and HL worth
9  scrutinizing.
10       It means it has to be assessed, and that's
11  what they did in this study.  They assessed the
12  number of years of ████████████ and
13  statistically evaluated that for non-Hodgkin's
14  lymphoma and Hodgkin's lymphoma.
15    Q.  And then they reached a conclusion on page
16  8, right, and they state:  In conclusion, our
17  results lent additional support to the possibility
18  that ████████████ may play a role in the etiology
19  of both NHL and HL.
20       Right?
21    A.  Yes.  It's certainly a possibility, yes.
22  It's dependent upon the dose.  It's a dose-response
23  relationship is what this study has shown.
24    Q.  So ████████████ is a possibility to be a
25  risk factor for NHL?

Page 121

1       MR. DIAMOND:  Form.
2    A.  Based upon dose intensity, one must consider
3  that and evaluate it in that fashion, especially a
4  toxicologist who is dose oriented.
5    Q.  And that's based on the ████████ study,
6  right?
7    A.  Yes.
8    Q.  Did you base any of your findings -- any of
9  your findings about ████████████████████
10  ████████████████ any other studies?
11    A.  Yeah.  There is a study that I have reviewed
12  and I have discussed in the Johnson -- I believe it
13  was the Johnson deposition, which --
14    Q.  I'm just referring to your opinion in this
15  case, Dr. Sawyer.
   ████
   ████████████████████████████████████████
   ████
   ████████████████████████████████████
   ████
   ██████████████████████████████████
   ████
   ██████████
   ████
   ██████████████████████████████████████████
   ████
   ████████████
25    A.  No.



**Page 122**

**Page 124**

20  Q.  Mr. Alvarez, as we discussed, worked at
21  Sutter Home Winery, right?
22  A.  He worked where?
23  Q.  At Sutter Home Winery.
24  A.  He did.
25  Q.  That's a large winery, right?

**Page 123**

1  14 years, rather, to his history.
2  Q.

**Page 125**

1  A.  Acreage-wise, yeah.
2  Q.  And I mean in terms of production of wine
3  too, right?
4  A.  Could be.  I haven't evaluated the
5  production rate.
6  Q.  Would it surprise you to hear it's the
7  fourth largest winery in the United States?
8  A.  Could be.
9  Q.  And that it produces 20 million cases a
10  year?
11  A.  Send me a case.
12  Q.  20 million and 1 cases a year.
13  MR. DIAMOND:  I think they have
14  other holdings besides Napa, so it's not -- the
15  wine doesn't all come from Napa, where
16  Mr. Alvarez worked.
17  MR. WARREN:  That's perfectly fine.
18  A.  I have a friend -- I test -- I was on Fox
19  News Morning in New York on that Dominican problem
20  with the alcohol, and I got an e-mail from my best
21  friend after the interview that said "send me some
22  of that DR -- DR booze."
23  So send me a case of that good wine.
24  Q.  I certainly didn't represent that it's good
25  wine.  I believe it's the number one producer of

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 126

1 white zinfandel.
2     MR. DIAMOND: They have Napa Cellars, they
3 have Joel Gott, they have many, many brands.
4     MR. WARREN: I understand. I understand.
5     THE WITNESS: I'm going to need a glass of
6 wine soon after this deposition.
7     MR. DIAMOND: I think this would be a good
8 deposition where we actually have a bottle of
9 wine.
10     MR. WARREN: No comment.
11 BY MR. WARREN:
12   Q.  Did you look into whether any other Sutter
13 Home employees have gotten NHL?
14   A.  No, I don't have any information to evaluate
15 that.
16   Q.  Do you have any information as to whether
17 visitors to Sutter Home's properties have gotten
18 NHL?
19   A.  No, but I can't believe that the visitors
20 were out spraying and mixing. That wouldn't make
21 any sense.
22   Q.  Do you have any information as to whether
23 Roundup sprayed at Sutter Home's properties would
24 get into the grapes that produce the wine?
25   A.  Hopefully not. It was perimeter fencing.

Page 127

1 There was no information in the documents I reviewed
2 that the -- that Mr. Alvarez actually went into the
3 grape area but, rather, sprayed perimeter fencing.
4   Q.  Do you intend to offer any opinions in this
5 case about Mr. Alvarez's NHL diagnosis?
6   A.  Any opinions on what?
7   Q.  On his non-Hodgkin's lymphoma diagnosis.
8   A.  No. I'm aware of what it was. I checked
9 the pathology results, included a summary of it in
10 my report. As a toxicologist, I've studied
11 pathology, I've been through medical school
12 pathology, but I'm not a pathologist. I rely on the
13 diagnosis that was made.
14   Q.  You defer to others as to Mr. Alvarez's
15 non-Hodgkin's lymphoma diagnosis?
16   A.  Yes.
17   Q.  And that would also apply to his treatment,
18 right?
19   A.  Correct.
20   Q.  You don't intend to offer any opinions on
21 his treatment?
22   A.  No.
23   Q.  As you already stated, you don't intend to
24 offer any opinions to the jury about what caused
25 Mr. Alvarez's passing away?

Page 128

1   A.  No.
2   Q.  Do you intend to offer any opinions about
3 the Roundup label in this litigation?
4   A.  That's such a general question. I'm not
5 sure how to accurately answer it.
6   Q.  Mr. Alvarez didn't read the label, right?
7   A.  That's right.
8   Q.  So it did not impact Mr. Alvarez's Roundup
9 purchasing decision what was in the label?
10   A.  I think that's correct, yes.
11   Q.  And you don't intend to provide an opinion
12 to the jury as to that fact?
13   A.  As to what?
14   Q.  I'm sorry. That was an unclear question.
15     You do not intend to tell the jury that the
16 information in the label influenced Mr. Alvarez's
17 purchasing decisions?
18   A.  Not directly. It could have impacted the
19 decision of the person who recommended he purchase
20 it, but --
21   Q.  Do you have any information as to whether or
22 not that was the case?
23   A.  I thought I remember reading something about
24 the purchasing, but I would defer that to -- that's
25 really beyond the scope of my testimony, to judge

Page 129

1 whether the label impacted his superiors. I can't
2 answer that.
3   Q.  And therefore, you don't intend to provide
4 any opinions about that to the jury?
5     MR. DIAMOND: Form.
6   A.  It really -- if I'm asked a question about
7 the label, a specific question about the label, I'll
8 answer it, but I just don't have any information
9 with respect to the superiors who did read the label
10 and chose to buy the product. I can't really speak
11 on that issue. It's beyond my role.
12   Q.  And so it's your opinion -- do you intend to
13 tell the jury that some superiors at Sutter Home did
14 read the label and choose to buy the product that
15 Mr. Alvarez then used?
16   A.  No, I'm not even going to go that far. I
17 defer that to other appropriate experts who are
18 witnesses.
19   Q.  You don't know one way or the other whether
20 or not that was the case?
21   A.  I don't think so, no.
22   Q.  I'm sorry. That answer was unclear. Is it
23 that you don't think so or is the answer no, that
24 you don't know one way or the other?
25   A.  From the file I thought I remember some

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 130

1  information on the purchasing, but it's -- I didn't
2  really intend on including that in my report or
3  discussing it.
4      Q.  Because that's outside the scope of your
5  report, right?
6      A.  Yes.
7      Q.  In your opinion, what is the latency period
8  for Roundup and non-Hodgkin's lymphoma?  It's page
9  14 of your report, I believe.
10     A.  .4 to 25-year minimum latency.
11     Q.  Do you intend to offer an opinion at trial
12  about the non-Hodgkin's lymphoma latency period with
13  Roundup?
14     A.  Simply that he clearly met the minimum
15  latency period.
16     Q.  Does latency act as a floor or is it also a
17  ceiling?
18     A.  Could you repeat that, please?
19     Q.  Sure.  Latency is a minimum amount of time
20  between use and an event, right?
21     A.  It's a minimal amount of time from the first
22  exposure to the diagnosis, and actually, not the
23  first symptom, but to the actual diagnosis.
24     Q.  Is there a maximum time period for the
25  latency of Roundup causing NHL, in your opinion?

Page 131

1      A.  No.
2      Q.  So if somebody used Roundup for 10 days when
3  they were 18 years old and they never used it again
4  for the rest of their life and got non-Hodgkin's
5  lymphoma when they were 90, would you find Roundup
6  to be a substantial contributing factor?
7          MR. DIAMOND:  Form.
8      A.  I have not evaluated that in terms of a
9  cessation period of that length and the potential of
10  genetic repair mechanisms over that length of time.
11  I have not made that evaluation as that was not a
12  question in this case, or any of the Monsanto cases
13  thus far.
14     Q.  It's your opinion that it was not a question
15  of impact of cessation of Roundup use in assessing
16  whether Roundup caused non-Hodgkin's lymphoma?
17         MR. DIAMOND:  Form.
18     A.  Of a cessation of 30 years or, as you just
19  said, 80 years.  There has been no such case where a
20  person used Monsanto 80 years ago and then developed
21  NHL.  In fact, it wasn't even available 80 years
22  ago.
23     Q.  But would there be, in your opinion, a
24  period of time of cessation of use in which you
25  would not find Roundup to be a substantial

Page 132

1  contributing factor?
2      A.  Again, I have not made that evaluation.  It
3  has not been an issue in any of these cases and I'm
4  not about to give an off-the-cuff, irresponsible,
5  nonreferenced answer.  I will review the literature
6  if you would like and research that matter and then
7  provide the answer.
8      Q.  So, therefore, you're saying it's a
9  possibility that there is a maximum limit?
10         MR. DIAMOND:  Form.
11     A.  I have not made that evaluation.
12     Q.  But by saying you need to make an
13  evaluation, you are saying there is some
14  possibility, right?
15         MR. DIAMOND:  Form.
16     A.  I'm not offering any opinion without doing
17  the proper research and referencing the appropriate
18  generally accepted studies.
19     Q.  So sitting here today, it's your opinion
20  that there is a possibility?
21         MR. DIAMOND:  Form.
22     A.  We know that with asbestos and mesothelioma,
23  it's typical for a 35-year period to go by without a
24  single symptom or sign of malignancy.  We know with
25  mesothelioma, asbestos exposure can show up with

Page 133

1  mesothelioma 50 years later without any further
2  exposures.
3          Now you're asking me -- you're asking me a
4  similar question with respect to Roundup and that
5  evaluation I have not made and I'm not going to
6  speculate.  I know you're trying to get me to
7  speculate and put things on the record for you to
8  file motions against me.  I'm not going there.
9  That's just -- I am not that dumb to make such a
10  leap in speculation without appropriately
11  referencing the answer.
12     Q.  I'm certainly not asking you to speculate.
13  You have been through many depositions, you know
14  you're not supposed to speculate.  I'm also
15  certainly not attempting to be involved in the
16  filing of any motions.  I -- that's not my skill
17  set.
18     A.  Well, then why are you asking me such a
19  question?  I've explained to you that I've not made
20  the assessment.
21     Q.  I'm trying to find out what your opinions
22  are in this case and what the basis is for your
23  opinions.
24     A.  I don't provide opinions without consulting
25  the scientific literature.  Period.

Page 134

1    MR. DIAMOND:  And I think with respect to
2  your question, you asked him if it was possible.
3  I just don't think he's in a position today to
4  say whether it's possible or not.  I think that's
5  what he was saying.
6    MR. WARREN:  And I'm asking for his opinion
7  today.  By definition of not being able to say
8  that one way or the other, that means that it is
9  possible.
10    MR. DIAMOND:  No.
11    MR. WARREN:  If you're saying your opinion
12  today that it's not possible, then by
13  definition you're saying -- okay.  Can -- let's
14  rephrase the question and make sure the record is
15  clear.
16    MR. DIAMOND:  I'm just going to make a form
17  objection ahead of time.
18    THE WITNESS:  I like that.
19  BY MR. WARREN:
20    Q.  Sitting here today, can you rule out the
21  possibility that there is a maximum period of time
22  for cessation of Roundup use where it would not be a
23  contributing factor to non-Hodgkin's lymphoma?
24    A.  I have not made the assessment.  I cannot
25  answer that without performing the appropriate

Page 135

1  research and review.
2    Q.  So sitting here today, can you rule out that
3  possibility?
4    A.  I cannot provide any assessment without
5  looking at it further.
6    Q.  So the answer is no, you cannot rule out
7  that possibility?
8    A.  I'm not going to speculate.  I'm sorry.  Not
9  going to happen.
10    Q.  Therefore, the answer to that question is
11  no, you cannot rule out that possibility?
12    A.  That's not --
13    MR. DIAMOND:  Form.
14    A.  Not what I said.
15    MR. DIAMOND:  Come on.  We're wasting time
16  on this one.
17    MR. WARREN:  It's his decision to waste time
18  on this one.
19    MR. DIAMOND:  All right.
20  BY MR. WARREN:
21    Q.  Do you know whether there was any Roundup in
22  Mr. Alvarez's system at the time he developed his
23  first non-Hodgkin's lymphoma cancer cell?
24    A.  No.
25    Q.  In your report you state that POEA is banned

Page 136

1  in Europe, right?
2    A.  I believe it's banned at this point just
3  about everywhere in the world except the US.
4    MR. WARREN:  Strike that because it's -- I'm
5  not sure if it's accurate.  It's also not an
6  answer to my question.
7    Q.  You state that POEA is banned in Europe,
8  right?
9    A.  And many other countries:  Italy, France.
10    Q.  Did Mr. Alvarez use Roundup in Europe?
11    A.  No.
12    Q.  So why did you include this in your report?
13    A.  It's a generally recognized hazardous
14  chemical that potentiates the toxicity of glyphosate
15  as well as the genotoxicity of glyphosate.
16    Q.  And is it your opinion that POEA was banned
17  in Europe because it's carcinogenic?
18    A.  No.  I did not say it's carcinogenic.  I'm
19  not sure where you're finding that.
20    Q.  On page 42 of your report you state:  For
21  example, in a European Food Safety statement,
22  POE-tallow amine caused positive carcinogenic
23  findings in a number of test systems.  The consensus
24  was that the likely causative basis was
25  cytotoxicity.

Page 137

1    Did I read that portion of your report
2  correctly?
3    A.  Yes, but I did not declare it to be a
4  carcinogen, did I?
5    Q.  You state that according to a European Food
6  Safety statement, it caused positive carcinogenic
7  findings, right?  It's page 42 of your report.
8    A.  I stated on page 42:  Additionally, some
9  substances only become carcinogenic when mixed with
10  or in the presence of other substances, which
11  include formulation impurities, and I talk about
12  interactions, and that's what the studies have
13  revealed with respect to POEA, that the interaction
14  of POEA increases genotoxicity and carcinogenesis.
15  I never stated and declared that POEA by itself is a
16  human carcinogen.
17    Q.  So it's your opinion that POEA by itself is
18  not carcinogenic, right?
19    A.  There is no evidence that POEA in humans is
20  a carcinogen; however, as I stated, when mixed with
21  other compounds, such as Roundup or glyphosate, it
22  increases carcinogenesis and genotoxicity
23  significantly, as shown in studies cited in my
24  report.
25    Q.  But again, just to answer my specific

Page 138

1  question, it's your opinion that POEA by itself is
2  not carcinogenic, right?
3     A.  In humans, that is correct.
4     Q.  Your report references trace chemicals
5  present in Roundup?
6     A.  Yes.
7     Q.  If Roundup did not have these trace
8  chemicals that you reference in your report, would
9  you have still found that it was a substantial
10  contributing factor in Mr. Alvarez's non-Hodgkin's
11  lymphoma?
12    A.  Yes.
13    Q.  One of those trace chemicals is
14  formaldehyde, right?
15    A.  Yes.
16    Q.  And there is a lot of products that have
17  formaldehyde?
18       MR. DIAMOND:  Form.
19    A.  Yes, but not at the level measured in the
20  formaldehyde cake on Monsanto's MSDS at 31,000 ppm.
21    Q.  I'm showing you what's been labeled as
22  Exhibit 9 to your deposition.
23    (Sawyer Exhibit 9 was marked for identification.)
24  BY MR. WARREN:
25    Q.  This is from the National Institute of

Page 139

1  Health Household Products Database.  Have you seen
2  this before?
3     A.  No.
4     Q.  Do you have any reason to believe that the
5  NIH's assessment of products that contain
6  formaldehyde is incorrect?
7     A.  No, but I should point out the quantity in
8  the formaldehyde glyphosate cake is between --
9     Q.  Dr. Sawyer, the question is just --
10    A.  -- three and 1,000 times above the
11  numbers -- the values -- percent values on this
12  document.
13    Q.  Dr. Sawyer, if you could please just answer
14  the questions that I asked.
15    A.  I did.
16    Q.  If you could please limit your responses to
17  the questions that I ask.
18       So you have no reason to believe that the
19  NIH's assessment of what products, regardless of
20  quantity, contain formaldehyde?
21    A.  I can't -- I can't answer that by ignoring
22  quantity.  I'm required as a toxicologist to
23  consider dose.
24    Q.  Dr. Sawyer, as you can see on this paper, it
25  just states "products that contain this ingredient,"

Page 140

1  and this ingredient is formaldehyde.  Do you see
2  that.
3     A.  That's incorrect.  It shows the percentage
4  in each product.
5     Q.  I'm not asking for everything that's on this
6  piece of paper.
7     A.  I know.
8     Q.  If your lawyer wants to come back during his
9  portion and ask you the percent that's on this
10  document, he's more than welcome to do so.  My
11  question --
12    A.  But then your questions are misleading.
13    Q.  There is nothing misleading about my
14  question.  My question --
15       MR. DIAMOND:  Form.
16    Q.  I'll strike that and start over.
17       I want to make it clear with my question
18  that I'm not asking you for every single piece of
19  information that's on this document.  I am simply
20  asking you some specific questions about the
21  document.
22    A.  Okay.  I'll give you a misleading sound bite
23  you can play in front of the jury.
24    Q.  Dr. Sawyer, do you have any reason to
25  believe that the NIH's list of products that contain

Page 141

1  formaldehyde, regardless of quantity, is an accurate
2  list of products containing the ingredient?
3     A.  No, but the percent is also listed and
4  important in my consideration.
5     Q.  And similarly, you talk about ethylene
6  oxide?
7     A.  Yes.
8     (Sawyer Exhibit 10 was marked for identification.)
9  BY MR. WARREN:
10    Q.  I'm showing you what's been marked as
11  Exhibit 10 to this deposition, and I don't have many
12  questions about this.  I would just like to know is
13  this a list from the National Institute of Health as
14  well?
15    A.  Yes.
16    Q.  Have you seen this document before?
17    A.  No.
18    Q.  Ignoring the percent, do you have any reason
19  to believe that the NIH's list of products that
20  contain ethylene oxide is incorrect?
21    A.  Well, yes, and actually, on both documents
22  you gave me, they are incorrect because neither of
23  them include Roundup.
24    Q.  Is it your opinion that the NIH is
25  incorrect?

Page 142

1    MR. DIAMOND:  Form.
2    A.  Well, unfortunately, Roundup is not on these
3  documents because the information in the
4  confidential documents from Monsanto that I have
5  were not provided to the US Department of Health and
6  Human Services NIH.
7    Q.  When did you receive those documents,
8  roughly, the year?
9    A.  2018.
10    Q.  It's now just about the end of 2019.  Have
11  you done anything to reach out to the National
12  Institute of Health as to the amount of ethylene
13  oxide that you believe is in Roundup?
14    MR. DIAMOND:  Form.
15    A.  You know, I will do that Monday morning if
16  you grant me permission to turn over the
17  confidential documents to the US government, I will
18  do it immediately.
19    Q.  Dr. Sawyer, do you have --
20    A.  Are you giving me permission?
21    Q.  I am not.
22    A.  Okay.
23    Q.  Dr. Sawyer, do you have any reason to
24  believe that the products that are listed on here --
25    A.  Your buddy is smiling.  I'm not sure why.

Page 143

1    MR. WHITMAN:  I'm just having a great time
2  overall.
3  BY MR. WARREN:
4    Q.  Dr. Sawyer, do you have any reason to
5  believe that the NIH's list of products that contain
6  Roundup contains an accurate list of some of the
7  products that contain Roundup?  I'm not asking
8  whether it is a full and complete list of
9  products -- sorry.  I misspoke in my question.  I'll
10  start over.
11    MR. DIAMOND:  Start again.
12    Q.  Dr. Sawyer, do you have any reason to
13  believe that the NIH's list of products that contain
14  ethylene oxide accurately lists some of the products
15  that contain that ingredient regardless of whether
16  or not it is a full and complete list of the
17  products that contain ethylene oxide?
18    A.  Yes.  The lists are not complete, but what I
19  see in here is correct.
20    Q.  Thank you.  So the items that are listed
21  here are correct in that they do contain ethylene
22  oxide?
23    A.  Yes.
24    Q.  Thank you.
25    MR. WARREN:  Can we go off the record for a

Page 144

1  minute?
2    MR. DIAMOND:  Sure.  How much time have we
3  got?
4    MR. WARREN:  We're at 2:56.
5    THE VIDEOGRAPHER:  We're off the record at
6  11 -- I'm sorry.  12:06.
7    (Recess from 12:06 p.m. until 12:07 p.m.)
8    THE VIDEOGRAPHER:  We're back on the record.
9  The time is 12:07.
10    MR. WARREN:  Dr. Sawyer, thank you for your
11  time.  I have no further questions at this
12  moment.
13    CROSS-EXAMINATION
14  BY MR. DIAMOND:
15    Q.  Dr. Sawyer, I'm going to want to ask you
16  about a few things, one of them being Dr. Cohen's
17  report, but before I get to that, I'm only
18  mentioning it now so that I don't forget.  Can I ask
19  you a couple questions about Dr. Grossbard?
20    Dr. Grossbard was deposed, he did a report
21  in this litigation, he was hired by Monsanto and
22  he's a hematologist and I believe oncologist, and he
23  was asked a few questions about risk factors for
24  Mr. Alvarez's non-Hodgkin's lymphoma, and in his
25  report he was asked:  You mentioned in the next

Page 145

1  paragraph -- this is a quote.
2    Quote:  You mention in the next paragraph
3  that his past medical history was notable for ██
4  ██████████████  Any special significance
5  in Mr. Alvarez's case for that?
6    Answer:  There could be but there isn't in
7  his case.  The reason I point it out is that there
8  are search types of lymphoma that are associated
9  with ███████████ that does not appear to be
10  his type.
11    Question:  And that you talked about
12  earlier, the malt?
13    Answer:  Correct.
14    Question:  Okay.  And he didn't have that
15  type of lymphoma?
16    Answer:  No, he did not.
17    Do you agree with Dr. Grossbard where he
18  says that Mr. Alvarez's ███████ would not be a
19  risk factor for him with the type of non-Hodgkin's
20  lymphoma Mr. Alvarez had?
21    MR. WARREN:  Objection; form.
22    A.  Yeah.  Helicobacter -- ████████ is not
23  directly associated with NHL DLBCL.
24    Q.  Which would be what Mr. Alvarez had?
25    A.  Correct.

Page 146

1    Q.  Dr. Grossbard was also asked in his
2  deposition:  Question:  You mentioned in here --
3  referring to his report -- that he has a history of
4  ██████████████████████████████████████████
5  ██          any specific relevance to your opinions
6  regarding causation?
7      Answer:  There's some very -- there is some
8  literature suggesting a relationship between
9  ████████████████████  and specifically follicular
10  lymphoma.  In his case, I don't think that's a major
11  factor.
12      Question:  So just to be clear, is it a
13  factor or not -- or I'm sorry.  Is it a factor or
14  not a factor, more likely than not?
15      Answer:  More likely than not it is not a
16  substantial contributing factor.
17      Would you agree with Dr. Grossbard with
18  respect to that?
19      MR. WARREN:  Object to form.
20    A.  That's correct.  Even with a ████████████
21  history than I have reported in my report on
22  Mr. Alvarez, it would still not be a DLBCL but,
23  rather, a follicular relationship.
24    Q.  Okay.  I don't remember what exhibit number
25  Dr. -- Mr. Cohen's report is.  If you could just

Page 147

1  pull up your copy of it and I just want to ask you a
2  few questions.
3    A.  Oh, it's right here.
4      MR. WARREN:  For the record just to be
5  clear, it's Exhibit 6.
6    Q.  It's Exhibit 6.
7      MR. DIAMOND:  Thanks.
8    Q.  And so you had a chance to take a look at
9  Dr. -- I'm sorry, Mr. Cohen's report and the version
10  on Exhibit 6 is actually yours with some highlights
11  in it.  What is it that you've highlighted and why?
12    A.  Well, first of all, I highlighted that he
13  testified that ████████████████████  That's consistent with my
14  ██████████████████████
15  report.
16    Q.  Okay.
17    A.  However, he has made a number of serious
18  methodological errors.
19    Q.  What are those?
20      MR. WARREN:  Objection; vague.
21    A.  To start with, in the assessment of systemic
22  dose to glyphosate, the POEM methodology, that's a
23  UK methodology that's been used internationally, as
24  well as the Machado study, the Monsanto study as
25  referenced in my report, and many others, have

Page 148

1  evaluated the what we call PDE, potential dermal
2  exposure, that is how much Roundup lands on the
3  clothing or bare skin, depending what's worn, and
4  this has been performed using female pads which have
5  a double-stick tape on it, and these patches are
6  placed on various parts of the body before a sprayer
7  goes into the field and it measures how much spray
8  drift lands on the lower legs, the thighs, the
9  chest, the back, the hands, the face, and different
10  parts of the body, and that area constitutes a given
11  number of centimeters squared and for each area of
12  the body that amount of material that lands is
13  included in the dose calculation from the whole
14  body.
15      Mr. Cohen used his own self-proclaimed
16  methodology, which is not generally accepted or ever
17  published or reviewed or accepted in any of the
18  literature, and only measured the impact to the
19  front and back of the lower legs, ignored everything
20  else on the body.  So that's a fatal error in his
21  calculation that would need to be excluded.
22    Q.  And why is that a fatal error?
23    A.  Well, because he only focused on the lower
24  legs and the calf, when he -- the methodology
25  requires measurement of contact on the entire body

Page 149

1  surface.
2      Number two, generally, peer-reviewed
3  literature specifically refers to calculating human
4  dosage by dermal absorption factor and specifically
5  states that the use of the flux -- not like the flux
6  capacitor in back to the future, but the use of
7  what's called flux, in other words, penetration of
8  material over a centimeter squared over a given
9  amount of time, that methodology is inaccurate and
10  should be avoided in calculating dermal absorption
11  in humans, but rather than the dermal absorption
12  percent should be used, and he did not use the
13  percent, he used the flux rate.
14    Q.  Which is a lower rate?
15    A.  Well, it results in a much lower value, yes,
16  and because it assumes that only absorption
17  occurs during the time from exposure to the time of
18  bathing and after that there is zero exposure, which
19  is not true.  The amount that is contained in the
20  epidermis continues to be absorbed over time.
21      Thirdly, and really most significantly,
22  Mr. Cohen applies his extremely low erroneous dose
23  to that of animal studies rather than human studies,
24  and the animal studies he uses, in fact, are based
25  on reproductive toxicological effects, not cancer,

Page 150

1 and even if the animal studies he used were of
2 cancer in animals, it's still inappropriate as it's
3 not generally accepted to perform a causation
4 assessment solely on animal studies.
5      That's why I've used human exposure
6 time-weighted average studies, the same type of
7 scenario that's used with asbestos, which is a -- or
8 with benzene, which is benzene is measured in PPM
9 years.
10      So he's inappropriately taking his incorrect
11 calculation and then comparing it to an RFD or other
12 measure, such as the EU AOEL, for causation purposes
13 and that's incorrect. You have to use human data
14 to -- he's just comparing to regulatory and animal
15 toxicological levels and that's just not reasonable
16 and correct methodology.
17   Q.   Anything else?
18   A.   (No response.)
19   Q.   I have a specific question. Maybe I should
20 go to that first, or --
21   A.   Okay.
22   Q.   You're aware that Mr. Cohen makes an
23 assumption as to six ounces of Roundup concentrate
24 that was being mixed per one gallon of water by
25 Mr. Alvarez, and have you thought about that issue?

Page 151

1   A.   Thank you. That was one of the other errors
2 that I found and I forgot to mention that. The
3 Roundup Pro uses 1.5 ounces per gallon. Now, if you
4 multiply 1.5 times 3, that's 4.8 ounces per
5 three-gallon backpack.
6   Q.   1.6.
7   A.   I'm sorry?
8   Q.   1.6, not 1.5.
9   A.   Yeah. I'm sorry. I meant to say 1.6, which
10 is 4.8 for three gallons, and Mr. Alvarez stated he
11 used five ounces with three gallons of water, so he
12 used the correct mixture of Roundup Pro in his tank.
13      Mr. Cohen is incorrect in his claim.
14   Q.   And I think you copied the label and brought
15 it with you today?
16   A.   I did.
17      MR. DIAMOND: And I don't know if you want
18 to mark that as an exhibit or not, or at least
19 just take a look at it.
20      MR. WHITMAN: We might as well mark it.
21      MR. WARREN: Yeah, we can mark it. Is it
22 different than the label that's in his report?
23      THE WITNESS: No.
24      MR. DIAMOND: Then no, you're fine?
25      MR. WARREN: Yeah.

Page 152

1      MR. DIAMOND: Okay. It's just that --
2      MR. WARREN: Unless you want to ask
3 additional questions about it.
4      MR. DIAMOND: I don't want to ask additional
5 questions. It was just something that came up.
6      MR. WARREN: That's fine then.
7      MR. DIAMOND: Okay. I just have a couple of
8 things I want to take a look at to make sure that
9 I -- have been resolved.
10      That's all I have.
11           REDIRECT EXAMINATION
12 BY MR. WARREN:
13   Q.   I just have, hopefully, a few quick
14 follow-up questions.
15      Dr. Sawyer, you were asked some questions
16 about Dr. Grossbard's deposition and his report.
17 Have you seen Dr. Grossbard's report prior to today?
18   A.   Prior to today, no.
19   Q.   Have you seen his deposition prior to today?
20   A.   No.
21   Q.   Did you consider either one of those things
22 as part of forming your report that's dated
23 December 12, 2019?
24      MR. DIAMOND: Form.
25   A.   Prior to preparing my report? No.

Page 153

1   Q.   Did you consider any of them in forming your
2 report that's dated December 12, 2019?
3   A.   No. I did with respect to my answers in
4 deposition today, but not prior to preparing the
5 report.
6   Q.   What is the name of the methodology that you
7 used in Mr. Alvarez's case?
8   A.   POEM, UK POEM is one of them. The German
9 methodology also uses the calculation of
10 differential areas of the body. The Machado study
11 also uses measurements from differential areas of
12 the body. And also --
13   Q.   I'm sorry. I think my question is slightly
14 different than what you're answering.
15   A.   -- also the Monsanto study included in my
16 report references different areas of the body in
17 centimeters squared, which were not followed by
18 Mr. Cohen.
19   Q.   And that's not my question. My question is
20 what is the name of the methodology that you
21 performed in forming your report?
22   A.   Primarily POEM methodology.
23   Q.   Primarily POEM?
24   A.   Yeah.
25   Q.   So you followed the steps that are outlined

Page 154

1  in the POEM methodology?
2    A.   With respect to body areas, yeah.
3    Q.   And I'm referring to your entire report,
4  your opinions in this case that you intend to
5  provide to the jury.  The methodology that you
6  followed is POEM?
7    A.   Oh, for my overall report?
8    Q.   Yes.
9    A.   Bradford Hill methodology using weight of
10  evidence methodology.
11    Q.   So not POEM.  The methodology you employed
12  in this report is Bradford Hill using weight of
13  evidence methodology?
14    A.   That's correct.
15    Q.   And you followed all the steps that are
16  outlined in the Bradford Hill methodology?
17    A.   I have.
18    Q.   You did not conduct a milligram per kilogram
19  per day exposure for Mr. Alvarez, right?
20    A.   No, no.  Unnecessary as the human studies
21  don't contain any data whatsoever with respect to
22  milligram per kilogram per day body weight, but,
23  rather, exposure days.
24    Q.   But you have conducted those assessments in
25  prior cases for this Monsanto litigation, right?

Page 155

1    A.   Yeah, just to compare to see how individuals
2  compare to the AOEL since the AOEL is applicator
3  exposure level to see if the individual's exposure
4  was similar to or reasonably close to the AOEL, not
5  as a measure of causation but a measure of whether
6  or not the individual was similar to that of an AOEL
7  applicator.
8    Q.   And you just referred to what we mentioned a
9  couple of times, which is ADME, which is absorption,
10  distribution, metabolism, and excretion, right?
11    A.   Yes.
12    Q.   And I think we talked about absorption a
13  good amount during this deposition today.  I want to
14  ask you just a couple of quick questions about
15  metabolism and excretion.  Your opinion is not that
16  glyphosate or Roundup has remained in Mr. Alvarez's
17  system the entire time he was using it, right?
18        MR. DIAMOND:  Form.
19    A.   Actually, it did.  He never really had --
20  was spraying every other day or even from a Thursday
21  to a Monday, insufficient time for total clearance,
22  as glyphosate has been shown to remain in bone
23  marrow for up to six days.
24    Q.   Right.  And we already discussed multiple
25  different periods of time in which he was not

Page 156

1  spraying consistently during those periods, for
2  example, when he was going to chemotherapy, when he
3  may or may not have been spraying on certain
4  properties.
5    A.   Well, that's true, but overall, in general,
6  he sprayed frequently enough to not be able to clear
7  it all from his systemic circulation.
8    Q.   And I'm not asking whether he cleared it
9  all.  I'm asking whether at least some of the
10  Roundup that was in his system did clear his system?
11    A.   Well, sure.
12    Q.   Yeah.  And that's because glyphosate and
13  Roundup are rapidly metabolized and removed from the
14  body, right?
15        MR. DIAMOND:  Form.
16    A.   Well, that's actually uncertain in humans.
17  The study evidence that is in the literature
18  currently is based on IV bolus doses to rats, and I
19  don't know any human that IV abuses glyphosate.
20  When you absorb a chemical or a drug on a slow basis
21  over time, the pharmacokinetics and distribution can
22  be vastly different than that of a drug or chemical
23  given at IV bolus at an extraordinarily high dose.
24  It will tend to spill over into the urine at a high
25  dose by IV administration; where a dose continuously

Page 157

1  and slowly over time can be metabolized by the liver
2  and distributed to the tissues in a differential
3  pattern.
4        And the human studies have not been run.
5  I'm not sure why.  You know, Monsanto claims it's
6  safe as water.  I don't know why they haven't run
7  human studies.
8    Q.   So is it now your opinion that glyphosate
9  and Roundup are rapidly metabolized and removed from
10  the body?
11    A.   Are what?
12    Q.   Sorry.  I misspoke.  Are not rapidly
13  metabolized and removed from the body?
14    A.   That's not what I said.  I said that the
15  human study literature is insufficient to make that
16  determination.  We know what it does in IV dose in
17  animals but not on slow absorption in humans.
18    Q.   So at this point you don't know one way or
19  the other the speed at which it's metabolized and
20  removed from the body?
21    A.   There is evidence from some of the primate
22  studies anyway that perceived dermal dosing that a
23  percentage of it is excreted in the feces through
24  the liver, possibly, based on those studies, more
25  than even urine, but there have been no mass balance

Page 158

1  studies been performed on humans, which is normally
2  done in phase 4 studies of new drugs under
3  development, in which a tracer of that drug is given
4  to a group of humans and the mass balance of where
5  it distributes and finds its way out through either
6  breath or sweat or urine or feces is examined, and
7  that has not been done with glyphosate.  So we
8  really don't know as toxicologists the true ADME of
9  glyphosate in humans.
10     Q.  And if you really don't know the excretion
11 in humans, you can't testify to the jury about that,
12 right?
13        MR. DIAMOND:  Form.
14     A.  I will explain to the jury what I just
15 stated.
16     Q.  You -- strike that.
17        You intend to tell the jury about primate
18 studies and the lack of phase 4 studies in humans
19 relating to sweat or urine or feces and how that
20 relates to the excretion of Roundup?
21     A.  Or complete metabolism to carbon dioxide if
22 blown off on the breath.  Yeah, we really don't have
23 answers to that in humans.  Human studies have not
24 been conducted.  It's all animal-based studies with
25 IV -- primarily IV bolus doses, which do not

Page 159

1  accurately reflect the pharmacokinetics of flow
2  absorption.
3     Q.  Sitting here today, is it your opinion that
4  glyphosate accumulate -- bioaccumulates in the body?
5     A.  No.
6     Q.  No, it is not your opinion?
7     A.  No, it doesn't bioaccumulate.  There are
8  certain tissues, such as skin, that can form a
9  reservoir and it can accumulate in the epidermis,
10 based on I think it was the Nabok study.  There is
11 also known distribution to different parts of the
12 body, such as the bone marrow, but I don't believe
13 there is any evidence of bioaccumulation.
14     Q.  And then, as you said, that after a period
15 of approximately six days of not using Roundup, that
16 whatever Roundup is in your system has then been
17 excreted?
18     A.  Well, based on animal studies.  We don't
19 know in humans.  It hasn't been evaluated in humans.
20     Q.  And your best opinion at this point, based
21 on the studies that are available to you, is that
22 after six days of nonuse of Roundup, Roundup has
23 been excreted from your system?
24     A.  In humans, the urine studies even show
25 excretion out to I think five days, so I think

Page 160

1  approximately.
2     Q.  And just to be clear, and this is consistent
3  with the table in your report, Mr. Alvarez did not
4  use Roundup for the three-month period that you
5  define as the winter each year from 1986 to 2017,
6  correct?
7     A.  That's correct.
8        MR. WARREN:  I have no further questions.
9        MR. DIAMOND:  We're done.
10       THE WITNESS:  I don't know.
11       THE VIDEOGRAPHER:  This concludes the
12 deposition.  The time is 12:32.
13       (Whereupon, the deposition concluded at
14 12:32 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 161

1        C E R T I F I C A T E
2        I, SUSAN D. WASILEWSKI, Registered
3  Professional Reporter, Certified Realtime Reporter
4  and Certified Realtime Captioner, do hereby certify
5  that, pursuant to notice, the deposition of WILLIAM
6  R. SAWYER, Ph.D., was duly taken on Saturday,
7  December 21, 2019, at 8:40 a.m. before me.
8        The said WILLIAM R. SAWYER, Ph.D., was duly
9  sworn by me according to law to tell the truth, the
10 whole truth and nothing but the truth and thereupon
11 did testify as set forth in the above transcript of
12 testimony.  The testimony was taken down
13 stenographically by me.  I do further certify that
14 the above deposition is full, complete, and a true
15 record of all the testimony given by the said
16 witness, and that a review of the transcript was
17 requested.
18
19 _____
20 Susan D. Wasilewski, RPR, CRR, CCP
21 (The foregoing certification of this transcript does
22 not apply to any reproduction of the same by any
23 means, unless under the direct control and/or
24 supervision of the certifying reporter.)
25

William R. Sawyer, Ph.D.

Page 162

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 164

ACKNOWLEDGMENT OF DEPONENT

I, _____, do hereby acknowledge that I have read the foregoing pages, 1 through 163, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____     _____

WILLIAM R. SAWYER, Ph.D.                    DATE

Subscribed and sworn to before me this
_____ day of _____, 20___.
My Commission expires: _____

_____

Notary Public

Page 163

------
E R R A T A
------

PAGE  LINE  CHANGE

____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____

Page 165

LAWYER'S NOTES

PAGE  LINE

____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____