# EXHIBIT 4

Christopher J. Portier, Ph.D

```
1     IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2                  STATE OF MISSOURI
3    ------------------------------x
     WALTER WINSTON et al.,          :
4              Plaintiffs           :
       vs                           : Case No.
5    MONSANTO COMPANY,               : 1822-CC00515
             Defendant              :
6    ------------------------------x
     TIMOTHY KANE et al.,            :
7              Plaintiffs           :
       vs                           : Case No.
8    MONSANTO COMPANY,               : 1622-CC10172
             Defendant              :
9    ------------------------------x
10

        IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
11
                   STATE OF MISSOURI
12
     ------------------------------x
13   BURRELL LAMB et al.,            :
               Plaintiffs           :
14     vs                           : Case No.
     MONSANTO COMPANY,               : 17SL-CC03681
15           Defendant              :
     ------------------------------x
16
17          Videotaped deposition of
18        CHRISTOPHER J. PORTIER, Ph.D.
19
20   LOCATION:  RADISSON BLU HOTEL AMSTERDAM AIRPORT
21             Boeing Ave. 2, 1119 PB Schiphol-Rijk
22             The Netherlands
23   DATE/TIME: Wednesday, June 5, 2019 / 9:13 a.m.
24   REPORTER:  Lisa V. Feissner, RDR, CRR
```

Christopher J. Portier, Ph.D

1  A P P E A R A N C E S :
2  ON BEHALF OF PLAINTIFFS:
3     ROBIN L. GREENWALD, ESQUIRE
4     WEITZ & LUXENBERG
5     700 Broadway
6     New York, New York 10003
7     212-558-5500
8     rgreenwald@weitzlux.com
9        and
10    MATTHEW E. LUNDY, ESQUIRE
11    LUNDY, LUNDY, SOILEAU & SOUTH, LLP
12    501 Broad Street
13    Lake Charles, Louisiana 70601
14    337-439-0707
15    mlundy@lundylawllp.com
16
17
18
19
20
21
22
23
24

1         C O N T E N T S
2  EXAMINATION OF
3  CHRISTOPHER J. PORTIER, Ph.D.        PAGE
4     By Mr. Stekloff            10, 295
5     By Ms. Greenwald              291
6
7
8         E X H I B I T S
9       (Attached to transcript)
10  PORTIER DEPOSITION EXHIBIT          PAGE

11  1    Curriculum Vitae of                10
12       Christopher J. Portier, Ph.D.
13  2    International Journal of           102
14       Epidemiology article,
15       Pesticide use and risk of
16       non-Hodgkin lymphoid malignancies
17       in agricultural cohorts from France,
18       Norway and the USA: A pooled
19       analysis from the AGRICOH consortium
20
21
22
23
24

1  A P P E A R A N C E S (Continued)
2
3  ON BEHALF OF DEFENDANT MONSANTO CO.:
4     BRIAN L. STEKLOFF, ESQUIRE
5     CALI COPE-KASTEN, ESQUIRE
6     WILKINSON WALSH & ESKOVITZ
7     2001 M Street, NW, 10th Floor
8     Washington, D.C. 20036
9     202-847-4000
10    bstekloff@wilkinsonwalsh.com
11    ccope-kasten@wilkinsonwalsh.com
12
13  A L S O  P R E S E N T :
14    THOMAS K. FEISSNER, CLVS, Videographer
15
16
17
18
19
20
21
22
23
24

1       E X H I B I T S (Continued)
2       (Attached to transcript)
3  PORTIER DEPOSITION EXHIBIT          PAGE

4  3    Journal of Toxicology and         119
5       Environmental Health article,
6       Biomonitoring of Genotoxic Risk
7       in Agricultural Workers from Five
8       Colombian Regions: Association to
9       Occupational Exposure to Glyphosate
10  4    L. Zhang Manuscript titled,       146
11       Exposure to Glyphosate-Based
12       Herbicides and Risk for Non-Hodgkin
13       Lymphoma: A Meta-Analysis and
14       Supporting Evidence
15  5    Health Canada's Re-evaluation     168
16       Decision, Glyphosate, RVD2017-01
17  6    Health Canada, Notice of Objection  178
18       to a Registration Decision under
19       Subsection 35(1) of the Pest Control
20       Products Act
21  7    Statement from Health Canada on    186
22       Glyphosate, dated January 11, 2019
23
24

Christopher J. Portier, Ph.D

1      E X H I B I T S (Continued)
2        (Attached to transcript)
3  PORTIER DEPOSITION EXHIBIT          PAGE
4  8      EPA document titled, Glyphosate,      193
5        Proposed Interim Registration
6        Review Decision, Case Number 0178,
7        April 2019
8  9      Expert Report of              223
9        Christopher J. Portier, Ph.D.
10 10    Supplemental Expert Report of      225
11        Christopher J. Portier, Ph.D.
12 11    Rebuttal Report of              226
13        Christopher J. Portier, Ph.D.
14 12    ATSDR's Toxicological Profile      237
15        for Glyphosate, Draft for Public
16        Comment, April 2019
17 13    NTP Technical Report on Toxicity      242
18        Studies of Glyphosate
19
20
21
22
23
24

1          DEPOSITION SUPPORT INDEX
2
3  DIRECTION TO WITNESS NOT TO ANSWER
4  Page/Line  (None)
5
6  REQUEST FOR PRODUCTION OF DOCUMENTS
7  Page/Line  37/12, 39/8, 40/20, 240/7
8
9  STIPULATIONS
10 Page/Line  (None)
11
12 QUESTION MARKED
13 Page/Line  (None)
14
15
16
17
18
19
20
21
22
23
24

1        P R O C E E D I N G S
2      VIDEO OPERATOR:  This is the
3  videotaped deposition of Dr. Christopher
4  J. Portier taken in the matter of Walter
5  Winston versus Monsanto Company in the
6  Circuit Court of the City of St. Louis,
7  State of Missouri, Case Number
8  1822-CC00515, and related cases.
9      Today's date is Tuesday [sic], June
10 5th, 2019.  The time on the video
11 monitor is 9:13.  My name is Thomas K.
12 Feissner, CLVS, and I am the
13 videographer.  The court reporter is
14 Lisa V. Feissner, RDR, CRR.  We are here
15 today on behalf of Golkow Litigation
16 Services, Philadelphia, Pennsylvania.
17    This video deposition is taking
18 place at the Radisson Blu Hotel
19 Amsterdam Airport, Amsterdam,
20 Netherlands.
21    The attorneys will now introduce
22 themselves, beginning with counsel for
23 the plaintiffs.
24      MS. GREENWALD:  Robin Greenwald for

1  the plaintiffs.
2      MR. LUNDY:  Matt Lundy for the
3  plaintiffs.
4      MR. STEKLOFF:  Brian Stekloff for
5  Monsanto.
6      MS. COPE-KASTEN:  Cali Cope-Kasten
7  for Monsanto.
8      VIDEO OPERATOR:  The court reporter
9  will now swear in the deponent.
10    (The witness was placed under
11 oath.)
12    MS. GREENWALD:  So I'll just start
13 to say the other two cases that have
14 been cross-noticed here are Kane versus
15 Monsanto, which is also in the City of
16 St. Louis, and Lamb versus Monsanto,
17 which is in the County of St. Louis.
18    MR. STEKLOFF:  And we agree, this
19 applies in all three cases.  And this is
20 a discovery deposition, not a trial
21 preservation deposition.
22   CHRISTOPHER J. PORTIER, Ph.D.,
23 having been first duly sworn, was examined and
24 testified as follows:

Christopher J. Portier, Ph.D

Page 10

1          EXAMINATION
2  BY MR. STEKLOFF:
3      Q.  Good morning, Dr. Portier.
4      A.  Good morning.
5      Q.  I know you've been deposed many
6  times, so I will -- I will not walk through all
7  of the ground rules, but -- we discussed this
8  in advance, but if you have to take a break at
9  any time, we will go off the record and take a
10 break.  So just please let us know.
11         And then also, if you don't
12 understand one of my questions, you will make
13 sure to let me know, correct?
14     A.  Correct.
15     Q.  Okay.  So if you answer a question,
16 I can assume that you understood it.
17         MR. STEKLOFF:  So actually, I want
18     to just start by marking as Exhibit 1
19     your CV, which we received -- thank you,
20     Ms. Greenwald -- in the past couple
21     days.
22         (Exhibit Portier-1 marked for
23     identification and attached to the
24     transcript.)

Page 11

1         THE WITNESS:  By the way, today is
2     Wednesday, June 5th, just to correct the
3     record.
4         MR. STEKLOFF:  We're all off on our
5     timing here.
6  BY MR. STEKLOFF:
7      Q.  And is this your most current CV,
8  Dr. Portier?
9      A.  I can't be absolutely certain, but
10 probably, yes.
11     Q.  Okay.  And so I just wanted to go
12 over a few things in it.  Under Employment, on
13 page 1, it has, 2013 to present, Consultant to
14 various governmental agencies (multiple
15 countries) and law firms.
16     A.  Correct.
17     Q.  And are you currently, sitting here
18 today, consulting with any governmental
19 agencies?
20     A.  No, not formally.
21     Q.  What about informally?
22     A.  Informally, I am providing advice
23 to the World Health Organization on air
24 pollution in southern Italy.

Page 12

1      Q.  Air pollution in southern Italy?
2      A.  Yes.
3      Q.  When did that start?
4      A.  About three months ago.
5      Q.  And what branch of the World Health
6  Organization?
7      A.  The European regional office.
8      Q.  Is IARC involved in any way?
9      A.  I don't know.
10     Q.  And can you generally describe the
11 role that you're playing there?
12     A.  They're planning on doing a
13 health -- a health -- what's it called -- a
14 health impact assessment of a city in southern
15 Italy that has a huge steel mill.  And the name
16 of the city is escaping me at this point, but
17 they're trying to understand what could be done
18 to reduce the emissions from the steel mill.
19 It's sitting right in the middle of this town,
20 and it has the worst air quality in all of
21 Europe, and so they're trying to figure out
22 what they can do.
23         We haven't met on the subject yet.
24 They simply have asked me to join them in

Page 13

1  looking at this problem.
2      Q.  And do you know what role you
3  specifically will play?
4      A.  Just as a unpaid consultant.
5      Q.  Any --
6      A.  They'll cover my expenses for
7  travel and anything like that, but other than
8  that, nothing.
9      Q.  Are any meetings scheduled?
10     A.  Not yet.  They are planning a press
11 conference sometime in the near future in Rome,
12 but I have not been notified as to when that
13 will be.
14     Q.  And do you know any of the other --
15 any other consultants who are -- who have been
16 asked to participate in that?
17     A.  There was someone they were going
18 to ask from Spain, and I -- the name's -- I'm
19 sorry --
20     Q.  That's fine.
21     A.  -- is escaping me.
22     Q.  No one you're aware of that's also
23 involved in the glyphosate litigation?
24     A.  No one that -- no one, no.  This is

Christopher J. Portier, Ph.D

Page 14

1 strictly an air pollution question.

2     Q.   And moving past the air pollution

3 issue, any other -- are there any other

4 governmental agencies that you are formally or

5 informally consulting with at this time?

6     A.   I don't believe there are, no.

7     Q.   And are there any governmental

8 agencies, formally or informally, that you are

9 consulting with regarding glyphosate or

10 Roundup?

11     A.   None.

12     Q.   And in the 2016 time frame, I know

13 that you -- and I'm not going to walk through

14 them in detail -- but wrote correspondence to

15 various governmental agencies.  Is that fair?

16     A.   That's correct.

17     Q.   And since that time, have you

18 worked -- or corresponded or had any

19 interaction with governmental agencies

20 regarding glyphosate?

21         MS. GREENWALD:  Objection, form.

22     A.   I don't know what year it was, 2016

23 or '17, I wrote to the president of the

24 European Union regarding glyphosate.  You have

Page 15

1 that.  Beyond that, I'm trying to think through

2 whether I've had any interactions whatsoever

3 with any government agency.  I -- the answer is

4 no.

5     Q.   And just the -- I think, since the

6 answer is no, that the answer to this will be

7 no, but just to make sure, have you contacted,

8 even informally, any person associated with a

9 governmental agency since that letter to the

10 president of the European Union to try to

11 discuss the governmental agency's position on

12 glyphosate in, say, the last year?

13     A.   Not that I recall.

14     Q.   You also have here, consultant to

15 various law firms.  And I don't want to get

16 into any of your discussions with law firms,

17 but other than the law firms that we know are

18 working on the glyphosate litigation, are there

19 any other law firms that you are a consultant

20 to currently?

21     A.   There is a law firm in Atlanta that

22 had asked me to consult with them regarding

23 talc.  They have not really asked me to do

24 anything.  We don't have a formal contract.

Page 16

1     Q.   Okay.  When were you contacted by

2 that law firm?

3     A.   Three years ago.

4     Q.   And do you remember the name of the

5 law firm?

6     A.   No.  I would have to look it up.

7     Q.   But have you done anything in the

8 talc --

9     A.   No.

10     Q.   Okay.

11     A.   I met with them once and we

12 discussed the science that they have available

13 to them, in about an hour, and that was it.

14     Q.   Were you paid for that service?

15     A.   I don't recall.  They certainly

16 paid the cost of transportation, et cetera, to

17 get me there.  I don't recall if they paid my

18 time.

19     Q.   So is it fair to say you're not

20 involved in -- currently involved in any U.S.

21 litigation other than the glyphosate/Roundup

22 litigation?

23     A.   That would be correct.

24     Q.   And a couple lines down, you

Page 17

1 continue to be a senior contributing scientist

2 for the Environmental Defense Fund in New York,

3 and I know that you've testified about that

4 previously.

5         You know, in the last year, has

6 your role with the EDF changed in any way?

7     A.   No.

8     Q.   And does any of your work with the

9 EDF relate to glyphosate or Roundup?

10     A.   No.

11     Q.   Are you paid for any of your work

12 with the EDF?

13     A.   Yes.

14     Q.   Generally, what are the contours of

15 that?

16     A.   It's two days a week as a part-time

17 employee.  There are no benefits.  It's just

18 straight employment as a partial -- part-time

19 employee.

20     Q.   So you get a salary -- like a

21 part-time salary for that?

22     A.   Yes.

23     Q.   It's not an hourly thing; it's an

24 actual salary?

Christopher J. Portier, Ph.D

Page 18

1    A.  I think it's hourly.  But I don't
2 file -- I don't file things that say, I worked
3 these hours.  It's just a -- it's two days a
4 week, and that's what the contract says.
5    Q.  And how much -- I mean, do you work
6 on -- this is not to judge whether you're
7 earning your time, but are you -- do you spend
8 two days a week, generally, on that, on EDF
9 work?
10    A.  In a year, yes.  In a given week,
11 it could be all five days or it could be ten
12 minutes.
13    Q.  Okay.
14    A.  But generally, at least four hours
15 a week because I sit in on meetings that are
16 standing meetings for four hours a week.
17    Q.  And has glyphosate come up in any
18 way in that work?
19    A.  No.
20    Q.  And I also see that from 2010 to
21 2013, you were the director of the Agency for
22 Toxic Substances and Disease Registry; is that
23 correct?
24    A.  That is correct.

Page 19

1    Q.  And can we just call that ATSDR?
2    A.  Yes, we can.
3    Q.  And what was your -- very
4 generally, what was your role as the director
5 of the ATSDR?
6    A.  Basically, I ran the entire agency.
7 I was responsible for everything they did,
8 which is basically health risk assessments in
9 toxic dump sites, some epidemiology work,
10 mostly on U.S. Air bases and Marine bases and
11 Naval bases and things like that.
12       They also have responsibility for
13 clean-up -- the health assessments following
14 clean-up of U.S. weapons munitions and
15 destruction of U.S. weapons munitions, and I
16 was responsible for that.
17       And then they have an emergency
18 response function for things like Fukushima and
19 the Gulf oil spill and stuff like that that I
20 was responsible to make sure we appropriately
21 reacted to.
22    Q.  And you respect the scientists who
23 work at the ATSDR?
24       MS. GREENWALD:  Objection, form.

Page 20

1    A.  Too broad of a question.  You'd
2 have to talk about a specific scientist or
3 something along those lines.  There are good --
4 just like any place, there are good people and
5 there are people who are less than stellar.
6    Q.  Okay.  When they do -- are you
7 familiar with the recent publication that they
8 issued regarding glyphosate?
9    A.  Yes, I am.
10    Q.  And did you look at the specific
11 scientists who were involved in that
12 publication?
13       MS. GREENWALD:  Objection to form.
14    A.  No, I did not.
15    Q.  When you were at ATSDR, did you
16 oversee the publication of similar publications
17 on different -- different exposures or
18 different products?
19    A.  You're talking about --
20       MS. GREENWALD:  Objection to form.
21    A.  Yes.  You are talk --
22       THE WITNESS:  Sorry.
23       MS. GREENWALD:  That's all right.
24    A.  You are talking about the

Page 21

1 toxicological profiles.
2    Q.  Yes.
3    A.  And yes, I was -- I did oversee it.
4 I mean, not personally, but I certainly
5 reviewed multiple tox profiles and signed my
6 name to them when I felt they were of
7 sufficient quality to go out of the agency.
8    Q.  And do you believe that the
9 toxicological profiles are the gold standard of
10 such types of profiles of different substances?
11       MS. GREENWALD:  Objection to form.
12    A.  Let's just call them tox profiles.
13 It's so much easier.
14    Q.  Thank you.
15    A.  The tox profiles generally do an
16 adequate job of covering all end points other
17 than cancer.  The tox profiles have
18 historically used as their cancer potency
19 measures or their cancer TDIs the numbers
20 created by the Environmental Protection Agency.
21    Q.  And -- we'll come back -- we can
22 come back to that.
23       Did you ever, when you were
24 director of the ATSDR, suggest that tox

Christopher J. Portier, Ph.D

Page 22

1 profiles regard -- that related to cancer, that
2 the methodology should be different?
3      A.  Again, they don't have a
4 methodology for tox profiles related to cancer
5 because they didn't do that.  They looked at
6 all other toxicology end points.  They used
7 EPA's tox profile approach -- EPA's approach
8 for evaluating the risk of chemicals for cancer
9 as their approach, and they simply generally
10 just stated what EPA did.
11      Q.  And I guess -- was that true when
12 you were at ATSDR?
13      A.  Yes, it was.
14      Q.  And did you ever question that
15 process or methodology?
16          MS. GREENWALD:  Objection, form.
17      A.  I did question the process.  They
18 explained to me that the cancer process was
19 complicated, that they felt the EPA was better
20 prepared to deal with it, especially the IRIS
21 Program, and that that was the reason they did
22 it.  I had other priorities.  I did not pursue
23 changing that.
24      Q.  Who is the -- in that answer, who

Page 23

1 is the "they" that explained that to you?
2      A.  Oh, the director of that division
3 of ATSDR, and his staff.
4      Q.  But did you ultimately sign tox
5 profiles that -- that did discuss cancer with
6 other substances?
7      A.  I don't know.  Obviously a tox
8 profile will discuss cancer and what other
9 agencies have said about the carcinogenic risk
10 of those substances.  So in that sense, yes, I
11 would have signed tox profiles that had talked
12 about cancer.  I don't recall signing any tox
13 profiles where we did our own cancer profile.
14      Q.  Right.  You would have signed tox
15 profiles that discussed cancer and followed the
16 EPA's tox profile approach.  Is that fair?
17      A.  EPA's --
18          MS. GREENWALD:  Objection to form.
19      A.  EPA's risk assessment approach.  Or
20 didn't even follow it; just stated what EPA had
21 done.
22      Q.  And as director, you didn't require
23 the scientists at the ATSDR who were
24 responsible for the tox profile in -- with

Page 24

1 other -- we're talking about substances other
2 than glyphosate -- to conduct their own cancer
3 analysis?
4          MS. GREENWALD:  Objection, form,
5 asked and answered.
6      A.  I did not require them to conduct
7 their own cancer risk assessment; that is
8 correct.
9      Q.  And ultimately, those tox profiles,
10 you were the ultimate top signatory to those,
11 correct?
12      A.  I believe so, although my boss
13 might have signed it as well, the head of CDC.
14      Q.  But you certainly took
15 responsibility for those and --
16      A.  Absolutely.
17      Q.  Okay.  Are you involved in -- I'm
18 not talking about your legal research but in
19 any research regarding glyphosate at this time?
20          MS. GREENWALD:  Objection, form.
21      A.  No.  Any research?  Other than
22 something I'm doing on my own?  I'm a little
23 bit lost.  I mean, certainly no new research in
24 the sense of the development of new science

Page 25

1 around what's known about glyphosate.
2 Certainly I have reviewed a lot of information,
3 and I may well write a science paper on some of
4 the information I've reviewed.
5      Q.  Fair enough.  And thank you for the
6 clarification.  That was -- you actually
7 anticipated my next question.
8          So you're not doing any new
9 research in terms of conducting a new
10 independent study of glyphosate.  Is that --
11 we'll start there.
12      A.  Again, meaning wet work, meaning
13 laboratory work --
14      Q.  Yes.
15      A.  -- no, I am not doing any
16 independent, nor am I tied to any group that
17 is.
18      Q.  And then let's turn to the next,
19 which is authoring or drafting an article.  Are
20 you involved in that right now with respect to
21 glyphosate or Roundup?
22      A.  I'm contemplating doing it, and I
23 am preparing some notes and outlines for
24 something I might want to do, yes.

Page 26

1    Q.  And what is the topic of the paper
2  you are contemplating?
3    A.  It will be --
4    THE WITNESS:  Do I answer this?
5    MS. GREENWALD:  Can we take a
6  minute break?
7    MR. STEKLOFF:  Sure.
8    MS. GREENWALD:  I know you're
9  pending a question, but obviously
10  there's some issue that we need to talk
11  about, so...
12    MR. STEKLOFF:  I assume it relates
13  to privilege?
14    MS. GREENWALD:  Probably.
15    MR. STEKLOFF:  Okay.  Yeah, I'm
16  fine taking a break.
17    MS. GREENWALD:  Okay.
18    MR. STEKLOFF:  So we can go off the
19  record.
20    VIDEO OPERATOR:  We are now going
21  off the video record.  The time is 9:32.
22    (Recess from 9:32 a.m. until
23  9:36 a.m.)
24    VIDEO OPERATOR:  We are now going

Page 27

1  back on the video record.  The time is
2  9:36.
3  BY MR. STEKLOFF:
4    Q.  So you were discussing,
5  Dr. Portier, a paper that you are
6  contemplating.  What is the topic of the paper
7  you are contemplating?
8    A.  So it's not a privilege issue, I've
9  been told.  I don't know what a privilege issue
10  is, but --
11    Q.  You're probably becoming better
12  educated on those things.
13    A.  Most scientists are reticent to
14  discuss research that they are thinking of
15  doing for fear that someone else steals it or
16  does it before them and publishes ahead of
17  them.  So that is my concern.
18    But the bottom line is, it has to
19  do with the toxicological literature in and
20  around glyphosate, and my interp -- but for --
21  two things I'm thinking I want the paper for.
22  One is to make sure that it's all -- everything
23  that's available in both public and sort of
24  semipublic venues is now going to be in the

Page 28

1  public sector.  And the second is my thoughts
2  on what this data says.
3    Q.  And when you say "semipublic," are
4  you referring to -- what are you referring to?
5    A.  Things that have been released that
6  are available publicly but people don't
7  generally look at, data that are in EPA memos
8  and data that are in now publicly available
9  records, et cetera, that people generally don't
10  look at.  I want to make sure that that finds
11  its way into the peer-reviewed literature.
12    Q.  Do you at this time contemplate
13  having co-authors on the paper?
14    A.  No.
15    Q.  Will -- I mean, just to summarize,
16  is it fair to characterize this as a -- sort of
17  a review paper of your analysis of the animal
18  studies and genotox -- and cell studies,
19  similar to --
20    A.  Similar.
21    Q.  -- along the lines of what you've
22  testified to in litigation?
23    A.  Along those lines.
24    Q.  And -- okay.  I'll move on.

Page 29

1    MS. GREENWALD:  Brian, can we agree
2  that that part of the transcript will be
3  confidential for the reasons that
4  Dr. Portier is concerned about public
5  dissemination?
6    MR. STEKLOFF:  Yes.
7    MS. GREENWALD:  We can talk later,
8  but I think as long as you have that
9  confidence, it's not going to go beyond
10  this room.
11    THE WITNESS:  That's fine.
12    MR. STEKLOFF:  No objection to
13  that.
14    Q.  Someone could read your testimony
15  in the trials and try to copy it anyway, but --
16    A.  Correct.  All my expert reports.
17    Q.  -- I don't know if anyone will take
18  the time.
19    A.  All my expert reports --
20    Q.  Yes, exactly.
21    A.  -- or anything along those lines,
22  that's correct.  I'm less concerned about it,
23  now that I really think about it.
24    Q.  Okay.  And have -- I'm not trying

Christopher J. Portier, Ph.D

1  to make you uncomfortable on this.  But have
2  you had any -- it sounds like this is in the
3  infancy stages.  Have you had any discussions
4  with specific journals about this?
5      A.  No, I have not.
6      Q.  Have you had any discussions with
7  any other scientists about this?
8      A.  Yes, I have.
9      Q.  Who is that?
10     A.  My brother, I spoke with him about
11  it.  And a former graduate student of mine,
12  post-doc, I spoke with him about it.  I needed
13  some help with an analysis I thought might be
14  appropriate, and he is the guy who could tell
15  me.
16     Q.  And who is that?
17     A.  John Bailer.
18     Q.  And this can be confidential, but
19  what is that -- I'm curious what that analysis
20  is that hasn't already been done for the
21  litigation.
22     A.  Oh, it's the poly-3 test that John
23  Bailer and I developed.  The problem with doing
24  it is that we don't have the individual death

1  times of the animals that did or did not get
2  the cancers in the publicly available
3  literature, and we were trying to think of a
4  way that we might find a survival adjustment
5  that we could do with the information we did
6  have from the literature, which was the percent
7  surviving until a sacrifice at -- terminal
8  sacrifice.  But we really couldn't come up with
9  anything that we thought was defendable.
10     Q.  And do you have a timeline, an
11  ambitious or non-ambitious timeline, for when
12  you might try to do this?
13     A.  You know, I'm semi-retired.  I'm
14  not as ambitious as I used to be.  No, I don't
15  really have a timeline at this point.  Maybe in
16  six months.
17     Q.  Okay.  So is it six months to even
18  submit it to a journal?
19     A.  Maybe.
20     Q.  Yeah.
21     A.  It might be faster.  It depends on
22  whether I get, you know, all excited or not
23  about doing it.  This is a project I've been
24  contemplating for three years, so there's no

1  easy way to say I'm really going gung ho on
2  this.
3      Q.  And -- I mean, do you think there
4  will be -- under -- do you think there will be
5  a lot of new information beyond -- or new
6  opinions beyond what you've testified to in the
7  litigation or put in your expert reports, or is
8  this really a goal to have that information
9  distilled into the peer-reviewed literature?
10     MS. GREENWALD:  Objection, form.
11     A.  I don't believe that there will be
12  any new opinions.  I believe there will be some
13  minor corrections to what's in my expert report
14  in numbers and things like that that I've now
15  spent a lot of time being very careful and
16  going over very, very carefully.  Beyond that,
17  I don't see great changes.
18     Q.  And moving aside from that specific
19  contemplated paper, any other publications that
20  you are involved in regarding glyphosate or
21  Roundup?
22     A.  There was a Ramazzini conference
23  last year where several people, including me,
24  presented papers about the -- Roundup and other

1  issues, not just Roundup, that I believe a
2  publication is now going through review.
3      Q.  And --
4      A.  It's not specific to Roundup; it's
5  specific to corporate influence in science.
6      Q.  Okay.  And is that one specific
7  paper, or -- you know, sometimes you see papers
8  where they're almost like a compilation of
9  different things.  Do you know the format of
10  that?
11     A.  I don't know.  It's kind of
12  confusing.  We're dealing with a bunch of
13  Italians, and sometimes they don't -- it
14  changes as you go along.  So I have no idea.  I
15  think it's going to be little mini pieces, but
16  I'm not certain at this point.
17     Q.  And is it going through a peer
18  review process at a journal, or is it something
19  the Ramazzini Institute is putting out in --
20     A.  No, it's a --
21     Q.  -- on its own?
22     A.  It's a journal.
23     Q.  And what -- you said it wasn't
24  specific to Roundup.  With respect to the

Christopher J. Portier, Ph.D

Page 34

1 opinions or -- the opinions that you
2 participated in or provided for this potential
3 publication, what -- you know, can you
4 generally describe them?
5     MS. GREENWALD: Objection, form.
6     A. No. It's been a long time since I
7 wrote the little piece I wrote for them.
8 Roundup is being used as an example to talk
9 about failures of the regulatory process to get
10 the science correct.
11     Q. So on a high level, are the -- is
12 this sort of -- are the opinions that you've
13 offered in this paper similar to the ones
14 you've offered in litigation about, for
15 example, EPA's -- your opinion that EPA has
16 failed to follow its own processes in
17 evaluating glyphosate?
18     A. Correct.
19     Q. And did you opine on any other
20 substances or other examples beyond Roundup or
21 glyphosate?
22     A. I don't remember. I could have,
23 but I don't remember.
24     Q. Okay. Other than the paper you're

Page 35

1 contemplating that we've now discussed and then
2 this Ramazzini paper, anything else that you're
3 involved in, pending, in terms of publications?
4     A. There are a -- I've written nothing
5 on this, but there are -- there's one
6 conference where I gave a talk and they have
7 asked me to provide a paper, and I haven't
8 agreed or disagreed to do it yet. They want
9 seven thousand words. I'm contemplating it.
10     That is another case where Roundup
11 is being used as an example to discuss, again,
12 the same issue about regulatory review of
13 pesticides and why there are failures in that
14 process.
15     And there is a talk I will be
16 giving where they're also asking for a paper,
17 which I have not agreed to.
18     Q. Let's start with the one in the
19 past. What conference was that?
20     A. It was Doctors for Environment --
21 for the Environment, a small Swiss group of
22 doctors that meet once a year. They wanted a
23 talk on glyphosate and the regulatory process.
24 They didn't under -- what they really wanted

Page 36

1 was a talk on the regulatory process, which is
2 what I focused mostly on, and then gave them
3 some glyphosate examples towards the end.
4     But they wanted to know, how does
5 this work in Europe; how is it different than
6 in the EPA -- than in the United States; and
7 why is there all this controversy about
8 glyphosate? Those were sort of the things they
9 asked me about. The --
10     Q. When was that?
11     A. A week ago, week and a half ago.
12     Q. Where was it? In Switzerland?
13     A. In Switzerland.
14     Q. And then it sounds like there's an
15 upcoming one. What group is that?
16     A. That is a group in Rotterdam, the
17 Netherlands. The title of the conference is
18 Law and Science, Glyphosate, something like
19 that. It's a mixture of legal discussions and
20 discussions of the science around glyphosate.
21 It's just a -- it's a one-day thing.
22     Q. And that's tomorrow?
23     A. That's tomorrow.
24     Q. Ms. Greenwald said she was going to

Page 37

1 Rotterdam.
2     And do you have a PowerPoint that
3 you're using tomorrow?
4     A. Not yet. I'm still working on it.
5     Q. Will you have a PowerPoint that you
6 use tomorrow?
7     A. Yes, I do -- yes, I will.
8     Q. And did you have a PowerPoint at
9 the Swiss conference that you used in the last
10 few weeks?
11     A. Yes, I did.
12     Q. Okay. We would ask for production
13 of the Swiss presentation and then the final
14 presentation that's used tomorrow. So we'll
15 just put that on the record, and I can
16 coordinate with Ms. Greenwald on that.
17     A. Sure.
18     Q. And I -- you know, not having it,
19 is it fair to say that the opinions -- that
20 they may not be as comprehensive but that --
21 are you saying anything different in these
22 presentations than you have said in the
23 litigation?
24     A. No.

Christopher J. Portier, Ph.D

1    Q.   It's sort of a -- probably a
2 condensed version of the opinions you've
3 offered here -- you know, throughout the
4 litigation?
5        MS. GREENWALD:  Objection to form.
6    A.   Yes, with the exception of the
7 pooled analysis that has not entered into
8 litigation, which I'm still a strong proponent
9 of.
10   Q.   Okay.  Understood.
11       In your CV -- I promise we're not
12 going to go through every single page of it --
13 on page 9, there were a couple other invited
14 presentations you reference that I just wanted
15 to ask about.
16       At the top, there was a
17 presentation in November of 2018 at the
18 University of Washington.  Do you see that?
19   A.   Yes, that's correct.
20   Q.   And can you generally describe what
21 that presentation involved?
22   A.   It's the same one I gave in
23 Utrecht, which is I think almost identical,
24 which deals with, again, the data pertaining to

1 glyphosate's carcinogenicity and my
2 interpretation of it.
3    Q.   So similar interpretation that
4 you've given in the litigation?
5    A.   Correct.
6    Q.   Did you use a PowerPoint for that?
7    A.   Yes, I did.
8        MR. STEKLOFF:  We -- if we can mark
9        that, we'd add that to the list.
10   Q.   And who invited you to participate
11 in the University of Washington conference?
12   A.   Elaine Faustman, the dean of the
13 school of something or other -- public health.
14   Q.   Was Dr. Sheppard involved in that
15 conference?
16   A.   Yes, she was.
17   Q.   And unrelated to the --
18 specifically to the conference, I know in the
19 past we had some e-mail correspondence between
20 you and Dr. Sheppard.  Have you continued to
21 have e-mail correspondence with Dr. Sheppard
22 relating to glyphosate?
23   A.   To specific -- a dataset relating
24 to glyphosate, I have had a few e-mails.

1    Q.   And what was that specific dataset?
2    A.   The AHS, Agricultural Health Study.
3    Q.   And what did the e-mails discuss?
4    A.   One of them discussed a very
5 technical issue, looking at how bad the
6 exposure -- the differential exposure
7 misclassification could be in that particular
8 study.  She sent me this thing with all these
9 calculations on it, but I wasn't really that
10 interested, and so I never really responded or
11 looked through it.
12   Q.   And was that before or after the
13 publication of the Zhang meta-analysis?
14   A.   I don't recall.
15   Q.   Have you -- do you still have --
16 have you maintained your e-mails with
17 Dr. Sheppard?
18   A.   Yes, I have.
19       MR. STEKLOFF:  We'll -- we can deal
20       with it later, but we'll request
21       production of those as well.
22   Q.   Anything else about -- and
23 unrelated to this AHS dataset, any other
24 discussions that you recall with Dr. Sheppard

1 in e-mail that relate to glyphosate?
2    A.   I might have sent her an e-mail
3 when her Zhang paper came out saying, nice job,
4 interesting paper.  You know, that's possible.
5    Q.   Okay.
6    A.   And if I did, I did keep that
7 e-mail.
8    Q.   Okay, thank you.  And we will
9 discuss the Zhang paper later.
10       Are there other scientists with
11 whom you've had -- I'm not trying to ask, just
12 to preface this question, for any e-mail you've
13 ever had with the scientist, even -- if, you
14 know, after the trial if they write, hey, great
15 job, or something.  But are there any other
16 scientists with whom you've had substantive
17 discussions about the science of glyphosate in
18 the past year that stand out to you?
19   A.   If "a discussion" means that
20 there's a back-and-forth, then the answer is, I
21 think, no.  I get a lot of unsolicited e-mail
22 where people send me something they want me to
23 look at that I just don't respond to, but
24 sometimes it is substantive science and

Christopher J. Portier, Ph.D

Page 42

1 sometimes I spend some time looking at it.
2      Q.   And so is there anything that you
3 recall looking at that was substantive science
4 in the past year that was sent to you by other
5 scientists?
6      A.   Oh, yes.  But they're all now on
7 the list of supporting documents or whatever it
8 is.  You would have them if I -- if they were
9 substantive enough that I decided that it
10 affects my opinion.
11      Q.   Okay.  Have you -- I'm not asking
12 for any conversations with lawyers, but have
13 you had any discussions with other scientists
14 about becoming an expert in the litigation?
15      MS. GREENWALD:  Objection, form.
16      A.   In this litigation?
17      Q.   In the glyphosate litigation.
18      A.   No.
19      Q.   Have you had --
20      A.   In the last three years or in some
21 period of time?
22      Q.   Sure, in the last three years.
23      A.   Yes.
24      Q.   The answer is, no, in the last

Page 43

1 three years?
2      A.   The answer is, no, in the last
3 three years.
4      Q.   Perfect.  And have you had -- in
5 the last year, maybe since the Johnson trial,
6 have you had substantive discussions with any
7 other experts for the plaintiffs in the
8 litigation?  And I could list them, but -- but
9 I -- that you're aware of?
10      A.   On glyphosate?
11      Q.   On glyphosate.
12      A.   No.  In fact, the only person I had
13 any interaction with from all of the experts is
14 Bill Jameson, and we just had a beer and talked
15 about when we worked at the NTP.
16      Q.   Okay.  So no discussions, just
17 quickly, with Dr. Benbrook, Dr. Weisenberger --
18      A.   No.
19      Q.   -- or Dr. Ritz?
20      A.   No --
21      Q.   Dr. Nabhan?
22      A.   -- no, no.
23      Q.   Okay.  When you say -- when the
24 answers are "no," it makes it much faster, but

Page 44

1 I have to ask some of these questions.
2      And other than Dr. Sheppard -- and,
3 I mean, we can pull the article, but have you
4 had any substantive discussions about
5 glyphosate with any of the other authors on the
6 Zhang paper, including, for example, Dr. Zhang?
7      A.   No.  I'm -- I don't know who the
8 authors are other than Zhang and Sheppard.  So
9 no, I haven't, at least not that I'm aware of.
10      Q.   Okay.  So now let's -- let's switch
11 topics.
12      In terms of the opinions you intend
13 on offering in these three cases, which are the
14 Winston case, the Lamb case, and the Kane case,
15 and, you know, real -- I think using Pilliod as
16 the most recent example, are there any new
17 opinions that you have formed regarding
18 glyphosate that you intend to offer?
19      MS. GREENWALD:  Objection, form.
20      A.   I don't know what a discrete
21 opinion would be.  But in general, no.
22      Q.   Okay.  Do you consider yourself an
23 expert on the FDA?
24      A.   I'm very knowledgeable on the FDA.

Page 45

1 I wouldn't say I'm the world's expert on the
2 FDA, but I'm very knowledgeable.
3      Q.   Okay.  You're not a legal expert,
4 correct?
5      A.   I am not a legal expert.
6      Q.   You're not an expert in the Food,
7 Drug and Cosmetic Act, correct?
8      A.   I certainly know the act, but
9 I'm -- again, I'm not a legal expert.
10      Q.   And --
11      A.   I know its implications with regard
12 to risk assessment and the handling of food
13 contaminants in the United States, in terms of
14 the science half of it.
15      Q.   Okay.  And what is -- when you say
16 you know its implications, how is it that you
17 know -- what is the background through which
18 you know its implications?
19      A.   A requirement to understand it when
20 I ran the National Toxicology Program.  FDA is
21 part of the National Toxicology Program, and
22 understanding under what conditions they will
23 want certain types of information versus other
24 types of information is important to the

Christopher J. Portier, Ph.D

Page 46

1  National Toxicology Program.  We had to know we
2  were satisfying their legal needs.
3           And so in that sense, I had to have
4  some understanding of what is required under
5  that law for them to act on a particular
6  chemical, if -- if that's the case for them.
7      Q.  And would that have been through
8  the categorization of a substance as a
9  carcinogen that you would have reported that to
10  the FDA?
11      A.  It could have been, but more
12  importantly, it would be -- it would be the
13  report on carcinogens has direct implications
14  to the FDA in terms of how they might act on a
15  particular chemical.  But it also has to do
16  with, do they need an immunotox study, what
17  kind of immunotox study do they need, do they
18  need a reproductive tox study, et cetera.
19      Q.  A study run by the NTP?
20      A.  Correct.  Or they might ask about
21  the quality of a different study that they want
22  to know whether NTP should redo it or is this
23  good enough.
24      Q.  So would the -- when you were at

Page 47

1  the NTP, would this typically have come up in
2  the context of the FDA coming to the NTP to
3  assess whether or not it would need to -- to
4  help in its assessment of a substance as a
5  potential carcinogen?
6      A.  Yes.  It might not be formally done
7  that way.  The National Toxicology Program is
8  an executive committee.  The executive
9  committee consists of the heads of seven
10  federal agencies, the FDA included, the EPA
11  included.  The heads don't usually come, but
12  when I was there, actually the head of the FDA
13  was coming because he used to be at NTP.
14           But we would have discussions at
15  that high of a level and talk about, what's
16  your concerns today, what can we do, and then
17  that would go down to staff level and they
18  would work out details.
19      Q.  You're not an expert in
20  interpreting corporate intent, correct?
21      A.  Definitely not.
22      Q.  Okay.  And so my understanding, and
23  I appreciate Ms. Greenwald for flagging this to
24  our colleagues, is that you, in your -- you

Page 48

1  didn't have to -- well, as a background --
2  strike all that.
3           As background, you had to -- you
4  didn't write a separate expert report for the
5  Missouri litigation.  Are you familiar with
6  that?
7      A.  I did not.
8      Q.  Yes.  And there -- but there's a
9  disclosure that describes what your opinions
10  will be?
11      A.  I'm aware that there's something
12  like that, yes.
13      Q.  Okay.  And I think the only new
14  thing in that disclosure relates to something
15  called the Delaney Clause.  Are you familiar
16  with that?
17      A.  Yes.
18      Q.  And so -- and I'm not questioning
19  the answer.  But before, I think you said that
20  the opinions that you would offer in the
21  Missouri cases would generally be consistent --
22  I'm now paraphrasing -- with what you've
23  previously testified to.
24           Is this Delaney Clause a new

Page 49

1  opinion?
2      A.  It could be, depending on how the
3  questions were asked.
4      Q.  Okay.  And so what is it that
5  you -- what -- this is just trying to
6  understand what you -- what you, if asked,
7  would testify to.
8           What are the opinions that you
9  intend to potentially offer in the Missouri
10  cases relating to the Delaney Clause?
11      A.  That's a very broad question.  I
12  don't -- I don't know exactly how to answer the
13  question.  There's any number of opinions I
14  could offer, depending on what was asked.  I'd
15  need something a little more specific from you.
16      Q.  Okay.
17           MR. STEKLOFF:  Do we have the
18  disclosure?
19      Q.  I'll get the disclosure at a break
20  and just read it to you.  I mean, this is --
21  I'm not -- this is not me trying to play any
22  gamesmanship.  I just -- it is a broad question
23  because I don't know exactly what you might
24  testify to.

Christopher J. Portier, Ph.D

Page 50

1    MS. GREENWALD: I have it on my
2  computer. Do you want me to just pull
3  it up?
4    MR. STEKLOFF: Sure. That's fine.
5  Or we could probably pull it up, too.
6    Q. We'll pull it up, and I'll just
7  read you what it says, Dr. Portier, and then
8  ask what you might say.
9    THE WITNESS: We're on the eighth
10  floor, right? Okay. Some guy just
11  walked right along the window sill over
12  there.
13    MS. GREENWALD: Seriously? Oh, I
14  missed that.
15    Q. We'll find it. I can come back to
16  the Delaney Clause.
17    Other than the Delaney Clause, are
18  you -- you know, is there anything else that
19  would surprise Monsanto that you might testify
20  to in Missouri that has neither been disclosed
21  in one of your expert reports or discussed at
22  one of the hearings or at deposition or at
23  trial?
24    MS. GREENWALD: Objection, form.

Page 51

1    A. I don't think there's any new
2  opinions. As I said, I corrected some of the
3  slight problems with the expert report, and
4  that may appear. I have also -- there was
5  criticism of my expert report by one of your
6  experts regarding how I did an evaluation of
7  historical controls. That has been corrected.
8  I'm now using a peer-reviewed, referenced
9  evaluation of the historical controls. That
10  may appear.
11    Other than that, no.
12    Q. And those corrections that you've
13  just discussed, they were part of your
14  testimony in Pilliod, right? In other words,
15  you had already made those corrections in
16  advance of Pilliod?
17    A. Yeah, I think we mentioned the
18  historical control analysis, and there was an
19  objection, and I don't know if we went back to
20  it.
21    Q. Okay. So just to make sure I
22  understand, when you're now referencing any
23  historical controls, you are referring to
24  historical controls that have been referenced

Page 52

1  in peer-reviewed literature?
2    A. No. It's the test method. Tarone
3  wrote a paper in 1982 on how to analyze
4  historical controls. It's different than what
5  I was doing. I liked what I did, but the Court
6  wanted something that was already published, so
7  I used Tarone's test.
8    Q. Understood.
9    A. And redid the same thing I've done
10  with the other historical controls using
11  Tarone's test. There are historical
12  materials -- I have different datasets of
13  historical controls that I have found since
14  that time, most of them either in EFSA memos or
15  EPA memos, that are probably more appropriate
16  than some of the controls I was using, and I've
17  done those as well. No change in the opinion
18  whatsoever. But some different datasets.
19    Q. And so did using the different
20  datasets in any way change any of the
21  statistical significance of any of the trends
22  that you were looking at?
23    A. I'd have to look for one of them.
24  I'm not absolutely certain it's true for all.

Page 53

1  But in general, I'd say it hasn't changed any
2  of the opinions. It changed the p-value a
3  little, but I don't think it's changed any of
4  the opinions. They're still significant.
5  They're still important findings for rare
6  tumors.
7    Q. So for statistical significance --
8  or non -- it may have changed the actual
9  number, but it didn't change whether something
10  was statistically significant or
11  non-statistically significant?
12    A. Again, in my opinions, I don't
13  spend a lot of time on "statistically
14  significant" or not. It doesn't change my
15  opinion that this is an obvious positive
16  finding against those historical controls.
17    Q. Okay. So we found the language on
18  the Delaney Clause. So what it says,
19  Dr. Portier, is -- I'm just going to read it.
20    Dr. Portier is also designated as
21  an expert in the area of the processes and
22  methodologies encompassing the review,
23  evaluation, and assessment of chemicals,
24  including pesticides, by the EPA, including the

Christopher J. Portier, Ph.D

1 interplay of FIFRA and other regulatory
2 statutes such as the FDCA, specifically the
3 Delaney Clause, and by European regulatory
4 bodies, including EFSA and ECHA.
5     So understanding that that is
6 broad --
7     A.  It's very broad.
8     Q.  -- what is it that -- and I'm happy
9 to try to break it down more.  But what is it
10 that you might testify to regarding the
11 interplay of FIFRA and other regulatory
12 statutes such as the FDCA, specifically the
13 Delaney Clause?
14     A.  So if someone were to ask me about
15 the process through which FDA acted on the
16 Delaney Clause, I could certainly speak on that
17 and the science that would back such a process
18 and how that would work.
19     Methodologies, well, there's not a
20 lot of methodologies other than what we've
21 already talked about of how you decide if
22 something causes cancer in animals or not for
23 the Delaney Clause.
24     And let's see, review, evaluation,

1 assessment.  Again, I know how all the agencies
2 do all of that.  And so if asked any questions
3 about, is this typical, is this not typical, is
4 this how the agency should be doing it, is this
5 what their methods are listed as, those things
6 I can answer.
7     Q.  So -- and if I summarize something
8 wrong, please -- I know you'll let me know.
9 But is -- are you -- would you testify with
10 respect to the Delaney Clause generally about
11 the process through which the FDA acts, based
12 on your experience that we've already discussed
13 at the NTP?
14     A.  And experience with FDA directly in
15 other avenues, yes.
16     Q.  And do you have any specific
17 opinions relating to Monsanto or glyphosate as
18 it relates to the Delaney Clause?
19     A.  If asked a question about whether
20 or not there was sufficient information in,
21 say, 1990 to say that glyphosate was a positive
22 carcinogen in animals, I can answer that.  And
23 if asked, should that have triggered the
24 Delaney Clause, I can answer that question.

1 Those are the sorts of things I could answer.
2     Q.  I mean, basically, it is clear that
3 you think that, based on the science,
4 glyphosate is a carcinogen, correct?
5     A.  That is correct.
6     Q.  And so therefore, based on -- and
7 depending on when the science was available,
8 you would say at that point, based on your view
9 of the science, that the Delaney Clause would
10 have been triggered?  Is that fair -- is that
11 essentially what you're telling me now?
12     A.  That --
13     MS. GREENWALD:  Objection, form.
14     A.  A consideration of the Delaney
15 Clause would be -- should have been triggered,
16 yes.
17     Q.  And a consideration of the Delaney
18 Clause by whom?
19     A.  FDA.  But that involves a lot of
20 steps.  And so it -- they -- it should have
21 been triggered, however, at some point.
22     Q.  Because -- and it should have been
23 triggered because the EPA or some other -- or
24 the NTP or some other body, if they had agreed

1 with your evaluation of the science, would have
2 said that glyphosate was a carcinogen?
3     MS. GREENWALD:  Objection, form.
4     A.  Specifically in animals.  That's
5 the Delaney Clause.
6     Q.  Okay.
7     A.  But yes, specifically in animals.
8     Q.  And so who -- now just talking
9 generally about the process, who is it that
10 would have triggered that review?  Is it the
11 FDA itself looking at the animal studies, is it
12 the EPA, or is it some other governmental body?
13     A.  It would be FDA.  And the FDA would
14 be triggered to first test to see if the
15 compound was appearing in food products,
16 because that's a requirement of the Delaney
17 Clause.  And once they saw that, then they'd
18 have to agree with whoever said it was
19 carcinogenic in animals.
20     And once they saw that, they would
21 then have to, under law, ban the substance or
22 figure a way to keep it from getting into the
23 product, which would then bring them into
24 discussions with EPA on how to lower exposure

Christopher J. Portier, Ph.D

Page 58

1  so much that it never appears in the products.
2      Q.  So I want to break this down a
3  little bit.  First, you -- I think then -- and
4  I took this as hypothetical in your example.
5  You said 1990 in terms of when this would have
6  occurred.  But when -- so putting that as a
7  hypothetical, based on your evaluation of the
8  science, when is it that you -- now I'm asking
9  for a non-hypothetical.
10     When is it that you think that this
11 review should have been triggered, based on the
12 animal studies that existed at the time?
13     A.  Knezevich and Hogan, the 19 --
14     (Reporter interruption.)
15     A.  Knezevich and Hogan.  I think
16 that's a 1983 study, if I remember correctly,
17 in mice.  The kidney tumors are undeniably a
18 rare tumor.  They are undeniably raised.  It's
19 quite clear at that point you have satisfied
20 EPA's criteria for what would constitute at
21 least a -- at the time I think they called it a
22 2A or 2B carcinogen, and it should have -- it
23 should have triggered some concern.
24     Q.  So who at that time, if anyone,

Page 59

1  would you fault for not triggering a concern
2  under the Delaney Clause?
3      MS. GREENWALD:  Objection, form.
4      A.  I'm not sure I could answer that
5  question.  Again, I don't know who's at fault
6  for not seeing what's obvious to me in the
7  science from that -- from that study.
8      Q.  Will you disagree with the EPA's
9  evaluation of that study?
10     A.  Oh, definitely, yes.
11     Q.  And have you done any review to see
12 if the FDA did a review of that study?
13     A.  No, I have not.
14     Q.  And so in general, have you done
15 any review at any point in any time of what, if
16 anything, the FDA did with respect to
17 glyphosate?
18     A.  I don't believe I've looked at
19 anything from FDA with respect to glyphosate.
20     Q.  Okay.  So you are not offering any
21 opinions about whether the FDA complied with
22 its obligations under the Delaney Clause or any
23 other law?
24     A.  Specifically --

Page 60

1      MS. GREENWALD:  Objection, form.
2      THE WITNESS:  Oh, I'm sorry.
3      Q.  Specifically with respect to
4  glyphosate.
5      A.  Specifically with respect to
6  glyphosate, no, I'm unaware of -- either way.
7      Q.  Okay.  And with respect to
8  Knezevich and Hogan, is it your view that that
9  study alone was sufficient to determine that
10 glyphosate was a -- as I think you said, a 2A
11 or 2B carcinogen?
12     A.  It's enough to trigger -- under
13 modern classification, both EFSA, EPA, all of
14 them -- EFSA, EPA, IARC, all of them have a
15 clause in there that says, if you find a rare
16 tumor and it is raised in one single study, and
17 it's obvious that it is a dose-response issue,
18 that is sufficient evidence in animals.  That's
19 what I'm saying.
20     Then they have other
21 classifications that say, if it's sufficient in
22 animals and it's limited in humans, then we put
23 it here.  If it's sufficient in animals and
24 whatever, then they do the overall

Page 61

1  classification.
2      At the time, in the 1980s, the EPA
3  cancer guidelines had that same language in it,
4  and I believe that would have put it into
5  their, again at that time, the guidelines
6  classifications which would at least have given
7  it a possible human carcinogen classification,
8  which was like their third from the top
9  classification.
10     But in terms of the animal
11 evidence, with respect to the Delaney Clause,
12 it should have been sufficient to animals --
13 sufficient evidence in animals.
14     Q.  "It" being Knezevich and Hogan?
15     A.  Correct.  The kidney tumors --
16 specifically the kidney tumors in the male mice
17 in that study.
18     Q.  And understanding that if you were
19 asked questions -- specific questions about the
20 process of the Delaney Clause, you would answer
21 them, is there anything else generally that you
22 would opine on regarding the Delaney Clause
23 that we haven't discussed?
24     A.  No.

Christopher J. Portier, Ph.D

Page 62

1       MR. STEKLOFF: Anything that you
2  think I'm missing based on -- I mean --
3       MS. GREENWALD: I don't. I don't.
4  And I talked to Greg about this. I
5  didn't want to surprise you with
6  anything. That's why I put it in there.
7       MR. STEKLOFF: And I appreciate
8  that. That's why I mentioned it before,
9  and that's why I'm asking you now --
10      MS. GREENWALD: No.
11      MR. STEKLOFF: -- which is not
12 typical. But since Missouri has --
13      MS. GREENWALD: I know. Fair.
14      MR. STEKLOFF: -- no expert
15 reports, I'm just trying to make sure.
16      MS. GREENWALD: Fair.
17      MR. STEKLOFF: Okay.
18      Q. We're going to move to a new topic,
19 so I'm happy to take a break or keep going,
20 whatever you --
21      A. We can keep going. I'm fine.
22      Q. Okay. I wanted to ask you about
23 some other risk factors related to NHL and see
24 if you have any opinions on them.

Page 63

1       A. Okay.
2       Q. Do you believe that age is a risk
3  factor for NHL?
4       MS. GREENWALD: Objection, form.
5       A. Oh, yes.
6       Q. And do you believe that age can
7  cause NHL?
8       MS. GREENWALD: Objection, form.
9       A. I can't answer the question. It's
10 confounded with too many other things. I don't
11 think anybody can answer that question, that
12 age causes NHL. Clearly age is associated with
13 NHL. Obviously you have to live long enough to
14 get it. I mean, it's just impossible to come
15 up with the answer to that question.
16      In general, the way people think of
17 causation, I would have to say no.
18      Q. So you'd put age in a different
19 category than glyphosate?
20      A. You would want to control for age
21 in doing any evaluation of glyphosate risk
22 using human evidence. But it's not really a
23 causative factor. It's something you control
24 for.

Page 64

1       Q. And would the same be true for
2  gender?
3       A. Gender, generally you wouldn't,
4  again, think of it as causative. But certainly
5  gender could be associated with NHL. And the
6  cause of that association could be hormonal,
7  could be lifestyle, it could be all kinds of
8  different possibilities that might create that
9  association. But gender wouldn't be the cause;
10 gender would be something you control for.
11      Q. But you agree that gender is a risk
12 factor --
13      MS. GREENWALD: Objection.
14      Q. -- for the development of NHL?
15      MS. GREENWALD: Objection, form.
16 This is outside of Dr. Portier's
17 designated expertise. But I'm not going
18 to instruct him not to answer, but this
19 is way outside of it.
20      A. That's a very good point, but in
21 this case I feel comfortable answering your
22 question. Gender is a risk factor.
23      Q. Okay. If you become uncomfortable,
24 just -- hopefully you don't become

Page 65

1  uncomfortable, but if you become uncomfortable
2  answering a question, just let me know.
3       MR. STEKLOFF: And I understand the
4  objection.
5       Q. What about obesity?
6       MS. GREENWALD: Same objection.
7       A. I haven't read all the literature.
8  I don't really know.
9       I want to make clear what a risk
10 factor is. A risk factor means that in
11 evaluating an epi study, I would control for
12 it. I would be worried about not taking it
13 into account. But that doesn't mean I believe
14 it is a cause.
15      Q. Okay. And so obesity, you can't
16 say one way or another whether it's --
17      A. I've read some literature. There
18 is a suggestion of an association. I don't
19 know how strong it is.
20      Q. What about hepatitis C and
21 hepatitis B?
22      MS. GREENWALD: Same objection.
23      A. Same answer.
24      Q. And so can you say that hepatitis

Christopher J. Portier, Ph.D

Page 66

1 C, for example, is a cause of non-Hodgkin's
2 lymphoma?
3        MS. GREENWALD:  Same objection.
4     A.  And it's the same answer.  I've
5 read some literature, but I haven't studied it
6 well enough to have an opinion on that
7 question.
8     Q.  And is that true if I asked you
9 about anything else from Epstein?Barr to
10 exposure to radiation?
11    A.  Pretty much, yes.
12    Q.  Okay.  What about other pesticides,
13 are there any other pesticides other than
14 glyphosate that you believe cause non-Hodgkin's
15 lymphoma?
16    A.  "Cause" is an interesting term.  I
17 believe that there are pesticides where they
18 would be grouped 2A or grouped 2B by IARC
19 classification, and I suggest that that is
20 supported by the evidence.
21    Q.  And what other pesticides do you
22 believe --
23    A.  I would have --
24    Q.  -- would fall in that category of

Page 67

1 2A or 2B?
2     A.  I'd have to look at the Monograph
3 we did.  Monograph -- I believe it was 112, the
4 glyphosate Monograph.  I believe there was one
5 other pesticide in there which we classified as
6 2B or 2A.  I don't remember because I haven't
7 looked back at it in a long time.  But I
8 would -- whatever that opinion was, I agreed
9 with it at the time, and so I would still agree
10 with it.
11        Beyond that, again, it's just
12 looking through literature and reading IARC
13 Monographs and saying, oh, yeah, that looks
14 interesting, but not getting into the data in
15 depth myself --
16    Q.  Okay.
17    A.  -- except for that one Monograph
18 for that one pesticide --
19    Q.  Right.
20    A.  -- which I'm forgetting it -- what
21 it was called.
22    Q.  That's fine.  There were five
23 pesticides reviewed, correct?
24    A.  Correct.

Page 68

1     Q.  And then -- so fair to say you
2 would have been, during that IARC process, very
3 familiar with the data on those five
4 pesticides, including glyphosate?
5     A.  At that time, yes.
6     Q.  And you would have -- and you
7 agreed with the classifications that were made
8 by IARC in that Monograph 112?
9     A.  Not that my opinion mattered, but
10 yes, I agreed with their classifications.
11    Q.  And have you ever gone to look at
12 data for other pesticides that weren't part of
13 that IARC process to determine whether or not
14 they rise to the level of a 2A or 2B
15 carcinogen?
16    A.  No, I have not.
17    Q.  What about other pesticides, when
18 you were at NTP or any other -- or NIEHS or any
19 other governmental positions, were -- did you
20 assess pesticides as potential carcinogens at
21 that time?
22    A.  The NTP generally did not do
23 pesticides because that is the responsibility
24 of the Environmental Protection Agency, and

Page 69

1 unless they asked NTP to do something with
2 regard to a pesticide, they would be unlikely
3 to do it.  And so in my recollection, I don't
4 remember ever doing a pesticide while I was in
5 charge of the NTP.  But there were lots of
6 things going on.  I could have easily forgotten
7 that.
8        ATSDR generally is not involved in
9 pesticides because they're involved in toxic
10 dump sites, and unless the toxic dump site is
11 where somebody dumped a whole bunch of
12 pesticides, it's really not their
13 responsibility.
14        But when I was on the FIFRA science
15 advisory panel -- the Federal Insecticide,
16 Fungicide, and Rodenticide Act science advisory
17 panel -- and chaired it, we were involved in a
18 lot of pesticide issues for the EPA, and we
19 commented on them quite robustly.  There must
20 be 40 or 50 technical documents which I
21 contributed to in that period.  Most of those
22 are in my CV.  And so, yes, that is where I did
23 it.
24    Q.  What was that time period?

Christopher J. Portier, Ph.D

Page 70

1    A.  Oh.  Early -- the -- 2000-ish,
2  slightly -- just after the FQPA came in, which
3  would have been 1996 or '7, until maybe 2002 or
4  '3.
5    Q.  And do you remember any specific
6  pesticides that you were involved in evaluating
7  when you played that role on the SAP?
8        MS. GREENWALD:  Objection to the
9    form.
10    A.  Choline esterase inhibitors.  What
11  else?  Geez, there's so many of them.
12        Since I have my CV in front of me,
13  I can bring some of these up and take a quick
14  look here.  That's not there, that's not there,
15  not there.  Let's see.  These are just the
16  obvious.  Let's see.  N-methyl carbamate
17  pesticides, PPAR-alpha --
18        (Reporter interruption.)
19        MS. GREENWALD:  You have to go a
20    little slower.
21        THE WITNESS:  I'm sorry.
22    A.  N-methyl carbamate pesticides,
23  pesticides that bind or affect PPAR-alpha,
24  atrazine.  Is that enough?

Page 71

1  Acetylcholinesterase inhibitors, termite bait,
2  et cetera.
3    Q.  And what page are you on, just out
4  of --
5    A.  34, 35.  These are many of the
6  FIFRA reports that I signed off on as chairman.
7  I think they're about 30 or 40 or 50 of them.
8    Q.  And of those 30 or 40 or 50,
9  were -- I'm going to ask this broadly -- were
10  many associated with cancer?
11    A.  Certainly the PPAR-alpha ones were,
12  but most of them were neurotoxins because
13  that's the general way in which pesticides
14  target pests other than plant pests, and so
15  most of it was neurotoxicology.  A lot of it.
16        Some of it was toxicokinetics, how
17  does the compound get into humans and where
18  does it go.  There was a lot of discussion of
19  that.  Issues along those lines.
20    Q.  And so you became familiar, with
21  the pesticides you were reviewing, of the
22  mechanism of action?
23    A.  Certainly.
24    Q.  And do you agree that the mechanism

Page 72

1  of action for glyphosate is different than the
2  pest -- all of those other pesticides in terms
3  of the shikimate pathway?
4        MS. GREENWALD:  Objection, form.
5    A.  There was too much to that
6  question.  Humans don't have that pathway, and
7  so hence, it's -- obviously that's not the
8  mechanism by which it affects humans, although
9  in my opinion, there is a mechanism by which it
10  affects humans.  I just don't think it's
11  well-known at this point.
12        I can say that I doubt it's the
13  same as many of those other pesticides, but
14  that's as much as I can say.  I don't think
15  there's been enough research to go beyond
16  saying that it could affect PPAR-alpha; it
17  could affect other things that now might link
18  it to these other compounds.
19    Q.  So just to break it down a little
20  bit, when you spoke before about evaluating
21  neurotoxicity of some of these other
22  pesticides, were you just -- and this is just
23  to clarify -- are you saying that that's what
24  you focused on reviewing, or that those

Page 73

1  pesticides were not -- did not cause cancer?
2    A.  No, you -- I was answering a
3  general question.  Certainly some of these
4  pesticides caused cancer, and some of our
5  discussions -- atrazine was an example where we
6  focused on the cancer risk of atrazine at one
7  entire meeting, five days or something along
8  those lines.  But we also focused on the
9  ecological impacts of atrazine on another
10  five-day meeting.
11        So these meetings were on a broad
12  set of topics.  Generally, neurotoxicity was
13  the top -- top of the list.
14    Q.  Understood.
15    A.  Because that's where we were seeing
16  the problems in the animal data.
17    Q.  Does atrazine cause cancer?
18    A.  I think there's a good case for
19  arguing that atrazine is a human cancer risk,
20  yes.
21    Q.  And specifically for NHL?
22    A.  No.
23    Q.  Okay.  For different?
24    A.  For different, yes.  I can give you

Christopher J. Portier, Ph.D

Page 74

1 the mechanism if you'd like, but --
2      Q.  Probably not for --
3      A.  -- yes, they're very different.
4      Q.  Probably not for now.  I might have
5 a few more questions on mechanism, but probably
6 not -- I don't need specific for atrazine.
7           Is it -- from a timeline
8 standpoint, you're obviously aware that
9 glyphosate was introduced in 1974, correct?
10     A.  Correct.
11     Q.  Became more popular in the '90s?
12     A.  Correct.
13     Q.  And so before that, before
14 the '90s, a lot of other pesticides were being
15 used, correct?
16         MS. GREENWALD:  Objection, form.
17     A.  Are you talking about herbicides --
18     Q.  Yeah, we'll --
19     A.  -- specifically?
20     Q.  We'll focus specifically on
21 herbicides.
22         MS. GREENWALD:  Same objection.
23     A.  I'm not an expert there.  So it
24 would only be an uneducated opinion that I

Page 75

1 would be offering.
2      Q.  Okay.  What about your work on -- I
3 may pronounce this wrong -- but dioxins?
4      A.  Dioxins.
5      Q.  Dioxins.  Do you believe that
6 they -- that products that contain dioxins
7 cause cancer?
8      A.  Products don't contain dioxins;
9 they're contaminated by dioxins.
10     Q.  Ah, okay.
11     A.  It's clearly not of any use in the
12 product, nor of any use in the marketplace.  It
13 is a pure contaminant.
14          And yes, I do believe that dioxins
15 can cause cancer in humans in sufficient
16 quantities, sufficient dose, which is very
17 small.
18     Q.  The sufficient dose is very small?
19     A.  Yes.
20     Q.  And does that -- when you say you
21 believe that dioxins can cause cancer in humans
22 in sufficient quantities, does that include
23 NHL?
24     A.  I'm not aware of a linkage between

Page 76

1 dioxin and NHL.  So my answer would be no.
2           There is a linkage between PCBs and
3 NHL, but it's been sort of wishy-washy, on and
4 off.  I don't know where that stands now.  I
5 haven't looked at it in the last 10 years or 15
6 years.
7      Q.  Now, these other pesticides -- and
8 it doesn't specifically have to be herbicides,
9 but other pesticides that you evaluated and
10 we've discussed in your CV, do you believe that
11 the mechanism through which they affect humans
12 are better known than the mechanism through
13 which glyphosate may affect humans?
14         MS. GREENWALD:  Objection, form.
15     A.  It depends on the compound,
16 obviously.  I can't make a broad statement like
17 that.  I could certainly say that the way in
18 which atrazine affects gonadotropin hormones,
19 then leads to potential cancer risk, is very
20 well studied compared to what we understand
21 about glyphosate.
22     Q.  And given that the shikimate
23 pathway is not in humans, do you agree that
24 among pesticides, glyphosate was, at the time,

Page 77

1 an advancement in pesticides?
2         MS. GREENWALD:  Objection, form.
3     A.  Not my expertise.
4     Q.  But you do agree that the shikimate
5 pathway is not in humans?
6     A.  That's my understanding, and I will
7 stick with that, yes.
8     Q.  Is all of -- is the association
9 with other pesticides and cancer one of the
10 reasons why you think it's important to adjust
11 for other pesticides when conducting
12 epidemiology?
13         MS. GREENWALD:  Objection, form.
14     A.  No.  The potential association
15 between other pesticides and NHL, and the
16 association between the use of those pesticides
17 and the use of glyphosate, warrants their use
18 in epidemiology -- warrants an adjustment for
19 their use in epidemiology evaluations.
20     Q.  So was my question poor because I
21 said "cancer" instead of "NHL"?  I'm just
22 trying to --
23     A.  Correct.
24     Q.  Okay.

Christopher J. Portier, Ph.D

Page 78

1    A.  Because if it's any cancer, then
2  it's not interesting in an epidemiological
3  sense.
4    Q.  Fair enough.  So is the association
5  with other pesticides and NHL one of the
6  reasons why you think it's important to adjust
7  for other pesticides when conducting
8  epidemiology?
9       MS. GREENWALD:  Objection, form.
10    A.  Again, as long as the other piece
11  is part of it as well, and that is, those
12  pesticides are used in conjunction with
13  glyphosate.  They have to associate on two
14  levels.  The pesticide has to associate with
15  your target cancer, and it has to associate
16  with the product you're trying to evaluate.
17  Then you would correct for it.  You would
18  adjust for it.
19    Q.  And when you say "associate with"
20  glyphosate, can you explain that?
21    A.  It would mean that there's
22  co-exposure, sometimes; that a formula not only
23  uses glyphosate but also uses malathion, and if
24  malathion's associated with the outcome I'm

Page 79

1  interested in with glyphosate, I probably want
2  to correct for exposure to malathion, if I can
3  get the data.
4    Q.  So in the epidemiology that you're
5  familiar with, and we're not going to go
6  through it in detail, if -- you'd only want to
7  control for malathion if someone -- if you're
8  assessing glyphosate, if someone was exposed to
9  both malathion and glyphosate.
10       MS. GREENWALD:  Objection, form.
11    Q.  Is that --
12       MS. GREENWALD:  Sorry.
13    Q.  On the population basis within the
14  epidemiology.
15    A.  If there was a potential that the
16  exposure was associated with the end point and
17  the target compound glyphosate, then yes, I
18  would hope to try to control for it, if I could
19  get the data.
20    Q.  And do you know if malathion has an
21  association with NHL?
22    A.  I believe it does.  I believe in
23  the epi studies where they did control,
24  malathion was one of the things they

Page 80

1  considered.
2    Q.  And have you ever gone back to look
3  at that data, or are you just basing that on --
4  you assumed that they controlled for the right
5  things when they controlled for certain
6  pesticides?
7    A.  When I look at the study, if I see
8  that they're controlling for something, I do go
9  back and briefly look at the literature to see,
10  is this really justified and -- so in general,
11  they've done it right, except for potentially
12  one study, they just threw everything at it,
13  and that's sort of an overkill; and then the
14  studies who just didn't have that information
15  and didn't adjust for it, which is an
16  underkill.
17    Q.  And is the overkill the AHS, or is
18  it a different study?
19    A.  It's the De Roos --
20    Q.  Ah.
21    A.  -- evaluation of the AHS.
22    Q.  The 2005 De Roos?
23    A.  2005.  She did all 2 -- all 42 --
24    Q.  Yeah.

Page 81

1    A.  -- pesticides, which is likely to
2  have affected her overall confidence bounds
3  around the relative risks she saw.  The more
4  and more you throw at it that's actually not
5  relevant, the bigger your standard error gets.
6  And the bigger the standard error gets, you
7  lose being able to see something.  Your
8  degrees -- it's technical statistics, but
9  anyway, your degrees of freedom go down
10  tremendously.
11    Q.  And then which study is the
12  underkill?
13    A.  Oh, there's several that didn't
14  correct.
15    Q.  Okay.  And you would put less
16  emphasis on those?
17       MS. GREENWALD:  Objection, form.
18    A.  I have, in my expert report and in
19  any presentations I've made.
20    Q.  And generally when you've gone back
21  to double -- to do some -- a quicker assessment
22  of the pesticides that were controlled for in
23  the epidemiology, put aside De Roos 2005,
24  you've confirmed that the pesticides that were

Christopher J. Portier, Ph.D

Page 82

1 being controlled for were appropriate ones to
2 do so?
3        A.  To my recollection, yes.
4        Q.  And are you -- do you agree that
5 all of those pesticides pre-dated glyphosate in
6 terms of being on the market?
7        A.  Not my expertise.
8        Q.  And I assume it's also not your
9 expertise about the mechanism of actions of
10 those other pesticides --
11        A.  I --
12        Q.  -- like malathion and 2,4-D and
13 other pesticides?
14        A.  I may know something about them,
15 but I won't -- I wouldn't say I'm an expert.
16        Q.  Okay.
17        A.  Given two days, I could be, but --
18 you know, reading the literature would tell me
19 quite a bit.  But I haven't read all the
20 literature on it.
21        Q.  Okay.  And do you know if the
22 mechanism of action with respect to those other
23 pesticides and its -- how it impacts humans is
24 better established than glyphosate?

Page 83

1        MS. GREENWALD:  Objection, form.
2        A.  It would depend on the pesticide,
3 and I would have to search -- so I can't answer
4 the question.  I'd have to search the
5 literature.
6        Q.  With respect to glyphosate, is the
7 mechanism -- in your view, understanding that
8 you think glyphosate causes cancer,
9 specifically NHL, is the mechanism of action
10 still hypothetical and unknown?
11        MS. GREENWALD:  Objection, form.
12        A.  Most of the mechanisms of actions
13 for all compounds are hypothetical and unknown,
14 in -- technically speaking.  It's certainly not
15 as well-known as radiation or dioxin, but it is
16 at the same level as many other compounds that
17 are labeled carcinogens, in the sense that all
18 you have is a series of genotoxicity studies or
19 some oxidative stress studies or some binding
20 to estrogen receptor or androgen receptor
21 studies.
22        So in the realm of all the
23 information that's out there on mechanisms,
24 it's probably run-of-the-mill in terms of

Page 84

1 what's understand -- understood of it.
2        Q.  But it's still -- it's still
3 unknown.  You can't tell me to a reasonable
4 degree of scientific certainty the mechanism of
5 action of how glyphosate causes NHL in humans?
6        A.  That is correct.
7        Q.  And you know it's not the shikimate
8 pathway?
9        MS. GREENWALD:  Objection, form.
10        A.  As far as I understand it, that
11 pathway does not exist in the human body.
12 Therefore, it cannot be that pathway.
13        Now, that could be wrong.  We don't
14 know everything about the human body.  And
15 maybe during developmental phases or puberty
16 phases something happens that creates a
17 temporary pathway very similar to that.  We
18 don't know that.  That's speculation.  But it
19 hasn't been looked at.
20        Q.  So you would have to speculate to
21 tell me what the mechanism of action is in
22 humans for glyphosate?
23        MS. GREENWALD:  Objection, form --
24        A.  I can tell you --

Page 85

1        MS. GREENWALD:  -- it
2 mischaracterizes the testimony.
3        Go ahead.
4        A.  I can tell you that it damages DNA;
5 I can tell you that it causes oxidative stress;
6 I can tell you that those are indeed, in many
7 cases, related to the beginning of oncogenesis.
8 And that's a very good starting point for
9 talking about what might be the mechanism of
10 action by which glyphosate works.  But to be
11 able to tell you all the steps involved in
12 that, there has to be more research.
13        Q.  Okay.
14        MR. STEKLOFF:  Why don't we go off
15 the record because we're going to shift
16 topics.  It's been over an hour, so it's
17 a good time for a break.
18        MS. GREENWALD:  Okay.
19        VIDEO OPERATOR:  We are now going
20 off the video record.  The time is
21 10:38.
22        (Recess from 10:38 a.m. until
23 10:50 a.m.)
24        VIDEO OPERATOR:  We are now going

Christopher J. Portier, Ph.D

Page 86

1  back on the video record.  The time is
2  10:50.
3  BY MR. STEKLOFF:
4  Q.  I actually want to talk,
5  Dr. Portier, a little bit about your -- the
6  methodology that you used.  So before you
7  started assessing a single animal study, did
8  you come up with a methodology of how you were
9  going to review the available animal studies?
10  MS. GREENWALD:  Objection, form.
11  A.  I'm sorry, the question is a little
12  confusing for me.  There are methods you use
13  for identifying what studies you would use, and
14  then there's methods you use for analyzing
15  those studies.
16  Q.  I'm focused on the latter.  So I'm
17  curious if you had a methodology for how you
18  would, for example, count or categorize the
19  tumors in an animal study and then any
20  statistical analyses that you planned -- that
21  you were going to do.
22  A.  So the pathologist counts and
23  characterizes the number of animals with tumors
24  for you; you don't have to do that.  So that's

Page 87

1  not my role in looking at this.  You -- there
2  are tables and tables and tables of the numbers
3  of animals with what tumor of what type, and
4  how many animals were looked at, and all of
5  that information is readily available.
6  In the analysis of cancer data, it
7  wouldn't matter what it was, my approach would
8  be, if possible, use -- for cancer, if
9  possible, use the poly-3 test, which myself and
10  John Bailer originally did, but there have been
11  improvements to it by other statisticians who
12  have changed the variance structure a little
13  bit, and I'd probably use theirs -- Bieler and
14  Williams is the one that comes to mind.
15  Failure to be able to do that
16  because I don't have the individual death times
17  of the animals, I would go with the Armitage
18  linear trend test.  And I can always apply
19  that.  There's no way they would not give me
20  enough data to do that.
21  And I would probably also include
22  an analysis of Fisher's exact test, pairwise
23  comparisons, just for informational purposes so
24  that you can see, if there is a trend, where

Page 88

1  does it appear to be the strongest?
2  That's the typical way in which I
3  would approach any animal cancer bioassay.
4  Q.  And is that how you approached
5  glyphosate?
6  A.  Yes.
7  Q.  And so for tumor categorization,
8  did you always rely on the assessment of the
9  pathologist in every animal study?
10  A.  Yes.
11  Q.  And did you make any -- did you
12  change any categorizations than what a
13  pathologist had determined in any of the
14  underlying studies?
15  A.  I don't know what that means.
16  Q.  If a pathologist had categorized a
17  certain tumor as a certain type of cancer, did
18  you ever make any alterations to that
19  categorization?
20  A.  No.  There are changes in the
21  pathology nomenclature over the years.  So for
22  example, if I remember correctly, Knezevich and
23  Hogan talked about neoplastic nodules in the
24  liver, whereas modern terminology would call

Page 89

1  those hepatocellular adenomas.  And so when I
2  talk about hepatocellular adenomas, I include
3  the neoplastic nodules from Knezevich and
4  Hogan.
5  There were some changes in
6  nomenclature for skin tumors.  Epitheliomas of
7  a specific type are the same as
8  keratoacanthomas now, and so I'd link those
9  together.
10  But generally, other than that, no.
11  Q.  You're going to have to give some
12  spellings later.
13  When you say that the nomenclature
14  changed, what was your basis for determining
15  the current nomenclature?
16  A.  Oh, that's -- I don't know if
17  there's a published document.  There used to be
18  a published document on that issue.
19  In terms of the two cases I just
20  gave you, neoplastic nodule, I've known about
21  that since I was at the National Toxicology
22  Program.  That change occurred while I was
23  there.  And so clearly that's well-known to me
24  and well-known in the field.

Christopher J. Portier, Ph.D

Page 90

1    The skin keratoacanthomas -- sorry,
2 keratoacanthomas -- I asked the pathologist
3 about those tumors, and their opinion, does
4 this look the same as these epitheliomas or
5 whatever it was that I was seeing in this other
6 study, because I was never seeing those in any
7 other study after that point, and they
8 basically told me that is the same one.
9    So it's a personal interaction with
10 a pathologist to answer that question.
11    Q.  Which pathologist?
12    A.  That would be Jerry Ward, I think,
13 who used to be at NCI.  He's now retired from
14 NCI, but I think he has some sort of ad hoc
15 relationship with them, the National Cancer
16 Institute.
17    Q.  And you did that as part of your
18 work as a retained expert in the Roundup
19 litigation?
20    A.  I wouldn't call it that.  I
21 certainly didn't bill it.  I just called him
22 and asked him because I was curious.
23    Q.  But you needed to rely on a
24 pathologist in order to verify your

Page 91

1 nomenclature?
2    MS. GREENWALD:  Objection, form.
3    A.  In order to -- certainly study A,
4 study B, study C, I can compare the skin
5 keratoacanthomas because they all use the same
6 terminology, and the pathologists are hopefully
7 doing exactly the same thing.  But in those
8 older studies, you see things and you have to
9 ask yourself, is that the same thing or not?
10 So there is where I had to talk to an old
11 pathologist who understands the animals who
12 could give me that linkage.  That --
13    Q.  And did you -- sorry.  I didn't
14 mean to cut you off.
15    A.  No, that's fine.
16    Q.  And did Dr. Ward have -- did you
17 send Dr. Ward the underlying reports or data
18 that you were looking at in the glyphosate
19 animal studies?
20    A.  No.  This is a -- not a
21 study-specific question; it's just a
22 nomenclature question.  It didn't matter
23 whether it was glyphosate or gobbledygook.  It
24 was just a pathology question.

Page 92

1    Q.  But you were doing this as part of
2 your review of the glyphosate data for
3 litigation?
4    MS. GREENWALD:  Objection, form,
5 asked and answered.
6    A.  I can't -- I can't say it was the
7 "for litigation" part.  I can tell you that it
8 is part of what I did in looking at the
9 glyphosate information.  I did a lot of things
10 that had nothing to do with the litigation.
11    Q.  Understood.  Was it post-IARC?
12    A.  Oh, yes.  Every -- all of this is
13 post-IARC.
14    Q.  It could have been in relation to
15 preparing one of your letters for -- is -- just
16 to understand the differentiate -- the
17 potential differentiation there.
18    A.  Or just curiosity on my part.
19    Q.  Fair enough.  Fair enough.  Okay.
20    So then that's how you -- that was
21 the first step, that's how you categorized the
22 tumors, relying on the underlying data.  Then I
23 think you've already told us you didn't have
24 the -- I may get this wrong; this is not my

Page 93

1 area of expertise -- but the times of death to
2 be able to do this poly-3 analysis, correct?
3    A.  I had the times of death for the
4 full studies minus some things given to the
5 litigation team from Monsanto.  So this
6 included Knezevich and Hogan, and one other
7 study, and I can't remember it right off the
8 back of my head.
9    So I had those.
10    And I did do the poly-3 test for
11 specific tumors from those studies because --
12 and that's in the supplemental -- in the
13 rebuttal report.
14    Q.  Okay.
15    A.  Because I was challenged on the
16 fact that there were survival differences in
17 two of the studies and I didn't do this test.
18 But the only ones I could do was the ones I had
19 the data for.
20    But that's not publicly available
21 information, so that will not be in any report
22 I write for the literature because it's not
23 publicly available.
24    But I did do some there.

Page 94

1  Q. Understood. And everything you did
2 is included in that rebuttal report?
3  A. Or in the original report, correct.
4  Q. Okay. And you have no --
5  A. Again, with the exception of
6 Tarone's test for historical controls, which
7 I've done separately since then.
8  Q. Yes. Which came up in the Pilliod
9 litigation.
10  A. Correct.
11  Q. Yes. Okay. And you have no
12 allegation that Monsanto, in this litigation,
13 has withheld any necessary data from the
14 plaintiffs' attorneys who, in turn, provided it
15 to you, correct?
16  MS. GREENWALD: Objection, form.
17  A. I wouldn't know what's not there,
18 if it's not there. And I have not looked at
19 everything that Monsanto turned over.
20  Q. Understood. I hope no one has.
21  And you have no allegation that
22 Monsanto -- or no reason to believe that
23 Monsanto ever withheld any information from the
24 EPA, correct?

Page 95

1  A. I have to run through my head on
2 everything I've seen up to this point. Nothing
3 comes to mind.
4  Q. And that would be true with respect
5 to any other regulatory body around the world,
6 correct?
7  A. Nothing comes to mind; that's
8 correct. I can't swear if I didn't really
9 think hard about it for a long time I might see
10 something, but I don't think there's anything
11 that I remember seeing.
12  Q. Understood. Okay. And now -- I
13 might pronounce this wrong, but the oncogene
14 linear trend test, my question there is, so
15 before -- so you have the trend test and the
16 pairwise test, correct?
17  A. Correct.
18  Q. Did you make a determination before
19 you started reviewing any glyphosate data in
20 the animal studies about which tests you would
21 run and which tests you would rely upon to form
22 your opinions?
23  A. Back in 1982, I formed this
24 opinion. This opinion's not new to me. The

Page 96

1 Armitage linear trend test -- Armitage --
2  Q. Armitage. Got it.
3  A. Armitage is the correct test to use
4 if you don't have the survival information. It
5 is the uniformly most powerful test. This was
6 part of my Ph.D. thesis. It has not changed
7 since then.
8  Q. And did you make a determination --
9 well, strike that.
10  It sounds like you -- or I want to
11 use your language. I think you said you
12 used -- you included the pairwise test for
13 informational purposes in your report, correct?
14  A. Yes. That is normal.
15  Q. Okay. So that -- and so you
16 anticipated my question. Is it your view that
17 in the scientific community, that is always the
18 role the pairwise -- or that is typically the
19 role the pairwise test plays in assessing
20 animal studies?
21  MS. GREENWALD: Objection, form.
22  A. That should be the role that that
23 test plays in assessing these types of animal
24 studies. It is certainly the role used in the

Page 97

1 NTP evaluation of these studies.
2  That is not always the case in the
3 literature. Many cases don't do the trend test
4 at all; they just do the pairwise comparisons.
5 In my opinion as a statistician, with this
6 data, that's a -- that's not the most effective
7 test to use.
8  Q. And your opinion about the role of
9 the pairwise test, is that something you also
10 would have formed in the 1980s or --
11  A. Way back when, yes.
12  Q. So is it fair to say the
13 methodology that you used -- the methodology
14 you've described is the methodology that you
15 thought was best before you reviewed the
16 glyphosate animal study data?
17  A. Yes.
18  MS. GREENWALD: Objection, form.
19  Q. And that that would be the
20 methodology you would use in reviewing animal
21 studies related to any substance?
22  A. Yes.
23  Q. Did you use a computer program to
24 assist you in calculating the trends in the

Christopher J. Portier, Ph.D

Page 98

1 animal studies?

2    A.  Yes, I did.

3    Q.  And I'm not challenging the
4 accuracy of any of those, but did you save the
5 underlying calculations you used to come to
6 determine the trends?

7    A.  I don't know what that means.

8    Q.  So whatever the output was from the
9 computer program, did you save that output?  I
10 understand that you reported numbers in your
11 expert report, and I -- this is much more of a
12 methodological question.  I'm not questioning
13 that they're accurate or questioning that
14 that's what the computer put out.  I'm just
15 saying, the underlying data that -- the output
16 from the computer program, did you save any of
17 that?

18    A.  I have the program.  I have the
19 input data.  I can certainly rerun it if I
20 didn't save the output, but I'm -- I can't be
21 certain I saved all the outputs.

22    Q.  Okay.  So you -- in terms of, like,
23 the back-up material of what -- let me break
24 this down.

Page 99

1       You input numbers, and then it
2 outputs a final number.  But it -- I assume at
3 the time the computer program creates like a
4 spreadsheet or some other sheet of data,
5 including both the inputs and the output.  Is
6 that fair?

7    A.  That's fair.  The input is a
8 spreadsheet and the output is just a flat file.

9    Q.  Right.  And you reported the flat
10 file in your expert report?

11    A.  I extracted the numbers and put
12 them in the tables.

13    Q.  Okay.  But -- and this really is
14 not a criticism.  You don't -- sitting here,
15 you don't know if you saved the input -- the
16 spreadsheets?

17    A.  Oh, I saved the input files.

18    Q.  Okay.

19    A.  That I clearly saved.

20    Q.  And do you know if those were
21 produced in the litigation?

22    A.  I --

23       THE WITNESS:  There was some
24 discussion about it, Robin.  I don't

Page 100

1 recall.

2       MS. GREENWALD:  I don't know.  I
3 don't think so.

4    Q.  Do you know if the computer program
5 itself -- as opposed to you saving the Excel
6 sheets, do you know if the program that you run
7 saves that material?  That might be a poor
8 question.  I don't really understand how the
9 computer program works, so...

10    A.  This is quite simple.  If you were
11 interested in checking to see if my program
12 worked --

13    Q.  Exactly.

14    A.  It's just a question you're asking.

15    Q.  And I'm currently not, but I'm just
16 under -- trying to understand.

17    A.  The methodology is well-known.  You
18 can buy a program that will do the Armitage
19 linear trend test.  Most statistical packages
20 will do it for you.  You can run the numbers
21 and compare it to my p-values.  The p-values
22 are there to three significant digits.  You can
23 make the comparisons directly, and then you'll
24 know whether I did it right or wrong.  And it's

Page 101

1 trivial.

2    Q.  And I would need to have your Excel
3 sheets to be able to do that; is that right?

4    A.  No.  No.

5    Q.  What would I need to be able to do
6 it?

7    A.  Just what's in the expert report.
8 The number of animals with the tumor, the
9 number of animals that were examined, and the
10 doses used.  Given that information, you can
11 replicate everything I did.

12    Q.  Okay.  But you don't know if what
13 you actually did at the time in the computer
14 program itself was saved?  Understanding that
15 the spreadsheets were saved and that the final
16 output number was saved.

17    A.  Certainly they have undergone some
18 changes over time since that expert report.  As
19 I pointed out, I found some minor errors in
20 some of the counts.  We've -- I've added data
21 because it's turned out to be significant, and
22 I've added it to the -- so it's changed over
23 time.

24       I certainly don't have the original

Christopher J. Portier, Ph.D

1  set of programs that gave me the expert report,
2  but I have something very close to it.
3      Q.  All right.  Shifting topics.  I
4  actually want to talk to you about the Leon
5  paper.  You're familiar with that paper, the
6  meta-analysis that came out recently?
7      A.  Meta or pooled?
8      Q.  You'll correct me if I'm wrong.  I
9  thought it was meta.  But maybe it's pooled.
10     A.  This is the European cohorts with
11 the AHS?
12     Q.  Yeah.  I think it's pooled.  Yep.
13     A.  It's pooled.
14     Q.  But you're familiar with it?
15     A.  Yes, I am.
16     MR. STEKLOFF:  So I'm going to mark
17 this as Exhibit 2.
18     (Exhibit Portier-2 marked for
19 identification and attached to the
20 transcript.)
21     MR. STEKLOFF:  Do you want a copy,
22 Robin?
23     MS. GREENWALD:  I do, if you don't
24 mind.

1      MR. STEKLOFF:  Of course.  We have
2  lots of copies.  We don't help the trees
3  in this litigation.
4      MS. GREENWALD:  I know.  At least
5  you did it two-sided.  I appreciate
6  that.
7      MR. STEKLOFF:  The one time -- if
8  we didn't print everything, then, you
9  know, we would be criticized as well.
10 BY MR. STEKLOFF:
11     Q.  Dr. Portier, you've reviewed this
12 paper before?
13     A.  Yes, I have.
14     Q.  Okay.
15     A.  Well, I've read it.
16     Q.  Read it.  Okay.  Do you have any
17 opinions about the quality of the paper?
18     MS. GREENWALD:  Objection, form.
19     A.  As a paper, it's fine.  It's a
20 well-written piece of work.
21     Q.  What about the methodology, do you
22 have any criticisms of the methodology?
23     A.  This is three different cohorts,
24 and the three different cohorts all have three

1  different methodologies associated with them.
2      My concerns about the Agricultural
3  Health Study have already been made quite
4  clear.  And that still holds here because
5  they're still using the imputed exposures and
6  all the other things that I have said -- have
7  concerns about the Agricultural Health Study.
8      The AGRICOH study, I think that's
9  the French study -- I have to look at it.  Oh,
10 no, that's the consortium itself.  The French
11 study is AGRICAN?
12     Q.  AGRICAN is the French study.
13     A.  Yeah.
14     Q.  CNAP is the Norwegian study.
15     A.  The AGRICAN study is small relative
16 to the other two in terms of person-years at
17 risk.  It skips over dates.  You know, it's got
18 a little bit of data here and a little bit of
19 data here, and it really probably didn't play
20 much of a role in their overall conclusions
21 here because of its size.  But it certainly has
22 some limitations by itself.
23     The biggest piece of this is the
24 CNAP study, which is the Norwegian cohort

1  study, and I did spend some time looking into
2  the methodology used in the Norwegian study.
3  There's a number of publications on the
4  exposure methods they've used and other things.
5  I think we've included all of that in my
6  reliance list.
7      It's not an exposure study.  Let's
8  be clear what the Norwegian study is.  The
9  Norwegian study is a study of what farmers
10 grow.  And the actual relationship they get
11 from that is a relationship to what they grow
12 and cancer.
13     The fact that the "what they grow,"
14 they then associate it with this official list
15 of which pesticides can be used on which crops
16 in Norway, is the way they create an exposure
17 metric.  And that has some concern for exposure
18 misclassification, potentially differential,
19 but I can't tell you either way.  But it
20 clearly raises concerns about exposure
21 misclassification in this study because just
22 because a farmer grows a specific crop doesn't
23 mean they use that -- a specific pesticide
24 that's allowed for that crop.  And so that

Christopher J. Portier, Ph.D

Page 106

1  could create some problems in that dataset.
2       Pulling them all together was a
3  massive amount of work, and I certainly salute
4  them for doing that.  I look forward to getting
5  more detail into how they did it and pulled it
6  together.  It's not all in here.  But that's
7  most I have to say about it.
8       Q.  Okay.  Within the world of
9  epidemiology, have you ever heard the phrase,
10  garbage in, garbage out?
11       A.  That's used in everything.  GIGO.
12  That's quite common.  I do not believe this is
13  a garbage in, garbage out paper.
14       Q.  Okay.
15       A.  The Norwegian cohort has to be
16  looked at more carefully before you can say
17  anything about how much influence this paper
18  should have on your understanding of the
19  epidemiology.
20       I'm satisfied enough with the paper
21  that it's as good as the cohort -- the case
22  control studies.  It probably brings in about
23  the same level of information.  It's not like
24  the last version of the Agricultural Health

Page 107

1  Study, which I'm not sure was of any use.  But
2  it is -- it does bring some weight.
3       Q.  Does it change your -- I know
4  you've been asked ad nauseam about your views
5  of epidemiology.  Does this paper in any way
6  change your opinions about the epidemiology
7  relating to glyphosate?
8       A.  I would still call the
9  epidemiology -- an association exists.
10  Causality is credible, but I can't rule out
11  bias, confounding, or other issues that keep me
12  from going full causation with the epidemiology
13  data.
14       Q.  Does this paper make it, based
15  on -- and we can look in a moment at the hazard
16  ratio for glyphosate and NHL, but does this
17  paper, in your opinion, draw more into question
18  whether there's an association between
19  glyphosate and NHL?
20       MS. GREENWALD:  Objection, form.
21       A.  No.
22       Q.  Why not?
23       A.  Partially, because I haven't seen
24  it -- so there's NHL, and then there's DBL --

Page 108

1       Q.  DOBCL [sic].
2       A.  DOBCL [sic].  I have some questions
3  about this paper with regard to that.  DLBCL --
4  I can never remember those letters -- is the
5  substantial portion of NHL.  It's the biggest
6  piece of NHL.
7       I find the numbers unusual, that
8  they see no increased relative risk with NHL
9  but they see a significant increased relative
10  risk with DLBCL.  It's a concern I don't
11  under -- it's something I don't understand from
12  the paper.  And that's something I would like
13  to know more about.
14       So it doesn't subtract; it adds
15  maybe some power to the statement.  But it
16  certainly doesn't change my mind at all about
17  the epidemiology evidence.
18       Q.  If a patient had a non-Hodgkin's
19  lymphoma other than DLBCL, would you -- with
20  respect to -- I know you're not offering
21  specific causation opinions, but with respect
22  to non-DLBCL cases of non-Hodgkin's lymphoma,
23  would it -- does this paper cause you to
24  further question whether there's an

Page 109

1  between those forms of NHL and glyphosate?
2       MS. GREENWALD:  Objection to form.
3       A.  So to be fair, I always question
4  whether there's an association.  Every time
5  there's a new paper coming out, that's the only
6  way to approach it in an objective fashion.
7       My conclusion from seeing this
8  paper is that it doesn't change my opinion
9  about NHL, nor does it change my opinion about
10  DLBCL in terms of whether I believe that's
11  stronger than NHL as a total category or not.
12  I think it's still exactly where it was before.
13  There's clearly an association; it's clearly
14  credibly causal.
15       But there's not enough evidence
16  here for me to ignore all the animal data and
17  everything else, just ignore it and say, from
18  the epidemiology, I believe this clearly causes
19  NHL.  I'm not there with the epi, and this
20  hasn't changed that.  But it certainly hasn't
21  moved me to the point where I'm saying, I think
22  the epi is inadequate, or, I just don't see
23  anything there.  I'm certainly not there.  I'm
24  clearly where I've stated it all along, there

Christopher J. Portier, Ph.D

Page 110

1  is clearly an association.
2      Q.  So you've testified previously that
3  the epidemiology alone is insufficient for you
4  to say there's association between NHL and
5  glyphosate.  Is that fair?
6      A.  No, that's not fair.  It's not
7  enough to say there is a causal association
8  between glyphosate and NHL all on its own.
9      Q.  Thank you for that clarification.
10         This paper, one way or the other,
11  doesn't change your view that the epidemiology
12  alone is not enough to say that there is a
13  causal association between NHL and glyphosate?
14         MS. GREENWALD:  Objection, form.
15      Q.  I can ask it again.  How about I
16  ask a different question.
17      A.  Okay.
18      Q.  The video will demonstrate that
19  that question was a poor one.
20         Your opinion that the epidemiology
21  alone is not enough to say there is a causal
22  association between NHL and glyphosate is not
23  changed by the Leon paper.  Is that fair?
24      A.  That is correct.  I have to find my

Page 111

1  opinion in there.  It's -- it was hard to find
2  it.
3      Q.  That's fair enough.  I could have
4  tried it a third -- I don't mind trying it
5  three times.  It's helpful for you to have the
6  realtime.
7         Now, with respect to this Leon
8  paper, which we're almost done with -- and I
9  know you have criticisms of the Andreotti paper
10  that you just mentioned, but did you assess how
11  the Leon authors excluded some of the AHS
12  patients from this paper?
13      A.  Just in what they've written.
14      Q.  Right.  And so if you turn to page
15  12 of the paper.
16      A.  Okay.
17      Q.  Sorry.  If you look at the bottom
18  column on the left, continuing up to the top of
19  the right, I don't need to read all of it, but
20  do you recall reviewing that discussion of
21  excluding certain patients that were studied in
22  the AHS publication, the 2000 -- we're talking
23  about the latter, the Andreotti -- AHS
24  publication?

Page 112

1      A.  Yes, I remember reading this.
2      Q.  And do you -- I know it would be
3  some speculation, but do you agree that had all
4  of the patients from the AHS publication been
5  included in the Leon paper, the DLBCL and,
6  frankly, the NHL results may have been
7  different?
8         MS. GREENWALD:  Objection, form.
9      A.  No basis for me to draw that
10  conclusion.
11      Q.  You just don't know one way or the
12  other?
13      A.  Don't know one way or the other.
14      Q.  Okay.  It's certainly possible that
15  the DLBCL results would have either been lower
16  or not statistically significant had all of the
17  AHS patients been included?
18         MS. GREENWALD:  Objection, form.
19      A.  Or higher'd [sic] or unchanged --
20  or higher or unchanged.  It could be anything.
21      Q.  Now, your -- when I asked you for
22  criticisms of the methodology in Leon, you --
23  understanding you don't think this is garbage
24  in, garbage out -- talked about a few things.

Page 113

1  One was that the three studies that were pooled
2  together here had different methodologies.  Is
3  that a limitation of this paper?
4      A.  Yes.
5      Q.  Is that -- would that be a
6  limitation of any meta -- pooled analysis where
7  studies with different methodologies are pooled
8  together?
9      A.  Usually you would be concerned
10  about it.  You would spend time thinking about
11  the implications of it.
12      Q.  And also, if, you know, any other
13  study, say Zhang, that included AHS data, at
14  least in part, your concerns about the
15  underlying flaws of AHS would apply equally
16  there.  Is that fair?
17      A.  Zhang's a special case.  It's a
18  very good question, and it's one I'm surprised
19  I wasn't asked by you guys before.  But Zhang
20  is a very special case.
21      Q.  Just -- are we talking about Chang
22  or Zhang?
23      A.  Zhang.  It's Zhang.  I always say
24  "chaing."

Christopher J. Portier, Ph.D

Page 114

1  They used, if I remember correctly,
2  20-year lag data. And by using 20-year lag
3  data, the problem that occurs with the making
4  up of the doses, the exposures, isn't a
5  problem, okay? So it's an interesting
6  quandary. They used the only part of the data
7  that is extraordinarily clear in terms of how
8  you got it because that's basically the
9  original exposure information they asked
10  people, and that's all they're using, and just
11  looking into the future. And that's a common
12  thing in epidemiology.
13  Now, what that doesn't give you is
14  all the other cases that occurred later on that
15  might be very important in this. It requires
16  the concept that it's at least 20 years before
17  you see the cancers, and any other cancer that
18  occurs in less than 20 years of exposure is not
19  due to glyphosate. That's an assumption of
20  that analysis. So that would be a criticism.
21  But the other criticism I have from
22  the Andreotti study about the exposures and
23  about other issues like that don't apply in
24  that case. Because they're the original

Page 116

1  it's documented, and you see it. And it's --
2  it's almost likely to be differential.
3  Whereas the stuff at the beginning
4  is more like, I forget something. I don't know
5  whether I did this or didn't do this. And so
6  that's going to be equal between controls and
7  exposed. And so that's nondifferential. It's
8  probably going to lower the relative risk, but
9  not like a differential would.
10  Q. Are you aware that in the Andreotti
11  study, they also -- they excluded -- they did a
12  statistical analysis excluding the 30-some --
13  you said 20 percent, but I think it was
14  actually 30-some percent who didn't fill out
15  the second questionnaire -- and came up with
16  very similar results?
17  MS. GREENWALD: Objection, form.
18  A. It was 37 percent, and the 20
19  percent were holdouts for the permutation --
20  for the --
21  Q. Imputation?
22  A. Imputation, excuse me, for the
23  imputation. So that's where the 20 percent
24  was. It's 37 percent.

Page 115

1  exposures, you're not -- you don't have to
2  guess at what people were exposed to; you're
3  using what they told you from the original
4  questionnaire.
5  Q. And so you don't have any -- your
6  misclassification criticism of AHS isn't based
7  on what people reported when they originally
8  filled out the questionnaire. Is that --
9  A. That's -- I mean, there's still
10  some possibility of misclassification there,
11  but it's not going to be differential. The
12  problem is -- with the permuted data is that it
13  appears to be differential because when they
14  test it against the 20 percent holdouts where
15  they went back and tried to predict, they
16  predicted a whole bunch of people who said they
17  were exposed as being non-exposed. So that
18  moves people from the exposed category to the
19  non-exposed category.
20  And if that includes people who
21  have NHL in making that move, you've now caused
22  a differential exposure misclassification and
23  you've pushed down the relative risk. And
24  that's a serious concern with that study, and

Page 117

1  And yes, I did finally see that
2  analysis. It appeared in the response they had
3  to Sheppard's criticism of their study. That
4  response was odd, in the least, for some of the
5  things they said.
6  But let's see what it showed us.
7  What it showed us was exactly what I'm saying.
8  The relative risk went from way negative to
9  just about 1. So from being highly below 1,
10  almost significant, to being actually right on
11  1. So you're seeing exactly what I expected to
12  see. They are potentially having some
13  differential exposure misclassification.
14  The fact that it's still a 1 still
15  leaves us with the problem that Aaron Blair
16  pointed out about the impact of the exposure
17  misclassification in this type of study. And
18  he pointed out that if the relative risks are
19  small, meaning less than 2, he showed quite
20  clearly that in this study, you're going to
21  likely to get a null effect. And that's still
22  a problem here.
23  So in this case, in that study,
24  Blair's work suggested that no matter what you

Page 118

1 start with, you're likely to see nothing
2 significant because of this problem that he
3 pointed out.
4    Q.  And you're talking about the
5 published paper that Dr. Blair published --
6    A.  Yes.
7    Q.  -- with respect to AHS?
8    A.  With respect to AHS and
9 specifically with respect to the follow-up
10 study and the exposure misclassification that
11 is in -- likely to be in the follow-up study.
12    Q.  I know we talked before about
13 scientists.  Have you had any communications
14 with Dr. Blair in the past, say, two years?
15    A.  Not even in the past five years.
16 It's been a long time since I've talked to
17 Aaron.
18    Q.  And so going back to where we
19 started on this issue of Zhang, is it -- are
20 you saying that you don't have concerns about
21 Zhang's inclusion of AHS in her -- and we'll
22 talk more about Zhang, but in that paper?
23    A.  I -- certainly less than if they'd
24 have focused their meta-analysis on

Page 119

1 exposed/non-exposed.  Because they focused it
2 on this most highly exposed group with the
3 longest lag time, I don't have the same
4 criticisms.  I have concerns about that focus
5 and that study, but nonetheless, there's
6 nothing technically wrong in what they did.
7        MR. STEKLOFF:  We'll talk about
8    criticisms of Zhang later.
9        Okay.  All right.  Turning to a new
10    article.  Marking as Exhibit 3 the 2009
11    Bolognesi paper.
12        (Exhibit Portier-3 marked for
13    identification and attached to the
14    transcript.)
15 BY MR. STEKLOFF:
16    Q.  And I know you've testified about
17 this study.
18    A.  Yes.
19    Q.  So one of the opinions that I think
20 you've offered about this study is that it
21 shows a significant increase in genotoxicity --
22 I'm using genotoxicity -- I'll start over.
23        One of the opinions that I think
24 you've offered about this is that it shows a

Page 120

1 significant increase in genotoxicity
2 post-spraying compared to pre-spraying.  Is
3 that fair?
4    A.  That is correct.
5    Q.  And do you recall what the authors
6 of this paper said -- what the authors of this
7 paper said about whether that change was --
8 remained consistent?
9    A.  It differed from my opinion.  That
10 much I remember.
11    Q.  Okay.
12    A.  I can't tell you exactly what their
13 opinion was in words.  But it differed from
14 mine.
15    Q.  And what is the basis -- you know,
16 what -- given that you weren't involved in the
17 Bolognesi paper, what is the basis for you to
18 have different opinions about the consistency
19 of the genotoxicity changes in the patients
20 that were being studied in this paper?
21        MS. GREENWALD:  Objection, form.
22    A.  It will take me a minute because I
23 will have to find the part now where they
24 exactly come to their conclusion.  I'm not sure

Page 121

1 we differ --
2    Q.  Please take your time.
3    A.  I'm not sure we differ as much as
4 this is indicating.
5    Q.  I mean, I'll just show you, and I
6 realize this is the abstract at the front, but
7 on the first page, if you look at the end of
8 the abstract, it says overall, data suggest
9 that the genotoxic damage associated with
10 glyphosate -- I'm paraphrasing a little bit --
11 is small and appears to be transient.
12        And I think you may have different
13 opinions about that.  And I'm not trying to
14 limit you from looking at the rest of the
15 paper.  But I think that --
16    A.  You know what?
17    Q.  What?
18    A.  If that's the opinion you're asking
19 about, I might differ on the "small," but of
20 course it's transient.  DNA damage in blood,
21 which is what they were marking, is almost
22 always transient because blood is turned over,
23 over time.  And it's simply an indication of
24 DNA damage that is probably occurring at other

Christopher J. Portier, Ph.D

Page 122

1 points in the body, which is more important
2 than the DNA damage in the blood itself.
3 That's a biomarker; it's not necessarily the
4 cause in and of itself.
5        The cause for NHL is almost
6 likely -- is most likely to occur very early in
7 hematopoiesis when you still have stem cells.
8 The blood that you're measuring is all
9 differentiated cells.  So it's a biomarker.
10 You can't really get at the thing you're
11 interested in.  But it is transient because the
12 blood is turned over.
13     Q.  Okay.  So you don't disagree with
14 that statement that's at -- it's in the
15 underlying paper, too -- but that's at the end
16 of the abstract on page 986?
17     A.  Except for the word "small."
18 "Small" is a term that is relative, and it's
19 small relative to what?
20        If you look at the paper itself,
21 they did an ecological test -- an ecological
22 evaluation, and they did this before and after
23 evaluation.  The ecological evaluation, which
24 is the weaker of the two, the change is small

Page 123

1 and barely or even not, if I remember,
2 statistically significant.  I'd have to go look
3 at that.
4        But for the before and after, it's
5 statically significant.  It's quite clearly
6 statically significant.  So it's not small by
7 relative statistical terms.
8        So I don't agree with the word
9 "small."
10     Q.  Okay.  Do you recall that the -- so
11 do you recall, just as a -- more to preface my
12 questions, that there were five different
13 locations that were studied for the paper?
14     A.  Yes, I do.
15     Q.  And that the highest frequency of
16 the cell damage that the authors were looking
17 at, which was BNMN, was in an area where there
18 was no spraying of glyphosate at all?
19     A.  That is not correct.
20     Q.  Okay.  Tell me why that's not
21 correct.
22     A.  It just isn't.  You have to show me
23 where in the paper you see that particular
24 finding.

Page 124

1     Q.  Okay.  So let's look at page 986 on
2 the front.
3        (Reporter interruption.)
4     Q.  And again, Dr. Portier, of course
5 you should feel free -- and I will try to help
6 point you to places as well, but I'm not trying
7 to restrict you to just looking at page 986.
8 But if you look in that first column of the
9 abstract on the left, about two-thirds down, it
10 says, The highest frequency of BNMN was in
11 Boyac?, where no aerial eradication spraying of
12 glyphosate was conducted, and in Valle del
13 Cauca, where glyphosate was used for maturation
14 of sugarcane.
15        So do you see that?
16     A.  I do.
17     Q.  And so you said to me that -- you
18 told me before what I said wasn't correct.  So
19 can you explain why you think what I said
20 wasn't correct?
21     A.  I'm sorry, I missed the word
22 "aerial."  Boyac? had exposure.  It was -- they
23 were doing it by hand, walking in the fields.
24 You'd expect, in fact, the highest exposure to

Page 125

1 be in the place where people were walking
2 through the fields spraying with a hand sprayer
3 instead of aerial spraying, if you measured
4 those people.  That's not explained in here,
5 and I don't know if they measured those people,
6 or people nearby.
7        But there was obvious exposure in
8 the Boyac? population from spraying, even
9 though it was sprayed by hand, and the biggest
10 exposure may or may not have been aerial.
11 They're assuming aerial was the biggest source,
12 but it may be people walking through the
13 fields, may be runoff onto crops that they're
14 actually eating.  There's any number of ways in
15 which people who live near this spraying could
16 have gotten those micronuclei or other types of
17 DNA damage.
18        So yes, now I see it, yes, that
19 statement is correct.
20     Q.  Okay.  But you're also spec -- when
21 you say that other people may have had the
22 highest exposure based on what they were eating
23 or runoff on the crops, I mean, you're also
24 speculating when you say that too, right?

Christopher J. Portier, Ph.D

Page 126

1      MS. GREENWALD: Objection, form.
2      A.   Correct.  They did not follow
3 people to see if they went in the fields
4 afterwards or not.  They did not follow the
5 spraying or the runoff from the spraying to see
6 if it went into people's food or water or
7 whatever.  All they have is, you're close; we
8 sprayed; we measured you before; we measured
9 you after.  That's all they've got.  It's a
10 natural experiment.  But they did not follow on
11 the -- up on the pathways of exposure.
12     Q.   Okay.  And can you please turn to
13 page -- to Table 4 on page 993.  And are you
14 familiar with this table?
15     A.   Yes.
16     Q.   And these are three areas where
17 there was aerial spraying, correct?
18     A.   I have to look at the last table to
19 make sure.  Yes.
20     Q.   You can look -- and it's in the
21 description of the table: Self-reported
22 exposures to the glyphosate spray in three
23 areas where aerial application had occurred,
24 correct?

Page 127

1      A.   Correct.
2      Q.   They did a second sampling where
3 they went and took blood samples from the
4 patients in those three areas, correct?
5      A.   That is correct.
6      Q.   And if you look at the bottom row,
7 p-value, no exposure versus any exposure, do
8 you see that?
9      A.   Meaning their reported -- it's --
10 but yes, by that classification, what they mean
11 by "no exposure" or "any exposure," yes, I see
12 it.
13     Q.   And what is your understanding of
14 what they mean by "no exposure" versus "any
15 exposure"?
16     A.   It depends on what people said.
17     I didn't go in the field; I didn't
18 feel the spray.  That's their "no exposure" --
19     Q.   Okay.
20     A.   -- versus their "exposure" is, I
21 saw the spray; I felt it on my skin; I entered
22 the field.
23     Q.   Okay.  And do you agree that in all
24 three populations, those results were not

Page 128

1 statistically significant?
2      A.   Yes.  But those results were taken
3 several months afterwards, if I remember
4 correctly.  I'd have to go find it.  And again,
5 because of the turnover that occurs with blood
6 and hematopoiesis, you would have less ability
7 to detect something that was there because it
8 would have cleared.
9      Q.   So in other words, you're not --
10 because of the time lapse, the
11 non-statistically significant results don't
12 surprise you?
13     A.   Two things make it not surprising
14 to me.  First is that it was later, and you're
15 going to have less and less to look at.
16     And the second thing is that they
17 still didn't do a full exposure -- they're --
18 this is a partial exposure classification.  It
19 does not take into account food, ingested, in
20 the local area.  And so you're still left with
21 not exactly certain that this is the best
22 exposure metrics that they could come up with.
23     This is arguing there's no
24 dose-response.  That's what it's doing is what

Page 129

1 you're saying.
2      Q.   Right.
3      A.   And I'm saying, it's marginally
4 that.
5      Q.   Marginally, this paper shows no
6 dose-response?
7      A.   Correct, marginally --
8      Q.   How would they --
9      A.   -- because they did not take into
10 account food.
11     Q.   So you agree -- when you say
12 "marginally," I just want to clarify what you
13 mean.  You agree this paper showed no
14 dose-response, but you just put a marginal
15 value on it because they didn't take into
16 account food?
17     MS. GREENWALD: Objection, form.
18     A.   I give this part of this study a
19 low rate, partially because it's not as good as
20 the before-and-after in terms of just overall
21 clarity of understanding of what you're seeing
22 with the data, and because the exposure
23 classifications here versus non-exposed are
24 potentially wrong.  I think many of the

Christopher J. Portier, Ph.D

1 non-exposed were actually exposed and just
2 didn't answer the question because they just
3 didn't know they were exposed.
4     Q.  And exposed -- when you say they
5 were exposed, they were exposed through food?
6     A.  Or other routes -- water, food.
7 They didn't feel the spray on their skin, so
8 they didn't think they got it on their skin,
9 but they could well have.  Any number of
10 things.  The spray was on the leaves in their
11 back yard, and they went to cut the trees down
12 or to pick fruit off their own trees.  There's
13 any number of ways in which exposure can occur.
14         And so I have to be somewhat --
15 okay, it shows a negative result, fine.  But
16 that's as far as it goes.  It's certainly not
17 definitive.
18     Q.  And do you have any way of
19 assessing the potential level of exposure
20 through these other routes like food and water
21 as compared to direct spraying?
22     A.  Not in this population from this
23 study, no.
24     Q.  But even more generally, I mean, do

1 you have any -- put aside this study.  Do you
2 have any way of assessing the exposure through
3 food as compared to exposure through spraying?
4 I mean, my understanding is that some experts
5 for the plaintiffs think that the key way for
6 exposure is through the skin.  So, I mean,
7 you're just speculating about the exposure
8 associated through food?
9         MS. GREENWALD:  Objection, form.
10     A.  It depends on the population you're
11 talking about.  If I were in the -- if this
12 study were in the United States, and we're
13 talking about aerial spraying in the United
14 States of fields, and we're looking at a
15 community that's within half a mile of the
16 field, quarter of a mile of the field, there
17 are ways for me to go in and figure out exactly
18 what they're being exposed to.
19         But U.S. communities are very
20 different than these communities, and I don't
21 understand these communities enough to go
22 either way.  I don't know where their water
23 supply comes from.  I would in the U.S.  I
24 could tell you exactly because I'd figure --

1 I'd know.  You'd figure it out.  I don't know
2 that here.
3         So there's many things I don't know
4 here that could play an important role in who's
5 exposed and who's not.  In these -- but in the
6 U.S., on the other hand, I can see where some
7 experts might argue aerial spraying is the
8 biggest -- skin is the biggest source of
9 exposure because in the U.S., we don't go into
10 fields after they've been sprayed and steal
11 fruit or sugarcane or anything like that.  We
12 would get shot, more likely than not.  But it's
13 a different culture, a different place.  I
14 can't -- they just aren't comparable.
15     Q.  So you're -- but you agree with me,
16 you were speculating on whether, to use your
17 word, the population in this study was stealing
18 food or sugarcane in the fields, and what their
19 water sources may have been, and then what the
20 glyphosate levels may have been in any of that
21 food, sugarcane, or water?
22         MS. GREENWALD:  Objection, form,
23     asked and answered.
24     A.  I'm saying that the table you're

1 looking at, Table 4, carries less weight
2 because I don't believe the categories of
3 exposure were studied well enough and carefully
4 enough to convince me that there's nothing
5 there, and that it was a long time later so it
6 has low statistical power of being able to
7 detect any effect.  That's what I'm telling you
8 about that table.
9     Q.  Okay.
10     A.  And I'm not speculating; I'm
11 telling you the things that might be there that
12 would concern me if they're not discussed.  I
13 can't say that they really happened.  All I can
14 say is, I'd like to have seen some at least
15 discussion of these things.
16     Q.  And how at all, based on what you
17 just testified to, would it impact you, I mean,
18 had the authors done the second sampling
19 immediately after the initial sampling?  Would
20 that change your concerns at all?
21     A.  The initial or the second sample?
22     Q.  The second sample.
23     A.  After the spraying?
24     Q.  Let's say that it happened right

Christopher J. Portier, Ph.D

Page 134

1 after the -- right immediately after the
2 spraying, would that change your concerns about
3 Table 4 at all?
4      A.  Only, again, half of it because I'd
5 still have the problem with exposures.  And I
6 still don't think that's as good of a picture
7 as the before and after the spraying.  I think
8 the before-and-after spraying is the most
9 definitive piece of this work.  That's what
10 makes it -- that's what gives it the strongest
11 weight from this paper.
12      Q.  And the key is that the "after
13 spraying" occurred immediately after --
14 immediately after spraying?
15      A.  Within a few days.  But it's the
16 fact that you -- it's the same person.  I'm
17 comparing person to person.
18         Here, in the analysis you're
19 looking at there, I'm -- here I'm comparing my
20 before to my after.  So I don't have to worry
21 about population variability.  It's --
22 individual variability is the only thing that
23 matters in that evaluation.  So if I was eating
24 bananas before, I'm eating bananas afterwards.

Page 135

1 If I was drinking water from here before, I'm
2 drinking water from here afterwards.  So
3 nothing changes that within a community and
4 within a person.
5         But in what you're looking at here,
6 you're comparing from one person to the next.
7 You don't know their characteristics; you don't
8 know where they've been; you don't know how
9 accurately they can answer this exposure
10 question.  You're asking them.  And none of
11 that's documented or discussed.  So it carries
12 less weight than that before-and-after.
13      Q.  Right.  But we agree all these
14 studies could be done -- I mean, there's no
15 perfect way to do any of the studies that we're
16 talking about, right?
17      A.  Well, there's better ways.
18      Q.  And I guess my question with
19 Table 4 is, it's still an important
20 consideration to look at the "no exposure"
21 versus "any exposure," correct?
22         MS. GREENWALD:  Objection, form.
23      A.  That would be an important
24 consideration if you had a good measure of no

Page 136

1 exposure.  That's very, very important.
2      Q.  And understanding that that's half
3 of your concern, if the second sampling
4 occurred immediately after spraying, you would
5 put more weight on Table 4.  Is that fair?
6      A.  I would -- it would alleviate some
7 of the loss of weight, yes.  I'd still -- I'd
8 consider it.
9      Q.  Okay.  And so if you now look at
10 page 994, in the right-hand column, three
11 paragraphs down they talk about, The frequency
12 of BNMN increased after spraying of glyphosate
13 but not consistency -- not consistently.  The
14 results obtained with a second sampling,
15 carried out immediately after the glyphosate
16 spraying, showed a statistically significant
17 increase in frequency of BNMN -- it goes on.
18         Does that tell you that the second
19 sampling actually occurred immediately after
20 spraying like the first sampling?  And then
21 it -- well, I'll stop there.
22         If you go to -- I guess if you go
23 down to the next paragraph, it talks about a
24 third sampling occurring fourth months after.

Page 137

1 So I'm now trying to show you, Dr. Portier, if
2 you agree, based on the study, that the second
3 sampling being assessed in Table 4 actually did
4 occur immediately after spraying.
5         And you can tell me if you disagree
6 with that statement.
7      A.  Yeah, that problem doesn't exist.
8 That's why I said I believe --
9      Q.  So you still have some concerns
10 about Table 4.  You would put more weight on
11 Table 4 than when we started this discussion?
12      A.  Yeah, but it's not going to change
13 my mind about this paper.
14      Q.  Understood.  I didn't think
15 anything would change your mind about this
16 paper.
17      A.  Again, the driving force in this
18 paper is the before and after.
19      Q.  Okay.  Do you have -- shifting away
20 from Bolognesi, do you -- you know, if someone
21 asked you if you had to say what the -- based
22 on the epidemiology what the relative risk is
23 or the hazard ratio is between glyphosate and
24 non-Hodgkin's lymphoma, would you be able to

Page 138

1  give a number or give a range?
2         MS. GREENWALD: Objection, form.
3      A.  For a given exposure in a general
4  population?
5      Q.  Just based on the epidemiology. So
6  whatever exposure is occurring in the farmers
7  being studied across the epidemiology,
8  factoring in the meta-analyses and the pooled
9  analyses and everything that you've reviewed,
10  if you had to give me a number, 1.3, 1.4, 2.0,
11  would you be able to pinpoint or even give a
12  range of a number?
13         MS. GREENWALD: Objection, form.
14      A.  I understand the question. That's
15  not the way it would be presented.
16      Q.  Okay.
17      A.  Okay? It's -- in a population risk
18  assessment, not an individual person risk
19  assessment, because that's not my area, but in
20  a population-based risk assessment, you would
21  be calculating it for the population. If on
22  average the population has an exposure of this,
23  then on average you would expect to see this
24  fraction of the population getting this

Page 139

1  disease. That's the way it would be
2  calculated.
3      Q.  And are you able to give a -- your
4  best estimate of the hazard ratio for that --
5  with that -- you know, with that definition?
6  If on average -- in the epidemiology, if you
7  take the -- if on average that population, all
8  of the farmers being studied in Sweden and
9  Canada and the U.S., their exposure, the
10  increased risk for developing non-Hodgkin's
11  lymphoma would be X, are you able to tell me
12  what X is?
13      A.  I could if I spent enough time and
14  effort to try to do it. It's not a trivial
15  exercise to be able to do that, and I'm not
16  sure I would have enough information from the
17  epi studies to do it. Because they have to
18  give you that rate per unit exposure in the epi
19  studies, and sometimes they're just not giving
20  you that. There's a "exposed" or "not."
21         That's not enough. I have to know
22  sort of dose-response from that study to be
23  able to do this, and it has to be dose-response
24  in an understandable way for a population risk

Page 140

1  assessment, 2 days to 10 days.
2         That's not what you're asking me
3  for. You're asking me for a quantity of
4  exposure versus risk. And I'm not sure it's
5  going to be there. But it's not a trivial
6  exercise. I'd have to really sit down and work
7  hard to do it.
8      Q.  Okay. So sitting here today, you
9  can't give a best estimate?
10      A.  Oh, definitely not.
11      Q.  And if you did -- so now in the
12  hypothetical in which you went and did this,
13  and I'm not asking you to go do it, you would
14  want to use adjusted numbers from the
15  epidemiology, correct?
16      A.  First and foremost, I have to find
17  a study that gives me dose and hazard ratio.
18  That's number one. That I have to have.
19         Barring that, I don't care if the
20  study corrected for anything or didn't correct
21  for anything. Without that, there's nothing I
22  can do with the epi. So that's my first
23  concern.
24         And I'm afraid as I think through

Page 141

1  the epi studies, that's probably where I would
2  be lost in trying to do that myself for a
3  population basis.
4         Given I have that, which I don't
5  think I do, the next is, I would hope that I
6  would have it corrected -- now, even if they
7  did that, that doesn't mean they necessarily
8  gave me the beta value, the slope value from
9  their regression. If they don't give me that,
10  even though they did it, I'm still at a loss to
11  be able to do this. It's very complicated.
12      Q.  Fair enough. That's why I'm not an
13  epidemiologist or a biostatistician.
14         And so do you -- if you took any --
15  you're familiar with attributable risk,
16  correct?
17      A.  Yes.
18      Q.  And would you put any value on
19  attributable risk associated with any hazard
20  ratio and any of the epidemiology that you've
21  reviewed?
22         MS. GREENWALD: Objection, form.
23      A.  I certainly could, yes.
24  Attributable fraction or attributable risk, as

Christopher J. Portier, Ph.D

Page 142

1 it -- typically it's called attributable
2 fraction, certainly can be calculated for
3 exposure/no exposure.  But that's not what you
4 were asking me before.  It's a different case.
5      Q.  Right.  Understood.  I understand.
6 Okay.  So let's talk about --
7           MR. STEKLOFF:  How long have we
8      been going?  We're at 11:55.  We've been
9      going a little over an hour.  I'm going
10     to turn to Zhang.  So I'm happy to go
11     forward or see if you want a break or
12     see when you want to break for lunch.
13     So we can go off -- okay, so let's go
14     off the record.
15          VIDEO OPERATOR:  We are now going
16     off the video record.  The time is
17     11:56.
18          (Recess from 11:56 a.m. until
19     12:14 p.m.)
20          VIDEO OPERATOR:  We are now going
21     back on the video record.  The time is
22     12:14.
23 BY MR. STEKLOFF:
24     Q.  Dr. Portier, I want to turn to the

Page 143

1 Zhang, with a Z, study.  And I know you're
2 familiar with that study.  Can you tell me on a
3 high level what your criticisms, if any, are of
4 that study?
5           MS. GREENWALD:  Objection, form.
6      A.  That are different than the
7 criticisms I've already given about the
8 individual studies that go into that, are there
9 any differences?
10     It is an unusual piece of work in
11 the sense that they went for the highest
12 exposure only and didn't do other evaluations
13 in there.  That would probably be my biggest
14 criticism.
15     Q.  What about the fact that they take,
16 for example, never/ever studies and then pooled
17 the results with the dose-response studies?  Is
18 that a methodological concern?
19     A.  It falls in the same category as
20 the first statement.  It's -- you tend to want
21 to do a sensitivity analysis when you do a
22 meta-analysis.  You look to see how sensitive
23 the analysis is to what you've included and
24 excluded.

Page 144

1      They did some of that and looked at
2 that.  But I would have -- like anything else,
3 I would have liked to see something as broad as
4 what was done by Delzell and -- what's her
5 name --
6      Q.  Chang and Delzell?
7      A.  Chang and Delzell, where they
8 really went after all of the data and looked at
9 it.
10     On the other hand, they brought in
11 the animal data, which --
12          (Reporter interruption.)
13     A.  They brought in the animal data,
14 which the others have never done in their
15 meta-analysis and discussions, and that's a
16 nice piece of work.
17     Q.  And when -- well, I have a couple
18 of questions -- follow-up questions on what
19 you've discussed.  Would you put Zhang in the
20 category of garbage in, garbage out?
21          MS. GREENWALD:  Objection to form.
22     A.  No.
23     Q.  But you -- any criticisms that you
24 have to the underlying studies -- I'm just

Page 145

1 picking one, McDuffie -- would apply equally to
2 then using that data in Zhang?
3      A.  Yes.
4      Q.  And --
5      A.  With some reservations.  Again, it
6 depends what my criticism was.  It's like what
7 I said with the Andreotti study.  They chose
8 the one group in the Andreotti study that I
9 might be very comfortable with because of the
10 way it's created.
11     Q.  Understood.  And then when you talk
12 about the fact that they brought in animal
13 data, I mean, you agree they didn't do any
14 statistical analysis of the animal data.
15 You're just commenting on the fact that they
16 acknowledge the animal data in their
17 discussion?
18     A.  Correct.  But they did a good job
19 of looking at the literature on malignant
20 lymphoma in mice and talking about its linkage
21 to NHL, B-cell lymphomas.  I thought that was
22 fairly well thought through.
23     Q.  But that doesn't change any
24 independent criticisms you may have of the

1 statistical analysis of the pooled data that
2 they put together?
3      MS. GREENWALD: Objection, form.
4    A.  I don't have the statistical
5 concern about that.  They just -- I mean,
6 that -- statistical mean, that's just a method.
7 The thing about a meta-analysis is what you
8 choose to pool.  That's always the question.
9      And this one was unusual.  I don't
10 see anything blatantly wrong with it, but it is
11 unusual.
12    Q.  And I asked a poor question there.
13 The fact that they have a -- what you described
14 as a good -- good job of discussing the animal
15 data, that doesn't change any independent
16 criticism you may have of the methodological
17 process through which they pooled data?
18    A.  Correct.
19      (Exhibit Portier-4 marked for
20      identification and attached to the
21      transcript.)
22      MR. STEKLOFF:  I will hand you a
23      copy of the Zhang study.
24      Do you want a copy, Robin?

1      MS. GREENWALD:  I didn't bring one,
2      so I might as well look at it.
3      MR. STEKLOFF:  All right.  We have
4      it for you, so...
5 BY MR. STEKLOFF:
6    Q.  One other -- before we go into
7 the -- we won't go too far into the weeds of
8 the Zhang study, but is it fair to say that you
9 would put more weight on Chang and Delzell than
10 Zhang?
11    A.  No.  I would -- their -- they --
12 what Zhang did, they did not do.  She's got
13 Andreotti in there; they didn't.  So they both
14 carried some weight.
15    Q.  Okay.  Neither changed your opinion
16 that the epidemiology of glyphosate alone is
17 not sufficient to show a causal association?
18      MS. GREENWALD:  Objection, form.
19    A.  Rather than agreeing to the words
20 that are put in my mouth on the -- what my
21 thing is, I'll just say it again.  It does not
22 change my opinion of the epidemiology data,
23 period.
24    Q.  I don't think I could put any words

1 in your mouth, Dr. Portier, because you're very
2 good at correcting any words.  So I'm not --
3 that is not my goal here.
4    A.  Yeah, I know, I'm sorry.  I just --
5 I'd have to read it every time --
6    Q.  That's fair.  So you agree that in
7 the Zhang study, the authors did not include
8 all of the data that was included in the Leon
9 study that we just looked at, correct?
10    A.  It wasn't available; that's
11 correct.
12    Q.  Okay.
13    A.  This was before the Leon study.
14    Q.  Right, but they could have looked
15 at the underlying data from France and Norway
16 and included it in their analysis, and they did
17 not do so.
18    A.  No, that hasn't been published.
19 The only publication of that data is in the
20 Leon paper.
21    Q.  Got it.  Okay.
22    A.  They never published their own
23 individual analyses, which is unfortunate.
24    Q.  Okay.  And then you also noted that

1 in the Zhang study, they, where available,
2 tried to use the highest exposure in any of the
3 underlying studies -- highest exposure group,
4 correct?
5    A.  That is correct.
6    Q.  And that's a potential limitation
7 because you're excluding, potentially, a large
8 number of patients who were exposed to
9 glyphosate from the other studies?
10    A.  Well, you're not excluding them.
11 You're putting them into the category of -- in
12 some cases you're putting them into the
13 category of unexposed.  In some cases you are
14 excluding them.  It just -- it varies from
15 study to study as to what was pulled into this.
16    Q.  But that's a potential limitation
17 of the Zhang study?
18    A.  It's a limitation of the
19 interpretation.  It's a caution you have to put
20 on the interpretation of the study.
21    Q.  Okay.  Do you also agree that in
22 some instances they did not use the most
23 adjusted number available from the underlying
24 studies that they were pooling?

Christopher J. Portier, Ph.D

Page 150

1    A.  I don't know what you're asking me
2  in terms of adjusted or unadjusted number.
3  What would you mean there?
4    Q.  Sure.  So let's look at Table 7 in
5  the Zhang study.
6    A.  Do you know what page that is?
7    Q.  It's in the back, so --
8    A.  It's after the huge table.
9    Q.  Yeah.  It's on --
10       MS. GREENWALD:  Page 55.
11    Q.  -- page 55.
12    A.  Okay.
13    Q.  So you see there they have a
14  comparison of current meta-analysis, meaning
15  their meta-analysis, to other published
16  meta-analyses, correct?
17    A.  Correct.
18    Q.  And so just look -- well -- and for
19  example, let's look at McDuffie.  You know that
20  McDuffie has, you know, different relative
21  risks or different hazard ratios, depending on
22  whether they were adjusting for other
23  pesticides or not, correct?
24    A.  Yes, but I'm not certain these

Page 151

1  numbers are that.  I'd have to look at McDuffie
2  to refresh myself and be certain.
3    Q.  Well, on its face you can see here
4  that in Schinasi and Leon, IARC itself, which
5  you would have been at least observing, and
6  then Chang and Delzell, which we've discussed,
7  from McDuffie, they used a 1.2 relative risk
8  that was not statistically significant,
9  correct?  They all used the same relative risk
10  from McDuffie?
11    A.  But that's for an assessment of
12  never/ever exposure.  That's why they're using
13  the 1.2.
14    Q.  Okay.
15    A.  That's the never/ever from
16  McDuffie.  She's using the highest dose for
17  McDuffie, which is I think 10 days or more, if
18  I remember correctly.
19    Q.  You're right.
20    A.  And so she would definitely use a
21  different number.
22    Q.  Okay.  But do you recall that that
23  10 -- that I guess highest dose group in
24  McDuffie, the 10 days or more, was not adjusted

Page 152

1  for other pesticides?
2    A.  That I do not recall.  I would have
3  to look at the paper.
4    Q.  If it was not adjusted for other
5  pesticides, would that limit the input of
6  McDuffie in Dr. Zhang and others'
7  meta-analysis?
8    A.  There's two questions.  One is, is
9  the 1.2 adjusted?  Was McDuffie adjusted at
10  all?  That's the next -- the first question I'd
11  ask.  Second question is, if it was adjusted in
12  the high group and they chose the unadjusted
13  number, even though the adjusted number was
14  right there, I would question that.  But
15  it's -- if that's all they had, that's all they
16  had.
17    Q.  Right.  And I mean -- I'm sorry
18  that I didn't bring McDuffie, but in McDuffie,
19  they had never/ever, and they were able to
20  adjust for it, and then for the 10 days or
21  more, 10 days or less, they -- that the 10 days
22  or more group, it was just never adjusted.  So
23  there was no adjusted number.
24       So assuming I'm accurately

Page 153

1  portraying the study to you, would you have
2  concerns about using that higher unadjusted 2.1
3  number?
4    A.  No.  It's the number they used for
5  their evaluation.  And you can actually compare
6  there with regard to that, if you look at their
7  meta-analysis column "with AHS 2005," it's just
8  something you would compare against -- let's
9  take Chang and Delzell.  It just shows you what
10  happens when you look at all the highest
11  exposures in the same studies that Chang and
12  Delzell looked at.
13       So it's just telling you something
14  new about what you see in a meta-analysis when
15  you look at all the high doses from those same
16  studies.
17    Q.  But it's -- you agree that it's a
18  limitation if you are using some unadjusted
19  numbers and some adjusted numbers?  That is --
20  that's starting to mix apples and oranges,
21  which isn't ideal in a pooled analysis.  Do you
22  agree with that?
23       MS. GREENWALD:  Objection, form,
24    asked and answered.

Christopher J. Portier, Ph.D

Page 154

1    A.  That is what everyone does.  That's
2  what Chang and Delzell did.  Everyone ends up
3  having to do that same issue because you use
4  the data you have.  It's recognized as a
5  limitation, and in assessing the weight of
6  which I'm going to give all of these different
7  studies, I would, if not explicitly certainly
8  implicitly, use that as some of the -- my
9  thought processes.
10        If I'm just looking at these two
11  columns, it's simply a comparison for me of one
12  way versus the other.  It's telling me that it
13  didn't really change anything when I went to
14  the highest exposure except making it a little
15  stronger, which is what I would expect.  That's
16  what this is telling me.
17    Q.  And I'm not asking you to -- when
18  you say two columns, are you comparing Chang
19  and Delzell to the --
20    A.  2005 AHS --
21    Q.  2005 AHS.
22    A.  -- because it's -- just on
23  methodology alone, these are clean comparisons.
24  They're using the same studies.  So Delzell

Page 155

1  could have done the same analysis that they did
2  had she simply said, let's look at the highest
3  exposures and see what it does.  She didn't.
4  She looked at a lot of things but didn't look
5  at that.  But they did that.  So it sort of
6  fills out the -- the sort of sensitivity
7  analysis for me.
8    Q.  Okay.  So its -- would you -- I
9  mean, we could belabor Zhang, but is Zhang just
10  another data point for you?
11    A.  Yes.
12    Q.  And all of these meta-analyses have
13  their own limitations.  Do you agree with that?
14    A.  That is correct.
15    Q.  Zhang has different limitations
16  than some of the other studies based on the
17  methodology?
18    A.  Correct.
19    Q.  We can agree that there certainly
20  are limitations in Zhang?
21        MS. GREENWALD:  Objection to the
22    form.
23    A.  We can agree there are limitations
24  in Zhang, yes.

Page 156

1    Q.  And ultimately --
2    A.  Limitations to the interpretation
3  of Zhang.  I want to be clear.  There's no
4  limitation to what they did.  They did what
5  they did.  They explained it correctly.  They
6  used the math appropriately.  So that's fine.
7  It's the interpretation that you must place
8  limits on.
9    Q.  Right.  And some of the reasons why
10  you would limit your interpretation of Zhang
11  include the fact that they excluded some
12  patients that were in the underlying studies,
13  correct?
14    A.  No.  I mean, that's a net effect of
15  choosing the highest exposed individuals.  And
16  that's only for some studies.  Like I said, the
17  Agricultural Health Study didn't exclude
18  anybody.  All they did was take people who were
19  actually exposed and put them in "unexposed"
20  because of the 20-year lag.
21    Q.  Okay, so I'll -- okay.  One reason
22  why you would limit your interpretation of
23  Zhang is that they pooled never/ever with
24  dose-response, correct?

Page 157

1        MS. GREENWALD:  Objection, form.
2    A.  Again, it -- I would look at the
3  interpretation cautiously in interpreting this
4  relative risk because that's what they did.
5  But even if they'd had dose-response in every
6  one, you realize it would be a different high
7  group.  In one case it might be 10 days.  In
8  another case it might be 2 days.  And so you
9  have to interpret that with caution in trying
10  to figure out what you're actually looking at.
11    Q.  So you would also have to interpret
12  with caution -- or you do have to interpret
13  with caution Zhang because they, in picking the
14  highest exposure, in some instances used
15  unadjusted numbers for -- unadjusted for other
16  pesticides, correct?
17    A.  No more than any other, but yes,
18  you would be cautious about interpreting that.
19    Q.  Okay.  Any other reasons why you
20  would be cautious in the interpretation of
21  Zhang that jump out to you that we haven't
22  discussed?
23    A.  No.
24    Q.  So overall, you know, what

Christopher J. Portier, Ph.D

1 reliance -- understanding what your ultimate
2 opinion is about the epidemiology, how does
3 Zhang impact it, if at all?
4         MS. GREENWALD:  Objection, form.
5     A.  It tells me what I would have
6 expected to see had I done the same evaluation.
7 This is keeping in line with my current
8 interpretation.  It doesn't change it.
9     Q.  Did you have any discussions with
10 Dr. Sheppard about this paper before it was
11 published?
12     A.  When I visited in -- Thanksgiving
13 last year and gave a lecture, she mentioned to
14 me she was doing this.  She showed me her
15 timeline figure here and asked what I thought
16 about it.  I thought it was pretty cool.
17     Q.  You're referring to page 61?
18     A.  Yes, the last page, Figure 3, I
19 believe it's called here?
20     Q.  Yep.
21     A.  Yes.  She asked me some questions
22 about what she was doing, but I can't recall
23 going into much detail with her on it.
24     Q.  And have you had any discussions

1 with Dr. Sheppard or -- now you can see all the
2 authors -- any of the other authors of the
3 paper regarding other research that they are
4 conducting, if any, regarding glyphosate?
5     A.  Three of these I don't know.  So
6 I -- I just don't know.  The three in the
7 middle, I don't know the authors.
8         I'm trying to think if Dr. Zhang
9 and Dr. Sheppard talked to me about other
10 things they were planning to do when I was
11 there, and I simply can't recall.  I'm sorry.
12 I think they were planning to do other stuff,
13 but I simply can't recall.
14     Q.  Okay.  Now, on the question of
15 attributable risk -- but I think you called it
16 attributable ratio; is that right?
17     A.  Fraction.
18     Q.  Attributable fraction, okay, thank
19 you.  So if you look back on Table 7 on page
20 55, and I just want to see if -- you know, I
21 don't want to engage in a massive mathematical
22 exercise, but is the way to calculate -- I just
23 want to understand the way to calculate
24 attributable fraction.

1         So if we took the 1.41 odds ratio
2 from Dr. Zhang's meta-analysis with Andreotti,
3 would you -- is the way to calculate it 0.41 --
4 in other words, 1.41, minus 1, divided by 1.41,
5 does that give you the attributable fraction?
6     A.  No.
7     Q.  Okay.  So how would you -- using
8 that odds ratio, how would you calculate the
9 attributable fraction?
10     A.  It would be mighty difficult.
11 Attributable fraction -- so I've got an epi
12 study.  Let's say it's a case control study.
13 I'd first have to figure out what weight to put
14 on each case and each control to figure out
15 what makes them look like the general
16 population.  Is that clear?
17         It's -- the bottom line is, it's a
18 much more complicated and detailed calculation
19 than that.  You have to figure out whether your
20 population looks like the normal population
21 that you want to make a statement about.
22     Q.  Okay.
23     A.  And then you have to project to
24 that normal population from your study.

1         Here you've got a mixture of
2 studies.  You've got case control studies; you
3 have cohort studies.  You're going to want to
4 be somewhat careful in looking at attributable
5 fraction for that because you've got Swedish
6 studies, you've got -- I mean, it's hard to
7 take that attributable fraction from a
8 meta-analysis.  One could do it, but it would
9 be hard.  I'm not going to sit down and try to
10 do it in my head for sure.
11     Q.  Okay.  Thank you.  That's why
12 you're the expert and I'm a lawyer.
13         But -- and I'm not try -- putting
14 aside the math, take, say, Eriksson.  And, you
15 know, you have a -- say a 1.51 adjusted
16 relative risk.  Are you with me?
17     A.  Mm-hmm.
18     Q.  Now, for that, is the way -- and
19 this would -- I guess what you're explaining to
20 me is that if you were to calculate the
21 attributable fraction for that study, it would
22 only apply to the Swedish population that was
23 studied in that study?
24     A.  It would be best to make that

Christopher J. Portier, Ph.D

1 projection for that population. People can
2 certainly make projections for other
3 populations, but it would be best to make it
4 Swedish.
5     Q.  And is --
6     A.  Especially since I have an American
7 study, why not use the American study to do
8 Americans?
9     Q.  So which one would you do the
10 American study in?
11     A.  I would probably use --
12     Q.  De Roos 2003 or something?
13     A.  De Roos.
14     Q.  Okay.  Even if it wasn't adjusted?
15     A.  She adjusted all kinds of stuff,
16 2005.
17     Q.  Oh, you're right, you're right.
18 Okay.  And is the way to do it for a single
19 case control study to take the odds ratio minus
20 1, divided by the odds ratio?  Is that the --
21 or is it more complicated?
22     A.  I don't know what that is.  I
23 understand epidemiology uses that, and they
24 might call it attributable risk, but I haven't

1 used it myself.  So I don't know what its
2 interpretation is.  I'm going to have to sit
3 down and figure it out.
4     Q.  I don't think -- unless
5 Ms. Greenwald asks you to do that, you probably
6 don't need to.
7         So would you calculate attributable
8 risk in a different way, or it's just something
9 you haven't calculated before?  I'm just trying
10 to understand.
11     A.  Attributable fraction --
12     Q.  Oh, attributable fraction, yes.
13     A.  -- is what I was talking about.
14 What you're talking about I think is a
15 different measure, and I don't know that
16 measure.
17     Q.  Ah.  Got it.
18     A.  So I'd have to sit down and figure
19 it out in my head.  Why -- if I take relative
20 risk minus 1 over relative risk, is that
21 attributable fraction -- attributable risk?  I
22 have to figure that.  I'd do some math and
23 figure it out.
24     Q.  What is the role for what you're

1 talking about, attributable fraction, which
2 might -- may or may not be something different?
3 What does that tell you, if you have the
4 fraction?
5     A.  So if I'm looking at a population,
6 and let's take the whole United States, and
7 wanted to ask the question, what fraction of
8 NHL in the United States is due to exposure to
9 glyphosate?  That would be the attributable
10 fraction.  That's what I was calculating.
11     Q.  Got it.
12     A.  So it would be -- if it were -- you
13 know, I don't know what the number would be.
14 But there would be a percentage associated with
15 it, and that would be the fraction we were
16 interested in.
17     Q.  Right.  And then if you took that
18 percentage and you had a hundred patients -- or
19 a hundred people, who all developed NHL and
20 were all exposed to glyphosate, you would say
21 that whatever that fraction is, that's the
22 actual number -- you couldn't -- I'm not saying
23 you could differentiate between individuals,
24 but let's say the number was 40 percent, 40

1 percent of those people, the glyphosate was the
2 cause of their NHL?
3     A.  That would be your best estimate.
4 Of course, it's an estimate, so there's
5 confidence bounds associated with it and
6 assumptions that go into it, and you'd have to
7 be cautious in saying what you've actually
8 calculated, but yes.
9     Q.  Okay.  All right.  But then you
10 would, it sounds like, maybe not even want to
11 do attributable fraction or attributable risk
12 for a meta-analysis, or at a minimum it would
13 be extremely complicated?
14     A.  I don't know attributable --
15         MS. GREENWALD:  Objection, form.
16     Go ahead.
17         THE WITNESS:  Sorry.
18         MS. GREENWALD:  That's all right.
19     A.  I don't know attributable -- the
20 number you're talking about, attributable risk.
21 Attributable fraction would be complicated.  I
22 would have to be very cautious in doing it.
23     Q.  For a meta-analysis?
24     A.  Yes.

Christopher J. Portier, Ph.D

1    Q.  Because of all these different
2  pieces that are going in?
3    A.  Because of the population
4  representativeness.  It's -- you want it to be
5  representative of the population you're trying
6  to make a statement about.  And case control
7  studies are clearly not representative of the
8  population of the United States.  So you have
9  to make a projection.  You have to take some
10  time and effort to do it.
11    Q.  So the case control studies in
12  Sweden and Canada and France are not
13  representative of the patient population in the
14  United States?
15    A.  It wouldn't be the patient
16  population; it's the whole population.  You
17  could try.  I mean, you could try to, you
18  know -- it may be France has 52 percent women
19  and the United States has 53 percent women.
20  You can make adjustments to take that into
21  account.  But you'd be better off using a U.S.
22  study.
23    Q.  Okay.  All right.  Shifting away
24  from both Zhang and complicated calculations of

1  attributable fractions, I wanted to shift a
2  little bit to some of the regulatory bodies
3  around the world.  And I know you've looked at
4  a lot of this.  So some of this may be a little
5  more -- you know, what you've had a chance to
6  review and what you haven't.
7      So starting with Health Canada, you
8  know that in post-IARC, Health Canada made a
9  determination that it does not believe the
10  evidence is sufficient to say that glyphosate
11  is a carcinogen, correct?
12    A.  I'd have to look at their exact --
13  that's a sort of paraphrase of their exact
14  statement, but I have read their document.
15    Q.  Okay.  So that was my question.
16  Have you read their most recent document?
17    A.  I believe I have.  And the
18  underlying documents.
19    Q.  Okay.  And so have you read the
20  underlying objections that were filed by
21  different parties or different organizations?
22    A.  No, I did not.
23    Q.  And so do you know, sitting here,
24  whether some of your prior correspondence with

1  regulatory bodies were contained as attachments
2  to objections that others wrote to Health
3  Canada?
4    A.  I was already told that in the
5  video trial testimony.  So I know of it, but I
6  haven't gone and looked for it.
7    Q.  The testimony in Australia?
8    A.  Yes.
9    Q.  Okay.  I might show you -- okay.
10  Well, let's just start with the Health Canada
11  report most recent 2017 statement itself, which
12  I will mark as Exhibit 5.
13      (Exhibit Portier-5 marked for
14      identification and attached to the
15      transcript.)
16      MS. GREENWALD:  I'll take a pass on
17      that one.
18      MR. STEKLOFF:  Okay.
19  BY MR. STEKLOFF:
20    Q.  You've reviewed this document
21  before today?
22    A.  Yes, I have looked through it.
23    Q.  And obviously -- I mean, I'm not --
24  the sort of fundamental conclusion that Health

1  Canada reached about glyphosate and whether
2  it's a carcinogen you disagree with?
3    A.  They -- by association -- they did
4  this in association with EPA, they did exactly
5  the same as EPA.  Yes, I fundamentally disagree
6  with some of the things they have done.
7    Q.  And when you say they did this in
8  association with EPA, what are you saying?
9    A.  It's on the first or second page.
10  Let's see, where did they say this?
11    Q.  I think you're referring to the top
12  of page 3, In 2010, in that paragraph?
13    A.  But it goes further than that
14  paragraph.
15    Q.  Okay.
16    A.  It's somewhere in here.  They make
17  a statement about their close work with EPA.
18  They don't give the same degree of detail in
19  terms of why they accept or reject certain
20  animal cancer studies in here.
21      So you were asking me if I agree or
22  disagree.  I disagree with their overall
23  finding.  I disagree with their interpretation
24  of the animal data, definitely.  But I can't

Christopher J. Portier, Ph.D

Page 170

1 say why because they haven't told me why
2 they've chosen to ignore certain findings in
3 the animal studies other than they worked with
4 EPA on doing this.
5     Q.  And so is it your opinion --
6     A.  If they did the same as EPA, it's
7 the same problems, the scientific problems of
8 what they've done.
9     Q.  Understood.  I have a different
10 question, which is, are you suggesting or are
11 you opining that Health Canada didn't do its
12 own independent assessment of the underlying
13 data and only -- and relied on the EPA's
14 assessment?
15     A.  No.  But they did it in -- they did
16 it jointly with EPA.  My interpretation is that
17 they were both working together to develop
18 their drafts at the same time.  That is my
19 interpretation of this on reading the part
20 where they talk about EPA.  If I could search
21 it, we could probably find it in here.
22     Q.  Okay.  Well, maybe -- I mean, I'd
23 like to look to -- maybe on a break, at lunch
24 break you can try to find that?

Page 171

1     A.  I don't have my computer.  I can
2 look, certainly.
3     Q.  Well, I would like to know -- I
4 mean, I'm happy to sit here and wait now, or
5 look later, or, you know, pull it up on the
6 lunch break on a computer, just exactly what
7 part of this paper you're relying on for that
8 opinion.
9     A.  Page 9.
10     Q.  Okay.
11     A.  I think this is a better statement.
12     Canada and the USEPA have been
13 collaborating on the re-evaluation of
14 glyphosate.  In December 2016, the USEPA
15 Scientific Advisory Panel discussed the cancer
16 potential of glyphosate -- et cetera.
17     MS. GREENWALD:  She can't take all
18     this down.  You have to go slower.
19     THE WITNESS:  I'm sorry.
20     MS. GREENWALD:  You were at, and
21     Health Canada's --
22     A.  Yeah, I don't need to read it all.
23 But that, I believe, is where I'm reading that
24 they really are working closely together to

Page 172

1 come up with the same answers.
2     Q.  Okay.  So they -- so then this --
3     A.  And that's not unusual.
4     Q.  Right.  In this paragraph, they
5 discuss the fact that Health Canada's PMRA
6 participated as an observer at the EPA's SAP,
7 correct?
8     A.  Correct.
9     Q.  You're not criticizing that, right?
10     A.  Oh, no.
11     Q.  And that's not unusual, right?
12     A.  No.  I'm simply saying that, one, I
13 don't believe this is independent of U.S. EPA.
14 And I think that's quite clear.
15     And secondly, you had asked me
16 about whether I disagree with their findings,
17 and I'm saying, for cancer, I disagree, but I
18 don't know why they came to their findings
19 because they don't provide a detailed
20 explanation for it in enough -- form for me to
21 find that.
22     Q.  So you're unable to go into the
23 same level of analysis of, you know, their
24 interpretation of particular animal studies

Page 173

1 because they didn't provide that in this paper?
2     A.  Correct.
3     MS. GREENWALD:  Objection to the
4     form.
5     Q.  But you don't question that Health
6 Canada did its own -- the scientists at Health
7 Canada did their own review of the underlying
8 studies?
9     MS. GREENWALD:  Objection, form.
10     A.  I cannot even come close to
11 guessing if they did or not.
12     Q.  Okay.
13     A.  The entire carcinogenicity section
14 of this document amounts to five pages.  That's
15 just not enough detail for me to have any idea
16 of what they actually looked at.  They talk
17 about several long-term animal studies.  They
18 don't even tell me how many.  It's -- it's not
19 enough detail.
20     Q.  Okay.  So you don't know one way or
21 the other whether the scientists at Health
22 Canada did their own analysis or review of the
23 underlying studies?
24     A.  No, I do not.

Christopher J. Portier, Ph.D

Page 174

1    Q.  And your focus in -- it sounds like
2  you -- tell me if I'm wrong, but it sounds like
3  your focus of your disagreement with them is on
4  the animal studies themselves?
5    A.  I don't remember their human
6  evidence-level final response.  I'd have to
7  read it again to provide a good answer to that
8  question.  But I certainly disagree with the
9  animal and the genotoxicity findings.
10    Q.  And I think on page -- well, on
11  page 23, 24, that's where they have their
12  conclusion.  And so starting in the second
13  paragraph, they say, Based on a
14  weight-of-evidence analysis --
15        I won't read the whole thing, but
16  you disagree, obviously, with that conclusion,
17  right?
18    A.  Certain aspects, I would vehemently
19  disagree with.  The way they have carefully
20  worded their statement on the epidemiology, I
21  actually would agree with it.
22    Q.  Okay.
23    A.  But it's carefully worded:  The
24  currently available epidemiology evidence does

Page 175

1  not support a causal relationship.
2        That's a statement isolated in and
3  of itself.  That's correct, but that doesn't
4  mean there isn't a relationship.
5    Q.  And so without going bullet by
6  bullet, it's fair to say you probably disagree
7  with every other bullet up until that one about
8  epidemiology, some more vehemently than others?
9        MS. GREENWALD:  Objection, form.
10    A.  Remember that these bullets pertain
11  to over 35 -- 35 or so cancer findings in the
12  animal studies.  So some bullets matter on
13  some; they don't matter on other.  So I might
14  agree with the bullet in one case but disagree
15  in another case that the bullet's correct.
16    Q.  Okay.  That's fair.
17    A.  I can't give you a blanket
18  statement.
19    Q.  That's totally fair.
20    A.  Certain things are uniformly
21  incorrect.  There are bullets in here that are
22  uniformly wrong and should not be in there.
23    Q.  Right.  And then some bullets may
24  only apply to some of the -- a subset of the

Page 176

1  animal studies as opposed to every single one?
2    A.  Correct.
3    Q.  Okay.  And then this statement, The
4  currently available epidemiology evidence does
5  not support a causal relationship between
6  exposure to glyphosate and cancer outcomes, you
7  agree with, given the careful wording?
8    A.  Because they put "causal" in there
9  in an isolated setting, and yes, I would agree
10  with the statement.
11    Q.  Okay.  Now, do you agree that
12  Health Canada, like the EPA, has access to more
13  data than even -- than you have access to,
14  based on the publicly available information and
15  then what you've been able to -- what you've
16  been provided by Monsanto?
17        MS. GREENWALD:  Objection, form.
18    A.  I can only speculate.  There's not
19  enough information in here to state that.  The
20  only reference they give to data for the animal
21  studies is Greim, which I have all -- I have
22  all the supplements and the paper itself.  If
23  that's what they said and that's what they
24  used, then yeah, we have the same exact data

Page 177

1  for the animal cancer studies.  But I -- I
2  suspect they had more, but I -- there's nothing
3  in here that makes me believe they did.
4    Q.  As opposed to Health Canada, do you
5  agree that the EPA has more than you were able
6  to review?
7    A.  Oh, yes, they had more than I was
8  able to review because it's just not available
9  to me.
10    Q.  And it's not a criticism of you, to
11  be clear.  But they have more because there are
12  other companies, for example, that make
13  glyphosate -- glyphosate-based herbicides that
14  had to conduct their own studies that have been
15  produced to the EPA that are not publicly
16  available, correct?
17    A.  Correct.
18    Q.  And you just don't know one way or
19  the other whether Health Canada is similarly
20  situated in that regard?
21    A.  In a normal regulatory setting with
22  a normal document from them, I would say that
23  absolutely they had the original studies.  But
24  because of the way this is written, it doesn't

Christopher J. Portier, Ph.D

Page 178

1 appear that way. For the animal cancer
2 studies, I suspect that's wrong and it's a
3 mistake in the way they wrote it, but that's
4 the only thing I can say about it.
5     Q. Okay. I want to show you an
6 example of one of the -- or not an example.
7 One of the -- at least one of the objections
8 that was filed before Health Canada published
9 this, which we'll mark as Exhibit 6.
10     (Exhibit Portier-6 marked for
11     identification and attached to the
12     transcript.)
13 BY MR. STEKLOFF:
14     Q. And have you seen this before or
15 any other -- have you seen this before?
16     A. The first page or -- this is my
17 open letter to President Juncker.
18     Q. Right. And so have you seen it in
19 this format with it being attached to an
20 objection that was sent to Health Canada?
21     A. No.
22     Q. Okay. But you do see that this is
23 your open letter to the president of the
24 European Commission in 2017?

Page 179

1     A. This is the one to Juncker? Yeah.
2 Yes.
3     Q. And you see that a -- I assume
4 professor at the University of Quebec at
5 Montreal submitted this to Health Canada in
6 June of 2017. It was received in June of 2017
7 as part of, you know, an objection to the
8 registration and evaluation by Health Canada of
9 glyphosate.
10     A. I can't read French. I don't know
11 why it was submitted. All I can see is that it
12 was submitted in June. I don't know if it was
13 an objection. I don't know if it was FYI. I
14 don't read the French that goes with the
15 letter.
16     Q. Okay. Well, it says at the top, in
17 English, Notice of Objection to a Registration
18 Decision under Subsection 35(1) of the Pest
19 Control Products Act, correct?
20     A. I see that, but this may just be a
21 standard form that says, anything you want to
22 say about our -- even if you want to say, oh,
23 we love it, it's going to be put on a Notice of
24 Objection. I know bureaucracy.

Page 180

1     Q. Right. But no one would attach
2 your letter to the European Commission because
3 they love glyphosate, right?
4     A. This -- well, that's not true.
5 This letter -- sorry. This letter I
6 specifically said, I'm not going to revisit all
7 the flaws in what EFSA did. What I'm pointing
8 out in this letter is that they failed to look
9 at certain tumors that I had found, and they
10 should look at those tumors. That was the
11 focus of this particular letter. That was it.
12     Q. Are you suggesting in this letter
13 that you were not trying to persuade Europe to
14 consider glyphosate a car -- some category of
15 carcinogen?
16     MS. GREENWALD: Objection, form.
17     A. Oh, I'm sure I might have said
18 something like that in here. I think my last
19 two sentences state exactly -- paragraphs state
20 exactly what I intended from this letter.
21     Q. Okay. Well, I mean, going back to
22 the front page, which I realize you can't read
23 French, nor can I, for the record -- I mean,
24 just to walk through, it has objector

Page 181

1 information and then the name and address and
2 information of the person submitting the
3 objection, correct?
4     A. Correct.
5     Q. It has the product information, and
6 it specifically references glyphosate, correct?
7     A. Yes, I see that.
8     Q. It has registration decision to
9 which the objection relates, and it has a
10 decision on application -- that's an initial
11 application -- or decisions on re-evaluation or
12 special review, correct?
13     A. Yes.
14     Q. And then it is objecting to,
15 confirming -- the box that is checked is
16 confirming the registration as opposed to
17 cancelling the registration or amending the
18 registration, correct?
19     A. Correct.
20     Q. So that's all in English, right?
21     A. Yes.
22     Q. And this person checked the box
23 that he or she was objecting to Health Canada
24 confirming the registration of glyphosate,

Christopher J. Portier, Ph.D

Page 182

1 correct?
2     A.  But you're using "objection" in the
3 English language form that -- whereas in a
4 bureaucratic regulatory context, an objection
5 may be a comment.  That's the word they would
6 use for it.  It's an objection.  Anything that
7 you write is an objection.  I don't know that
8 in this context.  I'm saying that could be the
9 interpretation.
10         I doubt if that's how he sent it,
11 but to be fair to the record, I don't know why
12 this was sent to them because it's in French.
13     Q.  Okay.  Well, under any
14 circumstances, do you -- does this suggest to
15 you that Health Canada, whether they looked at
16 it or not, would have had your concerns in
17 front of them that were raised to the president
18 of the European Commission in 2017 when they
19 made the decision to confirm the registration
20 of glyphosate?
21     A.  Unless they saw the original letter
22 with 96 scientists that went to the head of the
23 Health Ministry of the European Union, they
24 would not have my scientific concerns.

Page 183

1     Q.  You don't think that your
2 scientific --
3     A.  I did not reiterate them in here.
4 I made it clear I was not going to reiterate
5 that.  This was, there's data you did not
6 consider.  I think you should ask the agencies
7 to consider this data and then make their
8 decision.
9         That's -- the last two paragraphs
10 are clear.  It's not like the first letter,
11 which was much more detailed into the science
12 itself.  So they would not have those concerns
13 if they didn't see that letter.  But since they
14 worked closely with EPA, they probably did.
15 But this doesn't prove that they did.
16     Q.  Okay.  I mean, they certainly would
17 have known if they read page 2 where you put in
18 bold that, Both EFSA and ECHA... failed to
19 identify all statistically significant cancer
20 findings in the chronic rodent carcinogenicity
21 studies with glyphosate, right?
22     A.  That is the point of this letter.
23     Q.  Yeah.  Okay.  And so they would
24 have known that you believed that at least EFSA

Page 184

1 and ECHA had failed to properly assess the
2 animal studies in making their carcinogenicity
3 determinations of glyphosate, right?
4     A.  They wouldn't know why.
5     Q.  I understand they wouldn't know
6 why, but they would know that that was a
7 concern that you had, correct?
8     A.  I don't think so.  I mean, this
9 statement's very clear about the failure they
10 did.  It's not clear about the other failures
11 they had.  This is a very specific failure,
12 failure to find certain cancers, as compared to
13 failure to properly evaluate the cancers they
14 did find.  They wouldn't have known about that.
15 But they would know about the fact that these
16 tumors should be in their evaluation.
17         The question of whether these
18 tumors are in their evaluation or not can't be
19 addressed because they don't show me.  They
20 don't list the tumors that they did evaluate.
21 They just say, several studies, lots of tumors,
22 we didn't believe any of them.  As compared to
23 EPA that said, here's the studies, here's the
24 tumors, and I can look at it and go, okay, you

Page 185

1 missed these, EPA, and you interpreted these
2 incorrectly.  That I can do.  Can't do that
3 here.
4     Q.  "Here" meaning with Health
5 Canada -- the other document -- the document
6 that we looked at previously --
7     A.  With the document, correct.
8     Q.  Yes.  Okay.  And you're also not an
9 expert in -- you're not an expert in Health
10 Canada's processes that they're supposed to
11 undergo?
12     A.  I used to be.  I don't know -- Dan
13 Krewski used to head this group at Canada, and
14 we were good buddies.  We talked about it a
15 lot.  But that was 25 years ago.  I can't
16 guarantee I know how they do it now.  That's
17 all I can say.
18     Q.  Okay.  And you don't know, sitting
19 here, one way or the other whether Health
20 Canada also may have looked at or received
21 your -- the letter with the 96 other
22 scientists?
23     A.  Yeah, that --
24         MS. GREENWALD:  Objection, asked

Christopher J. Portier, Ph.D

Page 186

1  and answered.
2      A.  I don't know.
3      Q.  Have you looked at a later -- the
4  later 2019 statement by Health Canada
5  responding to all of the objections that were
6  received in response to the previous exhibit we
7  looked at?
8      A.  I glanced at it.  It's a short
9  document, isn't it?
10     Q.  Yep.
11     A.  Yes.  Yeah, I glanced at it.  I
12 don't remember it specifically, but it was a
13 short document, so it's not very -- right.  It
14 was just a press release.
15     Q.  Yep.  So let's look at that.
16         MR. STEKLOFF:  Exhibit 7.
17         (Exhibit Portier-7 marked for
18         identification and attached to the
19         transcript.)
20 BY MR. STEKLOFF:
21     Q.  And so you've glanced at this
22 before?
23     A.  I've read it, yes.
24     Q.  And you can see it's dated January

Page 187

1  2019?
2      A.  Yes, I see that.
3      Q.  Okay.  And it says in the second
4  paragraph, Following the release of the
5  Department's final re-evaluation decision on
6  glyphosate in 2017 --
7         Which was just what we looked at
8  two exhibits ago, right?
9      A.  Mm-hmm.
10     Q.  -- Health Canada received eight
11 notices of objection.
12         We just looked at only one of the
13 eight, correct?
14     A.  I assume, but I can't be certain
15 that this is that notice.
16     Q.  Okay.
17         There have also been concerns
18 raised publicly about the validity of some of
19 the science around glyphosate in what is being
20 referred to as the Monsanto Papers.
21         You're familiar with those, right?
22     A.  I'm familiar with the term, not of
23 the papers.
24     Q.  And do you see -- now going to the

Page 188

1  second to last paragraph, it says, Our
2  scientists left no stone unturned in conducting
3  this review.  They had access to all relevant
4  data and information from federal and
5  provincial governments, international
6  regulatory agencies, published scientific
7  reports and multiple pesticide manufacturers.
8         Do you see that?
9      A.  I do see that.
10     Q.  And so do you have any reason to
11 question whether the scientists at Health
12 Canada first of all had more information
13 available to them than you did?
14     A.  Again, I still can't answer it.
15     Q.  Okay.
16     A.  I just can't.  This is -- we're
17 only talking about cancer.  This is talking
18 about everything, okay?  So I want to
19 distinct [sic] from that.
20         They talk about having data from
21 multiple pesticide manufacturers, which would
22 be the only thing that was different than what
23 I had.  But they don't tell me how many, and if
24 it's only two, then it's -- it could be

Page 189

1  Monsanto's papers, which I have.
2         So I don't know.  I honestly don't
3  know.  I guess they probably had everything.
4  That's all I can say.
5      Q.  Fair enough.  And then if you go
6  down, it talks in the next sentence, Health
7  Canada also had access to numerous individual
8  studies and raw scientific data during its
9  assessment of glyphosate, including additional
10 cancer and genotoxicity studies.
11         Do you see that?
12     A.  I see it.
13     Q.  And then it says that, To help
14 ensure an unbiased assessment of the
15 information, Health Canada selected a group of
16 20 of its own scientists who were not involved
17 in the 2017 re-evaluation to evaluate the
18 notices of objection.
19         Do you see that?
20     A.  Yes.
21     Q.  And does that -- you know,
22 understanding that you don't know exactly what
23 they did, do you think that that was a good
24 step by them to have 20 different scientists

Christopher J. Portier, Ph.D

Page 190

1 evaluate the notices of objection, including
2 your -- at least at a minimum your letter to
3 the president of the European Commission?
4     A. I don't know what they evaluated
5 because I don't -- I have -- you're -- I have
6 to be clear. Because my letter was attached, I
7 don't know what he wrote about my letter, so I
8 don't know if they were evaluating my letter or
9 evaluating what whoever that person wrote while
10 he was using my letter to argue a point. I
11 don't know.
12         So I won't give you the fact that
13 they reviewed my letter. I'll give you the
14 fact that they reviewed his objection, if his
15 objection is one of the eight that they got, an
16 assumption you've also made.
17         Now, to answer the question, the 20
18 people independent, that's a nice move. I
19 thought that was a nice move when I read it. I
20 think it was a very good move. Using their own
21 people, you know, I can select the right 20
22 people or I can select the wrong 20 people.
23 You can certainly play games with that. So --
24 but it is a nice twist.

Page 191

1     Q. And then it goes on to say, No
2 pesticide regulatory authority in the world
3 currently considers glyphosate to be a cancer
4 risk to humans at the levels at which humans
5 are currently exposed.
6         Do you see that?
7     A. Correct. I see it.
8     Q. Do you agree -- I know --
9     A. No.
10     Q. Do you agree that statement is
11 accurate, as opposed to agreeing with the
12 statement?
13     A. It's not accurate.
14     Q. Okay. Why is it not accurate?
15     A. There are pesticide regulatory
16 authorities in the world who currently consider
17 glyphosate to be a cancer risk.
18     Q. And which would those be?
19     A. Certain cities, some counties. If
20 you said national pesticide authorities, then
21 I'm -- it's probably correct.
22     Q. Okay.
23     A. But if you say local pesticide
24 authorities or people who have authority over

Page 192

1 pesticide use in local areas, it's probably not
2 correct.
3     Q. Okay. And if you go up above now
4 to the third to last paragraph, it says, As
5 part of this process, Health Canada will
6 publish its response to each notice of
7 objection in the... Public Registry on January
8 14.
9         Do you see that?
10     A. No, I don't, but -- oh, yeah, I see
11 it, third paragraph from the top.
12     Q. And you've never gone to look at
13 what Health Canada published, correct?
14     A. I don't remember. I don't recall.
15 I can't answer the question, no.
16     Q. Okay.
17     A. I just don't remember.
18     MR. STEKLOFF: Can we go off the
19 record?
20     VIDEO OPERATOR: We are now going
21 off the video record. The time is 1:10.
22     (Recess from 1:10 p.m. until
23 2:08 p.m.)
24     VIDEO OPERATOR: We are now going

Page 193

1 back on the video record. The time is
2 2:08.
3 BY MR. STEKLOFF:
4     Q. Dr. Portier, have you reviewed the
5 EPA's recent Proposed Interim Registration
6 Review Decision?
7     A. Can I see the document?
8     Q. Of course. We'll mark that as
9 Exhibit 8.
10     (Exhibit Portier-8 marked for
11     identification and attached to the
12     transcript.)
13 BY MR. STEKLOFF:
14     A. I glanced at it. This is not their
15 final review of the literature. This is just
16 the summary of their statements in each area.
17 Yes, I glanced at it. That's the best I can
18 say.
19     Q. Okay. And during that glance, did
20 anything that you reviewed in any way impact
21 the opinions you have offered, which we are
22 familiar with, about the -- with your
23 criticisms of the EPA's --
24     A. No.

Page 194

1      Q.  -- review process?
2          And so all of the same criticisms
3  that you have of their interpretation of the
4  data remain the same?
5      A.  Well, again, this is not -- this is
6  just their final summary statement on each
7  thing.  It really doesn't talk much about the
8  data.
9      Q.  Okay.  And then similarly, all of
10 your criticisms about whether they had followed
11 their own processes remain the same?
12     A.  Yes.
13     Q.  So I just want to walk through --
14         (Technical interruption.)
15         MR. STEKLOFF:  Should we go off the
16     record just quickly?
17         VIDEO OPERATOR:  We are now going
18     off the video record.  The time is 2:11.
19         (Recess from 2:11 p.m. until
20     2:13 p.m.)
21         VIDEO OPERATOR:  We are now going
22     back on the video record.  The time is
23     2:13.
24 BY MR. STEKLOFF:

Page 195

1      Q.  So Dr. Portier, if you can please
2  turn to page 6 of this document.  And at the
3  bottom of page 6, under Summary of Public
4  Comments, the EPA references a 60-day public
5  comment period.  Do you see that?
6      A.  Yes.
7      Q.  Did you participate or have any
8  involvement in any submissions to the EPA
9  during that 60-day period?
10     A.  No.
11     Q.  If you turn to the next page,
12 there's a section that says, Comments About the
13 EPA's Cancer Evaluation, and there's a
14 paragraph -- please read that short paragraph,
15 but -- I won't read it word for word, but
16 referencing IARC's classification.  Do you see
17 that?
18     A.  Right under the, Comments About --
19 the heading?
20     Q.  Right under -- it says, Comments
21 About the EPA's Cancer Evaluation, and then
22 there's a paragraph that starts, Many
23 commenters expressed disagreement.
24         Do you see that paragraph?

Page 196

1      A.  Yes.
2      Q.  And so I want to walk through parts
3  of the EPA response to that, to that paragraph,
4  and just see if you agree or disagree with
5  their statements.  It says, The EPA conducted
6  an independent evaluation of the carcinogenic
7  potential of glyphosate and has determined that
8  glyphosate is 'not likely to be carcinogenic to
9  humans'.
10         And I understand that you disagree
11 with their determination, but do you disagree
12 with their statement that they conducted an
13 independent evaluation?
14     A.  Independent of IARC, yes.
15     Q.  Okay.  It says, The agency's cancer
16 classification is based on a thorough
17 weight-of-evidence review of all relevant data
18 and is in accordance with the agency's 2005
19 Guidelines for Carcinogen Risk Assessment.
20         Do you see that?
21     A.  I see that.
22     Q.  Do you agree or disagree with that
23 statement?
24     A.  Disagree.

Page 197

1      Q.  And is it that -- you disagree --
2  well, let's break it down.  Do you disagree
3  that they did a thorough weight-of-evidence
4  review of all relevant data?
5      A.  Yes.
6      Q.  In what way?  And if it's -- just
7  to short-circuit this, if it's just all --
8      A.  It's a long -- yeah.
9      Q.  -- the reasons I've already said,
10 then --
11     A.  It's a long, detailed description.
12     Q.  That you've provided in all the --
13 in the other cases?
14     A.  Yes.
15     Q.  Including most recently where
16 Mr. Wisner and you walked through that in the
17 Pilliod trial?
18     A.  Yes.
19     Q.  And is that a fair summary of why
20 you disagree with that statement --
21         MS. GREENWALD:  Objection --
22     Q.  -- the testimony you gave at
23 Pilliod?
24         MS. GREENWALD:  Objection to form.

Page 198

1    A.  I do not believe their
2  weight-of-evidence review was thorough.
3    Q.  Okay.  And then similarly, I assume
4  you disagree that their review was in
5  accordance with the 2005 Guidelines that they
6  reference?
7    A.  That is correct.
8    Q.  And again, for the same reasons
9  that you've previously testified to?
10    A.  Yes.  There are no new reasons.
11    Q.  You said they're the only reasons?
12  I just --
13    A.  There are no new reasons.
14    Q.  Thank you.  I just didn't hear you.
15    They then go on -- I won't read it
16  word for word, but if you can just look at the
17  rest of that paragraph where they discuss the
18  SAP.  And do you disagree with anything they
19  say there, starting with, The agency presented
20  its draft cancer evaluation to the FIFRA SAP?
21    A.  I'm not sure about no panelists
22  believing it should be classified as likely.  I
23  don't recall whether that was the case or not,
24  so I can't answer that.

Page 199

1    The next sentence where they talk
2  about where consensus appeared to be reached, I
3  don't believe they did that.  I don't know what
4  their definition of "consensus" is.
5    Again, the rest is just statement
6  of fact.
7    Q.  Okay.  Do you agree that it was a
8  good step for the EPA to have -- to conduct --
9  to have an SAP?
10    MS. GREENWALD:  Objection, form.
11    A.  Yes.
12    Q.  And do you agree that it was a good
13  step for the EPA, understanding that you
14  disagree with their evaluation, to publish that
15  evaluation in their Revised Glyphosate Issue
16  Paper that they reference here?
17    MS. GREENWALD:  Objection, form.
18    A.  I don't know what you meant by
19  "evaluation."
20    Q.  Sure.  It says, EPA's full
21  weight-of-evidence evaluation can be found in
22  the Revised Glyphosate Issue Paper: Evaluation
23  of Carcinogenic Potential, available in the
24  glyphosate public docket -- and then it has a

Page 200

1  cite.
2    A.  Right.
3    Q.  And understanding that you -- I
4  understand that you disagree with their -- many
5  if not all of the conclusions they reach in
6  that evaluation.  My question is simply, do you
7  agree that it was a positive step for them to
8  make publicly available their full
9  weight-of-evidence evaluation?
10    A.  It's a required legal
11  responsibility of them.
12    Q.  Okay.
13    A.  So it's very good that they're
14  doing it.
15    Q.  It is good to comply -- that the
16  EPA complies with the law.
17    A.  Yes.
18    Q.  Okay.  If you go down to the bottom
19  paragraph on this page, it says, EPA's cancer
20  evaluation is more robust than IARC's
21  evaluation.
22    Do you agree or disagree with that
23  statement?
24    A.  What does "more robust" mean?  I

Page 201

1  guess they give it in the next definition.  I
2  disagree with the statement.
3    Q.  Why do you disagree?
4    A.  The last sentence where they talk
5  about discarding non-mammalian species studies,
6  I -- that makes it less robust.
7    Q.  You think it was -- that the EPA
8  should have considered the studies that were
9  available in worms, fish, reptiles, and plants?
10    A.  To some degree, yes.  They carry a
11  little bit of weight.
12    Q.  Okay.  Do you think that the EPA's
13  evaluation was more robust in the -- putting
14  aside that -- and I'm not trying to parse this
15  too much, but do you think it -- I
16  understand -- strike that.
17    Understanding IARC has its rules
18  and can only look at publicly available
19  information, in an ideal world, do you think
20  it's better to be able to consider all of the
21  data, whether publicly available or not?
22    MS. GREENWALD:  Objection, form.
23    A.  In an ideal world, a regulatory
24  agency would transparently share all of the

Christopher J. Portier, Ph.D

Page 202

1 information with everybody out there, and then
2 people could look at it on their own and judge
3 the quality of the weight-of-evidence
4 evaluation that was done by EPA. That would be
5 my favorite place.
6        Barring that, there's arguments for
7 both approaches, and I'm in favor of both
8 approaches.
9     Q.  If you turn to the next page,
10 please, at the top it says, The Agency's cancer
11 evaluation for glyphosate is also more
12 transparent.
13        I think -- they're stating, more
14 transparent than IARC's. And they go on to
15 describe what they mean by "transparent."
16        So if you could review that, and
17 sort of same question, do you agree or disagree
18 with EPA's view that their evaluation was more
19 transparent than IARC's?
20     A.  They're misunderstanding the word
21 "transparent," and they're talking instead
22 about inclusiveness. So yeah, I disagree with
23 the statement. It's not -- they're not talking
24 about transparency; they're talking about

Page 203

1 having peer review and including other people,
2 giving them comments and things. That's not
3 transparency; that's inclusiveness.
4     Q.  So if the statement said, the
5 Agency's cancer evaluation for glyphosate is
6 also more inclusive, would you agree with that
7 statement?
8     A.  Yeah, I would agree with that
9 statement.
10     Q.  Okay.
11     A.  Of public comment and things like
12 that. It's inclusive of something.
13     Q.  And then if you go to the next
14 section, it talks about sort of the next
15 concern that the EPA addresses, which is
16 that -- the assertion that the EPA relies too
17 heavily on industry-funded studies and these
18 studies are not accessible to the public. Do
19 you see that?
20     A.  Yes.
21     Q.  If you turn the page -- and I'm not
22 trying to preclude you, Dr. Portier, from
23 reading anything. But if you turn the page, on
24 page 9, it says that registrant -- in the first

Page 204

1 full paragraph, Registrant-submitted studies
2 are proprietary, and under FIFRA, cannot be
3 released to any representative of a
4 multinational pesticide producer or to anyone
5 who intends to deliver such information to a
6 multinational pesticide producer.
7        And then it talks about FOIA.
8        Do you see that?
9     A.  Yes.
10     Q.  And is that -- first of all, is
11 that consistent with your understanding of
12 FIFRA, to the extent you know?
13     A.  It's a convenient argument. I
14 believe FIFRA is a little more complicated in
15 terms of why they discuss -- they -- they call
16 this proprietary and under what conditions EPA
17 can release proprietary information. This is a
18 very short little sentence on it.
19     Q.  So that may preview the answer to
20 my next question. But my next question is, do
21 you have criticisms of the EPA for relying on
22 industry-funded studies that have not been made
23 available to the public?
24     A.  Only that they're not available to

Page 205

1 the public. There's nothing wrong with those
2 studies per se. The lack of availability to
3 the public doesn't allow me to check to see if
4 their interpretation is correct.
5     Q.  Okay. If you turn to page 10,
6 under Comments on Formulations Toxicity, do you
7 see that?
8     A.  Yes.
9     Q.  And I won't read the whole thing,
10 but if you look at the concern that was
11 expressed by many commenters, I'm going to ask
12 you about that, about the EPA's response.
13     A.  Okay. The first paragraph, you
14 mean?
15     Q.  Yes.
16     A.  Yes.
17     Q.  That's just to sort of set up
18 what -- so when you review EPA's response you
19 know what they're responding to.
20        Tell me when you're ready.
21     A.  Okay.
22     Q.  If you go to the second paragraph
23 of the EPA's response, it says, Glyphosate has
24 been studied in a multitude of studies,

Page 206

1 including on multiple formulations that contain
2 glyphosate. All studies of adequate scientific
3 caliber that the Agency was aware of were
4 incorporated into the risk assessment.
5        And then it talks about ecological
6 assessments.
7        Do you have any criticisms of the
8 process that the EPA sets forth there?
9    A.  No.  No.  They included all the
10 studies that I can find, most of them.  So I
11 don't have a process -- a problem with their
12 inclusiveness of the studies.
13    Q.  Okay.
14    A.  Doesn't seem to be what this
15 comment's about, but they did include the
16 studies.
17        Well, that's not quite right.  They
18 didn't use the glyphosate formulate -- they did
19 mention them, obviously, but they didn't use
20 them in the assessment because they were
21 formulations.  I disagree with that decision.
22 The formulations tell you something about the
23 parent product.  And so, as such, they should
24 be included.

Page 207

1    Q.  And you think the EPA did not
2 include them?
3    A.  Not as much as they could have.
4 Not in the actual evaluation.
5    Q.  Okay.  In --
6    A.  They described some of them, but
7 they didn't actually use them in the evaluation
8 because they're formulations and they're
9 evaluating the parent project -- the parent,
10 glyphosate.
11    Q.  Understood, okay.
12        If you turn to the next page, it
13 says, Most studies -- I'm halfway down the
14 first paragraph.
15        Most studies using commercial
16 formulations identified as part of EPA's review
17 were in vitro studies, which are difficult to
18 translate into in vivo effects where metabolism
19 and clearance would play a large role in
20 potential toxicity.
21        Do you agree or disagree with that
22 statement?
23    A.  It would be difficult to translate
24 into in vivo effects, sure.

Page 208

1    Q.  So you agree with that statement?
2    A.  Yeah.  I suspect EPA's science
3 office would be unhappy that they wrote it this
4 way.  But yes, I agree with the statement.
5    Q.  Okay.  Then the next sentence says,
6 EPA gave in vivo studies greater weight,
7 however none of the in vivo studies with
8 commercial formulations were found to be of
9 adequate quality for use in human risk
10 assessment.
11        Do you agree or disagree with that
12 statement?
13    A.  Disagree.
14    Q.  Why do you disagree with that
15 statement?
16    A.  There are in vivo studies -- first
17 of all, the mammalian micronucleus assay, which
18 they did consider in great detail and give a
19 considerable amount of weight to.  There were a
20 number of studies done with that assay with the
21 formulated product.  And they did give some
22 weight to that.  Well, no, they didn't, because
23 it's a formulated product.  They didn't use it.
24    Q.  So they certainly -- they

Page 209

1 considered them.  Would you agree with that?
2    A.  Yes.  They considered some of them.
3    Q.  Okay.  And then if you go on, I
4 won't read the whole sentence, but they have
5 a -- the next sentence that starts, Common
6 limitations observed in in vivo formulations,
7 do you see that?
8    A.  Mm-hmm.
9    Q.  And if you'll just read that to
10 yourself and then let me know if you agree or
11 disagree with the full sentence.
12    A.  Some of the studies had these
13 limitations, as did some of the
14 glyphosate-alone studies.  That's all I can
15 say.
16    Q.  Okay.  And then in the next
17 paragraph, I won't read the whole paragraph,
18 they talk about a collaboration with the NTP.
19 Do you see that?
20    A.  Yes.
21    Q.  And do you agree that that's a
22 positive step that they are engaged in that
23 collaboration?
24    A.  It's an interesting statement to

Christopher J. Portier, Ph.D

---

Page 210

1  put after the previous one, and why I said I
2  thought EPA's science office would not be happy
3  with the way that was written.
4         What they're doing with NTP is
5  strictly in vitro assay data, which they claim
6  is difficult to translate into in vivo data
7  because of metabolism problems, et cetera.  So
8  they're kind of playing a game here.
9      Q.  Well, do you agree that it's a
10  positive step that they are -- whether certain
11  people within EPA would be happy or not about
12  the statement, do you agree that it is a
13  positive step that they are engaged in this
14  collaboration with NTP?
15      A.  It is.  I don't -- I don't agree
16  with the previous statement that said -- made
17  it seem that it's so dismal to use in vitro
18  data to predict in vivo response.  I don't
19  think it's that dismal, and I think this is a
20  positive step.
21      Q.  And I'm not disagreeing with
22  your -- I have no reason to actually -- to know
23  one way or the other.  But how do you know that
24  what they're doing with NTP is strictly in

---

Page 211

1  vitro?
2      A.  Oh, that was published.  NTP put
3  out a flyer about it --
4      Q.  Okay.  It's probably --
5      A.  -- as part of their --
6      Q.  It's probably at this website here?
7      A.  Probably.
8      Q.  Yeah.
9      A.  It's part of their hard --
10  high-throughput screening and stuff like that
11  that they're trying to do.  They're looking at
12  whether it binds to receptors and things like
13  that.
14      Q.  Okay.  So that's something that
15  whatever statement NTP put out, you have
16  reviewed?
17      A.  I have looked at, yes.
18      Q.  Okay.  If you turn all the way
19  ahead to page 19, this is under Scientific
20  Assessments; do you see that?
21      A.  Yep.
22      Q.  And if you look under -- well,
23  first of all, if you look under Risk Summary,
24  there's a paragraph there that starts, The EPA

---

Page 212

1  thoroughly assessed risks to humans from
2  exposure to glyphosate from all uses and all
3  routes of exposure and did not identify any
4  risks of concern.
5         I assume you disagree with that
6  statement?
7      A.  They really play games with their
8  words a bit.  They assessed hazards.  They
9  found no hazards.  Therefore, they didn't
10  assess risk.  They only assess risk when they
11  find a hazard.  So the first half is
12  technically wrong.  EPA thoroughly assessed
13  hazards to humans and found none.  Therefore,
14  they did not identify any risks of concern.
15         Anyway, the thought of the sentence
16  is correct.
17      Q.  Okay.  Well, how would you describe
18  the difference between a hazard and a risk?
19      A.  A hazard would have been if they
20  found that glyphosate could, under certain
21  conditions, cause cancer in humans.  The risk
22  is, those conditions do not exist in the real
23  world, and that would be no risk.
24      Q.  And the IARC determination, that

---

Page 213

1  was a hazard determination, correct?
2      A.  That is correct.
3      Q.  And so IARC did not make a
4  determination one way or the other whether the
5  conditions under which they said it was a
6  probable carcinogen exist in the real world,
7  correct?
8      A.  Not technically correct.  Because
9  they -- because that decision depends upon the
10  quality and the magnitude of the effects seen
11  in the human epidemiology studies, they are
12  making somewhat of a statement about the
13  existence of exposures in the population that
14  would demonstrate this type of event.  So it's
15  not completely devoid of a statement about risk
16  in the real world.
17      Q.  And not to debate linguistics, but,
18  I mean, they're including some evaluation of
19  human exposure in their assessment, meaning
20  IARC, right?
21      A.  Correct.
22      Q.  Because they're looking at
23  epidemiology that has actual exposure, correct?
24      A.  Correct.

---

Christopher J. Portier, Ph.D

1  Q.  But do you agree that under -- have
2  you reviewed the preamble of IARC Monographs?
3  A.  The new one or the old one?
4  Q.  Let's start with the old one.
5  A.  I chaired the session that wrote
6  the old one.  Yes, I reviewed it very
7  carefully.
8  Q.  And so do you agree that under the
9  old preamble, while epidemiology may be
10  considered, at the end of the day the
11  classification is a hazard classification?
12  A.  The classification is a hazard
13  classification.  That is correct.  But that
14  wasn't what you'd said.
15  Q.  Understood.
16  A.  Okay.
17  Q.  And do you agree that, with respect
18  to glyphosate, IARC found that the evidence for
19  epidemiology was limited under their definition
20  of "limited"?
21  A.  Correct.
22  Q.  And so with those -- understanding
23  that IARC looked at human epidemiology and
24  assessed it as limited, do you agree, then,

1  with the statement that the classification as a
2  2A carcinogen was nonetheless -- it was not
3  saying that it is a carcinogen under the
4  conditions in which people are exposed to
5  glyphosate in the real world?
6  MS. GREENWALD:  Objection, form.
7  A.  I wouldn't agree with that
8  statement that you just made.  I would not.
9  Q.  For the same reasons we just
10  discussed?
11  A.  Yes.
12  Q.  Okay.
13  A.  Because it says something.  It's
14  not explicit, but it does say something.
15  Q.  Okay.  Based on -- understanding
16  that you disagree with the verb -- a lot of the
17  verbiage in this Proposed Interim Registration
18  Review Decision, do you have any additional
19  criticisms of the EPA's process coming out of
20  this document, beyond what you've testified to
21  in Pilliod and other cases?
22  A.  I would have liked to have seen a
23  line-by-line response to the FIFRA SAP.  They
24  didn't do that.  They just gave some broad

1  responses to a few of the SAP results.  I think
2  the SAP spent a lot of time and I think they
3  deserved real answers to every one of their
4  questions.
5  Other than that, I have no other
6  criticisms.
7  Q.  Okay.  We can put that aside.
8  So I want to -- I promise I'm not
9  going to go through every animal study in
10  detail, but I do want to ask you some sort of
11  macro questions about the animal studies.  So
12  if you want your report, I have it.  And I know
13  that there have been some changes.  But if you
14  don't need it -- I'll try to ask the questions,
15  and then --
16  A.  Yeah.  Let's see --
17  Q.  I'm not trying to keep the report
18  from you if you need it.
19  Okay.  So -- and I may -- I'm going
20  to get the numbers wrong, but how many
21  studies -- animal studies, both rat and mice
22  studies, are you relying on to form your
23  opinions about the -- just focused on animal
24  studies?

1  A.  I think at this point I have
2  reviewed 23.  The weight of my reliance,
3  let's -- to say I completely don't rely on
4  something is kind of hard to say because, of
5  course, I've read it.  It sticks in my head.
6  But the greatest weight is being given to --
7  how many -- seven rat studies and six mouse
8  studies.
9  Q.  Okay.
10  A.  And one of those mouse studies is
11  very partially reported, but 13 studies.
12  Q.  So 13 out of 23?
13  A.  I believe so, yes.
14  Q.  So you've been able to identify 23
15  animal studies on glyphosate; is that correct?
16  A.  Direct oncogenic measurements after
17  exposure to glyphosate or a formulation.
18  Q.  So let's start with the 10 of 23
19  that you have considered and reviewed but are
20  not --
21  A.  Getting heavy weight.
22  Q.  -- giving heavy weight.  And I
23  don't want to -- at a high level, can you
24  explain to me -- I'm not asking you to go one

Page 218

1 by one. I realize it may be different across
2 studies. But why are you not giving heavy
3 weight to those 10 studies?
4 A. Two of the studies were falsified
5 by a laboratory, according to EPA. They judged
6 them to be illegal documents, in essence.
7 Q. Just if I pause there, you're not
8 blaming Monsanto for that?
9 A. Oh, no. Absolutely not. The NTP
10 got caught by the same -- we paid the same
11 contractor to do the same crappy work.
12 Q. Okay. So now there are eight left.
13 A. Yeah. Please. That's terrible.
14 The other eight, some of them were
15 reported inappropriately. It just -- it wasn't
16 enough to understand what they actually did.
17 Some of them used so low exposures and got no
18 response, and you would expect that if the
19 exposures were so low. And so it's of little
20 use to see a study that's inadequate.
21 Some studies were -- one study was
22 aimed at something else and the Roundup work
23 was a side issue, and it was a very small
24 study, hard to see how to use it.

Page 219

1 And I'm sorry, there's 14, because
2 I include -- I do put weight on the
3 initiation-promotion study. So there are 14
4 of -- I'm sorry, there are seven mouse studies,
5 a total of 14 studies.
6 Q. Out of 23 or 24?
7 A. I think it's 23. Might be 24. I'm
8 never going to remember that number perfectly.
9 It will be 23 or 24.
10 Q. Okay. So I think you're right that
11 it's 23. I just wanted to make sure that you
12 were not changing the denominator. But you're
13 saying that the George study is the 14th study
14 that you're referencing?
15 A. Yes.
16 Q. It's just a different type -- the
17 methodology is different?
18 A. And the 13th study is the Takahashi
19 study which came out of the reading of the --
20 Q. Something in Europe.
21 A. -- the JMPR --
22 Q. JMPR. Got it. Okay. Yes.
23 A. -- document.
24 Q. And you testified to that in

Page 220

1 Pilliod. Okay.
2 And the studies -- so first of all,
3 the two falsified studies, those were done by
4 IBT; is that right?
5 A. Yes.
6 Q. And then for the low exposure
7 studies, did you compare the exposure in the
8 animals in those studies to exposures that had
9 been reported in epidemiology studies?
10 A. No. It wouldn't have mattered.
11 The proper way in which to do a toxicology
12 study in rodents is to challenge the animals as
13 hard as you can, because you only have 50
14 animals. It's not like an epi study -- a
15 cohort study in epi where you can have tens of
16 thousands of people. You have to challenge
17 them hard. And if you don't challenge them
18 hard, it's considered an inadequate study.
19 Q. So if you don't start from the
20 premise of using the maximum tolerable dose
21 and --
22 A. Or at least close to it.
23 Q. Okay. Then it -- you find it
24 invalid and not worth considering?

Page 221

1 A. Depends how far away they are from
2 the maximum tolerated dose. In this case, they
3 were about 200 away from -- 200-fold away from
4 the maximum tolerated dose. And they were
5 negative. If they'd been positive, then you
6 would use them. But you can't use a negative
7 in that context because a negative in that
8 context is expected. You didn't challenge the
9 animal. A positive would be unexpected and
10 you'd have to consider a positive seen in one
11 of those studies.
12 Q. Okay. So now I want to ask you
13 about the 13 studies, and I'm not -- I
14 understand that you're relying on the 14th
15 study in George. But I'm not asking about that
16 for now since it's different methodology and
17 you've also been asked about it extensively.
18 So let's just start with the rat
19 studies. I think you said there were seven rat
20 studies; is that correct?
21 A. Correct.
22 Q. And on a high level, do you agree
23 that there were zero reports of lymphoma in any
24 of those seven studies?

Christopher J. Portier, Ph.D

Page 222

1  A. Oh, no, there were malignant
2  lymphomas all over in those studies. There
3  were no increases in malignant lymphomas as a
4  function of exposure.
5  Q. Okay. Fair enough.
6  A. They looked at it.
7  Q. Okay. So there were no -- there
8  was nothing in the lymphomas in those studies
9  that caused you concern?
10  A. Not to my recollection. I'm pretty
11  sure no.
12  Q. Okay. Now, let's shift now to the
13  six mouse studies, including Takahashi. I'm
14  going to try to get my math right. Each study
15  had, because of the -- just to break it down,
16  you have male mice and female mice, right?
17  A. Correct.
18  Q. And then you have a low-dose group,
19  a medium-dose group, and a high-dose group,
20  correct?
21  A. As a general rule, yes.
22  Q. Is that --
23  A. One of the studies has an
24  extra-dose group.

Page 223

1  Q. One of the studies does?
2  A. Yeah. I don't know if it's a rat
3  study or a mouse study, though. It's one of
4  the Atkinson studies, but I don't remember
5  which one.
6  Q. Okay. Well, why don't I --
7  A. But the rest will.
8  Q. If I hand you your report, will it
9  help you to --
10  A. Sure. It will take me 12 seconds
11  to find it.
12  Q. Exactly. Yeah. I'd rather have
13  accuracy here. We'll be doing a little bit of
14  math, and I'd rather have it be accurate.
15  (Exhibit Portier-9 marked for
16  identification and attached to the
17  transcript.)
18  BY MR. STEKLOFF:
19  Q. So I'm going to hand you as your
20  report, which I know Ms. Greenwald does not
21  want, Exhibit 9.
22  A. It was a rat study.
23  Q. Okay. So let's focus on the mice
24  study. In each study you had six groups of

Page 224

1  mice receiving some amount of glyphosate,
2  right? Three in each -- three doses in each
3  gender?
4  A. Yes.
5  Q. Okay. And so six times six studies
6  means that you had 36 groups of mice receiving
7  some amount of glyphosate?
8  A. Yes. I would guess so, yes.
9  Q. Okay. And -- now, I don't know
10  where Takahashi -- I will concede -- I have
11  some questions relayed out, and I will concede
12  that Takahashi is not part of it. But -- so
13  correct me if I'm wrong based on Takahashi, but
14  do you agree that in those 36 groups, only 12
15  had a statistically significant finding of some
16  type of tumor?
17  A. Oh, that I can't tell you. I'm
18  sorry. That I can't do without spending some
19  time looking at my most recent analyses.
20  Q. Well, can you look at your report
21  and tell me?
22  A. I can tell you from this report,
23  but to be honest, it's changed a little. There
24  would be one or two that have not been in this

Page 225

1  report that we have included. I need the
2  supplemental report as well.
3  Q. That were statistically
4  significant?
5  A. Yes.
6  Q. That went from non --
7  A. They were just non-evaluated.
8  Because this report derived its tumors that are
9  listed from what was mentioned in any
10  regulatory report, and then when your
11  consultant did all of the data, he found seven
12  or eight more tumors which I had to incorporate
13  in this, and then when I redid all the data
14  after him, I found an additional two tumors.
15  Q. Okay.
16  A. And so they're not in here, all of
17  them. Some are in that supplemental; some of
18  are in here; some are still sitting on my
19  computer.
20  Q. Okay. Well, I'm going to hand --
21  (Exhibit Portier-10 marked for
22  identification and attached to the
23  transcript.)
24  BY MR. STEKLOFF:

Christopher J. Portier, Ph.D

Page 226

1    Q.  Let's do the best we can, if you
2  don't mind trying.  And then -- so that's
3  your -- Exhibit 10 will be your supplemental
4  report.
5    A.  Not supplemental.  I'm sorry, the
6  rebuttal report.
7    Q.  All right.  We'll find that one,
8  too.
9        MS. GREENWALD:  Yeah, that's what
10  it was.
11        THE WITNESS:  That was my mistake.
12        MR. STEKLOFF:  We'll mark that one
13  as -- well, let's just -- we'll un- --
14  well, you have stickers on there.  We'll
15  mark that one as Exhibit 11.  We have
16  that one, too.
17        (Exhibit Portier-11 marked for
18        identification and attached to the
19        transcript.)
20  BY MR. STEKLOFF:
21    A.  Okay.  Let's see what we've got
22  here.  Now, you want statistically significant
23  by the definition of 0.05 --
24    Q.  Yes.

Page 227

1    A.  -- which I don't agree with as a
2  general rule, but I will do it for you this
3  way.  Let's see, male and female,
4  Sprague-Dawley -- this is the Lankas study.
5  That one was positive.  Thyroid, female --
6        MS. GREENWALD:  So if you --
7    A.  Both of those are positive.
8        THE WITNESS:  Sorry.
9        MR. STEKLOFF:  I think this is
10  internal -- and maybe if you don't speak
11  it, then she won't have to report it.
12        MS. GREENWALD:  She feels she has
13  to write it down if you speak, which is
14  technically correct.  So --
15        MR. STEKLOFF:  Do you want a pen?
16        MS. GREENWALD:  Go for it.
17        (Reporter interruption.)
18    A.  Oh, I'm sorry.  I don't look at the
19  data the way you're addressing it.  I would
20  actually have to sit down and do an analysis to
21  make sure I got the question right in the way
22  you've addressed it because you're treating
23  each dose group as a separate group, whereas I
24  do a trend test, which means I treat each study

Page 228

1  sex as a separate group.  It would take me
2  literally an hour or two to go through this and
3  give you the answer to your question.
4        I can certainly -- if Robin agrees,
5  I can certainly follow up with an answer to
6  that question, but I have to do a Fisher's
7  exact test on each one, verify I got the right
8  p-value, and then tell you whether it's
9  positive or not, rather than what I did, which
10  is a trend test on each tumor.
11    Q.  Got it.  So what -- put aside that
12  you might not be able to do what I've asked you
13  to do right on the spot in the moment, you
14  could tell me, of the -- for the each of the
15  six studies, you could tell me male and female
16  whether the trend was statistically
17  significant?  So times 12 --
18    A.  Yes, I can.
19    Q.  -- you know, 12 data points, you
20  could tell me how many of those were
21  statistically significant?
22    A.  And that's what I was work -- oh,
23  how many?  Or had at least one statistically
24  significant finding, or how many total findings

Page 229

1  there were?  There were roughly 35 total
2  positive findings of trend in those 12
3  datasets, almost all of it in males.
4    Q.  Okay.  And that's what I want to
5  know is how many -- maybe you can tell me, of
6  those approximately 35, how many were
7  statistically significant?
8    A.  All of them.
9    Q.  They were all statistically
10  significant to 0.05?
11    A.  Yeah.  That's why I raised them.
12  There were 35 positive at 0.05, either by the
13  trend test or alone -- alone, or when it was a
14  rare tumor, defined as less than 1 percent
15  historical control response, when combined with
16  the historical control data using the Tarone
17  test, it was significant.  That brings the
18  total I believe to 35.
19    Q.  What if you take out the historical
20  control?
21    A.  Why would I do that?  That's a
22  classic way of approaching the data.  But if I
23  take out the historical controls, that
24  removes -- I believe I only did one, two,

Christopher J. Portier, Ph.D

Page 230

1  three, four, five -- I only did five historical
2  control analyses.  Four of them were
3  statistically significant.  So it would remove
4  four of those findings.
5      Q.  Four out of 35?
6      A.  Four out of 35.
7      Q.  Okay.  So you never conducted an
8  analysis of -- as opposed -- the original
9  analysis that I had asked you to calculate,
10  you've never calculated that?
11      A.  No, because as I pointed out at the
12  beginning of my expert report, just before I do
13  the animal evidence, I'm basing my decision on
14  the trend test.  That is the appropriate -- the
15  most appropriate statistical tool.
16          What you were asking me was to base
17  my decision on the pairwise comparison, which I
18  provided, but I'm not absolutely certain I got
19  the numbers exactly right there for the
20  p-values.  So I'd be uncomfortable just diving
21  in.  I'd want to double-check my numbers.
22      Q.  Okay.  That's fine.
23      A.  Because it was secondary to me.  It
24  was just there for informational purposes.

Page 231

1      Q.  Right.  Yeah.  And I'm not -- I
2  understand the role that the pairwise
3  comparison played in your opinions.
4          Okay.  On the animal studies,
5  understanding what you've said about why animal
6  studies need to start from the maximum
7  tolerated dose, or close to the maximum
8  tolerated dose, do you agree that the maximum
9  tolerated dose in those studies is thousands of
10  times higher than the dose that humans are
11  exposed to in the real world?
12      A.  I'm not an expert in human exposure
13  in the real world.  But as a nonexpert, that is
14  my understanding.
15      Q.  We might come back to the animal
16  studies, but I'm going to -- Cali is going to
17  educate me on a break and we're going to move
18  on.
19          So have you reviewed the most
20  recent -- I'm calling it a paper -- or tox
21  profile by the ATSDR related to glyphosate?
22      A.  I read it, yes.
23      Q.  And do you have criticisms of that
24  tox profile?

Page 232

1      A.  Specifically the cancer part of
2  that tox profile.
3      Q.  Yes, yes.
4      A.  Yes, of course.  They missed half
5  of the -- more than half of the data.
6          (Reporter interruption.)
7      A.  More than half of the data.  They
8  didn't even include some of the studies at all,
9  which EPA had reviewed, yet they cite EPA as
10  the source for all of their material.  They did
11  not come to a conclusion on the carcinogenicity
12  at all.  That's -- that's criticism enough.
13      Q.  So when you say they missed more
14  than half the data, are you talking about
15  animal data specifically?
16      A.  The animal cancer data.  And I'll
17  split that into two things.  There are two ways
18  you can miss animal cancer data.  One is, you
19  didn't include the animal cancer study.  And
20  they did -- they didn't include some of the
21  studies even though it's well-known those
22  studies are out there.  And the second is that
23  even for the studies they included, they did
24  not include all the tumors that had been

Page 233

1  identified in my publications, in EPA's
2  publications, and EFSA's publications.  So they
3  didn't do a complete job.
4      Q.  And then where you say they did not
5  come to a conclusion, specifically related to
6  cancer, do you think they should have come to a
7  conclusion?
8      A.  I think it's -- it's unusual in a
9  tox profile to review the cancer data, but if
10  you were going to review the cancer data, you
11  probably should have come up with a decision.
12  But they typically don't come up with decisions
13  about cancer.  Their decisions are every other
14  end point.  So they sort of went in between:
15  We're going to look at some of the data, but
16  we're not going to reach a decision.
17      Q.  So would you -- I'm not saying you
18  would have agreed with the conclusion, but do
19  you think it would have been better if they had
20  said that they don't think that glyphosate is
21  carcinogenic, at least -- and offered a
22  conclusion?
23          MS. GREENWALD:  Objection to form.
24      Q.  From a process standpoint.

Christopher J. Portier, Ph.D

1    MS. GREENWALD:  Same objection.
2    A.  From whose perspective?
3    Q.  From a methodology perspective.
4    A.  It's --
5    MS. GREENWALD:  Same objection.
6    A.  This was clearly a policy decision
7 of some sort, and I don't know what drove it.
8    Q.  Okay.  Did you review their -- I'm
9 not trying to go line by line, but their
10 comments about the limitations of certain
11 studies that they did identify?
12    A.  I read the whole document, so I'm
13 sure I must have.
14    Q.  Okay.  You're aware that
15 Dr. De Roos was one of the peer reviewers?  Are
16 you aware?
17    A.  Yes, I saw that.
18    Q.  And are you -- do you know
19 Dr. De Roos?
20    A.  I don't know if I've ever met her.
21 Certainly we have corresponded.  She was not at
22 the IARC Monograph review.  I don't think she
23 was one of the members.
24    Q.  Not that I'm aware of.

1    A.  Then I don't think I've met her.
2 We certainly have corresponded.
3    Q.  Right.  I mean, she signed on to
4 your 2016 --
5    A.  I know.
6    Q.  -- letter, correct?
7    A.  Right.
8    Q.  But you don't know her current
9 position on the carcinogenicity of glyphosate
10 since 2016, taking into account AHS and ATSDR
11 review, for example?
12    A.  I doubt if she has a position.  I
13 suspect her position would be on the
14 epidemiology data alone.  She's not an animal
15 tox person.
16    Q.  Okay.  You don't know her position
17 on the epidemiology --
18    A.  No.
19    Q.  -- alone at this point either?
20    A.  No.
21    Q.  And it could have changed since the
22 2016 letter?
23    MS. GREENWALD:  Objection, form.
24    A.  Don't know.

1    Q.  Well, it's possible it could
2 have -- it's different since 2016?
3    A.  Anybody's opinion can change.
4    Q.  Right.  And that's true for all of
5 the 96 doctors or scientists who signed on to
6 your letter, correct?
7    MS. GREENWALD:  Objection, form.
8    A.  Is it true that I don't know their
9 opinion, or is it true that they could have
10 changed their opinion?  Which part are you
11 asking me about?
12    Q.  It's true that they could have
13 changed their opinion, correct?
14    A.  Of course.
15    Q.  For some you may -- Dr. Blair, I
16 assume you know -- you believe his opinion is
17 the same?
18    A.  No, I haven't talked to him.
19    Q.  Okay.
20    MR. STEKLOFF:  I'm going to mark
21 the ATSDR as Exhibit 12.
22    Want a copy?
23    MS. GREENWALD:  Thank you.  Are you
24 going to go over a lot?  If you are --

1    MR. STEKLOFF:  No.  No.
2    MS. GREENWALD:  Okay.
3    (Exhibit Portier-12 marked for
4    identification and attached to the
5    transcript.)
6 BY MR. STEKLOFF:
7    Q.  If you turn to page 76,
8 Dr. Portier, please.
9    A.  Okay.
10    Q.  And you see here a discussion of
11 the De Roos 2003 study?  Do you see that?
12    A.  Yes, I do.
13    Q.  And that's -- how much weight do
14 you put on that study in your overall
15 assessment of the epidemiology?
16    MS. GREENWALD:  Objection, form.
17    A.  And impossible to answer.  It's
18 seven.  The units are impossible to answer.  I
19 don't know how to tell you how much weight I
20 put on it.  It's an important study.
21    Q.  Okay.  And do you see that in the
22 limitations on the right, one of the
23 limitations is that there were no specific
24 conclusions for glyphosate and NHL?

Page 238

1    A.  Yeah, I don't know what that means.
2  Of course, there were -- there were odds
3  ratios.  There were conclusions.
4    Q.  Okay.  So you disagree with this
5  statement in the ATSDR --
6    A.  I don't know what they mean when
7  they talk about no specific conclusions.
8  That's all I can say.
9    Q.  Okay.
10    A.  Oh, I see.  They're saying the
11  author didn't have any conclusions.  The "study
12  author conclusions and limitations."  That's
13  what they're saying.  Okay.  I actually thought
14  they had a conclusion, De Roos 2003.  But I'd
15  have to go back and look.
16    Q.  Okay.  And if you -- I'm not trying
17  to do a memory test.  But are there specific
18  studies where you -- before you said that there
19  were specific studies that they didn't include
20  that they should have included.  Are there
21  specific studies -- animal studies that you
22  recall that they did not include?
23    A.  Not right off -- is there a table
24  of the animal studies in here?  I can --

Page 239

1    Q.  I'm sure there is.
2    A.  So they've got 210, which looks
3  like the Knezevich and Hogan study.  211, also
4  Knezevich and Hogan.  That looks like Wood.
5  It's -- it's not easy.  They didn't use
6  the same names.  But they only reference I
7  think three or four total studies in what
8  they've looked at here, of the 15 that -- or 14
9  that -- 13, whatever they wanted to use that
10  should have been looked at.
11    Q.  Okay.  And do you have any similar
12  or other concerns about the discussion of
13  genotoxicity that looks like it starts on page
14  96 and continues to page 105?
15    A.  I wish I would have known you were
16  asking me this.  I actually had notes on which
17  studies they looked at and which ones they
18  missed as I was reading it.
19    They again are missing some of the
20  papers here, but it's not systematic in any
21  way, shape, or form.  They're just reporting
22  what they're seeing in these data.  It's fine
23  as far as it goes.
24    Q.  Okay.  If you --

Page 240

1    MR. STEKLOFF:  I guess, Robin, I
2  would just say, if he -- if Dr. Portier
3  intends on relying on -- you know,
4  offering opinions about the -- to be
5  clear, at trial, on the limitation -- or
6  the inadequacies of the ATSDR report, we
7  would ask for his notes that he took on
8  those, assuming a lawyer wasn't involved
9  in that, which it sounds like it wasn't.
10    A.  Yeah.
11    Q.  If you'll just hang on to whatever
12  notes you took as you were reviewing this.
13    A.  If they're not in Australia.
14    Q.  Oh, okay.
15    A.  I have to see if I took them home
16  with me.  But I -- I believe I did.
17    Q.  If you did, that's great, and we
18  would just ask that --
19    A.  I limit paper bulk when I travel.
20    Q.  -- you keep them and give a copy to
21  Robin at the appropriate time.  But if they're
22  in Australia, I totally understand.
23    MS. GREENWALD:  No problem.
24    Q.  All right, you can put that aside.

Page 241

1  Thank you.
2    Turning to a new topic, you're
3  aware that the NTP conducted an animal toxicity
4  study on glyphosate in 1992; is that right?
5    A.  It was a micronucleus assay, yes.
6    Q.  Okay.
7    A.  A genotoxicity assay, effectively.
8    Q.  Were you at NTP at that time?
9    A.  What year was it?
10    Q.  1992.  The report came out in 1992.
11    A.  Part of my job involved working
12  with NTP at that time.  Not on this, though.
13    Q.  So you weren't involved in any way?
14    A.  No, not on the acute toxicity
15  stuff, no.
16    Q.  Are you aware that the study was
17  peer-reviewed by independent scientists?
18    A.  They always are.
19    Q.  And it did look at the effects of
20  glyphosate on both rats and mice?
21    A.  Yes.  No.  It was a mouse
22  micronucleus assay study, wasn't it?
23    Q.  I think -- well, I'll hand it to
24  you.  I'm not trying --

Christopher J. Portier, Ph.D

Page 242

1    A.   Yeah.  Thank you.
2         MR. STEKLOFF:  This will be Exhibit
3    13.
4         (Exhibit Portier-13 marked for
5    identification and attached to the
6    transcript.)
7    BY MR. STEKLOFF:
8    A.   Rats and mice, that would be
9    unusual.  It does say rats and mice.
10   Q.   Look at page -- I think it's around
11   page 12.  Hold on.
12   A.   Now, these are a full -- acute
13   toxicity 13-week studies and 14-day studies.
14   Okay.  Yes, it's rats and mice.
15   Q.   Okay.  And are you aware that in
16   this study, the NTP found no evidence of
17   mutagenicity for glyphosate?
18   A.   In the one part of the mouse
19   micronucleus assay, I believe.  But I don't
20   think they looked at it in the rats.
21   Q.   In the part they -- anywhere they
22   looked, they did not find evidence of
23   mutagenicity; is that correct?
24   A.   That is correct.  But it was only

Page 243

1    the mice -- they found them in the mammalian
2    system they looked at, which was a -- I think
3    the mouse.
4    Q.   And do you agree this was a
5    well-conducted study by the NTP?
6    A.   Oh, almost certainly, yes.
7    Q.   And did you weigh this study in
8    forming your opinions about the genotoxicity of
9    glyphosate?
10   A.   It was part of it, yes.
11   Q.   You're aware that the NTP has
12   looked at oxidative stress of glyphosate or the
13   potential for oxidative stress of glyphosate as
14   recently as last year, correct?
15   A.   I'm aware that there was a
16   abstract -- a poster at a meeting, but I
17   haven't seen a paper.
18   Q.   Okay.  To date, NTP has never made
19   a conclusion that glyphosate is genotoxic,
20   correct?
21   A.   Not that I'm aware of.
22   Q.   And I know you've been asked
23   extensively about this, but your -- I think
24   there was some question of the most recent NTP

Page 244

1    report on carcinogens.  I mean, do you agree
2    that as of today, NTP has not included
3    glyphosate or Roundup in its report on
4    carcinogens?
5         MS. GREENWALD:  Objection, form.
6    A.   As far as I know, it has not been
7    evaluated, period.
8    Q.   When you say not evaluated, what
9    does that mean?
10   A.   The report on carcinogens is a list
11   of known or reasonably anticipated to be
12   carcinogens of the U.S. Government.  Many
13   things get looked at and don't make the list.
14   And you have to go looking for that.  So when
15   you talk about what's in the report on
16   carcinogens, you're talking about the things
17   that have been reviewed and are on the list.
18        I don't think glyphosate has even
19   been reviewed.  I don't think it's even been
20   considered to go on the list.
21   Q.   What's your basis for suggesting
22   that?
23   A.   Well, you can go look at the most
24   latest report, and it tells you what has been

Page 245

1    looked at but not on the -- doesn't make the
2    list.
3    Q.   Oh, okay.  So in the -- the most
4    latest report I think is in 2016; is that --
5    A.   Yes.
6    Q.   And you're saying in that report it
7    says, we looked at water, and water is not a
8    carcinogen?
9    A.   Water did not make our criteria to
10   be on this list.
11   Q.   Yes.  And so --
12   A.   It doesn't mean it's not a
13   carcinogen.  It means that the data is
14   insufficient to put it where it needs to go if
15   it needs to go there.
16   Q.   Fair enough.  And so you're saying
17   that you don't believe that that assessment has
18   been conducted by NTP with respect to
19   glyphosate?
20   A.   Correct.
21   Q.   But you do agree that glyphosate is
22   not on the list as of 2016?
23        MS. GREENWALD:  Objection, form,
24   asked and answered.

Page 246

1    A.   As far as I know, that is correct.
2        MR. STEKLOFF:  Okay.  Can we go off
3    the record?
4        VIDEO OPERATOR:  We are now going
5    off the video record.  The time is 3:09.
6        (Recess from 3:09 p.m. until
7    3:25 p.m.)
8        VIDEO OPERATOR:  We are now going
9    back on the video record.  The time is
10   3:25.
11   BY MR. STEKLOFF:
12       Q.   Okay, Dr. Portier, I'm trying to --
13   going back to the animal studies.  We had
14   talked a little bit off the record, but let's
15   go on the record.  You've said -- just to use
16   Pilliod -- most recently you've said there are
17   35 positive findings related to some form of
18   cancer in the animal studies that you've
19   reviewed, correct?
20       A.   I think it's in that neighborhood.
21   It might be 33 or something along --
22       Q.   Okay.  And I just want to get an
23   example.  So can you look at your rebuttal
24   report and look at page 33, which has a

Page 247

1    modified Table 9.
2        A.   Yes, thank you.  And I'm sorry.
3    Which page?
4        Q.   30 -- let's start at 33.
5        A.   So the mice.
6        Q.   Yes.  I'm only talking about mice
7    studies.
8        A.   Okay.
9        Q.   And if you use Knezevich and Hogan,
10   on this modified Table 9, of the approximately
11   35 positive findings, how many of these
12   findings on this table would be included in
13   that?
14       A.   Four.
15       Q.   Which four?
16       A.   Kidney adenoma, original pathology.
17   Maybe.  I don't remember, when I counted it,
18   whether I did that or not.  Clearly the kidney
19   carcinomas, and the kidney carcinomas and
20   adenomas combined, and the spleen composite
21   lymphosarcoma.  I'm trying to remember if
22   there's anything else after this.  I can't be
23   certain.  But that would be, I believe, the
24   three here.

Page 248

1        Q.   So if we had your color-coded chart
2    that you've used historically with Mr. Wisner,
3    those would be the only three that would be
4    reported on it from Knezevich and Hogan?
5        A.   No, because Mr. Wisner also used
6    the marginally significant findings, which I
7    agree we should look at and think about in
8    doing this, and -- well, I don't see any more
9    marginally significant ones on here.  So that
10   would be the three from Knezevich and Hogan
11   for --
12       Q.   Okay.  What's your definition of
13   "marginally significant"?
14       A.   0.05 to 0.1.
15       Q.   To 0.1, okay.  And of the 35,
16   understanding it might not be exactly 35, does
17   that include marginally significant or just --
18       A.   No.
19       Q.   No.
20       A.   Just significant.
21       Q.   So there's more -- so if you'd put
22   marginally significant, it's more than 35?
23       A.   You know, I should be careful with
24   that number.  There are 35 cancers that should

Page 249

1    have been reported in the -- no, no, no, no,
2    no, no.  Let's finish your accounting, and then
3    we'll get back to this.
4        Q.   Well, I guess my last question was,
5    if you put marginally significant, it's more
6    than 35?
7        A.   Yes.
8        Q.   Okay.
9        A.   Is that right?  I'm sorry, I don't
10   have my computer.  Give me my computer, I could
11   address the question in minutes.  But I can't
12   easily address it other than going through this
13   one at a time.
14       Q.   And then just to go back to
15   Modified Table 9, the reason you say kidney
16   adenoma and carcinoma combined is statistically
17   significant is because of the historical
18   controls, right?
19       A.   Correct.
20       Q.   Okay.  But what you're saying is
21   for all --
22       A.   I'm sorry, yeah, here it is.  If
23   you look at Table 15.
24       Q.   Okay.

Christopher J. Portier, Ph.D

Page 250

1    A.  It's in Table 15.
2    Q.  In your rebuttal report?
3    A.  Yes.  That's 30 of the 30-something
4  tumors are identified right there for you, at
5  the 0.05 level:  Nine in male Sprague-Dawley
6  rats; three in female Sprague-Dawley rats;
7  three in male Wistar rats; three in female
8  Wistar rats; eight in CD-1 mice, male; three in
9  CD-1 mice, female; and one female in that Kumar
10  study.  That comes to a total of 30 total
11  tumors that have p<0.05 significance.
12    Q.  Right.  And I just want to ask
13  about -- I just want to focus on mice.  So how
14  many is it if you just focus on mice?
15    A.  Just the CD-1 mice?  11.
16    Q.  Just the mice in -- any type of
17  mouse in any study that you've evaluated.
18  Because I don't know if there are non-CD-1 --
19    A.  Then there are 12 positive tumors
20  plus -- and I can get this wrong.  It's always
21  possible.  Because I never remember until I
22  look at the tables.
23      I found lung alveolae/bronchiole
24  adenomas and carcinomas at a 0.045 level in one

Page 251

1  of the -- I think it was a mouse study.  And I
2  think that brings in two more positives because
3  the adenomas and the combined were positive, I
4  believe.  But I'd have to go look at notes on
5  my computer to answer that question.
6      And I found a pheochromocytoma
7  positive in -- it could have been female mice
8  or rats, I'm not sure.
9      And then, of course, we picked up
10  the one mouse -- the two mouse findings from
11  Takahashi, which are the only findings I have
12  for Takahashi because it's the only thing I
13  have data for.
14      And I think that brings you to 35,
15  or close to it.
16    Q.  35 in just mice?
17    A.  No, no, total.
18    Q.  Right.
19    A.  I'm not certain that the
20  pheochromocytomas and the lung tumors that I'm
21  talking about were mice or rats.  I cannot
22  remember that detail.  But those are the ones
23  that are not in this table.  The two in
24  Takahashi, pheochromocytomas in females in the

Page 252

1  adrenal glands in one of the other studies, and
2  then these lung tumors in one of the other
3  studies that I think was mice.
4    Q.  And when you're -- now to go back
5  to where I started, when I was asking you to do
6  the "how many" -- where I was asking you to do
7  the -- I think what was more of a pairwise but
8  across -- along different doses as opposed to a
9  trend --
10    A.  Um-hmm.
11    Q.  -- those are all positive findings
12  of specific cancers in a trend analysis?
13    A.  Correct.
14    Q.  And in some, you've had to factor
15  in the historical control for it to become
16  positive?
17    A.  In three or four, yes.
18    Q.  Okay.  So sitting here --
19    A.  Yes, yes.  "For it to become
20  positive."  Let me think about that for just
21  one quick second.  Yes.  I think it's three of
22  them are positive because of historical
23  controls.
24    Q.  And so I realize we don't have the

Page 253

1  exact numbers here because things have changed
2  over time, but to the best of your
3  recollection, there are approximately
4  statistically significant trends in 12 plus 2,
5  14 --
6    A.  At least 14.
7    Q.  At least 14 cancers in the various
8  mice studies?
9    A.  Almost entirely in males.
10    Q.  All the other trends in the mouse
11  studies, male or female, were not statistically
12  significant?
13    A.  At the 0.05 level.
14    Q.  Correct, at the 0.05 level.
15    A.  Correct.
16    Q.  And you don't know how many that
17  is?
18    A.  I do.
19    Q.  Oh, okay.  So how many is that?
20    A.  It's approximately -- on here
21  somewhere.  I'm trying to work the new numbers
22  right now to figure out exactly how many this
23  really is, but for the male mice, I looked at
24  42 total sites in the four CD-1 studies.

Christopher J. Portier, Ph.D

Page 254

1 That's how many I did a statistical evaluation
2 on. And of those, eight were positive.
3      Q.   Okay. "Positive" meaning
4 statistically significant?
5      A.   At the 0.05 level.
6      Q.   Okay, so eight -- okay, perfect.
7 So you looked at 42 total sites in the mouse
8 studies?
9      A.   At the point of the supplemental
10 report.
11     Q.   Yes.
12     A.   That's what this table is giving
13 me.
14     Q.   Right. So let's put Takahashi to
15 the side. As of that point, you had looked at
16 42 total sites in mouse studies, correct?
17     A.   Correct.
18     Q.   Eight of the 42 were statistically
19 significant at the 0.05?
20     A.   Correct.
21     Q.   34 of the 42 were not statistically
22 significant at the 0.05?
23     A.   That's correct.
24     Q.   And then you added two from

Page 255

1 Takahashi, so 10 of 44 were statistically
2 significant?
3      A.   If that's the only ones that are
4 added in, that would be correct.
5      Q.   Okay. And is the 42 both genders?
6      A.   That's just males.
7      Q.   That's just males. Okay. So then
8 there were additional female --
9      A.   Correct.
10     Q.   -- that you would -- that would be
11 added to the 42 under my methodology?
12          MS. GREENWALD: Objection, form.
13     A.   There were -- it's right here in
14 Table 15. There were 60 sites evaluated in
15 females -- I'm sorry. The 42 would be 43 for
16 males because one of those sites was females
17 from the Takahashi study. So that 42 would
18 become 43, and it would be nine out of 43. And
19 the females is 60. And so it would be four out
20 of 61 at this point, if that's all there was.
21 But I'm getting a much more accurate
22 calculation of this.
23     Q.   Okay. So just to break it down so
24 the record is clear, there are 43 male

Page 256

1 evaluations that you did; is that right?
2      A.   Again, approximately, as looking at
3 Modified Table 15. These numbers will be
4 different, slightly.
5      Q.   Okay. And nine of those 43,
6 approximately, would be statistically
7 significant at 0.05?
8      A.   At a p-value less than 0.05.
9      Q.   And then there would be 61,
10 approximately, evaluations that you did on
11 female mice?
12     A.   That would be correct.
13     Q.   And approximately four would be
14 statistically significant at 0.05?
15     A.   That would be correct. And if you
16 look on page 7 of this report, it tells you the
17 probability of seeing that. You can actually
18 then calculate, is it unusual that I see 10 out
19 of -- or in this case eight out of 42 males
20 with tumors? Is that by random chance or is
21 that a really rare event? So I calculate that
22 probability for you. And you can walk through
23 that. And I calculated for males and females
24 combined. I calculated for the whole dataset.

Page 257

1 It's all worked out there for you if you'd like
2 to look at it.
3      Q.   Understood. Okay. Now, of the
4 approximately nine statistically significant --
5 I'm just going to define that as 0.05. I
6 understand that we can debate whether it's
7 meaningful or not. But of the approximately
8 nine statistically significant findings that
9 you saw in males, was that all through the
10 trend analysis, or were any of those through a
11 pairwise?
12     A.   All trend. This is entirely trend.
13     Q.   And the same with the four out of
14 61 in females?
15     A.   Yes. This is entirely trends.
16     Q.   Okay.
17     A.   And a few historical controls.
18     Q.   Yep. And of those -- and I don't
19 know if you can tell from this chart or not.
20 So we have 13, between both genders, positive
21 findings that are statistically significant at
22 0.05. How many of those were for malignant
23 lymphomas as opposed to a different type of
24 cancer?

Christopher J. Portier, Ph.D

Page 258

1    A.   Three in males, one in female.
2    Q.   So four for malignant lymphomas?
3    A.   Mm-hmm.
4    Q.   Okay.  Of the 13?
5    A.   But you couldn't possibly have 13
6  malignant lymphoma findings.
7    Q.   Understood.  So out of the 104
8  measurements that you had, there were four
9  statistically significant at 0.05 findings for
10  malignant lymphomas?
11    A.   Yes, I believe so.
12    Q.   And if you need to go back to your
13  original report to see this, of the pairwise
14  findings which you did for -- I realize for
15  informational purposes, do you agree that -- or
16  how many had statistically significant pairwise
17  findings for malignant lymphoma at a 0.05?
18    A.   I'm pretty sure -- well, I don't
19  know about Takahashi.  I clearly don't
20  remember.
21    Q.   Fair enough.
22    A.   But if you look at the modified
23  tables in this report, I'm pretty sure it's
24  only the one finding in the Wood study.

Page 259

1    Q.   Okay.
2    A.   Which is the strongest finding in
3  the whole dataset.
4    Q.   And why -- when you say that's the
5  strongest finding, why do you say that?
6    A.   In terms of its dose-response, in
7  terms of its p-value, in terms of its overall
8  finding, it is, in my opinion, the strongest
9  response.
10    Q.   Okay.  We're past the animal
11  studies.
12        Okay.  In Wood, that finding was
13  only at the highest -- the statistical -- at
14  a -- 0.05 was only at the highest dose; is that
15  correct?
16    A.   For the pairwise comparison, it was
17  only at the highest dose.
18    Q.   All right.  So when you were -- I
19  want to just get a clear timeline.  I know
20  you've been asked about this extensively of
21  your role on IARC and then your role in the
22  litigation.  But before that, when you were --
23  what was your role as chair of -- I'm going to
24  get the word wrong, but, like, of a group that

Page 260

1  decided what substances should be evaluated by
2  IARC?
3    A.   I can tell you how I run a
4  chairmanship in any situation, and this is the
5  same as always.  I view my role as making sure
6  the meeting achieves the goals that the agency
7  is asking me to help them achieve.  I make it
8  my -- I attempt not to include my opinion in
9  the overall discussions, let the discussion
10  flow from the -- a chair can dominate a
11  meeting.  I don't like to do that.  So I tend
12  to let the crowd lead the direction they want
13  to go.
14        So my job was to make sure the
15  meeting was successful in the sense that we get
16  all of every -- everybody's opinion and a
17  written document by the time the meeting was
18  over.
19        I was also responsible for writing
20  I think reviews for five or six compounds --
21  these were all metals -- and reading the
22  literature on those that we had in front of us
23  on those five or six compounds.
24        Then in addition, NTP was doing

Page 261

1  this Tox21 stuff, high-throughput screening,
2  and some of that high-throughput screening was
3  being used to help us set priorities.  And
4  since that was from my camp of people and it
5  was partially my idea that they start doing
6  that ten years earlier, IARC wanted me to make
7  sure that I -- they got it right when they sort
8  of played with that data, and plus my staff
9  back in North Carolina was doing some runs for
10  us while we were looking at some of these data.
11        So that was my role, those three
12  things.
13    Q.   And what -- were you present at the
14  meeting or a meeting where it was discussed
15  whether to evaluate the five pesticides that
16  included glyphosate?
17    A.   No.
18    Q.   Okay.  So do you have any personal
19  knowledge of how it was that IARC decided to
20  evaluate the five pesticides including
21  glyphosate?
22    A.   I'm not sure if it's speculation or
23  whether I heard it.
24    Q.   Okay.

Christopher J. Portier, Ph.D

Page 262

1    A.  All I can tell you is that my
2  understanding is they group them because these
3  are -- they have common epidemiology, and the
4  common epidemiology is the key factor in
5  bringing them together.  It makes it easier
6  because the epidemiologists don't have to work
7  so hard.
8    Q.  But did you have any -- who was it,
9  either specifically or generally, that decided
10  that IARC should evaluate the five pesticides,
11  as opposed to why they were grouped together,
12  just why even those -- why even pesticides at
13  all?
14    A.  That would be the Monograph
15  program, probably the head, Kurt Straif at that
16  point.  He would take input from his staff.
17  He'd make a decision, and then Chris Wild would
18  either agree to it or not.  If Chris had
19  concerns, I'm sure he would override.
20    Q.  And you weren't part of that
21  decision at all?
22    A.  No, not at all.
23    Q.  So when is the first that you heard
24  that glyphosate and the other pesticides would

Page 263

1  be evaluated by IARC?
2    A.  When they called me and asked me if
3  I was interested in sitting in -- working with
4  the working group.
5    Q.  And was that -- how long,
6  approximately, before the working group met was
7  that?
8    A.  I think it was almost a year.
9    Q.  Okay.  And --
10    A.  You could check the timeline
11  because they publish the names of the working
12  group members at some point in advance, and
13  they check with you first, but it's usually
14  within about three months that they publish it.
15  So it would be somewhere around that.
16    Q.  Okay.  But to be clear, you weren't
17  involved at all in the decision to -- for IARC
18  to evaluate glyphosate?
19    MS. GREENWALD:  Objection, asked
20  and answered.
21    A.  Only at the point of that meeting
22  where they listed it as a moderate priority for
23  review in the next five years.
24    Q.  And was that within a year of when

Page 264

1  they actually met, just to get the timeline
2  clear?
3    A.  I think it was about a year, if I
4  remember correctly.  But I would argue that if
5  you really want it on the record, you need to
6  let me go look at it or you should go look
7  yourself.
8    Q.  Yes.  And I think I'm now getting
9  confused.  The meeting where it was listed as a
10  moderate priority, what was that meeting -- had
11  you already been invited to be a part of the
12  working group?
13    A.  No.  No, no, there was no working
14  group being formed at that point.  That was --
15  they do it every five years -- they just did
16  one -- where they go through maybe 200, 250
17  compounds and set priority, moderate, high,
18  low, with some outside experts, and then that
19  gives the agency a list of compounds that they
20  can pick and choose from for the next five
21  years as to what they think should be reviewed.
22  And that's independent of that first committee.
23    Q.  And what was your position within
24  IARC, if any, at that time that that -- that

Page 265

1  the meeting happened where --
2    A.  I chaired that meeting.
3    Q.  And who -- and so were you
4  ultimately responsible for the decision to
5  include glyphosate on the list of five-year
6  considerations as a moderate --
7    A.  Not at all.
8    Q.  So who, if anyone, was responsible
9  for that decision?
10    A.  There was a voting scheme put in
11  place where people could vote priority one,
12  priority two, priority three, as a preliminary
13  for each of the compounds, and then those
14  scores were put together in a spreadsheet and
15  were shared, showing the rankings.  And then
16  they made sort of individual cuts through that.
17    Some things were obvious, everybody
18  ranked it high, so that clearly went in the
19  high; some things were obvious, everything
20  ranked as low, they clearly -- and then they
21  debated and argued and came to some agreement
22  on the middle ground.
23    Q.  And of the several -- couple
24  hundred compounds, do you know how glyphosate

Christopher J. Portier, Ph.D

Page 266

1  was put on that list as something to rank?
2      A.  Oh, yes, I do.  I had the
3  nomination.
4      Q.  By someone else?
5      A.  I saw the nomination.  Everybody
6  saw the nomination because that's part of the
7  process of going through this, why is somebody
8  suggesting this.
9      Q.  And do you know who suggested it?
10     A.  Yes, I do.
11     Q.  Who was that?
12     A.  I don't know that I'm at liberty to
13  tell you.  I don't know what IARC's rules are
14  on that particular issue, whether they take
15  these recommendations as confidential and
16  whether I agreed to that when they showed it to
17  me.  I don't recall.  So I'm reticent to tell
18  you.  I can tell you this.  I'll give you some
19  characteristics.
20     Q.  Okay.
21     A.  This person was from Europe.  This
22  person is not within IARC.  This person is not
23  in a regulatory agency but nor are they an
24  environmental -- from an environmental group.

Page 267

1  It was a university professor.
2      Q.  In Europe?
3      A.  In Europe.
4      Q.  Okay.  And has that professor been
5  on any glyphosate-related publications that
6  you're aware of?
7      A.  Not that I'm aware of at all.
8      Q.  And so this professor --
9      A.  His concern was the epidemiology.
10  He felt that there was enough epidemiological
11  evidence that IARC should look at glyphosate.
12     Q.  And how many people are at this
13  nominating meeting for...
14     A.  You can look online.  The minutes
15  of the meeting give everybody's name.  I think
16  about 30.
17     Q.  And you chaired the meeting?
18     A.  I chaired the meeting.
19     Q.  And then you see the list of
20  recommendations, and then everyone votes on
21  that list, prioritizes the list?
22     A.  Everybody sees the list.
23     Q.  Yeah.
24     A.  Everybody sees the list.  Everybody

Page 268

1  sees everything, yes.
2      Q.  And then as a group, prioritizes
3  each of the things that are on the list?
4      A.  That's correct.
5      Q.  Okay.  And do you recall what
6  priority you gave glyphosate?
7      A.  No, I'm sorry, I don't.
8      Q.  Okay.  And then --
9      A.  Actually, I can tell you this.  I
10  did not put my recommendations into the
11  spreadsheet.  Again, you spend so much time
12  chairing one of these things that you don't get
13  as much time as you should to look at every
14  single thing.
15         So I did the things I was supposed
16  to do, write write-ups on specific compounds,
17  what's in this literature and what's supporting
18  a listing -- a review or not.  But I didn't put
19  in recommendations for any chemical because I
20  didn't feel I had the time to sit down and look
21  at everything that was there.
22     Q.  So you more oversaw the process of
23  other the people's voting --
24     A.  Correct.

Page 269

1      Q.  -- on prioritization?
2      A.  Correct.
3      Q.  Okay.  So that list comes out -- I
4  want to call it the five-year list.  I'm not
5  saying that's the technical name.  And then
6  it's a different group that you were uninvolved
7  in that then teed it up for a formal review?
8      A.  That's correct.  It's strictly
9  internal --
10     Q.  And that --
11     A.  -- is my understanding.
12     Q.  And where you were mentioning
13  specific names at IARC, that was that process
14  that you were talking about?
15     A.  That would be the person
16  responsible for the process, yes.
17     Q.  Okay.  And then at that point is
18  when they called you to be an advisor to the
19  working group?
20         MS. GREENWALD:  Objection, form.
21     A.  After they decided what they were
22  going to do in that Monograph, then they
23  decided who they think they would like, and
24  they call them and ask them if they would be

Christopher J. Portier, Ph.D

Page 270

1 interested. It's not a guaranteed invitation.
2 It's a question of interest. And then if it
3 matches up with what they're needing, then
4 they'll send you the formal invitation. And
5 that must have been probably in summer.
6     Q. Yeah. I mean, the timeline is --
7 just now that I have it clear, in 2014 is when
8 the IARC advisory group to recommended parties
9 for the IARC Monographs met, and then the IARC
10 working group on glyphosate's meeting was from
11 March 3rd to 10th, 2015.
12     A. A year later.
13     Q. Yeah. And it was sometime in the
14 summer when you were contacted about
15 potentially being part of the working group?
16     A. I believe so. And if I had to
17 guess, the priority that brought that
18 particular one first -- as one of the first
19 ones they would do was mala -- I think it was
20 malathion. I think it was on there, I believe?
21     Q. Yep.
22     A. I think it was malathion.
23     Q. Based on the epidemiology that
24 existed at the time about malathion?

Page 271

1     A. Yep. And that it had been
2 previously reviewed by others and it hadn't
3 been reviewed in a very long time, and it
4 really needed updating.
5     Q. And then -- I'm not trying to go in
6 detail --
7     A. I think it was a priority "high."
8 That's what I'm telling you. I think malathion
9 was the priority "high," and then they built
10 things around malathion.
11     Q. Because of what you told us earlier
12 about similar --
13     A. Epidemiology.
14     Q. Yep. Okay. And then I'm not
15 trying to go in detail about, you know, the
16 potential conflict of interest from working
17 with EDF, but whose -- my specific question is,
18 whose decision was that? Was that something
19 that IARC said, or who initiated that?
20     A. That would be IARC.
21     Q. And do you know if there were --
22 other than your work for EDF, do you know if
23 there were any other reasons to have you, you
24 know, not have a vote in all the other steps?

Page 272

1     A. No.
2     Q. Do you know if IARC at the time
3 knew about the consulting work you had done
4 with the Lundy firm about cell phones?
5     A. I hadn't done any consulting work
6 with the Lundy phones -- firm about cell phones
7 before then, if "consulting" means I get paid
8 for it. All I did was answer questions for
9 them, which I also do with many other groups on
10 many different topics.
11     Q. Do you recall signing an engagement
12 letter with the Lundy firm related to cell
13 phones?
14     A. Yes, I do.
15     Q. And do you recall if you received a
16 retainer or not?
17     A. Yes, I did.
18     Q. And so you don't consider that
19 retainer being paid?
20     A. That was after the glyphosate
21 meeting.
22     Q. Okay. So for the cell phone work,
23 you didn't sign a letter or receive any
24 payment?

Page 273

1     A. Before the glyphosate?
2     Q. I'm talking like in 2011.
3     A. No.
4     Q. Okay.
5     A. Not that I'm aware of.
6     Q. So the first time that you were
7 formally retained by a plaintiffs' firm was
8 shortly after the IARC Monograph came out on
9 glyphosate; is that right?
10     A. Technically, no. The Monograph
11 came out later in terms of the publication. It
12 was after the Monograph meeting and shortly
13 after the short note in Lancet Oncology on what
14 the results were from the meeting.
15     Q. And then that's when nine days
16 after that Lancet publication you signed the
17 contract and received the retainer?
18     A. I believe that's when it happened,
19 but I'd have to check my records to be exactly
20 correct.
21     Q. Okay. And I know in that
22 document -- I think it's still true -- that
23 your rate is $450 per hour. Is that still true
24 as of today?

Christopher J. Portier, Ph.D

Page 274

1    A.   Yes, it is.
2    Q.   And then we've received -- I'm not
3  going to walk through all of them -- all of the
4  invoices.
5        MR. STEKLOFF:  I greatly appreciate
6        that, Ms. Greenwald, because we don't
7        often get that from plaintiffs' lawyers.
8        All of the invoices that you have to
9        date, including Pilliod.
10       MS. GREENWALD:  We try.
11   Q.   So if I add all of those up, is
12  that how much you've been paid collectively up
13  until the last couple days for this deposition?
14   A.   I've only been paid through these
15  firms, so yes.
16   Q.   Okay.  And I'm not trying to find
17  out exactly your income or anything, but I'm
18  just trying to understand what percentage,
19  approximately, of your current income is based
20  on work in this litigation as opposed to other
21  work.
22   A.   35 percent maybe.
23   Q.   And your other work is EDF and what
24  else?

Page 275

1    A.   Retirement.
2    Q.   So you're including --
3    A.   My pension.
4    Q.   Okay, pension.  And your pension is
5  from the federal government?
6    A.   Federal government.
7    Q.   And how do you -- so -- and I know
8  you've been asked about this extensively, but
9  how do you --
10   A.   And it depends on the year.  I'm
11  sorry.  I want to be -- I want to give you
12  honest answers.  It depends on the year.  The
13  year I had to write the expert report, it was
14  probably 50 percent of my income for that year.
15  It was much bigger than it is currently.
16   Q.   Right.  Oh, yeah.  That makes
17  sense.  I'm sure that is borne out in the
18  invoices when you spent many more hours --
19       MS. GREENWALD:  I didn't re-produce
20       those.  You have those.
21   Q.   -- reviewing --
22       MR. STEKLOFF:  Yeah, we have those.
23  I really do -- I sincerely appreciate
24  that.  It is like sometimes pulling

Page 276

1  teeth to actually get invoices.
2    Q.   So how do you decide when -- I
3  understand how -- some of the work you're
4  billing to attorneys, like today, and then when
5  you're writing a letter to the -- to EFSA, you
6  don't consider that litigation-related.  So how
7  do you decide whether or not to tell the
8  audience that you're communicating with that
9  you're working on the litigation?
10   A.   I always do that now.  There was so
11  much -- you guys took me and asked me lots of
12  questions, which quite honestly made me
13  uncomfortable in the sense that I hadn't really
14  thought about it before.  Now I always make it
15  quite clear.  If I'm going to talk about
16  glyphosate at all, there's a disclaimer at the
17  front.
18   Q.   Okay.  So even tomorrow, you'll
19  give a disclaimer before your presentation?
20   A.   Absolutely.
21   Q.   Okay.  And with respect to the
22  letter that you wrote to EFSA, there were 96
23  scientists who signed on -- 95 scientists in
24  addition to you who signed on to the letter; is

Page 277

1  that right?
2    A.   They -- yes, I think.
3    Q.   And you -- but you sent the
4  proposed letter to many more scientists who
5  either -- who didn't formally sign on; is that
6  correct?
7        MS. GREENWALD:  Objection, form.
8    A.   That's not quite correct.
9    Q.   Okay.
10   A.   I sent an idea to a whole bunch of
11  people that we would do this, with a very
12  crudely roughed-out concept of what we would do
13  in terms of a draft letter, but it was nothing
14  like what we ended up with, which was much more
15  thoughtful.  And it gained considerably from
16  everybody's inclusion.
17       But yeah, there were a lot of
18  people who I suggested might want to be
19  involved.
20   Q.   And when you sent that earlier -- I
21  think it was an e-mail that outlined what would
22  evolve into the letter that was submitted, were
23  there people who -- I assume there were many
24  people who just didn't respond because that's

Page 278

1 the nature of e-mail, but were there people who
2 formally rejected, said they did not want to be
3 involved for one reason or another?
4 　　A.　Oh, yes, of course.
5 　　Q.　Was there anyone who told you that
6 they just disagreed with your -- the concerns
7 you were raising in the e-mail?
8 　　A.　Not that I recall.
9 　　Q.　But you agree that since -- that
10 the actual letter with the 96 signatures went
11 out, that science has -- there's continued to
12 be new science in the field relating to
13 glyphosate and cancer?
14 　　A.　Absolutely.
15 　　Q.　And so sitting here today -- I
16 think this will be asked and answered, but
17 sitting here today, you don't know the position
18 of the other 95 people on glyphosate and
19 cancer?
20 　　A.　I might know the position of one or
21 two, but the rest I don't know.
22 　　Q.　And which are the one or two that
23 you think you know?
24 　　A.　I don't think James Huff has ever

Page 279

1 seen a chemical he ever liked.　No, I'm being
2 rough on James.　He typically would not -- he
3 doesn't change his mind once he makes a
4 decision.
5 　　　　And Jameson is still involved in
6 this litigation.　I suspect he hasn't changed
7 his mind, but I don't know that.　But I surely
8 strongly suspect it.
9 　　Q.　I suspect it as well.
10 　　A.　As are several other people.
11 　　Q.　And we -- often with -- Aaron
12 Blair, I think Dr. Charles Lynch, and
13 Dr. De Roos are highlighted as signing on to
14 your letter.　You don't know their position on
15 glyphosate sitting here today?
16 　　A.　No.　But I don't highlight their
17 names in signing on my letter.　I highlight
18 everybody.　They were all brilliant scientists.
19 　　Q.　No, no, I'm not saying you
20 highlighted them, either.　Others -- other --
21 lawyers highlight their names.　I'm sorry, I
22 was not saying you highlighted anyone.　If that
23 ever gets out, you highlight all 95 equally.
24 　　　　Turning to a new -- a few last few

Page 280

1 topics.
2 　　　　Do you have any opinion on whether
3 there are impurities in the Roundup
4 formulation?
5 　　　　MS. GREENWALD:　Objection, form.
6 　　A.　There are undoubtedly impurities in
7 the Roundup formulation.　Very seldom can you
8 build a commercial chemical product without
9 impurities.
10 　　Q.　Do you have any opinion about what
11 those impurities specifically might be?
12 　　A.　No, I do not.
13 　　Q.　Do you have any opinion about the
14 role that those impurities may play in the
15 alleged development of NHL?
16 　　A.　In the epi study I certainly can't
17 talk about the role of any impurities.　That's
18 quite clear.　In the animal studies, you've got
19 some studies there with 98, 99 percent purity
20 of the glyphosate that was used that are still
21 positive.
22 　　　　I could probably -- unless the
23 impurities are dioxins or something along those
24 lines, probably rule out the impurities from

Page 281

1 having a major impact.　But that's only the
2 animal studies because they are -- they spend a
3 lot of time making sure you have a pure a
4 product as you can get.
5 　　Q.　So just to be clear, based on the
6 animal studies you've reviewed, you believe
7 that the impurities have little to no impact on
8 the development of cancer?
9 　　A.　But again, I don't know what those
10 impurities --
11 　　　　MS. GREENWALD:　Objection to form.
12 　　　　THE WITNESS:　Oh, sorry.
13 　　　　MS. GREENWALD:　It's okay.
14 　　　　Go ahead.
15 　　A.　I don't know what those impurities
16 are.　What I'm saying is, unless they are
17 extraordinarily potent impurities for cancer,
18 they are unlikely to have an impact on the
19 positive findings in those studies.
20 　　Q.　And then sitting here now, you have
21 no reason to believe that they are
22 extraordinarily potent impurities?
23 　　A.　No, I don't.　When people tell you
24 they have 98 percent pure, they don't tell you

Christopher J. Portier, Ph.D

Page 282

1  what's not the pure.  And that's unfortunate.
2  NTP does.  NTP will try to identify the
3  impurities and tell you what they are.
4      Q.  But it's almost impossible, I think
5  you said, to have 100 percent pure?
6      A.  Correct.
7      Q.  Okay.  So that's not a criticism
8  you have of Roundup?
9      A.  No.  No.  Not of these studies, not
10  of Roundup, not of anything.  You have no
11  choice.
12          MR. STEKLOFF:  Can we go off the
13      record, please?
14          VIDEO OPERATOR:  We are now going
15      off the video record.  The time is 4:05.
16          (Recess from 4:05 p.m. until
17      4:13 p.m.)
18          VIDEO OPERATOR:  We are now going
19      back on the video record.  The time is
20      4:13.
21  BY MR. STEKLOFF:
22      Q.  Dr. Portier, have you now reviewed
23  the report on -- the 2016 NTP report on
24  carcinogens?

Page 283

1      A.  I would hesitate to say yes.
2      Q.  Okay.
3      A.  I would -- it's online.  I'd have
4  to go online and look at it.  It's online in
5  pieces.  It's not like it used to be when you'd
6  get a big book and you could look through the
7  book, or one big PDF.  It's hard for me to just
8  say up front, no, I don't -- I -- yes, I did
9  it.  No, I can't say that.
10      Q.  Okay.  But you feel confident that
11  glyphosate is not listed in that report?
12      A.  Or ever considered for it, correct.
13      Q.  Okay.  New topic.  On the
14  epidemiology, do you agree that the best group
15  of patients to study, which is consistent with
16  what's occurred, are farmers, given that they
17  most likely have the highest exposure to
18  glyphosate?
19          MS. GREENWALD:  Objection, form.
20      A.  No, I think that's such a -- that
21  requires a complicated answer.  It's not an
22  easy subject.  Farmers have a lot of other
23  co-exposures.  You may be better off with a
24  different set of exposed individuals if you

Page 284

1  really looked into it, like potentially, I
2  don't know, people who work for cities in weed
3  management and that's all they ever -- that's
4  the only ever pesticide they would come in
5  contact with might be a better set.
6          The literature is loaded with
7  either case control studies, which is anybody,
8  or the cohort studies, which appear to all be
9  farmers, or focused on sprayers or things like
10  that.
11      Q.  Right.  So understanding I had a
12  complicated question, the issue is that with
13  farmers as opposed to maybe workers who are
14  just spraying a weed killer, they may be
15  exposed to other pesticides or other chemicals
16  that then could potentially confound the
17  results?
18          MS. GREENWALD:  Objection, form.
19      A.  Correct.
20      Q.  In terms of exposure, do you agree
21  that farmers are the best group because they,
22  across pesticides, are the highest exposed
23  group?
24          MS. GREENWALD:  Objection, form.

Page 285

1  Assumes facts not in evidence.
2      A.  I'm not certain.  There was an
3  internal memo that you guys turned over that I
4  actually fumbled over at one point which talked
5  about exposures in the factories that make
6  glyphosate.  They may be bigger than the
7  farmers.  At some point they may have been
8  bigger.  I don't know what they are right now.
9          But if I were doing an epi study
10  and I had full rein of what study to do, I'd
11  look carefully at the occupational exposures
12  for people making the stuff, as well as the
13  farmers and the sprayers and others.
14      Q.  Okay.  Professional sprayers who
15  are doing it as part of their job?
16      A.  Yes, professional sprayers.
17      Q.  As opposed to residential users who
18  are using it in their driveway?
19          MS. GREENWALD:  Objection, form.
20      A.  They would not be my first choice.
21      Q.  And then the last question,
22  depending on your answer, do you believe that
23  Roundup should be pulled from the market?
24          MS. GREENWALD:  Objection, form,

Page 286

1    outside of Dr. Portier's expertise.
2        A.   And I don't think the answer to
3    that question is relevant.
4        Q.   So you're not -- I'll ask a
5    question that is maybe more relevant.  You're
6    not offering any opinion that Roundup should be
7    pulled from the market?
8        A.   That is correct.  I think that is
9    society's decision.  I think my role is to put
10   forth the science as best I see putting with
11   the science.  It's society's decision to remove
12   it or allow it or regulate it or whatever they
13   want to do, and they have representatives who
14   are hired by them to do that.  That's their
15   job.  My concern is, they're not doing their
16   job because they didn't do the science right.
17       Q.   Understood.  When you say they're
18   not doing their job because they didn't do the
19   science right, you're specifically talking
20   about the EPA in the United States?
21       A.   And EFSA in Europe, and other
22   places, in the sense that the decision-makers
23   who have to make a decision need the best
24   interpretation of the science they can possibly

Page 287

1    get, and there are rules for how to do that,
2    and those rules have not been followed.
3        Q.   And you would say the same thing
4    about Health Canada or the Australian authority
5    or the Japanese authority or any other
6    country's authority?
7        A.   Well, Australia, I would say
8    something else, in terms of what they did after
9    IARC.  New Zealand's interesting.  They
10   probably did as good a job as anybody.  It just
11   depends on the country.
12       Q.   Why do you say New Zealand did
13   probably as good a job as anybody?
14       A.   They hired a consultant to come in
15   and do the entire assessment for them.  He did
16   a fairly good job on the epidemiology.  He --
17   what part of the toxicology he looked at, he at
18   least didn't fall into all the same holes that
19   the regulatory agencies fell into.  I disagree
20   with his final opinion, but at least I feel he
21   was closer to following the rules than anybody
22   else.  He still broke some of those obvious
23   rules, but he did a better job.
24       Q.   And those rules that you're talking

Page 288

1    about, those are the rules you've laid out in
2    criticizing the EPA's evaluation?
3        A.   Historical controls, trend test
4    versus pairwise comparisons, et cetera.
5        Q.   Yep.
6        A.   All of those things that are in
7    there.  Australia did something completely
8    different which -- it doesn't even constitute
9    as a risk assessment.
10       Q.   In all of -- not all of your
11   criticisms.  The criticisms that you're most
12   focused on, the historical controls, the trend
13   versus pairwise, those relate -- of the three
14   pillars that we're talking about here, your
15   criticisms primarily relate to the animal
16   studies; is that fair?
17       MS. GREENWALD:  Objection, form.
18       A.   No, the mechanism studies as well.
19   And I will point out that there is a major
20   criticism of the epi work in the sense that
21   they're putting way too much weight on the
22   Agricultural Health Study and not enough weight
23   on the Gard studies.  They aren't paying
24   attention to the meta-analyses as much as they

Page 289

1    should, et cetera.
2        Everybody gets their little bit of
3    criticism in each of the pillars.  But my
4    biggest criticisms are by far and away the
5    animal cancer studies.  That is a fair
6    statement.
7        Q.   And even you have -- maybe not
8    criticisms but find limitations to the case
9    control studies of the epidemiology?
10       MS. GREENWALD:  Objection, form.
11       A.   Case control studies always have
12   limitations.
13       Q.   Including --
14       A.   For these types of end points, for
15   these environmental exposure cancer end points.
16       Q.   Including the five or six that are
17   the focus of this litigation with respect to
18   glyphosate?
19       A.   Correct.
20       Q.   And those limitations include the
21   difficulty to adjust for other confounders,
22   including pesticides?
23       MS. GREENWALD:  Objection, form.
24       A.   That's individual to each study

Christopher J. Portier, Ph.D

1  because they just didn't ask.  I mean, the
2  difficulties in general with case control
3  studies are recall bias.  That's always a
4  difficulty.  And then improper controls.  It's
5  always -- finding a good set of controls is
6  always a difficult problem in a case control
7  study.  You have to be very cautious about what
8  you're doing.
9      Q.  And here the issue of controls --
10  sorry.  Here, in terms of controlling or
11  adjusting for other pesticides, that also --
12  and each study is different, but that is also a
13  limitation of several of the studies, correct?
14      A.  Correct.
15          MS. GREENWALD:  Objection, form.
16          MR. STEKLOFF:  Okay.  No other
17      questions.  I pass the witness to
18      Ms. Greenwald.
19          MS. GREENWALD:  Give me one second.
20      Can we just take a two-minute break?
21          MR. STEKLOFF:  Yeah.
22          VIDEO OPERATOR:  We are now going
23      off the video record.  The time is 4:23.
24          (Recess from 4:23 p.m. until

1      4:33 p.m.)
2          VIDEO OPERATOR:  We are now going
3      back on the video record.  The time is
4      4:33.
5          MS. GREENWALD:  So you should look
6      at the camera even though I'm sitting
7      next to you.
8          THE WITNESS:  Okay.
9              EXAMINATION
10  BY MS. GREENWALD:
11      Q.  Dr. Portier, you were asked some
12  questions after lunch about a number of studies
13  that -- I think you said there were 23 animal
14  studies in total and that you used
15  approximately 14 of them in support of your
16  opinions.  Do you remember that?
17      A.  Yes.
18      Q.  Okay.  So I think that leaves nine
19  studies, if I'm doing my math right, or
20  thereabouts, that I want to ask you about.
21      A.  Okay.
22      Q.  Do you discard some of those nine
23  outright?
24      A.  Oh, yes, definitely.

1      Q.  And what would be -- which do you
2  discard, and why would you discard some of them
3  outright?
4      A.  So the IBT studies I discard right
5  away.  If it has falsified information, there's
6  nothing there I can use or trust to use.
7          The rest are not I think totally
8  thrown out, with the exception of one other
9  study reported in the literature -- I have to
10  find the name of it -- Chruscielska, from 2000.
11  It was so poorly reported that I'm not even
12  sure they were actually testing glyphosate in
13  the study.  I would have to totally discard
14  that one as well.
15          MR. STEKLOFF:  Can I just ask, only
16      for clarification, what page of your
17      report you were referring to and which
18      report?
19          MS. GREENWALD:  Page 32.
20          THE WITNESS:  32.
21          MR. STEKLOFF:  Of the original
22      report?
23          MS. GREENWALD:  Original.
24          MR. STEKLOFF:  Thank you.

1          MS. GREENWALD:  Sure.
2      Q.  Okay.  So that means that -- I
3  understand, if I'm correct, that there are
4  still -- that some of the other studies -- so
5  that would leave -- if there were nine, that
6  would leave six.
7          So six, am I correct, in some way
8  form part of your methodology but maybe don't
9  weigh as heavily in your ultimate opinions?
10  Would that be a fair statement?
11          MR. STEKLOFF:  Object to form.
12      A.  That would be a fair statement.
13      Q.  And maybe so I don't have a form
14  objection, maybe you can explain in your own
15  words how you analyzed or how you would use
16  those approximate six studies that you haven't
17  discarded in forming your opinions in this
18  case.
19      A.  So most of the studies were removed
20  because -- I didn't use them because they were
21  very low dose away from the maximum tolerated
22  dose, and quite honestly, I don't have all the
23  information for them like I have for the 12
24  that were in the appendix of Greim's paper.  So

Christopher J. Portier, Ph.D

Page 294

1 it's limited as to what I could use them for
2 other than to say, there doesn't appear in
3 these animals to be a problem with the
4 formulation at these doses. You can certainly
5 say something like that from that, but it's
6 limited because they're -- because of their low
7 exposure slope power.
8        But then there are other things you
9 could say. For example, the Seralini study saw
10 an increase -- a statistically significant
11 increase in mammary gland adenomas and adeno --
12 fibroadenomas and adenocarcinomas. With only
13 ten animals per group, he didn't do a trend
14 test; he did pairwise comparisons. But, I
15 mean, there are limitations to that study, but
16 the fact that we saw the same tumor arise in
17 the Wood study of Sprague-Dawley rats, which is
18 the same strain he does, that should be
19 considered in looking at the mammary tumors in
20 the Wood study as to whether you believe
21 they're a real finding or not. It's important
22 to consider this other finding in doing that.
23        MS. GREENWALD: Okay. I don't have
24     any other questions.

Page 295

1        EXAMINATION
2 BY MR. STEKLOFF:
3     Q. Dr. Portier, you agree it's
4 important to consider all findings, positive or
5 negative, in any study that's a valid study,
6 correct?
7        MS. GREENWALD: Objection, form.
8     A. Correct.
9     Q. Whether it's epidemiology, animal
10 studies, or cell studies, correct?
11     A. Yes.
12     Q. And so even though you think there
13 are limitations on the weight you should put on
14 the AHS, you still should consider it, correct?
15     A. Correct. But that's not true of
16 IBT. I want to be clear on that. I draw a
17 line there.
18     Q. Correct. And that's why I -- and
19 that's what I meant by "valid study." If it's
20 just completely invalid and falsified, we can
21 all agree, throw it out.
22     A. Good.
23     Q. And you should consider
24 genotoxity tests that have negative findings

Page 296

1 as well, right?
2     A. Absolutely.
3     Q. And there are genotoxicity tests
4 with negative findings, correct?
5     A. Absolutely.
6     Q. And it would be reasonable for
7 regulatory authorities or other scientists or
8 other experts to put some weight on those
9 studies?
10        MS. GREENWALD: Objection, form.
11     A. As do I, yes.
12        MR. STEKLOFF: Okay. No further
13 questions.
14        MS. GREENWALD: No more.
15        We would like to read and sign,
16 please.
17        I don't have any other questions.
18        MR. STEKLOFF: I think we're done.
19        VIDEO OPERATOR: We are now going
20 off the video record. The time is 4:39.
21        (Off the record at 4:39 p.m.)
22
23
24

Page 297

1        C E R T I F I C A T E
2     I, Lisa V. Feissner, RDR, CRR, CLR,
3 Notary Public, certify that the foregoing is a
4 true and accurate transcript of the deposition
5 of said witness, who was first duly sworn by me
6 pursuant to stipulation of counsel on the date
7 and place hereinbefore set forth.
8     I further certify that the foregoing
9 transcript is a true and correct record of the
10 proceedings; that reading and signing was
11 requested; that I am neither attorney nor
12 counsel for, nor related to or employed by, any
13 of the parties to the action in which this
14 deposition was taken; and that I have no
15 interest, financial or otherwise, in this case.
16
17     IN WITNESS WHEREOF, I have hereunto set
18 my hand this 13th day of June, 2019.
19
20
21 Lisa V. Feissner, RDR, CRR, CLR
22
23        (The foregoing certification of this
   transcript does not apply to any reproduction
   of the same by any means, unless under the
24 direct control and/or supervision of the

Page 298

## INSTRUCTIONS TO WITNESS

1
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  column on the errata sheet for any change made.
7      After doing so, please sign the errata
8  sheet and date it.
9      You are signing it subject to the
10  changes you have noted on the errata sheet,
11  which will be attached to your deposition.  You
12  must sign in the space provided.  The witness
13  need not be a notary public.  Any competent
14  adult may witness your signature.
15      It is imperative that you return the
16  original errata sheet to the deposing attorney
17  within thirty (30) days of receipt of the
18  deposition transcript by you.  If you fail to
19  do so, the deposition may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 300

## ACKNOWLEDGMENT OF DEPONENT

1
2
3      I hereby acknowledge that I have read
4  the foregoing deposition dated JUNE 5, 2019,
5  and that the same is a true and correct
6  transcription of the answers given by me to the
7  questions propounded, except for the changes,
8  if any, noted on the attached Errata.
9
10
11  SIGNATURE:
         CHRISTOPHER J. PORTIER, Ph.D.
12
13  DATE:
14
15
16
17  WITNESSED BY:
18
19  DATE:
20
21
22
23
24

Page 299

1  WITNESS NAME:    CHRISTOPHER J. PORTIER, Ph.D.
   DEPOSITION DATE:  JUNE 5, 2019
2
3              ERRATA
4  PAGE LINE  CHANGE        REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 301

1
2  LAWYER'S NOTES
   PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____