FILED DATE: 10/30/2018 8:39 AM   2018L011723

FILED
10/30/2018 8:39 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| MEGHAN CARUSO, individually and as Independent Executor of the Estate of John Caruso, deceased,<br><br>Plaintiff,<br><br>v.<br><br>RUSSO HARDWARE, INC. d/b/a RUSSO POWER EQUIPMENT, INC; d/b/a RUSSO POWER EQUIPMENT, and d/b/a GREEN INDUSTRY FINANCE<br><br>Defendant. | No.: 2018L011723<br><br>**PLAINTIFF DEMANDS A JURY TRIAL** |

## COMPLAINT AT LAW

NOW COMES the Plaintiff, MEGHAN CARUSO, individually and as Independent Executor of the Estate of John Caruso, deceased, by and through her attorneys, ROMANUCCI & BLANDIN, LLC, complaining of Defendant, RUSSO HARDWARE, INC. d/b/a RUSSO POWER EQUIPMENT, INC; d/b/a RUSSO POWER EQUIPMENT; and d/b/a GREEN INDUSTRY FINANCE ("RUSSO") pleading hypothetically and in the alternative, hereby states as follows.

### PARTIES

1. Plaintiff Megan Caruso is a citizen of the city of Chicago, County of Cook, State of Illinois.

2. On October 19, 2017, John Caruso, then a 33-year-old-citizen of the city of Chicago, County of Cook, State of Illinois, passed away.

3. On and before October 19, 2017, Meghan Caruso was John Caruso's lawfully wedded wife.

4. On October 25, 2018, Meghan Caruso was appointed the Independent Executor of

EXHIBIT A

the Estate of John Caruso, deceased, by the Probate Division of the County Department of the Circuit Court of Cook County.

5. Defendant RUSSO is an Illinois corporation with its headquarters and principal place of business in the County of Cook, State of Illinois.

6. Defendant RUSSO is "the premier power equipment and landscape supply dealer of the Midwest."[1]

7. Defendant RUSSO is part of the "Green Industry," taking responsibility for their environment.[2]

8. Far from just being a local distributor, Defendant RUSSO is a member of numerous national organizations including the American Public Works Association and the North American Trailer Dealers Association.[3]

9. Members of Defendant RUSSO's business relationship development (BRD) team attend trade shows and industry seminars.[4]

10. Employees of Defendant RUSSO impart product knowledge honed through vendor training programs and periodic in-house training sessions led by management.[5]

11. On information and belief, Defendant RUSSO was, at all relevant times, engaged in the distribution of glyphosate-based formulations to retailers and/or commercial/agricultural users in Illinois.

12. From at least 2015 through 2016, RUSSO sold glyphosate-based formulations that were herbicides to the University of Illinois at Chicago ("UIC").

---

1 https://www.russopower.com/about-us
2 *Id*.
3 *Id*.
4 https://outdoorpowerequipment.com/2016/05/09/unique-approach-keys-rise-of-russo-power-equipment/
5 *Id*.

2

FILED DATE: 10/30/2018 8:39 AM  2018L011723

13. From 2009 through 2016, John Caruso, deceased, worked for UIC, with the vast majority of his time being spent as a worker with the UIC Grounds Department.

14. Defendant RUSSO had superior knowledge of the risks associated with glyphosate-based formulations compared to those products' users and consumers, including the carcinogenic properties of the products, yet failed to accompany its sales and/or marketing of those products with any warnings or precautions for that grave danger.

15. Defendant RUSSO was one of the distributors providing glyphosate-based formulations actually used by decedent John Caruso.

16. Plaintiff is informed and believes, and based therein alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendant was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and their directors, officers and/or managing agents.

## **Jurisdiction**

17. The Circuit Court of Cook County has jurisdiction over Defendant RUSSO because it is a corporation and/or entity organized under the laws of the State of Illinois, registered with the Illinois Secretary of State, and has sufficient minimum contacts in Illinois, or otherwise intentionally avails itself of the Illinois market so as to render the exercise of jurisdiction over it by the Illinois courts consistent with traditional notions of fair play and substantial justice.

## **Venue**

18. Venue is proper in this Court pursuant to the Illinois Code of Civil Procedure in that the Defendant RUSSO has its principal place of business in Cook County, Illinois and its registered agent is located in Cook, County, Illinois.

19. Moreover, venue is proper because decedent John Caruso's exposure to glyphosate-based formulations, resultant diagnosis with non-Hodgkin's lymphoma, and death all took place in Cook County.

**Facts about Glyphosate and Glyphosate-Based Formulations**

20. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

21. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

22. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world and it has traced the health implications from exposure to glyphosate since 2001.

23. Upon information and belief, Defendant RUSSO was aware of the IARC's 2015 findings as it related to glyphosate and its dangerous and/or carcinogenic qualities.

24. Upon information and belief, Defendant RUSSO was aware of other evidence of glyphosate-based formulations' dangerous and/or carcinogenic qualities.

25. Defendant RUSSO continued to sell glyphosate-based formulations to John Caruso and/or his employer even after the IARC finding regarding glyphosate in 2015.

26. Upon information and belief, Defendant RUSSO never warned, disclosed, or

4

otherwise notified its consumers, such as decedent John Caruso and/or his employer, of the dangers associated with glyphosate-based formulations.

27. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

28. The IARC Working Group classified glyphosate as a Group 2A carcinogen, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin's lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

29. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

30. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

31. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

32. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group

FILED DATE: 10/30/2018 8:39 AM   2018L011723

membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

33.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

34.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

35.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

6

36. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

37. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

38. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

39. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

40. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

41. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

42. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal

FILED DATE: 10/30/2018 8:39 AM   2018L011723

microbial metabolism in humans.

43. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

44. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

45. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

46. Plaintiff is informed and believes that Defendant RUSSO did sell, market, and distribute glyphosate-based formulations with full knowledge of its dangerous and defective nature.

47. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

> Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped

8

sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

48. Several countries around the world have instituted bans on the sale of glyphosate-based formulations, both before and since IARC first announced its assessment for glyphosate in March 2015.

49. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. [. . .] unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

50. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

51. France banned the private sale of glyphosate following the IARC assessment for Glyphosate.

52. Bermuda banned both the private and commercial sale of glyphosates.

53. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

54. The government of Columbia announced its ban on using glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### *John Caruso's Exposure to Glyphosate Based Formulations*

55. For a period of eight years, John Caruso worked as a member of the UIC Grounds Department, regularly spraying glyphosate-based formulations to the green space of the enormous campus' 240 acres.

56. Throughout the spring, summer, and fall, John Caruso would spray glyphosate-based formulations on the campus' 240 acres between ten and twenty hours per week.

57. For the vast majority of the eight years John Caruso applied glyphosate-based formulations to the campus' 240 acres, he was not given any personal protective equipment to use.

58. The glyphosate-based formulations used by John Caruso at UIC were typically in concentrated form.

59. After eight years of consistent exposure to glyphosate-based formulations, John Caruso was diagnosed with Diffuse Large B Cell Lymphoma.

FILED DATE: 10/30/2018 8:39 AM   2018L011723

60. On October 19, 2017, John Caruso passed away as a result of Stage IV Diffuse Large B Cell Lymphoma.

## COUNT I
## WRONGFUL DEATH-NEGLIGENCE
**(Estate of Caruso v. Russo)**

61. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

62. Defendant RUSSO knew and/or should have known that it was foreseeable that persons, such as decedent John Caruso, would suffer injuries as a result of its failure to exercise ordinary care in the application of glyphosate-based formulations.

63. Decedent John Caruso did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to glyphosate.

64. At all times relevant to this litigation, Defendant RUSSO knew or, in the exercise of reasonable care, should have known of the hazards and dangers of glyphosate-based formulations and their carcinogenic properties.

65. Accordingly, at all times relevant to this litigation, Defendant RUSSO knew or, in the exercise of reasonable care, should have known that use of or exposure to the application of glyphosate-based formulations could cause or be associated with decedent John Caruso's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including decedent John Caruso.

66. Defendant RUSSO also knew or, in the exercise of reasonable care, should have known that users and those exposed to glyphosate-based formulations were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to those products.

67. It was the duty of the defendant, before and at the time of the occurrences, to use

11

ordinary care for the safety of the decedent, John Caruso.

68. Notwithstanding that duty, the defendant, RUSSO, committed one or more of the following acts and/or omissions:

    a. Directly sold glyphosate-based formulations to decedent John Caruso and/or indirectly sold glyphosate-based formulations to decedent's employer, UIC;

    b. Failed to exercise reasonable care in the sale, marketing, warning, and distribution of glyphosate-based formulations and exposure to glyphosate-based formulations of decedent John Caruso and other persons;

    c. Failed to take all reasonable steps necessary to apply the products that was not unreasonably dangerous to persons present or nearby;

    d. Failed to provide accurate, true, and correct information concerning the risks of using or being exposed to glyphosate-based formulations;

    e. Failed to provide appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to glyphosate-based formulations;

    f. Failed to exercise ordinary care in the sale, marketing, warning, and distribution regarding the use of glyphosate-based products;

    g. Sold, marketed, failed to warn, and distributed herbicides containing the chemical glyphosate when it knew or had reason to know of the defects inherent in those products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries; and/or

    h. Despite its ability and means to avoid applying glyphosate-based formulations, failed to warn those exposed or those potentially exposed, and/or otherwise minimize the risks of exposure.

69. As a result of extended and prolonged exposure to glyphosate and glyphosate-based formulations, John Caruso, deceased, became ill with Diffuse Large B Cell non-Hodgkin's Lymphoma.

70. Defendant RUSSO's negligence was a proximate cause of the injuries, harm, and economic losses that decedent John Caruso and his estate suffered, and will continue to suffer, as described herein.

FILED DATE: 10/30/2018 8:39 AM   2018L011723

71. As a proximate result of Defendant RUSSO's wrongful acts and omissions, the Estate of John Caruso, including Meghan Caruso and John Caruso, Jr., have suffered and continue to suffer pecuniary loss including without limitation the loss of money, benefits, goods and services of John Caruso including lost income; lost instruction, moral training, and superintendence of education; grief, sorrow, and mental suffering; loss of consortium; and the considerable financial expenses for the funeral and burial of a 33-year-old husband and father, for which they are entitled to compensation from Defendant RUSSO. Plaintiff and decedent's heirs will continue to incur these damages and expenses in the future.

72. Plaintiff, Meghan Caruso, as Independent Executor of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, ask that a judgment be entered against the defendant, RUSSO HARDWARE, INC., in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

### COUNT II
### SURVIVAL-NEGLIGENCE
### (Estate of Caruso v. Russo)

73. Plaintiffs incorporates realleges paragraphs 1 through 70 of her complaint as though they were fully set out herein.

74. As a direct and proximate result of Defendant RUSSO's acts and/or omissions, decedent John Caruso, a 33-year-old husband and father, suffered injuries of a personal and pecuniary nature including, but not limited to hospital, medical, and related expenses; disability and disfigurement, pain and suffering, physical and emotional trauma that decedent John Caruso

13

would have been entitled to receive compensation from Defendant Russo's for these injuries had he survived.

75. Plaintiff, Meghan Caruso, as Administrator of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, ask that a judgment be entered against the defendant, RUSSO HARDWARE, INC., in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

> Respectfully Submitted,
> ROMANUCCI & BLANDIN, LLC
>
> By: *[signature]*
>
> Attorney for the Plaintiff

Bruno R. Marasso
Vincent J. Arrigo
Bryce T. Hensley
ROMANUCCI & BLANDIN
321 N. Clark St.; Ste 900
Chicago, IL  60654
Tel: (312) 458-1000
Fax: (312) 458-1004
bmarasso@rblaw.net
varrigo@rblaw.net
bhensley@rblaw.net
Attorney No.: 35875