Bryce T. Hensley
Illinois State Bar No. 6327025
Romanucci & Blandin, LLC
321 N. Clark Street, Suite 900
Chicago, Illinois 60654
312-253-8800
bhensley@rblaw.net
*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION* | MDL Docket No. 2741 |
| | Case No. 3:16-MD-2741-VC |
| This Document relates to: *Meghan Caruso, et al. v. Russo Hardware, et al.* USDC – NDIL No. 1:19-cv-7121 USDC – NDCA No. 3:20-cv-01017-VC | The Honorable Judge Vince Chhabria **PLAINTIFF'S PROPOSED THIRD AMENDED COMPLAINT AT LAW** |

## PROPOSED THIRD AMENDED COMPLAINT AT LAW

NOW COMES the Plaintiff, MEGHAN CARUSO, Independent Executor of the

Estate of John Caruso, deceased, by and through her attorneys, ROMANUCCI &

BLANDIN, LLC, in her Second Amended Complaint against Defendants, RUSSO

HARDWARE, INC. d/b/a RUSSO POWER EQUIPMENT, INC., d/b/a RUSSO

POWER EQUIPMENT, d/b/a GREEN INDUSTRY FINANCE ("RUSSO");

MONSANTO COMPANY, INC.; HOME DEPOT USA, INC.; MENARD, INC.; and

ARCHER PINES LANDSCAPING, INC;  pleading hypothetically and in the

alternative, hereby states as follows.

**EXHIBIT**

1

## INTRODUCTION

1.     In 1970, Defendants MONSANTO COMPANY, INC.; MONSANTO ILLINOIS PRODUCTION CO., LLC; MONSANTO PRODUCTION SUPPLY, LLC; and MONSANTO TECHNOLOGY, LLC discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.

2.     Since that time, Defendant Monsanto has marketed and sold Roundup®, its formulations, and derivative products, including, but not limited to: RoundUp Quick-Pro, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed

& Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate, hereinafter referred to collectively as, "Roundup®" and/or "Roundup."

3.    Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

4.    Defendant Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Defendant Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

5.    Defendant Monsanto's glyphosate products and glyphosate-based formulations are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm

that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

6.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world and it has traced the health implications from exposure to glyphosate since 2001.

7.      On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

8.      The IARC Working Group classified glyphosate as a Group 2A carcinogen, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin's lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

9.      The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

10.     More likely than not, glyphosate causes Diffuse large B-cell non-

Hodgkin's lymphoma.

11.     More likely than not, glyphosate-based formulations cause Diffuse large B-cell non-Hodgkin's lymphoma.

12.     More likely than not, Roundup causes Diffuse large B-cell non-Hodgkin's lymphoma.

13.     Nevertheless, Defendant Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Defendant Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## THE PARTIES

### Plaintiff

14.     Plaintiff Megan Caruso is a citizen of the city of Chicago, County of Cook, State of Illinois.

15.     On October 19, 2017, John Caruso, then a 33-year-old-citizen of the city of Chicago, County of Cook, State of Illinois, passed away as a result of Diffuse large B cell non-Hodgkin's lymphoma.

16.     On and before October 19, 2017, Meghan Caruso was John Caruso's wife.

17.     On October 25, 2018, Meghan Caruso was appointed the Independent Executor of the Estate of John Caruso, deceased, by the Probate Division of the

County Department of the Circuit Court of Cook County.

18.     Decedent John Caruso worked for the University of Illinois at Chicago ("UIC") from 2008 through 2016 and regularly used Defendant Monsanto's Roundup® products that were sold to him and/or his employer by Defendant RUSSO.

**Defendants**

19.     MONSANTO COMPANY, INC. is a Delaware corporation, Illinois Secretary of State ID No. 61261028, with its headquarters and principal place of business in St. Louis, Missouri, authorized to do business in the State of Illinois that conducted significant business in Cook County at all times relevant herein.

20.     At all times relevant to this complaint, Defendant Monsanto discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup®.

21.     Defendant Monsanto has regularly transacted and conducted business within the state of Illinois for years, and has derived substantial revenue from goods and products, including Roundup®, used in the State of Illinois for years.

22.     Defendant Monsanto expected or should have expected their acts to have consequences within the State of Illinois, and derived substantial revenue from interstate commerce.

23.     Defendant RUSSO is an Illinois corporation with its headquarters and principal place of business in the County of Cook, State of Illinois.

24.     At all times relevant to this complaint, Defendant RUSSO owned and operated a supply business, and knowingly and intentionally sold Roundup® to

decedent and/or the decedent's employer, UIC, and exposed Plaintiff to Roundup's®
dangerous properties.

25.     Plaintiff is informed and believes that Defendant RUSSO did sell,
advertise,   and/or distribute Roundup® with full knowledge of its dangerous and
defective nature.

26.     Plaintiff is informed and believes that Defendant RUSSO did sell,
market, and distribute Roundup® with full knowledge of its dangerous and defective
nature.

27.     Plaintiff is informed and believes, and based therein alleges, that in
committing the acts alleged herein, each and every managing agent, agent,
representative and/or employee of the Defendants was working within the course and
scope of said agency, representation and/or employment with the knowledge, consent,
ratification, and authorization of the Defendants and their directors, officers and/or
managing agents.

28.     Defendant HOME DEPOT USA, INC. ("HOME DEPOT") is a Delaware
corporation with its headquarters and principal place of business in Atlanta, Georgia.

29.     At all times relevant to this complaint, Defendant HOME DEPOT
owned and operated numerous supply businesses within Cook County, Illinois, and
knowingly and intentionally sold Roundup® to decedent and/or the decedent's
employer, UIC, when it knew or should have known of Roundup's® dangerous
properties.

30.     Plaintiff is informed and believes that Defendant HOME DEPOT did sell, advertise, and/or distribute Roundup® to decedent and/or the decedent's employer, UIC, when it knew or should have known of its dangerous and defective nature.

31.     Plaintiff is informed and believes that Defendant HOME DEPOT did sell, market, and distribute Roundup® when it knew or should have known of its dangerous and defective nature.

32.     Plaintiff is informed and believes, and based therein alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of Defendant HOME DEPOT was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of Defendant HOME DEPOT and its directors, officers and/or managing agents.

33.     Defendant MENARD, INC. ("MENARD") is a Wisconsin corporation with its headquarters and principal place of business in the Eau Claire, Wisconsin.

34.     At all times relevant to this complaint, Defendant MENARD owned and operated numerous supply businesses within Cook County, Illinois, and knowingly and intentionally sold Roundup® to decedent and/or the decedent's employer, UIC, when it knew or should have known of Roundup's® dangerous properties.

35.     Plaintiff is informed and believes that Defendant MENARD did sell, advertise, and/or distribute Roundup® to decedent and/or the decedent's employer,

UIC, when it knew or should have known of its dangerous and defective nature.

36.     Plaintiff is informed and believes that Defendant MENARD did sell, market, and distribute Roundup® when it knew or should have known of its dangerous and defective nature.

37.     Plaintiff is informed and believes, and based therein alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of Defendant MENARD was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of Defendant MENARD and its directors, officers and/or managing agents.

38.     Defendant ARCHER PINES LANDSCAPING, INC. ("ARCHER") is an Illinois corporation with its headquarters and principal place of business in the County of Will, State of Illinois.

39.     At all times relevant to this complaint, Defendant ARCHER owned and operated a landscaping company in and around the Chicagoland area and used Roundup® on the UIC campus when it knew or should have known of Roundup's® dangerous properties.

40.     Plaintiff is informed and believes that Defendant ARCHER did use Roundup® on the UIC campus when it knew or should have known of its dangerous and defective nature.

41.     Plaintiff is informed and believes, and based therein alleges, that in

committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of Defendant ARCHER was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant ARCHER and their directors, officers and/or managing agents.

## **PERSONAL JURISDICTION**

42.    The Circuit Court of Cook County has jurisdiction over Defendant Monsanto because the Monsanto entities named as defendants in this care are foreign corporations authorized to do business in Illinois and registered with the Illinois Secretary of State, and/or have sufficient minimum contacts in Illinois, or otherwise intentionally avails itself of the Illinois market so as to render the exercise of jurisdiction over it by the Illinois courts consistent with traditional notions of fair play and substantial justice.

43.    The Circuit Court of Cook County has jurisdiction over Defendant RUSSO because it is a corporation and/or entity organized under the laws of the State of Illinois, registered with the Illinois Secretary of State, and has sufficient minimum contacts in Illinois.

## **VENUE**

44.    Venue is proper in this Court pursuant to the Illinois Code of Civil Procedure in that the Defendant RUSSO has its principal place of business in Cook County, Illinois and its registered agent is located in Cook County, Illinois.

45.     Venue is further proper as Defendant Monsanto's Roundup® used by Decedent John Caruso was, upon information and belief, sold to decedent John Caruso and/or his employer, the UIC, by Defendant RUSSO, which is located in Cook County, Illinois.

46.     Venue is further proper as Defendant Monsanto's Roundup® used by Defendant ARCHER PINES was used in Cook County.

47.     Venue is further proper as Defendant ARCHER's use of Roundup on the UIC campus took place in Cook County, Illinois.

48.     Moreover, venue is proper because decedent John Caruso's exposure to Defendant Monsanto's Roundup® product through his own use and Defendant ARCHER's use of Roundup®, resultant diagnosis with Diffuse large B cell non-Hodgkin's lymphoma, and death all took place in Cook County.

## FACTS COMMON TO ALL COUNTS

49.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

50.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

51.     For nearly 40 years, farms across the world have used Roundup®

without knowing of the dangers its use poses. That is because when Defendant Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Defendant Monsanto assured the public that Roundup® was harmless. In order to prove this, Defendant Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Defendant Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

52.     The herbicidal properties of glyphosate were discovered in 1970 by Defendant Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Defendant Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

53.    The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a)

54.    Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

55.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

56.    The EPA and the State of Illinois registered Roundup® for distribution,

sale, and manufacture in the United States and the State of Illinois.

57.    FIFRA generally requires that the registrant, Defendant Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

58.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

59.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of*

### *Glyphosate/Roundup*

60.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Defendant Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

61.     On two occasions, the EPA found that the laboratories hired by Defendant Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

62.     In the first instance, Defendant Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-based formulations, including nine of the 15 residue studies needed to register Roundup®.

63.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed

discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

64.     Three top executives of IBT were convicted of fraud in 1983.

65.     In the second incident of data falsification, Defendant Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

66.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Defendant Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Defendant Monsanto's Market Dominance Profits*

67.     The success of Roundup® was key to Defendant Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Defendant Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Defendant

Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

68.    In response, Defendant Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Defendant Monsanto to expand its market for Roundup® even further; by 2000, Defendant Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Defendant Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

69.    Through a three-pronged strategy of increased production, decreased prices and by coupling Roundup® with Roundup Ready® seeds, Roundup® became Defendant Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Defendant Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Defendant Monsanto has known for decades that it falsely advertises the safety of Roundup®*

70.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Defendant Monsanto based on its false and misleading advertising of

Roundup ® products. Specifically, the lawsuit challenged Defendant Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences …

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to

mammals, birds and fish.

j)  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

71.   On November 19, 1996, Defendant Monsanto entered into an Assurance of Discontinuance with NYAG, in which Defendant Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)  its glyphosate-based pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b)  its glyphosate-based pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c)  its glyphosate-based pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)  its glyphosate-based pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)  glyphosate-based pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)  its glyphosate-based formulations or any component thereof might be classified as "practically non-toxic."

72.   Defendant Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

73.     In 2009, France's highest court ruled that Defendant Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Defendant Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

74.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

75.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

76.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are

distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

77.    In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

78.    In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

79.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered

"reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

80.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

81.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

82.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

83.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

84.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

85.    The IARC Working Group also found that glyphosate caused DNA and

chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

86.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

87.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

88.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

89.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

90.     The IARC Working Group also reviewed an Agricultural Health Study,

consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

91.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was

applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

92.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-based herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known.

93.    The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

94.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

95.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

96.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

97.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

98.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### *Russo Hardware, Inc.*

99.     Defendant RUSSO was, at all relevant times, engaged in the distribution of Roundup®, Roundup Ready® crops, and other glyphosate-based formulations from Defendant Monsanto to retailers and/or commercial/agricultural users in Illinois.

100.    Defendant RUSSO had superior knowledge compared to Roundup® users and consumers, including the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger.

101.    Defendant RUSSO was one of the distributors providing Roundup® and glyphosate-based formulations actually used by decedent John Caruso.

102.    Defendant RUSSO is "the premier power equipment and landscape supply dealer of the Midwest."[1]

103.    Defendant RUSSO is part of the "Green Industry," taking responsibility for their environment.[2]

104.    Far from just being a local distributor, Defendant RUSSO is a member of numerous national organizations including the American Public Works Association and the North American Trailer Dealers Association.[3]

105.    Members of Defendant RUSSO's business relationship development (BRD) team attend trade shows and industry seminars.[4]

106.    Employees of Defendant RUSSO's impart product knowledge honed through vendor training programs and periodic in-house training sessions led by management.[5]

107.    Upon information and belief, Defendant RUSSO was aware of the IARC's 2015 findings as it related to glyphosate and its dangerous and/or carcinogenic qualities.

108.    Upon information and belief, Defendant RUSSO was aware of other

---

[1] https://www.russopower.com/about-us
[2] *Id.*
[3] *Id.*
[4] https://outdoorpowerequipment.com/2016/05/09/unique-approach-keys-rise-of-russo-power-equipment/
[5] *Id.*

evidence of glyphosate and Roundup's® dangerous and/or carcinogenic qualities.

109.   At all relevant times, Defendant RUSSO had greater knowledge than John Caruso as it related to the carcinogenicity of Roundup®.

110.   Defendant RUSSO continued to sell Roundup® to John Caruso and/or his employer even after the IARC finding regarding glyphosate in 2015.

111.   Upon information and belief, Defendant RUSSO never warned, disclosed, or otherwise notified its consumers, such as decedent John Caruso and/or his employer, of the dangers associated with Roundup® and its active ingredient, glyphosate, a Group 2A probable human carcinogen.

### *Home Depot, Inc.*

112.   Defendant HOME DEPOT was, at all relevant times, engaged in the distribution of Roundup®, Roundup Ready® crops, and other glyphosate-based formulations from Defendant Monsanto to retailers and/or commercial/agricultural users in Illinois.

113.   Upon information and belief, Defendant HOME DEPOT had superior knowledge compared to Roundup® users and consumers, including the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger.

114.   Upon information and belief, Defendant HOME DEPOT was one of the distributors providing Roundup® and glyphosate-based formulations actually used by decedent John Caruso.

115.    Defendant HOME DEPOT is the largest home improvement retailer in the United States.

116.    Defendant HOME DEPOT is one of the largest United States Corporations by total revenue.

117.    Defendant HOME DEPOT operates numerous stores in Illinois including numerous in Cook County and within the City of Chicago.

118.    Defendant HOME DEPOT, operating as a home improvement retailer, sells products and goods that focus both on internal and external home improvements.

119.    Defendant HOME DEPOT sells, distributes, markets, and advertises Roundup® as one such product and good that can be used for home improvement.

120.    Operating as the largest home improvement retailer in the country, upon information and belief, Defendant HOME DEPOT knew or should have known of the IARC's 2015 findings as it related to glyphosate and its dangerous and/or carcinogenic qualities.

121.    Upon information and belief, at all relevant times, Defendant HOME DEPOT had greater knowledge than John Caruso as it related to the carcinogenicity of Roundup®.

122.    Upon information and belief, Defendant HOME DEPOT sold Roundup® products to John Caruso and/or John Caruso's employer, University of Illinois-Chicago prior to John Caruso's diagnosis with non-Hodgkin's lymphoma.

123.    Upon information and belief, John Caruso used Roundup® products sold by Defendant HOME DEPOT prior to his diagnosis with non-Hodgkin's lymphoma.

124.    Upon information and belief, Defendant HOME DEPOT knew or should have known of other evidence of glyphosate and Roundup's® dangerous and/or carcinogenic qualities.

125.    Upon information and belief, Defendant HOME DEPOT continued to sell Roundup® to John Caruso and/or his employer even after the IARC finding regarding glyphosate in 2015.

126.    Upon information and belief, Defendant HOME DEPOT never warned, disclosed, or otherwise notified its consumers, such as decedent John Caruso and/or his employer, of the dangers associated with Roundup® and its active ingredient, glyphosate, a Group 2A probable human carcinogen.

### *Menard, Inc.*

127.    Defendant MENARD was, at all relevant times, engaged in the distribution of Roundup®, Roundup Ready® crops, and other glyphosate-based formulations from Defendant Monsanto to retailers and/or commercial/agricultural users in Illinois.

128.    Upon information and belief, Defendant MENARD had superior knowledge compared to Roundup® users and consumers, including the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger.

129.   Upon information and belief, Defendant MENARD was one of the distributors providing Roundup® and glyphosate-based formulations actually used by decedent John Caruso.

130.   Defendant MENARD is a national home improvement retailer in the United States, where it has approximately 350 stores in 15 states.

131.   Defendant MENARD is one of the largest private companies in the country with revenues in the billions of dollars.

132.   Defendant MENARD operates numerous stores in Illinois including numerous in Cook County and within the City of Chicago.

133.   Defendant MENARD, operating as a home improvement retailer, sells products and goods that focus both on internal and external home improvements.

134.   Defendant MENARD sells, distributes, markets, and advertises Roundup® as one such product and good that can be used for home improvement.

135.   Operating as the largest home improvement retailer in the country, upon information and belief, Defendant MENARD knew or should have known of the IARC's 2015 findings as it related to glyphosate and its dangerous and/or carcinogenic qualities.

136.   Upon information and belief, at all relevant times, Defendant MENARD had greater knowledge than John Caruso as it related to the carcinogenicity of Roundup®.

137.   Upon information and belief, Defendant MENARD sold Roundup®

products to John Caruso and/or John Caruso's employer, University of Illinois-Chicago prior to John Caruso's diagnosis with non-Hodgkin's lymphoma.

138.   Upon information and belief, John Caruso used Roundup® products sold by Defendant MENARD prior to his diagnosis with non-Hodgkin's lymphoma.

139.   Upon information and belief, Defendant MENARD knew or should have known of other evidence of glyphosate and Roundup's® dangerous and/or carcinogenic qualities.

140.   Upon information and belief, Defendant MENARD continued to sell Roundup® to John Caruso and/or his employer even after the IARC finding regarding glyphosate in 2015.

141.   Upon information and belief, Defendant MENARD never warned, disclosed, or otherwise notified its consumers, such as decedent John Caruso and/or his employer, of the dangers associated with Roundup® and its active ingredient, glyphosate, a Group 2A probable human carcinogen.

### *Archer Pines Landscaping, Inc.*

142.   At all relevant times, Defendant ARCHER was a landscaping company that provided landscaping work at University of Illinois-Chicago, including using Roundup® products around the campus.

143.   Upon information and belief, Defendant ARCHER was, at all relevant times, engaged in the use of Roundup®, and other glyphosate-based formulations while working on the University of Illinois-Chicago campus.

144.    Upon information and belief, Defendant ARCHER had superior knowledge compared to Roundup® users and consumers, including the carcinogenic properties of the product, yet failed to accompany its use of Roundup with any warnings or precautions for that grave danger.

145.    Upon information and belief, Defendant ARCHER was one of the users of Roundup® and glyphosate-based formulations that John Caruso was exposed to.

146.    Upon information and belief, Defendant ARCHER knew or should have known of the IARC's 2015 findings as it related to glyphosate and its dangerous and/or carcinogenic qualities.

147.    Upon information and belief, Defendant ARCHER used Roundup® products on the University of Illinois-Chicago campus prior to John Caruso's diagnosis with non-Hodgkin's lymphoma.

148.    Upon information and belief, Defendant ARCHER knew or should have known of other evidence of glyphosate and Roundup's® dangerous and/or carcinogenic qualities.

149.    Upon information and belief, Defendant ARCHER continued to use Roundup® to John Caruso on the University of Illinois-Chicago campus even after the IARC finding regarding glyphosate in 2015.

150.    Upon information and belief, Defendant ARCHER never warned, disclosed, or otherwise notified individuals, such as decedent John Caruso and/or his employer, of the dangers associated with Roundup® and its active ingredient,

glyphosate, a Group 2A probable human carcinogen.

### *John Caruso's Exposure to Roundup®*

151.    For a period of eight years, John Caruso worked for UIC, mostly as a member of the UIC Grounds Department, regularly working as a landscaper, spraying Roundup products to the green space of the enormous campus' 240 acres.

152.    Throughout the spring, summer, and fall seasons of those eight years, John Caruso would spray Roundup products on the campus' 240 acres between ten and twenty hours per week.

153.    Upon information and belief, John Caruso was also exposed to Roundup products being applied by Defendant ARCHER on the UIC campus.

154.    John Caruso was also exposed to Defendant Monsanto's Roundup products sold by Defendants RUSSO, HOME DEPOT, MENARD, and other distributors.

155.    For the vast majority of the eight years John Caruso applied Roundup products to the campus' 240 acres, he was not given any personal protective equipment to use, nor did he use any.

156.    The Roundup products John Caruso was exposed to at UIC were typically in concentrated form.

157.    After eight years of consistent exposure to Roundup products, John Caruso was diagnosed with Diffuse large B cell non-Hodgkin's lymphoma.

158.    On October 19, 2017, John Caruso passed away as a result of Stage IV

Diffuse Large B Cell Lymphoma, leaving behind his wife, Meghan, and his infant son.

## COUNT I
## WRONGFUL DEATH-NEGLIGENCE
### (Estate of Caruso v. Russo)

159.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

160.   Defendant RUSSO knew and/or should have known that it was foreseeable that persons, such as decedent John Caruso, would suffer injuries as a result of its failure to exercise ordinary care in the sale and distribution of glyphosate-based formulations.

161.   Decedent John Caruso did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to glyphosate.

162.   At all times relevant to this litigation, Defendant RUSSO knew or, in the exercise of reasonable care, should have known of the hazards and dangers of glyphosate-based formulations and their carcinogenic properties.

163.   Accordingly, at all times relevant to this litigation, Defendant RUSSO knew or, in the exercise of reasonable care, should have known that use of or exposure to the application of glyphosate-based formulations including Roundup could cause or be associated with decedent John Caruso's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including decedent John Caruso.

164.   Defendant RUSSO also knew or, in the exercise of reasonable care,

should have known that users and those exposed to glyphosate-based formulations including Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to those products.

165.   It was the duty of the defendant, before and at the time of the occurrences, to use ordinary care for the safety of the decedent, John Caruso.

166.   Notwithstanding that duty, the defendant, RUSSO, committed one or more of the following acts and/or omissions:

    a. Directly sold glyphosate-based formulations including Roundup to decedent John Caruso and/or indirectly sold glyphosate-based formulations to decedent's employer, UIC;

    b. Failed to exercise reasonable care in the sale, marketing, warning, and distribution of glyphosate-based formulations including Roundup and exposure to glyphosate-based formulations including Roundup of decedent John Caruso and other persons;

    c. Failed to take all reasonable steps necessary to apply the products that was not unreasonably dangerous to persons present or nearby;

    d. Failed to provide accurate, true, and correct information concerning the risks of using or being exposed to glyphosate-based formulations including Roundup;

    e. Failed to provide appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to glyphosate-based formulations including Roundup;

    f. Failed to exercise ordinary care in the sale, marketing, warning, and distribution regarding the use of glyphosate-based products including Roundup;

    g. Sold, marketed, failed to warn, and distributed herbicides including Roundup containing the chemical glyphosate when it knew or had reason to know of the defects inherent in those products, knew or had reason to know that a user's or consumer's exposure to the products

created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries; and/or

h. Despite its ability and means to avoid applying glyphosate-based formulations including Roundup, failed to warn those exposed or those potentially exposed, and/or otherwise minimize the risks of exposure.

167.   As a result of one or more of the following acts and/or omissions of RUSSO, John Caruso, deceased, became ill with Diffuse large B cell non-Hodgkin's lymphoma.

168.   As a result of extended and prolonged exposure to glyphosate and glyphosate-based formulations including Roundup, John Caruso, deceased, became ill with Diffuse Large B Cell non-Hodgkin's Lymphoma.

169.   Defendant RUSSO's negligence was a proximate cause of the injuries, harm, and economic losses that decedent John Caruso suffered, and that his estate suffered and will continue to suffer, as described herein.

170.   As a proximate result of Defendant RUSSO's wrongful acts and omissions, the Estate of John Caruso, including Meghan Caruso and his infant son have suffered and continue to suffer pecuniary loss including without limitation the loss of money, benefits, goods and services of John Caruso including lost income; lost instruction, moral training, and superintendence of education; grief, sorrow, and mental suffering; loss of consortium; and the considerable financial expenses for the funeral and burial of a 33-year-old husband and father, for which they are entitled to compensation from Defendant RUSSO. Plaintiff and decedent's heirs will continue to

incur these damages and expenses in the future.

171.   Plaintiff, Meghan Caruso, as Independent Executor of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, asks that a judgment be entered against the defendant, RUSSO HARDWARE, INC., in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

## COUNT II
## SURVIVAL-NEGLIGENCE
### (Estate of Caruso v. Russo)

172.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

173.   As a direct and proximate result of Defendant RUSSO's acts and/or omissions, decedent John Caruso, a 33-year-old husband and father, suffered injuries of a personal and pecuniary nature including, without limitation, hospital, medical, and related expenses; disability and disfigurement, pain and suffering, loss of normal life, physical and emotional trauma that decedent John Caruso would have been entitled to receive compensation from Defendant RUSSO for these injuries had he survived.

174.    Plaintiff, Meghan Caruso, as Administrator of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, asks that a judgment be entered against the defendant, RUSSO HARDWARE, INC., in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

**COUNT III**
**WRONGFUL DEATH-STRICT LIABILITY (DESIGN DEFECT)**
**(Estate of Caruso v. Monsanto)**

175.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

176.    Plaintiff brings this strict liability claim against Defendant Monsanto for defective design.

177.    John Caruso, deceased, developed Diffuse large B cell non-Hodgkin's lymphoma which caused him pain, suffering, disability, disfigurement, loss of normal life and eventually resulted in his death as a result of using Monsanto's Roundup products.

178.    At the time Monsanto's Roundup products left its control, it was unreasonably dangerous in that it was a carcinogenic glyphosate-based formulation.

179.    At all times relevant to this litigation, Defendant Monsanto engaged in

the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and laborers using the products, including decedent John Caruso, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto. At all times relevant to this litigation, Defendant Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products that decedent John Caruso was exposed to, as described above.

180.   At all times relevant to this litigation, Defendant Monsanto's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the decedent, John Caruso.

181.   At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including decedent John Caruso, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

182.   Defendant Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto were defective in design and formulation in

that when they left the hands of the Defendant Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

183.   Defendant Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto were defective in design and formulation in that when they left the hands of Defendant Monsanto's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

184.   At all times relevant to this action, Defendant Monsanto knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant Monsanto.

185.   Therefore, at all times relevant to this litigation, Defendant Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant Monsanto were defective in design and formulation, in one or more of the following ways:

a.   When placed in the stream of commerce, Defendant Monsanto's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b.   When placed in the stream of commerce, Defendant Monsanto's

Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Defendant Monsanto's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendant Monsanto did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e. Exposure to Roundup® and glyphosate-based formulations presents a risk of harmful side effects including without limitation causing non-Hodgkin's lymphoma, that outweigh any potential utility stemming from the use of the herbicide;

f. Defendant Monsanto knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

g. Defendant Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products; and/or

h. Defendant Monsanto could have employed safer alternative designs and formulations.

186.  Decedent John Caruso was exposed to Defendant Monsanto's Roundup® products while working as a landscaper, without knowledge of its dangerous characteristics.

187.  At all times relevant to this litigation, decedent John Caruso was exposed to the use of Defendant Monsanto's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

188.  Decedent John Caruso could not have reasonably discovered the defects

and risks associated with Roundup® or glyphosate-based formulations before or at the time of exposure.

189.  The harm caused by Defendant Monsanto's Roundup® products, non-Hodgkin's lymphoma, far outweighed their benefit, getting rid of weeds, rendering Defendant Monsanto's products dangerous to an extent beyond that which an ordinary consumer would contemplate.

190.  Defendant Monsanto's Roundup® products were and are more dangerous than alternative products and Defendant Monsanto could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

191.  At the time Roundup® products left Defendant Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant Monsanto's herbicides.

192.  Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant Monsanto is strictly liable to Plaintiff.

193.  The defects in Defendant Monsanto's Roundup® products were substantial and contributing factors in causing decedent John Caruso's grave injuries, including his Diffuse large B cell non-Hodgkin's lymphoma, and, but for Defendant Monsanto's misconduct and omissions, decedent John Caruso and his

estate would not have sustained their injuries.

194.   Defendant Monsanto risked the lives of consumers and users of its products, including decedent John Caruso, with knowledge of the safety problems associated with Roundup® and glyphosate-based formulations, and suppressed this knowledge from the general public.

195.   As a proximate result of Defendant MONSANTO's wrongful acts and omissions, the Estate of John Caruso, including Meghan Caruso and his infant son have suffered and continue to suffer pecuniary loss including without limitation the loss of money, benefits, goods and services of John Caruso including lost income; lost instruction, moral training, and superintendence of education; grief, sorrow, and mental suffering; loss of consortium; and the considerable financial expenses for the funeral and burial of a 33-year-old husband and father, for which they are entitled to compensation from Defendant Monsanto. Plaintiff and decedent's heirs will continue to incur these damages and expenses in the future.

196.   Plaintiff, Meghan Caruso, as Independent Executor of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, asks that a judgment be entered against the defendants, MONSANTO COMPANY, INC. in a fair and just

amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any

further relief this court deems just.

## COUNT IV
## SURVIVAL ACTION-STRICT LIABILITY (DESIGN DEFECT)
### (Estate of Caruso v. Monsanto)

197.   Plaintiff incorporates by reference each and every allegation set forth in

the preceding paragraphs as if fully stated herein.

198.   As a direct and proximate result of Defendant Monsanto's acts and/or

omissions, decedent John Caruso, a 33-year-old husband and father, suffered injuries

of a personal and pecuniary nature including, but not limited to hospital, medical,

and related expenses; disability and disfigurement, loss of normal life, pain and

suffering, physical and emotional trauma that decedent John Caruso would have

been entitled to receive compensation from Defendant Monsanto for these injuries

had he survived.

199.   Plaintiff, Meghan Caruso, as Administrator of the Estate of John

Caruso, deceased, brings this cause of action pursuant to the provisions of 755 ILCS

5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as

independent executor of the Estate of John Caruso, deceased, asks that a judgment

be entered against the defendants, MONSANTO COMPANY, INC. in a fair and just

amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any

further relief this court deems just.

<u>COUNT V</u>
## WRONGFUL DEATH-STRICT LIABILITY (FAILURE TO WARN)
### (Estate of Caruso v. Monsanto)

200.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

201.    Plaintiff brings this strict liability claim against Defendant Monsanto for failure to warn.

202.    John Caruso, deceased, developed non-Hodgkin's lymphoma which caused him pain, suffering, loss of normal life, and eventually resulted in his death as a result of using Monsanto's Roundup products.

203.    At the time Monsanto's Roundup products left its control, it was unreasonably dangerous in that it was a carcinogenic glyphosate-based formulation.

204.    At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup® products, which are defective and unreasonably dangerous to consumers, including decedent John Caruso, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant Monsanto.

205.    Defendant Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the

course of same, directly advertised or marketed the products to consumers and end users, including decedent John Caruso, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-based formulations.

206.   At all times relevant to this litigation, Defendant Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant Monsanto had a continuing duty to warn decedent John Caruso of the dangers associated with Roundup® use and exposure. Defendant Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

207.   At the time of manufacture, Defendant Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-based formulations because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

208.   At all times relevant to this litigation, Defendant Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup, including decedent John Caruso.

209.    Despite the fact that Defendant Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant Monsanto, or scientifically knowable to Defendant Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as decedent John Caruso.

210.    Defendant Monsanto knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

211.    At all times relevant to this litigation, Defendant Monsanto's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including decedent John Caruso, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendant Monsanto.

212. Decedent John Caruso was exposed to Roundup® products, as described above, without knowledge of their dangerous characteristics.

213. At all times relevant to this litigation, decedent John Caruso was exposed to the use of Defendant Monsanto's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

214. Decedent John Caruso could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-based formulations prior to or at the time of decedent John Caruso's exposure due to this failure to warn. Decedent John Caruso relied upon the skill, superior knowledge, and judgment of Defendant Monsanto.

215. Defendant Monsanto knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

216. The information that Defendant Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed, such as decedent John Caruso, to utilize the products safely and with adequate protection. Instead, Defendant Monsanto disseminated

information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

217.   To this day, Defendant Monsanto has failed to adequately and accurately warn of the true risks of decedent John Caruso's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

218.   As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant Monsanto, were distributed by Defendant Monsanto and when decedent John Caruso became exposed.

219.   Defendant Monsanto is liable to decedent John Caruso and his estate for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup®, glyphosate and glyphosate-based formulations.

220.   The defects in these Roundup® products were substantial and contributing factors in causing decedent John Caruso and his estate's injuries, and, but for Defendant Monsanto's misconduct and omissions, decedent John Caruso and his estate would not have sustained their injuries.

221.   Had Defendant Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, decedent John Caruso could have avoided the risk of developing injuries as alleged herein and the company who employed decedent John Caruso could have obtained alternative herbicides.

222.   As a direct and proximate result of Defendant Monsanto placing its defective Roundup into the stream of commerce without appropriate warnings as further set forth above, the Estate of John Caruso, including Meghan Caruso and his infant son,  have suffered and continue to suffer pecuniary loss including without limitation the loss of money, benefits, goods and services of John Caruso including lost income; lost instruction, moral training, and superintendence of education; grief, sorrow, and mental suffering; loss of consortium; and the considerable financial expenses for the funeral and burial of a 33-year-old husband and father, for which they are entitled to compensation from Defendant RUSSO. Plaintiff and decedent's heirs will continue to incur these damages and expenses in the future.

223. Plaintiff, Meghan Caruso, as Independent Executor of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, asks that a judgment be entered against the defendants, MONSANTO COMPANY, INC. in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

## COUNT VI
## SURVIVAL ACTION-STRICT LIABILITY (FAILURE TO WARN)
### (Estate of Caruso v. Monsanto)

224. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

225. As a direct and proximate result of Defendant Monsanto's acts and/or omissions, decedent John Caruso, a 33-year-old husband and father, suffered injuries of a personal and pecuniary nature including, without limitation, hospital, medical, and related expenses; disability and disfigurement, pain and suffering, physical and emotional trauma that decedent John Caruso would have been entitled to receive compensation from Defendant Russo's Monsanto for these injuries had he survived.

226. Plaintiff, Meghan Caruso, as Administrator of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, asks that a judgment be entered against the defendants, MONSANTO COMPANY, INC. in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

## COUNT VII
### WRONGFUL DEATH-NEGLIGENCE
### (Estate of Caruso v. Monsanto)

227.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

228.    Defendant Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by decedent John Caruso.

229.    At all times relevant to this litigation, Defendant Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

230.    Accordingly, at all times relevant, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with decedent John Caruso's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including decedent John Caruso.

231.    Defendant Monsanto also knew or, in the exercise of reasonable care,

should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-based formulations.

232. It was the duty of the defendant, Monsanto, before and at the time of the occurrences, to use ordinary care for the safety of the decedent, John Caruso.

233. Notwithstanding said duty, the defendant, Monsanto, committed one or more of the following acts and/or omissions:

   a. Promoted, developed, designed, sold, and/or distributed its Roundup® products without thorough and adequate pre-and post-market testing;

   b. Promoted, developed, designed, sold, and/or distributed Roundup® while concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

   c. Failed to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-based formulations were safe for their intended use in agriculture and horticulture;

   d. Failed to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

   e. Failed to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

   f. Failed to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

   g. Failed to disclose to decedent John Caruso, users/consumers, and the general public that use of and exposure to Roundup® presented severe

risks of cancer and other grave illnesses;

h.  Failed to warn decedent John Caruso, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to decedent John Caruso and other consumers;

i.  Systematically suppressed or downplayed contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-based formulations;

j.  Represented that its Roundup® products were safe for their intended use when, in fact, Defendant Monsanto knew or should have known that the products were not safe for their intended purpose;

k.  Declined to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.  Advertised, marketed, and recommended the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.  Continued to disseminate information to its consumers, which indicate or imply that Defendant Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and/or

n.  Continued the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

234.  As a result of one or more of the above acts and/or omissions, John Caruso developed Diffuse large B cell non-Hodgkin's lymphoma and eventually died as a result.

235.  Defendant Monsanto knew and/or should have known that it was foreseeable that consumers, such as decedent John Caruso, would suffer injuries, including without limitation non-Hodgkin's lymphoma, as a result of Defendant

Monsanto's failure to exercise ordinary care.

236.    Decedent John Caruso did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

237.    Defendant Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that decedent John Caruso suffered, and his estate has suffered and will continue to suffer, as described herein.

238.    As a direct and proximate result of Defendant Monsanto's acts and/or omissions, the Estate of John Caruso, including Meghan Caruso and his infant son have suffered and continue to suffer pecuniary loss including without limitation the loss of money, benefits, goods and services of John Caruso including lost income; lost instruction, moral training, and superintendence of education; grief, sorrow, and mental suffering; loss of consortium; and the considerable financial expenses for the funeral and burial of a 33-year-old husband and father, for which they are entitled to compensation from Defendant RUSSO. Plaintiff and decedent's heirs will continue to incur these damages and expenses in the future.

239.    Plaintiff, Meghan Caruso, as Independent Executor of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, asks that a judgment

be entered against the defendants, MONSANTO COMPANY, INC. in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

### COUNT VIII
### SURVIVAL ACTION-NEGLIGENCE
### (Estate of Caruso v. Monsanto)

240.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

241.    As a direct and proximate result of Defendant Monsanto's acts and/or omissions, decedent John Caruso, a 33-year-old husband and father, suffered injuries of a personal and pecuniary nature including, without limitation, hospital, medical, and related expenses; disability and disfigurement, pain and suffering, physical and emotional trauma that decedent John Caruso would have been entitled to receive compensation from Defendant Russo's for these injuries had he survived.

242.    Plaintiff, Meghan Caruso, as Administrator of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, asks that a judgment be entered against the defendants, MONSANTO COMPANY, INC. in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

<u>COUNT IX</u>
**WRONGFUL DEATH-NEGLIGENCE**
**(Estate of Caruso v. Home Depot)**

243.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

244.    Defendant HOME DEPOT knew or, in the exercise of reasonable care, should have known that it was foreseeable that persons, such as decedent John Caruso, would suffer injuries as a result of its failure to exercise ordinary care in the sale and distribution of glyphosate-based formulations.

245.    Decedent John Caruso did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to glyphosate.

246.    At all times relevant to this litigation, Defendant HOME DEPOT knew or, in the exercise of reasonable care, should have known of the hazards and dangers of glyphosate-based formulations and their carcinogenic properties.

247.    Accordingly, at all times relevant to this litigation, Defendant HOME DEPOT knew or, in the exercise of reasonable care, should have known that use of or exposure to the application of glyphosate-based formulations including Roundup could cause or be associated with decedent John Caruso's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including decedent John Caruso.

248.    Defendant HOME DEPOT also knew or, in the exercise of reasonable care, should have known that users and those exposed to glyphosate-based

formulations including Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to those products.

249.   It was the duty of the defendant, before and at the time of the occurrences, to use ordinary care for the safety of the decedent, John Caruso.

250.   Notwithstanding that duty, the defendant, HOME DEPOT, committed one or more of the following acts and/or omissions:

a.   Directly sold glyphosate-based formulations including Roundup to decedent John Caruso and/or indirectly sold glyphosate-based formulations to decedent's employer, UIC;

b.   Failed to exercise reasonable care in the sale, marketing, warning, and distribution of glyphosate-based formulations including Roundup and exposure to glyphosate-based formulations including Roundup of decedent John Caruso and other persons;

c.   Failed to provide accurate, true, and correct information concerning the risks of using or being exposed to glyphosate-based formulations including Roundup;

d.   Failed to provide appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to glyphosate-based formulations including Roundup;

e.   Failed to exercise ordinary care in the sale, marketing, warning, and distribution regarding the use of glyphosate-based products including Roundup;

f.   Sold, marketed, failed to warn, and distributed herbicides including Roundup containing the chemical glyphosate when it knew or had reason to know of the defects inherent in those products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries; and/or

g.   Despite its ability and means to avoid applying glyphosate-based

formulations including Roundup, failed to warn those exposed or those potentially exposed, and/or otherwise minimize the risks of exposure.

251.   As a result of one or more of the following acts and/or omissions of HOME DEPOT, John Caruso, deceased, became ill with Diffuse large B cell non-Hodgkin's lymphoma.

252.   As a result of extended and prolonged exposure to glyphosate and glyphosate-based formulations including Roundup, John Caruso, deceased, became ill with Diffuse Large B Cell non-Hodgkin's Lymphoma.

253.   Defendant HOME DEPOT's negligence was a proximate cause of the injuries, harm, and economic losses that decedent John Caruso suffered, and that his estate suffered and will continue to suffer, as described herein.

254.   As a proximate result of Defendant HOME DEPOT's wrongful acts and omissions, the Estate of John Caruso, including Meghan Caruso and his infant son have suffered and continue to suffer pecuniary loss including without limitation the loss of money, benefits, goods and services of John Caruso including lost income; lost instruction, moral training, and superintendence of education; grief, sorrow, and mental suffering; loss of consortium; and the considerable financial expenses for the funeral and burial of a 33-year-old husband and father, for which they are entitled to compensation from Defendant HOME DEPOT. Plaintiff and decedent's heirs will continue to incur these damages and expenses in the future.

255.    Plaintiff, Meghan Caruso, as Independent Executor of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, asks that a judgment be entered against the defendant, HOME DEPOT, INC., in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

### COUNT X
### SURVIVAL-NEGLIGENCE
### (Estate of Caruso v. Home Depot)

256.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

257.    As a direct and proximate result of Defendant HOME DEPOT's acts and/or omissions, decedent John Caruso, a 33-year-old husband and father, suffered injuries of a personal and pecuniary nature including, without limitation, hospital, medical, and related expenses; disability and disfigurement, pain and suffering, loss of normal life, physical and emotional trauma that decedent John Caruso would have been entitled to receive compensation from Defendant HOME DEPOT for these injuries had he survived.

258.    Plaintiff, Meghan Caruso, as Administrator of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, asks that a judgment be entered against the defendant, HOME DEPOT, INC., in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

## COUNT XI
## WRONGFUL DEATH-NEGLIGENCE
### (Estate of Caruso v. Menard)

259.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

260.    Defendant MENARD knew or, in the exercise of reasonable care, should have known that it was foreseeable that persons, such as decedent John Caruso, would suffer injuries as a result of its failure to exercise ordinary care in the sale and distribution of glyphosate-based formulations.

261.    Decedent John Caruso did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to glyphosate.

262.    At all times relevant to this litigation, Defendant MENARD knew or, in the exercise of reasonable care, should have known of the hazards and dangers of glyphosate-based formulations and their carcinogenic properties.

263.   Accordingly, at all times relevant to this litigation, Defendant MENARD knew or, in the exercise of reasonable care, should have known that use of or exposure to the application of glyphosate-based formulations including Roundup could cause or be associated with decedent John Caruso's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including decedent John Caruso.

264.   Defendant MENARD also knew or, in the exercise of reasonable care, should have known that users and those exposed to glyphosate-based formulations including Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to those products.

265.   It was the duty of the defendant, before and at the time of the occurrences, to use ordinary care for the safety of the decedent, John Caruso.

266.   Notwithstanding that duty, the defendant, MENARD, committed one or more of the following acts and/or omissions:

    a.   Directly sold glyphosate-based formulations including Roundup to decedent John Caruso and/or indirectly sold glyphosate-based formulations to decedent's employer, UIC;

    b.   Failed to exercise reasonable care in the sale, marketing, warning, and distribution of glyphosate-based formulations including Roundup and exposure to glyphosate-based formulations including Roundup of decedent John Caruso and other persons;

    c.   Failed to provide accurate, true, and correct information concerning the risks of using or being exposed to glyphosate-based formulations including Roundup;

    d.   Failed to provide appropriate, complete, and accurate warnings

concerning the potential adverse effects of exposure to glyphosate-based formulations including Roundup;

e. Failed to exercise ordinary care in the sale, marketing, warning, and distribution regarding the use of glyphosate-based products including Roundup;

f. Sold, marketed, failed to warn, and distributed herbicides including Roundup containing the chemical glyphosate when it knew or had reason to know of the defects inherent in those products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries; and/or

g. Despite its ability and means to avoid applying glyphosate-based formulations including Roundup, failed to warn those exposed or those potentially exposed, and/or otherwise minimize the risks of exposure.

267. As a result of one or more of the following acts and/or omissions of MENARD, John Caruso, deceased, became ill with Diffuse large B cell non-Hodgkin's lymphoma.

268. As a result of extended and prolonged exposure to glyphosate and glyphosate-based formulations including Roundup, John Caruso, deceased, became ill with Diffuse Large B Cell non-Hodgkin's Lymphoma.

269. Defendant MENARD's negligence was a proximate cause of the injuries, harm, and economic losses that decedent John Caruso suffered, and that his estate suffered and will continue to suffer, as described herein.

270. As a proximate result of Defendant MENARD's wrongful acts and omissions, the Estate of John Caruso, including Meghan Caruso and his infant son have suffered and continue to suffer pecuniary loss including without limitation the

loss of money, benefits, goods and services of John Caruso including lost income; lost instruction, moral training, and superintendence of education; grief, sorrow, and mental suffering; loss of consortium; and the considerable financial expenses for the funeral and burial of a 33-year-old husband and father, for which they are entitled to compensation from Defendant MENARD. Plaintiff and decedent's heirs will continue to incur these damages and expenses in the future.

271.   Plaintiff, Meghan Caruso, as Independent Executor of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, asks that a judgment be entered against the defendant, MENARD, INC., in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

## COUNT XII
## SURVIVAL-NEGLIGENCE
## (Estate of Caruso v. Menard)

272.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

273.   As a direct and proximate result of Defendant MENARD's acts and/or omissions, decedent John Caruso, a 33-year-old husband and father, suffered injuries of a personal and pecuniary nature including, without limitation, hospital, medical,

and related expenses; disability and disfigurement, pain and suffering, loss of normal life, physical and emotional trauma that decedent John Caruso would have been entitled to receive compensation from Defendant MENARD for these injuries had he survived.

274.   Plaintiff, Meghan Caruso, as Administrator of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, asks that a judgment be entered against the defendant, MENARD, INC., in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

### COUNT XIII
### WRONGFUL DEATH-NEGLIGENCE
### (Estate of Caruso v. ARCHER)

275.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

276.   Defendant ARCHER knew or, in the exercise of reasonable care, should have known that it was foreseeable that persons, such as decedent John Caruso, would suffer injuries as a result of its failure to exercise ordinary care in the application of glyphosate-based formulations.

277.   Decedent John Caruso did not know the nature and extent of the injuries

that could result from the intended use of and/or exposure to glyphosate.

278.   At all times relevant to this litigation, Defendant ARCHER knew or, in the exercise of reasonable care, should have known of the hazards and dangers of glyphosate-based formulations and their carcinogenic properties.

279.   Accordingly, at all times relevant to this litigation, Defendant ARCHER knew or, in the exercise of reasonable care, should have known that use of or exposure to the application of glyphosate-based formulations including Roundup could cause or be associated with decedent John Caruso's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including decedent John Caruso.

280.   Defendant ARCHER also knew or, in the exercise of reasonable care, should have known that users and those exposed to glyphosate-based formulations including Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to those products.

281.   It was the duty of the defendant, before and at the time of the occurrences, to use ordinary care for the safety of the decedent, John Caruso.

282.   Notwithstanding that duty, the defendant, ARCHER, committed one or more of the following acts and/or omissions:

   a.   Directly applied glyphosate-based formulations including Roundup in areas that were foreseeable for individuals like decedent John Caruso to come into contact with it;

   b.   Failed to take all reasonable steps necessary to apply the products that was not unreasonably dangerous to persons present or nearby;

    c.   Failed to provide accurate, true, and correct information concerning the risks of using or being exposed to glyphosate-based formulations including Roundup;

    d.   Failed to provide appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to glyphosate-based formulations including Roundup;

    e.   Failed to exercise ordinary care in the application of glyphosate-based products including Roundup;

    f.   Applied herbicides including Roundup containing the chemical glyphosate when it knew or had reason to know of the defects inherent in those products, knew or had reason to know that exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries; and/or

    g.   Despite its ability and means to avoid applying glyphosate-based formulations including Roundup, failed to warn those exposed or those potentially exposed, and/or otherwise minimize the risks of exposure.

283.   As a result of one or more of the following acts and/or omissions of ARCHER, John Caruso, deceased, became ill with Diffuse large B cell non-Hodgkin's lymphoma.

284.   As a result of extended and prolonged exposure to glyphosate and glyphosate-based formulations including Roundup, John Caruso, deceased, became ill with Diffuse Large B Cell non-Hodgkin's Lymphoma.

285.   Defendant ARCHER's negligence was a proximate cause of the injuries, harm, and economic losses that decedent John Caruso suffered, and that his estate suffered and will continue to suffer, as described herein.

286.   As a proximate result of Defendant ARCHER's wrongful acts and

omissions, the Estate of John Caruso, including Meghan Caruso and his infant son have suffered and continue to suffer pecuniary loss including without limitation the loss of money, benefits, goods and services of John Caruso including lost income; lost instruction, moral training, and superintendence of education; grief, sorrow, and mental suffering; loss of consortium; and the considerable financial expenses for the funeral and burial of a 33-year-old husband and father, for which they are entitled to compensation from Defendant ARCHER. Plaintiff and decedent's heirs will continue to incur these damages and expenses in the future.

287.   Plaintiff, Meghan Caruso, as Independent Executor of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, asks that a judgment be entered against the defendant, ARCHER PINES LANDSCAPING, INC., in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

## COUNT XIV
## SURVIVAL-NEGLIGENCE
### (Estate of Caruso v. ARCHER)

288.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

289.   As a direct and proximate result of Defendant ARCHER's acts and/or

omissions, decedent John Caruso, a 33-year-old husband and father, suffered injuries of a personal and pecuniary nature including, without limitation, hospital, medical, and related expenses; disability and disfigurement, pain and suffering, loss of normal life, physical and emotional trauma that decedent John Caruso would have been entitled to receive compensation from Defendant ARCHER for these injuries had he survived.

290.    Plaintiff, Meghan Caruso, as Administrator of the Estate of John Caruso, deceased, brings this cause of action pursuant to the provisions of 755 ILCS 5/27-6, commonly known as the Survival Act of Illinois.

WHEREFORE, the plaintiff, MEGHAN CARUSO, individually and as independent executor of the Estate of John Caruso, deceased, asks that a judgment be entered against the defendant, ARCHER PINES LANDSCAPING, INC., in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

## COUNT XV
## SURVIVAL ACTION-LOSS OF CONSORTIUM
### (Meghan Caruso, individually v. All Defendants)

291.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

292.    At all times relevant to this action, Plaintiff, Meghan Caruso, was the lawfully wedded wife of John Caruso.

293.   As a direct and proximate result of the injuries sustained by Plaintiff, John Caruso, Plaintiff, Meghan Caruso, was and will be denied his lawful consortium and the conjugal benefits of his marital relationship including without limitation loss of support and society.

294.   While Meghan Caruso's loss of consortium from October 19, 2017 going forward is incorporated into the counts of this Complaint brought pursuant to the Wrongful Death Act, she brings this count for her loss of consortium sustained before John Caruso's death.

295.   WHEREFORE, the plaintiff, MEGHAN CARUSO, individually, asks that a judgment be entered against the defendants, RUSSO HARDWARE, INC.; MONSANTO COMPANY, INC.; HOME DEPOT, INC.; MENARD, INC.; and ARCHER PINES LANDSCAPING, INC., in a fair and just amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs and any further relief this court deems just.

Respectfully Submitted,

By:_____/s/ Bryce T. Hensley
Attorney for the Plaintiff

Bruno R. Marasso
Bryce T. Hensley
ROMANUCCI & BLANDIN
321 N. Clark St.; Ste 900
Chicago, IL  60654
Tel: (312) 458-1000
Fax: (312) 458-1004
bmarasso@rblaw.net
bhensley@rblaw.net
Attorney No.: 35875