1  M. Elizabeth Graham (SBN 143085)
   Thomas V. Ayala (*Pro Hac Vice*)
2  Adam J. Gomez (*Pro Hac Vice* Forthcoming)
   Tudor I. Farcas (*Pro Hac Vice* Forthcoming)
3  **GRANT & EISENHOFER, P.A.**
4  One Market Street
   San Francisco, CA 94105
5  Telephone: (415) 293-8120
   Fax: (415) 789-4367
6  egraham@gelaw.com
   tayala@gelaw.com
7  agomez@gelaw.com
   tfarcas@gelaw.com
8
9  *Counsel for Putative Class Member*
   *Thomas DeShields*
10

11

12                    **UNITED STATES DISTRICT COURT**

13                 **NORTHERN DISTRICT OF CALIFORNIA**

14
   IN RE: ROUNDUP PRODUCTS          MDL NO. 2741
15 LIABILITY LITIGATION
                                     Case No. 3:16-md-02741-VC
16 ─────────────────────────────

17 THIS DOCUMENT RELATES TO:         **NOTICE OF JOINDER IN EX PARTE**
                                     **APPLICATION TO EXTEND DEADLINE**
18 *Ramirez, et al. v. Monsanto Co.*, Case No.  **TO FILE RESPONSE TO MOTION FOR**
   3:19-cv-02224                     **PRELIMINARY APPROVAL OF CLASS**
19                                   **SETTLEMENT, APPOINTMENT OF**
                                     **INTERIM CLASS AND SUBCLASS**
20                                   **COUNSEL, DIRECTION OF NOTICE**
                                     **UNDER FED. R. CIV. P. 23(e),**
21                                   **SCHEDULING OF A FAIRNESS**
                                     **HEARING, AND STAY OF THE FILING**
22                                   **AND PROSECUTION OF ROUNDUP-**
                                     **RELATED ACTIONS BY SETTLEMENT**
23                                   **CLASS MEMBERS**

24
                                     The Honorable Vince Chhabria
25

26

27

28

**PLEASE TAKE NOTICE THAT** Thomas DeShields[1] respectfully joins in putative settlement class member Tracie Ward's request for an extension of time to file a response to the pending Motion for Preliminary Approval of Class Settlement, Appointment of Interim Class and Subclass Counsel, Direction of Notice under Fed. R. Civ P. 23(e), Scheduling of a Fairness Hearing, and Stay of the Filing and Prosecution of Roundup-Related Actions by Settlement Class Members, (ECF No. 11042) (the "Motion for Preliminary Approval") for 25 days, up to and including August 7, 2020.[2]

As stated in Ms. Ward's moving papers, the proposed class action settlement threatens to affect "hundreds of thousands or even millions of persons who have been exposed to Roundup, may or may not have manifested NHL symptoms, and have not commenced an individual personal injury action or retained counsel to do so." (ECF No. 11042 at p. 13). Yet, it has never before been attempted in the history of American jurisprudence. It raises "unique" and profound questions not only under Rule 23, but also under federal statutes and the U.S. Constitution. It could have a dramatic effect not only on this litigation but on the future of mass tort litigation.

Further, Mr. DeShields believes that the complex and unique nature of these questions constitute good cause to extend the response date, especially given the "all-important nature of" preliminary approval where consideration of the merits of a proposed class action settlement is "front-loaded".[3] Courts rely on preliminary approval to determine whether the proposed class meets the standards of Rule 23(a) and (b), and it "must be justified by the parties' showing that the court

---

[1]   Mr. DeShields was exposed to Roundup, has not been diagnosed with NHL, and had not, by June 24, "commenced a lawsuit or otherwise retained counsel with respect to any individual actual or potential personal injury or false advertising claim" related to such exposure. Settlement § 1.1(a).
[2]   Mr. DeShields also joins in the Motion for Extension filed by Goldstein Russell, P.C. and Napoli Shkolnik, PLLC (ECF Doc. 11149)
[3]   *See* **Exhibit A** (Offering an extensive analysis of the importance of Preliminary Approval in light of the 2018 Amendments to Rule 23).

will likely be able" to approve the settlement and certify the class for settlement purposes.[4] By engaging in this full-scale, substantive analysis at the outset, courts preserve scarce judicial and party resources to avoid scheduling a fairness hearing for a class that might not ultimately meet the Rule 23 certification standards. *See* Cabraser, Elizabeth and Steinman, Adam, *What Is a Fair Price for Objector Blackmail? Class Actions, Objectors, and the 2018 Amendments to Rule 23*, 24 LEWIS & CLARK L. REV. 549 (2020) (attached as **Exhibit A**) (Noting that before the 2018 amendments to Rule 23, preliminary approval was "at most a determination that there is … probable cause to submit the proposal to class members and [thereafter] hold a full-scale hearing as to its fairness"; however, under the new Rule 23(e), this "full-scale hearing" occurs up front at the preliminary stage.); *see also* Manual for Complex Litigation 4th § 21.632.[5]

The critical importance of preliminary approval is perhaps most evident in the Court's direction of Rule 23(e)(1)(B)'s notice requirements.[6] This is especially true here where notice to this unprecedented future settlement class cannot be perfunctory, and putative class members should be provided with a reasonable amount of time to consult their own experts before deciding whether to lodge an objection on that basis.  To be sure, Mr. DeShields is consulting with these kinds of experts to independently assess the adequacy of notice on behalf of similarly situated future claimants; however, these experts have indicated that they need additional time to analyze and comment on the

---

[4]  When the parties have entered into a settlement agreement before the district court certifies the class, the court "must pay undiluted, even heightened, attention to class certification requirements." "A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until [those requirements] have been met." Advisory Committee 2003 Note on Fed. R. Civ. P. 23(c)(1).

[5]  This District's Procedural Guidance for Class Action Settlements endorses this approach.  *See* United States District Court, Northern District of California's Procedural Guidance for Class Action Settlement (attached as **Exhibit B**).  So, too, does Putative Class Counsel.  *See In re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2672 (N.D. Cal.), Motion for Preliminary Approval of Class Settlement and Direction of Notice Under Fed. R. Civ. P. 23(e) (attached as **Exhibit C**).

[6]    *See* Cabraser, Elizabeth and Steinman, Adam  *What Is a Fair Price for Objector Blackmail? Class Actions, Objectors, and the 2018 Amendments to Rule 23*, 24 LEWIS & CLARK L. REV. 549 (2020). *See also, Manual For Complex Litigation, Fourth* (Federal Judicial Center 2004) § 21.632 Preliminary Fairness Review, pp. 320-321.

proposed notice plan. *See* Declaration of M. Elizabeth Graham, ¶ 5. The notice experts' need for additional time to review the proposed notice plan is compounded by the fact that Rule 23(f) does not allow for the interlocutory appeal of a preliminary approval order, thus requiring Mr. DeShields and those similarly situated to wait until after final approval to challenge any notice deficiencies. The Court should therefore avoid the potential duplication of judicial and party efforts that Rule 23 is designed to prevent by granting a brief extension of time in which to permit putative class members to voice their serious, far-reaching concerns regarding this proposed settlement.

For the foregoing reasons, as well as those set forth in Ms. Ward's motion, putative class member Thomas DeShields respectfully requests this Court extend the time for all interested parties to respond to the Motion for Preliminary Approval up to and including August 7, 2020.

Dated: July 6, 2020                                    Respectfully submitted,

_____
M. Elizabeth Graham (SBN 143085)
Thomas V. Ayala (*Pro Hac Vice*)
Adam J. Gomez (*Pro Hac Vice* Forthcoming)
Tudor I. Farcas (*Pro Hac Vice* Forthcoming)
**GRANT & EISENHOFER, P.A.**
One Market Street
San Francisco, CA 94105
Telephone: (415) 293-8120
Fax: (415) 789-4367
egraham@gelaw.com
tayala@gelaw.com
agomez@gelaw.com
tfarcas@gelaw.com

*Counsel for Putative Class Member*
*Thomas DeShields*

1
2
3

## **CERTIFICATE OF SERVICE**

4

     I hereby certify that, on July 6, 2020, service of this document was accomplished

5

pursuant to the Court's electronic filing procedures by filing this document through the ECF

6

system.

7
8
9

_____
M. Elizabeth Graham

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit A

# WHAT IS A FAIR PRICE FOR OBJECTOR BLACKMAIL? CLASS ACTION OBJECTORS AND THE 2018 AMENDMENTS TO RULE 23

*by*
Elizabeth J. Cabraser[*] and Adam N. Steinman[**]

*As part of a symposium addressing what the next 50 years might hold for class actions, mass torts, and MDLs, this Article examines a recent amendment to Rule 23 that offers a new solution to the persistent problem of strategic objections. Most significantly, Rule 23 now requires the district judge to approve any payments made to class members in exchange for withdrawing or forgoing challenges to a class action settlement. Although the new provision is still in its infancy, it has already been deployed to thwart improper objector behavior and to bring for-pay objection practice out of the shadows. The 2018 changes—along with other on-the-ground developments—are important steps toward improving the class action settlement process.*

Introduction ................................................................................................. 550
I.      The Federal Rules and Objections to Class Action Settlements: The
        2003 Amendment to Rule 23 ............................................................. 551
II.     Settlement Objections Under the 2018 Amendment ........................... 555
III.    Addressing Improper Objector Behavior Under the 2018
        Amendment......................................................................................... 558
        A.   *Approving Payments to Settlement Objectors*.................................... 558
        B.   *Other Ways to Address Improper Objector Behavior and to Improve
             Class Settlements*.............................................................................. 562
IV.     A Fair Price for Objector Blackmail?.................................................... 569
Conclusion...................................................................................................... 570

---

[*]  Partner, Lieff, Cabraser, Heimann & Bernstein.

[**]  University Research Professor of Law, University of Alabama School of Law. The authors thank the Pound Civil Justice Institute, Lewis & Clark Law School, and Bob Klonoff for organizing a terrific symposium. This Article benefitted greatly from the comments and insights of our co-panelists and other symposium participants. Thanks also to the editors of the *Lewis & Clark Law Review* for their excellent editorial work.

INTRODUCTION

In 2018, the Supreme Court adopted a major amendment to Rule 23—the most significant revision in 15 years. This Article examines the provisions in the 2018 amendment that deal with objectors to class action settlements. The most notable change in this regard involves judicial approval of any payments made to class members in exchange for withdrawing or forgoing challenges to a class action settlement. Such payments have long been controversial, in the eyes of both courts[1] and commentators.[2] The 2018 amendment creates a new legal framework regarding such payments, but it also raises important questions regarding how the new requirements should be implemented going forward.

Part I of this Article lays the groundwork by summarizing the 2003 amendment to Rule 23, which was the rulemakers' first attempt to address objections to class action settlements. Part II discusses the concerns that led to the 2018 amendment and describes the new provisions. Part III addresses some of the early efforts to implement the 2018 amendment and the amendment's effect on class action practice. Finally, Part IV considers the most challenging issue posed by the 2018

---

[1] *See, e.g.*, Pearson v. Target Corp., 893 F.3d 980, 986 (7th Cir. 2018) ("By all accounts, selfish settlements by objectors are a serious problem."); *In re* Syngenta AG MIR 162 Corn Litig., 357 F. Supp. 3d 1094, 1104 (D. Kan. 2018) (noting that the attorney for the objecting class members "is a serial objector to class action settlements, with a history of attempting to extract payment for the withdrawal of objections"); Hefler v. Wells Fargo & Co., No. 16-cv-05479-JST, 2018 WL 6619983, at *11 n.12 (N.D. Cal. Dec. 18, 2018) ("The credibility of this objector's claim is also undermined by the fact that he attempted to solicit a $1 million payment from Class counsel to withdraw his objection."); Edelson PC v. Bandas Law Firm PC, No. 16 C 11057, 2018 WL 3496085, at *1, *11 (N.D. Ill. July 20, 2018) (considering a civil action against objectors who "regularly involve themselves in these case [sic] by filing what Plaintiff alleges are frivolous objections in order to leverage lucrative payoffs" and noting that the objectors "have engaged in a pattern of reprehensible conduct" and that "courts nationwide have denounced [the objectors'] behavior"); Yeagley v. Wells Fargo & Co., No. C 05-03403 CRB., 2008 WL 171083, at *2 (N.D. Cal. Jan. 18, 2008), *rev'd on other grounds*, 365 F. App'x 886 (9th Cir. 2010) ("The Court finds that class counsel simply 'bought off objectors' counsel. Approving the withdrawal of the objections under such circumstances is not in the interests of justice; instead, it will encourage attorneys to interject objections for the sole purpose of extracting a payment from class counsel.").

[2] *See, e.g.*, 7B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1797.4 (3d ed. West 2020) ("[C]oncerns have been raised that many objectors inject themselves into class-action settlement proceedings primarily to obstruct or delay those proceedings, thereby inducing other counsel to give them a special recovery in return for dropping their objections."); Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 416, 439 (2003); Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623, 1624–25 (2009); Bruce D. Greenberg, *Keeping the Flies Out of the Ointment: Restricting Objectors to Class Action Settlements*, 84 ST. JOHN'S L. REV. 949, 951 (2010); John E. Lopatka & D. Brooks Smith, *Class Action Professional Objectors: What to Do About Them?*, 39 FLA. ST. U. L. REV. 865, 865–67 (2012).

amendment: what sort of payments *should* a court approve in connection with an objector withdrawing its challenge to a class action settlement?

## I. THE FEDERAL RULES AND OBJECTIONS TO CLASS ACTION SETTLEMENTS: THE 2003 AMENDMENT TO RULE 23

Prior to 2003, the Federal Rules of Civil Procedure did not explicitly guarantee class members the ability to object to a proposed class action settlement. Rule 23(e) provided simply that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."[3] Although district court judges typically used their discretionary authority to give class members an opportunity to object to proposed settlements,[4] the rules did not formally require it.

The 2003 amendment to Rule 23 added an explicit provision that "[a]ny class member may object to a proposed settlement."[5] It further mandated that such an objection "may be withdrawn only with the court's approval."[6] The Advisory Com-

---

[3]  FED. R. CIV. P. 23(e) (1966).

[4]  *See, e.g.*, *In re* Inter-Op Hip Prosthesis Liab. Litig., No. 1401, 2001 WL 34131990, at *2 (N.D. Ohio Aug. 29, 2001) (noting that the court would "set forth procedures and a timeline for: (1) notice to the class; (2) discovery as to issues relating to the propriety and fairness of the settlement; and (3) the filing of objections or comments in support of the settlement"); *In re* Harrah's Entm't, No. 95–3925, 1997 WL 428667, at *1 (E.D. La. July 31, 1997) (noting that the court had laid out "procedures for filing objections to the settlement"); Swedish Hosp. Corp. v. Sullivan, No. 89–1693(LFO), 1991 WL 154459, at *2 (D.D.C. May 23, 1991) (providing a procedure for filing objections to the settlement); *In re* Corrugated Container Antitrust Litig., 556 F. Supp. 1117, 1130 (S.D. Tex. 1982) ("Any class member opposing, commenting on, or supporting the settlement agreements . . . shall file a memorandum detailing any specific objections, comments or support thereof on or before November 12, 1982 with the clerk of this court."); *see also* FED. R. CIV. P. 23(d) (1966) ("[T]he court *may* make appropriate orders . . . requiring . . . the opportunity of members to signify whether they consider the representation fair and adequate, . . . or otherwise to come into the action." (emphasis added)). *But cf.* Mungin v. Fla. E. Coast Ry. Co., 318 F. Supp. 720, 732 (M.D. Fla. 1970) (reasoning that Rule 23 imposed no "necessity to inform the members of the class . . . of any specific right to object to the settlement").

[5]  FED. R. CIV. P. 23(e)(4)(A) (2003) ("Any class member may object to a proposed settlement, voluntary dismissal, or compromise that requires court approval under Rule 23(e)(1)(A)."); *see also* FED. R. CIV. P. 23 advisory committee's note to 2003 amendment ("Subdivision (e)(4) confirms the right of class members to object to a proposed settlement, voluntary dismissal, or compromise. The right is defined in relation to a disposition that, because it would bind the class, requires court approval under subdivision (e)(1)(C).").

[6]  FED. R. CIV. P. 23(e)(4)(B) (2003) ("An objection made under Rule 23(e)(4)(A) may be withdrawn only with the court's approval.").

mittee Notes observed that court review would "follow[] automatically if the objections are withdrawn on terms that lead to modification of the settlement with the class," and that "[r]eview also is required if the objector formally withdraws the objections."[7] In the event that an objector does not make a formal withdrawal but "simply abandons pursuit of the objection," the Advisory Committee explained that "the court may inquire into the circumstances."[8]

Although the text of the 2003 amendment did not elaborate on how a court should decide whether to approve an objection withdrawal, the Advisory Committee Notes provided some guidance. The Committee explained that approval "may be given or denied with little need for further inquiry if the objection and the disposition go only to a protest that the individual treatment afforded the objector under the proposed settlement is unfair because of factors that distinguish the objector from other class members."[9] It recognized, however, that "[d]ifferent considerations may apply if the objector has protested that the proposed settlement is not fair, reasonable, or adequate on grounds that apply generally to a class or subclass."[10] The Committee noted that "[s]uch objections, which purport to represent class-wide interests, may augment the opportunity for obstruction or delay."[11] Nonetheless, as long as "such objections are surrendered on terms that do *not* affect the class settlement or the objector's participation in the class settlement, the court often can approve withdrawal of the objections without elaborate inquiry."[12]

Neither the 2003 amendment nor the Advisory Committee Notes indicated explicitly that the court must approve any *payments* that might be made to objectors in connection with withdrawal of their objections. Such payments raise particular concerns because they may invite what are sometimes called "strategic objections" or, less charitably, "objector blackmail" by so-called "professional objectors."[13] Interestingly, an earlier draft of the 2003 Advisory Committee Notes would have placed that concern front and center: "Class-action practitioners often assert that a group of 'professional objectors' has emerged, appearing to present objections for strategic purposes unrelated to any desire to win significant improvements in the settlement. An objection may be ill-founded, yet exert a powerful strategic force."[14]

---

[7]  FED. R. CIV. P. 23 advisory committee's note to 2003 amendment.

[8]  *Id.*

[9]  *Id.*

[10]  *Id.*

[11]  *Id.*

[12]  *Id.* (emphasis added).

[13]  Courts have functionally defined "professional objectors" as those "who seek personal gain by obstructing the case." Dennings v. Clearwire Corp., 928 F. Supp. 2d 1270, 1271 (W.D. Wash. 2013). The stock judicial responses to professional objectors have included monetary sanctions, and, as in *Clearwire*, the imposition of appeals bonds to discourage obstructive appeals. *See id.* at 1272.

[14]  Memorandum from David F. Levi, Chair, Advisory Comm. on Civil Rules, to Hon.

The draft language urged courts to "be vigilant to avoid practices that may encourage unfounded objections" and not to "reward an objection merely because it succeeds in winning some change in the settlement; cosmetic changes should not become the occasion for fee awards that represent acquiescence in coercive use of the objection process."[15] The draft also deemed it problematic "if settlement of an objection provides the objector alone terms that are more favorable than the terms generally available to other class members," explaining that "[an] objector may not seize for private advantage the strategic power of objecting."[16] Accordingly, "[t]he court should approve terms more favorable than those applicable to other class members only on a showing of a reasonable relationship to facts or law that distinguish the objector's position from the position of other class members."[17]

This draft language was ultimately deleted from the final Advisory Committee Notes on the 2003 amendment.[18] Perhaps for that reason, federal courts were not entirely uniform on whether—and under what circumstances—their approval of an objection withdrawal required an inquiry into any payment or other benefit provided to the objector in exchange for that withdrawal.[19]

---

Anthony J. Scirica, Chair, Comm. on Rules of Practice & Procedure 54–55 (May 14, 2001).

[15]  *Id.* at 55.

[16]  *Id.* at 55–56.

[17]  *Id.* at 56.

[18]  Memorandum from David F. Levi, Chair, Advisory Comm. on Civil Rules, to Hon. Anthony J. Scirica, Chair, Comm. on Rules of Practice & Procedure 274–75, 277 (May 20, 2002).

[19]  *Compare, e.g.*, Cody v. SoulCycle Inc., No. 15-6457 MWF (JEMx), 2017 WL 6550682, at *5 (C.D. Cal. Oct. 3, 2017) (stating "[b]oth Objectors indicate that their reason for withdrawing their Objections is that, after mediation, they reached settlements in their separate lawsuits against SoulCycle, and that the terms of those settlements included withdrawal of their Objections in this action" and that "this explanation is likely sufficient for [the court] to approve the withdrawals" without inquiring into any details about the payments), *and* Glass v. UBS Fin. Servs., Inc., No. C-06-4068 MMC, 2007 WL 160948, at *2 (N.D. Cal. Jan. 17, 2007) (allowing withdrawal of an objection "on terms that [did] not affect the class settlement or [the objector's] participation therein" where the objector "did obtain a personal benefit, forgiveness of a loan, in exchange for withdrawing" without inquiring into the appropriateness of the payment), *with* Yeagley v. Wells Fargo & Co., No. C 05-03403 CRB, 2008 WL 171083, at *2 (N.D. Cal. Jan. 18, 2008), *rev'd on other grounds*, 365 F. App'x 886 (9th Cir. 2010) ("The Court does not approve the purported withdrawal of the objections. . . . The Court finds that class counsel simply 'bought off' objectors' counsel. Approving the withdrawal of the objections under such circumstances is not in the interests of justice; instead, it will encourage attorneys to interject objections for the sole purpose of extracting a payment from class counsel."), *and In re* Elec. Carbon Prods. Antitrust Litig., 447 F. Supp. 2d 389, 397 (D.N.J. 2006) (noting that the 2003 amendment "would seem to give the court discretion to control the conditions upon which an objection may be withdrawn to assure that the erstwhile objector is not afforded an undue advantage or reward for tactics that 'augment the opportunity for obstruction or delay'" (quoting FED. R. CIV. P. 23 advisory committee's note to 2003 amendment)).

The 2003 amendment to Rule 23 also did not address the objector's decision whether to *appeal* the district court's approval of a class action settlement despite the objection.[20] Under the 2003 amendment, a district court must approve the withdrawal of an objection, but no judicial approval was required for an objector's decision to forgo an appeal—or to withdraw such an appeal after it was filed. This was potentially a significant omission, because the risks and delay inherent in *appellate* review of a class action settlement gave "strategic objectors" even greater leverage.[21] The 2003 Advisory Committee Notes did recognize, however, that if an objector *does* appeal, "[t]he court of appeals may undertake review and approval of a settlement with the objector" or "*may* remand to the district court to take advantage of the district court's familiarity with the action and settlement."[22]

The absence of explicit advice on objectors from the Rule and the Advisory Committee Notes themselves led district courts and practitioners to innovate in addressing and managing objectors. Some district courts allowed class settlement proponents to take discovery of objectors to determine whether such objectors had standing as class members to make their objection; to consider the history of certain objectors (or their lawyers) "as serial objectors" whose objections should be viewed with skepticism or rejection; and, on unusual occasions, to impose sanctions or appellate bonds as practical ways to foreclose objectors' efforts to hold settlements hostage on appeal.[23] The 2004 edition of the Federal Judicial Center's *Manual for Complex Litigation* dedicated a section of its Class Actions chapter to the "Role of Objectors in Settlement."[24] This section highlighted the "useful role" that objectors

---

[20]   In *Devlin v. Scardelletti*, 536 U.S. 1, 14 (2002), the Supreme Court confirmed that a class member who objects to a settlement has standing to challenge the settlement on appeal if the district court approves it, regardless of whether the objector has formally intervened in the lawsuit. *Id.* at 14 ("We hold that nonnamed class members . . . who have objected in a timely manner to approval of the settlement at the fairness hearing have the power to bring an appeal without first intervening.").

[21]   *See, e.g.*, Brunet, *supra* note 2, at 428–29; Fitzpatrick, *supra* note 2, at 1624–25.

[22]   FED. R. CIV. P. 23 advisory committee's note to 2003 amendment (emphasis added).

[23]   *See, e.g.*, Cody v. SoulCycle, Inc., No. 15-06457-MWF (JEMx), 2017 WL 8811115, at *1–2 (C.D. Cal. Dec. 7, 2017) (ordering repeat *pro se* objector to post an appeal bond of $1,000 to proceed with appeal on objection that district court determined to be "without merit"); Garber v. Office of the Comm'r of Baseball, No. 12-CV-03704 (VEC), 2017 WL 752183, at *6 (S.D.N.Y. Feb. 27, 2017) (describing the objector's conduct as "gravely concerning" and ordering the objector "to provide a copy of this opinion to any local counsel he seeks to engage for any case pending in the Southern District of New York" but declining to impose Rule 11 sanctions); *In re* Oil Spill by the Oil Rig "Deepwater Horizon," 295 F.R.D. 112, 159, n.40 (E.D. La. 2013) (rejecting a specious objection by an objector deemed "'serial objector' by several courts"); *In re* Cathode Ray Tube (CRT) Antitrust Litig., 281 F.R.D. 531, 532, 534 (N.D. Cal. 2012) (requiring the objector to sit for deposition).

[24]   FED. JUDICIAL CTR., MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.643 (2004) [hereinafter MANUAL FOR COMPLEX LITIGATION].

could play, while cautioning that "they might, however, have interests and motivations vastly different from other attorneys and parties," and observed that some objections "are made for improper purposes, and benefit only the objectors and their attorneys (e.g., by seeking additional compensation to withdraw even ill-founded objections)."[25] Focusing on the practical implications of strategic objections, the *Manual* noted that objections:

> even of little merit, can be costly and significantly delay implementation of a class settlement. Even a weak objection can have more influence than its merits justify in light of the inherent difficulties that surround review and approval of a class settlement. . . . A challenge for the judge is to distinguish between meritorious objections and those advanced for improper purposes.[26]

As the Seventh Circuit recently held, the equitable common benefit doctrine can apply to objectors who add to the class relief, justifying an "incentive award."[27]

While highlighting the problem and prescribing some procedural responses, such as taking discovery, the *Manual* largely left courts to their own devices in dealing with objectors. As the Rule 23 subcommittee of the Advisory Committee began to study potential amendments to Rule 23 in the several years preceding the resulting 2018 revision to Rule 23(e), its members found that a focus on the objector problem had not only revived from the earlier pre-2003 amendment cycle but had become the single most reported problem with the current rule, as identified by plaintiff attorneys, defense attorneys, and judges alike, in the dozens of meetings and conferences in which the subcommittee participated as part of its pre-amendment fact-finding.[28]

## II. SETTLEMENT OBJECTIONS UNDER THE 2018 AMENDMENT

Aside from a non-substantive revision that occurred as part of the 2007 restyling of the Federal Rules of Civil Procedure,[29] Rule 23's provisions on settlement objectors remained the same until 2018. The 2018 amendment made a number of changes. First, it gave more detailed instructions regarding what a class member's

---

[25] *Id.*

[26] *Id.*

[27] *In re* Sw. Airlines Voucher Litig., 898 F.3d 740, 746 (7th Cir. 2018).

[28] ADVISORY COMM. ON CIVIL RULES 67 (Nov. 3–4, 2016), https://www.uscourts.gov/sites/default/files/2016-11-civil-agenda_book_0.pdf.

[29] Among other things, the 2007 amendment relocated the provisions on settlement objectors from subdivision (e)(4) to subdivision (e)(5). Between 2007 and 2018, Rule 23(e)(5) provided as follows: "Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval." FED. R. CIV. P. 23(e)(5) (2007).

objection must contain. Rule 23(e)(5)(A) instructs that an objection must "state with *specificity* the grounds for the objection" and indicate whether the objection "applies only to the objector, to a specific subset of the class, or to the entire class."[30] The Advisory Committee Notes further explain that "objections must provide sufficient specifics to enable the parties to respond to them and the court to evaluate them," and that "[f]ailure to provide needed specificity may be a basis for rejecting an objection."[31] The Advisory Committee recognized, however, that "[c]ourts should take care . . . to avoid unduly burdening class members who wish to object, and to recognize that a class member who is not represented by counsel may present objections that do not adhere to technical legal standards."[32]

Second, Rule 23(e)(5)(B) replaced the 2003 language regarding withdrawal of objections with the following: "Unless approved by the court after a hearing, no payment or other consideration may be provided in connection with: (i) forgoing or withdrawing an objection, or (ii) forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal."[33] This amendment both shifts and expands the role of the district court regarding the withdrawal of settlement objections. It omits, presumably as impractical and unenforceable, the 2003 requirement that *every* withdrawal of an objection must be approved by the court.[34] Instead, the rule now requires explicit approval—after a hearing—of any *payment* made in connection with the withdrawal of an objection.[35] Such payments must also be approved if they are made in connection with a class member *forgoing* an objection at the district court level.[36] And such payments must be approved if they are made in connection with an objector's *appeal* from the district court's approval of a settlement—either forgoing, dismissing, or abandoning such an appeal.[37]

Third—in light of the requirement that payments to objectors must be approved with respect to appeals—the 2018 amendment provides that "[i]f approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending."[38] Rule 62.1 governs a district court's handling of motions for which it "lacks

---

[30]   FED. R. CIV. P. 23(e)(5)(A) (2018) (emphasis added).

[31]   Memorandum from Hon. John D. Bates, Chair, Advisory Comm. on Civil Rules, to Hon. David G. Campbell, Chair, Comm. on Rules of Practice & Procedure 26 (May 18, 2017).

[32]   *Id.*

[33]   FED. R. CIV. P. 23(e)(5)(B).

[34]   *See* Memorandum from Hon. John D. Bates, *supra* note 31, at 26 ("The rule is amended to remove the requirement of court approval for every withdrawal of an objection. An objector should be free to withdraw on concluding that an objection is not justified.").

[35]   *Id.* ("[T]he amendment requires approval under Rule 23(e)(5)(B)(i) only when consideration is involved.").

[36]   *Id.*

[37]   *Id.*

[38]   FED. R. CIV. P. 23(e)(5)(C).

authority to grant because of an appeal that has been docketed and is pending."[39]

The 2018 provisions regarding payments made to objectors dealt with some of the concerns that had not been squarely addressed by the 2003 amendment. As an initial matter, the 2018 Advisory Committee Notes highlighted the concerns regarding strategic, self-interested settlement objections that had been raised in the earlier Rule 23 amendment cycle but ultimately omitted from the 2003 note.[40] These concerns had continued to trouble practitioners and courts and were raised repeatedly during the Advisory Committee hearings on what became the 2018 amendments.[41] Although the Advisory Committee recognized that "[g]ood-faith objections can assist the court in evaluating a proposal under Rule 23(e)(2)" and that "[i]t is legitimate for an objector to seek payment for providing such assistance under Rule 23(h)," it also observed that "some objectors may be seeking only personal gain, and using objections to obtain benefits for themselves rather than assisting in the settlement-review process."[42] The Advisory Committee went on to describe precisely the dynamics that incentivize what is often called "objector blackmail":

> At least in some instances, it seems that objectors—or their counsel—have sought to obtain consideration for withdrawing their objections or dismissing appeals from judgments approving class settlements. And class counsel sometimes may feel that avoiding the delay produced by an appeal justifies providing payment or other consideration to these objectors. Although the payment may advance class interests in a particular case, allowing payment perpetuates a system that can encourage objections advanced for improper purposes.[43]

Thus, the Committee explained that the 2018 amendment shifted the focus to the payment of *consideration* in exchange for withdrawing or forgoing an objection to a class action settlement.[44] And it emphasized the importance of requiring approval, unlike under the 2003 amendment, for payments made in connection with

---

[39] FED. R. CIV. P. 62.1(a) (allowing the district court either to "(1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue").

[40] *See* ADVISORY COMM. ON CIVIL RULES 35 (Apr. 14–15, 2016), https://www.uscourts.gov/sites/default/files/2016-04-civil-agenda_book_0.pdf.

[41] *Id.*; *see also* ADVISORY COMM. ON CIVIL RULES 151, 157 (Apr. 25–26, 2017), https://www.uscourts.gov/sites/default/files/2017-04-civil-agenda_book.pdf; ADVISORY COMM. ON CIVIL RULES, *supra* note 28, at 67.

[42] Memorandum from Hon. John D. Bates, *supra* note 31, at 26.

[43] *Id.* at 35.

[44] *Id.* at 26 ("Because the concern only applies when consideration is given in connection with withdrawal of an objection, however, the amendment requires approval under Rule 23(e)(5)(B)(i) only when consideration is involved.").

an objector forgoing *appellate* review of a district court's decision to approve a class action settlement: "Because an appeal by a class-action objector may produce much longer delay than an objection before the district court, it is important to extend the court-approval requirement to apply in the appellate context."[45] This need to address objector appeals was a driving force behind the 2018 amendment.[46] Justice Brandeis's vivid image of sunlight as the best disinfectant apparently informed the emphasis on a visible process for evaluating the actual value an objection adds to a class settlement or the settlement approval process.[47]

## III. ADDRESSING IMPROPER OBJECTOR BEHAVIOR UNDER THE 2018 AMENDMENT

This Part discusses how improper objector behavior can be addressed under the 2018 amendment. Section A analyzes the 2018 amendment's most direct response to the problem of objector blackmail—the requirement of judicial approval for any payments to objectors in connection with withdrawing or forgoing their challenges to class action settlements. Section B highlights other practices that can deter or mitigate improper objector behavior.

### A. *Approving Payments to Settlement Objectors*

Given the 2018 amendment's recent vintage, there are few judicial decisions (at the time of this writing) applying the new provision requiring judicial approval of payments to objectors.[48] One recent decision, by Judge Lorna Schofield of the

---

[45]    *Id.* at 26–27.

[46]    *See* Memorandum from Hon. John D. Bates, Chair, Advisory Comm. on Civil Rules, to Hon. Jeffrey S. Sutton, Chair, Comm. on Rules of Practice & Procedure 11 (Dec. 11, 2015), https://www.uscourts.gov/sites/default/files/2015-12-11-cv_rules_committee_report_0.pdf ("Since the delay that can result from an appeal is much greater than the delay that would result from an ill-founded objection, the omission from the 2003 amendment of any ongoing approval requirement has—in at least some cases—produced unfortunate pressures on class counsel to accede to objector counsel's demands.").

[47]    LOUIS BRANDEIS, OTHER PEOPLE'S MONEY AND HOW THE BANKERS USE IT 62 (1914) ("Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.").

[48]    Several opinions, however, have recognized the significance of this part of the 2018 amendment without applying it, either because it had not yet come into effect or was not directly relevant to the particular issue being decided. *See* Pearson v. Target Corp., 893 F.3d 980, 987 (7th Cir. 2018) ("The pending amendments to Rule 23 may solve the problem prospectively, but that does nothing for the case before us."); Hefler v. Wells Fargo & Co., No. 16-cv-05479-JST, 2018 WL 6619983, at *11 n.12 (N.D. Cal. Dec. 18, 2018) ("The Advisory Committee specifically remarked on this predatory practice and amended Rule 23 to provide additional safeguards."); Edelson PC v. Bandas Law Firm PC, No. 16 C 11057, 2018 WL 3496085, at *11 (N.D. Ill. July 20, 2018) ("If allowed to go into effect, the new Rule would require district court

Southern District of New York, will likely be an influential guide as courts apply that provision going forward. The decision involved objectors in *In re Foreign Exchange Benchmark Rates Antitrust Litigation (Forex)*.[49] They had appealed Judge Schofield's award of attorneys' fees to class counsel to the Second Circuit, arguing that the award was too high.[50] With oral argument imminent, the objectors reached an agreement with class counsel under which they would dismiss their appeal in exchange for a payment of $300,000 to objectors' counsel.[51] The payment would come from class counsel's fee award rather than the settlement fund.[52]

Under the new language in Rule 23(e)(5)(B), such a payment required approval by the district court. Because the case was already on appeal, however, the parties used Rule 62.1 to obtain an indicative ruling from Judge Schofield.[53] In a brief but forceful opinion, she denied approval. Judge Schofield recognized that this sort of agreement to pay off an objector was "precisely what the court-approval provision in Rule 23(e)(5)(B) is meant to address,"[54] emphasizing the 2018 Advisory Committee Notes' concern that "some objectors may be seeking only personal gain" and that paying such objectors "perpetuates a system that can encourage objections advanced for improper purposes."[55] Somewhat more pointedly, Judge Schofield observed: "The Objector has appealed the settlement on the basis that the Class Counsel fee award was too great. However, the Objector is willing to withdraw his appeal and voluntarily dismiss it with prejudice, so long as Objector's counsel shares in the supposedly excessive funds awarded to Class Counsel."[56]

Judge Schofield also found that the objectors had provided no benefit to the class that would justify payment: "The only benefit to class members is to avoid further delay in the distribution of the settlement fund that the Objector already has

---

approval before any objector can withdraw an objection or appeal in exchange for money or other consideration."); *see also* Rougvie v. Ascena Retail Grp., Inc., No. 15-724, 2019 WL 944811, at *17 & n.37 (E.D. Pa. Feb. 21, 2019) (recognizing that the 2018 amendment "require[s] the trial court to have a hearing before someone can payoff [sic] the objector-appellant to forego or withdraw an objection or dismiss an appeal" but concluding that the amendment did not apply to payments that had been made prior to its December 1, 2018 effective date).

[49]   *In re* Foreign Exch. Benchmark Rates Antitrust Litig. (*Forex*), No. 13 Civ. 7789 (LGS), 2019 WL 5256957, at *1 (S.D.N.Y. Oct. 11, 2019).

[50]   *Id.*

[51]   *Id.* $5,000 of this amount would go directly to one of the objectors as an incentive award. *See id.*

[52]   *Id.*

[53]   *Id.* (citing FED. R. CIV. P. 23(e)(5)(C)); *see also* FED. R. CIV. P. 62.1(a) (authorizing the district court, among other things, to "deny the motion" or "grant the motion if the court of appeals remands for that purpose").

[54]   *Forex*, 2019 WL 5256957, at *1.

[55]   *Id.* (quoting FED. R. CIV. P. 23 advisory committee's note to 2018 amendment).

[56]   *Id.*

caused by filing the appeal."[57] And Judge Schofield rejected the objectors' argument that she had adopted their objection "in part" by awarding attorneys' fees amounting to 13% of the settlement fund rather than the 16.5% proposed by class counsel.[58] As she explained, it was "evident from the fee award decision" that "the amount of the award had nothing to do with the Objector's objection. That the Court's fee award minimally correlates with the premise of the objection should not be construed as helpful assistance from the Objector."[59]

In conclusion, Judge Schofield emphasized "the precedential concern associated with granting the instant motion."[60] Even though class counsel had "expressed its belief that the Agreement would be in the best interest of the Settlement Classes," to give the agreement judicial approval "would serve only to encourage objectors or their attorneys to extract this type of payment, and make a living as serial objectors simply by filing frivolous appeals and thereby slowing down the execution of settlements."[61] It would "make this Court complicit in a practice that undermines the integrity of class action procedure, and needlessly provide putative objectors with potentially dubious claims precedential support for a practice of fee extraction."[62] Other district courts have now had reason to utilize the indicative ruling procedure to effectuate remand for the purpose of considering objectors' arguments.[63]

Judge Schofield's approach is consistent with another source of guidance—a set of guidelines and best practices regarding the 2018 amendment that has been published by the Bolch Judicial Institute at Duke Law School.[64] The Bolch guidelines urge that "[a] court should interpret the language of Rule 23(e)(5) broadly and liberally to accomplish its stated intent to avoid perpetuating a system that facilitates objections advanced for improper purposes."[65] They also state that "[t]he parties

---

[57]  *Id.*

[58]  *Id.* at *2.

[59]  *Id.*

[60]  *Id.*

[61]  *Id.* (quoting *In re* Polyurethane Foam Antitrust Litig., 178 F. Supp. 3d 635, 639 (N.D. Ohio 2016) (brackets and internal quotation marks omitted)).

[62]  *Id.* Because Judge Schofield refused to approve the payment, the Second Circuit appeal proceeded as scheduled; just two and a half weeks after oral argument, the Second Circuit issued a summary order rejecting the objectors' challenge to the award of attorneys' fees to class counsel. *See* Kornell v. Haverhill Ret. Sys., No. 18-3673-cv, 2019 WL 5681336, at *1–2 (2d Cir. Nov. 1, 2019).

[63]  *See, e.g.*, Order Granting in Part Motion for Indicative Ruling, *In re* Lithium Ion Batteries Antitrust Litig., No. 4:13-md-02420-YGR (DMR) (N.D. Cal. 2019) (No. 2567).

[64]  BOLCH JUDICIAL INST., DUKE LAW SCH., GUIDELINES AND BEST PRACTICES IMPLEMENTING 2018 AMENDMENTS TO RULE 23 CLASS ACTION SETTLEMENT PROVISIONS ii (2018), https://judicialstudies.duke.edu/wp-content/uploads/2018/09/Class-Actions-Best-Practices-Final-Version.pdf [hereinafter BOLCH GUIDELINES].

[65]  *Id.* at 21.

must disclose the terms of all agreements between objector and the parties"[66] and that "[a] court should inquire into communications that class counsel may have had with individuals who decided not to pursue (forgo) objections."[67]

As for the scope of Rule 23(e)(5), the Bolch guidelines assert that "[w]hat constitutes payment or other consideration to an objector . . . should be broadly construed."[68] Such consideration would include "immediate and deferred or future benefits," "[n]onmonetary consideration, like preferred future business relationships or other financial commitments," and "[p]ayments made to organizations affiliated with the objector."[69]

Perhaps the hardest question prompted by the 2018 amendments is how to decide whether to approve a particular payment that is made in connection with an objector forgoing or withdrawing a challenge to a class action settlement. On that issue, the Bolch guidelines state that payments should be "based on the value that the objection provides to the class."[70] A court may not, however, "consider as a benefit to the class members the time that would otherwise be spent addressing the withdrawn objection or appeal."[71] Likewise, "[t]he sole fact that the withdrawal of an objection or dismissal of an appeal will expedite distribution of the settlement funds does not justify payment to withdraw an improper objection or dismiss an improper appeal."[72]

When the payment takes the form of attorneys' fees to the objector's counsel, the Bolch guidelines state that "[t]he court should evaluate whether the objection added value to the class and therefore justifies the proposed payment."[73] The court "need not award a fee to an objector merely because the objection assisted the court in understanding or evaluating the settlement."[74] But an award "may be justified" when "the objection actually enhanced the class recovery by improving the settlement or otherwise conferring a benefit to the class."[75] Such a benefit could include objections that illuminate correctible flaws or issues with a settlement or that otherwise assist the court in its independent evaluation of the settlement.[76]

---

[66] *Id.* at 25.

[67] *Id.* at 26.

[68] *Id.* at 25.

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*; *see also* Rougvie v. Ascena Retail Group, Inc., 2019 WL 944811, *17 & n.36 (E.D. Pa. Feb. 21, 2019) (quoting this language).

[73] BOLCH GUIDELINES, *supra* note 64, at 26.

[74] *Id.* at 27.

[75] *Id.*

[76] *See, e.g., In re* Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig., 332 F.R.D. 202, 229 (N.D. Ill. 2019) (incentive award of $2,500 granted to lead settlement objector for critiques of settlement that "meaningfully assisted the Court in its analysis") (appeal

Accordingly, the Bolch guidelines indicate that a payment should never be approved in connection with a class member's decision to forgo an objection or appeal—a simple "no *quid pro quo*" principle.[77] The text of Rule 23 requires court approval for such a payment,[78] and thereby "anticipates situations in which a professional objector informally or otherwise threatens to object unless the objector receives payment in return for assurances not to file the objection."[79] The Bolch guidelines state that such a payment "would clearly be inconsistent with the rule's stated purpose to avoid perpetuating a system that encourages objections advanced for an improper purpose."[80] This view follows from the general principle—summarized above—that payments should be approved only to the extent that the objector provided some value or benefit to the class.[81]

## B.    *Other Ways to Address Improper Objector Behavior and to Improve Class Settlements*

The 2018 amendment's requirement that the district court approve any payment made to an objector in connection with withdrawing or forgoing an objection or appeal is not the only way to deter or mitigate improper objections. Some recent major class settlements feature a term, colloquially called "quick-pay," under which the claims payment process occurs despite appeals. Such provisions require individual releases to be signed by class members in return for their payments. This feature allows defendants to gain the benefit of such releases notwithstanding the prospect—usually remote—of the settlement being overturned. It also frees the class from the hostage situation that can be created by opportunistic objectors, enabling class members to receive their payments upon approval by the district court, and sometimes during the approval period itself. In the $10+ billion class action settlement of the Volkswagen "Clean Diesels" multidistrict litigation, for example, approximately 90% of class members had made, and been paid, claims by the time the court of appeals affirmed the settlement.[82] In the multi-billion dollar class action settlement of economic loss and property damage claims arising from the Deepwater Horizon drilling rig fire, explosion, and oil spill, class members could make claims

---

pending).

[77]   BOLCH GUIDELINES, *supra* note 64, at 25.

[78]   FED. R. CIV. P. 23(e)(5)(B).

[79]   BOLCH GUIDELINES, *supra* note 64, at 26.

[80]   *Id.*

[81]   *Id.* at 21; *see supra* notes 72–75 and accompanying text.

[82]   *In re* Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig., 895 F.3d 597, 605, 610, 619 (9th Cir. 2018), *cert. denied sub nom.* Fleshman v. Volkswagen, AG, 139 S. Ct. 2645 (2019).

and be paid during the pendency of the approval process itself.[83] Hundreds of thousands did so.[84]

The use of "quick-pay" provisions addresses another persistent judicial and policy concern: promoting meaningful levels of participation in class actions so that they may achieve their compensatory and societal purposes. The "take rate," or claims level, has become all-important in class action settlement administration, with courts imposing ever-more-specific reporting and accounting requirements to police and ensure that the funds made available to the class in a class action settlement are actually delivered to the class members themselves. Experience has demonstrated that participation levels improve when class members are motivated to make claims, and the immediacy of payment, without a wait of months or years for the exhaustion of appeals by a few discontented class members, is a prime motivator.[85]

Greater care at the preliminary stage of the settlement approval process can also mitigate improper objector behavior. Even before the 2018 amendment, judges had typically conducted a preliminary inquiry into the fairness of a proposed settlement in order to decide whether notice to the class members and a full approval hearing were warranted.[86] The 2018 amendment codifies this "front-loading" practice by requiring settling parties to "provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class"[87] and to make a preliminary "showing that the court will likely be able to . . . approve the proposal" before the class is notified about the settlement and approval hearing.[88] This newly-articulated Rule 23(e)(1)(B)(i) standard is higher than that previously suggested by the *Manual for Complex Litigation*, under which a proposed settlement must simply be "within the range" of possible final approval.[89] The "formal fairness hearing" at the end of the process, after notice had gone out and any objections had been raised, was the main event.

Taking a page from the amended Rules' enhanced scrutiny of class settlements,

---

[83]  *In re* Oil Spill by the Oil Rig "Deepwater Horizon," 910 F. Supp. 2d 891, 903 (E.D. La. 2012) ("An unusual feature of the Settlement Agreement . . . is that class members have been able to submit claims and receive payments prior to the Court's grant of final approval, provided that they sign an individual release."), *aff'd*, 739 F.3d 790 (5th Cir. 2014).

[84]  Matt Sledge, *A Near-Decade After BP Oil Spill, Now-Public Payout Claims Run Gamut — Including an Ex-NBA Star*, NOLA.COM (July 2, 2019), https://www.nola.com/news/business/article_872a7ed6-9cf3-11e9-9055-7b30798f21b4.html.

[85]  For an account of contemporary class actions achieving high participation levels and the procedures devised by courts in such cases, including Volkswagen "*Clean Diesels*," *Deepwater Horizon* and the *NFL Concussion* litigation, see Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class Action*, 92 N.Y.U. L. REV. 846, 865 (2017).

[86]  *See* MANUAL FOR COMPLEX LITIGATION, *supra* note 24, § 21.632.

[87]  FED. R. CIV. P. 23(e)(1)(A).

[88]  FED. R. CIV. P. 23(e)(1)(B)(i).

[89]  MANUAL FOR COMPLEX LITIGATION, *supra* note 24, § 21.632 n.976.

especially at the preliminary stage, the Northern District of California has issued an extensively updated version of its "Procedural Guidance for Class Action Settlements."[90] The current version of this guide was issued on December 5, 2018, essentially contemporaneously with the effective date of the 2018 amendments. Notably, it now prescribes that information about the settlement provisions and terms—that formerly had provided fodder for objections—must be detailed and explained to the court at the preliminary stage so that the court may address and consider them.[91] These include differences between the definition and scope of the settlement class and the class proposed in the underlying litigation, differences in the scope of the claims asserted and the class release, the proposed allocation plan for the settlement fund and:

> in light of Ninth Circuit case law disfavoring reversions, whether and under what circumstances money originally designated for class recovery will revert to any defendant, the potential amount or range of amounts of any such reversion, and an explanation as to why a reversion is appropriate in the instance case.[92]

The Northern District's procedural guidance additionally provides a recommended procedure for judicial control of the objection process itself:

> OBJECTIONS – Objections must comply with Federal Rule of Civil Procedure 23(e)(5). The notice should instruct class members who wish to object to the settlement to send their written objections only to the court. All objections will be scanned into the electronic case docket and the parties will receive electronic notices of filings. The notice should make clear that the court can only approve or deny the settlement and cannot change the terms of the settlement. The notice should clearly advise class members of the deadline for submission of any objections.[93]

The guidance goes so far as to suggest specific language for inclusion in class action settlement notices. The recommended language provides:

> You can ask the Court to deny approval by filing an objection. You can't ask the Court to order a different settlement; the Court can only approve or reject the settlement. If the Court denies approval, no settlement payments will be sent out and the lawsuit will continue. If that is what you want to happen, you must object.
>
> Any objection to the proposed settlement must be in writing. If you file a

---

[90]  *See Procedural Guidance for Class Action Settlements*, U.S. DIST. CT. N.D. CAL. (Dec. 5, 2018), https://cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/.

[91]  *Id.*

[92]  *Id.*

[93]  *Id.*

timely written objection, you may, but are not required to, appear at the
Final Approval Hearing, either in person or through your own attorney.
If you appear through your own attorney, you are responsible for hiring
and paying that attorney. All written objections and supporting papers
must (a) clearly identify the case name and number . . . (b) be submitted
to the Court either by mailing them to the Class Action Clerk, United
States District Court for the Northern District of California . . . or by
filing them in person at any location of the United States District Court
for the Northern District of California, and (c) be filed or postmarked on
or before _____.[94]

The Northern District of California's guidance, which has gained the attention
of other courts and practitioners across the country, aims to clarify and make the
objection process public and transparent, both to bring it more directly under court
control and to reduce objections that are strategically made, ill-founded, or simply
uninformed.

Early experience with settlements approved under amended Rule 23(e)'s
"front-loading" procedure indicates a reduction in inappropriate objector practices.
This has been observed even in widely publicized, high stakes class actions in which,
historically, widespread public attention has elicited attacks by serial objectors. For
example, in the 2016 Volkswagen "*Clean Diesels*" litigation, a $10 billion class set-
tlement for owners and lessees of 2.0 liter diesel Volkswagen cars—a settlement that
provided essentially 100% recovery for class members—sparked hundreds of objec-
tions, with appeals by a handful of objectors.[95] Because of the settlement's "quick-
pay" provisions, these appeals did not disrupt the process of vehicle buy-back and
class member compensation, and the settlement was affirmed by the Ninth Cir-
cuit.[96] The "Clean Diesels" settlement approval cycle preceded the enactment of the
2018 amendments.

A subsequent and similar settlement, likewise involving allegations of undis-
closed emissions "cheating," was settled after the Rule 23(e) 2018 amendments, in
the same district, in similarly highly publicized litigation. In *In re Chrysler-Dodge-
Jeep Ecodiesel Marketing, Sales Practices, and Products Liability Litigation*, the settle-
ment approval process was conducted in compliance with the new Rule 23(e) and
the Northern District's procedural guide; there were virtually no objections, and no
appeals were taken.[97] While it is too early to tell whether the perceived and dramatic

---

[94]  *Id.*

[95]  *In re* Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig., 895 F.3d
597, 605, 610 (9th Cir. 2018), *cert. denied sub nom.* Fleshman v. Volkswagen, AG, 139 S. Ct.
2645 (2019).

[96]  *Id.* at 605.

[97]  *In re* Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig., No. 17-
md-02777-EMC, 2019 WL 2554232, at *1–2 (N.D. Cal. May 3, 2019).

downturn in the level of objections to class action settlements will continue, it is apparent that the Rule's prohibition on quiet objector buy-offs and judicial attention to enforcing transparency in the objection process will discourage and reduce objections made for purposes of payoff.

There is an additional and important side effect of the Rule 23(e) amendments and of the guidelines that have sprung up to elaborate upon them for the benefit of courts and practitioners. They have highlighted common kinds of objections to class settlements, both as made by "serial" objectors and (more importantly) as raised by the courts themselves, such as insistence upon meaningful and comprehensive notice and the avoidance, where possible, of "reversions" of the settlement fund to the defendant.[98] These insights have given class settlement proponents additional leverage in insisting upon terms that protect and promote the interests of the class. Formerly, the details of the class notice programs were sometimes an afterthought, and the notice budget was sometimes minimized if it was deducted from the class fund instead of being paid for separately by the defendant. In extreme cases, notice programs were built to a price, not a purpose, and claims levels suffered as a consequence. Now, for example, settlement proponents must report in detail to the court, at the preliminary stage, how and why they selected a particular notice provider, precisely what media will be used to publicize the settlement, and how they have designed any claims process to be simple, efficient, and as claimant-friendly as possible.[99]

District courts have taken the amendment's invitation to "front-load" the settlement approval process seriously. The Rule 23(e)(1)(B) requirement that giving notice of a proposed class settlement "is justified by the parties' showing that the court will likely be able" to approve the settlement and certify the class for settlement purposes imposes a higher burden on the preliminary approval/class notice decision

---

[98] The Ninth Circuit, for example, considers reversion clauses, under which any unclaimed residue of a class action settlement fund reverts to the defendant, to constitute a "red flag" requiring additional judicial scrutiny. *Cy pres* clauses, under which such residue, or sometimes essentially the entirety of the settlement itself, is directed to charitable or public interest foundations benefitting the class indirectly, will also subject a settlement to heightened scrutiny. *See In re* Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 947–48 (9th Cir. 2011).

[99] For example, at the preliminary stage, the Northern District of California's procedural guide aims to provide the district court with everything it will need or want to know with respect to how settlement administration would proceed. *Procedural Guidance for Class Action Settlements*, supra note 90 ("In the motion for preliminary approval, the parties should identify the proposed settlement administrator, the settlement administrator selection process, how many settlement administrators submitted proposals, what methods of notice and claims payment were proposed, and the lead class counsel's firms' history of engagements with the settlement administrator over the last two years. The parties should also address the anticipated administrative costs, the reasonableness of those costs in relation to the value of the settlement, and who will pay the costs. The court may not approve the amount of the cost award to the settlement administrator until the final approval hearing.").

than did pre-amendment practice.[100] A typical pre-amendment articulation of the preliminary approval standard was that preliminary approval, "in contrast to final approval, 'is at most a determination that there is . . . "probable cause" to submit the proposal to class members and [thereafter] hold a full-scale hearing as to its fairness.'"[101] Under the new Rule 23(e) regime, this "full-scale hearing," or at least full-scale judicial inquiry, occurs up front at the preliminary stage.[102]

In the past year, there have been several examples of district courts *denying* preliminary approval, sending the parties back to the drawing board to correct perceived omissions or differences in the terms, the notice program provisions, and/or the claims or distribution process.[103] Such instances of early, proactive judicial investment signal that a role traditionally played by legitimate objectors is now being played by the courts themselves.

As serial objectors recede, others interested in the reasonableness and efficacy of class settlements have stepped to the fore. One recent and notable trend is the more active role of state attorneys general in the settlement approval process. The Class Action Fairness Act of 2005 (CAFA) provides that notice must be given to state attorneys general and others of most proposed class action settlements.[104] Indeed, this CAFA notice requirement has had an impact on the timing of the class action settlement approval cycle itself, since at least 90 days' notice of a proposed class settlement must be given before a final approval order can be entered.[105] This

---

[100]  FED. R. CIV. P. 23(e)(1)(B).

[101]  Davis v. J.P. Morgan Chase & Co., 775 F. Supp. 2d 601, 607 (W.D.N.Y. 2011) (quoting Menkes v. Stolt-Nielsen S.A., 270 F.R.D. 80, 101 (D. Conn. 2010)).

[102]  BOLCH GUIDELINES, *supra* note 64, at 1; *see supra* notes 86–88 and accompanying text.

[103]  *See, e.g.*, Bronson v. Samsung Elec. Am., Inc., No. C 18-02300 WHA, 2019 WL 4738232, at *5 (N.D. Cal. Sept. 29, 2019) (denying preliminary approval for, *inter alia*, insufficient relief to the class and "onerous objection procedures" and directing the parties to submit a new class settlement to the court by October 4, 2019 for hearing on October 10, 2019); Haralson v. U.S. Aviation Servs. Corp., 383 F. Supp. 3d 959, 971–74 (N.D. Cal. 2019) (evaluating settlement under amended Rule 23(e)'s factors and denying preliminary approval for, *inter alia*, failure to provide information on the range of recovery at the preliminary stage, for the parties' failure to comply with the Northern District of California's *Procedural Guidance for Class Action Settlements*, and for notice plan deficiencies).

[104]  28 U.S.C. § 1715(b) (2012).

[105]  28 U.S.C. § 1715 requires parties to notify state attorneys general of proposed settlements and mandates that final approval of settlements "may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice." *Id.* § 1715(d). Notably, § 1715 also states that "[n]othing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials." *Id.* § 1715(f). As the Sixth Circuit held in *Chapman v. Tristar Products, Inc.*, this provision forecloses, rather than grants, attorneys general's standing as formal objectors with appellate rights. *See infra* notes 106–14 and accompanying text.

statutory requirement of notice, and express statutory permission for attorneys general to be heard on proposed class settlements, has in turn given rise to litigation over whether this statutory role also confers standing on attorneys general as objectors for purposes of appeal. Thus far, the appellate response has been that attorneys general do not possess standing for purposes of appeal from class action settlement orders.

This issue was most recently and comprehensively addressed by the Sixth Circuit in *Chapman v. Tristar Products, Inc.*[106] In *Tristar*, the Arizona Attorney General lodged an objection in the District Court to the terms of the settlement involving allegedly defective pressure cookers.[107] The settlement agreement, entered after the first day of trial, which the Sixth Circuit characterized as "not going well for plaintiffs," provided for approximately $2 million in attorneys' fees and costs and "substantially less than that—primarily in the form of coupons—for the class members."[108] Arizona made its first appearance in the case at the fairness hearing arguing as an amicus (along with the United States Department of Justice) that the settlement was unfair to the class.[109] "None of the class, however, ever joined in either Arizona or DOJ's objection to the settlement."[110]

Arizona sought to intervene for purposes of appeal under either Rule 24(a) (intervention is a right) or 24(b) (permissive intervention), and, in the alternative, asked the court to recognize it as an objector to the settlement.[111] The district court rejected these requests, and on appeal, the Sixth Circuit affirmed this rejection after a thorough review of standing under Rule 24, under CAFA, and under the theories advanced by Arizona that it had Article III standing under the doctrine of *parens patriae* and as a "repeat player" in class action settlements.[112] As the Sixth Circuit held, "Arizona's regular participation in class action lawsuits establishes at most a 'mere interest in [the] problem' of unfair class action settlements, which 'is not . . . sufficient to confer standing.'"[113] In addressing and rejecting standing under the panoply of doctrines advanced by Arizona, *Tristar* has seemingly foreclosed the various avenues under which a creative non-class member could seek to interpose itself as an objector in class action settlement proceedings. For now, the matter of the fairness, adequacy, and reasonableness of a class action settlement under Rule 23(e) remains a matter for the independent determination of the court informed by the

---

[106]  Chapman v. Tristar Prods., Inc., 940 F.3d 299, 307 (6th Cir. 2019).

[107]  *Id.* at 302.

[108]  *Id.*

[109]  *Id.* at 303.

[110]  *Id.*

[111]  *Id.*

[112]  *Id.* at 304–07.

[113]  *Id.* at 307 (citing Greater Cincinnati Coal. for the Homeless v. City of Cincinnati, 56 F.3d 710, 716 (6th Cir. 1995)).

submissions (pro and con) of the class action settlement proponents and the class members themselves under an amended Rule 23(e) procedure designed to eliminate gamesmanship and self-dealing from the process.

## IV. A FAIR PRICE FOR OBJECTOR BLACKMAIL?

One of the most intriguing questions courts will face going forward is whether to approve payments to objectors under Rule 23(e)(5)(B). What exactly *is* a proper payment for dropping an objection? Framed less sympathetically: what is a fair price for objector blackmail?

The latter may seem like a loaded question, but it reflects an important truth. Because the objector is forgoing or withdrawing its objection—or forgoing or abandoning an appellate challenge to the district court's approval of a class settlement—that objection is providing no substantive benefit for the class. The only value to the class is that the hostage-taker is releasing the hostage. Withdrawal or appellate rejection of appeals is typically necessary to enable the settlement proceeds to be delivered to the class.[114] Yet that is precisely the sort of "benefit" for which objectors are not to be rewarded.[115]

There may be some exceptions, however. A payment to an objector (or objector's counsel) *can* be justified where the objection leads to an improvement to the settlement. In that situation, however, compensation to the objector stems not from the benefit of *withdrawing* the objection, but rather in recognition of the benefit that is conferred from the improvement to the settlement or the settlement process. That is exactly how things should work, and the 2018 amendment—properly implemented—would permit courts to do just that.

Sometimes an outside observer can perceive a concrete and practicable improvement to the settlement that the parties did not—one that is capable of being integrated into the settlement as approved and administered.[116] If so, a payment provided in connection with the withdrawal of an objection is, in essence, a "settlement" of a claim for an award of fees that an objector might otherwise make in

---

[114] Not all class settlements will include "quick-pay" provisions like *Deep Water Horizon*, *Clean Diesels*, or *Chrysler-Dodge-Jeep*. Some defendants may continue to insist on the exhaustion of appeals before payments are made. In such instances, protection of the class from objector blackmail remains key.

[115] *See supra* notes 42–44 and accompanying text (discussing the 2018 Advisory Committee Notes); *see also supra* notes 70–72 and accompanying text (describing the Bolch guidelines' position on this issue).

[116] See, for example, *In re Domestic Air Transportation Antitrust Litigation*, 148 F.R.D. 297, 359 (N.D. Ga. 1993), in which objectors pointed out that certain provisions of the antitrust settlement could themselves give rise to follow-on antitrust litigation if not revised. The parties agreed to do so, final approval was granted, and the court awarded fees to these and other objectors whose contributions benefitted the class and improved the settlement and its administration. *Id.*

court. This is a possibility that Judge Schofield considers in her *Forex* decision—although she ultimately rejected it on the facts of that case.[117] Recall that the objectors in *Forex* argued that their objection was responsible for her decision to reduce the attorneys' fee award to class counsel from 16.5% of the settlement fund to 13%.[118] Judge Schofield was not persuaded by this narrative, finding that "the amount of the award had nothing to do with the Objector's objection."[119]

Imagine, however, a case where an objection *did* lead to an improvement for class members. An objector might (1) withdraw the objection going forward—that is, decide not to press for further changes on appeal—and (2) seek a payment from class counsel on the theory that the objector would be entitled to ask the court to award her fees based on the objection's initial benefit to the class. In that situation, an objector might reasonably accept an agreed-upon payment from class counsel rather than litigate her claim for an award of fees, and the court might legitimately approve the payment under Rule 23(e)(5)(B).

## CONCLUSION

The problem of "strategic objections" or "objector blackmail" has been a persistently vexing aspect of class action practice and procedure. The 2018 amendment to Rule 23 provides a new way to solve it. By requiring the district court to approve any payment made in connection with an objector withdrawing an objection or appeal, the amendment takes away objectors' ability to name their own price and addresses the hostage-taking dynamic that had enabled for-profit objectors to delay the delivery of settlement benefits to class members by interposing objections and appeals until a toll for passage was paid. The new provision is still in its infancy, but it has already been deployed to thwart improper objector behavior and to bring for-pay objection practice out of the shadows. The 2018 amendment and other on-the-ground developments show great potential to improve the process of settling class actions and to enhance their ability to resolve disputes and provide meaningful remedies on an aggregate basis.

---

[117] *In re* Foreign Exch. Benchmark Rates Antitrust Litig. (*Forex*), No. 13 Civ. 7789 (LGS), 2019 WL 5256957, at *1 (S.D.N.Y. Oct. 11, 2019).

[118] *Id.* at *2.

[119] *Id.* at *2; *see supra* notes 58–59 and accompanying text.

# Exhibit B

# Procedural Guidance for Class Action Settlements

*Updated November 1, 2018 and December 5, 2018*

> **NOTE**: *This updated guidance, first published November 1, 2018, was modified December 5, 2018 to include the following clarification: the first sentence of the guidance has been revised to reflect that even though the guidance is highly recommended, the parties must comply in the first instance with the specific orders of the presiding judge.*

Parties submitting class action settlements for preliminary and final approval in the Northern District of California should review and follow these guidelines to the extent they do not conflict with a specific judicial order in an individual case. Failure to address the issues discussed below may result in unnecessary delay or denial of approval. Parties should consider this guidance during settlement negotiations. Parties should also consider the suggested language below when drafting class notices. In cases litigated under the Private Securities Litigation Reform Act of 1995, follow the statute and case law requirements that apply to such cases, such as regarding reasonable costs and expenses awards to representative plaintiffs, and this procedural guidance to the extent applicable.

## Preliminary Approval

1) INFORMATION ABOUT THE SETTLEMENT—The motion for preliminary approval should state, where applicable:

   a. If a litigation class has not been certified, any differences between the settlement class and the class proposed in the operative complaint and an explanation as to why the differences are appropriate in the instant case.

b. If a litigation class has been certified, any differences between the settlement class and the class certified and an explanation as to why the differences are appropriate in the instant case.

c. If a litigation class has not been certified, any differences between the claims to be released and the claims in the operative complaint and an explanation as to why the differences are appropriate in the instant case.

d. If a litigation class has been certified, any differences between the claims to be released and the claims certified for class treatment and an explanation as to why the differences are appropriate in the instant case.

e. The anticipated class recovery under the settlement, the potential class recovery if plaintiffs had fully prevailed on each of their claims, and an explanation of the factors bearing on the amount of the compromise.

f. The proposed allocation plan for the settlement fund.

g. If there is a claim form, an estimate of the number and/or percentage of class members who are expected to submit a claim in light of the experience of the selected claims administrator and/or counsel from other recent settlements of similar cases, the identity of the examples used for the estimate, and the reason for the selection of those examples.

h. In light of Ninth Circuit case law disfavoring reversions, whether and under what circumstances money originally designated for class recovery will revert to any defendant, the potential amount or range of amounts of any such reversion, and an explanation as to why a reversion is appropriate in the instant case.

2) SETTLEMENT ADMINISTRATION—In the motion for preliminary approval, the parties should identify the proposed settlement administrator, the settlement administrator selection process, how many settlement administrators submitted proposals, what methods of notice and claims payment were proposed, and the lead class counsel's firms' history of engagements with the settlement administrator over the last two years. The parties should also address the anticipated administrative costs, the reasonableness of those costs in relation to the value of the settlement, and who will pay the costs. The court may not approve the amount of the cost award to the settlement administrator until the final approval hearing.

3)   NOTICE—The parties should ensure that the class notice is easily understandable, taking into account any special concerns about the education level or language needs of the class members. The notice should include the following information: (1) contact information for class counsel to answer questions; (2) the address for a website, maintained by the claims administrator or class counsel, that has links to the notice, motions for approval and for attorneys' fees and any other important documents in the case; (3) instructions on how to access the case docket via PACER or in person at any of the court's locations. The notice should state the date of the final approval hearing and clearly state that the date may change without further notice to the class. Class members should be advised to check the settlement website or the Court's PACER site to confirm that the date has not been changed. The notice distribution plan should be an effective one.

Class counsel should consider the following ways to increase notice to class members: identification of potential class members through third-party data sources; use of social media to provide notice to class members; hiring a marketing specialist; providing a settlement website that estimates claim amounts for each specific class member and updating the website periodically to provide accurate claim amounts based on the number of participating class members; and distributions to class members via direct deposit.

The notice distribution plan should rely on U.S. mail, email, and/or social media as appropriate to achieve the best notice that is practicable under the circumstances, consistent with Federal Rule of Civil Procedure 23(c)(2). If U.S. mail is part of the notice distribution plan, the notice envelope should be designed to enhance the chance that it will be opened.

Below is suggested language for inclusion in class notices:

This notice summarizes the proposed settlement. For the precise terms and conditions of the settlement, please see the settlement agreement available at www._____.com, by contacting class counsel at _____, by accessing the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov, or by visiting the office of the Clerk of the Court for the United States District Court for the Northern District of California, *[insert appropriate Court location here]*, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS.

4)   OPT-OUTS—The notice should instruct class members who wish to opt out of the settlement to send a letter, setting forth their name and information needed to be properly identified and to opt out of the settlement, to the settlement administrator and/or the person or entity designated to receive opt outs. It should require only the information needed to opt out of the settlement and no extraneous information. The notice should clearly advise class members of the deadline, methods to opt out, and the consequences of opting out.

5)   OBJECTIONS—Objections must comply with Federal Rule of Civil Procedure 23(e)(5). The notice should instruct class members who wish to object to the settlement to send their written objections only to the court. All objections will be scanned into the electronic case docket and the parties will receive electronic notices of filings. The notice should make clear that the court can only approve or deny the settlement and cannot change the terms of the settlement. The notice should clearly advise class members of the deadline for submission of any objections.

Below is suggested language for inclusion in class notices:

"You can ask the Court to deny approval by filing an objection. You can't ask the Court to order a different settlement; the Court can only approve or reject the settlement. If the Court denies approval, no settlement payments will be sent out and the lawsuit will continue. If that is what you want to happen, you must object.

Any objection to the proposed settlement must be in writing. If you file a timely written objection, you may, but are not required to, appear at the Final Approval Hearing, either in person or through your own attorney. If you appear through your own attorney, you are responsible for hiring and paying that attorney. All written objections and supporting papers must (a) clearly identify the case name and number ( _____ v. _____, Case Number _____ ), (b) be submitted to the Court either by mailing them to the Class Action Clerk, United States District Court for the Northern District of California, *[insert appropriate Court location here]*, or by filing them in person at any location of the United States District Court for the Northern District of California, and (c) be filed or postmarked on or

before _____."

6)   ATTORNEYS' FEES—The court will not approve a request for attorneys' fees until the final approval hearing, but class counsel should include information about the fees they intend to request and their lodestar calculation in the motion for preliminary approval. In a common fund case, the parties should include information about the relationship among the amount of the award, the amount of the common fund, and counsel's lodestar calculation. To the extent counsel base their fee request on having obtained injunctive relief and/or other non-monetary relief for the class, counsel should discuss the benefit conferred on the class. Counsel's lodestar calculation should include the total number of hours billed to date and the requested multiplier, if any. Additionally, counsel should state whether and in what amounts they seek payment of costs and expenses, including expert fees, in addition to attorneys' fees.

7)   INCENTIVE AWARDS—Judges in this district have different perspectives on extra payments to named plaintiffs or class representatives that are not made available to other class members. Counsel seeking approval of incentive awards should consult relevant prior orders by the judge reviewing the request. The court will not approve a request for incentive awards until the final approval hearing, but the parties should include information about the incentive awards they intend to request as well as the evidence supporting the awards in the motion for preliminary approval. The parties should ensure that neither the size nor any conditions placed on the incentive awards undermine the adequacy of the named plaintiffs or class representatives. In general, unused funds allocated to incentive awards should be distributed to the class pro rata or awarded to cy pres recipients.

8)   CY PRES AWARDEES—If the settlement contemplates a cy pres award, the parties should identify their chosen cy pres recipients, if any, and how those recipients are related to the subject matter of the lawsuit and the class members. The parties should also identify any relationship they or their counsel have with the proposed cy pres recipients. In general, unused funds allocated to attorneys' fees, incentive awards, settlement administration fees and payments to class members should be distributed to the class pro rata or awarded to cy pres recipients.

9)   TIMELINE—The parties should ensure that class members have at least thirty-five days to opt out or object to the settlement and the motion for attorney's fees and costs.

10)   CLASS ACTION FAIRNESS ACT (CAFA)—The parties should address whether CAFA notice is required and, if so, when it will be given. In addition the parties should address substantive compliance with CAFA. For example, if the settlement includes coupons, the parties should explain how the settlement complies with 28 U.S.C. § 1712.

11)   PAST DISTRIBUTIONS—Lead class counsel should provide the following information for at least one of their past comparable class settlements (i.e. settlements involving the same or similar clients, claims, and/or issues):

a.  The total settlement fund, the total number of class members, the total number of class members to whom notice was sent, the method(s) of notice, the number and percentage of claim forms submitted, the average recovery per class member or claimant, the amounts distributed to each cy pres recipient, the administrative costs, and the attorneys' fees and costs.

b.  In addition to the above information, where class members are entitled to non-monetary relief, such as discount coupons or debit cards or similar instruments, the number of class members availing themselves of such relief and the aggregate value redeemed by the class members and/or by any assignees or transferees of the class members' interests. Where injunctive and/or other non-monetary relief has been obtained, discuss the benefit conferred on the class.

Counsel should summarize this information in easy-to-read charts that allow for quick comparisons with other cases.

12)   ELECTRONIC VERSIONS—Electronic versions (Microsoft Word or WordPerfect) of all proposed orders and notices should be submitted to the presiding judge's Proposed Order (PO) email address when filed. Most judges in this district use Microsoft Word, but counsel should check with the individual judge's Courtroom Deputy.

## Final Approval

1)   CLASS MEMBERS' RESPONSE—The motion for final approval briefing should include information about the number of undeliverable class notices and claim packets, the number of class members who submitted valid claims, the number of

class members who elected to opt out of the class, and the number of class members who objected to or commented on the settlement. In addition, the motion for final approval should respond to any objections.

2)   ATTORNEYS' FEES—All requests for approval of attorneys' fees must include detailed lodestar information, even if the requested amount is based on a percentage of the settlement fund. Declarations of class counsel as to the number of hours spent on various categories of activities related to the action by each biller, together with hourly billing rate information may be sufficient, provided that the declarations are adequately detailed. Counsel should be prepared to submit copies of billing records themselves at the court's order.

Regardless of when they are filed, requests for attorneys' fees must be noticed for the same date as the final approval hearing. If the plaintiffs choose to file two separate motions, they should not repeat the case history and background facts in both motions. The motion for attorneys' fees should refer to the history and facts set out in the motion for final approval.

3)   INCENTIVE AWARDS—All requests for incentive awards must be supported by evidence of the proposed awardees' involvement in the case and other justifications for the awards.

4)   ELECTRONIC VERSIONS—Electronic versions (Microsoft Word or Word Perfect) of all proposed orders and judgments should be submitted to the presiding judge's Proposed Order (PO) email address at the time they are filed.

## Post-Distribution Accounting

1)   Within 21 days after the distribution of the settlement funds and payment of attorneys' fees, the parties should file a Post-Distribution Accounting, which provides the following information:

   a. The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average and median recovery per claimant, the largest and smallest amounts paid to class members, the method(s) of notice and the method(s) of payment to class members, the number and value of checks not cashed, the amounts distributed

to each cy pres recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, and the multiplier, if any.

b. In addition to the above information, where class members are entitled to non-monetary relief, such as discount coupons, debit cards, or similar instruments, the number of class members availing themselves of such relief and the aggregate value redeemed by the class members and/or by any assignees or transferees of the class members' interests. Where injunctive and/or other non-monetary relief has been obtained, discuss the benefit conferred on the class.

Counsel should summarize this information in an easy-to-read chart that allows for quick comparisons with other cases.

2)   Within 21 days after the distribution of the settlement funds and award of attorneys' fees, the parties should post the Post-Distribution Accounting, including the easy-to-read chart, on the settlement website.

3)   The Court may hold a hearing following submission of the parties' Post-Distribution Accounting.

# Exhibit C

1  Elizabeth J. Cabraser (State Bar No. 083151)
   ecabraser@lchb.com
2  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   275 Battery Street, 29th Floor
3  San Francisco, CA  94111-3339
   Telephone:  415.956.1000
4  Facsimile:  415.956.1008

5  *Plaintiffs' Lead Counsel*

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11

12  IN RE: VOLKSWAGEN "CLEAN            MDL No. 2672 CRB (JSC)
    DIESEL" MARKETING, SALES
13  PRACTICES, AND PRODUCTS            The Honorable Charles R. Breyer
    LIABILITY LITIGATION
14
                                       **MOTION FOR PRELIMINARY**
15  This Document Relates to:          **APPROVAL OF CLASS SETTLEMENT**
                                       **AND DIRECTION OF NOTICE UNDER**
16  Audi CO$_2$ Cases                  **FED. R. CIV. P. 23(e)**

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................... 1

II.  BACKGROUND AND PROCEDURAL HISTORY ........................................... 2

    A.  Factual background: Plaintiffs alleged that Defendants inflated the fuel economy labels for the Class Vehicles.................................................... 2

    B.  Procedural background: Plaintiffs investigated their claims through a comprehensive discovery process. ................................................................ 3

    C.  The Settlement process: The Parties engaged in a lengthy, fifteen-month negotiation process and conducted additional confirmatory discovery after the Settlement was reached. ........................................................................ 5

III.  SUMMARY OF SETTLEMENT TERMS ........................................................... 6

    A.  The Settlement Class definition ................................................................. 6

    B.  Cash benefits to Class Members ................................................................ 6

IV.  LEGAL STANDARD FOR PRELIMINARY APPROVAL AND DECISION TO GIVE NOTICE ........................................................................................................ 7

V.  ARGUMENT ........................................................................................................... 8

    A.  The Court will be able to certify the Class for settlement purposes upon final approval. ............................................................................................... 8

        1.  The Settlement Class meets the requirements of Rule 23(a). .................... 8

            a.  Rule 23(a)(1): The Class is sufficiently numerous. ....................... 8

            b.  Rule 23(a)(2): The Class Claims present common questions of law and fact.......................................................................... 9

            c.  Rule 23(a)(3): The Settlement Class Representatives' claims are typical of other Class Members' claims................................ 10

            d.  Rule 23(a)(4): The Settlement Class Representatives and Class Counsel have and will protect the interests of the Class. .................................................................................... 11

        2.  The Settlement Class meets the requirements of Rule 23(b)(3). .............. 12

            a.  Common issues of law and fact predominate. .............................. 12

            b.  Class treatment is superior to other available methods for the resolution of this case.......................................................... 14

    B.  The Court should appoint Lead Plaintiffs' Counsel as Interim Settlement Class Counsel under Rule 23(g)(3)........................................................... 15

    C.  The Settlement is fair, reasonable, and adequate. ................................... 15

        1.  Rule 23(e)(2)(A): Class Counsel and the Settlement Class Representatives have and will continue to zealously represent the Class. ........................................................................................................ 16

        2.  Rule 23(e)(2)(B): The Settlement is the product of good faith, informed, and arm's-length negotiations. ............................................... 16

        3.  Rule 23(e)(2)(C): The Settlement provides substantial compensation in exchange for the compromise of strong claims. ........... 19

- i -

**TABLE OF CONTENTS**
(continued)

|  |  |  |  | Page |
|---|---|---|---|---|
|  |  | a. | The Settlement mitigates the risks, expenses, and delays the Class would bear with continued litigation. | 20 |
|  |  | b. | Class Members will obtain relief through a straightforward claims process. | 22 |
|  |  | c. | Counsel will seek reasonable attorneys' fees and costs separate from the payments to the Class. | 22 |
|  | 4. | | Rule 23(e)(2)(D): The Proposed Settlement treats all Class Members equitably relative to one another. | 22 |
|  | 5. | | The Proposed Settlement merits approval under this District's Procedural Guidance. | 23 |
|  |  | a. | Preliminary Approval Guidance (1)(a) & (c): There are no meaningful differences between the litigation and Settlement Classes, and the released claims are consistent with those asserted in the Complaint. | 24 |
|  |  | b. | Preliminary Approval Guidance (1)(e): The Settlement Recovery mirrors that available if Plaintiffs had prevailed in litigation on the merits. | 25 |
|  |  | c. | Preliminary Approval Guidance (1)(f): The Settlement's Allocation plan is fair and equitable. | 25 |
|  |  | d. | Preliminary Approval Guidance (1)(g): A substantial number of Class Members are expected to participate through a streamlined claims program. | 26 |
|  |  | e. | Preliminary Approval Guidance (1)(h) & (8): Unclaimed Settlement funds will be distributed to environmental remediation efforts and will not revert to Defendants. | 26 |
|  |  | f. | Preliminary Approval Guidance (2): The Parties selected an experienced notice and claims administrator after a competitive bidding process. | 27 |
|  |  | g. | Preliminary Approval Guidance (3)-(5): The proposed Notice Plan comports with Rule 23, Due Process, and this District's Procedural Guidance. | 27 |
|  |  | h. | Preliminary Approval Guidance (6): Proposed Settlement Class Counsel will seek reasonable attorneys' fees and costs, which Defendant's will pay in addition to the money available to directly compensate the Class. | 27 |
|  |  | i. | Preliminary Approval Guidance (7): Plaintiffs will not seek incentive awards for the Settlement Class Representatives. | 28 |
|  |  | j. | Preliminary Approval Guidance (9): The Parties have proposed a reasonable schedule for the Settlement Approval Process that provides Class Members sufficient time to exercise their rights. | 29 |
|  |  | k. | Preliminary Approval Guidance (10): The Settlement complies with the Class Action Fairness Act ("CAFA"). | 29 |

**TABLE OF CONTENTS**
**(continued)**

Page

       l.     Preliminary Approval Guidance (11): Information about past distributions in comparable class settlements..................... 29

   D.    The Proposed Notice Plan provides the best practicable notice. ......................... 30

VI.    CONCLUSION ............................................................................................... 31

# TABLE OF AUTHORITIES

**Page**

### Cases

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................................ 8, 13

*Astiana v. Kashi Co.*,
    291 F.R.D. 493 (S.D. Cal. 2013) ................................................................................ 9

*Butler v. Sears, Roebuck & Co.*,
    702 F.3d 359 (7th Cir. 2012) .................................................................................. 12

*Clemens v. Hair Club for Men, LLC*,
    No. C 15-01431 WHA, 2016 WL 1461944 (N.D. Cal. Apr. 14, 2016) .............................. 11, 15

*Cohen v. Trump*,
    303 F.R.D. 376 (S.D. Cal. 2014) ................................................................................ 9

*Counts v. Gen. Motors, LLC*,
    237 F. Supp. 3d 572 (E.D. Mich. 2017) ..................................................................... 21

*Ellis v. Gen. Motors, LLC*,
    No. 2:16-cv-11747-GCS-APP, Dkt. 34-2 (E.D. Mich. July 14, 2017) .................................... 20

*Evon v. Law Offices of Sidney Mickell*,
    688 F.3d 1015 (9th Cir. 2012) ........................................................................... 10, 11

*Free Range Content, Inc. v. Google, LLC*,
    No. 14-CV-02329-BLF, 2019 WL 1299504 (N.D. Cal. Mar. 21, 2019) .................................. 16

*Friedman v. 24 Hour Fitness USA, Inc.*,
    No. CV 06-6282 AHM (CTx), 2009 WL 2711956 (C.D. Cal. Aug. 25, 2009) ........................... 13

*Guido v. L'Oreal, USA, Inc.*,
    284 F.R.D. 468 (C.D. Cal. 2012) ................................................................................ 9

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ................................................................... 10, 11, 12, 13

*Hanon v. Dataprods. Corp.*,
    976 F.2d 497 ((9th Cir. 1992) .................................................................................. 10

*In re Anthem, Inc. Data Breach Litig.*,
    327 F.R.D. 299 (N.D. Cal. 2018) ......................................................................... 17, 18

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*,
    No. 17-MD-02777-EMC, 2019 WL 536661 (N.D. Cal. Feb. 11, 2019) .................................... 9

*In re First Alliance Mortg. Co.*,
    471 F.3d 977 (9th Cir. 2006) .................................................................................. 12

*In re Hyundai & Kia Fuel Econ. Litig.*,
    926 F.3d 539 (9th Cir. 2019) (en banc) ............................................................... passim

*In re Hyundai & Kia Fuel Econ. Litig.*,
    No. MDL 13-2424-GW(FFMx), 2014 WL 12603199 (C.D. Cal. Aug. 21, 2014) ......................... 23

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000)..................................................................... 17

*In re Nissan Radiator/Transmission Cooler Litigation*,
   2013 WL 4080946 (S.D. N.Y. 2013) .......................................................... 18

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   No. 2672 CRB (JSC), 2016 WL 4010049 (N.D. Cal. July 26, 2016)................................ passim

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   No. MDL 2672 CRB (JSC), 2016 WL 6248426 (N.D. Cal. Oct. 25, 2016), *aff'd sub
   nom. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   895 F.3d 597 (9th Cir. 2018)................................................................. 18, 22

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   No. MDL 2672 CRB (JSC), 2019 WL 2077847 (N.D. Cal. May 10, 2019) ................ 18, 19, 26

*Jimenez v. Allstate Ins. Co.*,
   765 F.3d 1161 (9th Cir. 2014).................................................................. 9

*Kim v. Space Pencil, Inc.*,
   No. C 11-03796 LB, 2012 WL 5948951 (N.D. Cal. Nov. 28, 2012)......................... 21

*Klay v. Humana, Inc.*,
   382 F.3d 1241 (11th Cir. 2004)................................................................ 13

*Linney v. Cellular Alaska Partnership*,
   151 F.3d 1234 (9th Cir. 1998).................................................................. 17

*Marshall v. Holiday Magic, Inc.*,
   550 F.2d 1173 (9th Cir. 1977).................................................................. 19

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)............................................................................. 30

*Nachshin v. AOL, LLC*,
   663 F.3d 1034 (9th Cir. 2011).................................................................. 26

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
   238 F.R.D. 482 (C.D. Cal. 2006) ................................................................ 9

*Nobles v. MBNA Corp.*,
   No. C 06-3723 CRB, 2009 WL 1854965 (N.D. Cal. June 29, 2009) ...................... 20

*Palmer v. Stassinos*,
   233 F.R.D. 546 (N.D. Cal. 2006)............................................................... 9

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014)................................................................... 10

*Rainbow Bus. Sols. v. MBF Leasing LLC*,
   No. 10-CV-01993-CW, 2017 WL 6017844 (N.D. Cal. Dec. 5, 2017) .................... 28

# TABLE OF AUTHORITIES
### (continued)

Page

*Rickman v. BMW of N. Am.*,
  No. CV 18-4363, 2019 WL 2710068 (D.N.J. June 27, 2019) ........................ 21

*Ries v. Ariz. Beverages USA LLC*,
  287 F.R.D. 523 (N.D. Cal. 2012) ........................................................... 9

*Rodriguez v. Hayes*,
  591 F.3d 1105 (9th Cir. 2010) .............................................................. 10

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ............................................................... 25

*Slaven v. BP Am., Inc.*,
  190 F.R.D. 649 (C.D. Cal. 2000) ............................................................ 8

*Smith v. Cardinal Logistics Mgmt. Corp.*,
  No. 07-2104 SC, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) .................... 14

*Stockwell v. City & Cty. of San Francisco*,
  749 F.3d 1107 (9th Cir. 2014) ............................................................... 9

*Sykes v. Mel Harris & Assocs. LLC*,
  285 F.R.D. 279 (S.D.N.Y. 2012), *aff'd* 780 F.3d 70 (2d Cir. 2015) ............. 10

*Trosper v. Styker Corp.*,
  No. 13-CV-0607-LHK, 2014 WL 4145448 (N.D. Cal. Aug. 21, 2014) ....... 11, 14

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ...................................................................... 12

*Wahl v. Yahoo! Inc.*
  No. 17-CV-02745-BLF, 2018 WL 6002323 (N.D. Cal. Nov. 15, 2018) ......... 17

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ....................................................................... 9, 10

*Wolin v. Jaguar Land Rover N. Am., LLC*,
  617 F.3d 1168 (9th Cir. 2010) ....................................................... 10, 13, 14

**Statutes**

18 U.S.C. § 1964(c) ............................................................................ 25

28 U.S.C. § 1712 .............................................................................. 29

28 U.S.C. § 1713 .............................................................................. 29

28 U.S.C. § 1714 .............................................................................. 29

28 U.S.C. § 1715(b) ........................................................................... 29

49 U.S.C. § 32908, *et seq.* ................................................................... 2

**Rules**

40 C.F.R. §§ 600.301–302-12 ................................................................ 2

**TABLE OF AUTHORITIES**
(continued)

**Page**

Fed. R. Civ. P. 23(a) ...................................................................................................... 8

Fed. R. Civ. P. 23(a)(3) ................................................................................................ 10

Fed. R. Civ. P. 23(a)(4) ................................................................................................ 11

Fed. R. Civ. P. 23(c)(2)(B) ..................................................................................... 8, 30

Fed. R. Civ. P. 23(e) ...................................................................................................... 2

Fed. R. Civ. P. 23(e)(1) ................................................................................................. 8

Fed. R. Civ. P. 23(e)(1)(B) ...................................................................................... 7, 15

Fed. R. Civ. P. 23(e)(2) ......................................................................................... 7, 8, 15

Fed. R. Civ. P. 23(e)(2)(A) .......................................................................................... 16

Fed. R. Civ. P. 23(e)(2)(B) .......................................................................................... 16

Fed. R. Civ. P. 23(e)(2)(C) .......................................................................................... 19

Fed. R. Civ. P. 23(e)(2)(D) .......................................................................................... 23

Fed. R. Civ. P. 23(e)(5) ................................................................................................. 8

Fed. R. Civ. P. 23(g) .................................................................................................... 15

Fed. R. Civ. P. 23(h) ...................................................................................................... 1

**Other Authorities**

Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
  7 J. Empirical L. Stud. 832 ....................................................................................... 28

Northern District of California Procedural Guidance for Class Action Settlements ............. passim

William B. Rubenstein, et al., 4 Newberg on Class Actions (5th ed. 2012) ..................... 17, 18, 28

# NOTICE OF MOTION AND MOTION

TO ALL THE PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on Thursday, September 13th at 10:00 a.m. or at such other date and time as the Court may set, in Courtroom 6 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Lead Counsel and the Plaintiffs' Steering Committee, on behalf of a proposed Settlement Class of owners and lessees of certain Audi, Volkswagen, Porsche, and Bentley branded vehicles, will and hereby do move the Court for an order granting preliminary approval of the Class Action Settlement and directing notice to the Class under Fed. R. Civ. P. 23(e)(1); appointing Interim Settlement Class Counsel and Class Representatives under Fed. R. Civ. P. 23(g)(3); and scheduling a final approval hearing under Fed. R. Civ. P. 23(e)(2).

MOTION FOR PRELIMINARY APPROVAL OF CLASS
SETTLEMENT AND DIRECTION OF NOTICE
MDL No. 2672 CRB (JSC)

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The proposed Settlement now before the Court resolves the claims of more than 100,000 consumers who purchased or leased certain gasoline-powered Audi, Volkswagen, Porsche, and Bentley vehicles (the "Class Vehicles") that were initially labeled and marketed with overstated fuel economy (and understated carbon dioxide ("$CO_2$") emissions).[1] The Settlement provides compensation to the members of the Class for their time and expense in driving and continuing to drive Vehicles that obtain up to 1 mile per gallon ("MPG") less than was originally represented.

If all potential Class Members participate in the Settlement, the payments to the Class will total approximately $96.5 million. Individually, Class Members stand to receive lump-sum cash payments—ranging from $518.40 to $2,332.80 per Class Vehicle—correlating to their length of Vehicle possession and to their Vehicle's revised fuel economy ratings. To obtain this payment, Class Members need only submit a claim form and documents necessary to establish their eligibility. If any of the available funds are not directly claimed by Class Members, the remaining money will *not* revert to the Defendants. Instead, it will be dedicated to environmental causes, subject to Court approval, thereby ensuring the full Settlement Value inures to the benefit of the Class. Critically, none of the approximately $96.5 million available in Settlement benefits will be reduced to pay Class Counsel's attorneys' fees or expenses, or the costs of notice and claims administration.[2] Although Defendants reserve the right to contest the amount requested, any fees and costs that are awarded by the Court under Fed. R. Civ. P. 23(h) will be paid by Defendants separately, and in addition to the $96.5 million.

The proposed Settlement is an outstanding result for the Class, providing "full compensation" for the damages consumers incurred. *See* Declaration of Edward M. Stockton ("Stockton Decl.") ¶¶ 4, 23(f). Plaintiffs are proud to present this Settlement to the Court and

---

[1] All capitalized terms used herein have the meaning set forth in the Consumer Class Settlement Action Agreement and Release ("Settlement," "Settlement Agreement," or "Agreement"), unless otherwise indicated. The Settlement is attached as Exhibit 1 hereto.

[2] "Class Counsel" refers to proposed Interim Settlement Class Counsel and Settlement Class Counsel, as discussed below.

1    respectfully request approval to give notice to the Class and set the matter for final approval,

2    under the procedure delineated by Fed. R. Civ. P. 23(e).

3    **II.      BACKGROUND AND PROCEDURAL HISTORY**

4          **A.     Factual background: Plaintiffs alleged that Defendants inflated the fuel
                economy labels for the Class Vehicles.**

5          Fuel economy is a critical factor in consumers' decisions to purchase or lease a vehicle.

6    Given the important role it plays, vehicle manufacturers often advertise and emphasize their

7    vehicles' fuel economy. Indeed, federal law requires that new vehicles sold or leased in the

8    United States have a label—commonly referred to as a "Monroney" label—in their window that

9    displays specific information about the vehicle's fuel efficiency, including the ratings for City,

10   Highway, and Combined MPG. 49 U.S.C. § 32908, *et seq.*; 40 C.F.R. §§ 600.301–302-12.

11   These fuel economy ratings are also communicated via the manufacturers' vehicle brochures and

12   other consumer-facing materials, and are available for used car purchasers on

13   www.fueleconomy.gov. As set forth in Plaintiffs' operative Amended Consolidated Consumer

14   Class Action Complaint (the "Amended Complaint"), this case concerns specific Volkswagen,

15   Audi, Porsche, and Bentley-branded gasoline vehicles for which the MPG represented to

16   regulators and consumers was inflated by up to 1 MPG and will be revised accordingly.[3]

17          More specifically, Plaintiffs allege that a software program embedded in the Vehicles'

18   Transmission Control Unit—the "Warm-up Program" or the "Program"—caused the fuel

19   economy ratings for the Class Vehicles to be inflated. In each Class Vehicle, the Warm-up

20   Program software activates when it encounters certain "entry conditions" (such as a key start) and

21   de-activates under certain "exit conditions" (such as a steering wheel turn). *See* Amended

22   Complaint ("Am. Compl.") ¶¶ 6-7. Thus, in effect, the Warm-up Program operates primarily

23   during testing conditions (when the program is "active"), but not during on-road driving (when

24   the program is "inactive"). *Id.* When the Program is active (*i.e.*, during testing), the transmission

25   changes gears at lower engine speeds, which requires less fuel. As a result, the Class Vehicles

26

27   ─────────────────────
     [3] The revised fuel economy ratings will be available on EPA's "Fuel Economy Label Updates"
     website, https://www.epa.gov/recalls/fuel-economy-label-updates, as well as
28   www.fueleconomy.gov.

1814871.10

1   emitted less $CO_2$ and achieved better fuel economy in laboratory testing (the results of which

2   were reported to the government and marketed to consumers) and worse fuel economy and higher

3   $CO_2$ emissions when driven on the road. For all Class Vehicles, significant expert testing and

4   discovery have confirmed a difference of at least 1 MPG between the City, Highway, and/or

5   Combined fuel economy as represented to Class Members and as later tested with Warm-up

6   Program de-activated.

7        Plaintiffs and the proposed Settlement Class operated the Class Vehicles without

8   obtaining the reported fuel efficiency and while emitting higher $CO_2$. As a result of this

9   discrepancy, Class Members paid for more fuel, and were inconvenienced by more frequent trips

10  to the fuel pump, throughout the duration of their ownership or lease.

11       **B.**    **Procedural background: Plaintiffs investigated their claims through a**
    **comprehensive discovery process.**

12  

13       On November 5, 2016, the German newspaper Bild am Sonntag ("*Bild*") reported that the

14  California Air Resources Board had discovered a discrepancy in vehicle testing results and

15  suspected that Audi had installed an emissions cheating device in gasoline-powered Audi models

16  equipped with a particular 8-speed automatic transmission. The *Bild* article claimed that software

17  in these vehicles operates to reduce $CO_2$ emissions—and, as a result increase fuel economy—

18  only during testing cycles. In the wake of these revelations, consumers filed a number of class

19  action lawsuits in federal courts across the country. The actions were consolidated before this

20  Court in the pending MDL, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and*

21  *Products Liability Litigation*, MDL No. 2672 CRB (JSC). The Court had previously appointed

22  Plaintiffs' Lead Counsel and a PSC in the MDL (Dkt. 1084), and ordered Plaintiffs to file a

23  consolidated complaint in the new Audi $CO_2$ matters. *See* Dkt. 3217.

24       Following the *Bild* report, Plaintiffs and their experts conducted further investigation and

25  technical vehicle testing to detect discrepancies in emissions and fuel economy performance

26  between lab and normal driving conditions in the Defendants' vehicles. Thereafter, on October

27  12, 2017, Plaintiffs filed a 519-page Consolidated Consumer Class Action Complaint reflecting

28  

MOTION FOR PRELIMINARY APPROVAL OF CLASS
SETTLEMENT AND DIRECTION OF NOTICE
MDL No. 2672 CRB (JSC)

1    their initial testing results as well as information learned from documents produced by the

2    Defendants through Plaintiffs' discovery efforts.  *See* Dkt. 4043-3.

3         On December 11, 2017, the Audi Defendants and Bosch Defendants filed motions to

4    dismiss the Consolidated Complaint—totaling 58 and 41 pages, respectively.  Dkts. 4545, 4546.

5    Plaintiffs then filed an 81-page omnibus opposition on January 16, 2018 (Dkt. 4662), and both the

6    Audi and Bosch Defendants lodged their replies in support the following month. Dkts. 4743,

7    4744.  A hearing on those motions was scheduled for May 11, 2018, but, as detailed below, was

8    taken off calendar by the Parties' stipulation pending the outcome of ongoing settlement

9    discussions.

10        Ultimately, Plaintiffs' investigations and Defendants' own expert testing conducted after

11   the filing of the Consolidated Complaint confirmed that the particular transmission identified in

12   the *Bild* article (the AL 551-Q) was merely one of many transmissions Defendants programmed

13   with the Warm-up Program software.  As the testing revealed, the Warm-up Program was present

14   in a number of transmissions used in Audi, Volkswagen, Porsche, and Bentley vehicles, and in

15   many of those vehicles, the Program caused the Vehicles to achieve better fuel economy (and

16   emit less $CO_2$) in the lab than on the road.  Plaintiffs amended the Consolidated Complaint to

17   account for these developments and to reflect their further knowledge of the technological

18   background and broader scope of the misrepresented fuel economy issues gained throughout the

19   intervening months of litigation and discovery.  The result was the recently filed, 415-page

20   Amended Consolidated Consumer Class Action Complaint.  In the operative Amended

21   Complaint, Plaintiffs bring claims under the Racketeer Influenced and Corrupt Organizations Act

22   ("RICO"); the Magnuson-Moss Warranty Act; common law fraud by concealment; and state law

23   consumer protection claims.  The lengthy and detailed allegations related to the Warm-up

24   Program technology in both the Amended Complaint and the earlier Consolidated Complaint

25   reflect the arduous process undertaken by Class Counsel to analyze the multi-party fraud and

26   complicated engine and software technologies at issue in this case, and to research, develop, and

27   assert the various claims and the remedies available to those harmed by the conduct of

28   Defendants and their co-conspirators.

C. **The Settlement process: The Parties engaged in a lengthy, fifteen-month negotiation process and conducted additional confirmatory discovery after the Settlement was reached.**

Settlement negotiations began in April 2018 when, with a hearing on Defendants' motions to dismiss pending, the Parties agreed to commence negotiations in earnest. Dkt. 4977. Settlement discussions endured for fifteen months thereafter, ultimately resulting in the proposed Settlement now before the Court.

Throughout these negotiations, the Parties held numerous in-person sessions in locations including Germany, Washington DC, New York, and San Francisco, and continued their discussions with many telephone conferences and exchanges of information between those meetings. Declaration of Elizabeth J. Cabraser ("Cabraser Decl.") ¶ 8. The Parties ensured that many of those sessions included in-house counsel, high-level engineers, and experts to further the negotiations in an efficient and meaningful way. Meanwhile, Class Counsel continued to spend considerable time and energy gaining familiarity with the strengths and weaknesses of their claims, including through a robust and prolonged exchange of information with the Defendants. *Id.* ¶¶ 10-12. In support of both the litigation and settlement efforts, Plaintiffs' counsel retained multiple technical experts to conduct extensive testing on the Defendants' vehicles to measure and compare, among other things, their emissions and fuel economy under laboratory and on-road driving conditions. Plaintiffs worked with their experts for many months to test several vehicles under approved federal vehicle testing procedures. *Id.* Plaintiffs' experts also conducted on-road emissions testing and data collection using portable emissions measurement systems ("PEMS") on several vehicles. *Id.*

In response to regulatory inquiries and this litigation, Defendants also conducted their own extensive testing and analysis of the $CO_2$ emissions and fuel economy of their gasoline vehicles. Plaintiffs' counsel and their experts discussed the testing methodology with Defendants and their engineers at length, reviewed Defendants' testing data, and observed some of the testing in person. *Id.* Indeed, Plaintiffs and their experts traveled to Audi's testing facility in Ingolstadt, Germany, on two occasions to observe testing conducted by Defendants, and to engage in

interviews and meetings with several of the engineers responsible for testing the Class Vehicles and evaluating the results. *Id.*

The outcome of all these meetings, exchanges of information, and more than a year of negotiations is a proposed Agreement, under which the Defendants will pay approximately $96.5 million to the Class (and, if funds are unclaimed, to environmental remediation efforts), in addition to the Settlement administration costs and any attorneys' fees and costs awarded to Class Counsel by the Court. This is an exceptional result—described more fully below—that "provides full compensation to Class Members for the damages they incurred as a result of the reduced fuel economy ratings." Stockton Decl. ¶ 23(f).

## III.     SUMMARY OF SETTLEMENT TERMS

The Settlement provides substantial cash compensation—with payments to Class Members of up to $518.40 to $2,332.80 per Class Vehicle through a streamlined claims process. These payments fully compensate Class Members for having driven and continuing to drive Class Vehicles that did not obtain the fuel economy represented at the time of purchase or lease.

### A.     The Settlement Class definition

The Settlement Class is defined as follows: "a nationwide class, including Puerto Rico, of all persons (including individuals and entities) who own, owned, lease, or leased a Class Vehicle in the United States or its territories as of the date of the Motion for Preliminary Approval." Settlement Agreement ("SA") ¶ 2.9.[4]  The Class Vehicles include 97,890 Audi, Bentley, Porsche, and Volkswagen vehicles, as defined in the proposed Settlement Agreement. *Id.* ¶ 2.15.

### B.     Cash benefits to Class Members

The proposed Settlement delivers significant cash payments to any Class Member who submits a valid claim. The amount of compensation available to each Class Member is based on (1) the difference in cost for the amount of gasoline that would have been required under the

---

[4] Those excluded from the Class are: (a) Defendants' officers, directors and employees and participants in Volkswagen's Internal Lease Program, and/or Porsche Associate Lease Program; Defendants' affiliates and affiliates' officers, directors and employees; Defendants' distributors and distributors' officers, directors and employees; (b) Judicial officers and their immediate family members and associated court staff assigned to this case; and (c) All those otherwise in the Class who or which timely and properly exclude themselves from the Class as provided in the Class Action Agreement.

1    original Monroney fuel economy label and the greater amount required under the adjusted fuel

2    economy label, and (2) a goodwill payment of an additional 15% of those damages to compensate

3    for any inconvenience.  *Id.* ¶ 4.1.  The payments range from $518.40 to $2,332.80 for original

4    owners who still own their Class Vehicles as of the date this Motion is filed.  *Id.*, Ex. A.  Class

5    Members who sold, purchased used, or leased their Class Vehicles will be entitled to

6    compensation based on the same concept described above, but prorated to account for the number

7    of months of their ownership or possession.  Critically, in all circumstances, this compensation

8    represents 100% of the damages available to the Class under the relevant damages theory,

9    Stockton Decl. ¶ 23(f)—a remarkable result for a compromise of contested claims that have yet to

10   survive a motion to dismiss.

11        If there are any funds remaining in the Settlement Value after all valid, complete, and

12   timely Claims are paid, subject to Court approval, the balance will be directed to environmental

13   remediation efforts.  SA ¶ 4.5.  This *cy pres* distribution may include, for example, the purchase

14   of greenhouse gas credits, environmental projects in consultation with relevant regulators, and/or

15   other, environmentally-focused recipients, as agreed by the Parties and approved by the Court.

16   *Id.*  This ensures that all the money secured by the Settlement will inure to the benefit of the Class

17   and the interests advanced in this litigation.

18   **IV.   LEGAL STANDARD FOR PRELIMINARY APPROVAL AND DECISION TO
            GIVE NOTICE**
19

20        Federal Rule of Civil Procedure 23(e) governs a district court's analysis of the fairness of

21   a proposed class action settlement and creates a multistep process for approval.  First, a court

22   must determine that it is likely to (i) approve the proposed settlement as fair, reasonable, and

23   adequate, after considering the factors outlined in Rule 23(e)(2), and (ii) certify the settlement

24   class after the final approval hearing.  *See* Fed. R. Civ. P. 23(e)(1)(B); *see also* 2018 Advisory

25   Committee Notes to Rule 23 (standard for directing notice is whether the Court "likely will be

26   able both to approve the settlement proposal under Rule 23(e)(2) and . . . certify the class for

27   purposes of judgment on the proposal").  Second, a court must direct notice to the proposed

28   settlement class, describing the terms of the proposed settlement and the definition of the

1    proposed class, to give them an opportunity to object to or to opt out of the proposed settlement.

2    *See* Fed. R. Civ. P. 23(c)(2)(B); Fed. R. Civ. P. 23(e)(1), (5).  Third, after a hearing, the court may

3    grant final approval of the proposed settlement on a finding that the settlement is fair, reasonable,

4    and adequate, and certify the settlement class.  Fed. R. Civ. P. 23(e)(2).  In this District, a

5    movant's submission should also include the information called for under the District's

6    Procedural Guidance for Class Action Settlements ("Procedural Guidance").

7    **V.    ARGUMENT**

8           **A.    The Court will be able to certify the Class for settlement purposes upon final
             approval.**
9

10          Certification of a settlement class is "a two-step process." *In re Volkswagen "Clean*

11   *Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), 2016 WL 4010049,

12   at *10 (N.D. Cal. July 26, 2016) (Breyer, J.) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S.

13   591, 613 (1997)).  First, the Court must find that the proposed settlement class satisfies

14   Rule 23(a)'s four requirements.  *Id.* (citing Fed. R. Civ. P. 23(a)).  Second, the Court must find

15   that "a class action may be maintained under either Rule 23(b)(1), (2), or (3)." *Id.* (citing

16   *Amchem*, 521 U.S. at 613).  The proposed Settlement Class here readily satisfies all Rule

17   23(a)(1)-(4) and (b)(3) certification requirements. *See In re Hyundai & Kia Fuel Econ. Litig.*, 926

18   F.3d 539, 557 (9th Cir. 2019) (en banc) (upholding district court's preliminary approval and

19   certification of nationwide settlement class in similar fuel economy settlement).

20               **1.    The Settlement Class meets the requirements of Rule 23(a).**

21               **a.    Rule 23(a)(1): The Class is sufficiently numerous.**

22          Rule 23(a)(1) is satisfied where, as here, "the class is so numerous that joinder of all class

23   members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity is generally met when the class

24   exceeds forty members. *See, e.g.*, *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000).

25   It is undisputed that approximately 100,000 Class Vehicles were sold and/or leased nationwide

26   and that the Settlement Class—which includes current and former owners and lessees of those

27   Vehicles—includes at least 100,000 members.  The size of the Settlement Class and its

28   geographic dispersal across the United States renders joinder impracticable. *See Palmer v.*

- 8 -

1    *Stassinos*, 233 F.R.D. 546, 549 (N.D. Cal. 2006) ("Joinder of 1,000 or more co-plaintiffs is

2    clearly impractical."). Numerosity is satisfied.

3                    **b.      Rule 23(a)(2): The Class Claims present common questions of
                               law and fact.**

4

5           "Federal Rule of Civil Procedure 23(a)(2) conditions class certification on demonstrating

6    that members of the proposed class share common 'questions of law or fact.'" *Stockwell v. City*

7    *& Cty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014). Commonality "does not turn on

8    the number of common questions, but on their relevance to the factual and legal issues at the core

9    of the purported class' claims." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014).

10   Indeed, "'[e]ven a single question of law or fact common to the members of the class will satisfy

11   the commonality requirement.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 369 (2011).[5]

12          Courts routinely find commonality where, as here, the class claims arise from a

13   defendant's uniform course of conduct. *See, e.g.*, *In re Chrysler-Dodge-Jeep Ecodiesel Mktg.,*

14   *Sales Practices, & Prods. Liab. Litig.*, No. 17-MD-02777-EMC, 2019 WL 536661, at *6 (N.D.

15   Cal. Feb. 11, 2019) (commonality satisfied where claims arose from the defendants' "common

16   course of conduct" in perpetrating alleged vehicle emissions cheating scheme); *Cohen v. Trump*,

17   303 F.R.D. 376, 382 (S.D. Cal. 2014) ("Plaintiff argues his RICO claim raises common questions

18   as to 'Trump's scheme and common course of conduct, which ensnared Plaintiff[] and the other

19   Class Members alike.' The Court agrees."); *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D.

20   482, 488 (C.D. Cal. 2006) (finding common core of factual and legal issues in "the questions of

21   whether Allianz entered into the alleged conspiracy and whether its actions violated the RICO

22   statute").[6]

23

24   [5] Here, and throughout, internal citations are omitted unless otherwise indicated.

     [6] Likewise, commonality is satisfied in cases where defendants' deployed uniform
25   misrepresentations to deceive the public. *See Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523,
     537 (N.D. Cal. 2012) ("Courts routinely find commonality in false advertising cases . . . .");
26   *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501-02 (S.D. Cal. 2013) (same); *see also Guido v. L'Oreal,*
     *USA, Inc.*, 284 F.R.D. 468, 478 (C.D. Cal. 2012) (whether misrepresentations "are unlawful,
27   deceptive, unfair, or misleading to reasonable consumers are the type of questions tailored to be
     answered in 'the capacity of a classwide proceeding to generate common answers apt to drive the
28   resolution of the litigation'") (quoting *Dukes*, 564 U.S. at 350).

Here, the Settlement Class claims are rooted in commons questions of fact relating to

Defendants' development and use of the Warm-up Program and representations about the Class

Vehicles' fuel economy to regulators and consumers. *See, e.g.*, Am. Compl. ¶ 96; *see also In re*

*Hyundai,* 926 F.3d at 557 (similar common questions about misrepresented fuel economy ratings

satisfied commonality requirement). These common questions will, in turn, generate common

answers "apt to drive the resolution of the litigation" for the Settlement Class as a whole. *See*

*Dukes*, 564 U.S. at 350. As the Settlement Class' "injuries derive from [D]efendants' alleged

'unitary course of conduct,'" Plaintiffs have "'identified a unifying thread that warrants class

treatment.'" *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D. 279, 290 (S.D.N.Y. 2012), *aff'd* 780

F.3d 70 (2d Cir. 2015). As in the *Volkswagen* diesel litigation, "[w]ithout class certification,

individual Class Members would be forced to separately litigate the same issues of law and fact

which arise from Volkswagen's use of the [Program] and Volkswagen's alleged common course

of conduct." 2016 WL 4010049, at *10.

        **c.**      **Rule 23(a)(3): The Settlement Class Representatives' claims are typical of other Class Members' claims.**

Under Rule 23(a)(3), "'the claims or defenses of the representative parties'" must be

"'typical of the claims or defenses of the class.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir.

2014) (quoting Fed. R. Civ. P. 23(a)(3)). "Like the commonality requirement, the typicality

requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-

extensive with those of absent class members; they need not be substantially identical.'"

*Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon v. Chrysler Corp.*, 150

F.3d 1011, 1020 (9th Cir. 1998)). Typicality "assure[s] that the interest of the named

representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*,

617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508

((9th Cir. 1992)). Thus, where a plaintiff suffered a similar injury and other class members were

injured by the same course of conduct, typicality is satisfied. *See Parsons*, 754 F.3d at 685; *see*

*also Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) ("The test of

typicality is whether other members have the same or similar injury, whether the action is based

on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.").

Here, the course of conduct that injured the Settlement Class Representatives injured the other members of the proposed Settlement Class in the same way. The Settlement Class Representatives, like other Settlement Class Members, purchased or leased Class Vehicles that did not obtain the fuel economy represented to them as a result of the same Warm-up Program software active in all Class Vehicles. Like all Class Members, the Settlement Class Representatives were harmed by having to pay for more gas, and in the inconvenience of more frequent trips to the gas pump, while they used the Class Vehicles. The typicality requirements are satisfied.

### d. Rule 23(a)(4): The Settlement Class Representatives and Class Counsel have and will protect the interests of the Class.

Rule 23(a)(4)'s adequacy requirement is met where, as here, "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy entails a two-prong inquiry: "'(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Evon*, 688 F.3d at 1031 (quoting *Hanlon*, 150 F.3d at 1020). Both prongs are readily satisfied here.

The Settlement Class Representatives have no interests antagonistic to Settlement Class Members and will continue to protect the Class' interests in overseeing the Settlement administration and through any appeals. *See Clemens v. Hair Club for Men, LLC*, No. C 15-01431 WHA, 2016 WL 1461944, at *2-3 (N.D. Cal. Apr. 14, 2016). Indeed, the Settlement Class Representatives "are entirely aligned [with the Settlement Class] in their interest in proving that [Defendants] misled them and share the common goal of obtaining redress for their injuries." *Volkswagen*, 2016 WL 4010049, at *11. The Representatives understand their duties, have agreed to consider the interests of absent Settlement Class Members, and have reviewed and uniformly endorsed the Settlement terms. *See* Cabraser Decl. ¶ 22. *See also, e.g.*, *Trosper v. Styker Corp.*, No. 13-CV-0607-LHK, 2014 WL 4145448, at *12 (N.D. Cal. Aug. 21, 2014) ("All

1   that is necessary is a 'rudimentary understanding of the present action and … a demonstrated

2   willingness to assist counsel in the prosecution of the litigation.'").  The proposed Settlement

3   Class Representatives are more than adequate.

4       Similarly, as demonstrated through this litigation and this brief, Lead Counsel and many

5   of the PSC firms have undertaken an enormous amount of work, effort, and expense in this MDL

6   and in litigating the Audi $CO_2$ cases.  They have demonstrated their willingness to devote

7   whatever resources were necessary to reach a successful outcome throughout the nearly two years

8   since filing the Consolidated Complaint.  They, too, satisfy Rule 23(a)(4).

9       **2.**    **The Settlement Class meets the requirements of Rule 23(b)(3).**

10       Rule 23(b)(3)'s requirements are also satisfied because (i) "questions of law or fact

11   common to class members predominate over any questions affecting only individual members";

12   and (ii) a class action is "superior to other available methods for fairly and efficiently adjudicating

13   the controversy."  Fed. R. Civ. P. 23(b)(3).

14       **a.**    **Common issues of law and fact predominate.**

15       "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in

16   the case are more prevalent or important than the non-common, aggregation-defeating, individual

17   issues.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).  "When 'one or more

18   of the central issues in the action are common to the class and can be said to predominate, the

19   action may be considered proper under Rule 23(b)(3) even though other important matters will

20   have to be tried separately, such as damages or some affirmative defenses peculiar to some

21   individual class members.'"  *Id.*  At its core, "[p]redominance is a question of efficiency."

22   *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 362 (7th Cir. 2012).  Thus, "[w]hen common

23   questions present a significant aspect of the case and they can be resolved for all members of the

24   class in a single adjudication, there is clear justification for handling the dispute on a

25   representative rather than on an individual basis."  *Hanlon*, 150 F.3d at 1022.

26       The Ninth Circuit favors class treatment of fraud claims stemming from a "'common

27   course of conduct.'"  *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006);

28   *Hanlon*, 150 F.3d at 1022-23.  Even outside of the settlement context, predominance is readily

1814871.10

1   met for RICO and consumer claims arising from the defendants' common course of conduct.  *See*

2   *Amchem Prods.*, 521 U.S. at 625; *Wolin*, 617 F.3d at 1173, 1176 (consumer claims based on

3   uniform omissions certifiable where "susceptible to proof by generalized evidence," even if

4   individualized issues remain); *Friedman v. 24 Hour Fitness USA, Inc*., No. CV 06-6282 AHM

5   (CTx), 2009 WL 2711956, at *8 (C.D. Cal. Aug. 25, 2009) ("Common issues frequently

6   predominate in RICO actions that allege injury as a result of a single fraudulent scheme."); *see*

7   *also Klay v. Humana, Inc.*, 382 F.3d 1241, 1256-57 (11th Cir. 2004) (affirming certification of

8   RICO claim where "all of the defendants operate nationwide and allegedly conspired to underpay

9   doctors across the nation, so the numerous factual issues relating to the conspiracy are common to

10   all plaintiffs [and the] corporate policies constitute[d] . . . the very heart of the plaintiffs' RICO

11   claims").

12       Here, too, questions of law and fact common to the Settlement Class Members' claims

13   predominate over any questions affecting only individual members, because the common issues

14   "turn on a common course of conduct by the defendant in [a] nationwide class action."  *See In re*

15   *Hyundai*, 926 F.3d at 559 (citing *Hanlon*, 150 F.3d at 1022–23).  Indeed, "[i]n many consumer

16   fraud cases, the crux of each consumer's claim is that a company's mass marketing efforts,

17   common to all consumers, misrepresented the company's product—here, a vehicle's fuel

18   efficiency." *Id.*

19       Similar to *Hyundai*, Defendants' common course of conduct—here, the calibration of the

20   Warm-up Program in each Class Vehicle and the resulting overstatement of the Class Vehicles'

21   fuel economy—are central to the claims asserted in the Amended Complaint.  Common, unifying

22   questions as to the Defendants' conduct include, for example, "(1) "[w]hether the fuel economy

23   statements were in fact inaccurate"; and (2) "whether [the Defendants] knew that their fuel

24   economy statements were false or misleading." *Id.*  The alleged misrepresentations to the Class

25   were (among other sources) "uniformly made via Monroney stickers." *Id.* (internal quotation

26   marks omitted).  As such, Defendants allegedly "perpetrated the same fraud in the same manner

27   against all Class Members."  *Volkswagen*, 2016 WL 4010049, at *12.  Predominance is satisfied.

28

1        **b.      Class treatment is superior to other available methods for the
2                 resolution of this case.**

3        Superiority asks "whether the objectives of the particular class action procedure will be

4    achieved in the particular case." *Hanlon*, 150 F.3d at 1023.  In other words, it "requires the court

5    to determine whether maintenance of this litigation as a class action is efficient and whether it is

6    fair." *Wolin*, 617 F.3d at 1175-76.  Under Rule 23(b)(3), "the Court evaluates whether a class

7    action is a superior method of adjudicating plaintiff's claims by evaluating four factors:  '(1) the

8    interest of each class member in individually controlling the prosecution or defense of separate

9    actions; (2) the extent and nature of any litigation concerning the controversy already commenced

10   by or against the class; (3) the desirability of concentrating the litigation of the claims in the

11   particular forum; and (4) the difficulties likely to be encountered in the management of a class

12   action.'" *Trosper*, 2014 WL 4145448, at *17.

13       Class treatment here is far superior to the litigation of more than one hundred thousand

14   individual consumer actions.  "From either a judicial or litigant viewpoint, there is no advantage

15   in individual members controlling the prosecution of separate actions.  There would be less

16   litigation or settlement leverage, significantly reduced resources and no greater prospect for

17   recovery." *Hanlon*, 150 F.3d at 1023; *see also Wolin*, 617 F.3d at 1176 ("Forcing individual

18   vehicle owners to litigate their cases, particularly where common issues predominate for the

19   proposed class, is an inferior method of adjudication.").  The maximum damages sought by each

20   Settlement Class Member (ranging from a maximum of $518.40 to $2,332.80 per Class Vehicle)

21   are small relative to the significant cost of prosecuting each one's individual claims, especially

22   given the technical nature of the claims at issue. *See Smith v. Cardinal Logistics Mgmt. Corp.*,

23   No. 07-2104 SC, 2008 WL 4156364, at *11 (N.D. Cal. Sept. 5, 2008) (small interest in individual

24   litigation where damages averaged $25,000-$30,000 per year of work).

25       Class resolution is also superior from an efficiency and resource perspective.  Indeed, "[i]f

26   Class Members were to bring individual lawsuits against [Defendants], each Member would be

27   required to prove the same wrongful conduct to establish liability and thus would offer the same

28   evidence." *Volkswagen*, 2016 WL 4010049, at *12.  With a class of approximately 100,000,

1   "there is the potential for just as many lawsuits with the possibility of inconsistent rulings and

2   results." *Id.* "Thus, classwide resolution of their claims is clearly favored over other means of

3   adjudication, and the proposed Settlement resolves Class Members' claims at once." *Id.*

4   Superiority is met here, and Rule 23(e)(1)(B)(ii) is satisfied.

5                                              * * *

6           For all the reasons set forth above, Plaintiffs respectfully submit that the Court will—after

7   notice is issued and Class Member input received—"likely be able to . . . certify the class for

8   purposes of judgment on the proposal." *See* Fed. R. Civ. P. 23(e)(1)(B).

9   **B.      The Court should appoint Lead Plaintiffs' Counsel as Interim Settlement
10            Class Counsel under Rule 23(g)(3).**

11          Rule 23(g) requires this Court to appoint class counsel to represent the Settlement Class.

12  *See* Fed. R. Civ. P. 23(g).  At the outset of the MDL, as part of a competitive application process

13  with a total of 150 submissions, the Court chose Lead Counsel and each member of the PSC due

14  to their qualifications, experience, and commitment to the successful prosecution of this case.  *See*

15  Dkt. 1084.  The criteria that the Court considered in appointing Lead Counsel and the PSC were

16  substantially similar to the considerations set forth in Rule 23(g).  *See, e.g.*, *Clemens*, 2016 WL

17  1461944, at *2.  As noted above, Lead Counsel and many of the PSC firms have undertaken an

18  enormous amount of work, effort, and expense in this MDL and in litigating the Audi $CO_2$ cases.

19  *See* Cabraser Decl. ¶¶ 2-13.  Plaintiffs therefore submit that Lead Counsel should be appointed as

20  Interim Settlement Class Counsel under Rule 23(g)(3) to conduct the necessary steps in the

21  Settlement approval process.  Lead Counsel will seek appointment of PSC members as Settlement

22  Class Counsel under 23(g)(1) in connection with final approval.

23  **C.      The Settlement is fair, reasonable, and adequate.**

24          Rule 23(e)(2) identifies several criteria for the Court to use in deciding whether to grant

25  preliminary approval of a proposed class settlement and direct notice to the proposed class.  A

26  "presumption of correctness" attaches where, as here, a "class settlement [was] reached in arm's-

27  length negotiations between experienced capable counsel after meaningful discovery."  *See Free*

28  *Range Content, Inc. v. Google, LLC*, No. 14-CV-02329-BLF, 2019 WL 1299504, at *6 (N.D.

Cal. Mar. 21, 2019).  The Settlement proposed here readily satisfies the criteria for preliminary approval.

**1.      Rule 23(e)(2)(A): Class Counsel and the Settlement Class Representatives have and will continue to zealously represent the Class.**

Class Counsel and the Class Representatives fought hard to protect the interests of the Class, as evidenced by the significant compensation available to the Class through the proposed Settlement.  Class Counsel prosecuted this action and the fair resolution of it with vigor and dedication over the course of nearly two years.  *See* Fed. R. Civ. P. 23(e)(2)(A).  As detailed above, Class Counsel undertook significant efforts to uncover the facts—including retaining technical experts and conducting multiple rounds of vehicle testing—to continuously prosecute and refine the Class claims.  Class Counsel also engaged in robust Rule 12 motion practice—researching, drafting, and filing an 81-page omnibus opposition brief to Defendants' motions to dismiss.  *See* § II.B, *supra*.

The Settlement Class Representatives are also actively engaged.  Each worked with counsel to review and evaluate the terms of the proposed Settlement Agreement and has endorsed its terms.  Each Representative has also expressed their continued willingness to protect the Class until the Settlement is approved and its administration completed.  Cabraser Decl. ¶ 22.

**2.      Rule 23(e)(2)(B): The Settlement is the product of good faith, informed, and arm's-length negotiations.**

After the motion to dismiss hearing was taken off-calendar in April 2018 (Dkt. 4977), the Parties began to undertake serious, informed, and arm's-length negotiations—including multiple negotiation sessions in Germany, New York, San Francisco, and Washington DC.  *Id.* ¶ 8.  After fifteen months, these detailed, evidence-based discussions culminated in in the proposed Settlement now before the Court.  *See* Fed. R. Civ. P. 23(e)(2)(B).

With negotiations ongoing, and as described above (§ II.C), Class Counsel independently retained technical experts to conduct testing on the Class Vehicles in on-road and laboratory settings, resulting in comprehensive data and analysis of the Vehicles' emissions and fuel economy in both settings, while Defendants conducted an extensive testing and review process in

1    response to regulatory inquiries and this litigation.  The Parties agreed to share information about

2    their independent processes and results to facilitate informed negotiations.  In addition, the Parties

3    also engaged in extensive document and information exchanges, including the production and

4    review of millions of pages of documents in this MDL.  *Id.* ¶ 3; SA ¶ 6.1.  After the Agreement

5    was reached, the Parties conducted several more months of confirmatory discovery.  The

6    confirmatory discovery process included, among other things, an additional round of vehicle

7    testing conducted in Germany with experts from all Parties; detailed interviews of several key

8    witnesses including high-level managers and engineers; and the production of more than ten

9    thousand pages of documents, including technical presentations and data provided to the

10    regulators in a parallel investigation.  Cabraser Decl. ¶ 12.

11          Where extensive information has been exchanged, "[a] court may assume that the parties

12    have a good understanding of the strengths and weaknesses of their respective cases and hence

13    that the settlement's value is based upon such adequate information."  William B. Rubenstein, et

14    al., 4 Newberg on Class Actions § 13:49 (5th ed. 2012) ("*Newberg*"); *cf. In re Anthem, Inc. Data*

15    *Breach Litig.*, 327 F.R.D. 299, 320 (N.D. Cal. 2018) (concluding that the "extent of discovery"

16    and factual investigation undertaken by the parties gave them "a good sense of the strength and

17    weaknesses of their respective cases in order to 'make an informed decision about settlement'")

18    (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000)).

19          Here, too, the significant exchange of documents and information supports the parties'

20    ability to make a well-supported decision on settlement.  Notably, discovery supporting a

21    settlement need not have been formally produced and can include documents and information

22    learned in related proceedings.  *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239–40,

23    1241 (9th Cir. 1998) (noting that formal discovery is not required for settlement approval and that

24    "[i]n particular, the district court and plaintiffs may rely on discovery developed in prior or

25    related proceedings"); *Wahl v. Yahoo! Inc.,* No. 17-CV-02745-BLF, 2018 WL 6002323, at *4

26    (N.D. Cal. Nov. 15, 2018) (granting final approval of class settlement although "little formal

27    discovery" was conducted, noting relevant inquiry was whether parties had "sufficient

28    information to evaluate the case's strengths and weaknesses.").  Here, Defendants have produced

thousands of pages of documents directly responsive to Plaintiffs' claims in the Audi $CO_2$ matters, and millions of pages of relevant documents in the "Clean Diesel" MDL—all of which informed Plaintiffs' understanding of the strengths and weaknesses of their claims. Cabraser Decl. ¶¶ 3, 12.

A meaningful exchange of documents and information also evidences that the litigation was adversarial, and therefore serves as "an indirect indicator that a settlement is not collusive but arms-length." 4 *Newberg* § 13:49; *see also In re Anthem*, 327 F.R.D. at 320 ("Extensive discovery is also indicative of a lack of collusion. . . ."); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2019 WL 2077847, at *1 (N.D. Cal. May 10, 2019) ("Lead Counsel vigorously litigated this action during motion practice and discovery, and the record supports the continuation of that effort during settlement negotiations."). Here, Plaintiffs sought, reviewed, and analyzed a significant production of the Defendants' documents, data, and other information, and conducted on-the-ground investigations through expert interviews and site visits to Defendant AUDI AG's testing facility in Ingolstadt, Germany, among other things. Cabraser Decl. ¶¶ 3-4, 10-12.

The Parties' confirmatory discovery efforts further support the reasonableness of the settlement. Engaging in confirmatory discovery, as the Parties have here, adds even more legitimacy to the negotiation process. *See In re Nissan Radiator/Transmission Cooler Litig.*, No. 10 CV 7493(VB), 2013 WL 4080946, *5 (S.D. N.Y. May 30, 2013) (finding discovery sufficient to warrant approval because "plaintiffs conducted an investigation prior to commencing the action, retained experts, and engaged in confirmatory discovery in support of the proposed settlement").

It is also worth noting that the methodology and outcomes of the Parties' testing were independently assessed by the EPA, who has reviewed the fuel economy calculations underpinning the Settlement's compensation formula. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2016 WL 6248426 at *14 (N.D. Cal. Oct. 25, 2016), *aff'd sub nom. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 895 F.3d 597 (9th Cir. 2018) (government participation in

- 18 -

1    negotiations weighed "heavily in favor" of approval); *Marshall v. Holiday Magic, Inc.*, 550 F.2d

2    1173, 1178 (9th Cir. 1977) ("The participation of a government agency serves to protect the

3    interests of the class members, particularly absentees, and approval by the agency is an important

4    factor for the court's consideration.").  The revised fuel economy values will also be updated on

5    the official government website, www.fueleconomy.gov.

6        But perhaps most importantly of all, the result of the negotiations speaks for itself.

7    Where, as here, the Class stands to recover their damages *in full*, there is little room for argument

8    that counsel failed to protect the interests of the Class or otherwise engaged in collusive behavior.

9    *See* Cabraser Decl. ¶ 13; *see also In re Volkswagen*, 2019 WL 2077847, at *1 (granting final

10   settlement approval where "Lead Counsel ha[d] . . . a successful track record of representing

11   [plaintiffs] in cases of this kind . . . [and] attest[ed] that both sides engaged in a series of

12   intensive, arm's-length negotiations" and there was "no reason to doubt the veracity of Lead

13   Counsel's representations").

14           **3.      Rule 23(e)(2)(C): The Settlement provides substantial compensation in
                       exchange for the compromise of strong claims.**
15

16       The Settlement provides substantial relief for the Class, especially considering (i) the

17   costs, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed distribution plan;

18   and (iii) the fair terms of the requested award of attorney's fees.  *See* Fed. R. Civ. P. 23(e)(2)(C).

19       As noted above, the Settlement secures up to approximately $96.5 million for cash

20   payments designed to Class Members for having driven and continuing to drive vehicles for

21   which the actual, on-road fuel economy is up to 1 MPG less than was originally represented, and

22   separately requires Defendants to pay reasonable Settlement administration costs and attorneys'

23   fees and costs that would otherwise be deducted from the Class' recovery.  The amount of

24   compensation available to each Class Member is based on (1) the difference in cost for the

25   amount of gasoline that would have been required under the original Monroney fuel economy

26   label and the greater amount required under the adjusted fuel economy label, and (2) a goodwill

27   payment of an additional 15% of those damages to compensate for any inconvenience.  In making

28   this calculation, the compensation formula—which is detailed in the declaration of expert

MOTION FOR PRELIMINARY APPROVAL OF CLASS
SETTLEMENT AND DIRECTION OF NOTICE
MDL No. 2672 CRB (JSC)

economist Ted Stockton (Stockton Decl. ¶¶ 9-23) and in the Long Form Notice (Declaration of

Cameron Azari ("Azari Decl."), Attachment 3)—relies on a number of negotiated parameters—

including the average miles per year, the expected duration of ownership, and fuel cost—each of

which is favorable to the Class.

Specifically, the Settlement formula calculates the extra gallons attributable to the reduced

fuel economy based on the assumption that each Class Vehicle has been and will continue to be

driven an average of 1,250 miles per month (or 15,000 miles per year).  Stockton Decl. ¶¶ 16-

19.  Furthermore, the Settlement compensates Class Members for 96 months' worth of extra

gasoline (combined with the monthly estimate of 1,250 miles, this means the Vehicles are

compensated for 120,000 miles of extra fuel costs).  *Id.* ¶ 21.  This compares favorably to the

number of months compensated in two recent class action settlements related to MPG reductions.

*See Ellis v. Gen. Motors, LLC*, No. 2:16-cv-11747-GCS-APP, Dkt. 34-2 at 12 (E.D. Mich. July

14, 2017); *In re Hyundai*, 926 F.3d at 554.  Finally, the compensation formula uses an estimated

fuel cost of $3.54 per gallon, and applies a 15% goodwill premium to account for any

inconvenience to Class Members.  Stockton Decl. ¶¶ 20, 22.

Taken both individually and together, these inputs make clear that the Settlement provides

Class Members with full compensation for their damages.  *Id.* ¶ 23.  This is an exceptional result

for the compromise of contested claims that have not yet survived a motion to dismiss.

> **a.** **The Settlement mitigates the risks, expenses, and delays the Class would bear with continued litigation.**

The Settlement benefits (described above) are even more impressive given the inherent

uncertainties of continued litigation and the inevitable delay that would accompany it.  Even if the

Settlement secured something less than actual damages, compromise of potential recovery in

exchange for certain and timely provision of the benefits under the Settlement is an

unquestionably reasonable outcome.  *See Nobles v. MBNA Corp.*, No. C 06-3723 CRB, 2009 WL

1854965 at *2 (N.D. Cal. June 29, 2009) ("The risks and certainty of recovery in continued

litigation are factors for the Court to balance in determining whether the Settlement is fair.");

*Kim v. Space Pencil, Inc.*, No. C 11-03796 LB, 2012 WL 5948951, at *5 (N.D. Cal. Nov. 28,

MOTION FOR PRELIMINARY APPROVAL OF CLASS
SETTLEMENT AND DIRECTION OF NOTICE
MDL No. 2672 CRB (JSC)

1    2012) ("The substantial and immediate relief provided to the Class under the Settlement weighs

2    heavily in favor of its approval compared to the inherent risk of continued litigation, trial, and

3    appeal, as well as the financial wherewithal of the defendant.").

4         This case, like those cited above, is not without risk.  Defendants moved to dismiss the

5    Consolidated Complaint, and there is little doubt they would raise similar arguments against the

6    now-operative Amended Complaint should the litigation proceed.  The motions to dismiss are not

7    yet decided, and the outcome of those motions was far from certain.

8         As to the RICO claim, for example, Judge Chen recently remarked in the FCA EcoDiesel

9    proceedings that, "to the extent [the RICO claim] is predicated on fraud on the EPA . . . [it] raises

10   some tough questions, questions that I think are not very clear in the case law." *See In re*

11   *Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*, No. 17-md-02777,

12   Dkt. 455 at 4:3-9 (N.D. Cal. Oct. 26, 2018).  And while many courts (including this one, and

13   Judge Chen in the first round of briefing in *FCA EcoDiesel*) have upheld well-pled RICO

14   allegations in automotive litigation (in what, Plaintiffs respectfully submit, is the better-reasoned

15   view), Judge McNulty in the District of New Jersey recently dismissed a RICO claim on behalf of

16   a putative class alleging an emissions cheating scheme against BMW.  *Rickman v. BMW of N.*

17   *Am.*, No. CV 18-4363, 2019 WL 2710068, at *12 (D.N.J. June 27, 2019).

18        Success on Plaintiffs' state-law claims is likewise not guaranteed.  Indeed, similar state-

19   law claims have been dismissed in several recent automotive cases.  *See, e.g.*, *In re Chrysler-*

20   *Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 1027

21   (N.D. Cal. 2018) (dismissing plaintiffs' common law fraud claims, and various other state-law

22   claims for lack of privity and failure to obtain approval of state attorneys general); *Counts v. Gen.*

23   *Motors, LLC*, 237 F. Supp. 3d 572, 594 (E.D. Mich. 2017) (similar). Plaintiffs would likely face

24   these same challenges, and others, here.

25        Finally, while Plaintiffs have not moved to certify a litigation class, that process would be

26   expensive, lengthy, and, again, uncertain.  Avoiding years of additional, risky litigation in

27   exchange for the immediate and significant cash payments is a principled compromise that works

28   to the clear benefit of the Class.

MOTION FOR PRELIMINARY APPROVAL OF CLASS
SETTLEMENT AND DIRECTION OF NOTICE
MDL No. 2672 CRB (JSC)

**b.      Class Members will obtain relief through a straightforward claims process.**

The Parties were specific and intentional in their efforts to ensure that the claims process will be straightforward and efficient.  To receive compensation, Class Members need only submit a claim form online or by mail with sufficient supporting documentation to establish the dates during which they owned or leased their Class Vehicles (*e.g.*, purchase agreement, sale documentation, and/or proof of current registration).  No further action is required.  Class Members who have submitted a complete and valid claim will be sent a check for compensation within thirty days of the settlement Effective Date, or of receipt of their completed claim.  SA ¶ 5.1.  The effort required and safeguards incorporated in this process are proportional to the compensation available, and necessary and appropriate to preserve the integrity of the Claims Program.

**c.      Counsel will seek reasonable attorneys' fees and costs separate from the payments to the Class.**

The Settlement Value will not be reduced to pay any Court-awarded attorneys' fees or costs to Class Counsel, which Defendants will pay in addition to the cash available for payments directly to Class members.  Plaintiffs' success in negotiating for fees and expenses to be paid in addition to the Class recovery has significant monetary value to the Class, which otherwise would have had to pay such fees and costs out of the Settlement recovery.  The amount of the reasonable attorneys' fees and expenses to be paid to Class Counsel was not the subject of negotiation prior to signing the Settlement—only after executing the Settlement Agreement did the Parties commence discussion of the potential fees and expenses.  Waiting until after the Settlement terms are finalized before discussing fees is a settlement best-practice that puts the interests of the Class first and is routinely approved by courts in this District.  *See, e.g.*, *In re Volkswagen*, 2016 WL 6248426, at *23.

**4.      Rule 23(e)(2)(D): The Proposed Settlement treats all Class Members equitably relative to one another.**

The proposed Settlement fairly and reasonably allocates payments among the Class Members pursuant to a straightforward formula tied to the duration of possession of the Class Vehicle and the original and amended mileage ratings for each particular Class Vehicle make and

MOTION FOR PRELIMINARY APPROVAL OF CLASS
SETTLEMENT AND DIRECTION OF NOTICE
MDL No. 2672 CRB (JSC)

1   model.  The formula for calculating the maximum compensation for each Class Vehicle is

2   described above (*see* § V.C.3) and further explained in the Stockton Declaration (Stockton Decl.

3   ¶¶ 9-23) and the Long Form Notice (Azari Decl., Attachment 3).

4          Class Members who are the original owners of their Vehicles and continued to own them

5   as of the date this Motion is filed will receive the maximum compensation for that Vehicle.  All

6   other Class Members will receive compensation under the same formula, but prorated to account

7   for the months that they owned or leased their Class Vehicles.  Specifically, Class Members who

8   held active leases as of the date this Motion is filed are eligible for compensation for all months in

9   the full duration of their lease (even if the lease extends beyond the date of this Motion).  Class

10  Members who purchased their Vehicles used, but owned them as of the date this Motion is filed,

11  will be entitled to compensation for the months they have owned their Class Vehicles, as well as

12  any remaining months up to a total of 96 months after their Class Vehicles were first sold.

13         This system of calculating payment values in monthly increments, and based on the

14  degree of impact in a particular Class Vehicle make, model, and year, uses transparent and

15  objective criteria to determine Class Member payments.  These reasonable parameters ensure that

16  the Settlement treats Class Members equitably relative to one another.  *See* Fed. R. Civ. P.

17  23(e)(2)(D); *see also In re Hyundai & Kia Fuel Econ. Litig.*, No. MDL 13-2424-GW(FFMx),

18  2014 WL 12603199 at *2 (C.D. Cal. Aug. 21, 2014) (granting preliminary approval of similar

19  settlement, where payment amounts for each make and model ranged from $240 to $1,420 and

20  were "correlated to the amount of the fuel economy misstatements" and thus "differences

21  between the recovery amounts stem[med] mostly from differences in the damages suffered . . .

22  rather than any improper favoring of one group of Class Members over another.").

23         **5.      The Proposed Settlement merits approval under this District's
                     Procedural Guidance.**
24

25         This District recently updated its Procedural Guidance for Class Action Settlements.  The

26  Guidance provisions relevant to this Agreement are addressed below.  All of them favor approval

27  of the proposed Settlement.

28

1814871.10

**a.      Preliminary Approval Guidance (1)(a) & (c): There are no meaningful differences between the litigation and Settlement Classes, and the released claims are consistent with those asserted in the Complaint.**

Where a litigation class has not been certified, the Guidance instructs a party to explain differences between the settlement class and claims to be released compared to the class and claims in the operative complaint.  *See* Procedural Guidance, Preliminary Approval (1)(a), (1)(c) . Here, the proposed Settlement Class is essentially identical to the class in the Amended Complaint.  Am. Compl. ¶ 258.  The Settlement Class closes the class period, with a backstop as of the date of filing for Preliminary Approval, and treats Class Members equitably according to the duration of their possession of the Class Vehicle.  This minor refinement in the definition of the Settlement Class is appropriate to facilitate a principled and equitable Settlement, and reflects the fact that those who purchase or lease a Class Vehicle after the filing of this motion will—both through this litigation and through the disclosures that are to be amended on www.fueleconomy.gov—do so with full notice of the Vehicles' true fuel economy.  Moreover, those relatively few people who may have been class members under the proposed definition in the operative Amended Complaint but who are not members of the proposed Settlement Class are not releasing their claims.[7]

Finally, the claims released in the Settlement are limited to those arising out of the "Transmissions/Fuel Economy Matter," SA ¶ 10.3, which covers the issues relating to the Warm-up Program, the marketing of fuel economy related to Warm-up Program, and the "the subject matter of the Action," *id.* ¶ 2.40.  Thus, the claims at issue in the operative Amended Complaint and those released in the Settlement are substantially the same, if not identical.

---

[7] As discussed above, the definition of the proposed class was amended in the operative Amended Complaint to cover only those who own, owned, lease, or leased one of the vehicles that was demonstrated through exhaustive testing and regulatory confirmation to have an appreciable fuel economy difference attributable to Warm Up Program that resulted in modified fuel economy labeling.  Am. Compl. ¶¶ 4-12, 68-75.  Those who would have been members of the previously-defined proposed Class in the now-superseded Consumer Class Action Complaint, but who are not members of the Settlement Class, are not releasing their claims through this Settlement.

- 24 -

**b.** **Preliminary Approval Guidance (1)(e): The Settlement Recovery mirrors that available if Plaintiffs had prevailed in litigation on the merits.**

The Guidance instructs a party to address the "anticipated class recovery under the settlement, the potential class recovery if plaintiffs had fully prevailed on each of their claims, and an explanation of the factors bearing on the amount of the compromise." *See* Procedural Guidance, Preliminary Approval (1)(e). These considerations are addressed in Section V.C.3, above. To recap, Class members stand to receive "*full* compensation" for the damages associated with driving Class Vehicles that did not obtain the advertised fuel economy. Stockton Decl. ¶ 23 (emphasis added). In other words, the Settlement secures 100% of actual damages, and as an added benefit, Defendants will pay all administrative costs of the Settlement and any attorneys' fees and costs awarded to Class Counsel in addition to the cash available to pay Class members directly.

It is true that if Plaintiffs had fully prevailed on their RICO claim, they may have received treble damages. 18 U.S.C. § 1964(c). But success on the RICO claim (or the others, for that matter) was by no means guaranteed, as explained above. And, as general matter, "courts do not traditionally factor treble damages into the calculus for determining a reasonable settlement value." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009). In sum, the Settlement secures compensation that meets or significantly exceeds virtually all Class Members' actual damages in compromise for contested and uncertain claims that, if litigated to their conclusion, would not have resolved for several more years.

**c.** **Preliminary Approval Guidance (1)(f): The Settlement's Allocation plan is fair and equitable.**

The Procedural Guidance requires an explanation of the proposed allocation for the settlement fund. As explained above, the amount of compensation to each Class Member correlates with the months they possessed the Class Vehicle—either through lease or ownership. *See* § III.B, *supra*. The differences equitably apportion recovery corresponding to Plaintiffs' theory of injury and the harms endured by each Class Member.

1

**d.** **Preliminary Approval Guidance (1)(g): A substantial number of Class Members are expected to participate through a streamlined claims program.**

2

3    The Settlement, the Notice Plan, and the claims process are all designed to maximize class

4    member participation. The claim form is intended to be simple and the documents required are

5    intended to cover only that which is necessary to establish eligibility. The amount of

6    compensation available to Class Members, on the other hand, is considerable— ranging from

7    $518.40 to $2,332.80 per Class Vehicle. Furthermore, Defendants have no motivation to

8    minimize participation because the maximum Settlement Value is fixed at the outset and non-

9    reversionary, and any unclaimed monies will be put toward environmental remediation efforts in

10   the interests of the Class, subject to the Court's approval. Given all of the above, the Parties

11   anticipate a high rate of participation.

12

**e.** **Preliminary Approval Guidance (1)(h) & (8): Unclaimed Settlement funds will be distributed to environmental remediation efforts and will not revert to Defendants.**

13

14   As discussed above, unclaimed Settlement funds (if any) that are not paid directly to Class

15   Members will not revert to Defendants. SA ¶ 4.5. Instead, they will be directed toward

16   "environmental remediation efforts"—agreed to by the Parties and approved by the Court—that

17   are consistent with "(1) the objectives of the underlying statute(s) and (2) the interests of the

18   silent class members." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011). This

19   Settlement provision ensures that all parties are properly motivated to compensate as many Class

20   Members as possible and that all the Settlement funds will benefit the Class. *In re Volkswagen*

21   *"Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL

22   672820, at *3 (N.D. Cal. Feb. 16, 2017) (granting preliminary approval of Bosch "Clean Diesel"

23   settlement, including provision that remaining funds not distributed to the class would be

24   "distributed through *cy pres* payments according to a distribution plan and schedule filed by Class

25   Counsel and approved by the Court"). The Parties' selection of *cy pres* recipients (if any) will be

26   announced on the Settlement Website—as explained in the Long Form Notice. *See* Azari Decl.,

27   Attachment 3 at Q10.

28

- 26 -

1814871.10

1

   **f.**  **Preliminary Approval Guidance (2): The Parties selected an experienced notice and claims administrator after a competitive bidding process.**

2

3   The Parties solicited proposals from three well-known and experienced notice and

4 settlement administration vendors.  Cabraser Decl. ¶ 19.  After multiple rounds of detailed bids,

5 the Parties selected Epiq to serve as the Settlement Claims and Notice Administrator.  Lead

6 Counsel has worked with Epiq as the settlement claims and/or notice provider in six cases over

7 the last two years, but has also worked with numerous other providers over this time period.  *Id.* ¶

8 21.  Epiq estimates that the cost of implementing the Notice Plan and administering the

9 Settlement will be approximately $500,000, which is reasonable in the context of a settlement of

10 this scope and value.  As discussed above, Defendants will pay these costs over and above the

11 cash compensation to Class Members and Class Counsel's attorneys' fees and costs.  *See* SA

12 ¶ 5.3.

13

   **g.**  **Preliminary Approval Guidance (3)-(5): The proposed Notice Plan comports with Rule 23, Due Process, and this District's Procedural Guidance.**

14

15   As detailed below (§ V.D) and in the accompanying Azari Declaration, the notice program

16 comports with the best-practices outlined in the Procedural Guidance.  *See* Preliminary Approval

17 Guidance (3).  It also explains Class Members' rights to opt-out of or object to the Settlement,

18 and provides clear instructions for how and when to exercise those rights.  *See* Preliminary

19 Approval Guidance (4)-(5).

20

   **h.**  **Preliminary Approval Guidance (6): Proposed Settlement Class Counsel will seek reasonable attorneys' fees and costs, which Defendant's will pay in addition to the money available to directly compensate the Class.**

21

22

23   Class Counsel will move the Court for an award of reasonable attorneys' fees and costs,

24 in an amount to be negotiated or litigated and then approved by the Court.  Class Counsel's fees

25 and expenses will not reduce Class Members' recovery in any way.  *See* § V.C.3.c, *supra*.

26   Specifically, Class Counsel intend to seek reimbursement of up to $2,130,392.04 in out-

27 of-pocket costs reasonably expended to prosecute and resolve this case.  Cabraser Decl. ¶ 26.

28 Class Counsel also intend to seek up to $23,869,607.97 in attorneys' fees for work performed and

1  expenses incurred in furtherance of this litigation pursuant to Pretrial Orders 7 and 11.[8]  *Id.* ¶ 28.

2  This fee request will represent less than 20% of the total settlement value, which includes (1) the

3  non-reversionary cash component of the Settlement ($96,543,645) and the separately-paid (2)

4  class notice and settlement administration costs (approximately $500,000) and (3) attorneys' fees

5  and costs ($26,000,000).  *See, e.g.*, *Rainbow Bus. Sols. v. MBF Leasing LLC*, No. 10-CV-01993-

6  CW, 2017 WL 6017844, at *1 (N.D. Cal. Dec. 5, 2017) (The fund from which a fee percentage is

7  calculated includes "the total benefit made available to the settlement class, including costs, fees,

8  and injunctive relief.").  This percentage falls well below the 25% benchmark in this Circuit as

9  well as the mean and median awards in similarly-sized settlements.  *See, e.g.*, Brian Fitzpatrick,

10 *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud.

11 832, 839 Table 11 (2010) (finding a mean and median of 23.7% and 24.3% in settlements valued

12 between $72.5 to $100 million); 5 *Newberg* § 15:81, Graph 2 (similar conclusion).  Class

13 Counsel's lodestar—which remains subject to further review and auditing that could reduce the

14 amount—is approximately $8,157,663.70, which would yield a multiplier of 2.93.  Cabraser Decl.

15 ¶ 25.

16      Class Counsel will provide additional information and rationale for their request in the fee

17 application and in the class notice, so that Class Members will have the opportunity to comment

18 on or object to the requested fees prior to the final approval hearing.

19                      **i.      Preliminary Approval Guidance (7): Plaintiffs will not seek
                              incentive awards for the Settlement Class Representatives.**
20

21      The Settlement Class Representatives will be entitled to the same compensation,

22 calculated under the same formula, as all other Settlement Class Members, and will not seek

23 incentive awards.

24

25

---

26 [8] Pursuant to ¶ 12.1 of the Settlement Agreement, the Parties continue to attempt to negotiate the
   amount of attorneys' fees and expenses to be paid by Defendants.  SA ¶ 12.1.  If the Parties reach

27 agreement, Plaintiffs "will submit the negotiated amount to the Court for approval." *Id.*  If they do
   not reach agreement, the Parties "will litigate the fee issue(s), and each Party will present its

28 respective position to the Court for determination." *Id.*

**j.      Preliminary Approval Guidance (9): The Parties have proposed a reasonable schedule for the Settlement Approval Process that provides Class Members sufficient time to exercise their rights.**

The last step in the settlement approval process is the fairness hearing, at which the Court may hear any evidence and argument necessary to evaluate the Settlement and the application for attorneys' fees and costs. The Parties propose a detailed schedule for final approval and implementation in the attached Proposed Order and incorporate it by reference herein.

**k.      Preliminary Approval Guidance (10): The Settlement complies with the Class Action Fairness Act ("CAFA").**

Pursuant to the Settlement Agreement, Defendants will serve notices in accordance with the requirements of 28 U.S.C. § 1715(b) within ten days of the filing of this motion. The Settlement fully complies with all of CAFA's substantive requirements because it does not provide for a recovery of coupons (28 U.S.C. § 1712), does not result in a net loss to any Class Member (28 U.S.C. § 1713), and does not provide for payment of greater sums to some Class Members solely on the basis of geographic proximity to the Court (28 U.S.C. § 1714).

**l.      Preliminary Approval Guidance (11): Information about past distributions in comparable class settlements.**

Pursuant to the Guidance, Plaintiffs provide an "easy-to-read" chart detailing certain information about three comparable settlements in the attached Cabraser Declaration. Cabraser Decl., Attachment 1. The three settlements compared are the three "Clean Diesel" settlements that were previously negotiated by Class Counsel in this MDL, namely—the 2.0-liter settlement (Dkt. 1685), the 3.0-liter settlement (Dkt. 2891), and the Bosch settlement (Dkt. 2918). As the chart shows, those three settlements have delivered more than $10 billion in compensation to the classes, and each settlement has already reached or is on pace to reach participation rates of over 90%. Cabraser Decl., Attachment 1.

The Settlement now before the Court will utilize a similar notice and outreach program, provides substantial compensation, and utilizes a simplified administration that involves only a single step for Class Members. Class Counsel are therefore able to predict with some confidence that much of the money available to Class Members will be paid out in this case as well. And

1  notably, to the extent money remains after the Class is paid, it too will be directed towards efforts

2  that benefit the interests of the Class and the causes advanced in this litigation.

3  **D.     The Proposed Notice Plan provides the best practicable notice.**

4  Rule 23(e)(1) requires that before a proposed settlement may be approved, the Court

5  "must direct notice in a reasonable manner to all class members who would be bound by the

6  proposal." "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient

7  detail to alert those with adverse viewpoints to investigate and come forward and be heard.'"

8  *Churchill Vill., L.L.C., v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). For a Rule 23(b)(3)

9  Settlement class, the Court must "direct to class members the best notice that is practicable under

10  the circumstances, including individual notice to all members who can be identified through

11  reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The best practicable notice is that which is

12  "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency

13  of the action and afford them an opportunity to present their objections." *Mullane v. Cent.*

14  *Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

15  The proposed Notice Plan meets these standards. The Parties created this proposed

16  program—including both the content and the distribution plan—with Epiq, an experienced firm

17  specializing in notice in complex class litigation. The program includes a Short and Long Form

18  Notice, and a comprehensive Settlement Website, that are clear and complete, and that meet all

19  the requirements of Rule 23 and the Procedural Guidance.

20  The Long Form Notice is designed to explain Class Members' rights and obligations

21  under the Settlement in clear terms and in a well-organized and reader-friendly format, and

22  follows the Ninth Circuit's *en banc* guidance in *In re Hyundai*. 926 F.3d at 567 ("[S]ettlement

23  notices must 'present information about a proposed settlement neutrally, simply, and

24  understandably.'"); *see also* Azari Decl., Attachment 3. It includes an overview of the litigation;

25  an explanation of the Settlement benefits; contact information for Class Counsel; the address for a

26  comprehensive Settlement Website that will house links to the notice, motions for approval,

27  attorneys' fees, and other important documents; instructions on how to access the case docket;

28  and detailed instructions on how to participate in, object to, or opt out of the Settlement. *Id.*

1814871.10

There are also two forms of Short Form Notice: a Postcard Notice and an Email Notice. *Id.*, Attachments 2, 4. The Postcard Notice is in eye-catching "postcard" form conveying the basic structure of the Settlement and designed to capture Class Members' attention with concise, plain language. The Email notice is similarly structured and provides all basic information about the Settlement and Class Members' rights thereunder. Both forms of Short Form Notice direct readers to the Settlement Website (where the Long Form Notice is available) for more information.

The principal method of reaching Class Members will be through individual direct mail notice, consisting of postcard notices by U.S. first class mail to all readily identifiable Class Members. *Id.* ¶¶ 14-19. Direct mail notice will be coupled with individual notice by email (designed specifically to avoid spam filters), a robust paid-media campaign including digital banner advertisements and sponsored search listings, a toll-free telephone number, and a Settlement Website. *Id.* ¶¶ 20-29. Based on his considerable experience, Mr. Azari anticipates that the Notice Plan will "successfully deliver notice to more than 95% of the Settlement Class." *Id.* ¶ 11. This Notice Plan satisfies due process and Rule 23, and comports with all accepted standards and this District's Procedural Guidance.

## VI.   <u>CONCLUSION</u>

Plaintiffs respectfully request that the Court: (1) determine under Rule 23(e)(1) that it is likely to approve the Settlement and certify the Settlement Class; (2) direct notice to the Class through the proposed notice program; (3) appoint Lead Plaintiffs' Counsel as Interim Settlement Class Counsel to conduct the necessary steps in the Settlement approval process; and (4) schedule the final approval hearing under Rule 23(e)(2).

1814871.10

Dated: August 30, 2019

Respectfully submitted,

*/s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
E-mail: ecabraser@lchb.com

*Plaintiffs' Lead Counsel*

Benjamin L. Bailey
BAILEY GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Telephone: 304.345.6555
Facsimile: 304.342.1110
E-mail: bbailey@baileyglasser.com

Roland K. Tellis
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818.839.2320
Facsimile: 818.986.9698
E-mail: trellis@baronbudd.com

W. Daniel "Dee" Miles III
BEASLEY ALLEN LAW FIRM
218 Commerce Street
Montgomery, AL 36104
Telephone: 800.898.2034
Facsimile: 334.954.7555
E-mail: dee.miles@beasleyallen.com

Lesley E. Weaver
BLEICHMAR FONTI & AULD LLP
Bleichmar Fonti & Auld LLP
555 12th St., Suite 1600
Oakland, CA 94607
Telephone: 415.445.4004
Facsimile: 415.445.4020
E-mail: lweaver@bfalaw.com

David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: 914.749.8200
Facsimile: 914.749.8300
E-mail: dboies@bsfllp.com

J. Gerard Stranch IV
BRANSTETTER, STRANCH & JENNINGS,
PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: 615.254.8801
Facsimile: 615.250.3937
E-mail: gerards@bsjfirm.com

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO P.C.
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: 973.994.1700
Facsimile: 973.994.1744
E-mail: jcecchi@carellabyrne.com

David Seabold Casey, Jr.
CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD, LLP
110 Laurel Street
San Diego, CA 92101-1486
Telephone: 619.238.1811
Facsimile: 619.544.9232
E-mail: dcasey@cglaw.com

1814871.10

| | | |
|---|---|---|
| 1 | Frank Mario Pitre<br>COTCHETT PITRE & McCARTHY LLP | Rosemary M. Rivas, Esq.<br>LEVI & KORSINSKY LLP |
| 2 | 840 Malcolm Road, Suite 200<br>Burlingame, CA  94010 | 44 Montgomery Street, Suite 650<br>San Francisco, CA 94104 |
| 3 | Telephone: 650.697.6000<br>Facsimile:  650.697.0577 | Telephone: 415.291.2420<br>Facsimile: 415.484.1294 |
| 4 | E-mail: fpitre@cpmlegal.com | E-mail:  rrivas@zlk.com |
| 5 | Adam J. Levitt<br>DICELLO LEVITT & CASEY LLC | Steve W. Berman<br>HAGENS BERMAN |
| 6 | Ten North Dearborn Street, Eleventh Floor<br>Chicago, Illinois  60602 | 1918 8th Avenue, Suite 3300<br>Seattle, WA  98101 |
| 7 | Telephone:  312.214.7900<br>E-mail: alevitt@dlcfirm.com | Telephone: 206.623.7292<br>Facsimile:  206.623.0594 |
| 8 | | E-mail: steve@hbsslaw.com |
| 9 | Michael D. Hausfeld<br>HAUSFELD | Michael Everett Heygood<br>HEYGOOD, ORR & PEARSON |
| 10 | 1700 K Street, N.W., Suite 650<br>Washington, DC  20006 | 6363 North State Highway 161, Suite 450<br>Irving, TX  75038 |
| 11 | Telephone: 202.540.7200<br>Facsimile:  202.540.7201 | Telephone:  214.237.9001<br>Facsimile:  214.237-9002 |
| 12 | E-mail: mhausfeld@hausfeld.com | E-mail: michael@hop-law.com |
| 13 | Lynn Lincoln Sarko<br>KELLER ROHRBACK L.L.P. | Joseph F. Rice<br>MOTLEY RICE, LLC |
| 14 | 1201 3rd Avenue, Suite 3200<br>Seattle, WA  98101-3052 | 28 Bridgeside Boulevard<br>Mount Pleasant, SC  29464 |
| 15 | Telephone: 206.623.1900<br>Facsimile:  206.623.3384 | Telephone: 843.216.9000<br>Facsimile:  843.216.9450 |
| 16 | E-mail: lsarko@kellerrohrback.com | E-mail: jrice@motleyrice.com |
| 17 | Paul J. Geller<br>ROBBINS GELLER RUDMAN & | Roxanne Barton Conlin<br>ROXANNE CONLIN & ASSOCIATES, P.C. |
| 18 | DOWD LLP<br>120 East Palmetto Park Road, Suite 500 | 319 Seventh Street, Suite 600<br>Des Moines, IA  50309 |
| 19 | Boca Raton, FL  33432<br>Telephone:  561.750.3000 | Telephone: 515.283.1111<br>Facsimile:  515.282.0477 |
| 20 | Facsimile:  561.750.3364<br>E-mail: pgeller@rgrdlaw.com | E-mail: roxlaw@aol.com |
| 21 | | |
| 22 | *Plaintiffs' Steering Committee* | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

MOTION FOR PRELIMINARY APPROVAL OF CLASS
SETTLEMENT AND DIRECTION OF NOTICE
MDL No. 2672 CRB (JSC)

1
2

## CERTIFICATE OF SERVICE

3

I hereby certify that, on July 6, 2020, service of this document was accomplished

4

pursuant to the Court's electronic filing procedures by filing this document through the ECF

5

system.

6
7
8

_____
M. Elizabeth Graham

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28