# EXHIBIT A

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br>Case No. 3:16-md-02741-VC |
| This document relates to:<br><br>*Ramirez, et al. v. Monsanto Co.,* Case No. 3:19-cv-02224<br><br>*Sheller, et al. v. Monsanto Co.,* Case No. 3:19-cv-07972 | **DECLARATION OF PROFESSOR CHARLES SILVER ON ADEQUACY OF REPRESENTATION** |

I, Charles Silver, state as follows:

## I.      SUMMARY OF OPINIONS

In this Declaration, I show that:

- The proposed Class and Subclasses were inadequately represented because structural protections were imposed both informally and too late;

- The proposed Class and Subclasses were inadequately represented because putative Class and Subclass Counsel had a variety of interest conflicts;

- The proposed Subclasses were inadequately represented because putative Subclass Counsel's fees were not tied to Subclass members' recoveries; and

- The proposed Class and Subclasses were inadequately represented because both were "headless," meaning that putative Class and Subclass Counsel neither represented named plaintiffs who were class members during the negotiations nor were supervised by them.

## II.      CREDENTIALS

I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law. I joined the Texas faculty in 1987, after receiving an M.A. in

1

political science at the University of Chicago and a J.D. at the Yale Law School. I received tenure in 1991. Since then, I have been a Visiting Professor at University of Michigan School of Law (twice), the Vanderbilt University Law School, and the Harvard Law School.

I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for 30 years. I have published over 100 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Declaration. My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996), the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004), the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, and the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT.

My first publication after joining the Texas Law faculty, an analysis of the restitutionary basis for fee awards in class actions, appeared in 1991. Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656 (1991). My most recent publication in the field, an empirical study of fee awards in securities fraud class actions, appeared in the Columbia Law Review nearly twenty-five years later. Lynn A. Baker, Michael A. Perino, and Charles Silver*, Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUM. L. REV. 1371 (2015) (*Is the Price Right?*). The CORPORATE PRACTICE COMMENTATOR chose this article as one of the ten best in the field of corporate and securities law in 2016.

From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010). Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court.

I have testified as an expert on class action procedures and attorneys' fees many times. Courts have cited or relied upon my opinions when awarding fees in many class actions, including *In re Enron Corp. Securities, Derivative & "ERISA" Litig*., 586 F. Supp. 2d 732 (S.D. Tex. 2008), *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2019 WL 6888488 (E.D.N.Y. 2019); and *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185

(S.D. Fla. 2006), all of which settled for amounts exceeding $1 billion.

Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field. I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association. In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

I have attached a copy of my resume as Exhibit 1 to this declaration.

## III.   DOCUMENTS REVIEWED

When preparing this declaration, I reviewed the following materials, all of which were produced in this litigation, unless otherwise noted. I may also have reviewed case reports, treatises, academic articles, news reports, and other items not listed here.

- *Class Action Complaint Under Fed. R. Civ. P. 23(c)(4) and Fed. R. Civ. P. 23(b)(2)*, filed in *Ramirez v. Monsanto Co*., Case No. 3:19-cv-02224-VC, Dkt. 1 (N.D. CA April 24, 2019)

- *First Amended Class Action Complaint,* filed in *Ramirez v. Monsanto Co*., Case No. 3:16-md-02741-VC, Dkt. 11039 (N.D. CA June 24, 2020)

- *Pretrial Order No. 4: Plaintiffs' Leadership Structure*, Dkt. 62 (Dec. 7, 2016)

- *Pretrial Order No. 12: Common Benefit Fund Order*, Dkt. 161 (Feb. 22, 2017)

- *Pretrial Order No. 211: Denying Motion to Appoint Interim Class Counsel*, Dkt. 10587, Apr. 27, 2020

- *Class Action Settlement Agreement*

- *Plaintiffs' Administrative Motion to File Document Under Seal*

- *Plaintiff's Motion to Appoint Fegan Scott, LLC as Interim Class Counsel for the Medical Monitoring Class,* filed in *Sheller v. Bayer AG and Monsanto Co., Case No.* 1:19-cv-04063-TWP-DML, Dkt. 19 (S.D. IN Nov. 12, 2019)

- *Plaintiff's Renewed Motion to Appoint Fegan Scott, LLC as Interim Class Counsel for the Medical Monitoring Class and Riley Williams & Platt as Interim Liaison Counsel*

- *Motion For Preliminary Approval of Class Settlement, Appointment of Interim Class and Subclass Counsel, Direction of Notice Under Fed. R. Civ. P. 23(e), Scheduling of a Fairness Hearing, and Stay of the Filing and Prosecution of Roundup-Related Actions by Settlement Class Members, and Exhibits Thereto* (Dkt. 11042)

- *Declaration of Elizabeth J. Cabraser in Support of Motion for Preliminary Approval of Class Settlement, Appointment of Interim Class and Subclass Counsel, Direction of Notice under Fed. R. Civ P. 23(e), Scheduling of a Fairness Hearing, and Stay of the Filing and Prosecution of Roundup-Related Actions by Settlement Class Members*

- *Plaintiffs' Oppositions to Motions for Extension of Time*

- *Motion for Extension of Time to File Response to the Motion for Preliminary Approval of Class Settlement, Appointment of Interim Class and Subclass Counsel, Direction of Notice under Fed. R. Civ P. 23(e), Scheduling of a Fairness Hearing, and Stay of the Filing and Prosecution of Roundup-Related Actions by Settlement Class Members (filed by Napoli et al.)*

- *Declaration of Elizabeth J. Cabraser in Support of Plaintiffs' Opposition to Motions for Extension of Time*

## IV. ONLY STRUCTURAL PROTECTIONS CAN ENSURE THAT FUTURE CLAIMANTS ARE REPRESENTED ADEQUATELY

Question 1 asks about the protections that are needed to ensure that future claimants' interests are adequately protected when a proposed class action settlement seeks to resolve claims on behalf of both present claimants and future claimants. This section addresses this question.

### A. Subclasses[1] Are Mandatory

The law governing the protections that must be imposed to ensure that future claimants are

---

[1] Because subclasses must meet the requirements for class certification under Rule 23 of the Federal Rules of Civil Procedure and are otherwise treated the same as classes, authorities that discuss plaintiff classes are freely drawn upon in support of assertions regarding plaintiff subclasses.

adequately protected is unevenly developed, and many important matters have yet to be addressed. Even so, the fundamental principle is clear. Future claimants must be separated from current claimants and represented by named plaintiffs and subclass counsel[2] whose loyalties run exclusively to them.

The Supreme Court recognized the need to separate future claimants from current claimants in *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997), and again in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). Both were asbestos cases in which current claimants had active diseases and future claimants were at risk of developing diseases as a result of past exposures.

In *Amchem*, current claimants and future claimants were lumped into a single class and represented by a common group of named plaintiffs and counsel.[3] When a settlement was proposed, the Supreme Court ruled that this arrangement violated "Rule 23(a)(4)'s requirement that the named parties 'will fairly and adequately protect the interests of the class'" because:

> [N]amed parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses. In significant respects, the interests of those within the single class are not aligned. Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future.

*Amchem*, 521 U.S. at 625-626.

In the following passage, the Supreme Court described subclassing as a "structural" measure intended to ensure adequate representation of persons with distinctive interests:

> The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected. Although the named parties alleged a range of complaints, each served generally as representative for the whole, not for a separate constituency. In another asbestos class action, the Second Circuit spoke precisely to this point:
>
>> "Where differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups. The class

---

[2] In this opinion letter, the term "representative" or "class representative" includes both named plaintiffs and class or subclass counsel.

[3] Professor Samuel Issacharoff and I coauthored an amicus curiae brief submitted on behalf of a group of law professors in support of the objectors to the *Amchem* settlement. 1997 U.S. S. Ct. Briefs LEXIS 183.

> representatives may well have thought that the Settlement serves the aggregate interests of the entire class. *But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.*" *In re Joint Eastern and Southern Dist. Asbestos Litigation,* 982 F.2d 721, 742-43 (2d Cir. 1992)*,* modified on reh'g *sub nom. In re Joint E. & S. Dist. Asbestos Litig.,* 993 F.2d 7 (2d Cir. 1993).
>
> The Third Circuit found no assurance here—either in the terms of the settlement or in the structure of the negotiations—that the named plaintiffs operated under a proper understanding of their representational responsibilities. *See* 83 F.3d at 630-631. That assessment, we conclude, is on the mark.

*Amchem*, 521 U.S. at 627-28.

The italicized sentence in the quotation from *In re Joint Eastern and Southern Dist. Asbestos Litigation* makes the point mentioned above. Subclass representatives, including both named plaintiffs and subclass counsel, must "represent solely the members of their respective subgroups." In other words, they must be fiduciaries of the claimants for whom they act.

In *Ortiz*, the Supreme Court reinforced *Amchem*'s message. "[I]t is obvious after *Amchem*," the majority wrote, "that a class divided between holders of present and future claims . . . requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel." *Ortiz*, 527 U.S. at 856. Because in *Ortiz* no subclasses were created, the conflict between the two groups rendered their joint representation inadequate. The possibility that claimants of both types had an overarching and weightier common interest in securing contested insurance funds did not eliminate the need for structural protections. According to the Court, "'[t]he benefits asbestos-exposed persons might gain from the establishment of a grand-scale compensation scheme is a matter fit for legislative consideration,' but the determination whether 'proposed classes are sufficiently cohesive to warrant adjudication' must focus on 'questions that preexist any settlement." *Id.* at 858-59 (quoting *Amchem*, 512 U.S. at 622-623).

## B.   Subclass Representatives Are Fiduciaries

It is firmly established that class representatives are fiduciaries. This means that, like all fiduciaries, class representatives owe undivided loyalty to the persons on whose behalf they act.

In *Ortiz*, the Supreme Court stated plainly that the loyalties of subclass representatives, meaning both named plaintiffs and subclass counsel, must run "solely" to the members of the subgroups they represent. This is the classic hallmark of a fiduciary relationship and has been taken to mean that class representatives have that status. Section 23.25 of Moore's Federal Practice, which the Supreme Court relied upon in *Ortiz*, 527 U.S. at 859, states this expressly.

> The class representative acts as a fiduciary for the entire class. As a fiduciary, the class representative owes the putative class a duty of loyalty. Because any conflict of interest between the named representative and class members would undermine the fiduciary relationship and would impugn the duty of loyalty, courts use the adequacy-of-representation analysis to uncover conflicts of interest between the named plaintiffs and the class they presume to represent.

5 MOORE'S FEDERAL PRACTICE-CIVIL § 23.25 (2020). Because all sources agree that class representatives are fiduciaries, I will not belabor the point.

### C.    Subclass Counsel Should Be Appointed Earlier Rather Than Later

Class representatives become fiduciaries as soon as they purport to act for others. In *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995), the Third Circuit wrote that "class attorneys, purporting to represent a class, [] owe the entire class a fiduciary duty once the class complaint is filed."

Because the fiduciary duty arises early, the need to ensure that subclasses are represented by faithful agents arises early too. As stated in *Ortiz*, 527 U.S. at 859, "Rule 23 requires protections under subdivisions (a) and (b) against inequity and potential inequity at the precertification stage, quite independently of the required determination at post-certification fairness review under subdivision (e) that any settlement is fair in an overriding sense" (emphasis added).

The most straightforward and reliable way to ensure adequate representation during the precertification period is to appoint interim class representatives. Although interim appointments are not mandatory, they are often advisable. As Judge D. Brock Hornby explained:

> There is no [] requirement to appoint counsel before a class is certified, and the Advisory Committee Notes recognize that ordinarily pre-certification work "is handled by the lawyer who filed the action. In some cases, however, there may be rivalry or uncertainty that makes formal designation of interim counsel appropriate." Fed. R. Civ. P. 23(g), advisory committee notes to 1998

Amendments; see also Federal Judicial Center, Manual for Complex Litigation 246-47 (4th ed. 2004).

*In re Hannaford Bros. Co.*, 252 F.R.D. 66, 67 (D. Me. 2008).

In the pages of the Manual for Complex Litigation that Judge Hornby cited one finds the following recommendation.

Before ruling on class certification, a judge should address the following matters at an early stage in the case, typically in initial case-management conferences under Rule 16: . . . .

- *Whether to appoint interim class counsel during the period before class certification is decided.* If the lawyer who filed the suit is likely to be the only lawyer seeking appointment as class counsel, appointing interim class counsel may be unnecessary. If, however, there are a number of overlapping, duplicative, or competing suits pending in other courts, and some or all of those suits may be consolidated, a number of lawyers may compete for class counsel appointment. *In such cases, designation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement*. . . .

Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION 246 (4th ed. 2004) (emphasis added).

This proceeding is *not* one in which only a single lawyer seeks appointment as class counsel. Dozens of lawyers might serve as class or subclass counsel. Some have actively sought these positions. Many others would do so if the Court chose to let them apply. This is precisely the type of proceeding that the Manual's authors had in mind when they encouraged judges to address "the possibility of appointing interim class counsel" early on.

The importance of "clarif[ying] responsibility for protecting the interests of the [sub]class during precertification activities, such as . . . negotiating settlement" is obvious and cannot be exaggerated. All settlement negotiations fix the amounts that claimants will receive. When groups of plaintiffs with divergent interests compete for shares of the amount a defendant is willing to contribute to a global resolution, groups that are not represented by loyal advocates bent on maximizing their recoveries must expect to be shortchanged.

### D.    Subclass Counsel's Fee Must Be Tied to The Subclass' Recovery

The duty of loyalty requires fiduciaries, including lawyers, to exercise their judgment and discretion in what they subjectively believe to be the best interests of the persons who rely on them

8

for protection. To ensure that fiduciaries do this, the law prohibits them from incurring interest conflicts, meaning that they may not operate under pressures that might cause them to subordinate beneficiaries' interests to other concerns. When the prohibition is violated, the law treats a fiduciary's judgments and actions as tainted, even when a beneficiary can prove neither intent to harm nor harm itself.

Taint is presumed because interest conflicts color fiduciaries' judgments insidiously and in ways that are impossible to prove. As Professor Lionel Smith, a leading commentator and theorist, explains:

> A conflict [of interests] . . . creates a situation in which an external influence has the potential to affect, in an inappropriate way, the fiduciary's judgment. . .. A trustee is selling land held in trust, and proposes to sell it to a company in which the fiduciary has a financial interest. . .. The presence of his own financial interest on the other side of the contract does more than just create a risk of corruption. *It actually makes it impossible to know whether his judgment was untainted.* This is why such a contract is voidable: it is impossible to know whether the fiduciary power was used in the only way it could properly be used, that is, solely for the benefit of the beneficiaries.

Lionel Smith, *Prescriptive Fiduciary Duties*, 37 UNIVERSITY OF QUEENSLAND LAW REVIEW 261 (2018) (emphasis added). The same is true in class actions. When class counsel have conflicts, it is "impossible to know whether the fiduciary power was used . . . solely for the benefit of" the classes they represent.

Ideally, both conflicts and the risks of disservice they entail would be eliminated by harmonizing the interests of lawyers and claimants perfectly. Unfortunately, this cannot be achieved. Their interests can, however, be brought into close alignment by linking lawyers' fees to claimants' recoveries. This is what the contingent percentage fee does, and it is one reason why claimants commonly use this arrangement.

To create a strong alignment of interests, of course, a lawyer's fee must be tied to the result obtained *for the represented claimant* and not to anything else. In the class action context, this means that subclass counsel's fee must be a function of the subclass members' recoveries. If linked to anything else, such as other class members' recoveries, the contingent fee may cause the interests of subclass members and subclass counsel to conflict. Subclass counsel's judgment will

then be tainted and, as Professor Smith stated, it will be impossible to know whether it was employed "solely for the benefit" of the subclass members, as the fiduciary duty requires.

For the contingent fee to have the desired effect, the dependency of subclass counsel's fee on the result obtained for the subclass must be established *before* subclass counsel begins to act. Otherwise, the desired alignment of interests will not exist at the time discretionary decisions are made. For example, if the connection between fees and results is established after a settlement is negotiated, a conflict of interests would taint the result, subclass counsel having had no financial reason to prefer a better outcome for the subclass to a poorer one while negotiations were underway.

The Principles of the Law of Aggregate Litigation,[4] published by the American Law Institute in 2010, explains both the function of the contingent fee and the importance of establishing fee terms early. It does so first in the Comment on § 1.05.

> Because fees have significant potential to harmonize the interests of lawyers and represented persons, judges can help ensure adequate representation by choosing fee formulas wisely. In this endeavor, judges should take guidance from the private market; they should attempt to employ the same fee and cost arrangements represented persons would use if they could hire lawyers directly. This requires the use of contingent-percentage compensation in claimant representations. It also argues strongly for setting fees as early as possible in litigation.

ALI, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 1.05, Comment *h* (2010). The Principles then returns to the subject in § 3.13, which encourages judges to "consider defining the expected fee recovery as a percentage [] early in the litigation rather than after the fact." Id., § 3.13(d). The Comment explains that "[t]his Section recognizes the value of creating reasonable expectations by providing that courts should attempt to define the parameters of attorneys' fees early in the litigation." Id., Comment *c*.

In academic writings published over many years, I have repeatedly urged judges to create good incentives by setting fee terms early when presiding over class actions. See, e.g., Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-*

---

[4] Professor Samuel Issacharoff was the Lead Reporter on the Principles of the Law of Aggregate Litigation. I was an Associate Reporter.

*Setting in Securities Class Actions,* 115 COLUM. L. REV. 1371 (2015) (recommending ex ante fee setting in securities class actions); Charles Silver, *Dissent from Recommendation to Set Fees* Ex Post, 25 REV. LITIG. 497 (2006) (recommending ex ante fee setting in class actions in general). In this statement, I take the same position and explain how early fee setting aligns the interests of class fiduciaries with those of the absent plaintiffs who rely on them for protection.

### E.     Summary

To ensure that future claimants are represented adequately in a class proceeding that also encompasses current claimants, a court should:

- Put future claimants and current claimants in separate subclasses;

- Treat subclass representatives as fiduciaries who owe future claimants undivided loyalty;

- Appoint subclass counsel as early as practicable during the precertification period; and

- Before subclass counsel acts, link subclass counsel's fees to future claimants' recoveries and to nothing else;

By saying that a court should take these steps, I do not mean to imply that a judge should do so *sua sponte*. The responsibility for ensuring that parties receive zealous representation rests first and foremost with attorneys, who structure lawsuits and move them forward. This principle is reflected in Rule 23 of the Federal Rules of Civil Procedure, which requires lawyers who want to represent plaintiff classes to demonstrate their adequacy. To make this showing, would-be class counsel must establish a strong harmony of interests between class representatives and absent claimants. Otherwise, if a serious conflict exists, representation must be found inadequate under Rule 23(a)(4) and class certification must be denied.

### V.     PRIOR TO AND DURING THE NEGOTIATIONS THAT LED TO THE PROPOSED SETTLEMENT, RECOMMENDED STRUCTURAL PROTECTIONS FOR FUTURE CLAIMANTS WERE NOT EMPLOYED.

Question 2 asks whether future claimants received adequate representation during the negotiations that generated the proposed settlement. This section addresses this question.

A.     **During the Precertification Period, Neither Future Claimants Nor Current Claimants Were Formally Placed Into Subclasses Or Assigned Separate Representation.**

As explained in Part IV, *Amchem* and *Ortiz* both condition the existence of adequate representation on the structural separation of current and future claimants. At minimum, this requires the placement of current and future claimants into separate subclasses, each led by representatives whose loyalties run exclusively the relevant claimants. Ideally, these steps should be taken at the outset of litigation, but they are absolutely required to happen during the precertification period.

In this litigation, the members of the Plaintiffs' Executive Committee (PEC) did not ask the Court to create separate subclasses for current and future claimants until the settlement was proposed in late June of 2020. By that point, the leadership structure for this MDL had been in place for about three and a half years. *See* Pretrial Order No. 4: Plaintiffs' Leadership Structure, Dkt. 62 (Dec. 7, 2016).

The delay also extended more than a year beyond the filing of "[t]he original Class Action Complaint . . . by Robert Ramirez on April 24, 2019." *Declaration of Elizabeth J. Cabraser in Support of Motion for Preliminary Approval of Class Settlement, Appointment of Interim Class and Subclass Counsel, Direction of Notice under Fed. R. Civ P. 23(e), Scheduling of a Fairness Hearing, and Stay of the Filing and Prosecution of Roundup-Related Actions by Settlement Class Members*, Dkt. 11042-1 ("*Cabraser Dec.*"). The *Ramirez* Class Action Complaint did not seek the creation of subclasses. It asked the Court to certify a single nationwide declaratory and injunctive relief class containing "[a]ll individuals and entities that have been exposed to Roundup products in the states and the territories of the United States." *Class Action Complaint Under Fed. R. Civ. P. 23(c)(4) and Fed. R. Civ. P. 23(b)(2), Ramirez v. Monsanto Co.*, Case No. 3:19-cv-02224-VC, Dkt. 1 (N.D. Cal. April 24, 2019). Ramirez also sought to represent a multistate class that included:

> All individuals and entities that have been exposed to Roundup products in the territories of the United States are residents of the following states: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New

York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, and the District of Columbia.

*Id*. In its prayer for relief, the *Ramirez* Class Action Complaint did ask the Court to "[e]nter an order certifying the proposed Class (and subclasses, if applicable)." Id. In view of the failure to mention subclasses in the meat of the pleading and the absence of any explanation as to why they might be needed, this throw-away line is meaningless. Moreover, because Mr. Ramirez, the only plaintiff named in the complaint, was already diagnosed with NHL, he could not have represented future claimants anyway.

The first formal attempt by the PEC to separate current and future claimants into subclasses appears in the Plaintiffs' Amended Class Action Complaint. This pleading was filed on June 24, 2020 as part of the package of papers in which the proposed settlement was offered to the Court for approval. As explained in Part IV, the failure to implement structural protections in the precertification period is less than ideal. "Rule 23 requires protections under subdivisions (a) and (b) against inequity and potential inequity at the precertification stage," as the Supreme Court stated in *Ortiz*.

As the Court knows, lawyers at Fegan Scott LLC did make a formal effort during the precertification period to create a subclass of future claimants. Their motion was filed on behalf of Aaron Sheller, a future claimant who stood to benefit from a medical monitoring program funded by Monsanto. As the Court observed, "Fegan Scott request[ed] a seat at the table for court-ordered mediation to defend the interests of the absent members of the putative medical-monitoring class." *Pretrial Order No. 211: Denying Motion to Appoint Interim Class Counsel*, Dkt. 10587, Apr. 27, 2020.

Despite the need to separate future claimants from current claimants structurally, the Court denied the motion, finding that it "provided no evidence that these plaintiffs [the current and future claimants] are competing over diminishing assets insufficient to discharge the potential liability" and that it also failed to "advance any other interest that justifies departure from the standard order of operations for class actions." *Id*. In the Court's view, the "standard order" is for the court to

13

consider the appointment of class counsel "once a class has been certified absent a special justification." *Id*.

Searching the docket, I found no filing by the PEC that responded to Fegan Scott's motion. I therefore infer that the PEC neither supported it nor opposed it. This is disappointing. As explained, the burden of establishing adequate representation falls on the lawyers who hope to have classes certified and to serve as class counsel. Fegan Scott's motion gave the PEC an opportunity to meet this burden by supporting a formal, structural separation of claimants with conflicting interests.[5]

Had the PEC risen to the occasion, its members might have explained to the Court that structural protections are needed in the precertification period. As the Supreme Court wrote in *Ortiz*, 527 U.S. at 831-32, and as previously explained in Section IV.C, the settlement proposed there had to be rejected because "the District Court took no steps *at the outset* to ensure that the potentially conflicting interests of easily identifiable categories of claimants [were] protected by provisional certification of subclasses under Rule 23(c)(4)" (emphasis added).

The members of the PEC might also have explained that the need for structural protections exists whether class members are actively fighting over diminishing assets or not. The Supreme Court stated this expressly in *Amchem*, writing that

> The disparity between the currently injured and exposure-only categories of plaintiffs, and the diversity within each category are not made insignificant by the District Court's finding that petitioners' assets suffice to pay claims under the settlement. []. Although this is not a "limited fund" case certified under Rule 23(b)(1)(B), the terms of the settlement reflect essential allocation decisions designed to confine compensation and to limit defendants' liability. For example, . . . the settlement includes no adjustment for inflation; only a few claimants per year can opt out at the back end; and loss-of-consortium claims are extinguished with no compensation. The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected.

*Amchem*, 521 U.S. at 626–27. The same is true here. Even if Monsanto has sufficient funds to cover all claims, its willingness to part with money in hope of settling this litigation is limited.

---

[5] It bears mentioning that the PEC could have supported the creation of subclasses but opposed the appointment of Fegan Scott as counsel for the future claimants.

Consequently, in the negotiations that produced the proposed settlement, "essential allocation decisions" had to be made. *Amchem*'s point is that class members with divergent interests must be represented in settlement negotiations by advocates loyal solely to them, lest they be shortchanged when allocation decisions are made. Had the PEC urged the Court to create provisional subclasses and outfit them with interim counsel, adequate representation would have been assured.

The PEC's silence seems even more remarkable when one considers that, within three months of the Court's decision to deny Fegan Scott's motion, the PEC assigned the responsibility for representing subclasses to William Audet and TerriAnne Benedetto. The Court entered its order denying Fegan Scott's motion on April 27, 2019. Elizabeth Cabraser reports that settlement discussions began in earnest, with proposed subclass counsel participating, "in late July 2019." *Cabraser Dec.*, p. 1. See also *Motion for Preliminary Approval of Class Settlement, Appointment of Interim Class and Subclass Counsel, Direction of Notice under Fed. R. Civ P. 23(e), Scheduling of a Fairness Hearing, and Stay of the Filing and Prosecution of Roundup-Related Actions by Settlement Class Members*, pp. 16-17, Dkt. 11042 ("*Motion for Preliminary Approval*").

The lawyers on the PEC surely knew that a need for subclasses existed when Fegan Scott's motion was before the Court. The requirement to separate current and future claimants has been clear to everyone in the class action business since the 1990s, when the Supreme Court decided *Amchem* and *Ortiz*. Everyone has also known that structural separation is supposed to be accomplished during the precertification period, preferably "*at the outset* to ensure that the potentially conflicting interests of easily identifiable categories of claimants are protected by provisional certification of subclasses under Rule 23(c)(4)." *Ortiz*, 527 U.S. at 831-32. I therefore find the PEC lawyers' failure to recommend the creation for provisional subclasses and the appointment of interim counsel when Mr. Sheller's motion was before the Court hard to explain.

### B.    Informal Designation of Class and Subclass Counsel Was Insufficient

The decision by the lawyers on the PEC to designate Mr. Audet and Ms. Benedetto as provisional subclass counsel without any formalities is also lamentable. Had the PEC gone through the Court, as the Fegan Scott attorneys did, the Court would have addressed the adequacy of the

proposed class and subclass representatives. The Court would also have provisionally defined the class and the subclasses, and thereby established the identities of the claimants to whom the undivided loyalties of the class and subclass representatives were owed. Finally, and as discussed further below, the Court could have inquired into the arrangements the PEC made for paying class and subclass counsels' fees, to ensure that counsel's financial interests and class members' interests in maximizing their recoveries were aligned. Because the PEC acted informally, these advantages were lost.

<ol style="list-style-type: decimal">
<li>The Failure to Define the Class and The Subclasses Upfront Was A Fatal Mistake Because All Were "Headless" Throughout the Negotiations</li>
</ol>

This case shows in many ways that the desirability of going through the formalities is more than a matter of academic speculation. First and foremost, early provisional certification would have ensured that capable named plaintiffs stood at the head of the Class and the Subclasses throughout the negotiations. In fact, none did. Both the Class and the Subclasses were "headless" the entire time. Because neither a class nor a subclass can exist or be adequately represented without a competent named plaintiff, the failure to observe the formalities was a fatal mistake.

To see that the Class and both Subclasses were "headless" throughout the negotiations, one need only examine the class definition. Per § 1.1 of the Settlement Agreement:

> (a) "Settlement Class" means (i) those individuals who are either citizens or Residents of the United States as of June 24, 2020 or who claim exposure to Roundup Products through the application of Roundup Products in the United States and *who as of June 24, 2020* both (1) have been exposed to Roundup Products through the application of Roundup Products and (2) *have not commenced a lawsuit or otherwise retained counsel* with respect to any individual actual or potential personal injury or false advertising claims arising from, resulting from, in any way relating to or in connection with such exposure;

By definition, all persons with Roundup-related claims who retained counsel prior to June 24, 2020 are excluded from the class. All such persons are excluded from the subclasses too, because to be a subclass member one must first be a member of the class.

Putative Class Counsel made this point themselves when arguing against an extension of the deadline for filing objections to preliminary approval of the proposed settlement. They contended that certain movants lacked standing to object because their clients were not class

members. "A Roundup plaintiff who already had 'existing counsel' on June 24," they wrote, "is by definition not a Class member and has no interest in the Court's preliminary or final approval determinations." *Plaintiffs' Oppositions to Motions for Extension of Time*, Dkt. 11153, p. 2. This is true for putative Class and Subclass Counsel too. No claimant who hired them prior to June 24, 2020 is a class member.

Because the negotiations that produced the settlement occurred prior to June 24, 2020, it follows by simple logic that no member of the class or the subclasses can have been a representative plaintiff or monitored Class Counsel or Subclass Counsel while the negotiations were ongoing. This being so, it is necessarily true that, throughout the negotiations, the Class and the Subclasses were inadequately represented. To put the matter another way, the lawyers offered to the Court as putative Class Counsel and Subclass Counsel negotiated a proposed settlement for people they did not represent and could not have come to represent until after the negotiations concluded. Even when lawyers have the best of intentions, as I am sure that the lawyers who negotiated the settlement do, courts should not let them negotiate resolutions in which none of their signed clients has a personal stake.

2. <u>Potential Conflicts Created by Inventory Settlements Were Not Policed</u>

In *Ortiz*, 527 U.S. at 855, the Supreme Court noted that the plaintiffs' attorneys settled their signed clients' cases outside the class action and was bothered by the fact that the plaintiffs in "the settled inventory claims . . . appeared to have obtained better terms than the class members." The lawyers' signed clients received preferential treatment because their retainer contracts obligated them to pay larger fee percentages than the court presiding over the class settlement was likely to award. On every dollar moved from the class settlement to the inventory settlement, the lawyers' fees increased.

Two of the lawyers who negotiated the proposed class action settlement, William Audet and TerriAnne Benedetto, are associated with law firms that represent signed clients with Roundup-related claims. For example, the Dugan Law Firm, at which Ms. Benedetto practices, represents the plaintiff in *Ian M. Bodin v. Monsanto Company*, No: 2:19-cv-11362 (E.D.L.A. June

25, 2019). Mr. Bodin is a current claimant. He was "diagnosed . . . with [N]on-Hodgkin's Lymphoma, Non-Hodgkin lymphocytic Leukemia, and Non-Hodgkin Follicular Cancer, low grade B cell[,] . . . and Hairy Cell Leukemia, a form of Non-Hodgkins Lymphoma." Complaint, *Bodin v. Monsanto Co*., No: 2:19-cv-11362 (E.D.L.A. June 25, 2019), Doc. 1, ¶ 99. Consequently, the possibility exists that the lawyers' signed clients, many or all of whom are participating in inventory settlements funded by Monsanto, are also paying fees greater than those that will be sought or awarded if the proposed settlement is approved. The difference between the two could lead to preferential treatment for signed clients, as it did in *Ortiz*.

I have no information about the fees that the lawyers will receive from their signed clients. Nor do I know how large a fee will be requested in the class suit. However, I do know two things. First, because the fee fund for the settlement contains $150 million and the merits portion of the settlement is valued at $1.1 billion, the fee award cannot exceed 12 percent of the gross recovery ($150 million/($150 million + $1.1 billion) = .12). Second, lawyers who represent signed clients in mass actions normally charge at least 33 percent contingent fees and often more. The potential for an *Ortiz*-style conflict is obvious.

If the PEC had observed the procedural niceties when appointing lawyers to represent the class and subclasses in the negotiations, the Court might have asked about fees and appointed only lawyers who lacked clients with filed cases to lead it; the Court might have required complete transparency regarding inventory settlements to ensure that class members were treated fairly; or the might have decided that future claimants could not be represented adequately and prohibited class based negotiations from proceeding. The Court did none of these things because the lawyers in charge of this MDL opted for a "trust us to do things correctly" approach. Although there are judges who set the rulebook aside when appointing lawyers to negotiate class-based settlements in MDLs, *Amchem* and *Ortiz* are strong warnings against this practice. They urge judges to set the rules for class actions formally, for example, by imposing structural protections when needed, and to do so at or near the start of litigation. Only by requiring compliance with the rules can judges be confident that absent claimants will be represented faithfully and zealously.

By way of example, I offer putative class counsel's repeated representation that "at all times during the critical stages of the negotiations, the Subclasses were represented by their own proposed Subclass counsel, William Audet for Subclass 1 and TerriAnne Benedetto for Subclass 2." *Motion for Preliminary Approval*, p. 16. *See also Cabraser Decl.* ¶ 6. Neither a disinterested observer like myself nor an interested subclass member can know that this is true. Nor can such persons know (1) who decided what the "critical stages of the negotiations" were or (2) whether the lawyers who determined that "critical stages" had been reached were loyal solely to the subclass members whose fates were at stake. The point of having formally appointed subclass counsel is to incentivize lawyers to stick their noses into all discussions with the potential to affect subclass members' interests, even when other lawyers would rather not have them around.

Again, I wish to emphasize that my criticisms as not meant to be personal attacks only any of the lawyers involved in the negotiations. I have known Elizabeth Cabraser and Sam Issacharoff for decades, and I have great regard and affection for both. I do not know William Audet or TerriAnne Benedetto, but having reviewed their accomplishments I am sure they are both outstanding attorneys. My point is only the one I have stated. Having witnessed coupon deals, sweetheart inventory deals, reversionary settlements, and other disloyal behaviors, judges have abjured the "trust us to do things correctly" approach and have required lawyers wanting to serve as class counsel to "tick all the boxes." Had the procedural formalities been observed in this litigation, interim class and subclass counsel would have been appointed formally, the class and subclass definitions would have been made clear in advance, structural protections would have been in place during the precertification period, possible conflicts would have been policed, interest-aligning fee arrangements could have been established, and the answers to the questions I have asked would be obvious.

## C.    Subclass Counsel's Fees Have Not Been Linked to Subclass Members' Recoveries

Throughout my academic career I have argued in favor of percentage-based fee awards in class actions. I have done so for many reasons, one being that a strong harmony of interests exists

when class counsel can enhance their compensation by recovering more for absent plaintiffs. Academics, judges, and attorneys agree about this. The percentage method occasionally meets with resistance (usually unwarranted, I believe) because judges worry about awarding windfall fees in enormous cases, not because the desirability of the incentives it creates are disputed.

Looking at the papers submitted in support of the proposed settlement, I could not tell how either class counsel or subclass counsel will be paid if it is approved. The Motion for Preliminary Approval states, at p. 31, that "Class Counsel will seek no more than $150 million for fees and reimbursement of out-of-pocket costs." It does not say whether the fee application will request compensation on a percentage basis, a lodestar basis, or both, and it does not mention Subclass Counsel's compensation at all. One supposes that some understanding regarding compensation existed among the lawyers on the PEC and the new lawyers brought in to represent the class, but its terms are not stated. Consequently, one can neither understand the incentives under which putative Class Counsel and Subclass Counsel operated during the negotiations nor evaluate the extent to which the lawyers' interests aligned with those of the absent class members they represent.

In a complicated MDL like this one, conflicts cannot be managed without knowing how, in the event of a recovery, lawyers will be paid. If, as seems to be the case, Mr. Audet and Ms. Benedetto will be paid out of the entire Class' recovery—an inference I base on the fact they are serving as putative Class and Subclass Counsel concurrently and that no separate discussion of Subclass Counsel's fees appears in any of the materials I read—then the lawyers had no financial reasons to care about how their respective subclasses fared. Their only interest was in the class-wide recovery. This is undesirable, given that the entire reason for appointing subclass counsel is to ensure that subclass members' interests are represented zealously. One can be confident of this when subclass members' champions are lawyers who gain when they do. Otherwise, one cannot.

The lack of information about compensation arrangements is another consequence of the PEC's decision to use the "trust us to do things correctly" approach instead of asking the Court to appoint class and subclass counsel formally. Had a motion been filed (or the motion filed by the

Fegan Scott lawyers been endorsed), interested parties might have asked how the lawyers nominated for these positions would be paid, if only in hope of avoiding the sorts of fee-related altercations that erupted the NFL Concussion Litigation, where discussions of fees were also delayed. Following their presentations, the court could have provided for the payment of fees upfront in a manner calculated to ensure that absent claimants would be represented adequately.

It bears repeating that lawyers appointed to represent subclasses should not concurrently serve as class counsel because, by holding both positions, they incur conflicting loyalties. A lawyer devoted only to a subclass would be inclined to blow up a deal that treated the subclass poorly, regardless of the consequences for other class members. A lawyer serving as both subclass counsel and class counsel would have to worry about the impact a decision to blow up a deal would have on all class members, including those not in the subclass. These are incompatible responsibilities and, when subclass counsel's fees are tied to the entire class' recovery, the conflict between them can be severe.

### D.    Summary

In my opinion, the history of this litigation indicates that:

- The PEC waited longer than it should have to put current and future claimants into separate subclasses and to appoint separate counsel for each;
- The PEC should have handled both the creations of subclasses and the appointment of subclass counsel formally by filing a motion with the Court; and
- It is impossible to be confident that putative Subclass Counsel were incentivized to maximize subclass members' recoveries because their fees were not formally linked to the recoveries in advance and because information about compensation flows is incomplete.

The observations just made are not personal attacks on the lawyers involved in the negotiations and should not be read as such. Elizabeth Cabraser and Sam Issacharoff have been my friends for decades. They stand atop the class action bar. I have worked with them many times, admire them greatly, and have often sung their praises. I do not know William Audet or TerriAnne

Benedetto, but their accomplishments are impressive, and I have no reason to doubt their abilities.

Although the lawyers offered to the Court as putative Class and Subclass Counsel are elite practitioners, the arrangement they created calls to mind an infamous statement by William Lerach that once stood as a stinging indictment of class action practices: "I have the greatest practice of law in the world. I have no clients." Shakedown Street, Forbes, Feb. 11, 2008, https://www.forbes.com/2008/02/11/lerach-milberg-weiss-biz-cz_nw_0211lerach.html#4872e8838cea.

## VI.   THE FAILURE TO EMPLOY RECOMMENDED STRUCTURAL PROTECTIONS PRIOR TO AND DURING THE NEGOTIATIONS MAKES THE REASONABLENESS OF THE TREATMENT OF FUTURE CLAIMANTS DIFFICULT OR IMPOSSIBLE TO EVALUATE

Question 3 asks how one can determine whether the proposed settlement allocates a reasonable portion of the available benefits to future claimants. This section addresses this question.

### A.   Benefits Must Be Allocated Equitably

Rule 23(e) permits a court to approve a proposed class action settlement only if "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). This requirement exists because the allocation of benefits is a matter concerning which the interests of class members inherently conflict. All prefer larger shares of a recovery to smaller ones, but within the total amount that a defendant is willing to pay to resolve a class action, more for one claimant always means less for someone else. This is why the Supreme Court was right when it observed in *Amchem* that "essential allocation decisions" are made even when, in theory, a defendant is wealthy enough to compensate everyone in full. *Amchem*, 521 U.S. at 626–27.

The general principle of allocational equity is easy to state. Like cases must be treated similarly, and unlike cases must be treated differently. Applying the principle in a defensible manner is, by contrast, devilishly hard. The difficulty arises, first, because no two class members are identical in all respects or different in all respects. Consequently, any pair of them can be deemed like or unlike only in light of substantive sorting criteria. Those criteria must be chosen

by the person doing the sorting, and the decision to employ a criterion or to omit it is subjective and contestable. For example, among agricultural workers with Non-Hodgkin's Lymphoma, some will be older than others, some will have worked more years than others, some will have worked at farms whose owners used more Roundup than others, some will have weaker immune systems than others, and some will have had more bacterial or viral infections than others. Because all these factors correlate with the risk of suffering Non-Hodgkin's Lymphoma, all could be used to sort claimants. The decision to employ some but not others must be defended. Because claimants' fortunes will vary with the factors selected, no defense is likely to satisfy everyone.

There is a second problem as well. Once class members are sorted, the importance or magnitude of the difference(s) between subgroups must be gauged when allocating compensation. For example, if claimants are sorted by age, additional years of life must be "cashed out" in terms of dollars paid or other benefits. Again, however, the valuation will be subjective, contestable, and unsatisfactory to many.

Reflecting the inherent difficulty of evaluating allocation plans, a district court judge has discretion to approve an "unequal distribution of settlement funds so long as the distribution formula takes account of legitimate considerations and the settlement remains 'fair, reasonable, and adequate.'" *Radcliffe v. Hernandez*, 794 F. App'x 605, 607–08 (9th Cir. 2019) (quoting Fed. R. Civ. P. 23(e)). As the Ninth Circuit found, "[n]othing in Rule 23 . . . prohibits parties from tying distribution of settlement funds to actual harm." *Id.* Similarly, a judge can approve equal payments to class members who differ in some respects as long as the decision to ignore the differences is reasonable. *Grant v. Ocwen Loan Servicing, LLC*, No. 315CV01376J34PDB, 2019 WL 367648, at *7 (M.D. Fla. Jan. 30, 2019) (approving equal division of settlement fund in view of statutory objective of deterring future misconduct rather than compensating losses).

### B.    The Only Reliable Source of Guidance Is A Fiduciary's Honest Assessment

Because the standards that govern the reasonableness of allocation plans are flexible and the decision to employ or omit sorting criteria is inherently subjective and contestable, the requirement that an allocation plan treat class members equitably is an exceedingly weak

constraint. If an allocation plan can be given no plausible defense whatsoever, a judge must reject it. Otherwise, a judge has discretion to accept it and an appellate court is unlikely to overrule.

The growing insistence on procedural formalities reflects and attempts to correct for the weakness of the substantive constraint on allocation plans. *Amchem* and *Ortiz* require the structural separation of current and future claimants in the hope that the clash of the groups' champions will produce an allocation of benefits that reflects the relative merits of their claims.

The policy decision to rely mainly on adversarial bargaining makes sense in class actions for the same reason it makes sense in conventional litigation. With the prospect of a trial looming in the background, the best evidence one can have that a compromise is reasonable is the opinion of an experienced, informed, and unconflicted attorney who is incentivized to maximize the value of a plaintiff's claim. In other words, the best evidence is the subjective judgment of a loyal fiduciary who considers all relevant considerations from the perspective of and with the sole object of helping the client.

### C.   The Failure to Address Subclass Counsel's Compensation At The Outset Renders Their Judgments Unreliable

In the class action context, the clash of loyal champions creates a dynamic in which, to settle an entire matter, a defendant must offer an amount that each subclass' counsel deems sufficient post-allocation for the group he or she represents. For this dynamic to exist, however, subclass counsel's loyalty must run to the subclass alone. For this to be true, however, subclass counsel's fees must be a function of a subclass's recovery exclusively. In other words, subclass counsel's financial interest cannot be a function of both a subclass' recovery and the aggregate recovery for the class as a whole.

One might respond to the point just made by asking how it could possibly be wrong to give counsel for a subclass a financial interest in maximizing the recovery for a class as a whole. Can't maximizing the aggregate recovery only be good for everyone? The reason comes straight out of fiduciary law, which forbids fiduciaries from considering the interests of third parties when exercising judgment. Again, Professor Lionel Smith explains. "From the point of view of a

beneficiary," he writes, "the fiduciary's judgment can be tainted just as much by his unselfish consideration of some other party's interest, as by his selfish consideration of his own self-interest. The rule is about securing the disinterested exercise of judgment [for the benefit of the beneficiary], and self-interest is only one way in which this ideal can be compromised." Lionel D. Smith, Deterrence, Prophylaxis and Punishment in Fiduciary Obligations, 7 J. of Equity 87 (2013).

In the class action context, the aggregate recovery will be maximized if counsel for each subclass seeks to maximize that subclass' recovery. There is no need for a separate incentive to maximize the recovery for the class as a whole, just as there is no need for such an incentive when plaintiffs with related claims against the same defendant sue individually and are represented by different lawyers. If each lawyer maximizes the relevant plaintiff's recovery, the aggregate recovery will be maximized too. Worse, the existence of an incentive to maximize the aggregate recovery can only dilute counsel's commitment to the members of a subclass by providing a source of compensation that is independent of the results they obtain.

Because the PEC ignored the formalities when appointing counsel for the class and subclasses, there was no public discussion of the compensation arrangements for the attorneys involved before the negotiations commenced. Even now that a settlement has been proposed for approval, the information that is available is both incomplete and unsettling. The materials I have read lead me to infer that fees for lawyers involved in the class action, including counsel for the subclasses, will come out of the $150 million fund and we be justified by comparing them to the entire $1.1 billion recovery. If that is correct, then the lawyers' subjective assessments of the reasonableness of the settlement allocation are tainted and untrustworthy. Mr. Audet and Ms. Benedetto are compromised because their financial ties ran to the class as a whole rather than only to the subclasses they represented. The other lawyers have financial interests in only the aggregate recovery. Consequently, their opinions regarding the allocation of benefits across the subclasses carry no weight.

Important parts of the proposed settlement reflect the lawyers' indifference to particular subclass members' fates. For example, although the Settlement Agreement nominally devotes 18

percent of the Settlement Amount to the Diagnostic Assistance Program, it empowers the Settlement Administrator to use some of that money to fund payments to people with current diagnoses, so long as the funds allocated to the Diagnostic Accessibility Grant Program Fund do not drop below $100 million. In other words, it authorizes the Settlement Administrator to move money from members of Subclass 2 to members of Subclass 1.Settlement Agreement, §§ 7.4(b), 7.4(b)(i), 7.5. It is easy to see why a lawyer whose devotion runs to the class as a whole would support this arrangement. Giving the Settlement Administrator this option also provides a means of blunting objections from current claimants who believe that Subclass 1 is being shortchanged. At the same time, the Settlement Administrator's actions would not affect class counsel's fee because moving dollars from one use to another leaves the total value of the settlement remains unchanged. But neither a lawyer devoted solely to Subclass 1 nor one devoted solely to Subclass 2 would endorse an arrangement that gave an independent administrator control over a substantial fraction of class members' recoveries and, relatedly, over the amount against which his or her fees would be compared. Nor would the possibility of meeting objections by members of Subclass 1 matter in the least to a lawyer devoted solely to the members of Subclass 2.

The decision to devote 18 percent of the fund to the Diagnostic Assistance Program also requires a defense. If the number was the product of hard-nosed bargaining by a savvy mass tort lawyer whose loyalties ran solely to the members of Subclass 2, its primary justification would be that, in the lawyer's subjective opinion based on experience and knowledge of relevant considerations, it compensates future claimants adequately for the temporary (and perhaps permanent) loss of the right to sue. However, because Class and Subclass Counsel are conflicted, their agreement on 18 percent means only that they chose that number for the sake of consummating a deal that Monsanto would agree to and that the Court would approve.

The Interim Assistance Grants program, which will receive and dole out the bulk of the cash portion of the proposed settlement, is also troubling because it blurs the line between Subclass 2 and Subclass 1. Instead of creating a separate pool of money to be used solely for the benefit of future claimants, the Settlement Agreement deals with future claimants who are diagnosed with

Non-Hodgkin's Lymphoma before 2025 by allowing them to receive Interim Assistance Grants. In practical effect, it moves these plaintiffs into Subclass 1 as they are diagnosed and allows them to share in the relief made available to that subclass. As a consequence of this arrangement, counsel for Subclass 2 can serve the interests of future claimants who are later diagnosed with Non-Hodgkin's Lymphoma only by increasing the size of the fund that is devoted primarily to the members of Subclass 1. Why a lawyer devoted solely to Subclass 2 would opt for this arrangement, which gives the members of Subclass 2 an interest in the size of Subclass 1's recovery, is unclear.

The natural course for a lawyer devoted solely to Subclass 2 would have been to create a fund to be used solely for the benefit of its members. The fund might pay for the Diagnostic Assistance Program. Or, it might provide an insurance policy for the benefit of future claimants who develop Non-Hodgkin's Lymphoma, as the Supreme Court suggested in Amchem. It might conceivably do both. Regardless, a separate fund would make the magnitude of Subclass 2's recovery clear. By contrast, the arrangement proposed in the Settlement Agreement forces future claimants and the Court to guess how large it is.

Other aspects of the proposed settlement also raise important questions. Would a fund devoted solely to future claimants have a 2025 cutoff for benefit eligibility? Or would it provide an insurance policy available in perpetuity? Would such a fund be used to help only class members with low incomes, as the Interim Grants Program does, or would it make compensation available without regard to income, as insurance policies normally do? The latter seems more likely, especially if one believes, as some judges do, that all class members whose rights are encumbered by a settlement must receive consideration for what they give up. Would future claimants tie the availability of relief to the proposed Science Panel's findings, or would they prefer an insurance policy that paid them upon being diagnosed, without regard to the strength of the evidence of causation?

I cannot answer these questions, and I do not mean to imply that the choices reflected in the proposed settlement are necessarily wrong. My point is: first, that some choices seem odd; second, that all require justifications; and third, that the best evidence that might support the

choices—the honest opinions of experienced, informed, and zealous fiduciaries devoted solely to interests of Subclasses 1 and 2—are not available because the lawyers who made them had conflicts.

**D.     Summary**

In my opinion:

- The point of creating subclasses was to outfit discrete groups of claimants whose interests conflicted with loyal champions who cared only about maximizing their recoveries.

- Because the PEC appointed class and subclass counsel informally, the compensation arrangements chosen for the lawyers involved in the class action negotiations were neither given a public airing nor, apparently, designed in a manner that assured the subclass members that the lawyers' financial interests ran solely to them.

- Consequently, neither class counsel nor subclass counsel could satisfy the fiduciary duty to exercise unconflicted judgment solely for the benefit of the relevant subclass members when negotiating the settlement.

- For the same reason, the lawyers' subjective assessments of the reasonableness of the allocation of benefits are untrustworthy.

- In view of this, neither the Court nor anyone else can be confident that appropriate criteria were chosen or were given appropriate weight when the allocation plan was designed.

**VII.    CONCLUSION**

For the reasons set out above, I believe that the subclass members were inadequately represented during the settlement negotiations, and that they will remain so until lawyers devoted solely to the protection and advancement of their interests are formally appointed and properly incentivized.

I declare under penalty of perjury of the laws of the United States that the foregoing is true

and correct. Executed this 19th day of August, 2020, at Empire, Michigan.

_____

CHARLES SILVER

29