Pages 1 - 43

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE:  ROUNDUP PRODUCTS            )
LIABILITY LITIGATION.               )   NO. 16-md-02741 VC
                                    )
_____)

                          San Francisco, California
                          Thursday, August 27, 2020

          TRANSCRIPT OF ZOOM VIDEOCONFERENCE PROCEEDINGS

APPEARANCES VIA ZOOM:

For Plaintiffs:
                    ANDRUS WAGSTAFF PC
                    7171 W. Alaska Drive
                    Lakewood, Colorado 80226
               BY:  AIMEE H. WAGSTAFF, ATTORNEY AT LAW

                    ANDRUS ANDERSON LLP
                    155 Montgomery Street, Suite 900
                    San Francisco, California 94104
               BY:  LORI E. ANDRUS, ATTORNEY AT LAW

                    WEITZ & LUXENBERG P.C.
                    700 Broadway
                    New York, New York 10003
               BY:  PERRY WEITZ, ATTORNEY AT LAW
                    ROBIN L. GREENWALD, ATTORNEY AT LAW

                    THE MILLER FIRM LLC
                    108 Railroad Avenue
                    Orange, Virginia 22960
               BY:  MICHAEL J. MILLER, ATTORNEY AT LAW


          (APPEARANCES CONTINUED ON FOLLOWING PAGE)


Reported Remotely By: Ana M. Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                      CSR NO. 7445, Official U.S. Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For Plaintiffs:

                        AUDET & PARTNERS, LLP
3                       711 Van Ness Avenue, Suite 500
                        San Francisco, California 94102
4              BY:  **MARK E. BURTON, ATTORNEY AT LAW**

5                       BAUM HEDLUND ARISTEI & GOLDMAN, PC
                        10940 Wilshire Boulevard, 17th Floor
6                       Los Angeles, California 90024
               BY:  **R. BRENT WISNER, ATTORNEY AT LAW**
7                   **MICHAEL L. BAUM, ATTORNEY AT LAW**

8                       MOORE LAW GROUP, PLLC
                        1473 South Fourth Street
9                       Louisville, KY 40208
               BY:  **JENNIFER A. MOORE, ATTORNEY AT LAW**

10

11   For Defendants:

12                      ARNOLD PORTER KAYE SCHOLER LLP
                        601 Massachusetts Avenue, N.W.
13                      Washington, D.C. 20001-3743
               BY:  **WILLIAM HOFFMAN, ATTORNEY AT LAW**
14
                        WILKINSON WALSH
15                      2001 M Street N.W., Tenth Floor
                        Washington, D.C. 20036
16             BY:  **BRIAN L. STEKLOFF, ATTORNEY AT LAW**

17

18   Also Present:

                        **KENNETH FEINBERG, SPECIAL MASTER**
19

20

21

22

23

24

25

| | |
|---|---|
| **Thursday - August 27, 2020** | **11:07 a.m.** |

**P R O C E E D I N G S**

**---o0o---**

1
2
3
4          **THE CLERK:**  Calling Case Number 16-md-2741,
5    In Re Roundup Product --
6          **THE COURT:**  Kristen, I -- oh, sorry.
7          **THE CLERK:**  -- In Re Roundup Products Liability
8    Litigation.
9          Counsel for the plaintiff, please state your appearances
10   for the record.
11         **MS. WAGSTAFF:**  Good afternoon, Your Honor.  This is
12   Aimee Wagstaff.  And I'm going to introduce the plaintiffs'
13   counsel.  We have Mike --
14         **THE COURT:**  Good idea.
15         **MS. WAGSTAFF:**  -- Mike Miller, Mark Burton, Lori
16   Andrus, Michael Baum, Robin Greenwald, Brent Wisner, and
17   Jennifer Moore.
18         **THE COURT:**  Hi, everybody.  All right.
19         **THE CLERK:**  And for defendants?
20         **MR. HOFFMAN:**  Good morning, Your Honor.  William
21   Hoffman for Monsanto.
22         **MR. FEINBERG:**  And, Your Honor --
23         **MR. STEKLOFF:**  And good morning, Your Honor.
24         **MR. FEINBERG:**  And, Your Honor --
25         **MR. STEKLOFF:**  Brian Stekloff.

```
 1            MR. FEINBERG:  Your Honor, court-appointed settlement
 2   master, Kenneth Feinberg.
 3            THE COURT:  Hello, Ken.
 4            MR. FEINBERG:  Hello.
 5            MR. WEITZ:  And, excuse me.  Perry Weitz for the
 6   plaintiffs.
 7            MS. WAGSTAFF:  Oh, I'm sorry, Perry.  I didn't see you
 8   down there.  I'm sorry.
 9            THE COURT:  All right.  And we have Mr. Stekloff.
10   Those are the two lawyers for Monsanto.
11       Mr. Hoffman, are you kind of in charge on the -- in terms
12   of effectuating the settlement?
13            MR. HOFFMAN:  Yes, Your Honor.  I'm one of the lead
14   participants in that and will be addressing the issues today.
15            THE COURT:  Okay.  So we wanted to start with --
16   Mr. Feinberg wanted to give an update of his own, and so we'll
17   start with that.  I just have one quick comment before that.
18       I've received several confidential letters from
19   plaintiffs' counsel.  The upshot of those letters is that
20   counsel is expressing concern that Monsanto is maybe welshing
21   on its deal with them.  And the plaintiffs wanted to submit
22   those letters confidentially.
23       Frankly, it's not clear to me why those letters should be
24   confidential or whether anything in particular in those letters
25   is confidential.  They're not protected by Rule 408.  And this
```

1  case and these settlements are a matter of significant public

2  interest.  And to the extent that plaintiffs' counsel is

3  concerned that Monsanto is going back on the deal that it had

4  with them and the deal that it announced in June, that, it

5  seems to me, is not something that should be kept confidential.

6      Now, I don't -- I'm not sure it's necessary to get into

7  all the nitty-gritty of all the individual communications back

8  and forth between Monsanto and plaintiffs' lawyers.  I'm not

9  sure that matters.  But the concept contained in the letters

10 that were sent to me, I think -- I assume that we're going to

11 have a discussion about that in this hearing, and I'm sort of

12 tentatively inclined to say that those letters need to be on

13 the docket because they're matters of significant public

14 concern.

15     So I just wanted to throw that out there.  And if

16 anybody -- after Mr. Feinberg makes his presentation, if

17 anybody wants to address that, they can.

18     Mr. Feinberg?

19         **MR. FEINBERG:**  Thank you, Your Honor.

20     The settlement that was announced publicly on June 24th is

21 now being implemented, in part.  You will hear shortly from

22 members of the PSC group:  Perry Weitz of Weitz & Luxenberg,

23 Robin Greenwald of Weitz & Luxenberg, and Mike Miller, members

24 of the PSC who have -- are now implementing the settlement of

25 some 20,000 cases.

1          Also being implemented, but not as part of the PSC, are an

2     additional 12,000 cases from lawyers involving about 50 or more

3     law firms, all coordinated by James Dugan in New Orleans, not a

4     member of the PSC, mostly, but not inclusively, state cases.

5          So there are about 30,000-plus cases, close to 32,000

6     cases that have been officially documented and settled and, as

7     Mr. Weitz, Ms. Greenwald, and Mr. Miller will explain, are now

8     being implemented.

9          There is then, Your Honor has referenced the letters that

10    have been submitted in confidence.

11         There are then a series of settlements that are the

12    subject of ongoing discussion, some more completed than others,

13    where there has not yet been a final settlement, a formal final

14    settlement.  Those cases are the subject of my great interest

15    as settlement master during the remaining 60 days of the

16    extended period granted by the Court.

17         And as Monsanto, Mr. Hoffman -- who's really the

18    settlement guru/outside lawyer for Monsanto.  As Mr. Hoffman

19    will state, he has, with the urging of the settlement master,

20    urged the settlement master to focus, during the remaining time

21    of the extension, on resolving any of those sort of what I call

22    Bucket 2 cases, where there's been extensive negotiation but,

23    unlike Bucket 1 with Mr. Weitz and Mr. Miller, no final

24    agreement in writing.

25              **THE COURT:**  Okay.  Let me -- sorry to interrupt, Ken.

1          Let me just make one additional comment about the letters

2     that I've received from the lawyers.  One of the things that

3     they have requested in those letters is that I lift the stay.

4          So I think it was about a month ago that I granted a stay

5     in these proceedings for 90 days for the purpose of wrapping up

6     and tying a bow on all of these settlements that were announced

7     back in June.  And the plaintiffs, the lawyers who wrote me

8     those letters, one of the things they've requested is that the

9     stay be lifted.

10         And that's one of the reasons why I think that those

11    letters should be on the docket, because whether the stay is

12    lifted or not, that's a matter of public concern.  That's a

13    question about how these court proceedings are going to go.

14    And any such request, I think, needs to be on the docket.  None

15    of this stuff relating to the litigation of the MDL can be done

16    behind closed doors.

17         So I just wanted to make that additional comment about the

18    letters and why I think they should probably be put on the

19    docket.

20         And I apologize for interrupting.  Go ahead.

21            MR. FEINBERG:  Not at all.

22         And then, as you know, Your Honor, there's a third bucket

23    of cases we have not -- where the plaintiffs are all part of

24    your MDL docket who are either pro se or with law firms with

25    one or two or five or a small number, relative number of cases,

1    where, again, during the 60-day extension period, Monsanto,

2    coordinating with the settlement master, plans to reach out to

3    all of those remaining cases that are one-offs, et cetera, on

4    your docket with a view towards getting them resolved full,

5    hopefully in the next 60 days.

6         So those are really -- that's really my report.  I want

7    you to hear, of course, from the lawyers in those first two

8    buckets at least.

9         And for what it's worth, Your Honor, I just want you to

10   know that I believe that with Monsanto's urging the special

11   settlement master to resolve in this time that you have allowed

12   the extension, I would urge the Court to consider my efforts

13   during that 60-day period to bring these matters to a

14   successful settlement conclusion.  And that is what I plan to

15   do, regardless of what, you know, ultimately is the decision of

16   the Court.

17        But my focus now will be to take the 32,000 cases which

18   have been settled and are now being allocated to each of those

19   claimants with a view of getting a release and dismissing the

20   case from your docket with prejudice.

21        I plan to take those negotiations in Bucket 2, the subject

22   of the letters, excellent lawyers who I know and who are acting

23   in utmost good faith, trying to get their settlements resolved.

24        And I would also focus my time in the next 60 days, with

25   the help of the company and William Hoffman, in categorizing

1    those cases that are on the docket.  Robin Greenwald will speak

2    shortly, Your Honor.  She is the expert on what is in the

3    docket and the status of those cases from the perspective of

4    the PSC.

5          And I would ask Your Honor's indulgence now in allowing

6    Mr. Weitz, Mr. Miller, and Ms. Greenwald, all in Bucket

7    Number 1 with settled inventories, to provide Your Honor with

8    an update on the status of implementation of the settlement.

9          **THE COURT:**  Let me just ask a couple of quick

10   follow-up questions of you, Ken.

11         You mentioned Bucket 2 and Bucket 3.  And, of course, the

12   greatest lack of clarity is with Bucket 2.  How many cases are

13   we talking about in Bucket 2?

14         **MR. FEINBERG:**  I don't know.  I have not been privy to

15   those immediate -- the last negotiations.  I think that's a

16   question, Your Honor, that should be asked of the Bucket 2

17   lawyers, Mr. Wisner and Aimee Wagstaff, and the company,

18   William Hoffman.

19         **THE COURT:**  Okay.  And what about Bucket 3?  What are

20   we talking about in terms of numbers?

21         **MR. FEINBERG:**  Robin Greenwald will shortly give

22   Your Honor an update on the quantity, at least, if not the

23   quality, of those individual claims.

24         **THE COURT:**  Okay.  And so it's -- so -- and

25   Bucket 1 -- so one of the things I want to hear -- and I think

1    it'll be from the lawyers that I hear this, and I'm

2    particularly interested in hearing from Monsanto or Bayer or

3    whatever we should be calling it now.

4        What are the numbers -- How many cases are in Bucket 1?

5    How many cases are in Bucket 2?  How many cases are in

6    Bucket 3? -- both overall, nationwide, and out of the universe

7    of cases in this MDL, which is, of course, my primary concern?

8        Mr. Hoffman, can you give me a numeric breakdown like

9    that?

10           **MR. HOFFMAN:**  I can, Your Honor.  They're estimates

11   because some of the status of these discussions are in flux.

12   And I have the MDL numbers here.  I'd have to go and check the

13   nationwide numbers because we don't necessarily break them down

14   as easily as we do the MDL, which is a defined universe.  So I

15   apologize for that.

16       I believe there are approximately 667 individual claims

17   that are within special master's Bucket 1, approximately 2,200

18   cases that would be -- individual cases that would be within

19   Bucket 2, and approximately 780 cases that would be within

20   Bucket 3.

21           **THE COURT:**  Okay.  So while I have you, Mr. Hoffman --

22   I know that the thinking was maybe we would hear from some of

23   the plaintiffs' lawyers, but while I have you.

24       So I'm looking at Bayer's press release from June 24th,

25   and I'm reading from it now.  It says (reading):

1                "The main feature is the U.S. Roundup resolution

2          that will bring closure to approximately 75 percent

3          of the current Roundup litigation . . . .  The

4          resolved claims include all plaintiff law firms

5          leading the Roundup federal multi-district

6          litigation . . . and those representing approximately

7          95 percent of the cases currently set for

8          trial . . . ."

9          It says that the resolutions were approved.  So I took all

10    of that to mean the MDL is settled; we've reached a resolution

11    in the federal multidistrict litigation.

12         And now I'm hearing that there are three buckets.  One

13    bucket is a group of cases that it sounds like actually have

14    been settled, the first bucket, 667 cases.

15         And, by the way, for that bucket, has money changed hands,

16    actually?

17         **MR. HOFFMAN:**  There has been a small payment, an

18    initial deposit; but, no, Your Honor, not in substantial part.

19         And as we indicated --

20         **THE COURT:**  Okay.  Hold on.  Let me just --

21         **MR. HOFFMAN:**  Of course, Your Honor.

22         **THE COURT:**  I'll give you a chance to respond.

23         So that bucket is a small bucket in the MDL; right?  I

24    mean, we have upwards of almost 4,000 cases in the MDL, and

25    you're saying that 667 of those are in Bucket 1.

```
 1          And then 2,200 of them are in Bucket 2, where we have this
 2     real concern being expressed by the plaintiffs' lawyers that
 3     Monsanto is going back on its deal; or another way to put it is
 4     maybe there was no deal in the first place.  I'm not sure.
 5          And then we have this Bucket 3, which is another
 6     780 cases.
 7          So I guess I'm having a little bit of trouble squaring
 8     what I read in Bayer's press release in June with the numbers
 9     that you're giving me right now.  Can you explain that?
10          MR. HOFFMAN:  I can, Your Honor.
11          So at the time of the announcement in June, the company
12     anticipated that it would be able to finalize the agreements
13     that were described.  The company also indicated that it was
14     viewing the settlement in an overall or holistic fashion, both
15     the current pending cases, cases that have not yet been filed
16     but are held by lawyers or represented by lawyers, and an
17     arrangement to deal with potential future claimants through a
18     class action.
19          THE COURT:  Wait.  But, I'm sorry.  I don't
20     understand.  I'm looking at your press release, and I'm trying
21     to figure out, where does it say that -- the way I read the
22     press release -- and I will admit that I hadn't read it
23     carefully; so I may be -- I just sort of glanced at this before
24     we got on today.  Maybe I'm misreading it.  But it says
25     (reading):
```

1          "The company will make a payment" -- will make a

2      payment -- "of 8.8 billion to 9.6 billion to resolve

3      the current Roundup litigation . . . and 1.25 billion

4      to support a separate class" -- separate class --

5      "agreement to address potential future litigation."

6          And then you go on to say that the class agreement will be

7   subject to approval by the Court.

8          So I don't read -- at least those two sentences, I don't

9   read those sentences as suggesting that court approval of the

10  class agreement is a contingency for the settlement of the

11  existing cases.  So I --

12          **MR. HOFFMAN:**  Your Honor --

13          **THE COURT:**  -- understanding what you're --

14          **MR. HOFFMAN:**  I apologize.

15          **THE COURT:**  -- saying about holistic.

16          **MR. HOFFMAN:**  Well, I think the press release, read as

17  a whole, indicates the company was attempting to have a

18  comprehensive solution and thought it was on a road to having a

19  comprehensive solution.

20          The change in cir- --

21          **THE COURT:**  I mean, if you -- everybody sort of

22  thought that there should be a stay in this case; and you asked

23  for relief on all of these litigation deadlines.

24          I mean, if you had said to me, "Hey, we've got this

25  settlement in place, but it's contingent on you approving some

future settlement.  Can you please put a halt to all the

litigation?" I think I would have said "no" to that.  And I

certainly didn't interpret anything that you said as suggesting

that these settlements of the current litigation was contingent

on my approval of some future's class action.

     **MR. HOFFMAN:**  I understand that, Your Honor.  And

I think what we have here is something that occurs in a lot of

negotiations, especially high-stakes negotiations, a speed

bump, a slight hiccup, a change in circumstance that has led

one party to put things on hold temporarily and see if they can

put a package that they desire back together.  And that's what

we're working on now.

    I appreciate the question about the litigation stay.

     **THE COURT:**  But I put the litigation on hold because I

thought the settlements were done based on what you said.

    So what gives you -- so I'm confused when you say "put it

on hold."  I mean, I thought we put the litigation on hold so

that you could dot your I's and cross your T's with respect to

the settlement that you had already reached in these cases.

     **MR. HOFFMAN:**  So, frankly, Your Honor, it has become

more complicated.  The company has indicated that it is firmly

committed to trying to get these cases resolved, and I think

the special master can report that we're trying to do that

aggressively.

     **THE COURT:**  You're trying to get these cases resolved.

1    Okay.  So the cases are not resolved, is what you're saying?

2        **MR. HOFFMAN:**  I would say at this point that there are

3    no final agreements.  We had what we believed to be agreements

4    in principle.  We have not been able -- or chosen not to

5    finalize those.  We hope to be in a position to do that soon.

6        On the question of the litigation stay, it's a very fair

7    question from Your Honor.  And certainly, the position that my

8    friends on the other side had suggested is understandable.  It

9    should be on the table.  I recognize that.  And what I would --

10       **THE COURT:**  Sorry.  What should be on the table?

11       **MR. HOFFMAN:**  Whether the stay should be lifted and

12   litigation should pick back up.

13       **THE COURT:**  Okay.

14       **MR. HOFFMAN:**  I fully understand your question and my

15   friends on the other side raising this.

16       What I would suggest on this score is that -- the special

17   master has indicated, both today and privately, that he intends

18   to aggressively address this situation over the next 30 days.

19   I would propose that in that 30 days, we also work to develop a

20   litigation plan moving forward in case that doesn't come to

21   fruition.  And I'll work directly with my colleagues on the

22   other side to have that ready to go, if need be.

23       I'm not sure how much we would accomplish in the next

24   30 days anyway, given the situation that our country finds

25   itself in, but I think that it's a legitimate question to ask.

And we'll move forward sort of on two tracks so that the motion of my colleagues on the other side is not prejudiced and your objective, Your Honor, of moving this forward if we're not able to put Humpty Dumpty back together again fails.

If I could also just for a moment, Your Honor, address the confidentiality issue that you raised at the outset. I do think that in -- I understand what you said about Federal Rule of Evidence 408, and I'm not going to quarrel with you about that. I do think, though, that there are parts of that -- and, also, no quarrel that the issues that we're talking about today and that are in those letters are matters of public interest. But as you suggested, there are parts of those letters that deal with the back-and-forth discussion. And I do think your Pretrial Order 200 and, also, the local ADR rules would suggest that there's strong interest in not having that ventilated.

So before you make your decision, may I propose that I have a discussion with the colleagues who wrote those letters and see if there's a way that some part of it could be put on the public record to capture, at a high level, both their position and their interest in restarting litigation but keep private and confidential, as I think it should be, the back-and-forth? And I think my colleagues would agree with that, but I don't want to speak for them. At least our brief discussions before the letters were submitted to Your Honor suggested that they saw some wisdom in that position.

1          **THE COURT:**  I think that sounds -- at least facially,

2     that sounds reasonable to me.

3          **MR. HOFFMAN:**  By the way, Your Honor, I think that the

4     overall proposal the special master made is one that we support

5     and, I think, will further the objectives that everyone has.

6          I understand my colleagues on the other side being

7     frustrated, being angry, and wanting to protect the rights of

8     their clients.  I have been in their shoes in other

9     negotiations that have gone off the rails temporarily, and I

10    would do many of the things that they're doing.

11         But on behalf of the company, I will recommit to our

12    desire to try and get a solution.  We are moving aggressively

13    on several fronts.  And I still remain quite confident that we

14    can do that.

15         So I think what the special master proposed is a good path

16    forward, with the addition that we also put a train on the

17    litigation tracks, if need be -- if need be -- so that that can

18    be picked up quickly.

19         **THE COURT:**  Okay.  Anybody else want to say anything?

20         Mr. Feinberg, I think that I saw you -- in response to

21    Mr. Hoffman's suggestion that we come back in 30 days with a

22    proposal for how to get the litigation going again, I

23    thought -- I think I maybe saw you shaking your head "no."  Did

24    I see that right?

25         **MR. FEINBERG:**  This is the risk of Zoom modern

1    technology.  Every inflection, every nod, eyebrow raised,

2    Your Honor picks it up.

3        My hesitation was only not the 30 days.  And I have no

4    problem with whatever Your Honor and Mr. Hoffman want to do.

5    My only skepticism was that I have more confidence that in the

6    60 days remaining, we will be able, on that first track, to get

7    these cases resolved.  But that's what a special master should

8    be, optimistic.

9        And I have no -- of course, no problem with a 30-day

10   report, or I can report back to the Court and the parties

11   within 30 days.  I am committed to trying to get Buckets 2

12   and 3 resolved.

13        **THE COURT:**  Thank you.

14       Okay.  Who else wants to talk?

15        **MR. FEINBERG:**  I'd like -- Your Honor, if it's okay, I

16   wanted Mr. Weitz and Ms. Greenwald and Mr. Miller to make brief

17   presentations about Bucket 1 --

18        **THE COURT:**  Sure.

19        **MR. FEINBERG:**  -- so Your Honor would have a full

20   picture of this.

21       Why don't we go Perry, Mike, and Robin.

22        **MR. WEITZ:**  Good afternoon, Your Honor.

23       Let me report some good news.  As Your Honor knows,

24   starting approximately a year ago, the MDL leadership began

25   negotiations with Monsanto with the assistance of

1   Special Master Feinberg, who was very helpful in helping us

2   discuss the nature of the settlement, how we try to get

3   everything done and create a structure that can resolve all of

4   the cases.

5         And as Monsanto pursued these negotiations, it seemed that

6   they wanted to have the structure move more towards individual

7   firm settlements based upon their inventories of cases.  And so

8   the Weitz and Miller firm began negotiations, separate and

9   apart from other firms, while Monsanto continued to negotiate

10  individually with other MDL leadership and many other firms

11  around the country.

12        The Weitz and Miller firm successfully ended up signing an

13  MSA, a final settlement agreement with Monsanto in the late

14  spring; and we have -- both firms have been implementing that

15  settlement since that time.  That settlement involves

16  approximately 18,000 cases, both in the MDL and in other

17  jurisdictions throughout the country.  The other large,

18  significant portion of those cases is in Missouri.

19        I know the Court was interested and inquired about when

20  the Court could expect dismissals.

21        **THE COURT:**  Yes.

22        **MR. WEITZ:**  So let me -- yes.  So let me detail for

23  the Court what is happening and why there is some delay with

24  the dismissals.

25        Both the Miller firm and the Weitz firm have sent out

1   extensively detailed settlement letters to our clients

2   detailing the settlement and the allocation process so that

3   each of our clients can make a substantive decision on whether

4   to participate in the settlement or to opt out of the

5   settlement.

6        Once our clients accept the settlement and sign a release

7   and we have a certain aggregate number of claims by each firm

8   that reach a certain participation rate that has been agreed

9   upon, we can then notify the Court as to which cases will be

10  dismissed at that time in the MDL and in Missouri state court.

11       So that process is now under way.  We expect that process

12  to be concluded sometime in the fall and for the Court to get

13  those dismissals within the 2020 year.  So this will not extend

14  into 2021.  The Court will have the dismissals on a rolling

15  basis during the fall of 2020.

16       As far as -- as far as the remaining cases in the MDL,

17  Robin Greenwald is going to update the Court on, you know, the

18  number of cases remaining in the MDL, the number of cases that

19  have been settled, the number of cases each firm has.

20       The leadership -- we want the Court to know, the MDL

21  plaintiff leadership that has worked through this structure

22  with Monsanto over the last year is ready, willing, and able to

23  work with the special master and work with Monsanto in trying

24  to resolve all of those cases in the MDL with Monsanto's

25  authority.  We believe that that's something that could get

```
1   done within this 90-day extension, and we're willing to

2   activate that process as soon as Monsanto gives us the word.

3             THE COURT:  Okay.

4        MR. FEINBERG:  I'm sorry.  Judge, shall we hear from

5   Mike Miller and Robin Greenwald next?

6             THE COURT:  Sure.

7        MR. FEINBERG:  Mike Miller.

8        MR. MILLER:  Thank you, Your Honor.  I'll be brief,

9   but I will echo what Mr. Weitz said.  It's consistent with

10  exactly what happened.

11       But I want to first thank Mr. Feinberg.  He's been

12  absolutely invaluable in getting us this far, as has

13  Mr. Hoffman.

14       As leadership, we do get contacted by people in Bucket 2

15  and Bucket 3.  We're urging them all to work with Mr. Feinberg.

16  I echo what Mr. Feinberg has to say, in that I think 60 days

17  might make his life a little bit less hectic than 30 days; but,

18  of course, it's always up to Your Honor.

19       And, finally, just, we'll get the releases in.  I think we

20  can do this before the end of the year.  We've had excellent

21  participation where our clients have been advised about this.

22  They're responding favorably and quickly, and we think it will

23  get done.

24       Thank you for your time.

25            THE COURT:  Thank you.
```

1            **MR. FEINBERG:**  And Robin Greenwald to provide

2    the Court with the statistics, at least that you have

3    available, Robin.

4            **MS. GREENWALD:**  Sure.

5        Good afternoon, Your Honor and everybody.

6        I actually looked at the docket for Your Honor in a

7    different way, to try to understand and help you to understand

8    where the numbers are as far as the number of law firms and how

9    many law firms have very small number of cases, because we do

10   get -- as Mr. Miller said, we do get a lot of calls from people

11   who have one or two or three cases in the MDL, saying:  Can you

12   help me resolve this case?

13       And I have to say, Mr. Hoffman has been great.  I e-mail

14   him; we have communications.  And as of now, he's asked me to

15   wait.  And I do.  I sit back.  But we are available to help

16   because we do get a lot of calls.

17       So just, I thought this might be helpful for maybe

18   everybody.  Again, these numbers are rough.  Like Mr. Hoffman

19   said, it's not easy to always have it exactly right.

20       There are about 440 law firms who have cases filed in the

21   MDL.  And of those 440, 380 of them, about, have five cases or

22   less filed in the MDL.  So there's just a lot of lawyers out

23   there that one has to get to.  Now, maybe they're part of a

24   larger group at this point and we don't know about that.

25       And of those 380 law firms, about 275 have only one single

 1   case filed.  And so the majority of the people -- of the law

 2   firms in the MDL have a very small number of cases.  And so

 3   I guess that's one of the challenges that we all face, we, as

 4   co-leads; getting calls from people wanting help, saying, "I

 5   only have one or two cases.  I don't know that anyone's going

 6   to talk to me."

 7        And I speak with Mr. Feinberg often.  He's been phenomenal

 8   in this process.  And we do have a process in place.  And we're

 9   ready.  We stand ready and able to help in any way Monsanto,

10   the Court, Mr. Feinberg, or anyone wants us to with some of

11   these cases and these law firms who have very small cases.

12        I probably got ten calls yesterday, before this hearing

13   today, from people asking me about how this process is going to

14   work.  And I said, "You've got to wait until" -- "Call in,

15   listen, and we'll see where we go from here."

16        I have some other numbers.  I don't know how relevant they

17   are to anything.

18        But 20 firms have between six and ten cases filed in the

19   MDL; 24 firms, between 11 and 20; about eight firms have

20   between 21 and 50; only six firms have between 51 and a

21   hundred; and then I think it's only two firms who have over a

22   hundred.

23        Now, I want to say one thing.  These numbers may be a

24   little off with the larger numbers.  There may be a couple of

25   docket entries that still show multiple plaintiff filings.  And

1   remember Your Honor had us break up cases which had multiple

2   plaintiffs in them.  And I may have those larger numbers wrong.

3   So it could be there's more than two firms that have more than

4   a hundred.  But really, the majority of the firms that are

5   before you have a very small number of cases.  And that's

6   really what I wanted to help explain to the Court, which is

7   maybe the problem -- the issue that Mr. Hoffman was talking

8   about as well, is how to wrap all that up.

9       So anyway, unless you have questions, I don't really have

10  anything else that I had to report.

11          **THE COURT:**  Okay.  Who's next?

12          **MR. FEINBERG:**  I guess we go to Bucket Number 2.

13      By the way, Judge, on Bucket Number 1, when Mr. Weitz gave

14  the numbers, just a reminder.  I want to reemphasize what I

15  said earlier.

16      There are an additional, about, a little over 12,000 cases

17  that have already been resolved, ready to be implemented, but

18  not as part of the MDL.  It's state cases.  And the lead lawyer

19  there is James Dugan of New Orleans, and he has reached an

20  agreement with Monsanto with the help of the special master.

21  And they are ready -- as Mr. Weitz explained, they are also

22  ready to implement their 12,000-plus settlement.  That's where

23  I got all the little over 30,000 cases.  So...

24      And Bucket 2, I think Brent Wisner and Aimee Wagstaff.

25  There may be others that are going to speak because they are

1    part of the PSC leadership.  And I don't know whether Brent or

2    Aimee want to go first, but the Court, I guess, is ready.

3                 **MS. WAGSTAFF:**  Brent, you can go first.

4                 **MR. WISNER:**  Thank you, Mr. Feinberg.

5         And, Your Honor, it's good to see you.  I like the beard.

6                 **THE COURT:**  Doing what every other middle-aged

7    suburban dad does during this time.

8                 **MR. WISNER:**  So, you know, I think I want to answer a

9    few of the questions you asked point-blank during the Q and A

10   with my friends and colleagues here.

11                **THE COURT:**  Could you speak up a little bit?

12                **MR. WISNER:**  Oh, sure.

13                **THE COURT:**  Not sure I've ever needed to ask you to

14   speak up before, Mr. Wisner.

15                **MR. WISNER:**  Is that better?

16                **THE COURT:**  Yes.

17                **MR. WISNER:**  Okay.  I just wanted to address some of

18   the questions you specifically raised in the prior

19   conversations.

20        The first is the confidentiality of the letters.  I

21   100 percent agree with Your Honor that they are not

22   confidential.  I submitted mine as such because that's what

23   Monsanto wanted me to do.  So I don't have a position on the

24   confidentiality of them.  And I would be happy to work with my

25   friends across the aisle to work out whatever they think's

1  appropriate.  You know, Your Honor, I'm particularly cautious

2  on confidentiality.  So I just wanted to not cross any lines,

3  look before leaping this time.

4      On the settlement process, I really think that there's

5  sort of a lost fact in all this, and I think you reading the

6  press release really nails the point on the head.  You know, on

7  the 23rd and 24th, I was told we were settled.  I was told that

8  we had a deal, that it was approved and all of those things.

9      I don't really want to get into the back-and-forth,

10  Your Honor.  I don't think that's necessarily productive at

11  this point.  But the simple fact is, we're not settled.  And,

12  in fact, as of today, they have completely terminated the

13  agreement.

14      And so while I have --

15      **THE COURT:**  What do you mean, "they've" -- what does

16  that mean, "they've completely terminated the agreement"?

17      **MR. WISNER:**  So the underlying agreement which was

18  driving the negotiations since March was a term sheet that had

19  certain provisions in it, including -- the most important

20  provisions, obviously, are, like, how much we settle -- how

21  much are we settling for, things of that sort.  That was

22  supposed to be tied up in a master settlement agreement within

23  60 days.  Obviously, that was in March.  Lots of extensions

24  later, lots of processes later.  But the way the term sheet was

25  written is that Monsanto could walk away at any time; but if

they didn't execute the MSA by a specific time, then it would
be binding.

          And, you know, the long and the short of it is, we came to
a meeting of the minds on all material terms for our
settlement, gosh, in May, really, about May 15th, May 14th,
right around there.  And the entire time since, between then
and July, we were just working out procedural things related to
how the actual settlement would be administered for my clients
in a way that I thought was both ethical and fair and that
whole process.  And we fully negotiated that.  I mean, it was
done.  I signed it, sent it to them.

          And then, on August 19th, they terminated the term sheet
and, with that, the terms that we had been settling.  And part
of that term sheet involved confidentiality.  It involved
agreeing to sort of stay the litigation and not pursue forward.

          And so at this point, you know, it's become clear to me
that when I was told we had an agreement, either, one, they
didn't have authority to tell me that when they said it to me;
or, two, they've reneged on it.  And either way, in either
case, there's no agreement anymore.

          And with that in mind, I never -- just as Your Honor said,
I would never have agreed to a stay in litigation if I had
known that it was a possible settlement.  And I was told that
it was a deal.

          So at this point, Your Honor, we don't have any objection,

 1   obviously, to Mr. Feinberg doing his wizardry to try to get

 2   these cases resolved.  He's the best in the business.  He's

 3   been fantastic so far.  But I think in conjunction with

 4   Mr. Feinberg's efforts, let's restart the litigation.  The only

 5   thing that has been successful in bringing Monsanto to the

 6   table has been litigation.  And I have clients who have cancer.

 7   They are dying.  All right?  And every time they die, it

 8   fundamentally changes the dynamics of their case.  And I have

 9   an obligation to push those cases forward.

10       And right now, I don't believe that I have -- frankly, I

11   don't think that they've been honest with me in the process,

12   and I'm tired of it.  And I'm not angry.  I just want to

13   litigate.  I want to get back at it.  And I don't think we need

14   to have a 30-day process to negotiate a plan.  Just lift the

15   stay, and we'll start serving discovery.  I mean, it's what we

16   do.  It's a process.

17       **THE COURT:**  Well, Mr. Wisner, let me respond to one

18   thing.  And I don't remember your exact words, but it was

19   something to the effect of:  The only thing that has caused

20   these settlements to go forward is the threat of litigation.

21   Something like that.

22       What I want to say to you in response is I don't care

23   about that.

24                         (Laughter.)

25       **THE COURT:**  I'm not interested -- I don't care whether

1  these cases settle or not.  My job is not to settle cases.  My

2  job is to try cases.  And so I'm not -- to the extent that I'm

3  seriously entertaining your request to lift the stay and to

4  start moving forward again full speed, it is not out of an

5  interest in pressuring anybody to settle, because I really -- I

6  don't consider that to be part of my job.  If you want --

7  people want to settle, they can settle.  If they don't want to

8  settle, they don't have to settle.

9       But what I am concerned about is that Monsanto may be

10  manipulating this litigation process to its advantage somehow

11  in these settlement negotiations that you all are having and

12  that I'm not interested in the details of.

13       So my only concern is that I don't want the litigation to

14  be used as a pawn in settlement negotiations either way.

15  Right?  I don't want them to manipulate -- take advantage of

16  and use to their advantage a stay in litigation, and I

17  don't want the lifting of the stay to prompt settlement.

18       My job is to -- I have a bunch of these cases, and my job

19  is to try them and to get them ready for trial in other

20  jurisdictions.  And my concern is that I am -- if I leave the

21  stay in place, am I sort of complicit in whatever shenanigans

22  are taking place right now on the Monsanto side or, I should

23  say, the Bayer side?

24       And I don't know what -- we've got a bunch of cases that

25  we could send out very quickly to other jurisdictions where

1    they were initially filed and could be tried.  And there are a

2    lot of judges out there who are looking for things to do right

3    now, who might be excited about doing a Zoom trial, civil jury

4    Zoom trial with an interesting case like this.

5         And we also have -- I don't know if there are any cases

6    that are ready for trial in this district right now, in my

7    courtroom right now, but there's the Stevick case; right?  That

8    was one of the -- there were three bellwethers initially.

9    There was the Hardeman case, which went to trial.  That reminds

10   me.  I have another question about the Hardeman case.  But the

11   Hardeman case went to trial.  The Stevick case is now, like,

12   the one case that is actually settled and can be dismissed --

13   right? -- or has been dismissed.

14        **MR. WISNER:**  That's correct, Your Honor.

15        **THE COURT:**  Has it actually already been dismissed

16   from the docket?

17        **MR. WISNER:**  Yes, Your Honor.

18        **THE COURT:**  Okay.  And then there's the Gebeyehou

19   case.  That was the other one.

20        Now, the lawyer for Mr. Gebeyehou is not participating in

21   this, but he did e-mail my courtroom deputy in anticipation of

22   this.  I mean, we can bring him on if he wants to raise his

23   hand and participate, the lawyer for Mr. Gebeyehou.  He can

24   raise his hand and we can bring him in.

25        But what I will say is that he e-mailed my courtroom

1    deputy and he said:  Nobody has had any contact with me about

2    settlement.  I haven't had any discussion with Monsanto about

3    settlement at all, and I'm ready to try my case.

4        So maybe we should set the Gebeyehou case for trial

5    promptly.

6            **MR. WISNER:**  Your Honor --

7            **MR. HOFFMAN:**  Your Honor --

8            **MR. WISNER:**  -- I just want to say --

9        Sorry, Mr. Hoffman.

10       Just quickly, Your Honor, I agree with you.  I reference

11   litigation as a -- as a way to leverage settlement, but the

12   truth is, there is no settlement.  I actually just want to get

13   back to litigation.  Like you, I want to try cases.  And I

14   would have -- I fully support setting a trial date as soon as

15   possible.  I know my firm has before Your Honor at least four

16   cases that are properly venued in the Northern District of

17   California.

18           **THE COURT:**  But those still need to be worked up;

19   right?

20           **MR. WISNER:**  That's correct.

21           **THE COURT:**  Right.  Are you providing assistance --

22   are you providing assistance to Mr. Gebeyehou's counsel?  Do

23   you have some sort of relationship with them as far as getting

24   that case ready for trial?

25       Ms. Greenwald is raising her hand.

1      **MS. GREENWALD:**  I have worked with him, with Tes for

2  some time from time to time, and I have reached out to

3  Mr. Hoffman, at Tes's request, to discuss resolution of that

4  case as well.

5      And the last time Mr. Hoffman and I spoke about it, he

6  said:  We'll talk about it soon.  We didn't -- we didn't get

7  anywhere.  I'm not going to say we did because we didn't.  But

8  it's on his radar.

9      I might defer to Mr. Hoffman now to go and say what their

10  intent is with Mr. Gebeyehou's case.  But I had worked with Tes

11  over the time on a number of issues with that case.

12      **THE COURT:**  Well, I don't think we need to get into

13  and I don't think it's really appropriate for me to get into a

14  discussion with you about the ins and outs of settlement

15  negotiations in particular cases.

16      Like I said, I'm focused on adjudicating the cases and

17  moving the cases forward.  But I'm just throwing out there this

18  idea that just came to my mind as I was thinking about the

19  three buckets.  I was wondering:  Well, which bucket is

20  Gebeyehou in?  Because that's the case that's ready for trial.

21      **MS. GREENWALD:**  It is, Your Honor.  It is definitely

22  ready for trial.  I don't know if Tes is there to get on the

23  phone, but it is ready for trial.

24      **MR. WISNER:**  And, Your Honor, I have had conversations

25  with Mr. Gebeyehou's counsel several times; and obviously --

1    and I've told him and I'll tell Your Honor, my firm's ready to

2    help as needed for his trial, if he needs it.   So...

3            **MR. HOFFMAN:**  So, Your Honor, if I can jump in.

4        First, I just want to say, categorically, there are no

5    shenanigans and no manipulation that are going on here.   We're

6    trying in good faith to wrestle to the ground an

7    extraordinarily large and complex settlement process.   And the

8    last thing we would do or that I would do or any counsel on our

9    side would do is try and manipulate the process.   It is part of

10   the reason that I suggested that we look to two tracks at this

11   point, because I don't want you to have that view nor my

12   colleagues on the other side.   That's one.

13       Two, with respect to Mr. Gebeyehou's case, Ms. Greenwald

14   is correct, a hundred percent accurate in her description of

15   our calls.   I won't get into any further about the substance.

16   But I will say that Your Honor may recall that there's a fairly

17   substantial pending summary judgment motion in that case, but I

18   don't think we need to discuss that now.

19       I would just reiterate that I think we send the two trains

20   down their tracks over the next 30 days.   The proposal that we

21   could work on on the litigation track is more than just pending

22   discovery.   It could be some kind of proposal for a way to --

23   for you to do what you say is your job.   And I totally

24   understand that.

25           **THE COURT:**  Okay.  Does anybody else have anything to

1    say at this point?

2            **MR. FEINBERG:**  Your Honor, Ken Feinberg.

3        I think Aimee Wagstaff is also on the list.

4            **MS. WAGSTAFF:**  Yes.  Good afternoon, Your Honor.

5        With respect to the Andrus Wagstaff cases, like

6    Mr. Wisner's law firm, we had a term sheet that we had signed.

7    It was a non-binding term sheet.  And off of that term sheet,

8    we drafted and negotiated an MSA.  Monsanto sent us the final

9    version of the MSA in PDF for execution, which we executed and

10   sent back to them.

11       It's our belief we have a deal with them that would be

12   enforceable in Missouri, which is the law that is -- that our

13   MSA is subjected to.  Nonetheless, because we would rather just

14   have them countersign it, we are here.

15       And we have put in the letter that we sent to you sort of

16   some of our concerns, and we had requested that you remand some

17   of our trials, our Wave 1 cases.  And I will tell you that our

18   law firm -- and I'm not sure about Mr. Wisner's -- is going

19   forward, also litigating in the state court in Missouri.  We

20   had a trial set in June of two plaintiffs that got moved

21   because of COVID; and we had a trial set in October, upcoming

22   in October, in 60 days, that got moved because of COVID; and we

23   have another trial setting of a different plaintiff in

24   April 2021 that we think we can get.  So we are actually moving

25   forward in other jurisdictions with respect to litigating

1   against both Bayer and Monsanto now.

2       But overarching all of that, we believe -- my law partner

3   and I believe we actually have a deal with Bayer to complete

4   our inventory, should it come to that.

5           **MR. FEINBERG:**  Your Honor, this is Ken Feinberg again.

6       Those were the names on my list.  I know of no other

7   scheduled speakers that I'm aware of.

8           **MS. MOORE:**  Your Honor, if I may address the Court's

9   questions about the confidentiality of the letters.

10          **THE COURT:**  Sure.

11          **MS. MOORE:**  Okay.  Thank you, Your Honor.  Jennifer

12  Moore.

13      Your Honor, I was one of the attorneys that submitted a

14  letter to you last week.  I agree with Mr. Wisner.  I'm fine

15  with working with Monsanto, with Mr. Hoffman in particular.  We

16  did communicate that night, before we served them on you, to

17  make sure that Monsanto was in agreement.  I also don't think

18  that they're necessarily subject to confidentiality, but out of

19  an abundance of caution, that's why we submitted them to you in

20  that manner.  I have no problem working with Mr. Hoffman to see

21  what we could put on the public record.  So I just wanted to

22  let you know, since I was one of the ones that sent that.

23      I also wanted to clarify a couple of things with respect

24  to the cases that I represent.  Your Honor, myself, Mr. Wisner,

25  Ms. Wagstaff, we were actually the first law firms in the

1    country to have a signed agreement with Monsanto.  As

2    Ms. Wagstaff mentioned, we had a non-binding term sheet that

3    was signed on March 2nd.  We then negotiated very -- we spent a

4    lot of time on this and worked on the master settlement

5    agreement.

6         When the announcement was made on June 24th that the Court

7    referenced earlier in this hearing, I specifically had a call

8    with Bayer, because Bayer is the one driving the settlement

9    process, and expressed my concern that we did not have a fully

10   executed MSA at that time.  I was assured that that was not an

11   issue and that we, in fact, were done.  We had a deal.  We were

12   settled.  We had negotiated the final terms as far as the

13   amount, and as Mr. Wisner said, we were negotiating, you know,

14   procedural issues on implementation of an aggregate settlement.

15        Knowing that, I did not object to them going forward and

16   making that public announcement.  If I had known now what I --

17   if I knew now -- if I had known then what I know now, I would

18   not have agreed to that public announcement.  And I take that

19   very seriously because I don't want to misrepresent anything to

20   the Court.

21        I do not -- I, like Mr. Wisner and Ms. Wagstaff, signed my

22   MSA and have been waiting on a countersignature.  I'm being

23   told that I do have a settlement deal by Monsanto, but I still

24   don't have that signature.  So I just wanted the Court to be

25   aware of that as well.

```
1          And I'm happy to answer any questions.  Thank you,

2     Your Honor.

3               THE COURT:  Okay.  Anybody else want to say anything?

4               MS. ANDRUS:  Yes, Your Honor.  This is Lori Andrus.

5     I'm co-liaison counsel.  Good afternoon.

6          I just wanted to let you know that my firm is one of the

7     firms that only has a handful of cases in the MDL.  Most of our

8     cases are on file in state court.

9          But within our small group of clients that are on file in

10    federal court, one of them is directly filed in the Northern

11    District of California because my client lives in

12    San Francisco.  And so I'm aware, in addition to Mr. Gebeyehou,

13    that there are other cases on file in your courtroom that could

14    be worked up.

15         And so I would request that as Your Honor contemplates on

16    your next steps, that you consider creating yet another small

17    wave of cases that could be worked up for trial here in the

18    Northern District of California.

19         Thank you.

20              THE COURT:  Anything else anybody want to say about

21    the plaintiffs' request to lift the stay or anything else?

22              MR. WISNER:  Your Honor --

23              THE COURT:  Or at least some of the plaintiffs'

24    request to lift the stay.

25              MR. WISNER:  Brent Wisner.
```

```
 1        I just wanted to finish what I was saying on that point.
 2    And that is, in my mind, I'm always open to talking settlement
 3    should we ever get to that point in the future.  But that's
 4    really beside the point.
 5        We're here in a court of law.  We'd like to proceed
 6    forward with litigation.  There are multiple cases in this
 7    courthouse that could be tried here.  We'd love to get them
 8    going, get them worked up, get the expert reports done, get
 9    them Daubert-ed out and set for trial as soon as we can.
10    I think that's -- I'm with you.  In this time of COVID, I'm
11    interested in trying a case by Zoom as well.  So I'd like to
12    see how that goes.
13        If we end up settling in the future, so be it; but I don't
14    think we should let that get in the way of our jobs, which is
15    getting these cases to trial.
16        So thank you, Your Honor.
17            THE COURT:  Okay.  I'm going to take --
18        MR. BAUM:  Your Honor, Michael Baum.  I just wanted to
19    add one little gloss.  And that is that --
20            THE COURT:  No problem.
21        MR. BAUM:  -- relevant to our group of cases and,
22    I think, the cases in Bucket 2, I think that tying this group
23    of cases to the future's class action was not something we
24    agreed to or were aware of.  And I think that they should not
25    be tied.  I think that things derailed as a result of that
```

1    linking between the future's cases and the existing cases we

2    had filed and in progress.

3              **THE COURT:**  Okay.

4         **MR. BAUM:**  That's the main point I'm going to make,

5    Your Honor.

6              **THE COURT:**  Okay.  Thank you.

7         So what I want to do now is I just want to take a break.

8    I want to take a ten-minute break.  And I will go off video and

9    off of audio.  And, people, why don't we plan on -- let's make

10   it a 15-minute break.  Let's plan on coming back at 12:20.  You

11   all are free -- you should stay on the line, of course, but

12   you're free to mute your audio and video until 12:20.

13        Thank you.

14                   (Recess taken at 12:04 p.m.)

15                 (Proceedings resumed at 12:24 p.m.)

16             **THE COURT:**  Are we still on the record?

17             **THE CLERK:**  Yes.

18             **THE COURT:**  Okay.  So you all have expressed great

19   confidence in the special master.  I, of course, have great

20   confidence in the special master.

21        And so what I'm willing to do is adopt Mr. Hoffman's

22   suggestion for now and -- or at least my understanding of that

23   suggestion, and that is to, for now, not lift the stay.  Let me

24   say that nobody should bother coming to seek an extension of

25   the 60-day stay.  Don't even bother.

1      But on whether to lift the stay, I'm willing to put off

2   that decision for 30 days, or however many days until our next

3   meeting, four weeks.  But the condition is that, as Mr. Hoffman

4   suggested, the parties start working on a plan now for getting

5   the litigation back on track and present that plan at our next

6   meeting roughly four weeks from now.

7      And at that point, we can also receive an update from

8   Mr. Feinberg and from you all about where things are.  And it

9   may be that in four weeks from now, the stay is lifted and we

10  implement the plan that you present for how to get these cases

11  adjudicated or some version of the plan that you present; or

12  maybe when we next meet, it'll be clear that things are moving

13  forward again and it's not necessary to lift the stay

14  immediately.

15     So that's what we'll do.  And so what I'd like to do is

16  have another status conference roughly four weeks from now.

17  Let me look in my calendar.  The 24th of September seems

18  reasonable.  And let me think for a second.

19     Yeah, the 24th of September, same time, 11 o'clock.

20  Sounds fine.  And seven days prior to that, I want either a

21  joint proposal or competing proposals filed on the docket for

22  how to restart the MDL.

23     You've heard some of the questions I have.  Should we set

24  the Gebeyehou trial for early 2021 on Zoom with a civil jury

25  trial, for example?  Maybe the answer is yes.  Maybe the answer

1   is no.  Or should my primary focus be on sending cases to other

2   districts for trial?  There are several that, if I recall

3   correctly -- it was a long time ago, but if I recall correctly,

4   there were a number of case that were on the verge of being

5   ready to be sent to other districts for trial; and that could

6   happen with very little work, if I recall correctly.  So that's

7   another possibility in terms of things that I could be focusing

8   on immediately.

9       Or you may all have some different plan entirely.  But why

10   don't you present that plan seven days prior to the conference,

11   and we'll plan on meeting again.

12       And, by the way, Mr. Gebeyehou's counsel is welcome to

13   join that, if he wishes.

14       And we'll do that on September 24th at 11 o'clock.

15       Any final comments from anybody?

16         **MS. WAGSTAFF:**  Your Honor, this is Aimee Wagstaff.

17         **THE COURT:**  Thank you very much, Mr. Feinberg, for all

18   your wizardry, as I believe Mr. Wisner put it.

19       Ms. Wagstaff, were you trying to say something?

20         **MS. WAGSTAFF:**  Yeah.  I'm sorry.  You had mentioned

21   earlier that --

22         **THE COURT:**  You're mute.  I can't hear you.

23       Oh, wait.  Hold on.

24         **MS. WAGSTAFF:**  It doesn't show that I'm mute.

25         **THE COURT:**  That was my fault.

1          **MS. WAGSTAFF:**  Okay.

2          **THE COURT:**  I had you mute.

3          **MS. WAGSTAFF:**  What did you say?  I didn't hear what

4    you said?  That was your fault?

5          **THE COURT:**  You're not used to hearing that?

6                        (Laughter.)

7          **MS. WAGSTAFF:**  Just kidding.

8      You had mentioned earlier that you had a question about

9    the Mr. Hardeman case.  So I just wanted to -- if you had a

10   question still, I wanted to answer it for you.

11         **THE COURT:**  Sorry.  Say that again.

12         **MS. WAGSTAFF:**  You had mentioned earlier that you had

13   a question on the Hardeman case.

14         **THE COURT:**  Oh, yeah.  I don't remember.

15         **MS. WAGSTAFF:**  Okay.

16         **THE COURT:**  Anyway, okay; great.  Thank you very much.

17         **MR. FEINBERG:**  Your Honor?  Your Honor, this is Ken

18   Feinberg.

19     Have you taken under advisement the letters, redacting the

20   letters, not disclosing the letters?

21         **THE COURT:**  Yes.  The letters need to be on the

22   docket.  So the parties need to file the letters on the docket.

23     I'm perfectly happy to accept Mr. Hoffman's suggestion

24   that the parties work together to redact sort of the details of

25   the back-and-forth, which I agree doesn't necessarily need to

1  be disclosed.  But the gist of what is going on needs to be

2  disclosed.  And to the extent the letters describe the gist of

3  what is going on or the gist of one side's assertions about

4  what's going on, they need to be on the docket.

5      And included in those letters, of course, is a request to

6  lift the stay; and that's one of the main reasons why those

7  letters need to be on the docket, because it's a request as it

8  relates to the litigation that I need to act upon and have

9  partially acted upon here today.

10          **MR. FEINBERG:**  Thank you.

11          **THE COURT:**  Thank you.  All right.  Bye.

12          **THE CLERK:**  Court is adjourned.

13              (Proceedings adjourned at 12:31 p.m.)

14                      ---o0o---

15

16              <u>**CERTIFICATE OF REPORTER**</u>

17      I certify that the foregoing is a correct transcript

18  from the record of proceedings in the above-entitled matter.

19

20  DATE:  Thursday, September 3, 2020

21

22

23  _____

24      Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
              Official Reporter, U.S. District Court

25