# EXHIBIT C

*(Plaintiffs',  including MONSANTO, Memorandum in Support of Summary Judgment-dkt#117-1, filed 9/25/2019*

Philip J. Perry (CA Bar No. 148696)
Richard P. Bress (admitted *pro hac vice*)
Andrew D. Prins (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
philip.perry@lw.com
(*additional counsel on signature page*)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHEAT GROWERS; NATIONAL CORN GROWERS ASSOCIATION; UNITED STATES DURUM GROWERS ASSOCIATION; WESTERN PLANT HEALTH ASSOCIATION; MISSOURI FARM BUREAU; IOWA SOYBEAN ASSOCIATION; SOUTH DAKOTA AGRI-BUSINESS ASSOCIATION; NORTH DAKOTA GRAIN GROWERS ASSOCIATION; MISSOURI CHAMBER OF COMMERCE AND INDUSTRY; MONSANTO COMPANY; ASSOCIATED INDUSTRIES OF MISSOURI; AGRIBUSINESS ASSOCIATION OF IOWA; CROPLIFE AMERICA; AND AGRICULTURAL RETAILERS ASSOCIATION,<br><br>               Plaintiffs,<br><br>XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,<br><br>               Defendant. | Civil Action No. 2:17-cv-02401-WBS-EFB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing: February 10, 2020<br>Time:    1:30 p.m.<br>Ctrm:    5<br><br>The Honorable William B. Shubb<br><br>Case Filed: Nov. 15, 2017 |

## TABLE OF CONTENTS

**Page**

INTRODUCTION.....................................................1

BACKGROUND.......................................................5

    A.   Glyphosate And Its Federal Regulation.................5

    B.   The International Scientific Consensus That Glyphosate Does Not Cause Cancer, And IARC's Contrary Outlier View.................................7

    C.   The Proposition 65 Scheme...........................16

    D.   OEHHA's Glyphosate Listing And NSRL.................23

    E.   Significant Effects Of Proposition 65's Glyphosate Warning Requirement......................26

    F.   Proceedings Before This Court.......................29

ARGUMENT........................................................31

I.   THE COMPELLED GLYPHOSATE WARNING VIOLATES THE FIRST AMENDMENT...........................................31

    A.   The Compelled Glyphosate Warning Cannot Be Sustained Under *Zauderer* Because It Is Not "Purely Factual And Uncontroversial".................34

        1.   The Warning Mandated By Proposition 65 Cannot Be Sustained Under Zauderer..............34

        2.   The Alternative Warnings Proposed By The Attorney General Also Cannot Be Upheld Under Zauderer..........................39

    B.   The Warning Mandate Fails Intermediate Scrutiny...........................................46

        1.   The Attorney General Cannot Prove That The Warning Directly And Materially Advances The State's Legitimate Interests......................................47

        2.   The Attorney General Cannot Prove That The Warning Requirement Is Narrowly Tailored.......................................50

C.   The First Amendment and Due Process Clause
     Do Not Permit The State To Continually
     Invent New Warnings To Save The Warning
     Mandate From Invalidity...............................51

II.   A PERMANENT INJUNCTION SHOULD ISSUE.......................54

CONCLUSION.....................................................61

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*44 Liquormart, Inc. v. Rhode Island*,
   517 U.S. 484 (1996) ........................................46

*Am. Beverage Ass'n v. City of S.F.*,
   916 F.3d 749 (9th Cir. 2019) (en banc) ....3, 4, 32, 33, 47, 48

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
   760 F.3d 18 (D. C. Cir. 2014) (en banc) .............33, 34, 36

*Am. Trucking Ass'ns, Inc. v. City of L.A.*,
   559 F.3d 1046 (9th Cir. 2009) ............................59

*Amidon v. Student Ass'n of S.U.N.Y.*,
   508 F.3d 94 (2d Cir. 2007) ...............................44

*Baggett v. Bullitt*,
   377 U.S. 360 (1964) ......................................52

*Baxter Healthcare Corp. v. Denton*,
   120 Cal. App. 4th 333 (2004) .............................26

*Bullfrog Films, Inc. v. Wick*,
   847 F.2d 502 (9th Cir. 1988) .............................52

*Cal. Chamber of Com. v. Brown*,
   196 Cal. App. 4th 233 (2011) ..........................48, 49

*Cal-Almond, Inc. v. U.S. Dep't of Agric.*,
   14 F.3d 429 (9th Cir. 1993) ...........................46, 49

*Cent. Hudson Gas & Elec. Co. v. Pub. Serv. Comm'n of
   N.Y.*,
   447 U.S. 557 (1980) ......................................32

*CKE Rests., Inc. v. Moore*,
   159 Cal. App. 4th 262 (2008) .............................22

*Consumer Cause, Inc. v. Mrs. Gooch's Nat. Food Mkts.,
   Inc.*,
   127 Cal. App. 4th 387 (2005) .............................20

*Consumer Cause, Inc. v. SmileCare*,
   91 Cal. App. 4th 454 (2001) (Vogel, J., dissenting) .20, 22, 23

*Consumer Def. Grp. v. Rental Hous. Indus. Members*,
   137 Cal. App. 4th 1185 (2006) ...........................20, 21

*Corales v. Bennett*,
   567 F.3d 554 (9th Cir. 2009) .................................54

*CTIA - The Wireless Ass'n v. City of Berkeley*,
   928 F.3d 832 (9th Cir. 2019) ..........................3, 4, 32

*CTIA - Wireless Ass'n v. City of S.F.*,
   494 F. App'x 752 (9th Cir. 2012) .......................35, 39

*De Simone v. VSL Pharm., Inc.*,
   133 F. Supp. 3d 776 (D. Md. 2015) ...........................58

*Design Furnishings, Inc. v. Zen Path LLC*,
   No. CIV. 2:10-02765 WBS GGH, 2010 WL 4321568 (E.D.
   Cal. Oct. 21, 2010) .........................................58

*DiPirro v. Bondo Corp.*,
   153 Cal. App. 4th 150 (2007) ................................21

*Doe v. Harris*,
   772 F.3d 563 (9th Cir. 2014) ................................61

*Dowhal v. SmithKline Beecham Consumer Healthcare*,
   32 Cal. 4th 910 (2004) ......................3, 17, 34, 40, 50

*Edenfield v. Fane*,
   507 U.S. 761 (1993) .........................................47

*Elrod v. Burns*,
   427 U.S. 347 (1976) .........................................56

*Envtl. Law Found. v. Beech-Nut Nutrition Corp.*,
   235 Cal. App. 4th 307 (2015) ................................22

*Envtl. World Watch, Inc. v. Walt Disney Co.*,
   No. CV 09-04045 DDP, 2009 WL 3365915 (C.D. Cal. Oct.
   19, 2009) ...................................................22

*Evergreen Ass'n v. N.Y.C.*,
   740 F.3d 233 (2d Cir. 2014) .................................51

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) .....................................53, 54

*Gaeta v. Perrigo Pharm. Co.*,
   562 F. Supp. 2d 1091 (N.D. Cal. 2008) .......................50

LATHAM & WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

*Gerling Glob. Reinsurance Corp. of Am. v. Quackenbush*,
    No. Civ. S-00-0506WBSJFM et al., 2000 WL 777978
    (E.D. Cal. June 9, 2000), *aff'd sub nom Gerling
    Glob. Reinsurance Corp. of Am. v. Low*, 240 F.3d 739
    (9th Cir. 2001) ..........................................................57

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ...............................55

*Hufford v. McEnaney*,
    249 F.3d 1142 (9th Cir. 2001) .............................54

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*,
    515 U.S. 557 (1995) ....................................1, 31

*Idaho v. Couer d'Alene Tribe*,
    794 F.3d 1039 (9th Cir. 2015) .............................60

*Int'l Dairy Foods Ass'n v. Amestoy*,
    92 F.3d 67 (2d Cir. 1996) ...................................56

*Int'l Franchise Ass'n v. City of Seattle*,
    803 F.3d 389 (9th Cir. 2015) .............................57

*Italian Colors Rest. v. Becerra*,
    878 F.3d 1165 (9th Cir. 2018) .................31, 47, 48, 49

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps.,
    Council 31*,
    138 S. Ct. 2448 (2018) ..................................1, 31

*Johnson v. Am. Standard, Inc.*,
    43 Cal. 4th 56 (2008) .......................................50

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006) ...........................61

*Libertarian Party of L.A. Cty. v. Bowen*,
    709 F.3d 867 (9th Cir. 2013) .............................29

*Life Alert Emergency Resp., Inc. v. LifeWatch, Inc.*,
    601 F. App'x 469 (9th Cir. 2015) ........................56

*Linkmark Assocs., Inc. v. Willingboro*,
    431 U.S. 86 (1977) .........................................51

*People ex rel. Lockyer v. Tri-Union Seafoods, LLC*,
    Nos. CGC-01-402975, CGC-04-432394, 2006 WL 1544384
    (Cal. Sup. Ct. May 11, 2006) .................3, 17, 34, 53

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
    538 U.S. 600 (2003) ........................................52

*Mason v. SmithKline Beecham Corp.*,
    596 F.3d 387 (7th Cir. 2010) ..............................50

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*,
    138 S. Ct. 1719 (2018) ....................................44

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ..............................55

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010) ....................................33, 34

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) .......................................55

*N.E. Med. Servs., Inc. v. Cal. Dep't of Health Care Servs.*,
    712 F.3d 461 (9th Cir. 2013) ..............................60

*Nat'l Ass'n of Mfrs. v. S.E.C.*,
    800 F.3d 518 (D.C. Cir. 2015) .............................35

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
    272 F.3d 104 (2d Cir. 2001) ...............................34

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ..............4, 32, 33, 46, 47, 51, 54

*Nelson v. NASA*,
    530 F.3d 865 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011) ...............................60

*Nicolle-Wagner v. Deukmejian*,
    230 Cal. App. 3d 652 (1991) ...............................49

*Nken v. Holder*,
    556 U.S. 418 (2009) .......................................61

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
    475 U.S. 1 (1986) .........................................35

*Pac. Merch. Shipping Ass'n v. Cackette*,
    No. CIV. S-06-2791 WBS KJM, 2007 WL 2914961 (E.D. Cal. Oct. 5, 2007) (Shubb, J.) ...........................60

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

*PDK Labs., Inc. v. DEA*,
   362 F.3d 786 (D.C. Cir. 2004) ................................54

*Reckitt Benckiser Inc. v. EPA*,
   613 F.3d 1131 (D.C. Cir. 2010) ..............................14

*Rent-A-Center, Inc. v. Canyon Television & Appliance
   Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) ................................57

*Riley v. Nat'l Fed'n of Blind of N.C., Inc.*,
   487 U.S. 781 (1988) .........................................53

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ...............................61

*In re Roundup Prods. Liab. Litig.*,
   385 F. Supp. 3d 1042 (N.D. Cal. 2019) .......................15

*In re Roundup Prods. Liab. Litig.*,
   390 F. Supp. 3d 1102 (N.D. Cal. 2018) .......................16

*In re Roundup Prods. Liab. Litig.*,
   No. 16-md-02741-VC, 2019 WL 1371806 (N.D. Cal. Feb.
   18, 2019) ...................................................16

*Rubin v. Coors Brewing Co.*,
   514 U.S. 476 (1995) .........................................47

*San Miguel Pure Foods Co. v. Ramar Int'l Corp.*,
   625 F App'x 322 (9th Cir. 2015) .............................58

*Sciortino v. Pepsico, Inc.*,
   108 F. Supp. 3d 780 (N.D. Cal. 2015) ........................22

*Sorrell v. IMS Health, Inc.*,
   564 U.S. 552 (2011) .........................................51

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ...............................60

*Thalheimer v. City of San Diego*,
   645 F.3d 1109 (9th Cir. 2011) ...............................56

*Thompson v. Cty. of Alameda*,
   27 Cal. 3d 741 (1980) .......................................50

*United States v. United Foods, Inc.*,
   533 U.S. 405 (2001) .........................................33

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

*Valle Del Sol Inc. v. Whiting*,
  709 F.3d 808 (9th Cir. 2013) ...........................50, 55

*Video Software Dealers Ass'n v. Schwarzenegger*,
  556 F.3d 950 (9th Cir. 2009), *aff'd*, 564 U.S. 786
  (2011) ....................................4, 33, 35, 41, 47

*Zauderer v. Office of Disciplinary Counsel of Sup. Ct.
  of Ohio*,
  471 U.S. 626 (1985) ...............1, 4, 32, 33, 34, 52, 53

*Zetwick v. Cty. of Yolo*,
  850 F.3d 436 (9th Cir. 2017) ..............................31

**STATUTES**

7 U.S.C. § 136(a) ...........................................7

7 U.S.C. § 136(bb) ..........................................7

21 U.S.C. § 331(b) ..........................................7

21 U.S.C. § 342(a) ..........................................7

21 U.S.C. § 346a(b)(2)(A) ...................................7

21 U.S.C. § 346a(b)(2)(A)(ii) ...............................7

Cal. Code Regs. tit. 11, § 3202(b)..................42, 43, 53

Cal. Code Regs. tit. 11, § 3203(b) .........................19

Cal. Code Regs. tit. 11, § 3203(d) .........................19

Cal. Code Regs. tit. 27, § 25600............................3

Cal. Code Regs. tit. 27, § 25601.....................3, 17, 40

Cal. Code Regs. tit. 27, § 25603(a)(operative Aug. 30,
  2018) .....................................................18

Cal. Code Regs. tit. 27, § 25603(b) (operative Aug. 30,
  2018) .....................................................18

Cal. Code Regs. tit. 27, § 25603(d) (effective Jan. 1,
  2019) .....................................................18

Cal. Code Regs. tit. 27, § 25603.2 (abrogated Aug. 30,
  2018) .....................................................17

Cal. Code Regs. tit. 27, § 25701............................25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

vii
i

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

Cal. Code Regs. tit. 27, § 25703...............................25

Cal. Code Regs. tit. 27, § 25703(a)(3)....................25, 26

Cal. Code Regs. tit. 27, § 25705(b)(1).........................25

Cal. Code Regs. tit. 27, § 25904(c)............................18

Cal. Health & Safety Code § 25249.6................3, 16, 17, 34

Cal. Health & Safety Code § 25249.7(a).........................19

Cal. Health & Safety Code § 25249.7(b).........................19

Cal. Health & Safety Code § 25249.7(c).........................19

Cal. Health & Safety Code § 25249.7(d)(1)......................20

Cal. Health & Safety Code § 25249.7(e)(1)(A)...................21

Cal. Health & Safety Code § 25249.7(e)(1)(B)...................21

Cal. Health & Safety Code § 25249.8(a)................3, 17, 18

Cal. Health & Safety Code § 25249.10(b)........................17

Cal. Health & Safety Code § 25249.10(b)........................34

Cal. Health & Safety Code § 25249.10(c)...........21, 22, 25, 27

Cal. Health & Safety Code § 25249.11(e)........................19

Cal. Lab. Code § 6382(b)(1)................................3, 18

**RULES**

Fed R. Civ. P. 56(a).........................................31

**REGULATIONS**

40 C.F.R. § 180.364...........................................7

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1

## INTRODUCTION

2      This case presents a simple question: Can a State force
3  private parties to defame their own products by reciting a cancer
4  warning with which they vehemently disagree, in circumstances
5  where the primary federal regulatory authority body——in agreement
6  with a nearly unanimous worldwide scientific consensus——has
7  determined that the state-mandated warning would be "false and
8  misleading"?  Under bedrock First Amendment principles, the answer
9  is no.

10      The First Amendment generally forbids regulations that compel
11  speech to the same extent that it forbids regulations that restrict
12  speech.  *See, e.g.*, *Janus v. Am. Fed'n of State, Cty., & Mun.*
13  *Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018); *Hurley v. Irish-*
14  *American Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 573 (1995).
15  In *Zauderer v. Office of Disciplinary Counsel of Supreme Court of*
16  *Ohio*, 471 U.S. 626, 651 (1985), the Supreme Court recognized a
17  narrow exception to this rule permitting the government in certain
18  circumstances to require commercial speakers to disclose "purely
19  factual and uncontroversial" information about their products.
20  *Id.* at 651.  Most common health and safety disclosures fit that
21  mold, informing consumers of indisputable facts, such as
22  ingredient lists, calorie counts, country of origin, and
23  universally acknowledged health risks.  The compelled speech at
24  issue in this case is nothing like those.  Under threat of steep
25  civil penalties and bounty hunter lawsuits, California is
26  requiring that products sold in-state that expose consumers to the
27  herbicide glyphosate be accompanied by a warning communicating to
28  consumers that glyphosate causes cancer——even though the U.S.

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1  Environmental Protection Agency (EPA), numerous regulators around
2  the world, and California's own Office of Environmental Health
3  Hazard Assessment (OEHHA) have concluded otherwise.   This
4  compelled-speech requirement fails the *Zauderer* test and violates
5  the First Amendment.

6      Plaintiffs are a nationwide coalition of agricultural
7  producers and business entities that collectively represent a
8  substantial segment of U.S. agriculture.   Glyphosate is a critical
9  tool in modern American agriculture, approved by the federal
10  government for use in more than 250 agricultural crop applications,
11  and Plaintiffs and their members use, sell, manufacture, grow, and
12  rely upon products containing glyphosate or to which glyphosate is
13  applied.   Because of its longstanding and widespread use,
14  glyphosate has been subject to rigorous scientific scrutiny by the
15  federal government and regulators worldwide for decades.   It is
16  widely regarded as one of the safest herbicides ever developed,
17  and the overwhelming scientific consensus is that it does *not* pose
18  any risk of cancer.

19      One entity in Lyon, France, the International Agency for
20  Research on Cancer (IARC), disagrees.   IARC has concluded, based
21  on admittedly "limited evidence in humans," that glyphosate is
22  "probably carcinogenic."   Decl. of David C. Heering, Monsanto Co.,
23  Ex. W (112 Int'l Agency for Research on Cancer (IARC), WHO, Some
24  Organophosphate Insecticides and Herbicides, IARC Monographs 398
25  (2017) [hereinafter "IARC Monograph 112"]).   Under California's
26  Safe Drinking Water and Toxic Enforcement Act of 1986 (more
27  commonly known as Proposition 65), IARC's outlier determination
28  triggered an automatic requirement that OEHHA list glyphosate as

a chemical "known to the state to cause cancer."  Cal. Health & Safety Code § 25249.8(a) & Cal. Lab. Code § 6382(b)(1) (IARC triggering mechanism).   This listing, in turn, triggers a presumptive requirement under Cal. Health & Safety Code § 25249.6 that any "person" exposing "any individual" to glyphosate must provide a "clear and reasonable warning" that their "'product contains [glyphosate], a chemical known to the state of California to cause [cancer],' or words to that effect." *Dowhal v. SmithKline Beecham Consumer Healthcare*, 32 Cal. 4th 910, 918 (2004); *see also People ex rel. Lockyer v. Tri-Union Seafoods, LLC*, Nos. CGC-01-402975, CGC-04-432394, 2006 WL 1544384, at *61 (Cal. Sup. Ct. May 11, 2006) (providing that this is the "core language . . . in any warning"); Cal. Code Regs. tit. 27, §§ 25600, 25601, 25602, 25603 (providing the content of the warning and safe harbor warnings).

Plaintiffs brought suit to enjoin that warning requirement, and last year this Court entered a preliminary injunction after concluding that Plaintiffs are likely to succeed on the merits of their First Amendment claim.  This Court subsequently denied the Attorney General's motion to alter or amend that ruling, then stayed further proceedings in the case pending the Ninth Circuit's decisions in *American Beverage Ass'n v. City of San Francisco* and *CTIA – The Wireless Ass'n v. City of Berkeley*.  Those cases have now been decided, and nothing in them undermines this Court's earlier conclusion that the State cannot compel Plaintiffs to spread a controversial and misleading warning message on the State's behalf.  *See Am. Beverage Ass'n v. City of S.F.*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc); *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 842 (9th Cir. 2019).  Accordingly,

1   Plaintiffs now respectfully ask this Court to declare the

2   glyphosate warning requirement unconstitutional and permanently

3   enjoin it.

4       The basis for doing so is straightforward.  Under *Zauderer*,

5   California cannot compel Plaintiffs to broadcast a warning that is

6   misleading, inaccurate, or controversial.  *See, e.g.*, *Nat'l Inst.*

7   *of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018)

8   ("*NIFLA*"); *Zauderer*, 471 U.S. at 651; *Am. Beverage Ass'n*, 916 F.3d

9   at 756; *CTIA*, 928 F.3d at 842; *Video Software Dealers Ass'n v.*

10  *Schwarzenegger*, 556 F.3d 950, 965-67 (9th Cir. 2009), *aff'd*, 564

11  U.S. 786 (2011).  The Proposition 65 warning, as applied to

12  glyphosate, is all three.  As this Court explained in granting the

13  preliminary injunction, "[i]t is inherently misleading for a

14  warning to state that a chemical is known to the state of

15  California to cause cancer based on the finding of one organization

16  . . . , when apparently all other regulatory and governmental

17  bodies have found the opposite," and "given the heavy weight of

18  evidence in the record that glyphosate is not in fact known to

19  cause cancer, the required warning is factually inaccurate and

20  controversial."  Mem. & Order re. Mot. for Prelim. Inj. at 16-17,

21  ECF No. 75 ("PI Order").  And intervening developments have

22  reinforced that finding.  Indeed, just last month EPA indicated

23  that it "considers the Proposition 65 warning language based on

24  the chemical glyphosate to constitute a false and misleading

25  statement," and pesticide labels containing such language to be

26  "misbranded," because the warning inaccurately suggests that

27  glyphosate is carcinogenic.  *See* Heering Decl. Ex. E (Letter from

28  Michael L. Goodis, Dir., Reg. Div., Office of Pesticide Programs,

1  to Monsanto (Aug. 7, 2019) [hereinafter "EPA Aug. 2019 Letter"]).

2  Under *any* level of First Amendment scrutiny, California's attempts

3  to compel Plaintiffs to misleadingly and disparagingly describe

4  their own products cannot be sustained.

5      Because there is no genuine dispute as to any material fact

6  and Plaintiffs have shown that they prevail on the merits of their

7  claims, the Court should enter judgment in Plaintiffs' favor;

8  declare that the Proposition 65 warning requirement for glyphosate

9  violates the First Amendment, and convert its preliminary

10 injunction enjoining the application of Proposition 65's warning

11 requirement as it pertains to glyphosate into a permanent

12 injunction.

13                          **BACKGROUND**

14 **A.   Glyphosate And Its Federal Regulation**

15     Glyphosate is an herbicide that is used to control weeds in

16 agricultural, residential, aquatic, and other settings.

17 Heering Decl. ¶¶ 6-17; Statement of Undisputed Facts No. 1

18 [hereinafter "SUF"]. Since its introduction in 1974, glyphosate

19 has become the world's most widely used herbicide because it is

20 effective, economical, and "environmentally benign." *See* Heering

21 Decl. Ex. A (Jorge Fernandez-Cornejo et al., USDA, EIB No. 124,

22 Pesticide Use in U.S. Agriculture: 21 Selected Crops, 1960-2008 at

23 21 (May 2014)); SUF No. 2. It is the active ingredient in many

24 commercial products that are marketed by multiple businesses under

25 a number of trade names, including Roundup®, and has been

26 registered for use in over 160 countries. Heering Decl. ¶¶ 8, 9,

27 31-33, 67; SUF No. 3.

28

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1    In the United States, glyphosate is approved for use in more

2 than 250 agricultural crop applications.  Heering Decl. ¶¶ 13, 31;

3 SUF No. 4.  In California, for instance, it is used, among other

4 things, in the cultivation of almond, citrus, and cotton.  Heering

5 Decl. ¶ 31; SUF No. 5.  Elsewhere in the United States, glyphosate

6 is used on canola and on a high percentage of critical crops such

7 as corn, wheat, cotton, and soybean.  Heering Decl. ¶¶ 13, 30-

8 31; *see also, e.g.*, Heering Decl. Ex. M (Michael Livingston et

9 al., *Economic Returns to Herbicide Resistance Management in the*

10 *Short and Long Run: The Role of Neighbor Effects*, 64 Weed Sci.

11 (Special Issue) 595, 595-96 (2016) ("The percentage of acres

12 treated with glyphosate rose from 1 to 77% for corn from 1996 to

13 2014, from 13 to 99% for cotton from 1996 to 2010, and from 25 to

14 98% for soybean from 1996 to 2012.")); SUF No. 6.  It is also

15 widely used in Canada, including for cultivation of oats and wheat.

16 Heering Decl. ¶ 13; SUF No. 7.  Glyphosate-based herbicides are

17 also widely used by government agencies to control vegetation in

18 rights of way, in aquatic environments, in garden settings, and to

19 reduce the risk associated with rapid-spreading wildfire.  Heering

20 Decl. ¶ 16; SUF No. 8.  Glyphosate is used for this broad range of

21 applications because of its well-recognized benefits over other

22 cultivation and weed-suppression techniques.[1]

23

24 [1] *See, e.g.*, Heering Decl. ¶¶ 15, 17; Heering Decl. Ex. B (Stephen O. Duke & Stephen B. Powles, *Glyphosate: A Once-in-a-Century Herbicide*, 64 Pest Mgmt. Sci. 319, 322 (2008)); *see also, e.g.*,

25 Decl. of Blake Hurst, Mo. Farm Bureau ¶ 5 ("Glyphosate is an integral tool because it enables farmers to engage in no-till

26 farming, a conservation tilling tactic that reduces soil erosion, is widely accepted to be better for the environment, and reduces

27 the labor involved in farming practices."); Decl. of Jefferson Jon Doggett, Nat'l Corn Growers Ass'n ¶ 4; Decl. of Dan Mehan, Mo.

28 Chamber of Com. & Indus. ¶ 6; Decl. of Dan Wogsland, N.D. Grain

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

As an herbicide, glyphosate is subject to comprehensive federal regulation. Under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), all commercial herbicides must be "registered" with EPA. 7 U.S.C. § 136a. Before EPA grants a registration, it must conclude that the herbicide will not cause "unreasonable adverse effects on the environment," which include "any unreasonable risk to man or the environment" or "human dietary risk." 7 U.S.C. §§ 136(bb), 136a. Among other things, EPA's review includes an evaluation of whether the herbicide is potentially carcinogenic. *See, e.g.*, Heering Decl. Ex. C (EPA, EPA/630/P-03/001F, Guidelines for Carcinogen Risk Assessment (Mar. 2005)); SUF No. 10. The Federal Food, Drug, and Cosmetic Act (FDCA), in turn, regulates the presence of herbicides on food products. 21 U.S.C. §§ 342(a), 331(b). Under the FDCA, EPA is charged with evaluating the human health impact of the presence of the herbicide's residue, including its potential carcinogenicity. 21 U.S.C. § 346a(b)(2)(A). After concluding that "there is a reasonable certainty that no harm will result," 21 U.S.C. § 346a(b)(2)(A)(ii), EPA has allowed the presence of glyphosate residues on all relevant United States crops and food inputs. 40 C.F.R. § 180.364.

**B.    The International Scientific Consensus That Glyphosate Does Not Cause Cancer, And IARC's Contrary Outlier View**

Because of its immense popularity and widespread use, glyphosate is one of the most, if not *the* most, studied herbicides in the world. Regulators worldwide, including EPA and even

Growers Ass'n ¶¶ 5-9; Decl. of Gordon Stoner, Nat'l Ass'n of Wheat Growers ¶¶ 7-10; Decl. of Greg Kessel, N.D. Grain Growers Ass'n ¶ 4; Decl. of Mark Jackson, Iowa Soybean Ass'n ¶¶ 6-12; Decl. of Mark Martinson, U.S. Durum Growers Ass'n ¶¶ 5-8; SUF No. 9.

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW

1   California's own expert regulator, have recognized for over 40

2   years that glyphosate is safe when used as directed.

3        The overwhelming scientific consensus is that glyphosate does

4   not cause cancer.  EPA has repeatedly reached and re-affirmed this

5   conclusion.  In 1993, when it approved a renewal of glyphosate's

6   registration under FIFRA, EPA reported as follows:

> Several chronic toxicity/carcinogenicity
> studies . . . resulted in no effects based on
> the parameters examined, or resulted in
> findings that glyphosate was not carcinogenic
> in the study.  In June 1991, EPA classified
> glyphosate as a Group E oncogen—one that
> shows evidence of non-carcinogenicity for
> humans—based on the lack of convincing
> evidence of carcinogenicity in adequate
> studies.

13  *See* Heering Decl. Ex. N (EPA, EPA-738-F-93-011, Registration

14  Eligibility Decision (R.E.D.) Facts: Glyphosate 2 (Sept. 1993));

15  SUF No. 11.  More recently, "[i]n 2014, EPA reviewed more than 55

16  epidemiological studies conducted on the possible cancer and non-

17  cancer effects of glyphosate.  [Its] review concluded that 'this

18  body of research does not provide evidence to show that glyphosate

19  causes cancer.'"  *See* Heering Decl. Ex. O (Eric Sfiligoj, *EPA Plans*

20  *Response to IARC Glyphosate Finding … But Not Just Yet*, CropLife

21  (Apr. 6, 2015) (quoting Carissa Cyran, Chemical Review Manager for

22  the EPA Office of Pesticide Programs)); SUF No. 12.  In late 2017,

23  EPA issued a comprehensive evaluation of glyphosate, and again

24  determined that glyphosate is "not likely to be carcinogenic to

25  humans" and that "[b]ased on all of the available data, the weight-

26  of-evidence clearly do not support the descriptors 'carcinogenic

27  to humans' and 'likely to be carcinogenic to humans' at this time."

28  Heering Decl. Ex. SS (EPA, Revised Glyphosate Issue Paper:

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

Evaluation of Carcinogenic Potential EPA's Office of Pesticide Programs 139, 144 (Dec. 12, 2017)); SUF No. 13.  And in April 2019, EPA issued another evaluation, reaffirming that "glyphosate is 'not likely to be carcinogenic to humans.'"  Heering Decl. Ex. WW (EPA, Glyphosate: Proposed Interim Registration Review Decision, Case No. 0178, 7-8, 19-20 (Apr. 23, 2019)); *see also* Heering Decl. Ex. XX (EPA, Glyphosate: Response to Comments on the Human Health Draft Risk Assessment 2-3 (Apr. 23, 2018)); SUF No. 14.

Prior evaluations by California's own OEHHA have been materially in agreement with EPA.  In 1997 and 2007, OEHHA conducted risk assessments for glyphosate in drinking water in order to set public health goals, including an evaluation of glyphosate's potential carcinogenicity.  *See* Heering Decl. Ex. P (OEHHA, Public Health Goal for Glyphosate in Drinking Water (Dec. 1997)); Heering Decl. Ex. Q (OEHHA, Public Health Goal for Glyphosate in Drinking Water 1 (June 2007)); SUF No. 15.  It reported as follows:

> Three carcinogenicity studies [were] conducted, two in rats and one in mice, and all [we]re considered to be negative.  *In vitro* and *in vivo* genotoxicity tests [we]re generally negative.  There [we]re a few reports of increased sister chromatid exchange in human and bovine lymphocytes at high concentrations *in vitro*, which could be secondary to oxidative stress, and effects on mouse bone marrow after very large intraperitoneal doses.  Based on the weight of evidence, glyphosate [wa]s judged *unlikely to pose a cancer hazard to humans*."

*See* Heering Decl. Ex. Q (OEHHA, Public Health Goal for Glyphosate in Drinking Water at 1 (emphasis added)); SUF No. 17; *see also* Heering Decl. Ex. P (OEHHA, Public Health Goal for Glyphosate in Drinking Water at 10 ("Glyphosate is a Group E carcinogen (evidence

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

1  of no carcinogenic effects).")); SUF No. 16.  OEHHA has never re-
2  evaluated or modified those views.

3     The global community has long been in accord.  The European
4  Chemicals Agency recently concluded "the available scientific
5  evidence did not meet the criteria to classify glyphosate as a
6  carcinogen, as a mutagen or as toxic for reproduction."  Heering
7  Decl. Ex. OO (Press Release, European Chems. Agency (ECHA),
8  ECHA/PR/17/06, Glyphosate Not Classified as a Carcinogen by ECHA
9  (Mar. 15, 2017); SUF No. 30.  The European Commission's Health and
10  Consumer Protection Directorate-General has concluded that
11  glyphosate presents "[n]o evidence of carcinogenicity."  *See*
12  Heering Decl. Ex. R (Health & Consumer Prot. Directorate-Gen.,
13  European Comm'n, 6511/VI/99-final, Review Report for the Active
14  Substance Glyphosate app. II at 12 (Jan. 21, 2002)); SUF No. 18.
15  Two divisions of the World Health Organization ("WHO") have reached
16  the same conclusion.  *See* Heering Decl. Ex. S (WHO,
17  WHO/SDE/WSH/03.04/97, Glyphosate and AMPA in Drinking Water:
18  Background Document for Development of WHO Guidelines for
19  Drinking-Water Quality 5 (rev. June 2005) ("[n]o effect on
20  survival" in glyphosate "carcinogenicity study")); Heering Decl.
21  Ex. T (Int'l Programme on Chem. Safety, WHO, Environmental Health
22  Criteria 159: Glyphosate 15 (1994) ("The available studies do not
23  indicate that technical glyphosate is mutagenic, carcinogenic or
24  teratogenic.")); SUF Nos. 19-20.  And global regulators, from
25  Germany to Canada, Australia, New Zealand, Japan, South Korea, and
26
27
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

the European Chemicals Agency, have also reached the same
conclusion.[2]

    An organization known as IARC, based in Lyon, France,
disagrees with this worldwide consensus.  IARC is not a regulator.
It is an agency within the WHO that forms *ad hoc* panels to prepare
informational "Monographs" regarding the possibility that a
variety of "agents" (*e.g.*, chemicals, complex mixtures,

---

[2] *See*, *e.g.*, Heering Decl. Ex. U (1 European Comm'n, Renewal
Assessment Report: Glyphosate 35 (rev. Mar. 31, 2015) (glyphosate
is "unlikely to pose a carcinogenic risk in humans")); *id.* at 36
("In epidemiological studies in humans, there was *no evidence* of
carcinogenicity . . . ." (emphasis added)); Heering Decl. Ex. Z
(Fed. Inst. for Risk Assessment (BfR), BfR Comm'cn No. 007/2015,
Does Glyphosate Cause Cancer? (Mar. 23, 2015)); Heering Decl. Ex.
LL (*Conclusion on the Peer Review of the Pesticide Risk Assessment
of the Active Substance Glyphosate*, EFSA J., Nov. 12, 2015, at
11)); Heering Decl. Ex. MM (Food & Agric. Org. of U.N. (FAO) &
WHO, Joint FAO/WHO Meeting on Pesticide Residues: Summary Report
§ 1.2 (May 16, 2016) (finding that "glyphosate is *unlikely* to pose
a carcinogenic risk to humans")); Heering Decl. Ex. NN (Pest Mgmt.
Regulatory Agency, Health Can., RVD2017-01, Re-evaluation
Decision: Glyphosate 1 (Apr. 28, 2017) ("Glyphosate is not
genotoxic and is unlikely to pose a human cancer risk.")); Heering
Decl. Ex. PP (Austl. Pesticides & Veterinary Meds. Auth., Austl.
Gov't, Final Regulatory Position: Consideration of the Evidence
for a Formal Reconsideration of Glyphosate 9 (Mar. 2017)
(concluding "that the scientific weight-of-evidence indicates that
. . . exposure to glyphosate does not pose a carcinogenic or
genotoxic risk to humans")); Heering Decl. Ex. QQ (Wayne Temple,
N.Z. Envtl. Prot. Auth., Review of the Evidence Relating to
Glyphosate and Carcinogenicity 16 (Aug. 2016) ("[G]lyphosate is
unlikely to be genotoxic or carcinogenic . . . .")); Heering Decl.
Ex. RR (Food Safety Comm'n of Japan, Risk Assessment Report:
Pesticides: Glyphosate Summary (Sept. 2016)); Heering Decl. Ex.
CCC (Korea Rural Dev. Admin., Safety of Pesticides Containing
Glyphosate and Diazinon Confirmed (Mar. 10, 2017)); *see also*
Heering Decl. Ex. AA (Gabriella Andreotti et al., *Glyphosate Use
and Cancer Incidence in the Agricultural Health Study*, 110 J. Nat'l
Cancer Inst. at 5) (study sponsored by the U.S. National Institutes
of Health, National Cancer Institute, and the National Institute
of Environmental Health Science, confirming that there is "no
evidence of an association between glyphosate use and risk of any"
cancer); SUF No. 21-31.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1   occupational exposures, and personal habits) may be carcinogenic.

2   "[O]f all the things the IARC has looked at, there is just *one* it

3   is pretty sure *doesn't* cause cancer."  Heering Decl. Ex. V (Akshat

4   Rathi & Gideon Lichfield, *Why it Sometimes Seems Like Everything*

5   *Causes Cancer*, Quartz (June 23, 2016) (emphasis added)); SUF No.

6   32.  In March 2015, IARC released a Monograph concluding, despite

7   the global consensus otherwise, that "[g]lyphosate is *probably*

8   *carcinogenic to humans*."  Heering Decl. Ex. W (IARC Monograph 112

9   at 398 (emphasis in original)); SUF No. 33.  IARC reached that

10  conclusion based on what it conceded was "*limited evidence* in

11  humans for the carcinogenicity of glyphosate," (*i.e.*, "chance,

12  bias, or confounding could not be ruled out with reasonable

13  confidence") and it seems to have based its conclusion primarily

14  on its (again outlier) interpretation of a limited subset of

15  studies on "experimental animals" and "mechanistic" data.  Heering

16  Decl. Ex. W (IARC Monograph 112 at 27, 398 (emphasis in original));

17  SUF No. 33.

18      Many of IARC's pronouncements have provoked substantial

19  backlash among the scientific and public health communities, and

20  that has been especially true with IARC's 2015 glyphosate

21  classification.  Immediately after IARC published its Monograph,

22  EPA's Deputy Director for Pesticide Programs testified before the

23  U.S. Senate Committee on Agriculture, Nutrition and Forestry to

24  reaffirm EPA's long-standing non-carcinogenic evaluation.  *See*

25  Heering Decl. Ex. X (*Agriculture Biotechnology: A Look at Federal*

26  *Regulation and Stakeholder Perspectives: Hr'g Before the S. Comm.*

27  *on Agric., Nutrition, & Forestry*, 114 Cong. 261, 6-7 (2015)

28  (statement of William Jordan, Deputy Dir., Office of Pesticide

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1   Programs, EPA)); SUF No. 34.  Others at that hearing, such as the

2   Chief Physician at MassGeneral's Hospital for Children, observed

3   that IARC's conclusion was "not supported by the data" and "flies

4   in the face of comprehensive assessments from multiple agencies

5   globally."  Heering Decl. Ex. X (*Agriculture Biotechnology: A Look*

6   *at Federal Regulation and Stakeholder Perspectives: Hr'g Before*

7   *the S. Comm. on Agric., Nutrition, & Forestry*, 114 Cong. 261, 43);

8   SUF No. 35.  The following year, EPA's Office of Pesticide Programs

9   issued a 227-page glyphosate issue paper that concluded based upon

10  "an extensive database . . . for evaluating the carcinogenic

11  potential of glyphosate, including 23 epidemiological studies, 15

12  animal carcinogenicity studies, and nearly 90 genotoxicity

13  studies" that the available data "do no[t] support a carcinogenic

14  process for glyphosate."  *See* Heering Decl. Ex. Y (EPA, Glyphosate

15  Issue Paper: Evaluation of Carcinogenic Potential 140 (Sept. 12,

16  2016)); SUF No. 36.  EPA confirmed again in December 2017 that

17  glyphosate is "not likely to be carcinogenic to humans" in a

18  revised version of this Glyphosate Issue Paper.  Heering Decl. Ex.

19  SS (EPA, Revised Glyphosate Issue Paper: Evaluation of

20  Carcinogenic Potential EPA's Office of Pesticide Programs 139,

21  144); SUF No. 13.  In April 2019, another EPA evaluation reaffirmed

22  that "glyphosate is 'not likely to be carcinogenic to humans.'"

23  Heering Decl. Ex. WW (EPA, Glyphosate: Proposed Interim

24  Registration Review Decision 7-8, 19-20); *see also* Heering Decl.

25  Ex. XX (EPA, Glyphosate: Response to Comments on the Human Health

26  Draft Risk Assessment 2-3); SUF No. 14.  And most recently, in an

27  August 2019 letter to registrants, EPA's Office of Pesticide

28  Programs reiterated that "EPA disagrees with IARC's assessment of

glyphosate," that EPA had instead "determin[ed] that glyphosate is 'not likely to be carcinogenic to humans,'" and that EPA would therefore not approve herbicide labels bearing the contrary Proposition 65 cancer warning, which would be "false and misleading" and render a product "misbranded" under FIFRA. Heering Decl. Ex. E (EPA Aug. 2019 Letter)[3]; SUF No. 37.

Global regulators, from Germany, to Canada, to Australia, to New Zealand, to Japan, to South Korea, to the European Chemicals Agency, which have reviewed the same studies that IARC relied upon, have likewise rejected IARC's conclusion. *See*, *e.g.*, Heering Decl. Ex. Z (Fed. Inst. for Risk Assessment (BfR), BfR Comm'cn No. 007/2015, Does Glyphosate Cause Cancer? (German regulator considering and explicitly rejecting IARC's bases for its carcinogenic conclusion)); SUF Nos. 21-30. One of the most recent and most extensive epidemiological studies ever conducted of glyphosate also refutes IARC's conclusions. SUF No. 31. The Agricultural Health Study—sponsored by the U.S. National Institutes of Health, National Cancer Institute, and the National Institute of Environmental Health Science—analyzed health effects in over 54,000 pesticide applicators over the course of three decades and confirmed there is "no evidence of an association between glyphosate use and risk of any" cancer. *See* Heering Decl. Ex. AA (Gabriella Andreotti et al., *Glyphosate Use and Cancer*

---

[3] This letter reflects a duly delegated exercise of EPA's FIFRA authorities, including instructing any registrants who have added such warnings to remove them. *See Reckitt Benckiser Inc. v. EPA*, 613 F.3d 1131, 1138 (D.C. Cir. 2010) ("EPA, which is charged with administering FIFRA, has made an authoritative interpretation of its FIFRA misbranding authority that has practical and significant legal effects.").

1 *Incidence in the Agricultural Health Study*, 110 J. Nat'l Cancer

2 Inst. 5 (Nov. 9, 2017)); SUF No. 31.

3     IARC's review process, in contrast, has been criticized as

4 less robust and transparent than regulators'.  For example, in its

5 most recent review, EPA observed that "EPA's cancer evaluation is

6 more robust than IARC's" because IARC only considers publicly

7 available scientific literature.  Heering Decl. Ex. WW (EPA,

8 Glyphosate: Proposed Interim Registration Review Decision, Case

9 No. 0178, 7 (Apr. 23, 2019)); SUF No. 38.  Thus, for example, IARC

10 considered only slightly more than half of the animal

11 carcinogenicity studies that EPA considered, and IARC did not

12 consider the Agricultural Health Study, which at the time of its

13 publication in 2018 was the largest epidemiologic study to address

14 the question.  Heering Decl. Ex. WW (EPA, Glyphosate: Proposed

15 Interim Registration Review Decision, Case No. 0178, 7 (Apr. 23,

16 2019)); SUF No. 39.  As EPA further observed, unlike regulatory

17 interactions, IARC's "closed door" process does not allow for

18 public participation, comment, or peer review.  Heering Decl. Ex.

19 WW (EPA, Glyphosate: Proposed Interim Registration Review

20 Decision, Case No. 0178, 7 (Apr. 23, 2019)).  Indeed, OEHHA itself

21 has raised questions about IARC's assessment of other substances

22 in the past.  *See* Heering Decl. Ex. EE (Letter from Joan E. Denton,

23 Dir., OEHHA, to Dr. Paul Kleihues, Dir., IARC, at 2 (Feb. 7,

24 2002)); SUF No. 40.

25     Despite the overwhelming scientific consensus that glyphosate

26 does not cause cancer, over the last year juries in several

27 California cases have returned verdicts for tort claimants after

28 being informed of IARC's determination.  *See In re Roundup Prods*.

1  *Liab. Litig.*, 385 F. Supp. 3d 1042, 1044 (N.D. Cal. 2019).  Those

2  cases do not alter the scientific consensus.  But they do

3  illustrate the degree to which California would mislead consumers

4  and trample on Plaintiffs' First Amendment rights if the State

5  were allowed to force Plaintiffs *themselves* to repeat IARC's

6  conclusions as though they were established scientific fact.

7  Indeed, the district court overseeing the federal multi-district

8  litigation in which the tort claims have been consolidated found

9  it a "close question" whether even the tort claimants—who claim

10  to *believe* IARC's conclusion—could present that conclusion into

11  evidence themselves.  *In re Roundup Prods. Liab. Litig.*, 390 F.

12  Supp. 3d 1102, 1151 (N.D. Cal. 2018).  And while it ultimately

13  concluded that the tort claimants could present the evidence to

14  the jury, the court made clear its view that "[t]he evidence,

15  viewed in its totality, seems too equivocal to support any firm

16  conclusion that glyphosate causes" Non-Hodgkins' Lymphoma.  *Id.* at

17  1109; *see also id.* at 1108-09 ("[T]he evidence of a causal link

18  between glyphosate exposure and [Non-Hodgkins' Lymphoma] in the

19  human population seems rather weak," with "the largest and most

20  recent [studies] suggest[ing] there is no link at all.").[4]

21  **C.   The Proposition 65 Scheme**

22      California's Proposition 65 prohibits businesses from

23  exposing California residents to chemicals listed by the State as

24  causing cancer without providing prescribed warnings.  Cal. Health

25  _____

26  [4]  The record in these tort cases also does not reflect what is
   before this Court.  *See, e.g.*, *In re Roundup Prods. Liab. Litig.*,
   No. 16-md-02741-VC, 2019 WL 1371806, at *4 (N.D. Cal. Feb. 18,

27  2019) (granting plaintiff's motion "to exclude decisions by
   foreign regulators" from the Phase 1 causation stage of the trial,

28  and excluding those same regulators' post-2012 findings from the
   Phase 2 liability stage of the trial).

& Safety Code § 25249.6.  OEHHA is required to maintain "a list of those chemicals known to the state to cause cancer."  *Id.* § 25249.8(a).  Within twelve months after a chemical is listed, the statute requires that any "person in the course of doing business" provide a "clear and reasonable warning" before "expos[ing] any individual to" the listed chemical, unless the business can prove that an affirmative defense to the warning requirement applies.  *Id.* §§ 25249.6, 25249.10(b).  Although Proposition 65 does not define precisely what text suffices to convey a "clear and reasonable warning," the California Supreme Court has held that the statute requires a warning which conveys that the "product contains [chemical], a chemical known to the state of California to cause [cancer],' or words to that effect."  *Dowhal*, 32 Cal. 4th at 918.  Lower courts in California are in accord.  *See, e.g.*, *Tri-Union*, 2006 WL 1544384, at *61 (providing that this is the "core language . . . in any warning").  And OEHHA was in lockstep until this litigation.  *See*, *e.g.*, Heering Decl. Ex. VV (OEHHA, Revised Final Statement of Reasons, Section 12601, Clear and Reasonable Warning at 2, 4 (1988) (providing that this is a "minimum" for the warning)).  Indeed, for years, OEHHA's regulations provided that a warning message "must clearly communicate that the chemical in question is known to the state to cause cancer . . . ."  Cal. Code Regs. tit. 27, § 25603.2 (abrogated Aug. 30, 2018).

The only warnings that are assured to be found to comply with that statutory standard are OEHHA's safe harbor warnings.  Under OEHHA's new regulations, which became effective August 30, 2016 and completely replaced the prior regulations two years later,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1  Plaintiffs can shield themselves from threat of enforcement only

2  if they adopt one of the two following safe harbor warnings:

3

4  ⚠ **WARNING:** This product can expose you to chemicals including glyphosate, which is known to the State of California to cause cancer.  For more information go to www.P65Warnings.ca.gov.

5

6  ⚠ **WARNING:** Cancer - www.P65Warnings.ca.gov

7  Cal. Code Regs. tit. 27, §§ 25603(a), (b) (operative Aug. 30,

8  2018).[5]

9     Proposition 65 provides that, in addition to other

10 substances, OEHHA's "list shall include at a minimum those

11 substances identified by reference in Labor Code Section

12 6382(b)(1)."  Cal. Health & Safety Code § 25249.8(a).  Section

13 6382(b)(1) of the California Labor Code in turn references

14 "[s]ubstances listed as human or animal carcinogens by" any one of

15 several entities, including IARC.  According to OEHHA, once IARC

16 finds that a chemical is potentially carcinogenic to humans, the

17 agency's listing task is "ministerial"——it publishes a "Notice of

18 Intent to List" and provides a 30-day comment period during which

19 interested parties may claim the chemical in question has *not* "been

20 identified by reference in Labor Code section 6382(b)(1)."  Cal.

21 Code Regs. tit. 27, § 25904(c).  But OEHHA will "not consider

22 comments related to the underlying scientific basis for

23 classification."  *Id.*  In other words, OEHHA will consider whether

24 it misunderstood which chemical IARC had classified as

25

26 _____

27 [5] OEHHA subsequently amended the new regulations to allow
   substitution of the word "ATTENTION" or "NOTICE" for "WARNING" if

28 a pesticide label is regulated by EPA under FIFRA.  *See* Cal. Code
   Regs. tit. 27, § 25603(d) (effective Jan. 1, 2019).

1  carcinogenic, but it will *not* consider whether IARC erred in its
2  assessment or is a radical outlier.

3      Proposition 65 has a multi-faceted enforcement scheme.  The
4  statute imposes penalties on businesses of up to $2,500 *per day*
5  for *each* failure to provide an adequate warning.  Cal. Health &
6  Safety Code § 25249.7(b).  In addition to these penalties, the
7  statute also provides that any person who "*threatens* to violate"
8  ——that is, "create[s] a condition in which there is a substantial
9  probability that a violation will occur"——may be "enjoined in any
10 court of competent jurisdiction."  Cal. Health & Safety Code
11 §§ 25249.7(a), 25249.11(e) (emphasis added).  Claims may be
12 brought by the Attorney General, a district attorney, or a variety
13 of local government attorneys.  *Id.* § 25249.7(c).  In addition,
14 *any person* (even someone who has not been injured) may bring a
15 private enforcement action on behalf of the pubic.  Such a private
16 plaintiff——colloquially known as a "bounty hunter"——may recover up
17 to a quarter of the civil penalties plus attorneys' fees, Cal.
18 Code Regs. tit. 11, §§ 3203(b), (d), 3201.  Accordingly, private
19 litigation under Proposition 65 is a "lucrative" business.  *See*
20 James T. O'Reilly, *Stop the World, We Want Our Own Labels:*
21 *Treaties, State Voter Initiative Laws, and Federal Pre-Emption*, 18
22 U. Pa. J. Int'l Econ. L. 617, 635 (1997).

23     Because *any* exposure to *any* listed chemical sold without the
24 mandated warning may trigger civil penalties, there has been wide-
25 scale abuse of the Proposition 65 regime through bounty-hunter
26 plaintiff "strike suits."  In the words of then-Governor Jerry
27 Brown, the law has been abused by "unscrupulous lawyers driven by
28 profit rather than public health."  *See* Heering Decl. Ex. FF (Press

Release, Governor Brown Proposes to Reform Proposition 65 (May 7, 2013)); SUF No. 41.[6]  For example, one bounty hunter plaintiff successfully sued Whole Foods for "selling *firewood*" without the warning label.  *Consumer Cause, Inc. v. Mrs. Gooch's Nat. Food Mkts., Inc.*, 127 Cal. App. 4th 387, 392 (2005) (emphasis added). As California judges have noted, the Proposition 65 framework allows even frivolous suits to result in "judicial extortion" that forces defendants to settle to avoid legal fees and the costs of proving that they are not in violation of the Act.  *Consumer Cause, Inc. v. SmileCare*, 91 Cal. App. 4th 454, 477-79 (2001) (Vogel, J., dissenting); *see also Consumer Def. Grp. v. Rental Hous. Indus. Members*, 137 Cal. App. 4th 1185, 1216 (2006) (strike suits are "intended to frighten all but the most hardy of targets (certainly any small, ma and pa business)[] into a quick settlement").

The reason for this widespread abuse is straightforward—it is "absurdly easy" to initiate Proposition 65 litigation.  *Consumer Def. Grp.*, 137 Cal. App. 4th. at 1215.  The principal check against frivolous lawsuits is that private parties must file a "certificate of merit" indicating a legitimate basis for their claim.  Cal. Health & Safety Code § 25249.7(d)(1).  But this requirement is trivial to satisfy.  A bounty hunter need only "go on the internet

---

[6] *See also, e.g.*, Heering Decl. Ex. GG (Anthony T. Caso, *Bounty Hunters and the Public Interest—A Study of California Proposition 65*, 13 Engage (Issue 1), Mar. 2012, at 30, 31 (describing case in which "law firm created an 'astroturf' environmental group to be a plaintiff in Proposition 65 litigation," which group "consisted of partners from the law firm" and which "sent out hundreds of demand letters charging businesses with failure to provide warnings" and "extort[ing] payments of attorney fees or contributions to the front group")); Heering Decl. Ex. HH (Leeton Lee, *Nailed by a Bounty Hunter—A California Prop 65 Violation Can Cost Your Company*, PPB Mag. (Jan. 24, 2013) (documenting Proposition 65 bounty hunter suits)); SUF No. 42.

1  and find some common objects (e.g., furniture, paper, carpeting)

2  which may 'contain' a substance on the regulatory carcinogen

3  list. . . . [A] common place item, like a chair, doesn't have to

4  contain any significant amount either, even a few molecules will

5  do.   Next, [the bounty hunter] call[s] up a local chemistry

6  professor who will tell [him] that, at least in sufficient

7  quantities, substances in those common objects will cause cancer,

8  and are in fact on the list. . . . This phone call to your friendly

9  professor will allow you to file the certificate of merit."

10 *Consumer Def. Grp.*, 137 Cal. App. 4th at 1215.[7]

11    In contrast to established First Amendment principles, which

12 place the burden on the government to prove that the product in

13 fact poses the warned-of risk, under Proposition 65, once a suit

14 is initiated, the burden is on the defendant to establish as an

15 affirmative defense that "the exposure"——to the extent there is

16 any——"poses no significant risk assuming lifetime exposure at the

17 level in question."  Cal. Health & Safety Code § 25249.10(c).  In

18 some instances, OEHHA will predetermine a "No Significant Risk

19 Level" (NSRL) for a particular listed substance, commonly referred

20 to as a "safe harbor" exposure level.  But this safe harbor does

21 not eliminate the prospect of strike suits.   Proof that a

22 defendant's product fits within the safe harbor is an alternative

23 way the defendant may establish the affirmative defense, *DiPirro*

24

25 [7] The California Attorney General may additionally send "a letter"
   to a Proposition 65 plaintiff if he believes the enforcer's claim
   lacks merit, "stating the Attorney General believes there is no

26 merit to the action."  Cal. Health & Safety Code
   § 25249.7(e)(1)(A).  But the Attorney General is not required to

27 send such a letter.  *Id.* § 25249.7(e)(1)(B).  The private enforcer
   is also free to ignore the letter, as exemplified by past actions

28 in California state court.  *See* Decl. of Trenton H. Norris. ¶¶ 10-
   12.

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1 | *v. Bondo Corp.*, 153 Cal. App. 4th 150, 185 (2007); Cal. Health &
2 | Safety Code § 25249.10(c), but a bounty hunter "need not make *any*
3 | *showing at all*" that the product falls outside the safe harbor
4 | before filing suit, *Consumer Cause*, 91 Cal. App. 4th at 469
5 | (emphasis added).  And, in contrast, establishing the affirmative
6 | defense is costly for the defendant, usually requiring detailed
7 | scientific analyses, possibly of multiple products.  Litigating
8 | lifetime exposure or even the safe harbor is generally extremely
9 | expensive and often drags on to trial.  *See, e.g.*, *Envtl. Law*
10 | *Found. v. Beech-Nut Nutrition Corp.*, 235 Cal. App. 4th 307, 314
11 | (2015) (safe harbor defense litigated at trial).

12 | Likely because a product's compliance with an NSRL is a
13 | question of fact reliant on complex testing procedures and expert
14 | testimony, the existence of the NSRL defense has not effectively
15 | deterred bounty hunter suits; suits have been maintained even where
16 | the California Attorney General said a proposed enforcement action
17 | had no merit.  *See, e.g.*, Norris Decl. ¶¶ 11-17 (discussing lawsuit
18 | lasting for 6 years brought against McDonald's Corporation and
19 | other restaurants based on allegations that their cooked chicken
20 | exposed Californians to the listed carcinogen "PhIP," despite a
21 | California Attorney General determination that the level of PhIP
22 | in cooked chicken fell far below the level that would require a
23 | warning under Proposition 65); SUF No. 43; *see also Sciortino v.*
24 | *Pepsico, Inc.*, 108 F. Supp. 3d 780, 786 (N.D. Cal. 2015) (bounty
25 | hunter suit where safe harbor NSRL present); *Envtl. World Watch,*
26 | *Inc. v. Walt Disney Co.*, No. CV 09-04045 DDP (PLAx), 2009 WL
27 | 3365915, at *1 (C.D. Cal. Oct. 19, 2009) (same); *CKE Rests., Inc.*
28 | *v. Moore*, 159 Cal. App. 4th 262, 265 (2008) (dismissing suit

seeking declaration that bounty hunter could not initiate Proposition 65 litigation because NSRL was not exceeded). Indeed, although OEHHA promulgated a safe harbor NSRL for the chemical acrylamide decades ago, bounty hunters have sued over 180 food manufacturers and retailers, seeking Proposition 65 warnings on foods as diverse as coffee, breakfast cereal, french fries, olives, and prune juice. *See* Norris Decl. ¶¶ 31-33; SUF No. 44. Faced with such daunting litigation fees and the costs of commissioning an expert assessment, most parties logically "[s]ettle with the plaintiff," "[s]ave the cost of the assessment," "[s]ave the legal fees," and "[g]et rid of the case." *Consumer Cause*, 91 Cal. App. 4th at 478 (Vogel, J., dissenting). In other words, they succumb to "judicial extortion" and adopt a Proposition 65 warning regardless of their opposition. *Id.*

### D.   OEHHA's Glyphosate Listing And NSRL

On July 7, 2017, despite the overwhelming contrary views of the U.S. government, the international regulatory community, and even OEHHA itself that glyphosate is not carcinogenic, OEHHA listed glyphosate under Proposition 65 as a chemical "known to the state to cause cancer." *See* Heering Decl. Ex. II (OEHHA, *Glyphosate Listed Effective July 7, 2017, as Known to the State of California to Cause Cancer* (June 26, 2017)); SUF No. 47. OEHHA acknowledged that it made this listing mechanically—without conducting its own scientific analysis—based solely on the fact that IARC had issued a monograph concluding that glyphosate is "probably" carcinogenic to humans. *See* Heering Decl. Ex. JJ (OEHHA, *Notice of Intent to List: Tetrachlorvinphos, Parathion, Malathion, Glyphosate* (Sept. 4, 2015) (citation omitted)); SUF No. 48. OEHHA refused to

consider comments critiquing IARC's process and conclusion, and disclaimed any ability to address the underlying scientific dispute or reassess "the weight or quality of the evidence considered by IARC." Heering Decl. Ex. JJ (OEHHA, *Notice of Intent to List: Tetrachlorvinphos, Parathion, Malathion, Glyphosate*); SUF No. 49.

As a result of OEHHA's listing, as of July 2018 any seller or manufacturer of a product sold in California that could expose a consumer to glyphosate would have been required—but for this litigation—to either provide a "clear and conspicuous" warning conveying that the product contains a chemical "known to the state of California to cause cancer," or prepare to defend against a costly enforcement action or strike suit. Professional bounty hunters have already threatened new strike suits regarding glyphosate. *See* Heering Decl. ¶ 52; Heering Decl. Ex. KK (Joseph Perrone, *Advocacy Groups Have Ulterior Motive in Wanting Weedkiller Banned*, Modesto Bee (June 21, 2017 12:55 PM) (describing how "environmental groups cheered" at the glyphosate listing because it will be "a boon to their pocketbook")); SUF No. 51. This is consistent with past experience—Proposition 65 litigants routinely threaten litigation *within days* of the active warning date. *See* Heering Decl. ¶ 52; Norris Decl. ¶¶ 8-9; SUF No. 52. The only thing preventing the warning requirement from coming into effect—and the avalanche of bounty hunter lawsuits from beginning—is this Court's preliminary injunction enjoining enforcement of Proposition 65's warning requirement as it pertains to glyphosate. *See* PI Order at 16, ECF No. 75.

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1    On April 6, 2018, the California Office of Administrative Law

2 approved an amendment to Cal. Code Regs. tit. 27, § 25705(b)(1),

3 establishing a safe harbor NSRL of 1100 micrograms per day for

4 glyphosate, effective July 1, 2018. *See* Heering Decl. Ex. YY

5 (OEHHA, Notice of Amendment to Section 25705, No Significant Risk

6 Level – Glyphosate (2018)); Heering Decl. Ex. ZZ (OEHHA, Final

7 Regulatory Amendment Section 25705, Glyphosate (2018)); Heering

8 Decl. Ex. AAA (OEHHA, Final Statement of Reasons, Section 25705(b),

9 Specific Regulatory Levels Posing No Significant Risk, No

10 Significant Risk Level: Glyphosate (2018) [hereinafter "OEHHA

11 Final Statement of Reasons for NSRL"]); SUF No. 53.   OEHHA felt

12 constrained by regulation when developing the NSRL for glyphosate

13 to rely on the same narrow set of studies and flawed analysis that

14 IARC itself considered. *See* Heering Decl. Ex. AAA (OEHHA Final

15 Statement of Reasons for NSRL at 6-7); SUF No. 54.[8]  Indeed, OEHHA

16 expressly concluded in setting the NSRL that comments regarding

17 whether IARC correctly classified glyphosate as "probably

18 carcinogenic" were "not directed to the subject of this

19 rulemaking," and refused to address such comments. *See* Heering

20 ─────────────────────

21 [8] As OEHHA pointed out, in developing the NSRL for glyphosate,
OEHHA "followed the guidance set forth in Section 25703 that [its]

22 assessment 'be based on evidence and standards of comparable
scientific validity to the evidence and standards which form the

23 scientific basis for the listing of the chemical as known to the
state to cause cancer', and based the NSRL on the results of the

24 most sensitive scientific study deemed to be of sufficient
quality." Heering Decl. Ex. AA (OEHHA Final Statement of Reasons

25 for NSRL at 7 (citing Cal. Code Regs. tit. 27, § 25703(a)(3))).
Nowhere in the NSRL process was OEHHA authorized to reconsider

26 whether glyphosate is "known" to "cause cancer" taking all
available scientific studies into account. *See* Cal. Health &

27 Safety Code § 25249.10(c); Cal. Code Regs. tit. 27, §§ 25701,
25703.   Nor was OEHHA authorized to consider whether IARC was

28 correct in concluding based on "limited evidence in humans," that
glyphosate is "*probably* carcinogenic." Heering Decl. Ex. AA (OEHHA
Final Statement of Reasons for NSRL at 4).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1  Decl. Ex. AAA (OEHHA Final Statement of Reasons for NSRL at 2

2  (noting OEHHA's refusal to address comments "supporting or

3  disagreeing with IARC's classification of glyphosate as a Group 2A

4  carcinogen")); SUF No. 55.   Instead, OEHHA identified a single

5  mouse study on which IARC relied as the "most sensitive study

6  deemed to be of sufficient quality," Cal. Code Regs. tit. 27,

7  § 25703(a)(3), and derived the NSRL 1100 micrograms per day for

8  glyphosate based on data in that one study.   *See* Heering Decl. Ex.

9  AAA (OEHHA Final Statement of Reasons for NSRL at 6-7 & n.24); SUF

10 No. 56.[9]

11     **E.   Significant Effects Of Proposition 65's Glyphosate
          Warning Requirement**

12     Absent a permanent injunction, the Proposition 65 glyphosate

13 warning requirement would have severe adverse impacts on

14 Plaintiffs.  Plaintiffs (and their members) who sell glyphosate to

15 public and private entities (including consumers) in California

16 will be faced with a "Hobson's choice," *Baxter Healthcare Corp. v.*

17 *Denton*, 120 Cal. App. 4th 333, 344 (2004)——either communicate to

18 consumers a disparaging health warning about glyphosate products

19 that is contrary to nearly all global scientific regulatory

20 findings of glyphosate's safety (and, indeed, contrary to EPA's

21 determination that the warning would be false and misleading) or

22

23 ────────────────

24 [9] Notably, in 2006 the World Health Organization and the Food and
   Agriculture Organization of the UN reviewed that same mouse study,
25 and concluded that "[o]wing to the lack of a dose-response
   relationship, the lack of statistical significance and the fact
26 that the incidences recorded in this study fell within the
   historical ranges for controls, these changes are not considered
27 to be caused by administration of glyphosate," and that the
   "administration of glyphosate to CD-1 mice for 104 weeks produced
28 no signs of carcinogenic potential at any dose." *See* Heering Decl.
   Ex. BBB (Int'l Programme on Chem. Safety, WHO, Pesticide Residues
   in Food – 2004: Toxicology Evaluations (2006)); SUF No. 57.

1    face the significant risk of suit under Proposition 65 for failing

2    to do so.   Heering Decl. ¶¶ 41-45, 55; Decl. of Renee Pinel,

3    W. Plant Health Ass'n ¶¶ 14-15; SUF No. 59.

4        That remains true notwithstanding OEHHA's establishment of a

5    safe harbor NSRL.   As explained above, showing that a product

6    satisfies a safe harbor NSRL established by OEHHA is merely an

7    alternative way of seeking to prove the general "no significant

8    risk" affirmative defense, and does nothing to prevent a plaintiff

9    from litigating a Proposition 65 lawsuit up through trial.   Cal.

10   Health & Safety Code § 25249.10(c).   Without an injunction,

11   Plaintiffs would be forced to choose between providing the warning,

12   or undertaking costly assessments to demonstrate that exposures to

13   glyphosate from their products will fall below the NSRL and

14   incurring the substantial risks and costs of defending against

15   enforcement actions.   Heering Decl. ¶¶ 41-42, 45, 55; Pinel Decl.,

16   W. Plant Health Ass'n ¶¶ 13-16; Decl. of Ray McCarty, Associated

17   Indus. of Mo. ¶ 10; Mehan Decl., Mo. Chamber of Com. & Indus.

18   ¶¶ 10-11; SUF No. 60.

19       The warning requirement would have similar impacts, should it

20   come into effect, for entities that sell finished food products

21   into California that are made using glyphosate-treated crops, like

22   members of Plaintiffs Missouri Chamber of Commerce and Industry

23   and Associated Industries of Missouri.   *See, e.g.*, Jackson Decl.,

24   Iowa Soybean ¶¶ 14-32; Mehan Decl., Mo. Chamber of Com. & Indus.

25   ¶¶ 9-17; McCarty Decl., Associated Indus. of Mo. ¶¶ 10-12; SUF No.

26   61.   Members of these Plaintiffs would face an imminent choice

27   between (1) providing a disparaging glyphosate warning for their

28   products that is contrary to the worldwide scientific consensus,

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1   which would diminish demand for those products; (2) engaging in

2   costly efforts to demonstrate that any exposures to glyphosate

3   residues on their products would fall below any established NSRL

4   or requiring their suppliers to undertake those efforts (which

5   still would not prevent the likely prospect of expensive

6   enforcement actions); or (3) halting the use of glyphosate-treated

7   crops as inputs. *See* Mehan Decl., Mo. Chamber of Com. & Indus.

8   ¶¶ 10-11; Stoner Decl., Nat'l Ass'n of Wheat Growers ¶¶ 17-21;

9   Decl. of Kathleen Zander, S.D. Agri-Business Ass'n ¶¶ 14-18;

10  Jackson Decl., Iowa Soybean Ass'n ¶¶ 17-20; Martinson Decl., U.S.

11  Durum Growers Ass'n ¶¶ 15-19; McCarty Decl., Associated Indus. of

12  Mo. ¶¶ 8-13; SUF No. 62.

13      The pressures on these Plaintiffs would then have ripple

14  effects on farmers upstream:  Under the threat of Proposition 65

15  enforcement, many grain handlers and finished food producers would

16  demand that farmers providing inputs either cease using glyphosate

17  on their crops altogether or certify that their crops do not

18  contain glyphosate residues beyond particular levels, which would

19  require expensive testing or segregation of glyphosate-treated

20  crops from non-glyphosate-treated crops——each an undesirable

21  option that would require modifications to business practices

22  around the country and carry considerable expense. *See, e.g.*,

23  Hurst Decl., Mo. Farm Bureau ¶¶ 12-14; Decl. of Blake Inman, U.S.

24  Durum Growers Ass'n ¶¶ 18-21; Mehan Decl., Mo. Chamber of Com. &

25  Indus. ¶¶ 10-17; Stoner Decl., Nat'l Ass'n of Wheat Growers ¶¶ 14-

26  21; Kessel Decl., N.D. Grain Growers Ass'n ¶¶ 8-13; Jackson Decl.,

27  Iowa Soybean Ass'n ¶¶ 18-20; McCarty Decl., Associated Indus. of

28  Mo. ¶¶ 11-14; SUF No. 63.  This would dramatically affect the

1  practices and businesses of farmers across the country, including

2  members of Plaintiffs National Association of Wheat Growers,

3  National Corn Growers Association, United States Durum Growers

4  Association, Missouri Farm Bureau, Iowa Soybean Association, North

5  Dakota Grain Growers Association, and Missouri Chamber of Commerce

6  and Industry.[10]   Mehan Decl., Mo. Chamber of Com. & Indus. ¶¶ 10-

7  19; Wogsland Decl., N.D. Grain Growers Ass'n ¶¶ 15-25; Hurst Decl.,

8  Mo. Farm Bureau ¶¶ 13-25; Inman Decl., U.S. Durum Growers Ass'n

9  ¶¶ 16-30; Stoner Decl., Nat'l Ass'n of Wheat Growers ¶¶ 17-30;

10  Kessel Decl., N.D. Grain Growers Ass'n ¶¶ 9-20; Doggett Decl.,

11  Nat'l Corn Growers Ass'n ¶¶ 12-23; Zander Decl., S.D. Agri-

12  Business Ass'n ¶¶ 12-20; Jackson Decl., Iowa Soybean Ass'n ¶¶ 17-

13  28; Martinson Decl., U.S. Durum Growers Ass'n ¶¶ 15-26; Pinel

14  Decl., W. Plant Health Ass'n ¶¶ 17-18, 20; SUF No. 64.

15      **F.   Proceedings Before This Court**

16      Plaintiffs filed their complaint on November 15, 2017, and

17  filed an amended complaint on December 5, 2017, bringing claims

18  under the First Amendment, the Supremacy Clause, and the Due

19  Process Clause of the Fourteenth Amendment, and seeking

20  declaratory and injunctive relief.  *See* ECF Nos. 1, 23.  Shortly

21  thereafter, Plaintiffs moved for a preliminary injunction based

22  solely on their First Amendment claim.  *See* ECF Nos. 29, 29-1.

23  After briefing and oral argument, this Court granted that

24  ───────────────

25  [10] For these and other reasons, Plaintiffs have Article III standing
    and this case is ripe.  *See, e.g.*, *Libertarian Party of L.A. Cty.
    v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) (recognizing that the
26  Article III "inquiry tilts dramatically toward a finding of
    standing" in the case of "First Amendment challenges"); *see also*
27  PI Order at 6-10, ECF No. 75 (concluding that Plaintiffs have
    identified multiple "cognizable injuries" and that their challenge
28  is ripe); Reply in Supp. of Prelim. Inj. at 8-30, ECF No. 66
    (addressing standing and ripeness arguments).

1   preliminary injunction. *See* PI Order at 19, ECF No. 75.  The Court

2   first found that Plaintiffs' First Amendment challenge was both

3   constitutionally and prudentially ripe for decision.  *Id.* at 5-

4   10.  Applying *Zauderer*, this Court then held that Plaintiffs had

5   "established a likelihood of success on the merits of their claim

6   that the warning requirement violates their First Amendment

7   rights" because "the required warning is factually inaccurate and

8   controversial" in light of "the heavy weight of evidence in the

9   record that glyphosate is not in fact known to cause cancer." *Id.*

10  at 17.

11       The Attorney General sought reconsideration. *See* Defs.' Mot.

12  to Alter or Amend Court's Order Granting Prelim. Inj. at 1, ECF

13  No. 81-1 ("Motion to Alter").  The Attorney General argued that

14  this Court's First Amendment holding was clearly erroneous and, in

15  addition, urged the Court to consider the permissibility of certain

16  supposedly Proposition 65-compliant alternative warning options.

17  *Id.* at 4-5, 12.  But the Court denied that motion.  The Court found

18  that its initial decision was not clearly erroneous, and that even

19  assuming the Attorney General's alternative warning options

20  complied with Proposition 65 they would "not change the court's

21  conclusion that the required Proposition 65 warning for glyphosate

22  is not purely factual and uncontroversial." Mem. & Order re: Mot.

23  to Alter or Amend PI Order at 4-5, ECF No. 97 ("Order on Motion to

24  Alter").  That conclusion, this Court recognized, would likely

25  require entry of judgment in favor of Plaintiffs on their First

26  Amendment claim.  *Id.*

27

28

ARGUMENT

A party may move for summary judgment on any claim, defense, or part of any claim or defense, and the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). Thus, "[s]ummary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018) (quoting *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017)). Here, as a matter of law, Proposition 65's warning requirement for glyphosate violates the First Amendment. Thus, summary judgment should be entered in favor of Plaintiffs, along with a permanent injunction against enforcement of the warning requirement as it pertains to glyphosate.

## I.   THE COMPELLED GLYPHOSATE WARNING VIOLATES THE FIRST AMENDMENT

In general, the First Amendment forbids regulations that *compel* speech to the same extent that it forbids regulations that *restrict* speech. *See, e.g.*, *Janus*, 138 S. Ct. at 2464 ("Perhaps because such compulsion so plainly violates the Constitution, most of our free speech cases have involved restrictions on what can be said, rather than laws compelling speech. But measures compelling speech are at least as threatening."); *Hurley*, 515 U.S. at 573 ("[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" (citation omitted)). And regulations of non-misleading commercial speech are, in general, subject at least to intermediate scrutiny,

1   under which the government must show its regulation directly

2   advances a substantial government interest and is no more

3   "extensive than is necessary to serve that interest." *Cent. Hudson*

4   *Gas & Elec. Co. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566

5   (1980).

6   In *Zauderer*, the Supreme Court recognized a narrow exception

7   to this intermediate scrutiny. *Zauderer* held that the government

8   may compel the disclosure of "purely factual and uncontroversial

9   information" about commercial products or services in certain

10   circumstances where the compelled message is reasonably related to

11   a substantial governmental interest and is neither "unjustified

12   [n]or unduly burdensome."   471 U.S. at 651 (upholding rule

13   requiring lawyer to disclose on advertisements that in contingency

14   cases client would still be liable for costs, because the

15   advertisements would otherwise be misleading). But as the Supreme

16   Court recently emphasized in *NIFLA*, *Zauderer*'s more lenient form

17   of First Amendment scrutiny is available *only* where the state-

18   mandated compelled speech is "purely factual and uncontroversial."

19   138 S. Ct. at 2372. Where a compelled disclosure is *not* "purely

20   factual and uncontroversial," the "*Zauderer* standard does not

21   apply." *Id.*; *see also CTIA*, 928 F.3d at 842 ("Under *Zauderer* . . .

22   the compelled disclosure . . . [must] involve[] 'purely factual

23   and uncontroversial information' that relates to the service or

24   product provided."); *Am. Beverage Ass'n*, 916 F.3d at 756.[11]

25   ───────────────

26   [11] *NIFLA* also held that the more lenient *Zauderer* standard applies
only to required disclosures of "information *about the terms under
which . . . services will be available*." *NIFLA*, 138 S. Ct. at

27   2372 (emphasis added); *see id.* ("*Zauderer* does not apply outside
of these circumstances."). Plaintiffs believe that earlier cases

28   show that such information can be the subject of "[c]ompelled

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1    Here, that heightened review is appropriate because the

2  Attorney General cannot satisfy his "burden of demonstrating that

3  [the]   disclosure   requirement   is   purely   factual   and

4  uncontroversial."  PI Order at 12, ECF No. 75; *see also NIFLA*, 138

5  S. Ct. at 2377 (government "has the burden to prove that [compelled

6  speech] is neither unjustified nor unduly burdensome"); *Am. Meat*

7  *Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 26 (D.C. Cir. 2014)

8  (en banc) (the government must "meet[] its burden of showing that

9  the mandate advances its interest in making the 'purely factual

10 and uncontroversial information' accessible to the recipients").

11 That is true whether one considers just the warnings authorized by

12 Proposition 65 and its implementing regulations, or the additional

13 warnings the Attorney General produced when he moved for

14 reconsideration of the Court's preliminary injunction.   These

15 inaccurate, misleading, and controversial warnings plainly fail

16 under the *Central Hudson* test, and the First Amendment and Due

17 Process Clause prevent any further efforts by the Attorney General

18 to invent new warnings even less moored to the statute in his

19 efforts to avoid judgment.

20

21

22 _____

   disclosures" only where, as in *Zauderer* itself, the disclosure is
23 "justified by the need to 'dissipate the possibility of consumer
   confusion or deception.'"  *Video Software Dealers Ass'n*, 556 F.3d
24 at 966 (quoting *Zauderer*, 471 U.S. at 651)).  Where, as here, the
   required warning does not operate to correct misleading
25 advertising, Plaintiffs believe that *Zauderer* is inapplicable and
   the more exacting *Central Hudson* standard should govern.  *See id.*;
26 *United States v. United Foods, Inc.*, 533 U.S. 405, 416 (2001);
   *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229,
27 250 (2010).  The Ninth Circuit recently held otherwise, however,
   and Plaintiffs therefore raise the issue only to preserve it for
28 future review, should such review become necessary.  *See Am.*
   *Beverage Ass'n*, 916 F.3d at 756.

A.   **The Compelled Glyphosate Warning Cannot Be Sustained Under *Zauderer* Because It Is Not "Purely Factual And Uncontroversial"**

1.   ***The Warning Mandated By Proposition 65 Cannot Be Sustained Under* Zauderer**

Once a chemical is "listed" under Proposition 65, the statute requires that any "person in the course of doing business" provide a "clear and reasonable warning" before "expos[ing] any individual to" the listed chemical, unless an affirmative defense to the warning requirement applies. Cal. Health & Safety Code §§ 25249.6, 25249.10(b). The California Supreme Court has held that, under the statute, such a warning must convey that "this product contains [chemical], a chemical known to the state of California to cause reproductive harm [or cancer],' or words to that effect." *Dowhal*, 32 Cal. 4th at 918; *see also, e.g.*, *Tri-Union*, 2006 WL 1544384, at *61 (providing that this is the "core language . . . in any warning" (emphasis added)).

A state requirement that Plaintiffs issue such warnings for glyphosate cannot be upheld under *Zauderer*. As just discussed, review under *Zauderer*'s more lenient standard is limited to compelled disclosure of uncontroversial factual information, the accuracy of which cannot be reasonably disputed. *See supra* at 32-33. For example, courts have allowed the government to compel the disclosure of a product's country of origin, *American Meat Institute*, 760 F.3d at 27; whether a product contains mercury, *National Electrical Manufacturers Ass'n v. Sorrell*, 272 F.3d 104, 107 (2d Cir. 2001); the costs a client is liable to pay, *Zauderer*, 471 U.S. at 650; and what contents are included in a package of services offered, *Milavetz, Gallop & Milavetz*, 559 U.S. at 232——

1    all uncontroversial facts that can be reasonably and definitively

2    ascertained.

3         By contrast, the government cannot force its citizens to

4    broadcast the government's⸺or any third party's⸺subjective

5    opinions. *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,

6    475 U.S. 1, 13-14 (1986) (plurality op.); *Video Software Dealers*

7    *Ass'n*, 556 F.3d at 965-67.   Thus, the government cannot under

8    *Zauderer* compel disclosure of purported "facts" over which there

9    is significant room for disagreement, either directly

10   ("Controversial Fact X is true") or indirectly ("The Government

11   has concluded that Controversial Fact X is true.").   For example,

12   in *CTIA-Wireless Ass'n v. City & County of San Francisco*, the Ninth

13   Circuit affirmed a preliminary injunction of a requirement that

14   cell phone dealers inform consumers about health risks from the

15   phones' radiofrequency energy emissions.   494 F. App'x 752, 753

16   (9th Cir. 2012).   The warning contained suggestions as to "what

17   consumers should do" to avoid exposure⸺language that

18   "could . . . be interpreted by consumers as expressing San

19   Francisco's opinion that using cell phones is dangerous."   *Id*.

20   Such an impression would have conflicted with the Federal

21   Communications Commission's (FCC) "established limits," within

22   which radiofrequency energy exposure is considered safe, and would

23   have waded directly into an ongoing "debate in the scientific

24   community about the health effects of cell phones."   *Id.* at 753-

25   54; *see also Nat'l Ass'n of Mfrs. v. S.E.C.*, 800 F.3d 518, 537

26   (D.C. Cir. 2015) (Srinivasan, J., dissenting) (conceding that,

27   under *Zauderer*, "the government cannot attempt to prescribe, under

28   the guise of requiring disclosure of 'purely factual' information,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1  . . . 'matters of opinion.'  If a compelled statement communicates

2  a 'matter of opinion,' it of course would not be 'purely factual'"

3  (citation omitted)).

4      Sometimes, determining whether a compelled warning is purely

5  factual and uncontroversial "may be difficult."  *Am. Meat Inst.*,

6  760 F.3d at 34 (Kavanaugh, J., concurring).  But the determination

7  is easy in this case.  As this Court has previously found, "the

8  most obvious reading of the Proposition 65 cancer warning is that

9  exposure to glyphosate in fact causes cancer."  PI Order at 14,

10  ECF No. 75.  That message is the opposite of "purely factual and

11  uncontroversial."   As  the  chart  attached  as  Appendix  1

12  demonstrates, the chief U.S. glyphosate regulator——the EPA——and

13  virtually every other national regulator that has studied the

14  question has concluded that the message is wrong.  *See supra* at 7-

15  11.  Even *California's own expert regulator* has twice found that

16  glyphosate does not cause cancer.  *See supra* at 9-10.

17      Indeed, regulators around the world specifically rejected

18  IARC's conclusion after it was rendered and after reviewing much

19  of  the  same  evidence  as  IARC.   For  example, Germany's BfR

20  concluded, despite IARC's contrary designation, that it continued

21  to assess "glyphosate as non-carcinogenic."  *See* Heering Decl. Ex.

22  Z (BfR, Does Glyphosate Cause Cancer? at 1); SUF No. 22.  BfR noted

23  that  it  "ha[d]  compiled  the  most  comprehensive  toxicological

24  database, presumably worldwide, for glyphosate" and that "the

25  entire  database"——rather  than  IARC's  "more  or  less  arbitrary

26  selection of studies"——supported the non-carcinogenic conclusion.

27  Heering Decl. Ex. Z (BfR, Does Glyphosate Cause Cancer? at 1-2).

28  The  European  Union's  European  Food  Safety  Authority  (EFSA)

1  likewise rebutted IARC's unfounded classification and set forth

2  reasons for its disagreement similar to those expressed by BfR.

3  *See* Heering Decl. Ex. LL (EFSA, *Conclusion on the Peer Review of*

4  *the Pesticide Risk Assessment of the Active Substance Glyphosate*

5  at 11, EFSA J. (Nov. 12, 2015)); SUF No. 23. And, notably, although

6  IARC is part of the WHO, a separate component of the WHO concluded

7  in a 2016 review, after the IARC classification, that "glyphosate

8  is *unlikely* to pose a carcinogenic risk to humans." *See* Heering

9  Decl. Ex. MM (Food & Agric. Org. of U.N. (FAO) & WHO, Joint FAO/WHO

10 Meeting on Pesticide Residues: Summary Report § 1.2 (May 16, 2016)

11 (emphasis added)); SUF No. 24. At the risk of belaboring the

12 point, regulators from Canada, the European Chemicals Agency,

13 Australia, New Zealand, Japan, and South Korea also agree with the

14 non-carcinogenic consensus. *See* Heering Decl. Ex. NN (Pest Mgmt.

15 Regulatory Agency, Health Can., RVD2017-01, Re-evaluation

16 Decision: Glyphosate 1 (Apr. 28, 2017) ("Glyphosate is not

17 genotoxic and is unlikely to pose a human cancer risk.")); Heering

18 Decl. Ex. DDD (Statement from Health Canada on Glyphosate, Health

19 Can. (Jan. 11, 2019)); Heering Decl. Ex. OO (Press Release,

20 European Chems. Agency (ECHA), ECHA/PR/17/06, Glyphosate Not

21 Classified as a Carcinogen by ECHA (Mar. 15, 2017) (March 2017

22 conclusion that "the available scientific evidence did not meet

23 the criteria to classify glyphosate as a carcinogen, as a mutagen

24 or as toxic for reproduction.")); Heering Decl. Ex. PP (Austl.

25 Pesticides & Veterinary Meds. Auth., Final Regulatory Position:

26 Consideration of the Evidence for a Formal Reconsideration of

27 Glyphosate 9 (Mar. 2016) (concluding "that the scientific weight-

28 of-evidence indicates that . . . exposure to glyphosate does not

1  pose a carcinogenic or genotoxic risk to humans")); Heering Decl.

2  Ex. QQ (Wayne Temple, N.Z. Envtl. Prot. Auth., Review of the

3  Evidence Relating to Glyphosate and Carcinogenicity 16 (Aug. 2016)

4  ("[G]lyphosate is unlikely to be genotoxic or carcinogenic."));

5  Heering Decl. Ex. RR (Food Safety Comm'n of Japan, Risk Assessment

6  Report: Pesticides, Glyphosate Summary (Sept. 2016)); Heering

7  Decl. Ex. CCC (Korea Rural Dev. Admin., Assessment of the Safety

8  of Pesticides Containing Glyphosate and Diazinon (Mar. 10, 2017));

9  SUF Nos. 25-30; *see also* Heering Decl. Ex. AA (Gabriella Andreotti

10  et al., *Glyphosate Use and Cancer Incidence in the Agricultural*

11  *Health Study*, 110 J. Nat'l Cancer Inst. at 7) (study sponsored by

12  the U.S. National Institutes of Health, National Cancer Institute,

13  and the National Institute of Environmental Health Science,

14  confirming that there is "no evidence of an association between

15  glyphosate use and risk of any" cancer); Heering Decl. Ex. SS (EPA,

16  Revised Glyphosate Issue Paper: Evaluation of Carcinogenic

17  Potential EPA's Office of Pesticide Programs 138, 144) (EPA

18  evaluation finding that glyphosate is "not likely to be

19  carcinogenic to humans" and that "[b]ased on all of the available

20  data, the weight-of-evidence clearly do not support the

21  descriptors 'carcinogenic to humans' and 'likely to be

22  carcinogenic to humans' at this time."); Heering Decl. Ex. WW (EPA,

23  Glyphosate: Proposed Interim Registration Review Decision 7-8,

24  19-20 (explaining that "EPA's cancer evaluation" concluding that

25  "glyphosate is 'not likely to be carcinogenic to humans'" is both

26  "more robust" and "more transparent" than IARC's evaluation));

27  Heering Decl. Ex. XX (EPA, Glyphosate: Response to Comments on the

28

1   Human Health Draft Risk Assessment 2-3); Heering Decl. Ex. E (EPA

2   Aug. 2019 Letter); SUF Nos. 13-14, 31.

3       In *CTIA v. City of San Francisco*, the warning's conflict with

4   the view of FCC was sufficient to establish that the warning was

5   not purely factual and uncontroversial.  494 F. App'x at 753

6   (contrasting San Francisco's warning language, which "could prove

7   to be interpreted by consumers as expressing San Francisco's

8   opinion that using cell phones is dangerous," with the position of

9   the "FCC . . . [which] has established limits of radiofrequency

10  energy exposure, within which it has concluded using cell phones

11  is safe").  Here, the chorus of dissent is far louder.  A purported

12  health warning cannot be upheld as "purely factual and

13  uncontroversial" when nearly every regulator worldwide believes it

14  is wrong, and the primary federal agency with jurisdiction to

15  address the issue has expressly concluded that *giving* the warning

16  would be "false and misleading."  Heering Decl. Ex. E (EPA Aug.

17  2019 Letter); SUF No. 37.

18              2.   ***The Alternative Warnings Proposed By The Attorney***
                     ***General Also Cannot Be Upheld Under* Zauderer**

19

20      In an attempt to escape the fundamental inconsistency between

21  the First Amendment and Proposition 65's warning requirement as

22  applied to glyphosate, the Attorney General previously proffered

23  two alternative "Warning Options."  *See* Mot. to Alter at 5-16,

24  ECF No. 81-1.  This Court held that neither alternative warning

25  would solve the Attorney General's constitutional problem.

26  *See* Order on Mot. to Alter at 4-5, ECF No. 97 (finding that, even

27  if compliant with Proposition 65, the Attorney General's

28  additional warning options would "not change the court's

1   conclusion that the required Proposition 65 warning for glyphosate

2   is not purely factual and uncontroversial"). Should the Attorney

3   General attempt to resuscitate this argument at the summary

4   judgment stage, the Court should reject it again.

5            a.   *"Warning Option 1" Would Not Comply With*

6               *Zauderer*

7     The first warning offered up by the Attorney General——Warning

8   Option 1——would require Plaintiffs to inform their customers as

9   follows:

10     **WARNING:** This product can expose you to glyphosate, a
      chemical listed as causing cancer pursuant to the
11     requirements of California law. For more information go
      to www.P65warnings.ca.gov.
12

13   Mot. to Alter at 5, ECF No. 81-1. But this is no solution. To

14   the extent this warning complies with Proposition 65's

15   requirements, it conclusively falls short of *Zauderer*'s.

16     As discussed, the California Supreme Court has held that a

17   Proposition 65 warning must convey that "th[e] product contains

18   [chemical], a chemical known to the state of California to cause

19   reproductive harm [or cancer],' or words to that effect." *Dowhal*,

20   32 Cal. 4th at 918; *see also supra* at 17 (collecting additional

21   sources). It is far from certain that, in an enforcement action,

22   Warning Option 1 would be found compliant. In arguing that it

23   would, the Attorney General previously contended that Warning

24   Option 1 would comply with Proposition 65 because it "clearly

25   communicate[s] that [glyphosate] is known to the state to cause

26   cancer," as the regulations then in effect explicitly required.

27   Cal. Code Regs. tit. 27, § 25601 (abrogated Aug. 30, 2018); *see*

28   *also see* Mot. to Alter at 4 n.4, ECF No. 81-1. But if Warning

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

Option 1 conveys that message, and is thereby compliant with Proposition 65, it would *not* be compliant with the First Amendment because——as this Court previously recognized——"the message that glyphosate is known to cause cancer is misleading at best." PI Order at 14, ECF No. 75; *see also* Order on Mot. to Alter at 6, ECF No. 97 ("Stating that a chemical is listed as causing cancer 'pursuant the requirements of California law' conveys essentially the same message to consumers as stating that a chemical is known to the state of California to cause cancer.").

Under *Zauderer*, a compelled disclosure stands or falls based on what it "convey[s]" to the "consumer[]." *Video Software Dealers Ass'n*, 556 F.3d at 967. And regardless of whether it is literally true, the statement that glyphosate is "a chemical listed as *causing cancer* pursuant to the requirements of California law" conveys to consumers that glyphosate causes cancer. "Ordinary consumers do not interpret warnings in accordance with a complex web of statutes, regulations, and court decisions." PI Order at 14, ECF No. 75; *see also* Order on Mot. to Alter at 6, ECF No. 97 (same). And "'the most obvious reading' of [this] warning" is that glyphosate is "listed as causing cancer" *because it causes cancer*. Order on Mot. to Alter at 6 (citation omitted). What else could a reasonable consumer take from such a message? Certainly not the truth——that after a thorough review of the science, virtually all regulatory and governmental bodies do *not* believe that glyphosate causes cancer. California cannot circumvent through word games the First Amendment's prohibition on laws that compel false, misleading, or factually controversial speech.

b.   *"Warning Option 2" Would Not Comply with*

*Zauderer*

Warning Option 2 fares no better.   Under this "option,"
Plaintiffs would provide the following warning:

> **WARNING:**   This product can expose you to glyphosate, a
> chemical listed as causing cancer pursuant to the
> requirements of California law.   The listing is based on
> a determination by the United Nations International
> Agency for Research on Cancer that glyphosate presents
> a cancer hazard.   The U.S. Environmental Protection
> Agency has tentatively concluded in a draft document
> that glyphosate does not present a cancer hazard.   For
> more information go to www.P65warnings.ca.gov.

Mot. to Alter at 12, ECF No. 81-1.

This warning would not even arguably comply with Proposition
65.   Indeed, the Attorney General did not genuinely contend that
it would.   *See id.* at 2 (arguing only that "[i]n the event the
Court were to find that even Warning Option 1 was misleading in
light of the unique circumstances of this case," Warning Option 2
would become available).   Because Warning Option 2 is designed to
acknowledge (albeit to a grossly inadequate extent) that there is
reason to doubt IARC's determination, it would violate the Attorney
General's own interpretation of Proposition 65.   Regulations
issued by the Attorney General state that use of "additional words
or phrases that contradict or obfuscate otherwise acceptable
warning language" will prevent a warning from being "clear and
reasonable" as required by the statute.   Cal. Code Regs. tit. 11,
§ 3202(b).   According to those regulations, the statute bars even
the "use of the adverb 'may' to modify whether the chemical causes
cancer," *id.*, because that would cast doubt on the required message
that the chemical in question *does* cause cancer.   If introducing
uncertainty of even that limited sort is impermissible, then it

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1   obviously is impermissible to introduce uncertainty of a greater

2   sort—not just suggesting that the State's cancer determination

3   "may" be wrong, but providing readers with information about one

4   of the (innumerable) studies that directly contradicts the State's

5   determination and says that it *is* wrong. As this Court recognized,

6   "[i]t . . . appears that a warning properly characterizing the

7   debate as to glyphosate's carcinogenicity would not comply with

8   Proposition 65," and "[t]he Attorney General's second alternate

9   warning, by discussing the EPA's contrary finding that glyphosate

10  does not cause cancer, appears to 'contradict or obfuscate

11  otherwise acceptable warning language' in violation of" Cal. Code

12  Regs. tit. 11 § 3202(b). Order on Mot. to Alter at 9 n.7, ECF No.

13  97; *see also* PI Order at 15 n.12, ECF No. 75 ("California's

14  regulations appear to make it impossible for plaintiffs to explain

15  in the warning that the IARC's determination is contrary to that

16  reached by other organizations . . . ."). Because Plaintiffs

17  using Warning Option 2 would be found non-compliant with

18  Proposition 65, it is not a viable option.

19      But even if the Attorney General were correct in his earlier,

20  equivocal suggestion that Warning Option 2 complies with

21  Proposition 65, *see* Mot. to Alter at 3 & n.3, ECF No. 81-1, it

22  would still be unconstitutional. The limited additional

23  information permitted in Warning Option 2 would not remedy the

24  misleading message conveyed by its "listed as causing cancer"

25  language; rather, it would make express that the State's compelled

26  disclosure *is* controversial. *Zauderer* does not permit the

27  government to end-run its "uncontroversial" requirement by

28  disclosing the fact of controversiality within the mandated

1  speech.  *Cf. Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights*
2  *Comm'n*, 138 S. Ct. 1719, 1745 (2018) (Thomas, J., concurring)
3  (explaining similar option was unavailing because if successful it
4  could be used to "justify any law compelling speech").  Further,
5  even though Warning Option 2 adds some additional context to the
6  basic Proposition 65 warning by providing the views of one body
7  from each side of the debate, depicting this debate as evenly
8  balanced is *itself* misleading where "only one health organization
9  ha[s] found that the substance in question causes cancer and
10 virtually all other government agencies and health organizations
11 that have reviewed studies on the chemical ha[ve] found there was
12 no evidence that it caused cancer."  PI Order at 14, ECF No. 75;
13 Order on Mot. to Alter at 9, ECF No. 97 ("The Attorney General's
14 second alternative warning is also deficient because it conveys
15 the message that there is equal weight of authority for and against
16 the proposition that glyphosate causes cancer, or that there is
17 more evidence that it does . . . ."); *see also supra* at 7-11
18 (describing the almost entirely uniform body of research finding
19 no evidence that glyphosate causes cancer).  The amount of space
20 "allocated to a [controversial view], whether a lot or a little,
21 can skew debate on issues" unconstitutionally.  *Amidon v. Student*
22 *Ass'n of S.U.N.Y.*, 508 F.3d 94, 101 (2d Cir. 2007).  Here, forcing
23 Plaintiffs to devote more than half of the warning to the outlier
24 view that glyphosate is a carcinogen has precisely that
25 unconstitutional skewing effect.
26      Even as to the one mainstream view that the Attorney General
27 deemed "relevant," moreover, Warning Option 2 is misleading.  Under
28 Warning Option 2, Plaintiffs would be required to report that EPA

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1  has "*tentatively* concluded in a *draft document* that glyphosate

2  does not present a cancer hazard." Mot. to Alter at 12, ECF No.

3  81-1 (emphases added). That dramatically understates the

4  definitiveness of EPA's conclusion. In fact, "[t]he human

5  carcinogenic potential of glyphosate has been evaluated by the

6  agency *several times*," Heering Decl. Ex. SS (EPA, Revised

7  Glyphosate Issue Paper: Evaluation of Carcinogenic Potential EPA's

8  Office of Pesticide Programs 143 (emphasis added)), and the agency

9  has time and time again found it non-carcinogenic. *See, e.g.*,

10 Heering Decl. Ex. N (EPA, R.E.D. Facts: Glyphosate at 2); Heering

11 Decl. Ex. Y (EPA, Glyphosate Issue Paper: Evaluation of

12 Carcinogenic Potential 139); SUF Nos. 11, 13, 36. EPA reaffirmed

13 those prior findings in a revised version of that Issue Paper,

14 concluding the evidence "strong[ly] support[ed]" that glyphosate

15 is "not likely to be carcinogenic to humans." Heering Decl.

16 Ex. SS, (EPA, Revised Glyphosate Issue Paper: Evaluation of

17 Carcinogenic Potential EPA's Office of Pesticide Programs 144);

18 SUF No. 13. To be sure, this finding was part of a broader

19 "[r]egistration [r]eview" for glyphosate that remains ongoing—a

20 regulatory process that considers various evaluations additional

21 to carcinogenicity, *see* Heering Decl. Ex. SS, (EPA, Revised

22 Glyphosate Issue Paper: Evaluation of Carcinogenic Potential EPA's

23 Office of Pesticide Programs 12)—but the carcinogenicity

24 conclusion *itself* was in no way "tentative." Indeed, in April

25 2019, as part of that registration review, EPA issued its most

26 recent evaluation in a Proposed Interim Registration Review

27 Decision, reaffirming that "glyphosate is 'not likely to be

28 carcinogenic to humans.'" Heering Decl. Ex. WW (EPA, Glyphosate:

1   Proposed Interim Registration Review Decision 7-8, 19-20); *see*

2   *also* Heering Decl. Ex. XX (EPA, Glyphosate: Response to Comments

3   on the Human Health Draft Risk Assessment 2-3); SUF No. 14.  And

4   EPA's August 2019 letter to registrants reiterated that it had

5   "determin[ed] that glyphosate is 'not likely to be carcinogenic to

6   humans,'" such that a warning that glyphosate causes cancer would

7   be "false and misleading."  Heering Decl. Ex. E (EPA Aug. 2019

8   Letter); SUF No. 37.  That conclusion was unequivocal and in no

9   way "tentative."

10                              * * * * *

11          Because any glyphosate warning that complied with Proposition

12   65 would be inaccurate, misleading, and controversial——and thus

13   not be "purely factual and uncontroversial"——the warning

14   requirement cannot be upheld under *Zauderer*.  *NIFLA*, 138 S. Ct. at

15   2372.

16   **B.   The Warning Mandate Fails Intermediate Scrutiny**

17          The glyphosate warning does not come close to surviving

18   intermediate scrutiny, either.  Indeed, to Plaintiffs' knowledge,

19   no court *anywhere* has ever found a compelled warning that is

20   inaccurate and misleading to be permissible under any standard of

21   First Amendment review.

22          Under *Central Hudson*, intermediate scrutiny requires the

23   government to establish a "substantial" government interest that

24   its regulation "directly" advances through burdens on speech no

25   more "extensive than . . . necessary to serve that interest."

26   *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 528 (1996); *see*

27   *also Cal-Almond, Inc. v. U.S. Dep't of Agric.*, 14 F.3d 429, 437

28   (9th Cir. 1993).  To "directly advance the state interest" under

*Central Hudson*, the government must demonstrate that "its restriction will in fact alleviate [the asserted harms] to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (same). The government's "burden under this test is 'heavy,'" and it "cannot satisfy it 'by mere speculation or conjecture.'" *Italian Colors*, 878 F.3d at 1176 (citations omitted); *see also NIFLA*, 138 S. Ct. at 2377 (reaffirming that the government has the burden of proving that the compelled speech mandate "remed[ies] a harm that is 'potentially real not purely hypothetical,'" and "extend[s] 'no broader than reasonably necessary'") (citation omitted).

California can neither establish that its warning directly and materially advances a substantial interest, nor that the warning requirement is narrowly tailored.

    1.   ***The Attorney General Cannot Prove That The Warning Directly And Materially Advances The State's Legitimate Interests***

The glyphosate warning requirement fails intermediate scrutiny at the outset because, as discussed above, any message about glyphosate that complied with Proposition 65's requirements would necessarily be misleading and controversial. *See supra* at 34-45. And as a matter of law, California has no legitimate interest in requiring Plaintiffs to repeat a misleading and controversial message. *See, e.g.*, *Video Software Dealers Ass'n*, 556 F.3d at 953 (holding that a law that "compels the carrying of the State's controversial opinion" is "unconstitutional[]" under any standard of review); *id.* at 967 ("[T]he State has no legitimate reason to force retailers to affix false information on their products."); *Am. Beverage Ass'n*, 916 F.3d at 756 ("The *Zauderer*

test, as applied in *NIFLA*, contains three inquiries: whether the notice is (1) purely factual, (2) noncontroversial, and (3) not unjustified or unduly burdensome. *A compelled disclosure accompanying a related product or service must meet all three criteria to be constitutional.*" (emphasis added)); *id.* at 764 (Christen, J., & Thomas, C.J., concurring in part) ("[A]ny government-compelled speech must be, at the very least, factually accurate."); *see also* PI Order at 17, ECF No. 75 ("[W]here California seeks to compel businesses to provide cancer warnings, the warnings *must* be factually accurate and not misleading." (emphasis added)). The Court need go no further to resolve the merits of this case.

But the glyphosate message fails intermediate scrutiny for other reasons as well. California's asserted interest in mandating disclosures under Proposition 65 is in "informing [its residents] about exposures to chemicals that cause cancer." *Cal. Chamber of Com. v. Brown*, 196 Cal. App. 4th 233, 258 (2011) (quoting preamble to Proposition 65 ballot initiative). Here, though, California has not conducted a causation analysis showing that the warning would inform consumers about a chemical that actually causes cancer in humans.[12] *See Italian Colors*, 878 F.3d at 1177 ("[T]he Attorney General must do more than merely identify a state interest served

---

[12] OEHHA has acknowledged that it was precluded from conducting a scientific analysis of whether glyphosate causes cancer in listing glyphosate because the statute required that it list glyphosate under Proposition 65 automatically once IARC made its determination. *See* Heering Decl. Ex. JJ (OEHHA, *Notice of Intent to List: Tetrachlorvinphos, Parathion, Malathion, Glyphosate*); SUF No. 50. And the Attorney General cannot evade his burden to prove material advancement in this case by complaining that the State was required by its own laws to accept IARC's conclusions as definitive and ignore the larger body of scientific evidence about glyphosate.

1   by the statute . . . [he] 'must demonstrate that . . . [the speech]
2   restriction will in fact alleviate [the harms] to a material
3   degree.'" (second alteration in original) (citation omitted)); *id.*
4   at 1176 (the government cannot satisfy its "heavy burden" by "mere
5   speculation or conjecture" (citation omitted)); *Cal-Almond*, 14
6   F.3d at 438 (no direct advancement where government admits it has
7   not conducted its own analysis).   Indeed, the evidence instead
8   shows that the message would *not* inform consumers about a genuine
9   cancer risk, given that the State's own regulators have found that
10  glyphosate is "unlikely to pose a cancer hazard to humans," EPA
11  has concluded that the statement is "false and misleading," the
12  worldwide consensus is that glyphosate does not cause cancer, and
13  even IARC only goes so far as saying it "probably" does.

14      The Attorney General's equivocal suggestions that a
15  Proposition 65 warning could be diluted to the point that it need
16  not actually communicate that glyphosate causes cancer, *see supra*
17  at 40-46, only exacerbate this problem.   Such a *non-cancer* warning
18  could not possibly serve Proposition 65's intended purpose of
19  "informing [Californians] about exposures to chemicals that *cause*
20  cancer." *Cal. Chamber of Com.*, 196 Cal. App. 4th at 258 (emphasis
21  added); *see also* Order on Mot. to Alter at 8-9, ECF No. 97.   Indeed,
22  requiring Plaintiffs to provide such a warning would actively
23  *undermine* the State's stated interest.   Mandating warnings without
24  an adequate basis contributes to *over*warning, which causes
25  consumers to tune warnings out entirely, even when (unlike here)
26  they are well-founded and important. *See, e.g.*, *Nicolle-Wagner v.*
27  *Deukmejian*, 230 Cal. App. 3d 652 (1991) (upholding OEHHA
28  regulation exempting "naturally occurring" chemicals from

Proposition 65 because it reduces "unnecessary warnings, which could distract the public from other important warnings on consumer products" (quoting OEHHA)); *Johnson v. Am. Standard, Inc.*, 43 Cal. 4th 56, 70 (2008) (overwarning "invite[s] mass consumer disregard and ultimate contempt for the warning process"); *Dowhal*, 32 Cal. 4th at 932 ("problems of overwarning are exacerbated" where, as here, "warnings must be given even as to very remote risks"); *Thompson v. Cty. of Alameda*, 27 Cal. 3d 741, 754-55 (1980) (noting that "by reason of their sheer volume," insignificant warnings "would add little to the effective protection of the public"); *see also Gaeta v. Perrigo Pharm. Co.*, 562 F. Supp. 2d 1091, 1097 (N.D. Cal. 2008) (noting that overwarning can "have a *negative* effect on . . . public health"); *Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 392 (7th Cir. 2010) (concluding that overwarning "can deter potentially beneficial uses of [the substance] by making it seem riskier than warranted and can dilute the effectiveness of valid warnings"); *see also* Br. for 11 States as Amici Curiae in Supp. of Pls.' Mot. for Prelim. Inj. at 9, ECF No. 34-1 (explaining how Proposition 65 warning requirement would "decrease[] the efficacy of disclosures already required by" many other states).

> 2. ***The Attorney General Cannot Prove That The Warning Requirement Is Narrowly Tailored***

Finally, the compelled glyphosate warning also fails intermediate scrutiny for the independent reason that it is not narrowly tailored. Indeed, there is no evidence that California has explored *any* less restrictive alternatives to communicate concerns about glyphosate. *See Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 826 (9th Cir. 2013) (holding that a speech restriction

1   is overinclusive where it "restricted more speech than

2   necessary"). And such alternatives are obvious. In particular,

3   as *NIFLA* explained, the most straightforward alternative to

4   "coopt[ing] [a private speaker] to deliver its message for it" is

5   for the State to convey its message on its own media and on its

6   own dime. 138 S. Ct. at 2376 ("California could inform low-income

7   women about its services 'without burdening a speaker with unwanted

8   speech[,]' [m]ost obviously [through its own] public-information

9   campaign."); *see also Linkmark Assocs., Inc. v. Willingboro*, 431

10  U.S. 86, 97 (1977) (government could have used alternative of

11  speaking itself to give "widespread publicity" to issue); *Sorrell*

12  *v. IMS Health, Inc.*, 564 U.S. 552, 578 (2011) ("The State can

13  express [its] view through its own speech."); *Evergreen Ass'n v.*

14  *N.Y.C.*, 740 F.3d 233, 250-51 (2d Cir. 2014) (city could have

15  communicated message through its own advertisements).

16  California's complete failure to explore such alternatives, or to

17  show why they are inadequate, means that it cannot meet its burden

18  under *Central Hudson*.

19  **C.   The First Amendment and Due Process Clause Do Not Permit**
        **The State To Continually Invent New Warnings To Save The**
20      **Warning Mandate From Invalidity**

21      The foregoing has shown that, as applied to glyphosate, the

22  First Amendment protects Plaintiffs from any obligation to make

23  the warning California courts have held Proposition 65 requires,

24  and that none of the alternative warnings the Attorney General has

25  to date suggested might satisfy Proposition 65 would comply with

26  the First Amendment. But if past is prologue, the Attorney General

27  may respond by now proposing Warning Option 3 (and maybe 4 and 5).

28  After all, it was only after Plaintiffs demonstrated the inadequacy

1    of Proposition 65's classic warning that the Attorney General

2    proposed Warning Options 1 and 2 in the first place, arguing that

3    "[t]he statute says nothing about what constitutes a clear and

4    reasonable warning" and that he was therefore free to make up new

5    options. Mot. to Alter at 4, ECF No. 81-1. Then, once Plaintiffs

6    demonstrated that his new proposals were inadequate, too, the

7    Attorney General insisted that "[i]f the Court disagrees as to the

8    content of any particular warning, the warnings can be modified as

9    appropriate." Defs.' Reply in Supp. of Mot. to Alter at 11 n.17,

10   ECF No. 95.

11       This Court should not condone this sort of First Amendment

12   gamesmanship. As the Supreme Court explained in *Zauderer* itself,

13   imposing serious penalties based on a disclosure law that fails to

14   "specify precisely what disclosures [are] required" "would raise

15   significant due process concerns." 471 U.S. at 653 n.15. To

16   comply with Due Process and the First Amendment, a State must

17   "articulate its disclosure rules" to give a "sure guide" to those

18   tasked with following them. *Id.*; *see also Baggett v. Bullitt*, 377

19   U.S. 360, 372 (1964) (finding compelled loyalty oaths void for

20   vagueness under the First Amendment); *Bullfrog Films, Inc. v. Wick*,

21   847 F.2d 502, 512 (9th Cir. 1988) (government cannot "delegate[]

22   basic policy matters . . . for resolution on an *ad hoc* and

23   subjective basis" in litigation (citation omitted)). The *State*

24   must supply these warnings; it cannot shift the burden to devise

25   a lawful warning onto Plaintiffs. *See Illinois ex rel. Madigan v.*

26   *Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 n.9 (2003) ("The

27   Court has long cautioned that, to avoid chilling protected speech,

28   the government must bear the burden of proving that the speech it

1   seeks to prohibit is unprotected."); *Riley v. Nat'l Fed'n of Blind*

2   *of N.C., Inc.*, 487 U.S. 781, 794 (1988) (holding that limitations

3   on charitable solicitations that "require[d] the speaker to prove

4   'reasonableness'" of their fees as a defense to liability were "in

5   direct contravention of the First Amendment[]"). Here, the

6   Attorney General has had every incentive, through multiple rounds

7   of briefing and multiple hearings before this Court, to "articulate

8   [Proposition 65's] disclosure rules" in the manner that was most

9   likely to comply with the First Amendment, *Zauderer*, 471 U.S. at

10  653 n.5. And for the reasons already discussed, the options he

11  has proposed fail. Any new hypothetical warning that is so obscure

12  and non-obvious that no one has even thought of it yet would be

13  extremely unlikely to satisfy Proposition 65.[13] But even if there

14  were a chance that a California court *might* accept some new warning

15  that the Attorney General now devises, the course of this

16  litigation has demonstrated at the very least that the statute and

17  binding regulations do not provide "fair notice" that such warning

18  options are available. *FCC v. Fox Television Stations, Inc.*, 567

19  U.S. 239, 253 (2012). A statute that so thoroughly disguised the

20  means of compliance would violate Due Process, *especially* where——

21  _____

22  [13] The Attorney General's own regulations prohibit use of diluting
    and qualifying language. Cal. Code Regs. tit. 11, § 3202(b); *see
    also Tri-Union*, 2006 WL 1544384, at *61 (concluding language that
23  "dilutes the actual warning" is non-compliant, citing Attorney
    General's regulation). It therefore should be no surprise that
24  every one of the hundreds of approved Proposition 65 warning
    settlements since September 2016 mandated inclusion of the
25  specific phrase "known to the State of California to cause cancer"
    or required the warning to otherwise "clearly communicate that the
26  chemical in question is known to the state to cause cancer."
    Norris Decl. ¶¶ 3-7; SUF No. 45. And California courts have
27  declined to dismiss enforcement actions even where the warnings
    provided deviated only slightly from approved safe harbor
28  warnings. Norris Decl. ¶¶ 13-20; SUF No. 46.

1    as here——it "touch[es] upon 'sensitive areas of basic First

2    Amendment freedoms.'"    *Id.* at 254 (citation omitted); *see also*

3    First Am. Compl. ¶ 125, ECF No. 23 ("FAC") (asserting, as an

4    additional basis for relief, that "California's listing of

5    glyphosate and the attendant warning requirement are therefore

6    invalid under the Fourteenth Amendment's Due Process Clause").[14]

7    **II.    A PERMANENT INJUNCTION SHOULD ISSUE**

8         For the reasons set forth above, enforcement of Proposition

9    65's warning requirement as to glyphosate would violate

10   _____

11   [14] In their First Amended Complaint, Plaintiffs also explained that
     OEHHA's listing of glyphosate and the related warning violated the
12   Due Process Clause for the additional reason that the State has no
     rational basis to assert that it "know[s]" glyphosate causes
13   cancer. *See* FAC ¶¶ 118-24, ECF No. 23. Plaintiffs subsequently
     agreed to dismiss their claims against the Director of OEHHA,
14   Lauren Zeise, eliminating from the case the separate question of
     whether the *listing* is constitutional. *See* Stip. & Order for
15   Dismissal of Def. Dr. Lauren Zeise, ECF No. 93. In light of that
     development, there is no longer any need for this Court to
16   independently evaluate whether the classic Proposition 65 warning
     requirement violates the Due Process Clause. Indeed, where a
17   "plaintiff's claim can be analyzed under an explicit textual source
     of rights in the Constitution" like the First Amendment——as the
18   Attorney General has conceded is true with respect to the warning
     requirement——"a court should not resort to the more subjective
19   standard of substantive due process." *Hufford v. McEnaney*, 249
     F.3d 1142, 1151 (9th Cir. 2001); *see also Corales v. Bennett*, 567
20   F.3d 554, 569 n.11 (9th Cir. 2009). Accordingly, the Due Process
     Clause remains relevant in this case only insofar as it prevents
21   the Attorney General from continuing to make the warning
     requirement——a warning requirement that *the State* bears the burden
22   of showing is constitutional, *see NIFLA*, 138 S. Ct. at 2377——a
     moving target. *See supra* at 52-54.

23   Plaintiffs also explained in their First Amended Complaint that
     the Proposition 65 warning would be preempted as to food products
24   under the FDCA. But this Court need not address that argument now
     because Plaintiffs Western Plant Health Association and Monsanto
25   Company do not produce food and did not join this claim, *see* FAC
     ¶ 12 n.2, ECF No. 23, and because Plaintiffs' First Amendment claim
26   can resolve the Proposition 65 warning's constitutionality in *all*
     of its iterations and as regards all Plaintiffs. *PDK Labs., Inc.*
27   *v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring
     in part) ("[I]f it is not necessary to decide more, it is necessary
28   not to decide more."). Plaintiffs reserve the right, however, to
     press this claim at a later stage of this litigation, if warranted.

Plaintiffs' First Amendment rights and conflict with federal statutory law.  In light of that showing, Plaintiffs easily satisfy the remaining elements for permanent equitable relief——namely, that (i) Plaintiffs have suffered or will likely suffer an "irreparable injury" absent an injunction, (ii) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury," (iii) "a remedy in equity is warranted" in light of the "balance of hardships between the plaintiff and defendant," and (iv) "the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).  Indeed, the Court already concluded that Plaintiffs satisfied the analogous requirements for issuance of a preliminary injunction.  PI Order at 17-20, ECF No. 75.

Plaintiffs' demonstration that enforcement of the warning requirement would violate their First Amendment rights satisfies the "irreparable injury" requirement.  *Id.* at 17-18.  Absent an injunction, Plaintiffs will be unlawfully coerced by the threat of litigation and penalties to abandon their right not to disseminate a factually controversial and literally false and misleading warning with which they vehemently disagree.  "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *see also Valle Del Sol*, 709 F.3d at 828 ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1  (1976)); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1128 (9th

2  Cir. 2011); *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 72 (2d

3  Cir. 1996) (finding irreparable harm because "compelled speech

4  'contravene[s] core First Amendment values'" (alteration in

5  original) (citation omitted)).

6      Plaintiffs would also suffer irreparable reputational,

7  business, and monetary injuries from enforcement of the warning

8  requirement.   In addition to the constitutional injury, the

9  compelled warning requirement would cause several additional types

10  of injury that constitute irreparable harms:[15]

11      • The compelled glyphosate warning would damage the

12        reputation and goodwill associated with Plaintiffs (and

13        their members) and their products by misleading

14        consumers and branding their products as cancer-causing

15        killers.   Heering Decl. ¶¶ 41, 49, 68-69; Inman Decl.,

16        U.S. Durum Growers Ass'n ¶¶ 16-17; Doggett Decl., Nat'l

17        Corn Growers Ass'n ¶ 17; Kessel Decl., N.D. Grain

18        Growers Ass'n ¶ 17; Zander Decl., S.D. Agri-Business

19        ¶ 12; Pinel Decl., W. Plant Health Ass'n ¶ 25; Jackson

20        Decl., Iowa Soybean ¶ 26; Martinson Decl., U.S. Durum

21        Growers Ass'n ¶¶ 25-26; McCarty Decl., Associated Indus.

22        of Mo. ¶¶ 15-16; SUF No. 65; *see Life Alert Emergency*

23        *Resp., Inc. v. LifeWatch, Inc.*, 601 F. App'x 469, 474

24        (9th Cir. 2015) (threat to "reputation and

25        goodwill . . . constitutes irreparable harm"); *see also*

26

27  [15] Plaintiffs' success on their First Amendment claim is sufficient
standing alone to establish that irreparable harm would flow absent

28  an injunction.   *See* PI Order at 18.   Plaintiffs provide the
additional irreparable harms for completeness.

1    *Rent-A-Center, Inc. v. Canyon Television & Appliance*

2    *Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (same);

3    *Gerling Glob. Reinsurance Corp. of Am. v. Quackenbush*,

4    No. Civ. S-00-0506WBSJFM et al., 2000 WL 777978, at *13

5    (E.D. Cal. June 9, 2000) (Shubb, J.) (irreparable harm

6    where defendant's actions "suggest" plaintiff's

7    services are unsavory), *aff'd sub nom. Gerling Glob.*

8    *Reinsurance Corp. of Am. v. Low*, 240 F.3d 739 (9th Cir.

9    2001).

10   • This reputational disparagement would put Plaintiffs at

11   a significant competitive disadvantage. Hurst Decl.,

12   Mo. Farm Bureau ¶¶ 25-28; Inman Decl., U.S. Durum

13   Growers Ass'n ¶¶ 30-33; Wogsland Decl., N.D. Grain

14   Growers Ass'n ¶¶ 25-28; Stoner Decl., Nat'l Ass'n of

15   Wheat Growers ¶¶ 30-33; Zander Decl., S.D. Agri-Business

16   ¶¶ 19-22; Jackson Decl., Iowa Soybean Ass'n ¶¶ 28-31;

17   McCarty Decl., Associated Indus. of Mo. ¶¶ 21-24; SUF

18   No. 66; *see also, e.g.*, *Int'l Franchise Ass'n v. City*

19   *of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015) ("A rule

20   putting plaintiffs at a competitive disadvantage

21   constitutes irreparable harm.").

22   • The threat of the warning requirement caused some

23   Plaintiffs to lose customers prior to this Court's entry

24   of a preliminary injunction, and Plaintiffs would

25   certainly lose additional customers if the warning

26   requirement were allowed to go into effect. Pinel

27   Decl., W. Plant Health Ass'n ¶ 21; Heering Decl. ¶¶ 59-

28   60; SUF No. 67; *San Miguel Pure Foods Co. v. Ramar Int'l*

1      *Corp.*, 625 F App'x 322, 327 (9th Cir. 2015) ("loss of

2      prospective    customers    sufficient    evidence    of

3      irreparable injury"); *Design Furnishings, Inc. v. Zen*

4      *Path LLC*, No. CIV. 2:10-02765 WBS GGH, 2010 WL 4321568,

5      at *4 (E.D. Cal. Oct. 21, 2010) (Shubb, J.) (irreparable

6      harm where defendant's actions "cause plaintiff to lose

7      prospective customers").

8    - Major glyphosate retailers have previously indicated

9      that without an injunction, they will not carry

10     glyphosate-based products unless the products' labels

11     are updated to carry a warning with which Plaintiffs

12     vehemently disagree.  Pinel Decl., W. Plant Health Ass'n

13     ¶ 22; Heering Decl. ¶ 45; SUF No. 68.  This is true

14     without regard for the NSRL.  Pinel Decl., W. Plant

15     Health Ass'n ¶ 31; Heering Decl. ¶¶ 46-48; SUF No. 69.

16     Accordingly, major retailers would remove Plaintiffs'

17     unlabeled glyphosate-based products from store shelves

18     and inventory if the warning requirement is allowed to

19     go into effect.  Heering Decl. ¶ 45; SUF No. 70; *see*

20     *De Simone v. VSL Pharm., Inc.*, 133 F. Supp. 3d 776, 799

21     (D. Md. 2015) ("irreparable harm" from pulling products

22     "off the shelves").  Likewise, the warning requirement

23     would impose operational burdens on major retailers,

24     further impairing Plaintiffs' reputations and goodwill.

25     *See, e.g.*, Heering Decl. ¶ 49; SUF No. 71.  The warning

26     requirement threatens, if it is allowed to go into

27     effect, to force changes throughout the food,

28     agricultural, and herbicide industries by imposing (at

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

a minimum) extensive and wholly unnecessary testing requirements, and disruption to and segregation of supply chains. *See, e.g.*, Hurst Decl., Mo. Farm Bureau ¶¶ 25-28; Inman Decl., U.S. Durum Growers Ass'n ¶¶ 30-33; Doggett Decl., Nat'l Corn Growers Ass'n ¶¶ 12-13; Wogsland Decl., N.D. Grain Growers Ass'n ¶¶ 15-21; Stoner Decl., Nat'l Ass'n of Wheat Growers ¶¶ 30-33; Kessel Decl., N.D. Grain Growers Ass'n ¶¶ 19-23; Jackson Decl., Iowa Soybean Ass'n ¶¶ 20-25; Martinson Decl., U.S. Durum Growers Ass'n ¶¶ 20-24; McCarty Decl., Associated Indus. of Mo. ¶¶ 17-19; Heering Decl. ¶¶ 37, 49-50; SUF No. 72. It also threatens to cause burdensome operational changes in the retail setting, which will further impair the goodwill of Plaintiffs and their relationships with suppliers and retailers. Heering Decl. ¶ 49; SUF No. 73.

- If Plaintiffs who farm using glyphosate are forced to cease using glyphosate by suppliers, this will result in significant disruption to their longstanding business practices. *See, e.g.*, Hurst Decl., Mo. Farm Bureau ¶¶ 5-7, 17-22; Wogsland Decl., N.D. Grain Growers Ass'n ¶¶ 19-22; Stoner Decl., Nat'l Ass'n of Wheat Growers ¶¶ 7-9, 24-27; Kessel Decl., N.D. Grain Growers Ass'n ¶¶ 3, 11-14; Jackson Decl., Iowa Soybean Ass'n ¶¶ 6-12, 22-25; SUF No. 74; *see Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1058 (9th Cir. 2009) (forcing a "change [in] the whole nature of [plaintiff's] business" constitutes irreparable harm).

1    Moreover, to the extent any of these injuries could be deemed

2 financial in nature, they are not reparable as a matter of law

3 because California's sovereign immunity precludes them from being

4 remedied by money damages. *See Idaho v. Couer d'Alene Tribe*, 794

5 F.3d 1039, 1046 (9th Cir. 2015) (finding irreparable harm due to

6 economic loss where sovereign immunity prevents recovery of money

7 damages); *Pac. Merch. Shipping Ass'n v. Cackette*, No. CIV. S-06-

8 2791 WBS KJM, 2007 WL 2914961, at *3 (E.D. Cal. Oct. 5, 2007)

9 (Shubb, J.) ("irreparable harm" from "complying with regulations"

10 where "Eleventh Amendment" prohibits recovery); *N.E. Med. Servs.,*

11 *Inc. v. Cal. Dep't of Health Care Servs.*, 712 F.3d 461, 466 (9th

12 Cir. 2013) (California has immunity from "monetary damages.").

13    As a matter of law, Plaintiffs' constitutional injuries

14 cannot adequately be compensated by legal remedies. *See Nelson v.*

15 *NASA*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*,

16 562 U.S. 134 (2011) ("Unlike monetary injuries, constitutional

17 violations cannot be adequately remedied through damages."); *see*

18 *also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir.

19 2009). And as a matter of fact, the harms that they would suffer

20 to their reputations and businesses from enforcement of the warning

21 requirement are *literally* non-compensable, because California's

22 sovereign immunity precludes them from being remedied by money

23 damages. *See supra* at 59-60.

24    An injunction is necessary, moreover, to prevent all of these

25 irreparable injuries from occurring. Even if the Attorney General

26 could be relied upon to comply with the Court's judgment absent an

27 injunction, Plaintiffs have no comfort that those in privity with

28 him——*i.e.*, bounty hunters——would similarly comply.

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1    The final two factors—the balance of equities and public

2    interest—"merge when the Government is the opposing party." *Nken*

3    *v. Holder*, 556 U.S. 418, 435 (2009).  These factors also strongly

4    support permanent relief.  It is well established that the

5    government "cannot suffer harm from an injunction that merely ends

6    an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145

7    (9th Cir. 2013).  Likewise, the "public interest" tips sharply in

8    favor of enjoining the constitutional violation, "because all

9    citizens have a stake in upholding the Constitution." *Id.* at 1146;

10   *see also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (courts

11   have "consistently recognized the significant public interest in

12   upholding First Amendment principles."); *see also* PI Order at 18-

13   19, ECF No. 75.  And neither the public nor the government "has

14   [any] legitimate interest in enforcing an unconstitutional" law.

15   *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th

16   Cir. 2006).

17                              **CONCLUSION**

18   For the foregoing reasons, this Court should enter summary

19   judgment for Plaintiffs on Claim I (First Amendment) of their First

20   Amended Complaint and enjoin the Attorney General and those in

21   privity with him from enforcing the Proposition 65 warning

22   requirement as to glyphosate.

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

1   Dated:   September 25, 2019          Respectfully submitted,

2                                        /s/   Philip J. Perry

3
    Catherine L. Hanaway (admitted      Philip J. Perry (CA Bar No.
4   *pro hac vice*)                      148696)
    Matthew T. Schelp (admitted *pro*   Richard P. Bress (admitted *pro*
5   *hac vice*)                          *hac vice*)
    Matthew P. Diehr (admitted *pro*    Andrew D. Prins (admitted *pro*
6   *hac vice*)                          *hac vice*)
    Christopher C. Miles (CA Bar        Ryan S. Baasch (admitted *pro*
7   No. 268774)                          *hac vice*)
    Natalie R. Holden (admitted *pro*   Nicholas L. Schlossman
8   *hac vice*)                          (admitted *pro hac vice*)
    HUSCH BLACKWELL                     LATHAM & WATKINS LLP
9   The Plaza in Clayton                555 Eleventh Street NW
    190 Carondelet Plaza Suite 600      Suite 1000
10  St Louis, Missouri 63105            Washington, DC 20004
    Tel. (314) 480-1903                 Tel: (202) 637-2200
11  catherine.hanaway@huschblackwel     philip.perry@lw.com
    l.com
12                                      *Attorneys for Plaintiffs*
    *Attorneys for Plaintiffs*          *Monsanto Company and CropLife*
13  *National Association of Wheat*     *America*
    *Growers, National Corn Growers*
14  *Association, United States*        Trenton H. Norris (CA Bar No.
    *Durum Growers Association,*        164781)
15  *Monsanto Company, Missouri Farm*   ARNOLD & PORTER KAYE SCHOLER
    *Bureau, Iowa Soybean*              LLP
16  *Association, South Dakota Agri-*   Three Embarcadero Center
    *Business Association, North*       10th Floor
17  *Dakota Grain Growers*              San Francisco, CA 94111
    *Association, Missouri Chamber*     Tel:   (415) 471-3303
18  *of Commerce and Industry,*
    *Agribusiness Association of*       *Attorney for Plaintiff*
19  *Iowa, and Associated Industries*   *Monsanto Company*
    *of Missouri*
20                                      Eliot Belilos (admitted *pro*
    Ann M. Grottveit (CA Bar No.        *hac vice*)
21  256349)                             Gary Baise (admitted *pro hac*
    KAHN, SOARES & CONWAY, LLP          *vice*)
22  1415 L Street, Suite 400            OLSSON FRANK WEEDA TERMAN MATZ
    Sacramento, CA  95814               PC
23  Tel: (916) 448-3826                 600 New Hampshire Ave NW # 500
    agrottveit@kscsacramento.com        Washington, DC 20037
24                                      Tel: (202) 789-1212
    *Attorney for Plaintiff Western*    ebelilos@ofwlaw.com
25  *Plant Health Association*
                                        *Attorneys for Plaintiff*
26                                      *Agricultural Retailers*
                                        *Association*

27

28