# Exhibit C

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

RENAE L. KIRSCH, Executrix of the Estate :
of JOHN C. KIRSCH, deceased, and : Civil Action
RENAE L. KIRSCH, individually, in her :
own right, : No. 17-5396
 :
    Plaintiff, :
 :
 v. :
 :
MONSANTO COMPANY, : **JURY TRIAL DEMANDED**
 :
    Defendant. :

## AMENDED COMPLAINT

As a result of the recent death of Plaintiff's Decedent, John C. Kirsch, on September 22, 2020, Plaintiff Renae L. Kirsch, Executrix of the Estate of John C. Kirsch, alleges against Monsanto Company as follows:

### INTRODUCTION

1. In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops and other useful plants. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

2. Monsanto is a Delaware corporation with a principal place of business located in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was

---

[1] Grube et al, on behalf of EPA, <u>Pesticides Industry Sales and Usage, 2006-2007 Market Estimates</u>, 14, (2011) available at <u>https://www.epa.gov/sites/production/files/2015-10/documents/market_estimates2007.pdf</u>

the world's leading producer of seeds, accounting for 27% of the world seed market.[2]  The
majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup
Ready® crops is that they substantially improve a farmer's ability to control weeds, since
glyphosate can be sprayed in the fields during the growing season without harming their crops.
In 2010, an estimated 70% of corn and cotton, and 90% of soybean, fields in the United States
were Roundup Ready®.[3]

3.   Monsanto's glyphosate products are patented and registered in 130 countries and
approved for use on over 100 different crops.  They are ubiquitous in the environment.
Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in
agricultural areas where Roundup® is used.[4]  It has been found in food,[5] in the urine of
agricultural workers[6][7], and even in the urine of urban dwellers who are not in direct contact with
glyphosate.[8]

4.   On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an
agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides,
including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate

---

[2] ETC Group, Who Will Control the Green Economy?, 22, (2011) available at
http://www.etcgroup.org/sites/www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf
[3] William Neuman and Andrew Pollack, Farmers Cope With Roundup-Resistant Weeds, N.Y. Times, May 3, 2010,
available at http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.
[4] See:  USGS, USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in
the Mississippi River Basin, 2011, available at https://www.usgs.gov/news/widely-used-herbicide-commonly-found-
rain-and-streams-mississippi-river-basin
[5] Bohn, et al., Compositional differences in soybeans on the market: Glyphosate accumulates in Roundup Ready
GM soybeans, 153 Food Chemistry, 207, (2013), available at
http://www.sciencedirect.com/science/article/pii/S0308814613019201.
[6] Acquavella, et al., Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family
Exposure Study, 112(3) Environmental Health Perspectives, 321, (2004), available at
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/.
[7] Guyton, et al. Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon and glyphosate, 112 IARC
Monographs, 76, section 5.4 (2015), available at http://dx.doi.org/10.1016/S1470-2045(15)70134-8.
[8] Brandli D, Reinacher S, Herbicides found in Human Urine, 1 Ithaka Journal, 270 (2012), available at
http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

2

in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

7. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## THE PARTIES

### PLAINTIFF

9. Plaintiff's Decedent, John C. Kirsch, died on September 22, 2020 from complications of Chronic Lymphocytic Leukemia caused by exposure to Roundup® as described hereafter. Attached hereto as Exhibit A please find a copy of the Certificate of Death.

---

[9] See Guyton, et al. Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon and glyphosate, supra.

3

10. On or about December 10, 2020, Plaintiff, Renae L. Kirsch, the wife of Plaintiff's Decedent, was appointed Executrix of the Estate of John C. Kirsch by the Berks County Register of Wills. A true and correct copy of the Short Certificate is attached hereto as Exhibit B.

11. Plaintiff Renae L. Kirsch, Executrix of the Estate of John C. Kirsch, and individually, in her own right, is a citizen of the Commonwealth of Pennsylvania and resides at 6 Antietam Drive, Birdsboro, Berks County, Pennsylvania 19508.

12. Plaintiff's Decedent, John C. Kirsch, the husband of Plaintiff Renae L. Kirsch, was exposed to Roundup®, primarily in Berks County, Pennsylvania, from the late 1970s until early 2017.

### DEFENDANT

13. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

14. Monsanto is registered to conduct business in the Commonwealth of Pennsylvania as a foreign business corporation. Therefore, it is amenable to service of process through its registered agent.

15. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the sole or exclusive manufacturer of Roundup®.

### <u>JURISDICTION AND VENUE</u>

16. Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff, Renae L. Kirsch, is a citizen of a different state, Pennsylvania, from Defendant Monsanto Company, which is a citizen of Delaware and Missouri, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

17. This Court has personal jurisdiction over Monsanto under the Pennsylvania Long-Arm Statute, because (a) Monsanto is registered to conduct business in Pennsylvania as a

4

foreign corporation, (b) Monsanto knows or should have known that its Roundup® products are sold throughout Pennsylvania, and (c) Monsanto caused Roundup® to be sold to Plaintiff's Decedent in Pennsylvania.

18.   In addition, Monsanto maintains sufficient contacts with the Commonwealth of Pennsylvania such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

19.   Venue is proper within this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims asserted in this Complaint occurred in this District.  Further, Monsanto, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## FACTS

20.   Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

21.   Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

22.   For nearly 40 years, users across the world have used Roundup® without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough:  it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that to be false.  According to the World Health Organization (WHO), the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer.

5

23. Monsanto assured the public that Roundup® was harmless. To prove this, Monsanto championed false data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

24. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup as "safe" today.

### Registration of Herbicides under Federal Law

25. The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

26. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

6

27. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

28. Roundup®-branded products are registered by the EPA for manufacture, sale, and distribution, and are registered by Pennsylvania for sale and distribution.

29. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

30. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides; the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

31. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

12/30/2020 SL1 1488578v4 111294.00001

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

32.  Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.  In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer:  "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[10]

33.  On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

34.  In the first instance, in seeking initial registration of Roundup® by EPA, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[11]  IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

35.  In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it too found the

---

[10] U.S. Environmental Protection Agency, Memorandum, Subject:  SECOND Peer Review of Glyphosate, 1, (1991), available at https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/417300-1991-10-30a.pdf

[11] Backgrounder.  Testing Fraud: IBT and Craven Laboratories, Monsanto, (Sept 2, 2015), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf

8

toxicology studies conducted for the Roundup® herbicide to be invalid.[12]  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[13]

36.  Three top executives of IBT were convicted of fraud in 1983.

37.  In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®.  That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides."[14]

38.  Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

39.  The success of Roundup® has been a key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

40.  In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the

---

[12] U.S.  EPA, Summary of the IBT Review Program Office of Pesticide Programs, (1983), available at https://tinyurl.com/ya3m7y7l
[13] Robin, Marie-Monique.  The World According to Monsanto:  Pollution, Corruption and the Control of the World's Food Supply (2011).  Citing U.S.  EPA.  Data validation.  Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch.  Washington, D.C.  (August 9, 1978).
[14] Backgrounder.  Testing Fraud: IBT and Craven Laboratories, Monsanto, supra.

9

crop.  This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds.  It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

41.  Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[15]  Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®*

42.  In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences . . .

b) And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use

---

[15] David Barboza, <u>The Power of Roundup;  A Weed Killer Is A Block for Monsanto to Build On</u>, N.Y. Times, Aug. 2, 2001, available at <u>http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html</u>

10

    Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It . . . stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[16]

43. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

---

[16] *In the Matter of Monsanto Company*, Office of the Attorney General of the State of New York, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

    c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

*      *      *

    d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

*      *      *

    e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

44. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

45. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[17]

### *Classifications and Assessments of Glyphosate*

46. The IARC process for the classification of glyphosate follows the stringent procedures for the evaluation of a chemical agent.

47. Over time, the IARC Monograph program has reviewed more than 1,000 agents. Of those reviewed, it has determined 120 agents to be Group 1 (Known Human Carcinogens); 81 agents to be Group 2A (Probable Human Carcinogens); 299 agents to be Group 2B (Possible Human Carcinogens); 502 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

---

[17] <u>Monsanto Guilty in 'false ad' row</u>. BBC, Oct. 15, 2009, available at
http://news.bbc.co.uk/2/hi/europe/8308903.stm

12

48.  The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[18]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

49.  One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

50.  In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

51.  In March 2015, IARC reassessed glyphosate.  The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

52.  On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112.  For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015 to assess the carcinogenicity of certain

---

[18] World Health Organization, <u>IARC Monographs on the Evaluation of Carcinogenic Risks to Humans:  Preamble</u>, (2006), available at <u>http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf</u>

herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available".

53. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

54. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

55. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

56. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

57. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma (NHL) and several subtypes of NHL, including chronic lymphocytic leukemia (CLL), and the increased risk persisted after adjustment for other pesticides.

14

58. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

59. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

60. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

61. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

62. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[19] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

63. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

---

[19] Guyton, et al. Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon and glyphosate, supra at 77.

15

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

64.  The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical fact sheet predates the IARC March 20, 2015, evaluation.  The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites.  These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills.  Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup.  They may also be exposed by touching soil and plants to which glyphosate was applied.  Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[20]

65.  In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[21]

66.  The State of California maintains a list of carcinogenic chemicals under the law known as "Proposition 65" which requires business to provide warnings to Californians about significant exposures to chemicals that cause cancer, birth defects and other reproductive harm.

---

[20] U.S. EPA, Technical Factsheet on:  Glyphosate, supra.
[21] Cox, Caroline.  Glyphosate, Part 2:  Human Exposure and Ecological Effects, 15:4 *J Pesticide Reform*, (1995).

16

67. In 2017, the California Office of Environmental Health Hazardous Assessment determined that glyphosate will be added to California's list of chemicals that cause cancer.

68. In 2017, the State of California added glyphosate to the states Proposition 65 list, a list of chemicals known to cause cancer.

### Recent Worldwide Bans on Roundup®/Glyphosate

69. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Children, in particular, are sensitive to toxic substances and should therefore not be exposed to it."[22]

70. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[23]

71. France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[24]

---

[22] Holland's Parliament Bans Glyphosate Herbicides, The Real Agenda, 14 April 2014, available at http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.
[23] Christina Sarich, Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link, Global Research 14 May 2015, available at http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440;
[24] Zoe Schlanger, France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen", Newsweek, June 15, 2015, available at http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

17

72. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[25]

73. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.[26]

74. The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[27]

### *Plaintiff's Exposure to Roundup®*

75. Plaintiff's Decedent, John C. Kirsch ("Mr. Kirsch"), was born on December 17, 1963.

76. From the late 1970s until 2002, at various residences owned and/or rented by himself or his parents, Mr. Kirsch used Roundup® regularly to control weeds, using the small handheld spray bottles according to the instructions supplied with the packaging.

77. From approximately 2002 through early 2017, Mr. Kirsch utilized Roundup®, on a more frequent basis, in accordance with the instructions on the packaging to control weeds around his property located at 6 Antietam Drive, Birdsboro, Pennsylvania. On these occasions, he utilized gallon-size bottles with the hand pump, gallon-size bottles with a battery operated

---

[25] Health Minister: Importation of Roundup Weed Spray Suspended. Today in Bernews, May 11, 2015, available at http://bernews.com/2015/05/importation-weed-spray-round-suspended/
[26] Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides, Sustainable Pulse, May 25, 2015, available at https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.Wh8SA8uWy70
[27] Columbia to ban coca spraying herbicide glyphosate, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.

pump, and eventually a backpack sprayer to spray around and over a large paver patio·
surrounding a pool, around his home, along his driveway and in landscaped areas.

78.  Mr. Kirsch utilized Roundup® on at least a weekly basis throughout the growing
season for the entire period of time mentioned above in both concentrated and unconcentrated
forms.

79.  When the concentrated Roundup® was utilized Mr. Kirsch would mix the
concentration with water and fill a backpack sprayer to utilize during application as he walked
over his property, often while barefoot as he sprayed weeds on his pool deck.  He recalled the
vapors of Roundup® and the wind drifts of Roundup® during application in all locations.

80.  Mr. Kirsch also utilized premixed Roundup® out of a one and/or two-gallon
applicator and the smaller spray bottle on many occasions.

81.  During the entire time that he utilized Roundup®, Mr. Kirsch did not know that
exposure to Roundup® could be injurious to his health or the health of others.

82.  On December 23, 2016, Mr. Kirsch was diagnosed with chronic lymphocytic
leukemia (CLL), a form of non-Hodgkin lymphoma (NHL).

83.  On or about June 4, 2017, while at a NASCAR race in Dover, Delaware, Mr. Kirsch
first learned through a radio advertisement that exposure to Roundup® can cause NHL, CLL,
and other serious illnesses.  Mr. Kirsch ceased using all Roundup® products as of that date.

84.  As a result of the conduct of Monsanto, and exposure to the product Roundup®,
Mr. Kirsch developed CLL, suffered serious and dangerous side effects, underwent progression
of the disease and ultimately died on September 22, 2020.

85.  At all times material hereto, Mr. Kirsch used Roundup® in accordance with the
instructions on the packaging.

19

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

86.  Plaintiff incorporates by reference each and every allegation set forth in all proceeding paragraphs as if fully stated herein.

87.  The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment.  Defendant, through its affirmative misrepresentations and omissions, actively concealed from Mr. Kirsch the true risks associated with Roundup® and glyphosate.

88.  At all relevant times, Defendant has maintained that Roundup® is safe, nontoxic and non-carcinogenic.

89.  Indeed, even as of July 2016, Defendant continued to represent to the public that "regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[28]

90.  Through the date of filing this complaint, Defendant continues to maintain that its Roundup® brand herbicides do not cause cancer and are not genotoxic.

91.  As a result of Defendant's action, Mr. Kirsch was unaware, and could not reasonably know or have learned through reasonable diligence, that Roundup® and/or glyphosate contact exposed Mr. Kirsch to the risks alleged herein and that those risks were the direct and approximate result of Defendant's act and omissions.

92.  Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality, and nature of Roundup®.

---

[28] Backgrounder-Glyphosate:  No evidence of carcinogenicity.  Updated November 2014.  (Downloaded October 9, 2015).

20

93. Defendant was under a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Mr. Kirsch or to distributors of Roundup®.

94. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

95. Mr. Kirsch had no knowledge that Defendant was engaged in the wrongdoing alleged herein because of the fraudulent acts of concealment or wrongdoing by Defendant, which Mr. Kirsch could not have reasonably discovered at any prior time.

96. Also, the economics of this fraud should be considered because the Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of advertising, distributing, marketing, promoting and/or selling a profitable herbicide, notwithstanding the known or reasonably known risks.

97. Mr. Kirsch could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and was forced to and did rely only on Defendant's representations regarding Roundup® products.

98. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION
### (WRONGFUL DEATH ACTION)

99. Plaintiff incorporates herein as though a part hereof the averments contained in Paragraphs 1 through 98 of this Amended Complaint, inclusive, the same as though they were herein set forth in full.

21

100. Plaintiff's Decedent left to survive him the following:

— His wife, Renae L. Kirsch, residing at 6 Antietam Drive, Birdsboro, Berks County, Pennsylvania 19508

— His son, Brandon J. Kirsch, residing at 6 Antietam Drive, Birdsboro, Berks County, Pennsylvania 19508

— His daughter, Jessica D. Kirsch, residing at 6 Antietam Drive, Birdsboro, Berks County, Pennsylvania 19508.

101. As the Executrix of the Estate of John C. Kirsch, Plaintiff is entitled to bring this Wrongful Death Action on behalf of herself and all the above statutory heirs of the Decedent John C. Kirsch.

102. As a result of the aforesaid exposure and resulting injuries sustained, Plaintiff's Decedent and his statutory heirs were obliged to accumulate reasonable and necessary medical expenses for physician's fees, hospital bills, medicines, and various other treatment and expenses, said amounts to be proven at time of trial.

103. Plaintiff is entitled to recover on behalf of all statutory heirs, the pecuniary loss for the loss of earnings, services, support and contributions which Decedent would have provided and made during the remainder of his natural life, which earnings, services, support and contributions would have continued until the termination of Decedent's natural life but for the aforesaid acts, omissions and conduct of Defendant.

104. As a result of the death of Mr. Kirsch, his heirs, including but not limited to his wife, have sustained a loss of the value of his services, contributions he would have made to them and his comfort, consortium, society, guidance and tutelage.

105. As a result of the injuries and death of Mr. Kirsch, funeral, burial, administration expenses and/or other pecuniary losses were incurred for which the statutory heirs are entitled to reimbursement.

12/30/2020 SL1 1488578v4 111294.00001

106. At no time during his life did Plaintiff's Decedent recover any damages for his related personal injuries, and no action other than the above-captioned suit has been commenced to recover damages for his death.

107. Plaintiff brings this action pursuant to 42 Pa. C.S.A. § 8301 and Pa. R.C.P. § 2202(a) as the Executrix of the Estate of John C. Kirsch, on her own behalf and on behalf of all those entitled by law, to recover any and all damages recognized under Pennsylvania law for the wrongful death of decedent John C. Kirsch.

## SECOND CAUSE OF ACTION
### (SURVIVAL ACTION)

108. Plaintiff incorporates herein as though a part hereof the averments contained in Paragraphs 1 through 107 of this Amended Complaint, inclusive, the same as though they were herein set forth in full.

109. On the date of his death, Plaintiff's Decedent John C. Kirsch was 56 years of age, his date of birth being on December 17, 1963.

110. By reason of the injuries sustained resulting in his death, Plaintiff's Decedent John C. Kirsch is believed to have endured great physical, emotional, mental pain and suffering as a result of the conduct of the Defendant.

111. By reason of the aforesaid acts, omissions and conduct of the Defendant resulting in the injuries suffered by Plaintiff's Decedent and his ultimate death, Plaintiff claims damages for related medical bills for treatment rendered, to the extent not awarded in the Wrongful Death Action, and for the loss of wages, earnings, earning power of Decedent for a period of time beginning on the date of his first illness from exposure, and continuing through the remainder of his life expectancy, including any retirement benefits, Social Security benefits and lost fringe

23

benefits, less his estimated cost of personal maintenance, and the amount of contributions the

Decedent would have made to his statutory heirs under the Wrongful Death Action.

112.  By reason of the willful, wanton and outrageous conduct, and the reckless

indifference of the Defendant as described herein, Plaintiff's Decedent John C. Kirsch is entitled

to an award of punitive damages in addition to compensatory damages.

113.  Plaintiff brings this action on behalf of the Decedent's estate pursuant to 20 Pa.

C.S.A. § 3373 and 42 Pa. C.S.A. § 8302 for all damages and financial losses authorized under

Pennsylvania law, which were suffered by Plaintiff's Decedent as a result of his exposure.

**COUNT I**
**(Renae L. Kirsch, Executrix of the Estate of John C. Kirsch v. Monsanto Company)**

**402A - STRICT PRODUCTS LIABILITY**
**(DESIGN DEFECT)**

114.  Plaintiff incorporates by reference each and every allegation set forth in the preceding

paragraphs as if fully stated herein.

115.  Plaintiff brings this strict liability claim against Defendant for defective design.

116.  At all times relevant to this litigation, Defendant engaged in the business of testing,

developing, designing, manufacturing, marketing, selling, distributing, and promoting

Roundup® products, which are defective and unreasonably dangerous to consumers, including

Plaintiff's Decedent, thereby placing Roundup® products into the stream of commerce.  These

actions were under the ultimate control and supervision of Defendant.  At all times relevant to

this litigation, Defendant designed, researched, developed, manufactured, produced, tested,

assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup®

products used by the Plaintiff's Decedent, as described above.

117.  At all times relevant to this litigation, Defendant's Roundup® products were

manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner

24

that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff's Decedent.

118.  At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including Plaintiff's Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

119.  Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

120.  Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

121.  At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

122.  Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed,

25

sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a.  When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.  When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.  When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.  Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.  Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.  Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.  Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h.  Defendant could have employed safer alternative designs and formulations.

26

123. Mr. Kirsch was exposed to Defendant's Roundup® products in the course of his regular and consistent residential use, as described above, without knowledge of its dangerous characteristics.

124. At all times relevant to this litigation, Mr. Kirsch used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

125. Mr. Kirsch could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

126. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

127. At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

128. Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Mr. Kirsch.

129.  Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

130.  The defects in Defendant's Roundup® products were substantial and contributing factors in causing Mr. Kirsch's grave injuries and ultimate death, and, but for Defendant's misconduct and omissions, Mr. Kirsch would not have sustained the injuries which caused his death.

131.  Defendant's conduct, as described above, was reckless.  Defendant risked the lives of consumers and users of its products, including Mr. Kirsch, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public.  Defendant made conscious decisions not to redesign, warn, or inform the unsuspecting public.  Defendant's reckless conduct warrants an award of punitive damages.

132.  As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Mr. Kirsch suffered grievous injuries, endured great physical pain and discomfort, incurred economic hardship, including considerable financial expenses for medical care and treatment, and ultimately died from his exposure.

WHEREFORE, Plaintiff, Renae L. Kirsch, Executrix of the Estate of John C. Kirsch, respectfully requests that this Court enter judgment against Defendant, Monsanto Company, for compensatory and punitive damages, together with interest, costs herein incurred, delay damages, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiff also demands a jury trial on the issues contained herein.

**COUNT II**
**(Renae L. Kirsch, Executrix of the Estate of John C. Kirsch v. Monsanto Company)**

## 402A - STRICT PRODUCTS LIABILITY
## (FAILURE TO WARN)

133.  Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

134.  Plaintiff brings this strict liability claim against Defendant for failure to warn.

135.  At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Mr. Kirsch, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Defendant.

136.  Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Mr. Kirsch,  and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

137.  At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks.  Defendant had a continuing duty to warn Mr. Kirsch of the dangers associated with Roundup® use and exposure.  Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

29

138.  At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

139.  At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Mr. Kirsch.

140.  Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure.  The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Mr. Kirsch.

141.  Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products.  Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

142.  At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including Mr. Kirsch, without

30

substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

143. Mr. Kirsch was exposed to Defendant's Roundup® products in the course of his regular and consistent residential use, as described above, without knowledge of the dangerous characteristics.

144. At all times relevant to this litigation, Mr. Kirsch used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

145. Mr. Kirsch could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Mr. Kirsch's exposure. Mr. Kirsch relied upon the skill, superior knowledge, and judgment of Defendant.

146. Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

147. The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled users such as Mr. Kirsch to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or

31

exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to. Roundup® and glyphosate.

148.  To this day, Defendant has failed to adequately and accurately warn of the true risks of the injuries of Plaintiff's Decedent, and potential death, associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

149.  As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Mr. Kirsch.

150.  Defendant is liable to Plaintiff for injuries and death of Plaintiff's Decedent caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

151.  The defects in Defendant's Roundup® products were substantial and contributing factors in causing Mr. Kirsch's injuries and death, and, but for Defendant's misconduct and omissions, Mr. Kirsch would not have sustained his injuries and death.

152.  Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Mr. Kirsch could have taken steps to protect himself by using protective equipment, avoided the risk of developing injuries as alleged herein, and/or obtained alternative herbicides, and he would be alive today.

153.  As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Mr. Kirsch suffered grievous injuries, endured great

32

physical pain and suffering, incurred economic hardship, including considerable financial expenses for medical care and treatment, and ultimately died from his exposure.

WHEREFORE, Plaintiff, Renae L. Kirsch, Executrix of the Estate of John C. Kirsch, respectfully requests that this Court enter judgment against Defendant, Monsanto Company, for compensatory and punitive damages, together with interest, costs herein incurred, delay damages, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

### COUNT III
**(Renae L. Kirsch, Executrix of the Estate of John C. Kirsch v. Monsanto Company)**

### NEGLIGENCE

154. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

155. Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Mr. Kirsch.

156. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

157. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate

33

warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

158.  At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

159.  Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Mr. Kirsch's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Mr. Kirsch.

160.  Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

161.  As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup' products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and/or potential death as a result of the unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

162.  Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so.  Indeed, Defendant has wrongfully concealed

34

information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

163. Defendant's negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm and/or death associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm and/or death associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

35

g. Failing to disclose to Mr. Kirsch, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Mr. Kirsch, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Mr. Kirsch and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicates or implies that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

164. Defendant knew and/or should have known that it was foreseeable that consumers such as Mr. Kirsch would suffer injuries and/or death as a result of Defendant's failure to

36

exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

165. Mr. Kirsch did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

166. Defendant's negligence was the proximate cause of the injuries, harm, economic losses and death of Mr. Kirsch, as described herein.

167. Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Mr. Kirsch, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Mr. Kirsch. Defendant's reckless conduct therefore warrants an award of punitive damages.

168. As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Mr. Kirsch suffered grievous injuries, endured great pain and suffering, incurred economic hardship, including considerable financial expenses for medical care and treatment, and ultimately died from his exposure.

WHEREFORE, Plaintiff, Renae L. Kirsch, Executrix of the Estate of John C. Kirsch, respectfully requests that this Court enter judgment against Defendant, Monsanto Company, for compensatory and punitive damages, together with interest, costs herein incurred, delay damages, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT IV
### (Renae L. Kirsch, Executrix of the Estate of John C. Kirsch v. Monsanto Company)

### BREACH OF EXPRESS WARRANTIES

169.  Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

170.  At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff's Decedent, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

171.  Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup® products, including a duty to:

a.  Ensure that its products did not cause the user unreasonably dangerous side effects;

b.  Warn of dangerous and potentially fatal side effects; and

c.  Disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff's Decedent.

172.  At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant in labels, publications, package inserts, and online materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use.  Defendant advertised, labeled, marketed, and promoted

38

Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

173. These express representations include incomplete warnings and instructions that purport but fail to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate, a proven carcinogen. Defendant knew or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries and/or death complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Mr. Kirsch, and/or that they were safe and effective as herbicides.

174. The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

175. Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries and potential death associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

176. Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their

39

intended, ordinary, and foreseeable use and purpose.  Specifically, Defendant breached the warranties in the following ways:

a.  Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury and potential death associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.  Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

177.  Mr. Kirsch was at all relevant times in contractual privity with Defendant.

178.  Mr. Kirsch is the intended beneficiary of express warranties made by Defendant to the purchasers of its herbicides, and as such Plaintiff is entitled to assert this claim.

179.  On information and belief, Mr. Kirsch justifiably and detrimentally relied on the express warranties and representations of Defendant in the purchase and use of its Roundup® products.  When Mr. Kirsch made the decision to purchase Roundup®, he reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate.

180.  Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers, and users such as Mr. Kirsch, could not have reasonably

40

discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

181. Mr. Kirsch had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

182. Mr. Kirsch used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant, without any substantial change.

183. Had the warnings and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries and death, rather than expressly excluding such information and warranting that the products were safe for their intended use, Mr. Kirsch could have avoided his injuries and ultimate death.

184. As a direct and proximate result of Defendant's wrongful acts and omissions, Mr. Kirsch suffered grievous injuries, endured great pain and suffering, incurred economic hardship, including considerable financial expenses for medical care and treatment, and ultimately died from his exposure.

WHEREFORE, Plaintiff, Renae L. Kirsch, Executrix of the Estate of John C. Kirsch, respectfully requests that this Court enter judgment against Defendant, Monsanto Company, for compensatory and punitive damages, together with interest, costs herein incurred, delay damages, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

41

## COUNT V
### (Renae L. Kirsch, Executrix of the Estate of John C. Kirsch v. Monsanto Company)

### BREACH OF IMPLIED WARRANTIES

185.  Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

186.  At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Mr. Kirsch, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

187.  Before the time that Mr. Kirsch used and/or was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers— including Mr. Kirsch—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

188.  Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries and/or death, including Mr. Kirsch's injuries and ultimate death.

189.  Upon information and belief, Mr. Kirsch reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

190.  Mr. Kirsch was at all relevant times in contractual privity with Defendant.

191.  Mr. Kirsch is the intended beneficiary of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

12/30/2020 SL1 1488578v4 111294.00001

192. The Roundup® products were expected to reach and did in fact reach consumers and users, including Mr. Kirsch, without substantial change in the condition in which they were manufactured and sold by Defendant.

193. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Mr. Kirsch, would use Roundup® products as marketed by Defendant, which is to say that Mr. Kirsch was a foreseeable user of Roundup®.

194. Defendant intended that its Roundup® products be used in the manner in which Mr. Kirsch in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

195. In reliance upon Defendant's implied warranty, Mr. Kirsch used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

196. Mr. Kirsch could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

197. Defendant breached its implied warranty to Mr. Kirsch in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries and death, including those injuries and ultimate death complained of herein.

198. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

43

199. As a direct and proximate result of Defendant's wrongful acts and omissions, Mr. Kirsch suffered grievous injuries, endured great pain and suffering, incurred economic hardship, including considerable financial expenses for medical care and treatment, and ultimately died from his exposure.

WHEREFORE, Plaintiff, Renae L. Kirsch, Executrix of the Estate of John C. Kirsch, respectfully requests that this Court enter judgment against Defendant, Monsanto Company, for compensatory and punitive damages, together with interest, costs herein incurred, delay damages, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT VI
### (Renae L. Kirsch, Executrix of the Estate of John C. Kirsch v. Monsanto Company)

### NEGLIGENT MISREPRESENTATION AND/OR FRAUD

200. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

201. Defendant is the designer, researcher, developer, manufacturer, tester, packager, promoter, marketer, advertiser, distributor, labeler, supplier, and/or seller of Roundup® and, while engaged in the course of such business, made representations to consumers, including Mr. Kirsch, regarding the character and/or quality for guidance in the decision to select Roundup® for use.

202. Defendant had a duty to disclose material information about serious health effects to consumers such as Mr. Kirsch. Defendant negligently, recklessly and/or intentionally failed to disclose this information for the purpose of inducing customers, including Mr. Kirsch to purchase Defendant's dangerous products.

44

203. Specifically, Defendant's advertisement regarding Roundup® made material misrepresentations to the effect that Roundup® was safe, which misrepresentations Defendant knew to be false, for the purpose of fraudulently inducing customers, such as Mr. Kirsch, to purchase said product. Defendant further misrepresented that its products were just as safe, and just as effective or more effective, than other weed control products on the market.

204. Defendant's representations regarding the character or quality of Roundup® were untrue. In addition, Defendant fraudulently suppressed material information regarding the safety of Roundup®, including the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

205. Defendant had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup®.

206. Defendant negligently and/or intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements and instead labeled, promoted and advertised its products as safe and effective in order to avoid losses and sustain profits in its sales to customers.

207. In supplying the false information, Defendant failed to exercise a reasonable care or competence in obtaining or communicating information to their intended recipients, including Mr. Kirsch.

208. Mr. Kirsch reasonably and justifiably relied to his detriment upon Defendant's misrepresentations and/or omissions in its labeling, advertisements, promotions concerning the serious risks posed by the product. Mr. Kirsch reasonably and justifiably relied upon

45

Defendant's representations to him that Roundup® was safe for use and that Defendant's labeling, advertisements and promotions fully described all known risks of the product.

209.  As a direct and proximate result of Defendant's wrongful acts and omissions, Mr. Kirsch suffered grievous injuries, endured great pain and suffering, incurred economic hardship, including considerable financial expenses for medical care and treatment, and ultimately died from his exposure.

WHEREFORE, Plaintiff, Renae L. Kirsch, Executrix of the Estate of John C. Kirsch, respectfully requests that this Court enter judgment against Defendant, Monsanto Company, for compensatory and punitive damages, together with interest, costs herein incurred, delay damages, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiff also demands a jury trial on the issues contained herein.

## COUNT VII
**(Renae L. Kirsch, Executrix of the Estate of John C. Kirsch v. Monsanto Company)**

### VIOLATION OF PENNSYLVANIA UNFAIR
### TRADE PRACTICES AND CONSUMER PROTECTION LAW

210.  Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

211.  Plaintiff pleads this Count in the broadest sense available under law to include pleading same pursuant to all substantive law that applies to this case as may be determined by choice of laws principals, regardless of whether arising under statute and/or common law.

212.  Defendant violated 73 P.S. § 201-1 *et seq*., through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Roundup®.

213.  Defendant communicated the purported benefits of Roundup® while failing to disclose the serious and dangerous side effects related to the use of Roundup® and of the true state of Roundup®'s regulatory status and safety.  Defendant made these representations to the

46

public at large, including Mr. Kirsch, in the marketing and advertising campaigns described herein.

214. Mr. Kirsch justifiably relied upon said representations, purchased Defendant's Roundup® products for personal family and/or household purposes, used Defendant's Roundup® products, and suffered personal injuries, ultimate death and other ascertainable losses as a result of Defendant's actions in violation of the aforementioned consumer protection laws.

215. Defendant used unfair methods of competition or deceptive acts or practices that were prohibited by law including the following:

a. Violating 73 P.S. § 201-2(4)(v) by engaging in unfair or deceptive trade practices as defined in this statute by making false representations that Defendant's products have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, including but not limited to statements concerning the safety and the health consequences of the use of Roundup®.

b. Violating 73 P.S. § 201-2(4)(xxi) by engaging in other fraudulent and/or deceptive conduct that creates a likelihood of confusion or misunderstanding, including but not limited to deception, fraud, misrepresentation, knowing concealment, and/or suppression or omission of material facts about Defendant's products and their use and safety that consumers, including Mr. Kirsch, relied upon, in connection with the purchase, use, and continued use of Roundup®.

c. Engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers about the safety of its Roundup® products.

47

d. Engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts the omission of which deceived or tended to deceive, including but not limited to facts relating to the safety and the health consequences of the use of Roundup®.

216. Defendant had a statutory duty to refrain from engaging in unfair trade practices and deceptive conduct in the design, development, manufacture, promotion and sale of Roundup®.

217. Had the Defendants not engaged in the unfair trade practices and deceptive conduct described herein, Mr. Kirsch would not have purchased and/or used Roundup® products and would not have incurred personal injuries, death and other ascertainable losses, including but not limited to substantial medical bills and costs.

218. Specifically, Mr. Kirsch was misled by the unfair trade practices and deceptive conduct described herein.

219. Defendant's deceptive, unconscionable, false, misleading and/or fraudulent representations and material omissions to the public at large, including Mr. Kirsch, of material facts relating to the safety of Roundup®, upon which Mr. Kirsch justifiably relied, constituted unfair trade practices or deceptive conduct in violation of the state consumer protection statutes listed above.

220. Defendant uniformly communicated the purported benefits of Roundup® products while failing to disclose the serious and dangerous side effects related to the use of Roundup® and the true state of Roundup® products' regulatory status and its safety.

221. Defendant made these representations to the public at large, including Mr. Kirsch, in the marketing and advertising campaign described herein.

222. Defendant's conduct in connection with Roundup® was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding because Defendant

48

misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the safety of Roundup® products.

223.  As a direct and proximate result of the Defendant's wrongful conduct, Mr. Kirsch was diagnosed with CLL, suffered serious and dangerous side effects and progression of the disease, incurred substantial expenses for necessary medical treatment and medication, and ultimately died from that exposure.  Plaintiff is legally entitled to recover those losses.

224.  By reason of wrongful acts engaged in by the Defendant, Mr. Kirsch suffered ascertainable loss of money and/or property and other harm or damages for which Plaintiff is legally entitled to recover.

225.  As a direct and proximate result of the Defendant's statutory violations and unfair trade practices and deceptive conduct, Mr. Kirsch sustained economic losses and other harm or damages for which Plaintiff is legally entitled to recover, including actual compensatory damages, statutory damages, treble and/or punitive damages, and costs and reasonable attorneys' fees in the amount to be proven at time of trial.

WHEREFORE, Plaintiff, Renae L. Kirsch, Executrix of the Estate of John C. Kirsch, respectfully requests that this Court enter judgment against Defendant, Monsanto Company, for compensatory and/or statutory damages, treble and/or punitive damages, together with interest, costs herein incurred, delay damages, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiff also demands a jury trial on the issues contained herein.

## COUNT VIII
### (Renae L. Kirsch, individually v. Monsanto Company)

### LOSS OF CONSORTIUM

226.  Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

49

227. At all times relevant, Plaintiff Renae L. Kirsch ("Mrs. Kirsch") was the wife of Mr. Kirsch up until the date of his death on September 22, 2020

228. As a result of the aforesaid acts or omissions by Defendant, from the date of Mr. Kirsch's diagnosis of CLL on December 23, 2016 until the date of his death, Mrs. Kirsch was been deprived of the care, protection, comfort, companionship, services, assistance and society of her husband, John C. Kirsch, all of which was to Mrs. Kirsch's great financial and emotional loss.

WHEREFORE, Plaintiff, Renae C. Kirsch, individually, respectfully requests that this Court enter judgment in her favor and against Defendant and award her compensatory and punitive damages, together with interest, costs therein incurred, delay damages, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Renae L. Kirsch, Executrix of the Estate of John C. Kirsch, requests that the Court enter judgment against Defendant, Monsanto Company, on all Counts pleaded above, and award Plaintiffs the following:

a. Past medical expenses, funeral expenses, burial expenses and expenses of administration;

b. Past pain and suffering;

c. Past lost earnings and future loss of earning capacity, minus the estimated cost of personal maintenance and the amount of contributions that Decedent would have made to his statutory heirs under the Wrongful Death Act;

d. Value of services that Plaintiff's Decedent would have rendered to the statutory beneficiaries;

50

e.  Lost retirement benefits, Social Security benefits, and fringe benefits;

f.  Interest;

g.  Punitive damages;

h.  Treble damages under the UTPCPL;

i.  Costs and reasonable attorneys' fees;

j.  Delay damages;

k.  Any and all other relief the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all of the triable issues within this Amended Complaint.

Respectfully submitted,

Dated: _____          By: _____

Daniel E. P. Bausher / Atty ID #29980
STEVENS & LEE
111 North Sixth Street
Reading, PA 19603
Phone:  (610) 478-2207
Fax:  (610) 988-0802
Email:  deb@stevenslee.com

Jeffrey D. Bukowski / Atty ID #76102
Smith / Bukowski
14133 Kutztown Road
Fleetwood, PA 19522-1300
Phone:  (610) 685-1600
Fax:  (610) 685-1300
Email:  jbukowski@smithbukowski.com

*Attorneys for Plaintiff,*
*Renae L. Kirsch,*
*Executrix of the Estate of John C. Kirsch, and*
*Renae L. Kirsch, individually, in her own right*

51

## **VERIFICATION**

I, RENAE L. KIRSCH, verify that I am the Executrix of the Estate of John C. Kirsch, deceased, and a Plaintiff in my own right in the within action; that the attached Amended Complaint is based upon the facts of which I have personal knowledge or information furnished to me by counsel; that the language of the document is that of counsel and not my own; and that the facts set forth in the foregoing document are true and correct to the best of my knowledge, information and belief.  I understand that the statements herein are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

_____

Renae L. Kirsch

Date: _____, 2020

12/30/2020 SL1 1488578v4 111294.00001