# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| IN RE: DEPUY ORTHOPAEDICS, INC., PINNACLE HIP IMPLANT PRODUCTS LIABILITY LITIGATION § § § § | MDL Docket No. 3:11-MD-2244-K |
| § | |
| ------------------------------------------------- § | |
| This Document Relates to All Cases § | |
| ------------------------------------------------- § | |

## ORDER GRANTING MOTION FOR FINAL ASSESSMENT

Before the Court is the parties' Sealed Motion for Final Assessment (Doc. 983), filed jointly by the Plaintiffs' Executive Committee ("PEC") and Defendants. As agreed with Defendants, the PEC requests the Court reduce the 25 percent preliminary holdback and instead assess a 10 percent holdback of common benefit funds for costs and fees. Also before the Court are the PEC's Sealed Motion for Sanctions and to Compel (Doc. 966) and Sealed Supplemental Motion for Sanctions and to Compel (Doc. 971), to which Defendants filed no response. Having considered these motions, the Court GRANTS IN PART the Motion for Final Assessment and DENIES as moot the sanctions motions for the reasons set forth in this Order.

## I.   BACKGROUND

In August 2018, the Court issued a Preliminary Holdback Order (Doc. 889). That Order required Defendants to hold back 10 percent of the gross value of any settlement or judgment in a case that has been or is included in this MDL for the common benefit fund pending the determination of a common benefit assessment. Of

the holdback, 70 percent (7 percent of the gross value) would be held back for common benefit attorneys' fees, and 30 percent (3 percent of the gross value) would be held back for costs expended for the common benefit of Plaintiffs.  No parties objected to that Order, although the PEC filed a reservation of rights (Doc. 898), in which it did not concede that the preliminary 10 percent holdback should be the final assessment.

Starting on November 21, 2018, Defendants informed the Court that at least 3,000 of the more than 10,000 cases pending in this MDL were subject to confidential settlements with certain Plaintiffs' counsel.  Notwithstanding the imminent nature of payments in potentially thousands of cases and acknowledging that tens of millions of dollars of common-benefit fees and expenses were potentially in controversy, Defendants informed the Court that they were unable to calculate the amount subject to the Preliminary Holdback Order for approximately four months.  Unlike MDLs in which the ultimate settlement or judgment value is known, Defendants' confidential settlements left the Court without necessary information about the total or projected value of settlement, let alone the amount of holdback funds to be deposited in the Court's registry.

Upon motion by the PEC (Doc. 913) and after a full opportunity for briefing by all parties, the Court increased the holdback amount to 25 percent in December 2018 (Doc. 924).  Although the Court had the benefit of the to-date lodestar amount at that point, the Court still had incomplete data regarding settlements.  At the time, this change was immediately deemed "unprecedented," "unwarranted," "unreasonable,"

"inappropriate," and alleged to be "dragging this litigation out farther" in a response and objection by Defendants and dozens of responses and objections filed by certain Plaintiffs' firms; however, it now appears the Court's action was prescient.

On the February 1, 2019, after 5 days into the fifth jury trial the PEC and Defendants informed the Court of the specific terms of an inventory settlement for certain firms. Defendants have informed the Court that they estimate the total settlement payments to resolve claims regarding the DePuy Pinnacle litigation is $950,000,000. At 25 percent of the gross settlement amount the holdback would be $237,500,000, and at 10 percent of the gross settlement amount the holdback would be $95,000,000—a difference of $142,500,000. The February 1, 2019, terms of settlement required the PEC and Defendants to jointly move the Court to reduce the holdback from 25 percent to 10 percent on the condition that Defendants also agree to contribute up to $139,600,000 to a fund to be used for common benefit fees and expenses to make up for the reduction in the holdback percentage. The Defendants also agreed to retain an ethics expert regarding the propriety of the direct common-benefit payment subject to this Court's approval, and to withdraw their objections that the 25 percent holdback was "unprecedented," "unwarranted," "unreasonable," and "inappropriate" and persuade all objecting Plaintiffs to withdraw their objections. Contemporaneous with the filing of the motion for final assessment, Defendants and all objecting Plaintiffs withdrew their objections in unison. As a result of this agreement, Defendants are agreeing to a 10 percent holdback, estimated at

$95,000,000, plus a supplemental common-benefit fund payment of up to $139,600,000 for a total of $234,600,000—24.6 percent of the estimated total settlement payments of $950,000,000.

## II.     LEGAL STANDARD

Given the voluminous and contentious briefing stretching back many months across several dozen filings, the Court is not inclined to recount all of the since-withdrawn arguments and will not address arguments made in now-dismissed appellate proceedings not directly material to this Order. The Court has reviewed and considered all relevant filings and will duly apply the applicable legal authorities.

### A. The Court has Broad Common Benefit Holdback Authority.

As stated in its multiple orders on this topic, the Court can create a holdback from potential settlement payments or judgments that must be paid by Defendants through its inherent authority to establish common benefit funds, assess parties and their counsel, and appropriate and distribute those funds. *See In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir. 1977). A common benefit fund is designed to compensate attorneys for the costs incurred and work performed for the common benefit of all plaintiffs and their counsel. *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 647 (E.D. La. 2010). The primary theory supporting such funds is the common benefit doctrine, which holds that persons who obtain the benefits of a lawsuit without contributing to defraying its costs are unjustly enriched at the successful litigant's expense. *See id.*

The Court must therefore exercise its managerial power to establish an equitable common benefit fund and ensure that all attorneys working for the Plaintiffs' common benefit are adequately compensated for their contributions and reimbursed for the appropriate expenses that contributed to the Plaintiffs' successes, if any. *See In re Air Crash Disaster*, 549 F.2d at 1013-14 (citing FED. R. CIV. P. 42(a) and emphasizing the strength and necessity of the trial court's managerial power in multidistrict litigation); *id.* at 1020 (acknowledging that although the trial court could not determine the exact percentage that should be contributed to a common fund without a liability finding, the interest of justice required such a fund be established so the court could make a just distribution when it had adequate information to do so). And as in this case, "[t]he need for a court to exercise its managerial powers . . . may take precedence over the desires of counsel." *Id.* at 1014.

**B. The Court Must Determine the Reasonableness of Any Assessment.**

To determine the reasonableness of Plaintiffs' attorneys' fees, the Fifth Circuit has adopted the 12-factor "lodestar" test enunciated in *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974). These factors are:

> (1) the time and labor required;
> (2) the novelty and difficulty of the questions;
> (3) the skill requisite to perform the legal services properly;
> (4) the preclusion of other employment by the claimant's attorney due to acceptance of the case;
> (5) the customary fee;
> (6) whether the fee is fixed or contingent;
> (7) time limitations imposed by the claimant or the circumstances;
> (8) the amount of recovery involved and the results obtained;
> (9) counsel's experience, reputation, and ability;

   (10) the "undesirability" of the case;
   (11) the nature and length of the professional relationship with the claimant; and
   (12) awards in similar cases.

*Id.* at 717-19. "[M]any of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 434 n.9 (1983).

### III. ANALYSIS

As in the 25 percent Amended Preliminary Holdback Order, the Court finds the effective 24.6 percent holdback adequate and necessary given its review of the PEC's Motion for Final Assessment as agreed by Defendants, its firsthand knowledge of the common benefit attorneys' efforts, skill, and results, its review of other relevant MDL proceedings, and its application of the *Johnson* factors. Understanding that Defendants have agreed to make a direct common benefit payment of $139,600,000 and having reviewed the ethics expert's opinion provided by Defendants, the Court will apply a 10 percent holdback under the conditions and terms stated in this Order.

The Court finds that the direct payment is appropriate, because, as outlined in the PEC's motions for sanctions, Defendants' actions increased both time and expenses incurred for the common benefit throughout every phase of this litigation. (Docs. 966, 971). Many of Defendants' actions are recounted in the PEC's sanctions motions. *See id.* Rather than recite a laundry list of questionable conduct within this Order, the Court will unseal those now-mooted motions—which would be well-taken by the Court

6

but for the parties' settlement. As outlined below, this delta, in addition to the ten percent holdback is reasonable.

**A. The Court Finds the Common Benefit Fees Sought are Reasonable.**

Applying the *Johnson* factors, the Court finds as follows:

(1) The time and labor required were immense. Plaintiffs and their counsel first appeared before this Court in 2011. They spent 134 days in trial and sifted through more than 100 million pages of documents produced, in addition to responding to two mandamus proceedings and three appeals spawned by this MDL. Recent totals provided to the Court show that Plaintiffs' firms have accounted for more than 246,000 hours of common benefit time since 2011.

(2) The novelty and difficulty of the questions were substantial. Both Plaintiffs and Defendants, at times, agreed that this MDL presented questions of first impression before this Court and within the Fifth Circuit. One of Defendants' mandamus proceedings, regarding venue waiver, proceeded entirely on that basis. Given the lack of binding precedent on MDL proceedings in this Circuit and, indeed, throughout the federal judiciary, the Court asked Plaintiffs and Defendants to thoroughly brief and explain their positions on numerous novel and difficult questions.

(3) The skill requisite to perform the legal services properly was exceptional. Defendants were ably represented by multi-national law firms. At one point, Defendants asserted they had 50 lawyers working on this case. To fight Defendants to

7

a draw—or, in reality, better—Plaintiffs' legal skill was readily apparent to even a casual observer.

(4) The preclusion of other employment by the claimant's attorney due to acceptance of the case is noted. The Court understands that, based on this MDL, certain Plaintiffs' attorneys declined invitations to join other large cases in significant roles that could yield large recoveries and fees.

(5) The customary fee is typically based on the lodestar figure, which is simply hours billed multiplied by hourly rate. Plaintiffs' request for common benefit fees and expenses is in line with this Court's expectations given the length and complexity of this proceeding.

(6) Whether the fee is fixed or contingent is largely immaterial under a lodestar calculation, although most Plaintiffs' counsel have contingent agreements with their clients due to fronting the cost and labor of this proceeding.

(7) Time limitations imposed by the claimant or the circumstances are relatively immaterial given the length of this MDL proceeding and effort required to reach a global settlement.

(8) The amount of recovery involved and the results obtained appear solidly within expectations. Although Plaintiffs lost the first bellwether trial, they were ultimately successful in the remaining trials with total verdicts exceeding $1 billion. The settlement amounts, as reviewed by the Court, are in line with other relevant MDL proceedings.

(9) Counsel's experience, reputation, and ability are unquestioned. Plaintiffs were represented by many of the most experienced and able attorneys in the country, with trial counsel providing exceptional service across 134 days in the courtroom and thousands of others outside.

(10) The "undesirability" of the case became apparent after the first bellwether trial loss. Plaintiffs could have agreed to a settlement that devalued their claims. Instead, Plaintiffs' counsel fought through years more discovery, three more trials, two mandamus proceedings, and three appeals just to reach this settlement. The Court is aware that some Plaintiffs' firms declined to participate in common benefit assessments after the first trial; those that stayed well deserve their fees and costs.

(11) The nature and length of the professional relationship with the claimant(s) is, in many cases, nearing a decade. This MDL has been pending eight years, with many cases filed before consolidation in this Court and the bulk of settlement dollars remaining to be distributed. Plaintiffs and their counsel deserve credit for their patience and persistence.

(12) Awards in similar cases are in line with this Order, as the PEC demonstrates in the Motion for Final Assessment, to which Defendants agree. Here, if including the additional difference covered by Defendants, the Court calculates the maximum multiplier to fall around 1.33 times the lodestar amount submitted by Plaintiffs. This is on the low side of the relevant MDL authorities submitted by the parties.

## IV. CONCLUSION

For these reasons, the Court GRANTS IN PART the PEC's Motion for Final Assessment. Defendants and their counsel shall hold back the percentage described herein of the gross value of any settlement or judgment in a case that has been or is included in this MDL for the common benefit fund pending the determination of a common benefit assessment, if any. Of the holdback, 7 percent of the gross value shall be held back for common benefit attorneys' fees, and 3 percent of the gross value shall be held back for costs expended for the common benefit of Plaintiffs until satisfied.

Defendants shall continue to deposit all holdback funds in an interest-bearing common benefit fund in the registry of the Court unless instructed otherwise by the Court in a subsequent order. Defendants shall continue to provide monthly statements *in camera* to the Court showing the aggregate of the amount deposited in the Court's registry pursuant to this Order. Defendants shall abide by this Order for cases in this MDL that are remanded from this Court to a state court or transferred to other federal judicial districts pursuant to 28 U.S.C. § 1407(a).

The Clerk is ORDERED to unseal the PEC's Motion for Sanctions and to Compel (Doc. 966) and the PEC's Supplemental Motion for Sanctions and to Compel (Doc. 971), although all supporting exhibits shall remain under seal.

**SO ORDERED.**

Signed July 22nd, 2019.

*Ed Kinkeade*
ED KINKEADE
UNITED STATES DISTRICT JUDGE