# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION** | **CIVIL ACTION** |
| | **MDL NO. 2592** |
| **THIS DOCUMENT RELATES TO:** *ALL CASES* | **SECTION "L" (5)** |

## ORDER AND REASONS

Pending before the Court is the Plaintiffs' Steering Committee's ("PSC") Motion for an Award of Attorneys' Fees and Reimbursement of Expenses. R. Doc. 17623. The Court now rules as follows.

## Table of Contents

I.   **BACKGROUND** — 2
II.   **MOTION FOR ATTORNEYS' FEES AND COSTS** — 4
   A.  *Law and Analysis* — 5
     1.  Development of the Common Fund Doctrine — 5
     2.  Methodology for Determining Common Benefit Fees — 7
       a.  Lodestar Method — 8
       b.  Percentage Method — 9
       c.  Blended Method — 10
     3.  Determining the Appropriate Common Benefit Fee in this Case — 10
       a.  Valuation of Benefit Obtained and Determination of a Benchmark Percentage — 11
       b.  Johnson Factors — 13
         i.  The time and labor required — 13
         ii.  The novelty and difficulty of the questions — 14
         iii.  The skill required to properly perform the necessary legal services — 14
         iv.  The preclusion of other employment by the attorneys due to acceptance of this case — 15

|  |  |  |
|---|---|---|
| v. | The customary fee | 15 |
| vi. | Whether the fee is fixed or contingent | 15 |
| vii. | Time limitations imposed by circumstance | 16 |
| viii. | The amount involved and the result achieved | 16 |
| ix. | Experience, reputation and ability of common benefit counsel | 17 |
| x. | The "undesirability" of the case | 17 |
| xi. | The nature and length of the professional relationship with the client | 17 |
| xii. | Fee awards in similar cases | 18 |
| c. | Lodestar Cross-Check | 18 |
| 4. | Costs | 21 |
| **III.** | **CONCLUSION** | **22** |

# I.  BACKGROUND

The current matter arises out of the private settlement in the MDL case involving the prescription anticoagulant medication known as Xarelto. To put this matter in perspective, a brief review of the litigation is helpful. Beginning in 2014, lawsuits were filed in federal courts throughout the nation against Defendants, Bayer Corporation, Bayer HealthCare LLC, Bayer HealthCare Pharmaceuticals Inc., Bayer HealthCare AG, Bayer Pharma AG, and Bayer AG, Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, Janssen Ortho LLC, and Johnson & Johnson. In their suits, the Plaintiffs specifically allege that they or their family members suffered severe bleeding and other injuries due to Xarelto's allegedly inadequate warning label, as well as other theories.

The Judicial Panel on Multidistrict Litigation determined that the Plaintiffs' claims involved common questions of fact, and that centralization under 28 U.S.C. § 1407 would serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. Therefore, on December 12, 2014, the Judicial Panel on Multidistrict Litigation consolidated the Plaintiffs' Xarelto claims into a single multidistrict proceeding ("MDL 2592"). MDL 2592 was assigned to Judge Eldon E. Fallon of the United States District Court for the Eastern District of Louisiana to coordinate discovery and other pretrial matters in the pending

cases. Subsequent Xarelto cases filed in federal court have been transferred to this district court to become part of MDL 2592 as "tag along" cases; at its peak, the Court had over 30,000 cases in the Xarelto MDL.

In February 2015, the Court issued Pretrial Order #7 appointing members to the Plaintiffs' Steering Committee ("PSC"). R. Doc. 169. The Court first appointed Leonard Davis and Gerald Meunier to serve as Co-Plaintiffs' Liaison Counsel and then on February 9, 2015, the Court appointed twelve people to the PSC, designating Andy Birchfield and Brian Barr as Co-Lead Counsel for Plaintiffs. R. Doc. 17623-1 at 13. Since their appointment, the members of the PSC, their firms, and coordinated counsel have worked on behalf of the plaintiffs in this litigation. The PSC has expended considerable time and resources to develop the plaintiffs' claims, including but not limited to the following: (1) conducting no less than 83 depositions of Defendants' executives, scientists, and other employees; (2) submitting a total of 16 thoroughly prepared expert reports issued by witnesses retained on the plaintiffs' behalf; (3) engaging in extensive briefing on dispositive issues, as well as on numerous critical evidentiary matters; (4) being involved in over 3,000 Orders entered by this Court to resolve discovery disputes, trial issues, and related matters; and (5) participating in a total of 6 bellwether trials (conducted both in the MDL and in parallel state court proceedings in Pennsylvania), each of which proceeded for approximately two weeks and involved the presentation of evidence including substantial expert witness and corporate testimony. R. Doc. 17502 at 2.

After years of discovery and bellwether trials, the PSC and the Defendants entered into settlement discussions and in early 2019, reached a settlement. On March 25, 2019, the PSC and Defendants announced an opt-in settlement agreement, a $775,000,000 private agreement that was negotiated over the course of several months and reflected compromises on both sides that were

3

informed by years of pretrial discovery, motion practice, and trials. R. Docs. 17499-1 at 2, 17623-1 at 6. This opt-in settlement agreement resolves the claims of eligible Xarelto patients who suffered bleeding events, strokes, or cerebrovascular accident ("CVA"), venous thromboembolism ("VTE"), blood clots, and other various injuries that they associated with their use of Xarelto. R. Doc. 17623-1 at 6–7.

Since the announcement of the settlement program on March 25, 2019, the PSC has engaged in efforts to explain the details of the program and to ensure that the program is administered fairly and efficiently. The PSC's efforts in this regard have included the following: a number of "town hall" style meetings in various cities, as well as webinars and "all counsel" conference calls to explain all aspects of the settlement program; hiring and working with a Settlement Special Master to devise a settlement protocol that offers the fairest distribution of the settlement proceeds; hiring and working with BrownGreer and Archer to serve as the Settlement Administrator and Lien Resolution Administrator, respectively; and complying with numerous pretrial orders and case management orders to effectively manage the litigation and assist in the administration of the settlement program. R. Doc. 17623-1 at 7–8. As mentioned, this is an opt-in settlement program and thus far, over 99 percent of the plaintiffs in this litigation have chosen to opt into the settlement.

The settlement was fully funded by the Defendants as of January 17, 2020. R. Doc. 17623-1 at 8. On March 6, 2020, the PSC submitted a Fee and Expense Petition for approval and a hearing on this Motion was held on March 19, 2020 following the monthly status conference.

## II.    MOTION FOR ATTORNEYS' FEES AND COSTS

The PSC seeks a fee assessment of 12 percent plus a cost assessment of 3 percent for common benefit counsel as to all claimants except those who elected to participate in the

Alternative Resolution Program and those who were awarded a total, gross settlement amount of $5,000 or less. R. Doc. 17623-1 at 8. If the requested 12 percent fee assessment were applied to the total amount of the $775,000,000 settlement fund, then the common benefit fee award would total $93,000,000. R. Doc. 17623-1 at 43. Therefore, once the claimants who elected to participate in the Alternative Resolution Program and those who were awarded $5,000 or less are factored out, the common benefit fee award will be less than $93,000,000. R. Doc. 17623-1 at 43–44. Similarly, if the requested cost assessment of 3 percent were applied to the total amount of the $775,000,000 settlement fund, then the requested cost reimbursement would total $23,250,000.

### A. Law and Analysis

#### 1. Development of the Common Fund Doctrine

"[U]nder the 'American Rule,' the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 561 (1986) (quotation omitted). Likewise, the attorney for the prevailing litigant must generally look to his or her own client for payment of attorneys' fees. Since the nineteenth century, however, the Supreme Court has recognized an equitable exception to this rule, known as the common fund or common benefit doctrine, that permits the creation of a common fund in order to pay reasonable attorney fees for legal services beneficial to persons other than a particular client, thus spreading the cost of the litigation to all beneficiaries. *See In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 128 (2d Cir. 2010) (Kaplan, J., concurring).[1] This equitable common fund doctrine

---

[1] Some authorities have commented on the "persistent and confusing identification of common-fund recovery as an 'exception' to the American rule on attorneys' fees," noting that in a common fund situation the funds are actually distributed "among those aligned with the plaintiff rather than extract[ed] ... from the defeated adversary." See Restatement (Third) of Restitution § 30 Reporter's Note a (Tentative Draft No. 3, 1994) (quoting Thomas D. Rowe, Jr., *The Legal Theory of Attorney Fee Shifting: A Critical Overview*, 1982 Duke L.J. 651, 662 (1982)). Regardless of specific taxonomy, the common-fund doctrine, as well as the Court's inherent power to assess fees to compensate appointed managing attorneys, constitute departures from the traditional rule that each litigant bears his or her own costs.

was originally, and perhaps still is, most commonly applied to awards of attorney fees in class actions. *See e.g.*, 5 William B. Rubenstein, Newberg on Class Actions § 15:53 (5th ed. 2019) (discussing common fund doctrine in context of class actions).

But the common fund doctrine is not limited solely to class actions. *See Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939) (employing common benefit doctrine to award fees and costs to litigant whose success benefitted unrelated parties by establishing their legal rights); *Alan Hirsh & Diane Sheeley*, Fed. Judicial Ctr., Awarding Attorneys' Fees and Managing Fee Litigation 51 (2nd ed. 2005) ("Although many common fund cases are class actions . . . the common fund doctrine is not limited to class actions."); Manual for Complex Litigation § 14.121. As class actions morph into multidistrict litigation, as is the modern trend, the common benefit concept has migrated into the latter area. The theoretical bases for the application of this concept to MDLs are the same as for class actions, namely equity and her blood brother, quantum meruit. However, there is a difference. In class actions the beneficiary of the common benefit is the claimant; in MDLs the beneficiary is the individually retained attorney (contract counsel). *See Eldon E. Fallon, Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371, 375 (2014).

MDL courts have consistently cited the common fund doctrine as a basis for assessing common benefit fees in favor of attorneys who render legal services beneficial to all MDL plaintiffs. *See e.g.*, *In re Genetically Modified Rice Litig.*, MDL 1811, 2010 WL 716190, at *4 (E.D. Mo. Feb. 24, 2010) (relying on common fund doctrine as an alternate basis of inherent managerial authority and concluding that "[b]oth sources of authority provide the same result"); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05–1708, 2008 WL 682174, at *4 (D. Minn. Mar. 7, 2008).

In addition to judicial precedent the Court also finds authority to assess common benefit attorney fees in its inherent managerial authority, particularly in light of the complex nature of this MDL. The Fifth Circuit has long recognized that a court's power to consolidate and manage litigation necessarily implies a corollary authority to appoint lead or liaison counsel and to compensate them for their work. *See In re Air Crash Disaster at Fl. Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir. 1977). Further, the Fifth Circuit has explained that a district court has inherent authority "to bring management power to bear upon massive and complex litigation to prevent [the litigation] from monopolizing the services of the court to the exclusion of other litigants." *In re Air Crash Disaster*, 549 F.2d at 1012. This policy seeks to avoid the unjust enrichment of those who profit from a common fund at the expense of those whose labors produced the fund, and it serves to encourage attorneys to accept the considerable risks associated with prosecuting complex, multi-plaintiff matters for the benefit and protection of all plaintiffs' rights.

## 2. Methodology for Determining Common Benefit Fees

Attorney fees and costs, authorized by law or the agreement of the parties, must be reasonable. Fed. R. Civ. P. 23(h). "The decision of an award of attorney fees in a common-fund case is committed to the sound discretion of the trial court, which must consider the unique contours of the case." Manuel for Complex Litigation § 14.121 (4th ed. 2004).

Courts have employed various methods for determining the reasonableness of an award of common benefit fees. These methods include: (1) the lodestar method, which entails multiplying the reasonable number of hours expended on the litigation by an adjusted reasonable hourly rate; (2) the percentage method, in which the court compensates common benefit attorneys based on a percentage of the amount recovered; or (3) the blended method, a combination of both methods, in which the percentage is selected and cross checked for reasonableness by utilizing the lodestar

method.  *See Union Asset Mgmt. Holding A.G. v Dell Inc.*, 669 F.3d 632, 644 (5th Cir. 2012); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 652 (E.D. La. 2010) (finding the blended method to be in line with Fifth Circuit precedent).  It is appropriate to consider each of these methods in turn in an effort to determine a fair common benefit fee in this case.

### a.  Lodestar Method

Using the lodestar method to calculate reasonable common benefit fees begins with a determination of the reasonable number of hours spent on this part of the case.  Once this is done, the appropriate hourly rate is established.  This is then tested based on an analysis of 12 factors known as the *Johnson* factors—first formulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974).  These factors include (a) the time and labor required; (b) the novelty and difficulty of the questions; (c) the skill required to perform the legal service properly; (d) the preclusion of other employment by the attorneys due to acceptance of the case; (e) the customary fee; (f) whether the fee is fixed or contingent; (g) time limitations imposed by the client or circumstances; (h) the amount involved and the results obtained; (i) the experience, reputation, and ability of the attorneys; (j) the "undesirability" of the case; (k) the nature and length of the professional relationship with the client; and (l) awards in similar cases.  *Id.* at 717-19; *see also Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir. 1990).

The lodestar method is not without flaws.  Many courts and commentators have noted problems with the lodestar method including potential for manipulation, disincentive for an early settlement, reward for excessive and wasteful attorney effort, and confusion and lack of predictability in setting fees.  *See* Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Case*s, 18 Geo. J. Legal Ethics 1453, 1456 (2005) (summarizing *Court Awarded Attorney*

*Fees: Report of the Third Circuit Task Force*, 108 F.R.D. 237 (1985)). In response to the difficulties with the lodestar method, some courts have used the percentage method for determining an appropriate common benefit fee.

### b. *Percentage Method*

The percentage method bases the common benefit fee on a fair percentage of the amount recovered. Some courts have concluded that the percentage method provides more predictability to attorneys and class members, encourages settlement, and avoids protracted litigation for the sake of racking up hours. *See* Walker and Horwich, *supra* at 1456-57 (citing *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1378 (N.D. Cal. 1989)); *accord In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009).

The percentage method, however, cannot be arbitrary, devoid of all reality, or inconsistent with usual fees for the type of case involved. There is no one percentage that should apply to all cases. The percentage should be informed by the facts and circumstances of the particular case. Data compiled in empirical studies of attorney fees in class actions reveal that the higher the settlement, the lower the percentage of the fee. Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements 1993–2008*, 7 J. Empirical Legal Studies 248 (2010). For example, in settlements between $190 million and $900 million, common benefit fees between 10 percent and 12 percent have been allowed. *See id.* at 265. Whereas for settlements between $1 million and $2 million, common benefit fees between 32 percent and 37 percent have been awarded. *See id.* Of course, the percentages allowed in past cases are only guideposts, and each case should be analyzed on its own basis with the objective of determining a reasonable fee in the case before the court.

#### c. *Blended Method*

The blended method is usually used to ensure that the amount of the common benefit fee established by the percentage method is reasonable. Under the blended method, the fee arrived at by the percentage method is cross-checked by the lodestar method utilizing the *Johnson* factors. If the fee arrived at by the percentage method is within "the ballpark" of the fee that would result from the lodestar method, the reasonableness of the fee is more sustainable. The blended method has been used by many district courts, including this one. *See In re Vioxx*, 760 F. Supp. 2d 640; *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008); *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525 (N.D. Miss. 2003). All circuit courts, including the Fifth Circuit, have approved this use of the blended method. *See Union Asset Mgmt. Holding*, 669 F.3d at 644 ("To be clear, we endorse the district courts' continued use of the percentage method cross-checked with the *Johnson* factors. We join the majority of circuits in allowing our district courts the flexibility to choose between the percentage and lodestar method in common fund cases, with their analyses under either approach informed by the *Johnson* considerations.").

### 3. Determining the Appropriate Common Benefit Fee in this Case

The Court finds the blended percentage approach to be the best method for calculating reasonable attorney fees in this litigation. As such, the Court will (1) determine the value of the benefit claimants receive and assign an initial benchmark percentage, (2) determine whether the benchmark percentage should be adjusted in light of the *Johnson* factors, and (3) conduct a lodestar analysis to determine whether the fee is indeed reasonable. The Court notes, however, that "[t]he lodestar analysis is not undertaken to calculate a specific fee, but only to provide a broad cross

check on the reasonableness of the fee arrived at by the percentage method." *In re Vioxx*, 760 F. Supp. 2d at 652.

> ### a. Valuation of Benefit Obtained and Determination of a Benchmark Percentage

The Xarelto Settlement Agreement creates a $775,000,000 fund for the compensation of all claimants except those who are in the Alternative Resolution Program and those that received $5,000 or less. The Court finds it is reasonable to omit from consideration the claimants who are in the Alternative Resolution Program and those that received $5,000 or less from this settlement with respect to the reasonable amount of attorney fees.

The PSC and Common Benefit Law Firms now seek an award of 12 percent and argue that this benchmark percentage is reasonable and consistent with Fifth Circuit precedent. However, the Court's goal in setting a benchmark percentage is not simply to rubber-stamp the proposed figured. Rather, the Court is required to independently determine a reasonable percentage appropriate to the facts specific to the Settlement in this aspect of the case.

Determining a reasonable benchmark percentage is an inquiry that must be addressed on a case by case basis. An influential empirical study analyzing attorney fees in class action settlements is instructive to this endeavor. *See In re Vioxx*, 760 F. Supp. 2d at 652; *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1012-15 (E.D. Wis. 2010); *Murphy Oil*, 472 F. Supp. 2d at 862-64; *In re Educ. Testing Servs.*, 447 F. Supp. 2d 630; *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212 (S.D. Fla. 2006); *In re Cabletron Sys. Inc. Sec. Litig.*, 239 F.R.D. 30, 37 n. 12, 41 (D.N.H. 2006). Theodore Eisenberg and Geoffrey Miller's detailed study, titled *Attorney Fees in Class Action Settlements: An Empirical Study*, investigates the relationship between the amount recovered through a settlement and the award of attorney fees over a fifteen-year period. In particular, it explains that there exists

"an overwhelming correlation between class recovery and attorney fees," and that the benchmark percentage should be determined by considering two specific *Johnson* factors: the customary fee and awards in similar cases. Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Studies 27, 72 (2004).

The Court will look to Eisenberg and Miller's data sets to determine an average percentage for cases of similar magnitude. The Court has already determined that for purposes of calculating reasonable attorney fees in this case, the class benefit is valued at $775,000,000. This recovery falls within the "greater than 90%" decile of client recovery in the study, which includes all recoveries greater than $190 million. *Id.* at 73. The data suggests that the mean fee percentage in such cases is 12 percent with a standard deviation of 8.1 percent. *Id.* Further, "fee requests falling within one standard deviation above or below the mean should be viewed as generally reasonable and approved by the court unless reasons are shown to question the fee." *Id.* at 74. In other words, a fee falling between 4 percent (approximately one standard deviation below) and 20 percent (approximately one standard deviation above) is considered reasonable under this metric.

While the Manual for Complex Litigation states that a fee of 25 percent of a common fund "represents a typical benchmark," *see* Manual for Complex Litigation § 14.121, Eisenberg and Miller report that "a scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases." Eisenberg & Miller, *supra*, at 28; *see also* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Studies 248, 250 (2010) [hereinafter "Eisenberg & Miller II"]. In other words, the higher the recovery, the lower the percentage. Thus, after studying the relevant data and considering awards in similar cases, the Court will use an initial benchmark of 12 percent in this

case to compensate common benefit counsel. This sum is less than the Manual for Complex Litigation's standard benchmark but is the same as the mean fee percentage in similar cases according to Eisenberg and Miller's study.

### b. Johnson *Factors*

In order to test the appropriateness of this percentage, the Court now considers the *Johnson* factors, addressing them in conjunction with the circumstances of this case, to determine whether a reasonable number of hours was spent on this case and the appropriate hourly rate for these hours.

### i. The time and labor required

The PSC, common benefit counsel, and their staff have logged 214,293.47 hours of work in common benefit professional time from August 2014 through January 31, 2020. R. Doc. 17623-2 at 4. These hours have been logged contemporaneously with performing the work and were reported monthly in accordance with the protocol established by the Court in Pretrial Order 8. These reports have been systematically audited by a paralegal and the Court-appointed CPA, and reviewed monthly by the Court. A summary of these reports reflects the type of work performed and the total number of hours logged by common benefit counsel.

The work performed by common benefit counsel was time-consuming. During the course of this litigation, approximately 30,000 Plaintiffs brought Xarelto claims against Defendants. Because the claims were mostly from seniors, the aging population called for an appropriately efficient pace in the litigation and tasks needed to be completed in a compressed time frame. Counsel had to negotiate trial plans and coordinate various schedules, engage in extensive discovery involving millions of pages of documents from Defendants and third parties, develop Plaintiff and Defendant Profile Forms, oversee bundled complaints and expend tens of thousands

of hours on pleadings and complex motions practice. In addition, common benefit counsel actively participated in numerous trials and the work-up of cases for remand.

Once the Court initiated remand procedures, the PSC made headway in negotiations with Defendants. Subsequently, the PSC then devoted itself to negotiating the terms of a private Settlement Agreement, which itself was time- and labor-intensive and complex. The Court therefore concludes that the benchmark percentage is justified in view of the time and labor required in this particular case.

### ii. The novelty and difficulty of the questions

Throughout this litigation, the Court has recognized the complex nature of this multidistrict, multi-party litigation. At all times during this case—and still today—Xarelto has been available on the market and is widely prescribed. Therefore, this litigation was particularly challenging and complex for Plaintiffs. The Court finds that the benchmark percentage adequately considers the novelty and difficulty of the questions presented by this particular case.

### iii. The skill required to properly perform the necessary legal services

The level of legal skills required to bring about the settlement in this case was by no means ordinary. Common benefit counsel faced formidable adversaries with significant resources and had to make the case credible enough to convince Defendants to resolve thousands of claims at a substantial economic cost despite not winning a single verdict in the bellwether trials. The Court concludes that the benchmark percentage appropriately recognizes common benefit counsel's skill and quality of services provided to Plaintiffs.

### iv. The preclusion of other employment by the attorneys due to acceptance of this case

As the time records and submissions in this case suggest, this litigation required common benefit counsel to whole-heartedly devote themselves and their offices to the handling of this matter for a period of more than four years. The urgency of the situation was recognized, and the Court imposed a strict schedule, which Counsel abided by. The compressed timetable of activities in the combined and parallel MDL and Pennsylvania state court proceedings required constant attention and undoubtedly caused common benefit counsel to forego other cases and potential fees to focus on this litigation. The Court thus concludes that this factor warrants awarding the benchmark fee percentage of 12 percent.

### v. The customary fee

"These factors primarily deal with the expectation of plaintiffs' attorneys at the outset of the case when measuring the risks involved and deciding whether to accept the case." *Murphy Oil*, 472 F. Supp. 2d at 866 (citing *Johnson*, 488 F.2d at 718). "In effect, these factors seek to reward the attorney for accepting the risk and achieving successful results." *Id.* The Court considered this factor when determining the benchmark percentage. Further, the Court notes that the 12 percent benchmark percentage is reasonable in light of Eisenberg and Miller's mean fee percentage for similar cases as well as the awards granted in pharmaceutical personal injury cases. *See* Eisenberg & Miller, *supra*, at 73. For settlements between $190 million and $900 million, fees between 10 percent and 12 percent have generally been allowed. *See* Eisenberg & Miller II, supra, at 265.

### vi. Whether the fee is fixed or contingent

All Plaintiffs' Counsel undertook this case on a contingency basis, assuming a substantial risk that the litigation would yield no recovery and leave them uncompensated. Courts have consistently recognized that the risk of receiving little or no recovery is a factor in considering an

award of attorneys' fees. *See, e.g., In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 791 (S.D. Tex. 2008). Where counsel face such substantial risks and recover significant compensation for their clients, courts find this factor to favor the fee applicant. *See id.* at 796. In this case, the Court concludes that Counsel were subject to risks inherent in a contingent fee arrangement and have recovered significant compensation for their clients, which warrants an award of the benchmark percentage.

### vii.     Time limitations imposed by circumstance

This case required the litigants and the attorneys to abide by a strict time schedule. During the earlier stages of the litigation, the Court employed "hands-on" management to ensure that discovery was being conducted promptly and that the litigation was proceeding effectively. Since the settlement was announced, the Court has continued to be intimately involved with every step of the case and holds the parties to a high standard of efficient and effective work. The Court regularly holds monthly status conferences to discuss case developments and resolve any disputes that arose. Counsel responded diligently to the time schedule imposed by the Court, and their efforts played a major role in bringing this matter to a prompt and successful conclusion. Accordingly, the Court believes the benchmark percentage adequately reflects the time limitations imposed in this particular case.

### viii.    The amount involved and the result achieved

This *Johnson* factor is entitled to considerable weight in evaluating the reasonableness of a common benefit fee award. In fact, the Supreme Court has observed, "[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).

The Court recognizes that this settlement directly benefits the tens of thousands of individuals who have opted in. A $775,000,000 settlement in a drug product liability case where the product being challenged remains on the market, and where multiple trials have resulted in only defense verdicts, is clearly a positive result obtained for Plaintiffs. The Court thus concludes that this *Johnson* factor weighs in favor of awarding the benchmark percentage of 12 percent.

### ix. Experience, reputation and ability of common benefit counsel

All counsel on the PSC or authorized by the PSC to do common benefit work are highly skilled and very capable professionals, and therefore the Court finds that this factor is reflected in the benchmark percentage.

### x. The "undesirability" of the case

Considerable economic risks were accepted by counsel in prosecuting a personal injury product liability case of this magnitude against both a domestic drug manufacturer and a foreign drug manufacturer who vigorously defended a profitable product that is still being prescribed by doctors. Plaintiffs' counsel faced issues involving service of Defendants, incurred significant travel expenses, and were exposed to legal risks involving preemption and other potentially dispositive issues, as well as the customary risks of uncertain jury trial outcomes. Therefore, the Court finds that this factor is adequately reflected in the benchmark percentage.

### xi. The nature and length of the professional relationship with the client

This factor was designed to consider those instances in which an attorney in private practice may vary his or her fee for similar work in the light of the professional relationship of the client with his or her office. Because there were very few, if any, longstanding client relations between

common benefit counsel and class members in this MDL, this *Johnson* factor is a neutral as it relates to the reasonableness of the fee.

### xii.     Fee awards in similar cases

In MDL cases, the determination of a reasonable hourly fee is largely influenced by the relationship which the total fee bears to the total amount recovered. The Court specifically considered comparable awards of common benefit attorney fees, including the mean fee percentage in cases of a similar magnitude, when determining the benchmark percentage. The data suggests that the mean fee percentage in such cases is 12 percent, *see* Eisenberg & Miller, *supra*, at 73, which is the requested fee award in this case. Therefore, this *Johnson* factor weighs in favor of awarding the requested fee percentage.

### c.  *Lodestar Cross-Check*

The final step of the blended method is to cross-check the benchmark percentage with an abbreviated loadstar analysis. *See In re Oil Spill by the Oil Rig Deepwater Horizon*, MDL 2179, 2016 WL 6215974, at *19 (E.D. La. Oct. 25, 2016) (citing *In re Vioxx*, 760 F. Supp. 2d at 659) ("[T]he loadstar cross-check is a streamlined process, avoiding the detailed analysis that goes into a traditional lodestar examination."). In this cross-check, the Court multiples the reasonable hours worked by reasonable billing rates to calculate a time-fee value for the common benefit work that was performed. *In re Vioxx*, 760 F. Supp. 2d at 658. The Court then divides the percentage-fee value by the time-fee value to determine a lodestar multiplier and to test whether the percentage fee value represents an unreasonable award, or "windfall," over the reasonable value of the work that was performed. *Id.* (citing *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F.Supp.2d 442, 485–86 (E.D. Pa. 2008)).

18

The cross-check process begins with the analysis of the time logged and the appropriate hourly rate to be assigned. To assist in this process, the Court approved the retention of Philip Garrett, CPA, to receive, compile, and report the common benefit time and expense submissions of counsel. Mr. Garrett provided monthly reports of time and expenses submitted by the PSC and common benefit counsel in accordance with the protocol established by the Court in Pretrial Order 8. The Court has reviewed these reports throughout the litigation.

With respect to the number of common benefit hours submitted, as of January 31, 2020, Mr. Garrett presented a figure of 214,293.47 hours of common benefit work audited and accepted from attorneys. R. Doc. 17623-2 at 4. In his affidavit, Mr. Garrett explains the procedures he followed to vet and disallow deficient submissions by attorneys. *See* R. Doc. 17623-2 at 3–4. Therefore, the PSC and common benefit counsel have submitted documentation of 214,293.47 hours, which has been checked and approved by the Court-appointed CPA. The Court finds those hours to be reliable and supported in light of the procedures put in place by PTO 8 and implemented by Mr. Garrett.[2]

With respect to the appropriate hourly rate, if the Court uses a common benefit fee of $93,000,000, which is 12 percent of the settlement amount, and divides it by the 214,293.47 hours reported by common benefit counsel, then this award results in an hourly fee of approximately $433.98. The Court recognizes that attorneys from across the country contributed common benefit work to the MDL, and that billing rates vary among legal markets. The Court has previously recognized that when attorneys come from states across the country, a more national rate is the appropriate pole star to guide the Court. *See In re Vioxx*, 760 F. Supp. 2d at 660. Although the

---

[2] This finding is sufficient for the purposes of the rough lodestar cross-check. This finding does not preclude the Court from disallowing any particular submissions of common benefit time when allocating the common benefit fee award.

Court has not been provided the individual attorney billing rates, for the purposes of the lodestar cross-check, the Court need not crunch the numbers for individual attorneys and other legal professionals from 70 law firms across the country, or to apply a single billing structure. *Id.* The Court finds that the hourly rate of 433.98 is an appropriate hourly rate considering the fact that it is a combined rate and does not distinguish between work done by various levels of attorneys, including the work done by others. Moreover, this rate is in line with hourly rates used by courts supervising national MDLs. *See, e.g., id.* (average billing rate of $443.29 for all partner, associate, and other professional common benefit time is reasonable); *In re Guidant Corp.*, 2008 WL 682174, at *15 (average attorney rate of $379.40 per hour and paralegal rate of $127.49 per hour); *Survey: Class Action Defense Rates Keep Pace with Plaintiffs' Rates in 2020*, NALFA NEWS BLOG (Mar. 4, 2020), http://www.thenalfa.org/blog/survey-class-action-defense-rates-keep-pace-with-plaintiffs-rates-in-2020/ (finding that 95 percent of all class actions fall within the $200 to $1,200 hourly rate for counsel at partner and associate levels).

The next step in the lodestar cross-check is to compare the time-fee value to the Court's adjusted percentage-fee and determine whether a lodestar multiplier is warranted.[3] That is, the Court must verify its percentage calculation and determine whether the percentage fee should be increased or decreased based on other factors. The use of a multiplier is not mandatory and depends on the circumstances of the case. Indeed, a multiplier may not be warranted if the time-fee value adequately compensates the attorneys for their services. In the present case, the Court has considered the *Johnson* factors and concludes that neither an increase or decrease in the benchmark

---

[3] The Supreme Court addressed lodestar and lodestar multiplier analysis in the context of a civil rights fee-shifting statute in *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010). In *Perdue*, the Supreme Court held that the lodestar analysis pursuant to 42 U.S.C. § 1988 generally takes into account any factors that might justify a multiplier of the lodestar amount. *Id.* at 1673–75. Absent "rare" and "exceptional" circumstances, the lodestar amount is presumptively reasonable. *Id.*

percentage is warranted. Therefore, there is no need for a lodestar multiplier to the time-fee value when performing the lodestar cross-check.

Based on the above analysis, the Court is satisfied that the rough lodestar cross-check demonstrates that the 12 percentage blended percentage fee is well within the reasonable range. Accordingly, the Court determines that the lodestar cross-check firmly supports an award of 12 percent of the total settlement of $775,000,000, less the awards given to claimants in the Alternative Resolution Program and those that receive $5,000 or less, to compensate common benefit counsel in light of the circumstances in this case. This common benefit fee is to come out of the fee charged by contract counsel and is not to be an addition to that fee. For example, assuming contract counsel has a 33⅓ percent fee arrangement with the plaintiff-litigant, the 12 percent would come from that fee arrangement so that contract counsel would receive 21⅓ percent and common benefit counsel 12 percent. The Court will determine the appropriate division of the common benefit fee among those counsel who performed common benefit work at a later date.

### 4. Costs

"Typically, class action counsel who create a common fund for the benefit of the class . . . are entitled to reimbursement of reasonable litigation expenses from that fund." *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, MDL 2328, 2015 WL 4528880, at *18 (E.D. La. July 27, 2015). The reimbursement of costs and expenses seeks not to reward attorneys for their work but restore the status quo. However, the requested expenses may not "cannibalize the entire . . . settlement." *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 196 (5th Cir. 2010). Accordingly, the Court must review the estimated expenses for which reimbursement is sought and determine whether the total requested sum is fair to the settlement class.

The PSC and common benefit counsel seek a 3 percent cost assessment, which includes shared expenses, held costs, and settlement administration expenses. According to detailed records kept by the Court-appointed CPA pursuant to PTO 8, the PSC and common benefit counsel incurred $4,008,023.11 in held costs and $12,526,555.89 as cash assessments, for a total of $16,828,023.10 as of January 31, 2020. R. Doc. 17623-2 at 4–5. Moreover, the PSC and common benefit counsel aver that administration of the settlement program will cost an additional $28,000,000 at least. R. Doc. 17623-1 at 44. Because only $25,000,000 was set aside from the total settlement fund to pay for the cost of settlement administration, the Plaintiffs' Counsel Leadership will need to pay the additional $3,000,000 of administrative expenses from the cost assessment. R. Doc. 17623-1 at 10.

In view of the nature and circumstances of this case, the Court concludes that an award of 2.75 percent as to all claimants—except those that enrolled in the Alternative Resolution Program and those whose total program award is $5,000 or less—is appropriate to cover the costs and expenses of common benefit counsel. This award is in addition to the attorney fee award of 12 percent to cover the fees of common benefit counsel. Although this total award is slightly less than the 12 percent attorney fee assessment, plus 3 percent for costs sought by common benefit counsel, the Court finds that it strikes a fair balance between the diligent and commendable effort exerted by common benefit counsel and the funds available to compensate Plaintiffs for their injuries.

## III.  CONCLUSION

Considering the foregoing,

**IT IS ORDERED** that the Plaintiffs' Steering Committee's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, R. Doc. 17623, is **GRANTED IN PART**. Common benefit counsel are awarded 12% of the Settlement funds, which will total less than

$93,000,000 once the claimants enrolled in the Alternative Resolution Program and those who receive award amounts of $5,000 or less are removed from the calculation. Common benefit counsel are also awarded 2.75% of the Settlement funds to cover costs and expenses.

New Orleans, Louisiana, this 23rd day of March, 2020.

Eldon E. Fallon
United States District Judge