Robin Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg
700 Broadway
New York, NY  10003
Telephone: (212) 558-5500
Facsimile:  (212) 344-5461

Michael Miller
mmiller@millerfirmllc.com
The Miller Firm LLC
108 Railroad Avenue
Orange, VA  22960
Telephone: (540) 672-4224
Facsimile:  (540) 672-3055

Aimee Wagstaff, SBN 278480
aimee.wagstaff@andruswagstaff.com
Andrus Wagstaff, PC
7171 West Alaska Drive
Lakewood, CO  80226
Telephone: (303) 376-6360
Facsimile:  (303) 376-6361

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: | **PLAINTIFFS' CO-LEAD COUNSEL'S NOTICE OF MOTION AND MOTION TO SUPPLEMENT PRE-TRIAL ORDER 12: COMMON BENEFIT FUND ORDER TO ESTABLISH A HOLD BACK PERCENTAGE** |
| **ALL CASES** | |
| | Hearing date:  February 18, 2021 Time: 2:00 PM |

---

**PLAINTIFF CO-LEAD COUNSEL'S MOTION TO SUPPLEMENT PTO 12**

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on February 18th, in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Plaintiffs' Co-Lead Counsel will present its Motion to Supplement Pre-trial Order 12: Common Benefit Fund Order, to establish a holdback percentage.

Plaintiffs' Co-Lead Counsel will move the Court to supplement PTO 12 to provide for a total holdback of eight and one-quarter percent (8.25%) on all prospective gross monetary recoveries from all plaintiffs and attorneys, as defined by Pretrial Order No. 12, Paragraph 4.

Dated:  January 14, 2021

Respectfully submitted,

/s/ Robin Greenwald
Robin Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg
700 Broadway
New York, NY 10003

/s/ Mike Miller
Michael Miller
mmiller@millerfirmllc.com
The Miller Firm LLC
108 Railroad Ave
Orange, VA 22960

/s/ Aimee Wagstaff
Aimee Wagstaff
aimee.wagstaff@andruswagstaff.com
Andrus Wagstaff, P.C.
7171 West Alaska Drive
Lakewood, CO 80226

*Co-Lead Counsel for Plaintiffs*
*in MDL No. 2741*

---

**PLAINTIFF CO-LEAD COUNSEL'S MOTION TO SUPPLEMENT PTO 12**

Robin Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg
700 Broadway
New York, NY  10003
Telephone: (212) 558-5500
Facsimile:  (212) 344-5461

Michael Miller
mmiller@millerfirmllc.com
The Miller Firm LLC
108 Railroad Avenue
Orange, VA  22960
Telephone: (540) 672-4224
Facsimile:  (540) 672-3055

Aimee Wagstaff, SBN 278480
aimee.wagstaff@andruswagstaff.com
Andrus Wagstaff, PC
7171 West Alaska Drive
Lakewood, CO  80226
Telephone: (303) 376-6360
Facsimile:  (303) 376-6361

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
|---|---|
| This document relates to: | Case No. 16-md-02741-VC |
| **ALL CASES** | **PLAINTIFFS' CO-LEAD COUNSEL'S MEMORANDUM IN SUPPORT OF MOTION TO SUPPLEMENT PRE-TRIAL ORDER 12: COMMON BENEFIT FUND ORDER TO ESTABLISH A HOLD BACK PERCENTAGE** |

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... ii

I.       INTRODUCTION ......................................................................................................... 1

II.      STATEMENT OF FACTS ............................................................................................ 2

III.     CASE ACQUISITION.................................................................................................. 6

IV.      THE REQUESTED HOLDBACK IS TIMELY AND APPROPRIATE........................... 8

CONCLUSION…………………………...................................................................... 16

# TABLE OF AUTHORITIES

Cases                            Page

*Boeing v. Van Gemert*, 444 U.S. 472 (1980).................................................................... 3, 8

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) .............................................................. 3, 8-9

*DeLaventura v. Columbia Acorn Trust,* 417 F. Supp.2d 147 (D. Mass. 2006)............................... 6

*Hardeman v. Monsanto Co.*, No. 3:16-cv-005250VC (N.D. Cal. May 3, 2016) ....................... 4-5

*In re: Air Crash Disaster at Florida Everglades*, 549 F.2d 1006 (5th Cir. 1977) ...................... 8, 9

*In re: Genetically Modified Rice Litig.*, No. 06-md-1811,
2010 WL 716190 (E.D. Mo. 2006) .......................................................................... 9

*In re: Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*,
No. 05-1708, 2008 WL 682174 (D. Minn. Feb. 15, 2006) ............................................. 8

*In re: Johnson & Johnson: MDL No. 2738 Talcum Powder Products,*
*Marketing, Sales Practices and Products Litig.*,
Case 3:16-md-02738-FLW-LHG, Document 13186, Filed 04/27/20 ........................... 13

*In re: Levaquin Prod. Liab. Litig.*, MDL No. 1943, Pretrial Order No. 3,
(ECF No. 105) (D. Minn. Jan. 22, 2009) ................................................................ 9-10

*In re: Pradaxa (Dabigatran Etexilate) Prod. Liab. Litig.*, MDL No. 2385,
Case Management Order No. 16 at 14 (ECF No. 61) (S.D. Ill. Nov. 13, 2012) ...........................10

*In re Roundup Prod. Liab. Litig.*, 364 F. Supp.3d 1085 (N.D. Cal. 2019)...................................... 2

*In re Roundup Prod. Liab. Litig.*,, No. 16-md-02741, MDL No. 2741,
Pre-Trial Order 4 (Dec. 7, 2016) ........................................................................... 1

*In re Roundup Prod. Liab. Litig.*,, No. 16-md-02741, MDL No. 2741,
Pre-Trial Order 12 (Feb. 22, 2017)................................................................ 1, 8, 16

*In re Roundup Prod. Liab. Litig*.,, No. 16-md-02741, MDL No. 2741,
Pre-Trial Order 214 (July 6, 2020) ........................................................... 6

*In re Syngenta AG Mir162 Corn Litig.,* 2:14-MD-02591, MDL No. 2591,
2018 WL 7254709 (D. Kan., Nov. 21, 2018)......................................... 2-3, 6

*In re Syngenta AG Mir162 Corn Litig.,* 2:14-MD-02591, MDL No. 2591,
2020 WL 1659860 (D. Kan. Apr. 3, 2020) ................................................ 5

*In re Vioxx Prods. Liab. Litig.,* 802 F. Supp. 2d 740 (E.D. La. 2011) .................................. 5-6, 15

*In re: Worldcom,* No. 02-3288, 2004 WL 2549682 (S.D.N.Y. Nov. 10, 2004) ........................... 15

*In re: Yasmin & Yaz (Drospirenone) Mktg., Sales Prac. & Prod. Liab. Litig.,*
MDL No. 2100, Case Management Order No. 14 (S.D. Ill. Mar. 25, 2010) ....................10

*In re: Zyprexa Prod. Liab. Litig.,* 467 F. Supp.2d 256 (E.D.N.Y. 2006)................................. 9, 15

*In re: Zyprexa Prod. Liab. Litig.,* 594 F.3d 113 (2d Cir. 2010) ......................................... 8

*Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 715 (5th Cir. 1974)............................................10

*Johnson v. Monsanto Co.,* No. CGC-16-550128, 2018 WL 2324413
(Cal. Super. Ct. May 17, 2018) .......................................................... 4

*Johnson v. Monsanto Co.,* No. 16-cv-01244, 2016 WL 1730361
(N.D. Cal. May 2, 2016)................................................................. 5

*Smiley v. Sincoff,* 958 F.2d 498 (2d Cir. 1992) .......................................... 8

*Turner v. Murphy Oil USA, Inc.* 422 F. Supp.2d 676 (E.D. La. 2006) ...................................... 1, 15

*Walitalo v. Iacocca,* 968 F.2d 741 (8th Cir. 1992)......................................................... 8

## I. INTRODUCTION

The U.S. Supreme Court approved the common benefit doctrine to avoid the "problem of free riding, that is, when individuals who benefit from the litigation avoid sharing the full burden and expense of litigation by relying on the work of other." *Turner v. Murphy Oil USA, Inc.* 422 F. Supp.2d 676, 680 (E.D. La. 2006). As explained below, because a small group of attorneys conducted the substantial work of the litigation in both federal and state courts, this litigation embodies the exact circumstances for which the common benefit doctrine was intended. The amount and level of work performed by the six MDL leadership firms, and their collective financial investment in this litigation, warrant a holdback percentage of eight percent (8%) from attorney fees to the "Legal Fees Fund" and a holdback of one quarter of one percent (.25%) from client's recovery for the "Expense Funds." *See*, PTO 12, para 2. The 8% holdback percentage on attorney fees will not affect the claimants' recovery and is squarely in line with historical and recent holdback orders. The .25% holdback percentage from claimants for common expenses is remarkably low.  All appointed Leadership will be subjected to this assessment.[1]

Since 2015, a group of plaintiffs' counsel has worked tirelessly for the common benefit of all Roundup plaintiffs across the country. On December 7, 2016, this Court appointed a Leadership Committee of three Co-Lead Counsel ("CLC") and three Executive Committee Members ("EC"). See, Pretrial Order 4, ECF 62. Since that time, the MDL Leadership has worked full time developing and resolving this litigation. In doing so, they reviewed millions of documents, negotiated and argued countless discovery disputes, fought privilege log disputes, argued dozens of substantive motions, negotiated ESI and Protective Orders, negotiated Plaintiff Fact Sheets, conducted all phases of disclosures and discovery, took dozens of corporate witness depositions,

---

[1] Importantly, the Co-Lead Counsel (CLC) is only requesting a holdback; in other words, no monies will be disbursed to the CLC, to the Executive Committee, or to any other common benefit attorneys until a fee committee is established, attorneys who participated in common benefit work submit applications for fees, a Court-appointed settlement master reviews the allocations and hears any objections to allocations, and the Court decides the final allocation of fees and costs. Because Bayer has reached substantial resolution, and monies have begun to be distributed, creation of the holdback percentage is necessary now to ensure common benefit attorneys the potential for compensation of their time and reimbursement of their capital investment.

developed general and specific causation experts and presented them for *Daubert* hearings before this Court, successfully argued *Daubert*, preemption, and summary judgment motions, tried three cases to verdict, and created considerable litigation pressure on Monsanto with many more trials scheduled. They also responded to appeals in both federal and state courts and worked with Court-appointed Settlement Mediator Ken Feinberg and counsel for Monsanto to resolve the majority of current Roundup cases. Because the MDL Leadership conducted most of the state court litigation as well, much of the federal work was utilized in state court litigations.

Of most significance is the successful federal *Daubert* proceeding, preemption victories, the cases that the MDL leadership tried to verdict, and the additional scheduled trial cases that provided pressure toward resolution. As of January 2020, the MDL leadership had worked up an unprecedented 60 plaintiffs' cases for trial, and it had trial dates set in 2020 (pre-COVID) for 45 individual plaintiffs, many of them in multi-plaintiff trials. This trial pressure benefited all Roundup plaintiffs, regardless of where, or even if, a particular case is filed.

## II.   STATEMENT OF FACTS

The IARC 112 Summary was released in March 2015. For the ensuing five-plus years,[2] the CLC and EC devoted enormous time and resources to advocating on behalf of all plaintiffs in this complex litigation in both federal and state courts. Co-Lead Counsel filed the first Roundup case in September 2015, and this MDL was established one year later. Prior to the formation of this MDL, including before this Court, the CLC successfully briefed and argued the first of many preemption attacks. These efforts benefited all Roundup claimants. As the Court knows, this litigation was highly litigious, hotly contested, and required unwavering dedication by leadership. Indeed, as the Court noted, even to get to trial in this litigation was "a daunting challenge." *In re Roundup Products Liability Litigation*, 390 F. Supp.3d 1102, 1109 (N.D. Cal. 2018). Yet, because the CLC and EC worked seamlessly together, their collective efforts led to substantial verdicts for plaintiffs in each Roundup trials – an accomplishment that benefited all plaintiffs.

The work of the CLC and EC did not stop after trial; they continued to work diligently, securing numerous more trial dates in state courts, working up cases in Wave 1 before this Court,

---

[2] Prior to the MDL formation, the CLC and EC were working together on an informal basis.

and working on federal and state court appeals that will affect all plaintiffs. And, most significantly, the MDL leadership's led the Court to appoint Special Master Ken Feinberg, which in turn led to the current settlement of Roundup cases. *See e.g. In re Syngenta AG Mir162 Corn Litig.,,* 2:14-MD-02591, MDL No. 2591,  2018 WL 7254709 at *20 (D. Kan. Nov. 21, 2018) ("The successful result in this case was obtained through the work of multiple counsel in multiple jurisdictions who collectively applied litigation pressure in multiple forums that ultimately persuaded" defendant to settle.").

The world was watching this litigation; there can be no doubt that it was high risk for contingency fee lawyers, which explains why all the heavy lifting and lion's share of litigation costs and risks were left to the MDL Leadership. However, after the MDL Leadership won the two-year federal *Daubert* attack and began winning trials, a tsunami of advertising resulted in thousands of new lawsuits filed by law firms that had hedged their bets and previously sat on the sidelines waiting for the *Daubert* ruling and jury verdicts. Because those firms sidestepped any risk while benefitting tremendously from the MDL leadership's litigation efforts and substantial financial contributions, they should pay their share through the mechanism of a holdback. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991); *Boeing v. Van Gemert*, 444 U.S. 472, 478-79 (1980)(common benefit doctrine established to spread litigation costs proportionately to all who benefit from common efforts and to remedy free-riding; "persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense").[3]

Since this litigation began, the CLC and EC firms devoted dozens of attorneys and staff, many of whom worked exclusively on Roundup litigation for years, to accomplish the countless tasks necessary to reach successful resolution of the cases. Just getting through document review of approximately two million documents was a herculean task in the MDL, a review performed exclusively by MDL leadership. Leadership also took the deposition of each and every current and former Monsanto corporate witness – over 35 -- in the MDL and/or in state court proceedings.

---

[3] In contrast to the MDL Leadership, most law firms were able to resolve their Roundup cases without hiring any experts, without accessing or reviewing discovery documents, without taking any depositions, and really without doing any pre-settlement work at all.

Knowing the high stakes of this litigation, the CLC and EC spent millions of dollars to find and retain the world's leading experts in their respective fields. Because most of the Plaintiffs' experts had never worked as an expert witness, MDL Leadership worked tirelessly to prepare them for the world's stage, which was this litigation. For example, MDL Leadership ensured that each expert reviewed all three pillars of science and assisted each expert in understanding expert report requirements under the Federal Rules. Leadership then prepared each expert for multiple days of deposition and the *Daubert* hearing. Leadership also deposed each Monsanto-designated expert and conducted seven court days of expert testimony at the joint *Daubert/Sargon*[4] hearing. These experts survived Monsanto's *Daubert/Sargon* challenges and summary judgement motions here and in each of the six state courts that ruled on similar motions. After the *Daubert/Sargon* hearing, these experts, and new experts, were repeatedly deposed as new studies were published and/or the experts offered case specific opinions. For example, Dr. Sawyer, who opines on general and specific causation, was deposed for 26 days. *See also* Nabhan (18 days); Portier (10 days); Weisenburger (10 days); Benbrook (8 days); Jameson (6 days); Ritz (6 days).

The MDL leadership had confidence in this case from the outset based on an early review of company documents and discussions with its highly qualified experts. However, their view was not universally shared. For example, prior to its acquisition of Monsanto, Bayer commissioned an "external expert opinion" by a "leading law firm" which found "the liability risk in connection with glyphosate to be low."[5] Difficulties in the litigation were widely publicized, most notably through Monsanto's own motion to bifurcate the proceedings.[6] *See Hardeman v. Monsanto Co.,*

---

[4] *Sargon* is the standard for expert admissibility under California law. *Johnson v. Monsanto Co.,* No. CGC-16-550128, 2018 WL 2324413 (Cal. Super. Ct. May 17, 2018). Justice Petrou, who was presiding over the coordinated Roundup cases in California (JCCP 4953), joined this Court's Daubert hearing, and each California state court judge has relied on the *Daubert/Sargon* hearing.

[5] https://media.bayer.com/baynews/baynews.nsf/id/BBLB9P-Address-by-Werner-Baumann.

[6] NBC news reporting that case specific causation will be a "daunting challenge." https://www.nbcnews.com/news/us-news/lawsuits-claiming-weed-killing-chemical-causes-cancer-moves-forward-n890686; *see* Cara Bayles, Law360, "Link Between Roundup and Cancer is Shaky Judge Says", https://www.law360.com/articles/1022200/link-between-roundup-and-cancer-is-shaky-judge-says; Dan Charles, NPR,  "EPA Weighs In On Glyphosate, Says It Likely Doesn't Cause Cancer"

No. 3:16-cv-005250VC (N.D. Cal. May 3, 2016), ECF No. 48. But the CLC's and EC's time and financial commitments to this litigation never wavered. Largely due to the litigation risks involved prior to resolution of the *Daubert* motions and at least the first jury trial, only the CLC and EC firms were willing to devote substantial resources to the prosecution of these cases.

Transferee Courts should consider common benefit work done by leadership in state jurisdictions as well in determining the holdback amount. A key element of the leadership's success was to advance novel jurisdiction and venue theories in multiple state venues, including securing trial dates against Monsanto in five California county courts and in St. Louis County, St. Louis City, and Kansas City, Missouri; Montana; Delaware; Hawaii; and Florida. Monsanto vigorously fought against many of these venues through removals to federal court requiring the MDL leadership to brief motions to remand. *See e.g. Johnson v. Monsanto Co.,* No. 16-cv-01244, 2016 WL 1730361 at *3 (N.D. Cal. May 2, 2016). Monsanto engaged in a particularly drawn out battle to keep cases out of St. Louis City, taking multiple writs that required extensive briefing in the Missouri Appellate Courts and Supreme Court. The CLC eventually prevailed in establishing venue in St. Louis City for multi-plaintiff trials and secured multi-plaintiff trials in St. Louis County also. In all, the CLC and EC prepared for trial and secured trial dates for an additional 33 plaintiffs in multi-plaintiff trials in Missouri courts and 11 single-plaintiff trials in venues in four other states prior to settlement, eight of which were scheduled to commence in early 2020.

By establishing "multiple fronts" in the litigation, leadership added to Monsanto's "defense burden and thus created more pressure on [a defendant] to settle." *In re Syngenta AG MIR 162 Corn Litig., Litig.,* 2:14-MD-02591, MDL No. 2591, 2020 WL 1659860 at *4 (D. Kan. Apr. 3, 2020). While the MDL is important and effective in resolving litigation, Plaintiffs' counsel would be remiss to abandon the rest of the toolbox. *Id.* at *36 (pressing defendant on multiple fronts resulted in "the specter of multiple bellwether trials for Syngenta, with corresponding discovery burdens and the development of new experts to compliment those developed in the Kansas MDL litigation."). Work completed in moving cases to trial in state court have a "salutary rippling effect"

---

https://www.npr.org/sections/thesalt/2016/09/17/494301343/epa-weighs-in-on-glyphosate-says-it-doesnt-cause-cancer.

on the resolution of mass tort cases. *In re Vioxx Prods. Liab. Litig.,* 802 F. Supp. 2d 740, 785 (E.D. La. 2011). Multiple trials in multiple jurisdictions play "a substantial role in creating an environment in which settlement could be spawned, birthed, and nurtured. [T]he attorneys who took up the cudgels and participated in those trials deserve an appropriate recognition for their efforts." *Id.* at 773 (holding MDL court should award fees for state court work). Indeed, "all litigants bargain in the shadow of trial. Those averse to the inevitable uncertainties of the direct democracy of the American jury will factor the risks of trial into their settlement postures." *DeLaventura v. Columbia Acorn Trust,* 417 F. Supp.2d 147, 155 (D. Mass. 2006).

Finally, in the wake of PTO 214, the CLC, working with Professor William Rubenstein and others, spent time considering a "Plan B" and, in fact, crafted what they believe are legally sound and factually supportable class, non-class, and a hybrid of class and non-class proposals for addressing claims of (i) individuals who are diagnosed with NHL but do not have counsel, and (ii) individuals who have used Roundup but have not been diagnosed with NHL. And while it was not consulted on the futures proposal that was the subject of PTO 214, the CLC informed Monsanto that it has viable proposals and continues to stand ready to discuss and work with them.

## III.   CASE ACQUISITION

In July 2018, immediately prior to the federal *Daubert* Order and the *Johnson v. Monsanto* verdict, there were approximately 8,000 Roundup cases filed in federal and state courts, with a CLC or EC firm representing the vast majority of those plaintiffs. *See, e.g.* Figure 1. But following the trials, this Court's establishment of litigation waves as a remand mechanism, and upcoming state court trials, the number of lawsuits *filed* in court against Monsanto was estimated in April 2020 to have surged to over 52,500 as reported by Bayer.[7] *See, e.g.* Figure 1. Further, in its June 24, 2020 Press Release, Bayer reported resolution of 75% of the estimated 125,000 filed and unfiled cases.[8] Figure 1 shows that both Ad Spending and the number of Plaintiffs increased after the Johnson verdict/federal Daubert Order (July/August 2018); the Hardeman verdict (March

---

[7]   https://news.bloomberglaw.com/corporate-governance/bayer-seeks-investor-forbearance-over-lack-of-closure-on-roundup.

[8] https://media.bayer.com/baynews/baynews.nsf/id/Bayer-announces-agreements-to-resolve-major-legacy-Monsanto-litigation.

2019); and then a dramatic spike after the Court's appointment of Special Master Ken Feinberg, and the $2 billion *Pilliod* verdict (May 2019).



Figure1 (created by Wall Street Journal) [9]

Bayer has reported that the increase in cases "may reflect a campaign by plaintiffs' lawyers and lead generators to increase the volume of plaintiffs as quickly as possible in connection with [the mediation] process."[10] Most of these new plaintiffs are not represented by CLC or EC firms but rather by firms whose advertisements co-opt the MDL leadership's successes.[11] As a Bayer attorney noted "TV lawyers who pass on clients to bigger firms 'are building inventory without close scrutiny being given to the claims that they have filed, and hoping that hard work by other lawyers will lead to a mass settlement that will allow them to cash in.'" *Id.*

Given the dedication and contributions of a small number of law firms – leading to the current resolution -- for the common benefit of the more than 500 law firms that have one or more filed Roundup cases in the MDL, eight and one-quarter percent (8.25%) is an appropriate holdback. This amount is not only reasonable, it is fair to all concerned. Indeed, this case is unique in that the CLC and EC firms performed the vast majority of the work that led to the resolution of these cases. They also bore all the financial risk, and without a holdback, their clients will unfairly bear the financial burden of this litigation. Moreover, the vast majority of law firms with settling

---

[9] https://www.wsj.com/articles/inside-the-mass-tort-machine-that-powers-thousands-of-roundup-lawsuits-11574700480.
[10] https://www.reuters.com/article/us-bayer-glyphosate-lawsuit-claims/bayer-expects-significant-surge-in-number-of-u-s-glyphosate-cases-idUSKBN1WV1KH.
[11] https://www.youtube.com/watch?v=AVMynG_qCKQ.

Roundup cases have done little or no substantive legal work to advance this litigation, nor have they contributed to the litigation costs; they would be unjustly enriched by the work of the CLC and EC if they were not required to have part of their fee held back for a common benefit fund or their clients contribute to the litigation costs. The attorneys who performed the work and participated in bringing substantial closure to this litigation deserve to be paid for their work.

**IV. THE REQUESTED HOLDBACK IS TIMELY AND APPROPRIATE.**

Because the majority of the Roundup cases are now entering resolution, it is timely to enter an order which provides for a holdback of eight and one-quarter percent (8.25%) on all prospective gross monetary recoveries from all plaintiffs and attorneys, as defined by PTO 12, Paragraph 4.

The common benefit doctrine permits federal courts, in the exercise of their equity jurisdiction, to prevent unjust enrichment by those who benefit from the efforts of designated counsel (and other "common benefit" attorneys) in MDL proceedings. It is those attorneys whose risk, investment, and effort generates, enhances, and protects a fund or benefit enjoyed by beneficiaries. *In re: Zyprexa Prod. Liab. Litig.*, 594 F.3d 113, 129-30 (2d Cir. 2010). The authority to implement and enforce the common benefit doctrine is well established. *Id.; See also Boeing Co.*, 444 U.S. at 478; *Walitalo v. Iacocca*, 968 F.2d 741, 747 & n.11 (8th Cir. 1992); *In re: Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*, No. 05-1708, 2008 WL 682174 (D. Minn. Feb. 15, 2006); *Smiley v. Sincoff*, 958 F.2d 498, 501-02 (2d Cir. 1992); *In re: Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1019-21 (5th Cir. 1977).

The common benefit doctrine, as manifested in the scope of the proposed common benefit order here, spreads the costs of the litigation, including attorneys' fees, among all of the beneficiaries of the fund. *See Guidant*, 2008 WL 682174, at *5, 6. This prevents non-participating counsel from "free-riding;" it is inequitable for MDL attorneys actively litigating the case for the benefit of all plaintiffs to perform the heavy lifting and to bear all litigation costs, while non-participating attorneys sit on the sidelines waiting to reap the benefits of the MDL's counsel's efforts. *See Chambers*, 501 U.S. at 45-46; *Boeing*, 444 U.S. at 478-79 (common benefit doctrine established to spread litigation costs proportionately to all who benefit from common efforts and to remedy problem of free-riding; "persons who obtain the benefit of a lawsuit without contributing

to its cost are unjustly enriched at the successful litigant's expense"). Further, the clients of CLC and EC should not bear all of the common benefit litigation expenses, which are estimated to exceed $20,000,000.00.

As early as 1977, the Court of Appeals for the Fifth Circuit recognized the necessity of common benefit reimbursement orders by transferee courts in an MDL, affirming an eight percent (8%) assessment on all prospective recoveries to be taken from the individual lawyers' fees. *In re: Air Crash Disaster*, 549 F.2d at 1011. The Court articulated valid common principles for all MDL transferee courts: where plaintiffs' attorneys, such as the plaintiffs' leadership in *In re: Air Crash Disaster* and plaintiffs' leadership in this MDL, perform "duties beyond their responsibilities to their own clients," assessment of prospective recoveries to reimburse counsel is "a *necessary* incident to achievement of the goals of multi district litigation." *Id.* (emphasis added).

As a practical matter, the equitable spreading of costs to compensate for labor expended and costs incurred by certain attorneys for all plaintiffs' common benefit is accomplished by means of a judicial order requiring defendants to "holdback" a set portion of any settlement they may now or in the future agree to disburse in exchange for dismissal of claims. *In re: Zyprexa Prod. Liab. Litig.*, 467 F. Supp.2d 256, 266 (E.D.N.Y. 2006). This "holdback," or common benefit reserve, is paid over to attorneys whose work has created or enhanced the settlement value of such claims, whether through the development of the law and facts common to all claims, or through the development of structures, mechanisms, and systems that facilitate or expedite the settlements.

The holdback mechanism – requiring direct deposit of the assessed percentage of settlements into funds for the benefit of Plaintiffs' counsel who have worked for Plaintiffs common benefit – is well established. *See, e.g.*, *In re: Genetically Modified Rice Litig.*, No. 06-md-1811, 2010 WL 716190, at *8-9 (E.D. Mo. 2006); *In re: Levaquin Prod. Liab. Litig.*, MDL No. 1943, Pretrial Order No. 3 at 3 (ECF No. 105) (D. Minn. Jan. 22, 2009) ("Defendants are directed to withhold the amount of this assessment from any amounts paid to plaintiffs and their counsel, and to pay the assessment directly into the common benefit fund as a credit against the settlement or judgment"); *In re: Pradaxa (Dabigatran Etexilate) Prod. Liab. Litig.*, MDL No. 2385, Case Management Order No. 16 at 14 (ECF No. 61) (S.D. Ill. Nov. 13, 2012) (common benefit order

that, like Proposed Order, requires defendants "to withhold an assessment from any and all amounts paid to plaintiffs and their counsel and to pay the assessment directly into the Funds as a credit against the settlement or judgment"); *see also In re: Yasmin & Yaz (Drospirenone) Mktg., Sales Prac. & Prod. Liab. Litig.*, MDL No. 2100, Case Management Order No. 14 (Establishing Common Benefit Fee and Expense Fund) at 7 (S.D. Ill. Mar. 25, 2010).

The Fifth Circuit in *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 715, 717-19 (5th Cir. 1974), established 12 factors for courts to consider (commonly referred to as the "Johnson Factors") as guideposts for determining an appropriate percentage holdback:

> (1) *The time and labor required.* During the past five-plus years, the Roundup litigation consumed extraordinary hours and expense. With a leadership of only six law firms and no other firms participating in most phases of the litigation, there were, *inter alia,* dozens of corporate depositions, more expert depositions, millions of documents to review, three trials, and dozens of additional cases worked up for trial. The hours spent were, by and large, exclusively legal in nature, not clerical or administrative. In addition, the settlements reached in the vast majority of the cases were made possible by the extensive work performed by the CLC and EC. The members of the CLC and EC firms carried out significant and substantial services for the common benefit of all plaintiffs, including but not limited to the following:
>
>     a. Successfully defeated Defendant's attempt to dismiss all relevant claims as preempted by the Federal Insecticide and Rodenticide Act ("FIFRA") in multiple jurisdictions;
>
>     b. Successfully petitioned the Judicial Panel for Multi-District Litigation to create this MDL and the California State Judicial Counsel to create JCCP 4953; created a coordinated proceeding in Delaware; set multi Plaintiff trial in St. Louis County, MO; and established venue in St. Louis City, MO;
>
>     c. Created a searchable electronic document storage platform that housed over two million documents, comprising more than 12 million pages;
>
>     d. Reviewed, coded and analyzed millions of pages of documents. These efforts led to the discovery of documents showing "strong evidence from which a jury could conclude that Monsanto does not particularly care whether [Roundup] is in fact giving people cancer" but "focus[ed] instead on manipulating public opinion and undermining anyone who raises genuine and legitimate concerns about the issue." *In re Roundup Prod. Liab. Litig*., 364 F. Supp.3d at 1089. This evidence was critical to the three successful jury verdicts and punitive damage awards which drove settlement;
>
>     e. Conducted 30(b)(6) deposition for the purpose of understanding Defendants' electronically stored information systems;
>
>     f. Monitored developments at the United Stated Environmental Protection

Agency, including attending a Scientific Advisory Panel ("SAP") meeting;

g.  Prepared and presented 'Science Day' to the Court identifying and developing key elements of the liability and damages themes in the litigation;

h.  Monitored the quickly developing scientific literature on glyphosate to ensure plaintiffs' experts were current on all data, to cross-examination Monsanto's experts, and to defeat Monsanto's numerous motions to exclude experts;

i.  Prepared and led all aspects of discovery on Defendant;

j.  Negotiated ESI and Protective Orders and other forms and procedures utilized throughout the Country;

k.  Provided in depth analysis of case specific information by way of fact sheets and disclosure forms to determine demographics of all MDL cases and prepare for the bellwether trial process;

l.  Established the identity of many document custodians that were not initially identified and negotiated with Monsanto to produce additional custodians;

m.  Took and/or defended hundreds of depositions, including (1) liability witnesses (current and former employees of Defendants); (2) 30(b)(6) depositions of Monsanto's corporate representatives on topics related to science, marketing, regulatory compliance; (3) over 30 expert witnesses; and (4) over 600 depositions of case specific witnesses in Roundup cases in state courts and in MDL Wave 1 and 2 cases being prepped for trial;

n.  Researched, interviewed and retained expert witnesses to opine on the medical and scientific principles that support the plaintiffs' general and specific causation claims and regulatory compliance experts whose knowledge and preparedness underpinned this Court's Daubert rulings;

o.  Conducted direct and cross examination of expert witnesses at multi-week general causation *Sargon/Daubert* hearing and defeated Monsanto's *Daubert/Sargon* motions in federal court and multiple state court proceedings;

p.  Drafted multiple dozens of legal briefs on contested factual, evidentiary and/or legal issues necessary to developing this case; establishing venue and jurisdiction; and proceeding to trial;

q.  Successfully defeated Monsanto's motions for summary judgment on non-causation grounds in California, the MDL, St. Louis County and St. Louis City[12] creating favorable precedent for future Plaintiffs;

r.  Took three cases to multi-week trials resulting in favorable jury verdicts for plaintiffs, including substantial punitive damage awards in every verdict;

s.  Responded to post-trial motions, preserving all jury verdicts finding Monsanto liable for causing plaintiffs' cancers and punitive damages;

t.  Litigated (and still litigating) appeals from the jury trials which, if successful, will enshrine favorable precedent for all plaintiffs and ensure the courthouse doors remain open for anyone suing over injuries related to Monsanto's failure to warn consumers about the cancer risk posed by its Roundup products;

u.  After the verdicts, continued to obtain trial dates, over Monsanto's objections, in multiple venues in multiple jurisdictions forcing Monsanto to face a gauntlet of trials in 2020 and beyond, requiring for each trial plaintiff an exacting review of thousands of pages of medical records, a detailed analysis Roundup

---

[12] The other jurisdictions have not yet considered those motions.

exposure history; and depositions of treating physicians and relatives;

v. Established the availability of multi-plaintiff trials in Missouri; and

w. Prepared for five multi-plaintiff trials scheduled in Missouri between October 2019 to April 2020; three separate expedited trials in California state court scheduled in January 2020; and one MDL trial scheduled for February 2020.

(2) *The novelty and difficulty of the questions.* The Roundup litigation was a new tort, and Monsanto vigorously fought both general causation and liability. The CLC and EC spent two years litigating only general causation in a bifurcated MDL before proceeding to a bifurcated federal trial. They were successful in both instances, benefiting all Plaintiffs. And even after three trial losses, and despite the June 24, 2020 Settlement announcement, Monsanto continues to fight the verdicts in the courts of appeal. Furthermore, the U.S. Department of Justice on behalf of the EPA is actively intervening on Monsanto's behalf, filing Amicus briefs in the appeal courts.  The science involved the review and analysis of hundreds of studies from the fields of epidemiology, toxicology, genotoxicity, and exposure. The CLC and EC had to understand those studies and also ensure that experts had access to all data that they needed to arrive at reliable conclusions. Further, venue issues in St. Louis City, Missouri involved four separate interlocutory appeals requiring an in-depth analyses of state substantive and procedural law.

(3) *The skill requisite to perform the legal service properly.* This case required skilled legal talent and the full unwavering commitment of Plaintiffs' leadership from the outset. As but one example, the Court required plaintiffs to produce general causation reports in May 2017 – six months after the MDL was formed in November 2016. Counsel met that deadline, producing general causation experts that passed Monsanto's *Daubert* challenges and defeated summary judgement. The California trials were both expedited trial settings requiring counsel to diligently and skillfully complete all pre-trial matters within 120 days. The liability and complex scientific evidence spanned forty years, requiring skilled synthesis of the data into a concise and understandable presentation for the jury. The Missouri cases set for trial were mostly multi-plaintiff trials (2 to 15 plaintiffs per trial) requiring skillful coordination and preparation of expert and fact witness testimony.

(4)  *The preclusion of other employment by the attorney due to acceptance of the case.* Most of the CLC and EC attorneys who worked on this case did so nearly full time, but all spent well more than half of their time on the litigation.

(5) *The customary fee.* This relates to the customary fee for similar work in the legal community. As the attached chart illustrates, the holdback being requested is in line with many other holdbacks in other MDLs.

(6) *Whether the fee is fixed or contingent.* In this case, the CLC and EC fee structure was a contingency fee; thus, counsel invested substantial time and financial capital into this litigation for the past four-plus years without any guarantee of a successful outcome. Leadership made payments into a common fund to support litigation expenses, costs that were substantial given the subject matter of the litigation, the number of expert witnesses retained, the costs of trials, and much more. To this day, the CLC and EC counsel have

not been reimbursed for any of those expenses and costs.  The other firms who are benefiting from the work of the CLC and EC did not take this financial risk. In fact, some law firms were invited to share in the common expenses and refused.

(7) *Time limitations imposed by the client or the circumstances.* This factor overlaps with factor 4 above; the CLC and EC attorneys largely worked on Roundup litigation to the exclusion of other cases.

(8) *The amount involved and the results obtained.* The results of this case followed hard-fought litigation. Moreover, the decisions have been relied on by other courts, including this Court's *Daubert* decision. *See, e.g., In re: Johnson & Johnson: MDL No. 2738 Talcum Powder Products*, *Marketing, Sales Practices and Products Litig.*, Case 3:16-md-02738-FLW-LHG, Document 13186, Filed 04/27/20.

(9) *The experience, reputation, and ability of the attorneys.* While this factor is particularly relevant to individual applications for a common benefit awards, the CLC and EC attorneys who prosecuted this case are well established and leading attorneys in their field. Under this Court's direction and tight deadlines, they applied their knowledge and experience to bring its successful and speedy resolution.

(10)   *The "undesirability" of the case.* In the early days of this litigation, non-leadership attorneys remained on the sidelines because, as a new tort, the outcome was necessarily uncertain.  As the Court will recall, the only applicants for leadership were the same small group of attorneys who worked together successfully since the outset of this case.

(11)   *The nature and length of the professional relationship with the client.* Members of the CLC and EC firms first began working on Roundup litigation in the spring of 2015, and have worked on it consistently since that time. These firms devoted extensive attorney and legal assistant time to accomplish the results they achieved for the plaintiffs over the past four-plus years. The firms also incurred substantial expenses and costs, the current estimate being over $20 million.

(12)   *Awards in similar cases.* As shown in Attachment A, the holdback requested here is in line with other holdback orders in similar MDLs.

Finally, the CLC has prepared an extensive, electronic litigation notebook that contains nearly every litigation tool an attorney with a Roundup case would need to litigate and to prepare a case for trial. The Table of Contents for that notebook is attached as Attachment B.

The proposed holdback extends to the efforts of the MDL leadership, other attorneys who performed substantive work in the MDL or state cases that benefitted and continue to benefit all

plaintiffs in actions within and outside the MDL.[13] Numerous MDL courts have issued and enforced common benefit orders similar to (and often higher than) the holdback percentage proposed here. See Declaration of Jeffrey Travers in Support of Plaintiffs' Co-Lead Counsel's Motion to Supplement PTO 12 (Travers Decl.) and attached Exhibits.

The recent holdback orders in *In re: Depuy Orthopaedics, Inc. Pinnacle Hip Implant Product Liability Litigation*, MDL 2244, are instructive. In MDL 2244, like here, the MDL leadership spent substantial time and financial resources litigating the cases, including trying several cases and arguing several appeals (but, unlike in this case, not all trials were successful). In addition, like here, there was no national settlement program; instead, each firm with Pinnacle hip cases negotiated its own settlement.  Nevertheless, the MDL court ultimately approved a set aside of 10 percent.[14]  *Id.,* Travers Decl., Exhibit 1.

This MDL litigation presents a compelling situation for the requested common benefit assessment against attorneys' fees.  At the time of the CLC's and EC's first request for a common benefit holdback, over 90% of filed lawsuits were represented by these six firms and litigation was at an early stage. Now that the CLC and EC has had across-the-board successes in this litigation, an influx of cases have been filed by attorneys who avoided and will never have to incur the time

---

[13] The CLC is mindful that in 2017 they asked for a holdback percentage of seven percent. At that time, the MDL leadership had no way to know that they would shoulder nearly all of the work, including in state courts across the country, including working up for trial approximately 50 cases and trying three Roundup cases. As compensation for these significant efforts that forced Monsanto into the recent settlements, the CLC believe that a holdback of eight percent – only one percent higher than requested three years ago – is fair and reasonable under the circumstances. What is more, an eight percent holdback is in the low range of holdbacks that MDL courts have awarded in other mass torts.

[14] Because the MDL leadership did not, and could not, have known the amount of confidential settlements of other settling firms' cases, it asked the court to amend the initial holdback order of 10 percent and to increase it to 25 percent to ensure there would be sufficient funds at the time of fee allocations. The court agreed, noting that the holdback is "preliminary in nature and may be subject to change based on additional information, [including] the Court's monitoring of the gross balance of the common benefit fund in the registry" but was granting plaintiffs' motion "to ensure it does not unfairly assess fees and expenses against plaintiffs who may resolve their cases with Defendants at a later date. Exhibit 1A (interim order).  Ultimately, the Pinnacle Hip leadership requested the court to reduce the 25% holdback back to the initial 10% holdback amount.

and expense of replicating these efforts for their cases. The requested holdback amount in the proposed common benefit order reflects substantially less than the costs those other attorneys would have incurred if they performed any substantive legal court work on their own.

Finally, entry of a set-aside order now – before settlements are paid and judgments are entered – is necessary to avoid leadership counsel's having "'to pursue separate compensation claims in any number of jurisdictions around the country'" from claimants and their counsel following payment of settlement funds, thus distracting and burdening Plaintiffs' attorneys or, more likely, resulting in a windfall to claimants who resolve their claims early. *In re: Zyprexa*, 467 F. Supp.2d at 267 (quoting *In re: Worldcom,* No. 02-3288, 2004 WL 2549682 at *4 (S.D.N.Y. Nov. 10, 2004)); *see also Turner* 422 F. Supp.2d at 680 (E.D. La. 2006) ("[I]t has been a common practice in the federal courts to impose set-asides in the early stages of complex litigation in order to preserve common-benefit funds for later distribution.'").

There are over 500 law firms with filed cases in the MDL, yet likely less than five percent of those firms engaged in any common benefit work. Without the work of the CLC, EC and a handful of other firms, the 500-plus law firms whose cases are before this Court would not have, or about to have, their cases resolved. From retention of experts pursuant to PTO 5, to preparing and presenting those experts for the *Daubert* hearing, to three successful trials and more trial dates on the horizon prior to settlement, and much more, this case is where it is today, including a settlement of most cases across the country, because of leadership counsel's work.

For the reasons stated above, an eight and one-quarter percent (8.25%) holdback, with eight percent (8%) deemed fees to be subtracted from the attorneys' fees portions of individual fee contracts, and one-quarter of one percent (.25%) deemed costs to be subtracted from the client portion of individual fee contracts for reimbursement of litigation expenses, advanced for the common benefit of all Roundup plaintiffs by the CLC and EC law firms is fair and reasonable.  As Judge Fallon noted in the Vioxx MDL, "between a common benefit attorney who expended considerable time, resources, and took significant economic risks to produce the fee, and the primary attorney who did not, it is appropriate and equitable that the former receive some economic recognition from the beneficiary of this work." *In re Vioxx,* 760 F.Supp.2d at 653.  \

**IV. CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully requests that the Court supplement PTO 12 to provide for a holdback of eight and one-quarter percent (8.25%) on all prospective gross monetary recoveries from all plaintiffs and attorneys, as defined by Pretrial Order No. 12, Paragraph 4.

Dated:  January 14, 2021

Respectfully submitted,

/s/ Robin Greenwald
Robin Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg
700 Broadway
New York, NY 10003

/s/ Mike Miller
Michael Miller
mmiller@millerfirmllc.com
The Miller Firm LLC
108 Railroad Ave
Orange, VA 22960

/s/ Aimee Wagstaff
Aimee Wagstaff
aimee.wagstaff@andruswagstaff.com
Andrus Wagstaff, P.C.
7171 West Alaska Drive
Lakewood, CO 80226

*Co-Lead Counsel for Plaintiffs*
*in MDL No. 2741*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 14th day of January, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ Robin Greenwald

ATTACHMENT A

| Case Name | Case No. | Date of Order | Assessment |
|---|---|---|---|
| In re: JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation | 19-md-02913 | 5/27/20 | 7% for current participants and 10% for later participating counsel |
| In re Xarelto (Rivaroxaban) Products Liability Litigation | MDL 2592 | 3/24/20 | 12% |
| In re Lidoderm Antitrust Litigation | 14-md-02521 | 8/14/17 | 10% |
| In re Bair Hugger Forced Air Warming Products Liab. Litig. | MDL 2666 | 5/25/16 | 10%-16% |
| In re Ethicon, Inc., Power Morcellator Products Liability Litigation | 2:15-md-2652 | 5/2/2016 | range between 6% and 12% |
| In Re Cook Medical, Inc., IVC Filters Marketing, Sales Practices and Product Liability Litigation | 1:14-ml-2570 | 3/16/2016 | 8% |
| In Re Actos (Pioglitazone) Products Liability Litigation | 6:11-md-2299 | 2/29/2016 | 8.60% |
| In Re Bard IVC Filters Products Liability Litigation | 2:15-md-02641-DGC | 12/18/2015 | 8% |
| In Re Fresenius Granuflo/Naturalyte Dialysate Products Liability Litigation | 1:13-md-2428-DPW | 12/15/2015 | 9% [7%] |
| In Re Risperdal and Invega Products Liability Litigation | JCCP 4775 | 5/14/2015 | 8% |
| In Re Testosterone Replacement Therapy Products Liability Litigation | 1:14-cv-1748 | 11/25/2014 | 10% |
| In Re New England Compounding Pharmacy, Inc. Products Liability Litigation | 1:13-md-02419-RWZ | 8/13/2014 | 8% |
| In Re Stryker Rejuvenate and ABG II Hip Implant Products Liability Litigation | 0:13-md-2441-DWF- | 5/28/2014 | range between 4% and 6% |
| In Re Toyota Motor Corp. Untended Acceleration Marketing, Sales Practices and Products Liability Litigation | 8:10-ml-02151-JVS-FMO | 6/9/2013 | 8% |
| In Re Zimmer Nexgen Knee Implant | 1:11-cv-05468 | 2/19/2013 | 8% |

| | | | |
|---|---|---|---|
| Products Liability Litigation | | | |
| In Re Wright Medical Technology Inc., Conserve Hip Implant Products Liability Litigation | 1:12-md-2329 | 2/15/2013 | 7% |
| In Re Nuvaring Products Liability Litigation | 4:08-md-01964-RWS | 12/9/2011 | 15.50% 11% |
| In Re Vioxx Products Liaiblity Litigation | 2:05-md-01657 | 10/19/2010 | 6.50% |
| In Re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Relevent Products Liability Litigation | 3:09-md-2100-DRH- PMF | 3/25/2010 | range between 6% and 10% |
| In Re Kugel Mesh Hernia Patch Products Liaibility Litigation | 1:07-md-1842 | 12/18/2009 | 12% |
| In Re Avandia Marketing, Sales Practices and Products Liaiblity Litigation | 2:07-md-1871-CMR | 8/26/2009 | 7% |
| In Re Bextra and Celebrex Marketing Sales and Practices and Product LiabilityLitigation | 3:06-md-1699 | 7/7/2008 | initially 4%; amended to range between 8% and 12% |
| In Re Ethicon Physiomesh Flexible Composite Hernia Mesh Products Liability Litigation | 1:17-md-02782-RWS | 9/11/2020 | 10% Holdback |

ATTACHMENT B

ROUNDUP LITIGATION NOTEBOOK
TABLE OF CONTENTS

**I.    Pretrial Materials**
1.  MDL Case Management Orders
2.  MDL Pretrial Management Orders
3.  Written Fact Discovery of Defendants
    a.  Interrogatories
    b.  Requests for Production
    c.  Requests for Admissions
    d.  Other
4.  Depositions of Current and Former Monsanto Employees and other Liability Depositions
    a.  Third-Party & Fact Witnesses
        a.  Dr. Wallace Hayes (Food and Chemical Tox, 2/7/2019)
        b.  Doreen Manchester (CropLife America, 2/8/2019)
        c.  Roger McClellan (Critical Reviews in Tox, 2/6/2019)
        d.  Rick Reiss (Exponent, 2/18/2019)
        e.  Jesudoss ("Jess") Rowland (4/24/2017)
        f.  Larry Kier (JCCP, 2/5/2019)
        g.  Peter Infante (*Kane*, 7/13/2018)
        h.  Kathy Feldman (*Winston*, 8/25/2019)
    b.  Corporate Witnesses
        a.  John Acquavella (Epi Group Head, 4/7-8/2017)
        b.  Stephen Adams (Regulatory Affairs Manager, 1/26/2017)
        c.  Kirk Azevedo (Market Manager, *Kennedy v. Monsanto*, 6/8/2016)
        d.  Stanton Dotson (*Kennedy*, 5/24/2016)
        e.  Donna Farmer (MDL & JCCP, 1/11-12/2017; 9/26-27/2018; 1/24/2019)
        f.  Tim Ford (Sales/Regional Account Manager, *Neal*, 4/24/2018)
        g.  Daniel Goldstein (Science Affairs Lead, MDL 1/18/2017; *Johnson*, 2/27/2018)
        h.  Steven Gould (Manages IT&O distribution/sales, *Johnson*, 1/23/2018)
        i.  Hugh Grant (CEO, MDL, 2/4/2019)
        j.  James Guard (L&G lead, *Neal* 9/13-14/2018; 12/12/2018)
        k.  David Herring (Director, Global Gly Sustainability – MDL, 2/22/2017)
        l.  Matthew Helms (Global Ag. Productivity Tech Lead, *Kennedy* 8/24/2016)
        m.  William Heydens (Reg. Product Safety Assessment Strategy Lead, MDL 1/23-24/2017)
        n.  Daniel Jenkins (Director, Regulatory Affairs, MDL 3/21/2017)
        o.  Michael Koch (Tox, MDL 1/11/2019)
        p.  Mark Martens (Tox Director, Europe/Africa – MDL 4/7/2017)
        q.  Susan Martino-Catt (Global Supply Chain Strategy & Operations Lead – MDL 3/30/2017)
        r.  Matthew Muckerman (Corn States Marketing Manager – *Winston* 8/30/2019; 9/4/2019)
        s.  Samuel Murphey (Global External Affairs Lead, Chem. – MDL 1/22/2019)
        t.  Jennifer Ozimkiewicz (Reg. Marketing Head – *Kennedy* 5/24/2016; *Johnson* 1/8/2018)
        u.  Todd Rands (Global Corp Strategy – MDL 2/12/2019)
        v.  William Reeves (Reg. Crop Systems Lead – MDL 1/13-24/2019; 1/13/2020)
        w.  Myron Richardson (IT&O Area Business Manager – *Neal* 4/26/2018)

        x.  Eric Sachs (Lead, Reg Policy & Scientific Affairs – JCCP 9/18/2018;
            1/22/2019)
        y.  David Saltmiras (Small Molecule Tox Lead – MDL 1/31/2017; 2/1/2017;
            *Kane, Seitz, & Winston* 2/3/2020)
        z.  Dan Schulz (Roundup Marketing Manager – *Neal* 4/19/2018)
        aa. Ty Vaughn (Global Reg. Lead – *Winston* 7/31/2019; 8/1/2019)

5. General Causation Expert Witness Reports
   a. Plaintiffs' Experts
      a. Dr. Charles Benbrook
      b. Dr. Albert Neugut
      c. Dr. Christopher Portier
      d. Dr. Beate Ritz
      e. Dr. William Jameson
      f. Dr. Dennis Weisenburger
      g. Dr. William Sawyer
      h. Dr. Chadi Nabhan
      i. Dr. James Mills
      j. Mr. Stephen Petty
      k. Dr. Martyn Smith
      l. Dr. Barry Boyd (GC portion only)
   b. Monsanto's Experts
      a. Dr. Kassim Al-Khatib
      b. Dr. Christopher Corcoran
      c. Dr. William Fleming
      d. Dr. Warren Foster
      e. Dr. Jennifer Rider
      f. Dr. Lorelei Mucci
      g. Dr. Thomas Rosol
      h. Dr. Kelli Boyd
      i. Dr. Daniel Bucks
      j. Dr. John Fowle
      k. Dr. Jay Goodman
      l. Dr. Michael Grossbard (GC portion only)
      m. Dr. Bradley Hanson
      n. Dr. Timothy Kuzel
      o. Dr. Alex LeBeau
      p. Dr. Alexandra Levine (GC portion only)
      q. Dr. Kent Gates
      r. Dr. Scott McElroy
      s. Dr. Robert Phalen
      t. Dr. Paul Pharoah (epi)
      u. Dr. Connie Welch
      v. Dr. Kendall Wallace

6. Plaintiffs' General Causation Expert Witness Depositions (with exhibits)
   a. Dr. Charles Benbrook [2/8-9/2018, CA]
   b. Dr. Charles Benbrook [5/23/2018, St. Louis]
   c. Dr. Charles Benbrook [8/14/2018, St. Louis]

     d.   Dr. Charles Benbrook [9/13/2018, St. Louis]
     e.   Dr. Charles Benbrook [5/24/2019, St. Louis]
     f.   Dr. Charles Benbrook [11/18/2019, MDL]
     g.   Dr. Barry Boyd [10/25/2019 St. Louis]
     h.   Dr. William Jameson [9/21/2017, MDL]
     i.   Dr. William Jameson [1/10/2018, MDL]
     j.   Dr. William Jameson [9/27/2018, St. Louis]
     k.   Dr. William Jameson [7/19/2019, St Louis]
     l.   Dr. Chadi Nabhan [8/23/2017, MDL]
     m.   Dr. Chadi Nabhan [1/30/2018, MDL]
     n.   Dr. Christoper Portier [9/5/2017, MDL]
     o.   Dr. Christoper Portier [1/12/2018, MDL]
     p.   Dr. Christoper Portier [4/16-17/2018, St. Louis]
     q.   Dr. Christoper Portier [7/10/2018, St. Louis]
     r.   Dr. Christoper Portier [2/21-23/2019, MDL]
     s.   Dr. Christoper Portier [6/5/2019, *Winston*]
     t.   Dr. Chrstopher Portier [11/26/2019, MDL Wave I]
     u.   Dr. Beate Ritz [9/18/2017]
     v.   Dr. Beate Ritz [1/19/2018]
     w.   Dr. Beate Ritz Deposition [5/3/2019 St. Louis]
     x.   Dr. Beate Ritz Deposition [6/20/2019 St. Louis]
     y.   Dr. Beate Ritz Deposition [10/11/2019 St. Lousi]
     z.   Dr. William Sawyer [2/26-27/2018, CA]
     aa. Dr. William Sawyer [8/23/2018, St. Louis]
     bb. Dr. William Sawyer [10/16/2018, St. Louis]
     cc. Dr. Michael Siegel [7/19-20/2018, St. Louis]
     dd.  Dr. Michael Siegel [8/10/2018, St. Louis]
     ee. Dr. Dennis Weisenburger [9/11/2017, MDL]
     ff. Dr. Dennis Weisenburger [1/22/2018, MDL]
     gg. Dr. Dennis Weisenburger [11/26/2018, *Adams Jr.*]
     hh. Dr. Dennis Weisenburger [12/18/2018, *Stevick*]
     ii. Dr. Dennis Weisenburger [12/19/2018, *Gebeyehou*]
     jj. Dr. Dennis Weisenburger [12/20/2018, *Hardeman*]

7.   Monsanto's General Causation Expert Witness Depositions (with exhibits)
     a.   Dr. Christopher Corcoran [9/20/2017 MDL]
     b.   Dr. Christopher Corcoran [date]
     c.   Dr. William Fleming [9/19/2017 MDL]
     d.   Dr. Warren Foster  [9/15/2017]
     e.   Dr. Jennifer Rider [9/21/2017 MDL]
     f.   Dr. Jennifer Rider [1/23/2018 MDL]
     g.   Dr. Lorelei Mucci [9/22/2017 MDL]
     h.   Dr. Lorelei Mucci [1/23/2018 MDL]
     i.   Dr. Thomas Rosol [9/15/2017 MDL]
     j.   Dr. Paul Pharoah [11/18/2019 MDL]
     k.   Dr. Bettina Drake [10/16/2018 St. Louis]
     l.   Dr. Ronald Baynes [10/9/2018 St. Louis]

     m.   Dr. Christian Steidl [7/24/2019 St. Louis]

     n.   Dr. Piper Treuting
     o.   Dr. Connie Welch [12/18/2018 St. Louis ]
     p.   Dr. Glen Millner [8/26/2019 St. Louis]

q. Dr. Kendall Wallace [6/18/2018 St. Louis]
r. Dr. Roger Lewis [6/20/2018 St. Louis]

8. General Causation Fact Witness Depositions (with exhibits)
   a. Dr. Aaron Blair (IARC Chair, 3/20/2017)
   b. Dr. William Jameson [5/3/2017, MDL], IARC working group member
   c. Dr. Matthew Ross (IARC working group member 5/4/2017)
   d. Dr. Robert Tarone [IARC critic 12/17/2019]

9. *Daubert* and Summary Judgement Motions
   a. Johnson (California State Court
      a. Monsanto's Motion
      b. Plaintiff's opposition and affirmative motion
      c. Monsanto's opposition and reply
      d. Plaintif's' reply
   b. Hardeman /Stevick/Gebeyehou
      a. Monsanto's Motion
      b. Plaintiffs' opposition and affirmative motion
      c. Monsanto's opposition and reply
      d. Plaintiffs' reply
   c. Barrera, et al. (Delaware Superior Court)
      a. Monsanto's Motion
      b. Plaintiffs' opposition and affirmative motion
      c. Monsanto's opposition and reply
      d. Plaintiffs' reply
   d. Pilliod (JCCP – California)
      a. Monsanto's Motion
      b. Plaintiffs' opposition and affirmative motion
      c. Monsanto's opposition and reply
      d. Plaintiffs' reply
   e. Wade, et al. (St. Louis City)
      a. Monsanto's Motion
      b. Plaintiffs' opposition and affirmative motion
      c. Monsanto's opposition and reply
      d. Plaintiffs' reply

   f. Gordon, et al (St. Louis County)
      e. Monsanto's Motion
      f. Plaintiffs' opposition and affirmative motion
      g. Monsanto's opposition and reply
      h. Plaintiffs' reply

   g. Wave 1 - WL
      a. Monsanto's Motion
      b. Plaintiffs' opposition and affirmative motion
      c. Monsanto's opposition and reply
      d. Plaintiffs' reply

10. *Daubert* (Sargon) and Summary Judgement Orders
    a. *Johnson*

   b. *Hardeman (*preemption)
   c. Hardeman/Gebehyou/Stevick
   d. Pilliod
   e. MDL Wave 1
   f. SDCA (preemption)
   g. EDCA (preemption)
   h. CDCA (preemption)
   i. EDNY (preemption)
   j. Caballero (CA)
   k. St. Louis City
   l. St. Louis County
   m. Delaware state court

**II.** Trial Materials
  **a.** Trial exhibit list
   **i.** Johnson (California)
   **ii.** Hardeman (MDL)
   **iii.** Pilliod (California)
   **iv.** Winston (St. Louis City)
   **v.** Stevick (MDL)
   **vi.** Caballero (California)
   **vii.** Wade (St. Louis City)
  **b.** Demonstrative Exhibits
  **c.** Outlines for Direct and Cross-Examination of Expert Witnesses
  ***d.*** Motions *in limine*
   **i.** Johnson
   **ii.** Hardeman
   **iii.** Pilliod
   **iv.** Caballero
   **v.** Wade
  **e.** Jury instruction
   **i.** Johnson
   **ii.** Hardeman
   **iii.** Pilliod
  **f.** Bench Briefs (Pilliod)
  **g.** Liability Deposition cuts
   **i.** Johnson
   **ii.** Hardeman
   **iii.** Pilliod
   **iv.** Wade (supplemental only/not ruled on by court)
   **v.** Winston (supplemental only/not ruled on by court)
  **h.** Trial Transcripts with exhibits
   **i.** Johnson
   **ii.** Hardeman
   **iii.** Pilliod
  **i.** Post-verdict motions
   **i.** Johnson
   **ii.** Hardeman
   **iii.** Pilliod
  **j.** Post-verdict decisions
   **i.** Johnson
   **ii.** Hardeman
   **iii.** Pilliod

**III.**   Appellate Materials
     a.   Johnson v. Monsanto (San Francisco, CA)
     b.   Hardeman v. Monsanto (MDL)
     c.   Pilliod v. Monsanto (Alameda County, CA)

**IV.**   Studies
     a. epidemiology
     b. exposure
     c. genotoxicity
     d. animal studies