Elizabeth J. Cabraser (SBN 083151)
Robert L. Lieff (SBN 037568)
Steven E. Fineman (SBN 140335)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: 415.956.1000
ecabraser@lchb.com

William M. Audet (SBN 117456)
AUDET & PARTNERS, LLP
711 Van Ness, Suite 500
San Francisco, CA 94102-3229
Telephone: 415.568.2555

*Counsel for Plaintiffs and the Proposed Class*
*(additional counsel listed below)*

James R. Dugan, II
TerriAnne Benedetto
THE DUGAN LAW FIRM, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, LA 70130
Telephone: 504.648.0180

Samuel Issacharoff
40 Washington Square South
Suite 411J
New York, NY 10012
Telephone: 212.998.6580

Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Fl.
Chicago, IL 60606
Telephone: 312.741.1019

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL NO. 2741 |
| | Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | **MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT, APPOINTMENT OF INTERIM CLASS AND SUBCLASS COUNSEL, DIRECTION OF NOTICE UNDER FED. R. CIV P. 23(e), SCHEDULING OF A FAIRNESS HEARING, AND STAY OF THE FILING AND PROSECUTION OF ROUNDUP-RELATED ACTIONS BY SETTLEMENT CLASS MEMBERS** |
| *Ramirez, et al. v. Monsanto Co.*, Case No. 3:19-cv-02224 | |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

SETTLEMENT BACKGROUND AND SUMMARY ........................................................7

    A.    The Settlement Class and Subclasses ..................................................7

    B.    Compensation Awards ..........................................................................8

    C.    Diagnostic Accessibility Grant Program ............................................12

    D.    Legal Services Program ......................................................................16

    E.    Labeling Change ................................................................................17

    F.    Research Funding Program ..................................................................17

    G.    Advisory Science Panel ......................................................................17

    H.    Potential Extension of the Settlement ................................................18

    I.    Limited Release (Except for Those Who Accept Compensation Awards)............19

    J.    Notice Plan..........................................................................................20

    K.    Attorneys' Fees, Expenses, and Incentive Awards............................22

ARGUMENT ....................................................................................................................23

I.    The Court will likely certify the class and subclasses at final approval. ...........24

    A.    The class and subclasses meet the requirements of Rule 23(a). ...........24

        1.    The class and subclasses are sufficiently numerous. ...............24

        2.    Roundup claims raise a cluster of common questions with resolution-driving common answers..........................................25

        3.    The proposed class representatives' claims are typical. ...........26

        4.    The proposed class representatives and Class Counsel have and will adequately represent the class and subclasses. ...............27

    B.    The class and subclasses meet the predominance requirement of Rule 23(b)(3). ..........................................................................................28

    C.    Class certification for settlement purposes satisfies the superiority requirement. ......................................................................................33

    D.    Alternatively, certification under Rule 23(b)(2) is also appropriate.....................36

    E.    The Court should appoint proposed Class Counsel and Subclass Counsel as Interim Settlement Class Counsel under Rule 23(g)(3)....................37

II.    The Court will likely find the Settlement fair, reasonable, and adequate..........38

# TABLE OF CONTENTS
## (continued)

<div align="right">Page</div>

A.  Rule 23(e)(2)(A): Counsel and the class representatives have and will
    continue to zealously represent the class. ............................................................38

B.  Rule 23(e)(2)(B): The Settlement is the product of more than 18 months of
    adversarial negotiation under the supervision of the Court-appointed
    mediator. ....................................................................................................................40

C.  Rule 23(e)(2)(C): The Settlement provides guaranteed programmatic relief
    in exchange for a limited release and a short delay, and compensation to
    those who choose to accept it in exchange for a full release. ...............................42

    1.  The Settlement offers class benefits and compensation that are fair,
        adequate, and reasonable alternatives to the costs, risks, and delay
        of trial and appeal....................................................................................42

    2.  Class members who are not diagnosed, or who do not accept a
        compensation award, give up relatively little. ..........................................44

        a.  The litigation stay is a small concession on the part of class
            members, who by definition have not filed a claim or
            retained counsel to do so.................................................................44

        b.  The release of medical monitoring claims is reasonable in
            light of the Settlement benefits. ....................................................45

        c.  The release of punitive damages is reasonable. ............................48

    3.  Class members are eligible for relief through straightforward
        processes. ..................................................................................................50

    4.  Counsel will seek reasonable attorneys' fees and costs that pose no
        obstacle to preliminary approval...............................................................50

    5.  There are no side agreements relevant to preliminary approval. ...............51

D.  The Settlement treats all class members equitably relative to one another. ..........51

E.  The Settlement merits preliminary approval under this District's
    Procedural Guidance.............................................................................................53

    1.  Guidance (1)(a) & (c): The Settlement class and released claims
        are consistent with the operative complaint..............................................53

    2.  Guidance (1)(e): The Settlement compares favorably to potential
        litigation. ..................................................................................................53

    3.  Guidance (1)(f): The allocation of the Settlement Fund is
        considered and reasonable. .......................................................................55

# TABLE OF CONTENTS
## (continued)

Page

4.     Guidance (1)(g): A substantial number of class members are expected to participate in the Settlement programs. ...............................55

5.     Guidance (1)(h) & (8): The Settlement is non-reversionary.....................56

6.     Guidance (6): Attorneys' fees, when requested, will meet all federal and local requirements. .................................................................57

7.     Guidance (7): The requested incentive awards are reasonable and subject to Court approval. ..........................................................................57

8.     Guidance (9): The Settlement provides a reasonable time for class members to exercise their rights. ..............................................................58

III.     The notice plan provides the best practical notice. ...........................................58

    A.     The notice plan was specifically designed to reach those exposed to Roundup who have not yet developed NHL, as well as those who have. .............59

    B.     The concerns articulated in *Amchem* are not present here.....................61

    C.     Guidance (2): The Administrators and Notice Agents were selected based on capabilities and experience with large, complex settlements. ..........................63

IV.     The proposed Settlement addresses the four concerns the Court raised regarding the prior, withdrawn settlement. ....................................................................64

V.     The Court should stay class members from filing or prosecuting new Roundup Lawsuits and Related Party Lawsuits. ................................................................66

VI.     Requested Timetable...............................................................................................69

CONCLUSION.....................................................................................................................70

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Allen v. Monsanto Co.*,
  No. 13-0418, 2013 WL 6153150 (W.V. Nov. 22, 2013) ........................................................ 47

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................................... passim

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ................................................................................................... 25, 34

*Betts v. Reliable Collection Agency, Ltd.*,
  659 F.2d 1000 (9th Cir. 1981) ......................................................................................... 24

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996) ................................................................................................... 32, 48

*Buchanan v. Tata Consultancy Servs., Ltd.*,
  No. 15-1696, 2017 WL 6611653 (N.D. Cal. Dec. 27, 2017) ..................................................... 32

*Carson v. Monsanto Co.*,
  No. 17-237, 2020 WL 7497385 (S.D. Ga., Dec. 21, 2020) ..................................................... 36

*Celano v. Marriott Int'l, Inc.*,
  242 F.R.D. 544 (N.D. Cal. 2007) ......................................................................................... 24

*Churchill Vill., L.L.C. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004) ......................................................................................... 58

*Cote v. Philip Morris USA, Inc.*,
  No. 19-14074, 2021 WL 162022 (11th Cir. Jan 19, 2021) ..................................................... 49

*Cotter v. Lyft, Inc.*,
  No. 13-4065, Doc. 256 (N.D. Cal. July 1, 2016) ......................................................... 66, 68

*Crawford v. Honig*,
  37 F.3d 485 (9th Cir. 1994) ......................................................................................... 36

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ......................................................................................... 26

*Elsea v. U.S. Eng'g Co.*,
  No. 1016-15976 (Mo. Cir. 2018) ......................................................................................... 47

*Flores v. Dart Container Corp.*,
  No. 19-83, 2021 WL 107239 (E.D. Cal. Jan. 12, 2021) ......................................................... 29

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ......................................................................... 25, 29, 66, 68

## TABLE OF AUTHORITIES
### (continued)

Page

*Hardeman v. Monsanto Co.*,
Nos. 19-16636, 19-16708 (9th Cir.) ........................................................ 45

*Hardeman v. Monsanto Co.*,
No. 3:16-cv-00525 (N.D. Cal.) ................................................................ 45

*Hardeman v. Monsanto*,
No. 19-16636 (9th Cir.) ........................................................................... 50

*Hefler v. Wells Fargo & Co.*,
No. 16-05479, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018), *aff'd*,
802 F. App'x 285 (9th Cir. 2020) ............................................................. 51

*In re Actos Prods. Liab. Litig.*,
274 F. Supp. 3d 485 (W.D. La. 2017) ...................................................... 57

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
689 F.3d 229 (2d Cir. 2012) .................................................................... 31

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ................................................................... 57

*In re Citric Acid Antitrust Litig.*,
145 F. Supp. 2d 1152 (N.D. Cal. 2001) .................................................... 55

*In re Corrugated Container Antitrust Litig.*,
659 F.2d 1332 (5th Cir. 1981) ................................................................. 68

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ............................................................. 2, 32

*In re Diet Drugs (Phentermine/Fenfluramine/Dexenfluramine) Prods. Liab. Litig.*,
369 F.3d 293 (3d Cir. 2004) ...................................................................... 2

*In re Diet Drugs Prods. Liab. Litig.*,
No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) ................................. passim

*In re Diet Drugs*,
282 F.3d 220 (3d Cir. 2002) .................................................................... 67

*In re High-Tech Emp. Antitrust Litig.*,
No. 11-2509, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ....................... 53

*In re Hyundai and Kia Fuel Economy Litig.*,
926 F.3d 539 (9th Cir. 2019) ....................................................... 28, 29, 30

*In re Inter-Op Hip Prosthesis Liability Litigation*,
204 F.R.D. 330 (N.D. Ohio 2001) ..................................................... 35, 47

# TABLE OF AUTHORITIES
## (continued)

Page

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*,
332 F.R.D. 202 (N.D. Ill. 2019), *aff'd*,
No. 19-2638, 2019 WL 8058082 (7th Cir. Oct. 25, 2019) .................................... 32, 37, 46, 47

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*,
No. 13-9116, 2016 WL 3854603 (N.D. Ill. July 15, 2016) .................................... 47

*In re Nat'l Football League Players Concussion Injury Litig.*,
301 F.R.D. 191 (E.D. Pa. 2014)........................................................................ 66

*In re Nat'l Football League Players Concussion Injury Litig.*,
307 F.R.D. 351 (E.D. Pa. 2015)........................................................................ 47

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016) .................................................................... passim

*In re Oil Spill by Oil Rig Deepwater Horizon*,
295 F.R.D. 112 (E.D. La. 2013) ................................................................. 26, 48

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) ............................................................................ 53

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-1720, 2019 WL 359981 (E.D.N.Y. Jan. 28, 2019)...................................... 38

*In re Roundup Prods. Liab. Litig.*,
214 F. Supp. 3d 1346 (J.P.M.L. 2016)............................................................... 26

*In re Tyco Int'l, Ltd.*,
535 F. Supp. 2d 249 (D.N.H. 2007)................................................................... 57

*In re Veritas Software Corp. Sec. Litig.*,
No. 03-0283, 2005 WL 3096079 (N.D. Cal. Nov. 15, 2005),
*vacated in part on other grounds*, 496 F.3d 962 (9th Cir. 2007)............................. 51

*In re Vioxx Prods. Liab. Litig.*,
869 F. Supp. 2d 719 (E.D. La. 2012)................................................................. 66

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prod. Liab. Litig.*,
MDL No. 2672, 2017 WL 2212783 (N.D. Cal. May 17, 2017) .............................. 48

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*,
MDL No. 2672, 2017 WL 672727 (N.D. Cal. Feb. 16, 2017) ................................ 41

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*,
229 F. Supp. 3d 1052 (N.D. Cal. 2017) .......................................................... 66, 68

*In re Volkswagen and Audi Warranty Extension Litig.*,
273 F.R.D. 349 (D. Mass. 2011)....................................................................... 33

- vii -

## TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Warfarin Sodium Antitrust Litig.,*
391 F.3d 516 (3d Cir. 2004) ................................................................................. 31

*In re Wells Fargo & Co. Shareholder Deriv. Litig.,*
No. 16-5541, 2020 WL 1786159 (N.D. Cal. Apr. 7, 2020) .................................... 52

*Jabbari v. Farmer,*
965 F.3d 1001 (9th Cir. 2020) ....................................................................... 29, 31

*Jimenez v. Allstate Ins. Co.,*
765 F.3d. 1161 (9th Cir. 2014) ............................................................................ 25

*Johnson v. Monsanto Co. et al.,*
No. GC16550128 (Cal. Super.) ............................................................................ 50

*Johnson v. Monsanto Co.,*
52 Cal. App. 5th 434 (2020), *pet. for rev. denied* (Cal. Oct. 21, 2020) ............. 45, 50

*Juris v. Inamed Corp.,*
685 F.3d 1294 (11th Cir. 2012) ........................................................................... 63

*Levya v. Medline Indus. Inc.,*
716 F.3d 510 (9th Cir. 2013) ............................................................................... 32

*Mullane v. Cent. Hanover Bank & Tr. Co.,*
339 U.S. 306 (1950) ............................................................................................. 58

*Nitsch v. DreamWorks Animation SKG Inc.,*
No. 14-4062, 2017 WL 2423161 (N.D. Cal. June 5, 2017) .................................... 53

*O'Connor v. Uber Techs., Inc.,*
No. 13-03826, 2019 WL 1437101 (N.D. Cal. Mar. 29, 2019) ................................ 38

*Palmer v. Stassinos,*
233 F.R.D. 546 (N.D. Cal. 2006) .......................................................................... 24

*Penn. Bureau of Corr. v. U.S. Marshals Serv.,*
474 U.S. 34 (1985) ............................................................................................... 67

*Pilliod v. Monsanto Co.,*
No. A158228 (Cal. App.) ................................................................................ 45, 50

*Pilliod v. Monsanto Co.,*
No. RG17862702 (Cal. Super.) ............................................................................ 50

*Prantil v. Arkema,*
No. 19-20723, 2021 WL 222722 (5th Cir. Jan. 22, 2021) .......................... 32, 33, 37

*Radcliffe v. Experian Info. Sols., Inc.,*
715 F.3d 1157 (9th Cir. 2013) ............................................................................. 27

## TABLE OF AUTHORITIES
### (continued)

Page

*Richie v. Blue Shield of Cal.*,
No. 13-2693, 2014 WL 6982943 (N.D. Cal. Dec. 9, 2014)...................................................... 24

*Rodriguez v. West Pub'g Corp.*,
563 F.3d 948 (9th Cir 2009) ............................................................................................. 48, 52

*Sandpiper Vill. Condo. Ass'n, Inc. v. La.-Pac. Corp.*,
428 F.3d 831 (9th Cir. 2005) .................................................................................................. 68

*State Farm Ins. Co. v. Campbell*,
538 U.S. 408 (2003)................................................................................................................. 48

*Staton v. Boeing Co.*,
327 F.3d 938 (2003)............................................................................................................ 27, 38

*Sullivan v. DB Inv., Inc.*,
667 F.3d 273 (3d Cir. 2011) ................................................................................................... 29

*Torres v. Mercer Canyons Inc.*,
835 F. 3d 1125 (9th Cir. 2016) ............................................................................................... 25

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016)........................................................................................................ 28, 29

*United States v. N.Y. Tel. Co.*,
434 U.S. 159 (1977)................................................................................................................. 67

*Uppal v. CVS Pharmacy, Inc.*,
No. 14-2629, 2015 WL 10890652 (N.D. Cal. Sept. 11, 2015)........................................... 66, 68

*Vargas v. Ford Motor Co.*,
No. 12-8388, 2020 WL 1164066 (C.D. Cal. Mar. 5, 2020).................................................... 52

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ................................................................................................ 57

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)............................................................................................................ 25, 37

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) ............................................................................................ 26, 33

*Zepeda v. PayPal, Inc.*,
No. 10-1668, 2017 WL 1113293 (N.D. Cal. Mar. 24, 2017) ................................................. 48

*Zinser v. Accufix Res. Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001) ............................................................................................... 37

## TABLE OF AUTHORITIES
### (continued)

Page

**Statutes**

28 U.S.C. § 1651 ................................................................................................................. 66

28 U.S.C. § 2283 ................................................................................................................. 68

**Rules**

Fed. R. Civ. P. 23(a)(1) ...................................................................................................... 24

Fed. R. Civ. P. 23(a)(2) ...................................................................................................... 25

Fed. R. Civ. P. 23(a)(4) ...................................................................................................... 27

Fed. R. Civ. P. 23(b)(2) ......................................................................................... 32, 36, 37

Fed. R. Civ. P. 23(b)(3)(A) ................................................................................................ 35

Fed. R. Civ. P. 23(b)(3)(B) ................................................................................................ 35

Fed. R. Civ. P. 23(b)(3)(C) ................................................................................................ 35

Fed. R. Civ. P. 23(b)(3)(D) ................................................................................................ 36

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................................... 23, 58

Fed. R. Civ. P. 23(e)(1) ...................................................................................................... 23

Fed. R. Civ. P. 23(e)(1)(B) .............................................................................................. 7, 23

Fed. R. Civ. P. 23(e)(2) ................................................................................................. 24, 38

Fed. R. Civ. P. 23(e)(2)(B) ................................................................................................ 40

Fed. R. Civ. P. 23(e)(5) ...................................................................................................... 23

Fed. R. Civ. P. 23(e), 2003 Ad. Comm. Notes ................................................................. 51

Fed. R. Civ. P. 23(g)(1)(A) ................................................................................................ 37

Fed. R. Civ. P. 23(g)(3) ...................................................................................................... 37

**Treatises**

William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2018) ................................. 31

**Other Authorities**

Press Release, Bayer AG, *Bayer announces agreements to resolve major legacy Monsanto litigation* (June 24, 2020) ........................................................................................... 42

- x -

## NOTICE OF MOTION AND MOTION

TO ALL THE PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on such date and time as the Court may set, in Courtroom 4 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, unless the Court orders proceedings be held by telephone or videoconference, proposed Class Counsel, on behalf of a proposed Settlement class, will and hereby do move the Court for an order (1) granting preliminary approval of the Class Action Settlement and Settlement Agreement; (2) appointing Interim Class Counsel and Subclass Counsel; (3) approving the dissemination of Settlement class notice; (4) Scheduling a Fairness Hearing; and (5) staying the filing and prosecution of Roundup-related actions by Settlement class members, pursuant to Rules 23(a), 23(b), 23(c)(2)(B), and 23(e) of the Federal Rules of Civil Procedure.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Last July, in PTO 214, this Court expressed its skepticism about the "propriety and fairness" of a proposed settlement and informed the parties that it was "tentatively inclined to deny" preliminary approval. MDL Doc. 11182, at 3. The Court invited the parties to refashion a "Plan B" that avoided the pitfalls of "Plan A." In response, the parties withdrew the proposed settlement and started anew. After more than six months of difficult negotiations, we are able to offer an alternative proposed resolution.

Given the history of this litigation, it is best to start off immediately with how the parties have responded to the Court's concerns. The June proposed settlement was fundamentally organized around an issue determination about the relation between Roundup and NHL. The June settlement created a Science Panel to offer a binding assessment of the central causation question at the heart of the litigation. In turn, an issues class certification would have given the panel determination preclusive effect in all future tort cases brought by class members. There was a novel system for "interim" payments and other assistance for the class while the panel did its work. But the operational heart of the class was the issue determination that, it was hoped, would streamline all subsequent cases.

This Court gave extensive guidance to the parties on the legal difficulties of binding this proposed class to the outcome of a single factual determination, even with an individual ability to opt out. Because so many people have had exposure to Roundup and have not had any indication of NHL, the class was not self-identifying (unlike, e.g., NFL players, as the Court noted). Yet because the settlement would bind a large class into the future and potentially compromise the ability to sue Monsanto (if the Science Panel's determination were in Monsanto's favor), there would be great pressure upon the class notice. The Court stated it was "dubious" that current

notice directed at migrant farmworkers or individuals working in a small gardening business who did not have NHL would meaningfully alert them that, unless they opted out immediately, they could face the consequences of issue preclusion in a subsequent suit against Monsanto if and when they did develop NHL in the future.

The present agreement has been rebuilt from the studs on up. First, and foremost, the present agreement is based on conventional notions of claims resolution rather than issue preclusive determinations. The new Settlement contains a straightforward compensation fund to make offers to class members who have or develop NHL, together with a broad program of diagnostic assistance for NHL risk and other programmatic benefits. The total value has increased to up to $2 billion. In its structure of scheduled compensation awards and medical assistance, this Settlement follows the model set out in the most successful mass harm resolutions under Rule 23.[1] And, importantly in light of the Court's concerns, the Settlement does so on terms whereby not a single class member can lose the right to sue Monsanto for compensation in the tort system unless he or she individually decides – *after* being diagnosed with NHL – to participate in the compensation fund and accept payment, in return for a release.

The key features of the Settlement[2] include the following benefits to class members:

(1) **Compensation**: A compensation fund to provide individual compensation for class members with NHL who elect it. The awards range between $10,000 and $200,000 per person who chooses to accept it, with the potential for increased awards based on

---

[1] The key Settlement elements are based on *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, 369 F.3d 293, 317 (3d Cir. 2004) ("landmark" class settlement of mass tort including diagnostic services, compensation, and back-end opt-out with punitive damages release); *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) (class settlements of medical and economic claims related to oil spill); *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016) (class settlement involving diagnostic, compensatory, and educational elements).

[2] Capitalized terms are defined in the Settlement Agreement, which is attached as **Exhibit A** to the Cabraser Declaration, unless otherwise indicated.

exceptional circumstances. As noted, this fund is completely optional for class members, and class members do not have to decide whether to participate in it or to accept the amount offered until after they develop NHL. Class members who choose not to do so retain the right to sue Monsanto in the tort system.

(2) **Legal Assistance**: A Legal Services Program to provide class members with free legal assistance and representation in connection with navigating and evaluating settlement benefits.

(3) **Diagnosis**: A Diagnostic Accessibility Grant Program (DAGP) offering testing for NHL, with a focus on early diagnosis for the most medically-underserved populations.

(4) **Outreach**: A multimedia notice program of unprecedented scope, to satisfy Rule 23 and bring class members in to the diagnostic and compensatory programs.

(5) **Labeling Change**: Monsanto will seek permission from the EPA to include in its label a reference and link to information regarding whether exposure to Roundup causes NHL.

(6) **New Treatments**: A Research Funding Program to develop improved treatment for, and diagnosis of, NHL.

To fund these benefits, the amount of the settlement has increased by 60 percent to up to $2 billion to cover the first four years, with at least $1.325 billion for the compensation fund and $210 million for the Diagnostic Accessibility Grant Program (making it one of the largest medical-monitoring-type programs ever). Up to $250 million of the compensation fund will be made available following approval by this Court, regardless of any appeals. After the initial four years, the Parties can seek to extend it – with additional funding above the $2 billion – if, based

on experience with the program and the state of the science, the Parties are able to negotiate extension terms. Critically, however, any extension terms would have to be proposed to and approved by the Court at that time.

Through these features, we submit the Settlement centrally addresses the concerns the Court raised regarding the prior proposed settlement. It offers direct benefits to class members. It does so first in the form of a predictable set of compensation offers to class members with NHL. As developed below and in the accompanying declarations and exhibits in support of the Settlement, the compensation system is a transparent one, whose payment structure and factors are known in advance by claimants, with further provisions (like the free Legal Services Program) to ensure that more of the compensation amounts will go to class members rather than the transaction costs that normally mark a litigated outcome. It also offers diagnostic assistance to class members who have not yet been diagnosed with NHL, and free legal assistance, research funding, and other benefits to all class members.

But the key point bears emphasis: these are *offers.* This Settlement *offers* all class members following an NHL diagnosis a cash award for a standard release of claims. The word "*offers*" is critical, because class members with NHL may accept or reject the compensation proposal and, if they do reject it, may return to the tort system to seek resolution there. This feature, we submit, addresses the Court's concern about the binding effects of a decision whether to opt out of the settlement initially, particularly for people who do not yet have NHL.

Thus, in this Settlement, class members do not lose their right to sue Monsanto for compensatory damages unless and until they make an individual, affirmative choice to give up such rights in exchange for a compensation award at a specific dollar amount known to them. And they do not need to make that choice, unless and until they are diagnosed with NHL. If they

choose to take no action whatsoever, or if they reject the amount offered, they retain the right to sue Monsanto for compensation in the tort system. Because there is less consequence to mere membership in the class, the due process concerns are correspondingly reduced. Unlike in the June settlement, where the decision not to opt out meant that class members were bound to a scientific determination whose implications they might not grasp and that could have resulted in their losing the ability to seek recourse in the tort system, this Settlement provides that class members who do not opt out on the front end can later sue in the tort system ***even after receiving a compensation offer*** with only the following limitations:

1.       There is a standstill for a four-year period on filings while the Settlement compensation and diagnostic programs are implemented (with corresponding tolling of class member claims). As discussed below, only three cases have won trial verdicts nationally during the existence of this MDL, and further delays are inevitable in light of COVID. Few civil actions filed after this Settlement (the class is defined to exclude all persons with cases in process) are likely to have had any prospect of trial in the four-year window.

2.       Class members do not retain claims for punitive damages. As discussed below, punitive damages are not an individual right, and punitive damages releases are thus a standard, accepted feature of mass-tort compensation settlements where class members are given a compensation option, but retain rights to sue in the tort system. Here, moreover, the scope and features of this Settlement, and the private settlements to date, and the vast amounts paid to fund all of them achieve the publicity, reform, and deterrence functions customarily served by punitive damages.

3.       Class members may not seek programmatic medical monitoring. This function is taken up in the Settlement's Diagnostic Accessibility Grant Program.

- 5 -

4.     The conclusions of an advisory science panel are admissible as evidence in any subsequent trials. The new Settlement creates an independent advisory science panel to assess the medical evidence. But, unlike in the June settlement, the function of this panel is just that: advisory. No one is bound by the findings of the panel. It does not undo existing orders or determinations. Bluntly stated, there is no issue preclusion for class members as a result of this Settlement. The advisory determination will be a guidepost for the parties negotiating, and the Court reviewing, an extension of the compensation options into the future, for additional funding and subject to Court approval. And the advisory determination will be admissible in any follow-on individual actions by class members (including that class members may introduce it *against* Monsanto), but subject to argument, to contrary evidence, and to challenge based on subsequent scientific development.

This Settlement does retain one critical feature of the June settlement: it does not affect any person who has filed an individual lawsuit against Monsanto or retained counsel to do so. Those people are not in the class. Accordingly, the Settlement does not interfere with any attorney-client relationship and does not preclude any persons who have filed a case or retained counsel from proceeding with their case.

Instead, the class is strictly defined to include people who have been exposed to Roundup Products and either have or may develop NHL, but who have not sued or retained counsel to do so. And the Settlement is structured to provide these people with what most serves their interests: an option for substantial compensation should they get NHL, as well as other programmatic relief, while still preserving their right to sue Monsanto should they decide that route is preferable – if and when they get sick. If consigned to individual litigation alone, the members of the class would be at the very back of the line – or, in the case of those who do not yet have

NHL, would have to wait even to be able to join the back of the line. They are not covered by the current inventory settlements. They will have to wait for any benefits to come their way. In the meantime, there could be any number of developments that delay, jeopardize, or entirely prevent them from ever realizing those benefits. Monsanto will continue to litigate its preemption argument and other legal defenses on appeal and across the nation. The current Covid-related trial delays continue without visible end, and even when they do end, will leave an immense backlog that will take years to undo. The EPA has continued to stand by its claim regarding Roundup and NHL, with unknown and unpredictable effects on future individual litigation. And no one can predict what alternative course Monsanto might decide to take if there is no prospect of reasonable closure in this litigation. This Settlement gives class members an opportunity to avoid those risks, while not compelling them to take it.

Plaintiffs submit that the requirements of Federal Rule of Civil Procedure 23(e)(1)(B) are satisfied, that the Court likely will be able to certify the class and approve the Settlement, and that the Court should therefore grant preliminary approval and direct notice to the class.

## SETTLEMENT BACKGROUND AND SUMMARY

This Settlement builds on the most recently affirmed and effectuated compensatory mass tort class settlements with a single defendant (*NFL* and *Deepwater*), while incorporating a feature those settlements lacked: an ability to return to the tort system, as developed in *Diet Drugs*, for class members who reject the settlement's compensation offers or whose claims mature after the class compensation program has ended.

### A.      The Settlement Class and Subclasses

The Settlement class includes those persons, already exposed to Roundup in the U.S., who have not yet filed an individual (non-class) lawsuit or retained counsel to do so. The full definition is:

- 7 -

> (i) those individuals who are either citizens or Residents of the United States as of February 3, 2021 or who claim exposure to Roundup Products through the application of Roundup Products in the United States and who as of February 3, 2021 both (1) have been exposed to Roundup Products through the application of Roundup Products and (2) have not commenced an individual, non-class lawsuit or retained counsel for the pursuit of any individual, non-class personal injury or false advertising claims arising from, resulting from, in any way relating to or in connection with such exposure; and (ii) all Derivative Claimants.

Settlement § 1.1(a). In addition, the Settlement class contains two subclasses:

> Subclass 1 includes class members who have been diagnosed with NHL as of February 3, 2021, and their Derivative Claimants.

> Subclass 2 includes class members who have not been diagnosed with NHL as of February 3, 2021, and their Derivative Claimants.

*Id.* § 1.2. Derivative Claimants include those who have a right to sue by reason of their relationship with a class member. A class member may retain counsel to assist with obtaining Settlement benefits while remaining a class member.

### B.   Compensation Awards

The compensation fund, to be funded at $1.325 billion for the initial four-year settlement period, will provide class members individual compensation awards in exchange for a full release from those who choose to accept the awards. Class members may be eligible for compensation awards if they demonstrate (1) exposure to Roundup; and (2) an NHL diagnosis made at least 12 months after first being exposed. Settlement § 6.1(a).

There are two types of compensation awards: Accelerated Payment Awards and Claims Program Awards. Accelerated Payment Awards of $5,000 are available on an expedited basis, and require only a streamlined showing of exposure and diagnosis. *Id.* §§ 6.1(a)(i), 7.2(a). These payments will begin after preliminary approval of the Settlement by this Court, even if further approval proceedings remain to come. A class member who submits a claim package for an Accelerated Payment Award is guaranteed a determination within 30 days and prompt payment

- 8 -

thereafter if the claim is deemed compensable. *Id.* §§ 7.7(a), 7.9(a). Because these payments are made before final approval and before any appellate challenges have run their course, they serve as offers to class members and acceptance is a matter of individual choice.

If class members elect instead to submit more extensive records, then they may be eligible for a Claims Program Award ranging from $10,000 to $200,000 (or potentially more under exceptional circumstances). *Id.* §§ 6.2(a)(ii), 7.2(b). These payments will begin 60 days after final approval of the Settlement by this Court, even if appellate challenges remain. *Id.* § 6.2(a)(ii)(2). The amount of the Claims Program Award will be determined by the Claims Administrator through application of criteria set out in Exhibit 5 to the Settlement:

| Tier | Tier Criteria |
|------|---------------|
| Tier One | If the Settlement Class Member meets either of the following two criteria, the Settlement Class Member is in Tier One: <br><br> (i) More than 80 years of age at the time of the Qualifying Diagnosis. <br><br> (ii) Received a Qualifying Diagnosis prior to January 1, 2015 and their Roundup Claims against the Defendant are not barred by the applicable statutes of limitations and statutes of repose. <br><br> If the Settlement Class Member does not fit within Tier One, move to Tier Two. |

- 9 -

| Tier | Tier Criteria |
|------|---------------|
| Tier Two | If the Settlement Class Member is not in Tier One, and meets any of the following criteria, the Settlement Class Member is in Tier Two:<br><br>(i) At least 60 and not more than 80 years of age at the time of Qualifying Diagnosis.<br><br>(ii) Medical records confirm the existence of one or more Group A Medical Conditions.[3]<br><br>(iii) Remission for five or more years.<br><br>(iv) Proof of exposure to Roundup Products, in accordance with Part 4 of this Exhibit 5, with frequency and duration of exposure between 12 and 36 months.<br><br>If the Settlement Class Member does not fit within Tier One or Tier Two, move to Tier Three. |
| Tier Three | If the Settlement Class Member is not in Tier One or Two, and meets any of the following criteria, the Settlement Class Member is in Tier Three:<br><br>(i) At least 45 years of age and less than 60 years of age at the time of Qualifying Diagnosis.<br><br>(ii) Medical records confirm the existence of one or more Group B Medical Conditions.[4]<br><br>(iii) Occupation that elevates NHL risk separate and apart from Roundup Products' use: cleaning service, electrician, hairdressing, handling fission products/jet propellant/solvents, metal working, painting, pest exterminator, petroleum refinery, textiles, woodworking, x- or gamma radiation.<br><br>(iv) Remission for three to five years.<br><br>(v) Proof of exposure to Roundup Products, in accordance with Part 4 of this Exhibit 5, with frequency and duration of exposure between 36 and 60 months.<br><br>If the Settlement Class Member does not fit within Tiers One, Two, or Three, move to Tier Four. |

[3] Group A medical conditions include First Degree Relative with NHL, First Degree Relative with Other Lymphoma, Leukemia or Myeloma, Organ or Stem Cell Transplant, Certain Autoimmune Disorders, Epstein-Barr virus under certain circumstances, Certain Immunosuppressive Medications, HIV/AIDS, Hepatitis C virus, Certain Bacterial Infections, or Radiation Exposure as treatment for prior cancer. Settlement, Ex. 5 at 1.

[4] Group B medical conditions include Prior History of Cancer, First-Degree or Second-Degree

*Footnote continued on next page*

MOTION FOR PRELIMINARY APPROVAL<br>OF CLASS ACTION SETTLEMENT<br>MDL NO. 2741, CASE NO. 3:16-MD-02741

| Tier | Tier Criteria |
|------|---------------|
| Tier Four | If the Settlement Class Member is not in Tiers One, Two, or Three, the Settlement Class Member is eligible for Tier Four.  Tier Four Settlement Class Members must meet all of the following criteria:<br><br>(i) Less than 45 years of age at the time of Qualifying Diagnosis.<br><br>(ii) No Group A Medical Conditions or Group B Medical Conditions.<br><br>(iii) NHL recurrence, remission for less than three years, or active NHL.<br><br>(iv) Proof of exposure to Roundup Products, in accordance with Part 4 of this Exhibit 5, with frequency and duration of exposure in excess of 60 months. |

The Declarations of Amit R. Mehta and Michael L. Grossbard (the latter separately filed by Monsanto) explain the basis for some of these criteria. Once a class member's tier is determined, he or she is eligible for an award within the specified tier range:

| Tier | Low | High |
|------|-----|------|
| Tier One | $10,000 | $10,000 |
| Tier Two | $10,000 | $25,000 |
| Tier Three | $25,000 | $65,000 |
| Tier Four | $65,000 | $200,000 |

The Claims Administrator also has discretion to offer an award exceeding $200,000 upon a showing by a Tier 4 claimant of exceptional circumstances, with $50 million of the fund earmarked for amounts exceeding the standard range. *Id.* § 6.2(a)(ii). The tier system uses objective factors typically used to allocate mass tort settlements. Unlike individual settlements, the class Settlement includes provisions ensuring that more of each award reaches the class member's pocket and does so more quickly – including greatly reduced transaction costs (e.g., free legal help for claimants through the Legal Services Program, and a cap on separate attorney's fees of 7.5%), reduced risk (no need to retain counsel and file a lawsuit), and quick

---

*Footnote continued from previous page*
Family Member with History of Cancer, Smoking (current smoker or former smoker with I ppd/20 year history), Hepatitis B virus, Obesity at time of diagnosis of NHL (Body Mass Index greater than 30), Diabetes, or Breast Implants in certain circumstances. Settlement, Ex. 5 at 2.

- 11 -

payment (schedule for prompt processing and payment, without the delays of the tort system).

Once a class member submits a claim package, the Claims Administrator will verify that the package contains all required information, and, if not, give the class member an opportunity to cure. *Id.* §§ 7.4, 7.5. When a claim package is complete, the class member will receive a determination of eligibility and, if eligible, the proposed amount within 90 days. *Id.* § 7.8(a). Class members can challenge the proposed amount of a Claims Program Award in mediation and then appeal to the Settlement Administrator.[5] *Id.* §§ 7.10(a). After appeal, class members remain free to reject the Claims Program Award and file a tort lawsuit for compensatory damages after the stay period ends. *Id.* §§ 7.10(a)(3), 7.13. In that event, the amount of the final compensation award the class member rejected will be treated as an offer of judgment. *Id.* § 7.13(e).

Critically, the Settlement will operate without many months or years of delay; it will begin to compensate class members immediately. Although full funding of the Settlement will occur upon the judgment's effective date, after exhaustion of any appeals, $250 million will be available to pay class member claims prior to and during appeals, beginning after preliminary approval (for Accelerated Payment Awards) and after entry of this Court's final approval order (for Claims Program Awards). *Id.* §§ 6.2(a)(i), 6.2(a)(ii)(2), 6.3(a).

## C.    Diagnostic Accessibility Grant Program

The $210 million Diagnostic Accessibility Grant Program (DAGP) will provide class members with access to NHL diagnostic services and provides sought-after medical-monitoring-type relief to Subclass 2 through the diagnostic services. *See* Settlement Art. VIII. Unlike acceptance of a compensation award, participation in the DAGP does not affect class members'

---

[5] The Court-appointed mediator, Mr. Feinberg, will also serve as Settlement Administrator, subject to the Court's approval.

rights to file a lawsuit for compensatory damages after the stay period ends.[6] The DAGP is a medical outreach and diagnostic assistance program. The DAGP will conduct outreach to Class Members, their communities, and their community medical providers; distribute grants to designated medical clinics and healthcare providers; and provide funding for telehealth services – all in order to facilitate education for and the provision of diagnostic services to Class Members who have not been diagnosed with NHL (members of Subclass 2). The DAGP will supplement the notice plan by continuing to educate Subclass 2 members on an ongoing basis after the Settlement takes effect about the potential risks associated with their exposure to Roundup products and the availability and advisability of diagnostic evaluation. And, it will provide crucial diagnostic services to promote the early discovery and diagnosis of NHL.

The first step of the DAGP is an extensive, four-year outreach campaign to inform DAGP-eligible Settlement class members of the objectives of the DAGP, including how to conduct initial self-evaluation for NHL indicators and about the availability of NHL diagnostic evaluations from medical providers who receive DAGP grants. *See* Settlement § 8.2. The DAGP Administrator will design the outreach campaign to best reach the affected populations (including through critical entities that promote health awareness in particular communities) by leveraging the communications channels that best reflect how Subclass 2 Members receive and share information regarding healthcare. *See* Messina Decl. ¶¶ 12-35 & Ex. B (detailing survey work used to identify communication channels). To this end, in addition to substantial research through surveys and on-ground interviews, the DAGP Administrator has engaged in significant

---

[6] The DAGP will be conducted by the Court-appointed DAGP Administrator, under the supervision of the Settlement Administrator. Plaintiffs propose that Wolf Garretson, LLC be appointed DAGP Administrator. Garretson has unparalleled experience in the administration of complex litigation and settlement programs, including the *Deepwater Horizon*, *NFL Concussion*, and *World Trade Center* cases. *See* Garretson DAGP Decl., Ex. A.

dialogue with organizations that provide training and technical assistance to community and migrant health centers nationwide; community-based health centers, systems and associations, including Federally Qualified Health Centers; and organizations that focus upon grassroots, localized communication regarding worker and health-related causes and initiatives. *See* Garretson DAGP Decl. ¶ 6. Engagement with these organizations will help overcome cultural or economic biases that may otherwise dissuade certain cohorts from engaging with the healthcare system (e.g., lack of resources to pay for such services, language barriers, and limited knowledge of healthcare providers or services). *See id.* ¶ 6(e).

The second part of the program – free diagnostic evaluation of class members – likewise takes an innovative approach designed to meet the specific needs of class members, particularly those in medically underserved areas. Unlike some traditional court-approved medical monitoring programs (e.g., *Deepwater Horizon*, *NFL Concussion*, and *NCAA*), the DAGP will provide grants to medical providers in geographic areas with limited healthcare resources rather than simply reimbursing individuals' healthcare screening costs. This structure serves an important purpose: it helps to increase the *capacity* and *capability* of medical providers to reach at-risk populations and provide critical diagnostic services. Consequently, rather than encouraging class members to travel to areas where diagnostic evaluation services already exist, the DAGP builds local infrastructure and capacity.

To focus its efforts on the most needy areas, the DAGP Administrator will identify service areas using occupational data provided by the Settlement Class Notice Agents, including geographic information regarding where certain class members (including farm, landscaping, and groundskeeping workers) reside or work in the greatest concentrations, and analyze disparities in access to NHL Diagnostic Evaluation within those areas. Based on that analysis, the DAGP

Administrator will identify and publish an initial list of service areas in which to focus the distribution of grants to health providers. That list may be modified based on class member registration data, to ensure the program is accomplishing its goal of increasing access to NHL Diagnostic Evaluation among Settlement Class Members, including to address regional disparities in such access. While the majority of the DAGP funding will focus on areas that are currently under-served by medical providers to address regional disparities in availability of diagnostic services, a meaningful amount of the funding will go to other areas as well. The DAGP will also utilize grant funds to increase the availability of nationwide telehealth consultations with medical practitioners for class members. Such consults will provide additional convenience and accessibility for class members to receive education regarding potential signs and symptoms of NHL, and to further facilitate their initial self-evaluation and decision-making.[7]

To identify grant recipients, the DAGP Administrator will apply a thorough selection and evaluation process based on, among other things, the provider's capabilities to arrange for or perform NHL Diagnostic Evaluation, the estimated number of DAGP-eligible class members within the provider's service area, and the extent of usage of Roundup Products in the provider's service area.[8] *See* Settlement § 8.3. The DAGP Administrator will develop transparent procedures and criteria for grant awards, with the goal of ensuring grants are distributed to well-qualified medical providers (including Federally Qualified Health Centers) and of increasing the availability of NHL diagnostic evaluation to the greatest number of class members. All guidelines will be approved by the Settlement Administrator. The DAGP Administrator will also monitor grantees' performance to ensure that the funds are being deployed appropriately and

---

[7] This telehealth consult is an option and not a prerequisite to a class member receiving in-person NHL diagnostic evaluation.

[8] The complete list of criteria is provided in the Settlement Agreement at § 8.3(a)(i)-(ix).

efficiently, and, in each budget period, re-allocate the grants in a manner that the DAGP Administrator determines will increase the availability of NHL Diagnostic Evaluation to the greatest number of class members in the service areas.

Through these grants, medical providers will be well-resourced to provide diagnostic evaluation services to Subclass 2 members – promoting the critical early discovery and treatment of NHL in those exposed to Roundup, and enabling those who are diagnosed through the program to then apply for compensation awards.

### D.     **Legal Services Program**

The Settlement provides a unique program to provide free legal advice and support to assist class members in navigating, registering, and applying for Settlement benefits. *See id.* Art. XI. The Legal Services Program (LSP) will be funded out of Class Counsel's attorneys' fees, as approved by the Court, which will be paid by Monsanto separately from the amounts allocated to the Settlement programs. Up to 40 percent of the funds earmarked for potential fee awards may be spent on providing personal counsel to the class for the initial four-year Settlement period, beginning after final approval. In addition to Class Counsel themselves, who will have ongoing responsibility and accountability to the Court to implement the Settlement for the benefit of the class and its members, the Settlement also provides for Class Counsel's selection, subject to Court approval, of outside LSP Counsel, such as lawyers with Roundup litigation and claims experience. Class members may take advantage of the LSP if they choose, but also remain free to employ counsel of their choice. The existence of the free LSP also permits the Settlement's cap on outside attorneys' fees of 7.5% of any compensation award, to ensure that as much of each award reaches class members' pockets rather than going to transaction costs. *Id.* §§ 6.2(d), 11.3(a).

### E. __Labeling Change__

Within 180 days of the entry of the final approval order, Monsanto will seek permission from the EPA to include in the labeling of all Roundup Products a reference to information regarding whether exposure to Roundup causes NHL. *See* Settlement Art. IX. The reference will consist of links to scientific evidence, including government assessments, IARC Monograph 112, and other published studies. *Id.* § 9.1. If EPA approves the labeling change, then Monsanto will implement it as soon as reasonably practicable. *Id.* §§ 9.2, 9.3. Information promotes informed choice; this change will provide ongoing information to the class and to the public regarding the issue of NHL risk, and in itself is an important public health and safety advance.

### F. __Research Funding Program__

The Settlement will also fund medical and scientific research into the diagnosis and treatment of NHL. *See* Settlement Art. X. The Settlement allocates $40 million to the Research Funding Program. Following Settlement approval, Class Counsel and counsel for Monsanto will solicit and evaluate proposals for funding related to medical or scientific research into the diagnosis and treatment of NHL from medical and scientific professionals and entities. Counsel will then submit joint or individual recommendations regarding which proposals should be approved. The Settlement Administrator will make the final decision as to allocation of funds, taking into consideration the credentials and past effectiveness of the medical and scientific professionals and entities sponsoring the proposal, as well as the potential number of class members that may benefit from the proposal.

### G. __Advisory Science Panel__

Like the June settlement proposal, this Settlement includes a Science Panel. *See id.* Art. XII, Ex. 8 (Science Panel Determination Form). But this Advisory Science Panel's determination

- 17 -

will have no preclusive effect on anyone. Instead, the Panel's determination will serve two functions. First, it will serve as a guidepost for the parties' negotiation, and the Court's consideration, of any potential extension of the Settlement's (optional) compensation program beyond the initial four years and above the initial $1.325 billion funding level. *See id.* § 13.2. Second, in any post-settlement tort cases brought by class members (those who do not exercise an initial opt out) who do not accept awards from the compensation fund, either class members or Monsanto may introduce or challenge the determination in individual cases, and either may introduce supplemental or conflicting evidence on causation. *Id.* §§ 12.3(d), Ex. 9 (Science Panel Stipulation). In addition, if new scientific evidence emerges three years or more after the Panel reaches its determination, any party may challenge the admissibility of the Panel's determination under *Daubert/Frye* on that basis. *Id.* § 12.5.

### H.   Potential Extension of the Settlement

The Settlement is designed to be able to continue into the future, offering compensation options for class members diagnosed with NHL after the initial four-year period. After that period expires, the parties will negotiate whether to extend the compensatory portion of the Settlement into future years (with additional funding), taking into account the success of the Settlement and the state of the science on Roundup exposure, including the Advisory Science Panel Determination. *See id.* Art. XIII. Any negotiated extension would subject to the Court's approval, would retain the essential feature of the Settlement that class members always have the option to reject compensation awards and instead pursue tort lawsuits, and would not necessarily extend the litigation stay on the filing of those lawsuits. If no agreement is reached, and Monsanto rejects certain default terms, then Monsanto will pay $200 million as an "End Payment" to be allocated among the compensation fund and research programs. *Id.* § 13.3(b)(i).

- 18 -

I.      **Limited Release (Except for Those Who Accept Compensation Awards)**

Unlike the usual class settlement, this one offers a significant additional protection for class members. Typically, the finality of a class settlement releases all claims by class members, including compensatory damages, whether or not class members actually make a claim by the claim deadline. Not so here: the class members who give a full release are *only* those who affirmatively apply for, receive, and accept compensation awards. *See* Settlement, Ex. 6 (Form of Release). Class members cannot lose their right to sue for compensation in the tort system absent an independent affirmative choice to accept a compensation award – the compensation fund is completely optional. And no one needs to exercise that choice, to decide whether to take the compensation fund offer (or file a claim in the program at all) until that individual class member is diagnosed with NHL. Any class members who do not file a claim and accept individual compensation retain their right to sue Monsanto for compensatory damages on any legal theory, including personal injury, fraud, misrepresentation, negligence, fraudulent concealment, negligent misrepresentation, breach of warranty, false advertising, and violation of any consumer protection or unfair and deceptive acts or practices statute.

Instead, the class-wide release that applies to all class members who do not opt out is narrow. *See* Settlement Art. XVII. *First*, the Settlement provides for a stay period while the Settlement programs operate. During that time, class members may not file new litigation related to Roundup. The statutes of limitations for class members' claims related to Roundup exposure and NHL will be tolled during the stay period to preserve class members' claims. Following the four-year initial settlement period, the litigation stay will terminate and class members who have not accepted compensatory awards will be free to sue in the tort system. *Second*, class members release any claims against Monsanto for punitive damages and for medical monitoring.

- 19 -

J.    **Notice Plan**

A central feature of the Settlement is a notice plan of unprecedented breadth, including a focus on reaching and informing individuals who may be itinerant, lack exposure to traditional media, or do not speak English as a first language. At great time and expense, Class Counsel, working with the Settlement Class Notice Agents, addressed these challenges.[9]

The chart below summarizes the notice plan:

| CLASS NOTICE OVERVIEW |
|---|
| **Roundup Settlement Class Members** |
| Settlement Class Members are very diverse and geographically widespread. Roundup is used in residential garden and lawn care, large properties such as golf courses, schools, universities and parks, and within the entire agricultural industry. The ubiquity of Roundup requires a comprehensive notice program in the U.S., U.S. territories and possessions, and Mexico. Additionally, those most likely to develop Non-Hodgkin's Lymphoma are those who are subject to repeated exposures through their work. The heavily exposed population will require additional notice through targeted media and community outreach. |
| **Geographic Concentration of Professionally At-Risk Population** |
| A number of different sources were reviewed in order to determine geographic concentration of Settlement Class Members who have the greatest likelihood of exposure to Roundup Products:<br><br>• Pre-Notice Research: In-depth phone survey of 50 agricultural workers and online opinion survey of 656 agricultural workers and landscapers.<br>• The Bureau of Labor Statistics (BLS) county level data on the number of workers employed as: landscaping/groundskeeping workers; farmworkers/laborers (crop, nursery, greenhouse); vegetation pesticide handlers, sprayers, and applicators, ground maintenance workers; and other agriculture workers (inspectors, graders and sorters, and equipment operators).<br>• The United States Department of Agriculture (USDA) county level data on farm labor, migrant workers, farms using pesticides for weed control, and farms that harvested cropland.<br><br>An estimated "At-Risk Population" was created using the BLS and USDA data. Additionally, information from the BLS and the National Agricultural Workers Survey was used to estimate the percent of the At-Risk Population likely to be Hispanic/Latino. These estimations were used to tier local media in counties with the heaviest concentration of Settlement Class Members who may have had the greatest exposure to Roundup Products. |
| **U.S. Direct Notice/Third Party Notice (mail/email)** |
| Mail/Email Notice to approximately 266,000 potential Settlement Class Members and organizations. Includes:<br><br>• Farms in counties w/1,000+ farmworkers,<br>• Businesses/Organizations (e.g., greenhouses, herbicide consultants, weed control, vineyards, farm labor/ management/organizations/services, landscape, grounds maintenance, sports fields, cemeteries, garden centers, golf courses, schools/universities),<br>• Diplomatic establishments, and<br>• Government entities (building directors, weed supervisors, public works directors).<br><br>Mail notice to a list of approximately 41,000 individuals with NHL who have opted in to receive information related to |

---

[9] The proposed Settlement Class Notice Agents are Kinsella Media and Signal Interactive Media.

| CLASS NOTICE OVERVIEW |
|---|

their disease.

Mail posters to approximately 2,700 stores (farming /lawn and garden supplies) asking them to post notice. Send letter to large retailers (e.g., Lowes, Home Depot) asking if they would like to receive posters so they can post notice. Stores can contact the settlement administrator for additional posters.

| U.S. Media (TV/radio/print/online) | | |
|---|---|---|
| • TV: Broadcast (English)<br>• Radio (English/Spanish) | • 6 Consumer Magazines (5 English/1 Spanish) | • 10 newspapers from U.S. territories<br>• Online: Google / Facebook / Conversant/ Verizon Media |

| U.S. State Media Targeting At-Risk Population (radio/print/online) | | |
|---|---|---|
| • Radio: Agricultural (covering 20 states) | • 22 Spanish-language newspapers<br>• 4 Landscaping Magazines | • 21 State Agricultural Magazines<br>• Digital: Ag Network |

| U.S. Local Media Targeting At-Risk Population (TV/radio/outdoor) |
|---|

**Media Markets with 50% or more Hispanic/Latino At-Risk Population = Spanish TV/radio**

**Media Markets with 50% or more Non-Hispanic/Latino At-Risk Population = English radio**

**Zip Codes with 1,000+ At-Risk Population = English/Spanish gas station TV, supermarkets & bus shelter ads**

**Indigenous Populations** (CA, AZ): Radio (Mixteco, Zapotec, Triqui)

| U.S. Digital Targeting At-Risk Populations |
|---|

The targeted digital campaign is designed to run for a period of six months, concurrent with due process notice efforts and on-ground outreach. Ads will be focused in areas with the heaviest concentration of At-Risk Population. A variety of ads in different formats and languages (English, Spanish, Mixteco, Zapotec, and Triqui) will be served across a range of platforms. Media targeted to migrant farmworkers will be heavily focused on mobile.

| **Farmworkers** | **Landscapers/Groundskeepers** | **NHL Diagnoses** |
|---|---|---|
| • Targeting 919 counties in 38 states.<br>• English, Spanish, and Indigenous (Mixteco, Zapotec, Triqui) | • Targeting 668 counties in 50 states + DC.<br>• English and Spanish | • National level targeting.<br>• Desktop/Tablet/ Mobile<br>• CDC modeled NHL data<br>• English and Spanish |

**Examples of platforms**: Facebook/Instagram, YouTube, Google, Weather apps, etc.

| International Military/Diplomatic Media | |
|---|---|
| • 3 editions of *Stars & Stripes* | • Digital: Military Audience Network, LinkedIn, military.com, TheDiplomat.com |

- 21 -

| On-Ground Outreach |
|---|
| Work with organizations that have contact with the At-Risk Population to communicate information about the Settlement and build trust. Organizations include:<br><br>• National, State, and Local Organizations (such as non-profits, labor unions, legal defense funds, community health centers, and churches),<br>• Government Officials including state and local U.S. elected officials and the Mexican Consulate,<br>• Businesses (e.g., community centers, gas stations, convenience stores, restaurants, and laundromats),<br>• Events such as county fairs and sporting events, and<br>• Schools, through organizations like the National Association of State Directors of Migrant Education (NASDM) and the National Migrant Seasonal Head Start Association (NMSHSA)<br><br>Contact national organizations as avenues to disseminate information in Mexico, including Instituto Mexicano del Seguro Social (IMSS) and the Instituto de Seguridad y Servicios Sociales de los Trabajadores del Estado (ISSSTE), Mexico's public social security and services organization. |

| Earned Media | | |
|---|---|---|
| • U.S. Bilingual Multimedia News Release<br>• Outreach to international military bases and military public affairs officers | • U.S. Bilingual Satellite Media Tour | • U.S. Bilingual Pitch Team<br>• Mexico Press Release |

| Mexico | |
|---|---|
| **TV/Radio (National/Local)** | **Digital** |
| • Markets in states with the highest number of migrants to the U.S.<br>• 3-4 weeks<br>• Spanish with some indigenous language radio in select states (Mixteco, Zapotec, Triqui) | • Coverage in metropolitan border areas over 25 weeks<br>• Coverage in states with the highest number of migrants to the U.S.<br>• Spanish, with some indigenous language in select states (Mixteco, Zapotec, Triqui) |

The full comprehensive and state-of-the-art notice plan, including the methodology and research deployed to develop and update it, are detailed in the Declarations of Shannon Wheatman and James Messina.

### K.   Attorneys' Fees, Expenses, and Incentive Awards

As a part of the proposed approximately $2 billion class settlement, Monsanto has agreed to pay attorneys' fees and costs up to $170 million, an amount that will also cover the Legal Services Program, as well as service awards of $25,000 for each of the six class representatives. Settlement Art. XXV. A different fee amount, $150 million, was initially negotiated only after the parties had agreed to all material terms and conditions of the $1.1 billion June settlement, and

- 22 -

had received authorization from the Court-appointed mediator to separately negotiate fees. Cabraser Decl. ¶ 11. The new amount was not settled upon until after the parties had agreed to all material terms and conditions of the new Settlement, increased funding for compensation and the DAGP, and including a novel Legal Services Program established under the supervision of Class Counsel. *Id*. The new amount also reflects that the Legal Services Program will be funded from the fee award. As the law and this court's rules on class counsel fees under Rule 23(h) provide, the application for fees, costs, and service awards will be made well in advance of the objection/opt-out date, on a date to be set by the Court, with information provided to the Class in the long-form class notice and posted on the Settlement Website. Should the Court award fees in an amount lower than $170 million, the remainder would be added to the Settlement Fund for the benefit of the class. Settlement § 3.6(a)(ix).

## **ARGUMENT**

Fed. R. Civ. P. 23(a) and (b) govern the certification of a class and Rule 23(e) governs a district court's analysis of the fairness of a proposed class action settlement. Under the settlement structure of Rule 23(e), a court must first determine whether to preliminarily approve the settlement. Preliminary approval requires the Court to determine that it is likely to (i) certify the settlement class after the final approval hearing and (ii) approve the proposed settlement as fair, reasonable, and adequate, after considering the factors outlined in Rule 23(e)(2). *See* Fed. R. Civ. P. 23(e)(1)(B). Second, if it grants preliminary approval, the Court must direct notice to the proposed settlement class, describing the terms of the proposed settlement and the definition of the proposed class, to give class members an opportunity to object to or to opt out of the proposed settlement. *See* Fed. R. Civ. P. 23(c)(2)(B); Fed. R. Civ. P. 23(e)(1), Fed. R. Civ. P. 23(e)(5). Third, following the notice and opt-out period and after a hearing, the court may grant final approval of the proposed settlement on a finding that the settlement is fair, reasonable, and

- 23 -

adequate, and certify the settlement class. Fed. R. Civ. P. 23(e)(2). In this District, a movant's submission should also include the information called for under the District's Procedural Guidance for Class Action Settlements.

## I.      The Court will likely certify the class and subclasses at final approval.

A class must satisfy the four requirements of Fed. R. Civ. P. 23(a), and one of the three prerequisites of Fed. R. Civ. P. 23(b). Each "subclass must independently meet the requirements of Rule 23." *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).

### A.      The class and subclasses meet the requirements of Rule 23(a).

#### 1.      The class and subclasses are sufficiently numerous.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although no strict numerical test defines numerosity, courts in this Circuit find the requirement typically met with at least 40 class members. *See*, *e.g.*, *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007). "A specific minimum number is not necessary, and [a] plaintiff need not state the exact number of potential class members." *Richie v. Blue Shield of Cal*., No. 13-2693, 2014 WL 6982943, at *15 (N.D. Cal. Dec. 9, 2014). The class here includes all persons exposed to Roundup who have not yet filed litigation or retained counsel to do so, and is divided into subclasses of those who have been diagnosed with NHL and those who have not. The number in each subclass far exceeds 40. *See* Settlement, Ex. 7 (identifying large numbers of potential class members). Rule 23(a)(1) tests impracticably of individual joinder. The proposed settlement class and each of its subclasses easily meet this test. "Joinder of 1,000 or more co-plaintiffs is clearly impractical." *Palmer v. Stassinos*, 233 F.R.D. 546, 549 (N.D. Cal. 2006).

- 24 -

### 2. Roundup claims raise a cluster of common questions with resolution-driving common answers.

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires only one common question such that "a classwide proceeding [can] generate common *answers* apt to drive the resolution of the litigation." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011)). A common question need not be one that "will be answered on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013). It only "must be of such a nature that it is *capable* of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350 (emphasis added). Commonality looks to "the existence of shared legal issues" or "a common core of salient facts." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Either suffices, even in the presence of "divergent factual predicates" and "disparate legal remedies within the class." *Id*. As *Wal-Mart* established, the commonalty analysis "does not turn on the number of common questions, but on their relevance to the factual and legal issues at the core" of the class claims. *Jimenez v. Allstate Ins. Co.*, 765 F.3d. 1161, 1165 (9th Cir. 2014).

In this case, Rule 23(a)(2) is easily satisfied by the common questions concerning Monsanto's conduct in designing, manufacturing, and selling Roundup, and the scientific questions of whether Roundup can cause NHL in humans. *In re Diet Drugs Prods. Liab. Litig.*, No. 1203, 2000 WL 1222042, at *41 (E.D. Pa. Aug. 28, 2000) (finding common questions where the "drugs at issue … are essentially a single product … marketed by a single major manufacturer," allegedly producing "a common injury type …, albeit to varying degrees," and "there is a common body of science establishing a causal connection between the diet drugs and

heart valve injuries"); *NFL*, 821 F.3d at 427 (finding commonality "because the NFL parties allegedly injured retired players through the same course of conduct"). Most obviously, the general causation question is common to the class and critical to every member's claim. *See In re Roundup Prods. Liab. Litig.*, 214 F. Supp. 3d 1346, 1347-48 (J.P.M.L. 2016) (identifying general causation as "an overarching query" common to "all actions"); *see also In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 134 (E.D. La. 2013) ("In this case, there are numerous common questions of both law and fact, and it is for this reason that this action was centralized in this District by the Judicial Panel on Multidistrict Litigation.").

### 3.     The proposed class representatives' claims are typical.

Rule 23(a)(3)'s typicality standard is met when the class representative's claims rest on the same legal or remedial theory as those of absent class members. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). The claims of named plaintiffs and class members need not be identical, and can have "different factual circumstances." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). Plaintiffs' claims are typical of those held by the other members of the class in that each of them was exposed to Roundup, and none has commenced an individual personal injury lawsuit against Defendant or retained counsel to do so. The claims on which Plaintiffs seek certification arise from the same course of conduct and are based on the same legal theories. Additionally, the claims of each subclass representative are typical of the subclass: Plaintiff Ramirez's claims are typical of those held by other members of Subclass 1, in that he has been exposed to Roundup and has been diagnosed with NHL and will seek compensatory damages for his injuries. The claims of Plaintiffs Agtarap, Owens, Elko, Sheller, and Cain are typical of those held by other members of Subclass 2, in that they have been exposed to Roundup but have not been diagnosed with NHL and thus seek programmatic relief to address their alleged increased risk of developing NHL, including medical evaluation

and establishment of a compensation program available if they do become sick. *Id.* ¶¶ 11-15.

        **4.**        <u>The proposed class representatives and Class Counsel have and will</u>
<u>adequately represent the class and subclasses.</u>

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This requirement is rooted in due-process concerns – absent class members must be afforded adequate representation before entry of a judgment which binds them." *Radcliffe v. Experian Info. Sols., Inc*., 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks omitted). Adequacy is satisfied when (1) the named plaintiff and counsel have no conflicts with the class; and (2) plaintiff will "prosecute the action vigorously." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (2003). Plaintiffs have no interests in this action that are adverse or antagonistic to the interests of the class. Each of the proposed class representatives is a member of the class and each shares the same overriding interests as absent class members.

This class includes two subclasses: one for those already diagnosed with NHL, and one for those not. In employing these subclasses, the amended complaint and the Settlement class follows the Supreme Court's guidance in *Amchem Prods., Inc. v. Windsor*, that subclasses for already-diagnosed and "exposure-only" class members respectively are generally advisable as a procedural safeguard. 521 U.S. 591, 626 (1997).

In addition to employing the Supreme Court's specific suggested safeguard, the Settlement addresses the underlying concern in a more fundamental way. The *Amchem* Court's concern was that the settlement there set mandatory compensation amounts that applied in perpetuity, with no opportunity for class members to reject the offered amounts. *Id.* It also swept "diverse medical conditions" into "a single giant class." *Id.* The Court said that subclasses were needed because that settlement could create a conflict between "the currently injured, [whose] critical goal is generous immediate payments" and "the interest of exposure-only plaintiffs in

ensuring an ample, inflation-protected fund for the future." *Id.*

Here, by contrast, the compensation program is not mandatory: all class members can decide, for themselves, if the amount offered is adequate and, if not, sue in the tort system after the stay ends. The compensation levels are set for four years, not forever, with any extension subject to re-negotiation, and court review. And this case does not concern a set of "diverse medical conditions," but only one: NHL. Nevertheless, out of an abundance of caution, this Settlement followed *Amchem*'s suggestion and included subclasses, each represented throughout the negotiation process for this Settlement by separate representatives and counsel. *See NFL*, 821 F.3d at 429 (rejecting challenge to adequacy where "subclass counsel … were by all account active participants in the settlement negotiations").

The second adequacy factor is also met here. Plaintiffs have retained trial counsel highly experienced in complex litigation, including complex class action litigation, trial, and settlements involving toxic exposures, and Plaintiffs already have and will continue to vigorously prosecute this litigation. *See* Sections I.E, II.A, *infra*.

**B.      The class and subclasses meet the predominance requirement of Rule 23(b)(3).**

Fed. R. Civ. P. 23(b)(3) provides for class certification if "the court finds that questions of law or fact common to class members predominate over any questions affecting only individual members." The "predominance inquiry asks whether common, aggregation-enabling issues in the case are more prevalent or important that the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation omitted). Predominance "is not, however, a matter of nose-counting." *In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (en banc) (citation omitted). Rather, "more important questions apt to drive the resolution of the litigation are given more weight in

- 28 -

the predominance analysis over individualized questions which are of considerably less significant to the claims of the class." *Id.* (citation omitted). Predominance can be found when one or more "common questions present a significant aspect of the case" and "can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022. Thus, "when one or more of the central issues in the action are common to the class . . . , the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 136 S. Ct. at 1045.

Importantly, where, as here, class certification is sought for settlement purposes only, these requirements can be satisfied even if they would defeat certification for litigation purposes. As the Ninth Circuit has held, "predominance is easier to satisfy in the settlement context." *Jabbari v. Farmer*, 965 F.3d 1001, 1006 (9th Cir. 2020); *see also Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 304 n. 29 (3d Cir. 2011) (en banc) (courts are "more inclined to find the predominance test met in the settlement context") (internal quotation marks and alteration omitted). That is because "[s]ettlement may 'obviate the need to litigate individual issues that would make a trial unmanageable,' making common questions more important in the relative analysis." *Jabbari*, 965 F.3d at 1005-06 (quoting *Hyundai*, 926 F.3d at 558). Accordingly, many of the factors the Rule requires for certification in the litigation context are inapplicable in the settlement one, including "the difficulties likely to be encountered in the management of a class action." *See Amchem*, 521 U.S. at 620 (manageability considerations inapplicable in the settlement class context because "the proposal is that there be no trial"); *Flores v. Dart Container Corp.*, No. 19-83, 2021 WL 107239, at *7 (E.D. Cal. Jan. 12, 2021) (concerns about concentration of litigation in the particular forum "inapplicable" to settlement classes).

- 29 -

Here, a central issue, as called out by the Judicial Panel in its Transfer Order for this MDL in this litigation, is general causation: whether exposure to Roundup can cause NHL. As the Court will no doubt recall, it was a central dispute in the individual trials conducted to date. And it is common to all class members: there is a single disease, a single product, and a single common question of causality at the center of all cases before this court, at the center of the ongoing Roundup controversy, and at the center of the *Ramirez* class complaint. There are other key common issues, similarly featured in the litigation, including Monsanto's conduct, knowledge, and representations. The *Hardeman* trial itself illustrates the centrality of these common issues compared to any individual ones. The issues of general causation and whether Monsanto's conduct was wrongful were the centerpiece of that trial, comprising the substantial majority of court time. That satisfies the predominance requirement. *See Hyundai*, 926 F.3d at 563 (predominance met where "the class claims turn on the [defendants'] common course of conduct," "notwithstanding variations in state law) (citation omitted); *Diet Drugs*, 2000 WL 1222042, at *42 (finding predominance met because "plaintiffs' claims in this litigation all stem from allegations involving a common course of conduct followed by [the defendant]"); *NFL*, 821 F.3d at 434 (finding predominance met where the claims "presented predominate factual questions regarding the NFL's knowledge and conduct as well as common scientific questions regarding causation").

At the same time, because certification here is for settlement purposes only, many of the concerns and individual issues that Monsanto would cite in opposing class certification for litigation purposes are not pertinent. These include, among other things, individual causation, injury, and damage; variations in state law; individual reliance; and manageability concerns raised by the size of the class. *See*, *e.g.*, *Diet Drugs*, 2000 WL 1222042, at *43 (certifying a class

where "individual issues relating to causation, injury and damage …. disappear because the settlement's objective criteria provide for an objective scheme of compensation."); *Jabbari*, 965 F.3d at 1007 ("For purposes of a settlement class, differences in state law do not necessarily, or even often, make a class unmanageable."); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004) ("[W]hen dealing with variations in state laws, the same concerns with regard to case manageability that arise with litigation classes are not present with settlement classes … those variations are irrelevant to certification of a settlement class."); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 241 (2d Cir. 2012) ("With a settlement class, the manageability concerns posed by numerous individual questions," in that case reliance, "disappear.").

For this reason, courts have regularly held that the predominance requirement is met for settlement purposes in mass-tort cases even where it is questionable the case could be litigated on a class basis. For example, in both *Diet Drugs* and *NFL*, the courts determined that common issues of general causation and the defendants' knowledge and conduct sufficed for settlement purposes even where substantial individual issues existed (in particular, questions in each case about the actuality and extent of individual injuries). *See Diet Drugs*, 2000 WL 1222042, at *43; *NFL*, 821 F.3d at 434. There are many other examples. *See*, *e.g.*, *Jabbari*, 965 F.3d at 1005-06; William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2018) ("Courts . . . regularly certify settlement classes that might not have been certifiable for trial purposes because of manageability concerns."). The same conclusion is warranted here.

The structure of the Settlement also supports a finding of predominance. Issues of individual compensation are left to individual decisions, including individual litigation if a class member does not wish to accept the amount offered. The Settlement resolves on a class-wide basis only issues that have essential common elements. Punitive damages focus on the

defendant's conduct and the society-wide interest in punishment and deterrence, not the particulars of any individual class member's case. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 566-67 (1996).[10] And medical monitoring is programmatic relief that generally can be sought through Rule 23(b)(2) certification, with no predominance requirement at all. *See, e.g.*, *Prantil v. Arkema*, No. 19-20723, 2021 WL 222722, at *7 (5th Cir. Jan. 22, 2021) (explaining that "Rule 23(b)(2) requires common behavior by the defendant toward the class" and that medical monitoring can be an appropriate subject of b(2) certification so long as the injunction is specific as to "the range or types of medical monitoring") (citation and alteration omitted); *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 332 F.R.D. 202, 216 (N.D. Ill. 2019), *aff'd*, No. 19-2638, 2019 WL 8058082 (7th Cir. Oct. 25, 2019) (certifying medical monitoring b(2) class for settlement, and explaining that "23(b)(2) is the appropriate rule to enlist when the plaintiffs' primary goal is not monetary relief, but rather to require the defendant to do or not do something that would benefit the whole class").

Moreover, in prior mass-harm class action settlements, courts have found predominance satisfied even if full litigation would have required some form of separate proceedings for individual damages claims; indeed, litigation classes satisfy predominance based on commonality of important liability questions, rather than uniform proof of damages. *See, e.g.*, *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) ("[D]amages calculations alone cannot defeat certification.") (citation omitted); *Deepwater Horizon*, 739 F.3d at 815-16 ("[I]t is indeed possible to satisfy the predominance … requirements of Rule 23(b)(3) in a mass tort or mass accident class action despite the particular need in such cases for individualized damages

---

[10] *See also Buchanan v. Tata Consultancy Servs., Ltd.*, No. 15-1696, 2017 WL 6611653, at *19 (N.D. Cal. Dec. 27, 2017) (identifying "availability of punitive damages" as a common question).

calculations.") (internal quotations omitted).

As Judge Higginbotham wrote for the Fifth Circuit this year,

Since its early days, Rule 23 with its b(2) and b(3) classes has played an increasingly important role in addressing the challenges of aggregating large numbers of persons seeking recompense for a single event or for injuries suffered from a common set of facts – product failures, myriad disasters at the hand of man and nature. With all of its difficulties in application, the class action has proven to be a powerful workhorse to the benefit of plaintiffs and defendants so as now to be essential.

*Prantil*, 2021 WL 222722, at *2.

C.    **Class certification for settlement purposes satisfies the superiority requirement.**

Rule 23(b)(3) also requires "that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Here, class certification of a Settlement that provides the choice of a less adversarial, swifter, less expensive, and more certain opportunity for compensation is superior to leaving ongoing individual litigation or piecemeal or serial settlements as the only options open for these plaintiffs.

The superiority inquiry "requires the court to determine whether maintenance of this litigation as a class action is efficient and whether it is fair." *Wolin*, 617 F.3d. at 1175-76. Like the predominance requirement, this inquiry is easier to satisfy in the settlement context. *See, e.g.*, *In re Volkswagen and Audi Warranty Extension Litig.*, 273 F.R.D. 349, 354 (D. Mass. 2011) ("[i]n view of the fact that this court need not deal with intractable management problems presented by trial, the large size of the Class, the complexity of the litigation, the cost of the litigation, and similar issues, the superiority requirement is satisfied."). Translating this inquiry into the settlement-purposes context, the question is whether maintenance of the proposed settlement class to effectuate the class settlement's diagnostic, compensation, research, and labelling reform features is both fair and more efficient from the standpoints of vindicating the class members', the court system's, and the public's legitimate interests, than other methods

available to the Court. *See Amgen*, 568 U.S. at 460 ("[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'") (quoting Fed. R. Civ. P. 23(b)(3)).

Here, the class settlement is clearly superior for members of this class to individual litigation alone. The class consists entirely of people who have been exposed to Roundup, but have not yet brought suit or retained counsel to do so. For them, the alternative of individual litigation would mean first now placing their names at the end of the current queue of cases and *hoping* that, one day, they either get a trial date or the litigation proceeds to a point where Monsanto will agree to another round of inventory settlements that includes their cases – and also *hoping* that nothing goes wrong before that day arrives, such as Monsanto prevailing on its preemption argument or other appellate issues, such as Covid-related delays and likely resulting backlog preventing or greatly delaying the scheduling of future trials, such as different outcomes of future trials when they finally do take place, or such as Monsanto concluding that the absence of a path towards reasonable closure to the litigation means it should take a different route.

Moreover, the majority of class members – Subclass 2 – are people who have been exposed to Roundup, are potentially at greater risk of developing NHL, but have not developed it yet. The potentially theoretical prospect of individual litigation years from now (at which time they would be at the end of an even longer line) does little for them. Their immediate interest is programmatic relief now: diagnostic assistance to increase their access to early detection, research to advance treatment options, and establishment of a compensation program to be in place as an option if they do become sick. That relief is realistically available only through a class resolution. *See, e.g.*, *Diet Drugs*, 2000 WL 1222042, at *56 ("[T]he small monetary amount involved with a medical monitoring claim makes an individual claim for monitoring prohibitive

in the absence of class treatment."); *In re Inter-Op Hip Prosthesis Liability Litigation*, 204 F.R.D. 330, 438 (N.D. Ohio 2001) (same). And to repeat, the class action resolution here preserves their right to pursue individual litigation down the road if that is what they prefer.

Accordingly, the proposed settlement fulfills the superiority test under the four factors identified by the Rule.

1.      "[T]he class members' interests in individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). The settlement here achieves substantial programmatic relief, including a compensation fund available as an option for class members. This is not something realistically achievable through separate, individual resolutions. But the settlement also preserves class members' interests in "individually controlling" their potential "separate actions": each class member can individually decide, after he or she is diagnosed with NHL, whether to seek to participate in the compensation fund, whether to take the amount offered, or whether instead to pursue an individual lawsuit against Monsanto.

2.      "[T]he extent and nature of any litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3)(B). The class consists exclusively of people who have not commenced litigation. It thus does not interfere with any individual litigation "already begun" by any person who has chosen that route.

3.      "[T]he desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). This Court is already a focal point of the litigation and is well-situated to adjudge and oversee the programmatic relief of the class settlement. And because the settlement preserves all class members' rights to pursue individual litigation in any appropriate court, questions of the desirability of concentrating that litigation do not arise.

- 35 -

4.      "[T]he likely difficulties in the managing a class action." Fed. R. Civ. P.

23(b)(3)(D). The Supreme Court has expressly held that this factor is not applicable where

certification is for settlement purposes only. *See Amchem*, 521 U.S. at 620.

Perhaps most critically, the Settlement addresses litigation risk to class members going

forward. The Settlement was negotiated against a backdrop of considerable legal uncertainty.

Pending before the Ninth Circuit is an appeal of this Court's ruling on preemption, which if

reversed would substantially affect future recovery prospects. Already one district court has

largely sided with Monsanto on issues of preemption. *See Carson v. Monsanto Co.*, No. 17-237,

2020 WL 7497385 (S.D. Ga., Dec. 21, 2020). The Settlement preserves a program of known and

predictable benefits for all class members, regardless of future legal developments. The provision

of benefits and options the settlement class offers is "superior" to the consignment of its

members to individual litigation or nothing at all.

### D.      Alternatively, certification under Rule 23(b)(2) is also appropriate.

In addition to individual compensation, the Settlement provides programmatic benefits to

the class. While not necessary for the Settlement or class certification to proceed, the Court may

also appropriately certify the settlement class under Rule 23(b)(2), as to the diagnostic

assistance, research, and labeling reform components of the Settlement, and the resolution of the

medical monitoring claim asserted on a class basis in the *Ramirez* Second Amended Complaint.

Although the Court is not required to grant notice or opt-out rights for a (b)(2) class, it has the

discretion to do so, and the Settlement provides full notice and opt-out rights here. *See Crawford

v. Honig*, 37 F.3d 485, 487 n.2 (9th Cir. 1994).

Rule 23(b)(2) authorizes class certification where "the party opposing the class has acted

or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole." Certification of

claims for equitable relief is appropriate under Rule 23(b)(2) unless "the primary relief sought is monetary," *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001), or the claims require "individualized relief," *Wal-Mart*, 564 U.S. at 360 (emphasis omitted); *see also id.* ("The key to the b(2) class is the indivisible nature of the injunctive or declaratory remedy warranted") (internal quotation marks omitted). Courts recognize that medical monitoring and other programmatic, injunctive relief can be properly certified under Rule 23(b)(2) because they involve common action by the defendant toward the class. *See Prantil*, 2021 WL 222722, at *7; *NCAA*, 332 F.R.D. at 216-17.

### E.  The Court should appoint proposed Class Counsel and Subclass Counsel as Interim Settlement Class Counsel under Rule 23(g)(3).

Although the Court will not appoint class counsel until the Class is certified at final approval, the Court has the authority "to designate interim counsel to act on behalf of a putative class." Fed. R. Civ. P. 23(g)(3). In determining whether to appoint counsel, the Court must examine:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the type of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).

As explained above and in the Cabraser Declaration, proposed counsel dedicated extensive time and resources to investigating, designing, and negotiating the Settlement and will continue to do so during the four-year stay period. Counsel are also among the most experienced in class and mass tort litigation and resolution. Interim appointment is appropriate. The Court should appoint Robert L. Lieff, Elizabeth J. Cabraser (lead), and Steven E. Fineman of Lieff Cabraser Heimann & Bernstein, LLP; Samuel Issacharoff; James R. Dugan, II (co-lead) of the

Dugan Law Firm, APLC; William M. Audet (co-lead) of Audet & Partners, LLP; TerriAnne

Benedetto of the Dugan Law Firm, APLC; and Elizabeth Fegan of FeganScott LLC Class

Counsel; William Audet Subclass 1 Counsel; and Elizabeth Fegan and TerriAnne Benedetto

Subclass 2 Counsel. *See* Cabraser Decl. ¶ 27 & Ex. B (describing qualifications).

## II.   The Court will likely find the Settlement fair, reasonable, and adequate.

Under the recent amendments to Rule 23(e)(2), a court may approve a settlement as "fair,

reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately
> represented the class; (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account: (i) the
> costs, risks, and delay of trial and appeal; (ii) the effectiveness of any
> proposed method of distributing relief to the class, including the method of
> processing class-member claims; (iii) the terms of any proposed award of
> attorney's fees, including timing of payment; and (iv) any agreement
> required to be identified under Rule 23(e)(3); and (D) the proposal treats
> class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Those factors are satisfied here.

## A.   Rule 23(e)(2)(A): Counsel and the class representatives have and will continue to zealously represent the class.

Under the first Rule 23(e)(2) factor, courts consider whether the class representatives and

class counsel will represent the class adequately. Fed. R. Civ. P. 23(e)(2). Courts analyze this

factor in the same manner that they evaluate adequacy under Rule 23(a)(4). *See O'Connor v.*

*Uber Techs., Inc.*, No. 13-03826, 2019 WL 1437101, at \*6 (N.D. Cal. Mar. 29, 2019); *In re*

*Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-1720, 2019 WL 359981,

at \*15 (E.D.N.Y. Jan. 28, 2019). Adequacy is satisfied when (1) the named plaintiff and counsel

have no conflicts with the class; and (2) plaintiff will "prosecute the action vigorously." *Staton*,

327 F.3d at 957. As discussed above in Section I.A., there are no conflicts here.

Class Counsel and the class representatives have already proven they will represent the

- 38 -

class well. In addition to negotiating the Settlement itself, Class Counsel have worked closely

with the DAGP and Claims Administrators, as well as the Class Notice Agents, over many

months to design the Settlement programs.

The first step was to understand where class members – persons exposed to Roundup –

live and work. With the Claims Administrator, Class Counsel used demographic and

occupational data, sourced from various government agencies, to derive reliable estimates of

both the population of workers in agricultural and groundskeeping occupations and the

distribution of that population throughout the United States. The Claims Administrator refined

these estimates using data on per capita spending on gardening and landscaping products, as well

as data acquired from Monsanto regarding retail sales of Roundup. The result included visuals –

"heat maps" – and tabulations of occupational and residential populations, aggregated at the ZIP

Code, County, CBSA, and State levels. The data were further refined using extracts from the

USDA's Agricultural Census, which identified the specific geographic regions where Roundup is

most commonly used, and the National Agricultural Worker's Survey, which yielded

information on the countries of origin of migrant farm labor entering the United States each year.

Class Counsel also worked to understand where class members diagnosed or likely to be

diagnosed with NHL are concentrated using datasets from the National Cancer Institute.

Having found where class members live and work, the next step was to talk to them.

Class Counsel commissioned Class Notice Agent Signal IM to conduct in-depth, long-form

interviews of migrant agricultural workers, non-migrant agricultural workers, and landscapers.

Signal also conducted a nationwide survey of individuals likely to fit the class definition who

worked in the key industries most affected by professional Roundup exposure: landscaping and

groundskeeping, agriculture, and farm, ranch, or aquaculture animal operations.

- 39 -

These efforts yielded crucial insights on how to design the class notice, which notice channels to use, and which third-party organizations to target for the DAGP outreach effort. This work will enable the notice plan to reach class members and give them a meaningful opportunity to decide whether to participate in the Settlement. Further details are provided in the Declaration of James Messina.

Class Counsel also became well-versed in the science necessary both to design the DAGP and frame the Advisory Science Panel inquiry. Class Counsel, working with their own experts, studied the expert reports and testimony used in individual litigation Class Counsel, working with the DAGP Administrator, reviewed literature on the diagnostic criteria for NHL in order to understand the clinical capability and capacity requirements necessary for DAGP grant recipients. And Class Counsel retained and worked with consulting experts on questions of epidemiology and toxicology to understand how to frame the questions posed to the Advisory Science Panel.

**B.        Rule 23(e)(2)(B): The Settlement is the product of more than 18 months of adversarial negotiation under the supervision of the Court-appointed mediator.**

Rule 23 instructs the Court to consider whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). This Settlement was. In July 2019, under the supervision of Court-appointed mediator Kenneth R. Feinberg, settlement discussions began in earnest in the *Ramirez* case. Cabraser Decl. ¶ 6. Those discussions continued between proposed Class and Subclass Counsel and Monsanto for nearly a full year, in person during the fall and winter of 2019-2020, and then remotely once the COVID-19 pandemic began. *Id*. Beginning in January 2020, meetings occurred on a virtually daily basis, nights and weekends not excepted. *Id.* Negotiations culminated in the settlement presented to the Court on June 24, 2020. MDL Doc.

- 40 -

11042. On July 6, the Court issued an order tentatively declining to grant preliminary approval,

and anticipating that the parties would "move to Plan B." MDL Doc. 11182. The parties elected

to withdraw the settlement. MDL Doc. 11193.

At that time, there was no "Plan B." But, with the Court's concerns firmly in mind, the

parties immediately went back to work. Over many additional months, the parties negotiated

intensively, preserving and enhancing certain elements of the prior settlement (such as the

DAGP), rejecting others (such as the preclusive effect of the Science Panel), designing a $1.3+

billion compensation program, and adding new features not seen in the Roundup litigation, and

not available on an adversary basis, such as the labeling change. Cabraser Decl. ¶¶ 8-10.

The negotiations of each settlement were intense, including dozens and dozens of virtual

meetings, countless drafts of settlement documents and memoranda, status reports to the

mediator, and direct input on Settlement terms from the expert vendors proposed to administer

the programs, as well as other consulting experts related to science and medicine. *Id.* at ¶ 9.

Settlements of this magnitude, providing programmatic benefits this comprehensive, are never

easy, and the parties have been, at many times, far apart and often at odds on issues large and

small. *Id.* ¶ 10. While the content of the negotiations is confidential, the integrity and arm's-

length nature of the process was ensured, and can be attested to by, the mediator. *Id.* Such

involvement is a plus factor. *See*, *e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Prac., &*

*Prods. Liab. Litig.*, MDL No. 2672, 2017 WL 672727, at *16 (N.D. Cal. Feb. 16, 2017) (finding

approval appropriate where "the parties negotiated the Settlement under the supervision of a

court-appointed Settlement Master").

**C.     Rule 23(e)(2)(C): The Settlement provides guaranteed programmatic relief in exchange for a limited release and a short delay, and compensation to those who choose to accept it in exchange for a full release.**

      **1.     The Settlement offers class benefits and compensation that are fair, adequate, and reasonable alternatives to the costs, risks, and delay of trial and appeal.**

The centerpiece of the Settlement is individual compensation awards, including $5,000 Accelerated Payment awards available to those who elect a streamlined process requiring minimal documentation, Claims Program awards ranging from $10,000 to $200,000 in the ordinary case, and awards exceeding $200,000 available to those who demonstrate extraordinary circumstances. The compensation awards were negotiated in the wake of the inventory deals resolving the majority of outstanding individual cases. *See* Press Release, Bayer AG, *Bayer announces agreements to resolve major legacy Monsanto litigation* (June 24, 2020). The proposed class Settlement extends the opportunity for compensation to a group that did not – and for the undiagnosed, could not – participate in the inventory settlements. The class Settlement's compensation fund uses objective factors and a tier system common to mass tort settlements, a system that generally tracks what an allocation neutral would do in dividing an inventory settlement, and consistent with the approach taken in previous tort compensation programs. And the Settlement provides advantages and benefits that an inventory process does not. First, the Settlement minimizes transaction costs, in particular by providing free legal services. Class members can keep the entirety of the compensation awards. Second, the Settlement provides speedier payment, as optional compensation is available without the need to file a lawsuit. Third, the Settlement includes affirmative outreach and notice, providing a compensation opportunity to class members who might otherwise never be able to file a lawsuit to pursue their claim at all.

And most critically, the compensation program awards provide an option to class members, not a mandatory compromise of their claims. If a class member does not believe that

the compensation award he or she is offered is adequate, the class member may reject the award and proceed in the tort system after the stay period. In addition, class members (whether or not they receive or accept compensation awards) further benefit from the DAGP's improved access to diagnostic services, Monsanto's agreement to seek a labeling change, and the knowledge generated by the Research Funding Program. The DAGP in particular is an important benefit, providing outreach and diagnostic assistance so that class members can determine if they have NHL. Class members also benefit from the free Legal Services Program, providing assistance with navigating and applying for Settlement benefits with no corresponding fee reduction from those benefits.

The notice plan is a clear benefit to class members as well, regardless of whether they are ever diagnosed with NHL. It bears emphasis: class members are by definition those who have been exposed to Roundup but have not filed individual lawsuits against Monsanto or retained counsel to do so. The Settlement pays for an unprecedented notice effort directed at class members, many of whom may be unaware that there even is a controversy surrounding Roundup. This Settlement activates those class members, giving them outreach, diagnosis, and information, and, if they are diagnosed, the choice of compensation or a lawsuit.

All of the benefits – compensation, diagnosis, and information – are certain and immediate, some coming even before the results of any appeals of Settlement approval. The alternative for class members, even assuming they find counsel and file an individual case, is, eventually, an individual settlement offer. In reality, of course, there is no guarantee that individual settlement offers in the range of the net benefits under the Settlement will be available or, if so when: Monsanto has advanced legal defenses to these claims, including preemption, still working their way through the appellate systems. COVID has compounded the already-

substantial delays of the tort system. An option to take a meaningful compensatory award, while preserving the right to individual decision to go the tort-system route instead, best serves and protects class members' interests.

>    **2.**     **Class members who are not diagnosed, or who do not accept a compensation award, give up relatively little.**

The full release applies only to class members who choose to accept a compensation award. Those who are not diagnosed with NHL, or who decline to apply for or accept a compensation award, retain the right to sue Monsanto for compensatory damages after the stay, and are bound only by the class-wide release, which is relatively narrow. Under the class-wide release, class members refrain from pursuing litigation while the Settlement programs operate and waive only claims for medical monitoring and punitive damages.

Weighted against the substantial class-wide benefits, the consideration required from class members is modest. The Settlement preserves class members' right to bring almost any claim, class or individual, for compensatory damages or equitable relief after the litigation stay period, including but not limited to claims for personal injury, fraud, misrepresentation, negligence, fraudulent concealment, negligent misrepresentation, breach of warranty, false advertising, and violation of any unfair and deceptive acts or practices statute.

>    **a.**     **The litigation stay is a small concession on the part of class members, who by definition have not filed a claim or retained counsel to do so.**

The temporary stay of claims during the litigation stay period amounts to a minor concession given the litigation posture of class members' claims, as confirmed by the cases litigated thus far. Class members, by definition, "have not commenced an individual, non-class lawsuit or retained counsel for the pursuit of any individual, non-class personal injury or false advertising claims" relating to Roundup exposure. For those who have not received an NHL

diagnosis, the stay has little effect because they are not in a position to file a lawsuit in any event.

For those who have been diagnosed, as a practical matter, they would not be able to obtain relief

for years. Of the thousands of plaintiffs with Roundup-related lawsuits pending in federal and

state court, only one has collected on a judgment. The only federal Roundup personal injury case

to go to trial so far, *Hardeman v. Monsanto Co.*, No. 3:16-cv-00525 (N.D. Cal.), was filed in

February 2016, did not go to trial until May 2019, and remains on appeal and cross-appeal in the

Ninth Circuit. *See Hardeman v. Monsanto Co.*, Nos. 19-16636, 19-16708 (9th Cir.). Of the two

cases that have gone to verdict in state court, one was affirmed in July 2020 (albeit with a

significant reduction in damages), *Johnson v. Monsanto Co.*, 52 Cal. App. 5th 434 (2020), *pet.*

*for rev. denied* (Cal. Oct. 21, 2020), and the other remains pending on appeal, *Pilliod v.*

*Monsanto Co.*, No. A158228 (Cal. App.). (In the *Johnson* appeal, Monsanto's preemption

defense was rejected not on the merits, but due to "lack of a developed factual record." *Johnson*,

52 Cal. App. 5th at 445 n.**.) That is the *best* case scenario, and one due to the Herculean efforts

of the MDL and state court lawyers, and early and active case management by this Court and the

state courts: most claims, after five years, remain in the early stages of litigation. And of course,

any class member who wants to sue Monsanto immediately need only opt out.

> **b.** **The release of medical monitoring claims is reasonable in light of the Settlement benefits.**

Class members are well compensated for the waiver of class medical monitoring claims.

The Settlement includes the DAGP, an expansive diagnostic program with a value of $210

million, a substantial increase above the benefit range contemplated by the parties' earlier

settlement agreement. The DAGP will constitute one of the largest diagnostic funds in history.

Its benefits are particularly important here: many of the most at-risk class members are

predominantly agricultural workers from rural and otherwise under-served communities, many

of whom would be unable to otherwise afford or access diagnostic services. Learning about an NHL diagnosis in a matter of months versus years could be the difference between life and death for some. Indeed, without the Settlement and the educational mission of its notice plan and the DAGP, class members might be entirely unaware of the risks they may carry from their exposure to Roundup or the need for early diagnosis to facilitate more successful treatment options.

The remaining relief ensures that the NHL-related long-term health needs of all class members – including those who might have had valid medical monitoring claims – are met during the litigation stay. If, for example, a class member develops NHL during the stay period, she would be eligible to pursue a compensation award through the Settlement. A medical monitoring litigant who received an NHL diagnosis mid-litigation, on the other hand, would be required to begin the litigation process anew with personal injury claims. And if the class member so chooses, she is entitled to pursue traditional compensatory damages, with the benefit of having received detailed notice of the risks potentially associated with Roundup exposure, increased access to early diagnostic assistance, and continued outreach via the DAGP – benefits that would not otherwise exist without this Settlement.

The substantial benefits provided in the Settlement compare favorably to what class members could expect to receive through litigation of the released medical monitoring claim. Even in terms of more diffuse medical monitoring programs, the size and sophistication of this Settlement stands out. The largest federal medical monitoring settlement fund in over a decade was recently approved in the NCAA concussion lawsuit, after six years of litigation. *See NCAA*, 332 F.R.D. at 218.[11] That settlement established a fifty-year, $70 million medical monitoring

---

[11] The uncapped NFL concussion settlement included medical monitoring components, but is not a useful comparator to the alternatives to this Settlement. As this Court noted in its July order, the NFL class is made up of a relatively small number of individuals, all centrally understanding

*Footnote continued on next page*

fund, reduced by $14 million for attorneys' fees and costs. Other major medical monitoring

settlements have offered similar relief, also won after years of costly litigation. *See*, *e.g.*, *Allen v.*

*Monsanto Co.*, No. 13-0418, 2013 WL 6153150 (W.V. Nov. 22, 2013) (approving preliminary

fund of $21 million for medical monitoring, with up to $63 million in additional money,

dependent upon the level of dioxin found in residents); *Elsea v. U.S. Eng'g Co.*, No. 1016-15976

(Mo. Cir. 2018) (approving $80 million medical monitoring fund, with up to $24 million

allocated for attorneys' fees and costs); *Inter-Op*, 204 F.R.D. at 351 (approving $20 million

medical monitoring fund for approximately 21,000 class members). The Settlement here – more

than $200 million for diagnostic evaluation services, *plus* the other Settlement benefits – dwarfs

those amounts.

It also must be recognized that a medical monitoring claim is difficult to win. Some states

do not permit such claims "in the absence of present physical injury." *In re Nat'l Collegiate*

*Athletic Ass'n Student-Athlete Concussion Injury Litig.*, No. 13-9116, 2016 WL 3854603, at *6

(N.D. Ill. July 15, 2016); *see also NCAA*, 332 F.R.D. at 218 ("[T]he strength of the Settlement

Class's claims for medical monitoring depends upon myriad factors, including: whether the state

in which the class member resides recognizes medical monitoring claims as an independent

cause of action; whether the state recognizes medical monitoring as a form of injunctive relief at

all; and whether the state allows medical monitoring as a form of relief in the absence of actual,

present physical injury."). Even where available, medical monitoring claims are expensive to

litigate, and typically depend on complex scientific proof and expert testimony. *See NCAA*, 2016

---

*Footnote continued from previous page*

their relation to the NFL. Medical monitoring in the NFL settlement set the baseline for cognitive
capabilities in order to calculate damages awards over the 65-year settlement timeframe. *See In*
*re Nat'l Football League Players Concussion Injury Litig.*, 307 F.R.D. 351 (E.D. Pa. 2015),
*aff'd*, 821 F.3d 410 (3d Cir. 2016).

WL 3854603, at *6 (describing medical monitoring claims as "extremely complex, very costly, and sure to be protracted"). This would be particularly true here, as there is no standardized "test" for NHL that can be specifically requested in litigation.

<p style="text-align:center"><strong>c.      <u>The release of punitive damages is reasonable.</u></strong></p>

The release of punitive damages is also a reasonable trade-off for the Settlement benefits to the class, as has been recognized in many of the leading class action settlements. *See, e.g., Diet Drugs*, 369 F.3d at 296; *Oil Spill*, 295 F.R.D. at 155-56; *In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prod. Liab. Litig.*, MDL No. 2672, 2017 WL 2212783, at *24 (N.D. Cal. May 17, 2017) ("Given that any award of punitive damages is inherently speculative and discretionary, courts regularly approve settlements that offer no or little compensation representing the risk of a punitive damages award.") (citation omitted).[12]

No class member has an entitlement to a punitive damages claim, which by definition and function is not compensatory. The Supreme Court has expressly recognized that punitive damages are not part of individual plaintiff's interest in or right to compensation, because "[i]t should be presumed a plaintiff has been made whole for his injuries by compensatory damages." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). Instead, punitive damages perform deterrent and exemplary functions for society as a whole, not any individual or class of plaintiffs: "[p]unitive damages may properly be imposed to further *a State's* legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW*, 517 U.S. at 568 (emphasis added); *see also State Farm*, 538 U.S. at 419 ("punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to

---

[12] *See also, e.g.*, *Rodriguez v. West Pub'g Corp.*, 563 F.3d 948, 964-65 (9th Cir 2009); *Zepeda v. PayPal, Inc.*, No. 10-1668, 2017 WL 1113293, at *12 (N.D. Cal. Mar. 24, 2017) (Objector's contention that "Plaintiffs should have taken into account Defendants' potential exposure to punitive damages has [] been rejected by this Circuit.").

warrant the imposition of further sanctions to achieve punishment or deterrence"); *Cote v. Philip Morris USA, Inc.*, No. 19-14074, 2021 WL 162022, at *5 n.6 (11th Cir. Jan 19, 2021) (explaining that the Constitutional analysis begins with "identification of the government's interest and an assessment of the strength of that interest in imposing punitive damages") (internal quotation marks and alteration omitted).

The reasonableness of the punitive damages release is clearer in this Settlement than in the other class settlements cited above. First, unlike many of those other settlements, this Settlement gives class members a full option to reject a compensation award and sue for compensatory damages in the tort system. By contrast, in *Diet Drugs*, as the Third Circuit observed, the "downstream opt-out rights were not absolute," meaning there were limits on class members' rights to sue for compensatory damages if they rejected or did not receive a compensatory award. *Diet Drugs*, 369 F.3d at 296. The *Diet Drugs* court's conclusion that the punitive damages release was "a fair and wholly appropriate trade-off" for the settlement's creation of a capped compensation fund and medical monitoring program (2000 WL 1222042, at *49 n.22) thus applies with added force here. Second, the magnitude of the amounts Monsanto is paying, both in this Settlement and in the inventory deals, has already served the societal interests in deterrence and punishment that warrant punitive damages. Third, actual recovery of punitive damages is both rare and arduous, requiring success at both trial and throughout the inevitable appeals. Recall that during all Roundup litigation, a total of three cases progressed through trial and achieved a punitive damages verdict. These three no doubt opened the door to the settlements that ensued, but the punitive damages awarded were reduced by the trial judge in each case,[13] and subjected to additional challenge on appeal.[14]

---

[13] *Hardeman v. Monsanto Co.*, No. 16-525 (N.D. Cal.) (punitive damages reduced from $75

*Footnote continued on next page*

3. **Class members are eligible for relief through straightforward processes.**

The registration and compensation award processes have been designed to be as streamlined as possible given the sensitivity and complexity of the medical and exposure information involved. Class members are offered free support from the Claims Administrator, Class Counsel, and the Legal Services Program. Class Members are guaranteed prompt determinations on their compensation award packages once complete. The key deadlines are set out in Exhibit 12 to the Settlement.

4. **Counsel will seek reasonable attorneys' fees and costs that pose no obstacle to preliminary approval.**

Class Counsel will seek no more than $170 million for fees and reimbursement of out-of-pocket costs. Nothing about the fee request raises any red flags precluding preliminary approval. Agreement on fees followed, initially, resolution of the essential terms of the prior settlement, and then the new fee number was reached only after the parties agreed on all essential terms of the new Settlement. Cabraser Decl. ¶ 11. The new amount includes substantial funding for the Legal Services Program to operate throughout the initial settlement period, reflects the legal services that have been and will be provided by Class Counsel to date and throughout the same period, and is equivalent to 8.5% of the total value (up to $2 billion) of the settlement (assuming it does not continue past the initial settlement period; if it does, with additional funding, such

---

*Footnote continued from previous page*

million to $20 million); *Johnson v. Monsanto Co. et al.*, No. GC16550128 (Cal. Super.) (punitive damages reduced from $250 million to $39.25 million); *Johnson*, 52 Cal. App. 5th at 454, 462 (further reducing noneconomic damages from $37 million to $4 million and punitive damages further to $10.3 million); *Pilliod v. Monsanto Co.*, No. RG17862702 (Cal. Super.) (punitive damages for two plaintiffs reduced from $1 billion each to $24.5 million and $44.8 million)

[14] Every Roundup verdict has been challenged on appeal, in part for excessive punitive damages. *Johnson*, 52 Cal. App. 5th 434; *Hardeman v. Monsanto*, No. 19-16636 (9th Cir.); *Pilliod v. Monsanto Co.*, A158228 (Cal. App.).

additional funding for class benefits and legal services would again be subject to Court

approval). Should the Court ultimately award less than $170 million, the difference will revert to

the class, not Monsanto. Settlement § 3.1(a).The class will be fully notified of the fee request in

accordance with Fed. R. Civ. P. 23(h).

### 5.   There are no side agreements relevant to preliminary approval.

No side agreements requiring scrutiny under Rule 23(e)(2)(c)(iv) exist. This provision is

aimed at "related undertakings that, although seemingly separate, may have influenced the terms

of the settlement by trading away possible advantages for the class in return for advantages for

others." Fed. R. Civ. P. 23(e), 2003 Ad. Comm. Notes. Plaintiffs have not entered into any such

agreements. There are two documents in addition to the Settlement, but neither triggers scrutiny.

The parties will enter into an Escrow Agreement, subject to Court approval, the form of which is

attached as Exhibit C to the Cabraser Declaration. And Bayer Corporation has executed a

financial guarantee of Monsanto's obligations under the Settlement.

### D.   The Settlement treats all class members equitably relative to one another.

Fed. R. Civ. P. 23(e)(2)(D) requires the Court to consider whether the Settlement

Agreement "treats class members equitably relative to each other." In so doing, "the Court

considers whether the Settlement improperly grants preferential treatment to class representatives

or segments of the class." *Hefler v. Wells Fargo & Co.*, No. 16-05479, 2018 WL 6619983, at *8

(N.D. Cal. Dec. 18, 2018), *aff'd*, 802 F. App'x 285 (9th Cir. 2020) (internal quotation marks and

alteration omitted). The relief granted need not be identical – just equitable and rationally

apportioned. *See*, *e.g.*, *In re Veritas Software Corp. Sec. Litig.*, No. 03-0283, 2005 WL 3096079,

at *9 (N.D. Cal. Nov. 15, 2005), *vacated in part on other grounds*, 496 F.3d 962 (9th Cir. 2007)

(options trader class members were sufficiently different from in-and-out traders "to justify their

differential treatment in the plan of allocation of settlement proceeds"); *Vargas v. Ford Motor*

*Co.*, No. 12-8388, 2020 WL 1164066, at *10 (C.D. Cal. Mar. 5, 2020) ("[W]hile the Settlement was structured to deliver the most complete relief to those Class Members that experienced persistent defects (e.g., those with more service visits will receive a greater cash payment), this is an objective and logical explanation for the variations in monetary recovery.").

Here, the Settlement treats all class members equitably according to recognized objective factors, need and choice. Every single class member will benefit from the Research Funding Program and the labeling change. Eligibility for the DAGP depends on a class member's need for evaluation. Compensation awards to those suffering from NHL are based on criteria including age, severity of condition, extent of exposure, and other risk factors. Those similarly situated are similarly compensated. Acceptance of the award, and the accompanying full release, is left to class members' individual choice. And Accelerated Payment Awards provide a streamlined compensation option for class members who choose it.

Class Counsel will request incentive awards of $25,000 for the class representatives, in recognition of their service to the class and the benefit created. Such awards "are fairly typical in class action cases ... and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. The requested awards do not make the Settlement inequitable: they are subject to Court approval, will be noticed to the Class, will be paid out of Class Counsel's attorneys' fees, and fall within the normal range. *See*, *e.g.*, *In re Wells Fargo & Co. Shareholder Deriv. Litig.*, No. 16-5541, 2020 WL 1786159, at *18 (N.D. Cal. Apr. 7, 2020) (awarding $25,000 each to two class representatives).[15]

---

[15] *See also Nitsch v. DreamWorks Animation SKG Inc.*, No. 14-4062, 2017 WL 2423161, at *14

*Footnote continued on next page*

- 52 -

E.      **The Settlement merits preliminary approval under this District's Procedural Guidance.**

1.      **Guidance (1)(a) & (c): The Settlement class and released claims are consistent with the operative complaint.**

The Settlement Class and Subclasses are as defined in the Second Amended Class Action Complaint. The claims released class-wide – medical monitoring and punitive damages – are a subset of those pleaded in the Complaint. The difference is "appropriate in the instant case" because the Settlement releases the full set of Roundup claims only for class members who affirmatively elect to accept a compensation award. Class members who do not develop NHL, or who do not want a compensation award, retain their right to assert virtually any other claim after the stay period is over. Meanwhile, their claims, including those pleaded on their behalf in counts I through X in the Second Amended Class Action Complaint, which are analogous to those pleaded in the individual suits before this Court, are protected through the tolling provisions of the Settlement.

2.      **Guidance (1)(e): The Settlement compares favorably to potential litigation.**

This Court's Guidance requests identification of "[t]he anticipated class recovery under the settlement [and] the potential class recovery if plaintiffs had fully prevailed on each of their claims, and an explanation of the factors bearing on the amount of the compromise." First, the class comprises only individuals who have not filed suit nor retained counsel in anticipation of

---

*Footnote continued from previous page*
(N.D. Cal. June 5, 2017) ($100,000 service awards to each of three named plaintiffs); *In re High-Tech Emp. Antitrust Litig.*, No. 11-2509, 2015 WL 5158730, at *17 (N.D. Cal. Sept. 2, 2015) ($100,000 each for four representatives, and $140,000 for a fifth). The total service award—$150,000—is also less than .01% relative to the total (initial) Settlement amount of $1.8 billion. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 948 (9th Cir. 2015) ("[T]he $45,000 in incentive awards makes up a mere .17% of the total settlement fund of $27,250,000, which is far less than the 6% of the settlement fund in [an earlier settlement approval].").

filing a personal injury or false advertising claim. In the absence of this Settlement, class members are not before the legal system at all. In a time of national distress over COVID-19, courts in most of the country are not functioning fully and do not have the capacity to move litigation forward, let alone offer jury trials to newly-filed cases. Class members who seek to file suit presently are unlikely to be able to prosecute their cases to judgment within the initial four-year period of the compensation fund.

Second, this is not litigation that, as the Guidance presupposes, carries the possibility of a class-wide damages verdict. Instead, the alternative to a class Settlement is the *potential* for piecemeal individual litigation that could result, at best, in an individual settlement offer or the long, hard road to a far-off trial. This Settlement provides significant compensation awards that class members can choose to accept or reject, with advantages not available in individual deals, such as lower transaction costs, lower risks, free legal services, and speedier payments. This is on top of the class-wide benefits of the DAGP, the Research Fund, and the label change.

Finally, as to the class members who do not develop NHL within the first four-year period, the Settlement still compares favorably to potential litigation. No as-yet-undiagnosed class member, of course, can know today if or when he or she will develop NHL. The compensation program thus benefits them as an insurance policy, to be there for years and potentially extended beyond (subject to Court approval). In addition, these class members still are eligible for the diagnostic assistance program (minimum $210 million), draw benefits from the research (minimum $40 million) and labeling provisions, and retain all compensatory damages rights.

These benefits – in particular, an *optional* compensation fund that preserves the individual right to sue Monsanto in the tort system – would not be available if the class's claims

- 54 -

were litigated. For one thing, Monsanto would have arguments to oppose class certification on grounds inapplicable in the settlement context. *See* Section I.B & I.C, supra. Moreover, even if the class were certified for litigation, any potential class recovery on the medical monitoring and punitive damages claims (again, the only claims released) is speculative at best and unlikely to be realized any time soon.

### 3.   Guidance (1)(f): The allocation of the Settlement Fund is considered and reasonable.

Approval "of a plan for the allocation of a class settlement fund is governed by the same legal standards that are applicable to approval of the settlement: the distribution plan must be 'fair, reasonable and adequate.'" *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001) (citation omitted). The allocation of the Settlement Fund between the class benefits – the compensation awards, the DAGP, and the Research Funding Program – is a fair distribution of relief. The bulk of the funding is committed to the compensation awards, because that relief goes to the Class Members most in need, those diagnosed with NHL. And a sizable amount, more than $200 million, is set for the DAGP. Thus, recovery is apportioned to align with Plaintiffs' theory of injury and the relative harms endured by each class member. *See id.* ("A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable."). Any unused funds will be reallocated in the Settlement Administrator's discretion. Settlement § 3.2(b)(iv). Class Counsel commissioned modeling exercises to confirm that the Settlement Fund will be adequate to pay all claims, and to fund the DAGP. *See* Eveland Decl. ¶¶ 12-23; Horewitz Declaration ¶¶ 8-18; Garretson DAGP Decl. ¶ 13.

### 4.   Guidance (1)(g): A substantial number of class members are expected to participate in the Settlement programs.

The outreach to the class in this case to encourage participation in the settlement will be massive and multi-staged. Class notice is the first, but not the only step. The class will also be

informed of the Settlement through the DAGP outreach campaign, which will target both the affected populations in the service areas (including through critical entities that promote health awareness in those communities). The outreach program, informed by the extensive pre-notice survey and investigative work, will employ communications channels reflecting how class members receive and share information. And the DAGP grant program and Legal Services Program will further promote awareness by conferring diagnostic evaluation and free legal representation. As a result of the extensive outreach, the proposed Claims Administrator, who has extensive experience in modeling similar compensation programs, estimates that tens of thousands of class members should be expected to apply for compensation awards over the initial four-year period. *See* Eveland Decl. ¶ 20.

### 5.        Guidance (1)(h) & (8): The Settlement is non-reversionary.

This Settlement is non-reversionary. The Settlement expressly sets out that Monsanto will be obligated to pay $1.63 billion in class benefits to fund the notice program, the DAGP, Research Fund, and compensation programs, and to pay the costs of settlement administration. Settlement § 3.6. Monsanto has agreed to pay, separately and additionally, as much as $170 million in class counsel fees and costs, including the Legal Services Program, for legal services and costs already incurred, and to be provided for the benefit of the Class and its members throughout the initial settlement period. Should the Court award less, the difference goes to the class, not to Monsanto. *Id.* § 3.1(a). And although there are certain conditions on Monsanto's payment of the $200 million End Payment (that Monsanto reject certain "default" continuation terms), upon those conditions being met, the money must be paid (like all other payments under the Settlement once approved) and will not revert. If the Settlement continues, after class notice and subject to Court approval, it will do so with additional funding in a Court-approved amount.

6.      **Guidance (6): Attorneys' fees, when requested, will meet all federal and local requirements.**

Because Class Counsel's fee request will include projected future work administering the

Settlement as well as the Legal Services Program (understanding the Court's practice of

withholding a portion of fees), Class Counsel have not included in this motion the lodestar

analysis discussed in the Guidance. But this motion sets forth, at length, the "benefit conferred

on the class," and the maximum fee request of $170 million is within the range of reason. If, as

here, an agreement is reached on the amount of a settlement fund and a separate amount for

attorney fees, the sum of the two amounts ordinarily should be treated as a settlement fund for

the benefit of the class. The fees are then evaluated as a percentage of this whole. *In re Bluetooth

Headset Prods. Liab. Litig.*, 654 F.3d 935, 943 (9th Cir. 2011). Here, assuming no continuation

of the settlement past the initial four-year period, that sum is up to $2 billion, and the total

requested fee equals 8.5%. The Ninth Circuit's longstanding "benchmark" fee in class

settlements is 25%, *see Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002), but this

settlement, being well over $1 billion, is considered a "super mega fund", and percentage awards

in this rara avis category trend lower. *See, e.g., In re Actos Prods. Liab. Litig.*, 274 F. Supp. 3d

485, 525 (W.D. La. 2017) (surveying "super mega fund" class action and MDL settlements and

finding an average award of 9.9%, albeit "with any attempt to discuss a black letter percentage ...

illusory," and awarding 8.6%). For example, the class fees award in *In re Tyco Int'l, Ltd.*, 535 F.

Supp. 2d 249 (D.N.H. 2007) was 14.5% of a $3.2 billion class settlement.

7.      **Guidance (7): The requested incentive awards are reasonable and subject to Court approval.**

As discussed above in Section II.D, the requested incentive awards to the class

representatives are reasonable, subject to Court approval, properly noticed to the class, and fall

within the typical range of such awards.

8.      **Guidance (9): The Settlement provides a reasonable time for class members to exercise their rights.**

The Guidance requires that class members have at least 35 days to opt out or object to a settlement, including the fee motion. The proposed schedule in this Settlement gives class members 150 days to opt out. This Court's Standing Order clarifies that class members must have at least 14 days to object after the fee motion is filed. The proposed preliminary approval order (Exhibit 10 to the Settlement) provides that Class Counsel file the fee motion at least 30 days before the deadline to object.

III.    **The notice plan provides the best practical notice.**

Fed. R. Civ. P. 23(e)(1)(B) requires that before a proposed settlement may be approved, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." The Court must "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citation omitted).

The notice plan here will be one of the most comprehensive and well-designed programs ever utilized in a class settlement. The program was based on "unprecedented" and intensive research and information-gathering on the class, including a survey, long-form interviews, and analysis of U.S. government data. Wheatman Decl. ¶ 31. It is multifaceted – utilizing multiple communications

channels to reach class members including direct mail to employers, organizations, and government entities with direct connections to class members, and print, radio, digital, and television. It is granular – selecting communications channels (and languages) specific to different segments of the class, including homeowners, farmworkers, landscapers, and persons disproportionally likely to be diagnosed with NHL. And it is multinational – extending television, radio, and digital outreach to Mexico, recognizing that a portion of the class spend part of the year there. Full details are in the Wheatman Declaration.

This is not a standard class or standard Settlement. It is not possible to mail a postcard to a large portion of the class, and buy a print ad in USA Today for the rest. The plan does not gloss over those challenges, but embraces them and, using data gathered over many months, overcomes them. The content of the notice is also exemplary, including all of the information required by Fed. R. Civ. P. 23(c)(2)(B), giving the class everything it needs to know about the central features of the Settlement, how to opt out or object, and where to get more information. *See* Wheatman Decl., Exs. C & D (forms of notice).[16]

### A.   The notice plan was specifically designed to reach those exposed to Roundup who have not yet developed NHL, as well as those who have.

The notice program is designed to reach those who have been *exposed* to Roundup, as well as those presently diagnosed with NHL. As discussed in the Declarations of Dr. Wheatman and Mr. Messina, the plan is a cutting-edge, comprehensive, and far-reaching program that will inform class members across the United States and Mexico. The Notice Agents conducted exhaustive research to determine the demographics of Roundup users, identifying their sources of exposure and a range of demographics (e.g., age, gender, location, education, home

---

[16] This Court's Procedural Guidance (10) requires discussion of compliance with the Class Action Fairness Act (CAFA). Under the Settlement, Monsanto will complete CAFA notice. The substantive provisions of CAFA are not implicated here.

ownership, immigration status, country of birth, primary language, income) and crafted a Notice

Plan designed to target all relevant audiences. Wheatman Decl. ¶¶ 21-178; Messina Decl. ¶¶ 12-

37.The notice plan includes outreach via local, national, and international television, radio, and

print; online advertising; social media; email and mail to over 260,000 groups and companies

that include and/or employ potential class members; and outreach to farming and garden supply

stores, government officials, businesses, events, and schools. Wheatman Decl. ¶¶ 47-169. The

plan pays particular attention to concerns associated with hard-to-reach class members and

undocumented migrant class members, including the development of trust to counter aversions to

litigation and outreach to migrant workers who may no longer be in the country and/or who may

be affected by immigration policies and COVID-19. Wheatman Decl. ¶¶ 23, 141-50, 181.

Indeed, Plaintiffs' counsel brought together a team with unmatched ingenuity and expertise

to target this particular class and these class members. As reflected in great detail in the Wheatman

Declaration, Kinsella and Signal have experience developing and carrying out notice programs that

successfully inform and educate difficult-to-reach populations. Kinsella for example, has

developed notice programs to reach isolated, overlooked, and distrustful members of the

settlement class of Romani (or Roma) people in 15 countries in Eastern Europe; notice programs

to reach farmers from diverse backgrounds; notice programs ensuring the inclusion of Spanish

speakers; and notice programs reaching groups that overlap with class members in this particular

case. Wheatman Decl. ¶¶ 10-12, 17.

Those with latent disease are further benefited by outreach through the DAGP, which

employs dual approaches of continued outreach to class members regarding their risk and diagnostic

resources, and to the medical providers who will serve, educate, and continue that outreach to class

members and their communities. Under any scenario, class members will be better informed and

have more options than if the Settlement were not in existence.

**B.      The concerns articulated in *Amchem* are not present here.**

We recognize that the Supreme Court raised a question in *dicta* in *Amchem*, 521 U.S. 591, whether current notice under the circumstances there would have been sufficient for "exposure-only" class members. The Court raised similar concerns in its order expressing doubts about the prior proposed settlement. The Parties have taken pains to address those concerns in this Settlement. For several reasons, we submit we have done so successfully.

First and foremost, the compensation and full-release elements of the Settlement are optional and apply only to class members once they are diagnosed with NHL. Class members are not asked to decide whether to participate in the compensation program or take a compensation award until they get NHL, and cannot lose their right to sue Monsanto in the tort system unless and until they individually decide to take a compensation offer at that time. All that they surrender now (if they do not opt out initially) are claims for punitive damages and medical monitoring. But class members have minimal cognizable individual interest in the former, *see* Section II.C.2.c, and are receiving the latter, *see* Section II.C.2.b.

In *Amchem*, the class settlement fully resolved every class member's asbestos-related claims and decreed that individuals would receive specific dollar amounts as compensatory awards. It thus asked class members with latent injuries to decide, based on current notice, whether a preset compensatory award would satisfy them if and when they become sick. Any class member who did not opt out *did* lose the right to sue in the tort system (because the compensation program was mandatory). In the prior proposed settlement in this case, such a class member *could have* lost that right (if the issue-preclusive Science Panel decision were in Monsanto's favor). Here, neither of those things can happen: in this Settlement, class members

- 61 -

are offered a compensatory award only if and when they are diagnosed with NHL, and can make a decision at that point whether the proposed compensation is sufficient. They can accept it, appeal it within the program, ultimately reject it, and pursue their tort claims if they do so. The Advisory Science Panel decision is not binding or preclusive. And through the outreach and Legal Services Program discussed above (and any supplemental notice directed by the Court), class members who develop NHL will be informed and advised about their options on an ongoing basis. The due process concern in *Amchem* about adequacy of notice in latent injury cases is thus not applicable.

Second, and relatedly, the Settlement here expands class members' options, not restricts them as in *Amchem*. As detailed more fully above, the Settlement provides benefits for class members that insulates them against potential adverse developments in the continuing litigation, while preserving tort-system rights to pursue compensatory damages in individual litigation if they so elect. It would be passing strange if concerns about class members' due process were argued to foreclose their options and require them to proceed through individual litigation alone.

Third, Roundup is a consumer product. People buy it and apply it. Indeed, the large majority of plaintiffs that have brought suit to date have been "home and garden" users of Roundup products. And landscaping and agricultural workers know they are using herbicides, of which Roundup is a prominent example. *Amchem* involved asbestos, an undifferentiated product woven into buildings such that people may not even be aware of their exposure until they are diagnosed with an asbestos-related disease years later. The Court's question was thus whether notice would suffice for "legions so unselfconscious and amorphous." *Id.* at 628. The class here is thus not comprised of "legions" of "unselfconscious" people. The overwhelming majority of class members here know or have reason to know of their actual or potential exposure to Roundup products. And as set forth

above, the notice campaign here has been specifically designed to reach and educate the relatively few class members who may not.

In cases where "exposure only" class members have reason to know of their exposure and potential latent disease and the notice plan is comprehensive and designed with those class members in mind, the courts have regularly held that current notice is adequate. *See*, *e.g.*, *NFL*, 821 F.3d at 425, 435-36 (current notice adequate for class settlement of latent injury claims for ALS and other serious diseases); *Juris v. Inamed Corp.*, 685 F.3d 1294, 1305 (11th Cir. 2012) (current notice adequate for class settlement of silicone breast implant claims, including those of "future injury claimants" whose implants had not yet malfunctioned). Indeed, no court has ever held that current notice cannot be adequate where a class settlement resolves latent injury claims.

Finally, *Amchem*'s actual holding was not based on lack of notice; it was that the class there could not be certified because it did not meet the Rule 23 requirements, including structural protections like subclasses for class members with latent diseases, and because it made "essential allocation decisions" that disfavored "exposure-only" class members even though they were likewise required to release their damages claims. *Id.* at 619-22, 625-27. By contrast, as set forth above, the class here meets Rule 23's requirements, subclasses with active representation *were* employed to protect class members with latent injuries, and no injured person—present or future— releases their compensatory damages claims absent affirmative choice to do so.

C.     **Guidance (2): The Administrators and Notice Agents were selected based on capabilities and experience with large, complex settlements.**

The Settlement Administrator is intimately familiar with all aspects of the Roundup claims, having been appointed by the Court as mediator, and having actively mediated both the inventory and class settlements. He has successfully administered other large scale claims facilities as well. The DAGP Administrator, Wolf Garretson, was selected based on its

principals' extensive experience with complex settlements, including those specifically involving medical-related relief. *See* Cabraser Decl. ¶ 14; Garretson DAGP Decl. ¶¶ 2-4 & Ex. A. The Claims Administrator, Verus, was similarly selected based on its extensive experience, including in asbestos litigation. *See* Cabraser Decl. ¶ 15; Eveland Decl. ¶¶ 7-8 & Ex. A.

The Settlement Class Notice Agents were selected after a competitive bidding process that resulted in detailed bids from four providers. Cabraser Decl. ¶ 16. Kinsella and Signal were selected based on their capabilities and experience, specifically with respect to how well their notice proposals accounted for the unique nature of the Settlement and the class. *Id*.

The class notice costs are based on the budget drawn up by the Settlement Class Notice Agents. The DAGP Administrator, Lien Administrator, and Claims Administrator will submit annual budgets to the Settlement Administrator for review and approval, subject to challenge for reasonableness by Class Counsel or Counsel for Monsanto. Settlement §§ 14.2(c) 14.3(c), 14.4(d). The total administration costs, including initial notice costs, are capped at $55 million, with Court approval required for any additional costs. *Id.* § 3.3(b). At all times the Court retains authority to deem any administration costs unreasonable and order they not be paid. *Id.* § 14.1(c).

## IV.    **The proposed Settlement addresses the four concerns the Court raised regarding the prior, withdrawn settlement.**

In its order regarding the prior settlement, the Court raised four concerns to guide the parties in negotiating a revised version. Through the Settlement's revised approach, the parties have attempted to address those concerns. To reprise:

1.    *Concern whether it is legal to "delegate the function of deciding the general causation question" from judges and juries to a panel of scientists*. MDL Doc. 11182, at 3. The new Settlement does not do this. The advisory science panel's determination will not bind anyone. Juries will continue to decide the general causation question. The advisory determination

will be admissible as evidence, but all parties may introduce conflicting or supplemental
evidence and the jury will decide the issue.

2. *Concern that a potential class member would not "want to replace a jury trial
and the right to seek punitive damages with the process contemplated by the settlement
agreement." Id.* The new Settlement does not replace a jury trial. It offers class members an
option to take individual compensation award at known amounts, along with the diagnostic
assistance program, the research program, the free legal services program and the other benefits
described above. Each class member is free to reject the compensation award and pursue a jury
trial for compensatory damages. As detailed in Section II.C.2.c above, the compensatory
damages option (and the insurance it provides against adverse developments in the litigation) and
other settlement benefits are a fair and appropriate return for waiver of punitive damages, and
courts have consistently approved mass-tort settlements with that structure.

3. *Concern that, "[i]n an area where the science may be evolving, how could it be
appropriate to lock in a decision from a panel of scientists for all future cases." Id.* The new
Settlement does not do so. First, the panel decision is advisory-only and may be contested on the
basis of other evidence, including any new science. Second, the admissibility of the panel
decision itself is subject to challenge based on *Daubert/Frye* in light of any new scientific
evidence beginning three years after the decision is issued.

4. *Concern whether it is possible to give "proper notification" to members of a
"class that includes all Roundup users who will get cancer in the future" and a "meaningful
chance to consider their options." Id.* The new Settlement's measures to address notice concern
are discussed in detail in Section III above. In short, the Settlement does so in several ways.
First, the planned notice campaign will have unprecedented scope and intensity, and is designed

to reach harder-to-reach class members (like migrant workers). Second, the notification and education of class members will continue even after the initial notice campaign, among other things through the DAGP Outreach Campaign and the Legal Services Program. Third, and most fundamentally, the compensation fund is optional: no class member can lose the right to sue Monsanto for compensation in the tort system unless he or she individually decides – *after* being diagnosed with NHL – to participate in the compensation fund and accept a payment from it, and class members will have the benefit of the free Legal Services Program in helping them to make that decision. Finally, this Settlement is at bottom an easy to comprehend offer of cash payment in return for a release. It does not have the elements of issue resolution that might be hard to convey to a lay audience.

## V.     The Court should stay class members from filing or prosecuting new Roundup Lawsuits and Related Party Lawsuits.

It is well established that when a court preliminarily approves a class settlement, the All Writs Act permits the court to stay existing lawsuits and bar new litigation by class members pending final approval. *See, e.g.*, *Hanlon*, 150 F.3d at 1025; *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, 229 F. Supp. 3d 1052, 1072-73 (N.D. Cal. 2017); *Uppal v. CVS Pharmacy, Inc.*, No. 14-2629, 2015 WL 10890652, at *3 (N.D. Cal. Sept. 11, 2015); *Cotter v. Lyft, Inc.*, No. 13-4065, Doc. 256 at 4 (N.D. Cal. July 1, 2016); *In re Nat'l Football League Players' Concussion Injury Litig.*, 301 F.R.D. 191, 203-04 (E.D. Pa. 2014); *In re Vioxx Prods. Liab. Litig.*, 869 F. Supp. 2d 719, 726 (E.D. La. 2012).

The All Writs Act expressly authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. The Act permits the Court "to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously

- 66 -

issued in its exercise of jurisdiction otherwise obtained." *United States v. N.Y. Tel. Co.*, 434 U.S.

159, 172 (1977). It "fill[s] the interstices of federal judicial power when those gaps threate[n] to

thwart the otherwise proper exercise of federal courts' jurisdiction." *Penn. Bureau of Corr. v.*

*U.S. Marshals Serv.*, 474 U.S. 34, 41 (1985). This is especially so when a federal court grants

preliminary approval of a class action settlement that resolves a complex matter—in those

circumstances, "the challenges facing the overseeing court are such that it is likely that almost

any parallel litigation in other fora presents a genuine threat to the jurisdiction of the federal

court." *In re Diet Drugs*, 282 F.3d 220, 236 (3d Cir. 2002).

The Court's power to enter, and the appropriateness of, the stay and bar order here is

particularly clear for several reasons. The class definition includes only individuals who are not

in litigation and have taken no steps toward any litigation. The stay request only freezes the

status quo for these individuals and Monsanto between the time of preliminary and final

approval, so that the Court and the parties can determine the propriety of the class Settlement.

The preliminary stay is thus sought only to protect the Court's evaluation of the proposed

Settlement in the period between preliminary and final approval. If the Court approves the

Settlement, then the stay will continue for all class members, defined as those who have not

opted out.

The order is further justified by the unique nature of this Settlement. Class members, by

definition, have not filed any lawsuit against Monsanto. As consideration for up to $2 billion in

relief, class members remaining in the class agree to refrain from filing any lawsuit against

Monsanto until after the initial settlement period, a litigation stay that is critical to the deal. But

there is no stay on compensation. The Settlement itself will begin operations and make payments

(beginning with Accelerated Payments after preliminary approval and Claims Program Awards

after final approval). And there is no need for a Settlement class member to file a complaint to preserve claims: the settlement tolls statutes of limitation.

This Court's power under the All Writs Act is also fully consistent with the Anti-Injunction Act, 28 U.S.C. § 2283. Among other reasons, under the class definition, this Court is not being asked to enjoin any ongoing proceedings in state or federal court. By definition, there are no such proceedings. This is not the same as an order enjoining parallel litigation "based on conduct covered by the release," an order subject to the Anti-Injunction Act, and which this Court has explained requires "extraordinary circumstances." Standing Order for Civil Cases, at 13; *see also*, *e.g.*, *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332, 1334 (5th Cir. 1981) ("This statute [the Anti-Injunction Act] does not apply to those parts of the multidistrict court order that relate to state court actions that have not yet been filed.").

To be sure, there may be a few class members who initiate litigation during the time between the filing of this motion and the entry of the preliminary approval order. For those class members, if any, the order would operate to restrain "parallel" litigation, but only during the time of the litigation stay. This Court and the Ninth Circuit have recognized that the stay of parallel litigation during the Settlement approval process is appropriate, authorized by the All Writs Act, and not prohibited by the Anti-Injunction Act. *See Hanlon*, 150 F.3d at 1025; *Uppal*, 2015 WL 10890652, at *3; *Cotter*, Doc. 256 at 4; *see also*, *e.g.*, *Sandpiper Vill. Condo. Ass'n, Inc. v. La.-Pac. Corp.*, 428 F.3d 831, 845 (9th Cir. 2005) (explaining that *Hanlon* "concluded that a temporary stay pending settlement of the nationwide class action was appropriate under the All Writs Act and the Anti-Injunction Act because concurrent state proceedings at such a sensitive stage in the federal proceedings would have threatened the jurisdiction of the district court"); *Volkswagen*, 229 F. Supp. 3d at 1072-73 ("A stay of all state court actions relating to Released

Claims . . . is necessary to preserve the Court's jurisdiction.").

Importantly, there is no prejudice to class members from the stay. The stay would apply beginning with preliminary approval and run through the Court's decision on final approval (subject to extension at that time if the Court does grant final approval). This period coincides with the 150-day period for opt-outs. If a class member is eager to file a lawsuit and does not want the stay or the benefits of the Settlement, he or she can simply opt out of the Settlement and immediately escape the stay. . The opt-out process is simple and much less demanding than filing suit, requiring only written notice to the Claims Administrator, and is effective 21 days after receipt (or the resolution of any challenge to the validity of the request). Settlement § 4.2.

A stay is an important piece of what Monsanto bargained for in exchange for up to $2 billion. It works no harm to class members, who, despite years of public controversy about Roundup, have not filed lawsuits or even retained counsel. The few class members who want nothing to do with the Settlement need only opt out, and retain their full bundle of rights, including the right to sue Monsanto immediately. For these reasons, the Court should exercise its authority under the All Writs Act and stay class members from filing covered actions.

## VI.    <u>Requested Timetable</u>

| Event | Proposed Date |
|---|---|
| Preliminary Approval Hearing | The parties request a preliminary approval hearing within 30 days of this filing |
| Commencement of Notice Plan | 21 days after entry of Preliminary Approval Order |
| Deadline to Opt Out | 150 days after Commencement of Notice Plan |
| Motion for Attorneys' Fees, Costs, and Class Representative Incentive Awards | As ordered by the Court |
| Deadline to Object | As ordered by the Court |
| Motion for Final Approval and Response to Objections | As ordered by the Court |
| Fairness Hearing | As ordered by the Court |

## CONCLUSION

Plaintiffs respectfully request that the Court (1) grant preliminary approval to the

Settlement; (2) appoint Interim Class Counsel and Subclass Counsel; (3) direct notice to the

class; (4) schedule a Fairness Hearing; (5) stay the filing and prosecution of Roundup-related

actions by Settlement class members; and (6) enter the proposed Preliminary Approval Order

attached as Exhibit 10 to the Settlement Agreement.

Dated: February 3, 2021                    Respectfully submitted,

<div style="margin-left: 40%;">

*/s/ Elizabeth J. Cabraser*
Robert L. Lieff (of counsel) (SBN 037568)
Elizabeth J. Cabraser (SBN 083151)
Kevin R. Budner (SBN 287271)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
rlieff@lchb.com
ecabraser@lchb.com
kbudner@lchb.com

Steven E. Fineman (SBN 140335)
Wendy R. Fleishman
Rhea Ghosh
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
sfineman@lchb.com
wfleishman@lchb.com
rghosh@lchb.com

Andrew R. Kaufman
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN 37201
Telephone: 615.313.9000
akaufman@lchb.com

</div>

- 70 -                    MOTION FOR PRELIMINARY APPROVAL
                                                                OF CLASS ACTION SETTLEMENT
                                                                MDL NO. 2741, CASE NO. 3:16-MD-02741

Elizabeth A Fegan
 *Proposed Subclass 2 Counsel*
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: 312.741.1019
beth@feganscott.com

Melissa Ryan Clark
FEGAN SCOTT LLC
140 Broadway, 46th Floor
New York, NY 10005
Telephone: 347.353.1150
melissa@feganscott.com

James R. Dugan, II
TerriAnne Benedetto
 *Proposed Subclass 2 Counsel*
David S. Scalia
THE DUGAN LAW FIRM, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, LA 70130
Telephone: 504.648.0180
jdugan@dugan-lawfirm.com
tbenedetto@dugan-lawfirm.com
dscalia@dugan-lawfirm.com

William M. Audet (SBN 117456)
 *Proposed Subclass 1 Counsel*
Ling Y. Kuang (SBN 296873)
AUDET & PARTNERS, LLP
711 Van Ness, Suite 500
San Francisco, CA 94102-3229
Telephone: 415.568.2555
waudet@audetlaw.com
lkuang@audetlaw.com

Samuel Issacharoff
40 Washington Square South
Suite 411J
New York, NY 10012
Telephone: 212.998.6580
si13@nyu.edu

*Counsel for Plaintiffs and the Proposed Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on February 3, 2021, service of this document was accomplished pursuant to the Court's electronic filing procedures by filing this document through the ECF system.

  /s/ *Elizabeth J. Cabraser*
Elizabeth J. Cabraser

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741