UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2471 |
| THIS DOCUMENT RELATES TO: | Case No. 3:16-md-02741-VC |
| *Ramirez, et al. v. Monsanto Co.*, Case No. 3:19-cv-02224 | **DECLARATION OF MARK EVELAND** |

I, MARK EVELAND, being of majority age do pursuant to 28 USCS § 1746 declare as follows:

1.   I am employed with Verus LLC ("**Verus**"), which I co-founded in 2003. My title is Chief Executive Officer.

2.   Verus is a claims administration and litigation support services firm serving clients in the mass tort and class action fields nationally. The firm provides a full suite of litigation support services, including case intake and evaluation, medical record acquisition and review, accounting and financial reporting, settlement plan design, QSF administration, settlement administration, disbursement services, and reporting and analytics services. The firm is located in Princeton, New Jersey and employs a staff of over 125. Since its founding, Verus has administered over 6 million asbestos personal injury claims and disbursed billions in settlement funds related to asbestos claims. While known and well regarded for its work in the asbestos mass tort field, Verus also provides litigation

1

support services to law firms working on many other types of mass torts involving toxic exposures, defective medical devices, pharmaceuticals, and sexual abuse.

3. I have been directly involved in the handling, administration, analysis, and resolution of personal injury claims since 1993. Over the years I personally provided claims handling and claims management services to a wide array of clients, including various defendants, bankrupt corporations, and law firms nationwide representing defendants and insurance carriers in mass tort litigation. In the course of my professional activities, I have personally been involved in the design and implementation of hundreds of mass tort settlements involving numerous law firms and defendants across the country. Over the years I have been doing this work I developed a broad knowledge of mass tort litigation and believe I have a full understanding of the factors that lead to the successful resolution of claims through an effective settlement plan design.

4. Based on my education, knowledge and experience in the mass torts claims field I am able and competent to offer opinions on the fairness and adequacy of the pending proposed Compensation Award program incorporated into the Settlement Agreement (which I will refer to as the "**Plan**") in the *Ramirez, et al v. Monsanto Company ("Ramirez")* lawsuit before the Court, which Verus helped design. I also will describe to the Court Verus' capabilities and experience in support of the application being made by Class Counsel for Verus to be appointed by the Court to serve as the Administrator of the proposed Plan.

5.  Verus and I have been retained by Lieff Cabraser Heimann & Bernstein, LLP, and their co-counsel, to provide consultation and analytics services to support the negotiation of the Settlement Agreement in the *Ramirez* matter. I refer to the firm, and their co-counsel, as "Class Counsel".

6.  As consultants to Class Counsel on their development of the Settlement Agreement, my Verus colleagues and I are familiar with the Settlement Agreement, the informational sources available to execute the Settlement Agreement, and the Settlement Agreement's operational requirements and needs.

7.  With respect to my personal qualifications, my education, work history and forensic testimony work are set out in the resume attached as Exhibit "A". Briefly, my experience pertinent to *Ramirez* includes:

(a)  Employment with Peterson Consulting as a data analyst, supervisor, and manager from 1993 through 1997. In my tenure with this firm I was involved in developing claims review processes, including the implementation of the Georgine v. Amchem class action settlement. I was also involved in liability forecasting for a number of asbestos defendants and several medical device manufacturers.

(b)  Tenure with the Center for Claims Resolution ("CCR ) from 1998 through 2001. The CCR was a claims management organization entrusted with the management of all active asbestos personal injury claims on behalf of a collective of twenty national asbestos defendants. My responsibilities as a member of the Senior Management of this organization included (i) overseeing a team of analysts who allocated the indemnity, legal costs, and administrative overhead to the members

3

and their insurers; (ii) managing the data processing operations for new filings; (iii) directing the implementation of all settlement agreements; (iv) providing liability forecasting and operational analytics. Ultimately, my colleagues and I at CCR were responsible for resolving over 450,000 personal injury claims, as well as billing, collecting, and disbursing over $6 billion in settlement funds, litigation expenses, and operating expenses.

(c) In 2002 I joined the startup RG3 Claims Administration, where I served as Director. While at RG3, I oversaw the design of a claims processing system and managed the notice campaigns, opt outs, and claims processing for a number of securities fraud and wage & hour class action settlements.

(d) In 2003 I co-founded Verus where I have served as President and Chief Operating Officer since its inception.

8. With respect to Verus' qualifications, it currently provides claims liability projections, claim valuation model design, and claims administration services for approximately twenty-eight personal injury trusts involving asbestos, talc, and medical malpractice claims.

(a) In its capacity as a third-party claims administrator, Verus is frequently tasked with developing policies, procedures, and software systems for the intake, review, and settlement of asbestos and talc personal injury claims, as well as claims resolution systems for other mass tort matters. In performing these duties, Verus performs the following services for our clients:

- Designing claim valuation models for valuing individual claims consistently and accurately;
- Developing risk management strategies;
- Developing policies, recommendations and procedures for evaluating and liquidating claims;
- Developing customized claims portals for the intake and review of claims filings;
- Developing detailed profiles of the history of each defendant's involvement in the manufacture, distribution, and or application of toxic or faulty products;
- Providing liability forecasts, data analytics, claims estimations and cash flow projections for purposes of managing settlement fund assets to ensure availability of funds for future claimants;
- Processing all claims submissions and communicating determinations to claimants and/or claimants counsel;
- Disbursing funds to qualifying claimants;
- Overseeing mediation and/or Alternative Dispute Resolution proceedings; and
- Supporting outside counsel with respect to insurance recoveries and other litigation matters.

(b)     Since 2003, Verus has resolved in excess of six million personal injury claims filed with our bankruptcy trust clients. These clients consist of a diverse mix of former asbestos defendants, including raw fiber suppliers; installers of asbestos-containing products; distributors of asbestos containing products; manufacturers of thermal insulation, insulating cements, joint compounds, construction materials, cement-asbestos pipe, gaskets, friction products, and many other products.

(c)     In managing such a diversity of defendants over decades of litigation, Verus' personnel actively working on the *Ramirez* matter have developed a breadth and depth of knowledge of the elements of personal injury claims, including the

5

medical proofs necessary to support such claims, proofs of product usage, and the valuation of claims both for litigation and settlement purposes.

9.      Through our review of the information made available to us and our experience in providing the aforementioned services, my Verus colleagues and I have been able to counsel and assist Class Counsel in their development of the Plan before the Court to administer and distribute the Compensation Fund. From this I can also opine on the fairness, reasonableness, and adequacy of the Plan subject to the Court's approval.

10.     Verus is able and ready to take on the role of the Claims Administrator and faithfully execute its provisions.

11.     For the reasons that follow, it is my opinion that the proposed Settlement Agreement, if approved by the Court, would provide fair, reasonable and adequate compensation to Class Members in exchange for the Release of the Released Claims identified in the Settlement Agreement. Projected class member distributions under the proposed Plan offer Class Members the prospect of receiving substantial payments based on the severity of the injured person's damages, as measured by several attributes, including the frequency, proximity and duration of exposure to Roundup Products, the nature of the injured person's NHL disease progression, the presence of confounding medical conditions and other family and medical history circumstances, and the injured person's age.

12.     To arrive at these conclusions, I rely on publicly available data provided by the National Institute of Health's National Cancer Institute ("NCI") on

disease incidence rates; an estimation of the number of injured persons who have already filed suit or retained counsel from figures reported in legal and general media publications (such being excluded for the Class pursuant to the Settlement Agreement); and Verus' knowledge and experience of claimant behaviors vis-à-vis other large settlement funds with similar criteria and compensation opportunities.

13. To determine the adequacy of the Settlement Fund, I first estimated the number of NHL diagnoses in the United States from 2013 through 2025 (the expected end of the Initial Settlement Period assuming a Final Approval Order will be entered early in the first quarter of 2022). Using NCI data on incidence rates from 1999 through 2017, I calculated an average annual rate of increase in NHL diagnoses of 1.77% for this time period. I then used the actual number of diagnoses from 2013 through 2017 and projected from 2018 through 2025 using the average annual rate of increase previously calculated. The result of these calculations yielded and estimated [964,025] cases of NHL from 2013 through 2025.

14. I next estimate a "Participation Rate" factor by dividing the number of these injured persons who have already filed a lawsuit or retained counsel who were diagnosed or predicted to be diagnosed between 2013 and 2020 ("Ineligible Claimants") by the total number of NHL diagnoses in this same time period. I assume individuals diagnosed prior to 2013 were nearly all time-barred by the relevant statute of limitations and thus leave prior years out of this estimation. According to publicly available reports from numerous media outlets, there were approximately 125,000 such Ineligible Claimants as of the end of 2020. Dividing

7

this figure by the [572,345] NHL diagnosis over the same time period yield a Participation Rate factor of 21.8%. This factor is multiplied by the number of diagnoses in each year to estimate the number of Ineligible Claimants who were diagnosed in each year.

15. To estimate the number of injured persons who would be eligible to file for compensation awards, I subtract the Ineligible Claimants from the estimated number of NHL diagnoses in each year. I then apply a Participation Rate factor to these remaining "Unfiled" cases. I used different Participation Rate factors for three defined sub-periods in the 2013 through 2025 period:

(a) For the years 2013 through 2014, I estimate that a maximum of 1% of the Unfiled cases will have cognizable arguments that their claims are not time barred and will file claims for Compensation Awards.

(b) For the years 2015 through 2020, I use a Participation Rate factor of 7.5% of the Unfiled cases who are likely to respond to class notice and the ongoing outreach campaigns described in the Settlement Agreement by filing a claim with the Compensation Award program. This assumes that (i) the notice and outreach programs described in the plan will drive claimants with preexisting diagnoses who were previously undecided about pursuing a tort lawsuit to file claims because of the reduced friction costs of doing so with a settlement trust; (ii) the notice and outreach campaign incorporated in the plan has been specifically designed to include extensive outreach to underserved communities that may not have been reached in previous marketing efforts, thus increasing awareness of the availability

of compensation for members of these underserved communities with preexisting diagnoses of NHL; and, (iii) the Diagnostic Assistance Grant Program that is also targeted at these same underserved communities will result in a measurable increase in claiming resulting from the diagnosis of NHL cases that would have otherwise gone undetected due to the difficulty of accessing quality diagnostic and health care services in these communities.

(c)     I assume that the combined effect of the notice and outreach campaign described in the Plan will result in similar total claiming patterns for future diagnosis years. Thus, for the diagnosis years 2021 through 2025, I calculate a Participation Rate by dividing the sum of Ineligible Claims plus 7.5% of the Unfiled cases from 2015 through 2020 by the total number of NHL diagnoses in that same period. This yields a Participation Rate for 2021 through 2025 of 27.7%.

16.    The total number of estimated claims for compensation awards resulting from the calculations described in paragraphs 13 through 15 above is [134,819]. The detailed calculations are shown in Table 1 below.

*Table 1*

| Year of DX | Estimated Annual NHL Diagnoses | Tort System: Estimated Filed + Retained Counsel | Unfiled | Participation Rate | Settlement Fund Filings |
|---|---|---|---|---|---|
| 2013 | 69,362 | 15,121 | 54,241 | 1.0% | 542 |
| 2014 | 70,467 | 15,362 | 55,105 | 1.0% | 551 |
| **Subtotal:** | **139,829** | **30,483** | **109,346** | | **1,093** |
| 2015 | 71,516 | 15,590 | 55,926 | 7.5% | 4,194 |
| 2016 | 71,478 | 15,582 | 55,896 | 7.5% | 4,192 |
| 2017 | 70,487 | 15,366 | 55,121 | 7.5% | 4,134 |
| 2018 | 71,735 | 15,638 | 56,096 | 7.5% | 4,207 |
| 2019 | 73,004 | 15,915 | 57,089 | 7.5% | 4,282 |
| 2020 | 74,296 | 16,197 | 58,100 | 7.5% | 4,357 |
| 2021 | 75,612 | - | 75,612 | 27.7% | 20,918 |
| 2022 | 76,950 | - | 76,950 | 27.7% | 21,288 |
| 2023 | 78,312 | - | 78,312 | 27.7% | 21,665 |
| 2024 | 79,698 | - | 79,698 | 27.7% | 22,048 |
| 2025 | 81,109 | | 81,109 | 27.7% | 22,439 |
| **Subtotal:** | **824,196** | **94,289** | **729,908** | | **133,725** |
| **Total:** | **964,025** | **124,771** | **839,254** | | **134,819** |

17. The next task is to allocate the filings to the compensation tiers as described in Exhibit 5 to the Settlement Agreement. I first allocate all pre-2015 diagnosis claims to Tier 1 as required by the Plan, and estimate that 10% of the remaining claims will be filed for the Accelerated Claims Payment ("ACP") option. The remainder of the estimated claims filings are allocated to the four tiers of Compensation Ranges defined in Exhibit 5 to the Plan. To allocate to claims to these tiers, I used NCI data on the percentage of patients with NHL diagnoses from 2010 through 2016 within the age ranges defined for each of the four tiers. I then applied an "approval rate" to arrive at the number of filed claims that will ultimately be approved for compensation. Based on my experience with other personal injury trusts with similar requirements for proof of injury and product

10

exposure, I assume that 35% of filed claims will be approved, yielding an estimated [47,187] approved claims. The result of this allocation is shown in Table 2 below.

*Table 2*

| Tiers | % of NHL Population | % of Claims | Claims | Approved |
|---|---|---|---|---|
| Tier 1: pre-2015 DX | | | 1,093 | 383 |
| **DX 2016 and beyond** | | | | |
| ACP | NA | 10.0% | 13,373 | 4,680 |
| Tier 1: >= 2015 DX | 28.73% | 25.86% | 34,577 | 12,102 |
| Tier 2 | 49.43% | 44.49% | 59,490 | 20,822 |
| Tier 3 | 15.58% | 14.02% | 18,751 | 6,563 |
| Tier 4 | 6.26% | 5.63% | 7,534 | 2,637 |
| | 100.00% | 100.00% | 134,819 | 47,187 |

18.  The final step in determining the adequacy of the aggregate settlement amount to provide equitable compensation for all Class Members is to estimate the total amount of compensation based on the Compensation Ranges and the number of approved claims estimated for each tier.

19.  One of Verus' responsibilities as Claims Administrator will be to develop a data-driven model that satisfies the guidelines in Exhibit 5 to the Settlement Agreement and results in the assignment of consistent settlement values to similarly situated claims. Verus has extensive experience developing such models for settlement trusts involving long-tail claims. Such models are typically "tuned" to yield values for all claims liquidated over the life of the settlement fund such that an average value is achieved that will ensure the adequacy of the fund to pay all claims expected to arise. These average values in personal injury settlement programs typically fall below the midpoint of the range of settlement values. For purposes of my analysis, I conservatively assume that the average achieved over the

life of the settlement fund will be the 50th percentile of the Compensation Range for Tiers 1, 2, and 3. Tier 4 claims that can prove "extraordinary circumstances" are eligible for compensation in excess of [$200,000], provided that the total of all Claims Program Awards in excess of [$200,000] over the Initial Settlement Period may not exceed $50 million. I assume for purposes of stress testing the adequacy of the aggregate settlement fund that the full $50 million will be awarded to claimants in Tier 4. Dividing the $50 million by the estimated [2,637] Tier 4 claims yields an average of [$18,961] per claim in addition to the [$132,500] that is the 50th percentile of the Compensation Range. Thus, I estimate the average claims program award for Tier 4 will be [$151,461].

20.     I estimate that the settlement fund will pay out to claimants a total of [$1,207,372,500] of the available [$1,325,000,000] through 2025. Compensation Award payments at this level will leave an estimated remaining balance of [$117,627,500], or [8.9%] in the Compensation Fund by the end of the Initial Settlement Period. This cushion in the initial estimation is typical of other settlement programs I have managed. Such a cushion allows for the sensitivities in assumptions made in liability forecasts regarding Participation Rates, claimant demographics, and approval rates among other variables. This remaining balance, along with proactive monitoring of actual claims experience and management of Claims Award program procedures, once established, will enable Verus to make appropriate adjustments to ensure the Compensation Fund will be adequate to pay

all valid claims presented over the entire Initial Settlement Period. Details of the estimated payments within each Tier are shown in Table 3 below.

*Table 3*

| Tiers | Compensation Ranges | | | Approved Claims | Compensation Awards |
|---|---|---|---|---|---|
| | Low | High | Average Value | | |
| ACP | $ 5,000 | $ 5,000 | $ 5,000 | 4,680 | $ 23,400,000 |
| Tier 1 | $ 10,000 | $ 10,000 | $ 10,000 | 12,485 | $ 124,850,000 |
| Tier 2 | $ 10,000 | $ 25,000 | $ 17,500 | 20,822 | $ 364,385,000 |
| Tier 3 | $ 25,000 | $ 65,000 | $ 45,000 | 6,563 | $ 295,335,000 |
| Tier 4 | $ 65,000 | $ 200,000 | $ 151,461 | 2,637 | $ 399,402,500 |
| | | | **Total Compensation Awards** | **47,187** | **$ 1,207,372,500** |

21.     The estimated Compensation Award payments are conservatively high due to the reliance on age alone in allocating claims to the respective Tiers. Without detailed data on the claims experience of the defendant, I have not attempted to determine the percentage of claimants who would be assigned to a lower tier than that assigned based on age alone due to the failure to meet the other criteria defining each Tier. For example, per the criteria in Exhibit 5, in order to be assigned to Tier 4, in addition to being less than 45 years of age, a claimant must also show that (s)he has (i) no Group A Medical Conditions or Group B Medical Conditions; (ii) has had an NHL recurrence within the past three year and/or been in remission for less than three years; and (iii) has Roundup Exposure with a frequency and duration of 60 months (five years).

(a)     To illustrate the potential reduction in the number of Tier 4 claims when these other criteria are applied, consider the prevalence of Group B Medical Conditions in the general population. Among the Group B Medical Conditions is

"Obesity at time of diagnosis of NHL (Body Mass Index greater than 30). According to the Centers for Disease Control and Prevention[1], the prevalence of obesity in the United States in 2017-2018 was 42.4% (40.0% among adults aged 20 to 39 years, 44.8% among adults aged 40 to 59 years, and 42.8% among adults aged 60 and older). Given these statistics, it is reasonable to assume that approximately 40% of the NHL claimants below age 45 would be ineligible for Tier 4 compensation, and would be reduced to Tier 3 or an even lower Tier.

22.     Based on the above referenced analysis and projections, combined with my years of experience in resolving asbestos claims and administering asbestos claims resolution facilities, I believe that the proposed Plan provides an adequate Settlement Fund to pay all eligible claims, as well as a fair, reasonable and rational methodology to determine payment shares for eligible Settlement Class Members.

23.     To the extent any of what I state above is an opinion, it is expressed by me within a reasonable degree of certainty or probability within my fields of expertise, which include asbestos claim handling, asbestos claims valuation, and asbestos claims facility procedures and management.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Princeton, New Jersey this 3rd day of February 2021.

_[signature]_.

---

[1] "*Prevalence of Obesity and Severe Obesity Among Adults: United States, 2017 - 2018*", NCHS Data Brief No. 360, February 2020.