## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2471 |
| THIS DOCUMENT RELATES TO: | Case No. 3:16-md-02741-VC |
| *Ramirez, et al. v. Monsanto Co.*, Case No. 3:19-cv-02224 | **DECLARATION OF JESSICA B. HOREWITZ, PH.D.** |

I, JESSICA B. HOREWITZ, PH.D, being of majority age do pursuant to 28 USCS § 1746 declare as follows:

1. I am employed with Nathan Associates Inc.("Nathan") with the title of Senior Vice President. I serve on Nathan's Executive Committee, am the coordinator of the Litigation & Expert Services business line and am a member of the Product Liability & Mass Torts, Insurance Coverage & Claims Analysis ("PLMTI") practice.

2. Nathan is a consulting firm that delivers creative, viable, and defensible analytic and economic solutions for government and commercial clients around the world. Our PLMTI practice specializes in disputes or issues that fall at the nexus of environmental and financial analysis. Our experience extends to a wide array of product, toxic tort, environmental and exposure claims including those arising from pharmaceuticals, medical devices, toxic material releases, pesticides, asbestos, beryllium, lead paint, lead mining, smelting, latex gloves,

1

respirators, mercury, MRI contrast agents, silica and mixed dust, coal mine dust, and welding rods.

3. After earning my Master's and Ph.D. degrees in economics from the University of Virginia, I have spent the last 25 years instrumentally involved in liability estimation, in asbestos, pharmaceuticals and medical devices, environmental toxins, and other mass-tort matters. I have substantial expertise forecasting long-tailed product liabilities for the purposes of financial reporting, insurance coverage, corporate restructuring (including bankruptcy), evaluation of settlement funds and trust finances. I am also experienced in statistical analysis and allocation of environmental remediation costs in a diverse array of industries, representing clients in litigation and settlement settings such as state court, bankruptcy court, international and domestic arbitration, and governmental and regulatory hearings.

4. I have been retained by Lieff Cabraser Heimann & Bernstein, LLP, and their co-counsel, to review and comment on the declaration of Mr. Mark Eveland regarding the pending proposed Compensation Award program incorporated into the Settlement Agreement (the "Plan") in the *Ramirez, et al v. Monsanto Company ("Ramirez")* lawsuit before the Court. Based on my education, knowledge, and experience in liability estimation in the mass torts claims field, I am qualified to do so. My CV is attached as Exhibit A to this declaration.

5.  Counsel has provided me the Declaration of Mark Eveland[1] and the Confidential Settlement document[2] (the "Plan") which creates the Settlement Facility. I provide the following independent review of Mr. Eveland's methods and conclusions.

6.  I understand that Mr. Eveland has been asked to opine on the adequacy of the finances and terms of the Plan such that the Plan will be able to compensate all claimants making qualified submissions resulting from diagnoses through 2025. I further understand that the Settlement Facility has been funded with $1.325 billion[3] with administrative feels accounted for separately.[4] I have performed independent analyses, reviewed the documents made available to me, and rely on my education and experience in order to draw my conclusion that Mr. Eveland's analysis is robust.

7.  Rather than begin by reviewing Mr. Eveland's declaration, I began my evaluation by considering the methodology I would employ had I been given Mr. Eveland's assignment. I then compared the Eveland declaration to my approach and found that Mr. Eveland approached the analysis with the identical steps I would have taken.

---

[1] Declaration of Mark Eveland, February 2, 2011 In Re: ROBERT RAMIREZ, ET AL. v. MONSANTO COMPANY, CASE NO. 3:16-MID-02741-VA & 3:19-cv-02224.
[2] ROBERT RAMIREZ, ET AL. v. MONSANTO COMPANY, CASE NO. 3 :16-MID-02741-VA & 3:19-CV-02224-VC; CLASS ACTION SETTLEMENT AGREEMENT AS OF FEBRUAR 3, 2021 (subject to court approval).
[3] The Plan Section 3.2(i).
[4] The Plan Section 3.3(b). Typically, administrative costs would be included in my analysis or evaluation, however, given the terms of the Plan, I eliminate administrative costs from consideration in my conclusions.

8.  Mr. Eveland employed an analysis with six key inputs:

(a) Identify and quantify the total potential pool of applicants to the fund;

(b) Determine the number (and therefore percentage) of potential applicants that would be disqualified due to previously filed claims or retention of counsel (these potential applicants are ineligible to recover from the settlement fund because they do not fit within the Class Member definition);

(c) Determine the filing rate/participation rate for eligible applicants;

(d) Distribute eligible applicants into Tiers;

(e) Assign an approval rate for applicants;

(f) Assign a compensation value to approved applicants in each Tier, including the funds set aside for Extraordinary Circumstances.

Mr. Eveland then compares the total estimated value to the funds set aside for the facility in order to draw his conclusion. I evaluate each of the Eveland model inputs in turn.

9.  The Eveland declaration begins with a population of individuals diagnosed (or expected to be diagnosed) with Non-Hodgkin's Lymphoma ("NHL") between 2013 and 2025 of 964,025. In my independent analysis, I estimated the NHL population over the same time-period to be between 833,732 and 1,021,435. The Eveland starting population falls within the upper third of the range I established, and in my opinion, it is a valid and robust model input requiring no further analysis or commentary.

10. Next, diagnosed/eligible population is reduced by the number of individuals that have already participated in legal action (filing a lawsuit or retaining counsel), these individuals are ineligible to participate in the settlement fund. The number of individuals that are expected to participate in the settlement fund is estimated. Mr. Eveland thoughtfully uses the observed (publicly available) data on any legal action taken thus far and reduces the total diagnosed population through 2020 by this measure of ineligible injured parties. Absent an accounting from Monsanto, I am aware of no source that would be superior to that used by Mr. Eveland to determine the population of NHL diagnosed individuals who remain eligible to participate in the Settlement Fund.

11. With the eligible population defined, a measure of participation (or filing rate) is applied to convert the eligible population into the number of expected participants. Through my research and experience in various mass tort matters, I have observed that in instances in which the link between disease and exposure is strong, participation rates are high. The less certain the link, the lower the participation. Other factors also influence participation rates. If a condition or disease is more severe, participation increases; if the information regarding the possible compensation is readily available, participation increases, and if there is an administrative burden to participate, rates tend to fall. Given these factors, the particulars of the link between NHL and Roundup use, the progression of NHL, the anticipated reach-out regarding the settlement, a participation rate of 25 – 30% is

the range I would independently assign to this case. Mr. Eveland uses a participation rate of 27.7%, again falling within my conclusions.

12. Mr. Eveland then applies the 27.7% participation to the various populations to determine the number of expected submissions to the fund. However, those previously diagnosed individuals who have participated in legal action previously (and accounted for in the previous step) account for some of the 27.7% total participation. Mr. Eveland reduces the expected submission by the estimated ineligible population and applies the net participation rates to arrive at the expected total participation in the fund.

13. At this stage, the number of expected participants is known and must be divided into compensation tiers in order to value the claims. Mr. Eveland begins this separation in exactly the way I would, by age, the primary defining characteristic of the Tier system.[5] The age distribution of expected claimants, rather than a general age distribution, is used in Mr. Eveland's analysis, as is appropriate, and includes the conditions listed in Exhibit 3.[6] Using SEER data (what Mr. Eveland calls "NCI" data), I have replicated Mr. Eveland's age distribution. I note that the distribution would change should different conditions be allowed to be compensated by the Settlement Facility and a changing age distribution might impact Mr. Eveland's conclusions.

---

[5] The Plan, Exhibit 5.
[6] The Plan, Exhibit 3.

6

14. I further note that the participants by Tier that result from the above analysis is likely a conservative (or over) estimate of the actual number of participants in each Tier. Age is not the only criteria by which individuals qualify for a particular Tier of compensation. There is a prescribed list of pre-existing conditions and occupational disqualifiers that could render a participant ineligible for compensation or filter the participant to a lower-value Tier. By relying on age alone, Mr. Eveland is creating a measure of conservatism in his estimate that will serve to protect his conclusions from factors that might unexpectedly influence other model inputs and drive the expected fund outlays upward.

15. Each expected participant is assumed to submit a claim to the fund, that claim is then evaluated for adherence to the documentation requirements and approved for payment or not. Mr. Eveland's experience speaks more to this input factor than mine, and I defer to his expertise. I note that his assumption of a 35% approval rate is applied to each Tier, whereas it might be expected that different Tiers would have different approval rates with an overall rate of 35%. Note that if a participant submits a claim that does not qualify for the submitted Tier, it will fall to a lower Tier for compensation (before being rejected for no compensation). As such, Mr. Eveland's assumption of a 35% approval rate for each Tier might be different in practice with lower Tiers having slightly higher rates of approval than higher Tiers. If that is the case, then once again, Mr. Eveland's analysis is conservative.

16. The number of expected approved participants in each Tier are then assigned a compensation value. For Tier 1 there is no range associated with the compensation and the scheduled value is assigned to each participant in the Tier. However, for Tiers 2, 3, and 4, a range of value exists. In my experience with asbestos trusts, the average value observed in such cases typically falls at or below the midpoint of the range. Mr. Eveland conservatively uses the midpoint of Tiers 2 and 3 respectively to value Tier 2 and 3 participants. Mr. Eveland then augments the midpoint value in Tier 4 to account for Extraordinary Circumstances and applies the augmented value to Tier 4 participants. Although I agree with the ultimate result of Mr. Eveland's methods, I would have operationalized the allowance (total of $50 million) as a separate line item rather than incorporating it into the average, but my method would have arrived at the identical conclusions to Mr. Eveland.

17. Finally, I understand that the costs of administering the fund are ancillary to this analysis and thus, require no opinion from either Mr. Eveland or myself.

18. My conclusion is that Mr. Eveland's analysis is thoughtful and appropriate for the question at hand and his conclusions are reliable. I further note that in any such analysis, the conclusions are sensitive to the model input decisions. In this case, the conclusions can be undermined should the actual operations deviate from the behaviors assumed in his analysis. However, it is this possibility that necessitates continuous monitoring of a settlement fund once it is established

and opened. By reviewing each key input as the fund operates, any deviations can be identified early, and a re-estimation can inform any needed action in the fund procedures.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Fairfax, Virginia this 2nd day of February 2021.

*[signature: Jessica R. Horewitz]*