Karen Barth Menzies (CA SBN 180234)
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, CA  94612
Tel: (510) 350-9700
Fax: (510) 350-9701
kbm@classlawgroup.com

Fletcher V. Trammell
Melissa Binstock Ephron
TRAMMELL, PC
3262 Westheimer Rd., Ste. 423
Houston, TX 77098
Tel: (800) 405-1740
Fax: (800) 532-0992
fletch@trammellpc.com
melissa@trammellpc.com

Alexander G. Dwyer
Andrew F. Kirkendall
Erin M. Wood
KIRKENDALL DWYER LLP
4343 Sigma Rd, Suite 200
Dallas, TX  75244
Tel: 214-271-4027
Fax: 214-253-0629
ad@kirkendalldwyer.com
ak@kirkendalldwyer.com
ewood@kirkendalldwyer.com

*CATEGORY 3 OBJECTORS:*
*Attorney for Plaintiffs Whose*
*Counsel Have Signed A*
*Participation Agreement*

**REDACTED VERSION OF DOCUMENT(S)**
**SOUGHT TO BE SEALED.**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>**ALL CASES** | MDL 2741<br><br>Case No. 16-md-02741-VC<br>HON. VINCE CHHABRIA<br><br>**CATEGORY 3 OBJECTORS' OPPOSITION TO MOTION TO AMEND PRE-TRIAL ORDER 12: COMMON BEENEFIT FUND ORDER TO ESTABLISH A HOLDBACK PERCENTAGE (Doc. No. 12394)**<br><br>Hearing date: March 3, 2021<br>Time: 1:00 PM |

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF RELEVANT FACTS ....................................................... 1 – 2

III.    ARGUMENT ................................................................................................. 2 – 15

      A.  This Court Lacks Jurisdiction Over the Majority of the Category 3
          Objectors' Cases ................................................................................ 2 – 5

      B.  Leadership Is Not be Entitled to Common Benefit Fees and Expenses as to
          Those Cases that Have Not Settled ..................................................... 5 – 6

      C.  The $800 Million Amount Leadership Seeks is Simply too Much Based on
          any Reasonable Lodestar Calculation and Under ABA Rules........... 6 – 11

      D.  The Work-Product Some Category 3 Objectors were Given Access to is
          Ancillary and is Not Worth $800 Million....................................... 12 – 15

      E.  Category 3 Objectors Alternatively Seek Discovery to Establish the
          Reasonableness and Necessity of CLC's Required and Alleged Fees and
          Expenses ................................................................................................. 15

IV.     CONCLUSION.................................................................................................. 15

Category 3 Objectors' Opposition to Motion to Amend PTO 12; Case No. 16-md-02741-VC

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*In re Washington Public Power Supply System Securities Litigation*
19 F.3d 1291 (9th Cir. 1994) ....................................................................... 8
*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ..................................................................................... 5
*Bowling v. Pfizer, Inc.*,
102 F.3d 777 (6th Cir. 1996) ....................................................................... 8
*Gates v. Deukmejian*,
987 F.2d 1392 (9th Cir. 1992) ..................................................................... 7
*Goldberger v. Integrated Res., Inc.*,
209 F. 3d 43 (2d Cir. 2000) ......................................................................... 8
*Hartland v. Alaska Airlines*,
544 F.2d 992 (9th Cir. 1976) ....................................................................... 3
*In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*
549 F.2d 1006 (5th Cir. 1977) ........................................................... 5, 10, 13
*In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*,
2011 WL 611883 (N.D. Ind. Feb. 11, 2011) ............................................ 3, 4
*In re Gen. Motors Corp.*,
55 F.3d 768 .................................................................................................. 8
*In re Hyundai and Kia Fuel Economy Litig.*,
926 F.3d 539 (9th Cir. 2019) ....................................................................... 9
*In re Zyprexa Prod. Liab. Litig.*,
594 F.3d 113 (2d Cir. 2010) ......................................................................... 5
*In re: Genetically Modified Rice Litig.*,
764 F.3d 864 (8th Cir. 2014) ....................................................................... 3
*In Re: Lidoderm Antitrust Litigation*,
2017 WL 3478810 (N.D. Cal., Aug. 14, 2017) ........................................... 3
*Internal Imp. Fund Trs. v. Greenough*,
105 U.S. 527 (1881) ..................................................................................... 5
*Kerr v. Screen Extras Guild, Inc.*,
526 F.2d 67 (9th Cir. 1975) ......................................................................... 8
*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) .................................................................................. 3, 5
*Rodriguez v. Ancona*,
868 A.2d 807 (Conn. App. Ct. 2005) .......................................................... 12
*United States v. 8.0 Acres of Land*,
197 F.3d 24 (1st Cir. 1999)........................................................................... 8
*Vincent v. Hughes Air West, Inc.*,
557 F.2d 759 (9th Cir. 1977) ....................................................................... 3
*In Re Vioxx Products Liability Litigation*
MDL 1657............................................................................................... 13

Other Authorities

Manual for Complex Litigation (Fourth), § 10.22 (2004) ....................................................... 8, 10

Principles of the Law of Aggregate Litigation § 1.04 ............................................................. 10

*The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases,*
  18 Geo. J. Legal Ethics 1453 (2005) ........................................................................................ 9

The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal,
  63 Vand. L. Rev. 107 (2010) .................................................................................................. 10

*The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigations,*
  79 Fordham L. Rev. 1985 (2011) ............................................................................................ 10

I.      **INTRODUCTION**

The undersigned ("Category 3 Objectors") represent Plaintiffs whose Roundup cases are unfiled or filed in state court, and who have signed a Participation Agreement with the MDL PEC for purposes of receiving ancillary support. Some Category 3 Objectors also have a small number of cases improvidently removed to federal court. Plaintiffs' Co-Lead Counsels' ("CLC" or "Co-Leads") have filed a motion to modify PTO 12, requesting an 8.25% hold back for common benefit fees and expenses from all cases, an amount which comes out to well over $800 million.

Category 3 Objectors ask the Court to deny this request as to cases filed in state court or unfiled cases, because this Court does not have jurisdiction over such cases. Category 3 Objectors also ask the Court to deny this request respecting clients whose cases are filed in federal court, because CLC are already fully and highly compensated. Should the Court find that a common benefit holdback is appropriate respecting cased filed in federal court, the amount sought by CLC is an egregiously high fee for the work performed and vastly disproportionate to the expenses incurred. Alternatively, Category 3 Objectors request for the Court to allow discovery to be propounded so that Counsel and the Court may determine whether the sought-after holdback percentage is an equitable spreading of costs.

II.     **STATEMENT OF RELEVANT FACTS**

Thousands of lawsuits have been filed across the country by individuals diagnosed with non-Hodgkin's lymphoma after exposure to Monsanto's Roundup. The majority of these lawsuits were brought in state court, or remain unfiled, while only a miniscule percentage of cases have been coordinated in MDL 2741.[1] After buying Monsanto for $63 billion, Bayer chose to reserve

---

[1] There are 3,730 actions pending in MDL 2741 as of January 19, 2021, relative to potentially 125,000 claims as projected by Bayer – less than 3% (https://www.reuters.com/article/bayer-lawsuit/bayer-settles-thousands-of-u-s-roundup-cases-with-trial-attorneys-idINL1N2GC163 (last

Category 3 Objectors' Opposition to Motion to Amend PTO 12; Case No. 16-md-02741-VC

$10.9 billion to settle Roundup cases in the United States.[2] In preparation for a future global settlement, on February 22, 2017, this Court entered PTO 12, appropriately calling for a "*fair and equitable sharing* among plaintiffs . . . of the costs and expenses incurred and services performed by attorneys acting at the direction of the Plaintiffs' Co-Lead Counsel or the Executive Committee for the common benefit of all such plaintiffs and claimants."[3]

Since that time, leadership firms have settled their dockets while the majority of Category 3 Objectors are continuing to actively litigate their dockets, because leadership failed to obtain a nationwide settlement agreement. Instead, Co-Leads are reported to have settled their own cases for ▮▮▮▮▮ per case on average while Category 3 Objectors were offered ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[4] Now, Co-Leads submit this contested common benefit proposal, asking the Court to order an 8.25% holdback, an estimated $800 million beyond the estimated $2 billion in fees that CLC will already be receiving from settling their own cases. As elucidated below, this Court should deny CLC's proposal because this Court does not have jurisdiction over the majority of the cases sought to be taxed, but even if jurisdiction were found to exist, the holdback requested is egregiously, inappropriately, and unfathomably high.

## III.   ARGUMENT

### A.   This Court Lacks Jurisdiction Over the Majority of the Category 3 Objectors' Cases.

To determine whether Category 3 Objectors owe CLC common benefit fees and expenses, this Court must have subject matter jurisdiction over the cases and controversy, and personal jurisdiction over the plaintiffs.[5] However, the bulk of the plaintiffs represented by Category 3

---

visited 01/24/2021).
[2] https://www.wsj.com/articles/bayer-posts-third-quarter-loss-on-agriculture-woes-11604393190.
[3] PTO 12, [Doc. 161, p. 1] (emphasis added).
[4] *See* Exhibit 1, Trammell Decl., ¶ 6.
[5] "Federal courts are courts of limited jurisdiction. They possess only that power authorized by

Category 3 Objectors' Opposition to Motion to Amend PTO 12; Case No. 16-md-02741-VC

Objectors were either filed in state court or are unfiled. Only a small number of cases improvidently ended up in federal court due to removal. The tiny fraction of cases pending in federal court does not confer jurisdiction to this Court over the thousands of Roundup cases filed in state court, nor over plaintiffs with cases that are unfiled. As demonstrated below, this Court does not possess the authority to order a holdback from cases not pending before it in federal court, regardless of whether a Participation Agreement was signed.

Binding precedent demonstrates that a common benefit holdback cannot be imposed *unless the Court has jurisdiction over <u>the specific case and controversy</u>*. *Hartland v. Alaska Airlines*, 544 F.2d 992 (9th Cir. 1976); *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 766 (9th Cir. 1977). Simply because a universe of cases involves the same defendant and the same mass tort does not give a court jurisdiction over all the cases involved in that mass tort. *Id.; see also In Re: Lidoderm Antitrust Litigation*, 2017 WL 3478810, at *3 (N.D. Cal., Aug. 14, 2017) (quoting *In re: Genetically Modified Rice Litig.*, 764 F.3d 864, 873 (8th Cir. 2014)) ("[D]istrict courts operating pursuant to their multi-district litigation powers do not have jurisdiction to order holdbacks from state-court plaintiffs' recoveries.").

This holding stems from the fact that jurisdiction does not exist where cases were never actually before a court. *In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, No. 3:05-MD-527 RM, 2011 WL 611883, at *3 (N.D. Ind. Feb. 11, 2011). Further, any kind of agreement to confer jurisdiction to a court when cases are not before it is invalid, because subject matter jurisdiction cannot be created by agreement. *Vincent*, 557 F.2d at 766.

---

Constitution and statute, . . . which is not to be expanded by judicial decree," and "[i]t is to be presumed that a cause lies outside this limited jurisdiction[.]" *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).

Category 3 Objectors' Opposition to Motion to Amend PTO 12; Case No. 16-md-02741-VC

CLC have not put forth a basis to show that this Court has subject matter and personal jurisdiction over the universe of cases from which they seek a holdback. *This is because one does not exist.* And even though the language of the Participation Agreement tries to Frankenstein jurisdiction to extend this Court's reach to cases that are not before the Court, jurisdiction, again, simply cannot be conferred by agreement.

Furthermore, jurisdiction, respectfully, cannot be simply created by a court. *Kokkonen*, 511 U.S. at 377. In PTO 12, this Court provides as follows:

> This Order shall apply to the resolution of all cases pending, or later filed in, transferred to, or removed to, this Court and treated as part of this MDL 2741 for coordinated proceeding, and to their counsel, and to all plaintiffs' and claimants' cases maintained by such counsel. This Order further applies to all plaintiffs or other claimants from other non-MDL 2741 proceedings and *their counsel who voluntarily submit to this Court's jurisdiction or agree to be bound by the terms of this Order in return for MDL work product.*[6]

Here, the Court recognizes its jurisdictional limits, holding that the Court's purview only extends to cases before it in MDL 2741 due to direct filing, transfer, or removal. However, the argument cannot be made that by simply signing a Participation Agreement, Category 3 objectors voluntarily submitted to this Court's jurisdiction, because unlike personal jurisdiction, subject matter jurisdiction cannot be created outside its statutory confinements either by agreement or otherwise. *Vincent*, 557 F.2d at 766. Indeed, as courts have recognized in the past, even sharing the work-product created in an MDL is not sufficient to extend jurisdiction to cases not in that MDL.[7]

---

[6] PTO 12, ¶4 [Doc 161] (emphasis added).

[7] *In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, No. 3:05-MD-527 RM, 2011 WL 611883, at *3 (N.D. Ind. Feb. 11, 2011) ("This court doesn't have jurisdiction over cases never actually before this court, whether state or federal, even though it's possible that attorneys in state or federal cases might use the work done by co-lead and MDL counsel before this court. . . . Thus, co-lead counsel's proposed language applying their proposed order to cases 'derivative' of the MDL or that 'rely on the work performed in the MDL' is outside the scope of this court's power to order.").

Category 3 Objectors' Opposition to Motion to Amend PTO 12; Case No. 16-md-02741-VC

Therefore, signing a Participation Agreement to share in the MDL work-product is not sufficient to confer jurisdiction over cases not in front of this Court.

**B.** **Leadership Is Not Entitled to Common Benefit Fees and Expenses as to Those Cases that Have Not Settled.**

Even if jurisdiction does exist, CLC should not be entitled to common benefit fees and expenses as to those cases that have not settled. The purpose of the common benefit doctrine is to prevent unjust enrichment by those who benefit from the efforts of designated counsel in MDL proceedings. *Internal Imp. Fund Trs. v. Greenough*, 105 U.S. 527, 532–33 (1881). However, the basis for awarding common benefit fees rests in the understanding that a settlement fund has been established for *pending* cases. *In re Zyprexa Prod. Liab. Litig.*, 594 F.3d 113, 120 (2d Cir. 2010).

Indeed, it is well established that the primary basis for awarding common benefit fees is to reimburse leadership counsel for fees and litigation expenses out of the proceeds of a "fund" that leadership counsel have "created, increased or protected by successful litigation." *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1017 (5th Cir. 1977). The Supreme Court further emphasized this point, stating that a "litigant or a lawyer *who recovers a common fund for the benefit of persons other than himself or his client* is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted) (emphasis added).

Here, no global settlement was brokered such that Category 3 Objectors enjoyed the fruits of that settlement. Rather, Co-Leads bartered a settlement agreement *for themselves* and left Category 3 Objectors with ███████████████.[8] Based upon information and belief, Leadership cases settled for ██████ on average per case, the accuracy of which can be confirmed by an *in-camera*

---

[8] *See* Exhibit 1, Trammell Decl., ¶ 6.

Category 3 Objectors' Opposition to Motion to Amend PTO 12; Case No. 16-md-02741-VC

inspection of the Settlement Agreements reached between the leadership firms and Monsanto.[9] In contrast, Category 3 Objectors were offered ████████████████████.[10]

While CLC had the ability to negotiate a global settlement treating all plaintiffs equally, they chose not to in order to benefit their positions over non-lead firms. The resulting high settlement values for CLC and ████████████████ offers for many others, is one of the reasons why CLC should be precluded from an over $800 million holdback for their common benefit fee - CLC has already been compensated. Thus, CLC should be precluded from taxing a common benefit fee against cases that have not been settled through CLC, particularly here where Co-Leads admit there is no "national, court-approved settlement program for present claims."[11] Because this is *not* the "exact circumstances for which the common fund benefit doctrine was intended," as Co-Leads' motion argues,[12] CLC should not be entitled to any common benefit, much less the over $800 million.

### C. The Over $800 Million Amount Leadership Seeks is Simply too Much Based on any Reasonable Lodestar Calculation and Under ABA Rules.

Even if the Court finds jurisdiction and determines CLC is entitled to an Assessment as to Category 3 Cases in general, there is no justification for the inordinate amount of money Co-Leads seek to hold back on top of the vast sums of money they will be making in fees from their own cases. In PTO 12, the Court begins by noting its inherent power to modify its Order to include a common benefit fee and then states the following:

> Good cause exists to enter an order that provides for the ***fair and equitable sharing among plaintiffs*** in this Multi-District Litigation ("MDL 2741") and any other plaintiffs and claimants who are subject to this Order, and their counsel, ***of the costs and expenses incurred and services performed*** by attorneys acting at the direction

---

[9] *Id.*
[10] *Id.*
[11] Proposed Order, 2:14-15 [Doc. 12394-26, p. 2].
[12] CLC Mot., 1:7 [Doc. 12394, p. 7].

Category 3 Objectors' Opposition to Motion to Amend PTO 12; Case No. 16-md-02741-VC

of the Plaintiffs' Co-Lead Counsel or the Executive Committee *for the common benefit of all such plaintiffs* and claimants.[13]

As set forth more fully below, seeking over $800 million in a holdback for common benefit fees and expenses on top of the approximately fees CLC are already receiving is *not* a "fair and equitable sharing" among plaintiffs. Further, this amount was *never agreed to by Category 3 Objectors in the Participation Agreement*.[14]

It is well established in the Ninth Circuit that the "starting point for determining a reasonable fee is the 'lodestar' figure, which is the number of hours reasonably expended multiplied by a reasonable hourly rate." *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992). Under this Lodestar Method, "[t]he fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked." *Id*. "A number of courts favor the lodestar as a backup or cross-check on the percentage method when fees might be excessive."[15]

In *In re Washington Public Power Supply System Securities Litigation*, the Ninth Circuit panel rejected the pure percentage method, holding that a lodestar approach was preferrable:

> With a fund this large, picking a percentage without reference to all the circumstances of the case, including the size of the fund, would be like picking a number out of the air . . . Because a court must consider the fund's size in light of the circumstances of the particular case, we agree with the district court that the . . . "benchmark" is of little assistance in a case such as this.

19 F.3d 1291 (9th Cir. 1994). In his ruling, Judge Dwyer noted that his duty as a judge "corresponds to counsel's duty to their clients" to determine a "reasonable fee." *Id.* at 1297. And,

---

[13] PTO 12, ¶1 [Doc. 161, p. 1]

[14] *See* Exhibit 1, Trammell Decl., ¶ 4.

[15] Manual for Complex Litigation (Fourth), § 10.22 (2004) (citing *Goldberger v. Integrated Res., Inc.*, 209 F. 3d 43 (2d Cir. 2000); *United States v. 8.0 Acres of Land*, 197 F.3d 24, 33 (1st Cir. 1999); *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996); *In re Gen. Motors Corp.*, 55 F.3d 768, 820-822)).

7

to discharge that all-important duty, Judge Dwyer determined that the Lodestar Method would be utilized. *Id.*

In certain circumstances, the lodestar may be adjusted based on the factors set forth in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975), *abrogated on other grounds*.[16] However, while these factors provide alternative considerations to justify the reasonableness of a claimed attorney fee, they are presented as factors capable of supporting the lodestar figure, not supplanting it. Finally, so-called cross-checks of the lodestar amount via the percentage method are not required in the Ninth Circuit but can be utilized. Such cross-checks would "make little logical sense, because the Lodestar Method yields a fee that is presumptively [reasonable.]  The percentage method is merely a shortcut to be used in lieu of the often more time-consuming task of calculating the lodestar, but only if the benefit to the class is easily quantified." *In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 571 (9th Cir. 2019).

Here, PTO 12 implicitly sets out the Lodestar Method, ordering the following:

> Participating Counsel shall maintain appropriate documentation and records of their time and expenses as set forth in the guidelines attached hereto as Exhibit 1 . . . Eligible Counsel who seeks to recover Court-awarded common benefit attorneys' fees and expenses in connection with this litigation "***shall keep a [1] daily contemporaneous record of their [2] time and [3] expenses, noting with [4] specificity the [5] amount of time, [6] location (if relevant), and [7] particular activity along with [8] confirmation that authority was obtained [9] to have undertaken that common benefit effort[, and [10] be approved by the Court].***"[17]

That is, PTO 12 sets up the very number of hours to be multiplied by a reasonable hourly rate,

---

[16] These factors include: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Kerr*, 526 F.2d at 70.

[17] PTO 12, Ex. 1 [Doc. 161, p. 7; 9] (emphasis and bracketed numbers added).

Category 3 Objectors' Opposition to Motion to Amend PTO 12; Case No. 16-md-02741-VC

which is the Lodestar Method. Should this Court expressly enforce the lodestar requirement it has already implicitly required, determining an Assessment will easily be quantifiable once Co-Leads submit the requisite information, which they have conspicuously avoided doing, leaving this Court without any basis whatsoever to determine a "fair and equitable sharing" of fees and expenses.[18]

Indeed, either the pure Lodestar Method can be used, or a cross-check can be applied to determine any Assessment – both methods being endorsed by the Ninth Circuit. Here, while PTO 12 implicitly calls for the Lodestar Method, Co-Leads flouted this approach and, instead, simply picked a number out of thin air. The proposed 8.25% holdback, which equates to over $800 million, has no justifiable basis and grossly overcompensates CLC.[19] This Court should not condone what is essentially nothing more than a money grab, as this Court has a corresponding duty to determine a "reasonable fee."

Further, CLC's justification of an 8.25% fee rests in inapplicable case law. To support their requested percentage CLC cites to cases such as *In re Air Crash Disaster at Fla. Everglades*, 549 F.2d at 1011. While it is true that this court awarded an 8% common benefit fee in that case, CLC seeks to mischaracterize this figure by failing to mention that the sum total of that fee was estimated to be between $275,000 and $2-4 million. *Id.* Even at the high end of this estimation, CLC seeks an amount 200 times larger in this case. As such, the Lodestar Method or the Lodestar Cross-Check Method should be considered over CLC's self-serving, out-of-thin-air percentage method. The undersigned believe that use of this established method of calculation will demonstrate the sought-after assessment is unwarranted and not likely to be equitably distributed

---

[19] Walker, et al. *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases,* 18 Geo. J. Legal Ethics 1453, 1454 (2005).

9

Category 3 Objectors' Opposition to Motion to Amend PTO 12; Case No. 16-md-02741-VC

among all counsel.

In addition, CLC's fees and expenses are unreasonable and excessive under ABA's Model Rule 1.5(a) and ABA Model Code DR 2-106(A). At the outset, CLC owes fiduciary duties of loyalty to Category 3 Objectors' clients. The Manual for Complex Litigation states that lead attorneys must "act fairly, efficiently, and economically in the interests of all parties' counsel."[20] What's more, "Because 'parties' counsel' are fiduciaries of the clients they directly represent, in multidistrict litigation a double layer of fiduciary relationships also obtains."[21] As explained by Professor Silver, when leaders displace individual counsel and control the proceedings, they assume those lawyers' duties, "including the fiduciary duty to refrain from exploiting clients."[22] A fiduciary duty requires a lawyer to ignore his or her own interests and precludes an attorney from engaging in self-enriching behavior.

As such, if this Court is to accept that CLC was acting on behalf of any Objectors' clients, including Category 3 Objectors, then CLC owed ethical duties to those clients and ethical rules apply. By settling their own cases at a premium compared to those cases represented by non-CLC attorneys, CLC potentially violated their fiduciary obligations to Objectors' clients.  By acting as CLC, they had a fiduciary and ethical obligation to ensure that they did not prioritize their clients' and their own firms' interests over those of the remaining plaintiffs they did not directly represent,

---

[20] Manual for Complex Litigation (Fourth), § 10.22 (2004).

[21] Principles of the Law of Aggregate Litigation § 1.04 reporter's notes on cmt. A (Am. Law Inst. 2010).

[22] Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigations*, 79 Fordham L. Rev. 1985, 1989-90 (2011) ().  *See also,* Charles Silver & Geoffrey P. Miller, The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal, 63 Vand. L. Rev. 107 (2010) (lead lawyers are fiduciaries); Principles of the Law of Aggregate Litigation § 1.04 reporter's notes cmt. a (2010) (observing that "[c]lass counsel is a [] fiduciary to a client, [the named plaintiff], who is also a fiduciary [to other class members]," and that "[a] similar relationship obtains between lead attorneys and other lawyers in a multidistrict litigation").

yet, that is exactly what they did by settling their own firms' inventories of cases at ██████

██████ when compared to that offered in settlement to non-CLC law firms' clients.

Even setting aside their possible self-dealing, ABA's Model Rule 1.5(a) states, "*A lawyer shall not* make an agreement for, *charge, or collect an unreasonable fee or an unreasonable amount for expenses*." ABA Model R. Pro. C. 1.5(a) (emphasis added). ABA's Model Code DR 2-106(A) states, "*A lawyer shall not* enter into an agreement for, *charge, or collect an illegal or clearly excessive fee.*" ABA Model Code DR 2-106(A) (emphasis added). These rules present two issues: One, the unreasonableness of expenses, and two, the unreasonableness and/or clearly excessiveness of fees. As for both, Category 3 Objectors seek discovery from the CLC to establish whether the expenses and fees are unreasonable and excessive.  This is in part because the proposed $800 million fund would dwarf the common benefit litigation expenses approximated only at $20,000,000, or 2.5% of the total proposed fee.[23] Nowhere has the CLC accounted for this disparity.

The factors that establish whether an expense or fee is "unreasonable" and/or "clearly excessive" under both ABA's Model Rule 1.5(a) and ABA Model Code DR 2-106(A) are identical,[24] and all factors should be considered.[25] These factors are simply not met here. First,

---

[23] CLC Mot., 9:1-3 [Doc. 12394, p. 15].

[24] The factors to be considered in determining the reasonableness of a fee include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.  *See* ABA Model R. Pro. C. 1.5(a)(1-8); ABA Model Code DR 2-106(B)(1-8).

[25] *Rodriguez v. Ancona*, 868 A.2d 807 (Conn. App. Ct. 2005) (by looking solely to amount involved and results obtained in fixing fees as percentage of damage award, court abused discretion by "seizing from the full panoply of relevant factors merely one factor, to the exclusion and

while the CLC certainly spent time and labor on its own cases, the rules contemplate that a benefit

is to be conferred to Category 3 Objectors and their clients. This benefit is hotly contested and has

not been separated from the benefit to CLC's clients versus Category 3 Objectors and clients.

Second, it is unknown what, if any preclusions, the CLC suffered as a result of the purported

benefit conferred on Category 3 Objectors and clients. Third, while factors 3 and 4 are explainable

by PTO 12, factors 5 (time limits imposed by client) and 6 (length of attorney-client relationship

with CLC) are easily answered: None.  Fourth, while the experience, reputation, and ability of the

CLC lawyers cannot be understated, so too is the case for Category 3 Objectors. Additionally, even

if a billing rate of $1,000 per hour is assumed, it would take 375 attorney-years, billing 2080 hours

per year, to amount to the total fee requested.[26] Not only has the caliber of every attorney working

on the litigation not been shown to be worth $1000 per hour, but there has also been no indication

by CLC of how many attorneys or staff contributed to the common benefit work or how many

hours that work constituted. Finally, as to factor 8, the fee is contingent, which requires a written

agreement signed by the client that the CLC cannot produce; it simply does not exist.[27]

### D. <u>The Work-Product Some Category 3 Objectors were Given Access to is Ancillary and is Not Worth Over $800 Million.</u>

Finally, even if CLC is entitled to an Assessment as to Category 3 cases generally, and even if

a Lodestar Method is not utilized, simply assessing the work-product Category 3 Objectors have

been given access to, for ancillary purposes, shows that it is not worth $800 million. It is well

established that the primary reason for awarding common benefit fees is to reimburse leadership

---

disregard of the others").
[26] $800,000,000 CBF requested - $20,000,000 est. expenses = $780,000,000 fee.
$780,000,000 fee / [$1000 hourly rate *(52 weeks x 40 hrs)] = 375 atty. years.
[27] A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined. ABA Model R. Pro. C. 1.5(c).

counsel for fees and litigation expenses, given that non-leadership attorneys' time was "not so consumed" in the litigation. *In re Air Crash Disaster at Fla. Everglades*, 549 F.2d 1006, 1011 (5th Cir. 1977). The general understanding is that leadership counsel would be "intimately involved with the progress of [the] litigation . . . *on behalf of all plaintiffs.*" *Id.* (emphasis added). A prime example of leadership "intimately involved" and acting "on behalf of all plaintiffs" is reflected in *In Re Vioxx Products Liability Litigation* (MDL 1657). Leadership in *Vioxx* took over 2,000 depositions, reviewed and compiled over 50,000,000 documents, briefed and argued over 1,000 discovery motions, conducted bellwether trials, and at the end assembled a full trial package for all non-lead firms to use.[28] Finally, *Vioxx* leadership **secured and effectuated a global Settlement Agreement**.[29] Overall, leadership in *Vioxx* documented and submitted 560,000 hours of work they had completed.[30] Even with this herculean effort, the court awarded common benefit fee of $315,250,000.[31]

There is a clear and stark contrast between what is seen in *In Re Vioxx* and the present litigation. Of note, CLC is seeking an amount almost **three times** the amount received by Leadership in *In Re Vioxx*, which, again, is an entirely unsupported ask. This ask is particularly egregious, because CLC did **not** achieve the results seen in *In Re Vioxx*. Indeed, not only did CLC fail to distribute the trial package the Participation Agreement calls — even more to the point — CLC failed to reach a global Settlement Agreement. And the very reason for this failure rests in CLC's self-dealing decision to take high settlement offers for themselves while leaving Category 3 Objectors with ███████████.

---

[28] *See* Exhibit 2; *In Re Vioxx*: Order on Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses [p. 26].
[29] *Id.*
[30] *Id.*
[31] *Id.* at p. 37.

Further, it is also not the case that Category 3 Objectors' time has not been consumed like that of Co-Leads in litigating their cases. Category 3 Objectors have been actively litigating Roundup cases since 2018[32] and are *not* the Johnny Come Lately firms alleged to be "free-riding" off the efforts of leadership.[33] Rather, these firms have been actively involved in the work up and litigation of nearly 10,000 cases.[34] Even after signing the Participation Agreement, Category 3 Objectors have received only ancillary assistance from leadership firms,[35] and, again, they have not been provided a "trial package" as the Participation Agreement calls for.[36]

Regarding Category 3 Objectors' active cases, most of which are pending in Missouri and California state courts, significant independent case work up has been and continues to be underway. California, in particular, has required an extensive amount of work. In this venue, Category 3 firms responded to and propounded hundreds of pages of discovery requests and have numerous depositions that began the week of January 25, 2021 and are currently scheduled throughout February and March of this year.[37] Moreover, Category 3 firms have also retained their own experts at their own expense and have engaged in heavy motions practice and oral arguments.[38] In fact, Trammell, P.C., one of the Category 3 firms, currently has two preference cases that are being slotted for trial this summer, while Kirkendall Dwyer LLP, another Category 3 firm, had a preference motion granted.[39] Because these firms are currently preparing their cases for trial, they are more than familiar with the amount of time and energy that go into trial preparation and the state of the materials available to Plaintiffs' counsel; and that value is simply

---

[32] *See* Exhibit 1, Trammell Decl., ¶ 2.
[33] *See* CLC Mot., 3:2-3 [Document 12394, p. 8].
[34] *See* Exhibit 1, Trammell Decl., ¶ 2; *See* Exhibit 4, Kirkendall Decl., ¶ 2.
[35] *See* Exhibit 1, Trammell Decl., ¶ 4.
[36] *Id.*
[37] *See* Exhibit 1, Trammell Decl., ¶ 5; *See* Exhibit 4, Kirkendall Decl., ¶ 5.
[38] *Id.*
[39] *Id.*

Category 3 Objectors' Opposition to Motion to Amend PTO 12; Case No. 16-md-02741-VC

nowhere near $800 million.[40] Therefore, even if the Court finds that Category 3 Objectors should pay an assessment, it is unfathomable that receiving ancillary assistance should cost $800 million.

**E.   <u>Category 3 Objectors Alternatively Seek Discovery to Establish the Reasonableness and Necessity of CLC's Required and Alleged Fees and Expenses.</u>**

CLC's requested 8.25% holdback amounting to over $800 million for "common benefit" work performed is a colossal amount. Given this, Category 3 Objectors alternatively seek additional time to conduct discovery to determine whether CLC's expenses and fees are reasonable and necessary for the common benefit of Plaintiffs, and to assist this Court in its determination.[41] Indeed, this Court's PTO calls for this requested discovery.[42] As such, Category 3 Objectors alternatively request the opportunity to propound discovery prior to this Court's ruling.

## IV.   <u>CONCLUSION</u>

For the reasons stated above, CLC's motion should be DENIED.

Dated February 4, 2021.                    Respectfully Submitted,

*/s/Karen Barth Menzies*

Karen Barth Menzies (CA SBN 180234)
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, CA  94612
Tel: (510) 350-9700

---

[40] *Id.*

[41] PTO 12, ¶5 [Doc. 161, p. 5] (emphasis in the parenthetical) ("The Common Benefit assessment . . . will be determined in a subsequent order of this Court and will be based on the specific circumstances of this litigation, including but not limited to ***the <u>level of expenses</u> and the <u>value of the work</u> being done by the MDL Leadership***.).

[42] *See e.g.*, PTO 12, ¶4 [Doc. 161, p. 5] ("MDL Leadership must also make this list available to Participating Counsel.").

Category 3 Objectors' Opposition to Motion to Amend PTO 12; Case No. 16-md-02741-VC

Fax: (510) 350-9701
kbm@classlawgroup.com

Fletcher V. Trammell
Melissa Binstock Ephron
TRAMMELL, PC
3262 Westheimer Rd., Ste. 423
Houston, TX 77098
Tel: (800) 405-1740
Fax: (800) 532-0992
fletch@trammellpc.com
melissa@trammellpc.com

Alexander G. Dwyer
Andrew F. Kirkendall
Erin M. Wood
KIRKENDALL DWYER LLP
4343 Sigma Rd, Suite 200
Dallas, TX 75244
Tel: 214-271-4027
Fax: 214-253-0629
ad@kirkendalldwyer.com
ak@kirkendalldwyer.com
ewood@kirkendalldwyer.com

*CATEGORY 3 OBJECTORS:*
*Attorney for Plaintiffs Whose Counsel Have*
*Signed A Participation Agreement*